# EXHIBIT  D

**IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT**

**THE STATE OF MISSISSIPPI**                                          **PLAINTIFF**

**V.**                                          CIVIL ACTION NO. G2005-2021

                                                                **DEFENDANTS**  5/2

**ABBOTT LABORATORIES, INC.;
ABBOTT PHARMACEUTICALS;
ALCON LABORATORIES, INC.;
ALLERGAN, INC.;
ALPHARMA, INC.;
PUREPAC PHARMACEUTICAL CO.;
ALPHA THERAPEUTIC CORP.;
AMGEN, INC.;
IMMUNEX CORPORATION;
ANDRX PHARMACEUTICALS, INC.;
ASTRAZENECA PHARMACEUTICALS, L.P.;
ASTRAZENECA L.P.;
AVENTIS PHARMACEUTICALS, INC.;
AVENTIS BEHRING, L.L.C.;
ZLB BEHRING, L.L.C.;
DERMIK LABORATORIES, INC.;
BARR PHARMACEUTICALS, INC.;
BARR LABORATORIES, INC.;
BAXTER INTERNATIONAL, INC.;
BAXTER HEALTHCARE CORPORATION;
BAYER CORPORATION;
BAYER PHARMACEUTICALS CORPORATION;
BAYER HEALTHCARE, LLC;
BIOVAIL PHARMACEUTICALS, INC.;
BOEHRINGER INGELHEIM CORPORATION;
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.;
ROXANE LABORATORIES, INC.;
BEN VENUE LABORATORIES, INC.;
B. BRAUN OF AMERICAN, INC.;
MCGRAW, INC.;
BRISTOL-MYERS SQUIBB COMPANY;
ONCOLOGY THERAPEUTICS NETWORK CORP.;
CHIRON CORP.;
DEY INC.;
EISAI INC.;
ELI LILLY AND COMPANY;
ELKINS-SINN, INC.;**



F I L E D
OCT 2 0 2005
EDDIE JEAN CARR, CHANCERY CLERK
BY _____ D.C.

ENDO PHARMACEUTICALS INC.;
FOREST LABORATORIES, INC.;
FOREST PHARMACEUTICALS;
FUJISAWA HEALTHCARE, INC.;
FUJISAWA USA, INC.;
GENZYME CORPORATION;
GILEAD SCIENCES, INC.;
GLAXOSMITHKLINE, P.L.C.;
SMITHKLINE BEECHAM CORPORATION;
GLAXO WELLCOME, INC.;
HOFFMAN-LAROCHE, INC.;
ROCHE LABORATORIES, INC.;
IVAX CORPORATION;
IVAX PHARMACEUTICALS INC.;
JOHNSON & JOHNSON;
ALZA CORPORATION;
JANSSEN PHARMACEUTICAL PRODUCTS, L.P.;
ORTHO-MCNEIL PHARMACEUTICAL INC.;
ORTHO BIOTECH PRODUCTS, L.P.;
MCNEIL-PPC, INC.;
KING PHARMACEUTICALS, INC.;
MONARCH PHARMACEUTICALS, INC.;
K-V PHARMACEUTICAL COMPANY;
ETHEX CORPORATION;
MEDIMMUNE, INC.;
MERCK & CO., INC.;
MYLAN LABORATORIES, INC.;
MYLAN PHARMACEUTICALS, INC.;
UDL LABORATORIES, INC.;
NOVARTIS CORPORATION;
SANDOZ, INC.;
NOVO NORDISK PHARMACEUTICALS, INC.;
ORGANON PHARMACEUTICALS USA, INC.;
PAR PHARMACEUTICAL COS., INC.;
PURDUE PHARMA, L.P.;
SANOFI-SYNTHELADO, INC.;
SCHERING-PLOUGH CORP.;
WARRICK PHARMACEUTICALS INDUSTRIES, LTD.;
SERONO, INC.;
TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.;
TAP PHARMACEUTICAL PRODUCTS, INC.;
TEVA PHARMACEUTICALS USA, INC.;
NOVOPHARM USA, INC.;

SICOR PHARMACEUTICALS, INC.;
WATSON PHARMACEUTICALS, INC.;
WATSON LABORATORIES, INC.;
WATSON PHARMA, INC.;
WYETH, INC.; AND
WYETH PHARMACEUTICALS, INC.

## COMPLAINT

Plaintiff, the State of Mississippi, by and through its Attorney General (hereinafter "the State") files this Complaint against the above-named Defendants and alleges, on information and belief, the following:

### I. Introduction

1.      This action is brought in the public interest for and on behalf of the People of the State of Mississippi, by Jim Hood, Mississippi Attorney General, pursuant to the Mississippi Medicaid Fraud Control Act, the Mississippi Regulation of Business for Consumer Protection Act, and the common-law authority of the Attorney General to represent the People of the State of Mississippi.

2.      Mississippi, like all other States, has elected to provide prescription drug coverage to its over 720,000 poor and disabled Medicaid beneficiaries. Unfortunately, this benefit has become one of Medicaid's most expensive. Over the past four years, nationwide State Medicaid officials have cited prescription drugs as one of the top three Medicaid cost drivers along with enrollment growth and rising medical care costs generally. Nationally, Medicaid expenditures for prescription drugs have grown at more than twice the rate of overall Medicaid spending from fiscal year (FY) 1997 to 2001. Federal drug expenditures in the fee-for-service component of the Medicaid program grew at a real (inflation-adjusted) average annual rate of 15.5 percent between fiscal years 1998 and

3

2004, reaching $18.4 billion in 2004. Total nationwide State spending stood at $12.2 billion in 2004—for a combined spending level of $30.6 billion in FY 2004. Currently, Medicaid accounts for nearly one in five dollars spent on prescription drugs in the United States. It is predicted that Medicaid drug expenditures will continue to increase by an average of 12.7 percent per year through 2011.

