# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## PLAINTIFFS' RESPONSE TO THE COURT'S QUESTIONS REGARDING THE APPROPRIATENESS OF MAINTAINING CLASS 3

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ..........................................................................................................................2

I.  PLAINTIFFS HAVE ESTABLISHED CAUSATION  AND JUDGMENT
    IS NOT APPROPRIATE.................................................................................................3

    A.  Plaintiffs Have Proven Causation Based on Appropriate Testimony.....................3

    B.  BCBS-MA Choice in 2004 to Use AWP Did Not Negate Causation...................10

    C.  Defendants' Key Common Expert Dr. Bell Agrees That BCBS-MA
        Could Not Simply Change the System .................................................................14

    D.  There is No Basis for Judgment Against Any Other Class 3 TPP........................15

    E.  "Constructive Knowledge" Does Not Warrant Judgment ....................................16

II. DECERTIFICATION IS NOT WARRANTED................................................................17

    A.  BCBS-MA is Typical...........................................................................................17

    B.  Decertification in the Late Stages of Litigation Would Unfairly
        Prejudice Class Members and the Proper Alternative is Subclasses ....................19

    C.  If the Court Finds BCBS-MA Not Typical the Answer is to Create
        Subclasses ...........................................................................................................21

    D.  Subclassing is Superior to No Class ....................................................................22

III. CONCLUSION..............................................................................................................22

001534-16  149010 V1

## TABLE OF AUTHORITIES

**PAGE**

### CASES

*Brown v. Bank of Am., N.A.*,
457 F. Supp. 2d 82 (D. Mass. 2006) ................................................................13

*Chisolm v. TranSouth Fin. Corp.*,
194 F.R.D. 538 (E.D. Va. 2000) ...............................................................20, 21

*Langley v. Coughlin*,
715 F. Supp. 522 (S.D.N.Y. 1989)................................................................19

*In re Lupron Mktg. & Sales Practices Litig.*,
295 F. Supp. 2d 148 (D. Mass. 2003) ...........................................................13

*In re NTL Sec. Litig.*,
2006 U.S. Dist. Lexis 5346 (S.D.N.Y. 2006) ...............................................21

*Payne v. The Goodyear Tire & Rubber, Co.*,
216 F.R.D. 21 (D. Mass. 2003)....................................................................19

*In re Pharm. Indus. Average Wholesale Price Litig.*,
307 F. Supp. 2d 196 (D. Mass. 2004) ...........................................................13

*Samuel v. University of Pittsburgh*,
538 F.2d 991 (3d Cir. 1976).....................................................................19, 20

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003).........................................................................19

*Swack v. Credit Suisse First Boston*,
230 F.R.D. 250 (D. Mass. 2005)..............................................................17, 18

*Woe v. Cuomo*,
729 F.2d 96 (2d Cir. 1984).......................................................................19, 20

001534-16  149010 V1

Plaintiffs submit this memorandum in response to the questions raised by the Court concerning the appropriateness of maintaining Class 3 in view of the evidence introduced at trial.

## PRELIMINARY STATEMENT

On the second day of trial, after hearing from a few BCBS-MA witnesses, the Court raised the question of "how do you prove that they're typical on a causation basis."[1]  This question was posed after the Court had heard testimony that BCBS-MA "didn't change their position" after discovery of the truth about inflated AWPs in 2003/2004.[2]

Eighteen trial days followed this exchange, and the subsequent testimony proves that causation is measured by what prices would have been in a world where Defendants published truthful AWPs.  The testimony of Drs. Rosenthal and Hartman establish that AWPs would have been close to ASP, and hence BCBS-MA and all Class members, both TPPs and individuals in Class 3, would have paid hundreds of millions less than they did.  Drs. Rosenthal and Hartman's causation testimony is supported by actual price comparisons pre- and post-MMA where the total costs of administration for the drugs at issue has fallen even giving Defendants the benefit of including administration costs in the calculation without considering administration costs, drug prices have fallen and it is their current price that approximates what BCBS-MA and others would have paid absent the fraud.  It is also supported by the testimony of Defendants' employees, who wrote during the Class Period, or admitted in testimony that real AWPs would result in lower prices.  This "but for" causation testimony aligns BCBS-MA and each Class member perfectly because what BCBS-MA did after the Class Period is not relevant to what would have happened if the truth had been told prior to and throughout the Class Period.

---

[1] Trial Tr. Day 2 at 203.

[2] *Id*. at 201:5-10.

