## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |
| **TRIAL OF CLASS 2 AND CLASS 3 CLAIMS** | |

## <u>PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT</u>

# TABLE OF CONTENTS

**PAGE**

I.    FINDINGS OF FACT RELATED TO EACH CLASS PLAINTIFF.................................1

II.   PARTICULAR FINDINGS OF FACT AGAINST EACH TRACK 1
      DEFENDANT.................................................................................................................5

      A.    AstraZeneca Defendants ......................................................................................5

            1.    AstraZeneca knew that AWP was the reimbursement
                  benchmark used by Medicare Part B and many private payors..................6

            2.    AstraZeneca caused AWPs to be published for its Subject Drugs .............7

                  a.    AstraZeneca set the published AWP for Zoladex prior
                        to 2002 ...........................................................................................7

                  b.    AstraZeneca communicated its AWP to the Publishers
                        for publication ................................................................................8

            3.    AstraZeneca's AWPs for its Subject Drugs were false in that
                  they did not include relevant discounts nor reflect an average,
                  and AstraZeneca manipulated its AWPs and spreads..................................9

                  a.    AstraZeneca knew that its AWP was a fictitious number...............9

                  b.    AstraZeneca refrained from making AWP a meaningful
                        number ..........................................................................................10

            4.    AstraZeneca actively marketed spreads and "Return to Practice"
                  to physicians...........................................................................................11

                  a.    AstraZeneca recognized that spread was a driver in the
                        oncology market...........................................................................11

                  b.    AstraZeneca manipulated its AWPs in order to create
                        spreads...........................................................................................12

                  c.    AstraZeneca's strategic, operational, and marketing plans
                        and sales training materials focused on communicating to
                        physicians the Return to Practice on Zoladex................................15

                  d.    AstraZeneca's sales representatives marketed the spread
                        and Return To Practice to physicians.............................................16

e.    AstraZeneca used physician buy groups – and encouraged physicians to join them – in order to increase Return To Practice .......................................................17

f.    AstraZeneca used third parties to maximize reimbursement for Zoladex ...........................................................18

g.    AstraZeneca concealed its selling based on Return To Practice .....................................................................19

h.    AstraZeneca's MAP program did not tell TPPs about AZ's discounts to physicians or its spread marketing program .............20

i.    The Zoladex spreads increased during the Class Period...............21

j.    Damages.......................................................................22

k.    AstraZeneca could have published a truthful AWP....................24

l.    AstraZeneca did not disclose its RTP strategy .............................25

B.    The BMS Defendants.................................................................25

1.    BMS Subject Drugs ...........................................................27

2.    BMS understood that AWP was the reimbursement benchmark used by Medicare Part B and many private payors...................28

3.    BMS caused AWPs to be published for its Subject Drugs ........................29

a.    BMS controlled the AWPs for its Subject Drugs by reporting WLPs with full knowledge of the mark-up factors that the Publishers would use to create the AWPs............29

b.    BMS republished the AWPs for its Subject Drugs.......................31

c.    When BMS drugs faced generic competition, reimbursements were made at or near the BMS AWP .................32

4.    BMS's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average ...............................33

a.    BMS knew that its Subject Drugs were sold at confidential prices well below AWP ..............................................33

b.    BMS created spreads on its Subject Drugs, and those spreads increased substantially over time............................36

|   |   | c. | BMS recognized the importance that oncologists placed on reimbursement and spreads | 40 |

|   | 5. | BMS marketed spreads | 42 |
|   | 6. | Class Damages | 45 |

| C. | J&J | | 48 |

|   | 1. | J&J knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors | 48 |
|   | 2. | J&J caused AWPs to be published for its Subject Drugs – for Remicade it departed from industry norms and set AWP at 30% over WAC | 49 |
|   | 3. | J&J's AWPs for its Subject Drugs were false | 51 |

|   |   | a. | J&J did not include discounts in its reported AWP and did not report an actual average | 51 |
|   |   | b. | J&J manipulated its pricing to create spreads | 53 |
|   |   | c. | J&J was fearful of the impact of the government learning of its spreads | 54 |
|   |   | d. | J&J marketed the spread on Remicade | 56 |
|   |   | e. | J&J marketed the spread on Procrit | 58 |
|   |   | f. | J&J hid the true price of its products | 63 |
|   |   | g. | Government knowledge of Remicade and Procrit's true price | 65 |
|   |   | h. | OBI increased its price to eliminate the BBA price reduction | 67 |

|   | 4. | Damages | 67 |

| D. | The Schering-Plough Group | | 72 |

|   | 1. | Schering-Plough and Warrick knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors | 74 |
|   | 2. | The Schering-Plough Group caused AWPs to be published for its Subject Drugs | 74 |

3. The Schering-Plough Group's AWPs for its Subject Drugs did not include relevant discounts nor reflect an average, and the Schering-Plough Group manipulated its AWPs and spreads....................76

  a. The Schering-Plough Group knew that its Subject Drugs were sold at prices well below AWP ...............................................76

  b. Recognizing the importance of spreads, the Schering-Plough Group created spreads through confidential contract pricing, rebates, and other forms of discounting.............77

   (1) The importance of reimbursement .....................................77

   (2) Initial spreads and typical increases to the spreads............80

   (3) Using nominal pricing for Schering-Plough and Warrick drugs as a means of avoiding Medicaid rebates created enormous spreads.....................................84

   (4) Use the Integrated Therapeutics Group .............................87

4. Individual brand and price histories reveal the Schering-Plough Group's manipulation of spreads ................................................88

  a. Albuterol sulfate (generic) ..........................................................88

  b. Intron-A.........................................................................................89

  c. Proventil (branded albuterol) .....................................................89

  d. Temodar ........................................................................................90

5. Damages on Schering/Warrick Drugs ......................................90

6. Plaintiffs' Purchases of Schering Products .................................92

7. Multi-Source Issues .......................................................................93

III. CONCLUSION.....................................................................................95

## I.      FINDINGS OF FACT RELATED TO EACH CLASS PLAINTIFF

1.      Plaintiff Sheet Metal Workers National Health Fund ("Sheet Metal") provides

health and welfare coverage for sheet metal workers throughout the United States.  Sheet Metal

offers a Supplemental Medicare Wraparound Plus ("SMW+") program for retirees.  In this

program, its payments are directly tied to what Medicare pays, and it therefore has no control

over the cost of benefits.  Therefore, though the retirees enrolled in the SMW+ Plan are usually

on fixed incomes, in reality they have no power over the cost of benefits.  For example, if drug

costs increase and are paid by Medicare, Sheet Metal pays its portion.  This means the increased

cost may be passed on to the retiree who will be required to pay a higher amount to maintain

SMW+ coverage.[1]

2.      Sheet Metal reimbursed for Defendants' drugs at issue in this case, and

reimbursed Massachusetts residents for Defendants' drugs.[2]

3.      The Fund was found to be an adequate class representative for Class 2 in this

Court's January 30, 2006 Consolidated Order Re: Motion for Class Certification relating to

Track I Defendants.

4.      Plaintiff Blue Cross/Blue Shield of Massachusetts ("BCBS-MA") provides health

coverage for tens of thousands of lives in the State of Massachusetts.

5.      During the Class Period, BCBS-MA paid for the drugs at issue in this phase of the

case both in the Medicare Part B context and the non-Medicare context.[3]

6.      BCBS-MA reimburses physicians as follows.  BCBS-MA has historically had

several types of contractual arrangements with physicians and physician groups, including fee-

---

[1] Revised Trial Affidavit of Glenn Randle ("Randle Aff."), ¶¶ 2-4.

[2] Ex. 4012.

[3] Ex. 4012.

001534-16  147530 V1

for-service arrangements, capitated arrangements and risk sharing arrangements. Fee-for-service arrangements have always been the most prominent contractual arrangement between physicians and physician groups and BCBS-MA. This is especially true from the late 1990's to today, as BCBS-MA entered into fewer and fewer risk-sharing arrangements such as capitated contracts with physicians and physician groups.[4]

7.      In 1995, BCBS-MA began using AWP as a basis for reimbursement to physicians for physician-administered drugs. From 1995 to 1998, BCBS-MA used 100% of AWP as the basis for establishing the reimbursement amounts in its fee schedules related to physician reimbursement for physician-administered drugs. In 1998, BCBS-MA moved to using 95% of AWP as the basis for the reimbursement amounts set forth in these fee schedules.[5]

8.      Until 2005, BCBS-MA obtained the AWP it used for these fee schedules from Medicare. Fee updates would be retrieved from Medicare/NHIC websites or the Medicare B Resource guide.

9.      The fee schedules maintained by BCBS-MA, including the four fee schedules related to reimbursement for physician-administered drugs, are referenced in contracts with physicians or physician groups.[6]

10.     BCBS-MA maintains electronic claims data in its TPS claim system. This system records a multitude of variables related to each claim paid by BCBS-MA, including claims for payment for physician-administered drugs administered to BCBS-MA members and participants in plans for which BCBS-MA is the fund administrator. It is possible, using the information recorded in the claims data, to determine which claims were paid based upon the fee schedules

---

[4] Trial Tr. Day 2 at 186-191 (Mulrey).

[5] *Id.*

[6] Trial Affidavit of Michael T. Mulrey ("Mulrey Aff."), ¶ 14.

referenced above and which may have been paid under a different arrangement, such as a capitated arrangement, with the physician or physician group.  On the TPS claim segment HM screen, the Claim Payment element would show a value of "05", which indicates the claim was a capitated claim.[7]

11.     BCBS-MA has made payments for drugs manufactured by each Defendant in both Class 2 and 3 for single source drugs and in the case of multi-source drugs has purchased a drug with a J-code that matches a J-code of a drug manufactured by a Defendant.[8]

12.     Pipefitters Local 537 Trust Fund ("Pipefitters") is also a Plaintiff and class representative.

13.     All of the Pipefitter's operations are conducted from its location at 35 Travis Street, Unit One, Allston, Massachusetts.  Pipefitters operates out of a small space of approximately 1,300 square feet.  The staff of Pipefitters is likewise very small, consisting of five employees in total.  The other employees consist of an office manager, one employee who deals primarily with qualified domestic relations orders, and three other employees who each only have individual responsibility for issues related either to pension benefits, annuity benefits, or the health and welfare benefits provided to union members.[9]

14.     The Pipefitters Fund is a Taft-Hartley Fund, governed by a Board of Trustees consisting of three trustees appointed by management and three labor trustees.  In addition to providing a number of other benefits, the Pipefitters Fund provides major medical benefits, including prescription drug benefits, to all union members and their eligible dependents.[10]

---

[7] Mulrey Aff., ¶ 15.

[8] Ex. 4012; Mulrey Aff., ¶¶ 20-22

[9] Trial Affidavit of Charles Hannaford ("Hannaford Aff."), ¶ 6,

[10] *Id*. at ¶ 7.

15.     Currently there are approximately 4,600 individuals, both union members and their dependents, who receive major medical benefits, including prescription drug benefits, through the Pipefitters Fund.[11]

16.     Members of the Pipefitters Fund are tradesmen and tradeswomen who work on buildings systems, including but not limited to, heating ventilation and air conditioning ("HVAC") systems.  Members of the union and of the Pipefitters Fund generally work and live in Eastern Massachusetts in an area bounded north by Salem, Massachusetts, West by Interstate 495 and South by Route 128 in Massachusetts.[12]

17.     The Pipefitters Fund finances medical and other benefits for its members through employer contributions negotiated by the Union via the collective bargaining process.  The Pipefitters Fund is self insured.  It is fully responsible and at-risk for all payments made for medical benefits, including pharmaceutical products, administered to its eligible members, within the parameters of the coverage provided by the Pipefitters Fund and outlined for its members in the summary of benefits.  In general, the Pipefitters Fund covers 90% of all costs associated with treatment of its members, including the cost of pharmaceuticals.[13]

18.     Since approximately 1979, the Pipefitters Fund has contracted with BCBS-MA to administer the major medical benefit, including coverage for all prescription benefits, provided to members.  The financial arrangement between the Pipefitters Fund and BCBS-MA is "cost plus" meaning that BCBS-MA charges the Pipefitters Fund whatever it pays for the particular

---

[11] *Id*. at ¶ 8.

[12] *Id*. at ¶ 9.

[13] *Id*. at ¶ 10.

service or pharmaceutical plus an administrative fee.  In this way, the Pipefitters Fund is fully responsible for all costs associated with benefits provided to its members.[14]

19.     Pipefitters has paid for the following drugs manufactured by the following Defendants:  AstraZeneca, BMS and J&J, or in the case of multi-source drugs has purchased a drug with a J-code matching that of a drug manufactured by a Defendant.

20.     Each of the class representatives have testified that they were unaware of Defendants' marketing of the spread.[15]  Even Edward Curran, a former BCBS-MA  employee called as a witness by Defendants was unaware of Defendants' spread marketing.[16]

21.     During the trial Defendants introduced reports published by the GAO and Office of the Inspector General ("OIG") raising concerns about the issue of the difference between acquisition cost and AWP.  No witness from any plaintiff testified that he or she read or saw these reports.  No copies of these reports were introduced at trial that come from the files of any plaintiff or class member.

## II.     PARTICULAR FINDINGS OF FACT AGAINST EACH TRACK 1 DEFENDANT

### A.     AstraZeneca Defendants

22.     Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania.  Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

---

[14] *Id*. at ¶ 11.

[15] *See*, *e.g*., Trial Affidavit of Deborah DeVaux ("DeVaux Aff.") (BCBS-MA), ¶¶ 16-17 (not aware discounts could exceed 30%); Revised Trial Affidavit of Sharon Faulkner ("Faulkner Aff.") (Sheet Metal), ¶¶ 6-14 (thought AWP was an actual average and unaware of examples of AstraZeneca and BMS conduct); Hannaford Aff., ¶ 13 (believed AWP was an average) and ¶ 16 (not aware of spread marketing); Mulrey Aff. (BCBS-MA), ¶ 18 (believed AWP was an average).

[16] Trial Tr. Day 4 at 31-36 (Curran).

23.     Defendant AstraZeneca U.S. is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

24.     Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware.  AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

25.     Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S. are collectively referred to as "AstraZeneca" or "AZ".

26.     Plaintiff BCBS-MA purchased Zoladex in Class 2 and 3 for each year of the Class Period.  Such purchases were based on AWP.[17]  Sheet Metal purchased Zoladex[18] based on AWP as did Pipefitters.[19]

### 1.     AstraZeneca knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors

27.     AstraZeneca has acknowledged that AWP was the reimbursement mechanism for Part B Drugs.[20]

28.     Even at the highest levels of the Company, AstraZeneca's executives knew and expected that Part B drugs, including Zoladex, would be billed to and paid for by the government, insurers and individual patients based on AWP.[21]

---

[17] Ex. 4012; Trial Tr. Day 17 at 53-60 (Hartman); Trial Tr. Day 2 at 190-94 (Mulrey).

[18] Ex. 4012; Trial Tr. Day 17 at 53-60 (Hartman).

[19] Ex. 4012; Trial Tr. Day 17 at 53-60 (Hartman); Trial Tr. Day 1 at 163, 177-78 (Hannaford).

[20] *See* Trial Tr. Day 5 at 49 (Buckanavage) ("Q:  Well, you understood that the government reimbursed in the Medicare Part B formula based on AWP, correct?  A:  Yes, that's correct."); Brennan Dep. at 15:10-14 (Current CEO of AZ former President of AstraZeneca L.P. and now CEO of AstraZeneca PLC:  "Q. All right.  So now it is your understanding, right, that AWP was the benchmark for reimbursement under Medicare Part B for Zoladex, correct?  A. That's right, yes.").

29.     AstraZeneca also knew that AWP was the benchmark for reimbursement in the private-payor context.[22]

### 2.     AstraZeneca caused AWPs to be published for its Subject Drugs

### a.     AstraZeneca set the published AWP for Zoladex prior to 2002

30.     AstraZeneca acknowledges that, before 2002, and even later, pharmaceutical manufacturers set the AWPs for their respective drugs.[23]  As AZ's Director of Pricing Strategy likewise explained:  "[u]p until the last year or so manufacturers basically decided what the AWP should be – in other words they recommended a spread over the WAC (catalog) price which results in the Average Wholesale price (AWP)."[24]

31.     AstraZeneca set the published AWP for Zoladex prior to 2002.[25]

---

[21] Trial Tr. Day 5 at 13 (Buckanavage) ("THE COURT:  Excuse me.  Did you understand that Medicare beneficiaries paid 20 percent of AWP?  THE WITNESS:  Yes.  They paid 20 percent out of pocket.  THE COURT: So you understood that every time you raised AWP, they had to pay 20 percent of the increase?  THE WITNESS: Yes.  Whenever we took a price increase, it would raise the copay and also raise the reimbursement.") and 15:5-16 (admitting same); Ex. 143 at AZ0044010 (presentation recommending price increase for Zoladex 10.8 mg depot listing only downside as "slightly higher co-pay for patient").

[22] Direct Testimony Decl. of Julie-Ann G. Tracy, ¶ 6 ("I have always understood the term Average Wholesale Price or 'AWP' to be a reference price that is used by the government and private insurers to calculate reimbursement for pharmaceuticals.").  Iacono Dep. I at 126:21-127:16 (testifying that it is his "general understanding" that AWP was the benchmark for reimbursement from third-party payors).

[23] Trial Tr. Day 5 at 14 (Buckanavage) ("Q:  And so you felt that AstraZeneca had the ability to set its own AWP, correct?  A:  At that time we submitted those prices to the pricing services."), and at 34:3-9 ("THE WITNESS:  At that time we reported both to the pricing services.  THE COURT:  You reported - THE WITNESS: Both WAC and AWP.  THE COURT:  So you decided what AWP was, not the publication?  THE WITNESS:  At that time, that's correct.").  *See also* Ex. 131 at AZ0419345 (Document entitled Medicare Review stating that "To date, Medicare has not influenced the AWP of any medication that qualifies for reimbursement.  Companies have the latitude to set AWP as they wish.").

[24] Ex. 17 (Nov. 30, 2001 John Freeberry email, AZ0465663-65).

[25] Ex. 19 at AZ0021763 (Jan. 23, 1996 memorandum stating:  "[t]he Zoladex marketing team sought to derive a pricing strategy which would allow for: 1) an improved competitive position relative to Return To Practice, and 2) realization of a 4% increase in net revenue. In order to achieve both of the above stated objectives it is recommended that a 7% price increase be instituted, raising both the AWP and AWC in parallel."); Freeberry Dep. I at 109:2-11 (testifying that, prior to the time that WAC became the only price term reflected on the pricing spreadsheets sent to pricing services, AZ also included a "suggested AWP price").

- 7 -

32.     AstraZeneca's marketing teams, product managers, and pricing strategy managers made recommendations to management regarding whether, when, and how much the AWP for its drugs, including Zoladex, should be raised.[26]

33.     Approvals of new or revised AWPs came from top AstraZeneca employees.[27]

**b.      AstraZeneca communicated its AWP to the Publishers for publication**

34.     Once a new or revised AWP was approved, AstraZeneca would inform the Publishers.[28]

35.     AstraZeneca's communications to the Publishers were, as a general practice, made in written form.[29]

36.     After 2001, AstraZeneca used the AWPs from First DataBank and communicated those AWPs as their own to Red Book.[30]  AstraZeneca knew that the AWPs reported by Red Book were the AWPs that Medicare Part B carriers used.[31]  The *Red Book* never undertook an independent verification of the actual AWP.  *In re Lupron® Mktg. & Sales Practices Litig.*, 245

---

[26] *See, e.g.*, Ex. 45 (former Product Manager recommending AWP increase); Ex. 78 (Oncology Product Manager recommending that AWP be increased).  *See also* Direct Testimony Decl. of Stephen P. Buckanavage, ¶¶ 10-14 (Market Development manager describing pricing scenarios that included raising AWP).

[27] *See* Direct Testimony Decl. of Robert C. Black, ¶¶ 13-14 (Former President of Zeneca, Inc. testifying that "[p]ricing recommendations generally originated from the Product Manager, and were elevated through the Marketing Team.  From 1991 until my retirement from the Company, I had the final authority to approve price increases.").

[28] Trial Tr. Day 5 at 17 (Buckanavage) (Q:  "Now you understood then that your AWP price would be reported by AstraZeneca to the Red Book, correct?  A:  Yes.").

[29] *See, e.g.*, Ex. 29, at AZ0036585 (Jan. 29, 1996 Sample Letter from Paula Jordan to advise Publishers of price increases).

[30] *See, e.g.*, Ex. 167 (2002 *Pricing News* publication explaining that "FirstDataBank, with input from wholesalers, sets the AWP for each product.  Redbook on the other hand does not set AWP prices but reports the manufacturers [*sic*] suggested AWP.").

[31] *See* Ex. 14 at AZ0237145 ("It is imperative that we get our price increase into the January Redbook, because the Regional Medicare Carriers typically will change their reimbursement for products based on the January and July Redbooks."); Ex. 133 at AZ0080410 (same); Ex. 78 at AZ0013235 (same).

F. Supp. 2d 280, 285 n.7 (D. Mass. 2003); *In re Lupron® Mktg. & Sales Practices Litig.*, 295 F.

Supp. 2d 148, 159 (D. Mass. 2003).

37.     After 2001, AstraZeneca set the WAC with knowledge that First DataBank would

publish AstraZeneca's AWP at 125% of WAC.[32]

38.     When AZ raised WAC, AZ directed the Publishers to raise the AWP as well.

> We raise WAC prices for – you know, as inflation is up, we raise
> our prices occasionally, as most companies do.  And up until a
> couple of years ago, we would send communications out to First
> Databank – we see our WAC price went from a $1 to 1.05, we
> would use their AWP price and say that that also went up to a
> dollar.
>
> So we would provide the new AWP price for them.  We calculate
> it for them, essentially, based on whatever markup they were
> applying for us.[33]

39.     AstraZeneca also utilized the services of third-party consultants to communicate

AWPs on its behalf.[34]

**3.      AstraZeneca's AWPs for its Subject Drugs were false in that they did not
include relevant discounts nor reflect an average, and AstraZeneca
manipulated its AWPs and spreads**

     **a.      AstraZeneca knew that its AWP was a fictitious number**

40.     AstraZeneca's AWP has not reflected a true average wholesale price since at least

1994, when AstraZeneca's current Director of Pricing Strategy, John Freeberry, was asked by the

Company to research whether to change the spread on Company drugs from 25 to 20 percent.[35]

---

[32] *See* Ex. 167 (describing First DataBank's 2002 action raising WAC-AWP mark-up from 20% to 25%).

[33] Freeberry Dep. I at 25:5-17.

[34] *See* Ex. 29 at AZ0036585 (Jan. 29, 1996 model letter from Paula Jordan to be used to notify industry compendia of AZ price increases); Ware Dep. at 84:17-85:8 (S&FA employee regularly sent letters communicating the AWP for Zoladex to Publishers).

[35] *See generally* Freeberry Dep. I at 167-76.

