# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |
| **TRIAL OF CLASS 2 AND CLASS 3 CLAIMS** | |

## PLAINTIFFS' POST-TRIAL OMNIBUS TRIAL BRIEF

# TABLE OF CONTENTS

**PAGE**

I.   COMMON LEGAL ISSUES ...................................................................................................1

    A.   Defendants Have Committed Unfair Acts or Practices ...........................................1

        1.   G.L. Ch. 93A prohibits unfair and deceptive acts or practices
            in the conduct of trade or commerce...........................................................1

            a.   Unfair acts or practices standards ....................................................2

            b.   Deceptive acts or practices standards ...............................................3

            c.   Relevancy of the OIG guidelines......................................................3

        2.   Each Track 1 Defendant committed <u>unfair</u> acts or practices ......................4

            a.   The elements of Defendants' unfair conduct ....................................4

                 (1)   The Class 2 statutory scheme..................................................4

                (2)   Defendants knew that AWP was the basis for
                      reimbursement in the non-Medicare market .......................4

                (3)   Defendants published phony AWPs .....................................5

                (4)   Defendants knew that the government was
                      concerned about AWP abuse but concealed their
                      practices and often escalated their AWP marketing ...........5

                (5)   Defendants knew increases in AWP had a direct
                      effect on payors..................................................................6

                  (6)   Despite the foregoing, Defendants continued to
                      foist fictitious AWPs on Class members ............................6

             b.   Summary of Defendants' unfair conduct.........................................6

        3.   Each Track 1 Defendant committed <u>deceptive</u> acts or practices ................8

        4.   Each Track 1 Defendant has also violated Ch. 93A as a result
            of violating Federal Trade Commission Law and Massachusetts
            regulations...............................................................................................11

        5.   Privity is not required under Ch. 93A.......................................................11

001534-16  148664 V1

6.    Lack of systematic "knowledge" concerning AWP marketing and excessive spreads renders Defendants' conduct deceptive ...............11

    a.    No knowledge of spread marketing ...............................11

    b.    No knowledge by Taft-Hartley Funds ...........................12

    c.    No evidence exists that BCBS-MA, other Massachusetts TPPs or Taft-Hartley Funds were aware of the controversy regarding AWP ...........................................................13

    d.    Defendants' themselves admitted there was a lack of knowledge as to the meaning of AWP...........................13

    e.    There cannot be any "knowledge" when some of the deceptive practice had not even begun for some drugs until later in the Class Period .......................................14

    f.    Bell's shared enterprise theory fails to show knowledge...............15

    g.    BCBS-MA witness testimony does not support a lack of deception.........................................................................15

    h.    Medical West did not transfer knowledge to BCBS-MA .............19

    i.    Comparing BCBS-MA's actual acquisition prices with those of Medical West also evidences a lack of knowledge..........20

B.    The Claims of Plaintiffs and the Class are Timely ...............................21

    1.    The discovery rule tolls the limitations period ...........................21

    2.    Plaintiffs and the Classes did Not Have <u>Actual</u> Knowledge of their Claims.........................................................................25

        a.    Class members were unaware of Defendants' ASPs and their spread marketing schemes ....................................25

        b.    Federal government reports, academic studies and news articles did not put Plaintiffs or Class Members on notice of their claims ...............................................................26

    3.    Plaintiffs and the Classes did Not Have <u>Constructive</u> Knowledge of their Claims.........................................................................27

    4.    Defendants actively engaged in fraudulent concealment.........................31

        a.    Defendants wrongfully concealed their conduct from the Class and others ...........................................................32

b. Plaintiffs did not discover the facts underlying their causes of action any earlier, despite exercising due diligence ...................................................................37

C. Each Track 1 Defendant's Unfair or Deceptive Acts or Practices Have Caused an Injury to Plaintiffs and the Members of Classes 2 and 3.....................38

1. The evidence confirms causation ................................................39

2. Defendants' general arguments against causation are unavailing ............41

3. BCBS-MA's choice in 2004 to use AWP does not negate causation........42

4. Defendants' key common expert Dr. Bell agrees that BCBS-MA could not simply change the system .........................................45

5. Staff model purchases at discounts do not negate causation ...................47

6. There can be no knowledge imputation to the Taft-Hartley and consumer members of Class 3 ...............................................48

7. The Court should reject Defendants' failure-to-mitigate defense.............51

8. Causation is established for multi-source drugs .......................................52

a. For at least part of the Class Period, BMS, Schering and Warrick sold multi-source drugs via the corrupt AWP system .....................................................................53

b. BMS and Warrick are jointly and severally liable for the damages they caused by way of their illegal behavior ................54

c. In the alternative, BMS, Schering and Warrick should be held to account for their unlawful conduct under the doctrine of market-share liability....................................60

D. Plaintiffs Have Proved a Loss of Money or Property as Contemplated by Ch. 93A ...............................................................................................64

1. Background ...............................................................................65

2. Increased drug costs are not "passed on" to BCBS-MA members............66

3. Defendants' "pass through" defense should be rejected............................67

a. A defendant's responsibility is not eliminated or reduced because the plaintiff has been able to recover part of an illegal overcharge from a third party ...............................................68

    b.    The pass-on defense has been soundly rejected and should be rejected by this Court ...................................................................69

  E.    Plaintiffs and the Classes Are Entitled to an Award of Prejudgment Interest...............................................................................................72

II.    LEGAL ISSUES SPECIFIC TO ASTRAZENECA...........................................................73

  A.    Plaintiffs Established That AstraZeneca's Conduct Was Unfair and Deceptive ........................................................................................73

  B.    Plaintiffs Established That AstraZeneca Caused Plaintiffs' Harm .......................74

III.    LEGAL ISSUES SPECIFIC TO BMS ...............................................................................75

  A.    BMS's List Price Defense Fails ..........................................................................75

    1.    BMS owned and controlled its AWPs ......................................................76

    2.    Assessing BMS's conduct in the complete factual setting, as required, highlights the unfair and deceptive nature of that conduct.........78

    3.    BMS overplays its list price defense..........................................................82

  B.    The Court Should Reject BMS's Other Defenses..................................................86

IV.    LEGAL ISSUES SPECIFIC TO J&J ................................................................................86

  A.    There are Several Theories of Liability for Class 2 ................................................86

  B.    J&J has Liability to Class 3 for Remicade.............................................................88

  C.    J&J's Claims of Lack of Causation are Misleading and Misplaced .....................91

V.    LEGAL ISSUES SPECIFIC TO SCHERING-PLOUGH/WARRICK ............................92

VI.    CONCLUSION...................................................................................................................94

# TABLE OF AUTHORITIES

## CASES

*Alan Steiman's Landscape, Inc. v. Lawrence Sav. Bank*,
 1996 WL. 408942 (Jul. 16, 1996 Mass. App. Ct.)............................................................73

*Aspinall v. Philip Morris Cos.*,
 442 Mass. 381, 813 N.E.2d 476 (2004) .....................................................................3, 39

*Augat, Inc. v. Collier*,
 1996 U.S. Dist. Lexis 2702 (D. Mass. Jan. 22, 1996).........................................................9

*Bibeau v Pacific Northwest Research Found., Inc.*,
 188 F.3d 1105 (9th Cir. 1999) .......................................................................................22

*Bibeau v. Pacific Northwest Research Found. Inc.*,
 1999 U.S. App. Lexis 38092 (9th Cir. 1999)..................................................................27

*Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc.*,
 36 F. Supp. 2d 560 (E.D.N.Y. 1999) ..............................................................................71

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
 65 F.3d 1406 (7th Cir. 1995) .........................................................................................71

*Bonilla v. Volvo Car Corp.*,
 150 F.3d 62 (1st Cir. 1998)............................................................................................81

*Bowen v. Eli Lilly & Co.*,
 408 Mass. 204, 557 N.E.2d 739 (1990) .........................................................................21

*Bray v. Safeway Stores, Inc.*,
 392 F. Supp. 851 (N.D. Cal. 1975) ................................................................................71

*Brown v. Bank of Am., N.A.*,
 457 F. Supp. 2d 82 (D. Mass. 2006) ..............................................................................45

*Cambridge Literary Props., Ltd. v. W. Goebel Por-Zellanfabrik Gm.b.H. & Co.*,
 448 F. Supp. 2d 244 (D. Mass. 2006) .............................................................................32

*Cambridge Plating Co. v. Napco, Inc.*,
 85 F.3d 752 (1st Cir. 1996)..............................................................................................9

*In re Cardizem CD Antitrust Litig.*,
 218 F.R.D. 508 (E.D. Mich. 2003) .................................................................................71

001534-16  148664 V1

*Cascone v. United States,*
    370 F.3d 95 (1st Cir. 2004)..................................................................................23

*In Re Cement & Concrete Antitrust Litig.,*
    817 F.2d 1435 (9th Cir. 1987) ...........................................................................71

*Chase v. Roy,*
    363 Mass. 402, 294 N.E.2d 336 (1973) .............................................................57

*Craig v. Y&Y Snacks, Inc.,*
    721 F.2d 77 (3d Cir. 1983).................................................................................68

*Delicata v. Bourlesses,*
    9 Mass. App. Ct. 713, 404 N.E.2d 667 (1980) .................................................58

*Desiano v. Warner-Lambert Co.,*
    326 F.3d 339 (2d Cir. 2003)..............................................................................71

*Doty v. Sewall,*
    908 F.2d 1053 (1st Cir. 1990)............................................................................72

*Fairfield 274-278 Clarendon Trust v. Dwek,*
    970 F.2d 990 (1st Cir. 1992).............................................................................48

*Fraser Eng'g Co., Inc. v. Desmond,*
    26 Mass. App. Ct. 99, 524 N.E.2d 110 (1988) ...................................................3

*Great Lakes Gas Transmission Co. v. Grayco Constructors, Inc.,*
    506 F.2d 498 (6th Cir. 1974) ............................................................................68

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
    392 U.S. 481 (1968)................................................................................69, 70, 72

*Harper v. Albert,*
    400 F.3d 1052 (7th Cir. 2005) ..........................................................................57

*Hartford Hospital v. Chas. Pfizer & Co.,*
    52 F.R.D. 131 (2d Cir. 1971) ............................................................................71

*Hymowitz v. Eli Lilly and Co.,*
    73 N.Y.2d 487, 539 N.E.2d 1069 (1989)......................................................60, 61

*ICC v. Holmes Transp., Inc.,*
    983 F.2d 1122 (1st Cir. 1993) ...........................................................................49

*Illinois Brick v. Illinois*
   431 U.S. 720 (1977)..................................................................................72

*ISI Sys. v. Equifax, Inc.*,
   1996 U.S. Dist. Lexis 882 (D. Mass. Jan. 12, 1996)........................................47

*International Fidelity Ins. Co. v. Wilson*,
   387 Mass. 841, 443 N.E.2d 1308 (1983) ........................................................57

*International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*,
   29 Mass. App. Ct. 215, 560 N.E.2d 122 (1990) ..............................................21

*J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*,
   365 F. Supp. 2d 119 (D. Mass. 2005) .............................................................38

*Jensen v. Frank*,
   912 F.2d 517 (1st Cir. 1990)..........................................................................32

*Katzman v. Victoria's Secret Catalogue*,
   167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997)......................81, 82

*L.B. Corp. v. Schweitzer-Manduit Int'l, Inc.*,
   121 F. Supp. 2d 147 (D. Mass. 2000) .............................................................81

*Langford v. Rite Aid of Ala., Inc.*,
   231 F.3d 1308 (11th Cir. 2000) ......................................................................81

*Lawrence Sav. Bank v. Levenson*,
   59 Mass. App. Ct. 699, 797 N.E.2d 485 (2003) ..............................................48

*Leardi v. Brown*,
   394 Mass. 151, 474 N.E.2d 1094 (1985) ......................................................1, 3

*Levings v. Forbes & Wallace, Inc.*,
   8 Mass. App. Ct. 498, 396 N.E.2d 149 (1979) ...............................................2

*In re Lorazepam and Clorasepate Antitrust Litig.*,
   295 F. Supp. 2d 30 (D.D.C. 2003) ..................................................................71

*In re Lupron Mktg. & Sales Practices Litig.*,
   245 F. Supp. 2d 280 (D. Mass. 2003) .............................................................76

*In re Lupron Mktg. & Sales Practices Litig.*,
   295 F. Supp. 2d 148 (D. Mass. 2003) .................................................... *passim*

*In re Massachusetts Diet Drug Litig.*,
    338 F. Supp. 2d 198 (D. Mass. 2004) ............................................................22, 23, 27, 28

*Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*,
    420 Mass. 39, 648 N.E.2d 435 (1995) ....................................................................................3

*Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*,
    412 F.3d 215 (1st Cir. 2005)....................................................................................22, 24

*McCormack v. Abbott Labs.*,
    617 F. Supp. 1521 (D.  Mass. 1985) .................................................................. *passim*

*McDermott, Inc. v. AmClyde*,
    511 U.S. 202 (U.S. 1994)....................................................................................68

*McEvoy Travel Bureau, Inc. v. Norton Co.*,
    563 N.E.2d 188 (Mass. 1990) ..............................................................................72

*Medical Arts Pharmacy, Inc. v. Blue Cross & Blue Shield, Inc.*,
    675 F.2d 502 (2d Cir. 1982).................................................................................71

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005)...............................................................58

*Mohr v. Commonwealth*,
    421 Mass. 147, 653 N.E.2d 1104 (1995) .........................................................21

*Nei v. Burley*,
    388 Mass. 307, 446 N.E.2d 674 (1983) ............................................................57

*New England Trust Co. v. Farr*,
    57 F.2d 103 (1st Cir. 1932)..................................................................................51

*O'Connor v. Boeing N. Am., Inc.*,
    311 F.3d 1139 (9th Cir. 2002) ............................................................................22

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
    366 Mass. 593, 321 N.E.2d 915 (1975) ..............................................................2

*Patry v. Liberty Mobilehome Sales, Inc.*,
    394 Mass. 270, 475 N.E.2d 392 (1985) ............................................................73

*Payton v. Abbott Labs*,
    386 Mass. 540, 437 N.E.2d 171 (1982) ............................................................60

*Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*,
    754 F.2d 10 (1st Cir. 1985)............................................................................57

*Perez v. Wyeth Lab, Inc.*,
    161 N.J. 1, 734 A.2d 1245 (1999)..................................................................71

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)................................................................38, 77

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    307 F. Supp. 2d 196 (D. Mass. 2004)......................................................44, 45

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    2006 WL. 3102998 (D. Mass. Nov. 2, 2006)..................................................86

*Piccuirro v. Gaitenby*,
    20 Mass. App. Ct. 286, 480 N.E.2d 30 (1985)..............................................57

*Polycarbon Indus., Inc. v. Advantage Eng'g, Inc.*,
    260 F. Supp. 2d 296 (D. Mass. 2003)............................................................38

*RGJ Assocs., Inc. v. Stainsafe, Inc.*,
    338 F. Supp. 2d 215 (D. Mass 2004)..............................................................39

*Ravo v. Rogatnick*,
    514 N.E.2d 1104 (N.Y. 1987)........................................................................58

*Rini v. United Van Line*,
    903 F. Supp. 234 (D. Mass. 1995)..................................................................73

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987)...............................................................................9

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980)..........................................................................71

*Russo v. Material Handling Specialties*,
    4 Mass. L. Rep. 288, 1995 Mass. Super. Lexis 436 (1995)..............60, 61, 62, 63

*Sawyer v. Indevus Pharms., Inc.*,
    2004 Mass. Super. Lexis 274 (Mass. Super. Ct. July 26, 2004).................22, 23

*Service Publications, Inc. v. Goverman*,
    396 Mass. 567, 487 N.E.2d 520 (1986)...........................................................1

*Shantigar Found. v. Bear Mt. Builders,*
  441 Mass. 131, 804 N.E.2d 324 (2004) ....................................................................58, 59

*Slaney v. Westwood Auto, Inc.,*
  366 Mass. 688, 322 N.E.2d 768 (1975) ........................................................................2, 57

*Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,*
  245 U.S. 531 (1918)..............................................................................................................68

*St.-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.,*
  246 F.3d 64 (1st Cir 2001)...................................................................................................79

*Stryker Corp. v. XL Ins. Am., Inc.,*
  2006 U.S. Dist. Lexis 47899 (W.D. Mich. July 14, 2006) .................................................47

*Sunrise Props. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.,*
  679 N.E.2d 540 (Mass. 1997) .............................................................................................48

*Swanson v. Bankers Life Co.,*
  389 Mass. 345, 450 N.E.2d 577 (1983) ...............................................................................2

*In re Swine Flue Prods. Liab. Litig.,*
  764 F.2d 637 (9th Cir. 1985) ...............................................................................................22

*In re Synthroid Mktg. Litig.,*
  264 F.3d 712 (7th Cir. 2001) ...............................................................................................71

*In re Terazosin Hydrochloride Antitrust Litig.,*
  220 F.R.D. 672 (S.D. Fla. 2004) ........................................................................................66

*Thompson v. Metropolitan Life Ins. Co.,*
  149 F. Supp. 2d 38 (S.D.N.Y. 2001)........................................................................24, 28, 31

*Turner v. Johnson & Johnson,*
  809 F.2d 90 (1st Cir. 1986)...................................................................................................9

*Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.,*
  247 F.3d 547 (5th Cir. 2001) ...............................................................................................9

*United States v. President & Fellows of Harvard College,*
  323 F. Supp. 2d 151 (D. Mass. 2004) .................................................................................51

*V.S.H. Realty, Inc. v. Texaco, Inc.,*
  757 F.2d 411 (1st Cir. 1985)................................................................................................9

*Value Partners S.A. v. Bain & Co., Inc.*,
   245 F. Supp. 2d 269 (D. Mass. 2003) ...............................................................57

*Veranda Beach Club Ltd. P'ship. v. Western Sur. Co.*,
   936 F.2d 1364 (1st Cir. 1991) ...........................................................................51

*Wall Prods. Co. v. Nat. Gypsum Co.*,
   357 F. Supp. 832 (N.D. Cal. 1973) ...................................................................71

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002) ..........................................................................71

*Weiss v. Augat, Inc.*,
   2000 WL 1765434 (Mass. 2000) .......................................................................73

*Whitehall Co. v. Barletta*,
   404 Mass. 497, 536 N.E.2d 333 (1989) .............................................................81

*Wolinetz v. Berkshire Life Ins. Co.*,
   361 F.3d 44 (1st Cir. 2004) ..........................................................................21, 22

## STATUTES

Mass. Gen. L. ch. 93A ........................................................................................ *passim*

Mass. Gen. L. Ann. ch. 231 § 6B .................................................................................73

Mass. Gen. L. ch. 260 ..................................................................................................21

940 Ma. Admin. § 3.16(4) ..............................................................................................2

15 U.S.C. § 45(a)(1).........................................................................................................1

## MISCELLANEOUS

*OIG Compliance Program Guidance for Pharmaceutical Manufacturers,* 68 Fed. Reg.
   23731 (May 5, 2003)...................................................................................3, 4

RESTATEMENT (SECOND) OF AGENCY § 272 (1958) ................................................48, 51

RESTATEMENT (SECOND) OF TORTS § 433B(2) ............................................................59

RESTATEMENT (SECOND) OF TORTS § 882 ...................................................................58

RESTATEMENT (SECOND) OF TORTS § 920A(2)..............................................................68

RESTATEMENT (THIRD) OF TORTS § A18 ........................................................................57

001534-16  148664 V1

Plaintiffs respectfully submit their Post-Trial Omnibus Trial Brief.  Plaintiffs have responded to legal issues raised by the Court and Defendants during trial and by Defendants in various briefing previously submitted to the Court, including Defendants' motion for judgment on partial findings.  Plaintiffs have attempted to be as comprehensive as possible within the limited space available.  Plaintiffs respond separately, as did Defendants, to the Court's questions relating to maintaining certification of Class 3.

## I.      COMMON LEGAL ISSUES

**A.      Defendants Have Committed Unfair Acts or Practices**

**1.      G.L. Ch. 93A prohibits unfair and deceptive acts or practices in the conduct of trade or commerce**

Massachusetts Gen. Laws Ch. 93A, § 2 prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Chapter 93A "is a statute of broad impact" passed "to aid consumers and others . . . by making conduct unlawful which was not unlawful under the common law or any prior statute."  *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693, 322 N.E.2d 768, 772 (1975) (quoting *Commonwealth v. De Cotis*, 366 Mass. 234, 244 n.8 (1974)). In particular, the definition of an actionable unfair or deceptive act or practice "goes far beyond the scope of the common law action for fraud and deceit."  *Id.* at 703.  "[T]echnicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice." *Leardi v. Brown*, 394 Mass. 151, 159, 474 N.E.2d 1094, 1101 (1985) (quoting *Baldassari v. Public Fin. Trust*, 369 Mass. 33, 41 (1975)).

The Court need not find the presence of both unfair and deceptive conduct in order to find that Defendants violated G.L. Ch. 93A.  ***A practice can be unfair without being deceptive***. *See*, *e.g.*, *Service Publications, Inc. v. Goverman*, 396 Mass. 567, 578, 487 N.E.2d 520, 527 (1986).

- 1 -

In construing G.L. Ch. 93A, courts are to be guided by interpretations given by the
Federal Trade Commission and federal courts to section 5(a) of the Federal Trade Commission
Act, 15 U.S.C. § 45(a)(1).  Mass. Gen. Laws Ch. 93A, § 2(b); *Slaney*, 366 Mass. at 694; *PMP
Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 595, 321 N.E.2d 915, 917 (1975); *accord*,
940 Ma. Admin. § 3.16(4) (act or practice is a violation of Ch. 93A if it violates the FTC Act).

### a.       Unfair acts or practices standards

An unfair act or practice is not amenable to a bounded definition because, as courts have
recognized, "[i]t is impossible to frame definitions which embrace all unfair practices.  There is
no limit to human inventiveness in this field." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App.
Ct. 498, 503, 396 N.E.2d 149, 153 (1979) (quoting H. R. Conf. Rep. No. 1142, 63d Cong., 2d
Sess. (1914)).  Nonetheless, Massachusetts courts, following federal jurisprudence under the
Federal Trade Commission Act, have employed the following factors in evaluating whether
conduct is unfair:  (i) whether the practice is within at least the penumbra of some common-law,
statutory, or other established concept of unfairness; (ii) whether it is immoral, unethical,
oppressive or unscrupulous; and (iii) whether it causes substantial injury to consumers,
competitors or other business people.  *PMP Assocs., Inc.*, 366 Mass. at 596 (citing *FTC v. Sperry
& Hutchinson Co.*, 405 U.S. 233, 244 (1972)).

"Whether a given practice runs afoul of these touchstones must be determined from the
circumstances of each case." *Levings*, 8 Mass. App. Ct. at 504.  In doing so, courts evaluate the
"equities between the parties," and "[w]hat a defendant knew or should have known may be
relevant" in making that determination.  *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349, 450
N.E.2d 577, 580 (1983).  The Court is to "focus on the nature of challenged conduct and on the
purpose and effect of that conduct as the crucial factors in making a G. L. c. 93A fairness

determination." *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43, 648 N.E.2d 435, 438 (1995).

### b.      Deceptive acts or practices standards

An act or practice is deceptive if it possesses a tendency to deceive. *Leardi*, 394 Mass. at 156.  "In determining whether an act or practice is deceptive, 'regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public.'" *Leardi*, 394 Mass. at 156 (quoting *P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950)).  The plaintiff need not prove that the defendant intended to deceive the plaintiff. *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 394, 813 N.E.2d 476, 486 (2004).  Nor is proof of reliance required as long as there is a causal relationship between the act or practice and injury to the plaintiff. *Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99, 104, 524 N.E. 2d 110, 113 (1988).

