# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE       ) | Civil Action No. 01-12257-PBS |
| LITIGATION                    ) | |
| _____) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO      ) | |
| 01-CV-12257-PBS AND 01-CV-339 ) | |
| _____) | |
| TRIAL OF CLASS 2 & 3 CLAIMS | |

**THE TRACK 1 DEFENDANTS' PROPOSED COMMON FINDINGS OF FACT**

# TABLE OF CONTENTS

I.    It Has Been Well Known Throughout The Class Period That AWP Does Not
      Equal Or Bear A Predictable Relationship To Average Selling Price .................................. 1

      A.    History of AWP:  Overview ................................................................................... 1

      B.    History of AWP:  1960s-80s ................................................................................. 2

      C.    History of AWP: 1990s-2000s ............................................................................. 4

II.   The Implementation and Relevance of ASP Reimbursement in 2003 ................................ 9

III.  Payors' Understanding of AWP Was Consistent With Industry Understanding
      And Payors Were Not Harmed By Published AWPs ........................................................ 11

      A.    Blue Cross Blue Shield of Massachusetts Is Knowledgeable Regarding AWP
            And Typical of Payors ........................................................................................ 11

            (i)    BCBS/MA Employees Had Detailed Knowledge Regarding AWP
                   Throughout The Class Period ............................................................... 12

            (ii)   BCBS/MA Had Detailed Knowledge Regarding AWP Through Its Staff
                   Model HMO Medical West ................................................................... 14

            (iii)  BCBS/MA Continues to Reimburse at 95% of AWP .......................... 16

            (iv)   BCBS/MA Is Expanding Its Use Of AWP To New Areas ................. 18

            (v)    BCBS/MA Profits From Higher Drug Costs And Makes Strategic
                   Elections Around Premium Increases .................................................. 19

            (vi)   BCBS/MA Is Typical Of Other Payors ............................................... 20

      B.    Taft Hartley Funds Are Sophisticated Or Rely On Sophisticated Market Actors .... 22

      C.    Health Care For All Has Abandoned Its Claim ................................................. 24

IV.   Plaintiffs' Liability Theories Are Based on Unreliable Factual Assumptions
      And Economic Methodology ........................................................................................... 24

      A.    Dr. Hartman's Claimed 30% Market Expectation Is Irreconcilable With
            The Factual Record ............................................................................................ 25

            (i)    Dr. Hartman Largely Relies On Comparator Drugs Without Competition ........ 25

            (ii)   Publicly Available Information Contradicts Dr. Hartman's Expectation ........... 27

(iii) Reimbursement Contracts ................................................................................... 28

B.   Defendants' Experts' Testimony ............................................................................... 28

C.   Dr. Rosenthal's Testimony Does Not Compensate For Dr. Hartman's
     Shortcomings ............................................................................................................ 32

D.   Dr. Hartman's Class 3 Damage Analysis ................................................................. 32

E.   Dr. Hartman's "Zero" Spread for Class 2 ................................................................. 33

V.   Plaintiffs Have Failed To Identify Any Individual Class 3 Members ................................ 34

1337210v10

## PROPOSED COMMON FINDINGS OF FACT

I.      **It Has Been Well Known Throughout The Class Period That AWP Does
        Not Equal Or Bear A Predictable Relationship to Average Selling Price**

      A.      <u>History of AWP:  Overview</u>

          1.      There is no dispute in this case that before and throughout the class period:

            a.      Every known brand name prescription drug sold in the United States has had an Average Wholesale Price ("AWP") published by pricing services such as Red Book and First Data Bank.  (11/15/06 Rosenthal Tr. 87:11-19; 11/28/06 Bell Tr. 137:7-23).

            b.      The AWPs for branded drugs have been used as a reimbursement benchmark and are determined by applying a formulaic markup over Wholesale Acquisition Cost ("WAC").  (11/28/06 Bell Tr. 103:19-104:2; 11/15/06 Rosenthal Tr. 71:3-5).

            c.      WAC is the undiscounted list price at which single source brand name drugs are sold to wholesalers.  (Bell Trial Affidavit Submitted On Behalf of Track 1 Defendants ("Bell Trial Aff.") ¶ 19; 11/15/06 Rosenthal Tr. 71:6-17).

            d.      There is a standard 20% or 25% markup between WAC and AWP for branded drugs, which was derived historically from the markups charged by wholesalers and was not set by manufacturers. (11/15/06 Rosenthal Tr. 86:11-21).

            e.      At some point because of consolidation and competition among wholesalers, the 20% or 25% standard markup on brand name drugs no longer reflected actual wholesaler margins, but the standard markup continued to determine the relationship between WAC and AWP in the pricing compendia.  (Bell Trial Aff. ¶ 48; 11/15/06 Rosenthal Tr. 92:24-93:17).

f.      This standard markup between WAC and AWP for branded drugs never changed, and it was commonly known in the marketplace throughout the entire class period that this spread between AWP and WAC existed.  (11/15/06 Rosenthal Tr. 73:20-75:15; 94:3-95:4).

g.      In light of the foregoing, every brand name prescription drug purchased from manufacturers, wholesalers or specialty distributors in the United States has had an actual acquisition cost lower than its published AWP.  (Bell Trial Aff. ¶ 50; 11/15/06 Rosenthal Tr. 75:1-76:6).

B.      History of AWP:  1960s-80s

2.      Numerous publicly available government documents and publications dating back to the late 1960s demonstrate an understanding that AWP did not reflect an average of actual prices.  (11/28/06 Bell Tr. 104:24-105:8).

3.      These documents include the following:

–      **DX 1653:**  A 1969 Department of Health, Education and Welfare ("HEW") report on Medicare, which noted:  ". . . listed wholesale price[s] of a drug product . . . rarely have any realistic relationship with actual acquisition costs." (Id. at 148; 11/28/06 Bell Tr. 105:17-106:2).

–      **DX 1982:**  A 1974 HEW Proposed Rule on reimbursement similarly noted: "Most states use average wholesale price, Red Book, Blue Book data, survey results or similar standard costs.  Such standard prices are frequently in excess of actual acquisition costs to the retail pharmacist."  (Id. at 1; 11/28/06 Bell Tr. 106:8-14).

–      **DX 1037:**  A 1977 HEW Transmittal Letter discussing Medicaid reimbursement stated:  ". . . the Department [HEW] is not convinced that those states which continue to reimburse at average wholesale price (AWP), or wholesale invoice cost, have made a real effort to approach AAC [providers' actual acquisition cost]."  HEW went on to note that "[t]he Department has been issuing Federal Invoice level Price Data to assist states in establishing EAC's [estimated acquisition cost]."  This price data reflected government price discounts and concessions.  (Id. at 1; 11/28/06 Bell Tr. 106:17-107:8).

–      **DX 1039:**  A 1984 Office of the Inspector General ("OIG") report emphasized the same points the HEW had discussed earlier:  ". . . AWP cannot be the best – or

-2-

even an adequate – estimate of the prices providers generally are paying for drugs.  AWP represents a list price and does not reflect several types of discounts, such as prompt payment discounts, total order discounts, end-of-year discounts and any other trade discounts, rebates, or free goods that do not appear on the pharmacists' invoices." (<u>Id.</u> at 22; 11/28/06 Bell Tr. 107:11-108:8).

> –   **DX 1985:**  A HCFA administrative decision in 1989 resulting from Louisiana's attempt to make changes to its Medicaid reimbursement to reimburse at AWP found that "AWP significantly overstates the price that pharmacy providers actually pay for drug products.  Therefore, AWP was not the price generally and currently paid by providers . . . ." (<u>Id.</u> at 20255; 11/28/06 Bell Tr. 108:9-109:4).

> –   **DX 1965:**  A 1989 OIG Report stated:  ". . . AWP is not a reliable price to be used as a basis for making reimbursements for either the Medicaid or Medicare programs." (<u>Id.</u> at 7; 11/28/06 Bell Tr. 109:17-22).

4.   Plaintiffs have contended that this evidence is irrelevant because it largely pertains to self-administered drugs ("SADs") rather than physician-administered drugs ("PADs").  The Court disagrees.

5.   SADs are subject to the same principles of rebating and discounting in the face of competition as PADs – the only difference is who receives the price concession.  (11/28/06 Bell Tr. 85:10-86:10).  With SADs, institutions exercising control over physician prescribing patterns through formularies secure discounts from manufacturers selling competing "single source" (patent protected) and "multi-source" (generally no longer patent protected) drugs.  (<u>Id.</u> at 88:8-89:10).  With PADs, physicians themselves (as well as hospitals and staff model HMOs) exact discounts based on their ability to dictate which competing drug to administer.  (<u>Id.</u> at 87:8-88:7).  Moreover, AWPs exist for both SADs and PADs and the AWP benchmark is used by the same payors to reimburse both types of drugs.  There is no reason why knowledge of AWP acquired in one context is not applicable to the other.  Plaintiffs' own expert, Dr. Hartman, relied on information concerning SADs in forming his expectation yardsticks.  Indeed, according to Dr. Hartman, 33% of the studies he relied upon in forming his expectation yardsticks related to SADs.  (<u>Id.</u> at 85:10-86:10; 102:22-103:18; Hartman Trial Aff. ¶ 77(a)).

