## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| | MDL No. 1456 |
| | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | ) ) |
| | Judge Patti B. Saris |
| 01-CV-12257-PBS AND 01-CV-339 | ) ) ) |
| TRIAL OF CLASS 2 AND 3 CLAIMS | ) |

## SCHERING'S AND WARRICK'S POST-TRIAL PROPOSED FINDINGS OF FACT

# TABLE OF CONTENTS

I.  NONE OF THE SCHERING OR WARRICK DRUGS FIT PLAINTIFFS' THEORIES OF AWP MANIPULATION ........................................................................................... 1

    A.  Schering's and Warrick's Drugs Are Pharmacy Dispensed ..................................... 1

    B.  The Pharmacy Market Is Highly Price-Competitive and Transparent. ..................... 1

    C.  Schering and Warrick Had No Incentive to Manipulate AWPs ................................ 3

II. SPREADS ON SCHERING'S DRUGS RESULTED FROM ORDINARY COMPETITIVE MARKET FORCES ................................................................................. 3

    A.  The Evidence Shows that Schering Did Not Manipulate AWPs. ............................. 3

    B.  For Branded Drugs, Requiring AWP to Equal ASP Would: (1) Be Inconsistent with the Relationship Between WAC and AWP; (2) Impute Liability to the Entire Pharmaceutical Industry; and (3) Result in Losses to Providers .............................. 5

    C.  Any But-For AWP Should Be Based on Average Prices Charged by Wholesalers to Their Own Customers. ......................................................................................... 6

    D.  Plaintiffs Did Not Prove Liability for Any Schering Drugs .................................... 7

        (1)  Temodar ...................................................................................................... 7

        (2)  Intron-A ...................................................................................................... 7

        (3)  Proventil ..................................................................................................... 9

III. WARRICK (AND SCHERING) MULTI-SOURCE ALBUTEROL SPREADS WERE THE RESULT OF ORDINARY GENERIC PRICE COMPETITION, KNOWN TO THE PUBLIC AND TAKEN INTO ACCOUNT IN SETTING REIMBURSEMENT RATES ......................................................................................................................... 10

    A.  Albuterol Spreads Were Known to Public And Private Payors. ............................ 10

    B.  Public and Private Payors Responded to Albuterol Spreads by Using MACs ........ 13

    C.  The Reimbursement Rate for the 0.083% Solution was Substantially Below the Median AWP .......................................................................................................... 15

    D.  Plaintiffs Have Not Met Their Burden of Proof to Identify Purchases of Warrick's (or Schering's) Albuterol That Fall Within the Definition of Class 2. ................... 16

    E.  Plaintiffs' "Tacit Nash Equilibrium" Theory Does Not Provide a Basis for Finding Any Incentive to Manipulate the AWP of Warrick's Albuterol. ............................ 17

IV.     SCHERING AND WARRICK PRICED THEIR DRUGS AT ISSUE STRICTLY IN ACCORDANCE WITH KNOWN INDUSTRY STANDARDS AND MARKETED THOSE DRUGS ON THEIR MERITS ............................................................................. 19

     A.     The Government Never Instructed Any Manufacturer to Report ASP as AWP..... 19

     B.     Neither Schering nor Warrick Had the Information or the Ability to Calculate Average of Prices Charged by Wholesalers to Their Customers for Albuterol...... 20

     C.     Other Documents and Testimony Offered by Plaintiffs are Irrelevant. .................. 21

V.     THE EVIDENCE IS INCONSISTENT WITH DR. HARTMAN'S METHOD OF CALCULATING CLASS 2 DAMAGES FOR MULTI-SOURCE DRUGS. ..................... 22

Schering-Plough Corporation and Warrick Pharmaceuticals Corporation respectfully submit the following proposed findings of fact:

## I.   None of the Schering or Warrick Drugs Fit Plaintiffs' Theories of AWP Manipulation

*All Schering and Warrick drugs at issue were dispensed by pharmacies; therefore, there was no incentive to manipulate or market their AWPs, and PBMs operating in the intensely competitive pharmacy market assured that information regarding acquisition costs was readily available.*

### A.   Schering's and Warrick's Drugs Are Pharmacy Dispensed.

1.      Schering's products are almost exclusively pharmacy-dispensed.  (*See* Decl. of Direct Test. by Eugene M. ("Mick") Kolassa (Docket No. 3369) ("Kolassa Direct Decl.") ¶¶ 15, 20; Am. Decl. of Direct Test. of Dr. Sumanth Addanki (Docket No. 3430) ("Am. Addanki Direct Decl.") ¶¶ 8, 35.)[1]

2.      Schering sells principally to chain pharmacies, wholesalers, and other intermediaries; it makes virtually no sales directly to physicians.  (*See* Trial Tr. (12/13/06) 42:19-43:8 (Kane).)

3.      The Warrick drug at issue in this case, albuterol sulfate, is also almost exclusively dispensed by pharmacies.  (*See* Decl. of Harvey J. Weintraub (Docket No. 3380-1) ("Weintraub Direct Decl.") ¶ 23; Am. Addanki Direct Decl. ¶ 8; Kolassa Direct Decl. ¶ 19; Trial Tr. (11/15/06) 114:3-5 (Rosenthal) (agreeing that the "dominant application of albuterol . . . is in the home").)

4.      Warrick does not market or sell to physicians.  (*See* Weintraub Direct Decl. ¶ 23.)

### B.   The Pharmacy Market Is Highly Price-Competitive and Transparent.

5.      In the pharmacy market, "the bulk of the prescriptions are reimbursed by PBMs." (Trial Tr. (12/12/06) 88:21-22 (Kolassa).)  Through their control over formularies, PBMs are able to "extract price concessions" from manufacturers.  (*See* Trial Tr. (11/28/06) 88:8-89:18 (Bell).)  They "continue over time to force retailers to compete and to provide them relatively low margins in their

---

[1] The appendix ("Appendix") contains corresponding tabs for each paragraph in the Findings containing the materials cited therein.  When there is more than one citation in a paragraph, the documents are separated by a blue slipsheet.  The documents in the Appendix include the cover page of the referenced document and the actual page or paragraph cited.

reimbursement."  (Trial Tr. (11/15/06) 21:25-22:2 (Rosenthal); *see also* Trial Ex. 1275 (Report of

Independent Expert Prof. Ernst R. Berndt to Judge Patti B. Saris (02/09/05)) ("Berndt Report") ¶

200 (describing "vigorous" competition among PBMs); *In re Pharm. Indus. Average Wholesale*

*Price Litig.*, 230 F.R.D. 61, 73 (D. Mass. 2005) (stating "the PBM is able to stimulate competition

among pharmacies . . . [and] drive drug prices down").)

6.     Price competition "to get shelf space" results in pharmacy acquisition costs for

generic drugs that are less than AWP.  (*See* Trial Tr. (11/15/06) 134:25-135:6 (Rosenthal).)

7.     The fact that pharmacy acquisition costs for self-administered generic drugs are

typically less than AWP has "long been made very visible and public" and "has not been a secret."

