## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456

THIS DOCUMENT RELATES TO
01-CV-12257-PBS and 01-CV-339

Judge Patti B. Saris

TRIAL OF CLASS 2 AND 3 CLAIMS

## APPENDIX OF SELECTED MATERIALS CITED IN
## THE JOHNSON & JOHNSON DEFENDANTS' PROPOSED
## FINDINGS OF FACT RELATING TO PROCRIT® AND REMICADE®

Annexed hereto are copies of the cited pages from the deposition testimony

referenced in the J&J Defendants' Proposed Findings of Fact Relating to Procrit® and

Remicade®. All of the other cited materials were provided during the trial. If the Court believes

it would be useful to receive copies of additional cited materials, we will gladly provide them.

| Tab No. | Where Cited in Proposed Findings | Deponent |
|---------|----------------------------------|----------|
| Tab 1 | ¶ 20 | Deposition of Thomas Hiriak, Jul. 28, 2004 |
| Tab 2 | ¶ 20 | Deposition of Thomas Hiriak, Nov. 10, 2004 |
| Tab 3 | ¶ 21 | Deposition of John Hess, Mar. 24, 2006 |
| Tab 4 | ¶ 21 | Deposition of James Robbins, Mar. 22, 2006 |

Dated:  January 19, 2006          Respectfully submitted,

/s/ William F. Cavanaugh, Jr.
William F. Cavanaugh, Jr.
Andrew D. Schau
Erik Haas
Adeel A. Mangi
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036-6710
(212) 336-2000

Attorneys for the Johnson & Johnson Defendants

## Certificate of Service

I certify that a true and correct copy of the foregoing was served on all parties on

January 19, 2006 via LEXIS/NEXIS.

/s/ Andrew D. Schau
Andrew D. Schau

1339050v1

# TAB 1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    -------------------------------------x

6    IN RE PHARMACEUTICAL INDUSTRY

7    AVERAGE WHOLESALE PRICE LITIGATION,

8    -------------------------------------x

9

10   Civil Action:  01-CV-12257-PBS

11

12                         July 28, 2004

13                         9:40 a.m.

14

15       H I G H L Y   C O N F I D E N T I A L

16

17       30(b)(6) Deposition of THOMAS HIRIAK,

18   held at the offices of Patterson Belknap

19   Webb & Tyler, before David Henry, a

20   Certified Shorthand Reporter and Notary

21   Public of the State of New York.

22

1        Q.    So has it only been used for

2    managed care organizations?

3        A.    Yes.  So when you say retail,

4    again I'm putting those together.  So yes,

5    in that case there is, but again, the focus

6    was to deliver a cost message just using AWP

7    as a benchmark for reimbursement.  In terms

8    of discussing or analyzing there are --

9        Q.    I'm sorry, I'm going to talk to

10   you about that later.  You are talking about

11   the profit calculator, is that what it's

12   called, or some kind of calculator?

13       A.    Yeah, we didn't call it profit

14   calculator.

15       Q.    I apologize, I'm not trying to --

16   I don't recall what it's called.

17       A.    We did, internally might have

18   seen information about a calculator and that

19   was one of the programs that we developed,

20   yes.

21       Q.    And did that ever show what the

22   margin that a doctor would receive from

1    reimbursement over cost?

2         A.    It showed more what the cost of

3    Procrit was versus Aranesp using AWP as a

4    benchmark.  So it was more to say to a

5    managed care organization, what is your

6    reimbursement rate for Procrit, AWP minus 15

7    or whatever, they could plug that in and in

8    the end it was intended to show the

9    differences in cost.  But again, it did use

10   AWP --

11        Q.    It used AWP based reimbursement?

12        A.    Correct, yes, but it was not

13   intended, it was not used with physicians.

14   In terms of discussing and analyzing, again,

15   there has been a model that's been developed

16   breaking hospitals into three buckets,

17   Medicare reimbursement for out-patients,

18   private pay, out-patient, and then

19   in-patient.  And that can show how much, or

20   the financial picture for hospitals, that's

21   been an analysis that's been done.

22        Q.    Who did that analysis?

1        Q.    As it related to MCO's.

2        A.    But this is a different --

3        Q.    A different calculator.

4        A.    Yes.

5        Q.    And this calculator had no

6   reference to AWP based reimbursement?

7        A.    No.

8              MR. SCHAU:    He meant to ask you

9   if it had a reference, actually the way

10  he -- you asked, does it have no

11  reference --

12             THE WITNESS:    It did not have a

13  reference to AWP.

