# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| 01-CV-12257-PBS AND 01-CV-339 | |
| TRIAL OF CLASS 2 AND 3 CLAIMS | |

## SCHERING'S AND WARRICK'S POST-TRIAL BRIEF

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

I.      PLAINTIFFS' THEORY OF LIABILITY FAILS AS TO PHARMACY-DISPENSED DRUGS .................................................................................................................. 3

II.     PLAINTIFFS' CASE FAILS AS TO ALBUTEROL ........................................................ 4

     A.     There Was No Incentive to Manipulate the AWP of Albuterol............................. 4

          1.     Plaintiffs' Factual Characterizations are Unsupported ............................... 4

          2.     Plaintiffs' Legal Arguments Fail ............................................................... 5

     B.     Public Knowledge of Albuterol Spreads Bars Plaintiffs' Claims under the Statute of Limitations and Defeats Them on the Merits ...................................................... 6

          1.     The Statute of Limitations Bars Claims Prior to 1997................................ 6

          2.     Principles of Chapter 93A Liability Bar Claims After 1997 ..................... 8

     C.     The Named Class 2 Representatives Fail to Establish a Claim as to Warrick...... 10

          1.     Plaintiffs Did Not Establish that They Reimbursed for Warrick's Albuterol ..................................................................................................................... 10

          2.     Plaintiffs Did Not Establish that Any Albuterol Claim Was Reimbursed on the Basis of AWP..................................................................................... 11

     D.     Other Scant Documents and Testimony Do Not Support Liability ..................... 13

III.    PLAINTIFFS' CASE FAILS AS TO SCHERING BRANDED PRODUCTS ................. 14

     A.     Temodar ......................................................................................................... 14

     B.     Intron-A.......................................................................................................... 15

     C.     Proventil......................................................................................................... 16

IV.    PLAINTIFFS CANNOT SHOW SCHERING OR WARRICK HAD CULPABLE KNOWLEDGE OR INTENT ...................................................................................17

CONCLUSION................................................................................................................... 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47 (1st Cir. 1998) ................................2

*Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 928 F. Supp. 1189 (D. Mass. 1996) ............8

*In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999) ........................................................................................................... 4-5, 16

*Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181 (2d Cir. 2005) ...................................12

*Epstein v. C.R. Bard, Inc.*, 460 F.3d 183 (1st Cir. 2006) ....................................................7

*Federated Nationwide Wholesalers Serv. v. F.T.C.*, 398 F.2d 253 (2d Cir. 1968) ............14

*J.E. Pierce Apothecary v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119 (D. Mass. 2005) ..........................................................................................9

*James L. Miniter Ins. Agency Inc. v. Ohio Indem. Co.*, 112 F.3d 1240 (1st Cir. 1997) ........................................................................................................................14

*Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60 (D. Mass. 2001) ...........................9

*Martel v. Stafford*, 992 F.2d 1244 (1st Cir. 1993) ...............................................................5

*Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404 (D. Mass. 1995) .........................................................................................................................2

*Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1 (D. Mass. 2001) .................... 5-6

*Payton v. Abbott Labs.*, 512 F. Supp. 1031 (D. Mass. 1981) ..............................................6

*In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ....................................................................................................................3, 12

*Polycarbon Indus., Inc. v. Advantage Eng'g, Inc.*, 260 F. Supp. 2d 296 (D. Mass. 2003) ......................................................................................................................10

*Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23 (D. Mass. 2006) ..............2

*Santiago v. Sherwin-Williams Co.*, 3 F.3d 546 (1st Cir. 1993) ...........................................5

*Sarocco v. Gen. Elec. Co.*, 939 F. Supp. 91 (D. Mass. 1996) .............................................8

*Spencer v. Baxter Int'l, Inc.*, 163 F. Supp. 2d 74 (D. Mass. 2001) .....................................6

*State Resources Corp. v. Architectural Team, Inc.*, 433 F.3d 73 (1st Cir. 2005) ..............17

## STATE CASES

*Brown v. Superior Court*, 751 P.2d 470 (Cal. 1988) .............................................................6

*Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017 (Mass. 2004) .........................6

*McCann v. Davis, Malm & D'Agostine*, 669 N.E.2d 1077 (Mass. 1996) ...........................9

*Mechs. Nat'l Bank of Worcester v. Killeen*, 384 N.E.2d 1231 (Mass. 1979).....................18

*Payton v. Abbott Labs.*, 437 N.E.2d 171 (Mass. 1982).........................................................5

*Puritan Med. Ctr., Inc. v. Cashman*, 596 N.E.2d 1004 (Mass. 1992) ............................ 7-8

*Swanson v. Bankers Life Co.*, 450 N.E.2d 577 (Mass. 1983) ..............................................8

*Underwood v. Risman*, 605 N.E.2d 832 (Mass. 1993) .....................................................18

## STATUTES AND REGULATIONS

16 C.F.R. § 233.3 (2006) ...................................................................................................14

940 Mass. Code Regs. § 3.04 (2006)................................................................................14

## OTHER AUTHORITIES

Restatement (Second) of Torts § 433B (2006) ..................................................................6

Schering-Plough Corporation ("Schering") and Warrick Pharmaceuticals Corporation ("Warrick") respectfully submit the following post-trial brief.

## PRELIMINARY STATEMENT

Plaintiffs' case against Schering and Warrick fails for the fundamental reason that its foundation – that manufacturers can exploit the financial incentives of drug-dispensing physicians by inflating AWPs – is lacking. Schering's and Warrick's drugs are dispensed by pharmacies, not physicians. There is no place for "mischief" in the pharmacy market, which is dominated by PBMs and characterized by robust competition. Lacking any foundation, Plaintiffs' case against Schering and Warrick consists of a patchwork of unsupported assumptions, conclusory assertions, and specious legal theories.

