**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | Judge Patti B. Saris |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | |
| 01-CV-12257-PBS and 01-CV-339 | ) | |
| _____ | ) | |

**TRIAL OF CLASS 2 AND 3 CLAIMS**

**DEFENDANT ASTRAZENECA PHARMACEUTICALS LP'S**
**<u>PROPOSED FINDINGS OF FACT</u>**

1.  AstraZeneca Pharmaceuticals LP ("AstraZeneca") incorporates by reference the Proposed Findings of Fact filed jointly on behalf of all Track 1 Defendants.

## I.  Zoladex

2.  AstraZeneca manufactures and sells goserelin acetate depot, a leutenizing hormone-releasing hormone agonist ("LhRh-a"), under the brand name Zoladex.[1]  Zoladex is an injectable physician-administered drug primarily used to treat prostate cancer.

3.  Prior to the launch of Zoladex and another LhRh-a named Lupron (manufactured by TAP Pharmaceuticals), the most common treatment for advanced prostate cancer was surgical castration, known as orchiectomy.[2]

4.  Zoladex is an alternative to surgical castration that offers prostate cancer patients a better quality of life.[3]  Zoladex is the only LhRh-a clinically proven to provide the same therapeutic effect as surgical castration.[4]

5.  Urologists view Lupron and Zoladex as therapeutically interchangeable.[5]  According to John Freeberry, former Director of Pricing Strategy at AstraZeneca, "in [physicians'] minds these drugs were all the same, even though maybe chemically they're slightly different.  But the net effect was the same, so their patient's well-being would be the same whether they used one versus the other . . . ."[6]

## II.  Zoladex Pricing

6.  Of the two products, Lupron was the first to come to market in the United States in 1989.

---

[1] Direct Testimony Declaration of Robert C. Black ("Black Decl.") ¶ 9.
[2] Black Decl. ¶ 9; 11/28/06 Tr. 10:21-25 (A. Milbauer).
[3] Direct Testimony Declaration of Alan Milbauer ("Milbauer Decl.") ¶¶ 21-22; see also AZ Defendant's Exhibit ("DX") 2122, at AZ0049489.
[4] See Milbauer Decl. ¶¶ 24, 30; see also DX 2122, at AZ0049489; DX 2156, at AZ0682890.
[5] 11/28/06 Tr. 24:22-25:2 (A. Milbauer);  see also id. at 16:7-12; Direct Testimony Declaration of Stephen R. Buckanavage ("Buckanavage Decl.") ¶ 8.
[6] 10/4/05 Deposition Tr. of J. Freeberry, at 26:19-27:6.

1

Zoladex was launched in 1990.[7]

7.   At launch, AstraZeneca set the list price for Zoladex, also known as the Wholesale

Acquisition Cost ("WAC"), significantly lower than the WAC for Lupron.[8]  Zoladex was priced

at $255, approximately $75 less per injection than Lupron.[9]

8.   Consistent with industry custom for branded pharmaceuticals, the published AWP for

Zoladex (and Lupron) was derived by adding an industry-standard markup of 25% to the

Zoladex WAC.[10]  This mathematical relationship between the Zoladex WAC and AWP remained

constant over the relevant period and was generally well known in the health care industry.[11]

9.   It is common in the pharmaceutical industry, as in most other industries, to increase list

prices from time to time.[12]  AstraZeneca had a company policy during the class period to keep

the average WAC price increase for its product portfolio below the rate of inflation.[13]

10.   AstraZeneca's price increases for Zoladex were consistent with its price increases for

other products.[14]  The average annual WAC price increase for Zoladex from launch through

2005 was 2.6%, which is lower than the average annual rate of increase for the Consumer Price

Index ("CPI") as a whole (2.7%), the Producer Price Index for drugs and pharmaceuticals

(3.8%), the CPI for medical care (4.7%) and the Lupron WAC (4.1%) over the same time

period.[15]

11. Zoladex's WAC and its AWP have always been lower than Lupron's, and the price

---

[7] Black Decl. ¶ 8; 11/28/06 Tr. 11:15-17 (A. Milbauer).

[8] Milbauer Decl. ¶ 24; Black Decl. ¶ 17.

[9] See Gould Decl. ¶ 9, fig. 1.

[10] See, e.g., Black Decl. ¶ 16.

[11] 11/27/06 Tr. 53:6-9 (Dr. M. Rosenthal); 11/15/06 Tr. 94:12-20; 95:1-4 (Dr. M. Rosenthal); Direct
Testimony Declaration of Dr. John P. Gould ("Gould Decl."), ¶ 8; Black Decl. ¶ 16.

[12] See Milbauer Decl. ¶ 28; 11/28/06 Tr. 9:16-21 (A. Milbauer).

[13] See DX 2119, at AZ0049325; Black Decl. ¶ 5; 11/28/06 Tr. 9:13-21 (A. Milbauer).

[14] Milbauer Decl. ¶ 28.

[15] Gould Decl. ¶ 10; Milbauer Decl. ¶ 12; Black Decl. ¶ 5.

differential between the two drugs has grown over time.[16]  By 2004, the AWP for Lupron had

increased to $685.21 per injection and the Zoladex AWP was $469.99 – more than $200 less per

injection.[17]  As a result, patients, the Medicare program and private insurers paid less per unit for

LhRh-a therapy when Zoladex was administered instead of Lupron and when the Zoladex AWP

was used as the basis for reimbursement instead of the Lupron AWP pursuant to a least costly

alternative policy.[18]

    12. Since 1990, Zoladex also has been available to low-income individuals through the

AstraZeneca Patient Assistance Program.[19]

    13. Throughout the class period, pricing decisions relating to Zoladex were made at

AstraZeneca's headquarters in Wilmington, Delaware.  AstraZeneca then provided Zoladex

WAC pricing information and, for most of the class period, a corresponding suggested AWP to

First DataBank and Red Book, independent publishers of prescription drug pricing compendia

located in California and New Jersey respectively.[20]

**III.    Zoladex Discounting**

    14. It is a standard practice in the pharmaceutical industry when facing therapeutic

competition to compete by offering discounts to customers.[21]  Third party payers expect such

discounting in competitive therapeutic categories.[22]

    15. Zoladex and Lupron competed in the same therapeutic category – LhRh agonists – for the

---

[16] 12/04/06 Tr. 68:23-69:2 (Dr. J. Gould); Gould Decl. ¶ 9, fig. 2.

