**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
)
IN RE PHARMACEUTICAL INDUSTRY )   MDL No. 1456
AVERAGE WHOLESALE PRICE )
LITIGATION )
)
_____ )   Judge Patti B. Saris
)
THIS DOCUMENT RELATES TO )
01-CV-12257-PBS and 01-CV-339 )
_____ )

**TRIAL OF CLASS 2 AND 3 CLAIMS**

**MEMORANDUM OF LAW IN SUPPORT OF ASTRAZENECA
PHARMACEUTICALS LP'S POST-TRIAL MOTION FOR JUDGMENT**

TABLE OF CONTENTS

PAGE

I.    PLAINTIFFS HAVE FAILED TO ESTABLISH THE ELEMENTS OF A
      CH. 93A CLAIM ...................................................................................... 1

      A. Plaintiffs Have Failed to Establish that AstraZeneca Engaged in Unfair
         or Deceptive Conduct ......................................................................... 1

         1. AstraZeneca's Conduct Was Not Deceptive....................................... 1

            (a) AstraZeneca Did Not Deceive Massachusetts Third Party Payers ................. 2

            (b) AstraZeneca Did Not Deceive the Federal Government................................ 6

         2. AstraZeneca's Conduct Was Not "Unfair" to Massachusetts Third Party Payers. 8

            (a) AstraZeneca's Conduct Was Standard Practice in the
                Healthcare Industry....................................................................... 8

            (b) AstraZeneca's Conduct Saved Patients and the Healthcare
                System Money ............................................................................. 10

      B. Plaintiffs Have Failed to Establish Causation ........................................... 12

      C. Plaintiffs Have Failed to Establish that the Alleged Conduct Occurred in the
         Context of Transactions with AstraZeneca................................................ 14

      D. AstraZeneca's Alleged Unfair and Deceptive Conduct Did Not Occur
         Primarily and Substantially in Massachusetts............................................ 15

      E. AstraZeneca's Alleged Conduct Did Not Cause Plaintiffs Any Loss ....................... 15

II.   CLASS 2 AND CLASS 3 CLAIMS ARE BARRED BY THE STATUTE OF
      LIMITATIONS........................................................................................... 16

CONCLUSION ................................................................................................ 20

i

# TABLE OF AUTHORITIES

CASES

PAGE

Boston Children's Heart Found. Inc. v. Nadal-Ginard, 73 F.3d 429
 (1st Cir. 1996) ................................................... 19

Commercial Union Ins. Co. v. Seven Provinces Ins. Co. Ltd.,
 217 F.3d 33 (1st Cir. 2000).............................................8,10

Frullo v. Landenberger, 61 Mass. App. Ct. 814, 814 N.E.2d 1105
 (2004) ......................................................... 15

Govoni & Sons Constr. Co. v. Mechs. Bank, 51 Mass. App. Ct. 35,
 742 N.E.2d 1094 (2001) ...................................................... 9

Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.,
 445 Mass. 790, 840 N. E. 2d 526 (2006), aff'd, 445 Mass. 811,
 840 N.E. 2d 541 (2006) ................................................ 15

Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123 (1st Cir. 1987).................. 19

Markarian v. Conn. Mut. Life Ins. Co.,
 202 F.R.D. 60 (D. Mass. 2001)............................................. 12

Mass. Farm Bur. Fed'n, Inc. v. Blue Cross of Mass., Inc.,
 403 Mass. 722, 532 N.E.2d 660 (1989)................................. 12

Olsen v. Bell Tel. Labs., Inc., 388 Mass. 171, 445 N.E.2d 609 (1983) ............... 17

Palochko v. Reis, 67 Mass. App. Ct. 103, 852 N.E.2d 127 (2006)..................... 13

Tagliente v. Himmer, 949 F.2d 1 (1st Cir. 1991).................................. 1

USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888,
 28 Mass. App. Ct. 108 (1989)......................................... 2,9

Wise v. Hubbard, 769 F.2d 1 (1st Cir. 1985)..................................... 19

Whitcomb v. Pension Dev. Co., 808 F.2d 167 (1st Cir. 1986)............................ 17

Zamboni v. Aladan Corp., 304 F. Supp. 2d 218 (D. Mass. 2004) ...................... 17

STATUTES & RULES

Mass. Gen. Laws., Ann. 93A .......................................................................passim

MASS. GEN. LAWS CH. 260 ...........................................................................16, 19

AstraZeneca Pharmaceuticals LP ("AstraZeneca") respectfully submits this memorandum of law in support of its post-trial motion for judgment.[1]  As described below, Class 2 and Class 3 Plaintiffs have failed to satisfy their burden to establish the necessary elements of a Ch. 93A violation.  MASS. GEN. LAWS. ANN. 93A (West 2006).  Moreover, Plaintiffs' claims are barred by the four-year statute of limitations applicable to Ch. 93A claims.  Accordingly, AstraZeneca is entitled to judgment.

