# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) |

MDL No. 1456

Civil Action No. 01-CV-12257 PBS

Judge Patti B. Saris
Chief Magistrate Judge Marianne B. Bowler

## THE BMS DEFENDANTS' POST-TRIAL MEMORANDUM IN SUPPORT OF THEIR REQUEST FOR JUDGMENT PURSUANT TO FED. R. CIV. P. 58

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
  Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
  Steven M. Edwards, Esq.
  Lyndon M. Tretter, Esq.
  Thomas J. Sweeney, III, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co.*
*and Oncology Therapeutics Network Corp.*

<u>Introduction</u>

Plaintiffs have asserted claims against BMS under Mass. G.L. ch. 93A in connection with seven oncology drugs:  Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol and Vepesid.  <u>See</u> DX 2652 (chart of "BMS Subject Drugs").[1]  The essential basis for plaintiffs' claim is set forth in Attachment G.2.c of the direct testimony of plaintiffs' lead expert, Dr. Raymond S. Hartman.  In that chart, Dr. Hartman calculates the difference between the average wholesale price ("AWP") and average sale price ("ASP"), or "spread," for each of those drugs, on a National Drug Code ("NDC") basis, for each of the years 1993 through 2002.  For Class 3, where the spread exceeds 30%, Dr. Hartman finds liability, causation and damages.  For Class 2 – consisting of third-party payers ("TPPs") in Massachusetts that have made co-payments under Medicare Part B – plaintiffs contend that there is liability, causation and damages any time AWP exceeds ASP.

The AWPs for BMS's drugs were created by industry publications such as RedBook, First DataBank and MediSpan (the "Publications").  BMS reported list prices to the Publications, who applied a mark-up factor of 20% or 25% to calculate AWPs.  BMS established its list prices at the initial launch of a product based on a variety of factors, including what customers were willing to pay.  From time to time, BMS increased its list prices, but only when it believed that most customers were willing to pay the price increase.  As a result, with minor exceptions, during the time that BMS's products were protected by patents, most of BMS's net revenue was derived from sales within 5% of list price, or 30% of AWP.

---

[1] Citations to the record and abbreviations in this Memorandum follow the convention in the BMS Defendants' Post-Trial Proposed Findings of Fact (the "BMS Findings") submitted herewith.  Citations to the BMS Findings themselves are simply followed by a paragraph number.

When BMS's products lost their exclusivity and became subject to generic or "multi-source" competition, BMS did not lower its list prices even though its ASPs decreased as a result of discounting.  BMS's witnesses testified that, consistent with a business model it had adopted prior to the class period, BMS did not take that action because there were still customers who were willing to pay list price.  An analysis by BMS's expert, Dr. Gregory K. Bell, demonstrated that even after BMS's products lost exclusivity, 31.5% of BMS's net revenue came from sales within 5% of list price.  This analysis was not challenged by plaintiffs, and upon hearing it the Court observed:  "I can see why they're not changing the wholesale list price.  I understand that."  (12/7/06 Tr. 38.)

Plaintiffs nevertheless contend that because BMS communicated its list prices to the Publications, who used them to calculate AWPs, and those AWPs were used by Medicare and TPPs to establish reimbursement amounts, BMS engaged in deceptive or unfair conduct. The evidence at trial established, however, that BMS did not control the Publications and could not change the way they calculated AWPs.  Nor could BMS ignore the Publications, because a product will not be eligible for reimbursement if it is not listed in the Publications.

There was no evidence at trial that Medicare or TPPs were misled by the AWPs for BMS's drugs in establishing reimbursement amounts for providers.  In fact, the evidence demonstrated that both the Health Care Financing Administration ("HCFA") and Congress were aware of the spreads for BMS's drugs.  TPPs were also aware of the spreads because they purchased BMS's drugs at prices similar to Dr. Hartman's ASPs.

Furthermore, there was no evidence that BMS had any reason to believe that Medicare or TPPs were being harmed by the AWPs for BMS's drugs.  BMS understood that Medicare and TPPs were aware of the spreads for its drugs.  BMS further understood that

Medicare and TPPs permitted physicians to earn margins on drugs in order to encourage them to join their networks, incentivize them to treat patients outside of the hospital and to cross-subsidize underpayments for chemotherapy services.

The evidence also demonstrated that BMS established its practice of reporting list prices to the Publications long before the HCFA and Congress introduced AWP into Medicare. It never occurred to BMS that it should change its price reporting practices as a result of HCFA's or Congress's actions.  BMS simply continued to report its list price, which was a real price and could not be considered deceptive or unfair.

The evidence at trial also failed to support plaintiffs' claim that BMS or its former subsidiary, OTN, "used" AWP or discounting practices to "market spread" to customers.  All pricing decisions on BMS drugs were made at BMS's home office based on legitimate market factors (e.g. price matching of generics) that had nothing to do with customers' reimbursement relationships with payors who might use AWP; BMS and OTN sales representatives had no authority to negotiate prices.  To the extent that the sales representatives discussed reimbursement issues with physicians, those discussions were initiated by the physicians and were within BMS's policy of emphasizing the therapeutic advantages of its drugs but responding to customer questions about reimbursement issues.

