# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) | ) MDL No. 1456 |
| | ) Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) Judge Patti B. Saris ) Chief Magistrate Judge Marianne B. Bowler |

### THE BMS DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT[1]

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
Steven M. Edwards, Esq.
Lyndon M. Tretter, Esq.
Thomas J. Sweeney, III, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co.
and Oncology Therapeutics Network Corp.*

---

[1] The BMS Defendants incorporate and adopt the Track 1 Defendants' Proposed Common Findings of Fact submitted after trial. The BMS Defendants also incorporate and adopt their Rule 52(c) and Rule 56.1 statements and memoranda of law in support of their motions for judgment based on partial findings and for summary judgment against Classes 1 & 2 and Class 3. Finally, in this document, trial testimony is cited by witness's last name, date and transcript page number (e.g., Smith xx/yy/zz Tr. 123). References herein to the witness's written direct testimony includes last name, the abbreviation "Aff." or "Decl." and a paragraph number, (e.g., Smith Aff. ¶ 1). Citations to deposition transcripts are in the same format as trial testimony, but include the abbreviation "Dep." after the witness's name instead of "Tr." Deposition transcript pages and plaintiffs' counter-designations are contained in a separate appendix submitted herewith. References to "DX" or "PX" with a document number are references to trial exhibits in evidence. The BMS Defendants reserve the right to amend these proposed findings and the citations therefore based on the Court's rulings on applicable evidentiary objections that remain outstanding.

A.    *Overview of the BMS Defendants*

1.      Defendant Bristol-Myers Squibb Company ("BMS") was formed in 1989 through the merger of two established pharmaceutical manufacturing companies, Bristol-Myers and Squibb. (Pasqualone Aff. ¶ 26.) BMS is a major developer, manufacturer and marketer of "brand-name" prescription drugs, including chemotherapy drugs, which are produced by BMS's Oncology group ("BMSO"). (Pasqualone Aff. ¶¶ 2-3.) This case involves seven BMSO drugs: Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol and Vepesid (the "BMS Subject Drugs"). All of the BMS Subject Drugs are manufactured in formulations intended to be injected or infused into a patient under physician supervision, although two of the drugs, Cytoxan and Vepesid, were also manufactured in oral tablet and capsule formulations, respectively, that could be self-administered by the patient. (DX 2652; Bell Aff. ¶ 12; Pasqualone Aff. ¶¶ 29, 41.)

2.      Defendant Oncology Therapeutics Network Corporation ("OTN") was a BMS subsidiary until May 11, 2005, when it became an independent, privately-held company.[2] (Akscin Aff. ¶ 2.) OTN is what is known as a "specialty distributor" -- a business that sells and distributes injectible drugs and supplies, including but not limited to cancer drugs, of a large variety of manufacturers to medical providers who administer them to patients in a hospital or office setting. (Akscin Aff. ¶¶ 3, 10-13; DX 2609; DX 2581; Peterson Aff. ¶ 5; Pasqualone 12/06/06 Tr. 6.) OTN's primary target customers are oncologists in private practice who administer chemotherapy to patients in their offices (i.e. oncologists not employed by a hospital or hospital out-patient clinic). (Akscin Aff. ¶ 3; Peterson Aff. ¶ 5.)

---

[2] In the period during which it was a BMS subsidiary, defendant OTN was a holding corporation for a South San Francisco-based operating company also known as OTN. (Akscin Aff. ¶ 2.) Today, defendant OTN is the general partner of the operating entity. (Id. at n.1.) All references herein to "OTN" include the operating entity.

B.    *The BMSO Business Model*

3.    At all relevant times, BMSO pursued a consistent business model for its drugs. (Pasqualone Aff. ¶¶ 8, 10; Bell BMS Aff. ¶¶ 7, 26-31.) At launch, BMS established an initial list price, or wholesale list price ("WLP"), for sales to wholesalers. (Pasqualone Aff. ¶ 13; Pasqualone 12/06/06 Tr. 6; Szabo Aff. ¶ 7.) The list price was based on a variety of factors, including the price that customers would be willing to pay. (Pasqualone Aff. ¶ 11; Pasqualone 12/06/06 Tr. 8; Szabo Aff. ¶ 7; DX 2536.)

4.    From time to time, after initial launch, BMS increased the list prices of its drugs while they were protected by patents. (Pasqualone Aff. ¶ 14; Pasqualone 12/06/06 Tr. 7; Kaszuba Aff. ¶ 8.) BMS only did so, however, when it believed that it would achieve substantial sales at the higher list price without the need for price concessions like discounts and rebates. BMS never increased list to create "spread." (Pasqualone Aff. ¶ 14; Szabo Aff. ¶ 8.)

5.    When BMS's drugs reached the end of their patent life and generic competition appeared, BMS generally did not make any further changes to the list price. (Pasqualone Aff. ¶ 18; Pasqualone 12/06/06 Tr. 7; Marre 11/14/06 Tr. 133, 154-155; Szabo Aff. ¶ 11.) Those drugs became part of BMSO's "multi-source portfolio" of drugs and the marketing strategy changed to maximizing profitability for the remainder of the drug's useful life through increased discounting and rebating as competitive conditions warranted. (Marre Aff. ¶¶ 5-6; Pasqualone Aff. ¶ 17; Szabo Aff. ¶ 12.)

6.    BMS did not decrease the list prices of drugs that became multi-source because there were "brand loyal" customers who were willing to continue to pay the list price. (Pasqualone Aff. ¶¶ 18-19; Pasqualone 12/06/06 Tr. 11, 49-50; Marre Aff. ¶ 9; Marre 11/14/06 Tr. 129-131; Szabo Aff. ¶ 12.) In addition, there were institutional customers such as hospitals and long-term care facilities who were not entitled to discounts on BMS multi-source drugs

2

because they did not have contracts with BMS.  (Marre 11/14/06 Tr. 159-164; PX 207.) Furthermore, BMS did not discount below list price unless the customer could produce an offer from a competitor for a generic equivalent of the BMS drug.  (Bell BMS Aff. ¶ 57; Marre Aff. ¶ 7; Marre 11/14/06 Tr. 147-48; Pasqualone Aff. ¶ 17.)

