## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY<br>AVERAGE WHOLESALE PRICE LITIGATION ) | MDL No. 1456 |
|  | Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO<br>01-CV-12257-PBS AND 01-CV-339 | Judge Patti B. Saris<br>Chief Magistrate Judge Marianne B. Bowler |

## APPENDIX TO THE BMS DEFENDANTS'
## POST-TRIAL PROPOSED FINDINGS OF FACT

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
Steven M. Edwards, Esq.
Lyndon M. Tretter, Esq.
Thomas J. Sweeney, III, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co.*
*and Oncology Therapeutics Network Corp.*

| Appendix To The BMS Defendants' Post-Trial Proposed Findings Of Facts | |
|---|---|
| Cited Deposition Designations And Counter Designations | |
| Tab | |
| 1 | Raul Armand, July 29, 2005 |
| 2 | Gena Cook, April 28, 2005 |
| 3 | Dana Faulkner, August 16, 2005 |
| 4 | Dianne Ihling, August 12, 2005 |
| 5 | Greg Keighley, July 20, 2005 |
| 6 | Thomas Liptak, August 17, 2005 |
| 7 | Patricia Kay Morgan, January 11, 2005 |
| 8 | Fran Morrison, July 27, 2005 |

Tab 1

Raul Armand                                      July 29, 2005

New York, NY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------x

In Re:   PHARMACEUTICAL        )MDL Docket No.

INDUSTRY AVERAGE WHOLESALE    )Civil Action

PRICE LITIGATION               )01CV12257-PBS

-----------------------------x

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS                    )

-----------------------------x

July 29, 2005

8:06 a.m.


Deposition of RAUL ARMAND, held at

the law offices of Hogan & Hartson LLP, 875

Third Avenue, New York, New York, pursuant to

notice, before Donald R. DePew, an RPR, CRR and

Notary Public within and for the State of

New York.

38

1  competitors.
2      Q.  And at that time, again focusing on
3  this advanced training period, do you recall if
4  there were any presentations given on the business
5  of running an oncology practice?
6      A.  Specifically, I do not.
7      Q.  Okay.  Do you recall anything else
8  about that training?
9      A.  After thinking that I knew a lot about
10  clinical data I go into this six months or seven
11  months training up in Plainsboro, and when I came
12  out of there I was once again overwhelmed with the
13  higher knowledge that I needed to have to be able
14  to completely understand and convey the benefits
15  of the -- the clinical benefits of my drugs.
16  Because once they bring in the competitor
17  knowledge it's almost like you're starting all
18  over again.
19      Q.  Okay.  I want to be a bit more specific
20  then about what else might have been taught at
21  that training.
22          I'm wondering if you recollect if

39

1  during this advanced training you received any
2  training on Medicare reimbursement for oncology
3  drugs.
4      A.  I'm sure that it was part of the
5  training.  I cannot recall what was it
6  specifically.  But, yes, I'm sure that they give
7  you the specifics -- I mean, they give you the
8  understanding of the reimbursement model, that
9  physicians buy medications and that then Medicare
10  reimburses the physician or the payers.
11          And it was general in nature if it was
12  training.  And I continued to focus on the medical
13  part, which what I felt the weakest end.
14      Q.  And going back to this general training
15  that was given on reimbursement, do you recall the
16  person who would have offered that training?
17      A.  That's -- no, I'm sorry, I don't.
18      Q.  All right.  Do you know what the
19  letters AWP stand for?
20      A.  It's a -- from my understanding it's a
21  reference number that's used -- I don't know who
22  sets it and I don't know much about it, honestly.

