Tab 5

Greg Keighley          HIGHLY CONFIDENTIAL          July 20, 2005
                            New York, NY

1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

In Re: PHARMACEUTICAL INDUSTRY     MDL DOCKET NO.

AVERAGE WHOLESALE PRICE            CIVIL ACTION

LITIGATION                         01CV12257-PBS

----------------------------------X

ALL ACTIONS

----------------------------------X

Wednesday, July 20, 2005

8:00 a.m.

HIGHLY CONFIDENTIAL DEPOSITION of GREG

KEIGHLEY, held at the offices of 875 Third Avenue,

New York, New York, a Certified Shorthand

(Stenotype) Reporter and Notary Public within and

for the State of New York.

Greg Keighley          HIGHLY CONFIDENTIAL          July 20, 2005
                            New York, NY

46

1  medications not given intravenously, all given at
2  a pharmacy?
3      A  Yes.
4      Q  What were your responsibilities as
5  a manager?
6      A  At UCB I had a defined group of
7  reps in the district that I would oversee. I was
8  the LA Orange County District Manager. It
9  changed a variety of geography, but in that
10 general area.
11     Q  Other than the job you just
12 described with Russ, Whitbey and UCB, which was
13 one company that just changed name over time --
14     A  Yes.
15     Q  Did you have any other work
16 experience, besides your work employment with
17 BMS?
18     A  Clarification it was Whitbey, not
19 Whitley.
20     Q  I understand.
21     A  No, that was from '89 to '98 and
22 then I picked up on this job in '98. So there

47

1  was no gap in between employment.
2      Q  Have you ever reviewed the
3  complaint in this case?
4      A  Reviewed the complaint, can you
5  clarify "review"?
6      Q  Have you ever seen the complaint
7  in this case?
8          MR. TRETTER:  Do you know what a
9  complaint is?
10         THE WITNESS:  I need
11 clarification.
12         MR. TRETTER:  The complaint is a
13 pleading. In this case it's a big
14 thick document that outlines what the
15 allegations of the plaintiffs are.
16         THE WITNESS:  No. I have never
17 seen the document, nor have I had
18 purview to it.
19     Q  Can you tell me what your
20 understanding is as to what this litigation is
21 about?
22         MR. TRETTER:  If you have some

48

1  understanding separate from what your
2  lawyers may have told you, you can
3  testify. If it's based on what your
4  lawyers told you --
5      A  My understanding coming into this
6  proceeding?
7      Q  Yes.
8      A  AWP concerns in a timeframe,
9  earlier than now, that included a group of drugs
10 and another terminology was it was a suit with a
11 variety of companies involved, and that was the
12 take-home message in that. I wanted to find out
13 where I fit in. So I wanted to find if I was
14 named as a defendant or an auxiliary figure, and
15 I was told I was not directly tied to this and
16 that was my understanding coming into this.
17     Q  You said it concerned AWP. Did
18 you know coming into this what the concern was
19 with respect to AWP?
20     A  No.
21     Q  We'll talk about your call on your
22 accounts. I know you testified earlier that you

49

1  tried to conduct a full office visit, I think you
2  called it, where you meet with various
3  professionals in the office?
4      A  Yes.
5      Q  What sort of information, speaking
6  in general terms, what sort of information do
7  your customers ask for when you are calling on
8  them?
9      A  It depends on the actual or the
10 specific interaction. Sometimes they will have
11 specific questions of me and I will answer them
12 to the best of my ability or have them sign a
13 form if I don't know. You don't bluff when
14 you're talking to physicians or professionals.
15 So I have them sign a form, and I get that
16 information from the medical services. That's an
17 occasional time where I get a call from an office
18 saying we need this.
19         It's usually the other way
20 around, where I initiate a conversation about
21 the drug that I'm promoting, and questions will
22 evolve from that. It's always clinical based.

Greg Keighley   HIGHLY CONFIDENTIAL   July 20, 2005
New York, NY

Page 50

1  Our company has always been one that wants to
2  promote our drugs with clinical data and that's
3  what I am given as our basis for presenting to
4  offices.
5      Q  What about your customers, do they
6  inquire about the cost of the BMS oncology drugs
7  you are promoting?
8      A  Infrequently.
9      Q  How infrequently would you say?
10     A  If I have a hundred interactions,
11 it might come up two or three times of a hundred.
12 Most physicians are interested in how your drug
13 works, will it work for their patients, and
14 they're focused on what's best for their
15 patients, and that's what I try to focus in on
16 with my offices.
17     Q  You said it would happen two or
18 three times out of a hundred. Do you recall
19 specific instances where you have been asked
20 about the cost of the drug you are promoting?
21     A  I'll give you some
22 generalizations, and it's usually a statement

Page 51

1  that they're making. Wow, that seems like a lot
2  of money or that seems to be a costly entity. I
3  have to say it is what it is. You can talk to
4  other people about it, but I'm the person
5  promoting the drug, and I didn't make pricing
6  decisions.
7          It's usually a statement of they
8  see it as a high cost, and it's nothing I can
9  combat. I have to say neuroagents cost more,
10 and if they have a concern to possibly talk to
11 somebody in the department that might be able
12 to ease their concerns. There's nothing I can
13 do when that happens.
14         It's usually a statement of
15 concern, but ultimately in most instances they
16 know that, you know, what, if I have the right
17 patient and they run out of clinical options,
18 it is an option. Most doctors come around to
19 what is best for the patient. That's how we
20 typically end a conversation, you know what,
21 your drug is an option if I have a patient in
22 need. I try to do right by the patient, I

Page 52

1  think most physicians do the same.
2      Q  The rate you gave me on cost. Is
3  that generalization over your entire career at
4  BMS. Has it been more frequent in previous
5  years, or has it changed over time?
6      A  It's changed over time. Our new
7  entity Erbitux is a costly entity, it's a
8  biologic. It's not chemotherapy. We're for the
9  first time in a biologic area, and those costs
10 are much higher than traditional chemotherapy.
11 So it's been the last two years that I have heard
12 this, "cost issue" come up more than before.
13     Q  Do you have access to BMS pricing
14 of the drug your promoting?
15     A  They tell us a per vial count,
16 whether it's a hundred milligram vial, we have,
17 you know, an a idea what the drug costs. It's
18 not a major focus of our interactions with
19 physicians.
20     Q  How is that information
21 disseminated to you, is that done -- well, let's
22 leave it at that.

