UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) MDL No. 1456 ) ) ) Civil Action No. 01-12257-PBS ) |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) Judge Patti B. Saris ) ) ) |

**TRACK 1 DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR RENEWED MOTION TO STRIKE THE EXPERT
TESTIMONY OF DR. RAYMOND S. HARTMAN**

The Track 1 Defendants respectfully submit this memorandum in support of their renewed motion to strike the expert testimony of Dr. Raymond S. Hartman pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Preliminary Statement

In Case Management Order No. 20, the Court directed the parties to file *Daubert* motions by July 14, 2006. Defendants filed a *Daubert* motion to preclude Dr. Hartman's direct testimony in connection with Classes 1 and 2 on June 16, 2006, and a second *Daubert* motion in connection with Class 3 on July 14, 2006. Plaintiffs never responded to those motions.

At the final pre-trial conference on October 31, 2006, the Court stated that it would consider the *Daubert* issues in connection with Dr. Hartman's testimony at trial. That testimony has confirmed everything defendants stated in their initial *Daubert* motions -- and more. We submit this memorandum to update our previous *Daubert* motions with citations from the trial record.

Among other things, the evidence at trial establishes that:

(1) Dr. Hartman's 30% "expectation" yardstick is not based on payor expectations; in fact, he never attempted to determine payor expectations.

(2) Neither Medicare nor private payors had an expectation that AWPs exceeded ASPs by a reasonably predictable amount, and they understood that spreads could often exceed 30%.

(3) Payors do not consider reimbursement on a drug-by-drug basis; rather they focus on the impact of overall reimbursements on achieving their objectives of attracting physicians to their networks; incentivizing physicians to treat patients outside of the

hospital; and cross-subsidizing inadequate reimbursements for services --  none of which Dr. Hartman considered in his analysis.

(4)     In reaching his conclusions on causation, Dr. Hartman did not attempt to determine whether reimbursements in the "but-for" world would be any different from reimbursements in the real world.

(5)     In reaching his conclusions on damages, Dr. Hartman ignored factors that would have a significant -- but as yet unquantified -- impact on the amount of damages.

Since Dr. Hartman has already testified, defendants can understand why the Court might be tempted to deny the motion and consider his testimony for what it is worth.  The problem with that approach is that Dr. Hartman's testimony is so flawed in so many ways that even considering it raises the possibility that the finder of fact was influenced by inadmissible testimony.  Dr. Hartman's testimony is not worth anything, and it should be stricken so this case can be decided on the basis of admissible evidence.

## Statement of Facts

Plaintiffs called Dr. Hartman as their chief economic expert.  (11/20/06 Tr. 8-9.) Although he testified that he has spent "the last five to ten years doing almost exclusively healthcare economics" (id. at 9), most of that work has been performed in connection with litigation (Hartman Direct Test., Attach. A), including more than 10 cases for plaintiffs' law firm. (11/20/06 Tr. 105.)  While Dr. Hartman has written several articles on the tobacco litigation and antitrust issues in pharmaceutical markets, Dr. Hartman has no special background or training that qualifies him as an expert in healthcare economics.  (Id. at 103-05.)

Throughout his testimony, Dr. Hartman speculated about issues that he clearly knew nothing about.  For example, the first section of Dr. Hartman's written direct testimony

was devoted to Medicare (Hartman Direct Test. ¶¶ 7-18), even though he admitted at his deposition that he is not an expert on the statutory history of Medicare. (11/20/06 Tr. 107-09.) He then demonstrated his own lack of expertise by claiming that, beginning in January 1998, Medicare regulations required that reimbursement be based on the lower of 95% of AWP or the acquisition cost of a drug, when in fact the regulation (which he apparently had not read) states that reimbursement is to be based on the lower of 95% of AWP or the doctor's "actual charge" <u>to the</u> <u>patient</u> for the drug. (<u>Id.</u> at 110-12; DX 1852; DX 2640.)

