# EXHIBIT 1

Mike Beaderstadt                                     September 17, 2004

Moline, IL

<br>

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    IN RE PHARMACEUTICAL          )

 5    INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

 6    PRICE LITIGATION             )   Civil Action: 01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO     )

 8    ALL CLASS ACTIONS            )

 9

10

11        Deposition of MIKE BEADERSTADT, taken before

12    GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

13    pursuant to the Federal Rules of Civil Procedure for

14    the United States District Court pertaining to the

15    taking of depositions, at Suite 300, 1630 Fifth

16    Avenue, in the City of Moline, Illinois, commencing

17    at 9:07 o'clock a.m., on the 17th day of September,

18    2004.

19

20

21

22
```

Mike Beaderstadt                                              September 17, 2004

Moline, IL

20 (Pages 74 to 77)

---

**74**

1  manufacturer contracts, to your knowledge, were
2  these contracts -- as AWP or WAC -- strike that.
3          In your role as an oversight of
4  negotiation of these pharmacy and manufacturer
5  contracts, was AWP a component of all contracts?
6      A.  Certainly of all pharmacy contracts.  The
7  rebate, the manufacturer contracts, not always.
8      Q.  Do you know why the AWP benchmark was
9  used?
10         MR. HAAS:  Objection.
11         THE WITNESS:  My understanding is that
12  it's provided an objective source for us to price
13  our drugs, the price reimbursement that we will pay
14  for those drugs.
15  BY MS. MacMENAMIN:
16     Q.  To the best of your knowledge, do you know
17  who chose or designated that AWP as the benchmark?
18     A.  I believe it to be an industry standard.
19     Q.  Do you know of any other benchmarks
20  available for pharmacy reimbursement?
21     A.  I'm aware of WAC.  I'm aware that there's
22  a lot of discussion about changing some things, and,

---

**75**

1  in fact, our recent contracts have included some
2  language that indicate that should that be a new
3  standard in the future, some new standard arise, we
4  will go to that.
5      Q.  Can you tell me more about what you just
6  referred to as discussion about changing the
7  standards?  Do you know, what is the source of that
8  information?
9      A.  Just from what we have learned in
10  conferences, what we have learned in reading, what
11  we have -- a general buzz in the industry.  I guess
12  wherever we pick those things up, we know that there
13  are those who are questioning AWP.
14     Q.  Do you know why they are questioning AWP?
15     A.  No.  I mean, I could speculate, but I
16  don't know exactly why they are doing that.
17     Q.  Are they questioning AWP as an accurate
18  source for reimbursement?
19         MR. HAAS:  Objection to form.
20         THE WITNESS:  I don't know.
21  BY MS. MacMENAMIN:
22     Q.  In your experience at John Deere, have you

---

**76**

1  ever doubted AWP as an accurate source for
2  reimbursement?
3         MR. HAAS:  Objection to form.
4         THE WITNESS:  We have never used AWP in
5  the pharmaceutical world as a source for
6  reimbursement.  We have used it as a source to
7  calculate our reimbursement.
8  BY MS. MacMENAMIN:
9      Q.  Correct.  Have you ever doubted AWP as a
10  basis or benchmark for reimbursement in the pharmacy
11  world?
12     A.  My perspective is that we always try to
13  get that price as low as possible that still puts
14  together a reasonable network, and we'd go to minus
15  25 percent and nobody would sign it and we'd try
16  minus 13 percent and everybody signed up, so we knew
17  we had to have it somewhere in between there.  And
18  minus 20 is our latest venture there, and that has
19  produced some headaches for us, but we have been
20  able to put together a reasonable network based on
21  that.
22         So again, it's simply a basis for

---

**77**

1  negotiation, and we try to do as well as we can to
2  lower our costs for acquiring those drugs.
3      Q.  I want to skip to part of your testimony
4  regarding certain drugs called Remicaid, Lupron and
5  Synagis I believe it's called.
6      A.  Yes.
7      Q.  And at some point there was a change in
8  the reimbursement benchmark for these drugs.
9          Can you tell me, can you first of all just
10  describe for me that change and what went on?
11     A.  Essentially, and again I'm recalling here
12  something that I wasn't directly involved in, but we
13  knew that we could acquire that drug.  Those are
14  very expensive, high-cost drugs that are used in
15  very specific cases, very specific diseases.  Most
16  of those patients who require those drugs are going
17  through our case management program, being medically
18  managed in some other fashion.
19         So rather than purchase those at prices
20  that we would pay under our physician contracts, we
21  made the decision that we wanted to source those
22  drugs exclusively from specialty pharmacy

---

# EXHIBIT 2

Page 1

1              IN THE DISTRICT OF MASSACHUSETTS

2

3                            -O-

4

5    IN RE:                     :

6    PHARMACEUTICAL INDUSTRY        MDL No. 1456

7    AVERAGE WHOLESALE PRICE     :   01-CV-1225

8    LITIGATION

9

10        30(b)(6) DEPOSITION OF:  IHC HEALTH PLANS

11

12                    ERIC CANNON

13

14                         -O-

15

16        Place:        IHC Health Plans

17                      4646 West Lake Park Blvd.

18                      Salt Lake City, Utah 84120

19        Date:         September 13, 2004

20                      9:40 a.m.

21        Reporter:     Vickie Larsen, CSR/RPR

22                         -O-

Page 34

1    Q.    And did the prices paid to providers for
2  prescription drugs ever changed as a result of these
3  informal discussions?
4    A.    Yes, they did.
5    Q.    Are you aware of any specific examples
6  where prices changed?
7    A.    I cannot think of any specific examples.
8    Q.    Were prices usually decreased as a result
9  of the discussions?
10    A.    As many times as prices were decreased I
11  would imagine we also increased them.  It goes both
12  ways.
13    Q.    Okay.  In your current job as the
14  director of pharmacy services is it important to you
15  to keep up to date on prescription drug pricing
16  issues?
17    A.    Yes, it is.
18    Q.    And what do you do to keep up to date on
19  those issues?
20    A.    In order to keep up to date on pricing
21  issues we first of all load into our system on a
22  weekly basis databases from either First Data Bank or

Page 35

1  Medispan that include pricing information.  We talk
2  with vendors about pricing changes, price increases.
3  We receive from manufacturers notification when prices
4  are raised.
5         We track closely the number of
6  manufacturers that may be selling a generic product
7  that would indicate price competition in a specific
8  category.  We monitor communications that may take
9  place through newsletter groups or journal articles or
10  internet or wherever information -- wherever we can
11  find information, we'll take it.
12    Q.    One of the things that you mentioned is
13  that you keep track of the number of companies selling
14  generic products?
15    A.    Yes.
16    Q.    Why is the number of companies selling a
17  generic product important?
18    A.    The number of companies selling a generic
19  product is important to us in that as the number of
20  companies selling a particular product increases, so
21  does competition.  Generally speaking as price or as
22  competition increases within a category, the price

Page 36

1  then begins to drop.
2    Q.    Are you familiar with the term "AWP" or
3  "average wholesale price" in the context of
4  prescription drugs?
5    A.    Yes, I am.
6    Q.    And you mentioned that you subscribe to
7  First Data Bank and/or Medispan databases; is that
8  correct?
9    A.    Yes.
10    Q.    Are AWPs published in those?
11    A.    Yes.
12    Q.    Are AWPs for generic products also
13  published?
14    A.    Yes.
15    Q.    In your experience does the AWP for a
16  generic product tend to decrease when additional
17  sellers of generic products enter the market?
18    A.    No, it does not.
19        MR. EVERETT:  Let's go off the record.
20        (There was a break taken.)
21        MR. EVERETT:  Let's go back on the
22  record.

Page 37

1    Q.    When we went off the record we were
2  talking about things that you do as director of
3  pharmacy to keep up to date on drug pricing issues.
4  And you mentioned that you read a newsletter groups
5  and journal articles.  What newsletter groups does IHC
6  Health Plan subscribe to or receive?
7    A.    We receive The Pink Sheet.  We get a
8  newsletter called Generic Line.  We belong to a group
9  that provides updates on injectable pricing called
10  R.J. Health.  They provide a newsletter, the title of
11  which I'm unaware.
12    Q.    Okay.  What other periodicals?
13    A.    Those are the main periodicals I can
14  think of.
15    Q.    Okay.  What is The Pink Sheet?
16    A.    The Pink Sheet is a -- it's fairly big
17  and I'm not sure who the publisher is -- but it
18  provides updates on issues as they go through the FDA
19  or other issues as it relates to pharmaceuticals.
20    Q.    You also mentioned that you subscribe to
21  First Data Bank and/or Medispan for the pricing.  Are
22  there any other industry pricing compendia?

10 (Pages 34 to 37)

# EXHIBIT 3

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3      - - - - - - - - - - - - - - - x

 4      In re:  PHARMACEUTICAL        :MDL DOCKET NO.

 5      INDUSTRY AVERAGE WHOLESALE    :CIVIL ACTION

 6      PRICE LITIGATION              :01CV12257-PBS

 7      - - - - - - - - - - - - - - - x,

 8                          Tuesday, November 23, 2004

 9                          Washington, D.C.

10

11                HIGHLY CONFIDENTIAL

12

13         Deposition of KELLY ELLSTON, commencing at

14      9:59 a.m., held at the offices of Morgan, Lewis &

15      Bockius, 1111 Pennsylvania Avenue, N.W., Washington,

16      D.C., before Keith Wilkerson, a notary public in and

17      for the District of Columbia.

18

19

20

21

22
```

Kelly Ellston

Highly Confidential
Washington, DC

November 23, 2004

23 (Pages 86 to 89)

---

86

1   $5,000 for an immunization which is beyond anything
2   that would be expected, say 10 percent you'd be
3   paying, that would be something we would investigate
4   to say what would be reasonable and acceptable.
5       So in those instances, if there is an
6   outlier that doesn't make sense, we would research
7   it, and it's possible. We probably would not
8   understand what they paid for it, but we would
9   definitely benchmark it against what should be
10  acceptable.
11      BY MR. MANGI:
12      Q. So if a particular physician were to bill
13  an extraordinary sum in relation to an immunization,
14  then that may form the basis for an investigation.
15  Correct?
16      A. It would be a flag, just like we have
17  flags for fraud and abuse and we have reviews for
18  different dollar amounts. There are many steps in
19  the claims process that look to making sure that
20  things make sense.
21      Q. It would be a flag of some sort of
22  overbilling.

