UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION <br><br> **THIS DOCUMENT RELATES TO:** <br><br> *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.* <br><br> CIVIL ACTION NO. 06-11337-PBS | MDL No. 1456 <br> Civil Action No. 01-12257-PBS <br><br> Hon. Patti Saris <br><br> Chief Magistrate Judge <br> Marianne B. Bowler |

**ABBOTT LABORATORIES, INC.'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL ABBOTT TO PRODUCE ALL DISCOVERY PURPORTEDLY
REQUIRED BY CMOS 5 AND 10**

After conducting a one-sided investigation for more than a decade, the United States has finally unsealed a complaint against Defendant Abbott Laboratories, Inc. ("Abbott") for what it mischaracterizes as fraudulent pharmaceutical industry pricing. Specifically, the Government alleges that from January 1, 1991 to January 2001 (the "Relevant Claim Period"), Abbott reported inflated drug prices *for certain specifically enumerated drugs*, namely dextrose solutions, sodium chloride solutions, sterile water, and vancomycin products (the "Subject Drugs"), in an effort to entice customers or potential customers to purchase, use, and/or administer Abbott drugs and then submit claims to Medicare and Medicaid for reimbursement at higher amounts than the prices at which those customers purchased the Abbott drugs. (*See* Complaint; Pltfs. Mot. at p. 2). Far from the deceived party, the Government, for nearly four decades prior to this suit, knew about the existence of this so-called inflated industry pricing, and embraced such pricing to further its own political and administrative agenda.[1]

---

[1] The legal deficiencies of Plaintiffs' case are outlined in Abbott's Motion to Dismiss, originally filed in Dist. of FL, Case No. 06-21303, Doc. No. 28.

While the Government observed from the sidelines, the parties to this Multidistrict Litigation litigated and this Court issued over two-dozen case management orders and a protective order. Plaintiffs now seek to change the prior CMOs and protective order issued by this Court merely because "they represent the Government" and the proposed changes would make the Government's delayed prosecution of its claims more convenient.

Plaintiffs' contention that existing CMOs (5 and 10) *require* Abbott to produce all documents produced in other AWP cases plainly contradicts this Court's CMO 9. That CMO explicitly provides that Plaintiffs are *not* automatically entitled to defendants' documents relating to drugs not at issue in a particular plaintiff's case. (CMO 9, Doc. No. 612 at pp. 2-3, ¶3.) For the reasons discussed herein, Plaintiffs have failed to explain why the documents they seek from Abbott – *all* of the discovery that Abbott has produced in a host of other AWP-based actions (irrespective of the drug products or claims at issue) – is reasonably calculated to lead to the discovery of admissible evidence in this case. Similarly, Plaintiffs' request that this Court "clarify" that the United States, Ven-A-Care, and all MDL Plaintiffs may "share" discovery is inconsistent with the protective order already issued by this Court. Finally, Plaintiffs' request that Abbott be ordered to create a global "crosswalk" document between various prior Abbott document productions is a non-starter. Even if it were appropriate to force Abbott to do Plaintiffs' work for them (and it is not), it would not be just unduly burdensome for Abbott to create such a document; it would be effectively impossible.

## ARGUMENT

Having elected to bring suit on four drugs (all multi-source and marketed during the Relevant Claim Period by Abbott's former Hospital Products Division ("HPD")), the Plaintiffs assert, based on no more than their own say-so, that they are entitled to *every* document that Abbott has *ever* produced in multiple AWP lawsuits, regardless of the claims or drug products

involved in those cases. Moreover, Plaintiffs argue (incorrectly) that Abbott is refusing to produce relevant material from these other cases.

