# EXHIBIT 1



**U.S. Department of Justice**

Civil Division, Fraud Section

---

*601 D Street, NW*  
*Ninth Floor*  
*Washington, D.C. 20004*

*Telephone: (202) 305-9300*  
*Telecopier: (202) 616-3085*

January 5, 2007

*Via Electronic Transmission*

David Torborg  
Jones Day  
51 Louisiana Ave., N.W.  
Washington, DC 20001-2113

Martin F. Murphy  
Foley Hoag LLP  
155 Seaport Blvd  
Boston, MA 02210-2600

Neil Merkl, Esq.  
Paul F. Doyle, Esq.  
William A. Escobar, Esq.  
Kelley Drye & Warren, LLP  
101 Park Avenue  
New York, NY 10178

Re:  *U.S. ex rel. Ven-a-Care of the Florida Keys Inc v. Abbott Laboratories,* MDL No. 1456/Civil Action No. 01-12257-PBS; *U.S. ex rel. Ven-a-Care of the Florida Keys Inc v. Dey, Inc.,* MDL No. 1456/Civil Action No. 01-12257-PBS

Dear Counsel:

I am writing in regard to topics in Mr. Torborg's correspondence of December 13, 2006, which is based on numerous telephone conferences during November and December. I will address the points raised therein in the order set out in the letter from Abbott's counsel. I will also cover a few other items that have come up during these discussions between counsel for the parties.

**Scope of Search.** Mr. Torborg's letter identifies particular offices within HHS that he believes are likely to have responsive information. We appreciate the consideration which appears to have been given to the issue of how the scope of discovery can reasonably be focused. At this juncture, we do not take issue with the proposal as it relates to CMS, OIG and OPA - subject to and without waiving any of the objections made in response to individual discovery requests. We have conveyed your request about the other HHS offices that could be searched for responsive material to the victim agency and will further confer with you after we receive feedback from these offices.

**Documents Which are Not Specific to Payment Codes in the Complaint.** Both in correspondence and during phone conferences, Mr. Torborg has requested that the United States produce documents relating to payment for pharmaceutical products even if such documents, on their face, do not explicitly refer to the "Subject Drugs" covered by the claims of the United States. I believe we are generally in agreement with you - but need to state a clarification. As we indicated in a previous conversation, if CMS gave instructions to carriers regarding payment methods to be used, for example, for large volume parenterals or other instructions with broad application, we will consider documents reflecting or referencing those instructions to be responsive to the discovery requests even if they do not specifically mention any of the Subject Drugs. With respect to Mr. Torborg's reference to documents relating to "policy in the area of drug reimbursement generally," we continue to reserve our general and specific objections previously stated in response to individual discovery requests. We agreed to work with defendants going forward to identify materials that are responsive, not unduly burdensome to locate and produce, or which are not covered by privilege or subject to other protection.

**Time Period.** Mr. Torborg questions whether the production of documents created prior to 1991 would necessarily create more burden than restricting the scope of the production to post 1990. As I stated in discussions, when searching for responsive material, in the event we identify a file with responsive information and it contains documents created both before and after January 1991, we do not intend, for production purposes, to selectively withhold pre-1991 material based on our objection to the temporal scope of defendants' discovery requests. We will consult further with you over the course of the Government's production regarding any burdensomeness issues associated with the scope of the search which are attributable to the time-frame specified in the requests.

**Publically Available Documents.** It appears that we may generally be in agreement with respect to this item. For example, our response to Abbott's Requests for Production, in certain instances, specifies where responsive information is available on a CMS site. My concern about unreservedly agreeing with Mr. Torborg with respect to this item relates to those discovery requests to which the Government objected as overly vague or broad, and, therefore, as to which the difficulty in specifically identifying publicly-available material may stem from the over-breadth or vagueness of a request. In short, in instances where the Government is aware of a particular public source for material or information responsive to a discovery request, I do not anticipate that we will withhold that information from defendants. That said, it probably makes sense to further discuss this issue in reference to particular discovery requests or responses, as the need arises.

