UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti B. Saris |
| | ) | |
| *United States of America ex rel. Ven-a-Care of* | ) | |
| *the Florida Keys, Inc., et al. v.  Dey, Inc., et* | ) | |
| *al.,* CIVIL ACTION NO. 05-11084-PBS | ) | |
| | ) | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEY DEFENDANTS' MOTION TO DISMISS THE UNITED STATES' COMPLAINT**

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

MICHAEL F. HERTZ
JOYCE R. BRANDA
JOHN K. NEAL
LAURIE A. OBEREMBT
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 514-3345

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

GEORGE B. HENDERSON, II
Assistant U.S. Attorney
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3272

# TABLE OF CONTENTS

I.    PROCEDURAL AND FACTUAL BACKGROUND ........................................................1

II.   ARGUMENT ...........................................................................5

      A.    THE UNITED STATES' AND RELATOR'S CLAIMS ARE TIMELY PLED  . 5

            1.    The Filing of Relator's Complaint Tolls the Statute
                  of Limitations ................................................. 6

            2.    The United States' Complaint Relates Back to the
                  Relator's Complaint ........................................... 10

                  a.    The FCA Permits Relation Back to the *Qui Tam*
                        Complaint Pursuant to Fed. R. Civ. P. 15(c)(1) .............. 11

                  b.    The United States' Complaint Relates Back to the Relator's
                        *Qui Tam* Complaint Under Fed. R. Civ. P. 15(c)(2)  .......... 14

      B.    THE REBATE AGREEMENT DOES NOT BAR THE GOVERNMENT'S
            COMMON LAW OR FCA CLAIMS  ................................. 17

            1.    The Rebate Program Does Not Address the Fraud
                  Perpetrated by Dey ............................................ 18

            2.    The United States' Awareness of Dey's AMPs Does Not
                  Foreclose Either Its Common Law or FCA Claims ................ 21

            3.    The Rebate Agreement Is Not a Contract and Therefore
                  Does Not Bar Common Law Claims ............................ 23

      C.    THE FCA AND COMMON LAW FRAUD COUNTS ARE PLED
            WITH PARTICULARITY  ........................................ 25

      D.    THE ELEMENTS OF THE FCA AND COMMON LAW CLAIMS
            ARE PROPERLY PLED ........................................... 27

            1.    Dey Knowingly Caused the Submission of False Claims ........... 27

                  a.    Dey Caused False Claims to be Submitted ................. 27

       b.     Dey Cannot Escape Liability Based on Purported
Government Knowledge of Its Fraud . . . . . . . . . . . . . . . . . . . . . 29

       c.     The United States Properly Alleged Causation Here . . . . . . . . . . 32

    2.     The United States' Complaint Sufficiently Alleges that Dey
Violated the Anti-Kickback Statute as a Predicate for a
Violation of the FCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    3.     The United States Sufficiently Alleged A Claim for Unjust
Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    4.     The United States Sufficiently Alleged A Claim for Common
Law Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

### CASES

PAGE

*In re Art & Co.,*
179 B.R. 757 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*BP Am. Prod. Co. v. Burton,*
549 U.S. ___ , 127 S. Ct. 638 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Badaracco v. Comm'r,*
464 U.S. 386 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,*
477 U.S. 41 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, n.10

*Capozzi v. United States,*
980 F.2d 872 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

*Cook County v. United States ex rel. Chandler,*
538 U.S. 119 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*Davenport v. United States,*
217 F.3d 1341 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Doyle v. Hasbro, Inc.,*
103 F.3d 186 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*E.I. Dupont de Nemours & Co. v. Davis,*
264 U.S. 456 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Frillz, Inc. v. Lader,*
104 F.3d 515 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, n.12

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,*
545 U.S. 409 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*Greater Dallas Home Care Alliance v. United States,*
10 F. Supp. 2d 638 (N.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Guaranty Trust Co. v. United States,*
    304 U. S. 126 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hayduk v. Lanna,*
    775 F.2d 441 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Heckler v. Community Health Servs.,*
    467 U.S. 51 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, n.13

*Henderson v. United States,*
    517 U.S. 654 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*LaChapelle v. Berkshire Life Ins. Co.,*
    142 F.3d 507 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Lupron Marketing & Sales Practices Litig.,*
    295 F. Supp. 2d 163 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Massachusetts v. Mylan Labs,*
    357 F. Supp. 2d 314 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Maximum Care Home Health Agency v. HCFA,*
    No. 3-97-CV-1451-R, 1998 WL 901642 (N.D. Tex.1998) . . . . . . . . . . . . . . . . . . . . . 25

*McGinty v. Beranger Volkswagen, Inc.,*
    633 F.2d 226 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Memorial Hosp. v. Heckler,*
    706 F.2d 1130 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Miller v. American Heavy Lift Shipping,*
    231 F.3d 242 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, n.6

*Miller v. Holzmann,*
    No. Civ.A.95-1231RCLJMF, 2006 WL 568722 (D.D.C. Mar. 9, 2006) . . . . . . . . . . 7, 13

*Murray & Sorenson, Inc. v. United States,*
    207 F.2d 119 (1st Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,*
    470 U.S. 451 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, n.10

*New England Data Servs., Inc. v. Becker,*
    829 F.2d 286 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re New Care Health Corp.,*
274 B.R. 307 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*O'Gilvie v. United States,*
519 U.S. 79 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Office of Personnel Mgmt. v. Richmond,*
496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, n.12

*O'Loughlin v. National R.R. Passenger Corp.,*
928 F.2d 24 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pharmaceutical Research & Mfrs. of Am. v. Meadows,*
304 F.3d 1197 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Pharm. Indus. AWP Litig.,*
263 F. Supp. 2d 172 (D. Mass. 2003 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Pharm. Indus. Average Wholesale Price Litig.,*
339 F. Supp. 2d 165 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Pharm. Indus. Average Wholesale Price Litig.,*
460 F. Supp. 2d 277 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29

*Pharmaceutical Research & Mfrs. of Am. v. Walsh,*
538 U.S. 644 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 39

*Scolnick v. United States,*
331 F.2d 598 (1st Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, n.14

*Shaw v. AAA Eng'g & Drafting, Inc.,*
213 F.3d 519 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Siegel v. Converter Transp., Inc.,*
714 F.2d 213 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, n.5

*Simcox v. San Juan Shipyard, Inc.,*
754 F.2d 430 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Stone & Webster Eng'r Corp. v. Duquesne Light Co.,*
79 F. Supp. 2d 1 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*TAG/ICIB Services, Inc. v. Pan Am. Grain Co., Inc.,*
215 F.3d 172 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

vi

*Tiller v. Atlantic Coast Line R.R.*,
    323 U.S. 574 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, n.6

*United States ex rel. Becker v. Westinghouse Savannah River Co.*,
    305 F.3d 284 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States ex  rel. Bidani v. Lewis*,
    264 F. Supp. 2d 612 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
    71 F.3d 321 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States ex rel. Campbell v. Lockheed Martin Corp,* . . . . . . . . . . . . . . . . . . . . . . . . 15
    282 F. Supp. 2d 1324 (M.D. Fla. 2003)

*United States ex rel. Clausen v. Laboratory Corp. of Am., Inc.*,
    290 F.3d 1301 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States ex rel. Costa v. Baker & Taylor, Inc.*,
    No. C-95-1825-VRW, 1998 WL 230979 (N.D. Cal. Mar. 20, 1998) . . . . . . . . . . . . . . 9

*United States ex rel. Costner v. URS Consultants*,
    317 F.3d 883 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States ex rel. Downy v. Corning, Inc.*,
    118 F. Supp. 2d 1160 (D. N.M. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States ex rel. Flanagan v. Baptist Health Sys., Inc.*,
    No. 97-B-3070-S (N.D. Ala. Mar. 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States ex rel. Franklin v. Parke-Davis*,
    2003 WL 22048255 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 33, 34

*United States ex rel. Goodstein v. McLaren Reg'l Med. Ctr.*,
    No. 97-CV-72992, 2001 U.S. Dist. LEXIS 2917 (E.D. Mich. Jan. 1, 2001) . . . . . . . . . 7

*United States ex rel. Hagood v. Sonoma County Water Agency*,
    929 F.2d 1416 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United  States ex rel. Hill v. Morehouse Med. Assocs., Inc.,*
　　No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) . . . . . . . . . . . . . . . . . .  26

*United States ex rel. Jordan v. Northrop Grumman Corp.,*
　　CV 95-2985 ABC, slip op (C. D. Cal. Aug. 5, 2002). . . . . . . . . . . . . . . . . . . . . . . . 15-16

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
　　360 F.3d 220 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*United States ex rel. Kinney v. Hennepin County Med. Ctr.,*
　　No. Civ. 971680, 2001 WL 964011 (D. Minn. Aug. 22, 2001) . . . . . . . . . . . . . . .  33, 34

*United States ex rel. Kneepkins v. Gambro Healthcare,*
　　115 F. Supp. 2d 35 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,*
　　985 F.2d 1148 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*United States ex rel. Mueller v. Eckerd Corp.,*
　　95-2030-CIV-T-17C, slip op. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*United States ex rel. Marcus v. Hess,*
　　317 U.S. 537 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*United States ex rel. Mayman v. Martin Marietta Corp.,*
　　894 F. Supp. 218 (D. Md. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.,*
　　423 F.3d 1256 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.,*
　　238 F. Supp. 2d 258 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 37

*United States ex rel. Purcell v. MWI Corp.,*
　　254 F. Supp. 2d 69 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*United States ex rel. Sanders v. North Am. Bus Indus.,*
　　No. Civ. JFM-02-3084, 2006 WL 361337 (D. Md. Feb. 15, 2006) . . . . . . . . . . . . . . .  10

*United States ex rel. Schmidt v. Zimmer, Inc.,*
　　386 F.3d  235 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, n.14, 35

*United States ex rel. Shaver v. Lucas Western Corp.,*
　　237 F.3d 932 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, n.17

viii

*United States ex rel. Thompson v. Columbia Healthcare Corp.,*
 125 F.3d 899 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States ex rel. Walker v. R&F Properties, Inc.,*
 433 F.3d 1349 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott*
 *Labs., Inc.,* Civ. A. No. 06-11337-PBS (D. Mass.) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, n.2

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,*
 874 F.2d 20 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. The Baylor Univ. Med. Ctr.,*
 469 F. 3d 263 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*United States v. Calhoon,*
 97 F.3d 518 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, n.13

