# ATTACHMENT 7



## DEPARTMENT OF HEALTH & HUMAN SERVICES

RECEIVED
U.S. ATTORNEY
05 JUL 28 PM 3:25

**OFFICE OF INSPECTOR GENERAL**

Office of Investigations
Post Office Box 8767
Government Center Station
Boston, Massachusetts 02114

**JUL 2 5 2005**

Dey, Inc.
C/O: Martin F. Murphy, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

Dear Mr. Murphy:

Accompanying this letter is a subpoena addressed to you returnable at the Office of Inspector General, Office of Investigations, Boston Field Office, before my designee, Special Agent David Kelly. The subpoena has been issued pursuant to the authority provided to the Inspector General by Public Law 95-452 (5 USC App. 3 Section (6)(a)(4)), as amended by Public Law 100-504. Under the health information privacy regulation that implements the Health Insurance Portability and Accountability Act of 1996 (HIPAA), providing the information requested by the attached subpoena is a permitted disclosure since it (a) is "required by law" to be produced pursuant to an IG subpoena (see 45 C.F.R. §§ 164.512(a), 164.501), and (b) will be used for "health oversight" activities by OIG, which meets the definition of a "health oversight agency" (see 45 C.F.R. §§ 164.512(d), 164.501).

Fully legible and complete copies of the records called for by the subpoena will be accepted in response to the subpoena, provided that the original records will be made available to employees of my office, upon request, during normal business hours. Otherwise original documents (including copies as maintained in your files) should be produced.

Failure to appear at the time and place specified in the subpoena may be taken as a failure to comply with the subpoena. However, as a convenience you may assemble the documents requested and mail them by certified mail on or before August 19, 2005 to:

Special Agent David Kelly
U.S. Department of Health and Human Services
Office of Inspector General
Office of Investigations
JFK Federal Building
Room 2475
Boston, MA 02203

If you have any questions, please feel free to contact Special Agent David Kelly at (617) 565-2664

Sincerely,

Joseph C. Moraski
Special Agent in Charge

Enclosures

# UNITED STATES OF AMERICA

### DEPARTMENT OF HEALTH AND HUMAN SERVICES
#### OFFICE OF INSPECTOR GENERAL

## SUBPOENA DUCES TECUM

Control No.: 9900

*To:*     *Dey, Inc.*
*C/O Martin F. Murphy, Esq.*
*Bingham McCutchen, LLP*
*150 Federal Street*
*Boston, MA  02110*

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Special Agent David Kelly, an*
*official of the Office of Inspector General, at JFK Federal Building, Room 2475, Boston, MA,*
*02203, on the 19th of August, 2005, at ten o'clock, A.M. of that day, in connection with an*
*investigation into the potential submission of false claims to Medicare and Medicaid in*
*connection with prescription drugs and the potential violation of Medicaid drug rebate program*
*requirements and other Federal health care program requirements, and you are hereby required*
*to bring with you and produce at said time and place the following:*

*See Attachment A*

*which are necessary in the performance of the responsibility of the Inspector General under*
*Public Law 95-452 (5 USC App. 3 Section 6(a)(4)), as amended by Public Law 100-504, to*
*conduct and supervise audits and investigations and to promote economy, efficiency and*
*effectiveness in the administration of and to prevent and detect fraud and abuse in the programs*
*and operations of the Department of Health and Human Services.*



*IN TESTIMONY WHEREOF*

*Joseph C. Moraski, the undersigned official of the*
*Office of Inspector General of said DEPARTMENT*
*OF HEALTH AND HUMAN SERVICES, has*
*hereunto set hand this 25 th day of July 2005.*

*Special Agent in Charge*

UNITED STATES OF AMERICA
DEPARTMENT OF HEALTH AND
HUMAN SERVICES
OFFICE OF INSPECTOR GENERAL

**RETURN OF SERVICE**

I, being a person over 18 years of age, hereby certify
that a copy of this subpoena was duly served on the
person named herein by means of -

1. personal delivery to an individual, to wit:

_____
(Name)

_____
(Title)

_____
(Address)

2. personal delivery to an address, to wit:

_____
(Description of premises)

_____
(Address)

_____
(Address)

3. registered or certified mailing to:

Martin F. Murphy, Esq
_____
(Name)

150 Federal Street
_____
(Address)

Boston, MA 02110
_____
(Address)

at 1:00 ( ) a.m. ( ✓ ) p.m. on 7/26/05

_____
(Signature)

Special Agent
_____
(Title)

Upon contumacy or refusal to obey, this
subpoena shall be enforceable by order of
the appropriate United States District Court.

## Attachment A

## I.  **INSTRUCTIONS**

A.  If a claim of privilege is asserted in response to any document requested by this subpoena, and such document, or any part thereof, is not produced on the basis of such claim, for each such document or part thereof that is not produced, you are directed to provide a privilege log wherein you identify the type of document being withheld (e.g., letter, memorandum, handwritten notes, marginalia, etc.), all actual and intended recipients of the document, its date, and the specific privilege being asserted, all with sufficient particularity so as to allow the Inspector General, and potentially the Court, to assess the validity of the claim of privilege.

B.  All documents provided in response to this subpoena are to be the original documents and are to include all copies that differ in any respect (such as marginalia and/or notations), and are to include all markings and post-it notes and other similar documents attached thereto, as well as all attachments referred to or incorporated by the documents.

C.  If any document, information or data called for by this subpoena exists as, or can be retrieved from, information stored in electronic form, then you are directed to produce the information in electronic form, including sufficient identification of the applicable software program to permit access to, and use of, the document.  Whatever electronic base format is provided by the Company, the format shall be searchable by the use of key terms.

