**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

**PLAINTIFFS' OPPOSITION TO TRACK 1 DEFENDANTS' RENEWED MOTION TO STRIKE THE EXPERT TESTIMONY OF DR. RAYMOND S. HARTMAN**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................. 1

II.     APPLICABLE LEGAL STANDARDS ................................................................................ 1

III.    ARGUMENT ....................................................................................................................... 3

        A.      Dr. Hartman Is Qualified .................................................................................... 3

        B.      Dr. Hartman's Testimony Rests Upon A Reliable Foundation And Is Properly
                Applied To The Facts Of This Case .................................................................... 4

                1.      Dr. Hartman's expectations theory is reliable and was properly
                        applied here ............................................................................................. 4

                2.      Dr. Hartman's "but-for" causation model is reliable and was properly
                        applied here ........................................................................................... 11

                3.      Dr. Rosenthal confirms causation ......................................................... 13

                4.      The evidence confirms causation .......................................................... 15

                5.      Dr. Hartman's multi-source causation theory is sound ......................... 16

                6.      Dr. Hartman's damages theory is reliable and was properly
                        applied here ........................................................................................... 18

        C.      Defendants' Remaining Attacks Constitute Nothing More Than A
                Battle Of The Experts And Are Not Resolvable Via A *Daubert* Challenge ......... 18

IV.     CONCLUSION .................................................................................................................. 20

## I.      INTRODUCTION

Dr. Hartman's opinions in this case meet the classic test set forth by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).  Dr. Hartman is qualified; his testimony rests upon a reliable foundation; and his testimony is properly applied to the facts of this case.  *See also United States v. Monteiro*, 407 F. Supp. 2d 351, 356-58 (D. Mass. 2006) (Saris, J.).  Dr. Hartman's expectations model reflects a reasoned approach to the constellation of signals as to the market's expectations as revealed by (i) comparator drugs, (ii) contracts, (iii) public reports, and (iv) the publishers' own definitions.  His "but-for" model of causation is equally sound.  It is axiomatic that, had Defendants not published phony AWPs and instead reported information reflecting actual averages (or close thereto), reimbursements by Class members would have dropped.  Indeed, this is precisely what Medicare has experienced under the new regime in which reimbursements are made based on Defendants' reported ASPs.  And Dr. Hartman's damages modeling also passes the test.  Defendants' experts have not even proposed an alternative damages theory.

Dr. Hartman's opinions satisfy not only *Daubert* but also the test of common sense.  As Judge Stearn noted in *Lupron*, even if AWP was seen by some as a sticker price or to mean "Ain't What's Paid," that is different than a "sucker" price.  There is no evidence that TPPs, Taft-Hartley funds or Class 3 consumers viewed AWP as a "sucker" price such that spreads were at the whim of the manufacturer.  Yet, that is the only alternative that Defendants offer.  It is an alternative that makes no economic sense – TPPs would not use a "sucker" price as a basis for reimbursement.

## II.      APPLICABLE LEGAL STANDARDS

This Court recently explained that the proponent of the expert testimony must establish, by a preponderance of the evidence, that:  (i) the proffered expert is qualified; (ii) the testimony

rests upon a reliable foundation; and (iii) the testimony is properly applied to the facts of the case. *United States v. Monteiro*, 407 F. Supp. 2d 351, 356-58 (D. Mass. 2006) (Saris, J.) (citing, *inter alia*, *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999); FED. R. EVID. 702).

The Court's task is to be the gatekeeper to ensure that these criteria are satisfied. *Daubert*, 509 U.S. at 597. *Daubert* does not require the proponent prove that the expert's testimony is correct, only that the testimony is reliable, substantially sound, and arrived at in a methodologically reliable fashion. *Giard v. Darby*, 360 F. Supp. 2d 229, 236 (D. Mass. 2005) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*., 161 F.3d 77, 85 (1st Cir. 1998)).

Although *Daubert* provides a list of factors for courts to consider in weighing the admissibility of expert testimony, those factors are not exhaustive.[1] Rather, "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (evaluating admissibility of non-scientific expert testimony, including industry experts). A court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. Since *Kumho Tire,* most courts use this flexibility when reviewing the admissibility of expert testimony based on experience and knowledge of the expert, not scientific analyses.

In commenting on *Kumho Tire*'s flexible approach, this Court noted that how one exercises the gate-keeping function necessarily varies depending on the type of testimony at issue. *Monteiro*, 407 F. Supp. 2d at 357. And in recognizing that the *Daubert* factors "are not

---

[1] *Daubert*'s four non-exclusive factors are: (i) whether the evidence can be tested; (ii) whether the theory has been subjected to peer review or publication; (iii) the known or potential rate of error of the technique; and (iv) whether the relevant scientific community has generally accepted the theory. 509 U.S. at 593-94.

definitive or exhaustive, and [that] the trial judge enjoys broad latitude to use other factors to

evaluate reliability," the Court recently explained:

> Numerous courts have recognized that the particular factors the Court
> outlined in Daubert may not perfectly fit every type of expert testimony,
> particularly technical testimony based primarily on the training and
> experience of the expert.  See, e.g., *Thomas v. City of Chattanooga*, 398
> F.3d 426, 431 (6th Cir. 2005) (noting that "lower courts have flexibility in
> the application of the factors, because it may not make sense to apply
> some of the Daubert factors, such as the rate of error analysis, to non-
> scientific testimony"); *United States v. Hankey*, 203 F.3d 1160, 1169 (9th
> Cir. 2000) (noting that the "Daubert factors . . . simply are not applicable
> to . . . testimony, whose reliability depends heavily on the knowledge and
> experience of the expert, rather than the methodology or theory behind
> it").  Under *Kumho Tire*, it is clear that testimony based on experience
> must rest on a reliable foundation.  The critical inquiry is whether the
> expert "employs in the courtroom the same level of intellectual rigor that
> characterizes the practice of an expert in the relevant field."  526 U.S. at
> 156; *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).

