# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                        )
IN RE PHARMACEUTICAL INDUSTRY          )   MDL No. 1456
AVERAGE WHOLESALE PRICE                    )
LITIGATION                                              )   Civil Action No. 01-CV-12257-PBS
_____)
THIS DOCUMENT RELATES TO                   )
                                                        )   Judge Patti B. Saris
*State of Nevada v. American Home Prods.*        )
*Corp., et al.,*                                          )
D. Nev. Cause No. CV-N-02-0202-ECR         )
_____)

## DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR
## <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ................................................................................ 2

    *1.*    *Nevada Medicaid And The Use Of AWP.* ................................ 2

    *2.*    *Nevada's Claims* ................................................................... 4

ARGUMENT .................................................................................... 5

I.   NEVADA HAS ABANDONED MANY ASPECTS OF ITS ORIGINAL CASE
AND IS UNABLE TO PROVE THOSE ASPECTS OF THE CASE THAT
REMAIN. ....................................................................................... 6

    A.   The State Has Produced No Evidence Regarding A Number Of Its
Asserted Claims. ...................................................................... 7

        *1.*    *Claims prior to 1991 or after 2002* ................................ 7

        *2.*    *Physician-administered drug claims.* ............................. 7

        *3.*    *Medicare Part B co-payment claims.* ............................. 8

        *4.*    *Third-party claims.* ..................................................... 8

    B.   Defendants Are Entitled To Summary Judgment On All Medicaid
Claims Because Nevada Cannot Establish That Reimbursement
Was Based On AWP. ................................................................ 9

    C.   The Court Should Grant Defendants Summary Judgment Because No
Evidence Supports The State's Theory Of Liability. ...................... 11

II.   NEVADA KNEW WHAT AWP REPRESENTED, PRECLUDING ANY
CLAIMS OF DECEPTION OR FRAUD. ............................................. 12

    A.   Nevada's Reimbursement Regime Is Premised On AWP's Being A
Benchmark Price And Anticipates The Existence Of Spreads. ......... 14

        *1.*    *During all relevant times, Nevada Medicaid was aware that AWP
exceeded acquisition costs and, when it reimbursed on the basis of
AWP, it did so at a discount.* ........................................ 14

        *2.*    *Nevada's reimbursement of generic drugs is premised on there
being a substantial difference between AWP and acquisition cost.* ....... 18

        *3.*    *Nevada deliberately reimbursed above acquisition cost to ensure
beneficiaries had access to care.* ................................... 20

B.  Nevada Knew That AWP Could Greatly Exceed Acquisition Cost Because
Nevada Retained Knowledgeable Individuals To Run Its Medicaid And
Other Pharmacy Programs. ...................................................................... 23

C.  Nevada Knew That AWP Could Greatly Exceed Acquisition Cost Because,
Since At Least The 1980's, Nevada Has Been Purchasing The Very Drugs
That It Claims Have Inflated AWPs. ................................................. 25

D.  Nevada Knew That Its Medicaid Program Could Have Reimbursed
Providers Less, Because Nevada Was In Fact Reimbursing Providers Less
Under Other State-Run Pharmacy Programs. .................................... 26

E.  Nevada Knew That Defendants Were Not Representing That AWP Was
Equivalent To Provider Acquisition Cost, Because Several of the Defendants
Communicated This Knowledge Directly To The State. .................... 29

F.  Nevada Continues Today To Use AWP As A Basis For Reimbursement......... 30

III.  NEVADA'S STATUTORY MEDICAID FRAUD CLAIM FAILS AS A
MATTER OF LAW (COUNT V). ....................................................................... 31

A.  No Defendant With Intent To Defraud Made Any Knowingly False
Statement Or Representation Concerning AWP ............................... 31

B.  No Person Used AWP To Obtain Goods Or Services Pursuant To
The State Medicaid Plan. ................................................................. 32

C.  Defendants Are Not Liable For Penalties Under The Statute Because
They Are Not Providers Who Received Payments To Which They Were
Not Entitled. ...................................................................................... 32

IV.  NEVADA'S DECEPTIVE TRADE PRACTICES ACT CLAIMS FAIL
AS A MATTER OF LAW (COUNTS I, II, AND III). .................................. 34

A.  The Attorney General Has No Authority Under The DTPA To Bring
*Parens Patriae* Claims (Count I). ...................................................... 34

B.  Nevada Cannot Recover Restitution Under The DTPA (Counts I & III). ......... 35

1.  *Nev. Rev. Stat. § 598.0963(3) does not provide for restitution.* ............. 35

2.  *Nevada impermissibly seeks damages under the guise of
"restitution."* .................................................................................. 36

C.  The Civil Penalties Sought Are Not Permitted By Statute And Are
Unsupported By The Evidence (Counts I, II, and III)....................... 37

1.  *The DTPA does not allow penalties for Count II.* ................................. 37

2.  *Nevada cannot establish that any violation was willful.* ....................... 37

V.  THE APPLICABLE STATUTE OF LIMITATIONS BARS NEVADA'S
CLAIMS OF DECEPTION AND FRAUD. .................................................... 38

CONCLUSION ............................................................................................................ 40

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

Page(s)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...........................................................12

*Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)......................................30

*Forect v. E.I. Du Pont de Nemours & Co.*, 792 F. Supp. 1460 (D. Nev. 1992)....................31, 32

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) .................................36, 37

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........................................35

*Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304 (9th Cir. 1992) ..........................................39

*Newton v. Uniwest Fin. Corp.*, 802 F. Supp. 346 (D. Nev. 1990) ..............................................31

*Scaffidi v. United Nissan*, 425 F. Supp. 2d. 1172 (D. Nev. 2005)................................................13

*Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988)................................................35

*United States v. Colgate & Co.*, 250 U.S. 300 (1919)................................................................30

### **STATE CASES**

*Advanced Sports Information, Inc. v. Novotnak*, 956 P.2d 806 (Nev. 1998) ...............................34

*Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949 (Nev. 1998).................................................13

*Att'y Gen. v. Eighth Jud. Dist. Court*, 844 P.2d 124 (Nev. 1992) ...............................................34

*Bemis v. Estate of Bemis*, 967 P.2d 437 (Nev. 1998) ...................................................................39

*Builders Ass'n of N. Nev. v. City of Reno*, 776 P.2d 1234 (Nev. 1989).........................................34

*Howard v. Howard*, 239 P.2d 584 (Nev. 1952) ...........................................................................39

*Irving v. Irving*, 134 P.3d 718 (Nev. 2006) ..................................................................................5

*Lubbe v. Barba*, 540 P.2d 115 (Nev. 1975)......................................................................5, 13, 31

*Orr Ditch & Water Co. v. Justice Court of Reno Twp.*, 178 P.2d 558 (Nev. 1947)....................33

*Ryan v. Eighth Jud. Dist. Court*, 503 P.2d 842 (Nev. 1972) .......................................34

*Sierra Pac. Power Co. v. Nye*, 389 P.2d 387 (Nev. 1964) .........................................39

*State ex rel. Att'y Gen. v. NOS Communications, Inc.*, 84 P.3d 1052 (Nev. 2004)......................36

*State ex rel. Tax Comm'n v. Saveway*, 668 P.2d 291 (Nev. 1983) ..................................4

## FEDERAL STATUTES

42 CFR § 447.204 ..............................................................................20

Fed. R. Civ. P. 56(f) ...........................................................................6

## STATE STATUTES

1991 Nev. Stat. 1049-50........................................................................32

Nev. Rev. Stat. § 598.0973.....................................................................37

Nev. Rev. Stat. § 598.0903.....................................................................34

Nev. Rev. Stat. § 11.190.......................................................................38

Nev. Rev. Stat. § 422.490......................................................................33

Nev. Rev. Stat. §§ 422.540.....................................................................31, 32

Nev. Rev. Stat. § 422.580......................................................................31, 32, 33

Nev. Rev. Stat. § 422.590......................................................................38

Nev. Rev. Stat. § 598.0963(3) .................................................................35, 36, 37

Nev. Rev. Stat. § 598.0973.....................................................................37

Nev. Rev. Stat. § 598.0979.....................................................................37

Nev. Rev. Stat. § 598.099......................................................................35, 36, 37

Nev. Rev. Stat. § 598.0993.....................................................................36

Nev. Rev. Stat. § 598.0999.....................................................................37, 38

Nev. Rev. Stat. § 598A.160............................................................................................34, 35

## PRELIMINARY STATEMENT

Defendants are entitled to summary judgment on all counts of Nevada's Amended Complaint ("NV Am. Compl.").[1]  All of them, whether styled as claims under the Nevada Deceptive Trade Practices Act ("DTPA") or the State's Medicaid Fraud statute, reduce to the demonstrably false assertion that the State was deceived by published Average Wholesale Prices ("AWP") that were substantially higher than the prices paid by providers.  All of the evidence goes against this assertion:  State officials responsible for designing, implementing, and administering Nevada's Medicaid program knew that AWPs were benchmark prices that were substantially higher than provider costs, and they purposefully set Medicaid reimbursement rates higher than provider costs to ensure that Nevada doctors and pharmacies participated in the program.

The State constructs its theory of the case on a definition of "AWP" that is an artifact of litigation and is totally divorced from the decades-long understanding of responsible State officials.  Nevada law does not define "AWP," and Nevada officials have known for decades that the term "AWP" was used by those operating in the pharmaceutical industry, including Medicare and Medicaid, as a pricing benchmark, and was not a market price.  Outside the courtroom, Nevada officials used the term in precisely that way, and administratively set Medicaid pharmacy rates with this understanding of the term.

Nevada officials responsible for the State's Medicaid program testified they long have known that there was a substantial spread between AWP and provider cost, and they purposefully exploited that spread to induce providers to participate in the Medicaid program.  It

---

[1] Defendants submit this joint memorandum to address issues common to all Defendants.  Each Defendant has contributed pages toward this memorandum, and some Defendants will also submit individual supporting memoranda to address Defendant-specific issues.

is telling that those officials—the administrators alleged to have been defrauded and deceived—did not initiate this litigation.  They testified that for the past 25 years they understood AWP as a reference price used as a pricing benchmark, and *not* an average of wholesale prices.  To the same effect, Nevada Medicaid officials referred to AWP as "artificial wholesale price," "Average Whimsical Price," and "ain't what's paid," and testified they understood there were substantial and unpredictable spreads between AWP and a provider's actual acquisition cost.  They knew this because they purchased drugs in the private sector and on behalf of the State for other Nevada programs.  They also reviewed State and Federal government reports and commissioned studies that compared acquisition cost and AWP; these showed unequivocally that as early as 1986 Nevada Medicaid officials knew that AWP bore no predictable relationship to provider acquisition cost.  They also testified they were aware of other Nevada programs that reimbursed drugs at much greater discounts—up to 55% off AWP—than did Medicaid.  Mindful of these facts, these responsible State officials purposefully set Medicaid reimbursement rates above acquisition costs to secure participation from providers, and thereby to ensure Nevada beneficiaries, including those in remote locales, access to prescription drugs.

Now, after decades of using AWP-based reimbursement to support other policy goals and despite Nevada officials' longstanding knowledge of the difference between AWP and actual acquisition costs of drugs, Nevada's Attorney General alleges that Nevada's actions are the result of an industry-wide effort to defraud the State.  Nothing is further from the truth.

