UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs., Inc., et al.*,<br>D. Mont. Cause No. CV-02-09-H-DWM<br><br>*State of Nevada v. American Home Products Corp., et al.*,<br>D. Nev. Cause No. CV-N-02-0202-ECR | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

### DECLARATION OF GREGORY K. BELL, PH.D.

### SUBMITTED IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**February 8, 2007**

1. My name is Gregory K. Bell. I am an Executive Vice President at CRA International ("CRA"), an economics and management consulting firm. My education includes a master's of business administration and a doctorate in business economics, both from Harvard University. Details of my professional experience, publications, and past testimony are described in my curriculum vitae, a copy of which is attached as Exhibit A. CRA receives compensation for my time at a rate of $700 per hour. Neither CRA nor I has any financial interest in the outcome of this litigation.

2. For the past twelve years, I have directed the Pharmaceuticals practice within the Business Consulting platform at CRA. In this capacity, I have led many projects concerning the economics of business strategy in the pharmaceutical industry. Most of my work has focused on product pricing, contracting strategy for managed care organizations and hospitals, influences on physician prescribing behavior, and product launch strategy. In addition, I have submitted numerous expert reports and given testimony in a wide range of cases involving patent disputes, licensing, antitrust and other issues in the pharmaceutical industry. As a result of my experience as both a consultant to pharmaceutical companies and an expert witness in litigation matters, I have developed a familiarity with relevant aspects of the industry bearing on economics or business strategy.

3. With respect to *In re Pharmaceutical Industry Average Wholesale Price Litigation* (the "AWP litigation"),[1] Professor Fiona Scott Morton (Professor of Economics at the Yale School of Management and an expert on the economics of the pharmaceutical industry) and I prepared an expert tutorial entitled, "An Orientation to the Acquisition of and Reimbursement for Prescription Drugs," submitted on December 3, 2004 ("Tutorial") on behalf of the Track 1 Defendants, and I provided testimony to the Court on December 7, 2004, in connection with that Tutorial. I also submitted expert reports on behalf of the Track 1 Defendants dated March 22 and November 26, 2006, and on behalf of Bristol-Myers Squibb, dated March 15 and November 17, 2006; I testified at trial on November 28, December 7, and December 8, 2006. Additionally, I submitted a report on behalf of certain defendants on class certification in *Robert J. Swanston v. TAP Pharmaceutical Products, Inc., et al.* (Cause No. CV2002004988, State of Arizona), as well as affidavits on behalf of defendant Roxane Laboratories, Inc. in *State of Connecticut v. Dey Inc., et al.* (Docket No. TTD-X07-CV-03 0083296S),

---

[1] MDL No. 1456, Civil Action No. 01-12257-PBS, United States District Court of Massachusetts.

on behalf of defendant Pharmacia Corporation in *State of Connecticut v. Pharmacia Corporation* (Docket No. X07 CV03-0083297 S), and on behalf of certain defendants in *State of Alabama v. Abbott Laboratories, Inc., et al.* (Civil Action No. 2005-219, Circuit Court of Montgomery County).

4. I have been asked by counsel for the Defendant manufacturers to supply this declaration in support of their motions for summary judgment in connection with: *State of Montana v. Abbott Labs., Inc., et al.*, D. Mont. Cause No. CV-02-09-H-DWM, and *State of Nevada v. American Home Products Corp., et al.*, D. Nev. Cause No. CV-N-02-0202-ECR.

## I. PHARMACEUTICALS AT ISSUE AND THEIR PRICING

5. The pharmaceutical products at issue can be classified along two dimensions: whether they are self- or physician-administered, and whether generic versions of a branded product are available. Each of these characteristics can affect the pricing, price concessions, and distribution of the drug in question.

6. The first dimension that differentiates drugs is the manner by which drugs are administered. In general, self-administered drugs ("SADs") are dispensed by retail pharmacies,[2] mail order pharmacies, or hospital pharmacies, and the patient is responsible for taking the drug.[3] Alternatively, physician-administered drugs ("PADs") are commonly dispensed by physicians, who are also responsible for administering these drugs to their patients.

7. Most of the drugs sold in the United States are self-administered and dispensed through pharmacies, which generally purchase pharmaceutical products from wholesalers or directly from manufacturers. In the case of SADs, a patient receives a prescription for a given drug from his or her physician, takes the

---

[2] I include pharmacy sections of food, mass-merchant, and other retail establishments under the term "retail pharmacies."

[3] There are a few self-administered drugs for which the mode of administration is injection.

prescription to a pharmacy, and obtains the drug from the pharmacy.[4] The pharmacy may then be reimbursed by the third-party payor ("TPP") according to the patient's insurance coverage.

