# EXHIBIT C



# federal register

THURSDAY, JULY 31, 1975

WASHINGTON, D.C.

Volume 40 ■ Number 148



PART IV

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Office of the Secretary

■

# LIMITATIONS ON PAYMENT OR REIMBURSEMENT FOR DRUGS

63. Another comment suggests that the final regulation be amended to substitute the term "drug product" for the term "drug" in section 19.2(a) and elsewhere in the regulation to avoid confusion with the different and more expansive meaning of the term "drug" as defined in the Federal, Food, Drug, and Cosmetic Act.

The Secretary concludes that little would be gained by substituting the term "drug product" for the term "drug" in the final regulation. The definition of "drug" in the MAC regulation incorporates by reference the term "drug product". By so doing, items which would not normally be prescribed by physicians (e.g., antiperspirants, fluoride toothpastes, etc.) but which would be included under the definition of the term "drug" under the Federal Food, Drug, and Cosmetic Act are excluded from the MAC regulation's definition of "drug".

64. One comment recommends that the definition of "multiple-source drug" in section 19.2(b) of the proposed regulation be amended in the final regulation to provide that it means a drug marketed or sold by two or more formulators or labelers, chemically equivalent, and demonstrated to be bioequivalent.

The Secretary concludes that it would be inappropriate and unnecessary to amend section 19.2(b) of the proposed regulation in the manner suggested. As noted in paragraph 89, Food and Drug Administration advice is solicited by the Pharmaceutical Reimbursement Board, prior to making any lowest-unit price determinations in accordance with section 19.5(c), for the Food and Drug Administration's assurance that all drugs to be proposed for MAC listing are both safe and effective. It is sufficient that the Board is assured by the Food and Drug Administration in accordance with section 19.5(b), as amended in the final regulation, that present Food and Drug Administration regulatory control, including its procedures for establishment of a bioequivalence requirement, assures the safety, effectiveness and quality of MAC listed drugs.

65. One comment suggests that the proposed definition of "multiple-source drug" in section 19.2(b) be amended in the final regulation to include the situation where a manufacturer markets its own drug product under both a brand name and a generic name.

The Secretary concurs. The suggested language defining a "multiple-source drug" as: "a drug marketed or sold by two or more formulators or labelers, or a drug marketed or sold by the same formulator or labeler under two or more different proprietary names or both under a proprietary name and without such a name" is added in the definition of the term "multiple-source drug" in section 19.2(d) of the final regulation.

66. A comment suggests that the definition of "provider" in section 19.2(c) of the proposed regulation be amended to read: "one who furnishes medical or *pharmaceutical* services or supplies * * *" (new language italicized). The suggestion is made to clarify that reimbursement or payment under the MAC regulation is for pharmaceutical services and supplies.

The Secretary agrees and the final regulation is so amended.

67. Many comments criticize the proposed MAC regulation as it relates to reimbursement on the basis of "actual acquisition cost", as defined in section 19.2(d) of the proposed regulation, and urge that an "actual acquisition cost" limitation not be adopted in the final regulation. Numerous reasons for this view are cited.

Comments suggest that "actual acquisition cost" is difficult, if not impossible, to determine because of deferred and cumulative discounts to providers and frequently changing sources of supply. Other comments assert that pharmacists would be required to develop extensive and complex record-keeping and invoicing procedures to accommodate a reimbursement program of this kind. These procedures, according to proponents of this view, would be more comprehensive than those ordinarily needed to conduct a professional pharmaceutical practice. Several comments suggest that a reimbursement program based on "actual acquisition cost" would necessitate additional and more frequent auditing by reimbursement programs, and therefore cause administrative costs to increase. Other comments suggest that incentives to purchase efficiently would be reduced if reimbursement were based on "actual acquisition cost" because all savings would be passed through to medical assistance programs. Several comments note that reimbursement systems based on "actual acquisition cost" have been attempted and abandoned by some State Medicaid programs because of these difficulties.

Still other comments suggest that an "actual acquisition cost" limitation be adopted in the final regulation but recommend that its definition in section 19.2(d) as proposed be modified. A number of modifications are suggested.

One comment suggests that "actual acquisition cost" be based solely on the invoice price of the drug product dispensed. Many comments recommend that "actual acquisition cost" be defined as the average wholesale price (AWP) published in specified nationally distributed drug price catalogs. Others recommend defining such cost as average wholesale price less a fixed or variable percentage related to the volume of product dispensed under a particular program. One comment suggests that "actual acquisition cost" be based on wholesale prices supplied to the Federal government by manufacturers, and another comment suggests that this cost be based on a manufacturer's price to a wholesaler plus a fixed wholesaling allowance.

