UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) |  MDL No. 1456<br><br>Civil Action No.<br>     01-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO<br><br>*State of Nevada v. American Home Prods. Corp., et al.,*<br>D. Nev. Cause No. CV-N-02-0202-ECR | | |

**DEFENDANTS' JOINT LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR JOINT
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Defendants submit the following Joint Statement of Undisputed Material Facts in support of their Joint Motion for Summary Judgment:

**NEVADA MEDICAID CONTROLS THE RATE AT WHICH IT REIMBURSES PROVIDERS**

1. Medicaid is a jointly administered and funded federal and state program to assist the poor, elderly and disabled in obtaining medical care. 42 U.S.C. § 1396; *see also* NV Am. Compl. at ¶ 120.

2. In accordance with federal law, Nevada must submit for approval by the Secretary of the United States Health and Human Services a "State Plan" that governs its Medicaid program, including its methods for reimbursing health care providers for medical services. 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 430.10, 447.201.

3. Nevada's Medicaid Plan has been approved by the federal government and the Nevada Department of Health and Human Resources ("NDHHS"), which oversees the Medicaid program. Declaration of John H. Ray, III, dated Feb. 8, 2007, Tabs 1, 3 (Willden Dep. Vol. I at 59, 109; Duarte Dep. Vol. I at 216) (hereinafter citations directly to exhibits by tab).

4. Under its State Plan, Nevada elected to provide a prescription drug benefit. NV. Am. Compl. at ¶¶ 121, 124-25.

5. Participating pharmacies dispense prescription drugs to Medicaid beneficiaries, and Nevada Medicaid pays those providers directly according to the reimbursement formula in its State Plan. Tabs 15, 16 (Lawrence Dep. Vol. II at 330; Lawrence Dep. Vol. III at 449).

1

6. To receive federal funding, Nevada must satisfy the Centers for Medicare and Medicaid Services ("CMS") that in the aggregate its total reimbursement of providers does not exceed the estimated acquisition cost of the drugs dispensed plus a dispensing fee or the provider's usual and customary charge to the general public. 42 C.F.R. §§ 447.331, 447.332.

7. To receive federal funding, Nevada must also satisfy CMS that in the aggregate its total reimbursement of providers does not exceed the Federal Upper Limit ("FUL"), as established by CMS for certain generic drugs, plus a reasonable dispensing fee. *Id.*

8. Pharmacy reimbursement rates are set by NDHHS, which has set reimbursement at the lower of FUL (if applicable), usual and customary charge, or AWP-10% from February 1988 until July 2002 (later at AWP-15%). Tabs 3, 14, 52 (Duarte Dep. Vol. I at 240; Lawrence Dep. Vol. I at 189-90; Lawrence Vol. I Ex. 9, at NV 00556).

9. In December 2003, Nevada implemented a Maximum Allowable Charge ("MAC") for certain eligible drugs. Tab 15 (Lawrence Dep. Vol. II at 231).

10. Since May 2000, Nevada Medicaid has not used the compendia reported AWPs for approximately 400 drugs, but rather has used AWPs supplied by the United States Department of Justice and National Association of Medicaid Fraud Control Units. Tab 17 (Lawrence Dep. Vol. IV at 134-37).

11. Nevada reimburses physician-administered drugs at 62% of a physician's billed charge, unless otherwise noted in Medicaid policy. Tabs 17, 55 (Lawrence Dep. Vol. IV at 128-34; Lawrence Vol. IV Ex. 21 at 250-61).

12. If the state over-reimbursed providers for drugs, those payments went to providers, not manufacturers. Tab 5 (Duarte Dep. Vol. III at 108-09).

13. In the Nevada State Medicaid Plan reimbursement to providers is not identified as a good or service, but as a payment. Tab 67 (Nevada State Medicaid Plan, § 4.19, Attachment B, ¶ 12(a)).

## AWP IS A PHARMACEUTICAL INDUSTRY PRICING BENCHMARK

A. <u>The Pharmaceutical Industry Has Long Recognized AWP As A Pricing Benchmark Around Which Actual Prices Are Negotiated.</u>

14. AWP is a national industry pricing benchmark that does not vary state-by-state; while state Medicaid reimbursement rates based on AWP do vary, each pricing compendia publishes only one AWP for each NDC. Declaration of Eric M. Gaier, PH.D., dated February 8, 2007 ("Gaier Decl."), at ¶ 8; Tab 25 (Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, Feb. 9, 2005 ("Berndt Report"), at ¶¶ 14-16).

15. AWP serves as a reference point from which buyers, sellers, insurers and other market participants involved in the distribution of pharmaceutical drugs negotiate prices. Tab 84 (State of Nevada's Objections and Responses to Defendants First Requests to Admit, Mar. 2, 2006, at Response 7).

16. In the generics industry, most AWPs established at the launch of the drug are lower than the reference brand drug and often remain constant; competition drives prices down and leads to lower payments by providers. Tabs 90, 93 (Hartman Dep. Vol. II at 460-61; Report of Raymond Hartman, dated Apr. 6, 2006 ("Hartman MDL Report"), at ¶ 21(d)).

    B.    <u>In Adopting AWP As Part Of Its Medicaid Provider Reimbursement Nevada Did Not Give An Alternative Definition of AWP In Any Statute Or Regulation.</u>

17. AWP is not defined by Nevada or federal Medicaid statutes and regulations. NV Am. Compl. at ¶ 116; Tab 84 (State of Nevada's Objections and Responses to Defendants First Requests to Admit, Mar. 2, 2006, at Response 32)

18. No regulation governs how AWP is to be calculated, except insofar as Nevada designates First DataBank as its source for that information. Tabs 5, 67 (Duarte Dep. Vol. III at 149; Nevada State Medicaid Plan, § 4.19, Attachment B, ¶ 12(a)(3)).

