# UNITED STATES DISTRICT COURT
# THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

NO. 1456

Civil Action No. 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:

Judge Patti B. Saris

*State of Montana v. Abbott Labs Inc., et al.,*
D. Mont. Cause No. CV-02-09-H-DWM

## MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................1

II.     BACKGROUND ...........................................................................................................3

        A.      The Role of AWP in Montana Medicaid Reimbursement for Drugs. ..............3

                1.      Montana chose to use AWP precisely because it was well above
                        actual acquisition cost. .............................................................................6

                        a.      Montana retained an AWP-based reimbursement system to
                                offset under-reimbursement in other areas, primarily low
                                dispensing fees. .............................................................................7

                        b.      Montana retained an AWP-based reimbursement
                                methodology in order to give providers a profit margin, to
                                ensure equal access to drugs. ....................................................9

                2.      Montana not only knew that AWP exceeded acquisition cost, it
                        studied the extent of the difference. .......................................................12

                        a.      Montana actively participated in federal OIG studies that
                                informed the State of significant "spreads" between AWP
                                and actual acquisition cost. ......................................................12

                        b.      Depositions of Montana Medicaid officials establish that
                                the State knew that AWP substantially exceeded actual
                                acquisition cost................................................................................15

                        c.      Montana received and did not use actual "average sales
                                price" data from several Defendants.........................................17

        B.      Third-Party Payors in Montana Knew that AWP Did Not Represent Actual
                Acquisition Cost...............................................................................................18

III.    ANALYSIS....................................................................................................................20

        A.      The Court Should Grant Summary Judgment on Montana's Unfair Trade
                Practices Claims................................................................................................21

                1.      The Court should grant summary judgment on the MUTPA claim
                        on behalf of Montana Medicaid.........................................................21

                        a.      Because Montana Medicaid *chose* to reimburse based on
                                AWP, its MUTPA claim is barred. ...........................................21

b.    Exercising the discretion afforded to it under statute, Montana Medicaid *chose* to reimburse on the basis of AWPs published by First DataBank. .......................................24

c.    The State has not suffered any loss because of the rebates Defendants paid to the State. .................................................26

2.    The Court should grant summary judgment on the State's *parens patriae* claim on behalf of Third-Party Payors and other unnamed claimants. ........................................................................27

B.    The Court Should Grant Summary Judgment on Montana's Medicaid Fraud Claim. ...........................................................................................30

C.    The Court Should Grant Summary Judgment on Montana's False Claims Act Claim. ...........................................................................................33

1.    Montana admits that Defendants did not submit any claims to the State ......................................................................................................33

2.    The Court should grant summary judgment because Montana has not shown falsity. ...................................................................................34

D.    The Court Should Grant Summary Judgment With Respect to Montana's Claims for Multi-Source Drugs. .........................................................36

1.    Montana did not use AWP as the reimbursement benchmark for most multi-source drug claims. ...........................................................36

2.    For those multi-source drug claims arguably reimbursed based on AWP, summary judgment is appropriate. ...........................................38

E.    The Court Should Grant Summary Judgment on All Claims Because the Statute of Limitations Has Run. ........................................................40

1.    The statute of limitations began to run no later than 1995. .................40

2.    The statute of limitations also bars the State's *parens patriae* claims. .......................................................................................................41

F.    The State's Penalties Theory Is Not Supported by Law. .................................41

G.    The Court Should Grant Summary Judgment on Montana's Request for an Award of Punitive Damages. ...........................................................42

IV.   CONCLUSION...........................................................................................................42

# GLOSSARY OF TERMS

**AMP**……………………………………………..Average Manufacturer Price

**ASP**……………………………………………………Average Sales Price

**AWP**…………………………………………………..Average Wholesale Price

**BCBS**…………………………………………….....Blue Cross Blue Shield

**CMS**………………………………….....Centers for Medicaid and Medicare Services

**Complaint / Compl.**......................State of Montana's Second Amended Complaint

**DP**………………………………...………………………….........Direct Price

**DPHHS**………………….........Montana Department of Health and Human Services

**EAC**…………………………………………………Estimated Acquisition Cost

**FFP**…………………………………………………Federal Financial Participation

**FUL**……………………………………………………Federal Upper Limit

**HCFA**…………………………………....U.S. Health Care Financing Administration

**HHS**……………………………………………U.S. Health and Human Services

**MAC**……………………………………………….Maximum Allowable Cost

**MFCA**………………………………………………….....Montana False Claims Act

**MMCAP**………………Minnesota Multi-State Contracting Alliance for Pharmacy

**MUTPA**……………………………………....Montana Unfair Trade Practices Act

**NDC**……………………………………………………National Drug Code

**OIG**………………………………………………….....Office of Inspector General

**PAD**……………………………………………..physician-administered drug

**PBM**……………………………………………….pharmacy benefit manager

**TPP**……………………………………….....................Third Party Payor

**WAC**………………………………………………..Wholesale Acquisition Cost

# I.    INTRODUCTION

In the words of Montana Medicaid's former Pharmacy Program Officer, "we understood that AWP didn't reflect the average wholesale price."  Deposition of Dorothy Poulsen at 122:18-19.  Montana Medicaid officials knew this.  Third-party payors in Montana knew this and the HHS Inspector General repeatedly told Montana this, including advising Montana of very large *average* spreads between AWP and acquisition cost, particularly for multi-source drugs.  Statement of Undisputed Material Facts In Support of Defendants Motion for Summary Judgment ("56.1 Stmt.") ¶¶ 21-36, Exs. 11, 33-39, 76-78.  Yet Montana Medicaid chose to use, and continues to use, an adjusted AWP benchmark as an option for Medicaid reimbursement.  It did so for good reasons.  Montana Medicaid made this choice to ensure access to needed medical care by preserving an economic incentive for providers (pharmacists, physicians, and other dispensers of prescription drugs) to serve the low-income Medicaid population, including those located in small towns in rural Montana.  In so choosing, Montana Medicaid balanced the interests of three constituencies:  the beneficiaries (to whom the State was obligated to maintain access), the providers (who needed an economic incentive to serve Montana Medicaid clients), and the taxpayers (to whom the State was accountable for costs).  56.1 Stmt. ¶¶ 18-20, 41-50, Exs. 8, 12, 14 (Poulsen Tr. at 233:15-234:3; Deposition of Shannon Marr at 124:14-125:12; Deposition of Nancy Ellery at 159:13-160:7).

In this lawsuit, an elected official not charged with the task of facilitating medical care for poor Montana residents claims he is shocked to find out that Montana Medicaid was reimbursing providers at prices above their direct out-of-pocket acquisition costs.  The Attorney General seeks to overturn more than a decade of careful policy decisions by Montana Medicaid to pay providers at a level that would ensure their continued participation in the Montana Medicaid program, and to force the pharmaceutical companies to pay money that Montana Medicaid knowingly and intentionally paid to those providers (*not* to Defendants).

If the State now wants to reverse the policy decisions knowingly made years ago, it can make a prospective change—though tellingly, it has not done so even in the *five years* since it

filed this lawsuit.  Nonetheless, the Montana Attorney General alleges that the State was "deceived" because the AWPs published by third-party publishers were not actual average wholesale prices.  *See, e.g.*, Compl. ¶¶ 656, 663, 676, 688.  But Montana officials testified that they long knew that AWP did not equal average wholesale price, and they chose to reimburse for drugs in excess of acquisition cost for sound policy reasons.  In short, the State is asking the Court to legislate retroactively a change to its own rulemaking efforts and policy decisions.

This motion for summary judgment addresses the four statutory claims in the Complaint, each of which centers on an allegation that the State was deceived.  First, in a *parens patriae* claim on behalf of Montana residents and unidentified "Third-Party Payors," ("TPPs") Montana alleges that Defendants are liable for deceptive business practices under the Montana Unfair Trade Practices Act ("MUTPA"), MONT. CODE ANN. § 30-14-101, *et seq*.  Compl. ¶¶ 654-660.  Second, under the same MUTPA provision, the State asserts a claim on behalf of the State (for alleged overpayments to providers in the Montana Medicaid program) and in a *parens patriae* capacity on behalf of unidentified "residents."  *Id.* ¶¶ 661-667.  Third, Montana alleges that Defendants are liable for "Medicaid fraud" under MONT. CODE ANN. § 53-6-160.  *Id.* ¶¶ 668-679.  Last, Montana asserts a claim under the Montana False Claims Act ("MFCA"), MONT. CODE ANN. § 17-8-231.  *Id.* ¶¶ 680-691.[1]

None of these claims can survive summary judgment.  The State's deliberate choice to use AWP as a benchmark in its reimbursement system – while knowing that published AWPs substantially exceeded average wholesale prices (especially for drugs subject to competition) – is fatal to all four of these statutory claims.  But there are other powerful reasons for granting summary judgment:  (1) Montana cannot satisfy the requirements of the MUTPA – in its claims on behalf of either the State itself or its residents – as the State and TPPs  were not "deceived" by

---

[1] Montana also alleged that Defendants violated MUTPA in submitting their "Best Prices" to the federal government.  *Id.*  The Court dismissed all of Montana's Best Price claims except as to six of the drugs at issue.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187, 208 (D. Mass 2004).  Montana's case involves more than a thousand NDCs (National Drug Codes).  This brief does not address the "Best Price"-related claims that may remain as to those six drugs, except to note that the State produced no evidence to support those claims.

any "unfair" act or practice of Defendants; (2) the Medicaid Fraud Act claim is deficient because Montana cannot show that any of the Defendants are "providers," or that they submitted fraudulent claims, MONT. CODE ANN. § 53-6-155(13); and (3) Montana's False Claims Act claim also fails to meet the elements of that statute requiring proof that a defendant submitted a fraudulent claim, MONT. CODE ANN. § 17-8-231; Montana's claims regarding multi-source drugs – most of which were not reimbursed on the basis of AWP – fail under any of the statutory claims; and (5) Montana's claims are all barred by the two-year statute of limitations.

## II.   BACKGROUND

### A.   The Role of AWP in Montana Medicaid Reimbursement for Drugs.

Each state's participation in Medicaid is voluntary, but participating states must comply with federal statutory and regulatory requirements. *See generally Wilder v. Va. Hospital Ass'n*, 496 U.S. 498, 502 (1990). Among other requirements, a state must submit for approval by the Secretary of U.S. Health and Human Services ("HHS") a "state plan" that sets forth the methods for reimbursing health care providers for goods and services. *Id.*; *see* 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 430.10, 447.201. No federal statute or regulation requires the use of AWP as a reimbursement benchmark by a state Medicaid program.

A State plan "must describe comprehensively the agency's methodology of payment for, *e.g.*, prescription drugs." 42 C.F.R. § 447.333(a). Within the limits imposed by federal regulations, *see* 42 C.F.R. §§ 447.331(b)(1)-(b)(2) & 447.301, it is up to each state to decide how to reimburse Medicaid providers. A key limit to that discretion is that the reimbursement level must be such "that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). Pursuant to federal regulations, reimbursement for brand name drugs must not exceed, in the aggregate, the estimated acquisition costs plus reasonable dispensing fees, and reasonable dispensing fees is defined to include "overhead, professional services and profits." 42 C.F.R. § 50.504(b)(1). The standard for multi-source drug reimbursement is a reasonable dispensing fee plus an amount established by the federal Centers for Medicare and Medicaid

Services ("CMS") that is equal to 150% of the published price for the least costly therapeutic equivalent (the Federal Upper Limit or "FUL") – again "in the aggregate." *See* 42 C.F.R. § 447.332. In submitting its plan to CMS, Montana certified that it complied with these requirements and had findings available to support this determination, and CMS – after reviewing Montana's reimbursement methodology – approved it.[2]

No federal statute or regulation requires the use of AWP by a state Medicaid program, as the MDL Court has noted. *In re: Pharm. Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 65, 74 (D. Mass. 2006). As a result, several state Medicaid programs do not reimburse based on AWP.[3] To change its reimbursement method, a state must submit a "state plan amendment" for approval by the Secretary of HHS. 42 C.F.R. § 430.12. If a state wishes to make any "significant proposed change" in its "methods and standards for setting payment rates," it must provide public notice and an opportunity for providers, patient groups, and other interested parties to comment. 42 C.F.R. § 447.205(a).

