# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                          )
IN RE PHARMACEUTICAL INDUSTRY              )
AVERAGE WHOLESALE PRICE                       )          MDL No. 1456
LITIGATION                                               )
_____)          Civil Action No. 01-12257-PBS
                                                          )
THIS DOCUMENT RELATES TO:                     )          Judge Patti B. Saris
                                                          )
*State of Montana v. Abbott Labs., Inc., et al.,*      )
D. Mont. Cause No. CV-02-09-H-DWM          )
                                                          )
_____)

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendants submit this statement of the material

facts of record as to which there is no genuine issue to be tried in support of their motions for

summary judgment.  Deposition transcripts and documents cited herein are attached to the

following declarations, which are being filed with the Court with the filing of this 56.1

Statement:

(1) Declaration of Kathleen M. O'Sullivan in Support of Defendants' Joint

Motion for Summary Judgment ("O'Sullivan Declaration").  Exhibits are attached to that

declaration with numbers that correspond to the Exhibit numbers identified in this 56.1

Statement of Undisputed Material Facts.

(2) Confidential Declaration of Kathleen M. O'Sullivan in Support of Defendants'

Joint Motion for Summary Judgment ("Confidential O'Sullivan Declaration").  Where noted,

certain deposition excerpts and documents designated "Confidential" or "Highly Confidential"

have been attached as Exhibits to the Confidential O'Sullivan Declaration, which has been filed

under seal with the Court.  Exhibits are attached to the Confidential O'Sullivan Declaration with Exhibit numbers that correspond to Exhibit numbers identified in this 56.1 Statement of Undisputed Material Facts.

(3) Declaration of Dr. Eric Gaier in Support of Defendants' Joint Motion for Summary Judgment ("Gaier Declaration").  Paragraphs in the Gaier Declaration correspond to the paragraph numbers identified in this 56.1 Statement of Undisputed Material Facts.

### A.   The Role of AWP in Montana Medicaid Reimbursement of Drugs

1.      Montana Medicaid's methodology is, and always has been, established by administrative regulations promulgated by the Montana Department of Public Health and Human Services ("DPHHS"), the agency of which Montana Medicaid is a part.  O'Sullivan Declaration ¶ 74, Exhibit 74 (Mont. Code Ann. § 53-6-113; Administrative Rules of Montana ("A.R.M.") 37.86.1101; 37.86.1105).

2.      From 1988 until 2000, Montana Medicaid reimbursed based on "whichever is lower" between (1) "estimated acquisition cost" ("EAC"), which Montana defined as "[t]he Direct Price (DP) charged by manufacturers to retailers" or "[i]f no DP is available," AWP-10%; (2) "maximum allowable cost"; or (3) "usual and customary charge." A.R.M. 46.12.102, 46.12.703; *see also* O'Sullivan Declaration ¶ 19, Exhibit 19 (Methods & Standards for Establishing Payment Rates (Montana), TN 95-01 (approved Mar. 27, 1995).

3.      In 2000, Montana Medicaid added a reimbursement alternative, permitting reimbursement based on "allowable acquisition cost" if Montana Medicaid determined that "acquisition cost [was] lower than either the available DP or AWP less 10%."  *See* A.R.M. 37.86.1101(1); O'Sullivan Declaration ¶¶ 20-21; 74 Exhibits 20-21; 74 (June 19, 2000  Notice

on Proposed Hearing on Amendment to ARM 37.86.1101; Notice of Approval of State Plan

Material (Montana), TN-008 (approved Dec. 19, 2000).

4.      In 2002, Montana changed its definition of EAC from AWP less 10% to

AWP less 15%, but still reimbursed "whichever is lower" from among the "usual and

customary" charge submitted by the provider, "Direct Price," AWP less 15%, or "allowable

acquisition cost . . . when the department determines that acquisition cost is lower than [DP or

AWP – 15%]," or "maximum allowable cost" for multi-source drugs for which there is a Federal

Upper Limit.  A.R.M. 37.86.1105(1); A.R.M. 37.86.1101; O'Sullivan Declaration ¶¶ 23-24,

Exhibits 23-24 (April 15, 2002 Notice on Proposed Hearing on Amendment to ARM 37.86.1101

and 37.86.1105; Letter from Maggie Bullock, Administrator, DPHHS Health Policy & Services

Division, to Gail Gray, DPHHS Director (Apr. 1, 2002)).

5.      Montana Medicaid officials refer to Montana's rule-based reimbursement

as a "lesser of" methodology, meaning that claims are reimbursed based on AWP *only* when a

discounted use of that benchmark results in the lowest charge to the State among the

reimbursement formulas.  O'Sullivan Declaration ¶ 13, Exhibit 13 (Peterson Tr. 100:20-101:20).

6.      In the vast majority of claims for multi-source drugs, reimbursements

were not based on AWP at all.  Gaier Decl. ¶¶48-49, Exhibits 31, 33; *see also, e.g.*, O'Sullivan

Declaration ¶¶ 25-26, Exhibits 25-26 ((MT008430-008431) Consultec Prescription Drug Card

Services, Monthly Payment Summary for April 1998 through June 1998; ACS Prescription

Benefit Management, Monthly Payment Summary for Feb. 2006; Facsimile from Dorothy

Poulsen, Montana Medicaid Program Officer, to Jeanne Davies (June 10, 1999) (responding to

survey)).

7.      Some non-Medicaid Montana agencies did not pay for drugs based on AWP at all.  Confidential O'Sullivan Declaration ¶ 6, Exhibit 6 (Rose Svitak Dep. Tr. 12:10-18; 14:9-15; 21:18-21; 31:13-20 (testifying regarding agencies that purchased drugs through the Multi-State Contracting Alliance for Pharmacy ("MMCAP")).

8.      To the extent any non-Medicaid agency paid based on AWP, those agencies often paid at discounts far greater than the 10-15% discount off AWP in Montana Medicaid's reimbursement methodology (up to 60% off AWP for generic drugs under some PBM contracts).  *See, e.g.*, O'Sullivan Declaration ¶ 28, Exhibit 28 (MT076208-MT076240; Gaier Declaration ¶¶ 30-33, Ex. 11 (showing Montana's knowledge of the massive discounts off of AWP available to Montana providers in light of the State's own purchase of the subject drugs)).

**B.      Montana Is A Rural State With A Widely Dispersed Population And Few Pharmacies**

9.      Montana is a geographically large state with many rural areas, and its Medicaid population is widely dispersed throughout the state.  *See* O'Sullivan Declaration ¶ 4, Exhibit 4 (Buska Tr. 119:22-120:13, Oct. 19, 2005).

10.      A greater proportion of the poor and elderly in Montana are likely to reside in rural areas where access to care is geographically limited.  O'Sullivan Declaration ¶ 16, Exhibit 16 (Smith Tr. 91:15-20, Mar. 8, 2006).

11.      As of December 1999, there were approximately 300 pharmacies participating in the Montana Medicaid Program.  O'Sullivan Declaration ¶ 27, Exhibit 27 (Dorothy Poulsen, "Medicaid Services Prescription Drug Program" (Dec. 6, 1999), at MT 006627).

12.     In 1994, it was reported that "eight of the 56 counties in Montana have no pharmacy, and another 10-12 counties have only one."  O'Sullivan Declaration ¶ 29, Exhibit 29 ("Are Rural Independent Pharmacies an Endangered Species?," *Rural Health News* (Fall 1994), at 1, 10).

13.     As of 2001, eight Montana counties did not have a single pharmacy; many others had only one or two.  O'Sullivan Declaration ¶ 30, Exhibit 30 ("Montana Medicaid Prescription Drug Program," presentation prepared by Dorothy Poulsen (January 2001), at MT 017064).

14.     In the context of explaining difficulties Montana faced in complying with Medicare Part D access requirements for prescription drugs, Montana Medicaid Director John Chappius wrote to CMS requesting that CMS establish a "frontier" category that would reflect the very small number of providers available to reach beneficiaries in certain parts of Montana. O'Sullivan Declaration ¶ 31, Exhibit 31 (October 4, 2004 Letter from Chappuis to CMS).

