# EXHIBIT 1

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - x

**CERTIFIED COPY**

IN RE:  PHARMACEUTICAL      : MDL 1456

INDUSTRY AVERAGE WHOLESALE  : Master File No.

PRICE LITIGATION            : 01-CV-12257-PBS

- - - - - - - - - - - - - x


Billings, Montana

Wednesday, February 15, 2006


Deposition of RANDAL P. BOWSHER, a

witness herein, called for examination by counsel

for Defendants in the above-entitled matter,

pursuant to notice and the Federal Rules of Civil

Procedure, the witness being duly sworn, by

agreement, by CRAIG KNOWLES, a Notary Public in

and for the State of Colorado, taken at 33 Last

Chance Gulch, Helena, Montana, at 12:38 p.m., on

Wednesday, February 15, 2006, and the proceedings

being taken down in Stenotype by CRAIG KNOWLES and

transcribed under his direction.

Randal P. Bowsher                                    February 15, 2006

Billings, MT

63

1        A.   Again, generally, reduction in

2    reimbursement to any Medicaid services was usually

3    always communicated to the department.  And

4    increase, I don't recall.  But --

5        Q.   So your recollection is, then, that,

6    typically, when a reimbursement level was being

7    reduced, there would be some communications from

8    physicians or other providers expressing

9    opposition to that reduction?

10       A.   I don't recall any programs when I was

11   working that, any time we reduced reimbursement,

12   that we didn't hear from somebody.

13       Q.   Those, the concerns about changes to

14   reimbursement, was access to medical care a

15   concern of Montana Medicaid with respect to

16   reimbursement levels and the prospect of

17   physicians or other providers dropping out of

18   Medicaid due to under-reimbursement?

19       A.   As -- regarding the physician program, I

20   would attest to the fact that, yeah, we wanted

21   coverage statewide as much as possible.  And a

22   response from the physician community in regard to

Randal P. Bowsher                    February 15, 2006
                    Billings, MT

64

1    our reimbursement levels to physicians for

2    services, that was one of the things we heard from

3    the community, that possibly people would be

4    dropping out and would not provide Medicaid

5    service, or would not provide services to Medicaid

6    individuals.

7         Q.   Is it fair to say that Montana wanted to

8    prevent that result; they didn't like physicians

9    or the providers dropping out of the Medicare

10   network because of concerns about access?

11        A.   That's true.

12        Q.   Just going back very briefly to your

13   testimony about the files sort of kept in your

14   cubicle that may or may not at this point be with

15   Ms. Brunette.

16             Do you know whether or not those files

17   would contain any documentation regarding changes

18   to reimbursement levels for physician-administered

19   drugs, do you recall if that was the type of

20   document you kept some record of?

21        A.   I don't remember those specifically.

22        Q.   To the extent you did keep them, would

# EXHIBIT 2

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

In Re:  PHARMACEUTICAL            MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE        CIVIL ACTION

PRICE LITIGATION                  01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS


Taken at 33 South Last Chance Gulch

Helena, Montana

Friday, June 16, 2006 - 9:05 a.m.


CERTIFIED COPY


TELEPHONE DEPOSITION

OF

DENISE BRUNETT


Reported by Mary R. Sullivan, RPR, RMR,

Freelance Court Reporter, Notary Public, residing in

Missoula, Montana.

Brunett, Denise       HIGHLY CONFIDENTIAL          June 16, 2006
                          Helena, MT

Page 45

1      Q.    Well, if you reviewed any documents that

2   indicated what the reimbursement methodology was, if

3   you had conversations with other Medicaid employees

4   regarding the prior methodology or different

5   methodology, anything of that nature.

6      A.    I did have conversations with the--what

7   would be my predecessor and his claim manager.  His

8   name was Randy Bowsher, her name is Fran O'Hara,

9   because when I started my employment, I had realized

10   that the injectable--physician injectables had not

11   been updated as a whole in a number of years, and so

12   I'd called both of them to gain an understanding of,

13   you know, how was I going to tackle that beast and

14   what--what--how had they worked with it, and it was

15   a complaint-driven price update system is what they

16   had done.

17      Q.    What--what do you mean by complaint

18   driven? I think I understand what you mean, but I

19   want to make sure, complaint-driven price update

20   system.

21      A.    If a provider had called in saying, you

22   know, I'm wanting to do J-9999 but you only pay me

Brunett, Denise      HIGHLY CONFIDENTIAL      June 16, 2006
Helena, MT

Page 46

1    two bucks and it costs me 1,500 to get it, I'm no

2    longer going to do this service unless you can

3    update the price, and then we go in and review a

4    price update and update the price specific to that

5    one injectable.

6         Q.    And did--so was it your understanding that

7    when you joined in 2001, prior to that time there

8    hadn't been sort of a wholesale update of all

9    physician administered drug prices?

10        A.    I'm hoping you ask that in a different

11   way.

12        Q.    Sure, let me try to clarify.  You said

13   that in conversations with Mr. Bowsher and Ms.

14   O'Hara that you learned that they had used sort of a

15   complaint-based update system for physician

16   administered drugs.  Did I understand that

17   correctly?

18        A.    Right, yes.

19        Q.    Okay.  And, so, what I'm wondering is if

20   they told you when the last time was to the extent

21   that, you know, there was a last time, that all

22   physician administered drugs had received some kind

Brunett, Denise      HIGHLY CONFIDENTIAL      June 16, 2006
Helena, MT

1     programs you communicated with on this subject?

