# EXHIBIT 7

4/12/2006  DALTON, Mary V.1

1        THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3            ---0O0---

4    -----------------------------X

5    In Re:  PHARMACEUTICAL     )   MDL DOCKET NO.

6    INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

7    PRICE LITIGATION        )   01CV12257-PBS

8    -----------------------------X

9    THIS DOCUMENT RELATES TO:    )

10   ALL ACTIONS         )

11   -----------------------------X

12

13       Taken at 33 South Last Chance Gulch

14           Helena, Montana

15     Wednesday, April 12, 2006 - 8:43 a.m.

16

17        TELEPHONE DEPOSITION OF

18          MARY DALTON

19

20   Reported by Mary R. Sullivan, RPR, RMR, Freelance

21   Court Reporter and Notary Public, State of Montana,

22   residing in Missoula, Montana.

1          A.   The State had the authority to do it

2    within the guidelines that were available to the

3    states under the federal participation and Medicaid

4    program.

5          Q.   And Montana Medicaid controlled that

6    through the administrative rule-making process?

7          A.   That would be correct.

8          Q.   The legislature of Montana didn't need to

9    be involved?

10         A.   The legislature grants the--how would I

11   say it.  A state agency has no rule-making authority

12   that is not granted to it by the state legislature.

13         Q.   So state of Montana Medicaid controlled

14   the reimbursement rate through the administrative

15   rule-making process created by the state

16   legislature?

17         A.   State legislature gives the state agency

18   the power to do administrative rules, and they--if

19   you look back in the Montana Code Annotated, it will

20   tell you what agencies have the power to do, rules

21   and what areas.

22         Q.   If Montana had wanted to reimburse

4/12/2006  DALTON, Mary V.1

1   pharmacies and physician providers based on actual

2   acquisition costs, how would it do so?

3       A.  I'm not an expert in pharmacy

4   reimbursement.

5       Q.  While you were there at Montana Medicaid--

6   well, you're still there, but while you were the

7   bureau chief, who were the pharmacy reimbursement

8   experts?

9       A.  The pharmacy program officers and the

10  supervisors would have had more knowledge of this

11  than I would have had.

12      Q.  So that would be Dorothy Poulsen, Shannon

13  Marr, Jeff Ireland and Terry Krantz?

14      A.  Those are the people I recall.  There

15  could be additional people over a--I was there from

16  1986 through 2001, so.

17      MS. O'SULLIVAN:  Why don't we go off the

18  record and take a short break.

19      THE DEPONENT:  Good.  You're going to have

20  to find me a different chair.

21          (Whereupon, the deposition was in

22  recess at 10:15 a.m., and subsequently reconvened at

4/12/2006  DALTON, Mary V.1

1        Q.   If it was a performance review of the drug

2   delivery system for Montana Medicaid done in

3   September 1996, that would have been under your

4   supervisory duties as bureau chief?

5        A.   It would have been.

6        Q.   I'd like you to also look to Page 80.  In

7   about the middle of the page, the second full

8   paragraph where it states, "The Department's No. 1

9   funding priority in the 2003 biennium was for rate

10   increases for Medicaid providers."  Do you recall

11   that that was the department's No. 1 funding

12   priority?

13        A.   I don't recall.

14        Q.   The next sentence goes on to say, "This

15   conflicts with their first alternative for

16   controlling expenditures.  DPHHS staff indicated

17   adjusting provider service rates as the primary

18   alternative for controlling Medicaid expenditures."

19   Do you remember such a conflict?

20        A.   I'm sorry, Katie, I'm not understanding

21   what your question is to me.

22        Q.   Okay.  Sure.  Let me try again.

1     A.  Okay.

2     Q.  The first sentence said the No. 1 funding

3   priority was to increase rates.

4     A.  Okay.

5     Q.  And then the audit says this conflicts

6   with the first alternative for controlling

7   expenditures, which is to adjust provider service

8   rates.  Do you remember any type of conflict between

9   on the one hand DPHHS wanting to increase providers'

10   reimbursement or rates and on the other hand

11   actually wanting to reign in or lower those rates?

12     MS. BRECKENRIDGE:  Objection, form.

13     A.  Medicaid is always a balance of providing

14   rates that are high enough to get providers to

15   participate while at the same time trying to control

16   a limited budget.

17     Q.  (By Ms. O'Sullivan)  Was that your

18   experience the whole time you were the Medicaid

19   bureau chief?

20     A.  And continues to this day.

21     Q.  You can put that legislative audit away,

22   I'm not going to ask you questions about every page

1    that?

2         A.   Pharmacy program officer.

3         Q.   Were you consulted prior to the filing of

4    this lawsuit by the state of Montana?

5         A.   When was the lawsuit filed?

6         Q.   February 23rd, 2002?

7         A.   Not that I recall.

8         Q.   When do you recall first learning about

9    the suit?

10        A.   I don't recall the date that I first

11   learned about it.  I'm sure that it probably was--

12   well, I--I don't know how I--I first heard about it.

13        Q.   When you say you don't recall the date, do

14   you recall the year?

15        A.   No.

16        Q.   When were you first instructed to preserve

17   documents relative to the lawsuit?

18        A.   I don't know.

19        Q.   Do you know when you were first instructed

20   to preserve e-mails or other electronic documents

21   relevant to the suit?

22        A.   I don't.

# EXHIBIT 8

4/11/2006  ELLERY, Nancy V.1

0001

1         IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4   - - - - - - - - - - - - - - - - - -x

5   IN RE:  PHARMACEUTICAL INDUSTRY   )

6   AVERAGE WHOLESALE PRICE LITIGATION,)  MDL DOCKET

7   - - - - - - - - - - - - - - - - -x  CIVIL ACTION

8   THIS DOCUMENT RELATES TO:        )  01CV12257-PBS

9   ALL ACTIONS                )

10   - - - - - - - - - - - - - - - - - -x

11

12          DEPOSITION OF NANCY ELLERY

13            April 11, 2006

14              9:14 a.m.

