# EXHIBIT 12

0001

1          THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3      - - - - - - - - - - - - - x

4      IN RE PHARMACEUTICAL        : MDL 1456

5      INDUSTRY AVERAGE WHOLESALE  : Master File No.

6      PRICE LITIGATION            : 01-CV-12257-PBS

7      - - - - - - - - - - - - - x

8

9              Great Falls, Montana

10             Wednesday, March 29, 2006

11

12          Deposition of SHANNON E. MARR, a witness

13     herein, called for examination by counsel for

14     Defendants in the above-entitled matter, pursuant

15     to notice and the Federal Rules of Civil

16     Procedure, the witness being duly sworn, by

17     agreement, by CRAIG KNOWLES, a Notary Public in

18     and for the State of Colorado, taken at La Quinta

19     Inn, Great Falls, Montana, at 9:00 a.m., on

20     Wednesday, March 29, 2006, and the proceedings

21     being taken down in Stenotype by CRAIG KNOWLES and

22     transcribed under his direction.

1        Prior to coming to the Medicaid program in

2   October of 2001, did you have any experience with

3   pharmacy?

4        A.  No, none.  No.

5        Q.  And how is it that you came to take the

6   job at the Montana Medicaid program in October of

7   2001?

8        A.  I knew I was moving to Helena.  And during

9   my time as orientation director I think I mentioned

10  a big part of my job was advising functions for the

11  University of Montana and serving on a variety of

12  committees related to academic advising and student

13  retention and that kind of thing.

14       A number of committees I that I served on

15  I also served on with Lorie Moran who was a dean at

16  the School of Pharmacy there at the University of

17  Montana.  So we were colleagues. She knew I was

18  moving to Helena and knew of the position at

19  Medicaid that was open, and she encouraged me to

20  look into it.

21       I haven't -- had not had any pharmacy

22  experience, but she sort of pitched it to me as a

11

1        Why is pharmacy participation important?

2        A.  I believe pharmacy participation would be

3    important in Medicaid because Medicaid services

4    individuals across the state.  And if certain

5    pharmacies, particularly in rural areas, dropped out

6    of Medicaid, then individuals would be left without

7    a choice for getting their prescription drugs.

8        Q.  Do you remember any comments being made at

9    the meeting that are not reflected in the minutes?

10        A.  No.

11            (Whereupon, Deposition Exhibit Marr

12    009 was marked for identification.)

13            (Witness examines document.)

14    BY MR. DILLON:

15        Q.  You have been handed a document marked as

16    Exhibit Marr 009.

17        A.  Uh-huh.

18        Q.  It is titled Analysis of Change to

19    Pharmacy Reimbursement, and begins with Bates Number

20    MT 013441.

21            I believe that you may have authored this

22    document, based on a line on 013445 stating prepared

1    the dispensing fee.

2        Is this information that you would have

3    provided to Mr. Kerber?

4      A.  Yes.

5      Q.  Then going back to what is Exhibit Marr

6    014, I think this now might make sense.  The e-mail

7    from March 25th, where you are stating that:  We are

8    heeding the findings of the OIG study in that part

9    of the reason we are changing our reimbursement is

10    because of the study.

11        Is that, are you correcting what appears

12    to be Mr. Kerber's mistaken statement that you are

13    not doing anything with the report information?

14      A.  Correct.

15      Q.  I want to turn your attention on Exhibit

16    Marr 015 to the first page.

17        Did you look at what some of the other

18    states' comments were to the OIG report?

19      A.  I'm sure I did.

20      Q.  With respect to West Virginia in October,

21    2001, to the right of that date there are some

22    comments.  It suggests there they are going to

1    generic AWP minus 30 percent plus $2.50 dispensing

2    fee.

3        A.   Uh-huh.

4        Q.   Is it fair to say that you were aware at

5    the time you reviewed this document that West

6    Virginia was contemplating, or was going to a

7    generic reimbursement rate of AWP minus 30 percent?

8        A.   Yes.

9        Q.   Other than the six states referenced in

10   this particular document, are you aware of

11   conversations you had with any other states

12   regarding your response to the OIG report?

13       MS. BRECKENRIDGE:  Objection.

14       A.   Yes, I am aware of other conversations.

15   BY MR. DILLON:

16       Q.   What other states do you recall having

17   discussions with?

18       A.   Well, I didn't recall any until I saw in

19   my -- one of these previous exhibits that I actually

20   contacted surrounding states in Montana, like

21   Washington, Oregon, Idaho, Wyoming, North Dakota,

22   South Dakota.

1    phone or e-mail, or some other way?

2        A.   Probably by phone or e-mail or a

3    combination of them.

4            (Whereupon, Deposition Exhibit Marr

5    018 was marked for identification.)

6    BY MR. DILLON:

7        Q.   You have been handed what has been marked

8    as Exhibit Marr 018.  It's an e-mail chain.  The

9    first page is MT 013462.

10           If you could just take a moment to review

11   this.

12           (Witness examines document.)

13       A.   Okay.

14   BY MR. DILLON:

15       Q.   The first e-mail at the top dated --

16           I apologize, I think it is all one e-mail.

17       A.   Right.

18       Q.   The e-mail is dated April 3rd, 2002.  If

19   you look kind of midway through on the left-hand

20   column, it appears your e-mail address is listed as

21   a recipient of this e-mail.

22       A.   Uh-huh.

1    Q.   Do you recall whether you received this e-

2    mail?

3    A.   I -- yes, I received it.

4    Q.   And what is this e-mail about?

5    A.   This looks to be an e-mail of -- from

6    someone with a similar job in New York who was

7    gathering information from the states about their

8    AWP, or their reimbursement formulas.

9         Then he's referencing an article that was

10   featured in the New York Times regarding this very

11   issue.

