# EXHIBIT 15

4/20/2006  PRESHINGER, Duane V.1

0001

1       THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3               ---oOo---

4       ---------------------------X

5   In re:  PHARMACEUTICAL,    )    MDL DOCKET NO.

6   INDUSTRY AVERAGE WHOLESALE )    CIVIL ACTION

7   PRICE LITIGATION           )    01CV12257-PBS

8       ---------------------------)

9   THIS DOCUMENT RELATES TO:  )

10  ALL ACTIONS               )

11      ---------------------------X

12

13      DEPOSITION OF DUANE PRESHINGER

14              Taken at:

15          Law offices of

16  Gough, Shanahan, Johnson & Waterman

17      33 South Last Chance Gulch

18          Helena, Montana

19          April 20, 2006

20              9:00 a.m.

21

22

4/20/2006  PRESHINGER, Duane V.1

1      Q.   (By Ms. Smith-Klocek) So does the usual

2   and customary price include customers who are

3   covered by private insurers?

4          MS. BRECKENRIDGE:  Objection.

5          THE WITNESS:  I would assume so, yes.

6      Q.   (By Ms. Smith-Klocek) I'd like you to turn

7   to Section 9.1.

8      A.   Okay.

9      Q.   Where it says "Completing a Paper Claim",

10   do you see that?

11      A.   I do.

12      Q.   It refers to a Claim Form MA-5.

13      A.   Yes.

14      Q.   Is Form MA-5 the form used by pharmacists

15   to submit a claim to Medicaid for a prescription

16   drug?

17      A.   I believe so, yes.

18      Q.   Do you know or --

19      A.   I've never dealt with pharmacy claims on a

20   claim-by-claim basis.

21      Q.   Turning the page where it has a chart

22   where there's "Field Title" and "Instructions"

1    across the top, do you see that?

2        A.  I do.

3        Q.  And down to Field No. 19 where it says

4    "Amount Charged", what is a pharmacist supposed to

5    enter into the "Amount Charged" field?

6            MS. BRECKENRIDGE:  Objection; foundation,

7    form.

8            THE WITNESS:  I guess reading it, it says:

9    "Enter the pharmacy's usual and customary charge

10   including dispensing fee."

11       Q.  (By Ms. Smith-Klocek) Does this section

12   "Completing Paper Claims", Section 9.2 -- I guess

13   these are pages, so Section 9, pages 1 through 4.

14   Is this section intended to instruct pharmacists on

15   how to submit a claim to Montana Medicaid for

16   prescription drugs?

17       A.  It provides guidance regarding them

18   submitting a paper claim to Medicaid.

19           MS. SMITH-KLOCEK:  Could you please mark

20   this as Exhibit Preshinger 002?

21           (Document marked Deposition Exhibit

22   Preshinger 002 for identification.)

1          MS. SMITH-KLOCEK:  For the record, I have

2     marked as Exhibit Preshinger 002 a one-page document

3     entitled Form No. MA-5.  Across the top, it says

4     "State of Montana - Dept. Of Public Health & Human

5     Services."

6          THE WITNESS: (Perusing document) -- okay.

7     Q.  (By Ms. Smith-Klocek) Do you recognize

8     this document?

9     A.  It's the form that's in the manual.

10    Q.  Okay.  Is this a blank copy of the Form

11    MA-5 that is used by pharmacies to submit claims to

12    Medicaid for prescription drug reimbursement?

13    A.  Yes.

14    Q.  Okay.  I'm done with that.

15         Do you recall a time when Montana Medicaid

16    sought to change its reimbursement formula for

17    prescription drugs from AWP minus 10 to AWP minus

18    15?

19    A.  Yes.

20    Q.  Okay.  In 2002 your role was Acute

21    Services section supervisor, right?

22    A.  Correct.

1    invoice prices was 19.71 for brand name drugs and

2    65.37 percent for generic drugs."

3            Do you want me to continue?

4        Q.   No, you're fine.  Given that study, do you

5    know why the proposal to change met the

6    reimbursement formula for prescription drugs under

7    the Medicaid program was for AWP minus 15 percent

8    rather than a greater number discount off of AWP?

9            MS. BRECKENRIDGE:  Objection.

10           THE WITNESS:  At the time, we weren't --

11   after having read the report, we did not know

12   anything they took into consideration.  We don't

13   know who they had studied with, who they had talked

14   to, or how they had gotten their data.  The job of

15   Montana Medicaid is to ensure that the Medicaid

16   clients continue to have access to prescription

17   drugs.  Many pharmacies are the -- in many

18   communities, there's only one pharmacy.  And so it's

19   not our -- it's our obligation to make sure those

20   community pharmacies continue to stay open and they

21   continue to have access to them.  That AWP less 15

22   percent was just a middle number in regards to what

1    methodology has been in place since July 2002.

2    Since that time, the State's financial position has

3    worsened causing the Division to cut back services

4    and reimbursement to providers."

5         Was part of the impetus for this proposal

6    to AWP minus 25 percent an effort to reduce the

7    Medicaid budget?

8         A.  Yes.

9         Q.  In the next paragraph in the middle of the

10   paragraph, do you see where it starts -- let's start

11   with "However, the Division".  Do you see that?

12        A.  Where is that?

13        Q.  It's about seven lines down:  "However"?

14        A.  Okay, I've got it.  Thank you.

15        Q.  Could you read from there -- I'm sorry,

16   it's three sentences.

17        A.  "However, the Division does realize that

18   significant cost savings can be realized by

19   incorporating a multi-tiered reimbursement system,

20   specifically by changing the reimbursement rate for

21   generic multiple source drugs without FULs at a rate

22   consistent with those noted in the OIG report.  It

4/20/2006  PRESHINGER, Duane V.1

1    BY MS. SMITH-KLOCEK:

2        Q.   And did Montana Medicaid understand that

3    those costs would be included in the AWP minus 25

4    percent number?

5            MS. BRECKENRIDGE:  Objection.

6            THE WITNESS:  Can you repeat that, please?

7        Q.   (By Ms. Smith-Klocek) Let me rephrase it.

8    Was it your understanding that the reimbursement for

9    AWP minus 25 percent for generic drugs would be

10   adequate to compensate pharmacists for their

11   professional services and costs of dispensing?

