# EXHIBIT 28 Part II

## ATTACHMENT A1

## DIVERSIFIED PERFORMANCE GUARANTEES

1. <u>General Agreement Regarding Guarantees</u>. Diversified agrees to the following performance guarantees and the associated penalties. Client shall cooperate with Diversified's efforts to meet these performance guarantees. If Diversified is delayed in any way from performing any of the following guarantees primarily by Client's delay in completing its tasks as described below, elsewhere in the Agreement or in task schedules agreed upon with Diversified personnel, or as a result of some other action by Client, Diversified's obligation to perform such guarantee shall be delayed by a corresponding period of time. If Diversified is prohibited or prevented in any way from performing any of the following guarantees primarily by Client's failure to complete its tasks as described below or as a result of some other action by Client, Diversified shall not be in breach of such guarantee or be required to pay any penalty associated with such guarantee. In addition, if Diversified is prohibited or prevented in any way from performing any of the following guarantees as a result, directly or indirectly, of any changes in federal, state or local law, regulation, or agency action, or as stated in the Section of the Agreement entitled "Impossibility of Performance", for any reason beyond Diversified's reasonable control, Diversified shall not be in breach of such guarantee or be required to pay any penalty associated with such guarantee.

   Contract year as used in this Attachment shall mean October 1 through September 30, with the three last months under the October 1, 1997 Agreement considered herein.

2. <u>Data System Availability</u>. Diversified guarantees that its computer system for adjudicating claims submitted by Participating Pharmacies via on-line electronic means shall be up and running 98% or more of the time, excluding regularly scheduled maintenance. Diversified shall provide Client a report on an annual basis regarding the up-time of Diversified's computer system for adjudicating on-line Participating Pharmacy claims. In the event Diversified fails to meet this percentage guarantee for any contract year, Diversified shall pay Client $15,000 for each full percentage point below 98%, subject to the annual aggregate limit.

3. <u>Claims Processing Turnaround Time</u>. Diversified guarantees that 90% of prescription claims submitted on-line by Participating Pharmacies to Diversified will be adjudicated in two seconds or less. For purposes of this guarantee, the term "adjudicate" means to determine coverage and the specific reimbursement level applicable to the claim. Diversified shall provide Client a report on an annual basis regarding claims processing turnaround time, based on data for all of Diversified's Clients (i.e. not limited to Client's data). In the event Diversified fails to meet this guarantee for any contract year, Diversified will pay Client $15,000 for each full percentage point below 90% up to an annual maximum of $75,000, subject to the annual aggregate limit.

4. <u>Customer Service Survey</u>. Diversified shall conduct a random survey of Participant Satisfaction once each contract year. These surveys will include questions regarding Prescription Drug Services provided by Participating Pharmacies, non-Participating Pharmacies and related Diversified Services. Diversified guarantees 90% of the responses will be 3, 4, or 5, based upon a 5-point satisfaction scale as follows:

   a.   5 = very satisfied

   b.   4 = satisfied

   c.   3 = neutral

**MT 076226**

d.  2 = dissatisfied

e.  1 = very dissatisfied

For each survey, Diversified shall notify Client in writing within 30 days of Diversified's completion of the survey and its results and Client shall be deemed to have agreed with those results unless Client notifies Diversified otherwise in writing within 60 days of Client's receipt of Diversified's notice. In the event Diversfied fails to meet this guarantee for any survey, Diversified shall pay Client $20,000, subject to the annual aggregate limit.

5. Annual Aggregate Limit. Notwithstanding the foregoing sections of this Attachment, the parties agree that the annual aggregate limit of performance penalties payable by Diversified pursuant to this Attachment A1 for any contract year shall not exceed 100% of the service fees payable to Diversified by Client, exclusive of any rebate retention by Diversified, for such contract year under the Section of Exhibit C entitled "Service Fee".

6. Payment of Penalties. Any penalties due by Diversified under this Attachment shall be due no later than 60 days after the contract year end; provided however, that if Client disagrees with the amount of such penalty, Client shall so notify Diversified within 30 days and the parties shall meet, in person or by telephone, to mutually agree upon the final amount owed. Client shall be deemed to be in agreement with the amount of any such penalties unless Diversified receives notice from Client within the 30 days. The final amount agreed upon by the parties shall be due within 30 days of the parties' agreement, but not before the end of the 60 day period described above. Payments not received by the applicable due date shall accrue interest at an annual rate equal to 2% above the prime rate as reported in The Wall Street Journal, for each day following the due date up to and including the date payment is received. Payments by Diversified to Client are contingent on execution of this Agreement.

s:\legal\client\bcbsmont\k120299.doc

**MT 076227**

2

EXHIBIT B

CLIENT OBLIGATIONS

1. <u>Provision of Information</u>. In order for ESI parties to be able to perform the services called for by this Agreement, Client shall, subject to applicable disclosure and confidentiality laws, provide to such parties at Client's expense that information which is reasonably necessary for such parties to perform services under this Agreement, including but not limited to information regarding the Plans, Participants, Customers, Participating Pharmacies, and Client's participating physicians and other providers, if any. Client will be solely responsible for the accuracy and timeliness of all information. Client shall provide all necessary information in Diversified's standard format and in accordance with Diversified's standard specifications unless, subject to an additional fee, the parties mutually agree on a different format. All information furnished by Client to Diversified must be provided via electronic media (e.g. electronic data interface, magnetic tape, cartridge) from a single source or two eligibility feeds in the format specified by Diversified. Hard-copy submission of information shall be submitted by Client only to support emergency situations and shall include the use of Diversified's standard enrollment forms. In the event of emergency situations Diversified shall add new Plans to its eligibility system within 24 hours. ESI parties shall be entitled to rely entirely upon the eligibility data provided by Client. Client shall indemnify and hold harmless ESI parties from any claims, damages, liabilities or expenses (including attorneys' fees) arising out of the provision by Client of inaccurate, incomplete or untimely information. Client shall be responsible for any costs reasonably incurred by ESI parties (including programming costs) resulting from the submission by Client of files or data which do not conform to Diversified's specifications or which are not recognizable.

