UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| *State of Montana* v. *Abbott Labs., Inc.*, et al., D. Mont. Cause No. CV-02-09-H-DWM | ) ) ) ) Civil Action No. 01-CV-12257-PBS |
| AND | ) ) ) Judge Patti B. Saris |
| *State of Nevada* v. *American Home Prods. Corp.*, et al., D. Nev. Cause No. CV-N-02-0202-ECR | ) ) ) ) |

**MEMORANDUM IN SUPPORT OF SCHERING-PLOUGH CORPORATION'S AND WARRICK PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT AS TO NEVADA AND MONTANA ACTIONS**

**PRELIMINARY STATEMENT**

Schering-Plough Corporation ("Schering") and Warrick Pharmaceuticals Corporation ("Warrick") adopt the Joint Memorandum submitted in support of the Defendants' motions for summary judgment. This Memorandum is submitted on behalf of Schering and Warrick to address issues relating specifically to them.

Under familiar rules of summary judgment, it is the States' obligation in opposition to summary judgment to adduce evidence sufficient to permit a reasonable finder of fact to conclude in their favor as to each element essential to their claims. *See, e.g.*, *Milton* v. *Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir. 1992). With respect to Warrick and Schering, the States have fallen well short of this mark. Even viewed in the light most favorable to them, the evidentiary record contains *no* evidence that Warrick or Schering "manipulated" or "inflated" AWPs; *no* evidence that Warrick or Schering marketed the spread between AWP and providers' acquisition cost; and *no* evidence that Warrick or Schering gained market share as a result of increasing AWPs. On this record, judgment should be entered against the States.

**ARGUMENT**

I.  WARRICK DID NOT MARKET OR MANIPULATE "SPREAD" TO GAIN MARKET SHARE.

Warrick manufactures generic drugs. *See* Stmt. of Undisputed Material Facts in Supp. of Schering Plough Corp.'s and Warrick Pharms. Corp.'s Mot. for Summ. J. as to Nev. and Mont. Actions (hereinafter "L.R. 56.1 Stmt.") ¶ 3. Consequently, the allegation that Warrick manipulated AWPs to gain market share must be considered against the backdrop of the market for generic drugs, and against this backdrop, the allegation is demonstrably false. Warrick has

2

not adjusted AWPs in more than ten years, and simple logic applied to the Medicare and Medicaid programs demonstrates that changes in the AWP of one among several versions of a generic drug would have had no effect on the reimbursement rates paid by the States under either program.

      A.      Warrick Set AWPs at Launch In Accordance with Industry Practice and Left Them Alone Thereafter.

As the States' own expert has acknowledged, "once generic manufacturers set their AWPs, most manufacturers maintain them at constant levels." *See* L.R. 56.1 Stmt. ¶ 11. Warrick was no exception to the rule. As Harvey Weintraub, who has worked for Warrick in different capacities since its inception in 1993, explains, Warrick set an AWP at the time of a product's launch and then "in almost all instances, left it untouched for the life of the product." L.R. 56.1 Stmt. ¶ 12.

Compelling evidence of Warrick's innocent practice is found in the Appendix to the States' complaints. A table in the Appendix sets forth AWPs over time for the drugs that are the subjects of the Complaint, and that table shows that the AWPs for Warrick drugs[1] stayed the same over time except for one instance in 1995, when Warrick raised the AWP for one type of Albuterol. *See* L.R. 56.1 Stmt. ¶ 13; Mont. Compl. ¶ 535; Nev. Compl. ¶ 335. There is simply no evidence that Warrick strategically manipulated AWP to increase market share.[2]

---

[1] The States' Appendices label drugs distributed by both Schering and Warrick under the label "Schering." The drugs manufactured by Warrick have NDCs beginning with 59930.

[2] Furthermore, Schering and Warrick could not have deceived the States regarding the meaning of AWP or the difference between AWP and their actual sales prices. For years, Schering and Warrick have been sending letters to Nevada and Montana on a quarterly (Schering) or monthly (Warrick) basis informing the states as to the actual prices at which they are then selling their drugs. *See* Def.'s Joint Mem. of Law in Supp. of Their Mot. for Summ. J. at 29-30 (Nevada); Supp. Diederich Decl. Ex. 7 (Montana). Despite receiving such pricing information, the States did not change the reimbursement for Warrick's or Schering's drugs.

