UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*State of Montana* v. *Abbot Labs., Inc., et al.*, D. Mont. Cause No. CV-02-09-H-DWM<br><br>AND<br><br>*State of Nevada* v. *American Home Prods. Corp., et al.*, D. Nev. Cause No. CV-N-02-0202-ECR | Civil Action No. MDL No. 1456 |

## DECLARATION OF HARVEY J. WEINTRAUB

I, HARVEY J. WEINTRAUB, hereby declare:

### Background

1. I have personal knowledge of the facts stated in this Declaration, and they are true and correct. I am competent to testify relating to the matters contained herein.

2. I reside at 34 Woodcrest Drive, Convent Station, New Jersey. I was born on May 21, 1929 in Providence, Rhode Island.

3. From 1953 until 1993, I was employed by Schering Corporation ("Schering"). I retired from Schering as a Vice-President in 1993. I started working with Warrick in 1993, shortly before my retirement. I worked as a consultant in sales and marketing for Warrick Pharmaceuticals Corporation ("Warrick") from 1994 through the end of 2004.

### Education

4. In 1952, I received my Bachelor of Science in Pharmacy from the University of Rhode Island College of Pharmacy. I then became a registered pharmacist, and I worked "behind the counter" in pharmacies in both Rhode Island and Massachusetts. To maintain my status as a registered pharmacist, I participated in continuing education programs every year until the early 1990s. Subsequently, I have been on inactive status and more recently have allowed my registrations to lapse.

### Employment History

5. During my forty years at Schering, I held various jobs. I started as a professional sales representative in Massachusetts calling on physicians, pharmacies, and hospitals. I was then promoted to Hospital Sales Representative. In that position, I called on major hospitals in Rhode Island and Massachusetts.

6. In 1958, I was promoted to the Manager of the Albany District Field Sales Force, which covered the region from upstate New York to Ohio. I became Eastern Regional Sales Manager in 1967. In that position, I supervised a field force of 10 District Managers, 3 Regional Sales Specialists, 10 Hospital Representatives, and 115 Sales Representatives.

7. In 1973, I was promoted to Director of Marketing Services, a home office position in New Jersey. In this position, I provided Schering management with marketing information, analysis, and systems support. In 1975, I was promoted to Director of Marketing Planning and was responsible for the direction, planning, and coordination of Schering's new and established over-the-counter products. In 1979, I became Director of Marketing Planning for Schering prescription products.

8. I was promoted to Vice President for Marketing Communications and Services

for prescription and over-the-counter products in 1980. A year later, I became Vice President for Sales for Schering. I was responsible for managing Schering's entire U.S. sales operation. I supervised approximately 800 Schering employees.

9.   In 1991, I became Vice President for Marketing and Sales Services. In this position, I managed various aspects of the operations of Schering and Key Pharmaceuticals, a subsidiary of Schering. As noted above, I retired from Schering at the end of 1993.

10.   Following my retirement from Schering, I became a consultant for Warrick. I assisted the Warrick organization with various tasks relating to sales and marketing. I also worked with Warrick's sales force, and was involved in pricing decisions concerning Warrick products.

### Creation of Warrick

11.   Since it was created in 1993, Warrick has marketed and distributed exclusively generic products. These are products that are substitutable for drugs that are no longer subject to patent protection. Many of Warrick's generic products were first researched and developed by Schering and were once single-source products marketed under a Schering brand name. For example, Warrick marketed generic albuterol sulfate, the same chemical compound as Schering's Proventil®, both of which are used to treat asthma.

12.   At the time Warrick was established, the use of generic drugs was growing rapidly, and it was clear that this trend was going to continue. Warrick was formed in an effort to compete in the generic market.

13.   Warrick did not operate or do business under the Schering name. Warrick established sales prices for its products (generally on a customer-by-customer basis). Schering did not set, approve, or report Average Wholesale Prices for Warrick drugs. At the same time,

Warrick shared certain resources with its parent company, Schering, pursuant to a number of contracts. For example, Schering provided financial services and human resources management for Warrick. In addition, Warrick used contract manufacturers to produce its products. This was necessary because of the need to get to market quickly, and because pharmaceutical manufacturing is very complex and manufacturing plants are costly to build, license, and maintain. When a Warrick product was chemically identical to a Schering product, Warrick would contract with Schering to manufacture the product.

### Generic Marketplace

14. The generic market operated differently from the branded market. Prior to joining Warrick in 1993, I dealt exclusively with the brand side of the pharmaceutical business. I did not have any experience selling generic drugs. In order to learn the generic drug business, I spoke with the customers I knew over my many years working at Schering.

