**4**

**TESTIMONY OF**

**DENNIS G. SMITH**

**DIRECTOR**

**CENTER FOR MEDICAID AND STATE OPERATIONS**

**IN THE**

**CENTERS FOR MEDICARE & MEDICAID SERVICES**

**BEFORE THE**

**COMMITTEE ON FINANCE**

**ON**

**MEDICAID FRAUD AND ABUSE**

**June 28, 2005**



**TESTIMONY OF**
**DENNIS G. SMITH**
**DIRECTOR**
**CENTER FOR MEDICAID AND STATE OPERATIONS**
**IN THE**
**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**ON**
**MEDICAID OVERSIGHT**
**BEFORE THE**
**SENATE FINANCE COMMITTEE**

**JUNE 28, 2005**

Chairman Grassley, Senator Baucus, distinguished Committee members, thank you for inviting

me here to discuss the financing of the largest government health insurance program in the

United States, Medicaid, and the steps we have taken and are proposing to protect and strengthen

the financing of the Medicaid program. Fourteen months ago, I testified before a Congressional

subcommittee and presented our view of the problems in Medicaid financing and our strategies

for addressing them. I am pleased to share with the Committee our progress and results.

*Background*

Medicaid is a partnership between the Federal government and the states. While the Federal

government provides financial matching payments to the states, each state is responsible for

overseeing its Medicaid program, and each state essentially designs and runs its own program

within the Federal structure. The Federal government pays the states a portion of their costs

through a statutorily determined matching rate, currently ranging between 50 and 77 percent.

Over the past two decades, states have developed a number of ways of enhancing Federal

matching dollars. There have been numerous studies of these practices over the years from the

1

Government Accountability Office (GAO) and the Office of the Inspector General (OIG). The problem and descriptions of questionable financing arrangements have been well documented elsewhere as well. Using such arrangements, many states have managed to draw down more Federal Medicaid dollars with fewer state dollars, resulting in an effective match rate that is higher than the statutorily determined match rate. Such practices have resulted in both tensions and inequities among the states and with the Federal government.

### *Strengthening Program Integrity and Financial Management Activities*

We have made substantial progress in identifying states that we believe have used improper payment mechanisms and have set a course of action that will return these states to the appropriate match rates.

In 2002, we created a new team within the Centers for Medicare & Medicaid Services (CMS) to specifically review state plan amendments that involved reimbursement to institutional providers such as nursing homes and hospitals. We subsequently created another group to review plans affecting non-institutional providers such as physicians and clinics. Over time, these teams evolved into the Division of Reimbursement and State Financing (DRSF) in order to consolidate in one CMS component responsibility for all state Medicaid payment policy and state Medicaid funding issues. A central responsibility of this Division is to ensure consistency in the nationwide application of Medicaid payment and funding policy. The Division now comprises three Teams which are responsible for institutional reimbursement, non-institutional reimbursement, and state funding policy and oversight.

2

Since August 2003, as part of the review process for some 800 state requests for changes in payment methodologies through state plan amendments (SPAs), CMS has been examining information from states regarding detail on how states are financing their share of Medicaid program costs  Mr. Chairman, on April 28, 2004, the CMS Administrator replied to your request to be updated on the progress of our state plan reviews.  At that time, we had reviewed less than 300 plan amendments.  We had identified five states that did not use intergovernmental transfers (IGTs) as a funding mechanism in the provider payment plans we had reviewed; 10 states that used them appropriately; and potential recycling linked to plans in 30 states.  At that time, we reported that seven states had worked cooperatively with us to either remove new recycling features or terminate existing provisions.  Two of those seven had not implemented recycling provisions.

We now have reviewed more than 800 provider payment plans.  As of June 23, 2005, 26 states have revised their financing arrangements dealing with 55 different provider payments.  We continue to work with seven states to resolve outstanding financing arrangements.

### *The President's Proposal – Net Expenditures*

We have learned a great deal over the past few years about these financing arrangements and while we have been successful in working through the issues with the states, the history of Medicaid financing including DSH, UPL, and provider taxes shows us that the match rate structure itself tends to create incentives for states to find ways to tip the balance.  We share the concerns that GAO has previously expressed that the potential for inappropriate financing exists whenever government entities are also providers.  Therefore, we believe that the progress that we

have made over the past several years in our review of state financing arrangements should be made permanent. Accordingly, the Administration has proposed specific changes to address the issue of inappropriate funding transfers in the Medicaid program. Fundamentally, the Federal government should only be matching funds (in accordance with the statutorily-defined matching rate) that are actually used to reimburse a provider for the cost of furnishing a Medicaid-covered service to a Medicaid-eligible individual.

