14

VOLUME: I

CONFIDENTIAL TRANSCRIPT

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL NO. 1456

Civil Action No. 01-CV-12257-PBS

Judge Patti B. Saris

IN RE:                              )
PHARMACEUTICAL INDUSTRY              )
AVERAGE WHOLESALE PRICE              )
LITIGATION                           )
                                    )
                                    )
THIS DOCUMENT RELATES TO             )
ALL CLASS ACTIONS                    )

     DEPOSITION OF MICHAEL C. WALSH, called as a witness on behalf of the Plaintiffs, pursuant to the applicable provisions of the Federal Rules of Civil

Case 1:01-cv-12257-PBS   Document 3669-15   Filed 02/08/07   Page 3 of 10

Page 77

```
 1      version and we wanted to optimize our
 2      market share within CVS, or whatever, so
 3      we might or we would offer them a market
 4      share program to increase their share of
 5      that product category within CVS.
 6                As they increased share, they were
 7      entitled to certain rebates.  I believe
 8      all the rebates were from the Warrick side,
 9      not Schering side.
10 Q.   So, if I understand your testimony, there
11      would be -- the incentive for increased
12      sales of Proventil would perhaps result in
13      a rebate that would come from Warrick?
14 A.   I believe if you increased your market
15      share, not necessarily sales, if you
16      increased your market share of the categories
17      you were entitled to rebates, it did not
18      involve price, at least on the branded
19      side.
20 Q.   Getting back to the side of AWP by your
21      accounts, and particularly I'm referring
22      to the chain drugstores, is it not your
```

Page 78

```
 1      understanding that AWP is used by your
 2      accounts, your chain drugstores, for
 3      reimbursement purposes?
 4 A.   It's my understanding they, yes, they do
 5      that.
 6 Q.   And what is your understanding, who were
 7      they getting reimbursement from?
 8 A.   I'm not an expert in managed care, but
 9      managed care, Schering-Plough negotiates
10      with managed care based on the number of
11      lives that a particular account is, has,
12      and they, the managed care organization,
13      reimburses a chain at a certain level of
14      reimbursement.  And whether they do that
15      off of AWP or not, I suppose they do, but
16      I don't really know that.
17 Q.   In marketing, any of your experience in
18      marketing drugs to your accounts, have you
19      ever used as a selling point, a marketing
20      point, the spread between an invoice price
21      and AWP?
22 A.   Absolutely not.
```

1 Q. Have you ever heard of anybody in
2    Schering-Plough doing that?
3 A. No, not on any branded product.
4 Q. On non-branded products, have you heard of
5    anybody doing that?
6 A. I don't know what the non-branded people do.
7 Q. On a generic product, have you heard of
8    anybody doing, marketing the spread to move
9    inventory or to increase sales?
10 A. I don't know.  I don't have any knowledge
11    of that at all.
12 Q. You've been with Schering-Plough since
13    1970?
14 A. Yes.
15 Q. Have you ever heard of an instance where
16    someone was marketing the spread as we've
17    discussed it, the difference between an
18    invoice price and AWP?  Have you ever heard
19    of anybody marketing the spread at
20    Schering-Plough?
21 A. I'm not aware of anyone marketing the spread
22    on any branded product at Schering-Plough.

```
 1 Q.   Have you ever been instructed by a
 2      supervisor, a superior at any of your
 3      positions that marketing the spread was
 4      not to be done?
 5 A.   We were told not to talk about AWP, period.
 6 Q.   When were you told that?
 7 A.   I don't know exactly.  The last five years
 8      perhaps.
 9 Q.   Who told you not to talk about AWP?
10 A.   I believe it would have been Mr. DiLascia.
11 Q.   Did he offer a reason as to why you were
12      not to speak of AWP?
13 A.   I don't recall the actual reasoning
14      behind it, just that there was a lot of
15      misunderstanding as to what AWP was,
16      therefore, just don't get into discussions
17      about it.
18 Q.   And when you say "misunderstanding," who
19      was having the misunderstanding?
20 A.   Well, pricing groups were having a
21      misunderstanding.  I guess Schering was
22      having a misunderstanding also.  We would
```

1 A.   Not formal presentations.

2 Q.   Have you had informal presentations?

3 A.   Right.

4 Q.   And that would be -- what would your

5      presentation regarding Clarinex be with

6      your accounts?

7 A.   It would depend on at any particular point

8      in time.  Clarinex was the new version of

9      Claritin, which had gone over-the-counter,

10     Claritin had gone over-the-counter, and we

11     were trying to convert as much of the

12     prescription business for Claritin over

13     to Clarinex.  That was probably the main

14     thrust of our presentation on Clarinex.

15 Q.  And also, I believe you had competition in

16     the form of Allegra and Zyrtec; is that

17     correct?

18 A.  That's right.

19 Q.  And did you incorporate her suggestions

20     regarding comparing AWP pricing into your

21     Clarinex presentations?

22 A.  We never talk about AWP.  There's no reason

1    to.

2 Q.  Did you talk to Ms. Judith Dane after you

3    received this communication which is

4    Exhibit Walsh 017, and tell her that you did not

5    communicate or talk about AWP?

6          MR. KAUFMAN:  Objection.  You may

7    answer.

8 A.  I don't recall talking to her about it.

9 Q.  Is that something you would have done,

10   receiving a communication like Exhibit Walsh 017

11   where she is suggesting that you discuss

12   AWP with your accounts?

13         MR. KAUFMAN:  Objection.  You may

14   answer.

15 A.  I would never discuss it.  It wouldn't be

16   an option.  I just wouldn't discuss it.  I

17   would discuss differences in price, direct

18   selling price, but I have no reason to ever

19   bring up AWP.

20 Q.  Is it your testimony that you have never

21   discussed AWP pricing with any of your

22   accounts?

```
1           MR. KAUFMAN:  Objection.  He's
2   already testified differently than your
3   question assumes.  You may answer.
4 A. I have never proactively brought up AWP
5   as a selling point.
6           MR. KAUFMAN:  Mr. McNeely, I note
7   this is an incomplete document.  It's missing
8   a page.  77575 is followed by 77577.
9           MR. McNEELY:  It may have something
10  to do with if you look at 7575, it talks
11  about an image that cannot be produced or
12  created, so I don't know if there was -- if
13  that would explain it.  But no, there's no
14  intentionally leaving any part of this
15  document out.
16          MR. KAUFMAN:  Okay.
17          MR. McNEELY:  So I don't know if
18  that meant that there was another blank page,
19  but there's nothing intentional, and the
20  answer is I can't explain it.
21          MR. KAUFMAN:  Okay.
22
```

Page 107

```
 1              (Exhibit Walsh 018 marked for
 2       identification.)
 3
 4 Q.    Mr. Walsh, you've been handed Exhibit
 5       Walsh 017.  Would you please review
 6       that and I will -- I'm sorry.  Exhibit Walsh 018.
 7 A.    (Witness examines document)  Yes.
 8 Q.    Can you identify that document?
 9 A.    The latter part here came from Jerry
10       Rebel, who I'm not sure of his exact title,
11       but VP of finance for CVS Corporation,
12       responding to Schering-Plough's proposal
13       for a settlement on deductions, and we
14       made a proposal and then they made a
15       counterproposal.
16 Q.    This involves CVS?
17 A.    Right.
18 Q.    And that was one of your accounts?
19 A.    Yes.
20 Q.    Do you know how, when we talk about proposals
21       and counter-proposals, this involves --
22 A.    Two credit departments.
```