**17**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| IN RE: | ) |
| PHARMACEUTICAL INDUSTRY | ) |
| AVERAGE WHOLESALE PRICE | )MDL NO. 1456 |
| LITIGATION | )Civil Action No. 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) |
| ALL CLASS ACTIONS | ) |


VIDEOTAPED DEPOSITION OF PETER

KAMINS, called as a witness on behalf of the

Plaintiffs, pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Jeanette N. Maracas,

Registered Professional Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the Offices of Ropes &

Gray, LLP, One International Place, Boston,

Massachusetts, on Tuesday, July 19, 2005,

commencing at 10:18 a.m.

```
 1      upon a percentage increase over the

 2      wholesaler's cost, the net cost to the

 3      wholesaler plus 16 two-thirds percent,

 4      an increase over the wholesaler's cost

 5      depending upon the wholesaler's profit

 6      margin and the volume it does with the

 7      wholesaler.  The actual price that the

 8      retailer pays the wholesaler is usually

 9      less than 16 two-thirds percent due to

10      the competition for business among

11      wholesalers."  Did I read that correctly?

12 A.   Yes.

13 Q.   Is that your, what your understanding was

14      of AWP in 1990 through 1992?

15           MR. CHRISTOFFERSON:  Objection.  You

16      may answer.

17 A.   This is the first time that I can remember

18      seeing this.  I don't remember in 1990 what

19      the definition may have been for this.

20 Q.   And just to -- your answer was this is the

21      first time you've ever seen this definition

22      in a Schering sales policy and procedure
```

1    manual?

2 A.   This is all I recollect seeing.   I have not

3      remembered seeing this before.

4 Q.   As far as the substance or the definition

5      of AWP that you have before you in Exhibit

6      Kamins 001, does that reflect your

7      understanding of what AWP is?

8 A.   General understanding, yes.

9 Q.   Mr. Kamins, do you also -- are you familiar

10     with the term "spread" as it relates to

11     AWP and invoice price?

12 A.  I've heard the term before.

13 Q.  Have you ever used the term in either

14     conversations or meetings within

15     Schering-Plough regarding any marketing

16     or pricing issues?

17 A.  No.

18 Q.  What is your understanding of what the

19     term "spread" means?

20 A.  If you're referring to, which I don't use

21     and I'm not that familiar with, would be

22     the difference between what you've just

```
 1        read here, the average -- the purchase price

 2        and the 16 and two-thirds.

 3   Q.   Have you ever been -- and I'm not trying

 4        to repeat myself, but I want to make it

 5        clear that your recollection is that you've

 6        never been party to any Schering-Plough

 7        meetings where spread was discussed as

 8        part of a marketing strategy or issue?

 9   A.   No.

10   Q.   I'm going to refer you back to another

11        page which is part of Exhibit Kamins 001,

12        and the page is marked as SW 0098595, I

13        believe.  That's a little bit more towards

14        the beginning.  That's 98595, Mr. Kamins.

15   A.   98595?

16   Q.   Yes, sir.

17   A.   Okay.

18   Q.   That appears to be a letter from a Mr.

19        Richard Jay Kogan.  Is that how you see that?

20   A.   Yes.

21   Q.   That particular letter is dated August 20,

22        1996.  Do you ever recall seeing a letter
```

1    such as this?

2 A.  I do not remember this particular letter

3    from 1996, but I could have seen it.

4 Q.  Are you aware of -- if you would, please,

5    just go ahead and if you would review the

6    content of the letter.

7 A.  (Witness examines document)  Okay.

8 Q.  Mr. Kamins, my question is this.  Were you

9    aware that there existed at Schering-Plough

10    a hotline where someone could call and get

11    information regarding legal and ethical

12    guidelines?

13          MR. CHRISTOFFERSON:  Objection.  You

14    may answer.

15 A.  I knew there were means of communicating

16    information or communicating something of

17    this sort.  I don't remember the term

18    "hotline," but I do remember there were

19    means of communicating such as stated in

20    this letter.

21 Q.  From your answer, am I correct to understand

22    that you have never employed or used a

1    company.

2 Q. When you started as a director of trade

3    sales in 1990, can you just tell me what

4    were your duties and how did you go about

5    performing them in a general way?

6 A. In 1990 we had an account responsibility

7    based on the geographic area I had mentioned.

8    Our responsibility would be the management

9    of those accounts in that geographic area.

