18

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE       )   MDL No. 1456
                              )   Civil Action
THIS DOCUMENT RELATES TO      )   01-CV-12257-PBS
ALL CLASS ACTIONS             )   Judge Patti B.
                              )      Satis

The Deposition of MARK DAVID FLYNN,

Taken at 31500 Wick Road,

Doubletree Hotel, Superior Room,

Romulus, Michigan,

Commencing at 9:03 a.m.,

Friday, July 29, 2005,

Before Cynthia A. Chyla, CSR 0092.

Mark D. Flynn					July 29, 2005
Romulus, Michigan

Page 25

1   A.   Oncology, hepatology, rheumatology.

2   Q.   Can you give me the names of perhaps five of
3  your, what you would call your biggest, for lack of a
4  better description, biggest or your better accounts or
5  active, however you want to characterize it?  Do you
6  understand what I'm saying?

7   A.   I'm not sure I understand your question.  Is
8  this strictly to specialty --

9   Q.   Yes, specialty pharmacy.

10   A.   Diplomat Pharmacy in Flint, Michigan.
11  Peninsula Pharmacy, Thompson Pharmacy.

12   Q.   And Peninsula, could you give me -- are they
13  in one town?

14   A.   They are in Marquette, Michigan.

15   Q.   Thank you.  I'm sorry.  And then the --

16   A.   Thompson, Traverse City, Michigan.  Oh,
17  Apothecary Shop, Midland, Michigan.

18   Q.   Now, you have used the phrase that these
19  were somewhat specialty pharmacies.  Of these four,
20  those are what you have described as specialty
21  pharmacies?

22   A.   Yes.

Mark D. Flynn                                          July 29, 2005
Romulus, Michigan

Page 26

1    Q.    Do you call on other or nonspecialty
2    pharmacies or general pharmacists?
3    A.    Very rarely.
4    Q.    What would be the reason or occasion where
5    you would call on other pharmacies?
6    A.    Where either clinics or physician offices
7    are telling me they utilize that particular store.
8    Q.    On -- calling on the doctors and the clinics
9    that use injectable or physician-administered drugs and
10   pharmacies, how and to what extent, if you can describe
11   it, do you provide them pricing information?
12   A.    Rarely, if -- only if asked.
13   Q.    And, what kind of information would you
14   provide to them on those occasions?
15   A.    Typically the questions would be
16   administration, things like the J code for Intron-A,
17   and then the list price in the Schering-Plough price
18   book.
19   Q.    Are there -- do you ever engage your
20   customers in discussions regarding spread?
21   A.    No.
22   Q.    Do you understand what spread is?  Or what

1   is your understanding of what spread is relative to the
2   sales and purchase and reimbursement?
3              MS. MAYER: And, I'm just going to
4   caution the witness that if you have an understanding
5   that is independent of conversations with counsel,
6   you're free to share that. You can't share any
7   understanding you have based solely on conversations
8   with counsel.
9       A.    Excluding those conversations, my
10  understanding of your use of the term spread would be
11  the difference between acquisition price and
12  reimbursement level.
13  BY MR. McNEELY:
14      Q.    Okay. And, for your eight years' experience
15  as an oncology rep calling on doctors and pharmacies,
16  you understand that that is an important issue in those
17  clinics and pharmacies; is that correct?
18             MS. MAYER: Objection.
19      A.    In some of my offices, it's considered
20  important.
21  BY MR. McNEELY:
22      Q.    Okay. At this point, I'm going to hand you

Page 63

1    A.    I don't know.
2    Q.    How is it that you gave the information
3  about Caremark to Tammy in this particular call, or why
4  would you give that information?
5    A.    I would give Tammy that information on
6  Caremark because an individual patient is having a
7  problem with Temodar.  This patient typically diagnosed
8  with a brain tumor.  Average median survival for that
9  patient, depending on the type of brain tumor, could be
10 as little as nine months.  And, having that patient
11 have difficulty and having that patient or their
12 support person run around trying to find resources for
13 a prescription, that's a pretty tough way to spend your
14 time when you've been told that news.
15   Q.    Does Schering-Plough train or give you
16 information on such specialty pharmacies as Caremark?
17   A.    Yes.
18   Q.    How do they do that?
19   A.    Written materials and verbal discussions.
20   Q.    Would that be the same thing true about
21 Curascript, do you provide information relative to
22 Curascript to any of the customers that you call on?

