20

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL NO. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

x------------------------------x

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY : | DEPOSITION OF: |
| AVERAGE WHOLESALE PRICE : | |
| LITIGATION : | BRIAN |
| _____ : | LONGSTREET |
| : | |
| : | |
| THIS DOCUMENT RELATES TO : | |
| ALL CLASS ACTIONS : | |
| : | |

x------------------------------x

1 any of the products?

2 A.     Was a stake holder and involved in the
3 discussions, did not set the price.

4      Q.      What do you mean by the term stake
5 holder?

6 A.     Somebody who provided feedback and
7 information as it related to pricing.

8      Q.      And when you started in 1989, you
9 received training from Schering-Plough to do your
10 job as a sales rep?

11 A.     Yes, sir.

12      Q.      And you were provided certain
13 manuals and training materials relative to both
14 the general sales proceeds and protocols as well
15 as information on the drugs you were selling?

16 A.     Yes, sir.

17      Q.      Was that also a time you were
18 introduced to the term "average wholesale price"?

19 A.     No, sir.

20      Q.      When were you first introduced to
21 the term "average wholesale price"?

22 A.     Probably when I was in the Contracts and

1 Information Group.

2    Q.    And what year would that have been?

3 A.    Probably 1990 -- 1991, '92.

4    Q.    And what was the information that 5 you were provided concerning AWP at that time?

6 A.    It was a pricing list that contained AWP as 7 well as net direct.

8    Q.    And were you also introduced to the 9 term "spread" for contracting purposes?

10 A.    No, sir.

11    Q.    Were you ever introduced to the 12 term "spread" with relation to marketing or 13 promoting the products to any of your customers?

14 A.    No, sir.

15    Q.    Do you have an understanding of 16 what I'm talking about when I say "spread"?

17 A.    Not fully, no, sir.

18    Q.    And you've never used the term 19 "spread" in any of your analysis in providing 20 comments on pricing or potential marketing 21 incentives to any of your customers. Is that 22 correct?

1  A.      I don't recall.

2          Q.      Is that something that you would
3  have done?

4                  MR. KAUFMAN:  Object to the form of
5  the question.

6          You may answer.

7  A.      Not as routine course of business, no, sir.

8          Q.      Do you ever recall doing it as a
9  nonroutine course of business?

10                 MR. KAUFMAN:  Objection.  Asked and
11 answered.

12         You may answer.

13 A.      I don't recall.

14         Q.      Do you recall ever having
15 discussions with any person in Schering-Plough
16 concerning calculating spreads that would be
17 incentives to any of your customers to purchase
18 Schering-Plough products?

19 A.      I'm not sure what the term "spread" means,
20 sir.

21         Q.      Have you ever used the term
22 "spread" in considering pricing for any

1 Schering-Plough product?

2 A.     I don't recall.

3      Q.       Have you ever been engaged in
4 calculating profitability for any of your
5 customers relative to the purchase and sale of
6 Schering-Plough products?

7 A.     Could have, but I don't recall.

8      Q.       In 1996, as my notes reflect, when
9 you became an account manager in Minnesota, did
10 you have any discussions with UHC or Aetna
11 concerning profitability of selling or the
12 purchase and sale of product in any of those
13 contracts?

14 A.    I'm sorry.  I'm sorry.  Could you repeat
15 the question, sir.

16              MR. McNEELY: Probably not but I'm
17 going to ask the Court Reporter to read it back.

18              (The pending question is read back
19 by the Reporter.)

20              THE WITNESS:  What we discussed was
21 a discount off of our net direct price or
22 wholesale acquisition price for our products.