UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | ) ) Master File No. 01-CV-12257-PBS |
| *State of Montana v. Abbott Labs Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM | ) ) Judge Patti B. Saris ) ) |

### INDIVIDUAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT ASTRAZENECA PHARMACEUTICALS LP'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

<u>P</u>AGE

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 1

ARGUMENT ....................................................................................................................... 4

    A.    AstraZeneca Should be Granted Summary Judgment on All of the
    State's Claims Because the State Cannot Establish That It was Deceived ............... 4

        1.    Plaintiff's Spread Manipulation Theory Has No Application as to
        AstraZeneca's Branded Pharmacy-Dispensed Products ................................. 6

        2.    AstraZeneca's Reporting of ASP Data Demonstrates That the State
        Was Not Deceived as to the Prices of AstraZeneca's Drugs and That
        AstraZeneca's AWPs Did Not Cause Any Alleged Harm to the State .......... 7

        3.    The Spreads Between Acquisition Costs and AWPs for AstraZeneca's
        Products Are Within Plaintiff's Expert's Expectation Yardstick.................... 9

        4.    AstraZeneca Did Not Cause the State to Suffer an Injury Because the
        Net Prices Reimbursed by the State for AstraZeneca's Self-Administered
        Drugs Were Actually Less Than the Pharmacies' Acquisition Costs ........... 10

    B.    AstraZeneca Should be Granted Summary Judgment on All of the State's
    Claims Because the State Cannot Prove That It Suffered an Ascertainable Loss .. 11

        1.    The State Has Produced No Evidence Demonstrating That
        It Suffered a Loss For Certain Claims........................................................... 13

        2.    The State's Reimbursement Decisions Were an Effort to Balance
        Reimbursement Levels and Access................................................................ 14

    C.    AstraZeneca Should be Granted Summary Judgment on the State's Medicaid
    Claims Relating to Zoladex........................................................................................ 16

CONCLUSION ................................................................................................................... 18

i

# TABLE OF AUTHORITIES

<u>CASES</u>

PAGE

*Allen v. Wright,*
    468 U.S. 737 (1984) ............................................................................................ 12

*Arkansas Med. Soc'y, Inc. v. Reynolds,*
    6 F.3d 519 (8th Cir. 1993) .................................................................................. 14

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................................... 6,13

*Commodity Credit Corp. v. Rosenberg Bros.,*
    243 F.2d 504 (9th Cir. 1957) ............................................................................. 8,9

*Dep't of Commerce v. U.S. House of Reps.,*
    525 U.S. 316 (1999) ............................................................................................ 12

*Goins v. JBC & Assocs., P.C.,*
    352 F. Supp. 2d 262 (D. Conn. 2005) ................................................................. 13

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 12

*In re Medomak Canning,*
    922 F.2d 895 (1st Cir. 1990) .............................................................................. 17

*Orthopaedic Hosp. v. Belshe,*
    103 F.3d 1491 (9th Cir. 1997) ............................................................................ 15

*Osterman v. Sears,*
    No. BDV-99-522(c), 2000 Mont. Dist. LEXIS 1631
    (Cascade County District Court, August 30, 2000) ............................................. 5

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    230 F.R.D. 61 (D. Mass. 2005) ............................................................................ 7

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
    442 F.3d 741 (9th Cir. 2006) .............................................................................. 17

*Rivera v. Philip Morris, Inc.,*
    395 F.3d 1142 (9th Cir. 2005) ........................................................................... 8,9

*Ruiz v. Bally Total Fitness Holding Corp.*,
   447 F. Supp. 2d 23 (D. Mass. 2006) ........................................................................ 8

*Starr v. The Summit, Inc.*,
   No. DV 00-20, 2003 Mont. Dist. LEXIS 2451
   (Carbon County District Court, July 10, 2003) ............................................. 5,12,13

*Stoneman v. Morgan, Cameron & Weaver, P.C.*,
   44 F. App'x 846 (9th Cir. 2002) ............................................................................ 13

*United States ex rel. Durcholz v. FKW, Inc.*,
   189 F.3d 542 (7th Cir. 1999)..................................................................................... 5

### STATUTES & RULES

42 U.S.C. §1396(a)........................................................................................................ 14

42 U.S.C. § 1396a(a)(30)(A)........................................................................................... 2

42 U.S.C. § 1396r-8(a)(1) ............................................................................................... 3

42 U.S.C. § 1396r-8(b)(2) ............................................................................................... 3

42 U.S.C. § 1396r-8(b)(3) ............................................................................................... 3

42 U.S.C. § 1396r-8(c)(1) ............................................................................................... 3

42 U.S.C. § 1396r-8(c)(3) ............................................................................................... 3

