UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs., Inc., et al.*, D. Mont. Cause No. CV-02-09-H-DWM | ) ) ) ) ) ) ) ) ) ) ) MDL No. 1456<br><br>Master File No. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN FURTHER SUPPORT OF DEFENDANT ASTRAZENECA PHARMACEUTICALS LP's MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") hereby submits its statement of undisputed material facts in further support of its motion for summary judgment.

1. For AstraZeneca's self-administered drugs ("SADs") covered under the Montana Medicaid program, all prescribing decisions are made by physicians. In turn, pharmacists dispense the drugs, and are subsequently reimbursed by Montana Medicaid. (Declaration of Gregory K. Bell, Ph.D., Submitted in Support of Defendants' Motions for Summary Judgment, filed February 8, 2007 in support of Defendants' Joint Motion for Summary Judgment ("Bell Decl.") ¶ 7.)

2. Physicians make the decision as to which SAD to prescribe, and the physician does not pay for and is not reimbursed for the drug. (Bell Decl. ¶ 7.)

3. Pharmacists must dispense the specific branded drug prescribed by a physician. (Bell Decl. ¶ 7.)

4.      From 1991 to 2004, the top five AstraZeneca SADs (not subject to a Federal Upper Limit ("FUL") through 2004) prescribed and reimbursed for under the Montana Medicaid program were:  (1) Prilosec (omeprazole); (2) Seroquel (quetiapine); (3) Nexium (esomeprazole); (4) Pulmicort Respules (budesonide inhalation suspension); and (5) Accolate (zafirlukast).  These five drugs comprised over 82% of the State of Montana's (the "State") total Medicaid expenditures for AstraZeneca drugs during this period.  (Merits Report and Expert Declaration of Joel Winterton in the Montana AWP Litigation, filed February 8, 2007 ("Winterton Decl.") ¶ 30, Declaration of James J. Duffy in Support of the Individual Memorandum of Law in Further Support of AstraZeneca Pharmaceuticals LP's Motion for Summary Judgment ("Duffy Decl.") ¶ 2, Ex. 1; Centers for Medicare & Medicaid Services: Medicaid Prescription Reimbursement Information By State, *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/08_MdPresReimInfo.asp; Centers for Medicare & Medicaid Services: State Drug Utilization Data, *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp).

5.      From 1991 to 2004, the "spread" between Average Wholesale ("AWP") and Wholesale Acquisition Cost ("WAC") for all of AstraZeneca's Medicaid-covered drugs, including the top five SADs, was either 20 or 25 percent.  (Winterton Decl. ¶¶ 32 n.16, Duffy Decl. ¶ 2, Ex. 1.)

6.      For the purposes of his analysis, Dr. Hartman equates pharmacy acquisition cost with WAC:  "I understand that the retail acquisition costs (RAC) is approximately equal to WAC and indeed may be slightly less {that is, RAC (EAC) <WAC}, perhaps 1-2% of AWP.  To be conservative, I assume that RAC = EAC ~WAC."  (Calculation of Damages and Penalties for the

State of Montana, Declaration of Raymond S. Hartman ("Hartman MT Decl.") ¶ 22(a), Duffy Decl. ¶ 12, Ex 11.)

7. Taking into account Medicaid "Best Price" rebates paid by AstraZeneca, the average net Medicaid reimbursement paid by the State was between 8.5 and 19 percent less than what Montana pharmacies paid to acquire these drugs. (Winterton Decl. ¶¶ 17, 23 (relying on AstraZeneca pricing data, including Average Manufacturer Price ("AMP"), Best Price ("BP"), and Medicaid Rebate Per Unit data for the years 1991 through 2004), Duffy Decl. ¶ 2, Ex. 1.)

8. Taking into account Medicaid "Best Price" rebates paid by AstraZeneca, the average net Medicaid reimbursement paid by the State for Seroquel was roughly 17 percent less than what Montana pharmacies paid to acquire this drug. (Winterton Decl. ¶ 23 and Figure 2, relying on AstraZeneca pricing data, including AMP, BP, and Medicaid Rebate Per Unit data for the years 1991 through 2004, Duffy Decl. ¶ 2, Ex. 1.)

