# Exhibit D

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | M.D.L. No. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris |

REPORT OF INDEPENDENT EXPERT

PROFESSOR ERNST R. BERNDT

TO JUDGE PATTI B. SARIS

FEBRUARY 9, 2005

management firms.[8]  Plaintiffs' expert Dr. Raymond S. Hartman simply calls the proposed class "large".[9]

13.  In their December 17, 2004 amended motion for class certification, Plaintiffs have named end-payor classes as follows:  (i) physician-administered drugs class (Medicare Part B co-pay and private system physician-administered drugs); (ii) self-administered and specialty pharmacy drugs class (third-party and co-payor class for self-administered drugs), further subdivided into (iia) brand name sub-class and (iib) generic sub-class; (iii) RICO class for self-administered and specialty drugs, further divided into (iiia) brand name sub-class and (iiib) generic sub-class.  The proposed class period is January 1991 to the present.[10]

### B. The Role of AWP

14.  To knowledgeable industry observers, it has long been widely understood that in the US pharmaceutical industry the term "average wholesale price" (hereafter, "AWP") is a misnomer: it is not a measure of prices generally paid by wholesalers to manufacturers, it is not a measure of prices frequently paid by retail or mail order pharmacies to wholesalers, nor is it some average of these.  I will document this below.

15.  At least since the beginning of the widely publicized "Brand Name Drug Litigation" in 1994, it has been common knowledge among industry observers that brand pharmaceutical firms typically sell self-administered single-source drugs to wholesalers at a price known as "wholesale acquisition cost" ("WAC") that in most cases is 16.67% to 20% less than AWP; this

---

[8] *Declaration of Steven J. Young In Opposition to the Plaintiff's Motion for Class Certification*, United States District Court, District of Massachusetts, In Re Pharmaceutical Industry Average Wholesale Price Litigation, M.D. L. No. 1456, Civil Action No. 01-12257-PBS, United States District Judge Patti B. Saris, October 25, 2004, pp. 8-9.
[9] *Rebuttal Declaration of Dr. Raymond S. Hartman in Support of Plaintiff's Motion for Class Certification,* United States District Court, District of Massachusetts, In Re Pharmaceutical Industry Average Wholesale Price Litigation, M.D. L. No. 1456, Civil Action No. 01-12257-PBS, United States District Judge Patti B. Saris, December 16, 2004, p. 3.
[10] *Plaintiffs' Amended Motion for Class Certification*, United States District Court, District of Massachusetts, In Re Pharmaceutical Industry Average Wholesale Price Litigation, M.D. L. No. 1456, Civil Action No. 01-12257-PBS, United States District Judge Patti B. Saris, December 17, 2004, pp. 3-4.

implies that AWP is typically 20% to 25% greater than WAC.[11] Moreover, using various rebates and chargeback policies, brand pharmaceutical manufacturers have offered a variety of discounts to health care providers and pharmaceutical benefit management ("PBM") firms, frequently expressed as "AWP − x%" or "WAC ± y%", in return for favorable placement of their drug on the client's formulary, meeting market share or volume targets, and/or attaining other contractually specified goals.[12] In turn, providers and PBMs have contracted with pharmacy networks, reimbursing them for dispensing drugs, generally employing contractual terms such as "AWP − z%" plus a dispensing fee, and perhaps administrative fees.

16. If a contract involving branded single-source self-administered drugs were specified in terms of WAC rather than AWP, in most cases it has been straightforward to convert it to AWP terms, given the largely predictable relationships between AWP and WAC (although this AWP-WAC relationship is considerably more complex and variable with multisource brand and multisource generic drugs).[13] In this way, even though industry observers and academics have quipped that AWP stands for "Ain't What's Paid" rather than "Average Wholesale Price",[14] it is nonetheless the case that AWP has served as a reference or focal point, an industry standard for baseline reimbursement, and as such a fictional benchmark price from which discounts are frequently specified, directly or indirectly. Hence, as Plaintiffs' Expert Dr. Raymond Hartman has written, "AWP is interpreted by the industry as a measure of the underlying structure of drug

---

[11] *In re Brand Name Prescription Drugs Antitrust Litigation*, Case No. 94 C 897; MDL No. 997, United States District Court for the Northern District of Illinois.
[12] Laurie P. Cohen and Elyse Tanouye, "Bitter Pill: Drug Makers Set to Pay $600 Million to Settle Lawsuit by Pharmacies – Retailers Object to Practice of Granting Discounts To HMOs but Not Them – Eight Defendants to Fight On", *Wall Street Journal*, 18 January 1996, p. A1.
[13] A branded drug can be either a patent-protected single source drug, an innovator branded drug that has lost patent protection and faces generic competition, or in some cases, a patent-protected drug sold under distinct brand names, or in even rarer cases, a "branded generic" that is a multisource drug promoted by its brand rather than chemical name. Multisource drugs include both brands that have lost patent protection and generic drugs.
[14] Although "AWP: Ain't What's Paid" was prominently displayed in the 1996 Barron's article (Bill Alpert, "Hooked on Drugs: Why do insurers pay such outrageous prices for pharmaceuticals?", *Barrons*, June 10, 1996, 3 pp), as I note below, this association with AWP has an earlier history.

*The AWP Litigation: Report of Prof. Ernst R. Berndt      February 9, 2005*      11

> AWP unfairly distorts their prices and results in competitive disadvantages. The AWP, although not the cost paid by retailers, still provides the basis for much retail pharmacy pricing, with retailers euphemistically referring to the difference between their actual cost and the AWP as 'earned discount'. This tradition is so ingrained that a retailer that sells a product at AWP, which is 12%-18% above their cost, refers to this price as a 'loss leader'."[31]

Kolassa summarizes this discussion by stating, "Within pharmacy circles, the definition of AWP, it is joked, is 'Ain't What's Paid.'"[32]

23. The evolution of the AWP – WAC "spread" for branded self-administered pharmaceuticals is therefore, as best I can tell, quite understandable, and apparently not the result of any sinister or nefarious conspiracies. Moreover, since AWP was publicly known, it served as a convenient focal point metric for contractually specifying various reimbursements, and for efficiently adjudicating pharmacy transactions electronically.

24. Why this "spread" practice has continued long after its underlying rationale has largely disappeared is a bit puzzling, but is I believe understandable and plausible. Given the AWP – WAC history, retail pharmacies plausibly continued to expect their acquisition costs to be 20-25% below AWP, and thus in their contracts with third party payors and PBMs, retailers generally expected to be reimbursed at 10-15% below AWP. In such a context, one can understand that a single manufacturer marketing a newly FDA approved drug would find it quite challenging if not impossible to successfully set an AWP that was only, say, 2-5% above the WAC, for with that small a differential, retailers would be unable to recover their acquisition costs, unless they renegotiated and rewrote contracts with PBMs and other third party payers (such contracts typically applied a uniform percent discount across all single source branded self-administered drugs, regardless of therapeutic class).[33]

---

[31] Kolassa [1994], *supra,* pp. 236-237; much of this material is reproduced in Kolassa [1997], *supra,* pp. 33, 35-36.
[32] Kolassa [1994a], *supra,* p. 237.
[33] The percent figure typically varied, however, depending on whether the drug was a brand or generic.