# Exhibit F




Jun 13 2006
7:25PM

# Calculation of Damages and Penalties for the State of Nevada

## Declaration of Raymond S. Hartman

## I. Introduction and Overview

1. My name is Raymond S. Hartman. I am Director and President of Greylock McKinnon Associates (GMA), an economic consulting and litigation support firm located in Cambridge, Massachusetts. Since I have previously described my qualifications to this Court, I will not repeat them here.

2. I have been asked by Counsel to the State of Nevada to review the Complaints in this matter;[1] to review the allegations regarding fraudulent pricing practices on the part of Defendants; and to describe the formulaic methodologies I would use to calculate both the damages to the State and its consumers if the alleged fraudulent pricing practices are proved and the penalties to the Defendants arising from those fraudulent practices.

3. The fraudulent pricing practices specifically alleged of twenty-one Defendant drug manufacturers[2] are characterized as the "AWP Inflation Scheme."[3] Through the alleged "AWP Inflation Scheme" (or "AWP Scheme"), Defendant manufacturers fraudulently increased the AWPs of selected drugs (denoted by NDCs) above the provider acquisition costs (ACs) for which the AWPs were a market signal.[4] Defendants

---

[1] I have been instructed by Counsel to respond to the following three complaints:

1) State of Nevada's Amended Complaint, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, United States District Court for the District of Massachusetts, August 1, 2003 (hereafter, *State Complaint*);

2) State of Nevada's First Amended Complaint, *State of Nevada v. Abbott Laboratories, et. al.* Case No. CV 02-00260; Dept. No. 8, In the Second Judicial District Court in and for the County of Washoe, State of Nevada, October 31, 2003 (hereafter *Federal Complaint*); and

3) State of Nevada's Amended Complaint Against Defendant Bayer Corporation, *State of Nevada v. Bayer Corporation*, No. CV 02-00260, Dept. No. 8, In the Second Judicial District Court in and for the County of Washoe, State of Nevada, February 27, 2004 (hereafter *Bayer Complaint*).

Hereafter, reference to all three Nevada complaints will be *Complaints*.

[2] Identified and discussed in detail in the *Complaints*. The *State Complaint* identifies 13 Defendants (Amgen, AstraZeneca, The Aventis Group, The Boehringer Group, Braun, The Fujisawa Group, Immunix, The Johnson & Johnson Group, Novartis, Pfizer, The Schering-Plough Group, The Sicor Group and Watson). I have been instructed by Counsel to exclude the GSK Group from my analysis. The *Federal Complaint* identifies another 7 Defendants (Abbott, Baxter, The BMS Group, Dey, The GSK Group, The Pharmacia Group and Tap). The *Bayer Complaint* identifies Bayer as a Defendant. I have been asked by Counsel to omit from my analysis the following Bayer drugs: Koate HP, Kogenate , Konyne-80, Gamimune N 5 % , Gamimune N 10 % and Thrombate III.

[3] *State Complaint*, ¶¶ 5-10; *Federal Complaint*, ¶¶ 3-8; *Bayer Complaint*, ¶¶ 3-8.

[4] Market reliance upon reported AWPs is discussed in ¶¶ 132-135 of the *State Complaint*; ¶¶ 109-112 of the *Federal Complaint;* and ¶¶ 84-87 of the *Bayer Complaint.*

reported the inflated AWPs to the standard national price compendia (*First DataBank (FDB), Red Book* and *Blue Book*), and the industry based reimbursement amounts on those AWPs. Since providers acquired the drugs at acquisition cost (AC) while payors (Medicare, Medicaid, private Third-Party Payers (TPPs), and consumers) paid for the drugs at reimbursement rates based on the AWPs, the increased "spreads" (AWP – AC) caused by the AWP Scheme increased the profits earned by the providers of the drugs (pharmacies, physicians) at the expense of the payors. The increased profits induced providers to move market share of the relevant drugs, the *raison d'etre* of the AWP Scheme to the drug manufacturers.[5]

