# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 ) ) ) ) ) ) ) | Judge Patti B. Saris |
| | Chief Magistrate Judge Marianne B. Bowler |
| | **[FILED UNDER SEAL PURSUANT TO COURT ORDER]** |

**DECLARATION OF RAYMOND S. HARTMAN
IN SUPPORT OF PLAINTIFFS' CLAIMS OF LIABILITY
AND CALCUATION OF DAMAGES**

d) Reimbursement patterns for most physician-administered drugs, whether administered under Medicare coverage or under private commercial payor coverage, are driven primarily by Medicare reimbursement practices.[61] As a result, contracts negotiated by commercial payors with provider groups offer less information about "revealed preferences" or "revealed expectations" about spreads than do TPP contracts with PBMs for single-source self-administered orals.[62]

e) Given the information available, I weight most heavily the evidence from the physician-administered comparator drugs and the publicly available survey research for physician-administered drugs. I conclude that a reasonable range of yardsticks for spreads untainted by the AWP scheme is 11%-25%, using First DataBank. However, using RedBook AWPs, I conclude that a reasonable range of yardsticks for spreads untainted by the AWP scheme is 11%-27%. To be conservative, I choose 30% as my yardstick for a finding of liability. Specifically, if a manufacturer either raises its AWP and/or lowers its ASP such that the realized spread exceeds 30% for a given NDC for a given period of time (I choose a year), I conclude that the manufacturer has fraudulently increased the spread on that NDC in that period to move market share.

f) It is appropriate to proceed by NDC and its related AWP. It is clear from discovery materials, fact evidence and my analysis in the Lupron matter that manufacturers decide to artificially increase the spread for a given NDC relative to other NDCs for strategic reasons. Indeed, I understand that there has been documentation of the temptation to shop NDCs for the highest AWP.

The fact evidence certainly indicates that manufacturers strategically increase and decrease the spreads of certain NDCs over time relative to other NDCs, as their marketing strategies and product life cycles evolve. Likewise, providers can reasonably be assumed to be profit-maximizing actors who bill the most they can

---

*reasonably predictable amount'* is contradicted by plaintiffs' expert, Dr. Schondelmeyer (Schondelmeyer Declaration, p. 37; *Emphasis added*), who writes:

> 'For most brand name products that are still covered by patent or exclusivity terms, the price relationship between list prices (AWP and WAC) and actual transaction prices (actual acquisition cost or average selling price) for a given class of trade is *reasonably predictable*. That is, the WAC is equal to, or close to (+ or - 5%) the actual acquisition cost for the community pharmacy class of trade and the AWP, at present, is typically 20 to 25 percent above the WAC, or alternatively, WAC is 16.67 or 20 percent below AWP. *In such cases, a payment policy using AWP as a benchmark (e.g., usually AWP minus a certain percent) may be relatively accurate.*'"

**Despite Dr. Gaier's confused assertion to the contrary, there is no contradiction between Dr. Schondelmeyer and me.** We are in complete agreement. We both agree that for single-source self-administered innovator drugs, the market **reasonably predicted** that AWP was approximately 20-25% above drug acquisition costs, or the ASP.

[61] Again, See MedPAC Report, chapter 9.

[62] Both Mr. Young and I agree that negotiated reimbursement rates are AWP minus 13%-18% for these drugs (*Memorandum and Order*, p. 64), which allows for the pharmacy margins discussed in Attachment K to this Declaration. For physician-administered drugs, contracted reimbursement rates are AWP ± 15%.