# EXHIBIT 4

The Center for Pharmacoeconomic Studies
THE UNIVERSITY OF TEXAS AT AUSTIN
Technical Analysis
Summer 2005



Estimating the Costs of Dispensing Prescription Drugs
within a Chain Pharmacy
Michael Johnsrud, PhD
Kenneth Lawson, PhD

**Purpose**

Payments to pharmacies for prescription drugs within state Medicaid programs are typically based upon a formula comprised of two components: 1) an estimated drug product acquisition cost, and 2) a professional dispensing fee meant to cover the operational costs, at least in theory. The drug product acquisition component nearly always represents the majority of the payment. As such, recent studies and audits have sought to estimate the average discount off of catalog prices that pharmacies purchase drugs in order to provide program administrators with guidance in calculating a reasonable reimbursement for the product cost component.[1] However, no recent nationwide studies exist that seek to estimate the true cost of dispensing medications in pharmacies.

Dispensing fees within Medicaid programs have remained stagnant, or even declined, over the last few years. This trend has continued in light of increasing labor costs within the pharmacy marketplace. As payments for the drug product acquisition component continue to be discounted, it is important to review the adequacy of the dispensing fee payment in order to maintain equitable reimbursement policies. Therefore, we surveyed a sample of national and regionally-based chain pharmacies to estimate a current cost of dispensing based upon financial and operational data provided to The Center for Pharmacoeconomic Studies at The University of Texas at Austin.

**Methodology**

The Center for Pharmacoeconomic Studies at the University of Texas at Austin recently conducted a small survey of national and regional chain pharmacies to estimate the current costs related to dispensing a prescription medication within those stores. Confidential operational and financial data from the most recent corporate fiscal year was provided to the Center by 50 separate pharmacies using a modified survey instrument based upon the NCPA-Pfizer Digest.[2] These pharmacies combined to dispense over 4.6 million prescriptions within the reported fiscal year.

The particular sample used for the analyses was comprised of both high and low-volume Medicaid dispensing pharmacies across the country, representing 13 different states. Pharmacies were asked to provide sales and expense data for each site included in the study. A list of the expense items included in the cost of dispensing calculation are shown in Figure 1.

NACDSV 01110

Figure 1. Expense Items Included in Cost of Dispensing Calculation

| Direct Expense | Weighted by Pharmacy Area | Weighted by Pharmacy Sales |
|---|---|---|
| Pharmacist Wages | Utilities | Advertising, Sales, Marketing |
| Pharmacy Technician Wages | Rent | Business Insurance |
| Pharmacy Computer Charges | Other Employee Wages | Store Supplies |
| Pharmacy Payroll Taxes | | Office Postage |
| Fringe Benefits and Bonuses | | Delivery Service |
| | | Bad Debt |
| | | Corporate Overhead |
| | | Warehousing Costs |
| | | Inventory Shrinkage |

Additionally, pharmacies were surveyed for the total number of prescriptions dispensed during the most recent fiscal year, corresponding with the sales and expense items included in the survey instrument. Only those expenses that directly contributed towards the dispensing of a prescription within the site were included for final cost of dispensing calculations. Where appropriate, expense items were adjusted based upon total pharmacy versus front-end sales and pharmacy area square footage.

## Results

Overall, the statistical range of costs of dispensing fell between $8.85 and $10.39 per prescription. There is a 95% level of confidence that the true mean falls within this range. Our calculated mean (average) within this particular sample was $9.61 per prescription (Table 1). The median cost of dispensing for all 50 stores in the sample was $9.46.

Table 1. Estimated Cost of Dispensing per Prescription[1]

| Estimate | Cost of Dispensing | |
|---|---|---|
| Mean (Average) | $9.62 | |
| 95% Confidence Interval | $8.85 (Lower) | $10.39 (Upper) |
| Standard Deviation | $2.70 | |
| Median (Middle Point) | $9.46 | |

[1]Sample size: 50 pharmacy sites, 4,615,350 total prescriptions.

