EXHIBIT 11



11522484

Jun 13 2006
7:31PM

Calculation of Damages and Penalties for the State of Montana

### Declaration of Raymond S. Hartman

## I.     Introduction and Overview

1.     My name is Raymond S. Hartman. I am Director and President of Greylock McKinnon Associates (GMA), an economic consulting and litigation support firm located in Cambridge, Massachusetts. Since I have previously described my qualifications to this Court, I will not repeat them here.

2.     I have been asked by Counsel to the State of Montana to review the Complaint in this matter;[1] to review the allegations regarding fraudulent pricing practices on the part of Defendants; and to describe the formulaic methodologies I would use to calculate both the damages to the State and its consumers if the alleged fraudulent pricing practices are proved and the penalties to the Defendants arising from those fraudulent practices.

3.     The fraudulent pricing practices specifically alleged of twenty-one Defendant drug manufacturers[2] are characterized as the "AWP Inflation Scheme."[3]  Through the alleged "AWP Inflation Scheme" (or "AWP Scheme"), Defendant manufacturers fraudulently increased the AWPs of selected drugs (denoted by NDCs) above the provider acquisition costs (ACs) for which the AWPs were a market signal.[4]  Defendants reported the inflated AWPs to the standard national price compendia (*First DataBank (FDB), Red Book* and *Blue Book*), and the industry based reimbursement amounts on those AWPs. Since providers acquired the drugs at acquisition cost (AC) while payors (Medicare, Medicaid, private Third-Party Payers (TPPs), and consumers) paid for the drugs at reimbursement rates based on the AWPs, the increased "spreads" (AWP – AC) caused by the AWP Scheme increased the profits earned by the providers of the drugs (pharmacies, physicians) at the expense of the payors. The increased profits induced providers to move market share of the relevant drugs, the *raison d'etre* of the AWP Scheme to the drug manufacturers.[5]

---

[1] State of Montana's Second Amended Complaint, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, United States District Court for the District of Massachusetts, August 1, 2003 (hereafter, *Complaint*).

[2] Identified and discussed in detail in the *Complaint* in ¶¶ 214-602. I have been instructed by Counsel to exclude the GSK Group from my analysis.

[3] *Complaint*, ¶¶ 5-10.

[4] Market reliance upon reported AWPs is discussed in ¶¶ 169-172 of the *Complaint*.

[5] A more complete discussion of the fraud and its market effects are developed in ¶¶ 173-213 of the *Complaint*.

4.    The relevant Plaintiffs in this matter for whom damages are alleged include, but are not limited to,[6] the following:

a)  The State of Montana

- For pharmaceutical reimbursements under Medicaid (see *Complaint*, ¶¶ 15, 159-163)

- For pharmaceutical reimbursements under Medicaid for "dual eligibles" under Medicare (see *Complaint*, ¶ 158)

- For pharmaceutical reimbursements by State employees (see *Complaint*, ¶ 16)

- For pharmaceutical payments made by State agencies (see *Complaint*, ¶ 17)

b)  Montana consumers

- Those consumers making drug coinsurance payments under Medicare Part B (see *Complaint*, ¶ 20)

- Those consumers making coinsurance payments under a private third-party payer plan (see *Complaint*, ¶ 20)

- Those consumers without prescription drug insurance coverage making payments out of pocket (see *Complaint*, ¶ 2).

5.    The claims for damages and/or financial penalties made by Plaintiffs include, but are not limited to, the following:

a)  Restitution for losses incurred by Montana residents as a result of the AWP Scheme (*Complaint*, ¶¶ 654-660);

b)  Restitution of the losses suffered by the State of Montana as a result of the AWP Scheme and recovered as civil penalties for deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-103 (*Complaint*, ¶¶ 662-667);

c)  Recovery of inflated Medicaid reimbursements resulting from fraudulent reporting of inflated AWPs, in violation of Mont. Code Ann. § 53-6-160(1) (*Complaint*, ¶¶ 676-678);

d)  Payment of a claim for forfeiture, civil penalties, double damages and legal costs for each violation of Mont. Code Ann. § 17-8-231 under the AWP Scheme (*Complaint*, ¶¶ 681-691); and

e)  Payment of punitive damages to the State of Montana (*Complaint*, ¶ 693).

6.    To date, Defendants have provided incomplete data and insufficient guidance to fully interpret the data that they have provided to allow me to appropriately calculate damages for all the claims identified above.  For example, insufficient data and/or insufficient data description were provided by Defendants to appropriately calculate all

---

[6] Since I have not had sufficient time to fully analyze all discovery materials, there may be additional Plaintiff groups and additional drugs subject to damage calculations that I will be able to address, if asked to, in a Supplementary Declaration.  I anticipate that those damage calculations will make use of formulaic methods analogous to those put forward here.

$(100 - x)\%$.[19]  Denote the but-for allowed amount as $AA^{but\text{-}for}$.[20]  The difference between $AA$ and $AA^{but\text{-}for}$ can be used to calculate overcharge damages as follows.

16.     For each year of the period alleged to be subject to the AWP Inflation Scheme, State claims data summarize total number of claims and total dollar reimbursements paid by the State under the Medicaid Program and for drugs reimbursed for dual-eligibles (payment of Medicare supplemental insurance amounts (20%) for physician-administered drugs) by NDC and/or by J-Code.  For a given NDC or J-Code, those data would reflect the following:

(1a)     Actual Reimbursements $= \Sigma_i AA_i*q_i = \Sigma_i(p*AWP + df)_i*q_i = (p*AWP + df)*Q$,

where Actual Reimbursements is the total dollar amount of claims paid in a given year; $\Sigma_i$ is the summation of the allowed amount$_i$ ($AA_i$) times the number ($q_i =$ quantity$_i$) of claims (alternatively the units reimbursed per claim) reimbursed at $AA_i$; and $Q$ is the total claims or total units reimbursed by the State at an average allowed amount of $AA^{avg} = (p*AWP + df)$.[21]

Had these reimbursements been made at the but-for allowed amount per claim i ($AA^{but\text{-}for}_i$), the total reimbursements that should have been paid by the State in a given year would have been,

(1b)     But-For Reimbursements $= \Sigma_i AA^{but\text{-}for}_i*q_i = (AA^{but\text{-}for\text{-}avg})*Q$,

where the total number of units is assumed to be the same in the but-for and actual worlds.

Having calculated But-For Reimbursements, the damages to the State for reimbursements for drug j of Defendant k are

(1c)     Overcharge Damages$_{jk}$ = Actual Reimbursements$_{jk}$ – But-For Reimbursements$_{jk}$
$$= \Sigma_i AA_i*q_i - \Sigma_i AA^{but\text{-}for}_i*q_i$$
$$= (AA^{avg} - AA^{but\text{-}for\text{-}avg})Q.[22]$$

17.     Aggregate overcharge damages (1c) can be calculated for all units of drug j sold by Manufacturer k and reimbursed by the State as a whole for the Damage Period as a whole; alternatively, it can be calculated for some subset of NDCs of drug j for some subset of State reimbursements for some sub-period of the Damage Period.  The use of Equation (1c) is particularly straightforward.  The State has data for Actual

---

[19]  Of course, in the actual calculations the percentages are denoted as follows: 100% = 1.00; 15% = 0.15; 10% = 0.10; etc.

[20]  Which would be related to a but-for non-inflated AWP as $AA^{but\text{-}for} = AWP^{but\text{-}for} - x\% + df = (100\% - x\%)*AWP^{but\text{-}for} + df = p*AWP^{but\text{-}for} + df$.

[21]  The state data summarize reimbursement for all claims.  Hence, if some claims are determined by FUL, U&C or the amount billed (all of which I understand are related to AWP), the AA for those claims are specific to that definition and $AA^{avg}$ reflects those claims.

[22]  And if we make use of a but-for non-inflated AWP, Overcharge Damages$_{jk}$ = $(p*AWP + df)*Q - (p*AWP^{but\text{-}for} + df)*Q$.

Reimbursements$_{jk}$ for all relevant drugs and Defendant manufacturers, for the relevant Damage Period, for Medicaid and Medicare program reimbursements.  The But-For Reimbursements are determined by statute.

### D. Calculation of Penalties for Deceptive Practices and False Claims Under the AWP Inflation Scheme

18.     Under Count II (¶¶ 662-667) of the *Complaint,* the claim is made for restitution of losses suffered by the State of Montana as a result of the AWP Scheme.  Defendants conduct as alleged constitutes deceptive acts or practices in violation of Mont. Code Ann. § 30-14-103 for those transactions in which the AWP was inflated; and for which Defendant manufacturer failed to disclose material facts that the AWP exceeded the average of the wholesale price based upon a good faith and reasonable estimate; and that the Defendant manufacturer knowingly made false representations by representing that the AWP was an accurate reflection of the average wholesale price.  Pursuant to Mont. Code Ann. § 30-14-142(2), the *Complaint* states that the Court can assess civil penalties of $1,000 from each defendant for each willful violation of Mont. Code Ann. § 30-14-103.

