# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS RELATES TO | Civil Action No. 01-CV-12257 PBS |
| STATE OF MONTANA v. ABBOTT LABS., INC., et al., 02-CV-12084-PBS | Judge Patti B. Saris<br>Chief Magistrate Judge Marianne B. Bowler |

## THE BMS DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
    Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
    Steven M. Edwards, Esq.
    Lyndon M. Tretter, Esq.
    Thomas J. Sweeney, III, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon Inc.*

\\\NY - 058559/000066 - 944181 v5

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................................... ii

Preliminary Statement .................................................................................................1

Statement of Facts .......................................................................................................3

      A.     BMS Pricing .................................................................................3

      B.     BMS Price Reporting ....................................................................6

      C.     BMS Sales Efforts ........................................................................8

Argument .....................................................................................................................9

I.      BMS DID NOT PUBLISH AWPS .................................................................9

II.     BMS DID NOT "ARTIFICIALLY INFLATE" AWPS .................................12

III.    PROVIDING TRUTHFUL INFORMATION IN RESPONSE TO CUSTOMERS' QUESTIONS IS NOT  DECEPTIVE OR UNFAIR ......................................................13

IV.    THE STATE  FAILS TO DEMONSTRATE CAUSATION ..........................14

CONCLUSION ...........................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

<u>FEDERAL CASES</u>                                                                                                        <u>PAGE</u>

Alves v. Harvard Pilgrim Health Care, Inc.,
    204 F. Supp. 2d 198 (D. Mass. 2002) ......................................................................10

Alves v. Harvard Pilgrim Health Care, Inc.,
    316 F.3d 290 (1st Cir. 2003)...................................................................................10

Bonilla v. Volvo Car Corp.,
    150 F.3d 62 (1st Cir. 1998).....................................................................................10

In re Brand Name Prescription Drugs Antitrust Litig.,
    186 F.3d 781 (7th Cir. 1999) ....................................................................................5

In re Cabletron Sys., Inc.,
    311 F.3d 11 (1st Cir. 2002).....................................................................................11

Eisenstadt v. Allen,
    No. 95-16255, 1997 WL 211313 (9th Cir. Apr. 28, 1997)......................................11

Elec. Specialty Co. v. Int'l Controls Corp.,
    409 F.2d 937 (2d Cir. 1969)...................................................................................11

Katzman v. Victoria's Secret Catalogue,
    167 F.R.D. 649 (S.D.N.Y. 1996) ...........................................................................10

Katzman v. Victoria's Secret Catalogue,
    113 F.3d 1229 (2d Cir. 1997).................................................................................10

Kolari v. N.Y. - Pres. Hosp.,
    455 F.3d 118 (2d Cir. 2006) ..................................................................................10

Kolari v. N.Y. - Pres. Hosp.,
    382 F. Supp. 2d 562 (S.D.N.Y. 2005) ...................................................................10

Land v. Dixon,
    No. E2004-03019-COA-R3-CV, 2005 WL 1618743 (Tenn. Ct. App., July 12, 2005)...........15

Langford v. Rite Aid of Ala., Inc.,
    231 F.3d 1308 (11th Cir. 2000) .............................................................................10

Raab v. Gen. Physics Corp.,
    4 F.3d 286 (4th Cir. 1993) .....................................................................................11

Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.,
   246 F.3d 64 (1st Cir. 2001) ............................................................................................... 13

Scavio v. Smart Corp.,
   No. 397CV7209, 2001 WL 631326 (N.D. Ohio Apr. 26, 2001) ............................................ 10

In re Wall Data Sec. Litig.,
   No. C95-0528Z, 1996 WL 585596 (W.D. Wash. June 25, 1996) ........................................... 11

Zucker v. Sable,
   426 F. Supp. 658 (S.D.N.Y. 1976) ......................................................................................... 11

**STATE CASES**

AVCO Financial Services v. Foreman-Donovan,
   772 P.2d 862 (Mont. 1989) ................................................................................................... 14

Bache v. Owens,
   929 P.2d 217 (Mont. 1997) ................................................................................................... 14

Barrett v. Holland & Hart,
   845 P.2d 714 (Mont. 1993) ................................................................................................... 14

Blon v. Bank One, Akron,
   519 N.E.2d 363 (Ohio 1988) ................................................................................................ 10

Chicken Unlimited, Inc. v. Bochover,
   374 So.2d 96 (Fla. Ct. App. 2d Dist. 1979) .......................................................................... 15

Collins v. Anthem Health Plans, Inc.,
   880 A.2d 106 (Conn. 2005) .................................................................................................. 15

Emick v. Koch,
   739 P.2d 947 (Mont. 1987) ................................................................................................... 14

Green v. Paradise Pontiac,
   483 N.E.2d 1213 (Ohio Ct. App. 1984) ................................................................................ 10

Kopische v. First Cont'l Corp.,
   610 P.2d 668 (Mont. 1980) ................................................................................................... 14

Lee v. Stockman's Nat'l Bank of Hardin,
   207 P. 623 (Mont. 1922) ....................................................................................................... 14

Lowe v. Root,
   531 P.2d 674 (Mont. 1975) ................................................................................................... 14

Mass. Farm Bureau Fed., Inc. v. Blue Cross of Mass., Inc.,
   532 N.E.2d 660 (Mass. 1989) ............................................................................................... 15

Normand Josep Enters., Inc. v. Conn. Nat'l Bank,
    646 A.2d 1289 (Conn. 1994) ...................................................................................10

