# Exhibit H

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


-----------------------------X

In Re:  PHARMACEUTICAL      ) MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE  ) CIVIL ACTION #

PRICE LITIGATION           ) 01CV12257-PBS

-----------------------------)

THIS DOCUMENT RELATES TO:   )

ALL ACTIONS                 )

-----------------------------X


HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER


HIGHLY CONFIDENTIAL ORAL deposition of DEBRA

EKBORG, taken pursuant to notice at 1 North Wacker

Drive, 42nd Floor, Chicago, Illinois, on Thursday,

June 1, 2006, beginning at 9:41 a.m., before ROBIN M.

CHIMNIAK, a Notary Public within and for the County of

DuPage, State of Illinois, and a Certified Shorthand

Reporter of said State, there being present:

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

2 (Pages 2 to 5)

---

**Page 2**

```
 1  APPEARANCES:
 2
 3    HAGENS BERMAN SOBOL SHAPIRO, LLP
 4    BY: ELIZABETH A. FEGAN, ESQUIRE
 5    60 West Randolph Street
 6    Suite 200
 7    Chicago, Illinois 60601
 8      Appeared on behalf of the Plaintiffs
 9
10    HOGAN & HARTSON L.L.P.
11    BY: THOMAS J. SWEENEY, III, ESQUIRE
12    and JAMES S. ZUCKER, ESQUIRE
13    875 Third Avenue
14    New York, New York 10022
15      Appeared on behalf of Bristol-Myers Squibb
16
17    ROPES & GRAY (Telephonically)
18    BY: ERIC CHRISTOFFERSON, ESQUIRE
19    One International Place
20    Boston, Massachusetts 02110
21      Appeared on behalf of Schering-Plough
22      and Warrick
```

---

**Page 3**

```
 1           I N D E X
 2  WITNESS                    PAGE
 3  DEBRA EKBORG
 4    Examination by Ms. Fegan.............. 004, 075
 5    Examination by Mr. Sweeney................. 072
 6
 7
 8           E X H I B I T S
 9  NUMBER      DESCRIPTION          PAGE
10  Exhibit Ekborg 001, Notice of Rule 30(b)(6)
11      Depositions to Defendants
12      Regarding Sales & Marketing
13      in Nevada.................... 058
14
15
16
17
18
19
20
21
22
```

---

**Page 4**

```
 1           P R O C E E D I N G S
 2
 3      (Witness sworn.)
 4      DEBRA EKBORG, called as a witness
 5  herein, having been first duly sworn, was examined
 6  and testified as follows:
 7
 8           EXAMINATION
 9  BY MS. FEGAN:
10    Q.  Good morning.  My name is Beth Fegan.  I'm
11  one of the attorneys for the plaintiffs in this
12  matter.  I'm going to be asking you some questions
13  today.  If at any time you don't understand what I'm
14  asking you, please let me know, and I'll try to
15  rephrase so we're both on the same page.
16      If you do answer the question, I will
17  assume that you've understood the question, okay?
18    A.  Okay.
19    Q.  From time to time if you want to take a
20  break, just say the word.  This certainly isn't a
21  test of your stamina.  And if you don't hear the
22  question -- I should mention that -- just ask us to
```

---

**Page 5**

```
 1  repeat it, and we can always have the court reporter
 2  read it back.  Okay?
 3    A.  Okay.
 4    Q.  Could you please state your name for the
 5  record?
 6    A.  Deborah Ekborg.
 7    Q.  How do you spell your last name?
 8    A.  E-k-b-o-r-g.
 9    Q.  Where do you currently live?
10    A.  Oak Park, Illinois.
11    Q.  Where are you currently employed?
12    A.  Bristol-Myers Squibb.
13    Q.  What's your current title there?
14    A.  Regional and business director.
15    Q.  Let's go back and start with your
16  education.  Where did you go to school?
17      MR. SWEENEY:  You mean college?
18      MS. FEGAN:  College, yes.
19      THE WITNESS:  Colorado State University
20  and Utah State University.
21  BY MS. FEGAN:
22    Q.  Did you receive a degree from one of those
```

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

3  (Pages  6  to  9)

**6**

1  universities?
2      A.  I did.
3      Q.  From both or one?
4      A.  From Colorado State University.
5      Q.  What year was that?
6      A.  1981.
7      Q.  What was your degree?
8      A.  Bachelor of Science.
9      Q.  What was your major?
10     A.  Horticulture.
11     Q.  Did you have any minors or focuses,
12  certificate programs so to speak?
13     A.  No.
14     Q.  Did you do any postgraduate work?
15     A.  No.
16     Q.  At any time have you ever taken any
17  courses outside of employer training programs since
18  you graduated from college?
19     A.  I don't think so.
20     Q.  What was your first full-time position
21  after college?
22     A.  I believe it was working for a nursery in

**7**

1  Littleton, Colorado.
2      Q.  What was your position there?
3      A.  Sales.
4      Q.  How long did you work for the nursery?
5      A.  I don't remember.
6      Q.  What was your next position?
7      A.  UPS.
8      Q.  Do you recall approximately when you began
9  working for UPS?
10     A.  I don't remember the exact date.
11     Q.  Do you remember approximately the year?
12     A.  1982.
13     Q.  What was your position with UPS?
14     A.  Loader and driver.
15     Q.  How long were you with UPS?
16     A.  Not long; several months.
17     Q.  What was your next position?
18     A.  I believe it was working for a plant-
19  scaping company.
20     Q.  Where was that?
21     A.  San Diego.
22     Q.  How long did you work for the plant-

**8**

1  scaping company?
2      A.  I don't know.  For about a year.
3      Q.  Does that take us to approximately '83 or
4  '84?
5      A.  Give or take.
6      Q.  What was your next position?
7      A.  Time Warner Cable TV.
8      Q.  When did you start with Time Warner Cable
9  TV?
10     A.  About '85 I think.
11     Q.  What was your position with Time Warner?
12     A.  Sales.
13     Q.  Were you a sales representative?
14     A.  I was.
15     Q.  What were your responsibilities as a sales
16  rep for Time Warner Cable TV?
17     A.  Selling and installing cable TV door to
18  door.
19     Q.  How long did you hold this position?
20     A.  About four years.
21     Q.  What was your next position?
22     A.  Schering-Plough.

**9**

1      Q.  When did you start with Schering-Plough?
2      A.  I think January 2nd, 1990.
3      Q.  What was your first position with
4  Schering-Plough?
5      A.  Sales.
6      Q.  As a sales representative, who were your -
7  - who were you selling to?
8      A.  Mostly primary care physicians and
9  allergists.
10     Q.  What drugs or product market were you
11  responsible for?
12     A.  Allergy, asthma — I think that's what we
13  had when I started.
14     Q.  Do you recall the products that you were
15  responsible for?
16     A.  Trinalin, Vancenase, Vanceril.  I think
17  that might have been it when I first started.
18     Q.  When you first started with Schering-
19  Plough, what type of training did you receive?
20     A.  Basic product training and selling skills
21  training.
22     MR. SWEENEY: I don't mind some questions

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER         June 1, 2006
Chicago, IL

4 (Pages 10 to 13)

**10**

1  on background, but she's not here to talk about
2  Schering-Plough. She's here to talk about BMS.
3      MS. FEGAN: I understand that. But to the
4  extent that that's her first position in the
5  pharmaceutical industry, I'm certainly entitled to
6  test what she learned when about the industry, so
7  that I can understand the foundation of the
8  testimony.
9      MR. SWEENEY: I'm not instructing her not
10  to answer, but I hope we will move along to BMS
11  soon.
12  BY MS. FEGAN:
13      Q. You said that you received some basic
14  product training and selling skills training. Was
15  this formal for all sales reps, or was this done by
16  your supervisor?
17      **A. It was for every sales rep in the company.**
18      Q. When did you first -- in the sales
19  training, did you learn about pricing within the
20  pharmaceutical industry?
21      MR. CHRISTOFFERSON: I'm going to object
22  that it's outside the scope.

**11**

1      MS. FEGAN: I have no idea how it's
2  outside the scope, when I'm talking about -- we're
3  in an AWP litigation, and I'm trying to figure out
4  the first time that she learned about pricing in the
5  industry, so . . .
6      MR. CHRISTOFFERSON: This deposition is
7  for Bristol-Myers Squibb, not for Schering-Plough.
8  It's a 30(b)(6) deposition, and so it's outside the
9  scope of that deposition.
10      MS. FEGAN: Are you instructing her not to
11  answer?
12      MR. CHRISTOFFERSON: No, I'm not
13  instructing her not to answer. I can't do that
14  under the rules. I'm only saying that it's outside
15  the scope, and I'm objecting.
16      MS. FEGAN: Your objection is noted.
17      MR. SWEENEY: I agree with the objection.
18      MS. FEGAN: Your objection is noted.
19      Could you read the question back, please?
20      (Record read.)
21      THE WITNESS: Not that I recall, no.
22  BY MS. FEGAN:

**12**

1      Q. When was the first time that you were
2  introduced to pricing terminology or learned about
3  pricing terminology used within the pharmaceutical
4  industry?
5      **A. I don't remember.**
6      Q. Was it at Schering-Plough?
7      **A. I don't remember the first time.**
8      Q. I assume as a sales representative you had
9  to have some understanding of the prices of the
10  drugs that you were selling; is that right?
11      MR. SWEENEY: Objection. Objection to the
12  form.
13      MS. FEGAN: You can answer.
14      MR. SWEENEY: You can answer.
15      MS. FEGAN: From time to time they will
16  make objections obviously, and unless they instruct
17  you not to answer, they are making their objections
18  for the record.
19      THE WITNESS: Can you repeat the question?
20      MS. FEGAN: Can you read it back?
21      (Record read.)
22      THE WITNESS: No, not really.

**13**

1  BY MS. FEGAN:
2      Q. When was the first time you were
3  introduced to how prices are -- how drugs are priced
4  at the retail level?
5      MR. SWEENEY: By "retail level," do you
6  mean pharmacies?
7      MS. FEGAN: I do.
8      THE WITNESS: I don't remember.
9  BY MS. FEGAN:
10      Q. What is your understanding of how drugs
11  are priced at pharmacies?
12      **A. That's not something that I work on.**
13      Q. Okay. During your training -- let's go
14  back during your training at Schering-Plough. Was
15  pricing of pharmaceuticals covered, to your
16  recollection?
17      **A. Not that I remember, no.**
18      Q. How long did you hold the position of
19  sales representative?
20      **A. About a year.**
21      Q. What was your next position?
22      **A. Hospital rep.**

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

5 (Pages 14 to 17)

---

**14**

1  Q.  This was still for Schering-Plough?
2  **A.  Yes.**
3  Q.  As a hospital representative, what drugs
4  were you responsible for or product market?
5  **A.  The same I mentioned plus flutamide, and I**
6  **believe we had interferon at that point.**
7  Q.  As a hospital representative, were you
8  responsible for selling drugs that would be used in
9  the inpatient setting, or could they also be used in
10 an outpatient setting?
11 **A.  Most of them were outpatient.**
12 Q.  Were any of the drugs that you were
13 responsible for as a hospital representative covered
14 by Medicare Part B?
15 **A.  I have no idea.**
16 Q.  How long did you hold the position as
17 hospital representative?
18 **A.  About a year.**
19 Q.  What was your next position?
20 **A.  District manager.**
21 Q.  What were your responsibilities as
22 district manager?

---

**15**

1  **A.  Managing upper Midwest geography with 10,**
2  **12, 13 sales reps.**
3  Q.  And who were these sales reps calling on?
4  **A.  I think they were all outpatient-based**
5  **physician offices; might have been one rep that had**
6  **hospital responsibility.**
7  Q.  What drugs or product lines were you
8  responsible for?
9  **A.  All the products I've talked before, plus**
10 **we launched Claritin.**
11 Q.  Other than your on-the-job training that
12 you received as a sales representative and a
13 hospital representative, did you receive any
14 additional training to become a district manager?
15     MR. CHRISTOFFERSON: I'm going to object
16 again. It's outside the scope.
17     MS. FEGAN: You can answer.
18     MR. SWEENEY: I agree. But you can answer.
19     THE WITNESS: District manager training.
20 BY MS. FEGAN:
21 Q.  Within your training for district manager,
22 did you learn about how drugs are priced?

---

**16**

1      MR. CHRISTOFFERSON: Objection.
2      THE WITNESS: No.
3  BY MS. FEGAN:
4  Q.  You can answer.
5  **A.  Not that I recall, no.**
6  Q.  At the time that you were district
7  manager, did you have any understanding of the
8  phrase or term "average wholesale price"?
9  **A.  I would think so.**
10 Q.  What was your understanding at that time?
11 **A.  Exactly what it means, average wholesale**
12 **price.**
13 Q.  What does that mean to you?
14 **A.  It means that that's a price that's**
15 **published for the product.**
16 Q.  At the time that you were a district
17 manager for Schering-Plough, did you have an
18 understanding of who published the price or who set
19 the price that was published in the pricing
20 compendia?
21 **A.  No.**
22 Q.  Did you have any understanding of how

---

**17**

1  average wholesale price was set?
2  **A.  No.**
3  Q.  Did you have an understanding at the time
4  that you were district manager of who paid average
5  wholesale price?
6  **A.  Not really, no.**
7  Q.  Have you ever had any understanding of who
8  pays average wholesale price?
9  **A.  Not really, no.**
10 Q.  Is it your understanding that anyone pays
11 average wholesale price?
12 **A.  I don't deal with average wholesale price,**
13 **so I have no idea who pays it.**
14 Q.  What pricing terms do you or have you
15 dealt with?
16     MR. SWEENEY: Objection as to form.
17     MS. FEGAN: You can answer.
18     MR. SWEENEY: It's very vague.
19     THE WITNESS: Outside of average wholesale
20 price, I don't deal with them, so I -- I guess none
21 come to mind.
22 BY MS. FEGAN:

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006

Chicago, IL

6 (Pages 18 to 21)

---

**18**

1    Q.  For example, have you ever had experience
2  with the term "whole acquisition cost"?
3    A.  I've heard that before, yes.
4    Q.  Have you in any of your positions with any
5  pharmaceutical company spoken with doctors about
6  wholesale acquisition cost or average wholesale
7  price?
8    A.  I don't remember any particular time.
9  There could have been conversations if the
10  information was in a sales visual that we used.
11    Q.  From time to time has average wholesale
12  price been in sales visuals that you have used?
13    A.  I don't remember.
14    Q.  Tell me about what kind of prices would be
15  reflected in sales visuals that you have used.
16    A.  I don't remember.  I mean, if it's in the
17  visual aid, we can use it.  I don't recall a
18  specific example.
19    Q.  Do you recall generally that pricing would
20  have been included in sales visuals that you have
21  used?
22    A.  In my experience, it's generally not.

