# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY AVERAGE
WHOLESALE PRICE LITIGATION

THIS DOCUMENT RELATES TO:

*State of Montana v. Abbott Labs., Inc., et al.*,
D. Mont. Cause No. CV-02-09-H-DWM

*State of Nevada v. Abbott Labs., Inc. et al.*,
CA No. 02-CV-00260-ECR

MDL No. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

# MERITS REPORT AND DECLARATION OF GREGORY K. BELL, PH.D.

# ON BEHALF OF BMS DEFENDANTS

February 8, 2007

## Table of Contents

I.    INTRODUCTION ..............................................................................................................1

II.   SUMMARY OF OPINIONS ...........................................................................................4

III.  BMS ONCOLOGY DRUGS AT ISSUE .......................................................................7

IV.   BMS PRIMARY CARE AND VIROLOGY DRUGS AT ISSUE ...............................9

      A.    List Price and Sales ..............................................................................................10

           i.    Coumadin ..................................................................................................12

      B.    Rebates .................................................................................................................15

           i.    Medicaid ...................................................................................................17

V.    HARTMAN CRITIQUE:  NO POTENTIAL FOR MANIPULATION OF SPREADS ON BMS
      SADS ...............................................................................................................................17

# I.      INTRODUCTION

1.      I am a Group Vice President at CRA International, an economics and management consulting firm.  My education includes a master's of business administration and a doctorate in business economics, both from Harvard University.  Details of my professional experience, publications, and past testimony are described in my curriculum vitae, a copy of which is attached as Exhibit A.  CRA receives compensation for my time at a rate of $700 per hour.  Neither CRA nor I have any financial interest in the outcome of this litigation.

2.      For the past thirteen years, I have directed the Pharmaceuticals practice within the Business Consulting group at CRA.  In this capacity, I have led many projects concerning the economics of business strategy in the pharmaceutical industry, including such projects for defendant Bristol-Myers Squibb Company ("BMS").  Most of my work has focused on product pricing, contracting strategy for managed care organizations ("MCOs") and hospitals, influences on physician prescribing behavior, and product-launch strategy.  In addition, I have submitted numerous expert reports and given testimony in a wide range of cases involving patent disputes, licensing, antitrust, and other issues in the pharmaceutical industry.

3.      With respect to the AWP litigation, Professor Fiona Scott Morton and I prepared an expert tutorial entitled, "An Orientation to the Acquisition of and Reimbursement for Prescription Drugs," submitted on December 3, 2004 ("Tutorial"), and I provided testimony to the Court on December 7, 2004 and testified at trial on November 28, December 7–8, 2006.  I also submitted expert affidavits on behalf of BMS (dated November 17, 2006; the "BMS Class Action Affidavit") and the Track 1 Defendants (dated November 26, 2006; the "Track 1 Class Action Affidavit") for the Multi-District Litigation.  For these cases involving Montana and Nevada, I am also preparing a report on behalf of all defendants as a group ("Defendants' MT NV Report") regarding those elements of the Plaintiffs' allegations that are amenable to treatment at the group level.  My findings in this report incorporate the Tutorial, the BMS Class Action Affidavit,

the Track 1 Class Action Affidavit, my testimony in the class action, and the Defendants' MT NV Report in their entirety and by reference.

4.  Plaintiffs Montana and Nevada (the "Plaintiff States") have alleged an industry-wide "scheme" that spanned both self-administered drugs ("SADs") and physician-administered drugs ("PADs").[1]  Under this scheme, Defendants have allegedly reported "fictitious and fraudulent" AWPs, causing harm to patients, insurers, and other payors such as state Medicaid programs.  I understand that Plaintiffs are claiming damages allegedly sustained by:  the States of Montana and Nevada, patients resident in those states who made out-of-pocket copayments for drugs that were based on AWP, and third party payors ("TPPs") that reimbursed patients, healthcare providers, and pharmacists in Montana or Nevada at rates that were based on AWP.[2]  However, it is also my understanding that Plaintiffs have produced no data and have offered no expert opinion on any damages allegedly sustained by any of these groups, other than the state Medicaid programs.  I limit my analysis accordingly.

5.  I have been asked by counsel for BMS, Oncology Therapeutics Network Corporation ("OTN"), and Apothecon, Inc. ("Apothecon") to testify at trial as an expert on the economics of their business strategies with respect to the drugs at issue in these cases, to respond to Plaintiffs' allegations, and to respond to the arguments and data presented in reports submitted by Plaintiffs' expert, Dr. Raymond S. Hartman.[3]  In particular, I have been asked to render an opinion on

---

[1]   See State of Montana's Second Amended Complaint, August 1, 2003 ("Montana Complaint"), ¶¶ 5–12; State of Nevada's Amended Complaint, August 1, 2003 ("Nevada Complaint"), ¶¶ 5–8.

[2]   Montana Complaint, ¶¶ 13–21 and Nevada Complaint, ¶¶ 9–17.

