**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION  ) ) ) ) | MDL No. 1456 |
| ) | Civil Action No. 01-CV-12257-PBS |
| ) ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ) ) | |
| *State of Montana v. Abbott Labs Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM ) ) ) ) ) | |

**MEMORANDUM IN SUPPORT OF NOVARTIS PHARMACEUTICALS
CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

NPC'S STATEMENT OF UNDISPUTED FACTS................................................................... 2

  A. NPC's Sales and Marketing Methods................................................................. 2

  B. The NPC Drugs At Issue Here............................................................................ 3

      1. NPC's Self-Administered Drugs ("SADs") At Issue Here........................ 3

      2. NPC's Physician-Administered Drugs ("PADs") At Issue Here............... 4

  C. NPC's AWP is Based on a Mathematical Formula Applied to Its Wholesale Acquisition Cost, and NPC Disclosed that AWP Was Not An Actual Price ......................... 4

  D. Plaintiff Based Its Reimbursements to Providers on AWPs Set and Published by First DataBank, Which Often Were Greater than the AWPs that NPC Reported to FDB.......... 5

  E. NPC Provides Rebates and Price Discounts to Entities That Influence Which Drugs Physicians Prescribe............................................................................................. 6

ARGUMENT.................................................................................................................................. 7

  A. The Undisputed Facts Mandate Dismissal of Montana's Unfair Trade Practices Claims (Counts I & II) .................................................................................................... 8

      1. NPC's AWPs Were Not Deceptive............................................................. 8

      2. Montana Suffered No Injury By Virtue of NPC's Actions........................ 9

  B. The Undisputed Facts Demonstrate that NPC Did Not Violate Montana's Medicaid Fraud Act (Count III) ....................................................................................... 11

  C. The Undisputed Facts Do Not Support Montana's False Claims Act Claim  (Count IV) 12

CONCLUSION............................................................................................................................ 13

# TABLE OF AUTHORITIES

Page

*Bahlman v. Washoe Medical Center*,
   No: CV0400750, 2005 WL 4020525 (Nev. Dist. Ct. Dec. 2, 2005).......................... 9

*Benoit v. Technical Mfg. Corp.*,
   331 F.3d 166 (1st Cir. 2003)..................................................................... 7

*Doll v. Major Muffler Centers, Inc.*,
   208 Mont. 401, 687 P.2d 48 (Mont. 1984) ................................................ 9

*In re Estate of Kindsfather*,
   326 Mont. 192, 108 P.3d 487 (Mont. 2005) .............................................. 11

*FTC v. Patriot Alcohol Testers, Inc.*,
   798 F. Supp. 851 (D. Mass. 1992) ............................................................. 8

*Mass. Farm Bureau Fed'n v. Blue Cross of Mass., Inc.*,
   532 N.E.2d 660 (Mass. 1989) ................................................................... 10

*Osterman v. Sears, Roebuck & Co.*,
   No: BDV 99-522(c) (Cascade Cty. Dist. Ct. Aug. 30, 2000) ..................... 8

*In re Pharm. Indus. Average Wholesale Price Litigation*,
   321 F. Supp. 2d 187 (D. Mass. 2004) ....................................................4, 12

*Pickern v. Pier 1 Imports, Inc.*,
   457 F.3d 963 (9th Cir. 2006) ..................................................................... 7

*S. Bay Chevrolet v. GM Acceptance Corp.*,
   85 Cal. Rptr. 2d 301 (Cal. Ct. App. 1999) ................................................. 10

*Shannon v. Boise Cascade Corp.*,
   805 N.E.2d 213 (Ill. 2004) ........................................................................ 10

*Solomon v. Bell Atl. Corp.*,
   9 A.D.3d 49 (N.Y. App. Div. 2004) ......................................................... 10

*State ex rel. State Compensation Mut. Ins. Fund v. Berg*,
   279 Mont. 161, 927 P.2d 975 (Mont. 1996) ............................................11, 12

*Swift Freedom Aviation LLC v. Aero*,
   No: 1:04-CV-90 2005 WL. 2246256 (E.D. Tenn. Sept. 13, 2005).......... 10

*Tagliente v. Himmer*,
   949 F.2d 1 (1st Cir. 1991)......................................................................... 10

...

