# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs., Inc., et al.,*<br>        Cause No. CV-02-09-H-DWM (D. Mont.) | |

## THE STATE OF MONTANA'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CERTAIN DEFENDANTS

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    THE STATE'S STATEMENT OF UNDISPUTED MATERIAL FACTS........................1

    A.    A Brief History of Medicaid ...................................................................................2

    B.    It is Undisputed That The Montana Medicaid Drug Reimbursement Plan
        Is Based On AWP ..................................................................................................3

    C.    There Is No Genuine Issue Of Material Fact That (i) Each Of The Defendants
        Caused AWPs To Be Published For Each Of Their Subject Drugs; And (ii) AWP
        Was The Reimbursement Basis For The Subject Drugs And That Defendants
        Knew This.............................................................................................................4

    D.    The Numbers Defendants Reported Were Not Average Wholesale Prices............8

III.    LEGAL ARGUMENT.................................................................................................8

    A.    "AWP Means The Average Price At Which Wholesalers Sell Drugs To Their
        Customers, Including Physicians And Pharmacies" .................................................8

        1.    The Plain Meaning of the Montana Medicaid Plan .....................................9

        2.    The Only Reasonable Interpretation Is To Give AWP Its Ordinary
            Meaning .....................................................................................................11

    B.    Defendants Deviated From The Plain Meaning Of AWP When They Reported
        Prices..................................................................................................................12

    C.    The Publication of AWPs Violated The Montana Fraud Statute As A Matter|
        Of Law ................................................................................................................14

IV.    CONCLUSION.........................................................................................................17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Soc'y of Consulting Pharmacists v. Garner*,
    180 F. Supp. 2d 953 (N.D. Ill. 2001) ........................................................................2

*DeSario v. Thomas*,
    139 F.3d 80 (2d Cir. 1998)...................................................................................2, 3

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ...............................................................11, 17

*Oklahoma Chptr. Of the Am. Academy Of Pediatrics v. Fogarty*,
    366 F. Supp. 2d 1050 (N.D. Okla. 2005) ..................................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    321 F. Supp. 2d 187 (D. Mass. 2004) .......................................................................9

*Wilder v. Virginia Hosp. Ass'n.*,
    496 U.S. 498 (1990)...................................................................................................2

## FEDERAL STATUTES

42 C.F.R. § 430.12 ...........................................................................................................3

42 C.F.R. § 447.331-32 ...................................................................................................4

42 U.S.C. § 1396 .............................................................................................................2

## STATE STATUTES

Mont. Admin R. 37.86.1101 (2006) ...........................................................................3, 10

Mont. Admin. R. 46.12.102 (1998) ..............................................................................10

Mont. Code Ann. § 1-2-106 (2006) ................................................................................9

Mont. Code Ann § 53-6-143 (2006) .............................................................................14

Mont. Code Ann § 53-6-155 (2006) .............................................................................11

Mont. Code Ann. § 53-6-160 (2006) ...........................................................1, 14, 15, 16

Mont. Code Ann. § 53-6-1001 (2006) .........................................................................4, 9

# I.      INTRODUCTION

The State of Montana ("State") moves for partial summary judgment, asking the Court to find as a matter of law that each Defendant[1] has violated the Montana Medicaid fraud statute, Mont. Code Ann. § 53-6-160.[2]

There is no genuine issue of material fact that (i) Average Wholesale Price ("AWP") was the defined reimbursement benchmark under the Montana Medicaid pharmacy program for the drugs that are the subject of this litigation ("Subject Drugs"); (ii) the term AWP as used in governing regulations means the average price at which wholesalers sell drugs; (iii) the Defendants controlled the AWPs published for their respective Subject Drugs; but (iv) the reported AWPs were not average wholesale prices and the State was not paying what the regulations specified, AWP minus a specified percentage.

Defendants' creation, publication or assistance in the publication of false AWPs violated the Montana Medicaid fraud statute's proscriptions against the making of false statements in connection with State Medicaid reimbursement.  Under the facts described below, partial summary judgment on these Medicaid Fraud Act claims should be granted in favor of the State.

# II.      THE STATE'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Attorney General Mike McGrath brings this action on behalf of the State of Montana and its citizens to obtain relief for the overpayment for prescription drugs as a result of the Defendants' abuse of the drug reimbursement system through the promulgation and use of inflated AWPs and related marketing.  The following facts are undisputed.

---

[1] The State of Montana seeks partial summary judgment against the following Defendants:  Abbott, AstraZeneca, Aventis, Bayer, BMS, Dey, Fujisawa, Immunex, Johnson & Johnson, Novartis, Pfizer, Pharmacia, Schering-Plough/Warrick, Sicor, and TAP.  Baxter International, Inc. is also a defendant, but is subject to its own case schedule.

[2] For the Court's convenience, the State of Montana's has compiled all Montana statutes and administrative codes cited in the State's brief at Ex. 58 to the Declaration of Jeniphr Breckenridge in Support of the State of Montana's Motion for Partial Summary Judgment Against Certain Defendants.

