### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————————————— ) | |
| **In re: PHARMACEUTICAL INDUSTRY** ) | |
| **AVERAGE WHOLESALE PRICE** ) | |
| **LITIGATION** ) | MDL NO. 1456 |
| ) | Civil Action No. 01-12257-PBS |
| ) | Judge Patti B. Saris |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| ) | |
| *State of Montana v. Abbott Labs., Inc., et al.,* ) | |
| CA No. 02-CV-12084-PBS ) | REQUEST FOR ORAL ARGUMENT |
| ———————————————————————— ) | |

### MEMORANDUM IN SUPPORT OF BAYER'S
### MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendant Bayer Corporation ("Bayer") stands in a unique posture in this litigation.  In 2001, Bayer entered a settlement agreement with the State of Montana (the "2001 Settlement") that resolved Montana's allegations of AWP fraud concerning six Bayer drugs.  Since the 2001 Settlement took effect, Bayer has reported to the State of Montana average sales prices ("ASPs") for all of its drugs on a quarterly basis.  Thus, Bayer has for the past five years done precisely what the State contends all manufacturers should have done in the State's hypothesized "but-for world."  (BSUF ¶¶ 117-18).[1]

Recognizing that the 2001 Settlement (and Bayer's ASP reporting under the settlement) substantially undercuts its case, the State has in the course of this litigation abandoned nearly all of its claims against Bayer.  Specifically, the State has dropped its claims relating to:

- The entire post-settlement time period, based on Bayer's reporting of ASPs; and
- The pre-settlement time period, to the extent the Court dismissed such claims based on the 2001 Settlement in its June 10, 2004 decision.

All that remains are mere slivers of claims relating to a few drugs for limited time periods.   As explained below, when these remaining pieces are examined on a drug-by-drug basis, the undisputed facts require judgment as a matter of law in favor of Bayer.

---

[1] Citations to "BSUF" and "BAYAPP" refer to Bayer's Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment ("BSUF") and Bayer's Appendix of Documents in support thereof ("BAYAPP").

## BACKGROUND

The State's Second Amended Complaint ("SAC" or "Complaint") alleges that Bayer committed both "AWP fraud" (SAC ¶¶ 656, 663, 676-77, 688-89) and "best price fraud" (*id.* ¶¶ 663, 671-75, 683-86).  The State's AWP fraud claims relate to six Bayer drugs:  Cipro, Gamimune, Koate, Kogenate, DTIC-Dome, and Mithracin.  (*Id.* App. A).  Its best price fraud claims target two Bayer products, Cipro and Adalat.  (SAC ¶¶ 621-27).

Before explaining why each of the State's claims is barred, this brief begins by describing (1) Bayer's 2001 Settlement relating to AWP, and (2) Bayer's 2003 Settlement relating to best price.

### A.    2001 Settlement Agreement

On February 21, 2001, the State of Montana — through its Attorney General and the Director of its Medicaid program — executed the 2001 Settlement Agreement.  (BSUF ¶ 11) (BAYAPP Tab A-1).  The settlement was preceded by a lengthy government investigation that focused on Bayer's reporting of AWPs.  (BSUF ¶ 17).   Following that investigation, federal and state authorities took the position that Bayer had fraudulently inflated AWPs for six specific products, referred to in the settlement agreement as the "Qui Tam Drugs."  (BSUF ¶¶ 11-12).  Significantly, the investigating authorities made no allegation of AWP fraud as to any other Bayer products.  (BSUF ¶ 18).

Under the settlement agreement, Bayer paid a total of $14 million to the federal government and 45 participating states, including Montana.  (BSUF ¶¶ 9, 19, 37).

In consideration of Bayer's payment and other commitments under the agreement, the State of Montana agreed to a broadly-worded release.[2]  Based on the release, this Court has previously dismissed "all fraud claims" concerning drugs covered by the 2001 Settlement, "even those brought in a *parens patriae* capacity."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp 2d 187, 208 (D. Mass. 2004).  The effect of the Court's ruling is to dismiss the State's claims concerning Gamimune, Koate, and Kogenate — each of which is named in the SAC, but is also a "Qui Tam Drug" to which the release applies.

The 2001 Settlement also required Bayer to report ASPs for all its products to the State on a quarterly basis for five years.  (BSUF ¶¶ 21-24).  The ASP reporting requirement applied to *every* drug that Bayer sells in the United States.  (BSUF ¶¶ 22, 41).  The rationale behind the reporting obligation was to provide Montana and the other settling states with additional pricing information to consider in making reimbursement decisions.  (BSUF ¶¶ 27-28).  In accordance with this requirement, Bayer has faithfully reported ASPs to the Montana Medicaid program on a quarterly basis for the last five years.  (BSUF ¶¶ 39, 102).

