# Exhibit 1

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------

IN RE: PHARMACEUTICAL      )

INDUSTRY AVERAGE           )

WHOLESALE PRICE            )

LITIGATION                 )MDL Docket No.

                           )Civil Action 01CV12257PBS

-----------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

-----------------------------------------------------

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington  98101


REPORTED BY:  Judith A. Robinson, CCR #2171

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

---

182

1      Q.  Were you familiar with the survey
2   conducted by the pharmacy coordinating committee and
3   the University of Montana School of Pharmacy to
4   determine the extent to which pharmacies acquired
5   drugs directly from manufacturers?
6      A.  I don't know.  I don't remember whether I
7   had any input in the survey or whether I had that or
8   even saw the survey.  Although, I'm sure I must have
9   seen it at some point in time or whether I saw the
10  results of the survey.  So far as I remember, I
11  certainly wasn't instrumental in doing the survey or
12  conducting the survey.
13     Q.  Does the letter that you wrote that's
14  Exhibit Poulsen 022 reflect that you were familiar
15  with the results of the survey?
16     A.  Yes.  I mean, it does suggest that I was
17  familiar with the results of the survey.  However, I
18  don't know what the results were.  I mean, I can't
19  determine from this letter what the results were or
20  why I thought this was a good idea at the time.
21     Q.  Do you know whether the survey also looked
22  at whether Montana pharmacies could acquire any

---

183

1   drugs at published direct prices?
2      A.  That was the issue, I believe, is that
3   pharmacies in Montana had a great difficulty
4   acquiring drugs at that price.  And -- and this is
5   speculation on my part.  It could be that our system
6   was set up.  Our reimbursement system, the PBM
7   system was set up to take the lower of direct price
8   or AWP minus 10%.  And so for those labels that's
9   what I'm guessing.  For those labels that were at
10  direct price, they were paying at the.time.
11  but our pharmacies were unable to get the drugs at
12  that cost.  That is -- I think that was the issue.
13     Q.  Does this letter that's Exhibit Poulsen
14  022 refresh your recollection in any way as to
15  whether Montana Medicaid eliminated the use of
16  direct price?
17     A.  I do remember that we removed -- we were -
18  - we removed labels from that -- from that pricing,
19  yes.
20     Q.  Looking at page 2 of Exhibit Poulsen 022 -
21  -
22     A.  Uh-huh.

---

184

1      Q.  -- off the top of your head, do you know
2   the manufacturers associated with the labels that
3   have those numbers?
4      A.  Not anymore.  I would have at one time but
5   not anymore.
6      Q.  Looking at page 3 of Exhibit Poulsen 022,
7   your handwritten notes --
8      A.  Uh-huh.
9      Q.  -- does that appear --
10     A.  Oh, see.
11     Q.  -- to be tying the label to the --
12     A.  Yes.  Some companies that no longer exist.
13     Q.  And some that still exist?
14     A.  And some that still exist, yes.
15     Q.  I want to make sure I have this correct,
16  so I'll just ask you directly.
17     A.  Uh-huh.
18     Q.  Why did you propose in this letter to Jim
19  Smith that Montana Medicaid eliminate use of direct
20  pricing?
21        MR. LOPEZ:  Object to form.
22        THE WITNESS:  I believe that is what they

---

185

1   were asking me for.  That based on the survey, they
2   were asking -- pharmacists were asking that we do
3   away with direct price because they weren't getting
4   paid what they were having to pay.  So they wanted
5   to use AWP minus 10% for everything.
6   BY MS. O'SULLIVAN:
7      Q.  In looking at --
8      A.  Go ahead.
9      Q.  On the second page of Exhibit Poulsen 022,
10  the first line there, did you write:
11        "I propose that we phase in elimination of
12  direct price reimbursement by removing" and then
13  those labels listed above?
14     A.  Right.  I would have written that.
15     Q.  Page 3 of Exhibit Poulsen 022, are those
16  your handwritten notes?
17     A.  Yes.
18     Q.  Do those reflect your calculations of the
19  difference between AWP and direct price on those
20  specific labels?
21     A.  Yes.
22     Q.  Was it your conclusion that eliminating

---

Henderson Legal Services
(202) 220-4158

254

1    Q.  Looking at the last page of Exhibit
2  Poulsen 046, Lori Morin's name appears, a registered
3  pharmacist?
4    A.  Yes.
5    Q.  Her name came up earlier in the
6  deposition.
7       Did she work at the University of Montana
8  Pharmacy School?
9    A.  I believe so, yes.  Or at least that's how
10  I was, she was with the pharmacy advisory counsel
11  that was associated with the Pharmacy Association.
12  The Pharmacists Association.  I think she was like
13  the Chair or she had a relationship in the Pharmacy
14  Association.  She was an activist.
15    Q.  Where your summary states that:
16       "Lori Morin agreed that the current health
17  insurance system provides no incentive to save money
18  on prescription drugs," is that an accurate summary
19  of Ms. Morin's presentation?
20       MR. LOPEZ:  Object to the form.
21       THE WITNESS:  I wouldn't remember.  At
22  that point in time, I thought that was an accurate

255

1  summary of what she said.
2  BY MS. O'SULLIVAN:
3    Q.  When you drafted these documents, Exhibit
4  Poulsen 046, you attempted to make an accurate
5  summary of all the presentations?
6    A.  Yes.  Since I was sending it to all these
7  people, it would have been important for that to be
8  accurate.
9    Q.  I'll ask you to look at Exhibit Poulsen
10  047 Bates numbered MT006565 to 6592.  It's not
11  actually.  To be accurate, it's MT006565 to 6569 and
12  then the final page is 6592; is that correct?
13    A.  Yes.
14    Q.  Is the final page of Exhibit Poulsen 047
15  the agenda for the October 25 Prescription Drug
16  Forum?
17    A.  Yes, it is.
18    Q.  And are all the other pages of Exhibit
19  Poulsen 047 your presentation at that forum?
20    A.  That's what it looks like, yes.
21    Q.  And the title is, "Strategies In Other
22  States."

256

1       What did you mean by that?
2    A.  These forums were not limited to Medicaid.
3  These forums were designed to look at how people
4  generally in the state of Montana could have access
5  to drugs, to medications.  And so -- and so we wanted
6  to make it a broader issue than just Medicaid.
7       So when I'm talking about strategies in
8  other states, what I'm talking about is the pharmacy
9  assistance similar to what Washington has.  I can't
10  remember the name of the Washington program.  They
11  help people.  There is a program for people who are
12  employed that make money but are low income.  But
13  the state has a system or did have a system.
14    Q.  Just to go back to my question about
15  strategies.
16       What do you mean by that when you wrote,
17  "Strategies in other states"?
18    A.  Well, what other states were doing about
19  providing drug services or making drugs available to
20  the residents of their state.
21    Q.  Your point was that this wasn't limited to
22  Medicaid?

257

1    A.  Exactly.
2    Q.  I believe you testified that Montana
3  Medicaid got the AWPs it used for reimbursement from
4  Consultec or ACS?
5    A.  We used their system to price things, yes.
6    Q.  Do you know where FirstData Bank --
7    A.  Where Consultec got it from?
8    Q.  Right.
9    A.  They got it from FirstData Bank.
10    Q.  Do you know where FirstData Bank got its
11  information?
12    A.  You know, I think I -- I think from the
13  manufacturers.  But no, I don't know for a fact.
14    Q.  Did you ever asked anyone at FirstData
15  Bank?
16    A.  I may have.
17    Q.  Do you know if anyone at FirstData Bank
18  ever told you?
19    A.  No.  I mean, I don't remember.
20       (Whereupon, Email Document MT016589
21  Through MT016590 was marked Exhibit Poulsen 048 for
22  identification.)

