# Exhibit 8

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS



----------------------------------------x

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION,

----------------------------------------x



Civil Action:   01-CV-12257-PBS


                    July 28, 2004

                    9:40 a.m.


   H I G H L Y   C O N F I D E N T I A L


     30(b)(6) Deposition of THOMAS HIRIAK,

held at the offices of Patterson Belknap

Webb & Tyler, before David Henry, a

Certified Shorthand Reporter and Notary

Public of the State of New York.

Thomas Hiriak        Highly Confidential        July 28, 2004
                        New York, NY

Page 214

1    A.   I think there is doubt. Whether
2  First Data Bank will, as an example, will
3  change the AWP or set it somewhere besides
4  the 20 percent.
5    Q.   I understand going forward that
6  there is some doubt or concern about that,
7  but how about prior to today?
8    A.   Yes. And I don't know the
9  specifics, but it's my understanding that
10  one of our sister companies, the operating
11  companies within J&J, there was some type of
12  change in AWP with one of the pricing
13  structures or there was a potential change
14  with the, one of the pricing sources. So I
15  think that there is still question whether
16  First Data Bank will make a change or not,
17  and that's prior to today.
18    Q.   Are you aware of any instance
19  where an AWP that you communicated over to a
20  publisher was not accepted?
21    A.   On Procrit?
22    Q.   On Procrit.

Page 215

1    A.   No, I'm not aware.
2    Q.   Are you aware of any meetings or
3  discussions within OBI that would -- that
4  addressed any concern about whether or not,
5  and this is for the whole class period,
6  whether or not any publisher would publish
7  the AWP that was communicated to them by OBI
8  for Procrit?
9    A.   Whether there was any concerns?
10    Q.   Any meetings or discussions
11  expressing, or discussing concerns about the
12  fact that a publisher might not publish the
13  AWP that was sent from OBI to them for
14  Procrit.
15    A.   I know that there were meetings
16  or discussions held discussing if we took a
17  list price action, whether there is a
18  possibility that the AWP would change.
19    Q.   When were those meetings held?
20    A.   We had contemplated a price
21  action, this was probably in 2002, I believe
22  the pricing team had considered a list price

Page 216

1  action, and obviously as part of those
2  discussions there was questions whether any
3  of the pricing sources would change the AWP
4  or not.
5    Q.   Who attended that meeting? Was
6  it just the pricing team?
7    A.   That was just the pricing team.
8    Q.   Okay. Prior to those meetings,
9  are you aware of any other meetings that
10  were ever held at OBI to discuss the issue
11  of whether or not the communicated AWP would
12  be accepted by the publishers?
13    A.   Prior to that, no, I'm not aware
14  of any other meetings.
15    Q.   During the course -- during the
16  course of Procrit's history, there have been
17  price increases, correct?
18    A.   Yes.
19    Q.   How many?
20    A.   I believe six.
21    Q.   And are there documents at OBI
22  which lay out the price history of Procrit?

Page 217

1    A.   I believe so, yes.
2    Q.   Okay, what documents would those
3  be? Are they called something?
4    A.   No.
5    Q.   Who generates them?
6    A.   I don't know in all cases,
7  because the price increase, but now they're
8  generated by the contracting department.
9    Q.   And these would go back all the
10  way to 1991?
11    A.   The first price increase that I
12  am aware of occurred in 97.
13    Q.   By the way, who at OBI is
14  responsible for communicating with the
15  publishers?
16    A.   Elaine Kling.
17    Q.   And who did it before her?
18    A.   I don't know.
19    Q.   And other than the letters that
20  you referred to either updating new price
21  changes or setting the initial price for
22  Procrit, what other materials are sent to

# Exhibit 9

Elaine Kling          HIGHLY CONFIDENTIAL          August 3, 2005
                    Bridgewater, New Jersey

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In Re:  PHARMACEUTICAL              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE          CIVIL ACTION

PRICE LITIGATION                    01CV12257-PBS


_____


THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/


                    Tuesday, August 3, 2005

                    9:45 a.m.



        HIGHLY CONFIDENTIAL DEPOSITION of ELAINE

KLING, taken by DANIELLE GRANT, a Certified Shorthand

(Stenotype) Reporter and Notary Public, held at the

Bridgewater Marriot, 700 Commons Way Bridgewater,

New Jersey 08807.

ce2a757f-b884-4c65-9c8b-f6835c32952e

Elaine Kling          HIGHLY CONFIDENTIAL          August 3, 2005
                   Bridgewater, New Jersey

---

**Page 102**

1  aware of any situation?
2       A  I am not aware of any situation.
3       Q  How about AWP, did you ever
4  receive a call or communication from a pricing
5  source that questioned the AWP that had been sent
6  over by OBI?
7       A  For Procrit?
8       Q  Yes.
9       A  No.
10      Q  Do you ever recall a publisher
11 taking issue with the appropriate -- take an
12 issue with the markup of the AWP over the list
13 price of 20 percent?
14      A  Taking issue with?
15      Q  Yes.  Did they ever dispute that
16 or question it?
17      A  Why would they?
18      Q  Maybe they thought it was
19 inappropriate.
20         MR. SCHAU:  Do you have a
21      recollection of them calling you to
22      question the AWP?

---

**Page 103**

1         THE WITNESS:  No.
2       Q  Can you think of any instance when
3  the AWP that was sent by OBI to a publisher was
4  not adopted by that publisher?
5       A  No, I really don't.
6       Q  So publishers publish the exact
7  AWP and list prices that were sent over in the
8  price change notifications as far as you know?
9         MR. SCHAU:  Objection.
10      A  I don't know because I never
11 received a copy of the Red Book or any pricing
12 source book for me to check that.
13      Q  You don't recall --
14      A  Once I sent that price over there
15 or once everyone was notified, the only systems
16 that I actually checked was our own internal
17 system to make sure we had the correct DLP.
18      Q  Whose responsibility was it to
19 check that the pricing sources had the correct
20 list price and AWP?
21         MR. SCHAU:  Object to form.
22      A  I don't know.

---

**Page 104**

1  BY MR. HOFFMAN:
2       Q  Is it your understanding that no
3  one had that responsibility at OBI?
4         MR. SCHAU:  Object to form,
5       foundation.
6       A  I don't have any understanding
7  of -- it would not be in my duties to figure out
8  who should have done that.
9       Q  Was it -- do you understand why
10 that should have been done?
11        MR. SCHAU:  Object to form,
12      foundation.
13 BY MR. HOFFMAN:
14      Q  Doesn't it make sense that if
15 you're sending prices over to a publisher that --
16 let me ask a different question.
17        Were you aware that private
18 payers, meaning private insurers, Medicare,
19 used the publications to determine the AWPs of
20 the drugs?
21        MR. SCHAU:  Object to form.
22      A  Yes.

---

**Page 105**

1  BY MR. HOFFMAN:
2       Q  Were you aware that private
3  insurers, Medicare, used publications to
4  determine list price if they needed to of the
5  drug?
6       A  Yes.
7       Q  Were you aware that clinics and
8  physicians and hospital outpatients, among
9  others, who buy Procrit were reimbursed based on
10 a percentage of AWP?
11        MR. SCHAU:  Object to form.
12      A  Yes.
13 BY MR. HOFFMAN:
14      Q  So you are not aware of anyone who
15 had the responsibility of making sure the AWP was
16 accurately published by the publishing sources?
17      A  I am not aware of anyone who ever
18 checked that.
19      Q  You are not aware of anyone who
20 ever checked that from 1992 to 2005?
21      A  We had a reimbursement department
22 that I can assume checked that.  But did I check

---

27  (Pages 102 to 105)

ce2a757f-b884-4c65-9c8b-f6835c32952e

Elaine Kling          HIGHLY CONFIDENTIAL          August 3, 2005
Bridgewater, New Jersey

Page 114

1     Q   And before that? You don't know?
2     A   I don't know.
3     Q   And it was the expectation that
4   when a list price or an AWP was provided to the
5   pricing sources throughout the period 1991
6   through present, that the prices that you
7   provided to those pricing sources would be
8   published by those pricing sources?
9             MR. SCHAU: Object to form.
10    A   I don't know what they did after I
11  provided them because I did not check.
12    Q   Was it your expectation that those
13  publishers of pricing sources would publish the
14  numbers that you gave them?
15    A   I would assume they published
16  them, but I did not check them.
17    Q   Would you have been surprised to
18  find out that they didn't publish them?
19    A   I wouldn't be surprised to find
20  out anything.
21    Q   Why is that?
22    A   Because this business is the way

Page 115

1   it is. People make errors. It wouldn't surprise
2   me if they weren't published accurately.
3     Q   So if it didn't -- it wouldn't
4   surprise you that it wasn't published accurately,
5   why weren't you following up to see whether or
6   not they were being published accurately?
7     A   I think I answered all that
8   already. I didn't feel it was part of my
9   responsibility to go back and check, other than
10  the pricing that I was responsible for, which was
11  the DLP, which went into our own pricing systems.
12    Q   But you're not aware of any time
13  where a publisher published anything besides what
14  the provided list price and/or AWP price that was
15  provided by OBI to those pricing sources?
16            MR. SCHAU: I'm going to object to
17        the form.
18    A   I'm not aware of anything you just
19  said.
20  BY MR. HOFFMAN:
21    Q   We're going to have to clarify
22  that. Are you aware of any instance where a

Page 116

1   publisher did not publish the list price and/or
2   AWP price provided by OBI?
3             MR. SCHAU: Object to form.
4     A   I'm not aware.
5   BY MR. HOFFMAN:
6     Q   Are you aware of an instance where
7   a publisher questioned in any way the list price
8   or AWP price for Procrit?
9             MR. SCHAU: Object to form. Asked
10        and answered.
11    A   I think that I already covered
12  that in previous testimony.
13  BY MR. HOFFMAN:
14    Q   But I thought you had answered
15  differently, so I just want to understand the
16  answer to your question.
17            MR. HOFFMAN: Can you read the
18        last question of mine back, please.
19            (The requested portion of the
20        record was read back.)
21            MR. SCHAU: Objection.
22    A   No.

Page 117

1   BY MR. HOFFMAN:
2     Q   And again, for the entire period
3   beginning from when Procrit was launched, is it
4   your understanding that OBI knew that prior
5   insurers and Medicare, as well as any -- as well
6   as PBMs, used the publications to determine the
7   AWPs of the drug?
8             MR. SCHAU: Object to the form.
9     A   Would you restate that?
10  BY MR. HOFFMAN:
11    Q   Sure. Is it your understanding
12  that throughout the lifespan of Procrit, from
13  1991 to the present, that OBI knew that private
14  insurers and Medicare and PBMs used the
15  publications to determine the AWPs of the drugs?
16            MR. SCHAU: Object to form.
17    A   I don't know how I could determine
18  if OBI knew that.
19  BY MR. HOFFMAN:
20    Q   How far back do you have knowledge
21  as to when OBI was aware of that?
22            MR. SCHAU: Object to form.

30 (Pages 114 to 117)

ce2a757f-b884-4c65-9c8b-f6835c32952e

# Exhibit 10

# In The Matter Of:

*THE STATE OF TEXAS ex rel. v.*
*DEY, INC., ET AL.*

---

*HARVEY J. WEINTRAUB*
*Vol. 3, February 12, 2003*

---

*FREDERICKS-CARROLL REPORTING*
*Court Reporting-Video Services-Litigation Support*
*7719 WOOD HOLLOW DRIVE, SUITE 156*
*Austin, TX 78731*
*(512) 477-9911     FAX: (512) 345-1417*

*Original File 30212HW.V1, 379 Pages*
*Min-U-Script® File ID: 2354929096*

**Word Index included with this Min-U-Script®**

Page 429

[1] increased or decreased —"

[2]     Answer: "Then the AWP would change

[3] proportionately as a general rule," ending at Line 21

[4] on Page 195.

