# Exhibit 27

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
|  | ) ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) ) |  |

**TRIAL OF CLASSES 2 & 3 CLAIMS**

## AFFIDAVIT OF CHRISTOF MARRE
## SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
## OF DEFENDANTS BMS AND OTN IN TRIAL OF CLASSES 2 & 3 CLAIMS

STATE OF MASSACHUSETTS )
                      ) ss:
COUNTY OF MIDDLESEX )

CHRISTOF MARRE, being duly sworn, deposes and says:

1. I am a former marketing director for the oncology division of Bristol-Myers Squibb Company ("BMS"). I submit this affidavit based on personal knowledge and files in the possession of Bristol-Myers Squibb as direct testimony in the case-in-chief of BMS and its former subsidiary, Oncology Therapeutics Network Corporation ("OTN").

2. I graduated from the London School of Economics in 1993 with a Masters of Science in Economics. After school, I joined Monitor Company, a management consulting firm in London. In 1995, I began working for the Boston Consulting Group, another such consulting firm in Germany.

no reason to depart from what I understood to be the industry practice of keeping its list price in place after a drug went generic.

10. I am familiar with the term Average Wholesale Price or "AWP" as a published price that is sometimes used by Medicare and other drug reimbursers. My understanding is that the published AWP has historically reflected a mark-up of 20%-25% over the list price at which BMS or a competitor sells to a wholesaler. I believe that competition in the United States at the wholesale level is such that the wholesale-to-retail margin is in fact more like 1% to 3%. Nevertheless, industry publications have kept the historic mark-up factor. I do not know the reasons why the publications have done this, but I believe that this is very well known to anyone who follows the pharmaceutical industry.

11. I can tell the Court that neither I nor the customers with whom I contracted were interested in the published AWP (or, for that matter, the WLP/WAC) of the BMS products compared to those of our generic competitors when we engaged in negotiations. The relevant concerns to me and my customers were the bid price at which the competitor was willing to sell to the generic and whether or not BMS was interested in meeting or beating that price.

12. AWP and WLP/WAC were also irrelevant to my considerations of "floor prices" to OTN. Again, the issue was competition: at what price were other specialty distributors offering the generic equivalent of the BMS drug to the target market, the office-based oncologists. BMS did not "drive" the market price down to gain market share compared to competitors; rather, BMS preferred to lower its floor only if necessary to match the competition. Where possible, we instructed OTN to sell above the floor and as close to list as negotiations with a customer would allow.

# Exhibit 28

Page 1

                    HIGHLY CONFIDENTIAL

            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

--------------------------x

In Re: PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE     ) MDL No. 1456

PRICE LITIGATION               ) CIVIL ACTION NO.

                               )  01-CV-12257-PBS                    )

---------------------------)

THIS DOCUMENT RELATES TO       )

ALL ACTIONS                    )

---------------------------x




            DEPOSITION OF JOHN F. AKSCIN

                New York, New York

              Thursday, August 11, 2005

                   9:53 a.m.




Reported by:

Frank J. Bas, RPR

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin        HIGHLY CONFIDENTIAL        August 11, 2005
New York, NY

---

**Page 26**

1    couldn't specifically state that.
2        Q.   Okay.  What about -- taking you back
3    to your testimony about KRJ providing training
4    to OTN employees.
5        A.   Mm-hmm.
6        Q.   In the course of that training, was
7    AWP ever discussed?
8        A.   I believe so.
9        Q.   And in what context?
10       A.   In the context of very high level of
11   how office based oncology practices are
12   reimbursed in their insurance.
13       Q.   Until recently oncology based
14   practices reimbursed under Medicare based on an
15   AWP benchmark, correct?
16       A.   To my knowledge, that's correct.
17       Q.   And that was 95 percent of AWP,
18   right?
19       A.   As the history developed, yes, at
20   one time.
21       Q.   And many insurers reimburse for
22   chemotherapy drugs based on AWP; is that

**Page 27**

1    correct?
2        A.   I would say a number of them do.
3        Q.   When you say a number, can you
4    quantify that, in terms of majority or minority?
5        A.   I would say a majority of private
6    payers, outside the Medicare system.
7        Q.   And has that been your observation
8    since you worked at OTN?
9        A.   Yes.
10       Q.   You also mentioned consultants named
11   ProStat Resources?
12       A.   Correct.
13       Q.   Is that spelled P-r-o-s-t-a-t?
14       A.   Correct.
15       Q.   And where are they located?
16       A.   Kansas City, Missouri.
17       Q.   Have they always been there?
18       A.   To my knowledge.
19       Q.   And what is the nature, if any, of
20   the consulting relationship between OTN and
21   ProStat?
22       A.   There's no formal relationship.

**Page 28**

1        Q.   Does ProStat offer consulting
2    services to OTN?
3        A.   Under a formal relationship, they do
4    not.
5        Q.   When you qualify it with "formal" --
6        A.   Mm-hmm.
7        Q.   -- what about informal?
8        A.   Informally, yes.
9        Q.   Can you please describe the nature
10   of the consulting?
11       A.   Again from a very, very high level
12   relationship, general support in the area of
13   reimbursement assistance services to our
14   customer community.
15           MR. TRETTER:  I think the question
16       was whether they provide any consulting
17       services to OTN as a corporate entity.  Not
18       to the customer.
19       A.   Okay.  Again, informally --
20   formally they do not, to OTN.  And informally,
21   high-level services, as I described.
22       Q.   So let me make sure I understand

**Page 29**

1    your testimony on this topic.
2           Has OTN engaged ProStat to consult
3    with OTN on specific projects?
4        A.   No, they have not.  To my knowledge
5    they have not.
6        Q.   So is this a referral relationship,
7    then, that OTN will from time to time refer OBO
8    customers to ProStat for consulting purposes?
9        A.   On occasion.
10       Q.   And how often does that occur?
11       A.   Infrequently.
12       Q.   And is there a financial
13   relationship between ProStat and OTN, to your
14   knowledge?
15       A.   There is not, that I know of.
16       Q.   And can you recall some specific
17   instances in which OTN has referred customers to
18   ProStat?
19       A.   No, I cannot.
20       Q.   Have you personally referred anyone
21   to ProStat?
22       A.   I have.

8 (Pages 26 to 29)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

# Exhibit 29

Marsha Peterson                                    April 13, 2005
                         Seattle, WA

Page 1

          THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------

IN RE:  PHARMACEUTICAL )

INDUSTRY AVERAGE        )

WHOLESALE PRICE         ) MDL Docket No.

LITIGATION              ) Civil Action 01CV12257PBS

                  )

------------------------------------------------

          Deposition Upon Oral Examination

                   Of

             MARSHA PETERSON

------------------------------------------------


               April 13, 2005

          1301 Fifth Avenue, Suite 2900

             Seattle, Washington



JULIE C. OSWALD, CSR #299-06

COURT REPORTER

Marsha Peterson

April 13, 2005

Seattle, WA

Page 114

1  do to reference for their business, so we as a company
2  may have different -- whether it's a link on a web
3  site or something else -- have areas where they can
4  see what the AWPs are for business purposes.
5      Q.  There is information within Lynx that shows
6  AWPs?
7      A.  Not Lynx.  Lynx To OTN is our web site, and
8  there are many different links -- L-I-N-K-S -- links
9  within a web site that help to provide information to
10  a customer.  So AWP specifically, which would come
11  from Red Book, is updated.
12      There is a section in our web site where they
13  can go and get an AWP report that would literally show
14  them what AWP is, and that's simply as a reference
15  point.
16      Q.  Would they access that through the Lynx To
17  OTN web site?
18      A.  Yes, they would get a report out of there,
19  and that report is actually straight from Red Book.
20  There is a little link up on top that says when it was
21  updated.
22      Q.  So OTN loads the information from Red Book?

