# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION )<br><br>)<br>)<br>)<br><br>THIS DOCUMENT RELATES TO: )<br><br>)<br>)<br>_State of Montana v. Abbott Labs., Inc., et al.,_ )<br>CA No. 02-CV-12084-PBS )<br>) | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris<br><br><br><br><br>ORAL ARGUMENT REQUESTED |

## BAYER'S LOCAL RULE 56.1 STATEMENT OF
## UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, defendant Bayer Corporation ("Bayer") hereby submits the following statement of undisputed facts in support of its Motion for Summary Judgment.[1]

The materials cited herein are contained in the Appendix of Documents in Support of the Motion for Summary Judgment of Bayer Corporation ("BAYAPP").

## I.    PARTIES

1.    Plaintiff is the State of Montana, which is represented by the Montana Attorney General.  State of Montana's Second Amended Complaint ("SAC") ¶ 2 (Nov. 6, 2003) (Doc. 593).

---

[1]Bayer also separately joins the Statement of Undisputed Material Facts In Support Of Defendants' Motion For Summary Judgment submitted jointly by all defendants in this action.

2.      Defendant Bayer Corporation is an Indiana corporation with its principal place of business at 100 Bayer Road, Crafton, Pennsylvania.  SAC ¶ 50.

3.      At all relevant times, Bayer has been a diversified health care company whose business included the development, manufacture, marketing, sale, and/or distribution of health care products and services, including pharmaceuticals.  SAC ¶ 51.

## II.      FACTS PERTINENT TO BAYER'S MOTION FOR SUMMARY JUDGMENT

### A.      MONTANA'S CLAIMS AGAINST BAYER

4.      In its Complaint, Montana alleges that Bayer engaged in two fraudulent schemes.  First, Montana alleges that Bayer reported "fictitious" AWPs to national drug compendia, knowing that AWPs exceeded the actual averages of the wholesale prices of the pharmaceuticals in question, and knowing further that these published prices were used as bases for reimbursement by Medicaid, Medicare Part B, and certain private insurance plans (the "AWP Fraud Scheme").  SAC ¶¶ 7–8, 173, 177–84.

5.      Bayer's alleged purpose for engaging in the AWP Fraud Scheme was to allow providers to earn the difference between the amount reimbursed and the amount paid for the drugs (which Montana terms the "spread"), which allegedly motivated providers to favor Bayer's products over those of its competitors.  SAC ¶¶ 7–8, 173, 177–84.

6.      The only Bayer products with respect to which Montana alleges Bayer engaged in the AWP Fraud Scheme are:  Cipro, DTIC-Dome, Gamimune N, Koate-HP,

Kogenate, and Mithracin.  SAC ¶¶ 313–31; Appendix A to SAC.

7.     According to Montana's Complaint, Bayer allegedly engaged in a separate scheme to exclude certain discounts and other inducements offered to some purchasers from the calculation of the "Best Price" Bayer offered to relevant purchasers.  Montana contends this scheme deprived the State of rebates Bayer owed the State under the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, which was designed to allow the State to participate in Bayer's commercial "Best Price" for pharmaceuticals (the "Best Price Scheme").  SAC ¶¶ 612–16.

8.     The only Bayer products with respect to which Montana alleges Bayer engaged in the Best Price Scheme are Cipro and Adalat CC.   SAC ¶¶ 621– 27.

### B.     MONTANA SETTLED ITS AWP CLAIMS AGAINST BAYER

9.     In 2001, Bayer entered into settlement agreements with the federal government and 45 participating states, including the State of Montana, to resolve allegations of AWP fraud.  Affidavit of Jeffrey M. Greenman ("Greenman Aff.") ¶ 3–4 (BAYAPP Tab A)[2].

10.    Bayer was the first drug manufacturer to resolve and settle claims of AWP fraud with the federal and state governments.  BAYAWPC00178144-00178147 (BAYAPP Tab A-6) (Letter from Nat'l Ass'n of Medicaid Fraud Control Units copying State

---

[2] Unless otherwise designated, all documents and declarations cited in support of the undisputed fact appear in Bayer Corporation's Appendix In Support Of Motion For Summary Judgment.

Medicaid Fraud Control Unit Directors (Jan. 29, 2001)) ("The joint State and federal investigation of drug price misrepresentation by pharmaceutical manufacturers has resulted in the first concluded settlement with a manufacturer, Bayer, Inc."); Greenman Aff. ¶ 10 (BAYAPP Tab A).

11.     Specifically, on February 21, 2001, Montana executed a settlement agreement with Bayer (the "2001 Settlement Agreement") concerning the "marketing and sale of Koate-HP Antihemophilic Factor (Human), Kogenate Antihemophilic Factor (Recombinant), Konyne-80 Factor IX Complex (Human), Gamimune N, 5% Immune Globulin Intravenous (Human, 5%), Gamimune N, 10% Immune Globulin Intravenous (Human, 10%), and Thrombate III Antithrombin III (Human)," which were collectively referred to as the "Qui Tam Drugs."  2001 Settlement Agreement, Pt. II(C) (BAYAPP Tab A-1).

12.     The 2001 Settlement Agreement concerned Montana's allegation that Bayer engaged in a scheme — included in the so-called "Covered Conduct" — "whereby it set the Average Wholesale Prices ('AWPs') of the Qui Tam Drugs at levels far higher than what the vast majority of its customers actually paid for these products when purchasing either directly from [Bayer] or through a wholesaler."  2001 Settlement Agreement, Pt. II(C)(i) (BAYAPP Tab A-1).

13.     Montana also alleged that, because Montana Medicaid uses AWP "as a benchmark in determining reimbursement rates," Bayer's alleged conduct resulted in Bayer's customers receiving "reimbursement from [Montana's] Medicaid program[] at

levels far higher than their actual costs."  2001 Settlement Agreement, Pt. II(C)(i)
(BAYAPP Tab A-1).

