# Tab A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION )<br>)<br>)<br>)<br>) | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: )<br>)<br>) | Chief Magistrate Judge Marianne B. Bowler |
| *State of Montana v. Abbott Labs., Inc., et al.*,<br>CA No. 02-CV-12084-PBS )<br>)<br>) | |

**AFFIDAVIT OF JEFFREY M. GREENMAN IN SUPPORT OF
BAYER CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

I, Jeffrey M. Greenman, being first duly sworn, state as follows:

1. I currently serve as Vice President and Compliance Officer for Bayer HealthCare LLC. I have held this position from May 1, 2004 to the present. From September 2002 until May 2004, I served as the Compliance Officer for Bayer Pharmaceuticals Corporation. From January 1997 to June 2004, I was the Vice President, Patents and Licensing. In all, I have worked for Bayer for over 14 years. I am over the age of 21 and have personal knowledge of the matters set forth in this affidavit.

2. As Compliance Officer, my duties include monitoring and overseeing Bayer's compliance with laws governing pharmaceutical pricing and price reporting. I am also responsible for overseeing Bayer's compliance with its obligations under (a) the Corporate Integrity Agreement that Bayer entered into with the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG"), and (b) the Settlement Agreements that Bayer entered into with many States.

## The 2001 Settlement Agreement

3. The Corporate Integrity Agreement and the State Settlement Agreements arose out of an industry-wide investigation in the late 1990s of alleged misreporting of "average wholesale prices" ("AWPs") by pharmaceutical manufacturers. The investigation was a joint federal-state initiative handled by OIG along with the National Association of Medicaid Fraud Control Units ("NAMFCU"), a working group of state officials charged with overseeing Medicaid program integrity. For its part, Bayer cooperated fully in this investigation. At the close of the investigation, state and federal investigators identified their specific concerns with regard to Bayer's price reporting, and Bayer, without admitting any wrongdoing, agreed to settle these claims. Under the Settlement Agreement, Bayer agreed to pay $14 million to the federal government and the 45 states participating in the agreement.

4. The State of Montana – through the Director of its Medicaid program and a representative of its Attorney General – executed the Settlement Agreement in February 2001. A copy of the 2001 Settlement Agreement between Bayer and the State of Montana is attached as Exhibit 1. Under the agreement, the State released all of its claims against Bayer and its affiliates concerning (among other things) the allegation that Bayer caused to be published inflated AWPs with respect to six of its drugs: Koate, Kogenate, Konyne-80, Gamimune, and Thrombate (which the Settlement called the "Qui Tam Drugs"). Exhibit 1, Pt. II(B).

5. As part of the 2001 Settlement, Bayer also entered into a Corporate Integrity Agreement ("CIA") with OIG that put in place a first-of-its-kind compliance program at Bayer. A copy of the CIA is attached as Exhibit 3. One aspect of that compliance program was the creation of the position I currently hold, that of Compliance Officer, as well as an executive-level Compliance Committee, which I chair. The Compliance Officer and Committee have developed

and periodically review Bayer's Code of Conduct and written Policies and Procedures to ensure compliance with the terms of the CIA and the requirements of federal health care programs. Bayer also instituted a rigorous training program concerning these policies and practices for all of its employees involved in contracting, marketing, selling or reporting the price of products reimbursed by federal health care programs. Exhibit 3, at 7–11.

6. The Corporate Integrity Agreement and the State Settlement Agreement required Bayer to comply with detailed price reporting requirements. In particular, Bayer is required to report to OIG, each participating State, and First Data Bank the "average sale price" ("ASP") of every one of its products for each calendar quarter for a period of five years. ASP is defined under the 2001 Settlement Agreement as the average of all final sale prices Bayer charged, net of all relevant discounts, including volume discounts, chargebacks, free goods, rebates, etc. Exhibit 3, Pt. III(8)(b).

7. To ensure the accuracy of Bayer's ASP reports, the Corporate Integrity Agreement also calls for Bayer to engage an independent auditing firm (referred to as an "Independent Review Organization" or "IRO") to scrutinize Bayer's documents and pricing data and to ask questions, as necessary, of Bayer's employees. Exhibit 3, Attach. B, at 1. In each of its annual audits, the IRO analyzes a statistically valid sample of Bayer's transactions to determine whether Bayer accurately reflected the prices of the transactions and properly included or excluded the transaction from its calculation of ASP. Exhibit 3, Attach. B, at 1–2. After each annual assessment, the IRO drafted a report of its findings and recommendations, which Bayer submitted to OIG along with Bayer's response and a summary of the corrective action Bayer took. Exhibit 3, Attach. B, at 6–7.

