**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO | ) ) |
| *State of Montana v. Abbott Labs. Inc., et al.*, No. 02-CV-12084-PBS D. Mont. Cause No. CV-02-09-H-DWM | ) ) ) ) |

MDL NO. 1456

CIVIL ACTION NO. 01-CV-12257-PBS

Judge Patti B. Saris

**FUJISAWA HEALTHCARE INC.'S AND FUJISAWA USA, INC.'S INDIVIDUAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **INTRODUCTION** | | **1** |
| **BACKGROUND** | | **3** |
| **ARGUMENT** | | **6** |
| I. | **FUJISAWA IS ENTITLED TO SUMMARY JUDGMENT ON GENERIC DRUG CLAIMS, BECAUSE IT CEASED MANUFACTURING, SELLING, AND REPORTING AWPS FOR GENERIC DRUGS IN 1998, AND THE STATUTE OF LIMITATIONS BARS PRE-1998 CLAIMS.** | **6** |
| | A.  The Sale of its Generics Business Entitles Fujisawa to Summary Judgment for Claims Post-dating May 31, 1998. | 6 |
| | B.  The Statute of Limitations Entitles Fujisawa to Summary Judgment for Generic Drug Claims Predating May 1998. | 7 |
| II. | **THERE IS NO FACTUAL SUPPORT FOR THE PROPOSITION THAT MONTANA BASED REIMBURSEMENTS ON FUJISAWA'S AWPS.** | **8** |
| | A.  AWP Was Not Montana's Standard Reimbursement Benchmark for Multi-Source Drugs. | 8 |
| | B.  Reimbursement for Fujisawa's Drug Cyclocort Was Not Based on AWP. | 10 |
| | C.  The Reimbursements for Physician-Administered Multi-Source Drugs Cannot be Linked to Fujisawa as Opposed to Other Manufacturers. | 11 |
| III. | **THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA "MARKETED THE SPREAD" FOR ITS SINGLE-SOURCE DRUGS, WHICH HAD NO THERAPEUTIC EQUIVALENTS.** | **13** |
| IV. | **THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA "MARKETED THE SPREAD" FOR ITS SELF-ADMINISTERED DRUGS.** | **15** |
| **CONCLUSION** | | **17** |

# **INTRODUCTION**

During the period identified in the Second Amended Complaint ("Complaint"), Defendants Fujisawa USA, Inc. and Fujisawa Healthcare, Inc. were the successor U.S. subsidiaries of a Japanese drug company (hereinafter these parties are collectively referred to as "Fujisawa"). The companies were based in Deerfield, Illinois, and sold mainly specialty branded drugs.

Because its pricing and distribution history differs from most other drug manufacturers, Fujisawa is a poor fit in the Average Wholesale Price ("AWP") litigation. The Fujisawa companies have only been sued in a handful of AWP cases.[1] In fact, several plaintiffs have dismissed or dropped Fujisawa from their suits or investigations after inquiry revealed the nature of Fujisawa's drugs and its pharmaceutical business.[2] Nor has Fujisawa or any of its employees ever been deposed in these matters. At best, Fujisawa has been a marginal participant in the AWP litigation.

Fujisawa's role in these cases is not surprising given the nature of Fujisawa's products and their pricing. Fujisawa sold its entire generic drug line in 1998. Fujisawa has no legal liability for transactions involving the generic drugs manufactured or sold after that time. Fujisawa's biggest selling drug by far is Prograf®, an immunosuppressant prescribed to prevent

---

[1] Fujisawa is a named defendant only in the private pay Massachusetts MDL, *IOUE* and *Swanston* actions, and in the New York county, Arizona, Alabama, Montana and Nevada actions. As the Court is aware, many other cases originally brought in jurisdictions such as Pennsylvania, Kentucky, Hawaii, Idaho, Mississippi, Nevada, Alaska, Minnesota, Illinois, California, Florida, West Virginia, Wisconsin, Vermont, South Carolina, Connecticut, Missouri and Ohio. Fujisawa is not named in those suits.

[2] *See, e.g., State of California, ex rel. Ven-A-Care of the Florida Keys, Inc., a Florida Corp. v. Abbott Labs., Inc. et al.*, MDL 1456, No. 01-12257-PBS (D. Mass.); *State of Mississippi v. Abbott Labs., Inc., et al.,* Civil Action 3:06-CV-00566-HTW-LRA (Dist. Court for the Southern Dist. of Miss. Jackson Division); *State of Wisconsin v. Abbott Labs., Inc., et al.,* Case No. 04-CV 1709 (Circuit Court, Dane County).

organ rejection in transplant patients. Prograf® is a self-administered drug. It was reimbursed under a carve-out under Medicare Part B during the relevant time period. Prograf® has a very low "spread."[3] Moreover, there are no drugs therapeutically equivalent to Prograf®; no other drug manufacturer makes a drug that competes with Prograf®. Because there was no therapeutic competition for Prograf®, there was no incentive for Fujisawa to "market the spread" for the drug.

