# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO *State of Nevada v. American Home Products, et al.*, CA No. CV-12086-PBS (Nevada II) D. Nev. Cause No. CV-N-02-0202-ECR | CIVIL ACTION:  01-CV-12257-PBS  Judge Patti B. Saris |

## FUJISAWA HEALTHCARE INC.'S AND FUJISAWA USA INC.'S INDIVIDUAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT.........................................................................................................................6

I.  FUJISAWA IS ENTITLED TO SUMMARY JUDGMENT ON GENERIC DRUG
CLAIMS, BECAUSE IT CEASED MANUFACTURING, SELLING, AND
REPORTING AWPS FOR GENERIC DRUGS IN 1998, AND THE STATUTE OF
LIMITATIONS BARS PRE-1998 CLAIMS. ..................................................... 6

    A.  The Sale of its Generics Business Entitles Fujisawa to Summary Judgment for
Claims Post-dating May 31, 1998........................................................... 6

    B.  The Statute of Limitations Entitles Fujisawa to Summary Judgment for Generic
Drug Claims Predating May 1998. .........................................................7

II.  NEVADA KNEW CONCLUSIVELY THAT THERE COULD BE SIGNIFICANT
DIFFERENCES BETWEEN AWP AND MARKET PRICE. ................................... 8

III.  THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA
"MARKETED THE SPREAD" FOR ITS SINGLE-SOURCE DRUGS, WHICH
HAD NO THERAPEUTIC EQUIVALENTS. ............................................. 10

IV.  THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA
"MARKETED THE SPREAD" FOR ITS SELF-ADMINISTERED DRUGS......... 12

V.  FUJISAWA IS ENTITLED TO SUMMARY JUDGMENT ON ITS PHYSICIAN-
ADMINISTERED DRUGS IN THIS LITIGATION. ................................................ 14

CONCLUSION ...............................................................................................................15

# INTRODUCTION

During the period identified in the Second Amended Complaint ("Complaint"), Defendants Fujisawa USA, Inc. and Fujisawa Healthcare, Inc. were the successor U.S. subsidiaries of a Japanese drug company (hereinafter these parties are collectively referred to as "Fujisawa").   The companies were based in Deerfield, Illinois, and sold mainly specialty branded drugs.

Because its pricing and distribution history differs from most other drug manufacturers, Fujisawa is a poor fit in the Average Wholesale Price ("AWP") litigation.  The Fujisawa companies have only been sued in a handful of AWP cases.[1]  In fact, several plaintiffs have dismissed or dropped Fujisawa from their suits or investigations after inquiry revealed the nature of Fujisawa's drugs and its pharmaceutical business.[2]  Nor has Fujisawa or any of its employees ever been deposed in these matters.  At best, Fujisawa has been a marginal participant in the AWP litigation.

Fujisawa's role in these cases is not surprising given the nature of Fujisawa's products and their pricing.  Fujisawa sold its entire generic drug line in 1998.  Fujisawa has no legal liability for transactions involving the generic drugs manufactured or sold after that time. Fujisawa's biggest selling drug by far is Prograf®, an immunosuppressant prescribed to prevent organ rejection in transplant patients.  Prograf® is a self-administered drug.  It was reimbursed

---

[1] Fujisawa is a named defendant only in the private pay Massachusetts MDL, *IOUE* and *Swanston* actions, and in the New York county, Arizona, Alabama, Montana and Nevada actions. As the Court is aware, many other cases originally brought in jurisdictions such as Pennsylvania, Kentucky, Hawaii, Idaho, Mississippi, Nevada, Alaska, Minnesota, Illinois, California, Florida, West Virginia, Wisconsin, Vermont, South Carolina, Connecticut, Missouri and Ohio.  Fujisawa is not named in those suits.

