Case 1:01-cv-12257-PBS   Document 3676-8   Filed 02/08/2007   Page 1 of 39

# Exhibit 12

**12/15/2006 Peterson, Daniel Wade - Vol. #1**

1    THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3    ---oOo---

4    In re: PHARMACEUTICAL,        MDL DOCKET NO.

5    INDUSTRY AVERAGE WHOLESALE        CIVIL ACTION

6    PRICE LITIGATION        01CV12257-PBS

7    _____

8

9    THIS DOCUMENT RELATES TO:

10    ALL ACTIONS

11    _____

12

13        DEPOSITION OF DANIEL WADE PETERSON

14            Taken at

15            Law Offices of

16        Gough, Shanahan, Johnson & Waterman

17            33 South Last Chance Gulch

18            Helena, Montana

19            December 15, 2005

20            9:00 a.m.

21

22

Case 1:01-cv-12257-PBS   Document 3676-6   Filed 02/08/2007   Page 3 of 39

12/15/2006  Peterson, Daniel Wade - Vol. #1

1      APPEARANCES OF COUNSEL

2

3           FOR THE PLAINTIFF:

4              HAGENS BERMAN SOBOL SHAPIRO LLP

5              By: Jeniphr A.E. Breckenridge

6              1301 Fifth Avenue, Suite 2900

7              Seattle, Washington 98101

8

9           FOR THE DEFENDANTS:

10             PERKINS COIE LLP

11             By: Kathleen M. O'Sullivan

12             1201 Third Avenue, Suite 400

13             Seattle, Washington 98101-3099

14

15             MORGAN LEWIS & BOCKIUS LLP

16             By: Erica Smith-Klocek

17             1701 Market Street

18             Philadelphia, Pennsylvania 19103-2921

19

20

21

22

**12/15/2006 Peterson, Daniel Wade - Vol. #1**

1          I N D E X

2     Witness: DANIEL WADE PETERSON          Page:

3          Examination by Ms. Smith-Klocek          004

4          Examination by Ms. Breckenridge          109

5          Examination by Ms. Smith-Klocek          116

6

7          INDEX OF EXHIBITS

8     Exhibit Peterson 001, Notice of 30(B)(6)          014

9          Deposition

10    Exhibit Peterson 002, MT 003317 - 003366          025

11    Exhibit Peterson 003, MT 016274 - 016277          029

12    Exhibit Peterson 004, MT 01128          032

13    Exhibit Peterson 005, MT 01399 - 01410          038

14    Exhibit Peterson 006, MT 005849 - 005850          042

15    Exhibit Peterson 007, MT 00995 - 00997          067

16    Exhibit Peterson 008, MT 008663 - 008664          074

17    Exhibit Peterson 009, MT 00039 - 00043          077

18    Exhibit Peterson 010, MT 005768 - 005771          088

19    Exhibit Peterson 011, MT 014071 - 014082          094

20    Exhibit Peterson 012, MT 007029 - 007032          098

21    Exhibit Peterson 013, MT 01801 - 01873          107

22

3

**12/15/2006 Peterson, Daniel Wade - Vol. #1**

1      DANIEL WADE PETERSON

2    THURSDAY, DECEMBER 15, 2005: HELENA, MONTANA

3         - - -

4     BE IT REMEMBERED THAT, pursuant to notice,

5  the deposition of DANIEL WADE PETERSON was taken at

6  the time and place and with the appearance of

7  counsel hereinbefore noted before Craig L. Knowles,

8  CM and Notary Public for the State of Colorado, by

9  agreement.

10  The following proceedings were had:

11      DANIEL WADE PETERSON,

12    having been called as a witness by the

13    Defendants, being first duly sworn, was

14    examined and testified as follows:

15  EXAMINATION BY COUNSEL FOR DEFENDANTS

16      PFIZER AND PHARMACIA

17   BY MS. SMITH-KLOCEK:

18  Q.  Good morning, Mr. Peterson.  My name is

19  Erica Smith-Klocek, and I am with the law firm of

20  Morgan, Lewis and Bockius.  And I represent the

21  defendants Pfizer and Pharmacia in this matter.

22    Could you please state and spell your name

4

**12/15/2006  Peterson, Daniel Wade - Vol. #1**

1      appears to be dated February 14th, 2003.

2          A.  Uh-huh.

3          Q.  Is that correct?

4          A.  Yes.

5          Q.  Were you employed by DPHHS on February

6      14th, 2003?

7          A.  Yes, I was.

8          Q.  Was the language "if there is no available

9      DP for a drug or the department determines that the

10     DP is not available to providers in the state," was

11     that portion of the rule language in effect on

12     February 14th, at 2003?

13         A.  It was still in the rule, and it is still

14     there to this date.  But there was no direct price

15     available, and that is why it was canceled out, as

16     you will notice on the provider notice that was

17     issued sometime in 2002.

