UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                            )
IN RE PHARMACEUTICAL INDUSTRY   )
AVERAGE WHOLESALE PRICE              )        MDL NO. 1456
LITIGATION                                          )        Civil Action No. 01-12257-PBS
_____)
                                                            )        Hon. Patti B. Saris
THIS DOCUMENT RELATES TO           )
01-CV-12257-PBS AND 01-CV-339          )
_____)
TRIAL OF CLASS 2 & 3 CLAIMS

**THE TRACK 1 DEFENDANTS' PROPOSED COMMON FINDINGS OF FACT
REVISED IN COMPLIANCE WITH THE
COURT'S ORDER DATED FEBRUARY 7, 2007**

Table of Contents

Page

I.  It Has Been Well Known Throughout The Class Period That AWP Does
    Not Equal Or Bear A Predictable Relationship to Average Selling Price ..........................1

    A.  History of AWP:  Overview ................................................................................1

    B.  History of AWP:  1960s-80s..............................................................................2

    C.  History of AWP:  1990s-2000s...........................................................................3

II.  The Implementation and Relevance of ASP Reimbursement in 2003 ................................6

III.  Payors' Understanding of AWP Was Consistent With Industry Understanding
     And Payors Were Not Harmed By Published AWPs ........................................................7

    A.  Blue Cross Blue Shield of Massachusetts Is  Knowledgeable Regarding
        AWP And Typical of Payors ..............................................................................7

        (i)    BCBS/MA Employees Had Detailed Knowledge  Regarding
               AWP Throughout The Class Period .......................................................7

        (ii)   BCBS/MA Had Detailed Knowledge Regarding  AWP Through
               Its Staff Model HMO Medical West.......................................................8

        (iii)  BCBS/MA Continues to Reimburse at 95% of AWP...............................9

        (iv)   BCBS/MA Is Expanding Its Use Of AWP To New Areas.......................10

        (v)    BCBS/MA Profits From Higher Drug Costs And  Makes Strategic
               Elections Around Premium Increases.....................................................11

        (vi)   BCBS/MA Is Typical Of Other Payors ................................................11

    B.  Taft Hartley Funds Are Sophisticated Or Rely On Sophisticated
        Market Actors ...................................................................................................12

IV.  Plaintiffs' Liability Theories Are Based on Unreliable Factual Assumptions
     And Economic Methodology...................................................................................14

    A.  Dr. Hartman's Claimed 30% Market Expectation Is Irreconcilable
        With The Factual Record....................................................................................14

        (i)    Dr. Hartman Largely Relies On Comparator Drugs Without
               Competition.........................................................................................15

        (ii)   Publicly Available Information Contradicts Dr. Hartman's Expectation ........16

        (iii)  Reimbursement Contracts.....................................................................16

    B.  Defendants' Experts' Testimony...........................................................................17

    C.  Dr. Rosenthal's Testimony Does Not Compensate  For Dr. Hartman's
        Shortcomings ....................................................................................................19

    D.  Dr. Hartman's Class 3 Damage Analysis ..............................................................20

    E.  Dr. Hartman's "Zero" Spread for Class 2 ..............................................................20

V.  Plaintiffs Have Failed To Identify Any Individual Class 3 Members ...............................20

## PROPOSED COMMON FINDINGS OF FACT

**I.      It Has Been Well Known Throughout The Class Period That AWP Does Not Equal Or Bear A Predictable Relationship to Average Selling Price**

A.      <u>History of AWP:  Overview</u>

1.      There is no dispute in this case that before and throughout the class period:

a.    Every known brand name prescription drug sold in the United States has had an Average Wholesale Price ("AWP") published by pricing services such as Red Book and First Data Bank.  (11/15/06 Rosenthal Tr. 87:11-19; 11/28/06 Bell Tr. 137:7-23).

b.    The AWPs for branded drugs have been used as a reimbursement benchmark and are determined by applying a formulaic markup over Wholesale Acquisition Cost ("WAC").  (11/28/06 Bell Tr. 103:19-104:2; 11/15/06 Rosenthal Tr. 71:3-5).

c.    WAC is the undiscounted list price at which single source brand name drugs are sold to wholesalers.  (Bell Trial Affidavit Submitted On Behalf of Track 1 Defendants ("Bell Trial Aff.") ¶ 19; 11/15/06 Rosenthal Tr. 71:6-17).

d.    There is a standard 20% or 25% markup between WAC and AWP for branded drugs, which was derived historically from the markups charged by wholesalers and was not set by manufacturers. (11/15/06 Rosenthal Tr. 86:4-21).

e.    At some point, because of consolidation and competition among wholesalers, the 20% or 25% standard markup on brand name drugs no longer reflected actual wholesaler margins, but the standard markup continued to determine the relationship between WAC and AWP in the pricing compendia.  (Bell Trial Aff. ¶ 48; 11/20/06 Hartman Tr. 71:6-16; 11/15/06 Rosenthal Tr. 92:24-93:17).

f.    This standard markup between WAC and AWP for branded drugs never changed, and it was commonly known in the marketplace throughout the entire class

period that this spread between AWP and WAC existed.  (11/15/06 Rosenthal Tr. 73:20-75:14; 94:3-95:4).

       g.   In light of the foregoing, every brand name prescription drug purchased from manufacturers, wholesalers or specialty distributors in the United States has had an actual acquisition cost lower than its published AWP.  (Bell Trial Aff. ¶ 50; 11/15/06 Rosenthal Tr. 75:1-76:6).

    B.    <u>History of AWP:  1960s-80s</u>

    2.    Numerous publicly available government documents and publications dating back to the late 1960s demonstrate an understanding that AWP did not reflect an average of actual prices.  (11/28/06 Bell Tr. 104:24-105:8; DX 1653 at 148, 11/28/06 Bell Tr. 105:17-106:4; DX 1982 at 1, 11/28/06 Bell Tr. 106:8-14; DX 1037 at 1, 11/28/06 Bell Tr. 106:17-107:8; DX 1039 at 22, 11/28/06 Bell Tr. 107:11-108:8; DX 1985 at 20255, 11/28/06 Bell Tr. 108:9-109:4; DX 1965 at 7, 11/28/06 Bell Tr. 109:17-22).

