- Exhibit 2 -

**HIGHLY CONFIDENTIAL**

## EXPERT DECLARATION OF STEVEN J. YOUNG ON BEHALF OF TAP PHARMACEUTICAL PRODUCTS INC. RELATING TO MONTANA

**Dated February 8, 2007**

**HIGHLY CONFIDENTIAL**

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | | QUALIFICATIONS AND COMPENSATION | 1 |
| II. | | BACKGROUND | 3 |
| III. | | Opinions | 5 |
| | A. | TAP Sold Prevacid® To Wholesalers And Direct Retail Customers (i.e., Retail Pharmacies) At Its Published WAC. Thus, Retail Pharmacies That Were Reimbursed By Medicaid Purchased Prevacid® At Prices Approaching Or Above WAC | 5 |
| | B. | TAP's Sales To The Retail Class Of Trade Were Primarily Made Through Wholesalers, And TAP Did Not Control Or Possess Data Related To The Mark-up Wholesalers Added To The Acquisition Cost Of The Retail Pharmacies | 6 |
| | C. | The State Medicaid Agency Did Not Pay Its Prevacid® Claims Using The "AWP Based Formula" On Several Occasions and, In Fact, Paid Many Pharmacies at Amounts Below That level | 7 |
| | D. | The State Medicaid Agency Paid Amounts At Or Below The Commercial Market Price | 9 |
| | E. | The State Had Significant Actual Knowledge Regarding Discounting Of Prevacid® To Non-retail Purchasers And Received ASP Amounts From TAP Starting in 2002 | 11 |
| | F. | Dr. Hartman's Calculation Of Penalties For Prevacid® Is Fundamentally Flawed: | 12 |

**HIGHLY CONFIDENTIAL**

## I.    QUALIFICATIONS AND COMPENSATION

1.  I have been a consultant to the health care industry for more than twenty years.  I have substantial experience with health insurance reimbursement, claims processing, pharmaceutical pricing and distribution channels, and government pricing in the health care industry.  My Curriculum Vitae is attached as Exhibit 1a, and a listing of testimony I have provided is attached as Exhibit 1b.

2.  Specifically, I have substantial experience in analyzing insurance companies' claims data and reimbursement schedules.  For example, I have analyzed health insurance companies' claims and membership data to assess their Medicare coordination of benefits processes.  Associated with these engagements, I have analyzed large health insurer claims data sets.  In addition, I have analyzed large claims data sets reflecting a variety of contractual reimbursement structures outside of the Medicare context to determine if the insurance company or its subcontractor properly paid claims in accordance with particular contractual terms or state requirements.

3.  I also have extensive experience assisting insurance and managed care companies structure and prepare proposals to perform managed care support contracts for the Department of Defense under the TRICARE program.  This program provides health insurance to active duty and retired military personnel and their families.  In these engagements, dating back to the early 1990's and continuing through 2003, I have focused on assisting the managed care company structure and price its operations to meet all requirements of the contract, including claims processing, customer service, provider relations, provider contracting, utilization management, and quality management.  As part of these engagements, I have worked closely with the insurance companies' management as well as their actuarial and technical experts to make overall strategic pricing assessments relating to the various components of health care pricing, including pharmaceutical cost, and their related administrative costs.  The controllable health pricing components considered include provider network contracting, pricing, and discounting; utilization management; and coordination with military treatment facilities.

4.  I have also worked with various insurance companies that contract as Medicare Fiscal Intermediaries and Medicare Carriers to assist them in various

**HIGHLY CONFIDENTIAL**

government contracting requirements, proposals for the new Medicare Administrative Contracts and requirements associated with transitioning Medicare claims processing activities to a successor contractor. I am therefore familiar with the operating structure of these organizations and their related cost structures.

5. I also have experience related to pharmaceutical manufacturer pricing and discounting practices for both branded and generic drugs particularly as it relates to government programs such as the Medicaid Rebate Act ("MRA") and the Veterans Health Care Act ("VHCA") as well as the recently adopted Medicare ASP regulations. I have worked with pharmaceutical companies in performing detailed analyses of their historical pricing, chargebacks, and rebate data to assist them in complying with these Federal programs. As a result, I am familiar with the conceptual and practical objectives and processes that have resulted from the governmental guidance related to these programs as well as how that guidance is applied throughout the pharmaceutical industry. As part of those engagements, I have analyzed large data sets to assess compliance with applicable Best Price or Most Favored Customer price requirements as well as identify the appropriate classes of trade and pricing actions to arrive at the various average prices calculated under these Federal requirements (i.e. Average Manufacturer Price ("AMP") under the MRA, Non-Federal Average Manufacturer Price ("Non-FAMP") under VHCA and Average Selling Price (ASP) under Medicare Part B.)

6. I have also served as an independent expert in disputes and contractual compliance related to pharmaceutical manufacturers. These matters have included the assessment of a pharmaceutical company's cost allocation to product lines, performance of a royalty audit under the provisions of its joint marketing agreement, and an arbitration dispute between a pharmaceutical manufacturer and a PBM regarding the appropriateness of rebates billed by the PBM.

7. I have also assisted companies that sell commercial products to the Federal government through GSA and VA Federal Supply Schedules. The Federal regulations allowing companies to obtain these contracts require extensive disclosures of commercial sales practices and pricing. During these engagements, I have analyzed large volumes of data related to pricing, discounting, and rebates to determine the company's pricing and discounting practices. I have also assisted companies in

**HIGHLY CONFIDENTIAL**

preparing comprehensive disclosures of their commercial sales practices. These engagements involved a wide range of industries including, among others, furniture manufacturers, security equipment manufacturers, durable medical equipment manufacturers, secure communications systems, and satellite telephones.

8.      I am being compensated at an hourly rate of $425. No portion of my firm's compensation is dependent on the nature of my findings or on the outcome of this matter. A list describing the data and information I relied upon in preparing this report is attached as Exhibit 2.

## II.     BACKGROUND

9.      This report supplements the information and opinions provided in the Merits Report and Declaration of Eric M. Gaier, PH.D. dated February 8, 2007 with information specific to TAP Pharmaceutical Products Inc. ("TAP") and its product Prevacid® and provides additional opinions based upon Prevacid® sales information and Medicaid's reimbursement practices for Prevacid®.

10.     I have been asked to analyze TAP's sales and Medicaid data, pricing disclosures to Plaintiff State of Montana ("Montana Medicaid" or "Medicaid") and other government agencies, and the Medicaid reimbursement information provided by Montana Medicaid to assess the allegations and the conclusions of Montana Medicaid's expert Dr. Hartman as they relate to Prevacid®.

11.     Prevacid® is a single source branded self-administered drug that is subject to competition from other branded products within its therapeutic category.[1] Medicaid patients are dispensed self-administered drugs through retail pharmacies. There are certain well accepted, industry-wide practices related to branded products of this type.

12.     Most pharmaceutical manufacturers, including TAP, establish a "list price" for brand name drugs, which is the price at which manufacturers sell to direct customers that lack the leverage to negotiate discounts and to wholesalers. In the pharmaceutical industry, the list price is commonly referred to as the "wholesale acquisition cost"

---

[1] Prevacid® is included in the Proton Pump Inhibitors therapeutic category  which includes other drugs such as Nexium, Protonix, Aciphex and Omeprozole . See http://www.drugs.com/prevacid.html.

**HIGHLY CONFIDENTIAL**

("WAC").[2]  Manufacturers provide their list prices to wholesalers and report them to companies that publish pharmaceutical pricing information.

13.    Montana Medicaid's expert, Dr. Hartman, has acknowledged in his report and supplemental report and at his deposition on August 23, 2006 in this case that wholesalers and the retail class of trade (i.e., retail pharmacies) purchase branded pharmaceuticals, including Prevacid, at the manufacturers' Wholesale Acquisition Cost ("WAC").[3]  Manufacturers of brand name drugs such as Prevacid® do in fact distribute the majority of their drugs to retail pharmacies through wholesalers (e.g., McKesson, Cardinal and AmerisourceBergen).[4] It is well established that pharmacies acquire brand name drugs at or around the WAC.  Plaintiffs' expert in the MDL 1456 class action concurs that retail pharmacies normally buy branded self-administered drugs at or about WAC.[5]  Published studies have also concluded that retail pharmacies purchase at or around WAC.[6]

---

[2] *See* Dr. Stephen Schondelmeyer Declaration in Support of Plaintiffs' Motion for Class Certification for MDL 1456 dated September 2, 2004 ("Schondelmeyer Report") on pages 21-22 paragraph 54, "WAC is a publicly available price that is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product. Although drug wholesalers may receive "discounts or special deals" for some drug purchases, the wholesalers' price to the retail class of trade is typically based on, or is a function of, the WAC." See also
http://www.firstdatabank.com/support/rcs/policies/pricing_policy.aspx which states "Wholesale Acquisition Cost (WAC) (previously referred to as Net Wholesale Price) as published by First DataBank represents the manufacturer's *(for purposes of this Drug Price Policy, the term "manufacturer" includes manufacturers, repackagers, private labelers and other suppliers)* published *catalog* or *list* price for a drug product to wholesalers.  (Attached as Ex. 3)

[3] See Hartman Deposition Transcript dated August 23, 2006, p. 95. "Q. So, in equating ASP to estimated acquisition cost, you're assuming no wholesaler markup, correct? A. I'm assuming, as your own Mr. Young is – has – assumed – is that the – the retail acquisition cost is equal – is approximately equal to WAC, and that the – if one measures the – the various price judgements and discounts, that, when one is looking at those sales to the – to those providers, that's what's reflected in ASP."  (Attached as Ex. 4)

[4] See Hartman Transcript Dated August 23, 2006, p. 93.

