- Exhibit 3 -

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY )<br>AVERAGE WHOLESALE PRICE )<br>LITIGATION )<br>_____ ) | M.D.L. No. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris |

REPORT OF INDEPENDENT EXPERT

PROFESSOR ERNST R. BERNDT

TO JUDGE PATTI B. SARIS

FEBRUARY 9, 2005

TABLE OF CONTENTS

|    |                                                                                              | PAGE |
|----|----------------------------------------------------------------------------------------------|------|
| I. | INTRODUCTION                                                                                 | 4    |
|    | A. Qualifications                                                                            | 4    |
|    | B. Nature of Assignment and Terms of Engagement                                              | 6    |
|    | C. Interpretation of My Assignment                                                           | 7    |
|    | D. Information Considered                                                                    | 8    |
|    | E. Structure of the Report                                                                   | 8    |
| II.| OVERVIEW                                                                                     | 9    |
|    | A. The Complaint                                                                             | 9    |
|    | B. The Role of AWP                                                                           | 10   |
| III.| THE ORIGINS, EVOLUTION AND PERSISTENCE OF AWP AND "SPREAD"                                  | 14   |
|    | A. Brand Name/Single Source Self-Administered Drugs                                          | 14   |
|    | B. Generic/Multisource Self-Administered Drugs                                               | 22   |
|    | C. AWP Discounts Attained by Government and Commercial Purchasers                            | 34   |
|    | D. Why the Continued Confusion Concerning What is AWP?                                       | 41   |
|    | E. Other Uses of AWP                                                                         | 46   |
|    | F. Physician-Administered Drugs: Medicare Part B and Private Coverage                        | 46   |
| IV.| PBM COMPETITION AND PRICE TRANSPARENCY: SELF-ADMINISTERED DRUGS                              | 60   |
|    | A. Information with Vertically Integrated Drug Manufacturers and PBMs                        | 61   |
|    | B. Information with Horizontally Integrated Independent PBMs                                 | 64   |
|    |    1) Documentation of Continuing Diverse PBM Ownership                       | 66   |
|    |    2) Implications of Diverse Ownership for Preserving "Secret" Information   | 71   |
|    |    3) Contracts Between PBMs and Drug Manufacturers: Rebate Transparency      | 74   |
|    |       a. Price Transparency with Competing Oligopolists/Monopolists: Theory   | 77   |
|    |       b. Price Transparency with Competing Oligopolists/Monopolists: Evidence | 79   |
|    |    4) Contracts Between PBMs and Health Plans/Insurers: Rebate Transparency   | 82   |
|    | C. Information with Vertically Integrated Mail Order Firms and PBMs                          | 88   |

| | | |
|---|---|---|
| V. | COMPETITION, INFORMATION, AND PRICE TRANSPARENCY: PHYSICIAN-ADMINISTERED DRUGS | 98 |
| VI. | INITIAL OBSERVATIONS ON THE METHODOLOGY PROPOSED BY DR. HARTMAN, AND ON ISSUES REGARDING CLASS CERTIFICATION | 107 |
| |    A. Self-Administered Drugs | 110 |
| |    B. Physician-Administered Drugs | 123 |
| |    C. Final Comments | 126 |
| ATTACHMENT A: | Curriculum Vitae | 127 |
| ATTACHMENT B: | OIG Reports Related to Medicare & Medicaid | 160 |
| ATTACHMENT C: | Other Uses of AWP | 166 |
| ATTACHMENT D: | Ownership of Top PBMs – Quarter 1, 1999 | 170 |

*Pharmaceutical Pricing*.[26] Substantial portions of the material in that text overlap, however, with paragraphs in an earlier 1994 peer-reviewed article,[27] as well as with presentational material prepared for previous marketing consulting/research seminars conducted by Professor Kolassa.[28] Kolassa [1997] begins by defining AWP as follows:

> "Neither an average price nor a price charged by wholesalers, this figure is a vestige of earlier times. Few, if any, wholesalers even consider AWP today when pricing their prescription products. It is, however, commonly used by retailers and others who dispense medications as the basis for many pricing decisions. Due to its availability from many sources, the AWP is often used as a surrogate for actual prices when studying prescription price trends".[29]

