- Exhibit 4 -

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

---

In re: PHARMACEUTICAL        )
INDUSTRY AVERAGE WHOLESALE   )
PRICE LITIGATION             )
_____ )
THIS DOCUMENT RELATES TO:    )
STATE OF MONTANA V. ABBOTT   ) VOLUME I
LABS, INC., ET AL., D. MONT. )
CAUSE NO. CV-02-09-H-DWM     )
        -and-                )
STATE OF NEVADA V. AMERICAN  )
HOME PRODUCTS, ET AL., CA NO. )
02-CV-12086                  )
_____ )

H I G H L Y   C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF

RAYMOND S. HARTMAN, Ph.D.

TUESDAY, 22 AUGUST, 2006

9:37 AM

Page 2

1  VIDEOTAPED DEPOSITION of RAYMOND
2  S. HARTMAN, Ph.D., called as a witness by and on
3  behalf of the Defendants, pursuant to the
4  applicable provisions of the Federal Rules of Civil
5  Procedure, before P. Jodi Ohnemus, Notary Public,
6  Certified Shorthand Reporter, Certified Realtime
7  Reporter, and Registered Merit Reporter, within and
8  for the Commonwealth of Massachusetts, at the
9  offices of Ropes & Gray, LLP, One International
10 Place, Boston, Massachusetts, on Tuesday, 22
11 August, 2006, commencing at 9:37 a.m.

Page 3

1  APPEARANCES:
2
3      HAGENS, BERMAN, SOBOL & SHAPIRO
4      BY: Edward Notargiacomo, Esq.
5      One Main Street, 4th Floor
6      Cambridge, MA 02142
7      617 482-3700
8      Hagens-berman.com
9      Ed@hbsslaw.com
10     For the Plaintiffs
11
12     HOGAN & HARTSON, L.L.P.
13     BY: Steven M. Edwards, Esq.
14     Hoa T.T. Hoang, Esq.
15     Lyndon Tretter, Esq.
16     875 Third Avenue
17     New York, NY 10022
18     212 918-3000
19     Smedwards@hhlaw.com
20     Htthoang@hhlaw.com
21     For Defendant Bristol-Myers
22     Squibb

Page 4

1  APPEARANCES: (CONT'D)
2
3      JONES DAY
4      BY: Carol P. Geisler, Esq.
5      James R. Daly, Esq.
6      77 West Wacker
7      Chicago, IL 60601-1692
8      312 782-3939
9      Cgeisler@jonesday.com
10     Jrdaly@jonesday.com
11     For Abbott Labs and
12     T.A.P. Pharmaceuticals
13
14
15     DAVIS, POLK & WARDWELL
16     BY: James J. Duffy, Esq.
17     450 Lexington Avenue
18     New York, NY 10017
19     212 450-4000
20     James.duffy@dpw.com
21     For Defendant Astra Zeneca
22     Pharmaceuticals Corp.

Page 5

1  APPEARANCES: (CONT'D)
2
3      SIDLEY AUSTIN, LLP
4      BY: Richard D. Raskin, Esq.
5      One South Dearborn
6      Chicago, IL 60603
7      312 853-7000
8      Rraskin@sidley.com
9      For Bayer Corp.
10
11     ROPES & GRAY, L.L.P.
12     BY: Steven A. Kaufman, Esq.
13     Kim Nemirow, Esq.
14     One International Place
15     Boston, MA 02110-2624
16     617 951-7000
17     Steven.kaufman@ropesgray.com
18     For Defendant Shering Corporation/
19     Shering Plough and Warrick
20     Pharmaceuticals

Page 6

APPEARANCES: (CONT'D)

SHOOK, HARDY & BACON, L.L.P.
BY: Joseph G. Matye, Esq.
2555 Grand Boulevard
Kansas City, MO 64108-2613
816 474-6550
For Defendant Aventis Pharmaceuticals

(Via telephone)
PATTERSON, BELKNAP, WEBB & TYLER, L.L.P.
BY: Mark Young, Esq.
1133 Avenue of the Americas
New York, New York 10036-6710
212 336-2000
Mgyoung@pbwt.com
For Defendant Johnson & Johnson

Page 7

APPEARANCES: (CONT'D)

MORGAN, LEWIS & BOCKIUS, L.L.P.
BY: J. Clayton Everett, Jr., Esq.
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
202 739-3000
Jeverett@morganlewis.com
For Pharmacia Corporation

(Via telephone)
DICKSTEIN SHAPIRO, LLP
BY: Charles Mehler, Esq.
1177 Avenue of the Americas
New York, NY 10036-2714
212 377-6500
For Baxter Healthcare and Baxter International

