- Exhibit 5 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 ) ) CIVIL ACTION: 01-CV-12257 PBS ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) Judge Patti B. Saris ) ) [Filed Under Seal Pursuant to ) Court Order] |

### DECLARATION OF STEPHEN W. SCHONDELMEYER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I. **EXPERIENCE AND QUALIFICATIONS**

1. My name is Stephen W. Schondelmeyer. I am a pharmaceutical economist, and I make this statement as an independent consultant. I hold the following positions and titles in the College of Pharmacy at the University of Minnesota: Head, Department of Pharmaceutical Care & Health Systems; Century Mortar Club Endowed Chair in Pharmaceutical Management and Economics; Professor of Pharmaceutical Management and Economics; and Director of the *PRIME* Institute. I hold a Bachelor of Science in Pharmacy (1974, University of Missouri-Kansas City), a Doctor of Pharmacy and Residency Certificate (1977, University of Kentucky), a Master of Arts in Public Administration (1979, Ohio State University), and a Doctor of Philosophy in Pharmaceutical Administration with a major in Health Economics (1984, Ohio State University). A list of my professional memberships, professional activities, research activities, publications and other scholarly activities, citation of work in public media, offices held in professional and scientific organizations, university administrative and service positions, honors and awards, and civic and community activities is contained in a copy of my most recent curriculum vitae as Exhibit "A".



- 1 -

manufacturers and could experience change as the dynamics of the pharmaceutical marketplace evolve during the implementation and operation of the new Medicare outpatient drug benefit.[63]

*Drug Product Type Variations*

89. The pricing patterns of brand name drug products and generic drug products can be quite different. For most brand name drug products that are still covered by patent or exclusivity terms, the price relationship between list prices (AWP and WAC) and actual transaction prices (actual acquisition cost or average selling price) for a given class of trade is reasonably predictable. That is, the WAC is equal to, or very close to (+ or -5%) the actual acquisition cost for the community pharmacy class of trade and the AWP, at present, is typically 20 to 25 percent above the WAC or, alternatively, WAC is 16.67 or 20 percent below AWP. In such cases, a payment policy using AWP as a benchmark (e.g., usually AWP minus a certain percent) may be relatively accurate. This pricing pattern holds for community pharmacy classes of trade (independents, chains, and food & drug stores), but not necessarily for other classes of trade (i.e., mail order pharmacies, HMOs and health plan pharmacies, long term care, physicians or clinics, hospitals, or state and federal facilities or programs). Some of these other classes of trade control the demand (i.e., prescribe or influence the drug prescribed) and are reimbursed by a third party based on a percent off of AWP or a percent above WAC. When these other providers can actually purchase the drug product from the manufacturer, and when the manufacturer deliberately creates a large and hidden spread between actual acquisition cost and the reimbursement amount, then the physician or other provider has a very strong financial incentive to prescribe their drug. This non-transparent spread leads to a financial incentive to prescribe more often and to prescribe higher-priced drugs over lower-priced drugs even when they are not necessarily the most cost-effective alternative. These financial incentives from the

---

[63] Id. at 18.

hidden spreads may be one factor contributing to the rapid growth of Medicare Part B drug program expenditures over the past four years.[64]

90.   Once a brand name drug product loses its patent and market exclusivity, the brand name drug may face price competition from generic versions of the drug product. Usually the brand manufacturer does not compete on price with generics for the community pharmacy class of trade. This means that the AWP and WAC relationship to actual acquisition cost discussed earlier for brand name drugs still holds. However, brand manufacturers sometimes offer substantial discounts relative to WAC to certain classes of trade (i.e., hospitals, long term care, health plans, and physicians). This may keep the actual acquisition cost of the brand drug somewhat price competitive in non-community pharmacy settings, and particularly when the provider receives reimbursement keyed to list prices may result in excessive financial incentives to prescribe or use the brand name rather than a generic equivalent.[65]

91.   Generic drug products are therapeutically equivalent versions of a brand name drug product that have been made by drug firms other than the original NDA holder. When two or more generic drug products enter the marketplace they typically compete on price with each other even though the brand name product usually does not compete on price. The first generic will typically enter the market at a list price (both AWP and WAC, if a WAC is reported) that is 10 to 30 percent below the originator brand price. Often the price competition among generic versions of a drug product will be reflected by one or two decreases in list prices (AWP and WAC) in the first six to twelve months after generic entry, but after that time it is rare to see

---

[64] Id.
[65] Id. at 18-19.

I declare under penalty of perjury that this Declaration is true and correct. Executed on September 2, 2004.

*Stephen W. Schondelmeyer*
Stephen W. Schondelmeyer