- Exhibit 6 -

**CORPORATE INTEGRITY AGREEMENT**
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
TAP PHARMACEUTICAL PRODUCTS INC.

## I.  PREAMBLE

TAP Pharmaceutical Products Inc. ("TAP") hereby enters into this Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS") to promote compliance by its officers, directors, employees, contract workers, and agents working at TAP's facilities with the statutes, regulations and written directives of Medicare, Medicaid and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f))("Federal health care program requirements").  All persons identified in the preceding sentence shall collectively be referred to as the "Covered Persons".[1]  Contemporaneously with this CIA, TAP is entering into a Settlement Agreement with the United States, and this CIA is incorporated by reference into the Settlement Agreement.  Contemporaneously with this CIA, TAP is also entering into settlement agreements with various States, and TAP's agreement to this CIA is a condition precedent to those agreements.

Prior to the effective date of this CIA, TAP initiated certain voluntary compliance measures, which as represented by TAP, include regular training to all Covered Persons concerning TAP's Code of Conduct and Operational Guidelines and include review and disciplinary procedures aimed, in part, at ensuring that TAP's activities are in compliance with all Federal health care program requirements and meeting TAP's goals of continuing to promote high ethical standards in the conduct of TAP's business practices.  TAP agrees to continue the operation of its compliance measures in accordance with the terms set

---

[1]Specifically excluded from the definition of "Covered Persons" are the marketing, sales or other personnel of entities with which TAP has agreements to co-promote its products.  TAP shall, however, in good faith seek to obtain assurances that such personnel have received appropriate training on proper marketing and sales techniques.  The term "Covered Persons" specifically includes all other personnel, apart from those acting under co-promotion agreements, who comprise TAP's contract sales force, if any.

forth below for the term of this CIA.  TAP may modify its voluntary compliance
measures as appropriate, but, at a minimum, TAP will ensure that during the term of this
CIA, it shall comply with the integrity obligations enumerated in this CIA.

## II.    TERM OF THE CIA

The period of the compliance obligations assumed by TAP under this CIA shall be
seven (7) years from the effective date of this CIA (unless otherwise specified).  The
effective date ("Effective Date") of this CIA shall be the date on which the final signatory
of this CIA executes this CIA.

Sections VII, VIII, IX, X and XI shall remain in effect until OIG has completed its
review of the final Annual Report submissions and any additional materials submitted by
TAP pursuant to OIG's request, which review OIG agrees to complete without
unreasonable delay.

## III.   CORPORATE INTEGRITY OBLIGATIONS

TAP hereby agrees to maintain a Compliance Program that includes the following
elements:

A.  Compliance Officer and Committee.

1. *Compliance Officer.*  TAP presently has a Compliance Officer and
Compliance Committee with responsibility for administering TAP's Compliance
Program.  TAP shall continue to employ an individual to serve as its Compliance Officer
during the term of this CIA.  The Compliance Officer shall be responsible for developing
and implementing policies, procedures, and practices designed to ensure compliance with
the requirements set forth in this CIA and with Federal health care program requirements.
The Compliance Officer shall be a member of senior management of TAP, shall make
periodic (at least semi-annual) reports regarding compliance matters directly to the Board
of Directors of TAP, or its designated subcommittee, in such form or manner as the Board
of Directors of TAP determines, and shall be authorized to report on such matters to the
Board of Directors at any time.  The Compliance Officer shall be responsible for
monitoring the day-to-day compliance activities engaged in by TAP as well as for any
reporting obligations created under this CIA.

Any changes in the identity of or any material changes in the position description of the Compliance Officer, or any material actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, must be reported to OIG, in writing, within 15 days of such a change.

2. *Compliance Committee*. TAP shall maintain a Compliance Committee during the term of this CIA. The Compliance Committee shall, at a minimum, include the Compliance Officer and any other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of each major department, including the heads of those departments responsible for sales, marketing, and human resources). The Compliance Officer shall chair the Compliance Committee and the Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of TAP's risk areas and shall oversee monitoring of internal and external audits and investigations).

Any material changes in the composition of the Compliance Committee, or any material actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, must be reported to OIG, in writing, within 15 days of such a change.

