- Exhibit 8 -

Page 479

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

------------------------------x

In Re: PHARMACEUTICAL         )    MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE    )    CIVIL ACTION

PRICE LITIGATION              )    01CV12257-PBS

------------------------------x

THIS DOCUMENT RELATES TO:     )

ALL ACTIONS                   )

------------------------------x

HIGHLY CONFIDENTIAL

VIDEOTAPE 30(b)(6) DEPOSITION OF

JEFF BUSKA, VOLUME III

Taken at 33 South Last Chance Gulch

Helena, Montana

Friday, December 15, 2006 - 9:05 a.m.

Reported by Mary R. Sullivan, RPR, RMR, Freelance Court Reporter, Notary Public, residing in Missoula, Montana.

Buska, Jeff - 30(b)(6) - Vol. III    HIGHLY CONFIDENTIAL                December 15, 2006
Helena, MT

Page 480

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | ALI BOVINGTON, ESQ. |
| 3 | Attorney General's Office |
| 4 | 215 North Sanders |
| 5 | Helena, Montana 59601 |
| 6 | Appearing on behalf of the Plaintiff |
| 7 | State of Montana |
| 8 | |
| 9 | MICHAEL P. DOSS, ESQ. |
| 10 | Sidley Austin LLP |
| 11 | One South Dearborn |
| 12 | Chicago, IL 60603 |
| 13 | Appearing on behalf of the Defendant |
| 14 | Bayer Corporation |
| 15 | |
| 16 | KIM B. NEMIROW, ESQ. |
| 17 | Ropes & Gray LLP |
| 18 | One International Place |
| 19 | Boston, Massachusetts 02110-2624 |
| 20 | Appearing telephonically on behalf of |
| 21 | the Defendant Warrick Pharmaceuticals |
| 22 | and Schering-Plough |

Page 481

| | |
|---|---|
| 1 | A P P E A R A N C E S (CONTINUED) |
| 2 | |
| 3 | JAMES J. DUFFY, ESQ. |
| 4 | Davis, Polk & Wardwell |
| 5 | 450 Lexington Avenue |
| 6 | New York, New York 10017 |
| 7 | Appearing telephonically on behalf of |
| 8 | the Defendant AstraZeneca Pharmaceuticals |
| 9 | |
| 10 | KATHLEEN M. O'SULLIVAN, ESQ. |
| 11 | Perkins Coie LLP |
| 12 | 1201 Third Avenue, Suite 4800 |
| 13 | Seattle, Washington 98101 |
| 14 | Appearing telephonically on behalf of |
| 15 | the Defendant Immunex Corp. |
| 16 | |
| 17 | KATHERINE POLDNEFF, ESQ. |
| 18 | Kelley Drye & Warren LLP |
| 19 | 101 Park Avenue |
| 20 | New York, New York 10178 |
| 21 | Appearing telephonically on behalf of |
| 22 | the Defendant Dey Pharmaceuticals |

Page 482

| | |
|---|---|
| 1 | A P P E A R A N C E S (CONTINUED) |
| 2 | |
| 3 | JEREMY P. COLE, ESQ. |
| 4 | and GABRIEL H. SCANNAPIECO, ESQ. |
| 5 | Jones Day |
| 6 | 77 West Wacker Drive |
| 7 | Chicago, Illinois 60601 |
| 8 | Appearing telephonically on behalf of |
| 9 | the Defendants Abbott Laboratories and |
| 10 | TAF Pharmaceuticals. |
| 11 | |
| 12 | |
| 13 | Also Present: Ken Zoetewey, Videographer. |

