- Exhibit 12 -

LEXSEE 137 CONG REC S 10424

Congressional Record -- Senate

Thursday, July 18, 1991;
(Legislative day of Monday, July 8, 1991)

102nd Cong. 1st Sess.

*137 Cong Rec S 10404*

**REFERENCE:** Vol. 137 No. 110

**TITLE:** CLOTURE MOTION

**SPEAKER:** Mr. ADAMS; Mr. BAUCUS; Mr. BENTSEN; Mr. BOND; Mr. BURDICK; Mr. CHAFEE; Mr. CRANSTON; Mr. D'AMATO; Mr. DeConcini; Mr. FORD; Mr. FOWLER; Mr. GARN; Mr. GRAHAM; Mr. HEFLIN; Mr. JEFFORDS; Mr. KASTEN; Mr. KOHL; Mr. LAUTENBERG; Mr. LIEBERMAN; Mr. MACK; Ms. MIKULSKI; Mr. SASSER; Mr. SEYMOUR; Mr. SIMPSON; Mr. SPECTER; Mr. WIRTH; Mr. WOFFORD

**TEXT:** [*S10404] VOTE

The PRESIDING OFFICER. The question is, is it the sense of the Senate that debate on the Wirth amendment, No. 794, shall be brought to a close? The live quorum has been waived. The yeas and nays are required. The clerk will call the roll.

The legislative clerk called the roll.

Mr. FORD. I announce that the Senator from North Carolina [Mr. Sanford] is necessarily absent.

I also announce that the Senator from Arkansas [Mr. Pryor] is absent because of illness.

Mr. SIMPSON. I announce that the Senator from New Hampshire [Mr. Smith] is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The yeas and nays resulted -- yeas 57, nays 40, as follows:

(See Rollcall Vote No. 139 Leg. in the ROLL segment.)

The PRESIDING OFFICER. On this vote, the yeas are 57, and the nays are 40. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected.

AMENDMENT NOS. 794 AND 795 WITHDRAWN

The PRESIDING OFFICER. Under the previous order, amendment Nos. 794 and 795 are withdrawn.

ENVIRONMENTAL PROGRAMS

Mr. LAUTENBERG. Mr. President, I rise in support of the fiscal year 1992 VA, HUD, and independent agencies appropriations bill. I commend the leadership of the subcommittee Chair, Senator Mikulski, who has put together a good bill under difficult constraints.

This bill makes a major financial commitment to the protection of our Nation's environment. I want to highlight aspects of the environmental spending in this bill, as well as projects of special importance in New Jersey which I worked to secure, as a member of the VA, HUD, and Independent Agencies Subcommittee.

Mr. President, I am pleased that total EPA funding in the bill would increase by about 10 percent, which includes increases for the asbestos program, nonpoint pollution, and construction grants. The $2.4 billion appropriation for the

possibility of moving the facility to Menlo Park. I wish to assure you that all of the matters which appear to be of concern have been thoroughly analyzed both by the Department and by the Veterans' Affairs Committee, and I want you to be aware of a number of matters that I believe speak directly to your Committee's concerns.

First, with respect to the size of the replacement structure, the Committee report noted that the square footage of the new structure will be 37 per cent larger than the [*S10424] one it is replacing and urged consideration of reducing the number of beds. Regarding square footage, it must be remembered that the main hospital building being replaced was over 20 years old at the time of the earthquake. Patient bed areas in the damaged building were 43 percent under current space criteria and major clinical and patient treatment areas, 37 percent under the current criteria. The 37-percent increase is, VA advises me, necessary to bring the facility up to current standards for space and functional operations.

As to the number of beds, northern California already lags far behind the rest of the nation in the number of beds available for each 1,000 veterans. The most recent available data show that, as of FY 1990, there were only 2.09 VA hospital beds per 1,000 veterans in California compared to 2.58 beds per 1,000 veterans nationally, which is over 23 percent more. According to VA, its plans for northern California, assuming completion of the Palo Alto project, are for 2.19 beds per 1,000 veterans in FY 2005. Reducing hospital care for northern California veterans would obviously be most unfair.

Second, regarding the need to demolish certain existing structures, VA fully considered the strategy of constructing a smaller new building and reusing wings D, E, F, and G. That approach was rejected for a number of reasons. Those structures have seismic and many other deficiencies that would require correction as part of the project, and the phasing of the performance of that work would entail a great deal of disruption and cost in the form of temporary relocations of the functions range plans and the need to control cost overruns should not disrupt an emergency hospital-replacement project, and there can be no higher priority than putting this major VA health-care facility back into full operation.

