*HIGHLY CONFIDENTIAL*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL NO. 1456

Civil Action No. 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:

Judge Patti B. Saris

*State of Montana v. Abbott Labs Inc., et al.,*
02-CV-12084-PBS

## DEFENDANT TAP PHARMACEUTICAL PRODUCTS INC.'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### FILED UNDER SEAL

Dated: February 8, 2007

James R. Daly
Lee Ann Russo
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Chicago IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 7828585

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

**Counsel for Defendant**
**TAP Pharmaceutical Products Inc.**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT........................................................................................................................2

    I.     TAP Is Entitled To Summary Judgment As To All Of Montana's
          Purported Claims, Because There Is No Genuine Issue of Material Fact
          That Montana Was Not Defrauded As To The Pricing for TAP's Drug
          Prevacid® ...................................................................................................2

          A.     Montana knew TAP's ASP for Prevacid®, But Made a Conscious
                  Decision to Continue Reimbursing Providers On An AWP-Based
                  Formula...........................................................................................3

          B.     Montana Had Significant Actual Knowledge Regarding
                  Discounting of Prevacid® to Non-Retail Purchasers ...............................4

          C.     Nearly All Prevacid® Units Reimbursed By Montana Medicaid
                  Were Sold To The Retail Class Of Trade At Their Published WAC .........5

          D.     Montana Received Both Federally Mandated And Supplemental
                  Rebates On Prevacid®, Rendering the Price Per Pill Less Than the
                  Lowest Price in the Commercial Retail Market .........................................7

          E.     Many Reimbursements Paid To Providers Of Prevacid® Were
                  Based on Non-AWP Pricing...........................................................8

    II.    Summary Judgment As To Montana's Claims For Medicare Co-Pays
          Should Be Granted Because Medicare Does Not Reimburse For
          Prevacid® ...................................................................................................9

    III.   Summary Judgment As To Montana's State Employees, State Agencies,
          Consumer And Private Payer Claims That TAP Manipulated Its AWP or
          Marketed the Spread Should Be Granted Because Montana Has Produced
          No Evidence To Support These Claims .................................................9

    IV.   Plaintiff's Expert's Calculation Of Penalties Fails Because It Focuses On
          Reimbursements For Prevacid®.........................................................11

CONCLUSION ...................................................................................................................13

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Calotte Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 10

*Johnson v. Cambridge Industrial, Inc.*, 325 F.3d 892 (7th Cir. 2003) ............................................ 1

*Lawrence v. Northrop Corp.*, 980 F.2d 66 (1st Cir. 1992) ............................................................... 1

*In re Pharm. Industrial Average Wholesale Price Litigation*, 230 F.R.D. 61 (D. Mass. 2005) ....................................................................................................................................... 6

*United States ex rel. Lambers v. City of Green Bay*, 998 F. Supp. 971 (E.D. Wis. 1998) .............. 4

*United States v. Bornstein*, 423 U.S. 303 (1976) ........................................................................... 12

## STATE CASES

*In re Estate of Kindsfather*, 326 Mont. 192 (2005) ........................................................................ 4

## FEDERAL STATUTES

42 U.S.C. § 13965-8 ........................................................................................................................ 5

42 U.S.C. § 1396r-8 ..................................................................................................................... 4, 8

136 Cong. Rec. S12,954 (1990) ...................................................................................................... 8

137 Cong. Rec. S6831 (1991) ......................................................................................................... 8

137 Cong. Rec. S10,424 (1991) ...................................................................................................... 8

## STATE STATUTES

Mont. Code Ann. § 30-14-101, *et seq.* ......................................................................................... 11

Mont. Code Ann. § 30-14-142(2) ................................................................................................... 11

## MISCELLANEOUS

John T., Civil False Claims and Qui Tam Actions § 3.05[B] (3d ed. 1993 & Supp. 2007) .......... 12

*HIGHLY CONFIDENTIAL*

## INTRODUCTION

Montana's 256-plus page complaint lists page after page of allegations of wrongdoing by most of the pharmaceutical industry, all tied to alleged manipulation of AWP for Subject Drugs, which Montana contends caused it to over-reimburse for those drugs. Those allegations, however, no longer control. This is summary judgment – the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation and citation omitted); *see also Lawrence v. Northrop Corp.*, 980 F.2d 66, 68 (1st Cir. 1992) ("Summary judgment operates to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."). And after years of discovery, it is clear that the evidence belies Montana's contentions.

