UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| | Civil Action No. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| *State of Montana v. Abbott Labs Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM | **FILED UNDER SEAL** |

# DEFENDANT ABBOTT LABORATORIES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated: February 8, 2007

James R. Daly
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

**Counsel for Defendant
Abbott Laboratories**

## TABLE OF CONTENTS

Page

BACKGROUND ..................................................................................................................2

ARGUMENT......................................................................................................................3

I.     MONTANA'S CLAIMS MUST FAIL BECAUSE IT HAS NOT PROVEN THAT IT OVER-REIMBURSED FOR ABBOTT SUBJECT DRUGS BASED ON AWP...........................................................................................................5

    A.   Montana Rarely Reimbursed Based On AWP And When It Did Use AWP It Violated Its Own Rules ...............................................................................6

    B.   Montana Abandoned Direct Price As a Basis For Reimbursement In Favor of AWP Based Reimbursement Because It Concluded That Reimbursement Based on Direct Price Was Too Low ...........................................7

II.     MONTANA'S CLAIMS MUST FAIL FOR ADDITIONAL REASONS AS TO BIAXIN® AND DEPAKOTE® ........................................................................8

    A.   Abbott Had No Incentive To "Manipulate AWP" Or "Market The Spread" For Biaxin® Or Depakote® ...........................................................................8

    B.   Montana Paid Less Than Market Price For Biaxin® And Depakote® .................10

III.     MONTANA'S CLAIMS MUST FAIL FOR ADDITIONAL REASONS AS TO ABBOTT'S MULTIPLE-SOURCE SUBJECT DRUGS ........................................11

    A.   Montana Knew It Could Reimburse HPD Products And Erythromycin At Less Than AWP .............................................................................................12

    B.   The HPD Products Were Sold Almost Exclusively To Hospitals; Most Sales Are Not Part Of This Case, And The Remaining Few Do Not Fit Plaintiffs' Theory ..........................................................................................14

IV.     MONTANA'S LONG-HELD KNOWLEDGE THAT IT COULD PAY LESS THAN AWP FOR ABBOTT SUBJECT DRUGS ALSO GIVES RISE TO A STATUTE OF LIMITATIONS BAR ...................................................................15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 1, 2, 3

*Dialogo, LLC v. Bauza*, 456 F. Supp. 2d 219 (D. Mass. 2006) ....................................................... 4, 6

*Johnson v. Cambridge Industrial, Inc.*, 325 F.3d 892 (7th Cir. 2003) ............................................... 1

*Lawrence v. Northrop Corp.*, 980 F.2d 66 (1st Cir. 1992) ................................................................ 1

*United State ex rel. Durcholtz v. FKW, Inc.*, 189 F.3d 542 (7th Cir. 1999) ........................... 9, 12, 14

*United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971 (E.D. Wis. 1998) .... 9, 12, 14

*United States ex rel Englund v. Los Angeles County*, 2006 WL 3097941 (E.D. Cal. Oct. 31, 2006) ............................................................................................................................. 9, 12, 14

## STATE CASES

*In re Estate of Kindsfather*, 326 Mont. 192 (2005) ....................................................... 9, 12, 13, 14

*Osterman v. Sears, Roebuck & Co.*, 318 Mont. 342 (2003) ............................................................ 15

## FEDERAL STATUTES

136 Cong. Rec. S12954 (1990) ........................................................................................................ 10

137 Cong. Rec. S6831 (1991); 137 Cong. Rec. S10,424 (1991) ..................................................... 10

Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 143 ...................... 10

## STATE STATUTES

Mont. Admin. R. 37.86.1101 ............................................................................................................. 6

Mont. Admin. R. 37.86.1105 ............................................................................................................. 6

Mont. Code Ann. § 27-2-211(1) ...................................................................................................... 15

Mont. Code Ann. § 53-6-143 ............................................................................................................. 3

Montana False Claims Act, Mont. Code Ann. § 17-8-231 ................................................................ 4

