# EXHIBIT 1

HIGHLY CONFIDENTIAL

# EXPERT DECLARATION OF STEVEN J. YOUNG ON BEHALF OF ABBOTT LABORATORIES RELATING TO MONTANA
## DATED FEBRUARY 8, 2007

FILED UNDER SEAL

**HIGHLY CONFIDENTIAL**

# TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| I. | EXECUTIVE SUMMARY | | 1 |
| | A. | Summary of Opinions | 2 |
| | | 1. Reimbursement Requirements of State Medicaid Program | 2 |
| | | 2. Branded PPD - Products | 3 |
| | | 3. Generic PPD - Erythromycin | 3 |
| | | 4. Multi-source Hospital Products Division Drugs | 4 |
| II. | QUALIFICATIONS AND COMPENSATION | | 5 |
| III. | ABBOTT'S PPD AND HPD FOCUS ON DIFFERENT PRODUCTS, DIFFERENT CUSTOMERS AND DIFFERENT DISTRIBUTION CHANNELS | | 8 |
| | A. | PPD Products And Customer Contracting And Distribution | 9 |
| | | 1. Branded Drugs | 9 |
| | | 2. Generic Drugs | 10 |
| | B. | HPD Products And Customer Contracting And Distribution | 11 |
| IV. | OPINIONS | | 13 |
| | A. | Under The Montana Medicaid Administrative Rule, There Should Have Been No Reimbursements For Abbott's Subject Drugs Based On AWP. | 13 |
| | B. | Branded PPD Products Sold To Retail Pharmacy At Direct Price | 14 |
| | | 1. Abbott Sold Depakote® and Biaxin® To Wholesalers And Retail Pharmacies At Its Published Direct Price. | 14 |
| | | 2. In Almost Every Case Through Mid-2001 The Reimbursements Made By The State Medicaid Agency For Depakote® And Biaxin® Were Not Paid At The "AWP Based Statutory Formula". | 16 |
| | | 3. The Net Effective Reimbursement Paid By Medicaid Was Further Reduced Below Cost To The Retail Class of Trade Through Medicaid Rebates | 17 |

**CONFIDENTIAL DRAFT**                                    **HIGHLY CONFIDENTIAL**
**TABLE OF CONTENTS**
(continued)

Page

C. In Almost Every Case Until Mid-2001 The State Did Not Reimburse PPD's Sole Generic Subject Drug, Erythromycin, At The Statutory AWP Based Level and Normally Reimbursed Pharmacies At Widely Varying Levels Well Below the Statutory AWP Based Formula ................................... 19

D. In Almost Every Case Until Mid-2001 Medicaid Did Not Reimburse Abbott's HPD Drugs At The Statutory AWP Based Level And Normally Reimbursed Pharmacies At Widely Varying Levels Well Below The Statutory AWP Based Formula. Furthermore, Reimbursements Under Medicaid's Retail Pharmacy Benefit Are Inconsequential To The Overall Sales Of HPD Products. .......................................... 22

   1. In Almost Every Case Until Mid-2001 Medicaid Did Not Reimburse HPD Products Using the AWP Based Statutory Formula. .......................................................... 23

   2. Montana Medicaid's Reimbursements For Abbott's HPD Drugs Represent An Inconsequential Portion Of The HPD Sales In The State ........................................... 25

E. Montana Medicaid Had Significant Actual Knowledge Regarding Discounting Of Abbott Products To Non-retail Purchasers. ...................................................................... 26

V. CONCLUSION. ................................................................................. 27

## I. EXECUTIVE SUMMARY

1. This Executive Summary provides an overview of the opinions I render in this matter, which are based on and incorporate the reasons and grounds set forth in the sections that follow.

2. I am a consultant with extensive experience in the healthcare industry and, through that experience, I have gained in depth knowledge and understanding regarding the processes by which prescription pharmaceuticals are distributed, health care costs, including drugs, are reimbursed, and the interrelationships among the many different participants in the distribution and reimbursement chains for both branded and generic drugs.

