described above.[17] HPD sells and distributes many products other than drugs to hospitals including medical devices, delivery systems, solutions, monitoring systems and medication management systems.[18] These products, along with Abbott's complete line of injectible antibiotics, anesthetics, solutions and narcotics, allow Abbott to offer a large portfolio of products tailored to meet the needs of a hospital and allows the hospital to negotiate one contract to fulfill those needs.[19]

36.   HPD's sales process focuses on maximizing the portfolio of its products that it could include in its contracts with the hospital.[20] The contracting process for these hospital supplies and lower cost drugs did not focus on specific drugs and instead focused upon the reliability of supply of the entire portfolio, the competitiveness of the pricing for the portfolio of products and the breadth of the overall product portfolio itself.[21] Abbott's HPD also differentiates its products through its unique packaging and delivery systems which increase productivity of the medical staff and reduce the risk of medication errors.

37.   HPD distributed its products directly to its customers up until about 1983.[22] This direct distribution approach represents another unique aspect of HPD. Direct distribution was used by HPD until that time because its customer base was almost exclusively limited to hospitals, so the delivery locations were more limited than retail pharmacy drugs.[23] Furthermore, most of Abbott's products were intravenous solutions which were large in physical volume (i.e. one liter bottles of solutions versus pills). This distribution method resulted in HPD maintaining only a direct price up until the time it began using wholesalers.[24]

---

[17] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, p. 19.

[18] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at pp. 74-75.

[19] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at pp. 74-75

[20] See MDL December 20, 2005, Deposition Transcript for Mike Sellers at p. 134, and at Exhibit 2, p. 57.

[21] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at pp. 74-75.

[22] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, pp. 7-8.

[23] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, p. 20.

[24] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, pp. 7-8.

38. Direct prices represented the undiscounted price at which a non-contract direct customer would purchase the product.[25] These direct price purchases were often small volume purchases of less than a case. Discounted contract pricing to direct customers was stated as a percentage discount off the published direct price. Discounted contract pricing was granted to high volume contract customers.[26] In the 1980's when HPD began using wholesalers and distributors it also established the wholesaler list price or "WAC".[27] This price represented the list price at which wholesalers could purchase the product.[28] These prices were established for full case purchases only and were therefore set below the direct price level.

39. By far HPD's largest customers were contracted hospitals who received HPD's lowest overall pricing.[29] Other medical facilities such as nursing homes and home health entities also purchase products including drugs from HPD, but because they were generally smaller volume purchasers they do not receive discounting as deep as large hospital customers.[30] Sales of these products to retail pharmacies were inconsequential to the total sales of these products. Abbott also maintained a small volume of undiscounted sales to wholesalers or direct customers at the applicable list price when an emergency buy situation arose for that customer or when the customer was a low volume entity that could not obtain discounts based on their buying power.

## IV. OPINIONS

### A. Under The Montana Medicaid Administrative Rule, There Should Have Been No Reimbursements For Abbott's Subject Drugs Based On AWP.

40. The Montana Medicaid Administrative Rule employs a lesser of methodology for reimbursement. Medicaid pharmacy reimbursement is paid at the lower of (1) usual and customary charge; (2) maximum allowable cost; or (3) estimated

---

[25] *See* MDL December 20, 2005, Deposition Transcript for Mike Sellers, at p. 126-127.

[26] *See* MDL December 20, 2005, Deposition Transcript for Mike Sellers, at p. 131,136.

[27] *See* MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, pp. 7-8.

[28] *See* MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, pp. 7-8.

[29] *See* MDL December 20, 2005, Deposition Transcript for Mike Sellers, at p. 200.

[30] *See* MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, pp. 20-22.

acquisition cost.[31] Estimated acquisition cost is defined as the manufacturer's direct price, or, if no direct price is available, the AWP-10% prior to July 2002 and AWP-15% after July 2002. In addition, a lower acquisition cost may be established by Medicaid if the department determines that acquisition cost is lower than the AWP based formula or direct price based on data provided by the drug pricing file contractor.[32,33]

41.   I have determined that each of the Abbott Subject Drugs had direct prices published by the pricing compendia[34]. Medicaid should not have reimbursed any of Abbott's Subject Drugs based on the formula that referenced the published AWP and, therefore, any reimbursements done on such basis were due to an election on the part of Medicaid to override the requirement of the Administrative Rule.

