and were used by the State. As a result, the actual reimbursement data establishes that the State did not rely on the statutory AWP based formula as a proxy of the estimated acquisition cost.

58. Dr. Gaier determined that Medicaid also underpaid its dispensing fee when compared with the actual dispensing costs of the pharmacy for each prescription filled by the retail pharmacies. The dispensing fee underpayment was as much as $5.30 (dispensing costs of $10 less the dispensing fee which was normally $4.70 or less). This under-payment has a significant impact for low cost generic drugs such as erythromycin. From 1991 – June, 2001 Medicaid reimbursed 35,588 claims for a total drug reimbursement of $225,483 resulting in an average per claim drug cost including co-payment of $6.34 per prescription. The combined impact of Medicaid normally reimbursing pharmacies for erythromycin at an average drug reimbursement per claim of under $6.34 combined with the dispensing fee underpayment refutes Medicaid's allegation that it overpaid pharmacies for this drug.

> D. **In Almost Every Case Until Mid-2001 Medicaid Did Not Reimburse Abbott's HPD Drugs At The Statutory AWP Based Level And Normally Reimbursed Pharmacies At Widely Varying Levels Well Below The Statutory AWP Based Formula. Furthermore, Reimbursements Under Medicaid's Retail Pharmacy Benefit Are Inconsequential To The Overall Sales Of HPD Products.**

59. As previously discussed, the sales of Abbott's Hospital products to the retail class of trade are inconsequential to the overall sales of these products. This is reflected in both Abbott's sales data and through the limited volume of pharmacy claims paid by Medicaid for these products. Furthermore, Medicaid did not normally reimburse for HPD products using the statutory AWP based formula and in fact often reimbursed at levels well below that amount. This section will establish that any assertion of penalties or damages related HPD's products reimbursed by Medicaid's retail pharmacy benefit is unsupported and incorrect.

**HIGHLY CONFIDENTIAL**

1. **In Almost Every Case Until Mid-2001 Medicaid Did Not Reimburse HPD Products Using the AWP Based Statutory Formula**

60. I have determined that HPD Subject Drugs had published direct prices[47]. As a result, under the Medicaid Administrative Rule for the State of Montana, Medicaid should not have reimbursed HPD subject drugs based on a statutory AWP based formula.

61. The graph below summarizes the percentage of claims paid by Medicaid based on the statutory AWP based formula and other methods from 1991 through June of 2001 for all HPD Subject Drugs included in Dr. Hartman's calculations.



HPD Products (% of Claims)

3.40% Statutory AWP
96.60% Other Basis

62. This graph establishes that even the small volume of claims processed for HPD products through the Medicaid pharmacy benefit through June of 2001 were almost never reimbursed using the AWP based formula. Furthermore, many of the claims that were not based on the statutory formula were well below the statutory AWP based formula. As previously discussed, all of these HPD products were multi-source products under generic competition. Therefore, it was universally known in the

---

[47] I reviewed both First DataBank and Redbook as well as the Abbott's price catalog to validate the existence of direct price.

industry and by payors that these products were discounted heavily. Using Dr. Hartman's largest volume HPD product, Sodium Chloride Bacteriostatic, as an example helps illustrate that Medicaid understood that pharmacies accepted payment at levels well below published price. I have plotted the actual reimbursement payments made by Medicaid in the first quarter of 1997 in the graph below.



1) The Chart represents Reimbursement Claims for Sodium Chloride Bacteriostatic - 00074-1966-07
2) Reimbursement Price per unit is calculated using the following formula (CLM_REIMBURSE_AMT - Drug Clm Disp Fee + Copay)/ CLM_DRUG_QTY
3) Statutory AWP Reimbursement Amount is defined as AWP less 10%.

63.  The actual reimbursement levels paid by Medicaid establish that it did not rely upon the AWP based formula which forms the basis of its claims. During any given week of this period, Medicaid reimbursed for the NDC at widely varying levels some as low as 85% below published AWP. Therefore, any reimbursements that were made based upon the AWP based formula were based on Medicaid's election to do so with ongoing and extensive reimbursement experience that indicated that much lower reimbursements could be (and were) paid under the Medicaid program.

