# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | M.D.L. No. 1456 Civil Action No. 01-12257-PBS Judge Patti B. Saris |

REPORT OF INDEPENDENT EXPERT

PROFESSOR ERNST R. BERNDT

TO JUDGE PATTI B. SARIS

FEBRUARY 9, 2005

drug absolute gross margins had grown particularly rapidly for new multisource drugs, i.e. for drugs with initial generic entry after 1997.

41.   The essential reason that brands and generics have such differing gross profitability profiles for retail pharmacies stems from retailers' differential buying power in these two segments.  For any given prescription drug available from more than one generic manufacturer, the retail pharmacy buyer (particularly when organized into chains or other large buying groups) can stimulate price competition among the generic manufacturers.  This occurs since the retail pharmacist can credibly threaten to substitute between any of the FDA-certified bioequivalent generic versions of a drug, choosing the particular version having the most favorable price comparison, thereby stimulating price competition among generic manufacturers.  Moreover, commercial reimbursement from health plans/PBMs to pharmacies is typically the same, regardless of the generic manufacturer from whom the drug is purchased.

42.   By contrast, in most cases the retail pharmacy cannot freely substitute between different patent-protected single source brands, unless explicit permission is first obtained from the prescribing physician.  This inability to stimulate price competition among single-source brands means that when negotiating with branded manufacturer, the pharmacies have little bargaining power, and are essentially price takers.

43.   In terms of the historic relationship between AWP and pharmacies' acquisition costs, and between AWP and pharmacies' reimbursement from third party payors, the picture for generics is considerably more complex and diverse than that for brands.  Kolassa [1994a] paints a slightly different and potentially less benign picture for generic/multisource self-administered drugs:

> "This use of the AWP is even more pronounced with generic drugs.  Many
> generic companies have taken advantage of this use of AWP by inflating their

# EXHIBIT 3

# DEPARTMENT OF
# PUBLIC HEALTH AND HUMAN SERVICES
### HEALTH POLICY & SERVICES DIVISION



MARC RACICOT
GOVERNOR

LAURIE EKANGER
DIRECTOR

## STATE OF MONTANA

COGSWELL BLDG., 1400 BROADWAY
PO BOX 202951
HELENA, MONTANA 59620-2951

April 15, 1999

Jim Smith
Montana State Pharmaceutical Association
PO Box 4718
Helena, MT 59604

Dear Jim:

As you know, the Pharmacy Coordinating Committee conducted a survey of pharmacies with the University of Montana School of Pharmacy and Allied Health Sciences to determine the extent to which pharmacies acquired drug products directly from manufacturers. The survey showed that responding pharmacies purchase through drug wholesalers rather than directly from manufacturers. As a result of this survey, the Committee asked that Medicaid consider changing its reimbursement methodology for those labelers that currently pay at the direct price to average wholesale price less 10%.

We now have an opportunity to implement a change in the direct price methodology. The 1999 Legislature has authorized a 1% provider increase for each year of the next biennium. I propose that we use this increase to fund a change in the reimbursement methodology.

I recently completed an analysis of the direct price manufacturers to determine the program cost of changing from direct price (DP) reimbursement to average wholesale price (AWP) less 10%. Using product utilization from 7/1/97 through 6/30/98, I calculated the cost difference between the two reimbursement methods using the most current rates for AWP and DP. These cost differences are an estimate of program cost because they do not take into account recipient copay, maximum allowable cost (MAC) pricing on generics, and differences in submitted charges. The results of this analysis are shown below.

As you can see, removing all the labels from direct price would result in an increased cost of approximately $335,868 per year. The amount available to the program for a provider increase is approximately $48,817 in the first year, and $99,391 in the second year for a total of $148,208 for the biennium. These amounts were calculated by applying the 1% increase in each year of the coming biennium to the pharmacy dispensing fee. (Calculation: 1,162,310 scripts x .042 + 1,183,232 scripts x .084)

PHONE: (406) 444-4540     FAX: (406) 444-1861

MT 005370

Page Two
April 15, 1999

| Label | AWP- 10% | Direct Price | Difference/Year |
|---|---|---|---|
| 00005 | $163,253 | $146,954 | $16,300 |
| 00008 | $533,954 | $479,977 | $53,977 |
| 00009 | $236,015 | $209,561 | $26,454 |
| 00662-00663 | $3,363 | $3,167 | $196 |
| 00049 | $1,434,053 | $1,348,153 | $85,900 |
| 00069 | $805,650 | $758,464 | $47,186 |
| 00074 | $1,749,271 | $1,643,416 | $105,855 |
| TOTAL | $4,925,559 | $4,589,692 | $335,868 |

I propose that we phase in elimination of direct price reimbursement by removing labels 00005, 00008, 00009, 00662 and 00663 from this methodology for the 2000-2001 biennium. The analysis shows that this will result in approximately $193,854 greater cost to the Medicaid pharmacy program.  If the legislature authorizes another provider increase next biennium, we would continue to eliminate the labels subject to direct price.

Please share this proposal with members of the Montana State Pharmaceutical Association and let me know if it is acceptable.  If so, I will initiate the changes to become effective July 1, 1999. If you or anyone else have questions or comments, please feel free to contact me at (406) 444-2738 or dpoulsen@state.mt.us.

Sincerely,

Dorothy

Dorothy Poulsen
Pharmacy Program Officer
Medicaid Services Bureau

7.2.24.4
c:  Mary Dalton, Jeff Buska

MT 005371

# EXHIBIT 4

# Medicaid Provider Increase Proposal
## May 19, 1999

**Direct Price Survey**

The Pharmacy Coordinating Committee conducted a survey of pharmacies with the University of Montana School of Pharmacy and Allied Health Sciences to determine the extent to which pharmacies acquired drug products directly from manufacturers. The survey showed that responding pharmacies purchase through drug wholesalers rather than directly from manufacturers. As a result of this survey, the Committee asked that Medicaid consider changing its reimbursement methodology for those labelers that currently pay at the direct price to average wholesale price less 10%.

