**Table 2: Variation in Medicare Prices for Selected Drugs**

| HCPCS Code | Generic Drug Name | Median Medicare Amount | Minimum Medicare Amount | Maximum Medicare Amount | Difference Between Minimum and Maximum Amount |
|---|---|---|---|---|---|
| J0640 | Leucovorin Calcium | $18.02 | $17.51 | $35.47 | 102.6% |
| J1562 | Immune Globulin | $396.63 | $380.00 | $439.38 | 15.6% |
| J2820 | Sargromostim | $27.41 | $23.95 | $27.42 | 14.5% |
| J9000 | Doxorubicin HCl | $42.92 | $38.03 | $52.44 | 37.9% |
| J9217 | Leuprolide Acetate | $592.60 | $564.65 | $623.79 | 10.5% |
| J9350 | Topotecan | $573.75 | $546.44 | $602.44 | 10.2% |

Inconsistency in drug reimbursement amounts among Medicare carriers is not a new problem. A previous OIG report released in December 1997, *Excessive Medicare Payments for Prescription Drugs*, found similar variations. This previous report identified three likely causes for pricing discrepancies: (1) decisions regarding when to update reimbursement amounts, (2) the choice of pricing compendia used to determine AWPs, and (3) the selection of particular NDCs to meet the HCPCS code definition.

# RECOMMENDATIONS

## The HCFA should reduce excessive Medicare drug reimbursement amounts

Despite numerous attempts by HCFA to lower Medicare drug reimbursement, the findings of this report illustrate once again that Medicare simply pays too much for prescription drugs. The published AWPs that Medicare carriers currently use to establish reimbursement amounts bear little or no resemblance to actual wholesale prices that are available to physicians, suppliers, and other large government purchasers. We believe that HCFA's attempts to use the more accurate AWPs supplied by First Databank is a significant first step towards reimbursing drugs in a more appropriate manner. However, we believe that HCFA should continue to seek additional administrative and legislative remedies to reduce excessive drug reimbursement amounts.

We believe there are a number of options available to HCFA for implementing this recommendation, including: (1) continuing to collect more accurate average wholesale prices from drug pricing catalogs, (2) basing payment on physician/supplier acquisition costs, (3) establishing manufacturers' rebates similar to those used in the Medicaid program, (4) creating a fee schedule for covered drugs based on Department of Veterans Affairs prices, and (5) utilizing the inherent reasonableness authority.

## The HCFA should require all carriers to reimburse a uniform amount for each drug

We believe that the pricing differences among local carriers for individual drug codes is problematic. The amount which physicians and suppliers are reimbursed for drugs should not depend on which carrier they bill. The DMERCs have been able to adopt uniform pricing for the drugs which they cover, and we expect that local carriers should be able to do the same. In a 1997 report which noted similar problems, we recommended two options to correct pricing differences: (1) the HCFA could supply all carriers with list of average wholesale prices that it has determined represent each drug code, or (2) the HCFA could contract with a single entity to calculate drug reimbursement amounts and then distribute the amounts to each carrier. We continue to recommend that HCFA undertake one of these options.

## Agency Comments

The HCFA concurred with our recommendation that reimbursement amounts for Medicare-covered drugs should be lowered, noting that the current AWP-based reimbursement method creates incentives for price inflation, distorts clinical decisions, and cheats taxpayers. The HCFA also explained that some providers now rely on inflated drug payments to cover other practice expenses. The HCFA believes that any price reductions need to take these expenses into account. Nevertheless, the HCFA strongly agreed that the payment of inflated drug prices is an inappropriate way to compensate practitioners and suppliers for inadequate reimbursement of other practice costs.

The HCFA also agreed with our recommendation that Medicare carriers should be required to reimburse uniform amounts for covered drugs.  The full text of HCFA's comments is presented in Appendix F.

