**Attachment A To CIA**
**TAP Pharmaceutical Products Inc.**

## CERTIFICATION

In accordance with the Corporate Integrity Agreement ("CIA") entered between TAP Pharmaceutical Products Inc. ("TAP") and the OIG, the undersigned hereby certifies that the attached Average Sale Price information has been communicated to First DataBank Inc. (and/or other price reporting entity as specified in the CIA); to the State Medicaid programs of those States which executed settlement agreements with TAP, as required; to the OIG; and to the Centers for Medicare & Medicaid Services and that it has been calculated in accordance with the methodology described generally in the CIA and more specifically in the attached document.

__________________________
Signature

__________________________
Title

__________________________
Date

**Attachment B to CIA for TAP Pharmaceutical Products Inc.**

**Drug Price Reporting Engagement**

## I. Drug Price Reporting Engagement

Each year during the term of the CIA, an Independent Review Organization ("IRO") or Consultant, as explained below, shall review TAP's systems, policies and practices relating to the calculation and reporting of Average Sale Price and Best Price during each one year period covered by the Drug Price Reporting Engagement ("the Reporting Period"). Consistent with section III.E.1.c. of the CIA, after the fourth Reporting Period, the OIG may, at its discretion and upon request of TAP, permit TAP to perform the engagement described in this Attachment B (subject to validation by the IRO or Consultant, as appropriate). The Drug Price Reporting Engagement shall consist of two separate components: 1) a Reported Prices Engagement, and 2) a Systems Review Consulting Engagement. TAP may engage, at its discretion, a single entity to perform the Systems Review Consulting Engagement and the Reported Prices Engagement, provided that the entity has the necessary expertise and capabilities to perform both.

Prior to performing the Reported Prices Engagement, the IRO and TAP shall design agreed upon procedures as defined in the AICPA "attest standards" for Agreed Upon Procedures Engagements (hereafter "Agreed Upon Procedures") outlining the specific work to be performed by the IRO, and the Agreed Upon Procedures shall be submitted to the OIG for approval. Prior to performing the Systems Review Consulting Engagement, the Consultant and TAP shall design a workplan outlining the specific work to be performed by the Consultant. The Consultant's workplan may be submitted to the OIG for comment. The Engagements are described in general terms below.

### A. Reported Prices Engagement

The Reported Prices Engagement shall be designed to allow for evaluation of whether TAP is reporting Average Sale Price and Best Price in accordance with its obligations under the CIA and the requirements of the Medicaid Drug Rebate program (codified at 42 U.S.C. § 1396r-8), respectively. The Reported Prices Engagement shall consist of two parts, "Reported Prices Procedures for Average Sale Price" and "Reported Prices Procedures for Best Price."

**1. Reported Prices Procedures for Average Sale Price**

For each Reporting Period, the IRO shall conduct Reported Prices Procedures for Average Sale Price to determine whether TAP calculated and reported Average Sale Price in accordance with the CIA requirements. The Procedures shall require the IRO to select and test samples of transactions (consisting of sales and sales-related activities, for individual Government Reimbursed Products to individual purchasers or other entities, that are specifically included in or excluded from the Average Sale Price (as defined in section III.D.2.a. of the CIA) (hereafter "Transactions")). The IRO will also select and test samples of Estimated Transactions (as defined below) used in the calculation of Average Sale Prices in order to perform procedures regarding TAP's accrual methodologies as described in the certification referenced in section III.D.2.c. of the CIA.

*a. Grouping and Testing of Transactions*

The IRO shall begin its Agreed Upon Procedures by selecting and testing samples of Transactions (as grouped by TAP) from the Reporting Period. All Transactions that were finalized at the time of sale shall be grouped by transaction type (hereafter "Like-Kind Transactions")[1]. All transactions that were estimated (based on TAP's accrual methodology) during at least one quarter of the Reporting Period and were finalized during the Reporting Period shall also be grouped together (hereafter "Estimated Transactions"). The sum of all grouped Like-Kind Transactions and Estimated Transactions shall be deemed to be all Transactions that occurred during the Reporting Period. Each group of Like-Kind Transactions and the Estimated Transactions will be considered a separate universe from which the IRO will test a probe sample and, if required as set forth below, a statistically valid random sample of Transactions.

