1  multiply the proceeding.  That is exactly what Abbott has

2  done here.  The First Circuit unlike many circuits and unlike

3  the case law cited by Abbott in its opposition does not require

4  a finding of recklessness and does not require a finding of

5  subjective bad faith.  All the First Circuit says is that it

6  has to be beyond negligence and it has to be beyond

7  incompetence, but given the time period here where Abbott

8  delayed for a year, almost a year and a half of time, you can't

9  really come into court today and say, Your Honor, this is mere

10 negligence or this is mere incompetence.  It has clearly gone

11 beyond that into what Section 1927 was designed to prevent.

12         And, Your Honor, plaintiffs have clearly been

13 prejudiced by this action for this reason.  As you've heard in

14 the context of two motions this morning, the Track two

15 defendants have contended since December of 2005 and as

16 recently as the Track Two motion for class certification in

17 front of Judge Saris, the Track Two discovery is over.  To

18 date, plaintiffs have taken three depositions of Abbott

19 employees and likely may have to retake two of those three

20 because we've gotten the supplemental document production.  So

21 there is no way with regard to Abbott that Track Two discovery

22 can be over when we haven't gotten the documents to take the

23 depositions in the first instance.  And so for that reason,

24 plaintiffs have been severely prejudiced by this unheard of

25 delay by Abbott.

1          So, Your Honor, we respectfully request that you
2    grant our motion and grant the motion to compel and order the
3    costs, but if you're not inclined to order the costs against
4    Abbott's attorneys, we do ask that you require Abbott to submit
5    an affidavit saying that it is finished with its document
6    production because there's a lot of hedging in its opposition
7    that it's, you know, still looking and it's obligations are
8    continuing and language like that.  We want an affidavit saying
9    they're finished.

10          The second thing we'd like is an order that they have
11   to complete their email production within 45 days of your order
12   and the reason for that is as follows, Your Honor.  Back in May
13   26th of 2005, we first started talking to Abbott about doing an
14   email production.  We didn't get the email production until
15   January of 2006.  At that time my office did a very detailed
16   and expensive analysis of that email production and discovery
17   that there were vast time periods as well as personnel who were
18   missing from that. So since the filing of our motion to compel,
19   we've been having discussions with Abbott and they have
20   discovered that they believe that what happened with this email
21   production was the problem with their e-discovery vender and
22   that they have somehow screwed it up.  And there are a couple
23   of points with that.

24          First of all, we would have loved to have known this
25   and known this without our expense a year ago when we

1    originally requested the email production, and the second

2    thing is that given the history of bad faith with Abbott, we

3    just don't want this email process to drag on forever.   As

4    other defendants have said in this courtroom today, enough is

5    enough.   I would love to take depositions and get my avid

6    discovery over with but I simply can't do that if I don't have

7    an email production from them.   So we would ask that your court

8    enter an order with regard to that.

9              Thank you.

10             THE COURT:   I'll hear Abbott.

11             MR. MURRAY:   Good morning, Your Honor, Brian Murray

12   on behalf of Abbott.   Your Honor, this is the second of two

13   sanctions motions filed by plaintiffs' attorneys.   The first

14   was against Baxter, which this court disposed of--

15             THE COURT:   Well, first of all, are you ready to

16   prepare and affidavit to say that you are finished?

17             MR. MURRAY:   This is sort of the problem.   We've said

18   that already and I guess I want to start with that is what's

19   not at issue.   There are five categories of documents that this

20   motion is about, and we've worked with the plaintiffs.   The

21   problem is you'll see in their certificate of conference to

22   their motion, they don't say we asked for these five categories

23   and were refused and we couldn't reach accord.   What they say

24   is we've been dealing with these issues over the course of the

25   year.   As Your Honor has heard this morning, plaintiffs seem

1   to change as time goes along just like you would in any

2   discovery process.  They want certain things.  We give it to

3   them.   They want more things.  Abbott has never refused to

4   produce any of these categories of documents.  Abbott has in

5   fact worked diligently since what Your Honor has already termed

6   to be overly broad omnibus requests that you already dealt with

7   in the Baxter motion were served in 2004.  Of the five

8   categories that are set out in the motion since the motion was

9   filed, we didn't resist.  We've been giving them to them.  We

10  were in the process of doing that.  They've gotten four of the

11  five.  We've told them that's is all there is to have.  The

12  fifth is the email, the fifth is the email and that's a

13  problem.  The problem is this wasn't as simple as going to an

14  active system as pulling off the emails.  We had to restore

15  backup tapes.  Abbott has already spent over $100,000 on just

16  the computer costs involved in restoring those backup tapes.

17  We had 30 different Jones Day attorneys at one point or another

18  reviewing this email to get it produced on time or as quickly

19  as we possibly could.  In the process as you might guess, as

20  the email is segmented over 30 attorneys, there's no one person

21  looking at this that's able to say, hey, there seems to be

22  something wrong here, but in fact there does.  It seems that

23  in pulling the two backup tapes, what our vendor told us about

24  what would be on them was not quite right.  They thought we'd

25  be catching a whole period that was relevant.  In fact, we seem

1  to be localized around the two days of the tapes that we

2  got.  Ever since we got this motion we've been working with the

3  vendor.  We've been working with plaintiffs.  We continue to

4  work with the vendor and plaintiffs to get this worked out and

5  we want to do so as quickly as possible.  We're not holding

6  back anything.  Of the five categories, let me just summarize,

7  four are done and the fifth we are working on which is the

8  email.  There's nothing to compel.  So that leaves us with why

9  are we here.  We said all this in our response brief and the

10 answer was, well, in our opening brief just as they had against

11 Baxter, we'd asked for sanctions against the client, but under

12 1927 sanctions aren't available against the client as Your

13 Honor knows from the Baxter motion.  So in their reply brief,

14 in a footnote we get, no, we're really actually upset with the

15 lawyers.  They're here seeking sanctions from me, from my law

16 firm saying that we didn't do something, and I'm not clear what

17 that is.  To understand how baseless this is, you need to

18 understand just these three things.  The requests were served

19 in March of `04.  They were nationwide in scope seeking

20 information on every Abbott subject drug for a course over a

21 decade.  Specifically, I would point the Court to request 16,

22 17 and 26, and especially number 17 and this is Exhibit A to

23 Ms. Connolly's motion, to her declaration, 17 asks Abbott to

24 produce for each subject drug and I'm quoting now, "All

25 documents concerning any actual, proposed or prospective price

1  announcement, price change or price list." We immediately

2  began to comply with those requests. We continued to reply as

3  plaintiffs went silent for almost a year. When they resurfaced

4  in May of 2005, there was a big push because discovery cutoff

5  was coming up in the end of December and they wanted their

6  documents and they were entitled to them, and we worked hard.

