1  defendants that we intend to defend this case and the fact

2  that you have government reports in your files that show that

3  you've been aware since the 1960's that AWP and acquisition

4  costs are two different things.  If they had kept the documents

5  from that time period so that I have Ms. Swartzoff's folder

6  with her hard copies and whatever marginalia or notes or other

7  things that might be on it, that it would be very difference

8  when we got to take Ms. Swartzoff's deposition because then

9  instead of pulling off a very plain vanilla copy of the report

10 from the OIG website, I would have her copy.  I would have the

11 routing slip on it.  I would have any notes she made in her

12 folder, and I would be able to say to her, Ms. Swartzoff, did

13 you receive this study and she would say yes.  Did you read it?

14 She said yes, because she said in general she read these, and I

15 asked her about this recommendation where OIG says, we

16 recommend to you that you consider these findings in making

17 your reimbursement changes.  I submit she would have said yes

18 because she knew that was part of her job, and that's what she

19 testified in general.  She testified that in general terms she

20 received these reports.  She testified in general terms she

21 reviewed these reports, and she testified in general terms she

22 considered them.  What we didn't have to put before her though

23 during her deposition were her file and reports that she

24 created and that's the prejudice to the defendants and I submit

25 the fact admission we're seeking here is not an unwarranted

1  exercise of this Court's power to try to restore the

2  evidentiary balance on this particular issue.

3        MR. SOBOL:  Well, again, Your Honor, on this one I'm

4  constrained just to say, counsel keeps on talking about this

5  women who left six months or seven months before the lawsuit

6  was filed, so who knows what it is would have happened in this

7  situation.  One cannot just be simply saying, well, I think

8  that I could have gotten this or I could have gotten that.  One

9  has to prove the existence of destruction and counsel hasn't

10  done it.

11        THE COURT:  All right.

12        MR. DILLON:  With respect to the second issue, Your

13  Honor--

14        THE COURT:  I just want to tell you about the time

15  constraints, that if you can get through your argument in the

16  next say 20 minutes or so.

17        MR. DILLON:  I think we can do that, Your Honor.

18        THE COURT:  We have a couple of other motions and I

19  have to break at 1:00 so.

20        MR. DILLON:  With respect to this second issue, we're

21  looking, as you may recall in March of this year you authorized

22  us to go take discovery of certain entities within Nevada other

23  than the Medicaid Program office, and we did that, and what we

24  found as a result of that discovery was that there were other

25  entities within the state of Nevada that were reimbursing drugs

1  at far below the rates the Medicaid office was doing.  We

2  found that for example the senior Rx program was at AWP minus

3  55 during certain periods, that the PEBS program was at AWP

4  minus 45 in 1996 and later up to about AWP minus 55 for

5  generics.  We found that the MMCAP tables that we discussed

6  about earlier, the Nevada Department of Mental Health purchases

7  drugs and the rates they get when they purchase drugs are far

8  lower than what they reimburse, and what we submitted was that

9  this information would be relevant, and it is, and the reason

10  why it's relevant we've learned is that a number of these

11  programs fall under Mike Wilden who is the head of the

12  Department of Health and Human Services.  He's the top dog for

13  Medicaid and he also has the senior RF's and the mental health

14  programs underneath him and he has knowledge of some of these

15  others.  We have gotten that information from those programs

16  and what we are submitting as part of our next fact admission

17  is that the court should enter an order saying that the state,

18  the Medicaid program office was aware of the rates of these

19  other programs and then the next part of this is, what other

20  states were doing with respect to reimbursement, and I'll show

21  you that in just a minute.  The reason for this is because we

22  know as of 1995 that they were doing this.  We went and deposed

23  Ms. Swartzoff.

24  Ms. Swartzoff said that as part of her regular job she was

25  asked to survey what other third-party payers were doing and

1    also what other states were doing as to reimbursement.  She

2    was asked why she was doing this and she said that the reason

3    that she did this was for reimbursement because they wanted to

4    keep an eye on what other people were doing and what we have

5    are two memos from 1995, close in time, one looking at other

6    states, one looking at other programs within the state of

7    Nevada, both government and third-party.  Ms. Swartzoff's

8    testimony unequivocally was that she was periodically asked to

9    do this and yet the only document we have are these two

10   surveys.  We don't have anything else, and we submit it's not

11   that difficult of a fact admission to say that if the state of

12   Nevada, it's a small state, if they were reimbursing other

13   programs underneath Mr. Wilden who was in charge of the

14   Medicaid program office, that it's not that difficult of a leap

15   to charge the Medicaid program office with that knowledge.

16   Why, first because they fall under Mr. Wilden, secondly because

17   Ms. Swartzoff says that she did those kinds of surveys where

18   she reached out not only to other states but to other programs,

19   and her 1995 memo shows that she was aware that workers' comp.

20   was reimbursing generic drugs at AWP minus 40 in 1995.  What

21   we're asking for is since none of the documents were kept as to

22   Ms. Swartzoff and I would submit here that the duty arose in

23   May or June of 2000, not 2002 when they filed the lawsuit

24   because we had put them on notice in June of 2000 that whenever

25   they decided to bring this lawsuit, this is how we are going to

1  defend it, and that's when the obligation arose.   Ms.

2  Swartzoff was there after that period for almost another full

3  year.

