UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | Hon. Patti B. Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,* CIVIL ACTION NO. 05-11084-PBS | |

**UNITED STATES' SUR-REPLY MEMORANDUM IN OPPOSITION TO
DEY DEFENDANTS' MOTION TO DISMISS THE UNITED STATES' COMPLAINT**

**PRELIMINARY STATEMENT**

In this sur-reply memorandum, the United States will focus on the fundamental disagreements between the parties regarding the issues raised in Dey's initial motion. In its reply brief, however, Dey improperly raised an entirely new ground for dismissing this case, an alleged public disclosure prior to the filing of relator's complaint in 1997, that Dey now argues represents a jurisdictional defect. Relator is filing a separate sur-reply to address that issue.[1]

**I.      THE UNITED STATES' COMPLAINT IS TIMELY**

The United States' Complaint was filed within the statute of limitations set forth in the False Claims Act ("FCA"), 31 U.S.C. § 3731(b). The passage of time between the relator's original filing of claims against Dey and the United States' intervention is not cause for dismissal because the filing of relator's complaint tolled the statute of limitations with respect to the false claims that Dey caused to be submitted.

Dey argues that in the absence of an explicit statement in the FCA providing for tolling upon the filing of relator's complaint, the Court may only look to the FCA's three-year tolling provision under Section 3731(b)(2), which requires the United States to file suit within

> 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3730(b)(2). Dey contends that the three-year provision shows that Congress did not believe the government needed more than three years to investigate a case and therefore the

---

[1] The United States notes that allowing Dey to raise this issue in its reply brief would effectively convert Dey's motion from one under Rule 12(b)(6), based entirely on the pleadings, to one under Rule 12(b)(1), which permits responses to include affidavits, etc.

1

government's lengthy investigation here is presumptively unreasonable. Dey further argues that unless the Court reads the FCA in this fashion, the FCA's sealing provisions "would eviscerate the statute of limitations, completely contrary to the intention of Congress." Dey Reply Brief at 6.

Congress, however, permitted the government's need for extensions of the seal to be evaluated on a case by case basis, with the courts being authorized to extend the deadline where a court determines that the government's need for additional time outweighs any prejudice to the defendant, and that therefore good cause exists for the extension. The United States followed the procedure set forth by Congress in this case and Dey's battle is thus with Congress, not the United States.

Dey's argument assumes that the government has to file a complaint in order to proceed in an intervened case. Dey's invocation of this provision makes no sense where, as here, a civil *qui tam* action has been filed within the six years set forth in the preceding provision of the FCA, Section 3730(b)(1), which states: "A civil action under 3730 may not be brought –

> (1) more than 6 years after the date on which the violation of section 3729 is committed, . . . ."

31 U.S.C. § 3730(b)(1). Although the United States typically files its own complaint upon intervention, nothing in the FCA requires such a practice. If the United States did not file its own complaint upon intervention, there would be no question that the United States could rely on the relator's complaint to toll the statute of limitations. *See Graham Cty. Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 417 (2005) (6-year statute of limitation in FCA applies to actions filed by either the United States or relator). If the government chooses to file a complaint

and the complaint is declared untimely, the relator's complaint remains valid and the government may rely on relator's complaint as if it never filed its own complaint.  Once again, Dey is asking this Court to read limits into the FCA that Congress did not impose.

Dey also argues that Rules 3 and 4 of the Federal Rules of Civil Procedure require that service be completed within either 120 days or some other "reasonable period" undefined by Dey.  Dey then contends that since service was delayed and Dey was "prejudiced," no tolling may be permitted.  The FCA clearly states otherwise: "The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure." 31 U.S.C. § 3730(b)(3).  To adopt Dey's analysis would be to ignore the plain language of the FCA.

In fashioning its parade of horribles regarding the statute of limitations here, Dey again completely ignores the good cause standard imposed by Congress on the United States when seeking extensions.  The United States does not have unfettered discretion regarding the timing of filing suit; the United States must establish good cause for every extension sought.  Dey's reading of the decision in *United States v. Upton*, 339 F. Supp. 2d 190 (D. Mass. 2004), reflects its failure to acknowledge the critical role of the district court in the FCA's statutory scheme.  This Court in *Upton* upheld the initial sealing of an indictment, but required the government to file monthly status reports if it sought further extensions.  When the government failed to seek further extensions, the Court held that continued sealing was improper.  Here, by contrast, the government's requests for extensions of the seal were reviewed and granted by the respective district courts upon a finding of good cause.  The United States did not unilaterally extend the seal.  Under the logic of *Upton*, therefore, tolling should be permitted here.

