## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ASTRAZENECA TRIAL | Judge Patti B. Saris |

## REPORT OF DR. MEREDITH ROSENTHAL
## REGARDING ASTRA ZENECA AND CLASS 1

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................................1

II.     QUALIFICATIONS ...................................................................................................2

III.    BACKGROUND, SUMMARY OF ALLEGATIONS  AND SUMMARY OF MY
        CONCLUSIONS...........................................................................................................4

IV.     OVERVIEW OF ZOLADEX .........................................................................................6

V.      MEDICARE PART B...................................................................................................7

                1.      Reimbursement of Drugs Under Medicare Part B .......................................8

VI.     INCENTIVES FOR PROVIDERS IN THE CONTEXT OF MARKET  FAILURE:
        WHY COMPETITION IS UNLIKELY TO  DISSIPATE THE EFFECTS OF
        INFLATED AWPS ....................................................................................................10

VII.    THE ECONOMIC INCENTIVES FOR PHARMACEUTICAL
        MANUFACTURERS .................................................................................................13

VIII.   ROLE OF PUBLISHERS ...........................................................................................14

IX.     ANALYSIS OF DEFENDANT'S DATA SUGGESTS AWP INFLATION  WAS
        UNDERTAKEN FOR COMPETITIVE GAIN................................................................15

X.      SUMMARY AND CONCLUSIONS ..............................................................................17

# I.     INTRODUCTION

1.      I have been retained by Counsel to the Class of consumers who paid for Zoladex, which is manufactured by AstraZeneca ("Defendant"), based on an allegedly inflated AWP.  The Class certified by Judge Saris and addressed in this work is the nationwide Class of Medicare Part B beneficiaries.  I have investigated:

- the economic incentives for manufacturers to inflate AWPs and for health care providers to select therapies with inflated AWPs,

- empirical clues in the invoice data supplied by the Defendant that suggest AWP inflation, and in particular, whether the data support the theory that the Defendant used the spread between AWP and the net sales price to providers as a competitive device, and

- whether the Class would likely have been economically injured by the alleged AWP inflation.

2.      I conclude that Zoladex's AWP was inflated relative to its average sales price and that this inflation resulted in economic harm to the Class.  I find that there were strong economic incentives for the Defendant to have engaged in the allegedly unlawful AWP inflation.  These incentives, coupled with the general lack of price transparency in the market for the drug in question, created an environment in which AWP inflation would be economically rational behavior for a pharmaceutical manufacturer.  Moreover, my analysis of manufacturer invoice data demonstrates pricing patterns in response to changes in the market environment that are consistent with the allegations.  Finally, because their payments for Zoladex were a mathematical function of the AWPs, members of the Class would have been economically injured if the Defendant inflated those AWPs as alleged.

3.      To arrive at these opinions, I have appealed to theory, data, and methods generally relied upon by experts in my field and I have appropriately applied standard approaches and analyses.

The scientific bases for my conclusions are described in my testimony.  Because my findings relate to and build upon my amended tutorial report to the Court in this matter, I incorporate that document by reference as well.[1]

## II.    QUALIFICATIONS

4.    My name is Meredith Rosenthal.  I am an Associate Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of Greylock McKinnon Associates (GMA), a consulting and litigation support firm.  My principal research interests concern the economics of the health care industry including pharmaceuticals.

5.    At Harvard, I have taught in Masters'-level and Ph.D.-level health economics courses and lectured on a variety of health policy issues.  Since 1996, I have worked with GMA on a number of matters, most of which relate to litigation in health care markets generally and the pharmaceutical industry in particular.  I have submitted written and presented oral testimony in an earlier phase of this litigation.  I have submitted written and presented oral testimony in litigation regarding the physician administered drug Lupron;[2] I have submitted written testimony in litigation regarding the drugs Augmentin and Neurontin.[3] Working with a team of health care experts, I submitted written testimony assessing and measuring the impacts of smoking on Medicaid health care costs in the Commonwealth of Massachusetts.  In addition, I have consulted to GMA on other matters, including other pharmaceutical litigation related to the

---

[1]  "Amended Written Tutorial of Dr. Meredith Rosenthal to Reflect Matters Relevant to AstraZeneca and Class 1 Only," *In re Pharmaceutical Industry Average Wholesale Price Litig.*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS ("*Rosenthal Tutorial*").

[2]  *In re Lupron Marketing and Sales Practices Litig.*, United States District Court, District of Massachusetts, MDL No. 1430, CA No. 01-CV-10861.

[3]  *In re Augmentin Antitrust Litig.*, United States District Court for the Eastern District of Virginia, No. 02-CV-442; *In re: Neurontin Marketing and Sales Practices Litig.*, MDL Docket No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts; and *Gregory Clark and Linda Meashey, individually and on behalf of others similarly situated v. Pfizer Inc. and Warner-Lambert Co., LLC*, No. 01819, Philadelphia County Court of Common Pleas.

following drug products: Buspar, Cardizem CD, Cipro, Hytrin, K-Dur, lorazepam and

clorazepate, Relafen, Taxol, Wellbutrin SR, Neurontin, and Zyprexa.[4]

6.      I have conducted research on a wide variety of health economics topics, with a focus on

the financing and organization of the U.S. health care system.  A number of these studies relate

to prescription drugs.  Specific topics I have studied include the design of a Medicare

prescription drug benefit[5] and direct-to-consumer advertising of prescription drugs.[6]  Presently, I

am engaged in a large-scale evaluation of the effects of prescription drug formularies on drug

choice and health care spending.  I have published numerous peer-reviewed journal articles,

essays, and book chapters.

