# UNITED STATES DISTRICT COURT
## THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

THIS DOCUMENT RELATES TO:

*State of Montana v. Abbott Labs Inc., et al.,*
D. Mont. Cause No. CV-02-09-H-DWM

NO. 1456

Civil Action No. 01-CV-12257-PBS

Judge Patti B. Saris

## DEFENDANTS' JOINT OPPOSITION TO THE STATE OF MONTANA'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CERTAIN DEFENDANTS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 1

        A.      The State Has Consistently Interpreted the Relevant Regulations to Reflect
                the Fact That AWP Did Not Equal Actual Acquisition Cost................................. 1

        B.      The State's Characterization of Defendants' Conduct Is Inaccurate and
                Immaterial. ............................................................................................................ 4

        C.      For Those Reimbursements Based on AWP, Montana Medicaid Used First
                DataBank AWPs, Which Were Controlled by First DataBank, Not
                Defendants. ........................................................................................................... 4

III.    ARGUMENT ....................................................................................................... 5

        A.      The State's Medicaid Fraud Claim Fails. ............................................................ 6

                1.      The State failed to offer proof on the elements of Medicaid fraud........... 6

                2.      There was no fraud...................................................................................... 8

        B.      The State's "Plain Meaning" Argument Makes No Sense in This Case. ............. 9

                1.      The State's lead "plain meaning" argument is based on a Montana
                        statute enacted more than a year *after* the State filed suit and that
                        relates only to Montana's Prescription Drug Plus Discount
                        Program..................................................................................................... 9

                2.      The State's second "plain meaning" argument, based on Montana's
                        EAC regulation, ignores other Montana and federal Medicaid
                        regulations and is at odds with the undisputed testimony of
                        Montana Medicaid officials. .................................................................... 11

                3.      The State's effort to shoehorn this case into the MDL Court's
                        "plain meaning" decision does not fit in a state Medicaid case with
                        this record................................................................................................ 14

        C.      The State's Damages Expert Does Not Provide a Basis for Summary
                Judgment on Liability. ......................................................................................... 17

IV.     CONCLUSION.................................................................................................. 19

V.      REQUEST FOR ORAL ARGUMENT ............................................................. 19

## I.   INTRODUCTION

The State of Montana seeks summary judgment on only one of its claims, arising under Montana's Medicaid fraud statute.  Yet Montana's Motion for Partial Summary Judgment ("Motion") does not explain how record evidence supports (let alone how "undisputed facts" compel) a ruling in its favor on even that count.  Indeed, the State does not address key elements of that count, including that (1) a provider, (2) must submit a claim, (3) to a Medicaid agency, (4) that was known to be false.  More fundamentally, the State ignores that there can be no "Medicaid fraud" in a case where there was no fraud at all.

The State's failure of proof on the statute's elements makes it unnecessary for the Court to address the State's hope that the mere inclusion of the term "average wholesale price" in a Montana statute (enacted over a year *after* this lawsuit was filed and unrelated to Medicaid reimbursement) and in a Montana Medicaid regulation will result in per se liability under a "plain meaning" analysis.  The State's Motion ignores the undisputed and overwhelming record demonstrating that Montana's Medicaid regulation has been consistently understood and interpreted by Montana Medicaid to reflect its understanding that AWP did *not* equal actual acquisition cost or an average of those prices.  The Court should deny the State's Motion.

## II.   BACKGROUND

### A.   The State Has Consistently Interpreted the Relevant Regulations to Reflect the Fact That AWP Did Not Equal Actual Acquisition Cost.

In the Memorandum in Support of Defendants' Joint Motion for Summary Judgment ("Defs.' Motion") (docket no. 3647), Defendants submitted a detailed record obtained in discovery demonstrating Montana Medicaid's use and understanding of AWP as part of its reimbursement methodology.  Defs.' Motion at 3-12.  Without restating the record in its entirety,

several key facts, which are not contradicted or even addressed by the State's Motion or its

Statement of Facts,[1] bear emphasis here:

- No later than 1995, Montana Medicaid was well aware that AWP "has little to do with the acquisition cost of pharmacy products."  Defs.' Motion at 6-17; Defs.' 56.1 Stmt. ¶¶ 21-32; 37-50, Exs. 3; 7-17; 27; 30; 35-39; 40-42.

- In 2001, Montana Medicaid proposed and then rejected a reduction in reimbursement for generic drugs from AWP-15% to AWP-25%, despite its knowledge that *average* acquisition costs in Montana for those drugs were 65% less than AWP.  Defs.' Motion at 14-15; Defs.' 56.1 Stmt. ¶¶ 29-31; 78, Exs. 37-39.

- Montana Medicaid understood AWP not as an actual average of sales prices, but as "the pricing information supplied by First DataBank." Defs.' Motion at 17 n.14; Defs.' 56.1 Stmt., ¶ 39, Ex. 1.

- Montana Medicaid chose to use (and continues to use) discounted AWP as one of several benchmarks for reimbursement of drugs in order to: (1) offset persistent under-reimbursement of providers for their costs in dispensing drugs to Medicaid beneficiaries, and (2) ensure access to drugs for Medicaid beneficiaries, particularly those in rural communities.  Defs.' Motion at 6-12; Defs.' 56.1 Stmt. ¶¶ 41-79, Exs. 8-15; 30; 43-48; 52-55.