3.       Mississippi's experience with the skyrocketing cost of prescription drugs has mirrored that of the national trend. From FY 1999 to FY 2002, Mississippi's Medicaid program experienced an average annual increase of 26% in its prescription drug program. Only after taking drastic measures, such as limiting the number of prescriptions from 10 to 7 per month per beneficiary, did Mississippi gain a temporary reprieve, with prescription drug costs leveling out at $552 million in FY 2003. However, this respite was short-lived with the State finding itself in a $268 million Medicaid deficit in FY 2004. The largest portion of this deficit was attributed to the upward pressure of prescription drug costs.

4.       After the long and contentious process of filling the Medicaid deficit, the Mississippi Legislature and Governor were again forced to curb the advancing tide of prescription drug costs. With little alternative, legislation was passed further reducing the number of prescription drugs per month from 7 to 5 per beneficiary, for an estimated savings of $34 million a year.

5.       Mississippi's recent history with sharply increasing prescription drug costs is not only similar to that of other states because of the devastating impact on the State's budget and the lives of its most vulnerable citizens, but also because all states share a common source of this crisis: *the intentional and covert abuse of the reimbursement system for prescription drugs by the Defendant pharmaceutical manufacturers ("the Defendants")*. The Defendants have taken advantage of the

4

enormously complicated and non-transparent market for prescription drugs by engaging in an unlawful scheme to cause the State of Mississippi to pay inflated prices for prescription drugs. The scheme involves the publication by the Defendants to other purchasers of phony "average wholesale prices" ("AWPs"), which are relied on by the State in calculating the reimbursement rate for providers of prescription drugs, such as physicians and pharmacies. The Defendants set the AWPs for their products artificially high in order to attract providers and thus gain market share for their products, with the State picking up the tab. The Defendants have reinforced this tactic with other deceptive practices such as covert discounts, kickbacks and rebates to providers, and the use of various other devices to keep secret the prices of their drugs currently available in the marketplace. The Defendants' fraudulent pricing and marketing of their prescription drugs have resulted in the Mississippi Division of Medicaid's ("Division") paying grossly excessive prices for the Defendants' prescription drugs.

6.    Fair and honest pricing is a vital matter for the State and its citizens. The State is accountable to its citizens and taxpayers for how it spends limited State funds, and it is obligated to pursue any party whose unlawful conduct has led to the overspending of these funds. Further, the State is responsible for protecting its most vulnerable citizens who depend on the Medicaid program for their health and safety, and it is obligated to pursue any party whose unlawful conduct would jeopardizing this literally life-sustaining program.

7.    Consequently, the State of Mississippi, by and through Jim Hood, Mississippi Attorney General, seeks to permanently enjoin the Defendants from continuing to engage in their fraudulent and deceptive drug pricing acts and practices; to obtain a full accounting of all the State and taxpayer moneys absconded by the Defendants; to recover compensatory damages and/or

restitution on behalf of the State of Mississippi and its residents; and to impose civil penalties and punitive damages upon the Defendants for their fraudulent, illegal and unconscionable acts.

## II. Parties

8.     This action is brought for and on behalf of the sovereign State of Mississippi and its citizens, by and through Jim Hood, the duly elected and current Attorney General of the State of Mississippi, pursuant to, *inter alia*, the provisions of Mississippi's Medicaid Fraud Control Act, Miss. Code Ann. § 43-13-219 *et. seq.*, Mississippi's Regulation of Business for Consumer Protection Act, Miss. Code Ann. § 75-24-19, and the common law and statutory authority of the Attorney General to represent the State of Mississippi and its residents.

9.     Defendant, Abbott Laboratories, Inc. ("Abbott"), is an Illinois corporation engaged in the business of manufacturing and selling pharmaceuticals. Abbott's principal place of business is located at 100 Abbott Park Road, Abbott Park, IL 60064-6400.

10.     Defendant, Abbott Pharmaceuticals ("Abbott Pharma"), a wholly owned subsidiary of Abbott, is a corporation engaged in the business of manufacturing and selling pharmaceuticals. Abbott Pharma's principal place of business is located at 100 Abbott Park Road, Abbott Park, IL 60064-6400.

11.     Defendant, Alcon Laboratories, Inc. ("Alcon"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Alcon's principal place of business is located at 6201 S. Freeway (T1-3), Fort Worth, TX 76115.

12.     Defendant, Allergin, Inc. ("Allergan"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Allergan's principal place of business is located at 2525 Dupont Drive, Irvine, CA 92612.

6

13.     Defendant, Alpharma, Inc. ("Alpharma"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Alpharma's principal place of business is located at One Executive Drive, Fort Lee, NJ 07024.

14.     Defendant, Purepac Pharmaceutical Co. ("Purepac"), a subdivision of Alpharma, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Purepac was acquired by Alpharma in December 2001. Purepac's principal place of business is located at 14 Commerce Dr., Ste. 301, Cranford, NJ 07016.

15.     Defendant, Alpha Therapeutic Corp. ("Alpha"), is a California corporation engaged in the business of manufacturing and selling pharmaceuticals. Alpha's principal place of business is located at 2410 Lillyvale Ave., Los Angeles, CA 90032.

16.     Defendant, Amgen, Inc. ("Amgen"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Amgen's principal place of business is located at One Amgen Drive, Thousand Oaks, CA 91320-1799.

17.     Defendant, Immunex Corporation ("Immunex"), a wholly owned subsidiary of Amgen, is a Washington State corporation engaged in the business of manufacturing and selling pharmaceuticals. Immunex's principal place of business is located at 51 University Street, Seattle, WA 98101.

18.     Defendant, Andrx Pharmaceuticals, Inc. ("Andrx"), is a Florida corporation engaged in the business of manufacturing and selling pharmaceuticals. Andrx's principal place of business is located at 4955 Orange Drive, Daive, FL 33314.

19.     Defendant, AstraZeneca Pharmaceuticals, L.P. ("AstraZeneca Pharma"), is a Delaware limited partnership engaged in the business of manufacturing and selling pharmaceuticals.

7

AstraZeneca Pharma's principal place of business is located at 1800 Concord Pike, Wilmington, DE 19850-5437.