Therefore, the fact that BCBS-MA still uses AWP does not break the chain of causation proven by what the prices would have been in a fraud free market and thus neither judgment in favor of Defendants nor decertification of Class 3 is appropriate.  As Drs. Rosenthal and Hartman explain, and as Dr. Bell admitted, its not surprising that BCBS-MA did not adopt an entirely new payment system given the fact AWP has become an embedded and established industry standard.  Change of such an industry system due to abuse involving just a few of the thousands of drugs in a system that processes hundreds of millions of transactions is not likely to occur quickly.

What BCBS-MA chose to do after flaws in the system were finally exposed has little to do with what BCBS-MA and other Class members would have paid if prices had not been tainted by fraud at the start.

Given the foregoing, there is no grounds for judgment against the Class 3 or for decertification.[3]

If the Court concluded that causation was lacking with respect to BCBS-MA, the appropriate possible remedies are (1) judgment against BCBS-MA but no other Class member as there is no evidence that any other Class member considered AWP post Class Period and elected to continue to use AWP, (2) allow Pipefitters to be the sole Class 3 representative, or (3) allow for the establishment of two subclasses:  one being a Class of large insurers and the other constituting a Class of Taft-Hartley Funds and consumers.

These alternatives are far superior to decertification, which would then require relitigation by each large TPP, and would leave most Class members, including the Taft-Hartley Funds and consumers without a remedy.

---

[3] Defendants have not sought to decertify or reverse BCBS-MA as a Class 2 representative.

## ARGUMENT

### I.   PLAINTIFFS HAVE ESTABLISHED CAUSATION AND JUDGMENT IS NOT APPROPRIATE

Defendants' have asked for judgment against Class 3 on the grounds that Plaintiffs have failed to prove "causation."  In so doing they focus completely on the actions of BCBS-MA after the Class Period and ignore expert testimony demonstrating classic but for causation.

### A.   Plaintiffs Have Proven Causation Based on Appropriate Testimony

Dr. Rosenthal analyzed the invoice data that was turned into AWPs and ASPs by Dr. Hartman and his team.[4]  She looked at departures from normal pricing behavior to provide "natural experiments" where the spread was used as a competitive strategy.[5]  For most of the drugs at issue, she then opines as to the departure of AWP from ASP as a reaction to the competitive marketplace.[6]  Dr. Rosenthal concludes that as a result of this behavior, spreads resulting from a manufacturer's decision to create a significant spread, "members of the class paid more for these drugs than they would have in the absence of the alleged fraud."[7]  Dr. Hartman reaches the same conclusion based on his yardstick analysis.[8]

To support her opinion as to but for causation, Dr. Rosenthal also examined what has occurred in response to enactment of the MMA.  This is a world where for the most part inflated AWPs are not part of the system.  Dr. Rosenthal found numerous examples of projected and actual cost savings in a world where there is no AWP inflation, even taking into account changes in payments for administration of drugs:

---

[4] Direct Testimony of Dr. Meredith Rosenthal ("Rosenthal Direct"), ¶ 44.

[5] *Id.*

[6] *Id.* at ¶¶ 47, 50-62.

[7] *Id.* at ¶ 75.

[8] *See* Testimony of Raymond S. Hartman ("Hartman Direct"), ¶ 5, 94-95, 138-151, 155 describing his but for yardstick analysis of causation and damages.  *See also* Trial Tr. Day 8 at 75:10-12 (Hartman) (where not competing on spread then discounts were AWP – 15 to 25 percent).

a.      Exhibit 4040.  The Congressional Budget Office ("CBO") in November of 2003, estimated that the savings under Section 303, entitled "Competitive acquisition of covered outpatient drugs," would be $4.2 billion over the first 10 years; under Section 304, entitled "Application to certain specialties," an additional $7.3 billion; and under Section 305 relating to "Payment of inhalation drugs," an additional $4.2 billion;

b.      Exhibit 1303.  The Centers for Medicare & Medicaid Services in November of 2004 estimated for two specialties at the center of this case – hemotology/oncology and urology – a net reduction in costs given constant utilization of -6% and -14% respectively;

c.      Exhibit 4074.  "Review of CMS's Preliminary Estimate of the Physician Update for 2005" MedPAC Report to the Congress dated June 2004, estimated that payments for administration of drugs covered by Medicare Part B would drop $200 million (after a one-time transitional increase of 32% for 2004);

d.      Exhibit 4058.  MedPAC Report, "Effects of Medicare Payment Changes on Oncology Services" dated January 2006, found, among other things, that "Medicare's change to a payment system based on ASP has resulted in program savings, and most oncologists can purchase most drugs at prices below the payment rate," (at p. 14);[9]

e.      Exhibit 4019.  MedPAC Testimony Before the Subcommittee on Health, Committee on Ways & Means, U.S. House of Representatives:  "Medicare Part B drugs and Oncology" dated July 13, 2006, showing that Medicare spending for Part B drugs declined in 2005 despite increases in the volume of drugs used and the substitution of newer, more expensive drugs;

f.      Exhibit 4073.  MedPAC comments dated October 11, 2006 to CMS's proposed rule, "Medicare program; Revisions to payment policies under the physician fee schedule for calendar year 2007 and other changes to payments under Part B," noting that the new ASP system produced "dramatic price decreases" for many products;