During the course of that research, Freeberry realized that AWP was "fictitious."[36]  He reported

this up the chain of command.[37]  But despite his discovery, neither he nor AstraZeneca did

anything to make the published AWP accurate.[38]

41.     AZ has acknowledged that AWP is not tied to what wholesalers actually pay.[39]

42.     AZ has also acknowledged that AWP did not reflect discounts given to

physicians.[40]

43.     AZ knew that AWP was an "artificial number."[41]

44.     At trial, Steve Buckanavage, former Market Development manager, testified that

when, for example, he recommended that AWP be increased by 8.2%  (in Ex. 14) he just made

that number up "[a]s part of the evaluating scenarios."[42]

       **b.     AstraZeneca refrained from making AWP a meaningful number**

45.     AstraZeneca did not take any steps to make AWP a meaningful number.  This

was to preserve and expand its market share.[43]

46.     AstraZeneca took affirmative steps to prevent Medicare from making

reimbursements based on actual net sales prices and was pleased when it succeeded in

---

[36] Freeberry Dep. I at 168:6-20.

[37] *Id.* at 172:19-173:8.

[38] *Id.* at 173:18-174:11.

[39] *See* Ex. 167 (2002 AZ *Pricing News* publication explaining that "[o]bviously the AWP is currently not that actual average price that wholesalers charge.").

[40] Trial Tr. Day 5 at 50 (Buckanavage) ("Q:  All right.  And the AWP that was out there in the marketplace and reported to the government did not include taking into account the discounts that you were offering doctors, correct? A:  It never would."); Trial Tr. Day 11 at 31 (Milbauer) ("Q:  And that formula [AWP] did not include the discounts and other incentives that were being provided to physicians, correct?  A:  That's correct.").

[41] *See* Ex. 41.

[42] Trial Tr. Day 5 at 14:5-8 (Buckanavage).

[43] *See* Freeberry Dep. I at 175:11-20 and 176:3-6 ("So if we set our AWP at 2 percent, obviously they would lose money, and they wouldn't use our products.").

maintaining the AWP system for doctors so that they could realize a greater Return To Practice.[44]

47.     When Congress enacted the Balanced Budget Act in 1997 and thereafter reduced the Medicare Part B reimbursement rate to 95% of AWP, AstraZeneca implemented a price increase for Zoladex that compensated the physician for that lost 5%, effectively negating the effect of the statute for Medicare beneficiaries and members of Class 2.[45]

### 4.     AstraZeneca actively marketed spreads and "Return to Practice" to physicians

#### a.     AstraZeneca recognized that spread was a driver in the oncology market

48.     AstraZeneca knew that reimbursement was key to the Zoladex marketing strategy.[46]

---

[44] Ware Dep. at 119:5-20, 120:4-20, and 121:5-9 ("As I remember the specific issue now with Doctor Steffan (a Medicare reimbursement officer) wanting to – or changing the basis of reimbursement from AWP to invoice costs, based on some information he had obtained.  Q. And what was S&FA – or – sorry – well, Parexel's response to that?  A. We wanted to correct that situation.  Q. Why?  A. It could result in incorrect payment of claims across – across the state.  Q. And what do you mean by "incorrect payment of claims"?  People – doctors would be paid too much money?  A. Doctors would not be paid according to average whole price, which was the basis of reimbursement.  Q. All right.  So – okay.  And why was it important that doctors be paid on the basis of average wholesale price?  What was your understanding of why that was important?  A. Mine was just in keeping with accepted practice, as much as I understood.  Q. Did you understand that doctors would make more money if they were reimbursed based on average wholesale price, as opposed to estimated acquisition costs?  A. Yes, I understood that.").  *See also* Ex. 46 (letter from President of S&FA to AZ Oncology Product Manager reporting that "[t]he Office of Budget and Management has tied the hands of the Medical Directors, preventing them from surveying for prices or using invoices on which to base their payments.  This circumstance paves the way for us to accomplish the goals that we originally set for our contract. . . . We have a communication in one of the Medicare bulletins which I think is going to be helpful in turning the other states around.  It very succinctly states that communication from HCFA regarding using surveys and invoices and I think it will move others to average wholesale price (AWP)"); Ex. 48 (communicating to AZ the "great news" of accomplishing same).

[45] Ex. 146 ("The 1998 Medicare legislation effectively imposes a 5 percent penalty on physicians purchasing LhRh agonists through the 95 percent of AWP reimbursement scheme.  This increase compensates the customer for this 5 percent plus provides an additional improvement, an additional improvement in return to practice.").

[46] *See* Direct Testimony Decl. of Robert C. Black, ¶ 18 (former President of Zeneca explaining that "[w]e realized that the Medicare Part B reimbursement system, which reimbursed on the basis of AWP instead of acquisition cost, gave doctors an incentive to prefer TAP's higher price rather than Zeneca's lower cost.  I recall learning that physicians were benefiting from a greater 'spread' between Lupron's AWP and acquisition cost and, consequently, some would not consider using Zoladex in their practices.").  *See also* Ex. 118 (Jan. 12, 1995 memo to Marketing Director stating that "[t]his [physician] profit margin is a reflection of the reimbursement policy of

- 11 -

49.     From 1990 to 1993 AstraZeneca sold Zoladex directly to physicians at WAC.[47] Thus, contrary to certain direct testimony from defendants or witnesses they called, there was a predictable relationship between AWP and WAC.  After that time, AstraZeneca, rarely sold Zoladex at WAC and instead routinely gave physicians large discounts.[48]

50.     During these years AstraZeneca went head to head with TAP's in an effort to capture market share from Lupron.  TAP and AstraZeneca exchanged letters complaining of each other's illegal marketing practices including the provision of Free Goods and the offering of the spread.[49]  AstraZeneca threatened to report TAP to the authorities, but never did so.[50]  Instead, AstraZeneca joined the RTP competition.

51.     Moreover, AstraZeneca knew that physician profit was a driver of the Zoladex market.[51]

**b.     AstraZeneca manipulated its AWPs in order to create spreads**

52.     During the period spanning approximately from 1991 to 1993, the Promotions Department for Zoladex was governed by a series of one-year promotional and pricing plans

---

Medicare – 80% of AWP is reimbursed by Medicare, the remaining 20% is collected as a patient co-pay.  It has become increasingly apparent that the profitability of the LHRH agonists is the primary driving force behind the popularity of this class of agent and their use for the treatment of prostate cancer."); Ex. 119 (same).

[47] AstraZeneca Proposed Findings of Fact, ¶ 18.

[48] *See* Ex. 4006 at AZ0427153 (1999 Operational Plan for the Prostate Cancer Portfolio that says, for Zoladex, ">75% of customers are receiving 50% discount").

[49] Exs. 57, 4003, 4004.

[50] Ex. 4003 at 0588.

[51] Trial Tr. Day 5 at 8 (Buckanavage) ("Q:  Now, at some point, based on what you learned from your sales rep and the competitive intelligence that you gathered, did you form the belief that with respect to this class of drugs, what was motivating a choice by doctors was economics?  A:  Yes.  Q:  In other words, how much money they could put in their pocket from administering this drug?  A:  Yes, how much practice revenue they could generate.");  Trial Tr. Day 11 at 15 (Milbauer) ("We began to get feedback from our sales representatives who were saying that the fact that the government was reimbursing Medicare, reimbursing at AWP and not at the acquisition cost, that difference made a difference.");  Brennan Dep. at 20:22-21:12, 50:15-51:17 (Return To Practice was of concern to AstraZeneca and one of the bases on which AstraZeneca sold Zoladex to doctors).

- 12 -

focused on creating and maintaining a low direct-to-physician price along with a competitive spread between AWP and the price paid by physicians.[52]

53.     During this period, AZ's marketing team adopted the promotional plans and thus centered its marketing activity on promoting a lower AWP and co-pay for patients as compared to Lupron, along with a competitive spread between AWP and the price paid by physicians.[53]

54.     AstraZeneca later learned that doctors wanted a more expensive product so they could make a bigger spread between AWP and acquisition costs, and therefore, more profits.[54]

55.     Although AstraZeneca complained internally of TAP's sales practices, it did not report TAP to the authorities.  Instead, AstraZeneca decided to try to beat them by joining them, selling Zoladex based on a higher Return to Practice for doctors.[55]

56.     AstraZeneca realized that Zoladex would acquire more market share and be more profitable if AZ began manipulating spreads to a greater degree than it had been.[56]  As one memorandum explained:

---

[52] Direct Testimony Decl. of Robert C. Black, ¶ 17 ("Zoladex was launched at a lower price than Lupron in order to obtain market share.  Indeed, we used marketing materials that stated that Zoladex was more economical than Lupron, had a lower patient co-pay, and was cheaper for the system overall.").

[53] Ex. 67 at AZ0031261 (comparing the cost to the physician and co-pay of the patient of Zoladex versus Lupron).  *See also* Direct Testimony Decl. of Robert C. Black, ¶ 17.

[54] Direct Testimony Decl. of Robert C. Black, ¶ 18 (former President of Zeneca describing same).  Zeneca responded with a volume discount plan that enabled physicians to buy Zoladex for less while being reimbursed for the full AWP-based rate of reimbursement.  Trial Tr. Day 11 at 16 (Milbauer) ("we decided that we needed to create a differential between our AWP, if you will, and what the cost was going to be to the urologists.  And so we began to discount our product . . .").  *See also* Trial Tr. Day 5 at 36 (Buckanavage) (testifying that Zoladex's original low cost had not been a competitive advantage because physicians were motivated by Return to Practice).

[55] *See* Trial Tr. Day 5 at 51 (Buckanavage) ("Q:  And so you joined the same game that Lupron  was playing; namely, marketing the drug based on return to practice?  A:  We offered the volume discounts to level the playing field, yes.").

[56] *See* Direct Testimony Decl. of Robert C. Black, ¶ 24 ("If we had not discounted Zoladex, sales and market share growth would have stagnated."); Trial Tr. Day 5 at 19 (Buckanavage) ("Q:  And on each occasion there had been a volume discount, you'd seen sales rise, correct?  A:  Yes.") and at 36:24-25 ("Until we were able to level the playing field, we weren't able to grow market share.").

- 13 -

> ZENECA has learned that in order to compete in [the] market dominated by Medicare, there needs to be a compelling argument based on "total Return To Practice."  It is on this basis that many Urologists decide which LhRh agonist to use.***Return To Practice is derived by adding the difference between Medicare reimbursement [based on AWP] and acquisition price, ... patient co-pay which equals the 20% deductible that Medicare does not pay, and the benefit of [certain volume discounts].[57]

57.     Return To Practice was specifically considered by AstraZeneca when contemplating future price increases for Zoladex.  For example, on November 3, 1995, AZ's Market Strategy & Contract Operations and the Zoladex Marketing Team recommended an 8.25% increase in AWP (and 4.2% increase in AWC) to create a 30% spread, "which leverages reimbursement" and "deliver[s] a per-unit Return To Practice in excess of what Lupron's current scheme can deliver."[58]  The memorandum further recognized that AstraZeneca needed a compelling spread:  "[w]ithout rehashing the entire economic scenario, ZENECA has learned that in order to compete in market dominated by Medicare, there needs to be a compelling argument based on "total Return To Practice.""[59]

58.     AstraZeneca revised this November 1996 strategy in order to increase net revenue by increasing Return To Practice.[60]

59.     In 1996, AstraZeneca raised the AWP and also increased the discounts available to purchasers of Zoladex, thereby increasing the spread:

---

[57] Ex. 14 (Nov. 3, 1995 memorandum from Market Strategy and Contract Operations and the Zoladex Marketing Team, AZ0237142-163, at AZ0237143).

[58] Ex. 14 (Nov. 3, 1995 memorandum from Market Strategy & Contract Operations and the Zoladex Marketing Team, AZ0237142-163).

[59] Ex. 14, at AZ0237143.

[60] See Ex. 19 (Jan. 23, 1996 memorandum from Keith Patterson to Chris Iacono Re: Zoladex Pricing Strategy, AZ0021762-65 ("[T]he Zoladex marketing team sought to derive a pricing strategy which would allow for: 1) an improved competitive position relative to Return To Practice, and 2) realization of a 4% increase in net revenue.  In order to achieve both of the above stated objectives it is recommended that a 7% price increase be instituted, raising both the AWP and AWC in parallel.")).

- 14 -

> In each of the last two years a plateau in product performance was overcome and sales were stimulated by the implementation of a discounting strategy.  The basic objective behind these pricing scenarios is to provide an economically attractive package to the direct purchasing physician without eroding our realized revenues.[61]

60.     The team also discussed a ready-made alibi to "justify" this change by stating "[i]n the event that our increase is called to task, the move is easily justified on the basis of: 1) increased manufacturing costs, 2) no increase in realized revenue per unit over the last two years...."[62]

        c.       **AstraZeneca's strategic, operational, and marketing plans and sales training materials focused on communicating to physicians the Return to Practice on Zoladex**

61.     AstraZeneca's Strategic, Operational, and Marketing Plans which, beginning in 1993, all contained Return to Practice as a marketing tool, were reviewed and approved by the highest level of management, including the President of AstraZeneca.[63]

62.     Operating from those plans, sales management and marketing managers communicated to the sales force the current AWPs for Zoladex with intent that the sales representatives would pass this information on to physician customers who bought Zoladex because the AWPs affected the physicians' Return To Practice.  Christopher Bowman, AZ Oncology Sales Representative testified that:

> Q. During that time period, did you ever receive any instruction from Wilmington regarding how you should communicate with doctors about the pricing of Zoladex?

                               \* \* \*

---

[61] Ex. 19 (Jan. 23, 1996, Memorandum from Keith Patterson to Chris Iacono Re: Zoladex Pricing Strategy, AZ0021762-65, at AZ0021762).

[62] *Id.*

[63] Brennan Dep. at 63:2-4.

THE WITNESS:  Only that we needed to know what the average wholesale price was versus the average acquisition cost.  We needed to know the differences between that.[64]

### d.   AstraZeneca's sales representatives marketed the spread and Return To Practice to physicians

63.   AstraZeneca did not have a policy against marketing the spread.[65]

64.   On sales calls, AstraZeneca's sales representatives made presentations to physicians using spreadsheets that compared the Return To Practice of Zoladex to the Return To Practice of Lupron.[66]

65.   Zoladex sales representatives would review comparative information with urologists to increase sales of Zoladex by showing the doctors "how much money the doctor or the office would save purchasing one drug over the other."[67]

66.   AstraZeneca's sales representatives also marketed Return To Practice by answering physician's questions regarding reimbursement for Zoladex, comparisons to Lupron, and Return To Practice.[68]

67.   AstraZeneca's sales representatives also sent letters to potential accounts encouraging them to switch to Zoladex based on the current AWPs, cost to physicians and resulting Return To Practice versus Lupron.[69]

---

[64] Bowman Dep. at 37:14-22.

[65] Trial Tr. Day 5 at 17 (Buckanavage) (Q:  Did AstraZeneca ever have a policy that made it against company policy to market the spread?  A:  No, not to my knowledge.").

[66] See, e.g., Ex. 33 (Email dated January 3, 1999 with attached spreadsheet entitled "LHRH Reimbursement Analysis" (AZ0437459-60)); Bowman Dep. at 76:9-77:21 (describing a chart showing that, as "a physician purchased a greater volume of Zoladex, the Return To Practice would increase"); id. at 51:20-52:4, 53:4-14 (discussing charts he created comparing the Return To Practice for Zoladex and Lupron); Ex. 153, at AZ0391335 (Call notes saying that representative "[e]xplained 5% discount & told him about reimbursement"); Bowman Dep. at 53:4-14, 58:2-9.

[67] Bowman Dep. at 57:1-10 and 58:2-9.

[68] See, e.g., Bowman Dep. at 37:14-22, 38:4-8, 51:20-52:4, and 64:4-14.

68.     Certain AstraZeneca employees disagreed with the practice of selling Zoladex on the basis of spread.  Pricing Strategy Manager, Erik Schultz, testified that he thought it was "sleazy" for AstraZeneca to manipulate the AWPs for Zoladex based on whether physicians were making enough profit.[70]  Despite Mr. Schultz's resistance, AstraZeneca did it anyway.

69.     Even in the face of government scrutiny from the OIG, sales representatives continued to discuss Return To Practice with physicians and continued to sell Zoladex based on its higher Return To Practice than Lupron.[71]

> **e.     AstraZeneca used physician buy groups – and encouraged physicians to join them – in order to increase Return To Practice**

70.     AstraZeneca also created physician buy groups that could take advantage of higher volume discounts to create higher spreads and profits for Zoladex purchasers.[72]  Initially, purchase groups were informal associations of urologists.[73]  As time went by, Buy Groups became part of AstraZeneca's contract strategy, and members formally contracted with AstraZeneca.[74]

71.     AstraZeneca promoted the formation of Physician Buy Groups to doctors because the increased discounts to doctors enabled its members to realize a higher Return To Practice.[75]

---

[69] *See* Ex. 38 at AZ0105879 (Letter from Chris Bowman to the Maricopa Urology Lithotripsy Inc. Group comparing same and stating "**DO THE MATH!**") (emphasis in original).

[70] Schultz Dep. II at 93-95, 124-25.

[71] Bowman Dep. at 102:12-103:1.

[72] Bowman Dep. at 45:17-46:2, 70:12-71:2.

[73] Bowman Dep. at 70:15-22.

[74] Bowman Dep. at 74:4-8, 83-84.

[75] Bowman Dep. at 63:17-64:14, 77:11-21.  *See also* Ex. 131 at AZ0419347 (Document entitled "Medicare Review" asking:  "What do the physicians get?  Obviously a reduction in the price they pay with a correspondence increase in return to practice.  Other features:  buying group members get the discount no matter what quantity they order.").

**f.    AstraZeneca used third parties to maximize reimbursement for Zoladex**

72.    AstraZeneca helped physicians recover full AWP reimbursement from Third-Party Payors, including Medicare.[76]

73.    AstraZeneca contracted with third parties, including S&FA (also known as Parexel) and Physician Reimbursement Systems to assist physicians in getting paid the maximum reimbursement amount.[77]

74.    Some of the assistance provided by S&FA was through an 800-number called the Zoladex Reimbursement Hotline.[78]  AstraZeneca had no procedure in place to insure that doctors were reporting discounts they received on Zoladex to the government.[79]

75.    AstraZeneca, through S&FA, told physicians that they did not need to report discounts they received when they submitted invoices for reimbursement.[80]

76.    S&FA also provided monthly reports to AstraZeneca that described incoming calls to the Zoladex Reimbursement Hotline, as well as advice that was given to AZ sales representatives and purchasing physicians to help them gain the maximum reimbursement, and therefore, profit.[81]

---

[76] Bowman Dep. at 47:14-48:8.

[77] *See, e.g.*, Ex. 125 (Feb. 23, 1995 letter to Cigna from S&FA employee advising it of AWP increase to insure adequate physician reimbursement).

[78] Bowman Dep. at 47:20-48:8 (explaining how the Zoladex Reimbursement Hotline worked).

[79] Brennan Dep. at 44:4-7 and 44:12-16.

[80] Ware Dep. at 31:3-20 (testifying that the Zoladex Reimbursement Hotline did not "advise [physicians] on what to bill.  We can provide [physicians] with information on the basis of reimbursement.").

[81] Ware Dep. at 41:11-42:12 (describing that S&FA provided monthly reports summarizing the advice given on the hotline).

### g.   AstraZeneca concealed its selling based on Return To Practice

77.    By employing contracts with confidentiality clauses preventing the disclosure of pricing terms and discounts, AstraZeneca concealed its practice of selling Zoladex on the basis of Return To Practice.[82]

78.    AstraZeneca made no effort to tell consumers what their doctors paid for Zoladex.[83]

79.    AstraZeneca did not tell consumers about its spread marketing program.[84]

80.    AstraZeneca did not have a mechanism in place to inform the government or Third-Party Payors what physicians actually paid for Zoladex.[85]

81.    AstraZeneca did not tell the government that its discounting practices resulted in large spreads for Zoladex.[86]

82.    AstraZeneca did not tell the government about its spread marketing program.[87] AstraZeneca did not tell the government about TAP's spread marketing program either.  As Steve Buckanavage, former Market Development manager, testified at trial:

---

[82] Brennan Dep. at 29:1-17, 30:1 and 4-9, and 39:12-40:4; Ex. 67 (sample Zoladex Buy Group contract containing a confidentiality clause).

[83] Brennan Dep. at 29:15-30:7.

[84] Trial Tr. Day 5 at 30 (Buckanavage) ("Q:  Going back to this common knowledge part of your affidavit, to your knowledge, would consumers have known about the spread marketing program?  A:  No, not to my knowledge.") and at 30:23-31:1 (never saw any documents sent to consumers describing same); *id.* at 51:2-9 ("You mentioned your concern for patients, and you felt that there were no secrets being kept at AstraZeneca.  Was there ever a discussion about telling consumers, for example, about the return to practice and the impact it was having on their copay?  A:  Internally in my team?  Q:  Yes.  A:  No.").

[85] Trial Tr. Day 11 at 36-37 (Milbauer) ("Q:  And did you ever send any written communication to any member of Congress showing Congress exactly the types of discounts that AstraZeneca was offering physicians?  A:  Not to my knowledge."); Brennan Dep. at 34:1-4 and 37:5-14.

[86] Trial Tr. Day 5 at 27-28 (Buckanavage) ("Q:  Okay.  Did your group ever have any discussion about going to the federal government and telling the federal government that because of the incentives of Medicare pricing, that there was a discounting program going on, that Lupron was out there creating large spreads, and that perhaps the government needed to focus on that?  A:  No.").

Q:   Okay.  And another choice that you could have made, instead of playing the same game as Lupron, would have been going to the federal government and reporting what was going on the in the marketplace, and seeing if the federal government wanted to make some changes, correct?

A:   That's a possibility.

Q:   Not one that you pursued or your team recommended?

A:   No, we didn't.[88]

**h.   AstraZeneca's MAP program did not tell TPPs about AZ's discounts to physicians or its spread marketing program**

83.   Discounts offered through AstraZeneca's Managed Acquisition Program ("MAP") did not inform Massachusetts TPPs of the prices at which physicians were able to acquire Zoladex from AZ.  First, AZ did not offer the MAP program to union health and welfare funds.[89]

84.   Second, Ms. Tracy did not have any direct knowledge regarding whether the staff model HMOs and IPAs who purchased Zoladex had communications about the prices at which they were acquiring Zoladex with the parts of those companies reimbursing for Zoladex.[90]

85.   Nor was the MAP program a vehicle by which AstraZeneca informed TPPs that it was engaged in spread marketing.  Ms. Tracy did not even know that the physician side of the

---

[87] Trial Tr. Day 5 at 30 (Buckanavage); Trial Tr. Day 11 at 37 (Milbauer) (AstraZeneca did not respond to President Clinton's radio address by explaining to him spread marketing.).

[88] Trial Tr. Day 5 at 51 (Buckanavage).

[89] Trial Tr. Day 13 at 60 (Tracy).  *See also id.* at 61 ("the larger customers were clearly a bigger focus for me").