### c.      Relevancy of the OIG guidelines

The OIG has issued Guidelines that also inform the Court's analysis of whether the Track 1 Defendants have committed unfair or deceptive acts or practices in violation of G.L. Ch. 93A.  Pharmaceutical manufacturers are under a ***legal duty*** not to submit "false, fraudulent, or misleading information" where "reimbursement by Medicare and Medicaid[]… for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, ***directly or indirectly***, and the manufacturer has knowingly … failed to generate or report such information completely and accurately." *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23731, at 23733 (May 5, 2003) (emphasis added); Ex. 4016 at 23733-34 and 23737.

"Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-

front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers." *Id*. "If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated." *Id*. at 23737.

"[I]t is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product." *Id*. And "[t]he conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute. Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product." *Id*.

### 2.   Each Track 1 Defendant committed <u>unfair</u> acts or practices

#### a.   The elements of Defendants' unfair conduct

##### (1)   The Class 2 statutory scheme

Each Defendant knew that AWP was the basis for Medicare reimbursement.[1] Payors and beneficiaries were locked into AWP-based payments.[2]

##### (2)   Defendants knew that AWP was the basis for reimbursement in the non-Medicare market

Defendants knew that, in the non-Medicare market, AWP was the basis for reimbursement.[3] And Defendants knew that the industry was dependent upon AWP because it

---

[1] *See* Plaintiffs' Post-Trial Proposed Findings of Fact ("PFOF"), at II.A.1 (AstraZeneca); II.B.2. (BMS); II.C.1 (J&J); II.D.1 (SP).

[2] *See* Trial Tr. Day 3 at 123 (BCBS-MA Ken Arruda) (BCBS-MA required by law to offer Medigap coverage); *see* Rosenthal Written Direct Testimony, ¶¶ 18-20 (described Part B payment system).

[3] *See* PFOF, II.A.1 (AstraZeneca); II.B.2 (BMS); II.C.1 (J&J); II.D.1 (SP).

was used as the industry reimbursement standard.[4]  Put simply, a standard was needed, and AWP

was that standard.  Defendants willingly took advantage of this standard – in both the Medicare

and non-Medicare contexts – and harmed Class members (who relied on AWP to have a

meaningful relationship to ASP).

### (3)      Defendants published phony AWPs

Each Defendant, albeit in varying degrees, published AWPs that were not an average and,

in the case of all but J&J, Defendants' AWPs were not even close to average, or, in the case of

Class 3, within the reasonable expectations of Class 3 members.[5]

### (4)      Defendants knew that the government was concerned about AWP abuse but concealed their practices and often escalated their AWP marketing

Defendants each had employees whose job it was to monitor what was happening in

Washington with respect to Medicare reimbursement and were aware of Congressional and

agency concern with excessive payments as a result of AWP spreads.[6]  Thus, Defendants were in

the best position to correct those published AWPs.  They were also in a position to disclose to

Congress exactly what was happening.  They did neither.[7]

And while Congress was investigating the accuracy of AWPs and the issue of changing

the payment system, Defendants lobbied against changes to the AWP reimbursement system[8]

---

[4] *Id.*

[5] PFOF II.A.3 (AWPs for AstraZeneca were not real) and II.A.i and j (describing Zoladex spreads and damages); II.B.4 (AWPs for BMS were not real) and B.II.6 (describing spreads); C.3.a (J&J AWPs were not real) and C.4 (describing spreads); II.D.3-4 (SP AWPs were not real); and II.D.5 (damages).

[6] Alan Milbauer of AstraZeneca (Trial Tr. Day 11 at 19) and Cathleen Dooley of Johnson & Johnson are examples of such employees.

[7] *See, e.g.*, Trial Tr. Day 11 at 23, 35-36 (never informed Congress of RTP practices) (Milbauer); Trial Tr. Day 7 at 24-25 (Dooley claiming she disclosed spreads but she has no notes, memos or writings reflecting such disclosures); Trial Tr. Day 14 at 25-26 (Pasqualone) (BMS never sent Congress its true prices).

[8] *See infra* at I.B.4.a.

and increased the spreads on their drugs[9] during the period of Congressional investigation and review.

> **(5)      Defendants knew increases in AWP had a direct effect on payors**

There was also no dispute that Defendants knew an increase in AWP led to an increase in price.[10]

> **(6)      Despite the foregoing, Defendants continued to foist fictitious AWPs on Class members**

And Defendants knew that AWP was not readily understood by payors and that its use was misleading.[11]  Despite knowledge that the term was misleading, Defendants kept the system in place without disclosing truthful AWPs.

> **b.      Summary of Defendants' unfair conduct**

Plaintiffs have proved by a preponderance of the evidence that each Track 1 Defendant committed **unfair** acts or practices.  Defendants perpetuated the publication of the inflated AWPs set forth in Attachment G to the Hartman Direct, while knowing full well that those same AWPs constitute the Medicare Part B reimbursement benchmark for Class 2 and the private insurance reimbursement benchmark for Class 3.  In the case of Class 2, those AWPs did not reflect an actual average of prices in the marketplace, as Congress intended them to be.[12]  Consequently, for Class 2 the Court should find as unfair any AWPs that exceed an actual average of actual

---

[9] Direct Testimony of Dr. Raymond S. Hartman ("Hartman Direct"), Attach. G.4 (showing AstraZeneca increasing spreads during period of Congressional review; showing spreads on Taxol skyrocketing during period of Congressional review; and showing spreads of albuterol spiking to over 600%).

[10] *See, e.g.*, Trial Tr. Day 5 at 13 and 15:5-16 (Buckanavage admitting same); Ex. 143 at AZ0044010; Ex. 15 at AZ0431802; Ex. 196 at 1088201; Trial Tr. Day 14 at 33:18-34:2 (Pasqualone).

[11] *See, e.g.*, Ex. 196.

[12] Nov. 2, 2006, Memorandum and Order (Dkt. No. 3299).

costs to physicians.[13]  Nor did those AWPs constitute reasonable pricing signals as the members

of Class 3 reasonably expected them to be.  For purposes of Class 3, AWPs that exceed by 30%

an actual average of costs to physicians are unfair.

Defendants have never offered any explanation for what they contend AWP was

supposed to mean.  Hence under their argument, as advanced by their longtime consultant

Dr. Bell, Defendants were free to publish any AWP.[14]  Such an argument as to Class 2 defies

common sense and flouts Congress's intent, and for Class 3 defies what the market understood

AWP to mean.

Defendants also deliberately manipulated spreads between AWPs and actual costs, as the

spreads in Hartman Direct Attachment G reflect.[15]  To varying degrees, each Defendant also took

concrete steps to market those spreads to providers.[16]

Each of the foregoing actions constitutes unfair acts or practices.  ***First***, they fall within

the penumbra of common-law, statutory, or other established concept of unfairness, particularly

given the OIG's admonitions that:  (i) AWP must be a meaningful figure that is not artificially

inflated; (ii) the "government sets reimbursement with the expectation that the data provided are

complete and accurate" and include various price reductions; and (iii) it is illegal for a

manufacturer to knowingly establish or inappropriately maintain a particular AWP if one

purpose is to manipulate the "spread" to induce customers to purchase its product.

---

[13] Alternatively, the Court should rule that any AWPs exceeding the current CMS methodology violate ch. 93A. *See* Ex. 4010 (calculating damages on this basis).

[14] Trial Tr. Day 15 at 73:2-12 (Bell) (okay to market spread) and 79:22-80:16 (Bell believes it is acceptable to pay based on an increasingly fictitious number) and 80:24-81:12 (where Bell can cite to no evidence of what AstraZeneca thought AWP meant when it set AWPs); *see also* 82-83 (where the court asks Bell if Defendants can publish whatever they want, and there is no responsive answer from the witness to the question).

[15] *See also* PFOF, Secs. II.A.4 (AZ); II.B.4-5 (BMS); II.C.3 (J&J); II.D3-4 (SP).

[16] *Id.*

**Second**, that same conduct is immoral, unethical, oppressive or unscrupulous.  Although they perpetrated such conduct, even the Track 1 Defendants recognized that manipulating and marketing spreads was unethical or wrong or if exposed would become an issue for Congress and/or the public.[17]  Despite these recognitions, each Defendant sold product on the basis of spread anyway.[18]  Gouging payors that are locked into a statutorily- or industry-based payment scheme is immoral, unethical, oppressive and unscrupulous, particularly given the fact that the individuals who are impacted are going through traumatic cancer treatments.

**Third**, Defendants' conduct is also unfair because it has caused substantial injury to consumers, competitors or other business people, as detailed further below.

### 3.     Each Track 1 Defendant committed <u>deceptive</u> acts or practices

Plaintiffs have proved by a preponderance of the evidence that each Track 1 Defendants' course of conduct was **deceptive** because it had the tendency or capacity to deceive.  Defendants' deliberate decision to report AWPs to national pharmaceutical industry publications or list prices with knowledge of how they would be marked up to result in AWPs – knowing that these published AWPs would form the basis of an industry-wide reimbursement system – obligated Defendants by law to ensure that these pricing benchmarks were **not** misleading.  But the AWPs for the Subject Drugs were misleading.

For example, it is axiomatic under statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material

---

[17] *See, e.g.*, Schultz Dep. II at 93-95, 124-29 (AstraZeneca Pricing Strategy Manager, Erik Schultz, explained that he thought it was "sleazy" and "an ethical problem" for AstraZeneca to evaluate and increase the AWPs for Zoladex based on whether physicians were making enough profit); Ex. 32 (where at least one AstraZeneca manager told his team that "under no circumstances can we talk about return to practice"); Ex. 223 (BMS document acknowledging that "the spread should not be used as a promotional or marketing tool"); Glassco Dep. at 113-14 (Centocor's National Accounts Manager and Regional Business Director instructing employees to stop talking to physicians about profit); Ex. 2767 (where OBI advised "It is absolutely inappropriate to sell product based upon the difference between AWP and acquisition price.").

[18] *See* PFOF, Secs. II.A.4 (AstraZeneca); II.B.4-5 (BMS); II.C.3 (J&J); II.D.3-4 (SP).

facts he knows to avoid deceiving the other party." *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (RICO and securities claims).  Indeed, the First Circuit has specifically held that "[w]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *Roeder*, 814 F.2d at 26; *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769-70 (1st Cir. 1996) (seller's failure to disclose that a critical component was missing from system it sold to buyer and its misdirection of the buyer's attention to operator error as the source of the system's problems supported the District Court's conclusion that the seller behaved both unfairly and deceptively under Chapter 93A).  "'Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . ." *V.S.H. Realty*, 757 F.2d at 414-15 (quoting *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708 (1969)).  Thus, if a drug manufacturer "chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth." *Roeder*, 814 F.2d at 26 (quoting *Grossman v. Waste Mgmt., Inc*., 589 F. Supp. 395, 409 (N.D. Ill. 1984)); *see also Turner v. Johnson & Johnson*, 809 F.2d 90, 100 (1st Cir. 1986) (finding that "an incomplete or partial statement may be the basis for fraud when only full disclosure would avoid deception"); *Augat, Inc. v. Collier*, 1996 U.S. Dist. Lexis 2702, at *47 (D. Mass. Jan. 22, 1996) (noting that disclosure of partial information may be fraudulent); *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc*., 247 F.3d 547, 586 (5th Cir. 2001) (finding disclosure of "some but less than all material facts" may be actionable where "partial disclosure convey[s] a false impression").

Moreover, the Court should find relevant to the deception determination the OIG's admonitions that:  (i) AWP must be a meaningful figure that is not artificially inflated; (ii) the

- 9 -

"government sets reimbursement with the expectation that the data provided are complete and accurate" and include various price reductions; and (iii) it is illegal for a manufacturer to knowingly establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

Defendants were not required to volunteer their WLPs, WACs or AWPs to pricing compendia, like the *Red Book*, which supplied AWPs to Medicare.  And for those Defendants who provided mark-up factors, they were not required to direct the *Red Book* to use specified mark-up factors to derive the AWP.  But once Defendants chose to do so – knowing fully that Medicare and other payors would be reimbursing at those inflated prices – Defendants became obligated to ensure that their representations were accurate.  They were not.  In the case of Class 2, those AWPs did not reflect an actual average of prices in the marketplace, as Congress intended them to be.  Consequently, for Class 2 the Court should find as deceptive AWPs exceeding an actual average of actual costs to physicians.

Nor did those AWPs constitute reasonable pricing signals as the members of Class 3 reasonably expected them to be.  For purposes of Class 3, the Court should find as deceptive AWPs that exceed by 30% an actual average of costs to physicians.  The Court should find an exception for Remicade.  OBI has historically been a company that priced its drugs 20% or 25% above WAC.  But in the case of Remicade, in order to give doctors a profit this spread was priced to 30%.[19]  This increase was a deliberate abuse of the system and resulted in excess payments reaching into the hundreds-of-millions of dollars.[20]  Twenty-five percent should be the speed limit for Remicade.

---

[19] PFOF, II.C.2.

[20] PFOF, II.C.4 ¶ 260 and ¶ 265 (citing to Ex. 4066 where Dr. Hartman calculated the difference between 25% and 30% spread to amount to $191,593,208.

**4.     Each Track 1 Defendant has also violated Ch. 93A as a result of violating Federal Trade Commission Law and Massachusetts regulations**

Defendants have also committed *per se* violations of Chapter 93A by violating applicable Massachusetts regulations and FTC law. Plaintiffs have already thoroughly briefed these issues and refer the Court to Plaintiffs' Memorandum Regarding Defendants' *Per Se* Unfair or Deceptive Acts or Practices (Dkt. No. 3417), which is incorporated herein by this reference.

**5.     Privity is not required under Ch. 93A**

Defendants have argued that a plaintiff pursuing a Ch. 93A claim must have direct privity in a transaction with the defendant. *See*, *e.g.*, Memorandum of Law in Support of Track 1 Defendants' Motion for Judgment on Partial Findings at 2. This is untrue, and Plaintiffs refer the Court to their prior briefs on this issue, which are incorporated by this reference. *See* Plaintiffs' Memorandum Regarding the Transaction Requirement in Gen. Laws Ch. 93A, § 11 (Dkt. No. 3407); Plaintiffs' Sur-Reply Opposition Regarding the Transaction Requirement in Gen. Laws Chapter 93A, § 11 (Dkt. No. 3522).

**6.     Lack of systematic "knowledge" concerning AWP marketing and excessive spreads renders Defendants' conduct deceptive**

Defendants claim that no deception of the Class took place largely because class representative BCBS-MA purportedly ***knew*** of the misleading nature of AWPs. This claim as to BCBS-MA fails for a multitude of reasons. As to other Massachusetts payors, the claim is not even debatable.

**a.     No knowledge of spread marketing**

Not one shred of evidence exists demonstrating that any BCBS-MA witness knew of Defendants' spread marketing. A prime example of this is provided by AstraZeneca's Return-to-Practice ("RTP") scheme. Not a single BCBS-MA witness testified that they were aware of the RTP scheme. Nor does a single document demonstrate any such knowledge. Knowledge that

- 11 -

there may be a discount or a difference between AWP and acquisition cost does not constitute knowledge that, at your expense, a manufacturer is actively marketing the spread.  It also does not mean that you are aware that, for a few drugs, spreads far exceed the normal relationship between AWP and WAC.  Again the OIG specifically condemns this type of conduct, and no such evidence exists that BCBS-MA knew of such marketing by any Defendant.  Indeed, Defendants' key purported BCBS-MA "knowledge" witness, ex-Medical West employee Ed Curran, admitted that he had no knowledge of spread marketing or even the size of discounts.[21]

### b.    No knowledge by Taft-Hartley Funds

Dr. Bell gave extensive opinions that "[p]ayors understood [the] meaning of published AWP."[22]  He did not distinguish among payors.  Bell admitted, on cross-examination, that he overstated his opinion since there is no evidence or deposition testimony supporting this opinion as to Taft-Hartley Funds.[23]  Bell also admitted that Taft-Hartley Fund's did not gain any information from purported "shared enterprises."[24]  Nor has he analyzed their purchase prices to impute knowledge from purchasers as he and Gaier attempted to do for Medical West to BCBS-MA.[25]  Bell can cite no evidence that any large TPPs transmitted any such knowledge to Taft-Hartley Funds.[26]  Nor do the Taft-Hartley Funds have staff model HMOs, PBMs or hospitals from which such knowledge could allegedly be transmitted.[27]  Moreover, there is no evidence any such fund received or was even aware of GAO or OIG reports about AWP.[28]

---

[21] Trial Tr. Day 4 at 31-36 (Curran).

[22] Bell Slide 2.

[23] Trial Tr. Day 15 at 53:6-23 (Bell).

[24] *Id*. at 54.

[25] *Id*. at 54.

[26] Trial Tr. Day 15 at 57 (Bell).

[27] *Id*. at 56-57.

[28] *Id*. at 57:14-58.

To the contrary, the testimony from such payors is that they had no knowledge of reports and studies or the real ASPs; rather, they believed AWP was an actual average.[29]  These witnesses simply did not receive any information about AWP that would have pierced the deception created by Defendants' publication of false AWPs.[30]

> **c.**      **No evidence exists that BCBS-MA, other Massachusetts TPPs or Taft-Hartley Funds were aware of the controversy regarding AWP**

Defendants' "knowledge" defense is largely predicated on innuendo and Bell's analysis of GAO, OIG, and other reports regarding the difference between AWP and actual price.  However, Defendants offered *no evidence* that *any* Massachusetts TPPs had knowledge of these reports – *none*.  Tellingly, Defendants avoided asking BCBS-MA witnesses whether they had such knowledge and *no* copies of such reports from the files of any Massachusetts TPP was introduced into evidence at this trial.  The glaring absence of such evidence is ignored by Bell and speaks volumes to the irrelevance of these reports.

> **d.**      **Defendants' themselves admitted there was a lack of knowledge as to the meaning of AWP**

Defendants' own documents reflect an understanding that the payor community did not understand what AWP meant.  For example, when in 2002 BMS analyzed the meaning of AWP, it concluded that "AWP's can confuse the understanding of pricing within the U.S. pharmaceutical system" and that it consequently "needs to be wary of using AWPs because the name is misleading."[31]  This admission is resoundingly inconsistent with Defendants' TPP "knowledge" strawman that is a defense only to the 93A deception prong for the Class 3 claim.

---

[29] Trial Tr. Day 1 at 169 (Hannaford); Trial Tr. Day 2 at 31 (Alongi).

[30] Trial Tr. Day 1 at 214-15 (Faulkner).

[31] Ex. 196.

Similarly, J&J's Cathleen Dooley wrote that it would surprise patients to learn that "physicians bill at AWP, rather than off of acquisition cost (public relations issue)."[32]  Such a comment is not consistent with widespread knowledge of the meaning of AWP.  Defendants' experts ignore this and similar evidence when they opine as to purported "knowledge."

> **e.    There cannot be any "knowledge" when some of the deceptive practice had not even begun for some drugs until later in the Class Period**

Defendants' "knowledge" defense, which Bell begins in 1992 and/or 1997, also fails due to its overbreadth.  How can, for example, the Classes know of AWP abuse when for some drugs it had not occurred or, in other cases, the magnitude of the deception increased over time?  Taxol provides a paradigm example.  Bell and all BMS witnesses have admitted that, until 2001 Taxol's AWP was close to its ASP.  Beginning in 2001, that spread began to decline, plummeting in 2003 to the point at which less than .05% of sales were made at greater than 95% of WLP.  Defendants do not explain how there was knowledge of a fraud that did not occur until 2001, nor do they explain how, factually, in 2001, TPPs would suddenly have known that the AWP for Taxol was wildly inaccurate.[33]

Zoladex provides another example.  When AstraZeneca started its RTP scheme in 1994-95, spreads were at 40%.[34]  Knowledge of a 40% spread, assuming it existed, is not knowledge of the deceptive practices that sent spreads zooming to 133.6% in 1998 and 149% in 2002.[35]  The same is true for Albuterol, where spreads grew from 103% to 1052%.[36]

---

[32] Ex. 259.

[33] *See* Ex. 2524.

[34] Ex. 4028, Attach. G.1.c.

[35] *Id.*

[36] Hartman Direct, Attach. G.4.c.

**f.     Bell's shared enterprise theory fails to show knowledge**

No doubt clouded by the $13 million a year that Dr. Bell earns from pharmaceutical clients apart from his AWP work,[37] Bell posits a "shared enterprise theory" as a basis for imparting knowledge to the TPPs.  However, as demonstrated in the cross-examination of Bell, most of the purported "X's" in his Exhibit E evaporate based upon close scrutiny.[38]  *See* Ex. 4049 removing Xs improperly placed in the Bell chart.  By way of example, Bell imparts knowledge to Aetna based on ownership of a mail-order pharmacy.  However, Aetna did not acquire that facility until February 2003.  Thus, even assuming that cross-company communication existed (and there is no evidence of such communications in the record), Aetna's mail order ownership cannot be used to impute knowledge.  Furthermore, Aetna's specialty pharmacy was not acquired until 2004, after the Class Period.[39]  Again, this provides no basis for any such knowledge.[40]

**g.     BCBS-MA witness testimony does not support a lack of deception**

The witnesses most involved with physician-administered drugs at BCBS-MA testified that they believed until 2003-2004 that AWP was either an actual average or an accurate pricing signal.  As Mr. Mulrey from BCBS-MA explained:

> Until I began looking at materials published by Medicare in preparation for the analysis my staff and I conducted in early 2004 concerning the impact of a move from the use of AWP to ASP, I believed that the AWPs that BCBSMA had been using as a basis for reimbursement was the price at which, on average, physicians were paying to purchase physician administered drugs. . . .  I was not aware that the AWPs which BCBSMA used to establish its fee

---

[37] Trial Tr. Day 15 at 63:6-9 (Bell).

[38] Trial Tr. Day 16 at 5-8 (Bell).  The Court denied Plaintiffs' oral motion to strike Bell's shared enterprise chart but acknowledged that the misleading nature of the chart "affects its weight."  *Id.* at 18:20-21.

[39] Trial Tr. Day 16 at 5-8 (Bell).

[40] *See* Ex. 4049 for a further analysis of similar mistakes and overreaching by Bell in advancing his shared enterprise theory.

- 15 -

schedules for physician administered drugs may have been inflated and may not have borne a reasonable or predictable relationship to the actual prices being paid by physicians for these drugs.[41]

Similarly, BCBS-MA representative DeVaux testified that:

Until the PFSWG considered the move to ASP, I was unaware of the full magnitude of spreads between the published AWP and the actual sales prices at which physicians can apparently purchase some of these drugs.  In my years of experience negotiating contracts between insurers and physician groups, the basis of reimbursement for physician administered drugs was never raised as a point of negotiation.  As far as I know it was also not a subject that was often discussed or widely-known at BCBSMA. . . .  I was aware that some physicians or physician groups with large practices who could buy in greater quantities for instance, may have paid less and other doctors may have paid more to acquire these drugs.  However, I was not aware that certain drug manufacturers were publishing or causing to be published AWPs that exceeded some of their drugs' actual average sales prices by more than 30% and that they were doing so in order to increase their market share for these drugs at the expense of payors such as BCBSMA.  Even when PFSWG was considering whether to follow Medicare and begin using ASP, it was not clear to me which manufacturers were engaged in the inflation of AWP in this way or which drugs were involved. . . .  Other than through this litigation, I have not received information about which physician-administered drugs may have had unduly inflated AWPs.[42]

It was not until CMS announced its change to ASP that BCBS-MA understood as an organization that AWPs had been inflated as to certain drugs; indeed, this is what led to the formation of the working group that evaluated (and continues to study) alterations to the BCBS-MA reimbursement system.[43]

To combat this lack of knowledge Defendants rely on three witnesses and purchases by the staff model HMO.  One ex BCBS-MA employee, Ed Curran, on cross admitted that he was

---

[41] Mulrey Trial Aff., ¶¶ 18-19; *see also* Trial Tr. Day 2 at 194-95 (Mulrey).