C.      History of AWP:  1990s-2000s

6.      Reimbursement under Medicare Part B for PADs has always been based on a "reasonable charge" basis.  Prior to 1992, Medicare's carrier's used the customary or prevailing charge among physicians in a geographic area.  In June 1991, HCFA proposed changing reimbursement to the lower of 85 percent of AWP or estimated acquisition cost ("EAC") as determined by HCFA through surveys.  (DX 1048 at 25800; Bell Trial Aff. ¶¶ 77-79).  HCFA's 85% proposal was not adopted.  (DX 1049 at 59524-25; Bell Trial Aff. ¶ 80).  In November 1991, HCFA adopted reimbursement for PADs under Part B at the lower of AWP or EAC (plus an allowance for other costs), effective January 1, 1992.  (DX 1049 at 59525, 59621; Bell Trial Aff. ¶¶ 81-82).

7.      Although the government adopted AWP as a reimbursement benchmark, it had no illusions regarding its shortcomings.  In 1992, the OIG issued a report echoing earlier reports, but focusing specifically on PADs, stating:  "Our review of invoices revealed that the 13 chemotherapy drugs can be purchased at amounts below AWP.  This fact indicated that AWP is not a reliable indicator of physician cost; indeed, Red Book officials confirmed that AWP is not designed to reflect physicians' costs." (DX 1053 at 5 (emphasis added); 11/28/06 Bell Tr. 109:25-111:21).  OIG listed the discounts off of AWP on numerous PADs, including discounts on Doxorubicin of 56% to 59% [equivalent to "spreads" of 127-144%] and on Vincristine Sulfate of 83% [a "spread" of 488%].  (DX 1053 at App. III).

8.      In 1996, the OIG issued yet another report, which examined three specific options in relation to Medicare reimbursement, including a possible "best price" provision for Medicare.  (DX 1062; 11/28/06 Bell Tr. 113:10-116:8).  The OIG noted "If Medicaid rebate amounts were applied to Medicare utilization data, the Medicare program would have saved $122 million or 14.6 percent of its allowances for these drugs."  (DX 1062 at 7).  The report

-4-

included a table outlining the difference between AWP and available prices, and the rebate savings that could be achieved for each of the 17 drugs studied.  The table includes a number of drugs at issue in this litigation.  (Id.).

9.     On June 10, 1996 Barron's published an article examining AWP.  The Barron's article stated, among other things, that:  "[f]or many drugs, especially the growing number coming off patent and going generic, the drug providers actually pay wholesale prices that are 60%-90% ["spreads" of 150%-900%] below the so-called average wholesale price, or AWP used in reimbursement claims."  (DX 2641 at 15).  The article included a chart showing spreads for a number of the drugs in this litigation.  (Id.; 11/28/06 Bell Tr. 120:14-121:25).

10.     Also in 1996, Ven-a-Care (a pharmacy that served as a qui tam relator) wrote a letter to HCFA noting "profit margins of more than 500% and, in some cases, more than 1000%" and enclosing acquisition cost information for approximately 50 drugs, including many of the drugs at issue in this case.  (DX 1881 at HHC003-0481; 11/21/06 Hartman Tr. 13:12-17:21).

11.     In January 1997, The Washington Post published an article noting that "[physicians] buy at a substantial discount and bill Medicare for a price based on the AWP" and noting that HFCA was proposing to change this and reimburse "doctors only for the amount they pay for the drugs."  The article states that "the cost to Medicare would be far less, and the change could be adopted without new legislation."  (DX 1726 at 2; 11/28/06 Bell Tr. 121:25-126:24)

12.     Throughout this period, Congress knew that published AWPs were not averages of actual prices.  In June 1997, during the run-up to passage of the Balanced Budget Act of 1997 ("BBA"), the Committee on the Budget of the House of Representatives issued a report that stated:

> The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals.  For example, the Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs.

(DX 1071 at 1354; 11/28/06 Bell Tr. 121:7-22).

13.     The BBA was passed in June 1997 (11/28/06 Bell Tr. 139:4-21).  It required HCFA to reimburse physicians at 95% of AWP.  The statute does not include a definition of AWP.

14.     Over defendants' objection, this Court has ruled that Congress expressed its intention in the BBA that HCFA should base reimbursement on an actual average of wholesale prices, inclusive of discounts and rebates.  The Court's ruling means that Congress intended that, on average, providers would receive 5% less than their average acquisition cost. There is no evidence that anyone at the time recognized that this was Congress' intent.  (11/28/06 Bell Tr. 138:5-143:21).  The price reporters did not change the way they reported AWP.  There were no objections or comment by payors, providers or manufacturers concerning what would have amounted to a radical shift in Part B reimbursement.

15.     HCFA did not issue guidelines as to how AWP should be calculated (as it did in 2003 when an ASP benchmark was introduced).[1]  Nor did HCFA recognize that, as this Court has ruled, Congress intended AWP to reflect discounts and actual prices.  A 1999 Medicare Bulletin is instructive on this point:

> Drugs and biologicals not paid on a cost or prospective payment basis are paid at the lower of the billed charge or 95% of the

---

[1]     As Dr. Berndt pointed out, no single company in the industry could independently change the way AWPs were calculated and disseminated by industry publications.  (DX 1275 ¶¶ 24-26).

> average wholesale price (AWP) as reflected in sources such as the
> Red Book, Blue Book, or Medispan.  This payment allowance
> recognizes the average wholesale price is not a true discounted
> price and, therefore, does not reflect the cost to the physician or
> supplier rendering the drug to the Medicare beneficiary.

(DX 1166 at NHIC-BCBSMA 006617; 11/28/06 Bell Tr. 144:17-145:2).

16.     In a December 1997 report released shortly after the BBA was passed,
OIG indicated its belief that the shift to 95% of AWP would not result in reimbursement being
tied to acquisition cost any more than it had in the past:

> [P]ublished AWPs . . . bear little or no resemblance to actual
> wholesale prices that are available to the physician and supplier
> communities that bill for these drugs . . . the 5 percent discount [off
> of AWP] that will soon be implemented is not a large enough
> decrease . . . . [W]e've identified [spreads of] 11 to 900 percent . . . .

(DX 1075 at ii-iii; 11/28/06 Bell Tr. 143:22-144:16).  HCFA agreed with OIG's findings, noting
Congress' refusal in the BBA to move to reimbursement based on acquisition costs.  (DX 1075 at
D-2).

17.     Contemporaneous with the OIG report in December 1997, President
Clinton referred to AWP in a nationwide radio address.  His remarks reveal his belief that AWP
was a "sticker price" that did not include discounts:  "Sometimes the waste and abuses aren't
even illegal, they're just embedded in the practices of the system. . . . [T]hese overpayments
occur because Medicare reimburses doctors according to the published average wholesale price,
the so-called sticker price, for drugs."  (DX 1074 at 2033-34).

18.     These references are only part of a larger body of AWP-related reports,
studies and comments publicly available prior to 1998.  Defendants' expert Dr. Bell specifically
analyzed publicly available information about the difference between acquisition cost and AWP
for physician-administered drugs.  He found 274 observations in the studies published prior to
1998 comparing drugs' acquisition costs to their AWPs.  For single source PADs, some 25% of

-7-

the observations showed "spreads" in excess of 30.6%, <u>i.e.</u>, above Dr. Hartman's speed limit.

Not surprisingly, the drugs with spreads greater than 30% were those facing therapeutic

competition.  Dr. Bell did a similar analysis for muti-source PADs.  He found published reports

of spreads ranging from 27% (10th percentile) to 488% (90th percentile).  (Bell Trial Aff. ¶ 42,

App. E; 11/28/06 Bell Tr. 123:6-128:23).

19.     In 1999, Donna E. Shalala, the Secretary of the Department of Health and

Human Services, discussed AWP in a Report to Congress on the 1997 BBA (DX 1080; 11/28/06

Bell Tr. 145:5-146:19):

– "For the past 13 years, the Office of Inspector General (OIG) has issued a series of reports that consistently show a finding that the Medicare program overpays for the drugs and biologicals it covers.  This is because most drugs can be obtained at a much lower cost than the AWP.  To address this problem, the President's 1997 budget contained a legislative proposal that would have based payment on the lower of the billed charge or the actual acquisition cost (AAC) for the drug of the physician or supplier billing Medicare.  However, as discussed above, in the BBA, Congress rejected this proposal in favor of the current rule, which is to pay based on the lower of the billed charge, or 95 percent of AWP." (DX 1080 at HHC901-0802-HHC901-0803).