(*See* Berndt Report ¶¶ 65, 133 (stating that PBMs uncover over time all important information)

(cited at *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 72).)

8.     Plaintiffs' expert, Dr. Hartman, concedes that large generic spreads were known as

early as 1992 (*see* Trial Tr. (11/20/06) 122:5-123:21 (Hartman) (discussing Trial Ex. 1053 (HHS-

OIG, *Physicians' Costs for Chemotherapy Drugs*, A-02-91-01049 (11/92))), and that large albuterol

spreads "began to reach public awareness in 1996."  (Direct Test. of Raymond S. Hartman (Docket

No. 3296) ("Hartman Direct") ¶ 77(d).)

9.     Both of the class representatives asserting claims against Schering and Warrick,

Sheet Metal Workers and Blue Cross Blue Shield of Massachusetts, used PBMs for pharmacy

dispensed drugs.  (*See* Trial Tr. (11/7/06) 6:2-5 (Faulkner); Trial Tr. (11/20/06) 154:23-25

(Shramek); Trial Tr. (12/13/06) 15:1-15 (Dutch).)

10.     All other class representatives who testified at trial testified that they, too, used

PBMs for pharmacy-dispensed drugs.  (*See* Trial Tr. (11/6/06) 191:13-193:24 (Hannaford); Trial Tr.

(11/7/06) 26:3-18 (Alongi).)

11.     Third-party payors had extensive and "expert" knowledge about Schering's prices.

(*See* Am. Decl. of Debra Kane (Docket No. 3429) ("Am. Kane Direct Decl.") ¶¶ 19-22; Corrected Decl. of Carter L. Dutch (Docket No. 3406) ("Dutch Direct Decl.") ¶¶ 16-19; Trial Tr. (12/13/06) at 16:1-19:16 (Dutch).)

     **C.**     **Schering and Warrick Had No Incentive to Manipulate AWPs.**

12.     Because the Schering and Warrick drugs are largely dispensed by pharmacies, physicians are not reimbursed for them and have no pecuniary reason to choose them.  (*See* Trial Tr. (11/15/06) 115:1-14 (Rosenthal); Berndt Report ¶ 188 (stating that "a distinguishing feature" of physician-administered drugs, as opposed to self-administered drugs, is that they are "a source of their [physicians'] medical practice gross operating margin").)

13.     Pharmacies have "no control over the prescription" and must dispense whichever drug is prescribed.  (*See* Trial Tr. (11/15/06) 115:1-14 (Rosenthal).)

14.     With respect to multi-source drugs, Schering and Warrick had no incentive to manipulate the AWP (for Proventil or generic albuterol sulfate) for the additional reason that, while pharmacies can choose which version of a multi-source drug to carry, they are generally reimbursed at the same rate, usually a Maximum Allowable Cost ("MAC"), for all forms of the drug.  (*See* Trial Tr. (11/15/06) 115:15-116:5 (Rosenthal).)

**II.**     **Spreads on Schering's Drugs Resulted from Ordinary Competitive Market Forces**

*Schering sold the substantial majority of its branded pharmacy-dispensed drugs within five percent of list price (WAC); substantial discounts were targeted to end-users and reflected real price competition that benefited consumers.  Since Schering's WACs were bona fide prices at which substantial sales were made, and AWPs bore known, industry-standard relationships to WACs, Schering did not manipulate its AWPs.*

     **A.**     **The Evidence Shows that Schering Did Not Manipulate AWPs.**

15.     Spreads between AWP and actual prices evolve naturally over time for ordinary reasons that have nothing to do with AWP "manipulation."  (*See* Am. Addanki Direct Decl. ¶ 14.)

16.     The AWP of a branded product typically reflects a standard industry markup of 20% to 25% above Wholesale Acquisition Cost ("WAC"), the undiscounted list price at which manufacturers sold products.  (*See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 68; Trial Tr. (11/15/06) 71:3-8, 86:11-21(Rosenthal); Kolassa Direct Decl. ¶ 31; Am. Addanki Direct Decl. ¶ 14; Berndt Report ¶ 15.)

17.     The standard 20% to 25% mark-up for branded drugs "c[a]me out of the publishers or wholesalers themselves," and Dr. Rosenthal testified that she is "not aware of any evidence to th[e] effect" that manufacturers could "change the relationship between AWP and WAC."  (*See* Trial Tr. (11/15/06) 86:4-21, 87:5-10 (Rosenthal); Berndt Report ¶¶ 23-24, 29-31 (stating that mark-up was "quite understandable" and could not be changed by any individual manufacturer).)

18.     Schering's AWPs consistently reflected a 20% markup above WACs.  (*See* Dutch Direct Decl. ¶ 20; Trial Tr. (12/13/06) 21:23-22:3 (Dutch); Am. Kane Direct Decl. ¶ 18.)

19.     At launch, a branded drug often represents a breakthrough in therapy and faces little, if any, competition and little, if any, pressure for discounts.  In such situations, the price obtained by the manufacturer is close to the WAC.  (*See* Am. Addanki Direct Decl. ¶ 15.)

20.     As a drug ages, it begins to face therapeutic and, ultimately, generic competition. Manufacturers often respond to competition by discounting, which increases as competition increases.  (*See id.* ¶ 16.)  As Dr. Rosenthal testified, where the competition ultimately extends to generic versions of pharmacy-dispensed drugs, "the spreads are indeed greater than 30%, yes." (Trial Tr. (11/15/06) 78:22-79:8 (Rosenthal).)

21.     As in other markets, discounting in the pharmaceutical market is targeted: different customers receive different discounts, with many paying the list price.  (*See* Am. Addanki Direct Decl. ¶ 17; Trial Tr. (11/15/06) 72:18-73:13 (Rosenthal).)  Thus, it would not be economically rational to reduce the list price.  (*See* Trial Tr. (11/15/06) 90:11-91:6 (Rosenthal); Am. Addanki

Direct Decl. ¶ 17.)

22.     Inevitably, the average price at which a drug is sold ("ASP") will decrease and spread will increase due to normal economic competition.  (*See* Am. Addanki Direct Decl. ¶ 18.)

23.     As Dr. Rosenthal testified, where this competition occurs through negotiations directly with end payors (such as for "preferred formulary status" for pharmacy-dispensed drugs via PBMs), it is "real price competition . . . that really does benefit consumers."  (Trial Tr. (11/15/06) 49:22-50:20 (Rosenthal).)

**B.     For Branded Drugs, Requiring AWP to Equal ASP Would: (1) Be Inconsistent with the Relationship Between WAC and AWP; (2) Impute Liability to the Entire Pharmaceutical Industry; and (3) Result in Losses to Providers.**

24.     Dr. Hartman agrees that for branded drugs "WAC is equal to, or close to (+ or – 5%) the actual acquisition cost for the community pharmacy class of trade and the AWP, at present, is typically 20 to 25 percent above the WAC . . . . In such cases, a payment policy using AWP as a benchmark . . . may be relatively accurate."  (Decl. of Raymond S. Hartman in Support of Pls.' Claims of Liability and Calculation of Damages ("Hartman Rule 26 Report") (12/15/05) ¶ 59(c) n.60 (quoting Dr. Schondelmeyer).)