14        Q.    I'm having trouble.  How would

15  the physician or clinic know -- how would

16  then able to compare the revenue they were

17  going to get in light of your discounts and

18  rebates from OBI versus the ones that are

19  being offered from Aranesp without the

20  variable of knowing what their reimbursement

21  would be?

22        A.    They couldn't.

# TAB 2

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3

 4      IN RE:  PHARMACEUTICAL        )

        INDUSTRY AVERAGE             )   MDL No. 1456

 5      WHOLESALE PRICE              )

        LITIGATION                  )   No.

 6      ------------------------  )   01-CV-12257-PBS

        This Document Relates to   )

 7      All Actions                 )

        ------------------------  )

 8

 9

10      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12                        November 10, 2004

13                          9:45 a.m.

14

15              Continued deposition of THOMAS HIRIAK,

16      held at the offices of Hogan & Hartson, 875 Third

17      Avenue, New York, New York, pursuant to notice,

18      before Laurie A. Collins, a Registered Professional

19      Reporter and Notary Public of the State of New

20      York.

21

22
```

1  foundation. I don't think that's answerable.

2       But if you can, go ahead.

3    A.    Portions of this is accurate, the list

4  plus 20 percent being our AWP, our Medicare

5  reimbursement being AWP minus 5. Those -- that

6  type of information.

7       I don't know when this document --

8    Q.    And that information would have come

9  from people at OBI; is that correct?

10   A.    I would assume PWC could have picked

11  that up from public sources. They wouldn't have

12  had to come to Ortho Biotech for that.

13   Q.    Turn to page 35 it says at the top: A

14  benefit calculator enables tracking of incremental

15  profit gain/loss derived by physicians in oncology

16  for prescribing Procrit rather than NESP under a

17  variety of pricing strategies.

18       Do you see that?

19   A.    Yes.

20   Q.    Do you know if a benefit calculator was

21  ever created and distributed in field materials to

22  practices?

```
 1        A.    It was not.

 2        Q.    Are you sure it was not or you think it

 3   was not?

 4        A.    No, I know it was not.

 5        Q.    How do you know that?

 6        A.    Because of the definition a benefit

 7   calculator enables tracking of the incremental

 8   profit gained/lost by physicians in oncology.  We

 9   have not distributed any type of materials that

10   would enable tracking of incremental profit gain or

11   loss.  We have done different types of CD-ROMs, but

12   they have all been cost-based.  So a benefit

13   calculator is tough for me to say.  But when you

14   define it as enabling tracking of the incremental

15   profit gained or lost, I would say no, that was not

16   distributed in the field.

17        Q.    Was it credited internally and used

18   internally at OBI?