Plaintiffs' case is weakest as applied to its biggest target, albuterol. Warrick's albuterol is doubly distant from Plaintiffs' paradigm because it is a generic drug, and as such it is reimbursed by Medicare and private payors at the same rate as all other versions of the drug, and not on the basis of its own AWP. Because it is dispensed by pharmacies, Plaintiffs' notion that all manufacturers of the drug form a "Nash equilibrium" to gain market share from "therapeutic alternatives" founders on the fact that pharmacies cannot dispense "therapeutic alternatives" to fill prescriptions for albuterol. Their theory that manufacturers collude with each other in order to compete with one another is nonsensical. Plaintiffs' unavoidable concession that albuterol is the paradigm of a drug known to have had large spreads not only bars their claims under the statute of limitations, but also defeats their claims on the merits; widespread public knowledge of spreads negates any possibility that the spreads were secret, which is the *sine qua non* of the Plaintiffs' theory. Indeed, it was this public knowledge of large spreads that led to albuterol's being reimbursed by Medicare at rates far below any function of AWP—a maximum allowable amount of $0.14 versus a median AWP of $0.47.

Schering's branded drugs at issue – Temodar, Intron-A, and Proventil – are also dispensed by pharmacies and thus removed from any incentives that might cause "mischief." Further, all of them were sold in substantial quantities at their list prices – WACs – that bore known, industry-standard relationships to their AWPs. For that reason, too, there is no room for manipulation of AWPs.

The Court has held that Congress used "average wholesale price" in 1997 to mean an average of prices charged by wholesalers. The evidence is undisputed that everyone else – including HCFA, CMS, members of the Plaintiff classes, and drug manufacturers – used the term long before then to have had a different meaning. The unequivocal evidence in this case is that Schering and Warrick understood the term to have had the same meaning after 1997 as it indisputably had before; they would have expected the Government to issue guidelines for calculating actual averages if the Government had expected AWPs to have been calculated as actual averages; and no such guidelines were ever forthcoming.

## ARGUMENT

"The burden of establishing liability under Chapter 93A is demanding . . . ." *Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23, 29 (D. Mass. 2006). Plaintiffs bear the burden of proving by a preponderance of credible evidence that Defendants engaged in unfair or deceptive acts that caused a loss of money or property. *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir. 1998). Without ample evidence of such wrongdoing and injury, "the wrath of chapter 93A cannot be unleashed." *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 425 (D. Mass. 1995) (Saris, J.). Plaintiffs have not even approached these exacting standards.

I.      **PLAINTIFFS' THEORY OF LIABILITY FAILS AS TO PHARMACY-DISPENSED DRUGS**

Plaintiffs' theory of liability is inapplicable to pharmacy-dispensed products.  Their theory is that spread creates an incentive for misconduct when the prescribing doctor is also being reimbursed for the drug.  (S*ee* Direct Test. of Dr. Meredith Rosenthal (Docket No. 3274-16) ("Rosenthal Direct Decl.") ¶ 33.)[1]  Schering's and Warrick's drugs are almost exclusively dispensed by pharmacies, not physicians.[2]  (Schering's and Warrick's Post-Trial Proposed Findings of Fact ("SW FOF") ¶¶ 1-4.)  Physicians are not reimbursed for them and have no pecuniary reason to choose them.  (*Id.* ¶ 12.)  Pharmacies have "no control over the prescription" and must dispense whichever are prescribed.  (*Id.* ¶ 13.)  A pharmacy chooses which form of a generic to carry, but generic products are almost always reimbursed at a single rate not based on the AWP of a particular manufacturer, thus removing any possible incentive to use AWP as a pharmacy's basis for choosing the version of a generic to stock.  (*Id.* ¶ 14.)

The pharmacy market is dominated by PBMs and characterized by vigorous competition.  "PBMs are the 800-pound gorillas of pharmaceutical reimbursement."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 71 (D. Mass. 2005).  These large, sophisticated entities consolidate payor market power, extract price concessions from manufacturers, stimulate competition among pharmacies, and drive drug prices down for their customers, the TPPs.  (SW FOF ¶ 5; Trial Ex. 1275 (Report of Independent Expert Prof. Ernst R. Berndt to Judge Patti B. Saris (2/9/05) ("Berndt Report") ¶¶ 15, 133-34, 158, 166; 230 F.R.D. at 71-72.)  They collect, dispense and use knowledge of drug costs to ensure reasonable reimbursement rates.

---

[1] Schering and Warrick will refer principally to their Post-Trial Proposed Findings of Fact ("SW FOF") and the Track 1 Defendants' Proposed Common Findings of Fact ("Common FOF"), which themselves collect the relevant portions of the trial record.  Reference will be made directly to the trial record when necessary.

[2] Intron-A is occasionally administered by a physician, but its AWPs for those few physician-administered NDCs are treated no differently from the 20+ NDCs that are dispensed by a pharmacy.  *See* Section III.B *infra*.

## II.     PLAINTIFFS' CASE FAILS AS TO ALBUTEROL

### A.     There Was No Incentive to Manipulate the AWP of Albuterol

Albuterol is doubly devoid of incentives for AWP manipulation, as it is dispensed by pharmacies and reimbursed on a single rate not based on its AWP.  Plaintiffs resort to theories of collective liability to fill this vacuum, through which they seek to hold Schering and Warrick jointly and severally liable with all other manufacturers of albuterol.  (Pls.' Combined Proposed Findings of Fact, Conclusions of Law, and Trial Br. (Docket No. 3297) ("Pls.' Pre-Trial Proposed Findings") ¶¶ 472-476.)  This effort fails as a matter of fact and as a matter of law.