[17] See Gould Decl. ¶ 9, fig. 2; see also 12/04/06 Tr. 70:4-6 (Dr. J. Gould) (Zoladex's WAC has increased 47.4% since 1990, while Lupron's has increased by 81.3%).

[18] DX 2075, at i.

[19] 11/28/06 Tr. 9:22-10:14 (A. Milbauer); see also Black Decl. ¶ 6.

[20] Milbauer Decl. ¶¶ 14-15; see also DXs 2132, 2133.

[21] See 11/15/06 Tr. 71:22-24 (Dr. M. Rosenthal); 11/28/06 Tr. 79:18-81:24 (Dr. G. Bell).

[22] Direct Testimony Declaration of Eric M. Gaier ("Gaier Decl.") ¶ 37; see also 11/28/06 Tr. at 80:8-81:24.

entire class period and were considered to be therapeutically interchangeable.[23]

16. Because physicians are both the prescriber and the purchaser of products like Zoladex and Lupron, they have significant market power to demand discounts; according to Dr. Rosenthal: "[A]s is true in other markets, [drug] manufacturers can increase the market share by reducing the cost of their product to physicians through discounts or rebates."[24]  Managed care organizations ("MCOs") with formulary control have similar market power.[25]

17. Consistent with industry practice, AstraZeneca offered discounts to its Zoladex customers – both physicians and MCOs – in order to compete with Lupron.[26]

### A.   AstraZeneca Offered Discounts to Physicians

18. From 1990 to 1993, AstraZeneca sold Zoladex directly to physicians and other purchasers at WAC.[27]

19. AstraZeneca's promotional messages for Zoladex focused on clinical efficacy and lower cost to the physician, the patient and the health care system overall.[28]

20. Despite better clinical data and its lower cost, Zoladex did not gain market share from Lupron, the market leader, because the AWP-based Medicare Part B reimbursement system created a financial incentive for physicians to choose higher priced products for their Medicare patients.[29]  This financial incentive was commonly referred to as the "spread" or "Return to

---

[23] See supra note 5.

[24] Rosenthal Decl. ¶ 33; see also 12/04/06 Tr. 138:8-17 (Dr. J. Gould); Gould Decl. ¶ 4 (describing quantity discounts as "a widespread competitive practice in many industries."); Milbauer Decl. ¶ 43; Buckanavage Decl. ¶¶ 4, 18; Black Decl. ¶ 15.

[25] Gaier Decl. ¶¶ 32-33, 43-44.

[26] Black Decl. ¶¶ 19-21; Direct Testimony Declaration of Julie-Ann G. Tracy ("Tracy Decl.") ¶¶ 11-13, 39; see also 11/28/06 Tr. 80:8-81:24 (Dr. G. Bell).

[27] Milbauer Decl. ¶ 27; see also DX 2078 (Zoladex transactional data).

[28] See 11/28/06 Tr. 13:13-25 (A. Milbauer); Milbauer Decl. ¶¶ 24-25; DX 2122, at AZ0049489; Black Decl. ¶ 17; see also DX 2151 (promotional document stating that patient co-pay for Zoladex was $23.79 cheaper per month than Lupron; DX 2131 (emphasizing lower overall cost).

[29] 11/28/06 Tr. 14:1-10 (A. Milbauer); Milbauer Decl. ¶¶ 29-31; Black Decl. ¶¶ 17-18; 11/14/06 Tr. 11:1-

4

Practice," because physicians earned as income the difference between their acquisition cost, a price based on WAC, and AWP-based reimbursement.[30]  Even absent any discounting, physicians could earn more income purchasing Lupron instead of Zoladex.[31]

21. An internal memorandum dated November 3, 1995 expressed the Company's frustration with this dynamic, stating:  "Our campaigns to grow ZOLADEX sales based on product attributes and somewhat straightforward pricing strategies have continually been thwarted by TAP responses as well as the method used by Medicare to reimburse for LhRh agonists."[32]

22.  Medicare reimburses physicians directly for Zoladex and other Part B products; the reimbursement transaction does not involve AstraZeneca.[33]  According to Alan Milbauer, former head of Marketing for AstraZeneca:

> [T]here was nothing about the [Medicare reimbursement] system that we created, nor that we knew about, that the government itself didn't know about, and so it wasn't for us to change that but, rather, to operate efficiently and legitimately within that system.[34]

23. Thus, in order to address this competitive disadvantage vis-à-vis TAP, AstraZeneca began to offer quantity discounts to its customers on a limited basis in 1993.  From time to time from 1994 to 1997, AstraZeneca increased the discounts available.[35]

24. AstraZeneca's discounting strategy was designed to remove the financial incentive for doctors to choose Lupron over Zoladex, so that Zoladex could compete on its clinical merits. According to Stephen Buckanavage, former Zoladex Market Development Manager, "Each

---

12:8; 36:11-18 (S. Buckanavage); PX 14, at AZ0237143; PX 119, at AZ0010297.
    [30] Buckanavage Decl. ¶ 8; Black Decl. ¶ 18.
    [31] Milbauer Decl. ¶ 31.
    [32] See PX 14; see also Milbauer Decl. ¶¶ 31-33; Buckanavage Decl. ¶ 10.
    [33] See generally DX 2128.
    [34] 11/28/06 Tr. 18:5-19 (A. Milbauer); see also Buckanavage Decl. ¶ 10; Black Decl. ¶ 18; PX 14, at AZ0237143.
    [35] Black Decl. ¶¶ 20-21.

proposed pricing strategy was aimed at leveling the economic playing field between Zoladex and Lupron, and allowing us to compete on the basis of clinical efficacy, safety, and service."[36]