# I.    PLAINTIFFS HAVE FAILED TO ESTABLISH THE ELEMENTS OF A CH. 93A CLAIM

## A.    Plaintiffs Have Failed to Establish that AstraZeneca Engaged in Unfair or Deceptive Conduct

### 1.    AstraZeneca's Conduct Was Not Deceptive

By definition, one cannot be deceived if one has knowledge of the truth.  Tagliente v. Himmer, 949 F.2d 1, 3, 8 (1st Cir. 1991); USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass. App. Ct. 108, 125, 546 N.E.2d 888, 898 (Mass. Ct. App. 1989) (rejecting Ch. 93A claim where plaintiff had in fact been made aware of the purportedly withheld information and "was not misled by any of [defendant's] financial reports.")[2]  Plaintiffs' theory of the case, based on the unsupported opinions of their experts, is that the discounts AstraZeneca offered to physicians on the purchase of Zoladex were a "closely guarded secret" kept from third party payers in Massachusetts.[3]  However, Plaintiffs presented no evidence at trial that AstraZeneca deceived

---

[1] AstraZeneca also adopts and incorporates the additional arguments set forth in the joint submission of the Track 1 Defendants being filed simultaneously herewith.

[2] See Defendants' Memorandum of Law in Support of Track 1 Defendants' Post-Trial Motion for Judgment ("Track 1 Defendants' Memorandum"), at 2-4.

[3] See, e.g., 11/27/06 Tr. 32:13-20 (Testimony of Dr. M. Rosenthal); see also 11/21/06 Tr. 85:9-14, 92:1-5

Massachusetts third party payers – the only plaintiffs now before the Court[4] – regarding the published AWPs for Zoladex or the discounts it offered on Zoladex to physicians.  In fact, the record is unequivocal that AstraZeneca did not conceal the discounts it offered physicians on Zoladex from Massachusetts third party payers, but rather disclosed such discounts to them and to the federal government.  Plaintiffs therefore have failed to show that AstraZeneca's conduct with respect to Zoladex was deceptive to Massachusetts third party payers under Ch. 93A.

> (a)     **AstraZeneca Did Not Deceive Massachusetts Third Party Payers**

AstraZeneca did not deceive the Massachusetts third party payers in Classes 2 and 3 regarding the discounts it offered on Zoladex or the income earned by physicians from AWP-based reimbursement for Zoladex.  Indeed, the evidence is all to the contrary.  Throughout the class period, AstraZeneca engaged in a concerted effort to: 1) sell Zoladex directly to Massachusetts third party payers at the same discounted prices offered to physicians; 2) encourage Massachusetts third party payers to shift physician reimbursement for Zoladex and Lupron away from AWP; and 3) negotiate contracts with Massachusetts third party payers that would lower costs by eliminating the need to reimburse physicians for Zoladex at all.  These efforts, together with the information about Zoladex transaction prices that was publicly available, entirely refute the Class 2 and Class 3 allegations that AstraZeneca engaged in any deceptive conduct.

Although Plaintiffs allege that the published AWPs for Zoladex were deceptive, there is

---

(Testimony of Dr. R. Hartman); Direct Testimony Declaration of Dr. Raymond J. Hartman, ¶ 27.  These Rule 702 proffered experts did not purport to testify based on personal knowledge that Massachusetts third party payers did not know about Zoladex discounting.  Rather, they offered opinions.  If those opinions are unsupported by the record, as they are here, then the opinions are incorrect and should be disregarded.

[4] No § 9 claim by an individual consumer in Class 3 was presented at trial.

2

no evidence that the named Plaintiffs made reimbursement decisions for Zoladex based on a belief that the published AWP represented an average selling price for Zoladex or was a predictable signal for the average selling price.  See Defendant AstraZeneca Pharmaceuticals LP's Proposed Findings of Fact ("(AZ FF ¶ ___)"), at ¶¶ 70- 71.  Indeed, there is no evidence that any named Plaintiff was affirmatively misled by any act of AstraZeneca.  (AZ FF ¶ 74).

To the contrary, the evidence demonstrates that BCBS/MA, Harvard Pilgrim and Fallon, three of the largest third party payers in Massachusetts, had direct knowledge throughout the class period that Zoladex was sold by AstraZeneca to contracting customers at significant discounts off the WAC price.  (AZ FF ¶¶ 35-37).  For example, BCBS/MA's Staff Model HMO had direct annual contracts with AstraZeneca to purchase Zoladex at quantity discounts up to 41% off WAC.  (AZ FF ¶ 35).  Similarly, Harvard Pilgrim had direct annual contracts with AstraZeneca to purchase Zoladex for its Staff Model HMO at quantity discounts as high as 50% off WAC.  (AZ FF ¶¶ 35, 37).  These discounts off WAC are equivalent to a spread between acquisition cost and the published AWP of approximately 112% (for BCBS/MA in 1997) and 150% (for Harvard Pilgrim in 1998).  These spreads are larger than the spreads Dr. Hartman claims were secret during those years.  (AZ FF ¶ 35).[5]

Knowledge of these discounts within the health plans was not limited to personnel within the Staff Model HMOs.  (AZ FF ¶ 36).  Moreover, AstraZeneca believed, based on direct experience with Massachusetts insurers, that third party payers understood that physicians were

---

[5] In addition, drug-specific data reflecting deep discounts to providers was publicly available for purchase from IMS, a well-known third-party data provider.  (AZ FF ¶ 68).  Plaintiffs' expert Dr. Rosenthal admitted that the actual average selling prices for Zoladex as reflected in this publicly available data were very close to the ASPs calculated by Dr. Hartman.  See 11/27/06 Tr. 44:1-10 (Testimony of Dr. M. Rosenthal).  This evidence further undermines Plaintiffs' argument that AstraZeneca's actual transaction prices on Zoladex were a closely guarded secret.