We show below that plaintiffs cannot demonstrate that they have a claim for multi-source drugs. We also show that BMS's single source drugs satisfy Dr. Hartman's 30% yardstick.  In addition, we demonstrate that BMS has not engaged in deceptive or unfair conduct, and that plaintiffs have failed to demonstrate causation.  We also show that plaintiffs' claims are barred by the statute of limitations.  Finally, we show that plaintiffs have failed to demonstrate that they have suffered any damages.

<u>Argument</u>

POINT I

<u>PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEY HAVE A CLAIM</u>

    A.    <u>Multi-source Drugs</u>

Before it reaches the issue of whether BMS has engaged in deceptive or unfair conduct, the Court must determine whether plaintiffs have a claim. As a general matter, to establish that it has standing to sue under Mass. G.L. ch. 93A, a plaintiff must prove that it purchased the defendant's product. <u>Roberts v. Enter. Rent-A-Car Co. of Boston, Inc.</u>, 840 N.E.2d 541, 543-44 (Mass. 2006) (no standing to sue car rental company over allegedly deceptive collision insurance when plaintiff waived coverage); <u>Healy v. McGhan Med. Corp.</u>, No. CA975320, 2001 WL 717110, at *4 (Mass. Super. Ct. March 29, 2001) (no standing to sue breast implant manufacturer under ch. 93A where plaintiff's implant was manufactured by another). In the context of this case, that would mean that plaintiffs are required to demonstrate that they reimbursed physicians for drugs manufactured by BMS.

With respect to multi-source drugs, plaintiffs cannot satisfy that burden. Plaintiffs have conceded that multi-source drugs are reimbursed on a J-code basis, and they have no way of identifying the manufacturer that supplied the drug. (Mulrey 11/08/06 Tr. 53-55; Hartman 12/11/06 Tr. 59-60.) This eliminates approximately two-thirds of the claims against BMS.[2]

Plaintiffs have also failed to demonstrate that, for multi-source drugs, the AWP of the BMS drug had any bearing on reimbursement amounts. (Hartman 11/21/06 Tr. 65-67.) Once multi-source competition occurred, reimbursement was based on the median of the generic AWPs (prior to 1998) or the lower of the brand or the median of the generic AWP (after 1998).

---

[2] A chart identifying those multi-source drugs is annexed as Exhibit A to the BMS Findings.

Since generic AWPs were always below brand AWPs, and BMS did not change its list prices after its drugs lost exclusivity (BMS Findings ¶ 5), the reimbursement amount could not have been based on the AWP for the BMS drug.  See First State Ins. Co. v. Utica Mut. Ins. Co., 870 F. Supp. 1168, 1178 (D. Mass. 1994) (primary insurer's bad faith refusal to settle within policy limits did not cause injury to excess insurer because claimant would not have accepted policy limits in any event).

Plaintiffs have suggested that they can avoid these issues by proceeding on a market share theory, a theory of joint and several liability or an "alternative liability" theory. (Pls. Proposed Conclusions ¶¶153-154.)  No Massachusetts court has ever applied a market share theory to a case involving economic harm under Mass. G.L. ch. 93A.  Cf. Hunnings v. Texaco Inc., 29 F.3d 1480, 1488 (11th Cir. 1994) (market share theory inapplicable to economic torts, construing Florida law).  Even in cases involving common law torts for personal injury, Massachusetts appellate courts have declined to apply the market share theory and have instead required the plaintiff to identify the specific defendant responsible for actionable harm.  Santiago v. Sherwin Williams Co., 3 F.3d 546, 549-51 (1st Cir. 1993); Mathers v. Midland-Ross Corp., 532 N.E.2d 46, 49 (Mass. 1989); Payton v. Abbott Labs., 437 N.E.2d 171, 188 (Mass. 1982); see also Mills v. Allegiance Healthcare Corp., 178 F. Supp. 291, 8-9 (D. Mass. 2001) (Saris, J.); Armata v. Abbott Labs., 747 N.Y.S.2d 863, 865 (4th Dept. 2002) (interpreting Massachusetts law).  To the extent plaintiffs rely on joint and several liability, that theory requires plaintiffs to demonstrate that two or more tortfeasors are responsible for a single injury.  Boucher v. Lowell Automatic Transmission, No. 9722, 2001 WL 920693, at *2 (Mass. App. Div. May 16, 2001); Mitchell v. Hastings & Koch Enter., 647 N.E.2d 78, 84 (Mass. App. Ct. 1995).  Here, only one

party, the manufacturer of the drug given to the patient, can be responsible.[3]  Finally, to establish

a claim based on an alternative liability theory – in which the burden is shifted to defendants to

prove that they were not responsible for the plaintiffs' injury – plaintiffs must join all potential

tortfeasors.  Spencer v. Baxter Int'l, 163 F. Supp. 2d 74, 79 (D. Mass. 2001).  They have not

done that here.