       7.      Over the course of 1993-2002, the period for which BMS data was available and produced, BMS achieved 88.8% of its net revenues on the seven BMS Subject Drugs in sale transactions priced within 5% of list price.  (Bell BMS Aff. ¶ 7(a); DX 2524.)  For the periods during which the Subject Drugs were protected by patents, 96% of BMS's net revenue was from sales within 5% of list price.  (DX 2524.)  For the periods during which the Subject Drugs were multi-source and subject to generic competition, 31.5% of BMS's net revenue was from sales within 5% of list price.[3]  (Id.)

       8.      The Court finds that BMS's list prices were neither deceptive nor unfair. They did not reflect discounts, but a list price -- by definition -- does not reflect discounts. (Merriam-Webster Collegiate Dictionary (11th ed. 2003); Rosenthal 11/27/06 Tr. 53; Rogers Aff. ¶ 4.)  Furthermore, BMS's ability to generate substantial sales within 5% of list price even after its products lost exclusivity demonstrates that there were legitimate, non-fraudulent, business reasons why BMS did not lower its list prices even when the average sales price declined.  (See also Bell Aff. ¶¶ 25, 41; Bell 12/17/06 Tr. 35-37; Rosenthal 11/15/06 Tr. 90-91.)

---

[3] Each of the above and the following figures exclude sales to federal government buyers such as the VA and Public Health Service, which sales are made at federally-mandated discounted prices.  BMS's individual expert, Dr. Gregory K. Bell, explained that differences in timing between BMS sales to, and receipt of chargebacks from, wholesalers caused him to understate the BMS sales at or around list in some cases.  (Bell BMS Aff. ¶ 48 n. 93; Ex. C (DX 2522); Bell 12/07/06 Tr. 42-43.)  However, other evidence confirms that BMS achieved such sales for all drugs for all years.  (See, e.g., PX 207 ($2.5 million in Taxol sales at list in 2002 to one customer alone).)

C.   *BMS's Dealings With Industry Compendia*

9.      A pharmaceutical manufacturer cannot market a drug unless it is listed in one or more industry compendia, commonly known as RedBook, First DataBank and MediSpan (the "Publications"). (Kaszuba Aff. ¶ 5; Kaszuba 11/13/06 Tr. 125-26; Ihling Dep. Tr. 124-25; Szabo Aff. ¶ 13; PX 188 at 00337640.) That is because the electronic claims processing systems used by government programs like Medicare and Medicaid and private third-party payors use the Publications to identify the drugs for which they will pay. (Kaszuba Aff. ¶ 5; Kaszuba 11/13/06 Tr. 125-26; Ihling Dep. Tr. 124-125; Szabo Aff. ¶¶ 6, 13.) For this reason, since the early 1970s, BMS has reported prices and product descriptions to the Publications. (Rogers Aff. ¶¶ 1-2; Szabo Aff. ¶ 6; Ihling Dep. Tr. 89, 97; see also Kaszuba Aff. ¶ 3; Kaszuba 11/13/06 Tr. 55, 109.)

10.      BMS has never reported AWPs to the Publications. (Kaszuba Aff. ¶ 6; Kaszuba 11/13/06 Tr. 110, 113; DX 2595; DX 2650; Szabo Aff. ¶ 6; Rogers Aff. ¶ 2; Ihling Dep. Tr. 93.) Rather, it has always reported its list prices. (Kaszuba Aff. ¶ 3; Kaszuba 11/13/06 Tr. 52, 58, 109; Rogers Aff. ¶¶ 1-2; Szabo Aff. ¶ 6; Ihling Dep. Tr. 89, 97.) Those list prices were the list prices that appeared on invoices to wholesalers. (Szabo Aff. ¶ 7; Rogers Aff. ¶ 4.)

11.      The Publications have historically applied a mark-up factor of 20.5% or 25% to BMS's list prices to calculate average wholesale prices or "AWPs." (Kaszuba 11/13/06 Tr. 59, 120-21; DX 2611 at BMS/AWP/000186646, 000186649; DX 2616; Szabo Aff. ¶ 6; Ihling Dep. Tr. 96-97.) This practice existed long before AWP became the benchmark for reimbursement in Medicare. (DX 1275 (Berndt Report) ¶ 22; Bell 12/08/06 Tr. 46.) The Publications represented to BMS that the mark-up factor they apply for BMS drugs was based on surveys they had made of drug wholesalers as to the list prices that *wholesalers* provide to *their* customers. (Kaszuba 11/13/06 Tr. 58-59, 114-16.) That this was BMS's understanding of the

4

Publications' process is supported by both internal BMS documents (DX 2554), and documents internal to the Publications that were copied to BMS employees.  (DX 2553.)[4]

12.    BMS recognized, as a matter of history and industry practice that, if it reported a particular list price, it was foreseeable that the Publications would return an AWP that was 20% or 25% higher, depending on the particular BMS drug and the Publication in question. (Marre Aff. ¶ 10; Pasqualone 12/06/06 Tr. 12-13; Kaszuba 11/13/06 Tr. 59; DX 2611 at BMS/AWP000186649; DX 2616; Ihling Dep. Tr. 88-89; Szabo Aff. ¶ 6.)  Indeed, it was BMS's regular practice, after sending a list price to a Publication, to ask the Publication to send its AWP back and for BMS to check the math to see if the traditional mark-up remained in place. (Kaszuba Aff. ¶¶ 9, 11; Kaszuba 11/13/06 Tr. 89, 95-97, 120; Ihling Dep. Tr. 95-97.)  However, the Court finds that it was the Publications, and not BMS, that had exclusive control over any mark-up factor applied to the BMS WLP, as well as control over the very name of the resulting price calculation: "AWP".[5]