40

1      Q.  Do you know what the letters themselves
2  stand for?
3      A.  The letters, that's average wholesale
4  price.
5      Q.  And thinking back to either the most
6  initial training you received, both in terms of
7  the book training and then the initial time at
8  Princeton, up through this time of advanced
9  training that we're talking about, all those
10  included or whatever else you want to include,
11  when was the first time you probably heard the
12  term AWP?
13      A.  I honestly don't remember.
14      Q.  Okay.  Just in an attempt to jog your
15  memory, I'm wondering if you recall during this
16  general discussion of reimbursement issues in
17  advanced training if AWP would have been raised at
18  that time?
19      A.  I don't specifically remember.  I would
20  think that it was.
21      Q.  All right.  So you attend this advanced
22  training.  First I thought you said it was for a

41

1  week, but then I heard you say something about six
2  or seven months, so...
3      A.  Right.  Between the original classroom
4  training and the advanced classroom training
5  there's a six to seven-month period --
6      Q.  I see.
7      A.  -- of field experience.
8      Q.  Okay.  So you received the advanced
9  training, and then did you go back to your
10  territory --
11      A.  Yes.
12      Q.  -- and commence making calls again?
13      A.  Yes.
14      Q.  Okay.  And what was it like this time?
15      A.  It was a little better.  But again,
16  coming out of that advanced training there was a
17  lot more medical information that was given to us,
18  and to me specifically, that I had to try to
19  digest that and incorporate it into my calls.
20      Q.  Looking back at that early period when
21  you were making solo calls, either before the
22  advanced training or just after, was there any

Raul Armand

July 29, 2005

New York, NY



42

1  such thing as a typical sales call?
2    A.   Well, that's hard to qualify,
3  "typical," what is typical?
4        Generally you try to speak -- I try to
5  speak to the physician.  And I try to get to know
6  the oncology nurse.  I try to talk to the
7  receptionist to get to know them, because they
8  often are the ones that will let you into the
9  office or not.  And anybody else, the office
10  manager, anybody that's in the office.
11    Q.   But the goal was to try to talk to the
12  doctor each time?
13    A.   Yes.
14    Q.   Okay.  And as far as these most initial
15  sales calls that you made went, what was your
16  intention?
17        I mean, did you go in with case studies
18  and you wanted to talk about those or...
19    A.   Right.  To convey to the doctor the
20  benefits of the oncology drugs that I represented
21  at that time and in different tumor types.
22    Q.   Let's try to look back at the earliest

43

1  solo sales calls that you made before that
2  advanced training.
3    A.   Right.
4    Q.   Do you recollect if at any time the
5  subject for reimbursement for any of the products
6  that you were selling arose?
7    A.   If the doctors were to ask me I was so
8  confused that I basically said, Doctor, I really
9  am not clear on that.  You know, what I'm trying
10  to do is talk about the clinical data.  And they
11  understood that I was new and they understood, you
12  know, where I stood in my learning curve.
13    Q.   Sure.
14        I'm wondering if when they raised that
15  topic and you weren't quite sure how to give them
16  the information that they might want, was there a
17  place that you referred them to get more
18  information on that subject?
19    A.   Well, Bristol-Myers has a service
20  called Procert and Procert is -- was, is part of
21  the reimbursement assistance program to help
22  doctors in offices.  So generally my first answer

44

1  was call Procert.  Since I wasn't that clear on
2  what they were talking about I would refer them to
3  Procert.
4    Q.   How did you first learn about Procert?
5    A.   Along the way in the training they had
6  said -- "they" meaning the company or the
7  trainers -- that there is a program available to
8  the doctors offices.  When there's any issues with
9  reimbursement refer them to this Procert.
10    Q.   So Procert was something that was
11  available way back in the early days of your
12  tenure as an oncology salesperson?
13    A.   Yes.
14    Q.   All right.  So then let's talk about
15  Phase II, if you will, of your initial sales
16  calls, and those are the ones after advanced
17  training.
18        I'm wondering if in those first several
19  months after you received that advanced training,
20  when you were back in the field, if you can recall
21  any instances where a physician or his or her
22  staff raised the issue of reimbursement for