Page 53

1          How does pricing information get
2  to you?
3      A  Sometimes there's updates.
4  Companies usually have a price increase in
5  January and they'll give us what the change has
6  been for our current drugs in terms of -- most
7  likely it's a hard copy.
8          That's how I remember receiving
9  years back. We do much more on E-delivery of
10 things, electronic documents, that show there
11 has been price increases. We're told if there
12 are price increases, if your account has
13 questions, please have them call their
14 distributor or OTN. They don't want us
15 fielding these issues commonly. They feel
16 that's not our job to be dealing with that.
17         But, usually, we get a "yearly
18 update" because that was the nature of the
19 business that there would be a price increase
20 and they would let us know that for our own
21 sake of understanding.
22     Q  That information would come to you

Greg Keighley     HIGHLY CONFIDENTIAL     July 20, 2005
New York, NY

**66**

1 knew they were physically at a location I could
2 contact. And it was basically this account has a
3 problem, Amy could you call them and try to -- I
4 didn't want to get intimate with the problems
5 that OTN or any issues OTN may have with a
6 customer. That was not my job to clarify those
7 issues.
8      I was helping out the
9 organization by letting them know there was an
10 issue, please get in touch with who had the
11 issue and try to resolve it.
12     Q   Do you recall what the issues were
13 that caused you to refer them to OTN or speak to
14 someone within OTN?
15     A   Problems with the LYNX machine,
16 delays in getting orders, generally you get 24
17 hours turnaround on an order, and offices rely on
18 that turnaround, misorders, you know, it usually
19 was around the delivery of drug to the office was
20 the concern.
21     Q   The physical delivery?
22     A   Physical delivery, got brand B

**67**

1 instead of C. We thought the machine was
2 ordering A, we got B. Those types of issue.
3     Q   You said the other resource you
4 would refer your accounts to who had questions
5 about the price of BMS drugs was Procert. What
6 is it Procert?
7     A   That's a program delivered by a
8 company called Access Med. They have a variety
9 of -- I think they deal with multiple companies.
10 But in our -- we have labeled this product called
11 Procert which is a reimbursement assistance line.
12 All the companies have something like in in
13 place.
14      They have two different
15 functions. One call in number is for access to
16 drug if a patient doesn't have insurance, try
17 to get them to call for things. It's a variety
18 of things, did the patient have insurance, and
19 they're interested in trying to get a patient
20 on drug, they call one number and that was --
21 they call that the RAP, Reimbursement
22 Assistance Program.

**68**

1      Procert is a product that once
2 you used the drug and you're denied from an
3 insurance agency, then they would assist in the
4 claim. Did they not mark a box? Did they do
5 something wrong?
6      And the Access Program was for
7 patients, indigent or otherwise, that fell
8 through the cracks, and their insurance
9 wouldn't allow them to get the drug. They
10 could possibly seek that as a therapy to get
11 the patient on therapy.
12     Q   One of the purposes was if an
13 account was -- if their claim for reimbursement
14 was denied, Procert would help them with the
15 appeal of that decision?
16     A   Yes.
17     Q   If a client had questions about
18 some aspect relating to the reimbursement for an
19 oncology drug you promoted, what was your
20 response to questions related to the -- we've
21 talked about costs. I want to talk about
22 reimbursement.

**69**

1      Did customers ask you about or
2 have questions about the reimbursement
3 available to them for the drugs you were
4 promoting?
5     A   As a rep I cannot guarantee the
6 reimbursement of a drug. That's out of my
7 purview, and nor have I ever been asked to do
8 that.
9      Any questions on reimbursement
10 we are asked to pass it on to Access Med and
11 deliver a number that seems applicable for that
12 particular patient, one of those three, Access,
13 RAP or Procert. Depending what I heard from
14 the office, if they got the wrong number for
15 the patient they could get referred to within
16 that call system. It was one company
17 delivering the three programs. I personally
18 would make no commitment as to the drug. It's
19 not my job.
20     Q   You said you make no commitments.
21 Did you have conversations with your customers
22 about reimbursement?

Greg Keighley     HIGHLY CONFIDENTIAL     July 20, 2005
New York, NY

Page 70

1    A   If they brought it up, yeah. I
2  wasn't proactive in that. I would try to respond
3  adequately to anything the account brought up to
4  me.
5    Q   Can you tell me, in general terms,
6  what were the concerns that you recall concerning
7  issues of reimbursement?
8    A   I could give you general, maybe
9  comments made to me.
10   Q   Sure.
11   A   An office might come to me and it
12  could be a nurse, even a doctor might come up to
13  me and say I have used drug A in this tumor type,
14  I'm very happy with it, I have a patient with
15  tumor type B, I have never used it in this
16  setting before, you know, what are the chances,
17  what is the ability to get this paid for or
18  covered for this patient B. And I would state to
19  them that falls outside of our indication or
20  label or whatever and I can't -- there's no
21  guarantee, but what you need to do is call
22  Procert or actually it would be RAP, this is