The central point of Dr. Hartman's testimony was his 30% yardstick. According to Dr. Hartman, payors had an expectation that the difference between AWPs and ASPs, or "spread," did not exceed 30%. (Hartman Direct Test. ¶¶ 95, 148; 11/20/06 Tr. 58.) Where spreads exceeded 30%, Dr. Hartman found liability and causation, and he calculated damages based on the extent to which spreads exceeded his yardstick. (11/21/06 Tr. 23, 27, 77.)[1]

Contrary to what he initially said he was going to do to determine payor expectations, Dr. Hartman did not conduct a survey of payors to determine what they believed. (11/21/06 Tr. 27.) Nor did he talk to any payors before arriving at his 30% yardstick. (<u>Id.</u> at 28-29.) Rather, Dr. Hartman relied on three surrogates to determine payor expectations: (1) comparator drugs; (2) publicly available information on spreads; and (3) contracts. (<u>Id.</u> at 34-35.) None of those surrogates provides a basis for determining market expectations.

With respect to comparator drugs, Dr. Hartman looked at the spreads on drugs that do not face competition and compared them to the spreads on drugs that do face competition.

---

[1] Dr. Hartman conceded that Medicare had the same expectations as private payors (11/20/06 Tr. 118-20), but -- relying on what he called "the plain meaning rule" -- he used a different yardstick for Class 2 and found liability and causation, and calculated damages, whenever AWP exceeded ASP by any amount. (<u>Id.</u> at 88.) On redirect, he provided an alternative analysis for Class 2 using a series of threshold yardsticks, including 30%. (PX 4029 at 104.) On Class 3, Dr. Hartman did not calculate damages for multi-source drugs because he assumed that MAC pricing was in place. (Hartman Direct Test. ¶ 155(a) and (b).)

3

(11/21/06 T. 35-36.)  This was different from what he said he was going to do in his class certification report, where he indicated that he would use drugs from before the class period as well as drugs that were not subject to the alleged fraud as comparator drugs.  (Id. at 35-36.)  Since it is undisputed that competition affects spreads, Dr. Hartman's theory would only make sense if payors do not know that fact.  (12/18/06 Tr. 93, 103.)  As Dr. Berndt found, however, payors understand that there are "considerable" spreads for drugs that face competition, and there is extensive evidence corroborating that conclusion.  (DX 1275, ¶ 52; 11/21/06 Tr. 39; Killion (BCBS/MA) Dep. Tr. 122, 126; Cannon (IHC Health Plans) Dep. Tr. 35-36; Herbold (CIGNA) Dep. Tr. 85-86; Kenney Dep. (Harvard Pilgrim Health Care) Tr. 12-13, 15.)[2]

With respect to publicly available information on spreads, the very documents that Dr. Hartman relied upon depicted spreads in excess of 30%.  For example, a 1992 OIG report on which Dr. Hartman relied clearly stated that there are spreads in excess of 400%.  (DX 1053, App. III; 11/20/06 Tr. 123.)  An October 1996 letter from Ven-A-Care to Medicare discussed spreads of "more than 500 percent and, in some instances, more than 1,000 percent," and the exhibits to that letter identified the ASPs of approximately 50 drugs, including many of the drugs at issue in this case.  (DX 1881; 11/20/06 Tr. 124-25; DX 2631; 11/21/06 Tr. 14-17.)  A 1996 article in Barron's stated that generic drugs could be purchased at discounts of 60% to 85% below AWP, which in Dr. Hartman's nomenclature translates into spreads of 250% to more than 400%.  (DX 2641 at 2; 11/21/06 Tr. 42-43.)  A 1997 OIG report depicted spreads of up to 900%.  (DX 1075; 11/21/06 Tr. 20-21.)  While Dr. Hartman attempted to dismiss this evidence on the ground that it related to multi-source drugs only, these documents demonstrated that spreads often exceeded 30% on single-source drugs as well.  (Bell Direct Test. Apps. D and E;

---

[2] Exhibits 2, 5, 6 and 7 to the Edwards Declaration ("Edwards Decl.") submitted herewith.