---

87

1       A. Yes.
2       Q. And the basis for that flag would be a
3   comparison to the amount that Union Labor Life would
4   ordinarily pay in relation to a similar immunization.
5   Is that correct?
6       A. Or what would be, again possibly using
7   our pharmacy team, what would be the expected amount
8   that should be reimbursed.
9       Q. Does Union Labor Life have a particular
10  benchmark of what are common reimbursement amounts
11  for all drugs?
12      A. I don't know. That would be in the
13  pharmacy area, whatever tools or methods they use to
14  get information.
15      Q. Well, in relation to paying claims to
16  physicians in relation to drugs that are not
17  immunizations, other injectable and infusible drugs,
18  how will Union Labor Life determine whether or not
19  the amount that it's paying is subject to a flag or
20  not subject to a flag?
21      A. For the most part it is by the amount.
22  We have thresholds of review, and it's not just

---

88

1   specific to a drug. We have thresholds of review for
2   a provider claim over a thousand dollars for office
3   visits, hospital claims over 5,000, 10,000, 25,000.
4   So we have different points at which there's a review
5   just to make sure that things are adding up.
6       Q. Now, leaving aside those specific
7   instances where there's a suspicion that a physician,
8   a particular physician is overbilling or there's some
9   other concern about fraud or something like that,
10  leaving those instances aside, if Union Labor Life
11  were to gain more information generally about what
12  physicians in the market are paying to acquire drugs,
13  that wouldn't change the amount they would pay as
14  reimbursement. Correct?
15      MR. MCGLONE: Same objection.
16      THE WITNESS: In our current structure,
17  because we are guided and utilizing the PPO
18  contracts, it would not, because that's part of the
19  negotiation that the PPO and the provider have.
20      BY MR. MANGI:
21      Q. And indeed, Union Labor Life is not
22  involved in that negotiation process.

---

89

1       A. That's correct, between the PPO and the
2   provider.
3       Q. Now, based on the fact that Union Labor
4   Life does not know what physicians' acquisition costs
5   are, is it fair to say that Union Labor Life does not
6   know how much money physicians are or are not making
7   in relation to drugs they administer in office?
8       A. That's correct.
9       Q. Union Labor Life does not know how much
10  of a loss they're taking or how much of a profit
11  they're making?
12      A. That's correct.
13      Q. And it would be fair to say that Union
14  Labor Life certainly does not have a particular
15  percentage expectation of the amount of profit that a
16  physician may be making. Correct?
17      A. No.
18      Q. It would be impossible to say that Union
19  Labor Life expects that they'll make a percentage
20  profit of 5 percent, 10 percent, 20 percent, 30
21  percent, 40 percent?
22      A. That's not in our calculations.

---

Henderson Legal / Spherion
(202) 220-4158

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                 Washington, DC

24 (Pages 90 to 93)

**90**

1    Q.  That's something that is entirely
2  irrelevant to Union Labor Life's calculations of the
3  amounts that it's going to reimburse.  Is that
4  correct?
5    A.  Correct.
6    Q.  Now, we spoke about instances where
7  billing is a percentage of charges.
8    A.  Yes.
9    Q.  I just want to be clear here.  Do
10  physicians bill based on a fee schedule or on a
11  percentage of bill charges or either?
12    A.  It could be either.
13    Q.  Do you have any knowledge as to how
14  physicians would arrive at the amounts billed when
15  they're not using a fee schedule?
16    A.  Well, generally the physician doesn't
17  derive what they bill based on percentage of savings
18  or fee schedules.  To my knowledge, the physician's
19  billing is completely up to how they decide to set
20  their prices.  It's how they're reimbursed is the
21  percentage of savings or the fee schedule.  Billing,
22  they can charge what they charge.

**91**

1    MR. MANGI:  Nothing further.  Do you have
2  any questions, Alan?
3    MR. KLEIN:  I do have a couple of
4  questions.
5    EXAMINATION BY COUNSEL FOR PLAINTIFFS
6    BY MR. KLEIN:
7    Q.  My first question is:  To what degree
8  were you involved in the negotiation between Union
9  Labor Life and the PPOs?
10    A.  I was not.
11    Q.  And to what degree do you know what
12  factors those that did negotiate on behalf of Union
13  Labor Life, what factors they considered in
14  negotiating with the PPOs?
15    A.  My understanding is when we have
16  proposals or we are looking at new PPOs we have a
17  team of -- a multi-disciplinary team, that goes over
18  the process.  And in that team, discussions of the
19  codes for amount, CPT codes that are looked at,
20  access fees that are derived, and scope and
21  responsibility of the contracts are discussed.
22    Q.  And have you ever taken part in these

**92**

1  discussions?
2    A.  Yes.
3    Q.  And do you normally take part in these
4  discussions?
5    A.  Yes.
6    MR. KLEIN:  I have no further questions.
7    MR. MCGLONE:  I have a request to make
8  that we record on the record what I think is an
9  understanding, and if not, I hope it will be one,
10  that the deposition transcript will be designated
11  highly confidential pursuant to the protective order
12  in place in this case.
13    MR. MANGI:  We have no objection to that.
14  Alan, I trust you have no objection to that.
15    MR. KLEIN:  I have no objection.
16    EXAMINATION BY COUNSEL FOR JOHNSON & JOHNSON
17    BY MR. MANGI:
18    Q.  Just a quick bit of follow-up.  In
19  relation to the factors that are considered in
20  deciding whether or not to enter into a contract with
21  a PPO which you were just questioned about, is it
22  fair to say that the amount of profit or loss that

**93**

1  physicians in a particular network will make when
2  reimbursed for drugs in office is not one of the
3  factors that's considered by Union Labor Life?
4    A.  I would say that's correct.  Our factor
5  is what will it cost us to provide health care
6  services to our membership or our clients at a more
7  macro level.
8    Q.  And in that regard, Union Labor Life is
9  always looking, based on a competitive dynamic, to
10  get the best and most price efficient deal that it
11  can.  Correct?
12    A.  That's correct.
13    Q.  And as we discussed before, Union Labor
14  Life has no expectation of what sort of profit
15  physicians may be making in relation to drugs
16  administered in office, be it 20 percent, 30 percent,
17  40 percent, or something more than that.
18    A.  We don't get to that level of
19  granularity, and we're looking at the overall cost of
20  health care.
21    Q.  That's something that's irrelevant to
22  Union Labor Life's determination of the amounts that

**EXHIBIT 4**

Robert C. Farias                                   October 20, 2004
                      Wellesley, MA

1

1        UNITED STATES DISTRICT COURT

2        DISTRICT OF MASSACHUSETTS

3          NO. 01CV12257-PBS

4

5    _____

6    In re: PHARMACEUTICAL              )

7    INDUSTRY AVERAGE WHOLESALE         )

8    PRICE LITIGATION                   )

     _____ )

9    THIS DOCUMENT RELATES TO:          )

     ALL ACTIONS                        )

10   _____ )

11

12              DEPOSITION OF ROBERT C. FARIAS,

13   called as a witness by and on behalf of the

14   Defendants, pursuant to the applicable provisions

15   of the Federal Rules of Civil Procedure, before P.

16   Jodi Ohnemus, Notary Public, Certified Shorthand

17   Reporter, Certified Realtime Reporter, and

18   Registered Merit Reporter, within and for the

19   Commonwealth of Massachusetts, at the offices of

20   Harvard Pilgrim Health Care, 93 Worcester Road,

21   Wellesley, Massachusetts, on Wednesday, 20 October,

22   2004, commencing at 10:05 a.m.

Robert C. Farias                                           October 20, 2004
Wellesley, MA

150

1  who sets AWP?
2  A.  I -- again, I didn't know that it was set.
3  I don't know.
4  Q.  Okay.  So you have no idea who sets AWP.
5  A.  Right.
6  Q.  You referred to AWP as being an industry
7  standard.
8  A.  Yes.
9  Q.  When you say that, do you understand that
10  it's standard of the industry to use AWP as a
11  reimbursement benchmark, correct?
12  A.  Yes.
13  MR. NALVEN:  Objection.
14  Q.  And you understand that it's standard in
15  the industry to reimburse at a discount off AWP,
16  correct?
17  A.  Yes.
18  Q.  Mr. Nalven asked you a bunch of questions
19  about OIG and Medicare.
20  A.  Uh-huh.
21  Q.  You're not an expert in OIG or Medicare,
22  are you?

151

1  A.  No.
2  Q.  So, you were just testifying about your
3  general impressions, is that right?
4  A.  Based on previous experiences, yes.
5  Q.  Okay.  But you have no precise knowledge
6  about what the role of OIG is in relation to
7  Medicare.
8  A.  No.
9  MR. NALVEN:  Objection.
10  Q.  Now, then there were a whole bunch of
11  questions about whether or not -- well, your
12  knowledge of physicians' acquisition costs and so
13  on.
14  A.  Yes.
15  Q.  Let's see if we can get that straight in
16  my mind, based on your earlier testimony when we
17  were speaking.
18  A.  Uh-huh.
19  Q.  Physicians' acquisition costs form no part
20  of Harvard Pilgrim's reimbursement methodology,
21  right?
22  A.  Correct.