To make the record clear – Abbott has produced or offered to produce *all* responsive documents from those prior productions that specifically mention the Subject Drugs; *all* responsive documents that are related to the Subject Drugs, even if those drugs are not mentioned by name (*i.e.*, general sales or marketing information for classes of drug products that would include the Subject Drugs); and *all* responsive documents, if any, that would reflect any alleged effort by Abbott to "market the spread" or "manipulate AWP" for *any* drug within Abbott's former HPD during the Relevant Claim Period.[2] What Abbott has not done is produce material *exclusively* relating to non-Subject Drugs, and contrary to Plaintiffs' assertions, Abbott should not have to.

### A. Plaintiffs Have Failed To Show The Relevance of The Requested Material.

In arguing for the wholesale production in this case of every document produced in other actions, Plaintiffs seek a host of material that is irrelevant both to the drugs and the alleged scheme at issue in their own complaint. Rule 26(b)(1) provides, in relevant part, that parties "may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." FED. R. CIV. P. 26(b)(1). The Government's broad-brushed request for all documents previously produced by Abbott in AWP-related actions is inconsistent with the Federal Rules and applicable precedent. As noted by the First Circuit:

> Management of discovery is a largely empirical exercise, requiring judges to balance the inquirer's right to know against the responder's right to be free from unwarranted intrusions, and then to factor in systemic concerns. *Limits can best be set case by case.*

---

[2] Plaintiffs use terms such as "market the spread" and "manipulate AWP" with respect to these documents. Without conceding their appropriateness or validity, Abbott uses these terms for the sake of the Court's convenience in resolving this motion.

> Although judicial discretion is not unrestrained-courts must apply a set of general principles, see, e.g., Fed. R. Civ. P. 26-parties have a correlative obligation to tailor interrogatories to suit the particular exigencies of the litigation. *They ought not to be permitted to use broad swords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up.*

*Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 187 (1st Cir. 1989) (emphasis added); s*ee also Hickman v. Taylor*, 329 U.S. 495, 508 (1947) (Under Rule 26(b), "limitations come into existence when the inquiry touches upon the irrelevant.").

It is axiomatic that relevancy under Rule 26 turns directly on the claims alleged in the complaint.  See FED. R. CIV. P. 26(b); *Mack*, 871 F.2d at 187.  Here, Plaintiffs' claims involve an alleged scheme to defraud the United States Government with respect to its reimbursement of *certain enumerated drugs* under Medicare Part B and Medicaid.  Plaintiffs' own claims give rise to Abbott's relevancy objection, for Plaintiffs seek discovery of material that is irrelevant and, importantly, could not form the basis of liability (or damages) under the complaint.

Abbott has only one division under which it marketed and sold drugs relevant to the complaint, and that is its former HPD.[3]  With respect to these drugs, Abbott has produced or offered to produce every responsive document that could be construed as relevant to the claims in the complaint – including many documents that do not specifically relate to the Subject Drugs. In particular, Abbott has produced or has agreed to produce 1) any documents (to the extent they exist) that would reflect any alleged effort by Abbott to "market the spread" or "manipulate AWP" for *any* drug within Abbott's former HPD during the Relevant Claim Period (1991-2001) and 2) any documents related to the Subject Drugs, even if those drugs are not mentioned by name (*i.e.*, general sales or marketing information for classes of drug products that would include

---

[3] On April 1, 2004, Abbott divested itself of its Hospital Products Division resulting in a new corporation. Abbott no longer sells or markets products under a hospital products division.

the Subject Drugs). Indeed, Abbott has turned over or offered to turn over tens of thousands of documents with respect to the Subject Drugs.

Any documents that might remain are specific to the non-Subject Drugs and have nothing to do with this lawsuit. The mere fact that Abbott produced responsive documents in another case, where certain non-Subject Drugs *were* at issue, does not render such documents relevant to Plaintiffs' claims, where the non-Subject Drugs are clearly *not* at issue. That, of course, is the rationale behind CMO 9 stating that plaintiffs are *not* automatically entitled to a defendant's documents relating to drugs not identified in the plaintiff's complaint, and Abbott has already gone or offered to go far beyond what is contemplated by CMO 9.