**Documents Withheld on Relevancy Grounds.** Mr. Torborg's letter notes that the United States has objected to some of Abbott's discovery requests as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. The letter further requests that we provide a description of the material that the Government will not produce based on these grounds. We have spent several days in conference with defense counsel discussing the scope of the Government's document production on a category-by-category basis. In response to extensive questions regarding specific discovery requests we have provided explicit answers regarding the search that the Government has been engaged in and will continue to undertake. Material withheld based on privilege or doctrine will be identified in a privilege log. Again, it may make more sense to further discuss this issue in reference to particular material as the need arises while

the Government's production is underway.

**Carriers and State Medicaid Agencies.** We concur with Mr. Torborg's statements regarding these two sources of material and information. We agree that coordination among the parties is advisable.

**Production Time-Frame.** We recognize all parties' willingness to be flexible with regard to a time-frame for production on both sides. The Government's search for responsive material has been on-going. However, the search for and scanning and production of this material is requiring substantial effort such that the deadlines in your letter may not be feasible. Generally, we expect to begin a rolling production this month. Complete processing (i.e., scanning) and production of documents in some of the categories which you have designated may take us through February. Because we do not yet have a comprehensive assessment of the probable volume of material, it is difficult to estimate how long our contractor will require to process the production. We should be able to update you on this issue as the production gets more fully underway. You particularly inquired about the status of the following items.

* Documents relating to Program Memo 00-86 – This material is being retrieved from an archived storage location. We expect to produce non-privileged documents responsive to this category by January 31. Any material withheld based on privilege will be recorded on a privilege log.

* Public comments on proposed regulations (RFP 37) – CMS has identified 105 banker's boxes of material relating to 56 Fed. Reg. 25792 (June 5, 1991) (proposed rule); 56 Fed. Reg. 59502 (Nov. 25, 1991) (final rule). CMS has indicated that it must retain physical custody of the original documents to safeguard the integrity of the record relating to its rule-making. Accordingly, we propose to make the documents available for review at CMS headquarters in Baltimore. Please contact me to make arrangements for your review of this material. Given the volume of material relating to other rule-makings, we believe that it makes sense to phase production of these materials and will further confer with you to this end. Please advise concerning the particular rules as to which you want us to give priority.

* Litigation with state Medicaid agencies (RFPs 43-47) – We have already given you Bates ranges for some of these documents. We expect additional documents responsive to this category to be part of the rolling production that will begin later this month and continue through February.

* Documents from a revised list of agency personnel (RFP 25) – Mr. Torborg's letter pares down the list of individuals covered by RFP 25 to ten names. It appears that documents from the files of many of these individuals were produced in response to previous MDL subpoenas. That said, we are confirming that searches of the files of Neiman, Weintraub, Booth, Burney, Ault, and Patashnek were covered by the subpoena productions and will confirm that to you by January 31. We will contact you later this month regarding a production date for documents from the remaining four individuals – that is, Vladeck, Shalala, Scully, and DePerle. Because these four people are all former employees who held political appointments, their files implicate distinct retrieval and search steps from those of the other employees on Abbott's list.

* State Medicaid plans – We recognize that both sides need this material and are actively working to assemble a comprehensive set of documents in this category – a process complicated by the fact that the plans are subject to amendment. We understand that these materials are spread throughout ten regional HHS offices. We have started the process to collect them. In order to avoid burdening the states and make the process most efficient, we propose that we complete this process of collecting the documents from the regional offices before going to the states for the information.

* File Source Index relating to the previous subpoena productions – As I have previously indicated, we provided the only one we have with the initial disclosures. Abbott did not request a file source index at the time of the production in 2004. I is extraordinarily burdensome to retrace in detail the steps undertaken sufficiently to complete the file source index requested by Abbott. We are working to expand the section of the index which relates to documents produced by CMS with as much additional information as possible. This is turning out to be a labor-intensive exercise. We plan to provide you with a supplemental index by January 31.