*United States v. Commonwealth Energy Sys.,*
 235 F.3d 11 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Geri-Care, Inc., No. Civ. A 89-5720,*
 1990 WL 9463 (E.D. Pa. Feb.1, 1990), *vacated in part on other grounds,*
 1990 WL 39301 (E.D. Pa. Mar. 30, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*United States v. Goldberg,*
 256 F. Supp. 540 (D. Mass. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Greber,*
 760 F.2d 68 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*United States v. Incorporated Vill. of Island Park,*
 888 F. Supp. 419 (S.D.N.Y.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Maling,*
 737 F. Supp. 684 (D. Mass.1990), *aff'd sub nom. United States v. Richard*, 943
 F.2d 115 (1st Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, n.4

*United States v. Medica-Rents Co.,*
 285 F. Supp. 2d 742 (N.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Neifert-White Co.,*
 390 U.S. 228 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ix

*United States v. President & Fellows of Harvard Univ.,*
  323 F. Supp. 2d 151 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, n.17

*United States v. Rivera,*
  55 F.3d 703 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Ven-Fuel, Inc.,*
  758 F.2d 741 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, n.12

*Villante v. Department of Corrections,*
  786 F.2d 516 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, n.6

*Wang ex rel. United States v. FMC Corp.,*
  975 F.2d 1412 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*West v. Conrail,*
  481 U.S. 35 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Woods v. Indiana Univ.-Purdue Univ. at Indianapolis,*
  996 F.2d 880 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## RULES

42 C.F.R. §§ 447.331, 447.332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Fed. R. Civ. P. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, n.15

Fed. R. Civ. P. 15(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Civ. P. 15(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## STATUTES

Deficit Reduction Act, Pub. L. No. 109-171 § 6001, 120 Stat. 4 (2006) . . . . . . . . . . . . . 19, n.8

31 U.S.C. § 3729(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33

31 U.S.C. § 3730(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 12

31 U.S.C. § 3730(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7, 12

42 U.S.C. § 1304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, n.10

42 U.S.C. § 1320a-7b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

42 U.S.C. § 1395cc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 1395u(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 1396r-8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 1396r-8(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1396r-8(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 1396r-8(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1396r-8(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

42 U.S.C. § 1396r-8(c)(3)...........................................................................19

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, n.6

## LEGISLATIVE

S. Rep. No. 99-345 (1986), *as reprinted* 1986 U.S.C.C.A.N. 5266  . . . . . . . . . . . . . . . . . . . . . . 13

Hearing Before the Subcommittee on Health Care of the S. Finance Comm.,
(Mar. 14, 2002) (Statement of Thomas A. Scully) 2002 WL 399357 . . . . . . . . . . . . . . . . . 19, n.8

## MISCELLANEOUS

6A Wright, Miller & Kane, *Federal Practice & Procedure* § 1497 (2d ed. 1990) . . . . 15, n.5, 16

Medicaid Program: Payment for Covered Outpatient Drugs Under Drug Rebate
   Agreements With Manufacturers, 60 Fed. Reg. 48442, 48475
   (Sept. 19, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, n.8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti B. Saris |
| | ) | |
| *United States of America ex rel. Ven-a-Care of* | ) | |
| *the Florida Keys, Inc., et al. v.  Dey, Inc., et* | ) | |
| *al.,* CIVIL ACTION NO. 05-11084-PBS | ) | |
| | ) | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEY DEFENDANTS' MOTION TO DISMISS THE UNITED STATES' COMPLAINT**

The United States intervened in this case in order to hold the Dey defendants accountable

for years of deliberately deceptive conduct with respect to drug price reporting and the resultant

false claims.  Dey's conduct cost the Medicare and Medicaid programs millions of dollars in

inflated reimbursement for Dey's products -- with the inflated reimbursement serving as the

carrot that Dey dangled before its customers.  Dey's motion presents a variety of arguments,

ranging from statute of limitations (even on claims submitted within the last six years) to

contract defenses that have no bearing on a False Claims Act ("FCA") case.  In the end, none of

these arguments sustains a dismissal of this case and the United States' Complaint must stand.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

Relator filed a complaint against Dey on August 13, 1997, in the United States District

Court for the Southern District of Florida.  Relator filed a separate complaint against Dey in this

district on April 10, 2000.[1]  On December 22, 2004, the United States and relator moved to sever

---

[1]  Because both of these original complaints contain claims against other defendants in still
pending sealed matters, the United States obtained partial lift seal orders permitting it to disclose redacted
versions of these complaints to Dey.  At that time, the United States advised Dey to inform the United

and transfer the claims against Dey in Florida to Massachusetts. Those claims were transferred

to this district and assigned Case No. 05-11084. On June 26, 2006, in response to the United

States' and relator's request, the related claims originally filed against Dey in Massachusetts

were severed from the remainder of that case and consolidated with the claims transferred from

Florida. On August 23, 2006, the United States filed its notice of intervention and complaint in

Case No. 05-11084. The complaint was unsealed on September 7, 2006. On October 31, 2006,

relator filed an Amended Complaint, which adopted the United States' Complaint. On

November 20, 2006, the case was transferred to the AWP MDL proceeding, and represents the

second action pursued by the United States in the MDL.[2]

In its Complaint, the United States alleges as follows:

> From on or before December 31, 1992, and continuing through 2004 in the
> case of the Medicare program, and to the present in the case of the Medicaid
> program, Dey has knowingly caused the Medicare and Medicaid programs to pay
> false or fraudulent claims for the following respiratory therapy medications:
> albuterol sulfate, albuterol MDI, cromolyn sodium, and ipratropium bromide. As
> part of its unlawful conduct, Dey knowingly made false or fraudulent
> representations about drug prices and costs to the *Red Book*, First DataBank, and
> Medispan, while knowing that Medicare and Medicaid would use this information
> in paying or approving claims for such drugs. Dey further made these
> representations in order to use the "spread" between cost and reimbursement to
> induce purchasers to buy Dey's drugs.

U.S. Complaint ("Compl."), ¶ 50.

--------

States if Dey would need to publicly refer to these documents, in which case the United States would seek
an order fully unsealing the redacted complaints. Attachment ("Att.") 1, Dec. 8, 2006 Corresp. between
Dey and the Department of Justice. Dey has not made such a request, but nevertheless the United States
is obtaining partial lift seal orders rather than burdening the Court with additional sealed pleadings at this
time. Of course, even prior to unsealing, the Court is free to take judicial notice of the earlier pleadings in
this matter.

[2] The United States and relator have an action pending against Abbott Laboratories in the MDL.
*United States ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc., and Hospira, Inc.,*
Civil Action No. 06-11337-PBS (D. Mass.).

2

Relator's original complaints against Dey in Florida and Massachusetts allege the same core facts and legal theories articulated by the United States in its Complaint.  Relator alleged that Dey violated the FCA by causing the submission of false claims for certain Dey drugs by reporting false prices that Dey knew both Medicare and Medicaid would rely upon to set reimbursement, marketing the inflated reimbursement to prospective and current customers, and by submitting false statements used to get false claims approved or paid.

Shortly after relator named Dey as a defendant in 1997, the Office of Inspector General for the Department of Health and Human Services ("HHS-OIG") served a subpoena for documents on Dey.  The subpoena sought pricing and marketing information concerning Dey's reporting of Average Wholesale Price (AWP) and Wholesale Acquisition Cost (WAC) and put Dey on notice of a pending investigation of "Medicaid and/or Medicare fraud."  Oct. 6, 1997 Subpoena to Dey Laboratories, Att. 2.  Dey began producing documents shortly thereafter.  Oct. 31, 1997 Corresp. between Dey Laboratories and the Department of Justice (DOJ), Att. 3.  OIG served a second subpoena on Dey in July 2000.  July 27, 2000 Subpoena to Dey Laboratories, Att. 4.

On October 24, 1997, the United States obtained a partial lift seal order, allowing it to disclose to Dey the substance of the allegations against Dey.  (The order remains sealed.)  The United States met with Dey in the fall of 1998 and shared the substance of the allegations against Dey.  On March 17, 2000, Dey joined with a number of pharmaceutical companies under investigation to prepare and deliver a 36-page "white paper" to the head of the DOJ Civil Division, entitled "Analysis of Why the United States Should Decline Intervention in United

3

States Ex Rel. [Relator] v. [Defendants] (S.D. Fla.) (Under Seal).  Mar. 17, 2000

Correspondence  between Hogan & Hartson L.L.P. and DOJ, Att. 5.

After relator filed suit under seal against Dey in Massachusetts in April 2000, alleging

pricing fraud with respect to additional drugs, the United States Attorney's Office for the District

of Massachusetts issued authorized investigative demands ("AIDs") for documents from Dey on

or about August 25, 2000, October 16, 2001, and May 19, 2003.  See AIDs dated Aug. 25, 2000,

Oct. 16, 2001, and May 19, 2003, to Dey Laboratories, Att. 6.  As with the OIG subpoenas, these

demands sought pricing and marketing information.  When Dey disputed the use that the United

States could make of documents produced pursuant to the AIDs, OIG issued yet another

subpoena on July 25, 2005, again seeking documents relating to drug pricing fraud.  July 25,

2005 Subpoena to Dey Laboratories, Att. 7.

Over the course of the investigation, the United States and Dey exchanged views on the

facts and the law, particularly as more facts came to light after the State of Texas sued Dey for

Medicaid pricing fraud in September 2000.  The United States and Texas actually negotiated a

settlement of the state and federal claims against Dey for Medicaid pricing fraud in Texas in

2003.  Settlement Agreement between the U.S. and Dey, Att. 8; Settlement Agreement between

the State of Texas and Dey, Att. 9.  In the federal settlement agreement, the United States alleged

that "Dey knowingly made, directly and indirectly, false representations to the Texas Vendor

Drug Program of prices and costs for certain of their inhalation and other drugs and thereby

caused false and fraudulent claims to be submitted to and paid by the Texas Medicaid Program."

Att. 8 at 1.

The United States subsequently took steps to consolidate the remaining pricing fraud claims against Dey in one action.  When it became clear that the parties could not resolve the matter short of actual litigation, the United States moved to intervene and filed its Complaint.

## II.  ARGUMENT

In evaluating a motion to dismiss for failure to state a claim, the Court must accept the facts alleged in the complaint, draw all reasonable inferences therefrom in the plaintiff's favor, and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory.  *TAG/ICIB Services, Inc. v. Pan American Grain Co., Inc*., 215 F.3d 172, 175 (1st Cir. 2000); *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 508 (1st Cir. 1998).  Only if there is no theory on which the United States could prevail should the Complaint be dismissed.  *See TAG/ICIB Services, Inc.*, 215 F.3d at 175.