D.  Scope of search required:  This subpoena calls for all documents in the possession, custody or control of the Company, as defined below, including, but not limited to, its officers, directors, employees, agents, consultants and contractors.  The Company is required to search all files reasonably likely to contain responsive documents, including files left behind by former officers, directors, agents and employees.  This search must include all offices, including, without limitation, offices maintained in homes of employees and officers, and including without limitation, offices in any remote locations.

E.  Manner of production:  All documents produced in response to this subpoena shall comply with the following instructions:

a.  All documents produced in response to this subpoena shall be segregated and labeled to show the document request to which the

1

documents are responsive and the source and location where the document was found.

b. To the extent that documents are found in file folders and other similar containers, which have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

c. To the extent that documents are found attached to other documents, by means of paper clips, staples or other means of attachment, such documents shall be produced together in their condition when found.

F.    In the event there are no documents responsive to a particular subpoena request, please specify that the Company has no responsive documents.

G.    If the Company knows of documents it once possessed or controlled, but no longer possesses or controls, which would have been responsive to this subpoena, produce documents indicating what disposition was made of such documents, including identification of the person(s) who are or are believed to be in possession or control of such documents currently.

H.    To facilitate the handling and return of the submitted documents, please mark each page with an identifying logo or the first three letters of your company's name, the letters "IGMA," and number each page sequentially beginning with "00001." The marks should be placed in the lower right hand corner of each page but should not obscure any information on the document. All documents should be produced in enclosures bearing the name of your company, the date of the subpoena and the paragraphs of the subpoena to which the documents respond. Use of the foregoing procedure will preserve the identity of all documents submitted by your company and assure their accurate and expeditious return at the conclusion of this investigation or of any proceeding arising from it.

## II.    DEFINITIONS

The following are general definitions that apply to all parts of this subpoena.

A.    "Document(s)" means, without limitation, any written, printed, typed, photographed, recorded, or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created which have any non-conforming

2

notes or other markings and the backsides of any communication or representation, which contain any of the above.

By way of example, "document(s)" includes, but is not limited to: correspondence; memoranda; notes; drafts; records; letters; envelopes; telegrams; messages; electronic mail; analyses; agreements; accounts; working papers; reports and summaries of investigations; trade letters; press releases; comparisons; books; notices; drawings; diagrams; instructions; manuals; calendars; diaries; articles; magazines; newspapers; brochures; guidelines; notes or minutes of meetings or of other communications of any type, including inter- and intra-office or company communications; questionnaires; surveys; charts; graphs; photographs; films or videos; tapes; discs; data cells; bulletins; printouts of information stored, maintained, or transmitted by electronic data or word processing equipment; electronic claims filing and transmittals, invoices, all other data compilations from which information can be obtained including electromagnetically sensitive stored media such as floppy discs, hard discs, hard drives and magnetic tapes; laptop computers issued to officers and employees; and any preliminary versions, drafts or revisions of any of the foregoing.

      B.    The "Company" means any and all of the following: Dey, Inc. and Dey Laboratories, Inc., and any predecessors, parents, subsidiaries affiliates, segments, divisions, and any present or former officers, directors, employees, consultants, contractors, agents, or members of the board of directors.

      C.    The term "Drugs" means the brand name, trade name, or generic products identified in the applicable part of the Specifications contained in Part III of this Subpoena, and includes all variations of the products (i.e., packaging, dosage, owner/manufacturer, diluence, NDC number or otherwise) which may have been produced, sold, offered for sale or assigned an NDC number.

      D.    The words "and" and "or" in this subpoena shall be read in both the conjunctive and the disjunctive (i.e., "and/or"), so as to give the document request its broadest meaning.

## III.   **SPECIFICATIONS**

The specifications for this subpoena are categorized into three parts. Each part includes additional instructions and/or definitions that are applicable to that part.

## Part A

### Additional Definitions

For purposes of this Part A, the term "Drugs" means:  Albuterol Inhalation Aerosol, 17 gm, and Albuterol Inhalation Aerosol (refill), 17 gm.

### Additional Instructions

A.     For purposes of this Part A, unless otherwise indicated, the relevant time period for each document request shall be January 1, 1991, to August 25, 2000, and shall include all documents created or prepared during that period, or referring or relating to that period, regardless of when the document was created or prepared.

### Specifications

1.     Such documents as will show for the Company:  (a) the date it was incorporated; (b) the state in which it was incorporated; (c) its name at the time of its incorporation; and (d) each change in its name or state of incorporation and the date of such change.

2.     Such documents as will show for the Company:  (a) the name of each person who has served as a director and/or an officer; (b) each such person's current business and residence address; (c) the time period such person served as a director and/or an officer; and (d) the title of the director and/or officer.

3.     Such documents as will show the following information as to each of the Company's subsidiaries, divisions, and affiliates: (a) name; (b) date and state of incorporation; (c) current principal place of business; (d) name at the time of incorporation, if different than the current name; and (e) all changes in name or state of incorporation and the date of such change.

4.     One copy of each table of organization, organizational chart, diagram, or other similar document showing the lines of authority or reporting responsibilities for the officers, executives, supervisors, employees, consultants, independent contractors, distributors, and agents of the Company.  This specification is limited to Dey, Inc. and Dey Laboratories, Inc., and their predecessor corporations.