*Monteiro*, 407 F. Supp. 2d at 357.  The Court also specifically noted that the reliability standards

apply equally whether the expert is "scientific" like in *Daubert* or "technical" and based on

experience as in *Kuhmo Tire*.  *Id.* at 364.

Applying the foregoing standards here demonstrates that Defendants' motion to strike

should be denied.

## III.    ARGUMENT

### A.    Dr. Hartman Is Qualified

The Court has already found that Dr. Hartman is a qualified expert.[2]

---

[2] Trial Tr. Day 8 at 11.  Dr. Hartman is an economist specializing in microeconomics and econometrics.  He has spent a large portion of the past ten years working on projects related to health-care markets and has submitted testimony in a variety of pharmaceutical pricing cases.  Those cases include *In re Terazosin Hydrochloride Antitrust Litig.*, Case No. 99-MDL-1317 (S.D. Fla.), *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, Master File No. 1:00-MD-1383 (E.D.N.Y.), and *In re Lupron Mktg. and Sales Practices Litig.*, MDL No. 1430, CA No. 01-CV-10861 (D. Mass.).  He has 30 to 35 years of experience with applied economics in the teaching, consulting and publishing spheres.  Trial Tr. Day 8 at 8.  Dr. Hartman's experience is vastly superior than that of many of the experts offered by Defendants.  For example, Dr. Gaier, prior to this litigation, had ***no*** experience in healthcare or healthcare economics.  Trial Tr. Day 12 at 47-49.  Dr. McFadden had no prior experience in healthcare issues.  Trial Tr. Day 10 at 125-26.

**B.      Dr. Hartman's Testimony Rests Upon A Reliable Foundation And Is Properly Applied To The Facts Of This Case**

Defendants challenge Dr. Hartman's testimony related to liability, claiming that Dr. Hartman's expectations theory is unreliable because he purportedly ignored evidence that was inconsistent with the theory and otherwise "plucked his 30% yardstick out of thin air."  Defs. Br. at 12.  Defendants also challenge Dr. Hartman's causation opinions, arguing that he failed to demonstrate that total payments would have been different in the "but-for" world, and that he purportedly did not establish a causal link between any Defendants' drug, the AWP for the drug, and the alleged harm.  *Id.*  Defendants attack Hartman's damages opinion using the claim he failed to account for increases in reimbursements for services and assumed that all reimbursements were based on AWPs.  *Id.*  Each line of attack fails.

**1.      Dr. Hartman's expectations theory is reliable and was properly applied here**

The "yardstick" methodology employed by Dr. Hartman derives from standard economic theory based on expectation models that are commonplace in applied economics.[3]  In the first of a three-step process, Dr. Hartman identified single-source comparator pharmaceuticals that were untainted by the AWP Inflation Scheme and examined the evolving therapeutic competition they faced over the Class Period.[4]  Using *Red Book* AWPs, Dr. Hartman concluded that "the relevant spreads provided by innovator single-source physician-administered drugs that did not require exploitation of the AWP Inflation Scheme to compete range from 18-27% . . . ."[5]

In the second step, which Dr. Hartman characterizes as a "cross-check," Dr. Hartman reviewed "publicly available sources providing market-wide information concerning the relationship between AWP and ASP for branded and generic self-administered and physician-

---

[3] Hartman Direct, ¶ 137 & n.177; Trial Tr. Day 8 at 68.

[4] Hartman Direct, ¶ 138.

[5] *Id.*, ¶ 143(d).

- 4 -

administered drugs."[6]  This review was exhaustive, covering all OIG and other reports, including sources cited by Defendants.[7]  This review revealed "reasonably anticipated spreads" of 11%-25%, thereby corroborating the comparator drug conclusions formed in the first step of Dr. Hartman's analysis.[8]

In a third cross-check step, Dr. Hartman reviewed contracts negotiated by commercial payors with provider groups.  These contracts contained pricing in the range of AWP plus or minus 15% to 20%.[9]  Notably, Dr. Hartman found that the Dyckman survey for the MedPAC report, which itself reports on surveys of 33 large private health plans whose covered lives collectively represent over one-fifth of privately insured lives in the United States, found typical spreads of AWP plus or minus 15%.[10]  The NORC and Health Policy Institute studies reported in the MedPAC report found that private payors reimbursed from a low of AWP minus 20% to a high of AWP plus 10%.[11]  Thus, these independent reports confirm Dr. Hartman's own conclusions based on his contract review.

Based on the above comprehensive review, Dr. Hartman concluded that "a reasonable range of spreads expected in the market; negotiated into contracts; and untainted by the AWP scheme is 11%-25% using *First DataBank*" and 11%-27% using the *Red Book*.[12]  Taking a conservative approach, Dr. Hartman then chose 30% as the "Threshold Yardstick Spread."

---

[6] *Id.*, ¶ 139.

[7] *Id.*, Attach. D.

[8] *Id.*, ¶ 144.

[9] Hartman Direct, ¶¶ 123, 146.