## BACKGROUND

### 1.    *Nevada Medicaid And The Use Of AWP*

Medicaid is a jointly administered and funded federal and state program to assist the poor, elderly, and disabled in obtaining medical care.  Nevada Statement of Facts ("NSOF") ¶

1.[2]   Nevada is required to submit a Medicaid Plan in accordance with federal law.  NSOF ¶ 2.

Nevada's Medicaid Plan has been approved by the federal government and by Charles Duarte,

Nevada's Medicaid Administrator, and Michael Willden, the Director of Nevada's Department

of Health and Human Services ("NDHHS").  NSOF ¶ 3.

Nevada Medicaid has opted to reimburse providers—pharmacies and physicians (not

manufacturers)—for dispensing certain drugs to Medicaid beneficiaries.  NSOF ¶¶ 4, 5.  Federal

law does not set requirements for the reimbursement of any specific drugs.  To receive federal

funding, the State must satisfactorily demonstrate to Centers for Medicare and Medicaid

Services ("CMS") that: (i) *in the aggregate* its total reimbursement of providers does not exceed

(a) the estimated acquisition cost of the drugs dispensed *plus* a reasonable dispensing fee or (b)

the provider's usual and customary charge to the general public; and, (ii) for generic drugs, *in

the aggregate* its total reimbursement of providers does not exceed the Federal Upper Limit

("FUL"), as established by the Health Care Financing Administration ("HCFA") for certain

generic drugs, plus a reasonable dispensing fee.[3]  NSOF ¶¶ 6, 7.  Nevada does not contend that

in the aggregate (i.e., for all drugs dispensed) its payments to providers exceeded the amount

authorized by federal regulation or that the federal government withheld payment of the federal

share.

Pharmacy reimbursement rates are set by NDHHS, which has set reimbursement at the

lower of the FUL (if applicable), usual and customary charge, or AWP – 10% from February

---

[2] Defendants filed a Joint Motion for Redress for Spoliation of Evidence on July 21, 2006, Dkt. Entry No. 2899. For reasons set forth in the Memorandum supporting that motion, the evidence that the State destroyed should be deemed to support Defendants' positions in this litigation because all extant evidence supports Defendants' positions.

[3] In December 2004, Nevada implemented a Maximum Allowable Charge ("MAC") for certain eligible drugs. Estimated Acquisition Cost ("EAC") remained at AWP-15% for drugs that did not qualify for the MAC program. NSOF ¶ 9.

1988 until July 2002 (later at AWP – 15%).  NSOF ¶ 8.  Nevada has not defined the term AWP

and admits as much in its complaint:  "There are no regulations describing how AWPs are to be

calculated, nor any regulatory process for approving them."  NSOF ¶¶ 17,18.  Rather, Nevada

has interpreted the term AWP as it is used by the pharmaceutical industry.  *See* NV Am. Compl.

¶ 119 (the use of "AWP" is "***an industry-wide practice*** and exists with respect to all classes of

drugs, brand names and generics"); *see also* NSOF ¶¶ 19-20.[4]  Nevada does not require drug

manufacturers to submit any pricing information to the State.

     AWP is understood by those who use it in the pharmaceutical market, such as

manufacturers, wholesalers, physicians, pharmacies, private insurers and public insurers

(including the State), to be a pricing benchmark—not a market price or an average of wholesale

prices.  NSOF ¶ 14.  AWP is a national benchmark that does not vary state-by-state; while state

Medicaid reimbursement rates based on AWP do vary, each pricing compendia publishes a

single AWP for each drug.  NSOF ¶ 14.  As such, AWP serves as a reference point from which

buyers, sellers, insurers, and others involved in the distribution of pharmaceuticals may begin

their price negotiations.  NSOF ¶ 15.  In the context of the generics industry, most AWPs

established at the launch of the drug are lower than the reference brand drug's and often remain

constant; competition drives prices down and leads to lower payments by providers.  *See* NSOF

¶ 16.  Nevada officials have testified to sharing this understanding.  NSOF ¶¶ 19-20.  This

shared understanding of industry terminology is fatal to Nevada's entire case.

**2.     *Nevada's Claims***

     Even though Nevada Medicaid officials have long known that AWP was different from

acquisition price and was not a literal average of wholesale prices, the Attorney General filed

---

[4] Under Nevada law, Nevada Medicaid's reasonable interpretation of its own regulations is entitled to deference. *See State ex rel. Tax Comm'n v. Saveway*, 668 P.2d 291, 294 (Nev. 1983).

suit in 2002, alleging, among other things, that Defendants violated Nevada's DTPA and Medicaid Fraud statute, and engaged in illegal racketeering behavior by reporting AWPs that were not averages of wholesale prices. Five counts of Nevada's Amended Complaint survived Defendants' motions to dismiss. Nevada claims on behalf of Nevada residents that Defendants violated the DTPA (Counts I & II) and seeks civil penalties and restitution on its own behalf also under the DTPA (Count III). Nevada also alleges that Defendants are liable for violating Nevada's Medicaid Fraud statute (Count V) and includes a catch-all claim for punitive damages (Count VI).[5] At a minimum, as discussed in Section I, this case is properly limited to allegations regarding those self-administered drugs reimbursed by the Nevada Medicaid program between 1991 and 2003.

## ARGUMENT

Summary judgment as to Nevada's claims is required because there is no issue of material fact, meaning that there is no evidence upon which a jury could reasonably find in the State's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). The Court should view the question whether Nevada has located evidence upon which a reasonable jury could find in its favor "through the prism" of its burden of proof. *Id.* at 253-55. Under Nevada law, fraud claims must be shown by clear and convincing evidence. *See Lubbe v. Barba*, 540 P.2d 115 (Nev. 1975). The same rule applies to statutes that sound in fraud. *See Irving v. Irving*, 134 P.3d 718, 720-21 (Nev. 2006). Thus, at least for its claims under the Medicaid Fraud statute, the State bears the burden of establishing fraud with clear and convincing evidence.

---

[5] Certain aspects of Nevada's claims remain in the action as to specific companies only. Those aspects are treated in those Defendants' individual briefs accompanying this motion. *See supra* note 1.

Nevada cannot carry its case under any conceivable burden of proof.  The evidence amassed in discovery shows:

1. Nevada has no evidence regarding third-party claims, Medicare Part B co-payments, physician-administered drugs, or claims prior to 1991 or after 2002;  this case is therefore limited to self-administered drugs reimbursed by Nevada Medicaid between 1991 and 2003 (*see infra* pp. 6-9);

2. Nevada officials long understood that AWP was not a proxy for actual acquisition cost or an actual average of wholesale prices, a fact fatal to both its DTPA and Medicaid Fraud claims (*see infra* pp. 12-31);

3. Nevada's claims are not actionable under the Medicaid Fraud statute because that statute is intended to apply to providers (such as pharmacists and doctors) not drug manufacturers and, in any event, the state cannot meet the elements of a cause of action under that statute (*see infra* pp. 31-34);

4. Nevada is barred from proceeding on any of its counts under the DTPA because: (a) the State lacks standing to bring a claim on behalf of parties other than itself; (b) it cannot recover damages under this statute; and (c) the penalties it seeks are not allowed under the statute (*see infra* pp. 34-38);

5. All of Nevada's claims are barred by the statute of limitations (*see infra* pp. 38-39).

I.   NEVADA HAS ABANDONED MANY ASPECTS OF ITS ORIGINAL CASE AND IS UNABLE TO PROVE THOSE ASPECTS OF THE CASE THAT REMAIN.

Although Nevada initially purported to assert claims on behalf of government agencies other than Nevada Medicaid,[6] third-party payors and consumers, and Medicare beneficiaries, Nevada has adduced no evidence whatsoever regarding these claims;[7] thus, judgment should now enter for Defendants on these claims.  Similarly, although Nevada asserted claims for both self-administered drugs dispensed by pharmacies and physician-administered drugs dispensed in doctors' offices, Nevada has produced no evidence regarding physician-administered drugs or

---

[6] By its own admission, Nevada proceeds with its claims only as to its Medicaid program, and not as to other state programs that purchase or reimburse the drugs at issue in this case.  NSOF ¶ 117.

[7] Nevada's failure to produce any evidence regarding a number of its asserted claims is not a consequence of its having had an insufficient opportunity to develop evidence during discovery.  *See* Fed. R. Civ. P. 56(f).  Rather, in many instances, Nevada itself has control over the information it might use to support its case, but it simply declined to locate or provide that information.

for self-administered drug claims before 1991 or after 2002.  Consequently, this case is properly limited to self-administered drugs reimbursed by Nevada Medicaid between 1991 and 2003. Moreover, as set forth below, even with respect to Medicaid self-administered drugs, Nevada has failed to produce sufficient evidence to withstand summary judgment.

A.     <u>The State Has Produced No Evidence Regarding A Number Of Its Asserted Claims.</u>

For the following categories of claims, Nevada has failed to produce any evidence and, therefore, Defendants are entitled to summary judgment.

1.     *Claims prior to 1991 or after 2002.*

Nevada has produced absolutely no data or other evidence regarding reimbursement claims prior to 1991 or after 2002.  NSOF ¶ 122.  Nevada's damages expert, Dr. Hartman, does not purport to analyze or calculate damages for any claims during these periods.  *See* NSOF ¶ 124.  Without this data, Nevada cannot meet its burden to establish that it reimbursed any of the subject drugs on the basis of the Defendants' AWPs.

2.     *Physician-administered drug claims.*

Nevada has produced no claims data regarding physician-administered drugs.  NSOF ¶ 120.  Without this information, Nevada cannot establish what physician-administered drugs it reimbursed or the basis for its reimbursement.  Indeed, documentary and testimonial evidence suggest that Nevada Medicaid reimbursed physician-administered drugs not on the basis of AWP, but rather at 62 percent of a physician's billed charges.  *See* NSOF ¶ 11.[8]  Moreover, Dr.

---

[8] A document titled "Provider Type 20 Physician's Rates" shows that for all physician-administered drugs listed, reimbursement was at a $0 rate.  According to this document, the $0 rate indicates reimbursement at 62 percent of billed charges (a physician's usual and customary charges as submitted by the physician) unless otherwise noted in Medicaid Policy.  Coleen Lawrence, Nevada Medicaid's Social Service Chief responsible for pharmacy reimbursement, was unaware of any notes in the Medicaid Policy regarding these drugs.  NSOF ¶ 11.

Hartman does not report any damages or penalties for this segment of drugs, because the State did not provide him with this data.  *See* NSOF ¶ 125.

3.      *Medicare Part B co-payment claims.*

Nevada seeks to recover the Medicare Part B co-payment Nevada Medicaid paid to doctors on behalf of individuals who are eligible for both Medicare and Medicaid.  Nevada did not produce any information regarding the amount of this co-payment, NSOF ¶ 121, including: (i) claims data showing what Medicare co-payments it made regarding Defendants' drugs; (ii) information showing what, if any, of the co-payments were based on Defendants' AWPs; and (iii) any information, such as co-payment invoices or cancelled checks, evidencing that an actual co-payment was made.  Moreover, Dr. Hartman, Nevada's damages expert, did not report damages or penalties for Medicaid reimbursement of dual-eligible Medicare claims because Nevada did not provide him with the claims and reimbursement data.  *See* NSOF ¶ 126.