8. PADs are not generally distributed through retail pharmacies, although in some cases patients may acquire physician-administered drugs from retail pharmacies and bring them to a physician's office for administration (a process known as "brown-bagging"). Rather, physicians typically purchase PADs from a wholesaler or specialty distributor, administer them to patients, and receive reimbursement from the TPP, a process known as "buy & bill."

9. Drugs are also typically classified as single- or multi-source. Single-source, or "branded," drugs are sold under a brand name, are typically available from only one company, and are generally patent-protected.[5] Multi-source drugs are those for which generic equivalents are available, because these are not patent-protected and are available from multiple companies.[6]

10. Manufacturers of single-source SADs compete to be the product prescribed by a physician and reimbursed by a TPP.[7] Retail pharmacies generally must dispense prescriptions for single-source SADs as written.[8] Pharmacists do not expect to receive price concessions on these purchases and manufacturers do not normally offer them. Because pharmacists have little or no ability to influence market

---

[4] The patient may be required to make a co-payment or co-insurance payment to the pharmacy.

[5] Single-source drugs are also referred to as innovator products. Patent-protected drugs can only be manufactured and sold by the patent holder or under a license from the patent holder.

[6] Generic drugs are usually not sold under a trade name, but rather under the name of the active ingredient.

[7] TPPs benefit from this competition by receiving rebates from the drug manufacturers in order for a specific drug to be placed in a preferred position on the formularies used to influence prescribing practices for the members of the health plans administered by the TPPs. Physicians, however, are not involved in the financial aspects of SAD transactions.

[8] No states allow a pharmacist to substitute a therapeutic alternative (i.e., a different drug (chemical compound) approved by the Food and Drug Administration to treat the same condition); a physician first would have to write a new prescription if a retail pharmacy were to dispense an alternative single-source SAD to a patient.

share for single-source SADs, it would not make sense for manufacturers to attempt to increase the difference between AWP and acquisition cost (i.e., the "spread") on these drugs to benefit the pharmacists, as I understand the Plaintiffs are alleging.[9]

11. Manufacturers of single-source PADs that do not face significant therapeutic or generic competition generally have no incentive to offer significant price concessions on their products. As with single-source SADs, single-source PADs may face competition from other products in the same therapeutic category. In these situations, those purchasers that can influence market share, including dispensing physicians, gain leverage in negotiating price concessions. Physician office practice characteristics such as size and reputation affect the ability to obtain price concessions from manufacturers.

12. Retail pharmacies generally carry only one manufacturer's version of a multi-source drug. As a result, manufacturers compete to have their generic versions of multi-source SADs be the products stocked by pharmacies. Retail pharmacies, therefore, are often able to extract price concessions from generic manufacturers.

13. As with multi-source SADs, manufacturer pricing strategies for multi-source PADs vary widely. Manufacturers recognize that some physicians will continue to purchase the innovator product at pre-generic prices, while others will search for the product with the lowest acquisition cost. The result can be significant variation in the net price realized by the manufacturers of PADs subject to generic competition.

---

[9] Manufacturers would also have no reason to increase the "spread" in order to induce physicians to prescribe their single-source SADs, as physicians are not involved in the financial aspects of the transaction.

II. **MEDICAID REIMBURSEMENT FOR PHARMACEUTICALS**

14. Although Medicaid is administered jointly by the federal and state governments, Medicaid reimbursement policy for pharmaceuticals was determined solely by the state agencies prior to 1975.[10]

15. In 1974, the federal Department of Health, Education, and Welfare ("HEW," later the Department of Health and Human Services or "HHS") proposed that Medicaid agencies reimburse pharmacies at their actual acquisition costs for single-source drugs.[11] HEW abandoned this idea because of concerns about pharmacy difficulties with recordkeeping and the administrative problems of tracking deferred and cumulative discounts to pharmacies.[12] Instead, HEW recommended that Medicaid agencies were to reimburse for single-source drugs based on estimated acquisition costs ("EACs"), which commonly were based on AWPs, and to reimburse for multi-source drugs based on what they termed maximum allowable cost ("MAC").[13] The final regulations implemented in 1975 stated that the upper limit for reimbursement of prescription drugs was set at "the lowest of: (1) the MAC established for the drug, if any, ... plus a reasonable dispensing fee; (2) the [estimated] acquisition cost of the drug plus a reasonable dispensing fee; or (3) the provider's usual and customary charge to the general public for the drug."[14]

---

[10] The Department of Health, Education, and Welfare noted in its proposed Medicaid regulations, "Some States reimburse providers on the basis of published wholesale prices; others pay on the basis of published prices less a volume discount to the program; still others pay the actual cost to the provider." (See 39 Fed. Reg. 40302 (November 15, 1974), at 40303. An extract from these regulations is attached as Exhibit B.)