Still other comments suggest replacing "actual acquisition cost" in the final regulation with some other type of reimbursement mechanism. Several comments suggest that providers ought to be reimbursed under a schedule of estimated costs. Reimbursement would be based on this schedule of costs notwithstanding a provider's actual cost. A number of these comments suggest that the schedule apply to only some specific number of the most frequently (e.g., top 500) dispensed drugs. One of these comments suggests that cost estimates to be included in the schedule be determined on a regional basis, and another comment suggests that reimbursement be based on the greater of "actual acquisition cost" and scheduled estimated cost. One comment urges that "actual acquisition cost" be replaced in the final regulation by a reimbursement system under which a drug's cost would be billed directly to the reimbursing program at the same prices charged to direct government purchasers and supplied to providers without charge.

A number of comments also suggest that an "actual acquisition cost" limitation (as defined in section 19.2(d) of the proposed regulation) should be adopted in the final regulation but only if equitable dispensing fees are mandated.

After considering these comments, the Secretary concludes that the "actual acquisition cost" limitation in the proposed regulation should be amended. The Secretary agrees that "actual acquisition cost" limitations have been difficult to administer at the State level, and that an "actual acquisition cost" limitation would therefore be difficult to adopt on a nation-wide basis at this time. The Secretary disagrees, however, that average wholesale price should be used as the basis for "actual acquisition cost" determinations. Average wholesale price is not currently determined by surveying drug marketing transactions (i.e., by determining the actual price a pharmacist pays to a manufacturer or wholesaler for a particular drug product), and thus published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers.

The Secretary believes, however, that the objectives of an "actual acquisition cost" policy (i.e., increased savings on reimbursement or payment for prescribed drugs dispensed under Federally subsidized programs) can be achieved efficiently by using acquisition cost estimates. Accordingly, the Secretary advises that the "actual acquisition cost" limitation is amended in the final regulation to base reimbursement or payment for prescribed drugs furnished under Federally subsidized health care programs, where appropriate, on "aquisition cost" plus a reasonable dispensing fee.

"Acquisition cost", as defined in section 19.2(f) of the final regulation, "means the price generally and currently paid by providers for a drug marketed or sold by a particular formulator or labeler in the package size of drug most frequently purchased by providers."

Under section 19.3(b) of the final regulation estimates of acquisition costs are to be made by each program agency. To assist program agencies in making acquisition cost estimates, the Department will make available drug price information which will cover the most frequently purchased drugs, will reflect the drug prices generally and currently paid by

providers, classified by providers' total dollar volume drug sales, and will be issued with sufficient frequency to be current with drug prices existing in the marketplace.

The exact method for determining acquisition cost estimates is left to the discretion of program agencies. Program agencies are expected to use all available drug price information, including the drug price information furnished to them by the Department, in making these estimates. As also provided in section 19.3 (b), estimates of acquisition costs should be consistent with any drug price information furnished to the program agency by the Department. Accordingly, the Department expects that program agencies will make their estimates of acquisition cost with as much precision as possible, consistent with drug price information furnished to them by the Department.

68. A number of comments object to the warehousing and distributional cost allowance in section 19.2(d) of the proposed regulation. Of these comments, many assert that the allowance arbitrarily discriminates among and between those providers who maintain a warehouse separate from their retail place of business and purchase drugs in bulk quantities, and those who do not.

The Secretary concludes that the proposed warehousing and distributional cost allowance should be deleted in the final regulation in light of the new "acquisition cost" limitation noted in paragraph 67 above. As "acquisition cost" is defined in section 19.2(f) of the final regulation, warehousing and distributional cost allowances may be reflected in the program agencies' estimates of the drug price generally and currently paid by providers. The Secretary therefore believes that it would be inappropriate to recognize any additional allowance for drug warehousing and distribution.

COST LIMITATION

69. As originally proposed section 19.3 (a) of the MAC regulation would limit amounts to be recognized for reimbursement or payment for prescribed drugs furnished under Federally subsidized health care programs, and for prescribed drugs purchased directly by the Department, to the cost of the drug plus a reasonable dispensing fee. Cost, as determined in accordance with section 19.3 (b) of the proposed regulation, is "actual acquisition cost" or, for each multiple-source drug for which a maximum allowable cost (MAC) has been established, the lower of (1) the MAC or (2) the actual acquisition cost.