## NEVADA UNDERSTOOD AWP IS A PRICING BENCHMARK

    A.    <u>Nevada Medicaid Officials Understood That AWP Was A Pricing Benchmark.</u>

19. The State employees responsible for administratively setting Nevada Medicaid pharmacy rates understood that the term Average Wholesale Price does not refer to a literal average of wholesale prices. Tab 7, 9 (Duarte Dep. Vol. V at 44-45; 53-54; MacDonald Dep. at 34, 49).

20. The State employees responsible for administratively setting Nevada Medicaid pharmacy rates understood that the term "AWP" is used by the pharmaceutical industry as a pricing benchmark that did not represent actual acquisition costs. Tabs 4, 8, 9, 10, 15, 84 (Duarte Dep. Vol. II at 9-10, 87; Thompson Dep. at 10-12, 71-72; MacDonald Dep. at 34, 49; Squartsoff Dep. at 79-80; 125-126; Lawrence Dep. Vol. II at 228; State of Nevada's Objections and Responses to Defendants First Requests to Admit, Mar. 2, 2006, at Responses 9, 10).

21. With respect to the use of AWP in the generic drug market, Nevada concedes through its expert, Dr. Raymond Hartman, that the disparity between AWP and acquisition cost for generic drugs is well-documented. Tab 92, 84 (Rebuttal Decl. of Dr. Raymond S. Hartman in Support of Pl.'s Mot. For Class Cert., at ¶ 33(d) (Dec. 16, 2004); State of Nevada's Objections and Responses to Defendants First Requests to Admit, Mar. 2, 2006, at Responses 9, 10).

22. The Court's independent expert, Professor Berndt, also concludes that the disparity between AWP and acquisition cost for generic drugs is well-documented:

> I conclude, therefore, the fact that AWP very substantially overstates pharmacies' actual acquisition costs for generic self-administered drugs has been publicly available information, as has the fact that the extent of overstatement has been growing over time.

Tab 25 (Berndt Rep. at ¶ 73).

B.  Early Government Reports Warned States That They Must Discount AWP To Reach An Acceptable Estimated Acquisition Cost.

23. In 1969, a Department of Health, Education and Welfare report, stated that "[w]here acquisition cost was a factor in [a surveyed state's] reimbursing formula, this was generally presumed to be the listed wholesale price, although it is understood that this list price has little if any relationship to the actual acquisition cost." Tab 70 (Department of Health, Education and Welfare, *Task Force on Prescription Drugs—Final Report*, at 63, 90, 115 (February 7, 1969)).

24. When the federal government promulgated Medicaid reimbursement regulations in 1974 (Medicaid was enacted in 1965), it rejected AWP as a benchmark for Medicaid reimbursement because AWP is "frequently in excess of actual acquisition costs to the retail pharmacist." Tab 62 (39 Fed. Reg. 41,480 (Nov. 27, 1974)).

25. In 1975, the U.S. Department of Health and Human Services (HHS) told states, including Nevada, that "AWP data are frequently inflated," and urged them to stop reimbursing Medicaid providers on the basis of AWP. Tabs 63-64 (40 Fed. Reg. 34,516, 518 (Aug. 15, 1975); 40 Fed. Reg. 32, 284-293 (July 31, 1975)).

26. In 1984, the U.S. Health Care Financing Administration (HCFA) sent to state Medicaid agencies, including Nevada, an HHS-OIG report advising that "[w]ithin the pharmaceutical industry, AWP means non-discounted list price" and "[p]harmacies purchase drugs at prices that are discounted significantly below AWP or list price." Tab 69 (HCFA Medicaid Action Transmittal, No. 84-12 (Sept. 1984), *reprinted in* Medicare & Medicaid Guide (CCH) (Sept. 1984), ¶ 34,157 at 10,193 ("HCFA Medicaid Transmittal, CCH")).

27. The 1984 HHS-OIG report stated that "AWP cannot be the best – or even an adequate – estimate of the price providers generally are paying for drugs." *Id.* at 10,206.

28. The 1984 HHS-OIG report disclosed that 99.6% of pharmacy Medicaid-reimbursed drug purchases nationwide were made at prices below AWP. *Id.* at 10,193.

29. In 1989, HCFA issued a revision to the State Medicaid Manual, warning states that AWP overstated prices that pharmacies actually paid for drugs. Tab 71 (HHS-OIG, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services*, at 1 (May 1996)).

30. In 1992, the *HCFA State Medicaid Manual*, which was distributed to states, including Nevada, stated that as a matter of federal policy, a reimbursement formula that did not offer some discount from AWP would be considered presumptively unacceptable. Tab 68 (HCFA, State Medicaid Manual § 6305.1 at p.2).

C.  Since At Least The 1980s, Nevada Has Received (And In Some Instances Commissioned) Studies Showing The Discounts Off AWP Available To Providers.

31. In 1986, HCFA sent Nevada Medicaid an EAC Survey Report, dated March 14, 1986, that had determined that Nevada pharmacies realized "an aggregate drug purchase price of 18.85 percent below AWP." Tab 34 (MacDonald Ex. 1 at 1).

32. The report also showed that in Nevada "drugs purchased directly from the manufacturer were, in the aggregate, 22.76 percent under AWP while drugs purchased through wholesalers were, in the aggregate, 17.62 percent under AWP." *Id.* (MacDonald Ex. 1 at 2).