Montana Medicaid, pursuant to statutes conferring broad discretion on the agency, is responsible for establishing its reimbursement methodology based on its own determination of how to best achieve Montana Medicaid's broader purpose of providing access to care. Mont. Code Ann. § 53-6-113(3) ("The department may *in its discretion* set rates of reimbursement that it determines necessary for the purposes of the program.") (emphasis added); *see also* Mont. Code Ann. § 53-6-101(1). Montana Medicaid's methodology thus is, and always has been, established by administrative regulations promulgated by Montana Department of Public Health and Human Services ("DPHHS"), the agency of which Montana Medicaid is a part. 56.1 Stmt. ¶ 1, Ex. 74.

---

[2] 56.1 Stmt. ¶ 80, Ex. 57 (correspondence from Montana Medicaid officials to HCFA certifying compliance with relevant HCFA regulations).

[3] *See, e.g.*, Mass. Regs. Code tit. 114.3 § 31.01 (WAC (Wholesale Acquisition Cost) + 5%); 1 Tex. Admin. Code § 355.8541 ("wholesale estimated acquisition cost" or "direct estimated acquisition cost"); N.J. A.D.C. 10:54-8.4 (2006) (physician-administered drugs reimbursed based on "the physician's acquisition cost," if that is less than AWP)).

Since at least 1988 (pre-dating the State's claims by several years), Montana Medicaid has reimbursed providers for drugs based on whatever is the lowest of the several pricing benchmarks contained in its methodology. [4]

- From 1988 until 2000, Montana Medicaid reimbursed based on "whichever is lower" between (1) "estimated acquisition cost" ("EAC"), which Montana defined as "[t]he Direct Price (DP) charged by manufacturers to retailers" or "[i]f no DP is available," AWP-10%; (2) "maximum allowable cost"; or (3) "usual and customary charge."  A.R.M. 46.12.102; A.R.M. 46.12.703.

- In 2000, Montana Medicaid added a reimbursement alternative, permitting reimbursement based on "allowable acquisition cost" if Montana Medicaid determined that "acquisition cost [was] lower than either [the available DP] or [AWP less 10%]."  *See* A.R.M. 37.86.1101(1); 56.1 Stmt. ¶ 3, Exs. 20-21, 74. The 2000 change reflected Montana's knowledge that actual acquisition cost was often lower than AWP-10%.

- In 2002, Montana changed its definition of EAC from AWP less 10% to AWP less 15%, but still reimbursed *whichever is lower* from among the "usual and customary" charge submitted by the provider, "Direct Price," AWP less 15%, or "allowable acquisition cost . . . when the department determines that acquisition cost is lower than [DP or AWP – 15%]," or "maximum allowable cost" for multi-source drugs for which there is a Federal Upper Limit.  A.R.M. 37.86.1105(1); A.R.M. 37.86.1101 (emphasis added); 56.1 Stmt. ¶ 4, Exs. 23-24.

*See also* 56.1 Stmt. ¶ 5, Ex. 13.  While the specifics of Montana's reimbursement formula have changed over time, what has remained constant is that Montana Medicaid's rule-based reimbursement is based on AWP *only when that is the lowest amount that the formula produced*. Montana Medicaid officials refer to this as a "lesser of" methodology, 56.1 Stmt. ¶ 5, Ex. 13, Peterson Tr. 100:20-101:20, meaning that claims are reimbursed based on AWP *only* when a

---

[4] Although Montana's Complaint alleged that "numerous State agencies have overpaid for medicines based upon the fraudulently reported AWP's," Compl. ¶ 652, Montana subsequently disavowed any claim of damages to any State entity other than Medicaid.  *See* Montana's Objections and Responses to Defendants' First Set of Requests to Admit at 6 (RFA No. 15).  56.1 Stmt. ¶ 105, Ex. 82.  Montana likely did so because, contrary to the allegations, some non-Medicaid agencies did not pay for drugs based on AWP at all.  56.1 Stmt. ¶ 7, Ex. 6 (Rose Svitak Dep. Tr. 12:10-18; 14:9-15; 21:18-21; 31:13-20 (testifying regarding agencies that purchased drugs through the Multi-State Contracting Alliance for Pharmacy ("MMCAP")).  To the extent any non-Medicaid agency paid based on AWP, those agencies often paid at discounts far greater than the 10% - 15% discount off AWP in Montana Medicaid's reimbursement methodology (up to 60% off AWP for generic drugs under some PBM contracts).  *See, e.g.*, 56.1 Stmt. ¶ 98, Ex. 28 (showing Montana's knowledge of the massive discounts off AWP available to Montana providers in light of the State's own purchase of the subject drugs); Gaier Decl. ¶¶ 30-33, Ex. 11.

discounted use of that benchmark results in the lowest charge to the State.  In all other cases, including the vast majority of claims for multi-source drugs, reimbursements were not based on AWP at all.  56.1 Stmt.¶ 6, Exs. 25-26 (Gaier Decl. ¶¶ 48-49).

1.      **Montana chose to use AWP precisely because it was well above actual acquisition cost.**

Montana did not believe that AWP represented the actual acquisition cost for drugs, nor was it misled into such a belief; instead, its Medicaid program purposefully chose to use a discounted AWP as a reimbursement benchmark for its own policy reasons.  Montana understood that under-reimbursement for dispensing and other services was offset by an adjusted AWP reimbursement of drug ingredient costs.  56.1 Stmt. ¶ 63, Ex. 14 (Poulsen Tr. 95:20-96:20).  Montana knew that businesses such as retail pharmacies will not participate in the Medicaid program without a financial incentive.  *Id.* ¶ 47, Exs. 7-8 (Ellery Tr. 25:22-27:15; Chappuis 86:13-88:10; Dalton 121:6–122:20).  Montana was keenly aware that reducing reimbursement for drugs beyond the AWP formula it selected would have prompted the withdrawal of pharmacies and providers from participation in Montana Medicaid, thereby reducing patient access to services.[5]

Montana also knew that using an adjustment upward from actual acquisition cost was a possible alternative to get the same balance (and thus not an alternative that would have saved the State any money).  But an acquisition "cost plus" has its own problems, and Montana

---

[5]  *See* 56.1 Stmt ¶ 64, Exs. 1, 17 (Bowsher Tr. 63:10-64:11 ("A: I don't recall any program when I was working that, any time we reduced reimbursement, we didn't hear from somebody.  Q: [T]he concerns about changes to reimbursement, was access to medical care a concern of Montana Medicaid with respect to reimbursement levels and the prospect of physicians or other providers dropping out of Medicaid due to under-reimbursement?  A: As – regarding the physician program, I would attest to the fact that, yeah, we wanted coverage statewide as much as possible.  And a response from the physician community in regard to our reimbursement levels to physicians for services, that was one of the things we heard from the community, that possibly people would be dropping out and would not provide Medicaid service, or would not provide services to Medicaid individuals."); Stratton Tr. 106:10 – 107:3 ("A: 'There is no doubt that the proposed reductions in Montana Medicaid payments will impact the bottom line of Montana community pharmacies, particularly independent pharmacies, and particularly independent pharmacies in rural communities.'  Q: Is it fair to say that that conclusion is the same as the conclusion in the draft report that you authored?  A: That is correct.  Q: Is it fair to say that both the draft and the final report conclude that dispensing fees paid to pharmacies by Medicaid and TPPs are not sufficient to cover pharmacies' actual costs of dispensing drugs?  A: That is correct.")).

considered and rejected this method to replace AWP.  56.1 Stmt. ¶ 65, Ex. 2 (Deposition of Denise Brunett, Physician Program Officer, at 86:15-89:6 (paying for physician-administered drugs based on cost was a "bogus" method that would result in "elevated" charges to Montana Medicaid)).  Using an average acquisition cost would be even more problematic.  Pharmacies and medical practices in rural Montana have little buying power and relatively high costs.  *Id.* ¶ 48, Ex.17 (Stratton Tr. at 111:17-112:21 ("The cost of doing business for community pharmacies in rural communities tends to be higher, and yet, there is no rural supplement provided in the Medicaid reimbursement for that.")).  These Montana providers would be in the part of the range *above the average*, meaning that they would be doomed to spend more on Montana Medicaid patients than they would be reimbursed, hardly an incentive to participate.[6]

> **a.**    **Montana retained an AWP-based reimbursement system to offset under-reimbursement in other areas, primarily low dispensing fees.**

The testimony of key Montana Medicaid personnel confirmed that the State's use and retention of AWP as a reimbursement benchmark was a calculated policy choice intended to ensure Montana providers were adequately reimbursed.  Asked if it was her "understanding that [a] Montana [p]harmacy would lose money on every drug it dispensed, unless it received some additional reimbursement from Medicaid," Dorothy Poulsen, Montana Medicaid's Pharmacy Program Officer, responded "That was my rationale for paying them . . . AWP less 10%, rather than some other amount, is that otherwise, they would not be paid sufficiently to provide services to our clients."  56.1 Stmt. ¶ 53, Ex. 14 (Poulsen Tr. 131:21-132:7).

---

[6] For example, assume a drug with an AWP of $100, a national actual average sales price of $70, and actual costs to an independent pharmacy in Havre, Montana, of $80 to purchase and $10 to dispense.  If Montana had used average sales price as its reimbursement methodology, the Havre pharmacist would *lose* $15.30 every time the drug was dispensed (because its $90 cost to acquire and dispense the drug would result in reimbursement of only $74.70, $70 for the average price of the drug plus the $4.70 dispensing fee).  If forced to operate at a loss, that pharmacy's participation in Medicaid would end quickly.

Montana is a large state with a small and widely dispersed population.  Consequently, Montana Medicaid was particularly concerned about maintaining its network of Medicaid providers throughout the state.  Poulsen testified:

> A: [I]f, for instance, we said to the pharmacists, you have to charge us only your acquisition costs and we had some mechanism to determine whether or not they were actually doing that and we were paying them $4.14 for dispensing, they would not have been reimbursed adequately.
> Q: They would have lost money on every drug they dispensed?
> . . . .
> A: They would have lost money on their business, yes.
> Q: And that would have harmed access to Medicaid beneficiaries?
> . . . .
> A: Yes.  Well, it would have done worse than that.
> Q: What would it have done?
> A: In many instances, it would have closed pharmacies in small towns and it would have hurt the population as a whole.

*Id.* ¶ 54, Ex. 14 (Poulsen Tr. 95:20-96:20).  Montana's use of AWP less 10% in its reimbursement methodology, rather than applying a heavier discount or using an average acquisition cost, was partly intended to make up for the inadequate dispensing fee: "I'm not sure which is the chicken and which is the egg.  Did we pay a low dispensing fee because we thought that they [pharmacies] were making money on the drug?  Or did we let them have money on the drug because we were paying them a low dispensing fee?  I don't know." *Id.* (Poulsen Tr. 132:19-133:2).  Even after the Attorney General filed the Complaint, in June 2002, Montana Medicaid changed its reimbursement method from AWP-10% to AWP-15%, but at the same time, raised its dispensing fee from $4.35 to $4.70 to "make up for the loss imposed by the change to AWP-15%."  56.1 Stmt. ¶ 73, Ex. 52.

Although Montana made modest increases to its dispensing fee from time to time, it recognized that dispensing fees have consistently been too low to cover providers' actual costs.  In a December 6, 1999, report for Montana legislators, Poulsen estimated that the "maximum dispensing fee of $4.20 covers between one-fourth and one-half of the cost incurred by pharmacies."  56.1 Stmt. ¶ 55, Exs. 14, 27 (Dorothy Poulsen, *Medicaid Services Prescription Drug Program* (Dec. 6, 1999); Poulsen Tr. 128:2-128:17).  Montana Medicaid knew the

providers' actual dispensing costs because of surveys the State conducted, which validated providers' complaints that Medicaid's dispensing fee was simply too low to cover their costs. 56.1. Stmt. ¶ 61, Ex. 47 (showing many Montana pharmacies had average dispensing costs greater than $10 per prescription).  Based on its surveys, Montana Medicaid determined that pharmacies'

> cost of doing a prescription would have been . . . between $8 and $16 per prescription and we were paying $4.20.  When we used our methodology to determine what our dispensing fee should be, the amount we came up with was invariably higher than what the capped dispensing fee was.  So virtually everyone had the capped dispensing fee.

*Id.* ¶ 56, Ex. 14 (Poulsen Tr. 129:17-130:2, 130:21-131:7).