15.     "Based upon Montana DPHHS statistics, a community pharmacist practicing in a rural Montana town may be one of only two or three providers of first contact care in the entire county."  O'Sullivan Declaration ¶ 32, Exhibit 32 (Paul E. Polzin and Timothy P. Stratton, "2002 Survey of Montana Community Pharmacies" (January 2003), at 3); *see also* O'Sullivan Declaration ¶ 16, Exhibit 16 (Smith Tr. 126:7-19).

16.     A greater percentage of rural pharmacies in Montana are independent pharmacies, rather than chain pharmacies, which operate primarily in urban areas.  O'Sullivan Declaration ¶ 16, Exhibit 16 (Smith Tr. 41:4-42:17).

17.     The number of rural pharmacies participating in the Medicaid program continues to be a vital concern to Montana Medicaid:  "In a rural state like Montana, [it] is very

important that we have plenty of pharmacies willing to participate and accept reimbursement for our Montana Medicaid clients [with] low income." O'Sullivan Declaration ¶ 13, Exhibit 13 (Peterson Tr. 87:18-21, Dec. 15, 2005); *see also* O'Sullivan Declaration ¶¶ 8-10; 14, Exhibits 8-10; 14 (Ellery Tr. 26:6-22, Apr. 11, 2006; Poulsen Tr. 265:22-266:17, Feb. 22, 2006; Hunter Tr. 23:6-17, Apr. 18, 2006; Ireland Tr. 54:12-22, Apr. 10, 2006).

**C.    Medicaid Reimbursement is an Important Source of Revenue for Many Independent Pharmacies in Montana**

18.    According to a 2002 survey, independently owned pharmacies in Montana rely more heavily on prescription sales for revenues (86 percent of total revenues) than chain pharmacies (44 percent of total revenues), as the latter may be "larger [in] size" and offer a "greater variety of non-health-related merchandise."  O'Sullivan Declaration ¶ 16, Exhibit 16 ("2002 Survey of Montana Community Pharmacies," at 6).

19.    As the survey further notes, "[p]rescriptions for Montana Medicaid patients constitute almost 25 percent of the average Montana independent community pharmacy's total prescription volume (compared to 23 percent nationally)."  O'Sullivan Declaration ¶ 32, Exhibit 32 ("2002 Survey of Montana Community Pharmacies," at 2); *see also* O'Sullivan Declaration ¶ 16, Exhibit 16 (Smith Tr. 125:16-126:6).

20.    The survey also reveals that:

> Montana's independent community pharmacies operate on very tight margins.  Further reductions in dispensing fees to pharmacies will do little to reduce the overall price paid for prescription drugs, and could pose a very real threat to the ability of independent pharmacies to remain open for business.  This is particularly true of independent rural pharmacies serving Montana's rural communities.

O'Sullivan Declaration ¶ 32, Exhibit 32 ("2002 Survey of Montana Community Pharmacies," at 12).

D.     **Montana Actively Participated in Federal OIG Studies that Informed the State of Significant "Spreads" Between AWP and Actual Acquisition Cost**

21.     The OIG has conducted two studies comparing published AWPs and actual acquisition cost for Montana providers.  O'Sullivan Declaration ¶¶ 33-34, Exhibits 33-34 (HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services*, A-06-95-00068 (July 1996) ("1996 Montana Final Report"); HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services*, A-06-01-00005 (Feb. 2002)).

22.     Montana Medicaid actively participated in these two studies.  *See, e.g.*, O'Sullivan Declaration ¶ 11; 35, Exhibits 11; 35 (Letter from June Gibbs Brown, Inspector General, U.S. Department of Health and Human Services, to Peter Blouke, Director, Montana Department of Public Health and Human Services (Mar. 19, 1996) ("State Agency officials expressed significant interest in and were very supportive of this project"; "Terry Krantz, of Nancy Ellery's staff, worked closely with us during this review from the planning of our work through the drafting of the reports."); Krantz Tr. 54:10-12, Mar. 17, 2006).

23.     Terry Krantz, Supervisor of Montana DPHHS Health Maintenance Section, participated in a meeting in September 1995 with the OIG and representatives of other states also involved in OIG pharmacy acquisition cost studies.  O'Sullivan Declaration ¶ 36, Exhibit 36 (Memorandum from Terry Krantz to Nancy Ellery, Administrator, Montana Medicaid, (Oct. 5, 1995) ("Oct. 5, 1995 Krantz Memorandum")).

24.     On October 5, 1995, Krantz wrote to Montana Medicaid Administrator Nancy Ellery to report on preliminary results presented at the meeting: "While AWP is a national

standard it is apparent from the results of the survey that it has little to do with the acquisition

cost of pharmacy products."  O'Sullivan Declaration ¶ 36, Exhibit 36 (Oct. 5, 1995 Krantz

Memorandum).

25.     The study's preliminary results for Montana showed that average

acquisition cost for brand name drugs was AWP-16.23% and AWP-48.46% for generic drugs,

compared to national results of AWP-18.3% and AWP-42.45%, respectively.  O'Sullivan

Declaration ¶ 36, Exhibit 36 (Oct. 5, 1995 Krantz Memorandum).

26.     As the OIG report indicated, because these figures were averages, far

greater spreads existed for some drugs and far greater discounts (and thus greater spreads) were

available to certain providers, such as "non-traditional" pharmacies (which purchased brand

name drugs in Montana at an average of AWP -28% and generic drugs at an average of AWP-

62%), though the OIG did not even include these figures in its overall "average" discount.  *See*

O'Sullivan Declaration ¶ 33, Exhibit 33 (1996 Montana Final Report, at i).

27.     Other key Montana Medicaid employees received the OIG 1996 Montana

report and were aware of its findings.  O'Sullivan Declaration Exhibit 11 (Krantz Tr. 59:19-

60:3); *see also* O'Sullivan Declaration ¶ 27, Exhibit 27 (Dorothy Poulsen, "Medicaid Services

Prescription Drug Program" (Dec. 6, 1999), at MT 006629).

28.     Montana Medicaid did not alter its reimbursement methodology in

response to the 1996 OIG study, but instead maintained that the OIG study did not adequately

address dispensing fees and that "states must do additional work to determine whether the cost to

dispense is being accurately reimbursed."  O'Sullivan Declaration ¶¶ 33; 36,  Exhibits 33; 36

(Oct. 5, 1995 Krantz Memorandum ("In Montana, . . . the dispensing fee reimburse[ment] is

below the cost to dispense because of the cap on dispensing fees that is currently in place.");

Letter from Peter S. Blouke, Director, Montana Department of Public Health and Human

Services, to George M. Reeb, Assistant Inspector General, DHHS OIG (April 4, 1996), included

as App. 4 in 1996 Montana Final Report).

29.     In February 2000, Montana participated in another OIG study comparing

published AWPs and actual acquisition costs in Montana.  O'Sullivan Declaration ¶ 37,

Exhibit 37 (Letter from George M. Reeb, Assistant Inspector General, DHHS OIG, to Dorothy

Poulsen, Montana Medicaid Program Officer (February 28, 2000)).

30.     An August 2001 draft reported that, "[f]or Montana, the overall estimate

of the extent that invoice price was discounted below AWP was 19.71 percent for brand name

drugs and 65.37 percent for generic drugs."  O'Sullivan Declaration ¶ 38, Exhibit 38 (HHS-OIG

Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid*

*Prescription Drug Program of the Montana Department of Public Health and Human Services*,

A-06-01-00005 (Aug. 2001 draft)); *see also* Confidential O'Sullivan Declaration ¶ 2, Exhibit 2

(Chappuis Tr. 93:6-16).

31.     Montana again deferred any change to its reimbursement methodology,

because it believed the study failed to account for dispensing costs borne by its local pharmacies.