2          A.    No.

3          Q.    Do you recall what information you

4     received from those states?

5          A.    No.

6          Q.    Do you recall whether any of the

7     information you received discussed alternative

8     methodologies to AWP?

9          A.    An internal discussion--I'm sorry.

10         Q.    I'm sorry, yeah, I--I didn't enunciate

11    clearly, probably.  Whether any of the information

12    that you received discussed alternative

13    methodologies to AWP.

14         A.    Yes.

15         Q.    Okay.  And what were those methodologies,

16    if you can recall.

17         A.    I can recall one for sure that was just

18    paying a percentage of charge.

19         Q.    And this was a methodology that was in

20    place in some other state's Medicaid program?

21         A.    I didn't say that.

22         Q.    Okay.  Do you recall what--which--which

1    payor or even sort of category of payor was using

2    this percentage of charge methodology?

3        A.   I recall it as my own idea, not other

4    payor's idea.

5        Q.   And I mean, I mean this in a very genuine

6    way, I mean, how did you come up with that idea?

7        A.   Brainstorming.

8        Q.   Okay.  Was there any information that you

9    looked at aside from these communications to sort of

10   generate that idea?

11       A.   No, it--it--no, it--it--it's linked to the

12   by-report methodology, so it's not--remember how I

13   told you the whole 60 percent scenario?

14       Q.   Uh-huh.

15       A.   That's a methodology that's applied on a

16   rare occasion.

17       Q.   Okay.

18       A.   And I was thinking--the brainstorming was

19   should we apply it here.

20       Q.   Okay.  And did you pursue the use of that

21   methodology in terms of discussing it with your

22   superiors or other people at Medicaid?

1      A.    I'm sure I did.

2      Q.    Okay.  Do you recall who those discussions

3   were with?

4      A.    I'm sure it was with Mary Angela and Doug.

5      Q.    Okay.  And do you recall any of the

6   substance of those conversations?

7      A.    Yeah, it's a pretty bogus way to do it.

8      Q.    That--that was the conclusion reached that

9   that was a bogus way to do it?

10     A.    Yeah.

11     Q.    Was that a conclusion reached among the

12   three of you--

13     A.    Yes.

14     Q.    Or--okay.  And what--why did you come to

15   that conclusion or why was that your conclusion that

16   it was a bogus way to do it?

17     A.    Because charges are elevated, and once

18   somebody realizes you're paying on that methodology,

19   they elevate them more.

20     Q.    So the concern was that it would cause

21   providers to increase their charges; is that right?

22     A.    Yes.

Brunett, Denise      HIGHLY CONFIDENTIAL       June 16, 2006
Helena, MT

1      Q.    Okay.   And I assume that based on the

2   conclusion that it was a bogus methodology, in your

3   words, and what we've discussed about the

4   methodology in place now, that that was--that

5   methodology was never adopted by Medicaid?

6      A.    As an entirety, no.

7      Q.    Okay.

8      A.    I told you that rarely it's applied to a

9   code here, and there's no other way to price it.

10      Q.    How long was this--this process that you

11   underwent to review the methodology?   I--maybe I can

12   ask it a different way that might help clarify.

13   This was--if I understand you correctly, this was

14   sort of a--you know, a project that you took on to

15   look at this and communicate with other payors and

16   other state Medicaid agencies, and what I'm

17   wondering is sort of when the projects start--

18   started and when it ended?

19      A.    It started very soon after I began my

20   employment, and I would estimate that it was within

21   a year.   I'm looking to the memo that I handed you

22   earlier, because by the time we posted our first

Brunett, Denise     HIGHLY CONFIDENTIAL        June 16, 2006
                          Helena, MT

Page 93

1     as a document that's contained in your files?

2          A.    Yes.

3          Q.    Okay.  And for the record, is this the

4     same document that you showed me earlier this

5     morning?

6          A.    Yes.

7          Q.    Okay.  Ms. Brunett, in the--sort of the

8     upper left of this document, there's a column or a

9     listing, I should say, of dates underneath the

10    phrase "history when prices were updated".  Can you

11    tell me what--what information is reflected by

12    these--this series of dates here?

13         A.    Yes.  I had placed a request into ACS to

14    tell me when they had record of file update requests

15    for when physician injectables were updated, the

16    prices were updated, and they had e-mailed me these-

17    -these dates, and I cut and pasted them from the e-

18    mails into this memo.

19         Q.    And is it--is it correct that the first

20    date is January 1st, 1991 and then the next date is

21    July 1st, 2002?

22         A.    Yes.

1    form is called?

2        A.    CMS 1500.

3    EXHIBIT:

4                    (Exhibit Brunett 012 marked for

5    identification.)

6        Q.    (By Mr. Sipos)  Ms. Brunett, the court

7    reporter's--or I've, rather, I've handed you what's

8    been marked as Exhibit Brunett 012 to your

9    deposition.  For the record, this is document MT

10   03220 to 03221.  Ms. Brunett, is this a CMS 1500

11   claim form that you just referred to, or an example

12   of one?

13       A.    Yes.

14       Q.    And it--am I correct that with respect to

15   physician administered drugs, that physicians

16   submitting this form are the parties reimbursed for

17   those drugs.