15              Held at:

16         Hampton Inn & Suites

17     155 Southwest Peacock Boulevard

18       Port St. Lucie, Florida

19

20    Reporter:  Tamra K. Piderit, RPR, CRR

21

22

1

1      Q.   And that's the only case in which you have

2   testified at trial?

3      A.   The only one that I can recall.

4      Q.   Ms. Ellery, when did you first find out

5   about this lawsuit?

6      A.   I think the first time I found out was

7   when I got a call from the law firm representing the

8   State.

9      Q.   That was within the last several months?

10     A.   Yes.

11     Q.   Have you seen a Complaint that describes

12  the allegations in this case?

13     A.   I looked at the original Complaint online.

14     Q.   When did you look at the original

15  Complaint?

16     A.   When I first heard about this lawsuit.

17     Q.   Could you describe in your own words in

18  general what the allegations are in the Complaint?

19     A.   The allegations are that, you know, the

20  drug manufacturers have inflated their price that

21  the State pays.

22     Q.   Do you believe that the drug manufacturers

4/11/2006  ELLERY, Nancy V.1

1    setting up the panel of pharmacies that participated

2    in the Montana Medicaid pharmacy program?

3        A.   Explain what you mean by panel of

4    pharmacists.

5        Q.   There were pharmacies that would -- let me

6    start over.  There were pharmacies that would

7    provide pharmaceuticals to Montana Medicaid

8    recipients; is that correct?

9        A.   Yes.

10       Q.   And were there pharmacies also that did

11   not participate in the Montana Medicaid program?

12       A.   Yes.

13       Q.   Were you involved in putting together the

14   group of pharmacies that did participate in the

15   Montana Medicaid pharmacy program?

16       A.   No.

17       Q.   Was that done before the time that you

18   became administrator of Montana Medicaid?

19       A.   Each pharmacy decides on its own when to

20   enroll in the program.  I don't have any control

21   over that.  I didn't have any control over that.

22       Q.   Did you see it as part of your job to

25

1    assure that there were a sufficient number of

2    pharmacies participating in the Montana Medicaid

3    program?

4        A.   Yes, that's part of providing access to

5    care.

6        Q.   What sort of things did you consider in

7    making the determination that there was or was not

8    sufficient participation by Montana pharmacies in

9    the Montana Medicaid program?

10       A.   One would be that there are adequate

11   numbers of pharmacies within a reasonable distance

12   of the consumer, the beneficiary.

13       Q.   Does Montana by virtue of its demographics

14   present any unique challenges with regard to

15   assuring that a sufficient number of pharmacies

16   participate in the Medicaid program?

17       A.   Yes.

18       Q.   What are those?

19       A.   Well, obviously there is much of Montana

20   that is rural that may not have as many providers as

21   the more urban areas.  That's a challenge in every

22   service that you provide in Medicaid.

1      Q.   And how did having rural counties affect -

2    - let me start over.  How did having rural counties

3    with only a single or a few pharmacies affect

4    decisions that Montana Medicaid made about

5    reimbursement levels that it would provide to

6    pharmacies that participated in the Montana Medicaid

7    program?

8      A.   Could you repeat that?

9         MR. EVERETT:  Maybe the court reporter

10   could read it back.

11        (Question read)

12     A.   You had to consider access to meet the

13   federal regulations that services be available

14   comparable to those that the non-Medicaid population

15   can receive.

16     Q.   Was there a single reimbursement

17   methodology that was applied to reimbursement for

18   all pharmaceutical products reimbursed by Montana

19   Medicaid?

20     A.   That was some time ago.  I think that we

21   may have at that time had a "lower of" policy, which

22   means that we would pay the lower of the provider's

1      Q.  Can you read the title, though?

2      A.  "Licensed Community Pharmacies by County."

3      Q.  And part of your role as administrator of

4  the Medicaid program in Montana was to assure that

5  pharmacies were available for Medicaid recipients in

6  as many of the counties as possible; is that

7  correct?

8      A.  We could not generate pharmacies if they

9  weren't there.  We were concerned if there weren't

10  enough pharmacies, but we didn't have control over

11  who came into the program.

12      Q.  Did you try to set reimbursement for

13  pharmaceuticals at a level that would assure that

14  there were pharmacies available for Montana Medicaid

15  recipients in as many of the counties in Montana as

16  possible?

17      MR. GAUDET:  Objection.

18      A.  That's part of what you do when you set

19  reimbursement is to try to be sure that your

20  reimbursement rates will allow for access similar to

21  the private pay population.  That's what we do in

22  every service in Medicaid.  It's not possible in all

4/11/2006  ELLERY, Nancy V.1

1    cases, but that's the overall goal.

2        Q.   And if you believed that pharmacies in

3    counties where there were relatively few pharmacies

4    would leave the Montana Medicaid program if

5    reimbursements were lowered, would that affect your

6    decision about reimbursement levels?

7        MR. GAUDET:  Objection.

8        A.   Would you repeat the question.

9        MR. EVERETT:  Would the court reporter

10    read it back, please.

11           (Question read)

12        A.   We had to set reimbursement that would

13    meet the needs of most of the population.  Montana

14    is a rural state, you cannot generate pharmacies.

15    So, you know, you took it in consideration, but you

16    didn't have direct control over it.

17        Q.   Did you expect that the pharmacies that

18    participated in the Montana Medicaid program earned

19    some profit on sales of pharmaceutical products that

20    they sold to Montana Medicaid recipients?

21        A.   The pharmacies?

22        MR. GAUDET:  Objection.

1      Q.  How did they require it?

2      A.  I take that back.  They didn't report it

3  to the State.  I think how it worked was they

4  reported it through a third-party organization, kind

5  of self-reported prices, and we got those through

6  the First Databank.  I think that's how it worked.

7      Q.  So Montana Medicaid received information

8  about AWP from third-party sources like First

9  Databank or Red Book; is that right?

10     A.  Right.

11     Q.  What did the State of Montana do with that

12  information?

13     A.  We used that to set our reimbursement

14  level.

15     Q.  Did the State of Montana ever require

16  pharmacies to report their acquisition cost for

17  drugs?