12   Q.   If you could turn to the second page of

13   this exhibit, MT 013463, there is some information

14   there about the state of Montana midway down the

15   page.

16        And if you could turn also to page 4,

17   there is kind of a textual description also at the

18   very top related to Montana.

19   A.   Uh-huh.

20   Q.   Do you know how the author obtained this

21   information?  Is this something you provided?

22   A.   I'm sure it was.

1     formula?

2          A.   It appears, based what is here, AWP is not

3     used, then actual acquisition cost.

4          Q.   If you could turn to 013464 for Washington

5     state, it appears there their proposal is from AWP

6     minus 14 for brand and AWP minus 50 for generic.

7          A.   Uh-huh.  Yes.

8          Q.   Do you recall any discussions with anyone

9     from Washington state about their proposed change

10    from AWP minus 14 for brands and AWP minus 50 for

11    generics?

12         A.   I believe that is where Ron Kerber was

13    from, so I think that would have been the extent of

14    my conversations with him, or with the state of

15    Washington.

16         Q.   So when you had these conversations with

17    Mr. Kerber, was that a two-way street?  Were you

18    finding out what he was doing, as well as he was

19    finding out what you were doing?

20         A.   I think if I remember correctly, he

21    contacted me first to find out what Montana was

22    doing.  And then along the way, yes, we were sharing

1     information back and forth about what each state was

2     doing.

3         Q.  To your knowledge, Montana never

4     considered an AWP minus 50 percent discount for

5     generics?

6         A.  To my knowledge, no.

7             (Whereupon, Deposition Exhibit Marr

8     019 was marked for identification.)

9     BY MR. DILLON:

10        Q.  Feel free to review the document MT

11    013759, but I'm going to ask you almost nothing

12    about text, everything about the e-mail address.

13        A.  Okay.

14        Q.  It appears this is a document passing

15    along a news article from the Denver Post related to

16    Colorado pharmacy reimbursement and access issues.

17        A.  Yes.

18        Q.  My question to you goes more to at the

19    top, things being addressed to yourself and Mr.

20    Buska from a Kevin Quinn address indicating ACS.

21        A.  Yes.

22        Q.  Did you know Mr. Quinn?

3/29/2006  MARR, Shannon E. V.1

1       list from OIG?

2           A.   Not that I recall.

3           Q.   Did you receive any sort of newsletters or

4       other publications related to pharmacy while you

5       were at the Montana Medicaid program?

6           A.   From OIG, or just generally?

7           Q.   Anyone.

8           A.   I think there were some newsletters from

9       the Pharmacy Association and publications related to

10      my role on the DUR board, which was really purely

11      representative.

12          No, I don't recall other specific

13      publications.

14          Q.   Ms. Poulsen was previously deposed in

15      this, and one of the statements she made in her

16      deposition was that she had three constituencies

17      which she referred to.

18          She said you have three constituencies in

19      that position.  You have the client whose health

20      care is dependent upon you; you have the providers

21      with whom you want to have a good relationship and

22      cooperative relationship; and you have the taxpayer.

1     You have a responsibility to the state.  And

2     balancing those three roles was always what it was

3     you tried to do.

4          And my question, I guess, is, you held

5     this job for a fairly short period of time.  Was it

6     nine months?

7        A.   October to June, yeah, whatever that is.

8        Q.   Would you agree with that assessment, that

9     there were three different constituencies that you

10    had to serve in that position?

11       A.   I think, yes, that's a fairly accurate

12    representation of the constituencies.

13       Q.   I'd like to talk for a little bit of time

14    about that provider constituency.  In your case, who

15    were your providers?

16          MS. BRECKENRIDGE:  Objection.

17    BY MR. DILLON:

18       Q.   Not specific names.  It was meant to be a

19    pretty simple question.  They were primarily retail

20    pharmacists; is that correct?

21       A.   Yes, retail pharmacists.  And the home

22    infusion therapy providers.

# EXHIBIT 13

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CERTIFIED COPY

---oOo---

| | |
|---|---|
| In re: PHARMACEUTICAL, | MDL DOCKET NO. |
| INDUSTRY AVERAGE WHOLESALE | CIVIL ACTION |
| PRICE LITIGATION | 01CV12257-PBS |

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____

DEPOSITION OF DANIEL WADE PETERSON

Taken at

Law Offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

December 15, 2005

9:00 a.m.

Daniel Wade Peterson                                    December 15, 2005

Helena, MT

87

1       A.    Starting with the OIG?

2       Q.    Yes.

3       A.    The OIG studied actual acquisition costs in

4    Montana and found that overall estimate of the

5    discount below AWP on invoice prices was

6    19.71 percent for brand name drugs and

7    65.37 percent for generic drugs.

8       Q.    Okay.  Did the state of Montana consider

9    lowering the formula of reimbursement for generic

10    drugs to AWP minus a percentage closer to

11    65.37 percent?

12       A.    Not that I can remember.

13       Q.    Do you know why this proposal was not

14    implemented?

15       A.    Our main concern from what I can remember

16    at that time was -- was access issues for our

17    clients.

18          In a rural state like Montana, access is

19    very important that we have plenty of pharmacies

20    willing to participate and accept reimbursement for

21    our Montana Medicaid clients for our low income.

22          Another consideration was a report

Henderson Legal Services
(202) 220-4158

Daniel Wade Peterson                          December 15, 2005

Helena, MT

100

1    does your pharmacist on staff contribute to the

2    content of the due care program newsletter?