12       A.   Overall in the aggregate, yes.

13       Q.   Do you recall what the outcome was for the

14   this AWP minus 25 percent proposal?

15       A.   We later withdrew it.

16       Q.   Do you recall why?

17       A.   We withdrew it as the Congress, Federal

18   Congress had passed a change in our Medicaid

19   matching dollars that increased, I believe, right

20   around 3 percent our federal Medicaid match.  So we

21   were no longer in the hole, so to speak.  We weren't

22   -- (pause.)

1       Q.   Part of the reason for withdrawing the AWP

2    minus 25 percent proposal for generics was because

3    you no longer had the budget restraints that was the

4    impetus for proposing it in the first place?

5       A.   Right.

6            MS. BRECKENRIDGE:  Objection.

7            THE WITNESS:  That's one of the reasons.

8       Q.   (By Ms. Smith-Klocek) Was another reason

9    for the Department's withdrawal a result of provider

10   opposition to the rule change?

11      A.   There was provider opposition, yes.

12      Q.   Was provider opposition part of the

13   consideration for withdrawing the AWP minus 25

14   percent proposal?

15           MS. BRECKENRIDGE:  Objection.

16           THE WITNESS:  It was one of the things

17   that was taken into consideration, yes.

18      Q.   (By Ms. Smith-Klocek) Did you receive

19   comments or complaints from providers regarding the

20   AWP minus 25 percent proposal?

21      A.   I don't recall.  I assume we did.

22           MS. SMITH-KLOCEK:  Could we please mark

1    to already to get their food and things like that.

2    So we don't cover for them right now.

3           Conceivably, if there was more distance

4    that they had to travel in order to get to that,

5    could we?  We could, but that's making the

6    assumption that all the pharmacies would quit in

7    those rural communities.

8       Q.   So in determining the level of

9    reimbursement for pharmaceutical drugs, is access an

10   important consideration for Montana Medicaid?

11      A.   Yes, it is.

12           MS. SMITH-KLOCEK:  What's the next number?

13           COURT REPORTER:  Ten.

14           MS. SMITH-KLOCEK:  Would you please mark

15   this as Exhibit Preshinger 010?

16           (Document marked Deposition Exhibit

17   Preshinger 010 for identification.)

18           MS. SMITH-KLOCEK:  Exhibit Preshinger 010

19   is a two-page document Bates-stamped MT 025511

20   through MT 025512.

21           THE WITNESS:  (Perusing document.)

22   BY MS. SMITH-KLOCEK:

4/20/2006  PRESHINGER, Duane V.1

1    Montana Medicaid, you use J-codes?

2        A.   The physician program does, yes.

3        Q.   Do you know who within Montana Medicaid

4    has responsibility for setting reimbursement rates

5    for physician-administered drugs?

6        A.   The bureau chief is Mary Angela Collins,

7    the division program officer is Denise Brunett.

8        Q.   Do you recall having any discussions with

9    Denise Brunett regarding reimbursement rates for

10   drugs?

11       A.   Not specifically, no.

12       Q.   Do you recall any e-mails or

13   communications with Denise Brunett regarding

14   reimbursement rates for drugs?

15       A.   Not specifically, no.

16       Q.   Do you recall any conversations or

17   communications with Mary Angela Collins regarding

18   reimbursement rates for physician administered

19   drugs?

20       A.   I don't recall.

21       Q.   Where did you obtain your understanding

22   that physician-administered drugs are reimbursed at

1    an AWP minus formula?

2        A.   Just I think it's been talked about like

3    in meetings, you know, like management meetings, or

4    whatever, that kind of stuff.  They have worked with

5    -- I believe they have worked with Dan in regards to

6    that pricing methodology.

7        Q.   What kind of management meetings are you

8    referring to?

9        A.   Well, we have regular like division

10   management meetings, and then there's also -- those

11   are the ones the bureau chiefs attend, supervisors

12   attend.  I don't know if that was where I heard that

13   or not.

14       Q.   Do you know when you came to this

15   understanding?

16       A.   No.  I don't delve into the day-to-day of

17   the pharmacy realm.  I mean that's why there's

18   program officers that do that.

19       Q.   Before we break for lunch, just a couple

20   follow-up questions.  You mentioned that Julie

21   Frickle is an analyst in your section.  What kind of

22   reports does she generate?

113

4/20/2006  PRESHINGER, Duane V.1

1      OIG?

2          A.  Yes.

3          Q.  Dan Peterson, at this time, directly

4      reported to you?

5          A.  Yes.

6              (Document marked Deposition Exhibit

7      Preshinger 022 for identification.)

8              MS. SMITH-KLOCEK:  What's been marked as

9      Exhibit Preshinger 022 is Exhibit MT 023670 through

10     MT 023700. It's entitled "Office of Inspector

11     General, Medicaid Pharmacy - Additional Analyses of

12     the Actual Acquisition Cost of Prescription Drug

13     Products", dated September 2002, I believe.

14             THE WITNESS:  (Perusing document) -- okay.

15     BY MS. SMITH-KLOCEK:

16         Q.  Are you familiar with this document?

17         A.  I don't recall it specifically, no.

18         Q.  In your position as Acute Services section

19     manager -- I'm sorry, section chief and Acute

20     Services bureau chief, do you receive OIG reports

21     regarding prescription drug surveys?

22         A.  Typically, yes.

4/20/2006 PRESHINGER, Duane V.1

1    Q.   Do you receive OIG reports regarding

2    acquisition costs of prescription drugs?

3    A.   Typically, yes.

4    Q.   In your time at Acute Services in Montana

5    Medicaid, do you recall how many OIG reports you've

6    received?

7    A.   I do not.

8    Q.   How do you receive these OIG reports?

9    A.   Typically, on paper; although more

10   recently, I think they have sent some

11   electronically.

12   Q.   Who do you receive them from?

13   A.   It depends.  Typically, from like John

14   Chappuis, the State Medicaid Director, or whoever

15   gets them sometimes.