2. <u>Participant Census</u>. For purposes of this Agreement, the identity of or number of Participants at any given time shall be based on information taken from Diversified's enrollment report. The information in the Diversified enrollment report is based on enrollment information provided by Client to Diversified. Client agrees to provide Diversified with regular and timely enrollment updates and the ESI parties and the Participating Pharmacies are entitled to rely on the accuracy and completeness of enrollment information provided to Diversified by Client. It is Client's responsibility to reconcile the Diversified enrollment report to Client's internal enrollment reports and to notify Diversified of any discrepancies in writing on a timely basis. Client and Diversified shall cooperate in correcting any enrollment report discrepancies or resolving enrollment information transmission problems. Diversified's enrollment report shall be used by Diversified for purposes of claims payment and any errors in claims payment which result from inaccuracies in Diversified's enrollment report shall be the sole responsibility of Client. Client acknowledges and agrees that there will be no retroactive adjustments of claims payments to (i) Participating Pharmacies or (ii) ESI parties based upon retroactive terminations of eligibility.

3. <u>Financial Responsibility of Client</u>. Client shall be solely financially responsible for providing funds for payment of claims for Prescription Drug Services, including any taxes imposed in connection with the provision of such Prescription Drug Services, submitted by Participating Pharmacies or Participants. ESI parties shall not be financially responsible in any way for payment of any claims for Prescription Drug Services, including taxes of any kind. Client shall indemnify, defend and hold harmless ESI parties from any claims, liabilities or expenses asserted against any ESI party by any pharmacy or Participant for payment for Prescription Drug Services, except for any claim for which an ESI party has received full reimbursement from Client. ESI parties shall indemnify, defend, and hold harmless Client from any claims by Participating Pharmacies or Participants for reimbursement for Prescription Drug Services to the extent Client has transferred funds to an ESI party for payment of such claims.

4. <u>Drug Price File</u>. Client agrees to the use of a drug price file selected by and in operation at Diversified.

5. <u>Plan Provisions</u>. Client or the applicable Customer shall be solely responsible for the preparation of Plan documents and for ensuring that such documents are accurate and support the benefit designs which Client directs Diversified to administer in connection with this Agreement. Client acknowledges and agrees that it or the applicable Customer is responsible for disclosing to Participants any and all information relating to the prescription drug program which is material to Participants, including any information relating to the calculation of copayments, coinsurance, and/or deductibles, any other program coverage and eligibility requirements in connection with the prescription drug program, and any other information concerning

MT 076228

rebates or provider discounts. Client agrees that each Plan shall generally provide a higher level of coverage for Prescription Drug Services received from Participating Pharmacies than those received from non-Participating Pharmacies, and shall generally not require Participants to submit hard-copy claims to receive coverage under the Plan for Prescription Drug Services provided by Participating Pharmacies.

6. Exclusivity. Throughout the term of this Agreement, Diversified shall be the exclusive provider of pharmaceutical benefit management and/or administrative services to and on behalf of Client with respect to those Customers which require pharmaceutical benefit management services. In the event Client requests services from Diversified or offers a product or products that differ from those contemplated by this Agreement, the parties agree that the terms and conditions, including fees, for such differing products and/or Diversified services shall be negotiated by the parties.

7. Additional Client Obligations. Client obligations are further described in the body of this Agreement and its other Attachments and Exhibits.

s:\legal\client\bcbsmont\k120299.doc

**MT 076229**

2

EXHIBIT C

FINANCIAL ARRANGEMENTS

1. <u>Service Fee</u>.

    a. <u>Fee for Participating Pharmacy Claims</u>. Client shall pay to Diversified a fee per prescription claimed for each claim submitted by a Participating Pharmacy for processing by Diversified in accordance with the following schedule:

    | Prescriptions Per Month | Fee Per Prescription | Percentage of Rebates Retained* |
    |---|---|---|
    | 75,000 or less | $ 0.23 | 12% |
    | 75,000 - 100,000 | $ 0.22 | 10% |
    | Over 100,000 | $ 0.20 | 10% |

    The parties agree that in the event Client terminates the Agreement pursuant to Section 6.3.d., Diversified shall be entitled to retain 100% of rebates earned by and otherwise payable to Client during the final six months of the Agreement; provided, however, in the event of termination prior to June 30, 2000, rebates under the October 1, 1997 Agreement shall also be considered to the extent applicable.

    \* Diversified shall be entitled to retain, as a component of the service fee, a percentage of the rebates otherwise due Client under the Rebate Program.

    b. <u>Fee for Participant Hard-Copy Claims</u>. Client shall pay to Diversified a fee of $1.25 per prescription claimed for each hard-copy claim submitted by a Participant for reimbursement and processed by Diversified, plus the cost of mailing the reimbursement to the Participant. For any prescriptions submitted by a Participant more than once, it is the understanding of the parties that this fee will be paid by Client each time the prescription is submitted for processing by Diversified.

    c. <u>Fee for On-Line Eligibility</u>. Client may elect by 90 days advance written notice to Diversified to utilize Diversified's on-line eligibility product. In the event Client elects to utilize such product, Client shall pay a per prescription fee of $0.01 in addition to the other fees provided for in this Agreement.