B.      Warrick Did Not Market Spreads Between AWP and Acquisition Costs.

It follows, then, that there could not be evidence that Warrick "marketed" spreads that it had manipulated. In fact, the evidence shows that Warrick never marketed the spreads that arose from operation of market forces. The evidence shows that Warrick competed with other drug manufacturers on the basis of factors other than spread, including the breadth of its offerings, the capacity of its production, and customer service. *See* L.R. 56.1 Stmt. ¶ 15. Warrick also competed on price, meeting but generally not beating competitive prices. *See* L.R. 56.1 Stmt. ¶ 16. There is no evidence that any customer purchased drugs from Warrick because of spread. To the contrary, the evidence of record shows that major customers purchased on the basis of price in conjunction with the non-price factors mentioned above. William E. Groth, a Walgreens employee knowledgeable about Walgreens' drug purchases from drug manufacturers testified that in making purchasing decisions, he focused on purchasing the cheapest available drugs. *See* L.R. 56.1 Stmt. ¶ 8. Consequently, the States cannot demonstrate that anything Warrick did other than competitively pricing its products had any affect on its sales; therefore, they cannot prove the necessary element of causation. *See Nentwig* v. *United Indus., Inc.*, 845 P.2d 99, 143–44 (Mont. 1992) (plaintiff in fraud action must show that damage was caused by tortfeasor); *Lubbe* v. *Barba*, 540 P.2d 115, 118 (Nev. 1975) (causation is a required element of all torts).

The States' carbon-copy complaints assert that Warrick "touted" spreads. *See* Mont. Compl. ¶ 537; Nev. Comp. ¶ 338. The evidence is directly and unequivocally to the contrary. The written notices of product launches and changes in prices sent to Warrick's customers, which are referenced in the complaints, were no more than lists of drugs with AWPs and direct prices, *id.*, which notices were triggered by changes in *direct* prices, not AWP, *see* L.R. 56.1 Stmt. ¶ 16, so they cannot have been part of a scheme to exploit inflated AWPs. Consistent with the only record evidence, Warrick's customers were concerned with the price at which they

4

could purchase the drugs from Warrick (not the spread) and Warrick kept them apprised of changes in the direct price of the drug (not AWP).

### C. Warrick Gained Market Share Based on Price, Not Spread

Warrick's success in gaining market share relates not to spread, but to price and other factors. Once again, the facts refute the States' theories. Were it true that companies that manipulated AWP were able to gain market share, those companies with the highest AWPs would enjoy the largest market share. The opposite is true. Warrick's AWPs were sometimes at or below the median, *see* L.R. 56.1 Stmt. ¶ 27 (citing Addanki Aff. ¶ 63), yet Warrick was able to compete effectively for market share. *See* L.R. 56.1 Stmt. ¶ 9. The States have not proffered any evidence correlating AWPs with market shares, and the reason is likely exemplified by Warrick's case, where there are negative correlations between AWPs and market shares that refute the States' asserted theory: low AWPs correlate with high market shares.

The States' expert, Dr. Hartman, has calculated what he claims is the amount that the States overpaid for selected drugs, *see* Hartman Mont. Rept. ¶ 17; Hartman Nev. Rept. ¶ 17 (Supp. Diederich Decl. Exs. 5 & 6), but those alleged overpayments did not go to any of the Defendants. Instead they were retained by providers (from whom the States have never sought recoupment). To show that Warrick received some benefit from the claimed overcharges, the States would need to show that Warrick gained market share as a result of increasing its AWPs. The States cannot possibly prove any such thing, as the only evidence on this subject, described above, shows that market shares correlate negatively with AWPs, which is contrary to the States' theory.

D. **The States Cannot Demonstrate that Their Medicaid Reimbursements for Many Warrick Drugs Were Based on AWP.**

The States' failure of proof goes even further: for many of the drugs identified in their complaints, they cannot demonstrate that their Medicaid reimbursements were based on AWPs. This is so because both Nevada and Montana reimbursed drugs on the basis of any number of measures—including federal upper limits ("FULs") established by the Centers for Medicare and Medicaid Services ("CMS") and alternative AWP calculations made by the Department of Justice —that are not based on manufacturer-reported AWPs.