15. As a result of these efforts, I learned that there were several significant differences between brand and generic drugs. First, I learned that a generic drug was frequently preferred over its brand equivalent because it was a cheaper, substitutable version of the brand drug. Prices for generic drugs generally dropped over time due to vigorous competition in the generic drug market. This occurred in the generic market because usually numerous companies manufactured and distributed generic equivalents. In contrast, brand drugs tended to have prices that were stable or went up over time.

16. Second, the prescribing physician didn't control which manufacturer's version of a generic drug was dispensed. Instead, any manufacturer's version of a generic drug could be dispensed as a substitute when a generic drug was prescribed. When prescribing albuterol, for example, the prescribing physician did not determine the manufacturer of the albuterol to be

4

dispensed. As a result, the patient might receive any version of a generic stocked by the pharmacy.

17. Third, whereas brand drugs typically had a single list price, generally referred to as wholesale acquisition cost ("WAC"), that was applicable to all customers, the prices of generic drugs varied from customer to customer and from class of trade to class of trade. This occurred because generics operated much like commodities, and generic manufacturers competed based on price. As other generic manufacturers sought to gain share by offering a lower price to Warrick customers, Warrick would usually meet the competition by matching the price. Thus, customer-by-customer prices would change as Warrick met competitive conditions.

### Marketing Practices

18. In order to sell its products, Warrick hired three experienced former Schering Sales Directors: Al Graf, Jerry Sherman, and Walter Gough. These individuals were called National Sales Directors, and they were the "outside" salesmen who called on Warrick's customers. Collectively, Mssrs. Graf, Sherman and Gough had over one hundred years of sales experience between them. Because they were so experienced, they generally called on national generic buyers for chains, wholesalers, and generic distributors. Mssrs. Graf, Sherman and Gough covered the entire United States for Warrick, and the three of them continue to work as National Sales Directors for Warrick.

19. From the beginning, and through the time I left Warrick, Warrick had only about 60 to 70 customers for generic drugs in the United States. Because Warrick's customers generally stocked a single product for each bioequivalent, and because these customers commanded a significant share of the market, competition for each customer was intense.

20. Even though Warrick had a small number of customers, those few customers

commanded a major share of the generic albuterol sulfate market and had a centralized purchasing process. For example, Walgreens had approximately 5,000 drug stores, but only one generic buyer decided which generic product to buy and stock in all those stores. Warrick thus pursued its interests by focusing on chain pharmacies, full-line wholesalers, and generic distributors that purchased generics on a national basis.

21. Warrick competed on a number of bases, including the breadth of its product portfolio, production capacity, customer service levels, reputation, and price. Warrick communicated these key sales points to its customers.

22. Warrick customers were advised that Warrick's albuterol generics were manufactured using the identical facilities, specifications, and personnel as those used to manufacture the well-known Schering brand Proventil® line of products. This helped Warrick's sales efforts because the customers were familiar with the Proventil® albuterol products that had been on the market for years.

23. Warrick customers were assured that Warrick had the ability to provide product in sufficient quantity and deliver it to customers consistently and reliably. Warrick also had another advantage: Warrick had a "full line" of albuterol products, i.e., syrup, tablets, solutions, and aerosols. Because Warrick carried all forms of albuterol, the customer could do "one-stop shopping" at Warrick for all albuterol needs.

24. Finally, Warrick competed in the generic marketplace based on price. Usually, Warrick would match the price of its generic competitors in order to obtain and maintain business. Warrick offered customers certain discounts and rebates, including prompt-pay discounts, line-based rebates, market-share rebates, and stocking allowances. Warrick typically met lower prices offered by competitors to significant customers.

### Average Wholesale Price

25. In the pharmaceutical industry, AWP was generally understood to be a benchmark or reference price. I never understood AWP to have any relationship to a generic drug's actual price, average or otherwise. In my experience, this understanding was industry-wide. AWP was simply a reference price from which other prices were negotiated.

#### (1) Establishment of AWP

26. When I joined Warrick in 1993, I did not know how AWPs were established in the generic drug industry. I learned from Ed Edelstein at First DataBank that in order for a generic drug to be listed as a "generic" in the First DataBank publication, its AWP should be set between 10-20% below its brand equivalent. At no time did Mr. Edelstein – or anyone else – tell me that AWP was or should be an average of marketplace transactions charged by wholesalers to their customers.

27. As a result, Warrick followed the general industry practice and generally set its AWPs at levels that were 10-20% below the branded version of the drug.

28. I was aware that other generic competitors had, from time to time, significantly higher AWPs listed in the pricing books. However, as I have stated previously, that was not relevant to how Warrick sold its generic drugs. I did not focus on the relative AWPs because my interactions with Warrick's customers told me that they were interested in obtaining our lowest competitive price.