In order to assure that Federal matching is only available for a state's actual expenditures, we would propose amending the Medicaid statute so that a state's reported expenditures to any state, county, city, or other local governmental entity or taxing district (including providers owned, employed, or controlled by these entities) could not include any amount paid to the state or local government provider which has returned either directly or indirectly to the state or local government or which is not retained under the ownership and control of the provider for the purpose of furnishing Medicaid care and services.

States would have to provide annual assurances or other information determined by the Secretary that the state is in compliance with the provisions of these proposals.   The Secretary is authorized to audit any state that failed to provide sufficient information demonstrating that its report of estimated or actual quarterly expenditures complies with the requirements of this proposal. State plan amendments would not be approved unless the state provided certain information about payments to governmental entities. Failing to provide satisfactory information may result in the Secretary reducing the state's Federal payment or disallowing the claimed expenditure. States, however, would not be held to be out of compliance, nor claimed

4

expenditures disallowed, with respect to payments permitted under an upper payment limit (UPL) transition period. States that inappropriately use recycling arrangements after the effective date of this change would be subject to loss of Federal matching funds. The proposal would be effective with respect to calendar quarters beginning on and after October 1, 2006.

***The President's Proposal - Provider Tax Phase Down***

Until 1991, when Federal law restricted the use of health care provider related taxes, states were able to tax health care providers as a way to raise their share of the Medicaid matching payment. These funds, used to draw down Federal Medicaid dollars were then returned to the provider, in effect, holding them harmless for the tax they originally paid. This loophole in Federal law permitted states to shift the cost of their Medicaid programs directly to the Federal government.

Despite the 1991 changes in the law, CMS has noticed a recent trend in states' efforts to maximize their revenues through taxation of health care providers. The result is that the Federal government is paying too much.

By reducing the provider tax threshold the Administration is proposing to reduce the amount of cost-shifting that now takes place in some states.

The Administration's proposal would phase-down the maximum limit on the collection of health care-related tax revenues to a limit not to exceed three percent of the net revenues of the taxpaying class of health care providers. The reduction of the limit to three percent would become effective immediately for any health care-related tax programs enacted <u>after</u> the effective

5

date of the Federal legislation. However, states that are currently collecting up to the six percent limit would be given three years to reduce their rate to three percent. The Administration estimates that this change in law would save the Federal government $3.17 billion in FY 2006-FY 2010.

### *The President's Proposal – Limiting Reimbursement to Medicaid Cost*

Currently, payments to individual provider entities owned or operated by state and local governments are not limited to the amount it actually costs to provide medical assistance services. Instead, payment limits to these providers are governed by regulations defining the Medicaid UPL. These regulations limit Medicaid payments for a given service to what Medicare payments would be for the same service.

States have maximized Federal matching payments by claiming expenditures that far exceed their actual costs of providing a service and, through various recycling arrangements, have shifted their costs to the Federal government.

The GAO has repeatedly recommended that "Congress should consider implementing a recommendation...to enact legislation to prohibit Medicaid payments that exceed costs to any government-owned facility."[1]

The Administration proposes to amend the Social Security Act to provide that Medicaid Federal financial participation, or FFP, would not be available for state payments made to state or non-

---

[1] Allen, Kathryn. "Medicaid: State Financing Schemes Again Drive Up Federal Payments." GAO testimony presented to the U.S. Senate Committee on Finance. September 6, 2000. See also "Medicaid: States Use Illusory Approaches to Shift Program Costs to Federal Government." GAO/HEHS-94-133, August 1, 1994.

state government-owned or operated facilities or providers which exceed a facility's or
provider's actual costs of providing such assistance.

For purposes of determining cost, a variety of sources will be considered, including Medicare
reasonable cost payment principles.  Cost-based payment limits would be applied on an
individual, facility-specific basis to state-owned and non-state owned government providers for
services provided, including inpatient hospital services, outpatient hospital services, nursing
facility services, ICF-MRs, clinics, physicians, schools, and home and community based waiver
services.  The cost-based payment limit would replace current regulatory upper payment limits
that affect state or non-state government providers.  Limits would be calculated on a facility
basis for each type of service.  The Secretary would develop a uniform methodology for
determining the cost of care and services.   States would not receive Federal matching funds for
payments to these providers to the extent the payment rate in their approved state plan exceeded
the cost of care and services.