10 Q. And how would you describe the accounts

11    that you were responsible for?

12 A. Chain and wholesaler accounts headquartered

13    in the region that I was responsible for.

14 Q. Now, at any time during from 1990 to today,

15    have you ever marketed any Schering-Plough

16    product by publishing the spread?  By that

17    I mean AWP and invoice prices.

18         MR. CHRISTOFFERSON:  Objection.  You

19    may answer, if you understand it.

20 A. I'm not sure what you mean by marketing the

21    product.  Could you just explain that?

22 Q. I will ask the question.  Have you ever

```
 1      sent to any of your customers, the chains
 2      or wholesalers, information regarding AWP?
 3 A.   We have in the past listed products with
 4      AWP on it.  We since no longer have done
 5      that.
 6 Q.   When did that stop?
 7 A.   My guess is probably three or four years
 8      ago.
 9 Q.   And prior to three or four years ago, can
10      we use the date, say, 2001?  Is it somewhere
11      around 2001?
12 A.   My guess is it's somewhere within that
13      three or four-year period.
14 Q.   Whatever that period is, I'll just say
15      I'm going to use 2001 and we'll understand
16      that that may not be correct.  But prior to
17      2001, you would send information to your
18      customers regarding AWP; is that correct?
19              MR. CHRISTOFFERSON:  Objection.  You
20      may answer.
21 A.   There would be the list of AWP on a product,
22      yes.
```

 1 Q.   And the communications wherein you would

 2      list or provide AWP information, that was

 3      a communication with an intent to sell

 4      product; is that correct?

 5           MR. CHRISTOFFERSON:  Objection.  You

 6      may answer.

 7 A.   The intent was to notify them of what our

 8      current prices were on the product.

 9 Q.   You had no intent that they would act on

10      that and buy your product; is that what

11      you're telling me?

12           MR. CHRISTOFFERSON:  Objection.  You

13      may answer.

14 A.   It was a notification of what our current

15      prices were.

16 Q.   And these were your customers that you were

17      selling product to; is that correct?

18 A.   That we were notifying them of our products,

19      yes.

20 Q.   Now, as a national -- well, director of

21      trade sales for a specific region, since

22      1990, did you sell all of the Schering-Plough

1     products?

2  A.  Not all of them.  They were the

3      pharmaceutical products, branded

4      pharmaceutical products.

5  Q.  Branded pharmaceutical products.  Were you

6      ever involved in combining any of the branded

7      pharmaceutical products with any promotions

8      that included Warrick generics?

9  A.  Yes, we had a program.

10 Q.  And what were those programs?

11 A.  They were a market share program.

12 Q.  And what combined market share program do

13     you recall selling or promoting to your

14     customers?

15 A.  I don't remember specific details, but we

16     had a market share program based on the

17     specific category in which those programs

18     of Warrick and Proventil were involved in

19     and that would serve as the basis for the

20     vascular products.

21 Q.  That is an Albuterol Sulfate line of

22     products?

1 Q.   Now, Mr. Kamins, in connection with your

2      training as a sales rep before becoming a

3      director of trade sales, did you receive

4      training from Schering with regard to

5      reimbursement issues for your customers?

6 A.   No, I don't remember that as a sales rep

7      in '78.  I don't remember having specifically

8      education on reimbursement.

9 Q.   At any time while you were a sales

10      representative, did you ever have any

11      education from Schering on reimbursement

12      issues for pharmacies and other providers?

13 A.   Back in 1978, I don't remember that

14      reimbursement being a topic that we were

15      being reviewed or educated on.

16 Q.   After you became a trade director and I

17      believe it was 1990, coming forward, did

18      you receive any training from Schering

19      relative to reimbursement issues for your

20      customers, particularly your chain

21      pharmacies?

22 A.   No.

1 Q.  None at all?

2 A.  (Witness shakes head)

3 Q.  Did you ever receive any training with

4      regard to profitability of the chain

5      pharmacies relative to reimbursement

6      issues?

7           MR. CHRISTOFFERSON:  Objection.  You

8      may answer.

9 A.  No.

10 Q.  Is it your understanding that AWP has in

11      the past been a factor considered in

12      reimbursement scenarios, both from the

13      private as well as public reimbursement

14      to providers?

15           MR. CHRISTOFFERSON:  Objection.  You

16      may answer.