1    A.    Yes.

2    Q.    Now, the records or documents, marketing material that you have at your office or in your storage building at home, would that also include any of your training manuals that you received from Schering-Plough?

7    A.    Yes.

8    Q.    Would those training manuals go back to your initial training back in May of 1997?

10   A.    No.

11   Q.    How far would they go back?

12   A.    I cannot recall the exact date. Early '02, approximate. Early '02 forward.

14   Q.    And, what would be the dates or dating on the marketing material that you have at your office at your house and in storage in your storage shed?

17   A.    Approximately the beginning of 2002 to current.

19   Q.    And, what drugs would that cover, the marketing material that you have?

21   A.    That would be for Temodar and Intron-A.

22   Q.    And, would any of that marketing material

Mark D. Flynn                                            July 29, 2005
                            Romulus, Michigan

Page 65

1    include comparisons on pricing and reimbursement
2    between Temodar and Intron-A with any of its
3    competitors in the market?
4        A.    No.
5                   MS. MAYER:  Objection.
6    BY MR. McNEELY:
7        Q.    Have you ever been provided material on
8    comparisons between Schering-Plough products and your
9    competitors relative to pricing?
10                  MS. MAYER:  Objection.
11       A.    No.
12   BY MR. McNEELY:
13       Q.    Have you ever been provided by
14   Schering-Plough any materials, documents, charts or
15   anything of that nature showing the comparisons of
16   reimbursement between Schering-Plough products that you
17   sell and the competitor products?
18                  MS. MAYER:  Objection.
19       A.    No.
20   BY MR. McNEELY:
21       Q.    As a part of providing information to any of
22   your customers from red book material, have you

Mark D. Flynn                                           July 29, 2005
                          Romulus, Michigan

```
                                                          Page 66
 1    provided data or information relative to any of your
 2    competitors?
 3         A.    No.
 4         Q.    Since you joined Schering-Plough in May of
 5    1997, have you received instructions from
 6    Schering-Plough for the destruction of any of the
 7    documents or materials that they had provided to you?
 8         A.    No.
 9         Q.    What is, to your knowledge, the document
10    retention policy of Schering-Plough relative to the
11    materials that they provide to you?
12         A.    I'd like to go back to the last question,
13    please.
14         Q.    Okay.
15         A.    Can you restate that question for me.
16               MR. McNEELY:  I'm going to ask the
17    court reporter to read that back.
18               (Record repeated as requested)
19         A.    The answer to that question -- the correct
20    answer to that question is yes.
21    BY MR. McNEELY:
22         Q.    And, tell me on what occasions have you
```

Mark D. Flynn                                            July 29, 2005
                         Romulus, Michigan

Page 67

1   received such instructions?

2       A.   Cannot give you specific dates.  There would
3   be periodic typical mailings or e-mail notices or both
4   listing sales literature numbers referring to specific
5   pieces telling you to destroy those particular pieces,
6   and this was prior to '02.

7       Q.   As part of that process of notifying you to
8   destroy certain pieces of literature --

9       A.   Um-hum.

10      Q.   -- were you also required to fill out a
11  compliance form and return that to Schering-Plough?

12      A.   Yes.

13      Q.   And, have you maintained copies of those
14  compliance forms that you've sent back to
15  Schering-Plough personally in your office?

16      A.   I don't know.

17      Q.   Has there ever been a time when you received
18  instructions to destroy any records or materials from
19  Schering-Plough where a compliance sheet or record by
20  you was not filled out?

21      A.   I believe all the notices that I received
22  included the requirement of my signature on documents