52 Fed. Reg. 28,648 (July 31, 1987) .............................................................................. 9

MONT. CODE. ANN. § 17-8-231 ...................................................................................... 4

MONT. CODE. ANN. § 17-8-231(1) ................................................................................ 12

MONT. CODE. ANN. § 30-14-103 ...................................................................................... 4

MONT. CODE. ANN. § 30-14-133 .................................................................................... 12

MONT. CODE. ANN. § 53-6-155(7) ................................................................................. 12

MONT. CODE. ANN. § 53-6-160 ........................................................................................ 4

## PRELIMINARY STATEMENT

Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca")[1] respectfully submits this individual memorandum of law in further support of its motion for summary judgment.  As set forth in the Defendants' joint memorandum of law ("Joint Memorandum" or "Joint Mem."), Defendants are entitled to summary judgment on all claims brought by the State of Montana (the "State" or "Plaintiff") in its Second Amended Complaint ("2d Am. Compl.").  AstraZeneca is also entitled to summary judgment on the State's claims brought against it for the independent reasons set forth below:  (1) the State was not deceived or defrauded with respect to the pricing of AstraZeneca's drugs; (2) AstraZeneca did not cause, and the State did not suffer, any ascertainable losses due to AstraZeneca's alleged misconduct; and (3) the State's claims are barred in part by a 2003 settlement between AstraZeneca and the State.

## FACTUAL BACKGROUND[2]

As permitted under the federal Medicaid guidelines, Montana's Medicaid program includes a prescription drug benefit that is administered by the State's Medicaid agency.  *See* 2d Am. Compl. ¶ 159.  Like all other states, Montana has discretion in determining the payment methodology and payment rate for prescription drugs covered by its Medicaid program, subject to federal requirements.  *See* Joint Mem. at 3.  Federal law requires that states, in setting reimbursement rates, balance the interests of patients, pharmacists, and the government in

---

[1] Although named as Defendants, Zeneca, Inc. and AstraZeneca PLC have never been served with the State of Montana's Second Amended Complaint.  The entity identified in the Second Amended Complaint as AstraZeneca U.S. does not exist.

[2] AstraZeneca incorporates by reference the joint Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Joint 56.1 Stmt.").  Facts specific to AstraZeneca are set forth in its individual Local Rule 56.1 Statement of Undisputed Material Facts in Further Support of Defendant AstraZeneca Pharmaceutical LP's Motion for Summary Judgment ("AstraZeneca 56.1 Stmt.").

achieving efficiency, economy, and quality of care, and in enlisting sufficient providers to provide access to care.  *See* 42 U.S.C. § 1396a(a)(30)(A).

With respect to AstraZeneca's self-administered drugs ("SADs") covered under the Montana Medicaid program—which are at the core of the State's claims against AstraZeneca— all prescribing decisions are made by physicians.  *See* AstraZeneca 56.1 Stmt. ¶ 1.  In turn, pharmacists dispense these drugs, and are subsequently reimbursed by Montana Medicaid. While the physician makes the decision as to which SAD to prescribe, he or she does not have an incentive to choose one drug over the other based on the Average Wholesale Price ("AWP")/acquisition cost "spread" because the physician does not pay for and is not reimbursed for the drug.  *See* AstraZeneca 56.1 Stmt. ¶ 2.  The pharmacist must dispense the specific branded drug prescribed by the physician, and does not have the ability to dispense a different drug based on the "spread" he or she would receive via reimbursement.  *See* AstraZeneca 56.1 Stmt. ¶ 3.  Because there is a clear disconnect between *incentive* (the receipt of reimbursement) and *opportunity* (the decision regarding which SAD to dispense), Montana's core theory of liability—in which manufacturers "market the spread" in an attempt to increase market share—is illogical as to AstraZeneca's SADs.

From 1991 to 2004, the top five AstraZeneca SADs (not subject to a Federal Upper Limit ("FUL") through 2004) prescribed and reimbursed for under the Montana Medicaid program were:  (1) Prilosec (omeprazole); (2) Seroquel (quetiapine); (3) Nexium (esomeprazole); (4) Pulmicort Respules (budesonide inhalation suspension); and (5) Accolate (zafirlukast). AstraZeneca 56.1 Stmt. ¶ 4.  These five drugs comprised over 82% of the State's total Medicaid expenditures for AstraZeneca drugs during this period.  *See id.*  For this time, the "spread"

between AWP and Wholesale Acquisition Cost[3] ("WAC") for all of AstraZeneca's Medicaid-covered drugs, including the top five SADs discussed above, was either 20 or 25 percent.  *See id.* ¶ 5.