9. Montana pharmacies are not fully compensated for their dispensing costs by the dispensing fees paid by the State's Medicaid program. (Winterton Decl. ¶¶ 16, 43, Duffy Decl. ¶ 2, Ex. 1; Montana Pharmacy Association 2002 Survey of Montana Community Pharmacies (MPA0003916-35), Duffy Decl. ¶ 3, Ex. 2.)

10. The Montana Medicaid dispensing fee for 2002 was $4.71 and the average cost to dispense a prescription was $9.84. (Winterton Decl. ¶¶ 16, 43, Duffy Decl. ¶ 2, Ex. 1; Montana Pharmacy Association 2002 Survey of Montana Community Pharmacies (MPA0003919), Duffy Decl. ¶ 3, Ex. 2.)

11. A 2007 national survey of retail pharmacies stated that the average dispensing cost for each Medicaid prescription in Montana was $11.46.  (Winterton Decl. ¶ 43, Duffy Decl. ¶ 2, Ex. 1; Grant Thornton LLP, National Study to Determine the Cost of Dispensing Prescriptions in Community Retail Pharmacies, January 2007, Duffy Decl. ¶ 4, Ex. 3.)

12. A 2005 study of pharmacies in 13 states stated that the average cost to dispense a drug was $9.62.  (Winterton Decl. ¶ 43, Duffy Decl. ¶ 2, Ex. 1; The Center for Pharmacoeconomic Studies, The University of Texas at Austin, Summer 2005 (NACDSV01110-12), Duffy Decl. ¶ 5, Ex. 4.)

13. In 2002, Montana pharmacies incurred a net average loss of roughly one percent in dispensing AstraZeneca's top five drugs under the State's Medicaid program, when taking into account the underpayment of dispensing fees.  (Winterton Decl. ¶¶ 17, 44 and Figure 17, Duffy Decl. ¶ 2, Ex. 1; Montana Pharmacy Association 2002 Survey of Montana Community Pharmacies (MPA0003916-35), Duffy Decl. ¶ 3, Ex. 2; AstraZeneca pricing data, including WACs; Centers for Medicare & Medicaid Services: State Drug Utilization Data, *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp).

14. In 2002, Montana pharmacies incurred a net average loss of approximately 0.6 percent in dispensing Prilosec to Medicaid beneficiaries, when taking into account the underpayment of dispensing fees.  (Winterton Decl. ¶¶ 17, 44 and Figure 17, Duffy Decl. ¶ 2, Ex. 1; Montana Pharmacy Association 2002 Survey of Montana Community Pharmacies (MPA0003916-35), Duffy Decl. ¶ 3, Ex. 2; AstraZeneca pricing data, including WACs; Centers for Medicare & Medicaid Services: State Drug Utilization Data, *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp).

15. In Dr. Hartman's "but for" world, Montana pharmacies in 2002 would have incurred a significant loss every time they dispensed one of the top five AstraZeneca Medicaid-covered drugs. (Winterton Decl. ¶¶ 44 and Figure 17, Duffy Decl. ¶ 2, Ex. 1; Montana Pharmacy Association 2002 Survey of Montana Community Pharmacies (MPA0003916-35), Duffy Decl. ¶ 3, Ex. 2; AstraZeneca pricing data, including WACs; Centers for Medicare & Medicaid Services: State Drug Utilization Data, *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp).

16. Montana deliberately chose to use AWP as a pricing benchmark in its Medicaid reimbursement system, while knowing that AWPs did not equal average wholesale prices:

> A: [T]he common knowledge was that AWP was, again, as I've said before, not what it sounded like. That's why it was discounted.
>
> Q: And you knew that while you were the pharmacy provider for Montana Medicaid?
>
> A: Yes. I wouldn't have been paying attention if I didn't know that.

(Deposition of Dorothy Poulsen, Montana Medicaid's Pharmacy Program Officer, dated February 22, 2006 ("Poulsen Dep.") at 119, Defendants' Joint 56.1 Statement ("Joint 56.1 Stmt.") ¶ 38.)

17. Market conditions and the distribution process for AstraZeneca's SADs eliminate any incentive for AstraZeneca to attempt to increase pharmacy margins. (Bell Decl. ¶ 10.)