4. The relevant Plaintiffs in this matter for whom damages are alleged include, but are not limited to,[6] the following:

a) The State of Nevada

- For pharmaceutical reimbursements under Medicaid
- For pharmaceutical reimbursements under Medicaid for "dual eligibles" under Medicare
- For pharmaceutical reimbursements for State employees
- For pharmaceutical payments made by State agencies

b) Nevada consumers

- Those consumers making drug coinsurance payments under Medicare Part B
- Those consumers making coinsurance payments under a private third-party payer plan
- Those consumers without prescription drug insurance coverage making payments out of pocket

5. The claims for damages and/or financial penalties made by Plaintiffs include, but are not limited to, the following:[7]

a) Restitution for losses incurred by Nevada residents as a result of the AWP Scheme under violation of Deceptive Trade Practices;

---

[5] A more complete discussion of the fraud and its market effects are developed in ¶¶ 136-176 of the *State Complaint*; ¶¶ 113-160 of the *Federal Complaint;* and ¶¶ 88-135 of the *Bayer Complaint.*

[6] See ¶¶ 15, 16, 17, 20, 123 and Section X of the *State Complaint*; ¶¶ 11, 12, 13, 16, 100 and Section XI of the *Federal Complaint*; and ¶¶ 11, 12, 13, 16, 75 and Section XI of the *Bayer Complaint*. Since I have not had sufficient time to fully analyze all discovery materials, there may be additional Plaintiff groups and additional drugs subject to damage calculations that I will be able to address, if asked to, in a Supplementary Declaration. I anticipate that those damage calculations will make use of formulaic methods analogous to those put forward here.

[7] See Section XI of the *State Complaint*; Section XII of the *Federal Complaint*; and Section XII of the *Bayer Complaint*. I have been informed by Counsel that the Racketeering claim has been dismissed by the Court.

20. Under Count V of the *Complaints*, the claim is made for recovery of treble damages and civil penalties. Accordingly, if liable, each Defendant will be assessed an amount equal to three times the amount unlawfully obtained and pay civil penalties of not less than $5,000 for each false claim, statement or representation.

21. I have been directed by Counsel to assume that penalties of $7,500 (i.e., $2,500 plus $5,000) can be assessed for each claim submitted for reimbursement under Medicaid and Medicare that was subject to a deceptive practice and was false.[25] The number of such claims can be calculated as follows.

22. As noted in ¶ 8 above, the allowed amount (AA) under Medicaid is to be the lesser of {the EAC, the Federal Upper Limit (FUL), the state maximum allowable cost (MAC), the Usual & Customary amount (U&C) charged by a pharmacy, or the amount billed}. Likewise, as noted in ¶ 7 above, EAC is invariably the lowest price.

Hence, for any drug reimbursed under Medicaid, I have been instructed by Counsel that liability occurs as a matter of law if $AA_{jk} > EAC_{jk}$. Furthermore, as discussed above (see footnote 9), $EAC_{jk} = ASP_{jk}$ to the relevant group of providers (pharmacies, physicians). For self-administered drugs reimbursed under Medicaid, j denotes the NDC of the drug and k denotes the Defendant. For physician-administered drugs, j denotes the NDC or the J-Code and k denotes the Defendant.

23. I have been provided with information from the State sufficient to calculate $AA_{jk}$ by claim. While I received from Defendants a variety of data sets summarizing (to varying degrees of completeness) invoice information, rebates information and other accounting information, I have not received from Defendants sufficient explanation and clarification of these data to accurately calculate the $ASP_{jk}$ by NDC and/or J-Code for most drugs and most Defendants in this matter. Indeed, the data that I have been able to use to analyze liability using ASPs have been developed as part of the MDL AWP litigation addressing the Track 1 Defendants and the Connecticut AWP litigation.