## Conclusion

This technical analysis reports results from a sample of chain pharmacy financial operations data for 50 sites across 13 states. While we did not estimate costs for dispensing Medicaid prescriptions exclusively, future studies are needed to examine differences in dispensing costs for Medicaid versus non-Medicaid prescriptions. For example, potential differences in costs related to activities such as coordination of benefit functions, uncollected copayments, and prior authorization requests prior to dispensing should be considered, for comparison, between Medicaid and non-Medicaid prescriptions.

Given that current payments for dispensing fees fall well below our estimate, the results from this preliminary analysis confirm that more widespread studies are needed to estimate the actual costs of dispensing medications to patients. While the sampling method used for this analysis was not necessarily random, it begins to provide us with a description of the broad range of the current costs involved in dispensing prescriptions within a chain pharmacy.

NACDSV 0111

Notes

[1] Department of Health and Human Services. Office of Inspector General. "Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products." Report A-06-00-00023, August 2001.
[2] National Community Pharmacists Association-Pfizer Digest. 2004. Alexandria, VA, 2004.

## The Center for Pharmacoeconomic Studies
### THE UNIVERSITY OF TEXAS AT AUSTIN

Since its establishment in 1994, The Center for Pharmacoeconomic Studies at The University of Texas at Austin has conducted economic and policy research on the impact of pharmaceutical services and products on patients' quality of life and health care outcomes in Texas and across the U.S. The Center serves as a bridge in bringing researchers together from different sectors of the health care delivery system, in addition to fostering collaborations with other academic institutions to disseminate scholarly findings. Researchers at the Center provide expertise in the areas of study design, methodology, data collection and analysis, and interpretation of economic and policy research. The Center also develops and presents educational programming to further the understanding of pharmacoeconomics and its role in the decision-making process within the health care delivery system.

NACDSV 01112

# EXHIBIT 5

## SETTLEMENT AGREEMENT AND RELEASE

### I. PARTIES

This Settlement Agreement ("Agreement") is entered into this ____ day of _____, 2003. The parties to the Agreement are the state of Montana and Zeneca Inc. and AstraZeneca Pharmaceuticals LP (collectively and hereinafter referred to as "Zeneca"), which has its headquarters in Wilmington, Delaware, and is a successor to the pharmaceutical business of Zeneca, Inc., and are collectively referred to as the parties. The Parties now agree as follows:

### II. PREAMBLE

A.       WHEREAS, Zeneca is entering into a civil settlement with the United States of America, acting through and/or on behalf of its Department of Justice and the United States Attorney's Office for the District of Delaware, and the Office of the Inspector General of the United States Department of Health and Human Services ("HHS-OIG"); TRICARE Management Activity ("TMA") (formerly known as the Office of the Civilian Health and Medical Program of the Uniformed Services), a field activity of the Office of the Secretary of Defense; the Defense Supply Center Philadelphia, of the Defense Logistics Agency, the United States Department of Defense ("DSCP"); the Railroad Retirement Board ("RRB") (the "Federal Settlement"), and relator in a certain federal False Claims Act lawsuit, as well as settlement agreements with the state of Montana and numerous other states (hereinafter the "Participating States"), all of which are intended to resolve civil claims for the conduct alleged in Preamble Paragraph F below;

B.       WHEREAS, this Agreement addresses the state of Montana's claims against Zeneca for the conduct alleged in Preamble Paragraph F below;

**MT 037926**

1

DP11400000005

services, travel and entertainment, consulting and audit services, and honoraria, to obtain unlawfully

orders to purchase the drug Zoladex for treatment of prostate cancer from Zeneca, knowing that

reimbursement for the drug would be made by the state's Medicaid program;

      (iii)    The state of Montana contends that Zeneca knowingly and willfully offered

and paid illegal remuneration to physicians by marketing Zeneca's "Return-to-Practice" program to

physicians to unlawfully induce orders to purchase the drug Zoladex for treatment of prostate cancer,

knowing that reimbursement for the drug would be made by the state's Medicaid program. The state

of Montana further contends that Zeneca's Return-to-Practice program consisted of inflating the

Average Wholesale Price ("AWP") used by Medicaid and others for reimbursement of the drug,

deeply discounting the price paid by physicians to Zeneca for the drug ("the discounted price"), and

marketing the spread between the AWP and the discounted price to physicians as additional profit to

be returned to the physician's practice from Medicaid's reimbursements for Zoladex. The state of