19.     Under Count IV (¶¶ 682-691) of the *Complaint*, a claim for forfeiture, civil penalties, double damages and legal cost pursuant to Mont. Code Ann. § 17-8-231 is made in  ¶ 691.  Accordingly, it is claimed (¶ 691.C) each defendant must forfeit the entirety of their claims and pay (i) civil penalties of $2,000 per false claim, (ii) double the damages sustained by the State as a result of the false claim, and (iii) the State's legal costs incurred in connection with this action.

20.     I have been directed by Counsel to assume that penalties of $3,000 can be assessed for each claim submitted for reimbursement under Medicaid and Medicare that was subject to a deceptive practice and was false.[23]  The number of such claims can be calculated as follows.

21.     As noted in ¶ 8 above, the allowed amount (AA) under Medicaid is to be the lesser of {the EAC, the Federal Upper Limit (FUL), the state maximum allowable cost (MAC), the Usual & Customary amount (U&C) charged by a pharmacy, or the amount billed}.  Likewise, as noted in ¶ 8 above, EAC is invariably the lowest price.

        Hence, for any drug reimbursed under Medicaid, I have been instructed by Counsel that liability occurs as a matter of law if $AA_{jk} > EAC_{jk}$.  Furthermore, as discussed above (see footnote 8), $EAC_{jk} = ASP_{jk}$ to the relevant group of providers (pharmacies, physicians).  For self-administered drugs reimbursed under Medicaid, j denotes the NDC of the drug and k denotes the Defendant.  For physician-administered drugs, j denotes the NDC or the J-Code and k denotes the Defendant.

22.     I have been provided with information from the State sufficient to calculate $AA_{jk}$ by claim, net of the dispensing fee.  While I received from Defendants a variety of data

---

[23] My methodology focuses upon accurately calculating the number of complaints that were deceptive and false.  Should I receive alternative direction from the Court regarding the amount of the penalty to be assessed per false and deceptive claim, the calculation of aggregate penalties will be very easy to revise to accommodate those alternative directions.  The revised calculation is simple arithmetic.

sets summarizing (to varying degrees of completeness) invoice information, rebates information and other accounting information, I have not received from Defendants sufficient explanation and clarification of these data to accurately calculate the $ASP_{jk}$ by NDC and/or J-Code for most drugs and most Defendants in this matter. Indeed, the data that I have been able to use to analyze liability using ASPs have been developed as part of the MDL AWP litigation addressing the Track 1 Defendants and the Connecticut AWP litigation.

Given this limited ability to make use of discovery materials, I have developed a method to make use of the existing information to draw conclusions regarding liability. Specifically,

a) For claims for reimbursement for single-source self-administered drugs, I conclude liability as follows:

- For those NDCs for which I have ASPs and for which AA > ASP = EAC, I conclude that AA fraudulently exceeds EAC.
- Since the Amount Billed and the U&C > EAC, EAC will be the lesser of the alternative reimbursement bases.[24]
- AWP – (16.6%-20%)[25] = WAC
- I understand that the retail acquisition costs (RAC) is approximately equal to WAC and indeed may be slightly less {that is, RAC (EAC) < WAC}, perhaps 1-2% of AWP.[26]   To be conservative, I assume that RAC = EAC ≈ WAC.[27]
- Using the upper bound of these discounts off AWP, if AA > AWP – 20%, AA exceeds EAC.
- Using the lower bound of these discounts off AWP, AA > AWP – 16.6%, AA exceeds EAC.
- Absent a measure of ASP, I let the threshold for liability be AA > AWP – 20%. For sensitivity analysis, I let the threshold for liability be AA > AWP – 16.6%. In each case, if AA exceeds the threshold I conclude AA fraudulently exceeds EAC.

b) For claims for reimbursement for multi-source self-administered drugs, I conclude liability as follows:

- For those NDCs for which I have ASPs and for which AA > ASP = EAC, I conclude that AA fraudulently exceeds EAC.
- Since the Amount Billed and the U&C > EAC; since FUL > EAC; and since Montana does not have a state MAC; EAC will be the lesser of the alternative reimbursement bases.
- Evidence demonstrates that EACs (i.e., ASPs or RACs) < AWP – (16.6%-66%)[28] over the period 1991-2002.

---

[24] The U&C is the "walk-in" price paid by uninsured cash payers; it is usually ≈ AWP.

[25] These discounts off AWP are equivalent to spreads of 20%-25% above WAC.  For example, if AWP – 20% = WAC; then AWP (100%-20%) = .80*AWP = WAC; and AWP = 1.25 WAC or WAC + 25%.

[26] See footnote 9 above.

[27] This understanding is corroborated by Defendants' Experts; see footnote 8 above.

- Absent a measure of ASP, and given the fact that I have not made a complete enough analysis of the pattern of increasing discounts off AWP over the Damage Period, I conclude that a reasonable threshold for liability for the Damage Period as a whole is AA > AWP − 25%.  If AA exceeds this threshold, I conclude AA fraudulently exceeds EAC.
- However, in my calculations in Section IV below, I bound this reasonable threshold by allowing the threshold to be AWP − 20% and AWP − 66%.

c)  For claims for physician-administered drugs reimbursed under Medicaid, I conclude the following:

- For those drugs for which I have ASPs and AA > ASP = EAC, I conclude that AA fraudulently exceeds EAC.  The ASP may be delineated by NDC or J-Code.  Given the time consuming process of performing the cross-walk for multi-source physician-administered drugs reimbursed by J-Code, I do not analyze liability for physician-administered drugs once they go generic, even if I have ASP data for a generic drug of a Defendant.  Note that this exclusion will make my calculation of penalties conservative.
- Since the Amount Billed, the U&C and FUL > EAC; and since Montana does not have a state MAC; EAC will be the lesser of the alternative reimbursement bases.
- Evidence demonstrates that for single-source drugs, physician acquisition cost (PAC) is at most equal to WAC and often much less (i.e., PAC < AWP − (20%-75%).
- Absent a measure of ASP, and given the fact that I have not made a complete enough analysis of the pattern of increasing discounts off AWP over the Damage Period, I conclude that a conservative threshold for liability for the Damage Period as a whole is AA > AWP − 25%.  If AA exceeds this threshold, I conclude AA fraudulently exceeds EAC.
- However, in my calculations in Section IV, I bound this threshold by allowing the threshold to be AWP − 20% and AWP − 66%.
- Because Montana began to rely upon Medicare data for AWPs for Medicaid-reimbursed drugs dispensed under J-Codes and because Medicare shifted in 2005 to reimbursement based upon ASP, I do not include any reimbursement claims for 2005.

---

[28] Since evidence indicates that EAC < 16.6%-20% for brand name drugs, it is well known that the discount off AWP for generic drugs will be greater than 16.6% - 20%.  For example, by 1997, the OIG found that the average discounts below AWP at retail were 42.45% for generics.  By 2002, OIG found these discounts from AWP to be even deeper, approximately 66%.  See ¶¶ 21-24 of Attachment D to my September 3, 2004 MDL Declaration in Support of Class Certification.  Both of these OIG reports used a sampling of states.  The earlier report used a sample of ten states and the District of Columbia; the later report used a sample of 8 states.  Montana was one of the states chosen in both of the samples.  See *Medicaid Pharmacy – Actual Acquisition Costs of Generic Prescription Drug Products*, Office of Inspector General, Department of Health and Human Services, March 2002, A-06-01-00053.

regulation of the Medicaid drug program has encouraged states to base their payments on Estimated Acquisition Cost (EAC = ASP), state Medicaid programs have not. Instead, they have been forced to base their reimbursements on AWP.[32] As a result, Defendant Manufacturers' AWP Scheme and reliance by the State upon AWP has caused the State of Montana to be overcharged as follows.

Using the notation of ¶¶ 15-16 above

a)  For self-administered drugs "*presently*," $AA = AWP - 15\% + df = (100\% - 15\%)*AWP + df = 0.85*AWP + df$, and $AA^{but-for} = EAC + df = ASP + df$.

b)  For self-administered drugs "*formerly*," $AA = AWP - 10\% + df = 0.90*AWP + df$, and $AA^{but-for} = EAC + df = ASP + df$.

c)  I have been informed by Counsel that the reimbursement formula switched from AWP - 10% to AWP - 15% on July 1, 2002.[33]

d)  For physician-administered drugs reimbursed by Montana as a drug claim (and therefore reported by NDC), I assume the same reimbursement formulae.

26.    While Montana statutes indicate that the amount allowed on all, or at least substantially all, drug claims is formulaically based on AWP in this fashion, the actual calculation of $AA_i$, $\Sigma_i AA_i$ and $AA^{avg}$ in Section IV below is based upon the claims themselves. Actual claim amounts are compared with actual ASPs, when those ASPs are available.

27.    When ASPs have not been available and I have relied upon the thresholds determined as in ¶¶ 22-23 above, I also rely upon claims data and the thresholds calculated relative to AWPs.