Osterman v. Sears, Roebuck & Co.,
    80 P.3d 435 (Mont. 2003) .......................................................................................14

Osterman v. Sears, Roebuck & Co.,
    No. BDV-99-522(C), slip. op. (Mont. Dist. Ct. 8th Dist., Aug. 30, 2000) ...........14

Sheldon v. Am. States Preferred Ins. Co.,
    95 P.3d 391 (Ct. App. Wash. 2004) .......................................................................15

Van Ettinger v. Pappin,
    588 P.2d 988 (Mont. 1978) .....................................................................................14

Zekman v. Direct Am. Marketers, Inc.,
    695 N.E.2d 853 (Ill. 1998) .....................................................................................15

**FEDERAL REGULATIONS**

16 C.F.R. § 233.39(d) .................................................................................................11

**OTHER AUTHORITIES**

In re Bulova Watch Co.,
    64 F.T.C. 1054 (1964) ............................................................................................11

In re Regina,
    65 F.T.C. 246 (1964) ..............................................................................................11

In re Regina,
    61 F.T.C. 983 (1962) ..............................................................................................11

Defendants Bristol-Myers Squibb Company ("Bristol-Myers"), Oncology Therapeutics Network Corporation ("OTN") and Apothecon, Inc. (together "BMS")[1] respectfully submit this memorandum of law, the declaration of Steven M. Edwards, dated February 8, 2007 ("Edwards Decl."), the merits report and declaration of Dr. Gregory K. Bell, Ph.D. on behalf of BMS, dated February 8, 2007 ("Bell BMS MT Decl."),[2] and certain portions of the trial record in the Class 2 and 3 Trial in support of their motion pursuant to Fed. R. Civ. P. 56(b) for summary judgment on all claims against them in the State of Montana's Second Amended Complaint ("Montana SAC").[3]

BMS also incorporates by reference its Post-Trial Proposed Findings of Fact ("BMS Findings of Fact") and Memorandum in Support of Request for Judgment Pursuant to Fed. R. Civ. P. 58, dated January 19, 2007, that it filed in connection with the Trial with respect to Classes 2 and 3.

Preliminary Statement

Plaintiff, the State of Montana, alleges that BMS (1) "has stated fraudulent AWPs for all or almost all of its drugs" and (2) "scheme[d] to inflate its reported AWPs and market the

---

[1] OTN is a former wholly-owned subsidiary of Bristol-Myers that distributes oncology products (including but not limited to those manufactured by Bristol-Myers), primarily to office-based practices. Apothecon is a subsidiary of Bristol-Myers, which specialized in generic self-administered drugs.

[2] Class 2 and 3 trial testimony is cited by witness's last name, date and transcript page number (e.g., Smith xx/yy/zz Tr. 123). References herein to the witness's written direct testimony includes last name, the abbreviation "Aff." and a paragraph number, (e.g., Smith Aff. ¶ 1). Citations to deposition transcripts are in the same format as trial testimony, but include the abbreviation "Dep." after the witness's name instead of "Tr." References to "DX" or "PX" with a document number are references to trial exhibits in evidence. The Edwards declaration is proffered for the limited purpose of placing certain additional record evidence before the Court. The Bell BMS MT Declaration is proffered for the limited purpose of providing background information and presenting an analysis of the relationship of BMS transaction prices to list prices.

[3] BMS also joins in and adopts the facts and arguments in support of summary judgment of (a) Defendants' Joint Memorandum of Law and (b) the individual memoranda of law of the other Defendants to the extent such memoranda are relevant to BMS.

1

resulting spread to increase the market share of its drugs" which "has resulted in excessive overpayments by the State of Montana and Montana citizens."  (Montana SAC ¶¶ 364, 367.)

The Court should grant BMS's motion for summary judgment because the undisputed facts show that:

(i)   BMS has never reported AWPs; rather BMS has always reported wholesale list prices ("WLPs") that reflect the actual prices that appear on invoices to wholesalers and are the prices at which BMS achieves the overwhelming proportion of its revenue.

(ii)  The vast majority of claims against BMS in this case relate to sales of self-administered brand name drugs that pharmacies acquired at or above WLP; therefore,  plaintiff cannot claim that BMS has created any actionable "spread" as to those drugs.

(iii) BMS does not control the calculation or dissemination of AWPs by industry publications, and to the extent that such publications have increased AWPs as a result of increases in BMS's list prices, BMS only increased those list prices when it believed it could (and did) obtain sales at the increased prices.

(iv)  BMS sales representatives for self-administered drugs sold through pharmacies did not discuss the prices of BMS drugs or "spreads" with the physicians or pharmacies they called on.  To the extent that BMS oncology sales representatives discussed "spreads" with customers, those discussions involved nothing more than conveying truthful information in response to customer questions.

\\\NY - 058559/000066 - 944181 v5

Given these undisputed facts, no reasonable jury could find that BMS violated any of the Montana statutes at issue in this case by engaging in unfair or deceptive acts.  It is not deceptive for a company to have a list price for its products -- particularly when that list price is a price at which the company makes substantial sales.  Nor is a company obligated to disclose discounts below list prices.  Moreover, a company is not obligated to take steps to prevent others from publishing AWPs -- particularly where that company has no ability to control how others calculate AWPs.  In addition, providing a customer with truthful information about a transaction in which it is about to engage cannot be illegal.  Nor is there any evidence that any action of BMS caused any injury to the State, Montana residents or Montana Third Party Payors.

There is, in short, no basis on which a reasonable jury could conclude that BMS has engaged in unfair or deceptive acts that injured Montana or its residents.