---

**19**

1    Q.  Back when I asked in what context or if
2  you've ever used or discussed average wholesale
3  price or whole acquisition cost with physicians, you
4  brought up visual aids.  So I'm trying to understand
5  in what context you would have had a conversation
6  with doctors about AWP or WAC --
7    A.  Uh-hum.
8    Q.  (Continuing) -- that was reflected in a
9  sales visual aid, since you brought that up.  What
10  context would that have been?
11    A.  If there is information in a sales visual
12  aid, we naturally discuss it with any customer that
13  we're having conversation with.  I don't remember a
14  specific example.
15    Q.  But it may have occurred; is that right?
16    A.  If the information, again, is in the sales
17  visual aid, we would discuss it with customers.  But
18  I don't remember a specific example of doing it, no.
19    MS. FEGAN:  Could we go back to the
20  original question and answer where she brought up
21  sales visual aids for the first time?  I just want
22  to make sure I understand.

---

**20**

1    (Record read.)
2  BY MS. FEGAN:
3    Q.  So my question is, do you believe that
4  pricing may have been included in sales visual aids
5  that you have used?
6    MR. SWEENEY:  Objection, asked and
7  answered.
8    You can answer it again.
9    THE WITNESS:  I don't recall a specific
10  example.
11  BY MS. FEGAN:
12    Q.  I'm not asking for a specific example.
13  I'm just asking if you believe it may have been
14  included.
15    A.  It could have.  I'm sorry.  I don't
16  remember.
17    MR. SWEENEY:  It's within the realm of
18  possibility; is that what you're saying?
19    THE WITNESS:  Sure.  It could have.
20  BY MS. FEGAN:
21    Q.  During the time that you were district
22  manager, do you know whether any of the drugs that

---

**21**

1  you were responsible for were covered by Medicare
2  Part B?
3    A.  This is at Schering?
4    Q.  Yes.
5    A.  I have no idea.
6    Q.  What was your next position?
7    A.  District manager, Bristol-Myers.
8    Q.  What year did you start at Bristol-Myers?
9    A.  1997.
10    Q.  What product or group did you start or
11  were you responsible for as district manager?
12    A.  BuSpar, Serzone, and Cefzil.
13    Q.  As district manager, what were your
14  responsibilities?
15    A.  To manage geography and the, again, ten or
16  twelve sales representatives.
17    Q.  When you started with BMS, what
18  geographical area were you responsible for?
19    A.  Southern California.
20    Q.  The sales reps that you were responsible
21  for, who were they calling on?
22    A.  Private practice physicians, outpatient.

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

7 (Pages 22 to 25)

---

**22**

1    Q.  At the time that you started with BMS,
2  what training did you receive?
3    A.  District manager training.
4    Q.  What did the district manager training
5  entail?
6    A.  Training on human resources, training on
7  coaching representatives, training on company
8  processes. That's about the extent.
9    Q.  What is BuSpar?
10    A.  Anxiety medication.
11    Q.  And Serzone?
12    A.  Antidepressant.
13    Q.  And Cefzil?
14    A.  Antibiotic.
15    Q.  When you started with BMS, did you receive
16  any training about how the drugs are priced?
17    A.  No.
18    Q.  Did you have any understanding of
19  formulary placement when you started with BMS for
20  those drugs?
21    A.  I was sent information about formulary.
22    Q.  What type of information were you sent?

---

**23**

1    A.  Where our products were on formulary.
2    Q.  As a district manager, did you have any
3  contact with insurers or pharmacy benefit managers?
4    A.  No.
5    Q.  Who did you report to when you first
6  started at BMS?
7    A.  Denice Woltemath.
8    Q.  Could you spell her last name?
9    A.  W-o-l-t-e-m-a-t-h.
10    Q.  What was her position?
11    A.  Regional business head.
12    Q.  What region was she responsible for?
13    A.  I don't remember the name it was called.
14  It was California-based.
15    Q.  Do you believe it was only the state of
16  California, or did it extend out?
17    A.  I don't remember.
18    Q.  The training that you received as a
19  district manager, was this regional training, or did
20  you go to, like, a central location where all the
21  regional managers went for training?
22    A.  I went to home office with all the other

---

**24**

1  district managers.
2    Q.  At the time that you started as a district
3  manager, did you receive any training specific to
4  the geography or the geographical area for which you
5  would be responsible?
6    A.  No.
7        MR. SWEENEY: I'm sorry. Could you read
8  that back?
9        (Record read.)
10        MR. SWEENEY: Thank you.
11        THE WITNESS: Not that I recall.
12  BY MS. FEGAN:
13    Q.  How long did you hold the position as
14  district manager responsible for the Southern
15  California area?
16    A.  Just over a year.
17    Q.  What was your next position?
18    A.  Area marketing manager.
19    Q.  When did you take on this position?
20    A.  Early in '99.
21    Q.  What were your responsibilities as area
22  marketing manager?

---

**25**

1    A.  A liaison between sales and marketing.
2    Q.  Was this for a particular geographical
3  area or drug or product line?
4    A.  Yes.
5    Q.  What? Which ones?
6    A.  Basically the western half of the United
7  States and the products that were represented by the
8  neuroscience, infectious disease, dermatology
9  division.
10    Q.  What does the liaison between sales and
11  marketing do?
12    A.  Ensure that programs that are developed by
13  the marketing teams are implemented successfully in
14  the field, gather feedback from the field, and
15  forward that back to the marketing team.
16    Q.  Anything else?
17    A.  Support the area vice president in
18  whatever her responsibilities are from a sales
19  perspective.
20    Q.  Anything else?
21    A.  Not really.
22    Q.  The first thing that you said that the

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

8 (Pages 26 to 29)

**26**

1  liaison between sales and marketing was responsible
2  for was to ensure the programs developed by
3  marketing were implemented in the field. How did
4  you go about doing that?
5      **A. Have teleconferences with the management**
6  **team, send out the information to ensure that they**
7  **had the information about any programs, attended**
8  **meetings with managers.**
9      Q. Were you responsible for training the
10  field in the programs that marketing sent?
11      **A. I was responsible for making sure they**
12  **knew how to implement them.**
13      Q. Okay. And how would you go about that?
14      **A. I would take the information that**
15  **marketing had prepared and walk the sales team**
16  **through it.**
17      Q. What type of programs would marketing
18  deliver to you for implementation in the field?
19      **A. Product-related promotional medical**
20  **education events mostly.**
21      Q. Could you give me some examples?
22      **A. I don't recall if we did at that time, but**

**27**

1  **an example would be a teleconference series with**
2  **physicians as speakers.**
3      Q. Was it your responsibility, as liaison
4  between marketing and sales, to take visual aids
5  that marketing may have developed and implement them
6  in the field?
7      **A. No.**
8      Q. Whose responsibility was that to your
9  knowledge?
10      **A. The district manager or the regional**
11  **business head.**
12      Q. Other than educational programs such as
13  the teleconference series, were there any other
14  kinds of programs developed by marketing that you
15  were responsible for implementing in the field?
16      **A. The only other thing could have been if**
17  **they had prepared some performance updates to the**
18  **sales team.**
19      Q. What do you mean by "performance updates"?
20      **A. How the product is performing.**
21      Q. I don't mean to be dense, but what do you
22  mean by "how the product is performing"? Are you

**28**

1  talking about in terms of sales numbers, or are you
2  talking about in terms of perhaps their
3  efficaciousness or safety issues?
4      **A. The sales.**
5      Q. What types of performance updates -- can
6  you give me some examples of performance updates or
7  what would be included in the performance updates?
8      **A. I don't remember what we covered that long**
9  **ago. Again, just what the sales are.**
10      Q. Would the information that would be
11  communicated to the field be in terms of units or
12  dollars or both?
13      **A. It could have been both. I don't**
14  **remember.**
15      Q. In your position as liaison between
16  marketing and sales, were you involved in the
17  communication of pricing to the field sales teams?
18      **A. No.**
19      Q. You said that from time to time you might
20  join in teleconferences with the management team.
21  Who is the management team that you're referring to?
22      **A. Regional business heads mostly.**

**29**

1      Q. Anybody else?
2      **A. Could have been times with district**
3  **managers on the phone.**
4      Q. And when you say "regional business
5  heads," can you tell me a little bit about what
6  you're referring to or who you're referring to?
7      **A. A regional business head is the person in**
8  **charge of running the geographic business for that**
9  **sales division.**
10      Q. So it's within the sales group, not
11  marketing?
12      **A. Yes.**
13      Q. I think I asked the question wrong,
14  because I'm not sure the "yes" answer is it.
15      **A. Sales.**
16      Q. Sales. Okay.
17      You said you would attend meetings with
18  managers. Are you referring to the same people that
19  you would attend teleconferences with?
20      **A. Yes.**
21      Q. Other than product-related educational
22  events and performance updates to the sales team,

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER     June 1, 2006
Chicago, IL

9 (Pages 30 to 33)

---

30

1 were there any other types of programs that you were
2 responsible for communicating from marketing to the
3 sales force?
4    A. No.
5    Q. At the time that you became an area
6 marketing manager, you said that you were
7 responsible for the western half of the United
8 States. Was there one other marketing -- area
9 marketing manager, or were there more?
10    A. I think there were several.
11    Q. Do you recall who they were?
12    A. It would be a guess only. Those folks
13 moved through that department on a regular basis.
14 It would be a guess on a couple of names.
15    Q. How many areas was the country broken up
16 into?
17    A. I think three or four.
18    Q. Do you recall what the others were
19 approximately?
20    A. I'm sorry. I don't.
21    Q. What was your boundary?
22    A. I don't remember at the time.

---

31

1    Q. Who did you report to as area marketing
2 manager?
3    A. The area vice president, Jill Desimone.
4    Q. How do you spell her last name?
5    A. D-e-s-i-m-o-n-e.
6    Q. Did you have anyone that reported to you?
7    A. No.
8    Q. How long did you hold the position of area
9 marketing manager for the western half of the United
10 States?
11    A. About ten months.
12    Q. What was your next position?
13    A. Marketing.
14    Q. Marketing what?
15    A. On the brand marketing team.
16    Q. Do you recall what your title was?
17    A. Senior product manager.
18    Q. Approximately when did you become a senior
19 products manager?
20    A. Say that again.
21    Q. Approximately when did you become a senior
22 products manager?

---

32

1    A. November '01, I believe.
2    Q. Okay. I think I'm confused on dates. You
3 said you became an area marketing manager in early
4 '99 and held it for ten months.
5    A. Right. So it was the end of '99. Sorry.
6 I don't recall.
7    Q. That's okay. I just want to make sure
8 we're on the same page. So you became a senior
9 product manager approximately in the end of '99?
10    A. Yes.
11    MR. SWEENEY: Now I'm confused. So
12 originally you said November 2001. You don't think
13 that's right now?
14    THE WITNESS: That's not right.
15    MR. SWEENEY: Okay. All right.
16 BY MS. FEGAN:
17    Q. What were your responsibilities as senior
18 product manager on the brand marketing team?
19    A. Add to the effectiveness of the marketing
20 team to promote our products.
21    Q. What product or product line were you
22 responsible for?

---

33

1    A. Cefzil.
2    Q. Who did you report to?
3    A. Brand director, Robert Lacaze.
4    Q. Do you recall how to spell his last name?
5    A. Yes.
6    Q. What is it?
7    A. L-a-c-a-z-e.
8    Q. Did Mr. Lacaze have responsibility only
9 for Cefzil, or for additional products also?
10    A. I think it was only Cefzil.
11    Q. How many people were on the brand
12 marketing team for Cefzil?
13    A. When I started, I believe four.
14    Q. What were the other roles on the brand
15 marketing team, other than the brand director and
16 you as senior marketing manager?
17    A. There was another senior product manager
18 and an associate product manager.
19    Q. How were responsibilities divided among
20 you?
21    A. Robert gave each of us certain
22 responsibilities.

---

Henderson Legal Services
(202) 220-4158

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

10   (Pages 34 to 37)

34

1    Q.  What responsibilities did he give you?
2    A.  The oral suspension business.
3    Q.  So as the senior products manager for the
4  oral suspension business, what did you do?
5    A.  Helped to put together visual aids, worked
6  with the area marketing managers to train the field
7  on the approved resources and messages, manage the
8  expenses for the oral suspension.  I think that's a
9  general overview.
10    Q.  Did you have any responsibility with
11  respect to pricing for Cefzil or the oral suspension
12  business?
13    A.  No.
14    Q.  Did you have any responsibility for
15  providing information that was used in setting or
16  increasing prices for Cefzil?
17    A.  No.
18    Q.  In preparing visual aids, what groups or
19  persons would you gather information from to
20  include?
21    A.  From our market research department.
22    Q.  What's the market research department?

35

1    A.  It's just that.  A department in the
2  company that does research on all of the markets for
3  the products.
4    Q.  Would you obtain pricing information to
5  include on visual aids?
6    A.  Not that I remember, no.
7    Q.  Who were you preparing visual aids to be
8  used with?
9    A.  Our customers; physicians mostly.
10    Q.  Were these generally primary care
11  physicians?
12    A.  A majority were.  Some could have been
13  specialists.
14    Q.  Cefzil sold at retail pharmacies?
15    A.  Then or now?
16    Q.  Then; at the time that you were senior
17  product manager.
18    A.  Yeah.
19    Q.  Did you have any responsibility for
20  preparing marketing materials that would be used
21  with retail pharmacies?
22    MR. SWEENEY:  Object to the form.

36

1    THE WITNESS:  I don't recall that we did
2  any materials specific to pharmacies with Cefzil.
3  BY MS. FEGAN:
4    Q.  As senior product manager, did you have
5  any responsibility for contact with pharmacy benefit
6  managers or insurers?
7    A.  No.
8    Q.  You said that you had worked with area
9  marketing managers on messages.  Could you describe
10  for me a little bit what you would do?
11    A.  I would ensure that they knew the approved
12  product messages so when they were training the
13  sales force, they knew what the appropriate
14  conversations to have with the customers were.
15    Q.  How long did you hold this position?
16    A.  I believe about 14 months.
17    Q.  What was your next position?
18    A.  I stayed in marketing and worked for
19  another brand.
20    Q.  What other brand did you move to?
21    A.  Serzone.
22    Q.  Did you continue to hold the title "senior

37

1  product manager"?
2    A.  I did.  The time frame I gave encompasses
3  both brands.
4    Q.  The 14 months?
5    A.  (Nods.)
6    Q.  Yes?  You have to say it orally.
7    MR. SWEENEY:  You have to say it verbally.
8    THE WITNESS:  Yes.  I understand.
9    MR. SWEENEY:  Otherwise the court reporter
10  can't take it down.
11    THE WITNESS:  Sorry.
12    MS. FEGAN:  That's okay.
13  BY MS. FEGAN:
14    Q.  I'm going to try and short-cut this, but
15  if it's not correct, tell me.
16    The responsibilities that you had as
17  senior product manager with respect to Cefzil and
18  the whole discussion we just had, is it just as
19  applicable to Serzone, or were there differences?
20    A.  The only differences, there wasn't an oral
21  suspension form.  So I didn't have a particular
22  focus on Serzone like I did on Cefzil.  But the

Ekborg, Debra    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    June 1, 2006
Chicago, IL

11 (Pages 38 to 41)

---

**38**

1  basic marketing responsibilities are the same.
2    Q.  What form was Serzone in?
3    A.  It's an oral tablet.
4    Q.  I assume that also for Serzone you had no
5  responsibility or input into pricing; is that right?
6    A.  I did not.
7    Q.  To your recollection, did you ever put
8  together any programs or materials that contained
9  references to pricing for Serzone?
10    A.  I don't believe we did, no.
11    Q.  What was your next position?
12        It's so predictable, isn't it?
13    A.  Regional business director.
14    Q.  Approximately when was this?
15    A.  January 2001.
16    Q.  What area or region were you responsible
17  for?
18    A.  West neuroscience specialty.
19    Q.  What products fell within the neuroscience
20  specialty?
21    A.  Serzone, BuSpar; I think that's all we had
22  at the time.