[3]   The reports specific to these cases as submitted by Dr. Hartman include the following: Calculation of Damages and Penalties for the State of Montana:  Declaration of Raymond S. Hartman, June 13, 2006 ("Hartman Montana Damages Report"); Calculation of Damages and Penalties for the State of Nevada:  Declaration of Raymond S. Hartman, June 13, 2006 ("Hartman Nevada Damages Report"); Calculation of Damages and Penalties for the State of Montana: Supplementary Declaration of Raymond S. Hartman, June 20, 2006 ("Hartman Montana Supplement"); and Calculation of Damages and Penalties for the State of Nevada:  Supplementary Declaration of Raymond S. Hartman, June 20, 2006 ("Hartman Nevada Supplement").  In these reports, Dr. Hartman claims that he has not been provided with data sufficient to calculate damages under Plaintiff States' allegations.  (Hartman Montana Damages Report, ¶ 6 and Hartman Nevada Damages Report, ¶ 6.)  Specifically, Dr. Hartman claims that he was unable to calculate

whether the conduct of BMS at issue has been consistent with standard economic behavior. By standard economic behavior, I mean profit maximizing behavior that does not violate certain well-defined rules, such as those reflected in the antitrust laws or, in this case, those prohibiting fraud.

6.    Although the Montana and Nevada Complaints purport to assert claims with respect to 22 BMS drugs, Dr. Hartman's analysis of liability, damages and penalties focuses on five BMS Oncology drugs, most of which are PADs— Blenoxane, Cytoxan (injectable and tablets), Paraplatin, Taxol, and VePesid (injectable and capsules)—and thirteen BMS Primary Care and Virology drugs, most of which are SADs—Avapro, Buspar, Cefzil (suspension and tablets), Coumadin, Glucophage, Glucophage XR, Glucovance, Monopril, Monopril HCT, Plavix, Serzone, Tequin, and Videx EC. Dr. Hartman does not find liability, damages or penalties for two oncology drugs identified in the Complaints (Etopophos and Rubex) and one Apothecon drug (Fungizone), and there are only two claims involving the other Apothecon drug (Amikin). Because the Apothecon drugs were generics, for which the business model is completely different from brands, I do not analyze them here.[4] I note also that, while some of the BMS Oncology drugs at issue in this case were also at issue in the class actions, the set of NDCs in these cases are different, causing changes in the results of my analysis of sales at list price.

7.    In preparing this report, I have reviewed the materials listed in Exhibit B and cited throughout this report. I have also conducted interviews of several BMS employees. My quantitative analyses of BMS pricing for the products at issue cover the period from 1993 through 2002, based on the data made available for

---

certain average selling prices ("Hartman ASPs"). (Hartman Montana Damages Report, ¶¶ 34 and 35 and Hartman Nevada Damages Report, ¶¶ 35 and 36.)

[4]    The business model for generics typically involves establishing a list price at launch that is below that of the brand, thereby signaling to the market that the product is a generic, and then offering discounts as the market requires. As a result, there may not be substantial sales at list price, as there are for brands, although my preliminary analysis suggests that there were substantial sales at list price for Amikin and Fungizone.

this litigation, although I note that BMS rebate data as recorded in the CARS/IS system is available only as far back as 1997. I reserve the right to supplement or modify my opinions, if warranted, and to prepare additional supporting materials, such as summaries, graphical exhibits, or charts.

8. I summarize Plaintiffs' allegations in the Defendants' MT NV Report and note nothing further specific to BMS or OTN. The next section of this report presents a synopsis of my opinions as they relate specifically to the BMS products at issue. The third section summarizes certain elements of the BMS Class Action Affidavit as they relate to the BMS Oncology drugs at issue in this case. The fourth section addresses the BMS Primary Care and Virology drugs at issue. The fifth section provides a critique of Dr. Hartman's damages claims.

## II.  SUMMARY OF OPINIONS

9. My opinions specific to the BMS products at issue in this matter may be summarized as follows:

   a. The BMS price reporting practices are reasonable and appropriate. BMS reports the Wholesale List Price ("WLP" or simply "list price") for its products to the pricing publications. The vast majority of BMS net revenue at issue in this case, 89 percent, is generated from transactions at or about this list price. The pricing publications, such as the Red Book, apply a mark-up factor to the WLP to calculate AWP. BMS does not have any control over how the pricing publications use the BMS list price information to produce an AWP.

   b. The BMS list prices are determined in a manner that is consistent with standard economic behavior. For products subject to patent protection, BMS establishes a list price at launch based on an assessment of the market conditions, including the price of competing therapies. Over time, BMS may implement list price increases on a regular basis and as appropriate, again typically based on an assessment of the market conditions, including the price of competing therapies. Once a product

4

loses patent protection and becomes subject to generic competition, BMS generally does not implement further list price increases.

c.  Under some circumstances, most often as a result of therapeutic or generic competition, BMS offers price concessions that result in net revenues which are less than the revenue that would be realized from sales at the list price.  This is the expected outcome of competition for the business of a particular physician, hospital, or MCO.  Nonetheless, it would not be economically rational for BMS to lower the list price; to do so would cause BMS to lose revenue on those sales continuing to be made at or about list price.