*United States ex rel. Durcholz v. FKW, Inc.*,
   189 F.3d 542 (7th Cir. 1999) .................................................................................... 12

*Zekman v. Direct Am. Marketers, Inc.*,
   695 N.E.2d 853 (Ill. 1998) ........................................................................................ 10

## STATUTES

Mont. Code Ann. § 17-8-231 (2005) ................................................................................ 12

Mont. Code Ann. § 30-14-104 (2006) .............................................................................. 8

Mont. Code Ann. § 30-14-133(1) (2006) ......................................................................... 9

Defendant Novartis Pharmaceuticals Corporation ("NPC") submits this Memorandum of Law in support of its Motion for Summary Judgment dismissing the Complaint of Montana ("Plaintiff") as to NPC.

## PRELIMINARY STATEMENT

Plaintiff's core allegation is that the Montana Medicaid agency and other – unidentified – third-party payors were deceived into overpaying physicians and retail pharmacists ("Providers") for NPC Brand Name prescription drugs because they reimbursed Providers based on the benchmark known as "average wholesale price" ("AWP"), which they believed represented Providers' average actual acquisition cost.  As demonstrated in Memorandum in Support of Defendants' Joint Motion for Summary Judgment in *State of Montana v. Abbott Labs, Inc.* ("Defs. Joint Mont. Mem."), the undisputed factual record establishes that Plaintiff (i) knew at all relevant times that AWP and Medicaid's AWP-based reimbursement rates exceeded Providers' acquisition costs; and (ii) specifically elected to reimburse Providers at a discount off AWP, in order to give Providers a profit margin, and thereby ensure their participation in Medicaid, so that Medicaid enrollees would have equal access to drugs, as required under Federal law.

Specifically as to NPC, the undisputed factual record also establishes that:

- NPC accurately described its AWPs when NPC reported them;

- NPC's drug marketing efforts focus on efficacy and safety; NPC did not market the difference between its AWPs and physicians' acquisition cost (*i.e.,* "the spread");

- NPC did not report deceptive AWPs to induce Providers to purchase NPC drugs instead of competing products, nor could NPC possibly have had any motivation to do so because (i) nearly all of the NPC drugs at issue here are dispensed by retail pharmacies, which lack the ability to affect NPC drugs' market share; and (ii) with respect to the very few NPC drugs at issue which are administered by physicians, those products faced no competition for much of the relevant period and were not actively marketed when they did face competition; and

- Plaintiff relied upon AWPs published by First DataBank ("FDB") for NPC drugs, which NPC did not control and often were greater than the AWPs that NPC reported to FDB.

Discovery is now completed, and if there was evidence that NPC did any of the acts broadly and vaguely alleged in the Complaint against the entire pharmaceutical industry, Plaintiff would have found them. It has not. Consequently, there are no material facts in dispute that would, if resolved in Plaintiff's favor, entitle it to judgment. To the contrary, the undisputed factual record as to NPC demonstrates that NPC is entitled to judgment dismissing Plaintiff's Complaint.

## NPC'S STATEMENT OF UNDISPUTED FACTS

**A.     NPC's Sales and Marketing Methods**

NPC manufactures and markets Brand Name prescription drugs ("Brand Name drugs").  (Local Rule 56.1 Statement Of Undisputed Facts In Support Of Novartis Pharmaceuticals Corporation's Motion For Summary Judgment in *State of Montana v. Abbott Labs Inc., et al.* ("NPC Mont. 56.1") ¶ 2.)  In virtually all instances, Brand Name drugs are initially covered by one or more patents, which means that no other company can make, use or sell the same product without a license from the patent owner.  (*Id*. ¶ 3.)  NPC does not market and sell generic drugs.  (*Id*. ¶ 2.)

NPC delivers the vast majority of its drugs to, and is paid by, wholesalers, who resell them to retailers, private and public hospitals, and other health-care Providers which take possession of drugs and dispense them to patients.  (*Id*. ¶ 19.)  NPC also deals directly with certain "warehousing retail chains" -- drugstore chains of ten or more stores which have their own warehouses and which provide wholesaler-type functions to the chain.  (*Id*.)  Accordingly, NPC does not deliver products directly to, or take payment from, most retail pharmacies, physicians or other Providers.  (*Id*.)