**A.      A Brief History of Medicaid**

Congress created the Medicaid Program in 1965 by enacting Title XIX of the Social

Security Act at the same time it created the Medicare Program to provide similar coverage to the

nation's elderly and other qualified individuals.  42 U.S.C. § 1396 *et seq*.  "Title XIX established

a joint, cooperative federal-state program for furnishing and financing health care and services to

individuals who qualify. . . ."  *Oklahoma Chptr. Of the Am. Acad. Of Pediatrics v. Fogarty*, 366

F. Supp. 2d 1050, 1054 (N.D. Okla. 2005).  This includes the "financially and medically needy

individuals."  *DeSario v. Thomas*, 139 F.3d 80, 82 (2d Cir. 1998).  The program is run primarily

by the states, in conformity with federal guidelines, on the basis of each state's Medicaid plan.

*Id.*  Participation in the Medicaid Program by states is voluntary, but those that choose to

participate "must comply with certain statutory requirements imposed by the Medicaid Act and

with regulations promulgated by the Secretary of Health and Human Services."  *Wilder v.

Virginia Hosp. Ass'n,* 496 U.S. 498, 502 (1990).

The United States Department of Health & Human Services ("DHHS") is responsible for

the funding, administration and supervision of the Medicare and Medicaid Programs and does so

through the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the

Health Care Financing Administration ("HCFA").  Under the Medicaid Program, the federal

government provides funds to the states to assist the poor, elderly and disabled to receive

medical care, prescription drugs and no-prescription drugs, and related services.  *American Soc'y

of Consulting Pharmacists v. Garner,* 180 F. Supp. 2d 953 (N.D. Ill. 2001).  Coverage for

outpatient prescription drugs is an optional benefit within Medicaid, although all Medicaid

programs, including Montana's, offer prescription drug coverage.[3]

---

[3] Brian K. Bruen, Medicaid and Prescription drugs:  An Overview at 2 (October 2000) (prepared for the Kaiser
Commission on Medicaid and the Uninsured) (hereinafter "Medicaid and Prescription Drugs").

To participate in Medicaid, states must submit a State Plan ("Medicaid State Plan") to DHHS for approval.  Medicaid plans must be submitted to CMS for review and a determination of whether they conform to the requirements of the statute and regulations.  *DeSario v. Thomas*, 139 F.3d at 96 (quoting 42 U.S.C. § 1316 (1994)).

**B.      It is Undisputed That The Montana Medicaid Drug Reimbursement Plan Is Based On AWP**

The State of Montana provides medical assistance, including prescription drugs, to qualified Montana residents through the Montana Medicaid Program administered by the Montana Department of Public Health and Human Services ("DPHHS").[4]  The Medicaid Program is governed by the State Medicaid Plan.  The federal DHHS approves the State Plan and each amendment, as required by 42 C.F.R. § 430.12 *et seq*.

In Montana, the approved amendments include State Plan amendments setting the reimbursement rates for prescription drugs for Montana Medicaid recipients.  Montana Medicaid bases reimbursement for prescription drugs on AWP.  The State set its Medicaid reimbursement formula based on the plain meaning of AWP after analyzing the market place as an attempt to set a fair market price.  Montana Medicaid's use of AWP as the basis of drug reimbursement is mandated by administrative rules enacted to administer the State's Medicaid Program.  MONT. ADMIN. R. 37.86.1101 (2006) currently provides that:

> "Estimated acquisition cost (EAC)" means the cost of drugs for which no maximum allowable cost (MAC) price has been determined.  The EAC is the department's best estimate of what price providers are generally paying in the state for a drug in the package size providers buy most frequently.  The EAC for a drug is:
>
> (a)  the direct price (DP) charged by manufacturers to retailers;

---

[4] Approximately 300 pharmacies participate in the Montana Medicaid Program.  The Montana Medicaid Program accounts for approximately 15% of all prescriptions written in the State of Montana.  Second Amended Complaint ("Mont. SAC"), ¶ 161.

(b)  if there is no available DP for a drug or the department determines that the DP is not available to providers in the state, the EAC is the average wholesale price (AWP) less 15%; or

(c) the department may set an allowable acquisition cost for specified drugs or drug categories when the department determines that acquisition cost is lower than 1(a) or (b) based on data provided by the drug pricing file contractor.

*See also* 42 C.F.R. § 447.331-32 (setting Federal Upper Limits for Medicaid use and setting EAC plus a dispensing fee as an acceptable basis for Medicaid reimbursement).[5]

Under Montana law, "AWP" is currently defined by statute as "the wholesale price charged on a specific drug that is assigned by the drug manufacturer and is listed in a nationally recognized drug pricing file."  MONT. CODE ANN. § 53-6-1001(1) (2006).  "Nationally recognized drug pricing file" refers to numerous compendia of drug prices reported by the drug manufacturers to a third party and published for use by private and public payors, among others, as described more fully below.  The Montana Medicaid Program uses the AWP as reported through *First DataBank*.[6]

**C.     There Is No Genuine Issue Of Material Fact That (i) Each Of The Defendants Caused AWPs To Be Published For Each Of Their Subject Drugs; And (ii) AWP Was The Reimbursement Basis For The Subject Drugs And That Defendants Knew This**

The weight of evidence demonstrates that each of the Defendants caused AWPs to be published for their Subject Drugs in one of two ways:  (i) by sending an AWP or "suggested" AWP directly to a publisher; *or* (ii) by submitting wholesale list price ("WLP"), wholesale acquisition cost ("WAC") or Direct Price ("DP") to the publisher – with the knowledge that the