The ASPs that Bayer provides to the State are audited by an outside, independent review organization.  (BSUF ¶¶ 34-37).  Over the last five years, neither Montana nor any other State or federal body has identified any problems or raised any

---

[2] The State released Bayer from "any civil or administrative monetary claim, action, suit or proceeding the State has or may have relating to claims submitted to the State Medicaid Program for the Covered Conduct."  (BSUF ¶ 29).  In addition, the release "fully discharges Bayer from any obligation to pay restitution, damages, and or any fine or penalty to the State for the Covered Conduct."  (BSUF ¶ 30).

concerns with the quarterly ASP figures provided by Bayer.  (BSUF ¶¶ 43-44).  Based on Bayer's ASP reporting, the State abandoned a substantial part of its Complaint against Bayer, and now admits that it makes no claim against Bayer for any product since ASP reporting began in 2001.  (BSUF ¶¶ 68-69).

**B.      2003 Settlement Agreement**

In 2003, Bayer entered a second settlement agreement with the State of Montana.  (BSUF ¶ 50).  The 2003 Settlement followed an investigation into whether Bayer had misreported the "best price" for its drugs Cipro and Adalat, resulting in an underpayment of Medicaid rebates.  (BSUF ¶ 51).  As in the 2001 Settlement, the 2003 Settlement releases Bayer from "any civil or administrative claims for damages or penalties that the state of Montana has or may have relating to the Covered Conduct." (BSUF ¶ 52).  The 2003 agreement further requires Bayer to have its best price calculations audited by an independent review organization before they are reported to the HHS Office of Inspector General and State Medicaid programs.  (BSUF ¶¶ 53-55).

In its June 10, 2004 ruling on Bayer's motion to dismiss, the Court found that, by referencing the 2003 Settlement, plaintiffs had stated a claim against Bayer with sufficient specificity to satisfy Fed. R. Civ. P. 9(b).  *In re Pharm. AWP Litig.*, 321 F. Supp. 2d at 207-08.  At the same time, however, the Court dismissed "all fraud claims concerning drugs covered by the 2001 and 2003 settlements between Montana and Bayer."  *Id.* at 208.  Following discovery, the State has no evidence of any best price violation by Bayer that has not already been released under the 2003 Settlement.

## ARGUMENT

Montana has no remaining viable claim against Bayer.  Nearly all of its claims have been released pursuant to the 2001 and 2003 Settlements, dismissed by the Court, or abandoned by the State.  What remains lacks proof sufficient to create any genuine issue of material fact.  To explain why summary judgment is appropriate as to each of its drugs, Bayer will address each drug in turn.

## I.      THE STATE HAS NO VIABLE CLAIM OF AWP FRAUD AS TO ANY BAYER DRUG

### A.      <u>Gamimune, Koate, and Kogenate</u>

Montana has no AWP fraud claim as to Gamimune, Koate, and Kogenate because (a) the 2001 Settlement bars any such claims arising prior to the settlement, and (b) Montana has abandoned any post-settlement claims.  Moreover, each of these drugs is a physician-administered multi-source drug which does not fit the State's theory of fraud.

Under the 2001 Settlement, Montana released any AWP fraud claims as to Gamimune, Koate, and Kogenate.  The 2001 Settlement concerned allegations, as here, that Bayer engaged in a "marketing scheme" to set the AWPs of Gamimune, Koate, and Kogenate "at levels far higher than what the vast majority of its customers actually paid for these products."  (BSUF ¶ 12).  By the terms of the settlement agreement, Montana forever released any claim it may have had "under any source of law" for the alleged AWP fraud.  (BSUF ¶ 29).  Recognizing the agreement's preclusive effect, the Court in

its June 10, 2004 Order "dismisse[d] all fraud claims concerning drugs covered by the 2001 . . . settlement[]."[3]  *In re Pharm. AWP Litig.*, 321 F. Supp. 2d at 208.

With respect to the post-settlement time frame, Montana has expressly abandoned its claims.  When asked in discovery to state "the basis for any claim … against Bayer for any time period after Bayer began reporting ASP Information to [Montana's] Medicaid Program pursuant to the Bayer 2001 Settlement," Montana responded that it "makes no such claim."  (BSUF ¶ 68).  It is undisputed that Bayer has reported ASP information to Montana for every quarter since the second quarter of 2001 for a period of five years.  (BSUF ¶¶ 39, 69).  Montana thus concedes that summary judgment is appropriate as to Gamimune, Koate, or Kogenate for this post-settlement period.