# Exhibit 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 5-1 - 5-167



BENCH TRIAL - DAY FIVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 14, 2006, 9:20 a.m.






LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

## Page 14

1  Q.  And so you felt that AstraZeneca had the ability to set
2  its own AWP, correct?
3  A.  At that time we submitted those prices to the pricing
4  services.
5  Q.  And the 8.2 percent you were coming up with was just a
6  figure that you made up, right?
7  A.  As part of the evaluating scenarios. We did several
8  scenarios, yes.
9  Q.  Okay. And if you continue down to the last bullet
10 point — well, you're talking about what this would do.
11 Let's go back. You're recommending, first, the increase of
12 the AWP. Second, you were recommending the Zoladex volume
13 discount table, correct?
14 A.  Yes.
15 Q.  And we'll get to that table in a second. You were
16 recommending creating — that this would create a 30 percent
17 spread between AWP and AWC, correct?
18 A.  Yes.
19 Q.  All right. And you thought this would provide a
20 competitive discount schedule which results in a favorable
21 per-unit return to practice, correct?
22 A.  Correct.
23 Q.  And "favorable" meaning that it would compete with
24 Lupron?
25 A.  Yes. We were trying to level the playing field.

## Page 15

1  Q.  Okay. Then toward the bottom you write, "Medicare
2  reimbursement will increase with Zoladex to $310.96, but the
3  dollar amount will be $88.64 below Lupron reimbursement of
4  $397."
5      So you understood that if you raised the AWP, you
6  would raise the cost to Medicare?
7  A.  Well, I also understood that it would be less expensive
8  than the alternative, which was Lupron, to Medicare.
9  Q.  I understand that, but you knew that you would be
10 raising the price to Medicare?
11 A.  Yes.
12 Q.  And you knew that you would be raising the price to
13 Medicare recipients, correct?
14 A.  Well, the same applies. They would be paying less than
15 the alternative, but it would raise their out-of-pocket
16 copay.
17      THE COURT:  So it raised the copay $77?
18      THE WITNESS:  No, your Honor. That would be the
19 copay.
20      THE COURT:  That would be. So what was it before?
21 Do you know?
22      THE WITNESS:  I'd have to do the math, but a few
23 dollars less.
24      THE COURT:  So 8 percent less? Would that be a
25 fair way of doing the math? Is that right, I mean, 8 percent

## Page 16

1  less?
2      THE WITNESS:  It will probably get you in the
3  ballpark.
4      THE COURT:  Ten percent?
5  Q.  Okay, now, if you turn to the next page with me,
6  please --
7      THE COURT:  And is that a copay monthly?
8      THE WITNESS:  Yes, that would be monthly, monthly
9  copay.
10      THE COURT:  Is that because, is it a monthly
11 regimen of —
12      THE WITNESS:  It is a monthly injection.
13      THE COURT:  For how long?
14      THE WITNESS:  Usually the course of therapy will
15 last anywhere from one to two to three years.
16      THE COURT:  So it was roughly $70 before, I mean,
17 just ball-parking.
18      THE WITNESS:  Sure.
19      THE COURT:  It goes up to $77 a month for three
20 years.
21      THE WITNESS:  That's correct. It would still be
22 less than the alternative.
23 Q.  And --
24      MR. BERMAN:  I'm sorry. May I proceed, your
25 Honor?

## Page 17

1  Q.  If you turn to the next page, under "Price Increase
2  Timing," you write, "We would recommend the Zoladex price
3  increase to occur January 15, 1996, with notification of the
4  Red Book on or before December 15, 1995, for placement in the
5  January edition of the Red Book."
6      Now, you understood then that your AWP price would
7  be reported by AstraZeneca to the Red Book, correct?
8  A.  Yes.
9  Q.  And you wanted to make sure it got in there soon enough
10 so that you could immediately begin competing with Lupron?
11 A.  Yes.
12 Q.  And then if you turn to the last page, the very last
13 sentence writes, "A copy of this document has been submitted
14 to Legal for review. Since the recommendation is a departure
15 from past practices, it seemed prudent to seek the formal
16 opinion."
17      What was the departure from past practices?
18 A.  The recommendation on the pricing, the recommendation on
19 the spread, and the volume discounts. We were also
20 recommending some additional volume discounts.
21 Q.  Did AstraZeneca ever have a policy that made it against
22 company policy to market the spread?
23 A.  No, not to my knowledge.
24 Q.  Now, if you could continue on in this document to the
25 page stamped 7154, please. It's entitled "Zoladex

7f967b7b-0bb4-482c-8f40-ae5be3450e4b

Page 34

1  decision in the company as to whether it was 20 or
2  25 percent?
3       THE WITNESS: At that time we reported both to the
4  pricing services.
5       THE COURT: You reported --
6       THE WITNESS: Both WAC and AWP.
7       THE COURT: So you decided what AWP was, not the
8  publication?
9       THE WITNESS: At that time, that's correct.
10  Q.  And if one were to look in the Red Book at the time,
11  would one see both numbers?
12  A.  Yes.
13  Q.  Was there ever a time when you were using the term "AWP"
14  but had a different understanding than the one you've just
15  articulated?
16  A.  No.
17  Q.  And in your twenty-one years working for AstraZeneca,
18  what other kinds of entities have you dealt with in the
19  health care industry?
20  A.  Hospitals, HMOs, managed care plans like IPAs and PPOs.
21  Q.  You need to spell out the acronyms, I think.
22  A.  Oh, different, different managed care networks,
23  independent practice associations, preferred provider
24  networks.
25       THE COURT: What's an IPO in this context?

Page 35

1       THE WITNESS: IPA.
2       THE COURT: Oh, it's an IPA?
3       THE WITNESS: IPA, independent practice
4  association. It's more of just a network of physicians who
5  contract with an insurer for discounted services.
6  Q.  And can you recall encountering anyone else at any of
7  these entities over the twenty-one years you worked for the
8  company who thought AWP meant something different than what
9  you've just described?
10  A.  We generally talked about the acquisition price, which
11  is WAC, or the contract offer.
12  Q.  Now, you said you became involved in setting strategy
13  for Zoladex in 1995, correct?
14  A.  Correct.
15  Q.  And I think Mr. Berman already elicited what you did
16  with respect to the product, so we'll move on. As of 1995,
17  was the Zoladex list price higher or lower than Lupron's list
18  price?
19  A.  The price was lower. Zoladex was lower than Lupron.
20  Q.  And when I asked you the list price, what did you think
21  of?
22  A.  WAC.
23  Q.  And do you recall the order of magnitude of difference
24  between the two?
25  A.  Between Lupron and --

Page 36

1  Q.  The list price for Lupron versus the list price for
2  Zoladex.
3  A.  It was about $100.
4  Q.  And what about the AWP, was it higher or lower?
5  A.  It was higher for Lupron.
6  Q.  And in the Medicare context, what did that mean with
7  regard to reimbursement by Medicare and by patients?
8  A.  Well, it meant by how Medicare set its reimbursement
9  formula, that they would be reimbursing more for the
10  higher-cost product.
11  Q.  And when you studied and learned about this product in
12  1995, had Zoladex's lower price been an advantage in the
13  marketplace?
14  A.  It was not an advantage.
15  Q.  And according to what you learned, why was that?
16  A.  Because physician practices were motivated by the return
17  to practice, and they were reimbursed more for the
18  higher-priced product.
19  Q.  And what was your understanding of the effect that the
20  return to practice issue was having in sales discussions when
21  you became involved with this product?
22  A.  Well, it was keeping us from actually being able to talk
23  to doctors about the clinical efficacy or the attributes of
24  the product. Until we were able to level the playing field,
25  we weren't able to grow market share.