[5]     Did I read that correctly?

[6]     A: Yes, you did.

[7]     Q: And were you telling the lawyers that you

[8] were talking to then in 1995 that, if there is a

[9] change in direct price, that it would cause a

[10] proportional change in the AWP price?

[11]    A: Yes. Again, within the context of this

[12] particular deposition, we're talking about brand

[13] drugs; and I came out of the brand side of the

[14] business.

[15]    Q: Very well.

[16]    And was this a phenomenon that was

[17] well-known and recognized across the industry?

[18]    A: To my knowledge, yes.

[19]    Q: Very well.

[20]    On — and I'm going to take up with the

[21] very next line there, which is Line 22 on Page 195

[22] with a question.

[23]    "Is the AWP price list published?"

[24]    Answer: "We published a price list that

[25] has direct prices and AWPs. I haven't been employed

Page 430

[1] by Schering since '93, so I assume that we do the

[2] same."

[3]     Question: "Through the end of '93?"

[4]     Answer: "Yes."

[5]     Question: "Was that list published in a

[6] publication that was generally available?"

[7]     Answer: "Schering issued a price list

[8] to its accounts. There are various pricing services

[9] that issued these prices as well as those of all the

[10] manufacturers to the trade."

[11]    Answer: "Services like MediSpan" — I'm

[12] sorry.

[13]    Question: "Services like MediSpan?"

[14]    Answer: "MediSpan, Price Alert and Red

[15] Book. There are a number of them," ending at Line 13

[16] on Page 196.

[17]    Did I read that correctly?

[18]    A: Yes, you did.

[19]    Q: And do I understand from a reading of that

[20] that Schering did, in fact, publish price lists to

[21] both its customers and to reporting services which

[22] would contain the information set forth here?

[23]    A: At the time that I was employed there, yes.

[24]    Q: Direct prices and AWPs?

[25]    A: I don't recall direct prices. AWPs were

Page 431

[1] published.

[2]     Q: All right, sir. And next on Page 197, just

[3] down that column toward the bottom there, starting at

[4] Line 3.

[5]     Do you find that? We're on Page 197 on

[6] Line 3 —

[7]     A: 197, Line 3, yes.

[8]     Q: — with a question, "Would it tell you the

[9] direct prices that the manufacturer was charging?"

[10]    Answer: "It would tell you, for the

[11] most part, the direct price that the manufacturer was

[12] charging in the retail trade."

[13]    Question: "Would it tell you the direct

[14] price that the manufacturer was charging to the

[15] wholesale trade?"

[16]    Answer: "Generally it would tell you,"

[17] ending at Line 11 on Page 197.

[18]    Do I understand that to mean that in

[19] 1995 you were telling those lawyers that the reported

[20] prices to the reporting — to these reporting services

[21] would report both direct price and AWP?

[22]    A: Let me go back, if you don't mind, to read

[23] the questions up above this —

[24]    Q: You may.

[25]    A: — to get a context —

Page 432

[1]     Q: Please — please do so, and I'll let you do

[2] that on your own.

[3]     MR. MOORE: Yeah.

[4]     THE WITNESS: Okay. I've read that.

[5]     Would you rephrase your question again

[6] for me?

[7]     Q: (BY MR. CRAWFORD) My question is: Is that

[8] information that is — is still correct today as it

[9] was when you stated it in 1995, that the information

[10] that was reported by Schering-Plough to the reporting

[11] services would allow a reader of those reports to

[12] determine direct price and AWP?

[13]    MR. MOORE: I object to the form of the

[14] question.

[15]    You — you can answer. I just have an

[16] objection.

[17]    THE WITNESS: It would tell you, as

[18] published in the pricing services book, what the AWP

[19] would be. You would calculate what the direct price

[20] was to the retail trade from that AWP.

[21]    As I recall — and I really haven't

[22] looked at the brand picture for a long, long, time. I

[23] can't recall if direct prices were listed. On some

[24] cases they may have been; other cases they're not.

[25] But you always calculate. If you took — if you took

Page 653

[1] Q: Okay.

[2] A: This probably, by the way, was the first time

[3] we had any communication with any of the pricing

[4] services. This was a trial-and-error experience.

[5] (Exhibit 732 marked).

[6] Q: (BY MR. ANDERSON) If you could, please,

[7] Mr. Weintraub, review Deposition Exhibit 732 now.

[8] It's a two-page document.

[9] A: Oh.

[10] Q: Bates-labeled, first page, FDB001621 and

[11] TX-D&W-012308, and the next page FDB001618 and

[12] TX-D&W-012305.

[13] Have you had an opportunity to take a

[14] look at this two-page exhibit?

[15] A: Yes.

[16] Q: Is this a letter written by you in

[17] October 1993, notifying Ms. Rader and Dr. Edelstein at

[18] PriceAlert of a price change?

[19] A: Of an AWP change, yes.

[20] Q: And that was a — a decrease in AWP on the

[21] 25 by 3 milliliter —

[22] A: That's correct.

[23] Q: And also you have a sentence there, I notice,

[24] underneath the — the listed pricing, quote, "Please

[25] delete direct price listings from your publication or

Page 654

[1] database."

[2] Do you see that?

[3] A: Yes, yes.

[4] Q: Did I read that correctly?

[5] A: That's correct.

[6] Q: Why did you choose to delete direct prices

[7] from First DataBank?

[8] A: It became very apparent to us that direct

[9] price listings were not going to be the same for

[10] everybody. Getting into the business, we found out

[11] that the competition was such that they had different

[12] prices to different accounts. We met those prices in

[13] different accounts, and direct pricing just wasn't

[14] really going to be relevant to be published in a

[15] publication such as First DataBank.

[16] Q: Do you understand whether or not First

[17] DataBank was forwarding —

[18] A: Incidentally, I don't know that they ever

[19] published a direct price.

[20] Q: Well, that was going to be my question,

[21] actually.

[22] A: Yeah.

[23] Q: Do you recall that First DataBank published

[24] Warrick's direct pricing?

[25] A: I do not recall. I don't know.

Page 655

[1] Q: Do you understand how the deletion of direct

[2] pricing from First DataBank's database by Warrick

[3] would impact the third-party reimbursers who received

[4] pricing information from First DataBank?

[5] A: No, I don't. It would depend pretty much on

[6] how they utilized that data, whether they surveyed the

[7] market or had other means of finding out what the

[8] market price was in relation to the sticker price

[9] or — or market price — or marker price.

[10] Q: In submitting a new AWP on the 25 by 3

[11] Warrick generic, you understood that you were setting

[12] the AWP, correct?

[13] A: Yes. That was the AWP.

[14] Q: Yes, sir.

[15] Now, if you could, take a look at the

[16] next page; and I would ask whether or not you

[17] understand what is meant by the "delta GPI to 1" under

[18] "Other/Problems/Questions" section. Do you understand

[19] what that is?

[20] A: That's a First DataBank document. I have no

[21] knowledge of what that is.

[22] Q: Do you recall the need for you to lower the

[23] AWP on the 25 by 3 generic Warrick product in order to

[24] have that product classified as a generic by First

[25] DataBank?

Page 656

[1] A: I did that not because of — if memory serves

[2] me correctly, not because of any need. I just felt

[3] that it was ridiculous to have a 60 by 3 mL priced at

[4] $1.21 and a — and a 25 by 3 mL priced at $1.24. I

[5] felt it would be consistent; and rather than take the

[6] 60's up, I took the 25's down.

[7] Q: Do you remember receiving any kind of

[8] negative feedback, specific or general, from customers

[9] that they were not being reimbursed on Warrick's

[10] generic product because it was — had been classified

[11] as a brand by First DataBank?

[12] A: I do not.

[13] Q: Have you ever heard a term at First DataBank

[14] known as "generic price indicator"?

[15] A: I'm not familiar with it.

[16] Q: You are familiar, though, with the 10 percent

[17] rule that First DataBank uses to categorize products

[18] as brand —

[19] A: Yes, I do.

[20] Q: — as brands or generics?

[21] A: Yes, I do.

[22] Q: Okay.

[23] A: I'm sorry for the interruption.

[24] Q: That's all right.

[25] Does it seem likely that this means

# Exhibit 11

To:                     Birch, Greg <greg.birch@spcorp.com>; Ray, Darren <darren.ray@spcorp.com>;
Kilgallon, James <james.kilgallon@spcorp.com>; Conti, James <james.conti@spcorp.com>; Scapicchio,
Kenneth <kenneth.scapicchio@spcorp.com>; Wu, Paul <paul.wu@spcorp.com>; Beke, Jennifer
<jennifer.beke@spcorp.com>; Kennedy, Daniel <daniel.kennedy@spcorp.com>; Ken-Kwofie, Larry
<LARRY.KEN-KWOFIE@spcorp.COM>; Taylor, Daniela <daniela.taylor@spcorp.com>; Myer, Harvey
<harvey.myer@spcorp.com>; Bubany, Mark <mark.bubany@spcorp.com>; Mueller, Matthew
<matthew.mueller@spcorp.com>; Stadtmiller, John <john.stadtmiller@spcorp.com>; Malone, Kelly
<kelly.malone@spcorp.com>; Kendall, Kevin <kevin.kendall@spcorp.com>
From:                   Kane, Debbie </O=SCHP/OU=US/CN=RECIPIENTS/CN=EXCHANGE
US/CN=1998003649>
Cc:
Bcc:
Received Date:          2000-05-05 13:51:13
Subject:                Price Alert!

---

C&P Contract Staff -

As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement
purposes. Most manufacturers (including Schering) report AWPs at NDP plus 20%.

There are several third party sources that publish pricing information including First Data Bank (Price Alert) and
Medispan. The C&P department has a subscription to Price Alert. The monthly issues are kept on Eleanore's
desk and are quite often used as a reference to determine competitor NDPs.

Recently, it has been brought to my attention that the AWPs published in PriceAlert are NOT set by the
manufacturers. In the March 15th publication, the PriceAlert editor explains that First Data Bank surveys the
national wholesalers to ascertain what the true AWP is (NDP plus wholesale mark up.) She further explains that
historically there have not been differences between pharma manufacturers published AWPs (which she refers
to as SWPs "Suggested Wholesale Prices) and those reported by the wholesalers. Recently, however, there
have been discrepancies.

I took a look at the Claritin Family NDCs and in fact, Price Alert AWPs were listed at NDP plus 17.6%.
Therefore, be very careful if your using Price Alert as a source for competitor pricing.

Please let me know if you have any questions.
Thanks,
Debbie

Highly Confidential

Plaintiffs' Exhibit
**492**
01-12257-PBS

SFF0241686

# Exhibit 12

 **Fujisawa USA, Inc.**

# INTEROFFICE MEMORANDUM

October 5, 1993

To: Mark Wanda

From: Carol Robey

Re: AWP Outside Distribution List

Thank you for your recent memo dated October 4, 1993 regarding Fujisawa USA AWP product price listings. Currently I have four companies with which I contact on a regular basis regarding updates, new product info, and corrections of our AWP listing. I have also had one request from a customer to receive regular updates and have added the state agency you requested.

One of the issues regarding our companies AWP listing is that the databases only use our listing as a "Suggested Manufacturers AWP". The standard wholesaler mark-up used by those databases is currently at 25% above direct list price which is our hospital list. Almost all of our products are at 33% or higher above list price.