Page 115

1      A.  Its linked to our web site.
2      Q.  Its linked?
3      A.  Right, to our web site, and put into a report
4  that our customer can print out.  Actually in
5  distribution that's very common practice to have it
6  listed there just for reference sake.
7      Q.  That's because the customers, they base their
8  reimbursement on the AWP, correct?
9      A.  Yes.
10      Q.  And that's true in the Medicare context?
11      A.  Yes, and private payers.
12      Q.  Has that always been the case since you've
13  been with OTN?
14      A.  Yes.
15      Q.  Are you familiar with the term "chargeback"?
16      A.  Yes, I am.
17      Q.  What does it mean?
18      A.  Chargeback, what that is to me is that within
19  a distributor, if -- let me go back.
20      Chargeback is when there is a contract
21  between a manufacturer and whether its with a GP or
22  wherever that contract lies, then OTN will buy the

Page 116

1  drug at whatever the price is from the manufacturer,
2  and then there is a contract dollar amount.  We sell
3  it for whatever that contract dollar amount is, and
4  the difference between those two is the chargeback
5  that then is received back from the manufacturer to
6  OTN.
7      Does that make sense?
8      Q.  Okay.  In that situation OTN does receive
9  chargebacks?
10      A.  Yes.
11      Q.  You sell at the contract price?
12      A.  We sell at the contract price or the contract
13  minus whatever the price is, and then the manufacturer
14  will make up the chargeback which is the difference
15  between what they sold it to us for and what the
16  contract price was.
17      Q.  Is that very common?  What I'm trying to get
18  is an appreciation of the volume of sales that OTN
19  makes that involve chargebacks.
20      A.  You know, again, this is an evolution because
21  originally, even when I started out, there weren't as
22  many contracts as there are today.  There are a lot

Page 117

1  more contracts today because the customers have
2  mandated that from manufacturers.  So obviously the
3  more contracts you have the more chargebacks you end
4  up having.  It's not something that we particularly
5  dictate.  The contracts are between the manufacturer
6  and the customer, actually.  That's where the
7  contracting happens.
8      Q.  So it has become more common over time?
9      A.  Yes, and its becoming a larger percentage of
10  our business.  Yes.
11      Q.  Who within OTN handles that process?
12      A.  We actually have a contracts and chargebacks
13  department which is within the finance department.
14      Q.  Does OTN ever pay chargebacks?
15      A.  What do you mean?
16      MR. TRETTER:  Objection to the form.
17      Q.  Would there be any scenario under which OTN
18  would sell a drug to a wholesaler?
19      A.  No, not to my knowledge.
20      Q.  How about another distributor, another
21  competitor?
22      A.  Do they do that?

30 (Pages 114 to 117)

8b69d7c4-c696-4390-882f-2c51bce0c399

# Exhibit 30

1/15/2003 Zahn, Richard W.

```
 1              CAUSE NO. GV002327
 2   THE STATE OF TEXAS        )IN THE DISTRICT COURTex rel.
 3      VEN-A-CARE OF THE      )   FLORIDA KEYS, INC.,      )
 4        Plaintiffs,          )                           )
 5   VS.                       )TRAVIS COUNTY, TEXAS
 6   DEY, INC.; ROXANE         )LABORATORIES, INC.; WARRICK )
 7   PHARMACEUTICALS CORPORATION; )SCHERING-PLOUGH CORPORATION; )
 8   SCHERING CORPORATION;     )LIPHA, S.A.; MERCK-LIPHA, S.A.;)
 9   MERCK, KGAA; AND EMD      )PHARMACEUTICALS, INC.,       )
10        Defendants.          )53RD JUDICIAL DISTRICT
11   *****************************************     ORAL AND V
12                  RICHARD W. ZAHN
13                 JANUARY 15TH, 2003
14
15   *****************************************
16        ORAL AND VIDEOTAPED DEPOSITION OF
17   RICHARD W. ZAHN, produced as a witness at the instance
18   of the State of Texas and duly sworn, was taken in the
19   above-styled and numbered cause on the 15th of
20   January, 2003, from 9:10 a.m. to 4:55 p.m., before
21   Debra L. Sietsema, CSR in and for the State of Texas,
22   reported by machine shorthand, at McCarter & English,
23   4 Gateway Center, 100 Mulberry Street, Newark,
24   New Jersey, pursuant to the Texas Rules of Civil
```
1

1/15/2003 Zahn, Richard W.

```
 1   Procedure and the provisions as previously set forth.
 2               A P P E A R A N C E S
 3
 4   FOR THE PLAINTIFF:
 5        MR. PATRICK J. O'CONNELL,     MS. SUSAN J. MILLER
 6        Office of the Attorney General      State of Texas
 7        Post Office Box 12548      Austin, Texas  78711-2548
 8   FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
 9        MR. JAMES JOSEPH BREEN
10        The Breen Law Firm, P.A.     P.O. Box 297470
11        Pembroke Pines, Florida  33029-7470
12        - and -
13        MR. JARRETT ANDERSON     Attorney at Law
14        2411 Hartford Road ·    Austin, Texas  78703
15   FOR DEFENDANT DEY, INC.:
16        MS. LEILA R. PITTAWAY
17        Coudert Brothers, L.L.P.     114 Avenue of the Americas
18        New York, New York  10036-7703
19   FOR DEFENDANT ROXANE LABORATORIES, INC.:
20        MR. R. ERIC HAGENSWOLD     Scott, Douglass & McConnico,
21        One American Center, Fifteenth Floor     600 Congress Av
22        Austin, Texas  78701
23   FOR DEFENDANT WARRICK PHARMACEUTICALS CORPORATION:
24        MR. C. MICHAEL MOORE     Locke Liddell & Sapp, L.L.P.
```
2

1/15/2003 Zahn, Richard W.

```
 1        2200 Ross Avenue, Suite 2200     Dallas, Texas  75201-67
 2
 3   FOR THE DEFENDANT, SCHERING-PLOUGH CORPORATION:
 4        MR. CARLTON E. WESSEL     Schering-Plough Corporation
 5        Law Department     2000 Galloping Hill Road
 6        Kenilworth, New Jersey  07033
 7   ALSO PRESENT:
 8        Mr. John Maloy Lockwood, M.D.     Mr. Lewis Chon, Videog
 9
```
3

1/15/2003 Zahn, Richard W.

```
 1
 2
 3
 4                  I N D E X
 5
 6   WITNESS:  RICHARD W. ZAHN
 7   EXAMINATION                          PAGE
 8   By Ms. Miller . . . . . . . . . .      7     By Mr. Breen. . . .
 9   By Ms. Miller . . . . . . . . . .    254     By Mr. Breen. . . .
10               EXHIBITS
11   NO.  DESCRIPTION                     PAGE
12   600  . . . . . . . . . . . . . . .   115
13        "Schering/Warrick Albuterol Inhaler     Action Plan"
14   601  . . . . . . . . . . . . . . .   130
15        "Modeling Assumptions"
16   602  . . . . . . . . . . . . . . .   132     Memo from Zahn & De
17        1-4-93, Forwarding "Managed Care Trends     and Legislative Issu
18        Strategy"
19   603  . . . . . . . . . . . . . . .   136     "Schering Laborator
20        Strategic Plan"
21   604  . . . . . . . . . . . . . . .   139     File Folder Titled
22        in Generic Task Force Slides"
23   605  . . . . . . . . . . . . . . .   139     "Merck Flexeril Rev
24        1988-1992"
```
HIGHLY CONFIDENTIAL
SPW0039584
4

1/15/2003 Zahn, Richard W.

1    Q.  (BY MR. BREEN)  Well, you report AWPs,

2  correct?

3    A.  Yes.

4    Q.  You've testified to that?

5    A.  Yes.

6    Q.  All right.  And -- and you know generally

7  that those AWPs may be used by third-party payers in

8  calculating reimbursement?

9    A.  Yes.

10    Q.  All right.  So have you ever been aware that

11  the reporting that your companies do for AWP -- about

12  AWPs may have an effect upon the amount of profit the

13  pharmacist can make when they dispense your companies'

14  drugs?

15          MR. MOORE:  Objection, form.

16          THE WITNESS:  I don't -- AWP can be a

17  reference to show relative differences or similarities

18  among drugs.  AWP can be a reference for certain third

19  parties to establish a payment formula that they

20  develop and then disseminate to their contractors.  So

21  relative to that, AWP has a role in terms of not only

22  relativity but also in terms of how, you know, someone

23  may reimburse someone.

24    Q.  (BY MR. BREEN)  So you understood, then, that

173

---

1  AWPs could have an effect upon the amount of profit a

2  pharmacist could make dispensing your drugs?

3          MR. MOORE:  Objection, form.

4          THE WITNESS:  I guess I never thought

5  about it as a profit.  I know it's in the

6  reimbursement mix, yes.

7    Q.  (BY MR. BREEN)  Well, if we look at --

8    A.  Profit --

9    Q.  I'm sorry.  I didn't mean --

10    A.  Looking at the pharmacy profits, you know,

11  their costs and their out-of-pocket structures, I mean

12  a lot of other things, so I guess -- but AWP has

13  that -- is a relative term.

14    Q.  Okay.

15    A.  Right.

16    Q.  Okay.  And in -- okay.

17         How long have you been aware of that,

18  that AWP has a -- an impact upon the pharmacist's

19  profit?

20          MR. MOORE:  Okay.  I'm going to object

21  to form.  It's a mischaracterization of his prior

22  testimony.

23    Q.  (BY MR. BREEN)  How long have you been aware

24  of that?