14.     Montana contended that it had valid civil and administrative claims
against Bayer arising from the Covered Conduct.  2001 Settlement Agreement, Pt. II(C),
(D) (BAYAPP Tab A-1).

15.     For its part, Bayer denied that it had engaged in the Covered Conduct,
and that it had "any liability related to these allegations."  2001 Settlement Agreement,
Pt. II(E) (BAYAPP Tab A-1).

16.     Under its terms, the 2001 Settlement Agreement "does not constitute an
admission by [Bayer] or evidence of any liability or wrongful conduct."  2001 Settlement
Agreement, Pt. II(G) (BAYAPP Tab A-1).

17.     The 2001 Settlement Agreement was preceded by a lengthy government
investigation that focused on alleged misreporting of AWPs by pharmaceutical
manufacturers, including Bayer.  Bayer fully cooperated in this investigation.
Greenman Aff. ¶ 3 (BAYAPP Tab A).

18.     Following that investigation, the investigating authorities did not allege
AWP fraud as to any Bayer products other than the "Qui Tam Drugs."  2001 Settlement
Agreement, Pt. II; Greenman Aff. ¶ 3 (BAYAPP Tab A).

19.     Under the 2001 Settlement Agreement, Bayer paid a total of $14 million to federal and state agencies.  2001 Settlement Agreement, Pt. III(1)(a) (BAYAPP Tab A-1); Greenman Aff. ¶ 3 (BAYAPP Tab A).

20.     Under the terms of the 2001 Settlement Agreement, Bayer agreed to pay Montana its share of the total settlement amount, which was $6,599.26.  2001 Settlement Agreement, Pt. III(1)(a) (BAYAPP Tab A-1).

21.     Under the terms of the 2001 Settlement Agreement, Bayer also agreed to "report certain drug and biological product pricing information to [Montana's] Medicaid program . . . that accurately reflects the prices at which actual purchasers buy the drug and biological products sold by [Bayer]."    2001 Settlement Agreement, Pt. III(8) (BAYAPP Tab A-1).

22.     In particular, under the 2001 Settlement Agreement, Bayer agreed to provide Montana each calendar quarter for five years after the effective date of the agreement "the average sale price of each of its drugs and biological products," and for each "dosage form, strength and volume of the drug or biological product," that "are or shall be reimbursed by [Montana's] Medicaid Program."  2001 Settlement Agreement, Pt. III(8)(a)–(b), (f) (BAYAPP Tab A-1).

23.     The 2001 Settlement Agreement defines "average sale price" ("ASP") as the "average of all final sale prices charged by [Bayer] for the drug or biological product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of 'Best Price' for Medicaid Rebate Program purposes . . . and direct sales to hospitals."  2001 Settlement Agreement, Pt. III(8)(b) (BAYAPP Tab A-1).

24.     The ASPs Bayer has reported to Montana under the 2001 Settlement Agreement are required to be a weighted average of all sales to relevant customers "net of all the following:  volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates and all other price concessions provided by [Bayer] to any relevant purchaser . . . that result in a reduction of the ultimate cost to the purchaser."  2001 Settlement Agreement, Pt. III(8)(b) (BAYAPP Tab A-1).

25.     In addition to reporting ASP information to Montana Medicaid, Bayer was required under the 2001 Settlement Agreement to report ASP information to First DataBank and, upon written notification and "[i]f appropriate to reflect changes in the sources from which [Montana's] Medicaid program receives its pricing information," to "a drug pricing reporting source other than, and in addition to, First DataBank."  2001 Settlement Agreement, Pt. III(8)(a) (BAYAPP Tab A-1).

26.     Under the 2001 Settlement Agreement, with each report of ASP information to Montana Bayer also is required to provide a "detailed description of the methodology used to calculate the average sale price," and a certification by a "high managerial agent" of Bayer that "the average sale prices reported therein are the prices that have been reported to First DataBank, or any successor reporting agency, and that they have been calculated in accordance with the described methodology."  2001 Settlement Agreement, Pt. III(8)(d) (BAYAPP Tab A-1).

27.     Bayer was required with each certification of its ASP reports to "include an acknowledgment that the average sale prices reported will be filed with and used in the administration of [Montana's] Medicaid program."  2001 Settlement Agreement, Pt. III(8)(d) (BAYAPP Tab A-1).

28.     The 2001 Settlement Agreement expressly authorizes Montana to rely on Bayer's reported ASP information "in establishing reimbursement rates for drugs and biological products."  2001 Settlement Agreement, Pt. III(8) (BAYAPP Tab A-1).

29.     Under the terms of the 2001 Settlement Agreement, Montana agreed to "release [Bayer] from any civil or administrative monetary claim, action, suit or proceeding [Montana] has or may have under any source of law for the Covered Conduct."   2001 Settlement Agreement, Pt. III(2) (BAYAPP Tab A-1).

30.     Montana further agreed under the 2001 Settlement Agreement that Bayer's payment of the settlement amount "fully discharge[d] [Bayer] from any obligation to pay restitution, damages, and or any fine or penalty to [Montana] for the Covered Conduct."  2001 Settlement Agreement, Pt. III(2) (BAYAPP Tab A-1).

31.     In the 2001 Settlement Agreement, Montana acknowledged Bayer's "cooperation in [Montana's] investigation of drug pricing practices" and "agree[d] to communicate the nature and extent of this cooperation to other parties" upon Bayer's request.  2001 Settlement Agreement, Pt. III(12) (BAYAPP Tab A-1).

32.     As part of the 2001 Settlement, Bayer also entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG") that put in place a first-of-its-kind compliance program at Bayer.  Greenman Aff. ¶ 5 (BAYAPP Tab A).