8. Bayer has fully complied with its obligations under the 2001 Settlement Agreement and the Corporate Integrity Agreement. In particular, Bayer has faithfully complied with its ASP reporting obligations. Beginning with its ASP report for the second quarter of 2001 and each quarter thereafter for five years, Bayer reported to Montana and First DataBank the ASPs of all of its products — not just the Qui Tam drugs. Examples of Bayer's ASP reports for the second quarter of 2001 and the first quarter of 2002 and 2003 are attached as Exhibit 4. Copies of the cover letters, certifications, and receipt confirmations for Bayer's first quarter 2004 and 2005, and for the third quarter of 2006, are attached as Exhibit 5. Each report included hard copy and electronic versions of the ASPs, as well as a detailed description of the methodology used by Bayer to calculate the reported ASPs. Exhibit 1, Pt. III(8)(d). For two quarters, the second quarter of 2001 and the third quarter of 2004, Bayer also submitted revised reports to correct for inadvertent technical errors or to reflect newly available information. Bayer's final report covered the third quarter of 2006.

9. To the best of my knowledge, the ASP information Bayer reported was accurate and accounted for all rebates and other price concessions provided by Bayer to any relevant purchaser. Neither the OIG nor any State has questioned the accuracy of the ASP reports submitted by Bayer. Although Bayer must keep and make available to state officials all of its work papers and supporting documentation relating to its ASPs of its products, no state has ever requested to review them.

10. Bayer's AWP Settlement Agreement was widely recognized as a groundbreaking development. In a letter concerning the settlement to state Medicaid officials, NAMFCU explained that Bayer was the first pharmaceutical manufacturer to reach a settlement with state and federal agencies concerning drug price reporting. A copy of this letter is attached as Exhibit

6. In the letter (at p. 3), NAMFCU's Drug Pricing Task Force -- consisting of representatives from seven State Medicaid Fraud Control Units -- praised Bayer's cooperation and commitment to truthful drug price reporting.

11. The NAMFCU letter further explained that Bayer's ASP reporting gave the State "unprecedented access to true market prices [that would] provide [the State] an extraordinary opportunity to compare providers' real acquisition costs with Medicaid reimbursement prices and . . . provide [the State] the basis for determining where and how Medicaid prices should be adjusted." Exhibit 6, at 2. According to NAMFCU, this data "has enormous potential value."

## 2003 Settlement Agreement

12. In 2003, Bayer entered into a second settlement agreement with Montana (the "2003 Settlement Agreement"), a copy of which is attached as Exhibit 2. This settlement concerned the State's claims that Bayer misreported its Best Price and underpaid Medicaid rebates for its drugs Cipro and Adalat CC by failing to account for discounted sales of those drugs to Kaiser Permanente Medical Care Program ("Kaiser") and PacifiCare Health Systems ("PacifiCare"). The State also alleged that Bayer sold drugs to Kaiser and PacifiCare under their respective "private labels" without listing the drugs with the FDA as required by the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*

13. In exchange for the State's release of all civil and administrative claims, Bayer complied with its obligations under the 2003 Settlement Agreement. It paid the State $190,088.67. In addition, Bayer entered into an addendum to its Corporate Integrity Agreement with OIG, a copy of which is attached as Exhibit 3. The addendum expanded the scope of the IRO's independent audit to include an annual review of Bayer's "systems, processes, policies

and practices . . . associated with tracking, gathering, and accounting for all relevant data for purposes of appropriately calculating the Best Prices reported under the Medicaid Drug Rebate Program." Exhibit 3, ¶ III.E(1)(a), (b)(ii). After each assessment, the IRO drafted a report of its findings and recommendations, which Bayer submitted to OIG. In addition to this annual review, Bayer was required to engage an IRO at any time Bayer made a material change in the way it calculates or reports Best Price. Exhibit 3, ¶ III.E(1)(b)(iii).

14.     In addition to requiring the IRO to conduct a Best Price review, the addendum to the CIA also requires the IRO to scrutinize Bayer's policies and procedures related to non-rebate payments to managed care companies — for example, for honoraria, educational grants, continuing medical education grants, and charitable contributions. Exhibit 3 ¶ III.E(1)(b)(ii)–(iii); Attachment A to Addendum to CIA ¶ B(2). After each review, the IRO reported whether Bayer accurately accounted for these payments, and Bayer also submitted these reports to OIG. Exhibit 3, Addendum to CIA ¶¶ III.E(2), V.B.

15.     Since Bayer implemented these extensive oversight procedures, neither OIG nor any State has raised any questions with Bayer concerning the accuracy of its Best Price reporting.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: February 6, 2007

_____
Jeffrey M. Greenman

Subscribed and sworn to before me this 6 day of February, 2007.

_____
Paula A. Harney

**PAULA A. HARNEY**
Notary Public - State of New York
No. 4899023
Qualified in Westchester County
My Commission Expires July 6, 2007