Given the facts above, it is no surprise that Montana has utterly failed to adduce evidence that would establish Fujisawa's liability under the State's remaining claims, or respond to the shortcomings evident in its theories. Montana has failed to establish the deception element of its *parens patriae* claim under the Montana Unfair Trade Practices Act ("MUTPA"). There is no evidence that Fujisawa had any incentive to report "fraudulent" AWPs for Prograf® or its self-administered drugs, or that Fujisawa, rather than other manufacturers, actually reported improper AWPs for its multi-source drugs.[4] Similarly, Montana's second MUTPA claim, on behalf of the State and its residents, also fails. Montana alleges overpayments to Medicaid providers due to inflated AWPs, but the undisputed facts (i) demonstrate that AWP was not the basis of reimbursement for many multi-source drugs, (ii) do not tie Fujisawa to AWPs for multi-source drugs, and (iii) show that Fujisawa did not seek to expand spreads for its self-administered and

---

[3] Plaintiffs define the "spread" on a drug as the difference between the price that providers (i.e., physicians or pharmacists) paid for a drug and the drug's published "Average Wholesale Price" ("AWP"). *See, e.g.* Sec. Am. Compl. ¶ 171, 178.

[4] Further, as detailed at length in Defendants' Joint Memorandum, Montana cannot satisfy the deception requirements of the MUTPA, because the State and Third-Party Payors were not "deceived" by any act or practice of the Defendants. *See* Defs' Joint Mem. at 3-25, 32. The State knew that published AWPs were not the same as actual acquisition costs, and it chose to reimburse some drugs on the basis of AWP. *See id.*

single-source drugs.[5]  The State cannot even show that Fujisawa had any commercial reason to inflate spreads.  The Court should grant summary judgment for Fujisawa and remove it from another case in which it does not belong.

## BACKGROUND

The Memorandum in Support of Defendants' Joint Motion for Summary Judgment (hereinafter "Defendants' Joint Memorandum") provides a detailed background of AWP and its role in Montana Medicaid's reimbursement for drugs.  In sum, the State knew how the pharmaceutical industry utilized AWP, and the State adopted and incorporated the industry's use of AWP in administering the State's pharmaceutical reimbursement program.  *See generally* Defs' Joint Mem.  The State cannot demonstrate that any of the Defendants are liable for the State's alleged injury to the extent the State based drug reimbursement on AWP.  Additional background highlights why Fujisawa in particular is not liable on the State of Montana's claims.

The State filed a Complaint against several pharmaceutical manufacturers in early 2003, alleging that the manufacturers fraudulently overstated the published average wholesale prices AWP of many of their prescription drugs.  On August 1, 2003, the State amended its complaint to add several defendants, including Fujisawa.  *See generally* Sec. Am. Compl.  The Complaint

---

[5] Montana also raises claims under the Medicaid Fraud Act ("MFA") and the False Claims Act ("FCA").  *See* MONT. CODE ANN. §§ 53-6-155(13), 53-6-160 (MFA); MONT. CODE ANN. § 17-8-231 (FCA).  Defendants' Joint Memorandum demonstrates that summary judgment is warranted on both of these claims.  The undisputed facts show that Montana cannot establish the elements of the MFA that require: (i) proof that Fujisawa submitted false claims, (ii) Fujisawa to be a "provider" within the meaning of the statute, and (iii) reliance by the State on alleged statements that AWPs equaled acquisition costs.  *See* Defs' Joint Mem. at 30-33.  Also, Montana cannot point to any statute, rule or regulation that prohibits the reporting of benchmark AWPs to entities like *Red Book*, nor any rule that requires the State to use AWPs as the reimbursement benchmark for certain drugs.  *See id.* at 33 (citing MONT. CODE ANN. § 53-6-155(7), which requires such a showing under the definition of "fraud").  Montana's FCA claim collapses for similar reasons.  The claim requires proof that Fujisawa submitted a false claim, but Montana cannot adduce evidence that Fujisawa either submitted false claims or caused the submission of false claims.  *See id.* at 33-36.