[2] *See, e.g., State of California, ex rel. Ven-A-Care of the Florida Keys, Inc., a Florida Corp. v. Abbott Labs., Inc. et al.*, MDL 1456, No. 01-12257-PBS (D. Mass.); *State of Mississippi v. Abbott Labs., Inc., et al.,* Civil Action 3:06-CV-00566-HTW-LRA (Dist. Court for the Southern Dist. of Miss. Jackson Division); *State of Wisconsin v. Abbott Labs., Inc., et al.,* Case No. 04-CV 1709 (Circuit Court, Dane County).

under a carve-out under Medicare Part B during the relevant time period. Prograf® has a very low "spread."[3]  Moreover, there are no drugs therapeutically equivalent to Prograf®; no other drug manufacturer makes a drug that competes with Prograf®.  Because there was no therapeutic competition for Prograf®, there was no incentive for Fujisawa to "market the spread" for the drug.

Given the facts above, it is no surprise that Nevada has utterly failed to adduce evidence that would establish Fujisawa's liability under the State's remaining claims, or respond to the shortcomings evident in its theories.  Nevada has failed to establish the deception element of its *parens patriae* claim under the Nevada Deceptive Trade Practices Act ("DTPA").  The undisputed facts show that Nevada knew that AWP bore no formulaic relation to acquisition cost; therefore, Nevada was not "deceived" as to the import of AWP.  Further, there is no evidence that Fujisawa had any incentive to report "fraudulent" AWPs for Prograf® or its self-administered drugs.[4]  Further, the undisputed facts show that Nevada knew that AWP bore no formulaic relation to acquisition cost.  Nevada's second and third DTPA claims, on behalf of the State's residents, fail for the same reasons.  Nevada also pursues a claim under Nevada's Medicaid Fraud statute.  Nevada alleges overpayments to Medicaid providers due to inflated AWPs, but the undisputed facts demonstrate that there is no claims data in this case for physician administered drugs; so there is no evidence that the State made payments for physician-administered drugs, let alone *over*-paid for the drugs.  In addition, the State cannot show that

_____

[3] Plaintiffs define the "spread" on a drug as the difference between the price that providers (i.e., physicians or pharmacists) paid for a drug and the drug's published "Average Wholesale Price" ("AWP").  *See, e.g.* Am. Compl. ¶ 8.

[4] Further, as detailed at length in Defendants' Joint Memorandum, Nevada cannot satisfy the deception requirements of the DTPA, because the Nevada knew what AWP represented and utilized AWP as a benchmark based on its understanding of AWP.  *See* Defs' Joint Mem. at 3-12-31.  The State knew that published AWPs were not the same as actual acquisition costs, and it chose to reimburse some drugs on the basis of AWP.  *See id.*

Fujisawa made false statements regarding its AWPs for its self-administered and single-source drugs, or that it had any commercial reason to do so.[5]  For these reasons, the Court should grant summary judgment for Fujisawa and remove it from another case in which it does not belong.

## BACKGROUND

Defendants' Joint Memorandum of Law in Support of Their Motion for Summary Judgment (hereinafter "Defendants' Joint Memorandum") provides a detailed background of AWP and its role in Nevada Medicaid's reimbursement for drugs.  In sum, the State knew how the pharmaceutical industry utilized AWP, and the State adopted and incorporated the industry's use of AWP in administering the State's pharmaceutical reimbursement program.  *See generally* Defs' Joint Mem.  The State cannot demonstrate that any of the Defendants are liable for the State's alleged injury to the extent the State based drug reimbursement on AWP.  Additional background highlights why Fujisawa in particular is not liable on the State of Nevada's claims.

The State filed a Complaint against several pharmaceutical manufacturers in early 2003, alleging that the manufacturers fraudulently overstated the published average wholesale prices AWP of many of their prescription drugs.  On August 1, 2003, the State amended its complaint to add several defendants, including Fujisawa.  *See generally* Am. Compl.  The Complaint alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Nevada's Medicaid fraud statute and the State's deceptive trade practices statute.  *See id.* at 118-146.  The Complaint also raised "Best Price" claims under these statutes.  The Court dismissed Nevada's RICO and "Best Price" Medicaid claims.  *See* Mem. & Order, filed 6/10/04 (Doc. No.