18         Q.  So just to be clear, the rule that sets the

19     drug reimbursement formula contains the language

20     regarding direct price, but that language is not in

21     effect?

22         A.  Well, I discussed with Jeff Buska earlier

**12/15/2006  Peterson, Daniel Wade - Vol. #1**

1    around here whether we should take that language

2    out, and he said we might want to just keep that in

3    there in case direct pricing ever becomes available

4    again.  So.

5        Q.  Okay.

6        A.  That speaks to my knowledge to direct

7    pricing.

8        Q.  Okay.  The second part of the sentence, the

9    proposed language that we referred to.

10       A.  Uh-huh.

11       Q.  About AWP less 25 percent for generic

12   multiple source drugs, were you involved in the

13   consideration of changing the reimbursement formula

14   to AWP less 25 percent for generic multiple source

15   drugs?

16       A.  Yes.

17       Q.  Who else was involved in that

18   consideration?

19       A.  My supervisor, Duane Preshinger.

20       Q.  Anyone else?

21       A.  It would just be an assumption on my part,

22   but his direct supervisor.

84

Exhibit 13

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3       -------------------------------------------------------

4

5     IN RE: PHARMACEUTICAL   )

6     INDUSTRY AVERAGE       )

7     WHOLESALE PRICE        )

8     LITIGATION            )MDL Docket No.

9                          )Civil Action 01CV12257PBS

10    -------------------------------------------------------

11        DEPOSITION UPON ORAL EXAMINATION OF

12            DOROTHY POULSEN

13    -------------------------------------------------------

14            9:00 a.m

15            February 22, 2006

16            PERKINS COIE

17        1201 Third Avenue, #4800

18        Seattle, Washington  98101

19

20     REPORTED BY:  Judith A. Robinson, CCR #2171

21

22

**2/22/2006 Poulsen, Dorothy - Vol. #1**

1          A P P E A R A N C E S

2

3      FOR THE PLAINTIFF:

4

5          ROBERT F. LOPEZ, ESQ.

6          HAGENS BERMAN SOBOL SHAPIRO LLP

7          1301 Fifth Avenue, Suite #2900

8          Seattle, Washington  98101

9          Phone:  206-623-7292

10         Fax:    206-623-0594

11         Email:  rob@hbsslaw.com

12

13     FOR THE DEFENDANT, IMMUNEX:

14         KATHLEEN M. O'SULLIVAN, ESQ.

15         PERKINS COIE LLP

16         1201 Third Avenue, Suite #4800

17         Seattle, Washington  98101-3099

18         Phone:  206-359-6375

19         Fax:    206-359-9000

20         Email:  kosullivan@perkinscoie.com

21

22     (CONTINUED)

2

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1          A P P E A R A N C E S   (CONTINUED)

2

3    FOR DEFENDANT, PFIZER, INC.

4    AND PHARMACIA CORPORATION:

5          ERICA SMITH-KLOCEK, ESQ.

6          MORGAN, LEWIS & BOCKIUS LLP

7          1701 Market Street

8          Philadelphia, Pennsylvania  19103

9          Phone:  215-963-5364

10         Fax:    215-963-5001

11         Email:  esklocek@morganlewis.com

12

13   FOR DEFENDANT, DEY:

14         CLIFFORD KATZ, ESQ. (Via Telephone)

15         KELLEY DRYE & WARREN LLP

16         101 Park Avenue

17         New York, New York  10178-0002

18         Phone: 212-808-7609

19         Fax:    212-808-7897

20         Email: ckatz@kelleydrye.com

21

22      (CONTINUED)

3

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1        A P P E A R A N C E S   (CONTINUED)

2

3    FOR DEFENDANT, AVENTIS PHARMACEUTICALS:

4         BRIAN G. FEDOTIN, ESQ. (Via Telephone)

5         SHOOK HARDY & BACON LLP

6         2555 Grand Boulevard

7         Kansas City, Missouri  64108

8         Phone:  816-559-2041

9         Fax:    816-421-5547

10        Email:  bfedotin@shb.com

11

12    FOR DEFENDANT, BAYER CORPORATION:

13        MICHAEL P. DOSS & JOSEPH W. YOCKEY

14        (Via Telephone)

15        SIDLEY AUSTIN LLP

16        1 South Dearborn

17        Chicago, Illinois  60603

18        Phone:  312-853-7000

19        Fax:    312-853-7036

20        Email:  mdoss@sidley.com,

21            jyockey@sidley.com

22

4

**2/22/2006 Poulsen, Dorothy - Vol. #1**

1    A.  Remind me.

2    Q.  -- and not keep it a mystery.

3    A.  Okay.  That's good.

4    Q.  The court reporter has handed you Exhibit

5    Poulsen 022, a 3-page document Bates numbered

6    MT005370 to 72.

7         Is this a letter that you wrote to Jim

8    Smith of the Montana State Pharmaceutical

9    Association?  And I'm asking you about the first 2

10   pages of Exhibit Poulsen 022.