    3.    Some of these reports pertain to self-administered drugs ("SADs") rather than physician-administered drugs ("PADs").  However, SADs are subject to the same principles of rebating and discounting in the face of competition as PADs – the only difference is who receives the price concession.  (11/28/06 Bell Tr. 85:10-86:10).  With SADs, institutions exercising control over physician prescribing patterns through formularies secure discounts from manufacturers selling competing "single source" (patent protected) and "multi-source" (generally no longer patent protected) drugs.  (<u>Id.</u> at 88:8-89:10).  With PADs, physicians themselves (as well as hospitals and staff model HMOs) exact discounts based on their ability to dictate which competing drug to administer.  (<u>Id.</u> at 87:8-88:7).  The AWP benchmark is used by the same payors to reimburse both types of drugs and knowledge of AWP acquired in one context is fully applicable to the other.  Plaintiffs' own expert, Dr. Hartman, relied on information concerning

2

SADs in forming his expectation yardsticks.  (Id. at 85:10-86:10; 102:22-103:18; Hartman Trial

Aff. ¶ 77(a)).

        C.      <u>History of AWP:  1990s-2000s</u>

        4.      The government had no illusions regarding AWP when it chose to use it as

a reimbursement benchmark for Part B.[1]  OIG's 1992 report focusing on PADs is illustrative:

"Our review of invoices revealed that the 13 chemotherapy drugs can be purchased at amounts

below AWP.  This fact indicated that AWP is not a reliable indicator of physician cost; indeed,

Red Book officials confirmed that AWP is not designed to reflect physicians' costs." (DX 1053

at 5); 11/28/06 Bell Tr. 109:25-111:21).  That OIG report also identified the large discounts off

of AWP on numerous PADs.  (DX 1053 at App. III).

        5.      In 1996, the OIG issued yet another report, noting that "if Medicaid rebate

amounts were applied to Medicare utilization data, the Medicare program would have saved

$122 million or 14.6 percent of its allowances for these drugs."  (DX 1062 at 7; 11/28/06 Bell Tr.

113:10-116:8).  The report included a table outlining the difference between AWP and available

prices, and the rebate savings that could be achieved for each of the 17 drugs studied, including

drugs at issue in this litigation.  (<u>Id.</u>).

        6.      On June 10, 1996 Barron's published an article examining AWP, stating,

among other things, that:  "providers actually pay wholesale prices that are 60%-90% ["spreads"

of 150%-900%] below the so-called average wholesale price, or AWP used in reimbursement

claims." (DX 2641 at 15).  The article included a chart showing spreads for a number of the

---

[1]   Reimbursement under Medicare Part B for PADs has always been based on a "reasonable charge"
basis.  Prior to 1992, Medicare's carriers used the customary or prevailing charge among physicians in
a geographic area.  In June 1991, HCFA proposed the lower of 85 percent of AWP or estimated
acquisition cost ("EAC") as determined by HCFA through surveys.  (DX 1048 at 25800; Bell Trial
Aff. ¶¶ 77-79).  HCFA's 85% proposal was not adopted.  (DX 1049 at 59524-25; Bell Trial Aff. ¶ 80).
In November 1991, HCFA adopted the lower of AWP or EAC (plus an allowance for other costs),
effective January 1, 1992.  (DX 1049 at 59525, 59621; Bell Trial Aff. ¶¶ 81-82).

drugs in this litigation.  (Id.; 11/28/06 Bell Tr. 120:14-121:25); see also Ven-a-Care 1996 letter

to HCFA noting "profit margins of more than 500% and, in some instances, more than 1000%"

and enclosing acquisition cost information for approximately 50 drugs, including many of the

drugs at issue in this case.  (DX 1881 at HHC003-0481; 11/21/06 Hartman Tr. 13:12-17:21);

January 1997, Washington Post article (DX 1726 at 2; 11/28/06 Bell Tr. 121:25-126:24).

       7.     In June 1997, during the run-up to passage of the Balanced Budget Act of

1997 ("BBA"), the House Budget Committee issued a report noting that spreads ranged from

20% to nearly 1000% and the Senate Finance Committee noted that there were spreads ranging

from 20% to 993%, but the House Budget Committee nevertheless stated that it expected HCFA

to use the commercial reporting service to determine AWPs.  (DX 1071 at 1354; 11/28/06 Bell

Tr. 121:7-22).  The BBA was passed in June 1997 (11/28/06 Bell Tr. 139:4-21).  It required

HCFA to reimburse physicians at 95% of AWP.  The statute does not include a definition of

AWP.

       8.     Over defendants' objection, this Court has ruled that Congress expressed its

intention in the BBA that HCFA should base reimbursement on 5% less than an actual average

of wholesale prices, inclusive of discounts and rebates.  There is no evidence that anyone at the

time recognized that this was Congress' intent.  (11/28/06 Bell Tr. 138:5-143:21).  The price

reporting services did not change the way they reported AWP.  There were no objections or

comments by payors, providers or manufacturers concerning what would have amounted to a

radical shift in Part B reimbursement.

       9.     HCFA did not issue guidelines as to how AWP should be calculated.[2]  Nor

did HCFA recognize that, as this Court has ruled, Congress intended AWP to reflect discounts

---

[2]    As Dr. Berndt pointed out, no single company in the industry could independently change the way
AWPs were calculated and disseminated by industry publications.  (DX 1275 ¶¶ 24-26).

and actual prices.  A 1999 Medicare Bulletin is illustrative.  (DX 1166 at NHIC-BCBSMA 006617; 11/28/06 Bell Tr. 144:17-145:2).

10.    In a December 1997 report, OIG also indicated its belief that the shift to 95% of AWP would not result in reimbursement being tied to acquisition cost any more than it had in the past.  (DX 1075 at ii-iii; 11/28/06 Bell Tr. 143:22-144:16).  HCFA agreed with OIG's findings, noting Congress' refusal in the BBA to move to reimbursement based on acquisition costs.  (DX 1075 at D-2).  Contemporaneous with the OIG report in December 1997, President Clinton referred to AWP as a "sticker price" that did not include discounts and said: "Sometimes the waste and abuses aren't even illegal, they're just embedded in the practices of the system." (DX 1074 at 2033-34).