[5] See Schondelmeyer Report, para.89.

[6] See "A Survey of Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky." Prepared for the Kentucky Department for Medicaid Services by Myers and Stauffer LC, Certified Public Accountants, p.4. and also "Report to the General Court: October 2, 2002: Commonwealth of Massachusetts Executive Office of Health and Human Services Division of Health Care Finance and Policy: Linda L. Ruthardt, Commissioner." p.15. and See also www.cms.hhs.gov/MedicaidDrugRebateProgram.

HIGHLY CONFIDENTIAL

## III.    OPINIONS

### A.    TAP Sold Prevacid® To Wholesalers And Direct Retail Customers (i.e., Retail Pharmacies) At Its Published WAC. Thus, Retail Pharmacies That Were Reimbursed By Medicaid Purchased Prevacid® At Prices Approaching Or Above WAC

14.    TAP sold Prevacid® at WAC to the retail class of trade[7] (over 88% of TAP's sales to the retail class of trade were at WAC).  The large chain and mail order pharmacies, which purchased directly from TAP, paid prices at WAC and other retail pharmacies, which purchased from wholesalers, likely paid at or above WAC.  Since most retail pharmacies purchased Prevacid® at or around WAC (either slightly above or slightly below) there is no "spread" between the retailers' acquisition cost for Prevacid® and the published WAC.  The WAC for Prevacid® is provided to Medicaid along side the AWP focused upon by Medicaid.[8]   The table below summarizes my analysis of all direct and indirect sales data for Prevacid® from 1996 to 2003.  I have determined the percentage of TAP's sales of Prevacid® to the retail class of trade at a price that was equal to WAC.[9]

| Retail Class of Trade 1996-2003 | | |
|---|---|---|
| **Prevacid** (00300-3046-11, 00300-3046-13, 00300-3046-19) | | |
| | **Dollars** | **Percentage** |
| Sales at WAC [1] | $              12,998,594,734 | 88.33% |
| Sales below WAC | $                1,717,726,807 | 11.67% |
| Total | $              14,716,321,541 | 100.00% |

Notes:
(1) Sales at WAC represent those sales at prices greater than WAC less a 3.5% cash discount.

15.    Because TAP sold Prevacid® at its published WAC to the retail class of trade, there is no evidence to support Medicaid's allegation that TAP artificially inflated its published pricing to mislead the State.

---

[7]  In this report and all related analyses, I use the definition of retail class of trade established under the guidance published by CMS related to the Medicaid Rebate Act.  This is the appropriate class of trade to be used when assessing the allegations related to self administered drugs sold to patients primarily through retail pharmacies. This definition excludes hospitals, HMO's and governmental purchasers. Inclusion of hospital and governmental pricing is inappropriate when measuring retail acquisition costs.

[8]  The pricing compendia provided both an AWP and WAC for Prevacid® during the entire period subject to litigation.  In addition, both the AWP and WAC were identified in the pricing tables used by the State and provided by ACS in this matter.

[9]  Manufacturers normally grant an across the board prompt payment discount of 1% to 3.5% to all wholesalers, distributors and other direct customers.  Throughout the remainder of this report and in my analysis I consider sales at WAC less prompt payment discount to be sales at WAC.

**HIGHLY CONFIDENTIAL**

## B.    TAP's Sales To The Retail Class Of Trade Were Primarily Made Through Wholesalers, And TAP Did Not Control Or Possess Data Related To The Mark-up Wholesalers Added To The Acquisition Cost Of The Retail Pharmacies

16.    The majority of TAP's sales to the retail class of trade were made through wholesalers.  TAP does not control and has no data available to it regarding the price at which wholesalers sell to retail pharmacies. Montana Medicaid should have considered any wholesaler mark-up when establishing the EAC for the retail pharmacies. Furthermore, chain pharmacies that buy direct from the manufacturer incur the added cost, beyond drug acquisition and dispensing costs, of maintenance, storage, and distribution which Medicaid must consider when establishing EAC reimbursement levels for retail pharmacies.  Wholesaler mark-ups for smaller or independent pharmacies and distribution costs for direct purchaser pharmacies are a significant consideration given the narrow difference between the WAC price at which TAP sold Prevacid® and the reimbursement paid by Montana Medicaid under the EAC approach.[10]

17.    The table below provides the percentage of sales directly to retail pharmacies and the percentage of sales to the retail class of trade through indirect wholesaler distribution.

**Retail Class of Trade Category Analysis 1996-2003**
**Net Sales After Considering Chargebacks**

|  | Prevacid (00300-3046-11, 00300-3046-13, 00300-3046-19) | |
|---|---|---|
|  | **Dollars** | **Percentage** |
| **Wholesaler/Distributor** | $          9,715,726,530 | 66.02% |
| **Pharmacy** | $          5,000,595,011 | 33.98% |
| **Total Retail** | $        14,716,321,541 | 100.00% |

18.    Less than 34% of sales to the retail class of trade involve chargebacks or direct sales to retail[11] pharmacies.  For the remaining more than 66% of sales, TAP had

---

[10] *See* Affidavit of Stephen W. Schondelmeyer, dated May 26, 2000, pp. 8-9.  "Reasonable and rational comparisons between the ingredient acquisition process of chain versus independent community pharmacies cannot be made without a consideration of the wholesale and distribution costs incurred by chain pharmacies.  In addition to the actual cost of the drug product, the pharmacy has to pay the wholesaler a markup on the cost of the drug to cover the cost of the wholesaler's services.  In 1994 the average wholesaler markup (i.e., gross margin) was 5.38% (*The 1995 NWDA Industry Trend Report: The Fact Book*, National Association of Wholesale Druggists, 1995).  This is another real cost which the pharmacy must pay above and beyond the actual acquisition cost of the drug product.  The actual wholesale markup among pharmacies may vary widely, ranging from less than 1% markup in some cases to greater than 7% markup in other cases."

[11] Approximately 29% of sales were direct sales to pharmacies and 5% were chargeback sales to pharmacies.

no data showing the wholesaler mark-up to the retail pharmacy for indirect wholesalers that did not involve chargebacks. As a result, Medicaid cannot establish pharmacy actual acquisition cost for the majority (over 66%) of the Prevacid® units sold in the retail class of trade using manufacturer sales data.

### C.    The State Medicaid Agency Did Not Pay Its Prevacid® Claims Using The "AWP Based Formula" On Several Occasions and, In Fact, Paid Many Pharmacies at Amounts Below That level

19.    The Montana Medicaid statute employs a lesser of methodology for reimbursement. Medicaid pharmacy reimbursement is paid at the lower of (1) usual and customary charge; (2) maximum allowable charge; or (3) estimated acquisition cost.[12] Estimated acquisition cost is defined as the direct price[13] charged by manufacturers to retailer or, if no direct price is available, AWP-10% prior to July 2002 and AWP-15% after July 2002.

20.    Under this provision Medicaid should have used the published direct price if it were available. I have reviewed the First Data Bank pricing history and determined that a price designated as direct price was published for Prevacid® back until at least July of 1998. Furthermore, I reviewed the pricing table maintained by Medicaid's claim processor, ACS, which shows that ACS had those direct prices in the claims processing system's reimbursement table and should have used this price for reimbursement as required by the Montana Medicaid Statute.

21.    I have reviewed the reimbursement policies of Montana Medicaid and calculated the reimbursement level from 1991 to 2005 that would have resulted had Montana Medicaid used the formulaic reimbursement approach based upon the AWP published by the pricing compendia. Applying this calculation to the data produced by Medicaid, I have determined that Medicaid used various reimbursement methodologies or amounts that do not rely on the AWP associated with Prevacid®. The scatter graph below shows the Medicaid reimbursements during the period from 1995 to 2005.

---

[12] *See* 2004 Administrative Rules of Montana, 37.86.1105

[13] *See* 2004 Administrative Rules of Montana, 37.86.1101

HIGHLY CONFIDENTIAL

**PREVACID - 00300-3046-13**



1) The chart represents Reimbursement Claims for Prevacid NDC 00300-3046-13
2) Reimbursement price per unit  is calculated using the following formula (CLM_REIMBURSE_AMT - Drug Clm Disp Fee + Copay)/ CLM_DRUG_QTY
3) Redbook AWP data is displayed until 6/20/2001, and First Data Bank AWP data is displayed from 6/21/2001 through the remainder of the graph
4) Statutory Reimbursement Amount is defined as AWP less 10% through 7/1/2002 and as AWP less 15% after 7/1/2002
5) First Data Bank/ACS WAC data is displayed.

22.     The scatter shows a substantial number of reimbursements paid by Montana Medicaid were not made using the percentage off AWP formula.[14] Furthermore, these levels of reimbursement were normally below the AWP-based formula amount and approached levels as low as the published WAC.  Medicaid's use of reimbursement levels that were below the statutory level indicates that Medicaid was aware that the acquisition cost may vary and in fact could be below the established estimates of AWP less 15% or 10%, depending on the time frame involved.

23.     Dr. Gaier determined that Medicaid also underpaid its dispensing fee when compared with the actual dispensing costs of the pharmacy for each prescription filled by the retail pharmacies.  The dispensing fee underpayment was as much as $5.30 (dispensing costs of $10 less the dispensing fee which was normally $4.70 or

---

[14] The State used 90% of AWP until July 2002 and 85% of AWP after 2002.