22. In Kolassa [1994a], the original *raison d'être* for AWP and for the now infamous common 20%-25% "spreads" between wholesalers' acquisition and retail pharmacy acquisition costs of branded self-administered drugs is recounted. Recall that during the 1980s, following the pioneering practices of WalMart and other "superbox" retailers, implementation of information and communications technological developments significantly impacted the rationalizing of wholesaler-retailer distribution logistics, the monitoring of transactions in real time, and the management of inventory, reducing costs and in the process leading to the demise of many small retail and wholesale firms. These phenomena also occurred in the context of pharmaceuticals.[30] Despite its length, the following quote from Kolassa [1994a] is illuminating:

> "The AWP, the most common figure used for drug price comparisons, is a vestige of a drug distribution system that disappeared in the early 1980s. Prior to that

---

[26] E. M. (Mick) Kolassa, *Elements of Pharmaceutical Pricing*, Binghamton, NY: The Pharmaceutical Products Press, 1997.
[27] Mick Kolassa, "Guidance for Clinicians in Discerning and Comparing the Price of Pharmaceutical Agents", *Journal of Pain and Symptom Management*, 9(4), May 1994: pp. 235-243. Hereafter I denote this reference as Kolassa [1994a].
[28] See, for example, *Elements of Pharmaceutical Pricing: A two-day marketing research seminar*, Radisson Hotel & Suites, Fairfield, NJ, August 9-10, 1994. Hereafter I denote this reference as Kolassa [1994b].
[29] Kolassa [1997], *supra*, p. 30.
[30] For another discussion on the impacts of information and communications technology on wholesale-retail interactions in the pharmaceutical industry, see "Computers as Agents of Change" (pp. 61-65) and "Retailing Reorganized" (pp. 65-67) in John T. Fay, Jr., "The Wholesaler", ch. 12 in Mickey C. Smith, ed., *Principles of Pharmaceutical Marketing*, Third Edition, Philadelphia: Lea & Febiger, 1983.

time, there were several hundred small, independent drug wholesalers, each operating regionally. Due to the inefficiencies of such a fragmented system, the operating costs were quite high. The average markup above cost by these wholesalers to their retail customers, primarily pharmacies, was 20% to 25%, depending on manufacturer. The manufacturer differences were due to the fact that, while most pharmaceutical manufacturers used a wholesaler-only method of distribution to the retail class of trade, a significant number of large firms had invested in their own distribution networks and preferred 'direct' sales over the use of wholesalers. By convention, wholesalers added 20% to the price of products from companies following a wholesaler-only policy while adding 25% to the prices of products from those companies who chose to 'compete' with the wholesalers. At that time, virtually all pharmaceutical companies sold products directly to hospitals that did not use wholesalers. As a result, less than one-half of the pharmaceutical products sold in the United States were handled by drug wholesalers in the early 1970s. {Footnote in Kolassa [1994a] omitted.}

In the late 1970s and early 1980s, several wholesale drug companies began to acquire smaller competitors. At that time, a few companies expanded significantly, many becoming national in scope. As a result, there are fewer than 90 separate wholesaler drug companies today, with more consolidations expected in the next few years. The expansion of major firms also concentrated competition. Prior to this consolidation, most wholesalers had little or no competition, so there was little pressure to reduce their markups. The consolidation in the industry resulted in major wholesale companies competing for the same business. The net effect was price competition.

This expansion of major wholesalers led to greater efficiencies as the wholesalers adopted more sophisticated inventory control systems, and to the expansion of services offered to retail and hospital customers. Large wholesalers then used their competitive advantages to gain and keep new customers. The utilization of wholesalers increased substantially during this period, resulting in the wholesalers' handling of over 80% of prescription product sales by 1987. {Footnote in Kolassa [1994a] not reproduced here.}

Additionally, during the 1980s, the prices charged by the manufacturers began to increase. This allowed the wholesalers to practice arbitrage, buying drugs in anticipation of price increases, then selling their inventory at the new, higher prices. These combined forces brought the average wholesale markup today to roughly 2.5%, significantly lower than the markup implied by the published AWP.