Page 8

APPEARANCES: (CONT'D)

(Via Internet and Telephone)
PERKINS COIE, LLP
BY: Kathleen M. O'Sullivan, Esq.
1201 Third Avenue
Seattle, WA 98101-3099
206 359-8000
For Immunex Corporation

(Via telephone)
SONNENSCHEIN, NATH, ROSENTHAL, LLP
BY: Geoffrey Repo, Esq.
7800 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606-6409
312 876-8000
Grepo@sonnenschein.com
For Teva

Page 9

APPEARANCES: (CONT'D)

KELLEY, DRYE & WARREN, LLP
BY: Christopher C. Palermo, Esq.
101 Park Avenue
New York, NY 10178
212 808-7800
Cpalermo@kelleydrye.com
For Dey Pharmaceuticals

ALSO PRESENT:
Nauman Ilias, Ph.D.
The Brattle Group
44 Brattle Street
Cambridge, MA 02138-3736
617 864-7900

Andrew B. Tepperman, Ph.D.
CRA International
John Hancock Tower
200 Clarendon Street, T-33
Boston, MA 02116-5092
617 425-3000

3 (Pages 6 to 9)

Page 10

1  ALSO PRESENT: (CONT'D)
2
3        Christopher R. Stromberg, Ph.D.
4        Bates White
5        1300 Eye Street NW
6        Suit 600
7        Washington, DC 20005
8        202 408-6110
9
10
11
12       Ralph Scopa, Videographer

Page 11

        INDEX

TESTIMONY OF:                           PAGE
RAYMOND S. HARTMAN, Ph.D.
(By Mr. Edwards).............................. 016

        EXHIBITS
EXHIBIT      DESCRIPTION                    PAGE
Exhibit Hartman 001   Declaration of R. Hartman... 013
Exhibit Hartman 002   Supplementary Declaration... 013
Exhibit Hartman 003   Declaration of R. Hartman,
                      Nevada..................... 013
Exhibit Hartman 004   Supplemental Declaration.... 013
Exhibit Hartman 005   Errata Sheet, 8/22/06....... 021
Exhibit Hartman 006   OIG Guidance................ 065
Exhibit Hartman 007   Table Page 1 of 1........... 121
Exhibit Hartman 008   HHC 011-2202-2243........... 137
Exhibit Hartman 009   Memo, 3/14/02............... 141
Exhibit Hartman 010   NHPF Issue Brief 175........ 150
Exhibit Hartman 011   Federal Medicaid Statute
                      2000....................... 162
Exhibit Hartman 012   Page 303 Medical Regs....... 168

Page 12

    EXHIBITS (CONT'D)
Exhibit Hartman 013 Sections 447.331, 447.332..... 171
Exhibit Hartman 014 Federal Register 8/15/75...... 177
Exhibit Hartman 015 1977 Memorandum............... 185
Exhibit Hartman 016 HHC 902-1078-89............... 196
Exhibit Hartman 017 Assessment Chain Pharmacies'
                    Costs........................ 201
Exhibit Hartman 018 NACDS, 5/10/90................ 203
Exhibit Hartman 019 SisteMetrics, 8/1993.......... 205
Exhibit Hartman 020 Abt Associates Document...... 209
Exhibit Hartman 021 52 Federal Register
                    28.648.657................... 214
Exhibit Hartman 022 OIG Report, 9/2001............ 225
Exhibit Hartman 023 Historical Changes........... 232
Exhibit Hartman 024 Review Pharmacy Acquisition
                    Costs........................ 236
Exhibit Hartman 025 Bates MT 019199-205.......... 242
Exhibit Hartman 026 OIG Report, 2/7/02............ 246
Exhibit Hartman 027 Bates MT 006626-42........... 248
Exhibit Hartman 028 Poulsen Deposition........... 252
Exhibit Hartman 029 Bates MT 0025-29............. 265
Exhibit Hartman 030 Bates MT 027798-99........... 271

Page 13

        (Declaration of Raymond S. Hartman,
        Montana marked Exhibit Hartman 001.)
        (Supplementary declaration of Raymond S.
        Hartman, Montana, marked Exhibit Hartman 002.)
        (Declaration of Raymond S. Hartman,
        Nevada, marked Exhibit Hartman 003.)
        (Supplementary declaration of Raymond S.
        Hartman, Nevada, marked Exhibit Hartman 004.)
        VIDEO OPERATOR: Good morning. We are now
recording and on the record. My name is Ralph
Scopa. I'm a legal video specialist for G&M Court
Reporters, Limited. Our business address is 42
Chauncy Street, Suite 1-A, Boston, Mass. 02111.
I'm working on behalf of Henderson Legal Services.
Today's date is August 22nd, 2006. The time is
9:37 a.m.
        This is the deposition of Dr. Raymond
Hartman, in re: Pharmaceutical Industry Average
Wholesale Prices, State of Montana versus Abbott
Labs and the State of Nevada versus Abbott Labs, US
District Court, Massachusetts Case No. 01CV12257