B. <u>Written Standards</u>.

1. *Code of Conduct*. To the extent not already accomplished, TAP shall revise and redistribute its Code of Business Conduct (hereafter "Code of Conduct") to all Covered Persons within 120 days of the Effective Date of this CIA. TAP shall revise its Code of Conduct to reflect the items specified below. TAP shall continue to make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct shall, at a minimum, set forth:

> a. TAP's commitment to full compliance with all Federal health care program requirements, including its commitment to report prices for and market and sell its pharmaceutical and other products for which the Federal health care programs provide reimbursement ("Government Reimbursed Products") in accordance with Federal health care program requirements;

> b. TAP's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program

requirements and with TAP's own Policies and Procedures as
implemented pursuant to section III.B.2. (including the requirements
of this CIA);

c. the requirement that all of TAP's Covered Persons shall be
expected to report to the Compliance Officer or other individual
designated by TAP (such as district managers or other supervisory
personnel) suspected violations of any Federal health care program
requirements or of TAP's own Policies and Procedures;

d. the possible consequences to both TAP and Covered Persons of
failure to comply with all Federal health care program requirements
and with TAP's own Policies and Procedures or of failure to report
such non-compliance; and

e. the right of all individuals to use the Disclosure Program
described in section III.F., and TAP's commitment to maintain
confidentiality, as appropriate, and non-retaliation with respect to
disclosures made in accordance with the terms of the Disclosure
Program.

On or before January 31, 2002, or within 120 days of the Effective Date of this
CIA, whichever is later, each Covered Person who has not already done so within 180
days prior to the Effective Date of this CIA shall certify, in writing or electronically, that
he or she has received, read, understood, and will abide by TAP's Code of Conduct. New
Covered Persons shall receive the Code of Conduct and shall complete the required
certification within 30 days after becoming a Covered Person or by January 31, 2002 or
within 120 days of the Effective Date of this CIA, whichever is later.

TAP shall annually review the Code of Conduct to determine if revisions are
appropriate and shall make any necessary revisions based on such a review. Any such
revised Code of Conduct shall be distributed within 30 days of finalizing such changes.
Covered Persons shall certify that they have received, read, understood and will abide by
the revised Code of Conduct within 60 days of the distribution of such revisions.

2. *Policies and Procedures.* By January 31, 2002, TAP shall implement
written Policies and Procedures regarding the operation of TAP's compliance program

and its compliance with Federal health care program requirements.  At a minimum, the Policies and Procedures shall address:

a.  the subjects relating to the Code of Conduct identified in section III.B.1.;

b. the calculation and reporting of accurate prices for Government Reimbursed Products to certain entities, including the Centers for Medicare & Medicaid Services ("CMS"), the State Medicaid programs, and drug price reporting services on which government agencies rely (*e.g.*, First DataBank Inc., the Red Book, *etc.*);

c.  the proper calculation and reporting of all data and information reported to CMS and/or the State Medicaid programs in connection with the Medicaid Drug Rebate program, codified at 42 U.S.C. § 1396r-8;

d.  the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 353; and

e.  measures designed to promote marketing and sales practices that conform with all statutes, regulations and requirements applicable to Government Reimbursed Products.  The Policies and Procedures shall specify that TAP shall refrain from violating the Federal anti-kickback statute, codified at 42 U.S.C. §§ 1320a-7b(1) & (2), and other applicable statutes, regulations or requirements.

On or before January 31, 2002, or within 120 days of the Effective Date of this CIA, whichever is later, the relevant portions of the Policies and Procedures shall be distributed to all Covered Persons whose job functions are related to those Policies and Procedures.  Appropriate and knowledgeable staff should be available to explain the Policies and Procedures.

At least annually (and more frequently if appropriate), TAP shall assess and update as necessary the Policies and Procedures.  Within 30 days of the effective date of any revisions, the relevant portions of any such revised Policies and Procedures shall be

distributed to all Covered Persons whose job functions are related to those Policies and Procedures.

    C.  <u>Training and Education</u>.

        1.  *Training Requirements, General Description.*  The training and education required under section III.C. of this CIA may be provided by supervisory employees or outside consultant trainers selected by TAP and/or through electronic means. Persons providing the training must be knowledgeable about the subject areas of their training. TAP may provide the training required under this CIA through appropriate computer-based approaches. In that event, all applicable references to "hours" in this section III.C. shall mean "normative hours" as that term is used in the computer-based training industry. If TAP chooses to provide computer-based training, it shall also make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the Covered Persons who are receiving such training. To the extent a Covered Person is on a leave of absence when the required training is offered, the Covered Person shall receive the training within 60 days of the conclusion of the leave of absence.

        New Covered Persons shall receive the training outlined below in sections III.C.2. and III.C.3. within 60 days of the beginning of their employment or becoming Covered Persons or on or before January 31, 2002, whichever is later. A TAP employee who has completed the training shall review a new Covered Person's work, to the extent that the work relates to the promotion, marketing or sales of Government Reimbursed Products; the calculating or reporting of prices for Government Reimbursed Products; or the fulfilment of any responsibilities relating to the Medicaid Drug Rebate program until such time as the new Covered Person completes the applicable training.