Page 483

| | | |
|---|---|---|
| 1 | I N D E X | |
| 2 | WITNESS: JEFF BUSKA | PAGE |
| 3 | Examination by Mr. Doss........................ 486 | |
| 4 | | |
| 5 | E X H I B I T S | |
| 6 | NUMBER      DESCRIPTION | PAGE |
| 7 | Exhibit Buska 050 - Defendant Bayer Corporation's | |
| 8 | Notice of 30(b)(6) Deposition | |
| 9 | to State of Monana........... 487 | |
| 10 | Exhibit Buska 051 - MT 038340 to 8359............ 495 | |
| 11 | Exhibit Buska 052 - MT 076330 to 6361............ 506 | |
| 12 | Exhibit Buska 053 - MT 038297 to 8329............ 508 | |
| 13 | Exhibit Buska 054 - MT 038594 to 8626............ 508 | |
| 14 | Exhibit Buska 055 - MT 076440 to 6448............ 526 | |
| 15 | Exhibit Buska 056 - Objections and Responses to | |
| 16 | Defendant Bayer Corporation's | |
| 17 | First Set of Interrogatories. 551 | |
| 18 | Exhibit Buska 057 - MT 076251.................... 573 | |
| 19 | Exhibit Buska 058 - Letter dated January 29, 2001 578 | |
| 20 | Exhibit Buska 059 - Email dated 2/13/2002........ 582 | |
| 21 | Exhibit Buska 060 - Email dated November 19, 2002 582 | |
| 22 | Exhibit Buska 061 - Email dated November 22, 2002 582 | |

2 (Pages 480 to 483)

Henderson Legal Services, Inc.
(202) 220-4158

e5fb5e94-8668-4b15-8631-ed12d30c1451

Buska, Jeff - 30(b)(6) - Vol. III   HIGHLY CONFIDENTIAL   December 15, 2006
Helena, MT

Page 484

1  FRIDAY, DECEMBER 15, 2006
2      THE VIDEOGRAPHER: We are on the record
3  at 9:06. Today is December 15th, 2006. This
4  begins the videotape deposition of Jeffrey G.
5  Booska (phonetic)--
6      JEFF BUSKA: Buska (phonetic).
7      THE VIDEOGRAPHER: --Buska, 30(b)(6)
8  taken by the defense In Re Pharmaceutical Industry
9  Average Wholesale Price litigation. We are
10 located at 33 South Last Chance Gulch, Helena,
11 Montana, 59601. The court reporter is Mary
12 Sullivan; I'm the videographer, my name is Kenneth
13 Zoetewey. Will the attorneys now please introduce
14 themselves starting on my left.
15     MR. DOSS: My name is Mike Doss, I
16 represent Bayer Corporation, a Defendant in this
17 litigation.
18     MS. BOVINGTON: Ali Bovington with the
19 State of Montana.
20     THE VIDEOGRAPHER: Those on the phone
21 please introduce themselves?
22     MS. NEMIROW: Yes. This is Kim Nemirow

Page 485

1  representing Schering-Plough and Warrick from
2  Ropes & Gray.
3      MR. COLE: Jeremy Cole and Gabe
4  Scannapieco from Jones Day in Chicago representing
5  Abbott Laboratories and TAP Pharmaceutical
6  Products, Inc.
7      MS. O'SULLIVAN: Katie O'Sullivan from
8  Perkins Coie in Seattle representing Immunex.
9      MS. POLDNEFF: Katherine Poldneff from
10 Kelley, Drye & Warren on behalf of Dey.
11     MR. DUFFY: Jim Duffy with Davis, Polk &
12 Wardwell in New York representing AstraZeneca
13 Pharmaceuticals, LP.
14     THE VIDEOGRAPHER: Will the court
15 reporter now please swear in the witness?
16 Thereupon,
17     JEFF BUSKA,
18 a witness of lawful age, having been previously
19 sworn to tell the truth, the whole truth, and
20 nothing but the truth, testified upon his oath as
21 follows:
22