Barbara, I realize that your subcommittee faced very serious budgetary constraints and has been required to make difficult choices. I also acknowledge the great work you did for veterans in so many other respects. However the Palo Alto VAMC presents a dire and emergent need outside the ordinary planning process. Therefore, I urge that, in conference with the House, you accept the House position on funding this project. Further time spent studying it or its location is not warranted by the facts and could seriously impair quality of patient care available to the veterans of northern California.

With warm regards,

Cordially,
Alan Cranston,
Chairman.

OFFICE OF POLLUTION PREVENTION

Mr. BAUCUS. Would the distinguished floor manager, the Senator from Maryland, yield for a colloquy regarding a provision in H.R. 2519 relating to the relocation of EPA's Office of Pollution Prevention?

Ms. MIKULSKI. I would be happy to yield to the chairman of the Environmental Protection Subcommittee, the senior Senator from Montana.

Mr. BAUCUS. Is it correct that the floor manager seeks to relocate the Office of Pollution Prevention in an effort to maximize our Nation's waste reduction efforts? Is it also correct to say that the Senator from Maryland is concerned that the placement of this office within an EPA Program office would reduce its ability to optimize its mission?

Ms. MIKULSKI. The Senator from Montana is absolutely correct.

Mr. BAUCUS. I would say to the Senator from Maryland that I support her on this issue. I believe that EPA's pollution prevention activities have suffered from its current location of the Office of Pollution Prevention. Given the priority I place on pollution prevention, EPA's Pollution Prevention Office must be strategically placed where it has an opportunity to maximize results. I would be happy to work with the chairperson to make certain that the location of the Office of Pollution Prevention enhances its mission -- the minimization of waste production across all environmental media.

Ms. MIKULSKI. I thank the Senator from Montana. I look forward to working with the Senator on this matter.

Mr. BURDICK. If the manager, the Senator from Maryland, would yield, I too rise in support of her on this matter. I worked with Ms. Mikulski on this problem last year, and agree that the matter she raises, the proper placement of the

Office of Pollution Prevention, can have an inordinate impact on the reduction of hazardous waste production in our Nation. I will work with her to find the most appropriate EPA location where the office can have the maximum impact for its mission.

Ms. MIKULSKI. I thank the chairman of the Committee on Environment and Public Works, and look forward to working with him, as well.

COST CONTAINMENT IN MEDICAID PROGRAM

Mr. BENTSEN. Mr. President, I have some concerns about the committee amendment that changes section 520 of the bill -- H.R. 2519 -- and would appreciate it if the distinguished chair of the VA/HUD Appropriations Subcommittee would be willing to clarify the committee's intent.

As my colleague from Maryland knows, the Omnibus Budget Reconciliation Act of 1990 [OBRA 1990] contained provisions authored by my distinguished colleague, the junior Senator from Arkansas [Mr. Pryor], that were designed to contain costs in the Medicaid Program. These provisions protect American taxpayers by enabling the Medicaid Program to obtain prescription drugs at prices as low as those offered to the best customers of drug manufacturers, including the Department of Veterans Affairs [DVA]. The law operates by providing Medicaid with rebates sufficient to ensure that the price paid by Medicaid is the best on the market.

Mr. President, last year's development of these provisions was a long and contentious process, requiring numerous compromises to address the concerns of the administration, the pharmaceutical manufacturers, the States, consumers, and health care providers -- including the Department of Veterans Affairs -- while achieving the savings agreed to in the budget summit.

During these deliberations, I raised with the summit negotiators my concern over the potential for cost shifting to other Federal agencies and I, therefore, insisted on the inclusion of certain provisions intended to preserve the ability of the DVA to negotiate favorable discounts on pharmaceutical products. Yet, even with these provisions, I am advised that the Department of Veterans Affairs has encountered difficulty in obtaining the discounts it believes are justified. While much of the evidence at this point is anecdotal, we have asked the General Accounting Office to study the matter further.

As I understand it, the purpose of the amendment offered by the distinguished Senator from Maryland is to provide further protections for the DVA against possible price increases.

Ms. MIKULSKI. That is correct. This amendment is needed to ensure that the DVA can continue to secure the favorable prices on pharmaceutical products that it has so effectively negotiated in the past. It would do so by excluding VA prices from the calculation of rebates under the Medicaid law, by requiring the Secretary of Veterans Affairs to attempt to renegotiate current contracts to obtain better prices, and by requiring the Secretary to report to Congress on these negotiations and on pharmaceutical cost increases incurred by the DVA since OBRA 1990 was enacted.

Mr. BENTSEN. I appreciate that clarification and share the concerns of the distinguished Senator from Maryland. The DVA plays a special role in our Nation's health care system by providing care to the millions of men and women who have served in our [*S10425] Nation's defense. Because of its special role, it is imperative that we protect the DVA's ability to deliver the highest quality health care. However, it is also important that we obtain for the American taxpayer the most reasonable prices for pharmaceutical products essential to that care.