As set out in the Memorandum in Support of Defendants' Joint Motion for Summary Judgment (the "Joint Memorandum") (which TAP joins in full), summary judgment is appropriate for all defendants. Perhaps no defendant is more deserving than TAP, however; Plaintiffs' entire theory of the lawsuit (AWP manipulation, and reliance by Montana, with resulting damages) is simply inapposite for the single TAP Subject Drug, Prevacid®. *First*, Montana cannot plausibly claim to have been duped by the AWP associated with Prevacid® published in industry compendia:

- Montana often did not even use the published AWP in setting the reimbursement for Prevacid®.

- When Montana did base reimbursement for Prevacid® on AWP, it did so with full knowledge – which it possessed long before 1995, when TAP began selling its self-administered, brand-name drug Prevacid® – that the price retail pharmacies paid for drugs was less than AWP. *See generally* the Joint Memorandum.

- In fact, from the fourth quarter of 2001, Montana knew not only that TAP sold Prevacid® for less than AWP to retail pharmacies, but it knew the *specific* Average

*HIGHLY CONFIDENTIAL*

Sales Price ("ASP") for every Prevacid® NDC, which TAP reported *directly to Montana*.

- Regardless of the reimbursement calculation it employed, Montana's reimbursements for Prevacid®, when considered along with the rebates it received from TAP, resulted in effective payments for Prevacid® that were far less than TAP's Wholesale Acquisition Cost ("WAC") for Prevacid®, the price at which the providers reimbursed by Montana purchased the drug.

Faced with this uncontroverted evidence that TAP committed no fraud and that Montana was not injured, Montana cannot proceed to trial against TAP.

*Second*, despite five years of discovery, Montana literally has no evidence to support its claims that TAP marketed the difference or "spread" between the allegedly manipulated AWP price and the actual acquisition cost of its drugs to pharmacists, to increase its individual profits. Indeed, the discovery TAP provided Montana establishes the contrary: there was no "spread," as TAP sold nearly all units of Prevacid® to retailers at its published wholesale acquisition cost or "WAC," a price that was reported by the pricing compendia alongside the published AWP.

*Finally*, even if Montana could establish liability (and it cannot), it has no proper evidence to support its claims for penalties and those claims must fail. For these reasons, as set out below, summary judgment is particularly appropriate for TAP.

## ARGUMENT

**I.    TAP Is Entitled To Summary Judgment As To All Of Montana's Purported Claims, Because There Is No Genuine Issue of Material Fact That Montana Was Not Defrauded As To The Pricing for TAP's Drug Prevacid®.**

Prevacid® is the only Subject Drug identified for TAP. Defendant TAP Pharmaceutical Products Inc.'s Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Rule 56.1 Statement") at ¶ 1. Prevacid®, a proton pump inhibitor used to treat the symptoms of acid reflux disease, is a single source, self-administered, brand-name drug. Rule 56.1 Statement at ¶ 2. In Montana, the pricing for such drugs is transparent.

2

*HIGHLY CONFIDENTIAL*

Although the State contends it was duped into paying too much for Prevacid®, the facts establish anything but.

Montana's claims as to Prevacid® must fail for at least five reasons: (1) Montana knew TAP's ASP for Prevacid®, but made a conscious decision to continue reimbursing Prevacid® above this amount; (2) Montana had access to Prevacid®'s pricing with other classes of trade; (3) nearly all Prevacid® units reimbursed by Montana Medicaid were sold to the retail class of trade at their published WAC; (4) Montana received both Federally mandated and supplemental rebates on Prevacid®, giving it further knowledge of pricing for that product, and rendering its effective outlay for the drug less than its WAC; and (5) consistent with all of this knowledge, Montana often did not reimburse for Prevacid® based on AWP.