In February 2002, the Montana Attorney General filed this suit, claiming that Abbott Laboratories ("Abbott") – along with 20 other pharmaceutical company defendants – duped Montana's Medicaid Program and Montanans into paying too much for pharmaceutical products by manipulating the Average Wholesale Price (AWP) associated with them. The current complaint, filed in August 2003, fills nearly 234 pages with allegations of AWP-related wrongdoing by Abbott and the others. In motion practice up to now, the Court has had to believe them. Now, though, things are different. This is summary judgment – the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation and citation omitted); *see also Lawrence v. Northrop Corp.*, 980 F.2d 66, 68 (1st Cir. 1992) ("Summary judgment operates to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."). No longer can Montana rest on its say-so; it must provide *evidence* to support its claims, or lose them. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

As the Joint Memorandum illustrates, in nearly 5 years of discovery, Montana has failed to unearth evidence to support its claims as to Abbott or any other defendant. Abbott joins the Joint Memorandum in full; it warrants a grant of summary judgment to all defendants. Abbott submits this brief to point out yet further reasons why summary judgment should be granted against Montana as to Abbott. Specifically:

- Up until July 2001, Montana Medicaid rarely reimbursed for Abbott Subject Drugs based on AWP – and when it did choose to do so, it did so with full knowledge that it could pay less. That dooms its claims, both on the merits and by operation of the statute of limitations;

- In those rare instance in which Montana Medicaid reimbursed the Abbott Subject Drugs based on AWP, it did so in contravention of its own administrative rules, which required Montana Medicaid to use direct price when it was available. Unlike

most other defendants, Abbott had a published direct price for its Subject Drugs during the relevant time period;

- Although Montana administrative rules continued to require reimbursement based on direct price, when it was available, Montana Medicaid elected to discontinue using direct price in July 2002 in favor of its AWP-based methodology (four months after this lawsuit was filed) because it felt that it was *under-reimbursing* for drugs, including Abbott's Subject Drugs – Montana still uses that AWP-based methodology today; and

- Montana has abandoned the rest of the allegations set out in its complaint, having failed to calculate penalties or otherwise provide evidence of damages concerning individual co-pay claims from reimbursement for Abbott Subject Drugs by Medicare, state employee benefits, state agencies, consumers or private payors, or Medicaid medical benefit claims ("J-Codes").

For these reasons, as set out below, summary judgment is particularly appropriate for Abbott.

## BACKGROUND

The Abbott Subject Drugs are of two kinds.[1] First, there are products manufactured and sold by Abbott's Pharmaceutical Products Division ("PPD"), which are self-administered drugs (pills). (Abbott Statement of Undisputed Facts ("ASOF") at ¶ 2.) Abbott PPD Subject Drugs include Biaxin® and Depakote®, which are branded drugs, and Erythromycin, which is a generic drug. (*Id.* at ¶¶ 3 – 5.)

PPD's branded products are generally sold by Abbott to wholesalers, who in-turn sell them to pharmacists, who then dispense them to customers with prescriptions for that particular drug. (*Id.* at ¶ 7.) The marketing of branded self administered drugs, like Biaxin® and Depakote®, is generally focused on the doctors that prescribe the drugs, not the pharmacists that dispense them. (*Id.* at ¶ 11.) Abbott sells Biaxin® and Depakote® to retail pharmacies almost

---

[1] The Abbott Subject Drugs at issue are: Acetylcysteine, Acyclovir, A-Methapred, Amikacin Sulfate, Aminosyn, Cimetidine, Clindamycin, Dextrose, Diazepam, Fentanyl Citrate, Furosemide, Gentamycin, Heparin, Leucovorin, Liposyn, Lorazepam, Sodium Chloride, Tobramycin, Vancomycin, Biaxin®, Depakote®, and Erythromycin. (ASOF at ¶ 1.) Calcijex is also listed in the complaint as a Subject Drug, but there is no evidence of Montana paying any claim for it. (ASOF at ¶ 21.) Summary judgment is thus appropriate as to Calcijex.

exclusively at Wholesale Acquisition Cost (WAC), which for these drugs equals the direct price. (*Id.* at ¶ 8.) Direct price is the list price at which a direct customer can purchase the product on a non-discounted basis. (*Id.* at ¶ 9.) For PPD Subject Drugs, the industry compendia published the direct price and WAC along with an AWP. (*Id.* at ¶ 10.)[2]