3. This report supplements the information and opinions provided by Declaration of Eric M. Gaier, PH.D. dated February 8, 2007 with information specific to Abbott Laboratories ("Abbott") products and provides additional opinions based upon Abbott's sales information and Montana Medicaid's reimbursement practices for Abbott's Subject Drugs[1].

4. Montana Medicaid's expert, Dr. Hartman has provided a report and penalty determination[2] solely related to Medicaid pharmacy benefit transactions, and I have limited my discussion and analysis to these specific transactions. I reserve the right to address other areas if Dr. Hartman or the Plaintiff asserts liability and damages for claims reimbursed as Medicare supplemental payments under Medicaid, Medicaid medical benefit claims (i.e., J-code claims), State Employee Health Benefit Plans (SEHBPs), third-party commercial insurance claims or any other claims reimbursed under a program paid for by the State or its citizens.

5. Dr. Hartman's penalty calculation is solely focused on pharmacy reimbursements by Montana Medicaid. For Abbott, most of Dr. Hartman's penalties are associated with drugs manufactured, marketed and sold by its Pharmaceutical

---

[1] A "Subject Drug" is an Abbott drug that has been identified in Dr. Hartman's penalty calculation. This excludes for example drugs such as Calcijex for which there were no Montana Medicaid Pharmacy Benefit Claims.

[2] Dr. Hartman did not calculate damages related to the Medicaid pharmacy benefit transactions for Abbott Subject Drugs. I reserve my right to amend this report if Dr. Hartman or Plaintiff asserts damages associated with the Medicaid pharmacy benefit transactions.

Products Division "PPD". Therefore, much of my discussion and analysis will be focused on Abbott's self-administered drugs sold by PPD. The remaining drugs at issue are hospital products manufactured and sold by the Hospital Products Division "HPD"[3].

6.  In the body of this report I will address the most critical issues associated with the allegations of Montana Medicaid and Dr. Hartman's penalty calculation. I also provide certain additional opinions and related support that are germane to this matter in Appendix 1 to this report.

### A.  Summary of Opinions

#### 1.  Reimbursement Requirements of State Medicaid Program

7.  The State of Montana's Medicaid reimbursement methodology should have entirely avoided the use of an AWP based reimbursement for all Abbott products:

   A.  The Montana Medicaid reimbursement Administrative Rule required Medicaid to use direct price for reimbursement when such a price was available.[4] A direct price was published for all Abbott Subject Drugs for the entire period of this matter; therefore, an AWP based formula should not have been relied upon by Medicaid.

   B.  The reimbursement data indicates that during the 1990's and until mid-2001, Medicaid did not systemically use an AWP based reimbursement structure for pharmacy claims. In 2002, when Montana Medicaid did begin reimbursing for Abbott's drugs based on AWP, it did so after making a conscious policy decision to pay pharmacists more money.[5] In fact, Montana Medicaid agreed to allow pharmacists to resubmit claims for the

---

[3] On April 1, 2004, Abbott divested itself of its Hospital Products Division and no longer sells or markets these products. Nevertheless, Dr. Hartman calculates penalties for Abbott beyond that date.

[4] See Mont. Admin R. 37.86.1101.

[5] See MT 00035 and MT005358-59.

past twelve months in order to receive the AWP based reimbursement structure for Subject Drugs previously reimbursed based on direct price.[6]

### 2.    Branded PPD - Products

8.    Abbott's PPD sold its branded subject drugs at or about its published WAC to the retail class of trade[7]. For PPD branded products at issue here, WAC and direct price were the same. Accordingly, I will use the term direct price for these drugs for the remainder of this report.

9.    In almost every case until mid-2001, Medicaid did not reimburse the retail pharmacies for Abbott's branded PPD products relying on the statutory AWP based formula.

10.   The Medicaid rebates paid by Abbott's PPD brought the net reimbursement paid by Medicaid for the branded subject drugs well below the price retail pharmacies typically paid for the drugs.