42.   In 2002, Montana Medicaid made a conscious choice to reimburse at the AWP-based level after receiving numerous complaints from providers. In response to the complaints, the State even allowed providers to resubmit claims retroactive to July 1, 2001 so that the providers might receive the higher AWP based payment.[35]

### B.   Branded PPD Products Sold To Retail Pharmacy At Direct Price

#### 1.   Abbott Sold Depakote® and Biaxin® To Wholesalers And Retail Pharmacies At Its Published Direct Price.

43.   Abbott sold its Subject Drugs, Depakote® and Biaxin®, at direct price to its customers within the retail class of trade[36]. The large chain pharmacies, which purchased directly from Abbott, paid direct price and other retail pharmacies, which purchased from wholesalers, likely paid at or above direct price. Since most retail

---

[31] See Mont. Admin R. 37.86.1105.

[32] See Mont. Admin R. 37.86.1101

[33] According to the OIG report, OEI-30-01-00010, dated September 2001, Montana had access to the revised AWPs based on the data for 400 NDC's provided by the DOJ and reported by First DataBank as of May 2000, however, Montana did not use those DOJ AWP prices provided for Abbott Subject Drugs. The DOJ revised AWPs were typically lower than the published AWPs for the Abbott Subject Drugs.

[34] I reviewed both First DataBank and Redbook as well as Abbott's price catalog to validate the existence of direct price. The compendia published an AWP for these products, and periodically published a WAC.

[35] See MT 005358-005359.

[36] In this report and all related analyses and Exhibits I use the definition of retail class of trade established under the guidance published by CMS related to the Medicaid Rebate Act. This is the appropriate class of trade to be used when assessing the allegations related to self administered drugs dispensed to patients primarily through retail pharmacies. This definition excludes hospitals, HMO's and governmental purchasers. Inclusion of hospital and governmental pricing is inappropriate when measuring retail acquisition costs.

pharmacies purchased Depakote® and Biaxin® at or around direct price (either slightly above or slightly below) there is no "spread" between the retailers' acquisition cost for Depakote® and Biaxin® and the published direct price. The direct price for Depakote® and Biaxin® is published by the compendia along side the AWP.[37] As an example, below is a summary of the information published electronically by the pricing compendia related to Biaxin®.

**Price History for Biaxin 500 MG Tablet (00074-2586-11)[1]**

| Effective Date | AWP Unit | DIR Unit | WAC Unit |
|---|---|---|---|
| Current | 5.49240 | 4.39390 | 4.39390 |
| 2/1/2006 | 5.49240 | 4.39390 | 4.39390 |
| 2/1/2005 | 5.30660 | 4.24530 | 4.24530 |
| 5/4/2004 | 5.10810 | 4.08650 | 4.08650 |
| 5/3/2004 | 4.96480 | 3.97180 | 3.97180 |
| 1/7/2004 | 4.96480 | 3.97180 | 3.97180 |
| 10/17/2003 | 4.77910 | 3.82330 | 3.82330 |
| 7/2/2003 | 4.64500 | 3.71600 | 3.71600 |
| 2/4/2003 | 4.54990 | 3.63990 | 3.63990 |
| 1/2/2002 | 4.37975 | 3.50380 | 3.50380 |
| 1/3/2001 | 4.00900 | 3.34080 | 3.34080 |
| 2/3/2000 | 3.82260 | 3.18550 | 3.18550 |
| 10/6/1999 | 3.57700 | 2.98080 | 2.98080 |
| 2/19/1999 | 3.47340 | 2.89450 | 2.89450 |
| 8/22/1996 | 3.45100 | 2.76080 | 2.76080 |
| 1/22/1996 | 3.38340 | 2.70670 | 2.70670 |
| 6/1/1995 | 3.26900 | 2.61520 | 2.61520 |
| 9/7/1994 | 3.14690 | 2.51750 | - |
| 4/6/1994 | 3.02940 | 2.42350 | - |

(1) All prices obtained from Redbook and First DataBank.

44.     The table below summarizes my analysis of all direct and indirect retail sales data for Depakote® and Biaxin® from 1995 to 2003.

**Retail Class of Trade 1995-2003**

| | Depakote (00074-6215-11) | | Biaxin (00074-2586-11) | |
|---|---|---|---|---|
| | Dollars | Percentage | Dollars | Percentage |
| Sales at WAC [1] | 124,618,605 | 95.47% | 61,060,883 | 95.94% |
| Sales below WAC | 5,909,429 | 4.53% | 2,582,720 | 4.06% |
| Total | 130,528,034 | 100.00% | 63,643,602 | 100.00% |

Notes:
(1) Sales at WAC represent those sales at or above WAC less a 2% cash discount.

---

[37] The pricing compendia published AWP, direct price and WAC for Depakote® and Biaxin® during the entire period subject to litigation.