64.  The impact of the underpayment related to dispensing fee must also be considered for HPD products dispensed in the retail pharmacy setting since it has a particularly significant impact upon lower cost multi-source HPD products. As

previously discussed, Medicaid under paid its dispensing fee for each prescription filled by the retail pharmacies by as much as $5.30 per prescription which reduces the amount that the pharmacy was ultimately paid in the rare cases in which it dispenses an HPD product. Again using Sodium Chloride Bacteriostatic as an example, from 1991 – June, 2001 Medicaid reimbursed 2,028 claims for a total amount of $20,551 resulting in an average per claim drug cost including co-payment of $10.13 per prescription. The under-payment of dispensing fee associated with low cost multi-source drugs has a significant impact on these relatively low volume hospital products dispensed under the retail pharmacy benefit, and must therefore be assessed when analyzing the overall reasonableness of the payment for these products.

2. **Montana Medicaid's Reimbursements For Abbott's HPD Drugs Represent An Inconsequential Portion Of The HPD Sales In The State**

65. As previously discussed, the primary focus of Abbott's HPD is sales to hospitals (either commercial or Governmental) and retail pharmacy sales are minimal.[48] I have selected Sodium Chloride Bacteriostatic as an example of this. I selected Sodium Chloride Bacteriostatic because it is the highest claim volume HPD drug reimbursed by Montana Medicaid. The pie chart below shows the total units reimbursed in Montana Medicaid's data for Sodium Chloride Bacteriostatic from 1995 to 2001 as a percentage of the total sales of this product in Montana by HPD during that same period:

---

[48] See MDL December 20, 2005, Deposition Transcript for Mike Sellers, at Exhibit 2, p. 20.

HIGHLY CONFIDENTIAL



Sodium Chloride Bacteriostatic Abbott Sales and Reimbursement Chart For
Montana Medicaid
NDC 00074-1966-07
January 1, 1995 to June 30, 2001

1) Sales data represents all Abbott sales in the state of Montana for the NDC listed above.
2) As of 2003 the Medicaid population of Montana was 11%.
3) Units shown in liters.

66.  The chart above demonstrates that less than 3 % of total units sold in the State were reimbursed by Medicaid under its pharmacy benefit.  This chart demonstrates that retail pharmacy Medicaid reimbursements are inconsequential to overall HPD sales.

E.  **Montana Medicaid Had Significant Actual Knowledge Regarding Discounting Of Abbott Products To Non-retail Purchasers**

67.  I have been informed that The Montana Department of Health and Human Services is the Agency that supervises Montana Medicaid also supervises The Montana Prison System Health Care Operations.  The State of Montana purchased Abbott's HPD drugs at significant discounts through direct contracts with Abbott.  Specifically, the Montana Agencies [49] purchased Abbott's products in the early 1990's at discounts ranging from 48%% to 89% below Abbott's published direct price.  The

---

[49] Montana State Prison, Montana State Hospital, and Montana Department of Health Education purchased Abbott drugs. See ABT AWP/MDL 109807 – 109816, ABT AWP/MDL 109864 – 109876, ABT AWP/MDL 109778 – 109787, ABT AWP/MDL 109789 – 109797, ABT AWP/MDL 122508 -122516, ABT AWP/MDL 098516 – 098523, ABT AWP/MDL 098524 – 098530, and ABT AWP/MDL 098540 -098542.

HIGHLY CONFIDENTIAL

Table below summarizes the various contracts the State had with Abbott and the pricing at which it purchased the product in relation to the selling price published by Abbott.

| | Average Discount Off Direct Price | | | | |
| --- | --- | --- | --- | --- | --- |
| | Year | | | | |
| | 1991 | 1992 | 1993 | 1994 | 1996 |
| MT State Hospital & State Prison | | | | | |
| Dextrose | 82.1% | 88.9% | 82.0% | 47.6% | |
| Fentanyl Citrate | | | | 89.0% | |
| Furosemide | | | | 47.8% | |
| Gentamicin Sulfate | | | | 80.8% | |
| Sodium Chloride | 82.1% | 82.6% | 85.6% | 52.2% | 83.0% |

V.   CONCLUSION

68.   Overall, the Montana Medicaid's penalty calculation failed to recognize the statutory requirements related to drug reimbursements under the State Medicaid program, its actual reimbursement practices for both the Subject Drug and related dispensing fee, well established industry standards for the reimbursement of drugs and unique aspects of the limited volume of Abbott's hospital products that are reimbursed under retail pharmacy benefit.  As a result, Montana Medicaid has inappropriately asserted penalties for each of the Subject Drugs sold by Abbott with no reliable support that such penalties apply to those reimbursements.  Furthermore, the actual reimbursement data provided by Montana Medicaid in discovery disprove those assertions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 8, 2007.

_____
Steven J. Young