**Medicaid Cost Analysis**

An analysis of the direct price manufacturers to determine the program cost of changing from direct price (DP) reimbursement to average wholesale price (AWP) less 10% was completed. Using product utilization from 7/1/97 through 6/30/98, the cost difference between the two reimbursement methods using the most current rates for AWP and DP was calculated. These cost differences are an <u>estimate</u> of program cost because they do not take into account recipient copay, maximum allowable cost (MAC) pricing on generics, and differences in submitted charges. The results of this analysis are shown below.

| LABEL | NAME | AWP-10% | DIRECT PRICE | DIFFERENCE/YEAR |
|-------|------|---------|--------------|-----------------|
| 00005 | Lederle | $163,253 | $146,954 | $16,300 |
| 00008 | Wyeth | $533,954 | $479,977 | $53,977 |
| 00009 | Upjohn | $236,015 | $209,561 | $26,454 |
| 00662-00663 | Pfizer | $3,363 | $3,167 | $196 |
| 00049 | Pfizer | $1,434,053 | $1,348,153 | $85,900 |
| 00069 | Pfizer | $805,650 | $758,464 | $47,186 |
| 00074 | Abbott | $1,749,271 | $1,643,416 | $105,855 |
| **TOTAL** | | $4,925,559 | $4,589,692 | $335,868 |

**Increase Proposal**

Removing all the labels from direct price would result in an increased cost of approximately $335,868 per year. The amount available to the program for a provider increase is approximately $48,817 in the first year, and $99,391 in the second year for a total of $148,208 for the biennium. These amounts were calculated by applying the 1% increase in each year of the coming biennium to the pharmacy dispensing fee. (Calculation: 1,162,310 scripts x .042 + 1,183,232 scripts x .084)

The Department proposes phasing in the elimination of direct price reimbursement by removing labels 00005, 00008, 00009, 00662 and 00663 from this methodology for the 2000-2001 biennium. The analysis shows that this will result in approximately $193,854 greater cost to the Medicaid pharmacy program. If the legislature authorizes another provider increase next biennium, we would continue to eliminate the labels subject to direct price.

Dorothy Poulsen
Pharmacy Program Officer
Medicaid Services Bureau

MT 005369

# EXHIBIT 5



**MONTANA STATE PHARMACEUTICAL ASSOCIATION**

RECEIVED
MAY 28 1999
HEALTH POLICY & SERVICES

PO Box 4718 • 34 West Sixth Avenue • Helena, MT 59604 • 406-449-3843 • Fax 406-443-1592

May 27, 1999

Dorothy Poulsen, Pharmacy Program Officer
Medicaid Services Bureau
DPHHS
P.O. 202951
Helena, MT  59620-2951

Dear Dorothy,

Thanks for your patience. I am responding to your letter of April 15th, regarding the proposal to remove a limited number of brand name labels from direct reimbursement and add them to the regular Medicaid reimbursement formula (AWP minus 10% plus dispensing fee); and to do the same again with additional direct price labels in the second year of the biennium. I waited to get back to you until the Board of Directors had met and discussed the proposal.

The Association's annual convention was held last weekend and in conjunction with that we had a board of directors meeting. Your proposal was presented to the board and to the full membership; and it was well received by both groups. Please know that the Association supports this change in reimbursement method; and we thank you for proposing it.

I must note that not all 800 practicing pharmacists were at convention; nor are they all members of the Association, so I cannot promise you 100% unconditional support from every licensed pharmacist in the state. However, you can be assured that the leadership of the Association, and the most active, involved members are quite enthused over this proposal.

My understanding is that the wheels are already in motion, and that this change will be effective July 1st.

If I can be of further assistance to you in this regard, please do not hesitate to call. Thanks for your work and effort in this area; it is appreciated.

Kindest Regards,

Jim Smith
Jim Smith

"America's Most Trusted Profession"

MT 005368

# EXHIBIT 6

Dorothy Poulsen                          February 22, 2006
                      Seattle, WA

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------


IN RE: PHARMACEUTICAL    )

INDUSTRY AVERAGE         )

WHOLESALE PRICE          )

LITIGATION               )MDL Docket No.

                         )Civil Action 01CV12257PBS

-------------------------------------------------------

          DEPOSITION UPON ORAL EXAMINATION OF

                    DOROTHY POULSEN

-------------------------------------------------------

                    9:00 a.m

                February 22, 2006

                   PERKINS COIE

              1201 Third Avenue, #4800

              Seattle, Washington  98101


      REPORTED BY:  Judith A. Robinson, CCR #2171

5e65ecd9-b485-4146-86c9-6eee27c89d03

Dorothy Poulsen                     February 22, 2006
                    Seattle, WA

---

**Page 182**

1    Q. Were you familiar with the survey
2  conducted by the pharmacy coordinating committee and
3  the University of Montana School of Pharmacy to
4  determine the extent to which pharmacies acquired
5  drugs directly from manufacturers?
6    A. I don't know. I don't remember whether I
7  had any input in the survey or whether I had that or
8  even saw the survey. Although, I'm sure I must have
9  seen it at some point in time or whether I saw the
10 results of the survey. So far as I remember, I
11 certainly wasn't instrumental in doing the survey or
12 conducting the survey.
13   Q. Does the letter that you wrote that's
14 Exhibit Poulsen 022 reflect that you were familiar
15 with the results of the survey?
16   A. Yes. I mean, it does suggest that I was
17 familiar with the results of the survey. However, I
18 don't know what the results were. I mean, I can't
19 determine from this letter what the results were or
20 why I thought this was a good idea at the time.
21   Q. Do you know whether the survey also looked
22 at whether Montana pharmacies could acquire any

---

**Page 183**

1  drugs at published direct prices?
2    A. That was the issue, I believe, is that
3  pharmacies in Montana had a great difficulty
4  acquiring drugs at that price. And -- and this is
5  speculation on my part. It could be that our system
6  was set up. Our reimbursement system, the PBM
7  system was set up to take the lower of direct price
8  or AWP minus 10%. And so for those labels that's
9  what I'm guessing. For those labels that were at
10 direct price, they were paying at the direct price
11 but our pharmacies were unable to get the drugs at
12 that cost. That is -- I think that was the issue.
13   Q. Does this letter that's Exhibit Poulsen
14 022 refresh your recollection in any way as to
15 whether Montana Medicaid eliminated the use of
16 direct price?
17   A. I do remember that we removed -- we were -
18 - we removed labels from that -- from that pricing,
19 yes.
20   Q. Looking at page 2 of Exhibit Poulsen 022 -
21 -
22   A. Uh-huh.