**APPENDIX A**

## Previous OIG Reports on Medicare Drug Reimbursement

*Medicare Reimbursement of Albuterol* **(OEI-03-00-00311), June 2000.** We found that Medicare and its beneficiaries would save $120 million or $209 million a year if albuterol was reimbursed at amounts available through Medicaid and the VA, respectively. Medicare and its beneficiaries would save $47 million or $115 million a year if Medicare reimbursed albuterol at prices available at chain and Internet pharmacies.

*Medicare Reimbursement of End Stage Renal Disease Drugs* **(OEI-03-00-00020), June 2000.** We found that Medicare reimbursement amounts would be nearly halved for five ESRD drugs if amounts were based on VA acquisition costs. In addition, Medicare would save between 5 and 38 percent if its reimbursement amounts were equal to Medicaid reimbursement including rebates.

*Comparing Drug Reimbursement: Medicare and the Department of Veterans Affairs* **(OEI-03-97-00293), November 1998.** We found that Medicare and its beneficiaries would save $1 billion in 1998 if the allowed amounts for 34 drugs were equal to prices obtained by the VA. Furthermore, Medicare allowed between 15 and 1600 percent more than the VA for the 34 drugs reviewed.

*Are Medicare Allowances for Albuterol Sulfate Reasonable?* **(OEI-03-97-00292), August 1998.** We found that Medicare would allow between 56 to 550 percent more than the VA would pay for generic versions of albuterol sulfate in 1998, and 20 percent more than the average Medicaid payment for albuterol sulfate in 1997. Additionally, Medicare allowed 333 percent more than available acquisition costs for the drug in 1998. Customers of mail-order pharmacies would pay up to 30 percent less than Medicare for albuterol sulfate in 1998.

*The Impact of High-Priced Generic Drugs on Medicare and Medicaid* **(OEI-03-97-00510), July 1998.** We found that Medicare and its beneficiaries could have saved between $5 million and $12 million for four drugs if reimbursement had not been based on higher-priced generic versions. Florida's Medicaid program would have saved half a million dollars for eight drugs in 1996 if higher-priced generic drugs had been reimbursed at brand prices.

*Excessive Medicare Payments for Prescription Drugs* **(OEI-03-97-00290), December 1997.** We found that Medicare allowances for 22 drugs exceeded actual wholesale prices by $447 million in 1996. For more than one-third of the 22 drugs reviewed, Medicare allowed amounts were more than double the actual wholesale prices available to physicians and suppliers. Furthermore, we found that there was no consistency among Medicare carriers in establishing and updating drug reimbursement amounts.

**APPENDIX A**

*Appropriateness of Medicare Prescription Drug Allowances* **(OEI-03-96-00420), May 1996.**
We found that under a drug rebate program similar to Medicaid's, Medicare would have saved
$122 million for 17 prescription drugs in 1994. Medicare could have saved an additional $144
million in 1994 had the program employed a discounted AWP drug reimbursement formula. We
also found that the lack of an NDC-based billing system would prevent HCFA from taking
advantage of rebates and other discounted reimbursement formulas.

*A Comparison of Albuterol Sulfate Prices* **(OEI-03-94-00392), June 1996.** We found that many
of the pharmacies surveyed charged customers less than the Medicare allowed amount for generic
albuterol sulfate. The five buying groups surveyed had negotiated prices between 56 and 70
percent lower than Medicare's reimbursement amount for the drug.

*Suppliers' Acquisition Costs for Albuterol Sulfate* **(OEI-03-94-00393), June 1996.** We found
that Medicare's allowances for albuterol sulfate substantially exceeded suppliers' acquisition costs
for the drug, and that the program could have saved $94 million during the 14-month review
period if Medicare reimbursement amounts had been based on average supplier invoice costs.

*Medicare Payments for Nebulizer Drugs* **(OEI-03-94-00390), February 1996.** We found that
Medicare and its beneficiaries paid about $37 million more for three nebulizer drugs in 17 states
than Medicaid would have paid for equivalent drugs. In addition, we found that the potential
savings were not limited to the three nebulizer drugs and 17 states which were reviewed.