With regard to all grouped Like-Kind Transactions, the IRO will test for the following attributes: 1) whether the Transaction prices are supported by source

[1] Examples of the Like-Kind Transactions to be tested may include, but not be limited to: sales; volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; replacement goods; cash disbursements to purchasers; and other price concessions or incentives provided by TAP.

documents; and 2) whether TAP properly included or excluded each Transaction in the calculation of Average Sale Price under the definition of that term as set forth in section III.D.2.a. of the CIA.

With regard to the Estimated Transactions, the IRO shall test for the following attributes: 1) whether the recorded Estimated Transaction amounts were supported by commercial arrangements or other source documentation; 2) whether the Estimated Transactions were properly included or excluded in the calculation of Average Sale Price; 3) whether after the transactions became final, TAP reviewed the Estimated Transaction amounts in light of actual experience (including TAP's contract(s) with the customer, the customer's purchasing history, TAP's rebate policy or other relevant information); 4) whether the actual experience (as reviewed in Item 3 above) supported the recorded Estimated Transaction amount(s); and 5) if the actual experience did not support the recorded Estimated Transaction amounts, whether TAP adjusted the amounts during the Reporting Period.

*b. Sampling of Transactions*

The IRO shall initially test a probe sample of Transactions from each group of Like-Kind Transactions and Estimated Transactions. If the error rate for any of the probe samples falls below an identified threshold error rate, no further testing of the universe of Like-Kind Transactions or Estimated Transactions shall be required. If the error rate in any of the probe samples exceeds an identified threshold error rate, the IRO shall test a statistically valid random sample of Transactions or Estimated Transactions from that universe of Transactions. The size of the probe samples, the size of any required statistically valid random sample(s), the allocation of Transactions into universes, and the threshold error rate shall be agreed upon by TAP, the OIG and the IRO as an element of the Agreed Upon Procedures.

The probe samples and, if necessary, any subsequent statistically valid random samples shall be generated through the use of the OIG's Office of Audit Services Statistical Sampling Software, also known as "RAT-STATS" (which is available through the Internet at www.hhs.gov/oas/ratstat.html) or through the use of another method of random sampling acceptable to the OIG.

**2. Reported Prices Procedures for Best Price**

For each Reporting Period, the IRO shall conduct the Reported Prices Procedures for Best Price to determine whether TAP calculated and reported Best Price to CMS for Government Reimbursed Products in accordance with the applicable requirements of the Medicaid Drug Rebate program. The Procedures shall require the IRO to select and test samples of transactions (consisting of sales and sales-related activities, for individual Government Reimbursed Products to individual purchasers or other entities, that are specifically included in or excluded from the calculation of Best Price, (hereafter "Best Price Transactions")).

*a. Grouping and Testing of Like-Kind Best Price Transactions*

The IRO shall begin its Agreed Upon Procedures by selecting and testing samples of like-kind Best Price Transactions [2] (as grouped by TAP) from the Reporting Period. The sum of all Best Price Transactions in all the like-kind Best Price Transaction groups combined shall equal the sum of all Best Price Transactions that occurred during the Reporting Period. Each group of like-kind Best Price Transactions will be considered a separate universe from which the IRO will review a probe sample and, if required as set forth below, a statistically valid random sample of Best Price Transactions.

With regard to all grouped like-kind Best Price Transactions, the IRO will test whether: 1) the Medicaid Rebate Transaction prices are supported by source documents; and 2) TAP properly included or excluded each Best Price Transaction in the calculation of Best Price in accordance with 42 U.S.C.§ 1396r-8(c)(1)(C) or other applicable Medicaid Drug Rebate program requirements. The IRO shall also identify those instances in which TAP reported adjusted Best Price amounts to CMS based on the IRO's Reported Prices Procedures for Best Price and shall report the amounts of any adjustments to the reported Best Prices.

---

[2] Examples of like-kind Best Price Transactions to be tested may include, but not be limited to: sales; volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates paid to customers or credited to customers' accounts; replacement goods; cash disbursements to purchasers; and all other price concessions or incentives provided by TAP.

*b. Sampling of Like-Kind Best Price Transactions*

The IRO shall initially test a probe sample of Best Price Transactions from each group of like-kind Best Price Transactions. If the error rate for any of the probe samples falls below an identified threshold error rate, no further testing of the universe of like-kind Best Price Transactions shall be required. If the error rate in any of the probe samples exceeds an identified threshold error rate, the IRO shall test a statistically valid random sample of Best Price Transactions from that universe of like-kind Best Price Transactions. The size of the probe sample, the size of any statistically valid random sample, and the threshold error rate shall be agreed upon by TAP, the OIG and the IRO as an element of the Agreed Upon Procedures.