7  We pulled all the documents. We had a team of contract

8  attorneys starting the review, finished off by like I said, at

9  one point over 30 Jones Day lawyers in five offices over the

10 course of two months. Starting November 4th we made a rolling

11 production every week of documents, and these were on CDs.

12 This wasn't cheap. If you figure out the cost to pull the

13 documents, all the contract lawyers, all the added Abbott

14 lawyers, plus we had to tip and put them on CDs to hand them

15 over. We wouldn't have been doing this if we thought we didn't

16 have to do it. As we're nearing the end of this whole massive

17 process, December 12th we get an email from plaintiff's counsel

18 saying this is a document dump. We don't want these price

19 lists, and I'd point Your Honor to their Exhibit D and our

20 Exhibit N, which is the correspondence that goes back and

21 forth. The problem is at that point you can't just throw a

22 lever and say take out all the price lists from the process.

23 All the documents are being reviewed. We're working at great

24 neck speed to get them out the door. You can't just change

25 what you wanted and what you've been asking us for an threaten

1  us with motions to compel for at that late date.

2       Now, we've heard today they say that as early as May

3  2005 that they had asked, told us that they didn't need this

4  stuff.  The problem is, it's their Exhibit E where they say

5  that, and all they claim as support of that is some set of

6  phantom phone conversations.  It just doesn't ring true.  You'd

7  think that if someone told us we didn't have to go through all

8  the burden that we went to to produce all this stuff, we

9  wouldn't have.  We'd have written a letter.  We'd have

10 documented it and then we'd have limited our production.  You

11 won't find that in the inch and a half of exhibits on their

12 motion.  Also, these aren't people who don't know how to

13 document a phone call or state it differently.  I'd point the

14 Court to the May 25th letter, their Exhibit O.  This is a

15 six-page, single space letter documenting one phone

16 conversation in May of 2005.  there's nothing in there that

17 says we don't have to produce price lists and there's nothing

18 else in that inch and a half of documents that says we don't

19 have to produce each and everything that they asked for in this

20 overly broad set of requests.

21      So, Your Honor, why are we here, why are they asking

22 for sanctions?  It can't be because they didn't get these five

23 categories of documents.  They've gotten four and we're working

24 with them on the fifth.  It can't be because we just didn't do

25 it fast enough for them.  These were a set of document requests

1   that changed over time.  They had this focus or that focus.

2            THE COURT:  And will the fifth be done within 45

3   days?

4            MR. MURRAY:  We'll work as fast as we can, Your

5   Honor.  The problem is it involves getting computer consultants

6   in to restore backup tapes.  And as Your Honor knows from all

7   the discovery law, that's hard.  We're not stalling.  We're not

8   dragging our feet, and we understand that there will be

9   depositions that Abbott employees required after this.  We're

10  not trying to stonewall him on that either.  We're working as

11  fast as we can on the email, but it depends on what the

12  computer consultants are able to do, and at this point, they

13  haven't sorted out what they've done wrong in the first place.

14           Your Honor, I would respectfully submit to the court

15  the bottom line is we were served with overly broad requests.

16  We took our job as counselors and attorneys seriously.  We

17  tried to comply.  We've done everything we can and we're still

18  working to do everything we can.  The motion should be denied.

19           MS. CONNOLLY:  Could I address that briefly, Your

20  Honor.

21           THE COURT:  Certainly.

22           MS. CONNOLLY:  My brother has gone into again

23  focusing on the omnibus request and suggesting, which I don't

24  think he has an ability to do because he isn't the lawyer at

25  Jones Day who's actually been communicating with me for a year

1   and a half, and I respectfully suggest that he may not know

2   that I had phone call after phone call and letter after letter

3   telling Abbott that we were not interested in getting documents

4   that were fully responsive to the omnibus request.  That is

5   simply not what we're talking about here today.  What we're are

6   talking about is my January 19th, 2006 letter which is attached

7   as Exhibit F to the motion where I specifically identified the

8   five categories of documents that we then sought in our June

9   2006 motion to compel.  That's nearly six months later that we

10  were seeking those documents.  So when you're asking why are we

11  here today on a motion for sanctions, we're here today on a

12  motion for sanctions because it took a year and a half and only

13  after we filed a motion to compel that we got those documents.

14  That is not the intent of the local rules that require us to

15  meet and confer, and it's certainly not the intent that Your

16  Honor has meant to run this litigation that we have to come in

17  after a year and a half saying we've got nothing.  It's simply

18  bad faith when the only time you produce documents that a party

19  is looking for is in response to a motion to compel.

20         THE COURT:  Well, I guess I want to know whether or

21  not Abbott can meet your request.  Can you state that you are

22  finished and can you state that the E production will be done

23  within 45 days?

24         MR. MURRAY:  Part of the problem, Your Honor, is

25  finished with what?  If we're talking about the five categories

1   of documents set out in the motion, sure we'd be happy to

2   say that.  The problem is that since the motion has been filed,

3   there have been yet more requests.  We're now talking about

4   Bank of Myosin (ph) documents.  They now want every deposition

5   transcript in every government case that Abbott is a part of.

6   Their requests keep growing.  I'm not sure what we're supposed

7   to be done with.  If it's just as to these four categories,

8   we've told them we're done and I'd be happy to represent to the

9   Court, we're done.  As far as the fifth category, the email,

10  we're working with all due speed.  It's really in the hands of

11  the computer people to tell us how to fix our backup tapes,

12  which weren't necessarily meant for this sort of thing to get

13  it done so that we can make this complete and full a production

14  as possible.