4  Ms. Swartzoff's email, we have not received any of her email

5  because they didn't keep it, we didn't receive any of the email

6  from her immediate boss during this time period because they

7  didn't keep it even though she was there after June of 2000,

8  and we didn't receive any of these other periodic surveys that

9  Ms. Swartzoff said were in existence.

10          I would also just for the sake of time also like to

11  go into the next one which is other states.   With respect to

12  these other states, Ms. Swartzoff says that she did these

13  surveys.   We also have email list serves and here what we have,

14  Your Honor, is there were certain documents that were produced

15  in the state of Montana that show that all of these pharmacy

16  consultants for state Medicaid program offices and all of the

17  Medicaid directors regularly participated in the list serves

18  that communicate among themselves related to pharmacy

19  reimbursement issues, and we saw documents in the 1999 and 2000

20  timeframe for Montana that show that Nevada was on these list

21  serves.   We saw that Janice Wright's name was on them and yet

22  none of these documents have been produced either before or now

23  that we've looked at the e-documents because frankly, the

24  e-documents, 98 percent of them deal with after the litigation

25  was filed.   So the documents, what we've tried to do here is by

1  looking at the communications of Ms. Swartzoff in which she

2  did these surveys, looking at what communications existed in

3  other states that we've been able to show Nevada participated

4  in, and then also for the more current Nevada documents, we

5  found examples from 2005 in which there are 50 state surveys

6  conducted that show the reimbursement rates that all these

7  other states were on.  We don't think that it's too large of a

8  leap to say that had these documents been preserved, that what

9  we would have been able to establish was that Nevada was aware

10 during the time period we seek, which was only from 1999 to the

11 present of what other states were doing with respect to

12 pharmacy reimbursement, and with respect to other Nevada

13 programs, going back at least to 1996, which is the three years

14 and 30 days before the lawsuit was filed, if there were

15 documents that were created between, I'm sorry, three years and

16 30 days before the May 2000 Tim Terry letters.  You back that

17 up and it's a little bit more.  I think we got about another

18 year and that's because Mr. Duarte said that in their typical

19 practice they weren't as efficient as destroying documents.  So

20 we backed it up to April of 1996.  So almost four years.  It's

21 not too hard of a leap if the practice existed to do these

22 periodic surveys.  If they produced examples from 1995, but

23 none of the other examples exist, that we just create a

24 judicial fact admission that during this period the state of

25 Nevada was presumed to know the reimbursement rates of other

1  states as well as its own other programs.

2          MR. SOBOL:  In the sense of time, Your Honor, I would

3  suggest to have my brother finish his argument because a lot

4  of--

5          THE COURT:  All right.

6          MR. SOBOL:  --it sounds like a lot of my--

7          THE COURT:  Go right through it.

8          MR. SOBOL:  --responses are the same.

9          MR. DILLON:  And the last thing I would say on that,

10 Your Honor, is that I think we've submitted a number of

11 examples in our appendix of emails that were received by the

12 state of Montana that showed that Nevada was copied and those

13 documents were not retained.

14         The fourth area that we're seeking a fact admission

15 is with respect to a study conducted by or prepared by

16 Mr. Keith McDonald.  Keith McDonald was the pharmacy consultant

17 in the 1980's.  He went on to become the Medicaid director.

18 Prior to coming to the state of Nevada, he was a practicing

19 pharmacist for over 20 years.  He did a study sometime in the

20 1980s that we know from Colleen Lawrence's testimony that was

21 in the files when she began with the program office in 2001.

22 She says that the study existed, it was in her folders, it

23 dealt with acquisition, the difference between AWP and

24 acquisition costs.  It's an acquisition cost study and that

25 study has not been produced.  And so in this case here, the

1  document is relevant because it shows that in 1986, the

2  state of Nevada conducted some sort of acquisition cost study.

3  That document sat in its folders for over 15 years until

4  sometime within the last four or five years when it went

5  missing.  We have deposed Mr. McDonald and when we deposed Mr.

6  McDonald we asked him what was his understanding of the

7  difference between AWP and acquisition costs and he said that

8  he knew and referred to it as artificial wholesale price, that

9  he knew that there was a difference between, in the 1980's,

10  between AWP and acquisition costs of between 17 and 18

11  percentage points and what we've asked is that that document

12  that has gone missing be presumed to reflect Mr. McDonald's

13  deposition testimony and that that document be, the fact

14  admission be entered saying that the state of Nevada has been

15  aware since 1986 to the present of the study, that the study

16  comport with his testimony, that it was AWP, that he understood

17  AWP differed from acquisition cost in the 1980's by about 17 or

18  18 points, and that that study be deemed to be in the Nevada

19  program office files until some time, you know, I think we had

20  through 2002 or 2003 because we don't know when it went

21  missing, but during the relevant period, through the 90's and

22  up until the filing of this lawsuit that document existed.

23          And then the last one I talked to is something we've

24  heard a little bit earlier about and that's the pricing letters

25  and my client submitted pricing letters as did Bayer.  Starting

1   in January of 2002, every month, Warrick pharmaceutical sent

2   a letter to the state of Nevada.  Now, these letters list the

3   actual prices we're selling to wholesalers and gives a range.

4   The state of Nevada sued us claiming that we're deceiving them

5   and defrauding them because they understood that reported

6   prices by First Data Bank as to AWP were inaccurate.  Well,

7   every month we sent them our letters.  We said this is what we

8   are selling to wholesalers and there's a range because there's

9   a difference of pricing.  The state of Nevada has not kept any

10  of those documents for 2002.  They haven't kept any of those

11  documents for 2003 and there are gaps in their 2004 and 2005

12  production.  We've looked at some of the other manufacturer's

13  letter and there's some gaps in those as well, and I would

14  submit that that's an example of documents that have been

15  destroyed, like the OIG reports, like the periodic surveys, but

16  more importantly, they're documents that are crucial to this

17  case.  They're documents that are actual representations by my

18  client as to what pricing is.  And so we've asked is that a

19  fact admission be entered here stating that the state of Nevada

20  got these documents, that when they made their reimbursement

21  decisions that those documents were in light of the information

22  that manufacturers had submitted, so that if they chose after

23  receiving our letters to keep reimbursement for our drugs where

24  it was before they sued it, that they can't then later claim

25  they're somehow defrauded.  This is an example of specific

1    documents that have been destroyed, and although there are

2    these allegations that no documents have been destroyed,

3    clearly these have been filed since January of 2002.  There are

4    two years of these documents that don't exist and gaps after

5    that record.  The fact admission that we seek here is not, is

6    not too broad.  Plaintiff Nevada argues that we have made it

7    generically manufacture.  That's because it wasn't just one

8    manufacturer.  Tap, Bayer, Astrazeneca also sent ASP letters

9    and there's gaps in those production and, frankly, I think for

10   any defendant, even if they didn't send a pricing letter of the

11   sort, that if they could show that some manufacturers, here a

12   group of them sent pricing letters showing what their actual

13   prices were and the state of Nevada took no action with respect

14   to those letters to change its reimbursement, that that

15   information would be relevant to any defendant because it shows

16   as we assert in this case that the actual goal of reimbursement

17   was not to set it at precisely the cost at which the pharmacies

18   were receiving it, but to build in enough of a profit margin so

19   that they could ensure that pharmacists would want to

20   participate and serve the Medicaid beneficiaries.  And so

21   that's why we sought that particular fact admission.