3

In light of the above, the Court need not even reach Dey's bare claim of prejudice. Even if the Court were to consider it, any claim of prejudice must be viewed with considerable skepticism in the circumstances of this case, where Dey had notice of the action virtually from the time it was filed and engaged in considerable efforts to dissuade the government from intervening, and has been defending itself against very similar allegations for several years, rendering it highly unlikely that it suffered any impairment in its ability to mount a defense. In any event, such an inquiry is inherently fact-based and cannot be decided in the context of a Rule 12(b)(6) motion.

Finally, the government's reliance on the First Circuit's holding in *United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995), is in no way inconsistent with the Supreme Court's opinion in *United States v. Bornstein*, 423 U.S. 303 (1976). The two cases address completely different issues under the FCA. In *Rivera*, the First Circuit made plain that for purposes of the statute of limitations, where a defendant is charged with causing the submission of a false claim, the date of the claim is controlling. In *Bornstein*, the Supreme Court was determining how to assess penalties on a subcontractor who had caused false claims to be submitted. The Supreme Court held that the government must calculate the number of acts committed by defendant that caused the false claims to be submitted, even though the number of claims actually submitted by the prime contractor was higher. 423 U.S. at 313. Thus, *Bornstein* has no bearing on the statute of limitations issue before this Court. In short, while the defendant's acts determine the number of penalties, those acts do not give rise to liability, and the statute of limitations does not begin to run, until the false claims caused by these acts are filed.

## II.     THE UNITED STATES' COMPLAINT RELATES BACK TO THE RELATOR'S COMPLAINT

In opposing relation back under Rule 15(c)(1), Dey argues that the FCA cannot be read to permit relation back because such a reading is inconsistent with Congress's stated intention that the seal not affect defendant's rights and because it conflicts with Rule 3 of the Federal Rules of Civil Procedure.  Again, Dey ignores the structure set up by Congress to protect defendants - the requirement that the United States demonstrate good cause for an extension.  Dey also ignores the plain language of the FCA directing that service of the complaint only be made after the case is unsealed.  31 U.S.C. § 3730(b)(3).

In contrast to its previous arguments in favor of a strict application of the Federal Rules of Civil Procedure to FCA cases, Dey now argues that Rule 15(c)(2) must be read as not applying at all to FCA *qui tam* cases because of the sealing requirements.  Nothing in the Rule indicates that this is the case and the weight of authority is to the contrary.  See United States' Memorandum in Opposition ("Mem. Opp.") at 15-16.[2]  In any event, Rule 15(c)(1) permits relation back here.

## III.    THE FCA'S SEAL PROVISIONS ARE NOT UNCONSTITUTIONAL

The FCA does not deprive Dey or any other defendant of due process by (1) requiring that

---

[2]     As the United States previously noted, Dey improperly raises another ground for dismissal in its reply brief, arguing that the United States' Complaint cannot relate back here because relator's original complaint in the Southern District of Florida was barred by the public disclosure/original source provisions of the FCA, and relator's second complaint in this District was barred by the first to file provisions of the FCA.  Relator addresses these arguments in its brief.  Dey also argues that the United States failed to allege subject matter jurisdiction here.  Such is not the case.  The United States' Complaint alleged that the action was brought under the FCA, 31 U.S.C. §§ 3729-33, and common law or equitable theories of fraud and unjust enrichment.  U.S. Complaint ("Compl."), ¶ 1. The United States further alleged subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law causes of action pursuant to 28 U.S.C. § 1367(a). Compl., ¶ 8.  The United States also alleged the existence of personal jurisdiction over Dey pursuant to 31 U.S.C. § 3732(a).  *Id*.

cases be filed under seal with extensions approved by the district court, and (2) not providing for automatic unsealing of extension pleadings following intervention. Dey argues that unless this Court reads a limit into the length of seal extensions permitted under the FCA, the FCA is unconstitutional. There is, however, no due process issue attached to how long a sovereign is permitted to bring a case. As the Supreme Court recently reaffirmed in *BP Am. Prod. Co. v. Burton*, 127 S. Ct. 638 (2006), "time does not run against the King" and statutes of limitations must be strictly construed when a defendant seeks to foreclose claims of the sovereign. 127 S. Ct. at 646. Since Congress would not have violated any due process rights of defendants had it chosen not to impose any limitations period on false claims actions, plainly its chosen procedure does not run afoul of any due process requirements by virtue of the length of time that may exist between an initial relator filing and government intervention. Here, Congress instituted a good cause standard to be applied by the district court and did not limit the length of extensions that could be obtained by the United States. Dey, therefore, has no due process claim based on this procedure.