---

[4] *In re Buspirone Antitrust Litig.*, MDL No. 1413, United States District Court for the Southern District of New York; *In the Matter of Hoechst Marion Roussel, Inc., Carderm Capital L.P., and Andrx Corporation*, Docket No. 9293, United States of America Before Federal Trade Commission; *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, Master File No. 1:00-MD-1383, United States District Court for the Eastern District of New York; *In re Terazosin Hydrochloride Antitrust Litig.*, Case No. 99-MDL-1317 Seitz/Garber, United States District Court for the Southern District of Florida; *In re K-Dur Antitrust Litig.*, Civil Action No. 01-1652 (JAG), (Consolidated Cases), MDL No. 1419, United States District Court for the District of New Jersey; *In re Lorazepam and Clorazepate Antitrust Litig.*, MDL No. 1290, United States District Court for the District of Columbia; *In re Relafen Antitrust Litig.*, United States District Court, District of Massachusetts, Master File No. 01-CV-12222-WGY; *HIP Health Plan of Florida, Inc., on Behalf of Itself and All Others Similarly Situated v. Bristol-Myers Squibb Co. and American Bioscience*, Case Number 1:01CV01295, United States District Court for the District of Columbia; *IBEW - NECA Local 505 Health & Welfare Plan and Joanne C. Gaddy v. SmithKline Beecham Corporation, and GlaxoSmithKline, PLC*, United States District Court for the Eastern District of Pennsylvania;  *In re: Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts; *Gregory Clark and Linda Meashey, individually and on behalf of others similarly situated v. Pfizer Inc., and Warner-Lambert Company, LLC*, No. 01819, Philadelphia County Court of Common Pleas; *UFCW Local 1776 and Participating Employers Health and Welfare Fund, Eric Tayag and Mid-West National Life Insurance Company of Tennessee v. Eli Lilly and Company*, No. 05-CV-4115, United States District Court, Eastern District of New York.

[5] H.A. Huskamp, M.B. Rosenthal, R.G. Frank, and J.P. Newhouse, "The Medicare Prescription Drug Benefit: How Will the Game Be Played?" *Health Affairs*, 19(2): 8-23, March/April 2000.

[6] M.B. Rosenthal, E.R. Berndt, R.G. Frank, J.M. Donohue and A.M. Epstein, "Promotion of Prescription Drugs to Consumers," *New England Journal of Medicine*, 346(7):498-505, Feb. 2002; M.B. Rosenthal, E.R. Berndt, J.M. Donohue, A.M Epstein, R.G. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," *Frontiers in Health Policy Research*, v. 6, David M. Cutler and Alan M. Garber, editors, MIT Press, June 2003; M. Mello, M.B. Rosenthal, P.J. Neumann, "Direct-to-Consumer Advertising and Shared Liability for Pharmaceutical Manufacturers," *JAMA*, 289(4): 477-81, Jan. 22, 2003; J.M. Donohue, E.R. Berndt, M.B. Rosenthal, A.M. Epstein, R.G. Frank, "Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression," *Medical Care*, 2004.

---

7.      I received an A.B. in International Relations from Brown University in 1990 and a Ph.D. in Health Policy (Economics Track) from Harvard University in 1998.  A more complete description of my qualifications is found in my *Curriculum Vitae*, which is included as Attachment A to this report.

8.      In preparing this report, I reviewed a wide variety of documents produced by the Defendant in this case including strategic memoranda and contracts, related legal filings, reports, and both scientific and industry publications related to pharmaceutical distribution and reimbursement.  These sources are listed in Attachment B to this report.  I have also examined the drug transaction and pricing data that are summarized in Dr. Hartman's December 15, 2005 Liability and Damages Report.[7]  I also rely on my training, research, and experience as an economist on matters relating to health economics.  I am charging $475 per hour for my work.

### III.      BACKGROUND, SUMMARY OF ALLEGATIONS AND SUMMARY OF MY CONCLUSIONS

9.      I have been retained by Counsel to the Class of consumers enrolled in Medicare Part B (identified by Judge Saris as "Class 1") who paid a portion of the price of Zoladex.  The allegations in this matter are summarized in the Amended Master Consolidated Complaint[8] and pertain to the physician-administered drugs of manufacturers including AstraZeneca.

10.      In my testimony below I describe the economic theory and evidence that support the conclusion that the alleged practices of the Defendant caused harm to the Class defined by Judge Saris.  To do so, I have analyzed the economic circumstances and incentives that have made the

---

[7]  "Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages," *In re Pharmaceutical Industry Average Wholesale Price Litig.*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS, December 15, 2005.

[8]  Amended Master Consolidated Class Action Complaint, *In re Pharmaceutical Industry Average Wholesale Price Litig.*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS.

alleged fraud possible and profitable.  This analysis relies upon a standard economic

characterization of key institutions in the U.S. health care industry including the role of insurance

in paying for the drugs at issue, the nature of competition in both the pharmaceutical and

provider markets, and the central role of AWP as a pricing benchmark for pharmaceuticals.

Further, using standard empirical methods applied to the Defendant's transaction and price data,

I examine whether the Defendant's market behavior is consistent with the allegations of AWP

inflation.  Where appropriate, I support my economic analysis with the Defendant's own

statements as obtained through deposition and discovery.

11.     My analysis leads to the following conclusions:

- AWP is the most widely used pricing benchmark in the industry.  During the Class Period, AWP or a discount off of AWP was the basis for Medicare reimbursement for brand name drugs covered under Part B.

- The system of third-party reimbursement and the large number of drugs, procedures, and other services covered by health insurers combined with the opaque discounting practices of the Defendant presented an opportunity for the alleged unlawful conduct to have occurred.

- Physicians and other providers of the drugs at issue in this matter could increase their net revenues (*i.e.*, reimbursement net of the acquisition costs of the drugs) under this system by selecting drugs with larger spreads – *i.e.*, drugs where the AWP was inflated in relation to the acquisition cost of the drug.

- Manufacturers, including Astra Zeneca, could increase their unit sales not only by discounting their products, but also by raising their reported AWPs.

Moreover, raising the AWP would be the more profitable strategy in that it could be expected to increase the number of units sold, but would have no negative impact on the manufacturers' profit margins. Therefore, spreads can be created and/or maintained by either lowering ASP while maintaining AWPs or by increasing AWPs.

- Because their payments to providers for Zoladex were a mathematical function of the AWPs, members of Class 1 would have been economically injured if the Defendant inflated or maintained those AWPs as alleged. That is, members of the Class paid more for Zoladex than they would have in the absence of the alleged unlawful conduct.