The only effort the State has made to contradict these facts is the bald assertion by its

lawyers that "the State set its reimbursement formula based on the plain meaning of AWP after

---

[1] Defendants incorporate by reference their Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (docket no. 3648) ("Defs.' 56.1 Stmt.").  In compliance with Rule 56.1, Defendants also submit with this Opposition a Statement of Undisputed Material Facts in Support of Its Opposition to the State of Montana's Motion for Partial Summary Judgment Against Certain Defendants ("Defs.' Opp. 56.1 Stmt."). The State's 56.1 statement ("State 56.1 Stmt.") fails to comply with Rule 56.1's requirement that it contain only "the material facts of record."  Instead, its statement comprises testimony from the MDL trial in which there has not yet been a decision (State 56.1 Stmt. ¶ 3 n.3), documents that are not communications or evidence related to the State (State 56.1 Stmt. ¶ 4), legal conclusions the State masquerades as fact (State 56.1 Stmt. ¶ 5), and *proposed* findings of fact from different plaintiffs in another case (State 56.1 Stmt. ¶ 7, n.7).  The State's failure to submit a proper 56.1 statement flouts the rules and serves as an independent basis to deny its Motion.  *See Dale v. H.B. Smith Co.*, 910 F. Supp. 14, 20-21 (D. Mass 1995) (material non compliance with Rule 56.1 basis for denial of motion for summary judgment); *In re Atl. Fin. Mgmt., Inc. Secs. Litig.*, 718 F. Supp 1003, 1007 (D. Mass. 1988) (denial of motion for summary judgment appropriate where Rule 56.1 statement contains assertions that were "not facts, but conclusions, representing inferences [the moving party] hope[s] the finders of fact will draw").

analyzing the market place as an attempt to set a fair market price."  Motion at 3.  This statement is not a "fact," nor does it render Defendants' facts "disputed."  It is merely an unsupported assertion, contradicted by the record, which does not support summary judgment.  *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991) ("We need not, however, give credence to 'mere allegations,' or draw inferences where they are implausible or not supported by 'specific facts.'  By the same token, we cannot accept, in lieu of documented facts, conclusory assertions, or wholly anticipatory 'promise[s] to produce admissible evidence at trial.'") (internal citations omitted).

This claim by the State is particularly egregious because it suggests as true a state of affairs that is the polar opposite of the factual record.  Montana Medicaid *did* "analyze the market place" and in particular the relationship between AWP and actual acquisition cost, but that analysis confirmed that AWP was *not* even close to actual acquisition cost.  Defs.' Motion at 12-15.  In 1995 and 2001, the federal Office of Inspector General ("OIG") studied Montana providers' actual costs to acquire drugs.  The 1995 OIG study concluded that in Montana, actual acquisition costs for drugs were on average 16.2% (for brands) and 48.5% (for generics) less than AWP.  Defs.' Motion at 13; Defs.' 56.1 Stmt. ¶ 25, Ex. 36.  Montana Medicaid official Terry Krantz was involved in that study, and summarized its results by writing to the Montana Medicaid Director, "While AWP is a national standard *it is apparent from the results of the survey that it has little to do with the acquisition cost of pharmacy products*."  Defs.' 56.1 Stmt. ¶ 24, Ex. 36 (emphasis added).  The 2001 OIG study reached a similar conclusion, with an even greater disparity between AWP and acquisition costs reported.  Defs.' Motion at 14; Defs.' 56.1 Stmt. ¶ 29, Ex. 37 (showing an average of AWP less 19.7% for branded drugs; AWP less 65.5% for generics).  Yet, after both studies concluded that AWP was nowhere near an average of providers' acquisition costs for drugs, Montana Medicaid nonetheless retained AWP as one of its reimbursement benchmarks, and even *expanded* the use of AWP, where Montana had previously

used the lower Direct Price benchmark for certain drugs.[2]  Defs.' Motion at 14; Defs.' 56.1 Stmt.

¶¶ 37; 77, Exs. 39; 54.  It did so because it made a policy choice to use higher ingredient cost

reimbursement to cover the shortfall on dispensing fees, so that the aggregate reimbursement was

sufficient to keep providers within the network of Medicaid providers.  Defs.' Motion at 13-14;

Defs.' 56.1 Stmt. ¶¶ 28, 31, Exs. 33, 39.

**B.      The State's Characterization of Defendants' Conduct Is Inaccurate and Immaterial.**

Rather than focus on the material facts set out above, Montana instead dwells on facts

immaterial to the elements of a Medicaid fraud claim.  For example, the State focuses on the

mechanics of the reporting of AWPs to third-party publishers, in many cases overstating or

misstating Defendants' role in that process.  Defs.' Opp. 56.1 Stmt. Response ¶ 2, Exs. 1-2.

Likewise, the State suggests that it has marshaled proof to show that Defendants were somehow

responsible for Montana Medicaid's policy choice to use AWP as one of its reimbursement

benchmarks.  Motion at 7 n.20 & 21.  Examining this "proof" demonstrates that the State has not

even come close to this kind of showing, Defs.' Opp. 56.1 Stmt. Responses ¶¶ 4-6, as is also

demonstrated in the accompanying individual Defendant opposition briefs.

**C.      For Those Reimbursements Based on AWP, Montana Medicaid Used First DataBank AWPs, Which Were Controlled by First DataBank, Not Defendants.**

Finally, the State's Motion contends that Defendants "directly controlled what the AWP

would be."  Motion at 5.  That is not true in Montana.  For those reimbursements that were

---

[2] The State chose to eliminate most Medicaid reimbursements based on Direct Price (while retaining Direct Price in its regulation governing reimbursement), which was explained by Montana Medicaid's former Pharmacy Program Officer, Dorothy Poulsen, and cited in the State's Motion (except for the last sentence quoted below): "Pharmacies in Montana had a great difficulty acquiring drugs at [Direct] [P]rice. . . . [P]harmacists were asking that we do away with direct price because they weren't getting paid what they were having to pay. *So they wanted to use AWP minus 10% for everything*." Defs.' Opp. 56.1 Stmt. ¶ 1, Ex. 1 (Poulsen Dep. Tr. 183:2-3, 185:1-5) (emphasis added).  This does not show, as the State suggests in its Motion, that Direct Price was "an illusory basis for reimbursement." Motion at 4, n.5.  Rather, it shows that some Montana providers could not acquire drugs at the national Direct Prices, which were below AWP-10%. Defs.' Opp. 56.1 Stmt. ¶ 1, Ex. 1 (Poulsen Dep. Tr. 189:21-190:1).  This is consistent with the undisputed facts presented in Defendants' Motion that Montana Medicaid made a conscious policy choice to use AWP as a benchmark for some reimbursements because it wanted to ensure that reimbursement to its providers was sufficient for providers to remain in the Medicaid network.

actually based on AWP, Montana Medicaid used AWPs published by First DataBank.  Defs.'
56.1 Stmt. ¶ 85, Ex. 4 (Buska 30(b)(6) Dep. Tr. 180:9-181:21).  Patricia Kay Morgan, Manager
of Product Knowledge-Based Services with First DataBank, testified that First DataBank's
AWPs were not set by the pharmaceutical companies, but by First DataBank.  Defs.' Opp. 56.1
Stmt. ¶ 2, Ex. 1 (Morgan Dep. Tr. 26:11-27:6; 36:3-19).