20.     Defendant, AstraZeneca L.P. ("AstraZeneca"), is a Delaware limited partnership engaged in the business of manufacturing and selling pharmaceuticals.  AstraZeneca's principal place of business is located at 725 Chesterbrook Boulevard, Wayne, PA 19087.

21.     Defendant, Aventis Pharmaceuticals, Inc. ("Aventis Pharma"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Aventis Pharma's principal place of business is located at 300-400 Somerset Corporate Boulevard, Bridgewater, NJ 08807-2854

22.     Defendant, Aventis Behring, LLC ("Aventis Behring"), a wholly owned subsidiary of Aventis Pharma, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Aventis Behring's principal place of business is located at 1020 First Ave., King of Prussia, PA 19406-0901.

23.     Defendant, ZLB Behring, L.L.C. ("ZLB"), a wholly owned subsidiary of Aventis Pharma, is a Delaware limited liability company engaged in the business of manufacturing and selling pharmaceuticals. ZLB's principal place of business is located at 1020 First Avenue, P.O. Box 61501, King of Prussia, PA 19406-0901.

24.     Defendant, Dermik Laboratories, Inc. ("Dermik"), a wholly owned subsidiary of Aventis Pharm, is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals.  Dermik's principal place of business is located at 1050 Westlakes Drive, Berwyn, PA 19312.

8

25.     Defendant, Barr Pharmaceuticals, Inc. ("Barr Pharma"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Barr Pharma's principal place of business is located at 400 Chestnut Ridge Rd., Woodcliff Lake, NJ 07677.

26.     Defendant, Barr Laboratories, Inc. ("Barr Lab"), a wholly owned subsidiary of Barr Pharma, is a New York corporation engaged in the business of manufacturing and selling pharmaceuticals. Barr Lab's principal place of business is located at 2 Quaker Road, P.O. Box 2900, Pomona, NY 10970-0519.

27.     Defendant, Baxter International, Inc. ("Baxter"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Baxter's principal place of business is located at One Baxter Pkwy., Deerfield, IL 60015.

28.     Defendant, Baxter Healthcare Corporation ("Baxter Healthcare"), a wholly owned subsidiary of Baxter, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Baxter Healthcare's principal place of business is located at One Baxter Parkway, Deerfield, IL 60015.

29.     Defendant, Bayer Corporation ("Bayer"), a wholly owned United States subsidiary of a German corporation, Bayer AG, is an Indiana corporation engaged in the business of manufacturing and selling pharmaceuticals.   Bayer's principal place of business is located at 100 Bayer Road, Pittsburgh, PA 15205-9741.

30.     Defendant, Bayer Pharmaceuticals Corporation ("Bayer Pharma"), a wholly owned subsidiary of Bayer, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Bayer Pharma's principal place of business is located at 400 Morgan Lane, West Haven, CT 06516.

9

31.     Defendant, Bayer Healthcare, LLC ("Bayer Healthcare"), a wholly owned subsidiary of Bayer, is a Delaware limited liability company engaged in the business of manufacturing and selling pharmaceuticals.  Bayer Healthcare's principal place of business is located at 511 Benedict Avenue, Tarrytown, NY 10591.

32.     Defendant, Biovail Pharmaceuticals, Inc. ("Biovail"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Biovail is a wholly owned subsidiary of Biovail Corporation, a Canadian corporation whose principal place of business is located at 7150 Mississauga Road, Mississauga, Ontario, Canada, L5N 8M5.  Biovail's principal place of business is located at 700 Route 202/206 North Bridgewater, NJ 08807.

33.     Defendant, Boehringer Ingelheim Corporation ("Boerhringer Ingelheim"), is a Nevada corporation engaged in the business of manufacturing and selling pharmaceuticals.  Boehringer Ingelheim's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877.

34.     Defendant, Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Pharma"), a wholly owned subsidiary of Boehringer Ingelheim, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Boehringer Pharma's principal place of business is located at 900 Ridgebur Rd., Ridgefield, CT 06877.

35.     Defendant, Roxane Laboratories, Inc. ("Roxane"), a wholly owned subsidiary of Boehringer Ingelheim, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Roxane's principal place of business is located at 1809 Wilson Rd., Columbus, OH 43216-6532.

36.     Defendant, Ben Venue Laboratories, Inc. ("Ben Venue"), a wholly owned subsidiary of Boehringer Ingelheim, is a Delaware corporation engaged in the business of manufacturing and

selling pharmaceuticals. Ben Venue's principal place of business is located at 300 Northfield Road, Bedford, OH 44146.

37.      Defendant, B. Braun of American, Inc. ("Braun"), a wholly owned subsidiary of B. Braun Melsunder Aktiengesellschaft, a German corporation, is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals. B. Braun's principal place of business is located at 824 12th Ave., Bethlehem, PA 18018-027.

38.      Defendant, McGraw, Inc. ("McGraw"), a wholly owned subsidiary of Braun, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. McGraw's principal place of business is located at 824 12th Ave., Bethlehem, PA 18018-0027.

39.      Defendant, Bristol-Myers Squibb Company ("Bristol-Myers"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Bristol-Myers' principal place of business is located at 345 Park Avenue, New York, NY 10154-0037.

40.      Defendant, Oncology Therapeutics Network Corp. ("Oncology Therapeutics"), a wholly owned subsidiary of Bristol-Myers, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Oncology Therapeutics' principal place of business is located at 395 Oyster Point Boulevard, Suite 405, South San Francisco, CA 94080.

41.      Defendant, Chiron Corp. ("Chiron"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Chiron's principal place of business is located at 4560 Horton St., Emeryville, CA 94608-2916.

42.      Defendant, Dey Inc. ("Dey"), formerly Dey Laboratories, a/k/a Dey, L.P., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Dey

11

is an indirect subsidiary of Merck KgaA, a German pharmaceutical conglomerate.  Dey's principal place of business is located at 2751 Napa Valley Corporate Drive, Napa, CA 94558.