---

[9] This report also noted that payment changes under the MMA did not affect beneficiary access to chemotherapy services and that total payments for drug administration services to date in 2005 equaled 2004 levels even though the volume of services to Medicare beneficiaries increased (at pp. vii-viii).

g.      Exhibit 4020.  Testimony of Robert A. Vito, Regional Inspector General for Evaluation and Inspections, Office of Inspector General, U.S. Department of Health and Human Services, House Committee on Ways & Means Subcommittee on Health dated July 13, 2006, noting that, despite rising utilization of Part B drugs, the MMA produced a savings on covered drugs of "close to $1 billion" in 2005 compared to 2004;

h.      Exhibit 4018.  PriceWaterhouseCoopers, "Estimate of Savings to the Medicare Program from Payment Changes for Covered Outpatient Drugs and Biologicals Under the Medicare Modernization Act of 2003" dated April 27, 2005, projecting $1 billion in savings after behavioral offsets;

i.      Exhibit 4059.  Statement of Frederick M. Schnell, M.D., President, Community Oncology Alliance before the Subcommittee on Health of the House Committee on Ways & Means dated July 13, 2006, claiming that drug administration reimbursement has declined 20% since 2004; and

j.      Plaintiffs' Exhibit 4053.  Article in *Urology,* "Reimbursement Issues with Hormonal Therapies for Prostate Cancer" by M. Ray Painter, MD dated 2005, projecting 14% decrease in payments for LHRH agonists.

If this was not persuasive enough of what payments would have been if the Class had lived in a truthful AWP world, Dr. Rosenthal analyzed what the overall expenditures were for specific drug regimes compared to the pre-MMA world and found a decrease for each drug in the current relatively inflation-free world.[10]  This savings is depicted in the comparison as follows:

---

[10] *See* Rebuttal Testimony of Dr. Meredith Rosenthal ("Rosenthal Rebuttal"), ¶ 15 and Ex. 4069 ($212.58 decrease in drug/fee payment on Zoladex); Ex. 4070 ($1,316 change in Taxol); Ex. 4071 ($212.43 decrease in Remicade); Ex. 4072 ($9.22 decrease in Procrit); Ex. 4095 ($21 decrease in Albuterol reimbursement).



The relevant years for companies are the pre-MMA years of 2002 and 2003 to 2005 where there are not transition payments under the MMA.

001534-16  149010 V1

The same analysis holds true for Taxol:



And holds true for the most dominant form of albuterol:



The foregoing pre- and post-MMA evidence establishes full support for Dr. Rosenthal's opinion as to causation.

Causation is also confirmed by witness testimony.  For example, the following exchange took place between the Court and an AstraZeneca witness:

> THE COURT:  Excuse me.  Did you understand that Medicare beneficiaries paid 20 percent of AWP?
>
> THE WITNESS:  Yes.  They paid 20 percent out of pocket.
>
> THE COURT:  So you understood that every time you raised AWP, they had to pay 20 percent of the increase?

001534-16  149010 V1

THE WITNESS:  Yes.  Whenever we took a price increase, it would raise the copay and also raise the reimbursement.[11]

And following the logic of this testimony, if AWPs had not been inflated to begin with prices would have been lower.

When analyzing the impact of AWP in the Medicare market, AstraZeneca acknowledged that the patient or "secondary insurer" pays for the 20% copay and confirmed the impact of higher AWPs on TPPs. [12]

Likewise, in reviewing the meaning of AWP, BMS also acknowledged the relationship between lower AWPs and lower payments:

The AWP that is set by the pricing services can have an impact on different customers so we need to be aware of how AWPs are used in the system.

MCO's [Managed Care Organization] reimburse pharmacies based on AWP so they prefer that products have a lower spread.[13]

What this document acknowledges is that if AWPs were lower the cost to MCOs (TPPs) would be lower.  This was confirmed by BMS Senior Vice President Frank Pasqualone,[14] who when asked what would happen if BMS had published a list price which was an actual average of sales, responded that BMS would have "lost money."  In other words, if BMS had published a real AWP, payors would have paid less and BMS would have made less.  This is causation exactly as postulated by Drs. Rosenthal and Hartman.