[90] Trial Tr. Day 13 at 47 (Tracy) (with regard to Blue Cross Blue Shield).

business was engaged in spread marketing.[91]  Ms. Tracy testified that the managed care part of the company was "siloed" from the physician side.[92]

86.    Moreover, AstraZeneca did not focus on the MAP program because it knew that the largest percentage of Zoladex customers were elderly and therefore Medicare eligible.[93]  It likewise knew that Medicare beneficiaries generally were not enrolled in managed care programs.[94]

87.    Eventually AstraZeneca decided not to continue to offer the MAP program because it feared backlash from physicians.[95]

88.    Ultimately, the MAP program failed.[96]

### i.    The Zoladex spreads increased during the Class Period

89.    The spread on Zoladex increased throughout most of the Class Period.[97]  In the period 1990-1994 the spreads were between 20-25%.  When the RTP practice was implemented

---

[91] *Id.* at 51 ("Absolutely not.  This is from the sales side of the business, and I would not have even seen this in my years covering Zoladex.").

[92] *Id.* at 38-39 ("I deal with managed care and,  you know, we're sort of siloed, so I don't have a lot of, you know, intimate knowledge of the other side of the business . . . I would say the physician sales force compared to the managed care sales force were siloed.").

[93] Trial Tr. Day 5 at 44-45 (Buckanavage) ("THE COURT:  What percentage of people using Zoladex had Medicare coverage?  THE WITNESS:  I don't know.  THE COURT:  Mostly elderly?  THE WITNESS:  Right.  The age population would be Medicare-eligible, but I don't know how many actually had Medicare . . . But it was a fair amount.  It's – I don't know the exact number, but it would be a fair amount."); Trial Tr. Day 13 at 23 (Tracy) ("the preponderance of Zoladex use is in an older population, just by nature of the disease").

[94] Trial Tr. Day 13 at 22 (Tracy) ("At that time, you know, the large majority of the members were not Medicare customers, so that was really not my area.  You know, some of them had some Medicare customers in their member base, but the vast majority were not Medicare.").

[95] *See* Ex. 4024 at AZ0413740 (Oncology Contracting Director writing that "[t]hese types of transactions generally tend to upset the providers because of the deletion of a return to practice opportunity.  Historically, since the former Zeneca decided not to proactively offer such contracts (ie Zoladex Managed Acquisition Program …. MAP) several years ago, we have decided NOT to pursue arrangements that shift the RTP away from the physicians."); Ex. 4025 at AZ0431325 ("[L]et me say that there is NO contract strategy currently in place being offered to MCOs!  This past summer, a decision was made internally by the product team not to pursue contracts with MCOs due to the concern that we might alienate our physicians in the community.").

[96] Trial Tr. Day 11 at 16-17 (Milbauer) ("It wasn't a successful program."); Direct Testimony Decl. of Julie-Ann G. Tracy, ¶ 41 ("Unfortunately, the MAP program was not very successful.").

the spreads jumped to 40-70% in 1995.  In 1998 they jumped to 133.64% and reached a high of 149% in 2002.

90.     In 1998, to nullify the Congressional change to 95% of AWP, AstraZeneca implemented a 6.9% price increase to provide an "additional improvement in return to practice."[98]

### j.     Damages

91.     Dr. Hartman, using generally accepted economic techniques, has estimated damages for Class 2 and Class 3.  On both a national and a Massachusetts only basis, and both with and without interest.  For AstraZeneca for the product Zoladex.[99]  Those damages estimates are year-by-year estimates disaggregated by NDC (for the without interest estimates).[100]

92.     As to Class 2, these estimates assume that the "but for" AWP would be ASP.  On the basis of that assumption and for the Class Period 1991-2003,[101] Dr. Hartman estimates that the Massachusetts-only, Class 2 damages, without interest, are $3,996,351.[102]

93.     Also as to Class 2, Dr. Hartman, again using generally accepted economic techniques, presented the alternative damage analysis under which the "but for" AWP represents ASP times 1.06 (representing the formula adopted through the enactment of the Medicare

---

[97] Hartman Rebuttal Ex. 4028; Attach. G.1.c.

[98] Ex. 146.

[99] *See* Ex. 4028 at Attachs. G.1.a, G.1.c, I.1, J.1.a, and K.1.b.  Ex. 4028 and related Exhibits constitute replacements of Dr. Hartman's original direct testimony in order to recalculate ASPs in light of the Court's ruling regarding free samples relating to AstraZeneca.

[100] *Id.*

[101] In pretrial proceedings this Court ruled that damages would be recoverable only through 2003.

[102] *See* Ex. 4028, Attach. J.1.a. (taking Class 2 damages but subtracting the "2004" column from the "total" column).  *See also* Ex. 4008, first page, under column "Liability Threshold Equals 0%" for Massachusetts.

Modernization Act of 2003).[103]  Using that approach and for the Class Period 1991-2003, the

Massachusetts-only damages, without interest, total $3,784,854.[104]

94.     This Court finds as a reasonable estimate of damages to Class 2 as against

AstraZeneca in the amount of $___.

95.     As to Class 3, Dr. Hartman has estimated damages using an approach similar to

that for Class 2, except that he employs a threshold of 30%, *i.e.*, he does not estimate the

damages until the "spread" between AWP and ASP equals or exceeds 30%.  Using that approach

and for the Class Period 1999-2003, the Massachusetts-only damages, without interest, total

$5,916,821.[105]

96.     This Court finds that the methodologies used by Dr. Hartman in performing

estimates of the damages for Class 2 and Class 3 employ generally accepted economic

techniques and provide a sound basis upon which to estimate damages to the classes for Zoladex.

97.     First, Dr. Hartman has used reasonably reliable sources of data – invoice and

rebate data obtained directly from AstraZeneca, published and undisputed AWP data, well-

accepted survey information from the National Ambulatory Medical Care Survey (NAMCS) and

the National Disease and Therapeutic Index (NDTI).[106]

98.     Second, Dr. Hartman's calculation of the ASP appears quite conservative.  Dr.

Hartman's ASP calculations do not include as a class of trade hospitals (which tend to purchase

products at lower prices, thereby tending to drive down ASPs); they accept as true

---

[103] *See* Ex. 4010 and 4029 (replacement slides); Hartman Direct presentation, Slide 100.

[104] *See* Ex. 4010, page 2.

[105] Ex. 4028, Attach. J.1.a.  The damages figure of $5,916,821 is derived by taking the total, without interest, Massachusetts-only figure of $9,435,183 and subtracting the years 2004, 2005 and 2006 in order to obtain the 1991-2003 figure.

[106] *See* Hartman Direct, *et passimi*; Hartman Rebuttal, ¶¶ 16-28.

representations made by Defendant regarding classes of trade, and they do not include **any** of the

sample programs (even though there was some evidence that some portions of free samples were

used for price concession purposes).

99.     Third, the allocation of source of pay information between Medicare and non-

Medicare spending (and the backout of spending paid by Medicaid) appear to be based upon

analysis conducted by Dr. Hartman using the NAMCS and NDTI well recognized survey

information, and are corroborated by Professor Rosenthal.

100.     Finally, the conservatism of the damages calculations are demonstrated by

comparison to all dollars that were paid to dispensers, such as physicians, which acted as a

financial inducements to them.  Dr. Hartman estimated the "national return to practice dollars"

for each defendant; as to AstraZeneca, the return to practice dollars (*i.e.*, the dollars charged to

class members in Classes 2 and 3, over and above the dollars paid to the manufacturers)

exceeded $400 million.[107]

101.     Plaintiffs' damages calculations also included a component of interests.  During

the trial, Defendants raised no issue regarding the entitlement of Classes 2 and 3 to an award of

prejudgment interest.  The Court finds that the Classes are entitled to a calculation of interest.

The Plaintiffs are directed to supplement the calculations of interest on the basis of the findings

above, and Defendants will be afforded with an opportunity to respond.

### k.     AstraZeneca could have published a truthful AWP

102.     Several AstraZeneca witnesses and their experts testified that in order to compete

with Lupron AstraZeneca needed to compete based on RTP.

---

[107] Ex. 4009.

103.     The Court finds, based on Dr. Rosenthal's testimony[108] as well as the testimony of AstraZeneca witnesses, that the company could have competed based on accurate prices or published different price lists for different customers.  This may have reduced some sales, but often in our economic system obeying the law comes with a price.  Here, AstraZeneca chose to compete by "playing the same game Lupron was" and therefore published false AWPs and offered doctors the spread.[109]  Other companies believed that such RTP practices were unethical.[110]

### l.     AstraZeneca did not disclose its RTP strategy

104.     There is no evidence that AstraZeneca disclosed its RTP strategy to any TPP or to CMS.  No documents were produced by any TPP or CMS evidencing such knowledge.

## B.     The BMS Defendants

105.     Defendant Bristol-Myers Squibb Company is a Delaware corporation with its headquarters in New York.  BMS is a major developer, manufacturer and marketer of prescription drugs, including chemotherapy drugs.[111]

106.     BMS formerly owned a subsidiary called Apothecon, Inc. that manufactured and sold primarily generic drugs.  BMS sold Apothecon's assets in 2000.[112]

107.     Defendant Oncology Therapeutics Network Corporation ("OTN") is a Delaware corporation with its headquarters in South San Francisco, California.  Until BMS acquired OTN as a wholly-owned subsidiary in 1996, OTN was a joint venture between BMS and another

---

[108] Trail Tr. Day 6 at 19-20, 49-50 (Rosenthal).

[109] Trial Tr. Day 5 at 51 (Buckanavage).

[110] Ex. 223 (BMS policy statement).

[111] Affidavit of Frank C. Pasqualone Submitted as Direct Testimony in Case-in-Chief of Defendants BMS and OTN in the Trial of Class 2 & 3 Claims ("Pasqualone Trial Aff."), ¶ 1.

[112] Pasqualone Trial Aff., ¶ 1 n.2.

company called OTN Corporation.  After 1996, OTN remained a wholly-owned subsidiary of BMS until May 11, 2005, when it became an independent, privately-held company.[113]  OTN is known as a "specialty distributor" that sells and distributes injectable drugs and supplies, including but not limited to cancer drugs, to medical providers who administer them in a hospital or office setting to patients.[114]  OTN's primary target customers are oncologists in private practice who administer chemotherapy to patients in their offices (and not oncologists who are employed by a hospital or hospital out-patient clinic).[115]

108.    As the sales agent for BMS oncology products and its wholly-owned subsidiary, OTN had a close relationship with BMS.  For example, OTN customers were able to obtain a four percent discount on BMS oncology products, a discount that was not offered through any other distributor.[116]  And BMS established "floor" prices for the BMS drugs sold by OTN.[117]  BMS's Director of Marketing for Oncology, Christof Marré, was "in weekly contact with OTN about the proper 'floor' price for the BMS multi-source drugs in light of market condition."[118]  Marré also discussed joint marketing programs with OTN personnel once or twice per week.[119]

---

[113] Affidavit of John F. Akscin Submitted as Direct Testimony in Case-in-Chief of Defendants BMS and OTN in the Trial of Class 2 and 3 Claims ("Akscin Trial Aff."), ¶ 2.

[114] Akscin Trial Aff., ¶ 3.

[115] Affidavit of Marsha Peterson Submitted as Direct Testimony in Case-in-Chief of Defendants BMS and OTN in the Trial of Class 2 and Class 3 Claims ("Peterson Trial Aff."), ¶ 5.

[116] Trial Tr. Day 16 at 93-94 (Peterson).

[117] Affidavit of Christof Marré Submitted as Direct Testimony in Case-in-Chief of Defendants BMS and OTN in the Trial of Class 2 and Class 3 Claims ("Marré Trial Aff."), ¶ 6; see also Trial Tr. Day 4 at 94 (Peterson testimony explaining that OTN could charge below the floor price, but needed BMS approval to do so.).

[118] Marré Trial Aff., ¶ 7.

[119] Marré Dep. at 25-26.

109.    OTN and BMS sales representatives communicated regularly, and OTN Territory Business Development Managers ("TBDMs") occasionally went on sales calls with their BMS counterparts in a strategy commonly referred to within the company as "BMS/OTN Synergy."[120]

110.    "BMS" or the "BMS Group" is used herein to refer collectively to Bristol-Myers Squibb Company, Apothecon, Inc. and Oncology Therapeutics Network Corporation.

### 1.    BMS Subject Drugs

111.    The BMS drugs at issue in this case are Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol and Vepesid (sometimes referred to herein as the "BMS Subject Drugs").  These drugs are used by physicians to treat patients undergoing chemotherapy regimens.[121]

112.    In the non-Medicare context (Class 3), BCBS-MA made reimbursements during the Class Period for the following BMS Subject Drugs:  Blenoxane, Cytoxan (both injectible and lyphollized versions), Paraplatin, Rubex, Taxol and Vepesid (injectible).[122]  BCBS-MA also made Medigap reimbursements (Class 2) for these same drugs, in addition to Cytoxan tablets and Vepesid capsules, and such payments were based on AWP.[123]

---

[120] Peterson Dep. at 104-06; *see also* Ex. 843 (reviewing "BMSO/OTN Synergy in 2003"); Ex. 228 at 001483222 ("The combined efforts of BMS and OTN in driving sales with the OBO practices is a very strong part of our overall success. Every [OTN] TBDM is required to work with the appropriate [BMS] DBM and their teams on a regular basis.  In addition I have started to work with the Directors and continue to work with each of the DBM's in aligning our reps with common goals."); Ex. 4047 ("The Western region team was able to attend eight out of ten BMS POA meetings in late January and early February . . ."); Ex. 234 at 000217988 ("BMS/OTN Partnership is Key. Close collaboration between the BMS and OTN sales teams is critical to winning back the branded business").  Trial Tr. Day 16 at 96-99 (Peterson testimony discussing some of the foregoing exhibits); Marré Dep. at 26 (referring to close cooperation as "One BMS").

[121] For a more complete description of the uses of each drug, as well as year of introduction, applicable J-Code(s) and competing manufacturers, if any, see Ex. 4007.

[122] Ex. 4012; Trial Tr. Day 2 at 190 (Mulrey); Trial Tr. Day 17 at 59:11-17, 60:6-9 (Hartman).

[123] Ex. 4012; Trial Tr. Day 2 at 190-94 (Mulrey); Mulrey Trial Aff., at ¶¶ 11-20.

113.     Plaintiff Sheet Metal Workers' National Health Fund made Medigap reimbursements (Class 2) during the Class Period for the following BMS Subject Drugs: Cytoxan (injectible), Paraplatin, Rubex and Taxol.[124]

114.     Plaintiff Pipefitters made non-Medicare related reimbursements (Class 3) during the Class Period for the following BMS Subject Drugs:  Cytoxan (injectible), Vepesid, Paraplatin, Rubex and Taxol.[125]  Pipefitters' payment methodology was based on AWP.[126]

   **2.     BMS understood that AWP was the reimbursement benchmark used by Medicare Part B and many private payors**

115.     BMS "admits that Congress has mandated that Medicare Part B reimbursement be based, in part, upon AWP."[127]  Many senior BMS managers testified that they understood that Medicare, as well as private reimbursement schemes, were based on AWP.  These managers include Dianne Ihling, BMS's former Director of Pricing and Institutional Operations;[128] Christof Marré, BMS's former Director of Marketing, Oncology;[129] Denise Kaszuba, BMS's Associate Manager of Pricing Analysis and Compliance;[130] John Akscin, OTN's Vice President of Government Relations and Managed Care Services;[131] and Marsha Peterson, formerly OTN's Western Sales Manager.[132]

---

[124] Ex. 4012; Trial Tr. Day 17 at 53-60 (Hartman).

[125] Ex. 4012.

[126] Trial Tr. Day 1 at 166-67, 177-78 (Hannaford); Hannaford Trial Aff., at ¶ 12.

[127] Answer, ¶ 3 (Dkt. No. 800); *see also* Ex. 196 (BMS/AWP/01088191-202) (recognizing that Managed Health Care companies and Medicare reimbursed based on AWP).

[128] Ihling Dep. at 90-93, 117-18.

[129] Trial Tr. Day 5 at 142 (Marré); Marré Trial Aff., ¶ 10.

[130] Trial Tr. Day 4 at 62-64 (Kaszuba).

[131] Akscin Dep. at 26-27.

[132] Peterson Dep. at 114-15.

3.      **BMS caused AWPs to be published for its Subject Drugs**

a.      **BMS controlled the AWPs for its Subject Drugs by reporting WLPs with full knowledge of the mark-up factors that the Publishers would use to create the AWPs**

116.    BMS did not send AWPs directly to the Publishers.  Instead, BMS sent to the Publishers a wholesale list price ("WLP") or direct price, which the Publishers predictably marked up from 20 to 25 percent to derive the AWP.[133]  In some instances, BMS specifically instructed the Publishers to "[p]lease supply AWPs for these products once they have been processed through your database" or otherwise provided the list prices "necessary to establish the AVERAGE WHOLESALE PRICE (AWP)."[134]  BMS reported the WLP to the publications because, among other reasons, it wanted AWPs established for BMS drugs.[135]

117.    In 1992, BMS instructed the Publishers to use a 25% mark-up factor for BMS oncology products,[136] and the *Red Book* made this change as BMS directed.[137]  Kaszuba testified that, when she wrote this letter, she recognized that it could effect a change in the AWPs being reported for BMS oncology drugs.[138]  Prior to writing this letter, Kaszuba and her department

---

[133] Trial Tr. Day 4 at 55, 59 (Kaszuba).  Kaszuba was responsible, since 1991, for communicating BMS's wholesale list prices to customers and the *Red Book*, *First DataBank* and *MediSpan*.  Trial Tr. Day 4 at 52 (Kaszuba).

[134] *See*, *e.g.*, Ex. 179 (composite exhibit of letters) (all caps in original).

[135] Trial Tr. Day 4 at 56 (Kaszuba).

[136] *See* Ex. 183 ("Effective immediately, Bristol-Myers Oncology Division products factor used in determining the AWP should be changed from 20.5% to 25%.").

[137] Trial Tr. Day 4 at 60, 66 (Kaszuba).  The AWPs reported by the *Red Book* are the AWPs that Medicare Part B carriers used.  *See*, *e.g.*, *In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.  The *Red Book* never undertook an independent verification of the actual AWP.  *In re Lupron® Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d at 285 n.7; *In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.

[138] Trial Tr. Day 4 at 62 (Kaszuba).

conducted no research to determine that wholesalers in fact were marking up BMS oncology drugs by 25%.[139]

118.    BMS knew that it could effect precise changes in AWP through changes in its reported WLPs.  For example, the internal BMS documents found at Exhibits 209, 210 and 211 show the list price that BMS was establishing for a specific drug along with its "Anticipated AWP" based on the 25% mark up factor being used at the time.[140]  In each instance, the documents stated that the WLPs prices would not reflect actual selling prices.[141]  Nonetheless, Kaszuba testified that she communicated the WLPs to the Publishers.[142]

119.    As Plaintiffs' expert has opined, there is a well understood formulaic relationship between AWP and WLP.  They are functional equivalents in that reporting either to the Publishers implies that the other price is set automatically.  "AWP and WAC [or WLP] are 'interchangeable' since the two list prices are usually related by a constant ratio and convey the same information to purchasers and other entities that rely on published price data."[143]

120.    After receiving WLPs from BMS, the Publishers sent a report back to BMS showing the AWPs, and BMS then reviewed the AWPs for reasonableness and to determine the

---

[139] Trial. Tr. Day 4 at 65 (Kaszuba).

[140] *See also*, *e.g.*, Ex. 187 (PowerPoint recognizing that a 25% markup to WLP is applied and that, consequently, a 7% price increase on Plavix translates into an 11% AWP increase and a 13% MCO increase based on a typical reimbursement formula of AWP – 13%); Ex. 189 (PowerPoint titled "Sources of Price Data and their relationship to BMS pricing activities" (April 2002) further confirms that BMS knows how AWPs are set based on BMS's WLPs).

[141] *See* Ex. 209 at 0000612; Ex. 210 at 0000583; Ex. 211 at 0000105.  Indeed, the Court has already found that "[t]he AWP, or its formulaic equivalent the WAC (Wholesale Acquisition Cost), is interpreted by industry as the signal for the underlying structure of list and transaction prices for almost all drugs."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (D. Mass 2005) ("*In re AWP*") (quoting Hartman).

[142] Trial Tr. Day 4 at 74-77, 81-82 (Kaszuba).  For Apothecon multi-source drugs, BMS regularly communicated WLPs, even though BMS recognized that "we never sell these multi source products" at the "wholesale list price found under Billing Category 51."  Ex. 188 at BMS/AWP/00337638.  BMS used these WLPs "[s]ince the AWP . . . is calculated based on the wholesale list – retailers benefit from a High AWP Price under the reimbursement policies of Insurers."  *Id.; see also* Trial Tr. Day 4 at 83-86 (Kaszuba).

[143] Direct Testimony of Raymond S. Hartman ("Hartman Direct"), ¶ 44.

markup factor applied.[144]  If the AWP was different than that expected by BMS, BMS would

contact the Publisher.[145]  BMS also conducted a reasonability review of AWPs appearing on

software programs that BMS licensed from *First DataBank* and *MediSpan*.[146]

> **b.    BMS republished the AWPs for its Subject Drugs**

121.    BMS used AWPs internally and also directly published AWPs for its Subject

Drugs.

122.    Beginning in the mid-1990s, on a quarterly basis BMS distributed to in-house

staff, including marketing managers and analysts, an Internal Price List, which contained various

prices including AWPs from all three Publishers.[147]

123.    Throughout the latter half of the 1990s, Pricing Support provided the BMS

oncology sales force with a Pocket Reference Price List that contained AWPs from all three data

services.[148]

124.    In addition to distributing the Internal Price List and Pocket Reference Price List

to certain employees of BMS, BMS's Pricing Support Department also provided to marketing

analysts, when requested, AWPs for both BMS drugs and the drugs of competitors.[149]

125.    BMS's wholly-owned specialty distributor, OTN, continually republished the

AWPs for BMS Subject Drugs.  For example, periodic issues of the OTN publication, *The*

---

[144] Trial Tr. Day 4 at 89-90, 93-96 (Kaszuba); Ex. 180 at 000186649 ("Obtain AWP's from the Data Services (First DataBank and Red Book)  Approximate turn around time is 2-3 days.  Review AWP's for reasonability, ie 20%-25% higher than new wholesale price…."));  Ex. 849 (example of a *Red Book* product listing verification of BMS prices with BMS's approval indicated by Barbara Goetz's signature).

[145] Trial Tr. Day 4 at 90-91, 97 (Kaszuba).

[146] Trial Tr. Day 4 at 99-100 (Kaszuba).

[147] Trial Tr. Day 4 at 99-102 (Kaszuba); Ex. 190.

[148] Trial Tr. Day 4 at 103-04 (Kaszuba); Ex. 191.

[149] Trial Tr. Day 4 at 104-05 (Kaszuba).

- 31 -

*Network News*, which was distributed to OTN customers, reported AWPs taken from the *Red Book*.[150]  As *The Network News* explained in the back of the bulletin under the caption "Reimbursement":

> The Average Wholesale Prices (AWPs) and HCPCS codes for drugs commonly used in cancer treatment are provided for your use as a reimbursement resource.  Products are listed alphabetically by their generic name.  The AWPs are obtained from the *1998 Red Book* and the *November 1998 Red Book Update*.  For drugs that have multiple manufacturers, the AWP for the product most commonly stocked by OTN is listed.  For ease of use, we list the AWP information in the first three columns. . . .