[42] DeVaux Trial Aff., ¶¶ 15-17; *see also* Trial Tr. Day 2 at 129-30 (DeVaux)

[43] Trial Tr. Day 2 at 130-32 (DeVaux).

not involved in the purchase of PADs[44] and had no clue about how they were purchased.[45]  The same is true for Mr. Gary Shramek.[46]  Mr. Shramek, an employee of Defendant BMS for the last three years, was called by Defendants to testify to BCBS-MA's knowledge.  Mr. Shramek's understanding of the issue while at BCBS-MA was limited to a single conference he attended in 2002 on the issue of specialty pharmacies.[47]  Mr. Shramek admitted he was not involved with buying or selling of drugs at BCBS-MA, had very limited contact with providers[48] and was not responsible for setting reimbursement policies related to PADs at BCBS-MA.[49]

Defendants also rely on statements made by Mr. John Killion, Senior Director of Ancillary Services at BCBS-MA, during his deposition in this matter.  Defendants claim that during his deposition, Mr. Killion acknowledged that as early as 1994, while he was employed by Tufts Health Plan prior to his employment at BCBS-MA, he understood AWP to be an "artificial price" and that it bore no relationship to the prices being paid by physicians for PADs.  Defendants also contend that it was common for Mr. Killion and others at Tufts to refer to AWP as "ain't what's paid" in relation to what physicians paid to acquire PADs.  A careful analysis of Mr. Killion's testimony indicates that Defendants conveniently misconstrue his testimony for their own purposes.

In fact, Mr. Killion made it clear during his deposition testimony that he did not know how AWP related to acquisition cost:

---

[44] Trial Tr. Day 4 at 36 (Curran).

[45] Id. at 37, 40-41, 51.

[46] Trial Tr. Day 8 at 139, 166:7-16 (Shramek).

[47] Id. at 146-48.

[48] Id. at 160:10-161:5.

[49] Id. at 155:1-8.

Q.     Did you have an understanding about what average
       wholesale price was in relationship to the prices that
       physicians were paying for those drugs?

A.     No, I did not.[50]

Defendants' interpretation of Mr. Killion's testimony ignores testimony that Mr. Killion

understood and used the term "acquisition cost" to refer to the rate at which insurers like Tufts

reimbursed for retail drugs, not the acquisition cost paid by physicians or any other providers.

Q.     The question is:  Did you have an understanding that the
       acquisition cost by hospitals, by pharmacies, by doctors
       changed depending on whether a drug was brand name,
       multisource or retail, generic, depending upon the level of
       competition in the marketplace for the drugs?

MR. SULLIVAN:  Objection.  Form; compound; complex

A.     *When you are referring to acquisition costs, I am referring
       specifically to the price that Tufts Health Plan paid for the
       drugs*, and we knew it was more effective for mulitsource
       generic drugs than it was for our physicians to be
       prescribing brand named drugs.

Q.     And it was your understanding the reason for that was
       because manufacturers provided different discounts and
       incentives and depending upon the level of competition for
       the drug; correct?

MR. SULLIVAN:  Objection. Beyond the scope.

A.     That wasn't my understanding specific to, as you said, as
       you restated it, physicians, hospitals and others, but
       specific to the price that we paid as a health plan through
       the retail pharmacy program.[51]

Thus, when Mr. Killion referred to AWP as an "artificial price" in his deposition,[52] he

was referring to the fact that AWP was not the price that Tufts paid to reimburse for drugs.  Tufts

reimbursed all drugs at a discount off of AWP; thus he understood AWP to be an artificial price

---

[50] Killion Dep. at 137:8-22.

[51] Killion Dep. at 127:22-129:4.

[52] Killion Dep. at 119:7-120:12.

in relation to the price being paid by Tufts.  When Mr. Killion testified that AWP was referred to commonly at Tufts as "ain't what you pay,"[53] he was merely referring to the fact that Tufts did not pay AWP for the drugs for which it reimbursed.  The statements of Mr. Killion relied on by Defendants say nothing about what Mr. Killion knew about the relationship between AWP and the acquisition costs to physicians or what other TPPs paid.  Defendants' interpretation is inconsistent with the fact that Mr. Killion testified unequivocally that he had no understanding of the relationship between AWP and the acquisition cost to physicians.

### h.    Medical West did not transfer knowledge to BCBS-MA

Defendants' purported evidence of knowledge comes also from the purchase of drugs by a subsidiary of BCBS-MA called Medical West.  The most knowledgeable witness as to what occurred at Medical West, Maureen Coneys, credibly testified that Medical East/West did not discuss the purchase of physician-administered drugs with the BCBS-MA parent and that any contracting for these drugs was done independently.[54]

Defendants claim that it is not credible that the parent, BCBS-MA, would not know what a subsidiary is doing.  But this testimony is undercut by AstraZeneca witness Julie-Ann Tracey, who testified that one part of AstraZeneca was unaware of what was happening in another part, even though both areas were within the same entity (unlike BCBS-MA and Medical East/West, which were separate).  Ms. Tracy testified that while she was marketing the Managed Care side of AstraZeneca's business, others were marketing to the physicians, and she did not have knowledge of what they were doing.[55]  She did not find lack of cross knowledge within her

---

[53] Killion Dep. at 136:13-137:5, 138:7-13.

[54] Trial Tr. Day 3 at 70-78, 85 (Coneys).

[55] Trial Tr. Day 13 at 47:8-48:3 (Tracy).

organization to be unusual.[56]  Thus, it is not surprising that there was no cross-knowledge

between BCBS-MA and its subsidiary on the prices being paid for physician-administered drugs.

The actual contracts for the purchase of physician-administered drugs executed by

Medical West also support a finding of corporate independence.  Though Defendants try to

characterize these contracts otherwise, they all are signed by ***Medical West***, and not

BCBS-MA.[57]  Furthermore, even had the information been shared (and it was not), BCBS-MA

sold this staff model in 1997, negating any knowledge relating to transactions after this time.

The Court should find that information relating to Medical West's purchase of physician-

administered drugs was not transmitted to BCBS-MA in such a manner as to temper Defendants'

deceptive conduct.

> **i.    Comparing BCBS-MA's actual acquisition prices with those of
> Medical West also evidences a lack of knowledge**

Economists often examine actual transaction prices as a proxy for understanding the

behavior of market participants.  Dr. Hartman did just that; he analyzed the actual prices paid by

BCBS-MA to see if those prices reveal knowledge of spreads.[58]  This analysis revealed that

BCBS-MA purchases were closely tied to the AWP and not the ASP.[59]

Gaier, in contrast, ***refused*** to look at actual BCBS-MA data.  Instead, he created charts of

***Medical West's*** purchase prices, misleadingly slapped a title on the chart attributing these

purchases to "BCBS MA" and concluded that BCBS-MA was aware of all of Medical West's

---

[56] *Id.*

[57] *See*, *e.g.*, Ex. 1024 (purchasing self-administered drug Tagamet at a discount "on behalf of HMO Blue and only in respect to the staff model/group model sites listed on the attached sheet"); Trial Tr. Day 13 at 46:21-47:1 (Tracy) (admitting that all contracts with discounts were also executed on behalf of Medical West).

[58] Trial Tr. Day 8 at 69, 77-78 (Hartman).

[59] Hartman Direct, Attachs. F.1-F.9.

- 20 -

acquisition costs.  Such manipulation of the evidence, and refusal by an "expert" to deal with actual BCBS-MA data, eviscerates Gaier's analysis and Defendants' claims in this regard.

**B.     The Claims of Plaintiffs and the Class are Timely**

All claims brought by Plaintiffs are timely.  The original Complaint in this action was filed in December 2001.  The four year statute of limitations for claims under Mass. Gen. L. ch. 93A covers claims that had accrued as of December 1997.  Gen. Laws Ch. 260, § 5A.  The statute of limitations for claims prior to December 1997 was tolled by virtue of both the discovery rule and the doctrine of fraudulent concealment.  Plaintiffs have submitted sufficient proof demonstrating that (i) Class Plaintiffs had neither actual nor constructive knowledge of facts giving rise to their claims prior to October, 1997; and (ii) Defendants fraudulently concealed facts that, if revealed earlier, would have given Plaintiffs notice of those claims.

**1.     The discovery rule tolls the limitations period**

Ordinarily, a cause of action accrues at the time the plaintiff is injured.  *International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 217, 221, 560 N.E.2d 122 (1990).  The unfairness of such a rule, however, has been acknowledged in actions where the wrong is "inherently unknowable."  *Mohr v. Commonwealth*, 421 Mass. 147, 155-156, 653 N.E.2d 1104 (1995).  A statute of limitations cannot be deemed to have run "even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another."  *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 205, 557 N.E. 2d 739 (1990).  For this reason,  Massachusetts recognizes a "discovery rule" that tolls the running of the limitations period for claims under Mass. Gen. L. ch. 93A, among other causes of actions.  *Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44, 47 (1st Cir. 2004) (citing *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 125-26).

Under the discovery rule, "a cause of action … does not accrue until the plaintiff knew,

or in the exercise of reasonable diligence should have known of the factual basis for his cause of

action." *Id*. at 47-48 (citing *Patsos v. First Albany Corp.*, 741 N.E.2d 841, 846 (2001)).  The test

is an objective one:  "Only if a reasonable person *in the plaintiff's position* would have been

able to discern the harm or the cause of the harm will the cause of action accrue and the

limitations period begin to run."  *Sawyer v. Indevus Pharms., Inc.*, 2004 Mass. Super. Lexis 274,

at *33 (Mass. Super. Ct. July 26, 2004) (quoting *Riley v. Presnell*, 409 Mass. 239, 245, 565

N.E.2d 780 (1991)) (emphasis added).

      The inquiry under the discovery rule is a fact-intensive one.  Courts consider a number of

factors in determining whether plaintiff received actual or constructive notice sufficient to trigger

the statute of limitations:  (i) evidence of actual knowledge; (ii) notoriety of publicly-available

information; (iii) reasonable inferences to be drawn from any publicity; and (iv) whether a

reasonable inquiry would have put plaintiffs on notice of their claims.  *In re Massachusetts Diet

Drug Litig.*, 338 F. Supp. 2d 198, 203 (D. Mass. 2004).[60]  In evaluating the timing of plaintiff's

knowledge, Massachusetts courts have made it clear that they do not "equate suspicion with

knowledge"; suspicion alone will not put a plaintiff on notice of his or her claims.

*Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 240, (1st

Cir. 2005).

      In the *Diet Drug Litigation*, the court considered each of the above factors in deciding

whether the discovery rule tolled the limitations period for claims brought by former users of diet

drugs withdrawn from the market seven years before the case was brought.  Defendant drug

manufacturers argued that the substantial publicity surrounding the drugs' withdrawal and

lawsuits and settlements concerning the drugs put plaintiffs on actual notice of their claims or, at

---

[60] The court embraced Ninth Circuit precedent applying the same factors.  *See O'Connor v. Boeing N. Am., Inc.*,
311 F.3d 1139 (9th Cir. 2002); *Bibeau v Pacific Northwest Research Found., Inc.*, 188 F.3d 1105, 1110 (9th Cir.
1999); *In re Swine Flu Prods. Liab. Litig.*, 764 F.2d 637 (9th Cir. 1985).

a minimum, plaintiffs were on inquiry notice as former diet drug users.[61]  Plaintiffs claimed that despite the publicity, they had no actual knowledge of the claims and could not and should not have discovered their injuries any earlier.  338 F. Supp. 2d at 204.

The court articulated two questions that encompassed the relevant factors.  First, to what extent should knowledge of publicity be imputed to a plaintiff in the absence of evidence of actual notice to that plaintiff?  Second, was the content of the publicity sufficient to put a plaintiff on notice of their claims?  *Id*. at 206.  The answer to the first question, according to the court, depended on the circumstances pertaining to each plaintiff, such as whether he had actual knowledge, where he lived and what the media coverage was in that location.  *Id*. at 206-207.  To answer the second question, the fact finder would have to consider the ***content*** of the publicly-available information to which a similarly-situated reasonable plaintiff would have been exposed.  *Id*. at 207.  The court ultimately declined to resolve these questions on the record before it during a motion for remand proceedings, leaving resolution to the fact finder.  *Id*.

Other Massachusetts courts have applied the same standards to different facts.  *See*, *e.g.*, *Cascone v. United* States, 370 F.3d 95 (1st Cir. 2004); *Sawyer v. Indevus Pharms., Inc.*, 2004 Mass. Super. Lexis 274.  *Sawyer* was an earlier case involving wide-spread publicity surrounding the withdrawal of diet drugs from the market and whether the publicity should be imputed to plaintiffs as knowledge sufficient to bar their claims.  The plaintiffs brought their action against the drug manufacturer six-to-seven years after they stopped taking the drug and six years after the link between the diet drugs and heart disease became "one of the biggest news stories of

---

[61] "According to Wyeth, beginning in September 1997 the mass media was flooded with an overwhelming amount of information linking the diet drugs to valvular heart disease, indicating that even users who were experiencing no symptoms may have been injured, and suggesting that all users seek medical attention.  For example, Wyeth issued a press release, purchased advertisements in many national and regional newspapers, and sent information to approximately 450,000 doctors and pharmacists.  The Food and Drug Administration also issued a press release, and the information was reported on morning and evening television news programs and front pages of newspapers throughout the country."  *Id*. at 205.

1997." *Id*., at *8.  Publicity of the diet drug epidemic ranged from major, high-profile news outlets, including *The New York Times, USA Today, The Boston Herald, The Boston Globe*, "NBC Nightly News" and the "CBS Evening News," to 18,000 lawsuits and 100 putative class actions filed across the country.  *Id*.  However, despite the widespread publicity, the *Sawyer* Court could not find a "single public report that would have put [d]iet [d]rug users on notice that an echocardiogram was necessary to diagnose [d]iet [d]rug induced heart disease."  *Id*., at *13.  Thus, the Court held, the statute of limitations was tolled by the discovery rule.  *Id*., at *49.

*Thompson v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 38, 50-53 (S.D.N.Y. 2001), provides another persuasive example.  There, the court reviewed evidence alleged to show the class's knowledge of the overpriced life insurance at issue:  24 news articles over 60 years (including stories in *Time* magazine and *The Wall Street Journal*); an FTC Study; two prior individual lawsuits based on the same claims; and a segment on *60 Minutes*.  The court concluded that this publicity was insufficient to find on summary judgment that the plaintiffs should have discovered their claims earlier.  *Id*. at 50-53.

Courts have also recognized that in complex cases, there can be danger in construing plaintiff's notice of one instance of wrongdoing as sufficient to trigger the statue of limitations for all related claims.  *Eye and Ear Infirmary*, 412 F.3d at 241.  In the First Circuit's words: "[a]lthough we are not prepared to state a general rule . . . a wronged party should not be prejudiced with regards to later torts committed against it, simply because a defendant started the clock running by committing similar acts at an earlier time. . . .  [A] plaintiff must be able to decide when the harms it has sustained require bringing a suit, and no defendant should be able to immunize itself from later, potentially graver claims, by openly engaging in prior, similar offenses that the future plaintiff does not believe warrant bringing suit."  *Id*.

Applying the same factors to the evidence in this case leads to one result:  the Class did

not and could not have discovered their claims before December 1998.  Thus, the discovery rule

tolled the statute of limitations.

> **2.      Plaintiffs and the Classes did Not Have <u>Actual</u> Knowledge of their Claims**

Plaintiffs did not know and, in the exercise of reasonable diligence, could not have

known about Defendants' scheme any earlier.  Citing a parade of publicly available reports,

Defendants proclaim that the record shows that Massachusetts payors knew or should have

known in the exercise of reasonable diligence that AWPs bore no predictable relationship to

acquisition costs.  But the record evidence actually demonstrates the opposite.

> **a.      Class members were unaware of Defendants' ASPs and their spread marketing schemes**

As detailed in Section I.A.6 above, Plaintiffs and Class Members were simply not aware

of the real prices being paid for physician-administered drugs in the marketplace, the "mega

spreads" that Defendants had created, and Defendants' spread marketing schemes.  Furthermore,

Defendants have testified that their true pricing was internal and never released to the public.[62]

Notably, all Defendants marked the sales transaction data produced in this litigation as "Highly

Confidential."  Moreover, there is no suggestion that ASPs, as opposed to a few individual

specific sale prices, were generally available to the public or the members of Classes 2 or 3.

Even had Class Members been familiar with ***some*** discounts, this would still not be

sufficient to put Plaintiffs on notice of claims of systematic AWP inflation; nor would it disclose

the underlying creation, manipulation and marketing of the spread.  Since the market in general,

and Class 2 and 3 TPP members specifically, had an understanding that AWP was either an

---

[62] *See, e.g.*, Hiriak Dep. at 252:14-254:17 (only senior management got ASP info); Brennan Dep. at 31:4-7, 33:5-6 (AZ didn't give actual prices to consumers); *see also* Trial Tr. Day 5 at 131, 145 (Marré) (pricing is confidential); Trial Tr. Day 14 at 23 (Pasqualone testifying that standard confidentiality clause appears in all BMS contracts because discounts constitute "confidential and competitive information").

actual average or a reliable signal of actual transition prices, there would have been no reason for any TPP to become suspicious had it seen an acquisition price below AWP, or some contracts below AWP.

Not surprisingly, then, Plaintiffs did not have inquiry notice of potential wrongdoing until recently.  As Ms. DeVaux from BCBS-MA testified, BCBS-MA did not, as an organization, understand the extent of AWP inflation until CMS moved to the ASP system.[63]  Mr. Hannaford, the Pipefitters' Administrator who believed that AWP was in fact the average wholesale cost of a particular drug, testified that the prospect of AWP inflation did not hit his "radar screen" until he read a newspaper article in 2003, and even then still had insufficient information to determine whether the AWPs were inflated and to what extent.[64]

And, certainly, the consumer members of Class 3 were not familiar with the actual ASPs paid for the Subject Drugs, or Defendants' specific marketing practices designed to sell the spread.  Defendants introduced *no* evidence at trial indicating that consumers in Class 3 had any such knowledge.

> **b.**   **Federal government reports, academic studies and news articles did not put Plaintiffs or Class Members on notice of their claims**

Defendants attempt to bar Plaintiffs' pre-October 1997 claims by purporting to demonstrate Plaintiff "knowledge" back to the mid-1990's through government and academic reports.[65]  Defendants claim that a few, *ad hoc government* reports, issued sporadically over a period of several years and discussing certain, discrete aspects of drug pricing including AWP,

---

[63] Trial Tr. Day 2 at 130-32 (DeVaux).

[64] Hannaford Trial Aff., ¶¶ 13-17, 20.

[65] Importantly, Defendants' arguments regarding Class knowledge before December 1997 do not affect Class claims from December 1997 forward which were brought within the four year statute of limitation.

- 26 -

proves that Massachusetts payors knew or should have known in the exercise of reasonable diligence that AWPs bore no predictable relationship to acquisition costs.

What CMS and its predecessors knew and when is *not* the proper inquiry in analyzing the application of the discovery rule here.  The standard is whether "a reasonable person *in the plaintiffs' position* would have been able to discern the harm or the cause of harm."  *In re Massachusetts Diet Litig.*, 338 F. Supp. 2d at 204 (emphasis added); *see also Bibeau v. Pacific Northwest Research Found. Inc.*, 1999 U.S. App. Lexis 38092, at *13-16 (9th Cir. 1999) (court rejects defense suggestion that plaintiff should be charged with knowledge found in scientific journals and legislative reports).  Thus, purported government knowledge is irrelevant here.  The only relevant questions are whether Plaintiffs and the Class Members were specifically aware of any government reports and studies and, if they were, whether the reports conveyed information sufficient to put them on notice of Defendants' actionable conduct and the harm it was causing Plaintiffs.  The answer to both questions is indisputably "no".  *Defendants were unable to demonstrate at trial that a single Plaintiff or Class Member was aware of a single government report or study or news article cited by Defendants*.[66]

### 3. Plaintiffs and the Classes did Not Have <u>Constructive</u> Knowledge of their Claims

As profiled above, Massachusetts courts have recognized that some knowledge in the purported public domain does not alone constitute notice to plaintiffs.  The question remains whether or not the reports contained information specific enough to put a reasonable person on notice.  In *Massachusetts Diet Drugs*, for example, the court found that even the wide-spread publicity over a period of years regarding the potential danger of the diet drugs to their former

---

[66] But even had Defendants been able to show that Class Members regularly reviewed those reports, the reports could not have put anyone – including the federal government – on notice of Defendants' wrongdoing.  *See* the next section immediately *infra*.

users was not specific enough to put the plaintiffs on notice of their claims.  Importantly, there

was much less information in readily accessible public fora here than in *Massachusetts Diet*

*Drugs*.

Turning to the two lines of inquiry pursued by the *Massachusetts Diet Drugs* court, we

first ask to what extent should knowledge of publicity be imputed to a plaintiff in the absence of

evidence of actual notice to that plaintiff?  338 F. Supp. 2d at 206.  Here, Defendants rely

primarily on a report in an obscure business journal (*Barron's*) and a handful of reports

published by HCFA and the OIG.  These outlets hardly constitute pervasive public dissemination

and are a far cry from the substantial publicity of diet drug problems found in major news outlets

such as *The New York Times, USA Today, The Boston Herald, The Boston Globe,* "NBC Nightly

News," "CBS Evening News," "60 Minutes" and *Time* in the *Massachusetts Diet Drugs* and

*Thompson* cases discussed *supra*.

Turning to the second question posed by the *Massachusetts Diet Drugs* court, was ***the***

***content*** of the publicity sufficient to put a plaintiff on notice of their claims?  *Id*. at 206.  Here,

even if the purported "publicity" is imputed to Plaintiffs (and it should not be), the information

contained therein did ***not*** contain enough detail to put the Class on notice of any claims before

1998.  It was only much later, after prolonged investigation and what the *Lupron* court called the

"coercive assistance" of the federal government, that affected parties outside the industry were

able to develop a partial body of evidence of Defendants' wrongdoing.

As Dr. Hartman notes, Defendants' parade of public studies, and particularly the OIG

studies, focus on self-administered drugs and not physician-administered drugs.[67]  Moreover, the

studies indicate that, for the limited sampling of brand name drugs studied, discounts below

---

[67] Hartman Direct, ¶ 77(a).

AWP were well within Dr. Hartman's 30% "yardstick." In particular, one of the few studies that focuses on physician-administered drugs – the 1992 OIG report and the 2001 ASCO survey on chemotherapy drugs – found spreads within Dr. Hartman's liability yardstick.[68] Indeed, after reviewing tens of studies, Dr. Hartman concluded that the publicly available survey evidence about spreads on physician-administered drugs suggested that those spreads were not excessive.[69]

Defendants also cite the *Barron's* article from 1996, but no Plaintiff saw it, and, in any event, that article merely identified the fact that transaction prices for certain drugs were below AWP; it did not reveal ASP prices. Further, as detailed above, BCBS-MA was not aware of the actual ASPs on any of the Subject Drugs. Therefore, its knowledge could not have triggered any applicable statue of limitations for itself or any class members.

Further belying Defendants' assertions that market players should have known in the exercise of reasonable diligence that AWPs bore no predictable relationship to acquisition costs is Dr. Berndt's observation of the "importance of being unimportant," as summarized by Dr. Hartman:

> As introduced and developed by Dr. Berndt in his Independent Report to this Court, the "Importance of Being Unimportant" helps describe the limited response by managed care organizations to the increase in the costs of all pharmaceuticals, self-administered and physician-administered. Specifically, Dr. Berndt measures and discusses the extent to which pharmaceutical reimbursements have increased substantially since 1994. The first factor he identifies as a reason is "the importance of being unimportant," meaning that despite their significance on an absolute dollar basis, drug reimbursements still accounted for only 5-8% of all health care expenditures. According to Dr. Berndt (p. 102),[70] citing Alfred

---

[68] Hartman Direct, ¶ 77(b).

[69] Hartman Direct, ¶ 77.

[70] *See* Ernst R. Berndt, "The U.S. Pharmaceutical Industry:  Why Major Growth in Times of Cost Containment?" *Health Affairs*, 20(2), 2001.