– "The AWP is not a well-defined concept nor is it regulated in any way…. AWP is used as a standard benchmark, with negotiated prices often expressed in terms of AWP minus a certain percentage." (<u>Id.</u> at HHC901-0803).

– ". . . the AWP bears no consistent or predictable relationship to the prices actually paid by physicians and suppliers to drug wholesalers in the marketplace." (<u>Id.</u> at HHC901-0809).

20.     HCFA attempted in 2000 to administratively change reimbursement from

an AWP basis to cost-based prices calculated by the DOJ.  That attempt was rebuffed by

Congress.  (DX 1083; 11/28/06 Bell Tr. 146:22-147:3).  Relevant communications included:

– **DX 1085:**  A July 2000 Letter from 37 Members of Congress to Secretary Shalala stated:  "The Health Care Financing Administration's decision to undertake this change with no corresponding correction of the Medicare program's severe underpayment of the expenses associated with administering those therapies is unsound." (<u>Id.</u> at 1; 11/28/06 Bell Tr. 147:6-19).

–       **DX 1086**:  A July 2000 letter from 91 Senators stated that:  "These data [the proposed new reimbursement prices] do not take into account the fact that oncologists are chronically underpaid for their drug administration services in treating cancer patients – a fact that is widely recognized, including in your letter announcing the plan to reduce reimbursement."  (Id. at AS00359; 11/28/06; Bell Tr. 147:20-148:7).

–       **DX 1090**:  A September 2000 letter from HCFA to Congress that acknowledged the cross-subsidization points and left the AWP based system in place.  (Id.; Bell Tr. 148:10-19).

21.     While Congress had included the phrase "AWP" in the 1997 BBA, it was widely recognized that it had not been defined.  For example:

–       **DX 1099**:  At a 2001 Congressional hearing, William J. Scanlon, Director, Health Care Issues, United States General Accounting Office, stated:  "The term AWP is not defined in law or regulation, so the manufacturer is free to set an AWP at any level, regardless of the actual price paid by purchasers."  (Id. at 34).

–       **DX 1105**:  A 2002 Statement of Leslie G. Aronovitz, Director, Health Care – Program Administration and Integrity Issues for the GAO made a similar point:  "The reality is, however, that AWP is neither an average nor a price that wholesalers charge.  Because the term AWP is not defined in law or regulation, there are no requirements or conventions that AWP reflect the price of any actual sale of drugs by a manufacturer."  (Id. at 7; 11/28/06 Bell Tr. 148:25-149:4).

## II.       The Implementation and Relevance of ASP Reimbursement in 2003

22.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") was passed by Congress with an effective date of December 8, 2003.  The MMA provided for a shift in the general Medicare Part B drug reimbursement methodology from 95% of AWP to 85% of AWP in 2004 and then to 106% of ASP in 2005.  (42 U.S.C.A. § 1395w-3a et seq.).

23.     Plaintiffs' expert Meredith Rosenthal conceded that in order for an ASP-based system to operate properly, it is important that manufacturers report their ASPs in a consistent manner from company to company.  (11/27/06 Rosenthal Tr. 20:1-23).

24.     On April 6, 2004 CMS issued a detailed interim final rule on how manufacturers should calculate ASP data on Medicare Part B drugs.  CMS sought comments on

-9-

the proposed rule.  (69 Fed. Reg. 17935, 17936 (Apr. 6, 2004)).  On September 16, 2004 CMS

issued the final rule, which significantly revised the proposed methodology.  CMS noted:  "We

received 79 timely comments in response to the April 6, 2004 interim final rule . . . ."  (69 Fed.

Reg. 55763, 55764 (Sept. 16, 2004)).

        25.     ASP calculations have continued to be a focus of discussions and debate.

(70 Fed. Reg. 70116 (Nov. 21, 2005)).  Plaintiffs' expert Dr. Rosenthal acknowledged that

determining an appropriate ASP calculation methodology has required the resolution of many

issues, that despite the passage of three years those issues have not yet been fully resolved, and

that CMS is continuing to revise the methodology used.  (11/27/06 Rosenthal Tr. 19:17-25).

        26.     Dr. Rosenthal also acknowledged that the current ASP-based system is far

from ideal.  Reimbursement is now set at a percentage-based markup from ASP.  This gives

physicians a financial incentive to select the higher priced drug among competing therapies.

(11/27/06 Rosenthal Tr. 29:7-16).  The movement to an ASP-based system also results in "real

potential" for the shifting of care to more expensive administration settings such as hospitals.

(11/15/06 Rosenthal Tr. 17:21-18:6).

        27.     Towards the end of the trial there was expert testimony on whether the

MMA has resulted in savings.  Dr. Rosenthal testified that there are some indications the MMA

has produced savings, but admitted that while reimbursement for certain drugs has gone down,

reimbursement for services has gone up, and it is unclear whether any overall cost savings has

been achieved.  (12/18/06 Rosenthal Tr. 51:11-53:6: 57:17-59:14; PX 4058 at 4, 8-9; PX 4019 at

5).[2]  For defendants, Dr. Gaier testified that predicted cost savings have not materialized and

---

[2]    On rebuttal, Dr. Hartman also testified that total reimbursements under the MMA have decreased, but
stated that he relied on Dr. Rosenthal for this conclusion. (Hartman Rebuttal Trial Aff. ¶ 38).

there is evidence that overall costs have gone up.  (Gaier Trial Aff., Attach. 3; 11/29/06 Gaier Tr. 21:2-23:8).

28.     It is not appropriate to use the MMA as a basis for assessing liability or damages during the class period.  As to Class 3, there is evidence in this record, for example, that most private payors have declined to adopt ASP.  (¶ 62 _infra_).  Those that have done so have not necessarily adopted ASP plus 6%.  (11/14/06 Hoffman Tr. 109:9-16).  Moreover, the MMA is the product of the political landscape in 2003 and its impact on health care costs is unclear at this point.

29.     As to Class 2, it is speculative to conclude that an earlier Congress in an earlier time would have adopted the drug and service reimbursement levels selected in 2003.[3]

## III.    Payors' Understanding of AWP Was Consistent With Industry Understanding And Payors Were Not Harmed By Published AWPs

### A.    Blue Cross Blue Shield of Massachusetts Is Knowledgeable Regarding AWP And Typical of Payors

30.     The Court certified Blue Cross Blue Shield of Massachusetts ("BCBS/MA") as a named class representative for Classes 2 and 3.  (In re Pharm. Indus. Average Wholesale Price Litig., 233 F.R.D. 229, 231 (D. Mass. Jan. 30, 2006)).  BCBS/MA is the largest healthcare insurer in Massachusetts.  It provides health care coverage to nearly one-half of all insured lives in Massachusetts.  (Gaier Trial Aff., Table 27).

---

[3]    Also in 2003, the OIG issued a Compliance Program Guidance for Pharmaceutical Manufacturers, which was the first guidance addressing marketing practices related to AWP.  The document noted, however, its limitations.  It was "not [meant] to represent binding standards for pharmaceutical manufacturers," ". . . represents the OIG's suggestions," and "does not create any new law or legal obligations….."  (68 Fed. Reg. 23731, 23733, 23736 (May 5, 2003)).

(i)     BCBS/MA Employees Had Detailed Knowledge
        Regarding AWP  Throughout The Class Period

31.     Numerous current and former BCBS/MA employees have testified to having extensive knowledge regarding AWP as well of the existence of highly variable rebates and discounts throughout the class period.

32.     Edward S. Curran, Jr. worked at BCBS/MA from 1990 to 1994 as Director of Pharmacy.  (11/13/06 Curran Tr. 21:3-14).  He worked for the parent company BCBS/MA, not the staff model HMOs that were part of BCBS/MA.  Since at least the 1970s, he has been aware – and it has been common knowledge – that AWP is not an actual average of wholesale prices.  (Curran Trial Aff. ¶ 5).  As he testified, AWP typically has been 20% to 25% above WAC, but rebates and discounts often take prices below WAC.  (Curran Trial Aff. ¶ 6).

33.     Knowledge of rebates and discounts from manufacturers of prescription drugs and of their variable levels depending on the extent of therapeutic competition was common among all health insurance plans, including those without staff model HMOs, by the mid-1980s.  (Curran Trial Aff. ¶¶ 7-10).

34.     Mr. Curran testified that he had seen acquisition costs for drugs at 90% below AWP based on rebates and discounts, and discussed them with other senior people at BCBS/MA.  (Curran Trial Aff. ¶ 12; 11/13/06 Curran Tr. 21:22-22:2, 24:22-25:25).  He testified that "it has been commonly known in the health insurance industry since at least the mid 1980s that AWP – because it does not reflect rebates and discounts – bears no predictable relationship to drug acquisition costs.  And one cannot claim that rebates and discounts fall within any particular percentage band or levels or that the health insurance industry expected that to be the case."  (Curran Trial Aff. ¶ 13).