25.     Because the markup from a brand WAC to AWP "was known to be the standard during the [entire] class period" (Trial Tr. (11/15/06) 94:17-20 (Rosenthal)), those who used AWP as a negotiation benchmark "would understand that formulaically there was a difference between WAC and AWP" and that AWP did not equal the price at which manufacturers sold their products or the price at which pharmacies or other providers acquire them.  (*Id.* at 93:22-23 (Rosenthal); *see also id.* at 72:2-15, 75:1-10 (Rosenthal); Kolassa Direct Decl. ¶ 34.)

26.     Substantial sales of Schering's products were made during the class period within the 2% prompt payment discount from WAC, and the vast majority of Schering's sales were made within 5% of WAC.  (*See* Trial Exs. 2933, 2934, 2935, 2955, 2957, 2959; Trial Tr. (12/13/06) 68:2-

11, 85:20-86:10, 103:1-12 (Addanki).)

27.    Reducing Schering's WACs would have reduced revenues from sales near WAC for no reason.  (*See* Trial Tr. (11/15/06) 90:11-91:6 (Rosenthal); Am. Addanki Direct Decl. ¶¶ 17, 21.)

28.    Dr. Rosenthal conceded that the "actual acquisition cost would be lower than AWP with respect to every drug."  (Trial Tr. (11/15/06) 75:1-14 (Rosenthal).)  Every manufacturer would be liable if AWP was required to have equaled ASP.  (*See* Am. Addanki Direct Decl. ¶ 66.)

29.    It is not possible for all customers to purchase at ASP as long as some (such as wholesalers) are paying more; customers "can only get the price they can get."  (*See* Trial Tr. (12/13/06) 97:23-98:6 (Addanki).)

30.    If Schering had reported its ASP as its AWP, all of the customers who purchased at WAC would have been reimbursed at a loss, which would have "price[d] the product right out of the market."  (Trial Tr. (12/13/06) 94:1-95:4 (Addanki).)

### C.    Any But-For AWP Should Be Based on Average Prices Charged by Wholesalers to Their Own Customers.

31.    ASPs are not an accurate measure of what *wholesalers* charge their customers on average, *i.e.*, an "average wholesale price."  (*See* Trial Tr. (12/13/06) 71:11-16 (Addanki).)

32.    When, as often happens, wholesalers act as distributors through which Schering delivers product to Schering's customers (*e.g.*, HMOs and PBMs) at discounted prices negotiated by Schering (*see* Am. Kane Direct Decl. ¶ 14), those discounted prices reflect what Dr. Rosenthal characterizes as true price competition that benefits consumers.  (*See* Trial Tr. (11/15/06) 49:22-50:20 (Rosenthal); *see also* Hartman Direct ¶ 32(e).)  Those prices negotiated by Schering are not indicative of prices wholesalers would charge their customers.  (*See* Trial Tr. (12/13/06) 73:22-74:2 (Addanki).)  Wholesalers' prices, which Schering does not survey, are the prices wholesalers charge when they sell to their own customers.  (*See* Am. Kane Direct Decl. ¶ 13.)

33.    Wholesalers' prices could not be lower than the prices they paid.  (*See* Trial Tr.

(12/13/06) 71:11-72:14 (Addanki).)  There is no evidence that Dr. Hartman examined wholesaler transactions.

34.     On average, Schering's prices to full-line wholesalers are generally at or near WAC. (*See* Trial Exs. 2939, 2960.)  The spreads between these average prices and their AWPs are generally below 30%.  (*Id.*)

**D.      Plaintiffs Did Not Prove Liability for Any Schering Drugs.**

(1)     **Temodar**

35.     Temodar is a self-administered pill used to treat brain cancer.  (*See* Kolassa Direct Decl. ¶ 22; Trial Tr. (12/13/06) 63:8-13 (Addanki).)

36.     During the class period, 77% of all Temodar sales were within 2% of WAC, and 95% were within 5% of WAC.  (*See* Trial Ex. 2935.)

37.     The spread between Temodar prices charged by wholesalers to their customers and AWP on all NDCs at issue is below 30%.  (*See* Trial Ex. 2960.)

38.     After correcting his ASP calculations by removing units of Temodar provided free of charge under Schering's charitable programs, Dr. Hartman's spreads for Temodar throughout the class period are below 30 %.  (*See* Am. Addanki Direct Decl. ¶¶ 69-70; Trial Ex. 2968.)

39.     Given that WAC was a bona fide price at which substantial sales of Temodar were made and given the standard relationship between WAC and brand AWP, there is no factual basis for finding that the AWP of Temodar was manipulated and, thus, no factual basis for finding liability on Temodar in Class 2.  (*See* Am. Addanki Direct Decl. ¶ 21.)

(2)     **Intron-A**

40.     Intron-A is an immunomodulator that is used to treat hepatitis, leukemia, melanoma, follicular lymphoma, condyloma, and AIDS-related Kaposi's Sarcoma.  (*See* Kolassa Direct Decl. ¶ 21.)

41.     Intron-A is primarily a pharmacy-dispensed drug; when it is administered by physicians, it can be reimbursed under Medicare Part B.  (*See* Kolassa Direct Decl. ¶ 21; Am. Addanki Direct Decl. ¶ 36.)

42.     Six of the 26 NDCs of Intron-A are occasionally administered by physicians.  (*See* Hartman Direct Decl. ¶ 189 n.221.)

43.     Throughout the class period, the WACs and AWPs for the physician-administered forms of Intron-A on a per-unit basis were identical to, and moved together with, those of the self-administered forms.  (*See* Am. Addanki Direct Decl. ¶ 36; Trial Exs. 2929, 2930, 2953.)

44.     During the class period, 65% of Intron-A sales were within 2% of WAC, and 78% were within 5% of WAC.  (*See* Trial Ex. 2934.)

45.     The spread between Intron-A prices charged by wholesalers to their customers and AWP on all NDCs at issue was below 30% throughout the class period.  (*See* Trial Ex. 2960.)

46.     Dr. Hartman found only 4 periods out of 46 in which AWPs for the six subject Intron-A NDCs exceeded his calculated ASP by more than 30%, and then only by between 1.4% and 2.6%.  (*See* Trial Ex. 4109.)[2]

47.     The average spread for physician-administered NDCs of Intron-A over the class period was below 30%. (*See id*.)

48.     Given that WAC was a bona fide price at which substantial sales of Intron-A were made and given the standard relationship between WAC and brand AWP, there is no factual basis for finding that the AWP of Intron-A was manipulated and, thus, no factual basis for finding liability on Intron-A in Class 2.  (*See* Am. Addanki Direct Decl. ¶ 21.)

---

[2] Trial Exhibit 4109 is Dr. Hartman's Revised G.4.c chart, which Plaintiffs have asked – without objection – to move into evidence.  Schering's and Warrick's Appendix contains a non-stickered version of this document.