19        A.    I don't ever remember seeing a database,

20   an Excel spreadsheet, a CD-ROM that was termed a

21   benefit calculator.  But as we talked about earlier

22   internally, we do do analysis looking at the impact
```

1   analyze their practice differently than other

2   physicians.  So there could be a couple different

3   factors.

4       Q.   Do you know whether or not this last

5   bullet point we've been discussing, which is the

6   second-to-last on the page, was implemented as a

7   strategy by OBI in dealing with physician

8   practices?

9       A.   I don't know if I can answer

10   specifically the question as it relates to this

11   bullet point.  But have we gone out with a clinical

12   value message saying that Procrit is we believe

13   superior to Aranesp?  Yes.  Have we gone out with a

14   practice economics message that we believe is

15   appropriate, meaning lower health care costs, lower

16   patient copays, which may be different than the way

17   that PWC defined it in this document, but have we

18   gone out with a message talking about the savings

19   to the health care system?  The answer to that is

20   yes as well.

21       Q.   Right.  But prior to going out with that

22   message about the savings to the health care

1    system, was there ever a time where the message to

2    physician practices was that there is -- that

3    practice economics here in connection with the

4    prescription of -- at the prescribing of Procrit is

5    favorable?

6              MR. MANGI:  Just to be clear, are you

7    talking about the administration of Procrit?

8    You're excluding the retail sector when you say

9    "prescribing Procrit"?

10             MR. HOFFMAN:  Yes.

11       A.    There was a message about the fact of

12   reimbursement and that reimbursement is available

13   for Procrit.  But if you're saying did we quantify

14   that into a profit message, the answer to that

15   would be no.

16       Q.    How about prior to Aranesp coming on the

17   market, was this message ever delivered to

18   practices, the economics -- the practice economics

19   message?

20       A.    Practice economics from a profit

21   perspective?

22       Q.    From a favorable amount of reimbursement

1    perspective.

2         A.    Again, differentiating between the two,

3    the fact of reimbursement that it's widely

4    available for Procrit, yes.  The fact quantify

5    here's how much you, Mr. Oncologist, can make on

6    Procrit?  The answer to that would be no.

7         Q.    Without telling them exactly how much

8    they can make, was it ever communicated to the

9    practices that there was a favorable amount of

10   reimbursement that will be provided to those who

11   use Procrit?

12            MR. MANGI:  Object to the form.

13        A.    Again, maybe -- I don't mean not to

14   answer your question.  But if you're saying the

15   fact of reimbursement that Medicare and private

16   payors broadly --

17        Q.    No, I'm talking about the amount.

18        A.    No.

19        Q.    The amount of reimbursement being

20   favorable.

21        A.    No.

22        Q.    Not even speaking in general terms, it

1    was never communicated to practices the

2    economics -- the practice economics message that

3    there's a favorable amount of reimbursement to be

4    received for those who prescribe Procrit?

5            MR. MANGI:  Again, objection to the

6    form.  I'm not sure what you mean by "favorable."

7            But has that word ever been used in

8    conveying the message?

9            THE WITNESS:  Not that I'm aware.  The

10   corporate direction has been clear.  You can't in

11   any way talk about profit margins -- product

12   specialists can't be talking about that to

13   oncologists.

14       Q.    When did that come into effect?

15           MR. MANGI:  Objection, asked and

16   answered.

17       A.    From the discussions I've had with

18   people, that has always been in effect at Ortho

19   Biotech.

20           MR. HOFFMAN:  I'd like to mark as

21   Exhibit Hiriak 018.

22           (Exhibit Hiriak 018 document, Bates

# TAB 3

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS ·

3      -------------------------------

4      In Re:  Pharmaceutical Industry: MDL Docket No.

5      Average Wholesale Price        : Civil Action

6      Litigation                     : 01CV12257-PBS

7      -------------------------------

8      This Document relates to:      :

9      All Actions                    :

10     -------------------------------

11                HIGHLY CONFIDENTIAL

12                ORAL DEPOSITION OF

13                  JOHN R. HESS

14              FRIDAY, MARCH 24, 2006

15              MINNEAPOLIS, MINNESOTA

16

17          Oral Deposition of JOHN R. HESS taken at

18     the law offices of Heins, Mills & Olson, 3550

19     IDS Center, 80 South Eighth Street, Minneapolis,

20     Minnesota on Friday, March 24, 2006, commencing

21     at 9:30 a.m. before Rebecca L. Klanderud, a

22     Certified Shorthand Reporter.

1        A.    The main responsibility again was to

2   manage a group of sales representatives again in

3   this upper Midwest area overseeing their activities

4   regarding the sales of Procrit.

5        Q.    Now, I've heard or I've seen references to

6   a Minneapolis district.

7             Were you the district manager for

8   Minneapolis?

9        A.    That's correct.

10        Q.    Okay.  And that would have been during

11   that entire time period?

12        A.    Correct.

13        Q.    Was the Minneapolis district comprised of

14   geographic territories or something different than

15   that?

16        A.    Geographic territories, correct.

17        Q.    Okay.  What parts of the Midwest were

18   covered?

19        A.    Okay.  Minnesota, Wisconsin, Iowa,

20   Nebraska, the Dakotas, Missouri, and Kansas.

21        Q.    Approximately, how many sales reps would

22   have comprised your sales force in the Minneapolis

1    district?

2         A.    There was ten.

3         Q.    Covering all those states?

4         A.    Actually, there were realignments and

5    changes in our division boundaries.  So at one

6    point, I actually lost -- I'm trying to remember.  I

7    believe I lost part of Wisconsin, but they realigned

8    things usually every other year, and so there was

9    minor shifts in that. But typically, those ten reps

10   would have covered that geography.

11        Q.    Okay.  And ten reps would have been the

12   approximate size of the sales group during that

13   entire '92 to '97 time frame?

14        A.    Correct.

15        Q.    And these particular reps, how were they

16   designated for certain areas?

17              Was it based on volume or customers in a

18   particular area, or is it purely geographic?

19              MR. MANGI:  Object to the form.

20              THE WITNESS:  Really, it's where they live

21   and around metropolitan areas, and their territories

22   are set up based on just the geography and the

```
 1    under our reimbursement assurance program.