#### 1.     Plaintiffs' Factual Characterizations are Unsupported

Plaintiffs first alleged spread competition among manufacturers of albuterol; then, in response to summary judgment, they reversed their position and alleged tacit collusion among those same manufacturers in forming an "informal tacit Nash equilibrium."  (SW FOF ¶¶ 91-92.) This economic jargon, which has never appeared in any reported case in this country, was used to allege that manufacturers tacitly collude to inflate AWPs to take market share from unidentified "potential alternative therapeutic competitors."  (*Id.* ¶ 92.)  This allegation is impossible for pharmacy-dispensed drugs such as albuterol because if a physician prescribes albuterol, a pharmacy must dispense albuterol, not some therapeutic alternative.  (*Id.* ¶ 93.) Plaintiffs' last-gasp suggestion that generic manufacturers collude among themselves to inflate the median AWP so that they can simultaneously compete with one another on price, is indecipherable nonsense that fails as a matter of law.  (*Id.* ¶¶ 94-95.)  Even if Warrick had cooperated with other albuterol manufacturers – which it did not – such cooperation would not provide a basis for liability.  *See In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 784 (7th Cir. 1999) ("Competitors are permitted . . . to engage in cooperative behavior . . .

provided they don't reduce competition among themselves").  All of these theories fail for lack

of evidence; there is no evidence of collusion, direct or circumstantial.[3]  *See, e.g., id.* at 785.

###### 2.    *Plaintiffs' Legal Arguments Fail*

Plaintiffs' legal arguments impermissibly attempt to "steer state law into unprecedented

configurations."  *Santiago v. Sherwin-Williams Co.*, 3 F.3d 546, 549 (1st Cir. 1993) (quoting

*Martel v. Stafford*, 992 F.2d 1244, 1247 (1st Cir. 1993).  Theories of collective liability have

been used – rarely – when plaintiffs can prove injury caused by harmful products such as

asbestos and lead paint but they cannot prove which of the defendants manufactured the

particular agent of their harm; in these settings, the burden to identify the specific manufacturer

who caused the plaintiffs harm sometimes shifts to the defendants.  This approach has no legal or

logical justification where, as here, the product – albuterol – is not in itself harmful, and

Plaintiffs have not alleged that all 29 manufacturers of albuterol acted wrongfully.  (*See, e.g.*,

Trial Tr. (11/7/06) 203:10-16 (statement from Mr. Berman that there are only "eight or ten or 12

bad drugs" of the 550 reimbursed under Medicare Part B); SW FOF ¶ 58.)

The Massachusetts Supreme Judicial Court has rejected market-share liability for good

reason, namely, that it fails to "separate[ ] wrongdoers from innocent actors," and it fails to

"ensure[ ] that wrongdoers are held liable only for the harm that they have caused."  *Payton v.

Abbott Labs.*, 437 N.E.2d 171, 189-90 (Mass. 1982).  This Court likewise has refused to adopt

the theory even when necessary "to salvage Plaintiffs' otherwise doomed claim."  *Mills v.*

---

[3] The "clustering" of generic albuterol AWPs noted by Dr. Hartman is not evidence of anything. (*See* Direct Test. of Raymond S. Hartman (Docket No. 3296) ("Hartman Direct Decl.") ¶ 33.) This is a colorful characterization of a market outcome; it is not evidence of a scheme for collusion.  (Am. Decl. of Direct Test. of Dr. Sumanth Addanki (Docket No. 3430) ("Am. Addanki Direct Decl.") ¶ 41.)  Plaintiffs offered no evidence of *other* generic albuterol manufacturers' pricing practices.  In fact, Plaintiffs' purported theory that manufacturers collude in order to compete would belie such purported evidence.

*Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1, 9 (D. Mass. 2001) (Saris, J.).[4]  The purpose of

the doctrine of joint and several liability is to apportion damages, not assign liability.  *See, e.g.,*

*Payton,* 512 F. Supp. at 1036 n.4.  Plaintiffs invoke it improperly to assign liability to specific

manufacturers "for the whole of the harm suffered by the Plaintiffs and the Classes."  (Pls.' Pre-

Trial Proposed Findings ¶ 476.)

> **B.**     **Public Knowledge of Albuterol Spreads Bars Plaintiffs' Claims under the Statute of Limitations and Defeats Them on the Merits**

There was substantial and specific public knowledge of albuterol spreads prior to 1997.

(*See* SW FOF ¶¶ 7-8, 66-68.)  For this reason, claims dating *before* 1997 expired by the time this

lawsuit was filed in 2001.  That same pre-1997 knowledge defeats on the merits Plaintiffs' claims

dating *after* 1997 because that knowledge of albuterol spreads negates any claim under Chapter

93A of deception, unfairness, or causation concerning the spreads.