25. AstraZeneca also recognized that by remaining competitive it would be able to deliver a lower cost product to patients and the healthcare system.  For example, a 1995 internal memorandum specifically noted that Zoladex pricing changes implemented in early 1996 still resulted in Zoladex being priced $112.60 less per dose than Lupron, saving patients and the healthcare system $22.52 and $90.08 per dose, respectively.[37]

26. Although varying discounts were made available to different trade classes and for varying volume purchases, AstraZeneca also continued to make sales at WAC to those customers who did not purchase in sufficient quantities to qualify for volume discounts.[38]

27. AstraZeneca frequently provided written and oral information to physicians on the purchase price and the Medicare reimbursement rate for Zoladex as compared to the purchase price and Medicare reimbursement rate for Lupron.[39]  AstraZeneca's provision of this truthful information to its customers was a response to the demands of the marketplace.[40]

28. AstraZeneca's volume discount schedule for Zoladex was included in a standard contract widely available to thousands of urologists; discounts were not secretly or individually negotiated with providers.[41]  Invoices accurately reflected the discounted transaction price.[42]

---

[36] Buckanavage Decl. ¶ 17; see also id. ¶¶ 9-14.

[37] PX 19, at AZ0021764; see also DX 2127, at AZ0024480 (describing its pricing proposal as "a 'responsible' or 'patient friendly' pricing position which results in Zoladex 3.6mg being priced at $112.60 per dose less than our competition").

[38] See, e.g., DX 2087 (invoice reflecting low volume sale to a Massachusetts physician at $286.40, which was, at the time, the WAC for the Zoladex 3.6 mg depot); DX 2078 (Zoladex transactional data).  See generally Gould Decl. ¶¶ 32-33 (describing economics of list prices like WAC).

[39] 11/28/06 Tr. 33:4-15 (A. Milbauer).

[40] DX 2128, at AZ0237143; see also 11/28/06 Tr. 73:2-79:17 (OIG guidelines are not intended to prevent pharmaceutical companies from discussing the difference between purchase price and reimbursement rate).

[41] Gould Decl. ¶ 25; DXs 2199, 2203, 2100, 2099; PX 67.

[42] DX 2087.

29. AstraZeneca's written contracts with physicians included standard confidentiality clauses. The contracts also provided that physicians were obligated to report any discounts received on the purchase of Zoladex whenever such disclosure was required by law: "It is the sole responsibility of Urology Practice and/or Participating Physician to accurately report any discounts under this Agreement to federal, state and private reimbursers (including Medicare and Medicaid) if and as required by applicable law."[43]

30. A similar statement was stamped on the invoices physicians received when they purchased Zoladex at a discount.[44]

31. If AstraZeneca had not offered physicians discounts on Zoladex, there would have been more sales of Lupron, a higher priced product.[45]  By offering Zoladex as a lower priced product and by remaining competitive with Lupron, AstraZeneca delivered cost savings to Medicare patients and the Medicare program relative to Lupron.[46]  According to economist Dr. John Gould, in the period from 1991 through 2002, total patient co-payments would have been an estimated $129 million more if Zoladex's market share had remained at 10% (its approximate market share before discounts were available on Zoladex), and total Medicare payments for LhRh agonist therapy would have been over $516 million greater.[47]

---

[43] DX 2099, at AZ0069145 ¶ 11(a); accord DX 2100, at AZ0068159 ¶ 11(a); DX 2199, at AZ0410022 ¶ 11(a); DX 2203, at AZ0068892 ¶ 11(a). AstraZeneca's Zoladex MAP contracts with health plans contained the same language. See 12/04/06 Tr. 44:14-45:1 (J. Tracy) (discussing DX 2111, a Zoladex MAP contract with QualMed); DX 2055, at AZ0073337, ¶ 12(a); DX 2062, at AZ 0108959 ¶ 11(a); Milbauer Decl. ¶ 43.

[44] DX 2087; see also Buckanavage Decl. ¶ 18; 11/27/06 Tr. 42:4-22 (Dr. M. Rosenthal) (admitting that she had not previously considered the disclosure clause in AstraZeneca's invoices to physicians.

[45] See 11/28/06 Tr. 17:13-19 (A. Milbauer); Gould Decl. 42-44; Black Decl. ¶ 24; 11/14/06 Tr. 38:18-39:6 (S. Buckanavage).

[46] DX 2131 (Zoladex marketing material emphasizing patient savings); 11/28/06 Tr. 16:18-23 (A. Milbauer); 11/28/06 Tr. 17:20-24; see also Gould Decl. ¶¶ 42-44; Black Decl. ¶ 24; Buckanavage Decl. ¶ 17; 11/14/06 Tr. 25:4-5 (S. Buckanavage).

[47] Gould Decl. ¶¶ 42-44, fig. 12; 12/04/06 Tr. 100:19-102:21 (Dr. J. Gould) (same); see also 11/14/06 Tr. 38:24-39:6 (S. Buckanavage) (explaining that if volume discounts had not been offered, AstraZeneca would have likely stopped devoting resources to Zoladex, which would have left the substantially more expensive Lupron as the only alternative to surgical castration for patients with advanced prostate cancer).