purchasing Zoladex at the same discounts.  (AZ FF ¶¶ 37, 40, 44, 46-47, 49-52).  Harvard

Pilgrim was invited by a physician buy group to purchase Zoladex at the buy group's discounted

rate and AstraZeneca itself sent a physician discount schedule for Zoladex to Tufts directly.  (AZ

FF ¶ 37).  These unrefuted facts alone defeat any claim that Massachusetts third party payers

were deceived.[6]

Moreover, AstraZeneca encouraged Massachusetts health plans to abandon AWP-based

reimbursement for Lupron and Zoladex in favor of a maximum allowable cost ("MAC") equal to

Zoladex's WAC.  (AZ FF ¶¶ 38-39).  MAC reimbursement would have provided substantial

savings for health plans by removing the financial incentive for physicians to purchase the higher

priced product.  Notes from a July 1994 meeting with representatives from U.S. Healthcare

describe AstraZeneca's attempt to encourage U.S. Healthcare to "MAC" Zoladex and Lupron.

The notes clearly reflect that AstraZeneca discussed with U.S. Healthcare that physicians were

able to make a profit on LhRh drugs under the AWP-based reimbursement system.

Significantly, according to the notes, US Healthcare agreed that AstraZeneca "was not taking

advantage of US H[eal]thcare" by providing physicians with information on the "spread."  (AZ

FF ¶ 40).

Finally, AstraZeneca offered Massachusetts insurers with Independent Practice

---

[6] Plaintiffs' point to confidentiality clauses in AstraZeneca's contracts with physicians to suggest an effort
to keep Zoladex transaction prices a secret from Massachusetts third party payers.  Not only are such clauses
standard commercial practice for both physician and third party payer contracts, but each contract also contains clear
notification that the contract customer – whether it is a physician practice or a health plan – is responsible for
reporting any discounts to Medicare if required by law to do so.  (AZ FF ¶ 29).  The same requirement was stamped
on the invoices physicians received on the purchase of Zoladex, each of which properly reflected the discounted
transaction prices.  (AZ FF ¶¶ 28, 30).  In the face of the overwhelming and uncontested direct evidence that
AstraZeneca was communicating directly with Massachusetts third party payers about physician discounts on
Zoladex, such confidentiality clauses do not support Plaintiffs' allegation that these discounts were kept secret from
Massachusetts third party payers.

Association ("IPA") model HMOs, including BCBS/MA, Harvard Pilgrim and Tufts, the

opportunity to lower costs for LhRh therapy by eliminating physician reimbursement altogether

through the "Bill to/Ship to" or "MAP" program.  (AZ FF ¶ 41).  Under the MAP program,

physicians who participated in the health plan's IPA network would order Zoladex from

AstraZeneca's distributor, who would then ship the drug to the physician.  AstraZeneca would

bill the health plan directly for the Zoladex at discounted prices.  (AZ FF ¶¶ 43-44).

AstraZeneca's actions in connection with marketing the MAP program to health plans

were entirely inconsistent with an attempt to conceal physician profit.  Materials used to promote

the program clearly demonstrated that physicians were able to earn revenue from administering

LhRh-a drugs.  (AZ FF ¶ 46).  Indeed, AstraZeneca's efforts to explain the benefits of the MAP

program to health plans *required* it to discuss the volume discounts offered to physicians and the

resulting opportunity for physician profit. (AZ FF ¶¶ 43-47).

Even after AstraZeneca stopped promoting the MAP program due to lack of interest from

health plans, AstraZeneca continued in its efforts to discuss the dynamics of LhRh

reimbursement with its health plan customers.  For example, AstraZeneca continued to

encourage health plans to "MAC" Zoladex and Lupron.  In 2001, AstraZeneca met with

representatives of Aetna Health Management to promote MAC reimbursement.   The purpose of

this meeting "was to make the appropriate personnel with Aetna aware of [the reimbursement]

disparity [between Lupron and Zoladex] and to work to remedy the reimbursement policy to

where Zoladex is NOT at a competitive disadvantage."  (AZ FF ¶ 51).  AstraZeneca later offered

a specialty pharmacy contract to Aetna, because Aetna, fully aware that physicians were making

a profit on Zoladex, wanted to control its costs by eliminating the need to reimburse physicians

directly.  (AZ FF ¶ 50).

Again, the record is clear that AstraZeneca not only offered deep discounts on Zoladex to Massachusetts health plans in Class 2 and 3, but also openly *explained* to them the "Return to Practice" dynamic.  There simply is no evidence, or basis to infer, that discounts on Zoladex were a "closely guarded secret" kept from Massachusetts third party payers.  The only substantive evidence is to the contrary.  Therefore, there was no deception of Massachusetts third party payers with respect to Zoladex.

#### (b)      AstraZeneca Did Not Deceive the Federal Government

Plaintiffs also did not offer any evidence that the federal government made Medicare Part B reimbursement decisions for Zoladex based on a belief that the published AWP for Zoladex represented an average selling price (or a predictable signal for the average selling price).  As described in the Track 1 Defendants' Joint Proposed Findings of Fact, the federal government has long been aware that AWP does not represent an actual average of acquisition costs.[7]  The record reflects that the government was also specifically aware of the discounts AstraZeneca offered on Zoladex.  (AZ FF ¶¶ 53-69).