      B.      Single Source Drugs

As noted above, Dr. Hartman calculates spreads on an NDC-by-NDC basis.  In

other words, if a particular drug has five NDCs, he calculates five different spreads for a given

year.  As Dr. Bell pointed out in his testimony, that does not make sense because payors

reimburse physicians on a J-Code basis.  (Bell 12/7/06 Tr. 19.)  Today, CMS computes its ASPs

on a J-Code basis.  (Id. at 35-36.)  When BMS's single source drugs are analyzed on a J-Code

basis, there is only one drug that has a spread in excess of 30% – Paraplatin for 2002-03.  (Id. at

25-26; DX 2642-43; BMS Findings ¶ 48 & Exhibit B.)  Therefore, even under plaintiffs' theory,

BMS's liability should be limited to that drug.[4]

Plaintiffs still maintain that there should be liability to Class 2 whenever AWP

exceeds ASP by any amount.  This does not make sense because virtually every prescription

drug would be subject to liability.  (See Hartman 11/21/06 Tr. 22.)  As the government stated in

U.S. v. MacKenzie, "the spread between list price and AWP was known to the government in

various ways, and assumed by the Medicare reimbursement system."  Government's

Memorandum Regarding RTP as a Kickback Under Paragraph 55(b) of the Conspiracy Charged

---

[3] Suggesting that there was "tacit collusion" does not change the analysis.  Moreover, tacit collusion is just a term
for consciously parallel behavior, which by definition does not involve an explicit agreement and is not unlawful.
See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993).

[4] Dr. Hartman's Class 3 damage calculation for Paraplatin in those years is $804,568.  (Hartman Dir. Decl. at
Attachment J.2.a.)  His Class 2 damage calculation, using a 30% liability threshold, is $12,038 for Paraplatin going
back to 1991.  (He gives no figures for specific years.)  (PX 4029 at Slide 104.)

in Count I, U.S. v. MacKenzie, No. 01-CR-1350-DPW (D. Mass. filed June 24, 2004) at 1

(annexed hereto as Exhibit A).  Even Dr. Hartman used a 30% threshold for Class 2 in his

original liability report, because he concluded that Medicare had the same expectations as the

private sector.  (Hartman 11/21/06 Tr. 118-19.)

       If the Court is going to apply an expectation yardstick at all, it should apply it to

Class 2 as well as to Class 3.[5]  Under those circumstances, all of plaintiffs' claims against BMS

for single source drugs – except Paraplatin for 2002-03 – would be eliminated and, as

demonstrated below, those claims must also fail because plaintiffs have not established a

violation of Ch. 93A.

POINT II

PLAINTIFFS HAVE NOT DEMONSTRATED THAT BMS's
CONDUCT WAS DECEPTIVE OR UNFAIR

       Plaintiffs allege that BMS engaged in three types of conduct that were deceptive

or unfair under Mass G.L. ch. 93A:  (1) it failed to lower list prices to reflect ASPs; (2) it

communicated its list prices to the Publications, who used them to calculate AWPs; and (3) it

allegedly marketed the spread to its customers, thereby exploiting payor ignorance.  We address

each of these allegations in turn.

       A.     BMS's List Prices Were Not Deceptive Or Unfair.

       Plaintiffs allege that BMS should have adjusted its list prices when ASPs

decreased as a result of discounting.  But a list price, by definition, does not include discounts.

Merriam-Webster Collegiate Dictionary 726 (11th ed. 2003).  Furthermore, the Medicare

---

[5] By the same logic, plaintiffs' Class 2 claims with respect to multi-source drugs should be eliminated as well inasmuch as Dr. Hartman found no Class 3 damages for multi-source drugs.  (Hartman Direct Decl. ¶ 155(a)).

Modernization Act defines a list price as a price that does not include "prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. § 1847A(c)(6)(B).

        Even plaintiffs' expert, Dr. Rosenthal, agreed that in most industries the list price does not reflect discounts. (Rosenthal 11/27/06 Tr. 55.) She testified that a list price is potentially the price for the "least elastic buyer," suggesting that there are more elastic buyers who obtain discounts below list price. (Id. at 53-54.) She also acknowledged that if a company were to lower its list price to reflect discounts when there were customers who were willing to pay list price, it would be walking away from revenue (Rosenthal 11/15/06 Tr. 90-91) – a result that, in Dr. Bell's opinion, "would not be economically rational." (Bell BMS Aff. ¶ 25.)