13.    Plaintiffs' contention that BMS "controls" AWPs is simply contradicted by the overwhelming evidence.  Throughout the Class Period, there has been one employee at BMS, Denise Kaszuba, who has had primary responsibility for BMS's communications with the Publications.  (Szabo Aff. ¶ 6; Kaszuba Aff. ¶ 3; Kaszuba 11/13/06 Tr. 52.)  Ms. Kaszuba testified that the Publications determine AWPs, and BMS cannot control that process.  (Kaszuba

---

[4] See also Addanki 12/13/06 Tr. 77-78 (suggesting that wholesaler price benchmarks, such as AWP, should be considered a measure of prices that wholesalers might charge those customers who do not have a contract with a manufacturer for a discount below list and thus are not subject to wholesaler "chargebacks" to the manufacturer); PX 4075 (1991 First DataBank explanation of AWP as "an average price which a *wholesaler* would charge a pharmacy") (emphasis added).

[5] Indeed, in a separate lawsuit before this Court in which no drug manufacturer is a defendant, one of the Publications has agreed to change its mark-up factor and, in two years, to discontinue the use of the AWP benchmark.  See New England Carpenters Health Benefits Fund v. First Databank, Inc., C.A. 05-11148-PBS (11/14/06 Order preliminarily approving settlement).  The Court's Independent Expert, Dr. Ernest Berndt noted in his report that no single company in the industry was in a position to change the way AWPs were calculated and disseminated by the Publications.  (DX 1275 (Berndt Report) ¶¶ 24-31.)

Aff. ¶ 6; Kaszuba 11/13/06 Tr. 58, 110-13.)  A witness from First DataBank made the same point.

(Morgan Dep. Tr. 229-230; see also Pasqualone Aff. ¶ 26; Pasqualone 12/06/06 Tr. 12;

DX 1137.)  In addition, both BMS and plaintiffs also offered numerous documents, created in the

regular course of business, which explicitly stated that BMS did not control AWPs.[6]

       14.    On one occasion, BMS suggested a change in the mark-up factor to the

Publications.  This request arose from the fact that, after the Bristol-Myers and Squibb merger,

the Publications applied different mark-up factors to different BMSO drugs based on whether the

drug had been a Bristol-Myers or Squibb drug.  (Kaszuba Aff. ¶¶ 12, 13; Kaszuba 11/13/06 Tr.

72, 117-19; Pasqualone Aff. ¶ 26; Pasqualone 12/06/06 Tr. 12; DX 2545.)  To eliminate that

anomaly, in 1992 Ms. Kaszuba requested that all BMSO drugs carry the same mark-up factor of

25%.  (Kaszuba 11/13/06 Tr. 60, 114; Pasqualone Aff. ¶ 26; Pasqualone 12/6/06 Tr. 12; Szabo

Aff. ¶ 6; DX 2552.)  RedBook agreed; First Data Bank and MediSpan did not, further

demonstrating BMS's lack of control over the Publications.  (Kaszuba Aff ¶ 13; Kaszuba

11/13/06 Tr. 60, 114; DX 2553; DX 2554; Szabo Aff. ¶ 6.)  This is the only time BMS ever

suggested to the Publications what the mark-up factor should be.  (Kaszuba Aff. ¶ 6; Kaszuba

11/13/06 Tr. 60, 117, 131; Szabo Aff. ¶ 6; see also Pasqualone Aff. ¶ 26; DX 2554; DX 2650.)

There were no oral discussions between BMS and the Publications on this subject.  (DX 2650.)

       15.    BMS's lack of control over AWPs is also demonstrated by documents in

BMS's files from the 2002 time period when First DataBank unilaterally changed its mark-up

factor on hundreds of drugs of scores of manufacturers, including but not limited to the factor it

previously applied to certain of the BMS Subject Drugs.  (DX 2588 at BMS/AWP /01109782;

---

[6] See DX 1522; DX 2545; DX 2554; DX 2585 at BMS/AWP/001510398; DX 2588/PX 187 at
BMS/AWP/01109782; DX 2587/PX 196 at BMS/AWP/00442095; DX 2589/PX 189 at BMS/AWP/01088211;
DX 2595 at BMS/AWP/00059757.

DX 2589 at BMS/AWP/01088206; see also Kaszuba Aff. ¶ 15.)  It appears that certain BMS

employees were tasked with analyzing how and why such a change could be made by First

DataBank without notice to BMS.  These documents are also consistent with BMS's position

that it does not control the Publications' AWPs.

16.     In addition, beginning in 1999 BMS included in its communications to the

Publications a statement that its list prices did not include discounts.  (Kaszuba Aff. ¶ 7; Kaszuba

11/13/06 Tr. 127-28; Szabo Aff. ¶ 6; DX 2627 at FDB-AWP-18630.)  This had no impact on the

way the Publications calculated AWPs.  (Kaszuba Aff. ¶ 7; Kaszuba 11/13/06 Tr. 127-28; Szabo

Aff. ¶ 6.)  This further demonstrates the independence of the Publications in reporting AWPs.