45

1  oncology drugs?
2    A.   They did.  I'm sure that they did.
3  Specifically can I remember one, no, but they did.
4    Q.   Okay.  How frequently?
5    A.   Around that time, back in '99, the
6  Miami area was undergoing a lot of changes,
7  South Florida with HMOs, health maintenance
8  organizations.  And the doctors would comment that
9  the HMOs were infringing into the oncology arena.
10    Q.   So that was a particular concern --
11    A.   Yeah.
12    Q.   -- from oncologists?
13    A.   Yeah.
14    Q.   What did that mean, "infringing"?
15    A.   That they were taking the -- part of
16  the care of the medications that are given to the
17  patients, they were taking more control of that by
18  sending them the medications.
19    Q.   I see.  As opposed to --
20        What was the situation previous to
21  that?
22    A.   The previous situations, the doctor

Henderson Legal Services
(202) 220-4158

Raul Armand                                                    July 29, 2005

New York, NY



90

1  understanding, rather, that the pharmacist at that
2  time had the authority for actually placing any
3  orders for any of your products?
4      A.  No.
5      Q.  No, you don't know or, no, he didn't?
6      A.  Well, at the beginning, back in '99,
7  2000, there was a pharmacist and I would not talk
8  to him about that. I would talk to him more about
9  the medications, about any problems they had with
10 the medications.
11     Q.  Okay. Would you ever have any
12 discussions with the pharmacist about the price of
13 any of the products you were selling?
14     A.  No.
15     Q.  What about reimbursement for any of the
16 products that you were selling?
17     A.  I don't recall specifically. They may
18 have mentioned -- this gentleman may have
19 mentioned does that drug have a J-Code, or
20 something to that degree, but not specific.
21     Q.  Okay. Now let's talk about your visits
22 with the medical oncologist.

91

1      A.  Yes.
2      Q.  I believe you said that currently there
3  may be around 15 there.
4      A.  15.
5      Q.  Has that been about the same all the
6  time?
7      A.  It was maybe back then 12, 10 or 12.
8      Q.  And of these medical oncologists has
9  there been one or two individuals whom you've met
10 with the most?
11     A.  The way that I am able to interact with
12 this office is during the lunchtime hour I provide
13 a lunch. And depending on which doctors are
14 working on that day and which decide to have
15 lunch, they will come into a conference room very
16 much like this and they will have lunch, so that I
17 can talk to them. So they rotate.
18     Q.  Okay. What do you talk to them about?
19     A.  The medical information, the trials,
20 the studies, the protocols of the drugs that I
21 represent.
22     Q.  What about reimbursement for the drugs

92

1  that you represent, does that ever come up?
2      A.  It has.
3      Q.  In what context? .
4      A.  A lot of times the doctors, especially
5  back in the '90s, the late '90s and 2000 and all,
6  would be very interested if the drug was on what's
7  called compendia.
8      Q.  And what does that mean?
9      A.  From my understanding of compendia, is
10 a listing of the different drugs and it says that
11 the drug is efficacious based on clinical data on
12 the following types of cancer.
13     Q.  And how does that play into
14 reimbursement?
15     A.  From my understanding, that if the drug
16 is on a compendia it is -- the doctor's office is
17 able to be reimbursed for using it in that tumor
18 type.
19     Q.  Okay. And other than this concern
20 about whether or not a drug might be on a
21 compendium, is there anything else that would ever
22 come up in these meetings with medical oncologists

93

1  about reimbursement?
2      A.  Mostly concern about J-Codes, because
3  the medical oncologists understand that until a
4  drug has a J-Code they may or may not be
5  reimbursed at all.
6          So when we're talking here about
7  reimbursement the doctor's concern is -- since
8  they're mostly doctors, you know, that's their
9  primary focus, is the medical part. But they
10 understand that if they don't get reimbursed at
11 all for the drug -- and when I use the word
12 "reimbursement" I guess I'm trying to
13 understand -- that that's what I'm saying, when
14 they don't get reimbursed they either will not use
15 that drug or will have a concern about is that
16 drug reimbursed in ovarian cancer, for example, is
17 it reimbursed in breast cancer.
18     Q.  And aside from whether or not -- or
19 concerns about whether or not they might be
20 reimbursed at all, in your meetings with these
21 medical oncologists did the subject of the
22 quantity of reimbursement ever come up?

Henderson Legal Services
(202) 220-4158