Page 71

1  where they're thinking about putting a patient on
2  and RAP would get all the information about the
3  patient and discuss with the doctor, you know,
4  yes, you have -- there's enough data to support
5  the clinical decision or there's not. Those
6  conversations I'm not privy to. I never get
7  updates from Access Med. They consider that
8  privy information.
9      Now a doctor, I might on a
10  follow-up call say, did you call RAP? Were you
11  pleased with the response? They may say, hey,
12  my office rep called RAP, and patient B is on
13  the drug and that might be a wonderful success
14  story. And sometimes they would come back and
15  say there's no data to support it, they said we
16  were going out on a limb, and it was a good
17  chance it would be denied and not covered. So
18  we're not putting the patient on it. So that
19  would be a fall-out consideration.
20   Q   What you are describing is a
21  situation where the client had questions about
22  their use of a particular drug would be eligible

Page 72

1  for reimbursement?
2    A   Right.
3    Q   Did customers ever have questions
4  about the level of reimbursement available on the
5  oncology drugs you were promoting?
6    A   I don't recall.
7    Q   You don't recall. I want to
8  clarify that answer. You don't recall anyone
9  ever having such a question?
10   A   I guess my question to you is:
11  What do you mean level of reimbursement? Define
12  level.
13   Q   Did a customer, anyone at any of
14  your accounts ever ask you, for instance, how
15  much they could get reimbursed for the use of a
16  particular drug?
17   A   Maybe a couple of times, a handful
18  of times.
19      Once, again, this issue as a
20  whole only came up very infrequently, and that
21  specific instance maybe even with less
22  frequency.

Page 73

1    Q   Do you understand how the
2  mechanics work? Do you understand how the
3  oncology drugs you were promoting were reimbursed
4  by the various segments of the healthcare
5  industry?
6    A   I have a general understanding of
7  the issues at hand, yes.
8    Q   Can you give me your general
9  understanding of that issue?
10   A   Once again, you like an A to Z to
11  see how a doctor gets from one issue --
12   Q   Let me break it down. If a
13  patient is on Medicare, and the drug is covered
14  by Medicare Part B, do you understand how that
15  drug is reimbursed by Medicare Part B?
16   A   In terms of AWP as a starting
17  point?
18   Q   Yes.
19   A   I'm familiar with the steps you
20  get to a bottom line number, yes?
21   Q   Can you tell me the steps as you
22  understand them?

Greg Keighley        HIGHLY CONFIDENTIAL        July 20, 2005
New York, NY

Page 74

1    A  As I understand — it's not
2  current way it's happening -- but AWP is a
3  starting point. They get reimbursed at a level
4  of AWP, which in the recent past was 95 percent
5  of AWP, and that gives you a dollar figure after
6  starting AWP times .95. And they get 80 percent
7  of that number which is an allowable, and then
8  the final 20 percent is secondary insurance or
9  patient co-pay and that's my general
10  understanding of how that works.
11    Q  Do you understand how the
12  reimbursement works if the patient is privately
13  insured?
14    A  That is a little bit more gray
15  area to me.
16    Q  Do you know if AWP is used as a
17  starting point in the allowable reimbursement
18  amount for the drugs you are promoting?
19        MR. TRETTER: The private
20  insurance?
21        MR. NOTARGIACOMO: Private
22  insurance.

Page 75

1    A  I'm only going to give you a
2  generalization because that's how it was brought
3  to me. Typically, private insurers will follow
4  Medicare's example, and that's my understanding,
5  that it would be a format very similar.
6        You know, from Blue Cross, Blue
7  Shield, I never knew the specific calculations.
8  I didn't bother myself with that. I tried to
9  keep a general understanding that this format
10  played a part in the majority of cases. If you
11  told me XYZ insurance company how did they do
12  it, I couldn't tell you.
13    Q  How did you come to this
14  understanding that you just explained to me on
15  the Medicare side and the private insurance side?
16    A  At meetings and such. They wanted
17  us to be aware of how our accounts deal with this
18  issue, from just an awareness standpoint.
19    Q  Can you remember at what meetings
20  this issue was discussed?
21    A  Not specifically. I can only give
22  you generalities. That it would probably be at a

Page 76

1  regional meeting scenario, and then possibly at a
2  district meeting, which was a smaller group of
3  people to just go over this.
4    Q  Do you recall any specific
5  regional meeting where this was discussed?
6    A  No. I have been to 20 plus
7  meetings, and it doesn't stand out as an issue at
8  a meeting. It was a half-hour of a three-day
9  meeting type of thing. One or two meetings might
10  have dealt with this. It was an inconsequential
11  portion of the meeting and the dissemination of
12  the meeting.
13    Q  Can you recall, other than the
14  general outline that you gave me, can you recall
15  what else was discussed about this issue during
16  the half-hour meetings?
17    A  No, I don't recall.
18    Q  Do you recall whether there was
19  any written material disseminated at the meeting
20  concerning this?
21    A  I can only — once, again, just a
22  generality, I don't specifically know of an

Page 77

1  instance. But at these meetings you're reviewing
2  Power Point presentations and a portion of
3  meetings you get a hard copy for your educational
4  purposes. That's generally how it's written out
5  to us.
6    Q  Did you ever keep copies of things
7  given out at regional meetings?
8    A  Not always. I keep it in a hard
9  file for some time, and I go through and look at
10  stuff. And if it's not applicable to current
11  products or what my educational needs are at the
12  time I throw it away. I don't keep every piece
13  of paperwork. It's just cumbersome.
14    Q  Searching for documents responsive
15  to this case, did you search whatever copies of
16  the regional meeting material that you had in
17  your possession?
18    A  I went through every subcategory
19  of file and looked for anything that appeared to
20  have the resemblance of information requested of
21  me, and looked at the whole body of work, and if
22  there was anything that had a slight mention of

Greg Keighley         HIGHLY CONFIDENTIAL         July 20, 2005
                      New York, NY

Page 90

1  AWP portion was almost an after thought. It
2  seemed to be like the back of the book type of
3  thing. Offices and doctors could know, can I
4  use this drug. I think that's what they use
5  this for. Can I use this drug with this tumor?
6  Is there enough data to support my clinical
7  decision to use this, and that is what they use
8  it for.
9            And, by the way, there happen to
10 be some AWP on the back. There was some
11 designation to AWP, because I think that was
12 kind of the uniform or universal number that
13 most people used. This was a third-party
14 organization.
15    Q    Was there other pricing
16 information, other than AWP?
17    A    No.
18    Q    Other than this pamphlet the ACCC
19 pamphlet, other than that, did you have access to
20 the AWP for the BMS oncology drugs you were
21 promoting?
22    A    Our company would give us updates.