4

11/28/06 Tr. 123-24; DX 1075 at 17; 12/18/06 Tr. 93-94, 104-07.) In addition, there can be no doubt that payors had knowledge of these spreads because many of them purchased drugs at prices that were similar to Dr. Hartman's ASPs. (DX 1374-76; DX 1378-1403; DX 2001.)[3]

With respect to contracts, Dr. Hartman's theory was that the reimbursement amounts reveal the expectations of payors as to acquisition costs. (11/21/06 Tr. 44.) He admitted, however, that this was an assumption, and the contracts do not say anything about expectations. (Id.) His testimony also assumed that payors believe there is a consistent relationship between AWPs and acquisition costs. (11/21/06 Tr. 52-55.) One of the documents that Dr. Hartman relied on for this proposition, the 1992 OIG report, explicitly states that "AWP is not a reliable indicator of the cost of a drug to physicians." (DX 1053 at 2, 5, 11.) There was also substantial evidence that TPPs did not believe there was a consistent relationship between AWPs and acquisition cost. (DX 1268; Spahn (Anthem Blue Cross/Blue Shield) Dep. Tr. 97-98; Lemke (Humana) Dep. Tr. 123-24; Wert (Health Net) Dep. Tr. 35-37.)[4]

Furthermore, numerous TPPs testified that they do not consider drug reimbursement on a drug-by-drug basis; they focus on reimbursement levels overall. (Beaderstadt (John Deere) Dep. Tr. 76-77; Ellston (Union Labor Life Ins. Co.) Dep. Tr. 89-90; Lemke (Humana) Dep. Tr. 67-68; Spahn (Anthem Blue Cross/Blue Shield) Dep. Tr. 59.)[5] Dr. Hartman acknowledged that payors use profitability to attract providers to their networks and encourage doctors to treat patients outside of the hospital; and payors at times pay more for drugs as a way of cross-subsidizing underpayment for services (11/21/06 Tr. 45-47) – but he did not

---

[3] Dr. Hartman pointed out that these purchases were for HMOs owned by payors, and he speculated that this knowledge may not have been communicated by the HMO staff to the reimbursement staff, but he conceded that "One would expect that large profit-maximizing entities that purchase physician-administered drugs would be well-informed and sufficiently economically agile to exploit such information and negotiate reimbursement rates to ASPs (rather than off AWP) with their network providers." (11/21/06 Tr. 33-34.)
[4] Edwards Decl. Exhs. 8, 11 and 12.
[5] Edwards Decl. Exhs. 1, 3, 8 and 11.

5

take any of these factors into account in his analysis.  He did not consider the impact of the objective of attracting physicians to a network on physicians' profit margins.  (11/21/06 Tr. 45.) He did not analyze the impact of encouraging doctors to treat patients outside of the hospital on how much payors are willing to pay.  (Id. at 46.)  He did not consider cross-subsidization -- indeed, he was instructed by counsel not to do that.  (Id. at 46-47, 50, 56-57.)  He did not analyze payor competition for physicians.  (Id. at 55-56.)  Nor did he analyze how payors negotiate with physicians.  (Id. at 56.)  In addition, he did not conduct a formal analysis of physician market power; he did not analyze the impact on prices of competition among physicians; and he did not analyze the profitability of provider contracts.  (Id. at 56-58.)  He has not even looked at any provider contract to determine what the overall margin was on drugs and services.  (Id. at 58.)

Defendants' experts have considered these issues and based their opinions on depositions, documents and other admissible evidence.  For example, Dr. Gregory K. Bell, an industry expert, testified that payors and providers do not consider reimbursement on a drug-by-drug basis; rather, they focus on reimbursement levels overall.  (Bell Direct Test. ¶¶ 31, 71.)  He also testified that both Medicare and private payors understood the differences between AWP and acquisition costs when they devised their reimbursement approaches.  (Bell Direct Test. ¶¶ 40-57, App. D and E; 11/28/06 Tr. 105-35.)  In addition, he pointed out that competition has a significant impact on reimbursement amounts -- both competition among insurers for patients and competition among physicians for insurers.  (Bell Direct Test. ¶ 72; 11/28/06 Tr. 64-65.)  Dr. Bell also noted that payors have a strong incentive to encourage physicians to administer drugs in the office, as opposed to the hospital where it is more expensive, and that cross-subsidization

has an impact on reimbursement. (Bell Direct Test. ¶¶ 74-76, 90-92; 11/28/06 Tr. 65-67, 71-72, 74, 89-90,149-50.)[6]