152

1  Q.  So, if a physician were committing a crime
2  and billing for a drug that he had got as a free
3  sample, Harvard Pilgrim would still reimburse him,
4  but would hope that the authorities would catch up
5  with him, right?
6  A.  I think that's safe to say.
7  Q.  And Harvard Pilgrim doesn't have any
8  knowledge about what providers' acquisition costs
9  are, right?
10  A.  No.
11  Q.  Doesn't require them to disclose those.
12  A.  No.
13  Q.  And if it learned that those were higher
14  or lower than it currently thinks they are, that
15  wouldn't change the fact that it reimburses that
16  methodology, which is 95 percent of AWP?
17  A.  Correct.
18  Q.  Indeed, if it learned that in a particular
19  instance physicians were getting a particular drug
20  at a -- were getting a rebate or a discount from a
21  manufacturer on a particular drug, that wouldn't
22  change the fact that Harvard Pilgrim's standard

153

1  across the board methodology is 95 percent of AWP?
2  A.  Correct.
3  MR. NALVEN:  Objection.
4  MR. MANGI:  That's it.
5  MR. NALVEN:  I have nothing further.
6  THE WITNESS:  Okay.  Great.
7  (Whereupon the deposition ended at
8  12:52 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT 5

Jill S. Herbold                                          January 14, 2005
                        Bloomfield, CT

                                                                    1

 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3

 4

 5                  No. 01CV12257-PBS

 6

 7

 8      ***********************************

 9                                        *

        IN RE:  PHARMACEUTICAL INDUSTRY    *

10      AVERAGE WHOLESALE PRICE LITIGATION  *

                                          *

11      ***********************************

12

13      DEPOSITION OF JILL S. HERBOLD, taken pursuant to

14      the Federal Rules of Civil Procedure, at CIGNA

15      Headquarters, 900 Cottage Grove Road, South Building,

16      Bloomfield, CT, before Diana M. Noel, a Registered

17      Professional Reporter, Certified Realtime Reporter,

18      and Licensed Shorthand Reporter No. 199, in and for

19      the State of Connecticut, on Friday, January 14,

20      2005, commencing at 12:48 PM.

21

22

Jill S. Herbold                                           January 14, 2005
Bloomfield, CT

22 (Pages 82 to 85)

---

82

1   have knowledge of that period, is it your testimony
2   that Cigna reimburses the physician at a rate, a
3   negotiated rate, but a rate that was a percentage off
4   of -- expressed as a percentage off of average
5   wholesale price or AWP, is that correct?
6        MS. SCHOEN: Objection to form.
7        MR. ST. PHILLIP: If you could do that
8        one more time, we just increased in volume so
9        we'll be able to do it.
10       Q.  Sticking with the period from 2002 earlier,
11  I'm basing your conversations with people at Cigna, was
12  it your testimony today that Cigna reimburses
13  physicians or reimbursed physicians at a price that was
14  a discount off of average wholesale price?
15       MS. SCHOEN: Objection to form.
16       Q.  Is that correct?
17       A.  Prior to 2002, Cigna reimbursed physicians at
18  the negotiated rates.  Those negotiated rates were
19  commonly expressed as percent of AWP.  They may have
20  also been expressed as a percent of billed charges, but
21  those are the only two approaches that I'm aware of.
22       Q.  And then for the period from 2002 on, you

---

83

1   said that approximately 50 percent of reimbursement is
2   done at or under that same methodology as a negotiated
3   price off of the average wholesale price or as a
4   percentage of bill charged; is that correct?
5        A.  That is correct.
6        Q.  And the other 50 percent is based on Cigna's
7   national standard pricing list, is that correct?
8        A.  Yes, that is correct.
9        Q.  And even the prices on Cigna's national
10  standard pricing list are expressed as a percentage off
11  of average wholesale price, is that correct?
12       A.  Yes, some of them are.  Not all of them are.
13       Q.  Some of them are.
14           The ones that aren't, are you referring
15  specifically to the 13 -- the drugs that fall under the
16  13 codes that are based --
17       A.  Yes.
18       Q.  -- on something different?
19       A.  Yes.
20       Q.  And those exceptions, those 13 codes, the
21  reimbursement methodology for those drugs is based on
22  acquisition costs, but isn't it true that it also has a

---

84

1   part of the formula that is also based on average
2   wholesale price, is that correct?
3        A.  That is correct.
4        Q.  Would you agree with me that Cigna's goal is
5   to get the best -- when negotiating with physicians
6   about the reimbursement for physician administered
7   drugs, would you agree that Cigna's goal is to get the
8   best deal it can for itself while providing adequate
9   reimbursement to physicians for the drugs it
10  administers to its members?
11       A.  Yes.
12       Q.  And is it fair to say that Cigna expects that
13  the doctors in its network to make a living primarily
14  providing treatment to patients and not from large
15  markups on those physician administered drugs?
16       MS. SCHOEN: Objection to form.
17       A.  Could you please repeat the question.
18       Q.  Sure.
19           Is it fair to say that Cigna expects
20  that doctors in its networks are -- make their living
21  primarily providing treatment to patients and the
22  payment from providing treatment to patients and not

---

85

1   from large markups on prescription drugs that it
2   administers?
3        MS. SCHOEN: Objection to form.
4        A.  With respect to the reimbursement of
5   practitioners for their services, we expect that the
6   physician is negotiating with us and another carrier so
7   that they can maintain sufficient profit margin to
8   operate their business and stay in business.  We don't
9   have a specific expectation about exactly what their
10  billed charges might be for a particular service
11  because it's a difference between that billed charge
12  and the reimbursement amount that I would call and
13  refer to as a markup.
14       Q.  When you use the term billed charge, what are
15  you referring to?
16       A.  What I'm referring to there is the fee amount
17  that the physician would submit on the claim in order
18  for the claim to get paid.  It's -- another way to say
19  it is it is the amount that the physician would charge
20  for an indemnity member.
21       Q.  Let's turn back to the 13 codes that we
22  talked about a few minutes ago.

---

Jill S. Herbold                                                    January 14, 2005
Bloomfield, CT

23 (Pages 86 to 89)

86

1        I believe you testified that one -- and
2   correct me if I'm wrong -- that the reason that Cigna
3   singled out these 13 codes for different treatment was
4   the fact that there became available on the market
5   generic forms of those drugs that were available at a
6   cheaper price, is that accurate?
7        A.   Yes, and let me clarify.  Our change that we
8   made was in reaction to the result of competitive
9   market forces.  Generic drugs were introduced that
10  drove down the acquisition cost, the cost of the
11  product in the marketplace.
12       Q.   And the change -- were you finished?
13       A.   Yes -- I'm finished, yes.
14       Q.   And the change in the reimbursement for those
15  codes that Cigna instituted, was that an attempt to
16  bring physician reimbursements for those codes in line
17  with the lower price available in the marketplace for
18  those drugs?
19       A.   Yes.
20       Q.   So if Cigna had information that other drugs
21  other than that 13 were available for a price that was
22  significantly less than the reimbursement that Cigna

87

1   currently provides in its national standard price list,
2   would Cigna take steps to try to bring the
3   reimbursement rate that it provides down to the level
4   that's available -- the level of reimbursement that's
5   available to doctors who purchase in the marketplace?
6        MS. SCHOEN:  Objection to form.
7        A.   Cigna is trying to make sure that we maintain
8   -- well, that we have competitive medical costs that we
9   are able to sell our products and have members, and
10  Cigna is -- also has an interest, as I've stated, in
11  making sure that the providers can stay in business.
12       And in terms of applying that to the
13  reimbursement for specific drugs, we made those changes
14  reflecting the changes that were going on in the
15  marketplace, and also what physicians were willing to
16  accept for reimbursement.
17       I mean, another way of thinking about
18  that is that we ranked the changes that we're aware of
19  in terms of market price changes, but it also -- we
20  have to factor in what is the reimbursement amount that
21  physicians are willing to accept.
22       Q.   You testified that -- when you were asked

88

1   whether Cigna understands what physicians paid for
2   physician administered drugs, you just testified that
3   Cigna didn't have an understanding of that.
4        Is that generally your testimony?
5        A.   We don't have specific knowledge about it.
6   The knowledge that we have is just based on what --
7   it's really based on we set a fee amount, and the
8   providers come back and complain about it or they
9   don't.  So it's not that we understand their specific
10  acquisition costs, but if our reimbursement is too low,
11  we hear about it.
12       Q.   I think you testified that one of the
13  exceptions is some -- with respect to some
14  manufacturers of immunization products.
15       Do you remember testifying about that?
16       A.   I'm sorry, can you please repeat that
17  question?
18       Q.   Sure.
19       I think that you testified with respect
20  to having had some contact with some manufacturers of
21  immunization products?
22       A.   Yes.

89

1        Q.   And in that way learning what the physician
2   acquisition price for immunization products -- at least
3   some products are; is that accurate?
4        A.   That is accurate.  My prior comment was
5   related to injectables.  I'm sorry, I didn't clarify
6   that.
7        Q.   That's okay.
8        As with respect to the immunization
9   products and the information that Cigna obtained with
10  respect to those conversations, did that information
11  then -- was that used by Cigna in determining what
12  reimbursement it would provide to physicians for those
13  immunization products?
14       A.   That's a very interesting question.  As I
15  mentioned, it is in the recent past, and to be more
16  specific, the last month and a half, that we have
17  gotten that information, and we have yet to make a
18  determination about exactly how we're going to set our
19  reimbursement on immunizations going forward.
20       MR. NOTARGIACOMO:  I have no other
21  questions.
22       MR. ST. PHILLIP:  I have none.

Henderson Legal Services
(202) 220-4158

**EXHIBIT 6**

James T. Kenney                                    September 20, 2004
                        Wellesley, MA

<div style="border">

1

| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF MASSACHUSETTS |
| 3 | NO. 01CV12257-PBS |

4  _____

5  In re:  PHARMACEUTICAL          )

6  INDUSTRY AVERAGE WHOLESALE      )

7  PRICE LITIGATION                )

8  _____     )

9  THIS DOCUMENT RELATES TO:       )

10 ALL ACTIONS                     )

11 _____     )

12                 DEPOSITION of HARVARD PILGRIM HEALTH

13 CARE BY JAMES T. KENNEY, called as a witness by and

14 on behalf of the Defendants, pursuant to the

15 applicable provisions of the Federal Rules of Civil

   Procedure, Rule 30 (b)(6), before P. Jodi Ohnemus,

16 Notary Public, Certified Shorthand Reporter,

17 Certified Realtime Reporter, and Registered Merit

18 Reporter, within and for the Commonwealth of

19 Massachusetts, at the offices of Harvard Pilgrim

20 Health Care, 93 Worcester Road, Wellesley,

21 Massachusetts, on Monday, 20 September, 2004,

22 commencing at 10:50 a.m.