Plaintiffs' other attempts to articulate the relevance of documents (*see* Pltfs. Mot. at pp. 9-10) outside of what Abbott has already agreed to provide also fail. In addition to the arguments above, any pattern or practice "evidence" with respect to non-Subject Drugs would be both irrelevant and improper because it could only be used as evidence to show Abbott's propensity to commit the alleged wrong (the alleged Subject Drug fraud). Such evidence is clearly prohibited by FED. R. EVID. 404(b). Additionally, Plaintiffs claim, without any specificity, to have evidence contradicting Abbott's statement that it "had no role [in the] 'creation or existence' of any so-called 'spread.'" (*See* Pltfs. Mot. at p. 10). Merely citing to unidentified "evidence" that Plaintiffs "already have" does not entitle Plaintiffs to relief under Rule 37 or render such evidence relevant. And, in any event, Abbott has already produced or offered to produce documents, if any, from HPD that bear on this issue. Similarly, contrary to Plaintiffs assertion, Abbott has already produced or offered to produce any and all responsive documents with respect to any general marketing plans that would be relevant to Plaintiffs' claims.

Plaintiffs' other assertion, regarding any marketing-related documents for vancomycin that predate 1991, is a non-issue for purposes of this motion. Abbott has produced or agreed to produce any such documents that have been produced in other AWP cases. Finally, Plaintiffs' assertion that because Abbott has not filed an answer in this case they are somehow entitled to get what would otherwise be irrelevant material is unpersuasive. Abbott's motion to dismiss, its numerous defenses in other proceedings (some of which share the same Relator as the case at bar), as well as the voluminous documents provided to the United States in response to its numerous subpoenas all provide Plaintiffs, who have been investigating their claims for over a decade, with due notice as to the relevant issues of this case. (*See* Pltfs. Mot. at p. 10).

Furthermore, to the extent Plaintiffs seek discovery of material *exclusively* relating to an altogether different division, the Pharmaceuticals Products Division ("PPD"), and the different drugs made and marketed by that group, Plaintiffs fail to articulate even an arguable basis to receive such discovery. By way of background, drugs marketed and sold by Abbott's PPD are almost exclusively single-source, self-administered drugs (*e.g.*, branded pills) that are prescribed by a physician to an eligible patient, who then takes the prescription to be filled by a third-party (typically a pharmacist who has no discretion to alter the physician's prescription). Medicare Part B does not cover PPD drugs, and to the extent Medicaid reimburses third-party pharmacists for PPD drugs, such reimbursement occurs only *after* the third-party pharmacist fills the physician's *binding* prescription.

With no basis to contest these differences between HPD and PPD products, Plaintiffs nonetheless argue that discovery of material exclusively relating to PPD drugs might lead to evidence of a pattern or practice of Abbott's fraudulent activity (or at least constitute knowledge)

-6-

with respect to marketing and selling an alleged "spread" on the Subject Drugs.[4] (Pltfs. Mot. at pp. 9-10) However, PPD drugs, as single-source, self-administered pills, were *never* reimbursed by Medicare Part B, and were *never* sold, marketed, and/or reimbursed by Medicaid in a way consistent with Plaintiffs' alleged scheme. For single-source, self-administering drugs (like Abbott's PPD drugs), it was the *third-party* pharmacist, rather than the administering physician or hospital, who received reimbursement under Medicaid. Simply, Plaintiffs' theory that Abbott unlawfully marketed a "spread" to its existing and potential customers in an effort to get those customers to administer/use Abbott drugs because of the potential "spread" fails on its face with respect to PPD drugs. Hence, material exclusively relating to PPD drugs could never reap the "pattern or practice" evidence sought by Plaintiffs.[5] Accordingly, none of Plaintiffs' arguments sufficiently articulate why material exclusively relating to PPD drugs would either be admissible evidence or be reasonably calculated to lead to admissible evidence.