* FSS schedules – This does not appear to be a category of documents that CMS has in its possession. We do not object to producing these items. However, we need to further confer with you in order to obtain and produce documents in this category.

* OIG Reports and Responsive documents – Abbott has requested that we give priority to this item and we are so doing. We are locating material in this category. Once we have completed our review we will contact you and advise to what extent the Government will produce documents from this category. We hope to provide you with a plan by January 31. With respect to the separate request for documents relating to reports that Nancy Molyneaux worked on, we expect to be able to produce non-privileged documents relating to this request by January 19, 2007.

* Document Preservation Directives – The parties discussed this topic during our phone conversation on December 14, 2006. We agreed that the mutual exchange of directives is one that all parties must resolve. The Abbott attorneys indicated that they would let us know whether they would be providing the United States and Relators with details regarding the directions given by Abbott's in-house or outside counsel regarding the preservation of evidence, including the dates, contents, and identity of all persons participating in discussions or communications regarding the preservation of evidence. We also need to hear from counsel for Dey on this point. Please advise as to when defense counsel will be ready to take up this topic again. This is an issue that should be jointly resolved by both sides.

* Identities of persons with access to AMP data – We are working to obtain this information and expect to produce it by January 31.

* Documents from First DataBank, Wholesalers, and Gerimed – The FDB materials were sent to you last month. The confidentiality issues regarding most of the wholesaler documents have been resolved and we expect to be able to produce those materials soon. The Gerimed documents are also subject to confidentiality concerns and those materials relating to defendants will be made available as soon as those issues are resolved. Furthermore, and as we

have indicated previously, we will produce documents in our custody which we have obtained from third parties (subject to appropriate protective orders and agreements for any confidential proprietary information contained therein) which are responsive to defendants' discovery requests.

During our last teleconference, Christopher Cook inquired whether the Government would agree to provide a narrative answer to Interrogatory number 10 which pertains to the Government's investigation of the *qui tam* allegations or whether we would stand on our objections. Mr. Cook's question overlaps with several of the items in Mr. Torborg's letter regarding the *qui tam* case. The Government will produce non-privileged documents in its possession which are responsive to defendants' discovery requests (subject to appropriate protective orders for proprietary information contained therein) regardless of how the Government obtained the documents. The Government will not describe or otherwise disclose the investigative steps it employed to analyze, verify, evaluate or investigate the allegations involved in this litigation.

Thank you for your attention. I am certain that there will be ample opportunity to discuss the foregoing over the next several weeks.

Very Truly Yours,

/s/
Justin Draycott
Trial Attorney
Commercial Litigation Branch

cc:   James Breen

# EXHIBIT 2

STATE OF WISCONSIN    CIRCUIT COURT    DANE COUNTY
BRANCH SEVEN

STATE OF WISCONSIN,
        Plaintiff,                      DECISION & ORDER
v.                                      Case No. 04 CV 1709

AMGEN, et al.,
        Defendants.

## BACKGROUND

By last count, there were 37 pharmaceutical companies being sued by the State in this case. The administrative challenge of managing a case this size inspired the unusual step of appointing a Special Discovery Master. While graciously agreeing to such an appointment, the parties reserved for decision by this Court the issue of plaintiff's request to share discovery materials it receives from the defendants. The recipients of this sharing would be other states' "law enforcement officials who have filed lawsuits, or have authorized official investigations pending, that involve issues similar to these cases."[1] Any official receiving documents generated in this lawsuit would have to sign an agreement for no further dissemination and to submit to the jurisdiction of this Court. Apparently there are similar actions on-going or contemplated in many states, but the exact names, locations, or numbers are unknown. There currently is a "temporary protective Order" outstanding in this case, but plaintiffs seek to have it amended to permit others to have access to discovery materials. Defendants unanimously object.

---

[1] Plaintiff's proposed protective order, ¶ 9.