## A.    THE UNITED STATES' AND RELATOR'S CLAIMS ARE TIMELY PLED

The United States alleges in its Complaint that its claims are timely based on the filing of relator's complaint in this action.  Compl., ¶ 7.  The United States' and Relator's claims are timely pled in this action because the original filing of the relator's actions against Dey tolled the statute of limitations as to the FCA claims asserted by both relator and the United States.  Even assuming the relator's complaint did not toll the statute of limitations as to the government's claims, the United States' claims are timely because they relate back to the relator's claims against Dey.  Contrary to Dey's assertions, the First Circuit is clear that the relevant date for purposes of the statute of limitations is when the claim is submitted to the Government, not when the defendant initiates its fraudulent scheme.  *United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995).

1.      **The Filing of Relator's Complaint Tolls the Statute of Limitations**

The United States' claims are timely brought because relator's complaint in 1997 was filed within the six-year limitation period provided for by Section 3731(b) of the FCA.   The earliest violations alleged in this case are from 1992, only 5 years earlier, and thus actionable under the statute.

The FCA authorizes a *qui tam* relator to "bring" an FCA suit on the government's behalf. 31 U.S.C. § 3730(b)(1).  The relator commences his *qui tam* suit by filing his complaint and then serving a copy of the complaint and written disclosure on the government in accordance with Fed. R. Civ. P. 4.  31 U.S.C. § 3730(b)(2).  The statutory seal period allows the government to investigate the relator's claims and decide whether to intervene in the relator's *qui tam* suit.  The FCA further provides that the complaint  remain under seal and not be served on the defendant during this time.  *Id*. at § 3730(b)(2) - (4) ("[t]he complaint  shall be filed *in camera*, shall remain under seal for at least 60 days, and *shall not be served on the defendant until the court so orders*.") (emphasis added.).  Section 3730(b)(4) of the FCA goes on to state:

> Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—
>     (A) proceed with the action, in which case the action shall be conducted by the Government; or
>     (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

*Id*. at § 3730(b)(4).  The FCA thus explicitly provides that the Government has until the expiration of the 60-day period or any extensions obtained under paragraph (3) to proceed with the action.  When it does so, the government is joining in the relator's action and then

conducting that pre-existing action.  *See* 31 U.S.C. § 3730(c)(1) ("If the Government proceeds

with the action, it shall have the primary responsibility for prosecuting the action . . .").

    Considerable precedent upholds the United States' right to investigate and intervene in

FCA cases, with the statute of limitations tolled by the filing of the relator's complaint.  *See*

*Miller v. Holzmann*, 2006 WL 568722  (D.D.C. Mar. 9, 2006) (filing of FCA relator's complaint

tolls statute of limitations); *United States ex rel. Downy v. Corning, Inc.*, 118 F. Supp. 2d 1160,

1170-72 (D. N.M. 2000) ("the limitations provisions of Section 3731 [of the FCA] are referring

to the relator's initial act of filing the civil action, not to the later date when the complaint is

unsealed"); *United States ex rel. Goodstein v. McLaren Reg'l Med. Ctr.*, No. 97-CV-72992, 2001

U.S. Dist. LEXIS 2917 at *12 (E.D. Mich. Jan. 1, 2001) (FCA suit commences for statute of

limitations purposes when relator's complaint is filed); *see also* S. Rep. 99-435, 1986

U.S.C.C.A.N. 5266 at 5289 (filing of relator's *qui tam* complaint was intended to "start the

judicial wheels in motion."); *see generally* Fed. R. Civ. P. 3; *Henderson v. United States*, 517

U.S. 654, 657 n.2 (1996) ("filing a complaint suffices to satisfy the statute of limitations"), *citing*

*West v. Conrail*, 481 U.S. 35, 39 (1987).  The FCA further provides that:

> A civil action under 3730 may not be brought –
> (1) more than 6 years after the date on which the violation of
> section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right
> of action are known or reasonably should have been known by the
> official of the United States charged with responsibility to act in
> the circumstances, but in no event more than 10 years after the date
> on which the violation is committed, whichever occurs last.

*Id.* at § 3731 (b).

    It is a well-established legal doctrine that "no statute of limitations will block federal

government actions unless Congress clearly and specifically says so."  *Capozzi v. United States*,

980 F.2d 872, 875 (2d Cir. 1992).   "[S]tatutes of limitations sought to be applied to bar rights of

the Government, must receive a strict construction in favor of the Government."  *Badaracco v.*

*Comm'r*, 464 U.S. 386, 391 (1984) (quoting *E.I. Dupont de Nemours & Co. v. Davis*, 264 U.S.

456 (1924)); *see also O'Gilvie v. United States*, 519 U.S. 79, 92 (1996); *United States v.*

*Commonwealth Energy Sys.*, 235 F.3d 11, 13 (1st Cir. 2000).   As the Supreme Court recently

held, it is axiomatic that:

> [S]tatutes of limitations are construed narrowly against the
> government. *E. I. DuPont de Nemours & Co. v. Davis*, 264 U. S.
> 456 (1924) . This canon is rooted in the traditional rule quod
> nullum tempus occurrit regi—time does not run against the King.
> *Guaranty Trust Co. v. United States*, 304 U. S. 126, 132 (1938). A
> corollary of this rule is that when the sovereign elects to subject
> itself to a statute of limitations, the sovereign is given the benefit
> of the doubt if the scope of the statute is ambiguous.

*BP Am. Prod. Co. v. Burton*, 549 U.S. ___ , 2006 U.S. LEXIS 9586 (2006).  Notwithstanding

petitioner's argument in *Burton* that a narrow construction in favor of the government "would

frustrate the statute's purposes of providing repose, ensuring that actions are brought while

evidence is fresh, lightening recordkeeping burdens, and pressuring federal agencies to assert

federal rights promptly[,]" *id.* at *30, the Court nevertheless held that "arguing that an expansive

interpretation would serve the general purposes of statutes of limitations is somewhat beside the

point.  The relevant inquiry, instead, is simply how far Congress meant to go when it enacted the

statute of limitations in question."  *Id.* at *31.

   Dey urges this Court to do exactly what the Supreme Court refused to do in the *Burton*

case -- to impose on the government broad statute of limitations restrictions not expressly or

implicitly found in the FCA.  A court rejecting a similar argument from an FCA defendant in

another case noted:

> Defendants submit that the court should devise a new rule which would permit tolling and relation back only when a complaint is unsealed. Defendants offer no support for this suggestion, save some policy arguments regarding the purpose of statutes of limitations.  Such policy arguments cannot prevail.  Congress . . . obviously knew when [it] provided for sealed complaints that defendants named in such complaints would not have notice of the instigation of an action. Still, neither Congress nor the Legislature differentiated between sealed and unsealed complaints. The court cannot substitute its judgment for that of these legislative bodies, no matter how reasonable or attractive are the arguments which defendants mount for their proposed rules.

*United States ex rel. Costa v. Baker & Taylor, Inc.*, 1998 WL 230979 (N.D. Cal. Mar. 20, 1998). The FCA provides that the filing of relator's suit tolls the statute of limitations, and nothing in the FCA remotely suggests that the subsequent entry of the United States into the action somehow "untolls" the statute.  Dey is asking this Court to graft a limitation not found in the statute itself.

Furthermore, the relator's complaint more than adequately sets forth the claims the United States seeks to pursue here - pricing fraud by Dey in connection with specific Dey drugs. Since the filing of the relator's complaint tolls the statute of limitations, the claims identified therein are still actionable by both the government and the relator.  *See generally id*. at § 3730(b) (FCA provisions note that government may intervene and proceed with the action filed by the relator).   Nothing that either the relator or the United States does subsequently can undermine the timeliness of relator's original complaint, and there is no basis to dismiss this action.

Finally, contrary to Dey's assertions, the First Circuit is clear that the relevant date for purposes of the statute of limitations is when the claim is submitted to the Government, in this case, beginning in 1992, not when the defendant initiates its fraudulent scheme.  *Rivera*, 55 F.3d 703; *see also Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545

U.S. 409, 415 (2005) (FCA's "time limit begins to run on the date the defendant submitted a false claim for payment."); *United States v. Goldberg*, 256 F. Supp. 540, 542 (D. Mass. 1966) (no claim within the scope of the FCA until there has been a demand for money on the public treasury, even if demand is made by intermediary other than defendant).  In *Rivera*, the First Circuit explicitly found that even where a third party other than the defendant submits the actual claim, the statute of limitations dates from the submission of the claim, not from the defendant's earlier fraudulent acts.  55 F.3d at 712.[3]  Thus, the statute of limitations is determined based on the dates of the claims filed for reimbursement by Dey's customers, not when Dey first reported a false AWP or WAC.   The court's concern in *United States ex rel. Sanders v. North American Bus Industries, Inc.*, 2006 WL 361337 (D. Md. Feb. 15, 2006), cited by Dey, that this may subject a defendant to perpetual liability, while overstated, is exactly right – defendants who knowingly make false statements are liable for any false claims that proximately flow from those false statements .  That is the peril of knowingly making false statements.

> **2.**      **The United States' Complaint Relates Back to the Relator's Complaint**

Even if relator's complaint somehow did not toll the statute of limitations as to the government's claims, the government can still proceed in the action pursuant to Rule 15 governing relation back.  The United States' Complaint relates back to the relator's complaint because (a) the FCA, by operation of law, permits relation back as set forth in Fed. R. Civ. P.

---

[3]  Dey's attempt to distinguish *Rivera* on the basis of who received the proceeds of or controlled the timing of the false claim is equally unavailing.  The FCA attaches liability for causing a false claim to be submitted regardless of whether the government actually pays money on the claim or to whom funds are paid.  Further, the facts in *Rivera* are that the defendants' fraudulent acts occurred over the course of four years, and they had no control over when the third party submitted the claim.

15(c)(1); and (b) the claims in the Complaint arise out of the same conduct or occurrences as the relator's *qui tam* complaint, thus allowing relation back under Fed. R. Civ. P. 15(c)(2).