5.     Such documents as will show the following information for each of the Company's current and former officers, executives, supervisors, employees, consultants, independent contractors, distributors, and agents:  (a) name; (b) residential and business addresses; (c)

position; (d) date of hire or date of contract; and (e) termination date. This specification is limited to Dey, Inc. and Dey Laboratories, Inc., and their predecessor corporations.

6.     For each year from 1991 to the present, all documents that reflect or evidence the annual breakdown of purchasing data for purchasers of the Drugs that have entered into contracts with the Company, including the units sold and the purchase price, net of all rebates, discounts, or price reductions. This request excludes invoices.

7.     For each year from 1991 to the present, all documents that reflect or evidence the annual breakdown of purchasing data for purchasers of the Drugs that have not entered into contracts with the Company, including the units sold and the purchase price, net of all rebates, discounts, or price reductions. This request excludes invoices.

8.     All documents constituting, referring, or relating to the Company's document retention and destruction policy during the relevant time period.

9.     All documents constituting contracts or agreements, or drafts thereof, with all governmental entities, health maintenance organizations, hospitals, and buying groups or consortiums for the sale of any of the Drugs.

10.    All documents constituting, referring or relating to the Medicaid Rebate Agreement between the Company and (a) the Health Care Financing Administration (HCFA), now known as the Centers for Medicare and Medicaid Services (CMS), and (b) any state regulatory authorities. The time period of this specification is 1990 to the present. This request excludes invoices.

11.    All documents constituting, referring, or relating to all contracts or agreements between the Company and any wholesaler regarding or relating to the Drugs, including any documents constituting, referring, or relating to negotiations concerning such contracts of agreements. The time period of this request is 1990 to the present.

12.    All documents constituting, referring, evidencing, or relating to all monthly reports, referring, or relating to the Drugs, from national and regional account managers and managed care market managers.

13.    All documents constituting, referring, evidencing, or relating to projections, analyses, or reports of actual or projected revenue and/or actual and/or projected profit from sales of any of the Drugs by the Company, including, but not limited to, any review and assessment of profit margins regarding the Drugs. This includes the actual per unit cost of production for the Drugs.

5

14.     All documents constituting, referring, evidencing, or relating to projections, analyses, or reports of actual or projected revenue and/or actual or projected profit for any purchaser of the Drugs, including but not limited to, any health maintenance organization (HMO), group purchasing organization (GPO), retail pharmacy, and/or hospital.

15.     All documents constituting, referring, or relating to projections, analyses, and reports of actual or projected Medicaid reimbursement for any purchaser of the Drugs, including but not limited to, any HMO, GPO, retail pharmacy, and/or hospital, in connection with the actual or projected sale of any of the Drugs.

16.     All documents constituting, referring, or relating to the training, advising, or instruction of employees, officers, distributors, contractors or sales personnel regarding or relating to the reporting of Wholesale Acquisition Cost (WAC).

17.     All documents, which discuss, interpret, define, describe, relate, or refer to the meaning of the term Wholesale Acquisition Cost or WAC.

18.     All invoices reflecting the Best Price for the Drugs for each quarter beginning January 1, 1991.

19.     All documents constituting, referring, or relating to the training, advising, or instruction of employees, officers, distributors, contractors, or sales personnel regarding or relating to the Medicaid reimbursement system for pharmaceutical drugs.

20.     All documents constituting, referring, or relating to internal audits or analyses, conducted by the Company or outside auditors regarding whether the Company's reporting of WAC complies with federal and state law and regulations.

21.     All documents that mention, reflect or refer to any of the Company's competitors or any other companies involved in the manufacturing of pharmaceuticals regarding, referring, or evidencing uses, interpretations, and/or reporting of WAC, Average Wholesale Price (AWP), Estimated Acquisition Price (EAP), Estimated Acquisition Cost (EAC), Best Price, or Medicaid reimbursement.

22.     All documents that constitute discuss or refer to any complaints, lawsuits or administrative actions by or against the Company involving EAP, EAC, AWP, WAC, or Medicaid reimbursement.

23.     Minutes of all meetings of all supervisory groups and all executive meetings of the Company that mention, refer to, or regard any of the Drugs and/or WAC.  This

specification is limited to supervisory groups and executive meetings within Dey, Inc. and Dey Laboratories, Inc., and their predecessor corporations.

24.    All documents constituting, referring or relating to the calculation, reporting, or setting of AWP, WAC, EAP, EAC, Average Manufacturer Price (AMP), Direct Price, and Best Price of any of the Drugs.

25.    All documents constituting, referring, or relating to the quarterly reports submitted to HCFA and/or CMS by the Company relating or referring to the Drugs. This specification includes, without limitation, documents sufficient to show the Best Price as reported to HCFA and/or CMS for the Drugs.

26.    All documents constituting, referring, or relating to communications, whether internal, external or by proxy, regarding the calculation or setting of the AWP, WAC, the Actual Acquisition Price, EAP, Actual Acquisition Cost, EAC, the Direct Price (DP), the AMP, and/or the Best Price of any of the Drugs to HCFA and/or CMS, the Department of Health and Human Services, the United States Congress, Congressional committees and representatives, Congressional branches, and/or state regulatory authorities and agencies.

27.    All documents constituting, referring, or relating to the impact of WAC reporting on Medicaid reimbursement to any purchaser of pharmaceutical drugs, including but not limited to the Drugs.

28.    All catalogs, including on-line catalogs, listings, or advertisements, provided to HMOs, retail pharmacies, and/or GPOs, concerning any of the Drugs.

29.    All documents that mention, reflect, or evidence any of the Company's competitors for market share in the sub-market for the Drugs, including surveys, marketing proposals, and sales projections.