[10] *Id.*, ¶¶ 123, 140.

[11] *Id.*

[12] *Id.*, ¶ 147.

- 5 -

Spreads exceeding the 30% for a given NDC for a given period of time evidence spread inflation.[13]

Dr. Hartman's testimony is also consistent with Defendants' fact witnesses who all testified there was a widespread practice of discounting 20% or 25% off AWP. With one exception (Remicade), no evidence of WAC to AWP spreads greater than 25% was introduced. Such consistency in testimony of what insiders in the industry expected supports Dr. Hartman's work.

Therefore, far from plucking the 30% yardstick "out of thin air" as Defendants' assert, Dr. Hartman discerned the yardstick from a careful analysis of comparator drugs, publicly-available survey literature and historic events in the industry. And he applied it cogently to the facts of this case.

Defendants challenge Dr. Hartman's use of comparator drugs, because he chose drugs that faced no competition, and, according to Defendants, everyone knows there are discounts when there is competition. Defs. Br. at 3-4. This argument is nonsense. It would make no sense to use drugs that were already in the process of spread competition to compare what the world would be in a market free from such illegal practices. Further, Defendants' assertion assumes at its core that TPPs understand that competition created spreads that exceeded 20-25%. There is only sporadic evidence that the TPPs knew this could occur. Further, there is *no* evidence that TPPs understood that competition was occurring via marketing the spread, and that marketing the spread was leading to sizable spreads or dollars into the pockets of doctors for reasons that have nothing to do with acquisition costs. Even their alleged "star" witness on knowledge,

---

[13] *Id.*, ¶ 148; Trial Tr. Day 8 at 78-79.

Mr. Curran, was unaware of return-to-practice marketing efforts or of the size of the spreads.[14]
Thus, Dr. Hartman's choice of comparator drugs that were untainted is reasonable.

Defendants criticize Dr. Hartman for failing to note that some of the publicly available
reports documented spreads exceeding 30 percent on a small handful of drugs.  Defs. Br. at 4-5.
According to Defendants, such reports are inconsistent with Dr. Hartman's expectation analysis.
Yet Dr. Hartman did not ignore them or simply reject them without reason.  Rather, as a
economist, he examined their relevance, and as he carefully explained, they were discrete data
points that did not change market expectations.  Those expectations did not change
systematically until 2003.[15]

What Dr. Hartman found was that the sporadic information that spreads might exceed
30% for a small subset of the thousands of drugs that are part of the reimbursement system was
not sufficient to put TPPs on notice of systematic abuse of specific drugs:

> I find, as does Dr. Berndt, that publicly-available market
> information concerning the spreads for multi-source physician-
> administered drugs were sufficiently idiosyncratic or limited so as
> to be insufficient to market participants to draw any conclusions
> regarding Defendants' *systematic* abuse of the AWP system
> through spreads for Defendants' multi-source drugs.[16]

Thus, Dr. Hartman, rather than ignoring reports of spreads in excess of 30%, recognized
such spreads and accounted for them.[17]  Again, he found that "instances" of reported large
spreads would not translate to industry knowledge of systemic abuse.

Dr. Hartman also examined and considered the public reports of spreads for multisource
drugs and factored these into his analysis:

---

[14]  Trial Tr. Day 4 at 31:25-32:25.

[15]  *Id.* at 65-66; Trial Tr. Day 9 at 17-18.

[16]  Hartman Direct, ¶ 6 (emphasis in original).

[17]  Hartman Direct, ¶ 77.

> A variety of surveys purported to address **multi-source physician-administered** drugs **focus exclusively upon the drug albuterol** and its spreads, finding them to be quite large beginning in 1996 and growing considerably over time.  I identify those citations in Attachment D.  The reports focusing upon albuterol account **for approximately 22% of those cited**.  Hence, these large spreads that began to reach public awareness in 1996, were for **a single** generic physician-administered drug, which is obviously of interest to Schering-Plough.  The observation that **the spreads for a single drug were large would certainly not provide sufficient evidence** to the government, policy makers, and industry participants **that all spreads on all physician-administered drugs were large**.  Indeed, the results of the OIG and ASCO surveys and analyses upon which I relied and which looked at a broader cross section of drugs at later points in time, found just the opposite.[18]

In short, during the 1990s as reflected in publicly available reports, the number of drugs with spreads over 30 percent was too small to counteract the expectation.[19]  In sum:

> Defendants experts and I reviewed the same limited number of surveys.  Defendants' experts use 20/20 hindsight and conclude that the information reflected in the first surveys about multi-source drugs was sufficient to fundamentally alter systematic price expectations of Medicare.  The fact is that the world does not work that way.  There was too little information available and certainly not enough to reverse pre-existing expectations concerning spreads and preexisting institutional reliance upon AWP.  As a result, accumulating information came to reflect knowledge by CMS of systematic spread exploitation with the passage of the MMA in 2003 and the OIG Compliance Guideline.  Over the same period of time, it was impossible for private TPPs to defeat the AWP inflation scheme . . . .[20]

Defendants claim that Dr. Hartman's expectations theory fails when it is applied to multi-source drugs, but, to the contrary, the theory properly applies to multi-source drugs as well.  As Dr. Hartman explains:

---

[18] Hartman Direct, ¶ 77(d) (emphasis in original).

[19] Trial Tr. Day 20 at 83-84.  During this same testimony, Dr. Hartman explains how Dr. Bell greatly exaggerated purported information on spreads exceeding 30 percent.  *See id.* at 82-84; *see also* Rebuttal Testimony of Dr. Raymond Hartman ("Hartman Rebuttal"), ¶¶ 38-41.