4.      *Third-party claims.*

Nevada purports to bring claims on behalf of Nevada residents who allegedly were damaged by the alleged AWP inflation scheme.  As discussed below, Nevada does not have standing to assert those claims (*see infra* Section IV.A).[9]  Nor does the State even know who the

---

[9] Additionally, Defendants' discovery of third-party payors ("TPP"s) such as private insurers and self-insured employers confirms that Nevada's TPPs were not, in fact, deceived or damaged.  Numerous TPPs in Nevada purchase drugs directly from manufacturers or receive rebates from manufacturers relating to their purchases. These payors have direct knowledge of the prices at which self-administered drugs can be purchased and, as a consequence, know that these prices are far below AWP.  As is discussed in the Declaration of defense expert Dr. Eric M. Gaier, Ph.D., sales data provided by Defendants demonstrate that four of the top seven TPPs in Nevada purchased prescription drugs directly from manufacturers, through Group Purchasing Organizations ("GPO"s), or through drug wholesalers.  NSOF ¶ 111.  The sales data show that these TPPs purchased significant volumes of prescription drugs at discounted prices generally available to providers (and well below AWP), including many of the drugs in this litigation.  NSOF ¶ 112.  Those drug purchases were made over an extended time frame, spanning the entire relevant period, and starting as early as 1991.  NSOF ¶ 113.

TPPs in Nevada, like their counterparts in the rest of the country, also have taken advantage of the services offered by Pharmacy Benefit Managers ("PBM"s) that administer the pharmacy benefit, including the pass-through of the substantial rebates paid by manufacturers to PBMs, to achieve lower drug reimbursement costs.  NSOF ¶ 114. There is a highly competitive PBM market in Nevada, and payors' costs are far below AWP and often less than pharmacies' acquisition costs.  NSOF ¶ 115.  Defendants' discovery of Nevada TPPs confirms that the conclusions

people are that it purports to represent:  "As for the identity of the *parens patriae* claimants, the State expects these to be revealed at the time the claims are made as part of the claims process." NSOF ¶ 123. (Letter from Jeniphr Breckenridge to Christopher Dillon, dated June 1, 2006.) Since it does not know who it represents, not surprisingly Nevada does not have any evidence that these individuals were deceived or defrauded by Defendants or that they suffered damages. Nevada has not produced any claims data regarding their supposed damages, NSOF ¶ 123, including the drugs involved and the relevant price or basis for reimbursement.  Because he was provided no data regarding these reimbursements, the State's damages expert, Dr. Hartman, has not reported damages or penalties for these claims.  *See* NSOF ¶ 127.

Accordingly, Defendants are entitled to summary judgment, at a minimum, on all Medicaid claims before 1991 or after 2002, all physician-administered drug claims, all Medicare Part B co-payment claims and all third-party claims.

B.    Defendants Are Entitled To Summary Judgment On All Medicaid Claims Because Nevada Cannot Establish That Reimbursement Was Based On AWP.

Even for the period for which it has produced claims data, Nevada cannot establish that it reimbursed on the basis of the published AWPs for Defendants' drugs.  Nevada purportedly reimbursed at the lower of a provider's usual and customary price; the FUL or State MAC, where applicable; and AWP[10] – 10%.  NSOF ¶ 8.  Nevada has the burden of identifying which claims it paid on the basis of published AWPs, and Nevada has failed to meet its burden.

In response to Defendants' requests, the only evidence that Nevada has produced regarding how it reimbursed self-administered drug claims is a CD of archived data originally

---

reached by the Court and the Court-appointed independent pharmaceutical industry expert, Dr. Ernest R. Berndt, in the MDL regarding PBM competition, the benefits of PBMs to payors, and transparency in the PBM market are also applicable to Nevada.  NSOF ¶ 116.  As a result, payors have not been injured by the use of AWP by PBMs to charge them for prescription drugs.

[10] Nevada Medicaid used AWPs supplied by DOJ/NAMFCU, rather than published AWPs, from June 2000 through the present, which encompasses part of the relevant time period.  NSOF ¶ 10.

from Anthem, its former fiscal agent.  NSOF ¶ 128.  But this tape is insufficient to establish that

Nevada paid any claims on the basis of published AWPs.  *First*, the claims data does not

expressly state the basis of reimbursement; there is no field that identifies the basis of payment.

NSOF ¶ 129.  *Second*, Nevada's sole expert, Dr. Hartman, testified that he has not performed

such an analysis.  NSOF ¶ 133.  *Third*, in reviewing its own data, Nevada is unable to determine

which claims are based on AWP.  Indeed, if the testimony from Nevada's Rule 30(b)(6)

designee regarding the claims data, Ronald Swenson, NSOF ¶ 130, is to be believed, at least

97% of the claims were not based on AWP.  In his deposition, Mr. Swenson testified that there is

a field in the claims data, IC-DRUG-MAC-EXC, that indicates whether a claim was based on a

state upper limit ("SUL").  NSOF ¶ 130.  For over 97% of the claims this field indicates

payment was made on the basis of a SUL.  NSOF ¶ 132.  Given the importance of this result,

Defendants asked Nevada to confirm the accuracy of Mr. Swenson's testimony on this point.

On August 17, 2006, Mr. Swenson executed an affidavit in which he reaffirmed his prior

testimony.  NSOF ¶ 131.  It is unlikely that 97% of the claims were paid on the basis of a SUL—

a fact that, if true, would decimate Nevada's case; however, Mr. Swenson's testimony regarding

the claims data shows that the State has no credible evidence regarding how it actually did

reimburse drugs during this period.

　　　　After five years of litigation, Nevada has failed to adduce any evidence to meet its

burden of identifying which claims it paid on the basis of the published AWPs: the claims data is

not self explanatory, the testimony of Nevada's only fact witness regarding the claims data

shows it to be unreliable, and Nevada has produced no expert testimony on the subject.  Nevada

has utterly failed to meet its burden and, thus, Defendants are entitled to summary judgment on

all Nevada Medicaid claims.

C.    The Court Should Grant Defendants Summary Judgment Because No Evidence Supports The State's Theory Of Liability.

Not only has Nevada failed to adduce evidence that it paid claims based on the published AWPs, Nevada has also failed to adduce evidence that the Defendants manipulated their AWPs to defraud the Medicaid program.  Indeed, Nevada's theory of AWP manipulation is nonsensical in the context of self-administered drugs—the only drugs properly at issue in this case.

Under the Medicaid program, Nevada makes no payments to manufacturers.  Nevada reimburses providers; thus, any supposed overpayment was made to providers—not Defendants.  Since Defendants do not directly benefit from the alleged AWP inflation scheme, however, Nevada has hypothesized that there must be an indirect benefit to manufacturers.  Nevada asserts that Defendants received "increased market share and profit" as consequence of their alleged "AWP Inflation Scheme."  NV Am. Compl. ¶ 8.  But there is no evidence of this.[11]  Indeed, Nevada's sole expert testified that he was not even asked to analyze this theory.  NSOF ¶ 134.

Nevada has set forth no evidence regarding how the spreads on Defendants' drugs compare to the competition.  If the spread on a Defendant's drug is smaller than the spreads on competing drugs, that Defendant gains no advantage by marketing the spread.  Thus, Nevada has not established that the conditions for the alleged "marketing of the spread" even exist.  Furthermore, even if such conditions existed for some of the subject drugs, Nevada has no evidence that any Defendant actually increased its market share or profits as a result.  Nor does Nevada have evidence that providers actually buy drugs on the basis of AWP; indeed, the evidence amassed by Defendants in discovery suggests that they do not.  NSOF ¶ 136.

---

[11] Interestingly, Nevada Medicaid Director Charles Duarte (the individual responsible for verifying Nevada's Interrogatory Reponses) did not have the same understanding of "marketing the spread" as that set forth in Nevada's Amended Complaint or Interrogatory Responses.  Mr. Duarte testified that he understood the phrase to mean that "manufacturers provided better pricing to particular purchasers" and he saw nothing specifically wrong with this practice.  NSOF ¶ 135.  This further emphasizes that this litigation is driven by lawyers, and not the Nevada Medicaid program.

The fact that there is no evidence that providers buy drugs based on AWP is hardly surprising because, as to self-administered drugs (the only drugs for which Nevada has any evidence at all, s*ee supra* Section I.A.2, its theory of "marketing the spread" to increase market share is nonsensical.  Physicians prescribe self-administered drugs.  Pharmacists dispense them, and are reimbursed by Nevada Medicaid for them.  The physician makes the decision as to which self-administered drug to prescribe but does not have an incentive to choose one over the other based on spread, because the physician does not pay for and is not reimbursed for the drug.  The pharmacist must dispense the specific branded drug prescribed by the physician and does not have the ability to dispense a different drug based on the spread the pharmacist would receive via reimbursement.  Because there is a disconnect between incentive (the receipt of reimbursement) and opportunity (the decision regarding which self-administered drug to dispense), Nevada's theory regarding "marketing the spread" to increase market share is completely illogical as to self-administered drugs.

At bottom, Nevada's allegation that Defendants received "increased market share and profit" as consequence of their alleged "AWP Inflation Scheme" is created out of whole cloth with no basis in fact or logic.  Nevada's complete failure of proof warrants summary judgment on the issue of liability.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial).

II.   NEVADA KNEW WHAT AWP REPRESENTED, PRECLUDING ANY CLAIMS OF DECEPTION OR FRAUD.

The animating theory of all of Nevada's claims is that it was deceived by Defendants' reporting of AWP.  In the courtroom, Nevada asserts that an AWP is "intended to be a national average of list prices charged by wholesalers to pharmacies."  NV Am. Compl. ¶ 97.  Nevada's

burden, therefore, is to show that AWP was supposed to be an actual average of prices to providers *and* that Nevada reasonably understood the term in this manner. *Cf. Scaffidi v. United Nissan,* 425 F. Supp. 2d 1172, 1185 (D. Nev. 2005) (granting summary judgment for defendant on a DTPA claim where the plaintiff could not demonstrate the existence of a false representation); *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 957-58 (Nev. 1998) (stating that justifiable reliable is an essential element of a fraud claim); *Lubbe*, 540 P.2d at 117-18 (plaintiff in fraud action must show justifiable reliance by clear and convincing evidence). Nevada cannot meet this burden because it never defined AWP in this manner and has no evidence that it or anyone understood AWP in this way.

It is for this same reason that Nevada can never show that it lost a penny because of the Defendants' actions.  The Nevada Supreme Court has recognized in tort cases that, like this one, turn on an alleged misrepresentation,

> [t]he causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of inducement of the plaintiff to act, or to refrain from acting, to his detriment.  The false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course; and when he was unaware of it at the time that he acted, or it is clear that he was not in any way influenced by it, and would have done the same thing without it for other reasons, his loss is not attributed to the defendant.

*Lubbe*, 540 P.2d at 118 (quoting Prosser, Law of Torts 685, 714 (4th ed. 1971)).  Because Nevada never understood AWP to be an average of wholesale prices and never treated it that way, any "excess" reimbursement cannot be caused by Defendants' reported AWPs.