[11] 39 Fed. Reg. 40302 (November 15, 1974), at 40303.

[12] 40 Fed. Reg. 32283 (July 31, 1975), at 32293. An extract from these regulations is attached as Exhibit C.

[13] OIG, *Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs*, A-06-96-00030, April 10, 1997, p. 1. An extract from this report is attached as Exhibit D.

[14] 40 Fed. Reg. 32283 (July 31, 1975), at 32294.

16. In addition, HEW recognized that "pharmacists may be receiving inadequate compensation for their professional services in dispensing drug products" and required states to conduct surveys regarding the costs of dispensing drug products in order "to assure that established fees are equitable."[15] Furthermore, the conforming regulations for the Social and Rehabilitation Service and Public Health Service state, "The dispensing fee should be ascertained by analysis of pharmacy operational data which include such components as overhead, professional services, and profits."[16]

17. In July 1987, the Health Care Financing Administration ("HCFA")[17] replaced the Federal MAC program with the Federal Upper Limit ("FUL") program.[18] The FUL program set an aggregate limit on drug spending for multi-source drugs equal to "150 percent of the least costly therapeutic equivalent that can be purchased by pharmacists in quantities of 100 tablets or capsules ...."[19] In addition, HCFA set an upper limit on aggregate spending for non-FUL, generally single-source, drugs based on the lower of such drugs' EAC plus a dispensing fee or the pharmacy's usual and customary charge.[20] While many Medicaid agencies

---

[15] 40 Fed. Reg. 32283 (July 31, 1975), at 32294.

[16] 40 Fed. Reg. 34515 (August 15, 1975), at 34516. An extract from these regulations is attached as Exhibit E.

[17] Currently known as the Centers for Medicare and Medicaid Services ("CMS"), HCFA was created in 1977 to administer both the Medicaid and Medicare programs.

[18] 52 Fed. Reg. 28648 (July 31, 1987). An extract from these regulations is attached as Exhibit F.

[19] 52 Fed. Reg. 28648 (July 31, 1987), at 28653. The FUL program allowed individual reimbursement amounts to vary from the FUL for the drug, provided that, on balance, spending was no more than what would be obtained if all drugs were reimbursed at their FULs.

[20] 52 Fed. Reg. 28648 (July 31, 1987), at 28654-655. Under these regulations, states were no longer required to perform dispensing-fee surveys, however, "[w]e expect that most States will continue their present activities to establish a reasonable dispensing fee level and will document these and any new activities in their State plan. Such activities could include: (1) Audits and surveys of pharmacy operation costs; (2) compilation of data regarding professional salaries and fees; and (3) analysis of compiled data regarding pharmacy overhead costs, profits, etc." (See 52 Fed Reg 28648 (July 31, 1987), at 28651-28652.) Over time, the dispensing fee components of the reimbursement have fallen short of fully compensating costs incurred by pharmacists. (See Schondelmeyer, Stephen W., and Marian V. Wrobel, *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices, Final Report*, Prepared for Deirdre Duzor, CMS, August 30, 2004, p. 5. An extract from this report is attached as Exhibit G.) As a result, pharmaceutical

continued to define EAC based on AWP, other agencies may base their computation of EAC on WAC or other list prices.[21]

18. Exhibit J shows the FUL rates and average AWPs for a number of generic drug products in 1996.[22] This exhibit demonstrates that FULs are often substantially lower than the average generic AWP (the average discount from AWP was 50.3 percent and the highest such discount was 91.3 percent) and that there is not a consistent relationship between the two measures.

I declare under penalty of perjury that this declaration is true and correct.

*[signature]*
Gregory K. Bell

---

[footnote continued] reimbursement rates (i.e., the AWP-based reimbursement for the drug) have had to compensate for this shortfall in dispensing fees, thereby requiring that pharmaceutical reimbursements exceed pharmacies' acquisition costs.

[21] For example, the Maryland Medicaid agency's definition of EAC could be based on any of AWP, WAC, or direct price. (See NPC, Pharmaceutical Benefits Under State Medical Assistance Programs, 2000. An extract from this report is attached as Exhibit H.) Commercial insurers, manufacturers, pharmacies, and other participants in the pharmaceutical industry also use list prices. (See e.g., CBO, "*Prescription Drug Pricing in the Private Sector*, January 2007, p. 9. An extract from this report is attached as Exhibit I.)

[22] This exhibit includes all drugs included in Exhibit A to State of Montana's Second Amended Complaint, August 1, 2003, for which FULs had been set in 1996, except for topically-applied products. Many other drugs listed in Montana's Exhibit A have had FULs set since 1996. I understand that the drugs included in Exhibit J are also at issue in the Nevada case, so that these FULs, which are applied nationally, would apply in Nevada as well.