70. A number of comments recommend that the "cost plus fee" method of reimbursement for pharmaceutical services outlined in section 19.3(a) of the proposed regulation be abandoned in the final regulation and be replaced by some other type of reimbursement mechanism for these services. Some comments suggest that reimbursement be based on a percentage of acquisition cost. Others recommend that the final regulation be amended to provide that reimbursement for pharmaceutical services shall not be greater than the "usual and customary charge" to the general public. One comment urges that reimbursement should be limited to a 50 cents claims processing cost, plus the lower of cost plus a dispensing fee, and the "usual and customary charge" to the general public.

The Secretary concludes that the "cost plus fee" method of reimbursement should not be abandoned in the final regulation because it assures that reimbursement or payment for pharmaceutical services will be based on the services actually provided by implicitly recognizing that the costs of pharmaceutical services involves two principal elements—the cost of the drug to the provider, and the provider's charge for dispensing the drug. At the same time, however, the Secretary agrees that the amount of reimbursement or payment for pharmaceutical services provided under Federally subsidized health care programs should not be greater than the amount the provider usually and customarily charges to the general public for these services.

Accordingly, the Secretary advises that section 19.3(a) is amended in the final regulation to limit the amount of reimbursement or payment to be recognized for any prescribed drug furnished under Federally subsidized health care programs to the lowest of: (1) the MAC established for the drug, if any, established in accordance with section 19.5 plus a reasonable dispensing fee; (2) the acquisition cost of the drug plus a reasonable dispensing fee; or (3) the provider's usual and customary charge to the general public for the drug. The Secretary additionally notes that, as in the proposed regulation, the new section 19.3 (a) provides that where compensation for drug dispensing is included in some other amount payable to the provider by the reimbursing or paying program agency, a separate dispensing fee will not be recognized.

71. Many comments assert that the dispensing fee provision in section 19.3(a) of the proposed regulation does not provide adequate guidelines to assure equitable reimbursement for dispensing services. Some of these comments suggest that the section be amended in the final regulation to require States periodically to review and re-evaluate dispensing fees for equity, and to be required to increase or decrease the fee should such review reveal increases or decreases in the cost of dispensing a prescription.

Other comments suggest that the Department establish minimum fees in the final regulation. One of these comments recommends that the minimum fee be set at the 90th percentile of prevailing fees in each State.

Still other comments suggest that a variable fee approach be taken in section 19.3(a) of the final regulation. One comment recommends that the fee vary on the basis of operating data submitted by providers to reimbursing programs. Another comment suggests that the final regulation mandate a variable fee based on a provider's operating costs, allowing providers to retain 50 percent of any reduction in operating costs as a part of the dispensing fee and as an incentive to reduce their costs. A few comments urge that the fee vary in the final regulation according to the level of professional services provided, such as, hours of service, free delivery, continuing postgraduate education of practitioners, maintenance of patient records, and participation in drug utilization review.

Several comments recommend that the final regulation authorize separate and additional fees for special services, and some comments recommend adjusting fees according to the cost of living index.

The Secretary concludes that because dispensing fees relate primarily to the Medicaid and Public Health Service programs, procedures pertaining to dispensing fees are appropriately included in the conforming MAC regulations of the Social and Rehabilitation Service and the Public Health Service, and not in the Department's MAC regulation. Accordingly, comments and regulatory procedures relating to dispensing fees are more fully addressed in these regulations.

The Secretary notes, with respect to comments suggesting Federally mandated minimum fees, that under existing legislation the Department may only establish upper limits on Federal reimbursement or payment for pharmacy services. The Department may not therefore mandate minimum dispensing fees.

The Secretary recognizes, however, that pharmacists may be receiving inadequate compensation for their professional services in dispensing drug products. Accordingly, the Secretary advises that the Social and Rehabilitation Service's final MAC conforming regulation is amended to require State agencies to conduct periodic surveys of the costs of dispensing drug products. In determining fees, States should review data obtained through these surveys as well as other available information to assure that established fees are equitable.

The Secretary additionally notes that Departmental assistance will be available to the reimbursing or paying program agencies for the purpose of establishing equitable dispensing fees.

72. One comment suggests that the phrase "reasonable dispensing fee" in section 19.3(a) of the proposed regulation be amended in the final regulation to read: "reasonable fee for professional services." The reasons given for the suggested language are that it is more consistent with the terminology used to describe other professional practitioner services and that it is broad enough to encompass the time when pharmacists will be compensated for professional services other than the dispensing of drug products (i.e., rendering advice concerning non-use of a drug product).

The Secretary concludes that issues relating to compensation or reimbursement for professional services in cases where a drug product is not dispensed requires consideration beyond the scope of the MAC regulation. The Secretary further concludes that the term "dispensing fee" is appropriately descriptive for the purposes of reimbursement or payment of total drug costs.

73. Several comments additionally recommend that section 19.3(a) be amended