33. Nevada Medicaid officials received and reviewed over thirty federal reports from the Centers for Medicare and Medicaid Services (CMS) (and HCFA). These reports compared AWP to actual pharmacy acquisition costs, were published by CCH and were read by Nevada Medicaid personnel, discussed among Medicaid pharmacy administrators, and published on CMS's website. Tabs 3, 5, 9, 10, 14, 16, 18 (Duarte Dep. Vol. I at 60-61; Duarte Dep. Vol. III at 24-26; MacDonald Dep. at 53; Squartsoff Dep. at 55, 60-64, 127; Lawrence Dep. Vol. I at 26; Lawrence Dep. Vol. III at 618; Townley Dep. at 42-48, 66).

34. In 1984, HHS-OIG issued a report finding that acquisition costs averaged 15.93% below AWP. Tab 69 (HHS-OIG Report, Changes to the Medicaid Prescription Drug Program Could Save Millions, at 9 (1984)).

35. In 1996, HHS-OIG issued conducted a series of studies on the differences between AWP and actual acquisition costs and issued reports finding that nationally AWP exceeded actual acquisition costs by 18.3% for brand drugs and 42.5% for generic drugs. Tab 72 (1996 HHS-OIG, Pharmacy Acquisition Costs Reports).

36. In 1997, HHS-OIG issued two reports that summarized the 1996 state studies, estimating that pharmacies pay an average of AWP-42.5% for generic drugs and AWP-18.3% for brand drugs. Tab 73 (1997 HHS-OIG, Pharmacy Acquisition Cost Summary Reports).

37. In 2001, HHS-OIG conducted a series of studies on the differences between AWP and actual acquisition costs and issued reports finding that nationally AWP exceeded actual acquisition costs by 21.84% for brand drugs and 65.93% for generic drugs. Tab 74 (2001 HHS-OIG, Pharmacy Acquisition Costs Reports).

38. Nevada Medicaid conducted its own study in 2002, retaining Myers & Stauffer to review profit margins and the difference between AWP and actual acquisition costs in Nevada. Tabs 3, 4, 13, 29, 56-58 (Duarte Dep. Vol. I at 211, 222-223; Duarte Dep. Vol. III at 15; Hansen Dep. at 52-53, 74-75; Duarte Vol. III Ex. 16, at NV 00211-00214; Hansen Exs. 1, 2, 9).

39. Myers & Stauffer estimated that in Nevada single-source drugs acquisition costs' were 19.3% less than AWP, multi-source drugs without a FUL were 35.1% less than AWP and multi-source drugs with a FUL were 83.1% less than AWP. Tabs 13, 28, 57-58 (Hansen Dep. at 87-88, 94-97; Duarte Vol. II Ex. 20; Hansen Exs. 9, 10).

> D. <u>Nevada Knew That AWP Greatly Exceeded Acquisition Cost Because Nevada Retained Experienced Pharmacists To Run Its Medicaid And Other Pharmacy Programs.</u>

40. The fact that pharmacies' and providers' acquisition costs were typically less than AWP has long been made very visible and public to active observers and health care industry participants. Tab 25 (Berndt Report ¶ 65).

41. Nevada Medicaid employed experienced pharmacists and other state officials to establish, monitor and revise reimbursement policy and rates. These individuals understood that AWPs were pricing benchmarks and not actual averages of wholesale prices. Tabs 3, 9, 10 (Duarte Dep. Vol. I at 8-11; MacDonald Dep. at 12-17, 34, 39; Squartsoff Dep. at 16-17, 36-40, 42, 47-48, 79-80, 125-126).

42. From 1981 to 1988, Nevada employed Keith MacDonald as its Pharmaceutical Consultant and later head of its Medicaid program. Tab 9 (MacDonald Dep. at 13, 15, 17).

43. Prior to joining Nevada Medicaid, Mr. MacDonald practiced as a pharmacist for twenty-three years. *Id.* (MacDonald Dep. at 12).

44. As a pharmacist, Mr. MacDonald purchased pharmaceuticals and was familiar with the difference between AWP and his acquisition cost. *Id.* (MacDonald Dep. at 49).

45. Mr. MacDonald referred to AWP as "artificial wholesale price." *Id.* (MacDonald Dep. at 32-34, 48, 59.

46. Mr. MacDonald testified that while at Nevada Medicaid he received and would have been familiar with government studies regarding the differences between AWP and acquisition costs, including a 1984 OIG study stating that, on average, acquisition cost was 16% below AWP and a 1986 EAC Survey Report from HCFA showing that pharmacies in Nevada could purchase drugs at 18.85% below AWP. Tabs 9, 34-35 (MacDonald Dep. at 30-31, 52, 54-56; MacDonald Ex. 1 at 1-2, Ex. 2 at 9).

47. Mr. MacDonald proposed that the state change its EAC formula from AWP-5% to AWP-10%, which Nevada implemented in 1988. Tabs 9, 34 (MacDonald Dep. at 29, 44-45; MacDonald Ex. 1 at 1-2).

48. From 1989 to around 2000, Laurie Squartsoff was the Pharmaceutical Consultant for Nevada Medicaid. Tabs 10, 14-15, 53 (Squartsoff Dep. at 16, 36-38; Lawrence Dep. Vol. I at 21; Lawrence Dep. Vol. II at 313; Lawrence Vol. II Ex. 19 at 6).

49. Prior to working at Medicaid, Ms. Squartsoff had ten years' experience as a retail pharmacist and as a staff pharmacist for a hospital run by the State of Nevada, where she worked from 1986 through 1989. Tab 10 (Squartsoff Dep. at 16-17, 37).