The federal government has also recognized that Medicaid dispensing fees nationwide are too low.  A 1993 study done for the U.S. Health Care Financing Administration ("HCFA"), the predecessor to CMS, and a 2004 study for CMS concluded that Medicaid dispensing fees did not come close to covering pharmacy costs.  56.1 Stmt. ¶ 62, Ex. 48.  Accordingly, federal regulations provide that, for Medicaid, reimbursement should cover acquisition costs plus a reasonable dispensing fee "in the aggregate."  42 C.F.R. § 447.331(b)(1).  In other words, individual state Medicaid agencies could make up for unreasonably low dispensing fees by providing additional reimbursement to a provider for drug costs, in order to bring "aggregate" reimbursement to a level that covered pharmacists' costs and provided some level of profit.  56.1 Stmt. ¶¶ 63, 76, Exs. 14, 53.  In Montana, Medicaid chose to implement the aggregate limit rule by offsetting the under-reimbursement for dispensing fees with a greater reimbursement for drug costs.  *Id.* ¶ 66, Ex. 14.

> **b.     Montana retained an AWP-based reimbursement methodology in order to give providers a profit margin, to ensure equal access to drugs.**

Montana was concerned about access to care not just for its own purposes but because, under the federal Medicaid statute and regulation, state Medicaid plans must:

> assure that payments are consistent with efficiency, economy, and quality of care and *are sufficient to enlist enough providers so that care and*

> *services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area*[.]

42 U.S.C. § 1396a(a)(30)(A) (emphasis added); *see also* 42 C.F.R. § 447.204.  This federal "equal access" provision requires state Medicaid programs to adopt a reimbursement formula that will set rates that allow providers' continued participation in the Medicaid program so that beneficiaries may continue to have access to drugs.  *See, e.g., Rite Aid of Pa., Inc. v. Houstoun*, 171 F.3d 842, 851-52 (3d Cir. 1999); *Methodist Hosps., Inc. v. Sullivan*, 91 F.3d 1026, 1030 (7th Cir. 1996); *see also Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 530 (8th Cir. 1993) (agency must consider the Medicaid Act's factors of "equal access, efficiency, economy, and quality of care" when setting reimbursement rates)[7].

Montana witnesses confirmed that equal access to care was a predominant factor in Montana's choosing and repeatedly retaining an AWP-based reimbursement methodology.[8] Those concerns were articulated clearly, and in a binding fashion, by Montana's 30(b)(6) witness:

> Q:  So is that really a fourth and related factor that Montana Medicaid considered in setting its reimbursement rate, *was maintaining access to care for Medicaid beneficiaries*?
> A:  *It's always a concern that we have in setting payment rates*.
> …
> Q:  Was another factor in revising the reimbursement rate whether pharmacies might not be financially viable if reimbursement was reduced

---

[7] Montana Medicaid has described access as one of its "common values and principles."  56.1 Stmt. ¶ 44, Ex. 40.

[8] 56.1 Stmt. ¶ 45, Exs. 3, 11, 14-15 ("Q:  While you worked at Montana Medicaid in pharmacy issues, was the viability of Montana's pharmacies a concern for you?  A:  Yes.  Q:  Why was that?  A:  *Access to services was always a concern*.")  Poulsen Tr. at 266.14-16 (emphasis added); ("It's a rural state and *access to health care is a major issue*.") Preshinger.Tr. at 75.8-75.11 (emphasis added); ("Q:  So in determining the level of reimbursement for pharmaceutical drugs, is access an important consideration for Montana Medicaid?  A:  Yes, it is.") Bullock Tr. at 60.3-20; ("Q:  Do you recall concerns about making that change [to AWP – 25% for generics], that it might reduce access to generic drugs?  A:  Yes.  Q:  And what was the nature of the concern?  A:  That pharmacies would say we've had enough, we can't afford this anymore, we can't afford to serve Medicaid patients.  Q:  Even though they were reimbursed at something above their actual acquisition costs?  A:  Yes, that was the discussion, yes.  Q:  But it wasn't enough above their --  A:  Right.  Q:  And did you take those concerns seriously?  A:  Yes.  Q:  And were those factored into the policy decisions that Montana Medicaid made?  A:  Yes.") Krantz Tr. at 31.5-32.10).

significantly?
A:  I'm sure that was also a concern that we had, is the impact on the
pharmacies and the impact on the clients, as well.
Q:  By impact on the clients, the concern of Montana Medicaid was the
potential impact on the Medicaid beneficiaries?
A:  *Medicaid beneficiaries and their access to services.*

56.1 Stmt. ¶ 46, Ex. 5 (Buska Tr. 317; 382:1-12 (emphasis added)).  While access to care is an

issue for most Medicaid programs, access concerns were heightened in Montana because of its

dispersed population.  As of 2001, eight Montana counties did not have a single pharmacy; many

others had only one or two.  56.1 Stmt. ¶ 13, Ex. 30.  Then University of Montana professor of

pharmacy Timothy Stratton co-authored a 2002 survey considered by Montana Medicaid

regarding reimbursement and access in Montana, which observed:

> Montana's independent community pharmacies operate on very tight
> margins.  Further reductions in dispensing fees to pharmacies will do little
> to reduce the overall price paid for prescription drugs, and could pose a
> very real threat to the ability of independent community pharmacies to
> remain open for business.  This is particularly true of independent
> community pharmacies serving Montana's rural communities.

56.1 Stmt. ¶ 20, Ex. 32.[9]

Montana has been so acutely aware of – and responsive to – the relationship between

reimbursement levels and access, that in 2003 it considered and ultimately rejected a proposal to

reduce the AWP-based portion of its reimbursement for multi-source drugs from AWP-15% to

AWP-25%.  *Id*. ¶ 77, Ex. 54.  Montana's Pharmacy Program Officer Dan Peterson explained

Montana Medicaid's rationale for rejecting the change it had proposed:

> In March 2003 the Department conducted a public hearing to reduce [the]
> reimbursement rate to pharmacy providers for generic drugs to Average

---

[9] In the context of explaining difficulties Montana faced in complying with Medicare Part D access
requirements for prescription drugs, Montana Medicaid Director John Chappuis wrote to CMS requesting that CMS
establish a "frontier" category that would reflect the very small number of providers available to reach beneficiaries
in certain parts of Montana.  56.1 Stmt. ¶ 14, Ex. 31 ("Montana would like CMS to add language that defines
'frontier' service areas as well, and address how beneficiary populations, like those in Montana, can expect service
delivery.  We would expect to see that anywhere in the proposed rules that utilize these (3) service area definitions
also address 'frontier' services areas.  The term 'Rural' doesn't really do justice for places like Lame Deer and Two
Dot.").

> Wholesale Price (AWP) less 25% to AWP less 15%.  The Department
> decided not to pursue this reduction after considering testimony and
> comments given by pharmacy providers and the Montana Pharmacy
> Association that *the reduction could lead to the closure of pharmacies in
> Montana and would limit pharmacy access to Medicaid clients.*

*Id.* (emphasis added).

Since the filing of this lawsuit, Montana Medicaid has repeatedly chosen to retain an

AWP-based system and chosen not to go below the 15% discount off AWP it adopted in 2002.

*Id.* ¶ 78, Exs. 2, 8-10 (Deposition of John Chappuis, Medicaid Bureau Chief at 24:5-8; Ellery

Tr. at 132:13-22; Ireland Tr. at 99:4-8).  As of today, Montana still uses AWP as one of its

reimbursement benchmarks because it continues to recognize that providers require economic

incentives to participate in Montana Medicaid.  *Id.* ¶ 79, Ex. 55 ("Pharmacies are retail outlets

and if we bring their profit level down to or near zero, they may choose not to participate in

Medicaid.  We now pay a dispensing fee of about $4.75 per script.  In order to maintain access,

we may have to raise that.") (Aug. 19, 2005, Email from J. Chappuis to A. Weiss).

### 2. Montana not only knew that AWP exceeded acquisition cost, it studied the extent of the difference.

#### a. Montana actively participated in federal OIG studies that informed the State of significant "spreads" between AWP and actual acquisition cost.

Years before this lawsuit was filed, the Office of Inspector General ("OIG") conducted

two studies comparing published AWPs and actual acquisition cost for *Montana* providers.

These studies demonstrated the extent to which Montana providers' actual acquisition costs were

far below the published AWPs, particularly for drugs subject to competition.  56.1 Stmt. ¶ 21,

Exs. 33-34; (HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed

Under the Medicaid Prescription Drug Program of the Montana Department of Public Health

and Human Services*, A-06-95-00068 (July 1996); HHS-OIG Report, *Review of Pharmacy

Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the*

*Montana Department of Public Health and Human Services*, A-06-01-00005 (Feb. 2002)).

Montana Medicaid actively participated in these studies.  *See* 56. Stmt. ¶ 22, Exs. 11, 35.[10]

Terry Krantz, the Montana Medicaid official who actively participated with the OIG in preparation of the study, confirmed Montana's knowledge of its results.  *Id.* ¶ 22, Ex. 11 (Krantz Tr. 54:10-12).  Krantz participated in a meeting in September 1995 with the OIG and representatives of other states also involved in OIG pharmacy acquisition cost studies.  56.1 Stmt. ¶ 23, Ex. 36.  On October 5, 1995, Krantz wrote to the Montana Medicaid director Nancy Ellery to report on preliminary results presented at the meeting.  *Id.* ¶ 24, Ex. 36.  Krantz emphasized: "While AWP is a national standard it is apparent from the results of the survey that it *has little to do with the acquisition cost of pharmacy products*."  *Id.* (emphasis added); *Id.* ¶ 24, Ex. 11 (Krantz Tr. 55:2-17) ("Q:  The survey you were referring to there was the OIG survey of pharmacy acquisition costs?  A:  Yes.").  In his 1995 memo to Ellery, Krantz reported that the initial results for Montana showed that average acquisition cost for brand name drugs was AWP-16.23% and AWP-48.46% for generic drugs, compared to national results of AWP-18.3% and AWP-42.45%, respectively.[11]  *Id.* ¶ 25, Ex. 36.  Krantz testified that other key Montana Medicaid officials received that OIG report and were aware of its findings.  56.1 Stmt. ¶ 27, Exs. 11, 27 (Krantz Tr. 59:19-60:3).

Despite the study's clear finding of a large disparity between published AWPs and the prices actually paid by Montana providers, Montana Medicaid did not alter its reimbursement methodology in response.  Montana Medicaid instead maintained that the OIG study did not

---

[10] The Inspector General noted that "Terry Krantz, of Nancy Ellery's staff, worked closely with us during this review from the planning of our work through the drafting of the reports."  56.1 Stmt. ¶ 22, Ex. 35.

[11] As the OIG report indicated, because these figures were averages, far greater spreads existed for some drugs and far greater discounts (and thus greater spreads) were available to certain providers, such as "non-traditional" pharmacies (which purchased brand name drugs in Montana at an average of AWP-28% and generic drugs at an average of AWP-62%), though the OIG did not even include these figures in its overall "average" discount.  56.1 Stmt. ¶ 26, Ex. 33.  Translated into the misleading spreads used by the State's expert (by calculating spreads based on the percentage above acquisition cost instead of the method used by the OIG, the percentage discount below AWP), the 1995 OIG draft revealed to Montana spreads of 38.8% *average* spreads for certain Montana providers for brand name drugs and of 212% for generic drugs.

adequately address dispensing fees and that "states must do additional work to determine whether the cost to dispense is being accurately reimbursed." 56.1 Stmt. ¶ 28, Ex. 36. "In Montana," Krantz stated, "the dispensing fee reimburse[ment] is below the cost to dispense because of the cap on dispensing fees that is currently in place." *Id.* This basis for not using the study's findings to change its reimbursement methodology was also cited in Montana's official response to the OIG. 56.1 Stmt. ¶ 28, Ex. 33.

In February 2000, Montana participated in another OIG study comparing published AWPs and actual acquisition costs in Montana, and once again the results confirmed the vast gulf between the two figures. 56.1 Stmt. ¶ 29, Ex. 37. An August 2001 draft reported that, "[f]or Montana, the overall estimate of the extent that invoice price was discounted below AWP was 19.71 percent for brand name drugs and 65.37 percent for generic drugs." 56.1 Stmt. ¶ 30, Ex. 38 (HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services*, A-06-01-00005 (Aug. 2001 draft)).[12] Montana again deferred any change to its reimbursement methodology because it believed the study failed to account for dispensing costs borne by its local pharmacies. 56.1 Stmt. ¶ 31, Ex. 39 ("We appreciate your recognition of the fact that the review does contain some limitations, including . . . the costs of dispensing[,] which includes costs for supplies and staff.").