O'Sullivan Declaration ¶ 39, Exhibit 39 (Letter from Maggie Bullock, Administrator, Montana

DPHHS Health Policy and Services Division, to Gordon L. Sato, Regional Inspector General for

Audit Services, HHS-OIG (Dec. 5, 2001) ("We appreciate your recognition of the fact that the

review does contain some limitations, including . . . the costs of dispensing[,] which includes

costs for supplies and staff.")).

32.     Montana Medicaid officials testified to having routinely received OIG reports related to pharmacy acquisition costs.  O'Sullivan Declaration ¶ 5; 15, Exhibit 5; 15 (Buska Tr. 31:5-33:6; 145:6-146:10; Preshinger Tr. 126:8-127:3).

33.     The predecessor agency to HHS explained in 1975: "Average wholesale price is not currently determined by surveying drug marketing transactions (*i.e.*, by determining the actual price a pharmacist pays to a manufacturer or wholesaler for a particular drug product), and thus published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers."  O'Sullivan Declaration ¶ 76, Exhibit 76 (Limitations on Payment or Reimbursement for Drugs, 40 Fed. Reg. 32,284, 32,293 (July 31, 1975) (codified at 45 C.F.R. pt. 19)).

34.     A 1984 OIG study determined that 99.6 percent of pharmacies' Medicaid-reimbursed drug purchases nationwide were made at prices below AWP; the OIG concluded that "pharmacies do not purchase drugs at the AWP published in the 'Bluebook,' 'Redbook,' or similar publications[, and t]hus, AWP cannot be the best—or even an adequate—estimate of the prices providers generally are paying for drugs."  O'Sullivan Declaration ¶ 77, Exhibit 77 (*Medicaid Action Transmittal*, No. 84-12, "Title XIX of the Social Security Act, Limitation on Payment or Reimbursement for Drugs" (Sept. 1984), *reprinted in Medicare and Medicaid Guide* (CCH) ¶ 34,157, at 10,193, 10,206 (1984) (reporting results of study of six states)).

35.     In 1989, HCFA revised the *State Medicaid Manual* to emphasize "the preponderance of evidence demonstrating that AWP overstates the prices that pharmacies actually pay for drugs …[.]"  O'Sullivan Declaration ¶ 78, Exhibit 78 (HHS-OIG Report, *Medicare and Medicaid: Reimbursement for Drugs*, A-06-89-00037 (Oct. 3, 1989), *reprinted in Medicare and Medicaid Guide* (CCH) ¶ 38,215, at 21,163 (1989)).

36.     Montana Medicaid officials were not consulted by the Attorney General

prior to the filing of this lawsuit.  O'Sullivan Declaration ¶¶ 3; 6-9, Exhibits 3; 6-9 (Bullock Tr.

14:13 – 14:22; Chappuis Tr. 124:14 – 124:21; Collins Tr. 72:12-72:16; Dalton Tr. 140:2 – 140:7;

Ellery Tr. 10:4-10:10; Hunter Tr. 47:19-48:2).

> **E.     Depositions of Montana Medicaid Officials Establish that the State Knew that AWP Substantially Exceeded Actual Acquisition Cost**

37.     Montana Medicaid officials testified in deposition that they knew that

AWP did not represent actual acquisition cost:

- Margaret Bullock, Montana Medicaid Director, 2001-2002.  (Bullock Tr. 47:2-8, Apr. 5, 2006).

- Jeff Ireland, Pharmacy Program Officer, 1992-1995.  (Ireland Tr. 77:16-78:3).

- Dorothy Poulsen, Pharmacy Program Officer, 1996-2001.  (Poulsen Tr. 17:3-17, 43:3-10, 57:11-14, 116:12-16; 122:18-19; *see also* (MT 005418) Poulsen's handwritten notes comparing AWP, Montana Medicaid reimbursement, DP, and "Pharmacy's price," which clearly shows reimbursement exceeded the pharmacy's acquisition cost)).

O'Sullivan Declaration ¶¶ 3; 10; 14; 41, Exhibits 3; 10; 14; 41.

38.     Asked about an email sent by Minnesota's Medicaid pharmacy program

director to other state Medicaid administrators, Poulsen testified:

> Q: Do you see the third sentence where it says: "Almost everyone who is familiar with pharmacy reimbursement knows that AWP [means] 'Ain't What's Paid'"?
> A: Yes.
> Q: Did you know that?
> A: Yes.  I mean, the common knowledge was that AWP was, again, as I've said before, not what it sounded like.  That's why it was discounted.
> Q: And you knew that while you were the pharmacy [program officer] for Montana Medicaid?
> A: Yes.  I wouldn't have been paying attention if I didn't know that.

O'Sullivan Declaration ¶¶ 14; 42, Exhibits 14; 42 (Poulsen Tr. 119:5-16; Email from Cody Wiberg, Pharmacy Program Manager, Minnesota Department of Human Services, to email list serve for National Medicaid Pharmacy Administrators (June 22, 2000)(MT028841-28842)).

39.     Montana's 30(b)(6) witness Jeff Buska testified that the term "average wholesale price" in the Montana administrative code is not understood by Montana Medicaid to mean an actual average sales price, but rather is the price published by a third-party publisher, First Data Bank.  Confidential O'Sullivan Declaration ¶ 1, Exhibit 1 (Buska 30(b)(6) Tr.  569:4-12, Dec. 15, 2006); *see also* O'Sullivan Declaration ¶ 8, Exhibit 8 (Ellery Tr. 55:7-10).

40.     The record shows that Montana Medicaid deferred to the judgment of its Program Officers regarding the establishment of its reimbursement methodology for drugs. O'Sullivan Declaration ¶¶ 7-8; 15, Exhibits 7-8; 15 (Deposition of Mary Dalton, former Bureau Chief, Montana Medicaid Services Bureau at 63:22-64.16, Apr. 12, 2006; Ellery Tr. 103:13-14, 73:11-12, 128:7-10; Deposition of Duane Preshinger, current Bureau Chief, Acute Services Section of Medicaid, at 113:16-18, Apr. 20, 2006).

**F.     Montana Retained an AWP-based Reimbursement Methodology to Ensure Equal Access to Drugs**

41.     One of the overarching goals of the Montana Medicaid Program is to ensure access to care for Montana's Medicaid beneficiaries, which means making sure that there are a sufficient number of Montana pharmacies to service those beneficiaries.  O'Sullivan Declaration ¶¶ 10-15; 30, Exhibits 10-15; 30 (Preshinger Tr. 75:8-11; Ireland Tr. 54:6-22; ("Montana Medicaid Prescription Drug Program," presentation prepared by Dorothy Poulsen (January 2001), at MT 017045; Ellery Tr. 25:22-26:5; Hunter Tr. 22:22-23:5); Confidential O'Sullivan Declaration ¶ 2; Exhibit 2 (Chappuis Tr. 85:22-86:6).

42.     Duane Preshinger, the Acute Services Section Bureau Chief for Montana Medicaid whose responsibilities included the pharmacy program, testified:

> The job of Montana Medicaid is to ensure that Medicaid clients continue to have access to prescription drugs. . . . [I]n many communities there's only one pharmacy.  And so . . . it's our obligation to make sure those community pharmacies continue to stay open and [Medicaid beneficiaries] continue to have access to them.

O'Sullivan Declaration ¶ 15, Exhibit 15 (Preshinger Tr. 39:14-21).

43.     The concern surrounding access to care is particularly acute in rural areas where there are few providers operating in close proximity to Medicaid beneficiaries. O'Sullivan Declaration ¶¶ 8-9; 12; 14, Exhibits 8-9; 12; 14 (Marr Tr. 59:1-7, Mar. 29, 2006; Ellery Tr. 26:13-22; Hunter Tr. 23:6-15, 78:19-79:1; Poulsen Tr. 265:20-266:17).

44.     Access has been identified by Montana Medicaid as one of its "common values and principles" in the effective administration of the Medicaid program.  O'Sullivan Declaration ¶ 40, Exhibit 40 (document produced by the State of Montana titled "Montana Medicaid Values, Principles and Policy Goals").