18       A.    Yes.

19       Q.    This might cover just a little bit some of

20   the things we discussed already, but just to be

21   clear, the--if you look in Column D of this form,

22   which is two-thirds of the way down in a column

1   entitled Procedures, Services or Supplies, can you

2   tell me what information is put in this CPT/HCPCS

3   column by a provider who's seeking reimbursement for

4   physician administered drugs?

5       A.   If you're looking at Column 24 D, that's

6   where the providers list the services they render

7   and supplies or devices they're billing us for.

8       Q.   Okay.  And is this where a provider would

9   identify or write down the particular J-code for a

10  drug?

11      A.   If they were billing a J-code, yes.

12      Q.   Okay.  And for drugs, for physician

13  administered drugs, is it correct that--or let me

14  ask, does Montana require, then, an NDC number be

15  inserted here, or is it a J-code that's inserted

16  here?

17      A.   No--there's no NDC requirement.

18      Q.   Okay.

19      A.   So they're to bill us for what they do,

20  and if it's a J-code, that's what we require.

21      Q.   And is the J-code what's required for

22  physician administered drugs?

Brunett, Denise      HIGHLY CONFIDENTIAL      June 16, 2006
Helena, MT

Page 109

1        A.    No, not always.

2        Q.    Okay.  Are the instances where a J-code's

3    not required times when the provider might be

4    putting in an A or a Q code?

5        A.    Yeah, another code, another CPT or HCPCS

6    code, yes.

7        Q.    Okay.  Is there any instance in which an

8    NDC is required to be entered into this form for

9    providers to obtain reimbursement?

10       A.    For--when they bill unlisted codes, if

11   they don't put an NDC on here, we look for an

12   attachment, so it's not that it's required on this

13   form, but if it doesn't come with an attachment that

14   has an NDC on it, we just don't pay it, we deny it.

15       Q.    And I--and am I correct that providers,

16   when they're seeking reimbursement for a J-code

17   drug, for instance, that they put the J-code on here

18   as opposed to a particular price for a drug?

19       A.    They have to put their billed amount on

20   there.

21       Q.    Okay.

22       A.    But, yes.

Brunett, Denise      HIGHLY CONFIDENTIAL      June 16, 2006
Helena, MT

Page 110

1      Q.   Do you know for J-codes whether or not

2   those codes are drug specific so that a J-code can

3   be traced back to a specific drug manufactured by a

4   particular manufacturer?

5      A.   I think for the majority they are not

6   because there's multiple sources for some of them.

7      Q.   Okay.  So for a multiple source drug, a J-

8   code doesn't necessarily provide you the information

9   needed to--to match that to a particular

10   manufacturer?

11      A.   I believe so.

12      Q.   Do you know whether or not there are

13   instances of single-source products where there

14   might be more than one J-code for the same product?

15      A.   Would you repeat that, please?

16      Q.   Sure.  And I'll change the question just a

17   bit to try to clarify.  Do you know if there are J-

18   codes for single-source physician administered drugs

19   where the same J-code could be two different drugs?

20      A.   No, not for two drugs.

21      Q.   And what about--

22      A.   I'm sorry, I still need clarification on

Brunett, Denise     HIGHLY CONFIDENTIAL      June 16, 2006
                    Helena, MT

1   that.  Are you--the same type of drug or that it's--

2   let me say this and see if I answer your question.

3   One J-code can represent more than one drug, one J-

4   code can represent one drug.

5        Q.   I think that clarifies it for me.

6        A.   Okay.

7        Q.   So is it correct that Montana Medicaid,

8   relying on the J-code alone, couldn't determine who

9   the particular manufacturer is for a certain drug in

10  all instances?

11       A.   That's correct.

12       Q.   Okay.  You know, if it's okay with both of

13  you, I was thinking we'd break a little early for

14  lunch.  It's about ten until noon now.

15            MS. BOVINGTON:  That's fine.

16            MR. SIPOS:  Obviously we'll definitely

17  resume after lunch.

18            MS. BOVINGTON:  Okay.  So you want to

19  resume at 1:00?

20            MR. SIPOS:  Yeah, that works for me,

21  that's fine.

22            MS. BRECKENRIDGE:  I'm sorry, I couldn't

# EXHIBIT 3

1         THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3    -----------------------------x

4    In re:  PHARMACEUTICAL     )

5    INDUSTRY AVERAGE WHOLESALE   )

6    PRICE LITIGATION       ) MDL DOCKET NO.

7    _____) CIVIL ACTION

8    THIS DOCUMENT RELATES TO:   ) 01CV12257-PBS

9    ALL ACTIONS         )

10   -----------------------------x

11

12        DEPOSITION OF MARGARET BULLOCK

13          Phoenix, Arizona

14           April 5, 2006

15            9:00 a.m.

16

17   DEPOSITION OF MARGARET BULLOCK, commenced at

18   9:00 a.m. on April 5, 2006, at Phoenix, Arizona,

19   before Robin L. B. Osterode, RPR, CSR, Arizona

20   Certified Reporter No. 50695.

21

22

1

4/5/2006 BULLOCK, Margaret V.1

1     Q.   Then we'll definitely try to make it as

2   short as possible.  Since the time you left your

3   full-time position with Montana Medicaid, have you

4   been involved in supporting the lawsuit in any way,

5   providing information, or anything like that?

6     A.   No.

7     Q.   And in these questions I don't want to ask

8   about attorney-client communications, but I wanted

9   to get a general sense of what your role was in the

10  decision to file the lawsuit.  When -- do you recall

11  when you first became aware that there was a

12  possibility of filing this lawsuit?