18     A.  I don't recall.  I don't know.  I can't

19  remember.

20     Q.  Is that something that the State of

21  Montana could have required?

22     A.  To require to do what?

1      Q.   You don't remember it at all?

2      A.   I know we did it, but I couldn't tell you

3   when exactly it was.

4      Q.   Are there particular states that you would

5   benchmark for Montana Medicaid?

6      A.   Not that I'm aware of.  Again, as the

7   director, you know, that was all done at levels much

8   lower than I was involved in.

9      Q.   But you were involved in setting the

10   policy for Montana Medicaid, weren't you?

11      A.   I was responsible as administrator for the

12   policy, but staff did all the work and research.

13      Q.   If the dispensing fee for pharmaceutical

14   products were to change, would you have been

15   involved in that decision?

16      A.   Yes.

17      Q.   And, likewise, if the reimbursement rate

18   paid for the ingredient costs of a pharmaceutical

19   product were changed, you would have been involved

20   in that decision; is that right?

21      MR. GAUDET:  Objection.

22      A.   No, not at that kind of detail.  I would

73

1    A.  Let me just read it real quick.

2    Q.  Sure.

3    A.  (Witness reviews document)

4        It does appear to be a response to that.

5    Q.  Do you recall whether you discussed this

6    response with Ms. Poulsen before she sent it to Kim

7    Johnson?

8    A.  I don't recall.

9    Q.  Is that something you normally would have

10   done in the ordinary course of your business?

11   A.  It depends on what was going on at the

12   time. If I was busy with other crises, no, I

13   wouldn't have discussed it with her, because I

14   trusted my staff to do the right thing.

15   Q.  Does the fact that you were copied on this

16   memo suggest to you that you discussed the response

17   with Ms. Poulsen before it was sent?

18       MR. GAUDET:  Objection.

19   A.  Not necessarily.  She would -- since the

20   original thing was addressed to the Medicaid

21   director, she would have out of protocol copied me

22   on the response.  That doesn't mean we talked about

1          MR. GAUDET:  Objection.

2          A.  No.

3          Q.  Are you aware of any other criticisms that

4    Montana Medicaid had with regard to the 1996 OIG

5    report?

6          A.  No.

7          Q.  For most pharmacy issues were you

8    comfortable relying on the expertise of your staff

9    in making decisions?

10          A.  Yes.

11          Q.  Did you have any reason to believe --

12    strike that.

13          Did you have any reason to doubt work done

14    by Terry Krantz relating to the 1996 OIG report?

15          A.  No.

16          Q.  In general you felt comfortable relying on

17    Mr. Krantz?

18          A.  Actually, Jeff Ireland was the pharmacy

19    manager, so he was the primary one involved.

20          Q.  Would you feel comfortable relying in

21    general on Mr. Ireland?

22          A.  Yes.

1    Q.  Do you know who Michael S. Billings is?

2    A.  Yes.

3    Q.  Who is he?

4    A.  He at the time was administrator of the

5    Operations and Technology Division in the

6    department.  He obviously was acting on behalf of

7    Mr. Blouke and signing the letter.

8    Q.   In general in evaluating the reimbursement

9    methodology utilized by Montana Medicaid for

10   pharmacy products, did Montana Medicaid consider it

11   important to consider both the ingredient cost and

12   the dispensing fee together?

13        MR. GAUDET:  Objection.  Foundation.

14    A.  Would you repeat the question?

15         (Question read)

16    A.  I don't recall.

17    Q.  Do you recall any discussions during your

18   time as director of Montana Medicaid about the

19   dispensing fee that was paid to pharmacists who

20   dispensed pharmacy products to recipients?

21        MR. GAUDET:  Objection.

22    A.  Yes.

1    Q.   What discussions do you recall?

2    A.   That the dispensing fee was not adequate

3    to cover their cost.

4    Q.   And what was the basis for the belief of

5    Montana Medicaid that the dispensing fee was

6    inadequate to cover the costs of pharmacies?

7    A.   This is what the pharmacies told us.  At

8    some point in this process we had a survey of the

9    dispensing fees to validate or not validate what

10   they were telling us.

11   Q.   Was the inadequate dispensing fee

12   subsidized by the ingredient cost of the

13   reimbursement?

14   A.   I don't know.  I don't recall.

15   Q.   Did Montana Medicaid change the dispensing

16   fee during your time as director of the Montana

17   Medicaid program to make it adequate?

18   A.   I think we did.  I can't tell you when.  I

19   know we did something as a result of the dispensing

20   fee survey, but I don't know when that was.

21   Q.   Let's turn back to the beginning of

22   Exhibit Ellery 012.  Take a look at the first

1    paragraph of page 19235, under the heading

2    "Introduction."  Does that refresh your recollection

3    at all as to Montana Medicaid's participation in a

4    survey of acquisition costs that was then reported

5    in the 1996 OIG report?

6        A.   It just tells me that HCFA requested them

7    to take a look at this, but I don't recall the

8    details of that.

9        Q.   Do you recall that Montana Medicaid did,

10    in fact, do that?

11        A.   Yes.  When CMS requests you to do

12    something, you do it.

13        Q.   If you look at the last sentence under the

14    first paragraph under the heading "Background," it

15    says, "The State agencies are responsible for

16    determining the EAC and the dispensing fee."

17         Do you see that?

18    A.   Yes.

19        Q.   Does that accurately reflect your

20    understanding of the State agency's responsibility

21    with regard to EAC and dispensing fees?

22        A.   At that time it did.

4/11/2006  ELLERY, Nancy V.1

1    companies that publish the prices in the Red Book

2    and First Databank.

3        Q.  Did you believe that it reflected the

4    actual acquisition costs of pharmacies?

5        A.  No, because that's why we had a discount

6    off of it.

7        Q.  Did you believe that there was a standard

8    and consistent difference between the acquisition

9    cost of pharmacies and the published AWPs?

10        MR. GAUDET:  Objection.

11        A.  I don't recall.

12        Q.  Did you believe that AWP reflected

13    acquisition costs for physicians?