3        A.   He hasn't, simply because his duties have

4    kept him busy with our preferred drug list and

5    getting that implemented.

6        Q.   Does anyone within Montana Medicaid receive

7    a copy of the due care program newsletter before

8    it's disseminated to providers?

9        A.   No.

10       Q.   I would like to talk about the next item,

11   reimbursement by federal upper limit?

12           MS.  BRECKENRIDGE:  You are back to --

13           MS. SMITH-KLOCEK:  I'm sorry.

14           MS.  BRECKENRIDGE:  Exhibit Peterson 003?

15           MS. SMITH-KLOCEK:  Yes.

16           MS. O'SULLIVAN:  Exhibit Peterson 011.

17           MS. SMITH-KLOCEK:  I'm sorry, Exhibit

18   Peterson 011, which is the bullet points.

19           BY MS. SMITH-KLOCEK:

20       Q.   How does reimbursement by federal upper

21   limit help to contain costs by Montana Medicaid?

22       A.   Any drugs that the CMS has identified as

Henderson Legal Services
(202) 220-4158

Daniel Wade Peterson                                December 15, 2005
                            Helena, MT

101

1   being on the federal, or the MAC list or federal

2   upper limit list typically has a lower

3   reimbursement rate than what we would offer.

4        So that is why we have that within our

5   reimbursement methodology which is we price our

6   drugs the lesser of our EAC plus a dispensing fee,

7   FUL plus a dispensing fee, or a provider's usual

8   and customary fee charge.  So whichever is lower.

9        Q.   **You used a term MAC earlier?**

10       A.   Yes.

11       Q.   **Is that maximum allowable cost?**

12       A.   Yes.

13       Q.   **Do you consider that to be the same as FUL?**

14       A.   Yes, I do.

15       Q.   **Does Montana Medicaid use -- I'm sorry.**

16  **Does Montana Medicaid set any MAC prices for**

17  **generic drugs that are not on the federal upper**

18  **limit list?**

19       A.   No, we do not have a state MAC program in

20  Montana Medicaid.

21       Q.   **Has Montana Medicaid considered**

22  **implementing a state MAC program?**

Henderson Legal Services
(202) 220-4158

# EXHIBIT 14

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS        CERTIFIED COPY

-------------------------------------------------------


IN RE: PHARMACEUTICAL      )

INDUSTRY AVERAGE           )

WHOLESALE PRICE            )

LITIGATION                 )MDL Docket No.

                           )Civil Action 01CV12257PBS

-------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

-------------------------------------------------------

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington  98101


REPORTED BY:  Judith A. Robinson, CCR #2171

Dorothy Poulsen                                February 22, 2006

Seattle, WA

17

1   going to go through your employment history and

2   prior jobs and I'll address that in a few minutes.

3          Do you recall how you learned when you

4   were the Montana Medicaid pharmacy program officer

5   that AWP did not represent actual acquisition cost?

6              MR. LOPEZ:  Object to the form.

7              THE WITNESS:  It -- through discussions

8   with other pharmaceutical people -- through

9   discussions with other program officers in other

10  states.  Through -- I mean, I guess it was not

11  anything specific.  It was just a general

12  understanding.

13  BY MS. O'SULLIVAN:

14      Q.   It was a general understanding among State

15  pharmacy program officers that AWP didn't represent

16  actual acquisition cost?

17      A.   Right.

18      Q.   We'll talk a few minutes about the topic

19  of deposition preparation.

20          Did you meet with Mr. Lopez to prepare for

21  this deposition?

22      A.   Yes.

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

23

1      Q.    Did your position within the nursing home

2   section of Montana Medicaid involve any

3   responsibility for reimbursement for drugs?

4      A.    No.

5      Q.    There were no pharmacy issues involved in

6   your position?

7      A.    Not that I remember.   The pharmacy

8   position was all by itself.

9      Q.    I'm going to turn to that job in a minute

10   and probably spend a few hours on it, frankly.

11          When did you stop working at Montana

12   Medicaid?

13      A.    In June 2001.

14      Q.    Why?

15      A.    Because we moved to Seattle.

16      Q.    Are you currently employed?

17      A.    I am not.

18      Q.    Are you retired?

19      A.    Well, that's not a word we use anymore,

20   but yes. Sort of.

21      Q.    After you stopped working at Montana

22   Medicaid full-time in June of 2001, did you do any

Dorothy Poulsen                                      February 22, 2006
                         Seattle, WA

                                                              24

1    consulting work for Montana Medicaid?

2         A.    No.

3         Q.    Okay.  Turning to your job as the pharmacy

4    program officer, I believe you said you started at

5    some point in 1996?

6         A.    Yes.

7         Q.    I think we have documents that might help

8    you place exactly when that was.

9              Is it fair to say, you don't recall off

10   the top of your head?

11        A.    Well, yeah.  I know I started Medicaid in,

12   I'm pretty sure it was July of '93.  I know I worked

13   about 3 years in that position.  I worked in that

14   position about 5 years.  So it would be about June

15   or July of '96.  I would have to look at my resume.

16        Q.    Please don't take this question the wrong

17   way.

18             But what in your prior employment or

19   education qualified you for the job of pharmacy

20   program officer?

21             MR. LOPEZ:  Object to the form.

22             THE WITNESS:  In terms of knowing about

Dorothy Poulsen                                   February 22, 2006
                        Seattle, WA

43

1    towards the end, the last year I was there.

2              At this point in time, I don't remember

3    why it came up or what it was about.  But it always

4    just struck me as a strange thing that we were

5    talking about the new-true Medicaid AWP, recognizing

6    there was an old true AWP.  The language is silly.