16   Q.   Who else at Montana Medicaid gets them?

17   A.   You would probably be surprised on random

18   people they send things to.  I'm sure Jeff Buska

19   probably got some, Gail Gray, Maggie Bullock.

20   Q.   When you say "they" send, are you

21   referring to CMS or OIG?

22   A.   Right.

1          Q.   Is that Montana Medicaid's response to the

2     request for description of all efforts adopted by

3     Montana to reduce Medicaid prescription drug costs?

4          A.   Yes.

5          Q.   And in the request, it requests -- it

6     refers to Maximum Allowable Cost lists.  Are you

7     familiar with Maximum Allowable Cost lists, or

8     otherwise known as "MAC lists"?

9          A.   We don't have them in Montana, but I

10     understand what they are.

11          Q.   Let's start with your understanding of

12     what they are.

13          A.   From my understanding of what they are,

14     it's where states would go out and survey and set a

15     maximum allowable cost for a certain drug.

16          Q.   Is it your understanding that MAC lists

17     are intended to reduce Medicaid prescription drug

18     costs?

19          A.   I would assume so, yes.

20          Q.   And does Montana have a state MAC list?

21          A.   No; no, we don't.

22          Q.   Has Montana considered implementing a

1    state MAC list?

2         A.  We have looked at that, yes.

3         Q.  Do you recall --

4              MS. SMITH-KLOCEK:  I'm sorry, on the

5    telephone, whoever is typing, could you please mute

6    your telephone?

7         Q.  (By Ms. Smith-Klocek) When did Montana

8    Medicaid consider implementing a state MAC list?

9         A.  I don't recall.

10        Q.  But you recall it was during your tenure?

11        A.  Yes.

12        Q.  So since 2002?

13        A.  Yes.

14        Q.  Who was involved in those discussions?

15        A.  I don't recall specifically.  I would

16   assume Dan Peterson and probably Jeff Buska.

17        Q.  Do you recall why Montana Medicaid decided

18   not to implement a state MAC list?

19        A.  I don't recall specifically the reason,

20   no.

21        Q.  During your tenure, has Montana Medicaid

22   considered implementing a state MAC list more than

143

1    once?

2    A.  I don't believe so.

3    Q.  The last item on this list is with regard

4    to supplemental rebates.  Do you see where it says

5    "supplemental rebates" in the Montana response?

6    A.  I do.

7    Q.  Does Montana currently obtain supplemental

8    rebates fog drug?

9    A.  Yes, we do.

10    Q.  When did Montana Medicaid begin receiving

11    supplemental rebates for prescription drugs?

12    A.  I believe like in January or February of

13    last year, 2005.

14    Q.  Okay.  Item No. 5 on the same page

15    requests information.  I'll just read it:

16    "Has Montana performed any surveys,

17    audits, or reviews to determine actual pharmacy

18    acquisition cost during the past 10 years?  If so,

19    please describe in detail the timing, methodology

20    and results.  Please also provide copies of any such

21    surveys, audits or reviews."

22    Could you please read Montana's response

# EXHIBIT 16

1          UNITED STATES DISTRICT COURT FOR

2           THE DISTRICT OF MASSACHUSETTS

3    -------------------------------x

4    IN RE PHARMACEUTICAL INDUSTRY     )

5    AVERAGE WHOLESALE PRICE           ) MDL NO. 1456

6    LITIGATION                        )

7                                      ) Civil Action No.

8    -------------------------------x 01-CV-12257-PBS

9                                      )

10   THIS DOCUMENT RELATES TO:         ) Hon. Patti B. Saris

11   State of Montana v. Abbott Labs,)

12   Inc., et al., Civil Action        )

13   No. CV-02-09-H-DWM                )

14   -------------------------------x

15

16          DEPOSITION OF JAMES E. SMITH

17    Taken at Gough, Shanahan, Johnson & Waterman

18          33 South Last Chance Gulch

19               Helena, Montana

20               March 8, 2006

21                8:30 a.m

22

1  breakdown, either numbers or percentage-wise, of

2  members that would be chain pharmacies versus

3  independent pharmacies?

4      A.   Well, in the -- in the State of Montana,

5  there's about 200 retail pharmacies, and about 120

6  of them are independently owned, and 80, plus or

7  minus, are chain drug stores.  What I'm not sure

8  about right now is the membership percentage from

9  each of those categories, but just across the state,

10  that's roughly the breakdown in retail.  And most of

11  the independent members -- or the independents are

12  members in one way, shape, or form. Maybe less so

13  with the chains.  But actually, we've worked hard to

14  get more participation from the employee pharmacists

15  in the chain stores, and I think we're -- you know,

16  we're doing okay at that.

17      Q.   And who are the largest chains of

18  pharmacies in Montana?

19      A.   I think Albertson's is still the big one,

20  with about 21 or 22 stores across the state, and

21  they also own the eight Oscos that are in the state.

22  Safeway is a pretty big chain.  Wal-Mart and ShopKo.

1   with -- you know, even -- I think Wal-Mart has got

2   five stores in the state, and ShopKo, about the

3   same.  I mean, that would make them a pretty big

4   chain here.

5        Q.   And of those roughly 200 retail

6   pharmacies, do you have any idea of what the

7   breakdown would be of urban pharmacies versus rural

8   pharmacies?

9        A.   Well, I know we've got a lot of them out

10   in the rural areas of the state.  I don't know.

11   This would be a speculative guess, but half and

12   half.  I'd say half of those independents are in

13   towns of less than 10,000, maybe even less than

14   5,000 people, rural settings.  And the other half

15   are in the cities of Montana.

16        Q.   And how about the chain pharmacies?

17        A.   Well, largely in the cities, yeah.

18        Q.   And what is the mission of the MPA?

19        A.   Oh, I think it's to -- I'm trying to

20   remember.  I should know it and be able to recite it

21   verbatim.

22        Q.   Yeah, I don't need you to recite it.  I'm

1   in the reimbursement formula from AWP minus-10

2   percent to AWP minus-15 percent.  Does that sound

3   right?