    d. <u>Changes in Assumptions</u>. The parties agree that the administrative service fees paid to Diversified under this Agreement are based on the following assumptions: (i) the number of Participants covered under this Agreement will not decrease at a rate greater than 25% at any time over the term of the Agreement; (ii) Client will satisfy the requirements for participation in the Rebate Program with respect to all Participants; (iii) all Plans covering Participants of a health maintenance organization or indemnity insurance program on an insured basis will implement a minimum $5 differential copayment for formulary versus non-formulary drugs and adopt a Formulary as defined in Exhibit A, Section 5; (iv) all Plans covering Participants of a health maintenance organization or indemnity insurance program on a self-funded basis will be financially incented by Client to implement a minimum $5 differential copayment for formulary versus non-formulary drugs and adopt a Formulary as defined in Exhibit A, Section 5; and, (v) no change in circumstances will occur which are beyond Diversified's control and likely to result in Client's rebate earnings being less than the guaranteed rate. In the event of a change in any of these assumptions or a change in federal, state or local laws or regulations or the application of such laws or regulations during the term of this Agreement which has an impact on Diversified's cost in providing services, Diversified may, by notice to Client, request an appropriate change in its fees. Furthermore, in the event Client does not or is not able to follow the advice of Diversified's clinical pharmacists with respect to Formulary recommendations, but only to the extent formulary recommendations negatively affect Client's rebate earnings, Diversified may, by

**MT 076230**

notice to Client, request an appropriate change in its fees. If the parties cannot agree on an appropriate change to the fees within 30 days after Diversified sends such notice, then the ESI parties may terminate this Agreement by providing an additional 60 days prior written notice to Client.

2. Associated Costs Paid by Client. In addition to other costs or fees specifically provided for elsewhere in this Agreement, Client shall be responsible for the following costs:

   a. any costs associated with mailing payments to Participants;

   b. any costs associated with printing, producing, assembling and mailing to Participants newsletters, identification cards, explanations of payment, claim forms, or other communications to Participants which have received prior approval of Client;

   c. any costs associated with ad hoc reporting; and

   d. at the time Client notifies Diversified in writing of its request for services as described in the subsection entitled "Prior Authorization and Medical Necessity Review Services" of Exhibit A, Client shall have the option of having clinical prior authorization provided for an additional service fee of either (i) $0.04 for each claim submitted by a Participating Pharmacy and administrative prior authorization provided for an additional service fee of $0.02 for each claim submitted by a Participating Pharmacy or (ii) $15.00 per call requesting clinical prior authorization and $7.50 per call requesting an administrative prior authorization override by Diversified. Client shall indicate its preferred pricing option when it notifies Diversified of its desire to receive such services.

3. Implementation Credit. Diversified paid Client $2.00 for each Participant implemented prior to October 1, 1998 under the agreement superseded by this Agreement. Only rebate-eligible Plans and Participants of such Plans were considered with respect to the implementation credit. These payments were to be made quarterly during the period prior to October 1, 1998 based on net increases in the number of Participants over the baseline for Client during such quarter. The baseline number of Participants was adjusted each quarter for purposes of this provision to the highest total number of Participants covered under the superseded agreement at any point in time. Client had the option of being paid the implementation credit or receiving a credit against fees and payments otherwise owed to Diversified under the superseded Agreement. If the implementation credit for a particular quarter exceeded the fees and charges payable by Client for the quarter, the excess credit was to be carried forward and applied to fee invoices for subsequent quarters until it was eliminated.

4. Manual Enrollments. Each month during the term of this Agreement, Diversified shall process hard-copy enrollment forms, as described in the Section of Exhibit B entitled "Provision of Information", at no charge to Client, provided the number of file updates processed through hard-copy enrollment forms does not exceed the thresholds set forth below:

   a. If the volume of file updates processed through hard-copy enrollment forms for the month on an urgent basis (defined as "requested by Client to be processed within 1 hour of receipt") exceeds 0.05% of the total number of Participants as of the first day of such month, Client will be charged at the rate of $5.00 per urgent file update above the 0.05% threshold processed by Diversified through hard-copy enrollment forms in such month.

   b. If the volume of file updates processed through hard-copy enrollment forms for the month on a non-urgent basis (defined as "all hard-copy enrollment forms except for those requested to be processed on an urgent basis") exceeds 0.15% of the total number of Participants as of the first day of such month, Client will be charged at the rate of $1.00 per non-urgent file update above the 0.15% threshold processed by Diversified through hard-copy enrollment forms in such month.

5. Payments for Prescription Drug Services Dispensed by Network Pharmacies. Client shall pay Diversified or ESI the amounts set forth below, unless expressly stated otherwise, with respect to each approved claim

**MT 076231**

for Prescription Drug Services dispensed by Participating Pharmacies in the PERxCare® Network and submitted by such Participating Pharmacies:

<u>Ingredient Cost and Dispensing Fee</u>

The lower of:

(1) An ingredient cost of AWP less 15% (or, if lower, the MRA), plus a dispensing fee of (i) $2.00 per brand-name drug prescription or (ii) $2.25 per generic drug prescription, plus applicable sales or excise tax or other governmental surcharge, if any; or

(2) The Usual and Customary Retail Price of the Participating Pharmacy dispensing the prescription drugs, plus applicable sales or excise tax or other governmental surcharge, if any.

"Usual and Customary Retail Price" shall mean the retail price charged by the Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to Diversified or ESI by the Participating Pharmacy.

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as determined by Diversified from the most current information provided to Diversified by drug pricing services such as First Databank, or other source generally recognized in the retail prescription drug industry selected by Diversified.

"Maximum Reimbursement Amount" or "MRA" means the charge to Client for listed generic drugs established by Diversified using a variety of factors, including but not limited to the First Databank drug pricing service's published baseline price and the "maximum allowable cost" determined by the U.S. Health Care Financing Administration. For purposes of the Agreement, MRA is equivalent to an average of 55% to 60% discount off of generic drugs AWP, depending upon Client's actual generic drug mix. Diversified in its sole discretion, periodically updates the MRA to reflect changes in generic drug prices.