1. **CMS Establishes FULs That Are Not Based on AWP.**

The States' complaints both allege that "[u]nder the Medicaid Program, reimbursement for multiple source drugs for which there are at least three suppliers is equal to (i) a reasonable dispensing fee, plus (ii) an amount equal to 150 percent of the lowest *AWP* published by First DataBank, Medispan or the *Redbook*." Mont. Compl. ¶ 188; Nev. Compl. ¶ 151 (emphasis added). This statement is false. Federal Government regulations require CMS to calculate a FUL based on the "lowest published *price*" for the least costly multiple-source drug in a group of equivalents. 42 C.F.R. § 447.332(b). As Dennis Smith, the Director of the Center for Medicaid and State Operations at CMS explained in congressional testimony last year, "[t]o set the FUL, CMS selects lowest price (AWP, WAC or Direct Price) and multiplies it by 150% as required in regulations to arrive at the FUL." *See* L.R. 56.1 Stmt. ¶ 21 (parentheses in original). Because the WAC and Direct Price of a drug are lower than its AWP, the FULs are usually not calculated using AWP.

2.  Both Montana and Nevada Use CMS FULs For Drug Reimbursements.

The fact that CMS calculated FULs on bases other than AWP undermines both States' theories of "AWP inflation" because both States reimbursed providers for drugs based on these FULs. Montana's regulations require that the Medicaid Program pay the *lowest* of "estimated acquisition cost", "maximum allowable cost" or provider's "usual and customary charge." Mont. Admin. R. 37.86.1105(1). Montana defines "maximum allowable cost" as a FUL, when there is one. *See id.* 37.86.1105(3). Montana's Medicaid personnel confirmed that Montana reimburses at FULs when they have been set by CMS. *See* L.R. 56.1 Stmt. ¶ 23.

The same applies to Nevada. Under that State's regulations, Nevada pays the lower of the State MAC (instituted in 2003), AWP less a fixed percentage, the direct price paid by the pharmacist or the FUL. *See* L.R. 56.1 Stmt. ¶ 24. Again, State Medicaid personnel confirmed that this is how the system operates in practice. *See id.* Consequently, Montana's and Nevada's reimbursements for drugs with FULs cannot be based on AWPs.

3.  Many of the Warrick Drugs Identified in the States' Complaints Were Covered by FULs.

CMS established FULs on many of Warrick's drugs. Of the 25 drugs identified in the States' complaints or the appendices thereto, 15 of them were subject to FULs during the time period relevant to this matter, as summarized in Table 1.

7

| NDC | Description | Date FUL Effective |
|---|---|---|
| 59930-1500-06 | Albuterol Sulfate .83 mg/ml solution; 3x inhalation | October 1, 1997 |
| 59930-1500-08 | Albuterol Sulfate, .83 mg/ml solution 3x inhalation | October 1, 1997 |
| 59930-1515-04 | Albuterol Sulfate, 5mg/ml solution; 20 ml bottle | April 6, 2000 |
| 59930-1560-02 | Albuterol sulfate 90 microgram inhaler refill | October 1, 1997 |
| 59930-1570-02 | Clotrimazole 1% cream; 30 gram tube | April 6, 2000[3] |
| 59930-1620-01 | Griseofulvin, Ultramicrocrystaline, 125 mcg tablets, 100 count | August 1, 1996 |
| 59930-1621-01 | Griseofulvin, Ultramicrocrystaline, 250 mcg tablets, 100 count | August 1, 1996 |
| 59930-1624-01 | Griseofulvin, Ultramicrocrystaline, 330 mcg tablets, 100 count | August 1, 1996 |
| 59930-1600-01 | Perphenazine, 2 mg tablets, 100 count | January 1, 1995 |
| 59930-1603-01 | Perphenazine, 4 mg tablets, 100 count | January 1, 1995 |
| 59930-1605-01 | Perphenazine, 8 mg tablets, 100 count | January 1, 1995 |
| 59930-1610-01 | Perphenazine, 16 mg tablets, 100 count | January 1, 1995 |
| 59930-1650-01 | Theophylline, 100 mg tablets, 100 count | January 1, 1995 |
| 59930-1660-01 | Theophylline, 200 mg tablets, 100 count | January 1, 1995 |
| 59930-1670-01 | Theophylline, 300 mg tablets, 100 count | January 1, 1995 |
| 59930-1680-01 | Theophylline, 450 mg tablets, 100 count | September 1, 1998 |

Table 1.  Drugs Identified in States' Complaints Subject to FULs.