29. Given the multiple classes of trade to which Warrick sold, the multiple prices at which its drugs sold, and post-sale price reductions, as described above, Warrick could not report a single AWP that would have had a uniform relationship to the multitude of changing prices at which it sold its drugs. Warrick simply suggested an AWP at the launch of a product and, in

almost all instances, left it untouched for the life of the product.

30.     Warrick did not receive any revenue from payors based on reported AWPs, and Warrick did not seek to increase its market share as a result of the AWP system. Warrick's albuterol solutions were highly attractive to customers because of their quality, availability, price, and service provided by Warrick.

### (2) Changes to AWP

31.     Warrick typically suggested an AWP at launch and, in almost all instances, left it untouched for the life of the product. The only changes in AWP on Warrick's albuterol that I am aware of occurred in 1993 and 1995, when I was new to the generic industry and did not understand the practice in the generic industry was to keep AWPs constant. In 1993, I lowered the AWP once on the 0.083% solution, and, in 1995, I raised the AWP twice on the 0.5% solution.

32.     With respect to the 1993 change, I notified First DataBank that Warrick was lowering the AWP on one of the package sizes of 0.083% solution. I did this in order to make the AWPs the same for all forms of the product on a per unit basis.

33.     With respect to the 1995 changes on the 0.5% product, Warrick had a rare opportunity to increase the price of its product. This was unusual because generic products typically went down in price over time due to price competition. In this instance, however, Warrick was the only producer of the 0.5% solution in the market because a competitor was having manufacturing problems. Consequently, Warrick twice increased the price it charged most of its customers for the 0.5% solution to take advantage of changed competitive dynamics. Based on my experience working at Schering with brand drugs and my inexperience in the generic business, I assumed that the AWP needed to be increased proportionately with the sales

8

price, as was the custom in the brand industry. Therefore, I raised the AWP on the 0.5% albuterol solution twice in 1995 to correspond with actual increases in prices on that product to Warrick customers. I later learned that it was not the custom in the generic industry to change AWPs when actual prices changed, either up or down. Thus, I did not subsequently alter Warrick's AWPs.

34. By increasing the AWP for the 0.5% albuterol solution in 1995, I did not intend to make this product more attractive to customers by increasing third-party reimbursement. In fact, the AWP increase was made simultaneously and in proportion with an actual increase in the price of the product.

35. Warrick never changed the AWP on its largest selling product, the inhaler, even though generic competitors had higher AWPs. Warrick never raised the AWP for the 0.083% solution, which was a much bigger seller than the 0.5% solution.

36. Warrick has not changed any AWPs on any of its generic products since 1995.

37. At no time did I ever change any Warrick AWP in order to affect third-party reimbursement.

### (3) Marketing Practices

38. Warrick did not sell its drugs by discussing spread, AWPs, Medicare reimbursements or Medicaid reimbursements. Warrick's sales personnel did not discuss spreads between AWP and acquisition costs with customers, pharmacies, or providers, and they did not make comparisons of any spreads on Warrick's products with its competitors. Warrick competed on price, reliability of supply, reputation, and contacts in the industry.

39. No one at Warrick to my knowledge has ever sold or attempted to sell a Warrick drug by discussing reimbursement or relative reimbursement amounts under Medicare or

Medicaid programs. I never instructed anyone at Warrick to discuss AWP or reimbursement amounts in order to sell Warrick's drugs. I was never instructed by anyone to do so.

40. Warrick did not provide calculations comparing its products with competitors' products based on the spread between acquisition cost and AWP. Warrick did not instruct customers to calculate the spread between the AWP and the customer's acquisition price and to compare that to a competitor's spread. Between the nature of Warrick's customers and the small size of Warrick's sales force, it would have been difficult, if not impossible, to sell based on reimbursement. A Walgreens with 5,000 stores in states across the country would likely be getting reimbursed by thousands of providers in a multitude of ways. There was no way I or other members of my sales force could have known, much less marketed, based on reimbursement. What we could do – and did do – was market based on quality, availability, service, reputation, contacts, and price.

### (4) Knowledge of Reimbursement Rates

41. Warrick did not monitor the thousands of private and public reimbursement programs adopted by third party payors for its products, nor did it pay any attention to the various methods by which they reimbursed for drugs. These reimbursement methodologies, levels, and prices were irrelevant to Warrick's business. Warrick sold its generic products based on availability, reliability, and price competition. Accordingly, it would have been a waste of time and resources for Warrick to have attempted to track, monitor, and understand the varying and numerous reimbursement methodologies employed by the thousands of third-party payors in the United States drug market.

I declare under penalty of perjury that the foregoing is true.

*Harvey Weintraub*
Harvey J. Weintraub

EXECUTED this 6th day of February, 2007 in Convent Station, NJ 07960