The changes proposed by the Administration would be effective October 1, 2006.  Together with
the net expenditure proposal, the President's Budget projects $5.9 billion in savings over five
years.  CBO has not yet scored these proposals.

### *The President's Proposal – Medicaid Administrative Claiming*

The President's Budget proposes to curtail inefficient Medicaid administrative spending patterns
by establishing an allotment for Medicaid administrative claiming.

7

Under the Administration's proposal, the Federal government would establish a state-specific limit on the amount of Federal matching funds available for the costs of state and local administration of the Medicaid program, by establishing an administrative costs allotment for each state.  State administrative costs allotments would be based on the administrative costs for each state for a base year.  The Administration estimates that this provision would save $1.1 billion between FY 2006 and FY 2010.

*The President's Proposal – Clarifying the Definition of Rehabilitation Services*

Under current practices, states are billing Medicaid for rehabilitation services that are intrinsic elements of non-Medicaid programs.  In reviewing plan amendments, we realize that the definition of rehabilitation services is so broad that there is risk for Federal dollars to be inappropriately claimed.  The Administration proposes to prevent this cost shifting by statutorily excluding payment for rehabilitation services that are intrinsic to programs other than Medicaid. The proposal clarifies that Medicaid payments **will be** available for appropriate rehabilitation services that are intended for the maximum reduction of physical or mental disability and measurable restoration of an individual to the best possible functional level.

The proposal will ensure that payment is excluded for rehabilitation services if the services are routinely furnished without charge, are not billed under a fee schedule, or are not provided with respect to a specific individual.

*The President's Proposal –Clarifying the Definition of Case Management*

In a similar vein, we also believe that it is appropriate to prevent Medicaid from being billed for **other** activities that are intrinsic elements of non-Medicaid programs.  For example, CMS has determined that the costs of services that are part of the administration of programs such as foster care, the Individuals with Disabilities Education Act (IDEA), and state adult and juvenile justice programs are being shifted to Medicaid by some states.

In one state where millions of dollars had been claimed under Medicaid for case management services to fund the administrative costs of a state's foster care program, CMS found that court appearances, crisis counseling, training of parents and transportation services related to foster care and child welfare were claimed as Medicaid case management.

The Administration proposes to put an end to this cost shifting by statutorily excluding payment for case management services that are a part of programs other than Medicaid.  Additionally, the Administration seeks to lower reimbursement for targeted case management services to the administrative match rate of 50 percent.

The proposal clarifies that Medicaid payment **will be** available for case management services that will assist individuals in gaining access to needed medical, social, educational, and other services, so long as the case management services are distinct from these other services, and designed to achieve specific, measurable health care outcomes.

The Administration estimates that the changes to target case management and rehabilitation services will save $3 billion over five years.

In addition to these legislative proposals for clarifying the definition of rehabilitation services and case management, the Administration proposes to codify Medicaid "free care" policy in regulation.

### *The President's Proposal - Restructuring Medicaid Pharmacy Payment to Use Average Sales Price (ASP)*

Under current law pharmacies are paid for drugs they dispense to Medicaid beneficiaries based on the lower of the pharmacy's estimated acquisition cost (EAC) plus a reasonable dispensing fee, or their usual and customary charges to the general public.

States generally use published commercial compendia prices as the basis for establishing EAC. That is, states use average wholesale price (AWP) and apply a discount (generally in the range of 10 percent to 15 percent); or states might use wholesale acquisition cost (WAC) plus a percentage markup.

For multiple source drugs with sufficient competition in the market (generic drugs), CMS sets a Federal Upper Payment Limit (FUL) on Medicaid drug payment.  To set the FUL, CMS selects the lowest price (AWP, WAC or Direct Price) and multiplies it by 150% as required in regulations to arrive at the FUL.  If a state sets its EAC above the FUL, CMS will only pay

Federal matching funds up to the FUL, rather than for the full amount of the state-established EAC.