17 A.  I've heard that it's used in certain areas.

18 Q.  Have you ever discussed reimbursement

19      issues with any of your customers?

20 A.  No.

21 Q.  Have you ever discussed the margin spread,

22      return of investment or return to practice

1        regarding the difference between AWP and

2        invoice price with any of your customers?

3                MR. CHRISTOFFERSON:  Objection.  You

4        may answer.

5   A.   No.

6   Q.   Have you ever had any of those same

7        discussions regarding reimbursement issues

8        with any of the Schering co-workers?

9                MR. CHRISTOFFERSON:  Objection.  You

10       may answer.

11  A.   No.

12  Q.   You can go ahead and answer now.

13  A.   No.

14  Q.   Has the spread as it affects reimbursement by

15       third parties to any of your customers ever

16       been a source or a consideration in any of

17       your pricing strategies?

18               MR. CHRISTOFFERSON:  Objection.

19  Q.   By "your," I'm talking about Schering-Plough

20       marketing or pricing strategies.

21               MR. CHRISTOFFERSON:  Objection.  You

22       may answer.

1 Q.   To your knowledge.

2 A.   No.

3 Q.   What is your connection either now or in

4      the past with Schering Sales Corporation?

5           MR. CHRISTOFFERSON:  Objection.  You

6      may answer, if you understand it.

7 A.   If I understand what you're asking, I think

8      at some point the trade sales fell under

9      the Schering Sales Corporation, but it has

10     fallen under different areas over the time

11     I've been there.

12 Q.  To the best of your knowledge, what time

13     period was your group under the Schering

14     Sales Corporation, however you want to

15     put it, under its control or within its

16     organization?

17          MR. CHRISTOFFERSON:  Objection.  You

18     may answer.

19 A.  It will be a guess.  It would have been maybe

20     late '90s.

21 Q.  Were you involved or did you play any role

22     in the facts that led to the guilty plea to

1       an anti-kickback violation by Schering

2       Corporation last year?

3               MR. CHRISTOFFERSON:  Objection.  You

4       may answer.

5  A.   No.

6  Q.   Can you identify any of the persons who

7       were directly involved in violations of

8       the anti-kickback laws that led to the

9       guilty plea last year by Schering Sales

10      Corporation?

11              MR. CHRISTOFFERSON:  Objection.  You

12      may answer.

13 A.   No.

14 Q.   Have you ever been instructed by Schering

15      that it was against the policy of Schering

16      to market to your customers the spread or

17      pricing advantage created by the difference

18      between AWP and invoice price?

19              MR. CHRISTOFFERSON:  Objection.  You

20      may answer.

21 A.   Can you repeat the end, please?

22              MR. McNEELY:  Would you read that

1    back, please?

2              (Question read)

3 A.  We didn't do it.  I don't remember exactly

4    if we were instructed not to.  We may have.

5 Q.  As I understand your testimony today, is

6    it correct that you did not discuss AWP

7    and reimbursement issues with any of your

8    customers?

9 A.  Correct.

10 Q.  Now, is it your understanding that marketing

11   the spread as part of a selling strategy was

12   against Schering-Plough policy?

13            MR. CHRISTOFFERSON:  Objection.  You

14   may answer.

15 A.  I never heard it in terms of marketing a

16   spread.  We just did not do that.  My

17   understanding is we would not do that and

18   I did not do that.

19 Q.  If you had heard about somebody marketing

20   the spread as it related to reimbursement

21   profitability of one of your customers, is

22   that something that you would have reported

```
 1      to a supervisor?

 2              MR. CHRISTOFFERSON:  Objection.

 3      Hypothetical.  You may answer, if you

 4      understand it.

 5 A.   I would probably have raised the issue if

 6      I knew of it, yes.

 7 Q.   Have you ever raised the issue with any

 8      supervisor because you learned that someone

 9      was developing a strategy relative to

10      marketing the spread?

11 A.   No.

12              (Exhibit Kamins 015 marked for

13      identification.)

14 Q.   Mr. Kamins, you've been handed what has

15      been marked as Exhibit Kamins 015.  If you

16      would please just take a moment to review

17      that document.

18 A.   (Witness examines document)

19 Q.   What has been marked as Exhibit Kamins 015,

20      can you identify that document?

21 A.   It appears to be a document from a Brian

22      Longstreet to an Olav Hellebo and James
```