In addition to federal funding, the Montana Medicaid program receives rebate payments directly from the Defendant drug manufacturers that reduce the ultimate cost the State pays for pharmaceuticals.  *See* 42 U.S.C. § 1396r-8(a)(1), (b)(2) & (3).  The rebates range from a minimum of 11 percent of a drug's Average Manufacturer Price ("AMP") to considerably more for certain drugs, depending on the drug's reported "Best Price."  *See* 42 U.S.C. § 1396r-8(c)(1), (3).  These rebate payments—which are ignored by the State and its expert in their theory of liability—reduce the State's ultimate costs for drugs reimbursed on behalf of Medicaid beneficiaries to levels *substantially below* its payments to pharmacies.  For example, comparing the acquisition costs to Montana pharmacies of AstraZeneca's top five Medicaid-covered drugs to the net reimbursements paid by the State's Medicaid program—taking into account the Medicaid "Best Price" rebates paid by AstraZeneca—the average net Medicaid reimbursement paid by Montana was between 8.5 and 19 percent *less* than what Montana pharmacies paid to acquire these drugs.  AstraZeneca 56.1 Stmt. ¶ 7.  Comparing the pharmacy acquisition cost to the State Medicaid program's net cost for Seroquel, taking into account Medicaid rebates, the State paid roughly 17 percent *less* than did Montana pharmacies for this AstraZeneca product.  *See id.* ¶ 8.

---

[3] The State and its expert, Dr. Raymond Hartman, use Wholesale Acquisition Cost as a proxy for the actual acquisition costs of Montana pharmacies.  *See* AstraZeneca 56.1 Stmt. ¶ 6.  For the sake of addressing the State's allegations, AstraZeneca's expert, Joel Winterton, does likewise.

It is undisputed that Montana pharmacies are not fully compensated for their dispensing costs by the dispensing fees paid by the State's Medicaid program ($4.71 in 2002).  *See id.* ¶¶ 9–12.  Taking into account these inadequate dispensing fees—i.e., comparing the dispensing fees paid by the State to the dispensing costs incurred by pharmacies—Montana pharmacies incurred a small to substantial *loss* in dispensing the top five Medicaid-covered AstraZeneca drugs.  *See id.* ¶ 13.  For example, in 2002, Montana pharmacies incurred a net average loss of roughly one percent in dispensing AstraZeneca's top five drugs under the State's Medicaid program—when the underpayment of dispensing fees is taken into account.  *See id.*  More specifically, retail pharmacies in the State of Montana in 2002 incurred a net loss, on average, of approximately .6 percent when dispensing the drug Prilosec to Medicaid beneficiaries.  *See id.* ¶ 14.

## ARGUMENT

### A.    AstraZeneca Should be Granted Summary Judgment on All of the State's Claims Because the State Cannot Establish That It was Deceived

To prove a claim under Montana's Unfair Trade Practices Act ("MUTPA"), Montana's Medicaid Fraud statute, and Montana' False Claims Act ("MFCA"), the State—and the other parties on whose behalf it brings claims—must be able to point to some evidence of deception or fraud.  *See* MONT. CODE. ANN. § 30-14-103 (MUTPA claim requires proof of "deceptive acts or practices"); MONT. CODE. ANN. § 53-6-160 (Medicaid Fraud statute requires "truthfulness, completeness, and accuracy of submissions to Medicaid agencies"); MONT. CODE. ANN. § 17-8-231 (MFCA claim requires proof of "a false, fictitious, or fraudulent claim for allowance of payment to any state agency or its contractors").[4]

---

[4]  Because the alleged misconduct at issue in this case occurred before the amended version of the MFCA took effect, this memorandum cites to and discusses the pre-amended statute.  *See* Joint Mem. at 34 n.23.

Courts interpreting these Montana statutes have found that when a plaintiff has knowledge of the allegedly deceptive or fraudulent conduct at issue there can be no viable cause of action and, therefore, summary judgment is warranted. *See, e.g.*, *Osterman v. Sears*, No. BDV-99-522(c), 2000 Mont. Dist. LEXIS 1631 (Cascade County District Court, August 30, 2000) (granting summary judgment on a MUPTA claim where the plaintiff was aware of the supposed false information that formed the basis of the claim); *Starr v. The Summit, Inc.*, No. DV 00-20, 2003 Mont. Dist. LEXIS 2451 (Carbon County District Court, July 10, 2003) (holding that no fraud claim existed where the plaintiff had constructive knowledge of the alleged misrepresentation); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) (holding that the government's prior knowledge of an allegedly false claim can vitiate a Federal False Claims Act action).