18. The idea that pharmaceutical manufacturers would purposefully create a "spread" between AWPs and the acquisition costs of their branded outpatient drugs makes no sense. (Bell Decl. ¶ 10.)

5

19.  Bayer began reporting ASPs for certain of its drugs to the State as early as 2001. (Joint 56.1 Stmt. ¶¶ 118, 117.)

20.  As a result of a settlement agreement with the State of Montana, AstraZeneca began providing to the State Average Sales Prices ("ASPs") for eight classes of injectible drugs (Cefotan, Elavil Injection, Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, and Zoladex) in 2003.  (Settlement Agreement and Release by and among AstraZeneca Pharmaceuticals LP, AstraZeneca LP and the Office of the Attorney General of the State of Montana (Medicaid Fraud Control Unit), effective date September 4, 2003, at 7 ¶ III.2 (MT037926-46), Duffy Decl. ¶ 6, Ex. 5; Letter from Deborah A. Saez, AstraZeneca Medicaid Pricing Coordinator, to Montana Department of Public Health and Human Services, dated November 14, 2003 (MT038039), Duffy Decl. ¶ 7, Ex. 6.)

21.  Montana hospitals, universities, prisons, and other State non-Medicaid entities purchased significant volumes of AstraZeneca products at prices below the Medicaid reimbursement rate for ingredient cost.  (Declaration of Eric M. Gaier, Ph.D., in Support of Defendants' Joint Motion for Summary Judgment, filed February 8, 2007 in support of Defendants' Joint Motion for Summary Judgment ("Gaier Decl.") ¶¶ 30-34.)

22.  After receiving ASP data for several AstraZeneca products, the State did not change the methodology it used to reimburse for these AstraZeneca products under its Medicaid program.

> Q: Well, did Montana Medicaid use the average sale information—sale price information from other manufacturers in the same way as the Bayer average sale price information?

6

> A: As if you mean using it in the same way as not using it, yes, that would be correct."

(Deposition of Jeff Buska, dated December 15, 2006 ("Buska Dep."), at 572, Duffy Decl. ¶ 8, Ex. 7; Joint 56.1 Stmt. ¶ 119.)

23.  Dr. Hartman concluded that payers were aware that AWPs are greater than ASPs, but as an important publicly available price, they rely on AWPs to bear a predictable relationship to ASPs.  (Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages, dated December 15, 2005 ("Hartman MDL Decl.") ¶ 33, Duffy Decl. ¶ 9, Ex. 8.)

24.  Dr. Hartman calculated this reasonable expectation to be a 30 percent spread between AWP and ASP, which he has described as a liability threshold.

> Q: Are you willing to stand by your December 15 report as a reasonable determination of liability and damages in this case?
>
> A: I stand by my report that should the Court come to the decision that the -- that a finding of liability is related to the expectation, the pricing expectations in the market, then I would -- I would stand by this report of a threshold, of a liability threshold of 30 percent.

(Deposition of Raymond S. Hartman, dated February 27, 2006 ("Hartman I Dep."), at 665, Duffy Decl. ¶ 10, Ex. 9.)

25.  Dr. Hartman's yardstick theory applies to both third-party payers, on whose behalf the State asserts claims, and to state Medicaid agencies, who are market participants.

> Q: And the yardstick that you used was 30 percent, correct?
>
> A: That's correct.

7

>   …
>
>   Q: And that expectation would apply to the Medicaid agencies as well as the rest of the marketplace, is that correct?
>
>   A: This expectation and this understanding was a -- a general statement for the market as a whole.
>
>   Q: And that would include Medicaid, correct?
>
>   A: It -- it includes all market participants.
>
>   Q: Including Medicaid, correct?
>
>   A: That's right.

(Deposition of Raymond S. Hartman, dated August 22, 2006 ("Hartman II Dep."), at 32, Duffy Decl.¶ 11, Ex. 10.)

26.     The basis of Dr. Hartman's liability opinion is that Defendants' alleged misconduct caused Montana to reimburse pharmacies at levels above their acquisition costs for Medicaid-covered drugs.  (Hartman MT Decl. ¶ 3, Duffy Decl. ¶ 12, Ex 11.)