Given this limited ability to make use of discovery materials, I have developed a method to make use of the existing information to draw conclusions regarding liability. Specifically,

a) For claims for reimbursement for single-source self-administered drugs, I conclude liability as follows:

   - For those NDCs for which I have ASPs and for which AA > ASP = EAC, I conclude that AA fraudulently exceeds EAC.

[25] As currently implemented, my methodology focuses upon accurately calculating the total number of claims that were deceptive and false. However, it is possible that I can identify those claims submitted by elderly residents. If I were able to distinguish those claims submitted by elderly residents, I understand that an additional penalty of $10,000 per claim could be imposed. Should I be asked to do so, I could submit such calculations in a supplemental analysis. Should I receive any supplementary direction from the Court regarding the amount of the penalty to be assessed per false and deceptive claim, the calculation of aggregate penalties will be very easy to revise to accommodate those alternative directions. The revised calculation is simple arithmetic.

- Since the Amount Billed and the U&C > EAC, EAC will be the lesser of the alternative reimbursement bases.[26]
- AWP – (16.6%-20%)[27] = WAC
- I understand that the retail acquisition costs (RAC) is approximately equal to WAC and indeed may be slightly less {that is, RAC (EAC) < WAC}, perhaps 1-2% of AWP.[28] To be conservative, I assume that RAC = EAC ≈ WAC.[29]
- Using the upper bound of these discounts off AWP, if AA > AWP – 20%, AA exceeds EAC.
- Using the lower bound of these discounts off AWP, AA > AWP – 16.6%, AA exceeds EAC.
- Absent a measure of ASP, I let the threshold for liability be AA > AWP – 20%. For sensitivity analysis, I let the threshold for liability be AA > AWP – 16.6%. In each case, if AA exceeds the threshold I conclude AA fraudulently exceeds EAC.

b) For claims for reimbursement for multi-source self-administered drugs, I conclude liability as follows:

- For those NDCs for which I have ASPs and for which AA > ASP = EAC, I conclude that AA fraudulently exceeds EAC.
- Since the Amount Billed and the U&C > EAC; since FUL > EAC; and since Nevada did not have a State MAC during the period for which I have data; EAC will be the lesser of the alternative reimbursement bases.
- Evidence demonstrates that EACs (i.e., ASPs or RACs) < AWP – (16.6%-66%)[30] over the period 1991-2002.
- Absent a measure of ASP, and given the fact that I have not made a complete enough analysis of the pattern of increasing discounts off AWP over the Damage Period, I conclude that a reasonable threshold for liability for the Damage Period as a whole is AA > AWP – 25%. If AA exceeds this threshold, I conclude AA fraudulently exceeds EAC.
- However, in my calculations in Section IV below, I bound this reasonable threshold by allowing the threshold to be AWP – 20% and AWP – 66%.

---

[26] The U&C is the "walk-in" price paid by uninsured cash payers; it is usually ≈ AWP.

[27] These discounts off AWP are equivalent to spreads of 20%-25% above WAC. For example, if AWP – 20% = WAC; then AWP (100%-20%) = .80*AWP = WAC; and AWP = 1.25 WAC or WAC + 25%.

[28] See footnote 10 above.

[29] This understanding is corroborated by Defendants' Experts; see footnote 9 above.

[30] Since evidence indicates that EAC < 16.6%-20% for brand name drugs, it is well known that the discount off AWP for generic drugs will be greater than 16.6% - 20%. For example, by 1997, the OIG found that the average discounts below AWP at retail were 42.45% for generics. By 2002, OIG found these discounts from AWP to be even deeper, approximately 66%. See ¶¶ 21-24 of Attachment D to my September 3, 2004 MDL Declaration in Support of Class Certification. Both of these OIG reports used a sampling of states. The earlier report used a sample of ten states and the District of Columbia; the later report used a sample of 8 states. See *Medicaid Pharmacy – Actual Acquisition Costs of Generic Prescription Drug Products*, Office of Inspector General, Department of Health and Human Services, March 2002, A-06-01-00053.