Montana further contends that Zeneca falsely advised physicians that the discounted price could not

and should not be reported to Medicaid;

      (iv)    The state of Montana contends that Zeneca engaged in a marketing scheme

where it set an AWP for Zoladex at levels far higher than the majority of its physician customers

actually paid for the drug when purchasing from Zeneca. As a result, the state of Montana contends

that Zeneca's customers received reimbursement from the state of Montana's Medicaid program at

levels significantly higher than the physicians' actual costs or the wholesalers' average price;

      (v)    The state of Montana contends that Zeneca knowingly misreported and

underpaid its Medicaid rebates for Zoladex used for treatment of prostate cancer, i.e., the amounts

that it owed to the states under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8. The state

**MT 037927**

3

of Montana further contends that Zeneca was generally required on a quarterly basis to rebate to each state Medicaid program the difference between the Average Manufacturer Price ("AMP") and its "Best Price," as defined by 42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C). The state of Montana alleges that Zeneca falsely reported to the Centers for Medicare and Medicaid Services (formerly the Health Care Financing Administration) its Best Price for Zoladex used for treatment of prostate cancer because Zeneca calculated its Best Prices for Zoladex without accounting for off invoice price concessions provided in various forms including, for example, cash discounts in the form of grants, services, free goods contingent on any purchase requirement, volume discounts and rebates. As a result, the state of Montana contends that Zeneca misreported and underpaid its Medicaid rebates to the states under the Medicaid Rebate Program.

Zeneca's conduct alleged in Preamble Paragraph F is hereinafter referred to as the "Covered Conduct." The state of Montana contends that its Medicaid program was damaged as a result of the Covered Conduct;

G.      WHEREAS, the state of Montana contends that it has administrative and civil claims against Zeneca for administrative and monetary penalties under state and federal law for the Covered Conduct;

H.      WHEREAS, other than such admissions as Zeneca makes in connection with its plea in the Criminal Action, Zeneca denies the remaining allegations of the state of Montana as set forth herein and in any civil action filed by the state of Montana;

I.      WHEREAS, to avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement as set forth below.

**MT 037928**

4

## III.   TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.      Zeneca agrees to pay to the United States and the Participating States, collectively, the sum of two hundred ninety one million, twenty-seven thousand, eight hundred forty-four dollars ($291,027,844), as set forth below ("Settlement Amount").  This sum shall constitute a debt immediately due and owing to the United States and the Participating States on the effective date of this Agreement.  This debt is to be discharged by payments to the United States and the Participating States, under the following terms and conditions:

A.      Zeneca shall pay to the United States the sum of two hundred seventy nine million, eight hundred twenty-two thousand, eight hundred forty dollars ($279,822,844), plus simple interest at the rate of 6% in an amount of ($45,998.28) for each day following the effective date of this Agreement before complete payment is made (the "Federal Settlement Amount").  The Federal Settlement Amount shall be paid pursuant to the civil settlement agreement entered between Zeneca and the United States (the "Federal Agreement").

B.      Zeneca shall pay to the Participating State Medicaid programs the sum of eleven million, two hundred five thousand dollars ($11,205,000), plus simple interest at the rate of 6% in an amount of ($1,841.92) for each day following the effective date of the Federal Agreement until complete payment is made (the "State Settlement Amount").  This State Settlement Amount shall be paid to an escrow account pursuant to the State Settlement Agreement no later than seven business days after Zeneca receives written payment instructions from the negotiating team for the

**MT 037929**

5

4

Participating States and following the latest date on which the following occurs: (1) the Federal Agreement is fully executed by the Parties and delivered to Zeneca's attorneys, (2) the stipulated dismissals described in the Federal Agreement are filed and copies provided to Zeneca's attorneys, or (3) the Court accepts the Fed. R. Crim. P. 11(c)(1)(C) guilty plea in connection with the Criminal Action as described in Preamble Paragraph C and imposes the agreed-upon sentence. The escrow account into which Zeneca shall deposit the State Settlement Amount shall be an account under the custody and control of a Medicaid Fraud Control Unit, which shall be designated by the state negotiating team. This Medicaid Fraud Control Unit shall act as Escrow Agent and shall retain such funds until their release in accordance with the payment terms set forth in subparagraph D below.