### B.  Reimbursement for Drugs Reported as Medical Claims Under Montana's Medicaid Program

28.    Medicaid reimburses for physician-administered drugs recorded as Medical claims using J-Codes for two groups of patients: i) those patients strictly covered by Medicaid, and ii) those patients covered by Medicare whose 20% co-insurance is covered by Medicaid ("dual eligibles"). Reimbursement formulae and calculation issues for the first set of medically-related drug claims are the same as those discussed above in ¶¶ 24-27 for Medicaid drug claims.

29.    Reimbursement formulae and calculation issues for the second set of medically-related drug claims (dual eligibles) are determined by the Medicare reimbursement formulae presented in footnote 13 of my December 15, 2005 MDL Declaration on Liability and the Calculation of Damages. While these claims could be analyzed in a fashion similar to that put forward above, the Montana data for these claims do not disaggregate the 20% drug coinsurance payment from the 20% coinsurance payment for all medical services provided by the physician administering the physician-administered

---

[32] See ¶ 8 and footnote 9 above.

[33] I have examined the Montana Medicaid Drug Claims and confirmed that the switch in AA to AWP – 15% did occur on July 1, 2002.

drug. I did not have sufficient time to identify the allowed amount $AA_i$ for the drug alone on these claims, in order to calculate overcharges and penalties. For this reason, I do not compare a claimed amount to the AWP of the drug (by J-Code), in order to identify the number of false claims. Likewise, I do not calculate damages or penalties for this group of claims. Hence, my calculation of aggregate overcharge damages and my measures of penalties for false and deceptive claims are conservative.

### C. Reimbursement for Drug Claims and Medical Claims For State Employees and State Agencies

30.    The drugs for which reimbursement was paid based upon AWP by these groups will likewise be categorized as self-administered branded drugs, self-administered generic drugs or physician-administered drugs. Calculation of overcharge damages and the penalties for false and deceptive claims would proceed as above, if I had been provided with claims data for these groups. I was not, and do not therefore calculate overcharge damages or identify the number of false and deceptive claims subject to recovery of penalties. Hence, my calculation of aggregate overcharge damages and my measures of penalties for false and deceptive claims are conservative.

### D. Reimbursement for Drug Payments Made by Uninsured Consumers

31.    The price of drugs to walk-in customers without insurance is understood to be $U\&C \approx AWP$. Such consumers have been overcharged by the AWP Scheme. I have no data summarizing these reimbursements; hence, I cannot calculate the related damages or penalties. Hence, my calculation of aggregate overcharge damages and my measures of penalties for false and deceptive claims are conservative.

### E. Analysis of Medicaid Rebates

32.    I have not received complete data on Medicaid rebates paid to the State. According to the CMS Medicaid Drug Rebate Program, Medicaid rebates are to be calculated as a fixed percentage of AMP ("Average Manufacturer Price"),[34] which purports to approximate the ASP. For the purposes of the overcharge damage analysis, I assume that AMP is the same in the actual and but-for worlds (since ASP is the same), and therefore the total amount of rebates received by the state is the same in the actual and but-for worlds. As a result, if properly paid in the actual world, Medicaid rebates net

---

[34] See http://www.cms.hhs.gov/MedicaidDrugRebateProgram; rebates for innovator drugs are set at 15.1% of AMP; and rebates for non-innovator drugs are set at 11% of AMP.

# EXHIBIT 12

**LAURA OSTERMAN, Plaintiff, v. SEARS, ROEBUCK & COMPANY, K-DECORATORS, INC., A Montana Corporation, d/b/a K-Designers, JAMES E. SLUDER, Defendants.**

**Cause No. BDV 99-522(C)**

**EIGHTH JUDICIAL DISTRICT COURT OF MONTANA, CASCADE COUNTY**

*2000 ML 6027; 2000 Mont. Dist. LEXIS 1631*

**August 30, 2000, Decided**

**JUDGES:** [**1] Kenneth R. Neill, DISTRICT COURT JUDGE.

**OPINION BY:** Kenneth R. Neill

**OPINION:** ORDER RE SUMMARY JUDGMENT

[*1] Three Motions for Summary Judgment have been filed by the various Defendants. Briefing is complete and oral argument was heard on June 8, 2000.

I. FACTS

[*2] The following statement of facts is undisputed on the record.

[*3] Plaintiff is a resident of Great Falls. Defendant K-Decorators, d/b/a K-Designers, is a Montana corporation engaged in the marketing, sale and installation of vinyl siding. Defendant James Sluder is the marketing director for K-Designers and a resident of Billings.

[*4] Plaintiff's husband died in June of 1996. Following his death, Plaintiff decided to side their family home, an improvement Mr. Osterman had planned to make. Plaintiff contacted Sears regarding siding. (The record before the court variously indicates that Plaintiff chose Sears due to past experience with the store and a preference for Sears products, or that Plaintiff contacted Sears in response to an advertising mailer sent by Sears to Plaintiff.)

[*5] On August 15, 1996, James Sluder visited Plaintiff in her home regarding vinyl siding. Plaintiff states that she [**2] thought Defendant Sluder was an employee of Sears at that time. Plaintiff signed a "Sales Agreement" for the purchase and installation of vinyl siding on her home on that date. The Sales Agreement indicated the price of the siding and installation was $ 21,946.00, which was to be financed through "Sears Financial."

[*6] Plaintiff states that at all pertinent times she was lead to believe that she was dealing exclusively with Sears and that the materials provided would be Sears product. However, Plaintiff further pleads that "upon close inspection, the Sales Agreement, which was signed by the plaintiff and James E. Sluder, the marketing director for K-Designers, provides that K-Designers is a 'Sears Authorized Contractor'".

[*7] Substantively, Plaintiff asserts that the siding was not installed in a workmanlike manner, that the trim was not properly installed, that nails were put through the siding at inappropriate places, that some of the trim siding was attached to the house with double sided tape, and that the siding material is inappropriate to Montana's climate. Plaintiff further asserts that she notified the local Sears store regarding her dissatisfaction with the [**3] siding installation, but that repairs were not timely or satisfactorily made.

[*8] Plaintiff filed suit on this matter on May 4, 1999. Plaintiff alleged: COUNT I, ACTUAL FRAUD; COUNT II, NEGLIGENT MISREPRESENTATION; COUNT III, CONSTRUCTIVE FRAUD; COUNT IV, BREACH OF WARRANTY; COUNT V, NEGLIGENT HIRING OF INDEPENDENT CONTRACTOR; COUNT VI, NEGLIGENCE; and COUNT VII, UNFAIR TRADE PRACTICES.

2000 ML 6027, *8; 2000 Mont. Dist. LEXIS 1631, **3

## II. STANDARD FOR SUMMARY JUDGMENT.

[*9] Summary Judgment is appropriate when no issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Rule 56, Mont.R.Civ. P., O'Bagby v. 1st Interstate Bank of Missoula, 241 Mont. 44, 46, 785 P.2d 190, 191 (1990).* On a motion for summary judgment, "[t]he party seeking summary judgment has the burden of demonstrating absence of genuine fact issues." *First Security Bank of Bozeman v. Jones, 243, Mont. 301, 303, 794 P.2d 679, 681 (1990).* "The burden then shifts to the non-moving party who must show the existence of a genuine issue in order to prevail." Id. "To meet this burden, the non-moving party must proffer substantial evidence, not mere speculation and conclusory statements." Id. Under [**4] Rule 56(c), Mont.R.Civ. P., summary judgment may be granted where the party opposing the motion fails "to raise or demonstrate the existence of the genuine issue as to material fact or demonstrates that the legal issue should not be determined in favor of the movant." *Bills v Hannah, Inc., 230 Mont. 250, 253-54, 749 P.2d 1076, 1079 (1988).* However, all reasonable inferences are to be drawn in favor of the non-moving party. *Cereck v Albertsons, Inc., 195 Mont. 409, 411, 637 P.2d 509, 511 (1981).*

[*10] Pursuant to Rule 56(a), Mont.R.Civ. P, a party may move for summary judgment in the party's favor upon all or any party of a claim. If a party only seeks partial summary judgment, then under Rule 56(d), Mont.R.Civ. P., the court determines which issues may be decided as a matter of law and which issues remain for trial.

## III. DEFENDANT K-DESIGNERS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT.

[*11] The first motion is the motion of Defendant K-Designers for partial summary judgment (Docs # 10 and 11). In that motion, K-Designers asserts that Plaintiff's actions for actual fraud, constructive fraud, negligence, and negligent misrepresentation are barred [**5] by the statute of limitations. K-Designers bases this argument on the two year applicable statute of limitations for claims based on fraud or mistake set forth in § 27-2-203, MCA; the fact that Plaintiff knew or should have known at the time of signing the contract on August 15, 1996 that K-Designers and Sluder were not Sears; and the fact that Plaintiff's claim was not filed until May 4, 1999 when the statute of limitations would have

run on August 15, 1998.

[*12] K-Designers further asserts that Plaintiff's claims for Unfair Trade Practices is also subject to a two year statute of limitations applicable to liabilities created by statute, pursuant to § 27-2-211, and that Plaintiff's claims for negligence are barred by the two year statute of limitations applicable to actions for damage to property, pursuant to § 27-2-207.