<u>Statement of Facts</u>

A.      <u>BMS Pricing</u>

Plaintiffs' expert, Dr. Hartman, has analyzed and purported to find liability, damages and penalties with respect to five BMS oncology drugs at issue in this case:  Blenoxane, Cytoxan, Paraplatin, Taxol and Vepesid.[4]  (Hartman Montana Tables 1 and 3, annexed to Edwards Decl. as Exs. C & E.)  While these drugs were primarily physician-administered, there were self-administered versions available for some of them.  (Bell BMS MT Decl. ¶¶ 6, 10.)[5]  Dr. Hartman also purports to find liability and penalties for certain BMS self-administered drugs:  Avapro, Buspar, Cefzil, Coumadin, Glucophage, Glucophage XR, Glucovance, Monopril,

---

[4] Although the Montana SAC purports to assert claims with respect to Etopophos and Rubex, Dr. Hartman did not find liability, damages or penalties for these drugs.  (Bell BMS MT Decl. ¶ 6.)

[5] There were Cytoxan tablets and Vepesid capsules.  (Bell BMS MT Decl. ¶¶ 6, 10.)

Monopril HCT, Plavix, Serzone, Videx and Tequin.  (Hartman Montana Table 3, annexed to Edwards Decl. as Ex. E.)[6]

       For the branded drugs at issue in this case, BMS followed a consistent business model.  BMS established a list price, or WLP, when the product was launched, for sales to wholesalers.  (Szabo Aff. ¶ 7; Pasqualone Aff. ¶ 13; Declaration of Zoltan Szabo in Support of Defendant Bristol-Myers Squibb Company's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ¶ 2 ("Szabo Decl."), annexed to Edwards Decl. as Ex. F.)  The list price was based on a variety of factors, including the price that customers would be willing to pay.  (Pasqualone Aff. ¶ 11; Pasqualone 12/06/06 Tr. 8; Szabo Aff. ¶ 7; DX 2536; Bell BMS MT Decl. ¶¶ 9b, 19.)  From time to time, after initial launch, BMS increased the list prices of its drugs while they were protected by patents.  (Pasqualone Aff. ¶ 14; Pasqualone 12/06/06 Tr. 7; Kaszuba Aff. ¶ 8; Szabo Decl. ¶ 3; see also Bell BMS MT Decl. ¶¶ 9b, 19.)  BMS only did so, however, when it believed that it would achieve substantial sales at the higher list price without the need for price concessions like discounts and rebates; BMS never increased list to create "spread."  (Pasqualone Aff. ¶ 14; Szabo Aff. ¶ 8; Szabo Decl. ¶ 3; Bell BMS MT Decl. ¶¶ 14, 19, 20, 23, 24.)  After a drug lost its patent protection, BMS (with certain limited exceptions) did not make further changes to its list price. (Bell BMS MT Decl. ¶¶ 9b, 19; Marre 11/14/06 Tr. 133, 154-155; Pasqualone Aff. ¶¶ 14, 18; Pasqualone 12/06/06 Tr. 7; Szabo Aff. ¶ 11; Szabo Decl. ¶ 3; DX 2536.)

       From time to time, BMS offered discounts or rebates to the ultimate customer in order to meet competition.   (Szabo Aff. ¶¶ 9-10; Szabo Decl. ¶ 4.)  In the case of a discount, BMS entered into contracts with customers such as physicians, hospitals or HMOs which entitled

---

[6] Although the Montana SAC purports to assert claims as to two Apothecon drugs, Fungizone and Amikin,  there were no  Fungizone transactions and only two Amikin transactions in the claims data analyzed by Dr. Hartman. (Bell BMS MT Decl. ¶ 6.)

the customer to acquire the drug at a reduced price.  (Szabo Aff. ¶ 10; Szabo Decl. n.1.)  BMS then sold the drug to the wholesaler at the list price; the wholesaler sold the drug to the customer at the discounted price; and then the wholesaler received a "chargeback" from BMS that made it whole.  (Szabo Aff. ¶ 10; Szabo Decl. n.1.)[7]

The chargeback system is described in detail in In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 783-85 (7th Cir. 1999).  The purpose of the chargeback system is to enable a manufacturer to differentiate between customers and classes of trade (e.g., hospitals generally get larger discounts than pharmacies).  "The chargeback system eliminates diversion (arbitrage) by requiring the wholesaler, in order to avoid a loss when he resells at a discounted price, to report to the manufacturer his sales to that customer, so that the manufacturer can determine whether the customer is indeed one entitled to a discount."  Id. at 784.

To the extent that BMS gave discounts or rebates on the self-administered drugs at issue in the case, they were to PBMs, TPPs and hospitals.  BMS did not provide discounts or rebates to retail pharmacies in any material amount.  (Bell BMS MT Decl. ¶¶ 9f-g, 18, 20, 21, 29-33, 37.)  Thus, if Montana had wanted to reimburse pharmacies at their acquisition costs for BMS's drugs, it would have been easy enough to base reimbursement on BMS's published WLPs.

Charles River Associates ("CRA"), an economic consulting firm, has performed an analysis to determine the extent to which the drugs at issue were sold within 5% of list price.  (Bell BMS MT Decl. ¶¶ 13-15, 23-24, 27, Ex. F.)[8]  That analysis demonstrates that, during the

---

[7] In the case of a rebate, the customer will receive money some time after the original sale based on the volume of purchases.  (Szabo Aff. ¶ 10; Szabo Decl. n. 1.)