---

**39**

1    Q.  When you say "west," what was the
2  geographical area or boundary that you were
3  responsible for?
4    A.  As I recall, from basically Louisiana all
5  the way west in the U.S.
6    Q.  How many other regional business directors
7  were there in January 2001?
8        MR. SWEENEY:  You mean in neuroscience?
9        MS. FEGAN:  In neuroscience.
10        THE WITNESS:  Two.
11  BY MS. FEGAN:
12    Q.  What geographical areas were they
13  responsible for?
14    A.  I think one was called central and one was
15  called northeast.
16    Q.  Do you recall who they were?
17    A.  Yes.
18    Q.  Who were they?
19    A.  Steve Betulius.
20    Q.  How do you spell his last name?
21    A.  B-e-t-u-l-i-u-s.  And Henry Martini.
22    Q.  And Mr. Betulius was responsible for the

---

**40**

1  central region?
2    A.  Yes.
3    Q.  What were your responsibilities as
4  regional business director for the neuroscience
5  specialty in the west?
6    A.  Manage the people and the business in the
7  western United States.
8    Q.  Who did you report to?
9    A.  Catherine Potechin.
10    Q.  How do you spell her last name?
11    A.  P-o-t-e-c-h-i-n.
12    Q.  What was her title?
13    A.  I believe it was vice president of sales,
14  neuroscience.
15    Q.  When you say manage the people and
16  business in the U.S., what particular groups or
17  divisions of people were you responsible for
18  managing, such as sales, marketing, research?
19    A.  Just sales, just for the neuroscience
20  products with specialty physicians.
21    Q.  When you say "just for specialty
22  physicians," what physicians are you referring to?

---

**41**

1    A.  A large majority were psychiatrists.
2    Q.  Who reported to you?  Who were your direct
3  reports?
4    A.  District managers.
5    Q.  When you say you were also -- you were
6  managing people in business, describe for me on the
7  business side what your management responsibilities
8  were.
9    A.  To drive the performance of Serzone and
10  BuSpar.
11    Q.  Did you have any responsibility or input
12  into setting the price for Serzone or BuSpar?
13    A.  No.
14    Q.  Were you responsible for gathering
15  competitive intelligence on Serzone and BuSpar, and
16  their competitors obviously?
17    A.  We collected marketing pieces.  That was
18  about the extent.
19    Q.  As a regional business director, did you
20  have any responsibility for trade sales, including
21  sales and marketing to pharmacies?
22    A.  No.

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

12  (Pages 42 to 45)

42

1     Q.  Did you have any responsibility for sales
2  or marketing to insurers or pharmacy benefit
3  managers?
4     A.  I did not.
5     Q.  As regional business director for the
6  west, did you have responsibility for Nevada?
7     A.  Yeah.
8     Q.  Were there any differences in how you
9  managed Nevada compared to the other states that you
10  were responsible for?
11     A.  No.
12     Q.  As a regional business director, did you
13  have any contact with state Medicaid programs?
14     A.  No.
15     Q.  What was your next position -- or how long
16  did you hold the position as regional business
17  director for the west neuroscience specialty?
18     A.  About ten months.
19     Q.  What was your next position?
20     A.  I was laid off from Bristol-Myers Squibb.
21     Q.  That was approximately the end of -- when
22  was that?

43

1     A.  November.
2     Q.  2001?
3     A.  Yes.
4     Q.  What did you do then?
5        MR. SWEENEY:  Work related.
6        THE WITNESS:  Tried to get a job.
7  BY MS. FEGAN:
8     Q.  What was your next position?
9     A.  I came back to Bristol-Myers Squibb.
10     Q.  When did you come back to BMS?
11     A.  December of '01.
12     Q.  That's pretty good.  What was your title
13  when you came back?
14     A.  Associate director of regional operations.
15     Q.  For a particular division or group?
16     A.  I think at the time it was called the
17  cardiovascular division for a certain region.
18     Q.  Do you recall what region?
19     A.  Midsouth I think is what it was called.
20     Q.  What was your responsibility or what were
21  your responsibilities as associate director of
22  regional operations for the cardiovascular division

44

1  for the mid-south?
2     A.  Handle mostly operational issues of the
3  region.
4     Q.  Can you describe for me what you mean by
5  "operational issues"?
6     A.  Sure.  Managing the promotional budget,
7  ensuring that the regional vice president had
8  everything she needed to ensure that our
9  representatives had all the information about the
10  products that we represented, prepare slides for
11  presentations.
12     Q.  Anything else?
13     A.  That's in general terms.
14     Q.  Who did you report to in this position?
15     A.  Catherine Potechin.
16     Q.  What was her title then?
17     A.  Regional vice president.
18     Q.  Did you have anyone that reported to you?
19     A.  No.
20     Q.  What drugs fell within the cardiovascular
21  division at that time that you were responsible for?
22     A.  I'm going to take a guess at this.  I

45

1  believe it was Plavix, Avapro, Avalide and
2  Pravachol. I don't remember if there was any others
3  at that time.
4     Q.  You said that you had responsibility for
5  the promotional budget.  What did that entail you
6  doing?
7     A.  Distributing the money that we had
8  received from the marketing teams out to each
9  district manager and tracking their spend.
10     Q.  You said that one of your responsibilities
11  was ensuring that the regional vice president had
12  information about the products.  Could you describe
13  for me what the context of this was occurring then?
14     A.  Copies of any new visual aids that the
15  brand teams had produced, information about any new
16  promotional programs that they were intending to
17  roll out to the sales team.
18     Q.  In this role were you acting as liaison,
19  or were you providing input or analysis of the
20  pieces that the brand teams were putting together?
21     A.  I had no input to what marketing was
22  doing.

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

13 (Pages 46 to 49)

---

**46**

1    Q.  You said that you would prepare slides for
2  presentations.  Could you describe for me in what
3  context you were preparing slides for presentations?
4    A.  Sales meetings or business reviews.
5    Q.  What's a business review?
6    A.  When you review the performance of the
7  sales in your geography with your superior.
8    Q.  In the context of -- who was preparing
9  these business reviews?
10    A.  The regional vice presidents.
11    Q.  Were you putting slides together from
12  information that was provided to you from Catherine
13  Potechin, or were you preparing slides from
14  information that you had compiled?
15    A.  I didn't add my information, no.
16    Q.  So you were preparing slides based on
17  information provided to you by Ms. Potechin?
18    A.  Mostly information provided from the
19  marketing teams.  If Catherine had, you know,
20  insight, and she wanted to put it in the
21  presentation, I'd capture her thoughts.
22    Q.  How long did you hold the position as

---

**47**

1  associate director of regional operations?
2    A.  About three-and-a-half months.
3    Q.  What was your next position?
4    A.  Regional business head for the
5  cardiovascular specialty group in the midwest.
6    Q.  Approximately when did you hold this
7  position?
8    A.  I think April '02.
9    Q.  How long did you hold it for?
10    A.  I gave you the wrong sales group.  I was a
11  regional business head, but it was not in the
12  cardiovascular specialty.
13    Q.  What was that?
14    A.  It's still a regional position.  National
15  west.
16    Q.  Let's go back.  In April 2002 you became
17  the regional business head for national west; is
18  that right?
19    A.  Yes.
20    Q.  What particular products or lines were you
21  responsible for?
22    A.  Pravachol, Cefzil, and I don't remember

---

**48**

1  for certain, but I think we may have had Avapro and
2  Avalide as well.  I don't recall the exact dates.
3    Q.  What geographical area were you
4  responsible for?
5    A.  Just about the western half of the United
6  States again.
7    Q.  As regional business head, what were your
8  responsibilities?
9    A.  To manage the people in that geography and
10  manage the business as well.
11    Q.  And again, in this position did you have
12  any responsibility for pricing of the drugs that you
13  were responsible for?
14    A.  I did not.
15    Q.  Did you have any responsibility with
16  respect to retail pharmacies?
17    A.  Our representatives made calls on
18  pharmacists to discuss our products from a
19  scientific positioning.
20    MR. SWEENEY:  We've been going a little
21  over an hour.  Can we take a short break?
22    MS. FEGAN:  Sure.

---

**49**

1    (Brief pause.)
2  BY MS. FEGAN:
3    Q.  As a regional business head for national
4  west, you said that you had sales reps that worked
5  under you that made calls on pharmacies?
6    A.  Yes.
7    Q.  What types of things would they discuss
8  with pharmacies?
9    A.  The package label for the product and
10  anything that's in a visual aid.
11    Q.  Do you know whether sales reps discussed
12  pricing with pharmacies?
13    A.  I don't remember hearing about a call or
14  being in a call where we talked about pricing, no.
15    Q.  Do you have an understanding of the prices
16  on which retail prices are based?
17    MR. SWEENEY:  Object to the form.
18    You can answer that if you understand it.
19    THE WITNESS:  I have no idea what prices
20  are based on.
21  BY MS. FEGAN:
22    Q.  Do you have an understanding of how AWP is

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

14   (Pages 50 to 53)

50

1    used in retail pricing?
2        A.  No, not really.
3        Q.  During the time that you were regional
4    business head for national west, did you have any
5    understanding of how AWP was used?
6        A.  No.
7        Q.  As regional business head for national
8    west, did you have any understanding of how insurers
9    reimbursed for the drugs for which you were
10   responsible?
11       A.  No.
12       Q.  As regional head for national west, did
13   you have any responsibility for marketing sales or
14   contracting with pharmacy benefit managers or
15   insurers?
16       A.  I did not.
17       Q.  Did you have any understanding or do you
18   have any understanding -- let's take that back.
19           Who was responsible for negotiating or
20   contracting with pharmacy benefit managers during
21   the time that you were regional business head for
22   national west?

51

1        A.  I believe it's on managed care
2    organization.
3        Q.  As regional business head for national
4    west, did you have any contact with the managed care
5    organization?
6        A.  Which managed care organization?
7        Q.  For the products for which you were
8    responsible.
9        A.  Bristol-Myers Squibb?
10       Q.  Yes.
11       A.  Yeah.
12       Q.  In what context would you be working with
13   the managed care group?
14       A.  They would give me updates on our
15   formulary position of our products.
16       Q.  Anything else?
17       A.  Not that I remember, no.
18       Q.  In updates that you would receive
19   regarding formulary position -- or what types of
20   information would be included in those updates?
21       A.  If a product was added to formulary. And
22   if so, what position it was on the formulary.

52

1        Q.  What do you mean by "what position it was
2    on the formulary"?
3        A.  If they had to fail another product first
4    before they could get our product.  That's basically
5    what they would discuss.
6        Q.  Did the updates include information about
7    rebates?
8        A.  No.
9        Q.  Did the updates include any information
10   regarding contract pricing or the formulas that
11   would be included in the contracts?
12       A.  No.
13           MR. SWEENEY:  You mean contracts of the
14   PBMs?
15           MS. FEGAN:  Yes.
16   BY MS. FEGAN:
17       Q.  In the updates that you would receive
18   regarding formulary position, would it include
19   information -- or any information related to pricing
20   or reimbursement?
21       A.  Not that I recall, no.
22       Q.  Other than in the context of formulary

53

1    position updates, did you have any other contact
2    with the managed care group, as regional business
3    head?
4        A.  No.
5        Q.  The sales reps that would call on
6    pharmacies, were they the same sales reps that would
7    be calling on physicians?
8        A.  Yes.
9        Q.  Did they receive separate visual aids for
10   pharmacies, versus the physicians on which they were
11   calling?
12       A.  They did not.
13       Q.  Did they receive any training specific to
14   pharmacy calls as opposed to physician calls?
15       A.  Not that I remember, no.
16       Q.  Other than pharmacies and physicians,
17   would the sales reps call on anyone else?
18       A.  Nurses that were in the office of the
19   physicians.
20       Q.  Any other client types or customer types?
21       A.  I don't think so, no.
22       Q.  So the sales reps weren't calling on

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER     June 1, 2006
Chicago, IL

15  (Pages 54 to 57)

---

54

1  insurers or PBMs; right?
2      A.  No.
3      Q.  How long did you hold the position as
4  regional business head for national west?
5      A.  I think about nine or ten months.
6      Q.  Approximately the beginning of 2003?
7      A.  I don't remember the date exactly.
8      Q.  What was your next position?
9      A.  Regional business head, cardiovascular
10  specialty.
11      Q.  Is this for a particular region?
12      A.  I think it was called central.
13      Q.  Other than what we just discussed in terms
14  of your responsibilities as regional business head
15  for national west, were there any differences?
16      A.  I had representatives working in teaching
17  and community hospitals.
18      Q.  Explain to me in what context they were
19  working in teaching.
20      A.  Talking to the residents and physicians
21  that are training in teaching hospital about our
22  products.

---

55

1      Q.  Did those representatives have any
2  responsibility for talking to the residents and
3  physicians regarding reimbursement or insurance-
4  related issues?
5      A.  No.
6      Q.  Were they trained to talk to the residents
7  or physicians regarding pricing?
8      A.  They were trained to talk to the residents
9  and physicians within label of the products that we
10  represented.
11      Q.  Does that mean that they did not speak
12  with the residents and physicians regarding pricing
13  for BMS products?
14      A.  Not that I'm aware of, no.
15      Q.  How long did you hold this position?
16      A.  I believe about three months.
17      Q.  What was your next position?
18      A.  Regional business head, cardiovascular
19  north central.
20      Q.  Were your responsibilities in this
21  position the same as what we just discussed for your
22  other two positions as regional business head?