d.  Thus, I conclude that the BMS pricing practices at issue, including the list prices, are the result of a business model that appropriately responds to the competitive pressures brought forth by therapeutic and generic competition.  BMS uses rebates as price concessions with respect to the Primary Care and Virology SADs at issue as an appropriate response to the presence of therapeutic competition and the ability of MCOs to influence prescribing preferences through formulary position.  In most instances, the result is likely to be a "negative spread"—the TPP's reimbursement, net of the rebate, is likely to be less than the retailer's acquisition cost.  My analysis of BMS's direct sales, chargeback and rebating practices for these SADs indicates that no material discounts or rebates were given to the retail class of trade.

e.  Further, I conclude that the BMS pricing practices at issue benefit the Montana and Nevada state Medicaid programs through the Medicaid legislation introduced with the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90").  Currently, at a minimum, the state Medicaid programs are eligible to receive a rebate from BMS equal to 15.1 percent of the Average Manufacturer's Price ("AMP") for the BMS "innovator" (i.e., branded) products and 11 percent of the AMP for any BMS "non-

5

innovator" (i.e., generic) products dispensed under the state Medicaid programs.[5]  For innovator products, to the extent that BMS provides more substantial price concessions to some purchasers, the "best-price" provisions of the legislation require that the state Medicaid programs also be eligible to receive the benefit of those price concessions in the form of additional rebates paid by BMS.  The result is typically a negative spread—the state's reimbursement, net of the Medicaid rebates which the state is entitled to claim, is likely to be less than the retailer's acquisition cost for the BMS SADs at issue.  A similar "negative spread" below the physician's acquisition cost for the BMS PADs at issue would also likely occur, but for the fact that state Medicaid agencies generally fail to apply for Medicaid rebates on PADs.

f.      With respect to the marketing practices of BMS, I note that there could not have been any instances of "marketing the spread" to physicians regarding BMS Primary Care or Virology SADs.  Physicians neither bought nor were reimbursed for such SADs; further, rebates were paid to TPPs, not physicians or retail pharmacies.  As noted in the BMS Class Action Affidavit, to the extent that BMS Oncology and/or OTN sales representatives explain the relationship between acquisition cost and reimbursement for PADs to their physician customers, that is consistent with standard economic behavior.  Many businesses engage in activities that are designed to assist customers in understanding the financial consequences of their potential transactions; such activities are economically beneficial.

g.      My analysis shows that not only are Plaintiffs' allegations concerning spread marketing without merit as to the BMS Oncology drugs, they are non-sensical with respect to the BMS Primary Care and Virology SADs at issue.  Retail pharmacies are the primary providers of SADs to Medicaid

---

[5]      http://www.cms.hhs.gov/MedicaidDrugRebateProgram/.

recipients.  BMS provided virtually no discounts or rebates to retail pharmacies, implying that this class of customers paid the list price.  In other words, there was no "spread" to retail pharmacies on Montana and Nevada Medicaid prescriptions (beyond that created by the publications' mark-ups) that would support Plaintiffs' allegations.  Because states generally discount the publications' mark-ups in setting their reimbursement amounts, I find that the difference between Montana and Nevada Medicaid reimbursement and retail pharmacies' acquisition cost (i.e. list) on the BMS Primary Care and Virology SADs is generally less than $5 per prescription.  This profit is consistent with the need to compensate pharmacists for insufficient Medicaid dispensing fees as compared to the actual costs of dispensing prescriptions to Medicaid recipients.  As a result, pharmacists are not realizing any spread from dispensing SADs to Medicaid patients that would alter their behavior as providers as Plaintiffs allege.  Moreover, the states benefit from BMS's discounting to other classes of trade besides retailers through the Medicaid rebate mechanism.  After accounting for such rebates on the BMS SADs, Montana and Nevada pay significantly less than the statutory reimbursement rate (e.g., AWP – 10 or 15%) that they pay to the retail pharmacists.

## III.   BMS ONCOLOGY DRUGS AT ISSUE

10.   As explained in the BMS Class Action Affidavit, the BMS Oncology Drugs at issue in these cases—Blenoxane, Cytoxan, Paraplatin, Taxol and Vepesid—are primarily injectible PADs; however, certain formulations of Cytoxan and Vepesid are produced in a tablet or capsule form that can be self-administered.  The BMS "business model" for all of these drugs was to establish a list price at launch, to raise or maintain that price during the period of patent exclusivity, and to hold the list price steady and engage in selective discounting once generic competition

entered.[6]  Even after generic competition entered, however, BMS continued to achieve substantial net revenues from sales transacted within five percent of the list price from "brand-loyal" customers or others who had not negotiated for discounts.

11.    The methodology supporting my analysis of the prices of the BMS drugs at issue in these cases is outlined in Exhibit D.

12.    Exhibit E depicts the average discount, including chargebacks, by product by year for each product at issue in the case.  The exhibit encompasses all classes of trade, with the exception of government institutions, such as the Veterans' Administration, and PHS hospitals.

13.    Exhibit F segments the transactions reflected in Exhibit E according to the net revenue realized (net of discounts but not rebates) as a percentage of the list price, WLP.  For the BMS Oncology drugs at issue, during the data period analyzed, BMS achieved 86 percent of its net revenues in sale transactions priced within five percent of list price.