Although NPC does not typically sell directly to physicians, because physicians decide which drugs are prescribed, NPC maintains a sales force that calls upon them to provide medical research and other information concerning its products. (*Id*. ¶ 20.) NPC focuses its drug marketing on clinical efficacy and safety. (*Id*.) NPC's sales representatives do not market to physicians the difference between a drug's AWP and the physician's acquisition cost. (*Id*.) Any sales force member who deviates from the authorized message may be terminated. (*Id*.)

B.  **The NPC Drugs At Issue Here**

There is a relevant distinction among single-source Brand Name drugs between self-administered drugs ("SADs"), which patients pick up at pharmacies and take on their own, and physician-administered drugs ("PADs"), which a doctor or nurse administers to the patient. (*Id*. ¶ 4.)

1.  **NPC's Self-Administered Drugs ("SADs") At Issue Here**

When a prescription for a single-source Brand Name SAD is presented to a pharmacy, the pharmacy must dispense that drug. (*Id*. ¶ 6.) It may not substitute an alternative drug, even if the alternative is approved by the FDA for the same condition, nor can it control the number of prescriptions written for such products. (*Id*. ¶¶ 6-7.) As such, pharmacies have little to no influence over a Brand Name drug's sales volume – a conclusion drawn by Ernst R. Berndt, an independent expert appointed by the Court for class certification purposes. (*Id*. ¶ 7.) Accordingly, with respect to Brand Name SADs, a pharmaceutical company typically has no motive to report deceptive AWPs or "market the spread" for such drugs to pharmacists. (*Id*. ¶ 9.) All but two of the NPC drugs at issue here are entirely self-administered.[1] (*Id*. ¶¶ 10, 13.)

---

[1] The following NPC drugs at issue here are entirely self-administered: Clozaril, Combipatch, Comtan, Diovan, Diovan HCT, Elidel, Estraderm, Exelon, Famvir, Femara, Focalin, Lamisil, Lamprene, Lescol, Lescol XL, Lotensin, Lotensin HCT, Lotrel, Miacalcin SPR, Parlodel, Rescula, Ritalin, Ritalin LA, Starlix, Tegretol, Tegretol XR, Trileptal, Vivelle, Vivelle-DOT, Voltaren

### 2.    NPC's Physician-Administered Drugs ("PADs") At Issue Here

PADs are prescribed, "sold," and administered to the patient by the physician. (*Id*. ¶¶ 4-5.) Unlike a pharmacist, a physician chooses which drug to prescribe and administer. (*Id*. ¶¶ 5-6.) Aredia, an NPC PAD at issue here, faced no non-NPC competition until December 2001, at which point NPC was no longer marketing Aredia to physicians. (*Id*. ¶¶ 16-17.) Consequently, NPC had no reason to "market the spread" to induce physicians to administer it. Miacalcin Injection is an NPC SAD at issue here that may, in rare circumstances,[2] be physician-administered. (*Id*. ¶ 14.) Miacalcin Injection is principally used when other treatments fail, and it faced no competition, either brand or generic, during the relevant period. (*Id*. ¶ 15.) Thus, as with Aredia, NPC had no motivation to "market the spread" to induce physicians to administer it.

Montana Medicaid paid extremely low total reimbursements to Providers for Aredia and Miacalcin Injection during the relevant period. Montana Medicaid's total outlay for Aredia was $45,843.28, an average of $6,549.04 per year, and Montana Medicaid's total outlay for Miacalcin Injection was $25,785.17, an average of $3,683.60 per year. (*Id*. ¶ 18.)

### C.    NPC's AWP is Based on a Mathematical Formula Applied to Its Wholesale Acquisition Cost, and NPC Disclosed that AWP Was Not An Actual Price

NPC generally sells its prescription pharmaceuticals to wholesalers and warehousing retail chains at a price referred to as Wholesale Acquisition Cost ("WAC"), minus a

---

Opthalmic, Zaditor, and Zelnorm. (*Id*. ¶ 10.) NPC did not market and/or sell two of the drugs at issue here throughout the entire relevant period (*i.e.*, January 1, 1997, when NPC was formed by act of merger, to June 12, 2003, the date on which NPC was first named in a Complaint in *In re Pharmaceutical Industry Average Wholesale Price Litigation*). NPC purchased Famvir from GlaxoSmithKline on December 31, 2000, and purchased Combipatch from Sanofi-Aventis on March 30, 2001. (*Id*. ¶¶ 11-12.) Thus, NPC is not responsible for sales of Famvir prior to December 31, 2000, or for Combipatch prior to March 30, 2001.