---

[5] The EAC was defined as AWP less 10% until July 2002.  Montana witness testimony has established that "direct price" was seldom available to Montana retailers and thus was an illusory basis for reimbursement. Ex. 1 (Deposition of Dorothy Poulsen ("Poulsen Dep.") (Feb. 22, 2006) at 183 ("[P]harmacies in Montana had a great difficulty acquiring drugs at [direct price]. . . . For those labels that were at direct price, [the system] was paying at the direct price but our pharmacies were unable to get the drugs at that cost." As a result, "pharmacists were asking that we do away with direct price because they weren't getting what they were having to pay."  *Id.* at 184-85.  Thus, Montana discontinued the direct price reimbursement.  *Id.* at 183.)).
[6] Ex. 1 (Poulsen Dep. at 257).

publisher will mark that price up (usually by either 20% or 25%) to achieve the reported AWP. Through this system, each Defendant directly controlled what the AWP would be. They always had a chance to tell the truth. Defendants, not State Medicaid agencies nor Third-Party Payors nor consumers, were in a position to make AWPs accurate. Defendants guarded price information closely as confidential; the information was not publicly available.

Company insiders have testified to these practices at trial and at depositions and internal industry documents reflect the same.[7] Evidence shows that the reporting practices of other defendants were the same.[8]

---

[7] Ex. 2 (Trial Tr. Day 5 at 14 (Buckanavage) ("Q: And so you felt that AstraZeneca had the ability to set its own AWP, correct? A: At that time we submitted those prices to the pricing services."), and at 34:3-9 ("THE WITNESS: At that time we reported both to the pricing services. THE COURT: You reported - THE WITNESS: Both WAC and AWP. THE COURT: So you decided what AWP was, not the publication? THE WITNESS: At that time, that's correct.")). *See also* Ex. 3 at AZ0419345 (Document entitled Medicare Review stating that "To date, Medicare has not influenced the AWP of any medication that qualifies for reimbursement. Companies have the latitude to set AWP as they wish."). Once a new or revised AWP was approved, AstraZeneca would inform the publishers. Ex. 2 (Trial Tr. Day 5 at 17 (Buckanavage) (Q: "Now you understood then that your AWP price would be reported by AstraZeneca to the Red Book, correct? A: Yes.")). BMS did not send AWPs directly to the publishers. Instead, BMS sent to the publishers a wholesale list price (WLP) or direct price, which the publishers predictably marked up from 20% to 25% to derive the AWP. Ex. 4 (Trial Tr. Day 4 at 55, 59 (Kaszuba)). Kaszuba was responsible, since 1991, for communicating BMS's wholesale list prices to customers and the *Red Book, First DataBank* and *MediSpan*. *Id.* at 52 (Kaszuba). As Plaintiffs' expert opined in the Class case, there is a well understood formulaic relationship between AWP and WLP. They are functional equivalents in that reporting either to the publishers implies that the other price is set automatically. "AWP and WAC [or WLP] are 'interchangeable' since the two list prices are usually related by a constant ration and convey the same information to purchasers and other entities that rely on published price data." Ex. 5 (Direct Testimony of Raymond S. Hartman) ("Hartman Direct"), ¶ 44. J&J predecessor CNTO knew that the publishers would simply republish what CNTO provided them. Ex. 6 (Deposition of Carol Webb ("Webb Dep.") at 56); *see also* Ex. 7 (where CNTO discusses "setting" the AWP, not recommending or suggesting an AWP). OBI witnesses testified that they could not recall a single instance when the actual AWP prices provided by OBI were not published. *See, e.g.,* Ex. 6 (Webb Dep. at 66:16-21, 67:1-8); Ex. 8 (Deposition of Thomas Hiriak ("Hiriak Dep.") (July 28, 2004) at 214:18-215:1); Ex. 9 (Deposition of Elaine Kling ("Kling Dep.") at 103:2-5, 115:21-22, 116:1-22). Schering-Plough reported the AWPs for its branded drugs to the publishers of pharmaceutical industry pricing guides such as *Red Book* and *Price Alert* for publication in those guides. Ex. 10 (Deposition of Harvey J. Weintraub, February 12, 2003 ("Feb. 2003 Weintraub Dep.") at 429:23-431:1); Ex. 11 ("As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement purposes. Most manufacturers (including Schering) report AWPs at NDP [net direct price] plus 20%.").

[8] *See, e.g.,* Exs. 12 and 13 (The Fujisawa Group controlled and set the AWPs for all of its drugs through direct communications with industry compendia. Fujisawa documents confirm Fujisawa knowledge of compendium pricing and concern about how to increase the prices published to even higher levels.) (FJ-MDL 8346) (BBMDL FJ-MDL 015152-59); Ex. 14 (Immunex used the "AWP Product Pricing guide," which listed each Immunex drug, along with its dose, NDC number and AWP per *Red Book*) (IAWP112178-81); Ex. 15 (Immunex periodically provided Pricing Guides to the publishers or otherwise provided AWPs) (IAWP002632; IAWP109826); Ex. 16

Defendants understood that the published AWPs were the reimbursement basis used by Medicaid, Medicare and many private payors.  Internal documents and testimony reflect their understanding.  At trial, for example, AstraZeneca employee Julie-Ann G. Tracy, National Account Director, acknowledged the wide-spread use of  AWP as a basis of reimbursement:  "I have always understood the term Average Wholesale Price of 'AWP' to be a reference price that is used by the government and private insurers to calculate reimbursement for pharmaceuticals."[9]