Finally, summary judgment should also be granted as to Gamimune, Koate, and Kogenate because each of these products is a physician-administered multi-source drug, as summarized below:

| Multi-Source Drug | Bayer Trade Name | Procedure Code |
|---|---|---|
| Immune Globulin | Gamimune | J1561, 1562, 1563 |
| Factor VIII (human) | Koate | J7190 |
| Factor VIII (recombinant) | Kogenate | J7192 |

(BSUF ¶¶ 70-79).  As explained in the Defendants' Joint Brief, physician-administered multi-source drugs are generally not reimbursed based upon AWP by Montana's Medicaid program and otherwise do not fit the State's theory of fraud.  (Defs.' Jt. Br. 37-

---

[3] The specific time periods covered by the Settlement Agreement are January 1993 through August 1999.  To the extent the State contends that it may still recover for these products for the time period immediately thereafter (but prior to ASP reporting), its claims are still precluded by the applicable two-year statute of limitations.  *See* Defs.' Jt. Br. at 40-41.

38).  The undisputed fact that each of these products is a physician-administered multi-source drug provides an independent, and wholly sufficient, basis for granting summary judgment as to Gamimune, Koate, and Kogenate.

       **B.**       <u>**Cipro**</u>

       Montana has no viable AWP fraud claims related to Cipro because (a) the State has conceded any claims relating to the post-settlement time period, and (b) the State has no evidence to support a claim covering the pre-settlement time period.

       As demonstrated above at p. 6, Montana concedes that it has no AWP fraud claims for the period after the 2001 Settlement for any drug for which Bayer reported its quarterly ASPs.  Because Bayer reported ASPs for every one of its Cipro NDCs (BSUF ¶¶ 39, 41) — and, indeed, all of its drugs — the State has no post-settlement claim for Cipro.

       As to the pre-settlement period, it should first be noted that the 2001 Settlement was reached after a lengthy federal-state investigation in which Bayer fully cooperated.  (BSUF ¶ 17).  Had there been evidence of wrongdoing as to Cipro, government investigators would have raised these claims, and Cipro would have been included among the drugs named in and covered by the 2001 Settlement.  Then as now, however, there is no evidence to support the allegation that Bayer fraudulently "inflated" the AWPs of Cipro products — nor has the State ever cited any such evidence.  To the contrary, the undisputed facts demonstrate that Cipro's AWP always

maintained a precise, formulaic relationship to the price at which Bayer actually sold the product.[4]

Moreover, the State's own testimony — and its post-settlement conduct — conclusively demonstrate the absence of any causal relationship between Bayer's price reporting and any injury to the State.  In the course of discovery, the State offered the Rule 30(b)(6) testimony of a Montana Medicaid official, Jeff Buska.  Asked whether the State would have acted any differently had Bayer provided its ASPs to the State during the pre-settlement period, Mr. Buska testified:  "We wouldn't have changed . . .   It wouldn't have been any different. . . ."  (BSUF ¶ 116).  Mr. Buska further admitted that it "would be fair to say" that Montana Medicaid would have reimbursed providers the same "regardless of whether Bayer provided [the State] ASP information during that [earlier] period." (BSUF ¶ 115).  Mr. Buska's testimony constitutes an admission by the State that Montana Medicaid's reimbursements for Bayer products lacked any causal connection to Bayer's price reporting practices.[5]

But the Court need not rely on this admission alone.  The post-settlement period during which Bayer actually reported ASPs offers a "natural experiment" by which to examine what the State *would have done* with Bayer's ASPs in the pre-

---

[4] Cipro was a single-source, brand name product throughout the pre-settlement time period, and the vast majority of Bayer's sales of Cipro went to wholesalers who paid Wholesale Price ("WP") minus only a prompt-pay discount.  (BSUF ¶¶ 80-82, 98).  WP is Bayer's equivalent of WAC.  (BSUF ¶ 98).  Through 2001, and thus through the time period relevant in this case, the AWP for Cipro was always exactly 20 percent above its WP.  (BSUF ¶¶ 100-01).