Page 37

1  Q.  Now, turning to Plaintiffs' Exhibit 14, which is
2  Defendants' 2128, if we could have that, please, this was
3  discussed fairly extensively on cross. I want to bring back
4  to your attention Page 2, Paragraph 2, the sentence that the
5  Court already asked you about stating "Our campaigns."
6       THE COURT: Where are we now?
7       MR. BOUDETT: Your Honor, it's Exhibit 2128. 14
8  it's labeled in your binder then, Page 2. It's the second
9  paragraph which starts with "Market research," and we're
10  about halfway down the paragraph, the highlighted portion.
11       THE COURT: All right.
12       MR. BOUDETT: And you asked him about this sentence
13  as well, your Honor.
14  Q.  I just want to ask you again, Mr. Buckanavage, without
15  getting repetitive, can you just elaborate on what you
16  meant? What was being thwarted and why?
17  A.  Our access to doctors to talk about the products was
18  being thwarted because TAP was offering greater volume
19  discounts than we were offering at the time.
20  Q.  Now, this memo analyzes four different scenarios, and
21  then it goes on to recommend one of them; is that right?
22  A.  That's correct.
23  Q.  And as we've already established, your understanding is
24  that none of the exact four scenarios was actually adopted,
25  correct?

10  (Pages 34 to 37)

7f967b7b-0bb4-482c-8f40-ae5be3450e4b

---

Page 142

```
 1      MR. BERMAN: You're on 9756 Bates stamp.
 2      THE COURT: All right.
 3  Q. Since Rubex is facing competition, you're seeing a
 4  discount of 84 percent, correct?
 5  A. Yes.
 6  Q. And Taxol, 75.36?
 7  A. Yes.
 8  Q. And Vepesid, 94.36, correct?
 9  A. Correct. That's what it says here.
10  Q. And so if you look at the discount there for Taxol, what
11  is that? What is the Taxol discount?
12  A. On my page?
13  Q. Yes.
14  A. For all three sizes, it's the same discount of 75.36
15  percent.
16  Q. Okay. Now, were you involved -- did you have any
17  understanding that Medicare reimbursed for Part B covered
18  drugs, which these were, based on AWP?
19  A. Yes, that was my understanding.
20      MR. TRETTER: Your Honor, the questioning has been
21  about the hospital market, not about the office, but this
22  Premier is hospital-based, so if he's trying to ask the
23  question -- the witness a question about the hospital market,
24  I think he should make that clear.
25      MR. BERMAN: I was just asking a question.
```

Page 143

```
 1      MR. TRETTER: Well, this exhibit that he's working
 2  with is Premier, which is a hospital buying group.
 3      THE COURT: All right.
 4  BY MR. BERMAN:
 5  Q. Let me ask the question --
 6      THE COURT: Is that true, do you know?
 7      THE WITNESS: Yeah, Premier is a hospital buying
 8  group, so I think in the hospital market the reimbursement
 9  can be different depending on the setting. So I think Lyndon
10  is right. The office-based market was driven I think solely
11  by AWP, whereas the hospital market depended on whether it
12  was in- or outpatient setting.
13      THE COURT: Whoa. Run that by me again. All
14  right. So the hospital -- how did it differ from the
15  office-based?
16      THE WITNESS: So every office-based patient is an
17  outpatient. There's one reimbursement regime --
18      THE COURT: Based on AWP.
19      THE WITNESS: That's my understanding.
20      THE COURT: Okay. And so a hospital is different
21  how?
22      THE WITNESS: Some patients are admitted and they
23  stay overnight, so a different reimbursement system applies
24  for those patients as opposed to the patients who come in,
25  receive their treatment and go back home.
```

Page 144

```
 1      THE COURT: So why is that significant for the
 2  differences in the discounts? That's what I'm missing.
 3      THE WITNESS: That -- I didn't say that, that it
 4  would impact the differences in discount.
 5      THE COURT: All right. So this discount would be
 6  roughly reflective of what discounts people were getting in
 7  the office setting too?
 8      THE WITNESS: Yes. The drug is the same regardless
 9  of the setting and there's -- competitive forces in the
10  marketplace will drive it to the same price level in the
11  different settings.
12  BY MR. BERMAN:
13  Q. So going back to my original question, you understood
14  that when a Medicare patient was using one of these drugs,
15  that Medicare was basing its reimbursement to oncologists off
16  of AWP.
17  A. Right.
18  Q. Okay. Was there any discussion that you were involved
19  with at BMS about informing -- let's take the Medicare
20  beneficiary who's making a copayment -- about the size of the
21  discounts off of wholesale list price with respect to Taxol,
22  for example? Was that discussed?
23  A. Do you mean informing patients?
24  Q. Yes.
25  A. No.
```

Page 145

```
 1  Q. Was there any discussion that you were involved with
 2  about disclosing or informing union plans that are paying for
 3  their members' health benefits about these kinds of discounts
 4  off of Taxol?
 5  A. Not to my knowledge.
 6  Q. And BMS's published list price does not reflect the
 7  average contract selling price that's actually out there,
 8  correct?
 9  A. That's correct.
10      THE COURT: Who decided the markup factor from
11  wholesale list price to AWP? Do you know?
12      THE WITNESS: I'm not sure who would have decided
13  that. I know it's different depending on the publication,
14  but exactly how that percentage was determined, I couldn't
15  tell you.
16      THE COURT: Did you know it was always within a
17  certain range?
18      THE WITNESS: Yes. I think it was either 25
19  percent or 30 percent, to the best of my knowledge.
20      MR. BERMAN: That's all I have. Thank you.
21      THE COURT: All right. Thank you.
22  How long do you think you're going to be?
23      MR. TRETTER: Twenty minutes.
24      THE COURT: You do it in 20 minutes and I'll get
25  him out of here. I'll sit the extra ten minutes. I have a
```

7f967b7b-0bb4-482c-8f40-ae5be3450e4b

# Exhibit 3

## Medicare Review

**What is Medicare?**  A government program developed in the 60's to pay for medical coverage for people age 65 and over.  It pays for both hospital and office visits.  Hospital stays qualify under Medicare Part A; office visits qualify under Medicare Part B.

**How is Medicare Part B reimbursed?**  Office based physicians can choose to participate or not in Medicare.  As a participator, the physician agrees to accept the fee schedule Medicare establishes.  Essentially, the physician files a claim; Medicare pays for 80% of the claim and the patient is responsible for the remaining 20%.  Some patients may have a secondary insurance which will pay 80% of the 20% co-pay.  This leaves 20% of the 20% (4%) that the patient is responsible for.  Other patients may be enrolled in a senior plan for all their Medicare coverage.  This usually means the physician agrees to accept a capitated rate of payment for each patient.  These are becoming more popular and the government is encouraging enrollment in these plans.  Interestingly, insurance companies are backing out of senior plans because they are not making money, due to increased risk of carrying older patients.

**How does Medicare affect Zeneca?**  Medicare Part B has a rule that says that medication which must be administered in the office is reimburseable.  Since Zoladex must be given in the office, it qualifies for reimbursement.

**How does Medicare reimburse for Zoladex?**  Prior to 1998, Medicare reimbursed 80% of the Average Wholesale Price for all medications.  The patient was responsible for the remaining 20%.  Thus, the AWP was considered the Medicare Allowable; the 80% was called the Medicare Payable.