I would appreciate any suggestions you have, to make our listing with these companies more consistent. The attached, lists the companies and contact names I deal with most often. If you have any questions, please give Mary-Jo, or me a call.

Thank you.

cc: Mary-Jo Warfield
Jean Allen
Laura Cruz

F 18293

AWP Outside Distribution:   October 5, 1993

Beth Radar
Associate Editor
First Data Bank - Blue Book
1111 Bayhill Drive
San Bruno, CA  94066

Mr. Guy Hunt
Idaho Medicaid Policy-IDHW
450 W. State Street, 2nd Floor
StateHouse Mail
Boise, ID  83720

Medical Economics Data - Drug Topics RFDBOOK
Attn: Linda, Database Information
Five Paragon Drive
Montvale, NJ  07645-1742

*800
722-3062*

Wyndy Jones
Data Acquisition Specialist
MediSpan
8425 Woodfield Crossing Blvd
Box 40930
Indianapolis, IN  46240-0930

Karen Greene
Professional Drug Systems, Inc.
530 Maryville Center Drive
St. Louis, MO  63141

F 18204

FJ-MDL 008347
CONFIDENTIAL

# Exhibit 13

**Electronic Document Retention:**

# Reducing Potential Liability For Email

By Michael R. Overly

**Table of Contents:**
Introduction ............................................. 2
The Particular Threat of Email ...................... 3
Basic Requirements for a Retention Policy ..... 4
Legal Implications of Document Destruction .. 5
Conclusion................................................ 7



omniva
POLICY SYSTEMS

**BBMDL-015152**

BRAUN 001629

**Electronic Document Retention:**

# Reducing Potential Liability For Email

By Michael R. Overly[*]

### 1.    Introduction

Most businesses have policies that govern how long documents are to be retained before being destroyed or discarded. A growing number of businesses are extending their existing retention policies to include electronic documents – particularly email. For example, a common retention policy for email would require deletion after sixty days. If an employee desires to keep an electronic document past the automatic deletion date, she must take affirmative action to preserve the document (*e.g.,* contact the MIS department or copy the document to a special directory).

In the absence of a law specifically requiring certain documents to be retained (*e.g.,* documents relating to employee retirement plans and certain types of government contracts), document retention policies in the electronic context are directed at accomplishing three goals: (1) Document retention conserves valuable computer storage space; (2) Reducing the volume of stored electronic documents improves the efficiency of the business' system; and (3) Provided there is no legal obligation to preserve evidence, deleting electronic documents when they are no longer necessary reduces the likelihood that such documents may be exploited in future litigation.    This last element, reducing potential liability, is the key consideration of many businesses in choosing to implement an electronic retention policy.

Ensuring that an electronic retention policy is actually carried out can be difficult. Until very recently employers had to rely on the their employees to remember to delete their old files. This procedure often resulted in spotty compliance with the policy. Some employees would religiously police their files, while others would choose to ignore the retention requirements entirely. Fortunately, recent technological advances have resulted in the availability of software that can provide businesses with an automated means of effectuating their electronic retention policies. These programs can be configured to automatically delete, or render inaccessible, files that are older than a certain user defined threshold. The advantage of using such software is that it will ensure the retention

---

[*] Michael R. Overly is an information technology attorney in Los Angeles, California. His practice is limited to counseling clients regarding technology licensing, copyright law, electronic commerce, and Internet and multimedia law. Mr. Overly speaks and writes frequently on the legal implications of technology in the workplace, electronic commerce, email, and electronic evidence. He has written numerous articles on these subjects and has authored chapters in several treatises. Mr. Overly is the author of the best selling *e-policy: How to Develop Computer, Email, and Internet Guidelines to Protect Your Company and Its Assets* (AMACOM 1998) and *Overly on Electronic Evidence* (West Publishing 1999).

2

**BBMDL-015153**

BRAUN 001630

policy is uniformly and reliably applied. It also frees employees from the task of having to constantly review their documents for compliance with the retention policy. Such automated destruction will prevent the accumulation of email containing sensitive, proprietary information of the business that might be accidentally or intentionally leaked by employees to competitors.

The issue of uniformity and reliability in the enforcement of a retention policy is a significant one. In addition to reducing potential liability on the part of the employer and the cost of potential litigation, employees will feel freer to express themselves regarding sensitive matters if they know their messages will be permanently deleted after a brief period of time – making email more like a temporary voice mail message (as most employees incorrectly view it), instead of a near permanent record of their communications. Without such uniformity and reliability of enforcement, it may be imprudent for sensitive matters to be discussed using email, even with a responsible retention policy.

## 2.    The Particular Threat of Email

Because of the informality with which email is treated by most employees, it has become an almost constant target of discovery in litigation. Indeed, email has become such an important focus of discovery in business litigation that some attorneys claim that email is involved in 100% of their cases. The headlines are full of instances in which a business has sustained substantial liability because of employee email abuse. For example, a subsidiary of Chevron recently paid $2.2 million dollars to settle a class action law suit arising, among other things, out of an offensive joke circulated via email. The current Microsoft antitrust litigation provides another example. There, the government was able to discover damaging email that Microsoft thought no longer existed. Microsoft, in turn, introduced numerous email messages, which were previously thought deleted, from AOL's and Netscape's backup tapes. These messages were exhibited in support of Microsoft's case.

As illustrated in the following example, failing to implement an effective retention policy for email can substantially increase litigation costs and lead to greater liability. In particular, the failure to adequately address the significant risks posed by electronic documents could result in potential officer and director liability for failure to exercise reasonable business judgment.

**Example:** XYZ corporation is sued by one of its employees for wrongful termination. During the course of discovery, the plaintiff serves a request on XYZ for the production of all documents, including email, relating to the termination. If the business does not have a practice of periodically deleting email, it would be under an obligation to search through all of the email on its systems. This could mean reviewing an enormous volume of email accumulated over many years. A search of the foregoing nature can cost thousands of dollars and take substantial time to complete. XYZ may be forced to hire experts to assist it in sifting through the mass of potentially relevant email. If the company had a retention policy in effect and that policy is uniformly and reliably enforced, the expense and time required to respond to the discovery request would be significantly reduced. In contrast, if the company had a retention policy, but no

3

BBMDL-015154

BRAUN 001631

automated enforcement mechanism was used to insure uniform application of that policy, the employer would likely be under a duty to incur the expense of performing an expensive search to identify relevant email that may have been overlooked by employees for deletion.

In a recent case, a business sought protection from the court to avoid responding to a discovery request seeking production of electronic evidence, including email. The business argued that it would cost tens of thousands of dollars to respond to the request and asked that the cost be shifted to the requesting party or, in the alternative, that the cost be shared equally by the parties. The court ruled that the business voluntarily chose to store information electronically and that the business would have to bear the cost of producing the electronic evidence. If the business had implemented and uniformly and reliably applied an electronic document retention policy, its cost of responding to the discovery request would have been substantially reduced.

Mechanical deletion of email through encryption and scheduled destruction of keys is adequate protection to ensure that the content of those messages is effectively unrecoverable. Although it is theoretically possible to decrypt an encrypted file without the benefit of the key, such an effort would be computationally infeasible (*i.e.*, decryption would require the concerted use of massive computer power over a period of many years). It is highly unlikely that any court would order a business with such encrypted files to expend the extraordinary resources and time necessary to attempt decryption. This is particularly so given the prohibitive cost of decryption and the fact that decryption technology would be equally available to the requesting party. At most, a court may order production of the encrypted file along with any information relating to the method of encryption. The requesting party would then be free to use whatever resources it deems appropriate to try to decrypt the file. Given the security of modern encryption technology, efforts to decrypt such files would be an exercise in futility.

### 3.    Basic Requirements for a Retention Policy

Developing a records retention policy requires careful consideration of the way in which an organization conducts its business and the potential laws applicable to the organization that may require records to be retained. While a review of the broad range of applicable laws is beyond the scope of this White Paper, there are certain general guidelines for the establishment and implementation of a retention program that should be considered in developing an electronic records retention policy:

- The policy should clearly define the types of documents to which it will apply. In particular, electronic documents such as email should be specifically identified. If certain electronic documents are to be stored in designated locations, those locations should be clearly identified.

- The retention period for each type of document should be listed. For example, employment related documents may be kept for the

BBMDL-015155

BRAUN 001632

term of an employee's employment, while accounting related documents may only be retained for four or five years.

- Procedures should be provided for excepting certain documents from the program (e.g., copying files to a specified directory on the LAN used to store important "permanent" files).

- The policy should describe how the retention program will be implemented and policed (e.g., software will be used to automatically delete or render inaccessible email more than sixty days old).

- An individual or group of individuals should be specified as being responsible for maintaining the program and responding to questions about its implementation.

- An audit procedure should be developed to ensure the retention policy is properly implemented.

## 4.    Legal Implications of Document Destruction

The implementation of a document retention policy will, of necessity, require the destruction/deletion of certain documents. Such destruction/deletion may have legal implications. Destroying documents relevant to a threatened or ongoing litigation may result in liability for spoliation of evidence or subject the business to sanctions for abuse of the discovery process. Destroying documents needed for a criminal investigation and prosecution may subject the business to white-collar criminal liability (e.g., perjury, aiding and abetting, and conspiracy). Such destruction may also violate federal obstruction of justice laws.

Because of the substantial civil and criminal penalties that may result from the destruction of evidence, immediately upon learning of a threatened or pending litigation it is important for businesses to rapidly identify and protect relevant evidence from destruction. Automated technological solutions to electronic document retention can provide a central point of control for the policy, allowing a single administrator to quickly modify the deletion policy in response to a potential claim.

### a.    Duty to Preserve Evidence in Litigation

A party to a litigation is under a duty not to lose or destroy evidence relevant to that lawsuit. Such duty arises by reason of the pendency of the litigation itself, not by reason of any potential court intervention.

Fulfilling the duty to preserve evidence may be particularly difficult when information is stored electronically and can be easily deleted or altered. The following example illustrates how important evidence may be inadvertently destroyed.

**BBMDL-015156**

BRAUN 001633

*Example:*  A former employee sued a large aerospace company for wrongful termination.  The plaintiff's attorney knew that the defendant had a document retention policy and that relevant information might be lost or overwritten. The plaintiff's attorney contacted the defendant and reminded it of its duty to preserve relevant evidence.  Nevertheless, the defendant overwrote a backup tape destroying potentially relevant evidence.  The jury awarded the plaintiff $20,000 in compensatory damages and $60,000 in punitive damages against the defendant for spoliation of evidence.  Had the aerospace company used a technological solution to enforce its retention policy, an administrator could have likely modified the deletion policy to retain the relevant evidence.  Thus potentially avoiding the substantial damages assessed against the company.

### b.    Reconciling the Duty to Preserve Evidence with a Document Retention Policy

A business is only under a duty to preserve evidence if it is aware of a pending or threatened dispute or lawsuit.  In the absence of such knowledge, destruction of documents according to a retention policy will generally not result in any liability to the business.  This is particularly so when the business has adopted a uniform retention policy and has consistently and reliably applied that policy to its documents.  Such consistency and reliability can best be insured by employing a technological solution to electronic document retention.    Liability may arise, however, when a business selectively enforces the policy or only begins to enforce the policy after it learns of a potential lawsuit.  The benefit of a retention policy is in its consistency of application, ridding the organization of documents that are no longer of any business value and that may, at some point in the future, be exploited in litigation.