174

---

1          MR. MOORE:  Same objection.

2          THE WITNESS:  I'm not sure that I've

3  been aware that as a profit -- I mean I was aware

4  of AWP when I was trained as a sales rep 30 years

5  ago --

6          MR. BREEN:  Right.

7          THE WITNESS:  -- and I was just told,

8  "Here's what it is."  Nobody pays it.  It's a relative

9  document.  It's a relative -- maybe at some time it

10  meant average wholesale price, but today it's just a

11  reference guide that historically has been used.  So I

12  mean I knew AWP was this concept of relativity

13  30 years ago.  When did I realize it came into -- I

14  don't know.  I mean somewhere along the line.

15    Q.  (BY MR. BREEN)  Well, why does your company

16  continue to report AWPs?

17    A.  Well, as I mentioned before, sometimes we're

18  requested to, as the State of Texas Medicaid

19  application for Foradil asked us to put in AWP.  I

20  don't know why they ask.  We -- you know, and in the

21  past -- we are challenging that.  I mean I don't know

22  why we do that.  If we're asked -- It's a relative

23  tool.  I mean other people still refer to them, but we

24  don't, you know, view that as a -- an issue that we

175

---

1  particularly track.

2    Q.  Why do you keep --

3    A.  It's historical.  Sorry.

4    Q.  Why do you keep reporting it to First

5  DataBank, AWP?

6    A.  You know, I'm not sure how we do that.  I do

7  know recently, though, we told them that they were

8  misrepresenting it, that they arbitrarily took our

9  AWPs up, just cook them up.  And we said, "Hey, you --

10  what are you doing?  That's not our number.  We have

11  no clue why you're doing this."  And we informed them

12  of that.  They just took it up.

13         Historically -- historically everyone

14  knew that AWP was a relative comparator.  I mean it

15  was just a common knowledge that it was 20 percent.

16  And I -- to tell you the truth, I can't remember

17  whether you take your selling price and divide by .833

18  or you take the price and multiply it by .8, but

19  either way you get to the same number.

20    Q.  Right.

21    A.  And so there was a 20 percent margin or

22  difference between an AWP and a standard, you know,

23  shipment cost.  That was standard.

24    Q.  Shipment cost to who?

HIGHLY CONFIDENTIAL
SPW0039627

176

# Exhibit 31

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3                                              ORIGINAL

4    IN RE: PHARMACEUTICAL          :

5    INDUSTRY AVERAGE               :

6    WHOLESALE PRICE                :    MDL No. 1456

7    LITIGATION                     :

8    - - - - - - - - - - - - - :    No.

9    This Document Relates to    :    01-CV-12257-PBS

10   All Actions                    :

11   - - - - - - - - - - - - -

12                HIGHLY CONFIDENTIAL

13                ATTORNEYS' EYES ONLY

14                JUNE 15, 2004

15                Deposition of DEBRA KANE, held at

16   the offices of Schering-Plough Corporation, 2000

17   Galloping Hill Road, Kenilworth, New Jersey 07033,

18   pursuant to 30(b)(6) notices, before JANINE A.

19   CERRETO, a Certified Shorthand Reporter and Notary

20   Public of the State of New Jersey.

21

22

34

1   A.      An hour, hour and a half.

2           Q.        Nosey lawyer questions.  Let's

3   start with area of inquiry No. 1 and have you read

4   that to yourself and let me know when you are

5   done.

6   A.      Okay.

7           Q.        What is your understanding of the

8   phrase average wholesale price?

9   A.      It is a price that is used for

10  reimbursement purposes, there is considerable

11  controversy around.

12          Q.        That's an understatement?

13  A.      AWP.

14          Q.        When did you first become familiar

15  with the concept?

16  A.      A long time ago.

17          Q.        It is something that you have

18  worked with?

19  A.      Yes.  Yes.  Uh-huh.

20          Q.        And other than a price that is used

21  for reimbursement purposes, is there a more

22  specific definition that you are aware of within

# Exhibit 32



**CONFIDENTIAL**

Schering Laboratories

Schering-Plough Corporation
2000 Galloping Hill Road
Kenilworth, New Jersey 07033
Telephone (908) 298-4000

August 12, 1999

Honorable Thomas Bliley
Chairman
U.S. House of Representatives
Committee on Commerce
Room 2125
Rayburn House Office Building
Washington, DC 20515-6115

RE:     *Letter dated July 19, 1999 Requesting Information*
        *Concerning the Pricing for Albuterol Sulfate .083%*

Dear Mr. Bliley:

This is in response to the letter dated July 19, 1999 from the House Committee on Commerce (the "Committee") requesting certain information from Schering-Plough Corporation ("Schering-Plough") concerning pricing for albuterol sulfate solution 0.083%.

Request No. 1: Please provide all definitions of AWP used by your company since January 1, 1996 for the purpose of determining the reimbursement price for Medicare-covered drugs, and all records relating to those definitions. In particular, please provide the specific definitions you apply to the terms "average" and "wholesale".

Response to Request No. 1: The MCR Glossary of Terms used by Schering-Plough Labs Medicaid Administration (dated May 4th 1993) contains the following description with respect to AWP:

> "AWP Average Wholesale Price - The composite wholesale
> price charged on a specific commodity that is assigned by the
> drug manufacturer and is listed in either the Red Book, Blue
> Book (First Data Bank), or other pricing sources."

Schering-Plough does not apply any particular definition of AWP "for the purpose of determining the reimbursement price for Medicare-covered drugs." Similarly, Schering-Plough does not apply any particular definition for the terms "average" or "wholesale." Schering-Plough does provide to HCFA on a quarterly basis both its Best Price and Average Manufacturer's Price ("AMP") for albuterol sulfate .083%. Best Price is the single lowest price at which a covered outpatient single source or innovator multi-source drug is sold

Plaintiffs' Exhibit
**809**
01-12257-PBS

EXHIBIT  *83*
WIT: *Weintraub*
DATE: *9-22-06*
Cynthia Vohlken

HIGHLY CONFIDENTIAL

RGX 0315084

# Exhibit 33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 18-1 - 18-151



BENCH TRIAL - DAY EIGHTEEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 12, 2006, 9:15 a.m.




LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

a0606b95-19fb-4e82-ad6f-17833ab0c202

Page 22

1  by the industry or the government as a benchmark for
2  reimbursement?
3        THE WITNESS: Vaguely. I mean, we just didn't get
4  involved in reimbursement. Reimbursement was not our issue.
5  We sold the product.
6  Q. Mr. Weintraub --
7        THE WITNESS: In all honesty, your Honor, I don't
8  mean to be disrespectful, but we just never got involved in
9  reimbursement. That was not our issue. Reimbursement was a
10 matter between the government and the people who supplied
11 product to the patient. We just sold the product. We
12 never -- reimbursement issues just were not our focus because
13 we never achieved anything with reimbursement. We never got
14 any part of the reimbursement. We just sold product.
15       THE COURT: It wasn't part of your radar screen?
16       THE WITNESS: No.
17 Q. Now, with respect to AWPs, Mr. Weintraub, from the time
18 you started in '93, did you ever at any time raise the AWP on
19 the 3 ml .083 percent solution?
20 A. No.
21 Q. You never raised it. Did you lower it at one time?
22 A. Yes.
23 Q. Would you explain that, please.
24 A. When I came into Warrick, the albuterol sulfate solution
25 had already been marketed. I did not set the AWPs for the

Page 23

1  albuterol sulfate solution. We had two sizes on the market,
2  one a smaller package of either 25 or 30 and one a package of
3  60.
4  Q. Is this a 25 package?
5  A. Yes.
6  Q. There would be just a bigger package of 60, correct?
7  A. There would be a bigger package of 60. The AWP for the
8  60s had been set at one level, so that the unit price was, I
9  think, $1.24, as I remember it, and the 25 or 30 package had
10 a unit price of $1.21. I thought that was kind of silly,
11 inconsistent, because the unit product was the same in either
12 package. And I lowered the price for the package of 60 so
13 that it came down to $1.21 to be consistent on both package
14 sizes.
15 Q. Okay. And after 1995, the 20 ml bottle, were there
16 any -- you did raise the AWP on the 20 ml twice in 1995,
17 correct?
18 A. I did.
19 Q. And that was because there were some actual
20 increases?
21 A. Yes.
22 Q. After 1995, did you ever raise the AWP on the 20 ml
23 again?
24 A. No.
25       THE COURT: So explain that again to me. So what