33.     Under the CIA, Bayer created the position of Compliance Officer, as well as an executive-level Compliance Committee.  The Compliance Officer and Committee have developed and periodically review Bayer's Code of Conduct and written Policies and Procedures to ensure compliance with the terms of the CIA and the requirements of federal health care programs.  Bayer also instituted a rigorous training program concerning these policies and practices for all of its employees involved in contracting, marketing, selling or reporting the price of products reimbursed by federal health care programs.  CIA Pt. III(A)–(D) (BAYAPP Tab A-3).

34.     To ensure the accuracy of Bayer's ASP reports, the CIA also calls for Bayer to engage an independent auditing firm (referred to as an "Independent Review Organization" or "IRO") to scrutinize Bayer's documents and pricing data and to ask questions, as necessary, of Bayer's employees.  CIA Pt. III(E) & Attachment B (BAYAPP Tab A-3).

35.     In each of its annual audits, the IRO analyzes a statistically valid sample of Bayer's transactions to determine whether Bayer accurately reflected the prices of the transactions and properly included or excluded the transaction from its calculation of ASP.  CIA Attachment B (BAYAPP Tab A-3).

36.     After each annual assessment, the IRO drafted a report of its findings and recommendations, which Bayer submitted to OIG along with Bayer's response and a summary of the corrective action Bayer took.   CIA Attachment B, at 6–7 (BAYAPP Tab A-3).

37.     Bayer has fully complied with its obligations under the 2001 Settlement Agreement.  Greenman Aff. ¶ 8 (BAYAPP Tab A).

38.     Bayer has paid Montana the settlement amount of $6,599.26.  Greenman Aff. ¶ 8 (BAYAPP Tab A).

39.     As required by the 2001 Settlement Agreement and Corporate Integrity Agreement, Bayer reported its ASP information to Montana for every quarter since the second quarter of 2001 for a period of five years.  Greenman Aff. ¶ 8 (BAYAPP Tab A);

copies of ASP reports for 2Q 2001, 1Q 2002, and 1Q 2003 (BAPP Tab A-4); copies of

cover letters, certifications, and receipt confirmations for ASP reports for 1Q 2004, 1Q

2005, and 3Q 2006 (BAYAPP Tab A-5).

40.     Bayer also reported its ASP information to First DataBank in hard copy

and electronic form every quarter since the second quarter of 2001 for a period of five

years.  Greenman Aff. ¶ 8 (BAYAPP Tab A).

41.     Bayer has reported its ASP information for all Bayer products, not just for

the "Qui Tam drugs."  Greenman Aff. ¶ 8 (BAYAPP Tab A).

42.     The ASP information Bayer has reported has been accurate and has

accounted for all "rebates and all other price concessions provided by [Bayer] to any

relevant purchaser . . . that result[ed] in a reduction of the ultimate cost to the

purchaser."  2001 Settlement Agreement, Pt. III(8)(b) (BAYAPP Tab A-1); Greenman Aff.

¶ 9 (BAYAPP Tab A).

43.     Neither the OIG nor any State has advised Bayer of any problem or

concern with its ASP reporting.  Greenman Aff. ¶ 9 (BAYAPP Tab A).

44.     Although Bayer must keep and make available to state officials all of its

workpapers and supporting documentation relating to its ASP reports, no state has ever

requested to review them.  Greenman Aff. ¶ 9 (BAYAPP Tab A).

45.     Bayer's 2001 Settlement Agreement was recognized as a groundbreaking

development.  In a letter concerning the settlement to state Medicaid officials, the National Association of Medicaid Fraud Control Units ("NAMFCU") Drug Pricing Task Force – consisting of representatives from seven State Medicaid Fraud Control Units – praised Bayer's cooperation and commitment to truthful drug price reporting. Greenman Aff. ¶ 10 (BAYAPP Tab A); BAYAWPC00178144-00178147 (BAYAPP Tab A-6).

46.     The NAMFCU letter further explained that Bayer's ASP reporting gave the State "unprecedented access to true market prices [that would] provide [the State] an extraordinary opportunity to compare providers' real acquisition costs with Medicaid reimbursement prices and . . . provide [the State] the basis for determining where and how Medicaid prices should be adjusted."  According to NAMFCU, this data "has enormous potential value."  BAYAWPC00178144-00178147 (BAYAPP Tab A-6); Greenman Aff. ¶ 11 (BAYAPP Tab A).

### C.     MONTANA SETTLED ITS BEST PRICE CLAIMS AGAINST BAYER

47.     In addition to the AWP Fraud Scheme, the 2001 Settlement Agreement included in the definition of "Covered Conduct" Montana's allegations that Bayer "knowingly and intentionally misreported and underpaid its Medicaid Rebates for the Qui Tam drugs, *i.e.*, the amounts that it owed to the Medicaid program under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8."  2001 Settlement Agreement, Pt. II(C)(iv) (BAYAPP Tab A-1).

48.     Specifically, Montana alleged that Bayer misreported and underpaid its Medicaid rebates "by calculating its Best Prices for the Qui Tam Drugs without factoring in the value of discounts, rebates, short-dated goods discounts, unrestricted educational grants, free goods, chargebacks, and other price reductions which were not disclosed to the states or the federal government or the Medicaid programs."  2001 Settlement Agreement, Pt. II(C)(iv) (BAYAPP Tab A-1).

49.     Under the 2001 Settlement Agreement, Montana "release[d] [Bayer] from any civil or administrative monetary claim, action, suit or proceeding the [State] has or may have under any source of law for the Covered Conduct," which included Montana's Best Price claims.   2001 Settlement Agreement, Pt. III(2) (BAYAPP Tab A-1).

50.     In 2003, Montana and Bayer entered into another settlement agreement related to Bayer's reporting of Best Price under the Medicaid Rebate Program (the "2003 Settlement Agreement").  2003 Settlement Agreement (BAYAPP Tab A-2); Greenman Aff. ¶ 12–15 (BAYAPP Tab A).