3

alleged fraud under the False Claims Act, the Medicaid fraud statute and the deceptive trade practices statute.  *See id.*  The Complaint also raised "Best Price" claims under these statutes.  The Court dismissed Montana's "Best Price" claims under the False Claims Act and Medicaid Fraud Act.  *See* Mem. & Order, filed 6/10/04 (Doc. No. 866).  The State's remaining causes of action are:  Counts I and II, alleging deceptive trade practices under the Montana Unfair Trade Practices Act; Count III, seeking recovery for "false statements" under the Medicaid Fraud Act; Count IV, seeking recovery under the False Claims Act for allegedly fictitious and fraudulent claims; and Count V, seeking punitive damages.  *See* Sec. Am. Compl. at 223-34.

The State lists 14 drugs for which Fujisawa allegedly manipulated AWP to deceive and defraud the State and its constituents.  *See* Sec. Am. Compl. App. A.  The majority of those drugs are generic or "multi-source" drugs.  *See* Aff. of Steven Knowles, dated 2/6/07, ¶ 9 ("Knowles Aff.") (Ex. A)[6].  The drugs have multiple manufacturers or packagers.  *See id.*  Under Montana's Medicaid reimbursement schema, the State does not link any particular manufacturer to a reimbursement claim for physician-administered multi-source drugs.  Further, AWP was not Montana's reimbursement benchmark for many multi-source drugs.  *See* MONT. ADMIN. R. 37.86.1101 (2006); MT ADC 37.86.1101, 1105 (2005); Sec. Am. Compl. ¶ 162.

In addition, a number of Fujisawa's multi-source drugs were a part of its generic drug business that was sold on May 31, 1998.  *See* Knowles Aff. ¶¶ 6-7, 9.  Fujisawa had no role in setting AWP for the drugs, selling the drugs, or marketing them in any way after May 1998.  *See id.* ¶ 8.  Fujisawa has no legal responsibility or authority for transactions involving the drugs after that date.  *See id.*

---

[6] Exhibit numbers herein correspond with the exhibits attached to the Declaration of Lasagne A. Wilhite in Support of Fujisawa USA, Inc. and Fujisawa Healthcare, Inc.'s Individual Memorandum in Support of Defendants' Motion for Summary Judgment.

Further, three of the drugs the State identifies for Fujisawa are self-administered drugs. *See id.* ¶ 11; Sec. Am. Compl. App. A.  There could be no incentive for Fujisawa to create an inflated spread or to market such a spread for self-administered drugs, because the beneficiaries of any such spreads were pharmacists, and they did not make the prescription decisions.  *See* Decl. of Gregory K. Bell, Ph.D. Submitted in Support of Defendants' Motions for Summary Judgment ¶ 7, 10 & n. 8, 9 (Feb. 8, 2007) ("Bell Decl.").

Eleven of the identified Fujisawa drugs are physician-administered drugs.  However, as noted above, Montana's reimbursement schema did not link particular multi-source physician-administered drugs to particular manufacturers.  *See* Decl. of Eric M. Gaier, Ph.D. in Support of Defendants' Joint Motions for Summary Judgment in Montana and Nevada ¶ 46-47 (Feb. 8, 2007) ("Gaier Decl.").

For a small number of the subject drugs in this case, Fujisawa is the only manufacturer of the pharmaceutical product.  In addition, the drugs did not have competition from comparable drugs.  Doctors prescribed, and pharmacists dispensed, the drugs because there were no therapeutic equivalents.  *See* Bell Decl. ¶¶ 10-11 & n. 8; Knowles Aff. ¶ 12.  For those drugs (*e.g.,* Prograf), there was no incentive for Fujisawa to "create" a large "spread" to motivate providers to prescribe or dispense the drug, contrary to Plaintiff's assertions.  *See* Bell Decl. ¶¶ 10-11 & n. 9.

In short, the State has not made a case against Fujisawa because of the nature of Fujisawa's drugs named in this litigation, the State's reimbursement schemas as to the categories of drugs, and the operation and influences of the pharmaceutical industry as to those drugs.  The undisputed facts demonstrate that the State cannot possibly show Fujisawa's participation or liability in the alleged "AWP Inflation Scheme."  The Court should enter summary judgment for Fujisawa.

# ARGUMENT

I. **FUJISAWA IS ENTITLED TO SUMMARY JUDGMENT ON GENERIC DRUG CLAIMS, BECAUSE IT CEASED MANUFACTURING, SELLING, AND REPORTING AWPs FOR GENERIC DRUGS IN 1998, AND THE STATUTE OF LIMITATIONS BARS PRE-1998 CLAIMS.**

   A.   **The Sale of its Generics Business Entitles Fujisawa to Summary Judgment for Claims Post-dating May 31, 1998.**

Fujisawa is entitled to judgment as a matter of law on all allegations relating to the sale and reporting of AWPs for generic drugs after May 31, 1998.