---

[5] Defendants' Joint Memorandum explains at length additional bases for summary judgment on Nevada's Medicaid Fraud claim.  The facts do not support Nevada's claims that (i) any Defendant manufacturer knowingly made false statements or representations concerning AWP with an intent to defraud; (ii) any manufacturer used AWP to obtain goods or services under Nevada's Medicaid Plan; or (iii) manufacturers are "providers" who received payments under the statute.  *See* Defs' Joint Mem. at 31-32; Nev. Rev. Stat. §§ 422.540, 422.580.

866).  The State's remaining causes of action are:  Counts I and II, alleging deceptive trade practices on behalf of Nevada residents; Count III, seeking civil penalties and restitution on the State's behalf under the deceptive trade practices statute; Count V, seeking recovery for "false statements" under the Medicaid Fraud statute; and a claim for punitive damages in Count VI. *See* Am. Compl. at 118-146.

The State lists 14 drugs for which Fujisawa allegedly manipulated AWP to deceive and defraud the State and its constituents.  *See* Am. Compl. Appendix.  The majority of those drugs are generic or "multi-source" drugs.  *See* Aff. of Steven Knowles, dated 2/6/07, ¶ 9 ("Knowles Aff.") (Ex. A)[6].  The drugs have multiple manufacturers or packagers.  *See id.*  Under Nevada's Medicaid reimbursement schema, the State knew how AWP related to provider acquisition costs for the drugs.  *See* Defs' Joint Mem. at 18-20; Defs' Joint Rule 56.1 Statement ¶¶ 69-75.

In addition, a number of Fujisawa's multi-source drugs were a part of its generic drug business that was sold on May 31, 1998.  *See* Knowles Aff. ¶¶ 6-7, 9.  Fujisawa had no role in setting AWP for the drugs, selling the drugs, or marketing them in any way after May 1998.  *See id.* ¶ 8.  Fujisawa has no legal responsibility or authority for transactions involving the drugs after that date.  *See id.*

Further, three of the drugs the State identifies for Fujisawa are self-administered drugs. *See id.* ¶ 11; Am. Compl. App.  There could be no incentive for Fujisawa to create an inflated spread or to market such a spread for self-administered drugs, because the beneficiaries of any such spreads were pharmacists, and they did not make the prescription decisions.  *See* Decl. of

---

[6] Exhibit numbers herein correspond with the exhibits attached to the Declaration of Lasagne A. Wilhite in Support of Fujisawa USA, Inc. and Fujisawa Healthcare, Inc.'s Individual Memorandum in Support of Defendants' Motion for Summary Judgment.

Gregory K. Bell, Ph.D. Submitted in Support of Defendants' Motions for Summary Judgment ¶ 7, 10 & n. 8, 9 (Feb. 8, 2007) ("Bell Decl.").

Eleven of the identified Fujisawa drugs are physician-administered drugs. However, the State has not produced any claims data on these drugs. *See* Decl. of Raymond S. Hartman, Calculation of Damages & Penalties for the State of Nevada ¶ 16 n. 22, 23, 30 (June 13, 2006).

For a small number of the subject drugs in this case, Fujisawa is the only manufacturer of the pharmaceutical product. In addition, the drugs did not have competition from comparable drugs. Doctors prescribed, and pharmacists dispensed, the drugs because there were no therapeutic equivalents. *See* Bell Decl. ¶¶ 10-11 & n. 8; Knowles Aff. ¶ 12. For those drugs (*e.g.,* Prograf), there was no incentive for Fujisawa to "create" a large "spread" to motivate providers to prescribe or dispense the drug, contrary to Plaintiff's assertions. *See* Bell Decl. ¶¶ 10-11 & n. 9.

In short, the State has not made a case against Fujisawa because of the nature of Fujisawa's drugs named in this litigation, the State's reimbursement schemas as to the categories of drugs, and the operation and influences of the pharmaceutical industry as to those drugs. The undisputed facts demonstrate that the State cannot possibly show Fujisawa's participation or liability in the alleged "AWP Inflation Scheme." The Court should enter summary judgment for Fujisawa.