11   A.  It appears to be, yes.  I signed it so I'm

12   sure I wrote it.

13   Q.  The final page of Exhibit Poulsen 022 came

14   attached to this letter.  Is that your handwriting

15   on Exhibit Poulsen 022?

16   A.  Yes, it is.

17   Q.  Looking to the first page of Exhibit

18   Poulsen 022, it says -- it refers to a pharmacy

19   coordinating committee that conducted a survey of

20   pharmacies with the University of Montana School of

21   Pharmacy?

22   A.  Uh-huh.

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1      Q.  Do you know what that was, this pharmacy

2    coordinating committee?

3      A.  I -- I participated in this committee.  It

4    was -- it was people from the university that were

5    doing things in conjunction with the Pharmacy

6    Association.  And they had a lot of different aims.

7    For instance, trying to get all pharmacists to have

8    doctorates.  To be -- they had several different

9    focuses -- foci.  And I would meet with them to see

10   what their interests were and what their interests

11   were and then I learned some things.

12     Q.  Do you remember who else was a part of

13   this pharmacy coordinating committee?

14     A.  Actually, Tim Stratton was undoubtedly one

15   of them.  There was a woman.

16     Q.  Lori Morin?

17     A.  Lori Morin was one, yes.

18     Q.  Your letter referred to the survey of

19   pharmacies to determine the extent the pharmacies

20   acquired drugs from manufacturers.

21       Are you familiar with this survey?

22     A.  Okay.

**2/22/2006 Poulsen, Dorothy - Vol. #1**

1    Q.   Were you familiar with the survey

2    conducted by the pharmacy coordinating committee and

3    the University of Montana School of Pharmacy to

4    determine the extent to which pharmacies acquired

5    drugs directly from manufacturers?

6    A.   I don't know.  I don't remember whether I

7    had any input in the survey or whether I had that or

8    even saw the survey.  Although, I'm sure I must have

9    seen it at some point in time or whether I saw the

10   results of the survey. So far as I remember, I

11   certainly wasn't instrumental in doing the survey or

12   conducting the survey.

13   Q.   Does the letter that you wrote that's

14   Exhibit Poulsen 022 reflect that you were familiar

15   with the results of the survey?

16   A.   Yes.  I mean, it does suggest that I was

17   familiar with the results of the survey.  However, I

18   don't know what the results were.  I mean, I can't

19   determine from this letter what the results were or

20   why I thought this was a good idea at the time.

21   Q.   Do you know whether the survey also looked

22   at whether Montana pharmacies could acquire any

182

Case 1:01-cv-12257-PBS Document 3676-8 Filed 02/08/2007 Page 16 of 39

**2/22/2006 Poulsen, Dorothy - Vol. #1**

1    drugs at published direct prices?

2        A.   That was the issue, I believe, is that

3    pharmacies in Montana had a great difficulty

4    acquiring drugs at that price.  And -- and this is

5    speculation on my part.  It could be that our system

6    was set up.  Our reimbursement system, the PBM

7    system was set up to take the lower of direct price

8    or AWP minus 10%.  And so for those labels that's

9    what I'm guessing.  For those labels that were at

10   direct price, they were paying at the direct price

11   but our pharmacies were unable to get the drugs at

12   that cost.  That is -- I think that was the issue.

13       Q.   Does this letter that's Exhibit Poulsen

14   022 refresh your recollection in any way as to

15   whether Montana Medicaid eliminated the use of

16   direct price?

17       A.   I do remember that we removed -- we were -

18   - we removed labels from that -- from that pricing,

19   yes.

20       Q.   Looking at page 2 of Exhibit Poulsen 022 -

21   -

22       A.   Uh-huh.

1      Q.   -- off the top of your head, do you know

2    the manufacturers associated with the labels that

3    have those numbers?

4      A.   Not anymore.  I would have at one time but

5    not anymore.

6      Q.   Looking at page 3 of Exhibit Poulsen 022,

7    your handwritten notes --

8      A.   Uh-huh.

9      Q.   -- does that appear --

10      A.   Oh, see.

11      Q.   -- to be tying the label to the --

12      A.   Yes.  Some companies that no longer exist.

13      Q.   And some that still exist?

14      A.   And some that still exist, yes.

15      Q.   I want to make sure I have this correct,

16    so I'll just ask you directly.