11.    Defendants' expert Dr. Bell specifically analyzed publicly available information from 1997 or earlier.  For single source PADs, some 25% of the observations showed "spreads" in excess of 30.6%.  Not surprisingly, the drugs with spreads greater than 30% were those facing therapeutic competition.  For multi-source PADs published reports ranged from 27% (10th percentile) to 488% (90th percentile).  (Bell Trial Aff. ¶ 42, App. E; 11/28/06 Bell Tr. 123:6-128:23).

12.    In 1999, Donna E. Shalala, Secretary of HEW, discussed AWP in a Report to Congress on the 1997 BBA (DX 1080; 11/28/06 Bell Tr. 145:5-146:19).  Among the points made:

> "[T]he President's 1997 budget contained a legislative proposal that would have based payment on the lower of the billed charge or the actual acquisition cost (AAC) for the drug of the physician or supplier billing Medicare.  However, as discussed above, in the BBA, Congress rejected this proposal in favor of the current rule, which is to pay based on the lower of the billed charge, or 95 percent of AWP."  (DX 1080 at HHC901-0802-HHC901-0803).

5

"The AWP is not a well-defined concept nor is it regulated in any way…. AWP is used as a standard benchmark, with negotiated prices often expressed in terms of AWP minus a certain percentage."  (Id. at HHC901-0803).

". . . the AWP bears no consistent or predictable relationship to the prices actually paid by physicians and suppliers to drug wholesalers in the marketplace." (Id. at HHC901-0809).

13.     HCFA attempted in 2000 to administratively change reimbursement from an AWP basis to cost-based prices calculated by the DOJ.  That attempt was rebuffed by Congress.  (DX 1083, 1085, 1086, 1090; 11/28/06 Bell Tr. 146:22-147:3).  Moreover, while Congress had included the phrase "AWP" in the 1997 BBA, it was widely recognized that Congress intended that HCFA would use the AWPs published by commercially available pricing services.  (DX 1099 at 34; DX 1105 at 8; 11/28/06 Bell Tr. 148:25-149:4).

## II.     The Implementation and Relevance of ASP Reimbursement in 2003

14.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), passed by Congress with an effective date of December 8, 2003, shifted Part B drug reimbursement from 95% of AWP to 85% of AWP in 2004 and then to 106% of ASP in 2005.  (42 U.S.C.A. § 1395w-3a et seq.).

15.     On April 6, 2004 CMS issued a detailed interim final rule on calculating ASP.  CMS sought comments.  (69 Fed. Reg. 17935, 17936 (Apr. 6, 2004)).  On September 16, 2004 CMS issued the final rule, which significantly revised the proposed methodology, based on comments.  (69 Fed. Reg. 55763, 55764 (Sept. 16, 2004)).  CMS is continuing to revise the methodology used.  (11/27/06 Rosenthal Tr. 19:17-25; 70 Fed. Reg. 70116 (Nov. 21, 2005)).

16.     Dr. Rosenthal acknowledged that reimbursement based on a markup from ASP gives physicians a financial incentive to select the higher priced drug among competing therapies (11/27/06 Rosenthal Tr. 29:7-16) and has "real potential" for shifting care to more expensive administration settings such as hospitals.  (11/15/06 Rosenthal Tr. 17:21-18:6).

17.     Dr. Rosenthal also admitted that while reimbursement for certain drugs has gone down, reimbursement for services has gone up, and while she claimed that there were cost savings as a result of the MMA, it is unclear whether any overall cost savings has been achieved. (12/18/06 Rosenthal Tr. 51:11-53:6; 57:17-59:14; PX 4058 at 4, 8-9; PX 4019 at 5).  Dr. Gaier testified that predicted cost savings have not materialized and there is evidence that overall costs have in fact increased.  (Gaier Trial Aff., Attach. 3; 11/29/06 Gaier Tr. 21:2-23:8).

18.     The MMA is not a basis for assessing liability or damages during the class period.  As to Class 3, private payors in this region have declined to adopt ASP.  (¶ 35 infra). Those outside this region that have done so have not necessarily adopted ASP plus 6%. (11/14/06 Hoffman Tr. 109:9-16).  As to Class 2, it is speculative to conclude that an earlier Congress in an earlier time would have adopted the drug and service reimbursement levels selected in 2003.[3]

## III.   Payors' Understanding of AWP Was Consistent With Industry Understanding And Payors Were Not Harmed By Published AWPs

### A.   Blue Cross Blue Shield of Massachusetts Is Knowledgeable Regarding AWP And Typical of Payors

19.     The Court certified Blue Cross Blue Shield of Massachusetts ("BCBS/MA") as a named class representative for Classes 2 and 3.  BCBS/MA is the largest healthcare insurer in Massachusetts, providing health care coverage to nearly one-half of all insured lives in Massachusetts.  (Gaier Trial Aff., Table 27).

#### (i)   BCBS/MA Employees Had Detailed Knowledge Regarding AWP Throughout The Class Period

---

[3]   Also in 2004, the OIG issued a Compliance Program Guidance for Pharmaceutical Manufacturers, which was the first guidance addressing marketing practices related to AWP.  The document noted, however, its limitations.  It was "not [meant] to represent binding standards for pharmaceutical manufacturers," "…represents the OIG's suggestions" and "does not create any new law or legal obligations…." (68 Fed. Reg. 23731, 23733, 23736 (May 5, 2003)).

20.     Numerous current and former BCBS/MA employees have testified to having extensive knowledge regarding AWP as well of the existence of highly variable rebates and discounts throughout the class period ranging to 90% below AWP (a 1,000% spread). (Curran Trial Aff. ¶¶ 5-10,12-13; 11/13/06 Curran Tr. 21:22-22:2, 24:22-25:25; Shramek Trial Aff. ¶¶ 3, 5, 7, 10, 11/20/06 Shramek Tr. 142:6-144:14; Killion Dep. Tr. 24:12-22, 119:4-22, 122:18-22, 138:17-139:5; Fox Dep. Tr. 50:4-19, 126:16-127:10; Fanale Dep. Tr. 19:3-21:16, 84:13-86:13, 185:13-186:21).