**HIGHLY CONFIDENTIAL**

less).[15] This under-payment effectively reduces the amount Medicaid paid for each prescription of Prevacid® filled by pharmacies. This is because, as is widely known, the payment rate for the drug and the amount paid for the dispensing fee are inter-dependent. If Medicaid underpaid its dispensing fee, it would be obliged to have a higher EAC to compensate for the under-payment. The under-payment for dispensing costs establishes that the EAC range discussed in the previous paragraph was at or below the amount needed to properly compensate the retail pharmacy which refutes Dr. Hartman's conclusion that the pharmacies were overpaid for prescriptions of Prevacid®.

### D.    The State Medicaid Agency Paid Amounts At Or Below The Commercial Market Price

24.    For branded drugs such as Prevacid® state Medicaid agencies receive a rebate of the greater of 15.1 % of the Average Manufacturer Price (AMP) per unit or the difference between the AMP and the best price per unit and adjusted by the CPI-U based on launch date and current quarter AMP.[16] In addition, state Medicaid agencies recently have obtained additional drug rebates through supplemental rebate programs. The table below summarizes the overall process used by Medicaid to lower overall spending through drug rebates:

| Step 1: | The combined initial payment by the patient (co-pay) and Medicaid reimburses the pharmacy at an amount that is slightly above the published WAC (normally 0% to 10% above the published WAC.) |
|---------|---------|
| Step 2: | Medicaid calculates the units of the specific branded drug administered to its patients and submits a rebate request to the manufacturer based on the per unit rebate amount . |
| Step 3: | The manufacturer pays a rebate directly to the payor, thus reducing Medicaid's reimbursement for the branded drug. |

25.    As a result of this three step process, the net amount Medicaid and the patient pay for a specific drug equals the initial payment to the retail pharmacy[17] less the rebate paid by the manufacturer back to Medicaid. (I will refer to this net amount

---

[15] See Delcaration of Erc M. Gaier, Ph.D. dated February 8, 2007, section III.3.1.

[16] See http://www.cms.hhs.gov/MedicaidDrugRebateProgram.

[17] The amount paid to a retail Pharmacy associated with a specific drug is the sum of the co-payment paid by the patient and the reimbursement payment paid by the payor. In addition, the payor also pays a separate fixed dispensing fee for each prescription that is filled for a patient. This fee is designed to cover the full cost of maintaining the pharmacy and filling the prescription. Underpayments in dispensing fees are discussed in detail in Dr. Gaier's report and I addressed them separately in the previous section of this Declaration.

ultimately paid by Medicaid for the drug as the "Net Effective Payment After Rebate" throughout this report.)

26.    I have calculated the Net Effective Payment After Rebate paid by Montana Medicaid and determined that this amount is below the price paid by the commercial retail market place as approximated by TAP's WAC for Prevacid®.  The graph below reflects my calculation of the average reimbursement paid by Medicaid by year less the average rebate per unit paid to Medicaid each year.  This amount is the Net Effective Payment After Rebate actually paid by Medicaid.  I then compared these amounts to the WAC for Prevacid® in each of those years.  In all cases the Net Effective Reimbursement After Rebate paid by the State for Prevacid® was below the WAC.



ACS Montana - Net Effective Reimbursement Using Per Unit Rebate Data
Difference Between Net Effective Reimbursement & WAC
PREVACID (00300-3046-13)

1) The chart represents Per Unit Reimbursement less TAP Rebates and Supplemental Rebates for Prevacid NDC 00300-3046-13
2) Net Effective Reimbursement Price per unit is calculated using the following formula: [(CLM_REIMBURSE_AMT - Drug Clm Disp Fee + Copay)-Total Rebates-Total Supplemental Rebates] / Total Units Reimbursed
3) Net Effective Reimbursement is categorized based on the date of service by year and is compared to Rebate data that is categorized by date of payment by year.
4) The Wholesale Acquisition Cost (WAC) price displayed is from First DataBank/ACS.

27.    This comparison establishes that Medicaid ultimately paid an amount that was well below the price paid by the retail market for Prevacid®.  This further establishes that Medicaid has suffered no damages and no penalties apply to its Prevacid® reimbursements.

**HIGHLY CONFIDENTIAL**

28.      It should also be noted that, in 2004, Montana Medicaid negotiated Supplemental Rebates from TAP. It did so by exerting its market position and offering to place Prevacid® on its preferred drug list in exchange for additional rebate payments from TAP.   Thereafter, Montana Medicaid achieved a Net Effective Payment After Rebate of up to 62% below the price paid by the retail class of trade.

### E.      The State Had Significant Actual Knowledge Regarding Discounting Of Prevacid® To Non-retail Purchasers And Received ASP Amounts From TAP Starting in 2002.

29.      Since TAP's sales of Prevacid® to the retail class of trade were nearly all at WAC, TAP's discounting to other classes of trade is irrelevant to Medicaid's claims. Nonetheless, I note that Medicaid's claim that TAP misrepresented its pricing is undermined by the State's direct knowledge of TAP's pricing practices with other classes of trade.

30.      The State purchased Prevacid® at significant discounts through direct contracts with TAP.  Specifically, the Montana State Hospital purchased Prevacid® at significant discount.  This Department is part of the same agency as the Montana Department of Public Health and Human Services.[18]

31.      In 1992, Section 340B of the Public Health Service Act was enacted.  This section requires drug manufacturers to provide outpatient drugs to eligible health centers at a reduced price.  For a branded drug such as Prevacid,® the reduced price is based on a discount of 15.1% off the AMP.[19]  After notifying the Federal Pharmacy Affairs Branch of their intent to participate in the program, covered entities can begin taking advantage of the discounted prices.  Each covered entity can either contact the drug manufacturer directly or work with a wholesaler.  Once qualified, the manufacturer extends the 340B discount to the entity.

32.      Various entities in Montana are currently qualified to receive such pricing, including the Montana Department of Public Health, which has participated in the

---

[18] *See* http://www.dphhs.mt.gov/dsd/dsdorganizationalchart.pdf.

[19] *See* http://www.cms.hhs.gov/MedicaidDrugRebateProgram.

program since at least 1997 according to the U.S. Health Resources and Services Administration (HRSA) website.[20]

33.    Under the Veterans Healthcare Act which was passed and implemented in the early 1990's, the Department of Veterans affairs can purchase branded innovator drugs from a manufacturer at a price that is calculated based on a 24% discount off the average price at which the manufacturer sells that product (in this case Prevacid®) to non-Federal customers.  The VA prices are, and have been since enactment of the Veterans Healthcare Act, available publicly.  Therefore, the State or any other governmental agency could have easily calculated the average price at which the manufacturer sold to non-Federal customers by using the following standard formula: Non-Federal Average Manufacturer Price = VA price / .76 (i.e. 1.00 – 76% discount).

34.    In addition, starting in 2002, TAP submitted and Montana Medicaid received ASP calculations that were based upon the government's prescribed methodology.[21]  A review of Medicaid's reimbursement data before and after these disclosures began demonstrates that the knowledge of TAP's ASP's had no impact on the reimbursements paid by Medicaid.

### F.    Dr. Hartman's Calculation Of Penalties For Prevacid® Is Fundamentally Flawed:

- Dr. Hartman erroneously calculated penalties on reimbursements to retailers who purchased TAP's products at or around the published WAC (either somewhat above or somewhat below).  He incorrectly calculated these penalties despite industry acceptance that the published WAC is the most reliable measure of the price at which pharmacies buy branded drugs[22]. Indeed, Dr. Hartman acknowledged that WAC is the price at which retail pharmacies purchase branded pharmaceuticals, like Prevacid®.[23]  Additionally, because the pricing compendia provided the WAC for Prevacid® alongside the AWP, both published prices were equally available to Medicaid in determining its reimbursement

---

[20] Entities such as *See* http://opanet.hrsa.gov/opa/CP/CPExtract.aspx.

[21] *See* Attachment A to CIA TAP Pharmaceutical Products Inc. ASP Quarterly Certifications, dated 2002-2005.

[22] See supporting discussion and citations in the Industry Background section of this report.

[23] *See* Transcript of Dr. Hartman dated August 23, 2006, p 468.

levels. As a result, there can be no damages or penalties associated with Prevacid® sales.

- Dr. Hartman failed to recognize two interrelated facts that undermine his fundamental conclusion that Montana Medicaid established inaccurate and overstated EAC's for Prevacid®. First, Dr. Hartman failed to recognize that many of Medicaid's reimbursements for Prevacid® were in fact less than the AWP-based calculation he has applied. In fact, these reimbursement levels actually approach and sometimes fall slightly below the published WAC. Second, Dr. Hartman also failed to recognize that the majority of retail pharmacies (particularly non-chain pharmacies) buy through wholesalers. As a result, TAP does not control any potential wholesaler mark-up and is unaware of such pharmacies' actual acquisition cost. Similarly, Dr. Hartman cannot determine the pharmacy's acquisition cost from TAP's sales data.

  In fact, industry practice indicates that the majority of the purchases by non-chain pharmacies were likely at or above WAC. The difference between WAC and the AWP-based reimbursement level for Prevacid® used by Montana Medicaid is a narrow range normally equal to or less than 8% of the published WAC. This narrow range combined with a) the reimbursement data establishing that most reimbursements fall below the AWP-based level, b) TAP's unawareness of the actual acquisition cost levels for most non-chain retail pharmacies, and c) potential cross subsidization of under-payments in dispensing fee that must be considered when establishing EAC reimbursements establishes that Dr. Hartman has not shown that Montana Medicaid's EACs for Prevacid® were inaccurate or overstated. In fact, the data indicates that those reimbursements likely under-paid the retail pharmacies for their costs related to the Prevacid® they dispensed.