Price-reporting services, however, still rely upon the AWP as their primary figure, because many companies publish only that figure (usually called the "suggested price to pharmacy"). A recent move by several manufacturers, however, is to publish only their own list prices, refusing to offer the traditional AWP figure. This has been done, reportedly, because many name-brand drug makers feel the

> AWP unfairly distorts their prices and results in competitive disadvantages. The AWP, although not the cost paid by retailers, still provides the basis for much retail pharmacy pricing, with retailers euphemistically referring to the difference between their actual cost and the AWP as 'earned discount'. This tradition is so ingrained that a retailer that sells a product at AWP, which is 12%-18% above their cost, refers to this price as a 'loss leader'."[31]

Kolassa summarizes this discussion by stating, "Within pharmacy circles, the definition of AWP, it is joked, is 'Ain't What's Paid.'"[32]

23. The evolution of the AWP – WAC "spread" for branded self-administered pharmaceuticals is therefore, as best I can tell, quite understandable, and apparently not the result of any sinister or nefarious conspiracies. Moreover, since AWP was publicly known, it served as a convenient focal point metric for contractually specifying various reimbursements, and for efficiently adjudicating pharmacy transactions electronically.

24. Why this "spread" practice has continued long after its underlying rationale has largely disappeared is a bit puzzling, but is I believe understandable and plausible. Given the AWP – WAC history, retail pharmacies plausibly continued to expect their acquisition costs to be 20-25% below AWP, and thus in their contracts with third party payors and PBMs, retailers generally expected to be reimbursed at 10-15% below AWP. In such a context, one can understand that a single manufacturer marketing a newly FDA approved drug would find it quite challenging if not impossible to successfully set an AWP that was only, say, 2-5% above the WAC, for with that small a differential, retailers would be unable to recover their acquisition costs, unless they renegotiated and rewrote contracts with PBMs and other third party payers (such contracts typically applied a uniform percent discount across all single source branded self-administered drugs, regardless of therapeutic class).[33]

---

[31] Kolassa [1994], *supra*, pp. 236-237; much of this material is reproduced in Kolassa [1997], *supra*, pp. 33, 35-36.
[32] Kolassa [1994a], *supra*, p. 237.
[33] The percent figure typically varied, however, depending on whether the drug was a brand or generic.

*The AWP Litigation: Report of Prof. Ernst R. Berndt*   February 9, 2005   17

> "Much of the increase in the average markup was attributable to the use of relatively new generic drugs. For generic drugs that came on the market between 1997 and 2002, Medicaid reimbursed pharmacies an average of about $46 per prescription in 2002, of which only about $14 went for the purchase of the drug itself. Pharmacies and wholesalers retained the remainder, or markup, of about $32 per prescription."[100]

73. I conclude, therefore, the fact that AWP very substantially overstates pharmacies' actual acquisition costs for generic self-administered drugs has long been publicly available information, as has the fact that the extent of overstatement has been growing over time. There is also substantial, perhaps growing, heterogeneity in the extent of discounting off AWP among different pharmacy classes of trade, rural vs. urban, by state, and by whether the multisource drug was on the FUL list.

**D. Why the Continued Confusion Concerning What is AWP?**

74. Despite the fact that apparently most knowledgeable industry observers have long understood and taken into account in their decision-making that no one (except perhaps Medicare and the cash-paying retail customer) pays a price for branded drugs as high as AWP,[101] this knowledge is not universally held, and some confusion still remains. Depositions in this litigation document this confusion.