4 (Pages 10 to 13)

Page 14

1  PBS.
2       This deposition is being taken at Ropes &
3  Gray, One International Place, Boston. The court
4  reporter is Jodi Ohnemus. Counsel will state their
5  appearances, and the court reporter will administer
6  the oath.
7       MR. NOTARGIACOMO: Edward Notargiacomo for
8  the Plaintiffs, the State of Montana and the State
9  of Nevada.
10      MR. TRETTER: Lyndon Tretter for Defendant
11 BMS.
12      MR. KAUFMAN: Steve Kaufman for Defendant
13 Shering-Plough and Warrick Pharmaceuticals.
14      MR. ILIAS: Nauman Ilias from the Brattle
15 Group.
16      MR. DUFFY: Jim Duffy with Davis, Polk &
17 Wardwell for Astra Zeneca -- Astra Zeneca
18 Pharmaceuticals.
19      MR. RASKIN: Richard Raskin, Sidley
20 Austin, for Bayer Corp.
21      MR. TEPPERMAN: Andrew Tepperman, CRA
22 International.

Page 15

1       MS. GEISLER: Carol Geisler, Jones Day,
2  for Abbott Laboratories and TAP Pharmaceuticals.
3       MR. PALERMO: Chris Palermo, Kelley Drye,
4  for Defendant Dey.
5       MS. HOANG: Hoa Hoang from Hogan & Hartson
6  for Defendant Bristol-Myers Squibb.
7       MR. EDWARDS: Steve Edwards, Hogan &
8  Hartson, BMS.
9       MR. MATYE: Joe Matye for Aventis
10 Pharmaceuticals.
11      MR. STOMBERG: Chris Stomberg, Bates &
12 White.
13      MR. DILLON: Chris Dillon, Ropes & Gray,
14 for Shering-Plough and Warrick Pharmaceuticals.
15      MS. NEMIROW: Kim Nemirow. Also from
16 Ropes & Gray for Warrick and Shering.
17      THE WITNESS: Anybody on the phone?
18      MR. EDWARDS: Oh, yes. Is there anybody
19 on the phone?
20      MR. REPO: Yes. Geoffrey Repo on behalf
21 of Teva Pharmaceuticals.
22      MR. YOUNG: Mark Young, Patterson,

Page 16

1  Belknap, Webb & Tyler, on behalf of the Johnson &
2  Johnson Defendants.
3       MR. MEHLER: Yes. Charles Mehler of
4  Dickstein Shapiro on behalf of Baxter Health Care
5  Corporation and Baxter International, Inc.
6       MS. O'SULLIVAN: Amy O'Sullivan from
7  Perkins Coie on behalf of the Immunex Corporation.
8       RAYMOND S. HARTMAN, Ph.D.,
9       having first been duly sworn,
10      testified as follows to
11      direct interrogatories
12 BY MR. EDWARDS:
13   Q. State your name, please.
14   A. Raymond S. Hartman.
15      MR. NOTARGIACOMO: Before we get started,
16 I just want to -- for the record -- make a -- it
17 clear that from Plaintiffs' specific -- well, I
18 want it understood the fact that Mr. Hartman is
19 here to testify on behalf of Montana/Nevada and to
20 the reports that he submitted with respect to
21 Montana and Nevada.
22      For your benefit and the benefit of other

Page 17

1  counsel who may question Mr. Hartman after you,
2  he's not here to rehash his testimony in the MDL or
3  issues related to the MDL. Obviously, as you well
4  know, there are thousands of pages of his
5  transcript related to those issues, and I just
6  wanted to -- to make that clear that we're going to
7  object to going into any of the issues that have
8  already been hashed out in the MDL.
9    Q. And what is your address?
10   A. My home address or my -- my business
11 address?
12   Q. Business address is fine.
13   A. One Memorial Drive, Suite 1410, Cambridge,
14 Massachusetts 02142.
15   Q. By whom are you employed?
16   A. I am self-employed, but I do my -- most of
17 my consulting work there Greylock McKinnon
18 Associates.
19   Q. What is your profession?
20   A. I am an economist.
21   Q. And have you been retained by the
22 Plaintiffs in the Montana and Nevada cases?