        2.  *Training Provided to Covered Persons.*  On or before January 31, 2002, TAP shall provide at least four hours of training to each Covered Person. This training, at a minimum, shall explain:

          a.  TAP's CIA requirements;

          b.  TAP's Compliance Program (including the Code of Conduct and the Policies and Procedures as they pertain to general compliance issues);

c. proper methods of promoting, marketing and selling Government Reimbursed Products in accordance with all applicable statutes, regulations and requirements, including, but not limited to, the Federal anti-kickback statute and the Prescription Drug Marketing Act (to the extent such Covered Person's responsibilities involve handling drug samples);

d. the personal obligation of each individual involved in marketing and sales of Government Reimbursed Products to ensure that those products are marketed and sold in accordance with all applicable requirements;

e. all applicable legal rules (including the sanctions for violations) relating to promotion, marketing and sales of Government Reimbursed Products (including, but not limited to, the Federal anti-kickback statute; the Civil Monetary Penalties law, 42 U.S.C. § 1320a-7a; the civil False Claims Act, 31 U.S.C. §§ 3729-3733; the Medicaid Drug Rebate statute, and the Prescription Drug Marketing Act (to the extent such Covered Person's responsibilities involve handling drug samples); and

f. examples of proper and improper promotion, marketing and sales practices.

After receiving the initial training described above, each Covered Person shall receive at least three hours of training on the topics outlined above each calendar year.

3. *Additional Training for Certain Covered Persons.* In addition to the training outlined in section III.C.2. above, on or before January 31, 2002, TAP shall provide ninety (90) minutes of additional training (the "Additional Training") to those Covered Persons: 1) whose job responsibilities include responsibility for complying with any requirements of the Medicaid Drug Rebate program; or 2) who are involved in the calculation or reporting of any pricing data or other related information for Government Reimbursed Products. To the extent that TAP has provided training that satisfies the Additional Training requirements set forth below within 180 days prior to the Effective Date of this CIA, the OIG shall credit that training for purposes of satisfying TAP's Additional Training obligations for the first year of the CIA.

This Additional Training shall include a discussion of:

> a. the calculation and reporting of accurate pricing data and other information to CMS, the State Medicaid programs and drug price reporting services for Government Reimbursed Products;

> b. the calculation and reporting of accurate pricing data and other information as required by the Medicaid Drug Rebate program;

> c. the personal obligation of each individual involved in the calculation or reporting of drug pricing data or other information to ensure that prices are accurately calculated and reported;

> d. all applicable legal rules (including the sanctions for violations) relating to proper price and information calculation and reporting for Government Reimbursed Products (including, but not limited to, the Federal anti-kickback statute; the Civil Monetary Penalties law; the civil False Claims Act; and the Medicaid Drug Rebate statute); and

> e. examples of proper and improper drug price calculation and reporting practices.

After receiving the initial training described in this section, every Covered Person required to receive Additional Training shall receive at least one hour of Additional Training each calendar year.

4. *Certification.* Each individual who is required to attend training shall certify, in writing, or in electronic form, that he or she has received the required training. The certification shall specify the type of training received and the date received. The Compliance Officer (or his or her designee) shall retain the certifications, along with all course materials. These shall be made available to OIG, upon request.

D. Reporting Requirements.

1. *General Statement of Purpose and Intent.*

On a quarterly basis, TAP shall report to the entities identified below in section III.D.2.b. certain pricing information, as specified below in section III.D.2.a., for the

purpose of furnishing those entities with true pricing information that accurately reflects prices at which actual purchasers buy the Government Reimbursed Products sold by TAP. Such information shall be provided to the OIG subject to section IX and other conditions of this CIA, and TAP shall comply with section V.D. in providing the data.  The OIG agrees that if, and when, it shares the confidential pricing information with government agencies other than the OIG, it will encourage that the information not be used in a way that would competitively disadvantage TAP in relation to any of its competitors.

    2.  *Specific Reporting Requirements.*

    a.  *Average Sale Price Defined.*

For purposes of this CIA, "Average Sale Price" means, with respect to each dosage form, strength and volume of the Government Reimbursed Product (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package) the average of all final sales prices charged by TAP for the product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Drug Rebate purposes, pursuant to 42 U.S.C. § 1396r-8, and excluding direct sales to hospitals.  (Those purchasers for which the sales are included in the calculation of Average Sale Price are hereafter referred to as the "Relevant Purchasers".) The prices identified in the calculation of the Average Sale Price should be net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates;[2] and all other price concessions provided by TAP to any Relevant Purchaser that result in a reduction of the ultimate cost to the purchaser.   Notwithstanding the foregoing, the Average Sale Price shall not include the value of bona fide charity care or grants.