Page 486

1      EXAMINATION
2  BY MR. DOSS:
3      Q. Good morning, Mr. Buska. As I mentioned
4  earlier, my name is Mike Doss, and I represent
5  Bayer Corporation, one of the Defendants that's
6  been named as a Defendant in the litigation
7  between the State of Montana and numerous
8  pharmaceutical defendants. We're here today for
9  your deposition as a state representative, and
10 just--if we could first start, if you could tell
11 me what your current position with the state of
12 Montana is.
13     A. My current position is the division
14 administrator of the Quality Assurance Division
15 for the Montana Department of Public Health and
16 Human Services.
17     Q. And in that position, do you have
18 responsibilities with regard to the Montana
19 Medicaid program?
20     A. I have a--a part of the Montana Medicaid
21 program as it pertains to the surveillance
22 utilization review, prior authorization

Page 487

1  activities, prior-- third-party liability unit, as
2  well as the Medicaid Quality Control Review.
3      Q. Mr. Buska, I don't intend to go back
4  over your work history for the State of Montana,
5  but is it fair to say that you've worked within
6  the State's Medicaid program for over 15 years?
7      A. That would be correct, yeah, over 15.
8      MR. BUSKA: I'll first ask that this
9  document be marked as Exhibit Buska 050, 5-0.
10     Q. (By Mr. Doss) And I've already provided
11 a copy to your counsel.
12 EXHIBIT:
13     (Exhibit Buska 050 marked for
14 identification.)
15     Q. (By Mr. Doss) Mr. Buska, I've provided
16 to you a document marked for identification as
17 Exhibit Buska 050, and for the record, this
18 document is entitled Bayer Corporation's Notice of
19 Rule 30(b)(6) Deposition to State of Montana. Sir,
20 I'll direct your attention to the second page of
21 this document, and specifically to the paragraphs
22 that are listed under the heading Areas of

3 (Pages 484 to 487)

Henderson Legal Services, Inc.
(202) 220-4158

e5fb5e94-8668-4b15-8631-ed12d30c1451

Page 488

1  Inquiry. Do you see that?
2     A.  Yes.
3     Q.  And first, sir, I'll--I'll--I'll read
4  these to you and then I'll ask you questions
5  relating to this. First, in--directing your
6  attention to paragraph No. 1, Plaintiff--the--
7  well, let me go ahead and read the introductory
8  phrasing as well. "Plaintiff is requested to
9  designate one or more persons who consent to
10 testify on its behalf concerning the following
11 matters: 1., Plaintiff's use or consideration of
12 Bayer ASP Information, including how or if such
13 Bayer ASP Information has been used, relied upon,
14 referenced or considered in evaluating, revising,
15 or setting payments to Providers under Plaintiff's
16 Medicaid Program." Did you see that entry?
17    A.  Yes.
18    Q.  And are you today here to testify as the
19 Montana State representative on that topic?
20    A.  Yes, I am.
21    Q.  Sir, the--the second paragraph I'll read
22 as well. "Communications between Plaintiff and

Page 489

1  the National Association of Medicaid Fraud Control
2  Units ("NAMFCU") concerning the Bayer 2001
3  Settlement or concerning the Bayer 2003 Settlement
4  (or any investigation or inquiry that preceded
5  those Settlements) including internal analysis,
6  memoranda, reports, and reviews related to
7  communications with NAMFCU." Do you see that
8  paragraph entry on Exhibit Buska 050?
9     A.  Yes.
10    Q.  And Mr. Buska, are you here today as the
11 State of Montana's 30(b)(6) representative to
12 testify on that subject as well?
13    A.  Yes.
14    Q.  Mr. Buska--and we're finished with that
15 document for now, but if you could first tell me
16 what have you done in order to prepare yourself to
17 testify on the two paragraph topics that I've
18 mentioned as a representative of the State of
19 Montana.
20    A.  I've visited with--with Ali Bovington
21 and with Jeniphr Breckenridge--
22    Q.  And--