At the same time, it is critical that the Medicaid Program retain its ability to provide cost-effective benefits to the many pregnant woman, infants, children, and disabled and elderly individuals who rely on Medicaid for their health care. Thus, I would like to inquire whether the amendment offered by the distinguished Senator will preserve the Medicaid Program's access to favorable pharmaceutical prices, as provided in last year's budget agreement.

Ms. MIKULSKI. Yes, it will. I share my colleagues' concern that Medicaid costs be contained and, unlike the provision in the bill as reported, this amendment does not amend the Medicaid statute.

I want to add another point, and that is, if the pharmaceutical manufacturers continue to impose the exponential price increases in the same fashion, the Senate would have to consider taking whatever steps are necessary to confront the problem.

Mr. BENTSEN. Finally, I wonder if our distinguished colleague, the Budget Committee chairman, Senator Sasser, would confirm my understanding about the budget scoring of this provision. It is my understanding that this amendment

will not require offsetting reductions in entitlement programs or increases in revenues pursuant to the pay-as-you-go provisions in the Budget Enforcement Act.

Mr. SASSER. That is correct.

Mr. BENTSEN. I appreciate the comments of my distinguished colleagues.

PUBLIC HOUSING REPLACEMENT

Mr. CRANSTON. Mr. President, I would like to engage in a colloquy with the distinguished manager of this bill regarding the replacement of public housing that is demolished or sold.

Section 18 of the U.S. Housing Act of 1937 prohibits the Secretary from approving a PHA's application for public housing demolition or disposition unless the PHA has a plan for the replacement of each public housing unit. The section permits such 1-for-1 replacement to be provided in total or in part through: First, the acquisition or development of additional public housing units; second, the use of 15-year project-based assistance under section 8 or other Federal or State programs; or third, the use of 15-year tenant based assistance.

In recent years, replacement housing has been provided from two primary sources. First, appropriations acts have provided explicit funding for 15-year replacement certificates: 500 replacement certificates were provided in the fiscal year 1991 law; 500 in the fiscal year 1990 law and 333 in the fiscal year 1989 law. Second, a portion of funds made available for the development of incremental public housing units has been used to develop units to replace public housing lost through demolition or disposition.

I have mixed views about the current system for replacing public housing. I support giving public housing authorities the flexibility to choose from a variety of options in meeting the replacement requirement. I am concerned, however, by the use of incremental public housing development funds -- nominally appropriated to expand the supply of public housing -- for purposes of meeting the replacement requirement. I believe we should take a truth-in-budgeting approach that would provide separate funding for the development of replacement public housing.

The committee bill provides funding for the development of incremental public housing units -- without recognizing that a portion of these funds will be used to replace public housing units that are lost through demolition or disposition. The absence of funding for section 8 replacement certificates will, in fact, make public housing development the only source of funds available to meet the replacement mandate in fiscal year 1992.

Our current situation is a sad reflection of the inadequacy of HUD's reporting system on public housing demolition and disposition. That reporting system should improve -- as early as next fiscal year -- when section 513(b) of the National Affordable Housing Act takes effect. Section 513(b) requires the Secretary to transmit to Congress, as part of each annual budget request, a report outlining the commitments that the Secretary has made to fund replacement plans under section 18 and specifying, by fiscal year, the budget authority required to carry out such commitments. My hope and expectation is that over time such reports -- and other improvements to the Department's reporting system -- will lead to separate appropriations for replacement public housing in annual appropriations acts.

I ask whether my distinguished colleague from Maryland shares my concern and will work with me to improve the funding system for public housing replacement -- if not in the current appropriations bill than in next year's legislation.

Ms. MIKULSKI. I share the Senator from California's concern about the current system for appropriating funds to meet the public housing replacement mandate. I will work with the Senator first to improve the Department's reporting system on public housing demolition and disposition and then to provide separate explicit funding for these purposes in appropriations legislation.

SOUTHWARK PLAZA PROJECT, PHILADELPHIA, PA

Mr. SPECTER. Mr. President, I wish to express my support for the report language provided in the House VA, HUD, and Independent Agencies Subcommittee appropriation bill concerning the Southwark Plaza project in Philadelphia. I respect the arduous task that the esteemed chairperson of the subcommittee, Senator Mikulski, and the ranking Republican on the subcommittee, Senator Garn, faced in addressing the various issues and requests before the subcommittee, and I commend them for their work. Nevertheless, I am concerned that the success of the Southwark Plaza project, in terms of increased affordable housing, may be further impaired unless report language is provided to allow HUD to assist this project.