A.    **Montana knew TAP's ASP for Prevacid®, But Made a Conscious Decision to Continue Reimbursing Providers On An AWP-Based Formula**

Montana's claim that it relied on AWP as reflecting a true market price is particularly inapt as to Prevacid®; it just isn't true. From the fourth quarter of 2001 on, in accordance with Section III. D. 2. of the September 28, 2001 Corporate Integrity Agreement between the Office of the Inspector General of the Department of Health and Human Services and TAP Pharmaceutical Products Inc., TAP provided Montana with its quarterly ASP Report for all NDCs of Prevacid® as well as a detailed methodology of its ASP calculations, a formula created by the Federal Government.[1] Rule 56.1 Statement at ¶ 17. Despite this knowledge, Montana made *no changes* in its Medicaid reimbursement to providers for Prevacid®. *Id.* at ¶ 19. And

---

[1] Pursuant to the Corporate Integrity Agreement, TAP provided Montana with the Average Sales Price of Prevacid® on a quarterly basis beginning with the fourth quarter 2001 and continuing to the present. *See* Rule 56.1 Statement at ¶ 17 . Under the CIA, "Average Sales Price" is defined, with respect to each dosage, form, strength and volume of the Government Reimbursed Product, as the average of all final sales prices charged by TAP for [Prevacid] in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Drug Rebate purposes, pursuant to 42 U.S.C. § 1396r-8, and excluding direct sales to hospitals. *Id.* at ¶ 16.

*HIGHLY CONFIDENTIAL*

the reasons for that are simple.  In addition to Montana's policy decision to ensure that providers

are reimbursed at levels that incentivize them to continue providing services to Montana

Medicaid patients (*see generally* Joint Memorandum), Montana's regulations did not require it to

use the ASP information, and using it would have required Montana to go to the trouble of

having it manually entered into its pricing logarithm.  *Id.* at ¶¶ 18-19.  It did not trouble to do so.

*Id.* at ¶ 19.  Because of both the national publication of WAC data and access to TAP's specific

ASP data, Montana was and continues to be well aware of the price at which Prevacid® is sold to

pharmacies.

　　　　Montana's knowledge of Prevacid®'s average selling price negates all of its claims.  It is

well settled that knowledge of the truth vitiates any finding of "falsity."  *See United States ex rel.*

*Lambers v. City of Green Bay*, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("Since the crux of an

FCA violation is intentionally deceiving the government, no violation exists where the

government has not been deceived."); *see also In re Estate of Kindsfather*, 326 Mont. 192, 196-

97 (2005) ( to succeed on a Consumer Protection Act or fraud claim under Montana law, the

Plaintiff must prove its ignorance of the falsity of a Defendant's representation).  Because

Montana has not provided and cannot provide any evidence that it was unaware of the actual

acquisition price of Prevacid®, summary judgment for TAP is appropriate.

　　**B.**　　**Montana Had Significant Actual Knowledge Regarding Discounting of**
　　　　　　**Prevacid® to Non-Retail Purchasers**.

　　　　In addition to being provided direct knowledge of Prevacid®'s ASP, Montana knew

TAP's pricing practices with other classes of trade through three independent Montana state

agencies.  Since its launch in 1995, various Montana state entities also have been able to

purchase Prevacid® at significant discounts through direct contracts with TAP.  Those agencies

purchased Prevacid® at prices far below the published AWP.

*HIGHLY CONFIDENTIAL*

*First*, the Montana Department of Corrections purchased Prevacid® at significant discounts. Rule 56.1 Statement at ¶ 21. Despite being within the same Agency as the Department of Corrections, however, the Montana Department of Health and Human Services did not change its reimbursement formula. *Id.*

*Second*, Montana's Department of Public Health ("DPH") has purchased Prevacid® at 15.1% below AMP.[2] *Id.* at ¶ 22. The DPH has participated in this discount program available under Section 340B of the Public Health Service Act since at least 1997. *Id.*

*Third*, Montana had access to the same Non-Federal AMP pricing data from the Department of Veterans Affairs. Under the Veterans Healthcare Act, branded innovator drugs like Prevacid® are priced at a 24% discount off the average price at which the manufacturer sells that product to non-Federal customers. *Id.* at ¶ 23. Montana could have determined non-Federal AMP using the standard formula, Non-Federal Average Manufacturer Price = VA Price / .76. *Id.* Thus, Montana had access to Prevacid®'s pricing to other classes of trade and a means to determine its Non-Federal AMP from the date of Prevacid®'s commercial launch. Montana's decision to reimburse retail pharmacies who buy Prevacid® at WAC or higher were made with this knowledge in an effort to meet the federal mandate that it afford access to health care to Medicaid eligible individuals. *See generally* the Joint Memorandum. That is not fraud; summary judgment for TAP is appropriate on this ground, too.