The rest of the Abbott Subject Drugs[3] are a hodge-podge of products (primarily solutions and antibiotics) for which Montana claims minimal damages. (*Id.* at ¶¶ 14, 15.) They are generic multi-source drugs that were manufactured and sold by Abbott's former Hospital Products Division ("HPD"). (*Id.* at ¶ 14.) HPD products are sold primarily to hospitals, with minimal retail pharmacy sales or Medicaid reimbursements. (*Id.* at ¶ 15.) Because HPD products are often very inexpensive solutions, the "spreads" between provider acquisition cost and the AWP published for the products by third-party compendia can appear large when expressed as a percentage (Plaintiff styles these as "mega-spreads"), but translate into small dollar margins. (*Id.* at ¶ 16.) For HPD Subject Drugs, the compendia published the direct price (and periodically WAC) as well as an AWP for each Abbott Subject Drug. (*Id.* at ¶ 17.)

## ARGUMENT

Montana brings various claims against Abbott in connection with Montana's reimbursement for Abbott Subject Drugs under Medicaid, alleging violation of the Montana Unfair Trade Practice Act, "Medicaid fraud" under MONT. CODE ANN. § 53-6-143; and violation of the Montana False Claims Act, MONT. CODE ANN. § 17-8-231. Montana has provided *no evidence*, and calculated no damages or penalties, on claims for individual co-pays from

---

[2] Abbott hereinafter uses the term "direct price" to refer to both the WAC and direct price for Depakote® and Biaxin®.

[3] Other than Calcijex which, again, is no longer in the case.

reimbursements by Medicare, state employees benefit plans, state agencies, consumers or private payors, or for J-Code claims[4] under Medicaid.[5] (*See* Gaier MT/NV Rpt. and Decl.) By definition, summary judgment is appropriate for Abbott on these points. *Dialogo, LLC v. Bauza*, 456 F. Supp. 2d 219, 227 (D. Mass. 2006) (granting summary judgment to defendants "because Plaintiff has offered no evidence on an essential element of their case").

As to those penalties Montana *does* seek, all of its claims turn on essentially the same factual allegations:

- Montana Medicaid reimbursed for Abbott Subject Drugs based on the AWP associated with them (State of Montana's Second Amended Complaint ("Complaint") at ¶ 5);

- Abbott somehow "manipulated" the AWP associated with its Subject Drugs, and proactively marketed to pharmacists the difference between the allegedly manipulated AWP price and the actual acquisition cost of the drugs (the so-called "spread") (*Id.* at ¶¶ 7, 8, and 10); and

- Montana Medicaid was thereby duped into paying too much for the Subject Drugs (*Id.* at ¶ 15).

Because the record evidence does not bear out any of these factual allegations, summary judgment should be granted to Abbott.

## I. MONTANA'S CLAIMS MUST FAIL BECAUSE IT HAS NOT PROVEN THAT IT OVER-REIMBURSED FOR ABBOTT SUBJECT DRUGS BASED ON AWP.

Plaintiff's claims turn on the theory that drug manufacturers manipulated *AWPs*, Montana relied on the manipulated *AWPs* in making reimbursements, and Montana was thereby injured by

---

[4] Physician administered drugs, like Abbott's HPD Subject Drugs, were typically reimbursed by Montana Medicaid based on a J-Code (or CPT/HCPCS code). (*See* Joint Brief.) Montana Medicaid, however, reimbursed all competing versions of a multi-source drug using a single J-Code at a single reimbursement level. (*Id.*) Accordingly, it is impossible to tie receipt of such a multi-source drug to any particular manufacturer. (*Id.*)

[5] Montana also has not calculated damages for Medicaid pharmacy benefit claims ("NDC claims") for the Abbott Subject Drugs; Montana has, however, calculated penalties for these claims. (ASOF at ¶ 33.)