### 3.    Generic PPD - Erythromycin[8]

11.   Based on my industry experience and for the reasons cited by Dr. Gaier, I concur with Dr. Gaier's conclusion that it is widely accepted in the healthcare industry (by both purchasers and commercial and governmental payors) that generic products are sold and reimbursed at deep and widely varying discounts in the commercial market. It is also widely accepted that MAC's are usually established to replace the use of undiscounted published list prices or AWP benchmarks for reimbursement of these generic drugs and these MAC levels normally adjust reimbursements closer to the discounted market price of the generic drug.

---

[6] *See* MT 00035 and MT005358-59. Montana allowed pharmacies to retroactively receive this increased reimbursement level back to late June or early July of 2001 if the pharmacy re-filed its claims. Medicaid's reimbursement data supports this approach with claims starting with dates of service in the second half of 2001 beginning to be reimbursed at the increased level.

[7] Manufacturers normally grant an across the board prompt payment discount of 1% to 3.5% to all wholesalers, distributors and other direct customers. Abbott used a 2% prompt payment discount. Throughout the remainder of this report and in my analysis I consider sales at WAC or direct price (which for these drugs are equal) less a prompt payment discount to be sales at direct price.

[8] The Subject Drugs at issue include various strengths of erythromycin including Abbott's time release formula Ery-Tab®. All Abbott erythromycin NDCs including Ery-Tab® are generic products.

12. Montana Medicaid's actual reimbursements for the entire period that forms the basis of Medicaid's penalty calculation establishes the following:

   A. In almost every case until mid-2001, Medicaid did not reimburse retail pharmacies for Abbott's sole generic self administered Subject Drug, erythromycin, using the statutory AWP based formula. Rather, Montana reimbursed retail pharmacies at widely varying amounts many of which were a small fraction of both the statutory AWP based formula and the direct price of erythromycin. Therefore, Medicaid knew it could use substantial discounts below the statutory AWP based formula. As a result, the actual reimbursement data establishes that the State did not rely on the statutory AWP based formula as a proxy of the estimated acquisition cost.

   B. Furthermore, in the limited cases in which the Medicaid elected to use the statutory AWP based formula, it did so in contradiction to the State's requirement to use the published direct price or MAC for the drug.

   C. Finally, under-payments of dispensing fees have a particularly pronounced impact on low cost generic drugs such as erythromycin. For these low cost drugs, overall differences between the acquisition cost and the reimbursement amounts are likely to be insufficient to subsidize the under-payment of dispensing fees in most cases.

### 4.   Multi-source Hospital Products Division Drugs

13. For the entire period that forms the basis of the penalty calculation, a very small portion of Abbott's HPD sales of Subject Drugs relate to the pharmacy class of trade for which Medicaid bases its penalty calculation.

14. Medicaid's actual reimbursements establish the following regarding Medicaid's payments for HPD products:

   A. In almost every case until mid-2001, Medicaid did not reimburse for Abbott's HPD Subject Drugs based on the statutory AWP based formula. Similar to Abbott's erythromycin, Medicaid often reimbursed these multi-source

Subject Drugs at a fraction of the AWP based formula. Medicaid therefore knew that the published AWP was not a surrogate for estimated acquisition cost.

B.   Medicaid's reimbursements under its retail pharmacy benefit for Abbott hospital products represent an inconsequential portion of HPD sales in the State. In addition, the number of reimbursements that were based upon the statutory AWP formula were a small fraction of that inconsequential volume.

C.   Furthermore, in the limited cases in which the State elected to use the statutory AWP based formula, the State did so in contradiction to its own requirement to use the published direct price of Abbott's drug or MAC.

D.   Finally, under-payments of dispensing fees have a particularly pronounced impact on many of the low cost HPD products. For these low cost drugs, overall differences between the acquisition cost and the reimbursement amount are likely to be insufficient to subsidize the under-payment of dispensing fees.

15.   Based on a review of the State's contracts to purchase Abbott drugs, Medicaid had significant actual knowledge of the prices paid for Abbott products. These discounted prices paid by the State for Abbott's hospital products ranged from approximately a 48% to 89% discount off the published direct price.