45. This data establishes that at least 95 percent of Abbott's sales of the subject drugs Depakote® and Biaxin® to the retail class of trade were made at the published direct price.

46. Because Abbott sold Depakote® and Biaxin® at Abbott's published direct price to the retail class of trade, there is no evidence to support Medicaid's allegation that Abbott artificially inflated its published pricing, and therefore it is inappropriate to assess any penalties related to these products.

2. **In Almost Every Case Through Mid-2001 The Reimbursements Made By The State Medicaid Agency For Depakote® And Biaxin® Were Not Paid At The "AWP Based Statutory Formula"**

47. The reimbursement data provided by Montana Medicaid clearly establishes that in almost every case up to mid-2001 it did not use the AWP based statutory formula for its reimbursement payments for Depakote® and Biaxin®.

48. I have reviewed the reimbursement policies of the State and calculated the reimbursement level from January 1, 1991 to June 30, 2001 for Montana Medicaid that would have resulted had the State used the AWP based approach. Applying this calculation to the data produced by Medicaid, I have determined that Medicaid used various reimbursement methodologies or amounts that did not rely on the AWP associated with Depakote® and Biaxin®. The graphs below[38] show that during the period from 1991 to mid-2001, there were no reimbursements paid by the State for Biaxin® using the percentage off AWP formula and only ¼% of the Depakote® transaction were reimbursed using the AWP based formula.





---

[38] The reimbursement amount used in my analysis of Medicaid payments throughout this report represents the amount paid by Medicaid less dispensing fee plus co-payment. *See* MT 005195, MT 028943, MT 029944, MT 033215.

HIGHLY CONFIDENTIAL

### 3. The Net Effective Reimbursement Paid By Medicaid Was Further Reduced Below Cost To The Retail Class of Trade Through Medicaid Rebates

49. For branded drugs such as Depakote® and Biaxin® State Medicaid agencies receive a rebate of the greater of 15.1 % of the Average Manufacturer Price (AMP)[39] per unit or the difference between the AMP and the best price per unit, adjusted for drug price increases above the CPI-U since the launch date.[40] In addition, State Medicaid agencies recently have obtained additional drug rebates through supplemental rebate programs. The table below summarizes the overall process used by Medicaid to lower overall spending through drug rebates:

| Step 1: | The combined initial payment by the patient (co-pay) and Medicaid reimburses the pharmacy at an amount that is slightly above the published direct price (normally 0% to 10% above the published direct price.) |
|---|---|
| Step 2: | Medicaid calculates the units of the specific branded drug administered to its patients and submits a rebate request to the manufacturer based on the per unit rebate amount. |
| Step 3: | The manufacturer pays a rebate directly to the payor, thus reducing Medicaid's reimbursement for the branded drug. |

50. As a result of this three step process, the net amount Medicaid and the patient pay for a specific drug equals the initial payment to the retail pharmacy[41] less the rebate paid by the manufacturer back to Medicaid. (I will refer to this net amount ultimately paid by Medicaid for the drug as the "Net Effective Reimbursement After Rebate" throughout this section.)

51. I have calculated the Net Effective Reimbursement After Rebate paid by the State and determined that this amount is far below the price paid by the

---

[39] With respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts. See 42 U.S.C. Section 1396 r-8.

[40] See http://www.cms.hhs.gov/MedicaidDrugRebateProgram.

[41] The amount paid to a retail Pharmacy associated with a specific drug is the sum of the co-payment paid by the patient and the reimbursement payment paid by the payor. In addition, the payor also pays a separate fixed dispensing fee for each prescription that is filled for a patient. This fee is designed to cover the full cost of maintaining the pharmacy and filling the prescription. Underpayments in dispensing fees are discussed in detail in Dr. Gaier's report and I addressed them separately in the previous section of this Declaration.

HIGHLY CONFIDENTIAL

commercial retail market place as approximated by Abbott's direct price for Depakote® and Biaxin®. The graph below reflects my calculation of the average reimbursement paid Medicaid by year less the average rebate per unit paid to Medicaid each year[42]. This amount is the Net Effective Reimbursement After Rebate actually paid by the Medicaid. I then compared these amounts to the direct price for Depakote® and Biaxin® in each of those years. In all cases the Net Effective Reimbursement After Rebate paid by the State for Depakote® and Biaxin® was below, and sometimes substantially below, the direct price.