---

**Page 184**

1    Q. -- off the top of your head, do you know
2  the manufacturers associated with the labels that
3  have those numbers?
4    A. Not anymore. I would have at one time but
5  not anymore.
6    Q. Looking at page 3 of Exhibit Poulsen 022,
7  your handwritten notes --
8    A. Uh-huh.
9    Q. -- does that appear --
10   A. Oh, see.
11   Q. -- to be tying the label to the --
12   A. Yes. Some companies that no longer exist.
13   Q. And some that still exist?
14   A. And some that still exist, yes.
15   Q. I want to make sure I have this correct,
16 so I'll just ask you directly.
17   A. Uh-huh.
18   Q. Why did you propose in this letter to Jim
19 Smith that Montana Medicaid eliminate use of direct
20 pricing?
21      MR. LOPEZ: Object to form.
22      THE WITNESS: I believe that is what they

---

**Page 185**

1  were asking me for. That based on the survey, they
2  were asking -- pharmacists were asking that we do
3  away with direct price because they weren't getting
4  paid what they were having to pay. So they wanted
5  to use AWP minus 10% for everything.
6  BY MS. O'SULLIVAN:
7    Q. In looking at --
8    A. Go ahead.
9    Q. On the second page of Exhibit Poulsen 022,
10 the first line there, did you write:
11     "I propose that we phase in elimination of
12 direct price reimbursement by removing" and then
13 those labels listed above?
14   A. Right. I would have written that.
15   Q. Page 3 of Exhibit Poulsen 022, are those
16 your handwritten notes?
17   A. Yes.
18   Q. Do those reflect your calculations of the
19 difference between AWP and direct price on those
20 specific labels?
21   A. Yes.
22   Q. Was it your conclusion that eliminating

47 (Pages 182 to 185)

Henderson Legal Services
(202) 220-4158

5e65ecd9-b485-4146-86c9-6eee27c89d03

Dorothy Poulsen                                      February 22, 2006
                              Seattle, WA

---

Page 186

1   direct price would cost or save Montana Medicaid
2   money?
3       A.   It would have no effect.  The choice was,
4   the -- the legislature had once again given a
5   provider increase. What I was proposing is, rather
6   than giving providers an increase in the dispensing
7   fee as we had done in the past, that we do something
8   instead, which was to remove the direct pricing
9   mechanism.
10      And phasing it in, I was phasing it in at
11  the rate that the dispensing fee increase would
12  effect, would -- would be implemented. The idea
13  was, I wasn't costing the Medicaid program anything.
14  I was simply implementing the increase that the
15  legislature had provided in a way other than
16  increasing the dispensing fee.
17      Q.   In the second paragraph first page of
18  Exhibit Poulsen 022, is this referring to the 1%
19  provider increase for each year of the next
20  biennium?
21      A.   Right.
22      Q.   Are you aware of any studies that the

---

Page 187

1   legislature did that provided a basis for these
2   provider increases?
3       A.   The pharmacy program was simply
4   coincidentally in the provider increase.  The
5   provider increase was driven much more by nursing
6   homes and physicians and hospitals and every other
7   provider community in the state. And the
8   legislature, for expediency reasons, would do an
9   overall increase and we would be the beneficiary.
10  The pharmacy program never sought any kind of
11  increase from the legislature.
12      Q.   Had there not been this legislatively
13  authorized provider increase that was across the
14  board, would your proposed change to eliminating
15  direct price have resulted in an increased cost for
16  Montana Medicaid?
17      MR. LOPEZ: Object to the form.
18      THE WITNESS: Likely.  If I had --
19  BY MS. O'SULLIVAN:
20      Q.   Is that what you meant by on the first
21  line of the last paragraph of page one --
22      A.   Page one.

---

Page 188

1       Q.   -- where you wrote:
2       "As you can see removing all labels from
3   direct price would result in an increased cost of
4   approximately $335,868 per year."
5       Is that what you meant by that?
6       A.   I think what I was trying to explain in
7   there is that, we could not simply remove all the
8   labels at one time. Because that would exceed the
9   amount of the provider increase we were being
10  granted. So the only way to do this would be to do
11  it in steps. And --
12      Q.   To phase it in?
13      A.   To phase it in.
14      Q.   Even at the phased-in level though, had
15  there not been this provider increase across the
16  board, it would have resulted in an increased cost
17  to Montana Medicaid?
18      MR. LOPEZ: Object to form.
19      THE WITNESS: I presume so, yes.
20  BY MS. O'SULLIVAN:
21      Q.   Will you turn to Exhibit Poulsen 023,
22  please, which is a 1- page document Bates numbered

---

Page 189

1   MT005368?
2       A.   Uh-huh.
3       Q.   Did you receive this letter dated May 27,
4   1999 from Jim Smith?
5       A.   I will assume that I did.
6       Q.   Please take a look at this letter and tell
7   me whether it appears to be a response to your
8   letter of April 15th that was Exhibit Poulsen 022?
9       A.   The first line -- that -- that's the case.
10      Q.   Where it -- where he states, third
11  paragraph down, last sentence:
12      "However, you can be an assured that the
13  leadership of the association, the most active
14  involved members are quite enthused over this
15  proposal."
16      A.   Uh-huh.
17      Q.   What was your understanding of why the
18  pharmacists were enthused over this proposal to
19  eliminate certain labels from direct pricing?
20      MR. LOPEZ: Object to the form.
21      THE WITNESS: Because the pharmacies were
22  unable to acquire drugs at the direct price, which

---

48 (Pages 186 to 189)