**APPENDIX B**

## Description of 24 HCPCS Codes

| 2000 HCPCS CODE | 1999 HCPCS CODE | DESCRIPTION |
|---|---|---|
| J0640 | J0640 | Injection, Leucovorin Calcium, per 50 mg |
| J1260 | J1260 | Injection, Dolasetron Mesylate, 10 mg |
| J1440 | J1440 | Injection, Filgrastim (G-CSF), 300 mcg |
| J1441 | J1441 | Injection, Filgrastim (G-CSF), 480 mcg |
| J1562 | J1562 | Injection, Immune Globulin, intravenous, 5 g |
| J1626 | J1626 | Injection, Granisetron Hydrochloride, per 100 mcg |
| J2405 | J2405 | Injection, Ondansetron HCl, per 1 mg |
| J2430 | J2430 | Injection, Pamidronate Disodium, per 30 mg |
| J2820 | J2820 | Injection, Sargramostim (GM-CSF), 50 mcg |
| J7608* | K0503 | Acetylcysteine, unit dose form, per gram |
| J7619* | K0505 | Albuterol Sulfate, unit dose form, per mg |
| J7644* | K0518 | Ipratropium Bromide, unit dose form, per mg |
| J9000 | J9000 | Injection, Doxorubicin HCl, 10 mg |
| J9045 | J9045 | Injection, Carboplatin, 50 mg |
| J9170 | J9170 | Injection, Docetaxel, 20 mg |
| J9201 | J9201 | Injection, Gemcitabine HCl, 200 mg |
| J9202 | J9202 | Goserelin Acetate implant, per 3.6 mg |
| J9206 | J9206 | Injection, Irinotecan, 20 mg |
| J9217 | J9217 | Leuprolide Acetate (for depot suspension), 7.5 mg |
| J9265 | J9265 | Injection, Paclitaxel, 30 mg |
| J9310 | J9310 | Injection, Rituximab, 100 mg |
| J9350 | J9350 | Injection, Topotecan, 4 mg |
| J9390 | J9390 | Vinorelbine Tartrate, per 10 mg |
| Q0136 | Q0136 | Injection, Epoetin Alpha, (non-ESRD), per 1000 units |

* New HCPCS codes for nebulizer drugs took affect January 1, 2000.