The probe samples and, if necessary, any subsequent statistically valid random samples shall be generated through the use of the OIG's Office of Audit Services Statistical Sampling Software, also known as "RAT-STATS" (which is available through the Internet at www.hhs.gov/oas/ratstat.html) or through the use of another method of random sampling acceptable to the OIG.

## II. Systems Review Consulting Engagement

For each Reporting Period, TAP will retain a Consultant to review its price calculation and reporting systems as they relate to Government Reimbursed Products ("the Systems Review Consulting Engagement"). This Systems Review Consulting Engagement shall provide for a review of the following:

1. TAP's systems and operations relating to the calculation and reporting of Average Sale Price as required by section III.D. of the CIA;

2. TAP's systems and operations relating to the identification and correction of any inaccurate pricing information (*e.g.* Average Sale Prices), if any, provided to the State Medicaid programs, CMS, the OIG, and drug price reporting services to which TAP reports prices;

3. TAP's systems and operations relating to the calculation and reporting of Best Price as required under the Medicaid Drug Rebate program; and

4. TAP's systems and operations relating to the identification and correction of any inaccurate pricing information relating to the Medicaid Drug Rebate program, if any, provided to CMS or the State Medicaid programs in accordance with all applicable requirements of the Medicaid Drug Rebate program.

## III. Drug Price Reporting Engagement Report

The IRO shall annually prepare a report based upon the Drug Price Reporting Engagement. Each report shall include the following information:

### A. Elements to Be Included:

1. Engagement Objectives: A statement of the objectives intended to be achieved by the Drug Price Reporting Engagement;

2. Review Protocol: A detailed narrative description of the procedures performed and a description of each sampling unit and universe utilized in performing the procedures; and

3. Sources of Data: A full description of the documentation relied upon by the IRO when performing the Drug Price Reporting Engagement.

### B. Results to Be Included:

The following results shall be included in each Drug Price Reporting Engagement Report:

1. for each universe of Like-Kind Transactions and Estimated Transactions tested, the IRO shall describe the procedures performed and state its findings and supporting evidence as to whether the Transactions and Estimated Transactions tested satisfied the corresponding criteria outlined in section I.A.1. above;

2. for each universe of Like-Kind Transactions and Estimated Transactions, the IRO shall state the percentage error rate discovered;

3. for each universe of Like-Kind Transactions or Estimated Transactions for which the error rate exceeded the identified threshold error rate, and the IRO tested a statistically valid random sample, the IRO shall state its findings and supporting evidence based upon the testing of the larger sample;

4. for each universe of like-kind Best Price Transactions, the IRO shall describe the procedures performed and state its findings and supporting evidence as to whether the Best Price Transactions tested satisfied the criteria outlined in section I.A.2. above;

5. for each universe of like-kind Best Price Transactions, the IRO shall state the percentage error rate discovered, describe any instances in which Best Price adjustments were reported to CMS as a result of the IRO's Reported Prices Procedures for Best Price and the amounts of any adjustments to the reported Best Prices; and

6. for each universe of like-kind Best Price Transactions for which the error rate exceeded the identified threshold error rate, and the IRO tested a statistically valid random sample, the IRO shall state its findings and supporting evidence based upon the testing of the larger sample.

## IV. Systems Review Consulting Engagement Report

For each Reporting Period, the Consultant shall prepare a report based upon the Systems Review Consulting Engagement ("Systems Review Consulting Engagement Report"). Each Report shall include the following:

a) a description of the Systems Review Consulting Engagement performed (including a description of the documentation reviewed);
b) a description of any identified weaknesses in TAP's systems and operations relating to the calculation and reporting of Average Sale Price and Best Price;

c) a description of any identified weaknesses in TAP's systems and operations relating to the identification and correction of any inaccurate pricing information (including, but not limited to, Average Sale Price or Best Price), if any, provided to the State Medicaid programs, CMS, the OIG and to any drug price reporting services to which TAP reports in connection with reimbursement under Federal health care programs;

d) a description of any recommendations the Consultant may have to improve any of TAP's systems and operations relating to the calculation and reporting of Average Sale Price or Best Price;

e) a description of any recommendations the Consultant may have to improve any of TAP's systems and operations relating to the identification and correction of any inaccurate pricing information provided to the State Medicaid programs, CMS, the OIG and to any drug price reporting services to which TAP reports.