15          THE COURT:  Denied without prejudice.  You can renew

16  it in 45 days.

17          MR. MURRAY:  Thank you, Your Honor.

18          THE COURT:  All right.  Next is docket entry number

19  2745, motion of Montana and Nevada.

20          MR. SOBOL:  Yes, Your Honor, thank you.  This is a

21  motion, Your Honor, for a protective order with respect to a

22  subpoena that has been served, well, two subpoenas, one on Blue

23  Cross Blue Shield of Montana and then the other a deposition

24  notice on MMCAP.  Both deposition notices were filed, were

25  served rather on May 19, 2006, after the discovery period of

1   March 21, 2006 for the state cases.  So as a practical

2   matter, they're simply beyond the timeframe.  Moreover, with

3   respect to Blue Cross Blue Shield of Montana, that entity has

4   already been deposed once before in the case.  As to MMCAP, the

5   deposition seeks interpretation of data, which data had been

6   provided much earlier in the case.  Indeed, MMCAP, a deposition

7   notice had gone out to them in January of 2006 and then wasn't

8   acted on so it's not as if the defendants even weren't aware of

9   that entity.  So as a practical matter, we seek relief from

10   this Court in terms of a protective order.  I think the

11   defendants argument at least from the papers is well, you don't

12   have any standing to raise any issue with respect to the

13   depositions of non-parties.  I think that the rules enable a

14   litigant to the case to be able to enforce the timeframes of

15   the orders and also obviously it's burdensome for us because

16   obviously we play a role in the preparation of the defense and

17   the dealing with the deposition.  So that's why the motion

18   should be allowed, Your Honor.

19          THE COURT:  All right.  What's your response to the

20   fact that they're well beyond the discovery cutoff?

21          MR. PRATT:  Thank you, Your Honor, Nerag Pratt, from

22   Patterson, Belknap, Webb and Tyler on behalf of the defendants.

23          As a practical matter, this discovery should be

24   allowed.  It is relevant and there is no demonstration of undue

25   burden.  The state does not dispute that this discovery is

 1   relevant and is attempting to thwart defendant's efforts to

 2   obtain this material--

 3          THE COURT:  Well, get to my question--

 4          MR. PRATT:  --by saying it's untimely.

 5          THE COURT:  --which was they were beyond the

 6   discovery cutoff.

 7          MR. PRATT:  Yes, Your Honor.

 8          THE COURT:  Nobody saw it leave.

 9          MR. PRATT:  We submit, respectfully submit that

10   whether non-party discovery is subject to the cutoff date is

11   not settled and the cases cited by the plaintiff and the state,

12   state that this is viewed in context.  Here, the defendants

13   diligently sought this discovery after the state indicated on

14   May 9th of 2006 that they would not produce this data relevant

15   to its parents' patriotic claims.  On May 19th, just 10 days

16   later, we issued the subpoena to Blue Cross Blue Shield of

17   Montana to obtain this.  Blue Cross Blue Shield of Montana is

18   not here.  They have no alleged any undue burden, demonstrated

19   any undue burden in producing this material, and in fact even

20   after the state had filed its brief, its motion, they had

21   worked with defendants and then stated that certain of this

22   data is easily accessible and, therefore, we respectfully

23   request that we be allowed to pursue this discovery.

24          Thank you.

25          MR. SOBOL:  I do note, Your Honor, there's a document

1    2850, which is a concurrence of Blue Cross of Blue Shield of

2    Montana in the state of Montana's motion for a protective

3    order.  The fact it's untimely and the party that to whom the

4    subpoena has been served on joins in it, we respectfully ask

5    you allow the motion.

6         MR. PITT:  Your Honor, my name is Brian Pitt and I'm

7    from Shook Hardy and Bacon and I'm going to argue the MMCAP

8    portion of it just since it was my, it was my responsibility,

9    and I guess in answer to your question, the subpoena to MMCAP

10   was timely as plaintiffs state in their motion.  We subpoenaed

11   them on January 31st, 2006 and had a deposition date of February

12   21st, 2006, both well before the cutoff date.  As I've detailed

13   in my declaration and I won't repeat here unless the Court

14   would like me to, we negotiated with MMCAP to try to avoid an

15   unnecessary deposition if we could.  We narrowed the scope of

16   the materials we wanted and received a lot of data, roughly 650

17   folders of data from MMCAP and that was in early March.  We

18   went through those and determined that there were some gaps in

19   the data, requested more and, you know, after postponing the

20   deposition determined it was necessary but we were timely.

21   Everything we did was before the cutoff, and I'd also like to

22   point out MMCAP itself was more than willing to appear for the

23   deposition.  They have not filed anything in support of the

24   protective order and in reading the papers the only real

25   argument that appears plaintiffs make on the MMCAP front is

1    there wasn't sufficient notice of the June 23rd deposition.

2    They make a big issue out of that they had about a week's

3    notice, and that is true.  They had about a week's notice and

4    in meet and confers I gave Ms. Breckenridge the opportunity to

5    ask for other dates if that was her objection where we would

6    give them more notice and was met with a protective order and

7    no negotiation and that's why we are here today.  So the motion

8    for protective order should not be granted and the deposition

9    of MMCAP and Blue Cross Blue Shield as well should be able to

10   take place.

11        Thank you.

12        MR. SOBOL:  I think my brother's arguments are

13   understandable that the discovery process continued past the

14   discovery deadline in good faith, but it's still, went beyond

15   the discovery deadline and obviously, well, again, it's not

16   disrespect to him or the normal process of trying to get things

17   done, but if that argument were to be acknowledged for any

18   situation where there's an ongoing effort to get discovery from

19   somebody, then the deadline would be nothing.

20        THE COURT:  All right.  We'll take the morning break

21   now and I'll give you a ruling when I come back.