22           I really want to emphasize though two final points.

23   The first is the documents have clearly been destroyed, and by

24   that I'm not saying they've been shredded, but they've gone

25   missing, and we've submitted a very detailed appendix to our

1  motion that lists those documents.  We have identified

2  specific categories like the 30 OIG reports.  Those documents

3  would have existed if the litigation had been put in place, and

4  we would ask you to restore us to the evidentiary, restore the

5  evidentiary balance to put us in the place we would have.  I

6  would also submit though that here where the state has failed

7  to comply with its obligations to preserve documents, whether

8  they begin in May 2000 or even as January of 2002, as Nevada

9  argues, fail to comply with case management order number two,

10  requiring them to preserve their documents.  When we served our

11  discovery responses, our requests in May of 2005, they still

12  didn't send a litigation letter.  We put them on notice over,

13  now it's getting close to six years as to what the relevant

14  issues were going to be in this litigation, and the best

15  evidence of this, the OIG reports, the internal discussions of

16  those reports, the correspondence they would have had, that's

17  what I'm missing, and we do not think it would be inappropriate

18  if the Court went beyond restoring the evidentiary balance to

19  also address the other considerations the First Circuit had

20  suggested, that if you feel that there is some uncertainty as

21  to the fact admissions, that is a punitive or as a deterrent

22  sanction, that you enter those fact admissions anyway because

23  any uncertainty on this point should be resolved against the

24  party who has an unprecedented breach of its duty to preserve

25  it documents.

1          THE COURT:  Mr. Sobol?

2          MR. SOBOL:  Briefly, Your Honor.  First addressing

3   the issue with respect to the report of a Mr. McDonald from the

4   1980's.  It's a report from the 1980's, and according to the

5   argument of the defendant, they say that they know it was in

6   the Nevada files until 2001.  So before litigation it either

7   may or may not have, you know, been put away when the woman

8   left, you know, her employment there, that kind of thing.  To

9   the extent that the defendant would ever be able to get the

10  report anyway would be beyond the scope of discovery of course

11  because it's before the discovery period.  And even if then if

12  one's talking about well, we want to be able to show the things

13  before the discovery period, you know, were in your files, then

14  they've also indicated they've deposed the woman who said she

15  had a copy of it.  They even deposed Mr. McDonald.  They know

16  what it says.  They know what they think that it means.  That

17  kind of thing.  There is no intentional discretion of let alone

18  even negligent discretion pre the litigation that's been shown

19  in that report, and to the extent that the defendants want to

20  be able to make arguments, it seems to me that they're well

21  equipped to be able to make certain kinds of factual arguments

22  that they think that they, you know, that warrants the kind of

23  inferences that they would have with respect to that item.

24          Going back to the other agency, there's the other

25  state, Nevada state agency records, position there also is that

1   they've been able to identify two memos back in 1995 and

2   that they've been able to depose some people in that time

3   period who said that they had communications with other state

4   Nevada agencies regarding their reimbursement practices so

5   they've been able to get that information.  It sounds like to

6   the extent that the information existed in the files as of the

7   time the litigation was filed, they've gotten it.  To the

8   extent that the information may have been in the files

9   beginning in 2002 and is now gone, they haven't shown any

10  existence of that information.  It's only an inference that

11  they think that it might otherwise or should be there, although

12  the deponents from the state Medicaid agency have been

13  generally clear that they have had very limited formal

14  communications with none Medicaid agencies.  So again, it's one

15  of those situations which there might have been historical

16  practices which it sounds like the defendants have had more

17  than enough opportunity to be able to get information about and

18  to the extent they're talking about more current information or

19  practices, they've been able to depose people who say we don't

20  have the information.

21          Finally, with respect to the pricing letters, it

22  sounds like most of the pricing letters are in there from many

23  of the manufacturers and some of the pricing letters aren't

24  there, but we do know one thing, every manufacturer has their

25  pricing letters, and to the extent they want to put testimony

1   on that says we sent it to them and have the inference,

2   therefore, that Nevada got them and dealt with them, that's

3   available to them.

4          So that's why I will have two final comments then.

5   One is in the classic spoliation situation, you don't know what

6   the document is.  You don't have it.  You know it existed and

7   you also know that somebody says, you know, it's destroyed or

8   it's gone, but you don't know what it said.  Here, every single

9   item that the defendants pointed to that they know that they

10  can show that they haven't been able to find in somebody else's

11  files, they have.  So we don't have that, number one.

12         Number two, our brief addresses the appropriate

13  remedy even if there were a situation where you can prove

14  spoliation post litigation filing where the rules are quite

15  clear that you have to match the remedy with the infraction.

16  Without belaboring it, because I think it's clear when you go

17  through the papers, in each situation the defendants are trying

18  to overreach, rather than simply saying this document existed

19  and this is what the document would have said because they have

20  it, they're trying to take it, oh, no, well, we want all sorts

21  of more information for you not the finder of fact to conclude

22  and that's not appropriate under the law.

23         So I would conclude by saying that to the extent that

24  there are inferences on any of these issues that the defendants

25  think might be warranted or not, and we submit not, but if they

1  are to be put forward, those are issues for a fact finder

2  and the defendants haven't proven the case that a discovery

3  sanction under these circumstances would be warranted.