Furthermore, to the extent Dey argues that its due process rights have been violated because the earlier extension requests and claims against other defendants in this case remain sealed, Dey is free to challenge the sealing and the relevant district court will decide the issue. As with Rules 3 and 4 of the Federal Rules of Civil Procedure, Rule 5's service requirements must also be read in harmony with the FCA and its sealing requirements. Again, Dey can point to no case in which the United States' complaint was dismissed because the United States did not serve a defendant with still sealed pleadings. While the United States does not believe the extension requests or orders have any bearing on the issues in this case, complaints about the

sealing process should be dealt with in that fashion and not by dismissal of the Complaint here.

## IV.  THE REBATE AGREEMENT DOES NOT PERMIT FRAUDULENT PRICE REPORTING

Despite Dey's best efforts to ignore the plain language of the Medicaid Rebate Agreement, the Agreement simply cannot be read to permit drug manufacturers to misrepresent the prices they report in order to obtain higher Medicare and Medicaid reimbursement for their customers.  Nothing in the rebate contract even purports to address a manufacturer's reporting of AWPs for reimbursement purposes, and the agreement explicitly states that the government does not waive or relinquish any legal rights under federal law.  Rebate Agreement at § IX(d).  If, as Dey contends, it reported truthful AMPs, then Dey clearly had the ability to report equally truthful AWPs and WACs.  Dey chose not to, instead purporting to follow "preexisting industry practice."  That is not a defense to fraud, and never has been.

Dey further seeks to distinguish the numerous cases holding that the Medicare provider agreements do not bar common law claims by arguing that those cases involve either statutory entitlements or whether Medicare provider agreements gave rise to a contractual interest in Medicare payments.  Neither distinction controls the outcome here.  Like providers participating in Medicare, drug manufacturers like Dey, upon entering the rebate program, receive a type of statutory entitlement, not a contractual right, regarding Medicaid coverage and payment for their drugs. The legal effect of the provider agreements is sufficiently similar to the rebate agreement to reach a result consistent with those cases.  As to Dey's second point, just as the Medicare provider agreements focus on eligibility for Medicare payments, the Medicaid rebate program deals with eligibility for Medicaid payments, as well as the rebates associated with those

payments.  In both instances, the entities signing the agreements do so in order to ensure that their services or products are eligible for reimbursement under a federally funded program.  As the United States pointed out in its brief, neither the provider agreement nor the rebate agreement results from any bargained for exchange between the government and the private parties.  As such, the rebate agreement does not provide Dey with any contractual defenses to this action.

V.     **THE COMPLAINT PROPERLY ALLEGES FCA AND COMMON LAW CLAIMS**

   A.     **The Complaint Alleges Falsity Under the FCA**

Dey's claim that the United States has failed to allege falsity boils down to Dey's belief that (1) Dey and its fellow drug manufacturers were free to report any number they pleased as AWP and WAC; and (2) any information the government received to the contrary automatically absolves Dey of any liability for its conduct.  As to the first point, the Supreme Court has been very clear in stating that the FCA "was intended to reach *all types of fraud, without qualification, that might result in a financial loss to the Government*."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (emphasis added).  It is enough under the FCA to allege, as the United States has done in its Complaint, that Dey reported inflated prices in order to ensure higher government reimbursement to its customers and actually marketed such reimbursement to its customers as an inducement to purchase Dey's drugs, which in turn resulted in the submission of false claims.  *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) (FCA covers fraudulent course of conduct by defendant).

As to government knowledge, the First Circuit has stated, "'[I]t is not true that once a government agency smells a rat, the agency must exterminate it forthwith or allow it the run of

the public's house in perpetuo.'" *Precious Metals Assocs. v. Commodity Future Trading Comm'n*, 620 F.2d 900, 909 (1st Cir. 1980), quoting *United States v. Michael Schiavone & Sons, Inc.*, 430 F.2d 231, 233 (1st Cir. 1970). Dey cannot point to a single government report showing that the government not only knew about Dey's fraud, the government acquiesced in the fraud and willingly paid false claims. As the United States alleged in its Complaint, "No governmental payor knew of or sanctioned Dey's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its customers to purchase those products." Compl., ¶ 36. Not a single one of the reports cited supports Dey's version of events, and the case law cited by the United States accurately states the standards to be applied here, which Dey cannot meet. Mem. Opp. at 29-32. Moreover, as this Court has previously held, this issue is not appropriate for resolution on a motion to dismiss. *In re Pharm. Indus. Average Wholesale Price Litig.*, 339 F. Supp. 2d 165, 180 (D. Mass. 2004); *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187, 206 (D. Mass. 2004).