## IV.     OVERVIEW OF ZOLADEX

12.     For the purposes of my testimony, I focus on the allegations of AWP inflation with respect to Zoladex.

13.     Zoladex was approved by the Food and Drug Administration in 1989 and is an injectable drug in the luteinizing hormone releasing hormone (LHRH) class that is used principally to treat prostate cancer.  During the Class Period, Zoladex's main competitor within the LHRH class was Lupron.  Zoladex is referred to as "physician-administered" because it is typically delivered in a physician's office.  The AWP of a one-month dose of Zoladex ranged from roughly $320 to more than $450 during the Class Period.  Typically patients would be on Zoladex for more than one month.[9]

---

[9]  This reference to Zoladex "cost" is based on the published AWP according to the Red Book.  Dosing information was taken from the FDA-approved prescribing information produced by AstraZeneca.

## V.    MEDICARE PART B

14.    As was described more fully in my tutorial,[10] the Medicare program is comprised of several distinct parts:  Part A covers hospital services, Part B covers professional services, Part C is Medicare managed care (now called "Medicare Advantage"), and Part D is the prescription drug benefit that took effect on January 1, 2006.  During the Class Period, under Part B, Medicare generally covered only those drugs that were "incident to" a physician's service, drugs administered with durable medical equipment (DME),and drugs specifically covered by statute (for example, oral immunosuppressive drugs).  Covered drugs also include some self-administered forms of drugs that are primarily physician-administered, such as the anti-emetic drugs.[11]

15.    For a Medicare Part B covered drug, including Zoladex, 80% of the cost is paid for by the federal government, and 20% is paid for by whomever is responsible for the co-payment.  For example, an individual Medicare recipient may have a private supplemental insurance policy that covers their coinsurance and deductibles.  There are more than four million Medicare enrollees in the United States who do not have supplemental insurance coverage and must pay their own coinsurance for Part B.[12]  These individuals are represented in Class 1.  Even for those persons who have some form of supplemental coverage for the Medicare coinsurance, features of that coverage (*e.g.*, coinsurance on the coinsurance) may well result in the individual becoming obligated to pay some portion of the coinsurance.  For example, employer-sponsored

---

[10]  *See Rosenthal Tutorial.*

[11]  Currently, those drugs that "are not usually self-administered by the patient" are covered under Medicare Part B.  *See* § 112 of the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act ("BIPA").

[12]  *See* Distribution of Supplementary Insurance for the Medicare Population as presented in *Rosenthal Tutorial* and which cites Franklin Eppig and George Chulis, "Trends in Medicare Supplementary Insurance: 1992-1996," *Health Care Financing Review*, 19 (1), Fall 1997, Table 1, p. 202.

supplemental plans, which cover about a third of the Medicare population or 13 million people, typically require enrollees to pay 20% of the 20%.[13]  Individuals with this type of supplemental plan will also be in Class 1.

       **1.**       **Reimbursement of Drugs Under Medicare Part B**

16.     Reimbursement for prescription drugs under Part B in the Medicare program has been based on the Average Wholesale Price (AWP)[14,15] reported by drug manufacturers and published in the standard directories (Red Book, First Databank (Blue Book) and MediSpan).  While the precise formula for AWP-based reimbursement has changed over time, reliance on AWP has been a constant.

17.     Prior to January 1, 1998, Medicare carriers were to determine the allowed amount for a covered drug based on the lower of the Estimated Acquisition Cost ("EAC") or 100% of the national AWP for that drug.  The EAC was to be determined based on a survey of actual invoice prices paid for the drug and thus designed to represent the actual cost (or "usual and customary charges") of drugs for direct purchasers (the providers, in the case of Medicare Part B).

---

[13]  National Bipartsan Commission on the Future of Medicare, http://medicare.commission.gov/medicare/K-P-1499.html as accessed October 2006.

[14]  "Apparently from the beginning of the program, Medicare has based payment for drugs on published 'average wholesale price' (AWP).  AWP is used throughout public and private insurance programs as the basis for drug reimbursement, both for drugs administered in physician offices and for drugs dispensed by pharmacies.  The amount of reimbursement varies from plan to plan and setting to setting, but it is almost always expressed as a percentage of AWP."  American Society of Clinical Oncology (ASCO), *Reform of the Medicare Payment Methods for Cancer Chemotherapy*, May 2001, p. 5.

[15]  Medicare currently pays 106% of ASP for drugs administered in a physician's office (Department of Health & Human Services, Centers for Medicare & Medicaid Services, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 352, November 3, 2004); in 2004, Medicare generally paid 85% of AWP with selected drugs ranging from 80-95% of AWP (Department of Health & Human Services, Centers for Medicare & Medicaid Services, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 54, December 24, 2003); between 1998 and 2003 the amount was 95% of AWP (42 CFR 405.517, Revised October 1, 2003).

18.     Historically, however, Medicare carriers have not conducted such surveys and have based reimbursement on AWP.[16]  Furthermore, on January 1, 1998, 42 C.F.R. § 405.517 was amended so that the allowed amount would be based on the lower of the billed charge or 95% of AWP.  In practice, this has meant that the majority of reimbursement has been undertaken using the AWP.

19.     An AstraZeneca document succinctly explains reimbursement in the Medicare Part B market:

> "How is Medicare Part B reimbursed?  Office based physicians can choose to **participate** or not in Medicare.  As a participator, the physician agrees to accept the fee schedule Medicare establishes.  Essentially, the physician files a claim; Medicare pays for 80% of the claim and the patient is responsible for the remaining 20%.  Some patients may have a **secondary insurance** which will pay 80% of the 20% co-pay.  This leaves 20% of the 20% (4%) that the patient is responsible for."[17]

20.     As with other sectors, there has been rapid growth in Medicare Part B drug expenditures:

> "Analysis of the sources of this growth reveals that only a few of the approximately 450 covered drugs account for most of the spending.  [Part B] drug expenditures in 1998 were about $3.3 billion and this amount grew to more than $8.4 billion by 2002.  During the same period (1998 to 2002), Medicare enrollment grew only 1.4 percent per year while the drug spending grew an average of 27 percent per year.  The vast majority (77%) of the Medicare Part B drug expense is paid to oncologists and urologists.  Oncologist-based drug expenditures grew from $1.2 billion in 1998 to $3.8 billion in 2002 with the spending growth from 2001 to 2002 at 41 percent.  The spending on drugs under Medicare Part B is highly concentrated with 7 of the approximately 450 drugs accounting for 49 percent of the spending ($4.0 billion out of $8.4 billion).  Nineteen drugs accounted for 75 percent of the total drug spend [*sic*] and 33 drugs accounted for 86 percent of the total.  Both drug product price increases at the manufacturer level and increases in utilization appear to have been

---

[16]  *See* "Excessive Medicare Payments for Prescription Drugs," Office of Inspector General, Department of Health and Human Services, December 1997, OEI-03-97-00290, pp. i-iii.