In late 2001 and 2002, First DataBank changed the markup factor it used to calculate
AWPs for many of Defendants' drugs to 1.25 times WAC (Wholesale Acquisition Cost), instead
of 1.20 times WAC.  Defs.' Opp. 56.1 Stmt. ¶ 3, Ex. 2 (Morgan Dep. Ex. 25).  By controlling the
"markup" from WAC, First DataBank – not Defendants – controlled the AWPs published by
First DataBank and used by Montana Medicaid.  This undisputed fact is well known to
Montana's lawyers, who sued First DataBank for raising its AWPs (which in turn raised any
reimbursement based on AWP).  Defs.' Opp. 56.1 Stmt. ¶ 5, Ex. 5 (*New England Carpenters
Health Benefit Fund v. First DataBank, Inc.*, Civ. Action. No. 1:05-CV-11148-PBS (D. Mass.),
Complaint ¶ 1).

Moreover, even when Defendants submitted suggested AWPs, First DataBank did not
simply adopt them.  To the contrary, First DataBank's Morgan gave specific examples where
First DataBank's AWP was not the same as that submitted by Defendants.  Defs.' Opp. 56.1
Stmt. ¶ 2, Ex. 1 (Morgan Dep. Tr. at 111:4-8 ("Q: [T]he Blue Book AWP for First DataBank was
different from the suggested AWP for AstraZeneca's Prilosec.  Is that correct?  A: That's
correct.")).

## III.  ARGUMENT

To obtain summary judgment on a claim, a moving party that ultimately will bear the
burden of proof at trial must demonstrate that there is sufficient proof on all the elements of that
claim.  *Flanders & Mederios, Inc. v. Bogosian*, 65 F.3d 198, 206 (1st Cir. 1995).  The State is
not entitled to summary judgment (and, in fact, summary judgment should be entered *against* the
State) because the State has failed to meet its burden of proof on several of the essential elements
of its Medicaid fraud claim.

A.      **The State's Medicaid Fraud Claim Fails.**

Based on the erroneous premise that the Court may decide retroactively that Montana Medicaid's regulations required reimbursement on the basis of an average of actual sales prices, the State summarily concludes that each Defendant violated the Montana Medicaid fraud statute. But the State's Motion has put the cart before the horse, failing to provide any evidence on essential elements of the statutory offense.[3]  To succeed on a claim for Medicaid fraud based on over reimbursement for a submitted claim, the State must show that (1) a "provider"; (2) submitted a "claim"; (3) to a "Medicaid agency"; (4) that was "known" to be "false."  *See* MONT. CODE ANN. § 53-6-160(2)(a)–(b); (3); (5)(a).  More fundamentally, the State's claim of Medicaid fraud is doomed because there was no fraud of any kind.  The overwhelming record is that Montana Medicaid understood since at least 1995 that AWP was not equal to actual acquisition cost or an average thereof.

1.      **The State failed to offer proof on the elements of Medicaid fraud.**

*First*, as set forth in Defendants' Joint Motion, Defendants are not "providers" as defined by the Montana Medicaid fraud statute.  Defs.' Joint Motion at 31-32; MONT. CODE ANN. § 53-6-155(13). The statute places a duty on "providers" to exercise care regarding the submission of claims for reimbursement to Medicaid.  MONT. CODE ANN. § 53-6-160(2)(a)–(b).  To succeed on a Medicaid fraud claim when alleging that the State over-reimbursed, a plaintiff must establish that a "provider," or a person who purports to act on that provider's behalf, has submitted the claim for reimbursement.  That is because only "providers" are eligible for reimbursement from Montana Medicaid.  *See* MT ADC 37.85.406(4).[4] As set forth in Defendants' Joint Motion,

---

[3] This failure makes it unnecessary for the Court to reach the State's "plain meaning" argument, although for reasons discussed below, *see infra* Part III.C., the State's argument there is equally flawed.

[4] It is true that § 53-6-160(1) speaks in terms of an "application, claim, report, document or other information" submitted by a "person."  However, reading MONT. CODE ANN. § 53-6-160 in toto, it is clear that the reference to "person" in § 53-6-160 is meant to encompass misleading eligibility information tendered on behalf of individuals claiming to meet the requirements for Medicaid coverage, or for potential providers claiming to meet the requirements necessary to become providers.  When the statute discusses Medicaid fraud claims relating to over-reimbursement as a result of an alleged false statement, which is the basis for the State's Medicaid fraud claim

Defendants are not providers and the State admitted that Defendants did not submit claims to Montana Medicaid for reimbursement.  Defs.' 56.1 Stmt. ¶ 105, Ex. 82.

*Second*, the State overlooks the requirement that any allegedly fraudulent information be submitted to a "medicaid agency," which is a statutorily defined term.  MONT. CODE ANN. § 53-160(1) ("submits to a *medicaid agency*") (emphasis added).  Indeed, the State and Defendants agree that Defendants did not report AWPs to Montana Medicaid.  Motion at 4 (reporting to "a publisher"); State 56.1 Stmt. ¶¶ 4, 6; Defs' Joint Motion at 23; Defs' 56.1 Stmt. ¶ 39, Ex. 1.  And, though certain Defendants reported prices to the third-party publisher First DataBank, that is beside the point.  Under Montana statute, "medicaid agency" means

> [A]ny agency or entity of the state, county, or local government that administers any part of the medicaid program, whether under direct statutory authority or under contract with an authorized agency of the state or federal government.  The term includes but is not limited to the department, the department of corrections, local offices of public assistance, and other local and state agencies and their agents, contractors, and employees, when acting with respect to medicaid eligibility, claims processing or payment, utilization review, case management, provider certification, investigation, or other administration of the medicaid program.