43.     Defendant, Eisai Inc. ("Eisai"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Eisai is a U.S. pharmaceutical subsidiary of Tokyo-based Eisai Co., Ltd.  Eisai's principal place of business is located at 500 Frank W. Burr Boulevard, Teaneck, NJ 07666.

44.     Defendant, Eli Lilly and Company ("Eli Lilly"), is a Indiana corporation engaged in the business of manufacturing and selling pharmaceuticals.  Eli Lilly's principal place of business is located at Lilly Corporate Center, Indianapolis, IN 46285.

45.     Defendant, Elkins-Sinn, Inc. ("Elkins-Sinn"), is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  Elkins-Sinn's principal place of business is located at Two Esterbrook Ln., Cherry Hill, NJ 08003-4009.

46.     Defendant, Endo Pharmaceuticals Inc. ("Endo"), a subsidiary of Endo Pharmaceuticals Holdings Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Endo's principal place of business is located at 100 Painters Drive, Chadds Ford, PA 19317.

47.     Defendant, Forest Laboratories, Inc. ("Forest"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Forest's principal place of business is located at 909 Third Ave., New York, NY 10022.

48.     Defendant, Forest Pharmaceuticals ("Forest Pharma"), a wholly owned subsidiary of Forest Laboratories, is headquartered in St. Louis, Missouri and is in the business of manufacturing

and selling pharmaceuticals. Forest Pharma's principal place of business is located at 13600 Shoreline Drive, St. Louis, MO 63045.

49.     Defendant, Fujisawa Healthcare, Inc. ("Fujisawa"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Fujisawa's principal place of business is located at Three Parkway North, Deerfield, IL 60015.

50.     Defendant, Fujisawa USA, Inc. ("Fujisawa USA"), a wholly owned subsidiary of Fujisawa, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Fujisawa USA's principal place of business is located at Three Parkway North, Deerfield, IL 60015.

51.     Defendant, Genzyme Corporation ("Genzyme"), is a Massachusetts corporation engaged in the business of manufacturing and selling pharmaceuticals. Genzyme's principal place of business is located at 500 Kendall Street, Cambridge, MA 02142.

52.     Defendant, Gilead Sciences, Inc. ("Gilead"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Gilead's principal place of business is located at 333 Lakeside Drive, Foster City, CA 94404.

53.     Defendant, GlaxoSmithKline, P.L.C. ("GSK"), created through the merger of Glaxo Wellcome, P.L.C. and SmithKlineBeecham P.L.C., is a British corporation engaged in the business of manufacturing and selling pharmaceuticals. GSK's principal place of business is located at 980 Great West Road, Brentford, Middlesex, EN, TW8 9, U.K.

54.     Defendant, SmithKline Beecham Corporation ("SmithKline"), a wholly owned subsidiary of GSK, is a Delaware corporation engaged in the business of manufacturing and selling

13

pharmaceuticals.  SmithKline's principal place of business is located at One Franklin Plaza, Philadelphia, PA 19102.

55.     Defendant, Glaxo Wellcome, Inc. ("Glaxo Wellcome"), a wholly owned subsidiary of GSK, is a North Carolina corporation in the business of manufacturing and selling pharmaceuticals.  Glaxo Wellcome's primary place of business is located at 5 Moore Drive, Research Triangle Park, NC 27709.

56.     Defendant, Hoffman-LaRoche, Inc. ("Hoffman-LaRoche"), is a New Jersey corporation  in the business of manufacturing and selling pharmaceuticals.  Hoffman-LaRoche's principal place of business is located at 340 Kingsland Street, Nutley, NJ 07110-1199.

57.     Defendant, Roche Laboratories, Inc. ("Roche"), a wholly owned subsidiary of Hoffman-LaRoche, is a Delaware corporation in the business of manufacturing and selling pharmaceuticals. Roche's principal place of business is located at 340 Kingsland Street, Nutley, NJ 07110-1199.

58.     Defendant, Ivax Corporation ("Ivax"), is a Florida corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ivax's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137.

59.     Defendant, Ivax Pharmaceuticals Inc. ("Ivax Pharma"), a wholly owned subsidiary of Ivax, is a Florida corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ivax Pharma's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137.

14

60.     Defendant, Johnson & Johnson ("J&J"), is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. J&J's principal place of business is located at One Johnson & Johnson Plaza, New Brunswick, NJ 08933.

61.     Defendant, ALZA Corporation ("ALZA"), a wholly owned subsidiary of J&J, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. ALZA's principal place of business is located at 1900 Charleston Road, Mountain View, CA 94039.

62.     Defendant, Janssen Pharmaceutical Products, L.P. ("Janssen"), a wholly owned subsidiary of J&J, is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Janssen's principal place of business is located at 1125 Trenton-Harbourton Road, Titusville, NJ 08560.

63.     Defendant, Ortho-McNeil Pharmaceutical Inc. ("Ortho-McNeil"), a wholly owned subsidiary of J&J, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Ortho-McNeil's principal place of business is located at 1000 U.S. Route 202 South, Raritan, NJ 08869.

64.     Defendant, Ortho Biotech Products, L.P. ("Ortho Biotech"), a wholly owned subsidiary of J&J, is a Delaware limited partnership engaged in the business of manufacturing and selling pharmaceuticals. Ortho Biotech's principal place of business is located at 700 U.S. Highway 202, Raritan, NJ 08869.

65.     Defendant, McNeil-PPC, Inc. ("McNeil"), a wholly owned subsidiary of J&J, is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. McNeil's principal place of business is located at 7050 Camp Hill Road, Fort Washington, PA 19034.

66.     Defendant, King Pharmaceuticals, Inc. ("King"), is a Tennessee corporation engaged in the business of manufacturing and selling pharmaceuticals.  King's principal place of business is located at 501 Fifth St., Bristol, TN 37620.

67.     Defendant, Monarch Pharmaceuticals, Inc. ("Monarch"), a wholly owned subsidiary of King, is a Tennessee corporation engaged in the business of manufacturing and selling pharmaceuticals.  Monarch's principal place of business is located at 501 Fifth Street, Bristol, TN 37620.