---

[11] Trial Tr. Day 5 at 13 (Buckanavage).  *See also id.* at 15:5-16 (admitting same); Ex. 143 at AZ0044010 (presentation recommending price increase for Zoladex 10.8 mg depot listing only downside as "slightly higher co-pay for patient").

[12] Ex. 15 at AZ0431802, 08.

[13] Ex. 196 at 1088201.

[14] Trial Tr. Day 14 at 33:18-34:2 (Pasqualone).

- 9 -

**B.      BCBS-MA Choice in 2004 to Use AWP Did Not Negate Causation**

During Dr. Rosenthal's testimony, the Court directly asked Dr. Rosenthal if BCBS-MA

had known the truth earlier "would it have made a difference."[15]  Dr. Rosenthal opined that had

AWPs been reported in a fashion consistent with AWPs to begin with, "then that certainly would

have made a difference."  She went on to explain and rebut Defendants' no causation argument:

> THE COURT:  Would it have made a difference?
>
> THE WITNESS:  I think, in my view, the way I look at it, at least, is, what if those AWPs had been simply reported consistently in relationship to the average sales prices?  Then that certainly would have made a difference.  When this system is already embedded and AWP-based reimbursement is out there, and those physicians who are using these drugs are already getting very high margins, to try to turn that ship midcourse would have been politically costly for certain.  But, again, it seems to me, had the AWPs been reported in the same way that most AWPs have been, then this sort of turning-the-ship issue wouldn't have been there.
>
> \* \* \*
>
> THE COURT:  So you're saying you're right.  Once you have this huge spread, Blue Cross-Blue Shield isn't going to take the heat for decreasing it because of the politics, this provider politics, if you will.  On the other hand, you would fault them anyway for even beginning that game?
>
> THE WITNESS:  I guess I wouldn't fault Blue Cross-Blue Shield for having adopted an AWP-based system in the first place.
>
> THE COURT:  No, I'm sorry.  You'd fault the pharmaceutical industry for getting into that game, but once Blue Cross had it, you would say probably that they wouldn't have taken the lead in changing it?
>
> THE WITNESS:  That's correct.  There's this notion in labor economics about wages, and we have these models that say, when costs change, labor markets will adjust, wages will go down to reach the same equilibrium.  But we say "wages are sticky downwards," which is a very sort of technical way of saying it's very hard to give people a pay cut.  It's very easy to give a raise.  But in practice, when things like health benefits become expensive,

---

[15] Trial Tr. Day 6 at 17:9-13 (Rosenthal).

> those pay cuts, they can't happen in a one-year time frame.  We
> see wages grow more slowly.  It's very difficult to adjust
> particularly rapidly when we're looking at these very large margins
> to remove them.[16]

Simply put, if AstraZeneca, for example, had published an AWP that was an ASP, instead of an AWP inflated by as much as 145%, Class members would have paid based on the ASP.  That establishes causation.  The same is true for every Defendant.

Thus, the fact that BCBS-MA felt after the Class Period that AWP was so deeply embedded in its payment system and that it could not simply change payment systems for thousands of drugs, has no bearing on causation, which is measured by what would have happened if there had been no fraud to begin with.

BCBS-MA's position is not illogical assuming it had any bearing on causation.  Without a critical mass of participants, and huge capital expenditures, it would be impossible for any single plaintiff or class member to effect any changes on the industry as a whole in order to counteract the AWP scheme.[17]  Defendants thus overlook critical structural impediments to reforming the system *even if Plaintiffs and the members of Class 3 had learned the full extent of Defendants' fraud*.

Further, it is difficult and expensive for payors, even large payors, to track all pricing information for all drugs.[18]  Consequently, commonly understood notions of bounded rationality and administrative efficiency command that payors utilize common "rules of thumb" such as the

---

[16] Trial Tr. Day 6 at 19-21 (Rosenthal).

[17] *See*, *e.g.*, Trial Affidavit of Deborah DeVaux, ¶¶ 11-14; Hartman Direct, ¶¶ 116-23 & n.134.

[18] "Even when payors attempt to track information on drugs and the acquisition costs of drugs; even when the right to audit a PBM exists; and even when prescription drug benefit consultants are retained, there remains considerable non-transparency in the contracts, billing information and accounting information.  This fact is made vivid by the continued and recent attempts by payors to obtain greater pricing transparency from middlepersons and providers."  Hartman Direct, n.155.