126.   OTN also published numerous online reports to which customers subscribed, including (i) the "AWP Report," which contained a list of current AWPs for drugs that the client had previously purchased; and (ii) the "AWP/Price Report," which contained the AWP for drugs that the client purchases, and the billing unit for each particular drug.  OTN obtained the AWPs for both reports from the *Red Book*.[151]

127.   OTN touted access to AWP information:  "Practices can access current AWP and J-code information through the web site.  Starting April 3, 2000, a new display of AWP information will be available.  This information will be updated on a monthly basis."[152]

### c.   When BMS drugs faced generic competition, reimbursements were made at or near the BMS AWP

128.   While BMS Subject Drugs enjoyed patent protection, they were reimbursed at the BMS AWP.  For the periods when BMS Subject Drugs were multi-source, the median AWP was close to, or greater than, the AWP for the BMS drug.  For example, the first generic manufacturer of bleomycin sulfate entered the market in 1996 with an AWP that was almost

---

[150] Ex. 192 (various issues from 1994-2000); *see also* Akscin Trial Aff., ¶ 18.

[151] Ex. 193.

[152] Ex. 220 at 000096974.

identical to the BMS Blenoxane brand AWP, and generic AWPs were not lower than this brand AWP until other generic manufacturers entered the market in 2003.[153]

129.    Once Taxol went generic, an apparent "Nash equilibrium" resulted in the dispersion of generic AWPs, which were linked to the AWP of Taxol, placing the median AWP just below the Taxol AWP.[154]  In other words, the AWP for Taxol drove upward the AWP reported for the generic alternatives.[155]

    **4.    BMS's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average**

        **a.    BMS knew that its Subject Drugs were sold at confidential prices well below AWP**

130.    BMS distributes all of its drugs to wholesalers, which pay list price or "WLP" for the drugs.[156]  Most purchasers of BMS drugs bought those drugs from wholesalers.  Prices for those drugs were frequently established via contract with BMS.[157]  The wholesaler would provide the product at the contract price and then request payment of a "chargeback" from BMS for the difference between the WLP and the contract price that the wholesaler collected from the purchaser.[158]

---

[153] Hartman Direct, ¶ 46.

[154] Hartman Direct, ¶¶ 32-33 & Figure 2.

[155] *Id.*

[156] *See, e.g.*, Ex. 196 at 01088200 ("BMS has only one price which it charges to wholesalers . . . Wholesale List Price (WLP)").

[157] BMS provided discounts through contracting.  BMS sought to enter into contracts with larger customers such as hospitals and group purchasing organizations, so that BMS became the exclusive supplier of the drug for a period of time.  Marré Trial Aff., ¶ 6.  BMS was ultimately successful in signing contracts with most of the large hospitals in the country.  Marré Dep. at 35-36.

[158] Trial Tr. Day 5 at 155-57 (Marré); *see also* Ex. 2591 at 000056967 (graphic illustration of the chargeback process).

131. The discounts contained in the BMS contracts were confidential and not reflected in the WLP.[159] BMS never provided any specific information to the Publishers about the level of discounts offered on BMS oncology products.[160]

132. BMS knew that the AWPs for BMS Subject Drugs reflected a mark-up of 20% to 25% over the BMS WLPs, yet BMS also knew that wholesale-to-retail margins were only 1% to 3%.[161] BMS viewed AWP as an "artificially inflated number" that was "the only easily obtained published price source." "Therefore," BMS recognized, "reimbursement formulas are still based on AWP, with a discount subtracted from it."[162] BMS also recognized that "*AWPs can confuse the understanding of pricing within the US pharmaceutical system*" and that it consequently "need[s]to be wary of using AWPs *because the name is misleading*."[163]

133. Nonetheless, Frank Pasqualone, Senior Vice President of BMS Oncology, testified that BMS Oncology sales and marketing operations never considered the impact of AWPs on Medicare beneficiaries, notwithstanding BMS's knowledge that 20% co-pays were based on AWP.[164] He also had no qualms about causing fictitious AWPs to be published for BMS Subject Drugs.[165]

134. In response to a question regarding whether concern raised by the OIG in December 1997 about potentially excessive Medicare reimbursements on certain drugs "raise[d]

---

[159] Trial Tr. Day 5 at 131, 145 (Marré); *see also* Trial Tr. Day 14 at 23 (Pasqualone testifying that standard confidentiality clause appears in all BMS contracts because discounts constitute "confidential and competitive information.").

[160] Trial Tr. Day 4 at 130-31 (Kaszuba).

[161] Marré Trial Aff., ¶ 10.

[162] Ex. 195.

[163] Ex. 196 (emphasis added).

[164] Trial Tr. Day 14 at 14 (Pasqualone).

[165] Trial Tr. Day 14 at 34-36 (Pasqualone).

any kind of red flag for [BMS]," Pasqualone stated:  "No, it didn't.  I mean, this is how drugs are reimbursed at a given rate in our industry, and we know that that rate is higher than the rate at which we sell the drugs."[166]  Pasqualone also confirmed that, even though he was aware of OIG concerns about Medicare beneficiaries making potentially excessive payments for some drugs, BMS never provided confidential average sales price data for BMS drugs to Congress in reaction to that concern.[167]

135.    Indeed, in 1997 BMS lobbied the federal government to maintain AWP-based reimbursement for Part B drugs:

> Continued Medicare Part B Battle.  This past year, we worked closely with Oncology on the Medicare Part B Reimbursement Issue with a very favorable outcome (instead of Oncology drug reimbursement being based on actual acquisition cost, which was proposed by the Administration, reimbursement will be based on 95% of the AWP.  While this was a major success, the 95% number could be easily lowered in subsequent sessions of Congress.  At the same time, Oncologists are enjoying larger margins on generic oncolytics, which gives them strong incentives to use generics instead of branded products.  We need to actively manage this issue.[168]

136.    During 1992, when Congress was evaluating whether to amend the Medicare reimbursement statute, it appears that BMS actively sought to mislead the federal government about the actual prices that physicians were paying for BMS Part B drugs.  As BMS explained to a physician in an oncology-hematology medical group:

> The earliest draft of these regulations – and even the President's proposed budget for 1992 – would have set the drug allowable at 15 percent below AWP.  We were as active as possible to change this very low level, which would ideally have been set above AWP.  Included in our efforts was a formal meeting with the Inspector General's staff, which was evaluating the proposed regulations.  There we outlined our understanding of the fact

---

[166] Trial Tr. Day 14 at 20 (Pasqualone).

[167] Trial Tr. Day 14 at 26 (Pasqualone).

[168] Ex. 201.  The memo closes with a request to add personnel to the Policy Department given that "[a]ll of these issues have huge financial implications for Bristol-Myers Squibb."  *Id.*

> that most oncologists and hematologists would not be able to procure
> cancer chemotherapy products at a lower payment level.  We know that
> similar strong arguments were made at the Health Care Financing
> Administration (HCFA) and on Capitol Hill.[169]

Despite emphasizing to the federal government that most oncologists could not purchase drugs at

less than AWP, in the very next paragraph of the letter, BMS explained that, in fact, "all AWPs

listed are higher than the price at which Bristol-Myers pharmaceuticals can be purchased

directly."  The foregoing is significant in that Dr. Bell opines that, as early as 1992, the

government knew of Defendants' AWP practices.  However, the evidence demonstrates that

BMS was telling government officials that discounts were not readily available.

<h3 style="text-align:center">b.   BMS created spreads on its Subject Drugs, and those spreads<br>increased substantially over time</h3>

137.   While BMS Subject Drugs did not face therapeutic competition (that is, not

subject to generic competition or competition from other patented drugs that treat the same

condition), BMS generally did not grant many discounts, rebates or price concessions (other than

to wholesalers who receive a 2% prompt pay discount).[170]  However, once competition was

introduced, BMS offered discounts to meet the market.[171]  Accordingly, and as Marré testified,

"the average contract prices and floor prices for BMS drugs in the multi-source portfolio tended

to trend down over the long term."[172]  Nonetheless, WLPs and AWPs did not decrease – at all.

138.   Both Plaintiffs' and BMS's experts have confirmed this by analyzing

AWPs/WLPs and actual average sales price data from BMS.  Reviews done by Dr. Hartman and

Dr. Bell confirm that, after BMS Subject Drugs faced therapeutic and/or generic competition, the

---

[169] Ex. 4027 at 0403272.

[170] Pasqualone Trial Aff., ¶ 16.

[171] Pasqualone Trial Aff., ¶ 17; Trial Tr. Day 5 at 129 (Marré).

[172] Marré Trial Aff., ¶ 9.

actual prices at which physicians acquired those drugs decreased substantially.  After several years of generic competition, BMS did not make substantial sales at, or near, the WLPs that BMS continued to report for the Subject Drugs.[173]

139.   BMS Subject Drug *Blenoxane* first faced generic competition in 1996, after which its ASP decreased substantially while its WLP and AWP remained constant.[174]  Weighted average discounts off of WLP for 15 and 30 mg formulations of Blenoxane ranged from 62 to 66% at the end of 2002.[175]  Some discounts to hospitals were as high as 80%.[176]  Bell confirms that, by 2000, virtually no sales were made at WLP and that, by 2001, the vast majority of sales were made at prices less than 50% of WLP.[177]

140.   The injectible form of *Cytoxan* has been subject to generic competition throughout the Class Period, while a generic version of the tablet formulation did not enter the market until 2000.  BMS consistently sold injectible Cytoxan at ASPs significantly lower than the listed AWP, with spreads frequently exceeding 100% and even reaching over 500% in certain years, while WLPs/AWPs largely remained constant.[178]  Consorta, Owen and MHA received contract discounts from 65-75% off of WLP.[179]  Bell confirms that, by 1999, virtually

---

[173] Although a small minority of customers continued to pay WLP for BMS drugs after those drugs faced competition, Marré testified that such customers would have done so because they lacked information about available discounts or were brand loyal.  Trial Tr. Day 5 at 130-31 (Marré).

[174] Hartman Direct, ¶ 47; Trial Tr. Day 5 at 132-33 (Marré).

[175] Ex. 202.

[176] *See* Ex. 213.  Marré testified that discounts to hospitals would be roughly reflective of the discounts available to physicians in the office-based setting, as "competitive forces in the marketplace will drive it to the same price level in the different settings."  Trial Tr. Day 5 at 144 (Marré).

[177] Ex. 2524.

[178] Hartman Direct, ¶ 50; Trial Tr. Day 5 at 132-33 (Marré).  Cytoxan injectible became single source towards the end of 2002 or beginning of 2003 when both competitors exited the market, Marré Dep. at 88-89, which likely explains why spreads, although large, began contracting in 2001 as the drug was poised to become single source. *See* Hartman Direct Attach. G.2.b and G.2.c.

[179] *See* Ex. 204 at 000096293; Ex. 205; Ex. 207.

no sales were made at WLP and that, as early as 1996, the vast majority of sales were made at prices less than 50% of WLP.[180]

141.    Spreads for the injectible form of *Vepesid* increased dramatically beginning in 1994, when generic etoposide became available.  BMS kept the WLP for Vepesid constant while ASPs continued to decrease, with spreads ballooning in the late 1990s to over 1,000% for some NDCs.[181]  Contract discounts to large purchasers were as much as 94%-95% off of WLP.[182]  By 2002, most of BMS's sales of injectible Vepesid were made under contracts,[183] which means that few paid WLP let alone AWP for the drug.  Bell confirms that, beginning in 1996, the vast majority of sales were made at prices less than 50% of WLP (excepting year 2000).[184]

142.    *Rubex*, a multi-source Subject Drug, had WLPs and AWPs that remained constant after 1994, while spreads blossomed in the mid-to-late 1990s to over 400%.[185]  Contract discounts off of list price were very large,[186] and, from 1994 through 2000, the vast majority of sales were made at pricing less than 50% of WLP.[187]  Spreads decreased as BMS phased out the drug in 2001.[188]

---

[180] Ex. 2524.

[181] Hartman Direct, ¶ 52 & Attach. G.2.c.

[182] *See*, *e.g.*, Ex. 204 at 000096293 (Consorta pricing at 94% off of WLP); Ex. 205 (Owen pricing at 94% off of WLP); Ex. 206 at 00979756 (Premier pricing at 94% off of WLP); Ex. 207 at 01124141 (MHA pricing at 95% off of WLP).

[183] Marré Dep. at 130-31.

[184] Ex. 2524.

[185] Hartman Direct, ¶ 51 & Attach. G.2.b and G.2.c.

[186] *See*, *e.g.*, Ex. 206 at 00979756 (Premier at 84% off of WLP).

[187] Ex. 2524 (Bell).

[188] Marré Dep. at 97-98.

143.    **Taxol**, the oncology drug leader in 2000 with $805 million in sales,[189] lost

exclusivity in 2000 when a competing brand entered the market, followed by generic competition

in 2001.[190]  As a result, by 2003, BMS lost almost 50% of its market share of Taxol.[191]  The

WLP for Taxol remained constant over time, and then, after loss of exclusivity, contract prices

rapidly decreased.[192]  Spreads on some NDCs of Taxol were a stable 25%-27% until 2002 when

they jumped to over 500%.[193]  The Taxol unit-weighted average spread percentage across all

NDCs jumped nearly 100% between 2001 and 2002.[194]  By the fourth quarter of 2002, BMS was

routinely providing very large discounts on Taxol to high volume customers, some as high as

80% off of WLP,[195] and even Bell confirms that virtually no sales were made at WLP.[196]  Indeed,

only one-half a percent of sales were made within 5% of the WLP in 2002.[197]

144.    Because BMS kept WLPs constant even as average actual sales prices dropped

dramatically, Class members continued to reimburse for BMS Subject Drugs at artificially high

prices.  The impact is particularly significant vis-à-vis an expensive drug like Taxol.  For

instance, BMS sales representative Doug Soule confirmed that the AWP-based Medicare co-pay

for six cycles of Taxol to treat breast cancer approximates $1,000.[198]

---

[189] Ex. 215 at 000071259-60.

[190] Marré Trial Aff., ¶ 5; Hartman Direct, ¶ 48.

[191] Ex. 215 at 000071270.

[192] Hartman Direct, ¶¶ 48-49; Trial Tr. Day 5 at 134-35 (Marré).

[193] Hartman Direct, Attach. G.2.c.

[194] Hartman Direct, Attach. H.2.

[195] Ex. 203 at 000056988); *see also* Ex. 204 at 000096293 (Consorta pricing at 82% off of WLP); Ex. 205 (Owen pricing at 75% off of WLP); Ex. 206 at 00979756 (Premier pricing at 75% off of WLP).

[196] Ex. 2524 (Bell).

[197] *Id.*

[198] Trial Tr. Day 16 at 72-73 (Soule).

145. AWP-based reimbursements would have been dramatically lower had BMS been reporting accurate average pricing. BMS itself recognized that prices in the marketplace would be lower had it published prices that constituted a real average of sales.[199] Indeed, Pasqualone admitted that it would have lowered BMS revenues.[200] Furthermore, as Dr. Rosenthal demonstrated, Medicare reimbursement for Taxol decreased by over $1,300 in 2005 after BMS began reporting purportedly accurate ASP data to CMS.[201]

146. The reason BMS did not report accurate AWPs is that its business model was predicated on some sales, no matter how few at WLP, even though BMS could have reported an accurate AWP in addition to a WLP.[202] But reporting truthful AWPs would have resulted in lower revenue to BMS.[203]

### c. BMS recognized the importance that oncologists placed on reimbursement and spreads

147. BMS recognizes that reimbursement issues are very important to physicians working in office-based oncology practices ("OBOs"). This is emphasized in many documents and was acknowledged by numerous witnesses.

148. OTN's John Akscin had daily discussions with OTN clients that were referred to him by sales representatives. Topics discussed included drug reimbursement issues and AWPs.[204] Akscin sometimes provided specific AWPs to the clients, which he obtained from the *Red Book* or First DataBank. *Id*. at 58.

---

[199] Trial Tr. Day 14 at 33-34 (Pasqualone).

[200] Trial Tr. Day 14 at 33-34 (Pasqualone).

[201] Ex. 4070; Trial Tr. Day 13 at 15 (Rosenthal).

[202] Trial Tr. Day 15 at 38-41 (Bell).

[203] Trial Tr. Day 5 at 165 (Marré); Trial Tr. Day 15 at 38 (Bell).

[204] Akscin Dep. at 56-59.

149.    Akscin also gave many presentations to BMS sales representatives using PowerPoints.  In one, Akscin emphasized to OTN and BMS sales representatives that the "Top Three OBO Concerns" were "***Reimbursement, Today***", "***Reimbursement, Tomorrow***", and "***Reimbursement!***"[205]  This information reflected what OTN customers were telling OTN at the time, and this presentation was provided to OTN in-house and outside sales representatives, as well as to BMS sale representatives.[206]

150.    Akscin acknowledged that OBO revenue is "Highly Medicare Driven" because 50-55% of OBO patients are Medicare recipients,[207] and that 64% of OBO revenues came from drug reimbursements.[208]

151.    BMS and OTN offered various reimbursement consulting services to their clients, including free telephone support through a company called DocuMedix to answer questions about billing codes and published AWPs.[209]

152.    BMS knew the impact that creating spreads would have:  a growing disparity between WLP and AWP creates an incentive for physicians to select the brand.  For example, BMS once explained with respect to its Vepesid drug:

> The Etopophos product file is significantly superior to that of etoposide injection . . . . Currently, physician practices can take advantage of the growing disparity between Vepesid's list price (and, subsequently, the

---

[205] Ex. 197 at 000096636.

[206] Akscin Dep. at 88-90.  *See also* Ex. 232 at 000083798 ("Little Wonder… Why the Focus on Price?").

[207] Akscin Dep. at 91-92.

[208] Akscin Dep. at 93.  *See also* Ex. 197 at 000096634.

[209] Akscin Trial Aff., ¶ 18.  Akscin confirmed that OTN customers valued the DocuMedix service that was offered, and OTN actually marketed the service.  *Id.* at 42-43.  Examples of "mass produced, commonly used marketing materials" that refer to reimbursement assistance support, *id.* at 120-23, include Ex. 199 at 000096904 and 909.  Other examples of reimbursement consulting services offered through OTN were KR Johnson & Associates (which also trained OTN employees on how OBOs operate, including billing and reimbursement methods, Akscin Dep. at 18-20) and ProCert, which assisted office-based oncology practices in managing claim denials.  Akscin Dep at 33.

Average Wholesale Price [AWP]) and the actual acquisition cost when obtaining reimbursement for etoposide purchases.  If the acquisition price of Etopophos is close to the list price, the physicians' financial incentive for selecting the brand is largely diminished.[210]

153.    BMS also recognized that some physicians would return or "deconvert" to prescribing less effective cisplatin once Paraplatin went generic, because they could make more money prescribing cisplatin.[211]

**5.    BMS marketed spreads**

154.    BMS officially recognized that marketing the spread was wrong when in January 2001 BMS sent a memo to all U.S. Sales & Marketing Personnel advising that, "in accordance with its Code of Conduct, . . . the spread should not be used as a promotional or marketing tool.[212]  When asked whether this policy was enforced at BMS, Pasqualone testified, "Absolutely."[213]  Nonetheless, the record contains ample evidence that BMS marketed the spread and, in some cases, systematically.  Furthermore, there is no record evidence demonstrating that any BMS employee was ever disciplined for marketing the spread.

155.    Various OTN online services marketed spreads.  The "AWP/Price Report," which contained the AWP for drugs that the client purchases, and the billing unit for each particular drug, also showed OTN's dispensing unit price in one column and AWP less _% in the next column, permitting customers to input the discount from AWP manually in a setup screen.[214]  OTN marketed the report.[215]

---

[210] Ex. 208 at 0011221.

[211] Trial Tr. Day 15 at 45-46 (Bell).

[212] Ex. 223.  In contrast, Defendants' expert Bell testified that, in his opinion, marketing the spread was permissible.  Trial Tr. Day15 at 72-73.

[213] Trial Tr. Day 14 at 15 (Pasqualone).

[214] Ex. 193.  *See also* Trial Tr. Day 14 at 72-78 (Akscin testimony discussing how the report works).

[215] Ex. 844 at 001487358.

156.    Customers also had access to a "Purchase History Report," which showed AWPs and OTN pricing.[216]

157.    OTN also offered customers a "Cost Differential" report that displayed, by regimen, the AWP, acquisition cost and "AWP Cost Differential" or spread.[217]

158.    There were times when OTN sales representatives discussed spreads for BMS drugs with customers.[218]

159.    BMS provided its employees with information on spreads.  For instance, some of John Akscin's PowerPoint presentations included information on the difference between the acquisition cost and Medicare reimbursement amounts for oncology drugs.[219]

160.    In a document distributed to the sales force, BMS compared spreads on Taxol with spreads on Taxotere.  Taxol generated a 35.5% "margin" between Medicare reimbursement and OTN cost, while the same metrics for Taxotere produced a smaller margin of 12.7%.[220]  A similar analysis for weekly administration generated a 52% margin for Taxol compared to a 23% margin for Taxotere.[221]  Taxol also won out on a three-week administration period, with a 39% margin versus 23% for Taxotere.[222]

---

[216] Ex. 848; Peterson Dep. at 217-19.

[217] Ex. 219 at 000097134-36.  *See also* Trial Tr. Day 14 at 96-99 (Akscin testimony discussing how the report works).

[218] *See, e.g.*, Ex. 4048 ("Discussed generic taxol.  They do not want to switch.  I told Melva that we are constantly lowering the cost of Taxol and that AWP is still strong.  She will stay with OTN"); Trial Tr. Day 16 at 89-93 (Peterson testimony discussing this Site Note).  At the time that this discussion occurred, OTN was the only supplier of Taxol to physicians.  Trial Tr. Day 16 at 90 (Peterson).

[219] *See, e.g.*, Ex. 197 at 000096639; *see also* Akscin Dep. at 94-95.

[220] Ex. 221 at 000157426.

[221] *Id*. at 000157428-29.

[222] *Id*. at 000157430-31.

161.    BMS distributed to the sales force a PowerPoint comparing costs and reimbursement amounts for Taxol and Paraplatin purchased from OTN.[223]  Three slides discuss "How Drugs Are Reimbursed," stating that "[m]ost payers use AWP as a basis for calculating allowables"; "payers reference one AWP pricing source" for single source products and "use this value as basis for reimbursement"; and "private payers can vary calculation methodology" for multi-source drugs but "generally reference AWP."[224]  BMS Sales representative Greg Keighley testified that this "was a stand-alone presentation that we would verbally give on an account."[225] Pasqualone testified that these types of discussions would be against company policy.[226]

162.    Other record evidence reveals examples in which sales representatives marketed the spread between actual acquisition cost and AWP when Taxol came off-patent and, for the first time, faced a new competitive environment.  For example, BMS "Grand Master" Sales Representative Doug Soule admitted to having discussed margins with both clients[227] and other BMS sales representatives.[228]  Soule also created a number of documents reflecting spread marketing or other discussions with clients about reimbursement issues.  One includes a "Decision Analysis Worksheet," where Soule compared spreads between Taxol and Paraplatin.[229]

---

[223] Ex. 222 at 001502315-16, 00150330-31.