Marshall, "if spending on some good or service is perceived to be only a small portion of total costs, that good or service will not be as likely to be on cost cutters' radar screens; instead, they will tend to focus more on big-ticket items."  As a result, he infers that managed care organizations and payors likely focused their cost cutting efforts and analyses on hospital care, physician services and "all other" categories of reimbursement and expenditure.  The lack of focus upon pharmaceutical reimbursement made the increased spreads induced by the fraud alleged in this matter easier to conceal and to be overlooked by all payors.[71]

The foregoing demonstrates that, for most of the Class Period, there was no systematic evidence demonstrating that AWPs were not reliable signals for the prices of physician-administered drugs.  As Dr. Hartman has best summarized:

While hindsight, illuminated through discovery in this litigation and other related litigation, demonstrates that the substantial spreads found with generic self-administered drugs and selected generic physician-administered drugs in the latter half of the 1990s were indeed reflected in spreads for physician-administered drugs generally, *such a general understanding simply did not exist at that time*.  No consistent body of survey information supported such a *systematic* understanding, let alone such an understanding with respect to each of Defendants' suspect drugs and the scheme's associated with them.  Anecdotal information for some individual Part B drugs was not sufficient to change the overall expectation throughout the 1990s that the AWP provided *a reasonable expectation* for the EAC of Part B drugs.[72]

The evidence reveals that reliable information about true margins was simply not available or understood, and, until very recently, no one knew about Defendants' concealed efforts to manipulate and market spreads.[73]  And there is nothing in these reports indicating, for example, that spreads on Zoladex, a cancer drug, exceeded 100% from 1998 forward or that BMS's spreads on Taxol skyrocketed in 2001-2002 or that Schering spreads on Albuterol went

---

[71] Hartman Direct, ¶ 107; *see also* Direct Testimony of Dr. Meredith Rosenthal ("Rosenthal Direct"), ¶ 65.

[72] Hartman Direct, ¶ 77(g) (emphasis added in bold).

[73] *See* Mulrey Trial Aff., ¶ 20 (not aware of potential issues until 2004); Hannaford Trial Aff., ¶¶ 14-15 (not aware of potential issues until 2003).

from 142% in 1993 to over 600% in 2002.  And there is nothing in the so-called publicly available reports that evidence, for example, that Schering was telling doctors that as a result of its spreads "one patient on Intron can represent $16,956.36 of incremental sales and $2,373.84 of profit for our physicians just on the drug alone."[74]

In sum, when compared to cases like *Sawyer, Massachusetts Diet Drugs* and *Thompson*, the information available prior to 1998 in this case is extremely limited.  At best, Defendants' selective citation to a small handful of reports raised questions regarding individual drugs, but do not establish the systemic pricing scheme and other actionable conduct that was later uncovered and acted upon through this lawsuit and others.  The reports did not put Plaintiffs on actual *or* inquiry notice of Defendants' wrongdoing.  The evidence shows that reliable information about true margins was simply not available or understood, and, until very recently, no one knew about Defendants' concealed efforts to manipulate and market spreads.

### 4.    Defendants actively engaged in fraudulent concealment

The statute of limitations is also tolled by Defendants' fraudulent concealment of facts that would have exposed the truth about Defendants' schemes to Plaintiffs and Classes 2 and 3 and put them on notice of the financial harm they were suffering and the source of that harm.

The federal doctrine of fraudulent concealment operates to toll the statute of limitations "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part.'" *In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 183 (D. Mass. 2003) (citations omitted).  "[T]olling of the statute of limitations may be warranted where the defendant 'engaged in fraud or deliberate concealment of material facts relating to his wrongdoing' and the plaintiff consequently 'failed to discover these facts

---

[74] Ex. 394.

within the normal limitations period despite his exercise of due diligence.'"  *Cambridge Literary*

*Props., Ltd. v. W. Goebel Por-Zellanfabrik Gm.b.H. & Co.*, 448 F. Supp. 2d 244, 265 (D. Mass.

2006).  To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three

elements:  "(1) wrongful concealment of their actions by the defendants; (2) failure of the

plaintiff to discover the operative facts that are the basis of his cause of action within the

limitations period; and (3) plaintiff's due diligence until discovery of the facts."  *Id.* (citing

*Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984)).[75]  Each element is satisfied in this

case.

### a. Defendants wrongfully concealed their conduct from the Class and others

The record includes substantial evidence that Defendants wrongfully concealed their

actions from the Class and thus prevented the Class and others from discovering the harm caused

by Defendants.  Documents and testimony confirm that each Defendant made a concerted effort

to conceal the true prices of the Subject Drugs from the government, the Class and the market.

Defendants insisted on a level of confidentially that would have been unnecessary had true and

accurate information been publicly available.  Pricing information was closely controlled by

Defendants on the highest levels of their companies and released selectively.  At the same time

Defendants reported inflated AWPs, they employed contracts containing confidentiality clauses,

which prohibited the buyers (including doctors) from revealing the prices they were paying to

anyone, including payors.[76]  Industry witnesses also testified to the confidential nature of

contract discounts.[77]

---

[75] The doctrine of equitable tolling is also available to Plaintiffs to toll the statute of limitations because, for the same reasons, Plaintiffs satisfy the elements for fraudulent concealment, and the evidence supports finding that Plaintiffs were actively misled by Defendants.  *See Jensen v. Frank*, 912 F.2d 517, 521 (1st Cir. 1990).

[76] *See* Ex. 255 (1992 OBI contract with Caremark, ¶ 7); Ex. 256 (1993 OBI contract with Stadtlanders); Ex. 43 (AZ form Urology contract, ¶ 6 (requiring terms and existence of contract remain confidential)); Ex. 422 (1995 SPW

Defendants took further actions to suppress true pricing information and government pricing surveys out of fear that the truth about AWP pricing would be exposed. Their conduct reflects their recognition that such schemes were wrong. In the mid-1990s, the manufacturers – allied with ASCO – actively discouraged governmental surveys of actual prices in the marketplace. For instance, Dolly Hanrahan, Defendant Abbott's Washington lobbyist, in discussing HCFA's efforts to conduct EAC surveys reported that "ASCO is working directly with [OMB] to essentially kill the survey based on grounds that HCFA has not followed administrative procedures."[78] Acknowledging HCFA's lack of "manpower to meet all the requirements of the OMB to statistically validate the drug survey process," a TAP lobbyist approvingly referred to the state of affairs as "a 'Bureaucratic Mexican Standoff.'"[79] Manufacturers could have stepped up and assisted the market by disclosing true prices, but Ms. Hanrahan reported that ASCO preferred that the drug manufacturers not address the survey issue, and that "[l]egal counsel for Bristol-Myers concurs saying that it would only agitate the situation further, particularly since HCFA is focused on high volume drugs."[80] In referring to the cancellation of the HCFA survey as "fortunate for us," J&J acknowledged that "[i]f [HCFA] had done a survey and come up with an average price, this would have changed reimbursement [for Procrit]. . . . *Right now they do not know what the cost is for different providers*."[81]

---

contract with Massachusetts physician group requiring confidentiality of all pricing during term of contract and three years afterward).

[77] Trial Tr. day 5 at 131, 145 (Marré); Trial Tr. Day 14 at 23 (Pasqualone testifying that standard confidentiality clause appears in all BMS contracts because discounts constitute "confidential and competitive information").

[78] Ex. 257.

[79] Ex. 258.

[80] Ex. 257.

[81] Ex. 259 at 58842 (emphasis added); *see also* Dooley Dep. at 536.

Defendants regularly cautioned physicians and their own sales representatives not to reveal actual transaction prices to insurers: "if we were to routinely use cost to wholesalers we would set payers' expectations too low."[82] As late as 1999, Centocor believed that payers did not comprehend the spread between real prices and AWP, and did not want such payers to learn the truth.[83]

When Defendants did communicate with the federal government, they went out of their way to avoid revealing the true prices they were charging. One example is Defendant J&J's Procrit, where "the Dooley emails" evidence the fact that in August 1996 and January 1998, J&J did not think the government and private payors were aware of the actual spreads on Procrit.[84] Similarly, when asked by the federal government what the wholesale price of Remicade was, Defendant J&J's Centocor did not reveal its true price to wholesalers, but instead reported the higher AWP as the wholesale price.[85]

As early as 1995, AZ was concerned that "HCFA may see through" AZ's discounting and spread marketing strategy and "take offense."[86] In one instance in 1996, AstraZeneca developed a complicated way to increase the spread on Zolodex but to avoid any "regulatory/legal/public relations risk" and make AZ appear to be "responsible" or "patient friendly" by setting the AWP just below the competing drug while still offering bigger discounts

---

[82] Ex. 260 (memo from Centocor's Michael Ziskind, cautioning sales representatives to use different "costs" for different audiences).

[83] *Id.*

[84] *See* Exs. 339 and 259.

[85] *See* Ex. 261 (Remicade J-Code Application).

[86] *See* Ex. 44 (Patterson Pricing Memorandum at AZ0237167).

- 34 -

on the actual purchase price.[87]  This is direct evidence of AZ's intent to fraudulently conceal the true pricing of Zoladex.

Defendants also acted to conceal their fraudulent marketing of the spread.  As noted by the federal government in its Sentencing Memorandum filed in the case *United States v. TAP Pharm. Prods., Inc.*, No. 01-CR-10354-WGY (D. Mass.), AstraZeneca took measures to conceal both its fraudulent marketing and that of its competitor, TAP:

> [I]n 1995, TAP, in a moment of delicious irony, accused its competitor, [AstraZeneca], the manufacturer of Zoladex, with providing inducements to physicians in violation of the Medicare fraud and abuse laws, to include the fact that employees of the competitor were giving free samples to doctors to encourage them to switch from Lupron to Zoladex.  [AstraZeneca], in turn, accused TAP of the very same conduct.  Top employees from the two companies met in a summit meeting to discuss this exchange of criminal allegations.  Did the serious allegations curb TAP's conduct?  Did TAP, aware of allegations that its employees had engaged in criminal conduct, undertake expeditiously to stop the behavior, to train its employees in the rules and to enforce their adherence to the rules?  Did either company, in possession of information that a competitor was violating the rules, report the conduct to prosecutive authorities in an effort to clean up the industry?  Unfortunately, the answer to all of these questions is no: TAP, cognizant of the rules and having been accused of violations, simply carried on its business as it always had, full criminal speed ahead.[88]

As TAP advised doctors:

> Doctor, by discussing your costs of Lupron with other physicians, you run the risk of that information getting back to HCFA.  ***If HCFA then realizes that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amount you may charge.***[89]

---

[87] *See* Ex. 45.

[88] Ex. 913 (Sentencing Memorandum of the United States, at 62-63).

[89] Ex. 915 at TAP 5030300 (emphasis added).

At the same time, Defendants actively lobbied to preserve the system that they were exploiting.  For instance, BMS lobbied the federal government to maintain AWP-based reimbursement for Part B drugs:

> Continued Medicare Part B Battle.  This past year, we worked closely with Oncology on the Medicare Part B Reimbursement Issue with a very favorable outcome (instead of Oncology drug reimbursement being based on actual acquisition cost, which was proposed by the Administration, reimbursement will be based on 95% of the AWP.  While this was a major success, the 95% number could be easily lowered in subsequent sessions of Congress. . . .  We need to actively manage this issue.[90]

During 1992, when Congress was evaluating whether to amend the Medicare reimbursement statute, it appears that BMS actively sought to mislead the federal government about the actual prices that physicians were paying for BMS Part B drugs.  As BMS explained to a physician in an oncology-hematology medical group:

> The earliest draft of these regulations – and even the President's proposed budget for 1992 – would have set the drug allowable at 15 percent _below_ AWP.  We were as active as possible to change this very low level, which would ideally have been set above AWP.  Included in our efforts was a formal meeting with the Inspector General's staff, which was evaluating the proposed regulations.  There we outlined our understanding of the fact that most oncologists and hematologists would not be able to procure cancer chemotherapy products at a lower payment level.  We know that similar strong arguments were made at the Health Care Financing Administration (HCFA) and on Capitol Hill.[91]

Despite emphasizing to the federal government that most oncologists could not purchase drugs at less than AWP, in the very next paragraph of the letter, BMS explained that, in fact, "all AWPs listed are higher than the price at which Bristol-Myers pharmaceuticals can be purchased directly."

---

[90] Ex. 201; _see also_ Exs. 46, 47, 48 (evidencing Zeneca's lobbying of Medical Directors to maintain Zoladex reimbursement at AWP and to not survey for actual prices).

[91] Ex. 4027 at 0403272 (underlining in original).

If knowledge of Defendants' practices and pricing was wide spread and publicly available, as Defendants assert, Defendants would not have been forced to maintain the cloak of secrecy described above.  Defendants would not have taken affirmative steps to conceal their control and inflation of AWP and their promotion of spreads.  As Judge Stearns observed about the AWP inflation in the *Lupron* case, "[i]f everything [about Lupron®] was known to everybody, why did [d]efendants emphasize secrecy?"  *In re Lupron*, 295 F. Supp. 2d at 168 n.19.[92]  The answer is manifest:  Defendants took these actions because they knew that payors were not aware of Defendants' fraud.  There is ample evidence that Defendants worked to affirmatively conceal their true prices from the government, insurers and the Classes.

> **b.**      **Plaintiffs did not discover the facts underlying their causes of action any earlier, despite exercising due diligence**

As detailed above in Sections I.A.6 and I.B.1-3, Plaintiffs and the Class did not discover the facts underlying Defendants' concealed scheme and could not have given the very nature of that scheme.  Accordingly, the final elements of fraudulent concealment are satisfied.

---

[92] Judge Stearns more fully observed:

> Defendants repeatedly assert that they had no duty to disclose what was publicly known to everyone, that is, that the Lupron(R) AWP was a "sticker price" and never intended to reflect the drug's true average wholesale price.  In support of this argument, defendants cite a number of government reports acknowledging that the published AWPs for prescription drugs often exceed their acquisition cost.  The argument is ultimately unpersuasive.  There is a difference between a sticker price and a sucker price.  If one were confronting a modest markup of the actual AWP for Lupron(R) (which 300% is not), intended to make sales of the drug for the treatment of Medicare patients commercially viable (given the 95% of AWP reimbursement rate), it is unlikely that there would have been a government investigation of TAP's marketing practices.  Similarly, if the same inflated AWP had not been used to set reimbursement rates for private purchasers and insurers, the Amended Complaint would not have been filed.  The Blues, in their response to defendants' argument, have it exactly right:  "If everything [about Lupron(R)] was known to everybody, why did defendants emphasize secrecy?"  Blues Memorandum, at 7.  Finally, the recognition on the part of government regulators of inefficiencies in the administration of Medicare does not, as defendants contend, amount to condonation of fraudulent conduct.

*Id.*

**C.     Each Track 1 Defendant's Unfair or Deceptive Acts or Practices Have Caused an Injury to Plaintiffs and the Members of Classes 2 and 3**

Plaintiffs proved at trial that Defendants' unfair or deceptive acts or practices injured Plaintiffs and the members of Classes 2 and 3.  Regarding Class 2, MediGap insurers pay 20% of the allowed amount for covered drugs.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 71 (D. Mass. 2005).  Thus, because that allowed amount is by statute based on AWP, it is axiomatic that Defendants have caused substantial injury to the members of Class 2. Plaintiffs likewise established that Defendants were the cause of injury to Plaintiffs and members of Class 3.  Had Defendants reported accurate pricing information, and had Defendants not manipulated the spread, AWP-based payments would have been lower.

Under Ch. 93A, Plaintiffs must show "that the loss of money or property stems from the Defendants' unfair or deceptive acts."  *J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 148 (D. Mass. 2005) (finding causation existed for Section 11 claim where health plan violated "Any Willing Provider" law and entered into exclusive arrangement with pharmacy for provision of prescription drug benefits to its members).  To establish causation, Plaintiffs must prove both "but for" and proximate causation.  *Polycarbon Indus., Inc. v. Advantage Eng'g, Inc.*, 260 F. Supp. 2d 296, 306 (D. Mass. 2003) ("plaintiff must show causal connection between defendant's unfair and deceptive act and damaged suffered and that such damage was reasonably foreseeable") (entering judgment after trial in favor of plaintiff in products liability action and finding, *inter alia*, that plaintiff had established causation).

Defendants have claimed that to establish but for causation "Plaintiffs must show that the outcome would have been different if not for Defendants' allegedly unfair or deceptive

conduct."[93]  This is incorrect.  Rather, Massachusetts law requires that Plaintiffs prove that, as a result of Defendants' deception, Class members paid more than they otherwise would have. *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d at 492 ("This is so because all purchased . . . a product that was deceptively advertised."); *see also RGJ Assocs., Inc. v. Stainsafe, Inc.*, 338 F. Supp. 2d 215, 237 (D. Mass 2004) (Bowler, J.) ("The necessary 'loss of money must stem from' the chapter 93A misconduct") (citations omitted) (finding, in action tried to the Court challenging defendant's violation of covenant of good faith and fair dealing, that causation existed).  Plaintiffs established this at trial.

Plaintiffs have several sources of proof of causation:  experts, Defendants' own admissions and Defendants' documents.

### 1.	The evidence confirms causation

Dr. Rosenthal analyzed the invoice data that was turned into AWPs and ASPs by Dr. Hartman and his team.[94]  She looked at departures from normal behavior to provide "natural experiments" where the spread was used as a competitive strategy.[95]  For most of the drugs at issue, she then opines as to the departure of AWP from ASP as a reaction to the competitive marketplace.[96]  Dr. Rosenthal concludes that, as a result of this spread creation, "members of the class paid more for these drugs than they would have in the absence of the alleged fraud."[97]  Dr. Hartman reached the same conclusion based on his yardstick analysis.[98]

---

[93] *See* Track 1 Defs' Mem. of Law in Resp. to the Court's Questions Concerning the Implication of Evidence With Respect to Class 3 Named Representatives for the Remainder of the Class (Dec. 15, 2006, Dkt. No. 3479), at 2.

[94] Rosenthal Direct, ¶ 44.

[95] *Id.*

[96] *Id.* at ¶ 47, ¶¶ 50-62.

[97] *Id.* at 75.

[98] *See* Hartman Direct, ¶ 5, ¶¶ 94-95, ¶¶ 138-151, ¶ 155 describing his but for yardstick analysis of causation and damages.  *See also* Trial Tr. Day 8 at 75:10-12 (Hartman) (where not competing on spread the discounts were AWP-15 to 25 percent).

- 39 -

To support her opinion as to but-for causation, Dr. Rosenthal also examined what has occurred in response to enactment of the MMA. This is a world where inflated AWPs are not part of the system. Dr. Rosenthal found numerous examples of projected and actual cost savings in a "macro" world where there is no AWP inflation, even taking into account changes in payments for administration of drugs.[99] As if this was not sufficiently persuasive of what payments would have been in a truthful AWP world, Dr. Rosenthal analyzed what the overall expenditures were for specific drug regimes compared to the pre-MMA world. Her analysis documents a substantial decrease in payments for Zoladex, Taxol, Remicade, Procrit and Albuterol, even when administration payments are considered.[100]

Causation is also demonstrated by defense witness testimony and documents. For example, the following exchange took place between the Court and an AstraZeneca witness:

> THE COURT: Excuse me. Did you understand that Medicare beneficiaries paid 20 percent of AWP?
>
> THE WITNESS: Yes. They paid 20 percent out of pocket.
>
> THE COURT: So you understood that every time you raised AWP, they had to pay 20 percent of the increase?
>
> THE WITNESS: Yes. Whenever we took a price increase, it would raise the copay and also raise the reimbursement.[101]

And this testimony logically supports the conclusion that every time an AWP was higher than it should have been, Class members overpaid. When analyzing the impact of AWP in the

---

[99] Rebuttal Testimony of Dr. Meredith Rosenthal ("Rosenthal Rebuttal"), ¶ 13; Trial Tr. Day 20 at 7-8 (Rosenthal).

[100] Rosenthal Rebuttal, ¶ 15 and Exs. 4069 ($212.58 decrease in drug/fee payment on Zoladex); Ex. 4070 ($1,316 change in Taxol); Ex. 4071 ($212.43 decrease in Remicade); Ex. 4072 ($9.22 decrease in Procrit); Ex. 4095 ($21 decrease in Albuterol reimbursement). *See also* Trial Tr. Day 20 at 9-18 (Rosenthal). Note that the savings for Remicade is still substantial, even if we adopt the administration codes urged by J&J. *See id.* at 50.

[101] Trial Tr. Day 5 at 13 (Buckanavage). *See also id.* at 15:5-16 (admitting same); Ex. 143 at AZ0044010 (presentation recommending price increase for Zoladex 10.8 mg depot listing only downside as "slightly higher co-pay for patient").

Medicare market, AstraZeneca internally acknowledged that the patient or "secondary insurer" pays for the 20% copay and observed the impact of higher AWPs on TPPs.[102]

Likewise, in reviewing the meaning of AWP, BMS also acknowledged the relationship between lower AWPs and lower payments:

> The AWP that is set by the pricing services can have an impact on different customers so we need to be aware of how AWPs are used in the system.
>
> MCO's [Managed Care Organization] reimburse pharmacies based on AWP so that they prefer products have a lower spread.[103]

Thus, this document acknowledges that if AWPs were lower, the cost to MCOs (TPPs) would be lower.  This was confirmed by BMS Senior Vice President Frank Pasqualone, who when asked what would happen if BMS had published a list price which was an actual average of sales, responded that BMS would have "lost money."[104]  In other words, if BMS had published a real AWP, payors would have paid less, and BMS would have made less.  This is causation exactly as postulated by Drs. Rosenthal and Hartman.

### 2.     Defendants' general arguments against causation are unavailing

Defendants have argued that Plaintiffs and Class members were aware that drugs were available in the marketplace at prices significantly below AWP and that, consequently, the causal chain is broken.  However, as discussed above, the evidence demonstrates that Plaintiffs and the members of Classes 2 and 3, including BCBS-MA, did not know:  (i) the true extent of spreads on the Subject Drugs; (ii) that most of the Subject Drugs had a spread exceeding a reasonable relationship to acquisition costs; (iii) of Defendants' secret tactics to market the spread to

---

[102] Ex. 15 at AZ0431802, 08.

[103] Ex. 196 at 1088201.

[104] Trial Tr. Day 14 at 33:18-34:2 (Pasqualone).

- 41 -

doctors; and (iv) of the efforts by Defendants' own employees to keep these spread marketing efforts secret.

### 3.    BCBS-MA's choice in 2004 to use AWP does not negate causation

During Dr. Rosenthal's testimony, the Court directly asked if BCBS-MA had known the truth earlier "would it have made a difference."[105]  Dr. Rosenthal opined that, had AWPs been reported in a fashion consistent with averages to begin with, "then that certainly would have made a difference."  She went on to explain and rebut Defendants' no causation argument:

> THE COURT:  Would it have made a difference?
>
> THE WITNESS:  I think, in my view, the way I look at it, at least, is, what if those AWPs had been simply reported consistently in relationship to the average sales prices?  Then that certainly would have made a difference.  When this system is already embedded and AWP-based reimbursement is out there, and those physicians who are using these drugs are already getting very high margins, to try to turn that ship midcourse would have been politically costly for certain.  But, again, it seems to me, had the AWPs been reported in the same way that most AWPs have been, then this sort of turning-the-ship issue wouldn't have been there.
>
> * * *
>
> THE COURT:  So you're saying you're right.  Once you have this huge spread, Blue Cross-Blue Shield isn't going to take the heat for decreasing it because of the politics, this provider politics, if you will.  On the other hand, you would fault them anyway for even beginning that game?
>
> THE WITNESS:  I guess I wouldn't fault Blue Cross-Blue Shield for having adopted an AWP-based system in the first place.
>
> THE COURT:  No, I'm sorry.  You'd fault the pharmaceutical industry for getting into that game, but once Blue Cross had it, you would say probably that they wouldn't have taken the lead in changing it?
>
> THE WITNESS:  That's correct.  There's this notion in labor economics about wages, and we have these models that say, when costs change, labor markets will adjust, wages will go down

---

[105] Trial Tr. Day 6 at 17:9-13 (Rosenthal).