35.     Mr. Curran worked for other health plans in Massachusetts both before and after his time at BCBS/MA, including for Harvard Community Health Plans (now Harvard Pilgrim) (1980-1988) and Aetna (1992-2000).  He encountered a similar level of understanding regarding AWP at these companies.  (Curran Trial Aff. ¶¶ 2-3, 11/13/06 Curran Tr. 27:16-23, 48:16-49:8).

36.     Gary Shramek was employed by BCBS/MA as a Pharmacy Program Director, Clinical Pharmacy, from September 1999 until October 2002.  (Shramek Trial Aff. ¶ 3).  He first became familiar with AWP while working as a pharmacist in the mid-1970s.  He understood that AWP was not an actual average of wholesale prices.  This was common knowledge.  (Shramek Trial Aff. ¶ 5).  It was also commonly known in the industry since at least the 1980s that AWP and WAC do not reflect the discounts and rebates available on many drugs. And, because the rebates and discounts vary widely by drug, there is no predictable relationship between AWP and providers' acquisition cost.  (Shramek Trial Aff. ¶¶ 5, 7).

37.     During his time at BCBS/MA, he was personally familiar with acquisition costs of 60% off AWP on PADs because of rebates and discounts from manufacturers and discussed the subject with other BCBS/MA employees including James Fanale (Vice President for Provider Contracting and later Chief Medical Officer) and Kim Olsen (Vice President of Contract and Health Services).  (Shramek Trial Aff. ¶ 10; 11/20/06 Shramek Tr. 142:6-144:14).

38.     John Killion, BCBS/MA's Senior Director for Ancillary Services, was deposed in this case as BCBS/MA's Rule 30(b)(6) corporate designee.  (Killion Dep. Tr. 6:15-17).  Deborah Devaux, BCBS/MA's Senior Vice President for Health Care Contract Management, identified Mr. Killion as the person at BCBS/MA she would have spoken to had she been interested in learning about AWP.  (11/07/06 Devaux Tr. 169:20-24).  Mr. Killion

-13-

testified that he understood as early as 1994, when he worked at Tufts Health Plans, that AWP was "an artificial price" that "didn't bear a relationship to the [drug] acquisition cost[s]" and that "it was discussed at Tufts that AWP bore no predictable relationship to the actual cost as paid." (Killion Dep. Tr. 119:4-22, 122:18-22 and 138:17-139:5; see also id. at 24:12-22).

39.     Steven Fox, BCBS/MA's Senior Director of Provider Relations, Communications and eHealth, had long known that AWP was a "largely inflated" number that was used as a starting point in negotiations.  (Fox Dep. Tr. 126:16-127:10).  Mr. Fox has been "involved in physician reimbursement" since 1992.  (Fox Dep. Tr. 50:4-19).

40.     Dr. James Fanale worked at BCBS/MA from 1999 to 2004 as Senior Vice President for Provider Partnerships and then Chief Medical Officer.  (Fanale Dep. Tr. 19:3-21:16).  He provided similar testimony.  (Fanale Dep. Tr. 84:13-86:13; 185:13-186:21).

41.     Like the testimony of the individuals referenced above, numerous BCBS/MA internal documents from 1994-2000 show the organization's detailed knowledge that AWP was no more than a benchmark.  See e.g., DX 1979 at NHIC-BCBSMA 030343 (1994 – "can't rely on Red Book b/c physician's [sic] are generating huge profit."); DX 1980 at NHIC-BCBSMA 030378 (1996 – AWP is "grossly inflated"); DX 1020 at BCBSMA-AWP-00066 (1999 – "drug companies offer substantial discounts [to physicians] to increase their market share"); and DX 1126 at BCBSMA-AWP-42824 (1999 – noting drug margin is "integral to quality patient care.").

(ii)     BCBS/MA Had Detailed Knowledge Regarding
          AWP Through Its Staff Model HMO Medical West

42.     BCBS/MA also had first-hand knowledge of actual drug acquisition costs because it purchased those drugs directly.  From 1978 until the late 1990s, BCBS/MA operated a staff model HMO, i.e., it owned physician clinics, employed the doctors who worked in those

-14-

clinics, and purchased the drugs dispensed and administered to patients in those clinics.  (DX
1505 at NHIC-BCBSMA 023158; 11/8/06 Coneys Tr. 72:5-17, 79:22-24, 107:5-13).

43.     When Mr. Curran worked at the parent company, BCBS/MA, as Director
of Pharmacy (1990 to 1994), his responsibilities included negotiating such contracts with drug
manufacturers relating to drug purchases for the staff models.  He also signed those contracts
once they were finalized.  (Curran Trial Aff. ¶ 15).  Accordingly, the parent company was
certainly well aware of these prices.  Moreover, people at the staff model HMO and BCBS/MA
worked closely together.  (Id. ¶ 16).

44.     Mr. Curran was not the only BCBS/MA employee who signed contracts
relating to drug purchases for the BCBS/MA staff model HMOs.  Other such contracts were
signed by Sharon Smith, who was employed by BCBS/MA as Vice President for Network
Delivery Management. (Smith Dep. Tr. 10:1-10, 20:9-21:6).  She personally "signed all the
contracts that had to do with Medical East and Medical West," including drug purchase
contracts, above a dollar threshold.   (Smith Dep. Tr. 31:4-32:6; see also id. at 22:13-17, 33:3-7;
DX 1024).

45.     Despite this evidence, plaintiffs contend BCBS/MA employees had no
involvement or knowledge, relying on Maureen Coneys.  On cross examination, however, Ms.
Coneys admitted no personal knowledge regarding drug purchases at all and no knowledge as to
what department, division, individuals or part of the organization made these purchases.
(11/8/06 Coneys Tr. 83:14-84:9, 85:10-14; see also Coneys Trial Aff. ¶¶ 10-11; Coneys Dep. Tr.
50:14-51:13).

46.    Based on the Track 1 defendants' own pricing data,[4] defendants' expert Eric Gaier was able to calculate purchase prices paid by BCBS/MA for the Track 1 defendants' drugs.  This analysis showed that BCBS/MA purchased drugs for its staff model HMO at discounts as high as 92.67% below AWP (a "spread" of 1,265%).  (DX 1389; Gaier Trial Aff. ¶¶ 32-34).  Moreover, there was no apparent or fixed relationship between AWP and the prices paid by BCBS/MA to acquire drugs for its staff model HMO.  The discounts that BCBS/MA obtained varied dramatically from drug to drug and year to year.  (DX 1389-1391; Gaier Trial Aff. ¶¶ 32-34).[5]

(iii)    <u>BCBS/MA Continues to Reimburse at 95% of AWP</u>

47.    In 2004, senior officials at BCBS/MA considered whether to follow Medicare in shifting from AWP-based reimbursement for PADs to ASP-based reimbursement. (11/7/06 Devaux Tr. 126:23-24, 130:1-14, 129:20-25).

48.    BCBS/MA's actuarial department summarized a number of "Reasons for Reform":

--    "Physicians benefit from the "spread" between AWP and acquisition cost creating an overpayment for drugs and costs for Medicare.

--    According to GAO and CMS, in 2001 Medicare overpaid Part B drugs by over $1 billion.

--    In 2002, Oncologists collected approximately $600 million in overpayments.

--    Patients who pay a coinsurance are adversely affected by the inflated AWP."

---

[4]    BCBS/MA failed to produce any contracts or data relating to its purchases of physician-administered drugs for its staff model HMO, despite being ordered to do so after a motion to compel was granted in part.  (See May 9, 2006 Hearing Tr. at 31-39).

[5]    The patients treated at the BCBS/MA staff model HMO clinics included Medicare patients, uninsured cash paying patients, and members of other health plans.  (11/8/06 Coneys Tr. 99:3-10, 103:10-17, 103:23-104:6).  As a result, BCBS/MA was generating revenue from "spread" just like physicians in private practice.  (11/8/06 Coneys Tr. 99:18-100:6).

(DX 990 at 2; Mulrey Trial Aff. ¶ 3, 11/8/06 Mulrey Tr. 5:8-24).

49.     The report noted that it would be "administratively easy" to use ASP and that the estimated annual savings associated with a shift to ASP would be over $6 million. (11/7/06 Devaux Tr. 158:17-25; DX 990).[6]

50.     BCBS/MA was concerned about resistance to the change from its network, and understood that doctors consider reimbursement rates when determining whether to participate in a network.  (DX 990 at 12; 11/7/06 Devaux Tr. 159:8-14, 160:15-23).  BCBS/MA was also concerned that oncologists would stop administering drugs to patients in their offices and would instead send patients to hospitals, which could end up costing BCBS/MA and the plans it represents more money.  (DX 990 at 12; 11/7/06 Devaux Tr. 153:8-154:16, 163:2-15).

51.     In view of these market-driven concerns, BCBS/MA decided to continue to reimburse physicians for drugs administered in office at 95% of AWP.  (11/7/06 Devaux Tr. 158:2-5).  BCBS/MA did not even lower the percentage discount off AWP it used in calculating reimbursement, even though it recognized it had the ability to do so.  (Id. at 165:13-17).