Moreover, the spreads under 2004Q1 are no longer in this case, as this Court ruled on summary judgment.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257-PBS, 2006 WL 3102998, at *10 (D. Mass.  Nov. 2, 2006).

(3)    **Proventil**

49.    Proventil is Schering's branded form of albuterol sulfate used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases.  In its solution form, which is the only form at issue in this case, Proventil is almost exclusively pharmacy-dispensed.  (*See* Kolassa Direct Decl. ¶¶ 20, 23; Trial Tr. (11/15/06) 114:3-5 (Rosenthal).)

50.    For Proventil claims in Class 2, Dr. Hartman calculates spreads for liability as the difference between Proventil's AWP and his calculated ASP, whereas he calculates spreads for damages as the difference between his calculated ASP and the median AWP.  (*See* Trial Tr. (12/13/06) 88:7-19 (Addanki).)

51.    When Dr. Hartman's Proventil ASPs are compared with the median, many of the spreads are negative – *i.e.*, Proventil's ASPs are higher than the median – and those over 30% vanish almost entirely.  Negative spreads indicate that, if a pharmacy used Proventil to fill a Medicare Part B prescription, the pharmacy would lose money; therefore, it is highly unlikely that Proventil could have been marketed or used as a Part B drug, and the factual record does not support a finding of liability for Class 2.  (*See* Trial Ex. 2967; Trial Tr. (12/13/06) 91:17-92:4 (Addanki).)

52.    If Proventil's AWP had been reduced below the median generic AWP, as Dr. Hartman says it should have been (Trial Tr. (11/20/06) 25:16-20 (Hartman)), it would have been further below Proventil's ASP, and there would have been more and larger negative spreads.  (Trial Tr. (12/13/06) 91:17-92:4 (Addanki).)

53.    During the class period, 48% of Proventil sales were within 2% of WAC, and 83% were within 5% of WAC.   (*See* Trial Ex. 2933.)

54.    Because WAC was a bona fide price at which substantial sales of Proventil were made and given the standard relationship between WAC and AWP, there is no factual basis for

finding that the AWP of Proventil was manipulated and, thus, no basis for finding liability on Proventil in Class 2.  (*See* Am. Addanki Direct Decl. ¶ 21.)

55.     Plaintiffs continue to assert a Class 3 claim for Proventil in 1992.  However, Plaintiffs concede that no Class 3 damages for Temodar are warranted because it is self-administered drug.  (*See* Hartman Rule 26 Report Attach. J.5.)  For the same reason, there should be no damages for Proventil in Class 3.

56.     On the basis of the evidence cited above, there is no causal connection between Schering's conduct in relation to Proventil and any loss alleged by Plaintiffs.

## III.   Warrick (and Schering) Multi-Source Albuterol Spreads Were the Result of Ordinary Generic Price Competition, Known to the Public and Taken into Account in Setting Reimbursement Rates

*Spreads on multi-source drugs and for albuterol in particular were known to be large due to price competition; consequently, public and private reimbursement was at a single rate for all versions, and no manufacturer could gain market share by manipulating its AWP.*

### A.     Albuterol Spreads Were Known to Public And Private Payors.

57.     Generic albuterol sulfate is "used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases."  (*See* Weintraub Direct Decl. ¶ 22.)  It is primarily "dispensed by pharmacies for patients to use at home with the help of a machine called a nebulizer" (*see id*. ¶¶ 22-23), and reimbursed under the "Durable Medical Equipment" provision of Medicare Part B.  *See* 42 U.S.C. § 1395 *et seq.*

58.     Both Warrick's 0.5% albuterol solution ("concentrate") and its 0.083% albuterol solution ("unit dose") were launched in 1993 "at a time when several other branded and generic versions of albuterol sulfate had already been introduced to the market."  (Weintraub Direct Decl. ¶¶ 24, 14; *see also* Trial Exs. 2919, 2920 (showing the various brand and generic manufacturers of both the unit dose and the concentrate albuterol for each year of the class period).)  Albuterol sulfate

(including Proventil) was a multi-source drug for the entire period from 1993 forward.  Plaintiffs have identified 29 different albuterol manufacturers over the period.  (*See* Trial Ex. 4007 at 6; *see also* Trial Exs. 2919, 2920.)

59.     To be identified as a generic in the pricing compendia, Warrick followed the advice of First DataBank and set its AWPs 10% to 20% below the AWPs of the branded versions of the drugs.  (*See* Weintraub Direct Decl. ¶¶ 52-53; Trial Tr. (12/12/06) 17:1-21 (Weintraub).)

60.     It has generally been industry practice "that once the generic manufacturers set their AWPs, most manufacturers maintain them at constant levels."  (Hartman Direct Decl. ¶ 32(c); *see also* Trial Tr. (11/15/06) 133:24-134:3 (Rosenthal); Trial Tr. (12/12/06) 57:23-58:11 (Kolassa).)

61.     Warrick "typically suggested an AWP at launch and, in almost all instances, left it untouched for the life of the product."  (Weintraub Direct Decl. ¶ 57; *see also* Trial Tr. (11/27/06) 6:14-19 (Rosenthal); Trial Tr. (12/12/06) 19:18-24 (Weintraub).)  Warrick has not changed the AWP for any subject drug since 1995.  (*See* Hartman Dir. ¶ 32(c) n.48; Weintraub Direct Decl. ¶ 62; *see also* Am. Addanki Direct Decl. ¶ 40.)

62.     Warrick sells its products almost entirely to wholesalers, large chain pharmacies, and generic distributors and, in so doing, competes based on price, quality, and reliability of supply. (*See* Weintraub Direct Decl. ¶¶ 28-32.)  Because of the price-competitive nature of the generic industry, Warrick's principal competitive tool was to "match the price of its generic competitors in order to obtain and maintain business."  (*See id.* ¶ 31.)

63.     Generic manufacturers compete vigorously to provide the generic version of a drug stocked by a particular pharmacy or pharmacy chain.  (*See* Weintraub Direct Decl. ¶ 26; Kolassa Direct Decl. ¶ 49.)  As a result of that competition, Warrick's prices for albuterol sulfate declined substantially over time.  (*See* Weintraub Decl. ¶¶ 14, 19, 26; Hartman Direct Decl. Attach. G.4.a.)

64.     As Dr. Rosenthal agreed, albuterol spreads are determined by "how low the price is,"

– i.e., albuterol spreads are a function of price competition.  (*See* Trial Tr. (12/18/06) 46:22-25 (Rosenthal); *see also* Hartman Direct Decl. ¶ 62 (defining what he considers "spread competition" among the various producers of albuterol as "reducing their ASPs relative to the fixed median AWP"); Trial Tr. (11/20/06) 20:13-19 (Hartman) (noting that generic manufacturers are "essentially selling a commodity, and the ASP is going to fall" after launch); *id.* at 21:14-21 (Hartman) (noting that for generics, manufacturers try "to take market share " by "offer[ing] lower prices").)

65.     Due to stable AWPs and rapidly falling prices of generic drugs, "spreads as a percentage of price can become quite large, although the dollar spreads at issue are usually small relative to dollar spreads on branded drugs."  (Am. Addanki Direct Decl. ¶ 19.)