 2            Do you recall Margaret Gardner discussing

 3    those ideas at this western regional meeting?

 4            MR. MANGI:  Objection, asked and answered.

 5            THE WITNESS:  No, I don't.

 6    BY MR. WILLIAMS:

 7        Q.   Do you ever recall discussing with your

 8    sales reps the need or the ability to discuss profit

 9    when an office raises -- raised an objection about

10    the expense of Procrit therapy?

11        A.   No.  It's something I did not do. Whenever

12    I worked with my reps, our whole focus on any visit

13    with a rep, our whole objective for the sales reps

14    and for myself was to focus on Procrit, you know,

15    what it is, the clinical studies that were approved,

16    and actually promoting it as approved by the FDA for

17    the indications that we were selling it for.

18            So that -- on every call that we ever went

19    on, that was the actual focus of our call was the

20    clinical selling of the product and trying to

21    convince the physician that Procrit would be a

22    viable option for a patient, you know, that's
```

1  suffering from anemia.

2      Q.   Did you ever discuss profit, office profit

3  with customers relating to Procrit on the sales

4  calls that you attended?

5      A.   No, I did not.

6      Q.   Are you aware if your sales reps ever

7  discussed the notion of an office returning profit

8  relating to the use of Procrit with customers?

9      A.   No.  I was never aware of it.  And any

10  visit that I ever went on with them, that was never

11  anything that I observed.

12      Q.   Are you aware of customers ever inquiring

13  to you or to your sales reps if there was to be any

14  profit made from Procrit use?

15      A.   No.

16      Q.   This notion of a reimbursement assurance

17  program, do you have a recollection or understanding

18  what that is?

19      A.   I don't recall the specifics of that

20  program.  I do remember that we did have a

21  reimbursement support program, but I don't recall

22  what the specifics were of that, how it worked.

# TAB 4

1            UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3    IN RE:  PHARMACEUTICAL      )

4    INDUSTRY AVERAGE            ) MDL No. 1456

5    WHOLESALE PRICE             )

6    LITIGATION                  ) Civil Action No.

7    - - - - - - - - -  - - -  ) 01-CV-12257-PBS

8    This Document Relates to   )

9    All Actions                ) Volume II

10   - - - - - - - - - - - - -  )

11    HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

12                   March 22, 2006

13                    1:23 p.m.

14

15            Continuation of the deposition of

16   JAMES N. "DICK" ROBBINS, held at the Courtyard

17   Atlanta Marietta, 2455 Delk Road, Marietta,

18   Georgia, before Suzanne Beasley, a Registered

19   Professional Reporter and Notary Public of the

20   State of Georgia.

21

22

1    issues, where he's saying you have to be able to
2    tactfully discuss how an office can profit.  So now
3    was that a regional plan?
4        A.    You know, I can't speak for John Hess or
5    George Mooney.  All I can say is that that was not
6    company direction.  And I can say John Hess is no
7    longer with the company.  He was not a successful
8    district manager.  And George Mooney is no longer
9    with the company, and he was not a successful
10   business manager, so I can't tell you what was on
11   their mind.
12       Q.    Let me just interrupt for one minute.
13       A.    Yes.
14             MR. VERDERAME:  We're going to mark
15   another exhibit here.  Mark this Exhibit Robbins
16   022.
17                 (Exhibit Robbins 022 and Exhibit
18   Robbins 023 were marked for identification.)
19   BY MR. VERDERAME:
20       Q.    And I'll represent to you -- we can look
21   at these together -- that these are pages taken out
22   of OBI's organizational charts.

Page 463

1         A.    Uh-huh.

2              Q.    And the first page we're looking at is a

3    1997 chart, MDL-OBI00054182, showing John Hess as

4    the district manager in Minneapolis.  Do you see

5    that there?

6         A.    Uh-huh.

7              Q.    And then the next page is a March of 1998,

8    that Bates number is MDL-OBI00054249, and John Hess

9    is right in the middle.  He's now a strategic

10   accounts manager.

11        A.    Uh-huh.

12             Q.    So is it fair to say there was not an

13   adverse reaction to him between April and May of

14   1997 and 1998, despite the fact that he circulated

15   this memo in 1996?

16        A.    I don't know who -- I don't know if this

17   was ever -- you know, first of all, John didn't

18   report to me.  I don't know if this was ever -- if

19   this was a -- if this was seen and addressed.  I

20   don't know if this was a common practice of John's.

21   I can't speculate beyond this paragraph here, but

22   that was not the practice of the company.