> *1.*     *The Statute of Limitations Bars Claims Prior to 1997*

Plaintiffs have the burden to prove that their purported injury was "inherently

unknowable" in order to invoke the discovery rule to toll the four-year limitations period.  (*See*

Mem. in Supp. of Track 1 Defs.' Post-Trial Mot. for J. ("Common Brief") at 17-20.)  Here, it is

undisputed that there was substantial public knowledge of generic spreads as early as 1992, and

specific knowledge of albuterol spreads at least as early as 1996.  (SW FOF ¶¶ 65-67.)  In 1996,

the Federal Government published two reports specifically dedicated to detailing substantial

spreads between acquisition cost and AWP for albuterol.  (*Id.* ¶ 67.)  Dr. Hartman conceded that,

---

[4] Market share and enterprise liability also have been rejected where the liability-creating statute requires a fact-specific inquiry into a defendant's conduct and intent, as does Chapter 93A.  *See Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1032 (Mass. 2004); *Brown v. Superior Court*, 751 P.2d 470, 484 (Cal. 1988).  A theory of concerted action requires an agreement to a common tortious plan, which is absent here.  *See Payton v. Abbott Labs.*, 512 F. Supp. 1031, 1035 (D. Mass. 1981).  All theories of alternative liability require joinder of all potential tortfeasors, which is absent here.  *See Spencer v. Baxter Int'l, Inc.*, 163 F. Supp. 2d 74, 79-80 (D. Mass. 2001).  Theories of concurrent wrongdoing apply only where the harm is indivisible, which is not the case when, as here, the harm is money damages. *See* Restatement (Second) of Torts § 433B(2) cmts. c, e (2006).

for albuterol, "large spreads . . . began to reach public awareness in 1996."[5]  (*Id.* ¶ 68.)  When questioned by the Court, Dr. Hartman testified that the 1996 reports were sufficient to put a reasonable person on notice regarding the existence of substantial spreads for albuterol.  (*Id.*)

This public knowledge is evident in the class members' direct purchases of albuterol at prices well below AWP.  In 1994, for example, BCBSMA purchased Warrick generic albuterol at a price equating to a spread of 163%.[6]  (Trial Ex. 1391; *see also* Common FOF ¶ 45.)  And various contracts with BCBSMA for the purchase of drugs contain the discounted prices that Plaintiffs suggest were secret.[7]  Other Massachusetts TPPs also purchased albuterol in 1996 at prices amounting to spreads as high as 642%.  (*See* Trial Exs. 1395 (642% spread), 1399 (266.7% spread), 1403 (268.2% spread); *see also* Common FOF ¶ 62.)  Thus, claims prior to 1997 accrued – and expired – before Plaintiffs brought suit.[8]

This knowledge, as a matter of law, also bars any attempt to toll the limitations period based on the doctrine of fraudulent concealment.  (Common Brief at 21.)  Plaintiffs have also not demonstrated an "affirmative act of concealment done with an intent to deceive."  *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189 (1st Cir. 2006) (quoting *Puritan Med. Ctr., Inc. v. Cashman*, 596

---

[5] In fact, the experts agreed that there was substantial knowledge by, or before, 1996 regarding albuterol.  (*Id.* ¶ 68.)

[6] BCBSMA also made substantial purchases of other products manufactured by Schering and Warrick.  For example, it purchased Intron A during the 1990s at prices equating to a 40.9% spread.  (Trial Ex. 1391.)  In 1993, BCBSMA purchased Proventil at a price that equated to a spread of 117.2%.  (*Id.*)

[7] These contracts covered albuterol.  (*See* Decl. of Harvey J. Weintraub (Docket No. 3380-1) ("Weintraub Direct Decl.") ¶ 69; Trial Tr. (12/12/06) 28:3-10 (Weintraub); Trial Exs. 2904, 2905, 2906.)  But BCBSMA also had contracts with Schering covering various Schering drugs, including Proventil and Intron A.  (Corrected Decl. of Carter L. Dutch (Docket No. 3406) ("Dutch Direct Decl.") ¶ 19; Trial Ex. 2937.)  Other Massachusetts third party payors, such as Fallon, Harvard Pilgrim, and Tufts, had contracts with Schering for the purchase of subject drugs.  (*See* Dutch Direct Decl. ¶ 19; Trial Exs. 2900, 2901, 2903.)

[8] Plaintiffs claim that this knowledge about albuterol was not "actionable" (Trial Tr. (11/27/06) 93:21-95:23 (Rosenthal); *see also* Rebuttal Test. of Dr. Raymond Hartman (Docket No. 3477) ¶ 48 (stating such information was "becoming available" but was not "fully absorb[ed] and understood to reflect systematic knowledge").)  This argument fails because any uncertainty regarding "the nature and extent of an injury" does not toll the limitations period.  (*See* Common Brief at 19 n.29.)

N.E. 2d 1004, 1010 (Mass. 1992)).[9]  Indeed, Schering and Warrick employees testified that the means of acquiring such information was readily available, including from the company.  (*See* Am. Decl. of Debra Kane (Docket No. 3429) ¶¶ 19-21; Dutch Direct Decl. ¶¶ 16-18; Trial Tr. (12/13/06) 16:6-19:16 (Dutch)).)

## 2.   Principles of Chapter 93A Liability Bar Claims After 1997

Knowledge belies deception.  (Common Brief at 1-2.)  Neither the Government nor TPPs were deceived, nor could they have been deceived, about albuterol spreads when they knew of the existence and the order of magnitude of those spreads.  Dr. Rosenthal admitted that the Government had "enough information to conclude that the transaction prices were significantly lower" than AWP.  (SW FOF ¶ 68.)  BCBSMA and other Massachusetts TPPs continued to make direct purchases of albuterol after 1997.  (Trial Exs. 1391, 1395, 1399, 1403.)  In addition, both SMW and BCBSMA used sophisticated PBMs – who negotiated directly with manufacturers – to administer benefits for their members relating to self-administered drugs. (SW FOF ¶ 9; *see also* Common FOF ¶¶ 31-46, 69.)