32. According to Alan Milbauer:

> [Without discounting] our [market] share would diminish.  And so the patients
> and the government would end up spending more because we would be ceding the
> marketplace to a higher-priced product, and it didn't seem to us that that made
> much sense for anybody.[48]

33. Steve Buckanavage similarly stated: "[Y]es, the reimbursements went up [when

Zoladex's AWP was increased] but it was overall less cost to the healthcare system and less cost

to the patient.  So I actually felt good about that."[49]

### B.   AstraZeneca Offered Third Party Payers Substantial Discounts Off of WAC for the Purchase of Zoladex

34. AstraZeneca also sold Zoladex directly to MCOs, because AstraZeneca believed that

Zoladex's lower cost would be attractive to MCOs.[50]

#### 1.   *Staff Model HMOs*

35. Throughout the class period, MCO customers with Staff Model HMO divisions were

offered contracts to purchase Zoladex at discounts similar to those being offered to physicians:[51]

- AstraZeneca offered Blue Cross Blue Shield of Massachusetts ("BCBS/MA")
  increasing discounts on Zoladex during the class period.  By 1996, BCBS/MA
  was entitled to a 27% discount off WAC, equivalent to a spread of
  approximately 70% between their acquisition cost and AWP.  By 1997,
  AstraZeneca offered BCBS/MA up to a 41% discount off WAC, equivalent to a
  spread of 112%.[52]  These spreads are much greater than the roughly 43% and
  62% spreads Plaintiffs allege were closely guarded secrets in 1996 and 1997
  respectively.[53]

- Harvard Pilgrim's Staff Model HMO purchased Zoladex at substantial discounts
  off WAC.[54]  By 1996, Harvard Pilgrim was entitled to a discount on Zoladex
  equivalent to a spread of approximately 43%.  By 1998, the maximum discount

---

[48] 11/28/06 Tr. 24:15-19 (A. Milbauer).

[49] 11/14/06 Tr. 39:16-18 (S. Buckanavage).

[50] 12/04/06 Tr. 7:14-21 (J. Tracy); Tracy Decl. ¶ 11; Buckanavage Decl. ¶ 16.

[51] Tracy Decl. ¶¶ 12, 39.

[52] 12/04/06 Tr. 8:4-12:17 (J. Tracy); Tracy Decl. ¶¶ 21-25; DXs 2090, 2091, 2092, 2094.

[53] See PX 4028 (Direct Testimony Declaration of Dr. Raymond J. Hartman ("Hartman Decl."), Att. G.1.c).

[54] Tracy Decl. ¶ 29; id. ¶¶ 30-32; see also DX 1385; DX 2084, at AZ0552022 (discussing an extension of Harvard Pilgrim's Zoladex contract, which provided for discounts of 50% off WAC); DX 2078 (transactional data).

offered to Harvard Pilgrim had increased to 50% off WAC, equivalent to a spread of approximately 150%.[55]  These spreads are greater than the spreads Plaintiffs allege were closely guarded secrets in these years.[56]

- From 1999 to 2002, Fallon Community Health Plan purchased Zoladex for its Staff Model HMO ranging from approximately $188 to $190 per depot, prices lower than Dr. Hartman's ASPs for the same time period, which range from approximately $188 to $200.[57]

36. Knowledge of the discounts AstraZeneca offered on Zoladex to health plans with Staff Model HMOs was not limited to personnel within the Staff Model itself.  AstraZeneca employee Julie Tracy discussed these discounts with both Edward Curran and James Kenney, who were, respectively, the Pharmacy Directors for BCBS/MA and Harvard Pilgrim.  Mr. Kenney and Mr. Curran were responsible for pharmaceuticals under all of their respective health plans' insurance programs, and not simply for the Staff Model HMO divisions.[58]

37. AstraZeneca believed that health plans were aware that physicians could obtain substantial discounts on the purchase of Zoladex.[59]  For example, in December of 1997, Harvard Pilgrim informed Julie Tracy that it had been invited to join a physician buy group, LHRH, Inc.[60] That buy group offered Harvard the same Zoladex price being offered to physicians. AstraZeneca responded by offering Harvard an even better price:  50% off WAC.[61]

## 2.   *Non-Staff Model Health Plans*

38. As early as 1994, around the same time that AstraZeneca began to offer quantity discounts to physicians, AstraZeneca also tried to convince its health plan customers to stop reimbursing for LhRh agonists based on AWP.  AstraZeneca encouraged Massachusetts health

---

[55] Tracy Decl. ¶ 32; DX 2056, at AZ0609434; see also Gould Decl. ¶ 23; DX 2078 (transactional data).

[56] See PX 4028 (Hartman Decl. Att. G.1.c.).

[57] DXs 1381, 2078; PX 4028 (Hartman Decl. Att. G.1.a.).

[58] 12/04/06 Tr. 12:22-14:13 (J. Tracy); Tracy Decl. ¶¶ 22, 28, 39.

[59] See Tracy Decl. ¶ 40.

[60] See DX 2054; 12/04/06 Tr. 14:14-15:20 (J. Tracy); Tracy Decl. ¶ 30; see also DX 2100 (LHRH Inc. Zoladex contract).

[61] 12/04/06 Tr. 15:21-16:19 (J. Tracy); Tracy Decl. ¶¶ 30-31; DX 2056, at AZ0609437, ¶ 4.

plans to impose a maximum allowable cost ("MAC") on Zoladex and Lupron equal to Zoladex's

WAC price, as an alternative to the AWP-based reimbursement.[62]  If implemented, MAC-based

reimbursement would have removed the financial incentive for physicians to purchase the higher

priced product and would have saved health plans money.[63]

39. For example, in a June 1994 memorandum, AstraZeneca instructed its National Account

Managers to have health plans:

> [P]lace a MAC on Zoladex at our [WAC] of $275.81 and lock out Lupron.  This
> reduces the accounts [sic] cost considerably by changing their current
> reimbursement of AWP - 10%, which is [$]333.57 for Lupron, to [$]275.81, our
> [WAC].  This is a cost savings of [$]57.76 per depot. . . .  The profit for the
> physician is taken out of the system when their reimbursement is MACd.[64]

40. A month later, an AstraZeneca account director reported on his efforts to convince

national insurer US Healthcare to MAC the LhRh class:

> Have met with Richard Wolfson [of US Healthcare] . . ..  I have presented our
> proposal to "MAC" ZOLADEX @ $275.81.  He will consider the "MAC".  I have
> spoken with  . . . [other US Healthcare representatives] RE. the need to "MAC"
> ZOLADEX and create a competitive LHRH/US HEALTHCARE market place to
> offer Providers therapeutic options, create a competitive cost effective environment
> and our desire to work as partners with US H[ea]lthcare.  Rich did agree ZENECA
> WAS NOT taking advantage of US H[ea]lthcare by convncing [sic] Providers of the
> profit they could derive from the "spread".[65]

41. For MCO customers that had IPA model HMOs (where members received services from

a physician network),[66] AstraZeneca also designed a program called the "Bill to/Ship to"

program, later renamed the Zoladex Managed Acquisition Program ("MAP").[67]

42. AstraZeneca began to market the "Bill to/Ship to" program to health plans as early as

---

[62] 12/04/06 Tr. 17:7-19:13 (J. Tracy); PX 982D.