AstraZeneca has reported its Average Manufacturer's Price ("AMP") for Zoladex to the federal government quarterly since 1991 in connection with the Medicaid program.  (AZ FF ¶¶ 56-57).  This AMP data reflects all Zoladex discounts received by physician practices and closely tracks the ASP calculated by Dr. Hartman.  (AZ FF ¶ 58).  Although Plaintiffs allege that the AMP data is secret, the record evidence establishes that the Congressional Budget Office, the Department of Health and Human Services Office of Inspector General ("OIG") and the CMS

---

[7] See also Track 1 FF ¶¶ 6-8, 12, 17.

Administrator have all gained access to AMP data, analyzed AMP data, and publicly reported their conclusions that AMP data reflects transaction prices significantly lower than AWP. (AZ FF ¶ 59).

Moreover, the Health Care Financing Administration ("HCFA") and Medicare carriers had access to Zoladex invoice prices. In 1996, Dr. Grant Steffen of the Colorado Medicare Part B Carrier received and then forwarded a copy of the physician discount schedule for Zoladex to the Health Care Financing Administration ("HCFA"), noting the "great difference between the [Acquisition Cost] and the AWP" for Zoladex. (AZ FF ¶ 61). This discount schedule demonstrated spreads between the AWP for Zoladex and the physician's discounted cost of up to 60% – a spread greater than the 43% spread Dr. Hartman claims was a secret in that year. (AZ FF ¶ 63). Yet, despite this knowledge, HCFA specifically instructed Dr. Steffen to reimburse physicians for Zoladex based on the published AWP, and not acquisition cost. (AZ FF ¶ 62). In that same year another Medicare carrier also analyzed the difference between the Zoladex AWP and actual invoice prices, referring to the annualized difference as the "Yearly Medicare Allowed Profit." (AZ FF ¶¶ 64-65).

The federal government directly benefited from the discounts when purchasing Zoladex for the Veterans Administration ("VA"). (AZ FF ¶ 66). The discounted prices available to the VA were analyzed by the OIG in two reports. (AZ FF ¶ 67). The 1998 OIG report determined that Medicare could have saved $60 million in 1998 alone if it had reimbursed for Zoladex on the basis of the discounted price paid by the VA. (AZ FF ¶ 67). Not only was the OIG aware of the discounts, it was analyzing the discounts by comparing them to the AWP-based reimbursements being made by Medicare.

7

2.     **AstraZeneca's Conduct Was Not "Unfair" to Massachusetts Third Party Payers**

Unable to prove deception of Massachusetts third party payers, Plaintiffs resort to an amorphous allegation that AstraZeneca's conduct was somehow "unfair" to Massachusetts third party payers.  In order to show unfairness, Plaintiffs must establish that Defendants conduct attained a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Commercial Union Ins. Co. v. Seven Provinces Ins. Co. Ltd., 217 F.3d 33, 40 (1st Cir. 2000) (internal citations omitted).[8]  As explained below, courts have articulated two relevant factors to be considered in any unfairness analysis – the balance of equities between the parties and the "purpose and effect" of the challenged conduct.

(a)     **AstraZeneca's Conduct Was Standard Practice in the Healthcare Industry**

Courts have explained that a "major factor" in determining unfairness under Ch. 93A is the balance of equities between the parties.  Such analysis "requires an examination of the knowledge and bargaining power of the plaintiff, as well as the plaintiff's own conduct and what it reasonably should have known."  See, e.g., Davis v. Dawson, Inc., 15 F. Supp. 2d 64, 146 (D. Mass. 1998) (Saris, J.) ("In evaluating the unfairness of the objectionable conduct, this court may 'assess the equities between the parties, including what both parties knew or should have known.'") (internal citations omitted); Swanson v. Bankers Life Co., 389 Mass. 345, 349, 450 N.E.2d 577, 580 (1983).[9]  As described in the Track 1 Defendants' Joint Proposed Findings of

---

[8] See also Track 1 Defendants' Memorandum, at 4-5.

[9] See also Track 1 Defendants' Memorandum, at 5.

Fact (("Track 1 FF ¶__")), the named Plaintiffs are sophisticated entities, or engage the services of sophisticated entities in determining reimbursements.  (Track 1 FF ¶¶ 67-71).

Courts conducting an unfairness analysis under Ch. 93A, § 11 consider whether a defendant's conduct conformed with standard practices in the particular industry.  See Govoni & Sons Constr. Co. v. Mechs. Bank, 51 Mass. App. Ct. 35, 51, 742 N.E.2d 1094, 1107 (Mass. App. Ct. 2001) (rejecting Plaintiff's Ch. 93A claim and noting that "[t]he bank was merely following procedures which, although resulting in improper payment, were widely utilized by similar banks in the area."); USM Corp., 28 Mass. App. Ct. at 125. [10]

Plaintiffs have not introduced any evidence demonstrating that AstraZeneca's conduct contravened industry standards.  It is undisputed that manufacturers set WAC prices and raise them periodically.  (AZ FF ¶¶ 9-10).  It is also undisputed that AWPs on branded products are typically 20% or 25% above the WAC price set by the manufacturer.[11]  (AZ FF ¶ 8; Track 1 FF ¶¶ 1, 76).  Moreover, all of the experts agree that offering high-volume customers discounts off WAC for products facing competition is normal, rational economic behavior, because purchasers with market power have the ability to affect sales.  (AZ FF ¶¶ 5, 14-17; Track 1 FF ¶¶ 80-82). As Plaintiffs' expert Dr. Rosenthal explained, "as is true in other markets, [drug] manufacturers can increase their market share by reducing the cost of their product to physicians through

---

[10] See also Track 1 Defendants' Memorandum, at 5.