        During plaintiffs' rebuttal case, Dr. Rosenthal presented a chart which suggested that if BMS had lowered the list price of Taxol to reflect discounts that BMS offered after the product lost exclusivity, the total reimbursement for the drug and administration fees would have been less. (PX 4070.)[6] As Christof Marre demonstrated in his testimony, however, there were still customers who were willing to pay list price for Taxol after the product lost exclusivity. (Marre 11/14/06 Tr. 158-64; PX 207 at BMS/AWP/01124131, 01124138-39.) If BMS had lowered its list price, it would have lost revenue because no customer will pay more than list price. (Marre 11/14/06 Tr. 164-65; see also Pasqualone 12/6/06 Tr. 33-34.)

        Plaintiffs have suggested that the FTC's decision in Regina Corp. v. F.T.C., 322 F.2d 765, 767 (3d Cir. 1963) requires that list prices reflect "the usual and customary prices at which products are sold," but that case dealt with price comparisons in advertising to consumers

---

[6] Dr. Rosenthal relied on the congressional testimony of Dr. Frederick Schnell to construct this chart. (Rosenthal 12/18/06 Tr. 53.) Dr. Schnell, however, made it clear that Taxol is never administered alone; it is administered as part of a regimen. (PX 4059 at 6.) Dr. Rosenthal did not take that into account and therefore is not in a position to say whether the total reimbursement for a Taxol regimen would have been any different. (Rosenthal 12/18/06 Tr. 54-56.)

and is completely inapplicable here.  This case involves reimbursement decisions made by sophisticated entities such as Medicare and TPPs.  Furthermore, the FTC later modified Regina in light of a subsequently adopted regulation, 16 C.F.R. § 233.3, which provided that a list price "will not be deemed fictitious if it is the price at which substantial (that is, not isolated or insignificant) sales are made . . . ."  16 C.F.R. § 233.3 (emphasis added).  See In re Regina Corp., 65 F.T.C. 246 (1964).

As noted above, more than 88% of BMS's net revenue for the Subject Drugs during the period 1993 to 2002 was generated from transactions within 5% of list price – 96% while those drugs were on patent and 31.5% when they faced multi-source competition. (DX 2524.)  This more than satisfies the Regina standard.  Under any standard, therefore, BMS's list prices cannot be characterized as deceptive or unfair.

B.    BMS Did Not Engage in Deceptive or Unfair Conduct By Communicating Its List Prices To Industry Publications.

There can be no doubt that if the Publications had simply published BMS's list prices and had called them "list prices," BMS's conduct could not be deemed deceptive or unfair. Put another way, even if Medicare and TPPs had elected to base reimbursements *directly* on BMS's list prices, that would not have imposed a duty on BMS to change the way it established list prices.  The question is whether the situation is any different where the Publications apply a mark-up factor of 20% to 25% to BMS's list prices and call the result "AWPs."

Plaintiffs contend that BMS is responsible for the acts of the Publications because they are foreseeable, but the Publications are independent companies, and the record is replete with evidence that BMS did not control the way that they calculate AWPs.  (BMS Findings ¶¶ 13-15.)  Furthermore, BMS told the Publications that its list prices did not reflect discounts, but that had no impact on the way the Publications calculated AWPs.  (BMS Findings ¶ 16.)  It is

well-established that where, as here, one party does not control another party and does not adopt its statements as its own, it is not liable for the other party's statements.  In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002); see generally J. Harper et al., The Law of Torts § 26.3 (2d ed. 1986) ("The commonest test of a relationship to which the law attaches vicarious liability is control or the general right of control.")

Plaintiffs nevertheless contend that BMS has a special responsibility here because BMS knew that payors relied on AWPs.  That does not give rise to a duty on the part of BMS, however, because foreseeability – standing alone – is not sufficient to create liability under Mass. G.L. ch. 93A.  "[S]ome business connection between the parties is an essential element of liability under the statute."  Boyd v. Boston Gas Co., 775 F. Supp. 435, 440 (D. Mass 1991).  See also L.B. Corp. v. Schweitzer-Mauduit Int'l Inc., 121 F. Supp. 2d 147, 152 (D. Mass. 2000); Nei v. Boston Survey Consultants, Inc., 446 N.E.2d. 681, 684 (D. Mass. 1983).  Here, there is no business relationship between BMS and payors that could make BMS liable for the Publications' acts.

Furthermore, there is no proof in the record that payors – in fact – were deceived by the AWPs for BMS's drugs.  There was no testimony by Medicare or any TPP that they were acting under a mistaken impression when they relied on an AWP for a BMS drug to determine how much to pay a physician.  To the contrary, there was substantial evidence that Medicare and the TPPs knew what the spreads were for BMS's drugs.  (BMS Findings ¶ 19; DX 1053; DX 1881; DX 2631; DX 2641; DX 1075; DX 2647.)