17.     Finally, the evidence demonstrates that BMS never manipulated AWPs or

spreads.  (Marre 11/14/06 Tr. 155; Pasqualone 12/06/06 Tr. 10-13; Pasqualone Aff. ¶¶ 12, 25;

Kaszuba 11/13/06 Tr. 58, 110, 113; DX 2595; Szabo Aff. ¶ 8.)  To the extent that BMS increased

its list prices, which had the effect of increasing AWPs, that was because BMS was able to

obtain sales at the increased price.[7]  (Pasqualone Aff. ¶ 14; Pasqualone 12/6/06 Tr. 10, 50; Szabo

Aff. ¶ 8.)  To the extent that BMS offered discounts to customers while maintaining its list prices,

that was standard profit-maximizing to capture both sales at list and sales to those customers who

would otherwise switch to a generic.  (Marre 11/14/06 Tr. 164; Bell BMS Aff. ¶¶ 25, 41, 70-71.)

BMS offered discounts to meet generic competition, not to "create" spreads for providers.

(Pasqualone Aff. ¶ 14; Pasqualone 12/6/06 Tr. 10; Marre Aff. ¶ 17; Szabo Aff. ¶ 8; Akscin

12/06/06 Tr. 63, 78-79.)

---

[7] According to Dr. Hartman's charts (Hartman Dir. Decl. Attach. G.2.b), for two of the products at issue in the case -
- Taxol and Vepesid injectibles -- there were no price increases at all between 1993 and 2002.  For four of the
products -- Etopophos, Blenoxane, Cytoxan injectibles and Rubex -- there were no price increases between 1995 or
1996 and 2002, and there were substantial sales at list price both before and during that period.  For the other
products -- Cytoxan tablets, Paraplatin and Vepesid capsules -- there were price increases between 1993 and 2002
and substantial sales at the increased price.  (DX 2524.)

D.    *BMS's Understanding Of Payor Expectations*

18.    Plaintiffs did not offer any evidence that any payor was misled by an AWP for a BMS drug in determining how much to pay a provider for that drug.[8]  In fact, the evidence is to the contrary.  There were several publicly available OIG reports that depicted the spreads for a number of the BMS drugs at issue in the case.  (See, e.g., DX 1053; DX 1075.)  In June 1996, Barron's published an article that discussed the spread for a number of drugs including BMS's drug Vepesid.  (DX 2641.)  In October 1996, Ven-A-Care sent a letter to the head of HCFA that also discussed the spread for Vepesid and enclosed a series of exhibits that included transaction price information that was similar to Dr. Hartman's ASPs for all of the BMS drugs at issue in the case that existed at the time.  (DX 1881; DX 2631.)  In 1997, BMS received a table created by the Senate Finance Committee Staff that identified the spreads for Rubex and Vepesid.  (DX 2647.)

19.    Throughout this time period, TPPs in Massachusetts were purchasing drugs at discounted prices from BMS.  (Gaier 11/29/06 Tr. 35; Gaier Aff. ¶¶ 33-34; DX 1374; DX 1378; DX 1382; DX 1386; DX 1389; DX 1393; DX 1397; DX 1401; DX 2001.)  Those prices, again, were similar to Dr. Hartman's ASPs.  While plaintiffs contended that these purchases were made for the TPP's HMOs, in many cases the contracts were signed by the TPPs and there is no proof that the prices were not available to the persons who established reimbursement amounts for the TPPs.

20.    In 2000, HCFA made available to carriers what it described as "more accurate wholesale prices" for approximately 400 NDCs and directed its carriers to use those

---

[8] At trial, plaintiffs misrepresented PX 4027 as an alleged attempt by BMS to confuse the government in 1992 about doctors' inability to purchase drugs at prices below AWP.  (12/07/06 Tr. 107.)  In fact, the document refers to their inability to buy below 85% of AWP.  Most chemotherapy drugs were single-source in 1992 and 85% of AWP was generally the provider cost.  (Akscin 12/06/06 Tr. 85-86.)

prices in determining reimbursement amounts. (DX 1091 at 1.) HCFA deliberately exempted BMS's oncology drugs from that program, however, because it determined that the reimbursement for the administration of those drugs was "inadequate." (DX 1090 at 2.)

21.     BMS was aware of these documents, and numerous BMS witnesses testified that they did not believe that payors were deceived by the AWPs for BMS drugs. For example, Frank Pasqualone, BMSO's Senior Vice President, testified that he believed that it was well-understood in the industry, including by Medicare, that the AWPs used for reimbursement of BMS products were a 20-25% mark-up over the WLPs. (Pasqualone 12/06/06 Tr. 16.) Brian Garofalo also testified that he understood Medicare to have adopted the AWPs in the Publications for reimbursement purposes, not some average of discounted transaction prices. (Garofalo 12/08/06 Tr. 105-06; Garofalo Aff. ¶ 5.) This understanding was buttressed when both Mr. Pasqualone and Mr. Garofalo received government documents at BMS which discussed findings that providers could purchase Part B drugs reimbursed by Medicare at prices well below AWP. (See DX 2647; DX 2648; 12/06/06 Pasqualone Tr. 16-19; Garofalo 12/08/06 Tr. 109; see also Akscin Aff. ¶¶ 9(b) ("it was commonplace in government and industry circles that AWP was not a reliable proxy for acquisition costs for drugs"), 24-31.) These and other documents demonstrate that BMS understood that payors were knowledgeable about spreads. (See DX 2570; DX 2590 at 001506801-05; DX 2616.)