Page 91

1  As I said, typically in January there would be
2  price increases, and we would get something
3  saying the following drugs had a price increase.
4  That was for our own, again, our own edification.
5  But if a company had a drug increase we could
6  say, yes, we did. Call OTN as to what your price
7  is. They felt that that was an appropriate level
8  of information to know.
9     Q    When they were giving you an
10 update on the price increase, did they provide
11 you with any change in the average wholesale
12 price of the drug, AWP?
13    A    I don't recall.
14    Q    Did you understand that there was
15 a difference between the reimbursement amount
16 available to your accounts for the drugs that you
17 were promoting and the price that they were
18 paying OTN or some other source for those drugs?
19    A    Did I realize there was one number
20 and then the number that they got -- what they
21 paid for what was one number and what they got
22 reimbursed for was another?

Page 92

1     Q    Yes.
2     A    Yes.
3     Q    Did you have a name for that
4  difference?
5     A    I have heard the word margin used.
6     Q    Is that a term or word you used to
7  refer to that difference?
8     A    In what setting?
9     Q    In your job as you made sales call
10 on your accounts?
11         MR. TRETTER: Are you assuming
12    that's come up? You have a
13    foundational question.
14    Q    Let me back up. In what setting
15 have you heard the term, that difference we have
16 been discussing, called the margin?
17    A    In two different settings. The
18 doctor might be proactive. And as I said this is
19 so infrequent that I could count on my hands in
20 the years the times the doctor has used the term.
21         They might say what is the
22 margin? And in the Bristol-Myers setting,

Page 93

1  strictly without customers around, we would be
2  told there is a margin to drug. That being
3  said, it was in my job description and told to
4  me on more than one occasion that that issue is
5  not to be discussed with physicians. It was
6  something where they -- if that came up and it
7  certainly was something where I had to be
8  reactive to because I wouldn't bring it up to a
9  physician. That wasn't my essence of why I was
10 making a call to a physician. I'm discussing
11 clinical information.
12         If they brought this issue up to
13 me that's where I would have to utilize the
14 matrix team, OTN, Procert if that seemed to
15 be -- or Access Med, I may use that as a
16 general term. It had a variety of subsets to
17 it.
18         I felt it was something where I
19 didn't want to get into discussing that issue.
20 It got me off of the course of my clinical
21 discussion, but it would occur and occurred
22 very infrequently, a handful of times where a

Henderson Legal Services
(202) 220-4158

Greg Keighley  HIGHLY CONFIDENTIAL  July 20, 2005
New York, NY

Page 94

1  doctor that was their issue at hand. And they
2  were proactive in terms of asking me. And, you
3  know, because I was told it was something I
4  should not be handling it was a pass-off type
5  of thing. You know, call this number, please,
6  and they can deal with this issue. And that's
7  how I was asked to disseminate information.
8      Q  Did you ever, when you were asked
9  by a doctor, what is the margin, did you ever
10 provide the doctor with a calculation of the
11 margin on any of the drugs you were promoting?
12     A  To the best of my ability, no, I
13 don't recall doing that.
14         MR. TRETTER: To the best of your
15     recollection?
16         THE WITNESS: Yes, sir, to the
17     best of my recollection.
18     Q  Do you ever remember seeing any
19 materials, not talking internally, I'm talking
20 about your interactions with your customers, any
21 calculations of the margins on any of the drugs
22 that you were promoting?

Page 95

1          MR. TRETTER: What distinction are
2      you drawing?
3      Q  You drew a distinction. You said
4  when I asked you the question, where did you hear
5  the term margin used.
6          You said, one, the doctor might
7  be proactive and ask you the margin. And, two,
8  you said, strictly in a BMS setting, without
9  any doctors around there may be some other
10 discussion. I'm not talking about the latter
11 I'm talking about the former.
12         MR. TRETTER: What was the
13     question then?
14     Q  The questions is: Whether in any
15 of those meetings where the term margin might be
16 used or the concept of margin might have been
17 brought up, did you ever see any calculation of
18 what the margin was in any of the drugs?
19         MR. TRETTER: Did the witness put
20     pen to paper, is that the question?
21         MR. NOTARGIACOMO: Whether he ever
22     laid eyes on any sort of calculation.

Page 96

1          MR. TRETTER: Like the doctor
2      doing a calculation?
3          MR. NOTARGIACOMO: Any way.
4      A  I don't recall a scenario such as
5  that where a doctor was -- it never seemed to be
6  an elaborative event. They would say, what is
7  it. I would pass it on and say I make X number
8  dollars on this one and drug B is this. That
9  just never -- I think doctors were cautious about
10 this. This might be a discussion with colleagues
11 but at a rep level they're very cautious of
12 having this discussion. I don't think they want
13 to want be seen as people that base their
14 clinical decisions based on the money they make.
15         I can only hypothesize it
16 happens at different levels. At a rep level
17 they would make a statement and I move it to an
18 issue where I felt I could answer it in a way,
19 that please call this line if you have a
20 question, and I try to move the question on.
21         It's outside of my ability. I
22 would told -- where my interaction was with the