Dr. Eric M. Gaier, an economist, also testified that payors and providers do not consider reimbursement on a drug-by-drug basis. (Gaier Direct Test. ¶¶ 50, 54; 11/29/06 Tr. 39, 41-42; DX 1268.) In addition, he found that both Medicare and third-party payors were knowledgeable and sophisticated entities who understood the differences between acquisition costs and AWPs. (Gaier Direct Test. ¶¶ 8-16, 32-42; 11/29/06 Tr. 11.) He further concluded that both Medicare and third-party payors had sufficient leverage to negotiate competitive reimbursement amounts and avoid the effects of any alleged AWP inflation. (Gaier Direct Test. ¶¶ 17-21, 43-49; 11/29/06 Tr. 11-12, 128.) He noted that there were legitimate economic reasons why Medicare and third-party payors would permit providers to earn margins in excess of their acquisition costs, including an interest in attracting providers to their networks, a desire to encourage physicians to treat patients outside of the hospital and a need to cross-subsidize under-reimbursement for services. (Gaier Direct Test. ¶¶ 22-29, 50-54.)

Dr. Linda A. Haegele, a practicing oncologist, testified that the income derived from the drug margins was essential to make up for (1) the drug-related expenditures (such as financing, storage, mixing) that were not separately billable, (2) the under-reimbursed and unreimbursed services, facilities and supplies provided by her practice, and (3) instances where insurers or patients failed to pay her. (Haegele Direct Test. ¶ 50; 12/06/06 Tr. 123-124.) Aspects of cancer care that are not reimbursed include: (1) treatment planning; (2) I.V. access; (3) laboratory maintenance; (4) drug inventory maintenance; (5) drug mixing; (6) protective apparel; (7) medical waste disposal; (8) counseling; (9) social services; (10) pain management; (11)

---

[6] In addition, he found that it was always Medicare's objective to reimburse on a "reasonable charge" as opposed to a reasonable cost basis, and that the approach chosen by Medicare to cross-subsidize other costs. (Bell Direct Test. ¶¶ 77-92; 11/28/06 Tr. 147-48.)

7

terminal care; and (12) billing.  (Haegele 12/06/06 Tr. 124-125; *see also* Haegele Direct Test. ¶¶ 37-39, 41, 49.)

In addition, both Dr. Bell and Dr. Gaier concluded that there is no reason to believe that total reimbursements would have been lower in Dr. Hartman's "but-for" world. (Bell Direct Test. ¶¶ 33, 37; 11/28/06 Tr. 73-74; Gaier Direct Test. ¶¶ 3, 29, 40; 11/29/06 Tr. 21-25.)  Dr. Bell pointed out that any reduction in drug reimbursement would have prompted an increase in service fees.  (12/8/06 Tr. 33-34.)  Dr. Gaier testified that, notwithstanding the predictions that the Medicare Modernization Act ("MMA") would result in lower costs, there is no evidence that total payments for both drugs and services together have in fact gone down. (11/29/06 Tr. 21-25; Gaier Direct Test. ¶ 29.)  Dr. Gaier also pointed out that Blue Cross/Blue Shield of Massachusetts decided not to switch to an ASP-based system because it was concerned that a projected $6 million cost savings would not materialize because doctors would decide to treat patients in the hospital.  (11/29/06 Tr. 25.)  A number of third-party witnesses confirmed that they did not believe that total reimbursements would be any different in the "but-for" world. (Farias (Harvard Pilgrim) Dep. Tr. 152-53; Maxwell (University of Pittsburgh Medical Center Health Plan) Dep. Tr. 154-56; Sidwell (John Deere Health) Dep. Tr. 68-69; Spahn (Anthem Blue Cross/Blue Shield) Dep. Tr. 93-95.)[7]