</div>

James T. Kenney                                           September 20, 2004
Wellesley, MA

4 (Pages 10 to 13)

---

**10**

1  physician clinics that provide services to the
2  Harvard Pilgrim members, is that correct?
3      A.  Yes.
4      Q.  How did Harvard acquire the drugs that
5  were dispensed in its pharmacies through the staff
6  model HMO?
7          MR. HORGAN:  Objection.
8      A.  It purchased them either direct from a
9  manufacturer or through a wholesaler.
10     Q.  Similarly, with respect to the drugs
11 dispensed -- withdraw that question.  With respect
12 to the drugs administered in physicians' offices,
13 how did Harvard acquire those drugs --
14         MR. HORGAN:  Objection.
15     Q.  -- through the staff model HMO?
16     A.  Same, either direct or through the
17 wholesaler.
18     Q.  Were you involved at all in the
19 contracting or negotiation for the purchase of
20 drugs from either manufacturers or wholesalers for
21 the staff model HMO?
22     A.  Yes.

---

**11**

1      Q.  And what was your involvement?
2      A.  My role was to negotiate contracts with
3  those manufacturers that -- how do I phrase it?  We
4  didn't really have a central function.  So, each
5  pharmacy negotiated a few contracts.
6      Q.  Uh-huh.
7      A.  That's kind of how it worked.
8      Q.  How many pharmacies were -- made up the
9  network of the staff model HMO?
10     A.  At that time, I believe it was nine.
11     Q.  So, is it correct that in your role over
12 the years as -- in the various pharmacy roles for
13 your staff model HMO, you negotiated purchase
14 contracts with manufacturers for the drugs
15 dispensed through the pharmacy?
16     A.  In my role at the staff model, yes.
17     Q.  To your recollection, were the prices for
18 the drugs that Harvard purchased from manufacturers
19 set based upon any particular benchmark?
20         MR. HORGAN:  During the staff model HMO?
21         MR. HAAS:  Yes.
22     A.  I would say the benchmark was WAC.

---

**12**

1      Q.  Uh-huh.  And to your recollection, what
2  was the range of percentages markup or discount off
3  of WAC at which Harvard acquired drugs from
4  manufacturers for dispensing through its staff
5  model HMO pharmacists?
6          MR. HORGAN:  Objection.  You can answer.
7      A.  2 percent, to maybe 50, 60 percent.
8      Q.  Above or below WAC?
9          MR. HORGAN:  Objection.
10     A.  Below WAC.
11     Q.  With respect to brand name drugs -- let's
12 stick with brand name drugs for a moment.  What was
13 the percentage markup or discount off of WAC that
14 Harvard Pilgrim acquired drugs from manufacturers
15 for its staff model HMO?
16         MR. HORGAN:  Objection.  Can you -- all
17 these are just if you know, all these questions.
18     A.  The branded discount was 2 to 50 percent.
19     Q.  2 percent to 50 percent.
20     A.  2 to 50 percent off.
21     Q.  Did the discounts off of WAC differ with
22 respect to generic drugs that Harvard purchased on

---

**13**

1  behalf of its staff model HMO?
2      A.  Yes.
3      Q.  What were the discounts off of WAC that
4  Harvard Pilgrim received with respect to the
5  general risk purchased from manufacturers for its
6  staff model HMO?
7      A.  50 percent to 80 percent.
8      Q.  At that time did Harvard negotiate
9  separate manufacturer rebate agreements with
10 manufacturers for the drugs that were dispensed or
11 administered by the staff model HMO?
12     A.  No.
13     Q.  Were the rebate -- withdraw that question.
14 Were the discounts off of WAC at which Harvard
15 acquired drugs from manufacturers inclusive of a
16 rebate that pertained to the drugs that were
17 dispensed or administered by the pharmacies --
18         MR. HORGAN:  Objection.
19     Q.  -- or the clinics?
20         MR. HORGAN:  Objection.
21     A.  No.
22     Q.  Was it your understanding that at the time

---

James T. Kenney                                    September 20, 2004
Wellesley, MA

5 (Pages 14 to 17)

14

1   that you were negotiating these prices with
2   manufacturers for drugs for the staff model HMO
3   that Harvard Pilgrim was getting a particularly
4   good price from the manufacturers that wasn't
5   otherwise available in the marketplace?
6        MR. HORGAN: Objection.
7   A.  No.
8    Q.  So, to your understanding at the time, any
9   pharmacy could obtain drugs at between 2 percent to
10  50 percent or 60 percent off for brand name drugs
11  from manufacturers, is that correct?
12       MR. HORGAN: Objection.
13  A.  I don't know.
14   Q.  Was that your understanding at the time?
15  A.  I don't know.
16       MR. NALVEN: Objection.
17  A.  I don't know what any other pharmacies
18  were paying.
19   Q.  With respect to the drugs acquired from
20  wholesalers, was the price for the drugs that
21  Harvard Pilgrim purchased from wholesalers for the
22  staff model HMO based on any particular benchmark?

16

1   A.  The price that the manufacturer charged
2   the wholesaler.
3    Q.  Did you have an understanding at the time
4   whether or not that price was published in any
5   industry compendia?
6   A.  No.
7        MR. NALVEN: Object to the form on that
8   last question, please.
9    Q.  With respect to tracking drug costs or
10  reimbursement internally at the staff model HMO,
11  did Harvard Pilgrim track the drugs that were
12  dispensed to its members based upon a benchmark or
13  at a cost amount, to your knowledge?
14       MR. HORGAN: Objection.
15  A.  Cost.
16   Q.  Did there come a point in time that you
17  became involved in the negotiation of rebates for
18  manufacturers?
19  A.  Yes.
20   Q.  When was that?
21  A.  1988.
22   Q.  What was your involvement at that time?

15

1   A.  WAC.
2    Q.  Uh-huh.  What was the range of discounts
3   off of WAC or above WAC at which Harvard acquired
4   brand name drugs from wholesalers?
5   A.  WAC plus 2 percent.
6    Q.  What was the discount above or below WAC
7   at which Harvard acquired generic drugs from
8   wholesalers for its staff model HMO?
9   A.  50 to 80 percent.
10   Q.  Off WAC?
11  A.  Uh-huh.
12   Q.  And again, was it your understanding at
13  the time that those were market prices that
14  otherwise would be available in the industry?
15       MR. NALVEN: Objection.
16       MR. HORGAN: Objection.
17  A.  Yes.
18   Q.  When you were negotiating with
19  manufacturers and wholesalers for the purchase of
20  drugs on behalf of staff model HMO, what was your
21  understanding of the term "WAC" or wholesale
22  acquisition cost?

17

1   A.  My role was to establish a rebate program
2   -- or rebate contracts for Harvard Community Health
3   Plan.
4    Q.  Prior to 1988, did Harvard Community
5   Health Plan have any rebate program with
6   manufacturers?
7        MR. HORGAN: Objection.
8   A.  No.
9    Q.  To your knowledge, prior to 1998, did
10  Harvard Community Health Plan receive any rebates
11  through its contract with any pharmacy benefit
12  manager?
13  A.  I don't know.
14  Q.  Uh-huh.
15  A.  I'm sorry.  PBM, no.
16   Q.  At any point in time while you were at
17  Harvard Community Health Plan, did Harvard
18  Community contract with a PBM for the
19  administration of its pharmacy benefit?
20  A.  Could you repeat that question, please.
21   Q.  Yeah.  At any time that you worked for
22  Harvard Pilgrim, has Harvard Pilgrim contracted

**EXHIBIT 7**

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE: PHARMACEUTICAL            MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE       01CV12257-PBS

PRICE LITIGATION

* * * * * * * * * * * * * * * * * * * * * * * * * *      DEPOSITION OF

THIS DOCUMENT RELATES TO:        JOHN M. KILLION

ALL ACTIONS                      JANUARY 6, 2006

* * * * * * * * * * * * * * * * * * * * * * * * * *

     H I G H L Y   C O N F I D E N T I A L

DEPOSITION of JOHN M. KILLION, a witness called on

behalf of the Defendant Johnson & Johnson pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, Certified LiveNote Reporter, and Notary

Public in and for the Commonwealth of Massachusetts,

at the offices of Robins, Kaplan, Miller & Ciresi,

L.L.P., 800 Boylston Street, Boston, Massachusetts

02199, on Friday, January 6, 2006, commencing at

9:41 a.m.

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

122

1     Q.  Was it also your understanding at the
2   time that when competition came into the market
3   for brand name drugs, i.e., multisource
4   competition, there were also discounts and
5   rebates that were provided on those drugs?
6         MR. SULLIVAN:  Objection. Beyond the
7   scope.
8     A.  That's correct.
9     Q.  So typically -- so it was your
10  understanding then in the 1998 time frame that
11  when a brand name drug first came to market there
12  typically were no incentives associated with the
13  drug, but then as competition entered the market,
14  first multisource, and then with generics, more
15  incentives were provided for the drug; correct?
16        MR. SULLIVAN:  Objection.
17    A.  Correct.
18    Q.  And that is what led to your
19  understanding that AWP was an artificial price
20  because it didn't bear a relationship to the
21  acquisition cost; correct?
22    A.  Correct.

123

1     Q.  Now in 1998 when you had this
2   understanding, how did that impact the
3   reimbursement policies of Tufts at this time?
4         MR. SULLIVAN:  Objection. Beyond the
5   scope.
6     A.  Tufts put in place a pharmacy risk
7   program to encourage the utilization of generic
8   medications and formulary medications at this
9   point in time.
10    Q.  And what was the reimbursement
11  methodologies that Tufts put in place in order to
12  address its understanding that generic drugs were
13  cheaper?
14    A.  Can you repeat that question?
15    Q.  I am just trying to close a loop.  What
16  was the particular pharmacy risk program that
17  Tufts put into place?
18    A.  I am sorry.  Your question was what was
19  the particular pharmacy risk program that Tufts
20  put into place?
21    Q.  Yes.  You had testified that Tufts put
22  into place a pharmacy risk program.