### B. The CMOs Do Not Entitle Plaintiffs To The Requested Material.

In these MDL proceedings, which Plaintiffs only recently joined, the Court has consistently and fairly managed the administration of pre-trial matters on an on-going and supplementary basis. While Plaintiffs seek to pick and choose isolated provisions of certain

---

[4] As articulated in Plaintiffs' motion, the alleged "spread" constitutes the difference between the amount reimbursed by both Medicare and Medicaid and the actual acquisition cost paid by Abbott's customers. Plaintiffs allege that Abbott sought to influence its customers to administer Abbott's products by artificially inflating the reimbursement amounts, by way of the Average Wholesale Price ("AWP"), and then "marketing the spread." (Pltfs. Mot. at p. 2).

[5] Indeed, the Court's own expert doubts that any alleged "spread" with respect to PPD drugs was the result of *any* unlawful conduct. *See* Berndt Report, Doc. No. 1384 at ¶23 ("The evolution of the AWP – WAC "spread" for branded self-administered pharmaceuticals is therefore, as best I can tell, quite understandable, and apparently not the result of any sinister or nefarious conspiracies.").

CMOs to make things convenient for them, to do so would unfairly change the rules of this litigation midstream, and could alter the timeframe upon which discovery can be completed.[6]

CMO 9 specifically addresses and controls the issues raised in Plaintiffs' motion:

> Upon request, defendants who have produced documents to plaintiffs in the Lead Case pursuant to CMO 5 and/or CMO 7 shall make those documents available to *any government entity plaintiff* in any action included within MDL 1456, *except that no such plaintiff shall be entitled to have access to*: . . . b) documents relating to drugs that are not identified in the operative complaint filed by such plaintiff; and c) documents produced by a defendant that are not otherwise relevant to the claims asserted against that defendant in the operative complaint filed by such plaintiff.

CMO 9, Doc. No. 612 at pp. 2-3, ¶3. Plaintiffs do not dispute Abbott's proposed discovery production comports with this provision. Rather, Plaintiffs ask the Court to simply ignore it.[7]

### C. Plaintiffs' Request To Allow Wholesale Sharing Of Documents Is Procedurally Improper And Is Inconsistent With The Protective Order Entered Four Years Ago By This Court.

Plaintiffs similarly seek to change the Protective Order that the parties to MDL 1456 have been operating under for the last four years. Specifically, Plaintiffs improperly request that this Court "clarify" or "order" that the United States, Ven-A-Care, and all MDL Plaintiffs may share any and all pre-disclosed discovery. The procedural and substantive flaws of this request mandate denial. As an initial matter, the parties have already briefed and argued this issue in

---

[6] Indeed, Plaintiffs have already sought to twist the scope of discovery by demanding Abbott produce absolutely every document and deposition previously produced under CMOs 5 and 10, without regard to time or subject matter, while at the same time proposing to limit the scope of material Plaintiffs will produce with respect to crucial issues raised in Abbott's defense. (*See* Doc. No. 3108, Proposed Order for Plaintiffs' Motion For A Comprehensive Case Management Order (proposing that Abbott produce all documents produced in other cases yet proposing: "6. All of Defendants' discovery directed at the "United States" shall pertain specifically to the U.S. Department of Health and Human Services ("HHS"), including the Centers for Medicare and Medicaid Services ("CMS"), the victim agency, and its agents, concerning Defendants' drugs and the conduct set forth in the Complaint. 7. All discovery shall relate to the allegations in the Complaint and any specific defenses thereto. All discovery related to any "government knowledge" argument asserted by Abbott, or any other defendant, shall be deferred until the Court rules on Abbott's Motion to Dismiss."; *see also* Ex. 1 - Letter from DOJ (01/05/07)).

[7] In a feeble attempt to grapple with CMO 9, Plaintiffs agree with Abbott: "CMO 9 relieved the defendants from replicating prior discovery responses except to the extent pertinent to the drugs alleged by a particular government plaintiff." (Pltfs. Mot. at p. 12).