## DECISION

The existence of the temporary protective Order and the assumption that some protective Order will continue is of significance. The meaning is that both sides recognize that materials provided by defendants are worthy of protection so as to keep their revelation from harming the defendants' business interests. This is a legitimate concern for any Court ruling on discovery issues. See, Wis. Stat. § 804.01(3)(a) (7).

This need for a protective Order distinguishes this case from *Earl v. Gulf & Western Manufacturing Company*, 123 Wis. 2d 200, 366 N.W. 2d 160 (Ct. App. 1985). Yet, plaintiff relies massively on the *Earl* case: "Any analysis of defendants' attempts to preclude discovery begins (and pretty much ends) with the case of *Earl*." [2] However, the gist of *Earl* is that <u>no</u> protective Order was justified under its facts. Here, the question is the scope, not the necessity for such an Order. If *Earl* truly stands as an imprimatur for a general dissemination of materials produced in discovery, it does so for cases in which no protective Order is appropriate. This is not such a case.

Uncontroverted facts presented by defendants also undercut plaintiff's position. [3] Only a minority of Courts asked to permit sharing in drug pricing cases have done so. In those cases allowing it, far fewer defendants were involved, and in some of the states for which sharing is proposed, most of the defendants in this case are not parties. The universe into which these

---

[2] Plaintiff's reply brief at p. 2. [Citation omitted.]
[3] See, footnote 7 in defendants' memorandum of law.

2

materials would flow is far from defined. Nonetheless, plaintiff volunteers to have this Court enforce any violations of the proposed Order by any of these unidentified potential recipients. To say this is not a task welcomed by this decision-maker is to put it diplomatically. Almost three decades at this job have shown me the futility and frustration of trying to apply contempt powers beyond state lines. The practicality of plaintiff's proposal is dubious, at best.[4] The additional work that could be created by such enforcement is daunting, and, if required, it would do NOTHING to advance this case.

Combining three dozen major pharmaceutical companies in this one lawsuit is plaintiff's prerogative, but this crowded caption inures to only plaintiff's benefit. Being part of such a big group can increase delay, add to attorneys' fees, and afford less individual attention for the defendants. Just addressing the filings, issues, and disputes of the many parties relating to the issues in this lawsuit is enough work, even if this Branch did not have hundreds of other cases. While reaping the advantages of putting so many defendants in one lawsuit, plaintiff also wants to share what it learns with other jurisdictions and have this Court monitor how that is done. Defendants' point is well taken that this dissemination is well-beyond the proper purposes of discovery. Other than creating extra work and knotty legal issues, such sharing does nothing to promote resolution of this case.

---

[4] This section also includes consideration of defendants' example of the impact of such sharing on other Courts' discovery Orders (see, pp. 4-5 of their memorandum of law) and of the possibility of varying affect of Freedom of Information statutes.

There is a time-honored precept favoring the efficient administration of justice that guides the work of trial Courts. Expanding the Court's duties to include policing the individual actions of non-parties of unknown numbers and geographical locations is not consistent with that precept. Plaintiff's proposal has the potential for stretching the duties of this state trial Court far beyond its capabilities.

Outside counsel for plaintiff are already part of the litigation team in similar cases in Illinois and Kentucky, and they argue that this involvement makes "restrictions on information sharing between these states a practical impossibility."[5] Not only is this argument unique, it is also soundly countered by defendants:

> ... attorneys represent multiple clients all of the time and are prohibited from using information they learn about a client in one case to assist a client in a different case. Prohibiting plaintiff's counsel from sharing information it learns in the Wisconsin case with its clients in other cases is effectively no different than what attorneys must do regularly, making it far from impractical or "bizarre." Moreover, the fact that the Kentucky and Illinois attorneys general hired the same outside counsel as the State of Wisconsin in separate cases should not have any bearing on defendants' rights with respect to the confidentiality of their information. Allowing plaintiff to share information may make plaintiff's counsel's job easier, but this ease should not be at the expense of protecting defendants' confidential materials.[6]

If outside counsel cannot follow this Court's protective Order, consideration should be given as to whether they should remain as counsel in this case. Clearly the rights of so many defendants to a protective Order should not

---

[5] Plaintiff's reply memorandum, p. 1.
[6] Defendants' memorandum, footnote 4, p. 6.

hinge on the identity of the lawyers the plaintiff selected to help it prosecute this case.