> **a.     The FCA Permits Relation Back to the *Qui Tam* Complaint Pursuant to Fed. R. Civ. P. 15(c)(1)**

Under Fed R. Civ. P. 15(c)(1), "[a]n amendment of a pleading relates back to the date of the original pleading when . . . relation back is permitted by the law that provides the statute of limitations applicable to the action."  The 1991 Advisory Committee Notes accompanying the adoption of the rule stated, "[w]hatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in the rule, it should be available to save the claim."  Fed. R. Civ. P. 15 advisory committee's note; *see also Davenport v. United States*, 217 F.3d 1341, 1344, n.7 (11th Cir. 2000) ("the Advisory Committee Note is clear that (c)(1) was added to ensure that if the controlling body of limitations law afforded a more forgiving principle of relation back than the one provided in Rule 15, then the more forgiving principle should be available to save the claim.").  The relevant law must be analyzed to determine whether it expressly or impliedly permits relation back of amendments. *See, e.g., In re Newcare Health Corp.*, 274 B.R. 307, 312 (D. Mass. 2002); *In re Art & Co., Inc.*, 179 B.R. 757, 763 n.7 (D. Mass. 1995).  Such analysis must comport with the principle of statutory construction that "provisions of a statute are supposed to be read in such a way that all of them are given effect."  *Stone & Webster Eng'r Corp. v. Duquesne Light Co.*, 79 F. Supp. 2d 1, 8 (D. Mass. 2000) (statutes or parts of statutes in *pari materia* are to be construed together).

The procedures set forth in the FCA clearly contemplate a direct link and relation back between the relator's *qui tam* complaint and any Government complaint-in-intervention.   The FCA authorizes a *qui tam* relator to "bring" an FCA suit on the government's behalf.  31 U.S.C.

11

§ 3730(b)(1).  The statutory seal period allows the government to investigate and decide whether to intervene in the relator's *qui tam* suit, and further provides that the complaint not be served on the defendant during this time.  *Id*. at § 3730(b)(2) - (4).  Only the federal district court may extend the 60-day seal period upon good cause shown, and has discretion to determine how many good cause extensions to grant.  *Id*. at § 3730(b)(3).  Section 3730(b)(4) of the FCA explicitly provides that the Government has until the expiration of the 60-day period or any extensions obtained under paragraph (3) to proceed with the action.  When it does so, the government is joining in the relator's action and then conducting that pre-existing action.  *See* 31 U.S.C. § 3730(c)(1) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action . . .").

     If the Court were to conclude that a complaint-in-intervention filed by the United States was a separate action for statute of limitation purposes, such a ruling would put a *de facto* limit, not found in the FCA, on the period of time available to the United States under the FCA to investigate the relator's claims and files its own complaint in intervention.  For example, if a relator filed suit the day before the expiration of the statute of limitations, the government would effectively have one day to investigate the case and file a complaint, in derogation of the clear statutory language giving the government at least 60 days, plus any extensions, to decide whether to intervene and pursue the action.  It would make little sense under the FCA to allow court-sanctioned extensions to complete complex investigations, but also have the statute of limitations continue to run and potentially prevent the government from utilizing the results of that investigation to subsequently file its own complaint.

There is nothing in the statute or legislative history that suggests those procedures regarding the investigatory seal period are meant to be limited in any way by the FCA's statute of limitations provisions.  As one court has noted:

> It must be recalled that the government secured extensions of time within which to notify the court of its intervention in relator's action upon a showing that this court concluded presented good cause . . . It would be irrational to impute to Congress the intention to permit such enlargements yet bar the government's ultimate intervention on statute of limitations grounds when such enlargement sought received express judicial approval.

*Miller v. Holzmann*, 2006 WL 568722 at *5 (D.D.C. Mar. 9, 2006).  Any limits on the seal/investigatory period are to be imposed by the trial court on a case by case basis, not by the FCA's statute of limitations provisions.  Congress recognized that FCA investigations often involve complex, lengthy inquiries, and sought to ensure that the government did not lose enforcement rights through "a wrongdoer's successful deception." S. Rep. No. 99-345, 1986 U.S.C.C.A.N. 5266 at 5280.

Dey relies on *United States v. The Baylor Univ. Med. Ctr.,* 469 F.3d 263 (2nd Cir. 2006), a case holding that a complaint-in-intervention by the United States in a *qui tam* suit was time-barred because it did not, under Rule 15(c)(2), relate back to the date of the original complaint by the relator.  Even the *Baylor* decision, however, recognizes the likelihood of relation back being imbedded in the FCA.  *See Baylor*, 469 F.3d at 270 ("There is a colorable argument that the FCA implicitly 'permit[s]' a form of relation back that dispenses with the requirement of notice" pursuant to Fed. R. Civ. P. 15(c)(1)).  Because the Second Circuit determined that this argument had not been raised in that case, it decided not to address the point and did not resolve this issue.  *Id.*

Finally, Dey's arguments about delay cannot justify an expansive construction of the FCA statute of limitations beyond what Congress intended to provide.  Congress clearly determined that notice is not required for an FCA suit by requiring relator's complaint be first filed under seal.  If the statute of limitations can be initially tolled without notice to defendant, then it makes no sense to preclude the government from filing a new complaint based on lack of notice.[4]  As discussed above, the FCA's provisions clearly contemplate the seal and statute of limitations provisions operating in tandem, rather than at cross-purposes, and that any government complaint-in-intervention supersedes and relates back to the original *qui tam* complaint.  Accordingly, this Court should hold that the United States' Complaint relates back to the date the relator first filed, August 13, 1997.  Because the first claims are within six years of the date of that original complaint, the United States' action was timely filed.

### b.   The United States' Complaint Relates Back to the Relator's *Qui Tam* Complaint Under Fed. R. Civ. P. 15(c)(2)

In addition to the arguments presented above, the United States' Complaint also relates back under Fed. R. Civ. P. 15(c)(2), because it "[arises] out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading."  While the government's complaint may be more factually detailed than relator's initial complaint, it is well settled that Rule 15 (c) should be construed liberally to allow amended complaints that add new

---

[4]  This concept is not unique.  The courts have routinely held that a sealed indictment tolls statutes of limitations in criminal cases.  *See, e.g., United States v. Maling*, 737 F. Supp. 684, 693 (D. Mass. 1990)("For the purposes of the statute of limitations, a properly sealed indictment is found on the date of return to the magistrate, not on the date of the unsealing."), *aff'd by United States v. Richard*, 943 F.2d 115 (1st Cir.1991).

14

factual details or new examples of misconduct that fall within the scheme originally alleged.[5]
Rule 15 also permits the addition of new legal theories in a subsequent complaint as long as they
are based on the same "conduct, transactions, and occurrences" as the original complaint.[6]

Relator's original complaints against Dey in Florida and Massachusetts allege the same
core facts and legal theories articulated by the United States in its Complaint.  Relator alleged
that Dey violated the FCA by causing the submission of false claims for certain Dey drugs by
reporting false prices that Dey knew both Medicare and Medicaid would rely upon to set
reimbursement, marketing the inflated reimbursement to prospective and current customers, and
by submitting false statements used to get false claims approved or paid.  The United States'
Complaint sets forth the same scheme, albeit with more detail and thus is limited to the same
"conduct, transactions, and occurrences" as the relator's original complaint, and relates back to it
under Rule 15.

Contrary to the *Baylor* decision, numerous courts have concluded that Fed R. Civ. P.
15(c)(2) applies to FCA actions.  *See United States ex rel. Campbell v. Lockheed Martin Corp.*,
282 F. Supp. 2d 1324, 1336 (M.D. Fla. 2003) (Government's non-FCA claims relate back to
relator's complaint); *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 75-76

---

[5] *Siegel v. Converter Transp., Inc.*, 714 F.2d 213 (2d Cir. 1983)(allowing amended complaint seeking recovery for shipments that were not identified in original complaint, where new claims fell within general scheme alleged in original complaint); 6A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d*, § 1497 at 74 (1990) ("[A]mendments that merely . . . expand or modify the facts alleged in the earlier pleading meet the Rule 15(c) test and will relate back.").

[6] *See Tiller v. Atlantic Coast Line R.R.*, 323 U.S. 574, 580-81 (1945) (claim under Federal Boiler Inspection Act relates back to original complaint for negligence); *Villante v. Dept. of Corrections*, 786 F.2d 516, 520 (2d Cir. 1986) (claim for wrongful confinement relates back to original claim under 42 U.S.C. § 1983); *Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000) ("a court will permit a party to add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence.").

(D.D.C. 2003) (Government's common law claims relate back to relator's complaint); *United States ex rel. Jordan v. Northrop Grumman Corp.*, CV 95-2985 ABC, slip op. at p. 14, n.1 (C. D. Cal. Aug. 5, 2002) (Att. 10 ) (in dicta, noting that the Government's common law claims would relate back to relator's complaint); *United States ex rel. Flanagan v. Baptist Health Sys., Inc.*, No. 97-B-3070-S (N.D. Ala. Mar. 30, 2001) (Att. 11); *United States ex rel. Mueller v. Eckerd Corp.*, 95-2030-CIV-T-17C, slip op. at p. 8 (M.D. Fla. Oct. 2, 1998) (Att. 12) (Government's breach of contract claim relates back to relator's complaint); 6A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d*, § 1497 at 94-99 (1990); *but see Baylor*, 469 F.3d at 269-70 (holding that Rule 15(c)(2) is inapplicable).

Fed. R. Civ. P. 15(c)(2) says only that the claim in the subsequent pleadings needs to arise out of same conduct, transaction or occurrence, and does not contain any notice requirement such as is found in Rule 15(c)(3).  Rather, notice typically arises as the means to determine whether the proposed amendment is based on the same allegations as the original pleading.  *See, e.g., O'Loughlin v. National R.R. Passenger Corp.*, 928 F.2d 24, 27 (1st Cir. 1991) ("We have scoured the original complaint and can find no allegation of facts that could be said to give Amtrak fair notice of the general fact situation out of which the claim in the amended complaint arose.")