30.    All documents that mention, reflect, or evidence any drug manufacturer's market share for any of the Drugs, including surveys, marketing proposals, and sales projections.

31.    All documents that mention, evidence, or reflect any chargeback arrangement in which the Company has participated with any wholesaler of the Drugs.

32.    All documents that mention, evidence, or reflect any rebate or discount arrangement in which the Company has participated with any wholesaler of the Drugs.

33.    All documents that mention, evidence, or reflect the "spread" or difference between the actual acquisition cost or purchase price of any pharmaceutical drug,

7

including but not limited to the Drugs, by a retailer, and the reimbursement rate paid by
third party payors, including Medicaid, Medicare, and private insurers.

34. All documents that mention, evidence, reflect or refer to communications with or
from any person or entity engaged in publishing drug prices (e.g., AWP, DP, WAC),
including First Data Bank, Medical Economics and Medi-Span, regarding WAC
generally, or the WAC of any of the Drugs.

35. All documents that constitute, mention, evidence or reflect any procedures used by
the Company to calculate, set, report, and/or verify price information regarding the
Drugs.

36. All documents that constitute, mention, evidence or reflect any procedures used by
the Company to calculate or set actual prices charged to purchasers of the Drugs.

## Part B

### Additional Definitions

A. For purposes of this Part B, the term "Drugs" means the brand name, trade
name, or generic products *Albuterol Inhalation Aerosol*, and includes all variations of the
products (i.e., packaging, dosage, owner/manufacturer, diluence, NDC number or
otherwise) which may have been produced, sold, offered for sale or assigned an NDC
number.

B. The term "dead net" prices means the actual price the Company sells
product to a customer, including but not limited to all sources of departure from list price,
such as rebates, prebates, discounts, credits, charge backs, cash payments, free goods,
samples, and "stocking allowance." To the extent the Company ascribes a different
meaning to the term "dead net" price per unit, then the term shall also, in addition to the
meaning above, be defined as have the meaning ascribed to it by the Company in
Company documents.

C The terms "stocking allowance" or "distribution allowance" means
payments, discounts, and/or credits given by the Company to a customer that buys
product and stocks it at the customer's facility and/or payments, discounts, and/or credits
purportedly given to a customer to offset costs associated with switching from any
manufacturer's drugs to those manufactured by the Company.

D. The term "non-wholesaler customer" means all class of trade customers
other than wholesalers (e.g. retailers, HMOs, hospitals, etc.)

8

E.      The term "SKU" means, "stock keeping unit" for each package size, and dose strength of each product.

### Additional Instructions

For purposes of this Part B, unless otherwise indicated, the relevant time period shall be 1991 through October 16, 2001, and shall include all documents created or prepared during that period, or referring or relating to that period, regardless of when the document was created or prepared. "The present" as used in this Part B shall mean October 16, 2001.

For purposes of this Part B, this subpoena requests the following information in electronic database form, not electronic page image form, except where otherwise specified. More specifically, the information requested in Specifications 2-10 shall be provided in electronic database form, not electronic page image form. Information requested in Specifications 1 and 11 shall be provided in printed form. The information requested in Specifications 12 shall be provided in both electronic database form and in printed form.

All information maintained on personal computers shall be provided on standard Windows-accessible media, such as diskette, CD-ROM, Zip disk, or JAZ disk. Information not maintained on personal computers shall be transmitted on standard media (e.g., mainframe electronic tape). If the information is maintained both on personal computers and other computers (e.g., mainframe servers), it shall be transmitted in both formats. If information is transmitted in a proprietary format that is not accessible by publicly available software packages, the software to read the information shall be provided.

If the information is provided in a generic format, the Company shall also provide a complete and accurate description of the data layout. The Company shall also provide control-total information, including the number of records and sums for selected numeric variables, for each file transmitted.

In addition to the electronic information, the Company shall provide a complete and accurate description of the information, such as a data dictionary. This description shall include translation tables for all fields that contain coded values. The respondent shall also provide a description of each file, specifying the scope and time period of the information contained.

### Specifications

1.      For all Drugs sold and/or shipped in the United States for the Relevant Time
Period on an annual basis, to each customer of the Company (including all non-
wholesaler customers):

> a.  Provide copies of all contracts or arrangements with customers and
> amendments thereto, including all information on agreed to contract
> prices (including information on discounts, rebates, "prebates", free
> goods, "stocking allowances" and any other incentive) with
> customer identifying information including but not limited to:
>
> > (i)    Name of customer;
> > (ii)   Address of customer, including city, state and zip
> > code; and
> > (iii)  Customer Medicare and/or Medicaid number.

These contracts and customer information should be sent in printed form.

2.      For all Drugs sold and/or shipped directly to each non-wholesaler customer in the
United States for the Relevant Time Period, on an annual basis, the following
information:

> a.  Date of the invoice, credit, memo, or other financial record of
> the transaction or account adjustment;
> b.  Name of customer;
> c.  Address of customer, including city, state, and zip code;
> d.  Trade class of customer;
> e.  Customer Medicare and/or Medicaid number;
> f.  Total amount billed on invoice;
> g.  Total amount of all discounts, and other adjustments, credits
> whether or not attributed to a specific SKU; and
> h.  For each non-SKU items (e.g., shipping charges, credits)
> include any other charges or credits appearing on the invoice
> not attributable to a particular product sold.

For each line item listed on a specific invoice include:

> i.  Line item description including package description, NDC
> code, and number of such NDC-coded items including in the
> package;
> j.  Number of units purchased or returned;

k.    Per unit price billed before any departures from list price (e.g., discounts, rebates, "prebates," free goods);

l.    The "dead net" price per unit price shipped or returned, after any departures from list price (e.g., discounts, rebates, "prebates," free goods); and

m.    Total amount billed.