[20] Hartman Rebuttal, ¶ 49.

There is a difference between information and knowledge and there is a slow progression from initial information and increasing information to systematic knowledge.  This insight is critical to understanding when Medicare and the TPPs actually *knew* that spreads were larger than the historically accepted amounts.  The information available can be summarized as follows:

- Most governmental reports in the 1980s through early 1990s found that acquisition costs were less than 15% of AWP; most of these reports were based on Medicaid data and self administered drugs.

- This information reflected notions of spreads for physician-administered drugs;

- First survey of physician-admininstered drug is in 1992 and it documents for a single source drug spreads of 20%;

- The preponderance of spreads for single-source drugs reported through 2003 were 20%; and

- Limited evidence of spreads exceeding 20% for a limited number of multi-source physician-administered drugs, particularly albuterol sulfate, began to appear with the first report in 1996.

The fact that there were limited published documents after 1992 with larger spreads for multi-source physician-administered drugs, in particular for albuterol sulfate starting in 1996, only shows that some information was becoming available.  It does not demonstrate that this information was fully absorbed and understood to reflect systematic knowledge about spreads by Medicare or the TPPs.[21]

This knowledge or expectation was reinforced by evidence ***ignored*** by Dr. Bell, and all other defense experts, namely the fact the publishers themselves asserted that AWPs were based on surveys of average prices.[22]

Dr. Hartman's approach stands in contrast to that used by Defendants' experts.  For example, Bell opined that "all payors" knew of spreads exceeding 30%.  However, there was not a scintilla of evidence that Taft-Hartley plans knew that AWP was not an average, knew of the

---

[21] Hartman Rebuttal, ¶¶ 46-47.

[22] Hartman Direct, ¶ 9.

public reports about spreads or knew anything about spread marketing.  Bell also ignored

testimony of BCBS-MA employees that until 2003 they believed AWP was an average.  And

Bell, McFadden and Gaier, in reaching their knowledge opinions, all ignored testimony of payors

that they believed AWP was an average.  Gaier ignored the payment price of BCBS-MA as a

relevant factor and instead used data of Medical West's purchases, labeled them "BCBS-MA"

and opines that BCBS-MA "knew."  In stark contrast to the manipulation of Defendants' experts,

Dr. Hartman considered and dealt with the issues that tested his opinion.[23]  And, in response to

Defendants' examination and Dr. Bell's testimony on knowledge, Dr. Hartman examined Bell's

"costs" of reports of spreads over 30%.[24]  This analysis confirms Dr. Hartman's conclusion that

reports of spreads over 30% were insignificant.

Furthermore, Dr. Hartman did not ignore deposition testimony, as Defendants posit, in

rendering his expectations opinions.[25]  Rather, Dr. Hartman explained that payors generally were

not aware of actual prices in the marketplace.[26]  A plethora of third-party depositions and trial

testimony supports this opinion.[27]

To be sure, the experts disagree on the issues.  But that is not a reason to strike

Dr. Hartman's testimony.  His approach is reliable, his opinions reasonable.  The Court must

---

[23] *See* attached charts comparing the thoroughness of Dr. Hartman's work to that of Defendants' experts, whose work Defendants' must have concluded satisfied *Daubert* before they offered it.

[24] Hartman Rebuttal, ¶¶ 38-41; *see also id.* at Attachments D & E (highlighting Bell's miscounts).

[25] Defs. Br. at 5.

[26] Trial Tr. Day 9 at 29-30 (discussing testimony of Anthem's Joe Spahn).

[27] *See* Plaintiffs' Closing Argument Slides for Cross Cutting Issues at slides 34-49 (citing Deposition of Christopher E. Brecht (June 3, 2004) at 96-98, 61; Deposition of Dan Dragalin (Sept. 14, 2004) at 89-92; Deposition of William K. Ecklund (Mar. 3, 2004) at 193-94, 238; Deposition of Christopher Eddy (Oct. 6, 2004) at 30-32; Deposition of William Einhorn (Feb. 2, 2004) at 40-41; Deposition of Hal Goldman (Sept. 20, 2004) at 109-13, 116; Deposition of Russell J. Hailey (Aug. 4, 2004) at 56, 156-57; Deposition of Bruce M. Niebylski, M.D. (June 20, 2006) at 16; Deposition of Daniel Ryan (Mar. 16, 2004) at 162-64; Deposition of David Thomas (Sept. 24, 2004) at 132-33, 157).

decide which expert is more persuasive.  Plaintiffs respectfully submit that the evidence, theory and just plain common sense demonstrate that Dr. Hartman's opinions carry the day.

> **2.      Dr. Hartman's "but-for" causation model is reliable and was properly applied here**

Defendants next challenge Dr. Hartman's "but-for" approach as unscientific. Dr. Hartman calculated "but-for" damages for Class 2 and Class 3 taking different approaches.