Defendants are entitled to summary judgment because the evidentiary record demonstrates beyond dispute that those who participated in Nevada's Medicaid program did not understand AWP to mean an average of wholesale prices.  What the record demonstrates beyond

cavil is that the participants in the industry—including Nevada State personnel—understood that
AWP was a pricing benchmark and that AWP significantly exceeded provider acquisition cost
for drugs (or was "inflated" relative to that measure).  Nevada—and specifically NDHHS—
knew all of this because:

1. At all times relevant to this case, NDHHS reimbursed based on a *discount* from AWP,
   consistent with an understanding that AWP is not synonymous with actual acquisition
   cost (*see infra* pp. 14-15);

2. NDHHS has received and even commissioned studies dating back to the 1980s that show
   AWP was substantially higher than acquisition costs (*see infra* pp. 15-18);

3. NDHHS hired experienced pharmacists and other industry experts who understood how
   the term "AWP" was used in the pharmaceutical industry to run its Medicaid pharmacy
   program (*see infra* pp. 23-25);

4. NDHHS itself purchased drugs for other programs and therefore was aware of the
   discounts off of AWP that purchasers often received (*see infra* pp. 25-26);  NDHHS also
   operated other pharmacy reimbursement programs that applied even greater discounts
   (*see infra* pp. 26-28); and

5. NDHHS received letters and pricing information from manufacturers, including
   Defendants, that belied any misconception that AWP was the average price at which
   providers acquired drugs (*see infra* pp. 29-30).

Nevada cannot show that it knows anything more about AWP today than it did prior to
filing this action, and it cannot show that it would have done anything differently if it had
possessed such knowledge.  There was no deception regarding AWP and the central theory of its
case is simply wrong.

   A.   Nevada's Reimbursement Regime Is Premised On AWP's Being A Benchmark
        Price And Anticipates The Existence Of Spreads.

        1.   *During all relevant times, Nevada Medicaid was aware that AWP
             exceeded acquisition costs and, when it reimbursed on the basis of AWP,
             it did so at a discount.*

Nevada has long understood that as a benchmark price AWP had to be discounted to
reach a reasonable reimbursement measure acceptable to the federal government.  As early as

1969, a Department of Health, Education and Welfare report stated that "[w]here acquisition cost was a factor in [a surveyed state's] reimbursing formula, this was generally presumed to be the listed wholesale price, although it is understood that this list price has little if any relationship to the actual acquisition cost."  NSOF ¶ 23.  When the federal government promulgated Medicaid reimbursement regulations in 1974, it rejected undiscounted AWP as a measure of reimbursement because it was "frequently in excess of actual acquisition costs to the retail pharmacist."  NSOF ¶ 24.  In 1975, the United States Department of Health and Human Services ("HHS") told Nevada that "AWP data are frequently inflated," and urged Nevada and other states to stop reimbursing Medicaid providers on the basis of AWP.  NSOF ¶ 25.

Continuing to admonish the states that undiscounted AWP was not an appropriate measure, HCFA in 1984 sent to State Medicaid agencies, including Nevada's, an HHS-OIG report advising that "[w]ithin the pharmaceutical industry, AWP means non-discounted list price" and "[p]harmacies purchase drugs at prices that are discounted significantly below AWP or list price."  NSOF ¶ 26.  The HHS-OIG report emphasized that "AWP cannot be the best—or even an adequate—estimate of the price providers generally are paying for drugs."  NSOF ¶ 27.  Indeed, the OIG determined that *99.6 percent* of pharmacies' Medicaid-reimbursed drug purchases nationwide were made at prices *below AWP*.  NSOF ¶ 28.  And in 1992, the HCFA *State Medicaid Manual* made clear to states that a state reimbursement formula that did not offer some discount from AWP would be considered presumptively unacceptable by the federal government.  NSOF ¶ 30.

Since at least the 1980s, Nevada has received (and in some instances commissioned) studies showing the magnitude of discounts off AWP available to its providers.  Nevada was well aware that the discounts off AWP available to providers could be substantial, especially for

multi-source drugs.  Since 1984, CMS (and HCFA) have issued over *thirty* reports stating that AWP is not equivalent to actual acquisition cost.  These studies were sent to Nevada and reviewed by Medicaid personnel, published by CCH and read by Nevada Medicaid personnel, discussed among Medicaid pharmacy administrators, and published on CMS's website where Nevada Medicaid personnel viewed them.  NSOF ¶ 33.[12]

Below is a summary of the findings from a sampling of these reports.

- In 1984, HHS-OIG issued a report finding that acquisition costs were averaged 15.93% below AWP.  NSOF ¶ 34.

- In 1986, HCFA provided Nevada with an estimated acquisition cost survey that found Nevada pharmacies realized "an aggregate drug purchase price of 18.85 percent below AWP."  NSOF ¶ 31.  The report also showed that in Nevada "drugs purchased directly from the manufacturer were, in the aggregate, 22.76 percent under AWP while drugs purchased through wholesalers were, in the aggregate, 17.62 percent under AWP."  NSOF ¶ 32.

- In 1996, HHS-OIG conducted a series of studies on pharmacy acquisition cost in randomly-selected states and issued reports finding that nationally AWP exceeded actual acquisition costs by 18.3% for brand drugs and 42.5% for generic drugs.  NSOF ¶ 35.

- In 1997, HHS-OIG issued two reports that summarized the 1996 state studies, estimating that pharmacies pay an average of AWP-42.5% for generic drugs and AWP-18.3% for brand drugs.  NSOF ¶ 36.

- HHS-OIG conducted another series of studies in 2001 and issued reports finding that nationally AWP exceeded actual acquisition costs by 21.84% for brand drugs and 65.93% for generic drugs.  NSOF ¶ 37.

In addition to these federal studies, Nevada also conducted its own surveys of actual acquisition cost.  In 2002, Nevada retained Meyers & Stauffer to analyze Nevada pharmacists' profit margins.  NSOF ¶ 38.  Meyers & Stauffer estimated that, in Nevada,

- AWP exceeded acquisition cost by 19.3% for brand drugs,

---

[12] Indeed, Nevada concedes that "the State does not argue that federal reports were not received by the State and circulated among State Medicaid employees.  This was established via Medicaid employee testimony, and common sense."  State of Nevada's Opposition to Defendants' Joint Motion for Redress for Spoliation of Evidence, Dkt. Entry No. 2961, at 10.

- AWP exceeded acquisition cost by 35.1% for generic drugs without a FUL, and

- AWP exceeded acquisition cost by 83.1% for generic drugs with a FUL.

NSOF ¶ 39.  The State's own study concluded that the AWP for generics with a FUL—using the method of calculating spreads advanced by Nevada's lawyers—exceeded acquisition cost by *on average* 592%.  It is beyond the pale for Nevada to claim it thought AWP was equivalent to an average of acquisition prices, or that it was unaware of "mega-spreads," when its own consultants were advising that AWP exceeded acquisition cost by an average of 592% for a large group of generics.[13]

Nevada Medicaid's receipt, review and consideration of these studies completely belies Nevada's legal position that AWP was understood to be an actual price.  Nevada was not deceived regarding the meaning of AWP, it did not rely on AWP's being an average of wholesale prices, and its provider payment levels were not caused by a misunderstanding regarding the meaning of AWP.  In 1988, Nevada was aware—based on the 1986 HCFA audit of Nevada pharmacies—that acquisition cost was on average about AWP-18.85%, and it adjusted its reimbursement rate from AWP-5% to AWP-10%.

In 2002, aware that acquisition costs were on average about AWP-19.3% for branded drugs, AWP-35.1% for generics not subject to a FUL, and AWP-83.1% for generics subject to a FUL, Nevada adjusted its reimbursement rate from AWP-10% to AWP-15% for both brands and

---

[13] Nevada's knowledge of "mega-spreads" is further confirmed by a September 2002 e-mail sent from Charles Duarte to a Hawaii Medicaid employee:

> NV Medicaid reduced our pharmacy payments to AWP-15%, from 10%,
> effective August 1, 2002.  We've maintained a pretty healthy fill fee at $4.76.
> Be strong, go for the big cuts.  I took a beating in the media from the major
> chains, but I lost sympathy when I heard WalMart buys generics at AWP-
> 90%!!!  Guess what, none of them dropped out.

NSOF ¶ 57.  Mr. Duarte testified that he learned of Wal-Mart's purchasing of generics at AWP-90% in 2001 from former Arkansas Medicaid Director Ray Hanley.  NSOF ¶ 57.

generics.  Moreover, Nevada expected that pharmacists would be profitable at AWP-15%.

NSOF ¶ 82.  Nevada understood that AWP was not an average of wholesale prices and its clear

intent was not to set reimbursement rates at acquisition cost:  each time it changed its formula it

expressly rejected that option.

> 2.      *Nevada's reimbursement of generic drugs is premised on there being a substantial difference between AWP and acquisition cost.*

Nevada's practice of discounting AWP for reimbursement shows that it knew AWP was

not an average of wholesale prices.  Its reimbursement of multi-source drugs at the FUL shows

that it was aware of the vast and unpredictable spreads between AWP and actual acquisition

cost.  For multi-source drugs, the State's own damages expert, Dr. Raymond Hartman, concludes

that the disparity between AWP and acquisition cost is well-documented:

> once a generic launches its AWP usually remains constant (or may
> increase slightly), while the ASP [Average Sales Price] of the drug
> is known to decline precipitously with multiple generic launches
> over time, relative to the pre-generic-launch branded price and, by
> implication, relative to the generic AWP . . . This pattern for
> generics prices is well known and has been well-documented in
> the scientific peer–reviewed literature.

NSOF ¶ 21.  Dr. Hartman concedes that it is well-documented in the peer-reviewed literature

that the generic list price AWP often *remains constant*, while the actual price declines

precipitously.  The large spreads that develop as a result of price competition were well

understood and a function of price competition, not fraud.  The Court's independent expert,

Professor Berndt, concurred:

> I conclude, therefore, the fact that AWP very substantially
> overstates pharmacies' actual acquisition costs for generic self-
> administered drugs has been publicly available information, as has
> the fact that the extent of overstatement has been growing over
> time.

NSOF ¶ 22.  These discounts were so well-known that in 1987 an additional basis for reimbursement, the FUL, was created to account for them.

In establishing the FUL regulatory regime, HCFA deliberately adopted a system that allowed pharmacists to obtain substantial profits on the ingredient cost and expressly rejected a system of reimbursement based on actual acquisition cost.  Prior to 1987, federal Medicaid regulations required that reimbursement of certain multi-source drugs not exceed the federal MAC.  NSOF ¶ 69.  Due to the cumbersome nature of the process by which MACs were set, HCFA in 1986 proposed to the States three potential replacements:  one was based on using the pharmacists' actual acquisition costs, the second was a streamlined MAC system, and the third was what became the FUL.  NSOF ¶ 70.  HCFA expressly rejected the actual acquisition approach, "due to the consensus expressed by many State agencies regarding administrative costs and implementation problems."  NSOF ¶ 72.  Indeed, after considering this proposal, Nevada Medicaid responded to HCFA with a stated preference for the FUL option rather than the actual acquisition cost approach which "has some merit in theory, but in reality would be extremely complicated, expensive and difficult to administer, requiring perpetual data monitoring and updates."  NSOF ¶ 71.  In adopting the FUL, HCFA specifically recognized that the states would be reimbursing drug ingredients at a rate above that for which they may be obtained.  NSOF ¶ 73 ("In a State using the [FUL], pharmacists would be encouraged to purchase as prudently as possible because, in addition to the dispensing fee they receive under existing regulations, they would retain the difference between what they pay for the drug product and the upper limit of payment established by HCFA for the particular drug.")[14]

---

[14] Indeed, the FUL regulations foresaw and condoned the very conduct that the State decries.  *See* NSOF ¶ 74.