50. Ms. Squartsoff knew that AWP was a pricing benchmark and not an actual price. *Id.* (Squartsoff Dep. at 70-80).

51. Ms. Squartsoff, and other Medicaid officials, had heard and referred to AWP as "ain't what's paid." Tabs 1, 5, 10, 16 (Willden Dep. Vol. I at 54-55; Duarte Dep. Vol. III at 36-37; Squartsoff Dep. at 70-71, 78; Lawrence Dep. Vol. III at 406-7).

52. Squartsoff testified that she reviewed and discussed studies regarding AWP and acquisition cost over the course of her employment at Nevada Medicaid. Tab 10 (Squartsoff Dep. at 63-65).

53. Squartsoff had direct knowledge of the actual prices of prescription drugs through the state hospital's participation in a state buying cooperative, the Minnesota Multi-State Contracting Alliance for Pharmacy ("MMCAP"), which contracted directly with manufacturers. *See infra*, at ¶ 63; s*ee also* Tab 85 (Ebo Dep. at 95-98.)

54. Mr. Charles Duarte, the current Medicaid Administrator, referred to AWP in February 2005 as "Avg. WHIMSICAL Price." Tabs 7, 32 (Duarte Dep. Vol. V at 52-54; Duarte Vol. V Ex. 11 at 1.

55. Mr. Duarte described AWP to his department supervisor, Mr. Willden, Director of Nevada NDHHS, as "ain't what you pay" and as an "arbitrary number out there." Tab 1 (Willden Dep. Vol. I at 54).

56. Since 1997, Mr. Duarte has received and reviewed government studies regarding the differences between AWP and acquisition costs. Tabs 3, 5 (Duarte Dep. Vol. I at 60-61; Duarte Dep. Vol. III at 24-25).

57. As of the summer of 2001, Mr. Duarte was aware that Wal-Mart purchased generic drugs at AWP-90%. Tabs 7, 30 (Duarte Dep. Vol. V at 22, 26-27; Duarte Vol. V Ex. 5 at 1).

58. Dr. Emmanuel Ebo, Pharmacy Director for the Nevada Division of Mental Health and Developmental Services ("Mental Health"), has worked for Nevada since 1989. Tab 85 (Ebo Dep. at 8).

59. Dr. Ebo manages the pharmacy program and oversees a drug budget of over $20 million. Tabs 85, 39 (Ebo Dep. at 42-43, 46; Ebo Ex. 1 at 34).

60. Dr. Ebo is aware of prices at which drug manufacturers sell because he purchases drugs for use at the state mental health facilities. Tab 85 (Ebo Dep. at 43).

61. Dr. Ebo was aware that AWP was not equal to acquisition cost and referred to AWP as "ain't what's paid." *Id.* (Ebo Dep. at 86-87).

E. Nevada Knew That AWP Greatly Exceeded Acquisition Cost Because, Since At Least The 1980's, Nevada Has Been Purchasing The Very Drugs That It Claims Have Inflated AWPs.

62. Over thirty Nevada facilities purchase prescription drugs, including facilities run by the Department of Mental Health, the Department of Corrections and the Nevada State

7

University System.  Tab 75 (MMCAP list of Participating Facilities by State, *available at* http://www.mmd.admin.state.mn.us/mmcap/MFG_Facilities.asp (last visited Jan. 18, 2007)).

63. Nevada entities have purchased through the Minnesota Multi-State Contracting Alliance for Pharmacy (MMCAP) since at least May of 1992.  Tabs 10, 85, 87 (Squartsoff Dep. at 34; Ebo Dep. at 43, 63-64; Svitak Dep. at 22).

64. On behalf of its members, MMCAP negotiates contracts with manufacturers for a wide range of pharmaceutical and other medical products.  Tab 87 (Svitak Dep. at 26-28).

65. Members then purchase drugs directly from wholesalers at the MMCAP rates. Tabs 85, 87 (Ebo Dep. at 56-57, 78-79; Svitak Dep. at 32-35); Gaier Decl. at ¶ 30-31.

66. The Nevada Purchasing Department has access to MMCAP's catalog of discounted prices, as does every state-employed pharmacist who purchases drugs for his or her organization.  Tabs 85, 87, 40 (Ebo Dep. at 78-79, 116; Svitak Dep. at 82-84; Ebo Ex. 10).

67. In the mid-1990s, Nevada Medicaid considered purchasing drugs through MMCAP and dispensing them through state hospitals, a proposal that was rejected because it would not provide adequate access to beneficiaries.  Tabs 10, 85, 18 (Squartsoff Dep. at 113-16; Ebo Dep. at 95-99; Townley Dep. at 128-129).

68. Nevada Medicaid has access to the prices paid by the State Hospitals because they submit claims to Nevada Medicaid that contain their actual drug acquisition prices.  Tab 85 (Ebo Dep. at 80-83, 87-88).

F. <u>Nevada's Reimbursement Of Generic Drugs At FUL Shows That It Was Aware Of The Spreads Between AWP And Actual Acquisition Cost.</u>

69. Prior to 1987, federal Medicaid regulations required that reimbursement of certain multi-source drugs not exceed a federal Maximum Allowable Cost (MAC).  Tab 66 (Medicare and Medicaid Programs; Limits on Payments for Drugs, 52 Fed. Reg. 28,648 (July 31, 1987)).

70. In 1986, HCFA proposed three potential replacements to the states:  one was based on using the pharmacists' actual acquisition costs, the second was a streamlined MAC system, and the third was what became the FUL.  *Id.* at 28,649 - 650.