In addition to its direct involvement in the OIG's two-Montana-specific studies, Montana Medicaid officials regularly received other OIG studies that made plain that AWP did not come close to actual acquisition costs in other states either. 56.1 Stmt. ¶ 32, Exs. 5, 15 (Buska Tr. 31:5-33:6; 145:6-146:10; Preshinger Tr. 126:8-127:3). In 1975, the predecessor agency to HHS explained "Average wholesale price is not currently determined by surveying drug marketing transactions (*i.e.*, by determining the actual price a pharmacist pays to a manufacturer

---

[12] Using the State's expert's method of calculating the "spread," the 2001 OIG figures for Montana informed the State of *average* spreads of nearly 200% for generic drugs, and of spreads available to certain types of providers well in excess of 200%.

or wholesaler for a particular drug product), and thus *published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers.*"  56.1 Stmt. ¶ 33, Ex. 76 (emphasis added).

OIG investigations throughout the 1980s and 1990s consistently laid out the significant disparity between AWP and actual acquisition cost.  A 1984 OIG study determined that 99.6% of pharmacies' Medicaid-reimbursed drug purchases nationwide were made at prices below AWP. 56.1 Stmt. ¶ 34, Ex. 77.  The OIG concluded that "pharmacies do not purchase drugs at the AWP published in the 'Bluebook,' 'Redbook,' or similar publications[, and t]hus, AWP cannot be the best—or even an adequate—estimate of the prices providers generally are paying for drugs." These findings were reflected in guidance to state Medicaid agencies regarding establishment of proper reimbursement levels.  In 1989, HCFA revised the *State Medicaid Manual* to emphasize "the preponderance of evidence demonstrating that AWP overstates the prices that pharmacies actually pay for drugs."  56.1 Stmt. ¶ 35, Ex. 78.

> **b.    Depositions of Montana Medicaid officials establish that the State knew that AWP substantially exceeded actual acquisition cost.**

Montana Medicaid preserved access to care by reimbursing providers at a level that allowed a reasonable profit for their services.  Unsurprisingly then, Montana Medicaid officials knew that AWP did not represent actual acquisition cost:

- <u>Maggie Bullock</u> (Montana Medicaid Director, 2001-2002):

  Q:  When did you first become aware that AWP was not the actual acquisition price?
  A:  I don't remember when I actually became aware.
  Q:  But it was clear that people on your staff were aware of that?
  A:  Yes.

56.1 Stmt. ¶ 37, Ex. 3 (Bullock Tr. at 47:2-47:8).[13]

---

[13] The record shows that Montana Medicaid deferred to the judgment of its Program Officers regarding the establishment of its reimbursement methodology for drugs.  56.1 Stmt. ¶ 40, Exs. 7-8, 15.

- Jeff Ireland (Pharmacy Program Officer, 1992-1995):

  Q:  'While AWP is a national standard it is apparent from the results of the
  survey that it has little to do with the acquisition costs of pharmacy
  products.'  Do you see that?
  A:  Yes, I do.
  Q:  Was that your understanding at the time [1995] as well?
  A:  Yes.

56.1 Stmt. ¶ 37, Ex. 10 (Ireland Tr. at 77:16-22; 78-3).

- Dorothy Poulsen (Pharmacy Program Officer, 1996-2001):

  Q:  Do you recall how you learned when you were the Montana Medicaid
  pharmacy program officer that AWP did not represent actual acquisition
  cost? …
  A:  It – through discussions with other pharmaceutical people – through
  discussions with other program officers in other states.  Through – I mean,
  I guess it was not anything specific.  It was just a general understanding.
  Q:  It was a general understanding among State pharmacy program
  officers that AWP didn't represent actual acquisition cost?
  A:  Right.
  Q:  Did you understand what Mr. Hanley [Arkansas's Medicaid Director]
  was referring to by calling AWP a bogus mark?
  A:  Well, yes.  I generally understood, average wholesale price wasn't
  average wholesale price.

56.1 Stmt. ¶ 37, Ex. 14 (Poulsen Tr. at 17:4-17; Poulsen Tr. at 116:12-16); *see also* 56.1 Stmt.

¶ 37, Ex. 41 (Poulsen's handwritten notes comparing AWP, Montana Medicaid reimbursement,

DP, and "Pharmacy's price," which clearly show reimbursement exceeded the price to the

pharmacy).

Poulsen also admitted that she "understood that AWP minus 10% did not represent actual

acquisition cost."  *Id.* ¶ 37, Ex. 14 (Pouslen Tr. 57:11-14; *see also id.* 43:3-10 ("[I]t always just

struck me as a strange thing that we were talking about the new-true Medicaid AWP, recognizing

there was an old true AWP.  The language is silly . . . [because] that would assume there was an,

'old-true Medicaid AWP.'")).  Asked about an email sent by Minnesota's Medicaid pharmacy

program director to other state Medicaid administrators, Poulsen said:

  Q: Do you see . . . where it says: "Almost everyone who is familiar
  with pharmacy reimbursement knows that AWP [means] 'Ain't
  What's Paid'"?

A: Yes.

Q: Did you know that?

A: Yes.  I mean, the common knowledge was that AWP was, again, as I've said before, not what it sounded like.  That's why it was discounted.

Q: And you knew that while you were the pharmacy [program officer] for Montana Medicaid?

A: Yes.  *I wouldn't have been paying attention if I didn't know that.*

56.1 Stmt. ¶ 38, Ex. 14, 42 (Poulsen Tr. 119:5-16 (emphasis added)).[14]

### c.   Montana received and did not use actual "average sales price" data from several Defendants.

That Montana Medicaid has always understood and interpreted AWP to be a benchmark price and not an actual acquisition cost is even further confirmed by its receipt and non-use of "average sales price" ("ASP") data provided by three defendants:  AstraZeneca, Bayer, and TAP.  For example, under a 2001 settlement agreement with Montana, Bayer agreed to provide quarterly reports to Montana Medicaid that listed ASP data for all Bayer medicines.  Such ASPs were defined as "the average of all final sale prices charged by Bayer" net of "volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates and all other price concessions provided by Bayer to any relevant purchaser."  56.1 Stmt. ¶ 117, Ex. 56.  Montana admits having received such ASP data every quarter over the past five years.  Montana Medicaid Pharmacy Program Officer Shannon Marr even created a chart comparing the Bayer ASPs with the corresponding AWPs for the same products, which showed that the actual ASPs were below the published AWPs-15%, yet Montana chose to continue to reimburse providers for Bayer's drugs based on its standard AWP-based methodology.  56.1 Stmt. ¶¶ 118, Exs. 1, 81 (Montana's Response to Bayer's Interrogatory No. 1); (30(b)(6) Buska

---

[14] Montana's 30(b)(6) witness Jeff Buska confirmed that the term "average wholesale price" in the Montana administrative code is not understood by Montana Medicaid to mean an actual average sales price, but rather is the price published by a third-party publisher, First DataBank.  56.1 Stmt. ¶ 39, Ex. 1 (Buska Tr. 569:4-12 ("Q: Now, the average wholesale price in Montana's regulations reflected here, that does not mean Bayer's average sales price; is that right?  A: That's correct.  Q: It means the price reported by First Data Bank that you've referred to earlier.  A: It's the pricing information supplied by First Data Bank.")).

Tr. 563:14-564:3). Montana made the same decision regarding the ASP data that it received from other Defendants; it chose not to use those prices for Medicaid reimbursements. 56.1 Stmt. ¶ 119, Ex. 81. As of the filing of this motion, Montana has based no Medicaid reimbursements on ASPs, even though its existing reimbursement methodology permits the State to reimburse based on acquisition cost where the State determines that "acquisition cost is lower than [DP] or [AWP-15%]." A.R.M. 37.86.1101.

**B.     Third-Party Payors in Montana Knew that AWP Did Not Represent Actual Acquisition Cost.**

Beyond the vague allegations in the Complaint, Montana has not even bothered to identify the TPP claimants that are purportedly before the Court, much less identify specific drug purchases that were made due to any alleged "deceptive" practice. Compl. ¶ 2 (TPPs defined as "private insurers and self-insured employees and private individuals"). But what is true for Montana Medicaid – that it long knew and understood the difference between AWP and actual acquisition costs – is also true for the broadly drawn TPP class on whose behalf Montana now seeks recovery. It has been long and widely known to TPPs that AWP does not represent an actual average of prices paid by retailers to wholesalers. 56.1 Stmt. ¶ 86, Ex. 59 (Report of Ernst Berndt, Ph.D., MDL Court-appointed expert, at 10, ¶ 14).

TPPs in Montana purchase drugs directly from manufacturers or receive rebates from manufacturers for those purchases and therefore have direct knowledge of drug prices far below AWP. As discussed in the supporting declaration of Dr. Eric Gaier, sales data produced by Defendants demonstrate that four of the top five TPPs in Montana – Blue Cross Blue Shield of Montana ("BCBS-Montana"), New West, AETNA, and CIGNA – purchased prescription drugs at deep discounts directly through contracts with manufacturers, through group purchasing organizations, or through drug wholesalers. 56.1 Stmt. ¶ 87 (Gaier Decl. ¶ 37, Ex. 20). Montana TPPs were thus aware of the large differences between AWPs and provider acquisition costs, yet

they continue to use AWP as a reimbursement benchmark.  56.1 Stmt. ¶ 88 (Gaier Decl. ¶¶ 37-39, Exs. 22-24).[15]

The vast majority of TPPs contracted for drugs through pharmacy benefit managers ("PBMs"), and thus purchased those drugs at significant discounts off AWP.  TPPs in Montana have taken advantage of the cost-reducing services offered by PBMs, including the recovery of substantial rebates.[16]  In a proposal to BCBS-Montana, AdvancePCS gave an example of an MCO customer which had, through various AdvancePCS programs, saved over $100 million in drug costs.  56.1 Stmt. ¶ 96, Ex. 10.  In 2002, AdvancePCS estimated it had saved hundreds of plans over a billion dollars.  56.1 Stmt. ¶¶ 97, Ex. 4.

BCBS-Montana, which is the largest private payor in Montana, has contracted with various PBMs since 1994.  In each of these contracts, the PBMs have agreed to pay rebates to BCBS-Montana.  56.1 Stmt. ¶ 99 (Gaier Decl. ¶ IX).  BCBS-Montana is "very aware" that PBMs may charge it a different price for drugs than they pay to the pharmacies.  56.1 Stmt. ¶ 101,

_____

[15] Even BCBS-Montana and Great West, who are Medicare carriers and thus receive data showing manufacturers' actual ASPs, as required under the Medicare Modernization Act of 2003, 42 U.S.C. § 13951, continue to use AWP as a reimbursement benchmark.  56.1 Stmt. ¶ 89 (Gaier Decl. ¶ 40).

[16] Professor Berndt did a thorough analysis of competition in the PBM market in the context of class certification in the MDL Court and concluded that, as a result of the vigorous competition among PBMs, plaintiffs could not demonstrate injury to TPPs.  Professor Berndt found that competition among PBMs was vigorous.  56.1 Stmt. ¶ 92, Ex. 59 (Berndt Report at 110, ¶ 205.)  He stated:

> In summary, the Plaintiffs' theory in the context of self-administered drugs requires that competition among PBMs be insufficient to prevent injury and damages to third party payors.  In my judgment Plaintiffs have not put forward a convincing argument supporting the notion that competition among PBMs is inadequate.  Plaintiffs' contention is also at variance with conclusions reached by the FTC.  (*Id.* at 112-13, ¶ 209.)

According to Dr. Berndt, "[a]n important implication of the patterns of diversified ownership and heterogeneous scale and scope of operations among PBMs is that commercial information regarding common negotiable contractual terms, such as rebates, discounts, audit rights, fee structure, penalties, risk assignment and other services offered is widely dispersed."  56.1 Stmt. ¶ 94, Ex. 59 (Berndt ¶ 133).  However, while the terms of a specific contract may be secret, "general knowledge concerning what is negotiable and what is the range of terms typically offered is widespread."  56.1 Stmt. ¶ 95, Ex. 59 (Berndt ¶ 134).  Relying on Professor Berndt, the MDL Court found that, due to vigorous PBM competition, payors could easily switch PBMs to achieve better prices and "that knowledge of the availability of rebates would be widespread because of the marketing by PBMs."  *In re: Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 94 (D. Mass. 2005) (citing Berndt Report, ¶¶ 206, 209)).  These court-adopted findings of intense PBM competition nationally are equally true for the Montana market.