45.     Equal access to care was a predominant factor in Montana's choosing and repeatedly retaining an AWP-based reimbursement methodology.  O'Sullivan Declaration ¶¶ 3; 11; 14; 15, Exhibits 3; 11; 14; 15 (Poulsen Tr. 266:14-16; Preshinger.Tr. 75:8-75:11; Bullock Tr. 60:3-20; Krantz Tr. 31:5-32:10).

46.     Montana's 30(b)(6) witness also identified access to care as a substantial concern of Montana Medicaid's:

> Q:  So is that really a fourth and related factor that Montana Medicaid considered in setting its reimbursement rate, *was maintaining access to care for Medicaid beneficiaries*?
> A:  *It's always a concern that we have in setting payment rates.*
> ….
> Q:  Was another factor in revising the reimbursement rate whether pharmacies might not be financially viable if reimbursement was reduced significantly?

> A:  I'm sure that was also a concern that we had, is the impact on
> the pharmacies and the impact on the clients, as well.
> Q:  By impact on the clients, the concern of Montana Medicaid
> was the potential impact on the Medicaid beneficiaries?
> A:  *Medicaid beneficiaries and their access to services.*

O'Sullivan Declaration ¶ 5, Exhibit 5 (Buska Tr. 317:5-10; 382:1-12 (emphasis added)).

47.     Montana knew that businesses such as retail pharmacies will not participate in the Medicaid program without a financial incentive.  O'Sullivan Declaration ¶¶ 7-8, Exhibits 7-8 (Ellery Tr. 25:22-27:15; Dalton 121:6–122:20); Confidential O'Sullivan Declaration ¶ 2, Exhibit 2 (Chappuis 86:13-88:10).

48.     Pharmacies and medical practices in rural Montana have little buying power and relatively high costs.  O'Sullivan Declaration ¶ 17 Exhibit 17 (Stratton Tr. 111:17-112:21, Mar. 24, 2006).

49.     Montana Medicaid officials have long been concerned that pharmacies will drop out of the Medicaid program if they are not adequately reimbursed for their services. O'Sullivan Declaration ¶¶ 8-9; 16 Exhibits 8-9; 16 (Smith Tr. 94-95; Hunter Tr. 23:18-24:14, 77:21-78:18; Ellery Tr. 35:8-36:1).

50.     Montana Medicaid officials admit that they set reimbursement high enough so that rural pharmacies will continue servicing Medicaid beneficiaries:

> Q:     Is [e]nsuring beneficiary access to pharmacies participating in the
> Medicaid program for rural beneficiaries a concern faced by the Montana
> Medicaid program?
> A:     Yes.
> Q:     And how does the Medicaid program address that concern?
> A:     Well, trying to make sure that to the extent that there are rural
> pharmacies, that reimbursement is high enough so that rural pharmacies
> will continue to provide Medicaid scripts.

O'Sullivan Declaration ¶ 9, Exhibit 9 (Hunter Tr. 78:19-79-7).

### G. Montana Knew that Its Reimbursement for Dispensing Fees was Inadequate

51.     Montana Medicaid made various modest changes to its maximum dispensing fees from 1990 to the present as follows:

| DATE | DISPENSING FEE |
|---|---|
| July 1990 to June 1997 | $2.00 - $4.08 |
| July 1997 to June 1998 | $2.00 - $4.14 |
| July 1998 to June 2002 | $2.00 - $4.20 |
| July 2002 to December 2003 | $2.00 - $4.70 |
| January 2004 to present | Maximum of $4.70 for in-state pharmacies and $3.50 for out-of-state pharmacies |

O'Sullivan Declaration ¶ 43, Exhibit 43 (NPC Profiles).

52.     Montana Medicaid has long recognized that its dispensing fees have been insufficient to cover pharmacies' actual dispensing costs.  O'Sullivan Declaration ¶¶ 8; 11; 14; 27; 44, Exhibits 8; 11; 14; 27; 44 (Poulsen Tr. 129:12-133:3; Dorothy Poulsen, "Medicaid Services Prescription Drug Program" (Dec. 6, 1999), at MT 006627; Ellery Tr. 130:17-131:10; Krantz Tr. 39:6-40:4; Oct. 5, 1995 Krantz Memorandum; Stratton Tr. 84:19-85:16, 87:20-88:3, 89:11-89:22, 108:7-14, 111:17-112:21; "2002 Survey of Montana Community Pharmacies"; Timothy P. Stratton, "Findings from the Montana Pharmacy Association 2002 Survey of Montana Community Pharmacies" (Fall 2002)).

53.     Asked if it was her "understanding that [a] Montana [p]harmacy would lose money on every drug it dispensed, unless it received some additional reimbursement from Medicaid," Dorothy Poulsen, Montana Medicaid's Pharmacy Program Officer, responded that "That was my rationale for paying them . . . AWP less 10%, rather than some other amount, is that otherwise, they would not be paid sufficiently to provide services to our clients."  O'Sullivan Declaration ¶ 14, Exhibit 14 (Poulsen Tr. 131:21-132:7).

54.     Poulsen also testified:

A: [I]f, for instance, we said to the pharmacists, you have to charge us only your acquisition costs and we had some mechanism to determine whether or not they were actually doing that and we were paying them $4.14 for dispensing, they would not have been reimbursed adequately.

Q: They would have lost money on every drug they dispensed?

. . . .

A: They would have lost money on their business, yes.

Q: And that would have harmed access to Medicaid beneficiaries?

. . . .

A: Yes.  Well, it would have done worse than that.

Q: What would it have done?

A: In many instances, it would have closed pharmacies in small towns and it would have hurt the population as a whole.

O'Sullivan Declaration ¶ 14, Exhibit 14 (Poulsen Tr. 95:20-96:20).

55.     In a December 6, 1999, report for Montana legislators, Poulsen estimated that the "maximum dispensing fee of $4.20 covers between one-fourth and one-half of the cost incurred by pharmacies."  O'Sullivan Declaration ¶¶ 14; 27, Exhibits 14; 27 (Dorothy Poulsen, "Medicaid Services Prescription Drug Program" (December 6, 1999), at MT 006627; Poulsen Tr. 128:2-128:17).

56.     In her deposition, Poulsen elaborated on that statement: in examining pharmacies' dispensing fee surveys, Montana Medicaid determined that pharmacies'

Cost of doing a prescription would have been . . . between $8 and $16 per prescription and we were paying $4.20.  When we used our methodology to determine what our dispensing fee should be, the amount we came up with was invariably higher than what the capped dispensing fee was.  So virtually everyone had the capped dispensing fee.

O'Sullivan Declaration ¶ 14, Exhibit 14 (Poulsen Tr. 129:17-130:2, 130:21-131:7).

57.     A 2002 survey of Montana community pharmacies estimated these costs to exceed Montana's current $4.71 dispensing fee by an average of $5.13 per prescription. O'Sullivan Declaration ¶ 46, Exhibit 46 ("2002 Survey of Montana Community Pharmacies," at 5).

58.     The study found:  "While it costs the average Montana independent community pharmacy $9.84 to dispense each prescription, this same pharmacy receives a dispensing fee of only $4.71 for each Montana Medicaid prescription dispensed, and $2.87 for each prescription covered by a private third party insurer."  *Id.*  at 2.

59.     Additionally, the study found the average dispensing cost for a pharmacy in rural areas is "higher, $10.27, while the dispensing fees received from Montana Medicaid and other third party payors are similar to [other community pharmacies]."  *Id.*  at 3.

60.     The study also concluded:

> Montana's independent community pharmacies operate on very tight margins.  Further reductions in dispensing fees to pharmacies will do little to reduce the overall price paid for prescription drugs, and could pose a very real threat to the ability of independent community pharmacies to remain open for business.  This is particularly true of independent community pharmacies serving Montana's rural communities.

*Id.* at 12.