13    A.   I -- I was made aware of the lawsuit by

14  Joe in Montana, our former attorney general, Joe

15  Mazurek, who had left a message on my Helena phone

16  in January.

17    Q.   January of 2002?

18    A.   2006.  I was not made -- I don't remember

19  being made aware of it before then.

20    Q.   So you don't recall being consulted or

21  being involved in a decision to file a lawsuit?

22    A.   No.

14

1     A.  No, I'm sorry, I don't understand.

2     Q.  When did you first become aware that AWP

3  was not the actual acquisition price?

4     A.  I don't remember when I actually became

5  aware.

6     Q.  But it was clear that people on your staff

7  were aware of that?

8     A.  Yes.

9     Q.  And do you have any idea for how many

10  years they had been aware of that?

11     A.  No.

12     Q.  And do you have any reason to think that

13  Montana did not receive the 1997 OIG report that's

14  referenced here in 1997?

15     A.  I have no reason to believe that.

16     Q.  That they did not get it?

17     A.  But I don't know.

18     Q.  Okay.  Continuing on down towards the

19  bottom of that page there's a reference to a study

20  being done, again, in 2000 and showing that there

21  was even a larger difference between the AWP and the

22  discounts, the effective price; do you see that?

47

1    pharmacies were actually paying for these drugs?

2             MS. HORGAN:  Objection to form.

3             THE WITNESS:  Yes, it was a concern.

4    BY MR. BURMAN:

5        Q.   Because it was a way to save -- to reduce

6    Medicaid expenditures?

7        A.   Yes.

8        Q.   The first full paragraph on 5659, the

9    first sentence states "It is important to note that

10   while the OIG claims the discount below AWP is 19.71

11   and 65.37, the division does not wish to reduce

12   reimbursement to those exact levels."  Do you recall

13   why there was a decision not to go more than the 15

14   percent adjustment that you were considering?

15       A.   I don't recall.

16       Q.   Were you concerned that if the discount

17   off of AWP was increased to more than 15 percent,

18   that you would possibly lose access for Medicaid

19   patients to pharmaceuticals?

20       A.   Yes.

21       Q.   And how did you try to obtain information

22   on how far you could go for budget purposes without

49

1    paragraph?

2        A.  I do.

3        Q.  Do you have any recollection of the

4    University of Texas study?

5        A.  I don't.

6        Q.  Do you have a recollection of an issue

7    involving non-identifiable patient level

8    pharmaceutical data for any study?

9        A.  No.

10       Q.  Do you recall taking any action in

11   response to Exhibit Bullock 005?

12       A.  I don't.

13           (Marked for identification Exhibit

14   Bullock 006.)

15   BY MR. BURMAN:

16       Q.  Okay.  Ms. Bullock, Exhibit Bullock 006 is

17   Bates numbers 27591 - 92, and it's a December 20,

18   2002 memo from Mr. Chappuis; are you familiar with

19   this document?

20       A.  Yes.

21       Q.  And were you involved in making this

22   decision or these proposed changes?

1     A.  Yes.

2     Q.  If you'd look on the second page, the last

3  bullet item under number 5 talks about decreasing

4  the reimbursement rate for generic prescriptions

5  from the AWP less 15 percent to AWP less 25 percent;

6  do you see that?

7     A.  Yes.

8     Q.  And my understanding is that that proposal

9  ended up not being implemented; is that accurate?

10    A.  I don't remember.

11    Q.  Do you recall that -- what do you recall

12  about the proposal for the generics to go to AWP

13  less 25 percent?

14    A.  I don't recall the discussion.

15    Q.  At any time during your tenure, do you

16  recall consideration of whether generic drugs from

17  pharmacies should be reimbursed as a lower effective

18  rate than brand-name drugs?

19    A.  I believe we had a discussion or those

20  discussions.

21    Q.  And what do you recall was the reason for

22  having that differential or proposing that

1    differential?

2        A.  I don't recall.

3        Q.  Do you recall concerns about making that

4    change, that it might reduce access to generic

5    drugs?

6        A.  Yes.

7        Q.  And what was the nature of the concern?

8        A.  That pharmacies would say we've had

9    enough, we can't afford this anymore, we can't

10   afford to serve Medicaid patients.

11       Q.  Even though they were being reimbursed at

12   something above their actual acquisition costs?

13       A.  Yes, that was the discussion, yes.

14       Q.  But it wasn't enough above their --

15       A.  Right.

16       Q.  And did you take those concerns seriously?

17       A.  Yes.

18       Q.  And were those factored into the policy

19   decisions that Montana Medicaid made?

20       A.  Yes.

21           (Marked for identification Exhibit

22   Bullock 007.)

4/5/2006  BULLOCK, Margaret V.1

1     BY MR. BURMAN:

2         Q.  Ms. Bullock, Exhibit Bullock 007 is Bates

3     25569 to 71, and it appears -- whoops, did I do the

4     wrong one? Yeah, that's right.  It appears to be a

5     memo from you to Ms. Gray; is that correct?

6         A.  Yes.

7         Q.  And is that your signature on Exhibit

8     Bullock 007?

9         A.  Yes.

10        Q.  Why don't you take a second to review

11    that.  Have you had a chance to review --

12        A.  I have.

13        Q.  And what do you recall about Exhibit

14    Bullock 007?

15        A.  What I recall is there was a lot of time

16    put into trying to develop the rationale, because it

17    was difficult to do.