14        A.  I don't know.

15        Q.  Did you believe that AWP reflected

16    acquisition costs for hospitals?

17        A.  I don't know.

18        Q.  If you turn to page MT 19240, the first

19    full sentence of the second full paragraph under

20    "Conclusions and Recommendations" says that "We

21    recognize that acquisition cost is just one factor

22    in pharmacy reimbursement policy and that any change

1    Dorothy Poulsen was the pharmacy manager for a

2    significant portion of your tenure; is that correct?

3         A.   That's not what I said.  Dorothy was the

4    program manager at the time that I left.

5         Q.  Okay.

6         A.   I don't recall how long she was the

7    manager, but she was the pharmacy manager at the

8    time that I left.

9         Q.   As the pharmacy manager she would be the

10   person most knowledgable about pharmacy related

11   issues?

12        A.   Absolutely.

13        Q.   I'm going to read you a section of the

14   deposition transcript from Ms. Poulsen's February

15   22nd transcript.

16        A.  Okay.

17        Q.   "I wanted to make sure that we had access

18   to the drugs needed by our client.  We have three

19   constituency in that position; you have the client,

20   the providers with whom you want to have a good

21   relationship and cooperative relationship, and you

22   have the taxpayer.  You have a responsibility, you

1    are the State, in balancing those three roles was

2    always what it was you tried to do."

3         Do you agree with that statement?

4    A.  Yes.

5    Q.  Do you have anything to add to that

6    statement?

7    A.  It was well stated.

8         MS. NEMIROW:  I have nothing further.

9         MR. CLARK:  No questions.

10

11         CROSS EXAMINATION

12   BY MR. KATZ:

13   Q.  My name is Clifford Katz, and I represent

14   Dey.  Have you heard of the pharmaceutical company

15   called Dey?

16   A.  No.

17   Q.  Ms. Ellery?

18   A.  No.  I'm sorry, I will get closer to the

19   phone.  I have not heard of that company.

20   Q.  So is it safe to say you have never had

21   any communications with any representatives of Dey?

22   A.  That's correct.

# EXHIBIT 9

0001

1              THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSSETTS

3                        ---0O0---

4        -----------------------------X

5    In Re:  PHARMACEUTICAL      )   MDL DOCKET NO.

6    INDUSTRY AVERAGE WHOLESALE  )   CIVIL ACTION

7    PRICE LITIGATION       )    01CV12257-PBS

8        -----------------------------X

9    THIS DOCUMENT RELATES TO:    )

10   ALL ACTIONS              )

11       -----------------------------X

12             TELEPHONE DEPOSITION

13                     OF

14             CHARLES L. HUNTER

15

16       Taken at 33 South Last Chance Gulch

17               Helena, Montana

18       Tuesday, April 18, 2006 - 9:50 a.m.

19

20       Reported by Mary R. Sullivan, RPR, RMR, Freeland

21   Court Reporter, Notary Public, residing in Missoula,

22   Montana.

1     Q.  Did this initiative ultimately get

2  implemented?

3     A.  In a much smaller way than originally

4  thought.  It turned out that only the hospitals were

5  a group that wanted to be involved in this.

6     Q.  And why was that?

7       MS. BRECKENRIDGE:  Objection.

8     A.  If you're familiar with how provider tax

9  works, you have to have all providers in a

10  particular service type and you have to tax every

11  one of them, you have to tax them equally.  The

12  hospitals were the only group that was cohesive

13  enough with a clear enough direct benefit to them

14  with enough experience, you know, where they looked

15  at other states and saw how this worked, that it

16  made sense for them to step up to the plate and say,

17  yeah, we want to do this.  There were other groups

18  that would have benefited, but they were the only

19  ones that saw the benefit and didn't have the fear

20  of it, and, thus, acted on it.

21     Q.  (By Mr. Baranski)  Okay.  You mentioned

22  access as part of this initiative.  Can you explain

1    what you mean by access generally?

2        A.   What I mean by that is having enough

3    providers who are willing to be part of the Medicaid

4    network to assure Medicaid clients of being able to

5    go to the types of service providers they need.

6        Q.   And does Montana's rural and frontier

7    nature provide specific access challenges to the

8    state?

9        A.   Yes.

10       Q.   What are those?

11       A.   The challenges are, you know, pretty

12   simply stated, in a couple of ways.  One is, you

13   know, lots of square miles, not many people.  There

14   are not many physicians or other medical specialists

15   out in those communities.  Travel is the other

16   issue, people have to travel a long way.  It's kind

17   of the flip side of the answer I just gave you.

18       Q.   And providers' participation in the

19   Medicaid program is voluntary, correct?

20       A.   Correct.

21       Q.   And are they free to leave the program at

22   any time that they choose to or--

4/18/2006  HUNTER, Charles L. V.1

1      A.  Yes.

2      Q.  Would the access issues that you just

3  discussed generally that arise from Montana's sort

4  of makeup, would those access concerns apply to

5  pharmacies, for instance?

6      A.  Yes.

7      Q.  And what about physicians who see patients

8  in their offices and administer physician

9  administered drugs?

10      A.  Yes.

11      Q.  And one of the ways that the State has to

12  deal with the access challenges is ensuring adequate

13  reimbursement to these providers, correct?

14      A.  Correct.

15      MS. BRECKENRIDGE:  Objection.

16      Q.  (By Mr. Baranski)  Other than this

17  Medicaid assessment initiative that you worked on in

18  2002, for that job position, because I know you said

19  you switched about a year later, were there any

20  other Medicaid initiatives that you worked on during

21  that 2002 time period that related to Medicaid's

22  coverage of prescription drugs?

1     for documents related to this lawsuit?

2         A.  No.

3         Q.  Did you delegate to anyone to have them do

4     a search?

5         A.  There was a discussion at the meeting that

6     I mentioned prior about where those documents--where

7     documents related to this lawsuit might exist, and

8     it was generally agreed that those documents existed

9     at lower levels than mine, and that Duane Preshinger

10    and his staff were the place where those documents

11    would reside, so it was agreed that's where the

12    document search would take place.