7         Q.   Why did it strike you as strange that it

8    was referred to as, "new-true AWPs"?

9         A.   Well, that would assume there was an,

10   "old-true Medicaid AWP."

11        Q.   When, in fact, there was not?

12        A.   There was no "true" Medicaid.  I mean,

13   there wasn't a Medicaid AWP.  There was AWP that

14   Medicaid used and many, many Medicaid programs used

15   as a basis for their reimbursement.

16        Q.   You can put Exhibit Poulsen 001 away.  At

17   the end of the deposition, the court reporter is

18   going to want that, so you can turn that over.

19             Are you familiar with the term, "network

20   of providers?  What is your understanding of what

21   that means?

22        A.   Typically, it means everybody who has

Dorothy Poulsen                                February 22, 2006

Seattle, WA

57

1    be reimbursed our actual acquisition cost plus a fee

2    equivalent to the amount we receive for other state

3    facility prescriptions."

4         A.    Right.

5         Q.    Did you agree that the change to

6    reimbursement methodology from AWP minus 10% to

7    actual acquisition cost occur for MedManagement?

8              MR. LOPEZ:  Object to the form.

9              THE WITNESS:  Yes.

10   BY MS. O'SULLIVAN:

11        Q.    Is it fair to say, that as of this time in

12   1997, you understood that AWP minus 10% did not

13   represent actual acquisition cost?

14        A.    Yes.

15        Q.    The court reporter has handed you Exhibit

16   Poulsen 004 Bates numbered MT018455, a 1-page

17   document dated July 30, 1997.

18             Is this a letter that you sent to Al Stark

19   of MedManagement?

20        A.    Yes, it is.

21        Q.    And comparing Exhibit Poulsen 003 to this

22   document has Exhibit Poulsen 004, is this your

Dorothy Poulsen                                   February 22, 2006

Seattle, WA

94

```
 1    anyway, so it was an acceptable thing for us to do.

 2    It was that or interdepartmental warfare.

 3              MS. O'SULLIVAN:  Let's take a short break.

 4                  (Off the record.)

 5    BY MS. O'SULLIVAN:

 6         Q.   I wanted to follow up on 2 topics you

 7    testified about earlier.

 8              One is, you testified you received

 9    MedManagement acquisition costs related to generic

10    drugs and you compared those to Montana Medicaid's

11    costs.

12              Did you also compare acquisition costs

13    from non-generic drugs?

14         A.   If they used them.  I mean, I honestly

15    don't remember specifically what I looked at.  There

16    were probably some non-generics that they used.

17         Q.   And so there the comparison would have

18    been to AWP minus 10%?

19         A.   Yes.

20         Q.   I asked you those questions about the OIG

21    report about underreimbursed or overreimbursed and I

22    think I may have confused you.  I'm now asking for
```

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

95

1    what you believe. Not what the report said but what

2    you believe.

3              Did you believe that providers were being

4    overreimbursed?

5              MR. LOPEZ:  Object to the form.

6              THE WITNESS:  I guess, generally, I didn't

7    think my providers were being overreimbursed.

8    BY MS. O'SULLIVAN:

9         Q.   Did you think that providers were at times

10   undercompensated for their services?

11             MR. LOPEZ:  Object to the form.

12             THE WITNESS:  Since they weren't being --

13   since they weren't being reimbursed or paid

14   specifically for their services, their services were

15   not being paid for.  It wasn't a system of

16   reimbursement that I thought was in the best

17   interest of the pharmacies in the long-term.

18   Because I assumed that eventually there would be

19   concern about the cost of the drug, which were

20   always going up.  And if, for instance, we said to

21   the pharmacists, you have to charge us only your

22   acquisition costs and we had some mechanism to

Dorothy Poulsen                                February 22, 2006
                          Seattle, WA

96

1    determine whether or not they were actually doing

2    that and we were paying them $4.14 for dispensing,

3    they would not have been reimbursed adequately.

4    BY MS. O'SULLIVAN:

5        Q.    **They would have lost money on every drug**

6    **they dispensed?**

7            MR. LOPEZ:  Object to the form.

8            THE WITNESS:  They would have lost money

9    on their business, yes.

10   BY MS. O'SULLIVAN:

11       Q.    **And that would have harmed access to**

12   **Medicaid beneficiaries?**

13           MR. LOPEZ:  Objection.

14           THE WITNESS:  Yes.  Well, it would have

15   done worse than that.

16   BY MS. O'SULLIVAN:

17       Q.    **What would it have done?**

18       A.    In many instances, it would have closed

19   pharmacies in small towns and it would have hurt the

20   population as a whole.

21       Q.    **Mrs. Poulsen, the court reporter has**

22   **handed you what has been marked Exhibit Poulsen 006,**

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

116

1        Q.    Where it begins:

2              "We, and almost all states."  The second

3    or last full paragraph --

4        A.    Uh-huh.

5        Q.    -- it says:

6              "We, and almost all states pay a

7    percentage off of AWP, we pay AWP less 10.5% plus

8    fee in Arkansas.  Our research suggests AWP is

9    increasing a bogus mark.  The Wholesaler Acquisition

10   Cost (WAC) that we have access to is often half or

11   less of the AWP."

12             Did you understand what Mr. Hanley was

13   referring to by calling AWP a bogus mark?

14       A.    Well, yes.  I generally understood,

15   average wholesale price wasn't average wholesale

16   price.  That it came much closer to what I was

17   talking about before, the manufacturer's recommended

18   price but that it was called AWP.