4        A.   It does -- Yeah, it does.  I mean, I might

5   have thought closer to 2003.  It had something to do

6   with that hearing in February of 2003 that I

7   attended, I thought. But, yeah, it was discounted a

8   little further in '02 or '03.  I'm sure you know.

9   I'll say '02.

10       Q.   And how about for generic drugs; do you

11  know what the reimbursement formula is under

12  Medicaid?

13       A.   Well, I think that's still at AWP minus-15

14  plus 4.40.  I'm sorry, I should know this.  My

15  bosses at the Pharmacy Association would be

16  distressed that I don't know it by heart.

17            But that's what we were looking at in 2003

18  in that hearing.  As I recall, the Department's

19  proposal was to go to AWP minus-25 percent on

20  generics.  And I think we -- Well, we were arguing

21  against that, but it didn't happen, and I think the

22  reason it didn't happen is because the Department

1  opted for creating the so-called preferred drug list

2  instead.   I think there was a favorable -- a Supreme

3  Court decision having to do with the State of Maine

4  that you might say authorized or enabled or allowed

5  the states to make these preferred drug lists, and

6  when that decision was made, I think the Department

7  abandoned its formula change on generics and began

8  working to develop this preferred drug list.

9        Q.    And can you describe for me what this

10  preferred drug list is?  And I think you referred to

11  it as a drug formulary early on.

12        A.    That's my understanding, Mr. Duffy, that

13  for each class of drugs, there would be a formulary

14  so that there would only be one drug in a class that

15  would be approved for dispensing and approved for

16  the Medicaid standard reimbursement.  So, you know,

17  you're always -- I guess the cholesterol medicine

18  always is used as an example.  You know, they're not

19  going to put Lipitor and Mevacor on the same

20  formulary; it's going to be one or the other.

21        Q.    And do you know how they determine which

22  drug will be listed on the formulary?

1   bill?

2       A.   Yes.   Yep.

3       Q.   Okay, we talked a bit about what's been

4   referred to as equal access earlier.   I'd like to

5   talk a bit -- or ask you some questions about that

6   again.   Do you know what percentage of the

7   prescriptions that are filled by Montana pharmacies

8   were reimbursed through Medicaid?

9       A.   No, I don't right off the top of my head.

10      Q.   Would -- would a 25 percent figure be what

11  you would expect or what your understanding is?

12      A.   I would have guessed -- I was going to say

13  I could guess less than a third.   I would have maybe

14  guessed in that neighborhood, 20 to 30 percent.

15      Q.   And do you know, is there any significant

16  variance of that from urban-based pharmacies to

17  rural-based pharmacies in the state?

18      A.   I would suspect that percentage is higher

19  in rural communities with a greater proportion of

20  poor or elderly.

21      Q.   Any estimate on what it would be for rural

22  communities or pharmacies?

1   there's no extra money for it; they're still getting

2   that same Medicaid dispensing fee.

3           So I'm trying to answer yes, that whether

4   it's poor, frail, elderly people or other Medicaid

5   people with special needs, the pharmacists tell me

6   that it's just a more intensive group of people to

7   serve.

8       Q.   In your role as the executive director of

9   the MPA, what is your understanding of the financial

10  situation that's faced by Montana pharmacies?

11      A.   Well, I think they're operating on real

12  low profit margins.  The transition from a first-

13  party cash marketplace to this third-party

14  marketplace, third-party reimbursement over the last

15  10, 15 -- 15 years that I've been around, has been a

16  very difficult transition for these people to

17  withstand and undergo.  I think if anything -- if

18  there's any major reductions in those Medicaid

19  dispensing fees, half those rural pharmacies are

20  going to be gone within six months and the remaining

21  half will be gone within the next year.

22          I think they've managed to stay open

95

1   through a variety of innovative business practices

2   and good customer service.  I mean, there's a

3   pharmacy/Ace Hardware store up in Troy, Montana.

4   There's a pharmacy/floral shop in Seeley Lake,

5   Montana.  In Deer Lodge, it's a pharmacy and

6   probably one of the nicest little gift shops that

7   you'd ever want to see.  So they're trying to keep

8   the doors open by selling other things out of their

9   stores.  And, you know, then they've got the health

10  and beauty aids, the gift cards, they've got the

11  over-the-counter products.  I mean, all that stuff

12  is helping to buoy them up in this era of shrinking

13  reimbursements.

14           And I think the other thing they do in

15  order to stay open and viable is try to provide a

16  high level of customer service; you know, free

17  deliveries, packing these medicines into, you know,

18  weekly trays for people with special needs, stuff

19  like that.  But I think they're very much on the

20  bubble right now.

21      Q.   And I take it, from what you said, it

22  would be fair to say that the Medicaid reimbursement

1   the explanation.

2        Q.   And can you give me just a brief

3   description of kind of the methodology that was used

4   to conduct the survey?

5        A.   Well, I had several discussions with the

6   folks at the School of Business.  I'm trying to

7   remember the guy's name.  But I told him what we

8   were looking for, what kinds of information we were

9   trying to get from this survey, and then based on

10  those discussions, they crafted a questionnaire.

11  And I think they beta tested it to a couple

12  pharmacies, and then based on the feedback we got

13  from that, we sent it out to all the pharmacies, all

14  the retail pharmacies in the state and then awaited

15  the responses and compiled them into this document.

16       Q.   I'd like to talk a bit about some of the

17  conclusions that were reached by this study.  If

18  you'll turn to page 2, the third full paragraph

19  there, beginning with the second sentence of that

20  paragraph, it reads, "Prescriptions for Montana

21  Medicaid patients constitute almost 25 percent of

22  the average Montana independent community pharmacy's

126

1   total prescription volume," and then in parentheses,

2   "compared to 23 percent nationally."

3          Now, I know we talked a bit about this

4   before.  Again, that 25 percent figure, that would

5   be consistent with your understanding?

6      A.   Um-hum.

7      Q.   And if you'd turn to the next page, page

8   3, the top of the page there, the sentence reads,

9   "Based upon Montana DPHHS" -- and again, that's the

10  Montana Department of Health and Human Services --

11  "statistics, a community pharmacist practicing in a

12  rural Montana town may be one of only two or three

13  providers of first contact care in the entire

14  county."