Payment by Client shall be less applicable copayments, coinsurance and/or deductibles.

If Diversified or ESI pays a particular Participating Pharmacy a higher rate because Client has requested such pharmacy be included in the network, the rate charged to Client shall be the net ingredient cost plus dispensing fee paid by Diversified or ESI to such pharmacy, plus applicable sale or excise tax or other governmental surcharge, or any preferred product or generic incentive fee, if any.

If there is a change in Federal or applicable state law or regulation (including the interpretation of existing laws or regulations by a court or administrative agency), and in consequence thereof Diversified or ESI increases payments for Prescription Drug Services to Participating Pharmacies in the applicable jurisdiction under ESI's provider agreements, the fees set forth above will be increased by the same amount.

Client shall pay Diversified the amounts set forth below, unless expressly stated otherwise, for each Participant-submitted claim for Prescription Drug Services approved for payment (if Diversified processes claims payment):

<u>Ingredient Cost and Dispensing Fee</u>: The fees that would apply if the claim had been submitted by a Participating Pharmacy, unless Client has specified in the Drug Benefit Worksheet that payment of such Participant-submitted claims is to be determined based on the charge actually made by the pharmacy to the Participant.

6. <u>Payments for Prescription Drug Services Dispensed by Mail Service Pharmacy</u>. The payment terms for Prescription Drug Services dispensed by ValueRx mail service pharmacy or other mail service pharmacy are described in the addendum to this Agreement addressing mail service.

7. <u>Blended rate guarantee</u>. Diversified guarantees an average rate of AWP less 27.5%, net of accrued rebates. Such guarantee considers retail and mail service pharmacy claims in aggregate, but the parties acknowledge and agree that such average rate is subject to adjustment if ValueRx mail service pharmacy is not the exclusive mail service pharmacy utilized by Client. The following shall not be considered in such guarantee: (i) any applicable sales or excise tax or other governmental surcharge; (ii) any pharmacies contracted at

**MT 076232**

Client's request for which Diversified must pay a higher rate; and (iii) any Participant-submitted claims. This rate guarantee shall only apply for periods during which the following conditions are met and with respect to Participants covered under Plans that meet such conditions (reconciled at benefit plan level except with respect to condition (iv)): (i) no maintenance list shall apply with respect to Prescription Drug Services dispensed at retail pharmacies; (ii) Client agrees that Diversified or ValueRx may promote the use of the ValueRx mail service pharmacy to Participants in a manner approved by and coordinated through Client and in accordance with applicable confidentiality and disclosure laws; (iii) Client implements the Formulary currently referred to as Diversified's National Prime Formulary and a $15.00 minimum copayment differential between formulary and non-formulary Prescription Drug Services; and (iv) Client implements a mandatory MRA policy (this provision (iv) will be considered satisfied if at least 75% of Participants are in Plans which have implemented such a policy). A "mandatory maximum reimbursement amount (MRA)" program is one under which an ancillary charge is payable by the Participant in addition to the applicable copayment, for brand name drugs for which a generic equivalent exists, whether the physician or the Participant requests the brand name drug. If there is a change in Federal or applicable state law or regulation (including the interpretation of existing laws or regulations by a court or administrative agency), and in consequence thereof Diversified increases payments for Prescription Drug Services to Participating Pharmacies in the applicable jurisdiction under ESI's provider agreements, the guarantee set forth in this section will be adjusted accordingly.

In the event this guarantee is not met, Diversified will pay Client any difference between the targeted AWP rate in the preceding paragraph and the actual calculated ingredient cost plus the dispensing fee less accrued rebates, up to a maximum payment of $100,000 by Diversified, adjusted proportionately for assumption (iv) above, and subject to the other provisions described above in this section.

8.  Mandatory MRA Performance Guarantee. Diversified guarantees that Client's generic substitution rate (i.e. the percentage of generic drugs dispensed by Participating Pharmacies and ValueRx mail service pharmacy to the total Prescription Drug Services provided by such pharmacies) shall improve by 10% or more (i.e., the generic substitution rate for the twelve month period ending November 30, 1999 times 1.10). The following are excluded from consideration under this section: (i) benefit plans with a deductible of more than $100 per annum; and (ii) 100% Participant payment plans. The parties acknowledge that Diversified's successful completion of the guarantee under this section is contingent upon (i) Client implementing a mandatory MRA program (an ancillary charge is payable by the Participant in addition to the applicable copayment, for brand name drugs for which a generic equivalent exists, whether the physician or the Participant requests the brand name drug) with respect to at least 75% of Client's Participants, (ii) Client implementing the Formulary currently referred to as Diversified's National Prime Formulary, with respect to all its Participants; and (iii) any mail service pharmacy other than ValueRx utilized by Client having a generic substitution rate at least equivalent to ValueRx. In the event Diversified does not meet this guarantee, Diversified shall pay Client a penalty of $3.00 per prescription for each prescription falling below the 10% guarantee, up to a maximum payment by Diversified of $100,000, adjusted proportionately for the Participant requirements herein.