Summary judgment as to drugs subject to FULs for the period that the FULs were in place is unavoidable.

---

[3] For this NDC, the FUL was removed effective January 22, 2002.

E.     The States' Medicare Claims For Generic Drugs Should be Dismissed.

The States assert a right to recover for overpayments made for drugs purchased under the Medicare program on the theories that (a) the States may recover any co-payments made on behalf of Medicare recipients also eligible for Medicaid (the "dual eligible claim") and (b) that the States may recover as *parens patriae* to consumers who made co-payments for Medicare drugs. There is no evidence to support either theory.

1. The States Cannot Prove that Medicare Payments were Based on Warrick AWPs.

The States have adduced no evidence that Medicare payments for the drugs at issue in this case were made on the basis of AWP, let alone Warrick's AWPs. The *maximum* reimbursement for any multi-source drug under Medicare is 95% of "the lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name forms of the drug or biological." 42 C.F.R. § 405.517 (originally promulgated at 63 Fed. Reg. 58905 (Nov. 2, 1998)); *see also* Dec. 15, 2005 Hartman Decl. n.13 (demonstrating that, since at least 1992, median AWP has been used as a basis for drug reimbursement). Assuming for argument sake that any of Warrick's drugs were reimbursed based on the median AWP formula, the States cannot prove that the AWPs Warrick reported for its drugs affected the median AWP for any category.

A median, by definition, is the value in a given set of values above and below which there are an equal number of values. It is *not* an average. An increase in one of the values increases the median only if that increased value increases the number of values above the median. As a result, changes to individual values in a given set do not often result in a change to the median. It is extremely unlikely that a reduction in Warrick's AWP for those drugs would

9

have resulted in a reduction in the median AWP and the States offer no evidence that this unlikely event ever occurred.[4]

Moreover, Medicare often reimburses a common formulation of albuterol on a basis other than its AWP *or* the Median AWP of the formulation. *See* Nebulizer Drugs: Albuterol and Ipratomium *accessed at* http://www.palmettogba.com/palmetto/providers.nsf/44197232fa85 16898525719600693 9dd/85256d580043e754852570d6004f15cc?OpenDocument (Feb. 7, 2007). Thus, even assuming that AWP directly affects Medicare pricing, the Warrick drugs may have been reimbursed at a rate well below the rate for the J-code for the most common form of albuterol.[5]

       2.   The States Have Adduced No Evidence of Medicare Co-Payments.

Both States sue on behalf of consumers allegedly damaged by AWP pricing. The only consumer transactions potentially affected by AWP prices are the 20% co-payments made by Medicare beneficiaries. However, neither State has adduced any evidence that any consumer paid a co-payment for a drug, or that any such co-payment was higher than it should have been. Indeed, the States have absolutely no data regarding what was actually paid for any drug by any consumer. In response to discovery requests for information about the consumers on whose behalf the States claim to sue, the States' counsel has indicated that it intends to rely on information from the *defendants* to prove its case. *See* L.R. 56.1 Stmt. ¶ 31. But the defendants have no information about the price at which doctors and pharmacies sell their drugs to

---

[4] The States' expert conceded that an AWP below the median could not have caused any damage to the State. *See* L.R. 56.1 Stmt. ¶ 30. Because the States have not shown that any of Warrick's AWPs were above the medians, they cannot show that Warrick's AWPs caused them any damages.

[5] Of course, drugs cannot be reimbursed under Medicare for anything more than the actual billed charge, which could be less than the median AWP or any other reimbursement methodology used by Medicare. See 42 C.F.R. § 405.517(b). The States have adduced no evidence that providers have charged the maximum amount possible under any of the reimbursement methodologies used by Medicare and therefore none of their Medicare claims can survive summary judgment.

individual patients. Because the record is bereft of any evidence sufficient to support the States' claims, the Court should grant summary judgment.