In addition to payments for the drugs themselves, states add a *dispensing fee* that covers all of the cost of services that the pharmacy provides to dispense the drug, including pharmacy overhead, salaries and profit. The regulations require that this dispensing fee be reasonable. The states currently have options as to how they will establish EAC and dispensing fees. In some states these payment amounts are set by state legislation. In other states, studies are done as to what the amounts should be. Sometimes, states will look to what neighboring states are paying.

Under the current system, states have not been able to easily compare their rates with those of private payers as those payers have held their rates to be proprietary and confidential. States have also generally not been able to audit the prices that pharmacists pay in any systematic manner because of the administrative burden of keeping up with approximately 50,000 active National Drug Codes on the market.

Unfortunately, this statutorily established system results in inflated payment for Medicaid drugs. AWP is a list price that is set by a drug manufacturer for their products and most states use AWP as a basis for establishing EAC. Pharmacies acquire the drugs from the manufacturer for a cost that is usually much lower than the AWP. The difference between the pharmacy acquisition cost and the reimbursed amount is referred to as the "spread." The larger the "spread" the more a pharmacy profits on the reimbursement from Medicaid. This system has created an incentive for manufacturers to artificially raise the AWP to make their products more attractive to pharmacies

11

because the profit will be larger with the higher AWP. Pharmacies will stock and fill generic prescriptions with products that have the widest spread, thus resulting in the greatest profit. This has led to ever increasing AWPs and an ever increasing imbalance between what Medicaid pays and true market prices.

The President's Budget proposes to require state Medicaid programs to use the Average Sales Price (ASP) of a prescription drug to the pharmacy as the basis for reimbursement. The ASP is defined as the actual price at which a manufacturer sold a prescription drug to the pharmacy or wholesaler. Currently CMS collects ASP data from manufacturers for use in establishing prices for most drugs payable under Part B of the Medicare program. Using ASP in the Medicaid program would establish a similar price reporting system for both Medicare and Medicaid, making that process simpler for manufacturers to comply with. However, because Part B covers only a limited number of drugs, the ASP reporting would need to substantially increase to include all of the Medicaid covered drugs.

The President's proposal would require states to pay pharmacies a reasonable dispensing fee of six percent of ASP to compensate the pharmacy for the storage, dispensing, and counseling that they provide for Medicaid beneficiaries. This is consistent with Medicare reimbursement under Part B established under the Medicare Modernization Act of 2003 (MMA).

This proposal would give states flexibility in the way in which they pay for drugs. For example, states could reimburse at a rate higher than 106 percent of ASP for a generic drug, and less than 106 percent of ASP for a brand name drug, so long as in the aggregate the state is paying 106

12

percent of ASP per quarter.  This would continue to encourage the use of generic substitutes in the Medicaid prescription drug program.  States could also pay rural pharmacies a higher rate to encourage access.

The Administration estimates that this proposal would save $542 million in the first year, and $5.4 billion over 5 years.  CBO estimates that this proposal would save $947 million in the first year, and $5.2 billion over 5 years.

### *The President's Proposal – Amending the Medicaid Drug Rebate Formula*

The Medicaid program requires all drug manufacturers to pay a rebate for all drugs covered by Medicaid.  The calculations for this rebate involve a figure called lowest private market price, or best price.  This figures functions as a price floor.  The Administration proposes replacing best price with a budget neutral flat rebate.

### *The President's Proposal - Addressing Asset Transfers*

Current law requires individuals applying for Medicaid long-term care services to spend all but a minimum level of assets before becoming eligible.  However, creative estate planning often allows individuals to become eligible for Medicaid without using their own assets for needed care first.

When an individual who applies for Medicaid has transferred assets within the look-back period (currently 3 years for transfers to natural persons, and 5 years for transfers to trusts), the  value of

13

those assets are counted in determining a period of ineligibility for long term care services under Medicaid.

However, the penalty period for such asset transfers currently begins to run on the date of the asset transfer. The result is that at the end of the look-back period, the individual is free to shift the burden for paying for long-term care to the Medicaid program, and in some extreme cases, for assets transferred within the look-back period, the penalty period could be over before the individual even requires long term care services or applies for Medicaid.

The President's proposal would begin the penalty period upon the later of (1) the asset transfer; or (2) the point at which an individual is getting Medicaid and is receiving long-term care services either in an institution or, in certain circumstances, in the community. This would prevent individuals from planning ahead and transferring their assets so that the penalty period expires prior to their needing long-term care.