The State has not demonstrated that Defendants engaged in conduct that defrauded or deceived the State (or third-party payers).  As discussed in Defendants' Joint Memorandum, the State and other payers were not deceived regarding AWP.  The record establishes that AWP was known to be a pricing benchmark or sticker price, rather than an *actual* average of wholesale prices. *See* Joint Mem. at 3–20.  Indeed, Montana deliberately chose to use AWP as a pricing benchmark in its Medicaid reimbursement system, while knowing that AWPs did not equal average wholesale prices. *See* AstraZeneca 56.1 Stmt. ¶ 16.  Third-party payers possessed such knowledge as well. *See* Joint Mem. at 18–20.  Thus, because the State's central and essential allegation of deception cannot be established through evidence, summary judgment is warranted for all Defendants on all of Montana's claims.

Moreover, with respect to AstraZeneca's drugs, the record demonstrates that:  (1) the underlying economics and distribution mechanics for AstraZeneca's drugs render the Plaintiff's

5

theory of liability nugatory as to AstraZeneca's branded pharmacy-dispensed products; (2) AstraZeneca's reporting of average sales price ("ASP") data demonstrates that the State was not deceived as to the prices of AstraZeneca's drugs and that AstraZeneca's AWPs did not cause any alleged harm to the State; (3) the spreads between acquisition costs and AWPs for AstraZeneca's self-administered drugs are well within what the State's own expert has acknowledged as an expected yardstick by market participants; and (4) AstraZeneca's alleged misconduct could not have caused the State to suffer injury because, taking into account Medicaid rebates, the State's net costs for AstraZeneca's drugs were actually less than the acquisition costs of Montana pharmacies.

1.  **Plaintiff's Spread Manipulation Theory Has No Application as to AstraZeneca's Branded Pharmacy-Dispensed Products**

The State claims that AstraZeneca engaged in a scheme to "increase defendants' profits at the expense of Patients and programs such as the Montana Medicaid Program" by manipulating the spread between pharmacy acquisition costs and AWP.  2d Am. Compl. ¶ 173. But the State can point to no facts or evidence that demonstrate that AstraZeneca engaged in such manipulation or had any economic incentive to do so.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (noting that Rule 56 "must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in facts to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims and defenses have no factual basis").

The State chose to use AWP in its Medicaid reimbursement methodology and, while a difference between the published AWPs and actual acquisition costs of AstraZeneca drugs—the

alleged "spread"—might result in greater compensation to Montana pharmacists as a result of the State's choice, AstraZeneca did not have any incentive to increase pharmacy margins.  There is no evidence to the contrary and the record demonstrates that the market conditions and distribution process for AstraZeneca's products eliminate any such incentive on the part of AstraZeneca.  *See* AstraZeneca 56.1 Stmt. ¶ 17.  As discussed in the Factual Background Section, *supra* at 2, a "spread" on branded outpatient drugs could not result in additional sales or expanded market share for a manufacturer because pharmacists have no power to influence the prescribing decisions of doctors.  According to Defendants' joint expert Gregory K. Bell, the idea that manufacturers would purposefully create a "spread" on SADs makes no sense.  *See* AstraZeneca 56.1 Stmt. ¶ 18.  Such a conclusion is consistent with the finding of this Court in the MDL class-action litigation, in which the Court concluded that retail pharmacies cannot impact market share for branded outpatient drugs.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 74 (D. Mass. 2005).

2.   **AstraZeneca's Reporting of ASP Data Demonstrates That the State Was Not Deceived as to the Prices of AstraZeneca's Drugs and That AstraZeneca's AWPs Did Not Cause Any Alleged Harm to the State**

As discussed above, the State and third-party payers were never deceived as to the fact that AWP is merely a pricing benchmark or sticker price, rather than an actual average wholesale price.  Such a conclusion is supported by the fact that the State has chosen not to change its reimbursement methodology or reimbursement rates, even after it initiated this litigation against Defendants almost five years ago.  *See* Joint Mem. at 12.  This lack of change in reimbursement methodology is a strong indication that the State was never deceived—and did not detrimentally rely—on any purported misrepresentations by Defendants in establishing its reimbursement

7

rates. *See Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23, 30 (D. Mass. 2006) (explaining that conduct is considered deceptive when it would have caused an individual to act differently than he or she otherwise would have acted) (internal citation omitted); *see also Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1155 (9th Cir. 2005) (noting that, to establish reliance on a fraud claim under Nevada law, a plaintiff must show that an allegedly false representation played a material and substantial part in leading her to adopt a particular course of action); *Commodity Credit Corp. v. Rosenberg Bros.*, 243 F.2d 504, 512 (9th Cir. 1957) ("Even in cases where a party has been fraudulently induced … it follows that if, after full knowledge of the fraud or deceit, he goes forward and executes it notwithstanding such fraud, the damage which he thereby sustains is voluntarily incurred.").