27.     In Dr. Hartman's "but-for" world, the State should have been reimbursing pharmacies at the exact dollar amount paid by the pharmacies to acquire the relevant Medicaid-covered drugs.  (Hartman MT Decl. ¶ 16(1b), Duffy Decl. ¶ 12, Ex 11.)

28.     In his Declaration, Dr. Hartman does not calculate damages for the State's claims related to purported payments by the Montana Medicaid program to cover the 20 percent Medicare Part B co-payments made on behalf of individuals who are dually-eligible for Medicare and Medicaid benefits.  (Hartman MT Decl. ¶ 29, Duffy Decl. ¶ 12, Ex. 11.)

29.     Dr. Hartman acknowledges that he received no data that would have allowed him to calculate purported damages suffered by Montana state agencies or uninsured individuals for

either self-administered or physician-administered drugs.  (Hartman MT Decl. ¶ 29, Duffy Decl. ¶ 12, Ex 11.)

30. In his Declaration, Dr. Hartman does not calculate damages for the State's claims related to the losses purportedly suffered by unnamed third-party payers.  (Hartman MT Decl. ¶ 4, Duffy Decl. ¶ 12, Ex. 11.)

31. A reduction in Montana Medicaid reimbursement rates would have caused pharmacies to close, threatening access to care for rural Montanans.

> Q: In your role as the executive director of the [Montana Pharmacy Association], what is your understanding of the financial situation that's faced by Montana pharmacies?
>
> A: Well, I think they're operating on real low profit margins. The transition from a first-party cash marketplace to this third-party marketplace, third-party reimbursement over the last 10, 15 -- 15 years that I've been around, has been a very difficult transition for these people to withstand and undergo. I think if anything -- if there's any major reductions in those Medicaid dispensing fees, half those rural pharmacies are going to be gone within six months and the remaining half will be gone within the next year.

(Deposition of James Smith, Director of the Montana Pharmacy Association, dated March 8, 2006, at 94, Joint 56.1 Stmt. ¶ 49.)

32. In order to determine the net reimbursement paid to a retail pharmacy for dispensing a Medicaid prescription, the sum of the ingredient cost reimbursement level and the dispensing fee must be taken into account.  (Winterton Decl. ¶ 43, Duffy Decl. ¶ 2, Ex. 1.)

9

33.   Taking the inadequate dispensing fees into account, the Montana Medicaid program knowingly set reimbursement rates for drug ingredient costs at levels that provide a profit margin to pharmacies.

> Q: Based on this analysis that you did in [this Exhibit], was it your understanding that Montana Pharmacy would lose money on every drug it dispensed, unless it received some additional reimbursement from Medicaid?
>
> …
>
> A: That was my rationale for paying them is AWP less 10%, rather than some other amount, is that otherwise, they would not be paid sufficiently to provide services to our clients.
>
> Q: Was it your understanding that the reimbursement methodology of AWP minus 10% was in part intended to make up for the lack of reimbursement for the dispensing fee?
>
> …
>
> A: That was my assumption. When I came into the position, this was a system that was set up.

(Poulsen Dep. at 131-32, Joint 56.1 Stmt. ¶¶ 52, 53; Gaier Decl. ¶¶ 16-29.)

34.   Montana's Medicaid-related claims relating to Zoladex are barred by the 2003 settlement between the State of Montana and AstraZeneca. (2003 Settlement Agreement at 7 ¶ III.2, Duffy Decl. ¶ 6, Ex. 5.)

Dated:   Boston, Massachusetts
         February 8, 2007

By:  /s/ Katherine B. Schmeckpeper

Nicholas C. Theodorou (BBO # 496730)
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts  02210
Tel:  (617) 832-1000

D. Scott Wise (admitted *pro hac vice*)
Michael S. Flynn (admitted *pro hac vice*)
James J. Duffy (admitted *pro hac vice*)
**DAVIS POLK & WARDWELL**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:   (212)-450-3800

*Attorneys for Defendant AstraZeneca Pharmaceuticals LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2007, a true and correct copy of the foregoing, the Local Rule 56.1 Statement of Undisputed Material Facts in Further Support of Defendant AstraZeneca Pharmaceuticals LP's Motion for Summary Judgment, was served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.

/s/ Katherine B. Schmeckpeper
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts  02210
(617) 832-1000