      C.    The total portion of the Settlement Amount paid by Zeneca in settlement for alleged injury to the Medicaid program for the state of Montana is $92,891.72, consisting of a portion paid to the state of Montana under this agreement and another portion paid to the federal government as part of the Federal Settlement Agreement. The individual portion of the State Settlement Amount allocable to the state of Montana, and which may be withdrawn by the state of Montana from escrow pursuant to this Agreement is $27,554.67 (the "Individual State Settlement Amount"), plus any accrued interest on that portion of the State Settlement Amount. The portion of the Federal Settlement Amount allocable to the state of Montana is $65,337.05.

      D.    The state of Montana shall be entitled to disbursement of its Individual State Settlement Amount from the escrow account ten days after the Escrow Agent has received fully executed state settlement agreements from all of the participating states, or, in the alternative, when the state negotiating team and Zeneca agree that the Individual State Settlement Amounts shall be disbursed.

**MT 037930**

6

E.      If Zeneca's agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph C is not accepted by the Court or the Court does not impose the agreed upon sentence for whatever reason, this Agreement shall be null and void at the option of either the state of Montana or Zeneca.  If either the state of Montana or Zeneca exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within ten business days of the date on which the party receives actual notice of the Court's decision, the Parties will not object and this Agreement will be rescinded.  If this Agreement is rescinded, Zeneca agrees that the period of time between January 10, 2003, and thirty days after rescission of this Agreement shall be excluded for the purpose of considering any time-related defenses, including but not limited to those defenses based in whole or in part on a statute of limitation or on a theory of laches.

2.      In consideration of this Agreement and payment set forth herein and subject to the exceptions from release set forth in Paragraph 3, the state of Montana, on behalf of itself, and its officers, agents, agencies, and departments, releases and discharges Zeneca, its predecessors, successors, subsidiaries, partners, joint venture owners, and their corporate parents and affiliates, predecessors, successors and assigns, and their current and former directors, officers and employees from any civil or administrative claims for Medicaid damages or penalties that the state of Montana has or may have relating to the Covered Conduct as defined in Preamble Paragraph F.  The payment of the Settlement Amount fully discharges Zeneca from any obligation to pay Medicaid-related restitution, damages, and/or any fine or penalty to the state of Montana for the Covered Conduct.

3.      Notwithstanding any term of this Agreement, the state of Montana specifically does not herein release any person or entity, including Zeneca, its predecessors, successors, subsidiaries,

**MT 037931**

7

partners, joint venture owners, and their corporate parents and affiliates, predecessors, successors and assigns, and their current and former directors, officers, and employees from any and all of the following: (a) any criminal, civil or administrative claims arising under state of Montana revenue codes; (b) any criminal liability not specifically released by this Agreement; (c) any liability to the state of Montana (or any agencies thereof) for any conduct other than the Covered Conduct; (d) any claims based upon obligations created by this Agreement; (e) except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (f) any express or implied warranty claims or other claims for defective or deficient products and services provided by Zeneca; (g) any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct; (h) any claim based on a failure to deliver items or services due; or (i) any civil or administrative claims against individuals, including current and former directors, officers, and employees of Zeneca, its predecessors, subsidiaries, partners, joint venture owners, and their corporate parents and affiliates, who, related to the Covered Conduct, receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement; or (j) any reporting of AWP for Zolodex to First Data Bank or any other national reporting service for use in Medicaid reimbursement submitted subsequent to the effective date of this Agreement.

    4.    In consideration of the obligations of Zeneca set forth in this Agreement and conditioned upon Zeneca's payment in full of the Settlement Amount, the state of Montana agrees to release and refrain from instituting, directing, recommending or maintaining any administrative claim or any action seeking exclusion from the state of Montana's Medicaid program against Zeneca, its predecessors, successors, subsidiaries, partners, joint venture owners, their corporate parents and

**MT 037932**

8

DP11400000005

affiliates, predecessors, successors and assigns for the Covered Conduct or for Zeneca's conviction in the Criminal Action. Nothing in this Paragraph precludes the state of Montana from taking action against Zeneca in the event that Zeneca is excluded by the federal government, or for conduct and practices other than the Covered Conduct or the conviction in the Criminal Action. Zeneca acknowledges that the state of Montana does not have the authority to release Zeneca from any claims or actions which may be asserted by private payors or insurers, including those that are paid on a capitated basis for providing health care to the state's Medicaid program.