[*13] K-Designers' arguments with regard to the Actual and Constructive Fraud charges are compelling. While Plaintiff asserts there are factual issues related to when she discovered the alleged fraud perpetrated upon her - that K-Designers is not Sears and that the products used were not Sears products she signed an agreement [**6] on August 15, 1996, that clearly stated that K Designers was a "Sears Authorized Contractor." Further, all of the brochures and information supplied to Plaintiff indicated that K-Designers was an authorized contractor, not Sears per se, and that the siding materials were manufactured by a company named Gentek, not by Sears.

[*14] Plaintiff has not specified any alleged representation made by any defendant that K-Designers was a part of Sears or that Sluder was an employee of Sears. She simply asserts that she was lead to believe that that was the case. Any assumption on her part, though, would have been in contradiction to the actual information provided to her in the sales brochures and the sales agreement. The facts that Plaintiff relies on as continuing misrepresentations regarding the Sears affiliation of K-Designers - that she addressed her complaints regarding the siding work to Sears and that Sears at one point sent a Sears employee to inspect the siding due to her complaints - are consistent with the true relationship between the parties. Sears and K-Designers clearly have a contractual agreement, an agency relationship, whereby Sears markets the siding services of K [**7] Designers. Sears is not attempting to extricate itself from this suit based on lack of a relationship with Plaintiff. Rather, Sears has been involved in attempting to resolve Plaintiff's dissatisfaction with the installation of the siding.

[*15] The same reasoning disposes of Plaintiff's Unfair Trade Practices Act claim.

[*16] Defendant's statute of limitations argument regarding negligent misrepresentation is less compelling as the Montana Supreme Court has determined that the

2000 ML 6027, *16; 2000 Mont. Dist. LEXIS 1631, **7

general negligence statute of limitations - 3 years - applies to negligent misrepresentations claims. *Cechovic v. Hardin & Assoc. Inc., 273 Mont. 104, 902 P.2d 520 (1995).*

[*17] Finally, Defendant's argument regarding the statute of limitations applicable to Plaintiff's negligence claim is not well-taken. The Montana Supreme Court has clearly held that when negligence is asserted in a property damage claim, the property damage statute of limitations is in conflict with the general tort (negligence) statute of limitations, and must be resolved in favor of the longer statute of limitations - 3 years, pursuant to § 27-2-204. See *Ritlin v. Roe, 260 Mont. 453, 861 P.2d 175 (1993).* [**8] K-Designers asserts that the Supreme Court's decision in Ritlin is in error.

IV.   DEFENDANT   K-DESIGNERS   AND SLUDER'S MOTION FOR SUMMARY JUDGMENT ON ALL APPLICABLE COUNTS.

[*18] The second motion for summary judgment is made by K-Designers and Sluder for full summary judgment. This motion as it relates to fraud and misrepresentation primarily goes to the elements for fraud and misrepresentation and failure of Plaintiff to plead the primary element of those causes of action - a representation. The elements of fraud are:

1. A representation;

2. Falsity of the representation;

3. Materiality of the representation;

4. The speaker's knowledge of the falsity of the representation or ignorance of its truth;

5. The speaker's intent that the representation be relied upon;

6. The hearer's ignorance of the falsity of the representation;

7. The hearer's reliance on the representation;

8. The hearer's right to rely upon the representation; and

9. Consequent and proximate injury caused by the reliance on the representation.

[*19] Plaintiff has failed to make a prima facie showing of a number of these elements. First, the gravamen of Plaintiff's complaint, as recited by [**9] Plaintiff, is that "the vinyl siding was sold, furnished and installed on her home under false and misleading circumstances." The circumstances at issue are that Plaintiff asserts she was lead to believe that the vinyl siding was manufactured by Sears and would be installed by Sears employees. However, she does not specify false statements that she alleges were made to her that lead her to believe that was true. Certainly, from the facts of this case, Plaintiff would have reasonably believed that Sears was marketing a product and would stand behind that product, but there are no facts before the court that indicate that this is not exactly what has happened. Second, Plaintiff has not made a case for materiality of any alleged representation if statements were made that the product was manufactured by Sears and would be installed by Sears employees. She does not assert that she would not have purchased the product if she had fully comprehended that Sears did not manufacture it or that the installers were "authorized contractors" rather than Sears employees. Presumably, the fact that Sears was marketing and representing the product, and the fact that Sears continued to represent the [**10] product following installation when problems became apparent, are the material considerations in purchasing products from particular retailers. Third, if Plaintiff was ignorant of the falseness of the alleged representation, that ignorance cannot be charged to Defendants where Plaintiff was given numerous documents stating the relationship between KDesigners and Sears. Finally, Plaintiff has failed to show consequent and proximate injury resulting from the reliance on the alleged representations. Plaintiff's alleged injuries arise from issues of workmanship, fitness of the product, and warranty. Sears has continued to be involved in addressing the Plaintiff's concerns and repairing the defects whether or not it manufactured the product or its employees installed it.

[*20] The elements for Negligent Misrepresentation are:

1. The defendant made a representation as

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 14 of 24

Page 4

2000 ML 6027, *20; 2000 Mont. Dist. LEXIS 1631, **10

to past or existing material fact;

2. The misrepresentations must have been untrue;

3. Regardless of its actual belief, the defendant must have made the representation without any reasonable ground for believing it was true;

4. The representation must have been made with the intent to induce the plaintiff to [**11] rely on it;

5. The plaintiff must have been unaware of the falsity of the representation;

6. The plaintiff must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation; and

7. The plaintiff, as a result of its reliance, must sustain damages.

[*21] The same considerations made above are applicable here as well.

[*22] The elements of Constructive Fraud are:

1) Any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

2) Any such act or omission as the law especially declares to be fraudulent, without respect to actual fraud. *§ 28-2-406, MCA*.

[*23] While the Defendants assert that the facts of this case cannot give rise to a fiduciary duty or special circumstance to establish a duty as required by the statute, the Montana Supreme Court has previously held that a commercial transaction may give rise to a sufficient duty. *McJunkin v Kaufman & Broad Home Systems, 229 Mont. 432, 748 P.2d 910 (1987).* [**12] Once again,

however, the breach of duty alleged is the misrepresentation of the manufacturer of the siding products and employer of the installer. No misrepresentation has been identified.

[*24] Defendants further assert that Plaintiff's Unfair Trade Practices claim must fail for lack of evidence of misrepresentation.

[*25] As Plaintiff relies upon the same factual allegations for the Unfair Trade Practices claim, and asserts that the alleged misrepresentations regarding manufacture of the siding and employ of the installers constitute an unfair trade practice, if there was no misrepresentation, there was no unfair trade practice.

[*26] Defendants assert that Plaintiff's negligence claims are subject to summary judgment as evidence proffered by Defendants establishes that the siding was applied according to industry standards and was suitable for Montana's climate.

[*27] However, Defendants' evidence is from the affidavit and deposition of Al Judson, the general manager and vice president of K-Designers. The Plaintiff has not provided testimony of another expert in the field, but Plaintiff has alleged a number of defects in the product and/or installation and [**13] in the attempts to repair them. While Plaintiff has not offered evidence on the industry standards, the Court concludes that an assessment of the alleged defects is within the knowledge of the average juror. There are certainly questions of fact relating to quality of product and installation, and whether or not identified defects have been properly repaired. As negligence is generally not susceptible to summary judgment, this claim should stand.

[*28] The final count to be assessed is Plaintiff's claim for breach of warranty. The sales agreement specified that applicable warranties would be supplied to Plaintiff upon completion of the installation. Upon completion, Plaintiff apparently received a materials warranty from Gentek and a workmanship warranty from K-Designers. K-Designers asserts it is entitled to summary judgment on the warranty issue because the evidence (deposition and affidavit of Mr. Judson) establishes that the installation was performed within industry standards, and because any warranty on the siding product specifically is made by Gentek, not K-Designers.

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 15 of 24

Page 5

2000 ML 6027, *28; 2000 Mont. Dist. LEXIS 1631, **13

[*29] Notwithstanding the Defendants' arguments that Plaintiff has provided no evidence raising [**14] a genuine issue of material fact related to industry standards or the quality of the product or its installation, as stated above, the Court determines for purposes of this motion that the assertions Plaintiff has made regarding irregularities in siding and failure to remedy those defects raises an issue of fact of whether the product was properly installed or has been properly repaired. Those issues are covered in the warranty from K-Designers to Plaintiff. The materials warranty does run from Gentek to Plaintiff.

V.   SEARS'   MOTION   FOR   SUMMARY JUDGMENT.

[*30] The final Motion for Summary Judgment is filed by Sears, and requests summary judgment on all counts of fraud, misrepresentation, and deceptive practices (Counts I, II, III and VII). Sears does not request summary judgment on the negligence and warranty claims. For the same reasons stated above, Defendant Sears is entitled to Summary Judgment prayed for.

VI. SUMMARY.

[*31] To summarize, Defendant K-Designers is entitled to summary judgment on Counts I, II, III and VII by virtue of applicable Statutes of Limitations. Defendant Sluder has not pled the Statute of Limitation defenses. However both of those Defendants [**15] are also entitled to summary judgment based on absence of a genuine issue of material fact as to Counts I, II, III and VII. Count V is not applicable to these Defendants.