[8] The numbers in this analysis differ slightly from the numbers in Dr. Bell's analysis in the class actions because, while many of the drugs are the same, the NDCs are different.  (Bell BMS MT Decl. ¶ 6.)

\\\NY - 058559/000066 - 944181 v5

period 1993 through 2002, for the BMS oncology drugs at issue,  86.2 % of BMS's net revenue was achieved in transactions at prices that were within 5% of WLP.  (Bell BMS MT Decl. ¶ 13, Exh. F.)  While those products were protected by patents, more than 95 % of net revenue was attributable to sales that were within 5% of WLP.  (Bell BMS MT Decl., Ex. F.)  Even when the products became subject to multi-source competition, BMS continued to achieve 27.4 % of its net revenue from sales within 5% of WLP.  (Bell BMS MT Decl. ¶ 15, Ex. F.)[9]  For the remaining self-administered drugs at issue in this case, 90.4 % of BMS's net revenue – for all classes of trade -- came from sales within 5% of WLP during the period 1993 through 2002. (Bell BMS MT Decl. ¶ 23, Ex. F.)  While those drugs were protected by patents,  90.3% of BMS's net revenue came from sales within 5% of WLP.  (Bell BMS MT Decl. ¶ 24, Ex. F.) After generic competition, the percentage of net revenue achieved in sales at or near least price actually increased to 91.3%.  (Bell BMS MT Decl. ¶ 24, Ex. F.)

B.      BMS Price Reporting

A pharmaceutical manufacturer cannot market a drug unless it is listed in one or more industry compendia, such as RedBook, First DataBank and MediSpan (the "Publications"). (Kaszuba Aff. ¶ 5; Kaszuba 11/13/06 Tr. 125-26; Ihling Dep. Tr. 124-25; Szabo Aff. ¶ 13; PX 188 at BM/AWP/00337640.)[10]  For this reason, since the early 1970s, BMS has reported prices and product descriptions to the Publications.  (Rogers Aff. ¶¶ 1-2; Szabo Aff. ¶ 6; Ihling Dep. Tr. 89-97; see also Kaszuba Aff. ¶ 3; Kaszuba 11/13/06 Tr. 55, 109; Szabo Decl. ¶ 5.)

BMS has never reported AWPs to the Publications.  (Kaszuba Aff. ¶ 6; Kaszuba 11/13/06 Tr. 110, 113; DX 2595; DX 2650; Szabo Aff. ¶ 6; Rogers Aff. ¶ 2; Ihling Dep. Tr. 93;

---

[9] Note that Taxol continued to have significant sales at list (in terms of dollar amount) even though the percentage of such sales declined to less than 1%.  (Bell BMS Trial Aff. ¶ 48, n. 93; see also DX 2522.)

[10] Excerpts of the deposition of Dianne Ihling, taken on August 12, 2005, are annexed to the Appendix to the BMS Findings of Fact.

Szabo Decl. ¶ 6.)  Rather, it has always reported its list prices.  (Kaszuba Aff. ¶ 3; Kaszuba

11/13/06 Tr. 52, 58, 109; Rogers Aff. ¶¶ 1-2; Szabo Aff. ¶ 6; Ihling Dep. Tr. 89, 97; Szabo Decl.

¶ 5.)  Those list prices were the list prices that appeared on invoices to wholesalers.  (Szabo Aff.

¶ 7; Rogers Aff. ¶ 4; Szabo Decl. ¶ 2.)

   The Publications historically applied a mark-up factor of 20.5% or 25% to BMS's

list prices to calculate average wholesale prices or "AWPs."  (Kaszuba 11/13/06 Tr. 59, 120-21;

DX 2611 at BMS/AWP/000186649; DX 2616; Szabo Aff. ¶ 6; Ihling Dep. Tr. 96-97.)  The

Publications represented to BMS that the mark-up factor they apply for BMS drugs was based on

surveys they had made of drug wholesalers as to the list prices that wholesalers provide to their

customers.  (Kaszuba 11/13/06 Tr. 58-59, 114-16; see also Szabo Decl. ¶ 5.)  BMS did not

suggest the 20.5% to 25% mark-up factor that the Publications used.  (Kaszuba 11/13/06 Tr. 58;

DX 2650; Szabo Decl. ¶ 6; see also Szabo Aff. ¶ 6.)

   In addition, BMS did not control the mark-up factor that the Publications used.

(Kaszuba 11/13/06 Tr. 110; DX 2545; DX 2587/PX 196 at BMS/AWP/00442095; DX

2588/PX 187 at BMS/AWP/01109782; DX 2589/PX 189 at BMS/AWP/01088211; DX 2595;

DX 1137; Morgan Dep. Tr. 230.)[11]  While once, in 1992, BMS asked the Publications to change

their mark-up factor on oncology products from 20.5% to 25%, only Red Book acceded to that

request; First Data Bank and MediSpan refused – demonstrating that BMS did not control the

Publications.  (Kaszuba Aff. ¶ 13; Kaszuba 11/13/06 Tr. 60, 114; DX 2552; DX 2553; DX 2554;

Szabo Aff. ¶ 6; Szabo Decl. ¶ 6.)  In 2002, First Data Bank unilaterally changed the mark-up

---

[11] Excerpts of the deposition of Patricia K. Morgan, taken on January 11-12, 2005, are annexed to the Appendix to the BMS Findings of Fact.