---

56

1      A.  Yes.
2      Q.  Were there any differences that you can
3  think of?
4      A.  I had both primary care and specialty.
5      Q.  How long did you hold this position?
6      A.  I currently hold this position.
7      Q.  You said that you're responsible for north
8  central.  What geographical area does that entail?
9      A.  From Wisconsin west to Montana, and Iowa
10  and parts of Illinois.
11      Q.  How many other regional business heads are
12  there for cardiovascular?
13      A.  Now?
14      Q.  Yes.
15      A.  14.
16      Q.  And you say "now."  How has that changed?
17      A.  We've undergone several restructures.
18      Q.  Could you describe for me what those are?
19      A.  I'm not sure I understand.
20      Q.  You said that you have gone through
21  several restructures.  What restructures?
22      A.  Layoffs and reorganizing geographies.

---

57

1      Q.  As you sit here today, do you have any
2  understanding of what role AWP has played in
3  marketing at Bristol-Myers?
4      A.  Not really, no.
5      Q.  When you say "not really," what do you
6  mean?
7      A.  I know what the term "AWP" stands for, but
8  I don't know how it relates with marketing and the
9  products.
10      Q.  Do you have any understanding as you sit
11  here today of how AWP has been used in contracting
12  for BMS products?
13      A.  I have no idea.
14      Q.  Do you have any understanding of the role
15  that AWP plays or has ever played for BMS drugs with
16  respect to formulary placement?
17      A.  No.
18      Q.  Who would have been responsible, or do you
19  have any knowledge as to who would be responsible,
20  for contact with the state of Nevada for -- on
21  behalf of BMS with the Medicaid program for the
22  period 1991 to the present?

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

16  (Pages 58 to 61)

58

1     A.  My guess is the government person that
2  covers Nevada.
3     Q.  When you say your guess is, you mean you
4  don't know, or -- I mean, you're just assuming?
5     A.  I don't know straight on, no.
6     MS. FEGAN:  I'll go ahead and mark this.
7        (Whereupon Deposition Exhibit Ekborg
8  001 was marked as requested.)
9  BY MS. FEGAN:
10    Q.  I'm showing you what has been marked as
11 Deposition Exhibit Ekborg 001.  It's entitled
12 "NOTICE OF RULE 30(b)(6) DEPOSITIONS TO DEFENDANTS
13 REGARDING SALES AND MARKETING IN NEVADA."
14       Would you take a moment to look through
15 that and let me know if you've seen it before?
16       (Witness examines document.)
17       THE WITNESS:  I have not seen this before.
18 BY MS. FEGAN:
19    Q.  If you would take a look at Exhibit A,
20 it's the last three pages of the document, and
21 taking a look at No. 1, what investigation did you
22 do to make yourself knowledgeable regarding this

59

1  topic?
2     A.  Say that again.
3     Q.  Sure.  Taking a look at No. 1 on Exhibit
4  A, what investigation did you do to make yourself
5  knowledgeable about this topic?
6        And when it says "each of the defendants,"
7  it's for BMS.
8        MR. SWEENEY:  Let me say for the record
9  that I believe we produced Deb mainly because we
10 think she's knowledgeable about Montana.  She does
11 have some information about Nevada, but we've mainly
12 produced her related to Montana.  She does have some
13 territories at times that cover Nevada, and she can
14 talk about that, give you information about that.
15       I think it is also the case that the sales
16 organization, the basic organization, doesn't differ
17 from state to state, but she's mainly here to talk
18 about Montana.
19       MS. FEGAN:  All right.  Let me ask the
20 question this way.
21 BY MS. FEGAN:
22    Q.  Are you the person most knowledgeable at

60

1  BMS regarding the manner in which the sales and
2  marketing teams, if any relationship to or for the
3  responsibility of Montana, have been organized and
4  structured at BMS from 1991 to the present?
5     A.  I covered part of a sales force for part
6  of those years in Montana.
7     Q.  So let's first start with the part of the
8  years you're referring to.  Which part of the years?
9     A.  I believe 2001 I covered Montana, and I've
10 covered Montana since 2003 I believe.
11    Q.  So in terms of years, you believe that you
12 would have knowledge related to Montana for the
13 years 2001 and the years 2003 to the present; is
14 that right?
15    A.  Within the sales forces that I was
16 responsible for.
17    Q.  Okay.  And which sales forces would you
18 have this knowledge about?
19    A.  National west and north central.
20    Q.  Do you have any knowledge regarding the
21 manner in which the sales and marketing teams, with
22 any relationship to or responsibility for the state

61

1  of Nevada, have been organized and structured at BMS
2  for the period 1991 to the present?
3     A.  I covered Nevada, again, for partial sales
4  forces, partial dates.
5     Q.  What partial dates would those be for?
6     A.  January through October, I guess, 2001,
7  and then during the time I had national west.  I
8  don't recall the exact dates on that.
9     Q.  In preparation for your deposition today,
10 did you undertake any investigation to make yourself
11 knowledgeable regarding any other time periods or
12 parts of the sales force related to or with
13 responsibility for the states of Nevada or Montana?
14    A.  I was asked for any information or any
15 documents I had.
16    Q.  For example, you didn't go out and talk to
17 other persons that may have had responsibility for
18 those states for the time period 1991 to the present
19 to fill in the gaps; is that right?
20    A.  I did not.
21    Q.  You didn't go and look at any documents
22 that weren't already in your possession to make

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

17 (Pages 62 to 65)

---

**62**

1  yourself knowledgeable regarding the states of
2  Montana or Nevada for the period '91 to the present;
3  is that right?
4      MR. SWEENEY: Object to the form.
5      You can answer.
6      THE WITNESS: I did not.
7  BY MS. FEGAN:
8      Q.  For the part of the sales force and the
9  part of the time that you had responsibility related
10 to Montana, what is your understanding of how the
11 sales and marketing teams were organized -- let me
12 start over.
13     Do the sales and marketing teams -- were
14 the sales and marketing teams trained to do anything
15 different with the state of Nevada than they did
16 nationwide?
17     A.  I have no idea what the marketing team is
18 trained on.
19     Q.  So your knowledge is limited to sales; is
20 that right?
21     A.  Yes.
22     Q.  So with respect to the sales team, was the

---

**63**

1  sales team trained differently for sales within the
2  state of Nevada versus any other geographical area?
3      A.  Not that I'm aware of, no.
4      Q.  Are you aware of or were the documents
5  that were used by the sales team in connection with
6  the state of Nevada the same that were used
7  generally nationwide, or were there any particular
8  documents generated specifically for or related to
9  the state of Nevada?
10     A.  Not that I'm aware of, no.
11     Q.  When you say that you're aware of, you
12 believe that they were the same, applicable to all
13 geographical regions?
14     A.  I do.
15     Q.  During the time that you have knowledge
16 for part of the sales force that had any
17 responsibility for the state of Nevada, can you tell
18 me the names of the former and current managers that
19 had any responsibility for that state?
20     A.  Sales managers?
21     Q.  Sure.
22     A.  Steve Stores, Mary Kay Turner, and I don't

---

**64**

1  know who else covered parts of Nevada.
2      Q.  What about with respect to Montana?
3      A.  John Wiggins, Ed Koester. I'm not sure of
4  others who had Montana.
5      Q.  For what time period did John Wiggins and
6  Ed Koester have responsibility with respect to
7  Montana?
8      A.  I don't know when John started in Montana.
9  He's there today.
10     Ed Koester, I believe, had responsibility
11 for about a year and a half. He stopped covering
12 Montana about a year and a half ago.
13     Q.  At any one time is there just one sales
14 manager assigned to state of Montana?
15     A.  Different divisions cover it differently.
16     Q.  So the sales managers that you're
17 referring to, are those for CV? Is that right?
18     A.  Or national west.
19     Q.  Who was John Wiggins a sales manager for?
20 What division?
21     A.  I think John's always been with
22 cardiovascular group.

---

**65**

1      Q.  And Ed Koester?
2      A.  I think he's always been with
3  cardiovascular group as well.
4      Q.  As regional business head for CV for north
5  central, which drugs fall under your responsibility?
6      A.  Plavix, Avapro, Avalide, and Coumadin at
7  this point.
8      MR. SWEENEY: Why don't you give her the
9  ones you had previously.
10     THE WITNESS: I had Tequin at one point.
11 I think that might be it.
12     MR. SWEENEY: Pravachol?
13     THE WITNESS: I'm sorry. Yes. I didn't
14 even think about that.
15 BY MS. FEGAN:
16     Q.  The sales managers that you named with
17 respect to the state of Nevada, Steve Stores, when
18 was he responsible?
19     A.  I don't remember the exact dates. I'd
20 have to look at his personnel file. About three
21 years ago I think.
22     Q.  What group is he with?

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

18 (Pages 66 to 69)

66

1      A.  National west.
2      Q.  Mary Kay Turner, what --
3      A.  I don't know the exact date she was there
4  either.  She hasn't been there for probably at least
5  three years.
6      Q.  What group was she with?
7      A.  Neuroscience.
8      Q.  Are you aware of the nature and substance
9  of marketing plans that would have been created with
10  respect to the state of Montana, either to consumers
11  -- either with respect to consumers, doctors,
12  pharmacies, or the state generally?
13      A.  I've never seen any business plan or
14  information at all about consumers.  The marketing
15  plans I don't have access to.
16      Q.  So you don't have knowledge regarding
17  marketing plans that may be applicable to the state
18  of Montana; is that right?
19      A.  I have no idea.
20      Q.  You don't have knowledge -- I just have to
21  ask the question.  But you don't have knowledge with
22  respect to the marketing plans for the state of

67

1  Nevada; is that right?
2      A.  I have no idea.
3      MR. SWEENEY:  I think we have -- in
4  discussions with Sean, I think we have indicated
5  that it is our belief that all marketing for all
6  drugs is national.  So there wouldn't be any plans
7  for Montana.
8      MS. FEGAN:  That's fine if you want to go
9  on the record and testify, but we obviously have to
10  ask the 30(b)(6) witness about what she knows.
11      MR. SWEENEY:  That's fine.  I'm not
12  complaining about the questions.  I'm just making a
13  representation.
14      MS. FEGAN:  She hasn't said she knows one
15  way or the other.  She says she has no knowledge
16  about marketing plans.  If you want to go on or
17  produce someone that can testify to that, that's
18  fine.
19      MR. SWEENEY:  I'll stipulate to it.
20  BY MS. FEGAN:
21      Q.  Do you have knowledge regarding the
22  identity of all customers or potential customers of

68

1  BMS in the state of Montana since 1991?
2      A.  I have no idea.
3      Q.  Do you have any knowledge or understanding
4  of the identity of all customers or potential
5  customers of BMS in the state of Nevada since 1991?
6      A.  I do not.
7      Q.  Are you aware of whether there are any
8  sales directives, policies, or other sales-related
9  information with any relationship or applicability
10  to sales in the state of Nevada that were created
11  and implemented by BMS from 1991 to the present?
12      A.  Say that again.
13      Q.  Sure.  And you know what, if you want, you
14  can look.  It's Topic 3.  I'm just asking it
15  specifically.  So I'll repeat it, but you can follow
16  along.
17          Are you aware of whether there are any
18  sales directives, policies, or other sales-related
19  information with any relationship or applicability
20  to sales in the state of Nevada -- Montana created
21  and implemented by BMS from 1991 to the present?
22      A.  I'm not aware of any.

69

1      Q.  Did you do any research to make yourself
2  knowledgeable about whether there were any sales
3  directives, policies, or other sales-related
4  information with any relationship or applicability
5  to sales in the state of Montana created and
6  implemented by BMS from 1991 to the present?
7      A.  Outside of anything that was already in my
8  file or -- no.
9      Q.  Would you be the person that would know
10  whether -- at BMS -- let's start over.
11          Would you be the person at BMS that would
12  know or be the most knowledgeable about whether
13  there were any sales directives, policies, or other
14  sales-related information with any relationship or
15  applicability to sales in the state of Nevada
16  created and implemented by BMS for the period 1991
17  to 2001?
18      A.  I'm knowledgeable about what my sales team
19  did in the state -- in the time that I covered that
20  state.
21      Q.  I'm getting myself confused.  I have to
22  apologize.  I just asked about Nevada?

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

19 (Pages 70 to 73)

70

1          (Record read.)
2     BY MS. FEGAN:
3          Q.  For the time period that you were
4     responsible for the state of Nevada, were there any
5     particular sales directives that applied to that
6     state?
7               MR. SWEENEY:  You mean only to that state?
8     BY MS. FEGAN:
9          Q.  Yes.  Were there any sales directives
10    unique to that state?
11         **A.  Sales directives?  No.**
12         Q.  Was there any sales-related information
13    that was unique to the state of Nevada for the time
14    period that you were responsible for that state?
15         **A.  Formulary position for our products.**
16         Q.  Anything else?
17         **A.  Not that I'm aware of, no.**
18         Q.  Other than particular formulary positions
19    for your products, were the tools that the sales
20    representatives would use in the state of Nevada the
21    same that were being used nationwide?
22         **A.  Yes.**

71

1          Q.  Did you have any knowledge of any unique
2     pricing or reimbursement-related issues applicable
3     to the state of Nevada that were relevant to your
4     sales team?
5          **A.  No.**
6          Q.  For the time period that you were
7     responsible for the state of Nevada, were you aware
8     of any unique sales campaigns for that state?
9          **A.  No.**
10         Q.  Were the sales campaigns that would be
11    used in the state of Nevada for the time period you
12    were responsible the same sales campaigns that were
13    being used nationwide?
14         **A.  To my knowledge, yes.**
15              MS. FEGAN:  Why don't we take a break.
16              (Brief pause.)
17    BY MS. FEGAN:
18         Q.  Do you have any understanding of the
19    identity and nature of documents created or used by
20    sales reps in the field in the state of Montana?
21         **A.  Sales reps don't create documents used in**
22    **the field.**

72

1          Q.  Did you do any investigation to determine
2     whether any sales reps had created any documents to
3     be used in the field in the state of Nevada -- or
4     Montana?
5          **A.  No, because it's not standard practice to**
6     **create any pieces at all for sales reps to use with**
7     **any customer ever.**
8               MS. FEGAN:  Okay, I don't have any other
9     questions.
10              MR. SWEENEY:  Okay.  I've got a couple.
11
12              EXAMINATION
13    BY MR. SWEENEY:
14         Q.  Sales reps aren't permitted to create
15    documents to give to doctors; correct?
16         **A.  Correct.**
17         Q.  Where does all the materials that sales
18    reps use with doctors come from?
19         **A.  New Jersey; home office.**
20         Q.  Marketing?
21         **A.  Marketing, uh-hum; legal and regulatory.**
22         Q.  And the sales organization in Nevada and