14.    My analysis of BMS pricing for the BMS Oncology drugs at issue reveals that, when these products were single-source, an overwhelming proportion, 95 percent, of all net revenues was realized through sale transactions priced within five percent of list price.

15.    My analysis of BMS pricing for the BMS Oncology drugs at issue reveals that when these products lost patent exclusivity and generic alternatives became available, there were some instances of significant price concessions. Nonetheless, BMS continued to realize a substantial portion of its net revenues through sales within 5 percent of list price during the years subject to analysis that

---

[6]    There was one exception during the data period:  the WLP of VePesid capsules increased by 8.0 percent in January 2002 after generic capsules entered the market in November 2001.  (Pricing Revised.xls and IMS sales data)

these products confronted generic competition.[7]  For the products at issue in these cases, the figure is 27 percent as shown in Exhibit F.

16.     Based on my review of the depositions of BMS sales representatives and BMS documents produced, I found that BMS sales representatives emphasized the clinical aspects of products in their detailing to physicians.  They also "answered reimbursement questions when asked.  In my opinion, however, it would also be reasonable and appropriate for the BMS sales representatives to initiate a discussion with physicians regarding the acquisition cost and reimbursement of BMS products."[8]

## IV.     BMS PRIMARY CARE AND VIROLOGY DRUGS AT ISSUE

17.     The BMS Primary Care drugs at issue in this case are:  Avapro (irbesartan), Buspar (buspirone hydrochloride), Cefzil (cefprozil), Coumadin (warfarin sodium), Glucophage and Glucophage XR (metformin hydrochloride), Glucovance (glyburide; metformin hydrochloride), Monopril and Monopril HCT (fosinopril sodium), Plavix (clopidogrel bisulfate), Serzone (nefazodone hydrochloride), and Tequin (gatifloxacin).  There is also one BMS Virology SAD at issue in the case:  Videx EC (didanosine).  These products are briefly described in Exhibit C.

18.     Like its strategy for the Oncology products, the BMS pricing strategy for its Primary Care and Virology drugs reflects the market conditions confronted by each of its products.  As discussed below, however, the general principles of patent exclusivity and therapeutic and generic competition that affect list pricing and price concessions are the same across all drug categories.  The principal difference between BMS Oncology PADs and Primary Care/Virology SADs is the form of the price concessions and the identity of the party likely to receive them.  With respect to the BMS Primary Care and Virology drugs at issue, the

---

[7]     See BMS Class Action Affidavit ¶ 48 and my Class Action trial testimony for a discussion of Taxol pricing in 2002.

[8]     BMS Class Action Affidavit, ¶¶ 59–67 at 66.

price concessions are primarily in the form of rebates.  They are paid primarily to TPPs as a result of the BMS product being in a preferred position on a formulary; the price concessions are not discounts that reduce the acquisition costs of retail pharmacies, the principal providers of SADs.

### A.   LIST PRICE AND SALES

19.   As it does with Oncology products, BMS typically engages in market research to determine an appropriate list price for Primary Care and Virology products, a price at which the vast majority of revenue will be realized, at least until the advent of significant therapeutic competition and maybe until the launch of generic competition.[9]  Over the patent period, BMS will take periodic list price increases in recognition of prevailing market conditions, including the prices of competing therapies.  Once a product loses patent protection and faces generic competition, BMS generally does not implement further increases in list price; nor does it reduce list price.[10]  At this point, BMS generally makes no further list price changes to report to the pricing publications, thus the list price remains unaltered.  As noted with respect to Oncology drugs, this lifecycle of price increases while the product is protected by a patent and generally no price changes once the patent expires is fairly common in the pharmaceutical industry.

20.   While the product is on patent, there are some customers who pay below list price based on their preferred status.  For instance, the federal government negotiates and pays preferred prices for BMS products on the Federal Supply Schedule ("FSS").[11]  Some hospitals, those which provide care to uninsured and indigent

---

[9]   In the initial weeks of a product's launch, BMS might provide wholesalers a small discount from list price as an incentive for them to purchase the new product and to distribute it to retailers, thus ensuring that the product will be available at the pharmacy as physicians begin writing prescriptions.  Such discounts, often termed "stocking allowances", explain the higher level of price concessions that I observe during the launch periods for Glucophage XR, Glucovance, and Tequin.  (Interview with Vincent Bilinsky, Vice President, Trade Sales, U.S. Pharmaceuticals Group, April 17, 2006.)

[10]   Pricing Revised.xls, buspar_rubex.xls, WLP PRICING FOR MONTANA MDL.xls, and Declaration of Zoltan Szabo, October 25, 2004, ¶ 3.

[11]   There is no statutory determination of the FSS price; instead, the Veterans' Administration ("VA") negotiates FSS prices with BMS.  See BMSAWP/0044178–199 at 0044182.

patients, are qualified to access PHS prices, a set of reduced prices that pharmaceutical companies make available to these institutions.[12]  Other than the exceptions for certain classes of trade, which typically do not include retail drug stores, BMS will generally be able to sell its branded Primary Care and Virology SADs at list price.