[2] Miacalcin Injection may be physician-administered to demonstrate to a patient how to self-administer the drug or where a patient is incapacitated or too ill to self-administer the drug. (*Id*. ¶ 14.)

two percent prompt pay discount. (*Id.* ¶ 22.) NPC calculated the AWP that it reported for any given product by applying a percentage markup to that drug's WAC. (*Id.* ¶ 24.) For all but four NPC drugs at issue here, the AWP is equal to WAC plus 20 percent (*i.e.,* the WAC is equal to AWP minus 16.66 percent). (*Id.*) For Diovan, Diovan HCT, Famvir, and Zaditor, the AWP is equal to WAC plus 25 percent (*i.e.*, the WAC is equal to AWP minus 20 percent). (*Id.*)

When NPC launches a new product or changes the price of an existing one, it provides pricing information to wholesalers, warehousing retail chains, and independent reporting services, like First DataBank, by issuing a "broadcast fax." (*Id.* ¶ 22) A broadcast fax is essentially a letter that lists the WAC, AWP, or both for one or more drugs. (*Id.*) Beginning in January 1997, when NPC began doing business in its current form as a result of the merger of Ciba-Geigy Corporation and Sandoz Corporation, NPC's broadcast faxes including AWP information also contained the following statement:

> As used in this letter, the term AWP or Average Wholesale Price constitutes a reference for each Novartis product, and in keeping with current industry practices, *is set as a percentage above the price at which each product is offered generally to wholesalers.* Notwithstanding, the inclusion of the term price, in Average Wholesale Price, AWP is not intended to be a price charged by Novartis for any product to any customer.

(*Id.* ¶ 23.)[3]

D. **Plaintiff Based Its Reimbursements to Providers on AWPs Set and Published by First DataBank, Which Often Were Greater than the AWPs that NPC Reported to FDB**

Montana's Medicaid agency based its reimbursements for pharmaceutical drugs on the AWPs published by First DataBank ("FDB"). (*Id.* ¶ 25.) The undisputed factual record establishes that NPC did not control FDB's AWPs and that FDB set and published AWPs for

---

[3] The disclosure's exact wording has changed slightly over time, but the central message – that AWP is not intended to reflect a price charged by NPC to anyone – remained constant. (*Id.*)

NPC drugs that often were greater than the AWPs that NPC reported to FDB. (*Id*. ¶ 26-27.) Patricia Kay Morgan, Manager of Product Knowledge-based Services for FDB, testified that FDB based its published AWPs on surveys that it conducted of wholesalers to determine the "markup [wholesalers] were applying to a manufacturer's line [of products]," and not on the AWPs that manufacturers reported to FDB.[4]  (*Id*. ¶ 26.)  Beginning in January 2002, the AWPs that FDB published for NPC drugs were greater than the AWPs that NPC reported to FDB for all products except Diovan, Diovan HCT, Famvir, and Zaditor; as such, Plaintiff's reimbursements were, in many instances, based on AWPs that were greater than the AWPs that NPC reported. (*Id*. ¶ 27.)

### E.   NPC Provides Rebates and Price Discounts to Entities That Influence Which Drugs Physicians Prescribe

NPC generally provides discounted prices or rebates to entities that control drug formularies because formularies influence patients' preferences and physicians' prescribing decisions. (*Id*. ¶ 33.) To obtain or maintain positions on formularies of entities – such as state Medicaid agencies that have preferred drug lists, pharmaceutical benefits managers, and health maintenance organizations – NPC contracts to provide price concessions in the form of rebates. (*Id*. ¶ 33.) With respect to the NPC drugs at issue here, during the relevant period, NPC paid Montana Medicaid rebates totaling $2,094,784.94, which significantly lowered Plaintiff's net cost for NPC drugs. (*Id*. ¶ 32.)