Many senior BMS managers also testified that they understood that public and private reimbursement schemes, were based on AWP.  These managers include Dianne Ihling, BMS's former Director of Pricing and Institutional Operations;[10] Christof Marré, BMS's former Director of Marketing, Oncology;[11] Denise Kaszuba, BMS's Associate Manager of Pricing Analysis and Compliance;[12] John Akscin, OTN's Vice President of Government Relations and Managed Care Services;[13] and Marsha Peterson, formerly OTN's Western Sales Manager.[14]

---

(SICOR 00753-57, SICOR 02259-65, SICOR 00885-903; SICOR 00947-48, SICOR 00955-58, SICOR 00962, SICOR 00982-83, SICOR 00987-88); Ex. 17 (BAY005278); Ex. 18 (Armour Pharmaceutical circulates AWPs list sent to *First DataBank* and states that listing AWPs was "consistent with industry practice.") (ABAWP 005005-11); Ex. 19 (Armour Pharmaceutical send pricing update, including AWPs, to *Red Book*) (ABAWP005163-71); Ex. 20 (Centeon reporting price changes to *First DataBank*) (ABAWP 008440); Ex. 21 (2003 email string with price list submitted to publishers) (EDEY-LABS-0022217-22); Ex. 22 (2003 email, Dey writes: "[A]s a reminder, we (the Contracts Dept.) sends WAC & AWP information on all our products to First Databank (FDB).  Every month we receive a report from FDB that lists all our products and their AWP.  So far (within the last 3 months), I have not found any discrepancies with the prices being reported by FDB in our report and our published AWP.") (EDEY-LABS 0022187-93); Ex. 23 (Pharmacia chart reflecting Pharmacia & Upjohn reporting of AWP information to publishers) (PH 025785-94 at PH 025792).  *See also* Ex. 36, ¶ 6 (Aventis, Inc.); Ex. 37, ¶ 6 (Aventis Behring); Ex. 38, ¶¶ 6, 366 (BMS); Ex. 54 (Dey Answer to Mont. SAC (Dkt. No. 919), ¶ 388); Ex. 39, ¶¶ 6, 412 (Fujisawa); Ex. 55 (Immunex Answer to Mont. SAC (Dkt. No. 899), ¶¶ 5, 6); Ex. 40, ¶ 6, 438 (J&J); Ex. 56 (Schering-Plough Answer to Mont. SAC (Dkt. No. 901), ¶¶ 6, 534); Ex. 44, ¶ 6 (Sicor).

[9] Ex. 24 (Direct Testimony of Julie-Ann G. Tracy, ¶ 6); *see also* Ex. 25 (Deposition of Christopher Iacono ("Iacono Dep."), Vol. I at 126:21-127:16 (the Vice President of Marketing at AstraZeneca (testifying that it is his "general understanding" that AWP was the benchmark for reimbursement from Third-Party Payors)).

[10] Ex. 26 (Deposition of Dianne Ihling ("Ihling Dep."), at 90-93, 117-18).

[11] Ex. 2 (Trial Tr. Day 5 at 142 (Marré)); Ex. 27 (Marré Trial Aff., ¶ 10).

[12] Ex. 4 (Trial Tr. Day 4 at 62-64 (Kaszuba)).

[13] Ex. 28 (Deposition of John Akscin ("Akscin Dep."), at 26-27).

[14] Ex. 29 (Deposition of Marsha Peterson ("Peterson Dep."), at 114-15).

As for J&J, both J&J and OBI management[15] knew that providers and retailers billed private insurers, patients and Medicare based on a percentage of AWP. OBI management was also aware that public and private insurers used the compendia to determine the AWPs of drugs for reimbursement purposes.[16] Schering-Plough reported AWPs for its branded drugs with the full expectation that they would be published and later relied upon by Third-Party Payors for reimbursement purposes.[17]

Warrick reported AWPs for its generic drugs with the full expectation that they would be published[18] and later relied upon by Third-Party Payors for reimbursement purposes. Harvey J. Weintraub, Schering-Plough's vice-president, and later, a Schering-Plough consultant knew that when the AWP for Warrick's products were raised that this would impact drug payments.[19]

All Defendants shared the same understanding that States and other payors based their drug reimbursement on reported AWPs. This is reflected in Defendants' Answers to this lawsuit[20] and other internal documents.[21]

---

[15] Centocor (CNTO), which manufactures, markets and sells Remicade, and Ortho Biotech Products, L.P. (OBI), which markets and sells Procrit, are both corporations that are wholly owned by the parent company Johnson & Johnson (J&J).

[16] Ex. 9 (Kling Dep. at 105:2-6); Ex. 6 (Webb Dep. at 67:9-22, 68:1-9).

[17] Ex. 30 (Deposition of Richard W. Zahn, January 15, 2003 ("Zahn Dep.") at 173:1-23); Ex. 31 (Deposition of Debra Kane, June 15, 2004 ("Kane Dep.") at 34:7-11 ("[AWP] is a price that is used for reimbursement purposes. . . .")); Ex. 32 (RGX0315084-141, at 0315084).

[18] *E.g.*, Ex. 33 (Trial Tr. Day 18 at 29 (Weintraub)); Ex. 10 (Feb. 2003 Weintraub Dep. at 655:10-13).

[19] Ex. 33 (Trial Tr. Day 18 at 25-26 (Weintraub)).