[5] The testimony of Montana's Rule 30(b)(6) representative is binding on the State.  *See Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999); *Calzaturficio S.C.A.R.P.A., s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 37 (D. Mass. 2001) (a Rule 30(b)(6) witness testifies "so as to bind the corporation").

settlement time frame.  From 2001 to 2006, Bayer reported ASPs on Cipro and all its other drugs to Montana Medicaid and to First Data Bank on a quarterly basis. (BSUF ¶¶ 39, 41, 102).  The Montana Medicaid program reviewed Bayer's ASP data and identified the precise variances between Bayer's ASPs and the published AWPs for Bayer's drugs.  (BSUF ¶¶ 106-10).[6]  Despite its actual knowledge of the differences between Bayer's ASPs and the published AWPs, Montana Medicaid determined not to use these ASPs in setting payment rates to Montana providers.  (BSUF ¶¶ 103-04, 106-09, 112-13).

The lack of any causal connection between Bayer's ASP reporting and the State's payment rates is fatal to the State's AWP fraud claims.  Proof of causation-in-fact is essential to each of Montana's substantive causes of action.[7]   Montana thus must prove that — in the but-for world that it posits — Montana Medicaid would have paid providers less for Bayer products than it actually did.  In reality, however, Bayer's ASP reporting had no impact on the way that Montana Medicaid paid for Bayer's drugs. With or without ASP reports, Montana Medicaid based its reimbursements for Cipro on AWP.  (BSUF ¶¶ 103-04, 112-16).

In short, the State has no evidence to support any claim against Cipro relating to the pre-settlement time period.  To the contrary, the undisputed facts of

---

[6] Montana Medicaid's Pharmacy Program Officer personally compared the Bayer ASPs to the corresponding First DataBank AWPs on Bayer's ASP report for the second quarter of 2001. (BSUF ¶¶ 106, 110; MT 076440-076448 (BAYAPP Tab D-2)).

[7] *See* MONTANA CODE ANN. § 17-8-231(1) (Montana False Claims Act requires proof of damages sustained "as a result of the false claim"); MONTANA CODE ANN. § 30-14-131(1) (Montana Unfair Trade Practices Act requires proof of injury "by means of any practice . . . declared to be unlawful" under the Act); *Emick v. Koch,* 227 Mont. 365, 367 (1987) (same); *see also In re Estate of Kindsfather,* 326 Mont. 192, 196 (2005).

record establish that Bayer never inflated the AWP of Cipro and that its conduct was not the cause-in-fact of any injury to the State.[8]

### C.   Mithracin and DTIC-Dome

The State's claims for Mithracin and DTIC-Dome are barred both for the post-settlement period and the pre-settlement period.  For the post-settlement period, the State's claims are barred by Bayer's ASP reports and the State's admission that it makes no claim for any period after Bayer began ASP reporting.  (BSUF ¶¶ 39, 68-69).  For the pre-settlement period, the State's claims are barred because Bayer did not engage in any marketing or promotion of these drugs.

Mithracin and DTIC-Dome are both older products that Bayer inherited from predecessor companies.  Bayer has never marketed or promoted either product during the relevant time period.  (BSUF ¶¶ 86-88, 92-94).  For the past 20 years, it had no sales force for Mithracin or DTIC-Dome, nor did it provide its other sales representatives any targets or incentives for sales of these products.  (BSUF ¶¶ 87-88, 93-94).  It no longer sells either of these products.  (BSUF ¶¶ 89, 95).

It is therefore not surprising to learn that the Montana Medicaid program made virtually no purchases of either drug during the relevant time period.  In the case of Mithracin, the State made no purchases whatsoever.  (BSUF ¶ 85) (State "made no payments under [its] Medicaid program to any Beneficiary or Provider during the Relevant Time Period for Mithracin.").  With respect to DTIC-Dome, the Montana

---

[8] In any event, the State's pre-settlement claims as to Cipro are barred by the applicable two-year statute of limitations.  *See* Defs.' Jt. Br. at 40-41.

Medicaid program purchased less than $2500 worth of the product since 1990 and made

no purchases whatsoever since 1999 (BSUF ¶ 96) — before the cut-off date for statute of

limitations purposes.  *See* MONT. CODE ANN. § 27-2-211(1)(c).  Having made no

payments for either product during the time period genuinely at issue in the case,

Montana has no claim that it was deceived into overpaying for the drug.  *See In re Estate*

*of Kindsfather*, 326 Mont. 192, 196-97 (2005) (to succeed in a fraud claim, plaintiff must

prove "consequent and proximate injury . . . caused by . . . reliance on the

representation").