In order to cut costs, HCFA (Medicare policy maker) instituted a new reimbursement schedule that went into affect 1/1/98.  Simply, they made the Medicare Allowable 95% of the AWP, and the Medicare Payable was then calculated as 80% of the allowable.

| Example: | Pre 1/1/98 | Post 1/1/98 |
|---|---|---|
| AWP (Zoladex 1-mo) | $439.25 | $439.25 |
| Medicare Allowable | $439.25 | $417.28 (AWP-5%) |
| Medicare Payable | $351.40 | $333.82 (80% of Allow) |
| Patient Co-Pay | $87.85 | $83.46 (20% of Allow) |

To date, Medicare has not influenced the AWP of any medication that qualifies for reimbursement.  Companies have the latitude to set AWP as they wish.  Take our recent price increase:  Zoladex AWP will now be $469.99.  Again, Medicare will allow 95% of the Zoladex AWP ($446.49); physician will be paid 80% of the allowable ($357.19); patients will be responsible for 20% of the allowable ($89.30).

Plaintiffs' Exhibit
**131**
01-12257-PBS

HIGHLY CONFIDENTIAL

AZ0419345

| 2000 Medicare Scenario: | 1-Month | 3-Month |
|---|---|---|
| AWP | $469.99 | $1,049.97 |
| Medicare Allowable | $446.49 | $1,339.48 |
| Medicare Payable | $357.19 | $1,071.58 |
| Patient Co-Pay | $ 89.30 | $ 267.90 |

**What does it all mean for Zoladex pricing?** Before the major buying groups were established in 3Q97, physicians purchased Zoladex off a discount schedule that has two major components: 1) it is volume driven (the more you buy, the bigger the discount), and 2) the baseline price established is 80% of the AWP, which is exactly what the physician would be reimbursed. If a physician purchased 1 depot, it would cost exactly what Medicare would pay him/her. He still made money through the patient co-pay.

| Example: | Pre 1/1/98 | Post 1/1/98 |
|---|---|---|
| AWP | $439.25 | $439.25 |
| Medicare Allowable | $439.25 | $417.28 (95% of AWP) |
| Medicare Payable | $351.40 | $333.82 (80% of Allowable) |
| Cost of 1 Zoladex | $351.40 | $351.40 |
| Patient Co-Pay | $87.85 | $83.46 (20% of Allowable) |
| Return to Practice | $87.85 | $65.88 |
| (Med Allow -Med Payable) | | |

With the policy initiated 1/1/98, the physician's return to practice was reduced because he still paid 80% of the AWP for one Zoladex depot ($351.40), but the Medicare Allowable was reduced ($417.28 vs $439.25) which reduced the Medicare Payable ($351.40 vs $333.82) and the Patient Co-Pay ($87.85 vs $83.46).

However, very few physicians order one depot. The majority order at least 12 monthly equivalents (12 one-months or 4 three-months) to take advantage of Zoladex's minimum discount (11% for one-month;12% for three-month). Return to practice is still reduced. Refer to the Zoladex Discount Schedule for exact discounts.

**Zoladex Buying Groups:** In 1997, Zeneca established Zoladex buying groups. Basically, individual physicians could join a buying group and obtain deeper discounts than our original discount schedule. Again, the bigger the purchase, the deeper the discount. However, buying groups have to sign a contract which commits them to a yearly volume of Zoladex. Zeneca reviews buying patterns quarterly to ensure compliance and groups who are not purchasing up to their annual commitment risk reducing their discount.

| | Buying Group Discount Schedule | | |
|---|---|---|---|
| Yearly Equivalents | 1-month Discount | 3-month Discount | No. of Patients |
| 1200-1999 | 32% | 33% | 100-166 |
| 2000-2399 | 34% | 35% | 167-199 |

HIGHLY CONFIDENTIAL

AZ0419346

| | | | |
|---|---|---|---|
| 2400-3199 | 37% | 38% | 200-266 |
| 3200-3599 | 39% | 40% | 267-299 |
| 3600-4399 | 41% | 42% | 300-366 |
| 4400-4799 | 44% | 45% | 367-399 |
| 4800-5999 | 46% | 47% | 400-499 |
| 6000 + | 49% | 50% | 500 +* |

*We offer an additional 1% discount for the 3-month. This was done to encourage use when the 3-month was first approved and has been maintained. We also offer additional discounting for early payment: 5%30 days, 2%60 days, net 90.

Every buying group established elected the 6000 + discount level by putting enough customers together to qualify. Locally, both the North Central and Midwest buying groups have substantially more commitments than necessary to qualify for the maximum discount. (North Central has commitments for 24,000 + yearly equivalents.)

What do the physicians get? ·Obviously a reduction in the price they pay, with a corresponding increase in return to practice. Other features: buying group members get the discount no matter what quantity they order (go back to the Discount Schedule; to obtain a higher discount, physicians must order larger quantites). This helps them manage accounts payable better because they don't have large cash outlays, but instead order what they need.

What does Zeneca get? A commitment to use Zoladex. Prior to 10/99, customers had to commit at least 50% of their total LHRH business to Zoladex in order to be eligible for membership into a buying group. As of 10/99, we were given the latitude to offer membership into the buying group for new Zoladex business without respect to quantity. The Chicago district set a minimum of 120 monthly equivalents (10 patients X 12 months) as a prerequisite. However, this is flexible—if you feel offering a lower commitment is necessary to level the playing field, talk to me and it may be possible. Some PSSs have had success obtaining lower commitments and then using their good selling skills to pull through more business than was originally committed to. The bottom line: use the buying group opportunity to increase sales!

Additional Contracting Opportunities: As of 1/00, AZ began offering the Integrated Health System contract for organizations who do not qualify for a Zoladex buying group. Why would a group not qualify? From a legal standpoint, to qualify for a Zoladex buying group, the physician(s) must agree to pay for the Zoladex themselves. Some physicians' practices are owned by other entities (hospitals, managed care groups, etc.) who would pay the bill. It is important to understand who will assume responsibility for the Zoladex bill prior to offering either the buying group option or IHS or Premiere. If you have a question, submit the practice name, physician name, address and telephone number on e-mail to me and I will ask the credit department to run a Dunn & Bradstreet report. The IHS contract asks for a commitment of either 1) 750 annual equivalents or 2) 30% of the total LHRH business. The customer then receives the same discount as the buying group:

HIGHLY CONFIDENTIAL

AZ0419347

$179.21 for a 1-month and $527.10 for a 3-month. The difference is that the Zoladex is purchased through a wholesaler rather than direct from AZ. Also, note that there is no additional discount for early payment, but that is because the customer is not paying AZ!

AZ also established a contract with Premier which is a group purchasing organization. If a urology practice is affiliated with a hospital that is a Premier member, it is eligible for preferred Zoladex pricing of $182.87/1-month and $537.97/3-month. This represents a 2% higher cost than the Zoladex buying group price because Premier collects the 2% as an administration fee. Zoladex also goes through a wholesaler with this option.

Conclusion: Just about every customer segment you will encounter now has the opportunity to obtain Zoladex at our best price. One goal of the marketing team was to ensure that cost/return to practice of Zoladex would not be a negative. Now you can go out and sell, sell, sell!

AZ0419348

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 4-1 - 4-137

BENCH TRIAL - DAY FOUR

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 13, 2006, 9:15 a.m.

LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617) 345-6787

237b664b-02be-40b7-a1f6-f94f1a077769

## Page 50

1 if one wanted to get a clearer picture of what drugs were
2 purchased by Blue Cross-Blue Shield of Massachusetts, would
3 the logical place to go be the records of either the staff
4 model HMO, or BCBS of Massachusetts, or the records of drug
5 manufacturers?
6 A. Correct.
7     THE COURT: Have you ever checked those records to
8 see if the drugs at issue here were administered through your
9 staff models while you were there?
10    THE WITNESS: The drugs specific to this case? No.
11    MR. BERMAN: Sorry, your Honor. Just a few issues
12 I need to follow up on.
13         RECROSS-EXAMINATION
14 BY MR. BERMAN:
15 Q. Mr. Curran, I apologize. Maybe I'm confused and bear
16 with me.
17    I asked you if you recall telling the Blue Cross
18 lawyer who called you to figure out what knowledge you might
19 have about this case, if you recall telling him that you were
20 not involved in the purchase of physician-administered drugs.
21 A. My understanding of that question was this: I believe
22 the question was directed towards was I involved in
23 contracting for contracted physicians for drugs that were
24 administered in an office environment, and the answer to that
25 question is no.

## Page 51

1 Q. Okay. And with respect to any involvement you had on
2 physician-administered drugs, can you tell me a specific drug
3 that you recall, any cancer drug, negotiating a discount on
4 while you were at Blue Cross Medical West?
5 A. No.
6     MR. MANGI: Objection.
7     THE COURT: Overruled.
8     MR. BERMAN: That's it. Thank you, your Honor.
9 (Witness steps down)
10    MR. MATT: Good morning, your Honor. Sean Matt,
11 Hagens, Berman, Sobol, Shapiro. For the plaintiffs, we'd
12 like to call our next witness, Ms. Denise Kaszuba.
13    MR. EDWARDS: Your Honor, we're getting her right
14 now. She's outside the courtroom.
15 (Pause)
16    DENISE M. KASZUBA, PLAINTIFFS' WITNESS, SWORN
17    THE CLERK: Can you state your name and last name
18 and spell it for the record, please.
19    THE WITNESS: Denise M. Kaszuba, K-A-S-Z-U-B-A.
20         CROSS-EXAMINATION
21 BY MR. MATT:
22 Q. Ms. Kaszuba, good morning. Nice to see you again.
23 Thank you for coming. We met last year. My name is Sean
24 Matt and I represent the plaintiffs in this case.
25    You are presently the associate manager of pricing

## Page 52

1 support in the department of pricing institutional operations
2 for BMS, correct?
3 A. The title has changed somewhat.
4 Q. Okay. What's your new title?
5 A. My title is associate manager of pricing analysis and
6 compliance.
7 Q. And you are responsible for communicating BMS's
8 wholesale list prices to customers and others, including
9 industry publications, such as Red Book, First Databank and
10 Medispan, correct?
11 A. Yes.
12 Q. And that has been your responsibility since 1991?
13 A. Yes, it has.
14 Q. In fact, it is true that no prices would have been
15 communicated by BMS to publications since 1991 without your
16 knowledge, right?
17 A. That is correct.
18 Q. When I use the word "publications," I'm going to be
19 referring to the Red Book, First Databank and Medispan. Can
20 we agree that that's your understanding as well?
21 A. Yes.
22 Q. Okay. And although you have held various titles since
23 1991, your responsibilities with respect to reporting of BMS
24 prices have not changed, correct?
25 A. Have not.

## Page 53

1 Q. And you began working for Bristol-Myers in 1979, is that
2 right?
3 A. Yes, I have.
4 Q. Let's talk briefly about BMS's customers. Does BMS sell
5 drugs to wholesalers?
6 A. Yes, they do.
7 Q. And who are the major wholesalers today that BMS sells
8 to?
9 A. The major wholesalers today are Amerisource Bergen --
10    THE COURT: Slow down. You're a little nervous,
11 right?
12    THE WITNESS: Just a little.
13 (Laughter)
14    THE COURT: Ever been in court before?
15    THE WITNESS: No. This is the first.
16    THE COURT: All right. So there's some water
17 there. I've got to understand, so we'll just work --
18    THE WITNESS: Sorry.
19    THE COURT: Just take a deep breath. Here we go.
20 So who are the wholesalers?
21    THE WITNESS: The major wholesalers are Amerisource
22 Bergen, Cardinal.
23    THE COURT: Oh. See, I don't know any of these
24 people. What's the first name?
25    THE WITNESS: Amerisource Bergen is the first.

237b664b-02be-40b7-a1f6-f94f1a077769

Page 54

1   Cardinal, McKesson.
2   BY MR. MATT:
3   Q.  And those are the three majors that would be in --
4   A.  Yes.
5   Q.  Do some retailers buy drugs directly from BMS?
6   A.  We -- there are some.
7   Q.  And are these generally large chain retailers?
8   A.  Yes.
9   Q.  And could you give us an example?
10  A.  CVS.
11  Q.  And do some physicians buy drugs directly from BMS?
12  A.  No.
13  Q.  But in the past some physicians did buy drugs directly
14  from BMS, correct?
15  A.  In the past prior to 1991, '92.
16  Q.  And since 1992, have any physicians purchased direct
17  from BMS?
18  A.  If there were, there were very, very few, maybe one or
19  two. They actually buy from OTN, which is a distributor to
20  the physicians.
21  Q.  And up until recently, OTN was a wholly owned subsidiary
22  of BMS, correct?
23  A.  Correct.
24  Q.  Let's discuss briefly the reporting of list prices that
25  you did to the publications. You previously testified that

Page 55

1   this was a multistep process beginning with someone in the
2   finance department within BMS sending to your department
3   either a price of a new drug or a price increase on an
4   existing drug, is that correct?
5   A.  This is correct.
6   Q.  And in the second step, your department then inputs the
7   new pricing information into the BMS internal computer
8   system, which I believe you referred to as the list price
9   master file, right?
10  A.  Correct.
11  Q.  And then your department in the next step notifies
12  direct buying customers, which is wholesalers and the others
13  you just testified to that bought direct, correct?
14  A.  We do.
15  Q.  And that was done typically in writing, right, by
16  Mailgram, fax, or e-mail, correct?
17  A.  Either one.
18  Q.  And your department sends the wholesale list price or,
19  WLP for short, to the publications Red Book, First Databank
20  and Medispan, right?
21  A.  We do, and direct when we had a direct price.
22  Q.  So prior to August 2001, that direct price was also sent
23  by your department --
24  A.  Yes, it was.
25  Q.  And before that, that was because some retailers buying

Page 56

1   direct from BMS paid the direct list price, right?
2   A.  This is correct.
3   Q.  And then step five, as I understand your prior
4   testimony, your deposition, the publications generally send a
5   report back to BMS showing the WLP and an AWP, correct?
6   A.  Data services?
7   Q.  Correct. The publications --
8   A.  Publications, yes.
9   Q.  Can we agree that one of the reasons that BMS reported
10  the WLP to these publications is because BMS wanted AWPs
11  established for BMS drugs?
12  A.  Along with the product -- along with the product and
13  list price, that is correct.
14  Q.  Indeed, there were occasions when letters sent from your
15  department to the publications and containing list price
16  information also asked the publishers to, quote: "Please
17  supply AWPs for these products once the information has been
18  processed through your database," correct?
19  A.  That is correct.
20  Q.  In front of you is a notebook I've placed with a number
21  of tabs in it, Ms. Kaszuba. I'd like to draw your attention
22  to tab 1, please.
23        MR. EDWARDS:  Which tab is this?
24        MR. MATT:  Tab 1.
25  Q.  This is a document that comes from Plaintiff's Exhibit