### c.    Meeting a Discovery Request in the Context of a Technologically Mediated Email Retention Policy

In answering discovery requests, corporations have an obligation to perform a reasonable search of the documents in their possession, custody, or control.  The key to the obligation is that the search must be "reasonable."   Because it is so easy, and so common, to violate non-technologically mediated email retention policies, the corporation cannot have confidence that all of the old messages have been destroyed.  Given the foregoing and the fact that the business will likely be on notice that its destruction policy is not uniformly carried out, it may be unreasonable to overlook this potential source of evidence.  Therefore, having a destruction policy would probably not relieve the business of its obligation to perform a search of its backup tapes, users' hard drives and other holdings.  The business may have to expend considerable time and resources performing the search.

However, having an email retention policy that is technologically mediated can provide the business with substantial confidence that all messages older than the time period specified in that policy will be destroyed.  It would therefore be reasonable that the business forego inspecting backup tapes, hard drives, and other media for information that has clearly been previously destroyed pursuant to an

6   **BBMDL-015157**

BRAUN 001634

automated destruction policy.  It should be noted, however, that this would not relieve the business of its obligation to review recent email that have not been deleted.

In the event a rogue message surfaces in spite of the technologically mediated email retention policy (perhaps because it was printed onto paper or someone photographed their computer screen), the business would be required to produce the message. However, the existence of such a message would generally not call into question the corporation's reasonable expectation that no other messages exist.

### 5.    Conclusion

Based on the foregoing discussion, the following conclusions can be drawn:

- It is imperative for businesses to adopt appropriate retention policies for their electronic documents, particularly email;

- To be effective in reducing potential liability, a retention policy must be consistently and reliably applied;

- A technological approach to retention of email will ensure consistent and reliable application of the policy.  Such application will reduce potential liability, and in the case of a claim, minimize the expense and time required to respond to discovery requests.  If a human centered approach to enforcement is used, consistency and reliability may be compromised -- thus undermining any benefits that may have been achieved by adopting the retention policy;

- Mechanical deletion of email through encryption and scheduled destruction of keys is adequate protection to ensure that the content of those messages is effectively unrecoverable. Also, in the absence of a law or other obligation requiring retention, the regular policy based destruction of email messages is a legal and appropriate business practice; and

- In addition to reducing potential liability and the cost of litigation, employees will feel freer to express themselves regarding sensitive matters if they know their messages will be permanently deleted after a brief period of time.  Without uniformity and reliability of enforcement, it may be imprudent for sensitive matters to be discussed using email, even with a responsible retention policy.

**BBMDL-015158**

7

BRAUN 001635

| B.BRAUN General Procedure | GP No. | 04-04-00-00-250 |
|---|---|---|
| Issued by: | Issuance Date: | |
| Location: Puerto Rico | Supersedes: | 6/10/98 |

## RECORDS RETENTION GUIDE

### 1. GENERAL STATEMENT

1.1. B.Braun's policy is that records that are of value to company objectives, and/or that fulfill legal requirements must be retained and preserved in accordance with this Record Retention Guide.

1.2. Maintaining outdated records can be expensive. Records that have been retained for the specified time periods should be destroyed.

1.3. Microfilm - Most records that must be retained for a significant period may be microfilmed, and the original documents destroyed when the film has been checked for legibility. Generally, any business record that would be admissible in Court in its original form will be admissible if it is on microfilm, provided that the microfilm can be properly identified, and the microfilming program is carried out on a regular basis.

NOTE                    **BBMDL-015159**

Reproduction of naturalization records, automobile licenses and currency is prohibited by Federal law. Internal Revenue Service Regulations and Food and Drug Administration (FDA) Compliance Policy Guide 7150.13 have specific requirements for microfilming records.

1.3.1. All records must be readily available for review and copying by FDA investigators at any reasonable time.

1.3.2. Equipment must be provided to facilitate viewing and copying the records.

1.3.3. A reproduction must be a true and accurate copy of the original record. Thus, where the reproduction process results in a copy that does not reveal changes or additions to the original record, the original must be retained.

1.3.4. The reproduced copy, and any image shown on a viewing screen, must note, in a suitable manner, that an alteration has been made and that the original record is available.

1.3.5. Retention Period - In determining the year of disposal, time is computed from January 1st of the year subsequent to the date of the material. Thus, material dated 1990 with a storage life of two years would be destroyed in January 1993. Exceptions to this rule are retention periods calculated in months, instructions to destroy at the end of the relevant calendar year and regulations for Export

This document contains information that is the confidential and proprietary property of B.Braun Medical, Inc. Any dissemination, distribution or copying of this document is strictly prohibited without the prior written consent of B.Braun. Anyone receiving this document in error should immediately notify B.Braun's Legal Department and return this document to B.Braun Medical, Inc., 824 12th Avenue, Bethlehem, PA 18018.

BRAUN 001636

# Exhibit 14

Re-route

Log No. 246

**Promotional Information Review**

**I. Initial Routing**

Title: AWP Product Guide

Proposed Distribution (describe): OHCP

Initiated by: T Davis   Date: 8-26-93   Control No. (if applicable) SA070-00-Reir

DATE NEEDED: ASAP   Review Meeting Date: 10/7/93

**II. Committee Review**

| Check for Review. Signature/Date | Initial Review Appr'd Rel'd | | Re-Review (if needed) Appr'd Rel'd Initial/Date | | | Re-Rou-for SA070-01- |
|---|---|---|---|---|---|---|
| [✓] See attached Sales & Marketing (Date) 8-30-42 | X | X | X | X | | |
| [✓] _____ 10/07/93 Legal/Affairs (Date) | (X) | X | (X) | X | UM Fuedin | |
| [✓] _____ 10/7/93 Professional Services (Date) | (X) | X | X | X | | |
| [ ] _____ N/A 8-12-13 (Date) Clinical Affairs | X | X | X | X | | |
| [✓] Kathleen Milam 08-26-93 Other: (Date) | (X) | X | X | X | | |
| [✓] _____ 8-26-93 Other: (Date) | (X) | X signed in error 9-1-93 | X | X | | |
| [✓] Sally Gawel 10/7/93 Regulatory Affairs (Date) | (X) | X | (X) (Dawydyski) | X | XA 1/13/94 | |

**III. Final Regulatory Review (Attach Committee-approved draft and five submission-quality copies of final draft)**

Disposition: Final draft [X] approved [ ] not approved   Transmittal # N/A
FDA Approval required [ ] Yes [X] No   Date 1-4-94
Blue-line [X] Approved [ ] Not approved   _____ 1-4-94
   date   initials

**IV. To be completed by Quality Assurance**

FDA Label Rev # N/A
[ ] APPROVED   [ ] NOT APPROVED

Customer-quality sample sent to FDA N/A
   date
Customer-quality sample in QA files 1/6/94
   date

[ ] WITHDRAWN BY MARKETING
By: _____ Date: _____

Equivalent to approved draft [ ] Yes [ ] No

FORM #1/SOP I-007-05/Page 5 of 6

P 052400

**HIGHLY CONFIDENTIAL**

IAWP112178

## PROMOTIONAL PROJECT INITIATION SHEET

Date: _August 25, 1993_  
Initiator: _Mary Lipinsky/KMS_  
Project Name: _AWP Guide_  

For POA #: _____

Description: _AWP Product_  
_Pricing Guide_

Vendor: _____

Code #: _SA010-00-REIM_  
Job #: _____  
Revision #: _____  
P.O. #: _____  
Estimated Costs: _____  
Budget #: _7420.122.040_

**What are the main objectives and how is it to be used?** (*major idea/specific points to be communicated*)?  _Both third-party payers and customers request this information. Objective is to provide our AWP's in an easy to access manner, upon request._

**Target Audience:** _Third party payers, customers and sales team._

**Components of project** (*i.e., carrier, disc, meetings, etc.*):  _2-sided 8½ × 11_

**Additional considerations/services** (*i.e. contracts, statistical analysis, etc.*):  _No analysis planned or required._

**Distribution Route** (*i.e. sales force hand-out, etc.*):  _Reimbursement managers, Hotline and sales team, upon request (leave-behind)_

**Physical Limitations:**  
Format: _____ No. of Pages: _one sheet 2 sided_ No. of Colors: _____ Quantity: _____

Routing:  
LEUKINE — SAC _____ CJR _____ RK _____ LK _____ WAL _____ Other _____  
PIXY — LTD _____ CJR _____ RK _____ LK _____ WAL _____ Other _____  
HYDREA — MJV _____ RK _____ TM _____ WAL _____ Other _____

Attachment #1a

cmw 9/92

P 052401

HIGHLY CONFIDENTIAL

IAWP112179

# ımmunex   AVERAGE WHOLESALE PRICE (AWP)
## PRODUCT PRICING GUIDE

| PRODUCT DESCRIPTION | | | NDC NUMBER | AWP (Red Book) |
|---|---|---|---|---|
| AMICAR® (aminocaproic acid) Injection, USP, 250 mg/ml** | single-use vial | 20 ml<br>96 ml | 0205-4668-37<br>0205-4668-73 | $ 16.24<br>$ 74.04 |
| AMICAR® (aminocaproic acid) Syrup, USP, 25% Flavor, Raspberry** | bottle | 16 fl oz | 0005-4667-65 | $ 391.28 |
| AMICAR® (aminocaproic acid) Tablets, USP** | 100 tablets/bottle | 500 mg | 0005-4665-23 | $ 156.75 |
| HYDREA® (Hydroxyurea Capsules, USP)* | 100 capsules/bottle | 500 mg | 58406-501-01 | $ 131.20 |
| Leucovorin Calcium for Injection preservative-free, cryodesiccated powder** | single-use vial<br><br><br>box of 25 vials | 50 mg<br>100 mg<br>350 mg<br>50 mg | 0205-5330-92<br>0205-4646-94<br>0205-4645-77<br>0205-5330-19 | $ 21.53<br>$ 39.41<br>$ 137.94<br>$ 538.13 |
| Leucovorin Calcium Tablets** | 12 tablets/bottle<br><br>24 tablets/bottle<br><br>30 tablets/bottle<br>100 tablets/bottle<br>unit dose pack 10 x 5s<br>unit dose pack 5 x 10s | 10 mg<br>15 mg<br>10 mg<br>15 mg<br>5 mg<br>5 mg<br>5 mg<br>10 mg<br>15 mg | 0005-4525-83<br>0005-4501-83<br>0005-4525-90<br>0005-4501-90<br>0005-4536-38<br>0005-4536-23<br>0005-4536-40<br>0005-4525-64<br>0005-4501-64 | PTD<br>$ 100.56<br>PTD<br>$ 200.96<br>$ 85.54<br>$ 285.00<br>$ 142.56<br>PTD<br>$ 430.80 |
| LEUKINE® (Sargramostim) for injection | single-use vial | 250 mcg<br>500 mcg | 58406-002-01<br>58406-001-01 | $ 106.00<br>$ 200.00 |

continued on back

P 052402

| PRODUCT DESCRIPTION | | | NDC NUMBER | AWP (Red Book) |
|---|---|---|---|---|
| **LEVOPROME®** methotrimeprazine for intramuscular use, 20 mg/ml** | vial | 10 ml | 0205-4534-34 | $ 226.89 |
| **Methotrexate Sodium Injection** isotonic liquid, preservative-protected, 25 mg/ml** | 2 ml 10 ml | 50 mg 250 mg | 0205-4556-26 0205-5338-34 | $ 4.75 $ 20.48 |
| **Methotrexate Sodium for Injection** freeze-dried, preservative-free, low sodium** | single-use vial | 20 mg 50 mg 1 g | 0205-4654-90 0205-9337-92 0205-4653-02 | $ 2.78 $ 4.75 $ 61.44 |
| **Methotrexate LPF®Sodium** (methotrexate sodium injection), liquid, preservative-free, ready-for-use, 25 mg/ml** | single-use vial: 2 ml 4 ml 8 ml 10 ml box of 25 10 ml vials | 50 mg 100 mg 200 mg 250 mg 250 mg | 0205-5325-26 0205-5326-18 0205-5327-30 0205-5337-34 0205-5337-98 | $ 4.75 $ 8.50 $ 16.73 $ 20.48 $ 364.79 |
| **NOVANTRONE®** mitoxantrone for injection concentrate, 2 mg/ml** | multi-dose vial: 10 ml 12.5 ml 15 ml | 20 mg 25 mg 30 mg | 0205-9393-34 0205-9393-72 0205-9393-36 | $ 592.48 $ 740.58 $ 888.71 |
| **RUBEX®** (doxorubicin hydrochloride for injection, USP)* | single-use vial | 10 mg 50 mg 100 mg | 58406-511-01 58406-512-01 58406-513-01 | $ 42.06 $ 189.26 $ 378.52 |
| **Thiotepa for Injection**** | single-use vial | 15 mg | 0005-4650-91 | $ 60.46 |

\* Formerly marketed by Bristol-Myers Squibb under the following NDC numbers:
    Hydrea 500 mg capsules – 0003-0838-50;
    Rubex single-use vial    – 10 mg 0015-3351-22; 50 mg 0015-3352-22;
                   100 mg 0015-3353-22.
\*\* Formerly marketed by Lederle Oncology.
   Currently listed under Lederle Oncology NDC number.