Page 24

1  did you raise?
2        THE WITNESS: I raised the 20 ml product.
3        THE COURT: But why?
4        THE WITNESS: There was a company -- we had one
5  other competitor in the market. When we came into the market
6  with this product, it was at one price level. The price had
7  constantly deteriorated. When the other company was forced
8  off the market because of the fact that its product was
9  contaminated, we were the only ones on the market, and I
10 raised the price on the 20 ml so that I could -- the
11 opportunity was there, since there was no other competition,
12 in all honesty. And, secondly of all, it helped us recoup
13 the downward spiral, so to speak, that occurred when the
14 competition was in place.
15       THE COURT: I understand why you'd raise the list
16 price or the WAC. Why would you then raise the AWP?
17       THE WITNESS: Well, I did that because I came out
18 of the brand side of the business. On the brand side of the
19 business, whenever you raised the direct price of the
20 product, you'd raise the AWP in proportion. Again, I had
21 been forty years on the brand side of the business, and I
22 automatically, it's conservative to say, had taken the price
23 of the product up uniformly across the country; and with our
24 accounts, I raised the price of the AWP in accordance with
25 the same percentage that I raised the direct price of the

Page 25

1  product.
2        THE COURT: Why did you always raise it on the
3  brand side?
4        THE WITNESS: Brand products tend to go up in
5  price. I'm not talking about the albuterol solution. I'm
6  talking about brands overall of the forty years, brand prices
7  tend to rise in price. That's just a fact of life.
8        THE COURT: But why would you raise the AWP on the
9  branded side?
10       THE WITNESS: When you raise the AWP, the margins
11 on the brand side are set in such a way that the direct
12 price -- let's say a price is 83 cents on a brand product and
13 you set an AWP of $1 on it. Now, if you take the price 10 or
14 12 percent up on the direct price side, it's going to come
15 very close to the AWP. There's no differential there, so to
16 speak. You don't want to raise the direct price to the point
17 where it's at the AWP. You have to give some kind of margin
18 to the distributor to sell a product. So you'd raise the
19 price of the AWP in proportion to your direct price rise. Am
20 I making myself clear?
21       THE COURT: Did you understand at that point that
22 the reimbursement would go up that the government would have
23 to pay?
24       THE WITNESS: Again, we weren't focused on
25 reimbursement. We were focused on selling --

Page 26

1    THE COURT: Did you know that?
2    THE WITNESS: Did I know that? Well, it seemed if
3    you raised the price of the product, then you would
4    automatically raise the price of reimbursements.
5    THE COURT: Did you know that Medicare
6    beneficiaries would have to pay 20 percent of the increase?
7    THE WITNESS: Again, I wasn't focused on that, your
8    Honor.
9    Q. From the brand side, Mr. Weintraub, just to finish this,
10   this was not something that just Schering did? Was this an
11   industrywide convention or practice was that when, on the
12   brand side, when the price went up, the AWPs went up in a
13   proportional amount?
14   A. That's through the entire industry.
15   Q. The entire industry?
16   A. Yes.
17   Q. Every company?
18   A. Yes, yes.
19   Q. Okay. Now, I think I covered this, but we got off a
20   little bit. On the 20 ml, after those 95 changes you just
21   described to Judge Saris, did you ever raise the AWP again on
22   it after that?
23   A. No.
24   Q. Okay. I want to talk about Warrick's marketing
25   practices. Did Warrick sell or attempt to sell its generic

Page 27

1    drugs by discussing spread, AWPs, or Medicare reimbursements
2    with Warrick customers?
3    A. No.
4    Q. When you sold to these national central buyers, did you
5    know who they were going to sell to or at what price?
6    A. No.
7    Q. When you sold to your national buying customers, did you
8    know what third-party payor, private or public, might
9    reimburse for the drug, if at all?
10   A. No.
11   Q. Did Warrick provide customers with written sales
12   material or calculations comparing Warrick's product with
13   competitors' products based upon spreads between acquisition
14   cost and AWP?
15   A. No.
16   Q. Now, switching to another topic -- and I'm almost
17   through, your Honor, just about a minute -- in the notebook
18   that I've handed you, the white notebook, under Tabs 2, 3,
19   and 4 are Defendants' Exhibit 2904, 2906, and 2905. Have you
20   reviewed these, Mr. Weintraub, these exhibits?
21   A. Yes.
22   Q. These are contracts between Warrick and Blue Cross and
23   Blue Shield of Massachusetts for the two products we've been
24   looking at?
25   A. That's correct.

Page 28

1    MR. BERMAN: Excuse me. It mischaracterizes the
2    contracts. They were HMO Blue.
3    Q. You describe them, Mr. Weintraub. What are they?
4    A. It's a contract between Warrick and Blue Cross and Blue
5    Shield of Massachusetts to provide to Blue Cross and Blue
6    Shield of Massachusetts certain albuterol sulfate products at
7    a certain price, and those products would be delivered
8    through a wholesaler.
9    Q. And are these the market prices, the discounted prices?
10   A. It appeared to me that these would be discounted prices.
11   Q. And these are true and correct copies of those
12   contracts, to the best of your knowledge?
13   A. To the best of my knowledge.
14   MR. MOORE: Your Honor, we would offer 2904, 2905,
15   and 2906.
16   MR. BERMAN: No objection.
17   (Exhibits 2904, 2905, and 2906 received in
18   evidence.)
19   MR. MOORE: I pass the witness, your Honor.
20   THE COURT: Excuse me?
21   MR. MOORE: I pass the witness. I'm done.
22   THE COURT: That must be a term from somewhere.
23   MR. MOORE: Everybody does it a little differently.
24   THE COURT: Where are you from?
25   MR. MOORE: Dallas, Texas.

Page 29

1    THE COURT: All right. It must have to do with
2    the --
3    MR. MOORE: It's like a forward pass, yes. Roger
4    Staubach started that.
5    THE COURT: Now, what do they say in Seattle, you
6    caught 'em?
7    (Laughter.)
8    MR. BERMAN: I'll accept the pass, your Honor.
9    CROSS-EXAMINATION BY MR. BERMAN:
10   Q. Good morning, Mr. Weintraub.
11   A. Good morning.
12   Q. Let's take the topic you were talking about which was
13   your establishment of the first AWP for Warrick, okay? And
14   I'm going to ask you this: At the time that you were
15   deciding what the AWP would be, you understood, did you not,
16   that in order for Warrick's products to be reimbursed, for
17   third parties to be able to seek reimbursement, that you
18   needed to list an AWP, correct?
19   A. That is correct, to be listed as a generic, that was our
20   thrust.
21   Q. And so you contacted First Databank, and you came away
22   with the understanding that in order for your drug to be
23   listed as a generic, it needed to have a price 10 to
24   20 percent below the branded product, correct?
25   A. That is correct.

a0606b95-19fb-4e82-ad6f-17833ab0c202

# Exhibit 34

# UNITED STATES DISTRICT COURT FOR

## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>CIVIL ACTION: O1-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs., Inc., et al.,*<br>D. Mont. Cause No. CV-02-09-H-DWM | |

## DEFENDANT ABBOTT LABORATORIES' ANSWER AND DEFENSES TO STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendant Abbott Laboratories ("Abbott") hereby responds to the State of Montana's

Second Amended Complaint (the "Complaint") in corresponding numbered paragraphs as

follows:

### Preface

The Complaint improperly and repetitively refers to Abbott and certain other defendants

and third parties on a collective basis, failing to plead with requisite particularity allegations

against Abbott or other defendants or third parties. Intentionally ambiguous pleading is improper

and insufficient to apprise Abbott in any meaningful sense of the allegations asserted against it.

Abbott nevertheless attempts to respond to Plaintiff's allegations to the extent possible under the

circumstances. In answering the Complaint, Abbott responds only for itself, even when

Plaintiff's allegations refer to alleged conduct by Abbott and other persons or entities. To the

extent the allegations in the Complaint refer to the knowledge, conduct or actions of persons,

These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Answer.

I.

1.      Abbott admits that Plaintiff seeks to bring this action as alleged in Paragraph 1 of the Complaint. Abbott denies that Plaintiff is entitled to maintain this action in the manner alleged. Abbott denies the remaining allegations in Paragraph 1 of the Complaint.

2.      To the extent the allegations in Paragraph 2 of the Complaint refer to stautory or regulatory programs, the statutes, regulations and other sources regarding those programs establish their contents, and any characterizations thereof are denied. Abbott denies the remaining allegations in Paragraph 2 of the Complaint.

3-4.     The allegations in Paragraphs 3 and 4 of the Complaint contain Plaintiff's generalizations and self-serving conclusions to which no response is required. To the extent a response is required, Abbott denies the allegations in Paragraphs 3 and 4 of the Complaint and strict proof is demanded thereof.

5.      Abbott admits that Congress mandated that Medicare Part B reimbursement be based, in part, in certain circumstances, on AWP and that certain Medicaid programs and private insurance companies reimburse drugs based, in part, in certain circumstances, on AWP. Abbott denies the remaining allegations in Paragraph 5 of the Complaint.