51.     The 2003 Settlement Agreement defines its "Covered Conduct" to include Montana's allegations that Bayer "misreported its Best Price . . . and underpaid its Medicaid rebates" by failing accurately to reflect discounted sales of Cipro and Adalat CC to Kaiser Permanente Medical Care Program ("Kaiser") and PacifiCare Health Systems ("PacifiCare").   2003 Settlement Agreement, Pt. II(F) (BAYAPP Tab A-2); Greenman Aff. ¶ 12 (BAYAPP Tab A).

52.     Under the 2003 Settlement Agreement, Montana agreed to "release and forever discharge Bayer . . . from any civil or administrative claims for damages or penalties that the State of Montana has or may have relating to the Covered Conduct," including "any obligation to pay Medicaid-related restitution, damages, and/or any fine or penalty for the Covered Conduct."   2003 Settlement Agreement, Pts. III(2) (BAYAPP Tab A-2); Greenman Aff. ¶ 13 (BAYAPP Tab A).

53.     As part of the 2003 Settlement, Bayer entered into an addendum to its Corporate Integrity Agreement ("CIA") with OIG.  The addendum expanded the scope of the IRO's independent audit to include reviews of Bayer's "systems, processes, policies and practices . . . associated with tracking, gathering, and accounting for all relevant data for purposes of appropriately calculating the Best Prices reported under the Medicaid Drug Rebate Program."  CIA Addendum, Pts. III.E(1)(a), (b)(ii), V(B) & Attachment A (BAYAPP Tab A-3); Greenman Aff. ¶ 13 (BAYAPP Tab A).

54.     After each assessment, the IRO drafted a report of its findings and recommendations, which Bayer submitted to OIG.  CIA Addendum, Pts. III.E(1)(a), (b)(ii), V(B) & Attachment A (BAYAPP Tab A-3); Greenman Aff. ¶ 13 (BAYAPP Tab A).

55.     Under the addendum to Bayer's CIA, Bayer is required to engage an IRO *any* time Bayer makes a material change in the way it calculates or reports Best Price. CIA Addendum, Pt. III.E(1)(b)(iii) & Attachment A (BAYAPP Tab A–3); Greenman Aff. ¶ 13 (BAYAPP Tab A).

56.     In addition to requiring an IRO to conduct a review of Bayer's best price processes and systems, the addendum to the CIA also requires an IRO annually to scrutinize Bayer's policies and procedures related to non-rebate payments to managed care companies — for example, honoraria, educational grants,  continuing medical education grants, and charitable contributions.  CIA Addendum Pt. III.E(1)(b)(ii)–(iii) & Attachment A (BAYAPP Tab A-3)

57.     In each review, the IRO must verify that Bayer accurately accounts for these payments, and it provides a report detailing any discrepancies, which Bayer must submit to OIG each year.  CIA Addendum Pt. III.E(2), V.B & Attachment A (BAYAPP Tab A–3); Greenman Aff. ¶ 14 (BAYAPP Tab A).

58.     Since Bayer implemented these extensive oversight procedures, neither OIG nor any State has raised any questions with Bayer concerning the accuracy of its Best Price reporting.  Greenman Aff. ¶ 15 (BAYAPP Tab A).

59.     Under its terms, the 2003 Settlement Agreement "does not constitute an admission by Bayer or evidence of any liability or wrongful conduct."  2003 Settlement Agreement, Pt. II(H) (BAYAPP Tab A-2).

60.     Bayer has fully complied with all its obligations under the 2003 Settlement Agreement.  Greenman Aff. ¶ 13 (BAYAPP Tab A).

61.     Montana has neither argued nor identified evidence to suggest that Bayer has not fulfilled its obligations under its 2001 and 2003 Settlement Agreements with

Montana.  Doss Decl. ¶ 2 (BAYAPP Tab E); Pl.'s Objections & Resps. to Bayer's 1st Set of

Reqs. for Admis. & 2nd Set of Interrogs., Req. No. 1 (responding to Bayer's request that

Montana admit that it "does not contend that Bayer has failed to comply with any of

Bayer's obligations under the Bayer 2001 Settlement Agreement," that the State had

"conducted a reasonable inquiry" and had "insufficient information upon which to

admit or deny this Request"); id., Req. No. 2 (same for 2003 Settlement Agreement)

(BAYAPP Tab E-1).

### D.   THE COURT'S JUNE 10, 2004 ORDER

62.     On September 15, 2003, Bayer moved to dismiss Montana's Second

Amended Complaint on the ground that Montana's claims are precluded by the 2001

Settlement Agreement and the 2003 Best Price Settlement Agreement.  Bayer also

sought dismissal on the ground that the Second Amended Complaint failed to meet

Fed. R. Civ. P. 9(b)'s requirement that fraud be pled with particularly.  Individual Mem.

of Bayer Corp. in Supp. Mot. to Dismiss 2–5 & n.3 (Sept. 15, 2003) (Doc. 523); Bayer

Corp.'s Separate Reply Mem. Supp. Mot. to Dismiss 1–3 (Nov. 7, 2003) (Doc. 604).

63.     In its response in opposition to Bayer's Motion, Montana contended that,

although the Settlement Agreements "bar some of the State's claims," they did not

preclude claims concerning: (1) reimbursement by the State for relevant drugs after the

effective date of the Settlement Agreements; (2) reimbursements by the State for

Mithracin and DTIC-Dome at any time; and (3) purchases or reimbursements by private

payers and insurers for relevant drugs at any time, which the State purported to pursue

in its capacity as *parens patriae*.  Montana's Mem. in Opp'n to Defendant-Specific Mem.

on Mot. Dismiss 33–34 (Oct. 10, 2003) (Doc. 577); Montana's Surreply in Opp'n to Defs.'

Mot. to Dismiss. 35 (Nov. 25, 2003) (Doc. 624).