Prior to May 1998, Fujisawa USA, Inc. ("FUSA") manufactured and sold generic drugs. *See* Knowles Aff. ¶ 6. Specifically, FUSA manufactured and sold under their respective generic names the following drugs: acyclovir sodium, dexamethasone sodium phosphate, doxorubicin hydrochloride, flourouracil, gentamicin sulfate, vancomycin hydrochloride and vinblastine sulfate. *See id.* ¶ 7.

On May 31, 1998, FUSA sold its interest in generic drugs to American Pharmaceutical Products ("APP"). *See* Knowles Aff. ¶¶ 6-7. As of this date, APP assumed all legal responsibility for manufacturing, selling and setting/reporting prices for these generics, and Fujisawa's rights and responsibilities as to these generic drugs terminated. *See id.* Thus, after May 31, 1998, any prices or AWPs for the listed generic drugs were reported by another entity, entirely distinct and separate from Fujisawa, and Fujisawa did not retain any authority in setting or reporting prices or AWPs for these drugs. Fujisawa did not retain any legal responsibility for transactions involving these drugs. *See id.* ¶ 8.

Each of the causes of action in the Second Amended Complaint is premised upon Fujisawa's alleged "deliberate scheme to inflate AWPs," alleged misrepresentation or concealment of its prices, and alleged intentional manipulation of Fujisawa drug AWPs and their "spreads." *See, e.g.,* Sec. Am. Compl. ¶¶ 654-660, 661-67, 668-79, 680-691. It is undisputed

6

that Fujisawa terminated all sales, marketing, and price setting/reporting of the relevant generic drugs as of May 31, 1998.  *See* Knowles Aff. ¶¶ 6-7.  As a result, after 1998, Fujisawa did not engage in the alleged activity forming the basis for each of the causes of action in the Complaint, and there is no genuine issue of material fact remaining for trial.

Thus, summary judgment must be granted in favor of Fujisawa for alleged injury after May 31, 1998 relating to the claim that Fujisawa manufactured, marketed, sold or reported prices for acyclovir sodium, dexamethasone sodium phosphate, doxorubicin hydrochloride, flourouracil, gentamicin sulfate, vancomycin hydrochloride and vinblastine sulfate.

### B. The Statute of Limitations Entitles Fujisawa to Summary Judgment for Generic Drug Claims Predating May 1998.

Under the statute of limitations, Fujisawa is also entitled to summary judgment on claims that pre-date May 1998 relating to the drugs identified above.  A two-year limitations period applies to the State's claims.  *See* MONT. CODE ANN. § 27-2-211(1)(c).  As set forth more fully in the Defendants' Joint Memorandum, the two-year limitations period began to run in 1995 and was not tolled.  *See* Defs' Joint Mem. at 40-41.  The State did not amend its Complaint to name Fujisawa until August 2003.  *See generally* Sec. Am. Compl.  Thus, any generic drug claims prior to August 2001 are barred by the statute of limitations.[7]  *See id.*  Fujisawa has no liability for generic drug claims after August 2001 due to the sale of its generics business in 1998.  *See* Knowles Aff. ¶ 6. Accordingly, Fujisawa is entitled to summary judgment on all claims relating to the Fujisawa generic drugs listed in the State's Appendix.

---

[7] Further, as detailed in the Defendants' Joint Memorandum, all claims on every drug by every manufacturer, including Fujisawa, are barred by the statute of limitations.  *See* Defs' Joint Mem. at 40-41.

7

## II. THERE IS NO FACTUAL SUPPORT FOR THE PROPOSITION THAT MONTANA BASED REIMBURSEMENTS ON FUJISAWA'S AWPs.

Essential elements of the State's two claims under the Montana Unfair Trade Practices Act are that Fujisawa deceived the State in its reporting of AWPs, and that the State was injured by Fujisawa's alleged deception. *See* MONT. CODE ANN. §§ 30-14-101, -103; Sec. Am. Compl. ¶¶ 654-667. To avoid summary judgment, the State must present facts demonstrating that the State made overpayments to providers due AWPs reported by Fujisawa. *See* MONT. CODE ANN. § 30-14-101, -103. The State has failed to adduce such facts.

The majority of the Fujisawa drugs named in this action are multi-source drugs. *See* Knowles Aff. ¶ 9. It is undisputed that, under Montana's reimbursement methodology for multi-source drugs, there is no basis for the State to claim that it reimbursed those drugs based on Fujisawa's AWPs, rather AWPs submitted by other manufacturers. Further, Montana reimbursed many multi-source drugs on a benchmark other than AWP. Therefore, there is no support for the State's allegation that it made payments – or "overpayments" – based on Fujisawa's AWPs, or that it suffered injury due to Fujisawa's AWPs.