# ARGUMENT

I.   **FUJISAWA IS ENTITLED TO SUMMARY JUDGMENT ON GENERIC DRUG CLAIMS, BECAUSE IT CEASED MANUFACTURING, SELLING, AND REPORTING AWPs FOR GENERIC DRUGS IN 1998, AND THE STATUTE OF LIMITATIONS BARS PRE-1998 CLAIMS.**

   A.   **The Sale of its Generics Business Entitles Fujisawa to Summary Judgment for Claims Post-dating May 31, 1998.**

Fujisawa is entitled to judgment as a matter of law on all allegations relating to the sale and reporting of AWPs for generic drugs after May 31, 1998.

Prior to May 1998, Fujisawa USA, Inc. ("FUSA") manufactured and sold generic drugs. *See* Knowles Aff. ¶ 6. Specifically, FUSA manufactured and sold under their respective generic names the following drugs: acyclovir sodium, dexamethasone sodium phosphate, doxorubicin hydrochloride, flourouracil, gentamicin sulfate, vancomycin hydrochloride and vinblastine sulfate. *See id.* ¶ 7.

On May 31, 1998, FUSA sold its interest in generic drugs to American Pharmaceutical Products ("APP"). *See* Knowles Aff. ¶¶ 6-7. As of this date, APP assumed all legal responsibility for manufacturing, selling and setting/reporting prices for these generics, and Fujisawa's rights and responsibilities as to these generic drugs terminated. *See id.* Thus, after May 31, 1998, any prices or AWPs for the listed generic drugs were reported by another entity, entirely distinct and separate from Fujisawa, and Fujisawa did not retain any authority in setting or reporting prices or AWPs for these drugs. Fujisawa did not retain any legal responsibility for transactions involving these drugs. *See id.* ¶ 8.

Each of the causes of action in the Second Amended Complaint is premised upon Fujisawa's alleged "deliberate scheme to inflate AWPs," alleged misrepresentation or concealment of its prices, and alleged intentional manipulation of Fujisawa drug AWPs and their "spreads." *See, e.g.,* Am. Compl. ¶¶ 273-285. It is undisputed that Fujisawa terminated all sales,

marketing, and price setting/reporting of the relevant generic drugs as of May 31, 1998. *See* Knowles Aff. ¶¶ 6-7. As a result, after 1998, Fujisawa did not engage in the alleged activity forming the basis for each of the causes of action in the Complaint, and there is no genuine issue of material fact remaining for trial.

Thus, summary judgment must be granted in favor of Fujisawa for alleged injury after May 31, 1998 relating to the claim that Fujisawa manufactured, marketed, sold or reported prices for acyclovir sodium, dexamethasone sodium phosphate, doxorubicin hydrochloride, flourouracil, gentamicin sulfate, vancomycin hydrochloride and vinblastine sulfate.

### B.      The Statute of Limitations Entitles Fujisawa to Summary Judgment for Generic Drug Claims Predating May 1998.

Under the statute of limitations, Fujisawa is also entitled to summary judgment on claims that pre-date May 1998 relating to the drugs identified above. A four-year limitations period applies to the State's claims based on deceptive trade practices and Medicaid fraud. *See* Nev. Rev. Stat. §§ 11.190(2)(d), 422.590. A two-year limitations period applies to the extent the State seeks civil penalties. *See id.* § 11.190(4)(b). As set forth more fully in the Defendants' Joint Memorandum, the two year and four year limitations periods began to run in 1995 and was not tolled. *See* Defs' Joint Mem. at 38-39. The State did not amend its Complaint to name Fujisawa until August 2003. *See generally* Am. Compl. Thus, any generic drug claims prior to August 2001 are barred by the statute of limitations.[7] *See id.* Fujisawa has no liability for generic drug claims after August 2001 due to the sale of its generics business in 1998. *See* Knowles Aff. ¶ 6. Accordingly, Fujisawa is entitled to summary judgment on all claims relating to the Fujisawa generic drugs listed in the State's Appendix.

---

[7] Further, as detailed in the Defendants' Joint Memorandum, all claims on every drug by every manufacturer, including Fujisawa, are barred by the statute of limitations. *See* Defs' Joint Mem. at 38-39.