17      A.   Uh-huh.

18      Q.   Why did you propose in this letter to Jim

19    Smith that Montana Medicaid eliminate use of direct

20    pricing?

21      MR. LOPEZ:  Object to form.

22      THE WITNESS:  I believe that is what they

1    were asking me for.  That based on the survey, they

2    were asking -- pharmacists were asking that we do

3    away with direct price because they weren't getting

4    paid what they were having to pay.  So they wanted

5    to use AWP minus 10% for everything.

6    BY MS. O'SULLIVAN:

7        Q.  In looking at --

8        A.  Go ahead.

9        Q.  On the second page of Exhibit Poulsen 022,

10   the first line there, did you write:

11       "I propose that we phase in elimination of

12   direct price reimbursement by removing" and then

13   those labels listed above?

14       A.  Right.  I would have written that.

15       Q.  Page 3 of Exhibit Poulsen 022, are those

16   your handwritten notes?

17       A.  Yes.

18       Q.  Do those reflect your calculations of the

19   difference between AWP and direct price on those

20   specific labels?

21       A.  Yes.

22       Q.  Was it your conclusion that eliminating

1    direct price would cost or save Montana Medicaid

2    money?

3        A.   It would have no effect.  The choice was,

4    the -- the legislature had once again given a

5    provider increase. What I was proposing is, rather

6    than giving providers an increase in the dispensing

7    fee as we had done in the past, that we do something

8    instead, which was to remove the direct pricing

9    mechanism.

10           And phasing it in, I was phasing it in at

11   the rate that the dispensing fee increase would

12   effect, would -- would be implemented.  The idea

13   was, I wasn't costing the Medicaid program anything.

14   I was simply implementing the increase that the

15   legislature had provided in a way other than

16   increasing the dispensing fee.

17       Q.   In the second paragraph first page of

18   Exhibit Poulsen 022, is this referring to the 1%

19   provider increase for each year of the next

20   biennium?

21       A.   Right.

22       Q.   Are you aware of any studies that the

2/22/2006 Poulsen, Dorothy - Vol. #1

1    legislature did that provided a basis for these

2    provider increases?

3         A.   The pharmacy program was simply

4    coincidentally in the provider increase.  The

5    provider increase was driven much more by nursing

6    homes and physicians and hospitals and every other

7    provider community in the state.  And the

8    legislature, for expediency reasons, would do an

9    overall increase and we would be the beneficiary.

10   The pharmacy program never sought any kind of

11   increase from the legislature.

12        Q.   Had there not been this legislatively

13   authorized provider increase that was across the

14   board, would your proposed change to eliminating

15   direct price have resulted in an increased cost for

16   Montana Medicaid?

17        MR. LOPEZ:  Object to the form.

18        THE WITNESS:  Likely.  If I had --

19   BY MS. O'SULLIVAN:

20        Q.   Is that what you meant by on the first

21   line of the last paragraph of page one --

22        A.   Page one.

Case 1:01-cv-12257-PBS Document 3676-8-4 Filed 02/08/2007 Page 21 of 39

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1      Q.   -- where you wrote:

2         "As you can see removing all labels from

3   direct price would result in an increased cost of

4   approximately $335,868 per year."

5         Is that what you meant by that?

6      A.   I think what I was trying to explain in

7   there is that, we could not simply remove all the

8   labels at one time. Because that would exceed the

9   amount of the provider increase we were being

10  granted.  So the only way to do this would be to do

11  it in steps.  And --

12     Q.   To phase it in?

13     A.   To phase it in.

14     Q.   Even at the phased-in level though, had

15  there not been this provider increase across the

16  board, it would have resulted in an increased cost

17  to Montana Medicaid?

18         MR. LOPEZ:  Object to form.

19         THE WITNESS:  I presume so, yes.

20  BY MS. O'SULLIVAN:

21     Q.   Will you turn to Exhibit Poulsen 023,

22  please, which is a 1- page document Bates numbered

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1      MT005368?

2          A.  Uh-huh.

3          Q.  Did you receive this letter dated May 27,

4      1999 from Jim Smith?

5          A.  I will assume that I did.

6          Q.  Please take a look at this letter and tell

7      me whether it appears to be a response to your

8      letter of April 15th that was Exhibit Poulsen 022?

9          A.  The first line -- that -- that's the case.

10         Q.  Where it -- where he states, third

11     paragraph down, last sentence:

12             "However, you can be an assured that the

13     leadership of the association, the most active

14     involved members are quite enthused over this

15     proposal."