21.     Some of these witnesses worked for other health plans in Massachusetts both before and after their time at BCBS/MA where they encountered a similar level of understanding regarding AWP.  (Curran Trial Aff. ¶¶ 2-3, 11/13/06 Curran Tr. 27:16-23, 48:16-49:8; Killion Dep. Tr. 119:4-22, 122:18-22 and 138:17-139:5; see also id. at 24:12-22).

22.     Numerous BCBS/MA internal documents from 1994-2000 show the organization's detailed knowledge that AWP was no more than a benchmark.  See, e.g., DX 1979 at NHIC-BCBSMA 030343; DX 1980 at NHIC-BCBSMA 030378; DX 1020 at BCBSMA-AWP-00066; and DX 1126 at BCBSMA-AWP-42824.

(ii)     BCBS/MA Had Detailed Knowledge Regarding
          AWP Through Its Staff Model HMO Medical West

23.     From 1978 until the late 1990s, BCBS/MA operated a staff model HMO. (DX 1505 at NHIC-BCBSMA 023158; 11/8/06 Coneys Tr. 72:5-17, 79:22-24, 107:5-13).  Mr. Curran worked at the parent company, BCBS/MA, as Director of Pharmacy (1990 to 1994). (11/13/06 Curran Tr. 21:6-14).  His responsibilities included negotiating contracts with drug manufacturers relating to drug purchases for the staff model.  He also signed those contracts once they were finalized and people at the staff model HMO and BCBS/MA worked closely together. (Curran Trial Aff. ¶¶ 15-16).  Other such contracts were signed by Sharon Smith, who was

8

employed by BCBS/MA as Vice President for Network Delivery Management. (Smith Dep. Tr. 10:1-10, 20:9-21:6).  (Smith Dep. Tr. 31:4-32:6; see also id. at 22:13-17, 33:3-7; DX 1024).

24.    Plaintiffs rely on Maureen Coneys.  On cross examination, however, Ms. Coneys admitted to having no personal knowledge regarding drug purchases at all and no knowledge as to what department, division, individuals or part of the organization made these purchases.  (11/8/06 Coneys Tr. 83:14-84:9, 85:10-14; see also Coneys Trial Aff. ¶¶ 10-11; Coneys Dep. Tr. 50:14-51:13).

25.    BCBS/MA purchased drugs for its staff model HMO at discounts as high as 92.67% below AWP (a "spread" of 1,265%).  (DX 1389; Gaier Trial Aff. ¶¶32-34).  Moreover, there was no apparent or fixed relationship between AWP and the prices paid by BCBS/MA to acquire drugs for its staff model HMO.  (DX 1389-1391; Gaier Trial Aff. ¶¶ 32-34).[4]

(iii)    BCBS/MA Continues to Reimburse at 95% of AWP

26.    In 2004, senior officials at BCBS/MA considered whether to follow Medicare in shifting to ASP-based reimbursement.  (11/7/06 Devaux Tr. 126:23-24, 130:1-14, 129:20-25).  BCBS/MA's actuarial department summarized a number of reasons for doing so.  (DX 990 at 2; Mulrey Trial Aff. ¶ 3, 11/8/06 Mulrey Tr. 5:8-24).  The report noted that it would be "administratively easy" to use ASP and that the estimated annual savings associated with a shift to ASP would be over $6 million.  (11/7/06 Devaux Tr. 158:17-25; DX 990 at p. 12, 17 *et seq.*; 11/8/2006 Mulrey Tr. 7:7-14:17).

27.    BCBS/MA was concerned about resistance to the change from its physician network (DX 990 at 12; 11/7/06 Devaux Tr. 159:8-14, 160:15-23) and that oncologists would send patients to hospitals, costing BCBS/MA and the plans it represents more money.  (DX 990

---

[4]   In fact, BCBS/MA was generating revenue from "spread" just like physicians in private practice. (11/8/06 Coneys Tr. 99:3-10; 99:18-100:6; 103:10-17; 103:23-104:6).

at 12; 11/7/06 Devaux Tr. 153:8-154:16, 163:2-15).  As a result, BCBS/MA decided to continue

to reimburse physicians for drugs administered in office at 95% of AWP, instead of adopting

ASP or even lowering the percentage off of AWP.  (11/7/06 Devaux Tr. 158:2-5; 165:13-17).

28.     For the same reasons, BCBS/MA did not change its reimbursement

methodology for its managed Medicare program (Blue Care 65) where BCBS/MA assumed a

substantial financial risk – despite a projected savings.  (DX 999; 11/8/06 Mulrey Tr. 16:23-20:4;

21:8-11; 22:21-24; 24:21-25:21).  BCBS/MA has also rejected other alternatives such as using

specialty pharmacies.[5]

29.     There is no evidence in the record to support plaintiffs' theory that had

plaintiffs understood back in the 1990s that AWPs were allegedly grossly "inflated" they would

have provided lower reimbursement to physicians.  (11/7/06 Devaux Tr. 137:16-22).

(iv)     BCBS/MA Is Expanding Its Use Of AWP To New Areas

30.     In the past, BCBS/MA reimbursed for drugs administered in hospital out-

patient departments based on a negotiated percentage of the hospital's "billed charges."

(Cizauskas Dep. Tr. 124:5-19).  Starting in 2005, BCBS/MA decided to scrap this methodology

in favor of reimbursing hospitals at 95% of AWP.  (11/07/06 Devaux Tr. 148:15-18, 149:17-25;

Cizauskas Dep. Tr. 124:20-126:16).  BCBS/MA calculated a potential network wide savings of

$40.9 million associated with this move.  (PX 899 at BCBSMA-AWP-13035; 11/7/06 Devaux

Tr. 149:2-19).