- Dr. Hartman failed to evaluate and recognize that, after considering all rebates paid to Medicaid through base Medicaid rebates and supplemental Medicaid rebates, Medicaid met its objective of paying a Net Effective Payment After Rebate for Prevacid® at or below the net amount paid by commercial TPPs.

**HIGHLY CONFIDENTIAL**

- Dr. Hartman failed to recognize Medicaid's level of knowledge of the actual acquisition cost of Prevacid® which contradicts Medicaid's allegation that they were unaware of TAP's pricing practices.

35. Should Dr. Hartman amend his report, I reserve the right to supplement and amend my opinions accordingly.

**HIGHLY CONFIDENTIAL**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 8, 2007.

Steven J. Young

- Exhibit 1a -





Steven J. Young
**Managing Director**

P 312 583 8763
F 312 583 8701
syoung@huronconsultinggroup.com

550 West Van Buren Street
Chicago, Illinois 60607

**Curriculum Vitae**

Steve began his career with Arthur Andersen in 1983 where he became a partner in 1995. He became a Managing Director in Huron Consulting Group's Healthcare and Higher Education Consulting practice in May of 2002.

Professional experience
Steve has more than 21 years of experience assisting clients with complex financial, compliance, systems and government contracting issues. His work focuses upon the quantification of the impact of historical contractual or regulatory compliance issues; preparation of proposals and pricing submissions under cost based, competitive and commercial pricing contracts; implementation of, and transition of large government contracts within the Medicare and TRICARE programs; and pricing of change orders and terminations under large contracts. This work normally entails analyzing large data sets and statistical sampling to quantify the impact of the issue being addressed, working with operations personnel from various functional areas to understand the historic practices and governing contractual relationships and requirements, presenting of the results to the companies management and to the other contractual party, supporting the review and verification of the work by the other party, assisting in the preparation and implementation of corrective actions through systems and related procedures improvements, and testing of the companies processes and resulting outcomes to assess compliance with the contractual or regulatory requirements.

Steve has an extensive background in serving the unique financial and operating needs of companies in the health care industry, but he has also done work in the office furniture, engineering, electronics, and communications. Some of his specific areas of expertise are:

<u>Claims Processing and Reimbursement</u>

Steve has had various experience assisting health plans analyze historical claims processing and reimbursement issues to identify overpayment or underpayments related to those issues and prepare, execute and support the related refunds or recoveries. Steve has:
*   Assisted Health Plans extract large data sets to quantify the historic impact of certain system and process deficiencies related to compliance with Medicare Secondary Payment requirements, including performing a 100% re-pricing of large dollar claims and statistical samples of the remaining claims. Presented results to the CMS and supported the government in reviews of his proposed refund determinations and the supporting work papers and claims data analyses. Assisted in the preparation of claims systems edits and claims processor workflows to implement going forward corrective actions. Performed compliance tests post implementation to ensure revised system and procedural controls were operating properly.
*   Assisted Health Plans analyze historical reimbursements for compliance with various provider contract, state regulatory requirements or subcontracted outsourcing agreements. This included various projects ranging from large data analysis projects to individual claim-by-claim analyses under specific provider contracts spanning several years. He has created off system data models to identify improper claims and apply provider contract reimbursement schedules and employer group benefit structures to re-price the claims and generate provider-by-provider and member by member refunds for claims populations in excess of 100,000 spanning multiple years. He has also reviewed the large dollar claims under specific provider contracts spanning several years to assess improper payments.
*   Assisted various health plans perform comprehensive Medicare Coordination of Benefits projects to extract the health plans full membership information, match that data with Medicare and determine the proper coordination of benefits

**Exhibit 1a**



for all Medicare eligible members. These projects also include analyzing all historical claims for these members to identify improper payments and determine the appropriate repayment or recovery.

- Assisting a Health Plan in assessing a claims processing conversion to analyze claims data and the underlying data sources to identify incorrect payments under the new system and determine the root cause and propose corrective actions to the system logic or the underlying claims processor workflows. Performing stratified statistical samples of paid and denied claims to quantify the historical impact and potentially restate medical cost trends for establishing premium increases.

### *TRICARE experience*

Steve has had significant involvement in the CHAMPUS and TRICARE programs. Steve had significant involvement in the initial round of TRICARE Managed Care Support contracts and was actively involved as an industry representative in the meetings and seminars held by TMA to develop the next round of TRICARE RFPs. Steve has:

- Assisted in preparing five prime contractors' business proposals for CHAMPUS Managed Care solicitations in each of five separate regions. The most recent three business proposals were part of the client's winning bids for the MCS contract. Some of the specific tasks performed included the following:
- Assisted in creating and developing the strategic alliance amongst the bidding team
- Provided assistance with the organizational and business strategies for the solicitation
- Member of team in charge of negotiations with subcontractors and in subcontractor performance management
- Assisted in the project management of the business proposal
- Developed detailed cost and pricing model, which complied with all contractual requirements and provided real-time feedback to management on the cost and price impact of its operational decisions.
- Developed detailed monthly financial statement models for the entire five-year period of the contracts including balance sheets, income statements and cash flow statements.
- Provided other assistance in responding to the financial viability requirements of the RFP
- Provided support to actuaries to assist them in preparing the controllable trend factor justifications for the healthcare pricing.
- Assisted management analyze both healthcare and administrative pricing for the prime contractor and its subcontractors to reduce the initial proposed pricing as part of the Best and Final Offer effort.
- Assisted in the technical proposal writing for Task 7 related to fiscal controls.
- Performed similar tasks for two prime contractors under the most recent round of TRICARE contracts.
- Performed similar tasks for managed mental health subcontractors in two of the initial five regions.
- Performed tasks to assist a PBM prepare a business proposal in response to the initial TRICARE Mail Order solicitation and separately assisted another firm bid on the recent retail pharmacy solicitation for TRICARE
- Assisted a dental subsidiary of a large commercial insurer prepare its administrative cost proposal related to the CHAMPUS dental benefit.
- Assisted in the implementation of those contracts related to policy and procedure development, change order pricing and various financial, accounting and operational issues related to ongoing operations of the contract.

### *Medicare Carrier and Fiscal Intermediary Experience*.

Steve has assisted Medicare Carriers and Fiscal Intermediaries with various Operational, Compliance and Contracting Issues:

- Performed the project management tasks for large transitions of health care claims processing contracts. Assisted major CMS contractors exit their Medicare contracts. The work performed included developing detailed transition workplans for organizations to transition the contract, including monitoring and updating these workplans and performing overall project management responsibilities for the process. The work performed also included developing transition and termination budgets for the contractor and assisting in negotiations with CMS. We also assisted the clients related to operational compliance issues such as Medicare Secondary Payor.
- Assisted Medicare contractors perform a strategic assessment of its Medicare business to assess improvements in its operations to effective administer claims processing contracts and prepare for Medicare Contract Reform.
- Presented to various BCBS and commercial plans executives and financial personnel regarding the impact of Medicare Contract Reform.
- Assisted various health plans respond to government cost audits, defend Qui Tam allegations, and prepare voluntary disclosures associated with compliance activities.

**Exhibit 1a**



*Pharmaceutical Manufacturer Federal Pricing and Rebate Compliance Experience:*

Steve performed various projects for pharmaceutical manufacturers to analyze sales, chargeback, rebate and other pricing data to assess compliance with government regulations such as Medicaid Rebate Act, Veterans Healthcare Act, and FSS contract requirements.

- Analyzed the companies historic practices and assessed inconsistencies with guidance letters issued by the applicable Federal Agency.
- Downloaded historical sales, chargeback and rebate data for each of the companies NDCs to integrate the data from various sources to arrive at comprehensive best price and average manufacturer price in accordance with the specific Federal guidance, and Steve presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.
- Tested manufacturers recalculations of historic pricing submissions, identified findings that were corrected by the manufacturer and presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.
- Assisted in the preparation of computer extracts, work flows and procedures to maintain compliance with the applicable pricing requirements.

*Commercial Pricing Analysis Under GSA and VA Federal Supply Schedule Programs:*

Steve performed various projects with commercial companies doing business with the Federal government under the GSA and VA Federal Supply Schedule programs.  Under these programs companies must analyze all commercial pricing data to identify and disclose most favored customer pricing by class of trade in their proposal and implement ongoing system controls to identify future sales that fall below the disclosed level due to competition to provide the government with the appropriate reduction in the price it pays under these contracts.

- Interviewed commercial sales, marketing, contracting, pricing and accounting personnel to understand commercial pricing practices and to identify all potential forms of discount or price reduction.
- Downloaded historical invoice, rebate and promotional pricing data by class of trade to identify most favored customer pricing arrangements by class of trade.
- Assisted companies prepare their proposals to the government disclosing all pricing, sales and marketing practices by class of trade and assisted the company during the government data and transactional audits of that information.
- Assisted the company develop and implement ongoing price reduction compliance systems to identify and disclose any commercial transactions that create a requirement for a price reduction to the government.
- Performed analysis of historic issues for the companies related to non-compliance with proposal or price reduction disclosure requirements and presented the results to the Federal agency or the Department of Justice, and assisted the companies implement corrective actions.