75. In the attachments accompanying *Plaintiffs' Reply Memorandum in Support of Class Certification* summarizing testimony from individuals deposed in this litigation, the record reveals a number of deponents testified in a way indicating they clearly understood that WAC was less than AWP and that pharmacies typically acquired drugs at prices considerably less than

---

[100] Congressional Budget Office, *Medicaid's ts to Pharmacies for Prescription Drugs*, December 2004, p. 1.
[101] Interestingly, in the simulation model of the PBM industry used by Banc of America Securities, it is stated that " we assume AWP to be equal to average retail price (coincidentally this is often, approximately the case)". In particular, AWP is set equal to "Listed retail price". See Banc of America Securities, *Pharmacy Benefit Managers: Keeping a Lid on Drug Costs*, Health Care Technology and Distribution Industry Overview, February 2002, Figure 12, p. 21.

AWP; see, for example, testimony from deponents Gregory Madsen from Caremark;[102] Rena Maxwell from University of Pittsburgh Medical Center;[103] Bob Schultz from Blue Cross Blue Shield of Wyoming;[104] Carol Sidwell from John Deere, Inc.;[105] and Dale Kramer from Kaiser Permanente.[106] On the other hand, testimony from a number of other deposed individuals indicated they interpreted AWP more literally, as some average of wholesale prices charged by wholesalers and/or paid for by pharmacies to wholesalers, or prices paid by wholesalers to manufacturers; see, for example, the testimony by Linda Montefort from Empire Blue Cross Blue Shield of New York;[107] David Thomas from Three Rivers Health;[108] Dan Dragalin from Multiplan, Inc.;[109] Richard Francis from Harvard Pilgrim Health Care;[110] and Daniel Ryan from the United Food and Commercial Workers.[111]

76. Plaintiffs' Counsel have even noted that in the glossary of the 1999 textbook authored by Defendants' Expert Robert P. Navarro, the following definition is given:

> "AWP – average wholesale price; the standard charge for a pharmacy item; derived by taking the average cost of the item to a pharmacy as charged by a large representation of pharmacy wholesale suppliers (for items not otherwise being sold at a discount)."[112]

On the other hand, Plaintiffs' Expert Dr. Stephen Schondelmeyer has previously written that while AWP is not literally the average price paid by pharmacies for prescription drugs, the

---

[102] *Plaintiffs' Appendix of Summary Charts in Support of Class Certification*, December 16, 2004, Exhibit 1a, p. 8. Hereafter I will call this set of deposition summaries as "Plaintiffs' Appendix 1a [2004]".
[103] Plaintiffs' Appendix 1a [2004], *supra*, pp. 9-10.
[104] Plaintiffs' Appendix 1a [2004], *supra*, pp. 12-13.
[105] Plaintiffs' Appendix 1a [2004], *supra*, p. 13.
[106] *Plaintiffs' Appendix of Summary Charts in Support of Class Certification*, December 16, 2004, Exhibit 1b, pp. 13-16. Hereafter I will call this set of deposition summaries as "Plaintiffs' Appendix 1b [2004]".
[107] Plaintiffs' Appendix 1a [2004], *supra*, pp. 10-11.
[108] Plaintiffs' Appendix 1a [2004], *supra*, p. 15.
[109] *Plaintiffs' Appendix of Summary Charts in Support of Class Certification*, December 16, 2004, Exhibit 1c, p. 1. Hereafter I will call this set of deposition summaries as "Plaintiffs' Appendix 1c [2004]".
[110] Plaintiffs' Appendix 1c [2004], pp. 1-2.
[111] Plaintiffs' Appendix 1c [2004], p. 3.
[112] As cited in Class Plaintiffs Memorandum in Support of Their Motion to Strike Portions of the Declaration of Robert P. Navarro, , In Re Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Relates to 01-CV-12257-PBS, December 17, 2004.

relationship between these list prices and actual acquisition costs is "constant" over time. Specifically, when introducing the National Association of Chain Drug Stores PRIME price index for the "Top 200 drugs by 1991 dollar volume sold through community pharmacies" based on Medi-Span list price data, he wrote:

> "Even though the AWP does not represent the actual price paid by pharmacies for drug products, there is typically a constant relationship between these list prices and the actual acquisition cost for most pharmacies. Manufacturers nearly always raise their list prices and their actual transaction prices to traditional community pharmacies at the same rate. Manufacturers' price change patterns have been monitored to identify and adjust for those cases where list prices and direct prices appear to have changed at a different rate."[113]