5 (Pages 14 to 17)

Page 90

testimony by defense experts in this matter and the MDL matter.

And so, yeah, I take -- from a set of empirical analyses I make some assumptions about what might be an upper bound, a lower bound, but I did -- but the economic analysis informs ultimately what those bounds may be and helps inform someone coming to this data what might be a conservative estimate of numbers of claims that exceed a legal -- a legal standard that I've been asked to assume.

Q. Can you identify any book or article that would support the economic theory that you just described?

A. The economic theory of the -- the pattern of pricing, let's say, for multisource self-administered drugs.

Q. Well, let me back up. You make assumptions with regard to thresholds for EAC, correct?

A. That's correct.

Q. Are those assumptions based on economic theory?

Page 91

A. They're based on economic theory and -- and analysis of economic data that summarize the -- how economic entities behave according to that theory, what the parameters of that behavior lead to.

Q. What economic theory are they based on?

A. They're based on how -- in the -- in the case of multisource self-administered drugs, how price competition occurs in homogenous products.

Q. Okay. Can you identify any books or articles that support the economic theory underlying the assumptions that you've made with respect to thresholds for EAC.

A. I can -- I can provide for you, and I would be glad to provide for you, 10, 20 citations from -- but I -- you know, I don't memorize them. I'll -- I'll be glad to pull them together for you.

Q. Can you provide any as you sit here today?

A. I can provide 20 to 30 as I sit here today, but I don't -- I didn't know that this was a memory test. I've -- I refer to them regularly. I don't remember -- I refer to lots of articles,

Page 92

and I don't keep them in my mind.

Q. So --

A. But that they're -- but I have them. I have a whole -- I have a whole cabinet drawer full of them.

Q. So name one that supports the economic theory that underlies the assumptions that you have made with respect to thresholds for EAC.

A. I -- I've just -- I've just told you the -- there are so many of them that I'm not going to -- I'm not going to conflate names and articles. And I will be --- I will be glad to do this. If you want to wait till the next -- after the next break, I will have somebody fax over a list of -- of literature for you and we can go through that.

Q. If -- if you want to do that over the lunch break, that's fine.

A. Okay.

Q. Now, your assumptions with respect to EAC thresholds, they are based, in part, on average sales prices when you have them, correct?

A. That's right.

Page 93

Q. Average sale price or ASP is the manufacturer's average sales price, correct?

A. That's right.

Q. And is it your understanding that, in many cases, the manufacturer sells to a wholesaler, who, in turn, sells to a provider?

A. I know that there are cases where a wholesaler will sell to a -- a provider. I know there are cases where the -- where the -- much of what the wholesaler distributes is -- is subject to contracts between the manufacturer and the ultimate provider, so that there's -- they act as a distribution channel.

So there's a number of ways that drugs are -- get to the providers. Either a wholesaler may acquire a stock of generic drugs and then act as its own reseller, and in most -- in many, many cases, it's the manufacturer contracts with -- prices directly with the providers, and then there's a -- it -- a mechanism in which wholesalers are made whole for whatever differences they might have in the price -- prices between the

Page 94

1  manufacturer and the wholesaler.
2     Q.  Do wholesalers ever mark up the products
3  that they sell --
4     A.  Uhm.
5     Q.  -- so that they can earn a profit?
6     A.  The -- the information on -- on the
7  wholesaling business as a whole is that the -- the
8  markups are paper thin. I mean, I'm sure there's
9  an attempt to mark up some of them, but the success
10 and the ability to do so has been -- has -- has
11 been quite limited.
12    Q.  So, in equating ASP to estimated
13 acquisition cost, you're assuming no wholesaler
14 markup, correct?
15    A.  I'm assuming, as your own Mr. Young is --
16 has -- has assumed -- is that the -- the retail
17 acquisition cost is equal -- is approximately equal
18 to WAC, and that the -- if one measures the -- the
19 various price judgments and discounts, that, when
20 one is looking at those sales to the -- to those
21 providers, that's what's reflected in ASP.
22    Q.  Well, you say, "approximately equal." If