TAP shall report the Average Sale Price by National Drug Code ("NDC") for each Government Reimbursed Product identified by TAP's NDC.  The Average Sale Price reported shall be properly weighted to reflect the volume of sales at each sale price, *i.e.,* for each NDC, the price reported shall be an average per unit price determined by dividing the sum of all final prices charged by TAP to a Relevant Purchaser, net of all price reductions identified above, for a Government Reimbursed Product in a quarter by the total number of units of that product sold in that quarter.

---

[2] The term "rebate" as used in this paragraph does not include any payments made by TAP to the States pursuant to the Medicaid Drug Rebate program (42 U.S.C. § 1396r-8).

b. *Reporting Obligations for Government Reimbursed Products.*

Except as otherwise noted below, thirty (30) days after the last day of each calendar quarter, TAP shall report, in accordance with section III.D.2.a. above, the Average Sale Prices of each of its Government Reimbursed Products identified by TAP's NDC to: 1) the Medicaid programs of those States who have executed a state settlement agreement with TAP; 2) to First DataBank Inc.[3] solely for the purpose of reporting pricing information based on those Average Sale Prices to the Medicaid programs of those States that have executed a state settlement agreement; 3) to CMS; and 4) to the OIG. The first report of Average Sale Prices shall be made no later than 30 days after the end of the first full calendar quarter following the Effective Date of the CIA.

c. *Certification Requirement.*

In connection with each report of Average Sale Price, TAP shall also provide the OIG, CMS, and the applicable States a detailed description of the methodology used to calculate the Average Sale Prices. An appropriate employee or agent of TAP will certify that the Average Sale Prices reported are calculated in accordance with the described methodology. Said certifications shall be made in the form attached hereto as Attachment A. TAP agrees that this certification by an appropriate employee or agent of TAP constitutes a certification by TAP. To the extent that TAP's methodology involves accruing for the impact of future events, TAP shall include a description of its accrual methodology, including underlying assumptions, with its certification, and shall, on a quarterly basis, evaluate such accrual methodology in light of its actual experience and make any appropriate adjustments.

d. *Confidentiality and Use of Reported Information.*

TAP and the OIG (on behalf of itself and CMS) acknowledge that the pricing information provided by TAP is considered to be confidential commercial information and proprietary trade secrets that if disclosed may cause substantial injury to the competitive position of TAP. On behalf of itself and CMS, the OIG agrees to afford the pricing information disclosed by TAP the maximum degree of confidentiality permitted

---

[3] If appropriate to reflect changes in the sources from which the State Medicaid programs receive their pricing information, TAP agrees that, upon the receipt of a written request by any of the States, it will report the required information to a drug pricing reporting source other than, and in addition to, First DataBank Inc., subject to reasonable provisions equivalent to those agreed to by First DataBank Inc. to ensure the confidentiality of that information.

by law.  CMS has been advised by the OIG of the purpose and use of the pricing information provided by TAP.  The parties acknowledge that this information may be relied upon by CMS in establishing reimbursement rates for TAP products, provided however that CMS will not change reimbursement rates for any TAP product based on this information without conducting meaningful review for all government-reimbursed therapeutically similar products.  Similarly, the parties acknowledge that the pricing information may be relied upon by State Medicaid programs in establishing reimbursement rates for TAP's products, subject to the provisions of the settlement agreements entered between TAP and various States as referenced in the Preamble to this CIA.

> e. *Document Retention.*

TAP shall retain all supporting work papers and documentation relating to the Average Sale Price of its Government Reimbursed Products for eight years after the Effective Date of this CIA and, to the extent not protected by appropriately asserted privileges, shall make such documentation available for inspection by the OIG or its duly authorized representative(s) in accordance with the provisions set forth more fully below in section VII of this CIA.

> E. Review Procedures.

>> 1. *General Description.*

>> a. *Retention of Independent Review Organization and Consultant.*

TAP shall retain an entity (or entities), such as an accounting, auditing or consulting firm (hereinafter "IRO" or "Consultant"), to perform procedures to assist TAP in assessing and evaluating its drug price reporting practices, sales and marketing systems, policies and practices and compliance practices required pursuant to this CIA. Each IRO or Consultant must have expertise in auditing and the requirements of the Federal health care programs as they relate to the reporting for, reimbursement of and marketing/sales of Government Reimbursed Products.  The IRO(s) or Consultant(s) must be retained to conduct the engagements described below for the first year within 120 days of the Effective Date of this CIA.  Each IRO or Consultant shall assess, along with TAP, whether it can perform the engagements in a professionally independent fashion taking into account any other business relationships or other engagements that may exist.