Page 490

1     A.  --regarding the--regarding the documents
2  that were provided to them.
3     Q.  And those are attorneys for the State of
4  Montana; is that correct?
5     A.  Yes.
6     Q.  Did you have any communications with
7  anyone other than attorneys for the State of
8  Montana concerning the subjects reflected in
9  Exhibit Buska 050?
10    A.  I visited with Dan Peterson and with
11 Betty DeVaney regarding the material that's in
12 this document.
13    Q.  How do you spell Ms. DeVaney's last
14 name?
15    A.  D-e-V-a-n-e-y.
16    Q.  Who are those two individuals?
17    A.  Dan Peterson is the supervisor of the
18 Acute Services section right now, and he
19 previously was the State of Montana's pharmacy
20 Medicaid program officer, and Betty DeVaney is the
21 drug rebate program specialist.
22    Q.  They both are at Montana Medicaid?

Page 491

1     A.  Yes.
2     Q.  Have you had discussions with anyone
3  else, again, excluding your attorneys?
4     A.  No.
5     Q.  And when were these discussions with Mr.
6  Peterson and Ms. DeVaney?
7     A.  Last Friday.
8     Q.  Can you tell me what--what was discussed
9  during those meetings?
10    A.  One of the documents that was provided
11 to me from the attorneys was--had Betty DeVaney's
12 name on it in terms of a--I think an e-mail that
13 Dan Peterson had forwarded to her, and so I just
14 wanted to check with her on her recollection of
15 that particular e-mail and what she might have
16 done with it.
17    Q.  Okay.
18    A.  And same with Dan.
19    Q.  And with Dan, it was concerning that
20 same e-mail?
21    A.  Same e-mail with his name on it.
22    Q.  Did you have any discussions with any

Page 532

1  officer's files.
2     Q. Well, is it fair to say that this
3  document reflects Montana Medicaid's comparison of
4  Bayer's reported average sale price information to
5  the AWP information that the Medicaid department
6  has access to for each of the reference products?
7     A. Yeah, it would be a comparison.
8     Q. Were other similar comparisons made for
9  other time periods and other Bayer average sale
10 price reports?
11    A. Not to my knowledge.
12    Q. Were there any discussions within
13 Montana Medicaid concerning Exhibit Buska 055? In
14 other words, concerning the comparison of the
15 Bayer average sale price information to the AWP
16 information for the same product?
17    A. Could you clarify your question? Is
18 that there was a discussion?
19    Q. Any internal discussion within Montana
20 Medicaid concerning the comparison of the AWP
21 information and the Bayer average sale price
22 information.

Page 533

1     A. No, I'm not aware of any discussion
2  regarding it.
3     Q. And by discussion, I'm including e-mail
4  communications or telephone conversations or in-
5  person meetings. Are you aware of--
6     A. I'm not aware of anything like that, no.
7     Q. You mentioned that you're not aware of
8  any similar comparison documents that compare the
9  average sale price reported figures to the AWP
10 figures for those same products. Is it fair to
11 say, though, that anyone at Montana Medicaid could
12 have performed the same comparison at any time
13 during the time that Bayer was reporting the
14 average sale price information?
15    A. Yes, somebody could have, but likely,
16 no, because the document, as I indicated earlier,
17 wasn't given to anybody else.
18    Q. Well, any--any of the pharmacy program
19 officers could have done such comparisons at any
20 point in their time; is that right?
21    A. They could have, yes.
22    Q. Well, I'm going to be the one to ask for

Page 534

1  a break now.
2     MS. BOVINGTON: Okay.
3     MR. DOSS: I should have gone earlier.
4     THE VIDEOGRAPHER: Off the record--I'm
5  sorry. Off the record at 10:19.
6     (Whereupon, the deposition was in
7  recess at 10:19 a.m., and subsequently reconvened
8  at 10:26 a.m., and the following proceedings were
9  had and entered of record:)
10    THE VIDEOGRAPHER: On the record at
11 10:26.
12    Q. (By Mr. Doss) Mr. Buska, did--did
13 Montana receive average sale price information
14 from any other pharmaceutical manufacturers--
15    A. Yes.
16    Q. --other than Bayer?
17    A. Yes, I believe we did.
18    Q. And what other manufacturers did Montana
19 receive average sale price information?
20    A. I believe I recall seeing stuff from TAP
21 Pharmaceuticals, but I can't recall any others.
22    Q. Mr. Buska, I'd like to--I've asked to