### C. Nearly All Prevacid® Units Reimbursed By Montana Medicaid Were Sold To The Retail Class Of Trade At Their Published WAC.

Beyond supplying Montana with its ASP information since the fourth quarter of 2001, from Prevacid®'s 1995 launch, TAP has provided accurate WAC data to the pricing compendia.

---

[2] "The term 'average manufacturer price' means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts." 42 U.S.C. 13965-8.

This is important because the Prevacid® units reimbursed by the State were purchased at or about Prevacid®'s WAC.

Direct sales of Prevacid® from TAP to retail pharmacies – reimbursement for which is at the heart of Plaintiff's claims – are made at WAC. Rule 56.1 Statement at ¶ 10. For sales of such branded drugs, "[t]he invoice price usually refers to WAC, *rather than AWP*, and pharmacies typically acquire the drug *at or around WAC*." *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 74 (D. Mass. 2005) (Saris, J.) (citing Young). TAP's sales to wholesalers of Prevacid® also are at WAC. Rule 56.1 Statement at ¶ 11. Thus, in the context of self-administered, brand name pharmaceuticals like Prevacid®, WAC accurately reflects a drug's acquisition cost to pharmacies.

The theory of price fraud advanced in Plaintiff's Complaint hinges on whether TAP reported a false price to any of the pricing compendia. All of the evidence in this case, though, substantiates that there were no false prices reported to the pricing compendia by TAP. The WAC TAP reported was the price at which TAP sold Prevacid® to wholesalers and to chain pharmacies. *Id.* at ¶¶ 4-6. In fact, an analysis of TAP's sales data produced in this case shows that more than 88% of all sales of Prevacid® to the retail class of trade were at WAC. *Id.* at ¶ 12. Since most retail pharmacies purchased Prevacid® at or around WAC, there is no "spread" between the retailer's acquisition cost for Prevacid® and the published WAC. *Id.* at ¶ 14. TAP has no knowledge of the purchase price of those purchases of Prevacid® by pharmacies from wholesalers, which represent more than 66% of Prevacid®'s sales to the retail class of trade. *Id.*

Montana Medicaid, of course, only reimburses *pharmacists* for Prevacid®, and the price that pharmacists pay is the only relevant price for purposes of Montana's claims. TAP reported Prevacid®'s WAC to the pricing compendia, which they published along-side its AWP. *Id.* at ¶ 9.

*HIGHLY CONFIDENTIAL*

Therefore, Montana has no support for its claims that TAP reported a fraudulent price to the pricing compendia upon which Montana relied.[3]

### D. Montana Received Both Federally Mandated And Supplemental Rebates On Prevacid®, Rendering the Price Per Pill Less Than the Lowest Price in the Commercial Retail Market.

Montana's overpayment and penalty claims make no sense for the additional reason that, once federal and supplemental rebates are factored into Montana Medicaid's bottom line costs, Montana paid far less for Prevacid® than the price paid by the providers it reimbursed.

Montana has been eligible for federally mandated rebates under the provisions of the Omnibus Budget Reconciliation Act of 1990, and therefore Montana was eligible for such rebates on Prevacid® since its launch. Under the provisions of the Omnibus Budget Reconciliation Act of 1990, Montana was eligible for rebates of the greater of either (1) a specified percent (currently 15 percent) of AMP or (2) the difference between the "best price" and AMP.[4]  Rule 56.1 Statement at ¶ 25. These rebates allowed the Montana Medicaid program to procure Prevacid® at a substantial discount – and indeed, at a better price than could retail pharmacies.[5]  Rule 56.1 Statement at ¶ 26. Even for those providers Montana reimbursed on a

---

[3] In any event, Montana has no evidence to claim that it was (somehow) duped by the AWP for Prevacid®. The "spreads" between WAC and AWP for brand-name drugs are small, consistent and determined by the pricing compendia. For self-administered, brand-name drugs, like Prevacid®, the "spread" between WAC and AWP is consistently between 20 and 25 percent. (*Id.* at ¶ 7.) "The evolution of the AWP – WAC "spread" for branded self-administered pharmaceuticals is," as Professor Berndt explained, thus "quite understandable, and apparently not the result of any sinister or nefarious conspiracies." (*Id.* at ¶ 8.) And, again, the WAC for Prevacid® is published by the pricing compendia alongside the AWP. (*Id.* at ¶ 9.)