the manipulated *AWPs* – the so-called "*AWP* Inflation Scheme." (Complaint at ¶¶ 7, 8, 10, and 15) ("the AWP Inflation Scheme . . . ha[s] cost the State of Montana millions of dollars in excess Medicaid payments made for medications as a direct result of the illegal AWP Scheme.") This theory simply does not work for Abbott. As a general rule, Montana did not reimburse for Abbott Subject Drugs based on AWP. As a result, there can be no *AWP* fraud. And in those rare instances in which Montana did reimburse based on AWP, it did so in contravention of its own administrative rules, which required Montana to use direct price when it was available. Unlike most defendants in this case, Abbott had published direct prices for all of its Subject Drugs. Thus, reimbursement should have been based on direct price, not AWP. Further, in July 2002 – four months *after* this lawsuit was filed – Montana announced that it would no longer use direct price as a basis for reimbursement (instead it would use the AWP based formula) because it concluded that reimbursements based on direct price were *too low* and providers were not being reimbursed enough to remain in Montana's Medicaid program. For these reasons, Montana's claim that it was somehow defrauded by the AWPs for the Abbott Subject Drugs fails.

### A.   Montana Rarely Reimbursed Based On AWP And When It Did Use AWP It Violated Its Own Rules.

The evidence shows that, until July 2001,[6] Montana Medicaid rarely reimbursed for the Abbott Subject Drugs based on AWP. (ASOF at ¶ 22.) Indeed, for each of the PPD products, over 99% of reimbursements were effected at something other than AWP. (*Id.* at ¶ 23 (Depakote® 99.75%, Biaxin® 100%, Erthromycin 99.14%).) Similarly, for the HPD drugs, reimbursement was effected at something other than AWP in about 97% of cases. (*Id.*) Because

---

[6] As discussed in section I.B. *infra*, July 2001 is the relevant date because in July 2002, providers were allowed to retroactively reverse and resubmit claims for Abbott Subject Drugs originally paid based on direct price dating back to July 2001. (ASOF at ¶¶ 28, 32.)

this is an AWP case, penalties for those non-AWP-based reimbursements are not cognizable. Summary judgment on those claims is therefore appropriate. *See Dialogo, LLC*, 456 F. Supp. 2d at 227.

Nor should Montana have ever used AWP to reimburse for the Abbott Subject Drugs. By rule, Montana was *required* to reimburse for Subject Drugs based on the lesser of usual and customary charges, maximum allowable cost (for multi-source drugs only), or "estimated acquisition cost" (EAC). MONT. ADMIN. R. 37.86.1105 (2006). EAC, in turn, was defined as (a) *direct price (DP);* or (b) *if* no direct price is available, AWP less some percent (originally 10%, later 15%). MONT. ADMIN. R. 37.86.1101 (2006); (*see* Joint Statement of Facts ("JSOF") for historical cites). Because the direct price was available for the Subject Drugs, direct price – not AWP – should have been the basis of reimbursement for the Abbott Subject Drugs under Montana law. (ASOF at ¶ 25.) To the extent Montana nevertheless reimbursed based on AWP, it was violating its own laws. Accordingly, summary judgment as to any AWP-based claims is also appropriate.

> **B.   Montana Abandoned Direct Price As A Basis For Reimbursement In Favor Of AWP Based Reimbursement Because It Concluded That Reimbursement Based On Direct Price Was Too Low.**

As described in the joint brief, Montana was keenly aware of the importance of maintaining reimbursement levels that ensured equal access to care. (*See* Joint Brief.) Motivated by that concern, beginning in 1999 Montana began moving away from direct price-based reimbursement. (ASOF at ¶ 26.) At that time, Montana decided to use a budget increase to begin phasing out direct price reimbursement for certain manufacturers' drugs specifically to *increase* reimbursement to pharmacies. (*Id.*) It did this even though it acknowledged that eliminating direct price reimbursement would *cost* Montana an additional $335,868 per year ($105,855 per year for Abbott drugs alone). (*Id.* at ¶ 27.) Even after that, Montana was