## II.   QUALIFICATIONS AND COMPENSATION

16.   I have been a consultant to the health care industry for more than twenty years. I have substantial experience with health insurance reimbursement, claims processing, pharmaceutical pricing and distribution channels, and Government pricing and reimbursement in the health care industry. My Curriculum Vitae is attached as Exhibit 1a, and a listing of testimony I have provided is attached as Exhibit 1b.

17.   Specifically, I have substantial experience in analyzing insurance companies' claims data and reimbursement schedules. For example, I have worked with health insurance companies to analyze their claims and membership data to assess their Medicare coordination of benefits processes. Associated with these engagements, I have analyzed large health insurer claims data sets. In addition, I have analyzed large claims data sets containing a variety of contractual reimbursement structures outside of the Medicare context to determine if the insurance

company or its subcontractor properly paid claims in accordance with particular contractual terms or State requirements.

18. I also have extensive experience assisting insurance and managed care companies structure and prepare proposals to perform managed care support contracts for the Department of Defense under the TRICARE program. This program provides health insurance to active duty and retired military personnel and their families. My work on these engagements, dating back to the early 1990's and continuing through 2003, has focused on assisting managed care companies structure their operations and estimate the administrative pricing to perform all requirements of the contract, including claims processing, customer service, provider relations, provider contracting, utilization management, and quality management. As part of these engagements, I have worked closely with the insurance companies' management as well as their actuarial and technical experts to make overall strategic pricing assessments relating to the various components of health care pricing, including pharmaceutical reimbursements, and their related administrative costs. The controllable health pricing components considered include provider network contracting, pricing, and discounting; utilization management; and coordination with military treatment facilities.

19. I have worked with various insurance companies that contract as Medicare Fiscal Intermediaries and Medicare Carriers to assist them in various government contracting requirements, proposal for the new Medicare Administrative Contracts and requirements associated with transitioning Medicare claims processing activities to a successor contractor. I am therefore familiar with the operating structure of these organizations and their related cost structures.

20. I have experience related to pharmaceutical manufacturer pricing and discounting practices for both branded and generic drugs particularly as it relates to government programs such as the Medicaid Rebate Act ("MRA") and the Veterans Health Care Act ("VHCA") as well as the recently adopted Medicare ASP regulations. I have worked with pharmaceutical companies in performing detailed analyses of their historical pricing, chargebacks, and rebate data to assist them in complying with these Federal programs. As a result, I am familiar with the conceptual and practical

objectives and processes that have resulted from the Governmental guidance related to these programs as well as how that guidance is applied throughout the pharmaceutical industry. As part of those engagements, I have analyzed large data sets to assess compliance with applicable Best Price or Most Favored Customer price requirements as well as defining the appropriate classes of trade and pricing actions to be included to arrive at the various average prices calculated under these Federal requirements (i.e. Average Manufacturer Price ("AMP") under the MRA, Non-Federal Average Manufacturer Price ("Non-FAMP") under VHCA and Average Selling Price (ASP) under Medicare Part B.)

21. I have served as an independent expert in disputes and contractual compliance related to pharmaceutical manufacturers. These matters have included the assessment of a pharmaceutical company's cost allocation to product lines, performance of a royalty audit under the provisions of its joint marketing agreement, and an arbitration dispute between a pharmaceutical manufacturer and a PBM regarding the appropriateness of rebates billed by the PBM.

22. I have assisted companies that sell commercial products to the Federal government through GSA and VA Federal Supply Schedules. The Federal regulations allowing companies to obtain these contracts require extensive disclosures of commercial sales practices and pricing. During these engagements, I have analyzed large volumes of data related to pricing, discounting, and rebates to determine the company's pricing and discounting practices. I have also assisted companies in preparing comprehensive disclosures of their commercial sales practices. These engagements involved a wide range of industries including, among others, furniture manufacturers, security equipment manufacturers, durable medical equipment manufacturers, secure communications systems, and satellite telephones.

23. I am being compensated at an hourly rate of $425.00. No portion of my firm's compensation is dependent on the nature of my findings or on the outcome of this matter. A list describing the data and information I relied upon is attached as Exhibit 2.