ACS Montana - Net Effective Reimbursement Using Per Unit Rebate Data
Difference Between Net Effective Reimbursement & Direct Price
Biaxin - 00074-2586-11

1) The chart represents per unit reimbursement less Abbott Rebates for Biaxin NDC 00074-2586-11
2) Net Effective Reimbursement Price per unit is calculated using the following formula: [(CLM_REIMBURSE_AMT - Drug Clm Disp Fee + Copay)-Total Rebates] / Total Units Reimbursed
3) Net Effective Reimbursement is categorized based on the date of service by year and is compared to Rebate data that is categorized by date of payment by year.
4) The Direct Price displayed is from First DataBank and Redbook.

---

[42] This table includes the Depakote® and Biaxin® NDCs with the highest volume of claims and greatest alleged penalties. Each NDC accounts for 60% and 80% of the total reimbursement claims for Depakote® and the Biaxin® respectively.

HIGHLY CONFIDENTIAL



ACS Montana - Net Effective Reimbursement Using Per Unit Rebate Data
Difference Between Net Effective Reimbursement & Direct Price
Depakote - 00074-6215-11

1) The chart represents per unit Reimbursement less Abbott Rebates for Depakote NDC 00074-6215-11.
2) Net Effective Reimbursement Price per unit is calculated using the following formula: [(CLM_REIMBURSE_AMT - Drug Clm Disp Fee + Copay)-Total Rebates] / Total Units Reimbursed
3) Net Effective Reimbursement is categorized based on the date of service by year and is compared to Rebate data that is categorized by date of payment by year.
4) The Direct Price displayed is from First DataBank and RedBook.

52. This comparison establishes that Medicaid ultimately paid an amount that was well below the price paid by the retail market for Depakote® and Biaxin®. This further establishes that Medicaid has suffered no damages, and no penalties apply to its Depakote® and Biaxin® reimbursements.

C. **In Almost Every Case Until Mid-2001 The State Did Not Reimburse PPD's Sole Generic Subject Drug, Erythromycin, At The Statutory AWP Based Level and Normally Reimbursed Pharmacies At Widely Varying Levels Well Below the Statutory AWP Based Formula**

53. One of the Abbott Subject Drugs, erythromycin, is a self-administered generic drug. Generic forms of erythromycin have been available since well before 1990. More than four competing companies sold this product during the period 1995 to 2005.

54. I have determined that Abbott's erythromycin had a published direct price[43]. As a result, under the Medicaid Administrative Rule for the State of Montana, Medicaid should have not reimbursed erythromycin based on the AWP for that drug.

55. I have reviewed the reimbursement policies of the State and calculated the reimbursement level from 1991 to mid-2001 that would have resulted had the State used the AWP based approach. Applying this calculation to the data produced by Medicaid, I have determined that in almost every case Medicaid did not reimburse based on the statutory AWP based formula until mid-2001 and then it only sporadically used that reimbursement level. Instead, Medicaid used various reimbursement methodologies or amounts that do not rely on the published AWP associated with erythromycin. The pie chart[44] below summarizes the percentage of claims reimbursed from 1991 to mid- 2001 under the statutory AWP based formula and what percentage was on some other basis:



**ERYTHROMYCIN (% of Claims)**

0.87%

99.13%

- Statutory AWP
- Other Basis

---

[43] I reviewed both First DataBank and Redbook as well as the Abbott's price catalog to validate the existence of direct price.

[44] This pie chart is based on all erythromycin NDCs included in the complaint.

56.     This analysis establishes that from 1991 to mid-2001, almost every claim paid by the State was not made using the percentage off AWP formula.[45] Furthermore, Medicaid's actual levels of reimbursement were normally below the AWP-based formula amount and were often well below that amount. The scatter graph below shows three months[46] of reimbursements for erythromycin.



ERY-TAB - 00074-6320-13
First Quarter 1997

1) The Chart represents Reimbursement Claims for Ery-Tab NDC 00074-6320-13
2) Reimbursement Price per unit is calculated using the following formula (CLM_REIMBURSE_AMT - Drug Clm Disp Fee + Copay)/ CLM_DRUG_QTY
3) Statutory AWP Reimbursement Amount is defined as AWP less 10%.

57.     This scatter shows that Medicaid reimbursed retail pharmacies at widely varying amounts many of which were a small fraction of statutory AWP based formula. The reimbursement levels paid by Medicaid were as low as 8 cents per unit. During any given day of this period, Medicaid reimbursed for this NDC at widely varying levels.  Furthermore, in the limited cases in which Medicaid elected to use the statutory AWP based formula it did so with ongoing and continuous reimbursement experience that established that drastically reduced reimbursement levels could be

---

[45] The State used AWP minus 10% until July 2002 AWP minus 15% after 2002.

[46] The entire period of this complaint shows similar patterns of reimbursement, but for scale purposes to avoid overlapping data points I have shown one calendar quarter (3 months) as an example.