5e65ecd9-b485-4146-86c9-6eee27c89d03

Dorothy Poulsen                          February 22, 2006

Seattle, WA

---

**Page 190**

1  so far as I know, was less than AWP minus 10%.
2  Having that pricing mechanism removed means they
3  would be reimbursed at the AWP minus 10% charge or
4  the usual and customary charge, whichever was less.
5  And -- and so they would either be able to meet
6  their costs or they would make more money.
7  BY MS. O'SULLIVAN:
8      Q.  One more related document.  Exhibit
9  Poulsen 024 is a 1-page document, Bates number
10  MT005418, which some people might call some screen
11  shots and some handwritten notes.
12     A.  Uh-huh.
13     Q.  Are those your handwritten notes?
14     A.  Yes, I think so.  Yeah, I think so.
15     Q.  Where it --
16     A.  The pharmacy's price is not mine but the -
17  - but the others -- anyway.
18     Q.  Do you know whose handwriting reflects the
19  pharmacy's price equals $196.91?
20     A.  I'm not sure.
21     Q.  But is it your handwriting for listing the
22  AWP Medicaid and direct price for this drug, which

**Page 191**

1  appears to be Zerit, Z-E-R-I-T?
2      A.  It looks like my handwriting.  I know that
3  the pharmacy's price is not mine.  I think the top
4  part is my handwriting.
5      Q.  Do you know why you prepared those notes,
6  comparing AWP, Medicaid and direct price for this
7  product?
8      A.  I have no idea.
9      Q.  Do you know whether you did a similar
10  calculation for other drugs?
11     A.  I'm sure that I have -- that I did.  If I
12  knew what the drug was, you know, it might give me
13  an idea.  It says it's an HIV antiviral.  But no, I
14  have no idea.
15         MS. O'SULLIVAN:  I propose we take another
16  break here.  Maybe 5 or 10 minutes and come back.
17         (Off the record.)
18         (Whereupon, A Letter To Dorothy D.
19  Poulsen MT028879 Through MT028881 was marked Exhibit
20  Poulsen 026 for identification.)
21  BY MS. O'SULLIVAN:
22     Q.  I'm going to ask you, did Montana Medicaid

**Page 192**

1  use what are called Montana AWPs?
2      A.  Are you talking about the special AWPs
3  that came up after the whole fraud case that came up
4  in Florida?
5      Q.  Yes.
6      A.  Yes.  We used them, however, we didn't
7  have much choice.
8      Q.  What do you mean by that?
9      A.  FirstData, from whom Consultec acquired
10  their pricing information, implemented those costs
11  on their system.  And so when Consultec acquired the
12  -- the pricing from FirstData Bank, that was the
13  pricing that was -- that was put on the system that
14  I used to reimburse.
15     Q.  Do you know the period for which Montana
16  used these so-called Medicaid AWPs?
17     A.  Well, based on this Email to Leslie, I
18  would guess it was starting July 1st, 2000.  And I
19  don't know for how long.
20     Q.  Do you know whether Montana Medicaid ended
21  up at any point stopping using them?
22     A.  You know, I honestly don't remember how

**Page 193**

1  all this worked out.  I think our plan had been that
2  we were going to do a State MAC and then we could
3  implement those prices on an individual basis.
4         We were working with Consultec to allow us
5  to set up a State and MAC price.  But that didn't
6  work out.  There was the issue with FirstData Bank
7  and there was controversy about FirstData Bank
8  taking the Department of Justice's numbers.  I mean,
9  so that was more than Montana.  That was national --
10  it had a national scope to it.
11     Q.  Looking at Exhibit Poulsen 025, which is a
12  1-page document Bates numbered MT020421, is this an
13  Email you wrote to Leslie Bratton on May 24th, 2000?
14     A.  Yes.
15     Q.  And did you testify previously, Ms.
16  Bratton was at the Consultec PBM entity?
17     A.  Yes.
18     Q.  Where you wrote:
19         "We are not planning to discount these
20  AWPs," what did you mean by that?
21     A.  We were not planning to subtract 10% from
22  them.

Henderson Legal Services
(202) 220-4158

5e65ecd9-b485-4146-86c9-6eee27c89d03

# EXHIBIT 7

**Pharmacy Provider Increase Proposal**
April 5, 1999

Applying the legislative directive to give Medicaid providers a 1.0% increase in each year of the coming biennium to the pharmacy dispensing fee would result in an increased expenditure of approximately $48,817 in the first year, and $99,391 in the second for a total of $148,208. (Calculation: 1,162,310 scripts x .042 + 1,183,232 scripts x .084)

As an alternative to the dispensing fee increase, I propose that we offer the pharmacies a change in their reimbursement for labels that we have priced at the direct manufacturer's price. I have had requests from pharmacies for the last three years to remove direct manufacturer pricing. The Montana State Pharmacy Association asked me more than a year ago to consider removing this reimbursement methodology. They conducted a survey with The University of Montana School of Pharmacy and Allied Health Sciences demonstrating that Montana pharmacists do not buy directly from manufacturers. Thus, pharmacy cost for products includes a wholesaler fee added to the direct price. The result is that for some drugs, pharmacies do not receive sufficient reimbursement to cover the cost of the product much less the cost of filling the prescription. This causes an access problem for recipients needing single source drugs, particularly from independent pharmacies in small Montana communities. These pharmacies are unwilling to purchase expensive drugs when their reimbursement will not cover the cost.

I recently completed an analysis of the direct price manufacturers to determine the program cost for changing from direct price (DP) reimbursement to average wholesale price (AWP) less 10%. Using product utilization from 7/1/97 through 6/30/98, I calculated the cost difference between the two reimbursement methods using the most current rates for AWP and DP. These cost differences are an estimate of program cost because they do not take into account recipient copay, maximum allowable cost (MAC) pricing on generics, and differences in submitted charges.

| Label | AWP- 10% | Direct Price | Difference |
|---|---|---|---|
| 00005 | $163,253 | $146,954 | $16,300 |
| 00074 | $1,749,271 | $1,643,416 | $105,855 |
| 00049 | $1,434,053 | $1,348,153 | $85,900 |
| 00662-00663 | $3,363 | $3,167 | $196 |
| 00008 | $533,954 | $479,977 | $53,977 |
| 00009 | $236,015 | $209,561 | $26,454 |
| 00069 | $805,650 | $758,464 | $47,186 |
| TOTAL | $4,925,559 | $4,589,692 | $335,868 |

**Proposal**: Phase in elimination of direct price reimbursement by removing from labels 00005, 00008, 00009, 00662 and 00663 (total difference = $193,854) in the 2000-2001 biennium.