**APPENDIX C**

## Medicare Carrier Reimbursement Amounts

| HCPCS | FL | TX | PA | CA | WI | NY | OH | NJ | TN | IL |
|---|---|---|---|---|---|---|---|---|---|---|
| J0640 | $35.47 | $20.45 | $17.51 | $17.52 | $18.02 | $18.51 | $18.02 | $18.51 | $17.93 | $18.02 |
| J1260 | $15.81 | $15.82 | $14.80 | $14.80 | $14.82 | $15.81 | $14.82 | $15.81 | $14.70 | $14.82 |
| J1440 | $171.38 | $164.21 | $171.38 | $171.38 | $171.38 | $168.00 | $171.38 | $168.00 | $171.38 | $171.38 |
| J1441 | $273.03 | $261.58 | $273.03 | $273.03 | $273.03 | $273.03 | $273.03 | $273.03 | $273.03 | $273.03 |
| J1562 | $380.00 | $439.38 | $413.25 | $380.00 | $427.98 | $380.00 | $380.00 | $380.00 | $413.25 | $427.98 |
| J1626 | $18.54 | $18.54 | $18.54 | --- | $18.54 | $18.54 | $18.54 | $18.54 | $17.67 | $18.54 |
| J2405 | $6.08 | $6.09 | $6.08 | $6.09 | $6.10 | $6.08 | $6.10 | $6.08 | $5.94 | $6.10 |
| J2430 | $253.20 | $253.21 | $232.51 | $232.51 | $253.20 | $233.91 | $253.20 | $233.91 | $232.51 | $253.20 |
| J2820 | $27.41 | $24.60 | $25.62 | $23.95 | $27.42 | $27.41 | $27.42 | $27.41 | $27.41 | $27.42 |
| J9000 | $42.81 | $50.96 | $52.44 | $50.96 | $42.82 | $43.02 | $42.82 | $43.02 | $38.03 | $42.82 |
| J9045 | $103.84 | $94.96 | $98.90 | $103.84 | $103.84 | $98.90 | $103.84 | $98.90 | $98.90 | $103.84 |
| J9170 | $283.65 | $283.65 | $270.14 | $283.65 | $283.65 | $283.65 | $283.65 | $283.65 | $270.14 | $283.65 |
| J9201 | $88.46 | $88.46 | $88.46 | $88.46 | $88.46 | $88.46 | $88.46 | $88.46 | $88.46 | $88.46 |
| J9202 | $446.49 | $446.49 | $446.49 | $446.49 | $446.49 | $446.49 | $446.49 | $446.49 | $446.49 | $446.49 |
| J9206 | $117.81 | $117.81 | $110.10 | $117.81 | $117.82 | $117.81 | $117.82 | $117.81 | $117.81 | $117.82 |
| J9217 | $564.91 | $565.93 | $564.65 | $623.79 | $592.60 | $592.60 | $592.60 | $592.60 | $564.92 | $592.60 |
| J9265 | $173.49 | $166.58 | $173.48 | $173.50 | $173.50 | $173.49 | $173.50 | $173.49 | $173.49 | $173.50 |
| J9310 | $420.28 | $420.29 | $420.28 | $420.29 | $420.29 | $420.28 | $420.29 | $420.28 | $420.28 | $420.29 |
| J9350 | $602.44 | $602.44 | $573.75 | $573.75 | $573.75 | $602.44 | $573.75 | $602.44 | $546.44 | $573.75 |
| J9390 | $75.50 | $72.49 | $68.99 | $75.51 | $75.51 | $75.50 | $75.51 | $75.50 | $75.50 | $75.51 |
|  | $11.84 | --- | $12.00 | $11.62 | $11.40 | $11.40 | $11.40 | $11.40 | $11.40 | $11.40 |

| HCPCS | DMERC A | DMERC B | DMERC C | DMERC D | MEDIAN |
|---|---|---|---|---|---|
| J7608 | $5.05 | $5.05 | $5.05 | $5.05 | $5.05 |
| J7619 | $0.47 | $0.47 | $0.47 | $0.47 | $0.47 |
| J7644 | $3.34 | $3.34 | $3.34 | $3.34 | $3.34 |