The Consultant's Systems Review Consulting Engagement Report will be restricted solely to use by TAP management, and TAP will provide the final Report to the OIG as part of the Annual Report submission.

**Attachment C to CIA for TAP Pharmaceutical Products Inc.**
**Sales and Marketing Engagement**

## I. Sales and Marketing Engagement

Each year during the term of the CIA, an Independent Review Organization ("IRO") or Consultant, as explained below, shall review TAP's systems, policies and practices relating to the sales and marketing of Government Reimbursed Products (as defined in section III.B.1 of the CIA) for the one year period covered by the Sales and Marketing Engagement ("the Reporting Period"). Consistent with section III.E.1.c. of the CIA, after the fourth Reporting Period, the OIG may, at its discretion and upon request of TAP, permit TAP to perform the engagements described in this Attachment C (subject to validation by the IRO or Consultant). TAP may engage, at its discretion, a single entity to perform the Systems Review Consulting Engagement and the Documentation Review, explained below, provided that the entity has the necessary expertise and capabilities to perform both. The two Engagements are described in general terms in sections I.A. and I.B. below.

The Sales and Marketing Engagement shall consist of two separate components. The first (the "Systems Review Consulting Engagement") shall be a review by a Consultant of TAP's sales and marketing systems, policies and practices (including the controls on those systems, policies and practices) as they relate to several specified types of activities. Prior to performing the Systems Review Consulting Engagement, the Consultant and TAP shall design a workplan outlining the specific work to be performed by the Consultant. The workplan may be submitted to the OIG for comment.

The second component of the Sales and Marketing Engagement (the "Documentation Review") shall be a review by an IRO of samples of control documentation used in connection with TAP's sales and marketing related practices during the Reporting Period. Prior to performing the Documentation Review, the IRO and TAP shall design agreed upon procedures as defined in the AICPA "attest standards" for Agreed Upon Procedures Engagements (hereafter "Agreed Upon Procedures") outlining the specific work to be performed by the IRO, and the Agreed Upon Procedures shall be submitted to the OIG for approval.

**A. Sales and Marketing Systems Review Consulting Engagement**

For each Reporting Period, the Consultant shall review TAP's sales and marketing related systems, policies and practices pertaining to the following types of activities engaged in with purchasers or prescribers:

a) retention of physicians and other purchasers and/or prescribers of Government Reimbursed Products for consulting, speaking and other advisory fee-for-service arrangements;
b) sponsorship of speaking engagements, meetings or other events (*e.g.*, TAP Speakers Programs, Local Event Programs, *etc.*);
c) awarding or payment of educational grants;
d) awarding or payment of clinical and research grants;
e) expenditures for third party advice about reimbursement or claims submissions for Government Reimbursed Products;
f) provision of gifts;
g) provision of or payment for business courtesies;
h) provision of or payment for customer assistance programs;
i) provision of debt forgiveness, debt reduction, or other like assistance to customers; and
j) provision of drug samples.

This list of activities shall hereafter be referred to as the "Sales and Marketing Related Activities" or the "Activities."

**1. Review of Sales and Marketing Related Systems, Policies and Practices**

For each Reporting Period, the Consultant shall review TAP's systems, policies and practices in connection with each of the Sales and Marketing Related Activities.

In general terms, the Consultant shall review the following for each of the Sales and Marketing Related Activities:

a) whether TAP has instituted control and accountability systems (*e.g.*, documentation and approval requirements) and written policies regarding the Activity;
b) the manner in which the control and accountability systems and the written policies are made known or disseminated within TAP;
c) what disciplinary measures TAP has established for failure to comply

with the control and accountability systems and written policies; and

d) the number of instances and the circumstances in which TAP took disciplinary actions for failure to comply with the systems and policies.

To conduct the review, the Consultant shall review appropriate corporate documentation and may also interview TAP personnel (*e.g.*, the Compliance Officer) as appropriate to allow it to report the findings identified in section I.A.2. below.

**2. Systems Review Consulting Engagement Report**

For each Reporting Period, the Consultant shall prepare a report based upon the Systems Review Consulting Engagement performed ("Systems Review Consulting Engagement Report"). Each Report shall include the following items for each of the Sales and Marketing Related Activities:

a) a description of the documentation reviewed and any personnel interviewed;
b) a general description of TAP's control and accountability systems and written policies and actual practices;
c) a description of the manner in which the control and accountability systems and written policies are disseminated or made known within TAP;
d) a general description of the disciplinary measures TAP has established for failure to comply with the control and accountability systems and written policies;
e) a description of the number of instances and a description of the circumstances in which TAP undertook disciplinary actions for failure to comply with the systems and policies;
f) the findings and supporting rationale regarding the weaknesses in TAP's sales and marketing related systems, policies and practices; and
g) any recommendations to improve any of TAP's sales and marketing related systems, policies or practices.