22        MR. SOBOL:  Thank you, Your Honor.

23        THE COURT:  All right.  Ten minute break.

24                    (RECESS)

25        (Court called back into session)

1    THE CLERK:  Resuming on the record, Your Honor.

2  Civil Action No. 01-12257, Citizens for Consume, et al v.

3  Abbott Laboratories, et al.

4    THE COURT:  All right.  Before the break we were

5  dealing with docket entry number 2745, and my ruling is that it

6  is allowed as to Blue Cross and denied as to MMCAP.

7    All right, that takes us 2899, which is the joint

8  motion.

9    MR. DILLON:  Good morning, Your Honor.

10    THE COURT:  Good morning.

11    MR. DILLON:  Chris Dillon from Ropes and Gray for the

12  joint defendants here, and I have with me my colleague, Ryan

13  DeSantis.

14    THE COURT:  Thank you.

15    MR. DILLON:  Your Honor, we're before you on the

16  joint motion for redress of spoliation of evidence in Nevada,

17  and this was originally brought to the Court's attention last

18  December.  As you may recall, this case was filed in January of

19  2002, and yet the state of Nevada took no efforts before

20  November 30th of 2005 to institute a litigation hold.  At that

21  time, as we had not taken very many depositions in this case

22  and there hadn't been much production of documents, we were

23  uncertain as to the prejudice that we had suffered but presumed

24  that it was going to be gross.  Now, having largely completed

25  the discovery except for depositions that you authorized us to

1   take last month, we're in a position to stand before you and

2   say that indeed documents have been destroyed and the

3   defendants have been harmed by the state of Nevada's failure to

4   institute that litigation hold.

5          I'd like to break my argument if you don't mind up

6   into three parts.

7          THE COURT:  All right.

8          MR. DILLON:  The first part will deal with the fact

9   that there was in fact a duty here that's been breached.  The

10  second part goes to the appropriateness of the remedy that we

11  seek which is certain fact admissions be entered in this case,

12  and the third part would deal with specifically those specific

13  categories of fact that we would seek to have recorded, admit

14  for all purposes in this case.  But I think it's appropriate to

15  start with what went wrong here.  There is no dispute that a

16  litigation hold should have been put in place.  There's no

17  dispute that the lawsuit was filed in January of 2002 and that

18  the first litigation hold wasn't issued until there was an

19  email sent around November 30th of 2005.  The only issue as to

20  the duty stems from the, is the length.  The plaintiff,

21  Nevada's position is that the duty arose when they filed suit

22  on January 9th, 2002.  The defendant's position is that duty

23  arose about 18 months before when Mr. Tim Terry, who is the

24  head, he's an attorney, who's the head of the Nevada Medicaid

25  Fraud Control Unit, sent individualized letters to the

1    defendants who appear before you, identifying what

2    ultimately became the facts pled in the complaint and in this

3    case, and I would submit to you that at that particular moment

4    when he sent those letters and received a month later the

5    responses from the defendants, that the issues have been

6    joined.  The state of Nevada was put on notice that the

7    defendants intended to defend this case alleging that we

8    deceived them and defrauded them by pointing to the files of

9    the state of Nevada and the fact that within those files would

10   exist government reports and other documents and correspondence

11   that would show that the state of Nevada, like all other state

12   Medicaid programs and indeed all other pharmacy programs around

13   the country were aware that AWP was not a market based price

14   and that the difference between AWP and acquisition cost, a

15   pharmacy's acquisition cost could be very large and indeed

16   unpredictable, and I would submit that the most important

17   evidence on this issue are those letters that Mr. Terry sent

18   out and the responses from the defendants.  On May 9th of 2000,

19   Mr. Terry on stationary for the Medicaid Fraud Control Unit,

20   wrote a letter to my client, Warrick Pharmaceuticals and in

21   that letter he says, available information has indicated that

22   these AWP figures reported to the states by First Data Bank,

23   Inc. are derived from inflated pricing data communicated by

24   pharmaceutical manufacturers to First Data Bank.  With Nevada

25   Medicaid reimbursement tied to AWP, such inflation has caused

1 Nevada to overpay for drugs by a considerable amount and

2 will continue to do so until the inaccurate reporting prices

3 has been rectified.  That letter then lists the specific drugs

4 that are at issue, largely with my client, albuterol sulfate,

5 lists the NDC, the package size, the 1999 reported price, and

6 what they claim was the actual price, and then it asked a

7 series of six questions asking Warrick to set forth its

8 position with respect to certain allegations made by the state

9 of Nevada.  In response a month later, a lawyer (sic) was

10 written and the Office of General Counsel responded and in that

11 letter Warrick gives its position with respect to each of those

12 six.  And specifically with respect to question number six,

13 where the state of Nevada asked do you represent that the AWP's

14 communicated by Warrick are accurate representations of true

15 wholesale prices for your product.  Warrick responded.  Warrick

16 has never understood that AWP reflects the actual wholesale

17 prices at which all sales of its drugs are transacted.  Warrick

18 would be astonished if anyone else in the pharmaceutical

19 business, either buyer or seller, has such an understanding as

20 it has been long widely understood, including by the federal

21 and state governments that AWP does not reflect actual

22 wholesale prices at which transactions occur but it's in the

23 nature of list price.  I would also bring, and this is Exhibit

24 C-2 and they original request was Exhibit B-2 to our original

25 motion.  I would also bring to your attention though the letter

1  that was written by Day, a defendant also in these actions

2  because that was even more explicit in identifying the specific

3  government reports that existed out there upon which the

4  defendants were going to base their defense in this action.