4         MR. DILLON:  Briefly, Your Honor.

5         THE COURT:  Very briefly.

6         MR. DILLON:  Throughout this argument and in all

7  these papers I've never heard a response as to why a litigation

8  hold was not put in place, why these documents aren't there.

9  The folder that I referred to earlier with Ms. Lawrence in

10 which she said she had the McDonald study, Ms. Lawrence

11 testified that she started in 2001.  She's still there today.

12 She was deposed 2005.  She said, I had a folder with this in

13 there.  I don't know where it is.  So I don't know that it went

14 missing before the litigation.  It could be still there today.

15 It could have been there a month before.  The problem here is

16 that we've got this great catch 22 that the plaintiff's have

17 set up.  If I can identify for you what the document is that's

18 gone missing, no prejudice.  If I can't, I can't prove

19 destruction.  We've tried to thread that line as closely as we

20 can by pointing to specific examples of documents that people

21 acknowledge having kept in their files or as Swartzoff said,

22 she had a file of OIG reports.  Her replacement, Colleen

23 Lawrence, who started in 2001 said she had a file of OIG

24 reports.  I don't have any of those.  What I've tried to do

25 here is to identify those documents that we know existed in

1   files and I refer you to our appendix where we go through

2   extraordinary detail listing those out.  But I don't know

3   what's gone missing.  In four years or five and a half years, a

4   lot of documents are going to go missing when people are not

5   properly instructed to preserve them.  That whole aspect of

6   this I can't address because I don't know what might have

7   existed.  There may have been a great study or great emails or

8   great communications that would have helped me, but what I can

9   do is tie it back to these and I think that these fact

10  admissions help to restore the evidentiary balance of what

11  would have gone missing.  They're tied to specific documents

12  that people say they remember seeing and having.  The McDonald

13  study existed, I don't know what it says.  I have no idea.

14  Never seen the document.  No one can testify about its

15  contents, but I did know that Colleen Lawrence says it was in

16  her folder when she, at sometime during her employment which

17  began in April of 2001.  I don't know what that document says.

18  I do know what the OIG studies say.  But what I don't have

19  there, is I don't have the comments, the discussion or any of

20  that stuff, and with respect to the manufacturing letters, I

21  would really like to know as Mr. Doss argued here, whether

22  someone pulled out a pencil and took my pricing letters and

23  went down and compared the prices that we were submitting to

24  the state with the AWP's that they were doing a reimbursement,

25  because that would be very relevant information to show the

1  consideration.  But they didn't even keep those two years of

2  documents with respect to my client.  So it's not enough for me

3  to establish what a document says.  It's what that document

4  could do.  That document could show that somebody read it.

5  They had that information.  They considered it, and they made

6  decisions and they communicated in ways in which I'm never

7  going to know.  These fact admissions try to restore us back to

8  the place we are.  I would submit that this Court should enter

9  them.  Thank you.

10        THE COURT:  All right.  I'll take the matter under

11  advisement.  This is to be done by report and recommendation.

12        All right.  Moving on, we have 2966, which is

13  Nevada's motion for a protective order.

14        MR. SOBOL:  That's on the MGM, Your Honor?

15        THE COURT:  It is.

16        MR. SOBOL:  Your Honor, this motion relates to a

17  deposition that the defendants are attempting to take of a

18  non-party to the litigation after the time that the discovery

19  period was closed in the end of March of 2006 because it was

20  late and after March of--

21        THE COURT:  And it was noticed after the close?

22        MR. SOBOL:  There was notice prior to it, the close

23  of discovery--

24        THE COURT:  Right.

25        MR. SOBOL:  --but it was not concluded.  It wasn't

1    undertaken and then there was a series of efforts, we

2    learned I think sometime in, hold on a moment, in May of 2000,

3    excuse me, yeah, in May of this year we learned that there are

4    documents that had been produced by MGM to the defendants and

5    then there was a series of communications by the defendants

6    regarding an effort to get authenticity of the documents as

7    well as acknowledgements by us regarding admissibility, but we

8    weren't in a position to be able to say whether they were

9    authentic, whether they were admissible because it's a non-

10   party.  It's not as if it's the state documents, that kind of

11   thing, and as a result because it was after the fact, we said

12   it was after the fact, you know, the time period is gone.

13          THE COURT:  But it was noticed--

14          MR. SOBOL:  It was noticed, it was noticed prior to.

15   They didn't--

16          THE COURT:  And what was the delay?  What was the

17   sequence of the delay?  I've read so much I--

18          MR. SOBOL:  Um, the notices, the first subpoena was

19   issued in November.  There was a second subpoena issued in

20   January.  The time period for discovery lapsed March 31st.  We

21   then learned in May that documents had been produced by MGM to

22   the defendants.  This is now whatever, two, three months after

23   the discovery period, so now getting their documents, and it

24   was after that period of the time that the defendants wanted to

25   take a deposition of MGM, and although the deposition notice to

1    MGM now, a new notice to MGM now for their deposition is,

2    you know, a general, provides a variety of different topics in

3    fairness to, you know, my colleagues, I think that they've

4    indicated that well, no, now what they want to do is just be

5    able to deal with issues of authenticity and admissibility.  So

6    because it was after the fact, because the documents weren't

7    produced until after the fact discovery, the following

8    deposition notice because they didn't have these authenticated

9    or, you know, admissible, is all after the fact.

10            THE COURT:  Why shouldn't I allow this motion?

11            MR. LONERGAN:  Good afternoon, Your Honor, my name is

12   Sam Lonergan.  I'm an attorney with Kaye Scholer and I

13   represent Novartis Pharmaceuticals Corporation.  I'm here on

14   behalf of defendants to argue that the defendants should be

15   permitted to go forward with depositions of MGM Mirage, Great

16   Falls Clinic, Schneider's Drugs and Walgreens.  With respect to

17   all of these non-parties, defendants served subpoenas on them--

18            THE COURT:  Is that correct?  I see you bracing?

19            MR. SOBOL:  Well, and I'm going to ruffle through the

20   papers, the only motion that I know or the only, the only

21   motion that's on today, Your Honor, I'll put it that way, is

22   our motion--

23            THE COURT:  As to MGM.

24            MR. SOBOL:  --is with respect to MGM.  Okay?  Now,

25   I'm only dealing with the motions that are on today.  If there

1    is--

2              THE COURT:  Exactly.

3              MR. SOBOL:   --motion that relates to other parties,

4    I'm not aware of it.

5              THE COURT:  Do you have a motion that relates to the

6    others?