      **B.**      **The Anti-Kickback Statute Applies Here**

Dey seems to think that because it did not pocket the spread or pay out the remuneration that its conduct is outside the scope of the Anti-Kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b). To the contrary, the statute specifically takes aim at those who *offer* any remuneration, *directly or indirectly*, and clearly would cover the scheme arranged by Dey here. *See generally United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989). Dey manipulated the spread on its drugs so that it could offer and indeed deliver, indirectly, substantial remuneration to pharmacies to induce them to dispense Dey's drugs. Because the Medicaid program relied directly on the AWPs and WACs supplied by Dey, Dey

9

could guarantee a known amount of excess Medicaid reimbursement to its customers by virtue of its false prices, combined with discounts and rebates off those false prices. Dey in fact used a sales tool called the "Reimbursement Comparison Worksheet" to show customers their anticipated reimbursement. Compl., ¶ 57. This sure-fire bet in turn induced customers to also purchase Dey's drugs for supply to Medicare beneficiaries, where the impact of Dey's fraud on reimbursement was more difficult to quantify due to Medicare's reliance on median prices. The suggestion that Dey had no reason to set up the remuneration scheme because it did not pocket the spread is specious; Dey arranged for the remuneration to its customers to increase the market share for its drugs and its own bottom line. Under the illegal scheme, everybody wins, except, of course, for the federal health care programs that are footing the bill. Plainly, on a motion to dismiss, Dey cannot succeed in showing that there is no set of facts under which plaintiffs could prevail on their claims.

In arguing that there was no implied certification of compliance with the AKS, Dey ignores the significant body of case law cited by the United States holding that compliance with the AKS is a condition of payment, and claims for reimbursement contain an implied representation that they are being submitted in compliance with the AKS. Thus, when a person violates the AKS and obtains referrals or other business as a result, the claims relating to such referred items or services are not eligible for reimbursement. Opp. Mem. at 35 and cases cited therein. To hold otherwise would "put the government in the position of funding illegal kickbacks after the fact." *United States ex rel. Bidani v. Lewis,* 264 F. Supp. 2d 612, 615 (N.D. Ill. 2003).

Dey again argues that this holding has never been applied to Medicaid claims. Putting

aside Dey's failure to offer any reason why Medicaid should be treated any differently since the AKS, 42 U.S.C. § 1320a-7b(f), applies to both the Medicare and Medicaid programs, the statement is not even true.  In *United States v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006), the court held that even though the Medicaid cost reports at issue lacked an express certification of compliance with the AKS and Stark statutes, "both statutes clearly provide that compliance with their terms is a condition of payment under the Medicaid programs." *Id.* at 724.  The *Rogan* court held the defendant liable under the FCA for causing false claims to be submitted to the Medicaid program by the provider hospital in violation of the AKS.  Here, Dey caused its customers to file false claims with the Medicaid program in violation of the AKS and should be held similarly liable under the FCA.

Dey further argues that the government cannot allege that it would not have paid the claims had it known of the violation.  As established by the *Rogan* opinion and the other case law cited previously, compliance with the AKS is a condition of payment.  In other words, it is material as a matter of law to the decision to pay and is not an evidentiary question.

### C. The United States Sufficiently Alleged A Claim for Common Law Fraud

Dey again seeks to argue government knowledge to negate reliance as an element of common law fraud.  Once again, the government reports cited by Dey do not detail the fraud scheme alleged by the United States' Complaint - these reports allege that for certain drugs, including some sold by Dey, the reported prices are higher than market survey prices.  As detailed in the United States' memorandum in opposition, Dey's reporting of AMP also does not foreclose the government's reliance on Dey's reported AWPs and WACs.  Dey's argument also completely ignores that Dey's entire scheme depended upon the United States' reliance on Dey's

phony prices.  In order for Dey to ensure that its customers received inflated reimbursement, Dey did everything in its power to guarantee reliance by the government on false AWPs and WACs by continuing to report false prices year after year.

## **CONCLUSION**

For all of the foregoing reasons, the United States respectfully requests that the Court deny the defendants' motion to dismiss this action.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

By: /s/ Laurie A. Oberembt
GEORGE B. HENDERSON, II
Assistant U.S. Attorney
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3272

MICHAEL F. HERTZ
JOYCE R. BRANDA
JOHN K. NEAL
LAURIE A. OBEREMBT
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 514-3345

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day caused an electronic copy of the above "SUR-REPLY MEMORANDUM IN OPPOSITION TO DEY DEFENDANTS' MOTION TO DISMISS" to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: March 2, 2007

                                                  /s/ Laurie A. Oberembt
                                                 Laurie A. Oberembt