[17]  Plaintiffs' Exhibit 15, email with attachment titled "Medicare Review" from M. Hammons, October 19, 2000, AZ0431807-811 at AZ0431808 (emphasis in original).

the major contributors to growth in drug expenditures for the Medicare Part B program."[18]



**Medicare Spending and Annual Growth Rates for Part B Drugs, 1997-2003**

Source: MedPAC, "Medicare Part B Drugs and Oncology," July 13, 2006, Chart 1.

## VI.   INCENTIVES FOR PROVIDERS IN THE CONTEXT OF MARKET FAILURE: WHY COMPETITION IS UNLIKELY TO DISSIPATE THE EFFECTS OF INFLATED AWPS

21.    Most economic models of physician behavior are based on the notion that physicians choose therapies in part based on the impact of these choices on their net revenues.[19]  When it comes to Zoladex, physician net revenues are equal to the difference between AWP less an agreed-upon discount and the acquisition cost of a drug.  This difference has been called the

---

[18]  S. W. Schondelmeyer and M. V. Wrobel, *Medicaid and Medicare Drug Pricing:  Strategy to Determine Market Prices*, Abt Associates Inc., June 2004, pp. 8-9 (footnote to DHHS, Center for Medicare and Medicaid Services, "Medicare Program; Payment Reform for Part B Drugs; Proposed Rule," Federal Register, Aug. 20, 2003, 50428-52, has been omitted).

[19]  Thomas G. McGuire, "Physician Agency" in *Handbook of Health Economics*, eds. A.J. Culyer and J. P. Newhouse, Volume 1A, pp. 463-536, Elsevier, Amsterdam, 2000.

"spread," "margin," or "return to practice." Thus, all else equal, physicians will have an incentive to select a product with a larger spread, even if the acquisition cost of that drug exceeds that of a therapeutic substitute.

22.     The Defendant's economists have suggested that competition among the providers of pharmaceuticals will dissipate any possible impact of AWP inflation.[20]  Specifically, they imply that payers will simply negotiate larger discounts in their physician contracts to account for higher spreads.  But it is well known among health economists that medical care markets suffer from numerous market failures and are characterized by a wide variety of institutional features that serve to dampen price competition.[21]

23.     Under Medicare Part B and private insurance, the suppliers purported to compete vigorously on the basis of price are typically specialty physicians (Zoladex is typically administered by a urologist).  As professionals, physicians command a large amount of technical and clinical information that is not accessible to patients or payers who can only imperfectly judge whether a physician is making appropriate diagnoses or treatment choices.  Such asymmetric information about the nature of the service being delivered poses problems for price competition because patients and payers are unable to make "apples to apples" comparisons of providers – that is, to compare prices for services of equal value.  This asymmetry of information, along with the high stakes involved (health), also leads to the importance of trust in physician-patient interactions.  Trust, in turn, limits the substitutability of physicians from the patient's perspective.  This perceived differentiation of physicians on the basis of trust weakens

---

[20] *See* Declaration of Eric M. Gaier, PhD. in Support of Defendants' Opposition to Class Certification, *In re Pharmaceutical Industry Average Wholesale Price Litig.*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS, October 25, 2004, ¶¶ 31-32.

[21] A seminal paper by Nobel laureate Kenneth Arrow in 1963 examines these issues and forms the basis for modern health economics (*see* K. J. Arrow, "Uncertainty and the Welfare Economics of Medical Care," *American Economic Review* 53(5):941-973).

price competition, particularly when the patients concerned are acutely or chronically ill as are recipients of Zoladex.  In the Medicare context, "negotiations" over price take the form of congressional action in an environment of intense lobbying by specialty societies but have a largely similar outcome to the private process.

24.     In other markets, economists look to free entry as a prerequisite to competition; barriers to entry allow current market participants to enjoy excess profits.  But of course in the United States, entry into the market for physician services is constrained by limits on medical school capacity, limits on the numbers of foreign medical school graduates who may come to the United States as residents, medical licensing requirements, and specialty board exams among other factors.  These barriers to entry are even greater for specialist physicians, whose residency and board certification requirements are typically much greater than those for primary care physicians.

25.     In addition to looking at market structure, economists often look at the performance of an industry to judge competitiveness.  As a key example for this case, consider the profitability of oncology and urology practices.  Oncologists administer a large share of physician-administered drugs.  Indeed, according to Professor Berndt's report, hematologist-oncologists, oncologists, and urologists (largely treating prostate cancer) accounted for more than 50% of Medicare Part B drug reimbursements in 2001.[22]  According to the Medical Group Management Association, the top quartile of medical oncologists made upwards of $479,000 in 2001.[23]  Furthermore, two thirds of the income of practice-based medical oncologists (those earning the most) comes from

---

[22] Ernst Berndt, "Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris," *In re Pharmaceutical Industry Average Wholesale Price Litig.*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS, February 9, 2005 ("*Berndt Report*"), page 48.

[23] *Physician Oncology Report*, "Medical Oncology at a Glance," April 2003 (available at Atlantic Information Services, http://www.findarticles.com/p/articles/mi_m0FBW/is_4_4/ai_99824347, as accessed October 2006).

the mark-up on injectable drugs.[24]  Similarly, urologists derive up to 40% of their take-home pay from reimbursement of LHRH antagonists.[25]  These substantial profits are reflected in average annual urologist salaries as well, which surveys have shown range from $234,000 to $449,000.[26]  These figures suggest that competition has far from driven out excess profits associated with inflated AWPs.

## VII.   THE ECONOMIC INCENTIVES FOR PHARMACEUTICAL MANUFACTURERS

26.     Because physicians are the key decision makers for most therapies including those that are the subject of the allegations in this matter, pharmaceutical manufacturers compete for market share by positioning their products favorably from the physician's point of view.  Such competition will occur along the non-financial dimensions of a product – the clinical attributes, side effect profile, how these aspects are promoted to physicians, and how intensively they are promoted – as well as the financial implications of a product choice.  In the case of Zoladex for Class 1, the relevant measure is the difference between its AWP or 95% of its AWP and the acquisition cost of the drug to the physician or clinic.  This means, as is true in other markets, that manufacturers can increase their market share by reducing the cost of their product to physicians through discounts or rebates.  But the unique and perverse feature of this market is that pharmaceutical manufacturers including Astra Zeneca can also increase market share through raising their AWPs, since this list price is the basis for third-party reimbursement.