MONT. CODE. ANN. § 53-6-155(9).  The State put forth no evidence in its Motion to support the proposition that First DataBank is a Medicaid agency.

*Finally*, the assertion that Defendants' communications with third-party First DataBank, which the State later independently consulted, constitute a "claim [or] statement [by Defendants] . . . to the Medicaid program," stretches the statute past its intended scope and meaning.  MONT. CODE ANN. § 53-6-160(3), (4).  Writing in support of the Medicaid fraud statute, then-Medicaid Director Nancy Ellery explained Medicaid's understanding that subsections (3) and (4) of § 53-6-160 were intended only to reach the conduct of persons acting under the supervision or

---

(Motion at 14-15), the statute specifically references "providers."  *See* MONT. CODE. ANN. § 53-6-160 (2)(a)-(b) ("[*a*] *provider* has a duty to exercise reasonable care"); § 53-6-160(5)(a) ("There is an inference that a person who signs or submits a document to a Medicaid agency on behalf of or in the name of *a provider* is authorized by the provider to do so and is acting under the provider's direction.") (emphases added).

authority of a Medicaid provider who actually receives payment from Medicaid.  Ellery explained,

> The third key element in this statement of responsibility is the principle that the *provider*, who receives the benefit of the Medicaid payment, *must exercise supervision over and take responsibility for the acts of their employees that bill the Medicaid program on the provider's behalf.*

Defs.' Opp. 56.1 Stmt. ¶ 6, Ex. 3 (Mar. 13, 1995 letter from Nancy Ellery to Representative Duane Grimes) (emphasis added).  Counsel for Montana's Department of Health and Human Services, the State agency that oversees Montana Medicaid, testified similarly.  *Id.* ¶ 7, Ex. 6 (noting that the intent of the Medicaid fraud statute "is not to overreach and the purpose is to address the problem of supervisors attempting to escape the responsibility of repaying overpayment").  Indeed, the State's construction would create a form of strict liability under the Medicaid fraud statute anytime Medicaid purportedly overpaid, so long as it could trace the overpayment to any statement made by any non-provider.  The Medicaid fraud statute was not designed to sweep so broadly. [5]

### 2.   There was no fraud.

Because the Montana Medicaid program long understood the extent of the difference between AWP and actual acquisition cost, there was no fraud.  In the words of Montana Medicaid's former Pharmacy Program Officer, "we understood that AWP didn't reflect the average wholesale price."  Defs.' 56.1 Stmt. ¶ 37, Ex. 14.  Under Montana fraud case law, "[O]ne can secure no redress for a misrepresentation, which he knew to be false, nor for failure

---

[5] The State cannot show that providers who were reimbursed based on a discounted AWP under Montana Medicaid's regulations were "not entitled under applicable statutes, regulations, rules, or policies to [those] Medicaid payment[s] . . . or for the amount of payment requested."  MONT. CODE ANN. § 53-6-160(4)(b).  An AWP-based reimbursement, in the instances where drugs were reimbursed using that benchmark, is exactly what Montana Medicaid's regulations called for.  Moreover, the Medicaid fraud statute requires that the person "knew or had reason to know" that the person was not entitled to the reimbursement based on the information or claim submitted.  MONT. CODE ANN. § 53-6-160(4)(b).  In the analogous federal False Claims Act context, a false claim is not knowing where there is merely "legal argumentation and possibility" that the claim or alleged behavior was false.  *United States v. Jamieson Sci. & Eng'g.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000).  Here, it is only the State Attorney General's "legal argumentation" that challenges Montana Medicaid's use of AWP, which is the basis for the State's claim that Defendants knew their conduct was "false."

to disclose facts which he knew to exist.  If the representee knew the truth, it is obvious he was not deceived nor defrauded, and that any loss he may sustain is not traceable to the representations, but is in effect self-inflicted."  *Lee v. Stockmen's Nat. Bank of Hardin*, 207 P. 623, 630 (Mont. 1922); *see also Spence v. Yocum*, 651 P.2d 1022, 1025 (Mont. 1982); *Van Ettinger v. Pappin*, 588 P.2d 405, 428-29 (Mont. 1978) (citing *Lee*).[6]  The disparity between AWP and actual acquisition cost is a fact that Montana Medicaid "knew to exist," but it nonetheless chose to use and retain AWP-based reimbursement for certain claims in order to effectuate the policy goals of Montana Medicaid.  *Lee*, 207 P. at 630; Defs.' 56.1 Stmt. ¶ 41-79. The State cannot now disclaim that knowledge and recover on behalf of Montana Medicaid simply because others within the State are dissatisfied with that choice.[7]

**B.     The State's "Plain Meaning" Argument Makes No Sense in This Case.**

Ignoring the actual statutory requirements of a Medicaid fraud claim, the State makes the unsupported inferential leap that if the Court merely applies a "plain meaning" analysis, summary judgment on the Medicaid fraud claim is inevitable.  Motion at 14.  But the State's premise – that Montana Medicaid understood AWP to have a "plain meaning" – is as faulty as its conclusion.

**1.     The State's lead "plain meaning" argument is based on a Montana statute enacted more than a year *after* the State filed suit and that relates only to Montana's Prescription Drug Plus Discount Program.**

After five years of litigation, the State has come up with a new statutory theory of liability against Defendants for Medicaid fraud.  There are two insurmountable problems with

---

[6] Actions that sound in fraud may be judged by the requirements of a fraud cause of action.  *Compare Wajda v. R.J. Reynolds Tobacco Co.*, 103 F. Supp. 2d 29, 32 (D. Mass. 2000) (allegations that defendants intended to "mislead, deceive and confuse" the plaintiff "sound in fraud" and are judged by fraud standards) *with* Complaint ¶ 676 (State's Medicaid fraud allegations are that Defendants made "false statements" and "false representations" regarding AWP).