68.     Defendant, K-V Pharmaceutical Company ("K-V"), is a Delaware corporation engaged in the manufacturing and selling of pharmaceuticals.  K-V's principal place of business is located at 2503 South Hanley Road, St. Louis, MO 63144.

69.     Defendant, Ethex Corporation ("Ethex"), a wholly owned subsidiary of K-V, is a Delaware corporation engaged in the business of manufacturing and selling of pharmaceuticals.  Ethex's principal place of business is located at 10888 Metro Court, St. Louis, MO.

70.     Defendant, MedImmune, Inc. ("MedImmune"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  MedImmune's principal place of business is located at One MedImmune Way, Gaithersburg, MD 20878.

71.     Defendant, Merck & Co., Inc. ("Merck"), is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  Merck's principal place of business is located at One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 08889-0100.

72.     Defendant, Mylan Laboratories, Inc. ("Mylan"), is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals.   Mylan's principal place of business is located at 1500 Corporate Drive, Suite 400, Canonsburg, PA 15317.

16

73.     Defendant, Mylan Pharmaceuticals, Inc. ("Mylan Pharma"), a wholly owned subsidiary of Mylan, is a West Virginia corporation engaged in the business of manufacturing and selling pharmaceuticals. Mylan Pharma's principal place of business is located at 1500 Corporate Drive, Suite 400, Canonsburg, PA 15317.

74.     Defendant, UDL Laboratories, Inc. ("UDL"), a wholly owned subsidiary of Mylan, is a Illinois corporation engaged in the business of manufacturing and selling pharmaceuticals. UDL's principal place of business is located at 1500 Corporate Drive, Suite 400, Canonsburg, PA 15317.

75.     Defendant, Novartis Corporation ("Novartis"), is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Novartis' principal place of business is located at One Health Plaza, East Hanover, NJ 07936.

76.     Defendant, Sandoz, Inc. ("Sandoz"), a wholly owned subsidiary of Novartis, formerly known as Geneva Pharmaceuticals, Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Sandoz's principal place of business is located at 506 Carnegie Center, Suite 400, Princeton, NJ 08540.

77.     Defendant, Novo Nordisk Pharmaceuticals, Inc. ("Novo"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Novo's principal place of business is located at 100 College Road West, Princeton, NJ 085040.

78.     Defendant, Organon Pharmaceuticals USA, Inc. ("Organon"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Organon's principal place of business is located at 56 Livingston Ave, Roseland, NJ 07068.

79.     Defendant, Par Pharmaceutical Cos., Inc. ("Par"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Par's principal place of business is located at One Ram Ridge Road, Spring Valley, NY 10977.

80.     Defendant, Purdue Pharma, L.P. ("Purdue"), is a corporation engaged in the business of manufacturing and selling pharmaceuticals.  Purdue's principal place of business is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT.

81.     Defendant, Sanofi-Synthelabo, Inc. ("Sanofi-Synthelabo"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Sanofi-Synthelado's principal place of business is located at 90 Park Avenue, New York, NY 10016.

82.     Defendant, Schering-Plough Corp. ("Schering"), is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  Schering's principal place of business is located at 2000 Galloping Hill Rd., Kenilworth, NJ 07033-0530.

83.     Defendant, Warrick Pharmaceuticals Industries, Ltd. ("Warrick"), a wholly owned subsidiary of Schering, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Warrick's principal place of business is located at 12125 Moya Boulevard, Reno, NV 89506.

84.     Defendant, Serono, Inc. ("Serono"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Serono's principal place of business is located at One Technology Place, Rockland, MA 02370.

85.     Defendant, Takeda Pharmaceuticals North America, Inc. ("Takeda"), is a corporation engaged in the business of manufacturing and selling pharmaceuticals. Takeda's principal place of business is located at 475 Half Day Road, Suite 500, Lincolnshire, IL 60069.

86.    Defendant, TAP Pharmaceutical Products, Inc. ("TAP"), is a joint venture between Abbott and Takeda Chemical Industries, Ltd., engaged in the business of manufacturing and selling pharmaceuticals.  TAP is a Delaware corporation whose principal place of business is located at Bannackburn Lake Office Plaza, 2355 Waukegan Rd., Deerfield, IL 60015.

87.    Defendant, Teva Pharmaceuticals USA, Inc. ("Teva"), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Teva's principal place of business is located at 650 Cathill Road, Sellersville, PA 18960.  Teva is a subsidiary of an Israeli corporation, Teva Pharmaceutical Industries, Ltd.

88.    Defendant, Novopharm USA, Inc. ("Novopharm"), a wholly owned subsidiary of Teva, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Novopharm's principal place of business is located at 165 E. Commerce Dr., Ste. 100-201, Schaumburg, IL 60173-5326.

89.    Defendant, Sicor Pharmaceuticals, Inc. f/k/a Gensia Sicor Pharmaceuticals, Inc., ("Sicor"), a wholly owned subsidiary of Teva, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Sicor's principal place of business is located at 19 Hughes, Irvine, CA 92618-1902.

90.    Defendant, Watson Pharmaceuticals, Inc. ("Watson"), is a Nevada corporation engaged in the business of manufacturing and selling pharmaceuticals.  Watson's principal place of business is located at 311 Bonnie Circle, Conrona, CA 02880.

91.    Defendant, Watson Laboratories, Inc. ("Watson Labs"), a wholly owned subsidiary of Watson, is a Nevada corporation engaged in the manufacturing and selling of pharmaceuticals.  Watson Lab's principal place of business is located at 311 Bonnie Circle, Corona, CA 92880.

92.     Defendant, Watson Pharma, Inc. ("Watson Pharma"), a wholly owned subsidiary of Watson, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Watson Pharma's principal place of business is located at 311 Bonnie Circle, Corona, CA 92880.