- 11 -

AWP metric in order to adjudicate claims.[19]  As Dr. Anderson, Professor of Medicine and Health

Policy at Johns Hopkins, testified in *Lupron*, with 65,000 drugs "negotiation of a specific price

for each . . . would be administratively impossible," thus fostering the AWP pricing standard.[20]

And as Dr. Rosenthal explained:

> Given the large number of drugs and services that third-
> party payers reimburse, there is also a need to rely on a
> common standard to process literally millions of transactions.  Ascertaining
> the acquisition cost for each and every drug would simply not be
> feasible for payers. . . .  In this context, the published AWPs,
> which are readily available to payers from sources such as the Red
> Book, MediSpan, and First DataBank, provide what Berndt calls a
> 'focal point' for reimbursement.[21]

An industry cannot just simply abandon a market-wide pricing metric "at the drop of a

hat," even if individual participants wanted to.  Its participants need time to absorb learning,

rewrite systems, and get extensive provider networks on board.  Moreover, "before a major shift

occurs in operational practices, the institution wants to observe whether the newly acquired

information is indicative of a real change in the economic terrain in which that institution

competes."[22]  Thus, even if market participants had extensive knowledge of Defendants'

schemes – and the Court has found that they did not – the very nature of the AWP system would

prevent them from taking dramatic action to quickly change business practices.

And the notion that BCBS-MA cannot be faulted for not changing on its own to ASP is

corroborated by AstraZeneca witness Alan Milbauer, who testified that AstraZeneca could not

change its practices because "this was the system we were only one company in this" and "we

---

[19] Hartman Direct, ¶ 91.

[20] Hartman Direct, ¶ 96.

[21] Rosenthal Direct, ¶ 66 (citing Berndt).

[22] Hartman Direct, ¶ 118(e).

- 12 -

could [not] do that on our own."[23]  BCBS-MA should not be held after the fact to a higher

standard than Defendants engaged in during the Class Period.

       As this Court has previously observed:

> In the private, end-payor context, **the harm alleged by
> Defendants' alleged actions is visited directly upon the end-payor
> Plaintiffs, as they have paid directly for the named drugs based
> on the AWP's**.  Similar arguments about intervening causes
> between the setting of an AWP by a defendant and injuries to plans
> and individual co-payors were recently rejected [by Judge Stearns]
> as "bordering on the frivolous."

*In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 207 (D. Mass. 2004)

(quoting *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 175 (D. Mass. 2003)

(emphasis added)).  No intervening causes upset the chain of causation between the setting of an

AWP by a Defendant and injuries to Plaintiffs and members of the Class.  *See also Lupron*, 295

F. Supp. 2d at 175.

       During opening statements, Defendants' counsel relied on this Court's decision in *Brown

v. Bank of Am., N.A.*, 457 F. Supp. 2d 82 (D. Mass. 2006), for the proposition that the causal

chain has been broken.  However, the facts in *Brown* are not even remotely close to the facts

proven at trial here.  In *Brown*, the causal chain was broken by **the defendant's own disclosure**

of the information the plaintiffs alleged was inadequately or unclearly disclosed by defendant in

another location.  Here, in contrast, Defendants introduced no evidence at trial that any

statements they made broke the chain of causation.  Rather, Plaintiffs established that Defendants

made every effort to ensure the continuation of the system that enabled them to perpetuate their

fraud.

---

   [23] Trial Tr. Day 11 at 20, 27-28 (Milbauer).

Defendants knew that any payor who attempted a variation risked both confusion and backlash from the providers who utilized the standardized system.  Of course, the obvious resolution was for Defendants to simply stop their unlawful inflation of what should have been the "average wholesale price" for each product.  Defendants chose not to and are estopped from complaining that Plaintiffs failed to mitigate or that causation is somehow broken.

**C.     Defendants' Key Common Expert Dr. Bell Agrees That BCBS-MA Could Not Simply Change the System**

Drs. Rosenthal and Hartman do not stand alone with respect to their opinions about the "stickiness" and difficulty for an institution like BCBS-MA to suddenly completely drop AWP in 2003-2004 when it learned of the abuse that had occurred years before.

The Court questioned Dr. Bell on this very point.  Referring to BCBS-MA, the Court stated why hasn't it tried it?  (Going to ASP?)[24]  The Court referred to the "stickiness" issue[25] and Dr. Bell admitted "Yes, I think that's right.  They [BCBS-MA] got worries."  Bell later, after digressing,[26] answered the Court's question:

> THE WITNESS:  But, you know, an individual payor on its own is in a very difficult position to do this because, as I say, if they move first – you know, you talk about, well, premiums will come down, copays will come down.  Whether or not copays will come down I think is probably unlikely, but I agree that premiums would come down, or they could, they'd come down.
>
> All of this stuff has to happen, though, at the same time.  So there's a real issue of, how does this all get coordinated?  And we end up with is the situation that if one payor moves, they run a significant risk that nobody follows, and they're hurt, and they're going to come back and just have the same situation they had before, because that's the only alternative they have.  Or if they all move at the same time, where is it that they as individual payors have potentially made a net gain?  You're right, the cost of

---

[24] Trial Tr. Day 11 at 66:12-21 (Bell).