[224] *Id.* at 001502312-14.

[225] Keighley Dep. at 269-70.  Keighley admitted that it was important for BMS sales representatives to understand the financial aspects of the drugs that they are promoting (Keighley Dep. at 107), and that BMS trained its representatives in reimbursement concepts and drug margins (*id.* at 98-100) and provided them with reimbursement assistance binders to give customers.  *Id.* at 136-40.

[226] Trial Tr. Day 14 at 42-46.

[227] Soule Dep. at 55.

[228] Soule Dep. 167-68.

[229] *See* Ex. 224; Trial Tr. Day 16 at 66-73 (Soule testimony discussing Decision Analysis Worksheet ).

163.    Documents produced by sales representative Barbara Davidson, another "Grand Master," also reveal spread marketing.[230]  Call Notes and other memos produced by BMS also highlight discussions between sales representatives and OBOs regarding reimbursement issues. Exhibit 229 contains examples of Call Notes and memos highlighting discussions relating to reimbursement and/or profitability comparisons between Taxol and Paraplatin and competing regimens.

### 6.    Class Damages

164.    Dr. Hartman, using generally accepted economic techniques, has estimated damages for the Class 2 and Class 3, on both a national and a Massachusetts only basis, and both with and without interest, for BMS for the products Blenoxane, Cytoxin, Etopophos, Paraplatin, Rubex, Taxol, Vepesid.[231]

165.    As to Class 2, these estimates assume that the "but for" AWP would be ASP.  On the basis of that assumption and for the Class period 1991-2003, Dr. Hartman estimates that the Massachusetts-only, Class 2 damages, without interest, for all BMS drugs are $3,394,933.[232]

166.    As to Class 2, Dr. Hartman, again using generally accepted economic techniques, presented the alternative damage analysis under which the "but for" AWP represents ASP times

---

[230] Ex. 225 (BMS/AWP/001508052-53 – comparing profits on Taxol and Docetaxel using cost and reimbursement rates; BMS/AWP/001508047-61 – presenting various profit scenarios between Taxol and generic paclitaxel, factoring in Paraplatin savings tied to Taxol sales; BMS/AWP/001508114-15 – comparing profits on Taxol and Taxotere; BMS/AWP/001508116-17 – showing how spreads adversely affect prescribing decisions: "Cindy recommended to the doctors that they consider using more cisplatin [and not BMS's Paraplatin].  She doesn't want to do this and knows it's not as good for patients. . . .  Given the current environment I find it hard to believe that a decision on what drug to give is based on a small margin and not what is best for the patient. Congress and others would not be happy if they found out that Documedics and pharmacy directors are telling Doctors to use Cisplatin over Paraplatin based on just the drug prices and not the total APC.").

[231] Hartman Direct (Attachment J.2.b, those estimates are year-by-year estimates disaggregated by NDC (for the without interest estimates).

[232] See Hartman direct testimony attachment J.2.a, taking Class 2 damages but subtracting the "2004" column from the "total" column.  See also Plaintiffs exhibit 4008, first page, under column "Liability Threshold Equals 0%", Massachusetts.

1.06 (representing the formula adopted through the enactment of the Medicare Modernization Act of 2003).[233]  Using that approach and for the Class Period 1999-2003, the Massachusetts-only damages, without interest, for all BMS drugs total $2,694,906.[234]

167.     This Court finds as a reasonable estimate of damages to Class 2 as against BMS in the amount of $___.

168.     As to Class 3, Dr. Hartman has estimated Class 3 damages using an approach similar to that for Class 2, except that he employs a threshold of 30%, *i.e.*, he does not estimate the damages until the "spread" between AWP and ASP equals or exceeds 30%.  Using that approach and for the Class Period 1999-2003, the Massachusetts-only damages, without interest for all BMS drugs total $1,103,915.[235]

169.     As previously found in connection with AstraZeneca, this Court finds that the methodologies used by Dr. Hartman in performing the estimates for Class 2 and Class 3 employ generally accepted economic techniques providing a sound basis upon which to estimate damages in classes 2 and 3 with respect to all BMS drugs.

170.     First, Dr. Hartman has used reasonably reliable sources of data – invoice and rebate data obtained directly by BMS, published and undisputed AWP data, well-accepted survey information from the National Ambulatory Medical Care Survey (NAMCS) and the National Disease and Therapeutic Index (NDTI).[236]

---

[233] *See* Ex. 4010.

[234] *See* Ex. 4010, page 2.

[235] Hartman Direct, Attach. J.2.a.  The damages figure of $1,103,615 is derived by taking the total, without interest, Massachusetts-only figure of $1,505,899 and subtracting the year 2004 in order to obtain the 1991-2003 figure.

[236] *See* Hartman Direct, *et passimi*; Hartman Rebuttal, ¶¶ 16-28.

171.    Second, Dr. Hartman's calculation of the average selling price, or ASP, appears quite conservative.  Dr. Hartman's ASP calculations do not include as a class of trade hospitals (which tends to purchase products at lower prices, thereby sending to drive ASPs down); they accept as true representations made by BMS regarding classes of trade and they do not include *any* of the sample programs.

172.    Third, the allocation of source of pay information between Medicare and Non-Medicare spending (and the backout of spending paid by Medicaid) appear to be based upon analysis conducted by both Dr. Hartman using the NAMCS and NDTI well recognized survey information, and are corroborated by Professor Rosenthal.

173.    Finally, the conservatism of the damages calculations are demonstrated by comparison to all dollars that were paid to dispensers, such as physicians, which acted as a financial inducements to them.  Dr. Hartman estimated the "national return to practice dollars" for each defendant; as to BMS, the return to practice dollars (*i.e.*, the dollars charged to class members in Classes 2 and 3, over and above the dollars paid to the manufacturers) exceeded $1.3 billion.[237]

174.    Plaintiffs' damages calculations also included a component of interest.  During the trial, defendants raised no issue regarding the entitlement of Class 2 and 3 to an award of prejudgment interest.  The Court finds that classes are entitled to a calculation of interest.  The Plaintiffs are directed to supplement the calculations of interest on the basis of the findings above, and defendants will be afforded with an opportunity to respond.

---

[237] Ex. 4009.

C.    J&J

175.    Centocor ("CNTO"), which manufactures, markets and sells Remicade, and Ortho

Biotech Products, L.P. ("OBI"), which markets and sells Procrit, are both corporations that are

wholly owned by the parent company Johnson & Johnson ("J&J").[238]

176.    BCBS-MA paid for Procrit and Remicade in Class 2 and 3 based upon AWP.[239]

Pipefitters purchased Procrit and Remicade based upon AWP as well for Class 3.[240]

177.    Plaintiffs seek damages for Procrit in Class 2 and for Remicade in Class 2 and 3.

1.    **J&J knew that AWP was the reimbursement benchmark used by Medicare
       Part B and many private payors**

178.    CNTO knew that Medicare would be a major source of reimbursement for

Remicade, and CNTO also knew that Medicare Part B payments were based on AWP.[241]

179.    Even before it launched Remicade, CNTO was well aware of how important it

was to make sure all major payors were reimbursed for Remicade at a high price level.  The

initial Remicade Marketing Plan identified the need to "ensure payer formulary acceptance" as a

"Key Strategic Imperative."[242]

180.    OBI was aware that "the average wholesale price was what Medicare was

reimbursing off of."[243]  Medicare Part B reimbursed for Procrit administered in the non-dialysis

market at AWP through 1997.[244]  Beginning in 1998, it was reimbursed at 95% of AWP.[245]

---

[238] J&J Answer, ¶¶ 100, 101, 104 (Dkt. No. 789); Trial Tr. Day 5 at 54 (Hoffman).

[239] Ex. 4012; Trial Tr. Day 17 at 53-60.

[240] Ex. 4012; Trial Tr. Day 17 at 53-60.

[241] Ex. 249 (Remicade marketing plan, p. 51 Medicare "covered amount will be 95% of AWP"); Trial Tr. Day 5 at 62 (Hoffman).

[242] Ex. 249 at 2813; *see also id.* at 2758.

[243] Trial Tr. Day 7 at 17 (Dooley).

[244] *Id.* at 12.

181.    OBI management knew that providers and retailers billed private insurers, patients and Medicare based on a percentage of AWP.  OBI management also was aware that public and private insurers used the compendia to determine the AWPs of drugs for reimbursement purposes.[246]

### 2.    J&J caused AWPs to be published for its Subject Drugs – for Remicade it departed from industry norms and set AWP at 30% over WAC

182.    CNTO knew that the Publishers would simply republish what CNTO provided them.[247]

183.    During the trial most industry and expert witnesses testified that there was a standard markup of WAC by 20% or 25%, depending upon the company.  CNTO decided to create a 30% spread for Remicade by setting the AWP at 30% above WAC.[248]  CNTO's John Hoffman testified that the AWP spread was set at 30% because CNTO thought that spread would allow doctors to make a profit and because CNTO thought insurers would pay that high for Remicade.[249]

184.    In the initial price announcement CNTO provided only an AWP price to Publishers; there was no WAC for Publishers to calculate a different AWP.[250]

185.    For each of the four price increases for Remicade, CNTO announced the new "suggested" AWP at the same time it announced a new list price.  Each price increase had a WAC to AWP mark-up of 30%.[251]

---

[245] *Id.*

[246] Kling Dep. at 105:2-6; Webb Dep. at 67:9-22, 68:1-9.

[247] Webb Dep. at 56; *see, also*, Ex. 249 (where CNTO discusses "setting" the AWP, not recommending or suggesting an AWP).

[248] McHugh Dep. 134:11-135:10.

[249] Trial Tr. Day 5 at 56-58 (Hoffman).

[250] Ex. 250.

186.    When Procrit launched in 1991, OBI set the list price for all Procrit dosages.[252]
At OBI, "list price" means the "wholesale acquisition price" ("WAC") of the drug.[253]

187.    OBI also set, rather than recommended, Procrit's AWP.[254]  OBI set Procrit's
AWP by mechanically adding a 20% markup to the list price.[255]  This calculation was made at
launch and at every price change thereafter, irrespective of the actual costs of manufacturing, the
actual costs connected with administration, or any discounts, rebates or chargebacks provided to
Procrit customers.[256]

188.    There were no price increases from Procrit's launch until 1997.[257]  OBI increased
Procrit's price eight times between 1997 and 2005.  OBI's first price increases, in February 1997
and January 1998, applied only to certain Procrit NDCs.  OBI raised Procrit's price on all put-
ups twice in 2000 (in January and November 2000) and once again in September 2001.[258]  OBI
raised Procrit's list price in June 2004, December 2004 and April 2005.[259]

189.    Prior to June 8, 2004, OBI communications to Publishers, wholesalers and
distributors concerning Procrit's prices provided new list prices *and* corresponding AWPs.[260]

---

[251] Ex. 825; Trial Tr. Day 5 at 55 (Hoffman).

[252] Pearson Dep. at 180:6-8; Webb Dep. at 57:16-21.

[253] Pearson Dep. at 177:7-13.

[254] *Id*. at 178:16-18.

[255] Trial Tr. Day 7 at 36 (Dooley).

[256] *See*, *e.g.*, Kling Dep. at 109:17-110:17; Hiriak Dep. at 205:8-206:9; Webb Dep. at 64:3-15, 64:10-14, 64:18-65:9.

[257] Trial Tr. Day 7 at 39 (Dooley).

[258] Exs. 237, 238, 360 and 978.

[259] J&J Rule 56.1 Statement of Facts, ¶77.

[260] *See* Exs. 237, 238, 360 and 978.

None of the price notices cited characterized the AWP prices as "recommendations" or "suggestions."[261]

190.    OBI witnesses testified that they could not recall a single instance when the actual AWP prices provided by OBI were not published.[262]  Catherine Piech, a pricing expert for J&J's Pharmaceutical Group Strategic Marketing ("PGSM") expressed her surprise that any entity other than J&J could control published prices for J&J drugs.  "I'm not sure how a survey of wholesalers could produce a higher spread since ***branded companies typically set and publish/provide their WACs and AWPs***."[263]

### 3.    J&J's AWPs for its Subject Drugs were false

#### a.    J&J did not include discounts in its reported AWP and did not report an actual average

191.    CNTO acknowledges that its AWP for Remicade was simply the WAC price plus 30%.  Centocor never sold any Remicade to anyone at AWP, the highest price CNTO ever charged for Remicade was WAC.[264]

192.    CNTO did provide its customers with several types of price reductions from WAC, including prompt payment discounts of up to 2% and "service fees" to specialty distributors who handled Remicade and delivered it to physicians.[265]  CNTO also paid rebates to certain managed care plans to promote Remicade.[266]

---

[261] *Id.*

[262] *See*, *e.g.*, Webb Dep. at 66:16-21, 67:1-8; Hiriak Dep. at 214:18-215:1; Kling Dep. at 103:2-5, 115:21-22, 116:1-22.

[263] Ex. 236 (emphasis added).

[264] Trial Tr. Day 5 at 59 (Hoffman).

[265] *Id.* at 60-61.

[266] *Id.* at 109, 112.

193.    Procrit was launched 18 months after Epogen.  Since Procrit was "the second drug into the marketplace, [OBI] needed to offer a discount to get physicians to try the new drug that was on the market, which was the exact same drug that was already on the market."[267]  OBI determined that it was necessary to discount the 10,000 unit vial's list price to $9.50 per unit, contrasted with the $10.00 per unit price for the remaining put-ups.[268]

194.    Beginning in the early 1990s, OBI offered a 5% off-invoice discount to non-dialysis customers.[269]  Between 1993 and 1999, OBI offered its Retail, Physician, and Contracted Customer various rebate programs that ranged between 6 and 12%.[270]  Physician distributors received a 2% administration fee from OBI.[271]  Hospitals and acute-care facilities were eligible for up-front discounts ranging from 5 to 7%.[272]  OBI offered a variety of discounts and rebates to customers to stimulate Procrit sales.[273]

195.    Throughout the 1990's, OBI field sales representatives periodically circulated promotional flyers to physicians and hospitals offering enhanced discounts to purchasers of an additional 3%.[274]

196.    In 2003-2004, OBI created a new contract for physicians offering even greater discounts and rebates, including an up-front discount of 22% for Procrit purchases and an additional 2% rebate if market-share or volume-incentive levels were achieved.[275]

---

[267] Trial Tr. Day 7 at 58-59 (Dooley).

[268] *Id.* at 58:1-9.

[269] Robbins Dep. at 231:7-17; Dempsey Dep. at 121:7-22.

[270] Trial Tr. Day 7 at 14-15 (Dooley).  *See also* Ex. 976.

[271] Dempsey Dep. at 126:11-17, 132:3-133:19.

[272] Kling Dep. at 193:1-21.

[273] *See, e.g.*, Robbins Dep. at 126:13-18, 138:3-140:6, 231:7-17, 232:11-233:3, 235:13-236:14, 237:1-5.

[274] Robbins Dep. at 232:11-233:3, 235:13-236:14.

197.    Despite the fact that OBI offered significant rebates and off-invoice discounts throughout the Class Period, OBI never adjusted its reported AWP, other than coincident to price increases.  Nor did it change the established AWP from 20% above list price.

### b.    J&J manipulated its pricing to create spreads

198.    When Procrit was launched, OBI considered Epogen a competitor.[276]  OBI kept Procrit's list price and AWP at parity with that of Epogen.[277]  OBI attracted customers away from Epogen by offering customers greater rebates and discounts than Amgen.[278]

199.    According to Cathy Dooley, OBI's pricing strategy must enable physicians to receive an amount of reimbursement from Medicare that made them "whole" prior to collecting any co-payment revenue from the patient.[279]

200.    In order to offset Medicare's change in reimbursement on January 1, 1998 from AWP to AWP-5%, OBI twice raised Procrit's list price.  During February 1997, OBI increased prices on its most popular 10,000 unit vial by 3.5%.  Then, merely ten months later in January 1998, the same items were increased by an additional 1.8%.[280]  This strategy ensured that the *amount* of reimbursement physicians received remained essentially unchanged after reimbursements were reduced in 1998.

201.    Thomas Hiriak, OBI's Executive Director of Strategic Accounts and 30(b)(6) witness testified that the factors OBI considered in initiating Procrit price increases were

---

[275] *See* Dempsey Dep. at 121:7-122:18, 124:22-125:15.

[276] Pearson Dep. at 401:15-22, 402:1-5; Dempsey Dep. at 110:13-112:1.

[277] Ex. 365.

[278] Ex. 270 at 544.

[279] *See* Ex. 339 at 6807.

[280] Ex. 237, 238.

"*[o]bviously margins and what could potentially happen to physicians' margins*."[281]  Other

factors included "[t]iming since the last price increase, future marketplace changes, what

potential reaction would be of our competitors. . . ."[282]

> ### c.  J&J was fearful of the impact of the government learning of its spreads

202.    In 2000, an OBI manager noted that the advantages for taking a price increase

include "Greater discounting flexibility" and "Higher reimbursement from private payors –

Possible positive perception from Physicians."[283]

203.    OBI was aware that "there was a significant difference between AWP and

acquisition price" and that should Medicare conduct a survey of prices, it would lower

reimbursement.[284]

204.    OBI was also aware that Medicare did not know Procrit's actual costs that were

available to various providers.[285]  Further, OBI was aware that the only way Medicare could

determine Procrit's market price was to request invoices from each provider, a system that would

be "very cumbersome . . . ."[286]

205.    OBI was aware that Procrit's AWP caused increased costs to both Medicare and

consumers.  Cathy Dooley stated that "[t]his will be a sensitive issue because the physician is

---

[281] Hiriak Dep. at 228:21-22, 229:1-13 (emphasis added).

[282] *Id.* at 229:6-9.

[283] *See* Ex. 244.

[284] Trial Tr. Day 7 at 18 (Dooley); Ex. 339.

[285] Trial Tr. Day 5 at 23 (Dooley); Ex. 259.

[286] *Id.*

able to bill Medicare and the patient off of AWP.  The patient's 20 percent copay is higher than it would be if it was billed off acquisition cost (public relations issue)."[287]

206.    Cathleen Dooley referred to the spread between AWP reimbursement and acquisition cost as a "windfall" oncologists derived by administering Procrit through their practices.[288]

207.    OBI viewed a decrease in the spread available to physicians as a threat to Procrit's sales.[289]

208.    In 1997, OBI viewed Medicare's then proposed change in reimbursement from AWP to AWP – 5% as a threat to Procrit's sales.[290]

209.    When it increased Procrit's prices in 1997 and 1998, OBI was concerned that a price increase that raised Procrit's AWP over that of the equivalent Epogen product could "raise red flags" and "trigger a price survey."[291]  As noted above, the price survey would result in lowered reimbursement amounts for Procrit.

210.    OBI was aware that physicians had "significant economic incentives to prescribe supportive care drugs such as Procrit, due to revenue and profits from stocking and administering."[292]

211.    OBI was also aware that oncologists administering Procrit could earn as much as $1,520.00 per patient per course of therapy.[293]

---

[287] Trial Tr. Day 5 at 27-28 (Dooley); Ex. 259 at 843.

[288] Trial Tr. Day 7 at 29-30 (Dooley); Exs. 365, 979.

[289] *See* Exs. 365, 979.

[290] Trial Tr. Day 7 at 32-33 (Dooley); Ex. 365.

[291] *Id.*; *see also* Trial Tr. Day 7 at 34-35 (Dooley).

[292] Trial Tr. Day 7 at 44 (Dooley); *see also* Ex. 334 at 6789.

[293] Trial Tr. Day 7 at 45-46 (Dooley); *see also* Ex. 346.

212.   Ms. Dooley admitted that the true spread between Procrit's physician acquisition price and its AWP could be as much as 30 to 35%.[294]

### d.   J&J marketed the spread on Remicade

213.   CNTO created the AWP spread and AWP and WAC prices with the intention of ensuring that doctors buying Remicade could make a profit.  CNTO recognized that it was a "Key Strategic Imperative" to "set AWP at a level that preserves a modest margin for providers, ensures break-even potential for Medical providers, and is consistent with payer price elasticities."[295]  CNTO knew doctors would not administer Remicade in their offices if there was no financial incentive to do so.[296]

214.   CNTO developed and implemented a multi-faceted Practice Management Program ("PMP") to show physicians how to make money by buying, infusing and billing for Remicade.  The PMP began with the launch of Remicade in 1998 and continued for several years.[297]

215.   Among the PMP materials CNTO developed was a Financial Impact Worksheet, which a physician could use by filling in his acquisition cost for Remicade, the percent discount off AWP he would get in reimbursement (the AWP was pre-printed on the form) and his patient case load and the number of vials per patient.  From this a physician could calculate his estimated "margin per vial" "revenue per patient" and "monthly revenue from Remicade."[298]

---

[294] Trial Tr. Day 7 at 88-89 (Dooley).

[295] Ex. 249 at 97 (CNTO Initial Marketing Plan).

[296] Trial Tr. Day 5 at 93 (Hoffman).

[297] Glassco Dep. at 20:14-21:22; McHugh Dep. at 252:15-253:14 and 355:10-356:13.

[298] Ex. 252 at 8 and 4 (stating that one of the benefits of infusing Remicade is a "financial benefit to the physician's practice").

CNTO sales representatives would meet with physicians to discuss the worksheet and the "financial ramifications" of infusing Remicade.[299]

216.    The Financial Impact Worksheet was also available on CNTO's website.[300]

217.    CNTO also developed a more detailed and sophisticated software program that allowed physicians, with the assistance of a CNTO representative, to input detailed information about their various health plan payors and patient mix, to reach a more precise calculation about how much profit could be made from infusing Remicade.[301]

218.    Keith Patterson, a former CNTO Marketing Director, admitted that Remicade was marketed on a physician's "Return To Practice" or profit, similar to AZ's Zolodex.[302]  Patterson also confirms the CNTO touted a physician's profit or "financial incentives" as a reason to conduct in-office infusions.[303]

219.    CNTO executives held up as examples of good salesmanship reports of how sales representatives sold physicians on using Remicade based on the AWP spread.[304]

220.    CNTO also brought scores of doctors to PMP seminars, where the economics and profit potential of the AWP spread on Remicade was explained directly.[305]  CNTO senior sales executive Laura Glassco provided the PowerPoint presentations she used for such seminars and walked through her presentation on how doctors can profit from both Medicare and private

---

[299] Trial Tr. Day 5 at 66-68 (Hoffman).

[300] *Id.* at 68:13-15.

[301] Ex. 289; Trial Tr. Day 5 at 69 (Hoffman).

[302] Patterson Dep. at 311:21-313:17.

[303] *Id.* at 316:17-317:15.

[304] Ex. 272.