> to reach the same equilibrium.  But we say "wages are sticky downwards," which is a very sort of technical way of saying its' very hard to give people a pay cut.  It's very easy to give a raise. But in practice, when things like health benefits become expensive, those pay cuts, they can't happen in a one-year time frame.  We see wages grow more slowly.  It's very difficult to adjust particularly rapidly when we're looking at these very large margins to remove them.[106]

Thus, the fact that BCBS-MA felt after the Class Period that AWP was so deeply embedded in its payment system that it could not simply change has no bearing on causation, which is measured by what would have happened if there had been no fraud to begin with.

Without a critical mass of participants, and huge capital expenditures, it would be impossible for any single Plaintiff or Class member to effect any changes on the industry as a whole in order to counteract the AWP scheme.[107]  Defendants thus overlook critical structural impediments to reforming the system *even if Plaintiffs and the TPP members of Class 3 had learned the full extent of Defendants' fraud*.

Further, it is difficult and expensive for payors, even large payors, to track all pricing information for all drugs.[108]  Consequently, commonly understood notions of bounded rationality and administrative efficiency command that payors utilize common "rules of thumb" such as the AWP metric in order to adjudicate claims.[109]  As Dr. Anderson, Professor of Medicine and Health Policy at Johns Hopkins, testified in *Lupron*, with 65,000 drugs "negotiation of a specific

---

[106] Trial Tr. Day 6 at 19-21 (Rosenthal).

[107] *See, e.g.*, DeVaux Trial Aff., ¶¶ 11-14; Hartman Direct, ¶¶ 116-23 & n.134.

[108] "Even when payors attempt to track information on drugs and the acquisition costs of drugs; even when the right to audit a PBM exists; and even when prescription drug benefit consultants are retained, there remains considerable non-transparency in the contracts, billing information and accounting information.  This fact is made vivid by the continued and recent attempts by payors to obtain greater pricing transparency from middlepersons and providers."  Hartman Direct, n.155.

[109] Hartman Direct, ¶ 91.

price for each . . . would be administratively impossible," thus fostering the AWP pricing

standard.[110]  And as Dr. Rosenthal explained:

> Given the large number of drugs and services that third-
> party payers reimburse, there is also a need to rely on a common
> standard to process literally millions of transactions.  Ascertaining
> the acquisition cost for each and every drug would simply not be
> feasible for payers. . . .  In this context, the published AWPs,
> which are readily available to payers from sources such as the Red
> Book, MediSpan, and First DataBank, provide what Berndt calls a
> 'focal point' for reimbursement.[111]

Even BMS recognized that AWP was "the only easily obtained published price source."[112]

An industry cannot just simply abandon a market-wide pricing metric "at the drop of a

hat," even if individual participants wanted to.  Its participants need time to absorb learning,

rewrite systems, and get extensive provider networks on board.  Moreover, "before a major shift

occurs in operational practices, the institution wants to observe whether the newly acquired

information is indicative of a real change in the economic terrain in which that institution

competes."[113]  Thus, even if market participants had extensive knowledge of Defendants'

schemes – and the Court has found that they did not – the very nature of the AWP system would

prevent them from taking dramatic action to quickly change business practices.

As this Court has previously observed:

> In the private, end-payor context, ***the harm alleged by
> Defendants' alleged actions is visited directly upon the end-payor
> Plaintiffs, as they have paid directly for the named drugs based
> on the AWP's***.  Similar arguments about intervening causes
> between the setting of an AWP by a defendant and injuries to plans
> and individual co-payors were recently rejected [by Judge Stearns]
> as "bordering on the frivolous."

---

[110] Hartman Direct, ¶ 96.

[111] Rosenthal Direct, ¶ 66 (citing Berndt).

[112] Ex. 195.

[113] Hartman Direct, ¶ 118(e).

*In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 207 (D. Mass. 2004) (quoting *Lupron*, 295 F. Supp. 2d at 175) (emphasis added).  No intervening causes upset the chain of causation between the setting of an AWP by a Defendant and injuries to Plaintiffs and members of the Class.  *See also Lupron*, 295 F. Supp. 2d at 175.

During opening statements, Defendants' counsel relied on this Court's decision in *Brown v. Bank of Am., N.A.*, 457 F. Supp. 2d 82 (D. Mass. 2006), for the proposition that the causal chain has been broken.  However, the facts in *Brown* are not even remotely close to the facts proven at trial here.  In *Brown*, the causal chain was broken by ***the defendant's own disclosure*** of the information the plaintiffs alleged was inadequately or unclearly disclosed by defendant in another location.  Here, in contrast, Defendants introduced no evidence at trial that any statements they made broke the chain of causation.  Rather, Plaintiffs established that Defendants made every effort to ensure the continuation of the system that enabled them to perpetuate their fraud.

Defendants knew that any payor who attempted a variation risked both confusion and backlash from the providers who utilized the standardized system.  Of course, the obvious resolution was for Defendants to simply stop their unlawful inflation of what should have been the "average wholesale price" for each product.  Defendants chose not to and are estopped from complaining that Plaintiffs failed to mitigate or that causation is somehow broken.

### 4.    Defendants' key common expert Dr. Bell agrees that BCBS-MA could not simply change the system

Drs. Rosenthal and Hartman do not stand alone with respect to their opinions about the "stickiness" and difficulty for an institution, like BCBS-MA, to suddenly and completely drop AWP in 2003-2004 when it learned of the abuse that had occurred years before.  The Court questioned Dr. Bell on this very point.  The Court questioned why BCBS-MA had not tried

moving to an ASP-based model like Medicare.[114]  Acknowledging the "stickiness" issue,

Dr. Bell admitted "Yes, I think that's right.  They've [BCBS-MA] got worries . . . ."[115]  Bell

later, after a digression, answered the Court's question:

> THE WITNESS:  But, you know, an individual payor on its own is in a very difficult position to do this because, as I say, if they move first – you know, you talk about, well, premiums will come down, copays will come down.  Whether or not copays will come down I think is probably unlikely, but I agree that premiums would come down, or they could, they'd come down.
>
> All of this stuff has to happen, though, at the same time.  So there's a real issue of, how does this all get coordinated?  And we end up with is the situation that if one payor moves, they run a significant risk that nobody follows, and they're hurt, and they're going to come back and just have the same situation they had before, because that's the only alternative they have.  Or if they all move at the same time, where is it that they as individual payors have potentially made a net gain?  You're right, the cost of services go down, premiums come down, et cetera, but the payors haven't done any better.  They're no better off in some sense than they were without taking this risk of potentially ticking of their provider network, ticking off their employers, ticking off their members.
>
> Q.     Dr. Bell, is there a consensus that the new ASP system is the right alternative to AWP?
>
> A.     Absolutely not.  ASP is just another reimbursement benchmark.  I mean, it's still got exactly the same issues built into it around incentives.  And this is the case, you know, in some sense whenever you've got expert services, as I think Professor McFadden pointed out yesterday.  When the expert is sort of being paid –
>
> THE COURT:  It's at least truthful, more truthful.  It's a real average of sale prices.[116]

---

[114] Trial Tr. Day 11 at 66:12-21 (Bell).

[115] *Id.* at 67:25-68.

[116] *Id.* at 74-75.

Thus, Dr. Bell does not impose on BCBS-MA an obligation to have immediately adopted another payment system and admits there is no consensus to do so.  His testimony alone defeats Defendants' assertion that BCBS-MA's choice in 2004 defeats causation.[117]

### 5.    Staff model purchases at discounts do not negate causation

Defendants claim that BCBS-MA and other insurers in Classes 2 and 3 knew that AWP did not bear any relationship by virtue of having staff-model subsidiaries that purchased physician-administered drugs at discounts.  But, as Plaintiffs have shown, this knowledge was not shared between Medical West and BCBS-MA.  *See* Section I.A.6.h-i, *supra*.  Furthermore, unless the evidence shows otherwise, the general rule is to treat parents and subsidiary corporations as separate and distinct entities absent some abuse of the corporate form, *see*, *e.g.*, *Stryker Corp. v. XL Ins. Am., Inc.*, 2006 U.S. Dist. Lexis 47899, at *29 (W.D. Mich. July 14, 2006), or that the parent controlled the subsidiary's operations such that knowledge is imputed to the parent.  *See*, *e.g.*, *ISI Sys. v. Equifax, Inc.*, 1996 U.S. Dist. Lexis 882, at *11 (D. Mass. Jan. 12, 1996).  Here, there was no evidence introduced that BCBS-MA abused the corporate form, and no proof that BCBS-MA so controlled Medical West that knowledge of ASPs on the part of Medical West should be imputed to BCBS-MA.  For example, there is no evidence that Medical West was in any way responsible for BCBS-MA's traditional indemnity operations, and no evidence that BCBS-MA was responsible for Medical West's staff-model HMO functions. *See id*. (describing one factor to be considered in corporate-domination analysis the court employed as "the parent's and subsidiary's relative responsibility for day-to-day operations").

---

[117] This is a significant admission.  Dr. Bell is not an expert brought into a case with no factual involvement.  He is a fact witness who advised both J&J and BMS to market the spread despite written company policies to not do so. Every AWP Defendant, over 20 pharmaceutical companies, are his current clients, and he makes $13 million a year from such clients.  Thus, the above admission from such a biased advocate is even more significant than usual.

6.      **There can be no knowledge imputation to the Taft-Hartley and consumer members of Class 3**

The nature of the relationship between BCBS-MA and its customers is ***defined and limited by contract***.  *See*, *e.g.*, RESTATEMENT (SECOND) OF AGENCY § 272 (1958) ("In accordance with and subject to the rules stated in this Topic, the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information."); *id*. § 376 ("The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties. . . ."); *see also Sunrise Props. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 679 N.E.2d 540, 543 (Mass. 1997) (only actual knowledge of an agent ***learned in the scope of his employment*** may be imputed to principal); *Lawrence Sav. Bank v. Levenson*, 59 Mass. App. Ct. 699, 797 N.E.2d 485 (2003) (discussing the imputation of knowledge from an agent to principal).

*The contract between BCBS-MA and Pipefitters specifically disclaims the existence of a general agency relationship between the parties*.  It provides that:

> The Account also acknowledges that Blue Cross Blue Shield ***does not act either as the agent for or in any fiduciary capacity with respect to the Account***, any of its health benefit plans or any of its Covered Members when Blue Cross and Blue Shield negotiates its provider and/or vendor arrangements.[118]

Except in exceptional circumstances, the Court cannot infer the existence of an agency relationship if that is not the relationship for which the parties contracted.  *See Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992) (summarizing Massachusetts law and concluding that, where the contract is unambiguous, it is to be enforced according to its terms, and should be presumed to express the intent if the parties) (citing *Hess Oil & Chemical*

---

[118] Ex. 866 (emphasis added).

*Corp. v. Ristuccia*, 3 Mass. App. Ct. 772, 772, 331 N.E.2d 823, 823 (1975) (other citations

omitted)).  No such exceptional circumstances exist here.  For example, Defendants did not

introduce any evidence at trial indicating that Pipefitters or any Taft-Hartley fund had acted in a

manner that would reflect a belief that the terms of its contract with BCBS-MA were broader

than their plain language.  *See ICC v. Holmes Transp., Inc.*, 983 F.2d 1122, 1129 (1st Cir. 1993)

(citing *Hurley v. Ornsteen*, 311 Mass. 477, 42 N.E.2d 273 (1942) (existence of agency

relationship may be implied from "course of conduct showing that a principal has repeatedly

acquiesced therein and adopted acts of the same kind")).

      Even if the Court were to infer the existence of an agency relationship (and it should not),

the duties of that relationship under the Pipefitters/BCBS-MA contract did not include the duty

to search for pharmaceutical pricing fraud.  BCBS-MA administers Pipefitters' major medical

plan.[119]  Even though BCBS-MA chose the formula pursuant to which Pipefitters reimburses for

physician-administered drugs at 95% of AWP, that formula was not a "major part" of the

agreement with BCBS-MA.[120]  Rather, Pipefitters selected BCBS-MA because it wanted it to

negotiate the discounts at which physicians would be paid.[121]  In this regard, as part of the

fulfillment of its contract with Pipefitters, BCBS-MA provides Pipefitters reports informing it of

the amount of money it has saved by relying on BCBS-MA's expertise in developing physician

networks and negotiating discounts with physicians in those networks.[122]  BCBS-MA has told

Pipefitters that its AWP-based reimbursement system saves Pipefitters money as compared to

---

[119] Trial Tr. Day 1 at 166:25-167:1 (Hannaford).

[120] *Id*. at 167:11-168:2.

[121] *Id*. at 176:17-18.  *See also id*. at 177:2-177:5 ("Q:  And what basically is happening is that your fund is buying the bargaining power that Blue Cross has with the doctors?  A:  Yes.").

[122] *Id*. at 177:9-22.

what physicians would bill Pipefitters directly.[123]  Pipefitters has no ability to negotiate discounts with doctors on its own.[124]

Pipefitters' reliance on BCBS-MA is consistent with the reliance on BCBS-MA by other members of Class 3.  For example, Gina Alongi, administrator of the Operating Engineers, Local 4 health plan ("Local 4"), testified that, since August 15, 2005, BCBS-MA had administered that fund's major medical plan pursuant to a preferred provider organization agreement with BCBS-MA.[125]  Ms. Alongi testified that Local 4 relies on BCBS-MA to negotiate discounts with providers.[126]

The evidence at trial therefore showed that certain members of Class 3 relied on BCBS-MA, as administrator for their major medical plans, for its expertise in forming physician networks and in setting reimbursement rates for those networks.  They did not rely on BCBS-MA to affirmatively search for pharmaceutical pricing fraud.  The trial testimony was consistent with the language of the network administration agreement between BCBS-MA and Pipefitters, which specifically enumerates the duties of BCBS-MA under that contract and disclaims the existence of any other duties.

Finally, even if the evidence demonstrated that insurers like BCBS-MA had constructive knowledge of Defendants' schemes by virtue of their staff model HMOs (and the evidence does not so demonstrate), and even if – against the weight of authority – BCBS-MA was acting as the agent for Taft-Hartley Funds like Pipefitters with respect to rooting out pricing fraud, that

---

[123] *Id.* at 180:17-181:17.

[124] *Id.* at 184:5-7.

[125] Trial Tr. Day 2 at 52:14-18 (Alongi).

[126] *Id.* at 60:1-19.  This is likewise consistent with the type of reliance Sheet Metals had on its third party administrator, Southern Benefit Administrators, Inc. ("Southern Benefit").  In short, as Sharon Faulkner testified, it was Southern Benefit's duty to administer the claims made under Sheet Metals' SMW+ plan and to generally advise the Sheet Metals' trustees of the costs of the fund.  Trial Tr. Day 1 at 212:24-213:22 (Faulkner).

- 50 -

knowledge cannot be attributed to Plaintiffs like the Pipefitters' Fund and the members of

Class 3 who were insurers' customers.  Constructive knowledge imputed from one corporation to

another, related corporation cannot then be imputed to a principal, because it is well understood

that only actual knowledge can be imputed from agent to principal.  *See*, *e.g.*, *New England Trust*

*Co. v. Farr*, 57 F.2d 103, 110 (1st Cir. 1932) ("This [imputation] rule can apply only to actual

knowledge of an agent as distinguished from constructive knowledge.  Prior constructive

knowledge could not be present in the mind of an agent when acting for another principal, and

hence could not be imputed to such principal.").  This conclusion is an extension of the rule that

a principal is liable only for acts committed by his agent acting within the scope of its

employment.  *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151,

192 n.33 (D. Mass. 2004); *see also* RESTATEMENT (SECOND) OF AGENCY § 272 ("[T]he liability

of a principal is affected by the knowledge of an agent concerning a matter as to which he acted

within his power to bind the principal . . . .").  Therefore, even assuming that BCBS-MA had the

knowledge Defendants claim, that knowledge cannot be imputed to Pipefitters as a matter of law.

### 7. The Court should reject Defendants' failure-to-mitigate defense

Defendants have also asserted that Plaintiffs and Class members failed to mitigate their

damages.  Defendants bear the burden of proving by fair preponderance that the injured party

failed to take ***reasonable*** steps to hold down its losses.  *Veranda Beach Club Ltd. P'ship. v.*

*Western Sur. Co.*, 936 F.2d 1364, 1386 (1st Cir. 1991).  As the First Circuit has noted, a plaintiff

is not under any duty to take outlandish chances in order to mitigate its damages; nor is the

plaintiff "obliged to play the seer, choosing the course of action that would, in hindsight, have

turned out best."  *Id*.

Defendants have asserted that, in the wake of these lawsuits, Plaintiffs should have

implemented an immediate change to their reimbursement systems.  As demonstrated above in

Section I.C.3, the very nature of the reimbursement systems at issue and the insidiousness of Defendants' conduct foreclosed Plaintiffs' ability to mitigate. First, and with respect to Class 2 Medi-Gap insurers, Massachusetts law requires non-profits like BCBS-MA to offer Medicare supplemental insurance to residents of the Commonwealth.[127] In other words, BCBS-MA did not have the option of not providing Medi-Gap insurance under which AWP was the reimbursement benchmark.

Second, without a critical mass of participants, and huge capital expenditures, it would be impossible for any single Plaintiff or Class member to effect any changes on the industry as a whole in order to counteract the AWP scheme.[128] Defendants thus overlook critical structural impediments to reforming the system even if Plaintiffs and the members of Classes 2 and 3 had learned the full extent of Defendants' fraud.

Third, changing to ASP in 2003/2004, the time period in which a knowledgeable participant like BCBS-MA had enough information to rationally study the issue, would not have mitigated damages already suffered prior to 2004.

Defendants knew that any payor who attempted a variation risked both confusion and backlash from the providers who utilized the standardized system. Of course, the obvious resolution was for Defendants to simply stop their unlawful inflation of what should have been the "average wholesale price" for each product. Defendants chose not to and are estopped from complaining that Plaintiffs failed to mitigate.

### 8. Causation is established for multi-source drugs

Certain BMS, Schering, and Warrick products were multi-source drugs for at least part of the Class Period. The interchangeability of these drugs, coupled with the J-code reimbursement

---

[127] Arruda Trial Aff., ¶ 14.

[128] *See*, *e.g.*, DeVaux Trial Aff., ¶¶ 11-14; Hartman Direct, ¶¶ 116-23 & n.134.

system, has in some cases made it practically impossible for the Plaintiffs to know which drug

company's product was dispensed at any particular point in time.  Defendants wish to exploit this

situation by arguing that Plaintiffs can have no recovery because of their inability to make

prototypical identifications of product and manufacturer.  The inability to make pinpoint

identifications does not result in absolution of Defendants.  Rather, the Court may and should

apply the doctrine of joint and several liability, or, in the alternative, market-share liability, to

hold Defendants accountable for their unlawful practices.

        **a.**      **For at least part of the Class Period, BMS, Schering and Warrick sold multi-source drugs via the corrupt AWP system**

For parts of the Class Period, the BMS drugs Blenoxane (bleomycin), Cytoxan

(cyclophosphamide), Vepesid (etoposide), Rubex (doxorubicin), and Taxol (paclitaxel) were

multi-source drugs.[129]  During the Class Period, Schering manufactured albuterol products for its

subsidiary Warrick, which sold albuterol as a generic.  The fact that the referenced BMS and

Warrick drugs were multi-source means that other companies sold chemically identical products

during parts of the Class Period under the same given J-code.

As with other drugs at issue in this case, BMS and Warrick established and published

AWPs for their drugs.  Where the drugs were branded, the AWPs were uniformly inflated over

actual average wholesale prices.  Where the drugs were generic, the AWPs also were uniformly

inflated, only more so.  The industry had a practice of setting and maintaining generic prices at

rates slightly lower than the corresponding brand-drug AWPs.[130]

---

[129] Blenoxane became multi-source in 1996, and Vepesid in 1994.  Taxol faced a branded competitor in 2000 and generic competition in 2001.  Cytoxan and Rubex were multi-source throughout the Class Period.

[130] Hartman Direct, ¶ 32.  Warrick has admitted that in general, it simply pegged its albuterol AWPs to Schering AWPs for the branded version of the product, such that it set them lower than the corresponding Schering AWP, but within 10% of that figure.  PFOF, ¶¶ 285-86.  Schering's AWPs, of course, were themselves inflated.  At other times, Warrick simply slotted its AWPs somewhere in the pack with competitor AWPs.  PFOF, ¶ 286.  Both

Medicare Part B reimbursement for these and other multi-source drugs was made on the basis of a percentage of the median AWP for its generic sources.  Because each Defendant, including BMS and Warrick, controlled and published inflated AWPs for their products, each necessarily contributed to the establishment of an inflated median AWP for the multi-source products in question.  As dominant sellers in the marketplace who harmed members of the Classes, BMS and Warrick should not be allowed to escape from having to answer for their behavior.  Thankfully, the law provides avenues of redress even where precise identification is not possible.

### b.   BMS and Warrick are jointly and severally liable for the damages they caused by way of their illegal behavior

By setting inflated AWPs for their branded drugs, BMS and Warrick contributed to inflated median AWPs, which were the basis for Medicare Part B reimbursement for multi-source drugs including their own.  With high median AWPs in place, manufacturers of multi-source drugs, including BMS and Warrick, could amplify spreads simply by lowering net acquisition prices.

Dr. Hartman has described this process in detail.  Given the incentive to maintain a high median AWP, generics generally launch with an AWP fairly close to the AWP of the related brand drug.  Once the generic manufacturers set their AWPs, most manufacturers maintain them at constant levels, resulting in an apparent "Nash equilibrium" in the dispersion of generic AWPs not unlike that noted by Dr. Berndt with regard to the observed similar relationship between AWP and WAC for most branded drugs.  Once the dispersion is set, generic manufacturers then

---

Schering and Warrick submitted AWPs to industry publications with the full expectation that the numbers would be disseminated to every segment of the health care system.

compete on spread through reducing their ASPs.  The resulting price reductions do not reach payors, however, as is standard in competitive markets.[131]

As an example, Warrick based its AWPs for albuterol products on AWPs that Schering had set for branded albuterol products.[132]  Schering's AWPs were inflated; therefore, so were Warrick's, which differed from actual average wholesale prices by an even wider margin than Schering's, given the lower sale prices for generic drugs.  Accordingly, Warrick's and Schering's AWPs had the effect of influencing and reinforcing the median AWP for all generic albuterol products.[133]  Indeed, as Dr. Hartman has found, for many years the Schering-Plough/Warrick AWP was the median.[134]

The situation was similar with respect to BMS.  Again, industry custom was to base generic AWPs on always inflated brand-name-drug AWPs.  For periods when BMS Subject Drugs were multi-source, the median AWP was close to, or greater than, the AWP for the BMS drug.  For example, the first generic manufacturer of bleomycin sulfate entered the market in 1996 with an AWP that was almost identical to the BMS Blenoxane brand AWP, and generic AWPs were not lower than this brand AWP until other generic manufacturers entered the market in 2003.[135]  Once Taxol went generic, a Nash equilibrium resulted in the dispersion of generic AWPs, which were linked to the AWP of Taxol, placing the median AWP just below the Taxol

---

[131] Hartman Direct, ¶ 32.

[132] *See* PFOF, ¶¶ 284-286 describing how Warrick pegged its AWPs.

[133] Indeed, given the incestuous relationship between Warrick and its corporate parent, there can be no doubt that both Warrick and Schering played a role in setting, propping up, and bounding the median AWP for albuterol.

[134] Hartman Direct, ¶ 33 & Figures 1.B and 1.C.

[135] Hartman Direct, ¶ 46.

- 55 -

AWP.[136]  In other words, the AWP for Taxol drove upward the AWP reported for the generic

alternatives.[137]

Given that Medicare Part B reimbursement was based on a median AWP, all other sellers

of multi-source products, whether branded or generic, played a role in setting, propping up, and

bounding the AWPs at issue.  And again: ***all*** AWPs were inflated.  There is no evidence

whatsoever – and copious evidence to the contrary – that any product here at issue, branded or

generic, ***ever*** was sold at AWP.