52.     For the same reasons, BCBS/MA did not change its reimbursement methodology for its managed Medicare program (Blue Care 65) where BCBS/MA assumed a substantial financial risk – despite a projected savings.  (DX 999; 11/8/06 Mulrey Tr. 16:23-20:4; 21:8-11; 22:21-24; 24:21-25:21).

53.     There is no evidence in the record to support plaintiffs' theory that had plaintiffs understood back in the 1990s that AWPs were allegedly grossly "inflated" they would have provided lower reimbursement to physicians.  As BCBS/MA Senior Vice President Deborah Devaux admitted:

---

[6]   This figure was based on a mathematical analysis of the difference between ASP plus 6% and 95% of AWP for hundreds of physician administered drugs, minus the cost of anticipated increases in drug administration fees.  (DX 990 at p. 17 et seq.; 11/8/2006 Mulrey Tr. 7:7-14:17).

THE COURT:  Well, let me ask you this.  Since you're a named
plaintiff in this, if you had known early on when the suit started
and before, if you had known that AWP was grossly inflated,
would you have changed your practices at all.
THE WITNESS:  I don't know exactly what we would have done.
. . . .

(11/7/06 Devaux Tr. 137:16-22).

54.    BCBS/MA has also rejected other alternatives.  Throughout the class

period, payors such as BCBS/MA had the option of using specialty pharmacies, which could

purchase PADs at deep discounts and provide them to physicians for administration.  (11/28/06

Bell Tr. 56:22-57:25, 62:11-65:3; Shramek Trial Aff. ¶¶ 3, 11-12; 11/20/2006 Shramek Tr.

145:12-24; DX 1148).  BCBS/MA studied this option repeatedly.  For example, at a 2002 BCBS

Association conference, BCBS/MA noted that pediatricians who were being reimbursed at AWP

minus 5% were able to buy drugs at 60-70% less than AWP and that projected potential savings

from implementing specialty pharmacy programs for PADs was $200 million.  (Shramek Trial

Aff.  12, 15; DX 1148 at 17376-77).  A 2003 BCBS/MA-specific analysis also showed the

potential savings.  (Coneys Dep. Tr. 126:17-128:6; DX 1149 at 17191).  Nevertheless,

BCBS/MA decided to exclude PADs from its specialty pharmacy program because of concerns

that, without a sufficient drug margin, physicians would stop administering drugs in their offices

and instead send patients to the hospitals for administration where it was more costly.  (Killion

Dep. Tr. 80:9-81:1, 109:19-110:7; Coneys Dep. Tr. 138:9-18).

(iv)    BCBS/MA Is Expanding Its Use Of AWP To New Areas

55.    In the past, BCBS/MA reimbursed for drugs administered in hospital out-

patient departments based on a negotiated percentage of the hospital's "billed charges."

(Cizauskas Dep. Tr. 124:5-19).  Starting in 2005, BCBS/MA decided to scrap this methodology

in favor of reimbursing hospitals at 95% of AWP.  (11/07/06 Devaux Tr. 148:15-18, 149:17-25;

-18-

Cizauskas Dep. Tr. 124:20-126:16).  BCBS/MA calculated a potential network wide savings of $40.9 million associated with this move.  (PX 899 at BCBSMA-AWP-13035; 11/7/06 Devaux Tr. 149:2-19).

56.     BCBS/MA transitioned the first set of hospitals in October 2005. (Cizauskas Dep. Tr. 123:22-124:4).  In early 2006 – <u>after BCBS/MA joined this litigation as a named plaintiff</u> – BCBS/MA decided to transition all hospitals with contracts coming up for renewal in 2006 from billed charge based reimbursement to 95% of AWP.  (Case Management Order 19; Cizauskas Dep. Tr. 147:10-148:8, 150:8-17).  BCBS/MA anticipates all hospitals will have transitioned to AWP by 2011.  (<u>Id.</u>).  As BCBS/MA admitted at trial, moving to AWP has been "a move in the right direction."  (11/7/06 Devaux Tr. 164:22).

(v)     BCBS/MA Profits From Higher Drug Costs And Makes
        <u>Strategic Elections Around Premium Increases</u>

57.     BCBS/MA calculates the premiums that it will charge its members for its Medigap plans on an annual basis.  (11/8/06 Arruda Tr. 131:16-18).  The premium is calculated to recover projected benefit costs, expected administrative expenses and an amount representing a planned contribution to reserves (the margin BCBS/MA aims to recover above costs).  (<u>Id.</u> at 132:24-136:8, DX 1970).

58.     All third party payors use the same basic methodology to calculate premiums.  (11/8/06 Arruda Tr. 154:25-155:3).

59.     BCBS/MA may actually make a higher profit as a result of higher drug costs.  This is because it calculates the "contribution to reserves" (its margin above costs) as a percentage of benefits costs and then works that into its premium calculations.  In other words, the greater the cost, the greater the return in absolute dollars to BCBS/MA.  (<u>Id.</u> at 134:18-136:7, 138:24-139:8, 153:11-23).

-19-

60.     Plaintiffs failed to adduce any evidence regarding their contrary claim that they, in fact, suffered a loss as a result of defendants' conduct.  When questioned by the Court in this regard, BCBS/MA's only witness with regard to its Class 2 Medigap claims conceded an inability to prove damages.  (Id. at 154:8-13).

61.     To the extent BCBS/MA's premiums may not have covered the cost of  its Medigap products in certain years, this is because after calculating the premium amount it required for those years, BCBS/MA elected not to implement that premium increase for strategic reasons (DX 1231 at 3 ("If the rate request is over 10%, we will be subject to a rate hearing and the adverse publicity associated with it. . . . The public rate hearing process provides a "window" into the operations of BCBSMA."); 11/8/06 Arruda Tr. 139:17-143:3).[7]

(vi)     BCBS/MA Is Typical Of Other Payors

62.     BCBS/MA is not alone in having elected to continue using AWP despite full knowledge of what it is and is not.  Not a single payor in this region has abandoned using AWP.  (12/08/06 Bell Tr. 38:9-11).  As multiple witnesses admitted, the industry standard has remained to reimburse at 95% of AWP.  (11/7/06 Devaux Tr. 136:16-22; Killion Dep. Tr. 89:10-14.  See also 12/06/06 Akscin Tr. 90:11-22).

63.     Like BCBS/MA, all major Massachusetts insurers (with the exception of Tufts) purchased drugs directly through staff model HMOs during the class period producing substantial "spreads."  (DX 1392-1403; DX 2001; Gaier Trial Aff. ¶¶ 32-34).  Together with

---

[7]     BCBS/MA prepared detailed memoranda analyzing the poor financial performance of its Medigap products in certain years.  Those memoranda make no mention of drug costs.  (11/8/06 Arruda Tr. 141:20-142:3; DX 1231, 1232).  BCBS/MA gave no consideration to AWP in administration of its Medigap plans.  (11/8/06 Arruda Tr. 146:8-11).  BCBS/MA (like Sheet Metal Workers Health Fund) made Medi-gap payments in accordance with the amounts determined by CMS.  (Arruda Trial Aff. ¶ 8; 11/8/06 Arruda Tr. 122:7-123:1; Revised Randle Trial Aff. ¶ 3; 11/6/06 Randle Tr. 200:25-201:4).

BCBS/MA, these plans cover some 70% of the covered lives in Massachusetts. (Gaier Trial Aff. ¶¶ 32-34).

64.     Like BCBS/MA, numerous payors testified that they had no expectation as to there being any relationship between AWP and actual drug acquisition costs. (See, e.g., Lemke Dep. Tr. 123:17-124:16; Spahn Dep. Tr. 97:17-98:13; Ellston Dep. Tr. 89:18-90:5; Wert Dep. Tr. 35:17-37:17; Beaderstadt Dep. Tr. 72:17-73:5; Brown Dep. Tr. 127:7-14; Niebylski Dep. Tr. 71:5-18; Newcomer Dep. Tr. 128:20-129:17). Numerous other health plans testified to knowledge that competition leads to greater spreads. (See, e.g., Cannon Dep. Tr. 35:16-36:18; Herbold Dep. Tr. 85:21-86:11; Kenney Dep. Tr. 12:1-13:7, 15:2-17).

65.     Like BCBS/MA, numerous payors testified that the fact that providers earned a margin on drugs was both well known and intended by payors. (See, e.g., Johnson Dep. Tr. 30:22-31:19; Sidwell Dep. Tr. 40:2-8; Cannon Dep. Tr. 147:4-7; Pfankuch Dep. Tr. 50:3-14; Dragalin Dep. Tr. 60:7-18 Spahn Dep. Tr. 93:6-95:5; Newcomer Dep. Tr. 176:21-177:13; Maxwell Dep. Tr. 154:2-157:1).