66.     Since at least 1992, public and private payors have been aware of large spreads for multi-source drugs.  (*See* Trial Tr. (11/20/06) 121:6-122:17 (Hartman); Trial Tr. (12/12/06) 20:3-15 (Weintraub); Trial Tr. (12/12/06) 57:23-58:11 (Kolassa).)  Dr. Rosenthal testified that early in the class period "the watchdog agencies, the General Accounting Office . . . and the Office of the Inspector General on Health and Human Services had identified some of the[] issues" relating to large spreads in the generic market.  (*See* Trial Tr. (11/27/06) 8:3-14 (Rosenthal); *see also* Hartman Direct Decl. ¶ 77(e) (conceding the existence of at least some information that "the spreads on some multi-source drugs were large for some providers over the 1990s").)

67.     During the class period, the federal government published at least 6 reports describing spreads between albuterol solution AWPs and provider acquisition costs.  (*See* Trial Exs. 1064, 1065, 1078A, 1084A, 1103, 1115 (HHS-OIG Reports[3]); Am. Addanki Decl. ¶ 56, Ex. 9A-B; Hartman Direct Decl. ¶ 77(e).)

---

[3] Trial Ex. 1064 (HHS-OIG, *A Comparison of Albuterol Sulfate Prices*, OEI-03-94-00392 4-7 (06/96)); Trial Ex. 1065 (HHS-OIG, *Suppliers' Acquisition Costs for Albuterol Sulfate*, OEI-03-94-00393 6, 9 (06/96)); Trial. Ex. 1078A (HHS-OIG, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* OEI-03-97-00292 7-9 (08/98)); Trial Ex. 1084A (HHS-OIG, *Medicare Reimbursement of Albuterol*, OEI-03-00-00311 1-2, 10-12 (06/00)); Trial Ex. 1103 (HHS-OIG, *Excessive Medicare Reimbursement for Albuterol*, OEI-03-01-00410 8-12 (03/02)); Trial Ex. 1115 (HHS-OIG, *Update: Excessive Medicare Reimbursement for Albuterol*, OEI-03-03-00510 7/10 (01/04).)

68.     Payors knew of large spreads on albuterol specifically as of at least 1996.  Dr. Hartman conceded that, for albuterol, "large spreads . . . began to reach public awareness in 1996." (Hartman Direct Decl. ¶ 77(d) (noting that "a variety of surveys" starting in 1996 focused on albuterol and found "quite large spreads"); *see also* Trial Tr. (11/20/06) 64:22-65:4 (Hartman) (discussing with the Court these albuterol reports and whether they were sufficient to put a reasonable person on notice of the existence of substantial spreads for albuterol); Trial Tr. (11/27/06) 8:15-10:20 (Rosenthal) (acknowledging OIG published multiple public reports on albuterol during the class period and that the Government had "enough information to conclude that the transaction prices were significantly lower" than AWP); Trial Tr. (12/12/06) 144:22-145:14 (Kolassa) (testifying that substantial knowledge existed in the early 1990s); Addanki Direct Decl. ¶¶ 53-56, Ex. 9A (testifying that "very sizable spreads" were publicly known for albuterol by 1996); Berndt Report ¶ 73 ("the fact that AWP very substantially overstates pharmacies' actual acquisition costs for generic self-administered drugs has long been publicly available information").)

**B.      Public and Private Payors Responded to Albuterol Spreads by Using MACs.**

69.     Public and private payors responded to large spreads on generic drugs by imposing maximum allowable costs or "MACs" as uniform maximum reimbursement rates for all manufacturers of a version of a generic drug.  (*See* Am. Addanki Direct Decl. ¶ 10; Kolassa Direct Decl. ¶ 55; Trial Tr. (12/12/06) 58:12-20 (Kolassa).)

70.     Dr. Hartman concedes that six months after generic entry, MACs are widely used by private payors.  (*See* Trial Tr. (11/20/06) 86:12-15 (Hartman).)

71.     As Dr. Rosenthal testified, for self-administered, pharmacy-dispensed generics, "the existence of those spreads is well known" and "one strategy" for responding to those spreads is imposing MACs.  (*See* Trial Tr. (11/15/06) 119:2-6 (Rosenthal); Berndt Report ¶¶ 55-60, 68 (discussing public and private payor use of MACs); *In re Pharm. Indus. Average Wholesale Price*

*Litig.,* 230 F.R.D. at 73 (same).)

72.      Dr. Rosenthal further acknowledged that AWP often influences MACs.  (*See* Trial Tr. (11/15/06) 119:2-6, 119:18-120:6 (Rosenthal).)  However, "most MACs are proprietary" and "the specific formulas that are used to develop those MACs" are unknown, even to Dr. Rosenthal. (*See id.* at 119:7-10 (Rosenthal).)

73.      PBMs and TPPs have imposed MACs on generic drugs that reflect discounts from AWP of 60% or more.  Government entities have imposed MACs on generic drugs that take a number of forms.  For example, the federal government under Medicaid has instituted Federal Upper Limits ("FULs") for generics, and state Medicaid agencies have imposed state-specific MACs for generics.  The federal government also purchases drugs directly under the Federal Supply Schedule contracts and through Veteran's Administration contracts at prices reflecting steep discounts from AWP.  (*See* Kolassa Direct Decl. ¶ 55.)

74.      Throughout the class period, the *upper* limit for Medicare Part B reimbursement of a multi-source drug was a MAC based on "the median of the AWPs of all forms of a drug" within a J-code.  (*See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 70 (citing 42 C.F.R. § 405.17); 42 U.S.C. § 1395u(o); Trial Tr. (12/11/06) 32:11-15 (Hartman).)

75.      For albuterol, median AWPs were computed at different intervals by different carriers with different methods, yielding different rates at the same time, none of which were published or disclosed.  (*See* Trial Ex. 1064 (HHS-OIG, *A Comparison of Albuterol Sulfate Prices*, OEI-03-94-00392 2 (06/96)); Trial Tr. (11/27/06) 14:13-15:6 (Rosenthal).)

76.      It is difficult – if not impossible – for any one manufacturer to affect the median. (*See* Hartman Direct ¶ 32;  Am. Addanki Decl. ¶ 72.)

77.      Because a change in the median applies equally to all competing forms of the product, manufacturers had no incentive to manipulate the median even if they could.  (*See* Am.

Addanki Direct Decl. ¶¶ 71-73.)

78.     There is no correlation between the AWPs for Warrick's albuterol sulfate and its market share. "Even though Warrick's albuterol products had relatively low AWPs, their products often had a large share of the sales for products with comparable descriptions." (Am. Addanki Decl. ¶¶ 39-40; *see also* Kolassa Decl. ¶ 71; Trial Ex. 2951 (comparing the AWP and market share for Warrick's 0.083% albuterol sulfate).)