Knowledge of spreads also defeats any claim of unfairness arising from the existence of those spreads.  In construing unfairness claims under Chapter 93A, courts consider "a plaintiff's conduct, his knowledge, and what he reasonably should have known."  *Swanson v. Bankers Life Co.*, 450 N.E.2d 577, 580 (Mass. 1983).  Here, it is clear that TPPs knew, or should have known, that there were substantial spreads for albuterol.  (*See* SW FOF ¶¶ 66-69.)

---

[9] Plaintiffs' citations to scattered confidentiality provisions are unavailing.  There is no evidence that these provisions were intended to – or did – conceal the existence of a cause of action, especially when such information was public and available from the company.  *See Sarocco v. Gen. Elec. Co.*, 939 F. Supp. 91, 97 (D. Mass. 1996) ("[a] defendant is not obliged to . . . adopt a plaintiff's theory of a case . . . in order to avoid a defense of this sort.").  Indeed, Professor Berndt recognized that, even with such agreements, "general knowledge concerning what is negotiable and what is the range of terms typically offered is widespread."  (Berndt Report ¶ 134.)  Further, a failure to disclose absent a duty to disclose does not constitute fraudulent concealment; "mere silence is not enough."  *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 928 F. Supp. 1189, 1206 (D. Mass. 1996) (Saris, J.).

Knowledge likewise defeats causation.  Plaintiffs must show that Warrick's conduct regarding albuterol was "so significant and important a cause that the defendant should be held responsible." *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 68-69 (D. Mass. 2001) (internal citations omitted).  Speculation about how conduct might have harmed Plaintiffs is insufficient.  *See J.E. Pierce Apothecary v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 150 (D. Mass. 2005).  Here, knowledge of the truth eliminates any causal connection between a purportedly deceptive act and a loss.  (*See* Common Brief at 6-7.)  Dr. Rosenthal admitted that HCFA repeatedly received reports about albuterol recommending a change in the reimbursement system, and each time HCFA decided to maintain that system. (Trial Tr. (11/27/06) 11:16-12:5 (Rosenthal).)  She also admitted that such information did not fall within the category of the importantly "unimportant."  (*Id.* 96:20-97:5 ("albuterol is hugely important to Medicare"); Rosenthal Direct Decl. ¶ 16.)

But not only did public knowledge of albuterol exist, payors – including the Government – acted on this knowledge and, in so doing, broke any possible causal chain.  They did so in three ways.  First, the Government chose to set reimbursement for generics based on the median, a number that Warrick neither had the incentive, nor the ability, to affect.  (SW FOF ¶¶ 75-77.)  Warrick's AWPs, which were static and almost always below or at the median, had no affect on reimbursement.  (*Id.* ¶¶ 61, 79.)  For this reason, no claim can lie.  *See McCann v. Davis, Malm & D'Agostine*, 669 N.E.2d 1077, 1079 (Mass. 1996) (affirming finding for defendant based on lack of causation when defendants' conduct "would have made no difference").

Second, the Government chose to reimburse 0.083% albuterol on yet another basis.  As explained below, Medicare carriers applied a modifier to reduce reimbursement for the 0.083% solution significantly.  (SW FOF ¶¶ 79-81.)  As there is no evidence that Warrick knew anything

about this alternative rate, the causal chain between Warrick's AWP and Plaintiffs' alleged injury is hardly foreseeable, much less actionable. *See Polycarbon Indus., Inc. v. Advantage Eng'g, Inc*., 260 F. Supp. 2d 296, 306 (D. Mass. 2003) (stating that plaintiffs must prove a "causation connection" and that the damage "was reasonably foreseeable.").

Third, the Government and other payors intentionally used the larger spreads to cross-subsidize inadequate dispensing fees. The record is particularly strong with respect to albuterol, given that CMS increased the dispensing fee for albuterol by more than 10-fold when Medicare switched to an ASP-based reimbursement system. (SW FOF ¶ 112.) Astonishingly, Plaintiffs' experts entirely ignored the effect of this cross-subsidization when calculating liability and damages. (Common FOF ¶¶ 86, 94.) In Trial Exhibit 4095, for example, Plaintiffs attempted to show that total reimbursement nevertheless decreased for the 0.083% solution after the switch, but their exhibit fails to incorporate their concession that the appropriate reimbursement rate was 14 cents per unit, rather than the 47 cents they use. (SW FOF ¶ 112.) When corrected, the calculation reveals that total reimbursement in fact *increased*. (*Id.*) And the record demonstrates that no Massachusetts TPP has switched away from an AWP-based system to an ASP-based system. (Common FOF ¶¶ 51-52, 62.)

**C.     The Named Class 2 Representatives Fail to Establish a Claim as to Warrick**

*1.     Plaintiffs Did Not Establish that They Reimbursed for Warrick's Albuterol*

Plaintiffs have produced no evidence that claims by Sheet Metal Workers National Health Fund ("SMW") or Blue Cross Blue Shield of Massachusetts ("BCBSMA") fall within the definition of Class 2. They cannot establish that either of these entities reimbursed albuterol manufactured by Warrick.[10] Witnesses for both SMW and BCBSMA testified that – based on

_____

[10] In addition, SMW does not meet the class definition: Its principal place of business is outside Massachusetts (SW FOF ¶ 87); and none of its albuterol claims were from a Massachusetts provider. (*Id.* ¶ 88.)

their claims records – it is impossible to identify the specific manufacturers of a generic drug reimbursed under a J-code.  (SW FOF ¶ 90.)