[63] 12/04/06 Tr. 19:2-10 (J. Tracy); PX 982D; DX 2105 (regarding the "need to 'MAC' ZOLADEX and create a competitive LHRH/ US HEALTHCARE market place to offer Providers therapeutic options, [and] create a competitive cost effective environment").

[64] PX 982D, at AZ0008783-84.

[65] DX 2105.

[66] 12/04/06 Tr. 6:7-10 (J. Tracy).

[67] 12/04/06 Tr. 19:20-22 (J. Tracy); Tracy Decl. ¶ 13; Buckanavage Decl. ¶ 16.

1994, although the MAP program was officially launched in 1996.[68]  The same contract strategy

manager who recommended offering quantity discounts to physicians simultaneously

recommended launching the MAP program to MCO customers.[69]

43. Under the MAP program, AstraZeneca would enter into a contract with an MCO that

permitted the MCO to purchase Zoladex at discounts off the Zoladex WAC.[70]  Physicians who

participated in the MCO's IPA network would order Zoladex from AstraZeneca's distributor,

who would then ship the drug to the physician.  AstraZeneca would then bill the MCO directly at

discounted prices.[71]

44. AstraZeneca's strategy was to show MCOs that they would save money by removing the

physician from the financial transaction.  Instead of reimbursing physicians based on AWP,

MCOs would pay discounted prices for Zoladex directly to AstraZeneca.[72]  Julie Tracy promoted

the MAP program to Massachusetts MCOs and discussed with them that urologists earned

income from AWP-based reimbursement because physicians often purchased Zoladex at

discounts off WAC.[73]

45. A number of the MCOs that received offers of substantial discounts on Zoladex in

connection with the MAP program are members of Classes 2 and 3.  For example, Julie Tracy

---

[68] Tracy Decl. ¶ 19; DX 2110.

[69] See generally Buckanavage Decl.; DXs 2126; 2128.  See also PX 14, at AZ0237143.

[70] 12/04/06 Tr. 19:23-20:9 (J. Tracy); Tracy Decl. ¶¶ 13-15; see, e.g., DX 2111 (signed MAP contract with QualMed Plans for Health); DX 2107 (email to National Account Managers attaching MAP Discount Schedule for IPA Model HMOs).

[71] 12/04/06 Tr. 19:23-20:9 (J. Tracy); Tracy Decl. ¶¶ 13-14; DX 2110 (describing how the MAP program would operate in practice).

[72] 12/04/06 Tr. 20:10-15 (J. Tracy) (explaining that the MAP program's characteristic of taking physician reimbursement out of the equation was similar to the manner in which today's specialty pharmacies operate); Tracy Decl. ¶ 14; Buckanavage Decl. ¶ 16; 11/14/06 Tr. 43:1-13 (S. Buckanavage) (explaining the mechanics of the "Bill to/Ship to" program); DXs 2110; 2147.

[73] Tracy Decl. ¶¶ 16-18; 12/04/06 Tr. 24:18-28:10 (J. Tracy); DX 2115 (listing Physician Revenue for Lupron as $142.92); DX 2126, at AZ0108570-71.

offered MAP contracts to BCBS/MA,[74] Harvard Pilgrim[75] and Tufts Associated Health Plan ("Tufts").[76]

46. In connection with AstraZeneca's efforts to promote the "Bill to/Ship to"/MAP Program to Tufts, Julie Tracy explained to Tufts that the LhRh market allowed physicians to earn income from the difference between Zoladex's actual cost and its reimbursement rate.  For example, a May 1995 letter from AstraZeneca to Tufts Health Plan states:

> Since the majority of GNRH agonists are purchased direct I would like to review the cash flow for you again.  Currently, the physician purchases Lupron or Zoladex from the manufacturer at a discounted rate dependent on the size of the order. . . .  It is my understanding that the physician then requests reimbursement at the contracted rate of AWP or AWP minus a percentage depending upon the plans arrangement.  This method has allowed the physician to profit from the difference between the actual cost and the reimbursement rate.[77]

47. In May of 1996, AstraZeneca provided Tufts with a copy of the physician volume discount schedule, as well as the Bill to/Ship to volume discount schedule.[78]  Julie Tracy testified that she did this in order to "reinforce with [Tufts] that [] physicians were able to purchase the drug at a discount, and make her aware of what those discounts were so that she could compare those to the kinds of discounts that I was offering [Tufts] in the bill to/ship to program."[79]  The physician discount schedule showed a maximum discount of 22% off of WAC, equivalent to a 60% spread between physician acquisition cost and AWP.  This 60% spread is greater than the 43% spread that Plaintiffs allege was a closely guarded secret.[80]

---

[74] Tracy Decl. ¶¶ 20, 27.

[75] 12/04/06 Tr. 28:25-29:10 (J. Tracy); Tracy Decl. ¶ 20, 33; DX 2055 (MAP contract offered to Harvard Pilgrim providing for a discount off WAC up to 27%).

[76] 12/04/06 Tr. 29:20-21 (J. Tracy); Tracy Decl. ¶¶ 20, 34-38; DX 2059, at AZ0108977 ("[T]he Bill to/Ship to  program can provide Tufts with substantial savings.").

[77] DX 2058, at AZ0108966-67; see also id. at AZ0108970; Tracy Decl. ¶ 35.

[78] See DX 2060; Tracy Decl. ¶ 37.

[79] 12/04/06 Tr. 35:13-22 (J. Tracy).

[80] PX 4028 (Hartman Decl. Att. G.1.c.).