[11] AstraZeneca did not interpret the amendments to the Medicare Act implemented by the Balanced Budget Act ("BBA") of 1997 as imposing new requirements on manufacturers relating to AWP that changed previous industry standards.  After the BBA, AstraZeneca continued to calculate a suggested AWP for Zoladex by adding the industry standard 25% mark-up to the Zoladex WAC, just as it had prior to the BBA.  (AZ FF ¶ 55).  There is no evidence that anyone in the pharmaceutical or health care industries believed that the BBA amendments changed previous industry practices relating to the calculation of AWP.  (Track 1 FF ¶¶ 14-17).

discounts or rebates."[12]

Relying heavily on 2003 OIG Guidelines, Plaintiffs argue that AstraZeneca's conduct was unfair because the WAC and the corresponding AWP for Zoladex increased over the class period even though the average physician acquisition cost declined. This overly-simplistic analysis ignores the fact that an average is just that – an average. As more physicians took advantage of volume discounts to buy larger quantities of Zoladex at lower prices, the average sale price declined. That does not mean that no customers paid higher prices as the price increased. To the contrary, as the WAC price increased so did the sale price to certain classes of customers who were not eligible for the largest volume discounts. And AstraZeneca continued to make sales at WAC. Accordingly, not only is it common industry practice to increase WAC prices periodically, but it makes rational economic sense to do so.[13]

In short, there is nothing about the Zoladex pricing history that demonstrates unfairness. AstraZeneca's conduct conformed to widely accepted industry standards and therefore cannot be considered unfair.

        (b)    **AstraZeneca's Conduct Saved Patients and the Healthcare System Money**

Whether conduct should be deemed "unfair" under Ch. 93A also depends on the "purpose and effect" of the challenged conduct. <u>Commercial Union Ins. Co.</u>, 217 F.3d at 43. AstraZeneca launched Zoladex as the lower cost product and kept Zoladex the lower cost product for the entire class period. (AZ FF ¶¶ 7, 11). The discounts that AstraZeneca marketed to physicians in order to remain competitive had the purpose and effect of encouraging physicians to purchase

---

[12] Direct Testimony of Dr. Meredith Rosenthal, ¶ 33. <u>See also</u> (AZ FF ¶ 16).

[13] Direct Testimony Declaration of Professor John P. Gould, ¶¶ 31-33.

Zoladex instead of Lupron, resulting in substantial savings for both patients and the healthcare system.  (AZ FF ¶¶ 11, 18-33).

When asked what AstraZeneca should have done differently, Dr. Rosenthal suggested that, instead of offering discounts to physicians, AstraZeneca should have competed on the basis of lower cost to end-payers in exchange for some preferred status, such as formulary status.[14] That is exactly what AstraZeneca did by: 1) encouraging health plans to adopt a MAC for Zoladex and Lupron equal to the Zoladex WAC; and 2) creating and marketing the MAP program, which eliminated the need to reimburse physicians by offering health plans discounted prices on Zoladex and direct shipping to physicians in exchange for preferred status.  (AZ FF ¶¶ 38-51).

Despite AstraZeneca's best efforts, these programs were unsuccessful due to lack of interest from the health plans.  (AZ FF ¶ 49).  If AstraZeneca had also stopped offering physicians discounts on Zoladex, the result would not have been lower costs to patients and health plans, as Plaintiffs and their experts wrongly assume, but rather, increased sales of Lupron, a higher priced product.  According to Dr. John Gould, in the period from 1991-2002, total patient co-payments would have been $129 million more if Zoladex's market share had remained at 10% (its approximate market share before AstraZeneca began offering physicians discounts on Zoladex), and total Medicare payments for LhRh agonist therapy would have been over $516 million greater.  (AZ FF ¶ 31).

Plaintiffs nonetheless argue that it was unfair to third party payers for AstraZeneca to compete with TAP by "marketing the spread" to physicians, suggesting that such competition

---

[14] 11/15/06 Tr. 49:15 – 50:11 (Testimony of Dr. M. Rosenthal).

resulted in spiraling reimbursement costs for third party payers.  First, openly providing accurate and truthful information to customers about the difference between the cost of a product and the reimbursement rate cannot be considered unfair.  Second, AstraZeneca did not engage in an AWP "arms race" with TAP; AstraZeneca never increased the spread between the Zoladex WAC and AWP beyond 25% and never raised the Zoladex WAC, or the corresponding AWP, to meet or exceed the WAC and AWP of Lupron.  To the contrary, throughout the class period, AstraZeneca kept the WAC price of Zoladex, and the corresponding AWP, lower than the WAC and AWP of Lupron.  Indeed, the difference in price between the products increased over time.  By 2004, Zoladex was $200 cheaper per dose than Lupron.  (AZ FF ¶ 11).