In any event, foreseeability cannot create a duty to take action to avoid harm to a plaintiff unless the defendant knows that the plaintiff is acting under a misapprehension of fact which the defendant is responsible for creating.  Restatement (Second) of Torts § 551(2);

Greenery Rehab. Group, Inc. v. Antaramian, 628 N.E.2d 1291, 1294-95 (Mass. App. Ct. 1994).

Here, there was extensive evidence that BMS did not believe that payors were deceived.  (BMS

Findings ¶ 21.)  BMS reasonably understood that Medicare and TPPs used AWPs to establish

reimbursement amounts, even though they were significantly higher than acquisition costs in

some cases, in order to make up for shortfalls in reimbursement for services.  (BMS Findings

¶¶ 22-25.)

       Plaintiffs point to a PowerPoint presentation which states that "[w]e need to be

wary of using AWPs because the name is misleading" to suggest that BMS intended to mislead

payors.  (PX 196 at BMS/AWP/01088202.)  That is sheer speculation on plaintiffs' part.  They

did not take the deposition of the author of the document or call that person as a witness at trial.

An equally plausible explanation for the statement is that the author was referring to members of

the general public or media, as opposed to sophisticated industry participants such as Medicare

and TPPs, who clearly understood what AWP meant.  (BMS Findings ¶ 35.)

       Plaintiffs also point to the confidentiality clauses in BMS's contracts in an effort

to demonstrate an intent to deceive.  Those clauses, however, are standard clauses used

throughout the American economy to protect the confidentiality of discounts.  See Volvo Trucks

N. Am., Inc. v. Reeder-Simco GMC, Inc., 126 S.Ct. 860, 866-67 & n.1 (2006); see also BMS

Findings ¶ 37 (explaining why BMS used such clauses).  It is well-established that if discounts

are publicly disclosed, sellers will be inhibited from granting them because every customer will

want the same discount.  As Dr. Berndt observed, "the best discount is a secret discount."

(DX 1275 (Berndt Report) ¶ 145; see also ¶¶ 151-54.)

       At bottom, plaintiffs' claim comes down to the proposition that "it would have

been nice" if BMS had either lowered its list prices so that the Publications' AWPs more closely

approximated provider average acquisition costs, or had found some other way to disclose those

acquisition costs to Medicare and private payors.  Judge Woodlock rejected a similar argument

made by the government in U.S. v. MacKenzie, stating:

> "[Drug coverage under Medicare Part B] is clearly an area in which the Federal
> Government and its various agencies has been struggling to develop a coherent
> pattern for reimbursement.  And for a variety of reasons, it[ ] hit upon the idea
> about average wholesale price.  And depending on the [Presidential]
> administration, people at OMB [Office of Management and Budget] think that
> there's too much paperwork in trying to do a real evaluation of what those prices
> are.  And people who are in the pharmaceutical industry [are] . . . perfectly happy
> if the Government is not directly involved in the administering of prices except
> beyond the AWP.  …  And so, I guess I want to understand from the government
> what it was that [pharmaceutical industry participants] were supposed to do, not
> what would have been nice for them, what would have been public-spirited for
> them to do, but what they were obligated to do."

(Transcript, Jury Trial – Day 39, No. 01-CR-10350-DPW (D. Mass. June 24, 2004) at 5-6

(emphasis added) (attached hereto as Exhibit B).)  The government was unable to

articulate any such obligation there (id. at 11), and the law in this case is clear that BMS

had no duty to lower its list prices or to disclose discounts.

In Bonilla v. Volvo Car Corp., 150 F.3d 62, 68-70 (1st Cir. 1998), for example,

the court held that Volvo did not have a duty to disclose that Volvo cars were sold in the

mainland United States at "substantially lower"  (i.e. discounted) prices than Volvo cars sold in

Puerto Rico.  Id. at 71.  Similarly in Langford v. Rite Aid of Alabama, Inc., 231 F.3d 1308, 1313

(11th Cir. 2000), the Eleventh Circuit held:  "As a general matter of federal law, retailers are

under no obligation to disclose their pricing structure to consumers."  Likewise, in Katzman v.

Victoria's Secret Catalogue, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 (2d Cir.

1997), the court held: "Plaintiffs do not identify any duty which requires Defendants to sell their

goods to all buyers at the same prices [and] they have not, and cannot, identify any basis in

federal or state statutes or the common law for imposing on the Defendants a duty to disclose . . . promotional practices."

In <u>Alves v. Harvard Pilgrim Health Care, Inc.</u>, 204 F. Supp. 2d 198, 213-14 (D. Mass. 2002), <u>aff'd</u>, 316 F.2d 290 (2003), this Court held that an ERISA plan, which had a fiduciary duty to its beneficiaries, was not required to disclose the discounts it had received on drugs for which it was collecting a co-payment based on the "retail value."  That general proposition was also embraced in <u>Whitehall Co. v. Barletta</u>, 536 N.E.2d 333, 337 (Mass. 1989), where the court affirmed a trial court's decision that non-disclosure of a discount did not violate Mass. G.L. ch. 93A.  Courts interpreting Mass. G.L. ch. 93A have consistently held that the statute does not require the disclosure of proprietary cost and pricing information.  <u>E.g.</u>, <u>Natick Auto Sales, Inc. v. Commonwealth Dep't of Procurement and Gen. Servs.</u>, No. 974392, 1998 WL 1284172, at *4 (Mass. Super. Ct. June 4, 1998), <u>aff'd</u>, 715 N.Ed. 2d 84 (Mass. App. Ct. 1999).