22.     The BMS witnesses also understood that Medicare and TPPs deliberately chose to reimburse providers in excess of their acquisition costs. (Garofalo Aff. ¶ 5; Garofalo 12/08/06 Tr. 109; Pasqualone 12/6/06 Tr. 19-22; Soule 12/08/06 Tr. 70-71; Soule Aff. ¶¶ 7-8; see also DX 2648 at D-3.) It was generally recognized that reimbursement for the various services related to physician-administered drugs was either grossly inadequate or not reimbursed

9

at all.  (DX 1086 at 1; Garofalo Aff. ¶ 6; Garofalo 12/08/06 Tr. 110, 118-19; Pasqualone 12/06/06 Tr. 34, 53; Pasqualone Aff. ¶ 24; DX 2555; DX 1092.)  For example, OTN employee John Akscin testified that the drug margin on multi-source drugs was particularly important to the viability of office-based oncology practices.  (Akscin 12/06/06 Tr. 83-87; Akscin Aff. ¶¶ 24-26; DX 2585 at BMS/AWP/001510395-96.)  Dr. Linda Haegele testified that she would not have been able to treat patients in her office unless reimbursements were sufficient to cover all of her costs.  (Haegele 12/06/06 Tr. 114, 116, 123-25; Haegele Aff. ¶ 43.)  Mr. Akscin also testified that many payors still use AWP today because of concerns that providers might otherwise regard the payors' overall reimbursement to be inadequate.  (Akscin 12/06/06 Tr. 88-90.)

23.     Mr. Garofalo explained in detail how these concerns played out in the debate about reimbursement for Part B drugs in Congress in 1997 which he observed on behalf of BMSO.  He testified that patient advocacy groups opposed the Clinton Administration proposal in 1997 to reimburse for Part B drugs at actual acquisition cost, unless reimbursement for services related to administering Part B drugs was increased.  (Garofalo 12/8/06 Tr. 110.) BMS and the oncology community were concerned that oncologists might begin to send patients to hospitals where the quality of care was not optimal and it was more expensive.  (Garofalo Aff. ¶ 6; Akscin 12/06/06 Tr. 86-88; Akscin Aff. ¶ 23.)  The Administration's proposal for reimbursement at acquisition cost was not adopted.  (DX 2648 at D-3; PX 201; Pasqualone 12/06/06 Tr. 30, 52-53.)  Instead, the bills adopted by both the House and Senate provided for reimbursement at 95% of AWP.  The Senate bill gave the Secretary of HHS discretion to define AWP.  The House bill, which was enacted, did not give the Secretary such authority.  (Garofalo 12/8/06 Tr. 112.)

24.    BMS and the cancer community, including patient advocacy groups, regarded the enactment of the House bill as a favorable development because quality care would continue to be provided to patients in physician's offices, where BMS sold most of its oncology products.  (Garofalo 12/8/06 Tr. 113; see also PX 201; Pasqualone 12/06/06 Tr. 30, 52-53; Pasqualone Aff. ¶ 24.)

25.    Mr. Akscin of OTN gave a similar account of the backlash HCFA received from physicians and members of Congress when, in 2000, HCFA instructed its carriers to use DOJ AWPs for certain Medicare Part B drugs (although not the BMS chemotherapy drugs) instead of Published AWPs.  Ultimately, Congress enacted a moratorium that prevented the switch away from Published AWPs pending further study of the medical providers' claims that the profits on drugs cross-subsidized inadequate reimbursement elsewhere.  (Akscin Aff. ¶¶ 26-35; DX 1087; DX 1089; DX 1092; DX 2590 at BMS/AWP/001506804.)

26.    It never occurred to BMS that it should change the way it reported pricing information to the Publications because Congress decided to use AWP in a statute.  (Pasqualone 12/6/06 Tr. 22.)  In response to questions from the Court about whether he considered the impact of the AWPs on Medicare beneficiaries' co-payments, one OTN witness testified that he understood that 95% have supplemental insurance and physician practices would accommodate those who did not.  (Akscin 12/06/06 Tr. 99-100.)  Other BMS witnesses testified that Medicare reimbursement was not an issue that affected their business and they did not believe that they were doing anything wrong in reporting accurate list prices to the Publications.  (Marre 11/14/06 Tr. 153-55; Soule 12/08/06 Tr. 70; Pasqualone 12/06/06 Tr. 14.)  Under the circumstances, the Court finds that BMS's conduct in reporting list prices to the Publications had nothing to do with payor reimbursement and was neither deceptive nor unfair.

E.    *BMS's Sales and Marketing Practices*

27.    BMS's witnesses testified that it was BMS's policy to emphasize the therapeutic advantages of its drugs and to address reimbursement issues only in response to customers' questions. (Pasqualone 12/6/06 Tr. 13, 15; Pasqualone Aff. ¶ 42; Soule 12/08/06 Tr. 56-59; Soule Aff. ¶¶ 5, 9; see also Peterson Aff. ¶ 9; Peterson 12/08/06 Tr. 87-88; DX 2605 (the same policy applied to OTN sales representatives).)  In 2001, BMS formalized that policy in a memorandum from Ed Penick to all U.S. Sales and Marketing Personnel. (PX 223.)  BMS's witnesses testified that this policy was enforced. (Pasqualone 12/06/06 Tr. 15, see also Soule 12/08/06 Tr. 58-59; Peterson 12/08/06 Tr. 87-88; DX 2605.)

28.    In addition to the sales representatives that appeared at trial, plaintiffs took the depositions of several other BMS sales representatives.  Their testimony is consistent that in keeping with BMS's general policy discussed above, BMS's sales representatives "sold the science" behind BMSO drugs and addressed reimbursement questions only if the customer raised the issue. (Armand Dep. Tr. 42-43, 91-93; Cook Dep. Tr. 98-99; Faulkner Dep. Tr. 32, 42, 67; Keighley Dep. Tr. 49-51, 69-70, 92-94, 101, 166-167; Liptak Dep. Tr. 55-56, 65-66; Morrison Dep. Tr. 95-97.)

29.    Furthermore, BMS established through the manager of the database on which these communications were stored that BMS searched over 80 million computer records over the period 1997-2003 and received "hits" on the terms sought by plaintiffs in less than ½ of 1%. (Hammerstone Aff. ¶ 9.)  This supports the testimony of the BMS and OTN sales representatives at trial and in depositions that financial issues rarely came up in their communications with customers and that plaintiffs have selectively cited only those rare instances.