Page 97

1  physician, try to get them on with the clinical
2  information and the issues of the drug itself
3  and you know. Those decisions, as far as AWP,
4  that had to be an issue the doctor dealt with.
5  It wasn't my job as a sales rep to try to get
6  them the answer right there. I never told them
7  this is what I do on this drug, I just don't
8  think that ever occurred.
9          MR. TRETTER: Let the witness the
10     witness was drawing on a napkin what
11     didn't upon calculation with spread,
12     margin, things like that.
13     Q  We have been talking about this in
14 the context of discussions with doctors. You
15 said earlier you made whole office calls, and you
16 had meetings with doctors, nurses and, I believe,
17 some of the business people in the office.
18     A  Sure.
19     Q  I want to ask the same question
20 with regard to the use of margin or the concept
21 of a margin with not just the doctors, but either
22 the nurses, and/or the business people in the

Greg Keighley    HIGHLY CONFIDENTIAL    July 20, 2005
New York, NY

### Page 154

1  interface with.
2  Q  Has that person been the same over
3  time?
4  A  It's been consistent over the last
5  18 months. This is another thing that was
6  brought to my attention or not. I don't know if
7  this person is continuous at the position since
8  two years ago. I can't tell you since Erbitux we
9  were made aware this person is our contact.
10 Q  What about the marketing advisory
11 group, do you know if that entity goes back the
12 entire time?
13 A  I don't know. It's only a guess
14 to say there's something to that effect.
15    I know there's a marking group,
16 that meets together. I know legal goes to it.
17 From a hierarchy sense of things, from a rep
18 sort of things, there's always representation
19 at the meetings.
20 Q  I'm asking whether the advisory
21 group itself has existed going back in time?
22 A  In some form or another whether it

### Page 155

1  was always called the advisory group, there's
2  some function in place that a group meets and
3  goes over issues.
4  Q  Other than the person you couldn't
5  remember who is a sales rep, can you name any
6  other members of the sales marketing group?
7  A  No, I can't.
8  Q  Is there an advisory group that
9  deals with issues related to reimbursement that
10 you know?
11 A  Not that I am formally made aware
12 of.
13 Q  Is there anywhere that you are
14 aware of that has a list of the advisory groups
15 that exists now or that existed in the past?
16 A  No.
17 Q  We've touched on this subject
18 previously, but I want to go over it in more
19 detail. What were BMS policies, if any, relating
20 to the discussion of the margin that we have been
21 talking about with customers?
22

### Page 156

1  of.?
2     MR. TRETTER: If any, first of all
3  is there any policy?
4     MR. NOTARGIACOMO: Yes. Was there
5  any policy at BMS concerning whether to
6  discuss issues related to
7  reimbursement, let's start with that.
8     MR. TRETTER: With an office?
9  A  Can you -- a formal policy such as
10 a mandate marketing.
11 Q  I won't characterize it. Was
12 there a policy that you were made aware of that
13 related to, in any way, the discussion of
14 reimbursement issues with physicians or their
15 offices?
16    MR. TRETTER: Can you answer the
17 question.
18 A  With the clarification we had a
19 program called Practice Efficiencies. And that
20 wasn't a direct discussion of margin, but that
21 could be characterized as something that fits the
22 area that was brought down from the ADBAs. We

### Page 157

1  had a program called Practice Efficiency.
2  Q  When a say "program", what do you
3  mean program?
4  A  It was something we were made
5  aware of at a meeting, and it was something we
6  could possibly use in an office if needed to
7  or -- it was left at our discretion. When they
8  give us a marketing plan, they give us a variety
9  of things to utilize and it's the reps'
10 discretion to use any and all of it. It depends
11 on the office.
12    Having a lot of things at your
13 disposal allows you to pick and choose what is
14 appropriate for the office. It was a small
15 program that lasted four, six months. And it
16 was over all termed a Practice Efficiencies
17 Presentation.
18 Q  How was that material presented to
19 the sales reps?
20 A  Once, again, at a regional
21 meeting, PowerPoint presentation and there may
22 have been a subsequent district meeting to go

Greg Keighley          HIGHLY CONFIDENTIAL          July 20, 2005
                              New York, NY

Page 158

over the information again, but at least once it was presented to us.

Q This Practice Efficiency Program, do you know what department at BMS created this program?

A I can't say who created it. I can say who disseminated the information came from that Associate Director of Business Alliance, that was the division that gave the information to us.

Q You said the Practices Efficiencies program lasted four to six months, do you remember the time period?

A That's around 2000, 2001. And I can't give you an exact timeframe in terms of the length of when it first started and when it ended.

We rarely get defined end points in terms of stop discussing an issue. We're always told this is our marketing plan, but that doesn't mean you can't use information from a prior marketing plan. There's no finite

Page 159

stops in terms of a discussion from a final issue.

Q That leads me to the question. You said that the program lasted four to six months, what does it mean "the program lasted", does that mean the program is no longer available to you?

A No. The emphasis and interest waned. It went away and it was no longer -- when you get a marketing plan your manager in your discussions and work sessions will say are you implementing this speaker program. When the speaker program series comes up, and all the events have taken place, then that's not an issue with your manager.

This had a defined period of where she would ride with you, and if I were implementing this and she would suggest and she said ideas of may be working with your accounts, maybe you could utilize this bit of information. And at some point in time she stops mentioning it, and, you know it's gone by

Page 160

the wayside. You forget things, things you don't know. You forget you have access to them and they go into oblivion.

Q Was there a policy decision made or are you aware of any policy decision to stop using the information that was presented in the Practice Efficiency Program?

A I don't recall any substantive -- I only used it a handful of time, couple of times, I don't know why I stopped doing it. It was something specific the company provided me that made the emphasis in my call or change in my call. I can't recall -- we're not doing this type anymore -- that rarely, rarely happens.

When do get things where the FDA has deemed a piece, there's a wording that they caught and we have to cease and desist using it, and we throw it away, and we get a new one with the wording. And this is the only time we get the finite pieces and stop using it and it's usually an FDA mandate where they say you're not to use it, throw it away. And we

Page 161

don't get that from a company aspect, stop talking about this, they just highlight new things to start discussing.