Dr. Hartman did not analyze any of these issues in his testimony.  He did not model what the "but-for" world would look like if both drugs and services are taken into account. (11/21/06 Tr. 59.)  He did not do any analysis to determine whether total payments in the "but-for" world and the real world would be the same.  (Id.)  Nor did he consider the impact of the MMA before reaching his conclusions in this case.  (12/11/06 Tr. 80-81.)  His reaction to

---

[7] Edwards Decl. Exhs. 4, 9, 10 and 11.

testimony by payors that overall reimbursements would not be any different in the "but-for" world was to dismiss it on the ground that it reflected "the herd mentality," but he was forced to concede that the herd mentality existed throughout the class period. (11/21/06 Tr. 61-65.) And while he claimed in his rebuttal testimony that total reimbursements under the MMA have decreased (Hartman Rebuttal Test. ¶ 38), he relied on Dr. Rosenthal for that conclusion, and the documents that she relied upon clearly state that, while reimbursement for drugs has gone down, reimbursement for services has gone up, and it is unclear whether any overall cost savings have been achieved. (PX 4058 at 4, 8-9; PX 4019 at 5; 12/18/06 Tr. 51-52, 57-59.)

Faced with overwhelming evidence that was inconsistent with his 30% yardstick, Dr. Hartman was forced to retreat to the hypothesis that even though there was publicly available information about spreads, it was insufficient to be acted upon by public and private payors. (Hartman Direct Test. ¶ 77; Hartman Rebuttal Test. ¶¶ 46-50.) Defendants' competing hypothesis is that inaction by payors in response to information about spreads reflects a choice to pursue other objectives such as attracting providers to their networks, incentivizing doctors to treat patients outside of the hospital, cross-subsidizing underpayment for services and considering reimbursement amounts as a whole. (See 12/18/06 Tr. 94-97.) There is no evidence supporting Dr. Hartman's hypothesis, and there is extensive evidence supporting defendants' hypothesis.

There were numerous other errors in Dr. Hartman' analysis. He purported to find defendants liable for overpayments with respect to multi-source drugs, even though he cannot identify the company that supplied the drug and he has not attempted to link reimbursement amounts to the AWP for any particular defendants' drug. (11/21/06 Tr. 65-67; 12/11/06 Tr.62-63.) For purposes of his damages analysis, he failed to determine the extent to which

9

reimbursement for services would increase if reimbursement for drugs went down. (11/21/06 Tr. 59.) In addition, he assumed that all reimbursements were based on AWP, even though the data he relied on does not identify the basis for the reimbursement and there is evidence that a significant percentage of transactions are not based on AWP. (11/21/06 Tr. 67-70; Gaier Direct Test. ¶¶ 56-59; DX 3006; 11/29/06 Tr. 36-39; 12/18/06 Tr. 97-101.) As a result, his damage calculations are off by an unknown -- but significant -- amount.

Dr. Daniel L. McFadden, a Nobel prizewinner in economics, concluded that Dr. Hartman's analysis is not a scientific or "economic analysis" because he has not relied on any empirical evidence of what expectations were. (McFadden Direct Test. ¶ 16.) "His analysis, in effect, assumes his conclusions about the existence of the alleged fraud." (Id. ¶ 23.) Dr. McFadden pointed out that Dr. Hartman's assumptions include the assumption that payors had an expectation that AWP exceeded ASP by a reasonably predictable amount; the assumption that this amount does not exceed 30%; and the assumption that reimbursements would be less if spreads were limited to 30%. (Id. ¶¶ 51, 78.) Dr. Hartman did not cite any evidence to support those assumptions or refute the alternative hypothesis that payors knowingly permit providers to retain spreads in order to achieve other objectives. (Id. ¶¶ 16, 24-25, 48, 52-77.) Dr. McFadden also found that Dr. Hartman's damage estimates are overstated. (Id. ¶¶ 78-101.) In addition, Dr. McFadden concluded that Dr. Hartman's 30% speed limit, if it were enacted into law, could actually harm consumers by causing prices to increase -- a conclusion expressed by other experts and not considered by Dr. Hartman. (Id. ¶¶ 16, 102-07; 11/27/06 Tr. 131-32; see also Gaier Direct Test. ¶ 28; 11/28/06 Tr. 72-76; 12/18/06 Tr. 36-38; DX 1923; 12/18/06 Tr. 89-90.)