124

1     A.  That's correct.
2     Q.  My question simply is what was that
3   program.
4     A.  As I stated before, Tufts had a budget
5   per IPA, PHO, in regards to pharmacy expense,
6   provided reports to physicians in regards to
7   generic brand name utilization and encouraged the
8   use of generic utilization in our network along
9   with formulary utilization and other preferred
10  plans that we put in place where there was prior
11  authorization for high-cost brand name drugs.
12    Q.  Now we were discussing your knowledge
13  while at Tufts in 1998 that acquisition costs
14  varied based upon the competition for the drugs
15  in the marketplace.  When did you first obtain
16  that understanding?
17        MR. SULLIVAN:  Objection.  I think that
18  mischaracterizes what the witness' testimony was.
19        MR. HAAS:  I disagree.
20  BY MR. HAAS:
21    Q.  But you can clarify.
22        MR. SULLIVAN:  Do you understand the

125

1   question?
2         THE WITNESS:  No.
3     Q.  My question is when did you first
4   obtain the understanding that you have testified
5   to that in 1998 you understood that the
6   acquisition cost of drugs varied depending upon
7   whether it was branded, multisource or generic,
8   and the level of competition in the marketplace?
9     A.  Through our PBM and the discounts that
10  we were able to achieve through multisource drugs
11  versus brand name drugs --
12    Q.  All right.
13    A.  -- and the competition in the
14  marketplace.
15    Q.  All right.  Did you have that
16  understanding before coming to Tufts or while
17  working at Tufts?
18    A.  While working in Tufts.
19    Q.  So you obtained that understanding in
20  the 1998 time frame?
21    A.  Correct.
22    Q.  Was it your understanding that that was

Henderson Legal Services
(202) 220-4158

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
                              Boston, MA

---

126

1  basically common knowledge at this point in time?
2         MR. SULLIVAN: Objection; beyond the
3  scope. Objection; form.
4     A.  Common knowledge that generics were
5  less expensive?
6     Q.  No. Just that brand name drugs --
7  excuse me -- common knowledge --
8         MR. HAAS: Withdraw the question.
9     Q.  Was it your understanding at the time
10 that it was basically common knowledge that
11 acquisition costs varied depending upon whether a
12 drug was brand or multisource or generic given
13 the level of competition in the marketplace for
14 the drugs?
15    A.  Yes.
16        MR. SULLIVAN: Objection to form.
17    A.  Yes.
18        MR. NOTARGIACOMO: Let me clarify
19 "acquisition cost."
20        MR HAAS: You can object. He said yes.
21        MR. SULLIVAN: I objected to the form
22 of the question. I think it is unclear.

---

127

1  BY MR. HAAS:
2     Q.  Your answer was yes?
3     A.  Can you clarify "acquisition cost"?
4     Q.  Price paid for the drugs.
5         MR. SULLIVAN: By whom?
6         MR. HASS: You have to give me a
7  chance.
8         MR. SULLIVAN: Sorry.
9         MR. HAAS: Just object.
10        MR. SULLIVAN: I did object, and you
11 didn't change the form.
12        MR. HAAS: You object. That is your
13 job. You object.
14        MR. SULLIVAN: I know my job.
15        MR. HAAS: If I want to clarify, I can.
16 If I don't, I don't.
17        MR. SULLIVAN: I understand.
18        MR. HAAS: So I will reask the
19 question, and I am trying to address your
20 concerns.
21 BY MR. HAAS:
22    Q.  The question is: Did you have an

---

128

1  understanding that the acquisition cost by
2  hospitals, by pharmacies, by doctors changed
3  depending upon whether a drug was brand name,
4  multisource or retail, generic, depending upon
5  the level of competition in the marketplace for
6  the drugs?
7         MR. SULLIVAN: Objection. Form;
8  compound; complex.
9     A.  When you are referring to acquisition
10 cost, I am referring specifically to the price
11 that Tufts Health Plan paid for the drugs, and we
12 knew that it was more cost effective for
13 multisource generic drugs than it was for our
14 physicians to be prescribing brand name drugs.
15    Q.  And it was your understanding the
16 reason for that was because manufacturers
17 provided different discounts and incentives and
18 depending upon the level of competition for the
19 drugs; correct?
20        MR. SULLIVAN: Objection. Beyond the
21 scope.
22    A.  That wasn't my understanding specific

---

129

1  to, as you said, as you restated it, physicians,
2  hospitals and others, but specific to the price
3  that we paid as a health plan through the retail
4  pharmacy program.
5     Q.  Right. But the price that you paid as
6  the ultimate payer was dependent -- turned in
7  part upon the price that the drugs could be
8  acquired, but turned upon the competition in the
9  marketplace for the particular drugs; right?
10        MR. SULLIVAN: Objection to form,
11 "ultimate payer." Vague.
12    A.  It was clear to us that yes, yes,
13 generics were more cost effective than brand name
14 drugs.
15    Q.  And just to be clear, you understood
16 that multisource were more cost effective than
17 brand name drugs because there was more
18 competition for multisource than brand name
19 drugs; right?
20    A.  Correct.
21        MR. SULLIVAN: Can we have an off-the-
22 record discussion here?

---

# EXHIBIT 8

1

1

IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  01CV12257-PBS

3

4     IN RE:  PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

5     PRICE LITIGATION

6     THIS DOCUMENT RELATES TO:

ALL ACTIONS

7

8                    * * * * * * * * *

9            CONFIDENTIAL DEPOSITION OF

10                  EDWARD LEMKE

11                 JANUARY 11, 2005

12                   * * * * * * * * *

13            TAKEN BY DEFENDANTS

14           AT 500 WEST MAIN STREET

15            LOUISVILLE, KENTUCKY

16                   * * * * * * * * *

17

18            THE DEPOSITION OF EDWARD LEMKE, TAKEN AT

19    500 WEST MAIN STREET, LOUISVILLE, KENTUCKY ON

20    JANUARY 11, 2005; SAID DEPOSITION TAKEN PURSUANT TO

21    NOTICE AND IN ACCORDANCE WITH THE RULES OF CIVIL

22    PROCEDURE.

Edward Lemke               Confidential                January 11, 2005
                           Louisville, KY

18 (Pages 66 to 69)

---

66

1    THE WITNESS: I think the previous answers
2 cover it.
3 BY MR. MANGI:
4    Q.  Well, with respect, I think this question
5 is a little bit different.  My question is, is it
6 Humana's aim that physicians should break even, or
7 is it Humana's aim that physicians be reimbursed at
8 an amount something higher than that which they paid
9 to acquire drugs?
10    MR. ST. PHILLIP: Same objection.
11    THE WITNESS: I know of no stated policy
12 within Humana to attempt to limit a provider to its
13 net or exact cost.
14 BY MR. MANGI:
15    Q.  Are you involved at all in negotiations
16 with providers?
17    A.  Only on special occasions.
18    Q.  Do you have knowledge as to the issues
19 that come up in negotiations generally, other than
20 those special cases?
21    A.  Yes.
22    Q.  Would it be fair to say that as part of

---

67

1 that negotiation process, physicians are seeking to
2 maximize the reimbursement they can get from Humana?
3    MR. ST. PHILLIP: Objection to form.
4    THE WITNESS: I could safely say 100
5 percent of the providers are seeking it, yes.
6 BY MR. MANGI:
7    Q.  And at the same time, Humana's aim is to
8 maintain an adequate provider network, right?
9    A.  That is one of the goals of Humana, yes.
10    Q.  And Humana would recognize as part of that
11 negotiating process that if Humana were reimbursing
12 providers at an amount below their acquisition
13 costs, if Humana were causing providers to lose
14 money, they would be unlikely to enter into those
15 contracts; is that a fair statement?
16    MR. ST. PHILLIP: Objection.
17    THE WITNESS: I can't say that with
18 certainty.
19 BY MR. MANGI:
20    Q.  Okay.  So is it your understanding that
21 physicians, while seeking to maximize reimbursement,
22 would nonetheless accept reimbursement at an amount

---

68

1 below their acquisition costs for drugs?
2    MR. ST. PHILLIP: Objection.
3    THE WITNESS: I could only answer that
4 from my previous experience in my career from the
5 provider's side, that during negotiation, in the
6 give and take, a provider may well agree to a less
7 than cost reimbursement to gain an advantage in
8 another area, i.e., loss leader.  I will take less
9 for this, but I want this for that.  An internal
10 analysis says when the day is done, if I come out
11 with more dollars in my pocket, it's been a
12 successful negotiation.
13 BY MR. MANGI:
14    Q.  So it's fair to say, then, that during
15 that negotiation process, both Humana and physicians
16 are always keeping an eye on the overall pictures,
17 what's going to be paid in the end and what's going
18 to be received in the end; is that a fair statement?
19    A.  It is definitely from Humana's side.  I
20 can only speculate that on the provider's side,
21 they're doing the same thing.
22    Q.  Now, is Humana aware of submissions and

---

69

1 studies that have been done by providers groups and
2 trade organizations, referencing the --
3    MR. MANGI: Let's go off the record for a
4 second.
5    (OFF-THE-RECORD DISCUSSION.)
6 BY MR. MANGI:
7    Q.  Now, is Humana aware of the fact that
8 physicians groups have stated publicly on many
9 occasions that the amounts Medicare reimburses them
10 in relation to services or administrative fees alone
11 are inadequate?
12    MR. ST. PHILLIP: Objection, it's
13 argumentative.
14    THE WITNESS: I have no knowledge of that.
15 BY MR. MANGI:
16    Q.  Okay.  Do you have any knowledge as to
17 whether physicians regard Medicare reimbursement for
18 admin fees as sufficient to cover their overhead
19 costs?
20    MR. ST. PHILLIP: Objection, asked and
21 answered.
22    THE WITNESS: I really cannot speak to

---

Henderson Legal Services
(202) 220-4158

Edward Lemke                     Confidential                  January 11, 2005
                                 Louisville, KY

32 (Pages 122 to 125)

122

1  Lemke to provide an answer.
2        MR. MANGI: I obviously disagree with that
3  interpretation, and the question is encompassed by
4  other subject matters. You can answer.
5        THE WITNESS: I know of no analysis that
6  exists that would indicate that being the case.
7  BY MR. MANGI:
8     Q. Now, you testified earlier that you don't
9  know what exactly providers are paying to acquire
10 drugs, correct?
11    A. Correct.
12    Q. All right. So it's fair to say that you
13 have no particular expectation that there is a given
14 relationship between the amount they paid to acquire
15 drugs and the amount that Humana reimburses for
16 those drugs; is that correct?
17       MR. ST. PHILLIP: Objection, calls for
18 speculation.
19       THE WITNESS: I have no personal knowledge
20 that -- of that.
21 BY MR. MANGI:
22    Q. And certainly, Humana has no expectation