October 2006.  Plaintiffs are essentially asking this Court for a "re-do."  Besides, Plaintiffs' attempt to *de facto* amend or alter this Court's Protective Order by way of side-argument in a motion to compel is procedurally improper.  As a substantive matter, to the extent Plaintiffs seek to share discovery without any regard to relevance, subject matter, or pre-existing protective orders, Abbott would object on the same bases articulated in its September 29, 2006 Opposition to Plaintiffs' Motion for a Protective Order. (Doc. No. 3153).  For the convenience of the Court, Abbott summarizes those arguments below.

*First,* the Government again seeks preferential treatment under this Court's CMOs and the MDL 1456 Protective Order (as it has done with respect to several state courts' protective orders), for no other reason than because it is the Government.[8]  That is improper.  The Government, acting as a civil litigant in this case, should be equally subjected to the rules and orders in each AWP case that every other civil litigant must follow.

*Second*, Plaintiffs again fail to show why the United States, as non-party to a different litigation not subject to that litigation's protective order, or some other plaintiff as a non-party to this litigation not subject to this litigation's protective order, have the right to hand over documents regardless of relevance, subject matter, and without assurances that the applicable protective order will be followed.  Quite simply, Plaintiffs do not provide *any* assurance that the rights and protections secured by Abbott, by way of this Court's and numerous state courts' protective orders, will be preserved.  Indeed, Plaintiffs all but admit they seek unfettered access to any and all documents (as well as indiscriminately share discovery from this case) merely because it would be more convenient (and less costly) for them.  (Pltfs. Mot at p. 13).  This

---

[8] This is highlighted by the United States' assertion, without argument or law in support, that it need not sign the protective order in place with respect to the documents produced by Abbott in *State of Texas ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc., et al.*, Case No. GV401286, District Court, Travis County, TX.  (Pltfs. Mot. at p. 7n.3).

position has been squarely rejected before, and Plaintiffs offer no reason it should not be rejected again.  (*See* Ex. 2 - *State of Wisc. v. Amgen, et al.*, No. 04 CV1709, Nov. 29, 2005  Decision & Order at pp.2-3 ("The universe into which these [shared] materials would flow is far from defined.  Nonetheless, plaintiff volunteers to have this Court enforce any violations of the proposed [Protective] Order by any of these unidentified potential recipients.  To say this is not a task welcomed by this decision-maker is to put it diplomatically.  Almost three decades at this job have shown me the futility and frustration of trying to apply contempt powers beyond [the Court's jurisdiction].  The practicality of plaintiff's proposal is dubious, at best. . . .  Other than creating extra work and knotty legal issues, such sharing does nothing to promote resolution of this case.")).

*Third*, granting Plaintiffs' request for unencumbered sharing between any and all plaintiffs would result in undue confusion with respect to future discovery and future discovery disputes.  Under Plaintiffs' theory, future plaintiffs and/or future defendants will not know what documents they need to produce, what protective order such documents are or would be subject to, and why such documents are relevant to a given case.  A better approach would be to follow the rules and orders already in place within the MDL, and require Plaintiffs (including the Government), as well as any future litigants, to operate under the same set of rules that have been working for over four years.

Quite simply, other than their own convenience, Plaintiffs have not presented any reason to change the rules or scope of discovery midstream, which is only compounded by the inevitable difficulties that would arise if the Court allows the plaintiffs (all of them) to share, without limitation, any and all discovery.