## ORDER

1. Plaintiff's motion to be allowed to share materials produced by defendants pursuant to discovery in this case is DENIED.

2. The Temporary Qualified Protective Order entered on May 11, 2005 is now the governing Protective Order in this case.

Dated this 29th day of November 2005 at Madison, Wisconsin.

BY THE COURT:

Moria Krueger, Judge.
Case No. 04 CV 1709

CC:
Attorney General Peggy A. Lautenschlager
Attorney Charles Barnhill
Attorney Beth Kushner*
Attorney John C. Dodds
Attorney Scott A. Stempel
The Honorable William F. Eich

*Attorney Kushner is requested to share copies of this document with counsel with the rest of the defendants.

# EXHIBIT 3

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

Direct Number: 202-879-3734
christophercook@jonesday.com

November 3, 2006

<u>VIA EMAIL</u>

Gejaa Gobena
Patrick Henry Building
601 D Street, NW
Room 9028
Washington, DC 20004

James J. Breen
The Breen Law Firm
P. O. Box 297470
Pembroke Pines, Florida  33029-7470

      Re:    *United States ex rel. Ven-A-Care of the Florida Keys v. Abbott Laboratories, Inc.*

Dear Counsel:

      I write to summarize my understanding of where the parties stand on the discovery issues discussed at this Wednesday's meet-and-confer in our offices in Washington, D.C. The meet-and-confer was held on November 1, 2006, six days after Judge Saris officially kicked off discovery on October 26, 2006.

      **Discovery Limits.** The parties reached agreement on discovery limits for Interrogatories and Requests for Production: Each side in the above-referenced case is limited to 75 Interrogatories and seven (7) sets of Requests for Production. The parties were not able to reach agreement on the allowed number of Requests for Admission and believe Court intervention will eventually be necessary. As I understand, the parties agreed to hold in abeyance the RFAs Abbott served on July 12, 2006, pending the Court's resolution of this issue. If the Court limits the number of RFAs the parties may issue, Abbott will withdraw these RFAs and re-serve RFAs within the Court's limit.

      Consistent with the practice in other cases consolidated in MDL 1456, we agreed that it was unnecessary at this point to set limits on the total number of depositions or deposition hours, or the allowed number of deposition hours per witness.

      As you suggested, we will prepare a proposed CMO to submit to the Court on the number of Interrogatories and Requests for Production of Documents.

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**JONES DAY**

Gejaa Gobena
James J. Breen
November 3, 2006
Page 2

**Outstanding Discovery and the Scope of Discovery.** Putting aside Abbott's RFAs, Abbott expects that Plaintiffs will abide by Federal Rules 33 and 34 and provide written responses to the Requests for Production and Interrogatories that Abbott served on July 12, 2006 and August 4, 2006, respectively. Abbott previously provided Plaintiffs an extension to August 23, 2006 to answer the Requests for Production. The day before that deadline passed, Plaintiffs filed a motion to stay discovery. The Court granted that motion but officially opened discovery at the October 26, 2006 hearing. Accordingly, by our count, Plaintiffs' written responses to Abbott's Requests for Production of Documents were due on October 27, 2006. Plaintiffs' written responses to Abbott's Interrogatories are due no later than November 6, 2006, inasmuch as eleven days were left in Plaintiffs' time to respond when you filed your motion for a stay.

At the meet-and-confer, Abbott offered to allow Plaintiffs 14 additional days to provide written responses to this outstanding discovery. In making this offer, we stressed that such an extension would be contingent on Plaintiffs agreeing to provide written responses at the end of 14 days and committing to produce documents – particularly those documents that are indisputably responsive – in the very near future. We have no interest in giving Plaintiffs an extension on the time to respond only to receive instead yet another motion designed to delay discovery.