Although Rule 15(c)(2) does not contain any notice requirement, if the Court were to assess whether Dey had notice of the claims prior to unsealing, all the facts and circumstances must be evaluated.  Even in non-FCA litigation where seal restrictions play no role, formal notice via service of a pleading on the defendant is not required.  *Woods v. Indiana Univ.-Purdue Univ. at Indianapolis*, 996 F.2d 880, 889 (7th Cir. 1993) (court declined to uphold the

16

defendant's statute of limitations defense to being named in an amended pleading and held that determination of notice "cannot be made solely on the basis of when a party is named in a complaint."). Here, as detailed in the earlier factual summary, Dey received a subpoena confirming the existence and subject matter of the government investigation within months of the relator having filed suit, and received no less than six additional subpoenas over the years, all seeking documents related to drug pricing fraud. As it must, Dey concedes "awareness of the Government's investigation [,]" but argues that it "was deprived of the ability to fully prepare its defense." Dey Memo. at 16-17. Dey provides no facts to support this assertion. Given that Dey was able to submit a lengthy brief to DOJ in 2000, explaining in detail why the case against it should not proceed, Dey's claim rings hollow. Moreover, as this Court is well aware, Dey has been engaged in litigation of similar claims in the AWP MDL for years. In addition to the claims pending in this Court, Dey has been sued by numerous states. See Att. 13, listing captions of cases against Dey. Most critically, Dey does not and cannot argue that the claims asserted by the United States are somehow different from those put forth by relator, or that Dey is in a worse position than if relator was proceeding alone. Taking the facts as a whole here, Dey had notice of the claims against it.

**B.    THE REBATE AGREEMENT DOES NOT BAR THE GOVERNMENT'S COMMON LAW OR FCA CLAIMS**

Dey argues that the Medicaid Drug Rebate Agreement is a contract between Dey and the United States and the only source of Dey's drug price reporting obligations to Medicare and Medicaid. As such, Dey contends that the Rebate Agreement bars relief under "any implied contract theory such as unjust enrichment." Dey Memo. at 19. Dey further argues that since the United States did not allege any violation of the Rebate Agreement, there can be no basis to

17

accuse Dey of pricing fraud.  Finally, Dey contends that the United States could not have
reasonably relied on Dey's AWPs or WACs as truthful since the prices Dey reported pursuant to
the Rebate Agreement were so much lower.

### 1. The Rebate Program Does Not Address the Fraud Perpetrated by Dey

As an initial matter, the Medicaid Drug Rebate Statute ("MDRS") and Rebate Agreement
(collectively "Rebate Program") have no bearing on the price reporting fraud at issue in this
case.  The Rebate Program requires drug manufacturers to pay a quarterly rebates to the states
based on their drug utilization.  The Rebate Agreement does not affect, much less govern, how
much Medicare or the state Medicaid programs reimburse physicians or pharmacies for drugs.
More importantly, because Medicaid rebates are based on average manufacturer prices
("AMPs") -- not AWPs or WACs, Dey's rebates did not remedy the damage that it caused from
reporting inflated AWPs and WACs.

As Dey acknowledges, Dey sought to have its drugs reimbursed by the Medicaid
program.  To that end, Dey entered into a rebate agreement with the Center for Medicare and
Medicaid Services ("CMS") of HHS, pursuant to the MDRS, 42 U.S.C. § 1396r-8, to ensure that
federal matching funds would be made available for its covered outpatient drugs.  42 U.S.C.
§ 1396r-8(a)(1); Rebate Agreement at §II(a).  Drug manufacturers must calculate and report their
AMPs and best prices to the Secretary on a quarterly basis.  42 U.S.C. § 1396r-8(b)(3)(A)(I);
Rebate Agreement at § II(e).  Thereafter, states must report their total Medicaid drug utilization
to each manufacturer and the Secretary.[7]  42 U.S.C. § 1396r-8(b)(2)(A).  CMS then computes the

---

[7] The rebate agreement provides a dispute resolution mechanism in the event there is a
discrepancy between a state and manufacturer regarding the state's Medicaid utilization information.
Rebate Agreement at § V.

unit rebate amount (URA).  Rebate Agreement at § I(dd).  In order to preserve the confidentiality of manufacturer pricing data, while allowing states to verify the accuracy of their quarterly rebates, the Secretary provides the states with the URAs, and not (until very recently) the AMPs or best prices.[8]  A manufacturer must then pay a rebate directly to each state.  42 U.S.C. § 1396r-8(b)(1)(A); Rebate Agreement at § II(a).  For multiple source non-innovator drugs, the rebate is 11% of AMP.  42 U.S.C. § 1396r-8(c)(3).

      The rebate program does not require manufacturers to submit invoices to support their best price calculations or to regularly explain their methodologies for calculating AMP or best price.  The Secretary may survey wholesalers and manufacturers to verify reported AMPs and best prices, 42 U.S.C. § 1396r-8(b)(3)(B), and may audit manufacturer calculations of AMP and best price.  Rebate Agreement at § III(c).  The Secretary may impose civil money penalties on manufacturers that either fail to timely report their pricing information or submit false information to the Secretary.  42 U.S.C. § 1396r-8(b)(3)(c); Rebate Agreement at §§ III, IV.  Section 1396r-8(b)(3)(C)(ii) also provides that any civil money penalties imposed under this subsection are "in addition to other penalties as may be prescribed by law."  The Secretary may

---

[8]  Until very recently, any information provided by a manufacturer or wholesaler under the rebate statute was confidential and "shall not be disclosed by the Secretary . . . or a State agency . . . except as the Secretary determines to be necessary to carry out this section."  42 U.S.C. § 1396r-8(b)(3)(D); Rebate Agreement at § VII.  Pursuant to those confidentiality provisions, the Secretary did not give the states access to AMP data.  *See* Medicaid Program: Payment for Covered Outpatient Drugs Under Drug Rebate Agreements With Manufacturers, 60 Fed. Reg. 48442, 48475 (Sept. 19, 1995) (preface to proposed rule in 1995) (expressly discussing Secretary's limitation on access to AMP data by the states).  It was not until the Deficit Reduction Act of 2005 ("DRA") was passed that states were provided with AMP data.  DRA, Pub. L. No. 109-171 § 6001, 120 Stat. 4, 54 (2006).  The Secretary of HHS also is not permitted to use the AMP data for Medicare reimbursement and has publicly expressed that view.  See "Reimbursement and Access to Prescription Drugs Under Medicare Part B," 107th Cong. 16, Hearing Before the Subcomm. on Health Care of the S. Finance Comm.,(Mar. 14, 2002) (statement of Thomas A. Scully), 2002 WL 399357.

terminate the Rebate Agreement for either violations of the rebate agreement or for other good cause shown.  42 U.S.C. § 1396r-8(b)(4)(B).

As stated above, the Rebate Agreement does not govern or regulate what the Medicare and state Medicaid programs reimburse health care providers for drugs.[9]  For example, nothing in the Rebate Agreement speaks to state drug reimbursement methodologies or what pricing data or information drug manufacturers must report to third party drug pricing publications.  More importantly, because rebate calculations are not tethered to AWPs or WACs, Dey's quarterly rebate payments did not make the Medicaid program whole from the harm it suffered as a result of Dey's fraudulent conduct.  For example, a generic manufacturer may report a false AWP of $100 (when its true AWP is $60), and an AMP of $50, for a given drug.  In that instance, assuming that the state reimbursed at AWP - 10%, the state would have paid $90, when it should have paid $54 for the drug.  While that manufacturer will pay the state a rebate of $5.50 (or 11% of $50), which it is independently obligated to do under the Rebate Program, the state has nevertheless suffered additional damages as a result of the manufacturer's inflated AWP.

Finally, the Rebate Agreement is construed in accordance with federal common law and any "ambiguities shall be interpreted in the manner which best effectuates the statutory scheme." Rebate Agreement at IX(e).  To underscore this point, the Agreement expressly provides that "[n]othing in this Agreement shall be construed as a waiver or relinquishment of any legal rights of the Manufacturer or the Secretary under the Constitution, the Act, other federal laws, or state laws."  Rebate Agreement at § IX(d).  As set forth above, there is no ambiguity in the Agreement

---

[9] The *Medicaid* Drug Rebate Program does not impact *Medicare* whatsoever.  Medicare reimbursement is not based on AMP or Best Price.  Neither the Medicare program nor its beneficiaries receive any rebates from drug manufacturers.

on this issue, and the Agreement cannot be construed to permit rampant fraud by drug manufacturers in their reporting of different drug prices for purposes of federal reimbursement, separate and apart from the rebate program.

### 2.   The United States' Awareness of Dey's AMPs Does Not Foreclose Either Its Common Law or FCA Claims

Given the particular nature of AMP data, Dey's reporting of AMPs to the government cannot credibly negate "reliance" under the common law or any element of the FCA claims. Dey also contends that the government should be estopped in this case because Dey's reporting of AMPs enabled the government to discern something approximating Dey's actual sales prices notwithstanding its false price reporting.  Dey next contends that because Dey reported accurate AMPs to HHS, the government had no right to rely on Dey's false AWPs and WACs in setting drug reimbursement and cannot pursue a common law fraud claim against Dey.  Dey finally argues that under the FCA, the government's knowledge of Dey's AMPs means that falsity cannot be established.  Dey is wrong on all counts.

The reporting of AMP to the Medicaid drug rebate program was not used to set Medicaid or Medicare reimbursement rates for Dey's drugs.  (It remains to be seen whether Dey's AMPs even truly represented estimated acquisition cost.)  Dey knew that state Medicaid programs and Medicare relied on Dey's published AWPs and WACs to set reimbursements for the drugs at issue.  Compl., ¶¶ 3, 50.  Dey manipulated the published prices on its drugs because it knew (1) the published prices had a direct impact on government reimbursement systems in place and (2) inflated government reimbursement could be an effective marketing tool.  Dey could have just reported one number both (1) as its AMP to the Medicaid drug rebate program and (2) to the pricing compendia relied upon by Medicare and Medicaid to set reimbursement levels.  Instead,

21

Dey reported inflated prices to the price reporting compendia because doing so advanced Dey's overall fraudulent scheme.

Dey's AMP data was not an automatic trigger from which the United States could have determined that Dey's reported prices were artificially inflated or that Dey was engaged in fraudulent conduct. As the Court is well aware, Medicare reimbursement was, until recently, based on a drug's AWP, referencing sales by wholesalers to customers, including physicians and retail pharmacies. *In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277 (D. Mass. 2006). So knowing Dey's AMPs (i.e., what Dey charged wholesalers) would not have informed the Secretary what physicians or retail pharmacies were actually paying wholesalers for Dey's products. Similarly on the Medicaid side, for states that reimbursed based on AWP, knowing Dey's AMPs would not necessarily have helped the states to divine what Dey's actual AWPs were for its products. Even for states that reimbursed for drugs based on reported WACs, access to Dey's reported AMPs would not necessarily have been a clear indication that Dey was inflating its WACs since AMP also includes direct sales to customers.