3.    For all other transactions with each non-wholesaler customer in the United States (e.g., monthly, quarterly, or periodic rebate checks, including records of Rapidraft payments) for the Relevant Time Period:

a.    Date of transaction;

b.    Name of customer;

c.    Address of customer, including city, state, and zip code;

d.    Trade class of customer;

e.    Customer Medicare and/or Medicaid number;

f.    Itemized description of transaction (e.g., rebates, free goods, discounts, stocking allowances, performance related incentives, credits, prompt payment discounts); and

g.    Amount of each transaction (e.g., amount of payment, credit, free goods allowance).

4.    For all Drugs sold and/or shipped to each wholesaler customer in the United States for the Relevant Time Period the following information:

a.  All reports, financial statements, and other information the Company receives from wholesalers regarding wholesaler's sales of the Drugs to the wholesaler's customers in connection with those customers' contracts with the Company. This information includes units of the Drugs and/or other products sold, by NDC and/or other relevant tracking identification code, by quarter.

b.  Actual payments by the Company to each non-wholesaler customer by NDC and/or other relevant tracking identification code, by quarter.

5.    Data on units of the Drugs not invoiced or for which no charge was incurred (e.g., free goods or "free goods allowance," free samples, and units provided through a compassionate drug program) and distributed in the United States for the Relevant Time Period, as it relates to non-wholesaler customers, including:

a.    Name of customer;

b.    Address of customer, including city, state, and zip code;

11

       c.       Trade class of customer;

       d.      Customer Medicare and/or Medicaid number;

       e.      Date on which units of the Drugs not invoiced was supplied to customer;

       f.       Number of units supplied to customer, by formulation; and

       g.      Total dollar value of units.

6.      Data on "stocking allowances" or "distribution allowances" provided to non-wholesaler customers in the United States for Relevant Time Period, including:

       a.      Name of customer;

       b.      Address of customer, including city, state, and zip code;

       c.      Trade class of customer;

       d.      Customer Medicare and/or Medicaid number;

       e.      Date on which the stocking allowance was provided to customer;

       f.       Date on which units associated with the stocking allowance was provided to customer;

       g.      Number of units supplied to customer, by formulation; and

       f.       Total dollar value of stocking allowance.

7.      For the Relevant Time Period, all Wholesale List Prices (WLPs) for the Drugs, including the dates of any changes to the WLP, and provide backup documents (i.e., letters to FirstData Bank and other reporting services) in sequential order, reflecting the reporting of WLPs and/or the request for changes to Average Wholesale Price (AWP) and/or Wholesale Acquisition Cost (WAC).

8.      For the Relevant Time Period, all WAC data for the Drugs, including the dates of any changes to the WAC.

9.      For the Relevant Time Period, all AWP data for the Drugs, including the dates of any changes to the AWP.

10.     For the Relevant Time Period, all Average Manufacturer Price (AMP) data for the Drugs, including the dates of any changes to the AMP.  Provide all documents constituting and/or reflecting the reporting AMP to the state or federal government.

11.     For the Relevant Time Period, all documents concerning any special offer relating or referring to any of the Drugs. This information should not be provided in electronic format.

12

12.     Any data base or spreadsheet maintained by the Company to track rebates, prebates, discounts, free goods, stocking allowances, and any other form of payment provided to customers of the Company.  This information should be provided in both printed form and electronic form.

## Part C

## Additional Definitions and Instructions

A.      For purposes of this Part C, the term "Drugs" means the brand name, trade name, or generic products *Albuterol Inhalation, Cromolyn Sulfate and Ipratropium Bromide*, and includes all variations of the products (i.e., packaging, dosage, owner/manufacturer, diluence, NDC number or otherwise) which may have been produced, sold, offered for sale or assigned an NDC number.

B.      For purposes of this Part C, unless otherwise indicated, the relevant time period shall be January 1, 1995, to May 9, 2003, and shall include all documents created or prepared during that period, or referring or relating to that period, regardless of when the document was created or prepared.

### Specifications

1.      The complete Chart of Accounts for the Company for fiscal years ended 1995 through 2000.

2.      The general ledger for the Company, for fiscal years ended 1995 through 2000.

3.      Detailed financial statements for the Company, for fiscal years ended 1995 through 2000, with revenue and expense items (as well as contra-revenue and contra-expense items) detailed at the Chart of Accounts level.

4.      All adjusting journal entries, whether instigated by the Company, its parent, its auditors, or any other person, related to the fiscal years 1995 through 2000, whether or not made during that time period.

5.      All documents describing, referring, or relating to the accounting procedure for booking or recording any form of discount or rebate  in connection with any of the Drugs.

6.      All documents describing, referring, or relating to the accounting procedure for booking or recording to any stocking allowance or slotting allowance or shelf stock adjustment in connection with any of the Drugs.

7.     All documents describing, referring, or relating to the accounting procedure for booking or recording distribution allowance in connection with any of the Drugs.

8.     All documents describing, referring, or relating to the accounting procedure for booking or recording any cash payment made to a pharmacy or other retail distributor in connection with any of the Drugs.

9.     All documents describing, referring, or relating to the accounting procedure for booking or recording the "dead net" price or the "dead dead net" price (as defined above in Part B) for any of the Drugs.

10.    All documents describing, referring, or relating to the accounting procedure for booking or recording any administrative fee offered to a pharmacy or other retail distributor in connection with any of the Drugs.