For Class 2, Dr. Hartman calculated "but-for" causation taking into account a plain meaning ruling that would require published AWPs to reflect real prices as mandated by the OIG guidelines.  This assumes that AWPs were to be AWPs as Congress intended.  The difference between AWP and ASP is the cause of injury to the Class.[28]

As an alternative, he has calculated Class 2 damages assuming Congress intended there to be a slight cushion over ASP, and has used the CMS 106% methodology.[29]

As for Class 3 and for an alternate to AWP/ASP liability for Class 2, Dr. Hartman established causation as follows:  First, he identified yardstick drugs as comparators or "but-for baselines" that could be used to examine spreads free of cases where a manufacturer felt it necessary to move market share through AWP inflation.[30]  Second, as noted, Dr. Hartman surveyed public information to see what the market expected.[31]  He confirmed this analysis with a review of TPP contracts.[32]

Having performed the foregoing, he found causation by comparing actual spreads with his liability thresholds.  Dr. Hartman summarized this approach as follows:

---

[28] Hartman Direct, ¶¶ 67-60.

[29] Trial Tr. Day 17 at 71-74; Exs. 4010 and 4011.

[30] Hartman Direct, ¶ 138.

[31] *Id.* at ¶ 139.

[32] *Id.* at ¶ 140.

The basis for my finding of causation and liability is empirical. It requires a comparison of actual spreads with yardstick spreads or a Threshold Yardstick Spread. I conduct my analysis for the remaining Track 1 drugs by calculating the ASPs by NDC for each drug as precisely as the manufacturer data production allows. These ASPs are presented in Attachment G. Given those ASPs, I identify the relevant AWPs, which are also presented in Attachment G. Using the AWP and ASP, I calculate the spread for drug j of Defendant k as $Spread_{jk} = (AWP_{jk} - ASP_{jk})/ASP_{jk}$. These spreads are presented in Attachment G.

Since it is necessary for a manufacturer to increase the spread of the relevant physician-administered drug above what would have been the case absent the fraud in order to implement and benefit from the AWP scheme, I find causation and liability for any NDC of any of these drugs if Equation (1a) of my September 3, 2004 Declaration is found to hold. Specifically the alleged AWP scheme excessively raised reimbursement rates for drug j of Defendant k if (1a) $Spread_{jk} > {}^{but\text{-}for}$, where $Spread_{jk} > {}^{but\text{-}for}$ is the Yardstick Threshold Spread.[33]

Dr. Hartman explains his analysis in more detail in the section of his report entitled "Yardsticks For a Finding of Causation and Liability."[34]

Dr. Hartman's trial testimony on causation is consistent with the approach set forth in his liability report:

The basis for my finding of causation and liability is empirical. It requires a comparison of actual spreads with yardstick spreads. I conduct my analysis for the drugs listed in Table 2 by calculating the ASPs by NDC for each drug as precisely as the manufacturer data production allows. These ASPs are presented in Attachment G. Given those ASPs, I identify the relevant AWPs, which are also presented in Attachment G. Using the AWP and ASP, I calculate the spread for drug j of Defendant k as $Spread_{jk} = (AWP_{jk} - ASP_{jk})/ASP_{jk.}$ These spreads are presented in Attachment G.

Since it is necessary for a manufacturer to increase the spread of the relevant physician-administered drug above what would have been the case absent the fraud in order to implement and benefit from the AWP scheme, I find causation and liability for any NDC

---

[33] Hartman Direct, ¶ 141.

[34] *See id.*, Section C, ¶ 142, *et seq.*

of any of these drugs if Equation (1a) of my September 3, 2004 Declaration is found to hold.  Specifically the alleged AWP scheme excessively raised reimbursement rates for drug j of Defendant k if (1a) Spread$_{jk}$> Spread$_{jk}$$^{\text{but- for}}$.[35]

Dr. Hartman goes on to explain the modeling of "but-for" spreads:

> As noted above, the alleged AWP scheme was effectuated when a manufacturer increased the AWP of the drug and/or decreased its ASP in order to offer financial incentives to providers to move market share.  Reliance upon increased, non-transparent and unmonitored spreads became strategically useful to drug manufacturers when they faced increased therapeutic competition. In the absence of therapeutic competition, a given manufacturer would find it unnecessary **and unprofitable (if ASP were reduced)** to increase spreads to move market share.  Hence, as noted with my discussion of Table 3 above, successful "break-through" innovator drugs serve as reasonable yardsticks for "but-for" spreads, specifically, for spreads that would be anticipated in the market when spread manipulation was unnecessary to move market share and was therefore not undertaken.[36]

Thus, as summarized above, and as detailed in his Liability Report, Dr. Hartman explains the scientific method used to describe the "but-for" world.

### 3.    Dr. Rosenthal confirms causation

Dr. Rosenthal analyzed the invoice data that was turned into AWPs and ASPs by Dr. Hartman and his team.[37]  She looked at departures from normal behavior to provide "natural experiments" where the spread was used as a competitive strategy.[38]  For most of the drugs at issue, she then opines as to the departure of AWP from ASP as a reaction to the competitive marketplace.[39]  Dr. Rosenthal concludes that, as a result of this spread creation, "members of the

---

[35] Declaration of Raymond S. Hartman in Support of Liability and Calculation of Damages, ¶ 56.

[36] *Id.*, ¶ 58.

[37] Rosenthal Direct, ¶ 44.

[38] *Id.*

[39] *Id.* at ¶ 47, ¶¶ 50-62.

class paid more for these drugs than they would have in the absence of the alleged fraud."[40]  This

analysis thus confirms Dr. Hartman's own yardstick analysis.