Nevada's use of the FUL as one of its criteria for drug reimbursement reflects its understanding of the market reality that there can be significant differences between AWP and market price.  For generic drugs, Nevada reimburses at the FUL if it is lower than AWP-10% (or AWP-15% since 2002).  Thus, each time Nevada reimburses a generic drug with a FUL, it must compare AWP to the FUL.  This simple comparison, performed hundreds of times a day, conclusively shows that AWP bears no formulaic relationship to the FUL, and by implication acquisition cost (pharmacists will not continue to dispense drugs at reimbursement levels that do not cover their costs).  Exhibit B to the Declaration of defense expert Gregory K. Bell, Ph.D., shows the FUL rates and average AWPs for a number of generic drug products in 1996; this chart demonstrates that FULs are often substantially lower than the average generic AWP (the average discount from AWP was 49.1 percent, and the highest such discount was 91.3 percent) and that there is not a consistent relationship between the two measures.  NSOF ¶ 75.  This exhibit shows that Nevada knew of the unpredictable, and sometimes vast, differences between AWP and market prices for generic drugs.  Nevada cannot assert that it thought AWP was an average of wholesale prices when its reimbursement scheme is premised on the fact that it is not, and when the calculation it performs for generic drugs reveals substantial differences between AWP and acquisition cost.

> 3.    *Nevada deliberately reimbursed above acquisition cost to ensure beneficiaries had access to care.*

Although federal law does not set any requirements regarding the reimbursement rate for any specific drug, it does require that "in the aggregate" Nevada's reimbursement rates be sufficiently high so as to guarantee equal access to care for Medicaid beneficiaries.  42 CFR § 447.204.  In setting reimbursement rates, Nevada tried to allow providers a sufficient margin to ensure broad participation by providers, and, thus, to ensure access for Medicaid beneficiaries.

*See* NSOF ¶ 77. [15]   Testifying in his 30(b)(6) capacity, Mr. Duarte agreed that access is a "key

factor" in setting reimbursement rates and that Nevada "monitor[s] complaints related to

problems with access to care." *See* NSOF ¶ 77.  As Mr. Willden, the head of Nevada Medicaid,

testified regarding the 2002 Nevada Medicaid rate change:

> Q.  When Medicaid was contemplating its change in
> reimbursement rate, were you aware of any concerns that the
> reduction in the rate would have an impact on the access to
> prescription drugs?
>
> A.  I would have to say yes.  I recall a discussion of two things
> at the time.  You know, the AWP, you know, minus 10 or minus
> 15, and then also a discussion on fill fee.  There was some
> discussion on what the fill fee would need to be with the
> pharmacy.  And so I remember discussion being that we may not
> have enough pharmacy participation.  So I recall that discussion
> being, you know, if you will, linked.

NSOF ¶ 77.

Nevada's litigation position that reimbursement was supposed to be at acquisition cost

ignores the equal access requirement and the political reality that reimbursement is set at the rate

Nevada can negotiate with its providers.  When Nevada changed its Medicaid reimbursement

---

[15] There are other sound policy reasons for Nevada to reimburse at rates above acquisition cost.  In addition to insuring access for Medicaid beneficiaries and maintaining an adequate provider network, reimbursing above acquisition cost allowed Nevada to cross-subsidize its inadequate dispensing and service fees, and to achieve cost savings by increasing use of generics.  *See* NSOF ¶ 85.

As for cross-subsidization in particular, Nevada Medicaid's payment of the ingredient cost component of its reimbursement rate cross-subsidized, or offset, its underpayment of the other reimbursement rate component, the dispensing fee.  NSOF ¶ 84.  Nevada Medicaid understood, since at least the 1980s, that its dispensing fee was inadequate.  For example, in a 1986 letter, the Deputy Administrator of Welfare (responsible for the Medicaid program) justified Nevada's reimbursement at AWP-5% despite a federal study showing Nevada pharmacists acquired drugs at AWP-18.85%:  "there were costs associated with the dispensing of those drugs that had not been adequately taken into account in the . . . 3.95 dispensing fee that the Nevada Medicaid program authorized."  NSOF ¶ 78.  And Charles Duarte, Nevada Medicaid Director at the time of the 2002 rate change, acknowledged that prior to the 2003 implementation of an electronic point of sale system, Nevada Medicaid's dispensing fee may have been inadequate.  NSOF ¶ 88.

Nevada has not surveyed its providers to learn their costs to dispense or administer drugs since the 1980s, NSOF ¶ 87; however, as set forth in the Gaier Declaration, dispensing fees generally cover only about half of a provider's dispensing costs, especially for Medicaid beneficiaries.  NSOF ¶ 86.  Nevada's payment of the ingredient component was a deliberate effort to offset to some extent these uncompensated costs.  NSOF ¶ 84.

rate in 2002, its rates consultant (Meyers & Stauffer) informed NDHHS that providers were, on average,  acquiring drugs at rates 19.3% below AWP for brand drugs, 35.1% below AWP for generic drugs without a FUL, and 83.1% below AWP for generic drugs with a FUL (discussed *supra* Section II.A.1).  And yet, Nevada Medicaid did not set reimbursement at those levels.  In an e-mail to Mr. Willden, Charles Duarte, current director of Nevada Medicaid, explained that Nevada deliberately set its rates so as to keep providers profitable:

> In their letter, the NACDS suggest that this reduction [from AWP-10 to AWP -15] was taken without any evaluation.  For your information, we initiated this with the support of OIG as well as Tom Scully, CMS Medicaid Administrator.  Mr. Scully, and the OIG, have been urging states to increase the discount up to as high as 21%.  Additionally, we had our rates contractor, Myers and Stauffer conduct a "margin" analysis to look into the continued profitability of pharmacies at the 15% discount level.  I've attached that analysis as well.  As you can see, pharmacies remain profitable at this discount rate.

NSOF ¶ 82.  Nevada did not set its rates mechanically, but negotiated an acceptable rate with the pharmacy lobby and settled on AWP-15% for both brands and generics.  NSOF ¶ 89.[16]

Rather than attempting to reimburse precisely at actual acquisition costs, Nevada Medicaid set a reimbursement rate in 2002 that deliberately balanced the competing factors of trimming the budget and providing access to care for Medicaid beneficiaries.  Nevada Medicaid chose a discount high enough so that it would meet its budget targets, NSOF ¶ 90, but low enough to ensure access for its beneficiaries.  NSOF ¶ 77.

---

[16] A series of May 2002 e-mails written by Ms. Coleen Lawrence, Mr. Charles Duarte, and Ms. Mary Wherry confirms that Nevada Medicaid negotiated the 2002 rate increase with providers and was cognizant of access concerns in doing so.  NSOF ¶ 89.  Moreover, Mr. Duarte testified that Nevada Medicaid first presented pharmacy representatives with AWP-17% as part of their "negotiation strategy."  NSOF ¶ 89.

B.    Nevada Knew That AWP Could Greatly Exceed Acquisition Cost Because
      Nevada Retained Knowledgeable Individuals To Run Its Medicaid And Other
      Pharmacy Programs.

In managing its drug reimbursement program, Nevada Medicaid employed experienced

pharmacists and other knowledgeable individuals who testified that they understood the

difference between AWP and actual acquisition cost and participated in establishing, monitoring

and revising its reimbursement policy and rates.

Charles Duarte, the current Nevada Medicaid Director, understood the difference

between AWP and actual acquisition cost and was aware that Nevada Medicaid's reimbursement

formula leaves pharmacies with a profit.  Mr. Duarte received and reviewed OIG reports

regarding acquisition costs both during his tenure as Hawaii's Medicaid Director (from 1997 to

2000) and during his time at Nevada Medicaid (from July 2000 through the present).  NSOF ¶

56.  At the time he oversaw Nevada Medicaid's 2002 change in its reimbursement rate from

AWP-10% to AWP-15%, he was aware of the 2001 OIG report finding that AWP exceeded

actual acquisition costs by approximately 21% for brand drugs.  NSOF ¶ 80.  As for generic

drugs, Mr. Duarte testified that in 2001 he learned from former Arkansas Medicaid Director Ray

Hanley that Wal-Mart purchased generics at AWP-90%.  NSOF ¶ 57.  Prior to the 2002 rate

change, Mr. Duarte also reviewed the Myers & Stauffer margin analysis study, which estimated

that in Nevada AWP exceeded acquisition cost by 19.3% for brand drugs, by 35.1% for generic

drugs without a FUL, and by 83.1% for generic drugs with a FUL.  NSOF ¶ 81.  In the face of

this information regarding acquisition costs, Mr. Duarte and his staff changed Nevada

Medicaid's discount off AWP merely to fifteen percent, where it stands today.

Moreover, Mr. Duarte testified he understood that, even after Nevada Medicaid changed

its reimbursement rate from AWP-10% to AWP-15%, pharmacists would still be profitable.

NSOF ¶ 82.  Specifically, he understood from the margin analysis study performed by Myers &

Stauffer that pharmacists' general level of profitability would be 3.6% for brand name drugs, 19.3% for multi-source drugs with no FUL, and 9.7 % across all categories of drugs.  NSOF ¶ 83.  There can be no doubt that Mr. Duarte understood that AWP was not equivalent to acquisition cost, that he was aware of substantial discounts off of AWP, and that he knew Nevada Medicaid's reimbursement formula provided pharmacies with a profit margin.

Prior to Mr. Duarte's tenure at Nevada Medicaid, Nevada entrusted the oversight of its Medicaid Pharmacy program to pharmacists who knew that AWPs were pricing benchmarks and not actual averages of wholesale prices.  NSOF ¶ 41.[17]  From 1981 to 1988, Nevada employed Keith MacDonald as its pharmacy consultant and later head of its Medicaid program.  NSOF ¶ 42.  Before coming to work for the State, Mr. MacDonald was a practicing pharmacist for 23 years.  NSOF ¶ 43.  In that role he purchased pharmaceuticals and was familiar with the difference between AWP and his acquisition cost.  Mr. MacDonald knew that AWP was a pricing benchmark and not an actual price.  NSOF ¶ 44.  Indeed, he referred to AWP as "Artificial Wholesale Price."  NSOF ¶ 45.  Mr. MacDonald testified that while at Nevada Medicaid he received and would have been familiar with government studies regarding the differences between AWP and acquisition costs, including a 1984 OIG study stating that acquisition costs were 16% below AWP and a 1986 EAC Survey Report from HCFA showing that pharmacies in Nevada could purchase drugs at 18.85% below AWP.  NSOF ¶ 46.  Based on this information, Mr. MacDonald proposed that the State change its EAC formula from AWP-

---

[17] In addition to employing pharmacists to run his Medicaid pharmacy program, Mr. Willden, the Director of NDHHS and head of the Nevada Medicaid program, had other pharmacists on his staff.  For example, Dr. Emmanuel Ebo, Pharmacy Director for the Nevada Division of Mental Health and Developmental Services ("Mental Health"), has worked for Nevada since 1989.  NSOF ¶ 58.  He manages the pharmacy program and oversees a drug budget of over $20 million.  NSOF ¶ 59.  Dr. Ebo was and is aware of the prices at which drug manufacturers sell because he purchases drugs for use at the state hospitals.  NSOF ¶ 60.  Dr. Ebo was well aware by the early 1990s that AWP was not equal to acquisition cost and in fact referred to AWP as "ain't what's paid".  NSOF ¶ 61.