71. After considering this proposal, Nevada Medicaid responded to HCFA with a stated preference for the FUL option rather than the actual acquisition cost approach.  Tab 77 (Letter from William F. Engel, Chief of Nevada Medicaid, to William L. Roper, M.D., Administrator of HCFA, dated Oct. 15, 1986).

72. HCFA expressly rejected the actual acquisition approach, "due to the consensus expressed by many State agencies regarding administrative costs and implementation problems." Tab 66 (52 Fed. Reg. 28,648, 650).

73. In adopting the FUL, HCFA specifically recognized that states would be reimbursing drug ingredients at a rate above that for which they may be obtained:

8

> In a State using the [FUL], pharmacists would be encouraged to purchase as prudently as possible because, in addition to the dispensing fee they receive under existing regulations, they would retain the difference between what they pay for the drug product and the upper limit of payment established by HCFA for the particular drug.

Tab 65 (Medicare and Medicaid Programs; Limits on Payments for Drugs, 51 Fed. Reg. 29,560, at 29,562 (Aug. 19, 1986)).

74. The FUL regulations foresaw and condoned the possibility that there would be a disparity between published prices and actual sale prices:

> [O]ur policy of using published prices as a basis for determining payment levels may cause wholesalers to invent new ways of offering discounts to the smaller independent retail outlets, thereby expanding the practice of discounting to those outlets and enabling them to have access to less expensive sources of pharmaceuticals. The drawback is that neither State programs nor the Federal Medicaid program will benefit from such reductions in wholesale prices.

Tab 66 (52 Fed. Reg. at 28,656).

75. When looking at a comparison of FUL rates and average AWPs for various generic drugs, there is an obvious and easily illustrated difference between AWP and FUL. Declaration of Gregory K. Bell, PH.D., dated February 8, 2007 ("Bell Decl.") at ¶ 18 and Exhibit J.

G. <u>Nevada Voluntarily Reimbursed Above Acquisition Cost To Ensure Beneficiaries Had Access To Care.</u>

76. In 1988, Nevada Medicaid changed its EAC formula from AWP-5% to AWP-10%. Tabs 14, 52 (Lawrence Dep. Vol. 1, at 161; Lawrence Vol. I Ex. 9); *see also* NV Am. Compl. at ¶ 126 (citing Nevada Medicaid Services Manual § 1204.2).

77. In setting reimbursement rates, Nevada allowed providers a sufficient margin to ensure broad participation by providers and ensure access for Medicaid beneficiaries. Tabs 1, 3 (Willden Dep. Vol. I at 60-61; Duarte Dep. Vol. I at 154-55).

78. In 1986, the Deputy Administrator of Welfare (responsible for the Medicaid program) justified Nevada's reimbursement at AWP-5% despite a federal study showing Nevada pharmacists acquired drugs at AWP-18.85%: "there were costs associated with the dispensing of those drugs that had not been adequately taken into account in the … 3.95 dispensing fee that the Nevada Medicaid program authorized." Tab 9 (MacDonald Dep. at 86-87).

79. When Nevada changed its reimbursement formula from AWP-5% to AWP-10% in 1988, it was aware that pharmacists acquired drugs at an average discount off AWP of 18.85%. Tab 9, 34 (MacDonald Dep. at 29-31; MacDonald Ex. 1 at 1-2).

9

80. In 2002, when Nevada changed its rate from AWP-10% to AWP-15%, it was aware of OIG studies showing that pharmacists acquired single-source drugs at an average discount off AWP of 21%. Tabs 7, 31 (Duarte Dep. Vol. V at 28-31; Duarte Vol. V Ex. 6 at 1).

81. In 2002, when Nevada changed its reimbursement formula from AWP-10% to AWP-15%, it was also aware from its own study that pharmacists acquired drugs at an average discount off AWP of 19.3% for single source drugs, 35.1% for generic drugs without a FUL, and 83.1% for generic drugs with a FUL. Tab 7 (Duarte Dep. Vol. V at 16, 41-45).

82. In 2002, when Nevada changed its rate from AWP-10% to AWP-15%, it was aware that pharmacists could continue to earn a profit on the ingredient portion of Nevada Medicaid's pharmacy reimbursement. Tabs 7, 30 (Duarte Dep. Vol. V at 45; Duarte Vol. V Ex. 6 at 1).

83. Mr. Duarte understood from the margin analysis study performed by Myers & Stauffer, Nevada's consultant, that pharmacists' general level of profitability would be 3.6% for brand name drugs, 19.3% for multi-source drugs with no FUL, and 9.7 % across all categories of drugs. Tab 7 (Duarte Dep. Vol. V at 41-45).

84. Nevada Medicaid's payment of the ingredient cost component of its reimbursement rate cross-subsidized, or offset, its underpayment of the other reimbursement rate component, the dispensing fee. (Gaier Decl. at ¶¶ 16-17, 24, 26, 28-29).

85. Reimbursing above acquisition cost allowed Nevada to achieve cost savings by increasing use of generics. (Gaier Decl. at ¶¶ 42-44).

86. Dispensing fees generally cover only about half of a provider's costs, especially for Medicaid beneficiaries. (Gaier Decl. at ¶¶ 21, 24, 26).

87. Nevada has not surveyed its providers regarding drug dispensing fees since the 1980s. Tabs 7, 16 (Duarte Dep. Vol. V at 60-61; Lawrence Dep. Vol. III at 431-32).

88. Mr. Duarte, Nevada Medicaid Director at the time of the 2002 rate change, acknowledged that prior to implementation of an electronic point of sale system in 2003, Nevada Medicaid's dispensing fee may have been inadequate. Tab 7 (Duarte Dep. Vol. V at 59-60, 65-67).