Ex. 18.  The PBMs also disclosed to BCBS-Montana that they receive payments for administrative fees from manufacturers, which are not passed on by the PBM to BCBS-Montana. *Id.* ¶ 102, Ex. 18.  BCBS-Montana also has contracts with various State governmental entities, including Montana Children's Health Insurance Program ("CHIP"), which provided the State a discount of 60% off AWP for multi-source drugs.  56.1 Stmt. ¶ 98, Ex. 28.  The PBMs with which BCBS-Montana has contracted have negotiated rebate agreements with various manufacturers, including many of the defendants.  56.1 Stmt. ¶ 99 (Gaier Decl. ¶ IX).

In sum, the record in Montana is comprised of:  (1) statements of multiple Montana Medicaid witnesses confirming that the use of AWP was a conscious policy choice, made in full recognition that AWP did not reflect average wholesale prices or actual acquisition cost; (2) Montana-specific studies validating Montana's policy choices by identifying persistently low dispensing fees and the extent of the difference between AWP and acquisition costs; (3) consistent guidance from federal agencies that published AWPs are not closely related to actual acquisition costs; and (4) TPP testimony disproving the Complaint's allegation of deception regarding AWP.  The application of binding Montana law and federal authority to these undisputed facts requires Montana's claims to be dismissed on summary judgment.

## III.   ANALYSIS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where the non-moving party has failed to carry its burden of proof on an essential element of the claim, summary judgment must be granted.  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001); *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459 (9th Cir. 1985).  A fact is not "material" unless it is relevant to an element of a claim or defense and its existence might affect the outcome of the suit.  Disputes over irrelevant or unnecessary facts do not bar summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Similarly, a mere scintilla of evidence in support of a plaintiff's claim is insufficient; there must be evidence on which a jury could reasonably find for plaintiff.  *Id.* at 252.

**A.      The Court Should Grant Summary Judgment on Montana's Unfair Trade Practices Claims.**

MUTPA bars "[u]nfair methods of competition and unfair or deceptive acts or practices." § 30-14-103.  In both Counts I and II, Montana alleges that Defendants violated MUTPA based on their alleged involvement or acquiescence in the publication of AWPs that were greater than the acquisition costs of the drugs purchased by Montana providers.  Compl. ¶¶ 654-660, Count I (on behalf of Montana Medicaid); ¶¶ 654-667, Count II (on behalf of private payors in Montana). As to both counts, however, the evidence conclusively demonstrates that, for years, the State of Montana understood the nature of AWP and formulated Montana Medicaid reimbursement around that fully informed understanding, and so it can point to no deceptive or unfair act or practice necessary to prevail on its MUTPA claim.  Likewise, the evidence shows that TPPs were not deceived by Defendants or the nature of AWP.  Indeed, Montana has not identified a single third party who was deceived, much less produced evidence of its drug purchases or the prices paid for those drugs.

**1.      The Court should grant summary judgment on the MUTPA claim on behalf of Montana Medicaid.**

**a.      Because Montana Medicaid *chose* to reimburse based on AWP, its MUTPA claim is barred.**

Montana law comports with the principle that a party cannot claim to be deceived when it knew the relevant facts, and chose to act based on that knowledge.  Specifically, summary judgment is proper to dispose of a MUTPA claim when the facts show that the plaintiff has not been deceived.  In *Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435 (Mont. 2003), the Montana Supreme Court affirmed a grant of summary judgment to a defendant in a MUTPA action when

the plaintiff was aware of facts that contradicted the later claim of "deception."[17]  As the

*Osterman* summary judgment order makes clear, when a plaintiff is aware of facts that belie the

claim of deception, the MUTPA claim must fail.  Declaration of Kathleen M. O'Sullivan in

Support of Defendants' Joint Motion for Summary Judgment, ¶ 80, Ex. 80 (*Osterman v. Sears*,

No. BDV-99-522(c) (Cascade County Dist. Ct., Aug. 30, 2000)).

In *Osterman*, the plaintiff claimed that she was "at all pertinent times led to believe" by

all three co-defendants that defendant Sears would install home siding for which she had

contracted, despite the fact that the contracts identified the other defendants, not Sears, as the

installers.  *Osterman*, No. BDV-99-522(c) at 2.  On summary judgment, based on the plaintiff's

knowledge that contradicted her plea of deception, the court rejected the MUTPA claim.

> Plaintiff has not specified any alleged representation made by any
> defendant that K-designers was a part of Sears or that Sluder was an
> employee of Sears.  She simply asserts that she was lead to believe that
> that was the case.  *Any assumption on her part, though, would have been
> in contradiction to the actual information provided to her in the sales
> brochures and the sales agreement … [This] reasoning disposes of
> Plaintiff's Unfair Trade Practices claim.*

*Id.* at 5 (emphasis added).  The court likewise granted summary judgment to the defendant siding

salesman on the MUTPA because the record showed that he had not made any specific

misrepresentations to the plaintiff that he was an employee of Sears.  *Id.* at 10 ("As Plaintiff

relies upon the same factual allegations for the Unfair Trade Practices claim, and asserts that the

alleged misrepresentation regarding manufacture of the siding and employ of the installers

constitute an unfair trade practice,  *if there was no misrepresentation, there was no unfair trade

practice*.") (emphasis added).  Here, Defendants made no misrepresentations to Montana

regarding the AWPs for their drugs.

Just like the plaintiff in *Osterman*, Montana comes before the Court alleging it was

"tricked" into thinking that AWPs published by First DataBank were the same as actual

---

[17] Although the Supreme Court opinion dealt primarily with the statute of limitations defense under the
MUTPA, it noted that the District Court had also granted summary judgment to defendants for this claim "on the
merits."  80 P.3d at 439.

acquisition costs.  Compl. ¶¶ 656, 663, 676, 688.  And just as in *Osterman*, the undisputed facts

show that Montana Medicaid knew this was not the case.  *See, e.g.* 56.1 Stmt. ¶¶ 37-40, Exs. 3,

8, 10, 14, 41-42.  It "understood that AWP didn't reflect the average wholesale price."  Poulsen

Tr. 122:18-19.  Indeed, Montana's assertion that it was somehow deceived regarding AWP is "in

contradiction to the actual information" it had and used to implement Montana Medicaid policy.

*Osterman*, No. BDV-99-522(c)) at 5.  Under *Osterman*, Montana's MUTPA claim can go no

further, and summary judgment should be granted.

Similarly, in *Emick v. Koch*, 739 P.2d 947, 948 (Mont. 1987), the Montana Supreme

Court, reasoning that the plaintiff car purchaser had an opportunity to inspect and discover the

purported defects, agreed that the MUTPA had not been violated.  *Emick* supports the common-

sense interpretation of MONT. CODE ANN. § 30-14-103 that for there to be "an unfair or deceptive

act or practice," a party before the court must have actually been deceived.  As the undisputed

facts show, here there is no such plaintiff because Montana cannot legitimately claim that it was

deceived in its choice of discounted AWP as a reimbursement benchmark.  Montana not only

"had ample opportunity to inspect" the relationship between AWP and actual acquisition costs, it

studied and understood this relationship, but nevertheless chose to continue to use AWP as a

benchmark for certain reimbursements.  *Id.* at 948.

Nor can Plaintiff avoid summary judgment by re-constituting their claim now as an

allegation of an "unfair" trade practice, as opposed to a "deceptive" one.[18]  Both *Osterman* and

*Emick* bar the Plaintiff's claims whether labeled "deceptive" or "unfair."  *See Emick*, 739 P.2d. at

949 (failed to prove "an *unfair or deceptive act or practice*") (emphasis added); *Osterman*,

No. BDV-99-522(c)) at 10 ("if there was no misrepresentation, *there was no unfair trade*

*practice*").  Even if the Court were to make new Montana law and, in so doing, apply a more

lenient definition of "unfair" under the MUTPA, Defendants would still be entitled to summary

---

[18] The "Claims for Relief" in the Complaint plead the causes of action as "*Deceptive* Trade Practices,"
(emphasis added) and there is no allegation of an "unfair" practice in those Claims.  *See* Compl. ¶¶656, 663
("deceptive acts or practices").

judgment.  California, whose Unfair Business Practices Act contains language similar to the MUTPA, requires that plaintiffs must prove a practice is unfair with evidence that shows the practice is "connected to the harm by causative evidence."  *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 674 (Cal. Ct. App. 2005) (summary judgment granted for defendants where plaintiffs failed to produce evidence that defendants' conduct caused alleged harm).  Here, Montana has no evidence that Defendants' reporting of AWPs to third-party publishers is what caused Montana Medicaid to reimburse based on AWP.  Rather the evidence shows overwhelmingly that Montana Medicaid chose an AWP-based reimbursement methodology to fulfill its own policy goals, and with full knowledge of the significant disparity between AWP and actual acquisition cost. [19]

> **b.  Exercising the discretion afforded to it under statute, Montana Medicaid *chose* to reimburse on the basis of AWPs published by First DataBank.**

No federal statute or regulation requires Montana Medicaid to use AWP as one of its bases for reimbursement.  Montana Medicaid chose AWP as one of its reimbursement benchmarks in the exercise of the discretion given to it by Montana statute to set reimbursement levels that accommodate the numerous competing concerns at play in administering a Medicaid program.  MONT. CODE ANN. § 53-6-113(3) (reimbursement rates set by DPHHS "in its

---

[19] Plaintiff can draw no support from elsewhere in the MUTPA or its interpretive regulations.  Deceptive practices under the MUTPA are defined and regulated by statute or code, none of which reach this situation.  *See, e.g.*, MONT. ADMIN. R. 6.6.1701(1); MONT. ADMIN. R. 2.61.101 (defining deceptive acts or practices under the MUTPA); MONT. ADMIN. R. 61.203.  Further, MUTPA requires that any "unfair" or "deceptive act [] or practice occur in the conduct of any trade or commerce."  MONT. CODE ANN. § 30-14-103.  The terms "trade" and "commerce" have a statutorily defined, and limited, meaning:

> the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state.

MONT. CODE. ANN. § 30-14-102.  Even where Montana courts have stretched this language to its outer limits, *see Baird v. Norwest Bank*, 843 P.2d 327 (Mont. 1992) (interpreting § 30-14-102 to include mortgage lending), no court has ever applied it to the type of activity complained of here.  Regardless, reporting AWPs to third-party publishers is neither advertising for drugs nor offering them for sale.

discretion" and the agency "may consider but is not limited to considering: (a) the availability of appropriated funds; (b) the actual cost of services; (c) the quality of services; (d) the professional knowledge and skills necessary for the delivery of services; and (e) the availability of services."). Montana law requires that reviewing courts operate from a presumption that an agency's regulations implementing a statute are controlling. *Christenot v. State Dep't. of Commerce*, 901 P.2d 545, 548 (Mont. 1995) ("An administrative agency's interpretation of a statute under its domain is presumed to be controlling.  In fact, the construction of a statute by the agency responsible for its execution should be followed unless there are compelling indications that the construction is wrong.").  Accordingly, the Montana Supreme Court has shown great deference to the Montana Medicaid agency in its implementation of reimbursement rates.  In *Juro's United Drug v. Montana DPHHS*, 90 P.3d 388, 391 (Mont. 2004), the Montana Supreme Court upheld Montana Medicaid's interpretation of its reimbursement rules for delivery of diapers, despite plaintiff's argument that the agency's interpretation was contrary to the plain language of the regulations.  In so doing, the Court emphasized that "an 'agency's interpretation of its rule is afforded great weight,' courts should 'defer to that interpretation unless it is plainly inconsistent with the spirit of the rule,' and the interpretation will be upheld 'so long as it lies within the range of reasonable interpretation permitted by the wording.'"  *Id.* (quoting *Easy v. Dept. of Natural Res. & Conserv.*, 753 P.2d 746, 748 (Mont. 1988)).

Here, Montana Medicaid interpreted the term "average wholesale price" in the regulation that Montana Medicaid drafted to mean the AWPs published by First DataBank.  56.1 Stmt. ¶ 39 Ex. 1 (Buska Tr. 569:4-12).  Montana Medicaid knew exactly what that AWP represented:  a benchmark price; it "understood that AWP didn't reflect the average wholesale price."  *Id.* ¶ 37, Ex. 14 (Poulsen Dep. Tr. 122:18-19).  With that understanding, Montana Medicaid chose to use AWP as part of its reimbursement methodology.  This is a choice that falls well within the discretion given to Medicaid under Montana law, and the Court must defer to the agency's interpretation of the term "average wholesale price" – not the State's litigation position.  *Juro's United Drug*, 90 P.3d at 391, 393.