61.     Montana Medicaid routinely surveyed pharmacists in the State, who consistently complained that Montana Medicaid's dispensing fee was too low to cover their costs and submitted the accounting data that validated those complaints.  O'Sullivan Declaration ¶ 47, Exhibit 47 (MT033299, MT033303, MT033307, MT033337 (showing many Montana pharmacies had average dispensing costs greater than $10 per prescription)).

62.     A 1993 study done for the U.S. Health Care Financing Administration ("HCFA") and a 2004 study for the Centers for Medicare and Medicaid Services ("CMS") concluded that Medicaid dispensing fees did not come close to covering pharmacy costs.  O'Sullivan Declaration ¶ 48, Exhibit 48 (Hartman Dep. Exhibits 19-20).

### H. Montana Retained an AWP-based Reimbursement System to Offset Under-reimbursement in Other Areas, Primarily Low Dispensing Fees

63.     Montana understood that under-reimbursement for dispensing and other services was offset by an adjusted AWP reimbursement of drug ingredient costs. *See, e.g.*, O'Sullivan Declaration ¶ 14, Exhibit 14, (Poulsen Tr. 95:20-96:20).

64.     Montana was aware that reducing reimbursement for drugs beyond the AWP formula it selected would have prompted the withdrawal of pharmacies and providers from participation in Montana Medicaid, thereby reducing patient access to services. O'Sullivan Declaration ¶¶ 1; 17, Exhibits 1; 17 (Bowsher Tr. 63:10-64:11, Feb. 15, 2006; Stratton Tr. 106:10-107:3).

65.     Montana considered and rejected using an adjustment upwards from actual acquisition cost as a method to replace AWP-based reimbursement. O'Sullivan Declaration ¶ 2, Exhibit 2 (Brunett Tr. 86:15-89:6, June 16, 2006).

66.     Montana's use of AWP less 10% in its reimbursement methodology, rather than applying a heavier discount or using an average acquisition cost, was partly intended to make up for the inadequate dispensing fee. O'Sullivan Declaration ¶ 14, Exhibit 14 (Poulsen Tr. 132:19-133:2).

67.     In 2002, Montana considered changing the estimated acquisition cost ("EAC") in its reimbursement formula for the first time in fourteen years. O'Sullivan Declaration ¶ 49, Exhibits 49 (Notice of Public Hearing on Proposed Amendment No. 37-233 (April 15, 2002)); *see also* O'Sullivan Declaration ¶ 50, Exhibit 50 (Marr Department Testimony re: Public Hearing on Amendment of ARM 37.86.1101 and 37.86.1105 (May 16, 2002)).

68.     The Amendment to ARM 37.861101 proposed changing Montana's EAC from AWP – 10 % to AWP – 15%.  O'Sullivan Declaration ¶ 49, Exhibit 49 (Notice of Public Hearing on Proposed Amendment No. 37-233 (April 15, 2002)).

69.     Montana estimated that this proposed change would save the Medicaid program $2,114,011 in fiscal year 2003 and $2,434,992 in fiscal year 2004.  O'Sullivan Declaration ¶ 51, Exhibit 51 (Gray Letter re: SPA 03-002 (MT005684) (Oct. 3, 2002)).

70.     This change became effective July 1, 2002.  O'Sullivan Declaration ¶ 43, Exhibit 43 (2002 NPC Profile).

71.     Officials at Montana Medicaid picked AWP – 15% because it met their budgetary needs while still attempting to provide adequate provider reimbursement. Confidential O'Sullivan Declaration ¶ 2, Exhibit 2 (Chappuis Tr. 84:15-85:8; 85:16-86:6; 86:13-22).

72.     The reason Montana did not even consider cutting reimbursement below AWP – 15% was its concern that lowering reimbursement any more would result in limited access to care for Medicaid beneficiaries.  John Chappuis elaborated:

> Q:  Did you or Mr. Buska discuss why you decided to change the reimbursement to AWP minus 15 rather than AWP minus 21 percent?
>
> A:  In the Department, we always try to find the best reimbursement level we possibly can.  Jeff[ Buska]'s judgment that within that range, as I understand it, his recommendation which was within that range of the audit was 15 percent.  He felt that was the best for Montana.  He felt access was at risk if we were to go higher than that, and that this was the best we could do given the information that we had or he had.

Confidential O'Sullivan Declaration ¶ 2, Exhibit 2 (Chappuis Tr. 87:22-88:10); *see also* O'Sullivan Declaration ¶ 3, Exhibit 3 (Bullock 49:16-20 (agreeing that loss of access to Medicaid beneficiaries was a concern if reimbursement was cut to below AWP – 15%)).

73.    Also in 2002, Montana raised its dispensing fee from $4.35 to $4.70 to "make up for the loss imposed by the change to AWP-15%." O'Sullivan Declaration ¶ 52, Exhibit 52 (MT 013531-MT 013539 at MT 013534).

74.    As Timothy P. Stratton, one of the authors of the dispensing fee study, stated: "The cost of doing business for community pharmacies in rural communities tends to be higher, and yet, there is no rural supplement provided in the Medicaid reimbursement for that." O'Sullivan Declaration ¶ 17, Exhibit 17 (Stratton Tr. 112:18-21).

75.    The study concluded that "[t]hese cross subsidies created interdependencies between payments for drugs and services"; the study also concluded that the subsidy is critical to "cover pharmacy dispensing, acquisition, and other costs and thereby keep pharmacies viable and ensure sufficient access to participating providers for Medicaid beneficiaries." O'Sullivan Declaration ¶ 46, Exhibit 46 ("2002 Survey of Montana Community Pharmacies," at 5).

76.    Providers relied on the amount of reimbursement above ingredient costs to cover the un-reimbursed or under-reimbursed costs to dispense drugs, including rent, utilities, staff salaries and benefits, equipment, warehousing, and time spent performing quality assurance activities. *See* O'Sullivan Declaration ¶ 53, Exhibit 53 (Notice on Proposed Hearing and Amendment (Feb. 14, 2003 ) (MT00039-00043)).

77.    In 2003 Montana considered and ultimately rejected a proposal to reduce the AWP-based portion of its reimbursement for multi-source drugs from AWP-15% to AWP-25%. Montana's Pharmacy Program Officer Dan Peterson explained Montana Medicaid's rationale for rejecting the change it itself had proposed:

> In March 2003 the Department conducted a public hearing to
> reduce [the] reimbursement rate to pharmacy providers for generic
> drugs to Average Wholesale Price (AWP) less 25% from AWP

> less 15%.  The Department decided not to pursue this reduction
> after considering testimony and comments given by pharmacy
> providers and the Montana Pharmacy Association that the
> reduction could lead to the closure of pharmacies in Montana and
> would limit pharmacy access to Medicaid clients.

O'Sullivan Declaration ¶ 54, Exhibit 54 (Department Testimony, April 14, 2004, Public Hearing

on amendment of ARM 37.86.1102 (MT005768-5771)).

78.     Montana Medicaid has repeatedly chosen to retain an AWP-based system

and chosen not to go below the 15% discount off of AWP it adopted in 2002.  O'Sullivan

Declaration ¶¶ 8-10, Exhibits 8-10 (Ellery Tr. 132:13-22; Ireland Tr. 99:4-8); Confidential

O'Sullivan Declaration ¶ 2, Exhibit 2; (Chappuis Tr. 24:5-8).

79.     Montana continues to use AWP as one of its reimbursement benchmarks

because it recognizes that providers require economic incentives to participate in Montana

Medicaid.  *See, e.g.*, O'Sullivan Declaration ¶ 55, Exhibit 55 (August 19, 2005 Email from J.

Chappuis to A. Weiss).

### I.     Montana Certified to HCFA that its Aggregate Drug Reimbursement Approximated Provider Costs Plus a Reasonable Dispensing Fee

80.     For multi-source drugs, the Montana Medicaid agency stated that it had

reviewed a random sample of multi-source drug categories and had found that its expenditures

were consistent with federal regulations, and assured HCFA that its reimbursement methodology

did not violate the aggregate limit rule.  *See* O'Sullivan Declaration ¶ 57, Exhibit 57 (Letter from

Dorothy Poulsen to Spencer Ericson, Associate Regional Administrator HCFA, Region VIII

(Dec. 10, 1999); Letter from Dorothy Poulsen to Spencer Ericson (Dec. 4, 2000) (MT005538-

MT005539)).