18        Q.  Difficult, but you needed to find some way

19    --

20        A.  But we needed to find ways to reduce the

21    expenditure rate.

22        Q.  Do you recall any discussion of why you

# EXHIBIT 4



1

1          THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3                    ---oOo---

4

5

6     In re:  PHARMACEUTICAL,            MDL DOCKET NO.

7     INDUSTRY AVERAGE WHOLESALE         CIVIL ACTION

8     PRICE LITIGATION                   01CV12257-PBS

9     _____

10

11    THIS DOCUMENT RELATES TO:

12    ALL ACTIONS

13    _____

14                    Volume I

15            DEPOSITION OF JEFF BUSKA

16                  Taken at:

17               Law offices of

18     Gough, Shanahan, Johnson & Waterman

19          33 South Last Chance Gulch

20              Helena, Montana

21              October 19, 2005

22                 9:00 a.m.

CERTIFIED COPY

Jeff Buska                                          October 19, 2005

Helena, MT

31

1    Medicaid?

2         A.    Can you clarify that for me?

3         Q.    Are you aware -- yes, I can.  I can try.

4         A.    Okay.

5         Q.    Are you aware of any studies that the

6    Federal Government, such as the Office of Inspector

7    General of HHS, has done relating to Medicaid drug

8    reimbursement?

9         A.    Yes, I am aware of studies and reports

10   they have done.

11        Q.    Have you reviewed them?

12        A.    Yes.

13        Q.    Other than the OIG studies, have you seen

14   any other studies from the Federal Government that

15   relate to Medicaid drug reimbursement?

16        A.    I believe that the GAO has also done some

17   analysis as well.

18        Q.    Have you reviewed that analysis?

19        A.    Yes.

20        Q.    Where did you get these OIG or GAO reports

21   from?

22        A.    They are sent to the state Medicaid

Jeff Buska                                          October 19, 2005
                        Helena, MT

32

1    director from the Centers for Medicare and Medicaid

2    Services or directly from the OIG to him.

3         Q.    How are those studies then distributed

4    within the Montana Medicaid program?

5         A.    Either the state Medicaid director will

6    distribute those to the division administrators, who

7    in turn, they give them to their staff; or he will

8    give them to me and then I share them with the

9    division administrators as part of my duties as an

10   analyst and coordinator for him.

11        Q.    Are you a member of any e-mail listservs

12   relating to your work for Montana Medicaid?

13        A.    I'm a member of a listserv that comes from

14   the Centers for Medicare and Medicaid Services,

15   specifically relating to a lot of the current issues

16   on the Medicare Modernization Act.

17        Q.    Has that listserv also covered topics

18   related to Medicaid reimbursement?

19        A.    No.

20        Q.    How long have you been a member of that

21   listserv?

22        A.    Since CMS put that up in terms of their

Jeff Buska                                                    October 19, 2005

Helena, MT

33

1    getting information out to the states.

2         Q.    Do you recall roughly when they

3    established it?

4         A.    I believe they probably started a lot of

5    it in January 2004, since the law was passed in

6    December of 2003.

7         Q.    It's a listserv specific to the MMA?

8         A.    Specific to the MMA.

9         Q.    Are you a member of any other listservs

10   relating to your work?

11        A.    No.

12        Q.    Were you previously a member of any

13   listservs relating to your work?

14        A.    Previously, I believe, I was on a listserv

15   related to dental reimbursement, a lot of the issues

16   that were going on in the program regarding dental

17   services.

18        Q.    Are you aware of state Medicaid directors

19   meeting on any e-mail listserv?

20        A.    Yes.

21        Q.    Were you ever a member of that list?

22        A.    I'm not a member of that list, but I

Jeff Buska                                              October 19, 2005

Helena, MT

119

1    services are available to the general population."

2         Q.    I'll take it back.

3         A.    (Handing document to Counsel.)

4         Q.    In your position in Montana Medicaid, have

5    you been aware of that law?

6         A.    Yes.

7         Q.    Have you ever heard it referred to as the

8    "equal access provision"?

9         A.    Not specifically in terms of the equal

10   access, no.

11        Q.    Has it been referred to in Montana

12   Medicaid by any other general description?

13        A.    The general description is to ensure

14   reasonable access to healthcare services.

15        Q.    Is it fair to say that Montana is a large

16   state?

17              MS. BRECKENRIDGE:   Objection; that's very

18   vague.

19        Q.    (By Ms. O'Sullivan) Is it physically a

20   very large state?

21        A.    Physically large, yes.

22        Q.    It's a state with many rural areas?

1          MS. BRECKENRIDGE:  Is that a question?

2          THE WITNESS:  Is that a question?

3     Q.    (By Ms. O'Sullivan) Yes, it is.

4     A.    Yes, it is a state that we know there are

5  a lot of rural areas.

6     Q.    And because it's a large state, is it also

7  a state where the Medicaid population is widely

8  dispersed across the state?

9     A.    We do have clients across the state, but

10  whether they are widely dispersed, I think a lot of

11  them are -- we do have a number of clients in our

12  larger communities.  But, yes, we do have a lot of

13  clients that live in rural areas.