13        Q.  And that--that meeting took place in the

14    summer of 2005?

15        A.  That's my recollection of it.

16        Q.  And you don't--do you recall any other

17    meetings related to this lawsuit that you attended?

18        A.  No.

19        Q.  Had you heard of the lawsuit prior to that

20    meeting?

21        A.  Briefly.  I hadn't heard a lot about it.

22        Q.  Were you consulted in any way prior to the

47

4/18/2006  HUNTER, Charles L. V.1

1      filing of the lawsuit?

2          A.  No.

3          Q.  Did you receive any instruction about the

4      need to retain documents because of this lawsuit?

5          A.  No.

6          Q.  When you first became involved in 2002,

7      July of 2002 with the Medicaid program, do you

8      recall inheriting any files from anyone?

9          A.  There were all the files from the former

10     administrator there that related to Medicaid.

11         Q.  And who was the former administrator?

12         A.  Nancy Ellery actually, and Maggie Bullock

13     was my direct predecessor.  There were files from

14     both those people in my office.

15         Q.  Did you ever look through those files in

16     connection with your work responsibilities?

17         A.  Not really.  I did retain those files for

18     a period of time just to see if I would need them.

19     There were files that I kept in the office for about

20     six months, didn't find that I was in those files,

21     so they were moved to storage.

22         Q.  What happened with your files when you

1    less 15 percent to AWP less 25 percent.  Did you

2    have any involvement in this proposal?

3        A.  No.

4        Q.  Do you have any recollection of this

5    proposed change?

6        A.  No.

7        Q.  Did you ever have any communications with

8    providers regarding the proposed change to go from

9    AWP minus 15 percent to AWP minus 25 percent?

10       A.  Nope.

11           EXHIBIT:

12           (Exhibit Hunter 005 marked for

13   identification.)

14       Q.  (By Mr. Baranski)  Mr. Hunter, the

15   document I've put before you is a 2002 survey of

16   Montana community pharmacies Bates labeled MT 025491

17   through MT 025510.  Do you recognize this document?

18       A.  No.

19       Q.  Never seen it before, huh?

20       A.  Nope.

21       Q.  Do you have any understanding of what some

22   of the unique concerns that rural pharmacies in

1       Montana have with respect to Medicaid reimbursement?

2            MS. BRECKENRIDGE:  Objection, form.

3       A.  I have heard it said that they're

4       concerned about several things.  They're concerned

5       about having access to Medicaid reimbursement

6       because Medicaid can provide a foundation for

7       businesses to stay open.  I have heard it said that

8       there's concern about reimbursement level because if

9       reimbursement isn't adequate, it makes it difficult

10      for them to provide service or to keep their doors

11      open in rural communities.  I have heard that rural

12      pharmacies like Medicaid because Medicaid is a good

13      payer in comparison to others.  I have heard that

14      rural pharmacies don't like Medicaid because

15      Medicaid is not a good payer in comparison to

16      others, so those kind of sum up the things I've

17      heard about rural pharmacy issues related to

18      Medicaid.

19      Q.  (By Mr. Baranski)  Is insuring beneficiary

20      access to pharmacies participating in the Medicaid

21      program for rural beneficiaries a concern faced by

22      the Montana Medicaid program?

1      A.   Yes.

2      Q.   And how does the Medicaid program address

3   that concern?

4      A.   Well, trying to make sure that to the

5   extent that there are rural pharmacies, that

6   reimbursement is enough so that rural pharmacies

7   will continue to provide Medicaid scripts.  I will

8   also tell you that, you know, there--there is some

9   recognition that going to mail order pharmacy would

10   be a cheaper way to go and would provide access to,

11   you know, rural constituents.

12      Q.   But why hasn't the Medicaid program--

13      A.   Purely political.  I mean--

14      Q.   Can you explain it, please?

15      A.   You want to keep main street businesses

16   open.

17      Q.   Do the--to your knowledge, do the

18   pharmacists lobby the legislature on Medicaid

19   reimbursement issues?

20      A.   Yes.

21      Q.   Would you, in your words, describe the

22   Montana pharmacies as a powerful lobbying entity?

# EXHIBIT 10

1   THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MASSACHUSETTS

3   ---OoO---

4   ----------------------------X

5   In re:  PHARMACEUTICAL       )   MDL DOCKET NO.

6   INDUSTRY AVERAGE WHOLESALE  )   CIVIL ACTION

7   PRICE LITIGATION            )   01CV12257-PBS

8   ----------------------------X

9   THIS DOCUMENT RELATES TO:   )

10   ALL ACTIONS                )

11   ----------------------------X

12          Taken at 33 South Last Chance Gulch

13              Helena, Montana

14          Monday, April 10, 2006 - 3:00 p.m.

15

16          D E P O S I T I O N

17                  OF

18          JEFFREY E. IRELAND

19

20   Reported by Mary R. Sullivan, RPR, RMR, Freelance

21   Court Reporter and Notary Public, State of Montana,

22   residing in Missoula, Montana.

4/10/2006  IRELAND, Jeffrey E. V.1

1      probably issued by pharmacies in Montana.

2          Q.   Okay.

3          A.   So given that information, my response

4      would be yes, that would have been there when I took

5      over the program.

6          Q.   And was there some perceived benefit of

7      having rural pharmacy available for Montana

8      citizens?

9              MS. BRECKENRIDGE:   Objection.  You can

10     answer when I object.

11         Q.   (By Mr. Waterman)  You can answer.

12         A.   If I remember correctly, our

13     responsibility was to make sure that access to

14     pharmaceuticals was made available to eligible

15     Medicaid recipients. Because of the geographic size

16     and remoteness of the state of Montana, obviously

17     every pharmacy that we could have that would

18     participate would extend access to Medicaid

19     recipients, so given that information, my response

20     would be yes, that it was important that we have,

21     you know, as many pharmacies participate to include

22     those areas.

4/10/2006  IRELAND, Jeffrey E. V.1

1        Q.   Could it be that the survey does not

2    include claims that have been submitted and paid in

3    the usual and customary manner?