19       Q.    And then it goes on to say in this Email

20   from Mr. Hanley:

21             "When we pay off AWP, we pay the single

22   independent retailer the same as the chain who gets

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

119

1                    Do you see that?

2        A.    Yes.

3        Q.    Do you see the third sentence where it

4    says:

5              "Almost everyone who is familiar with

6    pharmacy reimbursement knows that AWP, 'Ain't What's

7    Paid'"?

8        A.    Yes.

9        Q.    Did you know that?

10       A.    Yes.  I mean, the common knowledge was

11   that AWP was, again, as I've said before, not what

12   it sounded like. That's why it was discounted.

13       Q.    And you knew that while you were the

14   pharmacy provider for Montana Medicaid?

15       A.    Yes.  I wouldn't have been paying

16   attention if I didn't know that.

17       Q.    Turning to the last paragraph on the same

18   page and the second full sentence:

19              "It is true that ingredient reimbursement

20   is supposed to be based on estimated acquisition

21   cost.  The ancillary costs of dispensing the drug

22   are supposed to be accounted for by the dispensing

Dorothy Poulsen                        February 22, 2006
                        Seattle, WA

122

1    pharmacy programs for Medicaid across the country

2    did talk?

3              MR. LOPEZ:  Objection.

4              THE WITNESS:  No.  Actually, in -- in what

5    terms?  No.  I mean, I don't know that I had ever

6    heard "Ain't What's Paid" before I read here.  And

7    no, we didn't usually talk in these terms.  This was

8    the -- in -- in any discussions that there may have

9    been about pricing, the -- the way that it would

10   have been phrased would not have been as informal as

11   this.

12   BY MS. O'SULLIVAN:

13       Q.   But you did testify a few minutes ago,

14   that it was common knowledge that AWP was, "Ain't

15   What's Paid"?

16             MR. LOPEZ:  Object to form.

17             THE WITNESS:  Colloquially, yes.  I mean,

18   we understood that AWP didn't reflect the average

19   wholesale price.

20   BY MS. O'SULLIVAN:

21       Q.   And the AWP also didn't reflect the actual

22   acquisition costs?

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

128

1    BY MS. O'SULLIVAN:

2        Q.   **Exhibit Poulsen 012 is a document with a**

3    **Bates range of MT006626 to 6642, entitled, "Medicaid**

4    **Services Prescription Drug Pricing," with your name**

5    **on it, "Dorothy Poulsen, Program Officer" and the**

6    **date, "December 6, 1999."**

7            **Will you please take a look at this**

8    **document and my question is, did you prepare this**

9    **report?**

10       A.   I did.

11       Q.   **What is it?**

12       A.   It's a summary or review of the Medicaid

13   drug program.  This, I believe, was more than likely

14   done for the legislative session.  So this was one

15   of those informative documents, so that legislators

16   would understand how the program works and what it

17   was that we did.

18       Q.   **So this document was sent by Montana**

19   **Medicaid to Montana State legislators?**

20       A.   You know, I don't know how it was used.

21           Normally when they did things like that,

22   my name wouldn't have appeared on it.  I'm not sure

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

                                                              129

```
1    exactly.  It may have been a report that I did for

2    the department and they used it.  I'm not absolutely

3    sure what I used this for at this point in time.

4    But this is what it looks like.  This was a time

5    when the cost of the program was going up and people

6    were very, very concerned about how much the

7    pharmacy  program was costing.

8           And so, again, my approach to it was to

9    try to educate people as to how things were

10   operating before they proceeded to cut my budget

11   without -- without input.

12       Q.    The second page of Exhibit Poulsen 012

13   MT00627 --

14       A.    Uh-huh.

15       Q.    -- states on the last sentence of the

16   second-to- the-last paragraph:

17            "The current maximum dispensing fee of

18   $4.20 covers between one-fourth and one-half of the

19   cost incurred by pharmacies."

20            What did you mean by that?

21       A.    Well, when -- pharmacies had to send in

22   information for their dispensing fee.
```

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

130

1       Q.    A dispensing fee survey?

2       A.    Yes.   Good.   So I vaguely recall.   I

3   recall better when a new pharmacy came on line and

4   they were applying for a dispensing fee.   And they

5   would have to indicate what their expenses were and

6   what their cost of business was. And then that --

7   that divided by the number of prescriptions was how

8   we could see -- what we took as their cost of

9   filling a prescription.

10      Q.    What type of costs are you talking about?

11      A.    Well, personnel.   You know, the building,

12  the heating.   There was something for inventory.

13  But that was separate because we weren't looking at

14  the cost of the drug. We were looking at the cost --

15  the other operational costs.

16      Q.    You just referred to the dispensing fee

17  surveys. I want it ask:

18           What was your basis for the conclusion

19  that dispensing fees were only covering one-quarter

20  to one-half of the costs incurred by pharmacies?

21      A.    When they filled those out and you divided

22  it out, their cost of doing a prescription would

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

                                                              131

1   have been $16 or, you know, between $8 and $16 per

2   prescription and we were paying $4.20.

3           When we used our methodology to determine

4   what our dispensing fee should be, the amount we

5   came up with was invariably higher than what the

6   capped dispensing fee was. So virtually everyone had

7   the capped dispensing fee.

8       Q.    Did you do the analysis that led to this

9   conclusion that the dispensing fee only covered one-

10  quarter to one-half of the cost?

11      A.    I believe so.

12      Q.    Do you know where those dispensing fees

13  are located at Montana Medicaid?

14      A.    In a file folder.

15      Q.    Who keeps that file?

16      A.    The pharmacy program officer or in

17  archives.  Or at this point in time, they may have

18  done many things differently.  But at the time I was

19  doing it, it would have been in a file folder.