15         Again, is that consistent with your

16  understanding of the situation of the Montana

17  pharmacies at this time?

18     A.   Yes, it is.  We say they're the most

19  readily accessible health care providers.

20     Q.   And if you'd turn to page 5 of the survey,

21  down at the bottom of the page there, the second

22  sentence of the paragraph at the bottom of the page

# EXHIBIT 17

3/24/2006  STRATTON, Ph.D., Timothy P. V.1

1        UNITED STATES DISTRICT COURT

2        THE DISTRICT OF MASSACHUSETTS

3        *************************************************

4    IN RE PHARMACEUTICAL INDUSTRY

5    AVERAGE WHOLESALE PRICE LITIGATION,

6

7                    MDL NO. 1456

8                    Civil Action No.

9                    01-CV-12257-PBS

10                   Hon. Patti B. Saris

11   THIS DOCUMENT RELATES TO:

12   State of Montana v. Abbott Labs, Inc., et al.,

13   Civil Action No. CV-02-09-H-DWM.

14

15   *************************************************

16

17              DEPOSITION OF

18        TIMOTHY P. STRATTON, PH.D.

19           Taken March 24, 2006

20

21           Scheduled for 9:00 a.m.

22      Reported By:  Lori L. Morrow, RPR, CRR

1    BY MS. O'SULLIVAN:

2        Q.   The court reporter has just handed you

3    Exhibit Stratton 010 to your deposition, a multipage

4    document that is not Bates numbered and is labeled

5    "Findings from the Montana Pharmacy Association 2002

6    Survey of Montana Community Pharmacies."  Will you

7    please take a look at it?

8        A.   I have completed reviewing this document.

9        Q.   Have you seen it before?

10       A.   I have.

11       Q.   What is it?

12       A.   This would have been my draft report to

13   the Montana Pharmacists Association based on the

14   data that was collected in the survey we have been

15   discussing.

16       Q.   Do you remember when you completed this

17   draft report?

18       A.   Right in December of 2002.

19       Q.   Do you recall generally the conclusions

20   you reached in your draft report?

21       A.   I have to review those.  I concluded that

22   a reduction in the Montana Medicaid payments would

3/24/2006  STRATTON, Ph.D., Timothy P. V.1

1    definitely impact the economic picture for Montana

2    community pharmacies, particularly the independent

3    pharmacies.  It was possible that if respondents to

4    the survey carried through on their -- on what they

5    indicated in the survey, they would indeed have

6    resulted in laying off part-time and possibly full-

7    time pharmacy employees because of these cuts in

8    Medicaid reimbursement.  I then go on to suggest

9    that Montana pharmacists should use this opportunity

10   to renegotiate the dispensing fee with the state for

11   Medicaid prescriptions, one that covered not only

12   the cost for dispensing but one that allowed for a

13   fair return independent of the drug cost.

14       Q.   Were you just looking at page 8 under the

15   heading "Conclusions" on Exhibit Stratton 010?

16       A.   That is correct.

17       Q.   Again, I have some specific questions

18   going through the document.  But just to start at a

19   really basic level, what is a community pharmacy?

20       A.   Community pharmacy is a retail pharmacy

21   that is located in a town.  It distinguishes from a

22   chain pharmacy such as Walgreen's, Long's, Eckerd.

3/24/2006  STRATTON, Ph.D., Timothy P. V.1

1       Q.   Would you explain what you mean by that?

2       A.   In the context of this particular study,

3   using the term "average" to describe the average

4   pharmacy, I guess, their income, wouldn't be as

5   accurate, because some pharmacies were -- would be

6   either very -- doing very well or doing very poorly.

7   And so, statistically, we know that there's

8   outliers.  And they would drag the average then

9   either higher or lower and may not accurately

10  represent the average revenue, for example, of all

11  community pharmacies that participated in the

12  survey. Therefore, I recommended using -- and I

13  didn't recommend. I used the median value, the

14  middle value, which helps to reduce the influence of

15  outliers on either end of that distribution.

16      Q.   Looking at the next paragraph on page 3,

17  seven lines down, do you see the sentence that

18  begins "Based solely on dispensing fees"?

19      A.   Yes, I do.

20      Q.   Did you conclude that, "Based solely on

21  dispensing fees recovered, the average responding

22  pharmacy lost $2.25 on each Montana Medicaid

1     prescription dispensed, and nearly $4.00 on every

2     Other Third Party prescription"?

3          A.   That is correct.

4          Q.   Why did you use the phrase "average" in

5     that sentence?

6          A.   There, I'm trying to describe the

7     representative pharmacy.  So we have this data from

8     80 different pharmacies around the state, and I was

9     trying to construct a profile for the average

10    pharmacy that responded to that particular survey.

11         Q.   Would you turn to page 5 of your draft

12    report?

13         A.   I am there.

14         Q.   Would you explain what the chart in Figure

15    2 represents?

16         A.   Figure 2 is entitled the "Median Cost of

17    Dispensing a Prescription, and Dispensing Fees for

18    Medicaid and Other 3rd Party Payors Reported by

19    Montana Community Pharmacies."  The furthest bar on

20    the left represents the dispensing cost.  These were

21    calculated by the individual pharmacy respondents

22    and included as some of their survey data that they

1     submitted to us.  And this looked at costs,

2     including the cost of vials, labels, computers,

3     staff in the dispensary department.  The second bar,

4     the middle bar, was the median Medicaid fee that was

5     received by these pharmacies as reported by those

6     pharmacies.  And the far right bar, the darkest bar,

7     is the third-party fee on average that was -- or the

8     median, I'm sorry, third-party fee that was received

9     by those pharmacies for filling third-party

10    prescriptions.

11        Q.  Does this chart reflect your conclusion

12    that the median cost of dispensing a prescription

13    was greater than the Medicaid fee for all different

14    types of Montana pharmacies?

15        A.  On average, yes.

16           MR. GAUDET:  Objection.

17    BY MS. O'SULLIVAN:

18        Q.  What was that conclusion based on?

19        A.  Again, that conclusion was based on the

20    Medicaid fees calculated from the state formula that

21    we had access to and comparing that Medicaid fee to

22    the dispensing cost reported by the pharmacies.