**MT 076233**

9. **Fee Adjustment Based on Trend.** References in this Section 9 to contract years shall reference contract years applicable under the October 1, 1997 Agreement and this Agreement, with this Agreement taking effect three months into the third contract year.

   a. **General.** Client has retained Diversified in part due to its expertise in managing Client's cost in providing prescription drug coverage to Participants. Diversified will, accordingly, increase or decrease Client's administrative fees found in Section 1 of Exhibit C of this Agreement for contract years three, four and five based upon Client's actual per Participant per month ("PPPM") claims experience for outpatient prescription drugs for contract years two, three and four as described below. The actual PPPM claims experience for a particular year (as adjusted for demographic changes which occurred during the year) shall be the claim target for the succeeding year for purposes of this section. Contract year is defined as October 1 through September 30 for purposes of this section.

   b. **Calculation of Actual Claims.** At the end of each of the first four contract years during the term of this Agreement, Diversified shall perform a calculation of Client's actual claims experience. Actual claims for any contract year will be based on claims submitted to Diversified for processing either on-line or in hard-copy form for Prescription Drug Services dispensed to Participants during the contract year. Hard-copy claims from Participants relating to Prescription Drug services dispensed during a particular contract year must be received by Diversified within 30 days following the end of the contract year to be included in the actual claims calculation for the preceding contract year; any hard-copy claims received after 30 days following the end of the contract year will be included in the actual claims calculation for the contract year in which they are received.

   c. **Determination of Change in Administrative Fees.** At the end of the second, third and fourth contract years, the actual PPPM claims experience for that contract year (total outpatient prescription drug cost divided by total number of member months) will be compared against the actual claims experience for the previous contract year. If the increase in the actual PPPM claims experience for a particular year compared to the claim target is less than 9%, Client's administrative fees for the next contract year will increase as indicated below. If the increase in the actual claims experience for that year compared to the claim target is greater than 11%, Client's administrative fees will decrease as indicated below. If the increase in the actual claims experience compared to the claim target is between 9 and 11%, Client's administrative fees will remain unchanged.

   | Actual Trend | Administrative Fee Impact |
   | --- | --- |
   | < 4.9% | $0.12 per claim increase |
   | 5.0% - 6.9% | 0.08 per claim increase |
   | 7.0% - 8.9% | 0.04 per claim increase |
   | 9.0% - 11.0% | No Change |
   | 11.1% - 13.0% | $0.02 per claim decrease |
   | 13.1% - 15.0% | 0.05 per claim decrease |
   | >15.0% | 0.08 per claim decrease |

   d. **Change in Administrative Fees.** For each contract year, Diversified shall make the calculations set forth in this Section, notify Client of the results of such calculations, and provide Client with a final report summarizing the data behind such calculations no later than 60 days following the end of the contract year. Any change to Client's administrative fee for each year shall be made to the fee schedule set forth in Exhibit C, Section 1 (the change in fees is not cumulative from year to year). The change in Client's administrative fees for years three, four and five shall be retroactive to the first day of the respective contract year.

**MT 076234**

5

e. <u>Assumptions</u>. The parties agree that this Fee Adjustment Based on Trend is subject to the following assumptions and methodology: (i) the actual trend will be calculated before the application of benefits (i.e. before applicable copays and/or deductibles and rebates are applied); (ii) a demographic comparison will be performed at least quarterly with mutually acceptable adjustments made to the claim target based on changes in demographics; (iii) the claim target will be adjusted if any disease management programs, which may be reasonably expected to increase outpatient pharmacy utilization, are implemented; (iv) reimbursements to Participating Pharmacies will not increase during the term of the contract; (v) Network utilization remains constant; and (vi) new Prescription Drug Services available after the baseline claim target has been established which represent new therapies not previously available and which do not replace existing therapies or are genetically engineered or biologically derived will be excluded from the calculations set forth in this section.

10. <u>Invoicing</u>. Both (i) Diversified or ESI claims payment reports and (ii) system-generated reports that provide data on non-paid prescription submissions shall be used by Diversified for service fee billing purposes under section 1 of this Exhibit and, except as expressly provided in this subsection, service fee billings shall not be adjusted because of any inaccuracies in such Diversified reports, unless such inaccuracies result from an error on the part of Diversified. Diversified shall provide an invoice bi-weekly for any claims payments due from Client with respect to claims submitted by Participating Pharmacies and the ValueRx mail service pharmacy, and, at Diversified's discretion, any administrative service fees payable by Client under the Agreement. Client shall be invoiced bi-weekly for paper claims processing fees, if any, described in the Agreement, and claims payments from Client with respect to Participant-submitted claims. Client shall additionally receive invoices on a monthly or more frequent basis for administrative fees Diversified elects to not include on the claims payment invoice, and any other amounts due ESI parties under the terms of the Agreement. If the parties mutually agree that the invoice is not complete and accurate, the time frame for payment may be extended, with respect to that invoice for the amount in dispute.

11. <u>Payment of Fees</u>. Client shall pay ESI parties by wire or ACH transfer, or on a pre-authorized debit basis, within two (2) business days from the date of Client's receipt of any invoice. Client shall be responsible for all costs of collection, and agrees to reimburse ESI parties for such costs and expenses, including reasonable attorneys' fees. Any amounts not paid by the due date thereof shall bear interest at the rate of eighteen percent (18%) per annum (1.5% per month) or, if lower, the highest interest rate permitted by law. If Client disputes any item on any invoice, Client shall state the amount in dispute in writing within thirty (30) days of the date of the invoice. Client shall pay the full amount owed and shall notify ESI parties of the disputed amount. If Client withholds payment due, ESI parties have the right to offset these fees against any amounts that may be due to Client by ESI parties. If and/or when any adjustments become due to Client, ESI parties shall amend the invoicing to Client so that the adjustment is shown as a reduction of fees payable to ESI parties.