II.     SCHERING SHOULD BE DISMISSED FROM THE ACTION.

As with Warrick, the States' efforts to adduce evidence to carry their burden of proof as to Schering have failed. The limited evidence that the States have obtained in discovery as to Schering's actions demonstrates—at most—that some Schering employees were aware of spreads. What the evidence does not show is that Schering ever manipulated or marketed spreads.

      A.     There Is No Evidence that Schering Manipulated Spreads.

All of the examples of allegedly deceptive spreads in the States' complaints focus on Warrick's generic drugs, rather than Schering's branded drugs. *See* Mont. Compl. ¶¶ 534–541; Nev. Compl. ¶¶ 334–342. As the States' proffered expert (Dr. Hartman) readily concedes, spreads tend to be smaller for branded drugs. The States have put forward virtually no evidence that any of the Schering drugs identified in the Complaint had spreads that could be considered "fraudulent" or "deceptive."

Instead, Dr. Hartman calculates damages for drugs that he deems to have fraudulently inflated AWPs, *see* Hartman Nev. Rept. ¶ 22; Hartman Mont. Rept. ¶ 21 (Supp. Diederich Decl. Exs. 5 & 6), assuming (at the direction of Nevada's and Montana's counsel) that liability attaches whenever Hartman's self-defined "ASP" is less than AWP minus the statutory amounts deducted by Nevada's and Montana's Medicaid Programs. Dr. Hartman's assumptions are contrary to the evidence. The Medicaid Directors of both States acknowledged that they were aware that AWP exceeded actual acquisition costs by more than the amount deducted in the regulatory scheme. Not only is there no evidence in the record as to what the spreads were with respect to Schering branded drugs, but there is no evidence in the record that these spreads

11

exceeded what the Medicaid Directors expected when arranging their regulatory systems. Without such evidence at this point in the case, there is no reason to let the States proceed to trial.

The absence of evidence is to be expected. In order to make a plausible case that Schering manipulated the spread for its drugs, the States would have to show that Schering had some reason to do so. But there is no incentive for manufacturers of self-administered drugs—like the Schering drugs at issue here—to manipulate spreads. When drugs are self-administered, the beneficiary of any "spread" between AWP and actual acquisition cost is the pharmacist that ultimately dispenses the drug, not the physician that prescribes it. *See* L.R. 56.1 Stmt. ¶¶ 35-36. Because the physician does not benefit from the spread, there is no reason to manipulate spreads to convince physicians to choose a particular drug. *See id.* Likewise, there is no reason to manipulate the spread to encourage a pharmacist to dispense one single-source drug rather than another. The pharmacist is obligated to dispense what the doctor has prescribed, even if there is an alternative drug with a more attractive spread. Both counterfactual and illogical, the States' flawed theory of liability requires that judgment be entered against them.

B.      There Is No Evidence that Schering Marketed Spreads.

Just as there is no credible evidence in the discovery record supporting the view that Schering's reported AWPs were inflated, there is no evidence that Schering deliberately relied on inflated AWPs to increase its market share with respect to any drug. In other contexts, Plaintiffs' counsel has touted a single piece of documentary evidence as proof that Schering knew about the AWP spreads and marketed based on that knowledge. However, as Plaintiffs are fully aware, that document contains a purely hypothetical discussion of an event that never took place and is not proof of anything.

12

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Joint Memoranda in support of the Defendants' motions for summary judgment, summary judgment should be granted to Schering and Warrick on all counts of the operative complaints by Nevada and Montana.

ROPES & GRAY LLP

By: /s/Bryan R. Diederich

Brien T. O'Connor (BBO # 546767)
Christopher R. Dillon (BBO # 640896)
Bryan R. Diederich (BBO # 647652)

One International Place
Boston, Massachusetts 02110
(617) 951-7000

Attorneys for Defendants,
Schering Plough Corporation & Warrick
Pharmaceuticals Corporation

Dated: February 8, 2007

**CERTIFICATE OF SERVICE**

I, Christopher R. Dillon, hereby certify that a true copy of the foregoing document was served upon all counsel of record electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 8th day of February, 2007, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.

                                                                       /s/   Christopher R. Dillon