The Administration estimates this change would save $99 million for the first year, and $1.5 billion over five years. CBO estimates this would save $260 million for the first year, and $1.4 billion over five years.

***Medicaid Oversight Activities***

Medicaid oversight involves at least two distinct and equally important functions. The first, financial management involves the oversight of state claims for Medicaid and SCHIP Federal reimbursement which includes the monitoring of Federal payments. This is distinct from our

14

second function which is to prevent and identify efforts to defraud the Medicaid program, generally by providers but occasionally by beneficiaries who most often are in collusion with providers. CMS and states need to partner to prevent and control these criminal acts because we are both victimized by these unscrupulous providers.

Both financial management review and fraud and abuse prevention and control activities need to be done to ensure overall program integrity. Financial management oversight requires that CMS audit and survey states to assure that tax payer dollars are not misspent. For fraud and abuse prevention and control, we must partner with the states because of the mutuality of interest. These are two different problems with two different solutions that require flexibility in the use of very limited staffing resources.

### *Financial Management Review Activities*

To improve the internal controls related to the Medicaid program to ensure a strong oversight function, CMS is in the process of hiring 100 new financial management staff. As of June 14, 2005, we had hired 97 FTEs to monitor state activities and enforce compliance with CMS financial management procedures and improve Medicaid financial management oversight. Ninety of the staff are allocated to specific states and 10 of these staff are based in Central Office. Extensive training for these new hires was conducted in September 2004, late February of 2005, and April of 2005 with additional training planned for September of this year.

Since that training, the new staff have begun making the necessary contacts with their respective Medicaid agencies to gain a thorough understanding of the overall organizational structure of the

state's Medicaid program; the programmatic structure of the state's Medicaid program; and the state budget, expenditure, and financial management processes. They have been working closely with current Regional Office and state financial management staff on these activities.

These new employees have met with numerous health officials in their respective states, attended public hearings regarding the 2006 state budgets, and have performed significant research of public records, and participated in financial management reviews with current Regional Office staff. They will be integrated into the review of Medicaid reimbursement state plan issues, perform reviews of state funding issues, assist in the resolution of OIG and GAO audit findings, and perform other financial oversight activities. Through their work, and through coordination with the Regional Offices, we will prevent new versions of inappropriate financing arrangements before they are put in place and replicated. The President's Budget alerts Congress to one of these new versions dealing with provider taxes on Medicaid-only managed care organizations and we have urged the adoption of legislation to close this loophole that will surely get bigger without Congressional action.

Additionally, as discussed previously, CMS recently consolidated our reimbursement review teams and created a Division of Reimbursement and State Financing (DRSF) within the Centers for Medicaid and State Operations (CMSO) to consolidate in one component responsibility for all state Medicaid payment policy and state Medicaid funding issues. A central responsibility of this Division is to ensure consistency in the application nationwide of Medicaid payment and funding policy. The 10 new Central Office staff noted above are housed in this Division. The Division comprises three Teams which are responsible for institutional reimbursement, non-

institutional reimbursement, and state funding policy and oversight. As part of this integrated approach, there are bi-weekly conference calls with DRSF and each Regional Office, in which we discuss pending Medicaid reimbursement SPAs and Medicaid financial management issues in the respective regional offices. Through these bi-weekly calls, we develop a cross-representational team that is equipped to address the full range of Medicaid reimbursement and financial issues in each state within each region. These calls began on February 7, 2005.

### *Contingency Fee Contracts*

A large number of states have used consultants, paid on a contingency fee basis, to implement projects to maximize their Federal Medicaid reimbursements. A number of the schemes created by these consultants have inappropriately inflated the Federal share of funding and CMS has moved to stop this practice. In May of 2002 and again in November of that year, CMS sent memoranda to its Regional Offices clarifying that except in certain limited cases, contingency fees are not permissible administrative expenses and should not be the cause of any Federal matching funds going to the states. Contingency fee consultants have helped states maximize the Federal dollars flowing into their systems through manipulation of targeted case management, rehabilitation services, supplemental payment arrangements, school-based services, and administrative costs. CMS has taken action in each of these areas, including disallowances, financial management reviews, OIG contracted audits, disapproval of state plan amendments, and legislative recommendations to Congress.