Moreover, the record establishes that the State could not have been deceived as to the sales prices of certain AstraZeneca drugs because the State received ASPs for these AstraZeneca products, but nonetheless maintained its AWP-based reimbursement methodology.  As discussed in the Joint Memorandum, certain Defendants began reporting ASPs for certain drugs to the State as early as 2001.  *See* Joint Mem. at 17–18; AstraZeneca 56.1 Stmt. ¶ 19.  Despite the undisputed fact that the State has received such ASP data every quarter over the past five years— even to the point of creating a chart comparing these ASPs to the corresponding published AWPs and, thus, demonstrating that the actual ASPs were uniformly well below the published AWPs— the State chose to disregard these ASPs and to continue to reimburse providers for these drugs based on its standard AWP-based methodology.  *See* AstraZeneca 56.1 Stmt. ¶¶ 16, 19, 22.

AstraZeneca itself has reported ASP data to the State for certain drugs since November 2003.  *See id.* ¶ 20.  Even after receiving these ASP data, the State has never altered the way it reimburses for these AstraZeneca drugs, despite the fact that Medicaid regulations permit the

8

State to do so.[5]  Furthermore, the State has never requested information from AstraZeneca

concerning the ASPs for its other products.  Indeed, when asked if the State used the

AstraZeneca ASP data in a manner similar to that of the ASP data reported by other Defendants,

Jeff Buska, Director of Montana's Medicaid agency, testified: "As if you mean using it in the

same way as not using it, yes, that would be correct."  AstraZeneca 56.1 Stmt. ¶ 22.

In the face of this undisputed record,[6] not only is the State's claim of deception unproven,

it is unmistakable that the State cannot prove that "but for" the alleged deception, it would have

done anything different.  This lack of "but for" causation evidence requires the entry of judgment

for AstraZeneca.  *See Rivera*, 395 F.3d at 1155; *Commodity Credit Corp.*, 243 F.2d at 511.

### 3. The Spreads Between Acquisition Costs and AWPs for AstraZeneca's Products Are Within Plaintiff's Expert's Expectation Yardstick

The fact that the State knew, or should have known, that the AWPs for AstraZeneca's

drugs were greater than retail pharmacies' actual acquisition costs is further confirmed by the

analysis prepared by the State's own expert, Dr. Raymond Hartman.  As part of his analysis in

the MDL class-action litigation, Dr. Hartman found that payers are aware that AWPs are greater

than ASPs, but as an important publicly available price, they rely on AWPs to bear a predictable

relationship to ASPs.  *See* AstraZeneca 56.1 Stmt. ¶ 23.  Consequently, Dr. Hartman went on to

---

[5] Federal Medicaid regulations are sufficiently flexible that a State is "free to make payments for individual drugs on any reasonable basis," as long as the State's overall reimbursement methodology still complies with federal regulations that mandate what a State reimburses in the aggregate in order to be entitled to Federal matching funds. 52 Fed. Reg. 28,648 (July 31, 1987).  For example, Montana adopted specific AWPs for certain drugs based on information received from the Department of Justice, and set maximum allowable costs ("MACs") for generic drugs.  If the State believed it was overpaying for AstraZeneca's products, then it could have taken similar steps.

[6] In addition, it is clear the State was not deceived regarding the prices of AstraZeneca's products because non-Medicaid State entities were purchasing various AstraZeneca drugs at prices *below* the Montana Medicaid ingredient cost reimbursement rate.  *See* AstraZeneca 56.1 Stmt. ¶ 21.

attempt to determine what the expectation was for that relationship—i.e., ASPs compared to the corresponding published AWPs.  Dr. Hartman calculated this reasonable expectation to be a 30 percent spread between AWP and ASP, which he has described as a liability threshold.  *See id.* ¶ 24.  Not only would Dr. Hartman's yardstick apply to third-party payers on whose behalf the State asserts claims, but Dr. Hartman specifically testified that state Medicaid agencies are market participants that would have such an expectation.  *See id.* ¶ 25.  Thus, the State's own expert explicitly acknowledges that Montana Medicaid and third-party payers must have known that AWPs were higher than pharmacies' actual acquisition costs.

Moreover, the "spreads" on AstraZeneca's self-administered drugs are well within the 30 percent threshold identified by Dr. Hartman.  Over the period of Plaintiff's allegations, the "spread" between AWP and WAC for all of AstraZeneca's Medicaid-covered drugs was either 20 or 25 percent.  AstraZeneca 56.1 Stmt. ¶ 5.  Because the spreads between the AWPs and the actual acquisition costs (using WAC as a proxy) of AstraZeneca's drugs were within the bounds of what would have been expected by the State and Montana third-party payers—as acknowledged by the State's own expert—the State cannot establish that it has been deceived or that the AWPs for AstraZeneca's drugs caused the State any loss.