5.     This agreement is expressly conditioned upon resolution of the Criminal Action. In consideration of the Criminal Action, the Medicaid Fraud Control Unit of the state of Montana agrees that it shall not prosecute or refer for investigation or prosecution to any agency Zeneca, its predecessors, successors, subsidiaries, partners, joint venture owners, and their corporate parents and affiliates, predecessors, successors and assigns for the Covered Conduct.

6.     Zeneca fully and finally releases the state of Montana, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Zeneca has asserted, could have asserted, or may assert in the future against the state of Montana, its agencies, employees, servants, and agents, related to or arising from the investigation and prosecution of Covered Conduct up to the effective date of this Agreement.

7.     Zeneca waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this

**MT 037933**

9

8

Agreement bars a remedy sought in such criminal prosecution or administrative action. Zeneca agrees that this Agreement is not punitive in purpose or effect.

8.      The Settlement Amount that Zeneca must pay pursuant to Paragraph 1 above will not be decreased as a result of the denial of claims for payment now being withheld from payment by the state of Montana's Medicaid program where such denial resulted from the Covered Conduct. If applicable, Zeneca agrees not to resubmit to the state of Montana's Medicaid program any previously denied claims, which denials were based on the Covered Conduct and agrees not to appeal any such denials of claims.

9.      Zeneca agrees to the following:

(a)      Unallowable Costs Defined: that all costs (as defined in the Federal Acquisition Regulations (FAR) § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf on Zeneca, its present or former officers, directors, employees, shareholders, and agents in connection with: (1) the matters covered by this Agreement and the related plea agreement; (2) the United States' and the state of Montana's audit and civil and criminal investigation of the matters covered by this Agreement; (3) Zeneca's investigation, defense, and any corrective actions undertaken in direct response to the United States' and the state of Montana's audit and civil and criminal investigation in connection with the matters covered by this Agreement (including attorney's fees); (4) the negotiation and performance of this Agreement and the plea agreement; (5) the payment Zeneca makes to the United States and the Participating States pursuant to this Agreement and any payments that Zeneca may make to relators; (6) the negotiation of the Corporate Integrity Agreement (CIA), and the obligations undertaken pursuant to the CIA to:

**MT 037934**

10

(i) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and (ii) prepare and submit reports to the HHS-OIG, are unallowable costs on Government contracts and under the Medicare Program, Medicaid Program, Railroad Retirement, TRICARE, DOD, and Federal Employees Health Benefits Program (FEHBP). However, nothing in this paragraph affects the status of costs that are not allowable based on any other authority applicable to Zeneca. (All costs described or set forth in this Paragraph 9(a) are hereafter, "unallowable costs").

(b)      Future Treatment of Unallowable Costs:  If applicable, these unallowable costs will be separately estimated and accounted for by Zeneca, and Zeneca will not charge such unallowable costs directly or indirectly to any contracts with the United States or any State Medicaid Program, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by Zeneca or any of its subsidiaries to the Medicare, Medicaid, TRICARE, DOD, Railroad Retirement or FEHBP Programs.

(c)      Treatment of Unallowable Costs Previously Submitted for Payment:   If applicable, Zeneca further agrees that within 60 days of the effective date of this Agreement, it will identify to applicable Medicare, Railroad Retirement and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid, DOD, VA and FEHBP fiscal agents, any unallowable costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Zeneca or any of its subsidiaries, and will request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Zeneca agrees that the United States and the state of Montana, at a minimum,

**MT 037935**

11

DP11400000005

will be entitled to recoup from Zeneca any overpayment plus applicable interest as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment. Any payment due after the adjustments have been made shall be paid to the United States or the state of Montana pursuant to the direction of the Department of Justice, and/or the affected agencies. The state of Montana reserves its rights to disagree with any calculations submitted by Zeneca or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this Paragraph) on Zeneca or any of its subsidiaries' cost reports, cost statements, or information reports. Nothing in this Agreement shall constitute a waiver of the rights of the United States or the state of Montana to examine or reexamine the unallowable costs described in this Paragraph.