[*32] Sears is entitled to summary judgment based on lack of genuine issue of material fact as to Counts I, II, III and VII. No motions were made by Sears as to Counts IV, V and VI, nor has Sears asserted Statute of Limitation defenses.

[*33] Thus, this case will proceed on Plaintiff's Counts numbered IV, V and VI. Accordingly,

[*34] IT IS HEREBY ORDERED that Motions for Summary Judgment by all Defendants are granted as to Counts I, II, III and VII. Defendant K-Designers and Sluder's Motions for Summary Judgment are denied as to Count IV and VI.

DATED this 30th day of August, 2000.

Kenneth R. Neill DISTRICT COURT JUDGE

FOCUS - 1 of 2 DOCUMENTS

**JUDITH L. STARR, Plaintiff, v. THE SUMMIT, INC.,d/b/a THE SUMMIT,
JEANNE RIZZOTTO, THE BROKERS, A REAL ESTATE CO, P.C., d/b/a
COLDWELL BANKER THE BROKER - RED LODGE, CHERYL ANN
HOWARD and DEAN A. LUPTAK, Defendants.**

**Cause No. DV 00-20**

**TWENTY-SECOND JUDICIAL DISTRICT COURT OF MONTANA, CARBON
COUNTY**

*2003 ML 2592; 2003 Mont. Dist. LEXIS 2451*

**July 10, 2003, Decided**

**JUDGES:** [**1] Blair Jones, DISTRICT COURT JUDGE.

**OPINION BY:** Blair Jones

**OPINION: ORDER**

[*1] This matter comes before the Court on a Motion for Summary Judgment, filed January 28, 2002, by defendant JEANNE RIZZOTTO, owner of THE SUMMIT, INC., d/b/a THE SUMMIT ("Rizzotto"), through her counsel of record, Robert Edd Lee. The remaining defendants, THE BROKERS, A REAL ESTATE CO., P.C., d/b/a COLDWELL BANKER THE BROKER - RED LODGE, CHERYL ANN HOWARD and DEAN A. LUPTAK (respectively, "The Brokers," "Howard," and "Luptak" as the context requires) through their counsel, William M. Gilbert, join in Rizzotto's motion and filed a brief in support thereof. Plaintiff Judith L. Starr ("Starr") filed a brief in opposition to Rizzotto's motion on March 8, 2002. The matter has been fully briefed by all parties. In support of her motion, Rizzotto has also filed Rizzotto's deposition and the depositions of Tilton, Howard, Luptak, and Starr together with documentary exhibits 121, referenced in the depositions. A hearing on the motion was held on December 17, 2002 at the Stillwater County Courthouse in Columbus, Montana. Having duly considered the parties submissions and the record before the Court at the time of [**2] hearing, together with the applicable law, the Court determines that Rizzotto's motion should be granted.

**STATEMENT OF FACTS**

[*2] 1. David A. Tilton, a former defendant in this case, bought Lots 6 and 7 in the Waples development near Rock Creek, south of Red Lodge, Montana, from the Roscoe family in February 1995. At the time of his purchase, Tilton believed that Lots 6 and 7 would be able to use Lot 17A as a septic drainfield because of a grant of interest in a multi-family sewage system placed of record by his predecessors in interest and other owners in the development. *(Affidavit of Lee at 2; Exhibit 13; Tilton Deposition at 29.)*

[*3] 2. In June 1996, Tilton engaged Rizzotto as his real estate agent for the sale of Lot 7. Rizzotto listed Lot 7 for sale at an asking price of $ 33,000, describing the septic system status as follows: "Multifamily drainfield system on Lot 17A. Beautiful tree covered lot south of Red Lodge just across the road to Rock Creek. Great winter access." *(Rizzotto Deposition at 9-12; Exhibits 1A and 1B.)*

[*4] 3. The sanitary restrictions for the Waples development (on the land which was ultimately resurveyed to include [**3] Lot 7 at issue in this case) were lifted by a Certificate of Removal of Sanitary Restrictions in April 1989. The lifting of the sanitary restrictions on Lot 7 has not changed, and the restrictions were not reinstated at any time material to this case. *(Exhibits 1 & 10; Tilton Deposition at 32; Rizzotto Deposition at 15.)*

[*5] 4. The original Waples development was

Page 2

2003 ML 2592, *5; 2003 Mont. Dist. LEXIS 2451, **3

subsequently resurveyed by Certificate of Survey 521, at which time the surveyor made an error in the tabulated square footage of Lot 6, adjacent to Lot 7. Lot 6 was erroneously described as nearly one-acre in size, when, in fact, it was nearer to one-half acre. (*Affidavit of Lee at 3.*) At all time prior to Tilton's sale of Lot 6 to different buyers (Reichelt and Schultz), Lots 6 and 7 were owned by the same persons, first the Roscoe family and then by Tilton. (*Affidavit of Lee at 4; Tilton Deposition at 12.*)

[*6] 5. Starr has lived in the south-central Montana area since 1972. She lived in Billings until 1994, when she moved to Red Lodge. (*Starr Deposition at 4-5.*) Starr is a former school psychologist now in private practice with a Ed.D. degree in education and counseling. (*Starr Deposition* [**4] *at 5-6.*) She invests through a broker. (*Starr Deposition at 6-7.*) Starr has bought and sold real property since her divorce, both in the Billings and Red Lodge areas, including property she owned in the 400 Ranch south of Red Lodge. (*Starr Deposition at 7-13.*) At least one residence has been sold by Starr without the assistance of a real estate agent or attorney after placing a sign in front of the house. (*Starr Deposition at 11.*)

[*7] 6. David A. Tilton is a Montana attorney living in the Red Lodge area. (*Tilton Deposition at 3.*) In 1985, Tilton purchased Lots 8 and 9 of the Red Lodge Estates south of Red Lodge, Certificate of Survey (COS) No. 521, to increase the "green belt" on the north side of his mother's cabin in that area. (*Tilton Deposition at 11-12.*) As a result of Tilt on's earlier contacts with other neighbors, the Roscoe family approached Tilton to sell him their Lots 6 and 7 in the same area, and he bought the two Roscoe family lots in 1995. (*Tilton Deposition at 12, 29.*)

[*8] 7. Tilton eventually closed his sale of Lot 6 to buyers Reichelt and Schultz in 1995. Five years later, Tilton was sued by Reichelt and Schultz, the buyers [**5] of Lot 6, in Civil Action No. DV 00-01, Montana Twenty Second Judicial District Court, Carbon County. The basis of that complaint was a survey error in the original plat for Certificate of Survey No. 521, which incorrectly reflected the acreage of Lot 6. (*Court file, Civil Action No. DV 00-01.*) Reichelt and Schultz contended that they were entitled to another one-half acre of land, more or less, to comport with the quantity of land they bargained for.

[*9] 8. On March 20, 1997, Starr signed a buy-sell agreement as an initial offer to buy Lot 7 from Tilton.

(*Exhibit 5-5A; Starr Deposition at 40-41.*) Various counter-offers were proffered between Tilton and Starr during the ensuing days. Ultimately, Tilton signed the buy-sell with a counter-offer to sell to Starr at a higher price than Starr initially offered. (*Exhibit 6.*) Both Tilton and Starr initialed a final addendum to the buy-sell, with a sale price of $ 22,000 for Lot 7. (*Exhibit 9; Starr Deposition at 43-50.*)

[*10] 9. The transaction was finalized March 25, 1997. (*Starr Deposition at 52.*) On March 27, 1997, Cheryl Howard, acting as buyer's agent for Starr, faxed Starr the addendum sheet for [**6] Starr to initial, indicating that Tilton had "agreed to everything you [Starr] wanted. Great goin' gal." (*Exhibit 4; Starr Deposition at 52.*)

[*11] 10. Significant to the disposition of this case is the "special provision" which was written into the buy-sell agreement from the time it was first submitted by Starr's real estate agent to Tilton's real estate agent on March 20, 1997. The "special provision" provided in pertinent part:

Contingent on Buyer's [Starr's] approval of the following:

Preliminary Title Report; covenants & restrictions (animals specifically); that sanitation restrictions have been lifted; type of septic system; if there is an association - who plows the road & fee." (*See Exhibit 5 and Exhibit 6.*)

[*12] Starr understood in her own mind that "contingency" meant that she would not have to buy Lot 7 if the "contingencies" were not met. (*Starr Deposition at 34.*)

[*13] 11. Starr also knew and understood what a "title report" was and how it was used in a real estate transaction. (*Starr Deposition at 35.*) Before closing, Starr had read the title report, including its exception # 18, which excluded (as a Schedule B exception) [**7] "[t]he effect of State of Montana Department of Health and Environmental Sciences Certificate of Removal of Sanitary Restrictions dated April 21, 1989. Copy attached." (*Exhibits 11, 16; Starr Deposition at 62-66.*)

[*14] 12. The sanitary restrictions were removed on April 21, 1989, based on a proposed multi-family sewage treatment system and drainfield to be constructed in