\\\NY - 058559/000066 - 944181 v5

factor for all drugs to 25% (Kaszuba Aff. ¶ 15.) -- further demonstrating that BMS does not

control AWPs.[12]

Furthermore, beginning in 1999, BMS included in its communications to the

Publications a statement that its list prices did not include discounts. (Kaszuba Aff. ¶ 7; Kaszuba

11/13/06 Tr. 127-28; Szabo Aff. ¶ 6; DX 2627 at FDB-AWP-18630; Szabo Decl. ¶ 5.) An

example shown to Kay Morgan of First Data Bank at her deposition states:

> "Wholesale and Direct List Prices, including those for the products
> listed herein, may not reflect actual Bristol-Myers Squibb sale
> prices. Certain multisource products are always sold at lower
> special offer prices. All products may be subject to negotiated
> discounts, rebates and chargebacks."

(Morgan Dep. Ex. 41, annexed to Edwards Decl. as Ex. G.) This had no impact on the way the

Publications calculated AWPs. (Kaszuba Aff. ¶ 7; Kaszuba 11/13/06 Tr. 127-28; Szabo Aff. ¶ 6;

Morgan Dep. Tr. 227.)

C.      BMS Sales Efforts

Plaintiffs took the depositions of eleven BMS sales representatives in the Class

Action and this case,[13] and two of those sales representatives testified in the Class 2 and 3 Trial.

The testimony of those witnesses was uniform and consistent. The BMS sales representatives

who sold physician-administered oncology drugs emphasized the therapeutic attributes of the

drugs, but when asked questions about reimbursement they responded with truthful information.

(Pasqualone 12/6/06 Tr. 13, 15; Pasqualone Aff. ¶ 42; Soule 12/08/06 Tr. 56-59; Soule Aff. ¶¶ 5,

---

[12] Various BMS documents confirming that the publications control AWPs were received in evidence at the Class 2
and 3 Trial. (See DX 2545; DX 2554; DX 2585 at BMS/AWP/001510398; DX 2588/PX 187 at
BMS/AWP/01109782; DX 2587/PX 196 at BMS/AWP/00442095; DX 2589/PX 189 at BMS/AWP/01088211;
DX 2595 at BMS/AWP/00059757.)

[13] Deborah Ekborg, Charles Tabano, Raul Armand, Gena Cook, Dana Faulkner, Greg Keighley, Thomas Liptak,
Marsha Peterson, Fran Morrison, Joe Patrella and Douglas Soule. The complete deposition transcript of Ekborg and
Tabano are annexed to the Edwards declaration as Exs. H & I, respectively. Testimony from the other sales
representatives are part of the Class 2 and 3 trial record -- Peterson and Soule testified at trial on December 8, 2006
and excerpts of the Armand, Cook, Faulkner, Keighley, Liptak and Morrison depositions are annexed to the
Appendix to the BMS Findings of Fact.

9; see also Peterson Aff. ¶ 9; Peterson 12/08/06 Tr. 87-88; DX 2605 (the same policy applied to OTN sales representatives); Armand Dep. Tr. 42-43, 91-93; Cook Dep. Tr. 98-99; Faulkner Dep. Tr. 32, 42, 67; Keighley Dep. Tr. 49-51, 69-70, 92-94, 101, 166-167; Liptak Dep. Tr. 55-56, 65-66; Morrison Dep. Tr. 95-97; Bell BMS MT Decl. ¶ 16.)  In 2001, BMS formalized that policy in a memorandum from Ed Penick to all U.S. Sales and Marketing Personnel.  (PX 223.)  BMS's witnesses testified that this policy was enforced.  (Pasqualone 12/06/06 Tr. 15, see also Soule 12/08/06 Tr. 58-59; Peterson 12/08/06 Tr. 87-88; DX 2605.)

The BMS sales representatives who sold pharmacy-dispensed self-administered drugs testified that pricing and reimbursement issues did not come up at all in their discussions with physicians because physicians do not purchase or sell those drugs.  (Ekborg Dep. Tr. 17-18, 35, 55; Tabano Dep. Tr. 42-45, 52-53.)  Nor did those BMS sales representatives discuss price with pharmacies. (Ekborg Dep. Tr. 49; Tabano Dep. Tr. 42-43.)[14]  Plaintiffs cannot contend that BMS "marketed the spread" for self-administered drugs.

Argument

I.

BMS DID NOT PUBLISH AWPS.

The core of plaintiff's case is that the AWPs in the publications are deceptive and unfair acts for which BMS is responsible.[15]  It is undisputed, however, that BMS does not report

---

[14] BMS's representatives do visit pharmacies, but they discuss only scientific positioning of BMS' drugs.  (Ekborg Dep. Tr. 48-49; Tabano Dep. Tr. 41-42.)  Mr. Tabano testified that the only occasion on which the subject of price arises is when the physician inquires as to price of BMS drugs.  On those occasions, he refers the physician to a local pharmacy for the prices.  However, he never initiates conversations about price with physicians.  (Tabano Dep. Tr. 44-45.)

[15] In addition to its claims for the State under the Montana Unfair Trade Practices Act ("MUTPA"), the State purports to bring parens patriae claims on behalf of Third-Party Payors.  (Second Amended Complaint, ¶ 2.)  Notwithstanding these allegations, Dr. Hartman's Montana expert reports do not set forth any damages suffered by TPPs.  Nor has plaintiff produced any evidence to support its TPP allegations.  Indeed, the evidence developed in the MDL and in these actions demonstrates that PBMs make very small margins on drugs provided to health plans, that health plans are aware of the "spread" between what PBMs charge and what they pay to pharmacies and that

9

AWPs to the publications; it reports list prices.  (Kaszuba Aff. ¶ 4; Kaszuba 11/13/06 Tr. 52,

109.)  Those prices are "real" list prices -- they appear on invoices to wholesalers and BMS has

substantial sales within 5% of WLP.  (Szabo Aff. ¶ 8; Szabo Decl. ¶¶ 2, 11; Bell BMS MT Decl.