73

1     Montana is structured pretty much the same way it is
2     across the country; correct?
3               MS. FEGAN:  Objection to form, ambiguous,
4     vague.
5     BY MR. SWEENEY:
6          Q.  You can answer.
7          **A.  It is.  It's a basic structure in all**
8     **sales.**
9          Q.  There are sales representatives, and what
10    are they called?  What are their titles?
11         **A.  There is a primary care rep.  There is a**
12    **specialty rep.**
13         Q.  But what are they called?
14         **A.  Sales reps.**
15         Q.  TBMs?
16         **A.  Some are territory business managers.**
17    **Some are senior territory business managers.**
18         Q.  Fine.  And they report to whom?
19         **A.  District business manager.**
20         Q.  And the district business managers report
21    to whom?
22         **A.  To regional business heads.**

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006

Chicago, IL

20 (Pages 74 to 77)

---

74

1    Q.   And that's pretty much the case in all of
2  the sales organizations across the country for all
3  types of drugs?
4        MS. FEGAN:  Objection to form.
5  BY MR. SWEENEY:
6    Q.   On the primary care side; correct?
7        MS. FEGAN:  Objection.
8        THE WITNESS:  That I'm aware of, yes.
9  BY MR. SWEENEY:
10   Q.   Including neuroscience and cardiovascular?
11   A.   Yes.
12   Q.   Who do the regional business heads report
13 to?
14   A.   In the cardiovascular case, area vice
15 president.
16   Q.   What about in primary care?  Who do they
17 report to in primary care?
18   A.   We are considered primary care, yes.
19   Q.   For neuroscience, who does the regional
20 business head report to?  Who did you report to?
21   A.   The vice president of neuroscience sales.
22   Q.   The vice president for sales who you

---

75

1  reported to, who do they report to?
2    A.   Currently the senior vice president of CV
3  metabolics.
4    Q.   Is there a head of a sales organization
5  nationally on the primary care side?
6    A.   There is a head of both sales and
7  marketing.
8    Q.   Okay.  And who is the head of sales?
9    A.   Bernadette Connaughton.
10   Q.   Who is the head of marketing?
11   A.   Bernadette Connaughton.  She has both
12 sales and marketing.
13   Q.   She has both.
14       MR. SWEENEY:  Okay, no further questions.
15
16       FURTHER EXAMINATION
17 BY MS. FEGAN:
18   Q.   We just went through an organization.  Is
19 that true for the period 1991 to the present?
20       MR. SWEENEY:  Well, she can't testify about
21 before '97, because she --
22       THE WITNESS:  I wasn't with Bristol-Myers

---

76

1  Squibb until 1997.
2  BY MS. FEGAN:
3    Q.   Has that organization that you've just
4  testified to been the same from 1997 to the present?
5    A.   No.  We've had multiple geographic and
6  people changes in that time.
7    Q.   Then tell me how and when it has changed.
8    A.   I don't have the dates.  We've undergone
9  multiple geographic and alignment changes, just
10 within the whole cardiovascular franchise.  We had
11 product changes in that time, and the people in
12 those seats have changed multiple times.
13   Q.   And I don't think I'm asking about which
14 people by name are in those seats.  But starting in
15 1997, was the structure that you just described the
16 same?  And if not, tell me what the differences
17 were.
18   A.   I only know about the group that I joined
19 when I joined Bristol-Myers.  I joined the
20 neuroscience, infectious, dermatology group.  At
21 that time, as I recall, there was a separate person
22 that was head of sales and a separate person that

---

77

1  was head of marketing.
2        MR. SWEENEY:  Can I ask a question?
3        MS. FEGAN:  Well, why don't I finish.
4        MR. SWEENEY:  All right.
5  BY MS. FEGAN:
6    Q.   For how long of a time period is your
7  knowledge about structure limited to the
8  neuroscience, infectious, dermatology group?
9    A.   Probably the first three years of the
10 organization.
11   Q.   So from approximately 1997 to 2000?
12   A.   That's close.
13   Q.   So during the time period 1997 to
14 approximately 2000, was the structure that you just
15 described where the sales reps -- some of them being
16 called territory business managers -- the territory
17 business managers reporting to the district
18 managers, who report to the regional business
19 managers --
20       MR. SWEENEY:  Business heads.
21 BY MS. FEGAN:
22   Q.   (Continuing) -- business heads; is that

---

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

21 (Pages 78 to 81)

78

1  right?
2      A.  Yes.
3      Q.  Was that the same?
4      A.  As I recall, yeah.
5      Q.  For the period 2000 to the present, was
6  the structure the same for all sales groups?
7      A.  I don't know about all the other sales
8  groups in BMS.  There is multiple divisions.  So I
9  don't really know how they were structured.
10         From the rep to the sales manager to the
11  regional business head in our group, yes.  I think
12  overall most of the rest of the company is
13  structured the same.
14      Q.  When you say "our group" --
15      A.  Cardiovascular.
16      Q.  Okay.  And you said that you believe that
17  the rest of the company is the same.
18         Are you aware of the differences or did
19  you undertake any research to determine what the
20  differences in structure for the sales groups
21  throughout the rest of the company are?
22      A.  I did not.  That's just common knowledge

79

1  of the organization.
2      Q.  Are there differences, or can you sit here
3  today and say on behalf of Bristol-Myers Squibb that
4  it's the same?
5      A.  It's my basic understanding it's the same,
6  but I don't know all the details about all the other
7  sales forces, no.
8      MS. FEGAN:  Okay.  I don't have any
9  further questions.
10      MR. SWEENEY:  If you're finished, you have
11  to say you're finished.
12      MS. FEGAN:  I did.  I said I don't have
13  any other questions.
14      MR. SWEENEY:  I don't have any other
15  questions.
16      MS. FEGAN:  Okay.
17      MR. SWEENEY:  We will reserve signature.
18         (FURTHER DEPONENT SAYETH NAUGHT.)
19
20
21
22

80

1                 SIGNATURE OF WITNESS
2
3      I, DEBRA EKBORG, state that I have read the
4  foregoing transcript of the testimony given by me at
5  my deposition on the 1st day of June, 2006, and that
6  said transcript constitutes a true and correct record
7  of the testimony given by me at said deposition
8  except as I have so indicated on the errata sheets
9  provided herein.
10
11
12      _____
13              DEBRA EKBORG
14
15
16  SUBSCRIBED AND SWORN to before me this _____ day
17  of _____, 2006.
18
19
20  _____
21      Notary Public
22

81

1  STATE OF ILLINOIS   )
2                     ) SS:
3  COUNTY OF DuPAGE    )
4
5      I, ROBIN M. CHIMNIAK, a notary public
6  within and for the County of DuPage and State of
7  Illinois, do hereby certify that heretofore, to wit,
8  on the 1st day of June, 2006, personally appeared
9  before me DEBRA EKBORG, a witness in a certain cause
10  now pending and undetermined in the United States
11  District Court, for the District of Massachusetts.
12      I further certify that the witness was by
13  me first duly sworn to testify the truth, the whole
14  truth and nothing but the truth in the cause
15  aforesaid; that the testimony then given by the said
16  witness was reported stenographically by me in the
17  presence of said witness and was thereafter
18  transcribed under my personal direction, and the
19  foregoing is a true and complete transcript of the
20  testimony so given by the said witness as aforesaid.
21      The signature of the witness to the
22  foregoing deposition was not waived.

22  (Page 82)

82

```
1          I further certify that the taking of this
2     deposition was pursuant to notice and that there were
3     present at the taking of said deposition the
4     appearances as heretofore noted.
5          I further certify that I am not a relative
6     or employee or attorney or counsel, nor a relative or
7     employee of such attorney or counsel for any of the
8     parties hereto, nor interested directly or indirectly
9     in the outcome of this action.
10         IN TESTIMONY WHEREOF, I have hereunto set
11    my hand and affixed my notarial seal this _____
12    day of _____, 2006.
13
14
15
16    _____
17         ROBIN M. CHIMNIAK, CSR
18         License No. 084-001999
19
20
21
22
```

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

1

**A**
access 66:15
acquisition 18:2
  18:6 19:3
acting 45:18
action 1:6 82:9
ACTIONS 1:10
add 32:19 46:15
added 51:21
additional 15:14
  33:9
affixed 82:11
aforesaid 81:15
  81:20
ago 28:9 64:12
  65:21
agree 11:17
  15:18
ahead 58:6
aid 18:17 19:9
  19:12,17 49:10
aids 19:4,21
  20:4 27:4 34:5
  34:18 35:5,7
  45:14 53:9
alignment 76:9
allergists 9:9
Allergy 9:12
ambiguous 73:3
analysis 45:19
answer 4:16
  10:10 11:11,13
  12:13,14,17
  15:17,18 16:4
  17:17 19:20
  20:8 29:14
  49:18 62:5
  73:6
answered 20:7
Antibiotic 22:14
Antidepressant
  22:12
Anxiety 22:10

Anybody 29:1
apologize 69:22
appearances 2:1
  82:4
appeared 2:8,15
  2:21 81:8
applicability
  68:9,19 69:4
  69:15
applicable
  37:19 63:12
  66:17 71:2
applied 70:5
appropriate
  36:13
approved 34:7
  36:11
approximately
  7:8,11 8:3
  30:19 31:18,21
  32:9 38:14
  42:21 47:6
  54:6 77:11,14
April 47:8,16
area 21:18 24:4
  24:15,18,21
  25:3,17 30:5,8
  31:1,3,8 32:3
  34:6 36:8
  38:16 39:2
  48:3 56:8 63:2
  74:14
areas 30:15
  39:12
asked 19:1 20:6
  29:13 61:14
  69:22
asking 4:12,14
  20:12,13 68:14
  76:13
assigned 64:14
associate 33:18
  43:14,21 47:1

assume 4:17
  12:8 38:4
assuming 58:4
asthma 9:12
attend 29:17,19
attended 26:7
attorney 82:6,7
attorneys 4:11
Avalide 45:1
  48:2 65:6
Avapro 45:1
  48:1 65:6
Avenue 2:13
average 1:6 16:8
  16:11 17:1,4,8
  17:11,12,19
  18:6,11 19:2
aware 55:14
  63:3,4,10,11
  66:8 68:7,17
  68:22 70:17
  71:7 74:8
  78:18
AWP 11:3 19:6
  49:22 50:5
  57:2,7,11,15
a.m 1:18

**B**
B 3:8 14:14 21:2
Bachelor 6:8
back 5:2,15
  11:19 12:20
  13:14 19:1,19
  24:8 25:15
  43:9,10,13
  47:16 50:18
background
  10:1
based 46:16
  49:16,20
basic 9:20 10:13
  38:1 59:16

73:7 79:5
basically 25:6
  39:4 52:4
basis 30:13
began 7:8
beginning 1:18
  54:6
behalf 2:8,15,21
  57:21 79:3
belief 67:5
believe 6:22
  7:18 14:6 20:3
  20:13 23:15
  32:1 33:13
  36:16 38:10
  40:13 45:1
  51:1 55:16
  59:9 60:9,10
  60:11 63:12
  64:10 78:16
benefit 23:3
  36:5 42:2
  50:14,20
BERMAN 2:3
Bernadette 75:9
  75:11
Beth 4:10
Betulius 39:19
  39:22
bit 29:5 36:10
BMS 10:2,10
  21:17 22:1,15
  22:19 23:6
  43:10 55:13
  57:12,15,21
  59:7 60:1,4
  61:1 68:1,5,11
  68:21 69:6,10
  69:11,16 78:8
Boston 2:20
boundary 30:21
  39:2
brand 31:15

32:18 33:3,11
  33:14,15 36:19
  36:20 45:15,20
brands 37:3
break 4:20
  48:21 71:15
Brief 49:1 71:16
Bristol-Myers
  2:15 5:12 11:7
  21:7,8 42:20
  43:9 51:9 57:3
  75:22 76:19
  79:3
broken 30:15
brought 19:4,9
  19:20
budget 44:6
  45:5
business 5:14
  23:11 27:11
  28:22 29:4,7,8
  34:2,4,12
  38:13 39:6
  40:4,6,16 41:6
  41:7,19 42:5
  42:12,16 46:4
  46:5,9 47:4,11
  47:17 48:7,10
  49:3 50:4,7,21
  51:3 53:2 54:4
  54:9,14 55:18
  55:22 56:11
  65:4 66:13
  73:16,17,19,20
  73:22 74:12,20
  77:16,17,18,20
  77:22 78:11
BuSpar 21:12
  22:9 38:21
  41:10,12,15
B-e-t-u-l-i-u-s
  39:21

Ekborg, Debra    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    June 1, 2006

Chicago, IL

2

**C**

C 4:1
cable 8:7,8,16
  8:17
California
  21:19 23:16
  24:15
California-ba...
  23:14
call 49:13,14
  53:5,17
called 4:4 23:13
  39:14,15 43:16
  43:19 54:12
  73:10,13 77:16
calling 15:3
  21:21 53:7,11
  53:22
calls 48:17 49:5
  53:14,14
campaigns 71:8
  71:10,12
capture 46:21
cardiovascular
  43:17,22 44:20
  47:5,12 54:9
  55:18 56:12
  64:22 65:3
  74:10,14 76:10
  78:15
care 9:8 35:10
  51:1,4,6,13
  53:2 56:4
  73:11 74:6,16
  74:17,18 75:5
case 59:15 74:1
  74:14
Catherine 40:9
  44:15 46:12,19
cause 81:9,14
Cefzil 21:12
  22:13 33:1,9
  33:10,12 34:11

34:16 35:14
36:2 37:17,22
  47:22
central 23:20
  39:14 40:1
  54:12 55:19
  56:8 60:19
  65:5
certain 33:21
  43:17 48:1
  81:9
certainly 4:20
  10:5
certificate 6:12
Certified 1:20
certify 81:7,12
  82:1,5
changed 56:16
  76:7,12
changes 76:6,9
  76:11
charge 29:8
Chicago 1:17
  2:7
CHIMNIAK
  1:19 81:5
  82:17
CHRISTOFF...
  2:18 10:21
  11:6,12 15:15
  16:1
CIVIL 1:6
Claritin 15:10
client 53:20
close 77:12
coaching 22:7
collected 41:17
college 5:17,18
  6:18,21
Colorado 5:19
  6:4 7:1
come 17:21
  43:10 72:18

common 78:22
communicated
  28:11
communicating
  30:2
communication
  28:17
community
  54:17
company 7:19
  8:1 10:17 18:5
  22:7 35:2
  78:12,17,21
compared 42:9
compendia
  16:20
competitive
  41:15
competitors
  41:16
compiled 46:14
complaining
  67:12
complete 81:19
CONFIDENT...
  1:13,15
confused 32:2
  32:11 69:21
Connaughton
  75:9,11
connection 63:5
considered
  74:18
constitutes 80:6
consumers
  66:10,11,14
contact 23:3
  36:5 42:13
  51:4 53:1
  57:20
contained 38:8
context 19:1,5
  19:10 45:13