21.    Where therapeutic competition exists, other institutions may negotiate with BMS for a preferred price.  If the sale to these institutions is direct, the preferred price is achieved as a discount; if the sale goes through a wholesaler, the preferred price is realized through a chargeback.  In virtually all cases, discounted prices are only offered to those institutions that can influence prescribing patterns through a formulary.  These institutions include hospitals, long-term care facilities, staff-model health maintenance organizations ("HMOs"), mail-order pharmacies owned by pharmaceutical benefit managers ("PBMs"), and TPPs.  Before a BMS product is placed on a formulary, each of these institutions first subjects the BMS product to a clinical review; it is only after the product passes the clinical review that the institution might negotiate for a reduced price in return for a preferred placement of the BMS product on the institution's formulary.  BMS is willing to offer discounts in return for a preferred position on the formulary because it expects an increased share of prescriptions.  The institution benefits because therapeutic competition among the pharmaceutical manufacturers leads to lower net prices for pharmaceuticals and reduced costs of care.

22.    The methodology supporting my analysis of BMS pricing for the Primary Care and Virology drugs in these cases is outlined in Exhibit D.  Exhibit E depicts the average discount, including chargebacks, by product by year for the products at issue in the case.  The exhibit encompasses all classes of trade, with the exception of government institutions, such as the Veterans' Administration, and PHS hospitals.  As indicated by the shading, BuSpar, Coumadin, and Glucophage were the only SADs that faced generic competition during the period for which BMS

---

[12]    http://www.hrsa.gov/opa/introduction.htm.

price data was available and produced.  Note that except for the launch year for Glucophage XR, Glucovance, and Tequin (see f.n. 9 above), the average discount almost never exceeds five percent when the product is single-source and the average discount for all of the SADs at issue during the time period is only 2.7 percent.

23.      Exhibit F segments the transactions reflected in Exhibit E according to the net revenue realized (net of discounts but not rebates) as a percentage of the list price, WLP.  Exhibit F shows that, over the entire period, 90.4 percent of net revenues for the Primary Care and Virology drugs at issue were realized through sale transactions priced within five percent of WLP.  For the years covered by the data during which the BMS Primary Care and Virology drugs were single-source, 90.3 percent of the sales revenue was realized at transaction prices that were within five percent of WLP.  For the years during which those drugs were subject to generic competition, 91.3 percent of the sales revenue was realized at transaction prices that were within five percent of WLP.[13]

24.      Accordingly, I find that for the BMS Primary Care and Virology drugs at issue, as for the BMS Oncology drugs at issue, the overwhelming proportion of all net revenues was realized in sale transactions at prices that were at or about list price.

### i.      Coumadin

25.      For a couple of reasons, Coumadin stands out as an exception to the standard BMS business model as it relates to pricing.  First, for most of the period at issue, Coumadin was manufactured and marketed by DuPont Pharmaceuticals Co. ("DuPont"); BMS acquired the Coumadin brand in October 2001 when it purchased the pharmaceutical operations of DuPont.[14]  Second, Coumadin has

---

[13]      The reason the figure goes up after generic entry is chiefly due to Coumadin, which is discussed immediately below.

[14]      "Bristol-Myers Buys DuPont Unit," *Wall Street Journal*, October 3, 2001.  BMS provided CRA with certain historical Coumadin sales data going back to 1997 (Exhibit D).  I understand that these data were obtained by BMS as part of the acquisition.  Unfortunately, these data are not as complete or as detailed as the data BMS maintained on the other drugs at issue (for example, there

certain clinical attributes that tend to lead to a lower likelihood of generic substitution once generics become available.  In fact, even though patent protection for Coumadin lapsed in 1962, concerns regarding bioequivalence and bioavailability kept generic versions off the market until 1997.[15]  As a result, BMS, and likely DuPont as well, tended to price Coumadin differently after it became subject to generic competition than was typically the case for other branded drugs.  The list price for Coumadin continued to increase after the advent of generic competition and the sales volume did not decrease by as much or as rapidly as was observed for other drugs facing generic competition.[16]

26.     Coumadin is classified as a Narrow Therapeutic Index ("NTI") drug.[17]  The critical feature of an NTI drug is that a small variance in the dose of the drug can have significant clinical implications.[18]  Given the severity of the condition for which Coumadin is typically prescribed, to prevent blood clots in patients at risk of stroke or heart attack, and its long-term use for many patients, it is my understanding that physicians were especially concerned about substituting a generic version of warfarin sodium for someone already stabilized on Coumadin, despite the FDA certification of bioequivalency.  For instance, one study found that 58 percent of pharmacists and physicians expressed that they would be unwilling to substitute generic warfarin sodium for Coumadin, whereas only 6 percent were unwilling to substitute the generic for another branded NTI, Procan SR, also prescribed for cardiovascular conditions.[19]

---

is no way to identify and remove sales to federal entities from these data) and these limitations have somewhat restricted my analysis.

[15]   Rankin, Ken. "Leaders seek new strategies to strengthen generic industry," *Drug Store News*, August 18, 1997.

[16]   "Generic Pharmaceuticals," PaineWebber, November 4, 1999 ("Generic Pharmaceuticals-Paine Webber"), p. 38.