By contrast, to obtain or maintain a position on the formulary of an entity that purchases and takes possession of NPC drugs, such as a hospital, NPC will negotiate a contract

---

[4] Further demonstrating that FDB sets and controls the AWPs that it publishes, as part of a proposed Settlement Agreement and Release in a separate litigation – to which NPC was not a party – FDB has since agreed to change its price-publishing practices; specifically, FDB agreed to reduce its "Blue Book" AWP to WAC plus 20 percent for all pharmaceuticals subject to the Settlement, which include NPC drugs. (*Id*. ¶ 28.)

price – typically at a discount from WAC – at which the entity may purchase the NPC drug from a wholesaler.[5]  (*Id*. ¶ 34.)  For example, NPC provides certain Montana state-run agencies with price concessions, pursuant to which NPC drugs are purchased at prices that, on average, are significantly lower than what Medicaid reimburses Providers.  (*Id*. ¶ 35.)  At least one of these state-run entities is overseen by the same department that oversees Montana's Medicaid agency.[6]  (*Id*.)

## ARGUMENT

## MONTANA'S CLAIMS AGAINST NPC CANNOT SURVIVE SUMMARY JUDGMENT

The undisputed factual record establishes that NPC accurately described its AWPs on its price announcements; marketed its drugs' clinical efficacy and safety; and did not have any motive to report deceptive AWPs or "market the spread."  (*Id*. ¶¶ 9, 21, 23-24.)  Additionally, the AWPs that Montana relied upon for NPC drugs often were greater than the AWPs that NPC reported to FDB.  (*Id*. ¶¶ 25, 27.)  Thus, Montana's claims as to NPC should be dismissed.[7]  *See Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003); *Pickern v. Pier 1 Imports, Inc.*, 457 F.3d 963 (9th Cir. 2006).

---

[5] When an NPC drug is sold at a contract price, NPC provides the wholesaler with a "chargeback," reimbursing the wholesaler for selling the product at a price below its cost.  (*Id*. ¶ 34.)

[6] Montana Mental Health Nursing Care Center's average cost of acquiring certain NPC drugs at issue here was only 90.1 percent of Montana Medicaid's reimbursement to Providers.  (*Id*. ¶ 35.)  Montana Medicaid and Montana's Nursing Care Center are overseen by the same department.  (*Id*.)

[7] Montana's Complaint also contains a claim for punitive damages (Count V), which should be denied for the reasons set forth in Defs. Joint Mont. Mem. at p. 42.

### A. The Undisputed Facts Mandate Dismissal of Montana's Unfair Trade Practices Claims (Counts I & II)

#### 1. NPC's AWPs Were Not Deceptive

Under Montana's Unfair Trade Practices Act ("UTPA"), "if there was no misrepresentation, there was no unfair trade practice." *See Osterman v. Sears, Roebuck & Co.*, No: BDV 99-522(c) (Cascade Cty. Dist. Ct. Aug. 30, 2000) (granting summary judgment with respect to plaintiff's UTPA claim for lack of a misrepresentation and on statute of limitations grounds), *aff'd*, 318 Mont. 342, 80 P.3d 435 (Mont. 2003). Further, it was "the intent of the [Montana] legislature that . . . due consideration and weight shall be given to the interpretations of . . . section 5(a)(1) of the Federal Trade Commission Act" ("FTC Act"). MONT. CODE ANN. § 30-14-104 (2006).[8] To be unfair under the FTC Act, "the representation [must] be likely to mislead." *FTC v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 855 (D. Mass. 1992).

The undisputed factual record demonstrates that NPC's reporting of benchmark AWPs, which were derived from NPC's wholesale price by a mathematical formula, were broadly known in the industry – and to Montana Medicaid – and were not "likely" to mislead anyone. The record establishes that NPC accurately stated in its broadcast faxes – the same documents in which NPC reported its AWPs – that its AWPs were "set as a percentage above the price at which each product is offered generally to wholesalers" (*i.e.*, WAC). (NPC Mont. 56.1 ¶¶ 23-24.) Because that fact is true, NPC accurately described its AWPs. Further, Montana concedes that no regulation governs how AWP is to be calculated. (*Id.* ¶ 30.) Accordingly, there is no support for Plaintiff's claim of misrepresentation by NPC.

---

[8] The relevant sections of the statutes are appended to Affidavit of Samuel N. Lonergan, ¶ 14, Ex. 7.