[20] *See, e.g.*, Ex. 34 (Abbott Answer to SAC (Dkt. No. 900), ¶ 5); Ex. 35 (AstraZeneca Answer to Montana SAC (Dkt. No. 896), ¶ 5); Ex. 36 (Aventis Pharmaceutical, Inc. Answer to Montana SAC (Dkt. No. 912), ¶¶ 5, 162); Ex. 37 (Aventis Behring LLC's Answer to Mont. SAC (Dkt. No. 916), ¶ 5); Ex. 38 (BMS Answer to Mont. SAC (Dkt. No. 914), ¶ 5); Ex. 39 (Fujisawa Answer to Mont. SAC (Dkt. No. 898), ¶¶ 5, 162); Ex. 40 (J&J Answer to Mont. SAC, ¶¶ 5, 162); Ex. 41 (Novartis Answer to Mont. SAC (Dkt. No. 911), ¶ 5); Ex. 42 (Pfizer Answer to Mont. SAC (Dkt. No. 908), ¶ 5); Ex. 43 (Pharmacia Answer to Mont. SAC (Dkt. No. 909), ¶ 5); Ex. 44 (Sicor Answer to Mont. SAC (Dkt. No. 932), ¶ 5); Ex. 57 (TAP Answer to Mont. SAC (Dkt. No. 930), ¶ 5).

[21] *See, e.g.*, Ex. 45 (Aventis compiles Medicaid and Medicare "Reimbursement Information by State," including "Payment Methodology," for Nevada and numerous other states) (AV-AAA-005243-92); Ex. 46 (Immunex communicated prices directly to individual compendia) (IAWP023473; IAWP008102; IAWP016500); Ex. 47 (Dey discusses HCFA pricing) (EDEY-LABS-0018690, 18688, EDEY-LABS-0000307-08); Ex. 48 (Dey discussing Medicaid reimbursement) (EDEY-LABS-0010325-28); Ex. 23 (Pharmacia power point presentation defining AWP as "an artificial pricing index that is used as a common basis for third-party reimbursement to pharmacists and physicians" (PH 025785-94 at 025785, 025793)).

**D.      The Numbers Defendants Reported Were Not Average Wholesale Prices**

It is beyond dispute that defendants did not report average wholesale prices.  Dr. Hartman was able to analyze on how many occasions the state paid for a drug on a basis other than that set forth in the applicable Regulation.

There is no "expectation" theory at issue on the claim.  Liability attaches because the AWPs were not as specified by Regulation.  Dr. Hartman has calculated for each defendant how many claims were paid where the AWP was not as defined by Regulation.[22]  That analysis is contained in Tab 7 in his original report and Tab 7A in his Supplemental Report.

### III.      LEGAL ARGUMENT

**A.      "AWP Means The Average Price At Which Wholesalers Sell Drugs To Their Customers, Including Physicians And Pharmacies"**

Judicial interpretation of the term "average wholesale price" as a matter of law is appropriate here.  The parties to the Class Case asked the Court to construe the term to resolve the parties' competing constructions.  "Plaintiffs assert[ed] that Congress intended AWP to mean some actual average of wholesale prices to customers.  Defendants assert that AWP is a term of art and means a reference price or benchmark used for price negotiations, rather than an average of actual prices."  *In re Pharm. Indus. Average Wholesale Price Litig.*, Memorandum & Order, at 15 (Nov. 2, 2006) ("Plain Meaning Order").  The Court concluded:

> [T]hat AWP means the average price at which wholesalers sell drugs to their customers, including physicians and pharmacies.

*Id.* at 1-2.

To reach this definition, the Court observed that "[s]tatutory construction ordinarily begins with the plain language of the statute."  *Id.* at 15.  The Court then reviewed the ordinary meanings of the words at issue, the history of the use of AWP, including its regulation, treatment

---

[22] Ex. 49 (Calculation of Damages and Penalties for the State of Montana ("Hartman Rpt.") at Table 3).

and analysis by the United States Congress and various other sources over the years.  The Court also carefully examined the Defendants' alternate "term of art" interpretation of AWP.  After considering all of this, the Court construed "average wholesale price" to include discounts and rebates.  *Id.* at 23.

The Court's interpretation of AWP applies equally to the use of the term in the Medicaid context where the source and history of its usage is the same as for Medicare and private payors.  Indeed, consideration of the use of AWP under Montana law strengthens the Court's well-reasoned construction.

### 1.      The Plain Meaning of the Montana Medicaid Plan

In Montana, AWP is currently statutorily defined.  The statute provides an independent basis for the "plain meaning" interpretation previously adopted by the Court.  Mont. Code Ann. § 53-6-1001(1) defines "AWP" as "the wholesale price charged on a specific drug that is assigned by the drug manufacturer and is listed in a nationally recognized drug pricing file." Again, applying the plain meaning rule to this definition, as is required under Montana law,[23] the meaning is evident:  AWP directly relates to the wholesale price.  The Montana statute unambiguously requires the price to be a ***wholesale*** price assigned by the manufacturer and actually ***charged*** to customers and then listed on a national drug pricing source.  This is entirely consistent with the Court's earlier interpretation of AWP to mean "the average price at which wholesalers sell drugs to their customers."  Under the Montana statute, there is no basis to interpret AWP as a random "sticker price" assigned by manufacturers without any reference to marketplace prices.  As part of doing business in Montana, the drug manufacturers would have

---

[23] MONT. CODE ANN. § 1-2-106 (2006) (in construing Montana statutes, "[w]ords and phrases used . . . are construed according to the context and the approved usage of the language."). *See also In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187, 203 (D. Mass. 2004) (quoting *Baitis v. Dep't of Revenue of Mont.*, 319 Mont. 292, 300, 83 P.3d 1278, 1283 (2004)).

had to have been on notice of this statutory definition and the State legislature's related intent to

rely on the AWPs in determining reimbursement at AWP – 15%.  MONT. ADMIN. R.