Finally, DTIC-Dome is a physician-administered multi-source drug

(dacarbazine).  (BSUF ¶ 97).  Thus, like Gamimune, Koate, and Kogenate, DTIC-Dome is

associated with a procedure code (J9140) that is shared with products made by several

other manufacturers.  (BSUF ¶ 97).  As explained above at pp. 6-7 and in the

Defendants' Joint Brief, multi-source drugs are generally not reimbursed based on AWP

by Montana's Medicaid program and otherwise do not fit the State's theory of fraud.

(Def. Jt. Br. at 3, 6, 11, 20, 36-39).  For all these reasons, the undisputed facts require

judgment as a matter of law on Montana's claims as to Mithracin and DTIC-Dome.

## II.    THE STATE HAS NO VIABLE CLAIM OF BEST PRICE FRAUD

The State has no remaining best price fraud claims because the Court

substantially dismissed these claims in its June 10, 2004 decision.  To the extent the

claims have not already been dismissed, the State has failed to adduce any evidence to

support them.

In its June 10, 2004 Order, the Court found that Montana had sufficiently stated a best price claim relating to Cipro and Adalat by making reference to the allegations contained in the 2003 Settlement.[9]  *In re Pharm. AWP Litig.*, 321 F. Supp. 2d at 207-08.  At the same time, the Court dismissed "all fraud claims concerning drugs covered by . . . the 2003 settlement."  *Id.* at 208.  The Court's ruling arguably left the door open for the State to attempt to prove best price claims outside the scope of the agreement.

The State has made no such attempt.  It has never identified any basis for claiming any "best price fraud" by Bayer, other than those allegations that have already been settled, released, and dismissed.  This "failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law."  *Smith v. Stratus Computer*, 40 F.3d 11, 12 (1st Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Nor would additional discovery cure the deficiencies in the State's proof. As part of the 2003 Settlement, Bayer instituted a compliance program that calls for exacting oversight of its methods for calculating and reporting best price.  (BSUF ¶¶ 53-57).  Each year, Bayer has engaged an independent auditing firm ("Independent Review Organization" or "IRO") with expertise in federal health care programs to scrutinize Bayer's "systems, processes, policies and practices . . . associated with tracking,

---

[9] The best price allegations in the SAC as to Cipro and Adalat precisely track the alleged conduct Montana released under the 2003 Settlement.  *Compare* SAC ¶¶ 621–22 *with* 2003 Settlement Agreement Pt. II(D), (F)(i) (BAYAPP Tab A-2); SAC ¶¶ 623–24 *with* 2003 Settlement Agreement Pt. II(D), (F)(ii) (BAYAPP Tab A-2); SAC ¶ 625 *with* 2003 Settlement Agreement Pt. II(F)(iii) (BAYAPP Tab A-2); SAC ¶ 626, *with* 2003 Settlement Agreement Pt. II(F)(iv); *id.* Pt. II(C) (BAYAPP Tab A-2).

gathering, and accounting for all relevant data for purposes of appropriately calculating the Best Prices reported under the Medicaid Drug Rebate Program."   (BSUF ¶ 53). After each assessment, the IRO drafted a report of its findings and recommendations, which Bayer submitted annually to the Office of Inspector General ("OIG") of the Department of Health and Human Services.  (BSUF ¶ 54).  Bayer must engage an IRO to conduct this review *any* time it makes a material change in the way it calculates or reports best price.  (BSUF ¶ 55).

Bayer has faithfully complied with the rigorous requirements of the 2001 and 2003 Settlements and the Corporate Integrity Agreements that accompanied them. (BSUF ¶¶ 58, 60).  Indeed, the State makes no allegation to the contrary.  (BSUF ¶¶ 60-61).  Since Bayer's compliance programs went into effect, no federal or state agency has raised with Bayer any comments or concerns relating to Bayer's best price reporting. (BSUF ¶ 58).  It is therefore no surprise that the State of Montana — having settled once yet inexplicably sued again — can adduce no evidence of any best price violation by Bayer.

## CONCLUSION

For the reasons stated above, Bayer respectfully requests that the Court grant its Motion and enter summary judgment against Montana on all counts of the State's Complaint.

February 8, 2007

>    /s/ Richard D. Raskin
> Richard D. Raskin
> Michael Doss
> Ben J. Keith
> SIDLEY AUSTIN LLP
> One South Dearborn Street
> Chicago, Illinois  60603
> 312-853-7000 (tel.)
> 312-853-7036 (facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2007, I caused a true and correct copy of the Memorandum in Support of Bayer's Motion for Summary Judgment to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.


_____/s/ Michael Doss_____