Page 57

1   179, and this first document is a letter to Cathy Gutgesell
2   from Barbara Goetz. Barbara Goetz worked for you, correct?
3   A.  Yes, she did.
4   Q.  Is this a document that you believe was prepared in the
5   ordinary course of her responsibilities at BMS?
6   A.  Yes.
7        MR. EDWARDS:  Excuse me, your Honor. Mr. Matt gave
8   me a notebook prior to the examination, but my notebook
9   doesn't seem to match what Mr. Matt is using.
10       MR. MATT:  What's behind your tab 1?
11       MR. EDWARDS:  Tab 1 of my notebook is this.
12       MR. MATT:  That's precisely the document we're
13  discussing.
14       MR. EDWARDS:  Okay. The document on the screen was
15  different.
16       MR. MATT:  Oh, okay.
17       MR. EDWARDS:  So we're all on tab 1.
18  BY MR. MATT:
19  Q.  Ms. Kaszuba, could you confirm, Ms. Gutgesell worked for
20  the publication, correct?
21  A.  She did.
22       MR. EDWARDS:  Excuse me. Again, the document on
23  the screen is a different document. Now it changed back.
24  Q.  Okay, Ms. Kaszuba. Let's turn to tab 2.
25       THE COURT:  Wait. I have to read it. So

Page 58

1   basically --
2        MR. MATT: Oh, yeah. Thank you, your Honor. There
3   was a follow-up question I wanted to ask.
4   BY MR. MATT:
5   Q. And this document says: "Please supply AWPs for these
6   products once the information has been produced through your
7   database," correct?
8   A. Correct. It was their AWPs that I wanted that they
9   established.
10  Q. Okay. Thank you. Turning to tab 2 is another exhibit.
11       THE COURT: Just so I understand, so what did you
12  tell them to do as far as calculating the AWPs from the list
13  price?
14       THE WITNESS: I would not. I would actually just
15  supply them the list price, and in turn I asked them for
16  their AWPs as they established them within their database.
17       THE COURT: And how did they do that? What was
18  your understanding.
19       THE WITNESS: My understanding is that they used a
20  factored, a markup, and that markup for the two major data
21  services, they surveyed the wholesalers to determine what
22  that factor was.
23       THE COURT: So this is to who, to Red Book?
24       THE WITNESS: This one is -- Cathy Gutgesell worked
25  -- I think she worked either for Medispan or First Databank.

Page 59

1        THE COURT: And your understanding is that they
2   were doing an actual survey?
3        THE WITNESS: My -- yes.
4   BY MR. MATT:
5   Q. Now, this example that we have right here is to an
6   employee at one of the publications. However, it would have
7   been the practice in your experience at BMS that a similar
8   letter would have been sent to the other publications as
9   well, is that correct?
10  A. That is correct.
11       THE COURT: And what was your expectation as to
12  what the range of the markup was in the industry?
13       THE WITNESS: My understanding, the range ranged
14  from 20 to 25 percent.
15       THE COURT: Was the typical --
16       THE WITNESS: Was the typical markup factor for the
17  data services.
18       THE COURT: During what time period?
19       THE WITNESS: Throughout my responsibilities.
20       THE COURT: From 1991 --
21       THE WITNESS: Yes, from 1991.
22       THE COURT: And if a markup was much larger than
23  that, was that something you told these publishers to mark
24  them up, like, say, if it was a hundred percent, or was it
25  something -- how would they do it on their own?

Page 60

1        THE WITNESS: There's only one instance that we
2   requested a markup change to the data services, and the two
3   major data services came back and said they surveyed the
4   wholesalers and felt the markup factors were correct,
5   and Red Book did make a change based on a request.
6        THE COURT: Which drug was that?
7        THE WITNESS: It -- what drug? Several drugs.
8        THE COURT: Any of the drugs at issue in this
9   litigation?
10       THE WITNESS: Yes.
11       THE COURT: Which ones?
12       THE WITNESS: Etopophos.
13       THE COURT: Is that the one that would be affected
14  by -- so how high did Red Book mark it up at your request?
15       THE WITNESS: Red Book at my request marked it up
16  25 percent.
17       THE COURT: And the others kept it at 20? Is that
18  what happened?
19       THE WITNESS: The other data services did not
20  change their factor and the factors were relevant to the
21  labeler code or the original company who owned it. So again,
22  it ranged between 20 and 25 percent.
23       THE COURT: Thank you.
24
25

Page 61

1   BY MR. MATT:
2   Q. Let's turn to tab 5 in your notebook, please, sticking
3   with the topic of markup factors.
4        Now, I believe you just testified that you in the
5   exercise of your usual and customary responsibilities at BMS
6   directed in 1992 the publications to change the markup factor
7   from 20.5 to 25 percent of Bristol-Myers oncology division
8   products, correct?
9        MR. EDWARDS: Objection, your Honor. It's
10  mischaracterizing the witness's testimony.
11       THE COURT: Overruled. You can answer.
12  A. I requested, again as a BMS employee, if they could
13  change the factor from 20 to 25 percent, yes.
14  Q. And this letter here to Mr. Edelstein -- and he works at
15  First Databank, correct?
16  A. Correct.
17  Q. And it was in the ordinary course of your
18  responsibilities that you sent him this letter, correct?
19  A. Correct.
20  Q. And although we don't have a copy of a letter to the Red
21  Book, it's your testimony that you would have sent a very
22  nearly identical letter to Red Book, correct?
23  A. A nearly identical letter, yes.
24       THE COURT: Are you marking these as exhibits?
25       MR. MATT: Yes, your Honor. This is actually part

16 (Pages 58 to 61)

Page 62

1  of a composite exhibit that we will offer to the Court at the
2  end of the examination and it will be part of Exhibit -- let
3  me give you the exact number so the record is clear. It's
4  going to be part of Exhibit 183.
5  BY MR. MATT:
6  Q.  Did you realize when you wrote this letter that this
7  letter could effect a change in the AWPs being reported for
8  BMS oncology drugs?
9  A.  Yes, I did.
10 Q.  And a little bit of foundation on reimbursement
11 methodology.  You are aware that till 2005, Medicare based
12 payments for Part B drugs on AWP, correct?
13 A.  I'm not in the reimbursement side.  I'm actually in the
14 implementation of the price changes.
15 Q.  But you nonetheless had that knowledge when you were --
16 in the ordinary course of your responsibilities, you
17 understood that Medicare did used to base payments for Part B
18 drugs on AWP, right?
19 A.  Again, from a reimbursement side, I don't know truly on
20 that end of the business how it actually was handled.
21 Q.  Okay.  Well, let me see if I can refresh your
22 recollection.
23       During your deposition last year when we first met,
24 at page 45 of your deposition transcript -- that's in a tab
25 in the back of your notebook -- you were asked by me:

Page 63

1        "Question: Are you aware that until recently
2  Medicare based payments for Part B drugs on AWP?"
3  A.  Could you direct me to --
4  Q.  Sure.  Page 45.
5  A.  This is my deposition, correct.
6  Q.  That's correct.
7        THE COURT:  Take a second.  Just read it.
8  Q.  The question I'm drawing your specific attention to is
9  at line number 9 on page 45.  So your testimony was:
10       "Question: Are you aware that until recently
11 Medicare based payments for Part B drugs on AWP?
12       "Answer: Yes."
13       Now, that testimony was truthful when you gave it,
14 correct?
15 A.  When I gave it, yes.
16 Q.  Okay.  And you are also aware that some insurance
17 companies based payments for oncology drugs on AWP as well,
18 correct?
19 A.  Again, I have to be very specific.  You know, I
20 implement price increase actions and, again, I communicate
21 this information to the data services.  So from the end
22 result, I do not know exactly how reimbursements are actually
23 applied using the AWPs.
24 Q.  Okay.  Let's back up.  On the same transcript --
25       THE COURT:  Did you know individuals made