PTD – Product Temporarily Deleted

©1993 Immunex Corporation, Seattle, WA 98101

SA070-00-REIM

11/93

P 052403

IAWP112181

# Exhibit 15

# IMMUNEX

January 12, 1995      VIA FAX

Don Jewler
ACCC
11600 Nebel Street
Suite 201
Rockville, MD  20852

Dear Don:

Below you will find a list of new suggested Average Wholesale Prices (AWPs) for selected
Immunex products, along with a new NDC for NOVANTRONE® 25 mg, all effective January
10, 1995.



| Product | NDC | New Suggested AWP |
|---------|-----|-------------------|

Also, please note that the following product will no longer be sold in single vials and will be
available only in boxes of ten. Its AWP has been multiplied by ten and is in the table below.
Each vial size has a new NDC and is now available under Immunex packaging. These changes
are effective January 10, 1995.

| Product | Old NDC | New NDC | New Suggested AWP |
|---------|---------|---------|-------------------|
| Leucovorin Calcium for Injection, preservative-free, cryodesiccated powder | | | |
| box of 10 vials | | | |
| 50 mg | 00205-5330-92 | 58406-0621-37 | $215.30 |
| 100 mg | 00205-4646-94 | 58406-0622-35 | $394.10 |
| 350 mg | 00205-4645-77 | 58406-0623-33 | $1379.40 |

Please update your databases accordingly.   A new copy of Immunex's Average Wholesale
Price Product Pricing Guide will be sent to you next week.  If you have any questions, call me
at (206) 389-4320.  Thank you.

Sincerely,

Mary

Mary Lipinsky
Manager, Health Care Policy

cc:   Laura Driscoll
      Silvia Chang-Haines
      Teresa Hedges
      Jim Hynes
      Kathleen Stamm

IMNX 002636
CONFIDENTIAL

**HIGHLY CONFIDENTIAL**

IAWP002632

Immunex Corporation

**ımmunex®**

January 12, 1995     VIA FAX

Roni Lane
Red Book
5 Paragon Drive
Montvale, NJ 07645

Dear Roni:

Below you will find a list of new suggested Average Wholesale Prices (AWPs) for selected
Immunex products, along with a new NDC for NOVANTRONE® 25 mg, all effective January
10, 1995.

| Product | NDC | New Suggested AWP |
|---|---|---|
| • LEUKINE® 250 mcg (Sargramostim) | 58406-0002-01 | $109.44 |
| • LEUKINE® 500 mcg (Sargramostim) | 58406-0001-01 | $206.00 |
| • NOVANTRONE® 20mg mitoxantrone for injection concentrate | 58406-0640-03 | $640.82 |
| • NOVANTRONE® 25mg mitoxantrone for injection concentrate | 58406-0640-05 | $801.01 |
| • NOVANTRONE® 30mg mitoxantrone for injection concentrate | 00205-9393-36 | $961.24 |
| • Thiotepa for injection | 00005-4650-91 | $66.65 |

Also, please note that the following product will no longer be sold in single vials and will be
available only in boxes of ten. Its AWP has been multiplied by ten and is in the table below.
Each vial size has a new NDC and is now available under Immunex packaging. These changes
are effective January 10, 1995.

| Product | Old NDC | New NDC | New Suggested AWP |
|---|---|---|---|
| Leucovorin Calcium for Injection, preservative-free, cryodesiccated powder | | | |
| box of 10 vials | | | |
| 50 mg | 00205-5330-92 | 58406-0621-37 | $215.30 |
| 100 mg | 00205-4646-94 | 58406-0622-35 | $394.10 |
| 350 mg | 00205-4645-77 | 58406-0623-33 | $1379.40 |

Please update your databases accordingly.   A new copy of Immunex's Average Wholesale
Price Product Pricing Guide will be sent to you next week. If you have any questions, call me
at (206) 389-4320.   Thank you.

Sincerely,

*Mary Lipinsky*

Mary Lipinsky
Manager, Health Care Policy

cc:   Laura Driscoll
      Silvia Chang-Haines
      Teresa Hedges
      Jim Hynes
      Kathleen Stamm

51 University Street, Seattle, Washington 98101
206.587.0430, Fax 206.587.0606

P 049509

**HIGHLY CONFIDENTIAL**                    IAWP109286

# Exhibit 16

# MEMORANDUM

**TO:**      **FIELD SALESFORCE**                     CC:  **STEVE EISOLD**
                                                           **JOHN PRUETT**
**FROM:**    **DAVE RITCHIE**                               **JON HEE**
                                                           **CAROL HOFMESTER**
**DATE:**    **APRIL 6, 1994**                              **MARIA YANTZ**
                                                           **ANNMARIE VENETO**
**RE:**      **AVERAGE WHOLESALE PRICES (AWP)**             **CINDY ROSE**

---

Ladies and Gentlemen:

Attached is a copy of Medi-Span's March 31, 1994 printout of product and AWP information for Gensia Laboratories. Since this information comes directly from Medi-Span's computer file, you will find it to be more accurate than the information that your customers are using from their reference texts. You will note, that the AWP information (listed in pack quantity) is found in the third column from the right. Additionally, the two columns to the immediate left of the AWP column represent: WAC (Wholesaler Acquisition Cost) and DP (Direct Price).

Should you have any questions regarding this information, please contact me.



Highly Confidential                                    SICOR 00753

Labeler Turnaround Report



| PRODUCT NAME | | SPA B C | SIZE UN | QTY UO | MAC | DP | AWP | EFF. DATE | INA DATE |
|---|---|---|---|---|---|---|---|---|---|
| 00703-5643-01 ETOPOSIDE | INJ 10MG | SOLN Y G | 5.000 ML | 1 | 105.96 | 105.96 | 139.30 | 2/14/94 | / / |
| 00703-5646-01 ETOPOSIDE | INJ 500MG | SOLN Y G | 25.000 ML | 1 | 483.73 | 483.76 | 638.74 | 2/14/94 | / / |

MATERIAL REDACTED

MATERIAL REDACTED

Highly Confidential

PAGE 2

Labeler Turnaround Report

| NDC | PRODUCT NAME | DEA | G C | SIZE UM | QTY UD | WAC | DP | AWP | EFF. DATE | INA DATE |
|-----|--------------|-----|-----|---------|--------|-----|-----|-----|-----------|----------|
| 60703-5140-01 | LEUCOVOR CA INJ 100MG | SOLN | P G | 1.000 EA | 1 UD | 32.50 | 32.50 | 40.63 | 7/ 1/93 | |

3/31/94

MATERIAL REDACTED

Highly Confidential

SICOR 00755

Rob, Joe

*Tim suggested sending this info to the reps. Your thoughts?*

**Comparison of AWPs**

Redbook '96

MATERIAL REDACTED

| Doxorubicin | Abbott/Adria | Bedford | FUSA | Gensia | |
|---|---|---|---|---|---|
| 10 | $48.31 | $47.35 | $44.50 | X $49.29 | < Polymer |
| 50 | $241.56 | $236.74 | $231.00 | X $246.46 | < Polymer |
| 200 | $946.94 | $945.98 | NA | X $966.14 | < Polymer |

Woods = PKSYSTEROCOMPAWP.XLS

Highly Confidential

SICOR 00756

*Comparison of AWPs*

| Etoposide | | Abbott | BMS | Redbook '96 | | |
|---|---|---|---|---|---|---|
| | | | | Gensia | GLL Poly | |
| 100 | | $136.49 | $136.49 | X | X | |
| | | | | $141.97 | $141.97 | |
| 500 | | $665.38 | $665.38 | X | X | |
| | | | | $692.10 | $692.10 | |
| 1 gram | | ? | $1,296.64 | X | | |
| | | | | $1,338.13 | | |

MATERIAL REDACTED



W:\004 = P:\ETC\ETC\COM\P\AWP.XLS

Highly Confidential

# GensiaSicor™



June 26, 2000

Martha McNeill, R. Ph.
Director of Product and Prescriber Management
Bureau of Vendor Drugs
Texas Department of Health

Re: Labeler Code 703

Dear Ms. McNeill,

On June 13, 2000, I sent to you a completed Pricing Request Form via Federal Express. It has been brought to my attention that I provided you information that was not formatted in the manner you requested. I apologize for this error.

Instead of providing you with AWP prices for our products reduced to the ML or EA level per vial, I submitted <u>PACKAGE</u> AWPs (for multi-vial shelf packs) and <u>VIAL</u> AWPs (for shelf packages of single vials) since this is the way AWP information for injectable products is typically reported in the standard published references (such as the Redbook or wholesaler ordering systems).

Therefore, I am enclosing a revised Pricing Request Form with the information in the terms you requested (per ML or EA).

During my review of the data, I did, however, find three errors on the original form that have been corrected on the form I am now submitting:

1.  The AWP (10 vial Pack) Pack price for the Desmopressin Acetate1mL Injection (NDC# 00703-5051-03) should be $173.80 per package. On an mL basis, this calculates out to a new AWP per mL of $17.38.

2.  The AWP Vial (Single unit pack) Pack price for the Desmopressin Acetate 10mL Injection (NDC# 00703-5051-03) should be $173.80 per package. On an mL basis, this calculates out to a new AWP per mL of $17.38.