6-10.    Denied.

11-12.   The Court dismissed Plaintiff's "Best Price" claims in its Order dated June 10, 2004. Accordingly, Abbott does not respond to Paragraphs 11 through 12 of the Complaint.

13-17.   Denied.

# Exhibit 35

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                                    x
                                                    :
In Re: PHARMACEUTICAL INDUSTRY                      : MDL NO. 1456
AVERAGE WHOLESALE PRICE                             .:
LITIGATION                                          : Master File No. 01-CV-12257-PBS
                                                    :
THIS DOCUMENT RELATES TO:                           : Judge Patti B. Saris
(State of Montana v. Abbott Labs., Inc., et al., 02- :
CV-12084-PBS)                                        :
                                                    :
                                                    x
```

### ANSWER AND DEFENSES OF DEFENDANT ASTRAZENECA PHARMACEUTICALS LP AND ZENECA INC. TO THE STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendants AstraZeneca Pharmaceuticals LP ("AZPLP") and Zeneca Inc.[1]

(collectively "AstraZeneca"), through its undersigned counsel, answer the State of

Montana's Second Amended Complaint (the "SAC") served via Verilaw on

August 1, 2003, in the above-captioned action as follows:

### I.   INTRODUCTION

1.        Admits that Plaintiff purports to bring this case as alleged in

paragraph 1, but denies the allegations in paragraph 1, specifically denies the

existence of or participation in an "Average Wholesale Price Inflation Scheme,"

denies that there exists any basis in fact or law for the institution or maintenance

of this action against AstraZeneca, and otherwise denies knowledge or

---

[1] The entity listed as AstraZeneca US does not exist. Although AstraZeneca PLC is
referenced in the SAC, it is not named as a defendant.

information sufficient to form a belief as to the truth of the allegations in paragraph 1 as to the other parties.

2.        Admits that AZPLP manufactures, sells, and/or distributes pharmaceutical products in the United States. To the extent the allegations in paragraph 2 refer to statutory or regulatory programs, the statutes, regulations, and other sources regarding those programs speak for themselves, and any characterizations thereof are denied. AstraZeneca denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 as to the other parties.

3.        Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3, except admits that the development of new drugs can benefit individuals.

4.        Denies the allegations in paragraph 4 to the extent that they are directed at AstraZeneca, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 as to the other parties.

5.        Denies the allegations in paragraph 5, except admits that some private and public drug reimbursement systems reimburse physicians and pharmacies based upon the AWP for some prescription drugs, as published and reported by various independent third-party publications, but denies the remaining allegations in paragraph 5 to the extent they are directed at AstraZeneca, and

2

# Exhibit 36

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO *State of Montana v. American Home Products Corp., et al.,* D. Mont. Cause No. CV- 02-09-H-DWM | |

## AVENTIS PHARMACEUTICALS INC.'S ANSWER TO
## STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendant Aventis Pharmaceuticals Inc.[1] ("Aventis") hereby responds and answers the

State of Montana's Second Amended Complaint (the "Complaint") as follows:

### Preface

Prior to addressing the specific allegations of the numbered Paragraphs, Aventis states

the following general objections and responses to the Complaint as a whole. The Complaint

contains purported quotations from a number of sources, many of which are unidentified. If any

of the quotations originate in documents protected by the attorney-client privilege, the work-

product doctrine or the joint-defense privilege, Aventis reserves the right to assert such

privileges, hereby moves to strike such references and demands return of any such documents

that Plaintiff may have in its possession, custody or control. In answering allegations consisting

of quotations, an admission that the material quoted was contained in a document or was uttered

---

[1]    Plaintiff's description of "Aventis Group (Aventis, Pharma, Hoechst & Behring)" in the Complaint is
inaccurate and misleading. This Answer is that of Aventis Pharmaceuticals Inc. in its own capacity and as
the successor in interests to Hoechst Marion Roussel, Inc.

1

regulations and other sources regarding those programs speak for themselves, and any characterizations thereof are denied.  To the extent the allegations in Paragraph 2 of the Complaint are directed to persons, entities or defendants other than Aventis, Aventis is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations.  Aventis denies the remaining allegations in Paragraph 2 of the Complaint that pertain to it.

3.      The allegations in Paragraph 3 contain Plaintiff's generalizations and self-serving conclusions.  Accordingly, no answer is required and none is made.  To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

4.      The allegations in Paragraph 4 contain Plaintiff's generalizations and self-serving conclusions.  Accordingly, no answer is required and none is made.  To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

5.      Aventis admits that some private and public drug reimbursement systems reimburse physicians and pharmacies based upon the AWP as published and reported by various compendia.  Aventis denies the remaining allegations in Paragraph 5 of the Complaint that pertain to it.

6.      Aventis admits that at one time it reported pricing information to various compendia, which may have considered that information when publishing AWP.  Aventis denies the existence of, and its participation in, any "AWP Inflation Scheme" as alleged in Paragraph 6 of the Complaint.  To the extent the allegations in Paragraph 6 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Aventis, Aventis is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.  To the extent the allegations of Paragraph 6 contain

3

113048v8

legal arguments or conclusions of law, no answer is required and none is made. Aventis denies the remaining allegations in Paragraph 6 of the Complaint that pertain to it.

7.     Aventis denies the existence of, and its participation in, any "AWP Inflation Scheme" as alleged in Paragraph 7 of the Complaint.     To the extent the allegations in Paragraph 7 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Aventis, Aventis is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations. To the extent the allegations of Paragraph 7 contain legal arguments or conclusions of law, no answer is required and none is made.  Aventis denies the remaining allegations in Paragraph 7 of the Complaint that pertain to it.

8.     Aventis denies the allegations in Paragraph 8 of the Complaint that pertain to it. To the extent the allegations in Paragraph 8 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Aventis, Aventis is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.

9.     Aventis denies the allegations in Paragraph 9 of the Complaint that pertain to it. To the extent the allegations in Paragraph 9 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Aventis, Aventis is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.

10.     Aventis denies the allegations in Paragraph 10 of the Complaint that pertain to it. To the extent the allegations in Paragraph 10 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Aventis, Aventis is without knowledge or

4

113048v8

162.    Aventis admits that the reimbursement methodology for outpatient prescription drugs covered by the Montana Medicaid Program is set forth at Mont. Admin. R. 37.86.1101 *et seq.*, which is the best evidence of its content.  To the extent the allegations rely on the "Prescription Drug Program" cited in the last sentence of Paragraph 162, Aventis avers that it is the best evidence of its content.  Aventis denies that Plaintiff has accurately characterized any alleged finding, opinion, statement or conclusion contained therein, or that such are applicable to Aventis.

163.    Aventis admits it is aware that Medicaid beneficiaries are generally responsible to pay a co-payment.  To the extent the allegations refer to statutes, regulations or other documents, those sources speak for themselves and are the best evidence of their contents.   Any characterizations are denied.   To the extent the allegations in Paragraph 163 set forth legal arguments or conclusions of law, no response is required and none is made.  Aventis denies the remaining allegations in Paragraph 163 of the Complaint that pertain to it.

## VI.   AWP PLAYS A CENTRAL ROLE IN ALL PRESCRIPTION DRUG REIMBURSEMENT SYSTEMS, AND THE TRUTHFUL REPORTING OF AWPS IS ESSENTIAL TO THE INTEGRITY OF THE MARKETPLACE

164.    Aventis admits that certain reimbursing entities have chosen AWP to play a role in various prescription drug reimbursement systems that operate in the United States.  Aventis denies all other allegations set forth in Paragraph 164.

165.    Upon information and belief, Aventis admits the allegations in the first two sentences of Paragraph 165 of the Complaint.  Aventis denies all other allegations set forth in Paragraph 165.

166.    Aventis admits that certain reimbursing entities have chosen AWP to play a role in various prescription drug reimbursement systems that operate in the United States. To the

14

# Exhibit 37

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO *State of Montana v. American Home Products Corp., et al.,* D. Mont. Cause No. CV- 02-09-H-DWM | |

### AVENTIS BEHRING LLC'S ANSWER TO
### STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendant Aventis Behring LLC[1] ("Behring") hereby responds and answers the State of

Montana's Second Amended Complaint (the "Complaint") as follows:

### Preface

Prior to addressing the specific allegations of the numbered Paragraphs, Behring states

the following general objections and responses to the Complaint as a whole. The Complaint

contains purported quotations from a number of sources, many of which are unidentified. If any

of the quotations originate in documents protected by the attorney-client privilege, the work-

product doctrine or the joint-defense privilege, Behring reserves the right to assert such