64.     In its June 10, 2004 Memorandum and Order on Bayer's Motion to

Dismiss, the Court "dismisse[d] all fraud claims concerning drugs covered by the 2001

and 2003 settlements between Montana and Bayer, even those brought in a *parens*

*patriae* capacity."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp 2d 187,

208 (D. Mass. 2004) (hereafter *In re Pharm. AWP Litig.*) (Doc. 866).

65.     In its June 10, 2004 Memorandum and Order, the Court also dismissed all

Best Price fraud claims against Bayer for failure to meet the pleading requirements of

Fed. R. Civ. P. 9(b) — except the Complaint's allegations of pre-settlement conduct as to

Cipro and Adalat CC.  *In re Pharm. AWP Litig.*, 321 F. Supp. 2d at 207–08.

66.     In the same June 10, 2004 Order, however, the Court "dismiss[ed] all fraud

claims concerning drugs covered by the . . . 2003 settlement[] between Montana and

Bayer."  *In re Pharm. AWP Litig.*, 321 F. Supp. 2d at 208.

67.     In light of the 2003 Settlement Agreement, no claims concerning the

alleged Best Price Scheme in the SAC survived the Court's June 10, 2004 Order.  2003

Settlement Agreement (BAYAPP Tab A-2).

**E.     MONTANA ABANDONS ITS POST-SETTLEMENT CLAIMS**

68.     In discovery, Montana has stated that it no longer makes any claim against Bayer for any time period after Bayer began reporting ASP Information to Montana's Medicaid Program pursuant to the Bayer 2001 Settlement.  Doss Decl. ¶ 3 (BAYAPP Tab E); Pl.'s Objections & Resps. to Bayer's 1st Set of Interrogs. & Reqs. for Produc., Interrog. No. 2, at 6 (Mar. 2, 2006).  ("Montana makes no such claim.") (BAYAPP Tab E-2).

69.     Bayer began reporting ASP information to Montana's Medicaid Program for the second quarter of 2001.  Greenman Aff. ¶ 8 (BAYAPP Tab A); BAY-MT 000001–000032 (2Q 2001 Bayer ASP Report) (BAYAPP Tab A-4).

## F.     FACTS PERTINENT TO SPECIFIC BAYER DRUGS AT ISSUE

**Gamimune N, Koate-HP, and Kogenate**

70.     Gamimune N is the brand name under which Bayer marketed immune globulin derived from human plasma.  Immune globulin is used to treat patients with immune deficiencies that impair their ability to form antibodies.  Immune globulin is also used in the treatment of idiopathic thrombocytopenic purpura, bone marrow transplants, and pediatric HIV infection.  The drug is administered intravenously, and is covered by Medicare Part B.  Declaration of Terry D. Tenbrunsel ("Tenbrunsel Decl.") ¶ 4 (BAYAPP Tab B).

71.     Gamimune N is Bayer's brand name for immune globulin, which is a physician-administered multi-source drug.  As a multi-source drug, Gamimune N and

other manufacturers' forms of immune globulin are all billed using common procedure
codes, J1561, J1562, and J1563.  Tenbrunsel Decl. ¶ 5 (BAYAPP Tab B) ; Office of
Inspector General, U.S. Department of Health and Human Services, "Medicaid Rebates
for Physician-Administered Drugs," at p. 17 Table 2 (April 2004), *available at*
http://oig.hhs.gov/oei/reports/oei-03-02-00660.pdf (identifying immune globulin as a
physician-administered multi-source drug billed under common procedure codes J1562,
J1562, and J1563) (BAYAPP Tab E-3).

72.     Among the other companies who marketed immune globulin at various
times in the last 20 years were Alpha, American Red Cross, Baxter, Centeon, Grifols,
Immuno, and Sandoz.  Tenbrunsel Decl. ¶ 5 (BAYAPP Tab B).

73.     Koate-HP is the brand name under which Bayer marketed human
antihemophilic factor VIII derived from human plasma ("factor VIII human").  Factor
VIII (human) is used to treat classical hemophilia (hemophilia A) in which there is a
demonstrated deficiency of the plasma clotting factor, factor VIII.  Factor VIII (human)
is administered intravenously and provides a means of temporarily replacing missing
clotting factor in order to correct or prevent bleeding episodes, or in order to perform
emergency and elective surgery on a patient suffering from hemophilia.  Factor VIII
(human) is a covered drug under Medicare Part B.  Bayer discontinued selling Koate-
HP in July 1999.  Tenbrunsel Decl. ¶ 6 (BAYAPP Tab B).

74.     Koate-HP is Bayer's brand name for Factor VIII (human), which is a multi-
source drug.  As a multi-source drug, Koate-HP and other manufacturers' forms of

Factor VIII (human) are all billed using a common procedure code, J7190.  Tenbrunsel

Decl. ¶ 7 (BAYAPP Tab B); Office of Inspector General, U.S. Department of Health and

Human Services, "Medicaid Rebates for Physician-Administered Drugs," at p. 17 Table

2 (April 2004), *available at* http://oig.hhs.gov/oei/reports/oei-03-02-00660.pdf

(identifying factor VIII (human) as a physician-administered multi-source drug billed

under common procedure code J7190) (BAYAPP Tab E-3).

75.     Among the other companies who marketed plasma-derived factor VIII

(human) at various times in the last 20 years were Aventis Behring, Baxter, and Grifols.

Tenbrunsel Decl. ¶ 7 (BAYAPP Tab B).

76.     Kogenate was the brand name under which Bayer marketed factor VIII

produced by recombinant DNA technology ("factor VIII recombinant"), not from

human plasma.  Like plasma-derived factor VIII, factor VIII recombinant was used to

treat patients with hemophilia A who had a deficiency in factor VIII.  It was also used to

treat hemophilia A in certain patients with inhibitors to human-derived factor VIII.