### A. AWP Was Not Montana's Standard Reimbursement Benchmark for Multi-Source Drugs.

Thirteen of the fourteen Fujisawa drugs listed in Appendix A to the State's Second Amended Complaint have been manufactured, sold or distributed by multiple manufacturers or packagers: (1) acyclovir sodium; (2) Aristocort® (triamcinilone, triamcinilone diacetate or triamcinilone acetonide); (3) Aristospan® (triamcinilone hexacetonide); (4) Cefizox® (ceftizomine sodium or ceftizoxime in d5w); (5) Cyclocort® (amcinonide); (6) dexamethasone sodium phosphate; (7) doxorubicin hydrochloride; (8) flourouracil; (9) gentamicin sulfate; (10) NebuPent® (pentamidine isethionate); (11) Pentam 300® (pentamidine isethionate); (12) vancomycin hydrochloride; and (13) vinblastine sulfate. *See* Expert Rep. of Steven Young

8

in Support of Track 2 Defs' Opp'n to Class Certification, Ex. 3-c at 1, 3 & n.3, Ex. 3-d at 1 & n.3, Ex. 4-B at 1-4, and Ex. 6 (June 15, 2006) ("Young Rep.") (Ex. B) (presenting analyses identifying drugs as "multi-source" and/or reflecting data presenting drugs for multiple manufacturers); 2002 Redbook (listing multiple manufacturers and/or packagers for Fujisawa drugs) (Ex. C); 1995 Redbook (Ex. D) (same); 1991 Redbook (Ex. E) (same); Sec. Am. Compl. App. A (naming generics under various manufacturers). These drugs include not only unbranded drugs that are distributed by multiple manufacturers, but also Fujisawa brand-name drugs that are either (i) repackaged and/or (ii) sold under generic or other brand names by other manufacturers.[8] *See id.* Accordingly, these drugs are designated as "multi-source" or "generic" drugs. *See, e.g.,* Sec. Am. Compl. ¶¶ 126-28 (describing drugs as "multi-source" and "generic" that are manufactured and/or sold by multiple companies).

In its claims of deceptive trade practices and fraud, Montana bears the burden of showing that it reimbursed for Fujisawa drugs on the basis of AWPs submitted by Fujisawa. *See In re Spiegel*, 260 F.3d 27, 31 (1st Cir. 2001) (indicating that a non-moving party has the burden of proof on essential elements of its claim); *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459 (9th Cir. 1985), *cert. den'd*, 475 U.S. 1048 (1986) (same). Montana based many reimbursements for multi-source drugs on the drug's Federal Upper Limit ("FUL"), rather than AWP. *See* Defs' Joint Mem. at 36-37. Because the State has not and cannot demonstrate that it reimbursed Fujisawa's multi-source drugs based on AWP rather than FUL, Fujisawa is entitled to summary judgment on claims alleging misconduct as to Fujisawa's multi-source drugs.

---

[8] Drugs that are repackaged by non-manufacturer distributors often bear different AWPs than the manufacturer's AWP for the same strength and quantity of the drug. *See, e.g.,* 2002 Red Book, *Aristospan*, at 214 (Ex. _); 2002 Red Book, *Cyclocort*, at 289 (Ex. _).

9

### B.     Reimbursement for Fujisawa's Drug Cyclocort Was Not Based on AWP.

Fujisawa is also entitled to summary judgment on its Cyclocort® drug (generic name amcinonide), because the State's reimbursement for the drug was not based on AWP.

As late as January 2003, Montana reimbursed providers according to a fee schedule.  *See* MT Medicaid Fee Schedule (2003) (Ex. G).  The Montana Fee Schedule demonstrates that reimbursement for Cyclocort® was not based on AWP.  The Montana Fee Schedule lists the method by which each drug's fee is determined, as well as the first date of service for which the listed fee is applicable.  *See id.*  Starting in 1988, Montana reimbursed providers for Cyclocort® based on a formula of 51% of a provider's billed charges.  *See id.*

The Montana Fee Schedule lists drugs by J Code.  Cyclocort® shares J Code J3940 with a number of drugs and manufacturers.  *See* Fujisawa J-Code List (Ex. H); Young Ex. 4-B at 1 (demonstrating that other defendants, *e.g.,* Baxter, also manufactured drugs classified under J Code J3940).  For J3940, reimbursement has been calculated since March 1, 1988 as 51% of a provider's billed charges.  *See* MT Medicaid Fee Schedule.  There is no evidence of a link between AWP and the 51% calculation for reimbursement.  Further, the period 1988 through the Fee Schedule's date of 2003 covers the entire period relevant to this litigation.  *See generally* Sec. Am. Compl.  Thus, Plaintiff cannot demonstrate injury during the relevant period from allegedly fraudulent AWPs as to Cyclocort®, because the drug's reimbursement was not based on AWP.