## II.   NEVADA KNEW CONCLUSIVELY THAT THERE COULD BE SIGNIFICANT DIFFERENCES BETWEEN AWP AND MARKET PRICE.

To enable Nevada to establish a prima facie case on its Medicaid fraud claims, the facts must show that Fujisawa knowingly made false statements or representations with the intent to defraud. *See* Nev. Rev. Stat. §§ 422.540, 422.580.  Similarly, the facts must show that Fujisawa made false or misleading statements as to AWP in order for Nevada to make out a case under the State's DTPA.  *See* Nev. Rev. Stat. §§ 598.0915, 598.0923, 598.0973.  Fujisawa's allegedly false representations must have caused injury to the State.  The facts do not support any of these elements.

The majority of the Fujisawa drugs named in this action are multi-source drugs.  Nevada knew that the AWPs for multi-source drugs bore no formulaic relationship to acquisition cost.  Therefore, Nevada cannot demonstrate that it relied on Fujisawa's allegedly deceptive or fraudulent AWPs to its detriment.  Accordingly, summary judgment for Fujisawa is warranted.

Thirteen of the fourteen Fujisawa drugs listed in Appendix A to the State's Second Amended Complaint have been manufactured, sold or distributed by multiple manufacturers or packagers:  (1) acyclovir sodium; (2) Aristocort® (triamcinilone, triamcinilone diacetate or triamcinilone acetonide); (3) Aristospan® (triamcinilone hexacetonide); (4) Cefizox® (ceftizomine sodium or ceftizoxime in d5w); (5) Cyclocort® (amcinonide); (6) dexamethasone sodium phosphate; (7) doxorubicin hydrochloride; (8) flourouracil; (9) gentamicin sulfate; (10) NebuPent® (pentamidine isethionate); (11) Pentam 300® (pentamidine isethionate); (12) vancomycin hydrochloride; and (13) vinblastine sulfate.  *See* Expert Rep. of Steven Young in Support of Track 2 Defs' Opp'n to Class Certification, Ex. 3-c at 1, 3 & n.3, Ex. 3-d at 1 & n.3, Ex. 4-B at 1-4, and Ex. 6 (June 15, 2006) ("Young Rep.") (Ex. B) (presenting analyses identifying drugs as "multi-source" and/or reflecting data presenting drugs for multiple manufacturers); 2002 Redbook (listing multiple manufacturers and/or packagers for Fujisawa

8

drugs) (Ex. C); 1995 Redbook (Ex. D) (same); 1991 Redbook (Ex. E) (same); Am. Compl. App. (naming generics under various manufacturers). These drugs include not only unbranded drugs that are distributed by multiple manufacturers, but also Fujisawa brand-name drugs that are either (i) repackaged and/or (ii) sold under generic or other brand names by other manufacturers.[8] *See id.* Accordingly, these drugs are designated as "multi-source" or "generic" drugs.

As detailed in the Defendants' Joint Memorandum, Nevada must demonstrate to the Centers for Medicare and Medicaid Services ("CMS") that, in the aggregate, Nevada's total reimbursements to providers for generic drugs do not exceed the Federal Upper Limit ("FUL") plus a reasonable dispensing fee. *See* Defs' Joint Mem. at 3; Defs' Joint Rule 56.1 Statement ¶ 6. Historically, FUL was set by the Health Care Financing Administration as 150% of a listed price of the least costly therapeutic equivalent that could be purchased by pharmacists at a set quantity of the drug. *See* Bell Decl. ¶ 17 (citations omitted). To satisfy CMS requirements, Nevada had to compare each generic drugs' FUL with discounts off of AWP, and reimburse at the FUL if FUL was lower than AWP – 10% (or AWP – 15% since 2002). *See* Defs' Joint Mem. at 19-20.