16         A.  Uh-huh.

17         Q.  What was your understanding of why the

18     pharmacists were enthused over this proposal to

19     eliminate certain labels from direct pricing?

20             MR. LOPEZ:  Object to the form.

21             THE WITNESS:  Because the pharmacies were

22     unable to acquire drugs at the direct price, which

**2/22/2006  Poulsen, Dorothy - Vol. #1**

1    so far as I know, was less than AWP minus 10%.

2    Having that pricing mechanism removed means they

3    would be reimbursed at the AWP minus 10% charge or

4    the usual and customary charge, whichever was less.

5    And -- and so they would either be able to meet

6    their costs or they would make more money.

7    BY MS. O'SULLIVAN:

8        Q.  One more related document.  Exhibit

9    Poulsen 024 is a 1-page document, Bates number

10   MT005418, which some people might call some screen

11   shots and some handwritten notes.

12       A.  Uh-huh.

13       Q.  Are those your handwritten notes?

14       A.  Yes, I think so.  Yeah, I think so.

15       Q.  Where it --

16       A.  The pharmacy's price is not mine but the -

17   - but the others -- anyway.

18       Q.  Do you know whose handwriting reflects the

19   pharmacy's price equals $196.91?

20       A.  I'm not sure.

21       Q.  But is it your handwriting for listing the

22   AWP Medicaid and direct price for this drug, which

**2/22/2006 Poulsen, Dorothy - Vol. #1**

1    appears to be Zerit, Z-E-R-I-T?

2       A.  It looks like my handwriting.  I know that

3    the pharmacy's price is not mine.  I think the top

4    part is my handwriting.

5       Q.  Do you know why you prepared those notes,

6    comparing AWP, Medicaid and direct price for this

7    product?

8       A.  I have no idea.

9       Q.  Do you know whether you did a similar

10   calculation for other drugs?

11      A.  I'm sure that I have -- that I did.  If I

12   knew what the drug was, you know, it might give me

13   an idea.  It says it's an HIV antiviral.  But no, I

14   have no idea.

15         MS. O'SULLIVAN:  I propose we take another

16   break here.  Maybe 5 or 10 minutes and come back.

17            (Off the record.)

18            (Whereupon, A Letter To Dorothy D.

19   Poulsen MT028879 Through MT028881 was marked Exhibit

20   Poulsen 026 for identification.)

21   BY MS. O'SULLIVAN:

22      Q.  I'm going to ask you, did Montana Medicaid

Exhibit 14

## STATE SETTLEMENT AGREEMENT

### I. PARTIES

This State Settlement Agreement is entered into between the state of Montana, and Pfizer

Inc, Warner-Lambert Company ("Warner-Lambert") and Parke-Davis Division (collectively,

Pfizer), hereinafter referred to as "the Parties," through their authorized representatives.

### II. PREAMBLE

As a preamble to this State Settlement Agreement, the Parties agree to the following:

A.  Pfizer is a corporation organized under the laws of the state of Delaware.  Its

headquarters are in New York.  Pfizer is a manufacturer of pharmaceutical products.  Parke-

Davis and Warner-Lambert were predecessor organizations that ultimately were merged into

Pfizer Inc in June 2000.  At all relevant times, Warner-Lambert manufactured, marketed and sold

a cholesterol-lowering drug, marketed under the name Lipitor.

B.  The state of Montana contends that Warner-Lambert owed additional rebate payments

under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8, which is part of the federal

Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.

C.  The state of Montana contends that it has certain civil claims against Pfizer as

successor in interest under the False Claims Act, 31 U.S.C. §§ 3729-3733, other federal and state

statutes and/or common law doctrines, for engaging in the following conduct: During the period

beginning January 1999 and ending December 1999, employees of a unit of Parke-Davis, a

Warner-Lambert division, offered and made payments, characterized as "unrestricted educational

grants," totaling $250,000 ($50,000 in the First Quarter of 1999 characterized as "program

funding," $200,000 in the Second Quarter of 1999 characterized as an "unrestricted educational

- 1 -



grant") to the Ochsner Health Plan ("Ochsner"), a managed care organization headquartered in New Orleans, Louisiana, in exchange for Ochsner's agreement to extend unrestricted formulary status to Lipitor in order to encourage Ochsner plan doctors to write Lipitor prescriptions for Ochsner plan beneficiaries. In addition, Ochsner agreed to extend this formulary status for three years and entered into a so-called market share contract that enabled Ochsner to receive additional discounts and rebates on the Ochsner plan's usage of Lipitor over the three year period of the agreement.