31.     BCBS/MA transitioned the first set of hospitals in October 2005.

BCBS/MA anticipates all hospitals will have transitioned to AWP by 2011, and sees the shift to

---

[5]     See 11/28/06 Bell Tr. 56:22-57:25, 62:11-65:3; Shramek Trial Aff.  3, 11-12, 15; 11/20/2006 Shramek
Tr. 145:12-24; DX 1148 at 17376-77; Coneys Dep. Tr. 126:17-128:6; DX 1149 at 17191; Killion Dep.
Tr. 80:9-81:1, 109:19-110:7; Coneys Dep. Tr. 138:9-18).

AWP as "a move in the right direction."  (Cizauskas Dep. Tr. 123:22-124:4; 147:10-148:8, 150:8-17; 11/7/06 Devaux Tr. 164:22).

(v)       BCBS/MA Profits From Higher Drug Costs And
          <u>Makes Strategic Elections Around Premium Increases</u>

32.    BCBS/MA calculates the premiums that it will charge its members for its Medigap plans on an annual basis.  (11/8/06 Arruda Tr. 131:16-18).  The premium is calculated to recover projected benefit costs, expected administrative expenses and an amount representing a planned contribution to reserves (the margin BCBS/MA aims to recover above costs).  (<u>Id.</u> at 132:24-136:8, DX 1970).  All third party payors use the same basic methodology to calculate premiums.  (11/8/06 Arruda Tr. 154:25-155:3).

33.    As a result, BCBS/MA may actually make a higher profit based on higher drug costs.  This is because it calculates the "contribution to reserves" (its margin above costs) as a percentage of benefits costs and then works that into its premium calculations.  The greater the cost, the greater the return in absolute dollars to BCBS/MA.  (<u>Id.</u> at 134:18-136:7, 138:24-139:8, 153:11-23).  Plaintiffs failed to adduce any evidence regarding their contrary claim that they, in fact, suffered a loss as a result of defendants' conduct.  (<u>Id.</u> at 154:8-13).

34.    To the extent BCBS/MA's premiums may not have covered the cost of  its Medigap products in certain years, it's because BCBS/MA elected not to implement required premium increases for strategic reasons (DX 1231 at 3; 11/8/06 Arruda Tr. 139:17-143:3).[6]

(vi)      <u>BCBS/MA Is Typical Of Other Payors</u>

---

[6]    BCBS/MA's analysis of the poor financial performance of its Medigap products make no mention of drug costs.  (11/8/06 Arruda Tr. 141:20-142:3; DX 1231, 1232).  BCBS/MA gave no consideration to AWP in administration of its Medigap plans.  (11/8/06 Arruda Tr. 146:8-11).  BCBS/MA (like Sheet Metal Workers Health Fund) made Medi-gap payments in accordance with the amounts determined by CMS.  (Arruda Trial Aff. ¶ 8; 11/8/06 Arruda Tr. 122:7-123:1; Revised Randle Trial Aff. ¶ 3; 11/6/06 Randle Tr. 200:25-201:4).

35.    Not a single payor in this region has abandoned using AWP.  (12/08/06 Bell Tr. 38:9-11).  The industry standard has remained to reimburse at 95% of AWP.  (11/7/06 Devaux Tr. 136:16-22; Killion Dep. Tr. 89:10-14.  See also 12/06/06 Akscin Tr. 90:11-22).

36.    All major Massachusetts insurers (with the exception of Tufts) purchased drugs directly through staff model HMOs during the class period producing substantial "spreads."  (DX 1392-1403; DX 2001; Gaier Trial Aff. ¶¶ 32-34).  These plans cover some 70% of the covered lives in Massachusetts.  (Id.).

37.    Like BCBS/MA, numerous payors testified that they had no expectation as to there being any relationship between AWP and actual drug acquisition costs and that competition leads to greater spreads.[7]  Numerous payors also testified that the fact that providers earned a margin on drugs was both well known and intended by payors.[8]

B.    Taft Hartley Funds Are Sophisticated
Or Rely On Sophisticated Market Actors

38.    Mr. Hannaford and Mr. Randle indicated that they personally did not have knowledge regarding drug pricing.  (11/06/06 Hannaford Tr. 169:7-170:14; 11/06/06 Randle Tr. 201:20-202:13).  But Dr. Rosenthal testified that in her experience some Taft-Hartley Funds are "incredibly sophisticated" in regard to drug pricing.  (11/15/06 Rosenthal Tr. 32:5-19).  Moreover, many rely on large insurers, like BCBS/MA – a point plaintiffs' counsel conceded at trial.  (12/07/06 Tr. 60:13-22).

---

[7]    See, e.g., Lemke Dep. Tr. 123:17-124:16; Spahn Dep. Tr. 97:17-98:13; Ellston Dep. Tr. 89:18-90:5; Wert Dep. Tr. 35:17-37:17; Beaderstadt Dep. Tr. 72:17-73:5; Brown Dep. Tr. 127:7-14; Niebylski Dep. Tr. 71:5-18; Newcomer Dep. Tr. 128:20-129:17; Cannon Dep. Tr. 35:16-36:18; Herbold Dep. Tr. 85:21-86:11; Kenney Dep. Tr. 12:1-13:7, 15:2-17.  Mr. Mulrey at BCBS/MA, testified to the belief that published AWPs reflected actual prices.  (Mulrey Trial Aff.  18), but he admitted that he does not work with physicians and that others at BCBS/MA are far more knowledgeable about AWP than he is.  (11/08/06 Mulrey Tr. 39:22-41:3).

[8]    See, e.g., Johnson Dep. Tr. 30:22-31:19; Sidwell Dep. Tr. 40:2-8; Cannon Dep. Tr. 147:4-7; Pfankuch Dep. Tr. 50:3-14; Dragalin Dep. Tr. 60:7-18; Spahn Dep. Tr. 93:6-95:5; Newcomer Dep. Tr. 176:21-177:13; Maxwell Dep. Tr. 154:2-157:1.