*Other experience:*

In addition to the areas discussed above Steve has experience related to:

- Developed commercial cost allocation systems for Health Plans to measure profitability by line of business
- Claims for equitable adjustment related to contract changes
- Defective pricing reviews
- Accounting, compliance and administrative procedure preparation and review
- Indirect Rate Determination and submission
- Performing attestation engagements related to various compliance and pricing areas.
- Contract terms and conditions reviews
- Labor reporting system reviews
- Contract administration control reviews
- Compliance training assessments and presentations
- Interpreting and complying with Cost Accounting Standards (CAS) and the cost principles of the Federal Acquisition Regulation (FAR)

**Exhibit 1a**



- Preparing CASB Disclosure Statements and determining the cost impact of cost accounting changes and violations of the Standards
- Contract Accounting and Project Reporting system design and implementation

Education & certification
- Bachelor's Degree in Accounting, Northern Illinois University
- Certified Public Accountant (Illinois)

Professional associations
- American Institute of Certified Public Accountants
- Illinois CPA Society
- Associate Member of the Public Contract Law Section of the ABA and member of the healthcare public contract law committee
- Member of Health Care Compliance Association and National Contract Management Association

Listing of Representative Clients
Horizon Blue Cross Blue Shield of New Jersey
CareFirst BlueCross BlueShield
BlueCross BlueShield of Arizona
BlueCross BlueShield of Illinois
BlueCross BlueShield of Tennessee
BlueCross BlueShield of Kansas City
BlueCross BlueShield of TexasTriWest Healthcare Alliance
Sierra Military Health Services
Anthem Alliance Acquired by Humana Military Healthcare Service
UnitedHealth Networks, Inc.
Physicians Corporation of America Acquired by Humana, Inc.
Wisconsin Physician Services
Affiliated Computer Services, Inc.
Merit Behavioral Health
PCS Acquired by Advance Paradigm
General American Acquired by MetLife
Bayer AG
Dey Pharmaceuticals, Inc.

**Exhibit 1a**

- Exhibit 1b -

## RECENT TESTIMONY OF STEVEN J. YOUNG AT DEPOSITION, HEARING OR TRIAL

HARRY E. STETSER, DALE E.NELSON, and MICHAEL de MONTBRUN, individually and on behalf of themselves and all others similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT LABORATORIES; TAKEDA CHEMICAL INDUSTRIES, LTD.; JOHNSON & JOHNSON; ETHICON ENDO-SURGERY, INC.; INDIGO LASER CORPORATION; DAVID JETT; CHRISTOPHER COLEMAN; SCOTT HIDALGO; and EDDY JAMES HACK, Defendants; STATE OF NORTH CAROLINA, NEW HANOVER COUNTY, SUPERIOR COURT DIVISION FILE NO. 1-CV-5268; Deposition taken on June 1 and 2, 2004.

IN RE: LUPRON MARKETING AND SALES PRACTICES LITIGATION (MDL 1430), U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, MASTER FILE NO. 01-CV-10861, Deposition taken on July 13, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01, Deposition taken on August 13, 2004.

IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, U.S. DISTRICT COURT DISTRICT OF MASSACHUSETTS, MDL NO. 1456, CIVIL ACTION NO.01-12257, Testimony taken November 18 & 19, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01, Hearing Testimony on April 20, 2005.

ADVANCEPCS HEALTH L.P., Claimant, v. TAKEDA PHARMACEUTICALS AMERICA, INC., Respondent, AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION TRIBUNAL, CASE NO. 76 193 00202 04 JMLE, Deposition taken on August 26, 2005.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on December 9, 2005.

- Exhibit 2 -

# Exhibit 2 - Summary of Information Relied Upon

| Entity/Description | Beginning Bates Range | Ending Bates Range |
|---|---|---|
| Prevacid Drug Description at http://www.drugs.com/prevacid.html | N/A | N/A |
| Dr. Stephen Schondelmeyer Declaration in Support of Plaintiffs Motion for Class Certification for MDL 1456 (dated: September 2, 2004) | N/A | N/A |
| First DataBank Pricing Policy at http://www.firstdatabank.com/support/rcs/policies/pricing_policy.aspx | N/A | N/A |
| Deposition Transcript for Raymond S. Hartman (dated:  August 23, 2006) | N/A | N/A |
| "A Survey of Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky", prepared for the Kentucky Department for Medicaid Services by Myers and Stauffer LC, Certified Public Accountants | N/A | N/A |
| "Report to the General Court: October 2, 2002: Commonwealth of Massachusetts Executive Office of Health and Human Services Division of Health Care Finance and Policy: Linda L. Ruthardt, Commissioner." | N/A | N/A |
| Guidance published by CMS related to the Medicaid Rebate Act at http://www.cms.hhs.gov/MedicaidDrugRebateProgram | N/A | N/A |
| First DataBank PricePoint Rx CD | N/A | N/A |
| Thomson Micromedex Redbook Advanced Database | N/A | N/A |
| Affidavit of Stephen W. Schondelmeyer (dated: May 26, 2000) | N/A | N/A |
| The 1995 NWDA Industry Trend Report:The Fact Book, National Association of Wholesale Druggists | N/A | N/A |
| 2004 Administrative Rules of Montana, 37.86.1105 | N/A | N/A |
| 2001 Montana State Profile in National Pharmaceutical Council Pharmaceutical Benefits | N/A | N/A |
| 2002 Montana State Profile in National Pharmaceutical Council Pharmaceutical Benefits | N/A | N/A |
| Merits Report and Declaration of Eric M. Gaier, PH.D. (dated: February 8, 2007) | N/A | N/A |
| Montana Department of Public Health and Human Services Organizational Chart at http://www.dphhs.mt.gov/dsd/dsdorganizationalchart.pdf | N/A | N/A |
| U.S. Health Resources and Services Administration (HRSA) website http://opanet.hrsa.gov/opa/CP/CPExtract.aspx | N/A | N/A |
| Attachment A to CIA TAP Pharmaceutical Products Inc. ASP Certifications (Quarterly 2002-2005) | N/A | N/A |
| State of Montana's Second Amended Complaint, MDL No. 1456, 01-CV-12257-PBS (dated:  August 1, 2003) | N/A | N/A |

Contains Highly Confidential Material Subject to Protective Order

**Exhibit  2**

# Exhibit 2 - Summary of Information Relied Upon

| Entity/Description | Beginning Bates Range | Ending Bates Range |
|---|---|---|
| Montana Medicaid Drug Data Files | MT 005195 | MT 005195 |
| Montana Medicaid Drug Data Files | MT 028943 | MT 028943 |
| Montana Medicaid Drug Data Files | MT 029944 | MT 029944 |
| Montana Medicaid Drug Data Files | MT 033215 | MT 033215 |
| State AG Data (3 Discs dated: April 18, 2006) | N/A | N/A |
| TAP Direct Sales Data 1994-2003 | N/A | N/A |
| AMCC LIT TAP Indirect Sales 1995-2003 | N/A | N/A |

Contains Highly
Confidential Material Subject to Protective Order

**Exhibit  2**

# - Exhibit 3 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 <br> ) <br> ) CIVIL ACTION: 01-CV-12257 PBS <br> ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) Judge Patti B. Saris <br> ) <br> ) [Filed Under Seal Pursuant to <br> ) Court Order] |

## DECLARATION OF STEPHEN W. SCHONDELMEYER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### I.    EXPERIENCE AND QUALIFICATIONS

1.      My name is Stephen W. Schondelmeyer. I am a pharmaceutical economist, and I make this statement as an independent consultant. I hold the following positions and titles in the College of Pharmacy at the University of Minnesota: Head, Department of Pharmaceutical Care & Health Systems; Century Mortar Club Endowed Chair in Pharmaceutical Management and Economics; Professor of Pharmaceutical Management and Economics; and Director of the *PRIME* Institute. I hold a Bachelor of Science in Pharmacy (1974, University of Missouri-Kansas City), a Doctor of Pharmacy and Residency Certificate (1977, University of Kentucky), a Master of Arts in Public Administration (1979, Ohio State University), and a Doctor of Philosophy in Pharmaceutical Administration with a major in Health Economics (1984, Ohio State University). A list of my professional memberships, professional activities, research activities, publications and other scholarly activities, citation of work in public media, offices held in professional and scientific organizations, university administrative and service positions, honors and awards, and civic and community activities is contained in a copy of my most recent curriculum vitae as Exhibit "A".

- 1 -



Schondelmeyer
EXHIBIT NO. 001
) D ·
R. L. Klanderud

for a 137 percent increase while pharmacy-dispensing fees actually decreased 20 percent, in constant dollars, over the last decade.[23]

## VII.   PRIVATE PAYER PROGRAMS AND EXPENDITURES

53.     Rising prescription drug expenditures are placing an increasing financial burden on Americans.  Retail purchases of prescription drugs account for an estimated 11.6 percent of U.S. health expenditures in 2004, and they have been the fastest-rising component of health care spending since 1998.[24]  One can attribute some of the drug spending increase to greater use of drugs and some to a change in the mix of drugs used (with an increase in use of more costly drug products). Higher prices at the drug manufacturer level, however, are a substantial component, accounting for between one-quarter and one-third of increases in drug expenditures in past years.[25]

54.     MediSpan is a private organization that collects price data directly from drug manufacturers and wholesalers.  According to Medi-Span's description of the Wholesale Acquisition Cost ("WAC"), WAC represents "the reported cost at which wholesalers purchase drug products from a manufacturer and is provided by the manufacturer.  WAC may not represent *actual* acquisition cost as wholesalers may obtain discounts through volume purchases or special deals." WAC is a publicly available price that is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product. Although drug wholesalers may receive "discounts or special deals" for some drug purchases, the wholesalers' price to the retail class of trade is typically based on, or is a function

---

[23]   *Medicare and Medicaid Drug Pricing: Strategy to Determine Market Prices*, p. 5.
[24]   Center for Medicare and Medicaid Services (CMS). Table 2: National Health Expenditure Amounts and Average Annual Percent Change by Type of Expenditure: Selected Calendar Years 1990-2013, www.cms.hhs.gov/statistics/nhe/projections-2003/t2.asp, accessed March 31, 2004.
[25]   See for example: David Kreling et al., *Prescription Drug Chartbook: An Update* (Menlo Park, CA: Kaiser Family Foundation), November 2001, p. 40; Stanley S. Wallack et al., *Recent Trends in Prescription Drug Spending for Insured Individuals Under 65 and Age 65 and Older* (Waltham, MA: Schneider Institute for Health Policy, Brandeis University), July 30, 2001.

of, the WAC. A change in WAC generally results in a similar percent change in price to most

prescription purchasers, including "cash pay" customers as well as private and public third-party

programs.[26]

55.     WACs are the prices typically reported on invoices between the manufacturer and

the drug wholesaler.  Some drug manufacturers have other names for this WAC price such as list

price, catalog price, or book price.  In the past, WAC was a term that typically included

adjustments for discounts, rebates, purchasing allowances, or other forms of economic

consideration.[27]  Over time, WAC has become a list price between the manufacturer and the

wholesaler.