77. Part of the continued confusion apparently emanates from statements made by First DataBank, a publisher of AWP prices. For example, in the September 1991 issue of a First DataBank's publication, in an article entitled "Understanding AWP", the following definition appears:

> "AWP represents an average price which a wholesaler would charge a pharmacy for a particular product. The operative word is average. AWP never means that every purchase of that product will be exactly at that price. There are many factors involved in pricing at the wholesale level which can modify the prices charged even among the same wholesaler. AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible."[114]

78. Essentially the same definition of AWP is given today. For example, the American Society of Consultant Pharmacists' website contains an "AWP Briefing Room" backgrounder on "AWP Changes for intravenous, inhalant and injectable Medications" in which information is

---

[113] Stephen W. Schondelmeyer, "The NACDS *PRIME* Index: Tracking Changes in Drug Prices", prepared for National Association of Chain Drug Stores, August 14, 1992, pp. 1-2. Italics in original. I note that elsewhere Professor Schondelmeyer has stated that the meaning of price terms have changed over time. See, for example, Schondelmeyer and Wrobel [2004], *supra*, p. 13.

[114] *First DataBank Monthly Interest*, "Understanding AWP", Vol. 6, No. 9, September 1991, p. 1. FDB-AWP 28850-28852.

given "on how AWP is calculated" by First DataBank ("FDB"). This internet search process yielded the following statement:

> "I have many conversations regarding what is 'AWP' and how does FDB determine it. There is much folklore and misunderstanding as to the determination of AWP and where we get the data.
>
> AWP is the average **wholesale** price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC). The operative word is **average**. AWP was developed to provide a price that all parties could agree upon for electronic processing to be possible.
>
> In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what they use as a price basis in their AWP files. We contact the wholesalers to determine what the markup should be for a new company or to confirm that the markup that we are applying is current. A survey may be performed on a single NDC number or for a manufacturer's entire line of products. In either case, each national wholesaler is surveyed on a number of products from each manufacturer.
>
> The number of surveys performed is increasing. First DataBank surveys drug wholesalers that represent over two-thirds of the wholesaler total dollar volume. The markup that First DataBank utilizes is representative of wholesalers on a national level. Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup proportionally. Wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesale price (SWP) in our determination."[115]

79. At the First DataBank website "Frequently Asked Questions", under the question "How does First DataBank determine the Net Wholesale Price, Direct Price and Blue Book AWP as published in NDDF Plus and PriceProbe?", the following statement was retrieved in January 2005:

> "The Net Wholesale Price (also known as the wholesale acquisition cost or wholesale price) represents the manufacturer's published price for a drug product

---

[115] *Average Wholesale Price*, as found on the American Society of Consultant Pharmacists website, with a note this was last modified on 06/05/00. Online at http://www.ascp.com/public/ga/awp/awpinfo.shtml, accessed 1/22/2005. Boldface in original.

*The AWP Litigation: Report of Prof. Ernst R. Berndt*    *February 9, 2005*    44

to wholesalers. The Direct Price represents the manufacturer's published price for a drug product to non-wholesalers.

First DataBank defines the 'Blue Book Average Wholesale Price,' which is commonly used as AWP, as the average of prices published by wholesalers to their customers for a given product. To determine Blue Book AWP, First DataBank typically identifies the Net Wholesale Price (or in some cases, the Direct Price) of a product, and then surveys the full-line national wholesalers to determine the average mark up applied to the manufacturer's line of products or a specific product. Such surveys may be conducted at the request of our customers or when a change in the marketplace occurs (such as a merger of manufacturers) which might occasion a change in prices. First DataBank does not include regional wholesalers or specialty distributors in its survey.