Page 95

1  there is a markup of 1 percent, will that have an
2  impact on your analysis?
3     A.  Well, one of the reasons I used thresholds
4  and bounds was precisely to -- to take account of
5  the fact that there's -- I -- I didn't have the
6  exact acquisition cost. I was approximating it.
7  If -- you will notice that if, indeed, the -- I'm
8  trying of think of how -- precisely how that -- in
9  any case, the -- the reason I used thresholds that
10 varied by a considerable amount was because it's an
11 approximate relationship.
12    Q.  You've also investigated the impact that a
13 difference of 1 percent could have on your penalty
14 calculations, haven't you?
15    A.  I -- when I looked at the penalty
16 calculation -- the -- there was -- there were two
17 statutory guidelines that I -- I -- I saw as -- as
18 potentially appropriate, and that -- but there was
19 a legal issue of which ones were. And those were
20 the estimated acquisition cost, as I read the
21 national -- the Medicaid and the Medicare statutory
22 history. And then there is just the -- the -- the

Page 96

1  EAC estimates that have been put forward by CMS and
2  reported as the 10 percent and 15 percent.
3        And where -- where I looked at those, I
4  did -- on that small subset, I looked at a
5  difference of 1 percent. I didn't look at a
6  difference of 1 percent through -- for all of the
7  -- the -- the analyses, only for -- if it should
8  turn out that -- that the -- the correct statutory
9  interpretation is the 10 and 15 percent, say, for
10 Montana, that has been -- that has been used and is
11 found in the CMS guidelines. I did look at the
12 point where -- you know, 1 percent was a very
13 arbitrary number. I could have -- I could have
14 made it a penny or 2. There was rounding errors,
15 and I just -- I was -- I was conservative to give
16 it 1 percent.
17    Q.  Well, what impact did a difference of 1
18 percent have in your penalty calculations?
19    A.  For the -- now, again, we're looking at --
20 when we're -- when we're talking about this 1
21 percent, we're not talking about acquisition cost.
22 We're talking about the number of claims that

Page 97

1  actually exceeded CMS's guidelines and the state's
2  guidelines for EAC, and that's the AWP less 10 and
3  less 15.
4        And if we look at my supplementary, which
5  is Exhibit Hartman 002 -- so you will notice in the
6  supplementary, Table 7 has been reiterated, and
7  that uses the -- the CMS guidelines as -- as the
8  potential statutory interpretation, rather than the
9  actual estimated acquisition cost. And the AWP
10 less -- 10 AWP less 15, because there was some
11 rounding error there that could have been a penny
12 or so, I said, Look, let's loosen that and give a
13 full percentage point to AWP less 9 and less 14
14 percent. And that's in Table 7-A, and that --
15 again, these are -- these are ones that are already
16 above the acquisition cost -- the first set. And
17 looking at that, it drops the number of claims
18 considerably --
19       VIDEO OPERATOR: Five minutes left on
20 tape.
21    A.  -- in that particular calculation. So
22 these are already claims -- these claims in -- in

25 (Pages 94 to 97)

Page 274

1  -- (Witness reviews document.) They are -- they
2  come to some conclusion about, No. 1, cost driver,
3  which I'm not -- I'm not quite sure of the
4  provenance of these studies upon which this
5  prudency decision is made. I can't comment whether
6  it's prudent or not, whether they -- the dispensing
7  fee -- whether the poor -- there would be a hole in
8  the safety net or not. There are many self --
9  self-interested parties submitting testimony here.
10 So I just -- I can't draw a conclusion of what --
11 whether this is a statement of fact or a statement
12 of advocacy.
13     Q.  You haven't reviewed the 2002 survey of
14 Montana community pharmacies referred to here?
15     A.  In terms of the materials at -- in helping
16 inform my understanding of dispensing fees, I was
17 not asked to do that and did not look at this and
18 -- which would be part of that.
19     Q.  And are you suggesting in this case that
20 the court should overrule the decision of the
21 Montana Medicaid agency to reimburse for drugs at
22 AWP minus 15 percent?

Page 275

1      MR. NOTARGIACOMO:  Objection.
2      A.  I -- I wouldn't presume to tell this Court
3  what to decide.
4      MR. EDWARDS:  Okay.  Why don't we break
5  for the day, and we'll pick up tomorrow.  Do you
6  have any interest in starting at 9?
7      THE WITNESS:  Are we on the record?
8      MR. EDWARDS:  We can go off the record.
9      MR. NOTARGIACOMO:  Let's go off the
10 record.
11     VIDEO OPERATOR:  The time is 5:16.
12 Today's deposition is concluded.  We are -- this is
13 the end of Cassette 4.  We're off the record.
14     (Whereupon the deposition recessed at
15     5:16 p.m.)
16     _____
17           Raymond S. Hartman Ph.D.
18 Subscribed and sworn to and before me
19 this _____ day of _____, 20____.
20
21 _____
22    Notary Public