### b. Types of Engagements.

The IRO(s) and, as appropriate, Consultant(s) will conduct three separate engagements.[4] One engagement shall address TAP's drug price reporting practices ("Drug Price Reporting Engagement"). The second engagement shall address TAP's systems, policies and practices with regard to sales and marketing activities ("Sales and Marketing Engagement"). The third engagement shall address TAP's compliance with the obligations assumed under this CIA ("Compliance Engagement").

### c. Frequency of Engagements.

The Drug Price Reporting and the Sales and Marketing Engagements shall each be performed by the IRO and, as appropriate, Consultant, for each of the seven years of the CIA and cover each of the one-year periods beginning with the Effective Date of the CIA. However, after the IRO and Consultant performs the Drug Price Reporting and Sales and Marketing Engagements for the fourth year of the CIA, TAP, at its option, may request the OIG to permit that the two Engagements be conducted internally and subject only to verification by the IRO and Consultant for the remainder of the term of the CIA. The OIG retains sole discretion over whether to permit the Drug Price Reporting and Sales and Marketing Engagements to be conducted internally by TAP and subject to validation by the IRO and Consultant after the fourth year of the CIA. In making its decision, the OIG will consider, among other factors, the results of the Drug Price Reporting and Sales and Marketing Engagements during the first four years of the CIA and TAP's demonstrated audit capabilities to perform the Engagements internally. If the OIG denies TAP's request to shift the audit responsibilities, TAP agrees to engage the IRO and Consultant to complete the remaining Drug Price Reporting and Sales and Marketing Engagements in accordance with the CIA. The Compliance Engagement shall be performed by the IRO for the first one-year period beginning with the Effective Date of the CIA.

---

[4] As explained below, one component of both the Drug Price Reporting Engagement and the Sales and Marketing Engagement shall be a systems review conducted pursuant to a consulting engagement. TAP may engage a separate Consultant to perform each systems review. Alternatively, at its discretion, TAP may engage a single entity (an IRO) to perform the systems reviews and the other components of the Drug Price Reporting Engagement and the Sales and Marketing Engagement.

### d. *Retention and Submission of Records.*

For each year of the CIA, a complete copy of the IRO's and/or Consultant's Drug Price Reporting Engagement and Sales and Marketing Engagement Reports (including the Systems Review Consulting Engagement Reports referenced in Attachments B and C to this CIA) and, for the first year of the CIA only, the IRO's Compliance Engagement Report, shall be included in TAP's Annual Reports to OIG.  The IRO and/or, as appropriate, Consultant and TAP shall retain and make available to the OIG upon request (to the extent not protected by appropriately asserted legal privileges) all supporting work papers and documentation, correspondence, and draft reports (those that are exchanged between the IRO or Consultant and TAP)  relating to the Engagements.

### 2.    *Drug Price Reporting Engagement.*

The Drug Price Reporting Engagement shall be composed of two separate reviews, a "Reported Prices Engagement" and a "Systems Review Consulting Engagement," both of which are described in detail in Attachment B to the CIA.  Prior to conducting the Reported Prices Engagement, the IRO shall submit its Agreed Upon Procedures workplan(s) to the OIG for approval.  Prior to conducting the Systems Review Consulting Engagement, the IRO or Consultant may submit its workplan(s) to the OIG for comment. However, any comments or recommendations made by the OIG in connection with a review of the submitted workplan(s) will not preclude the OIG from making further comments or recommendations for future workplan(s) after reviewing the Drug Price Reporting Engagement Report or the Systems Review Consulting Engagement Report.

### 3.    *Sales and Marketing Engagement*

The Sales and Marketing Engagement shall consist of two separate reviews, a "Systems Review Consulting Engagement" and a "Documentation Review," both of which are described in detail in Attachment C to the CIA.  Prior to conducting the Systems Review Consulting Engagement, the IRO or Consultant may submit its workplan(s) to the OIG for comment.  Prior to conducting the Documentation Review, the IRO shall submit its Agreed Upon Procedures workplan(s) to the OIG for approval. However, any comments or recommendations made by the OIG in connection with a review of the submitted workplan(s) will not preclude the OIG from making further comments or recommendations for future workplan(s) after reviewing the Systems Review Consulting Engagement Report or the Documentation Review Report.

### 4.    *Compliance Engagement.*

The IRO shall conduct an engagement regarding TAP's compliance activities under which it shall review TAP's adherence to the obligations set forth in sections III through V and section VIII of this CIA ("Compliance Engagement"). The IRO shall prepare a report based upon the Compliance Engagement performed (the "Compliance Engagement Report"), which shall include the IRO's findings, supporting rationale, and a summary of such findings and rationale regarding TAP's compliance with the terms of sections III through V and section VIII of the CIA, as applicable.