Page 535

1  be--or have handed to you three different
2  documents which have--were previously marked
3  during an earlier deposition of you in this
4  matter, and for the record, one is marked Exhibit
5  Buska 022, and it bears Bates label MT 005760.
6  The second is marked Exhibit Buska 023, which does
7  not bear Bates labeling, but is identified on the
8  first page as a transmittal and notice of approval
9  of a state plan material, again, marked in a
10 previous deposition of yours; and the third one is
11 Exhibit Buska 024, which bears Bates labeling MT
12 005648 through -5651, and it has a cover page
13 dated October 3rd, 2002. Sir--Mr. Buska, is it--
14 is it correct that these three different exhibits
15 reflect Montana's Medicaid's reimbursement
16 methodology for pharmaceutical products for
17 different periods of time?
18    A. Yes, they're all documents related to
19 the state plan for the Medicaid services for the
20 State of Montana.
21    Q. For the Montana Medicaid state plan.
22    A. Montana Medicaid state plan.

Page 552

1   A.  Okay.
2   Q.  And for the record and for the people on
3   the phone, Interrogatory No. 1 asks the following
4   question: "Describe what use has been made by You
5   of Bayer ASP Information, including how or if such
6   Bayer ASP information has been used, relied upon,
7   referenced or considered in evaluating, revising
8   or setting payments to Providers under your
9   Medicaid Program." The answer reflected in this
10  document is as follows: "The State of Montana
11  receives Bayer ASP Information.  The Bayer ASP
12  information is not used as a benchmark in
13  evaluating, revising or settling payments to
14  Providers under the Montana Medicaid program. The
15  pricing logarithm for Montana Medicaid is
16  delivered through First Data Bank.  Incorporating
17  the Bayer ASP information into the logarithm would
18  require a manual process.  Because Montana
19  Medicaid is a relatively small program with
20  limited resources, it is not able to incorporate
21  the Bayer ASP Information into its system." Did
22  you see that passage, sir?

Page 553

1   A.  Yes.
2   Q.  Mr. Buska, did--did you participate in
3   responding to the interrogatory I just read,
4   Interrogatory No. 1?
5   A.  No, I did not.
6   Q.  To your knowledge, did you review the
7   interrogatory response that's reflected here that
8   I just read before it was delivered to Bayer
9   Corporation?
10  A.  No.
11  Q.  I'd like to go through the answer in
12  your representative capacity to the extent you're
13  able to provide an answer.  First, in the first
14  sentence of the answer, "The State of Montana
15  receives Bayer ASP Information," and--and that's
16  correct--
17  A.  That's correct.
18  Q.  Yeah.  And you've testified that is
19  correct that Bayer average sale price information
20  was provided on a quarterly basis to the State of
21  Montana from the date of the Bayer settlement up
22  to the present; is that right?

Page 554

1   A.  That's correct.
2   Q.  Now, the second sentence I'll reference
3   here states, "The Bayer ASP Information is not
4   used as a benchmark in evaluating, revising or
5   settling payments to providers under the Montana
6   Medicaid program."  Do you see that entry?
7   A.  Yes.
8   Q.  Now, is that--you had previously
9   testified that the Bayer average sale price
10  information was not used in the Montana Medicaid
11  reimbursement methodology for estimated
12  acquisition costs, correct?
13  A.  That's correct.
14  Q.  Is that what this entry is--is--means?
15  A.  This--that's what this entry means is
16  that ASP information is not used in evaluating or
17  revising the Medicaid payment rates.  I think this
18  is meant to say not "settling" but "setting"
19  payments--
20  Q.  Uh-huh.
21  A.  --to providers under the Montana
22  Medicaid program as indicated in the previous