[4] For the quarters beginning January 1, 1995 through December 31, 1995, the Rebate was calculated as the greater of either (1) 15.2 percent of AMP (after deducting customary prompt payment discounts) or (2) the difference between AMP and the "best price" – the lowest price available from the manufacturer to any wholesaler, retailer, nonprofit entity, or governmental entity within the United States. For all quarters beginning after December 31, 1995, the Rebate was calculated as the greater of either (1) 15.1 percent of AMP (after deducting customary prompt payment discounts) or (2) the difference between AMP and the "best price." *See* 42 U.S.C. § 1396r-8(c)(1)(A, B).

[5] Statement of Senator Pryor regarding the purpose of the rebate provisions of OBRA '90. 136 CONG. REC. S12,954 (1990). *See also* 137 CONG. REC. S6831 (1991) ("In effect, the Federal Government told the pharmaceutical industry that since the Federal/State Medicaid Program pays for 13 percent of all drug purchases, this program should be charged the lowest price that the companies offer some private purchasers.") (statement of

*HIGHLY CONFIDENTIAL*

discounted percentage of AWP, after receiving its rebates, Montana Medicaid's Net Effective Payment After Rebate for Prevacid® was far below Prevacid®'s WAC. *Id.* ¶ 28. Simply put, after receiving its federally mandated rebates, Montana Medicaid paid far *less* for Prevacid® than the average price paid by the retail pharmacies it was reimbursing. *Id* at ¶¶ 28-29.

In addition to these federally-mandated rebates, in 2004 Montana entered into a supplemental rebate agreement with TAP. *Id.* at ¶ 27. This agreement allows Montana to receive a rebate over and above the federally mandated amount. *Id.* at ¶ 29. Indeed, the combination of the federal and supplemental rebate has substantially reduced the overall cost of Prevacid® to Montana. *Id.* (through negotiating Supplemental Rebates, "the state achieved a Net Effective Payment . . . of up to 62 % below Prevacid®'s WAC.") Because Montana has not provided any evidence of overpayment in light of the federal and supplemental rebates, summary judgment should be entered in TAP's favor.

### E.     Many Reimbursements Paid To Providers Of Prevacid® Were Based on Non-AWP Pricing.

Perhaps not surprisingly, given this vast store of knowledge of Prevacid® pricing, Montana has not demonstrated (and cannot demonstrate), that it consistently reimbursed Prevacid® based on AWP; it did not. Instead, Montana used a variety of methodologies to reimburse Prevacid® providers, many of which did not rely on the AWP associated with Prevacid® for determining reimbursement. *Id.* at ¶¶ 30-32. From 1995 through 2005, a substantial number of the reimbursements for Prevacid® made by Montana were not made using an AWP-based formula. *Id.* These non-AWP based reimbursements demonstrate that Montana

---

(continued...)

Sen. Durenberger); 137 CONG. REC. S10,424 (1991) ("These provisions protect American taxpayers by enabling the Medicaid Program to obtain prescription drugs at prices as low as those offered to the best customers of drug manufacturers.") (statement of Sen. Bentsen).

*HIGHLY CONFIDENTIAL*

knew it could pay less than the AWP-based formula for Prevacid®, and yet chose to do so anyway.[6]  This fact negates any allegation of fraud.

## II.   Summary Judgment As To Montana's Claims For Medicare Co-Pays Should Be Granted Because Medicare Does Not Reimburse For Prevacid®.

There can be no claim for recovery to Montana Medicaid or consumers for Medicare reimbursements of Prevacid®.  Medicare Part B co-pays, the claims at issue in this litigation, are, by definition, not applicable to Prevacid®.  Medicare Part B reimburses for physician-administered drugs only.  As described above, Prevacid® is a self-administered drug and therefore, is not reimbursed by Medicare.  Summary judgment in TAP's favor should be entered.