concerned that it was not reimbursing providers enough – so in 2002 (the very year it filed this suit claiming "fraud"), it made a reasoned and calculated decision to phase out direct price reimbursement (in favor of AWP-based reimbursement) *altogether* and increase dispensing fees. (*Id.* at ¶ 28.) It did so, even though its own rules continued to require reimbursement based on direct price when it was available; Montana just began ignoring those rules. (*Id.* at ¶ 31.) In fact, not only did Montana eliminate direct price reimbursement and increase dispensing fees, it even went so far as to allow providers to reverse and resubmit claims that were paid based on direct price over *the prior twelve months.* (*Id.* at ¶ 32.) At the same time, in response to a comment to the 2002 proposed changes, Montana acknowledged that pharmacies were *reimbursed below their cost for Abbott products* and blamed it on the fact that they were reimbursed based on direct price rather than AWP. (*Id.* at ¶ 30.) Indeed, five years after this lawsuit was filed, and to this very day – 2007 – Montana is still basing its reimbursements on AWP. (*See* JSOF.)

According to Montana's revisionist history vaguely sketched out in the Complaint, it was duped into paying too much for the Abbott Subject Drugs because it relied on the AWPs for those drugs. (Complaint at ¶ 15.) In point of fact, however, Montana made a conscious decision to *move toward* an AWP based system for reimbursement of Abbott's Subject Drugs in 2002 (*after* the filing of this lawsuit), because it was concerned about adequately covering providers' costs for acquiring and dispensing Abbott Subject Drugs. The evidence is overwhelming, and it is not controverted: Montana should not have reimbursed for Abbott Subject Drugs based on AWP – and when it chose to do so, it did so with the specific and express intent to increase reimbursement to providers and thereby ensure equal access to care. Montana cannot prove that it was defrauded by the AWPs for Abbott Subject Drugs; it was not.

II. **MONTANA'S CLAIMS MUST FAIL FOR ADDITIONAL REASONS AS TO BIAXIN® AND DEPAKOTE®.**

Beyond the overarching holes in Montana's evidence identified above, its claims must fail as to Biaxin® and Depakote® for two additional reasons. *First*, they are simply inapt, because for branded drugs there can be no argument (let alone evidence) that Abbott had an incentive to "manipulate" AWP or "market the spread." *Second*, in any event, the amount Montana ultimately paid for Biaxin® and Depakote® is less than market price. Since that is what Montana claims it meant to do, it sustained no damage.

A. **Abbott Did Not "Manipulate AWP" Or "Market The Spread" For Biaxin® Or Depakote®, Nor Did It Have Any Incentive To Do So.**

Montana's claims of being defrauded are particularly unsupported as to branded drugs Biaxin® and Depakote®. Approximately 95% of Abbott's sales to retail pharmacists for these drugs were at direct price (also referred to as WAC for these products). (ASOF at ¶ 8). Abbott's direct price for these drugs was published by the pricing compendia, along with an AWP. (*Id.* at ¶ 10.) Thus, Montana had all it needed to understand the actual pricing and sale of these drugs. This direct and undisputed evidence vitiates any fraud-based claim. *See United Statse ex rel. Durcholtz v. FKW, Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) ("The government's knowledge [of a false claim] effectively negates the fraud or falsity required by the FCA."); *United States ex rel. Englund v. Los Angeles County*, 2006 WL 3097941, *8 (E.D. Cal. Oct. 31, 2006) ("the 'knowing' submission of fraudulent claims is logically impossible when responsible government officials have been fully apprised of all relevant information"); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has not been deceived."); *see also In re Estate of Kindsfather*, 326 Mont. 192, 196-97 (2005) (Montana

Consumer Protection Act and fraud require proof of ignorance of falsity of defendant's representation).

Further, as discussed above, Montana should have reimbursed at the direct price, as required under Montana's own administrative rules. (ASOF at ¶ 25.) In other words, for these drugs, the compendia published direct price; Abbott sold at direct price; and Montana should have reimbursed at direct price. Accordingly, there can be no fraud.