## III. ABBOTT'S PPD AND HPD FOCUS ON DIFFERENT PRODUCTS, DIFFERENT CUSTOMERS AND DIFFERENT DISTRIBUTION CHANNELS

24. In this section, I explain the unique products, customers, and distribution channels in which Abbott sells both self-administered drugs (primarily retail pharmacy products) and physician administered drugs (primarily hospital products). The customer base and process of selling self administered drugs and physician administered drugs differs significantly. Abbott maintained two independent divisions to focus on these unique product portfolios and customer markets.

25. The Pharmaceutical Products Division ("PPD") focused primarily upon selling self administered drugs to retail pharmacies. Three of Abbott's Subject Drugs are self administered -- Depakote® and Biaxin®, which are branded drugs, and erythromycin, which is a generic drug. The Hospital Products Division ("HPD") focused primarily upon selling various hospital supplies, including certain lower cost multi-source physician administered drugs like the HPD Subject Drugs[9], to hospitals and other healthcare facilities such as nursing homes with minimal retail pharmacy sales and Medicaid reimbursements.

26. For all HPD and PPD Subject Drugs, a direct price was available from the pricing compendia during the entire period of this matter. Consistent with industry practice, the direct price is the list price at which a direct customer can purchase the product on a non-discounted basis. In situations in which the direct customer has control over which competing product is used by that pharmacy or facility, the direct customer can enter into a contract with manufacturer to purchase the product at discounted prices below the direct price. The level of discounting below direct list price is based upon the level of price competition from competing drug manufacturers and the relative size and negotiating power of the direct purchaser.

---

[9] Unlike oncology products that are used almost exclusively in cancer treatment and primarily delivered in a doctor's office, HPD drugs are primarily low cost-intravenous solutions and injectible antibiotics sold primarily to hospitals.

A.   **PPD Products And Customer Contracting And Distribution**[10]

1.   **Branded Drugs**

27.   PPD sells primarily branded products to retail pharmacies. Because the majority of these products are not subject to generic competition and substitution[11], Marketing efforts for branded self-administered products generally focus upon the physicians that prescribe the product and the sales and contracting effort is directed to TPPs that reimburse for these products and can influence product selection through their formularies. The retail pharmacies typically cannot influence the sales of these products because there are no substitutes. As a result, Abbott does not discount to retail pharmacies.

28.   Branded drug manufacturers selling efforts focus on educating the prescribing physician on the medical benefits and use of each specific branded drug it sells. These efforts are normally product specific because the drugs are proprietary and have unique medical benefits. The physicians do not purchase the drugs for resale; therefore, purchase price is not an element of the sales process to physicians.

29.   Retail pharmacies, the entities that receive reimbursement for drugs, typically buy branded products at direct price or more. With no ability to substitute, retail pharmacists must stock these branded drugs in order to have them available when their customers present a prescription. Under these circumstances retail pharmacies have little ability to influence price and negotiate discounts.

30.   In addition, PPD contracts with TPP's by entering into rebate agreements under which the TPP obtains rebates from PPD for its members' utilization of PPD's drugs. These rebates are granted in exchange for a) disease management programs that encourage the use of the drugs to lower overall medical costs through improved health management and b) preferred placement on formularies and preferred drug lists ("PDL") to lower overall cost to the payor and thereby encourage the selection of an Abbott branded drug within a therapeutic class from among the various other branded

---

[10] The information contained in this section is based on my review of the data provided in this case, my review of the company's website, and my past industry experience.

[11] See Montana State Code, 37.7.504 – General prohibition of drug substitution, states that, "No person may substitute a drug different from the one ordered or deviate in any manner from the requirements of an order or prescription, except as provided in this part".

products within that therapeutic class. These competing products are not equivalent, so they cannot be substituted like generic products can be substituted by a pharmacist. However, these branded therapeutic competitors can often treat the same medical condition through alternative branded product treatment regimens. As a result, the managed care company can influence a product selection through preferred formulary/PDL placement and reduced co-payments. It is important to note that these rebates are not price discounts to the retail pharmacies. These rebates reduce the reimburser's net outlay.