MT 005387

# EXHIBIT 8

-1-

BEFORE THE DEPARTMENT OF PUBLIC
HEALTH AND HUMAN SERVICES OF THE
STATE OF MONTANA

In the matter of the                )    NOTICE OF AMENDMENT
amendment of ARM 37.86.1101         )
and 37.86.1105 pertaining to        )
medicaid outpatient drug            )
reimbursement                       )

TO:  All Interested Persons

1.    On April 25, 2002, the Department of Public Health and
Human Services published notice of the proposed amendment of the
above-stated rules at page 1257 of the 2002 Montana
Administrative Register, issue number 8.

2.    The Department has amended ARM 37.86.1101 as proposed.

3.    The Department has amended the following rule as
proposed with the following changes from the original proposal.
Matter to be added is underlined.  Matter to be deleted is
interlined.

37.86.1105 OUTPATIENT DRUGS, REIMBURSEMENT  (1) remains as
proposed.
       (2)  The dispensing fee for filling prescriptions shall be
determined for each pharmacy provider annually.
       (a)  remains as proposed.
       (b)  The dispensing fees assigned shall range between a
minimum of $2.00 and a maximum of $4.35 $4.70.
       (c) and (d) remain as proposed.
       (3)  In-state pharmacy providers that are new to the
Montana medicaid program will be assigned an interim $3.50
dispensing fee until a dispensing fee questionnaire, as provided
in (2) above, can be completed for six months of operation.  At
that time, a new dispensing fee will be assigned which will be
the lower of the dispensing fee calculated in accordance with
(2) for the pharmacy or the $4.35 $4.70 dispensing fee.  Failure
to comply with the six months dispensing fee questionnaire
requirement will result in assignment of a dispensing fee of
$2.00.
       (4) through (5)(b) remain as proposed.

       AUTH:  Sec. 53-2-201 and 53-6-113, MCA
       IMP:   Sec. 53-6-101, 53-6-113 and 53-6-141, MCA

4.    The Department has reviewed and considered the
comments regarding the proposed change in the maximum dispensing
fee.  In response to comments received, the Department has
decided to change the proposed increase to the dispensing fee.
Whereas the Department planned to raise the maximum dispensing
fee from $4.20 to $4.35, the Department agrees that the increase
is too minimal to account for the cost of dispensing a

MT 013531

-2-

prescription. Providers strenuously objected to the notion that an increase of only $.15 would make the change to reimbursement more "palatable". Providers also regarded the insignificant increase as offensive, especially in light of dispensing fees in surrounding states. Upon further research, the Department has found that although the national average dispensing fee is $4.35, the average fee in surrounding states is much higher. Dispensing fees in Washington, Idaho, Wyoming, North Dakota and South Dakota average $4.67 (this average excludes Oregon because their dispensing fee of $3.50 is significantly lower than Montana's current fee). Therefore, the Department proposes to increase the maximum dispensing fee by $.50, which results in a maximum fee of $4.70. This change will more appropriately align Montana with surrounding states as well as recognize the cost to dispense a prescription. Additionally, the Department plans to undertake other significant cost containment measures that will require cooperation from pharmacy providers. The Department feels it is important to accurately compensate providers for the services they provide, especially when cost containment measures are enacted that may require additional assistance and time. Therefore, the Department feels the investment towards pharmacist's reimbursement is well worth the additional cost.

5.   The Department has thoroughly considered all commentary received. The comments received and the Department's response to each follow:

COMMENT #1:  The change to reimbursement will negatively affect all pharmacies, particularly independent, rural pharmacies. Concern was expressed about the potential impact to rural communities if pharmacies are forced out of business. Another person argued that the Office Of Inspector General (OIG) study has serious flaws and should not be considered as a basis for changes. This individual feels the change to reimbursement will negatively affect rural communities by forcing pharmacies out of business because Medicaid clients comprise nearly 40% of most pharmacies' business.

RESPONSE:  The Department has considered the impact this change will have on all pharmacies in Montana, including rural pharmacies. However, the OIG Report included rural pharmacies in the study and the OIG believes that the sample design took into account the number of chain pharmacies and the number of independent pharmacies in the State and appropriately weighed the sample results.

COMMENT #2:  The validity of the estimate of Average Wholesale Price (AWP) is questioned. The provider indicates he is unable to purchase drugs at the proposed levels.

RESPONSE:  The Department understands that not all pharmacies may be able to purchase drugs at AWP less 15%, however, when considering all pharmacies as an aggregate, the Department is heeding the recommendation of the OIG to more accurately reflect

MT 013532

-3-

acquisition cost.

COMMENT #3: The Department is asking pharmacy providers to sell their merchandise at cost and subsidize the Medicaid reductions with sales on other products.

RESPONSE: The Department has no intention to force providers to subsidize Medicaid reductions with sales of other products. The Department can only be concerned about the actual acquisition cost for drugs.

COMMENT #4: The increased demand for services should result in a corresponding increase in reimbursement for providers.

RESPONSE: The Department understands that increased utilization of services requires more work for Medicaid providers. As noted above, the Department has reconsidered the increase to the dispensing fee and has approved a new maximum of $4.70.

COMMENT #5: Recipients who require expensive medications may cause the Department's budget challenges.

RESPONSE: There is no doubt that a smaller percentage of utilizing members cause the largest percentage of expenditures. However, generally, high utilizers are often most in need of medical services, including drugs. It is important to note that Medicaid exists to help serve not only the financially needy, but also the medically needy who truly have expensive health care needs. Additionally, the Department is continually striving to monitor and control high utilizers by recommending alternative and less expensive courses of treatment.