**APPENDIX D**

# Medicare Savings Based on
# Department of Veterans Affairs Prices

| HCPCS CODE | GENERIC DRUG NAME | MEDICARE MEDIAN | VA MEDIAN | PERCENT SAVINGS* | 1999 ALLOWED CHARGES | ESTIMATED MEDICARE SAVINGS |
|---|---|---|---|---|---|---|
| J0640 | Leucovorin Calcium, 50 mg | $18.02 | $1.63 | 91.0% | $66,740,227 | $60,703,236 |
| J1260 | Dolasetron Mesylate, 10 mg | $14.82 | $4.95 | 66.6% | $46,647,272 | $31,066,705 |
| J1440 | Filgrastim, 300 mcg | $171.38 | $130.72 | 23.7% | $47,893,675 | $11,362,801 |
| J1441 | Filgrastim, 480 mcg | $273.03 | $208.23 | 23.7% | $67,411,261 | $15,999,157 |
| J1562 | Immune Globulin, 5g | $396.63 | $110.54 | 72.1% | $43,239,398 | $31,188,663 |
| J1626 | Granisetron HCl, 100 mcg | $18.54 | $7.81 | 57.9% | $46,432,246 | $26,872,600 |
| J2405 | Ondansetron HCl, 1 mg | $6.09 | $3.94 | 35.3% | $47,721,885 | $16,847,628 |
| J2430 | Pamidronate Disodium, 30 mg | $243.56 | $203.45 | 16.5% | $112,916,846 | $18,595,396 |
| J2820 | Sargramostim, 50 mcg | $27.41 | $10.06 | 63.3% | $23,533,251 | $14,896,093 |
| J7608 | Acetylcysteine, per g | $5.05 | $1.50 | 70.3% | $35,908,222 | $25,242,413 |
| J7619 | Albuterol Sulfate, per mg | $0.47 | $0.07 | 85.1% | $246,136,877 | $209,478,193 |
| J7644 | Ipratropium Bromide, per mg | $3.34 | $0.84 | 74.9% | $250,916,635 | $187,811,853 |
| J9000 | Doxorubicin HCl, 10 mg | $42.92 | $6.29 | 85.3% | $27,831,805 | $23,753,006 |
| J9045 | Carboplatin, 50 mg | $101.37 | $41.14 | 59.4% | $116,254,013 | $69,073,485 |
| J9170 | Docetaxel, 20 mg | $283.65 | $151.77 | 46.5% | $58,661,193 | $27,273,887 |
| J9201 | Gemcitabine HCl, 200 mg | $88.46 | $74.86 | 15.4% | $75,256,901 | $11,570,132 |
| J9202 | Goserelin Acetate, 3.6 mg | $446.49 | $214.87 | 51.9% | $321,485,273 | $166,772,870 |
| J9206 | Irinotecan, 20 mg | $117.81 | $75.45 | 36.0% | $79,914,022 | $28,734,046 |
| J9217 | Leuprolide Acetate, 7.5 mg | $592.60 | $257.00 | 56.6% | $620,102,889 | $351,175,379 |
| J9265 | Paclitaxel, 30 mg | $173.49 | $107.59 | 38.0% | $249,940,717 | $94,939,727 |
| J9310 | Rituximab, 100 mg | $420.29 | $239.58 | 43.0% | $71,072,780 | $30,558,810 |
| J9350 | Topotecan, 4 mg | $573.75 | $307.25 | 46.5% | $31,504,581 | $14,633,500 |
| J9390 | Vinorelbine Tartrate, 10 mg | $75.50 | $46.20 | 38.8% | $24,325,270 | $9,440,138 |
| Q0136 | Epoetin Alfa, per 1000 units | $11.40 | $7.22 | 36.7% | $379,708,697 | $139,226,522 |
| TOTAL FOR 24 HCPCS | | | | | $3,091,555,936 | $1,617,216,241 |

* To determine percent savings, we subtracted the VA price from the Medicare reimbursement amount. We then divided this number by the Medicare reimbursement amount.