The Consultant's Systems Review Consulting Engagement Report will be restricted solely to use by TAP management, and TAP will provide the final Report to the OIG as part of the Annual Report submission.

## B. Sales and Marketing Documentation Review

### 1. General Description of Documentation Review

TAP's Policies and Procedures (referenced in section III.B.2. of the CIA), including TAP's Operational Guidelines and Standard Operating Procedures (hereafter collectively "TAP's Policies"), set forth certain requirements relating to control documents used in connection with the Sales and Marketing Related Activities.

*a. Control Documents to Be Reviewed*

For purposes of this Sales and Marketing Documentation Review, the following categories of control documents ("Control Documents") shall be reviewed:

1. Speakers Agreements and related documentation (*e.g.*, Speaker Information Forms and Speaker Expense Forms);
2. Form agreements for consultation or other non-speaking arrangements;
3. Letters of Agreement (used for educational grants);
4. Agreements relating to clinical or research grants;
5. Administrative Check Requests; and
6. Expense Reports (used for gifts, business courtesies, customer assistance programs, *etc.*).

*b. Attributes to Be Tested*

During each Reporting Period, the IRO shall follow the Agreed Upon Procedures and test samples of Control Documents for the following attributes:

1. whether the Control Documents were completed in accordance with the requirements set forth in the TAP's Policies;
2. whether the Control Documents reflect that all required written approvals were obtained in accordance with TAP's Policies; and
3. for each Control Document reviewed, whether all supporting documentation (*e.g.*, receipts) and follow-up documentation (*e.g.*, progress and final reports produced in connection with grants) exists in appropriate files in accordance with TAP's Policies.

The IRO shall conduct an attribute test of the samples of Control Documents using

the three criteria set forth above and shall identify errors in the Control Documents in accordance with the protocols contained in the Agreed Upon Procedures. The IRO and TAP, in consultation with the OIG, will define what constitutes a material error for purposes of triggering the additional review as set forth in section I.B.3. below. Specifically, if the IRO calculates an overall material error rate of five percent (5%) or greater for any universe of Control Documents reviewed, it shall conduct the additional review explained below.

**2. Sampling of Control Documents**

For each Reporting Period, the IRO shall follow the Agreed Upon Procedures to test a total of 800 Control Documents, half of which shall relate to Sales and Marketing Related Activities for Lupron Depot® ("Lupron") and the other half of which shall relate to Sales and Marketing Related Activities for Prevacid® ("Prevacid"). The IRO shall select the Control Documents to be reviewed in the following manner.

*a. Review of Control Documents Relating to Lupron Sales and Marketing*

1. The IRO shall select 320 (eighty percent (80%)) of the Control Documents to be reviewed from those Control Documents reflecting transactions involving the largest volume purchasers of Lupron during the Reporting Period (the "Large Volume Purchasers").

2. The IRO, with assistance from TAP, shall identify the Large Volume Purchasers and rank them in descending order according to purchase volume, with the purchaser of the largest volume of Lupron (the "Largest Volume Purchaser") being ranked first.

3. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Volume Purchaser during the Reporting Period.

4. The IRO shall identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Volume Purchasers, in turn, until the IRO has identified a total of 320 Control Documents. (For instance, if transactions involving the Largest Volume Purchaser were reflected in twenty Control Documents, the IRO would then select and review a total of 300 Control Documents relating to transactions with other

Large Volume Purchasers.)

5. The remaining 80 (twenty percent (20%)) of the Control Documents to be reviewed shall be selected from among those Control Documents reflecting transactions with purchasers who had the largest percentage increase in the volume of Lupron purchased during the Reporting Period (as compared to the immediately preceding Reporting Period) ("Large Percentage Increase Purchasers").

6. The IRO, with assistance from TAP, shall list the Large Percentage Increase Purchasers and rank them in descending order of percentage volume increase, with the purchaser having the largest percentage volume increase being ranked first ("Largest Percentage Increase Purchaser").

7. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Percentage Increase Purchaser during the Reporting Period.