5  The Day letter, which was Exhibit C-1, has similar language

6  saying AWP has no consistent governmental definitions so far as

7  we're aware except that it is clearly not understood to

8  represent any actual net selling or market price.  Government

9  officials themselves had likened AWP to a sticker price which

10 most accurately represents their own understanding of the

11 meaning of the term.  We offer the following additional

12 information for clarification purposes.  And then over the

13 course of this, I believe it's a six- or seven-page letter,

14 goes through and meticulously documents the various government

15 studies that existed out there that had been sent to state

16 Medicaid programs and identified that these studies showed that

17 these state programs had known for at least a decade and there

18 are reports dating back to the 70's, that AWP was not a market

19 based price and that the differences between AWP and the

20 acquisition cost could be quite substantial, and there are

21 cites here to government reports.  AWP minus 42 for generics in

22 1996.  The footnote here is quite impressive.  It goes on, I'm

23 starting on page two, for about two pages, listing these

24 various reports and then there's some discussion attached for

25 another three, and it concludes by saying in short AWP is and

1  has been known for over a decade at least by government

2  regulators and everyone in the prescription drug business to be

3  a figure that cannot be likened to an actual market price.  I

4  submit to the Court that at the time the state of Nevada

5  received the responses from the various defendants to its

6  inquiry, and this wasn't the first inquiry because Mr. Terry

7  was also the president of the National Association of Medicaid

8  Fraud Control Unit, and he had been involved in earlier

9  discussions a year earlier summarizing the general issue of AWP

10 inflation, but that when Mr. Terry sent these letters to the

11 defendants and he received a response that said our defense is

12 going to be based on the fact that you've known this all along,

13 that at that moment the state of Nevada had an obligation to

14 preserve the records it had in its possession related to these

15 government studies and other documents showing the difference

16 between AWP and acquisition cost and they didn't, and as I'll

17 get into more specifically in the remedy section, but I do want

18 to preview that, we have identified 30 government reports

19 between April of 1996 and September of 2002, and not a single

20 one of those reports has been produced by the state of Nevada.

21 Those reports summarize that the state of Nevada was aware in

22 1996 and 1997 that for generic drugs, the difference between

23 AWP and acquisition cost was on average 42 and a half percent

24 discount off of AWP.

25             I would submit to you also that at the time that we

1    sent those letters and identified that these were going to

2    be the issues, that the state of Nevada had an obligation under

3    the case law in this jurisdiction and elsewhere, to not only

4    preserve those records, but to notify its employees that these

5    were going to be the relevant issues, to go ahead and institute

6    a litigation hold, to preserve its electronic documents and to

7    monitor to make sure that that was occurring and here none of

8    that occurred.  When we went and deposed the witnesses from the

9    state to ask them, we asked the Medicaid director and he said,

10   no litigation hold was put in place before his email of

11   November 30th, 2005.  We asked the chief of compliance for the

12   Nevada Medicaid program.  He was unaware of any litigation hold

13   before Mr. Duarte's email came around on November 30th of 2005.

14   And we also asked that their computer person, Mr. Mel

15   Rosenberg, whether or not they had taken any steps to preserve

16   their electronic documents and he indicated that they had not

17   as of that November 30th, 2005.  The issue is compounded because

18   none of these witnesses who are key to this litigation were

19   apparently aware of the fact that this litigation had been

20   filed, and when we deposed individuals within the Medicaid

21   program office, including Mr. Duarte, the Medicaid director,

22   his deputy, the pharmacy consultant, the head of the Department

23   of Health and Human Services, each of them said that they did

24   not learn about this litigation until 2005.  Now, in opposition

25   to this motion plaintiff's produced for the very first time an

1   email that was apparently sent around shortly after the

2   filing of this lawsuit with a press notice indicating that the

3   lawsuit had been filed.  I would submit that that notice of

4   just sending a press release is completely inadequate as the

5   correspondence surrounding that indicates.  For example, this

6   is found as Exhibit 2 to the plaintiff's opposition and

7   although it does say attached is the press release from Frankie

8   Sue concerning the lawsuits this office is filing, the

9   immediate response above by the deputy to Mr. Duarte, Mary

10  Weary, says what would we have to do in order to be prepared to

11  participate in this and Mr. Duarte's response is it's very

12  difficult and time consuming to anticipate what may be asked of

13  us and to prepare for it.  I'd say hold tight until we hear and

14  none of them ever heard because none of them in 2005 and 2006

15  when they were deposed remembered this litigation, and none of

16  them took any steps during that intervening period to preserve

17  their documents and none of them ever recall any communications

18  with attorneys representing the state, whether inside or

19  outside, telling them their obligations that they had to

20  preserve documents.

21          And that brings us to the final thing.  We have to

22  show that there was a duty and clearly here there was.  They

23  filed the litigation.  This Court entered case management order

24  number two in which the parties acknowledged they had

25  obligations to preserve documents.  The state of Nevada's

1   Medicaid program office has a document retention policy that

2   says when litigation is filed they're obligated to preserve

3   documents.  So there was a clear duty that arouse here to

4   preserve these documents.  There is a clear breach of that duty

5   and, yes, prejudice has befallen the defendants.

6          I'm going to go through in detail with respect to

7   each of the fact admissions that the defendants are seeking and

8   show how the loss of those documents has harmed us and why the

9   appropriate remedy is a fact admission, but I would submit that

10  there are only two facts you need to know in order to find that

11  there was prejudice.  One is that relevant evidence was

12  destroyed and we will demonstrate that for each of these

13  categories that we seek fact admissions.  And the second thing

14  is that to the extent the plaintiff is opposing our fact

15  admissions which we believe are the natural and logical

16  consequences of those documents being present in their files,

17  we've been prejudiced.  They're not accepting the fact

18  admissions that we believe would have been established if they

19  had kept those documents.  And so that gets to the question of

20  the remedy.  There's a whole panoply of remedies available to

21  the court.  What we have sought here in this motion is to

22  identify the harm that has come to us and in the words of the

23  court, to restore the evidentiary balance.  I would submit

24  though that that request only focuses on one of the three

25  prongs that the First Circuit teaches need to be addressed in

1  this spoliation context.