7              MR. LONERGAN:  I do not, Your Honor.  I was under the

8    impression that plaintiff's motion on page two relates to all

9    remaining non-party depositions, the first full paragraph on

10   page two.

11             THE COURT:  Well, I think this is pretty specific to

12   MGM.  I'll take it only as to MGM.

13             MR. LONERGAN:  Okay.  Well, with respect to MGM,

14   defendants served subpoenas for documents and depositions

15   during the discovery period.  The return date on the subpoenas

16   was prior to the close of discovery.  MGM did not produce, did

17   not complete its document production until after the close of

18   discovery.  This puts us in a position of needing to

19   authenticate the documents for admissibility purposes.  We went

20   to the plaintiffs and asked them if they would be willing to

21   stipulate as to the authenticity and admissibility of certain

22   of the documents that had been produced by MGM.  Plaintiffs

23   ultimately rejected our offer and now we're left in a position

24   of needing to take these depositions in order to authenticate

25   the documents.

1       THE COURT:  Are you willing to authenticate the

2   documents now?

3       MR. SOBOL:  Most of the documents can be

4   authenticated.  My understanding is there's one document that's

5   handwritten that we're not in a position even to agree about

6   its authenticity or not.  Issues of admissibility we're not

7   aware of and, frankly, I think the parties would need to go

8   through a deposition, although it's late to be able to deal

9   with issues of admissibility, which is why were pressing the

10  time period because they defendants had known for a couple of

11  months about trying to get these kinds of non-party--

12      THE COURT:  Is this one document critical to either

13  side?

14      MR. LONERGAN:  I'm not entirely sure what one

15  document plaintiff's counsel is referring to.  If he's

16  referring to--

17      THE COURT:  Well, he'll tell you.

18      MR. LONERGAN:  --a list of data, I don't think it's a

19  handwritten document, but we had already offered to plaintiffs

20  to remove that from the stipulation, and they still rejected

21  our offer so I'm not sure if that's what he's talking about.

22      THE COURT:  Well, let's see if we can work this out.

23  What is the one document?  Can you--

24      MR. SOBOL:  It may well be the list of data so, and

25  again--

1          THE COURT:  Well, it is or it isn't.  Take a

2   moment, look at your papers.

3          MR. SOBOL:  Okay.

4   (Pause)

5          MR. SOBOL:  Your Honor, I don't think we're going to

6   have an issue on authenticity.  Again, my recollection of this

7   is that the major issues weren't the admissibility.  In terms

8   of what purposes the documents were used for, whether or not

9   they're regular course, that was particularly the issue

10  regarding the list of data.  It wasn't clear to us what the

11  time period was for the data and that kind of thing.  So I

12  think the issues would go more to admissibility anyway

13  regarding whether or not it's an accurate photocopy of the

14  things that came out of MGM.

15         THE COURT:  Well, is there any possibility of a

16  stipulation here?

17         MR. SOBOL:  As to authenticity, yes.  As to

18  admissibility, the reason we pressed the motion was because

19  you'd have to actually do a deposition to be able to understand

20  the documents and understand for what purposes they were being

21  used for, that kind of thing.  That's why we pressed the time

22  period.  Many of these things are not self evident in terms of

23  what--

24         THE COURT:  Do you have anything else to say?

25         MR. LONERGAN:  Your Honor, the only thing that I have

1    to say is all of the cases that plaintiff's cite for the

2    proposition that defendants should not be allowed to go forward

3    with this deposition are distinguishable on the grounds that

4    they all deal with subpoenas that were either served after the

5    close of discovery in those cases or subpoenas that had return

6    dates that were after the close of discovery.  The MGM subpoena

7    does not present this issue.  The subpoena was served during

8    discovery.  The return date was prior to the disclose of

9    discovery.  We simply had to deal with the fact that the non-

10   party produced documents after the close of discovery.

11            Additionally, I just want to point out that

12   plaintiffs are being somewhat hypocritical in their attempt to

13   enforce case management order number 23.  Plaintiff served

14   30(b)(6) notices on all defendants on March 2nd, 2006 and

15   there's been multiple instances where plaintiffs have taken

16   depositions of defendants after the March 31 discovery cutoff

17   date.  Additionally, case management order number 23 also did

18   more than set a March 31st--

19            THE COURT:  Okay.  You can have your deposition.

20            MR. LONERGAN:  Thank you, Your Honor.

21            THE COURT:  Motion denied.

22            3105, United States.

23            MS. BROOKER:  Good afternoon, Your Honor.

24            THE COURT:  Good afternoon.

25            MS. BROOKER: Rene Brooker on behalf of the United

1    States, and just for clarity--

2            THE COURT:  And you are with the Justice Department,

3    with the U.S.--

4            MS. BROOKER:  Yes, with the Justice Department in

5    Washington, Your Honor, in the civil division, and just to be

6    clear 3105 is the--

7            THE COURT:  Judge Skinner used to always say, you

8    mean there's nobody in the U.S. Attorney's Office that's

9    capable of handling this.  Send someone from Washington?  I see

10   Mr. Henderson out there.  He's usually very competent.

11           MS. BROOKER:  Yes, Your Honor.  This is 3105, which

12   is a motion for protective order, is that correct?

13           THE COURT:  It is.

14           MS. BROOKER:  Just to be clear.  Your Honor, I'd just

15   like to briefly cover three areas, and I think I can do this

16   fairly briefly.  Since this is the first time the United States

17   is appearing before Your Honor in this MDL proceeding, I'd like

18   to set the stage for both of these motions by just briefly

19   telling the Court of the posture of the case currently.