---

[24]   Tom Reynolds, "Salary a Major Factor for Academic Oncologists, Study Shows," *Journal of the National Cancer Institute*, Vol. 93, No. 7, p. 491, April 4, 2001.

[25]   See Plaintiffs' Exhibit 236.

[26]   See *Physician Compensation Report*, "Physician compensation benchmarking sources: comparison of national medians," April 2003, accessed at http://www.findarticles.com/p/articles/mi_m0FBW/is_4_4/ai_99824349 on 3/14/07.

Unlike offering big discounts to physicians, raising the AWP relative to the acquisition cost to the physician does not reduce profit margins on the drug in question.

27.     A document produced by AstraZeneca has a blunt reference to this incentive:

> "The market we are in wants a more expensive Zoladex, because the doctor can make more money."[27]

28.     An AstraZeneca document sums this motivation up as follows with respect to the sale of Zoladex:  "As we have come to understand in our experience with ZOLADEX, Urologists are motivated by economics."  "ZOLADEX has learned that in order to compete in [a] market dominated by Medicare, there needs to be a compelling argument based on 'total return to practice'."[28]

29.     All of these documents (and there are many more examples) show the recognition by drug companies of the ability to increase market share using the disparity between AWP and acquisition cost.

## VIII.   ROLE OF PUBLISHERS

30.     Let me explain how AWP is transmitted to the marketplace.

31.     The AWP is established by the manufacturers either directly or indirectly.  In the direct approach, a manufacturer sends an AWP or suggested AWP to a publisher.[29]  Those AWPs are then published by the publisher, either with modification or without.  In the indirect approach,

---

[27]  Plaintiffs' Exhibit 117, AZ 0021838, a Zeneca internal memorandum from Thomas Chen, October 12, 1995; *see also* AZ 0037018-19 (Plaintiffs' Exhibit 187) referring to capturing more accounts due to an increase in the discount.

[28]  Plaintiffs' Exhibit 20, Zeneca Pharmaceuticals memo from Market Strategy & Contract Operations, November 3, 1995, AZ0237142-63 at AZ0237143.

[29]  *See* Plaintiffs' Exhibit 17 (An AZ email from John Freeberry, November 30, 2001, which states "Up until the last year or so manufacturers basically decided what the AWP should be – in other words they recommended a spread over the WAC (catalog) price which results in the Average Wholesale price (AWP)."); Plaintiffs' Exhibit 232, contains a listing of drugs sent to First DataBank by AZ, which includes a suggested AWP column; and Plaintiffs' Exhibits 233, 234, 235.

manufacturers report the Wholesale Acquisition Cost and publishers compute the AWP based on a predetermined mark up.  Discovery materials suggest that the manufacturers expressly or tacitly approved the AWPs by sending them out to providers.

32.    Either by submission of AWP or by submission of a number from which AWP is derived, AstraZeneca controlled its AWP.

### IX.    ANALYSIS OF DEFENDANT'S DATA SUGGESTS AWP INFLATION WAS UNDERTAKEN FOR COMPETITIVE GAIN

33.    Further support for the theory that the Defendant recognized the importance of the spread and manipulated it for their competitive purposes emerges from analysis of Defendant's invoice data.  In the section below, I examine departures of Defendant's AWPs from the associated ASPs.  I also show changes in spreads following events that altered the competitive environment. These changes provide "event studies" in which to examine the use of the spread as a competitive strategy.  Event studies such as these are widely used in empirical economics to test theories and estimate policy effects.[30]

34.    The particular market events that I examine here relate to the nature of competition between Zoladex and its principal competitor, Lupron, which was marketed by Takeda Abbott Pharmaceuticals (TAP).  In the case of Lupron, the Courts have found that TAP engaged in unlawful activities including the use of spread manipulation among other devices.[31]  In similar Federal litigation, AstraZeneca has pled guilty to providing Zoladex free samples to physicians

---

[30]  A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, 1997, pp. 13-39.

[31]  *See* Sentencing Memorandum of the United States, *United States of America v.  TAP Pharmaceutical Products, Inc.*, Criminal Action No. 01-CR-10354-WGY.

who were encouraged to submit those free samples for reimbursement.[32]  AstraZeneca also used "return-to-practice" (*i.e.*, spreads) to market Zoladex to physicians.[33]

35.     In the chart below, I compare the trends in Zoladex's Average Sales Price (ASP), which is a measure of the acquisition cost to physicians, and the AWP during two distinct periods.  In the first half of the Class Period, Medicare Part B reimbursement for Zoladex and Lupron was made with respect to their individual AWPs.  Beginning in 1997, Medicare Part B carriers (the private entities that pay Part B claims on behalf of the Centers for Medicare and Medicaid Services) implemented a "Least Costly Alternative" (LCA) policy in which they would reimburse for equivalent LHRH products only at the price of the least cost product, which was Zoladex.  LCA policies were adopted by individual carriers over several years and were in use in all but five states as of 2005.

36.     The chart demonstrates several important points.  First, through 1994, the ASP and AWP of Zoladex tracked one another fairly closely.  Beginning in 1995, however, two things occurred.  The ASP for Zoladex began to decline, and **at the same time**, the AWP was raised.  That is, the spread was being increased not just because the transaction price was falling but because of an intentional effort to increase the AWP.  It is also noteworthy that the increase in the AWP for Zoladex ends in 1999 (although the spread remains substantial thereafter).  At that point in time, the majority of Medicare Part B carriers had implemented the LCA policy whereby claims for Lupron and Zoladex would be reimbursed based on the AWP for the less costly of the two (which was and still is Zoladex).[34]  This meant that any increase in Zoladex's AWP would

---

[32] *See* Plaintiffs' Exhibits 1-5, 12. *United States of America v. AstraZeneca Pharmaceuticals LP*, Criminal Action No. 03-55-JJF, Proceedings, June 20, 2003 and *United States of America v. Robert A. Berkman*, Criminal Action No. 03-45-JJF, Proceedings, July 17, 2003.