[7] Montana Medicaid's long-standing use of a discounted AWP as one of its reimbursement benchmarks, including during the five years *after* this lawsuit was filed, likewise forecloses its fraud claim.  *See Schweigert v. Fowler*, 784 P.2d 405, 410 (Mont. 1990) (where plaintiffs worked ranch land for two years, they could not later claim fraud as to the ranch land's condition at the time of sale).

this theory: first, the statute did not exist during the period of the alleged fraud and second, the statute does not relate to Medicaid drug reimbursement.

The State directs the Court to MONT. CODE ANN. § 53-6-1001(1)'s definition of "average wholesale price" as providing an "independent basis" for the Court to determine that Montana Medicaid was defrauded into believing that AWP meant actual acquisition cost. Motion at 4, 9. What the State neglects to mention is that this statute was not on the books in Montana until July, 2003, over a year after this lawsuit was filed (and nearly a year after the State's second amended complaint was filed), and thus well after the alleged fraud had been uncovered. Defs.' Opp. 56.1 Stmt. ¶ 5, Ex. 2 (attaching legislative history for § 53-6-1001). This statute is not a basis to hold Defendants liable for the Medicaid fraud claim.

Moreover, even now Montana Medicaid does not rely on the definition of "average wholesale price" contained in § 53-6-1001(1) for its reimbursement of drugs. Rather, § 53-6-1001 is part of an elective Prescription Drug Plus Discount Program enacted to provide a supplemental drug benefit to persons who are not otherwise eligible for drug benefits under Medicaid. *See* MONT. CODE ANN. § 53-6-1003(2) (2006). The definition of AWP in MONT. CODE ANN. § 53-6-1001(1), along with the other defined terms in that statute, is expressly limited to that program. § 53-6-1001 ("*As used in this part*, unless the context requires otherwise, the following definitions apply[.]") (emphasis added).[8]

Relying on this statute would require the Court to engage in the fiction that a law passed after this case was filed, and not applicable to the drug reimbursements challenged in this lawsuit, somehow represents a codification of the State's historical understanding of AWP. The Court should reject the State's reliance on § 53-6-1001(1) for what it is – a sideways maneuver to attempt to trick the Court into relying on a statute irrelevant to the litigation.

---

[8] Even if it were relevant (which it is not), the Prescription Drug Plus Discount Program statute imposes no requirement on Defendants to report AWPs to Montana Medicaid in any manner, nor does it define "wholesale price" to include discounts and rebates provided to some end-customers, as suggested by the State, as opposed to an undiscounted price charged by pharmaceutical companies to wholesalers. *See* MONT. CODE ANN. § 53-6-1001(1).

2.      **The State's second "plain meaning" argument, based on Montana's EAC regulation, ignores other Montana and federal Medicaid regulations and is at odds with the undisputed testimony of Montana Medicaid officials.**

In the alternative, the State argues that Montana's regulatory definition of EAC (Estimated Acquisition Cost) [9] means that AWP must mean "actual average prices paid, including discounts and rebates."  Motion at 10.  The State's EAC-based argument, however, only tells half the story.  As set forth elsewhere in the applicable Montana regulations, reimbursement is based on EAC *in addition to* a reasonable dispensing fee.  *See* MT ADC 37.86.1105(1) ("Drugs will be paid for on the basis of the Montana 'estimated acquisition cost' or the 'maximum allowable cost,' *plus a dispensing fee established by the department*.") (emphasis added).[10]  Also, as noted in Defendants' Joint Motion, a federal Medicaid regulation requires that state Medicaid reimbursement for *all* brand name drugs and multiple source drugs without a federal upper limit "must not exceed in the *aggregate* . . . Estimated acquisition costs plus reasonable dispensing fees."  42 C.F.R. § 447.331(b)(1) (emphasis added).[11]  Montana Medicaid chose to implement the aggregate limit regulations by "over"-reimbursing drug

---

[9] By regulation, Montana defines EAC as "the department's best estimate of what price providers are generally paying in the state for a drug in the package size providers buy most frequently.  The EAC for a drug is: (a) the direct price (DP) charged by manufacturers to retailers; (b) if there is no available DP for a drug or the department determines that the DP is not available to providers in the state, the EAC is the average wholesale price (AWP) less 15% [10% prior to 2002]; or (c) the department may set an allowable acquisition cost for specified drugs or drug categories when the department determines that acquisition cost is lower than 1(a) or (b) based on data provided by the drug pricing file contractor."  MT ADC 37.86.1101.  Among many other problems, the State ignores the fact that, pursuant to its own regulation, AWP is not to be used as a benchmark if Direct Price is available or if Montana Medicaid determines that acquisition cost is lower than Direct Price or AWP-15%.

[10] The regulation further acknowledges and differentiates between reimbursement for drug costs and reimbursement for dispensing fees, in that the reimbursement based on EAC, or "maximum allowable cost" explicitly includes a dispensing fee, while reimbursement based on a providers "usual and customary charge" does not.  MT ADC 37.86.1105(1) ("Drugs will be paid for on the basis of the Montana 'estimated acquisition cost' or the 'maximum allowable cost', plus a dispensing fee established by the department, or the provider's 'usual and customary charge', whichever is lower.").  In both instances, Montana Medicaid's ultimate concern is the aggregate reimbursement amount.

[11] Similarly, a federal Medicaid regulation requires that state Medicaid reimbursement for all multiple source drugs with a federal upper limit "must not exceed, in the aggregate . . . a reasonable dispensing fee . . . plus an amount established by CMS that is equal to 150 percent of the published price for the least costly therapeutic equivalent," i.e., the Federal Upper Limit or FUL.

ingredient costs for some drugs and some Montana providers (many of whom paid more than the average) to offset Montana Medicaid's pervasive under-reimbursement for dispensing fees. Defs.' Joint Motion at 6-9; Defs.' Joint 56.1 Stmt. ¶¶ 53-56; 66, Exs. 14; 27; 53.