93.     Defendant, Wyeth, Inc. ("Wyeth"), formerly American Home Products Corp., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Wyeth's principal place of business is located at Five Diralda Farms, Madison, NJ 07940.

94.     Defendant, Wyeth Pharmaceuticals, Inc. ("Wyeth Pharma"), a wholly owned subsidiary of Wyeth, is a Delaware corporation engaged in the manufacture and sale of pharmaceuticals.  Wyeth Pharma's principal place of business is located at 500 Arcola Road, Collegeville, PA.

### III.  Jurisdiction and Venue

95.     Jurisdiction is proper in this Court pursuant to Miss. Code Ann. § 9-5-81 and Section 159 of the Mississippi Constitution in addition to the fact that all the claims asserted herein arise exclusively under Mississippi statutory or common law.

96.     This Court has personal jurisdiction over each Defendant because each of the Defendants resides in Mississippi, does business in Mississippi, purposefully directs or directed its actions toward Mississippi, and/or had the requisite minimum contacts with Mississippi necessary to constitutionally permit the Court to exercise jurisdiction.

97.     Venue is proper pursuant to Miss. Code Ann. § 11-11-3 due to the fact that substantial alleged acts of the Defendants which caused injury to the State and its citizens occurred in Hinds

County; the Division, which oversees the State Medicaid program, is located in Hinds County; and the State regularly and systematically conducts business in Hinds County.

### IV.  Medicaid Coverage of Prescription Drugs

#### A.  Marketplace for Prescription Drugs

98.     The marketplace for prescription drugs is extremely complex and non-transparent. It is composed of many layers, entities and products.  However, what is consistent throughout the prescription drug marketplace is the Defendants' absolute influence and control over prices.  In order to comprehend how the Defendants have been able to so covertly perpetrate their illegal scheme, one needs a basic understanding of the structure of the prescription drug marketplace.  The drugs themselves are manufactured by enormous and extremely profitable pharmaceutical corporations, such as the Defendants.  However, the Defendants typically do not distribute their products directly, but rather rely on wholesalers to warehouse and distribute their drugs.  The Defendants sell their products to these wholesalers at a wholesale acquisition cost ("WAC") which the Defendants establish.  The Defendants intend the WAC of a product to be understood by the marketplace as the average price paid by a wholesaler to a manufacturer for a given drug.  Each drug has a National Drug Code ("NDC"); currently, there are over 65,000 NDCs.  The Defendants report a WAC for each NDC to an industry reporting service, such as First DataBank (a/k/a Blue Book), Medical Economics, Inc. (a/k/a Red Book), and Medispan.  The wholesalers then resell the drugs to providers, such as physicians, pharmacies and hospitals, at what is known as the "actual acquisition cost."  The providers then resell the drugs to their patients when the drugs are prescribed, administered or dispensed.

21

99.     When these patients are Medicaid beneficiaries, the Medicaid program ultimately pays for these drugs according to a formula that derives from what is known as average wholesale price ("AWP").  AWP is an artificial sticker price established, not by the market, not by the providers or wholesalers, but by the Defendants.  The Defendants intend AWP to be understood by the marketplace as the average price charged by wholesalers to providers for a given drug.  The Defendants report an AWP for each NDC to the Blue Book, the Red Book, and/or Medispan.

100.    Thus, the market structure for prescription drugs differs in two respects from most markets.

101.    First, in most markets, demand for a product is determined by the ultimate consumers of the product.  In contrast, in the prescription drug market, the decision to use a prescription drug is made by the provider who treats, cares for, and/or supplies the patient with the drug.  Physicians prescribe, and sometimes even administer, drugs to their patients.  Hospitals and nursing homes supply and administer drugs to patients in their facilities.  Pharmacies supply prescription drugs to patients.  Each of these providers has enormous power over which drugs a Medicaid beneficiary receives.  Physicians' influence extends to which drugs they seek to prescribe.  Hospitals' and nursing homes' influence extends to which drugs they seek to provide to patients.  Pharmacies' influence extends to which drugs they seek to stock and thus make available to patients.

102.    Second, in most markets, the ultimate consumer of the product pays for it directly from his or her pocket.  In contrast, in the prescription drug market, most payments for drugs are made by "payors" such as the State of Mississippi through Medicaid.  In fact, nationally, Medicaid is the largest payor for prescription drugs, representing 14 percent (one seventh) of the drug market.

103.    These two unique factors create a situation where the Defendants, through the establishment of a drug's AWP, get to determine the reimbursement Medicaid will ultimately pay a provider for choosing to utilize their product, i.e. a drug.

**B. Medicaid's Coverage & Mississippi's Reimbursement of Prescription Drugs**

104.    Authorized under Title XIX of the Social Security Act, Medicaid is a means-tested entitlement program administered by the States and financed by both the Federal and State governments which provides health care insurance to more than 44 million low-income and disabled individuals. 42 U.S.C. 1396 *et seq.* While Medicaid does not require States to cover prescription drugs, all 50 States and the District of Columbia currently provide such coverage. 42 U.S.C. 1396d(a)(12).

105.    Medicaid payments for outpatient prescription drugs include three components: acquisition cost, dispensing fee, and a rebate. The acquisition cost covers the drug itself, while the dispensing fee covers the pharmacist's cost of filling the prescription and the rebate is simply the mechanism for reducing the effective price of the drug below the traditional acquisition cost.

106.    The acquisition cost is where AWP comes into play. The Federal Government, through the Centers for Medicare and Medicaid Services ("CMS"), sets maximum drug reimbursement limits within which each State determines its own pharmacy reimbursement formulas. For multiple source drugs with a sufficient number of equivalent products and at least three suppliers, CMS sets specific Federal upper limit (FUL) amounts. 42 CFR § 447.331-332. Specifically, FUL equals 150 percent of the lowest published price for the least costly version of the drug listed in a national pricing compendia. 42 CFR § 447.331 Multiple source drugs include both generic drugs and brand name drugs for which generic alternatives are available. For all other drugs,

23

including single source drugs (i.e. brand name drugs for which no therapeutic equivalent exists) and multiple source drugs without a FUL, payment established by a State may not exceed the estimated acquisition cost ("EAC") plus a reasonable dispensing fee or the providers' usual and customary charges to the general public. 42 CFR § 447.331(b). The EAC is established by the State.