[25] *Id*. at 67:25-68:2.

[26] *Id*. at 70:10.

services go down, premiums come down, et cetera, but the payors haven't done any better.  They're no better off in some sense than they were without taking this risk of potentially ticking of their provider network, ticking off their employers, ticking off their members.

Q.      Dr. Bell, is there a consensus that the new ASP system is the right alternative to AWP?

A.      Absolutely not.  ASP is just another reimbursement benchmark.  I mean, it's still got exactly the same issues built into it around incentives.  And this is the case, you know, in some sense whenever you've got expert services, as I think Professor McFadden pointed out yesterday.  When the expert is sort of being paid –

THE COURT:  It's at least truthful, more truthful.  It's a real average of sale prices.[27]

Thus, Dr. Bell does not impose on BCBS-MA an obligation to have immediately adopted another payment system and admits there is no consensus to do so.  His testimony is inconsistent with Defendants' assertion that BCBS-MA's choice in 2004 defeats causation.[28]

**D.      There is No Basis for Judgment Against Any Other Class 3 TPP**

Sweeping with a broad brush, Defendants claim that BCBS-MA's decision to continue to use AWP as a reimbursement mechanism mandates that judgment be entered against *all* TPPs.  However, there is no evidence that Pipefitters, any other Taft-Hartley Fund, *or* any other large insurer, made the same choice.

---

[27] *Id.* at 74:1-75:5.

[28] This is a significant admission.  Dr. Bell is not an expert brought into a case with no factual involvement.  He is a fact witness who advised both J&J and BMS to market the spread despite written company policies to not do so.  *See* Ex. 344; Trial Tr. Day 15 at 68:22-69:14 (Bell); Ex. 226 at p. 3120 where Bell advises BMS to discuss "spread opportunities."  Every AWP Defendant, over 20 pharmaceutical companies, are his current clients and he makes $13 million a year from such clients.  Trial Tr. Day 15 at 63:6-9 (Bell).  Thus the above admission from such a biased advocate is thus even more significant then usual.

Defendants claim that Pipefitters renewed their contract with BCBS-MA as a third-party administrator, therefore, Pipefitters somehow approved of Defendants' AWP fraud.  Defs' Mem. at 12-13.

Again, this evidence ignores that the but for causation in this case is measured by what Pipefitters and others would have paid in a fraud free world.  They would have paid lower prices. Further, it ignores the fact that Pipefitters has no choice – AWP is the standard used by those it must do business with.  This does not eliminate the causative effect of inflated AWPs.

## E.    "Constructive Knowledge" Does Not Warrant Judgment

Defendants also claim that judgment or decertification is warranted due to BCBS-MA's constructive knowledge through ownership during part of the Class Period of its staff model HMO.  Such transferred knowledge does not actually exist.[29]  It is in any event not a defense to the unfairness prong of 93A.  Defendants also argue that substantial evidence in the public domain warrants judgment.  Case law is to the contrary.[30]  And factually, Defendants were unable to show that ***any*** Massachusetts TPP had knowledge of the GAO or OIG reports or of any news articles.  No trial witness testified to this, and no evidence was introduced from the files of any Massachusetts TPP showing receipt of these reports.

And, as explained in Plaintiffs' trial brief, unfairness under 93A is different than deception and Defendants' practices were unfair.[31]  Knowledge does not render BCBS-MA or any Class member atypical for the purposes of the unfairness prong of 93A.

---

[29] *See* Plaintiffs' Post-Trial Omnibus Trial Brief at Section I.A.6 (showing lack of knowledge).

[30] *See id.*

[31] *See* Plaintiffs' Post-Trial Brief at Section A.1.a.

## II.      DECERTIFICATION IS NOT WARRANTED

### A.      BCBS-MA is Typical

The focus of Defendants' motion is that BCBS-MA, because of its decision to use AWP post Class Period, is not typical due to a break in BCBS-MA's causation proof that is not similar to the proof other Class members will offer.  Defendants are wrong.  BCBS-MA and each Class member will proceed on the theory that causation is established by proof of what prices would have been in a world without inflated AWPs.  Drs. Rosenthal and Hartman have modeled such a world and all Class members and the Class are aligned behind it.