[305] Glassco Dep. at 27:7-29:11.

insurers by using the AWP spread on Remicade.[306]  Glassco expressly used the term "profit" to highlight the AWP spread on Remicade.[307]

221.    At the same time CNTO was operating its wide-scale PMP campaign, its sister J&J Company, OBI, was telling its employees that it "is absolutely inappropriate to sell product based upon the difference between AWP and acquisition price."[308]

222.    Over a year after this case was filed, in June 2002, CNTO reversed its prior position and told its employees not to answer physician questions about Return To Practice or revenues from Remicade, saying that such answers would violate CNTO's policies.[309]

> **e.    J&J marketed the spread on Procrit**

223.    Prior to bringing Procrit to market, OBI was aware that the amount of reimbursement that physicians, hospitals and retail pharmacists received was a primary driver in those markets.[310]  By 1993, OBI knew that oncologists made a "significant" portion of their revenue from the drugs they prescribed.[311]

224.    Prior to at least November 2001, there was no writing or written policy at J&J or OBI that advised any segment of OBI's sales force against marketing Procrit's spread to customers.[312]

225.    Sales materials used by OBI field sales managers and representatives highlighted the financial benefit of Procrit's spread to customers.  Sales training materials presented at a

---

[306] *Id.* at 105:4-108:12, 109:15-19, 111:10-112:18; Ex. 254.

[307] Ex. 254 at 300; Glassco Dep. at 14:16-47:8.

[308] Ex. 2767.

[309] Ex. 2835 (questions 3, 4, 12, 14c and 15); Glassco Dep. at 113:17-114:5.

[310] Hiriak Dep. at 92:1-93:16, 94:1-95:12.

[311] *Id.* at 96:13-15, 96:18-97:14, 156:21-157:10, 157:12-15, 159:18-19, 160:3-18.

[312] Ex. 330.

three-day 1992 Regional Training Workshop held in Houston, Texas were distributed to OBI's

sales representatives from the Houston, Dallas, Atlanta, Florida, Carolina and Philadelphia

Divisions.[313]   Among these materials were included:  (i) A document reflecting the amount of

profit a physician will "clear" under Medicare based on the difference between acquisition cost

(including rebates) and Medicare reimbursement for the various Procrit dosages[314]; (ii) a

document showing that the overall cost of Procrit, after 11% rebates, is far below that of its

competitor Epogen (and therefore has a greater spread since it is reimbursed at the identical

amount)[315]; (iii) a document advising the sales force to highlight the "profitability of 8% retail

rebate"[316] and to "[k]now how to explain Procrit Profit to the Pharmacist."[317]  This document

was intended to be a standardized training program for all newly hired field sales representatives.

226.    OBI's marketing efforts for Procrit included providing value-added services to

physicians in obtaining reimbursement for Procrit.  OBI created the PROCRITline, a

reimbursement hotline to assist physician offices, and a reimbursement assurance program that

guaranteed reimbursement for physicians.[318]

227.    OBI's "1998 Reimbursement Update and Challenges" admits that from at least

the early 1990s through late 1997, the Procrit "[m]arket [was] driven by MD profit

incentives."[319]

---

[313] Ex. 270 at 62508.

[314] Ex. 270 at 62543.

[315] *Id*. at 62544.

[316] *Id*. at 62563.

[317] *Id.* at 62599.

[318] Ex. 270 at 62532-42.

[319] Ex. 242 at 58922.

228.    In 1999, a McKinsey and Company report for OBI concluded that as of that date, Procrit had primarily been "[u]sed by physicians because it is economically attractive."[320]  This report also found that "physicians have significant economic incentives to prescribe supportive care drugs such as Procrit, due to revenue and profits from stocking and administering."[321]

229.    McKinsey & Company notes that "[f]or private physicians, stocking and administering Procrit yield significant profit opportunities."  The report also highlighted physician statements that "[m]y practice makes $6-8,000 per month on Procrit."  The report also provides a graph of "physician economics" demonstrating the amount of profit physicians receive from prescribing Procrit.[322]  Further emphasizing the need for providing economic incentives to physicians, under the heading "Influencing Physician Usage" McKinsey notes that the "Implied Strategy" is that "OBI must preserve positive economics for physicians" and "if economics deteriorate" then "[s]tandard of care and 'habitual' prescribing increases in importance."[323]

230.    A former OBI Divisional Sales Manager, John Hess, sent a memorandum to his sales team (responsible for Minnesota, Wisconsin, Iowa, Nebraska, the Dakotas, Missouri and Kansas) summarizing an OBI Western Region Marketing Strategy meeting.  This memo details the main strategies that an OBI sales and marketing manager recommended to increase sales to high-user oncology clinics, including "the ability to tactfully discuss how an office can profit from providing Procrit in the office."[324]  The memo notes that "[t]his discussion can be brought

---

[320] Ex. 334 at 6807.

[321] Ex. 334 at 6789.

[322] *Id.* at 6792.

[323] *Id.* at 6810.

[324] Ex. 268 at 63656.

up whenever an office raises the objection about the expense of Procrit therapy and how they are at risk of losing money when they purchase expensive medications such as Procrit. The office needs to understand that there is profit associated with Procrit and that they are also protected from loss under our reimbursement Assurance Program."[325] The memo also describes a "return on equity for Procrit" explanation that sales representatives were to use on visits to oncology practices and advised that "[w]hen reviewing with a physician or office manager you should ask for their real numbers."[326]

231.    The document also specifically quantifies for sales representatives the: (i) Non-Medicare per patient profit, and (ii) Medicare per patient profit, for physicians prescribing Procrit over a week, month, six months and year.[327] In connection with these examples, Mr. Hess instructs: "When reviewing this information simply draw out the scenario on a piece of scratch paper asking for the office billing fee, injection fee, and acquisition fee based on medicare or non-medicare. Give this a try in those offices raising the objection of cost and risk to the office."[328] Mr. Hess stated that he did not believe that the content of his memorandum violated any written or unwritten policy at OBI at that time.[329]

232.    When confronted with the Hess Memorandum, James Robbins, OBI National Field Sales Director, conceded that it encouraged spread marketing.

> Q: And isn't that an incentive –we're referring again to the Exhibit Robbins 021. Isn't that an incentive for the doctor to put as many patients as he can on Procrit and to keep them on it for as long as possible?

---

[325] *Id.*

[326] Ex. 268 at 63656.

[327] *Id.*

[328] Ex. 268 at 63657.

[329] Hess Dep. at 96:18-97:1.

Mr. Schau:  Object to form.

Mr. Robbins:  There's two parts to your question, and the answer's not the same for both.  On the first part, assuming that John's [Hess] numbers are correct there, the first part would be yes."[330]

233.    An OBI memorandum dated March 22, 1995, shows that sales representatives successfully promoted margin to convert physician practices to purchase Procrit 20,000 unit put-ups instead of Procrit 10,000 put-up.  Patricia Hawley, an OBI sales representative in its Orlando District, noted that among the key factors that were successful in persuading physician practices to convert to the higher dosages were the "[g]ood profit margin between the $96.00 Medicare payment and the $80.75 promotion price for administering 10,000 units of the multidose vial."[331]

234.    A letter dated September 28, 1998, from Brock Weathers to Michael Kalson, M.D. at Academy Orthopaedics [sic], follows up a visit by explicitly laying out the costs and reimbursement of Procrit.[332]

235.    A presentation titled "Procrit Reimbursement Alternatives," was developed and presented by Documedics, with the input and approval of OBI's Cathleen Dooley.[333]  Bobbi Buell, the presenter, on behalf of OBI, asks, "Can you make money????"[334] and states "[d]rugs have paid well under part B."[335]  Ms. Buell concludes her presentation with the question "Should you give Procrit?" and her first reason in support thereof is that it provides "Additional revenue."[336]

---

[330] Robbins Dep. at 466:5-15.

[331] Ex. 269 at 63648.

[332] Ex. 364.

[333] Ex. 331.

[334] *Id.* at 33.

[335] *Id.* at 38.

[336] *Id.* at 41.

236.    In response to Amgen's Aranesp introduction in 2001, OBI sought to increase the level of rebates and discounts that it offered to its customers.[337]

237.    Based upon the recommendation of Dr. Bell, Defendants' expert, OBI delivered an economic message that a physician would be better off economically by staying with Procrit due to the comparatively higher cost of Aranesp to physicians and patients at higher doses, and the costs of switching from Procrit to Aranesp in terms of a loss of rebates, discounts and other administrative costs.[338]  Dr. Bell also advised OBI to develop a spreadsheet that doctors could use to calculate their profits.[339]

238.    OBI developed computer CD-Rom materials that were designed to show a physician the economic advantage gained by continuing to dispense Procrit, rather than switch to Aranesp, due to the comparative value of the discounts and rebates OBI offered.[340]  Testimony indicates that some of the CDs shown to physicians contained references to AWP.[341]

**f.    J&J hid the true price of its products**

239.    When discussing Remicade costs with health plans, CNTO was careful not to reveal the physicians' acquisition cost, but only to reference the AWP price.  CNTO's Cost Minimization Model or Cost Comparison Model software was used with health plans to encourage them to provide reimbursement for Remicade.[342]  That software only references AWP,

---

[337] Robbins Dep. at 138.

[338] *See* Bell presentation.  Exs. 343, 344, 466, 469-71, 478.

[339] Ex. 344.

[340] Ex. 248.

[341] Robbins Dep. at 295:4-19.

[342] Ex. 285.

not WAC or acquisition cost.  CNTO did not show health plans their various marketing tools that revealed physician acquisition prices or profit.[343]

240.    CNTO's Senior Director for Reimbursement Services, Michael Ziskind, articulated CNTO's policy of hiding acquisition prices from Third-Party Payors and Class members in a July 6, 1999 memo on the background of AWP and spread.  Ziskind explained that the "'cost of therapy' varies widely based on the audience."  Ziskind then explained CNTO's strategy was to not mention both wholesaler cost and AWP in the same conversation, because to do so would "set payers' expectations too low" and would "highlight spread more than we would like."[344]

241.    On the one occasion where CNTO did report the price of Remicade to the Federal government, it hid the truth.  When CNTO applied for a specific J-Code for Remicade, the application asked for Remicade's wholesale price.  CNTO responded by saying that the wholesale price was AWP and that the retail price was equivalent to WAC.[345]  Those statements were directly contrary to the fact that Remicade's WAC, not AWP, was effectively the wholesale price.[346]

242.    At trial, CNTO highlighted the fact that it worked with insurers to help them lower their cost of infusing Remicade, specifically citing to work done with Aetna.[347]  However, at the same time, CNTO was also telling its physician customers to threaten Aetna by saying the

---

[343] Trial Tr. Day 5 at 83-84 (Hoffman).

[344] Ex. 260.

[345] Ex. 261.

[346] Trial Tr. Day 5 at 59:14-17 (Dooley) (wholesale price close to WAC) and 59:21-25 (Remicade had no retail price) (Hoffman).

[347] *Id*. at 103-107.

doctors would send Remicade treatments back to the hospital unless Aetna raised reimbursement rates.[348]

243.    Both CNTO and OBI's rebate contracts contained confidentiality clauses, which prevented the parties receiving rebates from revealing the amount, or even the existence of rebates on Remicade or Procrit.[349]

g.    **Government knowledge of Remicade and Procrit's true price**

244.    Ms. Dooley testified that she had conversations with officials from CMS about the true prices for Procrit.[350]  Despite the fact she regularly wrote to her superiors, Ms. Dooley has no notes or memo regarding her meetings.[351]  Nor do any of the millions of documents produced by CMS reflect such conversations.[352]  However, as discussed below, Dooley authored several memorandum expressing concerns about the government learning of Procrit's true price.

245.    On August 6, 1996, Ms. Dooley warned that if the government conducted a survey and, in fact, learned of the "significant" discrepancy between AWP and actual acquisition cost for non-End Stage Renal Disease treatment, the likely consequence would be that the government would take action to lower the reimbursement rate for Procrit providers in non-dialysis.[353]

246.    When OBI considered taking a price change, it was careful not to raise its list price above that of Epogen because OBI did not want to raise the undue attention of HCFA, which could trigger a pricing survey or investigation by the government.

---

[348] Ex. 302 at 32731.

[349] Ex. 2804 (sec. 1.5 and 3.1).

[350] Trial Tr. Day 7 at 16 (Dooley).

[351] Trial Tr. Day 7 at 24-25 (Dooley).

[352] *Id.*

[353] Ex. 339 at 61805.

247.     In a memorandum dated December 2, 1997, Ms. Dooley highlighted several key "Implications for Increase over Parity" including:  (1) "Change in list price could trigger a drug pricing survey by HCFA," (2) "You may have a pricing survey anyway, but raising red flags could trigger it earlier," and (3) "Consequence of pricing survey could be acquisition, FSS or ESRD reimbursement rate in non-dialysis."[354]

248.     A day later, Gary Reedy sent a memorandum recommending against OBI taking a price increase above parity for similar reasons:  "We feel creating a higher list price could raise undue attention and possibly trigger a drug survey by HCFA because of the difference in list price for the two identical drugs, Procrit and Epogen."[355]

249.     Ms. Webb agreed that the risk of triggering a government price survey was a sound basis for advising against OBI taking a greater price increase at that time.[356]

250.     Ms. Dooley, in an e-mail dated January 7, 1998, explained that Medicare was in the dark as to the actual average acquisition price of Procrit, because if the government actually knew, it would lower reimbursement to providers.  "This was fortunate for us.  The only way they could correct the current system is to require an invoice be submitted with each Medicare claim that is sent in.  This would be very cumbersome and the medical providers and Medicare carriers have rejected this…Right now they do not know what the cost is for different providers."[357]

251.     OBI knew that consumers were unaware of the discrepancy between AWP and average acquisition cost, and indeed would have been unhappy to learn of it.  In an e-mail from

---

[354] Ex. 262 at 61052.

[355] Ex. 263.

[356] Ex. 263; Webb Dep. at 103:9-15.

[357] Ex. 259 at 58842.

- 66 -

Cathleen Dooley to Richard Moran dated January 6, 1998, Ms. Dooley highlighted that patients would be surprised to learn that physicians bill patients 20% off AWP, rather than off of the lower acquisition cost:  "***This will be a sensitive issue because the physician is able to bill Medicare and the patient off of AWP; the patient's 20% co-pay is higher than it would be if it was billed off of acquisition cost (public relations' issue).***"[358]

> **h.    OBI increased its price to eliminate the BBA price reduction**

252.    OBI carefully tracked Congressional developments with respect to changes in AWP reimbursement.  By April 1997, it was worried that a reduction in AWP would "impact the windfall that the physician receives for the drug" and that a change in reimbursement would impact "sales."[359]

253.    To mitigate the impact of a reduction in AWP effective January 31, 1998, OBI raised the price of Procrit in January 1998 by 1.7%.[360]  When combined with an increase of 3.5% in 1997, these two increases exceeded the 5% reduction in AWP Congress implemented in January 1998.[361]

> **4.    Damages**

254.    Dr. Hartman, using generally accepted economic techniques, has estimated damages for Class 2 and Class 3.  On both a national and a Massachusetts only basis, and both with and without interest, for Johnson & Johnson for the products Procrit and Remicade.[362]

---

[358] Ex. 259 (emphasis added).

[359] Ex. 365.

[360] Ex. 263; Trial Tr. Day 7 at 38 (Dooley).

[361] Trial Tr. Day 7 at 38-39 (Dooley).

[362] Hartman Direct, Attach. J.3.b.

Those estimates are year-by-year estimates disaggregated by NDC (for the without interest estimates).[363]

255.    As to Class 2, these estimates assume that the "but for" AWP would be ASP.  On the basis of that assumption and for the Class Period 1991-2003, Dr. Hartman estimates that the Massachusetts-only, Class 2 damages, without interest for Procrit are $3,079.517 and for Remicade are $817,062.[364]

256.    Also as to Class 2, Dr. Hartman, again using generally accepted economic techniques, presented the alternative damage analysis under which the "but for" AWP represents ASP times 1.06 (representing the formula adopted through the enactment of the Medicare Modernization Act of 2003).[365]  Using that approach and for the Class Period 1999-2003, the Massachusetts-only damages, without interest, for drugs total $2,694,906 and for Remicaid total $610,412.[366]

257.    This Court finds as a reasonable estimate of damages to Class 2 as against BMS for Procrit in the amount of $___, and for Remicade in the amount of $____.

258.    As to Class 3 relating to Procrit, Plaintiffs do not seek damages.

259.    As to Class 3 and relating to Remicade, Dr. Hartman has estimated damages using an approach similar to that for Class 2.  As with other drugs, he provides a conservative threshold in order to address the reality of the third party payor expectations.  As this applies to Johnson & Johnson and the drug Remicade, however, there are some unique features of

---

[363] *Id.*

[364] See Hartman Direct testimony at Attachment J.3.a, taking Class 2 damages but subtracting the "2004" column from the "total" column.  See also Plaintiffs' Exhibit 4008, first page, under column "Liability Threshold Equals 0%", for Massachusetts.

[365] Ex. 4010.

[366] Ex. 4010, page 2.

Remicade which pose different questions regarding the appropriate threshold to be determined in estimating damages under Class 3.

260.    First, unlike every other drug discussed in the litigation (and apparently unlike virtually all other drugs), Johnson & Johnson caused the AWP-to-WAC ratio for Remicade to depart starkly from the usual and expected 1.20 or 1.25 multipliers.  As to Remicade, Johnson & Johnson caused the AWP-to-WAC markup to be 1.30, *i.e.*, 5 percentage points higher than what is normally expected in the market place for single source, branded products.

261.    Second, it appears that significant difficulties were encountered by Plaintiffs in the acquisition and interpretation of ASP data from Johnson & Johnson.  Even Johnson & Johnson's own expert, Mr. Dukes, testified that his many adjustments to ASP were simply based upon representations that were given to him by counsel for Johnson & Johnson or employees at Johnson & Johnson – representations that he, himself, did not test for accuracy.

262.    Third, while at the trial the "spread" between AWP and ASP was typically discussed in terms of percentages, it was also recognized that "spread" might be measured n by the total dollars involved.  After all, large percentages can sometimes mean small dollars, and small percentages can sometimes mean large dollars: Since providers may be motivated by the dollars that he/she might receive by prescribing one drug rather than another, at times the percentages is less relevant than the actual dollars involved.  As with Remicade, the dollars are large although the spreads may "only" be close to, although sometimes higher than, 30%.

263.    As a result, at trial, alternate calculations of Class 3 damages for Remicade were adduced.

264.    As with other drugs, one approach was set forth by Dr. Hartman in which he employs a threshold of 30% *i.e.*, he does not estimate the damages until the "spread" between

AWP and ASP equals or exceeds 30%. Using that approach and for the Class Period 1999-2003, the Massachusetts-only damages, without interest for Remicade total $236,791.[367]

265. Alternatively, Dr. Hartman also provided a "5% margin analysis", *i.e.*, an analysis under which the artificial WAC-to-AWP markup of .30 exceeded the highest insurer markup for retail branded drugs of .25.[368] In the total national 5% margin analysis damages total $191,593,208; prorated as to Massachusetts (*i.e.*, 2.6433% of the national figure) and using the 5% approach for damages as to Johnson & Johnson's Remicade and for the class period 1999-2003, the Massachusetts-only damages, without interest, for Remicade total $506,438.

266. As a result, this Court finds as a reasonable estimate of damages to Class 3 as against Johnson & Johnson for Remicade in the amount of $____.

267. This Court finds that the methodologies used by Dr. Hartman in performing the estimates for Class 2 and Class 3 employ generally accepted economic techniques and provide a sound basis upon which to estimate damages in classes 2 and 3 with respect to both Johnson & Johnson drugs.

268. First, Dr. Hartman has used reasonably reliable sources of data – invoice and rebate data obtained directly from Johnson & Johnson, published and undisputed AWP data, well-accepted survey information from the National Ambulatory Medical Care Survey (NAMCS) and the National Disease and Therapeutic Index (NDTI).[369]

269. Second, Dr. Hartman's calculation of the ASP, appears quite conservative. Dr. Hartman's ASP calculations do not include as a class of trade hospitals (which tends to purchase products at lower prices, thereby sending to drive down ASPs) and they accept as true

---

[367] Hartman Direct, Attach. J.3.a.

[368] Hartman Rebuttal, Attach. G; Ex. 4066.

[369] *See* Hartman Direct, *et passim*; Hartman Rebuttal, ¶¶ 16-28.

representations made by BMS regarding classes of trade (representations which drive down the estimates of damages).

270.    Third, the allocation of source of pay information between Medicare and non-Medicare spending (and the backout of spending paid by Medicaid) appear to be based upon analysis conducted by Dr. Hartman using the NAMCS and NDTI well recognized survey information, and are corroborated by Professor Rosenthal.

271.    Finally, the conservatism of the damages calculations are demonstrated by comparison to all dollars that were paid to dispensers, such as physicians, which acted as a financial inducements to them.  Dr. Hartman estimated the "national return to practice dollars" for each Defendant; as to Johnson & Johnson, the return to practice dollars (*i.e*., the dollars charged to class members in Classes 2 and 3, over and above the dollars paid to the manufacturers) exceeded $1.5 billion.[370]

272.    Plaintiffs' damages calculations also included a component of interest.  During the trial, Defendants raised no issue regarding the entitlement of Classes 2 and 3 to an award of prejudgment interest.  The Court finds that the classes are entitled to a calculation of interest. The Plaintiffs are directed to supplement the calculations of interest on the basis of the findings above, and Defendants will be afforded with an opportunity to respond.

273.    Though the spreads of 25% to 30% might seem small compared to other spreads, each of these drugs is expensive, thus small changes in spread result in significant revenues to doctors.  Doctors earned $853,392,342 on Procrit and $669,146,331 on Remicade during the Class Period.[371]

---

[370] Ex. 4009.

[371] Ex. 4009.

**D.     The Schering-Plough Group**

274.     Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.  Schering-Plough Corporation's Answer to Intervenors' Amended Master Consolidated Class Action Complaint ("S-P Answer").[372]

275.     Defendant Warrick Pharmaceuticals Corporation ("Warrick") is a Delaware corporation with its current principal place of business purportedly at 12125 Moya Boulevard, Reno, Nevada.  Warrick Pharmaceutical Corporation's Answer to Intervenors' Amended Master Consolidated Class Action Complaint ("Warrick Answer").[373]  The Reno, Nevada address corresponds to a warehouse.[374]  Warrick, a wholly owned subsidiary of Schering Corporation, is one of the subsidiaries by and through which Schering-Plough conducts its business.[375] Schering-Plough formed Warrick in 1993.[376]  Warrick markets generic pharmaceutical products manufactured by Schering-Plough or entities controlled by Schering-Plough.[377]

276.     Drugs manufactured and sold by Schering-Plough, via one or more of its subsidiaries or units, and covered by Medicare Part B during the Class Period, include albuterol solution as a branded product (Proventil), Intron-A (interferon alfa-2b recombinant), and Temodar (temozolomide) (collectively referenced as "Schering-Plough drugs").[378]

---

[372] ¶ 116

[373] ¶ 118

[374] Deposition of Harvey J. Weintraub, September 18-22, 2006 ("Sept. 2006 Weintraub Dep.") at 576:1-10, 883:19-884:25; Deposition of Harvey J. Weintraub, November 7-8, 2001, at 76:1-24.

[375] Warrick Answer, ¶ 118.

[376] Warrick Answer, ¶ 118.

[377] Sept. 2006 Weintraub Dep. at 104:13-22.

[378] S-P Answer, ¶ 119.