These inflated AWPs led directly to overcharges to Plaintiffs.  BMS, Schering, and

Warrick, who were active exploiters of the AWP system like their fellow drug sellers, cannot

escape liability merely because the nature of the distribution and reimbursement models for their

products meant that it was practically impossible for a patient or payor to know precisely which

drug company had sold a particular dose of medicine.  With physician-administered drugs sold

by BMS, there simply was no reasonable way for a cancer patient to know which manufacturer's

chemotherapy drug flowed out of a bag into his or her veins.  As to Schering and Warrick's

albuterol, there simply was no reason for a patient to keep track of the manufacturer or seller of

the drug he or she used over the years, especially since albuterol solution was poured out of a

bottle into a nebulizer.  And, with respect to TPPs, the imprecise J-code system of

reimbursement likewise meant that a payor often would not know precisely whose multi-source

drug had been administered to its insured.

Though Plaintiffs' claims of unfair or deceptive acts or practices is statutorily based,

courts, including this one, have acknowledged that certain Section 93A claims can be tort-like in

---

[136] Hartman Direct, ¶¶ 32-33 & Figure 2.

[137] *Id.*

nature.[138]  *E.g.*, *Value Partners S.A. v. Bain & Co., Inc.*, 245 F. Supp. 2d 269, 274 (D. Mass.

2003).  Such is the case here, where Plaintiffs allege unfair or deceptive conduct in violation of

Section 93A.  Thus, it is apt that the Court should look to tort concepts in assessing liability.

When two or more tortfeasors each cause an indivisible harm, they each are jointly and

severally liable for the whole of the harm suffered.  As the RESTATEMENT (THIRD) OF TORTS

provides:  "If the independent tortious conduct of two or more persons is a legal cause of an

indivisible injury, each person is jointly and severally liable for the recoverable damages caused

by the tortious conduct."  RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY,

§ A18.  Moreover, joint and several liability has been, and can be, applied in the context of

Chapter 93A claims.  *See also*, *e.g.*, *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841,

853-60, 443 N.E.2d 1308 (1983) (approving joint and several liability under Chapter 93A);

*Piccuirro v. Gaitenby*, 20 Mass. App. Ct. 286, 292-93, 480 N.E.2d 30 (1985) (approving joint

and several liability under Chapter 93A); *Pepsi-Cola Metropolitan Bottling Co.*, *Inc. v.*

*Checkers, Inc.*, 754 F.2d 10, 19-20 (1st Cir. 1985) (approving joint and several liability under

Chapter 93A); *see also Chase v. Roy*, 363 Mass. 402, 408, 294 N.E.2d 336 (1973) ("[I]f two or

more wrongdoers negligently contribute to the personal injury of another by their several acts,

which operate concurrently, so that in effect the damages suffered are rendered inseparable, they

are jointly and severally liable."); *Harper v. Albert*, 400 F.3d 1052, 1061-62 (7th Cir. 2005)

(quoting *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) and noting "[j]oint and several

liability is a theory of recovery which requires that the plaintiffs, in an action alleging tortious or

---

[138] This is not to say, however, that tort standards such as the need to prove reliance apply in this case.  To the contrary:  as Plaintiffs have repeatedly shown, they need not prove reliance to prove their Section 93A claims.  *Nei v. Burley*, 388 Mass. 307, 313, 446 N.E.2d 674 (1983) ("[A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims."); *see also Slaney v. Westwood Auto, Inc.*, 366 Mass. at 693, 322 N.E.2d 768 (Chapter 93A "is a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.").

constitutionally repugnant conduct by multiple actors, establish that each defendant acted in concert to 'produce a single, indivisible injury'"); *Ravo v. Rogatnick*, 514 N.E.2d 1104, 1108 (N.Y. 1987) (finding joint and several liability appropriate where the plaintiff suffered brain damage and the defendants, an obstetrician and a pediatrician, failed to submit any evidence upon which apportionment of damages could be based).  Given that BMS, Schering, and Warrick contributed to the harm that each Plaintiff suffered due to their pricing practices, each is jointly and severally liable for the harm of which Plaintiffs complain.

Furthermore, it is no impediment that BMS, Schering, and Warrick are not the only sellers of the multi-source drugs at issue in this part of the case.  Successful application of joint and several liability does not require that all tortfeasors be joined to the action.  *See*, *e.g.*, *Shantigar Found. v. Bear Mt. Builders*, 441 Mass. 131, 141, 804 N.E.2d 324, 332 (2004) ("Under our current system of joint and several liability, a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages.") (citations omitted); RESTATEMENT (SECOND) OF TORTS, § 882 ("If each of two or more persons is subject to liability for the full amount of damages allowed for a single harm resulting from their tortious conduct, the injured person can properly maintain a single action against one, some or all of them."); *see also* *Delicata v. Bourlesses*, 9 Mass. App. Ct. 713, 720, 404 N.E.2d 667 (1980) ("The established rule is that an injured party is permitted to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident.") (citations omitted).  These Defendants must answer for their conduct regardless of the absence of other sellers of the same kind of multi-source drug.[139]  *E.g.*, *Delicata*, 9 Mass. App. Ct. at 720; *see also Shantigar*, 441

---

[139] In *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*, 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005), the court addressed a case in which cities, municipal corporations, and public and private water providers sued multiple

Mass. at 142 ("Significantly, Massachusetts has declined previous opportunities to eliminate joint and several liability (a system, we note, that favors plaintiffs because it places the risk of insolvent defendants on codefendants rather than on the injured party) in favor of imposing fault-based liability on all parties.") (citations omitted).

In short, BMS, Schering, and Warrick, like other sellers of the multi-source drugs they sold to Plaintiffs during parts of the Class Period, acted in such a manner as to establish inflated AWPs and median AWPs for those drugs.  These inflated values harmed the Plaintiff classes.  Thus, BMS, Schering, and Warrick each is liable for the whole of the harm suffered by Plaintiffs with respect to their multi-source drugs, and the Court would be justified in entering judgments in accordance with that conclusion.

Plaintiffs, however, have advised the Court that they will accept entry of judgments revised to reflect BMS's, Schering's, and Warrick's individual market shares for each of their multi-source drugs for Massachusetts, measured on an annual basis for each year of the Class Period, assuming that BMS, Schering, and Warrick can provide credible evidence of those market shares within a time appointed by the Court.  If, however, either party or both parties cannot produce such credible evidence, then judgments for the whole of the harm suffered by

---

designers, manufacturers, and distributors of gasoline containing the additive methyl tertiary butyl ether for alleged groundwater contamination.  Defendants sought the dismissal of complaints filed in fifteen states, in part based on questions of whether the plaintiffs could proceed with their claims based on collective theories of liability.  *Id*. at 361-62.  The court carefully examined six forms of collective liability, including concurrent wrongdoing (or joint and several liability), concert of action liability, alternative liability, enterprise liability, market share liability, and "'commingled product' market share liability." *Id*. at 370-79.  As the court explained, concurrent wrongdoing, concert of action liability, and alternative liability all focus on the tortious conduct of the defendants.  *Id*. at 371-72 (noting, in discussing joint and several liability, that "[f]or liability to attach, defendants' tortious conduct need not be simultaneous in time, but must combine to produce plaintiff's indivisible injury.  This concept of concurrent wrongdoing evolved to relieve plaintiffs of the burden of establishing several liability in cases where more than one defendant proximately caused the harm."); *see also id*. at 372 (regarding the theory of concert of action:  "One party is responsible for the acts of another if it (a) does a tortious act in concert…, or (b) knows that the other's conduct constitutes a breach of a duty and gives substantial assistance…, or (c) …[its] own conduct, separately considered, constitutes a breach of duty to the third person."); RESTATEMENT (SECOND) OF TORTS, § 433B(2) (defining alternative liability:  "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff … the burden of proof as to the apportionment is upon each such actor.").  Here, too, it is Schering and Warrick's own wrongful conduct that has led to liability to the Plaintiffs.

Plaintiffs with respect to the referenced multi-source drugs should be entered against BMS, Schering, and Warrick.

> **c.      In the alternative, BMS, Schering and Warrick should be held to account for their unlawful conduct under the doctrine of market-share liability**

In the alternative, the Court should apply the doctrine of market-share liability with respect to BMS's, Schering's, and Warrick's unlawful conduct.  This would result in judgments being entered against BMS, Schering, and Warrick to the extent during the Class Period of their shares of the relevant market – here, Massachusetts[140] – for the multi-source drugs at issue.

The Supreme Judicial Court of Massachusetts has indicated that on an adequate record, it might "recognize some relaxation of the traditional identification requirement" in the product-liability realm of torts.  *Payton v. Abbott Labs*, 386 Mass. 540, 574, 437 N.E.2d 171 (1982). Since *Payton* was decided (and before with respect to cases decided in other states), Massachusetts state and federal courts have applied market-share liability in certain instances. The principles supporting application of market-share liability in those cases are present here.

Market-share liability eliminates the traditional identification requirement – *i.e.*, the necessity for an allegation that a particular manufacturer sold the patient a particular drug – in favor of an approach that takes into account the extraordinary circumstances that make such identification practically impossible.  *McCormack v. Abbott Labs.*, 617 F. Supp. 1521, 1525 (D. Mass. 1985) ("The emergence of a market-share theory of liability in American jurisprudence stems from the recognition by several courts that the field of products liability has been changed drastically **with the advent of mass production of fungible goods and complex marketing methods**.") (emphasis added); *Russo v. Material Handling Specialties*, 4 Mass. L. Rep. 288,

---

[140] In the larger AWP litigation, outside this test case, Plaintiffs, to the extent they will advocate imposition of market-share liability, may well argue for liability to be assessed on the basis of national market share.  *See Hymowitz v. Eli Lilly and Co.*, 73 N.Y.2d 487, 511-12, 539 N.E.2d 1069 (1989).

1995 Mass. Super. Lexis 436, at *11 (1995) ("Because 'consumers may be harmed by a product not traceable to a specific producer,' various federal and state courts around the country reason that the 'traditional tests of liability are insufficient to govern the obligations of manufacturer to consumer in such situations, and some adaptation of the rules of causation and liability seems appropriate.'") (citations omitted); *Hymowitz*, 73 N.Y.2d at 507 (adopting market-share liability where the court "perceive[d] that [] judicial action [wa]s again required to overcome the 'inordinately difficult problems of proof' caused by contemporary products and marketing techniques") (citations omitted).  The imposition of market-share liability where traditional identification is not possible also furthers the principles that injured parties should be compensated and that wrongdoers should not escape the consequences of their actions. *McCormack*, 617 F. Supp. at 1526-27; *Hymowitz*, 73 N.Y.2d at 507 ("Indeed, it would be inconsistent with the reasonable expectations of a modern society to say to these plaintiffs that because of the insidious nature of an injury that long remains dormant, and because so many manufacturers, each behind a curtain, contributed to the devastation, the cost of injury should be borne by the innocent and not the wrongdoers.").

In *McCormack*, this Court explained its adoption of a market-share theory in the DES context by noting that the drug had been "produced in a 'generic' form," and that it had been produced by "300 drug companies from a chemically identical formula."  617 F. Supp. at 1525.  Here, too, albuterol was produced in generic form, from chemically identical formulae, such that the drug was considered multi-source and therefore bundled into a few separate J-codes.  And here, as in *McCormack*, BMS, Schering, and Warrick contributed to the identification difficulties "by not keeping or not being able to locate pertinent records."  *See id*.  Moreover, whereas in *McCormack* a further consideration was the long period before physical harm would manifest

itself, here there was a similar latency to the discovery of the harm done to patients because of the lack of transparency in the Defendants' pricing practices and the complexity that marked the Defendants' unlawful scheme.[141]  *See id.*

Two other important considerations are apt in both *McCormack* and this case.  First, here, as in *McCormack*, the importance of "separating wrongdoers from innocent actors . . . is of minor importance" because BMS, Schering, and Warrick, like all sellers of the drugs at issue, published inflated AWPs and contributed to the maintenance of inflated median AWPs.  *See id.* Plaintiffs already have proven that BMS's, Schering's, and Warrick's behavior violated Chapter 93A; thus, neither BMS, Schering, nor Warrick can be considered "truly innocent actors."  *See id.*  "Although [they] may not have caused the actual injury of a given plaintiff, each may be shown to share, in some measure, a degree of culpability" in marketing and pricing albuterol products in the manners proven by the plaintiffs.  *See id.*  Furthermore, as this Court pointed out, if a market-share theory of liability is properly fashioned, it "will not subject a particular defendant to liability for more harm than it statistically could have caused in the relevant market."  *See id.* at 1526.

Second, as in *McCormack*, manufacturers such as BMS, Schering, and Warrick are better able to absorb the cost of their unlawful behavior than Plaintiffs.  *See id.*  Certainly it would be more just if they did so, given that it was they who behaved unlawfully.

In short, there are excellent reasons for the imposition of market-share liability in this case.  Plaintiffs, therefore, urge the Court to adopt a theory based on that applied in *McCormack* and *Russo*.  Plaintiffs have proven that Class members were administered products

---

[141] No particular period of latency is required.  *Russo*, 1995 Mass. Super. Lexis 436, at *13 ("Plaintiff, through no fault of his own, cannot identify the manufacturer of the beverage cart which struck him. . . .  Although there was no delay between the time plaintiff used the cart and the manifestation of his alleged injury, it is undisputed that there is no way to identify the manufacturer of the cart.").

corresponding to the J-Codes in question during the Class Period; that BMS's, Schering's, and

Warrick's marketing practices as to those products caused them harm; that BMS, Schering, and

Warrick sold products corresponding to the J-codes for the multi-source drugs at issue; and that

BMS, Schering, and Warrick acted unlawfully in their pricing and marketing of these drugs. *See*

*McCormack*, 617 F. Supp. at 1526 (setting forth directly analogous elements of claim to market-

share liability); *Russo*, 195 Mass. Super. Lexis 436, at *16 (same).  Accordingly, BMS, Schering,

and Warrick should be held liable to Plaintiffs for their injuries unless one or more can prove that

it did not produce or market products corresponding to the J-Codes in question; that it did not

market any such products in Massachusetts; or that it did not produce, sell, or distribute any of

the referenced drugs during the Class Period. *See McCormack*, 617 F. Supp. at 1526 (setting

forth analogous exculpatory circumstances); *Russo*, 195 Mass. Super. Lexis 436, at *16 (same).

No evidence was introduced at trial satisfying any of these defenses.

As for establishing the market share of each Defendant, the market would be considered

Massachusetts.  For the Class Period, BMS would be presumed to have 100% of the market for

products that it sold, and Schering and Warrick would be presumed to have 50% each of the

market for products that they sold (Schering and Warrick have produced no evidence rebutting

this presumption).  McCormack, 617 F. Supp. at 1527.  As this Court wrote in *McCormack*,

"[u]pon proof of an actual market share, a defendant will only be liable for the portion of the

total judgment represented by such share." *Id*.

In sum, Plaintiffs submit that while they believe they are entitled to full judgments

against BMS, Schering and Warrick consistent with Massachusetts principles of joint and several

liability, the doctrine of market-share liability offers an alternative method of holding these

Defendants accountable for their behavior, notwithstanding the identification problems inherent

to this case.  If the Court is not inclined to apply joint and several liability here, Plaintiffs urge

the Court to apply the doctrine of market-share liability in its stead.

**D.      Plaintiffs Have Proved a Loss of Money or Property as Contemplated by Ch. 93A**

Defendants' claim that Plaintiffs have failed to prove that they suffered a loss of "money

or property" as a result of Defendants' conduct is contrary both to the facts as established at trial

and to applicable case law.  Defendants argue that any increase in amounts paid by BCBS-MA

for Medicare Part B covered drugs was, through BCBS-MA's rate setting process, essentially

"passed on" to the individuals who purchased health insurance in the form of higher

premiums.[142]

Despite Defendants' attempts to portray BCBS-MA's rate setting as a pure "pass on" of

costs to BCBS-MA members in the form of premiums, the record fails to support that

conclusion.  It is clear that to the degree costs in any given year are higher than projected, BCBS-

MA would incur higher costs for that year.  The complex actuarial process of using past years'

claims experience to estimate future claims in order to set premium rates for any given year is far

from the concept of a "cost-plus" contract that Defendants would have this Court apply.  As the

Court pointed out at trial, there is a two-year lag between the time when BCBMS-MA incurs a

cost (such as higher drug costs related to inflated AWPs) and the time when those costs may be

incorporated into the rate setting process used to determine premiums.  Even at that point, such

costs are not simply "passed on" to future premium payors but are instead part of a complex

actuarial process of estimating costs for a particular year.

---

[142] It should be noted that although Defendants' Motion makes no distinction between BCBS-MA claims under
MediGap policies (Class 2) and its commercial policies (Class 3), the Court heard no evidence concerning the rate
setting practices and policies related to any BCBMS-MA commercial policies.  Defendants' Motion with respect to
passing on of increased costs in the form of premiums is, and must be, limited to Class 2 claims.  However, the case
law and arguments against allowing such a "pass-on defense" apply equally to BCBS-MA's payments under its
commercial plans.

- 64 -

Even if the Court were to find that the increased costs to BCBS-MA as a result of their fraudulent scheme were truly "passed on" to consumers in the form of higher future premiums, courts have roundly rejected this "pass-on defense."  There is no danger of a "double-recovery" problem, and permitting Defendants' pass-on defense would weaken the private enforcement mechanisms that lie at the heart of Chapter 93A.

### 1.    Background

The only testimony this Court was presented on the issue of premium setting by any TPP was that or Mr. Kenneth J. Arruda, Director of Senior and Individual Products within the Marketing Division of BCBS-MA.[143]  Mr. Arruda established that BCBS-MA is required by Massachusetts statute and regulations to provide MediGap insurance to Massachusetts citizens (or lose its tax exempt status), and that BCBS-MA, under its various MediGap plans, pays the 20% MediGap Part B co-payment for its insureds under those plans.[144]

During cross examination, as well as questioning by the Court, Mr. Arruda explained, in very general terms, how premiums for BCBS-MA's MediGap plans are calculated.  Mr. Arruda explained that based on the prior two year's claims experience for any given MediGap plan (the amount paid out in 20% co-pays under that plan), actuaries at BCBS-MA estimate the cost to BCBS-MA of the next year's claims.[145]  Once this is established, an additional percentage is added for the estimated administrative costs associated with the particular plan.  An additional 2.5% is added, pursuant to applicable statute, to the premium as a "contribution to reserves."[146]  These reserved funds are used for various costs associated with a particular plan from which they are derived, including to cover any shortfall in income from premiums due to miscalculation,

---

[143] Trial Tr. Day 3 at 116 (Arruda).

[144] *Id*. at 123-124.

[145] *Id*. at 133.

[146] *Id*. at 134-35.

- 65 -

increased utilization due to unforeseen mass illness, previously unreported claims, etc.[147]  This

reserved amount, far from the "profit" Defendants attempt to portray, is used to help defer the

risk that the actuarial projections of the costs associated with claims for that particular plan in

any given year were wrong.  "This is generally a risky business because you are covering people

who are over age 65 who have severe and in some cases catastrophic health care needs."[148]

> **2.      Increased drug costs are not "passed on" to BCBS-MA members**

Defendants argue that because actuaries at BCBS-MA use the prior two year's claims

experience in order to estimate the potential claims for the next year as part of the premium

setting process, BCBS-MA somehow has a "cost-plus" arrangement with its insured.  "[T]hey

have a cost-plus contract, and they just pass the costs along."[149]  That is, Defendants argue that

BCBS-MA simply passes any of its costs, including any increased costs associated with wrongly

inflated AWPs on Medicare Part B drugs, on to its insureds.[150]  The record does not support such

a conclusion.  There is nothing in the record that indicates that costs incurred by BCBS-MA in

excess of its premiums received in any plan year are passed on in the form of additional

premiums to those same insureds.  Conversely, if income from premiums exceeds claims costs in

any given plan year, such excess is not refunded to those covered by the policy during that

period.[151]

The Court in *In Re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla.

2004), considered the identical set of facts presented here and concluded that use of ***previous***

---

[147] *Id*. at 135-36.

[148] *Id*. at 136.

[149] Trial Tr. Day 3 at 145:4-5 (argument of defense counsel Mr. Haas).

[150] Track 1 Defendants' Motion for Judgment on Partial Findings, at 2.

[151] Trial Tr. Day 3 at 136 (Arruda).

*claims* experience to project *future* costs is not a "pass through" of such costs to insureds.  The

court rejected the pass-on defense advanced by the Defendants:

> Further, to the extent that any third-party payer did charge its insureds a higher premium because of a drug company's monopolistic activities, ***the charging of a higher premium in the future cannot be accurately described as a "pass on" of those charges***.  The record is clear that the purpose of a future projection is, as the name implies, to estimate anticipated future costs.  Defendants point to nothing in the record that indicates that the purpose of projecting a future cost (and charging such a cost as a premium in the future) is to recover money that a third-party payer is paying out for *present claims*.  Nor have Defendants shown such a recovery to be the result of future claims projections.  Indeed, as [one witness] testified, if, in a given year, an insurance company pays our more in claims than it has charged as a premium, the company records that deficit as a loss and there is no retroactive increase of the premium charged for that year.

*Id.* at 690 (emphasis added).

Here, there is nothing in the record to even suggest that the purpose of the future

projection of costs is meant to recoup or recover monies paid out for present claims.  Thus, to the

extent BCBS-MA incurs higher costs as a result of Defendants' conduct, they have paid more in

claims relative to the premiums collected by their insureds and have established a loss under

M.G.L. c. 93A.

### 3.      Defendants' "pass through" defense should be rejected

Even if the Court is inclined to see the use of prior claims to project future costs as a

"pass-through" of costs to insureds, the Court should reject this as a defense to fraud.  It is

antithetical to the overwhelming weight of jurisprudence concerning who can and should benefit

from collateral sources.  Allowing Defendants to assert a pass through defense would also

severely weaken the private enforcement mechanisms that lie at the heart of M.G.L. Chapter

93A.

a.     **A defendant's responsibility is not eliminated or reduced because the plaintiff has been able to recover part of an illegal overcharge from a third party**

The United States Supreme Court long-ago recognized that, with respect to determining whether a defendant may escape liability for overcharges because the plaintiff was able to pass on the overcharges to others, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533-34 (1918) (considering railroad overcharges).  This same notion can also be found in Section 920A the RESTATEMENT (SECOND) OF TORTS, which provides that "[p]ayments made to or benefits conferred upon the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the torfeasor is liable." RESTATEMENT (SECOND) OF TORTS, § 920A(2).

This basic notion appears in a variety of areas of American jurisprudence.  For example, "[u]nder the collateral benefit rule, payment which a plaintiff receives for his or her loss from another source is not credited against the defendant's liability for all damages resulting from its wrongful or negligent act."  *Craig v. Y&Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir. 1983).  The Supreme Court has noted that "[t]he law contains no rigid rule against overcompensation. Several doctrines, such as the collateral benefits rule, recognize that *making tortfeasors pay for the damage they cause can be more important than preventing overcompensation*." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (U.S. 1994) (emphasis added).  *See also Great Lakes Gas Transmission Co. v. Grayco Constructors, Inc.*, 506 F.2d 498, 504 (6th Cir. 1974) (holding that "a defendant owes to the injured compensation for injuries the proximate cause of which was his own negligence, and [ ] their payment by third parties cannot relieve him of this obligation[.] . . . [T]he injured is the beneficiary of their bounty and not him who caused the injury.").