66.     Plaintiffs have focused on the fact that particular individuals at certain payors, such as Mr. Mulrey at BCBS/MA, testified to the belief that published AWPs reflected actual prices. (Mulrey Trial Aff. ¶ 18). Mr. Mulrey, however, admitted that he does not work with physicians and that others at BCBS/MA are far more knowledgeable about AWP than he is. (11/08/06 Mulrey Tr. 39:22-41:3). The weight of the evidence certainly does not support the contention that any institutional payor as a whole held this belief or set reimbursement rates based upon it. At a minimum, the evidence does not support a claim of classwide deception or ignorance as to what AWP represented.

B.   Taft Hartley Funds Are Sophisticated
     Or Rely On Sophisticated Market Actors

67.   Mr. Hannaford and Mr. Randle indicated that they personally did not have

knowledge regarding drug pricing.  (11/06/06 Hannaford Tr. 169:7-170:14; 11/06/06 Randle Tr.

201:20-202:13).  The lack of personal knowledge of these two witness does not establish that all

or many Taft-Hartley funds do not have well-developed knowledge regarding drug pricing.  In

fact, Dr. Rosenthal testified that in her experience some Taft-Hartley Funds are "incredibly

sophisticated" in this regard.  (11/15/06 Rosenthal Tr. 32:5-19).  Moreover, as shown below,

many of these funds rely on large insurers, like BCBS/MA, to administer health care benefits for

their members.  Indeed, plaintiffs' counsel conceded this point at trial.  (12/07/06 Tr. 60:13-22).

68.   One example is Pipefitters Local 537 Trust Funds ("Pipefitters"), which

the Court certified as a named class representative for Class 3.  (In re Pharm. Indus. Average

Wholesale Price Litig., 233 F.R.D. at 231).  Throughout the class period, Pipefitters has

contracted with BCBS/MA to provide health insurance to its members (Hannaford Trial Aff. ¶

11) because it thought that BCBS/MA, due to its size and sophistication, would "be able to exact

a better discount for [the Fund]" than other insurers or than Pipefitters could secure on its own.

(Hannaford Dep. Tr. at 133:4-11; 11/06/06 Hannaford Tr. 167:11-20, 176:12-177:5; 181:13-17).

Pipefitters has been "entirely dependant" on BCBS/MA and had "no independent knowledge" on

issues relating to that coverage.  (Hannaford Dep. Tr. 156:14-21).  BCBS/MA has continued to

reassure clients like Pipefitters that using 95% of AWP is still the best approach.  (11/6/06

Hannaford Tr. 168:6-23, 196:4-15).

69.   Another example is Sheet Metal Workers National Health Fund ("SMW"),

which the Court certified as a named class representative for Class 2.  (In re Pharm. Indus.

Average Wholesale Price Litig., 233 F.R.D. at 231).  SMW has engaged Southern Benefits

-22-

Administrators ("SBA") to act both as a third party administrator and as a consultant in relation to its provision of health benefits.  (11/06/06 Randle Tr. 204:19-205:1).  SBA has expertise in the area of health and welfare plan administration and understands that SMW trustees rely on it to provide the expertise and experience that they lack. (11/07/06 Faulkner Tr. 4:11-20).  SMW relies on SBA as a fiduciary of the fund to advise it regarding trends in medical costs, developments in the health care industry and legal and legislative developments that might affect the fund or its plans for its members.  (11/06/06 Randle Tr. 205:16-207:18).

70.     Plaintiffs also introduced testimony from the Operating Engineers, Local 4, Health & Welfare, Pension, Annuity and 401K Plans ("Local 4") as a purported member of Class 3 only.  (11/07/06 Alongi Tr. 24:16-19, 26:1-2).  Local 4 has made use of outside consultants in order to negotiate contracts relating to its provision of health benefits.  It has also utilized the purchasing power, consultants and lawyers of its international branch in Washington to negotiate preferential terms in its contracts.  (Id. at 35:18-37:9, 46:22-47:12).

71.     Prior to August 15, 2005, Local 4's PAD reimbursements were based on a negotiated rate unrelated to AWP.  (Id. at 29:25-30:20).  After August 15, 2005 Local 4's medical benefit was provided through BCBS/MA.  Local 4 trusted BCBS/MA to make decisions on reimbursement rates for drugs because "they were the experts contractually." (Id. at 29:6-24, 60:9-19).[8]

---

[8]   To the extent Local 4 reimbursed for any physician administered drugs at a rate related to AWP prior to 2005, it did so either (1) through specialty pharmacy services provided by its contracted PBMs (Caremark and before that Express Scripts), in which case there was no physician margin or spread at issue; or (2) to the extent these drugs were also dispensed as SADs at retail pharmacies, through the pharmacy benefit specified in its PBM contracts.  In both instances, reimbursement ranged from AWP minus 14% to AWP minus 23% and no evidence was introduced as to the prices retailers paid for those drugs.  (DX 3000-3001; 11/07/06 Alongi Tr. 26:3-22, 27:25-28:25, 38:11-14, 46:3-12, 51:21-52:6; 11/28/06 Bell Tr. 62:11-13, 63:21-25).

C.      Health Care For All Has Abandoned Its Claim

72.     The Court certified Health Care For All as a Class 3 representative

pursuant to Fed. R. Civ. P. 23(b)(2).  (In re Pharm. Indus. Average Wholesale Price Litig., 233

F.R.D. at 231).  There is no evidence in the record regarding Health Care For All.

IV.     **Plaintiffs' Liability Theories Are Based on Unreliable
        Factual Assumptions And Economic Methodology**

73.     Plaintiffs called Dr. Hartman as their chief economic expert.  (11/20/06

Hartman Tr. 8:10-22).  Although he testified that he has spent "the last five to ten years doing

almost exclusively healthcare economics" (Id. at 9:8-9), most of that work has been performed in

connection with litigation for plaintiffs' lead counsel in "more than ten" separate cases.

(Hartman Trial Aff., Attach. A; 11/20/06 Hartman Tr. 105:21-23).

74.     For Class 3, Dr. Hartman submits that the "marketplace" had an

expectation that AWP did not exceed ASP by more than 30%.  (11/20/06 Hartman Tr. 78:17-

79:9; 11/21/06 Hartman Tr. 27:3-14).  Liability, causation and damages are established in his

view for Class 3 for any drug whose AWP exceeds its ASP by more than 30%.  (11/21/06

Hartman Tr. 27:3-14, 77:16-19, 135:12-136:3).  In his original liability report, Dr. Hartman also

applied his 30% expectation theory to Class 2.  (11/20/06 Hartman Tr. 119:17-19).  At trial,

however, Dr. Hartman opined that for Class 2 liability, causation and damages exist for any drug

whose AWP exceeded its ASP (Id. at 115:18-116:6) – even though he conceded that Medicare

had the same expectations as the private sector.  (Id. at 88:12-17, 118:13-120:25).

75.     The Court finds that there is insufficient evidence to support Dr.

Hartman's 30% expectation liability theory as to Class 2 or Class 3 or to apply a "zero spread"

standard to Class 2.  There is substantial evidence that there was no classwide expectation that

AWP equaled ASP or that there was a predictable relationship of less than 30% between a
published AWP and the prices being paid by physicians.

> A.   Dr. Hartman's Claimed 30% Market Expectation
>       Is Irreconcilable With The Factual Record

76.   As noted previously, Plaintiffs' expert Dr. Rosenthal testified that the
existence of a formulaic markup relationship between WAC (the undiscounted list price at which
drugs are sold to wholesalers and other buyers) and AWP has been understood and known to be
standard in the marketplace throughout the entire class period.  (11/15/06 Rosenthal Tr. 71:6-17,
94:3-20; 11/27/06 Rosenthal Tr. 71:14-72:3).

77.   Given that the market understood and expected up to a 25% formulaic
markup from WAC to AWP, Dr. Hartman's liability theory rests on the premise that the market
understood and expected rebates or discounts no greater than 3.8% below WAC (resulting in a
spread below 30%), but was defrauded by a discount of 4% or higher (resulting in a spread over
30%).  (11/21/06 Hartman Tr. 135:7-136:3).  The evidence does not support this contention.

78.   Dr. Hartman originally told the Court that he was going to conduct
surveys to determine payor expectations.  But he did not conduct any surveys.  (Id. at 27:15-23).
Nor did he talk to any third-party payors before arriving at his 30% yardstick.  (Id. at 27:24-
29:4).  Rather, Dr. Hartman now relies on three surrogates to determine payor expectations:  (1)
comparator drugs; (2) publicly available information on spreads; and (3) reimbursement
contracts.  (Id. at 34:15-35:4).  None of those surrogates provides a basis for determining market
expectations.

> (i)   Dr. Hartman Largely Relies On Comparator Drugs Without Competition

79.   In arriving at his 30% expectation speed limit, Dr. Hartman relies on
spreads for single-source drugs that faced little or no therapeutic competition.  He then applies

this speed limit to find liability and damages for drugs that faced substantial therapeutic competition.  (11/21/06 Hartman Tr. 35:9-36:13).