**C.     The Reimbursement Rate for the 0.083% Solution was Substantially Below the Median AWP.**

79.     Warrick's AWPs for the 0.083% (unit dose) solution of albuterol were always at or below the median. (*See* Am. Addanki Decl. ¶ 39, Ex. 7B.)

80.     Medicare, through Durable Medical Equipment Regional Carriers ("DMERCs"), instituted policies such that the *actual* maximum allowable amount for the 0.083% (unit dose) solution of albuterol (J7619) could be significantly lower than the median AWP. (*See* Trial Ex. 2975 (Decl. of Direct Testimony by Eugene M. ("Mick") Kolassa (Docket No. 3480, Ex. B) ("12/16 Kolassa Decl.") ¶¶ 4, 7-12); Trial Ex. 4097 (Region A DMERC Supplier Manual (Rev. 21, 03/02) at 14.28-7-8).)

81.     Although the median AWP of J7619 was $0.47 per mg for most of the class period, the alternative "maximum allowable amount" for the 0.083% (unit dose) solution of albuterol (J7619), when dispensed in conjunction with ipratropium bromide, was based on the AWP of another form of albuterol and set at $0.14 per unit.

82.     A pharmacist receiving a prescription for albuterol and ipratropium bromide to be dispensed in combination "would dispense a box of the unit dose of albuterol and a box of the unit dose of the ipratropium bromide." (Trial Tr. (12/18/06) 118:7-9 (Kolassa).) Pharmacists in such cases dispense and bill for the unit dose of albuterol; however, under DMERC policy, they are reimbursed at the reduced rate. (*See* Trial Ex. 2975 (12/16 Kolassa Decl. ¶ 10); Trial Tr. (12/18/06)

117:18-121:7 (Kolassa).)[4]  On such claims, the code "CO42" appears, which indicates that the

billed amount exceeded the "maximum allowable amount."  (*See* Trial Ex. 2975 (12/16 Kolassa

Decl. ¶¶ 7-12); Trial Ex. 4097 (Region A DMERC Supplier Manual (Rev. 21 03/02) at 14.28-7-8);

Trial Ex. 2962.)

83.     The use of a "maximum allowable amount" for the unit does of albuterol that is far

below and unrelated to Warrick's AWP (or even the median AWP) for the unit dose is entirely

inconsistent with a basic premise underlying Plaintiffs' case – that all claims for a drug are

reimbursed based on the AWP (or median AWP) of *that* drug, which gives manufacturers an

incentive to inflate *that* individual or median AWP.  (*See* Trial Ex. 2975 (12/16 Kolassa Decl. ¶¶ 2-

3, 8-9) Trial Tr. (12/19/06) 121:24-122:15 (Kolassa).)

84.     This "maximum allowable amount" is consistent with Dr. Rosenthal's testimony that

MAC-based reimbursement is often set by reference to AWP.  (*See* Trial Tr. (11/15/06) 119:21-23

(Rosenthal).)

**D.     Plaintiffs Have Not Met Their Burden of Proof to Identify Purchases of Warrick's (or Schering's) Albuterol That Fall Within the Definition of Class 2.**

85.     A BCBSMA representative testified that that he was not aware of "any way [he]

could determine whether the 20 percent [BCBSMA was] paying was based on AWP."  (Trial Tr.

(11/8/06) 69:8-11 (Mulrey).)

86.     BCBSMA used a PBM for pharmacy-dispensed drugs.  (*See* Trial Tr. (11/20/06)

154:23-25 (Shramek); Trial Tr. (12/13/06) 15:7-15 (Dutch).)  Thus, it is likely that any purchases of

albuterol reflected the PBM's contract pricing.

87.     SMW is not a Massachusetts payor.  SMW's principal place of business is not

---

[4] Plaintiffs argued without evidentiary support that pharmacists would mix and dispense a combination of albuterol concentrate solution and ipratropium.  However, based on consultation with experienced pharmacists, Dr. Kolassa testified that "the pharmacist does not generally premix the albuterol and ipratropium."  (Trial Ex. 2975 (12/16 Kolassa Decl. ¶ 6).)  Dr. Hartman did not consult any pharmacists regarding pharmacy practices and had no basis on which to opine on such practices.  (*See* Trial Tr. (12/13/06) 136:21-135:16 (Hartman).)

Massachusetts.  Its Fund Office is located in Goodlettsville, Tennessee, and its Board of Trustees operates out of Texas.  (*See* Fourth Am. Consolidated Master Class Action Compl. (Docket No. 2171) ¶ 30; Trial Aff. of Glenn Randle (Docket No. 3274-15) ¶¶ 1-2.)

88.     None of the albuterol claims submitted by SMW reflect reimbursement of a Massachusetts provider.  (*See* Trial Ex. 957 (showing reimbursement to Lincare Pharmacy in Amherst, NY); Trial Ex. 957A (same); Trial Ex. 2975 (12/16 Kolassa Decl. ¶ 13).)

89.     All complete SMW Medicare claims for albuterol were or should have been reimbursed based on the $0.14 "maximum allowed amount" rather than the median AWP of $0.47. (*See* Trial Ex. 2975 (12/16 Kolassa Decl. ¶ 13); Trial Ex. 2976.)

90.     Neither BCBSMA nor SMW can tie any claims for albuterol to any specific manufacturer because Medicare claim forms record J-codes, which do not identify the manufacturer.  (*See* Trial Tr. (11/7/06) 16:14-17:6 (Faulkner); Trial Tr. (11/8/06) 46:15-48:5 (Mulrey); Kolassa Decl. ¶ 95; Trial Tr. (12/12/06) 68:14-69:15 (Kolassa).)

## E.     Plaintiffs' "Tacit Nash Equilibrium" Theory Does Not Provide a Basis for Finding Any Incentive to Manipulate the AWP of Warrick's Albuterol.

91.     Plaintiffs' key allegation originally was that pharmaceutical companies compete (not conspire) with one another for market share by increasing AWP to increase spread.  *See In re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. at 94.

92.     Plaintiffs then asserted that generic manufacturers collude to form a "tacit informal Nash equilibrium" to "maintain the median AWP as high as possible, to increase the spreads of all these manufacturers relative to potential alternative therapeutic competitors" to gain market share. (*See* Hartman Direct ¶ 32 (emphasis omitted).)

93.     With respect to generic, pharmacy-dispensed products such as albuterol, Plaintiffs' "tacit Nash equilibrium" theory is factually impossible because, as Dr. Rosenthal conceded, pharmacies have "no role in moving market share" for pharmacy-dispensed drugs; the pharmacy

must dispense the drug prescribed by the physician and may not dispense a "therapeutic alternative" to a prescribed drug.  (*See* Trial Tr. (11/15/06) 131:5-20 (Rosenthal); *see also* Am. Addanki Direct Decl. ¶ 42.)

94.     At trial, Plaintiffs presented a new version of their "tacit Nash equilibrium" theory: Warrick colludes to inflate the median AWP of albuterol, creates spread by reducing its price, and markets the spread in order to gain market share, *i.e.*, Warrick *colludes* with other generic manufacturers in order to *compete* with them.  (*See* Trial Tr. (11/20/06) 20:7-21:21 (Hartman).)