Dr. Hartman's "top down" allocation of manufacturer sales based on market share and Medicare utilization is supposed to solve this J-code problem, but it does not.  Proof of its failure is evident from its application to perphenazine, a Warrick multi-source drug.  The CMS website shows that total perphenazine reimbursement by Medicare was approximately $50,000 for all manufacturers for the entire class period (SW FOF ¶ 109); yet Dr. Hartman's methodology led him, earlier in the litigation, to the conclusion that Warrick alone was liable for damages of over $2 million on a national basis.  (*Id.*)  Among the many causes of Dr. Hartman's failure to solve the J-code problem are three fundamental flaws.  First, he allocates Medicare reimbursement based on manufacturer sales data, which is not tied – directly or indirectly – to Medicare reimbursement data.  Second, he assumes no variation by manufacturer, or by state, in manufacturer share of Medicare reimbursement.  Finally, Dr. Hartman's incorrect assumption that Medicare always reimburses at the maximum rate (*see id.* ¶ 111), necessarily affects his unit-share data and further compounds the errors in his analysis, as indicated by the Sheet Metal Workers albuterol claims in evidence.  (*Id.*)

> 2. *Plaintiffs Did Not Establish that Any Albuterol Claim Was Reimbursed on the Basis of AWP*

Plaintiffs produced no evidence that they reimbursed for albuterol on the basis of AWP. Dr. Hartman assumes that providers always bill Medicare at the maximum reimbursement rate. (SW FOF ¶ 110.)  He makes this assumption to sidestep the Medicare rule that reimbursement was at the billed charge if that was lower than the maximum reimbursement rate.  (*Id.*)   Contrary to his assumption, the majority of albuterol claims presented by Plaintiffs show billed amounts below Warrick's AWP and the median AWP.  (*Id*. ¶ 110.)   Dr. Hartman also assumes that

Medicare always reimburses at the maximum reimbursement rate.  (*Id.* ¶ 111.)  In addition to the fact that the SMW claims show billed charges below that rate (*id.* ¶ 110), the claims in evidence also show reimbursement amounts lower than and unrelated to that rate.  (*Id.* ¶¶ 89, 111.)  Indeed, Medicare often reimbursed for the 0.083% albuterol solution not based on its AWP, but on a maximum allowable amount – 14 cents – that is far less than the AWP or median AWP of that product. [11]  (*Id.* ¶¶ 79-81.)  That the maximum allowable amount is based on the AWP of a different formulation of albuterol is irrelevant; the product is not reimbursed on the basis of its AWP or the median AWP of that product.

Although not formally dubbed a "MAC" (maximum allowable cost),[12] the maximum allowable amount used by Medicare for the 0.083% solution when dispensed in combination with ipratropium bromide had the same effect as a MAC: to establish a "single set price" that Medicare would pay.  230 F.R.D. at 74.  Dr. Hartman's methodology *could not and did not* account for this alternative reimbursement rate (or for billed amounts below AWP) because he started with *manufacturer* data not *Plaintiffs' claims* data.  (SW FOF ¶ 111.)

Like SMW, BCBSMA admitted that it cannot attest to the basis on which it paid Medigap claims.  Mr. Mulrey of BCBSMA admitted that he had no way to determine "whether the 20 percent [BCBSMA was] paying was based on AWP" (SW FOF ¶ 85), or whether any claims involved albuterol manufactured by Warrick.  (*Id.* ¶ 90.)  Without such evidence, BCBSMA and SMW cannot recover.  *See, e.g., Cent.l States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.,* 433 F.3d 181 (2d Cir. 2005).

---

[11]  For example, all complete SMW Medicare claims for albuterol that were adjudicated correctly according to the DMERC policy described above, were reimbursed based on the $0.14 "maximum allowed amount" rather than median AWP of $0.47.  (SW FOF ¶ 89.)  Any claims showing reimbursement at the median AWP of $0.47 are either incomplete and do not provide a complete set of claims materials or involve albuterol dispensed in combination with ipratropium bromide but are billed and coded incorrectly.

[12]  Dr. Rosenthal testified that MAC-based reimbursement is often set by reference to AWP.  (*Id.* ¶ 84.)

### D.       Other Scant Documents and Testimony Do Not Support Liability

Plaintiffs assert that Warrick is liable under Chapter 93A for "marketing" spreads, but they have produced no evidence of such conduct.  They point to various price notifications containing both the price the pharmacy would pay and Warrick's AWP, and they infer "marketing the spread."  That inference is entirely unwarranted.  None of these documents calculates spreads; none identifies the actual reimbursement rate for albuterol, which differs from plan to plan and almost always is a single rate for all forms of albuterol, not tied to Warrick's AWP; and none mentions the AWP or spread of any competitive product.  (SW FOF ¶ 107.)  In fact, given the existence of MAC-based reimbursement and Dr. Hartman's testimony that manufacturers compete on ASP and those ASPs "are clustering," there is no reason to believe spread varies by manufacturer. (*Id.* ¶ 95(d).)

Mr. Pironti is the only witness presented by Plaintiffs against Schering or Warrick, and his testimony is not even remotely related to this case.  He testified regarding Best Price reporting obligations under Medicaid, *not* AWP reporting or anything else relating to Medicare. (*Id.* ¶ 106.)  He could not point to *any* subject drug whose AWP was "inflated" by the conduct he described.  The "inflated" price in his "scheme" was the brand's selling price, and the only drug Mr. Pironti could name was Claritin, which he admitted "is not what this case is about."  (Trial Tr. (11/16/06) 121:18-122:3 (Pironti); *see also* SW FOF ¶ 106.)  The marketing conduct he described related to formulary decisions by PBMs and other managed care organizations, not prescribing or dispensing decisions by physicians or pharmacies.  (*Id.*)  Indeed, Mr. Pironti agreed that a physician or a pharmacist "doesn't care" about the scheme he described.  (*Id.*)  Appropriately, the Court asked Mr. Pironti "how does this involve AWP at all [?]"  (*Id.*)  The answer was that it doesn't.