48. AstraZeneca and Tufts entered into a MAP contract in 1997.[81]  This contract provided Tufts with discounts of up to 41% off WAC on the purchase of Zoladex, which translates into a spread between acquisition cost and AWP of 112%.[82]  This spread is greater than the 62% spread Plaintiffs allege was a closely guarded secret in 1997.[83]

49. The MAP program was ultimately unsuccessful because AstraZeneca was unable to generate significant interest in the program among its MCO customers.[84]  Reasons given to AstraZeneca by MCOs included that (1) the MCOs were fearful of being perceived as interfering with treatment decisions; and (2) MCOs did not wish to endanger their relationships with physicians by reducing or eliminating the income they earned from AWP-based reimbursement for LhRh agonists.[85]  As a result, AstraZeneca stopped actively marketing the MAP program in or around 1999-2000.[86]

50. Even after 2000, however, AstraZeneca continued to discuss with its MCO customers ways to achieve cost savings in the LhRh category by using Zoladex.  For example, according to Jeffrey Alverson, former Director of Contract Strategy and Operations for AstraZeneca, AstraZeneca entered into a Zoladex specialty pharmacy contract with Aetna, which, like the MAP program, would remove physicians from the financial transaction:

> Aetna was paying at whatever reimbursement rate they had negotiated with their physician for that Zoladex.  And they were aware that the physicians were making that margin, and they wanted to control their cost on that product.  So the [specialty pharmacy] contract would have taken the purchasing and billing of Zoladex from the physician and placed it in the specialty pharmacy network's

---

[81] 12/04/06 Tr. 39:8-12; 42:3-4 (J. Tracy); DXs 2061, 2062.

[82] Tracy Decl. ¶ 38; DX 2062.

[83] PX 4028 (Hartman Decl. Att. G.1.c.).

[84] Tracy Decl. ¶ 41.

[85] See, e.g., 12/04/06 Tr. 42:5-43:9 (J. Tracy) (explaining that BCBS/MA declined to sign a MAP contract because it did not wish to anger its physician network); Tracy Decl. ¶ 41.

[86] 12/04/06 Tr. 57:23-6 (J. Tracy).

hand at a lesser discount . . ..[87]

51. AstraZeneca also continued to promote MAC reimbursement for Zoladex and Lupron.  In April 2001, AstraZeneca representatives met with Aetna Health Management representatives in order to "make the appropriate personnel within Aetna aware of [the reimbursement] disparity [between Lupron and Zoladex] and to work to remedy the reimbursement policy to where Zoladex is NOT at a competitive disadvantage."[88]  As a result of the meeting, Aetna committed to consider implementing MAC reimbursement.[89]

**C. There is No Evidence that AstraZeneca Sought to Deceive Third Party Payers**

52. AstraZeneca did not hide the discounts it offered to physicians from third party payers. AstraZeneca witnesses testified that they believed third party payers, including Massachusetts third party payers, knew that Zoladex was available to physicians at significant discounts, that physicians earned income as a result, and that this financial incentive was part of the competitive dynamic in the LhRh category.[90]

**IV. The Federal Government Was Aware of the Zoladex Volume Discounts**

**A. There Is No Evidence that AstraZeneca Sought to Deceive the Federal Government**

53. AstraZeneca believed the federal government was aware of Zoladex discounts.[91] According to Alan Milbauer, former AstraZeneca Vice President for Public Affairs:  "[I]t was always [AstraZeneca's] understanding that [the difference between Zoladex's AWP and actual

---

[87] 8/18/04 Deposition Tr. of J. Alverson, at 315:4-12; see also id. at 314:18-315:22.

[88] DX 2117, at AZ0396062.

[89] Id.

[90] 12/04/06 Tr. 14:14-15:16, 29:2-36:9, 42:5-44:6 (J. Tracy); 11/14/06 Tr. 30:16-19, 46:18-47:6 (S. Buckanavage); Tracy Decl. ¶ 40.

[91] 11/14/06 Tr. 29:4-21 (S. Buckanavage); 11/28/06 Tr. 19:21-22:10 (A. Milbauer); Milbauer Decl. ¶¶ 39-41.

acquisition cost] was not a surprise to anyone who was involved with Part B medications."[92]

54. The AstraZeneca governmental affairs group "communicated to management, that Congress, members of the Administration, and various federal agencies understood that AWP was not an actual average of wholesale prices and knew that there was a significant difference between AWP and acquisition price for many drugs covered by Medicare Part B."[93]

55. AstraZeneca did not believe that the amendments to the Medicare Act implemented by the Balanced Budget Act of 1997 required AstraZeneca to report any pricing information to the federal government in connection with Medicare Part B reimbursement for Zoladex or that the suggested AWPs for Zoladex it provided to publications should change to reflect an arithmetic average of wholesale prices including discounts and rebates.[94]

## B.  AstraZeneca Reported AMP Data to the Federal Government

56. AstraZeneca did not hide the discounts it offered to physicians from the federal government.[95]

57. AstraZeneca has reported an Average Manufacturer's Price ("AMP") for Zoladex to the federal government quarterly since 1991 in connection with the Medicaid program.[96]

58. The Zoladex AMPs reported by AstraZeneca reflect all discounts received by customers

---

[92] 11/28/06 Tr. 22:8-10 (A. Milbauer).

[93] Milbauer Decl. ¶ 39; see also id. ¶¶ 39-41 (giving specific examples of government knowledge that was communicated to AstraZeneca management by the governmental affairs group); 11/28/06 Tr. 19:21-22:10 (A. Milbauer); 11/14/06 Tr. 29:4-21 (S. Buckanavage).

[94] Milbauer Decl. ¶¶ 39-40; 11/28/06 Tr. 23:2-6, 25:24-26:7, 28:17-29:1 (A. Milbauer); see also the Track 1 Defendants' Proposed Common Findings of Fact ¶ 14.

[95] See, e.g., Buckanavage Decl. ¶ 18; 11/14/06 Tr. 46:3-47:13 (S. Buckanavage) (AstraZeneca did not intend for its pricing adjustments and volume discounts to be a secret); 11/28/06 Tr. 25:3-6 (A. Milbauer) (Zoladex discounts were well-known, and the Company make no attempt to hide them); see also supra note 93.