In sum, the purpose and effect of AstraZeneca's physician discounting program was far from unfair; on the contrary, it allowed Zoladex to remain competitive with Lupron and gave patients and the healthcare system the opportunity to achieve substantial savings on an effective therapy.[15]

### B.    Plaintiffs Have Failed to Establish Causation

To succeed on a claim under Ch. 93A, a plaintiff must prove both "but for" and proximate causation.  Markarian v. Conn. Mut. Life Ins. Co., 202 F.R.D. 60, 68 (D. Mass. 2001).  To establish "but for" causation, a plaintiff must demonstrate that the outcome would have been different if not for the defendants allegedly unfair or deceptive conduct.  This means that if Plaintiff Massachusetts third party payers were aware of the difference between AWP and actual acquisition cost, such knowledge precludes a finding of causation.  See Mass. Farm Bur. Fed'n, Inc. v. Blue Cross of Mass., Inc., 403 Mass. 722, 532 N.E.2d 660.  As described above and in the

---

[15] Since 1990, Zoladex also has been available to low-income individuals through the AstraZeneca Patient Assistance Program ("PAP").  (AZ FF ¶ 12).

Track 1 Defendants' Memorandum, Class Representative BCBS/MA has long been aware that the Zoladex AWP was not an actual average of acquisition costs.[16]

Moreover, the law is clear that even where a plaintiff is unaware of the allegedly unfair or deceptive conduct, it still must show that if such conduct had been disclosed, it would have acted differently.  See Palochko v. Reis, 852 N.E.2d 127, 131 (Mass. App. 2006).[17]  Plaintiffs in Class 2 and Class 3 cannot make such a showing with respect to Zoladex.

With respect to Class 2, the record demonstrates that CMS determined the amount of Medi-gap insurers' payment for Part B drugs, and that BCBS/MA and Class 2 Representative Sheet Metal Workers ("SMW") made Medi-gap payments in accordance with the amounts determined by CMS.  (AZ FF ¶ 73).  It was CMS's determination of the allowed amount, and not AstraZeneca's setting of AWP, that determined how much Sheet Metal Workers would pay on any given claim.  For example, the claims record for one of the two Zoladex claims paid by SMW during the class period demonstrates that the amount paid was not based on the Zoladex AWP.  The physician's billed charge was lower than 95% of the Zoladex AWP, so CMS allowed the lower billed charge.  (AZ FF ¶ 23).  SMW paid exactly 20% of the allowed amount, which was not based on AWP.  Thus, any loss suffered by Medigap insurer members of Class 2 was caused by CMS's actions in determining the allowed amount, and not by any actions on the part of AstraZeneca.[18]

---

[16]  See Track 1 Defendants' Memorandum, at 6-7; see also Track 1 FF ¶¶ 31-46.

[17]  See Track 1 Defendants' Memorandum, at 6-7, 15-16.

[18]  Moreover, as discussed above, Plaintiffs have not offered any evidence that the federal government was deceived with regard to the AWP for Zoladex.  The only evidence in the record demonstrates that the federal government had access to information on actual transaction prices for Zoladex throughout the class period. (AZ FF ¶¶ 53, 56-67).

Similarly, BCBS/MA and Pipefitters Local 537, the Class 3 representatives, still continue to reimburse physicians for Zoladex at 95% of AWP, despite the fact that BCBS/MA analyzed ASP data for Zoladex and concluded it would save $204.13 per dose of Zoladex if it switched to reimbursement based on ASP + 6%.  (AZ FF ¶ 72; Track 1 FF ¶¶ 47-51).  The fact that Class Representatives BCBS/MA and Pipefitters have failed to change their practices years after commencement of this litigation defeats causation under Ch. 93A.  Without establishing this essential element of their cause of action, Plaintiffs' Ch. 93A claim must fail.

### C.    Plaintiffs Have Failed to Establish that the Alleged Conduct Occurred in the Context of Transactions with AstraZeneca

The parties have engaged in extensive briefing on the business transaction requirement under Ch. 93A, § 11, which is incorporated by reference herein.[19]  It is undisputed that Plaintiffs have not and cannot point to any transaction between themselves and AstraZeneca as having given rise to their claims.  Rather, the record demonstrates that the only business transactions that occurred between Plaintiffs and AstraZeneca – transactions relating to Staff Model HMO purchases or purchases under the "Bill to/Ship to" or Managed Acquisition Program ("MAP") – actually *benefited* Plaintiffs by providing them with substantial discounts off the Zoladex WAC, in many cases, the same discounts offered to physicians.  (AZ FF ¶¶ 22, 34, 38-44).  These transactions, which Plaintiffs do not allege caused them any harm, were distinct from Plaintiffs' claims regarding AstraZeneca's communication of suggested AWPs to third party publishers.

---

[19] See Track 1 Defendants' Memorandum of Law in Response to the Court's Question Regarding the Transaction Requirement in 11 of Ch. 93A (filed November 6, 2006), Docket No. 3326; Defendants' Memorandum of Law in Reply to Plaintiffs' Response Memorandum Regarding the Transaction Requirement Under Massachusetts General Laws Ch. 93A, § 11 (filed December 1, 2006), Docket No. 3435; Defendants' Opposition to Plaintiffs' Motion for Leave to File a Sur-Reply Opposition Regarding the Transaction Requirement Under Massachusetts General Laws Ch. 93A § 11 (filed December 21, 2006), Docket No. 3498.  For additional recent authority, see also Defendants' Memorandum of Law in Support of Track 1 Defendants' Post-Trial Motion for Judgment, filed concurrently herewith.

Accordingly, Plaintiffs cannot satisfy the transaction requirement of Ch. 93A.