It is undisputed that BMS established its price reporting practices long before HCFA used AWP in a regulation or Congress incorporated it in a statute.  (BMS Findings ¶¶ 9-11.)  BMS's witnesses testified that it never occurred to them that by incorporating AWPs into Medicare regulations and later, a statute, HCFA and Congress intended to change the way BMS reported pricing information to the Publications.  (<u>Id.</u> at ¶¶ 22-26.)  BMS's witnesses also testified that they believed that the reimbursement system was the responsibility of Medicare and TPPs, and they were acting appropriately if they reported accurate list prices to the Publications. (<u>Id.</u>)

In deciding a claim under Mass. G.L. ch. 93A, a court must evaluate the equities between the parties, "including what both parties knew or should have known."  <u>Ahern v. Scholz</u>,

85 F.3d 774, 798 (1st Cir. 1996). Where, as here, a defendant has no reason to believe that the plaintiff has been deceived, there can be no viable claim. USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888, 897 (Mass. App. Ct. 1989). Plaintiffs have not demonstrated that BMS actually believed, or had any reason to believe, that providing list prices to industry publications deceived payors or was otherwise unfair.

            C.       BMS's Sales And Marketing Practices Were Proper.

Relying on the OIG's Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003), plaintiffs contend that BMS violated Mass. G.L. ch. 93A by allegedly marketing the spread. The provision on which plaintiffs rely states that "[t]he conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute." Id. at 23737 (emphasis added). BMS did not manipulate AWPs; to the extent that it increased its list prices, causing AWPs to increase, it did so when its products were protected by patents. In such cases, BMS achieved substantial sales at the increased prices. (BMS Findings ¶ 4.)

Plaintiffs rely on a handful of records of BMS's sales representatives' communications with doctors which, plaintiffs contend, is evidence that BMS knew payors to be uninformed about spreads and reflects how BMS teamed up with the providers to exploit the payors' ignorance. These arguments must also be rejected.

As the BMS Findings show:

- Most oncologists who are reimbursed on an AWP basis buy their drugs at prices negotiated by regional buying groups or GPOs and individual doctors do not have any control over the prices at which the GPO contracts with a manufacturer. (BMS Findings ¶ 31.)

- In the case of BMS, negotiations with provider GPOs were conducted by executives like Christof Marre in the home office

14

and the evidence shows that AWPs and spread were not part of these negotiations.  Mr. Marre also testified that BMS never lowered prices to create spread; it only lowered prices to meet bona fide offers by generic competitors.  (BMS Findings ¶ 32.)

- BMS had a written policy against its salespersons' marketing or promoting its drugs based on spread but allowed them to respond to concerns voiced by providers.  (BMS Findings ¶ 27.)

- Neither BMS nor OTN sales representatives had any authority to negotiate the price of drugs with medical providers to make a sale.  (BMS Findings ¶ 30.)

- A search of the sales representatives' "call notes" with doctors reveals that fewer than ½ of 1% of over 80 million computer records reflect any discussion of reimbursement, discounts spreads or similar concepts.  (BMS Findings ¶ 29.)

- The uncontradicted testimony at trial and in deposition was that those few discussions that did occur on those subjects were almost always brought on by inquiries from the providers who threatened to switch to a generic version of the BMS drug.  (BMS Findings ¶¶ 28, 41 & n.10.)

- Because neither the doctor nor the BMS sales representative had any ability to negotiate price, all a representative could do was illustrate to a provider the extent to which the BMS drug remained competitive with the generic.  Any AWP and spread information made available by the BMS or OTN representatives to individual physicians was purely factual and could not be changed to "make" a sale of a BMS drug.  (BMS Findings ¶¶ 30, 33.)

- The customers could have looked up AWPs in a publication or calculated spreads themselves from their own purchase invoices and practice data.  (BMS Findings ¶ 34.)

In short, other than (a) some training materials about the business of oncology so that the sales representatives would be informed when their customers asked questions about AWPs or spreads; (b) a handful of notes reflecting the rare occasions when a customer did in fact ask; and (c) an OTN web-based computer program that allowed doctors to compare AWPs with their purchase invoices for any manufacturer's (not just BMS's) products, there is no evidence whatsoever that the BMS Defendants concerned themselves about spreads.