30.     In addition, it is worth emphasizing that in these ½ of 1 % of sales calls where the issue of spreads and reimbursement amounts may have come up, neither the BMS nor the OTN sales representatives had authority to change prices or to "manipulate" the spread in order to make a sale.  (Soule Aff. ¶ 14; Peterson Aff. ¶ 12; Peterson 12/08/09 Tr. 86; Keighley Dep. Tr. 51.)

31.     Similarly, most oncologists who are reimbursed on an AWP basis buy their drugs at prices negotiated by regional buying groups or GPOs and individual doctors do not have any control over the prices at which the GPO contracts with a manufacturer.  (Rosenthal 11/15/06 Tr. 46; Marre Aff. ¶¶ 6-7; Peterson Aff. ¶ 10; Peterson 12/08/06 Tr. 85; Haegele 12/06/06 Tr. 132-33, 135-37; Haegele Aff. ¶ 50; see also Ihling Dep. Tr. 78-80.)

32.     In the case of BMS, negotiations with provider GPOs were conducted by executives like Mr. Marre in the home office and, Mr. Marre established that AWPs and spread were not part of these negotiations.  (Marre Aff. ¶¶ 11-12; Marre 11/14/06 Tr. 154-55.)  Indeed, BMS offered the same discounts to hospital providers who were not reimbursed on an AWP basis as it did to office-based oncology GPOs; accordingly, it is clear that "competitive forces" in the multi-source marketplace, not payors' reimbursement methodologies, drove BMS's discounts. (Marre 11/14/06 Tr. 143-44.)

33.     Plaintiffs pointed to several documents that provided information on AWPs to BMS's sales representatives and customers.  (See, e.g., PX 193; PX 219; PX 232; PX 844.)  The existence of these documents is not evidence of improper activity, but rather of the entirely legitimate practice of providing accurate information to customers about the transaction they are about to enter into.  (Bell BMS Aff. ¶¶ 59-69; Bell 12/7/06 Tr. 74-78; Akscin Aff. ¶¶ 18-21, 36; Akscin 12/06/06 Tr. 57, 72, 79; Peterson Aff. ¶ 15-17.)

34.     Finally, not only was any AWP and spread information made available by the BMS and OTN sales representatives to individual physicians' purely factual/informational material (as opposed to any marketing material) it was not novel or secret.  The customers could have looked up AWPs in a publication or calculated spreads themselves from their own purchase invoices and practice data.  (Peterson Aff. ¶¶ 15-17; Akscin Aff. ¶ 20(a); Akscin 12/06/06 Tr. 73-75, 79.)  I find that BMS's sales and marketing practices were neither deceptive nor unfair.

F.     *Plaintiffs' Arguments*

35.     Plaintiffs rely on a PowerPoint presentation which states that "[w]e need to be wary of using AWP because the name is misleading" to suggest that this demonstrates that BMS intended to mislead payors.  (PX 196 at BMS/AWP/01088202.)  Plaintiffs did not take the deposition of the author of the document or call that person as a witness at trial.  An equally plausible explanation is that the author was referring to members of the general public or media, as opposed to sophisticated industry participants such as Medicare and TPPs, who clearly understood what AWP meant.  (Bell 12/07/06 Tr. 94-96 (drawing a similar distinction).)

36.     Plaintiffs rely on a number of documents relating to BMS's Apothecon subsidiary, which sold primarily oral generics.  (See, e.g., PX 188; PX 209; PX 210; PX 211.)  There are no Apothecon drugs at issue in this case.  (Kaszuba Aff. ¶ 16; Kaszuba 11/13/06 Tr. 87-89, 121-24.)  Apothecon followed a different business model that is not applicable here.  (Pasqualone Aff. ¶ 3, fn. 1; Kaszuba 11/13/06 Tr. 87-89.)

37.     Plaintiffs argue that the confidentiality clauses in BMS's contracts (see e.g., DX 2649 at BMS/AWP 01228354) with customers evidence an intent to keep payors ignorant of ASPs.  The confidentiality clauses were not aimed at payors, nor were they designed to stop people from sharing general information about market prices for drugs.  They were

intended instead to prevent customers from sharing the terms of their particular deal with other customers, who might use them for leverage in negotiations with BMS. (Marre 11/14/06 Tr. 146-47; Pasqualone 12/6/06 Tr. 22-23.)

38.    Plaintiffs cite a 1995 document relating to the launch of Etopophos, which was a successor product to BMS's injectible Vepesid, chemically known as etoposide. (PX 208.) Because injectible Vepesid had become subject to generic competition in 1994, many BMS customers were able to obtain the drug at significant discounts. BMS was concerned that customers would not migrate or "convert" to Etopophos because they were being reimbursed based on the large spread between the discounted price of Vepesid and AWP. (Bell BMS Aff. ¶ 39.) A BMS employee, Larry Lunak, wrote a memorandum suggesting that BMS could incentivize medical providers to switch from Vepesid to Etopophos by either: (1) lowering the list price on Vepesid so that the differential or "spread" between the WLP (and thus the published AWP) on Vepesid and the discounted price for the drug was reduced or (2) by establishing a "premium" list price for Etopophos relative to transaction prices so that providers could enjoy a spread on that drug not usually associated with BMS's on-patent drugs. The evidence is unequivocal that BMS did not implement either option. Rather, BMS adhered to its business model even though, as a result, Etopophos was a relatively unsuccessful product. (Pasqualone Aff. ¶¶ 31-32; Bell BMS Aff. ¶ 40.)