Q I know you said 2000, 2001 they made this PowerPoint presentation, in what context? What sort of meeting?

A At least at a district meeting it most likely was at a regional meeting.

Q To the best of your recollection, can you recall whether it was 2000, 2001?

A It's a guess. I don't know. It either happened at the last POA of 2000 or one of the first of 2001. I don't recall the date.

Q Was it one person who made a presentation about the program?

A In terms of an initial presenter I can think of one person.

Q Who is that?

A Irene Paulin. How many people were involved in this program, I don't know. But that's the only person I recall disseminating the information for the first time.

Greg Keighley     HIGHLY CONFIDENTIAL     July 20, 2005
New York, NY

**Page 166**

1  that was the only time --
2      MR. TRETTER: Of your
3  recollection.
4      A   Recollection, sorry.
5      Q   And never occurred before that?
6      A   Not to my recollection.
7      Q   Were there ever any discussions
8  about whether or not to discuss reimbursement
9  issues with your clients prior to the institution
10 of the Practice Efficiency Program?
11     A   Can you state that again.
12     Q   Were there any discussions at any
13 meetings internally at BMS where the issue of
14 discussing reimbursement issues with your doctors
15 came up?
16     MR. TRETTER: What he's asking is,
17 now he's getting to the policy
18 question. Were there any rules,
19 regulations thousand shalt never
20 discuss reimbursement with your
21 customers by the powers that be?
22     A   I think there was a general

**Page 167**

1  statement that, this is not the essence of your
2  call that you are never -- you should not make it
3  your focus to bring the subject up. This should
4  not be the first thing out of your mouth. There
5  shouldn't be a proactive setting until you are
6  reacting to a situation or scenario where the
7  doctor is making mention of something where they
8  have a concern with.
9      We would never go in on an
10 account with the sole purpose or even the
11 purpose of bringing this issue to the
12 forefront.
13     MR. TRETTER: This issue being
14 reimbursement?
15     THE WITNESS: Yes. This was not
16 our function, our call to duty. It was
17 always get back to the patient and get
18 information the doctor needs to treat
19 the patient. That's our sole function
20 and that in being a person who can
21 hopefully, if an account has a concern
22 get them to the right person in the

**Page 168**

1  organization. This was a tool, one of
2  many that we had access to.
3      Q   When you say "this", what are you
4  talking about?
5      A   The Practice Efficiency Program
6  was a tool that was given to us. One of many and
7  nor was it asked of us to make this the primary
8  reason or focus for a sales call for any reason.
9      Q   You said there was a general
10 policy that discussion of reimbursement issues
11 was not to be the primary or first focus of your
12 calls?
13     A   Right.
14     Q   When you said that, were you talk
15 the time prior to the Practice Efficiency Program
16 or the time up to and including --
17     A   This was never, to the best of my
18 recollection, we were not to be proactive in our
19 discussion with accounts on any sub-issue
20 associated with reimbursement. That has never
21 been a focus -- or they wanted a percentage given
22 that 50 percent of your calls to be the focus --

**Page 169**

1  there never was any delineation as to that. We
2  were made aware this issue can come up, this is
3  how it comes up and this is how you deal with it.
4  Use your matrix team, use the people that have
5  the auxiliary functions to help them, that's how
6  we were told to function.
7      Q   Where were you told to function in
8  that way?
9      A   A variety of ways, district
10 meetings, every business unit had its presence at
11 meeting. You had legal there, the medical
12 services department that talked about medical
13 issues, you had all these divisions of the
14 company that you knew they had time set aside for
15 at a meeting to discuss what they were doing.
16 You know it existed within the organization.
17 They told you these are the issues we deal with,
18 if they come up have your account call us. It's
19 a way of doing business over time. It's never
20 changed. The people responsible have changed,
21 but the divisions have been there, and we knew we
22 could call them up if we had an issue.

Henderson Legal Services
(202) 220-4158

Greg Keighley     HIGHLY CONFIDENTIAL     July 20, 2005
New York, NY

Page 266

1  doctors.
2      I asked for additional examples
3  and he said as qualified by very
4  sensitive, I would say no, but there
5  made have some who made comments. I
6  asked him then who made comments. Let's
7  not be so narrow, let's broaden. You
8  brought up the fact that there were two
9  practices where he used the efficiency
10 program. And I wanted to speed things
11 along, so I exempted them out. And then
12 I asked who else may have made comments
13 other than the four either practices or
14 physicians we have identified so far.
15     A  I need to clarify. There are a
16 lot of quips that someone can say when you come
17 out with something. And this is getting to a
18 timeframe that I think is out of the analysis
19 because our drug Erbitux is not in the realm
20 here. I didn't get wow, that's expensive. That
21 terminology didn't exist.
22     It's a very infrequent amount,

Page 267

1  that's the sum total of doctors in essence of
2  what we're discussing timeframe-wise that had
3  any portion of a conversation that might allude
4  to this. It was, you know they make general
5  terms, cancer therapy is getting expensive.
6  You might say the doctor is sensitive to drug
7  costs, but I can't say it's just my drug.
8      Cost is an issue and I could say
9  in seven years of time, maybe half of my
10 doctors have made one-line sentences relating
11 to general issues. So for me to point out four
12 years ago this one doctor said this one thing,
13 I don't think amounts to anything in terms of
14 what we're trying to discuss.
15     I had two doctors that standout
16 in my mind; one was a hearsay, one was a doctor
17 coming to me. That was literally two times of
18 hundreds and hundreds interactions. We're
19 talking a snippet, snippet of time. That
20 they're brought to the surface in front of me
21 which is the only thing I can discuss.
22