Argument

DR. HARTMAN'S TESTIMONY SHOULD BE STRICKEN

Under Rule 702, a witness may testify concerning scientific, technical, or other specialized knowledge if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The word "knowledge", however, "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method," a requirement necessary to ensure "evidentiary reliability." *Id.*

Before allowing an expert to testify, a court must determine (1) "whether the reasoning or methodology underlying the testimony is scientifically valid" and (2) "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. In other words, the Court must determine whether the proposed expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. This standard applies to both non-scientific as well as scientific expert testimony submitted pursuant to Fed. R. Evid. 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 34 n.12 (1st Cir. 1999) ("The district court's gatekeeping function extends to all expert evidence, including economic analysis.").

Furthermore, "an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996). "Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point." *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999). Expert testimony that is inconsistent with the evidence should be excluded. Expert testimony that is based on unreliable evidence should also be excluded. *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 259-60 (1st Cir. 1997) (affirming exclusion of expert testimony that was "internally inconsistent and unreliable.")

Dr. Hartman's testimony violates all of these standards. With respect to liability, he expressed opinions on expectations without attempting to determine actual expectations. He ignored evidence that was inconsistent with his theory. He failed to consider alternative explanations for the facts. He plucked his 30% yardstick out of thin air.

With respect to causation, he did not even address the critical question: Would total payments have been any different in the real world than they were in the "but-for" world? Nor did he attempt to establish a causal link between any defendants' drug, or the AWP for the drug, and any plaintiffs' alleged harm. He admitted that his entire analysis consisted of comparing one spread to another to determine whether it exceeded 30%. (Hartman Direct Test. ¶ 82.)

With respect to damages, he made additional obvious errors. He did not attempt to determine the extent to which reimbursements for services would increase if reimbursements for drugs had been reduced. He assumed that all reimbursements were based on AWPs, even though that is demonstrably not so. Like the rest of his analysis, his damage calculation is inherently unreliable because it is off by an undetermined amount.

In short, Dr. Hartman did not do any of the things an expert would be expected to do in order to reach the conclusions that he reached. His testimony is both unsupported by, and inconsistent with, the evidence. It is nothing more than a series of assumptions that are neither scientific nor reliable and, as such, are inadmissible under *Daubert*.

## Conclusion

For the foregoing reasons, Dr. Hartman's testimony should be stricken.

Dated:  Boston, Massachusetts
        January 19, 2007

Respectfully Submitted,

By:   /s/ Jacob T. Elberg (BBO No. 657469)
      Thomas E. Dwyer (BBO No. 139660)
      Jacob T. Elberg (BBO No. 657469)
      **DWYER & COLLORA, LLP**
      600 Atlantic Avenue
      Boston, MA  02210
      Tel: (617) 371-1000
      Fax: (617) 371-1037
      tdwyer@dwyercollora.com
      jelberg@dwyercollora.com

      Steven M. Edwards (SE 2773)
      Lyndon M. Tretter ((LT 4031)
      Thomas J. Sweeney, III (TS 6557
      Admitted *pro hac vice*
      **HOGAN & HARTSON LLP**
      875 Third Avenue
      New York, NY  10022
      Tel: (212) 918- 3000

      *Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation*

**CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE**

I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on January 19, 2007, I caused a copy of **TRACK 1 DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION TO STRIKE THE EXPERT TESTIMONY OF DR. RAYMOND S. HARTMAN AND THE DECLARATION OF STEVEN M. EDWARDS IN SUPPORT OF TRACK 1 DEFENDANTS' RENEWED MOTION TO STRIKE THE EXPERT TESTIMONY OF DR. RAYMOND HARTMAN DECLARATION** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

      /s/ Lyndon M. Tretter
      Lyndon M. Tretter