123

1  that the amount that physicians pay to acquire drugs
2  are 10 percent, 20 percent, 50 percent, 60 percent
3  less than the amounts that Humana reimburses in
4  relation to those drugs; would you agree with that
5  statement?
6        MR. ST. PHILLIP: Objection, objection to
7  form.
8        THE WITNESS: I have no knowledge of that.
9  BY MR. MANGI:
10    Q. And you have no expectation to that effect
11 either; is that correct?
12       MR. ST. PHILLIP: Objection. Same
13 objection.
14       THE WITNESS: I'm not quite sure what you
15 mean, whether I have an expectation of that.
16 BY MR. MANGI:
17    Q. Is it Humana's expectation that the
18 amounts that providers pay to acquire drugs are a
19 fixed percentage less than the amount Humana
20 reimburses in relation to those drugs?
21    A. The expectation that -- first of all, that
22 it's fixed, no. The expectation that good business

124

1  practice and assuming providers that we do business
2  with practice good business practices, is that they
3  would only accept payment that is at or above their
4  costs. That's my only expectation.
5     Q. And certainly, you have no fixed
6  expectation as to how much higher it would be than
7  their acquisition costs, correct?
8     A. Correct.
9     Q. And indeed, that would vary from provider
10 to provider, depending on what they paid to acquire
11 drugs and what Humana reimburses them for drugs?
12    A. Correct.
13    Q. The percentage could be 10 percent in one
14 case, 50 in another, 100 in another, correct?
15       MR. ST. PHILLIP: Objection.
16       THE WITNESS: Could be.
17       MR. MANGI: Let's take a look at a few
18 documents. Before that, does anyone need a break?
19       MR. ST. PHILLIP: It's 12:35, let's take
20 one.
21       (A LUNCH BREAK WAS TAKEN.)
22 BY MR. MANGI:

125

1     Q. Now, Mister Lemke, when we started this
2  morning, I had asked you about your responsibilities
3  as director of fee schedule management, and at
4  first, you had identified was building a database
5  for use in contract negotiations. What's that
6  database you were referring to there?
7     A. It's an extract of physician claims,
8  provider claims from two of our major claims
9  processing platforms that we enhance the data from
10 the claim to include a Medicare equivalent based on
11 geographic area and CPT or HCPCS code so that we
12 have that data all together in one place to better
13 analyze an individual fee schedule or an individual
14 procedure or market all the way up.
15    Q. Okay. So it's a database that enables you
16 to compare what you're paying a particular provider
17 as opposed to what he would be getting from
18 Medicare?
19    A. Correct.
20    Q. Is that database still in existence?
21    A. Yes.
22    Q. What does that database generate by way of

**EXHIBIT 9**

Raeann Maxwell                                    September 10, 2004
Volume II                    Pittsburgh, PA

93

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

2                            - - - -

3

    In Re: PHARMACEUTICAL      ) MDL DOCKET NO.
4   INDUSTRY AVERAGE WHOLESALE ) Civil Action #
    PRICE LITIGATION           ) 01CV12257-PBS
5   _____)
                                   )
6   THIS DOCUMENT RELATES TO ALL   )
    ACTIONS                        )
7   _____)

8                            - - - -

9           DEPOSITION OF:  RAEANN MAXWELL

10                        VOLUME II

11                           - - - -

12                   September 10, 2004

13                   Friday, 1:30 p.m.

14

15           DEPOSITION OF RAEANN MAXWELL,

16  a witness, called by the Defendants for examination,

17  in accordance with the Federal Rules of Civil

18  Procedure, taken by and before Claire Gross, CRR,

19  RDR, a Court Reporter and Notary Public in and for

    the Commonwealth of Pennsylvania, at the offices of

20  UPMC, One Chatham Center, 112 Washington Place,

    Pittsburgh, Pennsylvania, on Friday, September 10,

21  2004, commencing at 1:30 p.m.

22

                             - - - -

Raeann Maxwell                                    September 10, 2004
Volume II                      Pittsburgh, PA

17 (Pages 154 to 157)

154

1    A.    No.
2    Q.    Earlier in the deposition Mr. Haas asked you
3          about your knowledge concerning controversy
4          in the last decade or so concerning the use
5          of AWP as a reimbursement mechanism, and he
6          asked you about your knowledge concerning
7          more recent legislation to use ASP as opposed
8          to AWP.
9                He asked you whether from UPMC's
10         perspective it mattered whether as a
11         reimbursement basis one used an AWP minus
12         some percentage or ASP above some percentage,
13         and you said not to my knowledge, I believe.
14         Is that accurate?
15   A.    That is correct -- that is accurate.
16   Q.    Would it make a difference to UPMC if UPMC
17         knew that -- in the answer to the question
18         would it make no difference to UPMC if UPMC
19         was aware that AWP, the average wholesale
20         price, for a particular drug was grossly
21         inflated and was not related to the actual
22         sales prices for that drug but it knew that

155

1          the ASP was a true average of the actual
2          sales price? Given that knowledge would it
3          make a difference to UPMC as to which basis
4          was used for reimbursement or payment?
5    MR. HAAS:  Objection to form,
6          characterization of the benchmarks, but you
7          can answer if you can understand it.
8    Q.    Were you able to follow that question?
9    A.    Basically you're saying that -- let me
10         paraphrase and see if I understand what you
11         were trying to get across, that you're
12         stating AWP is potentially inflated versus
13         ASP which would be a truer benchmark?
14   Q.    Basically yes.
15   MR. HAAS:  I will object on form and
16         foundation and characterization, among other
17         things.
18   MR. VUKMER:  This is Dan Vukmer. Let
19         me talk to my client for just one second, if
20         you wouldn't mind.
21                - - - -
22         (There was a discussion off the record.)

156

1                - - - -
2    A.    No, it shouldn't matter which that we would
3          potentially use.
4    Q.    Why is that?
5    A.    Because regardless of which number that you
6          utilize and you do whatever percentage minus
7          you should still come up close to a
8          negotiated reimbursement price to your
9          provider which would be a pharmacy or
10         physician.
11   Q.    Well, the instance where -- does that assume
12         that in the negotiation -- I don't know that
13         the negotiation you just posited -- does that
14         assume in that negotiation you understand
15         that AWP is, in fact, an inflated number?
16                MR. HAAS:  Objection, foundation,
17         form, speculative.
18   A.    I don't know how to answer that question.
19   Q.    Your testimony was it didn't matter whether
20         you used an AWP minus or an AWP plus system
21         because you would negotiate to a particular
22         point of reimbursement?

157

1    A.    Potentially, yes.
2    Q.    Would you reach the same point of
3          reimbursement if you did not understand that
4          AWP was an inflated number?
5                MR. HAAS:  Objection, ambiguous.
6          What does that mean?
7    Q.    All right. That AWP, in fact, did not
8          reflect or, put it this way, grossly
9          misrepresented what the actual sales prices
10         were in the market?
11                MR. HAAS:  Objection. She testified
12         she didn't believe it did.
13   Q.    You can answer the question if you understand
14         it.
15   A.    I don't understand.
16   Q.    Let me ask you why wouldn't it matter -- let
17         me see if I have time to get back to this.
18         Under the contract with Argus, which I
19         believe was Exhibit 6 to your deposition, at
20         least for those pharmacies that are in the
21         Argus network as opposed to the UPMC network,
22         with their being reimbursed Argus is being

# EXHIBIT 10

Carol Sidwell                                         September 17, 2004

Moline, IL

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    IN RE PHARMACEUTICAL        )

 5    INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

 6    PRICE LITIGATION           )   Civil Action: 01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO   )

 8    ALL CLASS ACTIONS          )

 9

10            Deposition of CAROL SIDWELL, taken before

11    GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

12    pursuant to the Federal Rules of Civil Procedure for

13    the United States District Court pertaining to the

14    taking of depositions, at Suite 300, 1630 Fifth

15    Avenue, in the City of Moline, Illinois, commencing

16    at 10:38 o'clock a.m., on the 17th day of September,

17    2004.

18

19

20

21

22
```

Carol Sidwell                                      September 17, 2004

Moline, IL

18 (Pages 66 to 69)

66

1   BY MS. MacMENAMIN:
2       Q.   Okay.  You also testified as to your
3   belief that the pharmacies had a reasonable margin
4   built into the reimbursement that they received from
5   you?
6           MR. HAAS:  Objection to form.
7           THE WITNESS:  Yes.
8   BY MS. MacMENAMIN:
9       Q.   Can you give us a ballpark guess as to
10  what that reasonable margin might have been?
11          MR. HAAS:  Objection to form.
12          THE WITNESS:  I don't know that I know
13  their specific margin.  I do know that even at AWP
14  minus 20 that they were still able to cover their
15  operating expenses without losing money, so whatever
16  their operating costs would be, their margin was
17  still there to cover that along with the dispensing
18  fee component that we pay.
19  BY MS. MacMENAMIN:
20      Q.   Okay.
21      A.   If you look at a pharmacy, in the data
22  that I've seen, it looks like the average cost to

67

1   dispense a prescription used to be 6 something.  I
2   think it's 7 or 8 something per prescription now.
3   And if I'm paying them as in some of these contracts
4   $1.75 or $1.49 per prescription, there has to be
5   additional margin in the drug cost for them to be
6   able to continue to be in business.
7       Q.   Okay.  From what you're saying, I
8   understand that you find AWP to be a useful
9   benchmark in place of actual acquisition cost?
10          MR. HAAS:  Objection to form.
11          THE WITNESS:  Yes.  It's an industry
12  standard.
13  BY MS. MacMENAMIN:
14      Q.   And would you say that it's a useful
15  benchmark because it has a relation to some kind of
16  real world price?
17          MR. HAAS:  Objection to form.
18          THE WITNESS:  I would say that it's useful
19  because it is a benchmark, because it is an industry
20  norm that I can apply discounts to to get
21  consistent adjudication of claims.
22  BY MS. MacMENAMIN:

68

1       Q.   Are you aware of any other benchmarks that
2   are available for use in reimbursing pharmacies?
3       A.   Certainly like the HCFA MAC would be a
4   benchmark price.  That's one that I don't -- we
5   don't use in our business to implement it.  We use
6   it as one of the things in compiling our own MAC
7   pricing.
8       Q.   Is the HCFA MAC exclusive to generic
9   products?
10      A.   I believe so.  It doesn't include all
11  generics.
12      Q.   So just speaking of brand name drugs here
13  exclusively, are you aware of any other benchmarks
14  available for use in reimbursing pharmacies?
15          I'm sorry, I didn't hear your answer if
16  you did answer.
17      A.   I'm still thinking.  I'm not aware of any
18  easily definable other benchmark out there.
19  Certainly there are different sources of AWP than
20  what we use today.
21      Q.   So if you learned that AWP did not have a
22  relation to any sort of real world prices, would

69

1   that affect your negotiations with pharmacies in
2   using AWP as a benchmark?
3           MR. HAAS:  Objection to form.
4           THE WITNESS:  I guess I already understand
5   that AWP is not necessarily a direct linear
6   relationship to the cost or the price that that
7   pharmacy pays for the drug, so since I know that
8   today, I'm not sure that it would change the way I'm
9   doing business or the way I'm contracting with my
10  pharmacies.
11  BY MS. MacMENAMIN:
12      Q.   In your negotiations with manufacturers
13  for rebates and discounts, are those negotiations
14  also based on the benchmarks AWP and WAC?
15      A.   Those are certainly two of the things that
16  are used to calculate the various levels of rebates.
17      Q.   Can you tell me of any other benchmarks
18  that are available?
19      A.   I look at the other costs of drugs in that
20  class based on AWP, based on WAC, and based on the
21  rebate amounts that the other manufacturers are
22  willing to offer to get down to a net price.

**EXHIBIT 11**

1