### D.  Plaintiffs' Incredible Demand For A "Crosswalk" Must Be Denied.

Not only do Plaintiffs seek unfettered access to all of Abbott's pre-disclosed discovery, but they also demand that Abbott create and provide a global "crosswalk" document that lists each and every document produced, with any correlating Bates stamp number that document has ever been given, along with a list of any case in which such a document has ever been produced.[9] To create this global "crosswalk" would require incalculable hours of work, as it consists of reviewing numerous document productions over the last 11 years, many of which were made in the "pre-electronic" days and only exist in paper form.  Thus, with no way to electronically "compare" the documents, which in and of itself would be unduly cumbersome, Abbott would have to manually compare, page-by-page, each document produced in those earlier days with a particular electronic document production, and then make a determination of whether the documents were the same as the ones produced in the previous case.  Then, after performing this onerous task, Abbott would have to collect, compile, and conform all identifying information with respect to that document in list-form for Plaintiffs' use.  This process would then have to be repeated for each and every electronic document production, reviewing produced material over and over again to ensure that all Bates labels were properly listed from each and every case in which that document was produced.

In light of the immense expense to Abbott of creating this contemplated "crosswalk" (even assuming it were possible to create), the mere fact that having such a chart might be

---

[9] Plaintiffs' claim that Abbott's offer to create a list comparing the Bates numbers of documents produced to Relator Ven-a-Care in the Texas case to the Bates numbers of documents produced to the United States in this case came too late is false.  The parties discussed a possible crosswalk solution immediately after the Court opened discovery during a meet-and-confer between the parties on November 1, 2006.  *See* Letter from C. Cook to  G. Gobena and J. Breen at p. 5 (11/3/06) (Ex. 3).  During the meet-and-confer, counsel for Ven-a-Care, Jim Breen, indicated that he would send a computer file that might allow Abbott to determine whether it could provide a cross-walk between the production in Texas and in this case.  *Id.*  Mr. Breen did not send that computer file until December 14, 2006.  *See* Email from J. Breen (12/14/06) (Ex. 4).

convenient for Plaintiffs cannot carry the day.  *See* FED. R. CIV. P. 26 (b)(2)(iii) (highlighting the limit on discovery when the burden or expense outweighs any likely benefit); *see also Gill v. Gulfstream Park Racing Ass'n., Inc.*, 399 F.3d 391, 400  (1st Cir. 2005) (Rule 26 requires a balance of the burden of proposed discovery against the likely benefit.).

## CONCLUSION

Plaintiffs have failed to show why documents relating exclusively to non-Subject Drugs are relevant to the complaint or why they are entitled to such material under the CMOs. Additionally, the Court should reject Plaintiffs' improper back-door requests to share documents, unencumbered, as well as require Abbott to create a document that would be effectively impossible to create.  Consequently, Plaintiffs' motion should be denied.

Dated:  January 23, 2007                    Respectfully submitted,

                                                ABBOTT LABORATORIES, INC.

                                                By:  /s/ Jason G. Winchester


James R. Daly
Tina M. Tabacchi
Jason G. Winchester
JONES DAY
77 W. Wacker Dr., Suite 3500
Chicago, Illinois  60601-1692
Telephone: (312) 782-3939
Facsimile:  (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Fax:  (202) 626-1700

## **CERTIFICATE OF SERVICE**

    I hereby certify that on January 23, 2007, a true and correct copy of the foregoing **ABBOTT LABORATORIES, INC.'S RESPONSE TO THE UNITED STATES' MOTION TO COMPEL ABBOTT TO PRODUCE ALL DISCOVERY PURPORTEDLY REQUIRED BY CMOS 5 AND 10** was served upon:

| | |
|---|---|
| Mark A. Lavine, Esq. **(By email)** <br> United States Attorney's Office <br> 99 N.E. 4 Street <br> Miami, FL 33132 | Gejaa T. Gobena, Esq. **(By email)** <br> United States Department of Justice <br> Commercial Litigation Branch <br> P.O. Box 261 <br> Ben Franklin Station <br> Washington, D.C. 20044 |
| James J. Breen, Esq. **(By email)** <br> Alison Simon, Esq. <br> The Breen Law Firm <br> 3350 S. W. 148th Avenue, Suite 110 <br> Miramar, FL 33029 | |

                                                        /s/ Carol P. Geisler