You did not offer a date when Plaintiffs would provide the written responses required under Rules 33 and 34. Instead, you reiterated your previously stated objections to the scope of Abbott's discovery and indicated Plaintiffs may seek a protective order in lieu of providing written responses.

As we stated in our meeting, Abbott is willing to discuss and negotiate about the scope of particular discovery requests. Notwithstanding our willingness to talk, Abbott is entitled to receive timely written responses under Rules 33 and 34. The exchange of such written responses is the only feasible way of moving forward with an effective and meaningful meet-and-confer about particular discovery requests. This is the process established by the Rules, and it should be followed here.

A motion for protective order is premature at this point. Plaintiffs cannot certify that they have met and conferred on Abbott's discovery, as required by Rule 26(c), before providing written responses to that discovery. In any event, Plaintiffs do not dispute that Abbott is entitled to many of the documents and answers sought in its discovery; and the filing of a protective order would have no impact on Plaintiffs' obligation to provide those documents and answers in the time provided by the rules.

**File Source Index.** We have repeatedly asked for an index that identifies the source of the documents produced as part of your initial document disclosures (which are in large part the same documents produced by HHS in 2004 in response to the Lupron MDL subpoena). We have

**JONES DAY**

Gejaa Gobena
James J. Breen
November 3, 2006
Page 3

asked that the index identify specific individuals from whom documents were collected, and we have indicated that we could provide such an index for the majority of Abbott's documents. During an October 4, 2006 call, more than a month after we originally requested a file source index, Mr. Lavine indicated he would provide a response in two weeks. We never received a response.

You indicated on November 1, 2006 that the individual attorney responsible for the original production was on paternity leave, but that you would provide a response by Friday, November 10, 2006 regarding our request for a file source index. You indicated that any "reverse engineering" that may be required to produce such an index for HHS' documents could be completed in a relatively short period of time.

We have asked that the Plaintiffs keep track in the future of the individuals from whom all documents are gathered to facilitate the provision of an acceptable file source index.

**Sealed Documents.** Since at least July we have asked you to provide all documents that in any way relate to the Ven-A-Care *qui tam* against Abbott that were filed under seal in the Southern District of Florida. Mr. Lavine indicated during the October 4, 2006 call that he would provide us with the DOJ's position within a week. We did not receive a response. At the meet-and-confer on November 1, you stated that Abbott was not automatically entitled to any of the documents filed under seal and that you would need another 30 days to decide what, if anything, you would agree should be provided to Abbott.

**First DataBank Documents.** Abbott is still waiting for you to produce those documents from First DataBank that were identified in your initial disclosures nearly three months ago. To avoid the need to segregate documents relating to other manufacturers, you asked whether we could receive clearance from other manufacturers to produce those documents to us. November 1, 2006 was the first time that we were ever advised of any confidentiality issues relating to these documents. Thus, we asked that you provide us a list of the other manufacturers and a description of the documents for which such clearance is needed.

This dispute over First DataBank documents has gone on for too long. We ask that you immediately produce to us all such documents that relate to Abbott, as well as a log of all documents you are withholding based on perceived confidentiality restrictions. If you will not agree to such a production, please advise us promptly.

**Wholesaler and Other Third Party Documents.** We repeated our request for a description, including the source and volume, of these documents. Here also, you are withholding documents on a claim of confidentiality. As with the First DataBank documents, we demand that you produce immediately all documents as to which you have no confidentiality concerns and a log of those withheld.