Finally, the United States was not required to "reverse engineer" Dey's AMPs every quarter, compare them to Dey's false reported prices and then take corrective action, and the absence of such efforts does not render the claims affected by Dey's false price reporting any more true. Furthermore, as this Court has observed, "the ability to make a mathematical calculation" to detect inaccuracies in prices reported by a pharmaceutical company does not preclude a finding of liability. *Massachusetts v. Mylan Labs.,* 357 F. Supp. 2d 314, 323 (D. Mass. 2005) (discussing common law claims). In sum, Dey's reporting of AMPs does not undermine a single claim brought by the United States here.

22

3.     **The Rebate Agreement Is Not a Contract And Therefore Does Not Bar Common Law Claims**

Finally, even if the Rebate Agreement addressed the fraud at issue here (which it does not), the Rebate Agreement is a statutory creation and does not strip the United States of its common law claims, nor afford Dey any type of contractual defense.   The Rebate Agreement is not a garden variety commercial "contract" with terms that reflect a "meeting of the minds" or obligations that arise from a bargained-for-exchange between a drug manufacturer and the Secretary.  Rather, the Rebate Agreement reflects the statutorily defined conditions that drug manufacturers must meet in order to participate in the Medicaid Drug Rebate Program and ensure that their drugs are covered by federal Medicaid funding.  For example, it is the MDRS that defines the length of the agreement, the pricing data that manufacturers must report, the methodology for computing the quarterly rebates owed, the penalties for noncompliance and the conditions for terminating the Rebate Agreement.  *See* 42 U.S.C. § 1396r-8(b).  Indeed, when analyzing the Medicaid Drug Rebate Program, the Supreme Court relied not on the Rebate Agreement to determine the requirements imposed on drug manufacturers, but relied instead on the statute itself.  *See Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 652 (2003).  Thus, it is the MDRS–that is, federal law–that provides the basis for the rebate obligations, not a contract between the Secretary and the manufacturer.

In this regard, the Rebate Agreement is much more analogous to a Medicare provider agreement than a commercial contract, and the courts have consistently refused to treat provider agreements as barring common law claims.  The Medicare statute requires providers to enter into an agreement, commonly referred to as a provider agreement, with the Secretary in order to receive Medicare reimbursement. 42 U.S.C. § 1395cc.  While the provider agreement is a

23

condition for reimbursement, it does not establish a contractual relationship between providers and the United States.[10]   As courts have noted, Medicare providers, upon joining the Medicare program, "*receive[] a statutory entitlement, not a contractual right*.  Although the hospitals entered into an 'agreement' with the Secretary that they would abide by the rules of the Medicare program, that agreement did not obligate the Secretary to provide reimbursement for any particular expenses."  *Memorial Hosp. v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983) (emphasis added).

Given the unique statutory nature of Medicare provider agreements, courts have rejected attempts to characterize such agreements as contracts and therefore a basis to bar common law claims.  *See*, *e.g.*, *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 777 (N.D. Tex. 2003)(holding that Government could bring unjust enrichment claim against defendant because Medicare provider agreement did not constitute a contract); *Greater Dallas Home Care Alliance v. United States*, 10 F. Supp. 2d 638, 647 (N.D. Tex. 1998)(rejecting a preliminary injunction argument that Medicare participation agreements "are essentially contracts"); *United States v. Geri-Care, Inc.*, No. Civ. A 89-5720, 1990 WL 9463, at *3 (E.D. Pa. Feb.1, 1990), *vacated in part on other grounds*, 1990 WL 39301 (E.D. Pa. Mar. 30, 1990) (rejecting the defendants'

---

[10] Indeed, the case law is clear that the Social Security Act itself does not create any contract rights with respect to providers, suppliers, or drug manufacturers. *See Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986).  The Supreme Court has held that courts should be very reluctant to permit a breach of contract claim arising under these circumstances since such an action implicates foreclosing the exercise of Congressional authority.  *Bowen*, 477 U.S. at 55.  Unless Congress clearly indicates otherwise, its laws are presumed to announce rules that may be changed by Congress, not to create private contractual or vested property rights.  *See*, *e.g.*, *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985).  Here, Congress has expressly reserved the right to "alter, amend, or repeal" any provision of the Social Security Act, and effectively agreements entered under it.  *See* 42 U.S.C. § 1304; *Bowen*, 477 U.S. at 52 (even contractual arrangements with the sovereign "'remain subject to subsequent legislation' by the sovereign.") (citation omitted).

argument that the government's unjust enrichment claim should be dismissed based on a contractual relationship between defendants and Medicare); *Maximum Care Home Health Agency v. HCFA*, No., 1998 WL 901642 at *5 (N.D. Tex.1998) ("a Medicare service provider agreement is not a contract in the traditional sense [;] [i]t is a statutory entitlement created by the Medicare Act").  For similar reasons, the Court should reject Dey's attempt to cast the Rebate Agreement as a "contract" and therefore a basis to bar the government's common law claims.

## C.   THE FCA AND COMMON LAW FRAUD COUNTS ARE PLED WITH PARTICULARITY

The purpose of Rule 9(b) is to "*give notice* to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (emphasis added); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 226 (1st Cir. 2004); *New England Data Servs., Inc. v. Becker*, 829 F.2d 286, 288 (1st Cir. 1987); *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228-229 (1st Cir. 1980); *Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 440 (1st Cir. 1985); *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985).

The Complaint provides ample fair notice of the United States' claims.  The scheme set forth in the Complaint is simple and clear: Dey reported false prices to pricing compendia relied upon by Medicaid and Medicare to inflate reimbursements for its products.  Compl., ¶¶ 50-61.  The claims at issue are all Medicaid and Medicare claims submitted for the Dey drugs or the J-Codes identified in the Complaint.  Compl., ¶¶ 29, 33.  The Complaint describes how Dey's false price reporting affected claims for payment made to the Medicare and Medicaid programs and

alleges false claims were submitted to the Government.  Compl., ¶¶ 50-61.  The Complaint

identifies the Dey drugs at issue and the Medicare J-Codes affected by the false price reporting.

Compl., ¶¶ 29, 33.  The Complaint sets forth the time period during which claims were submitted

to the Medicare and Medicaid programs for the Dey drugs identified in the Complaint.  Compl.,

¶ 50.

     Dey cites *United States ex rel. Karvelas* and *United States ex rel. Clausen v. Lab. Corp.

of America*, 290 F.3d 1301 (11th Cir. 2002) for the proposition that to survive Rule 9(b) the

United States must plead every single detail about every single claim that was submitted to the

Medicare or Medicaid programs for every one of Dey's drugs covered by the United States'

Complaint.  Memo. at 24.

     Dey misapprehends the holding of these cases for several reasons.  *First*, these cases

involved relators – not the United States – who failed to plead the filing of a claim.  *See

Karvelas*, 360 F.3d at 234; *Clausen*, 290 F.3d at 1311.  *Second*, neither of these Courts required

the relator to plead the kind of minutiae that Dey demands here.  As the Eleventh Circuit

clarified in *United States ex rel. Walker v. R&F Properties, Inc.*, 433 F.3d 1349 (11th Cir. 2005),

the *Clausen* decision set forth a non-mandatory list of claims-related information it was looking

for because the relator was a "corporate outsider" who was speculating that actual claims were

submitted.  *Id.* 433 F.3d at 1360; *see also United States ex rel. Hill v. Morehouse Med. Assocs.,

Inc.* 2003 WL 22019936 at *4-5 (11th Cir. August 15, 2003) (relator with firsthand knowledge of

submission of claims not required to plead exhaustive claims details due her inherent factual

credibility).  The Courts in *Karvelas* and *Clausen* were concerned with whether there is some

"indicia of reliability" to the relator's allegation that a claim was indeed submitted.  *See Clausen*,

290 F.3d at 1311.

The claims at issue here were either submitted to the United States through the Medicare

program or submitted to states (many of whom have sued Dey for this same conduct) through the

Medicaid program, and were partially reimbursed by the United States.  The United States is not

an outsider to the issue of whether claims were submitted to the Medicare and Medicaid

programs and is not required to provide the information Dey demands prior to commencing its

suit.  The United States is a reliable source as to whether the claims at issue were submitted, and

there is no speculation or uncertainty on that issue.[11]

## D.    THE ELEMENTS OF THE FCA AND COMMON LAW CLAIMS ARE PROPERLY PLED

### 1.    Dey Knowingly Caused the Submission of False Claims

#### a.    Dey Caused False Claims to be Submitted

The FCA addresses claims that are both "false" and "fraudulent."  *See* 31 U.S.C.

§ 3729(a)(1) and (2) (liability arises for person who (1) knowingly causes to be presented "false

or fraudulent claim(s)" or (2) "knowingly makes, uses, or causes to be made or used, a false

record or statement to get a false or fraudulent claim paid.").  Indeed, the FCA "was intended to

reach all types of fraud, without qualification, that might result in a financial loss to the

Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968); *see also Cook

County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) ("Congress wrote [the FCA]

---

[11]  If the Court were to decide that more specifics regarding actual claims were necessary, the
United States requests leave to amend to provide such information.

expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'")(citation omitted).

The Supreme Court, the First Circuit and this Court have sustained FCA liability where no falsity was apparent on the face of the specific claims. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-45 (1943) (collusive bid-rigging at outset of project made all requests for payment fraudulent); *Rivera*, 55 F.3d at 706 (although "from Merrill Lynch's perspective, the claim it presented may not have been 'false or fraudulent,' that claim was inflated by defendants' earlier fraud; and the case law allows the United States . . . to sue defendants under the FCA for having 'caused' the filing of a 'false' claim against the government."); *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255 (D. Mass. 2003) (sustaining FCA case based on fraudulent off-label marketing scheme which rendered related claims ineligible for payment); *United States ex rel. Kneepkins v. Gambro Healthcare*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000) (upholding FCA claims based on an underlying violation of the AKS despite no falsity on face of claim). Under a "fraudulent course of conduct" theory, FCA liability reaches claims submitted to the United States when there was fraud underlying a contract, benefit or status that resulted in the presentment of a claim for payment. *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999); *see also Marcus*, 317 U.S. at 543-44; *Murray & Sorenson, Inc. v. United States*, 207 F.2d 119, 123-24 (1st Cir. 1953); *United States v. Incorporated Vill. of Island Park*, 888 F. Supp. 419, 440 (S.D.N.Y.1995) (defendant engaged in a fraudulent course of conduct by intentionally subverting the purposes of the affirmative fair market housing plan, causing the innocent mortgagees to submit fraudulent claims to government agency).