11.     All documents describing, referring, or relating to the accounting procedure for booking or recording payments, credits or adjustments  to a pharmacy or other retail distributor for price protection, price differential, or write offs in connection with any of the Drugs.

12.    All documents describing, referring, or relating to the accounting procedure for booking or recording any payments, credits or adjustments to a pharmacy or other retail distributor in connection with conversion funding related to any of the Drugs.

13.     Any and all documentation that establishes the Average Wholesale Price (AWP), the Average Manufacturer's Price (AMP) and the Wholesale Acquisition Cost (WAC) for the Drugs for fiscal years ended 1995 through 2000.

14.    Any and all data "dictionaries" and/or manuals that can be utilized to interpret data provided by the Company in electronic form.

14

**ATTACHMENT 8**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered by and between the (1) United States of America, acting through (a) its Department of Justice and (b) the United States Attorney's Office for the Southern District of Florida, and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"); (2) Dey L.P. and Dey, Inc. (collectively referred to as "Dey"); and (3) Ven-A-Care (the "Relator") (collectively referred to as "the Parties"), through their authorized representatives.

## PREAMBLE

A.     WHEREAS, this Agreement addresses the United States' interest in civil claims against Dey as set forth in the petitions filed in State of Texas ex rel. Ven-A-Care v. Dey Inc., et al., Cause No. GV 002327.  Dey and the State of Texas and Ven-A-Care have entered into a Settlement Agreement and Release dated June 11, 2003 (the "Texas Settlement Agreement").

B.     WHEREAS, the United States alleges that between September 1, 1995 through March 31, 2003, Dey knowingly made, directly and indirectly, false representations to the Texas Vendor Drug Program of prices and costs for certain of their inhalation and other drugs and thereby caused false and fraudulent claims to be submitted to and paid by the Texas Medicaid Program.  The drugs covered by this Agreement are set forth in Exhibit A.  Dey's conduct, as described in Paragraph B, is hereafter referred to as the "Covered Conduct."

C.     WHEREAS,  the United States contends that it has civil claims against Dey for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733, other federal statutes and/or common law doctrines, as specified in Paragraph 2 below.  The United States also contends that it has certain administrative claims against Dey under the provisions for permissive exclusion from the Medicare, Medicaid and other federal health care programs, 42 U.S.C. § 1320a-7(b), and the provisions for civil monetary penalties, 42 U.S.C. § 1320a-7a, for the Covered Conduct.

1

D.     WHEREAS, Dey denies all the claims and allegations in Paragraph B and denies that it has any liability or engaged in wrongful conduct in connection with the Covered Conduct.

E.     WHEREAS, to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, and as a result of a mutual desire to settle their disputes, the United States and Dey reach a full and final settlement as to the Covered Conduct, as set forth in this Agreement.

## TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement and the Texas Settlement Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.     Dey agrees to pay to the United States the sum of nine million two hundred and seven thousand dollars ($9,207,000), consistent with Paragraph III(2)(a)(5) of the Texas Settlement Agreement and as set forth below (the "Federal Settlement Amount"). This sum shall constitute a debt immediately due and owing to the United States on the effective date of this Agreement. The Federal Settlement Amount shall be paid by electronic funds transfer no later than seven business days after Dey receives written payment instructions from the United States. Dey shall pay simple interest at the rate of 6% per annum in an amount of one thousand five hundred and thirteen dollars and forty-eight cents ($1,513.48) for each day following the effective date of this Agreement before complete payment of the Federal Settlement Amount is made.

2.     Subject to the exceptions in Paragraph 3 below, in consideration of the obligations of Dey set forth in this Agreement and conditioned upon Dey's payment in full of the Federal Settlement Amount, the United States, on behalf of itself, and its officers, agents, agencies, and

2

departments, releases (a) Dey and its current and former directors, officers and employees, and (b) Merck KGaA, Merck Sante S.A.S., Merck S.A., EMD Pharmaceuticals, Inc. and EMD, Inc. (collectively, the "Merck Companies") and their current and former directors, officers and employees from any civil or administrative monetary claim that the United States has or may have under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; and common law claims for fraud, payment by mistake, unjust enrichment, breach of contract or disgorgement for the Covered Conduct.

3.      Notwithstanding any term of this Agreement, the United States specifically does not herein release any person or entity, including (i) Dey and its current and former directors, officers and employees and (ii) the Merck Companies and their current and former directors, officers and employees, from any and all of the following:

(a)      any criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code);

(b)      any criminal liability;

(c)      any liability to the United States (or any agencies thereof) for any conduct other than the Covered Conduct;

(d)      any claims based upon obligations created by this Agreement;

(e)      any administrative liability other than that released in Paragraph 2 above;

(f)      any express or implied warranty claims or other claims for defective or deficient products and services provided by Dey;

(g)      any claims for personal injury or for related consequential damages arising from the Covered Conduct;

(h)      any claim based on a failure to deliver products or services due;

3

(i)      any civil or administrative liability of individuals (including current or former directors, officers, and employees) who receive written notification that they are the target of a criminal investigation (as defined in the United States Attorneys' Manual), are indicted, charged, or convicted, or who enter into a plea agreement related to the Covered Conduct. To the extent, however, any such individuals are legally entitled to repayment from Dey, by claim for indemnification, contribution, reimbursement or otherwise as a result of a claim brought by the United States, the releases provided in Paragraph 2 above shall apply to such individuals with respect to that claim; or

(j)      any claims arising from Dey's obligation to report prices or costs for the calculation of rebates and to pay rebates, under any law or contract, to the Centers for Medicare and Medicaid Services ("CMS") and the Texas Medicaid Program.