To support her opinion as to but-for causation, Dr. Rosenthal also examined what has

occurred in response to enactment of the MMA.  This is a world where inflated AWPs are not

part of the system.  Dr. Rosenthal found numerous examples of projected and actual cost savings

in a "macro" world where there is no AWP inflation, even taking into account changes in

payments for administration of drugs.[41]  As if this was not sufficiently persuasive of what

payments would have been in a truthful AWP world, Dr. Rosenthal analyzed what the overall

expenditures were for specific drug regimes compared to the pre-MMA world.  Her analysis

documents a substantial decrease in payments for Zoladex, Taxol, Remicade, Procrit and

Albuterol, even when administration payments are considered (thus crushing Defendants'

chimerical "cross-subsidization" defense).[42]

Further debunking the cross-subsidization myth was the testimony of Dr. Linda Haegele,

a practicing oncologist.  Defendants proffer those portions of the Haegele testimony asserting

that income derived from drug margins was "essential" to compensate for purported shortages

associated with the handling and administration of the drugs, Defs. Br. at 7, but the cross-

examination of Dr. Haegele quite clearly revealed that any shortfalls that her practice

experienced on a drug-by-drug basis were the result of poor purchasing practices and ***not***

Medicare reimbursement policies.  Indeed, in discussing the fact that her practice was purchasing

---

[40] *Id*. at 75.

[41] Rebuttal Testimony of Dr. Meredith Rosenthal ("Rosenthal Rebuttal"), ¶ 13; Trial Tr. Day 20 at 7-8 (Rosenthal).

[42] Rosenthal Rebuttal, ¶ 15 and Exs. 4069 ($212.58 decrease in drug/fee payment on Zoladex); Ex. 4070 ($1,316 change in Taxol); Ex. 4071 ($212.43 decrease in Remicade); Ex. 4072 ($9.22 decrease in Procrit); Ex. 4095 ($21 decrease in Albuterol reimbursement).  *See also* Trial Tr. Day 20 at 9-18 (Rosenthal).  Note that the savings for Remicade is still substantial, even if we adopt the administration codes urged by J&J.  *See id*. at 50.

- 14 -

two drugs, including Procrit, at prices that were multiples greater than the ASPs reported to Medicare, Dr. Haegele specifically admitted that Medicare reimbursement policies were not to blame for losing money on the administration of those two drugs.[43]  And even despite glaring purchasing and billing inefficiencies in her practice, in addition to the "meltdown" that occurred in 2003 when her practice manager stopped doing her job diligently and then eventually left,[44] Dr. Haegele still realized net income of $323,000 and $416,000 in 2004 and 2005, respectively.[45] Dr. Haegele's testimony simply does not support the cross-subsidization myth.

### 4.    The evidence confirms causation

The Court can cross-check the reliability of Dr. Hartman's analysis with defense witness testimony and documents.  For example, the following exchange took place between the Court and an AstraZeneca witness:

> THE COURT:  Excuse me.  Did you understand that Medicare beneficiaries paid 20 percent of AWP?
>
> THE WITNESS:  Yes.  They paid 20 percent out of pocket.
>
> THE COURT:  So you understood that every time you raised AWP, they had to pay 20 percent of the increase?
>
> THE WITNESS:  Yes.  Whenever we took a price increase, it would raise the copay and also raise the reimbursement.[46]

And this testimony logically supports the conclusion that every time an AWP was higher than it should have been, Class members overpaid.  When analyzing the impact of AWP in the

---

[43] Trial Tr. Day 14 at 135-37.

[44] Trial Tr. Day 14 at 110, 126.

[45] Trial Tr. Day 15 at 126-28.

[46] Trial Tr. Day 5 at 13 (Buckanavage).  *See also id.* at 15:5-16 (admitting same); Ex. 143 at AZ0044010 (presentation recommending price increase for Zoladex 10.8 mg depot listing only downside as "slightly higher co-pay for patient").

Medicare market, AstraZeneca internally acknowledged that the patient or "secondary insurer" pays for the 20% copay and observed the impact of higher AWPs on TPPs.[47]

Likewise, in reviewing the meaning of AWP, BMS also acknowledged the relationship between lower AWPs and lower payments:

> The AWP that is set by the pricing services can have an impact on different customers so we need to be aware of how AWPs are used in the system.
>
> MCO's [Managed Care Organization] reimburse pharmacies based on AWP so that they prefer products have a lower spread.[48]

Thus, this document acknowledges that if AWPs were lower, the cost to MCOs (TPPs) would be lower. This was confirmed by BMS Senior Vice President Frank Pasqualone, who when asked what would happen if BMS had published a list price which was an actual average of sales, responded that BMS would have "lost money."[49]  In other words, if BMS had published a real AWP, payors would have paid less, and BMS would have made less. This is causation exactly as postulated by Drs. Hartman and Rosenthal.

**5.    Dr. Hartman's multi-source causation theory is sound**

Defendants claim that Dr. Hartman did not attempt to establish a causal link between a Defendants' drug, the AWP for that drug and alleged harm, Defs. Br. at 12, yet he did. Dr. Hartman explained the detailed, multi-step process underpinning causation for multi-source drugs.

Medicare Part B reimbursement for multi-source drugs was made on the basis of a percentage of the median AWP for its generic sources. Because each Defendant controlled and

---

[47] Ex. 15 at AZ0431802, 08.

[48] Ex. 196 at 1088201.

[49] Trial Tr. Day 14 at 33:18-34:2 (Pasqualone).