5% to AWP-10%, which Nevada implemented in 1988. NSOF ¶ 47. Notably, Mr. MacDonald did not propose that the State reimburse at the surveyed acquisition cost, AWP-18.85%.

From 1989 to 2000, Laurie Squartsoff was the pharmacy consultant for Nevada Medicaid. NSOF ¶ 48. Prior to working at Medicaid, Ms. Squartsoff had ten years' experience as a retail pharmacist and as a staff pharmacist for a hospital run by the State of Nevada, where she worked from 1986 through 1989. NSOF ¶ 49. Like Mr. MacDonald and Mr. Duarte, Ms. Squartsoff knew that AWP was a pricing benchmark and not an actual price. NSOF ¶ 50. She testified that she too reviewed and discussed studies regarding AWP and acquisition cost over the course of her employment at Nevada Medicaid. NSOF ¶ 52. Those studies, discussed *supra* Section II.A.1, show it was no secret that acquisition cost was lower than AWP and that the discounts for generics were substantially below AWP. Ms. Squartsoff also had direct knowledge of the actual prices of prescription drugs through the state hospital's participation in a state buying cooperative (Minnesota Multi-State Contracting Alliance for Pharmacy ("MMCAP"), discussed *infra* Section II.C), which contracted directly with manufacturers. NSOF ¶ 53.

The individuals employed by Nevada to administer its Medicaid pharmacy program were not deceived about the relationship between AWP and acquisition cost.

C.    Nevada Knew That AWP Could Greatly Exceed Acquisition Cost Because, Since At Least The 1980's, Nevada Has Been Purchasing The Very Drugs That It Claims Have Inflated AWPs.

Since the early 1990s, NDHHS has purchased drugs for use in state hospitals through a multi-state group purchasing pool called MMCAP.[18] To maximize federal reimbursement for

---

[18] Over thirty Nevada facilities purchase prescription drugs, including facilities run by Mental Health, the Department of Corrections, and the Nevada State University System. NSOF ¶ 62. Nevada entities have purchased through MMCAP since at least May 1992. NSOF ¶ 63. MMCAP negotiates with manufacturers on behalf of its members to achieve low prices on a wide range of pharmaceutical and other medical products. NSOF ¶ 64. Members then purchase drugs directly from wholesalers at the discounted rates. NSOF ¶ 65. The Nevada Purchasing Department has access to MMCAP's catalog of discounted prices, as does every state-employed pharmacist who purchases drugs for his or her organization. NSOF ¶ 66.

these drugs, the hospitals submit claims for certain Medicaid patients to the Medicaid program, and these claims contain the purchase price.  NSOF ¶ 68.  Stated otherwise, one part of Mr. Willden's organization (Division of Mental Health) purchases drugs and submits claims to another part (Medicaid) containing the purchase price.

As a purchaser of drugs, Nevada could not possibly have been deceived or defrauded into believing that AWP was equivalent to acquisition cost.  Nevada was aware of the published AWPs for Defendants' drugs because it used those AWPs for reimbursement, and it was aware of the prices that providers paid for drugs because it purchased drugs.  Nevada Medicaid was not only aware of these differences, but, in the mid-1990s, it considered purchasing drugs through MMCAP and dispensing them through state hospitals, a proposal that was rejected because it would not provide adequate access to beneficiaries.  NSOF ¶ 67.

D.   Nevada Knew That Its Medicaid Program Could Have Reimbursed Providers Less, Because Nevada Was In Fact Reimbursing Providers Less Under Other State-Run Pharmacy Programs.

As director of NDHHS, Michael Willden has direct responsibility for (i) Medicaid's pharmacy reimbursement; (ii) Medicaid's managed care program[19]; (iii) Mental Health's purchase of drugs; and (iv) reimbursement of prescriptions through PBMs retained by the Mental Health, Senior Rx, and Disability Rx programs.  NSOF ¶ 92.  In addition, he is aware of other State programs that reimburse at levels below Medicaid, including the Nevada Public Employees' Benefit Program ("PEBs").  Mr. Willden is aware of the reimbursement rates used by these non-Medicaid programs:

Q.  Mr. Willden, do you need the question read back?

---

[19] Since 1997, the Nevada Medicaid program itself has contracted out half of its benefit program to health maintenance organizations ("HMO"s), including Nevada Care and Sierra Health Systems.  These HMOs either directly reimburse for drugs or sub-contract the pharmacy benefits services to pharmacy benefit managers ("PBM"s).  NSOF ¶ 96.

-26-

> A.   No.  If I recall right, you were wanting to know how we paid for the drugs in the Senior Rx and the Catalyst Rx program . . . . And then the discounts that Catalyst is providing to the state. Mail brand, 23 percent off AWP, mail generics, 55 percent off AWP . . . .

NSOF ¶ 94.

Nevada knew that it could have—if it chose—reimbursed Medicaid providers at greater discounts off AWP because it was in fact doing so under these other programs.[20]  Since at least 1996, the State has retained and used the services of PBMs and insurers to administer these other state programs.[21]  Nevada's PBMs and insurers have reimbursed at rates far below the Medicaid reimbursement rate:  PEBs (1996) generics AWP-45%;  PEBs (1998) branded AWP-20.5%, generics, AWP-55%; Senior Rx (2004) generics AWP-55%.  NSOF ¶ 97.  Through its administration of these other programs, Nevada knew the reimbursement rates that private payors used.  NSOF ¶ 98.[22]

To assist it in contracting with its PBMs, Nevada engaged the services of health benefit consultants including Segal and Aon Consultants.  NSOF ¶ 99.  These consultants assisted Nevada in preparing sophisticated RFPs that demonstrate Nevada's detailed understanding of

---

[20] Axiomatically, Nevada also knew that providers acquired drugs at discounts off AWP that were at least as great as these programs' reimbursement formulae.  No provider would voluntarily participate in a program that reimbursed at AWP-55%, if that provider's acquisition cost was greater than AWP-55%.

[21] The PEBs program retained Merck-Medco from 1996 through 2001, and Catalyst Rx from 2002 to the present.  NSOF ¶ 95.  Senior Rx used Fidelity Security Life Insurance Company until 2005 and then switched to Catalyst Rx.  NSOF ¶ 95.  Disability Rx has used Catalyst Rx since 2006.  NSOF ¶ 95.  Mental Health has used Catalyst Rx to provide a portion of its outpatient pharmacy service for the past seven years.  NSOF ¶ 95.

[22] Remarkably, both the Governor and former Attorney General Frankie Sue del Papa—the very individual who initiated this lawsuit—were aware of the lower reimbursement rates used by these non-Medicaid Nevada programs.  Indeed, the PBM contracts for PEBs and other State programs – which in 1996 list reimbursement rates as low as AWP-45% – were reviewed and approved by the Board of Examiners, which consists of the Governor of Nevada, the Attorney General, and the Secretary of State.  NSOF ¶ 102.  Thus, at the same time the Attorney General asserts that AWP was understood as an average of wholesale prices, she was approving (and members of her staff were signing) contracts that reimburse at AWP-55%.

how AWP was used in the pharmaceutical world.  Nevada's RFPs have requested that bidders

submit:

- Drug pricing information, given as "AWP less ___ %," for both branded and generic drugs, retail and mail order.  NSOF ¶ 100.

- The ingredient cost for the drugs most frequently reimbursed by the program. NSOF ¶ 100.

- A statement of the amount each potential PBM reimbursed for generic drugs, in terms of a discount off AWP.  The State has not produced the 1995 bids; however the 1998 winning bid from the same contractor (Merck Medco) reported that its MAC program reimbursed generics at AWP-52%.  NSOF ¶ 100.

When Nevada was unsatisfied with the discounts proposed by bidding PBMs, it

negotiated further reductions.  For example, in negotiating its 2005 Senior Rx reimbursement

contract, Nevada sent a letter to its vendor stating: "Catalyst Rx has proposed a 50% discount off

AWP for generics.  The State of Nevada is proposing a 55% discount off AWP for generics."

NSOF ¶ 101.  Far from being duped, the State understood AWP was a benchmark and

negotiated for deeper discounts, such as AWP-55%, as would any sophisticated market

participant.  Nevada's negotiating position—that the State "is proposing a 55% discount off

AWP for generics"—refutes its lawyers' litigation position, that AWP was an actual average of

market prices.[23]

---

[23] Since at least 1995, the Nevada Medicaid program has been actively monitoring the reimbursement formulas of other Nevada programs, other states' Medicaid programs and Nevada third-party payors.  Nevada Medicaid pharmacy consultant Laurie Squartsoff testified that she was *periodically* asked to provide such information to her boss, Social Services Chief Peggy Epidendio, and a memo prepared by Ms. Squartsoff in 1995 lists Nevada Worker's Compensation program reimbursement for generic drugs at a rate of AWP-40% (at a time when Medicaid reimbursed generics not subject to the FUL at AWP -10%).  NSOF ¶¶ 103, 104.  In addition, since at least 1999, Nevada Medicaid employees have participated in e-mail groups with pharmacy managers from other states through which they share information regarding reimbursement.  NSOF ¶ 105.  For example, a March 5, 2002, e-mail informed Coleen Lawrence, the Social Services Chief primarily responsible for Nevada Medicaid's prescription drug reimbursement, that Washington State was changing its reimbursement rate to AWP-50% for multi-source drugs as a result of a recent OIG study.  NSOF ¶ 106.

E.    Nevada Knew That Defendants Were Not Representing That AWP Was
Equivalent To Provider Acquisition Cost, Because Several of the Defendants
Communicated This Knowledge Directly To The State.

Defendants had no role in establishing Nevada Medicaid's reimbursement system.

Nevada chose to base reimbursement on AWP.  Nevada chose the applicable discount.  Nevada

did not consult with Defendants.  Indeed, the only pre-suit communications between Defendants

and Nevada Medicaid regarding reimbursement involved (i) certain Defendants' sending pricing

letters to Nevada showing their actual sales data—which demonstrated that neither AWP nor

AWP-10% was equivalent to acquisition cost; and (ii) some Defendants' sending letters

expressly disavowing that AWP was equivalent to or related to providers' acquisition costs.  For

instance, Dey, L.P. (a defendant in Nevada I) wrote to Nevada on June 13, 2000, that "AWP has

no consistent governmental definition, so far as we are aware, except that it is clearly not

understood to represent any actual net selling or market price."  NSOF ¶ 107.  Similarly,

Warrick Pharmaceuticals ("Warrick") wrote to Nevada on June 21, 2000, that

> Warrick understands, as it believes the entire pharmaceutical
> industry and the Federal and State governments understand, that
> AWP is in the nature of a "list" price set at the time of product
> introduction. . . . Warrick has never understood that AWP reflects
> the actual wholesale prices at which all sales of its drugs are
> transacted.  Warrick would be astonished if anyone else in the
> pharmaceutical business, either buyer or seller, has such an
> understanding, as it has long been widely understood, including by
> the Federal and State governments, that AWP does not reflect
> actual prices at which transactions occur, but is in the nature of a
> list price.