89. Nevada's pharmacy reimbursement rates were the product of a negotiation with the pharmacy lobby and were not set at Nevada's understanding of providers' acquisition cost. Tabs 1, 3, 7, 16, 21, 31, 33 (Willden Dep. Vol. I, at 62-63; Duarte Dep. Vol. I, at 220-23; Duarte Dep. Vol. V, at 55-57; Lawrence Dep. Vol. III, at 422-23; Lau Dep. at 34-35, 39-41, 85-87; Duarte Vol. V Ex. 6 at 1, Ex. 12 at 1-2).

90. In 2002, Nevada lowered its pharmacy rate from AWP-10% to AWP-15% due to budgetary constraints. Tab 7 (Duarte Dep. Vol. V at 12-13, 55-57).

91.     When Nevada lowered the pharmacy rate to AWP-15%, it did not believe that AWP-15% was equivalent to pharmacy acquisition costs.  Tab 7 (Duarte Dep. Vol. V at 12-13, 55-57).

H.     <u>Nevada Knew That It Was Reimbursing Providers Less Under Other State-Run Pharmacy Programs.</u>

92.     As director of NDHHS, Mr. Willden has direct responsibility for several pharmaceutical programs, including (i) Medicaid's pharmacy reimbursement; (ii) Medicaid's managed care program; (iii) Mental Health's purchase of drugs; and (iv) reimbursement of prescriptions through PBMs retained by the Mental Health, Senior Rx, and Disability Rx programs.  Tab 2 (Willden Dep. Vol. II at 18-19).

93.     Organizations reporting to Mr. Willden purchased over $19 million in pharmaceuticals through MMCAP in 2005.  Tabs 85, 39 (Ebo Dep. at 42-43, Ebo Ex. 1 at 34).

94.     Mr. Willden is aware of other State programs that reimburse at levels below Medicaid, including the Nevada Public Employees' Benefit Program ("PEBs") and the reimbursement rates of these non-Medicaid programs.  Tab 1 (Willden Dep. Vol. I at 89-90).

95.     Since at least 1996, the State has retained and used the services of PBMs and insurers to administer state programs:

- The PEBs program retained Merck-Medco from 1996 through 2001, and Catalyst Rx from 2002 to the present.

- Senior Rx used Fidelity Security Life Insurance Company until 2005 and then switched to Catalyst Rx.

- Disability Rx has used Catalyst Rx since 2006.

- Mental Health has used Catalyst Rx to provide a portion of its outpatient pharmacy service for the past seven years.

Tabs 1, 85, 11, 12, 27, 86, 94, 42, 47-49 (Willden Dep. Vol. I at 39-41, 89-93; Ebo Dep. at 112-113; Lopez Dep. at 8-10, 104-05, 150, 153-54; Hillerby Dep. at 81-90; Olson Dep. at 64-65; Willden Exs. 2-3; Lopez Exs. 3, 8 at NV 01928, Ex. 9 at NV 019538, NV 019541, Ex. 10 at NV 019544).

96.     Since 1997, the Nevada Medicaid program itself has contracted out half of its benefit program to health maintenance organizations ("HMO"s), including Nevada Care and Sierra Health Systems, who either directly reimburse for drugs or sub-contract the pharmacy benefits services to PBMs.  Tabs 15, 19 (Lawrence Dep. Vol. II at 239-48; Nowak Dep. at 40-47).

97.     Nevada's PBMs and insurers have reimbursed at rates far below the Medicaid reimbursement rate:  PEBs (1996) generics AWP-45%; PEBs (1998) branded AWP-20.5%,

11

generics, AWP-55%; Senior Rx (2004) generics AWP-55%. Tabs 11, 86, 42, 44, 47, 50 (Lopez Dep. at 122, 140, 148-49; Olson Dep. at 62-63; Lopez Exs. 3-5, 8; Olson Ex. 2).

98. Through its administration of these other programs, Nevada knew the reimbursement rates that private payors used. Tab 25 (Berndt Report at 71, ¶¶ 133-34).

99. To assist it in contracting with its PBMs, Nevada engaged the services of health benefit consultants, including Segal and Aon Consultants. Tab 11 (Lopez Dep. at 52-54).

100. Nevada's RFPs have requested that bidders submit:

- Drug pricing information, given as "AWP less ___ %," for both branded and generic drugs, retail and mail order.

- The ingredient cost for the drugs most frequently reimbursed by the program.

- A statement of the amount each potential PBM reimbursed for generic drugs, in terms of a discount off AWP. The State has not produced the 1995 bids; however, the 1998 winning bid, from the same contractor (Merck Medco) reported that its MAC program reimbursed generics at AWP-50%.

Tabs 11, 86, 41, 45-46, 51, 45, 76 (Lopez Dep. at 103, 129-131, 150; Olson Dep. at 66-68; Lopez Ex. 1 at 31-36; Lopez Ex. 6 at 22-24, 26-28; Lopez Ex. 7; Olson Ex. 7 at 15-16; Request for Proposal Number 1377 for Pharmacy Benefit Management Services, at 27-32).

101. In negotiating its 2005 Senior Rx reimbursement contract, Nevada sent a letter to its vendor stating: "Catalyst Rx has proposed a 50% discount off AWP for generics. The State of Nevada is proposing a 55% discount off AWP for generics." Tab 78 (Email from S. Berry to J. Smedes, dated Sep. 3, 2004, attaching Letter from S. Berry to K. Hooks, dated Sep. 3, 2004, at 2).