Montana Medicaid's calculated choice to use AWP as a reimbursement benchmark is further confirmed by the fact that it has not changed its methodology even though nearly *five years* have passed since it filed the Complaint.  Montana Medicaid's actions speak far louder than its attorneys' words in this regard.  Although the Complaint alleges that, in 2002, Montana "discovered" that it has been fraudulently deceived into using AWP as a reimbursement benchmark and that this fraudulent conduct had damaged the State, the State has no explanation for why Montana Medicaid continues to use the allegedly damaging AWPs to this day.  *See, e.g.*, *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142 (9th Cir. 2005) (to establish reliance on fraud claim in Nevada, a plaintiff must show that an alleged false representation played a material part in leading her to adopt a particular course of action); *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144 (9th Cir. 2000) (noting that fraudulent concealment under California law requires, among other things, that the plaintiff was unaware of a fact and would have acted differently had she known of it).  The State cannot possibly establish that it would have acted differently before 2002 had it known of the "AWP fraud," when the State has done nothing differently in the five years since the discovery of the "fraud."  This lack of causation is an insurmountable bar to *all* of the State's claims.

c.     **The State has not suffered any loss because of the rebates Defendants paid to the State.**

For a plaintiff to recover on a MUTPA claim, it must establish that it "suffer[ed] any ascertainable loss of money or property."  Mont. Code Ann. § 30-14.133(1).  The State's theory of damages is misleading and incomplete in that it fails to consider the payments that Montana received from Defendants under the federal Omnibus Reconciliation Act of 1990, ("OBRA").  Montana Medicaid officials were well aware that these rebates returned to Montana approximately 20% of Montana Medicaid's "drug spend," i.e., its gross reimbursement payment.  Preshinger Dep. Tr. 112.  Any "loss" must be based on the State's *net* reimbursement payment.  As the Congressional Budget Office concluded, "Medicaid prices are significantly lower on average than the lowest prices paid to manufacturers by private-sector purchasers…[I]n terms of

net payments to manufacturers for brand-name drugs, Medicaid does as well as many other federal purchasers and better than the private sector."  Gaier Decl. ¶ 11.  Indeed, Dr. Gaier has determined that Montana's net reimbursement payment is far below the State's expert's lower-bound estimate of pharmacy acquisition cost for numerous self-administered drugs.  Gaier Decl. ¶ 14.  As the MDL Court previously recognized, "[t]he state's damages will necessarily be reduced by the rebates the State received."  *In re Pharm. Indus. AWP Litig.*, 457 F.Supp.2d at 74. Unless the State comes forward with evidence that its net reimbursement costs were higher than its expert's estimate of provider acquisition costs for any drug, the State can show no loss, and thus, no damage, resulting from any of Defendants' drugs.[20]

2.      **The Court should grant summary judgment on the State's *parens patriae* claim on behalf of Third-Party Payors and other unnamed claimants.**

Montana has failed to identify which TPPs purportedly purchased or reimbursed for drugs on the basis of AWP, failed to produce any data substantiating the claims of the TPPs, and failed to produce evidence that Defendants deceived those TPPs into choosing to use AWP as a reimbursement benchmark.  This is reason enough to dispose of these claims on summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Setting aside this total failure of proof, these claims remain unsupported by the record or by Montana law.

As Professor Berndt informed the MDL Court, TPPs such as the private insurance companies and self-insured employers comprising Montana's *parens* class are a group of payors with extensive experience with the known differential between AWP and actual acquisition cost. 56.1 Stmt. ¶ 86, Ex. 59 (Berndt Report at 10, ¶ 14; at 41, ¶ 73).  Because of this knowledge, Montana's *parens* claim cannot survive summary judgment for the same reason that its Medicaid claim must fail – because when "actual information" contradicts the claim of deception there is no valid MUTPA claim.  *Osterman*, No. BDV-99-522(c) at 5.  However, even if these TPPs

---

[20] To the extent that the State may argue that it suffered a loss as to any physician-administered drug on which the State did not collect a rebate, that was the State' choice not to do so, 56.1 Stmt. ¶ 114, Ex. 6 (Collins Tr. 46:17 – 47:1), which decision – not any action of the Defendants – caused the State to "suffer" any loss.

lacked the knowledge that they clearly have, the Attorney General lacks the authority to bring a *parens* claim on behalf of such entities – insurance parties and other companies who are not consumers under the MUTPA.  The ability of businesses to use the MUTPA – a *consumer* protection statute – to recover for alleged overpayment on their business expenses is foreclosed by the statutory language of the MUTPA.  Likewise, MUTPA does not provide the necessary authority to bring these claims on behalf of absent parties or to obtain the remedy sought.

Reflecting the fact that the MUTPA provides for actions by *consumers*, the Montana Supreme Court has held that the statute does not allow recovery for goods purchased by businesses for business, which bars plaintiff's claim on behalf of its class of TPPs.  MONT. CODE ANN. § 30-14-133(1); MONT. CODE ANN. § 30-14-102(1) (recovery only for goods purchased for "personal, family, or household purposes"); *Doll v. Major Muffler*, 687 P.2d 48, 56-57 (Mont. 1984) (§ 30-14-133(1) of MUTPA bars action for item purchased for business); *see also Polar Bear v. Timex*, 384 F.3d 700, 705 (9th Cir. 2004) (MUTPA does not extend to manufacturers' claims).  As the court in *Doll* observed, businesses purchasing goods for use in business plainly "do not fall within the class of persons who may bring a private action under the Act."  687 P.2d at 52.  The TPPs on whose behalf Montana seeks to recover are "private insurers and self-insured employers."  Compl. ¶ 2.  These entities obviously do not purchase drugs for "personal" use.  Under the express terms of the MUTPA and Montana caselaw, the Court must grant summary judgment as to these payors and to any other non-individual entities in Montana's undefined *parens* claim.

The remaining third-party claims on behalf of unidentified individual citizens are also barred.  First, the MUTPA section dealing with recovery by consumers contains an express ban on using the statute on behalf of multiple plaintiffs.  MONT. CODE ANN. § 30-14-133(1) ("A consumer…*may bring an individual but not a class action under the rules of civil procedure*[.]") (emphasis added).  The State is not permitted to circumvent this limitation by bringing an action on behalf of individual Montanans capable of asserting a viable MUTPA claim themselves.

In addition, the Attorney General's assertion of authority to bring claims on behalf of a pseudo-class of unidentified consumers is an attempt to wield the MUTPA in an unconstitutional manner.  Assuming *arguendo* that any Montana citizen holds a viable cause of action, those claims constitute a property right owned by those consumers and protected by the Fourteenth Amendment.  *Tulsa Prof'l. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 486 (1988) (cause of action is valid property right).  An action purporting to assert the property rights of non-parties will not bind non-parties unless certain procedural requirements are met.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813-14 (1985).  Although the Attorney General may seek injunctive relief to halt a claimed unfair or deceptive practice, MONT. CODE ANN. § 30-14-111(1), the Montana statute in no way permits the Attorney General to circumvent constitutional limits on its ability to litigate property interests that belong to consumers, not to the State.[21]

Moreover, the *parens patriae* MUTPA claim must fail because the statute does not provide for the remedy requested, particularly recovery on behalf of unidentified individuals.  Montana asks that the Court, "pursuant to MONT. CODE ANN. § 30-14-131, enter an order restoring to the citizens of this State, all monies acquired by means of defendants' unlawful practices."  Compl.  Count I, ¶ E.  The statute provides that "[t]he court may enter orders or judgments necessary to *restore* to a person any money or property, real or personal[.]"  MONT. CODE ANN. § 30-14-131(1) (emphasis added).  By its terms, that remedy is not available in this case:  Defendants did not "acquire[]" "any money or property, real or personal," from Montana citizens.  Defendants did not receive any of the allegedly "excessive payments made by Patients who are Montana residents," Compl. ¶ 660, and therefore Defendants do not possess money or property that they may "restore" to Montana citizens.

---

[21] Nor does Montana common law regarding *parens patriae* actions give the State the authority to assert claims that belong to absent third parties.  Rather, the State's *parens* authority under common law is confined to representation of claimants incapable of representing themselves, a charge that is not made for the absent consumers in this action.  *See In re Mental Health of K.G.F.*, 29 P.3d 485, 495 (Mont. 2001) (in action involving seriously mentally ill individual committed to State institution, the court described the State's duties under *parens patriae* as "the 'humanitarian' or benevolent obligation to protect those citizens unable to protect themselves.").

Although no Montana cases deal with the remedy limitation in § 30-14-131(1), persuasive authority from California supports Defendants' interpretation.  California's Unfair Competition Law ("UCL") contains virtually identical language to the Montana statute.  *Compare* MONT. CODE ANN. § 30-14-131(1) *with* Cal. Bus. & Prof. Code § 17203.  The California Supreme Court has interpreted the "restore" prong of the statute as limited to orders "compelling a UCL defendant to return money obtained through an unfair business practice to *those persons* in interest from whom the property was taken."  *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718, 725 (Cal. 2000) (emphasis added).  Thus, in *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003), the California Supreme Court concluded that the restitutionary remedy sought by plaintiff was unavailable: "First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession…Any award that the plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff."  *See also Feitelberg v. Credit Suisse First Boston, LLC*, 36 Cal. Rptr. 3d 592 (Cal. Ct. App. 2005) (holding that the rationale of *Korea Supply Co.* also applies to class actions brought under the UCL).

**B.      The Court Should Grant Summary Judgment on Montana's Medicaid Fraud Claim.**

Montana claims that Defendants have committed Medicaid fraud in violation of MONT. CODE ANN. §§ 53-6-143(4) and 53-6-160, by allegedly submitting to third party publishers untrue and incomplete information about their AWPs.  Compl. ¶ 676.  The Medicaid fraud statute states in material part:

> A person who submits to a medicaid agency an application, claim, report, document, or other information that is or may be used to determine eligibility for medicaid benefits, eligibility to participate as a provider, or the right to or the amount of payment under the medicaid program is considered to represent to the department, to the best of the person's knowledge and belief, that the item is genuine and that its contents, including all statements, claims, and representations contained in the document, are true, complete, accurate, and not misleading.

MONT. CODE ANN. § 53-6-160(1); Compl. ¶ 676.

Summary judgment is warranted on this claim for at least three independent reasons. First, Defendants did not "submit" any "application, claim, report, document, or other information" to any Medicaid agency. Second, Defendants are not "providers" – a defined term under the statute that brings within the reach of the fraud provision only entities "that [have] enrolled or applied to enroll as a provider of services or items under [Medicaid]." *See* MONT. CODE ANN. § 53-6-155(13). Third, because Montana has long known the difference between AWP and acquisition cost, it cannot now claim that it relied on alleged statements to the contrary, negating any potential fraud or falsity by Defendants.

Under Montana law, Medicaid fraud claims may be asserted only against persons or entities who have "submit[ted] to a medicaid agency an application, claim, report, document, or other information." MONT. CODE ANN. § 53-6-160(1). Montana cannot claim Medicaid fraud because Defendants have never submitted AWPs to Montana's Medicaid agency. Rather, the Medicaid providers submit claims to Montana Medicaid for reimbursement: on "MA-5" forms for pharmacy-dispensed drugs and on "HCFA-1500" forms for physician-administered drugs. 56.1 Stmt. ¶ 103, Ex. 62. These forms set forth the nature of the claim and the reimbursement sought. *Id.* Montana does not contend that the information contained on any of those claim forms was false. *Id.* ¶ 104, Exs. 6, 15 (Collins Tr. at 74:2-9; Preshinger Tr. at 30:6-32:13). Moreover, the AWPs (which Defendants did not submit to Montana Medicaid) were published by First DataBank, an independent publication. *Id.* ¶¶ 82-83, Exs. 5, 10.

The Medicaid fraud statute makes clear that it is "providers" who are charged with the duty to submit accurate and truthful claims. MONT. CODE ANN. §§ 53-6-160(2)(a)-(b). "Provider" is a defined term under Montana law that is limited to:

> an individual, company, partnership, corporation, institution, facility, or other entity or business association that has enrolled or applied to enroll as a provider of services or items under the medical assistance program established under this part.