81.     For single-source drugs, Montana Medicaid stated that it had found that its

expenditures for single-source drugs were consistent with federal regulations, and assured HCFA

that its reimbursement methodology did not violate the aggregate limit rule.  *See* O'Sullivan

Declaration ¶ 57, Exhibit 57 (Letter from Nancy Ellery, Administrator, Montana Medicaid, to

Gary Wilks, Associate Regional Administrator HCFA, Region VIII (Oct. 21, 1994)(MT075897-

MT075898); Letter from Mary S. Dalton, acting for Nancy Ellery, to Spencer Ericson (Oct. 28,

1997)(MT075893-MT075893); Letter from Dorothy Poulsen to Spencer Ericson (Nov. 6,

2000)(MT075895-MT075896)).

### J.   Montana Receives Pricing Information from First DataBank

82.   First DataBank is a price reporting agency that publishes various prices,

including AWP and wholesale acquisition cost ("WAC") for prescription drugs.  O'Sullivan

Declaration ¶ 10, Exhibit 10 (Ireland Tr. 187:20-188:5).

83.   First DataBank considers AWP to be a "benchmark" price or "reference"

price.  Patricia Kay Morgan, Manager of Product Knowledge-based Services at First DataBank,

testified that AWP is a "reference that can be used for whatever use you want to use it for."

Confidential O'Sullivan Declaration ¶ 5, Exhibit 5 (Morgan Tr. 36:13-19).

84.   First DataBank determines the AWPs it publishes based upon surveys of

wholesalers.  Confidential O'Sullivan Declaration ¶ 5, Exhibit 5 (Morgan Tr. 36:13-19).

85.   Montana had access to and received pricing information from First

DataBank.  O'Sullivan Declaration ¶¶ 4; 10; 14; 58, Exhibits 4; 10; 14; 58 (Buska Tr. 181:3-6,

Ireland Tr. 129:13-17; Poulsen Tr. 257:2-9; Facsimile from Dorothy Poulsen to Jessica Binkley,

Healthpoint (Nov. 6, 2000) (responding to survey)).

### K.      Third Party Payors in Montana Knew that AWP Did Not Represent Actual Acquisition Cost.

86.      It has been long and widely known to Third Party Payors ("TPPs") that AWP does not represent an actual average of prices paid by retailers to wholesalers.  O'Sullivan Declaration ¶ 59, Exhibit 59 (Berndt Report at 10, ¶ 14; 41 ¶ 73).

87.      Sales data produced by Defendants demonstrate that four of the top five TPPs in Montana – Blue Cross Blue Shield of Montana ("BCBS-Montana"), New West, AETNA, and CIGNA – purchased prescription drugs at deep discounts directly through contracts with manufacturers, through group purchasing organizations ("GPO's"), or through drug wholesalers.  *See* Gaier Declaration. ¶ 37, Ex. 20.

88.       Montana TPPs were thus aware of the large differences between AWPs and provider acquisition costs, yet they continue to use AWP as a reimbursement benchmark.  Gaier Declaration. ¶¶ 37-39, Exs. 22-24.

89.      BCBS-Montana and Great West, who are Medicare carriers and thus receive data regarding manufacturers' actual ASPs, as required under the Medicare Modernization Act of 2003, 42 U.S.C. § 13951, continue to use AWP as a reimbursement benchmark.  Gaier Declaration ¶ 40.

90.      The vast majority of TPPs contracted for drugs through pharmacy benefit managers ("PBMs"), and thus purchased those drugs at significant discounts off of AWP.  Gaier Declaration. ¶ 41.

91.      TPPs in Montana have taken advantage of the cost-reducing services offered by PBMs, including the recovery of substantial rebates.  Gaier Declaration ¶ IX.

92.      Professor Berndt did an analysis of competition in the PBM market in the context of class certification in the MDL Court and concluded that, as a result of the vigorous

competition among PBMs, plaintiffs could not demonstrate injury to TPPs.  O'Sullivan

Declaration ¶ 59, Exhibit 59 (Berndt Report at 110, ¶ 205, 112-13 ¶ 209).

93.     Professor Berndt stated:

In summary, the Plaintiffs' theory in the context of self-
administered drugs requires that competition among PBMs be
insufficient to prevent injury and damages to third party payors.  In
my judgment Plaintiffs have not put forward a convincing
argument supporting the notion that competition among PBMs is
inadequate.  Plaintiffs' contention is also at variance with
conclusions reached by the FTC.

O'Sullivan Declaration ¶ 59, Exhibit 59 (Berndt Report at 112-13, ¶ 209).

94.     According to Dr. Berndt, "[a]n important implication of the patterns of

diversified ownership and heterogeneous scale and scope of operations among PBMs is that

commercial information regarding common negotiable contractual terms, such as rebates,

discounts, audit rights, fee structure, penalties, risk assignment and other services offered is

widely dispersed."  O'Sullivan Declaration ¶ 59, Exhibit 59 (Berndt ¶ 133).

95.     Dr. Berndt concluded that, although the terms of a specific contract may

be secret, "general knowledge concerning what is negotiable and what is the range of terms

typically offered is widespread."  O'Sullivan Declaration ¶ 59, Exhibit 59 (Berndt ¶ 134).

96.     In a proposal to BCBS-Montana, AdvancePCS gave an example of an

MCO customer which had, through various AdvancePCS programs, saved $84 million and $106

million in 1999 and 2000, respectively, or 30.5% and 34.9% in drug costs.  Confidential

O'Sullivan Declaration ¶ 10, Exhibit 10 (MON 10469).

97.     In 2002, AdvancePCS estimated it had saved 246 plans a total of $1.6

billion.  Confidential O'Sullivan Declaration ¶ 4, Exhibit 4 (Kilgore Tr. at 76-78); O'Sullivan

Declaration ¶ 60, Exhibit 60 (Kilgore Ex. 003.).

98.     BCBS-Montana, which is the largest private payor in Montana, has contracted with various PBMs since 1994; BCBS-Montana also has contracts with various State governmental entities, including Montana Children's Health Insurance Program ("CHIP"), which provided the State a discount of 60% off AWP for multi-source drugs.  O'Sullivan Declaration ¶ 28, Exhibit 28.

99.      The PBMs with which BCBS-Montana has contracted have negotiated rebate agreements with various manufacturers, including many of the defendants.  Gaier Declaration ¶ IX.

100.    In each of BCBS-Montana's contracts with PBMs, the PBMs have agreed to pay rebates to BCBS-Montana.  *See, e.g.*, Confidential O'Sullivan Declaration ¶¶ 7-9, Exhibits 7-9 (MON0003034-3064; MON0002995-3008; MON0006486-6500).

101.    BCBS-Montana is "very aware" that PBMs may charge it a different price for drugs than they pay to the pharmacies. O'Sullivan Declaration ¶ 18, Exhibit 18.

102.    The PBMs also disclosed to BCBS-Montana that they receive payments for administrative fees from manufacturers, which are not passed on by the PBM to BCBS-Montana.  O'Sullivan Declaration ¶ 18, Exhibit 18.

**L.     Montana Medicaid Claim Submission Process**

103.    Medicaid providers submit claims to Montana Medicaid for reimbursement on "MA-5" forms for pharmacy-dispensed drugs; and on "HCFA-1500" forms for physician-administered drugs; these forms set forth the nature of the claim, the provider's charge for the drug, and the reimbursement sought.  O'Sullivan Declaration ¶ 62, Exhibit 62 (MT011721; MT003220-3221).