14     Q.    When you use the term "client", you mean

15  Medicaid beneficiary?

16     A.    Medicaid beneficiary, Medicaid client.

17     Q.    What steps has State of Montana taken to

18  ensure reasonable access to healthcare services across

19  the state of Montana?

20     A.    Well, the services are available to all

21  Medicaid clients.  If they are eligible for the

22  Medicaid program and a healthcare program is enrolled

Jeff Buska                                      October 19, 2005
                        Helena, MT

                                                              145

1    don't we take a five-minute break.

2                    (A brief recess was taken.)

3                    (Document marked Deposition

4         Exhibit Buska 0012 for identification.)

5    BY MS. O'SULLIVAN:

6         Q.    Mr. Buska, the court reporter has handed

7    you what has been marked Exhibit Buska 012, a document

8    entitled "Review of Pharmacy Acquisition Costs for

9    Drugs Reimbursed Under the Medicaid Prescription Drug

10   Program of the Montana Department of Health and Human

11   Services", dated July 11, 1996.  Do you see that?

12        A.    Yes.

13        Q.    Did the state receive this document?

14        A.    I believe that we did, but I don't know

15   that for a fact.

16        Q.    Would you please turn to the second page

17   of the report itself?  Under the Summary, page 1, the

18   last paragraph, do you see where it says:  "In

19   Montana, we obtained pricing information from 43

20   pharmacies"?

21        A.    Yes.

22        Q.    Do you see in the third sentence, it says:

                 Henderson Legal Services
                    (202) 220-4158

Jeff Buska                                    October 19, 2005
                    Helena, MT

146

1            "For Montana, the overall estimate of the

2     extent that AWP exceeded invoice prices was 16.2

3     percent for brand name drugs and 48.5 percent for

4     generic drugs"?

5            Do you see that?

6            A.    Yes.

7            Q.    So the State of Montana was aware, at

8     least as of 1996, that AWP exceeded invoice prices for

9     these levels.

10           A.    Yes.

11           Q.    Turning to the next page, the first line

12    states:

13           "We are recommending that the Montana

14    Department of Public Health and Human Services (State

15    Agency) consider the results of this review as a

16    factor in any future changes to pharmacy reimbursement

17    for Medicaid drugs."

18           Do you see that?

19           A.    Yes.

20           Q.    Did the state reexamine -- did the state

21    consider the results of this review in any future

22    changes?

Jeff Buska                                    October 19, 2005
                    Helena, MT

180

1   produce later.  Can you tell me what the state

2   considered switching their reimbursement formula to?

3       A.    I know the state took a look at what other

4   states were doing in terms of how they paid for

5   prescription drugs.  I know some states use wholesale

6   acquisition costs, WAC, plus a percentage.  Most of

7   the states, the majority of the states, to my

8   knowledge, use a form of AWP minus a percentage.

9       Q.    Let's turn to 1(f), documents received

10  from publishers and documents related to plaintiff's

11  reliance on such documents.

12       Do you know what type of documents -- first of

13  all, do you know what the notice means when it refers

14  to a publisher?

15       A.    What I believe by a "publisher" would be

16  documents that might be generated by the Kaiser

17  Foundation, for example, or the APHA, which would be

18  the American Public Health Services Association, often

19  generate reports.

20       Q.    In this context for the purpose of

21  litigation, this is a term I definitely can clarify.

22  Here we mean Red Book, or First Data Bank, Blue Book.

Jeff Buska                                          October 19, 2005

Helena, MT

181

1    Are you familiar with those publications?

2         A.    Yes, I'm familiar with those.

3         Q.    Which publication, if any, did Montana

4    rely on?

5         A.    For the pricing, we relied on information

6    provided by First Data Bank.

7         Q.    In what format did the state get pricing

8    from First Data Bank?

9         A.    The state obtains that pricing information

10   through our contract with ACS, and ACS gets that

11   information electronically.

12        Q.    Does the state itself have access to that

13   electronic data?

14        A.    Yes, we do.

15        Q.    Who within Montana Medicaid has that

16   access?

17        A.    The program staff, pharmacy program

18   manager would have access to that pricing information.

19   The supervisor would have access to that, and the drug

20   rebate staff.  Those are the ones that typically use

21   it.

22              (Document marked Deposition

# EXHIBIT 5

247

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

CERTIFIED COPY

In re:  PHARMACEUTICAL,              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE           CIVIL ACTION

PRICE LITIGATION                     01CV12257-PBS

_____


THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____



Volume II

DEPOSITION OF JEFF BUSKA

Taken at

Law Offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

December 14, 2005

9:00 a.m.

Buska, Jeff - Vol. II                           December 14, 2005
                          Helena, MT

317

1    services, but are the payment rates reasonable and

2    adequate to assure access to -- that the provider will

3    continue to provide access to our beneficiaries for

4    prescription drugs.

5           **Q.  So is that really a fourth and related**

6    **factor that Montana Medicaid considered in setting its**

7    **reimbursement rate, was maintaining access to care for**

8    **Medicaid beneficiaries?**

9           A.  It's always a concern that we have in

10   setting payment rates.

11          **Q.  I would like to turn, then, to**

12   **physician-administered drugs.  What are the factors**

13   **considered in setting the reimbursement rate for**

14   **physician-administered drugs?**

15          A.  I don't know the details about those

16   factors, but I believe oftentimes, what they try to do

17   is, they try to -- some of the physician-administered

18   drugs, they are reimbursed based on what is called J

19   codes.  And there's -- CPT 4 or HCPCS codes is the

20   coding structure for those physician-administered

21   drugs.  They are typically injectable drugs.