4        A.   I suppose.

5        Q.   But, again, you've not really--you don't

6    have a remembrance of seeing this document.

7        A.   No, I don't.

8        Q.   Nor providing any comment on it.

9        A.   No, I don't, given the information that I

10   have in front of me.

11       Q.   Okay.  Do you know what percentage,

12   roughly, of the Montana Medicaid claims that were

13   paid and U & C rather than the AWP minus ten

14   percent?

15       A.   No, I don't.

16       Q.   Would you go back to the first page?  On

17   the first paragraph, the fourth line, apparently Mr.

18   Krantz says, "While AWP is a national standard it is

19   apparent from the results of the survey that it has

20   little to do with the acquisition costs of pharmacy

21   products."  Do you see that?

22       A.   Yes, I do.

1      Q.  Was that your understanding at the time as

2   well?

3      A.  Yes.

4      Q.  Okay.

5         MR. WATERMAN:  It's about 20 of five.

6   We've been going for about an hour and 20 minutes.

7   Do you want to take a break?

8         THE COURT REPORTER:  I'm fine.

9         MR. WATERMAN:  Does anybody want to take a

10   break?

11      A.  No, I'm okay.

12         EXHIBIT:

13            (Exhibit Ireland 005 marked for

14   identification.)

15      Q.  (By Mr. Waterman)  Showing you Deposition

16   Exhibit Ireland 005, take a moment to look through

17   that, please.

18      A.  Okay.

19      Q.   The issue of pharmacy acquisition costs

20   would have been one of the issues that you were

21   dealing with as the PPM for Medicaid back in 1996;

22   is that correct?

```
 1    whether or not they should, and if so, what is your

 2    memory of that discussion?

 3         A.   I don't remember any specific, you know,

 4    discussion as a result of that report.

 5         Q.   The same would be true with respect to

 6    changing the standards so that it was more closely

 7    tied to the actual acquisition costs.  I take it you

 8    don't remember any discussions about that either.

 9         A.   No, I don't.

10         Q.   Did the State at that time in 1996 have

11    the power to design its own Medicaid drug

12    reimbursement program?

13         A.   The State had flexibility to determine the

14    reimbursement, but I believe that there were federal

15    guidelines that we had to, you know, follow, so,

16    yes, there was flexibility for the State to have,

17    you know, specific things that may be unique to the

18    State itself.

19         Q.   Okay.  And if the State had wanted to

20    reimburse pharmacies for actual acquisition costs,

21    it could have done so, couldn't it?

22         A.   Without, you know, specific information
```

1    and having the references as far as the guidelines,

2    I don't know if I can answer yes or no, you know, to

3    that question.

4        Q.   Would it be correct that they could have

5    done so?  At least your knowledge is they could have

6    done so to the extent that the guidelines or

7    regulations permitted.

8        A.   My understanding, that's correct.

9        Q.   Okay.  Do you know of any instance where a

10   Medicaid provider provided Montana Medicaid with

11   actual retail pricing data?

12       A.   Actual retail pricing data.  Meaning the

13   costs that they would charge any paying customer?

14       Q.   Uh-huh.

15       A.   Well, they gave it to us when they billed

16   us, so if they billed us with the amount that they

17   actually charged, we would get that data all the

18   time.

19       Q.   Do you know whether or not that is, in

20   fact, what they gave you?

21       A.   No, we don't.  In some instances, you'd

22   have to make the assumption, you know, without going

4/10/2006  IRELAND, Jeffrey E. V.1

1    don't know that I would be able to tell you whether

2    my response would have been different because I

3    don't know what the HMO had to offer, but one of the

4    things that had to be considered was that currently

5    we're receiving a rebate that offsets our

6    pharmaceutical costs, and that needed to be

7    considered in this particular type of an approach.

8        Q.   (By Mr. Waterman)  On the second page at

9    the very bottom talking about reimbursement changes,

10    you say--it looks like the second sentence, "The AWP

11    was based upon a standard package size of 100 units

12    or 480 millimeters.  This was used regardless of the

13    actual AWP of the product being dispensed."  The--

14    when you say actual AWP, you mean the actual or the

15    AWP published in First Data Bank?

16        A.   Yes, that would be where we would have

17    gotten all of our AWP information.

18        Q.   Okay.  Does that mean that the AWP

19    published in the First Data Bank might have been

20    higher or lower than Montana Medicaid actually paid,

21    the amount that Montana Medicaid actually paid?

22        MS. BRECKENRIDGE:  Objection.

1    or did you do everything in the first instance

2    related to pharmacy?

3        A.   I think it would be a fair statement to

4    say that he did have some involvement with me as a

5    program officer.  Initially it was a pretty big

6    program, and to start with, there may have been

7    things that he was involved with that he carried on,

8    but I was always kept involved in most instances or

9    at least understood what was going on.  Maybe I

10   didn't have the in-depth knowledge that I would have

11   had I done the project myself.

12       Q.   I think in the correspondence he's

13   designated by people within the Montana Medicaid

14   program as the point of contact for the OIG in that

15   study and that's what prompted that question.

16       A.   Uh-huh.

17       Q.   Given that as I--as I understand it, you

18   don't recall much of anything related to that study.

19       A.   Right.

20       Q.   You indicated earlier that your AWP data

21   came from either Medispan or Blue Book or Red Book.

22   Do you recall specifically which outfit you got it

1    from and how?

2         A.  Let me think.  I believe that Red Book

3    sticks in my mind.

4         Q.  First Data Bank?

5         A.  First Data Bank, and I believe that they

6    were the ones that we used through MMIS that

7    actually used the reimbursement, but when we had the

8    contract with Pharmark, I believe they used

9    Medispan.

10        Q.  And when you refer to Pharmark, what is

11   Pharmark?

12        A.  Pharmark was the contract that we let for

13   the Drug Utilization Review program, and the Montana

14   Wyoming Foundation was subcontracted by them to

15   perform that because we required an entity located

16   here in Helena, so that's what that is.  I don't

17   know who they're called now or if they're still

18   around.

19        Q.  Was the contract between First Data Bank

20   and I think you said MMIS?