20      Q.    Based on this analysis that you did in

21  Exhibit Poulsen 012, was it your understanding that

22  Montana Pharmacy would lose money on every drug it

Dorothy Poulsen                                    February 22, 2006
Seattle, WA

132

1    dispensed, unless it received some additional

2    reimbursement from Medicaid?

3              MR. LOPEZ:  Objection.

4              THE WITNESS:  That was my rationale for

5    paying them is AWP less 10%, rather than some other

6    amount, is that otherwise, they would not be paid

7    sufficiently to provide services to our clients.

8    BY MS. O'SULLIVAN:

9         Q.   Was it your understanding that the

10   reimbursement methodology of AWP minus 10% was in

11   part intended to make up for the lack of

12   reimbursement for the dispensing fee?

13             MR. LOPEZ:  Objection.

14             THE WITNESS:  That was my assumption.

15   When I came into the position, this was a system

16   that was set up. This was how it was set up.  What I

17   then tried to determine or figure out over the years

18   is why we would set things up this way.  So that was

19   my understanding is we paid this way because -- I'm

20   not sure which is the chicken and which is the egg.

21   Did we pay a low dispensing fee because we thought

22   that they were making money on the drug?  Or did we

Dorothy Poulsen                          February 22, 2006
                        Seattle, WA

133

1    let them have money on the drug because we were

2    paying them a low dispensing fee?  I don't know.  I

3    just came into it and that's where that was.

4    BY MS. O'SULLIVAN:

5        Q.    Have you ever hear of the term, "cross-

6    subsidization"?

7        A.    No.  Not that I know of.

8        Q.    Let's turn to MT6627 of Exhibit Poulsen

9    012.

10            Did you write in the last paragraph:

11            "Drug pricing is a prime example of free

12   market capitalism at work in the United States,

13   manufacturers set the price of their drugs

14   independent of any regulation or guideline.  When

15   there is competition, the prices of drugs decreases;

16   without competition, the pharmaceutical company

17   charges whatever the market will bear"?

18       A.    Yes.  I would have written that.

19       Q.    And you thought it was accurate when you

20   wrote it?

21       A.    Yes, I did.

22       Q.    Page 6629.  And the second full paragraph

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

171

1    for billing medications or drugs.

2         Q.   Are you familiar that with multi-source

3    drugs from different manufacturers, the J code is

4    the same?

5         A.   Exactly.

6         Q.   Are there also single-source products

7    where 2 or more products have the same J code?

8         A.   As far as I know, yes.

9              MR. LOPEZ:   I'm going to object to the

10   form.

11   BY MS. O'SULLIVAN:

12        Q.   Do you know of any examples?

13        A.   I don't remember any examples.

14        Q.   Could Montana Medicaid determine who a

15   manufacturer of a particular drug is based only on

16   the J code?

17        A.   No.

18             MR. LOPEZ:   Object to the form.

19   BY MS. O'SULLIVAN:

20        Q.   Why not?

21        A.   Because it's category code basically and

22   isn't  specific.  The NDC is specific to

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

193

1    all this worked out.  I think our plan had been that

2    we were going to do a State MAC and then we could

3    implement those prices on an individual basis.

4              We were working with Consultec to allow us

5    to set up a State and MAC price.  But that didn't

6    work out.  There was the issue with FirstData Bank

7    and there was controversy about FirstData Bank

8    taking the Department of Justice's numbers.  I mean,

9    so that was more than Montana.  That was national --

10   it had a national scope to it.

11        Q.    Looking at Exhibit Poulsen 025, which is a

12   1-page document Bates numbered MT020421, is this an

13   Email you wrote to Leslie Bratton on May 24th, 2000?

14        A.    Yes.

15        Q.    And did you testify previously, Ms.

16   Bratton was at the Consultec PBM entity?

17        A.    Yes.

18        Q.    Where you wrote:

19              "We are not planning to discount these

20   AWPs," what did you mean by that?

21        A.    We were not planning to subtract 10% from

22   them.

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                    February 22, 2006
Seattle, WA

216

1       Q.    Mrs. Poulsen, Exhibit Poulsen 032 is a 3-

2  page document Bates labeled MT018379 to 81.

3       A.    Okay.

4       Q.    Is the first page of Exhibit Poulsen 032 a

5  memo that you wrote to -- for other Montana State

6  employees regarding the State pharmacy contract for

7  FY 2000 and 2001?

8       A.    Yes.

9       Q.    In the second paragraph of the document,

10  where it refers to:

11          "My experience is similar to theirs in

12  that I was informed after the Department of

13  Corrections and contractor had reached an agreement,

14  and this agreement was not consistent with the

15  Medicaid reimbursement methodology then in place,"

16  does this relate to your earlier testimony about the

17  Department of Corrections contract?

18       A.    Yes, it does.

19       Q.    Turning to the second and third paged of

20  Exhibit Poulsen 032, is this a fax that you sent to

21  Gary Willems at the Department of Corrections on

22  March 17th, 1999?

Dorothy Poulsen                                    February 22, 2006
Seattle, WA

233

1   the way they set things up or the way they had --

2   they made decisions without keeping everybody in the

3   loop and that sort of thing.  That wasn't the way I

4   operated or Medicaid operated.

5         Q.   As the pharmacy program officer for

6   Montana Medicaid, is it fair to say, your focus was

7   not totally budgetary?

8         A.   Absolutely.

9         Q.   And is it also fair to say, you were not

10  interested in the lowest cost you could possibly

11  acquire drugs?

12             MR. LOPEZ:  Object to form.

13             THE WITNESS:  No.  That's not -- that

14  would not be true.  I was very interested in having

15  the lowest cost we could get drugs at.  But I wanted

16  to make sure that we had access to the drugs needed

17  by our clients.