1    whole sentence deleted from the final report that is

2    Exhibit Stratton 011?

3         A.   I believe so, but let me check.  I do not

4    find that statement in the summary statement of the

5    final report.

6         Q.   I would like you to look at page 18 of

7    Exhibit Stratton 011, the "Conclusions" section.

8         A.   I am looking at that.

9         Q.   Will you read the first sentence there?

10        A.   "There is no doubt that the proposed

11   reductions in Montana Medicaid payments will impact

12   the bottom line of Montana community pharmacies,

13   particularly independent pharmacies, and

14   particularly independent pharmacies in rural

15   communities."

16        Q.   Is it fair to say that that conclusion is

17   the same as the conclusion in the draft report that

18   you authored?

19        A.   That is correct.

20        Q.   Is it fair to say that both the draft and

21   the final report conclude that dispensing fees paid

22   to pharmacies by Medicaid and Third Party Payors are

3/24/2006  STRATTON, Ph.D., Timothy P. V.1

1    not sufficient to cover pharmacies' actual costs of

2    dispensing drugs?

3        A.   That is correct.

4        Q.   And is it fair to say that the conclusion

5    in the draft and the final are that a reduction in

6    Montana Medicaid reimbursement could lead to closure

7    of pharmacies in Montana?

8            MR. GAUDET:  Objection.

9            THE WITNESS:  That is what we speculated,

10   yes.

11   BY MS. O'SULLIVAN:

12       Q.   What was the -- well, you call it a

13   speculation.

14       A.   What I speculated.

15       Q.   What was the basis for that?

16       A.   Responses that we had from some of the

17   respondents on the surveys, as I recall.

18       Q.   Respondents to the pharmacy survey said

19   that a reduction in Montana Medicaid reimbursement

20   might lead them to close their pharmacies?

21       A.   Let me back up for a moment on that.

22       Q.   Okay.

3/24/2006  STRATTON, Ph.D., Timothy P. V.1

1          A.  I retract that statement.  It does not

2   appear we asked that on this survey.  That was the

3   survey done by my graduate student, as I recall,

4   where a very small number of pharmacies surveyed

5   were asked what they might have to do.  So that was

6   speculation on our part -- on my part.

7          Q.  But it was not speculation in your report

8   to conclude that dispensing fees paid to pharmacies

9   by Medicaid and Third Party Payors were not

10   sufficient to cover pharmacies' actual costs of

11   dispensing drugs?

12          A.  That is correct.

13          Q.  That was your analysis based on the data?

14          A.  That is correct.

15          Q.  Do you still have a copy of the data that

16   formed the basis for your analysis?

17          A.  I believe so.

18          Q.  Do you believe Dr. Polzin also has a copy

19   of that data?

20          A.  I have no way of knowing how long they

21   retain their data.

22          Q.  He had a copy of it at one point?

1    correct?

2         A.    Yes, and hospitals and -- right.

3         Q.    And you had access to information about

4    how many pharmacists were in each county?

5         A.    Correct.

6         Q.    What was the source of information about

7    the number of pharmacists per county in Montana?

8         A.    That source could be the Montana State

9    Board of Pharmacy.  I believe that Montana Pharmacy

10   Association also has a similar data base.

11        Q.    Do you believe that is a true statement,

12   that a community pharmacist practicing in a rural

13   Montana town may be one of only two or three

14   providers of first contact care in the entire

15   county?

16        A.    Yes.

17        Q.    Page 5 of the report under "Estimated

18   Dispensing Costs and Fees."

19        A.    Yes, I see where you are.

20        Q.    Will you read into the record the line "As

21   can be seen."  That's in the bottom paragraph --

22        A.    Yes.

1        Q.    -- third line.  Will you read that,

2    please?

3        A.    "As can be seen from Table 1 and Figure 1,

4    the average dispensing fee currently paid by Montana

5    Medicaid covers less than half the cost of

6    dispensing a Medicaid prescription, while the

7    average dispensing fee paid by other third party

8    payors covers less than one-third of the cost of

9    dispensing."

10       Q.    Do you agree with that statement?

11       A.    I do.

12       Q.    The next sentence goes on to say, "This

13   shortfall is greater for rural community

14   pharmacies."  Do you also agree that that is a true

15   statement?

16       A.    I agree that's a true statement.

17       Q.    Why is that?

18       A.    The cost of doing business for community

19   pharmacies in rural communities tends to be higher,

20   and yet, there is no rural supplement provided in

21   the Medicaid reimbursement for that.

22       Q.    Put aside Exhibit Stratton 011.  What is

# EXHIBIT 18

Tina Wong                                        September 28, 2004

Helena, Montana

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4                         -oOo-

5

6    IN RE:  PHARMACEUTICAL        )

     INDUSTRY AVERAGE             )    MDL No.  1456

7    WHOLESALE PRICE              )

     LITIGATION                   )    No.

8    ------------------------     )    01-CV-12257-PBS

     This Document Relates to     )

9    All Actions                  )

                                  )

10                  Defendant.    )

     _____    )

11

12              September 28, 2004

13          DEPOSITION OF TINA WONG

14

15       Deposition of TINA WONG, taken on behalf of

16   Johnson & Johnson, at 404 Fuller Avenue, Helena,

17   Montana, commencing at 2:00 P.M., on Tuesday, September

18   28, 2004, before LESIA J. MERVIN, CSR No. 4753, RMR,

19   Certified Realtime Reporter.

20

21

22

Tina Wong                                    September 28, 2004
                    Helena, Montana

                                                              64

1    this on MON 3056 of Exhibit 2, under section 1(a), is

2    this the section that governs the reimbursement per

3    pharmaceutical product that you described to me earlier

4    for brand names?

5              A.    Right, at a retail pharmacy.

6              Q.    At a retail pharmacy.  Okay.  We had

7    talked earlier about looking at reimbursement rate of

8    the AWP rate less 15 percent, and the Ridgeway

9    reimbursement rate, which was AWP minus 23 percent.  Is

10   it your understanding that AWP less 15 percent is what

11   the pharmacists -- is all passed through to the

12   pharmacist, or that there's some margin in there that

13   ESI retains as part of its pharmacy benefit management

14   services?