12. <u>Disclosure of Certain Financial Matters</u>. Diversified provides certain administrative services and computer software to drug manufacturers participating in the Rebate Program. Such manufacturers pay Diversified a fee for such services and software. Diversified also enters into separate arrangements with manufacturers for the sale of anonymized and aggregated drug utilization data and related software, as well as for formulary compliance programs and other educational programs. These arrangements are separate from rebate agreements and fees for these products are negotiated separately. In addition, ESI contracts with Participating Pharmacies at various rates that are renegotiated from time to time, and Diversified or ESI charges clients at a rate that may be greater or less than the actual rate paid to Participating Pharmacies. In negotiating such fees and rates, ESI or Diversified acts on its own behalf, and not for the benefit of or as agent for Client, Participants or any Plan (including any employee welfare benefit plan) in which a Participant may participate. Diversified or ESI will retain all such non-rebate payments from pharmaceutical manufacturers and all provider discounts, if any, in addition to any administrative and other fees paid by Client. Client acknowledges for itself, its Participants and any Plan (including any employee welfare benefit plan) in which a Participant may participate that, except as may be expressly provided

**MT 076235**

herein, neither it, any Participants, nor any Plan in which a Participant may participate, has a right to receive, or possesses any beneficial interest in, any such discounts or payments.

s:\legal\client\bcbsmont\k120299.doc

MT 076236

12/02/99

# MAIL SERVICE ADDENDUM TO
# PHARMACEUTICAL SERVICE AGREEMENT

THIS ADDENDUM shall supplement the provisions of (i) the Pharmaceutical Service Agreement by and between Blue Cross and Blue Shield of Montana ("Client") and Diversified Pharmaceutical Services, Inc. ("Diversified") effective October 1, 1997, as of December 1, 1999, and (ii) the Pharmaceutical Service Agreement between Client and Diversified, Express Scripts, Inc. ("ESI"), and ValueRx Pharmacy Program, Inc. ("ValueRx"), effective January 1, 2000, as of January 1, 2000. Diversified, ESI and ValueRx may be singly referred to as "ESI party" or collectively referred to as "ESI parties" herein. References to the "Agreement" herein shall mean both of the above referenced agreements. The specific agreements may be referred to respectively as the "October 1, 1997 Agreement" and the "January 1, 2000 Agreement". The January 1, 2000 Agreement supersedes the October 1, 1997 Agreement, except for the continuation of this Addendum. This Addendum is for the purpose of addressing non-exclusive mail service provisions.

1. **ValueRx**. ValueRx is added as a party to the October 1, 1997 Agreement effective December 1, 1999. ValueRx shall provide mail service pharmacy services to Client during the duration of the Agreement; provided, however, that Section 7.1 of the January 1, 2000 Agreement addressing a transition to services by ESI Mail Pharmacy Services, Inc. applies to this Addendum, as addressed therein. ValueRx mail service shall also include internet pharmacy services. Internet pharmacy means PlanetRx or any successor internet pharmacy (i.e. pharmacy that conducts business solely on the world wide web) included by written agreement in ESI's network which agrees to comply with applicable state and federal laws. The internet pharmacy shall be considered mail service when filling a prescription in excess of a 34 day supply.

2. **Registration and Compliance**. ValueRx has registered with the Board of Pharmacy of the State of Montana, has registered and is active and in good standing as a foreign corporation with the Secretary of State for the State of Montana, and is in compliance with all applicable state and federal mail order pharmacy statutes and rules.

3. **Prescription Drug Substitution**. ValueRx shall not substitute a prescription drug unless the substitution is in compliance with the laws of the State of Montana and the rules and regulations of the Board of Pharmacy of the State of Montana and shall not dispense a substitute drug product to a resident of the State of Montana without first providing notification to the resident of the substitution by either telephone or in writing.

4. **Toll-free Telephone Service**. ValueRx has and shall maintain a toll free telephone service, available at least six days a week and for 40 hours a week, to facilitate communication between patients in the State of Montana and a pharmacist who has access to the patient's records at the location of the out of state pharmacy. ValueRx shall affix the toll-free number to all drug product containers dispensed to persons in the state of Montana.

5. **Participant Hold Harmless**. ValueRx agrees that it may not for any reason, including but not limited to nonpayment by Client, insolvency of Client, or breach of the Agreement or this Addendum, bill, charge, collect a deposit, seek compensation, remuneration, or reimbursement or have any recourse from or against a Participant or a person other than Client acting on behalf of a Participant for services provided pursuant to the Agreement or this Addendum. This provision does not prohibit ValueRx from collecting allowable coinsurance, copayment, or deductibles, or fees for uncovered services provided on a fee-for-service basis to a Participant. Neither does this provision prohibit ValueRx and a Participant from agreeing to continue services solely at the expense of the Participant if ValueRx has clearly informed the Participant that the Client may not cover or continue to cover a

specific service or services. Except as provided in the Agreement or this Addendum, this provision does not prohibit ValueRx from pursuing any legal remedy available for obtaining payment for services from Client. This provision shall survive the termination of this Agreement, regardless of the reason for termination and supersedes any oral or written contrary agreement.

6. <u>Insolvency</u>. If Client becomes insolvent or otherwise ceases operations, ValueRx's mail service pharmacy services will continue through the end of the period for which a premium has been paid to Client on behalf of the Participant, but not to exceed 30 days, provided Client pays or makes other arrangements acceptable to the parties to assure future payment for such services. Notwithstanding the preceding, Client acknowledges that ValueRx does not receive a premium for mail service pharmacy services, but rather receives payment on a fee for service basis. This provision shall survive the termination of the Agreement or this Addendum, regardless of the reason for termination and supersedes any oral or written contrary agreement.

7. <u>Administrative Requirements</u>. ValueRx shall comply with Client's administrative policies and programs, quality assurance programs, credentialing, grievance procedures, data reporting requirements, confidentiality requirements, and applicable federal or state requirements. Such requirements will be provided to ValueRx upon request.

8. <u>Records</u>. ValueRx shall make health records available to appropriate state and federal authorities, in accordance with the applicable state and federal laws related to the confidentiality of medical or health records, when the authorities are involved in assessing the quality of care or investigating grievances or complaints of Participants.

   ValueRx shall maintain the books, records, financial information and documentation of services provided to Participants for five (5) years in a manner that facilitates regulatory review.