***Fraud and Abuse Activities***

When considering fraud and abuse reduction efforts in the Medicaid program it is critical to remember that this is a joint Federal-state effort and that both levels of government have people devoted to preventing and addressing fraud. CMS works with the states, and uses its own systems as well, to prevent fraud and abuse prior to their occurrence, a more efficient model than attempting to find and prosecute fraudulent actors after the fact.

Federal regulations require that each state Medicaid agency maintain a Medicaid Management Information System (MMIS). The MMIS is a claims payment and information retrieval system. A vital part of each state's MMIS is the Surveillance and Utilization Review Subsystem (SURS). SURS is a mandatory component of MMIS. Each state also has a unit of the same name. The principal purpose of the SURS unit, utilizing the subsystem, is to safeguard against inappropriate payments for Medicaid services. This is done by analyzing and evaluating provider service utilization in order to identify patterns of fraudulent, abusive, unnecessary and/or inappropriate utilization.

Each MMIS must be Federally certified before funding is granted. CMS utilizes multidisciplinary teams to conduct comprehensive, onsite reviews before such certification is granted. CMS funds 90 percent of the administrative costs associated with the start up of each state's MMIS and then continues to fund each state at a 75 percent Federal match for the ongoing operations of these systems. In FY 2003, CMS' share for the funding of these state systems was over $1.5 billion.

18

When the SURS identify suspected fraud cases, they refer them to the State Medicaid Fraud

Control Units (MFCUs), another element of the Federal-state partnership to protect the Medicaid

system.  In FY 2003, the MFCUs recovered $268 million in court restitutions, fines, civil

monetary penalties and were instrumental in obtaining 1,096 convictions.  A total of 538

individuals and entities were excluded from participating in the Medicare and Medicaid

programs based on referrals made to the OIG by the MFCUs.


***Medicaid Alliance for Program Safeguards***

In an effort to better coordinate Medicare and Medicaid program integrity, CMS, in partnership

with the State of California, initiated a project, known as Medi-Medi, designed to share and

analyze both Medicare and Medicaid data beginning in 2001.  Comparing data from both of

these programs revealed fraudulent patterns previously invisible to either program, independent

of the other.


Participants in this project include staff from CMS' Central Office and San Francisco Regional

Office, the California Department of Health Services, the FBI (Central and Regional offices), the

Assistant United States Attorneys, the California Attorney General's Office, and the Department

of Health and Human Services' Office of Inspector General.


The project uncovered a number of fraudulent schemes.  For example, Medi-Medi discovered

one provider who was billing 32 hours of services on a single day, 16 hours to each program.

Although 16 hours worth of services is a high amount, it is not impossible and would be passed

over by either program independent of the knowledge of what was going on in the other

program.  In another scheme, a number of providers were found to be submitting bills designed

to be rejected by Medicare, submitting the bill to Medicaid for full payment (as opposed to the

20 percent Medicaid would pay after Medicare paid 80 percent), then resubmitting a clean,

"payable" bill to Medicare for full Medicare payment.

Since the inception of the original Medi-Medi Data Match Project in California in FY 2001,

CMS has allocated just over $23,000,000 in Health Care Fraud and Abuse Control (HCFAC)

funds for the continuation of the California project and for the expansion of the original Medi-

Medi project to eight (8) additional states.  The FBI also provided nearly $7,000,000, bringing

the total funding for the Medi-Medi Data Match Project to $30,000,000 between FY 2001 and

FY 2005.

One of the major benefits established by the California data match project was that it yielded

templates for a Scope of Work (SOW), and Computer Matching Agreements (CMA) for use by

the expansion states. This has enabled the expansion process for newly participating states to

move along more quickly.

CMS finalized the necessary SOWs and CMAs with the expansion states of Texas, Illinois,

Pennsylvania, North Carolina, Florida, and New Jersey.   These expansion states began data

sharing in May 2004.  Recently, CMS added the states of Ohio and Washington to this project

and they have recently finalized their CMAs.  They will likely begin data matching in FY05.

To date, tracking reports that include the State of California and the six expansion states that are currently operational indicate a total of approximately $199 million worth of cost avoidances, savings, and recoveries. To date, 240 investigations have been opened and are in various stages of development with 28 cases having been referred to law enforcement. Our Administrator, Dr. Mark McClellan, has publicly expressed his strong support for this program. CMS plans to continue and expand these efforts.