4.   **AstraZeneca Did Not Cause the State to Suffer an Injury Because the Net Prices Reimbursed by the State for AstraZeneca's Self-Administered Drugs Were Actually Less Than the Pharmacies' Acquisition Costs**

Surprisingly, in this litigation, the State asserts claims against AstraZeneca in situations where the net Medicaid reimbursements paid by the State to Montana pharmacies were actually significantly less than the amounts it cost these pharmacies to acquire the relevant AstraZeneca drugs.  Under Dr. Hartman's analysis, liability is premised on the State being caused to pay an

10

inflated reimbursement amount.  *See* AstraZeneca 56.1 Stmt. ¶ 26.  In other words, the basis of

Dr. Hartman's liability theory is that Defendants' alleged misconduct caused the State to

reimburse pharmacies at levels above their acquisition costs.  *See id.*  In Dr. Hartman's "but for"

world, the State should have been reimbursing pharmacies at the exact dollar amount paid by the

pharmacies to acquire the relevant Medicaid-covered drugs.  *See id.* ¶ 27.  However, when

Medicaid rebates are factored into this equation for AstraZeneca's drugs, not only is the State not

making reimbursement payments at levels higher than pharmacies' acquisition costs, but the

State is actually paying significantly less.  *See id.* ¶ 7.

AstraZeneca's expert, Mr. Winterton, conducted an analysis that compares the

acquisition costs to Montana pharmacies of AstraZeneca's top five Medicaid-covered drugs to

the net reimbursements paid by the State's Medicaid program, taking into account the Medicaid

"Best Price" rebates paid by AstraZeneca to the State.  *See id.*  Significantly, Mr. Winterton finds

that, for these top-five drugs, the average net Medicaid reimbursement paid by the State was

between 8.5 and 19 percent *less* than what Montana pharmacies paid to acquire these drugs.  *See*

*id.*  Accordingly, it is indisputable that—when Medicaid rebates are taken into account—the net

Medicaid reimbursements made by the State are actually *substantially lower* than the costs

incurred by Montana pharmacies to acquire AstraZeneca's drugs.  In such situations, there can be

no viable argument that AstraZeneca's alleged misconduct caused the State to suffer an injury

through higher Medicaid reimbursements.

**B.      AstraZeneca Should be Granted Summary Judgment on All of the State's Claims
Because the State Cannot Prove That It Suffered an Ascertainable Loss**

The State's claims also fail because it cannot demonstrate a cognizable injury or loss.  All

of the Montana statutes under which the State asserts claims against AstraZeneca contain a

requirement that a plaintiff plead loss or injury.  *See* MONT. CODE. ANN. § 30-14-133 (MUPTA

only provides a right of action to those plaintiffs who suffer an "ascertainable loss of money or

property as a result of the use or employment by another of an unfair or deceptive practice");

MONT. CODE. ANN. § 53-6-155(7) (the term "fraud" as defined under the Montana Medicaid

Fraud statute requires some showing that defendant engaged in conduct that "results in or may

result in [M]edicaid payments or benefits to which the applicant, recipient, or provider is not

entitled."); MONT. CODE. ANN. § 17-8-231(1) (MFCA requires some showing of "damages

sustained by the state as a result of the false claim").[7]  Moreover, a Montana court has

specifically found that the Montana consumer protection statute has a loss requirement.  *See*

*Starr v. the Summit, Inc.*, No. DV 00-20, 2003 Mont. Dist. LEXIS 2451, at *41 (Carbon County

District Court, July 10, 2003).

The State cannot show that it suffered a loss because it cannot show that any alleged

misconduct by AstraZeneca caused it to overpay Montana pharmacists for AstraZeneca drugs.

First, the State has not produced any data sufficient to show that it incurred an ascertainable loss.

Second, the State's causes of action are predicated on the basic assumption that pharmacies were

receiving windfall profits as a result of Defendants' purported fraudulent scheme.  Mr.

Winterton, however, conducted an analysis of the net amounts that Montana pharmacies received

in reimbursement from the State for dispensing AstraZeneca's drugs under the Medicaid

program, and found that these pharmacies barely broke even.  Indeed, in many instances, these

pharmacies actually lost money in dispensing AstraZeneca's drugs to Montana Medicaid

---

[7] The State's inability to demonstrate loss can also be characterized as an Article III standing defect because without proof of loss, the State has no standing to bring suit.  The Supreme Court has "repeatedly noted that in order to establish Article III standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct.  *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 329 (1999) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

beneficiaries.  Because the State could not have realistically lowered its reimbursement rates for these products—without Montana pharmacies suffering a loss each time they dispensed an AstraZeneca product—there is no ascertainable loss suffered by the State.