10.     If applicable, Zeneca agrees that it will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents or sponsors. Zeneca waives any causes of action against these beneficiaries or their parents or sponsors based upon the claims for payment covered by this Agreement.

11.     Zeneca expressly warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. Section 547(b)(3), and will remain solvent following its payment to the state of Montana hereunder. Further, the Parties expressly warrant that, in evaluating whether to execute this Agreement, the Parties (i) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to Zeneca, within the meaning of 11 U.S.C. Section 547(c)(1), and (2) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

**MT 037936**

12

DP11400000005

12.    This Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity, including but not limited to any individual or entity that purchased Zoladex from Zeneca.

13.    Nothing in any provision of this Agreement constitutes an agreement by the state of Montana concerning the characterization of the Settlement Amount for purposes of state internal revenue codes or the United States Internal Revenue Code.

14.    In addition to all other payments and responsibilities under this agreement, Zeneca agrees to pay all reasonable travel costs and expenses (including distribution costs) of the state negotiating team.  Zeneca will pay this amount by separate check or wire transfer made payable to the National Association of Medicaid Fraud Control Units after all Participating States execute this Agreement, or as otherwise agreed upon by the state negotiating team and Zeneca.

15.    Zeneca agrees to cooperate completely and truthfully with the state of Montana's on-going investigation of third parties for alleged violations of state and federal law arising out of its investigation.  Zeneca understands and agrees that such cooperation shall include the following:

(a)    prompt production of any non-privileged document or record in the possession, custody or control of Zeneca relating to the subject matter of the investigation.  In connection with this, Zeneca shall provide such technical assistance as is necessary and reasonable to facilitate the state of Montana's access to any non-privileged computerized information covered by this subparagraph:

(b)    taking all reasonable measures available to Zeneca to ensure that present and former officers, directors, agents and employees of Zeneca cooperate truthfully and completely in connection with the on-going investigation; and

**MT 037937**

13

(c)     taking all reasonable measures available to Zeneca to make all present and former employees of Zeneca available for interviews by law enforcement personnel, upon reasonable notice.

Provided, however, notwithstanding any provision of this Agreement, that Zeneca is not required to request of its present or former employees or agents that they forego seeking the advice of an attorney nor that they act contrary to that advice, and that Zeneca is not and will not be required to waive the attorney-client privilege, the protection of the work product doctrine, or any other privilege or protection from disclosure.

16.     Zeneca represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

17.     Zeneca has entered into a CIA with HHS-OIG. Zeneca acknowledges that the state of Montana may gain access to and use pricing information provided by Zeneca under the CIA, provided that the state of Montana meets its obligations relating to the use and confidentiality of that information as set forth in this Agreement. Zeneca acknowledges that the CIA does not preclude the state from taking any appropriate action against Zeneca for future conduct under the state of Montana's laws. The state of Montana hereby agrees to abide by all confidentiality provisions and restrictions contained in the CIA as allowed by state law and afford all such information the maximum degree of confidentiality permitted by law.

18.     Zeneca shall report directly to the Medicaid Program for the state of Montana the average sale price, as defined below, for the following currently marketed drugs: Cefotan, Elavil

**MT 037938**

14

Injection[1], Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, Zolodex, and all other newly developed injectible products which are primarily marketed and sold by Zeneca to individual medical practitioners/clinics for in-office administration and directly billed by the practioner/clinic to health care insurers, including federal health care programs (hereinafter "Covered Products").

(a)    Average Sale Price Definition:  For purposes of this Agreement, "Average Sale Price" means, with respect to each dosage form, strength and volume of the Covered Products (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package) the average of all final sales prices charged by Zeneca for the product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Drug Rebate purposes, pursuant to 42 U.S.C. § 1396r-8, and excluding identifiable direct sales to hospitals. (Those purchasers for which the sales are included in the calculation of Average Sale Price are hereafter referred to as the "Relevant Purchasers.")  The prices identified in the calculation of the Average Sale Price should be net of all the following: volume discounts; prompt pay discounts; cash discounts; charge backs; short-dated product discounts; free goods; rebates[2]; and all other price concessions provided by Zeneca to any Relevant Purchaser that result in a reduction of the ultimate cost to the purchaser.  Notwithstanding the foregoing, the Average Sale Price shall not include the value of bona fide charity care or bona fide grants.