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 18 of 24

Page 3

2003 ML 2592, *14; 2003 Mont. Dist. LEXIS 2451, **7

accordance with Carbon County regulations and the plans and specifications submitted by Larry Larsen, a professional engineer. *(Exhibits 1 & 10.)* The multi-family sewage system was installed in early May 1996. *(Exhibit 12.)* However, after an inspection of the multi-family sewage treatment system in September 1996, Mike Fahley, R.S., Carbon County Planning Director and Sanitarian, in correspondence dated October 28, 1996, indicated problems with the sewage system, and declared that it did not comply with the Carbon County permit issued in 1995. *(Exhibit 2 at P1.)* The letter suggested alternatives, such as an elevated sand mound septic system, which could be acceptable on a case by case basis on individual lots, or by another multi-family system shared by the owners. *(Exhibit 2 at P2.)* [**8]

[*15] 13. The Fahley letter clearly implicated a contingency which would have allowed Starr to avoid her buy-sell commitment, should she have elected to do so. Before closing, Starr understood what "covenants and restrictions" she intended to refer to when she first submitted Exhibit 5, her initial buy-sell and offer to buy, and she knew that she would not have to close the transaction unless she was satisfied. *(Starr Deposition at 35-36.)* Specifically, Starr knew that the lifting of sanitary restrictions meant "[t]hat it would be okay to put in the necessary things for a toilet, plumbing, and use of water on the property." *(Starr Deposition at 36-37.)* Starr indicated "type of septic system" meant to her "how the plumbing system would be constructed." *(Starr Deposition at 37.)* She had read Exhibit 5 before signing it. *(Starr Deposition at 37.)*

[*16] 14. At the time Starr prepared and signed Exhibit 5, she was already living on the 400 Ranch, a rural property served by a well and septic system farther upstream on Rock Creek, south of Red Lodge. *(Starr Deposition at 26-27.)*

[*17] 15. On March 26, 1997, Starr received both the "by-laws for the association" [**9] and the October 28, 1996 letter from Mike Fahley, R.S., Carbon County Planning Director/Sanitarian, regarding his inspection of the failed multi-family drainfield installation on Lot 17A, which ostensibly jeopardized the use of the multi-family sewage system on Lot 17A as then constructed. *(Exhibits 2 and 17; Starr Deposition at 52-53.)* Starr admits she received the Fahley letter the day it was faxed to her on March 26, 1997. *(Exhibit 17; Starr Deposition at 56-57.)*

Starr read it and believed she did not understand it, so she continued to talk about the implications of the Fahley letter with her own broker/agent, Howard. *(Starr Deposition at 57-59).* Although Starr purports not to remember what Howard told her about the Fahley letter, Starr admits that Howard told her that the information in Fahley's letter meant that "it was all right, that there were alternatives," to the existing multi-family sewage disposal system. *(Starr Deposition at 57).*

[*18] 16. In her deposition, Starr indicates uncertainty as to whether Howard understood the Fahley letter. *(Starr Deposition at 60).* However, after examination of the Fahley letter, Howard advised Starr "that if she [**10] wanted to buy this particular lot, [then] she was going to have to work with the other neighbors to get an acceptable sewage treatment system." *(Howard Deposition at 16.)* Upon examination of the Fahley letter, and further conversations with Fahley on the matter, it was Howard's opinion that a septic system could be successfully installed on Lot 7 itself. *(Howard Deposition at 17.)* As to Starr's opportunity to consult an engineer or sanitarian, Howard testified that Starr, "certainly had the opportunity and was available to do so. I called them, but also, even though I had a conversation with the president of the homeowners' association, I recommended that she contact all those people herself if she wanted to, and she did have her own conversation with Mr. Baranko, who is the president of the homeowners' association." *(Howard Deposition at 17.)* Starr is unable to contradict Howard's statement because she has no memory of the substance of anything Howard said to her with respect to the Fahley letter. *(Starr Deposition at 59-61).*

[*19] 17. The transaction did not close until April 15, 1997, when Starr elected to proceed with her purchase and received a deed from [**11] Tilton for Lot 7. *(Exhibit 3; Starr Deposition at 52, 71).* In the time that passed between the final buy-sell and closing, Starr took no action that would qualify as an investigation of the sanitation system with regard to the property she was intending to purchase. *(Starr Deposition at 71).*

[*20] 18. Starr bought Lot 7 as an "investment" and her intention was to resell the property in order to add on to her retirement. *(Starr Deposition at 27, 84).*

[*21] 19. In April 1997, Starr paid Tilton $ 22,000 to purchase Lot 7, which was the price she established by her own counteroffer. *(Starr Deposition at 46).* In

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 19 of 24

Page 4

2003 ML 2592, *21; 2003 Mont. Dist. LEXIS 2451, **11

October 2001, Starr was subsequently paid $ 25,000 for her "investment" in Lot 7, at which time she released Tilton and conveyed Lot 7 to Reichelt and Schultz, the purchasers of Lot 6 from Tilton. *(Affidavit of Lee, P6-8.)*

## STANDARD OF REVIEW

[*22] *Rule 56, M.R.Civ.P.* requires that disputes of material fact be established by personal knowledge of such facts as would be admissible in evidence by affiants or witnesses affirmatively shown to be competent to testify to the matters stated. An adverse party resisting a motion for [**12] summary judgment may not rest upon mere allegations or denials in pleadings, or arguments of counsel, but must, by affidavit or other appropriate means, set forth specific facts showing that there is a genuine fact issue for trial. See, *Rule 56(e), M.R.Civ.P.* The Montana Supreme Court has long been clear on this standard.

[*23] In *Brothers v. General Motors Corp., 202 Mont. 477, 481, 658 P.2d 1108, 1110 (1983)*, the Supreme Court confirmed that mere speculative statements supporting an element of the plaintiff's claim are insufficient to defeat a motion for summary judgment. Conclusory statements asserting issues of fact are not sufficient to resist the motion. The party opposing the motion has an affirmative duty to respond by affidavits or sworn testimony with specific facts to show there is a genuine issue suitable for trial. *Wagner v. Glasgow Livestock Sales Co., 222 Mont. 385, 389, 722 P.2d 1165, 1168 (1986).* The foregoing has been the applicable standard for summary judgment for nearly twenty years, and remains so today. In *Heller v. Gremaux, 2002 MT 199, 311 Mont. 178, 53 P.3d 1259*, the Supreme Court [**13] stated the current standard:

We review a district court's summary judgment ruling de novo and employ the same Rule 56, M.R.Civ.P., evaluation as applied by the district court. See *Andrews v. Plum Creek Manufacturing, 2001 MT 94, P5, 305 Mont. 194, P5, 27 P.3d 426, P5.* Pursuant to *Rule 56, M.R.Civ.P.*, we apply the following inquiry:

The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a

matter of law. We review the legal determinations made by a district court as to whether the court erred. *Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903 (citations omitted). Heller, P7.*

[*24] Once the moving party has met its burden, the opposing party must present to the Court, in admissible form, material and substantial evidence, rather than mere conclusory or speculative statements, [**14] to raise a genuine issue of material fact. *Albright v. Community, Counseling, Correctional, and Services, Inc., 2001 MT 272, P8, 307 Mont. 289, P8, 37 P.3d 675, P8; Hadford v. Credit Bureau of Havre, Inc., 1998 MT 179, P14, 289 Mont. 529, P14, 962 P.2d 1198, P14.*

## ISSUES

### Substantive Issues.

[*25] The central issue in this case is whether, before closing the purchase of Lot 7, Starr had the opportunity to ascertain all the important information concerning: (1) the status of the sanitary restrictions applicable to Lot 7 at the time she purchased it; and (2) the engineering and technical considerations, as a matter of fact, concerning the placement of future sewage facilities on Lot 7 in the event a residence were to be constructed there in the future.

[*26] To prevail in this case, Starr must establish, by admissible evidence, that one or more of the remaining real estate defendants in this case, either Rizzotto, acting for seller Tilton, or The Brokers (through Howard and Luptak), acting for buyer Starr, breached some duty, in contract or tort, which would give rise to an actionable claim for relief resulting [**15] from Starr's purchase. If so, then Starr must provide further admissible evidence of damages, if any, which Starr suffered as the legal consequence of the breach of duty or contract.

[*27] Pursuant to this Court's order dated January 30, 2002, and in support of her motion, Rizzotto filed the sworn depositions of Rizzotto, Tilton, Howard, Luptak, and Starr, together with documentary Exhibits 1-21 referred to in those depositions. At oral argument, Rizzotto also filed the Affidavit of Lee which provided the foundation for three deeds of record in Carbon County showing the conveyance of Lots 6 and 7 to Tilton in 1995, Tilton's conveyance of Lot 7 to Starr in 1997, and Starr's October 18, 2001 conveyance of Lot 7 back to

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 20 of 24

Page 5

2003 ML 2592, *27; 2003 Mont. Dist. LEXIS 2451, **15

the purchasers who bought Lot 6 from Tilton (together with Starr's concurrent October 18, 2001 release of Tilton after he paid Starr $ 25,000 to transfer Lot 7 to the owners of Lot 6).