¶¶ 9a, 13-15, 23-24, 27, Ex. F.) Furthermore, they are very close to the acquisition costs of

pharmacies.  (Bell BMS MT Decl. ¶ 9g, 18.)

To be sure, BMS's list prices do not include discounts to other classes of trade,

but a list price, by definition, does not reflect discounts.  (Merriam Webster Collegiate

Dictionary 726 (11 ed. 2003).)  Indeed, in the Medicare Modernization Act of 2003, Congress

defined Wholesale Acquisition Cost or "WAC" (which is the functional equivalent of BMS's list

price) as a price that does not include "prompt pay or other discounts, rebates or reduction in

price."  42 U.S.C.A. 1395w-3a(c)(6)(B).  Plaintiffs' economist, Dr. Meredith Rosenthal, agreed

that in most industries the list price does not reflect discounts.  (Rosenthal 11/15/06 Tr. 71-73,

11/27/06 Tr. 53-54.)[16]

---

PBMs, by passing on rebates received from the defendants to clients and other cost saving methods, save their clients, the TPPs, millions of dollars on their prescription drug costs.  (See discussion in joint brief at 19 and n. 16.)

[16] It is well established that there is no obligation under state or federal law to lower list prices or disclose discounts off list.  In Bonilla v. Volvo Car Corp., 150 F.3d 62, 71 (1st Cir. 1998), for example, the court held that Volvo did not have a duty to disclose that Volvo cars were sold in Puerto Rico at higher prices than on mainland.  Similarly, in Langford v. Rite-Aid of Alabama, Inc., 231 F.3d 1308, 1313 (11th Cir. 2000), the Eleventh Circuit held:  "As a general matter of federal law, retailers are under no obligation to disclose their pricing structure to consumers."  Accord Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 (2d Cir. 1997);  Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198, 213-14 (D. Mass. 2002), aff'd, 316 F.2d 290 (1st Cir. 2003) (holding that an ERISA plan, which had a fiduciary duty to its beneficiaries, was not required to disclose the discounts it had received on drugs for which it was collecting a co-payment based on the "retail value.");  Kolari v. N.Y. – Pres. Hosp., 382 F. Supp. 2d 562, 566 (S.D.N.Y. 2005), rev'd on other grounds, 455 F.3d 118 (2d Cir. 2006) (holding that "the Hospital had no obligation to disclose to Plaintiffs the rates other patients would be charged.");  Scavio v. Smart Corp., No. 397CV7209, 2001 WL 631326, at *3 (N.D. Ohio Apr. 26, 2001) ("Defendants are not required under the [Ohio Consumer Protection] Act to inform consumers of cheaper prices elsewhere. . . .").

Under many states' deceptive practices acts/consumer protection, a failure to disclose cannot be a basis for liability, in the absence of a duty to disclose.  See, e.g., Normand Josep Enters., Inc. v. Conn. Nat'l Bank, 646 A.2d 1289, 1307-08 (Conn. 1994); Blon v. Bank One, Akron, 519 N.E.2d 363, 362-68 (Ohio 1988); Green v. Paradise Pontiac, 483 N.E.2d 1213, 1215 (Ohio Ct. App. 1984).  Thus, BMS cannot be liable to Montana for failing to disclose its discounted prices.

In the class actions, plaintiffs have argued that BMS's list prices violate FTC standards because they do not reflect discounts.  In 1964, however, the FTC adopted a regulation providing that a list price "will not be deemed fictitious if it is the price at which substantial (that is, not isolated or insignificant) sales are made . . ."  16 C.F.R. § 233.39(d).  See In re Regina, 65 F.T.C. 246 (1964) (modifying In re Regina, 61 F.T.C. 983 (1962)).  Since virtually all of BMS drugs had substantial sales within 5% of WLP, under the FTC rule, those prices, by definition, are not deceptive.  See also In re Bulova Watch Co., 64 F.T.C. 1054, 1063 (1964) (dismissing complaint alleging deceptive list or "ticketed" prices of watch manufacturer where such list prices were not in "excess of the highest prices at which substantial sales were made in the area in which [the manufacturer] was doing business.")

Plaintiff may nevertheless contend that even if BMS's list prices are truthful, the AWPs that the Publications report for its drugs are deceptive, and BMS is responsible for those AWPs.  It is undisputed, however, that BMS does not control the way that the Publications report AWPs.  It is well-established that one party is not liable for the acts of another party unless it conspires with or controls that party.  See generally J. Harper et al., The Law of Torts, § 26.3 (2d ed. 1986) ("The commonest test of a relationship to which the law attaches vicarious liability is control or the general right of control.")[17]

---

[17] The "entanglement" cases under the securities laws are instructive here.  Under the securities laws, the mere provision of truthful information to a third party, such as a securities analyst, is insufficient to give rise to liability for the false statements of others. In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002) .  That is because "it is unreasonable to require the defendants to search out and correct errors in publications."  Eisenstadt v. Allen, No. 95-16255, 1997 WL 211313, at *15 (9th Cir. Apr. 28, 1997) ("Merely providing analysts with historical information and correcting factual inaccuracies is not sufficient to establish entanglement."); Zucker v. Sable, 426 F. Supp. 658, 663 (S.D.N.Y. 1976) (citing Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 949 (2d Cir. 1969)).  To demonstrate liability, a plaintiff must show that the defendant "publicly endorsed" the third party's statements as its own.  In re Wall Data Sec. Litig., No. C95-0528Z, 1996 WL 585596, at *3-4 (W.D. Wash. June 25, 1996); see also Raab v. Gen. Physics Corp., 4 F.3d 286, 288 (4th Cir. 1993) (company not required to police statements made by third parties for inaccuracies, even if the third party attributes the statement to the company).