46:3,8 51:12
  52:22 54:18
continue 36:22
Continuing 19:8
  77:22
contract 52:10
contracting
  50:14,20 57:11
contracts 52:11
  52:13
conversation
  19:5,13
conversations
  18:9 36:14
Copies 45:14
correct 37:15
  72:15,16 73:2
  74:6 80:6
cost 18:2,6 19:3
Coumadin 65:6
counsel 82:6,7
country 30:15
  73:2 74:2
County 1:19
  81:3,6
couple 30:14
  72:10
courses 6:17
court 1:1 5:1
  37:9 81:11
cover 59:13
  64:15
covered 13:15
  14:13 21:1
  28:8 60:5,9,10
  61:3 64:1
  69:19
covering 64:11
covers 58:2
create 71:21
  72:6,14
created 66:9
  68:10,20 69:5

69:16 71:19
  72:2
CSR 82:17
current 5:13
  63:18
currently 5:9,11
  56:6 75:2
customer 19:12
  53:20 72:7
customers 19:17
  35:9 36:14
  67:22,22 68:4
  68:5
CV 64:17 65:4
  75:2

**D**

D 3:1 4:1
date 7:10 54:7
  66:3
dates 32:2 48:2
  61:4,5,8 65:19
  76:8
day 80:5,16 81:8
  82:12
deal 17:12,20
dealt 17:15
Deb 59:9
Deborah 5:6
DEBRA 1:15
  3:3 4:4 80:3,13
  81:9
December 43:11
defendants 3:11
  58:12 59:6
degree 5:22 6:7
deliver 26:18
Denice 23:7
dense 27:21
department
  30:13 34:21,22
  35:1
DEPONENT

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

3

79:18
deposition 1:15
11:6,8,9 58:7
58:11 61:9
80:5,7 81:22
82:2,3
Depositions
3:11 58:12
dermatology
25:8 76:20
77:8
describe 36:9
41:6 44:4
45:12 46:2
56:18
described 76:15
77:15
DESCRIPTI...
3:9
Desimone 31:3
details 79:6
determine 72:1
78:19
developed 25:12
26:2 27:5,14
Diego 7:21
differ 59:16
differences
37:19,20 42:8
54:15 56:2
76:16 78:18,20
79:2
different 62:15
64:15
differently 63:1
64:15
direct 41:2
direction 81:18
directives 68:8
68:18 69:3,13
70:5,9,11
directly 82:8
director 5:14

33:3,15 38:13
40:4 41:19
42:5,12,17
43:14,21 47:1
directors 39:6
discuss 19:12,17
48:18 49:7
52:5
discussed 19:2
49:11 54:13
55:21
discussion 37:18
discussions 67:4
disease 25:8
Distributing
45:7
district 1:1,2
14:20,22 15:14
15:19,21 16:6
16:16 17:4
20:21 21:7,11
21:13 22:3,4
23:2,19 24:1,2
24:14 27:10
29:2 41:4 45:9
73:19,20 77:17
81:11,11
divided 33:19
division 25:9
29:9 43:15,17
43:22 44:21
64:20
divisions 40:17
64:15 78:8
DOCKET 1:5
doctors 18:5
19:6 66:11
72:15,18
document 1:9
58:16,20
documents
61:15,21 63:4
63:8 71:19,21

72:2,15
doing 19:18
26:4 45:6,22
dollars 28:12
door 8:17,18
drive 1:17 41:9
driver 7:14
drug 25:3
drugs 9:10
12:10 13:3,10
14:3,8,12 15:7
15:22 20:22
22:16,20 44:20
48:12 50:9
57:15 65:5
67:6 74:3
duly 4:5 81:13
DuPage 1:20
81:3,6
D-e-s-i-m-o-n-e
31:5

_____

E

E 3:1,8 4:1,1
early 24:20 32:3
Ed 64:3,6,10
65:1
education 5:16
26:20
educational
27:12 29:21
effectiveness
32:19
efficaciousness
28:3
either 66:4,10
66:11
Ekborg 1:16 3:3
3:10 4:4 5:6
58:7,11 80:3
80:13 81:9
ELIZABETH
2:4

employed 5:11
employee 82:6,7
employer 6:17
encompasses
37:2
ensure 25:12
26:2,6 36:11
44:8
ensuring 44:7
45:11
entail 22:5 45:5
56:8
entitled 10:5
58:11
ERIC 2:18
errata 80:8
ESQUIRE 2:4
2:11,12,18
events 26:20
29:22
exact 7:10 48:2
61:8 65:19
66:3
exactly 16:11
54:7
Examination
3:4,5 4:8 72:12
75:16
examined 4:5
examines 58:16
example 18:1,18
19:14,18 20:10
20:12 27:1
61:16
examples 26:21
28:6
Exhibit 3:10
58:7,11,19
59:3
expenses 34:8
experience 18:1
18:22
Explain 54:18

extend 23:16
extent 10:4 22:8
41:18
E-k-b-o-r-g 5:8

_____

F

fail 52:3
fall 65:5
feedback 25:14
Fegan 2:4 3:4
4:9,10 5:18,21
10:3,12 11:1
11:10,16,18,22
12:13,15,20
13:1,7,9 15:17
15:20 16:3
17:17,22 19:19
20:2,11,20
24:12 32:16
36:3 37:12,13
39:9,11 43:7
48:22 49:2,21
52:15,16 58:6
58:9,18 59:19
59:21 62:7
65:15 67:8,14
67:20 70:2,8
71:15,17 72:8
73:3 74:4,7
75:17 76:2
77:3,5,21 79:8
79:12,16
fell 38:19 44:20
field 25:14,14
26:3,10,18
27:6,15 28:11
28:17 34:6
71:20,22 72:3
figure 11:3
file 65:20 69:8
fill 61:19
fine 67:8,11,18
73:18

Henderson Legal Services
(202) 220-4158

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006

Chicago, IL

4

finished 79:10
79:11
first 4:5 6:20 9:3
9:17,18 10:4
10:18 11:4
12:1,7 13:2
19:21 23:5
25:22 52:3
60:7 77:9
81:13
Floor 1:17
flutamide 14:5
focus 37:22
focuses 6:11
folks 30:12
follow 68:15
follows 4:6
force 30:3 36:13
60:5 61:12
62:8 63:16
forces 60:15,17
61:4 79:7
foregoing 80:4
81:19,22
form 12:12
17:16 35:22
37:21 38:2
49:17 62:4
73:3 74:4
formal 10:15
former 63:18
formulary 22:19
22:21 23:1
51:15,19,21,22
52:2,18,22
57:16 70:15,18
formulas 52:10
forward 25:15
foundation 10:7
four 8:20 30:17
33:13
frame 37:2
franchise 76:10

full-time 6:20
further 75:14,16
79:9,18 81:12
82:1,5

——— G ———
G 4:1
gaps 61:19
gather 25:14
34:19
gathering 41:14
general 34:9
44:13
generally 18:19
18:22 35:10
63:7 66:12
generated 63:8
geographic 29:8
76:5,9
geographical
21:18 24:4
25:2 39:2,12
48:3 56:8 63:2
63:13
geographies
56:22
geography 15:1
21:15 24:4
46:7 48:9
getting 69:21
give 8:5 26:21
28:6 34:1
51:14 59:14
65:8 72:15
given 80:4,7
81:15,20
go 5:15,16 13:13
19:19 23:20
26:4,13 47:16
58:6 61:16,21
67:8,16
going 4:12 10:21
15:15 37:14

44:22 48:20
good 4:10 43:12
government
58:1
graduated 6:18
GRAY 2:17
group 21:10
29:10 43:15
47:5,10 51:13
53:2 64:22
65:3,22 66:6
76:18,20 77:8
78:11,14
groups 34:18
40:16 78:6,8
78:20
guess 17:20
30:12,14 44:22
58:1,3 61:6

——— H ———
H 3:8
HAGENS 2:3
half 25:6 30:7
31:9 48:5
64:11,12
hand 82:11
Handle 44:2
HARTSON
2:10
head 23:11
27:11 29:7
47:4,11,17
48:7 49:3 50:4
50:7,12,21
51:3 53:3 54:4
54:9,14 55:18
55:22 65:4
74:20 75:4,6,8
75:10 76:22
77:1 78:11
heads 28:22
29:5 56:11

73:22 74:12
77:20,22
hear 4:21
heard 18:3
hearing 49:13
held 32:4
Helped 34:5
Henry 39:21
hereto 82:8
heretofore 81:7
82:4
hereunto 82:10
HIGHLY 1:13
1:15
HOGAN 2:10
hold 8:19 13:18
14:16 24:13
31:8 36:15,22
42:16 46:22
47:6,9 54:3
55:15 56:5,6
home 23:22
72:19
hope 10:10
Horticulture
6:10
hospital 13:22
14:3,7,13,17
15:6,13 54:21
hospitals 54:17
hour 48:21
human 22:6

——— I ———
idea 11:1 14:15
17:13 21:5
49:19 57:13
62:17 66:19
67:2 68:2
identity 67:22
68:4 71:19
III 2:11
Illinois 1:17,20

2:7 5:10 56:10
81:1,7
implement
26:12 27:5
implementation
26:18
implemented
25:13 26:3
68:11,21 69:6
69:16
implementing
27:15
include 34:20
35:5 52:6,9,18
included 18:20
20:4,14 28:7
51:20 52:11
including 41:20
74:10
increasing 34:16
indicated 67:4
80:8
indirectly 82:8
industry 1:6
10:5,6,20 11:5
12:4
infectious 25:8
76:20 77:8
information
18:10 19:11,16
22:21,22 26:6
26:7,14 28:10
34:15,19 35:4
44:9 45:12,15
46:12,14,15,17
46:18 51:20
52:6,9,19,19
59:11,14 61:14
66:14 68:9,19
69:4,14 70:12
inpatient 14:9
input 38:5 41:11
45:19,21

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

5

insight 46:20
installing 8:17
instruct 12:16
instructing 10:9
   11:10,13
insurance 55:3
insurers 23:3
   36:6 42:2 50:8
   50:15 54:1
intelligence
   41:15
intending 45:16
interested 82:8
interferon 14:6
International
   2:19
introduced 12:2
   13:3
investigation
   58:21 59:4
   61:10 72:1
involved 28:16
Iowa 56:9
issues 28:3 44:2
   44:5 55:4 71:2

**J**
J 2:11
JAMES 2:12
January 9:2
   38:15 39:7
   61:6
Jersey 72:19
Jill 31:3
job 43:6
John 64:3,5,8,19
John's 64:21
join 28:20
joined 76:18,19
   76:19
June 1:18 80:5
   81:8

**K**
Kay 63:22 66:2
kind 18:14
kinds 27:14
knew 26:12
   36:11,13
know 4:14 8:2
   20:22 46:19
   49:11 57:7,8
   58:4,5,15 64:1
   64:8 66:3
   68:13 69:9,12
   76:18 78:7,9
   79:6
knowledge 27:9
   57:19 60:12,18
   60:20 62:19
   63:15 66:16,20
   66:21 67:15,21
   68:3 71:1,14
   77:7 78:22
knowledgeable
   58:22 59:5,10
   59:22 61:11
   62:1 69:2,12
   69:18
knows 67:10,14
Koester 64:3,6
   64:10 65:1

**L**
label 49:9 55:9
Lacaze 33:3,8
laid 42:20
large 41:1
launched 15:10
Layoffs 56:22
learn 10:19
   15:22
learned 10:6
   11:4 12:2
legal 72:21
let's 5:15 13:13

47:16 50:18
   60:7 69:10
level 13:4,5
liaison 25:1,10
   26:1 27:3
   28:15 45:18
License 82:18
limited 62:19
   77:7
line 25:3 32:21
lines 15:7 47:20
litigation 1:7
   11:3
little 29:5 36:10
   48:20
Littleton 7:1
live 5:9
LLP 2:3
Loader 7:14
location 23:20
long 7:4,15,16
   7:22 8:19
   13:18 14:16
   24:13 28:8
   31:8 36:15
   42:15 46:22
   47:9 54:3
   55:15 56:5
   77:6
look 58:14,19,21
   59:3 61:21
   65:20 68:14
Louisiana 39:4
L-a-c-a-z-e 33:7
L.L.P 2:10

**M**
M 1:18 81:5
   82:17
major 6:9
majority 35:12
   41:1
making 12:17

26:11 67:12
manage 21:15
   34:7 40:6,15
   48:9,10
managed 42:9
   51:1,4,6,13
   53:2
management
   26:5 28:20,21
   41:7
manager 14:20
   14:22 15:14,19
   15:21 16:7,17
   17:4 20:22
   21:7,11,13
   22:3,4 23:2,19
   24:3,14,18,22
   27:10 30:6,9
   31:2,9,17,19
   31:22 32:3,9
   32:18 33:16,17
   33:18 34:3
   35:17 36:4
   37:1,17 45:9
   64:14,19 73:19
   78:10
managers 23:3
   23:21 24:1
   26:8 29:3,18
   34:6 36:6,9
   41:4 42:3
   50:14,20 63:18
   63:20 64:16
   65:16 73:16,17
   73:20 77:16,17
   77:18,19
managing 15:1
   40:18 41:6
   44:6
manner 60:1,21
mark 58:6
marked 58:8,10
market 9:10

14:4 34:21,22
marketing 3:12
   24:18,22 25:1
   25:11,13,15
   26:1,3,10,15
   26:17 27:4,5
   27:14 28:16
   29:11 30:2,6,8
   30:9 31:1,9,13
   31:14,15 32:3
   32:18,19 33:12
   33:15,16 34:6
   35:20 36:9,18
   38:1 40:18
   41:17,21 42:2
   45:8,21 46:19
   50:13 57:3,8
   58:13 60:2,21
   62:11,13,14,17
   66:9,14,17,22
   67:5,16 72:20
   72:21 75:7,10
   75:12 77:1
markets 35:2
Martini 39:21
Mary 63:22
   66:2
Massachusetts
   1:2 2:20 81:11
materials 35:20
   36:2 38:8
   72:17
matter 4:12
MDL 1:5
mean 5:17 13:6
   16:13 18:16
   27:19,21,22
   39:8 44:4 52:1
   52:13 55:11
   57:6 58:3,4
   70:7
means 16:11,14
Medicaid 42:13

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006

Chicago, IL

6

57:21
medical 26:19
Medicare 14:14
  21:1
medication
  22:10
meetings 26:8
  29:17 46:4
mention 4:22
mentioned 14:5
messages 34:7
  36:9,12
metabolics 75:3
Midsouth 43:19
midwest 15:1
  47:5
mid-south 44:1
mind 9:22 17:21
minors 6:11
moment 58:14
money 45:7
Montana 56:9
  59:10,12,18
  60:3,6,9,10,12
  61:13 62:2,10
  64:2,4,7,8,12
  64:14 66:10,18
  67:7 68:1,20
  69:5 71:20
  72:4 73:1
months 7:16
  31:11 32:4
  36:16 37:4
  42:18 47:2
  54:5 55:16
morning 4:10
move 10:10
  36:20
moved 30:13
multiple 76:5,9
  76:12 78:8