[17]   "Guidance for Industry," Center for Drug Evaluation and Research, November 1995, Appendix A.

[18]   http://www.fda.gov/cder/news/ntiletter.htm.  The bioequivalence 'goalposts' for a generic drug is 80 to 125% of the reference listed (innovator) drug's bioavailability.

[19]   "Specialty Pharmaceuticals:  Barr Laboratories," CIBC World Markets, May 13, 1999, ("CIBC Specialty Pharmaceuticals") p. 11, Exhibit 7.

27.     Presumably because of the NTI concern, when confronted with generic competition, Coumadin was able to retain a large share of molecule unit sales transacted at prices close to WLP.  After one year of generic competition, Coumadin still accounted for 75 percent of molecule sales volume, implying only 25 percent generic erosion, as compared to typical generic erosion rates of 60 to 80 percent within a year of generic entry.[20]  As late as 2002, Coumadin retained slightly more than 50 percent of molecule sales and provided BMS $324 million in net revenues.[21]  Because of the high retention rate, it was appropriate, from a business perspective, for DuPont, and later BMS, to continue pricing and managing the product like a single-source drug, including regularly raising Coumadin list prices, but offering selective discounts in response to generic competition.[22]  Through selective discounting, Coumadin was able to retain a greater share of molecule sales than it would have otherwise and earn greater profits.  For each year during the period from 1997, when the first generic version of warfarin sodium was launched, through 2002 at least 80 percent of Coumadin net revenues were realized through sale transactions priced within five percent of WLP; during this entire period, 91 percent of Coumadin net revenues were realized through sale transactions priced within five percent of WLP.[23]

28.     In 2002, the first full year in which BMS owned Coumadin and the only year in which the data permit a class-of-trade analysis, retail drug stores accounted for less than 0.4 percent of direct purchases of Coumadin.  On these direct purchases, retailers effectively received no discounts below WLP.  On indirect transactions, retailers only received $653,000 in chargebacks from 1998 through 2002.  Given that Coumadin net revenues totaled $1.4 billion over this period and retailers

---

[20]   CIBC Specialty Pharmaceuticals, p. 11, and Generic Pharmaceuticals-Paine Webber, p. 38.

[21]   IMS Sales Data (BMS/AWP/001512267) and Exhibit E.

[22]   Deposition of John Ehret, September 8, 2006, pp. 147–148 and Interview with Frank Marra, Director, Targeting and Alignments, February 5, 2007.

[23]   These figures are understated.  Because of the limitations of the data that BMS received from DuPont, CRA was unable to exclude the discounted sales to federal entities.  See f.n. 14 and Exhibit D.

accounted for a significant portion of these revenues, the chargebacks to retailers generated a de minimus discount.[24]

**B.    REBATES**

29.    During the period at issue, most MCOs did not use formularies for PADs, but they did use formularies to influence prescribing behavior for SADs.  Where there existed therapeutic competition, MCOs (or their PBMs) tended to use a preferred formulary position to influence prescribing behavior in favor of one product or another.  In these situations, provided the product's clinical attributes were such that the MCO's Pharmacy & Therapeutics ("P&T") Committee deemed formulary position appropriate, a BMS account representative might have offered a rebate on the product prescriptions reimbursed by the MCO in return for a preferred position on the formulary and the expectation of a greater share of prescriptions.

30.    BMS typically expressed its rebates on Primary Care and Virology SADs as a percent of its list price; rebate amounts were calculated as the percentage rebate times the volume of the prescriptions reimbursed calculated at WLP.[25]  On average, these rebates do not represent a significant percentage of BMS revenue for the Primary Care and Virology SADs at issue; as shown on Exhibit G, the rebates on these drugs average less than 2.0 percent of revenue at WLP from 1993 through 2002.  In general, the rebates were paid only to those institutions that were expected to favorably influence sales of the related BMS single-source products that were subject to therapeutic competition.  As a result, the rebates could be significant to those particular TPPs that placed the BMS product in a preferred position on the formulary but other TPPs would receive no rebates.

31.    For those BMS products that confronted therapeutic competition, the magnitude of the rebates offered to TPPs was generally related to the expected influence on prescribing behavior—BMS would be willing to offer a higher rebate to a TPP, if

---

[24]    BMS data.
[25]    BMS/AWP/00259613–648 at 635; BMS/AWP/00969157–170 at 166; BMS/AWP/00259402–413 at 411.

BMS expected a greater share of prescriptions to result.  For those BMS products that did not confront significant therapeutic competition, rebates were generally not paid as there was no need to compete for a preferred position on formularies.  Such rational economic behavior is what one would expect and it was obviously what the MCOs (or their PBMs) expected as they were the parties that negotiated and received the price concessions in return for the preferred position on their formularies.