Moreover, while Plaintiff contends that all Defendants reported deceptive AWPs to increase their market share, retail pharmacies, which dispense nearly all of the NPC drugs at issue here, cannot prescribe or substitute other drugs for NPC drugs and therefore cannot affect NPC's market share. (*Id*. ¶ 7.)  Similarly, NPC's other two drugs at issue here – Aredia, which is a PAD, and Miacalcin Injection, which is a SAD but may, in rare circumstances, be physician-administered – either faced no competition or were not actively marketed during the relevant period. (*Id*. ¶¶ 14-17.)  Therefore, it would have been pointless for NPC to report deceptive AWPs, and it did not do so. (*Id*. ¶ 9.)  Nor is there any evidence that NPC "marketed the spread" for any of its drugs.

### 2.  Montana Suffered No Injury By Virtue of NPC's Actions

An UTPA plaintiff must prove that its alleged damages were "a proximate result" of the defendant's conduct. *See Doll v. Major Muffler Centers, Inc.*, 208 Mont. 401, 414, 687 P.2d 48, 55 (Mont. 1984).  Moreover, the UTPA grants standing only to a consumer who suffers "ascertainable loss of money or property . . . *as a result of*" an act that violates the UTPA. MONT. CODE ANN. § 30-14-133(1) (2006).  Courts outside of Montana interpret "as a result of" in other consumer protection statutes to require a showing that the alleged deception proximately caused injury in fact. *See generally Bahlman v. Washoe Medical Center*, No: CV0400750, 2005 WL 4020525 (Nev. Dist. Ct. Dec. 2, 2005).

The undisputed factual record demonstrates that FDB independently set and published the AWPs upon which Montana Medicaid relied without regard to whatever NPC reported.  Sometimes FDB's method for setting AWP yielded the same result; sometimes it yielded a higher result; either way, it was FDB's result, not NPC's. (NPC Mont. 56.1 ¶¶ 25-27.)  Therefore, there was no causal connection between NPC's reporting of AWPs and Montana's

alleged injury, which depended – even accepting Plaintiff's theory for the moment – entirely on FDB's decisions, not NPC's.

Further, although Montana courts have not addressed the issue in any reported opinion, other courts routinely dismiss consumer protection claims for lack of causation where plaintiff's own knowledge has broken the causal chain between the alleged deception and the alleged injury.[9] Thus, where a plaintiff knows the facts regarding a transaction and nevertheless elects to enter into that transaction, it is the plaintiff's decision to go forward, rather than the defendant's allegedly deceptive conduct, that is the cause of plaintiff's alleged loss. *See*, *e.g.*, *Tagliente v. Himmer*, 949 F.2d 1, 3, 8 (1st Cir. 1991) (affirming dismissal of Mass. Gen. Laws Ch. 93A claim because plaintiff was aware of facts relevant to alleged misrepresentation); *see also* cases cited *supra* footnote 9.

The undisputed factual record demonstrates that Montana Medicaid knew during the entire relevant period that AWP and its AWP-based reimbursement rate exceeded Providers' average actual acquisition cost and, in order to encourage Providers to participate in Medicaid (by offering a profit margin), it chose to base its reimbursements on AWP. (NPC Mont. 56.1 ¶ 30.) Indeed, by virtue of the fact that they were overseen by the same department, Montana Medicaid knew that Montana Mental Health Nursing Care Center acquired NPC drugs at prices that, on average, were significantly below Montana Medicaid's reimbursements to Providers for NPC drugs. (*Id.* ¶ 35.)

---

[9] *See Mass. Farm Bureau Fed'n v. Blue Cross of Mass.*, Inc., 532 N.E.2d 660, 665 (Mass. 1989); *S. Bay Chevrolet v. GM Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 310 (Cal. Ct. App. 1999); *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 219 (Ill. 2004); *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 861 (Ill. 1998); *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 55 (N.Y. App. Div. 2004); *Swift Freedom Aviation LLC v. Aero*, No: 1:04-CV-90, 2005 WL 2246256, at *18 (E.D. Tenn. Sept. 13, 2005).

Because it is undisputed that NPC's AWPs did not proximately cause Montana's alleged injuries, Montana's UTPA claim against NPC should be dismissed.

**B.      The Undisputed Facts Demonstrate that NPC Did Not Violate Montana's Medicaid Fraud Act (Count III)**

As set forth in greater detail in Defs. Joint Mont. Mem. (at p. 32), Montana must satisfy each element of fraud in order to maintain its Medicaid Fraud claim. *See In re Estate of Kindsfather*, 326 Mont. 192, 196-97, 108 P.3d 487, 490 (Mont. 2005). The undisputed evidence belies Montana's claim.