37.86.1101(1)(b) (2006).

In addition, under Montana law Defendants' alternate interpretation of AWP as a "term

of art" would have to ignore the State's clear definition of "Estimated Acquisition Cost"

("EAC") and its link to AWP.  The EAC definition supports the interpretation of AWP as actual

average prices paid, including discounts and rebates.  By administrative rule, "EAC":

> "means the cost of drugs for which no maximum allowable cost
> (MAC) price has been determined.  The EAC is the department's
> best estimate of ***what price providers are generally paying in the
> state for a drug in the package size providers buy most
> frequently***.  The EAC for a drug is:
>
> (a)  the direct price (DP) charged by manufacturers to retailers;
>
> (b )  if there is no available DP for a drug or the department
> determines that the DP is not available to providers in the state, the
> EAC is the average wholesale price (AWP) less 15%; or
>
> (c )  the department may set an allowable acquisition cost for
> specified drugs or drug categories when the department determines
> that acquisition cost is lower than 1(a) or (b) based on data
> provided by the drug pricing file contractor.

MONT. ADMIN. R. 37.86.1101 (2006) (emphasis added).[24]  The rule clearly conveys that in

Montana, EAC is the State's "best estimate" of "what price providers are ***generally paying in the

state***" for specific drugs.  The State will estimate "***acquisition costs***" and AWP will be used as

one component of that estimate.  Defendants could ask for no clearer signal; the State's intent is

unambiguous.  The Rule does not contemplate theoretical or phony pricing.  In Montana, as

---

[24] Earlier versions of the Montana Administrative Rule are consistent.  *See, e.g.,* Ex. 50 (State Plan Amendment
(2000)); Ex. 51 (MT004034-4043 at 4036 (MONT. ADMIN. R. 46.12.102 (1998)) (EAC as "the direct price (DP)
charged by manufacturers to retailers.  If there is no available DP for a drug or the department determines that the
DP is not available to providers in the state, the EAC is the average wholesale price (AWP) less 10%)); Ex. 52 (State
Plan Amendment approved in 1995, defines EAC in accordance with federal definition as "state agency's best
estimate of what price providers generally pay for a particular drug" and where drugs are paid by their AWP, the
EAC is AWP – 10%.) (MT005760 (1995)).

elsewhere, the EAC for a Subject Drug is intended to represent real market prices providers pay "in the state," and not a retail sticker price without any connection to prices in the market place. "Provider" is broadly defined under the Medicaid statutes and means an individual, company, partnership, corporation, institution, facility, or other entity or business association that has enrolled or applied to enroll as a provider of services or items under the medical assistance program established under this part. MONT. CODE ANN § 53-6-155(13).

>       **2.      The Only Reasonable Interpretation Is To Give AWP Its Ordinary Meaning**

The only reasonable interpretation of "AWP," then, is that it is an average of actual marketplace prices, including discounts and rebates. This interpretation is equally true for purposes of this litigation as it is for the Defendants' and the State's business purposes pre-litigation.

Montana has the same interests in predictable pricing and low costs as any reimbursing entity in any industry. In fact, the interest may be particularly acute in the Medicaid context where drug pricing increases and escalating demands for services chronically strain state budgets. There can be no suggestion that the State intended to leave the rate up to the caprice of the manufacturers, deliberately exposing the State and its coffers to the potential of unchecked prices, unbridled inflation and price manipulation. This implies not just gross fiscal irresponsibility on the part of the State, of which there is no evidence, but also the acceptance of unpredictable business conditions under which no business or government could operate effectively. Defendants must give the State and State medicaids more credit than that.

Various sources have articulated the absurdity of such a position. "The suggestion that Congress would deliberately condone a bribery scheme using public funds to enrich drug manufacturers and physicians is, to say the least, unusual." *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 163 (D. Mass. 2003) (footnote omitted). This Court

recognized the absurdity in its Plain Meaning Order:  "The interpretation that Congress intended to permit fictitious pricing produces the absurd result of penalizing the very beneficiaries the statute was designed to help."  Plain Meaning Order at 21.  Although the Court was describing the impact on Medicare beneficiaries of paying 20% of inflated drug prices, the concept extends to the Medicaid situation where the State's agreement to enrich drug manufacturers by using state funds to overpay for Subject Drugs would harm Medicaid beneficiaries by squandering resources that could have been spent elsewhere (to say nothing of the harm it would cause taxpayers).

As a matter of law, no reasonable person could find that the definition of AWP for purposes of this case differs from the Court's previous conclusion:  "AWP means the average price at which wholesalers sell drugs to their customers, including physicians and pharmacies," and should include rebates and discounts.  Plain Meaning Order at 1-2, 23.