Page 64

1  copayments based on AWP?
2        THE WITNESS:  No, I do not.
3        THE COURT:  Did you know that every time you raised
4  one of these things some person had to pay more for a
5  copayment?
6        THE WITNESS:  No, I did not.
7  BY MR. MATT:
8  Q.  Okay.  Let's back up.  On the same page, 45, line 5:
9        "Question: Do you know that insurers can base
10 their reimbursement payments based on AWP?"
11       Line 8: "Answer: Yes, I do."
12       Now, that testimony was truthful when you gave it
13 last year, correct?
14 A.  Yes, it was.
15 Q.  Okay.  Thank you.
16       Now, let's go back to --
17       THE COURT:  Well, did they actually -- is this one
18 of the drugs when they refused -- when you said the
19 Bristol-Myers oncology division products, did in fact First
20 Databank move up the AWP from 20 to 25 percent?
21       THE WITNESS:  Red Book.
22       THE COURT:  This is the one only Red Book will do.
23       THE WITNESS:  The only one Red Book --
24       THE COURT:  On all your oncology products.
25       THE WITNESS:  On the oncology products that didn't

Page 65

1  have a 25 percent factor.  There are other oncology products
2  that already had a 25 percent factor.
3  BY MR. MATT:
4  Q.  And prior to directing the publishers to change the
5  markup factor to 25 percent for BMS -- all BMS oncology
6  drugs, it's true that you did no research to determine that
7  wholesalers were in fact marking up BMS oncology drugs by 25
8  percent, right?
9  A.  No.  Could you restate that question again?
10 Q.  Sure.  Prior to directing the publishers to increase the
11 markup factor to 25 percent on all BMS oncology drugs, it is
12 true that you did no research to determine that wholesalers
13 were in fact marking up BMS oncology drugs --
14 A.  I did not do any research, but I do know that the
15 factors ranged from 20 to 25 percent.
16 Q.  Okay.  In fact, at no time did anyone under your
17 supervision do that research either, right?
18 A.  No.
19 Q.  Okay.
20       THE COURT:  Why did you ask for it?
21       THE WITNESS:  I was instructed from a Dennis
22 Buckley, who was the regional manager or sales manager at the
23 time.
24       THE COURT:  So he was your boss?
25       THE WITNESS:  No, he was not my boss.  He was

17 (Pages 62 to 65)

# Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY ) 
AVERAGE WHOLESALE PRICE )  MDL No. 1456
LITIGATION )
_____ )  CIVIL ACTION: 01-CV-12257-PBS
 )
THIS DOCUMENT RELATES TO )  Judge Patti B. Saris
01-CV-12257-PBS AND 01-CV-339 )
 )  Chief Magistrate Judge Marianne B. Bowler
 )
 )
 )
_____ )

## DIRECT TESTIMONY OF RAYMOND S. HARTMAN

g) It is my understanding that the methods to reduce ASP identified above would violate the False Claims Act and the federal antikickback statute, as described by the *OIG Compliance Program Guidance*.

### 3. *Bristol-Myers Squibb (BMS)*

43.   BMS's former Director of Marketing for Oncology, Christof Marre, testified that, in response to generic competition, BMS would offer pricing discounts contained in confidential contracts.[76] However, in keeping with the "industry standard," BMS would not lower WLP or AWP.[77] BMS would employ this pricing strategy with each of its drugs that lost exclusivity.[78]

44.   Although BMS acknowledges that "AWP is the most common reimbursement mechanism used in the marketplace," it also states that "BMS does not set AWP for its products. Third parties set AWP based on company labeler code and wholesaler surveys."[79] BMS has admitted that it directed the Red Book to change the mark-up factor on BMS oncology drugs from 20.5% to 25%,[80] and Red Book did so.[81] In addition, because AWP is directly related to WAC (WLP), whenever BMS reported a WAC price to these publishers they were in effect setting the AWP. BMS's response to an interrogatory explains this process:

> "Generally speaking, there is a multi-step information flow between BMS and the above publications [Red Book, First DataBank, and MediSpan]. In 'Step 1,' someone from the finance department within BMS sends to

---

[75]   *Ibid.*, at AZ0092154.

[76]   See Marre Deposition, pp. 40-41.

[77]   *Ibid.*, pp. 85-87.

[78]   See the graphs below for each BMS drug. See also *ibid.*, pp. 85-87, 94 and 100-101 for specific deposition testimony regarding Blenoxane, Vepesid and Taxol.

[79]   See BMS/AWP/00986726.

[80]   See BMS/AWP/0011247-8 and Affidavit of Denise M. Kaszuba, Plaintiffs' Exhibit 184.

[81]   See BMS/AWP/0011247-8.

---

the 'Pricing Administration' department either a price on a new drug or a
price increase on an existing drug ... In 'Step 2,' Pricing Administration
inputs the information into the BMS internal computer system. In 'Step 3'
customers are notified of the new prices. ... In 'Step 4' the publications
are notified. ... In 'Step 5' the publication generally sends a 'report' back
to BMS demonstrating what it has done with the information BMS has
provided. Such reports usually show the WLP/DLP and AWP."[82]

Clearly BMS recognizes that, as a matter of economics, list prices are some of the most
important signals that all drug manufacturers, particularly innovator drug manufacturers, use to
strategically place drug products in the market. The two most important list prices are the AWP
and the WAC (or WLP). Since there is a well understood formulaic relationship between AWP
and WAC, reporting *either* to the price reporting services implies that *the other list price is set
automatically*. AWP and WAC are "interchangeable" since the two list prices are usually
related by a constant ratio and convey the same information to purchasers and other entities that
rely on published price data.

45.     BMS understands that AWP affects "the way that customers view the cost of our
products."[83] And BMS clearly understood that "[m]ost payers use AWP as a basis for calculating
allowables."[84]

### 3.A.  Bristol-Myers Squibb: Blenoxane

46.     Blenoxane (bleomycin sulfate) is a chemotherapy drug for cancer including
lymphomas and testicular cancers. The first generic manufacturer of bleomycin sulfate entered
the market in 1996. It is interesting to note that the first generic AWP was almost identical to the

---

[82] BMS Response to Interrogatory 5, January 19, 2004 (Plaintiffs' Exhibit 178).

[83] See BMS/AWP/01109782.

[84] "Extending & Enhancing Lives: Practice Efficiencies and Quality Care Workshop" Plaintiffs Exhibit 222
(BMS/AWP/001502304-38 at BMS/AWP/001502312).