3.  On the last line of the product listing on the original sheet for Sulfamethoxazole and Trimethoprim 30 mL Multidose vial NDC# 0703-9526-01, I indicated a per pack price in the Price to the Distributor and/or Pharmacy Column and the Direct Price to Pharmacy Column. This was an error. The package size for this product is a single vial as I correctly indicated in the first column. Because the new prices are being submitted per ML as you request, it is not possible for these errors be repeated on the revised sheet. I simply wanted to bring this to your attention in



Gensia Sicor Inc. • 19 Hughes • Irvine CA • 92618-1902 • USA • Phone (800) 729-9991 • http://www.gensiasicor.com
GensiaSicor Pharmaceuticals, Inc. • 19 Hughes • Irvine CA • 92618-1902 • USA • Phone (949) 455-4700 • Fax (949) 855 8210
SICOR-Società Italiana Corticosteroidi S.p.A. • 20017 Rho • Via Terrazzano 77 • Milan • Italy • Phone 39 (2) 9303981 • Fax 39 (2) 9306630
Lemery, S.A. de C.V. • Martires De Rio Blanco No. 54 • Colonia Huichapan • C.P. 16030 • Mexico D.F. • Phone 52 (5) 676-59-11 • Fax 52 (5) 676-09-28
Sicor de Mexico, S.A. de C.V. • Av. San Rafael No. 35 • Parque Industrial Lerma • C.P. 52000 • Lerma • Edo. de Mexico • Phone 52-728-224-00 • Fax 52-728-513-33



order to avoid any confusion this may cause during a comparison of these two sets of data.

In the event you require ready access to the old data for comparative purposes, I am supplying an additional copy of that as well. The old copy is marked with a large SS to indicate it has been superceded. Please note that the prices in the Direct Price to Pharmacy Column and Institutional or Other Contract Column are priced per **VIAL.**

Again, please accept my apologies for the initial error. I was actually trying to be helpful by attempting to provide an AWP in the shelf keeping unit packages since it could be easily referenced, if you needed to do so.

If you have any further questions, please feel free to call me directly at 949 457-2814. I will be happy to assist you in any way I can.

Sincerely,

Barbara J. Kitayama
Sr. Marketing and Projects Manager

SICOR 02260

## Pricing Request Form

**Labeler Code** 00703

**Labeler Name** Gensia Sicor Pharmaceuticals

Please provide updated unit pricing for each listed NDC by the Unit Price Type in the spaces provided where the listed pricing is incorrect. If prices vary by specific contract or customer arrangement, please provide a price range.

Signature of Authorized Representative / Date

Title

| NDC | Unit Price Type | Average of Suggested wholesale price to pharmacy (AWP) | Price to Wholesaler and/or Distributor | Direct Price to Pharmacy (PER VIAL) | Price to Chain Warehouse | Institutional or Other Contract (e.g. Nursing Home, Home Health Care) (PER VIAL) |
|---|---|---|---|---|---|---|
| 00703500301 | ML | 10.512000 | 8.410000 | 0.000000 *42.05* | 8.410000 *N/A* | 0.000000 *5.12 - 41.50* |
| 00703505103 | ML | 18.940000 | 13.900000 | 0.000000 *13.90* | 13.900000 *N/A* | 0.000000 *8.45 - 13.90* |
| 00703505401 | ML | 18.937000 | 13.900000 | 0.000000 *13.00* | 13.900000 *N/A* | 0.000000 *8.13 - 13.00* |
| 00703570103 | ML | 27.000000 | 21.600000 | 0.000000 *21.60* | 21.600000 *N/A* | 0.000000 *5.43 - 17.12* |
| 00703570301 | ML | 27.000000 | 21.600000 | 0.000000 *100.00* | 21.600000 *N/A* | 0.000000 *5.03 - 21.20* |
| 00703702103 | ML | 49.500000 | 39.600000 | 0.000000 *36.60* | 39.600000 *N/A* | 0.000000 *10.91 - 36.60* |
| 00703702301 | ML | 49.500000 | 39.600000 | 0.000000 *193.00* | 39.600000 *N/A* | 0.000000 *5.12 - 193.00* |
| 00703703201 | ML | 49.500000 | 39.600000 | 0.000000 *10.00* | 39.600000 *N/A* | 0.000000 *2.60 - 9.91* |
| 00703810403 | EA | 12.600000 | 10.000000 | 0.000000 *10.00* | 10.000000 *N/A* | 0.000000 *7.00 - 18.51* |
| 00703810503 | EA | 23.250000 | 18.600000 | 0.000000 *18.60* | 18.600000 *N/A* | 0.000000 *4.40 - 6.94* |
| 00703812203 | ML | 4.375000 | 3.500000 | 0.000000 *7.00* | 3.600000 *N/A* | 0.000000 *3.48 - 7.00* |
| 00703903203 | ML | 4.375000 | 3.500000 | 0.000000 *7.00* | 3.600000 *N/A* | 0.000000 *6.00 - 13.44* |
| 00703904003 | ML | 4.375000 | 3.500000 | 0.000000 *14.00* | 3.500000 *N/A* | 0.000000 *1.60 - 10.91* |
| 00703904204 | ML | 6.845000 | 5.475000 | 0.000000 *10.95* | 5.475000 *N/A* | 0.000000 *1.60 - 10.91* |
| 00703941601 | ML | 2.441570 | 1.955330 | 0.000000 *58.83* | 1.955330 *N/A* | 0.000000 *23.00 - 58.83* |
| 00703950303 | ML | 0.556000 | 0.448000 | 0.000000 *4.42* | 0.448000 *N/A* | 0.000000 *0.32 - 0.44* |
| 00703951403 | ML | 0.620000 | 0.496000 | 0.000000 *4.30* | 0.496000 *N/A* | 0.000000 *0.59 - 4.96* |
| 00703952601 | ML | 0.505000 | 0.404000 | 0.000000 *14.36* | 0.404000 *N/A* | 0.000000 *1.60 - 14.36* |

\* Gensia Sicor does not sell to Chainwarehouses.

\*\* This Pricing Request Form supercedes the one dated 6/4/00.

Highly Confidential

SICOR 02261

## Pricing Request Form

Labeler Code: 00703

Labeler Name: Gensia Sicor Pharmaceuticals

Please provide updated unit pricing for each listed NDC by the Unit Price Type in the spaces provided where the listed pricing is incorrect. If prices vary by specific contract or customer arrangement, please provide a price range.

Signature of Authorized Representative / Date: 6-8-00

Title: Sr. Manager Marketing & Projects

| NDC | Unit Price Type | Average of Suggested wholesale price to pharmacy (AWP) | Price to Wholesaler and/or Distributor | Direct Price to Pharmacy | Price to Chain Warehouse | Institutional or Other Contract (e.g. Nursing Home, Home Health Care) |
|---|---|---|---|---|---|---|
| 00703350301 | ML | 10.512000 | *53.56/vial* — 8.410000 | 0.000000 | *42.05/vial* — N/A | *5.53–11.50* |
| 00703505103 | ML | 18.946000 | *189.37/pk* — 13.900000 | 0.000000 | *159.00/pk* — N/A | *8.43–13.7* |
| 00703505401 | ML | 18.950000 | *189.37/vial* — 13.900000 | 0.000000 | *159.00/vial* — N/A | *8.13–13.70* |
| 00703701103 | ML | 27.000000 | *290.00/pk* — 21.600000 | 0.000000 | *216.00/pk* — N/A | *5.13–17.70* |
| 00703701301 | ML | 27.000000 | *195.00/vial* — 21.600000 | 0.000000 | *108.00/vial* — N/A | *27.03–72.25* |
| 00703702103 | ML | 49.500000 | *435.00/pk* — 39.600000 | 0.000000 | *390.00/pk* — N/A | *10.87–35.40* |
| 00703702103 | ML | 49.500000 | *247.50/vial* — 39.600000 | 0.000000 | *168.00/vial* — N/A | *31.74–16.5* |
| 00703703201 | ML | 12.500000 | *125.00/pk* — 10.000000 | 0.000000 | *100.00/pk* — N/A | *2.60–9.89* |
| 00703810403 | EA | 23.250000 | *232.50/pk* — 18.800000 | 0.000000 | *186.00/pk* — N/A | *2.00–18.53* |
| 00703810503 | EA |  | *87.50/pk* — 18.800000 | 0.000000 | *70.00/pk* — N/A | *1.80–6.89* |
| 00703902203 | EA | 4.375000 | *81.50/pk* — 3.500000 | 0.000000 | *70.00/pk* — N/A | *3.15–7.00* |
| 00703902203 | EA | 4.375000 | *175.00/pk* — 3.500000 | 0.000000 | *140.00/pk* — N/A | *6.00–13.75* |
| 00703940203 | ML | 4.375000 | *379.19/pk* — 3.500000 | 0.000000 | *273.75/pk* — N/A | *16.4–10.91* |
| 00703940003 | ML | 6.845000 | — 5.475000 | 0.000000 | — N/A | *23.02–53.25* |
| 00703940204 | ML | 2.441670 | *73.25/level* — 1.853330 | 0.000000 | *56.60/vial* — N/A | — |
| 00703941601 | ML | 0.556000 | *20.80/pk* — 0.446000 | 0.000000 | *22.30/pk* — N/A | *0.32–2.22* |
| 00703953303 | ML | 0.620000 | *22.80/pk* — 0.499000 | 0.000000 | *49.80/pk* — N/A | *0.58–4.94* |
| 00703951403 | ML | 0.505000 | *15.15/vial* — 0.404000 | 0.000000 | *13.12/pk* — N/A | *1.65–12.10* |
| 00703952601 | ML |  |  | 0.000000 |  |  |

Handwritten note (bottom): *GensiaSicor does not sell to Chain Warehouses. If we were to do so, however, we would charge list price — which corresponds to Price to Wholesaler and/or Distributor.*

Handwritten date: 6/22/00

Highly Confidential

SICOR 02262

SICOR 02263



# Texas Department of Health

William R. Archer III, M.D.
Commissioner of Health

*http://www.tdh.state.tx.us*

1100 West 49th Street
Austin, Texas 78756-3199
512/458-7111

Charles E. Bell, M.D.
Executive Deputy Commissioner

**RECEIVED MAY 2 3 2000**

May 11, 2000

GENSIA SICOR PHARMACEUTICALS,
DINAH FEDOROW
19 HUGHES
IRVINE, CA 92618-1902

**Certified Mail # Z 407 646 849**
**Return Receipt Requested**

Re:     Labeler Code 703

Dear DINAH FEDOROW:

As you may be aware, a current national investigation by state and federal agencies has been focusing on alleged misrepresentations by some drug manufacturers of prices of certain of their products. Because of this investigation and information the Texas Department of Health (TDH) has received relevant to the investigation, we are concerned that pricing information previously provided to us by your company may not be accurate.

Chapter 25 of the Texas Administrative Code, Section 35.804, stipulates that a manufacturer's failure to provide accurate information to TDH concerning pricing may result in the State's request to HCFA that a manufacturer's product be deleted from coverage. Accordingly, it is imperative that all pricing information you have provided to us is current and accurate, and that you continue to provide current and accurate information for your company's products.

The current prices reflected in our system are provided for your review in the attached form. All prices on the attached form were provided by your company with the exception of the AWP figure, which may have been obtained from you or a reporting service.

To ensure the accuracy of the pricing information in the Texas Drug Code Index, the reference from which Texas pharmacies are reimbursed for participation in the Medicaid outpatient drug program, we are requiring that you review and complete the attached form with current information. Please return the completed form to my attention, Bureau of Vendor Drugs, Y-915, Texas Department of Health, 1100 W 49th Street, Austin, Texas 78756-3199 within 15 calendar days of your receipt of this letter.

*An Equal Employment Opportunity Employer*

Highly Confidential

SICOR 02264

May 11, 2000
Page 2

Please remember that you have a continuing obligation to accurately update prices for all of your drugs. If you have any questions regarding this correspondence or the attachment, please contact me at (512) 338-6965. I appreciate your cooperation.