privileges, hereby moves to strike such references and demands return of any such documents

that Plaintiff may have in its possession, custody or control. In answering allegations consisting

of quotations, an admission that the material quoted was contained in a document or was uttered

---

[1]     Plaintiff's description of "Aventis Group (Aventis, Pharma, Hoechst & Behring)" in the Complaint is inaccurate and misleading. This Answer is that of Aventis Behring LLC only.

1

regulations and other sources regarding those programs speak for themselves, and any characterizations thereof are denied. To the extent the allegations in Paragraph 2 of the Complaint are directed to persons, entities or defendants other than Behring, Behring is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Behring denies the remaining allegations in Paragraph 2 of the Complaint that pertain to it.

3.       The allegations in Paragraph 3 contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

4.       The allegations in Paragraph 4 contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

5.       Behring admits that some private and public drug reimbursement systems use AWP as published and reported by various compendia in developing their reimbursement methodologies for physicians and pharmacies. Behring denies the remaining allegations in Paragraph 5 of the Complaint that pertain to it.

6.       Behring admits that it reported certain pricing information for its medicines to pharmaceutical industry pricing publications. Behring denies the existence of, and its participation in, any "AWP Inflation Scheme" as alleged in Paragraph 6 of the Complaint. To the extent the allegations in Paragraph 6 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Behring, Behring is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations. To the extent the allegations of Paragraph 6 contain legal arguments or

3

# Exhibit 38

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

THIS DOCUMENT RELATES TO
State of Montana v. Abbott Labs. Inc., et al.
Civil Action No.: 02-1284-PBS

## ANSWER OF BRISTOL-MYERS SQUIBB COMPANY, ONCOLOGY THERAPEUTICS NETWORK CORPORATION AND APOTHECON, INC. TO STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendants Bristol-Myers Squibb Company ("Bristol-Myers"), Oncology Therapeutics
Network Corporation ("OTN"), and Apothecon, Inc. ("Apothecon") (Bristol-Myers, OTN and
Apothecon are collectively referred to herein as the "BMS Group"),[1] respond to State of
Montana's Second Amended Complaint, served via Verilaw on November 5, 2003, as follows:

### Preliminary Statement

The Second Amended Complaint improperly refers to Bristol-Myers, OTN, and
Apothecon, other Defendants and third parties on a collective basis, failing to plead with
requisite particularity allegations against Bristol-Myers, OTN and/or Apothecon.   This is
insufficient to apprise BMS Group (let alone each separate entity) of the allegations asserted

---

[1] In this Answer, Bristol-Myers, OTN and Apothecon follow the convention of the Second Amended Complaint by
referring to themselves collectively as the "BMS Group."   By following the Second Amended Complaint in this
manner, none of these Defendants concedes or admits that it is properly defined as a "Group" for any other purpose.

**Specific Responses**

1.  BMS Group admits the State of Montana seeks to bring this action as alleged in Paragraph 1 of the Second Amended Complaint. BMS Group denies that Plaintiff is entitled to maintain this action in the manner alleged.

2.  BMS Group admits that it is a manufacturer of pharmaceutical products. To the extent the allegations of Paragraph 2 refer to statutory or regulatory programs, the statutes, regulations and other sources regarding those programs speak for themselves, and any characterizations thereof are denied. To the extent the allegations in Paragraph 2 of the Second Amended Complaint are directed to persons, entities or defendants other than BMS Group, BMS Group is without knowledge or information sufficient to form a belief as to the truth of the allegations. BMS Group denies the remaining allegations in Paragraph 2 of the Second Amended Complaint that pertain to it.

3.  The allegations in Paragraph 3 of the Second Amended Complaint contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied.

4.  BMS Group denies the allegations in Paragraph 4 of the Second Amended Complaint, except admits it has spent significant sums of money to research, develop and market new drugs.

5.  BMS Group denies the allegations in Paragraph 5 of the Second Amended Complaint, except admits that it reports certain pricing information for its medicines to third-party publications, that Congress has mandated that Medicaid and Medicare Part B reimbursements be based, in part, upon AWP, and that AWP (often less a negotiated percentage discount) is sometimes used as a basis for reimbursement by private insurance companies and self-insured employers.

3

6-10.  BMS Group denies the allegations in Paragraphs 6 through 10 of the Second Amended Complaint.  To the extent the allegations in Paragraphs 6 through 10 of the Second Amended Complaint are directed to persons, entities or defendants other than BMS Group, BMS Group is without knowledge or information sufficient to form a belief as to the truth of the allegations.

11-12. The Court dismissed Plaintiff's Best Price claims against BMS Group in its Memorandum and Order dated June 10, 2004.   Accordingly, no response is required to Paragraphs 11 and 12 of the Second Amended Complaint, and none is made.

13-14. The allegations in Paragraphs 13 through 14 of the Second Amended Complaint state legal conclusions to which no response is required.  To the extent a response is required, BMS Group denies the allegations in Paragraphs 13 through 14 of the Second Amended Complaint.  To the extent the allegations in Paragraphs 13 through 14 of the Second Amended Complaint are directed to persons, entities or defendants other than BMS Group, BMS Group is without knowledge or information sufficient to form a belief as to the truth of the allegations.

15-18. BMS Group denies the allegations in Paragraphs 15 through 18 of the Second Amended Complaint, except it admits that Plaintiff seeks relief as alleged in Paragraph 18 of the Second Amended Complaint.  To the extent the allegations in Paragraphs 15 through 18 of the Second Amended Complaint are directed to persons, entities or defendants other than BMS Group, BMS Group is without knowledge or information sufficient to form a belief as to the truth of the allegations.

19-20. BMS Group denies the allegations in Paragraphs 19 through 20 of the Second Amended Complaint.

4

Complaint refer to the knowledge, conduct or actions of persons or entities other than BMS Group, BMS Group is without knowledge or information sufficient to form a belief as to the truth of those allegations.

216-363.    The allegations in Paragraphs 216 through 363 of the Second Amended Complaint are directed to other defendants and require no response from BMS Group. To the extent allegations in Paragraphs 216 through 363 of the Second Amended Complaint are deemed to include allegations against BMS Group, they are denied.

364-365.    BMS Group denies the allegations in Paragraphs 364 and 365 of the Second Amended Complaint and states that specific drugs as to which Plaintiff seeks relief are selected by Plaintiff and do not require a response from BMS Group; to the extent that such a response is required, BMS Group denies that Plaintiff is entitled to a judgment or any relief.

366.    BMS Group denies the allegations in Paragraph 366 of the Second Amended Complaint, except admits that it communicated with industry compendia concerning certain prices of its products. BMS Group further states that the document written by Denise Kaszuba and the BMS Group document (BMSAWP/0011246) cited in Paragraph 366 speak for themselves and are the best evidence of their contents. BMS Group denies the conclusions that Plaintiff draws from these documents.

367.    BMS Group denies the allegations in Paragraph 367 of the Second Amended Complaint.

368.    BMS Group denies the allegations in Paragraph 368 of the Second Amended Complaint that pertain to it and, to the extent the allegations in Paragraph 368 of the Second Amended Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than BMS Group, BMS Group is without knowledge or information sufficient to form a

14

# Exhibit 39



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO<br>*State of Montana v. Abbott Labs, Inc., et al.*,<br>D. Mont. Cause No. CV- 02-09-H-DWM | |

## FUJISAWA HEALTHCARE INC.'S AND FUJISAWA USA INC.'S ANSWER TO STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendants Fujisawa Healthcare, Inc. and Fujisawa USA, Inc. (collectively referred to as "Fujisawa"), for its Answer to the State of Montana's Second Amended Complaint (the "Complaint") as follows:

### Preface

Prior to addressing the specific allegations of the numbered Paragraphs, Fujisawa states the following general objections and responses to the Complaint as a whole. The Complaint contains purported quotations from a number of sources, many of which are unidentified. If any of the quotations originate in documents protected by the attorney-client privilege, the work-product doctrine or the joint-defense privilege, Fujisawa reserves the right to assert such privileges, hereby moves to strike such references and demands return of any such documents that Plaintiff may have in its possession, custody or control. In answering allegations consisting of quotations, an admission that the material quoted was contained in a document or was uttered



regulations and other sources regarding those programs speak for themselves, and any characterizations thereof are denied. To the extent the allegations in Paragraph 2 of the Complaint are directed to persons, entities or defendants other than Fujisawa, Fujisawa is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Fujisawa denies the remaining allegations in Paragraph 2 of the Complaint that pertain to it.

3.      The allegations in Paragraph 3 contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

4.      The allegations in Paragraph 4 contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

5.      Fujisawa admits that some private and public drug reimbursement systems reimburse physicians and pharmacies based upon the AWP as published and reported by various compendia. Fujisawa denies the remaining allegations in Paragraph 5 of the Complaint that pertain to it.