Factor VIII recombinant must be administered intravenously, and is a covered drug

under Medicare Part B.  Bayer discontinued selling Kogenate in August 2001.

Tenbrunsel Decl. ¶ 8 (BAYAPP Tab B).

77.     Kogenate FS, like its predecessor, is a factor VIII recombinant product

used to treat hemophilia A.  However, Kogenate FS incorporates a modified

purification and formulation process to better eliminate viruses and other sources of

infection.  Like all factor VIII recombinant products, Kogenate FS must be administered

intravenously and is a covered drug under Medicare Part B.  Bayer continues to sell Kogenate FS.  Tenbrunsel Decl. ¶ 9 (BAYAPP Tab B).

78.     Kogenate and Kogenate FS are Bayer's brand names for factor VIII (recombinant), which is a multi-source drug.  As a multi-source drug, Kogenate and other manufacturers' forms of factor VIII recombinant are all billed using a common procedure code, J7192.  Tenbrunsel Decl. ¶ 10 (BAYAPP Tab B); Office of Inspector General, U.S. Department of Health and Human Services, "Medicaid Rebates for Physician-Administered Drugs," at p. 17 Table (April 2004), *available at* http://oig.hhs.gov/oei/reports/oei-03-02-00660.pdf (identifying factor VIII recombinant as a physician-administered multi-source drug billed under common procedure code J7192) (BAYAPP Tab E-3).

79.     Among the other companies who marketed factor VIII recombinant at various times in the last 20 years were ZLB Behring (and various predecessor companies), Baxter, and Wyeth.  Tenbrunsel Decl. ¶ 10 (BAYAPP Tab B)

**Cipro**

80.     Cipro was the brand name under which Bayer marketed drugs for oral administration containing the active ingredient Ciprofloxacin, a synthetic broad spectrum antimicrobial used to treat various infections.  Bayer sold Cipro in tablet form with 250 mg, 500 mg, and 750 mg strengths in 50- or 100-tablet bottles, or in 100 Unit Dose blister packs.  Bayer sold Cipro in a 100-mg tablet in a "Cystitis" pack of 6 tablets.

Bayer also supplied Cipro as an oral suspension in 100 mL bottles of two strengths, 5% (5g in 100 mL) and 10% (10g in 100 mL).  Declaration of Gerald Rosenberg ("Rosenberg Decl.") ¶ 3 (BAYAPP Tab C).

81.     Cipro IV was the brand name under which Bayer marketed Ciprofloxacin for intravenous administration.  Bayer made Cipro IV available in 200 mg, 400 mg, and 1200 mg strengths in 20 mL, 40 mL, and 120 mL vials, respectively.  Prior to administration, the concentrate in these vials had to be diluted with a suitable intravenous solution.  Bayer also sold Cipro IV in premixed 100 mL and 200 mL flexible bags, which did not need to be diluted before administration.  Rosenberg Decl. ¶ 4(BAYAPP Tab C).

82.     Bayer first introduced Cipro XR, an extended release tablet for oral administration containing two forms of Ciprofloxacin, in 2002.  Rosenberg Decl. ¶ 5 (BAYAPP Tab C).

**<u>Mithracin</u>**

83.     Mithracin was once used to treat carefully selected hospitalized patients with malignant tumors of the testis in whom successful treatment by surgery and/or radiation was impossible.  Rosenberg Decl.  ¶ 10 (BAYAPP Tab C).

84.     Mithracin was administered intravenously and almost exclusively in a hospital setting.  Rosenberg Decl.  ¶ 10 (BAYAPP Tab C).

85.     Montana "made no payments under [its] Medicaid program to any

Beneficiary or Provider during the Relevant Time Period [under the Second Amended Complaint] for Mithracin, including Mithracin INJ 2500MCG." Declaration of Michael Doss ("Doss Decl.") ¶ 2 (BAYAPP Tab E); Pl.'s Objections & Resps. to Bayer's 1st Set of Reqs. for Admis. & 2nd Set of Interrogs., Req. No. 6 (BAYAPP Tab E–1).

86.     Because newer therapies existed, Bayer did not market or promote Mithracin at any point during the relevant time period identified by the Second Amended Complaint.  Rosenberg Decl. ¶ 11 (BAYAPP Tab C); Tenbrunsel Dep. at 42 (BAYAPP Tab D-1).

87.     For example, Bayer did not provide its sales representative targets or incentives for Mithracin sales.  Rosenberg Decl. ¶ 11 (BAYAPP Tab C).

88.     In addition, Bayer did not have a product manager for Mithracin during the relevant period or a sales force deployed to promote Mithracin sales.  Rosenberg Decl. ¶ 11 (BAYAPP Tab C); Tenbrunsel Dep. at 42-43 (BAYAPP Tab D-1).

89.     Bayer discontinued selling Mithracin altogether in 2001.  Rosenberg Decl. ¶ 11 (BAYAPP Tab C).

**DTIC-Dome**

90.     DTIC-Dome was the brand name under which Bayer marketed the drug dacarbazine.  It was used to treat skin cancer and, in combination with other drugs, as a secondary-line therapy for patients suffering from Hodgkin's disease.  Rosenberg Decl. ¶ 7 (BAYAPP Tab C).

91.     DTIC-Dome was administered intravenously, and, in the overwhelming number of cases, in a hospital setting.  Rosenberg Decl.  ¶ 7 (BAYAPP Tab C).

92.     Because newer therapies existed, Bayer did not market or promote DTIC-Dome at any point during the relevant time period identified by the Second Amended Complaint.  Rosenberg Decl. ¶ 9 (BAYAPP Tab C); Tenbrunsel Dep. at 42 (BAYAPP Tab D-1).

93.     For example, Bayer did not provide its sales representatives targets or incentives for DTIC-Dome sales.  Rosenberg Decl. ¶ 9 (BAYAPP Tab C).