10

### C. The Reimbursements for Physician-Administered Multi-Source Drugs Cannot be Linked to Fujisawa as Opposed to Other Manufacturers.

Fujisawa's 11 physician-administered drugs in this case are multi-source drugs.[9] The facts show that these drugs – and the reported AWPs for these drugs – cannot be linked to Fujisawa as opposed to other manufacturers. Therefore, summary judgment for Fujisawa is appropriate on these drugs.

As detailed in Defendants' Joint Memorandum, multi-source drugs that are administered in a physician's office cannot be linked to any specific defendant. *See* Defs' Joint Mem. at 37-38. Montana Medicaid reimbursed physician-administered drugs based on J Codes, a subset of the Healthcare Common Procedure Coding System ("HCPCS") codes. *See id.* at 37; Gaier Decl. ¶ 46. National Drug Codes ("NDCs") identify a particular manufacturer's drug at a particular strength, dosage and packaging. However, multiple NDCs are associated with a single J Code, which is a broader code to denote a drug generally, or a general class or category of products. *See* Gaier Decl.¶ 46. Montana Medicaid reimbursed all competing versions of a multi-source drug using a single J Code at a single reimbursement level. *See* Defs' Joint Mem. at 37 (citing Brunett 53:25, 87:21-80:03; Poulsen Ex. 21; Buska 319:12-19). The claim forms for multi-source drugs that were reimbursed by J Code do not indicate which of the manufacturer's drugs were received. *See id.* Consequently, for multi-source physician-administered drugs "there is no systematic way to know which manufacturer's drug was provided to the patient or whose AWP was the basis for reimbursement." Gaier Decl. ¶ 47.

---

[9] Fujisawa's physician-administered drugs include acyclovir sodium; Aristospan® (triamcinilone hexacetonide); Cefizox® (ceftizomine sodium or ceftizoxime in d5w); dexamethasone sodium phosphate; doxorubicin hydrochloride; flourouracil; gentamicin sulfate; vancomycin hydrochloride; NebuPent® (pentamidine isethionate); Pentam 300® (pentamidine isethionate); and vinblastine sulfate. *See* Knowles Aff. ¶ 10.

11

In fact, Plaintiff's damages expert, Raymond Hartman, refused to analyze liability for multi-source physician-administered drugs because of the difficulty in performing the "cross-walk" analysis (i.e., matching a particular manufacturer to a particular claim based on a J Code). *See* Declaration of Raymond S. Hartman, Calculation of Damages & Penalties for the State of Montana ¶ 23(c) (June 13, 2006) ("MT Hartman Decl.") (Ex. 6) ("I do not analyze liability for physician-administered drugs once they go generic, even if I have ASP data for a generic drug of a Defendant.").

Again, all of Fujisawa's physician-administered drugs named in this litigation are multi-source drugs. *See* Knowles Aff. ¶¶ 9-10; 2002 Redbook (excerpts). Moreover, most of Fujisawa's physician-administered drugs have been multi-source since as late as 1995. *See* 1995 Redbook (excerpts). Therefore, the State cannot link any reimbursement to Fujisawa or any other single defendant's sale of multi-source physician-administered drugs. Clearly there is no factual support for any allegation that the source providing a drug is Fujisawa, or even one of the manufacturers actually named in this case. There is no dispute as to these facts, and the State's liability arguments fail as a matter of law.

Further, multi-source physician-administered drugs present problems for Montana's theory that Fujisawa and the other defendant drug manufacturers "marketed the spread" on their drugs. *See* Defs' Joint Mem. at 37-38. Montana's reimbursement using J Codes was not tied to *any* changes in any AWP. Montana failed to systematically update its J Code fee schedule for any reason between 1991 and 2002. *See id.* (citing Brunett 74:3-76:19; Collins 29:6-18). Thus, alleged publication to "inflate" AWPs did not cause Montana any injury, because Montana did not rely on updated AWPs published for physician-administered drugs. Accordingly, summary judgment is further warranted for Fujisawa physician-administered drugs because Montana Medicaid cannot present evidence connecting allegedly fraudulent inflation of AWPs to

12

Montana's alleged injury.  *See, e.g., Osterman v. Sears, Roebuck & Co.*, 318 Mont. 342, 352 (Montana's Unfair Trade Practices Act requires that a plaintiff show damages "as a result of its reliance" on a false representation); *In re Spiegel*, 260 F.3d at 31.