Nevada's comparison of a drug's FUL with discounts off of AWP conclusively showed that AWP bore no formulaic relationship to the FUL and, by implication, no formulaic relation to acquisition cost. Because Nevada knew the unpredictable differences between AWP and market prices for generic drugs, Nevada cannot demonstrate that it believed that AWP was an average of wholesale prices. *See id.* at 18-20. Nevada's inability to show that it was deceived or defrauded

---

[8] Drugs that are repackaged by non-manufacturer distributors often bear different AWPs than the manufacturer's AWP for the same strength and quantity of the drug. *See, e.g.,* 2002 Red Book, *Aristospan*, at 214 (Ex. C); 2002 Red Book, *Cyclocort*, at 289.

by Fujisawa's multi-source AWPs entitles Fujisawa to summary judgment on Nevada's claims founded on Fujisawa's conduct as to its multi-source drugs.

### III.   THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA "MARKETED THE SPREAD" FOR ITS SINGLE-SOURCE DRUGS, WHICH HAD NO THERAPEUTIC EQUIVALENTS.

As detailed above, the central element to establish a *prima facie* case for Nevada's remaining claims is a showing that Fujisawa deceived the State by reporting or submitting AWPs that are inflated and which do not reflect an "average of wholesale price." *See generally* Am. Compl.; *see also* Nev. Rev. Stat. §§ 598.0915, 598.0923.  Nevada cannot carry its burden of proof on this essential element.   As detailed in the Defendants' Joint Memorandum, the State was not deceived by any manufacturer's AWP.  *See* Defs' Joint Mem. at 3-31.  Further, the undisputed facts show that Fujisawa had no reason to inflate AWPs for its drug, Prograf®; nor is there any evidence that it did so.

The nature of the pharmaceutical industry undercuts the legal basis for Plaintiff's claims concerning reimbursements for Fujisawa's therapeutically unique single-source drugs.  The State alleges that each manufacturer inflated AWPs for their drugs to motivate providers to prescribe that manufacturer's drugs.  According to the State, the difference between the price the provider paid the manufacturer for the drug and the AWP-based amount that the State reimbursed the provider gave providers a profit.  According to the State, the provider would choose among drugs in order to maximize his or her profit.  The State contends that Fujisawa and the other Defendants marketed the spread to increase market share.  *See* Am. Compl. ¶¶ 8-10; Hartman NV Decl. ¶ 3 ("The increased profits induced providers to move market share of the relevant drugs, the *raison d'etre* of the AWP Scheme to the drug manufacturers.") (citing Compl. ¶¶ 5-10, 136-176).

Plaintiff's theory collapses when providers do not have a choice for drugs. Providers lack a substantive choice when a manufacturer is the sole source of a particular drug and the drug is the only product in its therapeutic class. Fujisawa's drug Prograf® (generic name tacrolimus) is a unique, single-source drug named in this litigation.

Prograf® is a self-administered immunosuppressant used to lower the body's natural immunity in patients who receive organ transplants. *See, e.g.,* Reference.com, *Immunosuppressive drug*, http://www.reference.com/browse/wiki/Immunosuppressive_drug. Unlike Neoral (cyclosporin), another immunosuppressant approved by the FDA a decade before Prograf®, side effects are less common for Prograf® and Prograf® is less nephrotoxic. *See id.*

Fujisawa is the sole manufacturer of Prograf®. To date, Fujisawa is the only company that has produced a self-administered drug with the benefits of Prograf®; there are no therapeutically equivalent drugs that compete with Fujisawa's drug. *See* Knowles Aff. ¶ 12.

For drugs like Prograf, and other therapeutically unique single-source drugs, there is no need to promote a "spread" to obtain additional market share. The provider must pay the price set by the manufacturer, because there is no competitor that can offer the particular drug at a lower price. *See* Bell Decl. ¶¶ 10-11 n. 8 (stating that manufacturers of single-source drugs that do not face significant therapeutic competition have no reason to offer price incentives on their products). Pharmacies generally purchase single-source self-administered drugs at prices close to wholesale acquisition cost, or list price set by manufacturers. *See id.* ¶¶ 10-11, n. 8, 9. If the pharmacy chooses not to stock a drug for which a customer has a prescription, the pharmacy is likely to lose the customer's business to a pharmacy that does stock the manufacturer's drug. Thus, there was no reason for Fujisawa to inflate its AWPs for Prograf®.[9]