Prior to its acquisition by Pfizer, Warner-Lambert entered into a rebate agreement with the Centers for Medicare and Medicaid Services ("CMS"). The state of Montana contends that Warner-Lambert knowingly misreported and underpaid its Medicaid Rebates for Lipitor, i.e., the amounts that it owed to the state under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8. Warner-Lambert was generally required on a quarterly basis to calculate and pay rebates to each state Medicaid program based on the difference between the Average Manufacturer Price ("AMP") and its "Best Price," as defined by 42 U.S.C. § 1396r-8(k)(1) and 1396r-8(c)(1)(C). For the First, Second, Third and Fourth Quarters of 1999, Warner-Lambert misreported and underpaid its Medicaid rebates to states participating in the Medicaid Rebate Program by calculating its Best Price for Lipitor without factoring in the value of all unrestricted educational grants and rebates that were, in fact, discounts off the purchase price of Lipitor paid to Ochsner as described above which were not disclosed to the states or the federal government. By failing to disclose and properly report these discounts, Warner-Lambert was in breach of its Medicaid Rebate Agreement with CMS and was unjustly enriched by maintaining possession of the rebate

- 2 -

funds that were rightfully and statutorily owed to the Medicaid Rebate Program (hereinafter referred to as the "Covered Conduct").

D.  This settlement is based upon a _qui tam_ complaint filed by John D. Foster, Relator, against Warner-Lambert on May 4, 2000, which is styled United States ex. rel John David Foster v. Pfizer, Inc. Successor in interest to Warner-Lambert Co. No.1:00-cv-00246 (E.D. Texas).

E.  The Parties desire a final negotiated settlement and compromise of the claims against Pfizer set forth in Paragraph C.

F.  Warner-Lambert denies the contentions of the state of Montana as set forth as the Covered Conduct in Paragraph C above and denies that it has any liability relating to these contentions and allegations.  This State Settlement Agreement does not constitute an admission by Warner-Lambert of any liability or wrongful conduct.  All Covered Conduct occurred prior to the June 2000 merger into Pfizer Inc.

G.  In order to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, the Parties reach a full and final settlement as set forth below.

### III.  TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree as follows:

1.  Pfizer agrees to pay to the United States and the individual states the total amount of $49,000,000 (the "Settlement Amount") as follows: Pursuant to a settlement agreement executed on or about May 15, 2002 between Pfizer, the United States and Relator (the "Federal Settlement Agreement") Pfizer agreed to make payment to the United States of $49,000,000 (which includes

- 3 -



both the United States' and the states' shares of the Settlement Amount (the "State Shares")). That amount was deposited in the Court's Registry on May 30, 2002. Of that amount, $21,084,700 of the Pfizer funds in the Court's Registry represent the State Shares of this settlement agreement. The State Shares will be released for distribution to individual participating states when the negotiating team for the National Association of Medicaid Fraud Control Units ("NAMFCU Team") and Pfizer mutually agree in writing that the state settlements are final.

2. The state of Montana's total State Share of this Settlement Amount is $28,811.53.

3. The parties agree that no portion of the State's Share of the Settlement Amount is subject to any Relator's fees or recoveries.

4. Subject to the exceptions in Paragraph 6 below, in consideration of the obligations of Pfizer set forth in this State Settlement Agreement, conditioned upon the State's receipt of its State Share of the Settlement Amount, the state of Montana agrees to release Pfizer, including its predecessors, successors, subsidiaries and affiliates, and assigns, as well as its current officers, directors, employees, and agents (Pfizer Released Parties) from any civil or administrative claims or penalties the state of Montana has or may have for claims submitted to the state Medicaid program for the Covered Conduct.

5. In consideration of the obligations of Pfizer set forth in this State Settlement Agreement and the federal Corporate Integrity Agreement ("CIA"), conditioned upon the state's receipt of its State Share of the Settlement Amount, the state of Montana agrees to release and refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusion from its Medicaid Program against Pfizer, including its predecessors, successors,

- 4 -



subsidiaries and assigns, for the Covered Conduct, except as reserved in this Paragraph and in Paragraph 6, below. The state of Montana expressly reserves all rights to comply with any statutory obligations to exclude Pfizer from its Medicaid program under 42 U.S.C. § 1320a7(a) (mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the state of Montana from taking action against entities or persons, or for conduct and practices, for which civil claims have been reserved in Paragraph 6, below.