39.     Pipefitters Local 537 Trust Funds ("Pipefitters"), a named class representative for Class 3, contracted with BCBS/MA.  (Hannaford Trial Aff. ¶ 11).  Pipefitters thought that BCBS/MA, due to its size and sophistication, would "be able to exact a better discount for [the Fund]" than other insurers or than Pipefitters could secure on its own. (Hannaford Dep. Tr. at 133:4-11; 11/06/06 Hannaford Tr. 167:11-20, 176:12-177:5, 181:13-17). BCBS/MA has continued to reassure clients like Pipefitters that using 95% of AWP is still the best approach.  (11/6/06 Hannaford Tr. 168:6-23, 196:4-15).[9]

40.     Sheet Metal Workers National Health Fund ("SMW"), a named class representative for Class 2, has engaged Southern Benefits Administrators ("SBA") to act both as a third party administrator and as a consultant in relation to its provision of health benefits. (11/06/06 Randle Tr. 204:19-205:1).  SMW relies on SBA as a fiduciary of the fund to advise it. (11/07/06 Faulkner Tr. 4:11-20; 11/06/06 Randle Tr. 205:16-207:18).

41.     The Operating Engineers, Local 4, Health & Welfare, Pension, Annuity and 401K Plans ("Local 4"), a purported member of Class 3 only (11/07/06 Alongi Tr. 24:16-19, 26:1-2), made use of outside consultants to negotiate contracts and utilized the purchasing power, consultants and lawyers of its international branch.  (Id. at 35:18-37:9, 46:22-47:12). Prior to August 15, 2005, Local 4's PAD reimbursements were based on a negotiated rate unrelated to AWP.  (Id. at 29:25-30:20).[10]

---

[9]   Pipefitters has been "entirely dependent" on BCBS/MA and had "no independent knowledge" on issues relating to that coverage.  (Hannaford Dep. Tr. 156:14-21).

[10]   To the extent Local 4 reimbursed for any PADS at a rate related to AWP prior to 2005, it did so either (1) through specialty pharmacy services provided by its contracted PBMs, in which case there was no physician margin; or (2) to the extent these drugs were also dispensed as SADs at retail pharmacies, through the pharmacy benefit specified in its PBM contracts.  In both instances, reimbursement ranged from AWP minus 14% to AWP minus 23% and no evidence was introduced as to the prices retailers paid for those drugs.  (DX 3000-3001; 11/07/06 Alongi Tr. 26:3-22, 27:25-28:25, 38:11-14, 46:3-12, 51:21-52:6; 11/28/06 Bell Tr. 62:11-13, 63:21-25).

13

IV.     **Plaintiffs' Liability Theories Are Based on Unreliable
        Factual Assumptions And Economic Methodology**

42.     Plaintiffs called Dr. Hartman as their chief economic expert.  (11/20/06 Hartman Tr. 8:10-22).  Most of his "health care economics" work has been performed in connection with litigation for plaintiffs' lead counsel in "more than ten" separate cases. (Hartman Trial Aff., Attach. A; 11/20/06 Hartman Tr. 105:21-23).

43.     For Class 3, Dr. Hartman submits that the "marketplace" had an expectation that AWP did not exceed ASP by more than 30%.  (11/20/06 Hartman Tr. 78:17-79:9; 11/21/06 Hartman Tr. 27:3-14).  Liability, causation and damages are established in his view for Class 3 for any drug whose AWP exceeds its ASP by more than 30%.  (11/21/06 Hartman Tr. 27:3-14, 77:16-19, 135:12-136:3).  In his original liability report, Dr. Hartman also applied his 30% expectation theory to Class 2.  (11/20/06 Hartman Tr. 119:17-19).  At trial, however, Dr. Hartman opined that for Class 2 liability, causation and damages exist for any drug whose AWP exceeded its ASP (Id. at 115:18-116:6) – even though he conceded that Medicare had the same expectations as the private sector.  (Id. at 88:12-17, 118:13-120:25).

A.     Dr. Hartman's Claimed 30% Market Expectation
       Is Irreconcilable With The Factual Record

44.     Given Dr. Rosenthal's concession (see Finding 1(e)-(f)) that the market understood and expected at least a 25% formulaic markup from WAC to AWP, Dr. Hartman's liability theory rests on the premise that the market understood and expected rebates or discounts no greater than 3.8% below WAC (resulting in a spread below 30%), but was defrauded by a discount of 4% or higher (resulting in a spread over 30%).  (11/21/06 Hartman Tr. 135:7-136:3).

45.     Dr. Hartman originally told the Court that he was going to conduct surveys to determine payor expectations.  But he did not conduct any surveys.  (Id. at 27:15-23).  Nor did

he talk to any third-party payors before arriving at his 30% yardstick.  (Id. at 27:24-29:4).

Rather, Dr. Hartman now relies on three surrogates to determine payor expectations.

> (i)   Dr. Hartman Largely Relies On Comparator Drugs Without Competition

46.    In arriving at his 30% expectation speed limit, Dr. Hartman relies on

spreads for single-source drugs that faced little or no therapeutic competition.  He then applies

this speed limit to find liability and damages for drugs that face therapeutic competition.

(11/21/06 Hartman Tr. 35:9-36:13).

47.    This approach ignores the fundamental facts of pharmaceutical drug pricing

lifecycles.  A newly launched branded drug facing no competition will generally have few or no

rebates and discounts associated with it, and essentially will be sold at WAC.  When competition

enters the market, rebates and discounts off of WAC become a feature of the market as the drugs

compete on the basis of price.  Eventually, the drug loses its patent protection and generic

competitors enter the market, at which point drug prices fall even further.  Then eventually a new

branded drug enters the market and the pricing lifecycle starts over again.  (11/28/06 Bell Tr.

79:18-81:24, 83:10-84:13).

48.    The existence of differential pricing to different purchasers based on their

ability to move market share has long been known in the market.  (11/28/06 Bell Tr. 84:14-

88:19).[11]  As Dr. Berndt has found and common sense dictates, payors understand these market

dynamics result in competition-driven discounting and rebating (DX 1275 ¶ 52; 11/21/06

Hartman Tr. 39:4-18; ¶ 53 infra), which plaintiffs' experts described as "normal" and "rational"

competitive behavior."  (11/27/06 Rosenthal Tr. 51:15-21; Hartman Trial Aff. ¶ 35; 11/20/06

Hartman Tr. 114:6-115:9; see also Bell Trial Aff. ¶¶ 93-95).