56.     Both WAC (the stated price from manufacturer to wholesaler) and AWP (the

stated price from wholesaler to retailer) are used as benchmarks in the private payor arena.

WAC is the most consistent estimate available for tracking changes both in prices paid to

manufacturers for brand name drugs and in the ingredient cost component of prices paid for

those drugs by retail pharmacies (even though WAC has over time become more and more a list

price).  This is because manufacturers typically reference WAC or AWP as the basis for charging

wholesalers and pharmacies that buy directly from drug manufacturers.  In addition, nearly all

third-party contracts (including both private programs and public programs such as Medicaid and

Medicare) specifically reference AWP or WAC as the basis for determining prescription

payment amounts.  In short, the drug cost component of the private third party payer arena, and

---

[26]     Gross, David J., Stephen W. Schondelmeyer, and Susan O. Raetzman. *Trends in Manufacturer Prices of Brand Name Prescription Drugs Used by Older Americans, 2000 Through 2003* (Washington, DC:  AARP Public Policy Institute), May 2004, p.2.

[27]     Adams, Kathleen, Gavin, Norma and Kreling, David, Assessment of Adequacy of Reimbursement Rates to Pharmacies and Its Impact on the Access to Medication and Pharmacy Services by Medicaid Recipients, Systemetrics, Inc., (National Technical Information Service, PB94-187689), August 1993, p. 4.

of Medicaid and Medicare Part B drug payment systems, have historically been based on the publicly available price known as the "Average Wholesale Price" (AWP).

## VIII.   STRUCTURE OF THE PHARMACEUTICAL MARKET

### A.   Channels of Distribution

57.     In order to show the feasibility of determining class injury and a methodology for class wide damages estimation, it is important to understand the structure of the pharmaceutical market.

58.     Channels of distribution for prescription drug products are the pathways that drug products follow from the pharmaceutical manufacturer to the patient who ultimately uses the medication. There are three primary levels in the distribution channel: (1) manufacturers, (2) wholesalers, and (3) providers. Manufacturers and marketers reported $215.7 billion in revenue from prescription drugs in 2002. The flows of these drug products through various channels of distribution are depicted in Exhibit 1.[28]

### *Manufacturers and Marketers*

59.     The manufacturer level is the starting point for prescription drugs as they begin their movement through the various channels of distribution. Any firm that manufactures or sells a prescription drug in the United States must hold a new drug application (NDA) or an abbreviated new drug application (ANDA) issued by the U.S. Food & Drug Administration (FDA). However, other firms may market a prescription drug without holding either an NDA or an ANDA, if such a firm has entered into a licensing agreement with an NDA or ANDA holder or if the drug product was on the market prior to 1962 and is considered by the FDA to be generally recognized as safe and effective.[29]

---

[28]   *Medicare and Medicaid Drug Pricing: Strategy to Determine Market Prices,* p. 9.
[29]   Id. at 10.

manufacturers and could experience change as the dynamics of the pharmaceutical marketplace evolve during the implementation and operation of the new Medicare outpatient drug benefit.[63]

*Drug Product Type Variations*

89.     The pricing patterns of brand name drug products and generic drug products can be quite different. For most brand name drug products that are still covered by patent or exclusivity terms, the price relationship between list prices (AWP and WAC) and actual transaction prices (actual acquisition cost or average selling price) for a given class of trade is reasonably predictable. That is, the WAC is equal to, or very close to (+ or -5%) the actual acquisition cost for the community pharmacy class of trade and the AWP, at present, is typically 20 to 25 percent above the WAC or, alternatively, WAC is 16.67 or 20 percent below AWP.  In such cases, a payment policy using AWP as a benchmark (e.g., usually AWP minus a certain percent) may be relatively accurate. This pricing pattern holds for community pharmacy classes of trade (independents, chains, and food & drug stores), but not necessarily for other classes of trade (i.e., mail order pharmacies, HMOs and health plan pharmacies, long term care, physicians or clinics, hospitals, or state and federal facilities or programs).  Some of these other classes of trade control the demand (i.e., prescribe or influence the drug prescribed) and are reimbursed by a third party based on a percent off of AWP or a percent above WAC.  When these other providers can actually purchase the drug product from the manufacturer, and when the manufacturer deliberately creates a large and hidden spread between actual acquisition cost and the reimbursement amount, then the physician or other provider has a very strong financial incentive to prescribe their drug. This non-transparent spread leads to a financial incentive to prescribe more often and to prescribe higher-priced drugs over lower-priced drugs even when they are not necessarily the most cost-effective alternative. These financial incentives from the

---

[63]    Id. at 18.

hidden spreads may be one factor contributing to the rapid growth of Medicare Part B drug program expenditures over the past four years.[64]

90.      Once a brand name drug product loses its patent and market exclusivity, the brand name drug may face price competition from generic versions of the drug product. Usually the brand manufacturer does not compete on price with generics for the community pharmacy class of trade. This means that the AWP and WAC relationship to actual acquisition cost discussed earlier for brand name drugs still holds. However, brand manufacturers sometimes offer substantial discounts relative to WAC to certain classes of trade (i.e., hospitals, long term care, health plans, and physicians). This may keep the actual acquisition cost of the brand drug somewhat price competitive in non-community pharmacy settings, and particularly when the provider receives reimbursement keyed to list prices may result in excessive financial incentives to prescribe or use the brand name rather than a generic equivalent.[65]

91.      Generic drug products are therapeutically equivalent versions of a brand name drug product that have been made by drug firms other than the original NDA holder. When two or more generic drug products enter the marketplace they typically compete on price with each other even though the brand name product usually does not compete on price. The first generic will typically enter the market at a list price (both AWP and WAC, if a WAC is reported) that is 10 to 30 percent below the originator brand price. Often the price competition among generic versions of a drug product will be reflected by one or two decreases in list prices (AWP and WAC) in the first six to twelve months after generic entry, but after that time it is rare to see

---

[64]   Id.
[65]   Id. at 18-19.

- 38 -

generic list prices change and at some point in time the generic list prices for some drugs may even begin to rise again.[66]

92.   The relationship between list prices (AWP and WAC) is much less predictable for generic drugs than it is for brand name drugs. Some generic drug products will have AWPs that, at present, are the typical 20 to 25 percent above the WAC, but it is not unusual to see generic drug products with an AWP that is 50 to 100 percent, or more, above the WAC. Even more volatile is the relationship between the list prices (AWP or WAC) and actual acquisition cost for generics. Generic firms often discount their actual net price to the pharmacy to compete with other generics, but they do not always reflect these discounts in lower AWP or WAC list prices. Generic prices are also relatively volatile, because the market for generic drugs is effectively a commodity market. Thus, AWP-based payment policy is much less accurate for these drugs than it is for the branded drugs. Medicaid drug payment policy reflects the lower market prices for generic drugs by placing a FUL (or MAC) on many generic products.[67]

*Geographic Variations*

93.   Geographical variations in the actual drug cost at the manufacturer level are not common. Once one has accounted for class of trade differentials, most drugs have the same list prices (AWP and WAC) regardless of where they are purchased or used. In the few cases where a specific drug may have prices that vary by region, the variation is often in response to certain third party payment methods (i.e., the Least Costly Alternative (LCA) method) of paying for therapeutic alternates under Medicare Part B by certain fiscal intermediaries.[68]

94.   In contrast to the general uniformity of prescription drug prices, the cost of professional services (i.e., physician fees or pharmacy fees) usually varies by geographic region.

---

[66]   Id. at 19.
[67]   Id.
[68]   Id.

I declare under penalty of perjury that this Declaration is true and correct.  Executed on September 2, 2004.

Stephen W. Schondelmeyer

- Exhibit 4 -

Hartman, Ph.D., Raymond - Vol. I    HIGHLY CONFIDENTIAL                August 22, 2006
Boston, MA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

_____

In re: PHARMACEUTICAL              )

INDUSTRY AVERAGE WHOLESALE         )

PRICE LITIGATION                   )

_____)

THIS DOCUMENT RELATES TO:          )

STATE OF MONTANA V. ABBOTT         ) VOLUME I

LABS, INC., ET AL., D. MONT.       )

CAUSE NO. CV-02-09-H-DWM           )

        -and-                      )

STATE OF NEVADA V. AMERICAN        )

HOME PRODUCTS, ET AL., CA NO.      )

02-CV-12086                        )

_____)

H I G H L Y   C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF

RAYMOND S. HARTMAN, Ph.D.