First DataBank's Blue Book AWP is not intended to represent the wholesale price suggested by the manufacturer. Instead, First DataBank reports the manufacturer's suggested wholesale prices in a separate data field known as 'SWP.' In some cases, if manufacturers do not sell to wholesalers or if wholesalers agree with the manufacturer's suggested wholesale price, the Blue Book AWP and SWP may be the same.[116]

80. Two further examples illustrate factors contributing to the continuing confusion and ambiguity concerning AWP. First, in the 2000 edition of Novartis' Pharmacy Benefit Report, an industry trade publication, the glossary defines AWP as follows:

"Average wholesale price (AWP) -- A published suggested wholesale price for a drug, based on the average cost of the drug to a pharmacy from a representative sample of drug wholesalers. There are many AWPs available within the industry, AWP is often used by pharmacies to price prescriptions. Health plans also use AWP – usually discounted – as the basis for reimbursement of covered medications."[117]

Second, a more recent widely cited California HealthCare Foundation report (prepared by a well-known health care consulting firm) contains the following glossary definition:

"Average wholesale price (AWP) – A list of benchmark prices set by averaging across the spectrum of prices charged to pharmacies by wholesalers for both brand-name and generic drugs. The current list price is published in recognized

---

[116] First DataBank "Frequently Asked Questions". Accessed online at http://www.firstdatabank.com/customer_support/faqs, on January 20, 2005.
[117] *Novartis Pharmacy Benefit Report: Facts & Figures*, 2000 Edition, East Hanover, NJ, Novartis Pharmaceuticals Corporation, p. 43.

sources, including Medi-Span, FirstData Bank and its supplements, and Medical Economics' Red Book."[118]

81. It appears, therefore, that inconsistent and ambiguous information exists even currently concerning what type of price AWP measures. The continuing confusion is real and understandable.

### E. Other Uses of AWP

82. In the previous paragraphs I have considered AWP in the context of sending signals on the structure of prices for self-administered drugs to potential purchasers. Several other uses of AWP exist, and in some cases these uses are likely to constrain the extent to which manufacturers face incentives to "artificially inflate" their AWPs. In other cases, published guidelines recommend use of AWP, and even the FDA suggests use of AWP. I provide examples in Attachment C.

### F. Physician-Administered Drugs: Medicare Part B and Private Coverage

83. To this point, I have focused attention almost exclusively on self-administered single and multisource drugs. I have done so in part because I infer that the potential size of the class consisting of AWPID self-administered drugs is likely to be much larger than that for AWPID physician-administered drugs. An additional reason for beginning with self-administered drugs is that their distribution and benefit management differs markedly from that for physician-administered drugs, and combining the two into one discussion could mask their differences.

84. Some drugs are manufactured in both self-administered (e.g., tablets and capsules) and physician-administered (e.g., injectable) formulations. Even some injectable formulations can be either self-administered or physician-administered, depending on the health of and training

---

[118] California HealthCare Foundation, *Navigating the Pharmacy Benefits Marketplace*, Prepared by Mercer Human Resource Consulting, January 2003, p. 39. Available online at http://www.chcf.org/documents/hospitals/NavPharmBenefits.pdf.

been as rapid and as extensive as it has with self-administered drugs. Moreover, for those injectable/physician-administered drugs not having an oral formulation as well (i.e., tablet or capsule versions), generic prices tend to fall more slowly and not as sharply as do generic self-administered drugs. Finally, in cases where there is both an oral and an injectable/physician-administered formulation of the identical active ingredient, following loss of patent protection, generic entry and pricing tend to be quite similar for self-administered and injectable/physician-administered drugs. These are the only generalizations I can comfortably make in terms of price and entry patterns for self-administered vs. physician-administered generic drugs, and even for these, for confidentiality reasons I am unable to provide explicit examples and references.

233.    As I have indicated earlier in this report, it will be critical to be able to crosswalk easily between J-codes and NDC codes. At this point in time I cannot comment on how labor-intensive such a process will be, and the implications for class certification.

### C. Final Comments

234.    I have intentionally entitled this section of my report "Initial Observations on the Methodology Proposed by Dr. Hartman, and on Issues Regarding Class Certification". The issues surrounding class certification are indeed complex, and I will continue to think and deliberate on them. I am available to discuss these matters further with the Court, should the Court deem that useful and appropriate.