### 5.    *Verification/Validation.*

In the event that the OIG has reason to believe that: (a) any of TAP's IRO or Consultant Engagements (or internal audits, if permitted under section III.E.1.c.) fails to conform to the requirements of this CIA, or (b) the findings of the reports from these Engagements or audits are inaccurate, the OIG may, at its sole discretion, conduct its own review ("Validation Review") to determine whether the Engagement or audit in question complies with the requirements of the CIA and/or the reported findings for the Engagement are inaccurate. TAP agrees to pay for the reasonable cost of any such review performed by the OIG or any of its designated agents so long as it is initiated before one year after the submission the final Annual Report submission or any additional materials requested by the OIG as described in section II.

Prior to initiating a Validation Review, the OIG shall notify TAP of its intent to do so and provide an explanation for believing why such a review is necessary. In order to resolve any concerns raised by the OIG, and upon request by TAP, the OIG agrees to meet with TAP representatives to discuss the results of any Engagement or audit submissions or findings; present any additional or relevant information to clarify the results of the Engagement or audit or to correct any inaccuracies; and/or propose alternatives to the proposed Validation Review. To the extent the information is not protected by appropriately asserted legal privileges, TAP agrees to provide any additional information as may be requested by the OIG under this section in an expedited manner. The OIG will attempt in good faith to resolve any IRO or Consultant Engagement or audit issues with TAP prior to conducting a Validation Review. However, the final determination as to whether to proceed with a Validation Review shall be made at the sole discretion of the OIG.

6.    *Independence Certification.*

Within 120 days from the Effective Date of this CIA, the IRO(s) and, as appropriate, the Consultant(s) shall provide to TAP a certification or sworn affidavit that it has evaluated its professional independence with regard to the Drug Price Reporting, Sales and Marketing and Compliance Engagements and that it has concluded that it is, in fact, independent.  Such certification(s) shall be included in TAP's Implementation Report submission.

F. Disclosure Program.

TAP presently has a disclosure program designed to facilitate communications relating to compliance with law and TAP's policies.  During the term of the CIA, TAP shall maintain its Disclosure Program, which includes a mechanism (e.g., a toll-free compliance telephone line) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with TAP's policies, conduct, practices, or procedures with respect to a Federal health care program, believed by the individual to be a potential violation of criminal, civil or administrative law.  TAP shall continue to appropriately publicize the existence of the disclosure mechanism (e.g., via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall emphasize a non-retribution, non-retaliation policy, and shall continue to include a reporting mechanism for anonymous, confidential communications.  Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual.  The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted.  For any disclosure that is sufficiently specific so that it reasonably:  (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, TAP shall conduct an internal review of the allegations set forth in such a disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.  The disclosure log shall be available to OIG, upon request.

G. Ineligible Persons.

1. *Definition.* For purposes of this CIA, an "Ineligible Person" shall be any individual or entity who: (a) is currently excluded, debarred or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or non-procurement programs; or (b) has been convicted of a criminal offense that is governed by 42 U.S.C. §1320a-7(a) related to the provision of health care items or services, but has not yet been excluded, debarred or otherwise declared ineligible.   For purposes of this section III.G., "Relevant Covered Person" shall be any Covered Persons: 1) whose job responsibilities include responsibility for complying with any requirements of the Medicaid Drug Rebate program; 2) who are involved in the calculating or reporting of any pricing data or other related information for Government Reimbursed Products; and 3) who are involved in the promotion, marketing or sales of Government Reimbursed Products.

2. *Screening Requirements.*  TAP shall not hire or engage as Relevant Covered Persons any Ineligible Person in connection with TAP's business operations related to Federal health care programs.  To prevent hiring or engaging any Ineligible Person, TAP shall screen all prospective Relevant Covered Persons prior to engaging their services by:  (a) requiring applicants to disclose whether they are Ineligible Persons; and (b) reviewing the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://epls.arnet.gov) and the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.hhs.gov/oig) (these lists will hereinafter be referred to as the "Exclusion Lists").

3. *Review and Removal Requirement.* On or before January 31, 2002, TAP shall review its list of current Relevant Covered Persons against the Exclusion Lists. Thereafter, TAP shall review the list annually.  In addition, TAP shall require Relevant Covered Persons to disclose immediately any debarment, exclusion or other event that makes the individual an Ineligible Person.

If TAP has notice that a Relevant Covered Person has become an Ineligible Person, TAP shall remove such person from responsibility for, or involvement with, TAP's business operations related to the Federal health care programs and shall remove such person from any position for which the person's salary or the items or services rendered, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until

such time as the person is reinstated into participation in the Federal health care programs.