Page 555

1   testimony because we pay according to our state
2   plan.
3   Q.  One point I'll push on.  You've
4   previously testified that the Montana pharmacy
5   program director compared Bayer ASP information to
6   the corresponding AWP information for the
7   particular Bayer product; is that right?
8   A.  Yes, there's that document that
9   indicates that.
10  Q.  So is it fair to say that Montana
11  Medicaid considered the Bayer average sale price
12  information in evaluating its payment methodology
13  that was in existence at the time?
14  A.  No, I wouldn't say that--that document
15  would indicate that.
16  Q.  Well, what does that document indicate
17  to you?
18  A.  That document that we previously
19  referred to would indicate somebody did a
20  comparison of the AWP price to the average sales
21  price, not what we would pay for that particular
22  drug to the average sales price, because the

Page 556

1  payment, as you would recall, would be average
2  wholesale price minus 10 or 15 percent, which,
3  then, would have been more of an accurate
4  comparison. I think that program officer at the
5  time was new and was simply comparing to see what
6  the differences between the two were.
7     Q.  Well, have you talked with--this was who
8  again?
9     A.  Shannon Marr.
10    Q.  Have you talked to her about what was in
11 her mind when she was preparing the handwritten
12 entries--
13    A.  No, I haven't.
14    Q.  --of that document? So you really don't
15 know what she was considering or not in writing
16 out the AWP information corresponding to the
17 average sale price information.
18    A.  No, I don't.
19    Q.  Let's turn to the next sentence in this
20 response, which states as follows: "The pricing
21 logarithm for Montana Medicaid is delivered
22 through First Data Bank." Do you see that?

Page 557

1     A.  Yes.
2     Q.  What--what does that mean?
3     A.  The pricing logarithm, I believe, is
4  what he's referring to there is the data that we
5  receive regarding the AW--AWP prices is provided
6  to us through First Data--First Databank. That's
7  where we obtained the AW--AWP pricing.
8     Q.  Did Montana Medicaid ever contact First
9  DataBank to have the Bayer average sale price
10 information delivered to it?
11    A.  No.
12    Q.  Why not?
13    A.  Pardon me?
14    Q.  Why not?
15    A.  Because the State's payment rates were--
16 were paid under AWP minus 10 percent and/or AWP
17 minus 15 percent, and no analysis was done to
18 compare those rates and go through the
19 administrative rule changes to incorporate the
20 Bayer information into our payment methodologies.
21    Q.  Well, we'll come back to that. Let's
22 continue through this. The next sentence states:

Page 558

1  "Incorporating the Bayer ASP information into the
2  logarithm would require a manual process." Do you
3  see that?
4     A.  Yes.
5     Q.  What does that mean?
6     A.  What he's referring to there is that
7  this information is--from Bayer was for NDCs
8  provided by--by Bayer. The information that we
9  get from First DataBank is electronically,
10 although the information was submitted on a
11 diskette with this--with this data. What the State
12 of Montana would have to do is--is pay--or have
13 staff access our pricing system and manually enter
14 that information into our state's pricing system
15 for this one--one drug manufacturer. We receive
16 AWP information for over--I would guess over 400
17 drug manufacturers with thousands of NDCs done
18 electronically. Entering this information and
19 utilizing this would have required staff resources
20 to manually enter it, verify its accuracy in order
21 to establish the payment rates.
22    Q.  Well, First DataBank received this same

Page 559

1  Bayer average sale price information in electronic
2  form in the same way that the State of Montana
3  did; is that right?
4     A.  That's correct.
5     Q.  And did Montana ever speak to First
6  DataBank about providing the Bayer average sale
7  price information to Montana in electronic form so
8  that Montana could use it?
9     A.  No.
10    Q.  And is it correct to say that the reason
11 Montana did not contact First DataBank for that
12 purpose was because the Montana regulations did
13 not require that it use the Bayer average sale
14 price information in setting--determining an
15 estimated acquisition cost.
16    A.  That's correct.
17    Q.  If the Montana regulations did require
18 that it utilized the Bayer average sale price
19 information in determining a--an estimated
20 acquisition cost, the State of Montana would have
21 undertaken whatever was necessary in order to meet
22 that obligation; is that right?