## III.   Summary Judgment As To Montana's State Employees, State Agencies, Consumer And Private Payer Claims That TAP Manipulated Its AWP or Marketed the Spread Should Be Granted Because Montana Has Produced No Evidence To Support These Claims.

At summary judgment, a theory is no longer good enough; corroborating evidence is required.  The plain language of Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Calotte Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Yet, Montana has no evidence that TAP manipulated Prevacid®'s AWP or marketed its "spread."

That is, perhaps, not surprising; the record evidence on the point confirms the contrary. Montana's own expert explained the AWP manipulation theory applies only "[i]f a pharmaceutical manufacturer purposefully manipulates the AWP to increase its *customers'*

---

[6] By statute, Montana Medicaid reimburses at the lower of (1) usual and customary charge; (2) maximum allowable charge; or (3) estimated acquisition cost.  Estimated acquisition cost is defined as the direct price charged by manufacturers to retailer, or if no direct price is available, AWP-10% prior to July 2002 and AWP-15% after July 2002.  *Id.* at ¶ 30.  Under this statute, Montana should have used the published direct price if available. *Id.* at ¶ 31. Montana Medicaid's claims processor had a direct price for Prevacid® in its reimbursement table, but did not use it. *Id.*

*HIGHLY CONFIDENTIAL*

profits," noting that "[t]o the extent that a manufacturer controls the 'spread,' it controls customers' profits." Rule 56.1 Statement at ¶ 33. But the undisputed evidence is that TAP has zero incentive to market any alleged "spread" on Prevacid® to *pharmacists*, the entities that are reimbursed by the state and thus ultimately profit from any alleged "spread." Those in control of decisions to prescribe Prevacid® are the *physicians* who do not receive a penny in reimbursement and therefore have no financial incentive to prescribe Prevacid® based on the spread. They receive no reimbursement for the drug no matter what the alleged "spread." Instead, TAP communicates to physicians about matters that are important to them, namely product quality, innovation, safety, and efficacy. Because reimbursements are supplied directly to the pharmacists instead of physicians, TAP cannot influence monetarily the physician prescribing decisions. This disconnect undermines entirely Plaintiff's theory and Montana's claims that TAP marketed the spread to increase its Prevacid® sales.[7]

Montana cannot avoid this conclusion. Montana's pharmacists have no control over when to dispense Prevacid® or any other brand name drug without generic equivalents. There are no generic equivalents that may be substituted by the pharmacist for the brand name drug Prevacid® and thus, regardless of the size of the "spread," once a physician prescribes Prevacid®, a pharmacist has no option but to dispense it. Rule 56.1 Statement at ¶ 34 (retail pharmacies "cannot freely substitute between different patent-protected single-source brands, unless explicit permission is first obtained from the prescribing physician").) Because Montana's claims hinge on its ability to demonstrate that TAP marketed the spread to Montana physicians, which it cannot do, summary judgment must be entered for TAP on Montana's claims.

---

[7] Montana's allegations that TAP provided other inducements to physicians, hospitals and HMO's to stimulate drug sales fail for this reason also. Compl. ¶¶ 572-588. More important, all of these allegations relate to the physician administered drug, Lupron®, which is not a subject of this case. *Id.*

*HIGHLY CONFIDENTIAL*

**IV.    Plaintiff's Expert's Calculation Of Penalties Fails Because It Focuses On Reimbursements For Prevacid®.**

Finally, even if Montana could establish TAP's liability for its claims (and it cannot, as set out above), its claims for penalties also fail because its expert's opinion, the only arguable support Montana may offer for the imposition of penalties, is hopelessly flawed.