Indeed, Montana's entire theory of "manipulating" and "marketing the spread" simply makes no sense as to branded pills like Biaxin® and Depakote®. Montana's own expert explained the AWP manipulation theory applies only "[i]f a pharmaceutical manufacturer purposefully manipulates the AWP to increase its *customers'* profits," noting that "[t]o the extent that a manufacturer controls the 'spread,' it controls customers' profits." (*See* MT Hartman Decl. ¶ 13.) The problem is that, for these branded pills, there is an unbridgeable disconnect between *choosing* the product to be given to a patient and *receiving reimbursement* for that product. (ASOF at ¶ 11, 12) Pharmacists, not physicians, receive reimbursements for these products. (*Id.* at ¶ 13.) But physicians, not pharmacists, prescribe them – and pharmacists have no freedom to choose between Abbott's product and some other product when a prescription specifically calls for a branded pill like Biaxin® or Depakote® – the pharmacist must dispense what is prescribed by the physician. (*Id.* at ¶ 12; Berndt ¶ 42 (retail pharmacies "cannot freely substitute between different patent-protected single-source brands, unless explicit permission is first obtained from the prescribing physician").)

**B.     Montana Paid Less Than Market Price For Biaxin® And Depakote®.**

Montana's claims are also hollow as to Biaxin® and Depakote® because, not withstanding the allegations of the complaint, the record shows that Montana did for these drugs exactly what it claims it should have done: paid at or below a market price (*i.e.*, the direct price for these

drugs). Under the Omnibus Budget Reconciliation Act of 1990, Abbott was required to calculate and submit to the Federal Government the average price at which it sells to the retail class of trade – the Average Manufacturer's Price (AMP). Abbott was then required to rebate at least 15.1% of that AMP – and sometimes more – to Montana for each unit reimbursed by Montana Medicaid for these drugs.[7] (ASOF at ¶¶ 33, 34.) These rebates were substantial.[8] *See* 136 CONG. REC. S12954 (1990) (Senator Pryor informing the Senate that then proposed rebates would lead to "substantial discounted prices" for state Medicaid agencies.) Even for those providers Montana reimbursed on a discounted percentage of AWP, after receiving its rebates, Montana Medicaid's net effective payment for Biaxin® and Depakote® was far below the price at which many pharmacies purchased the drugs – direct price or above direct price. (*Id.* at ¶ 35.) In other words, after receiving its federally mandated rebates, Montana Medicaid paid *less* for Biaxin® and Depakote® than the price paid by the retail pharmacies it was reimbursing. (*Id.* at ¶¶ 8, 35.) In light of that evidence, then, Montana cannot support its claims to have overpaid for these drugs.

## III. MONTANA'S CLAIMS MUST FAIL FOR ADDITIONAL REASONS AS TO ABBOTT'S MULTIPLE-SOURCE SUBJECT DRUGS.

The remaining Abbott Subject Drugs at issue are multi-source; they are HPD products (generally solutions and antibiotics) and Erythromycin (a generic PPD product) (ASOF at ¶¶ 14,

---

[7] For all quarters beginning after December 31, 1992, the Rebate was calculated as the greater of either (1) 15 percent of AMP (after deducting customary prompt payment discounts) or (2) the difference between AMP and the "best price." *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 143 (1990) ("OBRA '90").

[8] *See also* 137 CONG. REC. S6831 (1991) ("In effect, the Federal Government told the pharmaceutical industry that since the Federal/State Medicaid Program pays for 13 percent of all drug purchases, this program should be charged the lowest price that the companies offer some private purchasers.") (statement of Sen. Durenberger); 137 CONG. REC. S10,424 (1991) ("These provisions protect American taxpayers by enabling the Medicaid Program to obtain prescription drugs at prices as low as those offered to the best customers of drug manufacturers.") (statement of Sen. Bentsen).

15.) Beyond the issues identified in Section I, Montana's claims as to these products suffer even further defects. To begin with, Plaintiff's expert Hartman calculates penalties for the HPD drugs for Abbott well past April 2004. (*Id.* at ¶ 19.) But on April 1, 2004, Abbott spun off its hospital products division. (*Id.* at ¶ 18.) The new company is a separate and independent company. (*Id.*) Clearly, Abbott is not liable for any claims following the spin-off, nor have Plaintiffs offered proof of how it could be liable.