### 2. Generic Drugs

31. PPD also sells a limited number of generic self administered drugs. The sales and distribution process for generic retail pharmacy drugs is entirely different than branded sole source drugs. Generic products are considered substitutable with the branded products and the generic versions are biologically equivalent. As a result, the pharmacy controls product selection because it chooses which of the equivalent, competing generics it dispenses in its pharmacies.

32. Manufacturers discount to pharmacies under direct head to head competition with other manufacturers selling indistinguishable generic products. This results in significant discounting to the retail pharmacies purchasing under contract. The manufacturer does maintain a limited volume of undiscounted direct price sales to non-contracted pharmacies (pharmacies that purchase discounted product from competing manufacturers under contract) associated with emergency purchases by those pharmacies when their contracted supplier of a drug cannot adequately supply the pharmacy due to manufacturing or other issues that limit the contracted manufacturer's supply. It is widely accepted that the level of discounting related to generic products under contracts varies depending upon how long the product has been under generic competition and how many companies compete with generic alternatives[12].

---

[12] See "How Increased Competition From Generic Drugs Has Affected Prices And Returns In The Pharmaceutical Industry", A CBO Study, dated July 1998.

33. The sales process for generics also differs significantly from branded drugs. Price competition drives success in this area because it is not possible to differentiate one generic drug from another competing generic. The sales effort is a broader contracting sales approach directly with the dispensing pharmacy or its buying group. This contracting effort focuses upon the competitiveness of the price, the reliability of the supply from the manufacturer and the breadth of the product portfolio (thereby limiting the number of suppliers with which the pharmacy must contract). In addition, TPPs do not achieve price control for generics through rebates but instead lower reimbursements by establishing strict reimbursement limitations through "Maximum Allowable Cost" ("MAC") [13] listings that lower reimbursements well below published list prices for these products. TPP MAC listings are updated on an ongoing basis to reflect market price reductions that occur as generic competition intensifies[14].

### B. HPD Products And Customer Contracting And Distribution[15]

34. Abbott's HPD sells primarily to hospitals with a modest volume of sales to other medical facilities such as nursing homes and out-patient facilities.[16] Furthermore, the majority of HPD's products are multi-source drugs with generic competition.

35. The HPD sales and contracting process to hospitals is significantly different from the sales and marketing process to retail pharmacies used by PPD and

---

[13] Medicaid's reimbursement policies contemplate an inferior form of MAC reimbursement limitations associated with the methodology employed under the FUL. The 2004 Mont. Admin. R. 37.86.1101 states that, "Maximum allowable cost (MAC) means the upper limit the department will pay for multi-source drugs. In order to establish base prices for calculating the maximum allowable cost, the department hereby adopts and incorporates by reference the methodology for limits of payment set forth in 42 CFR 447.331 and 447.332 (1996). The maximum allowable cost for multi-source drugs will not exceed the total of the dispensing fee established by the department and an amount that is equal to the price established......for the least costly therapeutic equivalent". See the following footnote for a discussion of the method employed by TPP's other than Montana Medicaid including other government programs.

[14] TPP employ MAC's based on current market pricing to reimburse generic drugs. This approach is employed by other governmental health plans such as Federal Employee Health Benefits Program, TRICARE Health Benefits Program, Various State Employee Health Benefits Programs and various other States' Medicaid Programs. For example, the Blue Cross FEHBP pharmacy benefits plan estimated that in 1995 the "Maximum allowable cost (MAC) savings accounted for approximately $72 million in savings. MAC refers to the maximum price that retail pharmacies in PCS' network may be paid for certain generic drugs. Savings resulted from the difference between the reimbursement amount PCS paid the pharmacies for these generic drugs and the drugs' usual and customary prices". Source: GAO/HEHS-960182R Blue Cross FEHBP Pharmacy Benefits, July 19, 1996, pp 15-16.

[15] The information contained in this section is based on my review of the data provided in this case, MDL December 20, 2005, Deposition Transcript for Mike Sellers, and my past industry experience.

[16] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at p. 124, and at Exhibit 2, p. 20.