COMMENT #6: All Medicaid agencies should be subject to salary reductions to offset the budget deficit.

RESPONSE: The Department has made internal reductions in order to contain costs. Those reductions have included elimination of travel and equipment and leaving vacant positions unfilled for a period of time to restore vacancy savings. This requires consolidation of duties and requires existing staff to shoulder more of the workload at a time when administrative requirements have increased due to the demands of implementing cost containment measures.

COMMENT #7: Pharmacy providers have not had a raise in reimbursement in over ten years.

RESPONSE: The Department has increased dispensing fees twice in the last ten years: once in July 1997 when the fee increased to $4.14 and again in July 1998 when the fee increased to $4.20.

COMMENT #8: The reduction of 5% will negatively impact the discount already in place by distributors and wholesalers.

Montana Administrative Register No. 37-233

MT 013533

-4-

RESPONSE:  The Department cannot comment on the discounts that each pharmacy may receive from their individual wholesaler or supplier because those discounts vary.  The Department can only control the discount taken off the AWP.

COMMENT #9:  The $.15 increase in dispensing fee is not enough to make up for the loss imposed by the change to AWP.  The Department should raise the dispensing fee to the average fee found in the Northwest ($4.68).  Additionally, an incentive should be provided to pharmacies for generic dispensing by paying a higher dispensing fee for generic drugs.

RESPONSE:  The Department has studied the matter and has adjusted the dispensing fee as addressed in paragraph 4 of this notice.

COMMENT #10:  The Department should re-evaluate who the reduction is targeted towards; pharmacists are not the reason for increased drug costs.  Drug prices are falsely blamed for much of the increase in health care expenditures.  However, the real reason for increase in drug expenditures is a result of the new and expensive drugs used to treat chronic diseases and the reduction in the industries' AWP.  Neither of these factors can be controlled by retail or home infusion pharmacies.

RESPONSE:  The Department understands that high drug costs are not the fault of pharmacies, however, only the federal government has the power to regulate the cost of drugs.  The Department continues to do all we can to contain costs, including prior authorization, drug utilization review, mandatory generic substitution, tab splitting and coverage of less expensive over-the-counter drugs.  Additionally, the Department continues to explore other cost saving measures to be implemented in the near future.

COMMENT #11:  The profit margins for most pharmacies are only 1/3 of 1%, and that will be worsened by the Medicaid reductions.  Acquisition costs of the newer, expensive drugs and highly utilized drugs are generally very high and profit margins are very low because reimbursement by insurers is low; another cut to reimbursement will cause reimbursement to be significantly below acquisition cost.

RESPONSE:  The Department understands that profit margins are low for pharmacy providers just as they are for other kinds of healthcare providers.  The Department would argue that we are not changing reimbursement to below cost for pharmacies; we are only trying to bring reimbursement more in line with actual acquisition costs.

COMMENT #12:  It does not make sense for the Department to reduce payments to pharmacy providers because the savings the Department will gain are automatically eliminated when considering all of the factors in provider reimbursement

MT 013534

-5-

(federal matching dollars, state income taxes, etc).

RESPONSE:  In light of the OIG study, the Department is only concerned about accurately reimbursing pharmacists based on actual acquisition cost. Although revenue is an important part of the budget equation, the Department does not have the ability to collect revenue (beyond funds we already collect from manufacturers for drug rebates).

COMMENT #13:  The Department should focus on the cost of drugs or amounts of drugs utilized in order to gain cost savings.

RESPONSE:  The Department is pursuing a cost containment measure to help control high utilizing clients, who typically contribute to the high expenditures in the drug program.  The Department plans to implement an intensive case management model whereby we can help control drug utilization for those clients who are receiving more drugs than necessary as well as recommend (in consultation with their physician and pharmacist) less costly alternatives.

COMMENT #14:  This reduction will only create more hardship for the uninsured population that is already in a difficult position.

RESPONSE:  Although the Department has an interest in the overall health of all of Montana's citizens, Medicaid has an obligation to control costs for our own clients.  Therefore, the Department can only try to impact those clients who are insured by Medicaid.

COMMENT #15:  The Department should focus on the pharmaceutical manufacturers to cut costs, rather than providers.

RESPONSE:  This comment was already addressed in Response to Comment #10. However, even though a few other states have recently pursued the development of Medicaid preferred drug lists and supplemental rebates from manufacturers, their experiences have been mired in legal controversy. At this time, the State of Montana is not willing to pursue supplemental rebates as another way to generate revenue because we are certain the State would need to spend more in legal fees trying to defend the plan than we would make in cost savings.

COMMENT #16:  Strenuous objections were made to the use of the OIG reports by the Department because there are too many problems with the report including the age of the report, the small number of sample pharmacies and the urban slant on the report.

RESPONSE:  As noted in a previous response and in the Department's testimony, we recognize that some entities have criticized the OIG investigation as being flawed. We agree that the OIG failed to account for the cost of professional services

Montana Administrative Register No. 37-233

MT 013535

and the cost of dispensing which includes supplies and staff. However, because there has not been an auditable counter-study conducted, we must base our decisions on the information provided. Because Medicaid is a public insurance benefit and is funded by both federal and state monies, one can understand how important it is that we heed the recommendations made by the OIG.

COMMENT #17:  Some pharmacies indicate that the reimbursement for certain drugs are actually lower than the acquisition cost, particularly products by Pfizer and Abbott.

RESPONSE:  The Department understands that pharmacies have been reimbursed below their cost for a select number of drugs made by Pfizer and Abbott.  The reason for the underpayment is because selected drugs have continued to be reimbursed at direct price, when in fact direct prices are not available for the majority of pharmacies in the state, that is, pharmaceutical companies are not selling these drugs to pharmacies in Montana at the direct price.  ARM 37.86.1101(1)(b) currently provides that if the direct price is not available to providers in the state, the estimated acquisition cost (EAC), on which reimbursement may be based, will be the AWP minus the discount specified in the rule. Thus, at the present time the EAC used to calculate reimbursement should be based on the AWP rather than the direct price.