**APPENDIX E**

## Medicare Savings Based on Physician/Supplier Costs

| HCPCS CODE | GENERIC DRUG NAME | MEDICARE MEDIAN | CATALOG MEDIAN | PERCENT SAVINGS* | 1999 ALLOWED CHARGES | ESTIMATED MEDICARE SAVINGS |
|---|---|---|---|---|---|---|
| J0640 | Leucovorin Calcium, 50 mg | $18.02 | $2.94 | 83.7% | $66,740,227 | $55,851,422 |
| J1260 | Dolasetron Mesylate, 10 mg | $14.82 | $8.29 | 44.1% | $46,647,272 | $20,553,758 |
| J1440 | Filgrastim, 300 mcg | $171.38 | $144.30 | 15.8% | $47,893,675 | $7,567,748 |
| J1441 | Filgrastim, 480 mcg | $273.03 | $229.90 | 15.8% | $67,411,261 | $10,648,821 |
| J1562 | Immune Globulin, 5g | $396.63 | $300.00 | 24.4% | $43,239,398 | $10,534,309 |
| J1626 | Granisetron HCl, 100 mcg | $18.54 | $13.81 | 25.5% | $46,432,246 | $11,845,983 |
| J2405 | Ondansetron HCl, 1 mg | $6.09 | $5.49 | 9.9% | $47,721,885 | $4,701,664 |
| J2430 | Pamidronate Disodium, 30 mg | $243.56 | $223.26 | 8.3% | $112,916,846 | $9,411,283 |
| J2820 | Sargramostim, 50 mcg | $27.41 | $23.13 | 15.6% | $23,533,251 | $3,674,656 |
| J7608 | Acetylcysteine, per g | $5.05 | $3.38 | 33.1% | $35,908,222 | $11,874,600 |
| J7619 | Albuterol Sulfate, per mg | $0.47 | $0.13 | 72.3% | $246,136,877 | $178,056,464 |
| J7644 | Ipratropium Bromide, per mg | $3.34 | $1.53 | 54.2% | $250,916,635 | $135,975,781 |
| J9000 | Doxorubicin HCl, 10 mg | $42.92 | $10.08 | 76.5% | $27,831,805 | $21,295,351 |
| J9045 | Carboplatin, 50 mg | $101.37 | $87.79 | 13.4% | $116,254,013 | $15,573,932 |
| J9170 | Docetaxel, 20 mg | $283.65 | $238.86 | 15.8% | $58,661,193 | $9,262,947 |
| J9201 | Gemcitabine HCl, 200 mg | $88.46 | $74.49 | 15.8% | $75,256,901 | $11,884,907 |
| J9202 | Goserelin Acetate, 3.6 mg | $446.49 | $375.99 | 15.8% | $321,485,273 | $50,761,969 |
| J9206 | Irinotecan, 20 mg | $117.81 | $98.63 | 16.3% | $79,914,022 | $13,010,364 |
| J9217 | Leuprolide Acetate, 7.5 mg | $592.60 | $499.03 | 15.8% | $620,102,889 | $97,912,635 |
| J9265 | Paclitaxel, 30 mg | $173.49 | $146.10 | 15.8% | $249,940,717 | $39,459,774 |
| J9310 | Rituximab, 100 mg | $420.29 | $353.93 | 15.8% | $71,072,780 | $11,221,751 |
| J9350 | Topotecan, 4 mg | $573.75 | $507.32 | 11.6% | $31,504,581 | $3,647,668 |
| J9390 | Vinorelbine Tartrate, 10 mg | $75.50 | $64.11 | 15.1% | $24,325,270 | $3,669,733 |
| Q0136 | Epoetin Alfa, per 1000 units | $11.40 | $10.72 | 6.0% | $379,708,697 | $22,649,291 |
| **TOTAL FOR 24 HCPCS** | | | | | **$3,091,555,936** | **$761,046,810** |

* To determine percent savings, we subtracted the catalog price from the Medicare reimbursement amount.  We then divided this number by the Medicare reimbursement amount.

**APPENDIX F**

## Health Care Financing Administration Comments

**APPENDIX F**



DEPARTMENT OF HEALTH & HUMAN SERVICES
Health Care Financing Administration

The Administrator
Washington, D.C.   20201

DATE:      DEC - 6 2000

TO:        June Gibbs Brown
           Inspector General

FROM:      Michael M. Hash
           Acting Administrator

SUBJECT:   Office of Inspector General (OIG) Draft Report: "Medicare
           Reimbursement of Prescription Drugs," (OEI-03-00-00310).

Thank you for the opportunity to review the above-mentioned draft report.
We concur with the OIG that there is a need for lowering the prices Medicare
pays providers for the limited number of outpatient prescription drugs that
Medicare currently covers. We have already made some strides in this area,
though many of our additional proposals to lower inflated prices would require
Congressional action.

First and foremost, in attempting to lower the prices Medicare pays providers for
drugs, the Health Care Financing Administration (HCFA) recognizes that the
payment system that compensates physicians and suppliers based on Average
Wholesale Price (AWP) creates a perverse incentive for price inflation.  In this
system, physicians and suppliers actually make profits when pharmaceutical
manufacturers raise their prices, thus distorting clinical decisions and cheating
taxpayers.