8. The IRO shall then identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Percentage Increase Purchasers, in turn, until the IRO has identified a total of 80 Control Documents.

9. Each set of Control Documents reviewed (those for the Large Volume Purchasers and those for the Large Percentage Increase Purchasers) shall be considered a separate universe for purposes of calculating an error rate.

10. After selecting the two universes of Control Documents to be evaluated, the IRO shall review the Control Documents using the criteria set forth in section I.B.1. and determine an error rate for each universe.

*b. Review of Control Documents Relating to Prevacid Sales and Marketing*

For each Reporting Period, the IRO shall follow Agreed Upon Procedures to test 400 Control Documents relating to the sales of Prevacid in a manner similar to that in which the Lupron-related Control Documents were tested.

1. The IRO shall select 320 (eighty percent (80%)) of the Control Documents to be reviewed from those Control Documents reflecting

transactions involving the largest volume prescribers of Prevacid during the Reporting Period (the "Large Volume Prescribers").

2. The IRO, with assistance from TAP, shall identify the Large Volume Prescribers and rank them in descending order according to the volume of Prevacid prescribed, with the largest volume prescriber (the "Largest Volume Prescriber") being ranked first.

3. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Volume Prescriber during the Reporting Period.

4. The IRO shall identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Volume Prescribers, in turn, until the IRO has identified a total of 320 Control Documents.

5. The remaining 80 (twenty percent (20%)) of the Control Documents to be reviewed shall be selected from among those Control Documents reflecting transactions involving prescribers who had the largest percentage increase in the amount of Prevacid prescribed during the Reporting Period (as compared to the immediately preceding Reporting Period) ("Large Percentage Increase Prescribers").

6. The IRO, with assistance from TAP, shall list the Large Percentage Increase Prescribers and rank them in descending order of percentage volume increase, with the prescriber having the largest percentage volume increase being ranked first ("Largest Percentage Increase Prescriber").

7. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Percentage Increase Prescriber during the Reporting Period.

8. The IRO shall then identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Percentage Increase Prescribers, in turn, until the IRO has identified a total of 80 Control Documents.

9. Each set of Control Documents reviewed (those for the Large Volume Prescribers and those for the Large Percentage Increase Prescribers) shall be

considered a separate universe for purposes of calculating an error rate.

10. After selecting the two universes of Control Documents to be evaluated, the IRO shall review the Control Documents using the criteria set forth in section I.B.1. and determine an error rate for each universe.

**3. Additional Review if Material Error Rates Are Five Percent or Greater**

If the IRO finds a material error rate in any of the four universes of reviewed Control Documents of five percent (5%) or greater, the IRO shall conduct an additional review of the transactions reflected in the erroneous Control Documents for that universe. The IRO will conduct this additional review by performing Agreed Upon Procedures designed to determine the cause of the errors. As referenced in section 1.B.1.b. when establishing the Agreed Upon Procedures, the IRO and TAP, in consultation with the OIG, shall agree what constitutes a material error for purposes of calculating the five percent error rate and shall agree, depending on the nature of the material error, what additional review should be conducted by the IRO to determine the cause of the identified errors. For instance, where necessary, the IRO may need to review additional documentation and/or conduct interviews to identify the cause of the errors.

**4. Documentation Review Report**

The IRO shall annually prepare a report based upon each Documentation Review performed ("Documentation Review Report"). Each Documentation Review Report shall include the following:

*a. Elements to Be Included:*

1. Engagement Objectives: A statement of the objectives intended to be achieved by the Documentation Review;

2. Review Protocol: A detailed narrative description of the procedures performed and a description of each sampling unit and universe utilized in performing the procedures; and

3. Sources of Data: A full description of documentation relied upon by the IRO when performing the Documentation Review.

*b. Results to Be Included*

The following results shall be included in each Documentation Review Report:

1. for each universe of Control Documents reviewed, the IRO shall describe the procedures performed and state its findings and supporting rationale as to whether: a) the Control Documents were completed in accordance with all requirements set forth in the TAP's Policies; b) the Control Documents reflect that all written approvals were obtained in accordance with TAP's Policies; and c) for each Control Document reviewed, all supporting documentation and follow-up documentation exists in accordance with TAP's Policies;

2. for each universe of Control Documents reviewed, the IRO shall state the percentage material error rate discovered; and

3. if the material error rate for any universe is five percent or greater, the IRO shall describe the material errors discovered and the additional procedures it performed and shall state its findings as to the cause of the material errors.