2       The first is to restore to us defendants where we
3  would have been if they had not destroyed these documents, and
4  I will go through and describe that in detail with respect to
5  each of the fact admissions.  But there is also a punitive and
6  a deterrent aspect to this and we are not specifically
7  addressing this in this motion except to bring to the Court's
8  attention that there has been a violation of the Court's case
9  management order and to our knowledge, this is the longest
10 period of time in all reported cases that we've been able to
11 look at, and I had summer associates this morning, this summer
12 spend a lot of time looking at all the reported cases.  We have
13 not found a single instance in which a party has delayed for
14 four years as they submit and five and a half years as we
15 submit.  I would also submit that most of the cases that I've
16 reviewed deal with the destruction of a single document or a
17 grouping of documents or documents related to a narrow set of
18 issues, and of course there are some exceptions to that.  But
19 this, in this case here, the real harm to the defendants is
20 that we can't even anticipate what might have been in their
21 files that is no longer there.  The documents that we have
22 recreated are the ones where we have gone to the other end of
23 the spoke in the communication.  We have submitted third party
24 subpoenas to entities.  We have gone out and taken discovery
25 from these parties and asked what kind of communications

1   they've had with the state and we've tried to recreate, but

2   we don't know who else they were communicating with and most

3   damaging, we don't know what kind of internal documents they

4   were creating, either related to these documents that were

5   destroyed or others.  And so we can only categorize a certain

6   level of the prejudice that has befallen us, but that's what

7   these specific fact admissions concentrate on.

8           So the next part of my argument, Your Honor, is I

9   would like to go into the appropriateness of the remedy, and

10  I'd also like to address the specific fact admissions, but if

11  you think it's appropriate at this point to stop and join the

12  issues as to the liability aspect, I'd be happy to do that, or

13  if you'd like, I can go onto the other aspects.

14          THE COURT:   I think maybe it's easier if you let

15  counsel address each part of it, and that way it doesn't become

16  so--

17          MR. SOBOL:   All over the place?

18          THE COURT:   Yeah.  I think I'd prefer--

19          MR. SOBOL:   Certainly, Your Honor.

20          THE COURT:   --to break it up that way.

21          MR. SOBOL:   Well, I will say that most of the

22  response to what my brother has said so far will also be dealt

23  with in the specific, meaning that there has been no evidence

24  whatsoever, not a single deponent, not a single declaration

25  that's before Your Honor from any witness that says, I recall X

1   being in the files and it's now no longer there.

2          And second, there was as I think the defendants

3   acknowledge an understanding of an ongoing duty that once

4   litigation is commenced regardless of whether the duty comes

5   from a case management order or the state's internal document,

6   you know, destruction and maintenance process, that once

7   litigation is commenced, then there is an effort to hold onto

8   the documents regardless of what the source of the duty is.

9   And so if you take what the defendants are saying, they're

10  basically saying, well, we think that people were destroying

11  documents, and if we can't find the document in your file then

12  it must be destroyed.  But they haven't come forward with a

13  single scintilla of evidence of any example of something being

14  destroyed at all.

15         What the defendants instead did is began back in

16  November of 2005 to try to create arguments, evidentiary

17  arguments that they might be able to eventually lose by an

18  allegation of destruction by filing their first motion back in

19  November and in all the depositions that happen since, the

20  defendant's primary effort has been an effort of trying to

21  prove not their case but spoliation of evidence.  So until they

22  can come forward with a witness or some other evidence that

23  shows some destruction that happened, rather than mere absence

24  of something in their file, then they haven't met their

25  particular burden, and I'm going to leave it at that because I

1   think that the examples of that get shown by the kinds of

2   things that the defendants are saying, they haven't been able

3   to find them in these files and why it is that this effort is

4   either they don't have evidence of spoliation or the documents

5   are irrelevant, that kind of thing.  I'll leave it at that.

6          MR. DILLON:  Your Honor, that's just patently not

7   true.   There have been numerous documents that have been

8   documented in our papers that have been destroyed, and I think

9   perhaps to clarify what the debate is about I would submit that

10  the important distinction on destroyed documents is that I

11  don't need to show that somebody backed up to the Medicaid

12  program office with a shredder and they brought documents down

13  and put them in.  The case law is replete with examples that

14  the failure to retain documents that are relevant to the

15  litigation constitutes destruction and spoliation of evidence,

16  and we cited numerous cases to that point in our reply brief.

17  And so if to the example I can show opposing counsel here that

18  there were documents that their witnesses testified were in

19  their folder as of the time that the litigation obligation to

20  retain documents arose in either May of 2000 or even as they

21  submit in January of 2002, those are documents that have been

22  destroyed.  I have numbers of examples of that and I'm happy to

23  go in and discuss with respect to each of these categories what

24  those documents are.

25          But I'd like to begin by beginning with an example

1  that we've taken off the table, because I think this proves

2  the validity of the approach the defendants have taken with

3  respect to this motion, and that deals with the Meyers and

4  Stouffers documents.  The Meyers and Stouffer is a consultant

5  who does consultant work for various government programs,

6  including state Medicaid programs and in 2002, after this

7  litigation began, Meyers and Stouffers conducted a study for

8  the state of Nevada in which the state of Nevada asked them

9  what pricing should we establish in order to keep our

10 pharmacist profitable and to do the best we can.  And so they

11 commissioned this study and Meyers and Stouffer went out and

12 prepared a study and came back to the state of Nevada.  Now at

13 the time that we brought this motion in July we had asked the

14 state numerous times, and these people have alluded to

15 discovery cutoff was March of this year, we had asked on

16 numerous occasions for the state whether or not other documents

17 existed relating to Meyers and Stouffer because all we had

18 gotten was one or two copies of the report, and some late

19 correspondence from 2003, very minimum, a handful of documents,

20 and the state said in their opposition papers here, and I want

21 to read it, and I'm not accustomed to reading from opposing

22 papers but this is very, very on point because it identifies

23 this precise issue of what was destroyed.  Defendants cannot,

24 this is the plaintiff's papers, page 12, defendants cannot

25 identify any one document that the state did not produce for

1  evidence that related documents were destroyed despite

2  having deposed the state Medicaid administrator, state pharmacy

3  director, Colleen Lawrence, the employee responsible for the

4  survey two times and deposing a Meyers and Stouffer's witness

5  exclusively on the topic of the survey.  There is no definitive

6  evidence that the documents the defendants wanted to see every

7  existed, and there are two footnotes dropped off of this

8  paragraph, one is to

9  Mr. Duarte's testimony in which the plaintiffs represent that

10 Mr. Duarte testifying that he knew of no other documents

11 related to the survey and a citation to Ms. Lawrence.  The

12 plaintiffs say she testified that defendants had all the

13 information related to the Meyer and Stouffer study.  The

14 plaintiffs go on and say defendants ask the Court to impose the

15 inference that the state had knowledge of the information set

16 forth in the Meyers and Stouffer margin analysis, including one

17 very specific example extracted from seven pages of examples,

18 and use that knowledge to set its reimbursement rate in 2002.