20           THE COURT:  Both, I'm only dealing with one.  I'm

21   only dealing with 3105.

22           MS. BROOKER:  Yes, yes, that's correct, Your Honor.

23           THE COURT:  3107 is for Judge Saris.  It was unclear

24   but I have checked with her and she will deal with that.

25           MS. BROOKER:  On Thursday, Your Honor?

1        THE COURT:  I don't know when--

2        MS. BROOKER:  Okay.

3        THE COURT:  --but she will deal with it.  On

4   Thursday, Mr. Duffy?

5        THE CLERK:  Yes, Your Honor.

6        MS. BROOKER:  Very well, thank you, very much, Your

7   Honor.

8        THE COURT:  So says Mr. Duffy.

9        MS. BROOKER:  Let me just briefly tell the Court just

10  a summary of the posture of the case.  Second, I do think it's

11  important to point out briefly, and I will do that--

12       THE COURT:  Trust me, I know the posture.

13       MS. BROOKER:  I will briefly point out the authority

14  that the United States relies upon for the amendment of the

15  current protective order and then I will just briefly state the

16  salient points for why the United States at this time needs an

17  amended protective order.

18       THE COURT:  Ten minutes.

19       MS. BROOKER:  Yes, Your Honor.  And in terms of the

20  posture of the case, I merely wanted to point out to the Court

21  that this is False Claims Act case brought by the United States

22  and that this case involves Abbott and not the entire

23  pharmaceutical industry.  It's a very limited case, and as Your

24  Honor knows we served the complaint on May 26th of this year,

25  years after this protective order was negotiated among the

1    parties to the MDL proceeding.

2            In terms of the authority for this amendment, I think

3    it is important to point out that Judge Saris granted a stay of

4    the current discovery in this case to allow the United States

5    to file its briefing on a motion for an amended protective

6    order.  I will also say that the current protective order

7    itself, Your Honor, paragraph 28 contemplates that a motion of

8    this kind might very well be filed in the future, and I'll just

9    specifically read it.  It says nothing in this order shall

10   prevent any party from apply to the Court for relief there from

11   or from applying to the Court for further or additional

12   protective orders or modification of this order.  So this is

13   not extraordinary relief by any means that the United States is

14   seeking here.  In addition, Abbott even agrees in its

15   opposition to this motion for protective order that certain

16   provisions do need to be amended or added to accommodate the

17   United States as a party.

18           Now, there is no question at this time that we need

19   an amended protective order.  In part because the Untied States

20   and the relator at the time in December of 2002 were not

21   parties to the protective order, there are simply missing

22   provisions and some of the provisions don't make any sense

23   quite frankly in terms of accommodating the United States as a

24   party.  If I would just point out a few of them first.  There

25   is actually no provision in the protective order to allow the

1   plaintiff relator in this case access to Abbott's

2   confidential materials.  So that means, Your Honor, that they

3   cannot see any materials produced in this litigation because

4   every single solitary page of materials produced by Abbott in

5   this case has been marked as confidential or highly

6   confidential, and even if that weren't the case, of course the

7   plaintiff relator is entitled to see confidential materials

8   subject to signing a certification.  In addition, given the

9   fact that the relator plaintiff cannot have access to any

10  materials produced by Abbott in this case, the United States

11  cannot discuss any materials produced by Abbott or any

12  depositions taken relating to Abbott employees or any employees

13  of the federal government that Abbott identifies as

14  confidential.

15          A second provision, Your Honor, is that there is no

16  explicit provision whatsoever in the current MDL protective

17  order that requires Abbott to make a good faith showing that it

18  has searched for the materials it's designating as confidential

19  and ensuring that they're not publicly available and believe it

20  or not in this case, Abbott is designating as highly

21  confidential or confidential materials that are publicly

22  available, and I cite a few examples in my motion, Your Honor.

23  That simply has to be changed.  The amended protective order

24  that we seek allows a specific provision.  It provides a

25  specific provision that requires a good faith effort on the

1   part of Abbott to ensure that materials it's producing is

2   not publicly available as highly confidential.

3            A few other provisions, Your Honor.  There are, one

4   of the provisions that we have in our amended protective order

5   that Abbott disputes is the provision that we be permitted to

6   share information again marked by Abbott as confidential or

7   highly confidential with our state partners in this case, and

8   that is, it's very specifically and narrowly drafted as written

9   in our amended protective order.  It allows us to share

10  materials with law enforcement entities in the state that have

11  active investigations or litigations involving the same exact

12  issues in this case.  Now, under the current protective order

13  and if Abbott were to have its way, we would not be permitted

14  even to share documents produced in this case, for example,

15  with the state of Texas, that's currently inactive

16  negotiations, excuse me, active litigation with Abbott.  That

17  simply cannot be the case.

18           Now, the amended protective order that the United

19  States has provided is not entirely different by any means than

20  the current protective order that's in place.  In fact, in

21  drafting it we attempted to mirror as closely as possible the

22  current protective order, and approximately half of the

23  provisions in the United States and relator's proposed

24  protective order, come straight from the MDL protective order.

25  Either they're the identical provisions or they're

 1 | substantially the same with some minor corrections proposed.
 2 | In addition, Your Honor, when we were negotiating this
 3 | protective order leading up to today, the moment we became
 4 | involved in this lawsuit when it was originally filed in
 5 | Federal District Court in Miami, the very first thing that the
 6 | United States did was start conversations with Abbott and we
 7 | have repeatedly and consistently told Abbott that it is
 8 | critical that we have a protective order in place that allows
 9 | for us to present our case, to prepare our case efficiently.
10 | We're having a problem with that already, even at this early
11 | outset with the initial disclosures because Abbott produced all
12 | of its initial disclosures in this case as highly confidential
13 | so that prevents us from even starting this case sharing our
14 | information with relators and also sharing this information
15 | with potential witnesses.  Now, there is a provision, it's a
16 | restrictive provision on, and it requires the party at a
17 | deposition or preparing a witness for a deposition to meet a
18 | certain standard for showing a witness a confidential document.
19 | The United States needs to show potential witnesses during the
20 | discovery phase confidential documents to the extent that it
21 | believes it is necessary to prepare its case and to prove its
22 | case at trial.  We cannot be prevented from sharing information
23 | with witnesses in that manner.  We always are operating under,
24 | and it's explicitly stated in the proposed protective order,
25 | we're always operating under a good faith obligation not to

1    show a witness who we believe has absolutely no need to see

2    a  confidential document.