[33] *Ibid.*

[34] The LCA policy was adopted by HCFA carriers beginning in May 1997 with South Carolina and was ultimately used by almost all states.  See also Plaintiffs' Exhibit 236.

increase the spread for <u>both</u> Lupron and Zoladex and thus the competitive impetus for AWP manipulation was largely removed.



**Zoladex Annual AWP vs. ASP, 1991-2002 (NDC 00310096036)**

## X.    SUMMARY AND CONCLUSIONS

37.    AWP is the most widely used pricing benchmark in the industry.  During the Class Period, AWP or a discount off of AWP was the basis for Medicare reimbursement for brand name drugs covered under Part B.

38.    The system of third-party reimbursement and the large number of drugs, procedures, and other services covered by health insurers combined with the opaque discounting practices of the Defendant presented an opportunity for the alleged fraud to have occurred.

39.     Physicians and other providers could increase their net revenues (*i.e.*, reimbursement net of the acquisition costs of the drugs) under this system by selecting drugs with larger spreads – *i.e.*, drugs where the AWP was relatively inflated in comparison to the acquisition cost of the drug.

40.     Manufacturers, in turn, could increase their unit sales not only by discounting their products, but also by raising or maintaining their reported AWPs.  Moreover, raising or maintaining the AWP would be a highly profitable strategy in that it could be expected to increase the number of units sold, but would have no negative impact on the manufacturers' profit margins.

41.     Analysis of Defendant's data suggests that spreads for Zoladex were substantial and in many cases increasing over the Class Period.  Moreover, analysis of a natural experiment in which the competitive environment for Zoladex was altered (i.e., the LCA policy was implemented) supports the theory that AWP inflation was a competitive strategy.

42.     Finally, because their payments to providers for Zoladex were a mathematical function of its AWPs, members of the Class would have been economically injured if the Defendant inflated those AWPs as alleged.  That is, members of the Class paid more for Zoladex than they would have in the absence of the alleged fraud.  To state it another way, if the Defendant had published an AWP that reflected discounts, the co-payments by Class members would have been significantly less.

43.     To arrive at these opinions, I have appealed to theory, data, and methods generally relied upon by experts in my field and I have appropriately applied standard approaches and analysis.

I declare that the foregoing is true and correct under penalty of perjury.


  **/s/ Meredith Rosenthal**
Meredith Rosenthal, Ph.D.


March 16, 2007    Cambridge, MA
Date and Place of Execution

**Attachment A**

**Curriculum Vitae**

*Meredith Rosenthal Curriculum Vitae*

# CURRICULUM VITAE

February, 2007

## MEREDITH B. ROSENTHAL

677 Huntington Avenue
Boston, MA  02115
(617) 432-3418

DATE & PLACE OF BIRTH:
5/7/68                  Boston, MA

EDUCATION:
| | |
|---|---|
| 1998 | Health Policy (Economics track), Ph.D., Harvard University |
| 1990 | International Relations, A.B., Brown University |

ACADEMIC APPOINTMENTS
| | |
|---|---|
| 1998- | Associate Professor of Health Economics and Policy<br>Department of Health Policy and Management<br>Harvard School of Public Health |

OTHER PROFESSIONAL EXPERIENCE:
| | |
|---|---|
| 1993-1994 | Analyst, Health Economics Research, Inc./The Center for Health Economics Research |
| 1990-1993 | Consultant, Price Waterhouse, Tax Economics Department |

PROFESSIONAL SOCIETIES:
| | |
|---|---|
| 1995-present | Member: AcademyHealth, American Public Health Association, International Health Economics Association, American Society of Health Economists |

PUBLIC SERVICE
| | |
|---|---|
| 2001 | Chair, Massachusetts Special Commission on Physician Compensation |
| 2003 | Expert Testimony, Senate Special Committee on  Aging, Hearing on Direct to Consumer Advertising of Prescription Drugs: Exploring the Consequences |
| 2005 | Expert Testimony, House Committee on Education and Workforce, House Subcommittee on Employer-Employee Relations, Hearing on Examining Pay-for-Performance Measures and Other Trends in Employer-Sponsored Health Care |

AWARDS
| | |
|---|---|
| 2003 | Labelle Lectureship in Health Policy, McMaster University |
| 2006 | Alfred P. Sloan Foundation Industry Studies Fellowship |

MAJOR ADMINISTRATIVE RESPONSIBILITIES:

| | |
|---|---|
| 2000-present | Committee on Higher Degrees in Health Policy, Harvard University |
| 1998-present | Admissions Committee, Ph.D. Program in Health Policy, Harvard University |

EDITORIAL ACTIVITIES:

| | |
|---|---|
| 1997-1998 | Assistant Editor, Evidence-based Health Policy and Management |
| 1997-present | Referee: *Journal of Health Economics*, *Inquiry*, *Health Services Research, Health Affairs, Journal of the American Medical Association* |

MAJOR RESEARCH INTERESTS:
Financial incentives for physicians
Economics of the pharmaceutical industry
Pay-for-performance in health care
Consumer-directed health plans
Behavioral health

TEACHING EXPERIENCE:

| | |
|---|---|
| 1999 | Health Policy and Management 507: Mental Health Economics and Policy in the United States |
| 2003-present | Health Policy and Management 209: Economics of Health Policy |

RECENT WRITTEN AND ORAL TESTIMONY:
*IBEW - NECA Local 505 Health & Welfare Plan and Joanne C. Gaddy v. SmithKline Beecham Corporation, and GlaxoSmithKline, plc*, United States District Court for the Eastern District of Pennsylvania.

*In re Augmentin Antitrust Litigation,* No. 02-CV-442, United States District Court for the Eastern District of Virginia.

*In re Lupron Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL No. 1430, CA No. 01-CV-10861.

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS

*In re Neurontin Marketing and Sales Practices Litigation*, MDL No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts.

*Gregory Clark and Linda Meashey vs. Pfizer Inc., and Warner-Lambert Company*, Court of Common Pleas, Philadelphia County, No. 001819.

*Meredith Rosenthal Curriculum Vitae*

BIBLIOGRAPHY

1.  Rosenthal MB, Geraty RD, Frank RG, and Huskamp HA.  Psychiatric Provider Practice Management Companies: Adding Value to Behavioral Health? *Psychiatric Services*, 50(8): 1011-1013, August, 1999.