As Montana Medicaid's former Pharmacy Program Officer, Dorothy Poulsen, put it succinctly:  "I'm not sure which is the chicken and which is the egg.  Did we pay a low dispensing fee because we thought that they [providers] were making money on the drug?  Or did we let them have money on the drug because we were paying them a low dispensing fee?  I don't know."  Defs.' Joint 56.1 Stmt. ¶¶ 66, Exs. 14.  But what Poulsen and the other Montana Medicaid officials did know, from surveying Montana Medicaid's providers, was that Montana Medicaid was systematically under-reimbursing those providers for their costs of dispensing and administering drugs to Medicaid beneficiaries; additional reimbursement on the drug ingredient side of the equation was needed to keep those providers in the Montana Medicaid network for Montana to comply with its obligations under the federal equal access requirement.  *See* 42 U.S.C. § 1396a(a)(30)(A); 42 C.F.R. § 447.204.  Moreover, Montana Medicaid's reimbursement regulations are not, and do not purport to be, regulations that regulate the conduct of drug manufacturers.  They impose no requirement on drug manufacturers to report AWPs to Montana Medicaid or to calculate such AWPs in any manner.  Defs.' Joint Motion at 3-4; Defs.' Joint 56.1 Stmt. ¶¶ 1-4, Exs. 19-21; 74.

If accepted, the State's EAC-based argument would mean that Montana Medicaid intended to reimburse providers at 10% or 15% *less* than the average acquisition cost plus a dispensing fee that did not cover even half of the providers' actual costs to dispense drugs to Medicaid beneficiaries.  This would have destroyed the Montana Medicaid drug program.  No deposition testimony and no document in the record support such a construction.  That is why the term "average wholesale price" in Montana Medicaid's regulations cannot be construed "as a matter of law" in a vacuum, but rather must be considered in light of the undisputed evidentiary record obtained through discovery of the officials that administered Montana Medicaid's drug program.

Accepting the State's assertions would not only require the Court's wholesale disregard of these facts, it would also offend Montana law.  That law grants State agencies considerable leeway in their interpretation of the agency's own regulations:  Montana Medicaid's interpretation of its reimbursement rules has been shown this deference by the Montana Supreme Court.  *Juro's United Drug v. Montana DPHHS*, 90 P.3d 388, 391 (Mont. 2004) ("[A]n 'agency's interpretation of its rule is afforded great weight,' courts should 'defer to that interpretation unless it is plainly inconsistent with the spirit of the rule,' and the interpretation will be upheld 'so long as it lies within the range of reasonable interpretation permitted by the wording.'") (quoting *Easy v. Dep't. of Natural Res. & Conserv.*, 752 P.2d 746, 748 (Mont. 1988)).

A Montana statute allows Montana Medicaid to consider multiple criteria in establishing reimbursement levels, including "quality [and] availability of services."  MONT. CODE ANN. §§ 53-6-113(3) (c), (e).  Montana Medicaid's understanding and interpretation of AWP as one pricing benchmark used to obtain these goals is thus consistent with this Montana statute and federal regulations regarding aggregate limits for reimbursement and equal access.  *Id.*; 42 U.S.C. § 1396a(a)(30)(A); 42 C.F.R. §§ 447.331(b)(1), 447.332.  The Court should defer to that interpretation.  Montana Medicaid's interpretation of its reimbursement regulations cannot be overwritten simply because the Attorney General believes his *post hoc* interpretation is superior, especially when Montana Medicaid has not seen fit to revise its own regulations and eliminate the use of AWP since the State filed this lawsuit over five years ago.[12]

---

[12] Where an agency has consistently interpreted statutes in a particular manner through its implementing regulations, creating reliance on that interpretation, the presumption is that the interpretation should be sustained. *Bartels v. Miles City*, 399 P.2d 768, 771 (Mont. 1965) ("'One of the soundest reasons sustaining contemporaneous interpretation of long standing is the fact that reliance has been placed thereon by the public and those having an interest in the interpretation of the law.'") (quoting Sutherland Statutory Construction, § 5107 (3d. ed.).  Both Montana Medicaid itself and the providers who serve the Medicaid beneficiaries, have come to rely on a definition of AWP as a pricing benchmark published by First Data Bank that is not an actual average of wholesale prices. Montana Medicaid relies on this interpretation in order to give providers a sufficient economic incentive to stay within the Medicaid network.  Defs.' Joint Motion at 12; Defs.' 56.1 Stmt. ¶ 79, Ex. 55.  Montana Medicaid providers rely on this interpretation so that reimbursement on ingredient costs offsets insufficient dispensing fees. Defs.' Joint Motion at 7-9; Defs.' 56.1 Stmt. ¶ 74-77, Ex. 46; 53-54.

3. **The State's effort to shoehorn this case into the MDL Court's "plain meaning" decision does not fit in a state Medicaid case with this record.**

The State's final "plain meaning" argument invokes the MDL Court's interpretation of a federal Medicare-related statute that does not apply to Medicaid.  As the State acknowledges in its Motion, the MDL Court interpreted the term "average wholesale price" in the 1997 Balanced Budget Act, which provided that certain drugs reimbursed under Medicare Part B would be reimbursed at 95% of AWP.  42 U.S.C. § 1395u(o).  As the MDL Court explained, the 1997 statute was the "first time" this term had appeared in "the Medicare statute."[13]  *In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 281 (D. Mass. 2006).  By contrast, Montana Medicaid regulations have contained the term "average wholesale price" as one of the benchmarks for Medicaid drug reimbursement since at least 1988.  Defs.' Opp. 56.1 Stmt. ¶ 8, Ex. 4 (A.R.M. 46.12.102; A.R.M. 46.12.703).  As the record evidence set out above demonstrates, Montana clearly knew what it meant by that term.

There is no evidence in the record in this case – and certainly none cited by the State – that Montana Medicaid's understanding of AWP changed as a result of the passage of the 1997 Balanced Budget Act.  Dorothy Poulsen, who was Montana Medicaid's Pharmacy Program Officer from 1996 to 2001 (thus prior to and after the enactment of the 1997 Balanced Budget Act), testified that there was a "general understanding among State pharmacy officers that AWP didn't represent actual acquisition cost" and that she also "understood that AWP minus 10% did not represent actual acquisition cost."  Defs.' 56.1 Stmt. ¶ 37, Ex. 14.  Poulsen's testimony was confirmed by other Montana Medicaid officials who came after Poulsen and also understood why Montana Medicaid chose not to pay for drugs based on acquisition cost – because they concluded it was a "bogus" method that would result in "elevated" charges to Montana Medicaid.  Defs.' 56.1 Stmt. ¶ 65, Ex. 2 (Deposition of Denise Brunett, Physician Program Officer, at 86:15-89:6).