107.    In complying with the framework established by the Federal Government, Mississippi reimburses multiple source drugs at the lowest of the FUL plus a dispensing fee, the EAC as determined by the Division plus a dispensing fee, or the providers' usual and customary charge to the general public. Miss. Code Ann. § 43-13-117(9)(b) The payment for covered drugs, other than multiple source drugs with an FUL, is the lower of the EAC cost plus a dispensing fee, or the providers' usual and customary charge to the general public. Miss. Code Ann. § 43-13-117(9)(b) EAC has been set at 12% of AWP. Provider Policy Manual 31.04. Prior to FY 2002, EAC was 10% of AWP.

### V.  Scheme to Defraud Mississippi Medicaid Program

**A. AWP Scheme**

108.    The Defendants knowingly, willfully, and/or intentionally provided or caused to be provided false and extraordinarily inflated AWPs to the Blue Book, the Red Book, and/or Medispan with the intent and knowledge that the Division would unknowingly rely on these fabricated AWPs published by these reporting services and pay providers exorbitant amounts for their drugs.

109.    The Defendants knowingly, willfully and/or intentionally provided or caused to be provided false and inflated AWP information for their drugs to the Blue Book, Red Book and Medispan (for examples see Exhibit A). These price reporting services do not independently determine the Defendants' AWPs. The Defendants knowingly, willfully and/or intentionally

24

represented, through their acts and omissions, that the AWP information provided to the reporting services was true and correct and could be fully and completely relied upon by the Division as the average price charged by wholesalers to providers for a Defendant's given drug, when in fact, the AWP information was grossly overstated.  So prevalent was this fraudulent scheme that a June 10, 1996 issue of *Barron's,* entitled, "Hooked on Drugs," reported that the industry insiders joke that AWP really means "Ain't What's Paid." Office of Inspector General ("OIG"), "Medicaid Pharmacy-Actual Acquisition Cost of Generic Prescription Drug Products," (A-06-97-00011) (August 1997).

110.    The Defendants at all times were aware of the State of Mississippi's formula for reimbursing providers for the provision of drugs under the State's Medicaid program, as set forth above, as well as the formula's reliance on AWP.

111.    The Defendants were aware that the State of Mississippi relied upon the pricing information they provided to nationally known price reporting services in determining the amount the Division would reimburse providers for providing drugs to Medicaid beneficiaries and that the Division's reliance would result in its paying excessive amounts for these drugs to providers.   In fact, a 2002 OIG report entitled "Medicaid Pharmacy-Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products" (A-06-02-00041), "found that the data upon which States base pharmacy reimbursement overstate pharmacy acquisition costs." OIG, "Variation in State Medicaid Drug Prices" (OEI-05-02-00681) (September 2004).

112.    The Defendants had a duty to report pricing information that fairly and accurately reflected the AWP of their products rather than artificially inflated prices that fraudulently increased Medicaid reimbursement payments to providers.

25

113.    The State of Mississippi obtained the Defendants' published AWP information from Blue Book, Red Book and Medispan.

114.    The State of Mississippi, as well as numerous other payors, did rely upon the pricing information provided by the Defendants to Blue Book, Red Book and Medispan as true and correct. In fact, before the House Energy and Commerce Committee, Subcommittee on Oversight and Investigation, George M. Reeb, Assistant Inspector General for CMS, noted that "one reason States continue to rely on AWP . . . is that States lack access to alternative, more accurate price information." *Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much: Hearing Before the House SubComm. on Oversight and Investigations,* 108th Cong., December 7, 2004.

115.    The State of Mississippi used the Defendants' false and inflated AWPs reported in the Blue Book, Red Book and Medispan in reimbursing providers for the provision of drugs to Medicaid beneficiaries under the State Medicaid program and did, in fact, pay excessive amounts to providers due to the Defendants' fraudulent scheme.

**B.  Marketing of the Spread**

116.    The difference between the actual price at which a wholesaler sells a Defendant's drug to a provider and the AWP established by a Defendant is known as the "spread" or alternatively, the "return to practice" or "return on investment." Another way to think of it is that the spread is the net difference between the actual acquisition cost and the AWP, which is pocketed by the provider. Unfortunately, as noted in Chairman Joe Barton's (R-TX) opening statement before the House Energy and Commerce Committee hearing on AWP, the "existence of substantial spreads remains a fixture of Medicaid prescription reimbursement." *Medicaid Prescription Drug Reimbursement:*

*Why the Government Pays Too Much: Hearing Before the House SubComm. on Oversight and Investigations,* 108th Cong., December 7, 2004.

117.    Each of the Defendants intentionally and purposefully created and widened the "spread" on their products by decreasing the actual acquisition cost and increasing the AWP of their products. As noted by Patrick J. O'Conell, Chief of the Civil Medicaid Fraud Section of the Office of the Attorney General of Texas, in his testimony to the Senate Finance Committee regarding Texas' litigation in the area of AWP:

> The evidence we have discovered in the lawsuits as well as in our pre-litigation investigations shows that some manufacturers make conscious, deliberate business decisions to create enhanced spreads and to market the sale of their products based on the spreads.

*Medicaid Waste, Fraud and Abuse: Threatening the Health Care Safety Net,* 108th Cong., June 29, 2005.