A recent decision by Judge Woodlock in *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250 (D. Mass. 2005), supports the typicality of BCBS-MA.  In *Swack*, defendants claim that the plaintiff was not typical because she had relied upon non-public information and the class was proceeding based on a fraud on the market theory, which is predicated on public information. Judge Woodlock soundly rejected defendants' argument:

> Defendants take the position that the reliance by Swack on any non-public information – no matter its quantum and even if Swack relied primarily upon the integrity of the market – renders her categorically atypical under 23(a).  This thesis, however, proceeds from an excessively wooden view of how the litigation could or should be managed by the court and when the "unique defense" Swack faces ought to arise.
>
> As set forth above, the typicality requirement is satisfied when (1) the injuries of the proposed class representative arise from the "same events or course of conduct" as the injuries giving rise to the class claims, and (2) her claims and those of the class are based upon the same legal theory.  *Guckenberger*, 957 F. Supp. at 325.  There can be no doubt that Swack has as much, if not more, interest in establishing fraud-on-the-market – the legal theory upon which her claims and those of the remainder of the class are based – as do the other members of the proposed class. The claim by the Defendants that Swack fails on the typicality prong because she is subject to a unique defense of non-reliance presupposes that this defense would be raised and fully litigated in

- 17 -

conjunction with the resolution of the fraud-on-the-market issue. Surely, however, alternative procedures are available.

\*   \*   \*

Focused on this class-protective purpose – while also bearing in mind that if class certification is denied, it is exceedingly unlikely that individual class members will pursue their claims to recovery, given the economics of litigation in this field – I am unsatisfied with the sterile incantation by the Defendants that because Swack is subject to a unique defense she categorically cannot be the class representative. If the question is whether Swack's incentives align with those of absent class members, the answer clearly is yes. Her claims against the Defendants rise or fall on the same legal theory – i.e., fraud-on-the-market – as do those of the absent class members and, therefore, she has the same interest as they do in vindicating the theory. If, on the other hand, the concern is that the "unique defense" to which Swack is vulnerable will derail the litigation, consuming all of class counsel's time and energy and thereby injuring the interests of the absent class members, the bifurcation mechanism outlined above will provide an adequate safeguard.

The mere fact that a putative class representative – whose claims arise from the same course of events and are based upon the same legal theory as the other members of the proposed class – is subject to a unique defense does not render her atypical for purposes of 23(a) unless that defense threatens to become the focus of litigation thereby prejudicing the absent class members.

*Id.* at 262-64 (footnote omitted).

The same rationale applies here. BCBS-MA has aligned interests with the Class. All are proceeding based on the same proof of but for causation. BCBS-MA's decision to continue with AWP does not matter in this analysis because it is not relevant. And although Defendants try to make BCBS-MA's decision a focus of the case, the focus is on Defendants' conduct and its impact on Class member payments.

Finally, the fact Defendants seek judgment against BCBS-MA and Pipefitters based on continued use of AWP by both entities, demonstrates an alignment of interests. Both entities

rely on the same but for causation and same argument that their post Class Period conduct is not relevant.

**B.    Decertification in the Late Stages of Litigation Would Unfairly Prejudice Class Members and the Proper Alternative is Subclasses**

Courts have been hesitant to grant decertification in the later stages of litigation because of the prejudice it will cause to the class members.

Evaluation of class proceedings must occur in conjunction with evaluation of the best interests of the class members.  "[T]he Court must take into consideration that an eve-of-trial decertification could adversely and unfairly prejudice class members, who may be unable to protect their own interests." *Langley v. Coughlin*, 715 F. Supp. 522, 552 (S.D.N.Y. 1989).  *See also Woe v. Cuomo*, 729 F.2d 96 (2d Cir. 1984) (finding abuse of discretion where district court decertified the class after granting summary judgment in part); *Samuel v. University of Pittsburgh*, 538 F.2d 991, 996 (3d Cir. 1976) (remanding for an order recertifying the class after district court decertified post trial but prior to determining damages).

Courts have deemed decertification an extreme action and one that should be avoided if an alternative means is available.  Courts have suggested placing class members with potentially barred claims in separate subclasses or excluding them from the class altogether.  *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) (citing 29A Fed. Proc., L. Ed. 70:411 & n.69, Predominance of Common Issues (2002); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001)).  The court in *Payne* also noted that if after certification it is discovered "that there are material differences between named plaintiffs' claims and [class claims] this can be remedied either by narrowing the class definition or by adding additional named plaintiff(s) as class representatives." *Payne v. The Goodyear Tire & Rubber, Co.*, 216 F.R.D. 21, 26 (D. Mass. 2003).