277.    During the Class Period, Warrick sold generic albuterol and albuterol sulfate solutions under the Warrick name.[379]

278.    Plaintiffs claim damages in the Class 2 trial as to Proventil (branded albuterol) solution, generic albuterol solution, Temodar and Intron-A.  Plaintiffs claim damages in the Class 3 trial as to Intron-A.

279.    Plaintiffs BCBS-MA purchased Intron, BCBS-MA also purchased albuterol with the same J-Code as Warrick's albuterol.[380]  Plaintiff Sheet Metal purchased albuterol with a J-Code that is the same as Warrick's albuterol for Class 2.  BCBS-MA paid based on AWP.[381] Sheet Metal also paid based on AWP.[382]

280.    Though Schering challenges the fact that payment by Sheet Metal was based on AWP, this challenge is based on a mistake by Dr. Kolassa.  Further, it is contrary to Dr. Addanki's testimony that in general throughout the Class Period, reimbursement was based on "the median AWP."[383]

---

[379] Sept. 2006 Weintraub Dep. at 99:14-101:1, 106:19-23, 390:20-391:21.

[380] Ex. 4012, in Class 3 and Class 2 and purchased Temodar in Class 2.

[381] Trial Tr. Day 2 at 190-94 (Mulrey); Ex. 4012.

[382] Ex. 4012.

[383] Amended Addanki Declaration (12/1/06 Direct Testimony) (Dkt. No. 3430), ¶ 71.  *See also* concise statement of undisputed facts filed by Schering (Dkt. No. 2266), ¶ 63 (same); Declaration of Addanki filed 3/15/2006, ¶ 40 (same).

1.   **Schering-Plough and Warrick knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors**

281.   Schering-Plough reported AWPs for its branded drugs with the full expectation that they would be published and later relied upon by Third-Party Payors for reimbursement purposes.[384]

282.   Warrick reported AWPs for its generic drugs with the full expectation that they would be published[385] and later relied upon by third-party payors for reimbursement purposes. Weintraub knew that when the AWP for Warrick's products were raised that this would impact TPP payments.[386]

2.   **The Schering-Plough Group caused AWPs to be published for its Subject Drugs**

283.   Schering-Plough reported the AWPs for its branded drugs to the Publishers of pharmaceutical industry pricing guides such as *Red Book* and *Price Alert*, for publication in those guides.[387] Specifically, Schering-Plough reported AWPs for the subject branded drugs at 20% above the so-called direct price (sometimes referenced as "net direct price"), which was Schering-Plough's analogue for wholesale acquisition cost ("WAC") or list price.[388]

---

[384] Deposition of Richard W. Zahn, January 15, 2003 ("Zahn Dep.") at 173:1-23; Deposition of Debra Kane, June 15, 2004 ("Kane Dep.") at 34:7-11 ("[AWP] is a price that is used for reimbursement purposes. . . ."); Ex. 809 (RGX0315084-141, at 0315084).

[385] *E.g.*, Trial Tr. Day 18 at 29 (Weintraub); Deposition of Harvey J. Weintraub, February 12, 2003 ("Feb. 2003 Weintraub Dep.") at 655:10-13.

[386] Trial Tr. Day 18 at 25-26 (Weintraub).

[387] Feb. 2003 Weintraub Dep. at 429:23-431:1; Ex. 492 (SPF0241686) ("As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement purposes.  Most manufacturers (including Schering) report AWPs at NDP [net direct price] plus 20%.").

[388] Ex. 492; Zahn Dep. at 176:4-24; Kane Dep. at 34:7-35:21 ("The company published AWP prices at 120 percent of the net direct price or list price. . . .  Q. So net direct price is the same as list?  A. Yes.  Yes. . . ."), 36:5-8; *see also* Ex. 809 (RGX0315084-141, at 0315085) ("As a matter of general practice, Schering-Plough sets AWP at 20% over the published Net Direct Price for the drug [referring to albuterol .083%].").

284.    Warrick also reported the AWPs for its generic drugs to the Publishers of pharmaceutical industry pricing guides for publication in those guides.  Specifically, Warrick caused to be published AWPs for the subject generic drugs marketed under the Warrick name (albuterol sulfate and perphenazine) at values slightly below the AWPs for the branded counterparts to those generic drugs.[389]  According to Harvey J. Weintraub, a Schering-Plough vice-president, and later, a Schering-Plough consultant, who was assigned to Warrick by Schering-Plough, his duties included the reporting of AWPs for Warrick-labeled drugs to the Publishers.[390]

285.    In general, the specific AWPs that Warrick reported for its generic drugs were, when Warrick started as a company, pegged at 10-15% off the corresponding brand drugs' AWPs,[391] supposedly "[b]ecause a product is not considered to be a generic unless it is 10 to 15% away [meaning lower in terms of AWP] from the brand."[392]  There was no requirement that a generic drug have an AWP within 10-15% of its branded counterpart.  Mr. Weintraub also admitted that if the AWP for a given generic drug were set, for example, at 50% off of the corresponding brand drug's AWP, the drug indeed would be considered a generic.[393]  In other words, there was no impediment to setting much lower AWPs for Warrick generic drugs; Warrick simply chose to set AWPs for its generic drugs at levels very close to those for its corporate parent's branded drugs.[394]

---

[389] Deposition of Harvey J. Weintraub, August 25, 2005 ("Aug. 2005 Weintraub Dep.") at 30:2-17; Feb. 2003 Weintraub Dep. at 485:1-6, 494:17-495:6.

[390] Feb. 2003 Weintraub Dep. at 472:10-16.

[391] Ex. 425 (WAR0006155-156, at 0006155).

[392] Feb. 2003 Weintraub Dep. at 472:10-16, 494:17-495-6; Trial Tr. Day 18 at 29 (Weintraub).

[393] Feb. 2003 Weintraub Dep. at 495:7-9.

[394] Trial Tr. Day 18 at 30 (Weintraub).

286.    In other instances, where one or more competitor generic products were already

on the market, Warrick simply would look to see where the competitor or competitors had set the

AWP(s) for the competitor product or products and "slot" the AWP for its own product

"somewhere in the pack."[395]  That was a conscious choice, too, and it was made "to save . . . a lot

of time and trouble."[396]

287.    In addition to causing specific AWPs for its branded drugs to be reported in

widely circulated industry pricing guides, Schering-Plough also republished its AWPs via its

sales force.[397]  Schering-Plough "issued a price list to its accounts" that included AWPs for its

branded drugs.[398]

288.    Warrick caused specific AWPs for its generic drugs to be reported in industry

pricing guides, and it also republished those AWPs.[399]

**3.    The Schering-Plough Group's AWPs for its Subject Drugs did not include relevant discounts nor reflect an average, and the Schering-Plough Group manipulated its AWPs and spreads**

**a.    The Schering-Plough Group knew that its Subject Drugs were sold at prices well below AWP**

289.    Schering-Plough knew that providers or their agents purchased Schering-Plough

subject drugs at prices well below the AWPs that Schering-Plough caused to be published for

---

[395] Sept. 2006 Weintraub Dep. at 527:6-528:8.

[396] *Id*. at 526:22-528:8; Trial Tr. Day 18 at 30-31 (Weintraub).

[397] Deposition of Gary Bishop, July 27, 2005 ("Bishop Dep.") at 30:22-31:12, 33:5-12, 54:11-56:1-4, 56:13-57:7.

[398] Feb. 2003 Weintraub Dep. at 429:23-431:1; Trial Tr. Day 18 at 32 (Weintraub).

[399] Deposition of Jerome A. Sherman, March 6, 2002 ("Mar. 2002 Sherman Dep.") at 45:12-14; Manfredi Dep. at 116:2-13, 117:17-119:8 ("It would not be uncommon to have an AWP listed on an ad [directed to retail pharmacies, managed care, buyers at chains, and wholesalers . . . .].")); Sept. 2006 Weintraub Dep. at 408:21-409:22, 512:12-513:15, 516:19-519:17; Ex. 719 (various price notices, including AWPs, direct prices, and references to actual price diminishments of many sorts).

those drugs.[400]  For example, Schering-Plough entered into contracts with certain providers or

provider-agents below the wholesale level, so it knew the prices those entities would pay for

Schering-Plough drugs.[401]

290.    Warrick knew that providers and retailers, including chain pharmacies that sold

Warrick subject drugs reimbursable under Medicare Part B, purchased Warrick subject drugs at

prices well below the AWPs that Warrick caused to be published for those drugs.[402]

291.    Warrick's AWPs never reflected an actual average of what customers were

paying for the product.[403]

> **b.     Recognizing the importance of spreads, the Schering-Plough Group
>          created spreads through confidential contract pricing, rebates, and
>          other forms of discounting**

> **(1)      The importance of reimbursement**

292.    Schering-Plough was aware that purchasers of its products were interested not

only in whether they would be reimbursed for its branded products,[404] but also in the level at

---

[400] S-P Answer, ¶ 3 ("Schering-Plough further admits that AWPs for its medicines published in trade publications are typically higher than the prices ultimately paid by providers purchasing such medicines from wholesalers and distributors.").

[401] Deposition of Thomas Kelly ("Kelly Dep."), July 15, 2004 at 27:5-28:8, 28:12-22, 29:22-30:5, 31:20-32:1, 72:11-22; *see also* Ex. 718 (WCT0133861-867, at 0133861-863) (showing knowledge of "dead net" prices for "superchains'" following price change, and after rebates).

[402] Warrick Answer, ¶ 3 ("Warrick further admits that AWPs for its medicines published in trade publications are typically higher than the prices ultimately paid by providers purchasing such medicines from wholesalers and distributors."); *see also*, *e.g.*, Ex. 421 (WCT0031786-790, at 0031786-788) (showing intention to sell directly to chains at prices well below AWP); Sept. 2006 Weintraub Dep. at 526:2-21, 761:23-766:10; Ex. 709 (WCT0133861-67).

[403] Trial Tr. Day 18 at 31 (Weintraub).

[404] Bishop Dep. at 85:11-86:8, 98:17-99:17; Deposition of Mark Flynn, July 29, 2005 ("Flynn Dep.") at 15:14-18:9.

which they would be reimbursed.  Purchasers were interested in how much profit they could

make on Schering-Plough branded drugs, and Schering-Plough knew that.[405]

293.    An example of Schering-Plough's knowledge of profits to be made on the spread

is found in a message between Schering-Plough executives regarding the "Retail Pharmacy

Trade."[406]  This communication, dated December 10, 2002, was sent by Brian Longstreet, then-

Director of Managed Care Marketing for Schering-Plough's Oncology and Biotech Business

Unit ("OBBU"), to the General Manager of the OBBU, Olav Hellebo, and to Mr. Longstreet's

direct supervisor within OBBU, James Robinson.[407]  The communication reads in pertinent part:

> []  As previously discussed there are a few stakeholders in the
> process of drug distribution (wholesalers-pharmacies-doctors-
> patients-managed care/insurance companies).  When it comes to
> pharmacies, they are driven by Managed Care or insurance
> reimbursement, profit motive, and state law.  A Managed Care
> organization (MCO) can mandate reimbursement of a product vs.
> another similar product; if a generic is available, either the MCO or
> state can mandate generic substitution.  In addition, Pharmacies are
> paid a dispensing fee, plus the margin of whatever they purchase
> the product minus the reimbursement rate (usually AWP minus
> a %).  ***With generics the acquisition cost is usually much
> lower than the published AWP and creates a very favorable "spread"
> particularly when multiple generics exist and the acquisition
> price drops dramatically (and the published AWP does not).***
>
> Having a higher AWP and having reimbursement being paid on
> a % of AWP can be favorable to the Pharmacies.  For example, our
> recommended strategy of keeping the AWP (and the NDP) higher
> if Roche comes in with a lower Net Direct Price (NDP) for [a
> competitor drug] actually could create a favorable situation

---

[405] Bishop Dep. at 89:9-90-4, 113:1-114:15; Deposition of James Butler, Aug. 11, 2005 ("Butler Dep.") at 7:2-9, 26-21, 33:2-20, 42:4-43:6, 60:5-12, 61:5-12; Ex. 713 (RGX 0255855-876, at 0255875) (discussing potential changes to Medicaid and Medicare Part B payments and opining that "[t]he reduction or elimination of the 'spread' is likely to have a significant effect on choices of Medicare Part B drugs and on utilization in areas of treatment where generic and brand drugs are available. . . ."); Ex. 721 (SPF0011695-696, at 0011695) (expressing concern at "negative impact on physician reimbursement" because Caremark had received their own NDC numbers for repackaging and distributing Intron and had published AWPs that were lower than Schering's AWP for Intron).

[406] Ex. 497 (SPF00017394-395).

[407] *Id.*

because the reimbursement rate will be higher for our product.
Simple example, if the reimbursement rate is AWP-15%, for a
$100 AWP product the reimbursement is $85 compared to a $70
AWP product where the reimbursement is $59.50. . . .[408]

294.    Likewise, Warrick was well aware that purchasers of its products were interested

not only in whether they would be reimbursed for its generic products,[409] but also in the level at

which they would be reimbursed.  Purchasers were interested in how much profit they could

make on Warrick generic drugs, and Warrick knew that.[410]

295.    Warrick would send its new AWPs to the publishers.[411]  At the same time it

would send, often on the same day, the AWP to retail accounts, also showing the "new direct

price"[412] – AWP of $13.95 with "new direct price of $6.68."[413]

296.    Over time the difference between AWP and the direct price increased.  So by

1997 with an AWP of $14.95 the price offers were at $3.95,[414] by 1999 they were at $2.75.[415]

Publishers were not informed of these discounts.[416]

---

[408] *Id*. at SPF00017395 (emphasis added); Deposition of Brian Longstreet ("Longstreet Dep.") at 85:1-88:18; *see also* Declaration of G. Raymond Pironti, Jr. (10/27/06) ("Pironti Decl.") (trial declaration of Schering-Plough whistleblower), ¶ 14 ("The comments in [Ex. 497] regarding creating favorable reimbursement spreads through manipulations of AWP and sales pricing for both branded and generic products reflect a well-known strategy by SP senior management in the marketing of SP products.").

[409] Feb. 2003 Weintraub Dep. at 515:20-516:18, 578:4-10.

[410] Ex. 772 (RGXA0098615-623, at 00986620 and 00986620) (showing Warrick's interest in, and knowledge of, various effects on retailer/provider profit depending on Warrick's increase in AWP for albuterol solution versus post-rebate prices for product, after reimbursement based on AWP); Sept. 2006 Weintraub Dep. at 460:2-464:10; Ex. 779 (SP 0000749-753) (letter to Warrick from retail pharmacy buying group, indicating that Warrick has been chosen to be an "endorsed generic contract vendor" and indicating further that the group looks forward to developing a long-term working relationship with Warrick based upon the attached "Generic Vendor and Product Selection Criteria"; attached document includes the criterion "AWP Spread; MAC" under the heading "Generic Product Selection Criteria").

[411] *See*, *e.g.*, Ex. 4080.

[412] Ex. 4081.

[413] *See also* Exs. 4082-84.

[414] Ex. 4086.

- 79 -

297.     It was important to Warrick's clients, retail pharmacies. to earn a spread.  The spread was a factor in their choice of which generic drug to use.[417]

298.     Dr. Kolassa, called as an expert by Warrick, wrote in a book he published that "many generic companies have taken advantage of this use of AWP by substantially inflating their published AWPs."[418]  He also wrote that "an artificially high AWP provides the retailer with greater profits"[419] and some retailers used AWP as a basis to charge cash customers.[420]

### (2)     Initial spreads and typical increases to the spreads

299.     Schering-Plough representatives admit that they set and caused to be published AWPs for Schering-Plough branded subject drugs that did not reflect actual average wholesale prices, *i.e.*, an average of prices charged by wholesalers to retailers or providers for those drugs.[421]  Rather, Schering-Plough simply set its AWPs at 20% above Schering-Plough's direct prices – prices analogous to undiscounted wholesale acquisition costs, or WACs.[422]

300.     Schering-Plough's direct prices for its branded drugs were subject to substantial discounts,[423] and chargebacks.[424]  In addition, customers enjoyed free goods,[425] grants,[426] and

---

[415] Ex. 4088; *see also* Trial Tr. Day 18 at 39:22-25 (Weintraub) (THE COURT:  "In other words the differences between your direct price and the AWP is increasing over this period of time, right?  THE WITNESS: That is correct.").

[416] Trial Tr. Day 18 at 41:16-22 (Weintraub).

[417] Trial Tr. Day 18 at 42-43 (Weintraub) ("That was their criteria.").  *See* Ex. 779.

[418] Trial Tr. Day 18 at 105 (Kolassa).

[419] *Id*. at 108:20-109:4.

[420] *Id*. at 111:18-112:5.

[421] Sept. 2006 Weintraub Dep. at 134:19-135:1.

[422] Feb. 2003 Weintraub Dep. at 427:20-428:3; Zahn Dep. at 176:4-24; *see also* Ex. 809 (RGX0315084-141, at 0315085).

[423] *E.g.*, Ex. 453 (SW0736212-217, at 0736213) (offering 25% market-share discount on Proventil solution if Proventil/generic albuterol market share target is met); Ex. 455 (WPX0011864); Deposition of Peter Kamins, July 19, 2005 ("Kamins Dep.") at 44:6-16; Kelly Dep. at 45:18-46:2, 46:18-47:8, 72:9-12.

[424] Kelly Dep. at 27:5-28:22, 72:9-12.

bundling with steeply discounted generic goods, which bundling had the effect of lowering the actual acquisition cost of the Schering-Plough drugs.[427]  All of these had the effect of amplifying the spread between net acquisition costs and AWPs for Schering-Plough's branded products.

301.    Warrick representatives admit that they set and caused to be published AWPs for Warrick generic subject drugs that did not reflect actual average wholesale prices, *i.e.*, an average of prices charged by wholesalers to retailers or providers for those drugs.[428]  Rather, Warrick simply set its AWPs for its subject generic drugs at 10-15% below the AWPs that Schering-Plough had set for its corresponding branded drugs.[429]

302.    Moreover, Warrick knew exactly what true average wholesale prices were to chain retailer pharmacies such as Walgreens, CVS, or Long's,[430] it knew that these prices were

---

[425] Ex. 381 (SPF00013329-331) (regarding deals to dispensing doctors: "[i]n the US we always went with free goods whenever possible. . . ."); Ex. 505 (WAR0072317-WAR0072336) ("Free Goods Summary" for Schering-Plough branded and Warrick generic products); Deposition of Portia Edens, Aug. 9, 2005 ("Edens Dep.") at 64:15-19 (acknowledging sampling program); Flynn Dep. at 69:2-70:3 (acknowledging the provision of samples, including Intron-A).  Schering-Plough also provided doctors with tickets to professional football games.  Butler Dep. at 68:1-9.

[426] Ex. 572 (SPF00017238-SPF00017279) ("[A]ll grants over 5000 given by OBBU last two years."); Bishop Dep. at 43:15-44:1, 44:7-12.

Recently, Schering-Plough agreed to pay hundreds of million of dollars to settle claims by the United States and certain of its agencies that it had marketed Temodar improperly by offering and paying "various forms of illegal remuneration to physicians and physicians's practices to induce utilization of Temodar . . . , including, for example, improper preceptorships, advisory boards, entertainment, and placement of clinical studies . . . ."  Ex. 559 at 6-7.  Schering-Plough's provision of these inducements had the effect of amplifying Temodar spreads by reducing the actual cost of the drug, to the detriment of the plaintiffs in this case.  Schering-Plough settled similar allegations with regard to marketing of Intron-A for superficial bladder cancer, *id.* at 7-8, together with allegations pertaining to free goods and "vial overfill," and insofar as Schering-Plough's marketing practices resulted in increased spreads for Intron-A, they had a detrimental effect on the Plaintiffs in this case.

[427] Pironti Decl., ¶ 12 (explaining bundling and referring to Exs. 418 and 470) and Exs. 418 (WCT0144924-WCT0144928) and 470 (WAR0036807-WAR0036809); *see also* Ex. 772 (WP0004815A-WP0048178A, at 0004817A) (showing effect of bundling of cheaper Warrick generic product with Proventil in lowering Proventil's "effective list price" to chain).

[428] Sept. 2006 Weintraub Dep. at 134:19-135:1, 760:16-761:15; Oct. 2004 Weintraub Dep. at 130:10-18, 130:24-25-131:9.

[429] Feb. 2003 Weintraub Dep. at 494:17-495:9.

[430] *E.g.*, Sept. 2006 Weintraub Dep. at 526:2-21; Ex. 432 (WAR0029661); Ex. 433 (WAR0015167-0015010) (discussing and illustrating chargeback arrangement with Rite-Aid, and illustrating that Warrick knew the prices at

---

nowhere near its published AWPs, and it also knew that as net acquisition costs inevitably

decreased over time, given the trend of ever-lowering prices in the generic market,

reimbursement to the pharmacies would grow in situations where AWP was the basis for

reimbursement and where, as was Warrick's practice, it did not lower AWPs to reflect lower net

acquisition costs.  Warrick did, however, *raise* the AWP for its 20 ml albuterol solution product

in 1995, supposedly to track higher net direct prices.[431]  But as copious numbers of records show,

the increase in AWP certainly did not track actual acquisition costs, which remained subject to

various diminishments, including discounts, rebates, price protection, and on-hand inventory

adjustments.[432]  Thus, in practice, the increase in AWP only served to amplify already large

spreads.[433]

303.     Warrick's direct prices for its generic drugs were subject to substantial

discounts[434] and chargebacks.[435]  In addition, customers enjoyed free goods.[436]  All of these had

---

which Rite-Aid pharmacies were buying its products, given that Rite-Aid was buying Warrick drugs on the basis of
a contract price that Warrick knew); Ex. 461 (WAR0002533).

[431] Sept. 2006 Weintraub Dep. at 462:17-463:4.

[432] *E.g.*, Ex. 719 (various Bates numbers) (showing AWP for 20 ml solution at $12.50 (*e.g.*, WCT0020159),
then at $13.95 (*e.g.*, WCT0012419A), then at $14.99 (*e.g.*, WCT0033782) and showing various adjustments to
actual acquisition costs (*e.g.*, WCT0033782, WCT0012073, WCT0134418)).

[433] Sept. 2006 Weintraub Dep. at 761:23-766:10; *see also id.*, 866:23-867:4 ("Q. And when Warrick's prices
fell, Warrick chose not to proportionally lower the AWPs; isn't that right?  A. That is correct.") (objections omitted)
and 868:11-869:1; Feb. 2003 Weintraub Dep. at 548:15-18 (in witness's experience, AWP on generic drugs does not
tend to erode with the erosion of market prices); July 2005 Sherman Dep. at 42:9-43:4 (Warrick did not lower
AWPs on generic drugs once established); Manfredi Dep. at 132:16-22; Mar. 2002 Sherman Dep. at 132:13-18 ("Q.
Is it the policy of Warrick to keep AWP and direct prices the same?  A. We keep the AWP the same and we lower
the contract prices to meet competition whenever necessary.").