- 68 -

The text of Chapter 93A reveals that Massachusetts legislature clearly recognized and adopted this widely accepted philosophy of valuing deterrence more than the concern for overcompensation of the directly injured party.  Sections 9(3) and 11 of Chapter 93A provide that "[f]or the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, ***regardless of the existence or nonexistence of insurance coverage available in payment of the claim***.") (emphasis added).  Just as the statue rejects the notion that a defendant can avoid responsibility under Chapter 93A where a plaintiff has been made whole through the plaintiff's insurance coverage, it would be inconsistent with the remedial purpose and deterrent goals of Chapter 93A to permit a defendant to escape liability merely because an immediately injured party, such as the TPPS here, happened to be able to recover some portion of the overcharges it was forced to pay as a result of the Defendants' fraud from other sources.  To conclude otherwise would not only be inconsistent with Chapter 93A, but would also represent a dramatic departure from fundamental American jurisprudence.

> **b.    The pass-on defense has been soundly rejected and should be rejected by this Court**

The Supreme Court has considered the viability of the pass-on defense in the context of an anti-trust violation and has unequivocally rejected it.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968), all but eliminated the pass-on defense in the context of anti-trust cases.  In that case, the Court ruled that the plaintiff "proved injury and the amount of its damages . . . when it proved that [the defendant] had overcharged it during the damage period and showed the amount of the overcharge." *Id*. at 494.  Similarly, here, BCBS-MA has proven that through manipulation and marketing of the AWP of their products, the Defendants artificially inflated the price of certain physician-administered drugs and that BCBS-MA made

higher payments based on that inflated price.  That is all that is required to show that BCBS-MA

sustained a loss of money or property.  Regardless of whether the drug prices were inflated as a

result of the manipulation of the market (anti-trust claims) or unfair or deceptive practices

(Chapter 93A), the result is the same – health insurers were required to pay more (*i.e.*, reimburse

at a higher level) for the drug than they should have if no unfair or deceptive practices had

occurred.

      The Court in *Hanover Shoe* relied upon three principal reasons for rejecting the pass-on

defense:  (i) it would allow a windfall for the illegal acts of the defendant; (ii) determining how

much of the overcharge was passed on to the plaintiff's customers would require "additional long

and complicated proceedings;" and (iii) it would weaken the anti-trust enforcement because

indirect buyers – *e.g.*, individual customers who bought a single pair of shoes – would have less

of an incentive and thus would be less apt to sue to enforce anti-trust laws.  *Id*. at 488-94.

      These three principles apply squarely to the circumstances of the present case.  To the

extent the Defendants artificially inflated the spread between their published AWP and the actual

price of the drugs and thereby increased their sales and profits, allowing the Defendants to assert

the pass-on defense here would result in a windfall for the Defendants.  In addition, it would

require a cumbersome and complex economic analysis to demonstrate how much of the inflated

price, if any, was passed on to BCBS-MA's members.  Finally, permitting the pass-on defense

here would create an enforcement vacuum because individual members "would have only a tiny

stake in a lawsuit and little interest in attempting a class action."  *See id*. at 494.

      A long line of case law recognizes that TPPs, like BCBS-MA, suffer a direct economic

injury and have standing to recover the portion of any overcharges they paid for products or

services used by their insureds.[152]  Courts have considered the pass-on defense with respect to

health insurers and found the defense that they may pass on any damages to their insureds in the

form of higher premiums completely unavailing.

> Virtually all wrongs committed against businesses, including
> antitrust, securities, and RICO violations, are ultimately passed on
> to consumers in the form of higher costs or reduced services or
> both.  Under American law, nevertheless, the right to bring a RICO
> or antitrust action devolves to the injured business which initially
> sustained the economic damages. . . . The law looks to the injured
> business because it is often the only party with sufficient resources
> and incentives to successfully vindicate society's interests and
> deter future violations. . . . The general class of consumers whom
> the costs were passed on by the Blues, will, in any event, be the
> likely ultimate beneficiaries of any recovery in the form of future
> reduced premiums or increased services, or both.  Where the
> plaintiffs are regulated, non-profit entities, as in the case of the
> Blues, there is a high degree of assurance that recoveries will be
> "passed back" to benefit the consumers.

*Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 569-70 (E.D.N.Y.

1999).  *See also Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980)

(concluding that the plaintiff could recover damages in the amount of the full overcharge even if

"it had 'mitigated' its damages by passing part of the excessive costs on to its customers"); *In Re

Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1444-45 (9th Cir. 1987); *Bray v. Safeway

Stores, Inc.*, 392 F. Supp. 851, 865 (N.D. Cal. 1975); *Wall Prods. Co. v. Nat. Gypsum Co.*, 357 F.

Supp. 832, 843-44 (N.D. Cal. 1973).

The Court in *Hanover Shoe* recognized that weighing evidence about how much of an

illegal increase in costs due to a defendant's actions were passed on to consumers would "require

---

[152] *See, e.g.*, *Desiano v. Warner-Lambert Co.*, 326 F 3d 339, 350 (2d Cir. 2003); *In re Lorazepam and Clorasepate Antitrust Litig.*, 295 F. Supp. 2d 30, 52 (D.D.C. 2003); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F 3d 1406, 1414 (7th Cir. 1995); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 717 (7th Cir. 2001); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003); *Hartford Hospital v. Chas. Pfizer & Co.*, 52 F.R.D. 131 (2d Cir. 1971); *Medical Arts Pharmacy, Inc. v. Blue Cross & Blue Shield, Inc.*, 675 F. 2d 502, 503 (2d Cir. 1982); *Perez v. Wyeth Lab, Inc.*, 161 N.J. 1, 4, 30-31, 734 A.2d 1245, 1247, 1263 (1999).

- 71 -

additional long and complicated proceedings involving massive evidence and complicated

theories," and rejected this approach in determining anti-trust damages.  *Hanover Shoe*, 392 U.S.

at 493.  In its subsequent decision in *Illinois Brick*, the Supreme Court concluded that:

> the principal basis for the decision in *Hanover Shoe* was the
> Court's perception of the uncertainties and difficulties in analyzing
> price and out-put decisions 'in the real economic world rather than
> an economist's hypothetical model,' and of the costs to the judicial
> system and the efficient enforcement of the antitrust laws of
> attempting to reconstruct those decisions in the courtroom.

431 U.S. 720, 731-32 (1977) (citing *Hanover Shoe*, 392 U.S. at 493).  The Court found that

introducing the confusion of how a defendant's excessive overcharges affect the price-setting

policies of the plaintiff is an unnecessary and undesirable enterprise.  *See id.*

The same arguments apply with equal force outside of the anti-trust context.  Here, the

Defendants are major drug companies, with billions of dollars in sales every year and vast

resources to contest allegations of the type raised in this litigation.  The Defendant drug

companies would like nothing more than to eliminate large health insurers, such as BCBS-MA,

as potential plaintiffs in these cases and, instead, require the members themselves, whose

premiums, on an individual bases, may have been inflated by only a small amount, to take on the

enormous burden of fighting the pharmaceutical industry.

**E.       Plaintiffs and the Classes Are Entitled to an Award of Prejudgment Interest**

Federal courts recognize that Massachusetts law governs an award of prejudgment

interest when plaintiffs recover under a Massachusetts state law cause of action.  *Doty v. Sewall*,

908 F.2d 1053, 1063 (1st Cir. 1990).  The purpose of prejudgment interest is to compensate the

prevailing party for loss of the use of money that party should have had in the first place but for

the other party's wrongdoing.  *McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188, 196

(Mass. 1990) (*citing Conway v. Electro Switch Corp.,* 402 Mass. 385, 390, 523 N.E.2d 255

- 72 -

(1988)); *see also Weiss v. Augat, Inc.,* 2000 WL 1765434, at *4 (Mass. 2000) (holding that prejudgment interest given as of right where necessary to compensate a party for the loss of the use of his money and in order to make the party whole).  Under Massachusetts law, Plaintiffs are entitled to prejudgment interest on the compensatory portion of a Chapter 93 claim, running from the date of the filing of the lawsuit until the date of entry of judgment.  *Rini v. United Van Line*, 903 F. Supp. 234, 239 (D. Mass. 1995); *Patry v. Liberty Mobilehome Sales, Inc.*, 394 Mass. 270, 272, 475 N.E.2d 392 (1985).  Prejudgment interest under Chapter 93A is controlled by Mass. Gen. Laws Ann. ch. 231, § 6B.  *Alan Steiman's Landscape, Inc. v. Lawrence Sav. Bank*, 1996 WL 408942, at *2 (Jul. 16, 1996 Mass. App. Ct.), provides that prejudgment interest shall be added to the amount of damages "at the rate of twelve per cent per annum from the date of commencement of the action."  Mass. Gen. Laws Ann. ch. 231 § 6B.

## II.    LEGAL ISSUES SPECIFIC TO ASTRAZENECA

### A.    Plaintiffs Established That AstraZeneca's Conduct Was Unfair and Deceptive

AstraZeneca claims that "the evidence demonstrates that AstraZeneca's pricing of Zoladex was consistent with industry practice and saved both patients and the healthcare system millions of dollars by remaining the substantially lower cost alternative to Lupron, the market leader."  Memorandum, at 2.  Thousands of drugs have AWPs that bear a predictable relationship of 20% to 25% above WAC.  AstraZeneca departed from this industry norm when it initiated its RTP Scheme.  Thus, Plaintiffs established that AstraZeneca engaged in conduct far outside "industry practice" and that AstraZeneca caused Plaintiffs as well as the healthcare system hundreds of millions of dollars in damages.  Two wrongs, TAP's spread practices for Lupron, and AstraZeneca's RTP for Zoladex, do not create a right.

As set forth in Plaintiffs' Findings of Fact, Plaintiffs established at trial that, though AZ knew that AWP was the reimbursement benchmark for Medicare Part B and for TPPs,

AstraZeneca published false AWPs that failed to take into account large confidential discounts that AstraZeneca was providing to physicians.  Further, Plaintiffs established that AstraZeneca marked the spread between acquisition cost and AWP and concealed its conduct from the government, TPPs and consumers.  Indeed, although AstraZeneca attempted to introduce evidence that AstraZeneca had no choice but to publish a false AWP and then market the spread between its discounted prices and its inflated AWP, Plaintiffs established at trial that, at every opportunity AstraZeneca refused to publish a truthful AWP.  Plaintiffs likewise established that, though AZ claimed to be a victim of a reimbursement system that required AZ to engage in the conduct proven at trial in order to keep Zoladex in the market, AstraZeneca itself lobbied to keep that "perverse" system in place.  Finally, the testimony at trial established that, though AstraZeneca certainly realized it *could have* done so, AZ never reported TAP's unfair conduct to the government.  Instead, it decided to engage in that conduct itself.  That conduct is more than sufficient to be unfair and deceptive under Section 93A.

AstraZeneca also claims that its conduct was not deceptive because "there is no evidence in the record that AstraZeneca deceived anyone regarding the discounts it offered on Zoladex." Memorandum, at 2.  On the contrary, Plaintiffs established at trial that AstraZeneca both hid its conduct from the government, TPPs and consumers and had no mechanism in place to tell those groups about the discounts it was giving or its spread marketing activities.[153]

## B.    Plaintiffs Established That AstraZeneca Caused Plaintiffs' Harm

Under the relevant standards,[154] Plaintiffs clearly established that AstraZeneca caused Plaintiffs harm.  Plaintiffs continued to reimburse based on AWP because it would have been extremely difficult for single members of Class 2 and Class 3 to begin basing their

---

[153] *See* PFOF, I.A.

[154] *See* Section I.A., *infra*.

reimbursement on ASP or another benchmark.  Indeed, the evidence at trial established that

AstraZeneca itself, a multi-billion dollar pharmaceutical company, did not think that it could

change the system of AWP-based reimbursement on its own:

> We weren't lobbying against any changes because we still felt that, you know, ***this was the system we, were only one company in this***. In fact, we were not a leader by a long shot.  We still only had, you know, perhaps 25, 30 percent of the share of this LhRh market, and there were many other products in this Part B coverage, chemotherapeutic agents, cytoxics.  As so we were a relatively small player in this, but we were monitoring. . . .  I'm saying, so we never felt that we could make that change by ourselves.  We were the smaller player, even within that market, and certain there were many, many other – . . . I mean, I'm just saying it because I think it's the kind of thing where all the powers that had the ability to make change, whether it was Congress or the Executive Branch, everyone recognized that this was not a perfect system, and they were concerned about it.  But, you know, through the period of the '90s, late '90s, and even into the early part of this century, they didn't make the change because of either competing factors or whatever they felt.  ***So that from an AstraZeneca point of view, we didn't think we could do that on our own***.[155]

Finally, AstraZeneca claims that Plaintiffs have not proven that AstraZeneca caused

Plaintiffs any loss because "[t]here is no evidence in the record that Plaintiffs would have

reimbursed physicians less for treating their patients with Zoladex if AstraZeneca had reported

an AWP that was an actual average of wholesale prices."  On the contrary, as set forth in the

opinions of Dr. Rosenthal and Hartman (*see* discussion *infra* at I.C.) prices would have been

lower.

### III.    LEGAL ISSUES SPECIFIC TO BMS

### A.    BMS's List Price Defense Fails

BMS contends that it did not commit any unfair or deceptive acts or practices because it

did not report AWPs to industry publications, but instead reported WLPs at which sales were

---

[155] Trial Tr. Day 11 at 20, 27-28 (Milbauer) (emphasis added).

- 75 -

made.  BMS Mem. in Supp. of Mtn. for Judgment at 2-3.  BMS's argument fails.  BMS controlled the AWPs for its Subject Drugs by reporting WLPs with full knowledge of the mark-up factors that the Publishers would use to create the AWP, and BMS itself published the AWPs. Moreover, BMS knew that its AWPs did not reflect the confidential prices at which the Subject Drugs were sold during much of the Class Period, yet BMS took no steps to correct the incorrect AWPs despite BMS's knowledge that Medicare and private payers reimbursed based on an AWP benchmark.  It is precisely this conduct – properly viewed in context of the totality of circumstances – that is unfair or deceptive.

### 1.      BMS owned and controlled its AWPs

While it is true that BMS did not send AWPs directly to the Publishers, BMS provided WLPs to them so that AWPs would be established for BMS drugs.[156]  BMS expressly instructed the Publishers to supply AWPs for the Subject Drugs[157] and was well aware that the Publishers would apply a mark-up factor of 20 to 25 percent to derive the AWP.[158]  Indeed, in 1992 BMS instructed the Publishers to use a 25% mark-up factor for BMS oncology products,[159] and the *Red Book* made this change as BMS directed.[160]

---

[156] Trial Tr. Day 4 at 56 (Kaszuba).

[157] *See*, *e.g.*, Ex. 179 (composite exhibit of letters) (all caps in original).

[158] Trial Tr. Day 4 at 55, 59 (Kaszuba).  Kaszuba was responsible, since 1991, for communicating BMS's wholesale list prices to customers and the *Redbook*, *First Databank* and *MediSpan*.  Trial Tr. Day 4 at 52 (Kaszuba).

[159] *See* Ex. 183 ("Effective immediately, Bristol-Myers Oncology Division products factor used in determining the AWP should be changed from 20.5% to 25%.").

[160] Trial Tr. Day 4 at 60, 66 (Kaszuba).  The AWPs reported by the *Red Book* are the AWPs that Medicare Part B carriers used.  *See*, *e.g.*, *In re Lupron*® *Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 159 (D. Mass. 2003). The *Red Book* never undertook an independent verification of the actual AWP.  *In re Lupron*® *Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 285 n.7 (D. Mass. 2003); *In re Lupron*® *Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.

- 76 -

BMS was so confident of what the AWPs would be, that BMS checked the prices sent back to them by the Publishers to ensure that the AWPs matched BMS's expectations,[161] and several BMS internal documents projected what those AWPs would be and/or otherwise demonstrate that BMS knew how to effect precise changes in AWP through changes in its reported WLPs.[162]

Given this record and more, Dr. Hartman has opined that there is a well understood formulaic relationship between AWP and WLP – to the point where they are functional equivalents:  reporting either to the Publishers implies that the other price is set automatically. "AWP and WAC [or WLP] are 'interchangeable' since the two list prices are usually related by a constant ratio and convey the same information to purchasers and other entities that rely on published price data."[163]  Accordingly, the Court has already found that "[t]he AWP, or its formulaic equivalent the WAC (Wholesale Acquisition Cost), is interpreted by [the] industry as the signal for the underlying structure of list and transaction prices for almost all drugs."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (D. Mass. 2005) (quoting Hartman).

---

[161] Trial Tr. Day 4 at 89-90, 93-96 (Kaszuba); Ex. 180 at 000186649 ("Obtain AWP's from the Data Services (First DataBank and Red Book)  Approximate turn around time is 2-3 days.  Review AWP's for reasonability, ie 20%-25% higher than new wholesale price….")); Ex. 849 (example of a *Red Book* product listing verification of BMS prices with BMS's approval indicated by Barbara Goetz's signature).  If the AWP was different than that expected by BMS, BMS would contact the Publisher.  Trial Tr. Day 4 at 90-91, 97 (Kaszuba).  BMS also conducted a reasonability review of AWPs appearing on software programs that BMS licensed from *First DataBank* and *MediSpan*.  Trial Tr. Day 4 at 99-100 (Kaszuba).

[162] *See, e.g.*, Exs. 209-211 (showing "Anticipated AWP" based on 25% mark up factor); Ex. 187 (PowerPoint recognizing that a 25% markup to WLP is applied and that, consequently, a 7% price increase on Plavix translates into an 11% AWP increase and a 13% MCO increase based on a typical reimbursement formula of AWP – 13%)); Ex. 189 (PowerPoint titled "Sources of Price Data and their relationship to BMS pricing activities" (April 2002) further confirms that BMS knows how AWPs are set based on BMS's WLPs).

[163] Hartman Direct, ¶ 44.

As this evidence reveals, BMS well understood the interchangeability between WLP and AWP. Although try as it may to be the veritable ostrich with its head in the sand, BMS's act of reporting WLPs resulted directly and predictably in the creation of AWPs.

But BMS did more. It actually published AWPs for its Subject Drugs. They were published internally to marketing managers and analysts and the oncology sales force.[164] And BMS published AWPs to the marketplace through the OTN on-line service[165] and distribution of OTN's *Network News*.[166]

### 2. Assessing BMS's conduct in the complete factual setting, as required, highlights the unfair and deceptive nature of that conduct

BMS was well aware that Medicare based reimbursements on AWP and that most private insurance reimbursement schemes relied upon AWP as well.[167] When Subject Drugs faced competition (that is, were not the sole source), BMS was aware that physicians acquired the drugs at substantial discounts that were not reflected in the WLP and that were kept confidential by the very terms of the contracts in which the discounts were embedded.[168]

Nonetheless, BMS did not take any action to correct the AWPs that it and others were publishing for BMS Subject Drugs. Tellingly, prior to directing the Publishers to use a 25% mark-up factor on BMS oncology drugs, Kaszuba and her department conducted *no* research to determine that wholesalers in fact were marking up BMS oncology drugs by 25%.[169]

---

[164] Trial Tr. Day 4 at 99-105 (Kaszuba); Ex. 190; Ex. 191.

[165] Ex. 193.

[166] Ex. 192 (various issues from 1994-2000); *see also* Akscin Trial Aff., ¶ 18.

[167] Answer, ¶ 3 (Dkt. No. 800); *see also* Ex. 196 (BMS/AWP/01088191-202) (recognizing that Managed Health Care companies and Medicare reimbursed based on AWP); Trial Tr. Day 5 at 142 (Marré); Marré Trial Aff., ¶ 10; Trial Tr. Day 4 at 62-64 (Kaszuba); Akscin Dep. at 26-27; Ihling Dep. at 90-93, 117-18.

[168] Trial Tr. Day 5 at 131, 145 (Marré); *see also* Trial Tr. Day 14 at 23 (Pasqualone testifying that standard confidentiality clause appears in all BMS contracts because discounts constitute "confidential and competitive information.").

[169] Trial. Tr. Day 4 at 65 (Kaszuba).

Furthermore, BMS never provided any specific information to the Publishers about the level of discounts offered on BMS oncology products.[170]  Instead, BMS was content to let Medicare and private insurers rely on its false AWPs, even though BMS viewed AWP as an "artificially inflated number"[171] that "can confuse the understanding of pricing within the US pharmaceutical system."[172]  Indeed, BMS recognized that it "need[ed]to be wary of using AWPs ***because the name is misleading***,"[173] yet BMS itself continued to publish AWPs.  Moreover, Frank Pasqualone, Senior Vice President of BMS Oncology, testified that BMS Oncology sales and marketing operations never considered the impact of AWPs on Medicare beneficiaries, notwithstanding BMS's knowledge that 20 percent co-pays were based on AWP.[174]  He also had no qualms about causing fictitious AWPs to be published for BMS Subject Drugs.[175]

BMS was not required to volunteer its WLPs to pricing compendia.  Nor was it required to direct those compendia to apply a 25% mark-up factor to WLP to get the AWP.  But once BMS chose to do so – knowing fully that those AWPs were "artificially inflated," that payors would be reimbursing at those inflated prices and that AWP can confuse the understanding of pricing within the US pharmaceutical system – BMS became obligated to ensure that its representations were accurate.  *See* Section I.A.3 *supra*, discussing applicable case law. Furthermore, as the First Circuit explained in *St.-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.*, 246 F.3d 64, 73 (1st Cir 2001), the methods, acts, and practices deployed by a defendant must be assessed "'in their factual setting,'" *id.* (citations omitted), not in terms of some cynical parsing

---

[170] Trial Tr. Day 4 at 130-31 (Kaszuba).

[171] Ex. 195.

[172] Ex. 196.

[173] Ex. 196 (emphasis added).

[174] Trial Tr. Day 14 at 14 (Pasqualone).

[175] Trial Tr. Day 14 at 34-36 (Pasqualone).

of the overall scheme.  *See also id.* (in interpreting ch. 93A "'[w]e focus on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. 93A fairness determination'") (citations omitted).

In light of these authorities, BMS's claims that it had nothing to do with AWPs and should therefore not be liable for them are unavailing.  BMS did not need to control the operations of the Publishers in a corporate or legal sense in order to benefit from using the AWPs that the Publishers disseminated, because it knew as surely as night follows day that the Publishers voluntarily would and did publish whatever AWPs that BMS wanted for their products.  Moreover, BMS *itself* published AWPs, thereby making affirmative misrepresentations itself.

BMS contends that it cannot be held liable for simply reporting list prices at which some sales were made, but this frames the issue too narrowly and at the expense of the larger picture.  The Court must evaluate the totality of BMS's conduct.  While applying the higher standard imposed under RICO, Judge Stearns in *Lupron* rejected a defense strategy nearly identical to that pressed by BMS here and distinguished several of the cases that BMS has cited to this Court:

> A good argument can go wrong when its fundamental premise is flawed.  It is true, as defendants contend, that no federal case or statute imposes a duty on a manufacturer to disclose to retail consumers the prices that it charges intermediate suppliers for its products, nor with a possible antitrust exception, is a seller required to charge the same price for a product to every consumer in every market.  This is true even where the seller derives a presumed benefit from the consumer's ignorance of what it actually paid for the products it sells.  *See Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d. 198, 212-214 (D. Mass. 2002) (Saris, J.), *aff'd*, 316 F.3d 290 (1st Cir. 2003). . . .  But this is not a case of nondisclosure.  Defendants did not stand mute. … [D]efendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud.  Whether one views the defendants' actions as involving the dissemination of information that was wholly false, or false

because of an incomplete depiction of the truth, they are actionable
under the mail and wire fraud statutes. . . .  This is not a case of a
retailer failing to disclose the discounted prices that it offered to
favored customers (*Langford*),[176] or a manufacturer the price
differentials on its sales of the same product in different markets
(*Bonilla*),[177] or a health plan the discounts it received on
prescription drugs (*Alves*).[178]  Rather, this is a case of affirmative
misrepresentation.  And because the alleged misrepresentations
were knowing, deliberate, and made in furtherance of a scheme to
defraud, they are sufficient to support the predicate acts of mail
and wire fraud.