80.     As Dr. Bell explained, this approach ignores the fundamental facts of pharmaceutical drug pricing lifecycles.  A newly launched branded drug facing no competition will generally have few or no rebates and discounts associated with it, and essentially will be sold at WAC.  When competition enters the market, rebates and discounts off of WAC become a feature of the market as the drugs price compete.  Eventually, the drug loses its patent protection and generic competitors enter the market, at which point drug prices fall even further.  Then eventually a new branded drug enters the market and the pricing lifecycle starts over again. (11/28/06 Bell Tr. 79:18-81:24, 83:10-84:13).

81.     This is hardly a novel concept.  As Dr. Bell explained, where there is therapeutic or generic competition, rebates and discounts have long been given to entities that can move market share against the competing drugs.  In relation to PADs, physicians are the purchasing entity that have that ability to control market share through prescribing patterns and therefore get rebates and discounts.  (11/28/06 Bell Tr. 84:14-88:19).  The existence of differential pricing to different purchasers based on their ability to move market share has long been known in the market.[9]

82.     As Dr. Berndt has found and common sense dictates, payors understand these market dynamics result in competition driven discounting and rebating.  (DX 1275 ¶ 52; 11/21/06 Hartman Tr. 39:4-18; ¶ 64 supra).  Indeed, the actions of defendants here in the face of

---

[9]     See e.g., DX 1042A at 4 (transcript of 1989 Senate proceedings dealing with prescription drug costs noting that "for the same bottle of prescription drugs, different buyers pay dramatically different prices");  DX 1630 at 2  (1993 LA Times article discussing In re Brand Name Prescription Drug Antitrust Litigation, MDL 997.  See also 11/28/06 Bell Tr. 112:2-113:4; DX 1056 at 46, Figure 2.10 (1994 study by one of plaintiffs' experts, Stephen Schondelmeyer, on how different classes of purchasers could buy drugs at dramatically different prices resulting in spreads up to 100% off of AWP).

competition were described by plaintiffs' experts as "normal" and "rational" competitive

behavior."  (11/27/06 Rosenthal Tr. 51:15-21; Hartman Trial Aff. ¶ 35; 11/20/06 Hartman Tr.

114:6-115:9; see also Bell Trial Aff. ¶¶ 93-95).

(ii)     Publicly Available Information Contradicts Dr. Hartman's Expectation

83.     With respect to publicly available information on spreads, Dr. Hartman's

approach does not account for the fact that numerous publicly available reports before and during

the class period depicted spreads in excess of 30%.  Medicare also knew that spreads often

exceeded 30%.  For example, the 1992 OIG report lists discounts resulting in spreads in excess

of 400%.  (DX 1053 at App. III; 11/20/06 Hartman 123:17-21).  It also explicitly states that

"AWP is not a reliable indicator of the cost of a drug to physicians."  (DX 1053 at 5; 11/21/06

Hartman Tr. 52:3-17, 53:10-55:8; ¶¶ 3-21 supra).

84.     Dr. Hartman sought to dismiss much of this evidence on the ground that it

related to multi-source drugs only and he excluded multi-source drugs from class liability.[10]

However, publicly available information on spreads for "multi-source" drugs provides insights

into how competition will produce increased spreads – precisely the situation where so-called

"single source" drugs face therapeutic competition.  Moreover, these documents demonstrated

that spreads often exceeded 30% on single source drugs as well once they began to face

therapeutic competition from other single source drugs.  For example, the 1997 OIG report

showed spreads on Kytril and Zofran (single source drugs competing with each other) for 1995

and 1996 that were all in excess of Dr. Hartman's speed limit, ranged up to 55.1%, and generally

increased over time.  (Hartman Trial Aff., App. D; 11/28/06 Bell Tr. 123:6-127:3; DX 1075 at

App. A-C; 12/18/06 Hartman Tr. 93:3-94:1, 104:14-107:2).

---

[10]   It should be noted, however, that for Class 2 when Dr. Hartman offers alternatives to his "zero" spread
theory, ranging from 5% to his 30% expectation, he applies them to multi-source drugs.  (PX 4008).

85.     Private payors similarly did not expect AWPs to be larger than ASPs by a reasonably predictable amount.  (¶ 64 supra).  This evidence, and other evidence like it, forced Dr. Hartman to admit that: "Over the period since Medicare's inception and most importantly during the 1990s, the relevant Medicare agencies (HCFA, CMS) were presented with increasingly compelling and consistent information sufficient to make clear that while AWP historically may have reflected provider acquisition cost . . . AWP was no longer the reliable benchmark it had been and had been believed to be."  (Hartman Trial Aff. ¶ 18; 11/21/06 Hartman Tr. 22:2-12).

(iii)     Reimbursement Contracts

86.     It appears that much of Dr. Hartman's theory rests on the assumption that payors contracting with providers would have stipulated lower reimbursement rates if payors had realized spreads could be greater than 30%.  (11/21/06 Hartman Tr. 43:25-44:15).  The case of BCBS/MA and other payors in this region contradicts this assumption.  (¶ 62 supra; Farias Dep. Tr. 43:4-16).  Moreover, Dr. Hartman admitted, but did not take into account in his analysis, that payors use profitability to attract providers, some of whom have significant market power, to their networks (11/21/06 Hartman Tr. 44:16-46:3); that payors want to encourage doctors to treat patients outside of the hospital (Id. at 46:4-20); and that payors paid more for drugs as a way of cross-subsidizing underpayment for services (Id. at 46:21-49:6; DX 1268).  Indeed, plaintiffs' counsel specifically directed Dr. Hartman not to analyze cross-subsidization.  (Id. at 50:18-21).

B.     Defendants' Experts' Testimony

87.     Defendants' experts have considered all of these issues.  For example, Dr. Gregory K. Bell, an industry expert, testified that both Medicare and private payors understood the differences between AWP and acquisition costs when they devised their reimbursement approaches.  (Bell Trial Aff. ¶¶ 38-57, App. C-E; 11/28/06 Bell Tr. 104:24-149:4).  Moreover,

-28-

competition has a significant impact on reimbursement amounts – both competition among insurers for competitive networks to service their members and competition among physicians for access to insurers' members. (Bell Trial Aff. ¶ 72; 11/28/06 Bell Tr. 65:4-66:11). Dr. Bell also noted that payors have a strong incentive to encourage physicians to administer drugs in the office, as opposed to the hospital where it is more expensive. (Bell Trial Aff. ¶ 74; 11/28/06 Bell Tr. 67:8-23, 149:9-20). Dr. Bell also considered the impact of cross-subsidization on reimbursement amounts and concluded that payors deliberately took that approach to reimbursement. (Bell Trial Aff. ¶¶ 75-76, 90-92; 11/28/06 Bell Tr. 149:9-150:7). In addition, he found that it was always Medicare's objective to reimburse on a "reasonable charge" as opposed to a reasonable cost basis, and that the approach chosen by Medicare assumed that drug reimbursement would cross-subsidize other costs. (Bell Trial Aff. ¶¶ 77-92; 11/28/06 Bell Tr. 146:22-149:8).

    88. Dr. Eric M. Gaier, an economist, also testified that both Medicare and third-party payors understood the differences between acquisition costs and AWPs, and had sufficient leverage to negotiate different reimbursement amounts and avoid the effects of any alleged AWP inflation. (Gaier Trial Aff. ¶¶ 8-21, 32-49; 11/29/06 Gaier Tr. 9:15-12:10). In addition, he found that there were legitimate economic reasons why Medicare and third-party payors would permit providers to earn margins in excess of their acquisition costs, including an interest in attracting providers to their networks, a desire to encourage physicians to treat patients outside of the hospital and a need to cross-subsidize under-reimbursement for services. (Gaier Trial Aff. ¶¶ 22-30, 50-55). This testimony is amply supported by the evidence relating to BCBS/MA and other payors that have continued to use AWP. (¶ 62 supra).

89.     In addition, both Dr. Bell and Dr. Gaier testified that payors and providers do not consider reimbursement on a drug-by-drug basis; rather, they focus on reimbursement levels overall.  (Bell Trial Aff. ¶¶ 31, 71; Gaier Trial Aff. ¶¶ 50, 54; 11/29/06 Tr. Gaier 39:9-19, 41:13-42:5).  This is consistent with the testimony of various third-party payors.  (Owens Dep. Tr. 37:20-38:6; Baederstadt Dep. Tr. 76:9-77:2; Lemke Dep. Tr. 68:14-21; Spahn Dep. Tr. 59:4-16; DX 1268; 11/21/06 Hartman Tr. 48:6-50:14).  Dr. Hartman did not address this issue in his analysis.