95.     Plaintiffs' assertions regarding the "tacit Nash equilibrium" are inconsistent with the record:

(a)     There is no evidence that Warrick colluded with any other albuterol manufacturer to inflate AWP, and no evidence that Warrick marketed the spread on its albuterol products.

(b)     Both Dr. Hartman and Dr. Rosenthal testified that albuterol spreads resulted from price competition.  (*See* Trial Tr. (11/27/06) 6:9-24 (Rosenthal); Trial Tr. (12/18/06) 46:22-25 (Rosenthal); Hartman Direct ¶ 32.)  Dr. Rosenthal agreed that liability *does not* occur under Plaintiffs' theory "simply because there are spreads produced by discounts."  (Trial Tr. (11/15/06) 66:5-10 (Rosenthal).)

(c)     Harvey Weintraub testified that Warrick competed by meeting competitors on price, not beating their price.  (*See* Weintraub Direct Decl. ¶ 31.)  Dr. Hartman testified that the prices on which generics compete, ASPs, are similar and "are clustering."  (*See* Trial Tr. (11/20/06) 48:4 (Hartman).)

(d)     Given the existence of MAC-based reimbursement and Dr. Hartman's testimony regarding "clustering" of ASPs through competition, there is no evidence – and Warrick had no reason to believe – that Medicare Part B spreads vary significantly from manufacturer to manufacturer and that there would have been an incentive for a pharmacy to select one manufacturer over another based on spread.

96.     On the basis of the evidence cited above, there is no causal connection between Warrick's conduct and any loss alleged by Plaintiffs in relation to generic albuterol.

IV.   **Schering and Warrick Priced Their Drugs At Issue Strictly in Accordance with Known Industry Standards and Marketed Those Drugs on Their Merits**

*In pricing their products, Schering and Warrick at all times adhered to known industry standards. They marketed their products on their merits and not on AWP or spread. Therefore, as set forth below, Schering and Warrick did nothing that could be construed as unfair or deceptive to any member of the class.*

A.   **The Government Never Instructed Any Manufacturer to Report ASP as AWP**

97.   Congress first employed the term "average wholesale price" in Medicare reimbursement rates when it enacted the Balanced Budget Act of 1997. *See* Pub. L. No. 105-33, § 4556(a), 111 Stat. 251 (1997) (codified as amended at 42 U.S.C. § 1395u(o)(1)).

98.   At that time, the Government did not instruct that the standard relationship between AWP and WAC for branded drugs be changed, and it was not changed. Similarly, the Government provided no instruction to change AWPs on generic drugs, and they were not changed. (*See* Kolassa Direct Decl. ¶¶ 32, 65.)

99.   Schering and Warrick continued to set AWPs consistently with historical and prevailing industry standards. (*See* Dutch Direct Decl. ¶ 20; Trial Tr. (12/13/06) 21:23-23:10 (Dutch); Trial Tr. (12/13/06) 45:17-46:3 (Kane).)

100.   As Dr. Rosenthal testified, without instruction from the government to all manufacturers, no one of them could have known how to calculate an appropriate ASP:

(a)   "Consistency would be important" and all companies should use the same rules to derive their ASPs. (Trial Tr. (11/27/06) 20:15-23 (Rosenthal).)

(b)   "As you might imagine, with an entirely new payment system for a large number of drugs, the calculations will be subject to error." (Trial Tr. (11/15/06) 13:16-19 (Rosenthal).)

(c)   "Even after three years" the Medicare program is "continuing to revise the methodology" for the calculation of ASP (*Id.* at 19:22-25 (Rosenthal).)

(d)   She is "not aware of" "any direction from CMS during the class period or from

private payors that would enable manufacturers to address the question of reporting AWP in relation to ASP on a consistent basis." (*Id.* at 21:4-12 (Rosenthal).)

101.    As Schering witness Debra Kane testified, when CMS wants uniform reporting of a price, it provides guidance as to the standards to be followed in the calculations; and no such guidance was ever provided for reporting of AWP. (*See* Trial Tr. (12/13/06) 45:25-46:19 (Kane).)

102.    After the MMA instituted the ASP system, Schering did receive guidance from the government regarding standards for calculating ASP. (*See id.* at 45:25-46:19, 47:22-48:14 (Kane).)

**B.      Neither Schering nor Warrick Had the Information or the Ability to Calculate Average of Prices Charged by Wholesalers to Their Customers for Albuterol.**

103.    When Schering sells through a wholesaler, chain pharmacy, or other intermediary, Schering does not normally know the prices at which the intermediary resells the product. When Schering has a chargeback arrangement with the ultimate customer, Schering has access to the ingredient price paid by such ultimate customer, but even then it does not know the service or handling charges by the intermediary. (*See* Kolassa Direct Decl. ¶ 57; Am. Kane Direct Decl. ¶¶ 13-15.)

104.    When Warrick sells to intermediaries, it does not know the prices at which those intermediaries resell. (*See* Weintraub Direct Decl. ¶¶ 43-44.)

105.    Wholesaler margins vary by product over time. They can be significant, ranging from 3% up to 43% for some products, including albuterol sulfate. (*See* Trial Ex. 1064 (HHS-OIG, *A Comparison of Albuterol Sulfate Prices*, OEI-03-94-00392 5-6 (06/96)); Trial Ex. 1065 (HHS-OIG, *Suppliers' Acquisition Costs for Albuterol Sulfate*, OEI-03-94-00393 Appendix B (06/96)) (listing acquisition cost from manufacturer as $0.14 and wholesaler charge to supplier as $0.20, with $0.06 difference reflective of 43% wholesaler margin)).)

### C.      Other Documents and Testimony Offered by Plaintiffs are Irrelevant.

106.    Plaintiffs' sole fact witness against Schering and Warrick, G. Raymond Pironti, Jr.,[5]
did not testify concerning the marketing of drugs on the basis of their AWPs or spreads.  He
testified to alleged Medicaid Best Price reporting violations on drugs not at issue, particularly
Claritin.  (*See* Trial Tr. (11/16/06) 102:25-104:9, 107:7-20, 121:18-122:14, 140:3-8 (Pironti).)
When asked by the Court "[h]ow does this involve AWP at all" (*see id.* at 128:9), Mr. Pironti
testified that it did not, and later agreed that a physician or a pharmacist "doesn't care" about the
conduct he described because its alleged targets were PBMs and not doctors.  (*See id.* at 137:13-
138:10 (Pironti); *see also id.* at 103:22-105:1, 108:9-109:3, 129:18-130:2, 136:14-17 (Pironti).)

107.    The Warrick price change notices proffered by the Plaintiffs (*e.g.*, Trial Exs. 4080,
4081, 4083) do not show spreads or any reimbursement rates; in particular, they do not show
Medicare MAC-based reimbursement rates – *i.e.*, the median AWP or the DMERC $0.14 unit dose
"maximum allowable amounts."  None shows final prices paid by providers.