## III.    PLAINTIFFS' CASE FAILS AS TO SCHERING BRANDED PRODUCTS

### A.    Temodar

Temodar, an innovative brain cancer therapy, is exclusively a self-administered, pharmacy-dispensed drug.  (SW FOF ¶ 35.)  Substantial sales were made at WAC, which was a list price precisely because it was a price "at which substantial (that is, not isolated or insignificant) sales are made . . . ."  16 C.F.R. § 233.3(d) (2006); *see also* 940 Mass. Code Regs. § 3.04 (2006).  During the class period, 77% of Temodar sales were at or within 2% – the industry standard "prompt-payment" discount – of WAC.  (*Id.* ¶ 36.)  There is no question that such sales are substantial.  *See Federated Nationwide Wholesalers Serv. v. F.T.C.*, 398 F.2d 253, 257 (2d Cir. 1968) (construing 40% of total sales as "substantial and significant").  95% of Temodar sales were within 5% of WAC and, consistent with standard industry practice, Temodar's AWP was always 20% above its WAC.  (SW FOF ¶¶ 16-18, 36.)  By Dr. Hartman's own admission, a WAC that is "equal to, or close to (+ or – 5%) the actual acquisition cost" and that is then increased by the customary markup, results in an AWP that is "relatively accurate." (*Id.* ¶ 24.)

Spreads between the AWPs and Dr. Hartman's ASPs for Temodar are modest and *all* are under his 30% "speed limit" for liability.[13]  (*Id.* ¶ 38.)  There is nothing to distinguish Temodar's AWPs and pricing from those of any other branded drug in the industry, which is fatal to Plaintiffs' claims under Chapter 93A.  *See, e.g.*, *James L. Miniter Ins. Agency Inc. v. Ohio Indem. Co.*, 112 F.3d 1240, 1251 (1st Cir. 1997) (no unfairness where defendant adhered to industry custom).

---

[13] Dr. Hartman had improperly included charitable donations in his ASP calculations for Schering's drugs, which inflated his "spread" and damage calculations for all of the products at issue.  Dr. Hartman submitted revised calculations that accounted for some – but not all – of these errors.  (*See* SW FOF ¶ 38.)

### B.     Intron-A

Intron-A is an immunomodulator indicated to treat hepatitis, certain types of cancer, and a few other conditions.  (SW FOF ¶ 40.)  It is predominantly self-administered and dispensed by pharmacies.  (*Id.* ¶ 41.)  Plaintiffs concede that, of the 27 Intron-A NDCs originally at issue in this case, only 6 are sometimes administered by physicians, and Plaintiffs now seek damages in Classes 2 and 3 only for those 6 NDCs.[14]  (*Id.* ¶ 42.)

Although Intron-A is sometimes dispensed by a physician, Schering treated the AWPs for the physician-administered NDCs of the drug no differently from the AWPs of the pharmacy-dispensed NDCs.  (*Id.* ¶ 43.)  Given that no incentive exists to manipulate the AWPs of pharmacy-dispensed drugs, Plaintiffs' suggestion that Schering was engaging in misconduct as to the physician-administered NDCs of Intron-A is contrary to the evidence.[15]

Schering offered only modest discounts on Intron-A and sold the vast majority (65%) during the class period at or within 2% of WAC.  (*Id.* ¶ 44.)  Its AWPs were always 20% above WAC, and 78% of sales were within 5% of WAC (therefore its AWP was "relatively accurate"). (*Id.* ¶¶ 18, 44.)  During the entire class period Dr. Hartman has cited only 4 instances in which the spread between the AWP and his calculated ASP on a particular NDC in a particular year was greater than 30%, and even then the spreads were in excess of 30% by only a few percentage points—hardly the "mega spreads" or a pattern of manipulation that Plaintiffs have touted throughout this litigation.  (*Id.* ¶ 46.)  These 4 instances disappear if AWPs are compared to the average of the prices actually charged by wholesalers to their customers, rather than to ASPs.

---

[14] The 6 NDCs are 00085-0689-01, 00085-1110-01, 00085-0285-02, 00085-0571-02, 00085-0571-06, and 00085-0539-01.  (*See* Hartman Direct Decl. ¶ 189 n.221.)

[15] Contrary to Plaintiffs' suggestion, Exhibit 394 does not support their claims that Schering was marketing the spread.  Not only does it not compare Intron-A with another drug, the prices it provides are publicly available and result in a spread that is well below 30%.  In addition, it is limited on its face to the State of Florida.  (SW FOF ¶ 108.)

Dr. Addanki has determined a conservative lower bound of prices wholesalers charge for Schering's products by simply looking at the prices charged by wholesalers for Schering's products where the wholesaler is setting its own price to its customers, rather than honoring prices already negotiated by Schering with retailers.[16]  Assuming the wholesaler does not operate at a loss, the price *charged* by the wholesaler to its customers could be no lower than the price it *paid* Schering, which is generally WAC.  (*Id.* ¶ 33.)   WAC was always within 30% of AWP for the 6 Intron NDCs.  (*Id.* ¶ 45.)  Therefore, there is nothing to distinguish those Intron-A AWPs and pricing from those of any other branded drug in the industry.