[96] 11/14/06 Tr. 29:14-21; 47:13-19 (S. Buckanavage); 11/21/06 Tr. 110:2-10 (Dr. R. Hartman) (noting that it is his understanding that AMP is provided by manufacturers to CMS on a quarterly basis); id. 111:5-12 (reaffirming statement from his September 2004 class certification report in which he defined AMP as including "up-front discounts, charge-backs, rebates, price protection discounts"); 11/27/06 Tr. 36:13-37:13; 38:2-5 (Dr. M. Rosenthal); Gould Decl. ¶ 21; Milbauer Decl. ¶ 41.

in the retail distribution chain, including physician practices.[97]  AMP data are a close proxy for

average sales prices.[98]  The Zoladex AMP data closely track Dr. Hartman's ASPs.[99]

59. The existence of AMP data has long been known to the CMS Administrator and others in

the federal government:

- The <u>Congressional Budget Office</u> was able to compare AMP data to AWPs in the mid 1990s, acknowledging as early as January 1996 that AMP is significantly lower than both AWP and WAC.[100]

- A May 1996 <u>HHS-OIG</u> report compared Medicare reimbursement rates for 17 physician-administered drugs to the amounts paid for those drugs under the Medicaid "best price" reimbursement policy.  The report determined that Medicare could have saved $122 million in 1994 alone, including approximately $5.5 million on Zoladex, if it had adopted the Medicaid "best price" system, rather than AWP-based reimbursement.[101]  HHS-OIG also audits AMP data to determine accuracy.[102]

- <u>CMS Administrator</u> Thomas Scully has commented on the substantial savings that would be generated if Medicare were to purchase drugs at AMP, and has admitted that AMP data could be used by the Medicare program, stating that:

  > Another option is average manufacturers price, which we do collect and GAO has talked about, which is a very reasonable number.  It works in the Medicaid program.  It is a much lower price, so it generates substantial savings. . . . [AMP] is clearly the number we use in Medicaid.  It is audited.  We have those numbers.  The manufacturers, under Medicaid law, give them to us, and we could use them.[103]

**C.  Medicare Carriers Were Aware of Discounts Provided to Physicians on the Purchase of Zoladex**

60. The commercial insurers contracted by HCFA/CMS to serve as the regional Medicare

carriers knew that Zoladex was available to physicians at discounted prices, enabling physicians

---

[97] 11/28/06 Tr. 22:5-8 (A. Milbauer); Gould Decl. ¶¶ 21-22; DX 2079.

[98] <u>See</u> 11/27/06 Tr. 36:13-25 (Dr. M. Rosenthal); 11/21/06 Tr. 111:5-15 (Dr. R. Hartman).

[99] Gould Decl. ¶ 22; DX 2079 (including 1996 Zoladex AMP data that reflect a 46% spread between average physician acquisition costs and the published AWP).

[100] <u>See</u> DX 1944, at 20.

[101] <u>See</u> DX 1062, at 7; <u>see also</u> 11/28/06 Tr. 113:10-115:3; 116:2-117:19 (Dr. G. Bell).

[102] PX 4015, at 20 (Hon. Janet Rehnquist); DX 2079.

[103] <u>See</u> PX 4015, at pgs. 8, 13.

to earn income from prescribing LhRh agonists.

61. For example, in 1996, Dr. Grant Steffen of the Colorado Medicare Part B carrier obtained a copy of the Zoladex volume discount schedule that AstraZeneca offered to physicians.  Dr. Steffen attempted to change reimbursement for Zoladex to reflect physician acquisition cost and requested invoices from physicians to accomplish that goal.[104]

62. On July 25, 1996, the Healthcare Financing Administration ("HCFA"), instructed Dr. Steffen to immediately stop basing reimbursement for Zoladex upon actual acquisition costs, and to resume reimbursement based on published AWP.[105]

63. On August 5, 1996, Dr. Steffen replied to HCFA, noting the "great difference between the [Acquisition Cost] and the AWP" for Zoladex.  Dr. Steffen also enclosed the volume discount schedule then in effect for Zoladex, which demonstrated spreads between AWP and actual cost of up to 60%.[106]  This spread is greater than the 43% spread Plaintiffs allege was a closely guarded secret in 1996.[107]

64. Palmetto Government Benefits Administrators, the Medicare carrier for South Carolina, was also aware of the difference between Zoladex's actual selling price and AWP.  In December 1996, in connection with its decision to implement a Least Costly Alternative policy with respect to LhRh agonists, Palmetto analyzed actual acquisition costs compared to reimbursement for both Zoladex and Lupron, referring to the annualized difference as the "Yearly Medicare Allowed Profit." [108]

65. Palmetto also acknowledged in 1996 that by reimbursing at the Zoladex AWP instead of

---

[104] See DX 2158.

[105] Id.

[106] DX 2176.

[107] PX 4028 (Hartman Decl. Att. G.1.c.).

[108] DX 2170.

the Lupron AWP, Medicare would save $94 million.[109]

**D.    The Federal Government Purchased Zoladex at Discounted Prices**

66. The publicly available Federal Supply Schedule ("FSS") listed a price for Zoladex sales to government purchasers at or below the Zoladex ASP calculated by Dr. Hartman for most of the class period.[110]  The Veterans' Administration ("VA") negotiated with AstraZeneca for even deeper discounts on Zoladex than the FSS prices during the class period.[111]

67. A report from the Office of the Inspector General ("OIG") dated November 1998 discussed the price at which the VA purchased Zoladex, and concluded that Medicare could have saved $60 million in 1998 alone if it had paid the same price for Zoladex as the VA ($206.29) rather than $389.98, which was at the time the median HCFA (Medicare) price.  The OIG report reflected that HCFA's reimbursement rate provided a spread of 89% over the VA price.[112]

**E.    Information on Zoladex Discounts Was Available For Purchase**

68. Information on amounts actually paid by physicians for Zoladex was also available through a company called IMS, which publishes national pharmaceutical sales and pricing data for all pharmaceutical trade classes.[113]  IMS is "one of the major data providers in this industry" and its data is publicly available for purchase.[114]

69. Subscribers include, among other entities, government agencies at both the federal and

---

[109] DX 2170.