### D.     AstraZeneca's Alleged Unfair and Deceptive Conduct Did Not Occur Primarily and Substantially in Massachusetts

As described fully above, Plaintiffs have failed to demonstrate that AstraZeneca engaged in "unfair" or "deceptive" conduct.  However, even if AstraZeneca's conduct could be characterized as such, third party payer claims under Ch. 93A, § 11 must be based on conduct which occurs "primarily and substantially in the commonwealth."[20]  Not only has the Court already so determined, but the evidence also demonstrates that all decisions regarding pricing for Zoladex took place at AstraZeneca's headquarters in Wilmington, Delaware, not in Massachusetts.  (AZ FF ¶ 13).  The record further shows that none of the third party publishers to whom AstraZeneca communicated its suggested AWPs for Zoladex were located in Massachusetts.  (AZ FF ¶ 13).  Because AstraZeneca's allegedly unfair and deceptive conduct did not occur primarily and substantially within Massachusetts, Plaintiffs' § 11 claims fail.[21]

### E.     AstraZeneca's Alleged Conduct Did Not Cause Plaintiffs Any Loss

For unfair or deceptive conduct to be actionable under Ch. 93A, § 11, Plaintiffs must demonstrate that such conduct caused a loss of money or property.  See Frullo v. Landenberger, 61 Mass. App. Ct. 814, 823, 814 N.E.2d 1105, 1113 (2004); Hershenow v. Enterprise Rent-A-Car of Boston, 445 Mass. 790, 801, 804 N.E.2d 526, 535 (Mass. 2006) (finding that although defendant engaged in deceptive conduct, plaintiffs could not recover under Ch. 93A because they

---

[20] See Track 1 Defendants' Memorandum, at 9-12.

[21] The "primarily and substantially" in Massachusetts requirement does not apply to consumer claims under § 9.

did not show that the conduct caused any loss).[22]

In addition to the reasons set forth in the Track 1 Defendants' Memorandum, and as described fully above, the record is clear that AstraZeneca's discounting strategy did not cause Plaintiffs any loss and actually resulted in substantial savings for both patients and the healthcare system.  (AZ FF ¶ 31).  Moreover, as set forth in the Track 1 Defendants' Memorandum, Plaintiffs are not entitled to an aggregate damage award.[23]  As evidenced by the SMW claim referenced above, Plaintiffs have not established what percentage of the claims reimbursed for Zoladex were based on AWP, as opposed to billed charge or some other methodology.

## II.   CLASS 2 AND CLASS 3 CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

The claims of Classes 2 and 3 are barred by the four-year statute of limitations applicable to Ch. 93A claims.  MASS. GEN. LAWS CH. 260, § 5A.[24]  Plaintiffs filed their first complaint in December 2001, seeking recovery for transactions as far back as 1991.  Thus, unless accrual of the statute is tolled, all claims under Ch. 93A are barred.  As described in the Track 1 Defendants' Memorandum, no tolling is appropriate because Massachusetts payers knew, or should have known, prior to December 1997, that AWP was not equivalent to acquisition costs for physician-administered drugs.

There can be no doubt that Class 2 and Class 3 payers, in the exercise of reasonable diligence, should have known that AWP could exceed acquisition cost by more than 30%, and

---

[22] See also Track 1 Defendants' Memorandum, at 16-17.

[23] See Track 1 Defendants' Memorandum, at 22-23.

[24] See also Track 1 Defendants' Memorandum, at 17-21.

bore no predictable relationship to acquisition cost.[25]  The third party payers in Classes 2 and 3 were sophisticated entities in a position to investigate the public record relating to the reimbursements they were making.  Because much of this information was publicly available well before December 1997, including information specific to Zoladex, Plaintiffs cannot show that any lack of knowledge was reasonable, and the discovery rule does not apply.  (AZ FF ¶¶ 59, 66-68).

There is evidence that even before 1996 there was sufficient information in the marketplace regarding the discounts AstraZeneca was offering to physicians on Zoladex to put Plaintiffs on notice of the difference between AWP and acquisition cost.  By 1996, AstraZeneca had already attempted to convince health plans to implement MAC reimbursement for Zoladex and Lupron.  (AZ FF ¶¶ 38-41).  The Company had also been promoting the Zoladex Bill to/Ship to program for several years.  (AZ FF ¶ 42).  Both of these efforts required that AstraZeneca educate third party payers regarding the physician reimbursement dynamic so that the plans could understand why these initiatives would save them money.

In any event, the record leaves no room for doubt that by the end of 1996 the existence and extent of these discounts was well-known by both the government and the rest of the healthcare industry.  By 1996:

---

[25] Any claim that the Plaintiffs lacked knowledge about the extent of their injury – such as ignorance of "mega-spreads" – is unavailing as a matter of law.  Massachusetts courts long ago "rejected the notion that knowledge of the extent of an injury should control accrual of a cause of action for statute of limitations purposes." Whitcomb v. Pension Dev. Co., Inc., 808 F.2d 167, 170 (1st Cir. 1986); see also Zamboni v. Aladan Corp., 304 F. Supp. 2d 218, 224 (D. Mass. 2004) (stating that claim accrues "even if the plaintiff does not apprehend the full extent or nature of the injury."); Olsen v. Bell Tel. Labs., Inc., 388 Mass. 171, 175, 445 N.E.2d 609, 612 (Mass. 1983) ("If knowledge of the extent of injury were to control the accrual of a cause of action, the fixed time period of statutes of limitations effectively would be destroyed.")