15

Based on this evidence, the BMS Defendants respectfully submit that no reasonable finder of fact could conclude that BMS knew that its price reporting practices were frustrating payor expectations of an AWP/ASP relationship. For both this reason *and* the lack of any relationship between the BMS Defendants and the Class 2 and 3 members, BMS had no duty to lower its list prices or to disclose average discounts to satisfy those alleged expectations and the BMS Defendants, therefore, cannot have deceived or been unfair to the class members within the meaning of Chapter 93A.

POINT III

<u>PLAINTIFFS HAVE FAILED TO DEMONSTRATE CAUSATION</u>

In addition to demonstrating that BMS engaged in deceptive or unfair acts or practices, plaintiffs must demonstrate a "causal connection between the seller's deception [or unfair conduct] and the buyer's loss." <u>Hershenow v. Enter. Rent-A-Car Co. of Boston</u>, 840 N.E.2d 526, 532 (Mass. 2006). This requires plaintiffs to prove that in the "but-for" world – a world without allegedly fraudulent AWPs – plaintiffs and the class members would have paid less for BMS drugs. <u>Aspinall v. Philip Morris Co.</u>, 813 N.E.2d 476, 490 (Mass. 2004). Knowledge of the truth, <u>i.e.</u>, that AWPs were not actual prices, eliminates any possible causal connection between the alleged deception or unfair practice and the alleged injury. <u>Tagliente v. Himmer</u>, 949 F.2d 1, 7 (1st Cir. 1991).

With respect to Class 2, there is overwhelming evidence that Medicare knew about the spreads between the AWPs for BMS's drugs and their acquisition costs. Nevertheless, Medicare continued to reimburse based on the published AWPs, and Congress explicitly rejected a proposal to base reimbursement on acquisition cost instead of AWPs. In addition, in 2000 when HCFA instructed its carriers to use AWPs calculated by DOJ that approximated acquisition costs, it explicitly exempted oncology drugs and continued to use the published AWPs. (BMS

16

Findings ¶ 20.)  That was, in effect, the "but for" world, and HCFA did not do anything differently.  (Bell 12/08/06 Tr. 49-51.)  Under the circumstances, therefore, plaintiffs have not established that the payments made by Class 2 in the "but-for" world would have been any different than they were in the real world.

With respect to Class 3, there was substantial evidence at trial that TPPs have considered switching to an ASP-based system since ASPs became publicly available in 2004, but for a variety of policy reasons, they have rejected that approach.  (Track 1 Defendants' Proposed Common Findings of Fact ¶¶ 47-52, 62.)  There was also substantial evidence that TPPs had access to information about spreads in the mid-1990s because they purchased BMS drugs at prices that were similar to Dr. Hartman's ASPs.  (BMS Findings ¶ 19.)  Under the circumstances, there is no reason to believe that payments made by Class 3 in the "but-for" world would have been any different than they were in the real world.

Finally, with respect to plaintiffs' claim that BMS "marketed the spread" by discussing reimbursement issues with providers, plaintiffs have failed to demonstrate any causal connection between such discussions and the amount that plaintiffs or the class members paid for BMS Subject Drugs.  Even assuming such discussions occurred, plaintiffs have not demonstrated that they had any impact on price.  Nor have plaintiffs demonstrated that such discussions are deceptive or unfair because there is no indication that the information provided was inaccurate in any way.  Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc., 246 F.3d 64, 74-75 (1st Cir. 2001) (no violation of Mass. G.L. ch. 93A where uncertainties were openly discussed before entering into the contract).

POINT IV

PLAINTIFFS' Ch. 93A CLAIMS ARE TIME-BARRED

The statute of limitations for Mass. G.L. ch. 93A is four years.  Mass. G.L. ch. 260, § 5A.  Plaintiffs were aware of the spreads for BMS's drugs by 1996 because they were purchasing BMS's drugs during that time frame and there was publicly available information about those spreads.  (DX 2641, DX 1053, DX 1039, DX 1965.)  They could have brought an action at that time, but they waited until December 2001 to do so.  Since they did not commence this action within the four-year limitations period, it is time barred.  Clark v. Mead Realty Group, Inc., 854 N.E.2d 972, 979 (Mass. App. Ct. 2006).

To the extent that plaintiffs contend that the statute of limitations was tolled by fraudulent concealment, that argument is without merit because they could have discovered the facts through the exercise of reasonable diligence.  Protective Life Ins. Co. v. Sullivan, 682 N.E.2d 624, 634-35 (Mass. 1997); see also, Wise v. Hubbard, 769 F.2d 1, 4 (1st Cir. 1985) (fraudulent concealment argument fails when plaintiff is capable of discovering allegedly concealed facts).  Even if plaintiffs claim they did not know the facts, it is well-established that a plaintiff will be charged with knowledge of publicly available information.  Wise, 769 F.2d at 2-3 ("Under Massachusetts law, a fact is not inherently unknowable when it is a matter discoverable by examination of public records"); see also Friedman v. Jablonski, 358 N.E.2d 994, 997 (Mass. 1976); Duco Assocs., Inc. v. Lipson, 416 N.E.2d 555, 556 (Mass. App. Ct. 1981).  This also has the effect of barring any claim for damages prior to December 1997 even if the claim is not completely barred.