39.    Plaintiffs also cite a document written by Dr. Bell about competition for Paraplatin from the generic of a different molecule, cisplatin. The document referred to "Performance-based contracting/pricing, acquisition cost and AWP" and "AWP and spread opportunities" and suggested that "Economic issues to be discussed in a low key manner, no printed materials." (PX 226 at 0123318, 120, 134.) Dr. Bell testified that the references to AWP

referred to the strategies of BMS's generic competitors, and he was suggesting a low-key approach to these issues in order to be consistent with BMS's policy of emphasizing the therapeutic advantages of Paraplatin. (Bell 12/07/06 Tr. 44-48; Bell 12/08/06 Tr. 42-45.) Moreover, the evidence is undisputable that AWP/ASP spreads on Paraplatin during this period of competition with generic cisplatin did not increase in any material sense. (Bell BMS Aff. ¶ 37; DX 2523.)

40.    Plaintiffs cited in their opening statement to a document entitled "Taxane Economics," (PX 221) which counsel claimed was evidence of BMS's investigating "how do we give the margin back to doctors so that we can compete with the generic." (Plaintiffs' Opening Statement 11/06/06 Tr. 32.) The document does not support plaintiffs' position. First, the document focuses primarily on the differences between Taxol and the Aventis branded product, Taxotere, not generic paclitaxel. Second, the document does not suggest that BMS "do" anything to compete on margin; it simply points out that, if one accounts not merely for the drugs themselves but also reimbursement for the services of administering the drugs (over which even Plaintiffs do not claim BMS has any control), the use of Taxol in certain chemotherapy regimens will produce a higher margin than Taxotere. Finally, the document is legended at the bottom with the words that it is "for educational purposes only and should not be utilized in any sales presentations."

41.    Plaintiffs also introduced a worksheet prepared by a BMS sales representative that compared the spreads that a particular oncology practice customer might receive on Taxol, generic paclitaxel and Taxotere. (PX 224 at 5.) BMS called the representative, Doug Soule, in its case. Mr. Soule's testimony was that:

(a)     generally, less than ½ of 1% of his calls on oncology practices focus on financial, as opposed to clinical, issues surrounding a drug (Soule 12/08/06 Tr. 59);

(b)     the reason financial issues came up at the time of writing PX 224 is that Taxol had recently become subject to generic competition (Soule 12/08/06 Tr. 66-68);

(c)     the oncology practice customer told Mr. Soule that it intended to switch to the generic unless he could show, on paper, that buying branded Taxol still made economic sense (Soule 12/8/06 Tr. 60);

(d)     Mr. Soule used prevailing prices for the drugs to develop his worksheet; he did not have discretion over any price point so as to make Taxol a more attractive alternative (Soule Aff. ¶ 14); and

(e)     he was able to convince the practice to use Taxol over generic paclitaxel *despite* the worksheet's showing a greater spread on the generic because of the non-monetary, "value-added" benefits of staying with the brand, such as receiving free nurse and patient educational materials about Taxol.  (Soule 12/08/06 Tr. 69.)

The Court finds nothing unusual or untoward in Mr. Soule's conduct.[9]

42.     Plaintiffs questioned BMS witness Frank Pasqualone about a presentation to sales representatives entitled "Practice Efficiencies & Quality Care Workshop" that appears to have been given in early 2001 -- shortly after the Penick memo.  The document contains general information about sources of revenue and expenses for an oncology practice and has examples of the AWP-based reimbursement amounts and acquisition costs for Taxol and Paraplatin.  (PX 222.)  Plaintiffs read from the deposition of the sales representative who identified the document, Greg Keighley, in an attempt to contradict BMS's claimed policy -- introduced through Mr. Pasqualone -- of not initiating discussions of spreads with customers.  Specifically, plaintiffs

---

[9] The plaintiffs questioned another witness, former OTN sales representative Marsha Peterson, about a third Taxol-related document: a sentence in a "site note," PX 4048, written by OTN representative who reported to her in which the author wrote: "Discussed generic Taxol. They do not want to switch.  I told Melva [the office manager at the doctor's practice] that we are constantly lowering the cost of Taxol and that the AWP is still strong.  She will stay with OTN." Like Mr. Soule, Ms. Peterson testified that conversations with customers about spreads were atypical, but that if the customer initiated discussion about the relative economics of the brand and the generic, the sales representatives were authorized to respond.  (Peterson 12/8/06 Tr. 89-93.)

read the deposition testimony of Mr. Keighley that the presentation document was "something we [the representatives] would verbally give on an account." (See Pasqualone 12/6/06 Tr. 43-45.)

43.     Neither the document nor the Keighley deposition testimony are inconsistent with BMS's policy.  First, plaintiffs did not cite the relevant portions of the Keighley deposition testimony, which continued "this [presentation] is such a general kind of overview, it was just to bring the thoughts to the audience and that was it" and that he personally used it only in "one or two instances." (Keighley Dep. Tr. 270.)  Moreover, the document itself simply illustrates how money is made on the drugs and how it is split between Medicare and the beneficiary.  It does not try to promote Taxol and Paraplatin over generic or therapeutic competitors; indeed, *it does not even mention any competitors' drugs*.  The profits shown are relatively modest and cannot be seen as an attempt to induce a physician to purchase -- as opposed to being an illustration of how the payment system works.

44.     In their rebuttal case, plaintiffs used a document created by Dr. Rosenthal that purported to compare changes from 2002-2005 in Medicare's reimbursement for a dose of Taxol administered over 3 hours.  (PX 4070.)  Plaintiffs sought to show that the "bundle" of reimbursement for both the drug ingredient cost and the administration fee was lower after the Medicare Modernization Act changed the drug reimbursement from AWP to ASP.   On cross-examination of Dr. Rosenthal, BMS showed that the methodology was flawed because Taxol is never administered alone; it is part of a chemotherapy regimen that will necessarily include infusions of other supportive drugs that would change the relative amounts of the reimbursement bundles.  (Rosenthal 12/18/06 Tr. 54-56.)