Page 268

1      Exhibit Keighley 004. You review it and tell me
2  what it is.
3      A  This is one document, a PowerPoint
4  presentation in its original form. That was
5  called a practice efficiency, that's how it was
6  presented to us. This is a workshop at a
7  regional meeting and it was presented to a group
8  of reps and managers that were attending this
9  meeting and then we got a hard copy associated
10 with it, either at the meeting or sometimes
11 afterwards.
12     Q  Would this be the PowerPoint
13 presentation given by Irene Pollin or something
14 different?
15     A  This she was involved. I believe
16 she gave the initial presentation to a group of
17 people, yes.
18     Q  When you received this copy,
19 either electronically or in paper – did you
20 receive it in electronic or paper?
21     A  I don't think that was the first
22 transmittal. I think we had a hard copy in front

Page 269

1  of us at a meeting that we could go through and
2  take notes on and see it in front of ourselves.
3  I think the first way that we got this was a hard
4  copy.
5      Q  Subsequently you received a hard
6  copy?
7      A  At some point after the initial
8  presentation, yes.
9      Q  Did you see anyone else besides
10 Irene Pollin give this presentation, you
11 indicated she had given the initial presentation.
12 Was there a subsequent presentation?
13     A  Not of the same material. There
14 may be references made by other individuals
15 regarding this, but not another rehashing of the
16 information.
17     Q  Am I correct in this information,
18 this form, is not a form that you would have
19 had -- is this something you would have shared
20 with your accounts or was there another document
21 that was produced as part of the Practice
22 Efficiencies and Quality Care Workshop that you

Greg Keighley     HIGHLY CONFIDENTIAL     July 20, 2005
New York, NY

270
1 would leave with your accounts?
2    A   This was a stand-alone
3 presentation that we would verbally give on an
4 account. If they're taking notes on the side
5 about it, that's their own doing. I didn't
6 physically make copies to leave off with the
7 office. This is such a general kind of overview,
8 it was just to bring the thoughts to the audience
9 and that was it. There was no leaving off of
10 forms and utilize this form in your office. That
11 was not the essence of the program.
12    Q   Was there any written information
13 that was part of the Practice Efficiency Program
14 that you were provided to leave with physicians?
15    A   I don't recall.
16    Q   So you don't recall whether that
17 ever existed?
18    A   I only can surmise that in the one
19 or two instances where this may have happened in
20 my territory, I did not physically leave off
21 these items, nor was I asked to leave off
22 information.

271
1    Q   Can you turn to Page 2 of that
2 document. There are a number of bullet points
3 there that seem to indicate differing years.
4       Do you understand what is being
5 portrayed there, 1990, '94, '99 and '02.
6    A   It's a historical background of
7 how doctors were reimbursed. In 1990 it was AWP
8 plus a percentage, in 1994 went to AWP. It's a
9 historical perspective. 1999 it went to AWP
10 minus a percent, and this is happening some time
11 in 2001. I assume this was put together in 2000
12 because we're referencing 2001. We don't know
13 when this is going to happen. This is some time
14 in 2000, we don't know as an industry where
15 things are going.
16    Q   Do you see how, I guess it's the
17 right-hand side, it says "co-pay 20 percent" and
18 then in larger numbers "co-pay 20 percent" and in
19 each successive line it gets larger and larger.
20 Do you know what is meant to be conveyed by the
21 increasing font size?
22    A   I can only guess the intention of

272
1 the presenter here is the co-pay becomes a larger
2 component as time goes on, on how important it is
3 to get that collected. That's the only
4 assumption I can make.
5    Q   Can you turn to the page that's
6 entitled "Net Revenue Factors", which is Bates
7 numbered 2309?
8    A   Okay.
9    Q   You see there are four different
10 bullet points under collection rate?
11    A   Yes.
12    Q   The second and third are
13 percentage charge versus reimbursement and
14 reconciliation colon co-pays. Do you know what
15 the reference to percentage charge versus
16 reimbursement is?
17    A   Not right offhand. Percentage
18 charge is something that is not in my lexicon.
19 I'm not sure what that is a reference to versus
20 reimbursement. That is a foreign concept for me.
21    Q   The next says, "reconciliation
22 colon co-pays". Is that an indication that

273
1 co-pays are an important part of how the revenue,
2 an important factor to consider when considering
3 revenue of your clients?
4    A   Well, it's under the category of
5 collection rate. It has to do with the
6 collection rate of co-pays, beyond that I cannot
7 answer.
8    Q   Can you go two more pages in, it
9 identifies five key terms and one is, Average
10 Wholesale Price and it says, calculated by
11 pricing companies, i.e. Red Book, Medi-Scan and
12 First DataBank, accounting for distribution and
13 overhead costs."
14       Is that a definition of average
15 wholesale price that you had seen at BMS any
16 place other than this presentation?
17    A   Verbally I heard of Medi-Scan, Red
18 Book, and First DataBank, but the terms weren't
19 significant in terms of hearing it on a daily
20 basis. I was aware of those terms as being major
21 third-party organizations that provide the data.
22 That's all I was aware of, that they were the

Greg Keighley  HIGHLY CONFIDENTIAL  July 20, 2005
New York, NY

### 274

1  source of the AWP, beyond that I didn't have a
2  familiarity of what it meant, how it was derived.
3      Q  Putting aside the parenthetical
4  reference, had you seen the definition
5  otherwise --
6      A  No. Not with that terminology,
7  no.
8      Q  Do you have an understanding today
9  whether that is an accurate definition of average
10 wholesale price?
11     A  I don't know if that's the
12 correct one. I would understand that average
13 wholesale price meant AWP. It never went beyond
14 that. My personal understanding is it was a
15 term -- it was what it was. And I didn't seek
16 greater understanding and no one disseminated any
17 greater level of knowledge of AWP to me.
18     Q  Turning to page Bates numbered
19 2312. Top bullet point "Most payers use AWP as a
20 basis for calculating allowables, is that
21 consistent with your understanding of how AWP is
22 used?