```
 1         IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

       IN RE:                      )
 4                                 )

       PHARMACEUTICAL INDUSTRY     ) Civil Action No.
 5     AVERAGE WHOLESALE PRICE     )   01CV12257-PBS
       LITIGATION                  )
 6

 7

 8              HIGHLY CONFIDENTIAL

 9                 DEPOSITION

10               of JOE SPAHN

11

12             Taken at Anthem

13          4361 Irwin Simpson Road

14           Mason, Ohio  45040

15      on November 30, 2004, at 9:12 a.m.

16     Reported by: Rhonda Lawrence, RPR/CRR

17

18

19                 -=0=-

20

21

22
```

Joe Spahn                     Highly Confidential                November 30, 2004
                                   Mason, OH

16 (Pages 58 to 61)

58

1    testified he does not know for certain, but
2    go ahead.
3        A.  I don't know for certain.  I will
4    say this, I think that what we pay them is a
5    fair and reasonable rate, which is our goal.
6    We're not trying to underpay them,
7    certainly.
8        Q.  What do you mean by "a fair and
9    reasonable rate"?
10       A.  Just what it says, that we think
11   it's fair and reasonable, adequate.
12       Q.  Okay.  Is one part of fair and
13   reasonable that Anthem is not paying
14   providers -- is not reimbursing providers an
15   amount in relation to drugs that's less than
16   what they pay to acquire those drugs?
17       MR. MATT:  I'm sorry.  Can I have
18   that question back.
19       (Record read as requested.)
20       MR. MATT:  Object to form.
21       MR. THOMAS:  I'm going to object to
22   foundation, because, again, I believe he

59

1    already testified he's not certain what
2    physicians pay to acquire drugs.
3        MR. MANGI:  I'm trying to --
4        A.  Well, the way we would look at it,
5    there's more than just -- I don't want to
6    look at just one drug.  You have to look at
7    the entire fee schedule.  I mean, they get
8    paid for the drugs, but you also get paid
9    for office visits, you get paid for
10   administering drugs.  So I don't know.
11       It could be that on one drug maybe
12   our reimbursement is less than it actually
13   costs them, but that's one drug.  We're
14   paying them much more on other things.  So
15   I'd rather look at the total reimbursement
16   rather than one drug.
17       Q.  Okay.  Let's leave aside specific
18   drugs and just talk about drugs generally.
19   To pay a fair and reasonable rate, would
20   Anthem understand that to mean that it's
21   generally paying -- not causing providers to
22   make a loss on drugs that they buy and then

60

1    administer?
2        A.  I think that's a fair statement,
3    yes.
4        Q.  Okay.  So we can agree, then, that
5    Anthem understands that it's reimbursing
6    providers in relation to drugs they
7    administer at some amount greater than what
8    they pay to acquire those drugs?
9        MR. THOMAS:  I'm going to interpose
10   an objection here only because we moved from
11   what Joe Spahn believes to what Anthem
12   believes on a corporation basis, and I don't
13   think we can make that jump, based upon his
14   testimony.  Foundation objection.
15       Q.  Okay.  Let's back up for a moment.
16   You understand that you're testifying here
17   today as a corporate representative on
18   behalf of Anthem, correct?
19       A.  Yes.
20       Q.  Okay.
21       MR. THOMAS:  That's correct.  But I
22   believe his response to the prior question

61

1    was I believe we try to pay.  I could be
2    wrong on my recollection, but that's the
3    basis for my objection.
4        MR. MANGI:  That's fine.
5        Could you repeat my prior question,
6    please.  And we can incorporate the same
7    objection.
8        (Record read as requested.)
9        A.  Okay.  I'm sorry?
10       Q.  Let's do it again.
11       A.  Okay.  Let's do it again.
12       Q.  Did you understand that question?
13       A.  No.  Can we do it again, please?
14       Q.  Sure.  We were speaking about fair
15   and reasonable, right?
16       A.  Yes.
17       Q.  And we agreed that, as a general
18   matter, in relation to drugs administered in
19   office, that means that Anthem doesn't
20   expect that the providers are making a loss
21   on those drugs, correct?
22       A.  Correct.

Henderson Legal / Spherion
(202) 220-4158

Joe Spahn                    Highly Confidential                    November 30, 2004
                                 Mason, OH

24 (Pages 90 to 93)

|  | 90 |
|---|---|
| 1 | baseline. |
| 2 | Q. Okay. And since that's the |
| 3 | baseline, is it fair to say that, as a |
| 4 | general proposition, providers are seeking |
| 5 | reimbursement at an amount greater than the |
| 6 | Medicare fee schedule? |
| 7 | A. In general, yes. But there's |
| 8 | another component, too, which is volume. |
| 9 | You have to -- you know, if Anthem is -- |
| 10 | drives a lot of volume to that provider, you |
| 11 | know, they may be willing to -- because, you |
| 12 | know, what they're looking at is their total |
| 13 | reimbursement. You got the -- how much |
| 14 | you're paying them for each procedure, but |
| 15 | also the number of procedures that they do. |
| 16 | So if Anthem has a large membership |
| 17 | in an area, they may be willing to take less |
| 18 | than the actual fees, but they make more |
| 19 | money because of the volume. |
| 20 | Q. So the determination of the |
| 21 | reimbursement rate that will be paid to a |
| 22 | practice is very much an individualized |

|  | 92 |
|---|---|
| 1 | power, the amount of volume that's driven to |
| 2 | it by Anthem? |
| 3 | A. Correct. |
| 4 | Q. Are there other factors that go into |
| 5 | that calculation? |
| 6 | A. I think those are the main ones. |
| 7 | Q. Okay. Now, do you have an |
| 8 | understanding -- well, withdraw that. |
| 9 | You know that there are some drugs |
| 10 | that can be administered either in a |
| 11 | physician's office or in a hospital, |
| 12 | correct? |
| 13 | A. I assume there are. Again, I'm only |
| 14 | familiar with the physician side. |
| 15 | Q. Okay. Do you have an understanding |
| 16 | as to whether Anthem regards the |
| 17 | administration of drugs in physicians' |
| 18 | offices as being more or less cost-effective |
| 19 | than the administration of the same drug in |
| 20 | a hospital setting? |
| 21 | A. I don't know. I've never heard |
| 22 | anyone talk about that. |

|  | 91 |
|---|---|
| 1 | issue focusing on that particular practice, |
| 2 | correct? |
| 3 | A. Did you say an individual practice? |
| 4 | Q. Let me clarify the question. |
| 5 | We've discussed how there are some |
| 6 | competitive factors that give one practice a |
| 7 | stronger bargaining practice than another, |
| 8 | right? |
| 9 | A. Correct. |
| 10 | Q. And what we just discussed is that |
| 11 | volume would also be a factor in determining |
| 12 | the reimbursement rates, how much volume |
| 13 | Anthem drives towards a particular physician |
| 14 | practice? |
| 15 | A. Correct. |
| 16 | Q. So it's fair to say that the |
| 17 | determination of the amount that Anthem will |
| 18 | reimburse a practice for drugs that are |
| 19 | administered in office turns on factors |
| 20 | specific to that practice, right? |
| 21 | A. Correct. |
| 22 | Q. Including its competitive bargaining |

|  | 93 |
|---|---|
| 1 | Q. Okay. Are you aware of any analysis |
| 2 | at Anthem regarding the relative costs of |
| 3 | administration of a drug in a physician's |
| 4 | office versus a hospital setting? |
| 5 | A. No, I haven't. |
| 6 | Q. Now, you testified earlier that |
| 7 | Anthem has -- does not know exactly what |
| 8 | providers are paying to acquire drugs, |
| 9 | correct? |
| 10 | A. Correct. |
| 11 | Q. That's not something that -- |
| 12 | withdraw that. |
| 13 | Anthem does not require providers to |
| 14 | disclose their acquisition costs for drugs |
| 15 | as part of their contracts with those |
| 16 | providers, correct? |
| 17 | A. Correct. |
| 18 | Q. So providers' acquisition costs for |
| 19 | drugs do not form part of Anthem's |
| 20 | determination of what it will reimburse them |
| 21 | in relation to drugs? |
| 22 | A. Correct. |

Joe Spahn                    Highly Confidential                    November 30, 2004
                                  Mason, OH

25 (Pages 94 to 97)

94

1    Q.  The reimbursement is driven entirely
2  by the fee schedule?
3    A.  Correct.
4    Q.  Regardless of what the specific
5  provider's acquisition costs for those drugs
6  may be?
7    A.  Correct.
8    Q.  So if, for example, Anthem were to
9  learn that a particular provider were
10  getting a discount or a rebate on a
11  particular drug that lowered his acquisition
12  costs for that drug, that wouldn't change
13  the amount that Anthem is reimbursing that
14  practice in relation to that drug, right?
15    A.  No.
16    Q.  Because the reimbursement amount is
17  tied to the fee schedule?
18    A.  Right.
19    Q.  And if Anthem were to learn that
20  providers in a region were getting a
21  discount or rebate from a drug manufacturer
22  in relation to a particular drug, again,

95

1  that wouldn't change the amount Anthem
2  reimburses because that's tied to the fee
3  schedule?
4    MR. THOMAS:  Asked and answered.
5    A.  Yes.  That's correct.
6    Q.  Do you know whether Anthem's
7  contracts with providers contain
8  confidentiality clauses?
9    A.  I don't know.
10    Q.  Do you know whether or not -- are
11  you aware of any free sample programs
12  whereby providers can get free samples of
13  drugs from manufacturers?
14    A.  No, I'm not aware.