**JONES DAY**

Gejaa Gobena
James J. Breen
November 3, 2006
Page 4


**Documents "Removed for Relevancy."** We reiterated our request that you produce the relatively small number of documents identified in my letter of October 30, 2006 that were "removed for relevancy" from your initial disclosures. Again, those Bates ranges are HHC001-0613, HHC001-0620, HHC001-0707, HHC002-0158, HHC002-0493 – 96, HHC003-0581, HHC004-0055 – 58, HHC004-0267-70, HHC009-0022, HHC009-1367-68, HHC010-0786, HHC013-0510, HHC015-0170 – 72, and HHC015-0176 – 77. Unless these documents are privileged or you can articulate some legally sufficient reason not to produce them (*e.g.*, the documents are personal in nature), we ask that you simply produce them. If you will not produce these documents, please provide a log of all documents withheld.

**Documents Previously Withheld Under the Deliberative Process Privilege.** Abbott asked if the United States will continue to assert the deliberative process privilege on those documents withheld by HHS when it responded to the Lupron MDL subpoena. For the reasons discussed at the meeting, Abbott believes it has a very strong argument to overcome any deliberative process privilege that might apply to these documents. As you requested, we will follow up with a letter formally asking you to reconsider your position on these documents.

**Sharing and Bates Numbering Issues.** As Abbott has consistently stated in briefs and correspondence, Abbott believes its confidentiality designations are consistent with Judge Saris' prior CMOs, and that governmental plaintiffs are not automatically entitled to share all documents Abbott has produced in various cases. At the meet-and-confer, you stressed that differing Bates numbers across productions made it difficult for you to use the same database for documents produced in this case and the Texas litigation. It is my understanding that Abbott did take steps to produce documents to the DOJ that maintained the Bates numbers used in the Texas litigation. Jim Breen indicated that this was not the case in all instances. Jim agreed to send a computer file that may allow us to determine whether Abbott is able to provide a cross-walk for all documents produced in Texas and the DOJ case. Once we receive that file, I will undertake to get you the information we have regarding Bates numbers in other cases. I am confident that we can work this issue out to Jim's satisfaction.

**Damage Disclosures.** Regarding your alternative damages theory (the only theory we believe is legally valid), we have previously asked Plaintiffs to explain in narrative form what the Medicare and Medicaid programs would have paid for the Subject Drugs absent Abbott's alleged wrongdoing. We stressed that we are not requesting detailed numbers calculations. You refuse to supplement your initial damage disclosures, claiming the need for additional sales information from Abbott. You did not articulate what additional sales information you claim to need, however, beyond the direct and indirect sales data Abbott already has given the government.

**JONES DAY**

Gejaa Gobena
James J. Breen
November 3, 2006
Page 5

   I hope that we can work together to resolve each party's discovery needs, and I look forward to hearing your response to these issues on Monday.

             Sincerely,

             R. Christopher Cook

cc: Renee Brooker
   Justin Draycott
   Mark A. Lavine
   Ana Maria Martinez
   Ann St. Peter-Griffith

# EXHIBIT 4



"Jim Breen"
<jbreen@breenlaw.com>

12/14/2006 04:31 PM

To "Brooker, Renee \(CIV\)" <Renee.Brooker@usdoj.gov>, "Alison Simon" <alisonsimon@breenlaw.com>, "Brian Murray" <bjmurray@jonesday.com>, "Chris Cook"

cc

bcc

Subject RE:


Attached is a large test file contained on one, but not all, C Ds produced by Abbott thus far which reveals a cross-walk to the Texas production.

Jim


**From:** Brooker, Renee (CIV) [mailto:Renee.Brooker@usdoj.gov]
**Sent:** Thursday, December 14, 2006 3:38 PM
**To:** Jim Breen; Alison Simon; Brian Murray; Chris Cook; Dan Reidy; David Torborg; Jason Winchester; Jim Daly; Tina Tabacchi; Lavine, Mark (USAFLS); Martinez, Ana Maria (USAFLS); St.Peter-Griffith, Ann (USAFLS)
**Subject:**



*Renée Brooker*
Assistant Director
U.S. Department of Justice
Civil Division, Fraud Section
601 D Street NW
Suite 9918
Washington, DC 20004
ph: (202) 616-3797
fax: (202) 514-7361

ABTDOJE0001.zip