Dey argues that the FCA is so narrow that it contemplates falsity only in those instances where a claim is submitted in "violation of some controlling rule, regulation or standard."  Mem. at 29.  Dey then leaps to the conclusion that even though AWP is a regulatory term, since there is no accompanying definition, Dey's AWPs cannot be found false.  Such is not the case.  This Court has already adopted a plain meaning interpretation of AWP as set forth in the Medicare statute, 42 U.S.C. § 1395u(o).  *In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277 (D. Mass. 2006).  The Court did not find the term impossible to understand and instead held that determining the meaning of AWP was "a straightforward exercise that begins with the dictionary."  460 F. Supp. 2d at 287.  The Court specifically rejected Dey's argument that AWP essentially means "any price the pharmaceutical industry places in the industry publication."  *Id.*

In this case, the United States has sufficiently alleged that Dey engaged in a fraudulent course of conduct in that Dey (1) reported inflated prices to price reporting compendia relied upon by Medicare and Medicaid to set reimbursement, (2) supplied those inflated prices to create artificially large spreads between Medicare and Medicaid reimbursement and the purchase price of Dey's drugs, and (3) marketed the spreads to customers as an inducement to purchase Dey's drugs.  Compl. *passim*.  This conduct is analogous to that in *In re Lupron Marketing and Sales Practices Litigation*, where the Court observed, "[The TAP defendants] ... trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud." 295 F. Supp. 2d 148, 167-68 (D. Mass. 2003) (finding elements of misrepresentation satisfied).

### b.   Dey Cannot Escape Liability Based on Purported Government Knowledge of Its Fraud

"Government knowledge" is not a defense to an FCA claim. "That the relevant government officials know of the falsity is not in itself a defense."  *United States ex rel. Hagood*

29

*v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).  Indeed, courts have held

that "even a contractor who tells a government contracting officer that a claim is false still

violates the statute when the false claim is submitted."  *United States ex rel. Mayman v. Martin*

*Marietta Corp.*, 894 F. Supp. 218, 223 (D. Md. 1995).  As a result, no case has held that

government knowledge automatically or invariably absolves a defendant of liability.  *See, e.g.,*

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2nd

Cir. 1993).

At most, evidence about government knowledge is only relevant under the FCA to the

extent that it serves to negate a defendant's scienter. *See United States ex rel. Becker v.*

*Westinghouse Savannah River Co.,* 305 F.3d 284, 289 (4th Cir.2002); *Kreindler*, 985 F.2d at

1157; *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000).  To make the

necessary showing, courts have required that the defendant (1) prove that it identified a problem,

(2) fully disclosed the problem, and (3) completely cooperated with the government to resolve

the problem.  *See, e.g., United States ex rel. Costner v. URS Consultants, et al.*, 317 F.3d 883,

888 (8th Cir. 2003) (defendants' "openness with the EPA . . . and their close working relationship

in solving the problems negated the required scienter" under the FCA); *Shaw*, 213 F.3d at 534

(defendant's knowledge was not negated where defendant "repeatedly evaded government

employees' questions"); *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321,

327-29 (9th Cir. 1995) (defendant "completely cooperated and shared all information" during the

testing of Apache helicopters); *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421

(9th Cir. 1992) (defendant disclosed deficiency and discussed how to fix it).  These cases all

focus on information within the defendant's control *and* an affirmative act by the government acquiescing in defendant's conduct.[12]

Dey contends that the government "knew" Dey's reported prices were false, and on that basis alone, the claims here should be dismissed.  Dey contends that various government reports note that AWP may not reflect "an actual acquisition cost."  The government reports that Dey cites suggest only that the government believed the reported prices deviated in significant fashion from the actual prices, without getting at the underlying cause of the discrepancy.[13]

As noted above, the law requires much more.  Dey argues that Dey itself knew that the government knew that Dey's prices were false, and that such knowledge negates Dey's required scienter under the FCA.  None of the reports appended to Dey's motion to dismiss, however, contain even a scintilla of evidence showing that Dey made a full disclosure, had an open dialogue, or completely cooperated with the government regarding the company's reporting of inflated drug prices.  In fact, as the United States' Complaint alleges, Dey did just the opposite.

---

[12]  Dey does not allege government misconduct here, and the United States, therefore, notes only that courts have been extremely hesitant to apply the doctrine of equitable estoppel against the government absent evidence of affirmative misconduct by government agents that was reasonably relied upon by a party.  *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 421 (1990) (noting that some dicta in Supreme Court decisions "mention the *possibility* ... that some type of 'affirmative misconduct' might give rise to estoppel against the government.") (emphasis added); *Frillz, Inc. v. Lader*, 104 F.3d 515, 518 (1st Cir. 1997) ("A party seeking to invoke equitable estoppel against the federal government at a minimum 'must have reasonably relied on some 'affirmative misconduct' attributable to the sovereign.'")*, quoting United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 761 (1st Cir. 1985).

[13]  To the extent that Dey relies on the government reports to support defenses of laches, estoppel or waiver, such arguments should be rejected.  It is well established that "[m]en must turn square corners when they deal with the government."  *Heckler v. Community Health Servs.*, 467 U.S. 51, 63 (1984) (citation omitted) (rejecting estoppel argument in Medicare overpayment case).  Openness and honesty are required if the Medicare system is "not to be turned into a cat and mouse game in which clever providers could, with impunity, practice fraud on the government."  *United States v. Calhoon,* 97 F.3d 518, 529 (11th Cir. 1996) (affirming conviction for submitting false cost reports to Medicare).  Accordingly, such defenses are inapplicable here.

31

Compl. ¶¶ 3, 59-60.  Dey concealed when it could have disclosed; it obfuscated when it could have cooperated.  Indeed, Dey cannot point to anything to support a claim that it reasonably believed that its conduct was permissible because of communications that it had with the government, much less any affirmative government approval of its conduct.  As Judge Stearns observed, "[t]he recognition on the part of government regulators of inefficiencies in the administration of Medicare does not, as defendants contend, amount to condonation of fraudulent conduct."  *In re Lupron*, 295 F. Supp. 2d at 168 n.19.  As it has before, this Court should reject Dey's attempt to divert the focus away from its own fraudulent conduct and lead this Court down a slippery slope.  *In re Pharm. Indus. AWP Litig.*, 263 F. Supp. 2d 172, 187 (D. Mass. 2003) ("the fact that Congress has failed to disturb the widespread practice on the part of pharmaceutical companies of grossly overstating their AWPs cannot be read as a clear and manifest intention to grant immunity from state regulation of such fraudulent practices."); *see also In re Lupron*, 295 F. Supp. 2d at 163 (rejecting notion that "Congress deliberately invited the very fraud of which defendants are accused.").

Indeed, as this Court has noted, the harm suffered by the United States in this matter stems not from the AWP system as Congress established it, but from Dey's abuse of that system through its fraudulent price reporting.  *See In re Pharm. Indus. AWP Litig.*, 263 F. Supp. 2d at 192 (rejecting defendants' argument under the government action doctrine, stating "[t]his doctrine is inapplicable to the case at bar because plaintiffs do not claim that the harm they suffer stems from the AWP system as Congress has established it, but rather from the defendants' fraudulent statements about their average wholesale prices.").

32

### c.    The United States Properly Alleged Causation Here

By its plain terms, the FCA is directed not merely at those who submit false claims but also at those who "cause" false claims to be submitted.  31 U.S.C. § 3729(a)(1), (2).  The First Circuit addressed a defendant's required role in causing the presentment of false claims in *Rivera*, where defendants siphoned money from a hospital through a scheme involving selling goods to the hospital at inflated prices by a company controlled by defendants.  After the fraud caused the hospital to default to Merrill Lynch on its mortgage, Merrill Lynch filed for insurance benefits from the United States Department of Housing and Urban Development ("HUD").  *Rivera*, 55 F.3d. at 706.  The Court noted that the case was "complicated" by the fact that the initial fraud was perpetrated against a private lender.  Nevertheless, the Court found that the application to HUD could form the basis for FCA liability because the fraud resulted in the hospital's default, which then resulted in Merrill Lynch's claims to HUD.  *Id.* at 706-07.  Plainly, the defendants there had not specifically directed Merrill Lynch to file an insurance claim, but were found liable under the FCA for causing the fraud and the eventual false claim to be submitted.[14]  As this Court explained in *Parke-Davis II*, all that is required is a showing that a

---

[14] Numerous other courts have upheld FCA allegations based on broad interpretations of the causation element.  *See, e.g.*, *United States ex rel. Schmidt v. Zimmer*, 386 F.3d 235, 243-44 (3rd Cir. 2004) (although defendant had not reviewed, approved or received copies of [hospital's] cost reports or participated in their filing, defendant's creation and pursuit of marketing scheme that, if successful, would lead to filing of false claims satisfied causation); *Scolnick v. United States*, 331 F.2d 598, 599 (1st Cir. 1964) (liability for accepting government payment known to have been made in error).

defendant's conduct was a substantial factor in producing the harm, and that such harm was foreseeable.  *Parke-Davis*, 2003 WL 22048255 at *4.[15]

Dey relies in part on *United States ex rel. Kinney v. Hennepin County Med. Ctr.*, 2001 WL 964011 (D. Minn. 2001).  However, this Court distinguished *Kinney* in *Parke-Davis II*, noting the difference where evidence showed that defendant's actions were "not irrelevant, but, rather, played a key role in setting in motion a chain of events that led to false claims."  *Parke-Davis II*, 2003 WL 22048255 at *6 (expressly rejecting defendant's argument that it could not be held liable under FCA because it exerted no control over and did not directly influence the filing of a false claim).[16]

Dey argues that the Complaint should be dismissed because it only alleges a fraudulent scheme and does not tie that scheme to the submission of claims.  Dey also argues that the United States merely alleged Dey's knowledge of the submission of a claim.  Memo. at 33-34. Dey is  wrong on both counts.  The United States alleges that Dey caused claims to be filed throughout its Complaint, and further alleges that Dey reported false, fraudulent and inflated drug prices to several price reporting compendia that Dey knew the Medicare and Medicaid programs relied upon to set reimbursement rates for Dey's customers.  *See* Compl. ¶¶ 3-4, 50-52, 55, 57-61, 63, 66.  Thus, Dey knew that its conduct of reporting fraudulent prices commenced a

---

[15] Furthermore, as is clear from *Parke-Davis*, a determination of causation is a fact-based, evidentiary inquiry that is not proper for adjudication in a Rule 12(b)(6) motion.  *Id*. at *5.  Notably, in *United States ex rel. Kinney v. Hennepin County Med. Ctr.*, 2001 WL 964011 (D. Minn. 2001), another case relied on by Dey, the issue was decided on a motion for summary judgment, not a motion to dismiss.