4.      The OIG-HHS expressly reserves all rights to institute, direct, or maintain any administrative action seeking exclusion against Dey, its current and former directors, officers, and employees, the Merck Companies, and their current and former directors, officers and employees, from Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) under 42 U.S.C. § 1320a-7(a) mandatory exclusion), or 42 U.S.C. § 1320a-7(b) (permissive exclusion).

5.      Dey fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Dey has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to or arising from the Covered Conduct or the United States' investigation of the Covered Conduct up to the effective date of this Agreement. Should the Merck Companies ever assert any claim against the United States, its agencies, employees, servants, and agents related to or arising from the

4

Covered Conduct, however, then the release provided for in Paragraph 2 for the Merck Companies will be rendered null and void.

      6.    The Relator agrees that this Settlement Agreement is fair, adequate, and reasonable under all the circumstances, and agrees not to challenge this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly waives the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B). The Relator further agrees that this Agreement, and information relating to this Agreement, may be made public.

      7.    Upon the United States' receipt of Dey's payment of the Federal Settlement Amount, the Relator, for itself and its employees, servants, attorneys and agents, fully and finally releases, waives and forever discharges Dey, its former and current directors, officers and employees, the Merck Companies, and their current and former directors officers and employees from any claim that the Relator has or may have for the Covered Conduct. The Relator expressly does not release Dey, its former and current directors, officers and employees, and the Merck Companies, their current and former directors, officers and employees, for (a) any claims the Relator may have arising from Dey's obligations to report and/or to pay rebates to any State under contract or law; (b) any claims the Relator may have under any provision of 31 U.S.C.A. §§ 3729 -3733, except for claims related to any recovery attributable to the impact on Texas Medicaid of the Covered Conduct; or (c) any claims the Relator may have under the qui tam provisions of the laws of any state other than Texas.

      8.    The United States agrees to pay the Relator an amount of one million eight hundred forty-one thousand four hundred dollars ($1,841,400) (the "Relator's share"), as Relator's share of the proceeds. Upon receipt of its Relator's share, the Relator, for itself, and its successors, agents, attorneys and assigns, and their successors, agents, attorneys, and assigns, fully and finally releases, waives, and forever discharges the United States from any claims pursuant to 31 U.S.C. § 3730, including 31 U.S.C. §§ 3730(b), (c), (d), and (d)(1), and any state

False Claims Acts, respectively, for a share of the Federal Settlement Amount; and in full settlement of its claims under this Agreement. The Relator expressly does not release the United States for any claims for a share of federal amounts recovered from (a) any claims the Relator may have arising from Dey's obligations to report and/or to pay rebates to any State under contract or law; (b) any claims the Relator may have under any provision of 31 U.S.C.A. §§ 3729 -3733, except for claims related to any recovery attributable to the impact on Texas Medicaid of the Covered Conduct; or (c) any claims the Relator may have under the qui tam provisions of the laws of any state other than Texas. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relator arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

9.    Dey fully and finally releases the Relator, its employees, servants, attorneys and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Dey has asserted, could have asserted, or may assert in the future against the Relator, its employees, servants, attorneys and agents, related to the Covered Conduct or the United States' investigation of the Covered Conduct, up to the effective date of this Agreement. This provision is not intended to release any claims Dey may have against the Relator unrelated to conduct in Texas.

10.    Dey waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct which defenses may be based on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. The parties agree that this Agreement is not punitive in purpose or effect.

11.    Dey agrees to the following:

(a)    Unallowable Costs Defined:   that all costs (as defined in the Federal

6

Acquisition Regulations (FAR) 48 C.F.R. § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Dey, its present or former officers, directors, employees, shareholders, and agents in connection with:  (1) the matters covered by this Agreement; (2) the United States' audit and civil investigation of the matters covered by this Agreement; (3) Dey's investigation, defense, and any corrective actions undertaken in response to the United States' audit and civil investigation in connection with the matters covered by this Agreement (including attorney's fees);  (4) the negotiation and performance of this Agreement; and (5) the payment Dey makes to the United States pursuant to this Agreement are unallowable costs on Government contracts and under the Medicare Program, Medicaid Program, Railroad Retirement, TRICARE , DOD, and Federal Employees Health Benefits Program (FEHBP).  However, nothing in this paragraph affects the status of costs that are not allowable based on any other authority applicable to Dey. (All costs described or set forth in this Paragraph 10(a) are hereafter, "unallowable costs").

(b)    Future Treatment of Unallowable Costs:  If applicable, these unallowable costs will be separately estimated and accounted for by Dey, and Dey will not charge such unallowable costs directly or indirectly to any contracts with the United States or any state Medicaid Program, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by Dey or any of its subsidiaries to the Medicare, Medicaid, TRICARE, DOD, Railroad Retirement or FEHBP Programs.

(c)    Treatment of Unallowable Costs Previously Submitted for Payment:  If applicable, Dey further agrees that within 60 days of the effective date of this Agreement, it will identify to applicable Medicare, Railroad Retirement and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid, DOD, VA and FEHBP fiscal agents, any unallowable costs (as defined in this Paragraph) included in payments previously sought from the United

7

States, the Texas Medicaid Program, or any state Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Dey or any of its subsidiaries, and will request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  Dey agrees that the United States, at a minimum, will be entitled to recoup from Dey any overpayment plus applicable interest as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment. Any payment due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by Dey or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this Paragraph) on Dey or any of its subsidiaries' cost reports, cost statements, or information reports.  Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or reexamine the unallowable costs described in this Paragraph.