- 16 -

published inflated AWPs for their products, each necessarily contributed to the establishment of an inflated median AWP for the multi-source products in question. The industry had a practice of setting and maintaining generic prices at rates slightly lower than the corresponding brand-drug AWPs.[50] Dr. Hartman has documented this "clustering" effect, noting that a tacit "Nash equilibrium" has resulted: the AWP of the generic remains fairly close to the branded AWP and fairly high relative to the ASP for that generic. The generic manufacturer then competes on spreads by driving ASP downward without altering AWP.[51]

Having established the generic manufacturer's inflation of the AWP at which generics are reimbursed, Dr. Hartman then explained the link between a particular Defendant's AWP inflation and excess reimbursements by Class members. Acknowledging that it is not possible to identify with particularly which drug company's product was dispensed at any particular point in time,[52] Dr. Hartman constructed a reliable estimate. Using databases commonly employed by heath care economists,[53] as well as unit sales data from the particular generic manufacturer, Dr. Hartman was able to provide a reliable estimate of the sales made by a particular Defendant under the inflation scheme.[54] And the damage numbers that Dr. Hartman presented were linked

---

[50] Hartman Direct, ¶ 32. Examples from the evidence abound. For instance, Warrick has admitted that in general, it simply pegged its albuterol AWPs to Schering AWPs for the branded version of the product, such that it set them lower than the corresponding Schering AWP, but within 10% of that figure. Plaintiffs' Proposed Findings of Fact ("PFOF"), ¶¶ 285-86. Schering's AWPs, of course, were themselves inflated. At other times, Warrick simply slotted its AWPs somewhere in the pack with competitor AWPs. PFOF, ¶ 286. Both Schering and Warrick submitted AWPs to industry publications with the full expectation that the numbers would be disseminated to every segment of the health care system.

[51] Trial Tr. Day 8 at 20-25.

[52] Trial Tr. Day 8 at 48.

[53] The databases include the National Ambulatory Medical Care Survey ("NAMC") and IMS data referred to as "NDTI," *id*. at 40-41, as well as Verispan. *Id.* at 54.

[54] *Id*. at 44-48, 51-52.

- 17 -

to the particular Defendant's market share and did not include damages associated with sales of other manufacturers.[55]

> ### 6.      Dr. Hartman's damages theory is reliable and was properly applied here

Defendants claim that Dr. Hartman included in the damages model reimbursements that were not made based on AWP, but that is false.  As Dr. Hartman explained, he excluded capitated plans from the damages model.[56]

Defendants also exclaim that Dr. Hartman's "speed limit" would actually result in increased prices.[57]  But as both Dr. Hartman and Dr. Rosenthal have demonstrated, ASPs have decreased since Medicare has required Defendants to report their actual sales prices.[58]  Indeed, MedPAC estimated a 22 percent decrease in Part B drug expenditures.[59]  This is not speculative, but is based on the real world experience in the post-MMA era.  It is Defendants' experts who engage in rank speculation on this score.

### C.      Defendants' Remaining Attacks Constitute Nothing More Than A Battle Of The Experts And Are Not Resolvable Via A *Daubert* Challenge

Defendants other attacks on Dr. Hartman stem from their view of the facts and are not the proper basis of a *Daubert* motion to strike.  Defendants fault Dr. Hartman for purportedly not considering the need to attract and hold onto physicians in a network, despite acknowledging that payors use profitability to attract providers to their networks and encourage doctors to treat patients outside of the hospital.  Defs. Br. at 5-6.  But this assertion has little to do with payors' expectation as to the margins doctors were receiving or to the fact that if AWPs had been real

---

[55] *Id.* at 49-52.

[56] Trial Tr. Day 9 at 68-70.

[57] Defs. Br. at 10.

[58] Hartman Rebuttal, ¶¶ 35-37; Rosenthal Rebuttal, ¶ 13; Trial Tr. Day 20 at 7-8 (Rosenthal).

[59] Hartman Rebuttal, ¶ 36.

- 18 -

AWPs, TPPs would have paid less in an AWP inflation-free world.  They trumpet Bell's direct testimony at paragraphs 40-57 stating that Medicare and TPPs understood the differences between AWP and actual acquisition costs when they devised reimbursement approaches, which focused on overall reimbursement levels and not on a drug-by-drug basis.  Defs. Br. at 6.  This is not a basis to strike Dr. Hartman's opinion.  This is simply Bell's unsupported view of what Medicare and TPPs intended.  As both Dr. Hartman and Dr. Rosenthal explained, Medicare set the payment for drugs to be based on the costs for drugs and not services.[60]

Defendants next claim that Medicare and TPPs understood differences between acquisition costs and AWPs and could negotiate competitive reimbursement amounts and avoided the effect of any alleged AWP inflation.  Defs. Br. at 7.  Again, this view is unsupported given the substantial evidence that Medicare and TPPs did not know of the spread marketing practices that were driving billions into the pockets of doctors solely to induce market share differences.  And, of course, the effects of AWP inflation were not avoided until the ASP system went into place, which in turn sharply lowered costs.  And for Class 2, this awareness, if it existed, is not relevant since Medicare set the statutory rate and TPPs were stuck with it.  Finally, there is a difference between knowing of a difference between AWP and actual acquisition costs and knowing of the magnitude of the spread or spread marketing.  Gaier fails to account for an astounding amount of evidence that Medicare and TPPs were unaware of these spread practices and the drugs involved such that Medicare and TPPs could avoid the effects of AWP inflation.