NSOF ¶ 108.

Not only did Defendants tell Nevada that AWP was not equivalent to provider

acquisition cost, but several Defendants reported their actual sales data to the State.[24]  NSOF ¶

---

[24] To report AWP as an average of wholesale prices would necessarily require that Defendants investigate those
prices, report the results of that investigation, and then enforce the prices it reports, in markets where prices would

109.  Some Defendants submitted their actual average sales prices (ASPs) while others sent a range of prices at which they made sales, NSOF ¶ 109; even though this information clearly showed Nevada that there is a difference between AWP and actual acquisition costs, Nevada Medicaid's officials made no effort to change their reimbursement scheme in light of these prices and, to date—years after the State initiated this action—it continues to base reimbursement on AWP.  NSOF ¶ 110.[25]  Nevada's continued reimbursement on the basis of AWP after its receipt of Defendants' actual sales data belies any implication that Nevada was deceived regarding the reimbursement of Defendants' drugs.

F.    Nevada Continues Today To Use AWP As A Basis For Reimbursement.

Nevada filed this action in 2002.  More than five years after it alleged that there was a "scheme" to inflate AWP and cause the State to overpay for prescription pharmaceuticals, Nevada still does not reimburse at acquisition cost.  Moreover, Nevada has taken no steps to recoup its alleged overpayments from the individuals it alleges that it overpaid:  Nevada pharmacists and physicians.

Nevada's actions during the past four years—with full knowledge of the alleged "fraud"—demonstrate conclusively that its reimbursement regime operated throughout the alleged damages period as intended.  From its interactions with the federal government decades ago right up to its actions after filing the instant action, Nevada has made clear in both word and

---

otherwise change constantly (lest Defendants be hauled into court again for making false or misleading statements). But that is the essence of vertical price fixing and resale price maintenance that violates federal antitrust laws. *United States v. Colgate & Co.*, 250 U.S. 300 (1919); *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911).

[25] Additionally, since at least 1991, Nevada had the ability to determine multi-source drugs' Average Manufacturer's Prices, or "AMPs," which reflect all discounts received by customers in the retail distribution chain. The Omnibus Budget Reconciliation Act of 1990 required that, beginning on January 1, 1991, drug manufacturers make available to all states a rebate for drugs reimbursed under Medicaid.  The rebate was initially set at 10% of the Average Manufacturer's Price ("AMP") for a drug.  *See* OBRA '90.  On January 1, 1994, the rebate amount was increased to 11 percent.  *Id.* at § 1396r-8(c)(3)(B).  Given its access to the rebate amounts, Nevada Medicaid possessed all the information it needed to determine each individual manufacturer's drugs' average prices including discounts, which the State could have used as a comparator to the published AWPs.

deed that it does not understand AWP to be an average of the prices at which providers obtain drugs from wholesalers.  That fact, in and of itself, renders futile Nevada's claims that it has somehow been deceived or defrauded.

III.   NEVADA'S STATUTORY MEDICAID FRAUD CLAIM FAILS AS A MATTER OF LAW (COUNT V).

Nevada's allegations cannot be shoehorned into the State's Medicaid Fraud statute (Nev. Rev. Stat. §§ 422.540 and 422.580).[26]  Even if they could be, there is no evidence, much less the clear and convincing evidence required for an action sounding in fraud.  *See Lubbe*, 540 P.2d at 115.  The State must show, under the statute, a person who (1) with intent to defraud (2) knowingly (3) made a false statement or representation, (4) for use by another in obtaining goods or services pursuant to the Plan, and (5) by reason of the false statement or representation (6) that person received a payment to which he was not entitled.  *See* Nev. Rev. Stat. §§ 422.540(1)(c), 422.580.  Nevada has *no* evidence to support such elements, let alone demonstrate them to a clear and convincing degree.

A.   <u>No Defendant With Intent To Defraud Made Any Knowingly False Statement Or Representation Concerning AWP</u>

As goes almost without saying, Nevada cannot maintain an action in fraud without demonstrating a statement that is actually untrue.  *Cf. Newton v. Uniwest Fin. Corp.*, 802 F. Supp. 346, 355 (D. Nev. 1990) (granting summary judgment where plaintiff failed to establish existence of false representations).  The State cannot demonstrate that Defendants' reported AWPs were "false" because there is no evidence to support the contention that AWP means an "average of the wholesale prices."  *See supra* p. 4.  Further, to show fraud, Nevada would need evidence of an intentional misrepresentation.  *See, e.g., Forect v. E.I. Du Pont de Nemours &*

---

[26] Although the complaint asserts claims under Nev. Rev. Stat. § 422.540(1)(a)-(d), *see* NV Am. Compl. ¶¶ 468-477, the claims under sections (a), (b), and (d) were premised on plaintiffs' "Best Price" theory, which has been dismissed as to all Defendants except AstraZeneca and Pfizer.

*Co.*, 792 F. Supp. 1460, 1470 (D. Nev. 1992).  Assuming arguendo that Nevada Medicaid

required AWP to equal an average of wholesale prices, the State has no evidence that any

Defendant knew Nevada Medicaid used AWP in that manner, or that it was required to report it

as such.  Axiomatically, if Defendants did not know they were supposed to report AWPs as

actual prices, any false statements were not "knowing"; nor could they have had the requisite

"intent to defraud."  Thus, Nevada cannot show that any Defendant with "intent to defraud"

made a "knowing[ly]" false statement or representation.

  B.  <u>No Person Used AWP To Obtain Goods Or Services Pursuant To The State
    Medicaid Plan.</u>

  Section 422.540(1)(c) is also inapplicable because Defendants' AWPs were not used to

"obtain[] goods or services pursuant to the [State Medicaid] plan."  Nevada Medicaid used AWP

to reimburse providers, NSOF ¶ 12, unrelated to the provision of any goods or services pursuant

to the Plan.  The State Medicaid Plan identifies all goods and services it offers.  Reimbursement

to providers is not identified as such a good or service, but as a payment.  NSOF ¶ 13.  The

Medicaid Fraud statute does not apply to a claim regarding the rate at which Medicaid chooses

to reimburse providers.

  C.  <u>Defendants Are Not Liable For Penalties Under The Statute Because They Are
    Not Providers Who Received Payments To Which They Were Not Entitled.</u>

  Nevada brings its claim for penalties and damages pursuant to Nev. Rev. Stat. § 422.580,

which provides penalties for a "provider who receives payment to which he is not entitled."  The

Court should grant Defendants' motion for summary judgment as to this claim because the

Nevada Medicaid Fraud statute is addressed to the conduct of *providers*, not *manufacturers*.  The

Nevada Medicaid Fraud statutes at issue here (which were adopted simultaneously, *see* 1991

Nev. Stat. 1049-50) include both civil penalties and criminal fines.  *See* Nev. Rev. Stat. §§

422.540, 422.580.  Nevada's long-held principle that penal statutes must be construed strictly

holds true even where, as here, the statutes at issue have both civil and criminal aspects. *Orr Ditch & Water Co. v. Justice Court of Reno Twp.*, 178 P.2d 558, 570 (Nev. 1947). The Nevada statutes define providers as (1) those who have "applied to participate or who participate[] in the [state Medicaid] plan as the provider of goods or services" or (2) entities "who contract[] to provide or provide[] goods or services that are reimbursement by or are a required benefit of the plan." Nev. Rev. Stat. § 422.490. There is no record evidence that any Defendant "participates" in Nevada's Medicaid Plan in the sense that it "take[s] part in" the plan. *See* American Heritage Coll. Dict. 995 (3d ed. 2000). Nor can Defendants be understood to provide goods reimbursed by the plan. Defendants sell drugs (sometimes to wholesalers and sometimes directly to pharmacies) and are paid directly by the wholesalers and pharmacies without ever knowing whether the drugs will even be dispensed to Medicaid recipients. Narrowly drawn as a penal statute, the Medicaid Fraud statute cannot be construed reasonably to reach Defendants.

Moreover, no Defendant received a "payment to which [it] was not entitled," Nev. Rev. Stat. § 422.580(1), and indisputably no such payment came from Medicaid. Nevada Medicaid did not purchase drugs directly from Defendants, but reimbursed its providers. NSOF ¶ 12. Nev. Rev. Stat. § 422.580 makes liable only those individuals who actually received a "payment," in an amount more than they were supposed to receive. In this case, Nevada readily concedes the allegedly inflated payment was paid to providers. NV Am. Compl. ¶¶ 8, 15, 476-77. A payment is "something that is paid: something given to discharge a debt or obligation or to fulfill a promise," Webster's Third New International Dictionary, at 1659 (1993), which under no reasonable reading could encompass market share or profits. The only thing paid to Defendants were the prices for its drug sales, which Nevada has not and can not show were in

any way "inflated" or sales that any of the Defendants would not have received absent the alleged fraud.

IV.   NEVADA'S DECEPTIVE TRADE PRACTICES ACT CLAIMS FAIL AS A MATTER OF LAW (COUNTS I, II, AND III).

Aside from the glaring fact that Nevada was never actually deceived or misled by any of the Defendants, its claims for relief independently fail because Nevada is legally barred from the remedies it seeks under the DTPA.

A.   The Attorney General Has No Authority Under The DTPA To Bring *Parens Patriae* Claims (Count I).

Nevada first requests restitution under the DTPA on behalf of Nevada residents.  NV Am. Compl. ¶ 21.  However, the powers of Nevada's Attorney General are strictly limited, *Att'y Gen. v. Eighth Jud. Dist. Court*, 844 P.2d 124, 125 (Nev. 1992); *Ryan v. Eighth Jud. Dist. Court*, 503 P.2d 842, 844 (Nev. 1972), and no language in the DTPA grants the Attorney General the authority to proceed in a *parens patriae* capacity on behalf of the residents of Nevada.  Under Nevada law, if a statute includes a specific remedy, "courts should be cautious in reading other remedies into the statute."  *Builders Ass'n of N. Nev. v. City of Reno*, 776 P.2d 1234, 1235 (Nev. 1989).  The Court should be especially cautious here where the legislature has expressly granted the Attorney General the right to proceed as *parens patriae* in the context of other consumer protection statutes.  *Compare* Nev. Rev. Stat. § 598.0903 et seq. (DTPA), *with* Nev. Rev. Stat. § 598A.160 (the Unfair Trade Practice Act, which addresses anti-competitive behavior, granting the Attorney General authority to recover damages "as *parens patriae*"); *cf. Advanced Sports Information, Inc. v. Novotnak*, 956 P.2d 806, 809 (Nev. 1998) (court can consider related statutes in statutory construction).  The carefully defined powers granted to the Attorney General under the Unfair Trade Practices Act contrast sharply with the powers the Attorney General claims in bringing this action under a statute that does not even mention *parens patriae* actions.