102. The PBM contracts for PEBs and other State programs were reviewed and approved by the Board of Examiners, which consists of the Governor of Nevada, the Attorney General, and the Secretary of State. Tab 11 (Lopez Dep. at 72-73).

I. <u>Nevada Medicaid Regularly Surveyed The Rates At Which Other Programs And States Were Reimbursing Drugs.</u>

103. Nevada Medicaid pharmacy consultant Laurie Squartsoff was periodically asked to provide information concerning reimbursement formulas used by others payors to her supervisor, Social Services Chief Peggy Epidendio. Tab 10 (Squartsoff Dep. at 88-91).

104. A memorandum prepared by Ms. Squartsoff in 1995 lists Nevada worker's compensation program reimbursement for generic drugs at a rate of AWP-40%. Tab 36 (Squartsoff Ex. 3 at 2).

12

105. Since at least 1999, Nevada Medicaid employees have participated in e-mail groups with pharmacy managers from other states through which they share information regarding reimbursement. Tab 10 (Squartsoff Dep. at 57-59, 120).

106. A March 5, 2002, e-mail informed Coleen Lawrence, the Social Services Chief primarily responsible for Nevada Medicaid's prescription drug reimbursement, that the State of Washington was changing its reimbursement rate to AWP-50% for multi-source drugs as the result of a recent OIG study. Tab 54 (Lawrence Vol. IV Ex. 10, at 1).

J.     <u>Nevada Knew That Defendants Were Not Representing That AWP Was Equivalent To Provider Acquisition Cost, Because Several of the Defendants Communicated This Knowledge Directly To The State.</u>

107. Dey, L.P. wrote to Nevada on June 13, 2000, that "AWP has no consistent governmental definition, so far as we are aware, except that it is clearly not understood to represent any actual net selling or market price." Tab 96 (Letter from C. Rice to L. Terry, dated Jun. 13, 2000, at 1).

108. Warrick Pharmaceuticals Corporation ("Warrick") wrote to Nevada on June 21, 2000, that

> Warrick understands, as it believes the entire pharmaceutical industry and the Federal and State governments understand, that AWP is in the nature of a "list" price set at the time of product introduction. …. Warrick has never understood that AWP reflects the actual wholesale prices at which all sales of its drugs are transacted. Warrick would be astonished if anyone else in the pharmaceutical business, either buyer or seller, has such an understanding, as it has long been widely understood, including by the Federal and State governments, that AWP does not reflect actual prices at which transactions occur, but is in the nature of a list price.

Tab 97 (Letter from J. Hoffman to L. Terry, dated Jun. 21, 2000, at 1, 2).

109. Several Defendants reported their actual sales data to the State:

- Beginning in January 2002 and continuing every month or quarter thereafter, Warrick and Schering voluntarily provided the State of Nevada with a monthly report of their high-low range of prices for the drugs at issue – specifically, Warrick's and Schering's high and low contract prices for the previous month for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors.

- Both Tap and Bayer Pharmaceuticals have been reporting actual sales prices to the state of Nevada since at least February of 2002.

Tabs 16, 17, 65, 98-101 (Lawrence Dep. Vol. III at 520-36; Lawrence Dep. Vol. IV at 125-26; Lawrence Vol. III Exs. 8-11).

13

110. Nevada Medicaid's officials made no effort to change their reimbursement scheme in light of these prices. Tabs 16, 17 (Lawrence Dep. Vol. III at 520-36; Lawrence Dep. Vol. IV at 125-26).

### THIRD PARTY PAYORS IN NEVADA UNDERSTOOD AWP IS A PRICING BENCHMARK

111. Four of the top seven third-party payors ("TPP"s) in Nevada purchased prescription drugs directly from manufacturers, through Group Purchasing Organizations ("GPO"s), or through drug wholesalers. Gaier Decl. at ¶¶ 34-39.

112. These TPPs purchased significant volumes of prescription drugs at discounted prices generally available to providers (and well below AWP), including many of the drugs in this litigation. *Id.*

113. TPP drug purchases were made as early as 1991 and continue to the present. *Id.*

114. TPPs in Nevada, like their counterparts in the rest of the country, also have taken advantage of the services offered by PBMs, including the pass-through of the substantial rebates paid by manufacturers to PBMs, to achieve lower drug reimbursement costs. *Id.* at ¶ 41.

115. There is a highly competitive PBM market in Nevada, and payors' costs are far below AWP and often less than pharmacies' acquisition costs. *Id.*

116. The benefits of PBMs to payors, and transparency in the PBM market are also available to companies seeking PBM services in Nevada. Tabs 24, 23, 95, 60-61 (Ginder Dep. at 29; Colwell Dep. at 91-93; Ginder Ex. 8; Colwell Exs. 11, 16).

### THERE IS NO EVIDENCE TO SUPPORT NEVADA'S CLAIMS

117. By its own admission, Nevada proceeds with its claims only as to its Medicaid program, and not as to other state programs that purchase or reimburse the drugs at issue in this case. Tab 84 (State of Nevada's Objections and Responses to Defendants' First Requests to Admit, Mar. 2, 2006, at Response 15).

118. Nevada's Amended Complaint includes allegations and claims for recovery regarding physician-administered drugs, co-payments made to physicians under the Medicare Part B program, self-administered drugs before 1991, and self-administered drugs after 2002. NV. Am. Compl. at ¶¶ 14-21, 141-143, 413-422.