MONT. CODE ANN. § 53-6-155(13). There is no dispute that Defendants are not providers and did not receive any reimbursement from the State. 56.1 Stmt. ¶ 105, Ex. 82 ("During the

Relevant Time Period, Defendants did not seek reimbursement from the Montana Medicaid program for the purchase of the Subject Drugs. Response: Admit."). Thus, it is not surprising that the reported Medicaid fraud cases in Montana concern the submission of fraudulent claims by Medicaid *providers*, not attenuated non-providers. *See, e.g.*, *State v. Vainio*, 35 P.3d 948 (Mont. 2001) (optometrist provider charged with Medicaid fraud based on the submission of an alleged false claim); *Kirchner v. State DPHHS*, 119 P.3d 82, 83 (Mont. 2005) (alleged false claim submitted by provider therapist).[22]

Assuming *arguendo* that Montana's Medicaid fraud statute applies to non-providers like the Defendants and that AWPs published by an independent third-party could be considered "information" "submitted" to a "Medicaid agency," Montana still cannot recover because Montana's Medicaid fraud statute sounds in *fraud*. In order to establish even a *prima facie* case of fraud, Montana must prove the following:

> (1) a representation; (2) the falsity of that representation; (3) the materiality of the representation; (4) the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance upon the truth of the representation; (8) the hearer's right to rely upon the representation; and (9) the hearer's consequent and proximate injury or damages caused by their reliance on the representation.

*In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005). Montana's witnesses testified uniformly that Montana Medicaid knew there was a substantial difference or "spread" between AWP and actual acquisition cost. There is no evidence to show that Defendants "misrepresented" AWP to be an actual acquisition cost. Under Montana law, this is fatal to a claim sounding in fraud. *Barrett v. Holland & Hart*, 845 P.2d 714, 717 (Mont. 1992) (where

---

[22] The legislative history of the Montana Medicaid fraud statute confirms that the term "provider" was to reach no further than its statutorily defined meaning. In urging passage of the law in 1995, Nancy Ellery, then Montana Medicaid Director, described the statute to the legislature as one directed toward fraud by providers themselves, and listed several examples of provider-specific practices such as "bill[ing] for services not provided, bill[ing] twice for the same service, cost reports can be falsified, and bill[ing] for unnecessary services." 56.1 Stmt. ¶ 106, Ex. 79 (Minutes of the Senate Public Health, Welfare & Safety Committee, Feb. 17, 1995 at 8).

plaintiff "chose not to use the means available to him to investigate the truth of the representations made to him, his claim for fraud must fail").

Finally, Montana's Medicaid fraud claim is fatally flawed for a fourth reason. The term "fraud" is defined under the Medicaid fraud statute, and requires some showing that a defendant engaged in "conduct or activity prohibited by statute, regulation, or rule involving purposeful or knowing conduct or omission to perform a duty that results in or may result in Medicaid payments or benefits to which the applicant, recipient, or provider is not entitled." MONT. CODE ANN. § 53-6-155(7) (definition of "fraud"). Plaintiff can point to no "statute, regulation, or rule" that prohibits reporting of benchmark AWPs to third parties such as First DataBank.

**C.      The Court Should Grant Summary Judgment on Montana's False Claims Act Claim.**

There are two essential elements under Montana's False Claims Act ("MFCA"): (1) the defendant submitted a false claim (2) to a state agency. MONT. CODE ANN. § 17-8-231; Compl. ¶ 688. This cause of action also must fail for the same reasons the Medicaid fraud count must fail. Montana's long-standing understanding of AWP negates falsity, and in any event the State has admitted that Defendants have not submitted a claim to any state agency.

**1.      Montana admits that Defendants did not submit any claims to the State.**

Summary judgment is appropriate because Defendants did not *"present or cause[] to be presented* . . . a false, fictitious, or fraudulent claim *to any state agency or its contractors*." MONT. CODE ANN. § 17-8-231 (emphasis added). Plaintiffs do not allege that Defendants submitted or cause to be submitted any claims to Montana Medicaid. Rather, as the State admitted, *providers* submit the claims. *See* Compl. ¶ 166; *see also id.* ¶ 151 ("Pharmaceutical companies do not report AWPs directly to the federal government [or to Montana]").

The Complaint's only suggestion of Defendants' involvement in the claim submission process is the vague allegation that the Defendant companies "had the authority or responsibility to make such claims, statements and representations [reporting AWP], exercised that authority and, as a direct or indirect result, the false statement was made." Compl. ¶ 690. Even if the

Court considers this an allegation that Defendants "caused" providers to submit false claims, summary judgment is still appropriate.  Knowledge that a claim will be presented, without a greater degree of participation in the claim process, is not sufficient to satisfy the causation requirement of the MFCA.  *See United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 189 (D. Mass. 2004) (granting summary judgment because "even if [defendant] knew or should have known about the claims process, and even if he knew that false claims were going to be submitted, his failure to take steps to ensure that [false claims were not submitted] does not constitute 'causation' under the False Claims Act"); *see also United States ex rel. Shaver v. Lucas W. Corp.*, 237 F.3d 932, 934 (8th Cir. 2001) (same).  Because Montana cannot show that Defendants submitted false claims to the state or a state agency, or caused such claims to be submitted, the Court should grant summary judgment on Plaintiff's MFCA claim.

### 2. The Court should grant summary judgment because Montana has not shown falsity.

Plaintiff must prove "a *false, fictitious, or fraudulent claim* for allowance or payment to any state agency or its contractors."  MONT. CODE. ANN. § 17-8-231 (emphasis added).  Because the MFCA, like the federal False Claims Act ("FCA"), focuses on "claims," liability under the MFCA attaches "not to underlying fraudulent [or wrongful] activity . . . but to the claim for payment."  *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995); *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-66 (9th Cir. 1996) (stating that the FCA requires a false claim and explaining that "[t]his does not mean that other types of violations of regulations, or contracts, or conditions set for the receipt of moneys, or of other federal laws and regulations are not remediable; it merely means that such are not remediable under the FCA.").[23]

---

[23] Defendants have not discovered any reported decisions on the MFCA.  Therefore, cases interpreting the FCA are cited in this motion as persuasive authority where the Federal False Claims Act and the Montana False Claims Act contain similar language.  In 2005 the Montana Legislature amended the MFCA to more closely track the language of the FCA.  *See* 2005 Mont. Laws ch. 312 (H.B. 40), *recodified at* MONT. CODE. ANN. § 17-8-402.  As Defendants' alleged conduct took place under the pre-amended MFCA, MONT. CODE ANN. § 17-8-231, this brief refers to the pre-amended statute.

By definition there can be no cause of action where the claim alleged as "false" is submitted in accordance with a reimbursement level Medicaid has established.

> [W]hile Plaintiff bases both his fraud claim and his breach of contract claim against these Defendants on the premise that they defrauded the government and breached their Provider Contracts with the Alabama Medicaid Agency by charging dispensing fees in an unlawful amount, he completely ignores the fact that it is the Alabama Medicaid Agency itself, and not the Defendants, that sets the amount of the dispensing fee.  42 C.F.R. § 447.331(b)(1).  *Defendants merely charge the fee Medicaid tells them to charge*.

*United States v. Bruno's*, 54 F. Supp. 2d 1252, 1260 (M.D. Ala. 1999) (emphasis added).  *See also Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347, 354 (D. Mass. 1999) (Stearns, J.) (vendor was not required to factor discounts given to private insurers into its Medicare charges); *U.S. ex rel Glass v. Medtronic, Inc.*, 957 F.2d 605 (8th Cir. 1992) (medical device manufacturer's Medicare claim was authorized by Medicare Manual and therefore not a false claim).  The claim forms used by Montana Medicaid require providers to submit information to Montana Medicaid, including the *provider's* charge for the drug.  56.1 Stmt. ¶ 103, Ex. 62 (HCFA-1500 physician claim form; MA-5 pharmacy claim form).  Accordingly, providers (not Defendants) set the charges submitted on the claim form and Montana does not allege that these charges, and thus these claims, were false.  *Id.* ¶ 104, Ex. 6, 15 (Collins Tr. at 74:2-9; Preshinger Tr. at 30:6-32:13).

Once a provider has submitted its claim, reimbursement is determined by the methodologies that *Montana Medicaid* establishes based on a formula that uses AWP as one of a number of upper bounds.  *See* Mont. A.R.M. 37.86.1101(1); Compl.¶ 162.  Thus, even if all Defendants reported AWPs – and not all Defendants do – to First DataBank, this is not a "claim" submitted to the government.  Rather, in certain circumstances, AWP is part of a methodology established by Montana Medicaid to provide an upper limit on the amount it will reimburse providers.  That Montana Medicaid may use AWP to determine an upper bound for provider reimbursement does not in any way render claims for reimbursement "false."

Montana knew and desired that AWP generally exceeded a provider's actual acquisition price.  Courts have routinely held that government knowledge precludes a finding of falsity.  *See United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("[T]he government's knowledge [of an allegedly false claim] effectively negates the fraud or falsity required by the FCA."); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has not been deceived.").  In light of the extensive Montana-specific studies showing that AWP exceeds actual acquisition costs, the State cannot prove the requisite "falsity" element of the claim.

**D.   The Court Should Grant Summary Judgment With Respect to Montana's Claims for Multi-Source Drugs.**

For many of the same reasons discussed above, the State's theory that Defendants manipulated AWPs fails for multi-source drugs as well.  First, in many instances, Defendants' multi-source drugs were not reimbursed by the State based on AWP.  Second, where the claims data show that reimbursement for multi-source drugs was based on AWP, that reimbursement was chosen with full understanding of what that AWP represented.

**1.   Montana did not use AWP as the reimbursement benchmark for most multi-source drug claims.**

Montana Medicaid's reimbursement formula employed a "lesser of" methodology.  In general, providers submitted claims based on their "usual and customary charge"; those claims could be paid on their face, or instead reduced to some lesser permitted amount – including (1) the drug's "maximum allowable cost" ("MAC"); (2) the drug's "Direct Price"; or (3) AWP minus 10% (or 15% as of 2002).  *See* A.R.M. 37.86.1101, 1105 (2005); *see also* Compl. ¶ 162; Bullock Tr. 329:11-329:19.

Montana Medicaid reimbursed nearly half of multi-source drug claims at MAC, which in Montana was based on the drug's Federal Upper Limit ("FUL").  56.1 Stmt. ¶ 107 Gaier Decl. ¶ 49, Ex. 33); *see* A.R.M. 37.86.1101 (2006).  Federal law limits the reimbursement a state may pay for generic drugs to the FUL for the drug, which is equal to 150% of the *lowest* published

price.  *See* 42 C.F.R. § 447.332(b) (2004) (providing for the federal establishment of FULs for drugs sold by at least three manufacturers).  States may not reimburse providers for generic drugs, from any source, at a level higher than the drug's FUL.  *See* C.F.R. §§ 444.331.332 (2004); 52 Fed. Reg. 28,648 (July 31, 1987).  Because only the lowest published price is used in this formula, it is impossible for any individual source to market the spread by inflating the AWP associated with its particular drug.  When the FUL was not used by Montana Medicaid, it used other non AWP-based reimbursement measures instead, including the use of billed charge for over 20% of the allegedly "fraudulent" multi-source claims, Gaier Decl. ¶ 49, Ex. 33, and the use of Direct Price for several Defendants, including Abbott and Pfizer.[24]

Multi-source drugs administered in a physician's office (physician-administered drugs, or "PADs") present additional problems for Montana's "marketing the spread" theory.  PADs were reimbursed by Montana Medicaid based on a J-Code (or CPT/HCPCS code).  Montana Medicaid, however, reimbursed all competing versions of a multi-source drug using a single J-Code at a single reimbursement level.  56.1 Stmt. ¶¶ 109, Exs. 2, 14.[25]  Accordingly, it is impossible to tie receipt of such a multi-source drug to any particular Defendant; in fact, the State cannot prove that the source providing the drug is actually a Defendant in this case *at all*.[26]

Indeed, it was Montana's practice that reimbursement using J-Codes was not tied to *any* changes in *any* AWP.  Instead, until at least 2002, the J-Code reimbursement schedule for Montana Medicaid was not routinely updated when AWPs increased, but instead, was simply set once and adjusted on a drug-by-drug basis when providers complained that reimbursement levels

---

[24] Defendants join in and incorporate by reference the Memorandum in Support of Pfizer's and Pharmacia's Motion for Summary Judgment regarding reimbursements based on Direct Price.