104.    Providers set the charges submitted on the claim forms; Montana does not contend that the information contained on any of those claim forms was false.  O'Sullivan

Declaration ¶¶ 6; 15, Exhibits 6; 15 (Collins Tr.  at 74:2-9, Mar. 17, 2006; Preshinger Tr. 30:6-32:13).

106.    Defendants did not receive any reimbursement from the State for the

purchase of drugs.  O'Sullivan Declaration ¶ 82, Exhibit 82 (Defendants' RFA's to Montana)

("During the Relevant Time Period, Defendants did not seek reimbursement from the Montana

Medicaid program for the purchase of the Subject Drugs.  Response:  Admit.").

106.    In urging passage of the Montana Medicaid fraud statute in 1995, Nancy

Ellery, then Montana Medicaid's Director, described the statute to the legislature as one directed

towards fraud by providers themselves, and listed several examples of provider-specific practices

such as "bill[ing] for services not provided, bill[ing] twice for the same service, cost reports can

be falsified, and bill[ing] for unnecessary services."  O'Sullivan Declaration ¶ 79, Exhibit 79

(Minutes of the Senate Public Health, Welfare & Safety Committee, Feb. 17, 1995 at 8).

**M.    Montana Did Not Use AWP as the Reimbursement Benchmark
for Most Multi-Source Drug Claims**

107.    Montana Medicaid reimbursed nearly half of multi-source drug claims at

MAC, which in Montana was based on the drug's Federal Upper Limit ("FUL").  Gaier

Declaration ¶ 49, Ex. 33; *see* MONT. ADMIN. R. 37.86.1101 (2006).

108.    When the FUL was not used by Montana Medicaid, it used other non-

AWP based reimbursement measures instead, including the use of billed charge for over 20% of

the allegedly "fraudulent" multi-source claims, Gaier Declaration ¶ 49, Ex. 33, and the use of

Direct Price for several Defendants, including Abbott and Pfizer.

109.    Multi-source drugs administered in a physician's office (physician-

administered drugs, or "PADs") were reimbursed by Montana Medicaid based on a J-Code (or

CPT/HCPCS code); Montana Medicaid reimbursed all competing versions of a multi-source

drug using a single J-Code at a single reimbursement level.  *See* O'Sullivan Declaration ¶¶ 2; 14, Exhibits 2; 14 (Brunett Tr. 110:1-11; Poulsen Ex. 21; Buska 319:12-19); Gaier Declaration ¶47.

110.    For multi-source drugs reimbursed based on J-Codes, the claim forms do not indicate which of the various sources' drugs was received, *see* O'Sullivan Declaration ¶¶ 2; 14, Exhibits 2; 14 (Poulsen Tr. 171:1-8; Brunett Tr. 45:17-46:5), nor is it possible to "cross-walk" a J-Code to the NDC of a multi-source product, as can sometimes be done for single-source products.  Gaier Decl. ¶ 46.

111.    Montana's own expert Dr. Hartman testified that he has not calculated any damages or penalties for reimbursement of generic PADs, and he has no intention to do so.  O'Sullivan Declaration ¶ 64, Exhibit 64 (Hartman Montana. Report ¶ 22(c); Confidential O'Sullivan Declaration ¶ 3, Exhibit 3 (Hartman Tr. 493:2-12, Aug. 23, 2006).

112.    Until at least 2002, the J-Code reimbursement schedule for Montana Medicaid was not routinely updated when AWPs increased, but instead, was simply set once and adjusted on a drug-by-drug basis when providers complained that reimbursement levels were too low.  O'Sullivan Declaration ¶ 2, Exhibit 2 (Brunett 93:7-22) (Montana would update the fee schedule of a J-Code only when a provider called in saying that he or she was "no longer going to do [a] service unless [Montana DPHHS] updated the price" of the service.).

113.    Montana DPHHS failed to systematically update its J-Code fee schedule between 1991 and 2002.  O'Sullivan Declaration ¶¶ 2; 6, Exhibits 2; 6 (Brunett 74:3-76:19); (Collins 29:6-18).

114.    Montana Medicaid chose not to collect any rebates on physician administered drugs until March of 2006.  O'Sullivan Declaration ¶ 6, Exhibit 6 (Collins Tr. 46:17 – 47.1).

### N.      Multi-source Drug Claims Arguably Reimbursed Based on AWP

115.    Montana used AWP-based reimbursement to promote the increased use of multi-source drugs – which are invariably less expensive than their branded alternatives – as a cost-containment device.  O'Sullivan Declaration ¶¶ 53; 65, Exhibits 53; 65 (Feb. 14, 2003 Notice on Proposed Hearing and Amendment; (MT005256) (discussing Montana Medicaid mandatory generic prescription policy).

116.    Montana has retained the multi-source spread with respect to physician-administered drugs to discourage physicians from leaving Montana Medicaid.  O'Sullivan Declaration ¶ 3, Exhibit 3 (Bullock 58:15-59:20).

### O.      Montana Declined to Use Average Sales Prices for Reimbursement

117.    Montana Medicaid has received "average sales price" ("ASP") data provided by three defendants:  AstraZeneca, Bayer, and TAP.  O'Sullivan Declaration ¶ 56, Exhibit 56.

118.    Montana admits having received such ASP data every quarter over the past five years, and Montana Medicaid Pharmacy Manager Shannon Marr created a chart comparing the Bayer ASPs with the corresponding AWPs for the same products, which showed that the actual ASPs were uniformly well below the published AWPs.  O'Sullivan Declaration ¶ 81, Exhibit 81(Montana's Response to Bayer's Interrogatory No. 1; (MT076440-76441); Confidential O'Sullivan Declaration ¶ 1, Exhibit 1 (Buska 30(b)(6) Tr. 527:18-530:22; 563:14-564:3)).

119.    Although Montana received ASP data from AstraZeneca, Bayer, and TAP, Montana chose not to use those prices for Medicaid reimbursements.  O'Sullivan Declaration ¶ 81, Exhibit 81.

**P.** **Montana has Declined to Implement Benchmarks that would Result in Lower Provider Reimbursement Because of Montana's Concerns about Access for Medicaid Beneficiaries**

**1.** **Montana has Declined to Include WAC in its Reimbursement Methodology**

120.    Montana has been aware for years that WAC is considerably lower than AWP.  In a 1998 email to Nancy Ellery, then Administrator of the Health Policy and Services division of Montana Medicaid, Ray Hanley of Arkansas Medicaid observed:

> Our research suggests AWP is increasing a bogus mark, the Wholesaler Acquisition Cost (WAC) that we have access to is often half or less of the AWP.  When we pay off AWP we pay the single independent retailer the same as the chain who gets huge discounts for volume purchase – we get none of the benefit of these discounts and an often huge markup is allowed to chain retailers.  Is anybody looking at innovative ways to move away from AWP toward something that makes more sense?  Let me know.

O'Sullivan Declaration ¶ 67, Exhibit 67 ((MT 016339 to 016341, at MT 016340 March 17, 1998)).

121.    Montana was also aware that other states used WAC in their reimbursement scheme (often in lieu of AWP).  O'Sullivan Declaration ¶ 68, Exhibit 68 (Memo from the American Public Welfare Association to National Association of State Medicaid Directors re: Generic Drug Pricing (May 29, 1998) (discussing whether states should consider changing reimbursement to be based on WAC as opposed to AWP); Buska Tr. 180:1-6).

122.    Montana could have included WAC in its reimbursement scheme as WAC was as accessible to Montana as AWP if it deemed it advisable as other states have done. O'Sullivan Declaration ¶¶ 4; 10, Exhibits 4; 10 (Ireland Tr. 129:13-17; Buska Tr. 181:3-6).

**2.** **Montana has Declined to Implement State MACs**

123.    Montana has been aware that implementing State MACs for generic drugs could reduce reimbursement to provider pharmacies beyond the savings provided for by the

federal FUL.  O'Sullivan Declaration ¶ 66, Exhibit 66 (Wynia Letter re: Medicaid Drug

Reimbursement (Mar. 8, 2005) (including adopting a Maximum Allowable Cost list among the

measures Montana could adopt to reduce Medicaid prescription drug costs (MT029085-

MT029089)).