22          And some J codes are 1 to 1 relationship

1    are set.

2         Q.   Mary Angela Collins is the head of the

3    managed care bureau?

4         A.   She is its bureau chief, yes.  Or she would

5    be able to identify the staff person who would know

6    the most about it.

7         Q.   I think I'm going to get back to the

8    question of what factors were considered in the rate

9    once I understand what the reimbursement rate was.  So

10   how does Montana Medicaid reimbursement physicians for

11   physician-administered drugs?

12        A.   How we reimburse for physician-administered

13   drugs is, the physician will bill a CMS 1500 claim

14   form, identify the CPT or HCPCS code which for these

15   drugs would be J codes, I don't know if there are

16   other codes that would be utilized.  And it would then

17   apply the lower of logic that we have of their bill

18   charges or the fee that we have on file for that

19   service.

20        Q.   Those are physician fee schedules?

21        A.   Physician fee schedule.

22        Q.   Who at Montana Medicaid sets those

Buska, Jeff - Vol. II                    December 14, 2005

Helena, MT

382

1      Q.   Was another factor in revising the

2  reimbursement rate whether pharmacies might not be

3  financially viable if reimbursement was reduced

4  significantly?

5      A.   I'm sure that was also a concern that we

6  had, is the impact on the pharmacies and the impact on

7  the clients, as well.

8      Q.   By impact on the clients, the concern of

9  Montana Medicaid was the potential impact on the

10  Medicaid beneficiaries?

11      A.   Medicaid beneficiaries and their access to

12  services.

13      Q.   In 2003, when Montana Medicaid considered

14  revising its reimbursement formula for generic drugs

15  to be AWP minus 25 percent, I would like to walk you

16  through the same question.

17          What factors did Montana consider in

18  revising that reimbursement formula?

19      A.   It would basically be the same factors as

20  in 2002, in that we were experiencing a need to -- a

21  budget reduction to stay within our appropriation of

22  having to implement cuts that not only included the

Page 1

1   ERRATA

2   CAPTION: _Deposition of Jeff Buska_ 12/14/2005

3   DATE: _1/18/06_

4   WITNESS: _Jeff Buska_

5   I wish to make the following changes, for the following

6   reasons:

7   PAGE   LINE

8   257   13   CHANGE: _joint_   REASON: _point_

9   261   2   CHANGE: _Counseltech_   REASON: _Consultec_

10   261   6   CHANGE: _EFS_   REASON: _EFT_

11   261   21   CHANGE: _—_   REASON: _MMIS_

12   263   20   CHANGE: _——_   REASON: _MMIS_

13   263   22   CHANGE: _UR_   REASON: _DUR_

14   272   15   CHANGE: _Counciltech_ REASON: _Consultec_

15   274   20   CHANGE: _Counseltech_   REASON: _Consultec_

16   275   22   CHANGE: _BP_   REASON: _AWP_

17   276   1   CHANGE: _Are_   REASON: _OR_

18   276   22   CHANGE: _ADCs_   REASON: _NDCs_

19   312   6   CHANGE: _AW_   REASON: _AWP_

20   317   2   CHANGE: _——_   REASON: _Care_

21   323   15   CHANGE: _built_   REASON: _billed_

22   325   19   CHANGE: _Submitable_   REASON: _Injectable_

Jeff Buska personally appeared before me on this
18th day on January, 2006.

Henderson Legal Services
(202) 220-4158

KARINS FERLICKA
NOTARY PUBLIC for the State of Montana
Residing at Helena, Montana

Page 2

| | PAGE | LINE | | CHANGE: | | REASON: | |
|---|---|---|---|---|---|---|---|
| 1 | PAGE | LINE | | | | | |
| 2 | 334 | 5 | CHANGE: | IN | REASON: | oF | |
| 3 | 394 | 20 | CHANGE: | Jean | REASON: | Jeanie | |
| 4 | 408 | 6 | CHANGE: | | REASON: | | |
| 5 | " | 7 | CHANGE: | Question, Does not make sense! | REASON: | | |
| 6 | " | 8 | CHANGE: | | REASON: | | |
| 7 | 416 | 14 | CHANGE: | Anything | REASON: | amount | |
| 8 | 419 | 21 | CHANGE: | bases | REASON: | basic | |
| 9 | 436 | 2 | CHANGE: | Mouser | REASON: | Munser | |
| 10 | 436 | 13 | CHANGE: | Cloaker | REASON: | Kloker | |
| 11 | 436 | 13 | CHANGE: | Maureen | REASON: | Marie | |
| 12 | 438 | 4 | CHANGE: | MAP | REASON: | FMAP | |
| 13 | 456 | 3 | CHANGE: | Betsy | REASON: | Betty | |
| 14 | | | CHANGE: | | REASON: | | |
| 15 | | | CHANGE: | | REASON: | | |
| 16 | | | CHANGE: | | REASON: | | |
| 17 | | | CHANGE: | | REASON: | | |
| 18 | | | CHANGE: | | REASON: | | |
| 19 | | | CHANGE: | | REASON: | | |
| 20 | | | CHANGE: | | REASON: | | |
| 21 | | | CHANGE: | | REASON: | | |
| 22 | | | CHANGE: | | REASON: | | |

# EXHIBIT 6

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------------------------------

                              )

                              )

IN RE: PHARMACEUTICAL   )

INDUSTRY AVERAGE        )

WHOLESALE PRICE         )

LITIGATION,             )Civil Action 01CV12257PBS

                              )

--------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

MARY ANGELA COLLINS

--------------------------------------------------------

12:00 p.m.