21        A.  Well, the MMIS is the Medicaid Management

22   Information System that was run by Consultec who was

1      average wholesale price?

2          A.  I don't.

3          Q.  Are you aware of any guidance that the

4      Montana Medicaid program provides to manufacturers

5      regarding what average wholesale price is supposed

6      to represent?

7          A.  No.

8          Q.  I apologize in advance because I'm sure

9      I'm going to confuse what you said even more than--

10         A.  Sure.

11         Q.  --I--

12         A.  It's a challenge.

13         Q.  --but earlier you were asked a series of

14     questions about how you obtained--prior to 1994 the

15     State obtained AWP information and somehow converted

16     it to different package sizes for reimbursement.

17         A.  Uh-huh.

18         Q.  And then in 1994 changed back to just

19     using whatever FDB published its AWP.

20         A.  Right.

21         Q.  Is it fair to say that prior to 1994 you--

22     the Montana Medicaid program or Consultec on your

# EXHIBIT 11

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------

                              )
                              )
IN RE: PHARMACEUTICAL         )
INDUSTRY AVERAGE              )
WHOLESALE PRICE               )
LITIGATION,                   )Civil Action 01CV12257PBS
                              )

------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

TERRY KRANTZ

------------------------------------------------------

8:30 a.m.

March 17, 2006

GOUGH SHANAHAN JOHNSON & WATERMAN

33 South Last Chance Gulch

Helena, Montana  59601


REPORTED BY:  Judith A. Robinson, CCR #2171

Terry Krantz                                    March 17, 2006
                    Helena, MT

                                                          31

1    by, "no information has been developed"?

2         A.   No.

3         Q.   Looking at the second page of Exhibit

4    Krantz 002 -- I'm sorry.  I went ahead of myself.

5         Below the average wholesale price review

6    on the first page of Exhibit Krantz 002 is something

7    that says, "Mail Order Drugs."  Do you see that?

8         A.   Yes.

9         Q.   And did you write, "It is the consensus of

10   the States that this will not be cost effective

11   because of on- and-off nature of eligibility, the

12   waste involved to guarantee the delivery of the

13   drugs, the economic impact on some rural retail

14   pharmacies."  And then you stated other reasons.

15        Do you remember what you meant by,

16   "talking about the economic impact on some rural

17   retail pharmacies"?

18        **A.   My recollection is that it was the**

19   **consensus of the states that small rural retail**

20   **pharmacies would suffer a loss of business if we**

21   **moved towards mail-order drugs.**

22        Q.   Was that also a consensus of Montana

Terry Krantz                                         March 17, 2006
                        Helena, MT

                                                              32

1    Medicaid?

2        A.   At that time I -- I don't recall.  I don't

3    recall if it was a finish if Montana was in the

4    consensus or not.

5        Q.   While you worked at Montana Medicaid in

6    pharmacy issues, was the viability of Montana's

7    rural pharmacies a concern for you?

8        A.   Yes.

9        Q.   Why was that?

10       A.   Access to services was always a concern.

11       Q.   Now looking at page 2 of Exhibit Krantz

12   002, there's some handwriting at the end.

13            Do you recognize that?

14       A.   No, I don't.

15       Q.   I would like you to look at Exhibit Krantz

16   003 which is entitled, "Partnership Plan,

17   Federal/State Joint Audits of the Medicaid Program."

18            Would you please look at this document and

19   tell me if this was the Federal/State Joint Audits

20   that you were referring to in your memo that's

21   Exhibit Krantz 002?

22       A.   Yes.  It appears to be the document.

Terry Krantz                                    March 17, 2006
Helena, MT

39

1    paragraph, third sentence that starts, "In Montana."

2              Do you see that?  Page 2 of Exhibit Krantz

3    004, first full paragraph, third sentence, "In

4    Montana."

5         **A.    Yes.**

6         Q.    Where you wrote, "In Montana we currently

7    have a fairly good idea that the dispensing fee

8    reimbursed is below the cost to dispense because of

9    the cap on dispensing fees that is currently in

10   place," do you recall your basis for saying that the

11   dispensing fee reimbursed is below the cost to

12   dispense?

13        **A.    I believe I stated it in the response that**

14   **we had a cap on the dispensing fees at that point in**

15   **time and as costs rise, the cap kept the dispensing**

16   **fee below the actual cost to dispense.  That is what**

17   **led to this statement.**

18        Q.    So you knew, at least as of writing this

19   memo in 1995, that a provider would lose money on

20   every transaction if they were reimbursed at their

21   actual acquisition cost?

22        **A.    I -- the statement was made that we had a**

Henderson Legal Services
(202) 220-4158

Terry Krantz                                    March 17, 2006
                      Helena, MT

40

1   fairly good idea that the dispensing fees were

2   actually being reimbursed at below cost.  But we

3   didn't have any specific information as to what that

4   amount might be.

5       Q.    Have you ever seen pharmacy dispensing fee

6   surveys filled out by Montana Medicaid providers?

7       A.    Yes.  I believe we -- I have seen them,

8   yes.

9       Q.    And in those dispensing fee surveys, were

10  providers required to provide data about their cost

11  to dispense drugs?

12      A.    I don't recall specifically.

13      Q.    What do you recall was contained in those

14  dispensing fee surveys?

15      A.    I just recall that we used to do

16  dispensing fee surveys.

17      Q.    When you were the supervisor over the

18  pharmacy program, do you remember who was the person

19  who was responsible for the dispensing fee surveys?

20      A.    I believe it was the pharmacy program

21  officer.

22      Q.    Looking at page 2 of Exhibit Krantz 004,

Terry Krantz                                    March 17, 2006
                    Helena, MT

                                                              54

1          **A.    Yes.**

2          Q.    Do you believe you received a copy of this

3     letter that's the last two pages of Exhibit Krantz

4     006?

5          **A.    Yes.**

6          Q.    The last page of Mr. Blouke's letter

7     signed by Mr. Billings states:

8               "If you have any questions, please contact

9     Terry Krantz of my staff."

10              Is it fair to say, you were the point

11    person for Montana Medicaid on the OIG's '96 report?