18             You have 3 constituencies in that

19  position.  You have the client whose healthcare is

20  dependant upon you.  You have the providers, with

21  whom you want to have a good relationship and

22  cooperative relationship and you have the taxpayer.

Dorothy Poulsen

February 22, 2006

Seattle, WA

234

1    You have a responsibility your the State.   And

2    balancing those 3 roles was always what it was you

3    tried to do.

4    BY MS. O'SULLIVAN:

5       Q.   **Where you wrote on this Email that's**

6    **Exhibit Poulsen 036:**

7            **"The view held by Mary Dalton and others**

8    **there during my time was that we should always let**

9    **the Federal government pay rather than use state**

10   **funds if we could do so.   Thus, even when it was a**

11   **different agency we cooperated in leveraging funds."**

12      A.   Right.

13      Q.   **What did you mean by that?**

14      A.   Exactly that.   If it was permissible under

15   Federal regulations to pay for services through

16   Medicaid, then it was best to pay through Medicaid

17   because the Federal government picked up 70% of the

18   cost for the state of Montana.

19            (Whereupon, Various Documents were

20   marked Exhibit Poulsen 037, Exhibit Poulsen 038,

21   Exhibit Poulsen 039, Exhibit Poulsen 040, Exhibit

22   Poulsen 041, Exhibit Poulsen 042, Exhibit Poulsen

Dorothy Poulsen                                February 22, 2006

Seattle, WA

257

1       A.   Exactly.

2       Q.   I believe you testified that Montana

3  Medicaid got the AWPs it used for reimbursement from

4  Consultec or ACS?

5       A.   We used their system to price things, yes.

6       Q.   Do you know where FirstData Bank --

7       A.   Where Consultec got it from?

8       Q.   Right.

9       A.   They got it from FirstData Bank.

10      Q.   Do you know where FirstData Bank got its

11  information?

12      A.   You know, I think I -- I think from the

13  manufacturers.  But no, I don't know for a fact.

14      Q.   Did you ever asked anyone at FirstData

15  Bank?

16      A.   I may have.

17      Q.   Do you know if anyone at FirstData Bank

18  ever told you?

19      A.   No.  I mean, I don't remember.

20           (Whereupon, Email Document MT016589

21  Through MT016590 was marked Exhibit Poulsen 048 for

22  identification.)

Dorothy Poulsen                                    February 22, 2006
                          Seattle, WA

                                                              265

1    communication with him?

2         A.    No.  I don't recall where I got it.

3         Q.    Looking at the last page of Exhibit

4    Poulsen 049, it appears to be a map of the state of

5    Montana --

6         A.    Yes.

7         Q.    -- listing licensed community pharmacies

8    by county?

9         A.    Yes.

10        Q.    Have you seen this page before?

11        A.    Well, I'm -- I can't be positive.  But I

12   would guess I probably have.

13        Q.    I'm trying to understand it.  If there was

14   a chain pharmacy in a county would that count?

15        A.    Oh.  Yes.  I don't think we would have

16   differentiated between independents and a chain.

17        Q.    So a community pharmacy means any

18   available?

19        A.    Exactly.

20        Q.    Any pharmacy available in that county?

21        A.    Yes.

22        Q.    Does this document reflect that certain

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

266

1    counties in Montana had no pharmacy?

2        A.    Yes.

3        Q.    **Was that of concern to Montana Medicaid?**

4        A.    Well, these would not be counties with a

5    lot of people in them.  And if there was no

6    pharmacy, then likely there was almost no other

7    health providers.  So those people had to go

8    somewhere else for their healthcare in any case. Of

9    course, it was of concern to the state there were

10   not health resources available to some people that

11   were not available in close proximity to some

12   people.

13       Q.    **And so it --**

14       A.    I mean it was a general concern.  It's a

15   rural state and access to healthcare is a major

16   issue.  It was as much as an issue for pharmacies as

17   it was for any other health provider.

18            The numbers are so small, aren't they?

19            (Whereupon, Montana Department Of

20   Public Health & Human Services, A Fascimile To: Etta

21   Hawkins/Carolyn Schmitz, From: Dorothy Poulsen,

22   Program Officer MT008391 Through MT008393 was marked

Dorothy Poulsen

February 22, 2006

Seattle, WA

280

1   just want to thank you for your time.  I have no

2   questions at this time.

3              THE WITNESS:  Thank you.

4              MR. LOPEZ:  We'll reserve signature.

5              (Whereupon, the deposition of Dorothy

6   Poulsen was concluded at 6:09 p.m.)

7

8

9                S I G N A T U R E

10  I declare under penalty of perjury under the laws of

11  the State of Washington that I have read my within

12  deposition.  And the same is true and accurate, save

13  and except for changes and/or corrections, if any, as

14  indicated by me on the change sheet page hereof.

15

16      Signed in *Seattle*.............., Washington, on

17  the ........ *17th* Day of *April*......., 2006.