15             MR. FEINBERG:  Counsel, are you asking about

16   the prices compared to the price paid by ESI to the

17   pharmacy, or the price paid by the pharmacy to whoever

18   it's getting the drug from?

19   BY MS. SCHOEN:

20             Q.    The price paid by ESI to the pharmacy.

21   But I can restate the question if it's unclear.

22             A.    No, I think I was following.  You know,

Tina Wong                                    September 28, 2004

Helena, Montana

65

1    in our arrangement -- our reimbursement is strictly AWP

2    less 15 percent to the pharmacy.  And I'm not aware of

3    what, you know, specifically ESI is reimbursing the

4    pharmacy.  It does in our contract talk about it could

5    be less than our -- I don't know what it calls, but

6    less or more than what we are reimbursing, but I don't

7    know any specifics to that at all.

8               Q.   Okay.

9               (Exhibit Wong 002 was marked for

10   identification.)

11   BY MS. SCHOEN:

12              Q.   Miss Wong, I'm showing you what's marked

13   as Exhibit 2.  Is this document familiar to you?

14              A.   You know, I haven't seen this in so

15   long.  I'm sure I saw it at one time, but it's been a

16   long time.

17              Q.   Okay.  Do you recognize it as to what it

18   is?

19              A.   Yes, I do.

20              Q.   Okay.  Can you tell me that?

21              A.   It is the contract with Pharmacy Gold

22   Inc. from 1994.

Tina Wong                                      September 28, 2004

Helena, Montana

83

1    those amounts are not disclosed to you?

2         A.    Right.

3         Q.    Okay.  So it was your understanding, and

4    I think you testified to this earlier, but just to make

5    sure I'm clear, that ESI may be paying pharmacies

6    either more or less than what you're paying to ESI for

7    a particular claim or a particular pharmaceutical

8    product?

9         A.    Yes.

10        Q.    Is that your understanding generally?

11        A.    Right.  We've never -- when we did our

12   new contract with them in 2002, we did talk to them

13   briefly about that, and I guess they assured us that it

14   wasn't -- because we were, I guess, maybe a little

15   uneasy that they were being very aggressive with

16   Montana pharmacies, and so we wanted to know -- or I

17   guess we didn't want to know specifically what the

18   reimbursement was, but I guess we wanted to know from

19   them that the price -- we understood the price may

20   vary, but it does not vary a lot, just because we

21   didn't want the pharmacies to, you know, be hurt by

22   getting a deeper discount off of AWP.

# EXHIBIT 19

<u>MONTANA</u>

Methods & Standards
for Establishing
Payment Rates,
Services 12 a.,
Outpatient Drug Services

Reimbursement for drugs shall not exceed the lowest of:

1. The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or;

2. The Federal Upper Limit (FUL), Maximum Allowable Cost (MAC) of the drug, in the case of multi-source (generic), plus a dispensing fee, or;

3. The provider's usual and customary charge of the drug to the general public.

<u>Exception:</u>  The FUL or MAC limitation shall not apply in a case where a physician certifies in his/her own handwriting the specific brand is medically necessary for a particular recipient.  An example of an acceptable certification is the handwritten notation "Brand Necessary" or "Brand Required."  A check off box on a form or rubber stamp is not acceptable.

The EAC is established by the state agency using the Federal definition of EAC as a guideline: that is, "Estimated Acquisition Cost" means the state agency's best estimate of what price providers generally pay for a particular drug.

The EAC, which includes single source, brand necessary and drugs other than multi-source, is established using the following methodology:

Drugs paid by their Average Wholesale Price (AWP) will be paid at AWP less 10%.  The policy for the reimbursement of Direct Price (DP) drugs (the price charged by manufacturers to retailers) is the current direct price (the direct price in effect on the date of service for the claim.

The MAC for multiple source drugs will not exceed the total of the dispensing fee established by the Department and an amount that is equal to 150 percent of the price established under the methodology set forth in 42 CFR 447.331 and 447.332 for the least costly therapeutic equivalent.

A variable dispensing fee will be established by the state agency, by using the results of a cost survey of pharmacy's operational costs.  A pharmacy may be assigned an enhanced dispensing fee to cover the additional costs associated with packaging "unit dose" prescriptions.

Provider dispensing fee(s) are available on-line in the Medicaid Management Information System (MMIS) provider file and in the Medicaid Prescription Drug Card System (PDCS) provider plan file.

**MT 005760**

TN 95-01
Superseedes TN #88(10)02       Approved _C3/27/95_       Effective _10/01/94_

# EXHIBIT 20

-1624-

BEFORE THE DEPARTMENT OF PUBLIC
HEALTH AND HUMAN SERVICES OF THE
STATE OF MONTANA

| | | |
|---|---|---|
| In the matter of the amendment of ARM 37.86.1101 pertaining to outpatient drugs definitions | ) ) ) ) | NOTICE OF PUBLIC HEARING ON PROPOSED AMENDMENT |

TO:  All Interested Persons

1.    On July 26, 2000, at 10:00 a.m., a public hearing will be held in the auditorium of the Department of Public Health and Human Services Building, 111 N. Sanders, Helena, Montana to consider the proposed amendment of the above-stated rule.

The Department of Public Health and Human Services will make reasonable accommodations for persons with disabilities who wish to participate in this public hearing or need an alternative accessible format of this notice. If you request an accommodation, contact the department no later than 5:00 p.m. on July 17, 2000, to advise us of the nature of the accommodation that you need.    Please contact Dawn Sliva, Office of Legal Affairs, Department of Public Health and Human Services, P.O. Box 4210, Helena, MT 59604-4210; telephone (406)444-5622; FAX (406)444-1970; Email dphhslegal@state.mt.us.

2.    The rule as proposed to be amended provides as follows.    Matter to be added is underlined.    Matter to be deleted is interlined.