9. <u>External Appeal</u>. ValueRx shall cooperate with Client on any Participant appeal related to denied claims and shall provide Client all reasonably necessary documents and information related to such appeal.

10. <u>Terms for Other Mail Service Vendors</u>. It is acknowledged by the parties that if Client is approached by another mail service vendor that agrees to meet the same terms and conditions as outlined in this Addendum for ValueRx, Client may contract directly with such mail service pharmacy to provide Prescription Drug Services by mail to Participants. Client acknowledges and agrees, however, that Diversified will process claims in accordance with the Agreement for drugs dispensed by the mail service pharmacies to Participants. Client further agrees to require the mail service pharmacies to comply with ESI parties' prescription drug benefit management programs and procedures, including, but not limited to, the procedures described in ESI's Pharmacy Network manual, the requirements of the Rebate Program, and acceptance of Diversified's drug price file, including the maximum allowable cost list. Client shall also require the mail service pharmacies to use its best efforts to comply with the Formulary and to comply with Diversified's on-line claim submission requirement, including the requirement that prescription claims be submitted electronically to Diversified prior to the dispensing of the applicable Prescription Drug Services.

11. <u>Mail Service Promotion</u>. ESI parties may promote the use of the ValueRx mail service pharmacy to Participants in a manner approved by and coordinated through Client and in accordance with applicable confidentiality and disclosure laws provided, however, that ESI parties shall bear the cost of any promotional incentives to Participants, except as contemplated herein. Call center support options for promotion of the ValueRx mail service pharmacy include: (i) use Diversified/ESI call center for such promotion; or (ii) use Client's call center for such promotion, with ESI parties reimbursing Client under this option (ii) at $1.00 per mail service prescription per month, with a minimum reimbursement of $2,500 per month during the first 12 months of this arrangement, and subject to a maximum reimbursement of $4,000 per month during the term of the Agreement.

**MT 076238**

12. <u>Payment for Prescription Drug Services Dispensed by ValueRx Mail Service Pharmacy.</u>

Client shall pay ValueRx or other ESI party the amounts set forth below, unless expressly stated otherwise, with respect to each approved claim for Prescription Drug Services dispensed through the ValueRx mail service pharmacy:

<u>Ingredient Cost</u>

The following applicable amounts, dependent upon the mail service prescription volume, plus applicable sales or excise tax or other governmental surcharge, if any:

Number of Annual

| Mail Service Prescriptions* | Brand Drugs | Generic Drugs |
|---|---|---|
| 30,000 or less | AWP less 19% | AWP less 50% |
| Over 30,000 | AWP less 20% | AWP less 50% |

<u>Dispensing Fee</u>: $0.00 per prescription.

\*   The parties acknowledge that the first 12 months (December 1, 1999 to December 1, 2000) the over 30,000 pricing tier will apply, regardless of the number of filled prescriptions. For the period of December 1, 2000 to December 1, 2001, the over 30,000 pricing tier will apply if either (i) the number of filled mail service prescriptions during the previous 12 month period exceeds 30,000 or (ii) the number of filled mail service prescriptions during November 2000 equals or exceeds 2,500.

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as determined by Diversified from the most current information provided to Diversified by drug pricing services such as First Databank, or other source generally recognized in the retail prescription drug industry selected by Diversified. The applicable AWP for prescriptions filled in the ValueRx mail service pharmacy will be the AWP for the standard package size (generally 100 units), as provided by First Databank, or a similar measure provided by another source.

"Generic Drugs" means those non-brand pharmaceuticals which are "A" or "B" rated and FDA approved or previously approved under state or federal law, and identified as generics in Diversified's drug price file.

Payment by Client shall be less applicable copayments, coinsurance, and/or deductibles.

13. <u>Payment for Prescription Drug Services Dispensed by Mail Service Pharmacy other than ValueRx</u>

Claims submitted by mail service pharmacies other than ValueRx mail service pharmacies shall be processed in accordance with any applicable standard operating procedure, the Drug Benefit Worksheet, and terms of Client's contract with such vendor. The ESI parties shall have no obligation to forward any claim payments to Client contracted mail service vendors unless and until Client has transferred the funds necessary for such payments. Notwithstanding any failure to transfer funds when required, Client shall remain responsible for payment of all claims. Client agrees that it shall not reimburse any such mail service vendor at a higher rate than is paid ValueRx, unless (i) required by law or regulatory authority or (ii) required for the month of December, 1999 under an existing contractual arrangement between Client and a mail service pharmacy.

**MT 076239**

To the extent this Addendum conflicts with any provision of the Agreement, the terms of this Addendum will control.

**Diversified Pharmaceutical Services, Inc.**

By: _____

Print Name _Stuart L. Bascomb_

Print Title _Vice President_

Date _____

**Express Scripts, Inc.**

By: _____

Print Name __Stuart L. Bascomb__

Print Title __Executive Vice President__
Phone: 314-702-7245
Date __Fax: 314-702-7055__

s:\legal\client\bcbsmont\msadd120299

**Blue Cross and Blue Shield of Montana**

By: _Peter J. Babin_

Print Name _Peter J. Babin_

Print Title _Executive Vice President_

Date _18/8/99_

**ValueRx Pharmacy Program, Inc.**

By: _____

Print Name _Stuart L. Bascomb_

Print Title _Vice President_

Date _____

MT 076240

# EXHIBIT 29

DEPOSITION EXHIBIT 5  
J. Sm



# RURAL HEALTH NEWS

fall 1994



**Inside**

TIERS TO THE
..ITOR
2

...NION
..e Future of Rural Health
..ends on Reforming
.... Education

AROUND THE COUNTRY
...0           p.4
...hington     p.4
...os          p.5
...th Carolina p.6
.....          p.6

..ATES STEP IN
..H REFORM AS
..S FLAIL
..