### *School-Based Services*

There is always some confusion regarding Medicaid payment of services versus the costs associated with administering them. With regard to payment of administrative services by Medicaid, which may include administrative functions related to providing transportation services, the Centers for Medicare & Medicaid Services (CMS) issued the Medicaid School-Based Administrative Claiming Guide (the Guide) on May 28, 2003. The Guide is intended to address the requirements for claiming the costs of Medicaid related administrative activities – including those related to transportation -- performed in schools. It is not intended to address or change existing requirements for providing Medicaid services in the school setting and claiming for related service expenditures.

In 1997, CMS issued a technical assistance guide that contained specific information on Medicaid requirements associated with seeking payment for coverable school-based services. This included specific guidance on transportation services. In 1999, CMS sent all state Medicaid Directors a letter providing further guidance on reimbursement for school-based health services under Medicaid.

Currently, the Office of the Inspector General is conducting audits in multiple states involving claims for school-based health services.  The objective of the audits is to determine if Medicaid payments for school-based health services are in accordance with applicable laws and regulations.  To date, OIG has issued final reports in eleven states.  Its audit work has shown that Federal Medicaid funds were claimed for (1) services that were not approved in the state plan, (2) services that were not sufficiently documented to ensure that services prescribed in the students' individualized educational plans (IEP) were delivered, (3) services that were not authorized or were in excess of the quantity authorized in the IEP, (4) transportation services when there was no authorized Medicaid service on the same day, (5) services rendered by health care providers that did not have the qualifications required by Medicaid regulations, (6) services provided free to other students, and (7) students who were absent.  OIG's audit work in this area continues.

As noted, the Department has already issued guidance to states to help them understand what administrative services Medicaid will reimburse.

***Payment Accuracy Measurement Project/Payment Error Rate Measurement (PAM/PERM)***

In July of 2001, CMS announced a demonstration project, known as Payment Accuracy Measurement (PAM), to work with states in developing model methodologies to measure the accuracy of payments made for Medicaid services.  CMS was interested in methodologies that multiple states could use so that the Agency could develop a national payment accuracy rate.

CMS took this step at the urging of Congress, the GAO and the Office of Management and Budget (OMB).

A payment accuracy rate establishes a base to:

- identify the extent of problems in the payment system;
- study causes; and
- strengthen internal controls.

The goals of the study team established under this demonstration project were to:

- overcome the various obstacles to identifying payment errors;
- foster experimentation to identify successful strategies and practices that would help public payers in future PAM projects; and
- help CMS gain perspective on the conceptual and practical challenges facing states in implementing Medicaid payment accuracy measurement systems.

The Payment Accuracy Measurement Project (PAM) methodology has been developed and pilot tested with extensive collaboration from participating states during a four-year research and demonstration project.

In the first year, FY 2002, the pilot study was conducted in 9 states, which expanded to 12 states in the second year, and to 27 states in the third year.  This year, the fourth year, 30 states are participating and the project was re-named the Payment Error Rate Measurement (PERM) project.  Twenty four of the states are pilot testing the CMS methodology in their Medicaid and SCHIP programs; three states are pilot testing the methodology in their SCHIP-only program;

and three states are pilot testing the methodology in their Medicaid-only program. The ultimate goal of the PAM is the national implementation of a Medicaid and SCHIP Payment Error Rate Measurement (PERM) project.

### *Survey and Certification of Facilities*

In addition to the efforts laid out above, CMS maintains oversight of the survey and certification of nursing homes and continuing care providers including hospitals, nursing homes, home health agencies, end-stage renal disease facilities, hospices, and other facilities serving Medicare and Medicaid beneficiaries, and makes available to beneficiaries, providers/suppliers, researchers and state surveyors information about these activities. Periodic surveys of these institutions are preformed by state agencies, under the direction of CMS, and reports are then made to CMS concerning the results. These efforts help not only to ensure that the appropriate conditions of participation are being met by the providers, but that they are not engaging in waste, fraud and abuse.

### Conclusion

We are proud of the progress we have made to date in protecting the integrity of the financing of the Medicaid program. We know our work is not over and that we must be ready to predict and respond to new developments. The President's Budget describes areas for your consideration in ensuring these actions will be enduring. Thank you again for the opportunity to speak with you today. I look forward to answering any questions you might have.