1.    **The State Has Produced No Evidence Demonstrating That It Suffered a Loss For Certain Claims**

Despite having years to develop and refine its liability and damage analysis in this litigation, the State has failed to produce data sufficient to show that it suffered an ascertainable loss for a number of its individual claims.  Not surprisingly, Dr. Hartman has failed to provide an expert analysis to support damages on these claims.

As discussed above, loss is a material element of all of the State's causes of action.  It is well-established that where a non-moving party has failed to carry its burden of proof on an essential element—as the State has done here regarding loss—summary judgment must be granted.  *See* Joint Mem. at 20–21; *Celotex*, 477 U.S. at 327.  Indeed, where a plaintiff is unable to demonstrate proof  of loss at this advanced stage of a litigation, courts have found it appropriate to grant summary judgment.  *See, e.g.*, *Stoneman v. Morgan, Cameron & Weaver, P.C.*, 44 F. App'x 846 (9th Cir. 2002) (upholding summary judgment on a Montana consumer protection claim where the plaintiff did not present evidence of an ascertainable loss); *Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262, 275-76 (D. Conn. 2005) (denying plaintiff summary judgment on a Connecticut consumer protection claim where the plaintiff did not present evidence of a measurable loss).  As succinctly explained by one Montana court, "without admissible evidence of proof of injury, [a plaintiff's] various claims against the … Defendants necessarily fail as a matter of law."  *Starr,* 2003 Mont. Dist. LEXIS 2451, at *41.

13

As an initial matter, the State cannot show that it suffered tangible damages on claims related to purported payments by the Montana Medicaid program to cover the 20 percent Medicare Part B co-payment made on behalf of individuals who are dually-eligible for Medicare and Medicaid benefits.  Because Dr. Hartman was not provided pertinent data by the State, he was unable to calculate damages for these co-payments.  *See* AstraZeneca 56.1 Stmt. ¶ 28. Similarly, Dr. Hartman acknowledges that he received no data that would have allowed him to calculate purported damages suffered by the State agencies or uninsured individuals for either self-administered or physician-administered drugs.  *See id.* ¶ 29.  Finally, Dr. Hartman's report is completely silent as to claims and losses suffered by unnamed third-party payers—a clear indication that the State cannot show that these payers suffered an ascertainable loss.  *See id.* ¶ 30.

2. **The State's Reimbursement Decisions Were an Effort to <u>Balance Reimbursement Levels and Access</u>**

Section 30(A) of the Medicaid Act, 42 U.S.C. §1396(a)—often referred to as the equal access provision—sets a floor on the amount that state Medicaid agencies can reimburse pharmacies:  they cannot reimburse providers below an amount that threatens access to care for the state's citizens.  *Id.*; *see Arkansas Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 530 (8th Cir. 1993) (explaining that the purpose of this provision is to "ensure adequate access and quality of care in the context of . . . Medicaid providers").  Relevant to this requirement, the financial situation of rural pharmacies in Montana was, and is, so precarious that a reduction in Medicaid reimbursement rates would have caused significant numbers of the State's pharmacies to close, threatening access to care for rural Montanans.  *See* AstraZeneca 56.1 Stmt. ¶ 31.  Forcing these rural pharmacies to realize a loss in dispensing drugs under the Medicaid program implicates this

14

statutory provision and, thus, would be contrary to federal law.  *See, e.g.*, *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1467 (9th Cir. 1997) (explaining that for payments to providers to be consistent with the equal access provision "they must approximate the cost of quality care provided efficiently and economically").

The State's bald assertions that Montana pharmacies are making large profits on the basis of AstraZeneca's alleged misconduct is not borne out by the available facts.  As explained by Mr. Winterton, it is the sum of the ingredient cost reimbursement level (e.g., AWP − 10%) and the dispensing fee (e.g., $2.00 in Montana for all but one year prior to 2003) that determines the net reimbursement to a retail pharmacy for dispensing a Medicaid prescription.  *See* AstraZeneca 56.1 Stmt. ¶ 32.  Further, it is undisputed that Montana pharmacies are not fully compensated for their dispensing costs by the dispensing fee paid by the State's Medicaid program and, as a result, would lose money on every Medicaid-covered drug they dispensed if they were forced to rely solely on the dispensing fee to cover their costs.  *See id.* ¶ 33.  Taking the inadequate dispensing fee into account, the Montana Medicaid program *knowingly* sets reimbursement rates for drug ingredient costs at levels that provide a profit margin to these pharmacies.  *See id.*; Joint Mem. at 9–12.  In other words, the Montana Medicaid program knowingly cross-subsidizes the underpayment of dispensing fees through its ingredient cost reimbursement rates.  *See id.*  Such a system has persisted even after the State filed its complaint in this action.