Zeneca shall report the Average Sale Price by National Drug Code ("NDC") for each Covered Products identified by Zeneca's NDC. The Average Sale Price reported shall be properly

---

[1] As of February 2003, AstraZeneca no longer makes or sells Elavil injection.  Consequently, AstraZeneca may be limited or unable to report average sale price for this product in the future.

**MT 037939**

15

weighted to reflect the volume of sales at each sale price, *i.e.,* for each NDC, the price reported shall be an average per unit price determined by dividing the sum of all final prices charged by Zeneca to a Relevant Purchaser, net of all price reductions identified above, for a Covered Products in a quarter by the total number of units of that product sold in that quarter.

      (b)    Time Frame: Except as otherwise noted below, forty five (45) days after the last day of each calendar quarter, Zeneca shall report, in accordance with section 18(a) above, the average sale prices of each of its Covered Products identified by Zeneca's NDC to: (1) the Medicaid programs of those States who have executed a State Settlement Agreement with Zeneca; and (2) First DataBank Inc.[3] solely for the purpose of reporting pricing information based on those Average Sale Prices to the Medicaid Programs of those States that have executed a state settlement agreement. The first such report of Average Sale Prices shall be made no later than 45 days after the end of the first full calendar quarter following the Effective Date of the CIA. The Average Sale Price reporting obligations under this agreement may be subject to modification consistent with a change in federal or state statutory or regulatory requirements for the submission of price information by pharmaceutical manufacturers.

      (c)    Certification: With each report of Average Sales Price information Zeneca sends to the Medicaid Program for the state of Montana, an appropriate employee or agent of Zeneca will certify that price information reported has been reported to First DataBank, or any successor or

---

[2] The term "rebate" as used in this paragraph does not include any payments made by Zeneca to the States pursuant to the Medicaid Drug Rebate Program (42 U.S.C. § 1396r-8).

[3] If appropriate to reflect changes in the sources from which the Medicaid programs for the Participating States receive pricing information, Zeneca agrees that, upon the receipt of a written request by any of the Participating States, Zeneca will report the required information to a drug pricing reporting source other than, and in addition to, FirstDataBank, provided that the price reporting source agrees to protect the confidentiality of Zeneca's pricing information in a written agreement containing reasonable provisions equivalent to the confidentiality provisions governing the submission of pricing information to First DataBank.

**MT 037940**

16

alternative reporting agency, and that the information has been calculated in accordance with the methodology described in this Agreement. Said certification shall be in the form annexed to this Agreement as Exhibit "A." Zeneca agrees that this certification by an appropriate employee or agent of Zeneca constitutes a certification by Zeneca.

(d)     Document Retention: Zeneca shall retain all supporting work papers and documentation relating to the average sale price of its Covered Products for six years after the effective date of the CIA, and, to the extent not protected by appropriately asserted privileges, shall make such documentation available for inspection by the MFCU for the state of Montana, or a duly authorized representative of the MFCU, pursuant to the confidentiality provisions set forth in paragraph 20 below.

(e)     Time Period: Zeneca agrees to submit Average Sale Price in accordance with this Agreement for a period of five years from the effective date of the CIA.

19.     (a)     Zeneca and the state of Montana acknowledge that Zeneca considers the pricing information provided by Zeneca to be confidential commercial information and proprietary trade secrets that if disclosed may cause substantial injury to the competitive position of Zeneca. It is further understood that all information provided by Zeneca shall be made available to the state of Montana's MFCU upon request. The state of Montana hereby agrees to afford to the pricing information disclosed by Zeneca the maximum degree of confidentiality permitted by law.

(b)     The Medicaid Program of the state of Montana has been advised by the MFCU of the purpose and use of this information. Without surrendering any legal right to contest the use of this information, Zeneca acknowledges that this information may be relied upon by the state of Montana in establishing reimbursement rates for Zeneca's products, provided however the

**MT 037941**

17

state of Montana will not change reimbursement rates for any Zeneca product based on this information without conducting meaningful review for all government-reimbursed therapeutically similar products.