### Procedural Issue.

[*28] At this point, it is necessary to discuss a procedural issue which arose in this matter. As previously indicated, the Court held a hearing on the Motion for Summary Judgment on December 17, 2002. At the conclusion of the hearing, the Court requested [**16] that the parties submit proposed orders and memoranda within two weeks. Starr failed to file her proposed order and memorandum within the time specified by the Court. Starr subsequently requested additional time to file her proposed order and memorandum and also sought permission from the Court to supplement the record with a deposition of Philip Murphy and the affidavits of one or more expert witnesses. Starr's requests in this regard came *after hearing and after the matter was deemed submitted by the Court.*

[*29] On January 17, 2003, the Court held a telephonic conference with all counsel regarding Starr's requests. The Defendants, through their respective counsel, strongly opposed allowing Starr the opportunity to further supplement the record after hearing. Because of legitimate time constraints experienced by Starr's counsel, the Court granted Starr until 5:00 p.m. on February 3, 2003 in which to submit a proposed order and memorandum. However, the Court did not authorize any other or additional submissions in opposition to the Motion for Summary Judgment which were not submitted on or before the date of hearing on December 17, 2002. See, *Order dated January 17, 2003* [**17] .

[*30] Starr has proffered additional submissions in opposition to the Defendants' Motion for Summary Judgment subsequent to the date of hearing. The Court deems it inappropriate to consider any of Starr's submissions filed after the date of hearing when the motion was deemed submitted except for the filing of proposed orders and supporting memoranda.

[*31] Rule 2(d), Uniform District Court Rules provides that a motion is deemed submitted at the conclusion of oral argument unless the presiding judge orders additional briefs to be filed. Here, the Court requested that proposed orders with supporting memoranda be filed two weeks after oral argument. By

such request, the Court did not open up the record for submissions other than the proposed orders and memoranda. To have done so then or to consider Starr's late submissions now would be fundamentally unfair to the opposing party and continue a submission procedure without end.

[*32] There is a proper procedure for seeking additional time from the Court to secure affidavits or depositions in opposing a summary judgment motion. If a party opposing summary judgment needs additional time to obtain affidavits or depositions, [**18] the party must apply to the court for a continuance. *See, Rule 56(f), M.R.Civ.P., Howell v. Glacier General Assur. Co., 240 Mont. 383, 386, 785 P.2d 1018, 1019 (1989).* The party seeking a Rule 56(f) continuance must demonstrate that the continuance will yield specific facts which will defeat a motion for summary judgment. *See, Environmental Contractors, L.L.C. v. Moon, 1999 MT 178, 295 Mont. 268, 983 P.2d 390.*

[*33] Starr opposed the Defendants' Motion for Summary Judgment with speculation as to the testimony of Phillip Murphy and her expert witnesses. *See, Plaintiff's Brief in Opposition to Summary Judgment.* At no time prior to the conclusion of oral argument did Starr buttress this speculation with affidavits or deposition testimony. Moreover, Starr did not seek a continuance of the hearing to obtain the testimony of these individuals.

[*34] It is also important to note that the Defendants' Motion for Summary Judgment has been pending before this Court for over a year. *See, Rizzotto/Summit Motion for Summary Judgment and Brief in Support,* dated January 28, 2002. Starr had over eleven months prior to oral [**19] argument to obtain any necessary affidavits or testimony. If any necessary affidavits or testimony could not have been obtained during that time, Starr should have sought a Rule 56(f) motion to allow additional time to obtain the necessary affidavits or testimony.

[*35] Although Starr attached to her response brief excerpts from her own discovery responses purporting to describe what possible witnesses might say at trial, it appears that those responses were signed by Starr's attorney and not sworn to by Starr nor by any of the other ostensible witnesses whom Starr hoped to call at trial. Therefore, the Court concludes that it would be manifestly unfair for the Court to consider, in arriving at the Court's decision today, any additional submissions

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 21 of 24

Page 6

2003 ML 2592, *35; 2003 Mont. Dist. LEXIS 2451, **19

offered after the hearing on the Motion for Summary Judgment other than the parties' proposed orders and supporting memoranda.

[*36] There is a consequence to the Court's ruling on this procedural matter. While Starr argued in her brief and during oral argument a number of theories Starr claims require a trial to resolve this case, there is no proper admissible evidence in the record of an engineering or technical nature addressed [**20] to the implications of the sewage problems relative to Lot 7. Furthermore, the only real estate expertise in the record comes from the depositions of Rizzotto, Howard, and Luptak, who might themselves qualify as experts on the listing and sale of real estate. Starr is not an expert with respect to any material issue of fact in this case. Tilton, although a lawyer and an intermediate owner of Lots 6 and 7, does not qualify as an expert to offer opinion evidence of a technical nature in support of any of Starr's theories or arguments. As the Montana Supreme Court has stated:

"[A] suspicion, regardless of how particularized it may be, is not sufficient to sustain an action or to defeat a motion for summary judgment. Unsupported conclusory or speculative statements do not raise a genuine issue of material fact. The trial court has no duty to anticipate possible proof." *Nelson v. Montana Power Co.* (1993), *256 Mont. 409, 412, 847 P.2d 284, 286, quoting Benson v. Diehl* (1987), *228 Mont. 199, 203, 745 P.2d 315, 317.*

**DISCUSSION**

**1. Whether Starr can prove injury as a result of any representation:**

[*37] The gravamen [**21] of Starr's case rests upon the assertion that at the time of closing and subsequent thereto, there was and is no practical way to legally construct a sewage disposal system for Lot 7. Starr alleges in her Complaint that "Lot 7 did not have access to any septic system on Lot 17A and is not, and was not, at the time of sale, capable of supporting a septic system of any reasonable design." However, Starr has failed to provide admissible evidence to establish that Lot 7 had no identifiable source of sewage disposal nor that the value of Lot 7 was diminished as a result.

[*38] Starr failed to provide any evidence of an engineering or technical nature that addresses any septic system implications with respect to Lot 7 either presently

or at the time of the sale of Lot 7. Rather, the relevant information in the record concerning this issue is found in the letters of Mike Fahley, R.S., Carbon County Planning Director and Sanitarian (Fahley). Of particular importance is Fahley's letter dated October 28, 1996, which clearly and unambiguously suggests that alternatives to the failed multi-family septic system constructed on Lot 17A in May 1996 may be available in accordance with legal standards. [**22] The letter, written in plain English in non-technical terms, states the following:

"The Carbon County Board of Health asks that the affected parties work cooperatively to find an acceptable alternative to conventional sewage disposal. Such alternatives may include an elevated sand mound sewage disposal system. This could be evaluated on an individual basis, lot by lot, or again, as a multi-family system, shared by all of you [meaning the individual lot owners.]"

[*39] Starr has provided no contrary evidence to dispute the installation of an "alternative" system apart from advancing her own personal belief. Nor does Starr offer any evidence by way of deposition testimony or otherwise that such alternative measures are impracticable. Rather, Starr presents to the Court a potential "witness list" together with statements Starr anticipates these witnesses might make at trial. However, as previously noted, conclusory or speculative statements are insufficient and a trial court has no duty to anticipate possible proof. *Gates v. Life of Montana Ins. Co., 196 Mont. 178, 182, 638 P.2d 1063, 1065-1066 (1982); Barich v. Ottenstror, 170 Mont. 38, 550 P.2d 395 (1976);* [**23] *Harland v. Anderson, 169 Mont. 447, 548 P.2d 613 (1976).* Moreover, "[a] suspicion, regardless of how particularized it may be, is not sufficient to sustain an action or to defeat a motion for summary judgment. Unsupported conclusory or speculative statements do not raise a genuine issue of material fact." *Benson, supra, 228 Mont. at 203, 745 P.2d at 317.*

[*40] When questioned by opposing counsel in her deposition, Starr provided the following as a basis for her belief in the defects affecting Lot 7:

Q: Exactly upon what are you basing your conclusion, Ms. Starr, that the property is basically worthless now?

A: Well, my belief is that - - well, my knowledge is

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 22 of 24

Page 7

2003 ML 2592, *40; 2003 Mont. Dist. LEXIS 2451, **23

that I bought the property in order to resell it at a later date, so that someone could build a home there, and now, because apparently here's at least no easy solution in sight that anybody has found to provide the plumbing and all of that, I'm not confident that anybody would buy that property as it is.

Q: Have you submitted any requests for approval of a septic system to the county sanitarian?

A: No.

Q: Or to any authority?

A: No

[Later,]

Q: Have you investigated [**24] the cost of establishing a mound system, if, indeed, that were a possible alternative?

A: No, I have not. (*Starr Deposition at 110-111.*)

[*41] Clearly, Starr's belief, without more, cannot give rise to a genuine issue of material fact. While Starr may believe that no reasonably affordable sewage disposal alternatives were available or presently exist, these beliefs alone are unsupported opinion and call for speculation. Because Starr has not submitted to this Court admissible evidence of a defect relative to sewage disposal from Lot 7, Starr cannot demonstrate actual damage. Accordingly, without admissible evidence of proof of injury, Starr's various claims against the remaining Defendants necessarily fail as a matter of law.