11

Here, there is no allegation that BMS conspired with the Publications, and it is undisputed that BMS did not control the way the Publications calculated AWPs. The Publications were independent companies who determined the mark-up factors and whether to call the results of their calculations AWPs. BMS's practice of reporting truthful and accurate list prices to the Publications cannot be deemed deceptive or unfair.

II.

BMS DID NOT "ARTIFICIALLY INFLATE" AWPS.

As demonstrated above, the AWPs for BMS's drugs are a mathematical function of its list prices. BMS cannot be said to have artificially increased AWPs unless it artificially increased list prices. For one of the five physician-administered drugs at issue in this case -- Taxol -- BMS never increased list prices during the class period, so plaintiffs' claims with respect to Taxol fail for that reason alone. (See Kaszuba Aff. ¶ 8; Pasqualone Aff. ¶ 39.) For the remaining four physician-administered drugs -- Blenoxane, Cytoxan, Paraplatin and Vepesid -- BMS generally increased list prices only during the time those drugs were protected by patents, and it had substantial sales at the increased price. (See Kaszuba Aff. ¶ 8; Pasqualone Aff. ¶ 14; Szabo Aff. ¶ 8; Szabo Decl. ¶ 3.) BMS never increased the list prices of its oncology drugs to create spread. (Pasqualone Aff. ¶ 14; see also Szabo Aff. ¶ 8; Szabo Decl. ¶ 3; Bell BMS MT Decl. ¶¶ 10, 13-14, 16.)

The same pattern holds true for the other drugs at issue in the case. Any increase in list price was justified by an increase in net revenue. (Bell BMS MT Decl. ¶¶ 19, 23-24, 27.) BMS did not increase its prices to create spread. (Szabo Decl. ¶ 3; Bell BMS MT Decl. ¶ 9f-g.)

Plaintiffs may nevertheless contend that BMS manipulated AWPs by failing to reduce its list prices after products lost exclusivity and average sales prices declined. As the evidence in the class action trial showed, there were legitimate business reasons for doing that

12

because BMS continued to make substantial sales at list.  (Bell BMS Trial Aff. ¶¶ 25, 41, 70-71; Pasqualone 12/6/06 Tr. 49-50; Marre 11/14/06 Tr. 164; Rosenthal 11/15/06 Tr. 90-91.)  Such normal profit maximizing activity, engaged in by companies throughout American industry, cannot be deemed deceptive or unfair.

III.

PROVIDING TRUTHFUL INFORMATION IN RESPONSE TO CUSTOMERS' QUESTIONS IS NOT  DECEPTIVE OR UNFAIR.

It is unclear what plaintiffs mean when they accuse BMS of "marketing the spread."  If they are referring to efforts by BMS oncology sales representatives to respond to customer's questions about reimbursement, their claim is without merit.  Providing truthful information in response to a question cannot be a deceptive act.  See, e.g., Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 74-75 (1st Cir. 2001) (no liability under Mass. G.L. ch. 93A where manufacturer provided truthful information about the capabilities of the product that ultimately did not work).

As to self-administered drugs sold through retail pharmacies, plaintiffs' theory simply falls flat on its face, because plaintiff cannot contend that BMS "markets the spread" for self-administered drugs to physicians.  BMS does not give material discounts or rebates to retail pharmacies.  (Bell BMS MT Decl. ¶¶ 9g, 18, 30, 37, 39b.)  Moreover, physicians do not buy and sell self-administered drugs, so it would be pointless to market the spread to them.  In addition, marketing the spread to retail pharmacies would be ineffective, because retail pharmacies do not have discretion regarding the stocking of brand name drugs.  (Rosenthal 11/15/06 Tr. 115; Addanki 12/13/06 Tr. 65; Bell BMS MT Decl. ¶¶ 9(f), 39b.)

13

IV.

THE STATE CANNOT  DEMONSTRATE CAUSATION.

Even if the State could show that BMS had committed acts which violate the MUTPA, its claims fail because there is no causal connection between BMS' actions and any injury to the State.  A plaintiff suing under the MUTPA must show that the defendant's acts caused her damages.[18]  See, e.g., Kopische v. First Cont'l Corp., 610 P.2d 668, 688 (Mont. 1980); see also AVCO Fin. Servs. v. Foreman-Donovan, 772 P.2d 862, 864 (Mont. 1989) (defendant was not responsible for plaintiff's inability to make payment on note and therefore plaintiff could not prove any damage due to defendant's alleged fraud).  The State cannot prove that here.

Montana's actual knowledge throughout the relevant period that AWP was not equivalent to providers' acquisition cost precludes any argument that BMS's acts caused the State any injury.  In addition, Montana's decision to continue to use AWP as a benchmark even though it had access to the acquisition costs of BMS's drugs – either through the publicly reported ASPs for oncology drugs or the WLPs for pharmacy-dispensed self-administered drugs – breaks the causal chain.  The Montana Supreme Court has held that a car buyer who had "ample opportunity to inspect" the car prior to purchase could not bring a claim under the MUTPA.  Emick v. Koch, 739 P.2d 947, 948 (Mont. 1987).[19]  And in Osterman v. Sears,

---

[18] Section 30-14-133, MCA provides that "A consumer who suffers any ascertainable loss of money or property as a result of the use of employment by another person of a method act or practice declared unlawful by 30-14-103 may bring an individual action . . . " under the MUTPA.