**N**

N 3:1 4:1
name 4:10 5:4,7
  23:8,13 31:4
  33:4 39:20
  40:10 76:14
named 65:16
names 30:14
  63:18
national 47:14
  47:17 49:3
  50:4,7,12,22
  51:3 54:4,15
  60:19 61:7
  64:18 66:1
  67:6
nationally 75:5
nationwide
  62:16 63:7
  70:21 71:13
naturally 19:12
nature 66:8
  71:19
NAUGHT 79:18
needed 44:8
negotiating
  50:19
neuroscience
  25:8 38:18,19
  39:8,9 40:4,14
  40:19 42:17
  66:7 74:10,19
  74:21 76:20
  77:8
Nevada 3:13
  42:6,9 57:20
  58:2,13 59:11
  59:13 61:1,3
  61:13 62:2,15
  63:2,6,9,17
  64:1 65:17
  67:1 68:5,10
  68:20 69:15,22
  70:4,13,20

71:3,7,11 72:3
  72:22
never 66:13
new 2:14,14
  45:14,15 72:19
nine 54:5
Nods 37:5
north 1:16
  55:19 56:7
  60:19 65:4
northeast 39:15
notarial 82:11
notary 1:19
  80:21 81:5
noted 11:16,18
  82:4
notice 1:16 3:10
  58:12 82:2
November 32:1
  32:12 43:1
NUMBER 3:9
numbers 28:1
nursery 6:22 7:4
Nurses 53:18

**O**

O 4:1
Oak 5:10
object 10:21
  15:15 35:22
  49:17 62:4
objecting 11:15
objection 11:16
  11:17,18 12:11
  12:11 16:1
  17:16 20:6
  73:3 74:4,7
objections 12:16
  12:17
obtain 35:4
obviously 12:16
  41:16 67:9
occurred 19:15

occurring 45:13
October 61:6
office 23:22
  53:18 72:19
offices 15:5
okay 4:17,18 5:2
  5:3 13:13
  26:13 29:16
  32:2,7,15
  37:12 60:17
  72:8,10 75:8
  75:14 78:16
  79:8,16
ones 25:5 65:9
on-the-job
  15:11
operational 44:2
  44:5
operations
  43:14,22 47:1
opposed 53:14
oral 1:15 34:2,4
  34:8,11 37:20
  38:3
orally 37:6
ORDER 1:13
organization
  51:2,5,6 59:16
  59:16 72:22
  75:4,18 76:3
  77:10 79:1
organizations
  74:2
organized 60:3
  61:1 62:11
original 19:20
originally 32:12
outcome 82:9
outpatient 14:10
  14:11 21:22
outpatient-ba...
  15:4
outside 6:17

10:22 11:2,8
  11:14 15:16
  17:19 69:7
overall 78:12
overview 34:9

**P**

P 4:1
package 49:9
page 3:2,9 4:15
  32:8
pages 58:20
paid 17:4
Park 5:10
part 14:14 21:2
  60:5,5,7,8 62:8
  62:9 63:16
partial 61:3,4,5
particular 18:8
  25:2 37:21
  40:16 43:15
  47:20 54:11
  63:7 70:5,18
parties 82:8
parts 56:10
  61:12 64:1
pause 49:1
  71:16
pays 17:8,10,13
PBMs 52:14
  54:1
pending 81:10
people 29:18
  33:11 40:6,15
  40:17 41:6
  48:9 76:6,11
  76:14
performance
  27:17,19 28:5
  28:6,7 29:22
  41:9 46:6
performing
  27:20,22

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

7

period 57:22
61:2,18 62:2
64:5 69:16
70:3,14 71:6
71:11 75:19
77:6,13 78:5
periods 61:11
permitted 72:14
person 29:7
58:1 59:22
69:9,11 76:21
76:22
personal 81:18
personally 81:8
personnel 65:20
persons 34:19
61:17
perspective
25:19
pharmaceutical
1:5 10:5,20
12:3 18:5
pharmaceutic...
13:15
pharmacies
13:6,11 35:14
35:21 36:2
41:21 48:16
49:5,8,12 53:6
53:10,16 66:12
pharmacists
48:18
pharmacy 23:3
36:5 42:2
50:14,20 53:14
phone 29:3
phrase 16:8
physician 15:5
53:14
physicians 9:8
19:3 21:22
27:2 35:9,11
40:20,22,22

53:7,10,16,19
54:20 55:3,7,9
55:12
pieces 41:17
45:20 72:6
Place 2:19
placement 22:19
57:16
plaintiffs 2:8
4:11
plan 66:13
plans 66:9,15,17
66:22 67:6,16
plant 7:18,22
Plavix 45:1 65:6
played 57:2,15
plays 57:15
please 4:14 5:4
11:19
Plough 9:19
plus 14:5 15:9
point 14:6 65:7
65:10
policies 68:8,18
69:3,13
position 6:20
7:2,6,13,17 8:6
8:11,19,21 9:3
10:4 13:18,21
14:16,19 21:6
23:10 24:13,17
24:19 28:15
31:8,12 36:15
36:17 38:11
42:15,16,19
43:8 44:14
46:22 47:3,7
47:14 48:11
51:15,19,22
52:1,18 53:1
54:3,8 55:15
55:17,21 56:5
56:6 70:15

positioning
48:19
positions 18:4
55:22 70:18
possession
61:22
possibility 20:18
postgraduate
6:14
Potechin 40:9
44:15 46:13,17
potential 67:22
68:4
practice 21:22
72:5
Pravachol 45:2
47:22 65:12
predictable
38:12
preparation
61:9
prepare 44:10
46:1
prepared 26:15
27:17
preparing 34:18
35:7,20 46:3,8
46:13,16
presence 81:17
present 1:21
57:22 60:4,13
61:2,18 62:2
68:11,21 69:6
75:19 76:4
78:5 82:3
presentation
46:21
presentations
44:11 46:2,3
president 25:17
31:3 40:13
44:7,17 45:11
74:15,21,22

75:2
presidents 46:10
pretty 43:12
73:1 74:1
previously 65:9
price 1:7 16:8
16:12,14,18,19
17:1,5,8,11,12
17:20 18:7,12
19:3 41:12
priced 13:3,11
15:22 22:16
prices 12:9 13:3
18:14 34:16
49:15,16,19
pricing 10:19
11:4 12:2,3
13:15 16:19
17:14 18:19
20:4 28:17
34:11 35:4
38:5,9 48:12
49:12,14 50:1
52:10,19 55:7
55:12 71:2
primary 9:8
35:10 56:4
73:11 74:6,16
74:17,18 75:5
Private 21:22
probably 66:4
77:9
processes 22:8
produce 67:17
produced 45:15
59:9,12
product 9:10,20
10:14 14:4
15:7 16:15
21:10 25:3
27:20,22 31:17
32:9,18,21,21
33:17,18 35:17

36:4,12 37:1
37:17 49:9
51:21 52:3,4
76:11
products 9:14
15:9 23:1 25:7
31:19,22 32:20
33:9 34:3 35:3
38:19 40:20
44:10 45:12
47:20 48:18
51:7,15 54:22
55:9,13 57:9
57:12 70:15,19
product-related
26:19 29:21
program 57:21
programs 6:12
6:17 25:12
26:2,7,10,17
27:12,14 30:1
38:8 42:13
45:16
promote 32:20
promotional
26:19 44:6
45:5,16
PROTECTIVE
1:13
provided 46:12
46:17,18 80:9
providing 34:15
45:19
psychiatrists
41:1
public 1:19
80:21 81:5
published 16:15
16:18,19
pursuant 1:16
82:2
put 34:5 38:7
46:20

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER        June 1, 2006

Chicago, IL

8

| | | | | |
|---|---|---|---|---|
| putting 45:20 | 51:18 52:17 | 55:22 56:11 | rephrase 4:15 | resources 22:6 |
| 46:11 | 53:9,13 | 65:4 73:22 | report 23:5 31:1 | 34:7 |
| P-o-t-e-c-h-i-n | received 10:13 | 74:12,19 77:18 | 33:2 40:8 | respect 34:11 |
| 40:11 | 15:12 23:18 | 78:11 | 44:14 73:18,20 | 37:17 48:16 |
| | 45:8 | regions 63:13 | 74:12,17,20,20 | 57:16 62:22 |
| **Q** | recollection | regular 30:13 | 75:1 77:18 | 64:2,6 65:17 |
| question 4:16,17 | 13:16 38:7 | regulatory | reported 31:6 | 66:10,11,22 |
| 4:22 11:19 | record 5:5 11:20 | 72:21 | 41:2 44:18 | responsibilities |
| 12:19 19:20 | 12:18,21 20:1 | reimbursed | 75:1 81:16 | 8:15 14:21 |
| 20:3 29:13 | 24:9 59:8 67:9 | 50:9 | reporter 1:21 | 21:14 24:21 |
| 59:20 66:21 | 70:1 80:6 | reimbursement | 5:1 37:9 | 25:18 32:17 |
| 77:2 | references 38:9 | 52:20 55:3 | reporting 77:17 | 33:19,22 34:1 |
| questions 4:12 | referring 28:21 | reimburseme... | reports 41:3 | 37:16 38:1 |
| 9:22 67:12 | 29:6,6,18 | 71:2 | representation | 40:3 41:7 |
| 72:9 75:14 | 40:22 60:8 | related 43:5 | 67:13 | 43:21 45:10 |
| 79:9,13,15 | 64:17 | 52:19 55:4 | representative | 48:8 54:14 |
| | reflected 18:15 | 59:12 60:12 | 8:13 9:6 12:8 | 55:20 |
| **R** | 19:8 | 61:12 62:9 | 13:19 14:3,7 | responsibility |
| R 4:1 | regarding 3:12 | 63:8 | 14:13,17 15:12 | 15:6 27:3,8 |
| Randolph 2:5 | 51:19 52:10,18 | relates 1:9 57:8 | 15:13 | 33:8 34:10,14 |
| read 5:2 11:19 | 55:3,7,12 | relationship | representatives | 35:19 36:5 |
| 11:20 12:20,21 | 58:13,22 60:1 | 60:2,22 68:9 | 21:16 22:7 | 38:5 41:11,20 |
| 20:1 24:7,9 | 60:20 61:11 | 68:19 69:4,14 | 44:9 48:17 | 42:1,6 43:20 |
| 70:1 80:3 | 62:1 66:16 | relative 82:5,6 | 54:16 55:1 | 45:4 48:12,15 |
| really 12:22 | 67:21 | relevant 71:3 | 70:20 73:9 | 50:13 55:2 |
| 17:6,9 25:21 | region 23:12 | remember 7:5 | represented | 60:3,22 61:13 |
| 50:2 57:4,5 | 38:16 40:1 | 7:10,11 12:5,7 | 25:7 44:10 | 61:17 62:9 |
| 78:9 | 43:17,18 44:3 | 13:8,17 18:8 | 55:10 | 63:17,19 64:6 |
| realm 20:17 | 54:11 | 18:13,16 19:13 | reps 10:15 15:2 | 64:10 65:5 |
| rebates 52:7 | regional 5:14 | 19:18 20:16 | 15:3 21:20 | responsible 9:11 |
| recall 7:8 9:14 | 23:11,19,21 | 23:13,17 28:8 | 49:4,11 53:5,6 | 9:15 14:4,8,13 |
| 11:21 16:5 | 27:10 28:22 | 28:14 30:22 | 53:17,22 71:20 | 15:8 21:1,11 |
| 18:17,19 20:9 | 29:4,7 38:13 | 35:6 45:2 | 71:21 72:2,6 | 21:18,20 23:12 |
| 24:11 26:22 | 39:6 40:4 | 47:22 49:13 | 72:14,18 73:14 | 24:5,14 26:1,9 |
| 30:11,18 31:16 | 41:19 42:5,12 | 51:17 53:15 | 77:15 | 26:11 27:15 |
| 32:6 33:4 36:1 | 42:16 43:14,22 | 54:7 65:19 | requested 58:8 | 30:2,7 32:22 |
| 39:4,16 43:18 | 44:7,17 45:11 | reorganizing | research 34:21 | 38:16 39:3,13 |
| 48:2 52:21 | 46:10 47:1,4 | 56:22 | 34:22 35:2 | 39:22 40:17 |
| 61:8 76:21 | 47:11,14,17 | rep 8:16 10:17 | 40:18 69:1 | 41:14 42:10 |
| 78:4 | 48:7 49:3 50:3 | 13:22 15:5 | 78:19 | 44:21 47:21 |
| receive 5:22 | 50:7,12,21 | 73:11,12 78:10 | reserve 79:17 | 48:4,13 50:10 |
| 9:19 15:13 | 51:3 53:2 54:4 | repeat 5:1 12:19 | residents 54:20 | 50:19 51:8 |
| 22:2,15 24:3 | 54:9,14 55:18 | 68:15 | 55:2,6,8,12 | 56:7 57:18,19 |