32.     Typical BMS contracting strategies evolved over time and over the product lifecycle.  For instance, BMS could pay a rebate to the TPP that was based on access, i.e., the BMS product was available on a preferred tier of the formulary or the product was not subject to prior authorization.  Access rebates may have been described based on the number of competing products that shared preferred access, e.g., the BMS product must be one of only two competing products with preferred access.[26]  Typically, BMS would have paid a higher rebate to the TPP if the BMS product were to be one of two competing products which shared preferred access as opposed to being one of three competing products which shared preferred access—the former tended to be associated with a higher share gain for preferred access than the latter.  BMS also paid rebates to TPPs based upon its share of the prescriptions reimbursed across the therapeutic category or an otherwise defined set of competing products.  As one would expect, BMS tended to offer TPPs a higher rebate for a greater share of prescriptions.[27]  A TPP that was receiving a significant rebate from BMS but was paying a retail provider only a small premium above WLP was likely incurring a net cost for the product, which was less than the retailer's acquisition cost.  These would be instances of "negative spread."

---

[26]     For examples, see BMS/AWP/00260342–373 at 361–366; BMS/AWP/00259613–648 at 622–635; BMS/AWP/00969157–170 at 165–166; BMS/AWP/00259402–413 at 411; BMS/AWP/00968954–981 at 967–971.

[27]     For examples, see BMS/AWP/00260003–018 at 011–012; BMS/AWP/00969451–465 at 458–460; BMS/AWP/00260142–154 at 149; BMS/AWP/00969377–396 at 385–389; BMS/AWP/00259223–254 at 237–240.

33.     As one would expect, the average rebates tended to be highest for the single-source product (Monopril) facing the most significant therapeutic competition.  In contrast, Plavix represents a BMS product that did not confront significant therapeutic competition.  As a consequence, BMS paid no rebates on Plavix, even as it was becoming one of the top-selling pharmaceuticals in the U.S. with sales reaching $1.5 billion in 2002.

**i.     Medicaid**

34.     Under OBRA 90, Medicaid currently receives 15.1 percent of AMP as a rebate from branded pharmaceutical manufacturers, unless the best price for a product, often set due to rebates paid to TPPs for a preferred position on formulary, is even lower.  The state Medicaid programs thus benefit from the price concessions that BMS grants to TPPs even though the states do not offer the BMS product a preferred position on a Medicaid formulary.  Some states may choose to institute a Medicaid formulary, generally referred to as a preferred drug list ("PDL").  In those circumstances, not only does the state Medicaid program benefit from best-price rebates, but it may also collect supplemental rebates from the preferred products on its own formulary.  Neither Montana nor Nevada took advantage of this opportunity with respect to BMS drugs.  However, the total amount of standard Medicaid rebates that these states obtained was substantial, as shown on Exhibit I.

## V.     HARTMAN CRITIQUE:  NO POTENTIAL FOR MANIPULATION OF SPREADS ON BMS SADS

35.     See the BMS Class Action Affidavit and my Class Action Testimony for a critique of Dr. Hartman's analysis of damages for the BMS Oncology products at issue.

36.     Dr. Hartman asserts liability and calculates damages for the BMS single-source Primary Care and Virology drugs whenever Medicaid reimbursement exceeds AWP – 16.6% or AWP – 20%, maintaining that either 83.4 percent or 80 percent of AWP respectively is a measure of retailer acquisition cost.  In his report, Dr.

Hartman asserts liability and calculates damages for drugs subject to generic competition whenever Medicaid reimbursement exceeds AWP – 16.6% or AWP – 66%, maintaining that 83.4 percent or 34 percent of AWP is a measure of retailer acquisition cost.[28]  However, Dr. Hartman failed to treat certain BMS drugs as multi-source when these drugs did face generic competition.

37.    I find Dr. Hartman's approach faulty for several more fundamental reasons.  First, the BMS data are sufficient to calculate an average selling price ("ASP") to the retail class of trade on the BMS Primary Care and Virology drugs, just as Dr. Hartman did when calculating his "Hartman ASPs" for BMS Oncology drugs in the Class Actions.  As discussed below, based on my analysis of the BMS data – namely the SHARP, Prime Vendor, and CARS/IS databases—I find that the principal Medicaid providers of Primary Care and Virology drugs, namely retail pharmacies, do not receive material discounts or rebates from BMS and that, therefore, the ASP of BMS single-source SADs for that class of trade (and therefore the retail acquisition cost) is at least WLP.[29]

38.    Second, Dr. Hartman does not explain how the "spread" on BMS Primary Care or Virology drugs, to the extent that there is any, leads retail pharmacies to alter their dispensing practices to the benefit of BMS and the detriment of the state Medicaid agencies.

39.    Third, Dr. Hartman assesses damages in the fixed amount of $3,000 per claim in Montana and $7,500 per claim in Nevada whenever a Medicaid reimbursement exceeds his threshold.[30]  My analysis indicates that this penalty is likely to be hundreds of times greater than any profit which may be earned by pharmacists dispensing BMS drugs.  Dr. Hartman provides no economic justification for assessing penalties of $3,000 in Montana and $7,500 in Nevada whenever a retail

---

[28]    Hartman Montana Damages Report, ¶ 24 and Hartman Nevada Damages Report, ¶ 23.

[29]    WLP is the price charged to wholesalers who provide the drug to retail pharmacies.  To the extent that wholesalers mark up the price of the drug to their retail pharmacy customers, retail pharmacies pay more than WLP.  WLP is therefore, to use a term that Dr. Hartman often uses, a "conservative" measurement of retail pharmacies' acquisition cost for the BMS SADs.