First, NPC's AWPs were not false, *see Kindsfather* at 196, because the undisputed factual record establishes that NPC accurately described its AWPs on its broadcast fax price announcements. (NPC Mont. 56.1 ¶ 23-24.)

Second, Montana was not "ignoran[t]" of the true nature of NPC's AWPs, *Kindsfather* at 196, because the undisputed factual record demonstrates that Montana Medicaid understood that AWP and its AWP-based reimbursement rate exceeded Providers' average actual acquisition cost. (NPC Mont. 56.1 ¶ 30.)

Third, Montana did not rely on NPC's alleged misrepresentation. *See Kindsfather* at 196. Montana Medicaid knew that AWP and its AWP-based reimbursement rate exceeded Providers' average actual acquisition cost. (NPC Mont. 56.1 ¶ 30) And, even in the unlikely event that Montana could establish that it used AWP as a benchmark believing that it represented a Provider's acquisition cost, Montana relied on AWPs that FDB independently set and published -- which were often higher than the AWPs that NPC reported to FDB -- not on any representations NPC made to Montana. (*Id.* ¶¶ 25-27.)

Fourth, Montana must prove that NPC intended that its published AWPs would deceive Montana Medicaid and other third-party payors. *State ex rel. State Compensation Mut.*

*Ins. Fund v. Berg*, 279 Mont. 161,176, 927 P.2d 975, 983 (Mont. 1996) (characterizing intent element as "intent to deceive or dishonesty of purpose"). It is beyond dispute that NPC had no motive to report "deceptive" AWPs or "market the spread" for any of the drugs at issue here. (NPC Mont. 56.1 ¶ 9.) Moreover, the undisputed evidence demonstrates that NPC did not "market the spread" on its drugs. Finally, NPC's disclosure in its broadcast faxes accurately describing its AWPs establishes that NPC lacked the requisite intent to defraud. (*Id*. ¶¶ 23-24.)

In sum, because the undisputed facts support none of the elements of Montana's Medicaid Fraud claim against NPC, this claim should be dismissed as to NPC.

## C. The Undisputed Facts Do Not Support Montana's False Claims Act Claim (Count IV)

Under Montana's False Claims Act, Montana must prove that NPC "knowingly present[ed] or cause[d] to be presented a false, fictitious, or fraudulent claim for allowance or payment to any state agency or its contractors." MONT. CODE ANN. § 17-8-231 (2005).[10] The undisputed factual record establishes that NPC accurately described its AWPs when it reported them and that Montana understood the nature of NPC's AWPs. (NPC Mont. 56.1 ¶¶ 23-24, 30.) NPC, therefore, neither submitted a "false, fictitious, or fraudulent claim" nor caused any Provider to submit one.[11] Summary judgment should be granted for this reason. *See cf. United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) ("government's knowledge [of a false claim] effectively negates the fraud or falsity required by the [Federal False Claims Act]").

---

[10] This Court has previously recognized that no reported case interprets the Montana False Claims Act. *See In re Pharm. Indus. Average Wholesale Price Litigation*, 321 F. Supp. 2d 187, 201 (D. Mass. 2004).

[11] Moreover, to NPC's knowledge, Montana has never filed a False Claims Act claim against any Provider based purely on the basis that a claim for reimbursement was based on AWP.

## **CONCLUSION**

For the reasons discussed above, summary judgment should be granted to NPC on all of Plaintiff's claims.

Dated:  Boston, Massachusetts
        February 8, 2007

                                              Respectfully submitted,

/s/ Karen F. Green
Karen F. Green, BBO # 209050
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Jane W. Parver (admitted *pro hac vice*)
Saul P. Morgenstern (admitted *pro hac vice*)
Samuel Lonergan (admitted *pro hac vice*)
Charles Graybow (admitted *pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000

*Attorneys for Defendant
    Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

      I hereby certify that on the 8th day of February, 2007, a true and accurate copy of the Memorandum in Support of Novartis Pharmaceuticals Corporation's Motion for Summary Judgment was served via the Lexis-Nexis Filing System:

      DATED: February 8, 2007.

                                                   Brett Budzinski