**B.      Defendants Deviated From The Plain Meaning Of AWP When They Reported Prices**

Evidence – and time – have proved that despite the plain meaning of the term Average Wholesale Price, Defendants' use of the term as a label for the prices reported by the national publishers was a misnomer.  Defendants can no longer dispute that they published – or caused to be published – Subject Drug pricing information under the label "AWP" that did not reflect the "average price at which wholesalers sell drugs to their customers, including physicians and pharmacies," in that they were not based on real marketplace information and did not reflect rebates, discounts, confidential pricing agreements or other concessions.

At trial Defendants themselves admitted that the prices they reported did not meet the plain meaning of the term "AWP."[25]  Rather, the prices they published – or caused to be published – were no more than "sticker prices" or a reference price or benchmark used for price negotiations.  The prices did not reflect averages charged.

Dr. Hartman analyzed Defendant pricing data for Defendants and concluded that the AWPs did not reflect average prices at which sales were made as required by the plain meaning of the term AWP.  Dr. Hartman performed two series of calculations.  The first, where he had ASPs, he was able to calculate how many times the State paid a claim for a drug where the ASP was lower than the statutory allowed amount.[26]  Where Dr. Hartman did not have ASPs, he counted the number of claims for each type of drug (single-source self-administered, multi-source self-administered and physician-administered) which exceeded that amount allowed under the Medicaid statute; *i.e.*, AA > AWP – 15% for the relevant periods of time.

In Table 7 of the June 13, 2006 Report, Dr. Hartman reported the results of the analysis using a strict application of the statutory language.  Specifically, if the allowed amount AA is > AWP – 10% and AA > AWP – 15% for the relevant periods of time, he found the claim false and subject to deceptive trade practices.  Using this criterion for the relevant claims (2.42 million in total), he found that 388,628 claims for single-source innovator drugs and 16,280 claims for multi-source drugs exceeded the amount allowed by statute.  The total is 404,908.  When he included those claims for which he could make a determination by ASP rather than the

---

[25] *See* Plaintiffs' Post-Trial Proposed Findings of Fact ("PFOF") (Dkt. No. 3553) where Plaintiffs submitted facts supporting a finding that each of the Defendant's AWPs were false in that they did not include relevant discounts nor reflect an average.  *See e.g.*, PFOF, ¶¶ 40-44 (AZ knew that its AWP was a fictitious number); ¶¶ 45-47 (AZ refrained from making AWP a meaningful number); ¶¶ 130-53 (BMS's AWPs for its subject drugs were false in that they did not include relevant discounts or reflect an average); ¶¶ 191-97 (J&J did not include discounts in its reported AWP and did not report an actual average); ¶¶ 198-201 (J&J manipulated its pricing to create a spread); ¶¶ 202-73, 289-347 (the Schering-Plough Group's AWPs for its subject drugs did not include relevant discounts nor reflect an average).  The State incorporates by reference these sections of the PFOF and rely on them in support of their Motion for Partial Summary Judgment.
[26] *See* Tables 3-5 attached to Ex. 49.

statutorily-calculated amount, an additional 16,518 claims for single-source innovator drugs and 87,312 claims for multi-source drugs were determined to be false and subject to deceptive trade practices.  The total number of claims that were false and subject to deceptive trade practices was 508,738; the total amount of penalties for these claims is $1.53 billion.[27]

Using these criteria for those claims (again 2.42 million in total) for which he used more liberal (to Defendants) thresholds, he found that 8,527 claims for single-source innovator drugs and 922 claims for multi-source drugs exceed the threshold.  The total is 9,449.  When he includes claims for which he made a determination based on ASP rather than the statutorily-calculated amount, the additional number of claims does not change; 16,518 claims for single-source innovator drugs and 87,312 claims for multi-source drugs are determined to be false and subject to deceptive trade practices.  The total number of claims that are false and subject to deceptive trade practices is 113,279.  *Id.*

## C.     The Publication of AWPs Violated The Montana Fraud Statute As A Matter Of Law

Each time a Defendant reported a false AWP that was used to determine payments under State Medicaid programs, the Defendant violated the Montana Medicaid Fraud Statute.

Montana brings claims against each Defendant pursuant to its Medicaid Fraud Statute, Mont. Code Ann. § 53-6-160 and § 53-6-143(4) for their submissions of untrue, incomplete, inaccurate and misleading information used to determine the amount of payment under the Montana Medicaid Program.  The State alleged that each Defendant "made false statements by reporting inflated AWPs that greatly exceeded the average of wholesales prices, based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs."  Mont. SAC, ¶ 676.  The State

---

[27] Ex. 53 (Calculation of Damages and Penalties for the State of Montana – Supplementary Declaration of Raymond S. Hartman ("Hartman Supp. Rpt.") at p. 1).

further alleged that each Defendant knew or should have known of the falsity of the claim, statement or representation.  In making the representations, Defendants knew that others would use the inflated AWPs to obtain reimbursement from Montana Medicaid.  *Id.* at 678.  Defendants had the "authority or responsibility" to make the claims, statements or representation, exercised that authority and, as a direct or indirect result, the false statement was made – resulting in an inflated claim being submitted to Montana Medicaid.  *Id.*

Section 53-6-160 states:

> (1)  A person who submits to a Medicaid agency an application, claim, report, document, or other information that is or may be used to determine eligibility for Medicaid benefits, eligibility to participate as a provider, or the right to or amount of payment under the Medicaid program is considered to represent to the department, to the best of the person's knowledge and belief, that the item is genuine and that its contents, including all statements, claims, and representations contained in the document, are true, complete, accurate, and not misleading.