# Exhibit 6

Page 1

HIGHLY CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

\* \* \*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

IN RE PHARMACEUTICAL INDUSTRY     :

AVERAGE WHOLESALE PRICE           : CIVIL ACTION:

LITIGATION                        :  01-CV-12257-PBS

- - - - - - - - - - - - - - - - x

Mt. Crested Butte, Colorado

Friday, August 12, 2005


Videotaped Deposition of CAROL WEBB, a

witness herein, called for examination by counsel

for Plaintiffs in the above-entitled matter, pursuant

to notice and the Federal Rules of Civil Procedure,

the witness being duly sworn by CRAIG KNOWLES,

a Notary Public in and for the State of Colorado,

at 9:30 a.m.,  and the proceedings being taken down

in Stenotype by CRAIG KNOWLES and transcribed under

his direction.

ced9d3be-854d-4b5b-b0eb-a7c780ba1c2f

Carol Webb       HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER August 12, 2005
                 Mt. Crested Butte, CO

Page 54

1   was also a group called PGSM that had a strategic
2   pricing group that we used as a consultant.
3       Q.   Was PGSM a Johnson & Johnson entity?
4       A.   Yes, it was.
5       Q.   So it's an internal entity?
6       A.   An internal entity. Excuse me for not
7   stating that. An internal entity that would help
8   with strategic pricing of our products.
9       Q.   Okay. Is that the only qualification you
10  wanted to make with respect to pricing?
11      A.   Well, then pricing would be reviewed by
12  upper management at the company group chairman
13  level and above.
14      Q.   Okay. So if I understand you, you are
15  saying that it wasn't just OBI who made a decision
16  as to price, but it was also the parent company and
17  other internal pricing entities at J&J?
18          MR. MANGI: Object to form.
19      A.   That's a pretty broad question.
20          BY MR. HOFFMAN:
21      Q.   I am just trying --
22      A.   The operating company did not set, did not

Page 55

1   increase or decrease price without checking with
2   upper management.
3       Q.   So it had to get the approval of upper
4   management before a price change, or the initial
5   price could be set?
6       A.   That is true. Altered. Not set, but
7   altered.
8       Q.   How about set?
9       A.   Prices were set also, but we weren't
10  talking about setting at the time, we were talking
11  about changes.
12      Q.   Okay. I just wanted to be clear for the
13  record, because I thought I was talking about both
14  setting and increases.
15          So at the time a price is set, is it the
16  same process that it's set with a combination of
17  OBI, PGSM and upper management?
18      A.   That's correct.
19      Q.   Okay. And since 1991, is it fair to say
20  that process, under that process that OBI and J&J
21  set the list price of all OBI drugs, including
22  Procrit?

Page 56

1           MR. MANGI: Object to the form.
2       A.   Could you repeat the question?
3           BY MR. HOFFMAN:
4       Q.   Is it fair to say that since 1991, OBI and
5   J&J, together, have set the list price of OBI
6   drugs, including Procrit?
7           MR. MANGI: Same objection.
8       A.   Well, it's not -- when you say J&J, do you
9   -- it's not exactly J&J. It would be senior
10  management.
11          BY MR. HOFFMAN:
12      Q.   Okay. But it has to get the approval of
13  senior management at J&J?
14      A.   Yes.
15      Q.   Okay. So when I say for the purposes of
16  questions with regard to setting price, J&J, I'm
17  referring to people at the parent company
18  and/or other J&J entities that were involved in
19  giving input or approval for setting or increasing
20  price. Is that fair?
21          MR. MANGI: I will object to the
22  clarification as unclear.

Page 57

1           BY MR. HOFFMAN:
2       Q.   Is that unclear?
3       A.   It is unclear, yes.
4       Q.   Okay. When I refer to J&J, I am referring
5   to the parent company and anyone at the parent
6   company who is in a position to give their approval
7   to price changes. Is that fair?
8           MR. MANGI: Well, Allan, you can't refer to
9   J&J as something that it's not. If you have a
10  question, when you are asking about senior
11  management, why don't you just pose it as such.
12  Then it will be clear.
13      A.   Yeah, because J&J is fairly broad.
14          BY MR. HOFFMAN:
15      Q.   Okay, I will try to state it that way.
16          Let me try it another way. Since 1991 is
17  it fair to say that OBI, senior management at J&J
18  and PGSM worked together to set the list price of
19  OBI's drugs, including Procrit?
20          MR. MANGI: Object to the form.
21      A.   Yes.
22          BY MR. HOFFMAN:

15 (Pages 54 to 57)

ced9d3be-854d-4b5b-b0eb-a7c780ba1c2f

Carol Webb       HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER August 12, 2005
## Mt. Crested Butte, CO

Page 66

1     Q.   And by publishers, just so we are clear,
2   I'm talking about Red Book, Blue Book, Medispan,
3   First DataBank. Do you understand that?
4     A.   Yes, I do.
5     Q.   And that is how you are using the term, as
6   well?
7     A.   Yes, I am.
8     Q.   Okay. When those prices, list price and
9   AWP were reported to the publishers, was it OBI's
10   expectation that the publishers would publish those
11   prices unaltered?
12        MR. MANGI: Objection. Form, lack of
13   foundation.
14     A.   Could you repeat the question?
15        BY MR. HOFFMAN:
16     Q.   Sure. Did OBI have the expectation that
17   the publishers would publish what you have called
18   recommended AWP and list price as it was provided
19   to the publishers?
20        MR. MANGI: Same objections.
21     A.   Yes.
22        BY MR. HOFFMAN:

Page 67

1     Q.   And in fact, are you aware of any instance
2   where the publishers did not publish the exact list
3   price in AWP that was provided by OBI to the
4   publishers?
5     A.   No.
6     Q.   And that is for the entire period of 1991
7   to 2003?
8     A.   As far as I recall.
9     Q.   And OBI knew that Medicare and PBMs used
10   the -- and private -- at least some private payers
11   used the publishers' publications to determine the
12   AWPs of the drugs?
13        MR. MANGI: Object to the form.
14     A.   As I stated before, AWP was a benchmark.
15   As I answered before, many -- many of the groups
16   who reimbursed used it as a benchmark for
17   reimbursement.
18        BY MR. HOFFMAN:
19     Q.   And OBI knew that those groups that used it
20   as a benchmark looked to the publications to find
21   the AWPs; is that correct?
22     A.   It is my understanding that those entities

Page 68

1   would look at those publications to look at the AWP
2   as a benchmark.
3     Q.   Okay. And isn't it also true that OBI knew
4   that clinics and physicians and hospital outpatient
5   clinics who purchased Procrit would bill Medicare
6   based on the percentage of AWP?
7        MR. MANGI: Objection. Lack of foundation.
8     A.   Medicare had a reimbursement policy which
9   they followed.
10        BY MR. HOFFMAN:
11     Q.   So OBI knew that physicians and clinics and
12   providers were billing drugs that they purchased
13   such as Procrit based on a percentage of AWP?
14        MR. MANGI: Object to the form. And also
15   object to any questions about what OBI knew. The
16   witness is not a corporate representative. She can
17   testify as to her own understanding.
18        MR. HOFFMAN: As president of the company I
19   would assume that she would have the understanding
20   of what the company knew at the time.
21        MR. MANGI: The company doesn't know
22   anything. It's not a human being. People at the

Page 69

1   company have knowledge.
2        MR. HOFFMAN: Okay.
3        MR. MANGI: You can ask the president for
4   her knowledge or her knowledge of other people's
5   knowledge.
6        BY MR. HOFFMAN:
7     Q.   When I refer to OBI knowing, if I refer to
8   OBI knowing as a company, what I mean is that upper
9   management or senior management was aware of that
10   fact. Is that fair?
11        MR. MANGI: It's not, because it's
12   misleading. You should --
13        MR. HOFFMAN: I just defined it as such.
14        MR. MANGI: It's a misleading and incorrect
15   definition. You should state your question in
16   terms of upper management --
17        MR. HOFFMAN: -- incorrect definition, if
18   I'm defining the term as such. But okay.
19        MR. MANGI: You are not free to bend the
20   rules.
21        MR. HOFFMAN: I'm not bending any rules.
22   So let's go back to the question.

18 (Pages 66 to 69)

ced9d3be-854d-4b5b-b0eb-a7c780ba1c2f