Sincerely,

*Martha Mc Neill*

Martha McNeill, R.Ph.
Director of Product and Prescriber Management
Bureau of Vendor Drugs

Enclosure

Highly Confidential

SICOR 02265

AWPREDBK.XLS

FINAL 6/11/96

**ETOPOSIDE**

THIS IS A RECAP OF AWP PRICES IN ANNUAL RED BOOKS

| 1993-1996 | 1996 | 1995 | 1994 | 1993 |
|---|---|---|---|---|
| **BRISTOL-MYERS,ONC.** | | | | |
| VEPISID VIAL 100MG | $136.49 | $136.49 | $136.49 | $131.49 |
| **GENSIA** | | | 3/31/94@$131.30 | |
| ETOPOSIDE VIAL 100MG | $141.97 | $141.97 | 10/15/94@$141.97 | |
| **PHARMACIA** | | | | |
| TOPOSAR VIAL 100MG | $136.49 | N/A | N/A | N/A |
| **CHIRON THERAPUTICS** | | | | |
| ETOPOSIDE VIAL 100MG | $140.00 | N/A | N/A | N/A |

| **DOXORUBICIN** | | | | |
|---|---|---|---|---|
| THIS IS A RECAP OF AWP PRICES IN ANNUAL RED BOOKS | | | | |
| 1993-1996 | 1996 | 1995 | 1994 | 1993 |
| **ASTRA USA** | | | | |
| 50 MG LIQUID | $259.35 | N/A | N/A | N/A |
| 200 MG LIQUID | $1,017.96 | N/A | N/A | N/A |
| **CHIRON THERAPUTICS** | | | CETUS | CETUS |
| 10 MG LIQUID | $47.35 | $47.35 | $47.35 | $47.35 |
| 50 MG LIQUID | $236.74 | $236.74 | $236.74 | $236.74 |
| 200 MG LIQUID | $945.98 | N/A | N/A | N/A |
| **FUJISAWA** | | | | |
| 10 MG LIQUID | $44.50 | N/A | N/A | N/A |
| 50 MG LIQUID | $231.00 | N/A | N/A | N/A |
| **GENSIA** | | | | |
| 10 MG LIQUID | $49.29 | N/A | N/A | N/A |
| 50 MG LIQUID | $246.46 | N/A | N/A | N/A |
| 200 MG LIQUID | $966.14 | N/A | N/A | N/A |
| **PHARMACIA** | | | | |
| **ADRIAMYYCIN** | | | | |
| 10 MG LIQUID | $48.31 | $48.31 | $48.31 | $48.31 |
| 50 MG LIQUID | $241.56 | $241.56 | $241.56 | $241.56 |
| 200 MG LIQUID | $946.94 | $946.94 | $946.94 | $946.94 |
| **VHA PLUS** | | | | |
| 10 MG LIQUID | $47.35 | $47.35 | $47.35 | $47.35 |
| 50 MG LIQUID | $236.74 | $236.74 | $236.74 | $236.74 |

Page 1

Highly Confidential

SICOR 00885

| Invent | s:\1996\rig96\AWP.XLS | | | | | |
|--------|-----------------------|---|---|---|---|---|
| NDC #  |                       | Concentration / | | Unit of | | |
| 0703-  | Product               | Fill | Size | Sale | AWP | List Price |
| 1060-08 | ~~Dyne~~ Pentamicine isethionate | 300 mg, SDV | 10mL | | 467.30 | |

MATERIAL REDACTED

| 5040-01 | Doxorubicin Hydrochloride Injection, USP | 2 mg/mL, MDV | 100mL (200mg) | 1 | $ | 966.14 | $ | 726.42 |
|---------|------------------------------------------|--------------|---------------|---|---|--------|---|--------|
| 5043-03 | Doxorubicin Hydrochloride Injection, USP | 2 mg/mL, SDV | 5mL (10mg) | 10 | $ | 49.29 | $ | 370.60 |
| 5046-01 | Doxorubicin Hydrochloride Injection, USP | 2 mg/mL, SDV | 25mL (500mg) | 1 | $ | 248.46 | $ | 185.31 |

| 5643-01 | Etoposide Injection, Glass | 20 mg/mL, MDV | 5mL (100mg) | 1 | $ | 141.97 | $ | 105.16 |
|---------|----------------------------|---------------|-------------|---|---|--------|---|--------|

AWP.XLS



SICOR 00899

| invent | s:\1996\rig96\AWP.XLS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **NDC #** | | **Concentration /** | | **Unit of** | | | | |
| **0703-** | **Product** | **Fill** | **Size** | **Sale** | | **AWP** | | **List Price** |
| | | | | | | | | |
| 5646-01 | Etoposide Injection, Glass | 20 mg/mL, MDV | 25mL (500mg) | 1 | $ | 692.10 | $ | 483.74 |
| 5653-01 | Etoposide Injection Polymer | 20 mg/mL, MDV | 5mL (100mg) | 1 | $ | 141.97 | $ | 105.16 |
| 5656-01 | Etoposide Injection Polymer | 20 mg/mL, MDV | 25mL (500mg) | 1 | $ | 692.10 | $ | 483.74 |
| 5668-01 | Etoposide Injection, Glass | 20 mg/mL, PBP | 50mL (1g) | 1 | $ | 1,338.13 | $ | 1,006.11 |

MATERIAL REDACTED

AWP.XLS

Highly Confidential

SICOR 00900

REDBOOK2.XLS

| NDC # | Product Description | AWP/VIAL |
|---|---|---|
|  |  |  |

MATERIAL REDACTED

| | | |
|---|---|---|
| 00703-5043-03 | Doxorubicin Hydrochloride (SDV) | 49.29 |
| | Inj IJ 2 mg/mL | |
| | 5 mL | |
| | | |
| 00703-5046-01 | Doxorubicin Hydrochloride (SDV) | 246.46 |
| | Inj IJ 2 mg/mL | |
| | 25 mL | |

Highly Confidential

SICOR 00901





REDBOOK2.XLS

| NDC # | Product Description | AWP/VIAL |
|-------|---------------------|----------|
| | | |
| | | |
| 00703-5040-01 | Doxorubicin Hydrochloride (MDV) | 966.14 |
| | Inj IJ 2 mg/mL | |
| | 100 mL | |
| | | |
| 00703-5643-01 | Etoposide (MDV) | 141.97 |
| | Inj IJ 20 mg/mL | |
| | 5 mL | |
| | | |
| 00703-5646-01 | Etoposide (MDV) | 692.10 |
| | Inj IJ 20 mg/mL | |
| | 25 mL | |
| | | |
| 00703-5668-01 | Etoposide (Vial, Bulk Package) | 1338.13 |
| | Inj IJ 20 mg/mL | |
| | 50 mL | |

MATERIAL REDACTED

Highly Confidential

SICOR 00902

REDBOOK2.XLS



| NDC # | Product Description | AWP/VIAL |
|-------|---------------------|----------|
| 00703-5140-01 | Leucovorin Clacium | 40.63 |
| | PDI  IJ 100 mg | |

MATERIAL REDACTED



Highly Confidential

SICOR 00903

OCT-13-1994  11:41  FROM RDI CALIFORNIA                    TO              4586109   P.01

 **Reimbursement Dynamics, Inc.**

October 13, 1994

Jonathan M. Hee
Associate Director, Market Planning
Gensia Pharmaceuticals, Inc.
19 Hughes
Irvine, CA 92718-1902                    BY FAX: 714-458-6109

Dear Jon,

It was a pleasure meeting you by phone. I look forward to meeting you in person and working with you. The information you requested is listed below.

Red Book prices are usually higher because they add an approximate 5% mark-up on the manufacturer's AWP. Blue Book/First Data Bank and Medispan use manufacturer's wholesale acquisition and surveys of wholesalers to determine listed AWP. You will note that the amounts differ slightly because they survey different sources.

| Red Book for Vepesid (updated 10/94) | | |
|---|---|---|
| **(vial)** | **NDC** | **Listed AWP** |
| Inj. 500 mg, 25 ml ea | 00015-3061-20 | *133.08* 665.38 |
| **(M.D.V.)** | | |
| 20 mg/ml 5 ml ea | 00015-3095-20 | 136.49 |
| 7.5 ml ea | 00015-3084-20 | *136.49* 204.74 |
| 1 gm, 50 ml ea | 00015-3062-20 | *1296.64* 1,296.64 |

*Gensia*

| Red Book for Etoposide (updated 1994) | | |
|---|---|---|
| **Inj. (M.D.V.)** | **NDC** | **Listed AWP** |
| 20 mg/ml | | |
| 5 ml | 00703-5643-01 | 131.45 |
| 25 ml | 00703-5646-01 | 604.68 |

*141.97*
*692.10*

750 The City Drive, Suite 210, Orange, CA 92668
714-750-4474 • 800-866-4474 • FAX: 714-750-8513

Highly Confidential                    SICOR 00947

OCT-13-1994  11:42   FROM  RDI CALIFORNIA         TO         4586109   P.02

| Blue Book/First Data Bank for Vepesid (updated 10/21/93) | | |
|---|---|---|
| (vial) | NDC | Listed AWP |
| Inj. 500 mg, 25 ml ea | 00015-3061-20 | 638.57 |
| (M.D.V.) | | |
| 20 mg/ml 5 ml ea | 00015-3095-20 | 131.05 |
| 7.5 ml ea | 00015-3084-20 | 196.58 |
| 1 gm, 50 ml ea | 00015-3062-20 | 1,244.98 |

| Blue Book/First Data Bank for Etoposide (updated 2/14/94) | | |
|---|---|---|
| Inj. (M.D.V.) | NDC | Listed AWP |
| 20 mg/ml | | |
| 5 ml | 00703-5643-01 | 126.19 |
| 25 ml | 00703-5646-01 | 580.49 |

| Medispan for Vepesid (updated 10/21/93). | | |
|---|---|---|
| (vial) | NDC | Listed AWP |
| Inj. 500 mg, 25 ml ea | 00015-3061-20 | 638.76 |
| (M.D.V.) | | |
| 20 mg/ml 5 ml ea | 00015-3095-20 | 131.03 |
| 7.5 ml ea | 00015-3084-20 | 196.55 |
| 1 gm, 50 ml ea | 00015-3062-20 | 1,244.77 |

| Medispan for Etoposide (updated 2/14/94) | | |
|---|---|---|
| Inj. (M.D.V.) | NDC | Listed AWP |
| 20 mg/ml | | |
| 5 ml | 00703-5643-01 | 131.30 |
| 25 ml | 00703-5646-01 | 638.76 |

Jon, I hope this information is useful. Please call if you need further assistance.

Best regards,

Debra L. Cheyne

Debra L. Cheyne
Director, Operation and Strategic Groups

Highly Confidential

SICOR 00948



**G E N S I A.**
LABORATORIES, LTD.

February 21, 1994

Wendy Jones
MediSpan
8425 Woodfield Crossing
Suite 500
Indianapolis, IN 46240

Dear Wendy:

As a follow-up to our conversation of today, I am forwarding the package insert from our Etoposide product for your review. As I indicated during our conversation, this product is the largest (dollar volume) product to ever hit the generic market place. Additionally, Gensia is the first company to have an approved ANDA on this product, which provides us with a decided advantage.

I have also include some guidelines in this pack for establishing Gensia's AWPs for our Etoposide. We officially stated shipping this product on February 14, 1994.

Thank you for your assistance and cooperation.