6.      Fujisawa generally admits that, historically, the AWPs for Fujisawa's products published by various compendia were based upon pricing data provided by Fujisawa. Fujisawa denies the existence of, and its participation in, any "AWP Inflation Scheme" as alleged in Paragraph 6 of the Complaint. To the extent the allegations in Paragraph 6 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Fujisawa, Fujisawa is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations. To the extent the allegations of Paragraph 6

3



contain legal arguments or conclusions of law, no answer is required and none is made. Fujisawa denies the remaining allegations in Paragraph 6 of the Complaint that pertain to it.

7.    Fujisawa denies the existence of, and its participation in, any "AWP Inflation Scheme" as alleged in Paragraph 7 of the Complaint.   To the extent the allegations in Paragraph 7 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Fujisawa, Fujisawa is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.   To the extent the allegations of Paragraph 7 contain legal arguments or conclusions of law, no answer is required and none is made.   Fujisawa denies the remaining allegations in Paragraph 7 of the Complaint that pertain to it.

8.    Fujisawa denies the allegations in Paragraph 8 of the Complaint that pertain to it. To the extent the allegations in Paragraph 8 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Fujisawa, Fujisawa is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.

9.    Fujisawa denies the allegations in Paragraph 9 of the Complaint that pertain to it. To the extent the allegations in Paragraph 9 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Fujisawa, Fujisawa is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.

10.    Fujisawa denies the allegations in Paragraph 10 of the Complaint that pertain to it. To the extent the allegations in Paragraph 10 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Fujisawa, Fujisawa is without knowledge or

4



are denied.  To the extent the allegations in Paragraph 159 set forth legal arguments or conclusions of law, no response is required and none is made.

160.  Fujisawa generally admits the factual allegations set forth in Paragraph 160 and avers that to the extent the allegations refer to statutes, regulations or other documents, those sources speak for themselves and are the best evidence of their contents.  Any characterizations are denied.  Fujisawa avers that the "Detailed Case Studies" cited in Paragraph 160 of the Complaint is the best evidence of its contents.  Fujisawa denies that Plaintiff has accurately characterized any alleged finding, opinion, statement or conclusion contained therein, or that such are applicable to Fujisawa.

161.  Fujisawa is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 161 and, therefore, denies those allegations.

162.  Fujisawa admits that the reimbursement methodology for outpatient prescription drugs covered by the Montana Medicaid Program is set forth at Mont. Admin. R. 37.86.1101 *et seq.*, which is the best evidence of its contents.  To the extent the allegations rely on the "Prescription Drug Program" cited in the last sentence of Paragraph 162, Fujisawa avers that it is the best evidence of its contents.  Fujisawa denies that Plaintiff has accurately characterized any alleged finding, opinion, statement or conclusion contained therein, or that such are applicable to Fujisawa.

163.  To the extent the allegations refer to statutes, regulations or other documents, those sources speak for themselves and are the best evidence of their contents.  Any characterizations are denied.  To the extent the allegations in Paragraph 163 set forth legal arguments or conclusions of law, no response is required and none is made.  Fujisawa denies the remaining allegations in Paragraph 163 of the Complaint that pertain to it.

13



410-411.    The allegations set forth in Paragraph 410-11 contain Plaintiff's characterization of the action. No response is required and none is made.

412.    Fujisawa admits that it reported certain pricing information for its medicines to independently produced pricing publications. Fujisawa admits that it reported a suggested AWP for its medicines during a portion of that time. Fujisawa states that FJ-MDL 015152-015159 is the best evidence of its contents and denies that the conclusions Plaintiff draws from these documents are accurate. The remainder of the allegations of Paragraph 412 are denied

413.    Fujisawa denies the allegations set forth in Paragraph 413 of the Complaint.

414.    Fujisawa states that FJ-MDL 005687-88 is the best evidence of its contents and denies that the conclusions Plaintiff draws from these documents are accurate. The remainder of the allegations of Paragraph 414 are denied.

415.    Fujisawa states that FJ-MDL 005668-69 is the best evidence of its contents and denies that the conclusions Plaintiff draws from these documents are accurate. The remainder of the allegations of Paragraph 415 are denied.

416.    Fujisawa states that FJ-MDL 008346 is the best evidence of its contents and denies that the conclusions Plaintiff draws from these documents are accurate. Fujisawa denies the remainder of the allegations of Paragraph 416.

417.    Fujisawa admits that it has produced documents in response to government subpoenas, and that it often sells it products at prices below AWP. Fujisawa denies the remaining allegations in Paragraph 417 of the Complaint that pertain to it.

418.    Fujisawa states that FJ-MDL 13079-81 is the best evidence of its contents and denies that the conclusions Plaintiff draws from these documents are accurate. Fujisawa denies the remainder of the allegations of Paragraph 418.

# Exhibit 40



### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

THIS DOCUMENT RELATES TO
*State of Montana v. American Home Products
Corp., et al.,*
D. Mont. Cause No. CV- 02-09-H-DWM

### JOHNSON & JOHNSON, CENTOCOR, INC., JANSSEN PHARMACEUTICA PRODUCTS, L.P., MCNEIL-PPC, INC., AND ORTHO BIOTECH PRODUCTS L.P.'S ANSWER TO STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendants Johnson & Johnson ("J&J"), Centocor, Inc. ("Centocor"), Janssen

Pharmaceutica Products, L.P. ("Janssen"), McNeil-PPC, Inc. ("McNeil-PPC"), Ortho Biotech

Products, L.P., incorrectly sued as "Ortho Biotech" ("Ortho Biotech") (collectively the "J&J

Defendants"), hereby responds and answers the State of Montana's Second Amended Complaint

(the "Complaint") as follows:

#### Preface

Prior to addressing the specific allegations of the numbered Paragraphs, the J&J

Defendants state the following general objections and responses to the Complaint as a whole.

The Complaint contains purported quotations from a number of sources, many of which are

unidentified. If any of the quotations originate in documents protected by the attorney-client

privilege, the work-product doctrine or the joint-defense privilege, the J&J Defendants reserve

the right to assert such privileges, hereby move to strike such references and demand return of

1

1025752v1



## I.   **INTRODUCTION**

1.      To the extent that the allegations set forth in Paragraph 1 contain Plaintiff's
characterization of the action, no answer is required and none is made. The J&J Defendants
deny the remaining allegations in Paragraph 1 of the Complaint that pertain to them.

2.      Except for J&J, which is a holding company, the J&J Defendants admit that they
manufacture pharmaceutical products. To the extent the allegations of this Paragraph refer to
statutory or regulatory programs, the statutes, regulations and other sources regarding those
programs speak for themselves, and any characterizations thereof are denied. To the extent the
allegations in Paragraph 2 of the Complaint are directed to persons, entities or defendants other
than the J&J Defendants, the J&J Defendants are without knowledge or information sufficient to
form a belief as to the truth of the allegations and, therefore, deny those allegations. The J&J
Defendants deny the remaining allegations in Paragraph 2 of the Complaint that pertain to them.

3.      The allegations in Paragraph 3 contain Plaintiff's generalizations and self-serving
conclusions. Accordingly, no answer is required and none is made. To the extent an answer is
deemed to be required, the allegations are denied and strict proof is demanded thereof.

4.      The allegations in Paragraph 4 contain Plaintiff's generalizations and self-serving
conclusions. Accordingly, no answer is required and none is made. To the extent an answer is
deemed to be required, the allegations are denied and strict proof is demanded thereof.

5.      The J&J Defendants admit that some private and public drug reimbursement
systems reimburse physicians and pharmacies based upon the AWP as published and reported by
various compendia. The J&J Defendants deny the remaining allegations in Paragraph 5 of the
Complaint that pertain to them.

6.      The J&J Defendants generally admit that the AWPs for the J&J Defendants'
products published by various compendia were based upon information provided by the J&J

3

1025752v1



Defendants. The J&J Defendants deny the existence of, and their participation in, any "AWP Inflation Scheme" as alleged in Paragraph 6 of the Complaint. To the extent the allegations in Paragraph 6 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than the J&J Defendants, the J&J Defendants are without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, deny those allegations. To the extent the allegations of Paragraph 6 contain legal arguments or conclusions of law, no answer is required and none is made. The J&J Defendants deny the remaining allegations in Paragraph 6 of the Complaint that pertain to them.

7.      The J&J Defendants deny the existence of, and their participation in, any "AWP Inflation Scheme" as alleged in Paragraph 7 of the Complaint. To the extent the allegations in Paragraph 7 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than the J&J Defendants, the J&J Defendants are without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, deny those allegations. To the extent the allegations of Paragraph 7 contain legal arguments or conclusions of law, no answer is required and none is made. The J&J Defendants deny the remaining allegations in Paragraph 7 of the Complaint that pertain to them.