94.     In addition, Bayer did not have a product manager for DTIC-Dome during the relevant period or a sales force deployed to promote DTIC-Dome sales.  Rosenberg Decl. ¶ 9; Tenbrunsel Dep. at 42-43 (BAYAPP Tab D-1).

95.     Bayer discontinued selling DTIC-Dome altogether in 2006.  Rosenberg Decl. ¶ 9 (BAYAPP Tab C).

96.     Bayer's records reflect that the State of Montana reimbursed providers for less than $2500 worth of DTIC-Dome since 1990 and that it made no payments for DTIC-Dome after 1999.  Rosenberg Decl. ¶ 9 (BAYAPP Tab C).

97.     Dacarbazine was a multi-source drug during the relevant period.  As a multi-source drug, DTIC-Dome and other manufacturers' forms of dacarbazine are all billed using a common procedure code, J9140.  Rosenberg Decl. ¶ 8 (BAYAPP Tab C).

-24-

98.     When Bayer first began selling Cipro, Cipro IV, Cipro XR, DTIC-Dome and Mithracin, it established the drugs' "Wholesale Price" ("WP").  Bayer's WP is its equivalent of other manufacturers' so-called "Wholesale Acquisition Cost" ("WAC"). Bayer sells the vast majority of its pharmaceutical products to wholesalers who pay WP, including the vast majority of Cipro, Cipro IV, Cipro XR, DTIC-Dome, and Mithracin. Because WP is a price wholesalers actually pay for Bayer drugs, Bayer periodically adjusts its WP to reflect changing market conditions.  Rosenberg Decl. ¶ 12 (BAYAPP Tab C).

99.     Bayer reviewed and, if necessary, revised the WP for its pharmaceuticals each year.  Bayer would change its WP based on the following factors: (1) competitors' price changes, both on an individual tablet and course-of-therapy basis; (2) unique features or therapeutic advantages of Bayer's drugs; (3) any new indications for the Bayer drug; and (4) any other life-cycle events for the drug.  Rosenberg Decl. ¶ 13 (BAYAPP Tab C).

100.     In addition to WP, Bayer's pharmaceutical products have also had an "Average Wholesale Price" ("AWP").  AWP is a reference price determined formulaically based on a drug's WP.  Through 2001, and thus throughout the time period relevant in this case, all of Bayer's pharmaceutical products – including Cipro, Cipro IV, DTIC-Dome, and Mithracin – had an AWP equal to WP times 1.20.  Put another way, AWP was 20% higher than WP, and WP was 16.7% lower than AWP. Rosenberg Decl. ¶ 14 (BAYAPP Tab C).

101.    As Bayer adjusted its WPs to reflect market conditions, its AWPs adjusted accordingly so that the two prices maintained their constant formulaic relationship — AWP at 20% above WP, WP at 16.7% below AWP.  For this reason, Bayer was known in the industry as a "16.7% house."  Rosenberg Decl. ¶ 15 (BAYAPP Tab C).

### G.    BAYER'S REPORTING OF ASPs TO MONTANA

102.    Montana Medicaid received Bayer Average Sales Price ("ASP") data every quarter from the second quarter of 2001 for a period of five years.  Greenman Aff. ¶ 8 (BAYAPP Tab A); Montana 30(b)(6) Dep. at 500-01 511-14, 519-50 (BAYAPP Tab D-2).

103.    Montana Medicaid did not utilize Bayer's quarterly Average Sales Price data in determining payments to pharmaceutical providers under Montana's regulations.  Pl.'s Objections & Resps. to Bayer's 1st Set of Interrogs. and Reqs. for Production, Interrog. No. 1 (BAYAPP Tab E-2).

104.    In response to an interrogatory, Montana stated in part:  "The State of Montana receives Bayer ASP Information.  The Bayer ASP Information is not used as a benchmark in evaluating, revising or settling payments to Providers under the Montana Medicaid program."  Pl.'s Objections & Resps. to Bayer's 1st Set of Interrogs. & Reqs. for Produc., Interrog. No. 1 (BAYAPP Tab E-2).

105.     Montana Medicaid and First DataBank each received Bayer's quarterly Average Sales Price data in both hardcopy and electronic forms during the period from August 2001 through 2006.  Greenman Aff. ¶ 8 (BAYAPP Tab A); Montana 30(b)(6) Dep. at 501, 511-14, 519-20 (BAYAPP Tab D-2).

106.     After receiving Bayer's second quarter 2001 ASP report in August 2001, Montana's Program Pharmacy Officer, Shannon Marr, personally compared Bayer ASPs to the corresponding First DataBank AWPs for each product.  She handwrote each First DataBank AWP alongside each of Bayer's printed ASPs on the report.  Montana 30(b)(6) Dep. at 527-31, 555 (BAYAPP Tab D-2); Dep. Exh. 055, MT 076440–076448 (BAYAPP Tab D-2).

107.     For at least the period from the second quarter of 2001 through 2006, Montana Medicaid had knowledge of the precise difference between Bayer's reported Average Sales Prices for all its drugs and the corresponding AWPs for those same products published in First DataBank.  Montana 30(b)(6) Dep. at 527-31, 555 (BAYAPP Tab D-2).

108.     Ms. Marr's comparisons of Bayer's Average Sales Prices to the corresponding AWPs published in First DataBank were maintained in Montana Medicaid's files.  Montana 30(b)(6) Dep. at 527-31, 555 (BAYAPP Tab D-2); Dep. Exh. 055, MT 076440–076448 (Bayer revised Quarterly ASP Report for 2Q 2001 with handwritten annotations) (BAYAPP Tab D-2).

109.    Ms. Marr's AWP/ASP comparison shows that the published AWPs for all of Bayer's 56 drugs were, with only two exceptions, greater than the ASPs Bayer reported to the Montana under the 2001 Settlement Agreement.  Neither of the two exceptions, Baycol and Adalat CC, are targets of Montana's AWP fraud allegations. Dep. Exh. 055, MT 076440–076448 (BAYAPP Tab D-2).