### III. THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA "MARKETED THE SPREAD" FOR ITS SINGLE-SOURCE DRUGS, WHICH HAD NO THERAPEUTIC EQUIVALENTS.

The central element to establish a *prima facie* case for the State's MUTPA claims is a showing that Fujisawa deceived the State by "caus[ing] to be published AWPs that are inflated and which do not reflect an 'average of wholesale price.'"  Sec. Am. Compl. ¶¶ 656, 663; *see also* MONT. CODE ANN. §§ 30-14-101, -103.  Montana's MUTPA claims cannot survive summary judgment because Montana cannot carry its burden of proof on this essential element. *See In re Spiegel*, 260 F.3d at 31; *Foster*, 772 F.2d at 1459.  As detailed in the Defendants' Joint Memorandum, the State was not deceived by any manufacturer's AWP.  *See* Defs' Joint Mem. at 3-26.  Further, the undisputed facts show that Fujisawa had no reason to inflate AWPs for its drug, Prograf®; nor is there any evidence that it did so.

The nature of the pharmaceutical industry undercuts the legal basis for Plaintiff's claims concerning reimbursements for Fujisawa's therapeutically unique single-source drugs.  The State alleges that each manufacturer inflated AWPs for their drugs to motivate providers to prescribe that manufacturer's drugs.  According to the State, the difference between the price the provider paid the manufacturer for the drug and the AWP-based amount that the State reimbursed the provider gave providers a profit.  According to the State, the provider would choose among drugs in order to maximize his or her profit.  The State contends that Fujisawa and the other Defendants marketed the spread to increase market share.  *See* Sec. Am. Compl. ¶¶ 8-10; MT Hartman Decl. ¶ 3 ("The increased profits induced providers to move market share of the

13

relevant drugs, the *raison d'etre* of the AWP Scheme to the drug manufacturers.") (citing Compl. ¶¶ 5-10, 173-213).

Plaintiff's theory collapses when providers do not have a choice for drugs. Providers lack a substantive choice when a manufacturer is the sole source of a particular drug and the drug is the only product in its therapeutic class. Fujisawa's drug Prograf® (generic name tacrolimus) is a unique, single-source drug named in this litigation.

Prograf® is a self-administered immunosuppressant used to lower the body's natural immunity in patients who receive organ transplants. *See, e.g.,* Reference.com, *Immunosuppressive drug*, http://www.reference.com/browse/wiki/Immunosuppressive_drug. Unlike Neoral (cyclosporin), another immunosuppressant approved by the FDA a decade before Prograf®, side effects are less common for Prograf® and Prograf® is less nephrotoxic. *See id.*

Fujisawa is the sole manufacturer of Prograf®. To date, Fujisawa is the only company that has produced a self-administered drug with the benefits of Prograf®; there are no therapeutically equivalent drugs that compete with Fujisawa's drug. *See* Knowles Aff. ¶ 12.

For drugs like Prograf, and other therapeutically unique single-source drugs, there is no need to promote a "spread" to obtain additional market share. The provider must pay the price set by the manufacturer, because there is no competitor that can offer the particular drug at a lower price. *See* Bell Decl. ¶¶ 10-11 n. 8 (stating that manufacturers of single-source drugs that do not face significant therapeutic competition have no reason to offer price incentives on their products). Pharmacies generally purchase single-source self-administered drugs at prices close to wholesale acquisition cost, or list price set by manufacturers. *See id.* ¶¶ 10-11, n. 8, 9. If the pharmacy chooses not to stock a drug for which a customer has a prescription, the pharmacy is

14

likely to lose the customer's business to a pharmacy that does stock the manufacturer's drug. Thus, there was no reason for Fujisawa to inflate its AWPs for Prograf®.[10]

Further, the State has not – and cannot – present any evidence that Fujisawa increased its sales or market share by increasing the AWP for its single-source self-administered drugs. The State cannot even show that Fujisawa promoted a spread in an *attempt* to increase market share for the drugs. Thus, the undisputed facts fail to support Montana's allegations. Yet again, the State's complete failure of proof entitles Fujisawa to judgment as a matter of law on the issue of liability. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.   THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA "MARKETED THE SPREAD" FOR ITS SELF-ADMINISTERED DRUGS.

Montana's theories about Fujisawa's manipulation of its AWPs, and the mechanism and reason for that manipulation, are both illogical and completely lacking in evidentiary support. For Fujisawa's self-administered drugs, there was no incentive or benefit to market the "spread" between a drug's alleged "real cost" and its AWP. Similar to the effect of industry factors on single-source drugs, the reimbursement scheme for self-administered drugs makes it impossible for the State to establish for its MUTPA claims that Fujisawa inflated AWPs in order to deceive the State and increase market share. *See* Sec. Am. Compl. ¶¶ 656, 663; MONT. CODE ANN. §§ 30-14-101, -103.