---

[9] In fact, Fujisawa's low "spread" for Prograf was within the range deemed an acceptable deviation from AWP in the pending MDL private class action by Plaintiff's liability expert in this case. *See* Decl. of Raymond S. Hartman in Support of Pls' Mot. for Class Certification at 24

11

Further, the State has not – and cannot – present any evidence that Fujisawa increased its sales or market share by increasing the AWP for its single-source self-administered drugs.  The State cannot even show that Fujisawa promoted a spread in an *attempt* to increase market share for the drugs.  Thus, the undisputed facts fail to support Nevada's allegations.  Yet again, the State's complete failure of proof entitles Fujisawa to judgment as a matter of law on the issue of liability.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.   THERE IS NO SUPPORT FOR THE ALLEGATION THAT FUJISAWA "MARKETED THE SPREAD" FOR ITS SELF-ADMINISTERED DRUGS.

Nevada's theories about Fujisawa's manipulation of its AWPs, and the mechanism and reason for that manipulation, are both illogical and completely lacking in evidentiary support.  For Fujisawa's self-administered drugs, there was no incentive or benefit to market the "spread" between a drug's alleged "real cost" and its AWP.  Similar to the effect of industry factors on single-source drugs, the reimbursement scheme for self-administered drugs makes it impossible for the State to establish for its DTPA and Medicaid fraud claims that Fujisawa inflated AWPs in order to deceive the State and increase market share.  *See* Am. Compl. at 118-125, 143-46; Nev. Rev. Stat. §§ 598.0915, 598.0923, 598.0973, 422.540.

The State alleges that Fujisawa and the other Defendants inflated their drugs' AWPs so that providers and pharmacies could earn a substantial profit from the "spread" between the "real cost" and the various AWP-related reimbursement rates established by Medicare, Medicaid and thousands of private health insurance plans.  *See* Am. Compl. ¶ 141.  The State further alleges that Fujisawa and the other Defendants highlighted to providers that they could profit from the "spreads," so that Fujisawa and the other manufacturers could increase market share for their drugs.  *See id.*  This theory is non-sensical for several Fujisawa drugs in this case.

(Sep. 3, 2004) (Filed Under Seal) (setting forth an upper bound "yardstick" of 33% for single-source drugs).

Three of the Fujisawa drugs listed in the Appendix to the State's Complaint are self-administered drugs:  Aristocort® (triamcinilone, triamcinilone diacetate or triamcinilone acetonide); Cyclocort® (amcinonide); and Prograf® (tacrolimus).  *See* Knowles Aff. ¶ 11.  This means that a physician prescribes the drug, and the patient obtains the drug from a pharmacy to administer the drug to him- or herself (e.g., orally, topically, through inhalation, etc.).  *See* Bell Decl. ¶ 7.

Fujisawa has no incentive to create spreads, and doctors have no incentive to seek spreads, for self-administered drugs.  Fujisawa and other drug manufacturers do not decide which drugs go to patients and do not dispense drugs to patients.  *See* Knowles Aff. ¶ 13.  Thus, under the Nevada Medicaid program, Nevada does not make any payments to drug manufacturers.  *See id.*  Therefore, even assuming that the State reimburses based on AWPs – which Fujisawa does not concede[10] – Fujisawa does not obtain any profit from a difference in the average manufacturing price of a drug and the AWP of a drug.  *See id.*

The patient's doctor decides which self-administered drug to prescribe, but the doctor lacks any incentive to choose one drug over the other based on potential profits from "spread."  The doctor neither pays for nor is reimbursed for the drug.  The pharmacist pays for drugs from manufacturers or wholesales, and Nevada Medicaid then reimburses the pharmacist.  *See* Bell Decl. ¶ 7.  Yet, the pharmacist does not decide which drug is dispensed; he or she "must dispense prescriptions for single-source SADs as they are written" (*i.e.*, where only one manufacturer

---

[10] As detailed in Defendants' Joint Memorandum, Nevada has failed to adduce evidence that it paid claims based on Defendants' AWPs.  *See* Defs' Joint Mem. § I.B.  Nevada reimbursed drug costs at the lower of usual and customary price, the Federal Upper Limit or State MAC, or AWP – 10%.  *See* Defs' Joint Rule 56.1 Statement ¶ 8.  Nevada has the burden of identifying which claims it based on the basis of Defendants' AWP, but the claims data does not state the basis of reimbursement.  *See id.* ¶ 129.

makes a self-administered drug, "[n]o states allow a pharmacist to substitute a therapeutic alternative"). *Id.* ¶ 10 & n. 8.