6. Notwithstanding any term of this State Settlement Agreement, specifically reserved and excluded from the scope and terms of this State Settlement Agreement as to any entity or person (including, without limitation, Pfizer) are any and all of the following claims of the state of Montana:

(a) Any civil, criminal or administrative claims of the state of Montana arising under state tax codes;

(b) Any criminal liability;

(c) Any civil or administrative liability that Pfizer has or may have under any state statute, regulation, or rule not covered by the release in paragraph 4 above;

(d) Except as explicitly stated in this State Settlement Agreement, any administrative liability, including mandatory exclusion from the state of Montana's Medicaid program;

(e) Any liability to the state of Montana (or its agencies) for any conduct other than the Covered Conduct;

(f) Any claims based upon such obligations as are created by this State Settlement Agreement;

- 5 -



(g)     Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by Pfizer;

(h)     Any claims of the state of Montana based on a failure to deliver items or services due;

(i)     Any civil or administrative claims against individuals, including current or former directors, officers, employees, agents or shareholders of Pfizer who are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement related to the Covered Conduct;

7. Pfizer waives and will not assert any defenses Pfizer may have to any criminal prosecution or administrative action relating to the Covered Conduct, which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution or equivalent State Constitutional provisions or laws, this settlement bars a remedy sought in such criminal prosecution or administrative action. Pfizer agrees that this settlement is not punitive in purpose or effect. Nothing in this paragraph or any other provision of this Settlement Agreement constitutes an agreement by the state of Montana concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code or State or Local Tax Codes.

8. Pfizer fully and finally releases the state of Montana from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) which Pfizer has asserted, could have asserted, or may assert in the future against the state of Montana related to the Covered Conduct,

- 6 -

9. The amount that Pfizer must pay pursuant to any applicable provision of this State Settlement Agreement will not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare Carrier or Intermediary or any State Medicaid program, related to the Covered Conduct. Pfizer agrees not to resubmit to any Medicare Carrier or Intermediary or any State Medicaid program any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims. Notwithstanding anything to the contrary, Pfizer does not submit such claims.

10. Pfizer agrees to the following:

(a) Unallowable Costs Defined: that all costs (as defined in the Federal Acquisition Regulations (FAR) § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Pfizer, its present or former officers, directors, employees, shareholders, and agents in connection with: (1) the matters covered by this State Settlement Agreement; (2) the United States' audit and civil investigation of the matters covered by this State Settlement Agreement; (3) Pfizer's investigation, defense, and any corrective actions undertaken in direct response to the United States' audit and civil investigation in connection with the matters covered by this State Settlement Agreement (including attorney's fees); (4) the negotiation and performance of this State Settlement Agreement, (5) the payment Pfizer makes to the United States and the participating states pursuant to this State Settlement Agreement and any payments that Pfizer may make to Relator; (6) the negotiation of the CIA, and the obligations undertaken pursuant to the CIA to: (i) retain an independent review organization to perform annual reviews as described in the CIA; and (ii)

- 7 -

prepare and submit reports to the HHS-OIG, are unallowable costs on Government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP). However, nothing in this sub-paragraph that may apply to compliance costs affects the status of costs that are not allowable based on any other authority applicable to Pfizer. (All costs described or set forth in this Paragraph 13(a) are hereafter, "unallowable costs").

     (b)    Future Treatment of Unallowable Costs: If applicable, these unallowable costs will be separately estimated and accounted for by Pfizer, and Pfizer will not charge such unallowable costs directly or indirectly to any contracts with the United States or any State Medicaid Program, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by Pfizer or any of its subsidiaries to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

     (c)  Treatment of Unallowable Costs Previously Submitted for Payment: If applicable, Pfizer further agrees that within 60 days of the effective date of this State Settlement Agreement, it will identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid, VA and FEHBP fiscal agents, any unallowable costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Pfizer or any of its successors or its subsidiaries, and will request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Pfizer agrees that the United States and any

- 8 -

participating state, at a minimum, will be entitled to recoup from Pfizer any overpayment plus applicable interest as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment. Any payment due after the adjustments have been made shall be paid to the United States and any participating state pursuant to the direction of the affected agencies. The United States and any participating state reserves its rights to disagree with any calculations submitted by Pfizer or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this Paragraph) on Pfizer or any of its subsidiaries' cost reports, cost statements, or information reports. Nothing in this State Settlement Agreement shall constitute a waiver of the rights of the United States or any participating state to examine or reexamine the unallowable costs described in this Paragraph.

11. Pfizer covenants to cooperate fully and truthfully with the United States' and any participating state's investigation of individuals and entities not specifically released in this State Settlement Agreement for the Covered Conduct. Upon reasonable notice, Pfizer will make reasonable efforts to facilitate access to, and encourage the cooperation of, their directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals, and will furnish to the United States and any participating state, upon reasonable request, all non-privileged documents and records in its possession, custody or control relating to the Covered Conduct.