---

[11]   See, e.g., DX 1042A at 4; DX 1630 at 2 (1993 MDL 997).  See also 11/28/06 Bell Tr. 112:2-113:4;
DX 1056 at 46, Figure 2.10.

(ii)    Publicly Available Information Contradicts Dr. Hartman's Expectation

49.    Numerous publicly available reports before and during the class period depicted spreads in excess of 30%. Medicare also knew that spreads often exceeded 30%. For example, the 1992 OIG report lists discounts resulting in spreads in excess of 400%. (DX 1053 at App. III; 11/20/06 Hartman 123:17-21). It also explicitly states that "AWP is not a reliable indicator of the cost of a drug to physicians." (DX 1053 at 5; 11/21/06 Hartman Tr. 52:3-17, 53:10-55:8; ¶¶ 2-18 supra).

50.    Dr. Hartman sought to dismiss much of this evidence on the ground that it related to multi-source drugs only and he excluded multi-source drugs from Class 3 liability.[12] Publicly available information on spreads for "multi-source" drugs provides insights into how competition increases spreads. Moreover, these documents demonstrated that spreads often exceeded 30% on single source drugs as well once they began to face therapeutic competition from other single source drugs. For example, the 1997 OIG report showed spreads on Kytril and Zofran (single source drugs competing with each other) for 1995 and 1996 that were all in excess of Dr. Hartman's speed limit, ranging up to 55.1%, and generally increasing over time. (Hartman Trial Aff., App. D; 11/28/06 Bell Tr. 123:6-127:3; DX 1075 at App. A-C; 12/18/06 Hartman Tr. 93:3-94:1, 104:14-107:2).

51.    Payors similarly did not expect AWPs to be larger than ASPs by a reasonably predictable amount, as Dr. Hartman ultimately acknowledged. (Hartman Trial Aff. ¶ 18; 11/21/06 Hartman Tr. 22:2-12).

(iii)    Reimbursement Contracts

---

[12]    Yet, when Dr. Hartman offers alternatives to his "zero" spread theory for Class 2, ranging from 5% to his 30% expectation, he applies these alternatives to multi-source drugs in this case. (PX 4008).

52.     Dr. Hartman assumes payors contracting with providers would have forced lower reimbursement rates on providers if payors had realized spreads were or could be greater than 30%.  (11/21/06 Hartman Tr. 43:25-44:15).  The case of BCBS/MA and other payors in this region still reimbursing at 95% of AWP contradicts this assumption.  (¶35 supra; Farias Dep. Tr. 43:4-16).  Moreover, Dr. Hartman admitted, but did not take into account in his analysis, that payors use profitability to attract providers, some of whom have significant market power, to their networks (11/21/06 Hartman Tr. 44:16-46:3); that payors want to encourage doctors to treat patients outside of the hospital (Id. at 46:4-20); and that payors paid more for drugs as a way of cross-subsidizing underpayment for services (Id. at 46:21-49:6; DX 1268).  Indeed, plaintiffs' counsel specifically directed Dr. Hartman not to analyze cross-subsidization.  (Id. at 50:18-21).

B.     Defendants' Experts' Testimony

53.     Defendants' experts have considered all of these issues.  For example, Dr. Gregory K. Bell, an industry expert, testified that both Medicare and private payors understood the differences between AWP and acquisition costs when they devised their reimbursement approaches.  (Bell Trial Aff. ¶¶ 38-57, App. C-E; 11/28/06 Bell Tr. 104:24-149:4).  Moreover, competition has a significant impact on reimbursement amounts.  (Bell Trial Aff. ¶ 72; 11/28/06 Bell Tr. 65:4-66:11).  Dr. Bell also noted that payors have a strong incentive to encourage physicians to administer drugs in the office, as opposed to the hospital where it is more expensive (Bell Trial Aff. ¶ 74; 11/28/06 Bell Tr. 67:8-23, 149:9-20) and that cross-subsidization impacted reimbursement.  (Bell Trial Aff. ¶¶ 75-76, 90-92; 11/28/06 Bell Tr. 149:9-150:7).  In addition, he found that it was always Medicare's objective to reimburse on a "reasonable charge" as opposed to a reasonable cost basis.  (Bell Trial Aff. ¶¶ 77-92; 11/28/06 Bell Tr. 146:22-149:8. See also Gaier Trial Aff. ¶¶ 8-49, 50-55; 11/29/06 Gaier Tr. 9:15-12:10).

54.     In addition, both Dr. Bell and Dr. Gaier testified that payors and providers do not consider reimbursement on a drug-by-drug basis; rather, they focus on reimbursement levels overall.  (Bell Trial Aff. ¶¶ 31, 71; Gaier Trial Aff. ¶¶ 50, 54; 11/29/06 Tr. Gaier 39:9-19, 41:13-42:5).[13]  Dr. Hartman did not address this issue.  Dr. Bell and Dr. Gaier both concluded that there is no reason to believe that total reimbursements would have been lower in Dr. Hartman's "but for" world for a variety of reasons.  (Bell Trial Aff. ¶¶ 33, 37; 12/8/06 Bell Tr. 32:24-34:1; Gaier Trial Aff. ¶¶ 3, 29-30, 40, 55; 11/29/06 Gaier Tr. 21:2-25:6, 24:13-25:18). Third party payor testimony was consistent with this conclusion.  (See, e.g., Maxwell Dep. Tr. 154:2-156:10; Farias Dep. Tr. 152:13-153:2; Sidwell Dep. Tr. 68:21-69:10; Spahn Dep. Tr. 93:18-95:5).