TUESDAY, 22 AUGUST, 2006

9:37 AM

37379500-1b00-40eb-a069-168cee764f55

Hartman, Ph.D., Raymond - Vol. I    HIGHLY CONFIDENTIAL                August 22, 2006
                                    Boston, MA

| Page 2 | Page 4 |
|---|---|
| 1           VIDEOTAPED DEPOSITION of RAYMOND<br>2   S. HARTMAN, Ph.D., called as a witness by and on<br>3   behalf of the Defendants, pursuant to the<br>4   applicable provisions of the Federal Rules of Civil<br>5   Procedure, before P. Jodi Ohnemus, Notary Public,<br>6   Certified Shorthand Reporter, Certified Realtime<br>7   Reporter, and Registered Merit Reporter, within and<br>8   for the Commonwealth of Massachusetts, at the<br>9   offices of Ropes & Gray, LLP, One International<br>10  Place, Boston, Massachusetts, on Tuesday, 22<br>11  August, 2006, commencing at 9:37 a.m. | 1   A P P E A R A N C E S : (CONT'D)<br>2<br>3      JONES DAY<br>4      BY: Carol P. Geisler, Esq.<br>5      James R. Daly, Esq.<br>6      77 West Wacker<br>7      Chicago, IL 60601-1692<br>8      312 782-3939<br>9      Cgeisler@jonesday.com<br>10     Jrdaly@jonesday.com<br>11     For Abbott Labs and<br>12     T.A.P. Pharmaceuticals<br>13<br>14<br>15     DAVIS, POLK & WARDWELL<br>16     BY: James J. Duffy, Esq.<br>17     450 Lexington Avenue<br>18     New York, NY 10017<br>19     212 450-4000<br>20     James.duffy@dpw.com<br>21     For Defendant Astra Zeneca<br>22     Pharmaceuticals Corp. |

| Page 3 | Page 5 |
|---|---|
| 1   A P P E A R A N C E S :<br>2<br>3      HAGENS, BERMAN, SOBOL & SHAPIRO<br>4      BY: Edward Notargiacomo, Esq.<br>5      One Main Street, 4th Floor<br>6      Cambridge, MA 02142<br>7      617 482-3700<br>8      Hagens-berman.com<br>9      Ed@hbsslaw.com<br>10     For the Plaintiffs<br>11<br>12     HOGAN & HARTSON, L.L.P.<br>13     BY: Steven M. Edwards, Esq.<br>14     Hoa T.T. Hoang, Esq.<br>15     Lyndon Tretter, Esq.<br>16     875 Third Avenue<br>17     New York, NY 10022<br>18     212 918-3000<br>19     Smedwards@hhlaw.com<br>20     Htthoang@hhlaw.com<br>21     For Defendant Bristol-Myers<br>22     Squibb | 1   A P P E A R A N C E S : (CONT'D)<br>2<br>3      SIDLEY AUSTIN, LLP<br>4      BY: Richard D. Raskin, Esq.<br>5      One South Dearborn<br>6      Chicago, IL 60603<br>7      312 853-7000<br>8      Rraskin@sidley.com<br>9      For Bayer Corp.<br>10<br>11     ROPES & GRAY, L.L.P.<br>12     BY: Steven A. Kaufman, Esq.<br>13     Kim Nemirow, Esq.<br>14     One International Place<br>15     Boston, MA 02110-2624<br>16     617 951-7000<br>17     Steven.kaufman@ropesgray.com<br>18     For Defendant Shering Corporation/<br>19     Shering Plough and Warrick<br>20     Pharmaceuticals<br>21<br>22 |

2 (Pages 2 to 5)

37379500-1b00-40eb-a069-168cee764f55

Page 90

1    testimony by defense experts in this matter and the
2    MDL matter.
3         And so, yeah, I take -- from a set of
4    empirical analyses I make some assumptions about
5    what might be an upper bound, a lower bound, but I
6    did -- but the economic analysis informs ultimately
7    what those bounds may be and helps inform someone
8    coming to this data what might be a conservative
9    estimate of numbers of claims that exceed a legal
10   -- a legal standard that I've been asked to assume.
11       Q.  Can you identify any book or article that
12   would support the economic theory that you just
13   described?
14       A.  The economic theory of the -- the pattern
15   of pricing, let's say, for multisource
16   self-administered drugs.
17       Q.  Well, let me back up.  You make
18   assumptions with regard to thresholds for EAC,
19   correct?
20       A.  That's correct.
21       Q.  Are those assumptions based on economic
22   theory?

Page 91

1        A.  They're based on economic theory and --
2    and analysis of economic data that summarize the --
3    how economic entities behave according to that
4    theory, what the parameters of that behavior lead
5    to.
6        Q.  What economic theory are they based on?
7        A.  They're based on how -- in the -- in the
8    case of multisource self-administered drugs, how
9    price competition occurs in homogenous products.
10       Q.  Okay.  Can you identify any books or
11   articles that support the economic theory
12   underlying the assumptions that you've made with
13   respect to thresholds for EAC.
14       A.  I can -- I can provide for you, and I
15   would be glad to provide for you, 10, 20 citations
16   from -- but I -- you know, I don't memorize them.
17   I'll -- I'll be glad to pull them together for you.
18       Q.  Can you provide any as you sit here today?
19       A.  I can provide 20 to 30 as I sit here
20   today, but I don't -- I didn't know that this was a
21   memory test.  I've -- I refer to them regularly.
22   I don't remember -- I refer to lots of articles,

Page 92

1    and I don't keep them in my mind.
2        Q.  So --
3        A.  But that they're -- but I have them.  I
4    have a whole -- I have a whole cabinet drawer full
5    of them.
6        Q.  So name one that supports the economic
7    theory that underlies the assumptions that you have
8    made with respect to thresholds for EAC.
9        A.  I -- I've just -- I've just told you the
10   -- there are so many of them that I'm not going to
11   -- I'm not going to conflate names and articles.
12   And I will be ---I will be glad to do this.  If you
13   want to wait till the next -- after the next break,
14   I will have somebody fax over a list of -- of
15   literature for you and we can go through that.
16       Q.  If -- if you want to do that over the
17   lunch break, that's fine.
18       A.  Okay.
19       Q.  Now, your assumptions with respect to EAC
20   thresholds, they are based, in part, on average
21   sales prices when you have them, correct?
22       A.  That's right.

Page 93

1        Q.  Average sale price or ASP is the
2    manufacturer's average sales price, correct?
3        A.  That's right.
4        Q.  And is it your understanding that, in many
5    cases, the manufacturer sells to a wholesaler, who,
6    in turn, sells to a provider?
7        A.  I know that there are cases where a
8    wholesaler will sell to a -- a provider.  I know
9    there are cases where the -- where the -- much of
10   what the wholesaler distributes is -- is subject to
11   contracts between the manufacturer and the ultimate
12   provider, so that there's -- they act as a
13   distribution channel.
14       So there's a number of ways that drugs are
15   -- get to the providers.  Either a wholesaler may
16   acquire a stock of generic drugs and then act as
17   its own reseller, and in most -- in many, many
18   cases, it's the manufacturer contracts with --
19   prices directly with the providers, and then
20   there's a -- it -- a mechanism in which wholesalers
21   are made whole for whatever differences they might
22   have in the price -- prices between the

24 (Pages 90 to 93)

37379500-1b00-40eb-a069-168cee764f55

Page 94

1  manufacturer and the wholesaler.
2     Q.  Do wholesalers ever mark up the products
3  that they sell --
4     A.  Uhm.
5     Q.  -- so that they can earn a profit?
6     A.  The -- the information on -- on the
7  wholesaling business as a whole is that the -- the
8  markups are paper thin.  I mean, I'm sure there's
9  an attempt to mark up some of them, but the success
10  and the ability to do so has been -- has -- has
11  been quite limited.
12     Q.  So, in equating ASP to estimated
13  acquisition cost, you're assuming no wholesaler
14  markup, correct?
15     A.  I'm assuming, as your own Mr. Young is --
16  has -- has assumed -- is that the -- the retail
17  acquisition cost is equal -- is approximately equal
18  to WAC, and that the -- if one measures the -- the
19  various price judgments and discounts, that, when
20  one is looking at those sales to the -- to those
21  providers, that's what's reflected in ASP.
22     Q.  Well, you say, "approximately equal."  If

Page 95

1  there is a markup of 1 percent, will that have an
2  impact on your analysis?
3     A.  Well, one of the reasons I used thresholds
4  and bounds was precisely to -- to take account of
5  the fact that there's -- I -- I didn't have the
6  exact acquisition cost.  I was approximating it.
7  If -- you will notice that if, indeed, the -- I'm
8  trying to think of how -- precisely how that -- in
9  any case, the -- the reason I used thresholds that
10  varied by a considerable amount was because it's an
11  approximate relationship.
12     Q.  You've also investigated the impact that a
13  difference of 1 percent could have on your penalty
14  calculations, haven't you?
15     A.  I -- when I looked at the penalty
16  calculation -- the -- there was -- there were two
17  statutory guidelines that I -- I -- I saw as -- as
18  potentially appropriate, and that -- but there was
19  a legal issue of which ones were.  And those were
20  the estimated acquisition cost, as I read the
21  national -- the Medicaid and the Medicare statutory
22  history.  And then there is just the -- the -- the