       4. *Pending Charges and Proposed Exclusions.* If TAP has notice that a Relevant Covered Person is charged with a criminal offense related to any Federal health care program, or is proposed for exclusion during his or her employment or contract, TAP shall take all appropriate actions to ensure that the Relevant Covered Person's continued performance of his or her responsibilities shall not adversely affect the accuracy of any claims submitted to any Federal health care program.

       H.  Notification of Government Investigation or Legal Proceedings.

       Within 30 days of discovery, TAP shall notify OIG, in writing, of any ongoing investigation or legal proceeding conducted or brought by a governmental entity or its agents involving an allegation that TAP has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. TAP shall also provide written notice to OIG within 30 days of the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the proceedings, if any.

**IV.  NEW BUSINESS UNITS OR LOCATIONS**

       In the event that, after the Effective Date of this CIA, TAP establishes or acquires new business units engaged in the contracting for, marketing, sales or price reporting of Government Reimbursed Products, TAP shall notify OIG of this fact as soon as possible, but no later than within 30 days of the date of the establishment or acquisition. This notification shall include the location of the new operation(s), phone number, fax number, Federal health care program provider number(s) (if any), and the corresponding contractor's name and address that has issued each provider number. All new Covered Persons at such business units shall be subject to the applicable requirements in this CIA (e.g., completing certifications and undergoing training).

**V.  IMPLEMENTATION AND ANNUAL REPORTS**

       A.  Implementation Report. Within 120 days after the Effective Date of this CIA, TAP shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA. This Implementation Report shall include:

1.  the name, address, phone number, position description, and summary of other non-compliance job responsibilities of the Compliance Officer required by section III.A.1.;

2.  the names and positions of the members of the Compliance Committee required by section III.A.2.;

3.  a copy of TAP's Code of Conduct required by section III.B.1.;

4.  a copy of all compliance-related Policies and Procedures required by section III.B.2. and a summary of all other Policies and Procedures required by section III.B.2.;

5.  a copy of all training materials used or to be used for the training required by section III.C., a description of such training programs and a summary of the activities undertaken in furtherance of these programs, including a schedule, topic outline and a description of the audiences for the training sessions held;

6.  a certification by the Compliance Officer that:

> a.  the Policies and Procedures required by section III.B.2. have been developed, are being implemented, and have been distributed to all appropriate Covered Persons;
>
> b.  all Covered Persons have completed the Code of Conduct certification required by section III.B.1.;
>
> c.  all Covered Persons have completed the applicable training and executed the certification(s) required by section III.C.; and
>
> d.  in the event that the Compliance Officer cannot certify to these items in their entirety, the Compliance Officer shall provide an explanation of any deficiencies and a timetable for when the deficiencies will be remedied.

The documentation supporting this certification shall be available to OIG, upon request.

7. a description of the Disclosure Program required by section III.F.;

8. the identity of the IRO(s) and Consultants(s); a summary/description of all current engagements between TAP and the IRO or Consultant; and a description of all engagements between TAP and the IRO or Consultant relating to the work of or issues examined by the IRO or Consultant in connection with the Engagements required by this CIA; and the proposed start and completion dates of the first Engagements;

9. a certification from the IRO and, as appropriate, Consultant regarding its professional independence from TAP;

10. a summary of personnel actions (other than hiring) taken pursuant to section III.G.;

11. a list of all of TAP's locations (including locations and mailing addresses) except for home offices, the corresponding name under which each location is doing business, the corresponding phone numbers and fax numbers, and, if applicable, each location's Federal health care program provider identification number(s) and the contractor's name and address that issued each provider identification number;

12. to the extent not already furnished to OIG, or if modified, a description of TAP's corporate structure, including identification of any parent and sister companies, subsidiaries and their respective lines of business; and

13. the certification required by section V.C.

B. Annual Reports. TAP shall submit to OIG Annual Reports with respect to the status of, and findings regarding, TAP's compliance activities for each of the seven one-year periods beginning on the Effective Date of the CIA. (The one-year period covered by each Annual Report shall be referred to as "the Reporting Period.")