Page 572

1  some other manufacturers; is that right?
2     A.  Yes.
3     Q.  And today as you sit here, do you recall
4  what other manufacturers those were?
5     A.  I think it was TAP Pharmaceuticals, but
6  I--
7     Q.  Do you know whether you also received
8  such average sale price information from
9  AstraZeneca?
10    A.  It's possible.
11    Q.  It's possible.  You just don't know
12 current--
13    A.  I just don't know currently.
14    Q.  Well, did Montana Medicaid use the
15 average sale information--sale price information
16 from other manufacturers in the same way as the
17 Bayer average sale price information?
18    A.  As if you mean using it in the same way
19 as not using it, yes, that would be correct.
20    Q.  Okay, that--that--that is what I meant.
21       MR. DOSS:  I'll ask that this document
22 be marked as Exhibit Buska 057.

Page 573

1  EXHIBIT:
2        (Exhibit Buska 057 marked for
3  identification.)
4     Q.  (By Mr. Doss)  For the record, Exhibit
5  Buska 057 is a document Bates labeled MT 076251.
6  It appears to be, at least initially, an e-mail
7  from Jeff Buska to Shannon Marr dated December 10,
8  2001, the subject line is a forward ASP
9  implementations.  Mr. Buska, can you identify this
10 document?
11    A.  Yes, it's an e-mail from--within the
12 State of Montana from me to Shannon Marr, and I
13 had received it from a Cynthia Denemark, and her
14 e--her e-mail address was
15 cynthia.denemark@eds.com.
16    Q.  And what is eds.com?
17    A.  I think EDS is the acronym for--EDS, I
18 don't know what EDS stands for.  It's a--it's a
19 private contractor out there that some states use.
20    Q.  Use--is it a Medicaid--provides Medicaid
21 management services?
22    A.  Not necessarily.  I think EDS is like

Page 574

1  another company that it provides claims processing
2  services for state Medicaid programs, and it's
3  probably--this was somebody acting on behalf of
4  another state Medicaid program.
5     Q.  Do you recognize that--so you're
6  forwarding an e-mail that you received from this
7  Cynthia Denemark.
8     A.  That's correct.
9     Q.  Who else received the Cynthia Denemark
10 e-mail?
11    A.  I recognize several of the names on
12 here.  Most of them are the Medicaid pharmacy
13 administrators in other states.
14    Q.  What--what did Cynthia Denemark's e-mail
15 say?
16    A.  It says for those states who are using
17 Bayer ASP, are you adding a percent to the
18 established ASP or are you using the ASP as a
19 definition of an ingredient cost.
20    Q.  Did Montana Medicaid respond to this e-
21 mail?
22    A.  I don't know if we did.

Page 575

1     Q.  I--I gather if Montana Medicaid had
2  responded, it would have responded that it was not
3  using the Bayer ASP information as a definition of
4  ingredient cost; is that right?
5     A.  That would be fair to say our response
6  would be that we pay at AWP minus a percentage.
7     Q.  Are you aware of any discussions
8  concerning this--that relate to this e-mail?
9     A.  No, I'm not aware of any.
10    Q.  What was your position at the time of
11 this e-mail?
12    A.  I was the supervisor of the Acute
13 Services section overseeing the Medicaid pharmacy
14 program, as well as several other Medicaid
15 programs.
16    Q.  And Shannon Marr whose--who you
17 forwarded this to, what was her position at the
18 time?
19    A.  She was the Medicaid pharmacy program
20 officer.
21    Q.  You had referenced earlier in today's
22 testimony that you--at least I believe that you

25 (Pages 572 to 575)