Under the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. 30-14-101, *et seq.*, a defendant is liable for civil penalties only if he is "willfully using or has willfully used an" unfair method of competition and unfair or deceptive act or practice in the conduct of any trade or commerce.  Mont. Code Ann. § 30-14-142(2).  The Montana False Claims Act allows civil penalties only if a defendant "knowingly present[s] or caus[es] to be presented to an officer or employee of the governmental entity a false claim for payment or approval."  As shown above, Montana can offer no proof that TAP engaged in such conduct as to its only drug at issue, Prevacid®.  As important, when, as here, a claim is submitted by an intermediary, a defendant is only liable for each false claim submitted to the intermediary, not for every subsequent false claim submitted by the intermediary to a governmental entity.  *See* Boese, John T., Civil False Claims and Qui Tam Actions § 3.05[B] (3d ed. 1993 & Supp. 2007) ("If a party submits false claims to an intermediary which in turn submits claims to the government, the number of claims for which the party is potentially liable is the number of the claims made to the intermediary.");  *United States v. Bornstein*, 423 U.S. 303, 311-13 (1976) ("If United had committed one act which caused Model to file a false claim, it would clearly be liable for a single forfeiture. If, as a result of the same act by United, Model had filed three false claims, United would still have committed only one act. . . . The Act, in short, penalizes a person for his own acts, not for the acts of someone else.").  In this case, the only information TAP submitted

*HIGHLY CONFIDENTIAL*

to any intermediary that filed a claim, *ie.* the pharmacist, was Prevacid®'s WAC, which, as demonstrated above, was the price at which pharmacists obtained the drug.

The Declaration of the State's expert, Dr. Raymond S. Hartman, the only support the State provides for its claim that penalties should be imposed on TAP, in fact highlights these defects. *First,* in his Declaration and Supplementary Declaration, Dr. Hartman erroneously calculates penalties to retailers who purchased Prevacid® at or around its published WAC. Again, Montana cannot reasonably contend that TAP should be penalized for reimbursements of Prevacid® at a price accepted by the industry as the most reliable measure of the acquisition cost of pharmacies of branded drugs. Rule 56. 1 Statement at ¶ 13. In fact, Dr. Hartman has conceded that WAC is the price at which retail pharmacies buy branded drugs. *Id.*

*Second*, Dr. Hartman failed to recognize that many of the State's reimbursements for Prevacid® were less than his AWP–based calculation. *Id.* at ¶¶ 28-29, 32. They also therefore provide no basis for imposition of any penalties.

*Third*, most retail pharmacies buy directly from wholesalers (who in turn purchase from TAP at WAC). TAP does not affect and in fact is unaware of any potential wholesaler mark-up. *Id* at ¶ 14. Therefore, Dr. Hartman cannot determine such pharmacies' acquisition costs from TAP's sales data. Indeed, industry practice indicates that the majority of such purchases were likely at or above WAC. *Id* at ¶ 13. The difference between WAC and the AWP-based reimbursement the state sometimes made is therefore equal to or less than 8% of WAC. *Id* at ¶ 35. Given the cross-subsidization for under – reimbursement of dispensing fees to which the state has admitted and TAP's lack of awareness of Prevacid®'s actual acquisition cost for the many pharmacies that purchased through wholesalers, Dr. Hartman cannot show that Montana's EACs for Prevacid® were inaccurate.

*HIGHLY CONFIDENTIAL*

*Finally*, Dr. Hartman's calculations fail to take rebates into account. Had he done so, he would have been forced to conclude that the State paid far less for Prevacid® than its WAC. *Id* at ¶ 28-29. Dr. Hartman thus has no basis for claiming that penalties should be imposed for Montana's reimbursements for these purchases either.

Montana has no more evidence to support an award of penalties against TAP than it does its underlying claims. Summary judgment should be entered in TAP's favor on all of Montana's claims, including its request for penalties.

## CONCLUSION

For the reasons described above, summary judgment should be granted as to all claims asserted against TAP Pharmaceutical Products Inc.

*HIGHLY CONFIDENTIAL*

Dated: February 8, 2007

Respectfully submitted,

James R. Daly
Lee Ann Russo
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Chicago IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 7828585

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone:  (212) 326-3939
Facsimile: (212) 755-7306

**Counsel for Defendant
TAP Pharmaceutical Products Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2007, I caused a true and correct copy of the

foregoing **Defendant TAP Pharmaceutical Products Inc.'s Memorandum In Support of Its**

**Motion for Summary Judgment** to be served on liaison counsel (identified below) via Federal

Express next day delivery.

_Lee Ann Russo_
Lee Ann Russo

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594