Even prior to 2004, Montana's claims regarding these drugs must fail. Montana's reimbursement data, contracts with Abbott and receipt of various government reports (including some that directly addressed certain of the Abbott Subject Drugs) establish that Montana was well aware that it could reimburse Abbott's multi-source products at less than AWP, but it sometimes chose not to do so. In addition, the vast majority of sales for these products were not made to retail pharmacies (as Montana's own expert admits, those sales are not part of this suit), and the tiny fraction that remain do not fit Montana's liability theory.

### A.   Montana Knew It Could Reimburse HPD Products And Erythromycin At Less Than AWP.

Although Montana claims to have blindly relied on the AWP for Abbott's multi-source Subject Drugs, the record shows otherwise.

*First*, as described above, Montana generally did not reimburse for these products based on AWP, but instead did so at amounts below the AWP-based rate and sometimes *substantially* below the AWP-based rate. For example, Abbott Subject Drug Sodium Chloride Bacteriostatic was in some instances reimbursed at 85% below AWP. (ASOF at ¶ 24.) Armed with the knowledge that it could reimburse providers at substantially lower rates, if Montana nonetheless chose (sometimes) to reimburse for Abbott multi-source products using an AWP-based methodology, it cannot claim to have been duped. That is fatal to Montana's claims. *See United*

*Statse ex rel. Durcholtz*, 189 F.3d at 544-45; *United States ex rel. Englund*, 2006 WL 3097941, *8; *United States ex rel. Lamer*, 998 F. Supp. at 988; *see also In re Estate of Kindsfather*, 326 Mont. at 196-97.

*Second*, Montana had *direct, first-hand, knowledge* of what those who purchased directly from Abbott were paying for Abbott's Subject Drugs. Montana, in addition to acting as a reimburser, also acts as a direct purchaser for many of Abbott's Subject Drugs. (ASOF at ¶ 36.) It contracts with Abbott to purchase these drugs at a steep discount for use in State prisons and hospitals (the State prisons are supervised by the same agency – Montana Department of Health and Human Services – as Montana Medicaid). (*Id.* at ¶¶ 36, 37.) For example, Montana contracted with Abbott to purchase Dextrose and Sodium Chloride in 1991 at a discount of 82.1% off direct price and had similar contacts and discounts for these drugs and other HPD Subject Drugs at various points in time. (*Id.* at ¶ 38.)Thus, Montana has long had direct knowledge that there were widely varying differences between AWP based reimbursement rates and the actual acquisition cost of Abbott multi-source products.

*Third*, as discussed in the Joint Brief, the Department of Health and Human Services' Office of the Inspector General (OIG) *repeatedly* informed Montana that AWP represents a sticker price, and that providers typically pay a lower amount. (*See* Joint Brief) Indeed, the OIG published reports detailing *actual prices* of various Abbott Subject Drugs. (ASOF at ¶¶ 40 – 42.) For example, in October *1992* the OIG published a report entitled "Cost of Dialysis-Related Drugs." (*Id.* at ¶ 40.) The report detailed an Estimated Acquisition Cost of Vancomycin (one of the Abbott Subject HPD Drugs) of $5 and a median AWP of $19.17. (*Id.*) Similarly, in December 1997 the OIG published a report aptly entitled "Excessive Medicare Payments For Prescription Drugs." (*Id.* at ¶ 41.) Remarkably, the report listed, among other information, the

average Medicare allowed amount, lowest wholesale price found, and the "*Actual* Average Wholesale Price" of Vancomycin for 1995. (*Id.*) (emphasis added) And again, in January 2001, the OIG published "Medicare Reimbursement of Prescription Drugs," which compared the Medicare median price and Veteran's Affairs median price of Leucovorin Calcium (another Abbott Subject HPD Drug). (*Id.* at ¶ 42.) Montana Medicaid officials reviewed publications it received from the OIG. (*Id.* at ¶ 39.)