For that reason, the Department has eliminated direct pricing from the reimbursement methodology effective June 5, 2002.  This change will enable pharmacies to be paid at the lower of the EAC, Federal Maximum Allowable Cost (FMAC), or their usual and customary charge.  Subsection (1)(a) of ARM 37.86.1101, which defines the EAC as the direct cost, is being left in the rule because the direct price may be available to pharmacies in the state at some time in the future.  The Department regrets not being able to change the reimbursement methodology sooner and will allow providers who have been paid incorrectly in the past year to reverse and resubmit those claims which were previously subjected to direct pricing.

COMMENT #18:  There was a time when few pharmacies participated as Medicaid providers.  This reduction will again force many pharmacies to withdraw from the Medicaid system.

RESPONSE:  The Department feels it is important to emphasize that we do not intend to alienate providers.  The Department understands that reductions in reimbursement rates may be difficult for Medicaid providers.  However, the Department does not expect the reduction in reimbursement to result in a significant impact on access to pharmacy services.

COMMENT #19:  Limits should be placed on the number of people enrolled in Medicaid.  Eligibility requirements should be changed, particularly so people moving from other states cannot

MT 013536

-7-

immediately qualify for Medicaid.

RESPONSE:  In an effort to control costs throughout Medicaid,
the Department will continue to examine eligibility requirements
and determinations to determine who should most appropriately
qualify for benefits.   Additionally, the Department does
undertake efforts to ensure those utilizing their health
benefits are not abusing the benefits.  One way the Department
pursues stricter control of Medicaid individuals' care seeking
is through the Restricted Card Program.  Under the Restricted
Card Program, Medicaid individuals who overuse the program are
restricted to one physician and one pharmacy and action is taken
to limit the number of unnecessary emergency room visits.  If
further actions are required, the Medicaid Fraud Control Unit is
notified and the situation is pursued by the Department of
Justice.   Federal law does not permit waiting periods for
medicaid recipients establishing state residency.

COMMENT #20:  The number of prescriptions a person can receive
in a given month should be limited.

RESPONSE:  Although some states have effectively instituted
script limits for their Medicaid clients, Montana Medicaid is
choosing to examine a more proactive approach at this time.  In
the near future, the Department plans to implement an intensive
case management system for high utilizing clients so we can
better monitor and control drug usage.  Often, there is a
clinical need for a client to have more than the average number
of scripts so the Department believes script limits may be more
punitive than necessary.  However, the Department feels that the
changes to cost sharing, effective April 1, 2002, have provided
incentive to clients to make informed health care choices,
including how many drugs they really need.

COMMENT #21:  The Department should change the cost sharing
requirements so the first two prescriptions would require a 5%
coinsurance.  The next three prescriptions would require a 33%
coinsurance and the next three would be 66%.  After six
prescriptions, the client would be required to pay the entire
amount of the prescription.

RESPONSE:  The suggestion to model cost sharing in Medicaid
after a private insurance plan is a good idea.  However, because
Medicaid is a joint federal and state funded program, we are
obligated to abide by strict regulations regarding cost sharing.
Within the current Code of Federal Regulations, states may only
impose cost sharing requirements up to a certain limit (5% is
the maximum coinsurance amount).  Therefore, we are unable to
impose greater coinsurance amounts at this time.

COMMENT #22:  Prescription amounts should be limited to only a
30-day supply.

RESPONSE:  The Department has examined and plans to implement a

MT 013537

change to the day supply in the near future.   We agree that because eligibility is determined monthly, it makes the most sense to limit prescriptions to only a 30-day supply.

COMMENT #23:   Time limits should be placed on expensive medications, like Prilosec. After 90 days of therapy, a less expensive generic medication should be dispensed.

RESPONSE:   In the next couple of months, the Department plans to implement a step therapy program for one expensive class of drugs, Proton Pump Inhibitors (PPIs).   This step therapy will allow the Department to realize cost savings at the same time we will be better controlling the drug regimens of the large number of people taking those expensive medications. Additionally, the Department already requires prior authorization on a number of expensive medications and the mandatory generic substitution program requires prescribers and pharmacies to prescribe and dispense a generic form of a drug, whenever possible.

COMMENT #24:   Initial prescriptions for expensive medications (particularly mental health drugs) should be limited in order to avoid expensive waste because of when a client must change dosages or strengths.

RESPONSE:   The Department is also investigating the idea of limiting the day supply on certain classes of drugs, particularly mental health drugs.  The Department hopes that by requiring smaller day supplies on drugs for which the strength often changes, we can realize cost savings and prevent waste of unused medications.

COMMENT #25:   More strenuous education should be provided for physicians so they better understand how to save money, and physicians who do not cooperate should be dropped from Medicaid.

RESPONSE:   The Department agrees that physician education is a key component to help contain costs in the pharmacy program. Although the Department does not have the authority to terminate a Medicaid provider based on their prescribing habits, the Department can target those providers and demand (by way of audits and information) changes in behavior.

COMMENT #26:  Mandatory generic dispensing should be enacted and physicians should not be allowed to write "Dispense As Written" on a prescription.

RESPONSE:   The Department has already instituted mandatory generic substitution (effective June 2001).  However, physicians will always have the ability to indicate Dispense As Written and the Department can only control that dynamic by requiring prior authorization before Medicaid will pay for a brand name drug.

COMMENT #27:  Direct-to-consumer advertising should be banned in the State of Montana because recipients are using that

MT 013538

-9-

information to demand unneeded drugs.

RESPONSE:  The Department has no control over direct-to-consumer advertising in the State of Montana.

COMMENT #28:  The Governor and the Governor's Budget Office do not understand the value of pharmacy in the total health care picture.  These reductions may result in immediate savings but will not result in long term solutions.

RESPONSE:   Although the Department cannot comment on the position of the Governor or her Budget Office, the Department does understand the positive impact pharmacotherapy has on the overall well being of any individual.  Although optional under the federal requirements, Montana Medicaid has chosen to provide a pharmacy benefit because we recognize the benefit to all Medicaid recipients.  Furthermore, the Department believes that we can achieve long term savings from the proposed changes to reimbursement and other program areas.