Indeed, some practitioners have come to rely on inflated drug payments to
subsidize associated, non-reimbursed costs, such as storage and administration,
and, in some cases, to provide other important services that are not adequately
compensated.  Consequently, the administrative actions we take to reduce the
price of a drug need to take such expenses into account.  Nevertheless, we
strongly agree with the OIG that the use of inflated drug prices is an inappropriate
way to compensate practitioners and suppliers for inadequate reimbursement for
other practice costs.

We believe the policy objective should be to pay the right price for the drug as
well as the right price for its administration and storage.  We believe the correct
approach to resolving these problems is to comprehensively address excessive
drug prices through legislation, and, at the same time, take regulatory action to
ensure that Medicare's provider payment systems appropriately take into account
costs for administration and storage.

**APPENDIX F**

**Page 2 – June Gibbs Brown**

As you know, our attempts to obtain legislation to pay more accurately for drugs
have not been successful. Congress has repeatedly rejected the Administration's
legislative proposals to pay on the basis of acquisition costs or to reduce the AWP
by 17 percent.

The administrative tools available to us are limited.  If we have creditable
information that the AWP prices we are using are incorrect, we can provide this
information to our contractors; we can also engage in rulemaking.  As you know,
when we have taken administrative action to reduce payments in the past, we have
been blocked by Congress.

For example, we attempted to use the inherent reasonableness authority, as revised
in the Balanced Budget Act of 1997 to lower payments for albuterol sulfate.
However, Congress suspended that effort until the recently released General
Accounting Office study and final rule making on inherent reasonableness.

In addition, this year we attempted to lower Medicare payments for drugs, while
taking administrative and legislative steps to increase certain payments to insure
access for beneficiaries to these drugs.  We transmitted to our Medicare carriers
the AWP data obtained by the Department of Justice (DOJ).  We asked carriers to
consider them for use in their drug pricing updates for those drugs where we
believe access would not be compromised.  However, the House-passed Medicare,
Medicaid, and State Children's Health Insurance Program Benefits Improvement
and Protection Act of 2000, H.R. 5543, contains a freeze on changes to the AWP
in use by Medicare as of September 1, 2000.  This provision would preclude
implementation of lower drug prices based on the DOJ data.  Because the
Medicare carriers must change their systems before the legislative outcome, and in
order to avoid disruption from lowering and then raising prices, we have
instructed carriers to delay implementation of the DOJ-derived prices until after
the outcome of the legislation is clear.

We want to continue to work with OIG and GAO to set reasonable payments for
drugs covered by the Medicare program.  However, we must recognize that the
drug payments are not made in a vacuum, and that program payments for other
administrative expenses must be fair and reasonable to ensure that Medicare
beneficiaries have access to the drugs that they need.  Our specific comments on
your recommendations are attached.

Attachment

APPENDIX F

Attachment

**Recommendation 1**

The HCFA should reduce excessive Medicare drug reimbursement amounts

**HCFA Comment:**

We agree. The first option that OIG suggests is to use wholesaler catalog prices. This was the basis for the DOJ data that we sent to carriers. We will continue to explore this approach.

OIG also recommends as other options that HCFA base payment on acquisition cost, on a Medicaid rebate type program, or on a Department of Veterans Affairs type fee schedule. While these options offer considerable promise, each requires legislation. Congress has been unwilling to accept acquisition cost as a basis, and, rather than attempt one of the other approaches OIG suggests, the Administration followed the Congress's lead by proposing a 17 percent reduction from AWP to replace the current 5 percent statutory reduction.

**Recommendation 2**

The HCFA should require all carriers to reimburse a uniform amount for each drug

**HCFA Comment:**

We agree that HCFA should move toward greater uniformity in carrier pricing. We have focused on utilizing the best practices used by the Medicare Part B contractors to calculate drug prices in addition to identifying and removing the less-than-best practices. Also, the use of a single computer software program to price drugs is under consideration.