19 Again, defendants are asking the Court to go beyond what any

20 document could show and to what Medicaid personnel did with the

21 information even if available the documents describe a

22 defendants, could not demonstrate what knowledge Medicaid had

23 or whether considered this information in setting its

24 reimbursement rate in 2002.  Our approach before this was to

25 look at what documents we thought should have existed and based

1   on that we put in the fact admission that we sought with

2   respect to Myers and Stouffers, that the state commissioned and

3   received the study and they considered it for purposes of the

4   reimbursement rate change that they made in July of 2002, and

5   we believe that that was the logical consequence of these

6   facts.  Now, after they produced all of the electronic

7   discovery, which was after we filed out motion but before we

8   filed out reply, we got a chance to look at the documents and

9   because Meyers and Stouffer was fairly late in the game to 2002

10  study, there were electronic documents preserved as to that

11  particular and that's why we withdraw now because frankly

12  although we think there were probably documents that were

13  destroyed, I can't claim the prejudice with respect to that now

14  that we've gotten those other documents.  Those other documents

15  show that there was regular correspondence between Colleen

16  Lawrence, the pharmacy program manager and Meyers and Stouffers

17  in which they were changing potential recommendations to the

18  reimbursement change.  There's email between Colleen Lawrence

19  and Mr. Duarte and his deputy, Mary Weary, discussing what rate

20  change they should recommend based on the Meyers and Stouffer's

21  study, and I also have documents, memoranda created by Mr.

22  Wilden, the director of the Department of Health and Human

23  Services and Chuck Duarte, the Medicaid administrator, in which

24  they specifically reference this study and OIG studies as the

25  basis for their rate change in 2002.  And most damaging of all

1   is the email that we submitted as part of our reply papers

2   in which Mr. Duarte writes to Mr. Wilden and he says, we went

3   out and commissioned a study from our rates contractor, Meyers

4   and Stouffer, and based on that, are recommending AWP minus 15

5   at a rate at which the pharmacists are still profitable.  So I

6   submit everything that we thought we would find if we had the

7   documents, we have in fact proven up.  The document, the Meyers

8   and Stouffer's study with all of its assumptions, the very

9   assumptions we put in our fact admission, those documents

10  exist.  I have in Colleen Lawrence's inbox a copy of the study

11  that shows what the assumptions are.  I've got the

12  correspondence that shows that she communicated with other

13  people in her department.  We show that it's part of the

14  administrative rule change in which they change from AWP minus

15  10 to 15, they consider this, and I see the correspondence even

16  afterwards from Mr. Duarte and his boss, Mr. Wilden, saying

17  this is why we've done this.  I can't at this point claim

18  prejudice as to that.  We got what we thought we would get if

19  those documents existed, but I don't have those documents as to

20  any of the other categories that we've moved on and the state

21  has now represented they've produced all the information we're

22  ever going to get, all the documents, we've got a few

23  depositions to clean those up but we're not getting any more

24  documents, and I'm never going to find any of those 30 OIG

25  studies that were sent to the state between September, I'm

1    sorry, April of 2006 and September of 2002.  What I can show

2    you though is that we have testimony from the witnesses of the

3    state in which they acknowledge not only receiving these

4    reports but they also acknowledge that they circulated those.

5    There were little routing slips on them, and the pharmacy

6    program officer also said that they kept those documents in

7    folders within their own office.  So we can establish through

8    the deposition testimony that these documents existed at one

9    time.  What we can't establish is that they kept them because

10   they didn't.  We've asked for them repeatedly and none of those

11   documents have been produced.  When we submitted our original

12   papers we didn't even have their e-documents and so we also

13   submitted at that time some examples from the Montana case,

14   which has been going on in parallel, of the types of internal

15   correspondence that we might have expected to see, reaction of

16   employees to the findings of these studies, using this to base

17   rate changes or not to make changes, and what we found when

18   they produced their e-documents was that these same kinds of

19   documents existed in the Nevada folder, but only for a later

20   period, 2005.  These documents don't exist for the earlier

21   period in which we seek redress, 1996 to 2002, because they

22   didn't keep any of those documents.

23          I would also submit that not only have we established

24   that those reports existed and that they were in their files,

25   and that the documents themselves submit, the documents

1   themselves contain evidence, these are the OIG reports, that

2   the state would have had to consider them, and I briefly want

3   to read to you from the August 1997 letter from June Brown who

4   was the inspector general onto the health care financing

5   administration, and she goes through and summarizes this study,

6   and I'm not going to go into all details, but the number that I

7   pointed out earlier is mentioned on the first page of the

8   letter.  We estimated the pharmacies pay an average of 42.5

9   percent less than AWP for drugs sold to Medicaid beneficiaries,

10   and then it goes on and says we calculate that as much as 145.5

11   million could have been saved in calendar years 1994 and 1995

12   for 200 generic drugs with the greatest amount of Medicaid

13   reimbursement in each year if reimbursement had been based on

14   the findings of this report.  So they say what the report is.