3            Another problem, a great problem as we see it with

4    the protective order, is that Abbott takes the position that

5    every document it produces in litigation is subject to the

6    terms of this protective order, primarily I believe because the

7    language of what constitutes confidential or highly

8    confidential information is extraordinarily broad and we submit

9    that the definition of highly confidential material is even

10   broader than regular confidential information.  What we

11   proposed is that we stick to the Federal Rule of Evidence,

12   26(c)(7) explicitly provides, and there's a body of case law,

13   that explicitly provides for what is confidential information.

14   To the extent that that is the definition, we can then litigate

15   that.   In addition, you have to read, we would submit,

16   different provisions of the current protective order to

17   understand the problems that we're having with it as Abbott has

18   interpreted it because it also requires, given that Abbott's

19   under the view that it can designate all materials even

20   publicly available information as confidential when you look at

21   the other corresponding provision about who bears the burden to

22   file a motion to address those overwhelming designations, it's

23   the United States and the relator or any other plaintiff must

24   file a motion to compel.  We submit that that is, shifts the

25   burden that's under Rule 26(c) to the plaintiff and the United

1  States and relator in this case to go through each and

2  every document and every page and there's going to be no doubt

3  probably a million pages, more than a million pages easily

4  produced in this case. It's not our burden to go through and

5  try to identify which is commercially sensitive information of

6  another party. Currently, that is the burden that's imposed.

7         The other point that I would like to make, Your

8  Honor, is that we spent, and I personally spent hours with my

9  brother in this courtroom who is going to address this argument

10  today on the telephone negotiating a protective order, sending

11  back and forth amended protective orders. I would submit that

12  almost all the provisions in the United States' proposed

13  protective order at one point and time during the negotiations

14  were accepted by Abbott, which should be no surprise because

15  there's nothing particularly unusual or earth shattering in any

16  of those provisions. They're standard provisions that one

17  would find in many protective orders that I personally

18  negotiated and that I've seen in other provisions. The United

19  States submits that Abbott protests greatly these simply

20  amendments that should appropriately place the burden on the

21  designating party, not the challenging party and that we are

22  entitled to a protective order that does not allow the other

23  side to simply make wholesale designations of any and all

24  materials without a good faith basis for those designations.

25  In fact Rule 26(c)(7), parties are subject under that rule to

1   sanctions motions for that conduct.  Now, I believe that

2   Abbott will say as it has said in its reply that if we don't

3   like it we can challenge it and, in fact, their response has

4   been to send us a letter twice with a name of an attorney in

5   the Chicago office with who if we have issues with the

6   designations we can call her and work it out.  That is not

7   acceptable to the United States.  Nobody wants to waste their

8   time in this case in order to have access to materials that

9   they should easily have access to to try this case to go

10  document by document and make phone calls to see if we can get

11  undesignated materials that are obviously, you know, over

12  designated and that either cannot possibly met its good faith

13  obligation in so designating.

14          I have submitted, Your Honor, and for the Court's

15  ease, there was last week we filed, the United States and

16  relator filed a motion for leave to reply.  As part of that we

17  submitted at Tab, let's see, it's Tab 1, we submitted a

18  paragraph by paragraph, provision by provision, comparison of

19  the current MDL protective order and the United States'

20  proposed order, and there Your Honor can see we've specifically

21  listed where the provisions are identical or they're comparable

22  or there are minor changes.  The ones that I covered here today

23  are more than minor changes, but I submit on behalf of the

24  United States that they're not extraordinary, they're not

25  unusual and in fact they're provisions that if Your Honor takes

1  a look at you will see are included in most protective

2  orders.  So while they may be different, they're not

3  extraordinary.

4          THE COURT:  All right.  You've just about ran out of

5  time.

6          MS. BROOKER:  Okay, Your Honor.  We would just submit

7  that the Court would adopt the United States proposed

8  protective order amending, which in effect simply amends the

9  current MDL.

10          THE COURT:  Why shouldn't I adopt it?

11          MR. DALY:  Your Honor, Jim Daly for Abbott Labs.

12  Your Honor, the protective order that this case has been

13  operating under has been operating for four years without

14  incident that I'm aware of in terms of how it gets interpreted.