2.  Rosenthal MB.  Risk Sharing and Delegation in Managed Behavioral Health Care, *Health Affairs*, 18(5): 204-13, (September/October), 1999.

3.  Huskamp HA, Rosenthal MB, Frank RG, Newhouse JP.  The Medicare Prescription Drug Benefit: How Will the Game Be Played?  *Health Affairs*, 19(2): 8-23, (March/April), 2000.

4.  Rosenthal MB.  Risk Sharing and the Supply of Mental Health Services,  *Journal of Health Economics*, 19(6): 1047-1065,  2000.

5.  Cutler DM, Epstein AM, Frank RG, Hartman RS, King C, Newhouse JP, Rosenthal MB, and Vigdor ER.  How Good a Deal Was the Tobacco Settlement? Assessing Payments to Massachusetts,  *Journal of Risk and Uncertainty*, 21 (2/3): 235-61, 2000.

6.  Rosenthal MB, Landon BE, Huskamp HA.  Managed Care and the Role of Physician Organizations in Four Markets,  *Health Affairs*, 20(5):187-93, (September/October), 2001.

7.  Rosenthal MB, Frank RG, Buchanan JL, and Epstein AM. Scale and Structure of Capitated Physician Organizations in California,  *Health Affairs*, 20(4):109-119, 2001.

8.  Frank RG and Rosenthal MB. Plan Choice, Risk Bearing and Experience Rating: Explaining the Demand for Risk Adjustment, *Inquiry*,38(3):290-8, (Fall) 2001.

9.  Cutler DM, Gruber J, Hartman RS, Landrum ME, Newhouse JP and Rosenthal MB.  The Economic Impacts of the Tobacco Settlement, *Journal of  Policy Analysis and Management*, 21(1): 1-19 (Winter) 2001.

10. Rosenthal MB and Newhouse JP. Managed Care and Efficient Rationing, *Journal of Health Care Finance*, 28(4):1-10, (Summer), 2002.

11. Rosenthal MB, Berndt ER, Frank RG, Donohue JM, and Epstein AM. Promotion of Prescription Drugs to Consumers, *New England Journal of Medicine*, 346(7):498-505, Feb. 2002.

12. Rosenthal MB, Frank RG, Buchanan JL, and Epstein AM. Transmission of Financial Incentives to Physicians by Intermediary Organizations in California, *Health Affairs*, 21(4):197-205, July-August, 2002.

13. Mello M, Rosenthal MB, and Neumann PJ. Direct-to-Consumer Advertising and Shared Liability for Pharmaceutical Manufacturers,  *JAMA*,  289(4): 477-81,  Jan. 22, 2003.

14. Rosenthal MB, Fernandopulle R, Song HR, and Landon BE. Paying for Quality: Providers' Incentives for Quality Improvement, *Health Affairs*, 23(2):127-41, March-April, 2004.

15. Rosenthal MB, Hsuan C. and Milstein A.  Awakening Consumer Stewardship of Health Benefits: Prevalence and Differentiation of New Health Plan Models. *Health Services Research*, 39(4): 1055-1070, August 2004.

16.  Donohue JM, Berndt ER, Rosenthal MB, Epstein AM, and Frank RG. Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression. *Medical Care*, 42(12):1176-85, December 2004.

17. Rosenthal MB. Doughnut-hole Economics. *Health Affairs*, 23(6):129-35, November-December, 2004.

18. Rosenthal MB, Frank RG, Li Z, and Epstein AM.  From Concept to Practice: Early Experience with Pay-for-Performance.  *JAMA*, 294(14): 1788-93, October 12, 2005.

19. Rosenthal MB, Hsuan C. and Milstein A.  A Report Card on the Freshman Class of Consumer-directed Health Plans.  *Health Affair*s, 24(6):1592-1600, November-December, 2005.

20. Rosenthal MB, Newhouse JP, and Zaslavsky AM. The Geographic Distribution of Physicians Revisited, *Health Services Research*, 40(6 Part I):1931-1952, December 2005.

21. Rosenthal MB, Minden S, Manderscheid R, Henderson S.  A Typology of Organizational and Contractual Arrangements for Purchasing and Delivery of Behavioral Health Care.  *Administration and Policy in Mental Health*, Published Online: December 29, 2005.

22. Rosenthal MB and Frank RG. What is the Empirical Basis for Quality-based Incentives in Health Care? *Medical Care Research and Review*, 63(2):135-157, April 2006.

23. Rosenthal MB and Daniels NB. Beyond Competition: the Normative Implications of Consumer-Driven Health Plans. *Journal of Health Politics, Policy, and Law*. 2006;31(3):671-686.

24. Rosenthal MB, Landon BE, Normand S-LT, Epstein AM.  Pay for performance in commercial HMOs. *New England Journal of Medicine.*  November 2, 2006;355(18):1895-1902.

25. Mehrotra A, Epstein AM, Rosenthal MB.  Do Integrated Medical Groups Provide Higher Quality Care than IPAs? *Annals of Internal Medicine,* 145:826-33, December 5, 2006.

26. Rosenthal MB and Dudley RA.  Pay-for-Performance: Will the Latest Payment Trend Improve Care? *Journal of the American Medical Association*, 297(7):740-43, February 21, 2007.

Essays

1. Rosenthal MB.  Provider Reimbursement in the Twenty-first Century.  *Oncology Economics*, 1;2000.

2. Rosenthal MB.  Commentary on The economics of direct-to-consumer advertising of prescription-only drugs: prescribed to improve consumer welfare?  *Journal of Health Services Research and Policy*, 8; 2003.

Book Chapters

1. Rosenthal MB, Berndt ER, Donohue JM, Epstein AM, Frank RG. Demand Effects of Recent Changes in Prescription Drug Promotion. In <u>Frontiers in Health Policy Research</u>, v. 6, David M. Cutler and Alan M. Garber, editors,  MIT Press. June 2003.

2. Rosenthal MB, Donohue JM.  Direct-to-Consumer Advertising of Prescription Drugs: A Policy Dilemma.  In <u>Ethics, Public Policy, and the Pharmaceutical Industry in the 21st Century</u>, ed. M. Santoro, Cambridge University Press.  Forthcoming.