---

[13] The term "average wholesale price" does not appear in any federal *Medicaid* statute or regulation.

The MDL Court's decision was premised in part on the notion of "cost-consciousness," i.e., that Congress intended to reimburse at 95% of the average because "'Congress might reasonably have wished to put Medicare on the lower rung of the equation.'"  460 F. Supp. 2d at 286 (quoting *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 163 (D. Mass. 2003) (Stearns, J.)).[14]  Here, the undisputed record obtained during discovery shows that Montana Medicaid had no desire to reimburse Montana Medicaid's providers at a rate 10% to 15% below the "average"[15] to acquire drugs given its under-reimbursement for dispensing fees. As a matter of basic economics, the Montana providers in rural Montana who could not acquire drugs at less than 10% to 15% below the average would have been doomed to spend more on Montana Medicaid patients than they would be reimbursed.  This "would have harmed access to Medicaid beneficiaries" and "would have closed pharmacies in small towns [in Montana] and it would have hurt the population as a whole."  Defs.' Joint 56.1 Stmt. ¶ 54, Ex. 14 (Poulsen Dep. Tr. 95:20-96:20).

Montana Medicaid's mission was not to pay as little as possible for a particular drug. The Montana statute that charges Montana Medicaid with promulgating reimbursement rules contains a non-exclusive list of criteria to take into account when developing those rules.  MONT. CODE ANN. § 53-6-113(3).  That statute includes costs to the State among the criteria, but it also includes "the quality of services . . . [and] the availability of services."  *Id.* § 53-6-113(3)(c), (e). As Montana Medicaid officials uniformly testified, maintaining reimbursement at sufficiently high levels was needed to ensure access to care across the large, and largely rural, State.  Defs.' Joint Motion at 6-12; Defs.' Joint 56.1 Stmt. ¶ 9-20, Exs. 16; 27-32.  Unless reimbursement is

---

[14] The MDL Court was relying on Judge Stearns' decision on the motion to dismiss AWP claims related solely to the drug Lupron.  Two years later, after having had the opportunity to see the evidence obtained in discovery in that case, he reached a different conclusion:  "Defendants have a powerful argument that the AWP was known to Congress and large insurers to be an artificial benchmark with no real market significance."  *In re Lupron Mktg. & Sales Practice Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005).

[15] It is unclear from the State's Motion whether its definition of "average" is of a national average or a state-by-state average, and whether the State contends that Defendants were responsible for calculating one national AWP to Medicare and 50 state-specific AWPs to each of the state Medicaid programs.  The State's argument ignores, of course, that no federal or Montana law or regulation required Defendants to report AWPs to Montana.

sufficient to keep providers within the Medicaid network throughout the State, Montana Medicaid would not have fulfilled its statutory directive to ensure "quality [and] availability of services," nor would it have been in compliance with federal regulations requiring it to deliver "equal access."  MONT. CODE ANN. § 53-6-113(3)(c), (e); 42 U.S.C. § 1396a(a)(30)(A) (2006). Using a discounted AWP as one of its reimbursement benchmarks allowed Montana Medicaid to strike a balance between costs and access.

Presented with a different record, different statutes, different regulations, and different players, the MDL Court concluded that the term "average wholesale price" was not a term of art until 2003 in the federal Medicare context.  As the MDL Court concluded:

> The statute [the 2003 federal Medicare Prescription Drug, Improvement, and Modernization Act] and the legislative history indicate that by 2003, [AWP] had become a term of art.  At that point, Congress clearly did understand AWP was different than average sales price and was not reflective of actual prices in the marketplace.  Therefore, it reduced reimbursement to 85 percent of AWP to account for the overstatement while the new pricing system was being phased in.

460 F. Supp. 2d at 288.  Here, by contrast, the undisputed testimony of Montana Medicaid officials shows that AWP was understood by Montana Medicaid since no later than 1995 as being "different than average sales price and . . . not reflective of actual prices in the marketplace," the standard that the MDL Court deemed relevant to determine whether AWP was understood as a term of art or not.[16]  In its Motion, the State places no evidence in the record whatsoever to support the notion that Montana Medicaid *ever* used AWP because it believed it represented actual acquisition cost or an average of those costs.  The State offers nothing more than its *ipse dixit* for its contention that applying the MDL Court's "plain meaning" ruling should result in Defendants' being liable on summary judgment to the State on its Medicaid fraud claim. The MDL Court did not even grant summary judgment to MDL class plaintiffs as a result of its "plain meaning" decision.  460 F. Supp. 2d at 288 (sending issues to trial).  The MDL Court has

---

[16] Because the statute of limitations is only two years, MONT. CODE ANN. § 27-2-211(1)(c), Montana's Medicaid fraud claim was barred long before the State filed this suit in 2002.

also recognized that its interpretation of *state* regulations regarding reimbursement is an inquiry that is independent from its interpretation of *federal* regulations.  *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 77, 80 (D. Mass. 2006) ("While the statue statute used the term "Average Wholesale Price," there was no indication in the statute, legislative history or caselaw that it should be construed in sync with the federal statute.").

Under Montana law, "technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning or definition."  MONT. CODE ANN. § 1-2-106 (2006).[17]  Here, AWP has been consistently treated by Montana Medicaid as such a phrase.  Montana Medicaid's long-standing understanding of AWP was as a technical term referring to a pricing benchmark contained in an independent publication (not an actual average of prices) and used by Montana Medicaid on a discounted basis for some reimbursements as a means to offset low dispensing fees and ensure continued participation of Medicaid providers.  Defs.' Joint 56.1 Stmt. ¶ 39, Ex. 1 (Montana's Rule 30(b)(6) witness testimony that AWP was not understood as an actual average of sales prices, but as "the pricing information supplied by First DataBank").  This is the *only* interpretation of AWP available based on the record here.  Defs.' Joint Motion at 6-17; Defs' Joint 56.1 Stmt. ¶¶ 37-40.