118.    Each of the Defendants intentionally and purposefully created and widened the "spread" on their drugs to increase the individual market share of their drugs, thereby increasing their own profits. Between 1997 and 2002, the Congressional Budget Office estimate that "the average markup [on a prescription drug] increased by nearly 60 percent–rising from $8.70 to $13.80 per prescription, or by about 9.7 percent per year." Congressional Budget Office, "Medicaid's Reimbursements to Pharmacies for Prescription Drugs," (December 2004). By marketing the "spread" on their products, the Defendants intended to induce providers to purchase their drugs, knowing that the larger "spreads" would allow the provider to pocket more money from the State in the form of higher Medicaid reimbursements. George Grob, Deputy Inspector General of the Department of Health and Human Services, referred to this trend as "upside-down economics," i.e. the drug company that receives the highest market share is the one with the highest AWP. *Medicare*

27

*Drug Reimbursements: A Broken System for Patients and Taxpayers: Joint Hearing before the SubComm. on Health and the SubComm. on Oversight and Investigations of the House Energy and Commerce Com.,* 107th Cong., September 21, 2001. This marketing practice was recently disclosed in a December 7, 2004 hearing before the House Subcommittee of Oversight and Investigation of the House Energy and Commerce Committee, where the Chairman of the full committee, Representative Barton, stated:

> During the course of this investigation, the committee has uncovered evidence that several manufacturers either inflate their AWPs or actively market their products, not based on the lowest price, but on the difference between price and the reimbursement amount, better known in the industry as the spread. . . . Data obtained by the committee from five of the largest retain pharmacy chains reveals that during the period of July 1, 2002 to June 20, 2003, the average acquisition costs for seven widely prescribed generic drugs was 22 cents, while the average Medicaid reimbursement just for those drugs alone was 56 cents, more than double the cost.

*Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much: Hearing Before the House SubComm. on Oversight and Investigations,* 108th Cong., December 7, 2004.

119.    One might expect the spreads on drugs to be limited to single-source drugs. Clearly, the Defendants have created "spreads" for single-source drugs. When accounting for the explosion in Medicaid expenditures for prescription drugs, the CBO noted that "the largest single factor contributing to the rapid increase in markups [in the cost of prescription drugs reimbursed under Medicaid] was the use of newer single-source brand name drugs, which had somewhat higher average markups than did older brand-name drugs." "Medicaid's Reimbursement to Pharmacies for Prescription Drugs," (December 2004). However, generic multi-source drugs are also highly susceptible to markups. In particular, the CBO noted that "since the average markup on generic drugs is close to that on brand-name drugs, reimbursements for generic drugs provided an estimated

28

47 percent of total revenue from markups on Medicaid drugs in 2002." "Medicaid's Reimbursement

to Pharmacies for Prescription Drugs," (December 2004). The reason for this phenomena is that as

competition increases among generic drugs, the Defendants compete on the basis of who can offer

the highest "spread." Former Chairman of the House Energy and Commerce Committee, and now

current president of PHARMA, Representative Billy Tauzin (R-LA) noted this rather bizarre trend

in his opening statement to a hearing on AWP in September of 2001:

> Think about this with me for a second. We introduced generic drugs into the system
> to create competition. Do you know what happens to the system when a generic drug
> comes into play? Evidence we have that we will develop today indicates that when
> a generic drug comes into competition with a patent drug finally, the price doesn't
> come down. The price goes up because both of the drug companies understand that
> if they are going to sell that drug to the doctor, they have got to give them a bigger
> spread. So they are in competition to give them a bigger spread, and they both post
> higher and higher artificial wholesale prices . . .
>
> It is a game that turns ordinary economics on its head. As competition comes into
> the field, prices go up.

*Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers: Joint Hearing before*

*the SubComm. on Health and the SubComm. on Oversight and Investigations of the House Energy*

*and Commerce Com.,* 107th Cong., September 21, 2001.

120.    The current Chairman of the House Energy and Commerce Subcommittee on Health,

Representative Nathan Deal (R-GA) reiterated this position, noting:

> In many instances, AWP bears little or no resemblance to what pharmacists
> really pay for drugs. This is especially true for generic drugs. In a recent report,
> CBO estimated the average "mark-up" between what Medicaid pays the pharmacy
> for each prescription and what the pharmacy or wholesaler actually pays for the drug
> has dramatically increased. They estimated that between 1997 and 2002, the average
> mark-up on generic drugs increased by nearly 79% per prescription.
> Generic drugs have a critical role to play in containing soaring drug costs.
> My concern, however, is that because of AWP, Medicaid is missing out on a large

portion of these cost savings. I want to increase Medicaid's use of generic drugs, but not at the expense of rapidly increasing drug costs.

*Medicaid Prescription Drugs: Examining Options for Payment Reform: the SubComm. on Health and the SubComm. on Health of the House Energy and Commerce Com.*, 109th Cong., June 22, 2005.

121.    Mark Jones, President of Ven-A-Care, provided an example of how "spreads" are used in the generic drug market by the Defendants to gain market share at the expense of Medicaid:

> I think more importantly than how they make it up [AWP] is what they're doing with it.  Basically, in the generic marketplace right now manufacturers are always in control of their prices.  They own every price that's ever published.  It's theirs.  They are taking those published prices, using the difference between what they're selling it [the generic drug] for and what the end buyer is going to bill the program, gets reimbursed for, as their marketing tool to sell their drugs.  So that's called the spread. A manufacturer reports price, $125 is the AWP, Medicaid uses that $125 to reimburse whoever's billing it, yet they sell it for $90.  Well, the difference between $90 and $125 is the spread.  That's the financial incentive that these companies use to sell their drugs, because you're talking about a generic market.  You're talking about marketplace in general where there's seven or eight manufacturers of the same drug.

*Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much: Hearing Before the House SubComm. on Oversight and Investigations,* 108th Cong., December 7, 2004.

122.    The inflated AWPs of each of the Defendants' drugs greatly exceeds the actual acquisition cost of the drugs in addition to a generous markup.  As again noted by Chairman Barton in his opening statement, "the primary beneficiaries of the current [Medicaid] reimbursement structure are the retail pharmacies. . . . Indeed, evidence gathered by the committee suggests that Medicaid reimbursement is more generous than that of most private payers." *Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much: Hearing Before the House SubComm. on Oversight and Investigations,* 108th Cong., December 7, 2004.  Thus, each of the Defendants' AWPs for these drugs bears no relation to any price acceptable within the marketplace.

30