In *Samuel v. University of Pittsburgh*, married women students raised equal protection challenges to a residency rule.  538 F.2d at 996.  The district court granted judgment to them but then decertified the class post-trial as to restitution, finding that each member would present an entirely different factual basis for her contention that she was due restitution.  *Id*.  The Third Circuit Court of Appeals failed to see any support for the District Court's conclusion that the class was unmanageable on the restitution issue and found that even if there were managerial difficulties, some investigation into the possible usefulness of subclasses should have been undertaken before decertification was ordered.  *Id*.  The Court of Appeals held that the district court's decertification was an abuse of discretion.

Subsequently in the Second Circuit, a class of civilly committed individuals raised constitutional challenges to the New York Mental Hygiene Law.  *Woe v. Cuomo*, 729 F.2d 96 (2d Cir. 1984).  The district court judge who initially certified the class found that the complexion of the action changed dramatically since origination and determined that the class was no longer viable.  *Id*. at 107.  Upon review, the Court of Appeals found that decertification of the class was an abuse of the district court's discretion.  The court was concerned about possible prejudice to members of the class unable to take steps to protect their rights precisely because they were members of a class.  *Id*.  The court stated, "Indeed, it is an extreme step to dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can easily be created."  *Id*.

In the Eastern District of Virginia, a class of purchasers brought an action against TranSouth Financial Corporation for conspiring in a "churning scheme" to defraud plaintiffs.  *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va. 2000).  Defendants argued that the case was not appropriate for class action treatment, in part because of the individualized nature

of the claims and affirmative defenses.  *Id*. at 557.  Defendants also argued that the named

plaintiffs were atypical and could not meet the requirements of the original class definition.  *Id*.

at 555-56.  The court agreed with the defendant, but concluded that alternatives to decertification

should be sought.  *Id*. at 556.  "If there are any doubts about adequate representation or potential

conflicts, they should be resolved in favor of upholding the class, subject to later reconsideration,

or subclasses."  *Id*. at 556-57 (quoting *Newberg on Class Actions* § 7.24 at 7-82 (3d ed. 1992)).

The *Chisolm* court found that decertification was the most extreme solution and that Rule 23

mandates a more measured response which "'requires the court to consider the employment [of

subclasses] where an apparently unmanageable class action could be converted to a manageable

one.'"  *Id*. at 557-58 (quoting *Pruitt v. Allied Chemical Corp.,* 85 F.R.D. 100, 111 (E.D. Va.

1980)).  The court proceeded to set forth acceptable subclasses.[32]

**C.     If the Court Finds BCBS-MA Not Typical the Answer is to Create Subclasses**

Rather than enter judgment, which is plainly not appropriate, if the Court believes

BCBS-MA is not typical, the remedy is to create subclasses.  The logical subclass for Class 3

would consist of BCBS-MA and any other Massachusetts TPP that had during the Class Period a

staff model HMO, a captive PBM or owned a hospital.  Defendants lump such payors together

on the theory that the ownership of "shared enterprises" creates an opportunity for knowledge of

the truth about AWPs.

The other subclass would consist of all Massachusetts Taft-Hartley Funds or self-insured

employers and consumers.  Defendants have failed to demonstrate any basis for concluding such

entities and consumers are not linked for the purposes of Rule 23.

---

[32] *See also In re NTL Sec. Litig.*, 2006 U.S. Dist Lexis 5346, at *26 (S.D.N.Y. 2006) (noting that a class representative may be typical even if later barred from recovering by a defense "particular to him that would not impact other class members").

**D.      Subclassing is Superior to No Class**

Assuming that BCBS-MA was atypical, which is not the case, decertification is still not a superior way of proceeding.  It would leave the Taft-Hartley Funds and Class 3 consumers without a remedy, none can litigate against the might and wealth of these Defendants.  And, of course, decertification would lead to the large TPPs filing their own cases and we would start this process over.  This might be a bonanza for the squadrons of defense big firm lawyers populating the courtroom, but it is not a superior result for the Class or for judicial economy.

## III.      CONCLUSION

Decertification is not warranted.  The Class remains aligned.

DATED:  January 19, 2007

By____/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

001534-16  149010 V1

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Donald E. Haviland, Jr.
The Haviland Law Firm
740 S. Third Street, Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  149010 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO THE COURT'S QUESTIONS REGARDING THE APPROPRIATENESS OF MAINTAINING CLASS 3** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 19, 2007, a copy to LexisNexis File & Serve for posting and notification to all parties.

By **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

001534-16  149010 V1