[434] *E.g.*, Ex. 612 (RGX 0001225-RGX 0001231) (showing discounts to match competitor's prices), Ex. 618
(WP00012330A) (showing planned 20% discount to chains); Ex. 619 (WP00012629A-WP00012633A) (showing
discounted direct prices to chains, among other classes of trade); Ex. 638 (SPW013819) (showing provision of
"instant rebate," *i.e.*, discount, in addition to regular rebate, to chain); Exs. 434, 438, 499 (cataloguing types of
available rebates), 501, 502, 503, 504, and 718; Manfredi Dep. at 153:21-23, 155:13-21.

[435] *E.g.*, Exs. 432 and 433.

the effect of amplifying the spread between net acquisition cost and AWP for Warrick-labeled generic products.

304.    Dr. Hartman has calculated the spreads for Intron A, which in certain years were at 36%.[437]

305.    The spreads on Temodar were usually between 20 and 27%, but exceeded 30% on occasion.[438]

306.    The spreads for Proventil exceeded 30% for the 0.83mg version in 1993 through 1997 and in 2001.[439]

307.    Dr. Hartman has calculated the spreads for albuterol sulfate solution and these spreads went from 121% in 1993 to 651.4% in 2001.[440]

308.    There is no evidence that any Warrick or Schering executive voluntarily disclosed these spreads to the government or the fact these spreads increased while the government was studying the issue of excessive payments for albuterol.  Thus, while the government studied this issue in 1996, the spreads increased from 247% in 1996 to 651% by 2001.

---

[436] *E.g.*, Ex. 441 (noting re: free goods: "This is a standard practice . . . ."); Ex. 505 (WAR0072317-WAR0072336) ("Free Goods Summary" for Schering-Plough branded and Warrick generic products); Ex. 443 (WAR0025195) ("Warrick will adjust on-hand inventory in the event of a market price decrease. . . ."); Ex. 469 (WAR0027852).

[437] Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

[438] *Id.*

[439] *Id.*

[440] *Id.*

### (3)     Using nominal pricing for Schering-Plough and Warrick drugs as a means of avoiding Medicaid rebates created enormous spreads

309.    Schering-Plough and Warrick both employed so-called "nominal pricing" to avoid paying best-price rebates under the Medicaid program.  Selling their products at nominal prices created enormous spreads vis-à-vis the products' static AWPs.[441]

310.    Medicaid provides health care coverage primarily to low-income families with dependent children and low-income aged or disabled individuals.  Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.  The federal government and the states share funding for the program.  Each state has established outpatient Medicaid prescription drug coverage.  Accordingly, Medicaid drives high volumes of prescription drug sales.

311.    If a drug manufacturer wants its products to be covered by Medicaid, the federal government requires that manufacturer to sign a rebate agreement.  42 U.S.C. §§ 1396a(a)(1)(A), 1396d(a)(12), and 1396r-8(a)(1).  The basic rebate contemplated by the agreement ensures that Medicaid pays manufacturers no more – and sometimes less – than any private purchaser in the United States for outpatient prescription drugs.  42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  The manufacturer directly pays the Medicaid rebate on outpatient prescription drugs to each state Medicaid agency.  42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  All forms of the Medicaid rebate are based on the average manufacturer price ("AMP") paid by wholesalers, inclusive of all discounts and price reductions for drugs distributed to the retail pharmacy class of trade.  42 U.S.C. § 1396r-8(c)(1).

---

[441] *E.g.*, Ex. 422 (showing contract price of $6.95 in February 2002 for albuterol solution, 20 ml., NDC 1515-4, discounted to $.30 and later discounted to $.08); Ex. 431 (WAR0022429) (showing AWP for albuterol solution 20ml., NDC 1515-4, at $13.95 in February 2002); Ex. 434 (showing AWP for albuterol solution, 20 ml., NDC 1515-4, at $14.99, after 1995 increase to AWP); *see also* Sept. 2006 Weintraub Dep. at 462:23-463:4 (affirming that Warrick raised AWP for 20 ml. albuterol solution to $14.99 in 1995).

312.     The rebate for products marketed under a New Drug Application, or NDA, *i.e.*,

branded drugs or non-branded versions of an NDA product[442] is equal to (1) the greater of 15.7%

of AMP for the product or (2) the difference between AMP for the product and the lowest price

at which the product is sold (the so-called "best price"), times the number of Medicaid units

dispensed.[443]  To minimize rebates, then, a manufacturer wants a spread that is as small as

possible between the AMP and the best price for the drug.[444]  This means that the manufacturer

has to discount carefully, lest the profit that would come from increased sales at the lower price

be offset or exceeded by liability for Medicaid rebates.[445]

313.     Schering-Plough saw a loophole in the rebate system that it sought to exploit.

Drugs sold at "nominal prices" (*i.e.*, at a discount of 90% or more) under certain circumstances

need not be considered in determining the best price for a given drug.  42 U.S.C. § 1396r-

8(c)(l)(C).  So as Schering-Plough admits, it undertook to sell Proventil inhalers at nominal

prices to certain segments of the marketplace as to which it wanted to give discounts.[446]  In other

words, instead of giving moderate-size discounts, or even large discounts, to those customers,

Schering-Plough opted to sell its branded inhalers to them at next-to-nothing prices.[447]  Whatever

money Schering-Plough lost in the process of discounting to such an extraordinarily high degree

---

[442] Ex. 408 at WAR0006070.

[443] *See generally* Ex. 523 (WTC0001679-87) (explaining how best-price rebates are calculated).

[444] Ex. 408 at WAR0006070-6073.

[445] *Id.* at WAR0006071.

[446] Ex. 714 (SP 000939-SP 000949) (discussing implementation of nominal pricing strategy); Ex. 408 (WAR0005993-6097, at 0006072) (discussion of sale of Proventil inhalers at nominal prices); *see also* Longstreet Dep. at 38:12-39:3 ("When I was in the contracts and information group we did institute nominal pricing for [] Proventil inhaler.").

[447] Ex. 408 at WAR0006072; Ex. 714 at SP 000942 ("Nominal pricing is in some cases less than our standard cost and may be below the standard cost of a generic manufacturer.  Are we in danger of predatory pricing?").

was made up for in terms of savings as to the best-price rebates that it would have to pay if it had sold the products at more moderate discounts.[448]

314.    A side-effect of this strategy was harm to the Plaintiffs in this case.  Given that it was Schering-Plough's practice not to lower AWPs in tandem with price cuts, enormous spreads developed whenever Schering-Plough employed nominal pricing that were not reflected in the reported AWP.[449]

315.    Furthermore, Warrick sold nominally priced drugs, too.[450]  The additional profits that Schering-Plough gained by employing the nominal pricing strategy for its branded products were not enough.  Even in the face of generic competition, Schering-Plough knew that it could continue to, and it wished to, sell quantities of its branded products at prices that were a good deal higher than the products' generic counterparts.[451]  Accordingly, it sought out a way by which it could sell its branded product with relatively moderate discounts while serving customers who would buy product only if it were more heavily discounted.

316.    Enter Warrick.  Schering-Plough recognized that it could use Warrick to sell generic versions of its drugs to buyers demanding heavy discounts.[452]  By employing this strategy, Schering-Plough could then figure best-price rebates for Schering-Plough branded and Warrick generic products separately, even though the products would be identical,[453] even

---

[448] *Id.*

[449] *E.g.*, Ex. 408 at WAR0006072; Trial Tr. Day 7 at 104-115, 123, 128-29 (Pironti).

[450] *E.g.*, Ex. 422 (WAR0043141-WAR0043148 and WAR0043124, at 0043124) (contract with pharmacy, listing contract price for albuterol sulfate solution at $11.50, and later reducing prices to $.30 and then $.08 for the same product); Sept. 2006 Weintraub Dep. at 914:5-915:14.

[451] Ex. 409; Ex. 418 (WCT0144924-928) ("Rather than lowering our Proventil prices, I recommend we offer a 2-year Warrick Solution and Syrup market share driven contract addendum to their existing GeriMed contract. . . .").

[452] Ex. 409 (WAR0005957-77).

[453] Ex. 408 (WPX0005993-6097, at 0006116).

though both would be manufactured by Schering-Plough or one of its wholly owned subsidiaries, and even though both sellers would be Schering-Plough entities.[454]

317.    Like Schering-Plough itself, Warrick also could minimize Medicaid rebates by pushing certain sales into the nominal-price category, so as not to set a best price that would be significantly less than the AMP for its drugs.  But the states that were denied the best-price rebates they should have received, and the Plaintiffs here, definitely lost.  As for the Plaintiffs, they paid for Warrick nominally priced drugs at a much higher rate than they should have had to pay.[455]

### (4)    Use the Integrated Therapeutics Group

318.    Yet another Schering-Plough subsidiary, Integrated Therapeutics Group ("ITG"), would also prove helpful to Schering-Plough in amplifying the spreads of its branded and generic drugs.[456]  In brief, among its many off-book inducements to purchase Schering-Plough drugs, ITG would give Schering-Plough customers unreported free or nominally priced drugs, including Proventil and Warrick-branded inhalers, as well as payments in the form of "administrative fees," "partnership fees," and "data fees."[457]  This led to a whistleblower suit and nearly $350 million in criminal fines and civil settlements.[458]

---

[454] Ex. 408 (WAR0005993-6097, at 0006061 ("Specifically, under current Medicaid legislation, by establishing separate NDC codes for the same product, i.e., one for Schering and one for Warrick, we believe they would be treated as distinct products for filing purposes.  Thus, we could move deep discounted business for products with minimal full price spillover into Warrick and not be forced to provide large 'best price' rebates in the retail Medicaid market.[454]"); *id.* at WAR0006070 ("A nonbranded product marketed under a separate NDC remains subject to the best price formula; however, this nonbrand will establish a separate AMP and best price relative to the brand.").  *See* Trial Tr. Day 7 at 120-21 (Pironti).

[455] Trial Tr. Day 7 at 122, 124-25 (Pironti).

[456] *See generally* Pironti Decl.

[457] Pironti Decl., ¶¶ 7-9, 12-13.

[458] Pironti Decl., ¶ 5.

319.    Where Schering-Plough/Warrick, via ITG, gave customers free or nominally priced subject branded and generic drugs, the provision of those free or nearly free products had the effect of decreasing actual acquisition prices for those drugs.[459]  This, in turn, increased spreads in light of Schering-Plough's and Warrick's policies not to lower AWPs even in the face of declining actual acquisitions prices, and Schering-Plough and Warrick exploited those increased spreads in their marketing.[460]

### 4.    Individual brand and price histories reveal the Schering-Plough Group's manipulation of spreads

#### a.    Albuterol sulfate (generic)

320.    The annual spreads of reported/captured discounts and rebates is evidenced by the AWP/pricing spreads reflected in analysis of the transactional data that shows spreads ranging from 103.3%[461] to 1052.8%.[462]

321.    Warrick created favorable marketing spreads by maintaining a fixed AWP and reducing the acquisition price to move the market.

322.    Warrick marketed the spread on generic albuterol by direct advertisement to customers by showing the fixed AWP juxtaposed with the acquisition price.[463]

---

[459] Pironti Decl., ¶¶ 8-9, 13; Trial Tr. Day 7 at 129, 136 (Pironti).

[460] Pironti Decl., ¶¶ 12, 14; Trial Tr. Day 18 at  31, 36 (Weintraub).

[461] NDC 151504 for 1994.

[462] NDC 151701 for 2004Q1; Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

[463] *E.g.*, Exs. 437, 443, 445, 719, 4079; *see also* Manfredi Dep. at 237:5-15 ("Q. How would a pharmacy benefit from receiving information from a telemarketer regarding Warrick's drugs that is comparing the cost on that product to the AWP on that same product?  A. Yeah.  I think a pharmacy would benefit from knowing on any product what the cost and AWP are.  Q. And that's what's known in the industry as the spread, right?  A. Yes.") (objection omitted).

### b.     Intron-A

323.     Marketing the profitability to physicians of Intron-A treatment for bladder cancer is demonstrated by a 1998 memorandum to oncology sales representatives.  The message was: "***Treating bladder patients with Intron is still very profitable!!***"  ***One patient on Intron can represent $16,956.36 of incremental sales and $2,373.84 of profit for our physicians just on the drug alone.***  These figures are based on having your physicians buy Intron-A at Net Direct pricing and treating on high dose of Intron. . . ."[464]

324.     Reported off-invoice discounts[465] and rebates are captured within the transactional databases produced to Plaintiffs.  Calculations based on the Schering-Plough databases show spreads for Intron-A always exceeded 20%, and during certain periods exceeded 30%,[466] up to 132%.[467]

### c.     Proventil (branded albuterol)

325.     The Schering-Plough albuterol line of products was marketed under the Schering Proventil and Warrick generic labels.  The products were identical and manufactured under the same NDA, but with different NDCs.[468]

326.     At the outset of the Class Period in 1991, Proventil still enjoyed the price protection inherent to on-patent status, and the AWP/actual sales price spread generally reflected the standard AWP mark-up of 20%.  However, in anticipation of generic competition in 1992

---

[464] Ex. 394 (SPF0104510-512) (emphasis added); *see also* Ex. 397 (SW0027026) ("Cost Analysis for Superficial Bladder Cancer," showing profitability of treatment using Intron-A).

[465] Schering had a standard form marketing Intron-A only by offering an off-invoice discount of 14% off NDP (~30% off AWP) if the quarterly utilization rate met or exceeded the quarterly national-market-share benchmark reported by NDC.  *See* Ex. 395 (SPW0042545).

[466] For example, the spreads exceeded 30% on NDC 23501, in 2001-2004, NDC 4201, in 2001-2002, NDC 11101 in 2001, 2003, NDC 2003, in 1991-92, NDC 3901 in 1992, 1993, 2001-2004.

[467] Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

[468] Aug. 2005 Weintraub Dep. at 63:9-64:16.

and the launch of albuterol generics in 1993, Schering increased the spread in order to compete against other manufacturers. Thus spreads were from 39.4% to 51.5% in 1997.[469]

### d.   Temodar

327.   Temodar's spreads were under 30% and is in under Class 2.

### 5.   Damages on Schering/Warrick Drugs

328.   Dr. Hartman, using generally accepted economic techniques, has estimated damages for Class 2 and Class 3. On both a national and a Massachusetts only basis, and both with and without interest. For Schering/Warrick for the products Albuterol, Intron, Proventil, and Temodar.[470] Those estimates are year-by-year estimates disaggregated by NDC (for the without interest estimates). *Id.*

329.   As to Class 2, these estimates assume that the "but for" AWP would be ASP. On the basis of that assumption and for the Class Period 1991-2003, Dr. Hartman estimates that the Massachusetts-only, Class 2 damages, without interest, for all Schering/Warrick drugs are $3,879,918.[471]

330.   Also as to Class 2, Dr. Hartman, again using generally accepted economic techniques, presented the alternative damage analysis under which the "but for" AWP represents ASP times 1.06 (representing the formula adopted through the enactment of the Medicare Modernization Act of 2003).[472] Using that approach and for the Class Period 1999-2003, the

---

[469] Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

[470] Hartman Direct, Attach. J.4.b.

[471] See Hartman Direct testimony Attachment J.4.a., taking Class 2 damages but subtracting the "2004" column from the "total" column. See also Plaintiffs' Exhibit 4008, first page, under column "Liability Threshold Equals 0%", for Massachusetts.

[472] Ex. 4010.

Massachusetts-only damages, without interest, for all Schering/Warrick drugs total $3,729,208.[473]

331.    This Court finds as a reasonable estimate of damages to Class 2 as against Schering/Warrick in the amount of **$___.**

332.    As to Class 3, Dr. Hartman has estimated damages using an approach similar to that for Class 2, except that he employs a threshold of 30%, *i.e.*, he does not estimate the damages until the "spread" between AWP and ASP equals or exceeds 30%.  Using that approach and for the Class Period 1999-2003, the Massachusetts-only damages, without interest for all Schering/Warrick drugs (which in Class 3 includes only Intro A) total $72,000.[474]

333.    This Court finds that the methodologies used by Dr. Hartman in performing the estimates for Class 2 and Class 3 employ generally accepted economic techniques and provide a sound basis upon which to estimate damages in Classes 2 and 3 with respect to all Schering/Warrick drugs.

334.    First, Dr. Hartman has used reasonably reliable sources of data – invoice and rebate data obtained directly from Schering/Warrick, published and undisputed AWP data, well-accepted survey information from the National Ambulatory Medical Care Survey (NAMCS) and the National Disease and Therapeutic Index (NDTI).[475]

335.    Second, Dr. Hartman's calculation of the average selling price, or ASP, appears quite conservative.  Dr. Hartman's ASP calculations do not include as a class of trade hospitals (which tends to purchase products at lower prices, thereby sending to drive down ASPs); they

---

[473] Ex. 4010, page 2.

[474] Hartman Direct, Attach. J.4.a.  The damages figure of $1,103,615 is derived by taking the total, without interest, Massachusetts-only figure of $1,505,899 and subtracting the year 2004 in order to obtain the 1991-2003 figure.

[475] *See* Hartman Direct, *et passim*; Hartman Rebuttal, ¶¶ 16-28.

also accept as true representations made by BMS regarding classes of trade and they do not include *any* of the sample programs.

336.     Third, the allocation of source of pay information between Medicare and non-Medicare spending (and the backout of spending paid by Medicaid) appear to be based upon analysis conducted by Dr. Hartman using the NAMCS and NDTI well recognized survey information and are corroborated by Professor Rosenthal.

337.     Finally, the conservatism of the damages calculations are demonstrated by comparison to all dollars that were paid to dispensers, such as physicians, which acted as a financial inducements to them.  Dr. Hartman estimated the "national return to practice dollars" for each defendant; as to Schering/Warrick, the return to practice dollars (*i.e*., the dollars charged to class members in Classes 2 and 3, over and above the dollars paid to the manufacturers) exceeded $240 million.[476]

338.     Plaintiffs' damages calculations also included a component of interest.  During the trial, Defendants raised no issue regarding the entitlement of Classes 2 and 3 to an award of prejudgment interest.  The Court finds that the Classes are entitled to a calculation of interest. The Plaintiffs are directed to supplement the calculations of interest on the basis of the findings above, and Defendants will be afforded with an opportunity to respond.

### 6.     Plaintiffs' Purchases of Schering Products

339.     Exhibit 4012 establishes reimbursements based upon AWP for each of three Class representatives.[477]

---

[476] Ex. 4009.

[477] Ex. 4012, pages 1-4.

340.    BCBS-MA, reimbursed on the basis of AWP for Intron, a single source drug manufactured by Schering Plough and thus the reimbursements were also the actual product manufactured by Schering itself.  It also reimbursed for albuterol on the basis of J-codes associated with Schering/Warrick albuterol products.  BCBS-MA also reimbursed for Temador under a Medigap policy, therefore also based on AWP.[478]

341.    Sheet Metals, too, reimbursed for albuterol products based upon the J-code J7619, a J-code also associated with Schering/Warrick products.  Similarly, Pipefitters reimbursed for albuterol based upon J-codes J7618, J7819 and J7625, all J-codes associated with Schering/Warrick products.[479]

342.    There is, then, then no question that the reimbursements of BCBS-MA for Intron establish not only that BCBS-MA reimbursed for Intron on the basis of AWP, but also that the products that were being dispensed as a result of those reimbursements were manufactured and distributed by Schering.   BCBS-MA has standing.

**7.    Multi-Source Issues**

343.    At trial, Defendants argued that Class members, such as Sheet Metals and Pipefitter that could "only" establish that they reimbursed on the basis of a J-code (but could not otherwise identify the actual product that was being dispensed as a result of that reimbursement) lacked standing.  The Court rejects that argument.

344.    It is true that within the Medicare system and private payor payments, multi-source drugs are reimbursed on the basis of J-codes which can include multiple manufacturers' products.  As a result, it is usually the case that while a third party payor can establish from the

---

[478] *Id.*

[479] *Id.*

claims data alone that it reimbursed on the basis of AWP for a product the J-code for which may had been influenced by the wrongful conduct of a Defendant, that claims data alone cannot establish that the product being dispensed and reimbursed was actually a product manufactured by a particular manufacturer.

345.    However, Defendants have been sued in this case by reason of their conduct, not their products.  This is not a product liability case where the Plaintiffs claim that the products manufactured and dispensed by the Defendants were in some way defective.  Instead, the trial involves the **conduct** of Defendants in inflating the AWP for certain of their products. Thus, the question at the trial was whether the lawful inflation of the AWP was the cause-in fact of inflated reimbursements incurred by Plaintiffs, and whether those inflated reimbursements were reasonably foreseeable.

346.    Credible evidence was adduced, and this Court finds, that when a generic manufacturer posts an unlawfully inflated AWP, that generic company has affected the median AWP for all purchases of that J-code product, not just the purchases of the generic company's product.  Thus, because Plaintiffs have established that Schering/Warrick unlawfully inflated the AWP for albuterol, that inflation was a substantial contributing factor for the J-code reimbursement level that was used for Medicare Part B and other payor reimbursements. Schering/Warrick established the basic benchmark upon which all albuterol J-code reimbursements would be based.   It first established the AWP for the branded Proventil and, after generic entry, then refused to, and did not, reduce the posted AWP for the branded Proventil (knowing that all generic manufacturers, including Warrick itself, would follow that inflated AWP).  Furthermore, Warrick's entering the market with an inflated AWP for the generic albuterol (albeit at al price point only modestly below Proventil, *i.e.*, about 15% lower)

demonstrated the historic fact consistent with the testimony of Dr. Hartman and Professor

Rosenthal, *i.e.*, that generic manufacturers will engage in a "Nash equilibrium" clustering their

AWPs near the median.

347.   Put simply, as a result of the conduct (not products) of Schering/Warrick in

setting the benchmarks for essentially all J-code reimbursements of albuterol during the 1990s

and early 2000s, all payments made under the J-code system were unlawfully higher than they

would have been for all payers of albuterol in the marketplace regardless of the product which

was being dispensed at any one particular time.  Any person or entity that purchased any

albuterol product using that J-code purchased a product the price for which was based upon the

wrongdoing of Schering/Warrick.

### III.    CONCLUSION

348.   Plaintiffs have met their burden of proof on behalf of themselves and the certified

Classes 2 and 3.


DATED:  January 19, 2007          By____/s/ Steve W. Berman_____
                                     Thomas M. Sobol (BBO#471770)
                                     Edward Notargiacomo (BBO#567636)
                                  Hagens Berman Sobol Shapiro LLP
                                  One Main Street, 4th Floor
                                  Cambridge, MA  02142
                                  Telephone: (617) 482-3700
                                  Facsimile: (617) 482-3003
                                  **LIAISON COUNSEL**

                                  Steve W. Berman
                                  Sean R. Matt
                                  Robert F. Lopez
                                  Hagens Berman Sobol Shapiro LLP
                                  1301 Fifth Avenue, Suite 2900
                                  Seattle, WA  98101
                                  Telephone: (206) 623-7292
                                  Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Donald E. Haviland, Jr.
The Haviland Law Firm
740 S. Third Street, Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

- 96 -

**CERTIFICATE OF SERVICE**

     I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 19, 2007, a copy to LexisNexis File & Serve for posting and notification to all parties.

                        By **/s/ Steve W. Berman**
                            Steve W. Berman
                            **HAGENS BERMAN SOBOL SHAPIRO LLP**
                            1301 Fifth Avenue, Suite 2900
                            Seattle, WA  98101
                            (206) 623-7292

- 97 -