295 F. Supp. 2d at 167-68 (footnote omitted).

Other cases that BMS has invoked fare no better than those distinguished by Judge

Stearns in *Lupron*.  BMS has cited *L.B. Corp. v. Schweitzer-Manduit Int'l, Inc.*, 121 F. Supp. 2d

147 (D. Mass. 2000), but that case actually supports Plaintiffs, because the court plainly held that

"[u]nlike common law fraud and misrepresentation, Chapter 93A imposes liability for material

nondisclosure in transactions."  121 F. Supp. 2d at 154 (citation omitted).  *Whitehall Co. v.*

*Barletta*, 404 Mass. 497, 536 N.E.2d 333 (1989), does not support BMS, where the court merely

commented on the evidence adduced below, which was equivocal enough as to contractual

requirements bearing on the duty to disclose the discount at issue that the appellate court would

not second-guess the trial judge.  536 N.E. 2d at 337.  Moreover, the fact that list prices here

admittedly did not reflect the reality of discounts is only a part of BMS's scheme.  And *Katzman*

---

[176] *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308 (11th Cir. 2000).  BMS has invoked *Langford*, but its
reliance thereon is risky given that the court in that decision went out of its way to limit its holding to the specific
circumstances before it, finding that the uninsured consumer plaintiffs were perfectly able to shop for lower prices
and that, had those consumers been "somehow less able to shop around and identify attractive drug prices than were
other consumers, the situation may have demanded that Rite Aid make certain disclosures to them."  231 F.3d at
1314.  That very concern operates in the instant case where the plaintiff consumers had **no** shopping choices
whatsoever because their physicians chose the medication to be administered in the provider's office, and either
Medicare Part B or the consumer's insurance plan required the consumer to make a 20% co-payment.  There simply
was no opportunity to "shop around," even if an elderly chemotherapy patient had wanted to.

[177] *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998).  Like the *Lupron* defendants, BMS has also errantly
relied on *Bonilla* in prior briefing submitted to the Court.

[178] Judge Stearns could have also distinguished *Alves* on the basis that this Court in *Alves* was balancing the
policy factors employed to determine whether a plan sponsor breached its fiduciary duty under ERISA.  Such an
inquiry under ERISA is not relevant here.

*v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997), has no bearing here, because the court merely held that Plaintiffs failed to identify any duty requiring Defendants to sell their goods to all buyers at the same prices.

### 3.      BMS overplays its list price defense

BMS exaggerates the "truthfulness" of its list prices (BMS Mem. in Supp. of Mtn. for Judgment at 3) and, in the process, underscores its pricing manipulation.

Once a BMS oncology drug is subject to competition – whether from another branded product or generic entrants – BMS offered confidential discounts,[179] with the effect that "average contract prices and floor prices for BMS drugs in the multi-source portfolio tended to trend down over the long term."[180]  The data reveal that those prices dropped sharply, while WLPs and AWPs did not decrease – at all.  In fact, there is no dispute that after BMS Subject Drugs faced therapeutic and/or generic competition, the actual prices at which physicians acquired those drugs decreased substantially and that, after several years of generic competition, BMS did not make substantial sales at or near the WLPs that BMS continued to report for the Subject Drugs. For a drug-by-drug analysis, please see Plaintiffs' Post-Trial Proposed Findings of Fact at ¶¶ 137-146.

Even Dr. Hartman and Dr. Bell agree on this point.  Furthermore, Bell's concession that the vast majority of BMS's revenues were generated at prices within 5% of WLP during the Class Period *reinforces that, as Dr. Hartman has testified, where there was a marketplace expectation, that expectation was of a 30%-or-less spread between AWP and actual price*. Gross deviations from the marketplace expectation and signal associated with BMS's AWPs are actionable.  BMS admits to creating that "marketplace expectation" by way of what it says are its

---

[179] Pasqualone Trial Aff., ¶ 17; Trial Tr. Day 5 at 129 (Marré).

[180] Marré Trial Aff., ¶ 9.

customary WLPs.  It is another thing entirely for BMS to deviate grossly from the established course of dealing by unilaterally effecting spreads for some products at certain times that are many multiples of what had come to be expected, all without any sort of disclosure to payors, and patients.  Accordingly, the deception occurred in the maintenance of AWP within certain relatively narrow bands even while BMS decreased actual prices, thus increasing the amount that its customers would be reimbursed or otherwise paid for the products they dispensed to patients, all to the detriment of Plaintiffs and the Classes.

Taxol is a plenary example.  Taxol was the oncology drug leader in 2000 with $805 million in sales.[181]  It lost exclusivity in 2000 when a competing brand entered the market, followed by generic competition in 2001.[182]  As a result, by 2003, BMS lost almost 50% of its market share of Taxol.[183]  The WLP for Taxol remained constant over time, and then, after loss of exclusivity, contract prices rapidly decreased.[184]  Spreads on some NDCs of Taxol were a stable 25%-27% until 2002 when they jumped to over 500%.[185]  The Taxol unit-weighted average spread percentage across all NDCs jumped nearly 100% between 2001 and 2002.[186]  By the fourth quarter of 2002, BMS was routinely providing very large discounts on Taxol to high volume customers, some as high as 80% off of WLP,[187] and even Bell confirms that virtually no

---

[181] Ex. 215 at 000071259-60.

[182] Marré Trial Aff., ¶ 5; Hartman Direct, ¶ 48.

[183] Ex. 215 at 000071270.

[184] Hartman Direct, ¶¶ 48-49; Trial Tr. Day 5 at 134-35 (Marré).

[185] Hartman Direct, Attach. G.2.c.

[186] Hartman Direct, Attach. H.2.

[187] Ex. 203 at 000056988); *see also* Ex. 204 at 000096293 (Consorta pricing at 82% off of WLP); Ex. 205 (Owen pricing at 75% off of WLP); Ex. 206 at 00979756 (Premier pricing at 75% off of WLP).

sales were made at WLP.[188]  Indeed, only one-half a percent of sales were made within 5% of the WLP in 2002.[189]

Because BMS kept WLPs constant even as average actual sales prices dropped dramatically, Class members continued to reimburse for BMS Subject Drugs at artificially high prices.  The impact is particularly significant vis-à-vis an expensive drug like Taxol.  For instance, BMS sales representative Doug Soule confirmed that the AWP-based Medicare co-pay for six cycles of Taxol to treat breast cancer approximates $1,000.[190]

Reporting of list prices cannot be assessed in isolation.  Whether they were "truthful" or not does not account for a pricing scheme whereby BMS could and did cause insurers and patients to pay deceptively inflated prices.  The deception occurred in the larger scheme, of which list prices were only one part.  BMS used list prices to set up AWPs, but it did not use list prices to cause the reporting of lower AWPs when it offered mega price cuts on its products, which widened the spreads well beyond what the market had come to expect – even though BMS could have reported an accurate AWP in addition to its WLP.  The reason:  it would have lowered BMS revenues.[191]  Had BMS done so, AWP-based reimbursements would have been dramatically lower.[192]  Indeed, as Dr. Rosenthal demonstrated, Medicare reimbursement for Taxol decreased by over $1,300 in 2005 after BMS began reporting purportedly accurate ASP data to CMS.[193]

---

[188] Ex. 2524 (Bell).

[189] Ex. 2524 (Bell).

[190] Trial Tr. Day 16 at 72-73 (Soule).

[191] Trial Tr. Day 5 at 165 (Marré); Trial Tr. Day 15 at 38 (Bell).

[192] Trial Tr. Day 14 at 33-34 (Pasqualone).

[193] Ex. 4070; Trial Tr. Day 13 at 15 (Rosenthal).

Finally, BMS claims that it could not have engaged in unfair or deceptive conduct because it was "common knowledge that the industry publications mark-up BMS's list prices to establish AWPs."  BMS Mem. in Supp. of Mtn. for Judgment at 3.  But there is no evidence in the record establishing any common knowledge of the mega spreads on BMS Subject Drugs. Indeed, BMS worked to keep those spreads confidential,[194] and BMS never provided any specific information to the Publishers about the level of discounts offered on BMS oncology products.[195]  BMS will argue that, beginning in 1999 it began advising publications generally that its list prices did not include discounts.  That BMS began including this very general statement in its communications with publications is an admission that notice to the marketplace of its pricing practices, given the use of the AWP-based reimbursement system for its products, was appropriate and necessary.  ***But the "notice" it gave was inadequate***.  To say simply, as BMS did, that "[c]ertain multisource products are always sold at lower special offer prices" is a gross understatement when BMS often caused spreads to zoom from below 30% to hundreds of percent in the face of competition.  More importantly, BMS did nothing more when, as it might have expected, the Publishers did not change the way in which they were arriving at AWPs based on BMS-supplied numbers.  BMS failed to notify payors who, if they could expect any sort of spread, would have expected spreads of 30% and below.  And BMS took no action to correct AWPs when it recognized internally that they were "artificially inflated" and "can confuse the understanding of pricing."

---

[194] Trial Tr. Day 5 at 131, 145 (Marré); *see also* Trial Tr. Day 14 at 23 (Pasqualone testifying that standard confidentiality clause appears in all BMS contracts because discounts constitute "confidential and competitive information.").

[195] Trial Tr. Day 4 at 130-31 (Kaszuba).

**B.      The Court Should Reject BMS's Other Defenses**

BMS has also raised statute of limitations and damages defenses that are common to all Defendants.  Plaintiffs rebut these defenses above and will not repeat those arguments here.

## IV.      LEGAL ISSUES SPECIFIC TO J&J

Plaintiffs hereby respond to Defendant Johnson & Johnson's Motion for Judgment on Partial Findings.  J&J's Motion is based almost entirely on the argument that since the spreads for Remicade and Procrit, as calculated by Dr. Hartman, do not exceed 30% there can be no liability.  Plaintiffs acknowledge that the spreads for Procrit do not exceed 30% for Class 3, and have therefore withdrawn claims for damages from Procrit in Class 3.  However there is substantial evidence upon which the Court can find liability and damages for Remicade in both Classes 2 and 3, and liability and damages for Procrit in Class 2.

**A.      There are Several Theories of Liability for Class 2**

Contrary to J&J's claims, both the Plaintiffs and the Court itself have put forth several alternative theories which could be used to find liability against J&J for purchases of Remicade and Procrit by the Medigap insurers of Class 2.

This Court interpreted the Medicare statute and its history and concluded that the phrase "Average Wholesale Price" should be construed under its plain meaning, inclusive of discounts and rebates.  *In Re Pharmaceutical Industry Average Wholesale Price Litig.*, 2006 WL 3102998, at *22-23 (D. Mass. Nov. 2, 2006).  After this ruling Plaintiffs argued that the Defendants, including J&J, are *per se* liable under the Mass. Consumer Protection Laws, Mass. Gen. Laws 93A, for stating AWPs far above their actual average wholesale prices.  *See* Plaintiffs' November 27, 2006 Memorandum Regarding Defendants' *Per Se* Unfair or Deceptive Acts or Practices, which details three separate theories of *per se* liability under Ch.93A, including violations of various Massachusetts regulations and violations of the federal Medicare Act.

- 86 -

There is no dispute that that the AWP prices set by J&J for its products were not in fact an average of the wholesale prices for those products, including discounts.[196]  Indeed, Centocor's John Hoffman testified that the list or WAC price of Remicade (which was always 30% below AWP) was the price at which wholesalers typically sold Remicade.  Centocor also provided additional price reductions to wholesalers in a form of prompt paid discounts and service fees.  The same was true for Procrit:  all sales were made at prices substantially below AWP, and the AWP prices for Procrit never represented the average wholesale cost of that drug.[197]

Since both Remicade and Procrit were sold at prices far below the published AWP, this Court can find liability against J&J for both drugs under the *per se* liability theories advanced by Plaintiffs.

Alternatively, the Plaintiffs have introduced damage calculations for Class 2 based on liability thresholds of 10, 20 and 25% above ASP.[198]  This was done in response to the Court's several statements during trial that it was looking for a middle ground approach to damages between a *per se* theory (where damages begin as soon as the AWP exceeds ASP) and Dr. Hartman's Market Expectation theory (where damages begin when AWP exceeds ASP by more than 30%).

The spreads for Procrit routinely exceeded 25%, and the spreads for Remicade hovered around 30%.  In addition, there is substantial evidence that J&J marketed the spread on both drugs and that J&J undertook to conceal the true nature of it spreads.[199]  There is substantial evidence upon which the Court can base liability against J&J for Class 2.

---

[196] PFOF, C.3.

[197] *See* PFOF, C.3.

[198] Ex. 4008; Trial Tr. Day 17 at 67-68 (Hartman).

[199] *See* PFOF, ¶ C.2, C.3.

The Court could also determine liability for the Subject Drugs by comparing the total amount of the payment, including administration fees, for each drug before and after the Medicare Modernization Act ("MMA") in 2003.  This approach was suggested by the Court itself in questioning Centocor's John Hoffman.  The Court recognized that the Medicare program was saving $87 per Remicade infusion after implementation of the MMA, after calculating both the lower payments for the drug and the higher payments for administration expenses.[200]  Damages could be calculated for both Remicade and Procrit based on the overall savings achieved by Medicare under the MMA, which is after the fraud was revealed, *i.e.*, ASP times 1.06.[201]

And, the evidence is clear that to market Remicade, J&J caused the WAC to AWP ratio for Remicade to exceed the norm of 20% to 25% and raised that ratio to 30%.  25% should be the speed limit for Remicade under Class 3.  Dr. Hartman has calculated damages based on this approach.[202]

The Court has before it several viable alternative bases on which to find liability and damages for both J&J drugs.  Therefore J&J's Motion for Judgment must be denied.

**B.      J&J has Liability to Class 3 for Remicade**

J&J seeks to avoid liability for Remicade in Class 3 by arguing that the spreads on Remicade were never above the 30% required to establish liability under Dr. Hartman's Market Expectations theory.  In fact, Dr. Hartman's analysis finds Class 3 liability for Remicade in two years, 1999 and 2001, and finds spreads very close to 30% in the remaining years.[203]

---

[200] Trial Tr. Day 5 at 109-11 (Hoffman).

[201] *See* PFOF, ¶ 256 and Ex. 4010, p.2 using this approach.

[202] *See* PFOF, ¶ 265.

[203] Given the fact that no Remicade was ever sold above WAC, and the fact that the WAC to AWP spread for Remicade was always 30%, it is  illogical to conclude that the ASP to WAC spread was ever below 30%, as J&J

J&J's challenges to Dr. Hartman's calculations come through its "expert" Jayson Dukes. However, on cross examination Mr. Dukes admitted all of the calculations he used to reduce Dr. Hartman's spreads (which he misleadingly calls "Assumptions") were done solely at the instruction of counsel. He didn't undertake any independent analysis to determine if such manipulations were appropriate.[204] Dukes further admitted that he never looked at Centocor's internal ASP calculations, and that the spread for (Remicade would be over 38% if he used the 2005 MMA ASP figure).[205] Finally, Dukes admitted that if the various discounts and service fees paid by Centocor were not excluded, the spreads on Remicade would be in excess of 30%.[206] Again these fees were removed at the direction of counsel.[207] Mr. Dukes' self-serving reductions to ASP cannot form the basis for a judgment in favor of J&J.

Even accepting Dr. Hartman's spread calculations for Remicade as supplied in his November 1, 2006 Direct Testimony and Report, this Court could find liability against Remicade by applying Dr. Hartman's Market Expectation theory but using a different, less conservative, ASP calculation than the one Dr. Hartman selected.

Dr. Hartman's analysis looks at the spread between average sales price (ASP) and AWP. Dr. Hartman testified repeatedly that his calculation of ASP was very conservative, much more so than the calculation of ASP required by the MMA. Dr. Hartman excluded several categories of sales and discounts which the MAA includes.[208] If the ASP for Remicade is recalculated

---

suggests. This is especially true in light of the fact that Centocor did offer discounts on Remicade, the effect of which is to reduce the ASP price below WAC. *See* Trial Tr. Day 5 at 59-61 (Hoffman).

[204] Trial Tr. Day 17 at 118-19 (Dukes) (relied on company to identify data errors) and 124 (relied on company instructions to take out $0 sales)

[205] *Id.* at 114, 111-12.

[206] *Id.* at 124-25.

[207] *Id.* at 119-20.

[208] *See* PFOF, ¶ 269.

using a less conservative methodology, than the spreads for Remicade will be in excess of the 30% liability threshold.  This is also obvious from a review of the Remicade spreads calculated by Dr. Hartman.  In those years where the Remicade spread does not exceed 30, it is very close to 30%:  29.8% spread in 1998, 29.9% in 2002 and 30.0% spread in 2003.[209]  Indeed, Plaintiffs have provided the Court with additional calculations of damages from Dr. Hartman which use the MMA ASP for the ASP calculation.[210]  As Dr. Hartman explained, the MMA ASPs for 2005 are still significantly below his ASPs for prior years.  Given that prices are generally rising, Dr. Hartman concludes that a calculation of the MMA ASP for these earlier years would generate even lower ASPs (and thus greater spreads), so his use of the 2005 MMA ASPs is conservative.[211]  The result of using the MMA ASPs is that spreads and damages would have increased.[212]

Given the substantial evidence that Centocor intentionally set the AWP at a level designed to ensure a hefty profit to physicians, this Court would have a very strong basis to modify the ASP and spread calculations for Remicade to establish liability.[213]

First, unlike every other drug discussed in the litigation (and apparently unlike virtually all other drugs), J&J caused the AWP-to-WAC ratio for Remicade to depart starkly from the usual and expected 1.20 or 1.25 multipliers.  As to Remicade, J&J caused the AWP-to-WAC markup to be 1.30, *i.e.*, 5 percentage points higher than what is normally expected in the market place for single-source, branded products.

---

[209] Hartman Direct, Attach. G.3.c.

[210] Ex. 4011.

[211] Trial Tr. Day 14 at 72-74 (Hartman).

[212] *Id.*

[213]  A recalculation of the Remicade spreads using the MMA ASP data is yet another alternative method to establish liability for Remicade in Class 2, assuming the Court chose to proceed with a 30% liability threshold.

Alternatively, Dr. Hartman also provided a "5% margin analysis", *i.e.*, an analysis under which the artificial WAC-to-AWP markup of .30 exceeded the highest insurer markup for retail branded drugs of .25.[214]  In the total national 5% margin analysis damages total $191,593,208; prorated as to Massachusetts (*i.e.*, 2.6433% of the national figure) and using the 5% approach for damages as to J&J's Remicade and for the Class Period 1999-2003, the Massachusetts-only damages, without interest, for Remicade total $506,438.

Though the spreads of 25% to 30% might seem small compared to other spreads, each of these drugs is expensive, thus small changes in spread result in significant revenues to doctors. Doctors earned $853,392,342 on Procrit and $669,146,331 on Remicade during the Class Period.[215]

Thus there is ample basis for this Court to conclude that J&J's conduct, including its spreads on Remicade, were fraudulent in Class 3.

## C.    J&J's Claims of Lack of Causation are Misleading and Misplaced

J&J's argument that all Class 3 claims should be denied for lack of causation rests solely on the testimony of one of the two representative Plaintiffs for Class 3, BCBS-MA.  J&J offers no evidence to challenge causation as to the other representative Plaintiff, Pipefitters, or to challenge causation as to any other member of the Class.  As detailed herein, BCBS-MA's testimony, when viewed in full, strongly supports causation, as does the testimony of the other Plaintiffs.

Finally, J&J's causation arguments apply only to the Class 3 claims.  J&J does not, and could not, argue that the Medigap insurers of Class 2 have failed to establish causation, given

---

[214] Hartman Rebuttal, Attach. G; Ex. 4066.

[215] Ex. 4009.

that such insurers were required by statute to reimburse doctors and pharmacies at prices based on AWP.

### V.      LEGAL ISSUES SPECIFIC TO SCHERING-PLOUGH/WARRICK

Schering has not filed a motion for a directed verdict.  It has argued however that Plaintiffs' purchases cannot be tied to Schering drugs, but this does not absolve Schering of liability for its unlawful schemes.

BCBS-MA, reimbursed on the basis of AWP for Intron, a single source drug manufactured by Schering Plough and thus the reimbursements were also the actual product manufactured by Schering itself.  It also reimbursed for albuterol on the basis of J-codes associated with Schering/Warrick albuterol products.  BCBS-MA also reimbursed for Temador under a Medigap policy, therefore also based on AWP.[216]

Sheet Metals, too, reimbursed for albuterol products based upon the J-code J7619, a J-code also associated with Schering/Warrick products.  Similarly, Pipefitters reimbursed for albuterol based upon J-codes J7618, J7819 and J7625, all J-codes associated with Schering/Warrick products.  *Id.*

There is, then, no question that the reimbursements of BCBS-MA for Intron establish not only that BCBS-MA reimbursed for Intron on the basis of AWP, but also that the products that were being dispensed as a result of those reimbursements were manufactured and distributed by Schering.  BCBS-MA has standing.

At trial, Defendants argued that Class members, such as Sheet Metals and Pipefitter that could "only" establish that they reimbursed on the basis of a J-code (but could not otherwise identify the actual product that was being dispensed as a result of that reimbursement) lacked

---

[216] Ex. 4012, pp. 1-4.

standing.  While it is true that within the Medicare system and private payor payments, multi-source drugs are reimbursed on the basis of J-codes which can include multiple manufacturers' products.  As a result, it is usually the case that while a TPP can establish from the claims data alone that it reimbursed on the basis of AWP for a product the J-code for which may had been influenced by the wrongful conduct of a Defendant, that claims data alone cannot establish that the product being dispensed and reimbursed was actually a product manufactured by a particular manufacturer.

However, Defendants have been sued in this case by reason of their conduct, not their products.  The trial involved the ***conduct*** of Defendants in inflating the AWP for certain of their products.  Thus, the question at trial was whether the lawful inflation of the AWP was the cause-in fact of inflated reimbursements incurred by Plaintiffs, and whether those inflated reimbursements were reasonably foreseeable.

As noted above, credible evidence was adduced, and this Court finds, that when a generic manufacturer posts an unlawfully inflated AWP, that generic company has affected the median AWP for all purchases of that J-code product, not just the purchases of the generic company's product.  Thus, because Plaintiffs have established that Schering/Warrick unlawfully inflated the AWP for albuterol, that inflation was a substantial contributing factor for the J-code reimbursement level that was used for Medicare Part B and other payor reimbursements.  Schering/Warrick established the basic benchmark upon which all albuterol J-code reimbursements would be based.  It first established the AWP for the branded Proventil and, after generic entry, then refused to, and did not, reduce the posted AWP for the branded Proventil (knowing that all generic manufacturers, including Warrick itself, would follow that inflated AWP).  Furthermore, Warrick's entering the market with an inflated AWP for the

- 93 -

generic albuterol (albeit at a price point only modestly below Proventil, *i.e.*, about 15% lower)
demonstrated the historic fact consistent with the testimony of Dr. Hartman and Professor
Rosenthal, *i.e.*, that generic manufacturers will engage in a "Nash equilibrium" clustering their
AWPs near the median.

Put simply, as a result of the conduct (not products) of Schering/Warrick in setting the
benchmarks for essentially all J-code reimbursements of albuterol during the 1990s and early
2000s, all payments made under the J-code system were unlawfully higher than they would have
been for all payers of albuterol in the marketplace regardless of the product which was being
dispensed at any one particular time.  Any person or entity that purchased any albuterol product
using that J-code purchased a product the price for which was based upon the wrongdoing of
Schering/Warrick.

## VI.    CONCLUSION

Plaintiffs respectfully request that judgment be entered for Plaintiffs against all
Defendants.

DATED:  January 19, 2007                    By____/s/ Steve W. Berman_____
                                               Thomas M. Sobol (BBO#471770)
                                               Edward Notargiacomo (BBO#567636)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003
                                            **LIAISON COUNSEL**

                                            Steve W. Berman
                                            Sean R. Matt
                                            Robert F. Lopez
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Donald E. Haviland, Jr.
The Haviland Law Firm
740 S. Third Street, Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

- 95 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **PLAINTIFFS' POST-TRIAL OMNIBUS TRIAL BRIEF** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 19, 2007, a copy to LexisNexis File & Serve for posting and notification to all parties.

By **/s/ Steve W. Berman**
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292