90.     Dr. Bell and Dr. Gaier both concluded that there is no reason to believe that total reimbursements would have been lower in Dr. Hartman's "but for" world.  (Bell Trial Aff. ¶¶ 33, 37; Gaier Trial Aff. ¶¶ 3, 29-30, 40, 55; 11/29/06 Tr. 21:2-25:6).  Third party payor testimony was consistent with this conclusion.  (See, e.g., Maxwell Dep. Tr. 154:2-156:10; Farias Dep. Tr. 152:13-153:2; Sidwell Dep. Tr. 68:21-69:10; Spahn Dep. Tr. 93:18-95:5).  Dr. Bell pointed out that any reduction in drug reimbursement would have prompted an increase in service fees.  (12/8/06 Bell Tr. 32:24-34:1).  Dr. Gaier testified that the decisions at BCBS/MA and others to stay with AWP provide natural experiments concerning what would happen in Dr. Hartman' "but for" world.  (11/29/06 Gaier Tr. 24:13-25:18).

91.     Dr. McFadden, a Nobel Prize winner in economics, concluded that Dr. Hartman's analysis is not a scientific or "economic analysis" because he has not relied on any empirical evidence of what expectations were.  (McFadden Trial Aff. ¶ 16).  "His analysis, in effect, assumes his conclusions about the existence of the alleged fraud."  (Id. ¶ 23).  Among other things, he assumes that payors had an expectation that AWP exceeded ASP by a reasonably predictable amount; he assumes that this amount does not exceed 30%; and he assumes that reimbursements would be less if spreads were limited to 30%.  (Id. ¶¶ 51-52, 78).  The evidence

actually supports the alternative hypothesis that payors knowingly permit providers to retain spreads in order to achieve other objectives.  (Id. ¶¶ 16, 25, 48, 52-77).[11]

92.     Dr. Hartman's theory is also contradicted by the testimony of Dr. Haegele, a practicing oncologist.  Dr. Haegele testified that the income derived from the drug margins was essential to make up for (1) the drug-related expenditures (such as financing, storage, mixing) that were not separately billable, (2) the under-reimbursed and unreimbursed services, facilities and supplies provided by her practice, and (3) instances where insurers or patients failed to pay her.  (Haegele Trial Aff. ¶ 50; 12/06/06 Haegele Tr. 123:22-124:1).  Aspects of cancer care that are not reimbursed include: (1) treatment planning; (2) I.V. access; (3) laboratory maintenance; (4) drug inventory maintenance; (5) drug mixing; (6) protective apparel; (7) medical waste disposal; (8) counseling; (9) social services; (10) pain management; (11) terminal care; and (12) billing.  (12/06/06 Haegele Tr. 124:2-125:23; see also Haegele Trial Aff. ¶¶ 37-39, 41, 49).  Dr. Haegele's testimony is supported by a 1999 study, The Impact of Medicare Payment Policies on Patient Access to Quality Cancer Care, by Barton C. McCann, M.D. & Julia A. James, Health Policy Alternatives.  (DX 1081).

93.     Dr. Haegele also described the benefits to patients and payors of in-office treatment – benefits that have led carriers like BCBS/MA to continue reimbursing at 95% of AWP to encourage in-office administration.  (12/06/06 Haegele Trial Tr. 107:8-22; 109:2-15; Haegele Trial Aff. ¶¶ 23-24).

---

[11]   Dr. McFadden also concluded that Dr. Hartman's 30% speed limit, if it were enacted into law, could actually harm consumers by causing prices to increase – a conclusion shared by other experts and not considered by Dr. Hartman.  (McFadden Trial Aff. ¶¶ 16, 102-07; Gaier Trial Aff. ¶ 28; 11/28/06 Bell Tr. 74:21-75:3; 12/18/06 Rosenthal Tr. 34:18-37:11; DX 1923).

C.     Dr. Rosenthal's Testimony Does Not Compensate
       For Dr. Hartman's Shortcomings

94.     Dr. Rosenthal has no opinion as to whether Dr. Hartman's 30% is the right yardstick.  (11/15/06 Rosenthal Tr. 58:22-59:7; 78:16-21; 11/27/06 Rosenthal Tr. 71:10-13). Moreover, to the extent she expressed views regarding spreads, she did not assess the impact of many factors that could affect the spread for any particular drug, including:  the competitive market for a drug (11/15/06 Rosenthal Tr. 100:9-24); the correlation between market share and a drug's spread (Id. at 102:2-8); the correlation between physician market power and a drug's spread (Id. at 102:16-103:1); expectations of TPPs concerning spreads that are inconsistent with the plaintiffs' posited 30% (Id. at 103:17-105:17); and TPP economic interest in site of care and size and accessibility of pharmacy and physician networks.  (Id. at 106:7-107:9)

95.     Additionally, Dr. Rosenthal's efforts to explain away why payors such as BCBS/MA have stayed with AWP are neither persuasive nor relevant.  The application of the theory of "sticky wages" to physician reimbursements is contrary to the limits of applicability of the theory to wage earners, and Dr. Rosenthal has done no study to justify expanding the theory to professionals.  (12/18/06 Rosenthal Tr. 22:12-23; 11/29/06 Gaier Tr. 27:11-28:10).  The simple fact is that payors within this region have – despite undisputed knowledge of large spreads – stayed with an AWP system for what they consider to be credible business reasons. (11/29/06 Gaier Tr. 28:11-30:9).

D.     Dr. Hartman's Class 3 Damage Analysis

96.     Dr. Hartman's Class 3 damage analysis is built on the assumption that all non-hospital drug reimbursements were based universally on AWP throughout the class period. (Gaier Trial Aff. ¶ 56).

-32-

97.     The evidence demonstrates that this assumption is incorrect.  For example, prior to 1995, BCBS/MA did not use AWP at all and instead reimbursed physicians at their reasonable and customary billed charges.  (Mulrey Trial Aff. ¶¶ 10-11).  Even after 1995, BCBS/MA has made only limited use of AWP in its reimbursements.  Some 43% of BCBS/MA's drug reimbursements since 1995 are not based on AWP and appears to result from the use of alternative reimbursement methodologies.  (Gaier Trial Aff. ¶ 59; DX 3006).

98.     Plaintiffs' expert Dr. Hartman disputes the 43% figure, focusing on a specific category constituting 7% of reimbursements as unrelated to AWP.  It is undisputed, therefore, that some 36% of BCBS/MA reimbursements since 1995 were not based on AWP and appears to result from the use of alternative reimbursement methodologies.  (12/18/06 Hartman Tr. 99:13-100:16).

99.     BCBS/MA is not alone among Massachusetts health insurers in making extensive use of non-AWP related reimbursement methodologies.  For example, Harvard Pilgrim though much of the late 1990s and early 2000s used capitated risk arrangements rather than fee-schedule based arrangements with the majority of its contracted physicians.  (11/8/06 Mulrey Tr. 32:11-33:12; Cizauskas Dep. Tr. 63:5-12).  When capitated arrangements are employed, AWP generally has no bearing on the patients' co-pay or co-insurance obligations.  (Gaier Trial Aff. ¶ 58; 11/08/06 Mulrey Tr. 37:16-21).

E.     Dr. Hartman's "Zero" Spread for Class 2

100.     As noted previously, plaintiffs' experts admit that, at a minimum, there was widespread recognition of the formulaic spread between AWP and WAC for branded drugs. And that discounting off of WAC occurred.  (¶¶ 1, 76 supra, 101 infra).

101.     Dr. Rosenthal and Dr. Hartman agree that Dr. Hartman's Class 2 liability theory would mean practically all drug manufacturers would be subject to findings of liability for

fraud in relation to all drugs sold in the U.S. during the class period.  Dr. Rosenthal's own view is that there is nothing wrong about drugs' AWPs being different from their ASPs.  She also takes the view that payors were aware of discounting from WAC and that such discounting is not in of itself unfair or deceptive.  (11/15/06 Rosenthal Tr. 66:5-10, 75:1-6; 11/27/06 Rosenthal Tr. 56:15-18; 69:21-71:9, 83:20-84:2; 11/21/06 Hartman Tr. 22:13-23:3).

102.    Accordingly, application of a zero spread to Class 2 is not supported by the record.

**V.     Plaintiffs Have Failed To Identify Any Individual Class 3 Members**

103.    Anna Choice and Rebecca Hopkins are not residents of Massachusetts and received all their medical care in other states.  (11/7/06 Choice Tr. 76:23-77:5; 11/7/06 Hopkins Tr. 95:2-10, 97:18-23, 110:20-25).

*Respectfully submitted*

Dated:  January 19, 2007          /s/ William F. Cavanaugh, Jr.
                                  William F. Cavanaugh, Jr.
                                  Andrew D. Schau
                                  Erik Haas
                                  **PATTERSON BELKNAP WEBB & TYLER LLP**
                                  1133 Avenue of the Americas
                                  New York, New York  10036-6710
                                  (212) 336-2000

                                  *Attorneys for the Johnson & Johnson defendants on
                                  behalf of all Track 1 defendants*

-34-

1337210v10

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was delivered on January 19, 2007 via electronic service to counsel for all parties.

/s/ Andrew D. Schau
Andrew D. Schau