108.    Plaintiffs' Exhibit 394, which is an email related to sales of Intron-A in Florida – *not
Massachusetts* – does not compare reimbursement for Intron-A with that of any competitor; it
shows the difference between Medicare reimbursement for Intron-A and its publicly available list
price ("NDP"), neither of which is a secret.  (*See* Trial Tr. (12/13/06) 132:6-12, 133:22-135:2
(Addanki).)  No spread is shown in the document, and the spread that could be calculated from the
information that is shown is 14%.  (Trial Tr. (12/13/06) 40:23-41:1 (Dutch).)[6]

---

[5] Portions of Mr. Pironti's written direct are subject to a motion to strike.  (*See* Schering's and Warrick's Mem. in Supp.
of Mot. to Strike Portions of Trial Aff. of G. Raymond Pironti, Jr. [Docket No. 3404].)

[6] Plaintiffs proffered Exhibit 497, an internal email that relates to a drug not at issue in the case (Rebetol) and that is
purely hypothetical.  Schering continues to object to its admission into evidence.

V.     **The Evidence is Inconsistent with Dr. Hartman's Method of Calculating Class 2 Damages for Multi-Source Drugs.**

*Dr. Hartman's methodology for calculating Class 2 damages incorporates assumptions that are inconsistent with claims data, CMS practice, and all other evidence.*

109.    Dr. Hartman testified that his method of calculating Class 2 damages for multi-source drugs uses national survey data (NDTI and/or NAMCS) to arrive at "the percentage of units reimbursed under Medicare."  (*See* Trial Tr. (11/20/06) 40:19-41:10 (Hartman).)   He then applies that percentage to the sales of a manufacturer of the drug to arrive at the percentage of the manufacturer's sales that were reimbursed by Medicare.  (*See id.* at 46:16-47:7 (Hartman).)  The evidence does not support this assumption, as illustrated by its application to perphenazine, a Warrick multi-source drug.  The CMS website shows total perphenazine reimbursement by Medicare was approximately $50,000 for all manufacturers for the entire class period (*see* Am. Addanki Decl. n.1 (incorporating by reference Report of Sumanth Addanki (3/12/06) ¶ 17 n.2)); yet Dr. Hartman's methodology led him, earlier in the litigation, to the conclusion that Warrick alone was liable for damages of over $2 million on a national basis.  (*See* Hartman Rule 26 Report Attachs. J.5.b, J.5.d.)  Dr. Hartman's calculation of damages at 40 times actual reimbursement reflects a serious structural flaw in his methodology.  Dr. Hartman concedes that it is "exactly right" that there is "absolutely no data" that will identify the portion of Medicare reimbursement within a J-code that can be tied to a specific manufacturer.  (*See* Trial Tr. (11/20/06) 48:10-25 (Hartman).) His methodology is his effort to solve that problem.  The structural error in his methodology demonstrates that he has not solved that problem.

110.    Dr. Hartman also assumes that all providers bill at the *maximum* statutory reimbursement rate.  (*See* Trial Tr. (11/20/06) 26:3-18 (Hartman).)  The evidence does not support this assumption.  The only provider claim forms in evidence are the SMW albuterol claims, and most of them are billed at an amount lower than AWP.  (*See* Trial Tr. (12/12/06) 67:4-70:12

(Kolassa) (discussing Trial Ex. 957A and explaining the claim shows a billed amount of $90 when the AWP-based amount would be $123); *id.* at 78:13-79:6 (Kolassa) (discussing Trial Ex. 2966 and noting, for all these claims, the AWP-based amount would have been $123); Trial Ex. 957A (example of claim where provider billed at less than AWP); Trial Ex. 2966 (showing 14 of 21 instances where providers billed less than AWP).)  Given that Medicare reimburses at the *lesser* of the billed amount and the statutory reimbursement rate, *see, e.g.*, 42 C.F.R. 405.517(c) (1998), Dr. Hartman's calculation of Class 2 damages for albuterol is not consistent with the evidence.

111.    Dr. Hartman assumes that the reimbursement rate used by Medicare is always the statutory maximum rate for the 0.083% unit dose (J7619) of approximately $0.42.  (*See* Trial Tr. (11/20/06) 26:3-18 (Hartman).)  That assumption is also contradicted by Medicare's use of an alternative and lower "maximum allowable amount" of $0.14 for the 0.083% solution unit dose of albuterol – an alternative reimbursement method that has been in effect since 1997.  (*See* ¶¶ 79-83 *supra*.)  Dr. Hartman learned of this alternative reimbursement rate in the "last week" of trial as Schering and Warrick presented their case and put the issue into evidence.  (Trial Tr. (12/18/06) 150:7-14 (Hartman).)  The existence of the $0.14 "maximum allowable amount" undermines Dr. Hartman's calculations of share data, which he made before learning of the alternative rate.  "Step Six" of Dr. Hartman's Class 2 methodology is "Determine Units Subject to Damage Calculations." (Trial Tr. (11/20/06) at 39:19-23 (Hartman); Slides for Oral Test. of Raymond S. Hartman (11/20/06) at 41-46.)  Following the discovery of a lower reimbursement rate applicable to those units, Dr. Hartman did not reduce the amount of his damages calculation – in fact, he suggested that damages could now be higher.  (Trial Tr. (12/18/06) 141:25-143:2 (Hartman).)  However, because the $0.14 rate is one-third of the $0.42 rate, it follows that reducing the reimbursement rate necessarily requires that the number of units be reimbursed three-fold.  Because Dr. Hartman included 58% of Warrick's albuterol units in his calculation of Class 2 damages at the higher rate,

his methodology could attribute 174% of Warrick's albuterol unit sales to Class 2.

112.    Dr. Hartman's assumption that a reduction in albuterol's AWP would cause a dollar-for-dollar reduction in reimbursement is contrary to undisputed evidence that Medicare used spreads on drugs to cross-subsidize drug administration fees.  (*See* Joint Findings ¶¶ 87-90, 92-93.) Under the MMA, when Medicare began reimbursing drugs on an ASP plus 6% basis, CMS increased the dispensing fee for albuterol more than ten-fold, from $5 to $55 for a month's supply. As a result, total reimbursement for the 0.5% solution increased.  (*See* Trial Exs. 2947, 2918; Trial Tr. (12/13/06) 106:3-107:14 (Addanki).)  Plaintiffs introduced no evidence to the contrary. Plaintiffs attempted to show that total reimbursement for the 0.083% solution decreased (*see* Trial Ex. 4095); however, their calculations used the median AWP instead of the $0.14 "maximum allowable amount."  When the calculation is made using the $0.14 reimbursement rate, total reimbursement under the MMA increased for the 0.083% solution as well as the 0.5% solution. (*See* Trial Exs. 2969, 2970.)  In addition, Plaintiffs produced no evidence that any Massachusetts payor has switched from an AWP-based system to an ASP-based system since Medicare did so. Thus, the evidentiary record is contrary to Dr. Hartman's assumption of causation.

Respectfully submitted,

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Schering-Plough Corporation and
Warrick Pharmaceuticals Corporation*

Dated: January 19, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2007, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Eric P. Christofferson
Eric P. Christofferson