### C.    Proventil

Proventil, which is Schering's branded version of generic albuterol, is also self-administered and subject to the economic forces affecting Warrick's albuterol product.  (*Id.* ¶ 49.)  Schering made substantial sales of Proventil (48%) at or within 2% of WAC, even though it faced intense generic competition, and its AWP was always 20% above its WAC.  (*Id.* ¶ 53.)  As 83% of sales were within 5% of WAC, its AWP was also "relatively accurate," given Dr. Hartman's concession.  (*Id.* ¶¶ 24, 53.)

When Proventil's ASPs are compared with the rate at which Medicare was reimbursing multi-source albuterol, i.e., the median of the generic forms of the drug, many of the resulting spreads are *negative*, and those over 30% largely vanish.[17]  (*Id.* ¶¶ 51-52.)  Schering was selling Proventil on average at prices *lower* than the Medicare reimbursement rate; therefore, pharmacists would have *lost money* had they dispensed Proventil to a Medicare patient.  (*Id.*)

---

[16] The wholesaler could not independently charge the chargeback price to a customer.  *See, e.g.*, *In re Brand Name*, 186 F.3d at 784.

[17] Of course, given the typical situation in which the 0.083% albuterol solution is dispensed in tandem with another drug, Medicare reimbursement is *even lower*, i.e., 14 cents per unit.

This belies Plaintiffs' assertion that Proventil AWPs or spreads were manipulated to the disadvantage of Medicare (or any other payor).

## IV.   PLAINTIFFS CANNOT SHOW SCHERING OR WARRICK HAD CULPABLE KNOWLEDGE OR INTENT

Plaintiffs have failed to show that Schering or Warrick had the intent or knowledge requisite to make their conduct unfair or deceptive under Chapter 93A.  (*See* Common Brief at 5-6.)  Mere participation in a system, without more, is not a basis for liability.  *See State Resources Corp. v. Architectural Team, Inc.*, 433 F.3d 73, 85 (1st Cir. 2005) (affirming denial of motion to amend to add Chapter 93A claim when alleged loss was "not a result of [defendant's] conduct, but is a consequence of the foreclosure process and its requirements.").

Schering and Warrick reported AWP pursuant to a good-faith interpretation of its meaning as a reimbursement benchmark established by industry standards.  (SW SOF ¶ 99.) For Schering, this meant reporting an AWP that was a 20% mark-up above WAC.  (*Id.* ¶¶ 16-18.)  For Warrick, this meant reporting an AWP at launch and competing based on price.  (*Id.* ¶¶ 59-61.)  The Government did not provide any instruction to Schering or Warrick – or any manufacturer – to the contrary.[18]  (*Id.* ¶ 98.)  In fact, the companies' understanding of AWP at the time was consistent with CMS's understanding at the time.  (*See generally* Common FOF ¶¶ 1-3, 6-20.)  In 1998, HCFA responded to one of the many OIG reports on albuterol by stating that "[a]cquisition price and the average wholesale price are *two distinct pricing methods*.  The acquisition cost relates to the invoice price for an item.  The AWP is a price that is essentially established by the industry, similar to the sticker price on a vehicle."  (Trial Ex. 1078A at A-2 -

---

[18] Such guidance was not only *typical* - when the Government wanted a certain price reported, it said so (*id.* ¶¶ 101-102) – but *necessary* - given the complexity of the calculation and the need for consistency for any kind of industry-wide reported term.  (*Id.* ¶ 100.)  As such, there can be no violation of Chapter 93A based on any purported violation of "public policy," since any such policy was not "clear and well-established."  (Common Brief at 15 n.22.)

A-3) (emphasis added).)  A good-faith interpretation of AWP is "not the stuff of which c. 93A is made." (Common Brief at 4-5.)

Schering also lacked culpable knowledge.  *See, e.g.*, *Underwood v. Risman*, 605 N.E.2d 832, 835 (Mass. 1993) ("[t]here is no liability for failing to disclose what a person does not know").  Schering or Warrick did not focus on reimbursement or spread, nor did they market on that basis.  (Weintraub Direct Decl. ¶¶ 64-67; Trial Tr. (12/13/06) 49:3-20 (Kane); Trial Tr. (12/13/06) 24:11-19 (Dutch).)  Schering, for example, did not track or analyze ASP during the class period.  (Trial Tr. (12/13/06) 47:20-21 (Kane).)  Indeed, calculating such a term would have required detailed instructions regarding eligible transactions, classes of trade, time period, among other factors that would have made a "significant difference."  (*Id.* 47:22-48:12, 50:6-12.) Moreover, neither Schering nor Warrick had the knowledge necessary to calculate the average of prices charged by wholesalers.  (SW FOF ¶¶ 103-105.)

Given this clear lack of culpable knowledge or intent, all that Schering and Warrick did was participate, in good faith, in a system they neither created nor controlled.  This is no basis for liability under Chapter 93A.  *See Mechs. Nat'l Bank of Worcester v. Killeen*, 384 N.E.2d 1231, 1237 (Mass. 1979) (vacating judgment against bank after finding "neither an over-zealous seller taking economic advantage nor a defenseless consumer.").

**CONCLUSION**

For the foregoing reasons, the Court should find NO LIABILITY as to Schering and

Warrick in this case.

Respectfully submitted,

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Schering-Plough Corporation and
Warrick Pharmaceuticals Corporation*

Dated:  January 19, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2007, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Eric P. Christofferson
Eric P. Christofferson