[110] Gould Decl. ¶ 18. 12/04/06 Tr. 73:16-74:2; see also id. at 133:10-16 (AstraZeneca's expert was able to obtain FSS prices by simple email request).

[111] Gould Decl. ¶ 19; Milbauer Decl. ¶ 41; 12/04/06 Tr. 74:3-19 (Dr. J. Gould).

[112] DX 2074 at B-1 (J9202 goserelin acetate); 11/27/06 Tr. 40:19-41:14 (Dr. M. Rosenthal) (discussing DX 2074); see also DX 1094, at 6 (similar report finding that Medicare could save approximately $321.5 million per year if it paid the same price for Zoladex that the VA received).

[113] Gould Decl. ¶ 20; DX 2066.

[114] 11/20/06 Tr. 41:2-3 (Dr. R. Hartman); 11/21/06 Tr. 114:19-115:3 (Dr. R. Hartman) (agreeing that IMS data are available publicly to anyone willing to purchase them).

state level.[115]  A 1980 General Accounting Office ("GAO") Report used IMS data to compare

drug reimbursement payments under the MAC and Estimated Acquisition Cost methodologies to

AWP-based reimbursement.[116]

**V.      There Is No Evidence that AstraZeneca Deceived Anyone About Zoladex Prices**

70. There is no evidence that any named plaintiffs saw or used published AWPs for Zoladex.

71. There is no evidence that the government or the named plaintiffs made reimbursement

decisions for Zoladex based on a belief that the published Zoladex AWP represented an average

selling price (or a predictable signal for an average selling price) for Zoladex.

72. In early 2004, BCBS/MA affirmatively decided <u>not</u> to change reimbursement for Zoladex

from 95% of AWP to ASP + 6%, despite knowing that it would save $204.13 per dose.[117]  Class

3 representative Pipefitters Local 537 and Class 3 member IUOE Local 4 continue to employ

BCBS/MA to administer their health and welfare funds.[118]  As a result, Pipefitters and IUOE also

continue to base their reimbursement for Zoladex on AWP.

73.   There were only two Zoladex claims paid by Class 2 Plaintiff Sheet Metal Workers

("SMW") during the class period and one of the two Zoladex claims was not based on the

Zoladex AWP.[119]  The physician's billed charge was lower than 95% of the Zoladex AWP, so

CMS allowed the lower billed charge and not 95% of AWP.[120]  SMW made these Medi-gap

payments in accordance with the amounts determined by CMS; it did not independently base its

---

[115] 11/21/06 Tr. at 114:19-115:4; 12/4/06 Tr. at 74:22-75:16.

[116] <u>See generally</u> DX 1038; <u>see also</u> DX 1564 (report by Cigna using IMS data), DX 1646 (report by Pacificare using IMS data).

[117] 11/07/06 Tr. 129:21-133:9 (D. Devaux); DX 990, app. at 5 (information for J Code J9202, goserelin acetate implant); 11/08/06 Tr. 5:19-9:5 (M. Mulrey).

[118] 11/06/06 Tr. 176:4-6 (C. Hannaford); 11/07/06 Tr. 29:11-18 (G. Alongi).

[119] PX 4012, at 3, n.1, listing as a source SMWMASS 000001-SMWMASS 01772; <u>see also</u> Revised Trial Affidavit of Sharon Faulkner ¶¶ 17-21 (authenticating documents bearing production numbers SMWMASS 000001-01771.  This range contains a claim for Zoladex, at SMWMASS 001174-76).

[120] <u>Compare</u> SMWMASS 001174-76 to DX 2066 (Zoladex data CD).

payments on the Zoladex AWP.[121]

74. There is no evidence that any named plaintiff was affirmatively misled by any act of AstraZeneca.

75. There is no evidence that any named plaintiff considered AstraZeneca to be a fiduciary.

76. There is no evidence that AstraZeneca had any contact with any consumer in Class 3.

## VI.   There is No Evidence Linking the Conduct Described in AstraZeneca's June 20, 2003 Guilty Plea to Massachusetts

77. There is no evidence that any member of Class 2 or Class 3 paid for a Zoladex sample.[122]

78. AstraZeneca's corporate policy expressly prohibited encouraging or advising physicians to bill for samples.[123]

Dated:   January 19, 2007
              Boston, Massachusetts

Respectfully Submitted,

By:   /s/ Katherine B. Schmeckpeper

Nicholas C. Theodorou (BBO # 496730)
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Tel: (617) 832-1000

D. Scott Wise
Michael S. Flynn
Kimberley Harris
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Attorneys for AstraZeneca Pharmaceuticals LP

---

[121] Revised Trial Affidavit of Glenn Randle ¶¶ 4-5; 11/07/06 Tr. 9:16-11:3 (S. Faulkner); see also PX 4012; SMWMASS 001174-76; SMWMASS 001288-90.

[122] 11/06/06 Tr. 17:2-3 (Plaintiffs' Opening Statement).

[123] Milbauer Decl. ¶ 48 ("AstraZeneca policy has always prohibited the provision of samples as a financial inducement to purchaser our products."); Buckanavage Decl. ¶ 19 (using samples to increase Return to Practice "would have clearly violated company policy."); Black Decl. ¶ 25 ("As a matter of corporate policy, the Company prohibited the distribution of samples of Zoladex to providers for the purpose of billing Medicare for free samples."); see also DX 2103, at AZ0229456 ("**NEVER** use samples to 'buy business' or to barter for other items of value.  **NEVER** sell samples for any reason.").

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered on January 19, 2007 to counsel for plaintiffs and to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, via LexisNexis File & Serve.


By:     <u>/s/ Katherine B. Schmeckpeper</u>
                Katherine B. Schmeckpeper