- Major third party payers in Massachusetts had direct contracts with AstraZeneca to purchase Zoladex at significant discounts off WAC for their Staff Model HMOs:

  § Harvard Pilgrim was purchasing Zoladex at discounted prices that translated to a spread of 43% between Harvard's acquisition cost and the published AWP for Zoladex – roughly the same spread that Plaintiffs allege was a secret in 1996.  (AZ FF ¶ 35).

  § BCBS/MA's Staff Model HMO was entitled to a discount off WAC up to 27%, which is equivalent to a spread of approximately 70% between acquisition cost and the published AWP for Zoladex in 1996 – a spread far greater than the spread Plaintiffs allege was a secret in 1996.  (AZ FF ¶ 35).

- March 1996 – AstraZeneca expanded the Bill to/Ship to Program and officially launched the Zoladex MAP Program, through which it offered health plans the very same discounts offered to physicians.  Through the MAP program and its predecessor, AstraZeneca was actively *informing* Massachusetts health plans including members of Classes 2 and 3, of the discounts it offered physicians on the purchase of Zoladex, and how the AWP reimbursement system permitted physicians to earn a profit on Zoladex.  (AZ FF ¶¶ 41-46).  AstraZeneca marketed the MAP Program to BCBS/MA, Harvard Pilgrim and Tufts, three of the largest third party payers in Massachusetts.  (AZ FF ¶ 45).  The MAP contract offered to Harvard Pilgrim in March 1996 provided for a discount off WAC up to 27%, which is again a spread between Harvard's acquisition cost and the published AWP for Zoladex in that year of approximately 70%.  (AZ FF ¶ 45 n.75).

- May 1996 – AstraZeneca National Account Manager Julie Tracy provided Tufts Health Plan, another major Massachusetts insurer, with a copy of the physician volume discount schedule so that the plan could compare discounts received by physicians to the discounts it was being offered through the MAP program.  (AZ FF ¶ 47).

- May 1996 – OIG publicly released a report finding that Medicare could have saved $5.5 million on reimbursement for Zoladex in 1994 alone if it had used pricing similar to that used by the Medicaid program, instead of AWP-based reimbursement.  (AZ FF ¶ 59).

- AstraZeneca was reporting quarterly AMP data to HCFA showing an average spread between physician acquisition cost and the published AWP for Zoladex of 46% – a spread substantially larger than Dr. Hartman's 30% threshold and closely tracking the 43% spread Dr. Hartman opines was a secret in 1996.  (AZ FF ¶ 58 n.101).

18

- July 1996 – the Colorado Medicare Carrier received and then forwarded to HCFA a physician discount schedule for Zoladex listing a maximum discount of 21% – equivalent to a spread between the physician's acquisition cost and the published AWP of Zoladex in 1996 of almost 60% – and specifically pointed out to HCFA the "great" difference between acquisition cost and AWP-based reimbursement for Zoladex.  HCFA nonetheless instructed the Colorado Medicare Carrier to continue reimbursing at the published AWP for Zoladex.  (AZ FF ¶¶ 61-63).

- December 1996 – the South Carolina Medicare Carrier compared physician invoice costs for Zoladex with AWP-based reimbursement and referred to the annual difference as the "Yearly Medicare Allowed Profit."  (AZ FF ¶ 64).

Finally, Plaintiffs have not shown any act of fraudulent concealment by AstraZeneca that would toll the statute of limitations.  The applicable statute, MASS. GEN. LAWS. CH. 260, § 12, requires that plaintiff show an affirmative act of fraudulent concealment by the defendant.  See Boston Children's Heart Found. v. Nadal-Ginard, 73 F.3d 429, 442-43 (1st Cir. 1996) (affirming district court's holding that Section 12 "requires a plaintiff to show an affirmative act of fraudulent concealment on the part of the defendant."); Wise v. Hubbard, 769 F.2d 1, 3-4 (1st Cir. 1985) (in absence of a fiduciary duty, a finding of fraudulent concealment requires a "positive act of concealment"); Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 130-31 (1st Cir. 1987).[26]  Plaintiffs have pointed to no such "affirmative acts."  Here, nothing AstraZeneca did prevented Massachusetts payers from discovering the truth about the relationship between AWP and acquisition costs.  On the contrary, the record demonstrates that AstraZeneca took affirmative steps to *inform* third party payers in Massachusetts of the discounts it was offering on Zoladex.  (AZ FF ¶¶ 35-36, 38, 40-47, 50-51).  In addition, the publicly available reports and information relating to providers' acquisition costs preclude any claim by plaintiffs that they diligently pursued their claims.  Therefore, Plaintiffs' claims against AstraZeneca are barred by

---

[26] See also Track 1 Defendants' Memorandum, at 28.

the statute of limitations.

## **CONCLUSION**

For the above stated reasons, AstraZeneca respectfully seeks judgment dismissing the

claims of the Massachusetts third party payers comprising Class 2 and Class 3.

Respectfully submitted,


By: /s/ Katherine B. Schmeckpeper

Nicholas C. Theodorou (BBO # 496730)
Michael P. Boudett (BBO #55757)
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02110

D. Scott Wise
Michael Flynn
Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017

Attorneys for AstraZeneca Pharmaceuticals LP

Dated: January 19, 2007

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered on January 19, 2007 to counsel for plaintiffs and to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, via LexisNexis File & Serve.


By:    /s/ Katherine B. Schmeckpeper  
         Katherine B. Schmeckpeper