Finally, plaintiffs should not be permitted to continue to claim damages after the complaint was filed in December 2001.  At that point, they were obviously aware of the alleged

deceptive and unfair conduct and were in a position to take action to avoid it.  Damages are not

available under Mass. G.L. ch. 93A where a plaintiff fails to mitigate.  Cambridge Plating Co. v.

Napco, Inc., 85 F.3d 752, 772-73 (1st Cir. 1996); Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,

72 F.3d 190, 204-05 (1st Cir. 1995).

POINT V

PLAINTIFFS HAVE FAILED TO PROVE DAMAGES.

To recover under Mass. G.L. 93A, plaintiffs must demonstrate damages with "a

fair degree of certainty." Damon v. Sun Co., 87 F. 3d 1467, 1472 (1st Cir. 1996).  The measure

of damages is the difference between what plaintiffs paid and what they would have paid in the

"but-for" world – i.e., a world without the alleged deceptive and unfair conduct.  Rice v. Price,

164 N.E.2d 891, 894 (Mass. 1960).  "[T]he purpose of a damage award is to compensate the

injured party for loss resulting from the conduct of the wrongdoer, 'not to penalize the

wrongdoer or to allow plaintiff to recover a windfall.'"  Cordeco Dev. Corp. v. Santiago Vasquez,

539 F.2d 256, 262 (1st Cir. 1976).

Plaintiffs admit that had the AWP inflation not existed and had drug

reimbursement been based on "but for" AWPs, the class members' drug "administrative

payments would increase."  (Devaux 11/7/06 Tr. 153.)  Nevertheless, plaintiffs' damage expert,

Dr. Hartman, testified that he was instructed by plaintiffs' counsel not to take that into account.

(Hartman 11/21/06 Tr. 47, 50, 58, 59.)  This means that plaintiffs' damage calculation (if indeed

they suffered any damages at all) is inaccurate by an undetermined amount – a fact that is fatal to

their entire claim. Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1, 4 (1st

Cir. 1996) (Massachusetts law requires plaintiffs to establish their "claim upon solid foundation

in fact, and [plaintiffs] cannot recover when any essential element is left to conjecture, surmise or hypothesis.")

Plaintiffs' damage calculation is also inaccurate because Dr. Hartman has based his analysis on manufacturer (as opposed to payor) data and assumed that all reimbursements to physicians were based on AWP even though there is nothing in the data that identifies the basis of the reimbursement. (Hartman 11/21/06 Tr. 67-70; 12/18/06 Tr. 97.) An analysis presented by Dr. Gaier demonstrated that this is not correct and that at least 43% of the reimbursements for BCBS/MA were not based on AWP. (Gaier Aff. Attach. 37; Gaier 11/29/06 Tr. 36-39.) On rebuttal, Dr. Hartman quibbled with Dr. Gaier's calculation, contending that the number was closer to 35%, but he admitted that he had not deducted that amount from his damage calculation. (Hartman 12/18/06 Tr. 99-100.) Even more significant, he did not attempt to determine the extent to which other TPPs reimbursed physicians on a basis other than AWP, and he was not aware of Mr. Mulrey's testimony that Harvard Pilgrim used capitated contracts, which were not based on AWP. (Mulrey 11/8/06 Tr. 33-36; Hartman 12/18/06 Tr. 98-99.) As a result, Dr. Hartman's calculations are inaccurate by an undetermined amount.

Given the uncertainties in Dr. Hartman's analysis, the Court cannot award any damages against BMS at this time. The burden of establishing damages is on plaintiffs. They have failed to satisfy that burden.

<u>Conclusion</u>

All of the foregoing demonstrates judgment should be entered for BMS and OTN on all claims of Classes 2 and 3.

Dated:    January 19, 2007

Respectfully Submitted,

By:    /s/ Jacob T. Elberg (BBO No. 657469)
Thomas E. Dwyer (BBO No. 139660)
Jacob T. Elberg (BBO No. 657469)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
Tel: (617) 371-1000
Fax: (617) 371-1037
tdwyer@dwyercollora.com
jelberg@dwyercollora.com

Steven M. Edwards (SE 2773)
Lyndon M. Tretter (LT 4031)
Thomas J. Sweeney, III (TS 6557)
Admitted *pro hac vice*
**HOGAN & HARTSON LLP**
875 Third Avenue
New York, NY  10022
Tel: (212) 918- 3000

*Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation*

## CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE

I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on January 19, 2007, I caused a copy of **THE BMS DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. P. 58** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

    /s/ Lyndon M. Tretter    

Lyndon M. Tretter