G.    *Most of The Drugs At Issue Are Multi-Source or Single-Source Drugs With Spreads of Less Than 30%.*

(A)    Multi-Source Drugs

45.    Of the 320 spreads depicted by Dr. Hartman in Attachment G.2.c. of his direct testimony, 209 are for years in which the BMS drugs are multi-source.  (See Exhibit A.)[10]

46.    Plaintiffs did not offer any evidence that payors reimbursed physicians for multi-source drugs manufactured by BMS.  In fact, plaintiffs have conceded that multi-source drugs are reimbursed on a J-code basis, and they have no way of identifying the manufacturer that supplied the drug.  (Mulrey 11/08/06 Tr. 53-55; Hartman 12/11/06 Tr. 59-60.)  Plaintiffs have also failed to demonstrate that, for multi-source drugs, the AWP of the BMS drug had any bearing on reimbursement amounts.  Once multi-source competition occurred, reimbursement was based on the median of the generic AWPs (prior to 1998) or the lower of the brand or the median of the generic AWP (after 1998). (DX 1049 at 59621; DX 1852.)  Since generic AWPs were always below brand AWPs, and BMS did not change its list prices after its drugs lost exclusivity (see ¶ 5, supra) the reimbursement amount could not have been based on the AWP for the BMS drug.  (See also Bell 12/07/06 Tr. 48-51; DX 2644; DX 2645.)   Thus, the Court finds that plaintiffs failed to prove their claims as to the multi-source NDCs.

(B)    Single-Source Drugs

47.    Most BMS single-source drugs have spreads below 30%.  Of the 320 spreads depicted by Dr. Hartman in Attachment G.2.c. of his direct testimony for BMS NDCs from 1993-2002 -- the period for which BMS data was available and produced -- 92 are for

---

[10]  Although Etopophos is a single-source drug, payors reimburse Etopophos as a multi-source drug under the J-code for etoposide.  (Bell 12/07/06 Tr. 6-9, 26-27.)  Thus, it is not possible to tell from claims data whether a patient received Etopophos or etoposide and, in any event, payor reimbursement was not based on Etopophos' AWP.

single source drugs where Dr. Hartman has calculated spreads of 30% or less. These NDCs in years where the spreads are below 30% are identified in the chart annexed hereto as Exhibit B. Dr. Hartman has testified that those spreads were within the expectations of both Medicare and third-party payors. (Hartman 11/20/06 Tr. 119-120.) Thus, the court finds that plaintiffs have no claims as to the single-source NDCs whose spreads are below 30%.

48.     Of the remaining 19 spreads in Exhibit B, the Court finds no basis for liability. As noted, Dr. Hartman calculates spreads on an NDC-by-NDC basis. (Hartman Dir. Decl. Attach. G.2.c.) In other words, if a particular drug has five NDCs, he calculates five different spreads for a given year. (Id.) As Dr. Bell pointed out in his testimony, that does not make sense because payors reimburse physicians on a J-Code basis. (Bell BMS 12/07/06 Tr. 19.)[11] Because payors reimburse for multiple NDCs within one J-code, a more appropriate methodology is to take the weighted average of all NDCs for a particular drug, based on the amount of sales of each NDC. (Bell 12/07/06 Tr. 19-20, 24-26; DX 2642; DX 2643.) When the 19 remaining spreads are analyzed on a J-Code basis, all but one fall below 30%. (Bell Tr. 12/07/06 Tr. 20; DX 2642; DX 2643.) The only drug that has a spread slightly in excess of 30% is Paraplatin in 2002. (Bell 12/07/06 Tr. 13-14; DX 2523.)[12] However, BMS achieved 83.3% of its Paraplatin net revenues in sales within 5% of list in 2002; thus, BMS's list price with respect to Paraplatin cannot give rise to any legal liability. (DX 2524.)

---

[11] Under the current Medicare ASP reimbursement system, CMS takes the NDC-based information provided by manufacturers and calculates the ASPs on a J-code level. (Bell 12/07/06 Tr. 35-36.)

[12] Dr. Hartman's Class 3 damage calculation for Paraplatin in those years is $804,568. (Hartman Dir. Decl. at Attach. J.2.a.) His Class 2 damage calculation, using a 30% liability threshold, is $12,038 for Paraplatin going back to 1991. (He gives no figures for specific years.) (PX 4029 at Slide 104.)

Dated:   Boston, Massachusetts
         January 19, 2007

                                Respectfully Submitted,


                          By:   /s/ Jacob T. Elberg (BBO No. 657469)
                                Thomas E. Dwyer (BBO No. 139660)
                                Jacob T. Elberg (BBO No. 657469)
                                **DWYER & COLLORA, LLP**
                                600 Atlantic Avenue
                                Boston, MA  02210
                                Tel: (617) 371-1000
                                Fax: (617) 371-1037
                                tdwyer@dwyercollora.com
                                jelberg@dwyercollora.com

                                Steven M. Edwards (SE 2773)
                                Lyndon M. Tretter (LT 4031)
                                Thomas J. Sweeney, III (TS 6557)
                                Admitted *pro hac vice*
                                **HOGAN & HARTSON LLP**
                                875 Third Avenue
                                New York, NY  10022
                                Tel: (212) 918- 3000

                                *Attorneys for Defendants Bristol-Myers Squibb
                                Company and Oncology Therapeutics Network
                                Corporation*

21

## <u>CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE</u>

I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on January 19, 2007, I caused a copy of **THE BMS DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT**, together with the exhibits and Appendix thereto to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

                                     _____/s/ Lyndon M. Tretter_____
                                             Lyndon M. Tretter