### 275

1      A  At that time or currently or
2  always?
3      Q  If you have a different
4  understanding over you can tell me?
5      A  Over time that's my understanding,
6  yes.
7      Q  Can you turn to the page,
8  "Medicare Allowables Taxol," Bates 2315.
9      When you presented the Practice
10 Efficiency Program information to the two
11 customers that you testified to earlier, did
12 you go through any of the numbers on this page
13 or the next?
14     A  Not specifically. I can't recall
15 the specific need at the time. There may have
16 been greater emphasis on one-page depending on
17 the audience. If I'm talking to billers, I'm not
18 looking at this page. It depended on that moment
19 in time. I wasn't told I need to spend 10
20 seconds on a particular slide. I can't answer
21 the amount on emphasis I gave this or if I
22 skipped over it. There was no format I was told

### 276

1  to give the presentation. This presentation was
2  to help the needs of the office, and if they said
3  oh, this is interesting, I would spend time on
4  it. Oh, I didn't know AWP -- it was tailored to
5  the needs of the office.
6      Q  I'm asking you, specifically, what
7  your recollection is?
8      MR. TRETTER: Sitting here today,
9  do you have a recollection of going
10 over this page?
11     THE WITNESS: Not specifically,
12 no.
13     Q  Would you agree with me looking at
14 the math, and I can walk you through, it says
15 Medicare pays 80 percent. That's represented,
16 and this is for Taxol $138.80 and it says OTN
17 cost 131.70. If one of your accounts was
18 purchasing Taxol for 131.70 and was being
19 reimbursed from Medicare for $138.80, the margin
20 just on the 80 percent now was $7.10 to the
21 practice group.
22     MR. TRETTER: Just on those two

### 277

1  numbers.
2      MR. NOTARGIACOMO: Yes?
3      MR. TRETTER: Not on anything
4  else?
5      MR. NOTARGIACOMO: Taking one
6  number and subtracting the next.
7      A  Yes.
8      MR. TRETTER: That's
9  mathematically true.
10     Q  You would agree, would you not, if
11 the co-pay were to be collected by the practice,
12 a co-pay of $34.70 would greatly increase the
13 margin available to the practice group on that
14 particular administration?
15     MR. TRETTER: Objection to the
16 form.
17     A  The analysis is the analysis that
18 the co-pay is something they're suppose to
19 legally bill for. It's part of the equation.
20 It's 20 percent -- those numbers are there.
21 There is not slight of hand. Yes, the co-pay is
22 $34.00 and yes, if you take a baseline of $7, and

Greg Keighley         HIGHLY CONFIDENTIAL         July 20, 2005
                         New York, NY

278

1  add $34 it goes up. It is what it is.
2      Q  Collecting the co-pay was
3  important, at least in part because in this
4  instance and in this example, the entire co-pay
5  was added to the margin available to the
6  practice?
7          MR. TRETTER: Objection to the
8  form. Based on the looking at only
9  these numbers, you collect 34.70 more
10 than you would collect if you collect
11 the co-pay. The question is margin can
12 take into account lots of other things,
13 services, waste, storage. It depends
14 on lots of things.
15         MR. NOTARGIACOMO: That is not to
16 be debated here nor determined. I'm
17 simply asking the question about the
18 $34.70, the $34.70 is in excess of any
19 amount paid for to OTN by the account.
20         MR. TRETTER: My problem is: You
21 want this witness to do something to
22 buttress your case as opposed to

279

1  reading the document.
2          Objection, the documents speaks
3  for itself.
4          Do you have question about the
5  witness' knowledge as opposed to use him
6  to bounce the document off of, go right
7  ahead. This seems to be, at this late
8  hour, not an appropriate line of
9  questioning.
10         MR. NOTARGIACOMO: My deposition.
11 Can you read the question back I asked
12 before.
13         (The requested portion of the
14 record was read back.)
15     A  It's an analysis that a co-pay is
16 a co-pay. They are demanded to collect a co-pay,
17 I can't add anything beyond that. And if you add
18 34 to seven yes, it's more than seven. There's
19 nothing more I can state about that.
20         A co-pay is part of the equation
21 in this analysis. It's part of what they do.
22 They collect co-pays. They have secondary

280

1  insurances. It's a function of how business is
2  done, and I don't think I can comment any
3  greater than that.
4      Q  Turn to the next page Medical
5  Allowables, Paraplatin, and quickly going through
6  the math, Medicare pays $88.89, it's costs an OTN
7  customer $89.83. Which means just accounting for
8  the Medicare payment of 80 percent, the practice
9  would loss and that's all they receive, they lose
10 $1.06?
11     A  Yes.
12     Q  If they didn't collect the co-pay
13 they would be out of pocket $1.06?
14     A  Yes.
15     Q  Can you turn four pages more to a
16 page entitled, Physician?
17     A  Okay.
18     Q  Actually turn to the page before
19 that Practice Efficiency Model. Can you tell me
20 what the bottom entry is, "BMSO Partners
21 100 percent guarantee for greater than 70 percent
22 patients," what is that a reference to there, if

281

1  you know?
2      A  At this timeframe the partners
3  meant OTN, Access Med, BMS, sum total. At that
4  point in time the compendia listings for both
5  drugs resulted to 70 percent of patients that
6  come through the door, 70 percent could get the
7  drug. That means 30 percent didn't have the
8  tumor type where these drugs work. They fit in
9  line with the drug usage met 70 percent of their
10 needs.
11         And the 100 percent guarantee
12 meant that if you used it for this 70 percent
13 of patients you would get reimbursed because it
14 had a compendia listing. That was a reference
15 to a compendia listing.
16     Q  The guarantee is if you're using
17 it for the patients that fall into that
18 70 percent, you're going to get reimbursement?
19     A  Yes. There's significant clinical
20 data to support your decision with that 70
21 percent of patients.
22     Q  The next page entitled Physicians.