15    Q.  That's not an area that you deal
16  with?
17    A.  No.
18    Q.  Are you familiar with the major drug
19  wholesalers operating the market today?
20    A.  No.
21    Q.  Do you have an understanding of what
22  wholesalers pay to acquire drugs?

96

1    A.  No, I don't.
2    Q.  Are you familiar with prompt pay
3  discounts?
4    A.  No, I'm not.
5    Q.  You've never heard that term?
6    A.  No, I haven't.
7    Q.  To the best of your knowledge, do
8  you know of any instances where providers
9  have conspired with drug manufacturers to
10  inflate the average wholesale prices for
11  drugs?
12    A.  No.
13    Q.  Are you aware of any instances where
14  pharmacies or pharmacy benefits managers
15  have conspired with any drug manufacturers
16  to inflate any drug's average wholesale
17  prices?
18    A.  No.
19    MR. MATT:  Objection.  No
20  foundation.
21    MR. THOMAS:  I was just going to let
22  it go.

97

1    Q.  Do you know whether Anthem has been
2  involved in any litigations pertaining to
3  average wholesale prices for drugs other
4  than this one here today?
5    A.  No.
6    MR. THOMAS:  Objection.  Foundation.
7    Q.  Do you know of any other litigations
8  that Anthem has been involved in relating to
9  reimbursements to providers for drugs
10  administered in office?
11    A.  No.
12    MR. THOMAS:  Same objection.
13    MR. MANGI:  Let's take another quick
14  break and then we'll look at some documents.
15    (Recess taken.)
16  BY MR. MANGI:
17    Q.  Prior to the break, we were talking
18  about providers' acquisition costs and the
19  fact they're not relevant to Anthem's
20  reimbursement amounts.  Do you recall that
21  testimony?
22    A.  Yes.

Joe Spahn                    Highly Confidential            November 30, 2004
                                  Mason, OH

26 (Pages 98 to 101)

---

**98**

1    Q.  Okay.  And part of that was that
2  Anthem has no information about what the
3  providers' acquisition costs are, right?
4    A.  Correct.
5    Q.  So it's fair to say that Anthem has
6  no particular expectation that providers'
7  costs would be, you know, 10 percent, 30
8  percent, 50 percent, something more,
9  something less than the amount they're
10  reimbursed in relation to those drugs,
11  right?
12    MR. THOMAS:  Object to form.
13    A.  Yes.
14    Q.  I'd like to just plug a couple of
15  gaps here.
16    Do you know how many states Anthem
17  operates in nationwide?
18    A.  Gosh.  I think it's nine.
19    Q.  Do you know how many regions that's
20  divided into?  One is the Midwest that we've
21  been discussing.
22    A.  You have Mideast, you have Midwest,

---

**99**

1  you have West, and you have South,
2  Southeast.  I think Virginia's called the
3  Southeastern region.
4    MR. THOMAS:  It's just East.  It's
5  not Mideast.
6    A.  Did I say Mideast?  Sorry.  East,
7  West, Midwest and Southeast.
8    Q.  So a total of four regions?
9    A.  Four regions.
10    Q.  Do you have an understanding as to
11  whether or not Anthem reimburses providers
12  that are not part of its network if an
13  individual insured is treated by that
14  physician?
15    A.  I'm sorry.  Could you repeat that?
16    Q.  Sure.  You understand that Anthem
17  has contracts with providers, correct?
18    A.  Correct.
19    Q.  And you understand that Anthem's
20  insureds primarily are treated by those
21  providers?
22    A.  Correct.

---

**100**

1    Q.  Now, if an Anthem insured visits a
2  doctor that is not part of Anthem's network
3  and is administered a drug by that doctor,
4  do you have an understanding as to whether
5  or not Anthem will reimburse that doctor in
6  relation to that drug?
7    A.  Do I have an understanding?
8    Q.  Right.
9    A.  Yes.
10    Q.  What are the terms of that
11  reimbursement?
12    A.  Well, we wouldn't.  If they're
13  non-par, we wouldn't reimburse.
14    Q.  I'm sorry?
15    A.  If they're not par,
16  non-participating, if they're noncontracted,
17  then we don't -- we wouldn't reimburse them.
18  We'd reimburse the member.
19    Q.  So in that instance, the individual
20  member would pay the physician's full bill
21  and then seek reimbursement from Anthem?
22    MR. THOMAS:  I'm going to object on

---

**101**

1  foundation.  We're not talking about any
2  specific product here.  It may vary
3  depending upon product.
4    Q.  Sure.  Let's clarify that.
5    Do you have an understanding as to
6  whether reimbursement for
7  out-of-network-provider visits varies from
8  plan to plan or product to product?
9    A.  No.  It's the same.
10    Q.  Okay.  Now, in those instances, will
11  Anthem reimburse anyone in relation to that
12  office visit?
13    A.  We would repay our fee schedule
14  amount to the member.
15    Q.  So the responsibility for making
16  payments to the physician would rest
17  entirely on the member; is that correct?
18    A.  Correct.
19    Q.  And the member would then seek
20  reimbursement from Anthem?
21    A.  Correct.
22    Q.  And in that instance, when we're

---

**EXHIBIT 12**

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

In re: PHARMACEUTICAL                )

INDUSTRY AVERAGE WHOLESALE    )    No. 01-2257-PBS

PRICE LITIGATION,                    )

                                     )

THIS DOCUMENT RELATES TO ALL  )

ACTIONS,                             )

_____  )

HIGHLY CONFIDENTIAL

PURSUANT TO PROTECTIVE ORDER

TELEPHONIC DEPOSITION OF SCOTT WERT

WEDNESDAY, FEBRUARY 1, 2006

Telephonic deposition of SCOTT WERT, taken

on behalf of Johnson & Johnson, 10834 International

Drive, Suite 200, Rancho Cordova, California, at

10:00 a.m., on Wednesday, February 1, 2006, before

RICHARD M. RAKER, CSR No. 3445, Certified Shorthand

Reporter.

Henderson Legal Services
(202) 220-4158

Scott Wert                    **HIGHLY CONFIDENTIAL**                    February 1, 2006
                                  Rancho Cordova, CA

34

1   BY MR. MANGI:
2       Q.  Well, let me ask it another way.  You're
3   aware that wholesalers will purchase drugs at WAC or
4   an amount below WAC depending on the rebates and
5   discounts that they get, correct?
6       A.  Yes.
7       Q.  You're also aware that WAC is a different
8   number from AWP, correct?
9       A.  Correct.
10      Q.  Indeed, the AWP will generally be either
11  20, 25 or 30 percent over the WAC for a drug, right?
12      A.  Right.
13      Q.  It's certainly fair to say that
14  wholesalers and other entities in the market are not
15  actually purchasing drugs at AWP; they're purchasing
16  at WAC or something below WAC, right?
17          MR. WILLIAMS:  Calls for speculation.
18          MR. SELFRIDGE:  Also lack of foundation.
19  BY MR. MANGI:
20      Q.  You can answer.
21      A.  Generally, yes.
22      Q.  Indeed, you're not personally aware of any

35

1   single entity that purchases at AWP, correct?
2          MR. WILLIAMS:  Lack of foundation.
3          THE WITNESS:  Am I aware?  I'm not aware.
4   BY MR. MANGI:
5       Q.  Okay.  Now, we've discussed a couple of
6   different things.  We've discussed WAC, and we've
7   discussed the fact that the price at which entities
8   in the market acquire drugs will be a percentage
9   below WAC that varies depending on the amount of the
10  rebate or discount that entity gets on that drug,
11  right?
12      A.  Right.
13      Q.  We've discussed AWP, which is a benchmark
14  that is either 20 or 25, sometimes 30 percent above
15  the WAC for given drugs, right?
16      A.  Right.
17      Q.  So it's fair to say, isn't it, that the
18  relationship between any individual entity's
19  acquisition cost for drugs and the AWP for that drug
20  will vary depending on the amount of rebates or
21  discounts that that entity is getting, right?
22      A.  Right.

36

1       Q.  Indeed, there will be no settled
2   percentage differential between the two of those
3   numbers, the actual acquisition costs on the one
4   hand and the AWP for that drug on the other, right?
5       A.  Right.
6       Q.  Will vary from entity to entity, drug to
7   drug depending on the leverage that those entities
8   have and their ability to exact differential rebate
9   and discounts from drug manufacturers, right?
10      A.  Yes.
11      Q.  And certainly Health Net has no fixed
12  expectation or has no expectation that there is, in
13  fact, a fixed relationship between actual
14  acquisition and AWP, correct?
15          MR. WILLIAMS:  Objection; lack of
16  foundation.
17          THE WITNESS:  Correct.
18  BY MR. MANGI:
19      Q.  In other words, Health Net recognizes that
20  the relationship between the actual acquisition cost
21  for a drug and the AWP for a drug will vary widely
22  depending on the amounts of rebates or discounts

37

1   that the purchasing entity can get from the
2   manufacturer.
3       A.  Right.
4       Q.  So certainly, if one were to say that,
5   well, you know Health Net expects that there will be
6   a fixed relationship of, say, 20 percent or 30
7   percent or 40 percent, there would be absolutely no
8   foundation for that, correct?
9       A.  Correct.
10      Q.  That would be simply an inaccurate
11  assumption that lacks any foundation whatsoever,
12  right?
13          MR. WILLIAMS:  I'll object as ambiguous.
14  Also calls for speculation.
15          MR. SELFRIDGE:  It's an argumentative
16  question, but you can answer.
17          THE WITNESS:  Yes.
18  BY MR. MANGI:
19      Q.  Now, let's talk for a moment about generic
20  drugs.  Actually, withdraw that.
21          Do you know at what rate Health Net can't
22  reimburse doctors for drugs that they administer to

Henderson Legal Services
(202) 220-4158