[16] Nor is it of any significance whether the parties submitting the individual claim forms (here, health care providers) knew the claims would be infected with falsity.  *E.g, Zimmer,* 386 F.3d at 243-44 (Supreme Court opinions' in *Hess* and *Bornstein* demonstrate that the outcome of FCA claims against a party that caused another entity to submit false claims "did not turn on whether the actual presenters were 'duped' or participated in the fraudulent scheme").

process that led to the government reimbursing claims for Dey's drugs at inflated rates, resulting in substantial profits to its customers.  Indeed, the Complaint alleges that Dey created this "spread" precisely to induce purchasers to buy Dey products, purchasers who would realize those profits by submitting claims to Medicare and Medicaid.  Thus, the United States has sufficiently alleged that it was foreseeable that Dey's conduct "would ineluctably result in false . . . claims." *Parke-Davis*, 2003 WL 22048255 at *5; *see also In re Lupron*, 295 F. Supp. 2d at 175 ("[I]t was the defendants who instigated both the culpable and the innocent intermediaries to commit acts that were not only foreseeable but intended.").  Here, of course, Dey's information was an integral and necessary component of the government's reimbursement to the health care providers for Dey's drugs. [17]

### 2. The United States' Complaint Sufficiently Alleges that Dey Violated the Anti-Kickback Statute as a Predicate for a Violation of the FCA

The Anti-kickback Statute ("AKS") prohibits the knowing and willful offering of any remuneration to induce referrals of services for which payment may be made under a federal health care program.  42 U.S.C. § 1320a-7b(b).  When a person violates the AKS and obtains referrals or other business as a result, the claims relating to such referred items or services are not eligible for reimbursement because compliance with the AKS is a condition of payment. *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-1260 (11th

---

[17] The other cited authorities in Dey's brief do not change this result.  For example, the *Shaver* case supports the *Parke Davis* holding that the submission of the claim must be foreseeable. *United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 933-34 (8th Cir. 2001).  Likewise, in *United States v. President & Fellows of Harvard Univ.*, 323 F. Supp. 2d 151 (D. Mass. 2004), the court distinguished claims against one individual who took no actions in connection with claims submissions and did not approve the claim information, but upheld claims against a second individual whose participation in approving invoices played a role in the forms ultimately submitted for payment. *Id.* at 188.

Cir. 2005); *see generally Schmidt*, 386 F.3d at 245 (violation of AKS can give rise to FCA

liability); *United States ex rel. Thompson v. Columbia Healthcare Corp*, 125 F.3d 899, 902 (5th

Cir. 1997) (same); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 238 F. Supp.

2d 258, 266 (D.D.C. 2002) (claim may be found false based on implied certification of

compliance with AKS).  When an entity knowingly submits or causes the submission of claims

resulting from an illegal remunerative arrangement, it has presented or caused the submission of

a false or fraudulent claim in violation of the FCA.  When such claims are submitted, the claims

contain an implied representation that they are being submitted in compliance with the AKS.  *Id.*

To hold otherwise would "put the government in the position of funding illegal kickbacks after

the fact."  *United States ex rel. Bidani v. Lewis,* 264 F. Supp. 2d 612, 615 (N.D. Ill. 2003).

The AKS is quite clear that both "direct" or "indirect" remuneration of any kind to health

care providers and suppliers is prohibited.  AKS, 42 U.S.C. § 1320a-7b(b) (as amended)

("whoever knowingly and willfully offers or pays *any remuneration* (including any kickback,

bribe, or rebate) *directly or indirectly, overtly or covertly, in cash or in kind* to any person to

induce such person") (emphasis added).  As is clear from the plain language of the statute, a

kickback is merely one of several types of illegal remuneration that can give rise to AKS

liability. *See United States v. Greber*, 760 F.2d 68, 71 (3rd Cir. 1985) ("That a particular

payment was a remuneration (which implies that a service was rendered) rather than a kickback,

does not foreclose the possibility that a violation [of the AKS] nevertheless could exist.").

Dey argues that arranging for the United States to fund illegal payments to Dey's

customers is not actionable because Dey itself did not pay anything directly to providers.  Dey's

argument reads the United States' Complaint too narrowly and contradicts the express language

36

of the statute.  The United States did not limit itself to alleging only payments in the form of "kickbacks" under the statute, but instead described conduct in violation of and quoted from the entire section of the statute dealing with the broader concept of "remuneration."  The statute makes clear that offering indirect remuneration that induces a provider to purchase Dey drugs for which payment may be made under Medicare and Medicaid – which is what Dey did here by causing inflated government reimbursement for its drugs as alleged in the Complaint –  is illegal.  *Id.* at § 1320a-7b(b)(2); *see also Greber*, 760 F.2d at 72 (remuneration under AKS was intended to be expansive and encompass any payments that induce providers to purchase certain goods and services that are later billed to federal programs); *cf. United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989)("Giving a person the opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient.").

Dey also argues that under the facts presented here, even if the AKS-based FCA theory of liability may apply to Medicare claims, it does not apply to the United States' Medicaid claims because no single federal certification is required for Medicaid payments from the states.  Memo. at 36, *citing Pogue*, 238 F. Supp. 2d at 264 & n. 2.  The *Pogue* court's decision, however, does not support Dey's argument here.  *Pogue* did not hold that a certification is *required* to show that compliance with an underlying statute or regulatory scheme is a condition of payment.  Rather, that court concluded that the existence of such a certification removed any possible doubt that compliance was in fact material. *Pogue*, 238 F. Supp. 2d at 264.  In an implied certification context, by its very name, liability is found even in the absence of an express certification.  It is the act of knowingly presenting or causing to be presented a claim for

37

payment when the claimant is not entitled to payment because of the underlying fraud that makes the claim false or fraudulent.  Therefore, the distinction that Dey attempts to make between Medicare and Medicaid liability because of supposed differences in certifications made in the programs has no bearing on the validity of the legal theories presented by the United States nor the ultimate question of liability in this case.

### 3.     The United States Sufficiently Alleged A Claim for Unjust Enrichment

The doctrine of unjust enrichment allows for restitution when it would be unconscionable to permit another to retain the benefit received.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 339 F. Supp. 2d 165, 181 (D. Mass. 2004); *In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d at 182.

Dey argues that because this claim is based on Dey's having profited from its unlawful actions and is not an independent claim, the United States cannot pursue it.  Mem. at 37-38. However, this Court has already held to the contrary in this case: "courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, *and* whether the defendant's conduct was tortious or *fraudulent*."  *In re Average Wholesale Price Litig.*, 339 F. Supp. 2d at 181 (emphasis added).  Under this standard, the claim must stand because Dey did in fact benefit from reporting false prices by maintaining and/or increasing its market position.  The relation between the resultant market share and Dey's fraudulent reporting of prices is evidenced by Dey documents, which show consideration by Dey employees of the additional profits that could be obtained by artificially inflating prices.  Compl., ¶ 57.  While Dey profited from this fraudulent price reporting, Medicare and Medicaid paid hundreds of millions

of dollars in reimbursement for Dey's drugs.  The payments from the government flowed to Dey's customers, who in turn paid Dey for the drugs, generating profits for Dey.[18]  The essence of unjust enrichment is taking back the benefit bestowed upon an undeserving party.  Here, Dey effectively sought to secure business away from competitors by its fraudulent conduct and should not be permitted to retain the benefit of that business.

### 4.    The United States Sufficiently Alleged A Claim for Common Law Fraud

Dey argues that the United States has not adequately alleged falsity because the United States does not allege any statements by Dey characterizing their prices.  Under Dey's theory, for Dey to be held liable for reporting false prices, it would have had to append a statement to its false price reports, saying, "these are truthful."  Dey further argues that since it reported allegedly truthful AMPs, which were different from its AWPs or WACs, it was excused from reporting truthful AWPs or WACs.  The United States previously addressed that argument in Section B of its brief here.

Finally, Dey contends that the since the states pay Medicaid reimbursement as an initial matter, the United States cannot bring a common law claim based on fraud perpetrated on the Medicaid program.  Medicaid, however, is a jointly funded federal-state program.  *Cf. Pharmaceutical Research and Mfrs. of Am. v. Walsh*, 538 U.S. at 666; *PhRMA v. Meadows*, 304 F.3d 1197, 1206 (11th Cir. 2002) (describing Medicaid as a "cooperative state-federal program").  Dey then compares the federal government to counties who fund certain state

---

[18]  Dey again attempts to argue here that it cannot be penalized for its false price reporting because the Medicare program sets reimbursement using a median AWP.  It is clear, however, that Dey's goal in reporting false prices was to increase overall sales.  The inflated reimbursement that Dey knew would arrive via the Medicaid program also ensured that customers bought Dey drugs to service Medicare patients, even if Dey could not predict in advance the amount of Medicare reimbursement for its drugs.  Moreover, in certain instances, Dey's false reporting did result in a higher median AWP.

Medicaid programs, but have no input into reimbursement decisions.  As alleged in the

Complaint, however, state Medicaid programs are required to develop reimbursement formulas

that must be approved by the Secretary of HHS.  42 C.F.R. §§ 447.331, 447.332, and 447.333

(2005).  Compl., ¶ 37.  The analogy and the attendant legal reasoning thus fail, and Dey presents

no basis to dismiss the United States' common law fraud claims involving Medicaid.

### III.  <u>CONCLUSION</u>

For all of the foregoing reasons, the United States respectfully requests that the Court

deny the defendants' motion to dismiss this action.

Respectfully submitted,

| | |
|---|---|
| PETER D. KEISLER<br>ASSISTANT ATTORNEY GENERAL | MICHAEL J. SULLIVAN<br>UNITED STATES ATTORNEY |
| MICHAEL F. HERTZ<br>JOYCE R. BRANDA<br>JOHN K. NEAL<br>LAURIE A. OBEREMBT<br>Civil Division<br>Commercial Litigation Branch<br>P. O. Box 261<br>Ben Franklin Station<br>Washington, D.C.  20044<br>(202) 514-3345 | By:    /s/ George B. Henderson, II  <br>GEORGE B. HENDERSON, II<br>Assistant U.S. Attorney<br>United States Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3272 |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused an electronic copy of the above "MEMORANDUM IN OPPOSITION TO DEY DEFENDANTS' MOTION TO DISMISS" to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

 /s/ George B. Henderson, II  
Dated: February 2, 2007                        George B. Henderson, II