12.     If applicable, Dey agrees that it will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents or sponsors.  Dey waives any causes of action against these beneficiaries or their parents or sponsors based upon the claims for payment covered by this Agreement.

13.     Dey expressly warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(A)(ii)(I), and will remain solvent following its payment to the United States hereunder.  Further, the Parties expressly warrant that, in evaluating whether to execute this Agreement, the Parties (i) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to Dey, within the meaning of 11 U.S.C. §

8

547(c)(1), and (2) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

14.     This Agreement is intended to be only for the benefit of the Parties and the persons and entities released by the Agreement, and by this instrument the Parties do not release any claims against any other person or entity.

15.     Nothing in any provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Federal Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

16.     Each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17.     Dey represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

18.     This Agreement is governed by the laws of the United States.  The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the United States District Court for the Southern District of Florida.

19.     The undersigned signatory represents and warrants that he is authorized by Dey to execute this Agreement.   The undersigned United States signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the United States through their respective agencies and departments.

20.     The effective date of this Agreement shall be the date of signature of the last signatory to the Agreement.

21.     This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties.

22.     This Agreement constitutes the complete agreement between the Parties with regard to the Covered Conduct.  This Agreement may not be amended except by written consent of the Parties.

23.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

24.     The Parties agree that this Agreement does not constitute an admission of fault or liability by Dey.  The Parties also agree that this Agreement does not constitute evidence of any liability or unlawful conduct on the part of Dey (although it may be used or relied upon for purposes other than as evidence of liability or unlawful conduct, such as demonstrating the fact of a settlement).  The Parties further agree that this Agreement is not a concession by the United States that its claims are not well founded.

UNITED STATES OF AMERICA

DEY, INC. and
DEY L.P.

By: _Laurie A. Oberembt_

By: _____

Date: _6/11/03_

Date: _____

Printed Name: Laurie A. Oberembt

Printed Name: _____

Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

Title: _____

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES'
OFFICE OF INSPECTOR GENERAL

By: _____

Date: _____

Printed Name: Larry J. Goldberg

Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services

**Relator, Ven-a-Care of the Florida Keys,
Inc.**

**Relator, Ven-a-Care of the Florida Keys,
Inc.**

By: _____

By: _____

Date: _____

Date: _____

Printed Name: James J. Breen, Esq.

Printed Name:  Zachary Bentley

The Breen Law Firm, P.A.

Title: _____

11

UNITED STATES OF AMERICA          DEY, INC. and
                                  DEY L.P.


By: _____       By: _____

Date: _____       Date: _____

Printed Name: Laurie A. Oberembt  Printed Name: _____

Trial Attorney                    Title: _____
Commercial Litigation Branch
Civil Division
United States Department of Justice


UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES'
OFFICE OF INSPECTOR GENERAL

By: _Larry J. Goldberg_

Date: _June 11, 2003_

Printed Name: Larry J. Goldberg

Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services


Relator, Ven-a-Care of the Florida Keys,   Relator, Ven-a-Care of the Florida Keys,
Inc.                                       Inc.


By: _____       By: _____

Date: _____       Date: _____

Printed Name: James J. Breen, Esq.  Printed Name: Zachary Bentley

The Breen Law Firm, P.A.            Title: _____


11

UNITED STATES OF AMERICA

By: _____

Date: _____

Printed Name: Laurie A. Oberembt

Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice


UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES'
OFFICE OF INSPECTOR GENERAL

By: _____

Date: _____

Printed Name: Larry J. Goldberg

Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services


Relator, Ven-a-Care of the Florida Keys,
Inc.

By: _____

Date: 11 June 2003

Printed Name: James J. Breen, Esq.

The Breen Law Firm, P.A.


DEY, INC. and
DEY L.P.

By: _____

Date: _____

Printed Name: _____

Title: _____


Relator, Ven-a-Care of the Florida Keys,
Inc.

By: _____

Date: _____

Printed Name:  Zachary Bentley

Title: _____

11

UNITED STATES OF AMERICA

By: _____

Date: _____

Printed Name: Laurie A. Oberembt

Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

DEY, INC. and
DEY L.P.

By: _____

Date: _____

Printed Name: _____

Title: _____

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES'
OFFICE OF INSPECTOR GENERAL

By: _____

Date: _____

Printed Name: Larry J. Goldberg

Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services

Relator, Ven-a-Care of the Florida Keys,
Inc.

By: _____

Date: _____

Printed Name: James J. Breen, Esq.

The Breen Law Firm, P.A.

Relator, Ven-a-Care of the Florida Keys,
Inc.

By: _____

Date: 6|11|03

Printed Name: Zachary Bentley

Title: President & Chairman

11

UNITED STATES OF AMERICA

By: _____

Date: _____

Printed Name: Laurie A. Oberembt

Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

DEY, INC. and
DEY L.P.

By: _~Mdull Engl_____

Date: _JUNE 11, 2003_____

Printed Name: _J. MELVILLE ENGLE_

Title: _PRESIDENT AND CEO_____

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES'
OFFICE OF INSPECTOR GENERAL

By: _____

Date: _____

Printed Name: Larry J. Goldberg

Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services

Relator, Ven-a-Care of the Florida Keys,
Inc.

By: _____

Date: _____

Printed Name: James J. Breen, Esq.

The Breen Law Firm, P.A.

Relator, Ven-a-Care of the Florida Keys,
Inc.

By: _____

Date: _____

Printed Name: Zachary Bentley

Title: _____