It is not at all unusual for economics experts to present competing views of the evidence.  When this occurs, courts are not required to strike the testimony of one expert over another, provided that the gate-keeping inquiry is satisfied.  Rather, the trier of fact decides the weight to

---

[60] Hartman Direct, ¶¶ 12-13 and Attachment C (explaining the RBRVS system).

be accorded the testimony.  *See, e.g.*, *Cummings v. The Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (holding that any shortcomings in the proffered testimony went to the weight, and not the admissibility, of the testimony); *McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 302 (1st Cir. 1998) (noting that failure to include particular variables in a regression analysis may diminish the testimony's probativeness but did not make it inadmissible); *Monteiro*, 407 F. Supp. 2d at 355 ("dispute over the effect of replacement parts does not render the testimony inadmissible but goes to the weight of the evidence").  As Judge Stearns has commented:

> I don't find that these differences [between each side's experts' proposed testimony], again, raise any of the kind of concerns that Daubert addresses, nor do I find anything about the credentials of either economist that would cause me to doubt that they are unqualified to give testimony of this kind.
>
> Rather, the conflicts between the two views [are] the ordinary sorts of differences that I encounter all the time between economists over issues like this which, to some degree, are speculative and have to be speculative because you're talking about events that did not occur, about a future that hasn't been revealed.

*Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 15 (1st Cir. 2000).

Defendants' attack on Dr. Hartman rests upon a classic "battle of the experts" that is properly resolved by the Court based on the totality of the factual record, including the expert testimony.  As set forth above, not only is Dr. Hartman's testimony admissible, his ultimate conclusions are far more credible than those proffered by Defendants' experts and should be weighted accordingly.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

DATED:  February 7, 2007

By____/s/ **Steve W. Berman**_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Donald E. Haviland, Jr.
The Haviland Law Firm
740 S. Third Street, Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  150984 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO TRACK 1 DEFENDANTS' RENEWED MOTION TO STRIKE THE EXPERT TESTIMONY OF DR. RAYMOND S. HARTMAN** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on February 7, 2007, a copy to LexisNexis File & Serve for posting and notification to all parties.

By **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

001534-16  150984 V1

**QUALIFICATIONS OF HARTMAN
vs. DEFENSE EXPERTS**

| Hartman | Bell | Gaier |
|---|---|---|
| Has provided expert testimony using economic modeling in dozens of instances including on cases involving over 13 different drugs | Paid clients include 21 pharmaceutical companies who are defendants in this case and who collectively paid him $13 million just last year.  Trial Tr. Day 15 at 61-63.<br><br>Gave advice to Ortho to market the spread in violation of Ortho's policy, is thus a fact witness being asked to opine on his own conduct.  Trial Tr. Day 15 at 65-66. | No experience with healthcare industry until this case |

## THOROUGHNESS OF HARTMAN
## vs. DEFENSE EXPERTS

| Hartman | Bell | McFadden | Gaier |
|---|---|---|---|
| Expectations theory accounts for deposition testimony regarding AWP | His "knowledge" opinion ignores testimony that AWP was believed by many to be AWP

Trial Tr. Day 15 at 55-56, 92-93. | His "knowledge" opinion ignores testimony that AWP was believed by many to be AWP | His "knowledge" opinion ignores testimony that AWP was believed by many to be AWP

Trial Tr. Day 12 at 55-56, 92-93. |
| Accounts for testimony regarding expectations of spreads over 30% | Ignores the importance of 75% of the public studies (by his own study) reports spreads under 30% | | |
| Accounts for public reports of spreads over 30% | Fails to account for lack of testimony that TPPs were aware of reports regarding spreads

Glaringly overestimates opinions on Taft-Hartley knowledge | Fails to account for lack of testimony that TPPs were aware of reports regarding spreads | Admits that certain of the reports Bell cites to support knowledge could be interpreted as seeking more information (Trial Tr. Day 12 at 68-75). |
| Examines actual contracts of TPPs as evidence of knowledge (theory of revealed preferences) | Ignores such evidence | Ignores such evidence | Ignores such evidence |

| | | | |
|---|---|---|---|
| Examines reimbursement data of TPPs as a guide to their knowledge and expectations | Ignores such evidence | Ignores such evidence | Systematically ignores actual TPP reimbursement data which tracks AWP, and labels purchase by BCBS, Harvard and other TPPS staff model HMOs as purchase by the parent to falsely establish knowledge of the parent (Trial Tr. Day 12 at 59-60.) |
| | Although he has done surveys as an expert he did not do any surveys to support his opinions that doctors could not afford to test patients in an ASP world.  (Trial Tr. Day 15 at 87-88)<br><br>Bell cites Ven-a-Care as evidence of knowledge by TPPs but fails to deal with fact it wasn't public and was under seal until 2001<br><br>Ignores in his opinion key defense documents including a BMS document stating AWP can be a "misleading" term. (Trial Tr. Day 15 at 93-94, discussing Ex. 196.)<br><br>Did not account for documents where defendants inform Congress discounts not available.  These | | Admits Ven-A-Care letter (DX 1881) would not be public until 2001 and fails to account for this in his opinion (Trial Tr. Day 12 at 72-73.)<br><br>Admits that a perfect storm in 2001 was a point where knowledge was triggered (Trial Tr. Day 12 at 80) but fails to account for it in his opinion)<br><br>Admits that many studies show payments lower in an ASP (but for) would but simply ignores them in his opinion. (Trial Tr. Day 12 at 56-57.) |

| | | | |
|---|---|---|---|
| | statements were made at the same time Bell claims the government knew the truth.  (Trial Tr. Day 15 at 105-106.)<br><br>Admits that he ignores statements in public reports contrary to his opinion.  (Trial Tr. Day 15 at 99-100.) | | |