Where the Nevada legislature *has* empowered the Attorney General to bring *parens patriae* actions, it has done so with procedural safeguards that require the Attorney General to notify citizens that an action is being brought on their behalf and permit them an opportunity to opt out.  *See* Nev. Rev. Stat. § 598A.160.  To allow the Attorney General to proceed without such safeguards would deprive Nevada citizens of their right, guaranteed by the due process clause, to notice that the State's attorneys propose to litigate or compromise their personal rights of action.  *See Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 486 (1988) (noting that a claim is a property right);  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (requiring notice when one person purports to litigate property rights on behalf of another).  The Nevada legislature did not contemplate, nor should this Court tolerate, the Attorney General's attempt to sponsor a quasi-class action with no lead plaintiff, no certified class, and no Rule 23 protections.

B.      Nevada Cannot Recover Restitution Under The DTPA (Counts I & III).

Likewise, the Nevada legislature did not intend to entitle Nevada to restitution under the DTPA (whether for itself or others).  The section of the DTPA that Nevada relies on in this action does not authorize restitution; and if it did any restitution would be due from Nevada providers (pharmacists and doctors) and not Defendants.

1.      *Nev. Rev. Stat. § 598.0963(3) does not provide for restitution.*

Because this action is brought by the Attorney General, it necessarily must be an action under Nev. Rev. Stat. § 598.0963(3).[27]  That section does allow the Attorney General to bring an

---

[27] Under the DTPA, there are only two types of actions that may be brought by the Attorney General: an action under Nev. Rev. Stat. § 598.0963(3) or an action under Nev. Rev. Stat. §598.099.  This clearly is not an action under Nev. Rev. Stat. § 598.099 because Nev. Rev. Stat. § 598.099 is a provision for *ex parte* injunctive relief;  it permits the Attorney General to institute an action for injunctive relief and bypass the notice requirements of Nev. Rev. Stat. § 598.0963(3), but only "upon proof of specific facts shown by affidavit or by verified complaint or otherwise that . . . immediate harm will be or is likely to be caused by the delay" of following Nev. Rev. Stat. § 598.0963(3).  Nev. Rev. Stat. § 598.099 contemplates an injunction *without prior notice*.  The State has not sought

action "*in the name of the State of Nevada,*" Nev. Rev. Stat. § 598.0963(3) (emphasis added);

however, the remedies under Nev. Rev. Stat. § 598.0963(3) are limited.  The Attorney General

may only seek "to obtain a temporary restraining order, a preliminary or permanent injunction,

or other appropriate relief."  *Id*.  Nev. Rev. Stat. § 598.0963(3) does not provide for restitution.

*See State ex rel. Att'y Gen. v. NOS Communications, Inc.*, 84 P.3d 1052, 1053 (Nev. 2004)

("Nev. Rev. Stat. § 598.0963(3) provides that the Attorney General's Office may bring an action

for *injunctive relief* against a person engaging in a deceptive trade practice.") (emphasis added).

In its Complaint, Nevada casually refers to Nev. Rev. Stat. § 598.0993 as authority for seeking

restitution, but that section permits equitable restitution only if an action is brought under Nev.

Rev. Stat. § 598.099 or other provisions inapplicable here.  It does not apply to actions brought

under Nev. Rev. Stat. § 598.0963(3).

> 2.     *Nevada impermissibly seeks damages under the guise of "restitution."*

Even if the "other appropriate relief" language in Nev. Rev. Stat. § 598.0963(3)

somehow encompassed restitution Nevada still could not recover the damages it seeks by merely

labeling its claim as one of "restitution."  "[F]or restitution to lie in equity, the action generally

must seek not to impose personal liability on the defendant, but to restore to Plaintiff particular

funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v.

Knudson*, 534 U.S. 204, 214 (2002).  As the Supreme Court explained further:

> [W]here the property sought to be recovered or its proceeds have been dissipated
> so that no product remains, the plaintiff's claim is only that of a general creditor,
> and the plaintiff cannot enforce a constructive trust of or an equitable lien upon
> other property. . . . Thus, for restitution to lie in equity, the action generally must
> seek not to impose personal liability on the defendant, but to restore to the
> plaintiff *particular* funds or property in the defendant's possession.

---

*ex parte* relief; nor has it attempted to comply with the requirements of Nev. Rev. Stat. § 598.099:  (i) allege
"immediate harm," (ii) file a verified complaint or affidavit, (iii) put forth any specific facts as proof of such harm
and (iv) allege this is an action without prior notice, as contemplated by Nev. Rev. Stat. § 598.099.  Nev. Rev. Stat.
§ 598.099 is inapplicable here.

*Id.* at 213-14 (internal citations, brackets and quotations omitted) (emphasis added).

Nowhere in the Amended Complaint does Nevada speak to money or property belonging to the State that could be traced to particular funds or property in Defendants' possession. Quite the contrary, if the State were to trace the funds that it has paid out, it would not find them in the coffers of drug manufacturers. The supposedly inflated payments were made to *providers*, from whom the State has never even attempted to seek recovery.

C.   The Civil Penalties Sought Are Not Permitted By Statute And Are Unsupported By The Evidence (Counts I, II, and III).

1.   *The DTPA does not allow penalties for Count II.*

Defendants are entitled to summary judgment on Count II because the DTPA does not authorize the Attorney General to seek civil penalties for actions brought under Nev. Rev. Stat. § 598.0963(3). Nevada asserts that it may seek penalties pursuant to Nev. Rev. Stat. § 598.0973. NV Am. Compl. at 122. But Nev. Rev. Stat. § 598.0973 states, "[i]n any action brought pursuant to Nev. Rev. Stat. § 598.0979 to 598.099, inclusive, if the court finds that a person has engaged in a deceptive trade practice directed toward an elderly or disabled person, the court may, in addition to any other civil or criminal penalty, impose a civil penalty of not more than $10,000 for each violation." As discussed earlier, the DTPA claims alleged by the Attorney General are not brought pursuant to any of the sections from Nev. Rev. Stat. § 598.0979 through 598.099, but, rather, are brought under Nev. Rev. Stat. § 598.0963(3).[28]

2.   *Nevada cannot establish that any violation was willful.*

The State also seeks civil penalties pursuant to Nev. Rev. Stat. § 598.0999 under Counts I and III. To obtain penalties, the State must prove that Defendants willfully engaged in the

---

[28] Even if such penalties were available here, as a predicate for imposing the non-mandatory civil penalties the court must first find evidence that Defendants' deceptive trade practices were "directed toward an elderly or disabled person." Nev. Rev. Stat. § 598.0973. There is no evidence to support such a finding and Nevada's damages expert, Dr. Hartman, has not calculated any such penalties. Indeed, the Amended Complaint itself counters the State's theory that the conduct at issue was directed towards the elderly. *See* NV Am. Compl. ¶ 129.

deceptive trade practice.  Nev. Rev. Stat. § 598.0999(2).  To establish willfulness Nevada must establish both that Defendants' AWPs were false and that Defendants knew they were false. Nevada cannot establish that the Defendants' AWPs were false.  *See supra* pp. 4; 31-32. Moreover, Nevada cannot prove that Defendant knew it was to calculate and report its AWPs in the manner Nevada now says that they should have been calculated.  *See supra* pp. 31-32.

## V.   THE APPLICABLE STATUTE OF LIMITATIONS BARS NEVADA'S CLAIMS OF DECEPTION AND FRAUD.

The foregoing demonstrates that Nevada failed to clear the bar set by the Federal Rules for moving to trial.  The record developed during discovery reveals also that any claims that otherwise might survive summary judgment are barred by the statute of limitations.  Nevada's 25-year knowledge regarding the difference between AWP and acquisition cost and its conscious decision to set reimbursement above acquisition cost are fatal to all of its claims.

Nevada's claims in this case, based on deceptive trade practices and Medicaid fraud, are subject to a four-year statute of limitations.  *See* Nev. Rev. Stat. § 11.190(2)(d); Nev. Rev. Stat. § 422.590 (with the cause of action accruing upon the discovery of the facts constituting the deceptive trade practice or fraud).[29]  Nevada contends that Defendants are liable because the AWPs for their drugs did not represent an "average of the wholesale prices," but greatly exceeded that measure and had little or no relationship to any purchase price by a provider.  NV Am. Compl. ¶ 7.  If Nevada's litigation position that such conduct gives rise to liability is correct, then the clock on when to bring that action began ticking long, long ago—well before the date four years prior to the March 7, 2002 filing date.  By no later than 1996, Nevada was not

---

[29] To the extent the State seeks civil penalties under the Medicaid Fraud statute and the DTPA, those are subject to a two-year statute of limitations pursuant to Nev. Rev. Stat. § 11.190(4)(b).

only on inquiry notice,[30] but was in fact fully aware of the facts it now claims give rise to

liability:

- In 1986, the State Medicaid program received a report from the federal government that stated that Nevada pharmacies realized "an aggregate drug purchase price of *18.85 percent below AWP*."  NSOF ¶ 31 (emphasis added).  It implemented a change in rates several years later from AWP-5% to only AWP-10%.  NSOF ¶ 76.

- Since at least the late 1980s, NDHHS has purchased the very drugs regarding which it claims it was defrauded, and thus had knowledge of actual acquisition costs.  NSOF ¶ 63.

- Since 1987, Nevada received FUL prices side-by-side with the AWPs for drugs, which showed that AWP significantly exceeded the cost at which providers were acquiring the lowest priced generically equivalent drug.  NSOF ¶ 75.

- Since 1996 at the latest, the State Medicaid program was aware that other Nevada agencies were reimbursing drugs at *AWP-45%.*  NSOF ¶ 97 (emphasis added).

- In 1996, Nevada Medicaid received a report from the federal government that stated that nationally *AWP exceeded actual acquisition costs on average by 18.3% for brand drugs and 42.5% for generic drugs*.  NSOF ¶ 35 (emphasis added).  It did not change its rates.

Nevada had an obligation to use reasonable diligence and investigate this information.

*See, e.g.*, *Bemis*, 967 P.2d at 440.  It did not investigate because Nevada knew exactly what it

was doing: reimbursing providers not at their acquisition cost but at more than their acquisition

cost, to ensure sufficient access to drugs for State Medicaid beneficiaries.  *See supra* Section

II.A.3.  Defendants should be granted summary judgment on all claims pursuant to Nevada's

statue of limitations.

---

[30] Ignorance regarding the existence of facts that constitute the cause of action does not preclude the operation of the statute of limitations.  It begins to run from the discovery of facts which in the exercise of proper diligence would have enabled Plaintiff to learn of the cause of action.  *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1306-07 (9th Cir. 1992) (quoting *Howard v. Howard*, 239 P.2d 584, 589 (Nev. 1952); *Bemis v. Estate of Bemis*, 967 P.2d 437, 440 (Nev. 1998); *Sierra Pac. Power Co. v. Nye*, 389 P.2d 387, 390 (Nev. 1964).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant summary judgment against the State of Nevada on all of its claims, and award such further relief as the Court deems appropriate under the circumstances.

*Respectfully submitted on behalf of Nevada II Defendants,*

    /s/   Christopher R. Dillon
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
Carisa A. Klemeyer (BBO# 655045)
ROPES & GRAY LLP
One International Place
Boston, MA  02110
(617) 951-7000

*Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation*

Dated:  February 8, 2007

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher R. Dillon, hereby certify that a true copy of the foregoing document was served upon all counsel of record electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 8th day of February, 2007, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.


       /s/   Christopher R. Dillon