119. During the discovery period, defendants sought discovery on Nevada's allegations and claims for recovery regarding physician-administered drugs, co-payments made to physicians under the Medicare Part B program, self-administered drugs before 1991, and self-administered drugs after 2002. Tabs 79-83 (Letter from C. Dillon to J. Breckenridge, dated Apr. 28, 2006; Letter from J. Breckenridge to C. Dillon, dated May 9, 2006; Letter from C. Dillon to J. Breckenridge, dated May 16, 2006; Letter from J. Breckenridge to C. Dillon, dated Jun. 1, 2006)

120.    Nevada does not have claims data or other reimbursement evidence for any physician-administered drugs.  Tabs 26, 83-84 (Swenson Decl. at Exhibit A, ¶ 1; Letter from J. Breckenridge to C. Dillon, dated Jun. 1, 2006; Letter from C. Dillon to J. Breckenridge, dated May 16, 2006; Letter from C. Dillon to J. Breckenridge, dated Jun. 7, 2006).

121.    Nevada does not have claims data or other reimbursement evidence for Medicare Part-B co-payments.  Tabs 83-84 (Letter from J. Breckenridge to C. Dillon, dated Jun. 1, 2006; Letter from C. Dillon to J. Breckenridge, dated Jun. 7, 2006).

122.    Nevada does not have claims data or other reimbursement evidence for provider reimbursement prior to 1991 or after 2002.  Tabs 26, 91, 81-84 (Swenson Decl. at ¶ 2; Decl. of Raymond S. Hartman, dated Jun. 13, 2006 ("Hartman NV Decl."), at ¶ 16 n.22; Letter from J. Breckenridge to C. Dillon, dated May 9, 2006; Letter from C. Dillon to J. Breckenridge, dated May 16, 2006; Letter from J. Breckenridge to C. Dillon, dated Jun. 1, 2006; Letter from C. Dillon to J. Breckenridge, dated Jun. 7, 2006).

123.    Nevada has not produced any *parens patriae* claims data regarding their supposed damages, including the drugs involved and the relevant price or basis for reimbursement.  Tabs 81-84 (Letter from J. Breckenridge to C. Dillon, dated May 9, 2006; Letter from C. Dillon to J. Breckenridge, dated May 16, 2006; Letter from J. Breckenridge to C. Dillon, dated Jun. 1, 2006; Letter from C. Dillon to J. Breckenridge, dated Jun. 7, 2006)

124.    Nevada's damages expert, Dr. Hartman, did not analyze or calculate damages prior to 1991 or after 2002.  Tab 91 (Hartman NV Decl., at ¶ 16 n.22).

125.    Dr. Hartman does not report any damages or penalties for physician-administered drugs, because the State did not provide him with this data.  Tab 91 (Hartman NV Decl. ¶¶ 16 n.22, 23(c), 30).

126.    Dr. Hartman does not report damages or penalties for Medicaid reimbursement of dual-eligible Medicare claims because Nevada did not provide him with the claims and reimbursement data.  Tab 91 (Hartman NV Decl. ¶ 24).

127.    Because he was provided no data regarding *parens patriae* claimants, Dr. Hartman has not reported damages or penalties for these claims.  Tab 91 (Hartman NV Decl. ¶¶ 16 n.22, 32).

128.    In response to Defendants' discovery requests, the only evidence that Nevada has produced regarding how it reimbursed self-administered pharmacy claims is a CD of archived data originally from Anthem, its former fiscal agent.  Tab 22, 26, 81 (Swenson Dep., at 14-18; Swenson Decl. at ¶ 2; Letter from C. Dillon to J. Breckenridge, dated May 16, 2006).

129.    Nevada's claims data does not contain a field identifying the basis of reimbursement.  Tab 22 (Swenson Dep. at 28).

130.    Mr. Swenson, the person most knowledgeable about the claims data, testified that there is a field in the claims data, IC-DRUG-MAC-EXC, that indicates whether a claim is based on a state upper limit ("SUL").  *Id.* (Swenson Dep. at 76).

15

131.    Mr. Swenson, the person most knowledgeable about the claims data, executed an affidavit on August 17, 2006, reaffirming his testimony concerning the IC-DRUG-MAC-EXC field.  Tab 26 (Swenson Decl. at ¶ 3-4, Exhibit A at ¶ 3).

132.    For over 97% of the claims, this field indicates payment was made on the basis of SUL, not AWP.  Gaier Decl. at ¶ 49, n.70.

133.    Nevada's expert, Dr. Hartman, did not analyze the basis for reimbursement in Nevada's claims data.  Tab 89 (Hartman Dep. Vol. I at 79-80).

134.    Nevada's expert, Dr. Hartman, also did not analyze whether any manufacturer received increased market share and profit as a consequence of the alleged AWP Inflation Scheme.  Tab 89 (Hartman Dep. Vol. I at 54-55).

135.    Mr. Duarte understood the phrase "marketing the spread" to mean that "manufacturers provided better pricing to particular purchasers" and saw nothing wrong with this practice.  Tab 7 (Duarte Dep. Vol. V at 73-75).

136.    Pharmacists purchase drugs on the basis of cost and not based on the amount they might be reimbursed by a private or government payor. Tab 88 (Groth Dep. at 61–62).

*Respectfully submitted on behalf of Nevada II Defendants,*

  /s/   Christopher R. Dillon
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
John H. Ray, III, (BBO# 664184)
Heather Crall (BBO# 665660)
ROPES & GRAY LLP
One International Place
Boston, MA  02110
(617) 951-7000

*Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation*

Dated:  February 8, 2007

16

**CERTIFICATE OF SERVICE**

    I, Christopher R. Dillon, hereby certify that a true copy of the foregoing document was served upon all counsel of record electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 8th day of February, 2007, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.

                                                                        /s/    Christopher R. Dillon