[25] Indeed, for multi-source drugs reimbursed based on J-Codes, the claim forms do not even indicate *which* of the various sources' drugs was received.  *See* 56.1 Stmt. ¶ 110, Ex. 2, 14.  Nor is it possible to "cross-walk" a J-Code to the NDC of a multi-source product, as can sometimes be done for single-source products.  *Id.* ¶ 110 (Gaier Decl. ¶ 46).

[26] Perhaps recognizing that the State has no valid claims as to multi-source PADs, Montana's own expert Dr. Hartman testified that he has not calculated any damages or penalties for reimbursement of generic PADs, and he has no intention to do so.  56.1 Stmt. ¶ 111, Exs. 3, 64 (Hartman MT. Rpt. ¶ 22(c)); Hartman Tr. 493:2-12.

were too low.  56.1 Stmt. ¶ 112, Ex. 2 (Brunett Tr. 93: 7-22).  Under this ad hoc system, Montana would update the fee schedule of a J-Code only when a provider called in saying that he or she was "no longer going to do [a] service unless [Montana DPHHS] updated the price" of the service.  *Id.*  In fact, Montana DPHHS failed to systematically update its J-Code fee schedule between 1991 and 2002.  *See* 56.1 Stmt. ¶ 113, Exs. 2, 6 (Brunett Tr. 74:3-76:19; Collins Tr. 29-6-18).  Thus, even if the publishers' AWPs were "inflated," as alleged, this publication did not cause Montana any injury because Montana did not rely on the AWPs published for PADs.  Because Montana Medicaid cannot offer evidence connecting the alleged fraud to its alleged injury for the non AWP-based reimbursements, summary judgment should be granted.  *See, e.g.*, *Osterman*, 80 P.3d at 443.

> **2.    For those multi-source drug claims arguably reimbursed based on AWP, summary judgment is appropriate.**

Even where Montana Medicaid can come forward with evidence that *any* Medicaid reimbursements for multi-source drugs in Montana were based on AWP, their claims must still fail as to those drugs.  Since at least 1991, Montana had direct "knowledge" of multi-source drugs' Average Manufacturer Prices, or "AMPs," which reflect all discounts received by customers in the retail distribution chain, including physician practices.  These discounts were not hidden from the State.  The Omnibus Budget Reconciliation Act of 1990 required that, beginning on January 1, 1991, drug manufacturers make available to all states a rebate for drugs reimbursed under Medicaid.  The rebate was initially set at 10% of the AMP for a drug.  *See* OBRA '90.  On January 1, 1994, the rebate amount was increased to 11%.  *Id.* at § 1396r-8(c)(3)(B).  Given its access to the rebate amounts, Montana possessed all the information it needed to determine each individual manufacturer's drugs' average prices including discounts, which the State could have used as a comparator to the published AWPs.

Even more directly, Montana also knew the *average* discount off AWP for multi-source drugs and thus had the information to calculate the large spreads on those drugs.  56.1 Stmt. ¶ 30, Ex. 2 (Chappuis 93:6-16).  In 1995, Montana Medicaid officials knew that the average difference

between acquisition cost and AWP for generic drugs was 48.46% (a "spread" of 94% in Plaintiff's terms), a far greater discount than was typical for brand-name drugs because generic drugs are the epitome of competition, which drives down acquisition prices. 56.1 Stmt. ¶ 25, Ex. 36. In addition to knowing the extent of the difference between AWP and acquisition cost, Montana knew that "[p]harmacy profit margins are generally greater on generic products than brand name products," as a result of this difference. *Id.* ¶ 11, Ex. 27.

Montana *chose* to base at least some reimbursements for Montana Medicaid drugs on AWP to further various policy goals. Montana used AWP-based reimbursement to promote the increased use of multi-source drugs – which are invariably less expensive than their branded alternatives – as a cost-containment device. 56.1 Stmt. ¶ 76, Ex. 53 (discussing Montana Medicaid mandatory generic prescription policy). Moreover, providers needed the amount of reimbursement above ingredient costs to cover the un-reimbursed or under-reimbursed costs to dispense drugs, including rent, utilities, staff salaries and benefits, equipment, warehousing, and time spent performing quality assurance activities. *Id.* ¶ 76, Ex. 53. In Montana these costs are estimated to exceed Montana's current $4.71 dispensing fee by an average of $5.13 per prescription. *Id.* ¶ 57, Ex. 46. As Professor Stratton explained in the 2002 survey, "[t]hese cross subsidies created interdependencies between payments for drugs and services[.]" *Id.* ¶ 75, Ex. 46. Because of the substantial shortfall in dispensing fees, the subsidy is critical to "cover pharmacy dispensing, acquisition, and other costs and thereby keep pharmacies viable and ensure sufficient access to participating providers for Medicaid beneficiaries." *Id.*[27]

---

[27] The multi-source spread is also critical to maintaining access to physician-administered drugs. Montana has chosen and retained this policy to avoid physicians leaving Montana Medicaid. 56.1 Stmt. ¶ 116, Ex. 3 (Bullock 58:16-16:20).

**E.      The Court Should Grant Summary Judgment on All Claims Because the Statute of Limitations Has Run.**

Montana's statutory claims are further barred under Montana's two-year statute of limitations.  MONT. CODE ANN. § 27-2-211(1)(c).[28]

**1.      The statute of limitations began to run no later than 1995.**

In Montana, the statute of limitations for fraud-like statutory actions begins to run when the alleged fraud occurs, unless the facts forming the basis of the fraud are, by their nature, concealed, or the defendant takes affirmative action to prevent the plaintiff from discovering the injury.  *Osterman*, 80 P.3d 435.  In *Osterman*, this rule was used to bar an untimely claim under the same MUTPA section Montana relies on here.  *Id.* at 437.  Without conceding that any Defendant is liable, the facts forming the basis of Montana's four statutory claims were known to Montana for decades before it filed this lawsuit in February 2002, although the State did not consult the knowledgeable Medicaid officials before filing this lawsuit.  56.1 Stmt. ¶ 36, Exs. 3, 6-9.

From 1995 onward, the responsible Montana officials knew that published AWPs did not reflect average wholesale price, and understood that these AWPs were substantially above actual acquisition cost.  In 1995, the OIG informed Montana Medicaid of the "significant difference between AWP and pharmacy acquisition costs."  56.1 Stmt. ¶ 21, Ex. 33.  In 1995, the Montana Medicaid Director was informed by Terry Krantz in writing that AWP "*has little to do with the acquisition cost of pharmacy products*."  *Id.*, ¶ 24, Ex. 36.  This knowledge triggered the two-year statute of limitations and Montana's failure to act then prevents it from doing so now.[29]

---

[28] In Montana, statutes of limitations apply equally to the State of Montana and its citizens.  MONT. CODE. ANN. 27-2-103, ("Actions by state subject to limitations. The limitations prescribed in part 2 of this chapter *apply to actions brought in the name of the state or for the benefit of the state in the same manner as to actions by private parties.*") (emphasis added).

[29] Tolling does not salvage Montana's claims.  In Montana ordinary diligence must be exercised in the discovery of the facts constituting a fraud or deceptive practice.  *See Osterman*, 80 P.3d at 441 ("[t]he test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation.").  Numerous studies and federal documents, including the draft 1995 study specific to Montana, provided the State with knowledge that published AWPs had

2.     **The statute of limitations also bars the State's *parens patriae* claims.**

Where state law explicitly provides that its statutes of limitations apply equally to the

state and its citizens, any *parens patriae* claim brought by the state must be filed within the

applicable statute of limitations or is barred.  *See Aetna Cas. & Sur. Co. v. Gulf Res. & Chem.*

*Corp.*, 600 F. Supp. 797, 801 (D. Idaho 1985).  In *Aetna*, Idaho's nearly identical statute of

limitations was interpreted by a federal court to bar a *parens* action.  "A plain reading of Idaho

Code § 5-225 would lead one to conclude that . . . [the] statute of limitations applies to actions

brought in the name of the State or for the benefit of the State," and that "absent a statute

immunizing the State from the statute of limitations, this court must hold that the State may not

avoid the limitation."  600 F. Supp. at 799, 801.  The analysis from *Aetna* applies with equal

force to bar Montana's *parens patriae* claims here.  No Montana law immunizes the State from

the two-year statute of limitations provided in § 27-2-211.  A plain reading of § 27-2-103 leaves

no doubt that the two-year statute of limitation applies to all of Montana's claims, including

those brought in a *parens patriae* capacity.

F.     **The State's Penalties Theory Is Not Supported by Law.**

Even if the State had a valid theory of liability under the MUTPA or the MFCA – which

it does not – its expert's theory of civil penalties is  flawed under Montana law.  When

determining the multiplier for civil penalties under the MUTPA and the MFCA, Dr. Hartman

incorrectly substitutes the number of Defendants' allegedly misleading representations of price

to publications with the much higher and unrelated number of third-party provider

reimbursement claims.  Under the MUTPA, a defendant is liable for civil penalties only if it is

"willfully using or has willfully used" an unfair or deceptive act or practice in the "conduct of

any trade or commerce."  The act constituting the alleged unfair or deceptive act or practice must

---

"little to do with the acquisition cost of pharmacy products."  56.1 Stmt. ¶¶ 33-35, Exs. 76-78.  There can be no
genuine dispute that Montana had "information of circumstances sufficient to put a reasonable person on inquiry" of
its claims regarding AWPs before the statute of limitations had run.

be committed by the defendant.  *See, e.g.*, *Plath v. Schonrock*, 64 P.3d 984, 996 (Mont. 2003).

There is no authority that permits civil penalties based on the acts of intervening third parties.

The State's expert commits a similar error in calculating the alleged number of violations

under § 17-8-231 of the MFCA.  The MFCA allows civil penalties only if a defendant

"knowingly present[s] or caus[es] to be presented to an officer or employee of the governmental

entity a false claim for payment or approval," and here the Defendants neither submitted nor

caused to be submitted any claims to Medicaid.  *Id.  See supra*, III.C.2.  It is well established that

when a claim is submitted by a third-party "intermediary," to the government, "the number of

claims for which the [defendant] is potentially liable is the number of the claims made to the

intermediary," not for every subsequent claim submitted by the intermediary to the government

entity.  *See* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 3.05[B] (3d ed. 1993

& Supp. 2007); *see also United States v. Bornstein*, 423 U.S. 303, 311-13 (1976) (federal False

Claims Act imposes penalties for actions of defendant, not actions of others).

**G.    The Court Should Grant Summary Judgment on Montana's Request for an
        Award of Punitive Damages.**

Montana's request for punitive damages, although pled as a separate "claim," is in truth a

request for a specific form of relief.  Because all of Montana's claims fail as a matter of law on

summary judgment, the Court may, in the alternative, simply dismiss Montana's request for

punitive damages as moot.  In any event, Montana is not entitled to punitive damages because it

cannot establish that Defendants acted with actual fraud or actual malice.  MONT. CODE ANN.

§ 27-1-221.  As established above, Montana cannot prove that Defendants acted with actual

fraud.  Defendants simply participated in a system established by Montana and other TPPs.

## IV.   CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment as a matter of

law in their favor on all of Montana's claims.

DATED this 8th day of February, 2007.

**ON BEHALF OF ALL DEFENDANTS[30]
IN THE MONTANA ACTIONS**

By: /s/ *Kathleen M. O'Sullivan*

David J. Burman, WSBA # 10611
Kathleen M. O'Sullivan, WSBA # 27850
Charles C. Sipos, WSBA # 32825
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206-359-8000
Fax:  206-359-9000
Email:  DBurman@perkinscoie.com
E-mail:  KOSullivan@perkinscoie.com
E-mail:  CSipos@perkinscoie.com


Thomas J. Sartory, BBO #442500
**GOULSTON & STORRS, P.C.**
400 Atlantic Avenue
Boston, MA  02110-3333
Telephone: (617) 482-1776
Email: tsartory@goulstonstorrs.com

---

[30] Baxter Healthcare Corporation and Baxter International Inc. (collectively, "Baxter") are joining this Joint Motion for Summary Judgment and the joint expert reports being filed with the Court today.  Pursuant to the Court's November 2, 2006 Order, Baxter will be filing its individual summary judgment motion and expert report at a later date, based on the schedule being negotiated between plaintiffs and Baxter.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of February, 2007, a true and accurate copy of the Brief in Support of Motion for Summary Judgment was served via the Lexis-Nexis Filing System:

DATED:  February 8, 2007.


<u>    Kathleen M. O'Sullivan            </u>