      124.    Duane Preshinger, the Acute Services Section Bureau Chief for Montana

Medicaid whose responsibilities included the pharmacy program, explained the nature of a state

MAC program:

> Q:  Are you familiar with Maximum Allowable Cost lists, or otherwise
> known as 'MAC lists'?
> A:  We don't have them in Montana, but I understand what they are.
> Q:  Let's start with your understanding of what they are.
> A:  From my understanding of what they are, it's where states would go
> out and survey and set a maximum allowable cost for a certain drug.
> Q:  Is it your understanding that MAC lists are intended to reduce
> Medicaid prescription drug costs?
> A:  I would assume so, yes.

O'Sullivan Declaration ¶ 15, Exhibit 15 (Preshinger Tr. 142:6-19).

      125.    Montana has known of the existence of state MAC programs for years and

that forty-three out of fifty states have implemented a State MAC program as a cost savings

measure.  O'Sullivan Declaration ¶ 71, Exhibit 71 (King Email re: Conference Call with

Consultec (Aug. 1, 2000) (noting that the claims processing system has a State MAC field,

allowing a state to create State MACs if it wants to); *see also* O'Sullivan Declaration ¶¶ 11; 14-

15, Exhibits 11; 14-15 (Preshinger Tr. 142:6-15; Poulsen Tr. 193:1-6; Krantz Tr. 94:17-95:7).

      126.    Montana briefly considered implementing a state MAC program to curb

prescription drug costs, but ultimately decided not to do so.  O'Sullivan Declaration ¶ 14, Exhibit

14 (Preshinger Tr. 142:20-143:2; 143:7-13; 143:21-144:2); *see also* O'Sullivan Declaration ¶ 15,

Exhibit 15 (Poulsen Tr. 193:1-6).

### 3. Montana has Declined to Implement a Higher Discount off of AWP for Generic Drugs

127.     In January 2003, Montana considered changing to a tiered reimbursement system, to take effect April 1, 2003, in which the EAC for multiple source generic drugs without Federal Upper Limits was AWP-25%, while the EAC for brand name drugs remained at AWP – 15%.  O'Sullivan Declaration ¶ 69, Exhibit 69 (Peterson Memorandum re: Proposed Rule Related to Medicaid Pharmacy Reimbursement (January 24, 2003)).

128.     Duane Preshinger explained that Montana Medicaid considered this change due to budget pressures.  O'Sullivan Declaration ¶ 15, Exhibit 15 (Preshinger Tr. 61:5-8).

129.     Montana estimated that lowering reimbursement for generic drugs would save the State $100,000 in 2003.  O'Sullivan Declaration ¶ 70, Exhibit 70 (SFY 2003 Budget Reduction Proposals (December 2002)).

130.     In March 2003, Montana decided not to institute the change to AWP – 25%.  O'Sullivan Declaration ¶ 54, Exhibit 54 (Dan Peterson Testimony re: Public Hearing on Amendment of ARM 37.86.1102 (Apr. 10, 2004)); *see also* O'Sullivan Declaration ¶ 15; 54, Exhibits15; 54 (Preshinger Tr. 63:13-15; Smith Tr. 56:18-57:8).

131.     One of the reasons that Montana did not put the proposal into effect was that some of its budget pressures were relieved as Duane Preshinger explained:

> Q:  Do you recall what the outcome was for this AWP minus 25 percent proposal?
> A:  We later withdrew it.
> Q:  Do you recall why?
> A:  We withdrew it as the Congress, Federal Congress had passed a change in our Medicaid matching dollars that increased, I believe, right around 3 percent our federal Medicaid match.  So we were no longer in the hole, so to speak.  We weren't – (pause.)
> Q:  Part of the reason for withdrawing the AWP minus 25 percent proposal for generics was because you no longer had the budget restraints that was the impetus for proposing it in the first place?
> A:  Right.

O'Sullivan Declaration ¶ 15, Exhibit 15 (Preshinger Tr. 63:13-64:5).

132.    Another reason that Montana chose not to make the reimbursement

reduction to AWP – 25% for generic drugs was because Montana providers opposed the AWP –

25% proposal, and this provider opposition was one of the State's considerations in not adopting

the proposed rule.  O'Sullivan Declaration ¶ 15, Exhibit 15 (Preshinger Tr. 64:8-16).

133.    Providers articulated their concerns regarding the proposed decrease in

reimbursement and continuing to be able to provider access to pharmacy services to Montana

Medicaid population.  For example, one provider stated the following:

> With the last vestige of pharmacy profit in serious jeopardy, I feel that you
> will lose the support of the pharmacy community in this state. I for one,
> will not have much incentive to use generic prescription medication when
> filling medicaid prescriptions.  This proposed cut will have far reaching
> negative results resulting in less savings than you might anticipate.
> Answer me this question 'After this, why would I want to work with the
> DPHHS?'

O'Sullivan Declaration ¶ 72, Exhibit 72 (Email re: Medicaid Generic Prescriptions (MT 025524

Apr. 4, 2003)).

134.    Another provider complained:

> We have reviewed our options.  If you reduce our compensation, we have
> to cut costs either by being open fewer hours or even days, limit the
> number of clients we accept in the Medicaid program, or completely
> eliminate the programs that expect us to do business at a loss.  To protect
> the financial stability of our company and the livelihood of our employees,
> we have decided to not accept the Medicaid generic at -25% program.  We
> are sad about the decision and the impact it will have on the people who
> live in Glacier County.  We will make every effort to notify Medicaid
> patients of the State's action and focus our concern to the health and well
> being of our Medicaid patients.  These patients cannot and should not have
> their medication regimen disturbed by this action of the State.

O'Sullivan Declaration ¶ 73, Exhibit 73 (Campbell Letter to Kathy Munson, Office of Legal

Affairs DPHHS, re: Notice of Decrease of Pharmacy Reimbursement (March 11, 2003)).

135.    Additionally, as Dan Peterson, a Pharmacy Program Officer of Montana Medicaid explained:

> In March 2003 the Department conducted a public hearing to reduce the reimbursement rate to pharmacy providers for generic drugs to Average Wholesale Price (AWP) less 25% from AWP less 15%.  The Department decided not to pursue this reduction after considering testimony and comments given by pharmacy providers and the Montana Pharmacy Association that the reduction could lead to the closure of pharmacies in Montana and would limit pharmacy access to Medicaid clients.

O'Sullivan Declaration ¶ 54, Exhibit 54 (Dan Peterson Testimony re: Public Hearing on Amendment of ARM 36.86.1102 (Apr. 10, 2004)).

136.    In deciding not to implement a higher AWP discount for generic drugs, Montana Medicaid Officials knew that other states were, in fact, switching to tiered reimbursement formulas which provided a greater discount off of AWP for generic drugs.

O'Sullivan Declaration ¶ 12, Exhibit 12 (Marr Tr. 99:20-100:8, 108:4-109:8, 111:4-112:6).

DATED this 8th day of February, 2007.


**PERKINS COIE LLP**
**ON BEHALF OF ALL DEFENDANTS**

By: /s/ *Kathleen M. O'Sullivan*
David J. Burman, WSBA # 10611
Kathleen M. O'Sullivan, WSBA # 27850
Charles C. Sipos, WSBA # 32825
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206-359-8000
Fax:  206-359-9000
Email:  DBurman@perkinscoie.com
E-mail:  KOSullivan@perkinscoie.com
E-mail:  CSipos@perkinscoie.com

Thomas J. Sartory, BBO #442500
**GOULSTON & STORRS, P.C.**
400 Atlantic Avenue
Boston, MA  02110-3333
Telephone: (617) 482-1776
Email: tsartory@goulstonstorrs.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of February, 2007, a true and accurate copy of the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment was served via the Lexis-Nexis Filing System:

DATED: February 8, 2007.

_/s/ Rebecca J. Gregory_
Rebecca J. Gregory