March 17, 2006

GOUGH SHANAHAN JOHNSON & WATERMAN

33 South Last Chance Gulch

Helena, Montana  59601

REPORTED BY:  Judith A. Robinson, CCR #2171

Mary Angela Collins          CONFIDENTIAL          March 17, 2006
Helena, MT

29

1    determined?

2        A.   I'm not.   I know the methodology has

3    changed in the past few years.   I directed that

4    pricing for J-codes be, number one, systematized and

5    number two, routinely updated.

6        Q.   Was there a period of time prior to that

7    direction when pricing for physician-administered

8    drugs was not systemized or routinely updated?

9        A.   I know it was not routinely updated.   That

10   happened before I came into the bureau.

11       Q.   And you know for what period of time that

12   was true that those prices weren't routinely

13   updated?

14       A.   I know only about when I came in, in '98

15   through whenever I gave that direction.   But I don't

16   remember when that was.   It was after Randy Bowsher

17   had left because it was Denise Brunett that

18   systemized and updates the J-code pricing.

19       Q.   What was it that prompted your decision to

20   give that directive?

21       A.   Denise explained to me that she would get

22   calls from physicians who would complain that, given

Henderson Legal Services
(202) 220-4158

Mary Angela Collins        CONFIDENTIAL              March 17, 2006
                           Helena, MT

46

1    conclusion that you would not be collecting those

2    rebates?

3              MS. BRECKENRIDGE:  Objection.

4              MR. SIPOS:  It was probably poorly worded.

5    BY MR. SIPOS:

6         Q.   At least as of 2002, it was concluded that

7    Montana Medicaid was not going to collect for

8    physician-administered drugs; correct?

9         **A.   Would you like to know what we did decide?**

10        Q.   Yes.

11        **A.   We decided not to require physicians to**

12   **put codes on claims.**

13        Q.   So did it collect rebates for physicians

14   who elected voluntarily to put NDC numbers on their

15   claim form?

16        **A.   No.**

17        Q.   Let me ask it this way then:

18             As of 2002, Montana was not collecting

19   rebates for physician-administered drugs; correct?

20        **A.   That's correct.**

21        Q.   Up until March of 2006, Montana was not

22   collecting rebates for physician-administered drugs?

Mary Angela Collins          CONFIDENTIAL          March 17, 2006
Helena, MT

47

1          A.     That's correct.

2          Q.     Were there facts or circumstances that

3    changed between 2002 and 2006 that led to Montana

4    actually collecting those rebates?

5          A.     Yes.

6          Q.     And what were those facts or

7    circumstances?

8          A.     **Completing our analysis of the options.**

9    **The alternative methods we could use to collect**

10   **rebates.**

11         Q.     What options or alternatives were

12   considered?

13         A.     **We considered an option we had heard about**

14   **that involved doing a kind of a time and motion**

15   **study of -- of the billing of J-codes.  Not really a**

16   **time and motion.  But just a survey of which NDCs**

17   **appeared most frequently in certain J-codes over a**

18   **specific period of time and then using that**

19   **allocation to then bill the drug manufacturers for**

20   **rebates.  And we abandoned that idea.**

21         Q.     So I understand correctly, was that idea

22   abandoned prior to the actual undertaking of the

Mary Angela Collins          CONFIDENTIAL          March 17, 2006
Helena, MT

72

1          **A.    I didn't in preparation for this**
2    **deposition, no.**
3          Q.    Did you bring any documents with you
4    today?
5          **A.    No.**
6          Q.    Did you discuss the deposition with anyone
7    else besides Ms. Breckenridge?
8          **A.    No.**
9          Q.    You understand that this deposition is
10   being taken in context of a lawsuit; correct?
11         **A.    I do.**
12         Q.    Were you consulted prior to the filing of
13   this lawsuit by Montana?
14         **A.    I wasn't.**
15         Q.    Do you know when it was filed?
16         **A.    I don't.**
17         Q.    When did you first learn about it?
18         **A.    Either -- I don't know exactly when.    In**
19   **the past month or so.**
20         Q.    So am I correct in understanding, you
21   learned about it in the context of being contacted
22   for your deposition?

Mary Angela Collins          CONFIDENTIAL          March 17, 2006
Helena, MT

74

1    BY MR. SIPOS:

2         Q.   Do I understand your previous testimony

3    correctly, this is the form you used to submit

4    claims to Montana Medicaid?

5         **A.   Yes.**

6         Q.   Do you have any reason to believe that

7    every claim submitted using this form in Montana is

8    false?

9         **A.   I do not have any reason to believe that.**

10        Q.   Like I said, I just need a couple of

11   minutes with my notes.

12                  (Off the record.)

13   BY MR. SIPOS:

14        Q.   I have a couple of quick follow-up

15   questions.

16             You indicated that you first learned about

17   the lawsuit about a month ago within the past couple

18   months and that was in the context of collecting

19   some documents from the lawsuit.

20             Did I understand that correctly?

21        **A.   That's correct.**

22        Q.   Prior to that time, were you ever asked to