12         **A.    Yes.**

13         Q.    The other people listed as CCs are, Mary

14    Dalton, Nancy Ellery and Jeff Ireland; correct?

15         **A.    Yes.**

16         Q.    Was each of them also involved in the OIG

17    study?

18         **A.    I'm not sure how to answer that.  I assume**

19    **that they would have been involved in at least to**

20    **the level of being kept aware of what was occurring.**

21         Q.    Can you recall specifically as to any of

22    them individually what their role was with the OIG

Terry Krantz                                          March 17, 2006

Helena, MT

55

1    report?

2         **A.    No.**

3         Q.    If you could pull back out Exhibit Krantz

4    004 and also keep in front of you the last two pages

5    of Exhibit Krantz 006?

6         **A.    Okay.**

7         Q.    So Exhibit Krantz 004 was your memo of

8    October 5, 1995 to Nancy Ellery; right?

9         **A.    Yes.**

10        Q.    And I'd like you to look from your memo

11   starting, "It is important to note."  That

12   paragraph.

13        **A.    Okay.**

14        Q.    And then looking at the last two pages of

15   Exhibit Krantz 006, the Mr. Blouke letter signed by

16   Mr. Billings, starting with the second paragraph,

17   "It is important to note."

18            Can you just take a look at those two

19   exhibits in conjunction with each other?

20        **A.    Okay.**

21        Q.    Is it fair to say, that the letter on

22   behalf of Mr. Blouke from April 1996 was based

Terry Krantz                                    March 17, 2006
Helena, MT

59

1    of acquisition costs without a discount off of AWP

2    being applied.

3    BY MS. O'SULLIVAN:

4        Q.    Going back to Exhibit Krantz 006 for just

5    a minute.   The final report of the OIG relating to

6    Montana Medicaid from 1996.

7              I believe you testified that you saw --

8    you saw that report before; correct?

9        A.    The Exhibit Krantz 006 report?

10       Q.    Yes.

11       A.    Yes.

12       Q.    Do you remember who else in Montana

13   Medicaid received that final report?

14       A.    I guess I have to assume that all the

15   people that are listed on the report as being CC'd.

16   I don't specifically recall who would have received

17   it but I think we discussed the general routing

18   practices.

19       Q.    It would be your assumption that Nancy

20   Ellery and Mary Dalton and Jeff Ireland would have

21   also received a copy of the final report?

22       A.    Yes.

Terry Krantz                                   March 17, 2006
                    Helena, MT

                                                          60

1        Q.    As well as the director of DPHHS, Peter

2   Blouke?

3        A.    Yes.

4        Q.    Do you recall any discussions you had with

5   any of those individuals about what Montana Medicaid

6   should do, if anything, in response to that report?

7        A.    No.

8        Q.    Have you ever seen a report like Exhibit

9   Krantz 006 for any states other than Montana?

10       A.    I don't recall seeing any of the other

11   reports.

12       Q.    You were aware they existed?

13       A.    I assume they existed.  Because there were

14   11 states involved in the study.

15       Q.    Just a few questions before we take a

16   break.

17              At Montana state, did you ever take any

18   courses in pharmacy?

19       A.    No.

20       Q.    After you graduated, did you ever take any

21   courses in pharmacy?

22       A.    No.

Case 1:01-cv-12257-PBS   Document 3649-3   Filed 02/08/07   Page 57 of 59

90

1          **A.    No.**

2          Q.    Just no recollection at all?

3          **A.    No recollection.**

4          Q.    To your knowledge, did the State of

5    Montana ever define the term AWP, or average

6    wholesale price?

7          **A.    If there were a definition of AWP, it**

8    **would probably be located in the administrative**

9    **refusals Montana related to the pharmacy program.  I**

10   **can't specifically recall if there's a definition in**

11   **that rule.**

12         Q.    You're not aware of any such definition?

13         **A.    No.**

14         Q.    To your knowledge, does the State of

15   Montana require manufacturers to report any sort of

16   pricing information to the State of Montana?

17              MS. BRECKENRIDGE:   Objection.

18         **A.    Could you restate that?**

19   BY MR. DILLON:

20         Q.    To your knowledge, does the State of

21   Montana require pharmaceutical manufacturers to

22   report any pricing information to the State of

Terry Krantz

March 17, 2006

Helena, MT

94

1    BY MR. DILLON:

2        Q.    Was the State of Montana interested in

3    increasing the use of generic versus brand-name

4    drugs?

5        A.    **I would say that the State of Montana was**

6    **interested in using the least costly alternative**

7    **that was appropriate for the situation.   That would**

8    **be how I would categorize it.**

9        Q.    Did the State of Montana for their

10   Medicaid program have a mandatory generic

11   substitution program?

12       A.    **I don't specifically recall.**

13       Q.    Do you recall whether there was a

14   difference in the co-payment for generic versus

15   brand-name drugs?

16       A.    **I don't recall at that time, no.**

17       Q.    Are you aware of state MAC, maximum

18   allowable cost, what that term means?

19       A.    **I have heard the term before.   I wouldn't**

20   **be able to define it.**

21       Q.    To your knowledge, did the State of

22   Montana ever consider for its Medicaid program

Terry Krantz

March 17, 2006

Helena, MT

95

1    setting up its own MAC program separate than the

2    federal upper limit program?

3        A.    I'm not aware of a State MAC program or

4    any discussions related to a creation of one.

5        Q.    Were you aware that other states had

6    created such programs?

7        A.    Yes.

8        Q.    Were you familiar at the time with how

9    other third-party payers were reimbursing drugs?

10       A.    I would say that probably not --

11       Q.    At that time --

12       A.    -- at that time familiar.

13       Q.    Mr. Krantz, a couple more questions.  One

14   is, in your role as supervisor of the acute services

15   section, was your job -- did your job involve just

16   implementing policy or were you also involved in the

17   creation of policy related to those areas?

18       A.    I would categorize it as being

19   recommending policy changes.  Most of the policy

20   changes did have to be approved by either the

21   Medicaid division administrator or the department

22   director.