18

19

20      *Dorothy Poulsen*
        _____
        DOROTHY POULSEN

21      Taken: February 22, 2006

22      Judith A. Robinson, CCR

Henderson Legal Services
(202) 220-4158

1  ERRATA                                              Page 1

2  CAPTION: _____

3  DATE: _February 22, 2006_

4  WITNESS: _Dorothy Poulsen_

5  I wish to make the following changes, for the following

6  reasons:

7  PAGE   LINE

8  _20_   _5_   CHANGE: _famous to infamous_ REASON: _accuracy_

9  _20_   _7_   CHANGE: _1990 to 1985_ REASON: _accuracy_

10 _20_   _7_   CHANGE: _add "and then full_ REASON: _accuracy_
                        _time until 1980."_

11 _20_   _12_  CHANGE: _SRSS to SRS_ REASON: _accuracy_

12 _22_   _14_  CHANGE: _I worked with staff_ REASON: _accuracy_
                        _in the community-based..._

13 _24_   _13_  CHANGE: _delete "I worked in the_ REASON: _clarification_

14 _24_   _14_  CHANGE: _delete "about 5 years."_ REASON: _clarification_

15 _25_   _11_  CHANGE: _Baska to Buska_ REASON: _accuracy_

16 _26_   _11_  CHANGE: _"which is" to "in"_ REASON: _clarification_

17 _30_   _7_   CHANGE: _"concerns" to "conferences"_ REASON: _accuracy_

18 _30_   _10_  CHANGE: _"their" to "the"_ REASON: _clarification_

19 _33_   _21_  CHANGE: _delete "of"_ REASON: _clarification_

20 _34_   _7_   CHANGE: _"or the" to "of the"_ REASON: _clarification_

21 _34_   _17_  CHANGE: _delete "a"_ REASON: _clarification_

22 _34_   _18_  CHANGE: _to_ _generally about kinds_ REASON: _clarification_

| 1 | PAGE | LINE | | | | Page 2 |
|---|------|------|---|---|---|---|
| 2 | 35 | 5 | CHANGE: delete "coming out of" | REASON: | duplication | |
| 3 | 37 | 17 | CHANGE: "him" to "them and" | REASON: | clarification | |
| 4 | 56 | 14 | CHANGE: delete "and" | REASON: | clarification | |
| 5 | 58 | 20 | CHANGE: add "to legislative hearings" | REASON: | clarification | |
| 6 | 67 | 6 | CHANGE: "they" to "patients" | REASON: | clarification | |
| 7 | 67 | 6 | CHANGE: add "taking medications on an on-going basis" | REASON: | clarification | |
| 8 | 67 | 7 | CHANGE: add "unlike" | REASON: | clarification | |
| 9 | 68 | 3 | CHANGE: 409 or 408 to "4.09 or 4.08" | REASON: | accuracy | |
| 10 | 81 | 14 | CHANGE: "LouisTown" to "Lewistown" | REASON: | accuracy | |
| 11 | 81 | 17 | CHANGE: "what was one" to "there was another one" | REASON: | clarification | |
| 12 | 82 | 3-4 | CHANGE: "made indicated" to "Medicaid" | REASON: | accuracy | |
| 13 | 83 | 14 | CHANGE: "Louis Town" to "Lewistown" | REASON: | accuracy | |
| 14 | 83 | 14 | CHANGE: delete "outside of" and replace with "considered" | REASON: | clarification | |
| 15 | 84 | 9 | CHANGE: "LouisTown" to "Lewistown" | REASON: | accuracy | |
| 16 | 85 | 7 | CHANGE: "building" to "billing" | REASON: | clarification | |
| 17 | 87 | 6 | CHANGE: "we pay" | REASON: | clarification | |
| 18 | 87 | 7 | CHANGE: "acquisitions" to "acquisition" | REASON: | clarification | |
| 19 | 87 | 11 | CHANGE: "where" to "were" | REASON: | clarification | |
| 20 | 93 | 21 | CHANGE: "at" to "as" | REASON: | clarification | |
| 21 | 110 | 5 | CHANGE: regiment to regimen | REASON: | clarification | |
| 22 | 121 | 19 | CHANGE: "being" to "not" | REASON: | clarification | |

| 1 | PAGE | LINE | | | Page 3 |
|---|---|---|---|---|---|
| 2 | 123 | 7 | CHANGE: "do" to "buy" | REASON: | clarification |
| 3 | 126 | 12 | CHANGE: delete "that was what" | REASON: | clarification |
| 4 | 126 | 21 | CHANGE: "were supposed" | REASON: | clarification |
| 5 | 126 | 22 | CHANGE: "to have a narrow..." | REASON: | clarification |
| 6 | 139 | 5 | CHANGE: "Drug" to "Blood" | REASON: | accuracy |
| 7 | 139 | 12 | CHANGE: "Drug" to "blood" | REASON: | accuracy |
| 8 | 140 | 16 | CHANGE: delete "to" add "could" | REASON: | clarification |
| 9 | 148 | 22 | CHANGE: "exercise" to "increase" | REASON: | clarification |
| 10 | 160 | 19 | CHANGE: "at" to "a" | REASON: | clarification |
| 11 | 160 | 20 | CHANGE: delete "don't" | REASON: | clarification |
| 12 | 173 | 12 | CHANGE: "have" to "ask" | REASON: | clarification |
| 13 | 199 | 3 | CHANGE: "to" to "through" | REASON: | clarification |
| 14 | 200 | 5 | CHANGE: "or" to "Other" | REASON: | clarification |
| 15 | 217 | 22 | CHANGE: "LouisTown" to Lewistown | REASON: | accuracy |
| 16 | 224 | 22 | CHANGE: "from" to "for" | REASON: | clarification |
| 17 | 230 | 18 | CHANGE: LouisTown to Lewistown | REASON: | accuracy |
| 18 | 230-231 | 22-1 | CHANGE: LouisTown to Lewistown | REASON: | accuracy |
| 19 | 234 254 | 1 | CHANGE: "your" to "to" | REASON: | clarification |
| 20 | 243 | 10 | CHANGE: "Counsel" to "council" | REASON: | clarification |
| 21 | ___ | ___ | CHANGE: _____ | REASON: | _____ |
| 22 | ___ | ___ | CHANGE: _____ | REASON: | _____ |