<u>37.86.1101 OUTPATIENT DRUGS, DEFINITIONS</u>
~~(1)~~ (4) "Outpatient drugs" means drugs which are obtained outside of a hospital.
    (2)    "Legend drugs" means drugs that federal law prohibits dispensing without a prescription.
    (3)    "Maximum allowable cost (MAC)" means the upper limit the department will pay for multi-source drugs.    In order to establish base prices for calculating the maximum allowable cost, the department hereby adopts and incorporates by reference the methodology for limits of payment set forth in 42 CFR 447.331 and 447.332 (1996).    The maximum allowable cost for multi-source drugs will not exceed the total of the dispensing fee established by the department and an amount that is equal to the price established under the methodology set forth in 42 CFR 447.331 and 447.332 for the least costly therapeutic equivalent that can be purchased by pharmacists in quantities of 100 tablets or capsules or, in the case of liquids, the commonly listed size.    If the drug is not commonly available in quantities of 100, the package size commonly listed will be the accepted quantity.    A copy of the above-cited regulations may be obtained from the Department of Public Health and Human Services, Health Policy and Services Division, 1400 Broadway, P.O. Box 202951, Helena, ~~Montana~~ MT 59620-2951.

12-6/29/00

MAR Notice No. 37-161

MT 00001

-1625-

~~(4)~~ (1)   "Estimated acquisition cost (EAC)" means the cost of drugs for which no MAC price has been determined.  The EAC is the department's best estimate of what price providers are generally paying in the state for a drug in the package size providers buy most frequently.  The EAC for a drug is ~~the direct price (DP) charged by manufacturers to retailers.  If there is no available DP for a drug or the department determines that the DP is not available to providers in the state, the EAC is the average wholesale price (AWP) less 10%.~~ :

(a)   the direct price (DP) charged by manufacturers to retailers;

(b)   if there is no available DP for a drug or the department determines that the DP is not available to providers in the state, the EAC is the average wholesale price (AWP) less 10%; or

(c)   the department may set an allowable acquisition cost for specified drugs or drug categories when the department determines that acquisition cost is lower than (1)(a) or (b) based on data provided by the drug pricing file contractor.

AUTH:  Sec. 53-2-201 and 53-6-113, MCA
IMP:   Sec. 53-2-201, 53-6-101, 53-6-111 and 53-6-113, MCA

3.   Medicaid provides health care to low-income Montanans.  The program is jointly funded by the federal and state government using public monies.  One benefit provided by Medicaid is prescription drugs.  In order to administer the program efficiently and contain costs, if possible, the rules regarding drug acquisition costs need clarification in order to avoid overpayment of drug claims.

The proposed amendments change the definition of "estimated acquisition cost (EAC)" to allow the department to use as the EAC a drug price that reflects the drug's acquisition cost more accurately than the direct price (DP) or average wholesale price (AWP) less 10%.

An additional definition of EAC has been added to ARM 37.86.1101 to allow the department to use as the EAC an allowable acquisition cost (AAC) which is different from the DP and the AWP less 10%.  This change allows the department to set the AAC when there is evidence that the DP and discounted AWP do not accurately reflect the provider's acquisition cost.

The concern regarding accurate pricing information arose as the result of a whistle-blower fraud investigation conducted by the Office of the Inspector General and several State Medicaid Fraud Control Units.  The investigation revealed "a pattern of misrepresentations by some drug manufacturers of the average wholesale prices and wholesale acquisition costs of certain of their products".  The misrepresented prices result in inflated claims being paid by Medicaid.

MT 00002

To remedy the inaccurate pricing, representatives of the State
Medicaid Fraud Control Units worked with First DataBank, Inc.
(FDB), to develop procedures to improve the accuracy and
validity of the pricing information provided to states.
Specifically, FDB agreed to base average wholesale prices on
market prices, rather that prices identified by manufacturers.
Additionally, FDB will not report a price for a product unless
its manufacturer has certified the completeness and accuracy of
the pricing information submitted.   Comparisons of FDB's new
prices and the prior average wholesale prices demonstrated that
significant overcharges to Medicaid have occurred.  The proposed
rule amendments are necessary to prevent overbilling on drugs in
the future, but still reimburse providers fairly, including
their cost of acquisition.

The Department considered maintaining the current reimbursement
methodology.  However, the proposed rule amendments implement a
pricing system which better reflects the provider's costs while
still ensuring a fair price to the Medicaid program.  Thus, the
Department chose to implement these changes.

Based on our review of this issue, discussions with providers,
and the experience of other states, the Department has
determined that it is necessary to revise the current drug
reimbursement methodology to include an additional methodology
that allows use of the <u>new prices</u> determined by FDB without
further discounting.  To use the current pricing methodology of
AWP less 10% could result in reimbursement less than the
provider's acquisition cost.  Because the intent of the revised
rule is to provide more accurate reimbursement to providers for
drugs, the rules will be applied retroactively to July 1, 2000.

The Department estimates that the proposed amendments will
result in a 24% decrease in expenditures for drugs.  Based on
the fourth quarter of 1999, this would equate to a savings of
approximately $295,000 in state and federal funds per fiscal
year.   There are approximately 300 pharmaceutical providers
which may be affected by this proposed rule amendment.

        4.   Interested persons may submit their data, views or
arguments either orally or in writing at the hearing.  Written
data, views or arguments may also be submitted to Kathy Munson,
Office of Legal Affairs, Department of Public Health and Human
Services, P.O. Box 202951, Helena, MT 59620-2951, no later than
5:00 p.m. on August 1, 2000.  Data, views or arguments may also
be submitted by facsimile (406) 444-1970 or by electronic mail
via the Internet to dphhslegal@state.mt.us. The Department also
maintains lists of persons interested in receiving notice of
administrative rule changes.  These lists are compiled according
to subjects or programs of interest.   For placement on the
mailing list, please write the person at the address above.

**MT 00003**

-1627-

    5.   The Office of Legal Affairs, Department of Public Health and Human Services has been designated to preside over and conduct the hearing.


Dawn Sliva
Rule Reviewer

*Laurie Thomas*
Director, Public Health and Human Services

Certified to the Secretary of State June 19, 2000.

MT 00004