..ETTING DATABASES
..N PRIMARY CARE
.. ..TTING
..

..SING RURAL
..SPITAL NETWORKS:
.. .. OOL?
..

## Are Rural Independent Pharmacies an Endangered Species?

Ted Bruya, age 30, bought Odessa Drug Store two and a half months ago from the previous owner, who had run it for 36 years. The store had been for sale for five years.

Odessa is a town of 980 people in north central Washington State. Like many remote rural towns in America, there is only one pharmacy. The town has a small hospital.

Bruya laughs when asked what possessed him to buy Odessa Drug. "After working in Seattle for seven years (at a hospital), I was ready to move to a smaller place. Actually, once the debt is paid off, I think I'll make better money than I did in Seattle."

In towns like Odessa, where the pharmacist is one of only a few health professionals around, he plays a big, if unintended, role in health care delivery. "I am just stunned on a daily basis by the number of people who come to see me asking for health care advice," Bruya says. "I had a guy come to see me last week with a 5-square inch second degree burn who wouldn't go to the doctor. I gave him something to put on it and advised him how to keep it clean."

For many towns in America, the changing of generations means a retiring town druggist must find someone to buy him out. Failure to do so means losing his retirement plan and leaving the town without a pharmacy.

Jim Smith, with the Montana Pharmaceutical Association, worries about just that. "There are a number of small town Montana pharmacies just hanging on," he says. "These are guys in their early or mid 50s, and it's frightening for them personally, and it's a great concern for their customers and patients.

(continued on page 10)

## Meatpacking Industry Stresses Out Rural Health System

A number of small Midwestern community health care systems have been dealing with the consequences of meatpacking plants setting up shop on the edge of town.

A 1990 study done in Kansas by Still and Broadway demonstrated that the meatpacking industry is evolving from an urban-based to a rural-based industry. The study demonstrated these industries move closer to the feedlots and into right-to-work states. The study also explained the labor costs for these industries have been reduced by



*IBP plant in Storm Lake, Iowa.*

avoiding unionization in their new rural locations. Additionally, in 1992, researchers at the Center for Rural Health Research at the University of Nebraska were concerned enough about their initial findings from a study in two Nebraska counties that they published the results of their work with call "for health impact statements to be included in plans for economic development.

(continued on page 11)

Published by the WAMI Rural Health Research Center, Department of Family Medicine, University of Washington, Seattle, Washington. Supported by a grant from the federal Office of Rural Health Policy, HRSA, DHHS. Grant #CSR000007-02-0.

*Greeley, Colorado is the setting for the 7th Annual Rural Nursing Conference to be .. April 7th & 8th, 1995. A call for presentations has been issued. The application de.. . is October 28th. For more information, contact Jan Martin at (303) 351-2293.*

## Pharmacy

(from page 1)

He reports that eight of the 56 counties in Montana have no pharmacy, and another 10-12 counties have only one.

There are three big threats to independent rural pharmacies: insurance market changes, discriminatory pricing, and mail order.

### Insurance Market Changes

As the care providers and insurers form closer networks to offer "integrated delivery systems," they often provide incentives to use designated pharmacies or mail order services which result in deals that leave out rural retail druggists. Todd Dankmyer represents the National Association of Retail Druggists (NARD). "We've lost about 1,000 independent pharmacies over the last two years in the US," he says, "usually related to closed networks, where they were cut out of closed insurance programs." This is happening first in urban areas, but is becoming a phenomenon in rural places as well.

### Discriminatory Pricing

Pharmaceutical prices vary widely depending on who is buying. Bruya explains: "For example, when I worked in the hospital setting, we could get a 100-day supply of nitroglycerine patches for a single penny. Here (at Odessa Drug), I pay $35 for a 30-day supply."

The NARD is tackling this issue, too. "Mail order is succeeding today because they get such incredible prices. They go to big employers and offer incredible drug benefits at prices we can't touch. It's got to stop."

Maine is a state that has tried to stop it. Greg Cameron, state pharmacy inspector, says his state's legislature was the first to outlaw discriminatory pricing, as of July 1. "Anyone who sells retail is buying at the same rate now," he says. "It will help rurals, because everyone is buying at the same price. The Rural Health Centers will get the best prices now, automatically."

So what do the manufacturers have to say for themselves? "What it amounts to," says Steve Berchem, the Pharmaceutical & Research Manufacturers of America, "is that's the way business is practiced in America. Some of us get things on sale and some people pay full price."

"Equal Access Provisions" in various health ref... proposals, including those proposed by Clinton, Gephardt, Mitchell and Pryor, would give retail dru.. gists equal access to discount prices and are support by the NARD. These provisions are opposed by the manufacturers.

### Mail Order

Companies like AARP or Medco can offer huge mail order discounts because of the lower prices the face from manufacturers. The disproportionate size the elderly population in small towns who patronize these services can hurt local pharmacies. "My UPS driver tells me he delivers more drugs to the post office than to me," says Bob Sloan, a pharmacist in ru ral, remote Packwood, Washington.

But some towns recognize the importance of savi their local pharmacies, and make an effort to "buy lo cal." Bruya says Odessa is such a place. "This is a very prideful town, and the older generation, particu larly, wants this pharmacy to be here. Even though odds are against most small retail pharmacies, I thin this place will continue to exist because of the attitu of this town."

The rural pharmacist also works in a team with t local doctor, monitoring drug interactions, complia.. and efficacy. It's little wonder the 1993 Gallup P.. rating the honesty and ethical standards of people in various professions once again put druggists and ph.. macists on top. "You don't get that from mail orde... says Montana's Jim Smith.

*Contact Steve Berchem (202) 835-3414 or Todd Dankmyer (703) 683-8200.*




... Bruya and family, Odessa, Washington.