Mr. Winterton analyzed the Medicaid reimbursements paid by the State for AstraZeneca's top five drugs in 2002 to determine—given the underpayment of dispensing fees—whether Montana pharmacies were in fact making large profits on dispensing AstraZeneca's Medicaid-covered drugs.  In stark contrast to the State's unsupported allegations, Mr. Winterton finds that Montana pharmacies were in fact incurring a small to substantial *loss* in

dispensing these AstraZeneca drugs.  *See* AstraZeneca 56.1 Stmt. ¶ 13.  For example, Mr.

Winterton determines that in 2002, Montana pharmacies incurred a net average loss of 0.8

percent in dispensing AstraZeneca's top five drugs under the State's Medicaid program—when

the underpayment of dispensing fees is taken into account.  *See id.*  Further, in Dr. Hartman's

"but for" world, which requires that actual acquisition costs for drugs equal the State's estimated

acquisition costs ("EACs"), Montana pharmacies would have realized a net loss of 3.5 percent in

dispensing these AstraZeneca drugs.  *See id.* ¶ 15.

Clearly, Montana pharmacies were not realizing windfall profits in dispensing

AstraZeneca drugs to Medicaid beneficiaries.  Taking into account the legal requirements of the

equal access provision, Montana's Medicaid program had little—if any—room to lower its

ingredient cost reimbursement rates and still keep a sufficient number of pharmacies servicing its

Medicaid beneficiaries.  Thus, because the State could not have realistically lowered its

reimbursement rates for AstraZeneca's Medicaid-covered products—without Montana

pharmacies suffering additional losses each time they dispensed such a product—there was no

ascertainable loss suffered by the State as a result of AstraZeneca's alleged misconduct.

C.    **AstraZeneca Should be Granted Summary Judgment on the State's Medicaid Claims Relating to Zoladex**

Montana purports to bring claims on its own behalf as a Medicaid payer.  *See* 2d Am.

Compl. ¶¶ 14–18.  AstraZeneca is entitled to summary judgment on such claims as they relate to

Zoladex (goserelin acetate) because such claims are barred by a 2003 settlement agreement

between AstraZeneca and the State.  The settlement agreement provides in relevant part:

> [T]he State of Montana, on behalf of itself, and its officers, agents, agencies, and departments, *releases and discharges Zeneca*, its predecessors, successors, subsidiaries, partners, joint venture owners, and their corporate parents and affiliates, predecessors, successors and assigns, and their current and former

> directors, officers and employees *from any civil or administrative claims for Medicaid damages or penalties* that the state of Montana has or may have relating [sales, marketing and pricing practices concerning Zoladex®].  The payment of the Settlement Amount fully discharges Zeneca from any obligation to pay Medicaid-related restitution, damages, and/or any fine or penalty to the state of Montana for the [aforementioned conduct].

*See* AstraZeneca 56.1 Stmt. ¶ 34.

Montana's Medicaid-related claims relating to Zoladex, including those concerning "Best Price" rebates, are thus barred by the valid and binding settlement agreement.  *See In re Medomak Canning*, 922 F.2d 895, 900 (1st Cir. 1990) (explaining that a court-approved settlement "receives the same res judicata effect as a litigated judgment"); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) ("The weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims in the settled class action.") (internal quotations omitted).

## CONCLUSION

For the foregoing reasons, as well as those set forth in Defendants' Joint Memorandum,

AstraZeneca is entitled to summary judgment on all of the State of Montana's claims.


Dated:   Boston, Massachusetts
         February 8, 2007

Respectfully Submitted,


By:   /s/ Katherine B. Schmeckpeper

Nicholas C. Theodorou (BBO # 496730)
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts  02210
Tel:  (617) 832-1000

D. Scott Wise (admitted *pro hac vice*)
Michael S. Flynn (admitted *pro hac vice*)
James J. Duffy (admitted *pro hac vice*)
**DAVIS POLK & WARDWELL**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212)-450-3800

*Attorneys for Defendant AstraZeneca*
*Pharmaceuticals LP*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2007, I caused a true and correct copy of the foregoing, the Individual Memorandum of Law in Further Support of Defendant AstraZeneca Pharmaceuticals LP's Motion for Summary Judgment, to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.

/s/ Katherine B. Schmeckpeper
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts  02210
(617) 832-1000