20.     Unless otherwise stated in writing subsequent to the execution of this Agreement, all notifications and communications made pursuant to this Agreement shall be submitted to the entities listed below:

**STATE PHARMACY MANAGER**
**[For the submission of Average Sale Price Data]:**

Department of Public Health and Human Services
1400 Broadway, P.O. Box 202951
Helena, MT  59620


**STATE MEDICAID FRAUD CONTROL UNIT**
**[For legal notices and other purposes]:**

MFCU of Montana
Division of Criminal Investigations
303 N. Roberts St., Rm. 367
Helena, MT  59620


**ZENECA**

Glenn Engelmann
Vice President, General Counsel
And Secretary
Zeneca, Inc.


21.     This Agreement is governed by the laws of the state of Montana.  The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the appropriate court having jurisdiction and venue in the state of Montana.

**MT 037942**

18

22.     The undersigned Zeneca signatory represents and warrants that he is authorized by the Board of Directors of AstraZeneca PLC, the parent corporation of AstaZeneca Pharmaceuticals, LP, to execute this Agreement.  The undersigned state of Montana signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the state of Montana through their respective agencies and departments.

23.     This Agreement is effective on the date of signature of the last signatory to the Agreement.

24.     This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties.

25.     This Agreement constitutes the complete agreement between the Parties with regard to the Covered Conduct.   This Agreement may not be amended except by written consent of the Parties.

26.     This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

**MT 037943**

19

DP11400000005

## THE STATE OF MONTANA

DATED: 7-8-03

*Gordon Hage*
state of Montana
Office of the Attorney General
Medicaid Fraud Control Unit

BY: GORDON HASE
Title: DIRECTOR

DATED: 7/7/03

*John Chappuis*
state of Montana
Medicaid Program

BY: John Chappuis
Title: DPHHS deputy director
and mt. medicaid director

## ASTRAZENECA PHARMACEUTICALS LP

By: _____        Dated: 9/04/03
Glenn Engelmann
Vice President, General Counsel
And Compliance Officer
AstraZeneca Pharmaceuticals LP

By: _____        Dated: 8/18/03
JOHN C. DODDS
Morris, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Counsel to AstraZeneca Pharmaceuticals, LP

**MT 037944**

20

19

DP11400000005

ZENECA, INC.

By: _____  Dated: 9/04/03

~Glenn Engelmann
Vice President, General Counsel
And Secretary
Zeneca, Inc.

By: _____  Dated: 8/18/03

John C. Dodds
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA   19103-2921
Counsel to Zeneca, Inc.

**MT 037945**

21

EXHIBIT 'A' CERTIFICATION FORM

**CERTIFICATION**

      The undersigned, an agent of AstraZeneca Pharmaceuticals LP, hereby certifies that the attached average sale price information has been communicated to First Databank or any successor or alternative reporting agency, and that it has been calculated in accordance with the methodology described in the State Settlement Agreement and as further described in AstraZeneca Pharmaceuticals LP's Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services.

Signed _____

Title _____

Date _____

**MT 037946**

22

# EXHIBIT 6



November 14, 2003

Department of Public Health and Human Services
1400 Broadway, P.O. Box 202951
Helen, MT 59620

RECEIVED
NOV 1 7 2003
CHILD & ADULT
HEALTH RESOURCES

In accordance with Section III (D)(2) of the June 2003 Corporate Integrity Agreement between
AstraZeneca Pharmaceuticals LP and the OIG, enclosed are the Average Sale Prices for Covered
Products identified in Appendix A of the CIA along with a description of the methodology used
to calculate the Average Sale Prices and Requisite Certification.

If you have any questions or concerns relating to these Average Sale Prices, please contact
Esther Selvaggi at (302) 886-2268 or myself at (302) 886-8589 and we will provide further
details.


Sincerely,

Deborah A Saez
Medicaid Pricing Coordinator
AstraZeneca


Enclosures (3)


**MT 038039**


**AstraZeneca Pharmaceuticals LP**
1800 Concord Pike   PO Box 15437   Wilmington DE 19850-5437

Tel       302 886 3000
www.astrazeneca-us.com

AZPH1001 (01/00)

DP11400000008                                                          1