**2. Whether Starr had actual or constructive knowledge concerning the defective septic system affecting Lot 7 prior to closing.**

[*42] Having found that Starr's failure to make any showing on the issue of damages is dispositive of this case, the Court nevertheless deems it appropriate to discuss the merits of the remaining claims.

[*43] Starr contends in her Complaint that representations made by the various Defendants involving [**25] the sale of Lot 7 amounted to fraud, constructive fraud, or negligent misrepresentation. The Defendants' evidentiary submissions initially met the Defendants' burden to show that there were no genuine issues of material fact. The burden of proof then shifts to

Starr to demonstrate a *prima facie* case of fraud, constructive fraud, or negligent misrepresentation.

[*44] Assuming *arguendo* that false representations were made to Starr by one or all of the Defendants, the Court concludes that Starr actually knew about or could have reasonably ascertained the falsity of the representations at a time when Starr could have legally avoided the purchase of Lot 7 by invoking the contingency clause in the Tilton/Starr buy-sell agreement. Starr alleges that the "[collective Defendants] knew, or should have known that the permission to build a multi-family septic system on Lot 17A was revoked when the system installed failed to pass inspection." The record reflects that the multi-family septic systems in place on Lot 17A at the time of closing on Lot 7 failed to pass county inspection. However, the record also reflects important undisputed facts in this regard. First, the same information [**26] regarding the failed septic system on Lot 17A which was available to the respective Defendants prior to closing on Lot 7. Indeed, on October 28, 1996, Fahley had written to Larry Larsen, a professional engineer and an affected lot owner, regarding Fahley's inspection of the multi-family septic system on Lot 17A. This letter eventually was presented to both Rizzotto and Howard. On March 26, 1997, Starr acknowledges having received the letter the day it was sent to her by her agent, Howard. (*Starr Deposition at 56-57.*) Starr's receipt of the Fahley letter was approximately three (3) weeks prior to the closing date of April 15, 1997.

[*45] The October 28, 1996 Fahley letter clearly and unambiguously indicates that "[the Lot 17A] installation does not comply with the Carbon County permit issued in 1995, nor does the installation comply with the Certificate of Removal of Sanitary Restrictions from the Montana Department of Health and Environmental Sciences number ES 5-88-S14-555 and ES 5-88-S5-123 dated April 21, 1989." The letter continues as follows:

"[t]he consequence of these findings are several-fold. First, the installation does not meet minimum health standards [**27] established by the State of Montana and Carbon County. Second, the system simply will not function properly for you. And third, the system will discharge directly to the groundwater without treatment, thereby contaminating the groundwater supply."

[*46] The contents of the Fahley letter clearly

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 23 of 24

Page 8

2003 ML 2592, *46; 2003 Mont. Dist. LEXIS 2451, **27

identified sewage disposal concerns relative to Lot 7. When questioned about unintentionally false or misleading information provided by Howard, Starr asserts that Howard told Starr not to worry, "that there was some sort of septic system available, that a house could, in fact, be built on that . . . " (*Starr Deposition at 17.*) Starr's failure to remember pertinent and material disclosures is not evidence. In light of Starr's timely receipt of the Fahley letter, and in light of the subsequent conversations with Howard regarding the implications of the Fahley letter, Starr had no reason to assume that the sewage disposal issue regarding Lot 7 had been resolved prior to closing. Moreover, the Court concludes that even if Howard had misrepresented information to Starr, Howard's recommendation to Starr to talk with other lot owners about "alternatives" together with Starr's opportunity [**28] three (3) weeks prior to closing to contact individuals with professional expertise to assist Starr with regard to the sewage disposal issues outlined in Fahley's letter defeats Starr's fraud and misrepresentation claims. As stated by the Montana Supreme Court:

"When it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself, or that the means were at hand to ascertain the truth of any representations made to him, his reliance upon such representations made to him, however false they may have been, affords no ground for complaint." *Lee v. Stockmen's Natl. Bank et.al., 63 Mont. 262, 284, 207 P. 623, 630 (1922).*

**Montana Consumer Protection Act.**

[*47] The Court now turns to Starr's allegations that the real estate defendants violated the Montana Consumer Protection Act ("MCPA"), *§§ 30-14-101 et seq., MCA.* The act makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *§ 30-14-103, MCA.* An individual right of action is granted to any person who purchases or leases goods or services [**29] primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property as a result of the use or employment by another of an unfair or deceptive practice. *§ 30-14-133, MCA.*

[*48] The Court concludes that Starr's purchase of Lot 7 was not a purchase or lease of goods or services primarily for personal, family, or household purposes. Starr purchased Lot 7 as a business investment, primarily to add on to the retirement fund when she resold the property. As such, her purchase of Lot 7 was a business activity. Consequently, Starr's claim does not come within the statutory definition of the MCPA. *Doll v. Major Muffler Centers, Inc., 208 Mont. 401, 409-10, 687 P.2d 48, 52-53, (1984).*

[*49] In addition, Starr has failed to submit any admissible evidence of a deceptive or unfair practice on the part of any real estate defendant. Nor has she provided any evidence of a ascertainable loss of money or property. Indeed, Starr subsequently sold Lot 7 at a $3,000 profit. Consequently, Starr has failed to establish by admissible evidence the necessary elements to state a claim for [**30] relief under the MCPA. *Emick v. Koch, 227 Mont. 365, 368-69, 739 P.2d 947, 949, (1987); Taylor, Thon, Thompson & Peterson v. Cannaday, 230 Mont. 151, 156-57, 749 P.2d 63, 66-67, (1988).*

[*50] Starr has failed to establish by admissible evidence any disputed issues of material fact in support of her claims for relief in this case. As a matter of controlling law, a judgment of dismissal with prejudice should be entered in favor of all remaining Defendants and against Starr.

**Attorneys' Fees and Costs.**

[*51] Finally, the Court turns to the issue of attorney fees. As between Starr and her own broker/agents (The Brokers, Howard, and Luptak), Starr admits that the agency agreement between them provides that the prevailing party will be awarded attorney fees. (*Complaint at P14.*) As between Starr and Rizzotto, Starr alleges that the buy-sell agreement provides for costs and reasonable attorney fees to be awarded to the prevailing party. (*Complaint at P15.*) Starr contends that the buy-sell agreement was signed by Rizzotto on behalf of herself and her real estate agency. That is incorrect. The buy-sell was signed [**31] only by the parties to it, Tilton and Starr. (*Exhibits 5-9.*) Starr released Tilton on October 18, 2001. (*Affidavit of Lee at P8.*)

[*52] This Court need not determine whether the release of Tilton by Starr constituted, as a matter of law, the release of Rizzotto, who was merely acting as Tilton's agent. The Court has determined and ruled on other grounds that Starr has stated no actionable claim for relief against Rizzotto. Rizzotto seeks an award of attorneys' fees based on the equitable doctrine enunciated in *Foy v. Anderson, 176 Mont. 507, 580 P.2d 114, (1978).* However, an award of attorney fees on equitable grounds

Case 1:01-cv-12257-PBS   Document 3707-5   Filed 02/08/07   Page 24 of 24

Page 9
2003 ML 2592, *52; 2003 Mont. Dist. LEXIS 2451, **31

is left to the sound discretion of the trial court. *In re Marriage of Hereford*, 223 Mont. 31, 33-34, 723 P.2d 960, (1986); *Martin v. Randono*, 191 Mont. 266, 270, 623 P.2d 959, (1981). While this Court has seen fit to dismiss Starr's claims in their entirety against the remaining Defendants in this case, it does not follow that Starr's cause of action, in its content or its prosecution, was either so reprehensible or so vexatious as to warrant the imposition of attorneys' fees against [**32] Starr except as to those Defendants entitled to attorney fees by contract provision or by statute.

**WHEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED:**

[*53] 1. The Defendants' Motion for Summary Judgment on all counts of Plaintiff Starr's Complaint as against all remaining Defendants should be and hereby is **GRANTED**.

[*54] 2. In the event the parties cannot stipulate to an amount of reasonable attorneys' fees and allowable costs which were incurred by Defendants, The Brokers, Luptak, and Howard in this case, the Court shall conduct an evidentiary hearing on **Monday, the 28th day of July, 2003, at the hour of 1:30 o'clock p.m.**, in the courtroom of the Courthouse in Red Lodge, Carbon County, Montana, to determine the amount of attorneys' fees and allowable costs which shall be awarded in favor of Defendants, The Brokers, Luptak, and Howard and against Plaintiff Starr in this case.

[*55] 3. Upon a stipulation regarding the appropriate amount of attorneys' fees and costs to be awarded or upon the ruling of the Court following the hearing on attorney fees, the remaining Defendants shall prepare and submit a judgment dismissing with prejudice Starr's Complaint [**33] and all claims for relief pleaded or which could have been pleaded therein and awarding The Brokers, Luptak, and Howard their reasonable attorneys' fees and costs as ultimately determined by stipulation or ruling of the Court.

**DATED** this 10th day of July, 2003.

Blair Jones DISTRICT COURT JUDGE