[19] In Montana, a fraud plaintiff must prove his ignorance of the falsity of the representation made by the defendant. Where plaintiff, as here, had the means and opportunity to discover the truth of the representations made to him, he has no claim.  Bache v. Owens, 929 P.2d 217, 222 (Mont. 1997) (deeds disclosing existence of easement were a matter of public record and was constructive notice to plaintiff, barring any fraud claim); Barrett v. Holland & Hart, 845 P.2d 714, 717 (Mont. 1993) (where plaintiff "chose not to use the means available to him to investigate the truth of the representations made to him, his claim for fraud must fail"); Van Ettinger v. Pappin, 588 P.2d 988, 994 (Mont. 1978) (Plaintiffs, who were aware prior to closing of house that swimming pool would not be available to them, had no fraud claim); Lowe v. Root, 531 P.2d 674, 677 (Mont. 1975) (plaintiff's inspection of premises would have revealed its true physical condition and therefore summary judgment on fraud was appropriate); Lee v. Stockman's Nat'l Bank of Hardin, 207 P. 623, 630 (Mont. 1922) (plaintiff who "was in a position as favorable as the defendant to know the true situation and facts pertaining thereto" had no claim for fraud).

<u>Roebuck & Co.</u>, No. BDV-99-522(C), slip op. (Mont. Dist. Ct. 8th Dist., Aug. 30, 2000), <u>aff'd</u> 80 P.3d 435 (Mont. 2003), the Court held plaintiff's deceptive practices claim was barred by disclosures in the contract plaintiff had signed, which disclosed the actual information she claimed was fraudulently withheld.  <u>Id.</u> at 4-5.  Cases from other State Courts are consistent with these holdings.  <u>See</u> <u>Mass. Farm Bureau Fed., Inc. v. Blue Cross of Mass., Inc.</u>, 532 N.E.2d 660, 665 (Mass. 1989) (plaintiff's knowledge of defendant's position regarding rate stabilization plan negated any causal relationship between alleged unfair acts and its claimed loss); <u>Chicken Unlimited, Inc. v. Bochover</u>, 374 So. 2d 96, 97 (Fla. Ct. App. 2d Dist. 1979) (franchisee's knowledge of falsity of plaintiffs' statements barred any showing of causation).[20]

Finally, the State's claim that BMS marketed the spread could not have caused the State to suffer any loss.  Marketing the spread has no impact on any amount the State pays.  If BMS's price reporting practices were not deceptive or unfair, marketing the spread adds nothing to the State's claim.[21]

<u>CONCLUSION</u>

For the foregoing reasons, BMS's motion for summary judgment should be granted.

---

[20] <u>Accord</u> <u>Collins v. Anthem Health Plans, Inc.</u>, 880 A.2d 106, 120 (Conn. 2005) (plaintiffs must prove that each "class member suffered a loss that was caused by the challenged policies of defendant"); <u>Zekman v. Direct Am. Marketers, Inc.</u>, 695 N.E.2d 853, 859-60 (Ill. 1998) (plaintiff who was not deceived by defendant's representations could not demonstrate that defendant's fraud proximately caused his injury and had no claim under Illinois Deceptive Practices Act); <u>Sheldon v. Am. States Preferred Ins. Co.</u>, 95 P.3d 391, 393-94 (Ct. App. Wash. 2004) (defendant's failure to describe insurance payment fee as premium caused no injury to plaintiff and could not be basis for claim under Washington Consumer Protection Act); <u>Land v. Dixon</u>, No. E2004-03019-COA-R3-CV, 2005 WL 1618743, at *4 (Tenn. Ct. App., July 12, 2005) at *12 (plaintiffs who closed on sale of property with full knowledge of alleged misrepresentations "cannot show the required causative link between the misrepresentations and their alleged injury.")

[21] Significantly, when the State received ASPs from Bayer and other companies, it did not change its reimbursements for those drugs.  (Buska Tr. 527-30, 533-34, 563-64, annexed to Edwards Decl. as Ex. J; <u>see also</u> MT 038330, annexed to Edwards Decl. as Ex. M.)

\\\NY - 058559/000066 - 944181 v5

Dated:   Boston, Massachusetts
          February 8, 2007

                              Respectfully Submitted,


                      By:    /s/   Jacob T. Elberg
                             _____
                             Thomas E. Dwyer (BBO No. 139660)
                             Jacob T. Elberg (BBO No. 657469)
                             **DWYER & COLLORA, LLP**
                             600 Atlantic Avenue
                             Boston, MA  02210
                             Tel: (617) 371-1000
                             Fax: (617) 371-1037

                             Steven M. Edwards (SE 2773)
                             Lyndon M. Tretter ((LT 4031)
                             Thomas J. Sweeney, III (TS 6557)
                             Admitted *pro hac vice*
                             **HOGAN & HARTSON L.L.P.**
                             875 Third Avenue
                             New York, NY  10022
                             Tel: (212) 918-3000

                             *Attorneys for Defendants Bristol-Myers Squibb*
                             *Company, Oncology Therapeutics Network, Corp.*
                             *and Apothecon, Inc.*

\\\NY - 058559/000066 - 944181 v5