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

9

| | | | | |
|---|---|---|---|---|
| 60:16 65:18 | 25:1,10,18 | **Schering-Plou...** | short-cut 37:14 | **stamina** 4:21 |
| 70:4,14 71:7 | 26:1,15 27:4 | 2:21 8:22 9:1,4 | showing 58:10 | **standard** 72:5 |
| 71:12 | 27:18 28:1,4,9 | 10:2 11:7 12:6 | side 41:7 74:6 | **stands** 57:7 |
| **rest** 78:12,17,21 | 28:16,17 29:9 | 13:14 14:1 | 75:5 | **start** 5:15 8:8 |
| **restructures** | 29:10,15,16,22 | 16:17 | signature 79:17 | 9:1 21:8,10 |
| 56:17,21,21 | 30:3 36:13 | **school** 5:16 | 80:1 81:21 | 60:7 62:12 |
| **retail** 13:4,5 | 40:13,18,19 | **Science** 6:8 | sit 57:1,10 79:2 | 69:10 |
| 35:14,21 48:16 | 41:20,21 42:1 | **scientific** 48:19 | skills 9:20 10:14 | **started** 9:13,17 |
| 49:16 50:1 | 45:17 46:4,7 | **scope** 10:22 11:2 | slides 44:10 46:1 | 9:18 21:17 |
| **review** 46:5,6 | 47:10 49:4,11 | 11:9,15 15:16 | 46:3,11,13,16 | 22:1,15,19 |
| **reviews** 46:4,9 | 50:13 53:5,6 | **seal** 82:11 | **SOBOL** 2:3 | 23:6 24:2 |
| **right** 12:10 | 53:17,22 58:13 | **Sean** 67:4 | sold 35:14 | 33:13 64:8 |
| 19:15 32:5,13 | 59:15 60:1,5 | **seats** 76:12,14 | soon 10:11 | **starting** 76:14 |
| 32:14,15 38:5 | 60:15,17,21 | **seen** 58:15,17 | sorry 20:15 24:7 | **state** 1:20,21 5:4 |
| 47:18 54:1 | 61:3,12 62:8 | 66:13 | 30:20 32:5 | 5:19,20 6:4 |
| 59:19 60:14 | 62:11,13,14,19 | **selling** 8:17 9:7 | 37:11 65:13 | 23:15 42:13 |
| 61:19 62:3,20 | 62:22 63:1,1,5 | 9:20 10:14 | **Southern** 21:19 | 57:20 59:17,17 |
| 64:17 66:18 | 63:16,20 64:13 | 12:10 14:8 | 24:14 | 60:22 62:15 |
| 67:1 77:4 78:1 | 64:16,19 65:16 | **send** 26:6 | speak 6:12 | 63:2,6,9,17,19 |
| **Robert** 33:3,21 | 68:8,10,18,20 | **senior** 31:17,18 | 55:11 | 64:14 65:17 |
| **ROBIN** 1:18 | 69:2,5,13,15 | 31:21 32:8,17 | speakers 27:2 | 66:10,12,17,22 |
| 81:5 82:17 | 69:18 70:5,9 | 33:16,17 34:3 | specialists 35:13 | 68:1,5,10,20 |
| **role** 45:18 57:2 | 70:11,19 71:4 | 35:16 36:4,22 | specialty 38:18 | 69:5,15,19,20 |
| 57:14 | 71:8,10,12,20 | 37:17 73:17 | 38:20 40:5,20 | 70:4,6,7,10,13 |
| **roles** 33:14 | 71:21 72:2,6 | 75:2 | 40:21 42:17 | 70:14,20 71:3 |
| **roll** 45:17 | 72:14,17,22 | **sent** 22:21,22 | 47:5,12 54:10 | 71:7,8,11,20 |
| **ROPES** 2:17 | 73:8,9,14 74:2 | 26:10 | 56:4 73:12 | 72:3 80:3 81:1 |
| **Rule** 3:10 58:12 | 74:21,22 75:4 | **separate** 53:9 | specific 18:18 | 81:6 |
| **rules** 11:14 | 75:6,8,12 | 76:21,22 | 19:14,18 20:9 | **states** 1:1 25:7 |
| **running** 29:8 | 76:22 77:15 | **series** 27:1,13 | 20:12 24:3 | 30:8 31:10 |
| | 78:6,7,10,20 | **Serzone** 21:12 | 36:2 53:13 | 40:7 42:9 48:6 |
| **———————** | 79:7 | 22:11 36:21 | specifically 63:8 | 61:13,18 62:1 |
| **S** | **sales-related** | 37:19,22 38:2 | 68:15 | 81:10 |
| **S** 2:12 3:8 4:1 | 68:8,18 69:3 | 38:4,9,21 41:9 | spell 5:7 23:8 | **stayed** 36:18 |
| **safety** 28:3 | 69:14 70:12 | 41:12,15 | 31:4 33:4 | **stenographica...** |
| **sales** 3:12 7:3 | **San** 7:21 | **set** 16:18 17:1 | 39:20 40:10 | 81:16 |
| 8:12,13,15 9:5 | **SAYETH** 79:18 | 82:10 | spend 45:9 | **Steve** 39:19 |
| 9:6 10:15,17 | **saying** 11:14 | **setting** 14:9,10 | spoken 18:5 | 63:22 65:17 |
| 10:18 12:8 | 20:18 | 34:15 41:12 | **Squibb** 2:15 | **stipulate** 67:19 |
| 13:19 15:2,3 | says 59:6 67:15 | **SHAPIRO** 2:3 | 5:12 11:7 | **stopped** 64:11 |
| 15:12 18:10,12 | **scaping** 7:19 8:1 | **sheets** 80:8 | 42:20 43:9 | **Stores** 63:22 |
| 18:15,20 19:9 | **Schering** 9:18 | **short** 48:21 | 51:9 76:1 79:3 | 65:17 |
| 19:11,16,21 | 21:3 | **Shorthand** 1:20 | **SS** 81:2 | **straight** 58:5 |
| 20:4 21:16,20 | | | | |

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006

Chicago, IL

10

| | | | | |
|---|---|---|---|---|
| **Street** 2:5 | 79:14,17 | **Telephonically** | 65:14,21 67:3 | **topic** 59:1,5 |
| **structure** 73:7 | **sworn** 4:3,5 | 2:17 | 67:4 76:13 | 68:14 |
| 76:15 77:7,14 | 80:16 81:13 | **tell** 18:14 29:5 | 78:11 | **tracking** 45:9 |
| 78:6,20 | | 37:15 63:17 | **Third** 2:13 | **trade** 41:20 |
| **structured** 60:4 | _____ | 76:7,16 | **THOMAS** 2:11 | **train** 34:6 |
| 61:1 73:1 78:9 | **T** | **ten** 21:15 31:11 | **thoughts** 46:21 | **trained** 55:6,8 |
| 78:13 | | 32:4 42:18 | **three** 30:17 | 62:14,18 63:1 |
| **SUBSCRIBED** | **T** 3:8 | 54:5 | 55:16 58:20 | **training** 6:17 |
| 80:16 | **tablet** 38:3 | **Tequin** 65:10 | 65:20 66:5 | 9:19,20,21 |
| **substance** 66:8 | **take** 4:19 8:3,5 | **term** 16:8 18:2 | 77:9 | 10:14,14,19 |
| **successfully** | 24:19 26:14 | 57:7 | **three-and-a-h...** | 13:13,14 15:11 |
| 25:13 | 27:4 37:10 | **terminology** | 47:2 | 15:14,19,21 |
| **Suite** 2:6 | 44:22 48:21 | 12:2,3 | **Thursday** 1:17 | 22:2,3,4,6,6,7 |
| **superior** 46:7 | 50:18 58:14,19 | **terms** 17:14 | **time** 4:13,19,19 | 22:16 23:18,19 |
| **supervisor** | 71:15 | 28:1,2,11 | 6:16 8:7,8,11 | 23:21 24:3 |
| 10:16 | **taken** 1:16 6:16 | 44:13 54:13 | 8:16 11:4 12:1 | 26:9 36:12 |
| **Support** 25:17 | **talk** 10:1,2 55:6 | 60:11 | 12:7,15,15 | 53:13 54:21 |
| **sure** 19:22 20:19 | 55:8 59:14,17 | **territories** 59:13 | 13:2 16:6,10 | **transcribed** |
| 26:11 29:14 | 61:16 | **territory** 73:16 | 16:16 17:3 | 81:18 |
| 32:7 44:6 | **talked** 15:9 | 73:17 77:16,16 | 18:8,11,11 | **transcript** 80:4 |
| 48:22 56:19 | 49:14 | **test** 4:21 10:6 | 19:21 20:21 | 80:6 81:19 |
| 59:3 63:21 | **talking** 11:2 | **testified** 4:6 | 22:1 24:2 | **Tried** 43:6 |
| 64:3 68:13 | 28:1,2 54:20 | 76:4 | 26:22 28:19,19 | **Trinalin** 9:16 |
| **suspension** 34:2 | 55:2 | **testify** 67:9,17 | 30:5,22 35:16 | **true** 75:19 80:6 |
| 34:4,8,11 | **TBMs** 73:15 | 75:20 81:13 | 37:2 38:22 | 81:19 |
| 37:21 | **teaching** 54:16 | **testimony** 10:8 | 43:16 44:21 | **truth** 81:13,14 |
| **Sweeney** 2:11 | 54:19,21 | 80:4,7 81:15 | 45:3 50:3,21 | 81:14 |
| 3:5 5:17 9:22 | **team** 25:15 26:6 | 81:20 82:10 | 61:7,11,18 | **try** 4:14 37:14 |
| 10:9 11:17 | 26:15 27:18 | **Thank** 24:10 | 62:9 63:15 | **trying** 11:3 19:4 |
| 12:11,14 13:5 | 28:20,21 29:22 | **thing** 25:22 | 64:5,13 69:19 | **Turner** 63:22 |
| 15:18 17:16,18 | 31:15 32:18,20 | 27:16 | 70:3,13 71:6 | 66:2 |
| 20:6,17 24:7 | 33:12,15 45:17 | **things** 49:7 | 71:11 76:6,11 | **TV** 8:7,9,16,17 |
| 24:10 32:11,15 | 62:17,22 63:1 | **think** 6:19 8:10 | 76:21 77:6,13 | **twelve** 21:16 |
| 35:22 37:7,9 | 63:5 69:18 | 9:2,12,16 15:4 | **times** 29:2 59:13 | **two** 39:10 55:22 |
| 39:8 43:5 | 71:4 | 16:9 29:13 | 76:12 | **type** 9:19 22:22 |
| 48:20 49:17 | **teams** 25:13 | 30:10,17 32:2 | **title** 5:13 31:16 | 26:17 |
| 52:13 59:8 | 28:17 45:8,15 | 32:12 33:10 | 36:22 40:12 | **types** 28:5 30:1 |
| 62:4 65:8,12 | 45:20 46:19 | 34:8 38:21 | 43:12 44:16 | 49:7 51:19 |
| 67:3,11,19 | 60:2,21 62:11 | 39:14 43:16,19 | **titles** 73:10 | 53:20,20 74:3 |
| 70:7 72:10,13 | 62:13,14 | 47:8 48:1 | **today** 4:13 57:1 | |
| 73:5 74:5,9 | **teleconference** | 53:21 54:5,12 | 57:11 61:9 | _____ |
| 75:14,20 77:2 | 27:1,13 | 56:3 59:10,15 | 64:9 79:3 | **U** |
| 77:4,20 79:10 | **teleconferences** | 64:21 65:2,11 | **tools** 70:19 | **uh-hum** 19:7 |
| | 26:5 28:20 | | | 72:21 |
| | 29:19 | | | |

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER   June 1, 2006
Chicago, IL

11

undergone
56:17 76:8
understand
4:13 10:3,7
19:4,22 37:8
49:18 56:19
understanding
12:9 13:10
16:7,10,18,22
17:3,7,10
22:18 49:15,22
50:5,8,17,18
57:2,10,14
62:10 68:3
71:18 79:5
understood 4:17
undertake 61:10
78:19
undetermined
81:10
unique 70:10,13
71:1,8
United 1:1 25:6
30:7 31:9 40:7
48:5 81:10
units 28:11
universities 6:1
University 5:19
5:20 6:4
updates 27:17
27:19 28:5,6,7
29:22 51:14,18
51:20 52:6,9
52:17 53:1
upper 15:1
UPS 7:7,9,13,15
use 18:17 70:20
72:6,18
Utah 5:20
U.S 39:5 40:16

**V**
vague 17:18

73:4
Vancenase 9:16
Vanceril 9:16
verbally 37:7
versus 53:10
63:2
vice 25:17 31:3
40:13 44:7,17
45:11 46:10
74:14,21,22
75:2
visual 18:10,17
19:4,9,11,17
19:21 20:4
27:4 34:5,18
35:5,7 45:14
49:10 53:9
visuals 18:12,15
18:20

**W**
WAC 19:6
Wacker 1:16
waived 81:22
walk 26:15
want 4:19 19:21
32:7 67:8,16
68:13
wanted 46:20
Warner 8:7,8,11
8:16
Warrick 2:22
wasn't 37:20
75:22
way 39:5 59:20
67:15 73:1
went 23:21,22
75:18
weren't 53:22
61:22
west 2:5 38:18
39:1,5 40:5
42:6,17 47:15

47:17 49:4
50:4,8,12,22
51:4 54:4,15
56:9 60:19
61:7 64:18
66:1
western 25:6
30:7 31:9 40:7
48:5
we're 4:15 11:2
19:13 32:8
we've 48:20
56:17 59:11
76:5,8
WHEREOF
82:10
wholesale 1:6
16:8,11 17:1,5
17:8,11,12,19
18:6,6,11 19:2
Wiggins 64:3,5
64:19
Wisconsin 56:9
wit 81:7
witness 3:2 4:3
4:4 5:19 11:21
12:19,22 13:8
15:19 16:2
17:19 20:9,19
24:11 32:14
36:1 37:8,11
39:10 43:6
49:19 58:16,17
62:6 65:10,13
67:10 74:8
75:22 80:1
81:9,12,16,17
81:20,21
Woltemath 23:7
word 4:20
work 6:14 7:4
7:22 13:12
43:5

worked 34:5
36:8,18 49:4
working 6:22
7:9,18 51:12
54:16,19
wouldn't 67:6
wrong 29:13
47:10
W-o-l-t-e-m-a...
23:9

**X**
X 1:4,11 3:1,8

**Y**
yeah 35:18 42:7
51:11 78:4
year 6:5 7:11
8:2 13:20
14:18 21:8
24:16 64:11,12
years 8:20 60:6
60:8,8,11,13
60:13 65:21
66:5 77:9
York 2:14,14

**Z**
ZUCKER 2:12

**0**
001 3:10 58:8,11
004 3:4
01 32:1 43:11
01CV12257-P...
1:7
02 47:8
02110 2:20
058 3:13
072 3:5
075 3:4
084-001999
82:18

| **1** |
|---|
| 1 1:16,18 58:21 |
| 59:3 |
| 1st 80:5 81:8 |
| 10 15:1 |
| 10022 2:14 |
| 12 15:2 |
| 13 15:2 |
| 14 36:16 37:4 |
| 56:15 |
| 1981 6:6 |
| 1982 7:12 |
| 1990 9:2 |
| 1991 57:22 60:4 |
| 61:2,18 68:1,5 |
| 68:11,21 69:6 |
| 69:16 75:19 |
| 1997 21:9 76:1,4 |
| 76:15 77:11,13 |

| **2** |
|---|
| 2nd 9:2 |
| 200 2:6 |
| 2000 77:11,14 |
| 78:5 |
| 2001 32:12 |
| 38:15 39:7 |
| 43:2 60:9,13 |
| 61:6 69:17 |
| 2002 47:16 |
| 2003 54:6 60:10 |
| 60:13 |
| 2006 1:18 80:5 |
| 80:17 81:8 |
| 82:12 |

| **3** |
|---|
| 3 68:14 |
| 30(b)(6) 3:10 |
| 11:8 58:12 |
| 67:10 |

| **4** |
|---|

Henderson Legal Services
(202) 220-4158

Ekborg, Debra   HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER      June 1, 2006
Chicago, IL

12

**42nd** 1:17

**6**
**60** 2:5
**60601** 2:7

**8**
**83** 8:3
**84** 8:4
**85** 8:10
**875** 2:13

**9**
**9:41** 1:18
**91** 62:2
**97** 75:21
**99** 24:20 32:4,5
32:9