[30]    Hartman Montana Damages Report, ¶ 20 and Hartman Nevada Damages Report, ¶ 21.

pharmacy receives $0.01 more than its drug acquisition cost as Medicaid reimbursement from the state.

a.  In Exhibits E and F of this report, I examine the price concessions BMS provided to all classes of trade (other than federal entities) on the drugs at issue in these cases.   Using the "customer codes," the data also permit an examination of discounting by class of trade (e.g. hospital versus pharmacy).

b.  I have performed such an analysis and have concluded that BMS provided virtually no discounts or rebates to retail pharmacies for its Primary Care and Virology drugs, which drugs drive the overwhelming majority of Dr. Hartman's "penalty" calculations for BMS.  Overall, the retail class of trade received less than $750,000 in chargebacks (which reflect contractual discounts received by the customer at the time of purchase) as compared to $389 million that BMS granted to other classes of trade for these drugs.[31]  Given that the overall revenues were nearly $25 billion for the BMS SADs at issue from 1993 through 2002[32] and that these drugs are largely dispensed through retail pharmacies, the chargebacks to the retail class of trade are negligible.  Similarly, because retail pharmacists lack any ability to significantly influence physician prescribing behavior,[33] the retail pharmacies also did not receive any substantial rebates on their sales of the BMS SADs at issue; as shown in Exhibit H, the retail class of trade received less than two percent of these rebates.[34]

c.  I conclude therefore, this class of customers paid the BMS WLP (or more) for the BMS Primary Care and Virology drugs, i.e., the BMS WLP is a conservative measure of the retail pharmacist's acquisition cost.  The

---

[31]  BMS data.

[32]  Exhibit E.

[33]  *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 783–85 (7th Cir. 1999).

[34]  Analysis of the few rebates granted to retail pharmacies shows that they are limited to three drugs, Glugophage, Glugophage XR, and Glucovance, and primarily paid to one retail entity, Wal-Mart.

profit earned by the pharmacist on the drug is then the difference between the reimbursement amount from the state Medicaid agency and WLP. These amounts are calculated on a per prescription basis as shown on Exhibits J-1 for Montana and J-2 for Nevada; they are usually less than $5 per prescription.  The drops in these amounts in 2002 and 2003 reflects the July 2002 and August 2002 decline in Medicaid reimbursement in Montana and Nevada, respectively, from AWP − 10% to AWP − 15%.[35]

d. Further, studies have shown that the dispensing fee paid by Medicaid is often inadequate to fully compensate retail pharmacists for their costs to dispense drugs.[36]  Given this shortage, the excess of reimbursement over ingredient cost, as shown in Exhibits J-1 and J-2, is consistent with an attempt to compensate pharmacists more fully for their dispensing costs.

40. Fourth, Dr. Hartman's approach does not consider the substantial rebates paid by BMS to the Montana and Nevada state Medicaid programs.  Exhibits J-1 and J-2 also show that the Montana and Nevada Medicaid programs received substantial rebates ranging from 12 to 72 percent of their reimbursements for BMS Primary Care and Virology drugs.

41. In sum, I conclude that BMS pricing of the Primary Care and Virology drugs at issue did not harm Montana and Nevada by providing retail pharmacists with large spreads.  Retail pharmacists had no control over the prescribing of single-source drugs and the small amount of profit that the pharmacist made on dispensing these drugs to Medicaid recipients was generally needed to support an

[35] Montana and Nevada changed from AWP–10% to AWP–15%, effective July 2002 (MT 00039–43 at 40) and August 2002 (NV 00187–228 at 189; NV 00343–393 at 348), respectively.

[36] Studies show dispensing costs ranging from $6.08 to $10.50 (Assessment of Adequacy of Reimbursement Rates to Pharmacies and Its Impact on the Access to Medication and Pharmacy Services by Medicaid Recipients, HCFA Contract No. 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, 8/25/1993, p. 39; "2005 NCPA-Pfizer Digest," National Community Pharmacists Association, 2005, p. 49; and Polzin, Paul E., and Timothy P. Stratton, "2002 Survey of Montana Community Pharmacies," Montana Pharmacy Association, January 2003, p. 5), as compared to Medicaid dispensing fees in Montana ranging from $2.00 to $5.45 (drug_clm_disp_fee in drug_90_05.txt) and in Nevada from $4.42 prior to January 1995 (NV 00070–104 at 71 and 83) to $4.64 from 1/1/1995 to 12/17/2003 (NV 00343–393 at 346).

otherwise inadequate dispensing fee.  Moreover, BMS pricing practices for its drugs benefit Montana and Nevada to the extent that price concessions to other classes of trade result in greater Medicaid rebates.  After accounting for the Medicaid rebates paid by BMS, the net cost to the Montana and Nevada Medicaid programs for the BMS Primary Care and Virology drugs is significantly less than the statutory reimbursement rate (AWP – 10 or 15%) paid to the retail pharmacists.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on February 8, 2007.

_____

Gregory K. Bell