The statute attributes knowledge that a claim, statement, or representation is false "if the person knew, or by virtue of the person's position, authority, or responsibility should have known, of the falsity of the claim, statement, or representation."  *Id.* at § 53-6-160(3).  A person can make a false statement or representation directly or indirectly:

> A person is considered to have made or to have authorized to be made a claim, statement, or representation if the person:
>
> (a) had the authority or responsibility to:
>
> (i) make the claim, statement, or representation;
>
> (ii) supervise another who made the claim, statement, or representation; or
>
> (iii) authorize the making of the claim, statement, or representation, whether by operation of law, business or professional practice, or office policy or procedure; and
>
> (b) exercised or failed to exercise that authority or responsibility and, as a ***direct or indirect result***, the false statement was made,

> resulting in a claim for a service or item when the person knew or
> had reason to know that the person was not entitled under
> applicable statutes, regulations, rules, or policies to medicaid
> payment or benefits for the service or item **or for the amount of
> payment requested or claimed.**

MONT. CODE ANN. § 53-6-160(4) (2006) (emphasis added).  Pursuant to the plain language of

the statute, a person may face liability whether or not the false statement was made directly.  *Id.*;

*see also In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257, MDL 1456,

Memorandum and Order, at 23-25 (D. Mass. June 6, 2004) (Dkt. No. 866) (recognizing claim

may be made where Defendants caused the Secretary to the DHHS to make false statements

regarding certain prices).  The interpretation of "direct or indirect" applies to the reporting of

false AWPs here.

The Defendants published – or caused to be published – AWPs that were used as a basis

for reimbursement by State Medicaid and others.  This reporting falls within the "claim report,

document or other information that is or may be used to determine . . . amount of payment under

the Medicaid program."  MONT. CODE ANN. § 53-6-160(1).

Each time Defendants submit an AWP price, under the Medicaid Fraud Statute, the

defendant represents to Montana Medicaid that the AWP price submitted "is genuine and that its

contents . . . are true, complete, accurate, and not misleading."  MONT. CODE ANN. § 53-6-160(1)

(2006).  Defendants chose to report, or allowed to be reported, to State Medicaid prices that were

not wholesale averages and did not bear any relationship to any real market prices – every time it

allowed AWPs to be published.  As discussed above, the words "average," "wholesale," and

"price" are so plain and ordinary, that the meaning of the term was manifest from the inception

of the term's usage in drug pricing statutes and rules.  The plain meaning of the statutory term

"AWP" is "the average price at which wholesalers sell drugs to their customers, including

physicians and pharmacies."  Plain Meaning Order at 1-2; *see also supra* at 8.  Pursuant to the

governing plain meaning rules of construction – and common sense – the drug manufacturers could not have interpreted AWP any differently as they disseminated AWPs for use by the States and others.  Here, Defendants clearly knew or should have known that the AWPs they provided were false in that they were not average wholesale prices as contemplated by the State rules.  Thus, the State was not paying an average wholesale price.

Evidence confirms that falsity of the information.  Defendants admit that the AWPs they reported did not reflect true averages, but rather characterized them as  "sticker prices."  The analysis of the AWPs conducted by State Expert, Ray Hartman, has analyzed for each defendant and found that the AWPs reported did not comport with the plain meaning.[28]

By providing false information, each Defendant violated the Medicaid Fraud Statute every time it reported an AWP.  And each time the State paid a Medicaid claim based on the untrue and inaccurate AWP, it overpaid and thus was damaged.

In short, to quote Judge Stearns, "defendants trumpeted a lie by publishing the inflated AWPs knowing (and intending) them to be used as instruments of fraud."  *In re Lupron*, 295 F. Supp. 2d at 167.  In doing so, Defendants committed an "offense" under the Montana Medicaid Fraud Act.

For these reasons, partial summary judgment should be entered in the State of Montana's favor on its Medicaid Fraud Statute Claims as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment should be granted against all Defendants on the issues identified above.

---

[28] *See* Ex. 49 (Hartman Rpt., Tab 7) and Ex. 53 (Hartman Supp. Rpt. at Tab 7A).

By  /s/ Steve W. Berman                DATED:  February 8, 2007
   Steve W. Berman
   Sean R. Matt
   Jeniphr A.E. Breckinridge
   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Thomas M. Sobol
   Edward Notargiacomo
   HAGENS BERMAN SOBOL SHAPIRO LLP
   One Main Street, 4th Floor
   Boston, MA  02142
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003

   Mike McGrath
   Attorney General of Montana
   Ali Bovingdon
   Assistant Attorney General
   Justice Building
   215 North Sanders
   P.O. Box 201401
   Helena, MT  56920-1402
   (406) 444-2026

   COUNSEL FOR PLAINTIFF
   STATE OF MONTANA

**CERTIFICATE OF SERVICE**

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **THE STATE OF MONTANA'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CERTAIN DEFENDANTS** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on February 8, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By_____/s/ Steve W. Berman_____
      Steve W. Berman
      **HAGENS BERMAN SOBOL SHAPIRO LLP**
      1301 Fifth Avenue, Suite 2900
      Seattle, WA  98101
      (206) 623-7292