Sincerely,

David E. Ritchie
Director, Product Marketing

Gensia Laboratories, Ltd. ▪ 19 Hughes, Irvine, CA 92718-1902 ▪ (714) 455-4700 ▪ FAX (714) 855-8210
Gensia Pharmaceuticals, Inc. ▪ 11025 Roselle Street, San Diego, CA 92121-1204 ▪ (619) 546-8300 ▪ FAX (619) 453-0095
Gensia Europe Ltd. ▪ Wolfelands, Westerham, Kent, TN16 1RQ ▪ 959-63093 ▪ FAX 959-64500

Confidential

SICOR 00955



### GENSIA
LABORATORIES, LTD.

February 21, 1994

Wendy Jones
MediSpan
8425 Woodfield Crossing
Suite 500
Indianapolis, IN  46240

Dear Weedy:

On February 14, 1994, Gensia received FDA approval on and began shipping
Etoposide for Injection (generic oncology product).  The following represents the
detailed information for this product and the AWP that we would like MediSpan to use:

## ETOPOSIDE INJECTION

| NDC # | PRODUCT DESC. | VIAL SIZE | LIST PRICE | AWP |
|---|---|---|---|---|
| 0703-5643-01 | 20MG/ML (100MG) | 5ML | $105.16 | $131.30 |
| 0703-5646-01 | 20MG/ML (500MG) | 25ML | $483.74 | $638.76 |

The aforementioned prices (list price and AWP) are represented in "per vial"
quantities.  Additionally, both of the above sizes are sold in singles.

Should you have questions, please contact me at (714) 457-2850.

Sincerely,

David E. Ritchie
Director, Product Marketing

Gensia Laboratories, Ltd. ▪ 19 Hughes, Irvine, CA 92718-1902 ▪ (714) 455-4700 ▪ FAX (714) 855-8210
Gensia Pharmaceuticals, Inc. ▪ 11025 Roselle Street, San Diego, CA 92121-1204 ▪ (619) 546-8300 ▪ FAX (619) 453-0095
Gensia Europe Ltd. ▪ Wolfelands, Westerham, Kent, TN16 1RQ ▪ 959-63093 ▪ FAX 959-64500

Highly Confidential

SICOR 00956



### GENSIA
LABORATORIES, LTD.

August 24, 1995

Sent Via FAX:    (317) 469-5252

Michelle Christopher
MediSpan
8425 Woodfield Crossing, Suite 500
Indianapolis, IN 46240

Dear Michelle:

Gensia Laboratories, Ltd. expects to be introducing its Doxorubicin Injection in Polypropylene vials in August of this year. The following represents the detailed information for this product for inclusion in your database.

## DOXORUBICIN HYDROCHLORIDE INJECTION, USP

|  | 10MG | 50MG | 200MG |
|---|---|---|---|
| NDC# | 0703-5043-03 | 0703-5046-01 | 0703-5040-01 |
| Desc. | Doxorubicin Hydrochloride Injection, USP | | |
| Size | 10mg/5mL | 50mg/25mL | 200mg/100mL |
| Strength | 2MG/ML | 2MG/ML | 2MG/ML |
| Form | Injection (Solution) | Injection (Solution) | Injection (Solution) |
| Package Qty. | 10 vials | 1 vial | 1 vial |
| Whsl. Net | $37.06/vial | $185.31/vial | $726.42/vial |
| Direct Price | $37.06/vial | $185.31/vial | $726.42/vial |
| AWP | $49.29/vial | $246.46/vial | $966.14/vial |

HEE/CORRES/DATABASE.FAX

Gensia Laboratories, Ltd. ■ 19 Hughes, Irvine, CA 92718-1902 ■ (714) 455-4700 ■ FAX (714) 855-8210
Gensia Pharmaceuticals, Inc. ■ 11025 Roselle Street, San Diego, CA 92121-1204 ■ (619) 546-8300 ■ FAX (619) 45
Gensia Europe Ltd. ■ Wolfelands, Westerham, Kent. TN16 1RQ ■ 959-63093 ■ FAX 959-64500

SICOR 00957

lighly Confidential

Michelle Christopher – August 24, 1995
Page Two

(cont'd)

|  | 10MG | 50MG | 200MG |
|---|---|---|---|
|  | RX Drug | RX Drug | RX Drug |
| Availability | 8/95 | 8/95 | 8/95 |

Innovator Product:  Adriamycin PFS

Should you have any questions, please contact me at (714) 457-2834.

Sincerely,

Jonathan M. Hee
Associate Director of Marketing

JMH:pt

nly Confidential



G E N S I A.
LABORATORIES, LTD.

May 25, 1995

Michelle Christopher
MediSpan
8425 Woodfield Crossing
Suite 500
Indianapolis, IN 46240

VIA FAX: (317) 469-5252

Dear Michelle:

Gensia Laboratories, Ltd. expects to be introducing a new size of its Etoposide Injection
in June of this year. The following represents the detailed information for this product for
inclusion in your database.

## ETOPOSIDE INJECTION

| NDC# | PRODUCT DESC. | VIAL SIZE | LIST PRICE | AWP |
|------|---------------|-----------|------------|-----|
| 0703-5668-01 | 20MG/ML (1 Gram) | 50ML | $1,006.11 | $1,338.13 |

The aforementioned prices (list price and AWP) are represented in "per vial"
quantities. Additionally, the product is sold in singles.

Should you have any questions, please contact me at (714) 457-2834.

Sincerely,

Jonathan M. Hee
Associate Director of Marketing

Gensia Laboratories, Ltd. ■ 19 Hughes, Irvine, CA 92718-1902 ■ (714) 455-4700 ■ FAX (714) 855-8210
Gensia Inc. ■ 9360 Towne Center Drive, San Diego, CA 92121 ■ (619) 546-8300 ■ FAX (619) 453-0095
Gensia Europe, Ltd. ■ Genaresa House ■ 1 Bracknell Beeches, Old Bracknell Lane, Bracknell, Berkshire RG127BW
44-344-308803 ■ FAX 44-344-360515

Highly Confidential



**G E N S I A.**
LABORATORIES, LTD.

August 24, 1995

Sent Via FAX:   (415) 588-6867

First Data Bank
The Hearst Corporation
1111 Bayhill Drive
San Bruno, CA  94066

Gensia Laboratories, Ltd. expects to be introducing its Doxorubicin Injection in
Polypropylene vials in August of this year. The following represents the detailed
information for this product for inclusion in your database.

## DOXORUBICIN HYDROCHLORIDE INJECTION, USP

|  | 10MG | 50MG | 200MG |
|---|---|---|---|
| NDC# | 0703-5043-03 | 0703-5046-01 | 0703-5040-01 |
| Desc. | Doxorubicin Hydrochloride Injection, USP | | |
| Size | 10mg/5mL | 50mg/25mL | 200mg/100mL |
| Strength | 2MG/ML | 2MG/ML | 2MG/ML |
| Form | Injection (Solution) | Injection (Solution) | Injection (Solution) |
| Package Qty. | 10 vials | 1 vial | 1 vial |
| Whsl. Net | $37.06/vial | $185.31/vial | $726.42/vial |
| Direct Price | $37.06/vial | $185.31/vial | $726.42/vial |
| AWP | $49.29/vial | $246.46/vial | $966.14/vial |

HEE/CORRES/DATABASE.FAX

Gensia Laboratories, Ltd. ■ 19 Hughes, Irvine, CA 92718-1902 ■ (714) 455-4700 ■ FAX (714) 855-8210
Gensia Pharmaceuticals, Inc. ■ 11025 Roselle Street, San Diego, CA 92121-1204 ■ (619) 546-8300 ■ FAX (619) 451 · · ·
Gensia Europe Ltd. ■ Wolfelands, Westerham, Kent, TN16 1RQ ■ 959-63093 ■ FAX 959-64500

Highly Confidential                                        SICOR 00982

First Data Bank - August 24, 1995
Page Two

(cont'd)

|  | 10MG | 50MG | 200MG |
|---|---|---|---|
|  | RX Drug | RX Drug | RX Drug |
| Availability | 8/95 | 8/95 | 8/95 |

Innovator Product:  Adriamycin PFS

Should you have any questions, please contact me at (714) 457-2834.

Sincerely,

Jonathan M. Hee
Associate Director of Marketing

JMH:pt

HEE/CORRES/DATABASE.FAX

Highly Confidential

SICOR 00983



# GENSIA.
### LABORATORIES, LTD.

May 25, 1995

First Data Bank
The Hearst Corporation
1111 Bayhill Drive
San Bruno, California 94066

VIA FAX: (415) 588-6867

Gensia Laboratories, Ltd. expects to be introducing a new size of its Etoposide Injection in June of this year. The following represents the detailed information for this product for inclusion in your database.

## ETOPOSIDE INJECTION

| NDC# | PRODUCT DESC. | VIAL SIZE | LIST PRICE | AWP |
|------|---------------|-----------|------------|-----|
| 0703-5668-01 | 20MG/ML (1 Gram) | 50ML | $1,006.11 | $1,338.13 |

The aforementioned prices (list price and AWP) are represented in "per vial" quantities. Additionally, the product is sold in singles. Also, following is a completed copy of your new product form.

Should you have any questions, please contact me at (714) 457-2834.

Sincerely,

Jonathan M. Hee
Associate Director of Marketing

Gensia Laboratories, Ltd. ■ 19 Hughes, Irvine, CA 92718-1902 ■ (714) 455-4700 ■ FAX (714) 855-821
Gensia Inc. ■ 9360 Towne Center Drive, San Diego, CA 92121 ■ (619) 546-8300 ■ FAX (619) 453-00
Gensia Europe, Ltd. ■ Genaresa House ■ 1 Bracknell Beeches, Old Bracknell Lane, Bracknell, Berkshire RG
44-344-308803 ■ FAX 44-344-360515



Highly Confidential

SICOR 00987



**The leader in electronic drug databases**

# First DataBank

## THE AMERICAN DRUGGIST BLUE BOOK ANNUAL PRODUCT UPDATE REPORT

### DOCUMENT YOUR NEW PRODUCT ADDS BELOW:

*(Copy this document if you have more than two product adds, thank you.)*

Gensia Laboratories, Ltd.

| | |
|---|---|
| **NDC NUMBER:** | 0703-5668-01 |
| **UPC IF APPLICABLE:** | |
| **HRI/OTHER IF APPLICABLE:** | |
| **PRODUCT LABEL NAME:** | Etoposide Injection |
| **STRENGTH:** | 20 mg/ml (1 gram/50ml) |
| **DOSE FORM:** | Injection |
| **PACKAGE QTY:** | One (1) |
| **$WHOLESALE NET:** | $ 1,006.11 |
| **$DIRECT PRICE:** | $ 1,006.11 |
| **$AWP PRICE:** | $ 1,338.13 |
| **EFFECTIVE DATE:** | June 1995-Estimated Availability |
| **OTC OR RX?:** | RX |
| **BRAND NAME EQUIVALENT OR ATTACH LABEL INGREDIENTS:** | Vepesid |

| | |
|---|---|
| **NDC NUMBER:** | |
| **UPC IF APPLICABLE:** | |
| **HRI/OTHER IF APPLICABLE:** | |
| **PRODUCT LABEL NAME:** | |
| **STRENGTH:** | |
| **DOSE FORM:** | |
| **PACKAGE QTY:** | |
| **$WHOLESALE NET:** | $ |
| **$DIRECT PRICE:** | $ |
| **$AWP PRICE:** | $ |
| **EFFECTIVE DATE:** | |
| **OTC OR RX?:** | |
| **BRAND NAME EQUIVALENT OR ATTACH LABEL INGREDIENTS:** | |

The Hearst Corporation. 1111 Bayhill Drive, San Bruno, California 94066. Telephone:(415) 588-5454 Fax:(415) 588-6867



Highly Confidential

SICOR 00988