8.      The J&J Defendants deny the allegations in Paragraph 8 of the Complaint that pertain to them. To the extent the allegations in Paragraph 8 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than the J&J Defendants, the J&J Defendants are without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, deny those allegations.

9.      The J&J Defendants deny the allegations in Paragraph 9 of the Complaint that pertain to them. To the extent the allegations in Paragraph 9 of the Complaint refer to the

4



that Plaintiff has accurately characterized any alleged finding, opinion, statement or conclusion contained therein, or that such are applicable to the J&J Defendants. The J&J Defendants are without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, deny those allegations.

161.    The J&J Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 161 and, therefore, deny those allegations. The J&J Defendants aver that the "Detailed Case Studies" cited in Paragraph 160 of the Complaint is the best evidence of their contents. The J&J Defendants deny that Plaintiff has accurately characterized any alleged finding, opinion, statement or conclusion contained therein, or that such are applicable to the J&J Defendants.

162.    The J&J Defendants admit that the reimbursement methodology for outpatient prescription drugs covered by the Montana Medicaid Program is set forth at Mont. Admin. R. 37.86.1101 *et seq.*, which is the best evidence of their contents. To the extent the allegations rely on the "Prescription Drug Program" cited in the last sentence of Paragraph 162, the J&J Defendants aver that it is the best evidence of its contents. The J&J Defendants deny that Plaintiff has accurately characterized any alleged finding, opinion, statement or conclusion contained therein, or that such are applicable to the J&J Defendants.

163.    The J&J Defendants admit they are aware that Medicaid beneficiaries are generally responsible, but not necessarily required, to pay a co-payment. To the extent the allegations refer to statutes, regulations or other documents, those sources speak for themselves and are the best evidence of their contents. Any characterizations are denied. To the extent the allegations in Paragraph 163 set forth legal arguments or conclusions of law, no response is

14



knowledge, conduct or actions of or benefits received by persons, entities or defendants other than the J&J Defendants, the J&J Defendants are without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, deny those allegations.

216-480. The allegations in Paragraphs 216 through 480 of the Complaint are directed to another defendant and require no response from the J&J Defendants. To the extent allegations in Paragraphs 216 through 480 of the Complaint are deemed to include allegations against the J&J Defendants, they are denied.

481. The J&J Defendants deny the allegations set forth in Paragraph 481 of the Complaint.

482. The allegations set forth in Paragraph 482 contain Plaintiff's characterization of the action. No response is required and none is made.

483. The J&J Defendants admit that they reported certain information for its medicines to independently produced pricing publications and that the J&J Defendants were aware that the compendia considered the information that the J&J Defendants supplied.

484. The J&J Defendants deny the allegations set forth in Paragraph 484 of the Complaint.

485. The J&J Defendants state that the rebate agreement (J&J000599) cited in Paragraph 485 of the Complaint is the best evidence of its contents. The J&J Defendants deny that the conclusion drawn by Plaintiff from the alleged quotation from this document is accurate. The J&J Defendants deny the remaining allegations in Paragraph 485 of the Complaint that pertain to them.

486. The J&J Defendants deny the allegations set forth in Paragraph 486 of the Complaint.

21

# Exhibit 41

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) |
| | MDL No. 1456 |
| THIS DOCUMENT RELATES TO *State of Montana v. Abbott Labs., Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM | ) ) ) ) ) |
| | Civil Action No. 01-CV-12257 PBS Judge Patti B. Saris |

## ANSWER OF DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION TO THE STATE OF MONTANA'S SECOND AMENDED COMPLAINT

Defendant Novartis Pharmaceuticals Corporation ("Novartis"), for its Answer to

the State of Montana's Second Amended Complaint (the "Complaint") in the captioned action,

by its undersigned counsel, alleges upon knowledge as to itself, and upon information and belief

as to all other matters, as follows:

### I.    INTRODUCTION

1.    Admits as to the allegations set forth in numbered paragraph 1 of the Complaint

that the State of Montana purports to bring this case on behalf of the State of Montana and

persons residing in Montana but denies that there is any basis on which to permit it to do so.

2.    Denies the allegations set forth in numbered paragraph 2 of the Complaint as to

Novartis and otherwise denies knowledge or information sufficient to form a belief as to the truth

of the allegations set forth, except admits that Novartis is or has been engaged in the business of

manufacturing, marketing and selling prescription pharmaceuticals throughout the United States,

including Montana.

3.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in numbered paragraph 3 of the Complaint, except admits that the

30915758.DOC

development of new drugs can benefit Patients through better overall health, avoidance of more expensive surgical procedures, and, in some cases, longer life.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in numbered paragraph 4 of the Complaint, except denies as to Novartis the allegations of abuses and injury to Patients, the State and its Medicaid program.

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in numbered paragraph 5 of the Complaint, except admits that certain drug reimbursement systems reimburse physicians and pharmacies for prescription drugs based upon AWPs as published and reported by third party publications.

6.      Denies the allegations set forth in numbered paragraph 6 of the Complaint as to Novartis and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein.

7.      Denies the allegations set forth in numbered paragraph 7 of the Complaint as to Novartis and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein.

8.      Denies the allegations set forth in numbered paragraph 8 of the Complaint as to Novartis and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein.

9.      Denies the allegations set forth in numbered paragraph 9 of the Complaint as to Novartis and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein.

10.     Denies the allegations set forth in numbered paragraph 10 of the Complaint.

# Exhibit 42



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

THIS DOCUMENT RELATES TO
*State of Montana v. American Home Products
Corp., et al.,*
D. Mont. Cause No. CV- 02-09-H-DWM

## PFIZER, INC.'S ANSWER TO STATE OF MONTANA'S
## SECOND AMENDED COMPLAINT

Defendant Pfizer, Inc. ("Pfizer") hereby responds and answers the State of

Montana's Second Amended Complaint (the "Complaint") as follows:

### Preface

Prior to addressing the specific allegations of the numbered Paragraphs, Pfizer

states the following general objections and responses to the Complaint as a whole.  The

Complaint contains purported quotations from a number of sources, many of which are

unidentified.  If any of the quotations originate in documents protected by the attorney-

client privilege, the work-product doctrine or the joint-defense privilege, Pfizer reserves

the right to assert such privileges, hereby moves to strike such references and demands

return of any such documents that Plaintiff may have in its possession, custody or control.

In answering allegations consisting of quotations, an admission that the material quoted

was contained in a document or was uttered by the person or entity quoted shall not

1



2.      Pfizer admits that it is a manufacturer of pharmaceutical products. To the extent the allegations of this Paragraph refer to statutory or regulatory programs, the statutes, regulations and other sources regarding those programs speak for themselves, and any characterizations thereof are denied. To the extent the allegations in Paragraph 2 of the Complaint are directed to persons, entities or defendants other than Pfizer, Pfizer is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Pfizer denies the remaining allegations in Paragraph 2 of the Complaint that pertain to it.

3.      The allegations in Paragraph 3 contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

4.      The allegations in Paragraph 4 contain Plaintiff's generalizations and self-serving conclusions. Accordingly, no answer is required and none is made. To the extent an answer is deemed to be required, the allegations are denied and strict proof is demanded thereof.

5.      Pfizer admits that some public drug reimbursement systems reimburse physicians and pharmacies based upon the AWP as published and reported by various compendia. hat some public drug reimbursement systems reimburse physicians and pharmacies based upon the AWP as published and reported by various compendia. Pfizer is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations regarding private drug reimbursement and, therefore, denies those

3



allegations. Pfizer denies the remaining allegations in Paragraph 5 of the Complaint that pertain to it.

6.     Denied.

7.     Pfizer denies the existence of, and its participation in, any "AWP Inflation Scheme" as alleged in Paragraph 7 of the Complaint. To the extent the allegations in Paragraph 7 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Pfizer, Pfizer is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations. To the extent the allegations of Paragraph 7 contain legal arguments or conclusions of law, no answer is required and none is made. Pfizer denies the remaining allegations in Paragraph 7 of the Complaint that pertain to it.

8.     Denied. To the extent the allegations in Paragraph 8 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Pfizer, Pfizer is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.

9.     Denied. To the extent the allegations in Paragraph 9 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Pfizer, Pfizer is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.

10.     Denied. To the extent the allegations in Paragraph 10 of the Complaint refer to the knowledge, conduct or actions of persons, entities or defendants other than Pfizer, Pfizer is without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denies those allegations.