110.    For example, Ms. Marr's AWP/ASP comparison shows the following for Bayer drugs:

| NDC | Product Name | AWP | ASP |
|---|---|---|---|
| 00026-8511-06 | Cipro Cystitis Pack | $2.97500 | $2.264977 |
| 00026-8512-51 | Ciprofloxacin HCL 250 mg Bottle/100 | $3.99120 | $3.091273 |
| 00026-8512-48 | Ciprofloxacin HCL 250 mg 100'S UD | $4.13420 | $2.985979 |
| 00026-8513-51 | Ciprofloxacin HCL 500 mg Bottle/100 | $4.67180 | $3.064391 |
| 00026-8513-48 | Ciprofloxacin HCL 500 mg 100'S UD | $4.82740 | $3.242213 |
| 00026-8514-48 | Ciprofloxacin HCL 750 mg 100'S UD | $4.82740 | $3.429394 |
| 00026-8514-50 | Ciprofloxacin HCL 750 mg Bottle/50 | $4.67220 | $3.626352 |
| 00026-8562-20 | Ciprofloxacin IV 200 mg Vials | N/A | $0.438203 |
| 00026-8564-64 | Ciprofloxacin IV 400 mg Vials | $0.72030 | $0.470136 |
| 00026-8566-65 | Cipro IV Pharmacy Bulk Pkgs | $0.64772 | $0.335826 |
| 00026-8552-36 | Ciprofloxacin IV 200 mg Bag | $0.15606 | $0.090560 |
| 00026-8554-63 | Ciprofloxacin IV 400 mg Bag | $0.15006 | $0.087004 |
| 00026-8527-36 | Cipro IV 200 mg Bags (Baxter) | $0.15606 | $0.091473 |
| 00026-8527-63 | Cipro IV 400 mg Bags (Baxter) | $0.15006 | $0.087867 |
| 00026-8551-36 | Cipro 5% Oral Suspension | $0.79820 | $0.563428 |
| 00026-8553-36 | Cipro 10% Oral Suspension | $0.93460 | $0.703776 |
| 00026-8151-20 | Dacarbazine 200 mg 20 mL Vial | $27.72660 | $0.108105 |
| 00026-8161-15 | Mithracin 2500 | $98.73600 | $0.045324 |

111.    Montana officials communicated with one another and with providers of state Medicaid management services in 2001 concerning the use of Bayer ASP information to reimburse providers for prescription drugs.  Dep. Exh. 057, MT 076251 (Email from Jeff Buska to Shannon Marr (Dec. 10, 2001)) (forwarding an email asking various state Medicaid officials, including Jeff Buska, "For those state[s] who are using the Bayer ASP, are you adding a percent to the established ASP or are you using the ASP as a definition of ingredient cost?") (BAYAPP Tab D-2).

112.    Montana Medicaid did not use Bayer's quarterly Average Sales Price data in determining an Estimated Acquisition Cost within the meaning of Montana regulations.  Montana 30(b)(6) Dep. at 558 (BAYAPP Tab D-2).

113.    Montana Medicaid did not use Bayer's quarterly ASP data in determining Average Wholesale Price within the meaning of Montana Medicaid regulations.  Montana 30(b)(6) Dep. at 568 (BAYAPP Tab. D-2).

114.    The same circumstances that existed from 2001 to the present that resulted in Montana Medicaid not using Bayer's Average Sales Price data in determining payments to pharmaceutical providers existed before the 2001 Bayer Settlement Agreement.  Montana 30(b)(6) Dep. at 566-67 (BAYAPP Tab D-2).

115.    Montana Medicaid would not have used Bayer Average Sales Price data in determining payments to pharmaceutical providers had such ASP data been provided to Montana at any point during the relevant period before 2001.  Montana 30(b)(6) Dep. at 567-68 ( "Q.   The State of Montana would have used that methodology for determining estimated acquisition cost  during those time periods [1996-1999] regardless whether Bayer provided you ASP information during that time period.   A. Yes, I guess that would be fair to say.") (BAYAPP Tab D-2).

116.    Asked whether the State would have acted any differently had Bayer provided its ASP information to the State during any pre-settlement period, Montana's 30(b)(6) witness stated: "We wouldn't have changed . . . It wouldn't have been any different. . . . We would have paid according to our state plan that we had at the time." Montana 30(b)(6) Dep. at 567:4-5, 8-9 (BAYAPP Tab D-2).

117.    The State's damages expert, Dr. Raymond Hartman, testified that ASP represents the but-for world for purposes of his overcharge analysis.  Hartman Dep. at 503 (BAYAPP Tab D-3).

118.    Dr. Hartman testified that a manufacturer that reports its ASPs to Medicaid programs would achieve pricing transparency and allow Medicaid programs to make informed decisions about how to reimburse for the manufacturer's drugs. Hartman Dep. at 508:4-11 (Q.  "So you would allow then that the reporting of ASPs would cure any concern about price transparency?"  A.  "It is certainly -- it is certainly what the OIG has asked for, and it would make -- a full understanding of those prices would make the pricing transparent to the market if it were provided to the market."); *id.* at 501:19-502:5 (ASP reporting to a state "would certainly provide the information for the Medicaid agencies to make an informed decision about the . . . alternative bases for reimbursement"); *id.* at 507:2-4 (ASP reporting to the state "would provide the information , if communicated, to make informed decisions") (BAYAPP Tab D-3).

February 8, 2007

/s/ Richard D. Raskin
Richard D. Raskin
Michael P. Doss
Ben J. Keith
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
*Attorneys for Bayer Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2007, I caused a true and correct copy of Bayer's Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.

/s/ Michael Doss

CH1 3729519v.2

-33-