The State alleges that Fujisawa and the other Defendants inflated their drugs' AWPs so that providers and pharmacies could earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates established by Medicare, Medicaid and

---

[10] In fact, Fujisawa's low "spread" for Prograf was within the range deemed an acceptable deviation from AWP in the pending MDL private class action by Plaintiff's liability expert in this case. *See* Decl. of Raymond S. Hartman in Support of Pls' Mot. for Class Certification at 24 (Sep. 3, 2004) (Filed Under Seal) (setting forth an upper bound "yardstick" of 33% for single-source drugs).

thousands of private health insurance plans.  *See generally* Sec. Am. Compl.  The State further alleges that Fujisawa and the other Defendants highlighted to providers that they could profit from the "spreads," so that Fujisawa and the other manufacturers could increase market share for their drugs.  *See id.*  This theory is non-sensical for several Fujisawa drugs in this case.

Three of the Fujisawa drugs listed in the Appendix to the State's Complaint are self-administered drugs:  Aristocort® (triamcinilone, triamcinilone diacetate or triamcinilone acetonide); Cyclocort® (amcinonide); and Prograf® (tacrolimus).  *See* Knowles Aff. ¶ 11.  This means that a physician prescribes the drug, and the patient obtains the drug from a pharmacy to administer the drug to him- or herself (e.g., orally, topically, through inhalation, etc.).  *See* Bell Decl. ¶ 7.

Fujisawa has no incentive to create spreads, and doctors have no incentive to seek spreads, for self-administered drugs.  Fujisawa and other drug manufacturers do not decide which drugs go to patients and do not dispense drugs to patients.  *See* Knowles Aff. ¶ 13.  Thus, under the Montana Medicaid program, Montana does not make any payments to drug manufacturers.  *See id.*  Therefore, even assuming that the State reimburses based on AWPs – which Fujisawa does not concede – Fujisawa does not obtain any profit from a difference in the average manufacturing price of a drug and the AWP of a drug.  *See id.*

The patient's doctor decides which self-administered drug to prescribe, but the doctor lacks any incentive to choose one drug over the other based on potential profits from "spread." The doctor neither pays for nor is reimbursed for the drug.  The pharmacist pays for drugs from manufacturers or wholesales, and Montana Medicaid then reimburses the pharmacist.  *See* Bell Decl. ¶ 7. Yet, the pharmacist does not decide which drug is dispensed; he or she "must dispense prescriptions for single-source SADs as they are written" (*i.e.*, where only one manufacturer

16

makes a self-administered drug, "[n]o states allow a pharmacist to substitute a therapeutic alternative").  *Id.* ¶ 10 & n. 8.

Because the persons who would allegedly profit from "spreads" are not the persons who decide which drugs will be sold, there is no merit to the State's argument that Fujisawa could increase its drug sales by promoting its "spreads" to providers.  Nor has Montana presented a shred of evidence that Fujisawa increased its market share or profit for any of its drugs as a result of the alleged "AWP Inflation Scheme."  Thus, Fujisawa is entitled to summary judgment on the issue of liability.  *See Celotex Corp.*, 477 U.S. at 323 (holding that all other facts of the nonmoving party's case are immaterial where there is a complete failure of proof concerning an essential element of the party's case).

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Memorandum in Support Of Defendants' Joint Motion for Summary Judgment, Fujisawa respectfully requests that the Court grant summary judgment in its favor on all claims in the State of Montana's Second Amended Complaint.

>
> Respectfully submitted,
>
> REED SMITH LLP
>
> By:   /s/  Andrew L. Hurst
> ─────────────────────
> Douglas K. Spaulding
> Andrew L. Hurst
> 1301 K Street NW
> Suite 1100 – East Tower
> Washington, DC 20005
> (202) 414-9200
> (202) 414-9299 (fax)
>
> *Attorneys for Defendants Fujisawa
> USA, Inc. and Fujisawa Healthcare, Inc.*

Dated:  February 8, 2007

**CERTIFICATE OF SERVICE**

    I certify that a true and correct copy of Fujisawa Healthcare, Inc.'s and Fujisawa USA, Inc.'s Individual Memorandum in Support of Defendants' Motion for Summary Judgment was delivered to all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending, on February 8, 2007, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                                                                                       /s/ Andrew L. Hurst
                                                                                                                      Andrew L. Hurst