Because the persons who would allegedly profit from "spreads" are not the persons who decide which drugs will be sold, there is no merit to the State's argument that Fujisawa could increase its drug sales by promoting its "spreads" to providers. Nor has Nevada presented a shred of evidence that Fujisawa increased its market share or profit for any of its drugs as a result of the alleged "AWP Inflation Scheme." Thus, Fujisawa is entitled to summary judgment on the issue of liability. *See Celotex Corp.*, 477 U.S. at 323 (holding that all other facts of the nonmoving party's case are immaterial where there is a complete failure of proof concerning an essential element of the party's case).

## V.  FUJISAWA IS ENTITLED TO SUMMARY JUDGMENT ON ITS PHYSICIAN-ADMINISTERED DRUGS IN THIS LITIGATION.

Fujisawa has 11 physician-administered drugs in this case.[11] Fujisawa is entitled to summary judgment on Nevada's claims as they relate to alleged false representations and "fraud" regarding all of these Fujisawa drugs.

Nevada has listed Fujisawa's physician-administered drugs in its Appendix among the drugs for which Nevada seeks relief. *See* Am. Compl. ¶ 274, Appendix. However, Nevada has not produced any claims data regarding these or any other physician-administered drugs. *See* Hartman NV Decl. ¶¶ 16 n.22, 23, 30; Defs' Joint Rule 56.1 Statement ¶ 120. Consequently, Nevada cannot establish that it reimbursed these drugs, or the basis for such reimbursement.

---

[11] Fujisawa's physician-administered drugs include acyclovir sodium; Aristospan® (triamcinilone hexacetonide); Cefizox® (ceftizomine sodium or ceftizoxime in d5w); dexamethasone sodium phosphate; doxorubicin hydrochloride; flourouracil; gentamicin sulfate; vancomycin hydrochloride; NebuPent® (pentamidine isethionate); Pentam 300® (pentamidine isethionate); and vinblastine sulfate. *See* Knowles Aff. ¶ 10.

Without evidence of the basis for reimbursement, Nevada cannot establish either that it relied on allegedly inflated AWPs or that it suffered injury by reimbursing based on such AWPs.[12]  No genuine issue of fact remains.  Accordingly, Fujisawa is entitled to judgment as a matter of law on Nevada's claims founded on physician-administered drug reimbursement.


## CONCLUSION

For the foregoing reasons, as well as those set forth in the Memorandum in Support Of Defendants' Joint Memorandum of Law in Support of Their Motion for Summary Judgment, Fujisawa respectfully requests that the Court grant summary judgment in its favor on all claims in the State of Nevada's Amended Complaint.

Respectfully submitted,

REED SMITH LLP

By:   /s/  Andrew L. Hurst
_____
Douglas K. Spaulding
Andrew L. Hurst
1301 K Street NW
Suite 1100 – East Tower
Washington, DC 20005
(202) 414-9200
(202) 414-9299 (fax)

*Attorneys for Defendants Fujisawa*
*USA, Inc. and Fujisawa Healthcare, Inc.*

Dated:  February 8, 2007

_____

[12] In fact, as noted in the Defendants' Joint Memorandum, Nevada Medicaid did not reimburse physician-administered drugs based on AWP, but on a percentage of a physician's billed charges instead.  *See* Defs' Joint Mem. at 7; Defs' Joint Rule 56.1 Statement ¶ 11.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of Fujisawa Healthcare, Inc.'s and Fujisawa USA, Inc.'s Individual Memorandum in Support of Defendants' Motion for Summary Judgment was delivered to all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending, on February 8, 2007, a copy to LexisNexis File & Serve for posting and notification to all parties.

    /s/ Andrew L. Hurst    
Andrew L. Hurst

1