12. Pfizer has entered into a CIA with HHS-OIG in connection with this matter. Pfizer acknowledges that the state of Montana may gain access from the OIG to the certain information that Pfizer submits to the OIG pursuant to the CIA. Specifically, such access is limited to the following: (a) any information contained in Pfizer's Implementation Report and/or Annual

- 9 -

Reports; and (b) information that is included in the IRO reports (collectively, "CIA Information"). The state of Montana agrees to afford all such CIA Information the maximum degree of confidentiality permitted by state law. As set forth in the CIA, when Pfizer submits any CIA Information to the HHS-OIG pursuant to its obligations under this CIA, Pfizer shall identify any portions of such CIA Information that it believes are trade secrets, or information that is commercial or financial information, or privileged and confidential, and therefore exempt from disclosure ("Exempt CIA Information") under the state of Montana's freedom of information (or its equivalent) or the federal Freedom of Information Act (collectively, "FOIAs"). It is understood that the disclosure of Exempt CIA Information may cause substantial injury to Pfizer. Therefore, the state of Montana agrees to notify Pfizer promptly in the event of a request for copies or access to CIA Information, whether or not identified as exempt by Pfizer. Such prompt notice shall afford Pfizer a meaningful opportunity to respond to such requested disclosure. Such notice shall be made in writing, by overnight mail or hand delivery to the following addresses:

> Douglas M. Lankler, Esq.
> Deputy Compliance Officer
> Pfizer Inc
> 235 East 42d Street (150/5/22)
> New York, NY 10017
> Phone: 212-733-3026

> With a simultaneous copy to:

> Lynn Shapiro Snyder, Esq.
> Counsel to Pfizer Inc
> Epstein Becker & Green
> 1227 25th Street, N.W.
> Washington, D.C. 20037
> Phone: 202-861-0900

- 10 -

13. This State Settlement Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity.

14. Pfizer expressly warrants that it has reviewed its financial situations and that it is currently solvent within the meaning of 11 U.S.C. Section 547(b)(3) and 548(a)(1)(A)(ii)(I), and will not become insolvent as a result of the payment obligations to the United States and the participating states set forth in this State Settlement Agreement. Further, the Parties expressly warrant that, in evaluating whether to execute this State Settlement Agreement, the Parties (a) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to Pfizer, within the meaning of 11 U.S.C. Section 547(c)(1), and (b) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

15. Pfizer represents it has entered into this State Settlement Agreement freely and voluntarily.

16. This State Settlement Agreement is governed by the laws of and subject to the exclusive Jurisdiction and Venue of the state of Montana.

17. The Parties agree that any disputes arising under the CIA shall be resolved exclusively through the breach and dispute resolution provisions included in that agreement. A breach by Pfizer of the CIA will not constitute a breach of this State Settlement Agreement.

18. This State Settlement Agreement and the CIA, constitute the complete agreement between the Parties. This State Settlement Agreement may not be amended except by written consent of the Parties, except that only Pfizer and HHS-OIG must agree in writing to modification of the CIA.

- 11 -

19. The undersigned individuals signing this State Settlement Agreement on behalf of Pfizer represent and warrant that they are authorized by Pfizer to execute this State Settlement Agreement. The undersigned State signatories represent that they are signing this State Settlement Agreement in their official capacities and that they are authorized to execute this State Settlement Agreement.

20. This State Settlement Agreement may be executed in counterparts and/or in facsimile form, each of which constitutes an original and all of which constitute one and the same agreement.

21. The Effective Date of this State Settlement Agreement is the date on which the final signatory to this State Settlement Agreement executes this State Settlement Agreement.

22. This State Settlement Agreement is binding on the Parties, their transferees, heirs, successors and assigns.

- 12 -



THE STATE OF MONTANA

DATED: _10-29-02_

_____
state of Montana
Office of Attorney General
Medicaid Fraud Control Unit

BY: _Gordon Clage_
Title: _Director - MFCU_

DATED: _11/1/02_

_Johl Clapper_
state of Montana
Medicaid Program

BY: _____
Title: _State Medicaid Director_

- 13 -

PFIZER INC, WARNER-LAMBERT, and PARKE-DAVIS


DATED: _1/13/07_                    BY: _George W Evans_
                                        GEORGE W. EVANS, Esq.
                                        HEIDI CHEN, Esq.
                                        Counsel for Pfizer, Warner-Lambert,
                                        Parke-Davis


DATED: _1/14/03_                    BY: _Lynn Shapiro Snyder_
                                        LYNN SHAPIRO SNYDER, Esq.
                                        STUART M. GERSON, Esq.
                                        Epstein, Becker & Green
                                        Counsel for Pfizer, Warner-Lambert,
                                        Parke-Davis


- 14 -