55.     Dr. McFadden, a Nobel Prize winner in economics, concluded that Dr. Hartman's analysis is not a scientific or "economic analysis" because he has not relied on any empirical evidence of what expectations were.  (McFadden Trial Aff. ¶ 16).  "His analysis, in effect, assumes his conclusions about the existence of the alleged fraud" (Id. ¶¶ 23, 51-52, 78) while the evidence actually supports the alternative hypothesis.  (Id. ¶¶ 16, 25, 48, 52-77).[14]

56.     Dr. Hartman's theory is also contradicted by the testimony of Dr. Haegele, a practicing oncologist, who stated that the income derived from the drug margins was essential to make up for (1) the drug-related expenditures (such as financing, storage, mixing) that were not separately billable, (2) the under-reimbursed and unreimbursed services, facilities and supplies provided by her practice, and (3) instances where insurers or patients failed to pay her (Haegele

---

[13]   This is consistent with the testimony of various third-party payors.  (Owens Dep. Tr. 37:20-38:6; Baederstadt Dep. Tr. 76:9-77:2; Lemke Dep. Tr. 68:14-21; Spahn Dep. Tr. 59:4-16; DX 1268; 11/21/06 Hartman Tr. 48:6-50:14).

[14]   Dr. McFadden also concluded that Dr. Hartman's 30% speed limit, if it were enacted into law, could actually harm consumers by causing prices to increase – a conclusion shared by other experts and not considered by Dr. Hartman.  (McFadden Trial Aff. ¶¶ 16, 102-07; Gaier Trial Aff. ¶ 28; 11/28/06 Bell Tr. 74:21-75:3; 12/18/06 Rosenthal Tr. 34:18-37:11; DX 1923).

18

Trial Aff. ¶ 50; 12/06/06 Haegele Tr. 123:22-124:1).  She identified a number of aspects of cancer care that are not reimbursed.[15]  Dr. Haegele's testimony is supported by a 1999 study. (DX 1081).  Dr. Haegele also described the benefits to patients and payors of in-office treatment. (12/06/06 Haegele Trial Tr. 107:8-22; 109:2-15; Haegele Trial Aff. ¶¶ 23-24).

       C.     Dr. Rosenthal's Testimony Does Not Compensate
             For Dr. Hartman's Shortcomings

       57.    Dr. Rosenthal has no opinion as to whether Dr. Hartman's 30% is the right yardstick.  (11/15/06 Rosenthal Tr. 58:22-59:7; 78:16-21; 11/27/06 Rosenthal Tr. 71:10-13).  Dr. Rosenthal did not assess the impact of many factors that could affect the spread for any particular drug, including:  the competitive market for a drug (11/15/06 Rosenthal Tr. 100:9-24); the correlation between market share and a drug's spread (Id. at 102:2-8); the correlation between physician market power and a drug's spread (Id. at 102:16-103:1); expectations of TPPs concerning spreads that are inconsistent with the plaintiffs' posited 30% (Id. at 103:17-105:17); and TPP economic interest in site of care and size and accessibility of pharmacy and physician networks.  (Id. at 106:7-107:9).

       58.    The application of the theory of "sticky wages" to physician reimbursements is contrary to the limits of applicability of the theory to wage earners, and Dr. Rosenthal has done no study to justify expanding the theory to professionals.  (12/18/06 Rosenthal Tr. 22:12-23; 11/29/06 Gaier Tr. 27:11-28:10).  Payors within this region have – despite undisputed knowledge of large spreads – stayed with an AWP system for what they consider to be credible business reasons.  (11/29/06 Gaier Tr. 28:11-30:9).

---

[15]  These include: (1) treatment planning; (2) I.V. access; (3) laboratory maintenance; (4) drug inventory maintenance; (5) drug mixing; (6) protective apparel; (7) medical waste disposal; (8) counsel; (9) social services; (10) pain management; (11) terminal care; and (12) billing.  (12/06/06 Haegele Tr. 124:2-125:23; see also Haegele Trial Aff. ¶¶ 37-39, 41, 49).

D.      Dr. Hartman's Class 3 Damage Analysis

59.     The evidence contradicts Dr. Hartman's assumption that all non-hospital drug reimbursements were based universally on AWP throughout the class period.  (Gaier Trial Aff. ¶ 56).  Prior to 1995, BCBS/MA did not use AWP.  (Mulrey Trial Aff. ¶¶ 10-11).  Even after 1995, BCBS/MA has made only limited use of AWP in its reimbursements.  Some 43% of BCBS/MA's drug reimbursements since 1995 are not based on AWP and appears to result from the use of alternative reimbursement methodologies.  (Gaier Trial Aff. ¶ 59; DX 3006; 12/18/06 Hartman Tr. 99:13-100:16).

60.     Harvard Pilgrim through much of the late 1990s and early 2000s used capitated risk arrangements where AWP generally has no bearing on the patients' co-pay or co-insurance obligations.  (Cizauskas Dep. Tr. 63:5-12; 11/08/06 Mulrey Tr. 32:11-33:12; 37:16-21. See also Gaier Trial Aff. ¶ 58).

E.      Dr. Hartman's "Zero" Spread for Class 2

61.     Dr. Hartman's Class 2 liability theory would result in liability for all drugs sold in the U.S. during the class period because apparently all drugs have "spreads."  Dr. Rosenthal's own view is that there is nothing wrong about drugs' AWPs being different from their ASPs.  She also takes the view that payors were aware of discounting from WAC and that such discounting is not in of itself unfair or deceptive.  (11/15/06 Rosenthal Tr. 66:5-10, 75:1-6; 11/27/06 Rosenthal Tr. 56:15-18; 69:21-71:9, 83:20-84:2; 11/21/06 Hartman Tr. 22:13-23:3).

V.      **Plaintiffs Have Failed To Identify Any Individual Class 3 Members**

62.     Anna Choice and Rebecca Hopkins are not residents of Massachusetts and received all their medical care in other states.  (11/7/06 Choice Tr. 76:23-77:5; 11/7/06 Hopkins Tr. 95:2-10, 97:18-23, 110:20-25).

20

Respectfully submitted

Dated:  February 13, 2007                /s/ William F. Cavanaugh, Jr.
                                              William F. Cavanaugh, Jr.
                                              Andrew D. Schau
                                              Erik Haas
                                         PATTERSON BELKNAP WEBB & TYLER LLP
                                         1133 Avenue of the Americas
                                         New York, New York  10036-6710
                                         (212) 336-2000

                                         *Attorneys for the Johnson & Johnson defendants
                                            on behalf of all Track 1 defendants*

21

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on February 13, 2007 via electronic service to counsel for all parties.

/s/ Andrew D. Schau

Andrew D. Schau

1345017v2