Page 96

1  EAC estimates that have been put forward by CMS and
2  reported as the 10 percent and 15 percent.
3       And where -- where I looked at those, I
4  did -- on that small subset, I looked at a
5  difference of 1 percent.  I didn't look at a
6  difference of 1 percent through -- for all of the
7  -- the -- the analyses, only for -- if it should
8  turn out that -- that the -- the correct statutory
9  interpretation is the 10 and 15 percent, say, for
10  Montana, that has been -- that has been used and is
11  found in the CMS guidelines.  I did look at the
12  point where -- you know, 1 percent was a very
13  arbitrary number.  I could have -- I could have
14  made it a penny or 2.  There was rounding errors,
15  and I just -- I was -- I was conservative to give
16  it 1 percent.
17     Q.  Well, what impact did a difference of 1
18  percent have in your penalty calculations?
19     A.  For the -- now, again, we're looking at --
20  when we're -- when we're talking about this 1
21  percent, we're not talking about acquisition cost.
22  We're talking about the number of claims that

Page 97

1  actually exceeded CMS's guidelines and the state's
2  guidelines for EAC, and that's the AWP less 10 and
3  less 15.
4       And if we look at my supplementary, which
5  is Exhibit Hartman 002 -- so you will notice in the
6  supplementary, Table 7 has been reiterated, and
7  that uses the -- the CMS guidelines as -- as the
8  potential statutory interpretation, rather than the
9  actual estimated acquisition cost.  And the AWP
10  less -- 10 AWP less 15, because there was some
11  rounding error there that could have been a penny
12  or so, I said, Look, let's loosen that and give a
13  full percentage point to AWP less 9 and less 14
14  percent.  And that's in Table 7-A, and that --
15  again, these are -- these are ones that are already
16  above the acquisition cost -- the first set.  And
17  looking at that, it drops the number of claims
18  considerably --
19       VIDEO OPERATOR:  Five minutes left on
20  tape.
21     A.  -- in that particular calculation.  So
22  these are already claims -- these claims in -- in

25  (Pages 94 to 97)

37379500-1b00-40eb-a069-168cee764f55

Page 277

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

---

In re: PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )

---

THIS DOCUMENT RELATES TO:       )   VOLUME II

STATE OF MONTANA V. ABBOTT      )

LABS, INC., ET AL., D. MONT.    )

CAUSE NO. CV-02-09-H-DWM        )

          -and-                 )

STATE OF NEVADA V. AMERICAN     )

HOME PRODUCTS, ET AL., CA NO.   )

02-CV-12086                     )

---

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

RAYMOND S. HARTMAN, Ph.D.

WEDNESDAY, 23 AUGUST, 2006

9:32 AM

e95af580-9958-4ad1-bce2-a1bb30bc718b

Hartman, Ph.D., Raymond - Vol. II   HIGHLY CONFIDENTIAL                     August 23, 2006
                                Boston, MA

---

Page 278

1        CONTINUED VIDEOTAPED DEPOSITION
2    of RAYMOND S. HARTMAN, Ph.D., called as a witness
3    by and on behalf of the Defendants, pursuant to the
4    applicable provisions of the Federal Rules of Civil
5    Procedure, before P. Jodi Ohnemus, Notary Public,
6    Certified Shorthand Reporter, Certified Realtime
7    Reporter, and Registered Merit Reporter, within and
8    for the Commonwealth of Massachusetts, at the
9    offices of Ropes & Gray, LLP, One International
10   Place, Boston, Massachusetts, on Wednesday, 23
11   August, 2006, commencing at 9:32 a.m.
12
13
14
15
16
17
18
19
20
21
22

---

Page 279

1    A P P E A R A N C E S:
2
3        HAGENS, BERMAN, SOBOL & SHAPIRO
4        BY: Edward Notargiacomo, Esq.
5        One Main Street, 4th Floor
6        Cambridge, MA  02142
7        617 402-3700
8        Hagens-berman.com
9        Ed@hbsslaw.com
10       For the Plaintiffs
11
12       HOGAN & HARTSON, L.L.P.
13       BY: Steven M. Edwards, Esq.
14       Hoa T.T. Hoang, Esq.
15       875 Third Avenue
16       New York, NY  10022
17       212 918-3000
18       Smedwards@hhlaw.com
19       Htthoang@hhlaw.com
20       For Defendant Bristol-Myers
21       Squibb
22

---

Page 280

1    A P P E A R A N C E S: (CONT'D)
2
3        JONES DAY
4        BY: Carol P. Geisler, Esq.
5        James R. Daly, Esq.
6        77 West Wacker
7        Chicago, IL  60601-1692
8        312 782-3939
9        Cgeisler@jonesday.com
10       Jrdaly@jonesday.com
11       For Abbott Labs and
12       T.A.P. Pharmaceuticals
13
14       DAVIS, POLK & WARDWELL
15       BY: James J. Duffy, Esq.
16       450 Lexington Avenue
17       New York, NY  10017
18       212 450-4000
19       James.duffy@dpw.com
20       For Defendant AstraZeneca
21       Pharmaceuticals Corp.
22

---

Page 281

1    A P P E A R A N C E S: (CONT'D)
2
3        SIDLEY AUSTIN, LLP
4        BY: Richard D. Raskin, Esq.
5        One South Dearborn
6        Chicago, IL  60603
7        312 853-7000
8        Rraskin@sidley.com
9        For Bayer Corp.
10
11       ROPES & GRAY, L.L.P.
12       BY: Steven A. Kaufman, Esq.
13       Kim Nemirow, Esq.
14       One International Place
15       Boston, MA  02110-2624
16       617 951-7000
17       Steven.kaufman@ropesgray.com
18       For Defendant Shering Corporation/
19       Shering Plough and Warrick
20       Pharmaceuticals
21
22

---

2 (Pages 278 to 281)

e95af580-9958-4ad1-bce2-a1bb30bc718b

Page 466

1   here. I -- I've given the guidance for the -- for
2   the -- the different end points, the 20 percent and
3   the 66 percent. Now, you're asking me what one
4   observes with multisource drugs in this literature
5   that -- that I've --
6       Q.  I didn't ask you that, what you observed.
7       A.  Well, you've asked me about --
8       Q.  I'm actually just trying to talk to you
9   about math for a second. I just want to establish
10  that the lowest AWP times 150 percent --
11      A.  Right.
12      Q.  -- what you're suggesting in passing, as
13  you put it, is half of that. Because AWP minus 25
14  percent is one-half of AWP times 150 percent, right
15  -- for the same drug, obviously?
16      A.  The -- you've -- you've come up with a
17  serendipitous concordance of numbers that has no
18  meaning in my analysis, I mean, but the -- the fact
19  that FUL is -- I know you've never been accused of
20  that, but there's always a first time for
21  everything. The fact that I come up with 25
22  percent has -- as a -- as a conservative measure,

Page 467

1   has nothing to do with FUL, if that's what you're
2   asking about with the math. Yes, half of 50
3   percent is 25 percent.
4       Q.  Well, but -- well -- but wait, because
5   you're finding liability for all the Defendants in
6   the room, even if the states used FUL to reimburse,
7   right, because you're finding that's higher than
8   ASP or higher than ASP plus some kind of additional
9   percent, right?
10      A.  Minus some addition -- minus some percent.
11      Q.  Right.
12      A.  And what I'm --
13      Q.  Isn't that right? So F -- is what I said
14  correct?
15          MR. NOTARGIACOMO: Objection. Let him
16  answer the question.
17          MR. DALY: I asked him if that was
18  correct.
19          MR. NOTARGIACOMO: This is not a rolling
20  thing. You ask questions. He answers them.
21  That's how it's supposed to go.
22      A.  Yeah, take a -- take a breath. Good. A

Page 468

1   cleansing exhalation. The FUL is 150 percent of
2   the lowest AWP, which is going to cluster around
3   the -- most of these drugs are going to be
4   clustering the AWPs fairly closely. 150 percent of
5   that is going to be -- of the minimum of that -- is
6   going to be well above all of these AWPs. And what
7   I'm looking -- what -- what -- data that I have --
8   analyses that I have done in many Hatch-Waxman
9   matters and what has been done in the literature
10  demonstrate that the actual ASPs drop like a rock
11  with generic entry such that the -- you can come up
12  with an AWP that's 150 percent at FUL, it's 150
13  percent of AWP, but that is going to be in excess
14  of the ASPs. And so, yeah, you've got 150 percent
15  of some AWP, but there is -- there's no case that I
16  know of where that is less than the ASPs of generic
17  drugs entering the market.
18      Q.  Are you finished?
19      A.  I am. Thank you.
20      Q.  Okay. So my --
21      A.  Your turn.
22      Q.  -- my serendipitous mathematical exercise

Page 469

1   was correct, though?
2       A.  That half of 50 is 25.
3       Q.  Or that half of 150 is 75, right?
4       A.  That's another serendipitous one.
5       Q.  Is that true, though?
6       A.  Half of 150 is 75, yes.
7       Q.  Okay.
8       A.  I will -- with -- I think in all -- at
9   least in base 10, that's true.
10      Q.  Now, in -- in your report, when it comes
11  to single-source branded drugs, all right -- that's
12  the topic -- you -- you are basing your analysis on
13  retail acquisition costs being equal to WAC,
14  correct?
15      A.  Being approximately equal to WAC, that's
16  correct.
17      Q.  With the 1 -- or perhaps minus 1 or 2
18  percent. In that kind of a range, correct?
19      A.  Yeah, probably less, but close to -- very
20  close to WAC.
21      Q.  And if -- if a company reports WAC to the
22  compendium --

49 (Pages 466 to 469)