Each Annual Report shall include:

3. a summary of any significant changes or amendments to the Policies and Procedures required by section III.B. and the reasons for such changes (e.g., change in Federal health care program requirements) and copies of any Policies and Procedures;

4. a copy of all training materials used for the training required by section III.C. (to the extent it has not already been provided), a description of such training conducted during the Reporting Period, including a list of attendees, a topic outline of training sessions, and a schedule of when the training sessions were held;

5. a complete copy of all reports prepared pursuant to the IRO's and/or Consultant's Engagements required by this CIA, including, to the extent not already provided, a copy of the methodology used, along with a copy of the IRO's and/or Consultant's engagement letter;

6. TAP's response and corrective action plan(s) related to any issues raised by the IRO(s) or Consultant(s);

7. a revised summary/description of all engagements between TAP and the IRO or Consultant, as described in section V.A.8., if different than what was submitted as part of the Implementation Report;

8. a summary of the disclosures in the disclosure log required by section III.F. that relate to Federal health care programs;

9. a description of any personnel actions (other than hiring) taken by TAP as a result of the obligations in section III.G., and the name, title, and responsibilities of any person that falls within the ambit of section III.G.4., and the actions taken in response to the obligations set forth in that section;

10. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to section III.H. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

11. a description of all changes to the most recently provided list (as updated) of TAP's locations except home offices as required by section V.A.11., the corresponding name under which each location is doing business, the corresponding phone numbers and fax numbers, and, if applicable, each location's Federal health care program provider identification number(s), and the contractor name and address that issued each provider identification number; and

12. the certification required by section V.C.

The first Annual Report shall be submitted to the OIG no later than 120 days after the end of the first Reporting Period except for TAP's response to any issues raised by the IRO(s) or Consultant(s), which shall be submitted to the OIG no later than 150 days after the end of the first Reporting Period. Each subsequent Annual Report shall be submitted to OIG no later than 120 days after the end of each subsequent Reporting Period except for TAP's response to any issues raised by the IRO(s) or Consultant(s), which shall be submitted to the OIG no later than 150 days after the end of each subsequent Reporting Period.

C. Certifications.

The Implementation Report and Annual Reports shall include a certification by the Compliance Officer that: (1) except as otherwise described in the applicable report, TAP is in compliance with all of the requirements of this CIA, to the best of his or her knowledge; and (2) the Compliance Officer has reviewed the Report and has made reasonable inquiry regarding its content and believes that the information therein is accurate and truthful.

D. Designation of Information.

TAP shall clearly identify any portions of any of its submissions under this CIA that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. TAP shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI.   NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date of this CIA, all notifications and reports required under this CIA shall be submitted to the following entities:

OIG:

          Civil Recoveries Branch - Compliance Unit
          Office of Counsel to the Inspector General
          Office of Inspector General
          U.S. Department of Health and Human Services
          Cohen Building, Room 5527
          330 Independence Avenue, SW
          Washington, DC 20201
          Phone:  202-619-2078
          Fax:     202-205-0604

TAP:

          Compliance Officer
          TAP Pharmaceutical Products Inc.
          675 North Field Drive
          Lake Forest, IL  60045
          Phone: 800-621-1020
          Fax:    847-582-5006

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, messenger delivery (such as Federal Express, or its equivalent), hand delivery or other means, provided that there is proof that such notification was received.  For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt.

## VII.   OIG INSPECTION, AUDIT AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of TAP's books, records, and other documents and supporting materials (to the extent such items are not protected under appropriately asserted legal privileges) and/or conduct on-site reviews of any of TAP's locations for the purpose of verifying and evaluating:  (a) TAP's

compliance with the terms of this CIA; and (b) TAP's compliance with the applicable requirements of the Federal health care programs. The documentation described above shall be made available by TAP to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of TAP's Covered Persons who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. TAP's employees shall have the right to be represented by counsel and any such employee may, at his or her option, be accompanied by counsel for TAP and/or their personal counsel at any interview by the OIG. TAP agrees to assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. Notwithstanding such agreement, the OIG recognizes that individuals have the right to refuse to submit to interviews, and TAP shall not be obligated to require such individuals to submit to interviews. If any individual decides not to submit to an interview, such refusal shall not constitute a breach of this CIA. TAP's employees may elect to be interviewed with or without a representative of TAP present.

## VIII. DOCUMENT AND RECORD RETENTION

TAP shall maintain for inspection all documents and records relating to reimbursement to TAP from the Federal health care programs, or to compliance with this CIA, for eight years after the Effective Date of this CIA (or longer if otherwise required by law).

## IX. DISCLOSURES

The OIG shall follow all applicable Federal laws concerning privacy and confidentiality, including the Federal Privacy Act, 5 U.S.C. §552a, to the greatest extent allowed by law. Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, the OIG shall make a reasonable effort to notify TAP prior to any release by OIG of information submitted by TAP pursuant to its obligations under this CIA and identified upon submission by TAP as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, TAP shall have the rights set forth at 45 C.F.R. § 5.65(d). The OIG shall provide the pre-disclosure notice required pursuant to 45 C.F.R. §5.65(d) to the Compliance Officer at the address provided in section VI. Nothing in this CIA or any communication or report made pursuant to this CIA shall constitute or be construed as a waiver by TAP of TAP's