Buska, Jeff - 30(b)(6) - Vol. III    HIGHLY CONFIDENTIAL                December 15, 2006
Helena, MT

Page 588

1  have provided would have been that--that same
2  response.
3      Q. Any other discussions with Mr. Peterson
4  or Ms. DeVaney on the topic of Montana's use of
5  the Bayer average sale price information?
6      A. Just that he clarified that we were
7  just--we were not using that information. He told
8  me he took that information, he put it into his
9  file, and, you know, after I had left the program,
10 no analysis has been done on that for setting
11 reimbursement rates.
12     Q. And what you're referring to is Dan
13 Peterson--
14     A. Dan Peterson.
15     Q. I see. So he--Dan Peterson confirmed he
16 continued to receive the average sale price
17 information, but that Montana Medicaid continued
18 to determine in its estimated acquisition cost
19 based upon AWP minus 15 percent.
20     A. That's correct, we don't use this
21 information.
22     Q. Did you get a call?

Page 589

1      A. That's my wife.
2      Q. Do you want to take a two-minute break?
3      A. No, go ahead. She can--. You probably
4  will hear if she leaves a message a little ring.
5  Sorry.
6      Q. And Montana's reason for not using the
7  Bayer average sale price information in its
8  reimbursement methodology was that its regulations
9  did not require that the estimated acquisition
10 cost use average sale price information for
11 manufacturers?
12     A. Our regulations don't require the use of
13 that information, and it's information that's
14 obtained from Bayer, which is but one of over 400
15 drug manufacturers that we receive pricing
16 information on and pay--pay services for.
17     MR. DOSS: I have no additional
18 questions for Mr. Buska. Does anyone on the phone
19 have anything they'd like to add?
20     MR. DUFFY: I do not.
21     MR. DOSS: Well, hearing no response,
22 we'll take that as a no. So with that, unless you

Page 590

1  had any questions for Mr. Buska?
2      MS. BOVINGTON: I don't have any
3  questions.
4      Q. (By Mr. Doss) very much appreciate you
5  coming in once again for a deposition, and thanks
6  for your time and for coming down.
7      A. Okay. My pleasure.
8      THE VIDEOGRAPHER: Off the record--off
9  the record, end of deposition, end of Tape 2 at
10 12:01.
11     (Deposition concluded at 12:01
12 p.m.; witness excused; signature reserved.)

Page 591

SIGNATURE OF WITNESS

I hereby certify that this is a true
and correct copy of my testimony, together with
any changes I have made on any subsequent pages
attached hereto.

Dated on this the ___ day of _____, 2006.


_____
JEFF BUSKA

Sworn and subscribed before me this ___ day of
_____, 2006.

NOTARY PUBLIC FOR THE STATE OF MONTANA
Residing in _____, Montana
My Commission expires:

29 (Pages 588 to 591)

Henderson Legal Services, Inc.
(202) 220-4158

Page 592

1              CERTIFICATE

2    STATE OF MONTANA )
                      : ss.
3    County of Missoula )

4         I, Mary Sullivan, Freelance Court Reporter and
5    Notary Public for the State of Montana, residing in
6    Missoula, Montana, do hereby certify:

7         That I was duly authorized to and did report
8    the deposition of JEFF BUSKA in the above-entitled
9    cause;

10        That the reading and signing of the deposition
11   by the witness have been expressly reserved.

12        That the foregoing pages of this testimony
13   constitute a true and accurate transcription of my
14   stenotype notes of the testimony of said witness.

15        I further certify that I am not an attorney
16   nor counsel of any of the parties; nor a relative or
17   employee of any attorney or counsel connected with the
18   action, nor financially interested in the action.

19        IN WITNESS WHEREOF, I have hereunto set my
20   hand on this the 18th day of December, 2006.

20

21        _____
          Mary Sullivan, RPR, RMR
          Freelance Court Reporter
21        Notary Public, State of Montana
          Residing in Missoula, Montana
22        My Commission expires: 4-06-10

30 (Page 592)