*Fourth*, the federal government went so far as to send to Montana its *own* suggested AWPs for numerous drugs in January 2000 (the "DOJ AWPs"). (*See* ASOF at ¶ 43.) These DOJ AWPs included suggested AWPs for 15 Abbott Subject Drugs, and were lower than the published AWPs for those products. (*Id.* at ¶ 44.) Although Montana decided to use the DOJ AWPs for some drugs, it chose not to use them for the Abbott Subject Drugs. (*Id.* at ¶ 45.) Again, Montana cannot claim it was somehow duped by the AWPs for Abbott's Subject Drugs when it had access to lower AWPs and yet purposely chose to ignore them. (In addition, since DOJ explicitly instructed the States to use its AWPs, and not those in the publications, there can be no "causation" here; nothing Abbott did required, let alone permitted, Montana to use compendia AWPs rather than the DOJ's AWPs in violation of the DOJ directive.)

All of this evidence is uncontroverted: To the extent Montana based reimbursement for multi-source products on AWP, it would have been with eyes wide open, knowing it could pay less, yet choosing to pay more to advance its own policy goals. Montana cannot prove that it was defrauded by the AWPs for Abbott Subject HPD Drugs and Erythromycin; it was not. Summary judgment for Abbott is therefore appropriate. *See United States ex rel. Durcholtz*, 189 F.3d at 544-45; *United States ex rel. Englund*, 2006 WL 3097941, *8; *United States ex rel. Lamers*, 998 F. Supp. at 988; *In re Estate of Kindsfather*, 326 Mont. at 196-97.

### B. The HPD Products Were Sold Almost Exclusively To Hospitals; Most Sales Are Not Part Of This Case, And The Remaining Few Do Not Fit Plaintiffs' Theory.

The volume of Abbott's sales of HPD Subject Drugs to retail pharmacies is inconsequential. (ASOF at ¶ 20.) For instance, from January 1, 1995 to June 30, 2001, only 2.60% of sales of Sodium Chloride Bacteriostatic (one of the HPD Subject Drugs) were reimbursed by Medicaid (the only claims at issue in this case). (*Id.*) While Montana contends that Abbott manipulated the AWP for these products to induce dispensing pharmacies, they have no evidence of that – nor could they because it makes no sense: Montana has not even tried to explain why Abbott would center its entire pricing approach for these products around these inconsequential sales to retail pharmacies. Accordingly, summary judgment is appropriate.

### IV. MONTANA'S LONG-HELD KNOWLEDGE THAT IT COULD PAY LESS THAN AWP FOR ABBOTT SUBJECT DRUGS ALSO GIVES RISE TO A STATUTE OF LIMITATIONS BAR.

Finally, Montana's extensive, pervasive, and long-standing knowledge that it could reimburse for less than the AWP-based statutory amount for Abbott Subject Drugs – and indeed, that it did so as far back as 1995 – means that Montana was on notice of any alleged AWP fraud at least as early as 1995. Thus, the two-year statute of limitations for any claim of fraud against Abbott began running at least as early as 1995, and Montana's knowledge refutes any claim for tolling. MONT. CODE ANN. § 27-2-211(1)(c) (2005); *see Osterman v. Sears, Roebuck & Co.*, 318 Mont. 342 (2003) (running of statute of limitations for fraud-like statutory actions begins when alleged fraud occurs, unless the operative facts are inherently concealed, or defendant affirmatively prevents plaintiff from discovering injury). The first complaint in this case was not even filed, however, until 2002; Montana's knowledge thus also renders its claims untimely. Summary judgment for Abbott is appropriate on this ground, too.

**CONCLUSION**

The court should grant summary judgment to Abbott on all claims against it.

Dated:  February 8, 2007                    Respectfully submitted,

                                                     /s/ Toni-Ann Citera
Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

James R. Daly
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

**Counsel for Defendant**
**Abbott Laboratories**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2007, I caused a true and correct copy of the foregoing **Defendant Abbott Laboratories, Inc.'s Memorandum In Support of Its Motion for Summary Judgment** to be served on liaison counsel (identified below) via Federal Express next day delivery.

                                                                                 __/s/ Toni A. Citera_
                                                                                     Toni A. Citera

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594