Dawn Sliva
Rule Reviewer

Director, Public Health and
Human Services

Certified to the Secretary of State June 17, 2002.

# EXHIBIT 9

MONTANA
Department of Public Health & Human Services
Health Policy Services Division
PO Box 202951
Helena, MT 59620-2951
(406) 444-4540
www.dphhs.state.mt.us/hpsd/

# FAX from the desk of:

Shannon Marr
Pharmacy Program Officer
Medicaid Services Bureau
e-mail: smarr@state.mt.us
phone: (406) 444-2738
fax: (406) 444-1861

| Date: | May 21, 2002 | |
|---|---|---|
| To: | Karen & Kip, Corvallis Drug | |
| Fax: | 961-4344 | Phone: 961-3221 |
| Re: | Direct Pricing | No. of pages, including cover: 2 |

As I mentioned on the phone, I am trying to resolve this direct pricing issue as soon as possible.

As you'll find in both the provider manual and the administrative rules (37.86.1101), reimbursement for covered drugs is the lessor of:

- The provider's usual and customary charge
- The estimated acquisition cost (EAC) plus a dispensing fee
- The maximum allowable cost (MAC) plus a dispensing fee

The EAC is the Department's best estimate of providers' cost for a drug in the package size most frequently purchased. <u>The Department uses the direct price charged by manufacturers to retailers as the EAC.</u> If the direct price is not available to providers in the state, the Department uses the average wholesale price (AWP) less 10 percent or the Department may set an allowable acquisition cost when the department determines that acquisition cost is lower than either the direct price or AWP less 10 percent (this is the case for some 400 drugs that are assigned Medicaid AWP prices).

We understand that pharmacies are no longer able to purchase direct. We are working to eliminate direct pricing from the reimbursement methodology for the remaining five labels. The drugs affected include <u>any manufactured under the following labels:</u>

MT 005358

- Pfizer 00049. Examples include: Geodon, Unasyn, Geocillin, Glucotrol, Antivert, Cardura, Diflucan, Trovan, Glucotrol, Zoloft, Sinequan, Vistaril, Atarax, Navane)
- Pfizer 00069. Examples include: Vibramycin, Norvasc, Procardia, Zithromax, Diabinese, Viagra, Zyrtec
- Abbott 00074. Examples include: Colchicine, Sodium Chloride, Heparin, Demerol, Morphine, Norvir, Talwin, Lorazepam, Ketorolac, Biaxin, Hytrin, Gabitril, Depaene, Cylert, Depakote,
- Pfizer 00063 and Pfizer 00995 are also subject to direct pricing. However, we have not had any claims submitted under these NDCs in the past year.

This change is scheduled to be effective July 1, 2002. At that time, direct pricing will be removed from the following labels. Additionally, the Department plans to remove Medicaid AWP prices and change the reimbursement methodology to AWP less 15% (see Provider Notice dated May 1, 2002 for more information about the proposed rule). However, I am working with our contractor in Atlanta to see if we can remove the direct pricing methodology sooner than July 1.

Once the direct pricing change is effective, the Department will allow providers to reverse and resubmit any affected claims within the last year. We will follow up with all providers in an official Provider Notice once the change is made.

I apologize for the inconvenience this has caused. Even though direct pricing has been used for several years, I understand that it has become more of an issue recently because other reductions are now in effect (such as the 2.6% reduction and changes to cost sharing).

Please let me know if you have any other questions or concerns.

MT 005359

# EXHIBIT 10

**Marr, Shannon**

| | |
|---|---|
| **From:** | McCreight, Susan [Susan.McCreight@acs-inc.com] |
| **Sent:** | Tuesday, May 21, 2002 12:21 PM |
| **To:** | 'Marr, Shannon'; McCreight, Susan |
| **Cc:** | Oh, Susan |
| **Subject:** | RE: rule changes |

All of this can be handled "on line" and we can definately meet 7/1.

I'll try to have an answer for you on the direct pricing removal tomorrow; we are shooting for a bit after June 1 per your last email of maybe not wanting to go in effect while you are on vacation. This is not a big deal, it's just a matter of going about it the right way.

Susan Oh and Jerry will probably be the best one to address removal of MAWP or just a few "problem" NDCs.

-----Original Message-----
From: Marr, Shannon [mailto:smarr@state.mt.us]
Sent: Tuesday, May 21, 2002 1:45 PM
To: Susan McCreight (E-mail)
Cc: Susan Oh (E-mail)
Subject: rule changes

Susan,
An update: The rule hearing related to 1) change to AWP and 2) change to dispensing fee was held last Thursday. It went fine and we had two pharmacists comment. I'm in the process of responding to all comments (the comment period ends this Thursday).

It looks like we will proceed with the change to AWP (moving from AWP less 10% to AWP less 15%) to be effective July 1. There is a possibility that we could get the authority to change the dispensing fee higher than we thought (proposed to go to $4.35) which may result in the maximum fee changing to as high as $4.70 but we are waiting for approval on that.

So, in regard to those changes, I need to know what you need from me by way of programming requests. The things I know I need are:
1. Change AWP methodology from AWP less 10% to AWP less 15%. This should be effective July 1, 2002 (meaning it will only affect claims from that date of service forward).
2. Change the maximum dispensing fee (but the amount is yet to be determined). This will also be effective July 1, 2002. This is why I need a report of dispensing fees for all participating providers so I can determine how to go about updating the fees.
3. Elimination of direct pricing for those five remaining labels. This must be effective July 1, 2002 at the latest but if we can fix prior to July 1, that will be great. It's important to note that we will allow providers to reverse claims and resubmit for any that were paid in the last year (at the incorrect price due to direct price).
4. Elimination of Medicaid AWPs effective July 1, 2002. However, this is something I need to discuss further with you. I know Jerry Dubberly suggested not eliminating those prices, but I need some further research on why. What analysis are you able to do for me related to how much it will cost us to move away from Medicaid AWP?

So, those are the changes that will need to be implemented. I hope I'm giving you enough advance notice. Please let me know what else you need from me.
Thanks,

1

MT 013591