15   They say you could save a lot of money and then they say we are

16   recommending that HCFA work to ensure that states reimburse the

17   ingredient portion of Medicaid drugs in a manner more

18   consistent with the findings of this report, and HCFA responds

19   to the OIG saying we believe the findings in this report are

20   significant and warrant the attention of all state Medicaid

21   agencies.  We intend to share this report with all state

22   Medicaid agencies and hope this report will provide the

23   necessary impetus for states to restructure their payment

24   methodology for outpatient payments.  This isn't us saying

25   there was an article in the New York Times that might have

1  existed in their folder.  This is a report commissioned by

2  the Office of Inspector General for the federal government

3  looking at the Medicaid program.  It says that it recommends

4  that there is a lot of money that can be saved by passing on

5  this report to the states.  It recommends that the states

6  consider this report in making revisions to their

7  reimbursement.  We have submitted deposition testimony from

8  Laurie Swartzoff, who was the pharmacy consultant at the time

9  when this study came out.  She said she got these reports.  She

10 didn't know which specific reports because we didn't have them

11 to show her.  Her file contained OIG reports existing when she

12 left the office in June of 2001, but we do not have that

13 report, that file.  What we also don't have are any comments,

14 marginalia, internal memos or any other documents that might

15 have been created about this report or any of the other 30

16 reports that I referenced.  What we do know though is she said

17 she read these reports when the came across her desk.  There

18 were routing slips that came to her.  She said that she

19 considered them, and why, because this was her job with setting

20 policy with respect to pharmacy reimbursement.  We submit it's

21 not too great a leap for this Court to find that had any of

22 those OIG reports been kept, and had we had the opportunity to

23 depose Mr. Swartzoff during that time period with her folder

24 showing what reports she has specifically received, if we had

25 been able to put this report in front of her and ask her was

1   this something you considered in setting reimbursement rates

2   for Nevada Pharmacy, it's not that hard of a leap of faith.   I

3   submit just stepping off the curb.   We established they got the

4   reports and the plaintiffs can see that in their report.   They

5   say it's, let me quote from exactly, in opposition on page 10

6   Nevada says, "and if they had asked defendants would have

7   learned that the state does not argue that the federal courts

8   were not received by the state and circulated among state

9   Medicaid employees.   This was established to be a Medicaid

10  employee testimony and common sense."   Their only objection is

11  that we can't show they read these or considered them, and I

12  submit that the testimony of Ms. Swartzoff, the testimony later

13  of Charles Duarte and Colleen Lawrence, the more recent

14  correspondence we've received in which individuals relating to

15  these most recent reports in 2005 discuss them and acknowledge

16  them, all of that shows that it's not that hard of a leap of

17  faith for this Court to enter the fact admission that we seek.

18  They received these reports during this timeframe.   They read

19  them.   They considered them and they made their reimbursement

20  rate changes based on that information.

21          That's the first of the five fact admissions.   I'd be

22  happy to go into the others.   If you want, we can discuss just

23  this one.

24          THE COURT:   I think I'd like to hear the response on

25  those.

1          MR. SOBOL:  Your Honor, with respect to this

2    category, first, one has to understand what is it that the

3    defendants don't have.  They have the OIG reports.  So they're

4    not destroyed.  They have them.  And the state has in

5    depositions said, the defendants have conducted, said that yes

6    we would receive them.  Some of the deponents said well, the

7    reason we don't keep hard copies is because all you have to do

8    is look up and get them on the internet.  There's no reason for

9    us to have a hard copy.  The defendants have the ability to

10   undertake depositions where they've been able to get testimony

11   regarding Medicaid personnel's review of the reports.  Now they

12   give one example of a Ms. Swartzoff but that's even

13   pre-litigation, June of 2001 when she had left.  So with

14   respect to this, first there isn't a demonstration that there

15   are documents that existed in the files of Nevada Medicaid

16   agency from the time of the filing of the lawsuit to the

17   present that the defendants don't have and that Nevada

18   destroyed.  Even the example that my brother started out with

19   regarding the Meyers and Stouffer's survey, first the

20   defendants knew about the survey, and then second, Nevada

21   produces precisely the kind of information that they say is

22   being destroyed, an email discussion of the study.  How is it

23   that that ends up being evidence of spoliation, production of

24   the kinds of things that they say is being destroyed.  That's

25   just a nonsensical argument.  Now, the OIG arguments or the OIG

1  reports, if there are reports that the defendants think that

2  a Mr. Swartzoff or other people from Nevada might have

3  considered, they have all the reports.  They can put the

4  reports in front of the witnesses.  Again, this is no evidence

5  of destruction and certainly no evidence of any prejudice when

6  they say these reports, the versions of the reports that we

7  think should have been in their files, either before 2002 or

8  after 2002, we haven't been able to find have in any way

9  prejudiced them.  The defendants have spent four years

10 chronicling every report that came out of every federal and

11 state agency on this topic that they think has some kind of

12 view about general knowledge or specific knowledge.  There

13 isn't any scintilla of evidence that we have been able, that

14 Nevada Medicaid agencies have been able to try to hide the ball

15 on any kind of study like that at all.  By definition, they're

16 talking about destruction of public reports.  It doesn't make

17 any sense.

18        MR. DILLON:  Your Honor, two points, one is that with

19 respect to Ms. Swartzoff, she was there through 2001.  Her

20 replacement was Ms. Colleen Lawrence.  Ms. Colleen Lawrence

21 also testified in her deposition that she kept a hard copy file

22 of these OIG reports.  So it wasn't just Ms. Swartzoff as an

23 isolated instance.  There was a three year and 30 days document

24 retention period so those documents should have been kept by

25 the state of Nevada according to its own document retention.

1           The second thing is it's a very different thing

2    for me to tell you, there's a book in a library that says

3    something than it is to be able to say, I found that book on

4    somebody's shelf and there's some handwriting and there's some

5    emails about it as they discuss that particular document.  I

6    would submit that the 30 reports we have submitted were all

7    submitted to the state of Nevada.  They acknowledge keeping

8    paper copies of them.  Later correspondence shows that in 2005

9    when they got these kinds of government reports, they did

10   discuss these, and there were documents sent around.  In the

11   2002 rate change, the email that we submit as part of our

12   rebuttal papers from Chuck Duarte to Mike Wilden, there's two

13   important parts.  One deals with Myers and Stouffer.  One deals

14   with OIG.  With respect to Myers and Stouffer, he says we did

15   the study.  It shows pharmacists are still profitable, AWP

16   minus 15.  The other part of that EC says, Tom Skully from CMS

17   has been urging us to go to AWP minus 21.  They got the

18   government reports.  They consider them as part of their rate

19   change.  What I don't have and how we're prejudiced is I don't

20   have them back during the time period that I would have had if

21   they had complied with their discovery obligations, and I

22   submit any uncertainty that's been created here is uncertainty

23   created by their failure to preserve documents for either four

24   or five and a half years, and that had we gotten a litigation

25   hold in place at the time that Mr. Terry was informed by the