15  There have been no problems with this case.  This case that the

16  government is talking about has been on file since 1995 in the

17  Southern District of Florida.  They only decided to open it up

18  this spring and now because they don't like certain things,

19  they want to come in and rewrite Judge Saris' order.  I think

20  that that's totally inappropriate.  I'll also take issue with

21  something that was said at the end.  The things that Abbott is

22  willing to agree to are reflected in Abbott's proposed order

23  and we have indeed talked with them and made some changes.  The

24  United States is a litigant in this case.  It's a litigant just

25  like anybody else in this case, and they need to play by the

1  rules.   Where changes need to be made we've agreed to make

2  them.   For example, they have said, we as the government, we,

3  you know, if Congress request that we produce, give them

4  documents, we have to give them to them.   If a federal agency

5  requests documents from us in a formal way through a request or

6  informally, we are duty bound to give Congress and these

7  agencies these documents.   Therefore, we've made those changes

8  in what we've proposed that the court adopt.   But for other

9  things that don't need to be changed, we believe that the Court

10 should continue to use the order that's been in place without

11 incident for four years.   On Schering, there's this notion

12 that, I don't know what it is, it's like a feeding trough for

13 Abbott documents so that they can go around and show everybody

14 Abbott's documents.   This is a protective order.   It's not a

15 every Tom, Dick and Harry in the country order, and this

16 Schering issue is dealt with by Judge Saris' CMO Number 9.   She

17 says that, that when you come into the case you get the

18 documents that have been produced to you, except the documents

19 that don't relate to the drug you sued on and except the

20 documents that don't relate to your claims.   There's nothing in

21 there about Schering.   There's nothing in there about passing

22 documents around to other people who aren't in this litigation

23 and in fact aren't in any litigation at all.   There are

24 mechanisms out there pursuant to which they can get this

25 information.   They can use their own CID powers if it's a

1    state.  They can subpoena us.  They can intervene.  They

2    can call up and ask, but they certainly don't have to be given

3    pre-approval to run around and share our documents.  I don't

4    think there's any basis for that at all and we don't include

5    that in what we propose.  And by the way, when you look at our

6    exhibit, Judge, our exhibit is a black line of the changes that

7    we propose to make to the existing--

8                THE COURT:  Uh-huh.

9                MR. DALY:  --protective order.  On the issue of

10   confidentiality designations, if we designated a public

11   document as confidential, we made a mistake.  We'll correct

12   that.  I mean, that's not a big deal.  The problem, the big

13   deal is that we have a definition of confidentiality that's

14   been in use in this case for four years.  All of the parties

15   here have produced documents pursuant to that.  All of the

16   parties have marked their documents pursuant to that.  To come

17   in and suggest that at this late stage that, well, we ought to

18   have a new definition of confidentiality because we're the

19   United States and that this is going to apply to everybody else

20   that we maybe we eventually unseal against and bring them into

21   the case too.  That means that--

22               THE COURT:  I mean, your brother's argument is

23   cogent.  They've all been her a long time and to change the

24   rules now at this point is--

25               MS. BROOKER:  Would Your Honor like me to address

1  that?

2           THE COURT:  In 30 seconds or less.

3           MS. BROOKER:  Your Honor, the amended protective

4  order would apply to any order, any case in which the United

5  States is a party and that would include Abbott and any other

6  party or party defendant that joins this litigation.  Abbott is

7  subject to various protective orders in AWP litigation and will

8  continue to be around the country throughout the states.

9  There is absolutely no reason why they cannot do in this case

10  what they are doing around the country which is being obligated

11  to be subjected to various protective orders and even for the

12  very same documents.  There's no reason why just by virtue of

13  the fact that we've coordinated discovery that Abbott cannot be

14  subjected to this one additional protective order.  In

15  addition, there are just simply provisions that are absent that

16  are unfair to the United States who has not contemplated

17  entering this at the time.  And if I could just say really

18  briefly on those three additional provisions that Abbott has

19  agreed to out of the amendments that the United States has

20  proposed, we propose our language.  They do recognize that we

21  have to accommodate congress and agencies and third parties and

22  FOIA requests and our provisions specifically say that we will

23  provide them notice as allowable under the law.  Abbott wants

24  to change that.  The United States can't change language such

25  as that.  We can provide them notices allowable under the law,

1   no more and no less would be allowed.

2        MR. BREEN:   Your Honor, if I may for 30 seconds

3   address the relator issue.  I represent relator and Ven-A-Care

4   of the Florida Keys.  The protective order we're proposing, as

5   the protective order that we have with Abbott and Mr. Daly, and

6   my brother, Mr. Daly in Texas, allows the relator to have

7   access to these documents.  The relator is not a competitor.

8   It's a pharmacy.  It was the industry insider that brought

9   these cases from the very beginning across the country.  It's a

10  doctor, a registered nurse, a pharmacist and they do on a daily

11  basis they work with the Justice Department and whatever states

12  we brought cases in as the law, False Claims Act requires

13  relators to do.  As the order is currently in existence, they

14  can't do that.  They cannot see these documents unlike the

15  order in Texas and that was not contemplated obviously when

16  this class action case was brought back in 2001 and 2002.  So

17  we would clearly ask, now Abbott states that well Ven-A-Care's

18  in-house counsel can see the documents.  Well, they don't have

19  an in-house counsel.  They're a small pharmacy that is a

20  relator in these cases and it's their medical and health care

21  expertise that the Untied States and the attorneys generals are

22  relying upon, so we clearly ask that that provision be added to

23  the protective order.

24        MR. DALY:   Your Honor, may I respond to that very

25  last point?

1           THE COURT:  You may.

2           MR. DALY:  I think that to, the relator is a

3   corporation and typically the order provides that in-house

4   counsel gets to see these documents.  If they have no in-house

5   counsel and if these individuals associated with the relator

6   are going to be witnesses, they can see it under that.  Having

7   said all that--

8           THE COURT:  Agreed.

9           MR. DALY:  --I mean do--

10          THE COURT:  Do you acknowledge that?

11          MR. DALY:  Under paragraph 4(f) and 6(f) I think if

12  they're witnesses they get to see, but having said, what I was

13  going to say, Judge, is--

14          MR. BREEN:  Okay.

15          MR. DALY:  --I will work something, I'm happy to work

16  something out with Mr. Breen where we can create, you've got

17  two employees, correct?

18          MR. BREEN:  Three.

19          MR. DALY:  Three, that we can work something out on

20  that line because they don't have an in-house counsel because

21  usually it's a corporation that we deal with.

22          THE COURT:  All right. I'm going to take this under

23  advisement, but I'll give you an electronic order quickly.

24          MR. DALY:  Thank you, Judge.

25          THE COURT:  All right.

1          What about the Wintraup deposition?  What's the

2    status?

3          MR. SOBOL:  My understanding is that it proceeded.

4    It went forward.

5          THE COURT:  It went forward?

6          MR. SOBOL:  Yes.

7          THE COURT:  All right.  Any other matters that people

8    want scheduled?

9          Hearing nothing, we stand in recess.

10          MR. DALY:  Thank you, Judge.

11          THE COURT:  You're welcome.

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

## CERTIFICATION

    I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____      November 13, 2006
Maryann V. Young

**YOUNG TRANSCRIPTION SERVICES**
**(508) 384-2003**