**Attachment B**

**Documents Relied Upon**

**Bates-Numbered Documents:**

- AZ 0021838
- AZ 0037018-19
- AZ0431262-71

**Plaintiffs' Exhibits:** 1, 2, 3, 4, 5, 12, 15, 17, 20, 117, 187, 232, 233, 234, 235, 236.

**Legal Documents:**

Amended Master Consolidated Class Action Complaint, *In re Pharmaceutical Industry Average Wholesale Price Litigation,* United States District Court for the District of Massachusetts, MDL, No. 1456, CIVIL ACTION: 01-CV-12257-PBS, June 12, 2003.

Berndt, Ernst, "Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris," *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action No. 01-12257-PBS, February 9, 2005.

Gaier, Eric M., "Declaration of Eric M. Gaier, PhD. in Support of Defendants' Opposition to Class Certification," *In re Pharmaceutical Industry Average Wholesale Price Litigation*, October 25, 2004.

Hartman, Raymond, "Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages," *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court of the District of Massachusetts, MDL No. 1456.

Deposition of Denise M. Kaszuba, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS, August 18, 2005

Deposition of Christof A. Marre, August 26, 2005, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS

Rosenthal, Meredith, "Amended Written Tutorial of Dr. Meredith Rosenthal to Reflect Matters Relevant to AstraZeneca and Class 1 Only," *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court of Massachusetts, MDL No. 1456, Civil Action 01-CV-12257-PBS.

Saris, Judge Patti B, "Memorandum and Order Re: Motion for Class Certification," *In re Pharmaceutical Industry Average Wholesale Price Litigation,* United States District Court for the District of Massachusetts, MDL, No. 1456, CIVIL ACTION: 01-CV-12257-PBS, August 16, 2005.

"Sentencing Memorandum of the United States," *United States of America v. TAP Pharmaceutical Products, Inc.*, Criminal Action No. 01-CR-10354-WGY.

**Other Documents Relied Upon:**

American Society of Clinical Oncology (ASCO), *Reform of the Medicare Payment Methods for Cancer Chemotherapy,* May 2001.

Arrow, K.J., "Uncertainty and the Welfare Economics of Medical Care," *American Economic Review*, 53(5): 941-973.

Berndt, E.R., "The U.S. Pharmaceutical Industry: Why Major Growth in Times of Cost Containment?" *Health Affairs* 20(2): 100-114, 2001.

CFR, 42 CFR 405.517, Revised October 1, 2003.

Department of Health and Human Services, Center for Medicare and Medicaid Services, "Medicare Program; Payment Reform for Part B Drugs; Proposed Rule," Federal Register, Aug. 20, 2003, 50428-52.

Department of Health & Human Services, Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act ("BIPA").

Department of Health & Human Services, Centers for Medicare and Medicaid Services ("CMS"), Program Memoranda (PM AB 02-139).

Department of Health & Human Services, Centers for Medicare & Medicaid Services, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 352, November 3, 2004.

Department of Health & Human Services, Centers for Medicare & Medicaid Services, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 54, December 24, 2003.

Department of Health & Human Services, "Excessive Medicare Payments for Prescription Drugs," Office of Inspector General, December 1997, OEI-03-97-00290.

Donohue, J.M., E.R. Berndt, M.B. Rosenthal, A.M. Epstein, R.G. Frank, "Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression," *Medical Care*, 2004.

Dyckman & Associates, Medicare Payment Advisory Commission, Health Plan Payment for Physician-Administered Drugs, August 2003.

Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," Department of Health and Human Services, December 1997, OEI-03-97-00290.

Eppig, Franklin and George Chulis, "Trends in Medicare Supplementary Insurance: 1992-1996," Health Care Financing Review, 19(1), Fall 1997, Table 1.

Huskamp, H.A., M.B. Rosenthal, R.G. Frank, J.P. Newhouse, "The Medicare Prescription Drug Benefit: How Will the Game Be Played?" *Health Affairs*, 19(2): 8-23, March/April 2000.

Kaiser Family Foundation, State Health Facts, *Health Insurance Coverage of Nonelderly 0-64, states (2003-2004), U.S. (2004)* (www.statehealthfacts.org accessed 12/13/05).

Kaiser Family Foundation and Health Research and Educational Trust, 2004 Annual Survey of Employer Health Benefits.

MacKinlay, Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(13), 1997.

Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act ("BIPA").

MedPAC, "Medicare Part B Drugs and Oncology," July 13, 2006.

MedPAC Report to the Congress, "Variation and Innovation in Medicare," June 2003.

M. Mello, M.B. Rosenthal, P.J. Neumann, "Direct-to-Consumer Advertising and Shared Liability for Pharmaceutical Manufacturers," *JAMA*, 289(4): 477-81, Jan. 22, 2003.

McGuire, Thomas G. "Physician Agency" in *Handbook of Health Economics*, eds. A.J. Culyer and J. P. Newhouse, Volume 1A, pp. 463-536, Elsevier, Amsterdam, 2000.

National Bipartsan Commission on the Future of Medicare, http://medicare.commission.gov/medicare/K-P-1499.html.

Physician Compensation Report, "Physician compensation benchmarking sources: comparison of national medians," April 2003, accessed at http://www.findarticles.com/p/articles/mi_m0FBW/is_4_4/ai_99824349 on 3/14/07

Physician Oncology Report, "Medical Oncology at a Glance," April 2003 (Atlantic Information Services, http://www.findarticles.com/p/articles/mi_m0FBW/ is_4_4/ai_99824347).

Reynolds, Tom, "Salary a Major Factor for Academic Oncologists, Study Shows," *Journal of the National Cancer Institute*, 93(7), April 4, 2001.

Rosenthal, M.B, E.R. Berndt, J.M. Donohue, A.M Epstein, R.G. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," *Frontiers in Health Policy Research*, v. 6, David M. Cutler and Alan M. Garber, editors, MIT Press, June 2003.

Rosenthal, M.B, E.R. Berndt, R.G. Frank, J.M. Donohue and A.M. Epstein, "Promotion of Prescription Drugs to Consumers," *New England Journal of Medicine*, 346(7):498-505, Feb. 2002.

Schondelmeyer, Stephen W., and Marian V. Wrobel, "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates Inc., June 21, 2004.