**C.      The State's Damages Expert Does Not Provide a Basis for Summary Judgment on Liability.**

Finally, in support of its Motion, the State relies on a lengthy discussion of the report of its damages expert Dr. Hartman.  Defs.' Opp. 56.1 Stmt. ¶ 9, Ex. 3 (June 13, 2006, Hartman Decl. and June 20, 2006, Supplemental Hartman Decl.).  The State contends that Dr. Hartman analyzed claims data and found that literally thousands of claims were "false and subject to deceptive trade practices."  Motion at 14.  That is simply not true.

---

[17] The State cites this same statutory provision in support of its plain language argument, Motion at 9 n.23, but omits the language from the statute relating to technical terms quoted above.

Dr. Hartman testified at his deposition that he is not making a finding of fraud or deception. Defs.' Opp. 56.1 Stmt. ¶ 10, Ex. 4 (Hartman Dep. Tr. 47-50, 52-53, 235). In fact, he is not expressing any opinion on liability on any of the State's claims.[18] *Id.* at 79, 326. Nor is he expressing an opinion on causation. *Id.* at 79. He has not attempted to model the "but for" world. *Id.* at 366, 369. His opinion is limited to a calculation of damages and penalties, and for that he is basically comparing one number to another based on assumptions provided by counsel. *Id.* at 76, 81-82.

Instead, the State's counsel instructed Dr. Hartman to *assume* that there is liability if the amount allowed by the State exceeds the estimated acquisition cost of a drug. Defs.' Opp. 56.1 Stmt. ¶¶ 9;11, Exs. 3-4 (Hartman Decl. ¶ 14; Hartman Dep. Tr. 76, 78). Where he has not calculated actual average sales prices (which is in over 99% of the cases), even his determination of estimated acquisition cost is an assumption, and he has made no effort to determine the actual acquisition costs of providers in Montana. *Id.* at 90-92, 115-17, 148-50.

Most importantly, Dr. Hartman has made no effort to determine the expectations of Montana Medicaid officials with respect to the relationship between acquisition cost and AWP. Defs.' Opp. 56.1 Stmt. ¶ 12, Ex. 4 (Hartman Dep. Tr. 60-63, 193-94).[19] He has not even read the depositions of Montana Medicaid officials or the documents produced by the State in this litigation. *Id.* at 32-34, 36-40, 240. At his deposition, Dr. Hartman admitted that he has ignored the evidentiary record in this case. *Id.* at 253-60, 274-75, 510-12. Although he purports to base

_____

[18] To the extent Dr. Hartman's testimony is examined for liability issues, it supports Defendants. He admits that there is extensive evidence that both federal and state officials were aware of the difference between AWP and acquisition cost: "I mean, everybody knew that. . . . [W]hat people knew during this period was that AWP did not equal ASP." Defs.' Opp. 56.1 Stmt. ¶ 13, Ex. 4 (Hartman Dep. Tr. 529-30); *see also id.* at 189-91, 242-44, 544.

[19] In the MDL class action case, Dr. Hartman opined that private payors "expected" a 30% difference between AWP and actual sales prices. At his deposition in this case, he testified that his 30% "expectation yardstick" would apply to Montana Medicaid officials, which is inconsistent with the State's assertion in its Motion that "[t]here is no 'expectation' theory on the claim" and with the State's argument that it intended for AWP to represent actual prices paid. Defs' Opp. 56.1 Stmt. ¶ 14, Ex. 4 (Hartman Dep. Tr. 31-32, 336-39). Another conflict is that Dr. Hartman proposes assessing penalties on some drugs that he found non-fraudulent in the MDL class action. *Id.* at 326-35.

his opinion on an analysis of the federal Medicaid statute, Dr. Hartman was not even familiar with the federal equal access requirement when confronted with it at his deposition.  Defs.' Opp. 56.1 Stmt. ¶ 15, Ex. 4 (Hartman Dep. Tr. 165-67, 169).  Nor was he aware that the statute, in the case of single source drugs, provides for reimbursement of ingredient cost *plus* a reasonable dispensing fee "in the aggregate," and in the case of multi-source drugs, the FUL *plus* a reasonable dispensing fee, "in the aggregate."  *Id.* at 175-76, 216-17.  Dr. Hartman does not consider dispensing fees at all in his analysis, *id.* at 173-74, 183, 199, 205, 212, 245-46, 263-64, though in his deposition he admitted that the dispensing fee was "obviously" a concern to Montana Medicaid, *id.* at 248-49, and that "given the intention of what Medicaid is supposed to accomplish, there has to be an incentive for pharmacies to participate."  *Id.* at 224.  He testified that the State's counsel had instructed him that cross-subsidization is irrelevant.  *Id.* at 198-99, 257.  In short, and without going into how his penalty calculations are riddled with errors, Dr. Hartman provides no support for the State's Motion.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny the State's Motion.

## V.   REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Defendants  hereby request oral argument on this motion.

DATED this 22nd day of March, 2007.

<div style="margin-left:40%">

**PERKINS COIE** LLP
**ON BEHALF OF ALL DEFENDANTS**

By: /s/ *Kathleen M. O'Sullivan*
David J. Burman
Kathleen M. O'Sullivan
Charles C. Sipos
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  (206) 359-8000
Fax:  (206) 359-9000
Email:  DBurman@perkinscoie.com
E-mail:  KOSullivan@perkinscoie.com
E-mail:  CSipos@perkinscoie.com

</div>

Thomas J. Sartory, BBO #442500
**GOULSTON & STORRS, P.C.**
400 Atlantic Avenue
Boston, MA  02110-3333
Telephone: (617) 482-1776
Email: tsartory@goulstonstorrs.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of March, 2007, a true and accurate copy of the Defendants' Joint Opposition to the State of Montana's Motion for Partial Summary Judgment Against Certain Defendants was mailed, postage prepaid, and served via the Lexis-Nexis Filing System:

DATED:  March 22, 2007.

*Kathleen M. O'Sullivan*