# Exhibit 1

Dorothy Poulsen February 22, 2006

Seattle, WA

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS **CERTIFIED COPY**

-------------------------------------------------

IN RE: PHARMACEUTICAL    )

INDUSTRY AVERAGE         )

WHOLESALE PRICE          )

LITIGATION               )MDL Docket No.

                         )Civil Action 01CV12257PBS

-------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

-------------------------------------------------

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington  98101

REPORTED BY:  Judith A. Robinson, CCR #2171

Dorothy Poulsen                                      February 22, 2006

Seattle, WA

182

        Q.    Were you familiar with the survey

conducted by the pharmacy coordinating committee and

the University of Montana School of Pharmacy to

determine the extent to which pharmacies acquired

drugs directly from manufacturers?

        A.    I don't know.  I don't remember whether I

had any input in the survey or whether I had that or

even saw the survey.  Although, I'm sure I must have

seen it at some point in time or whether I saw the

results of the survey. So far as I remember, I

certainly wasn't instrumental in doing the survey or

conducting the survey.

        Q.    Does the letter that you wrote that's

Exhibit Poulsen 022 reflect that you were familiar

with the results of the survey?

        A.    Yes.  I mean, it does suggest that I was

familiar with the results of the survey.  However, I

don't know what the results were.  I mean, I can't

determine from this letter what the results were or

why I thought this was a good idea at the time.

        Q.    Do you know whether the survey also looked

at whether Montana pharmacies could acquire any

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

183

1   **drugs at published direct prices?**

2        A.   That was the issue, I believe, is that

3   pharmacies in Montana had a great difficulty

4   acquiring drugs at that price.  And -- and this is

5   speculation on my part.  It could be that our system

6   was set up.  Our reimbursement system, the PBM

7   system was set up to take the lower of direct price

8   or AWP minus 10%.  And so for those labels that's

9   what I'm guessing.  For those labels that were at

10  direct price, they were paying at the direct price

11  but our pharmacies were unable to get the drugs at

12  that cost.  That is -- I think that was the issue.

13       Q.   **Does this letter that's Exhibit Poulsen**

14  **022 refresh your recollection in any way as to**

15  **whether Montana Medicaid eliminated the use of**

16  **direct price?**

17       A.   I do remember that we removed -- we were -

18  - we removed labels from that -- from that pricing,

19  yes.

20       Q.   **Looking at page 2 of Exhibit Poulsen 022 -**

21  **-**

22       A.   Uh-huh.

Dorothy Poulsen                                    February 22, 2006
                            Seattle, WA

184

1        Q.    -- off the top of your head, do you know

2    the manufacturers associated with the labels that

3    have those numbers?

4        A.    Not anymore.  I would have at one time but

5    not anymore.

6        Q.    Looking at page 3 of Exhibit Poulsen 022,

7    your handwritten notes --

8        A.    Uh-huh.

9        Q.    -- does that appear --

10       A.    Oh, see.

11       Q.    -- to be tying the label to the --

12       A.    Yes.  Some companies that no longer exist.

13       Q.    And some that still exist?

14       A.    And some that still exist, yes.

15       Q.    I want to make sure I have this correct,

16   so I'll just ask you directly.

17       A.    Uh-huh.

18       Q.    Why did you propose in this letter to Jim

19   Smith that Montana Medicaid eliminate use of direct

20   pricing?

21            MR. LOPEZ:  Object to form.

22            THE WITNESS:  I believe that is what they

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

                                                              185

1    were asking me for.  That based on the survey, they

2    were asking -- pharmacists were asking that we do

3    away with direct price because they weren't getting

4    paid what they were having to pay.  So they wanted

5    to use AWP minus 10% for everything.

6    BY MS. O'SULLIVAN:

7         Q.   In looking at --

8         A.   Go ahead.

9         Q.   On the second page of Exhibit Poulsen 022,

10   the first line there, did you write:

11              ."I propose that we phase in elimination of

12   direct price reimbursement by removing" and then

13   those labels listed above?

14        A.   Right.  I would have written that.

15        Q.   Page 3 of Exhibit Poulsen 022, are those

16   your handwritten notes?

17        A.   Yes.

18        Q.   Do those reflect your calculations of the

19   difference between AWP and direct price on those

20   specific labels?

21        A.   Yes.

22        Q.   Was it your conclusion that eliminating

Dorothy Poulsen

February 22, 2006

Seattle, WA

189

MT005368?

    A.   Uh-huh.

    Q.   **Did you receive this letter dated May 27,**
**1999 from Jim Smith?**

    A.   I will assume that I did.

    Q.   **Please take a look at this letter and tell**
**me whether it appears to be a response to your**
**letter of April 15th that was Exhibit Poulsen 022?**

    A.   The first line -- that -- that's the case.

    Q.   **Where it -- where he states, third**
**paragraph down, last sentence:**

        **"However, you can be an assured that the**
**leadership of the association, the most active**
**involved members are quite enthused over this**
**proposal."**

    A.   Uh-huh.

    Q.   **What was your understanding of why the**
**pharmacists were enthused over this proposal to**
**eliminate certain labels from direct pricing?**

        MR. LOPEZ:  Object to the form.

        THE WITNESS:  Because the pharmacies were
unable to acquire drugs at the direct price, which

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

190

1    so far as I know, was less than AWP minus 10%.

2    Having that pricing mechanism removed means they

3    would be reimbursed at the AWP minus 10% charge or

4    the usual and customary charge, whichever was less.

5    And -- and so they would either be able to meet

6    their costs or they would make more money.

7    BY MS. O'SULLIVAN:

8         Q.   One more related document.  Exhibit

9    Poulsen 024 is a 1-page document, Bates number

10   MT005418, which some people might call some screen

11   shots and some handwritten notes.

12        A.   Uh-huh.

13        Q.   Are those your handwritten notes?

14        A.   Yes, I think so.  Yeah, I think so.

15        Q.   Where it --

16        A.   The pharmacy's price is not mine but the -

17   - but the others -- anyway.

18        Q.   Do you know whose handwriting reflects the

19   pharmacy's price equals $196.91?

20        A.   I'm not sure.

21        Q.   But is it your handwriting for listing the

22   AWP Medicaid and direct price for this drug, which

# Exhibit 2

**Bill Draft Number:** LC0094
**Bill Type - Number:** SB 473
       **Short Title:** Providing a prescription drug expansion program under Medicaid
**Primary Sponsor:** Jim Elliott

# Bill Actions - **Current Bill Progress:** Became Law

**Bill Action Count:** 99

| Action - Most Recent First | Date | Votes Yes | Votes No | Committee |
|---|---|---|---|---|
| Chapter Number Assigned | 05/01/2003 | | | |
| (S) Signed by Governor | 05/01/2003 | | | |
| (S) Transmitted to Governor | 04/30/2003 | | | |
| (H) Signed by Speaker | 04/29/2003 | | | |
| (S) Signed by President | 04/29/2003 | | | |
| (S) Returned from Enrolling | 04/29/2003 | | | |
| (C) Sent to Printing | 04/28/2003 | | | |
| (C) Sent to Printing | 04/26/2003 | | | |
| (S) Sent to Enrolling | 04/26/2003 | | | |
| (H) Returned to Senate Concurred in Governor's Proposed Amendments | 04/26/2003 | | | |
| (H) 3rd Reading Governor's Proposed Amendments Concurred | 04/26/2003 | 97 | 3 | |
| (S) Transmitted to House for Consideration of Governor's Proposed Amendments | 04/26/2003 | | | |
| (S) 3rd Reading Governor's Proposed Amendments Concurred | 04/26/2003 | 49 | 0 | |
| (S) Scheduled for 3rd Reading | 04/26/2003 | | | |
| (H) Scheduled for 3rd Reading | 04/26/2003 | | | |
| (H) 2nd Reading Governor's Proposed Amendments Concurred | 04/25/2003 | 99 | 0 | |
| (S) 2nd Reading Governor's Proposed Amendments Concurred on Voice Vote | 04/25/2003 | 49 | 0 | |
| (H) Scheduled for 2nd Reading | 04/25/2003 | | | |
| (S) Scheduled for 2nd Reading | 04/25/2003 | | | |
| (S) Returned with Governor's Proposed Amendments | 04/24/2003 | | | |
| (C) Sent to Printing | 04/23/2003 | | | |
| (S) Transmitted to Governor | 04/23/2003 | | | |
| (S) Signed by President | 04/23/2003 | | | |
| (S) Returned from Enrolling | 04/23/2003 | | | |
| (S) Sent to Enrolling | 04/23/2003 | | | |
| (H) Returned to Senate | 04/22/2003 | | | |
| (H) 3rd Reading Concurred | 04/22/2003 | 92 | 8 | |
| (H) Scheduled for 3rd Reading | 04/22/2003 | | | |
| (H) 2nd Reading Concurred | 04/17/2003 | 91 | 9 | |
| (H) 2nd Reading Motion to Amend Failed | 04/17/2003 | 32 | 67 | |

| Action | Date | | |
|---|---|---|---|
| (S) Revised Fiscal Note Printed | 04/17/2003 | | |
| (H) Scheduled for 2nd Reading | 04/17/2003 | | |
| (H) Scheduled for 2nd Reading | 04/16/2003 | | |
| (H) Taken from Committee; Placed on 2nd Reading | 04/15/2003 | 73 | 27 (H) Taxation |
| (S) Revised Fiscal Note Received | 04/15/2003 | | |
| (S) Revised Fiscal Note Requested | 04/10/2003 | | |
| (H) Hearing | 04/09/2003 | | (H) Taxation |
| (S) Revised Fiscal Note Printed | 04/07/2003 | | |
| (H) Hearing Canceled | 04/07/2003 | | (H) Taxation |
| (S) Revised Fiscal Note Signed | 04/07/2003 | | |
| (S) Revised Fiscal Note Received | 04/07/2003 | | |
| (H) Referred to Committee | 04/04/2003 | | (H) Taxation |
| (H) First Reading | 04/04/2003 | | |
| (S) Transmitted to House | 04/03/2003 | | |
| (S) 3rd Reading Passed | 04/03/2003 | 31 | 19 |
| (S) Scheduled for 3rd Reading | 04/03/2003 | | |
| (C) Sent to Printing | 04/02/2003 | | |
| (S) Revised Fiscal Note Requested | 04/02/2003 | | |
| (S) 2nd Reading Passed as Amended | 04/02/2003 | 24 | 20 |
| (S) 2nd Reading Motion to Amend Carried on Voice Vote | 04/02/2003 | 47 | 0 |
| (S) Committee Report--Bill Passed as Amended | 04/02/2003 | | (S) Finance and Claims |
| (C) Sent to Printing | 04/02/2003 | | |
| (S) Committee Executive Action--Bill Passed as Amended | 04/02/2003 | 10 | 9 (S) Finance and Claims |
| (S) Scheduled for 2nd Reading | 04/02/2003 | | |
| (S) Fiscal Note Printed | 03/31/2003 | | |
| (S) Fiscal Note Signed | 03/25/2003 | | |
| (S) Fiscal Note Received | 03/25/2003 | | |
| (S) Hearing | 03/24/2003 | | (S) Finance and Claims |
| (S) Hearing Canceled | 03/18/2003 | | (S) Finance and Claims |
| (C) Introduced Bill Text Available Electronically | 03/12/2003 | | |
| (S) Referred to Committee | 03/12/2003 | | (S) Finance and Claims |
| (S) First Reading | 03/12/2003 | | |
| (S) Fiscal Note Requested | 03/12/2003 | | |
| (S) Introduced | 03/12/2003 | | |
| (C) Draft Delivered to Requester | 03/10/2003 | | |
| (C) Draft Ready for Delivery | 03/07/2003 | | |
| (C) Draft in Assembly/Executive Director Review | 03/07/2003 | | |
| (C) Draft in Final Drafter Review | 03/07/2003 | | |
| (C) Draft in Input/Proofing | 03/07/2003 | | |
| (C) Draft to Drafter - Edit Review [CMD] | 03/07/2003 | | |

| | |
|---|---|
| (C) Draft in Edit | 03/06/2003 |
| (C) Draft in Legal Review | 03/06/2003 |
| (C) Draft to Requester for Review | 03/05/2003 |
| (C) Draft Back for Redo | 02/26/2003 |
| (C) Draft Ready for Delivery | 02/21/2003 |
| (C) Draft in Assembly/Executive Director Review | 02/21/2003 |
| (C) Draft in Final Drafter Review | 02/21/2003 |
| (C) Draft in Input/Proofing | 02/20/2003 |
| (C) Draft to Drafter - Edit Review [CMD] | 02/20/2003 |
| (C) Draft in Edit | 02/20/2003 |
| (C) Draft in Legal Review | 02/20/2003 |
| (C) Draft to Requester for Review | 02/17/2003 |
| (C) Draft to Requester for Review | 02/15/2003 |
| (C) Draft to Requester for Review | 02/14/2003 |
| (C) Draft Back for Redo | 02/14/2003 |
| (C) Draft Ready for Delivery | 12/30/2002 |
| (C) Pre-Introduction Letter Sent | 11/25/2002 |
| (C) Draft in Assembly/Executive Director Review | 11/24/2002 |
| (C) Draft in Final Drafter Review | 11/21/2002 |
| (C) Bill Draft Text Available Electronically | 11/18/2002 |
| (C) Draft in Input/Proofing | 11/15/2002 |
| (C) Draft to Drafter - Edit Review [CMD] | 11/15/2002 |
| (C) Draft in Edit | 11/12/2002 |
| (C) Draft in Legal Review | 11/12/2002 |
| (C) Draft Back for Redo | 11/12/2002 |
| (C) Draft On Hold | 10/30/2002 |
| (C) Draft to Requester for Review | 10/17/2002 |
| (C) Fiscal Note Needed | 05/01/2002 |
| (C) Draft Request Received | 05/01/2002 |

## Sponsor, etc.

| Sponsor, etc. | Last Name/Organization | First Name Mi |
|---|---|---|
| Requester | Elliott | Jim |
| Drafter | Petesch | Greg |
| Primary Sponsor | Elliott | Jim |

## Subjects

| Description | Revenue/Approp. | Vote Majority Req. | Subject Code |
|---|---|---|---|
| Health Care Services (see also: Health) | | Simple | HLTC |

Case 1:01-cv-12257-PBS    Document 3887-2    Filed 03/22/07    Page 13 of 30

| | | |
|---|---|---|
| State Finance (see also: Appropriations; Taxation Subjects) | Simple | STF |
| Social Services | Simple | SOC |

# Additional Bill Information

| | |
|---|---|
| **Probable Fiscal Note:** | Yes |
| **Preintroduction Required:** | N |
| **Session Law Ch. Number:** | 551 |
| ***DEADLINE*** | |
| **Category:** | Revenue Bills |
| **Transmittal Date:** | 04/03/2003 |
| **Return (with 2nd house amendments) Date:** | 04/16/2003 |

# Section Effective Dates

**Section(s)   Effective Date Date Qualified**

All Sections 01-JUL-03

# Exhibit 3

EXHIBIT_____2___
DATE __3/22/95___
SB __293___

## DEPARTMENT OF
## SOCIAL AND REHABILITATION SERVICES

MARC RACICOT
GOVERNOR

PETER S. BLOUKE, PhD
DIRECTOR

 STATE OF MONTANA

P.O. BOX 4210
HELENA, MONTANA 59604-4210
(406) 444-5622
FAX (406) 444-1970

March 13, 1995

Representative Duane Grimes, Chairman
House Human Services and Aging Committee

Dear Mr. Chairman:

I am writing to address questions raised in the committee hearing on Friday, March 10, 1995 regarding certain aspects of Senate Bill 293, regarding medicaid fraud.

Section 6 of Senate Bill 293 is intended to specify certain fundamental responsibilities of every medicaid provider. We believe that, as a matter of public policy, these responsibilities must be stated to protect the integrity of the medicaid program.

The first key element in this statement of responsibility is the basic principle of honesty. Under subsection (1), providers and persons acting on their behalf would be deemed to represent that the documents and other information submitted to the medicaid program are true, complete, accurate and not misleading, to the best of the person's knowledge and belief. Under subsection (2)(a), providers would have a duty to exercise reasonable care to ensure the truthfulness, completeness and accuracy of documents and information submitted to the medicaid program.

The second key element in this statement is a responsibility to inquire in advance of billing in areas that are reasonably subject to question. The medicaid fiscal agent processes about 250,000 claims each month through an automated claims processing system. In this system, information stated on the claim form is keyed into the system and the system automatically processes the claim. If the claim is facially correct, the provider will receive payment. This allows providers to be paid quickly, rather than waiting for manual claims processing. The system relies heavily upon the honesty and integrity of providers. False or other improper claims may not be discovered until after the provider has received payment. Providers should be held to a duty to inquire before undertaking questionable billing. Subsection (2)(b) would establish a provider duty to exercise reasonable care to ensure that the claims submitted to the medicaid program are claims for which the provider is entitled to be paid.

The third key element in this statement of responsibility is the principle that the provider, who receives the benefit of the medicaid payment, must exercise supervision over and take responsibility for the acts of their employees that bill the medicaid program on the provider's behalf.   Without such a responsibility, it is too easy for a provider to accept the benefit of improper or even dishonest billing, but then when confronted with the impropriety or dishonesty, to disclaim knowledge and responsibility.   Subsection (3) would prevent a person from disclaiming knowledge if the person knew of the impropriety or, by virtue of their position, authority or responsibility should have known of the impropriety.   Subsection (4) would prevent a person from avoiding responsibility if the person's failure to exercise actual authority or responsibility caused the improper conduct to occur.

The primary intended effect of section 6 is to encourage providers to exercise care and to practice honesty in their dealings with the medicaid program.   If a provider fails to meet its responsibilities under section 6 and that failure is fraud or abuse as defined in section 1 of the bill, the department could impose civil sanctions under section 15 of the bill.   The use of sanctions may be appropriate and necessary in specific cases to address the behavior of problem providers.

Section 6 would not create absolute liability for providers.   In a civil sanction case under section 6, the burden would be on the department to show that the provider or person failed to exercise reasonable care, or that the particular circumstances of the individual provider indicate that the provider knew or should have known of certain facts.   Providers would have the opportunity to show otherwise.   This section is not intended to penalize honest misunderstandings or mistakes, or occurrences beyond the reasonable control of the provider.   Further, the section is not intended to make a person responsible solely by virtue of their position.

Concerns have been raised regarding whether section 6 would be used to prosecute providers for acts of their employees even though the provider did not know of or authorize the improper conduct. Section 6, which would be codified in the Title 53 medicaid statutes, is not intended to provide a basis for criminal prosecution.   Section 7 establishes a criminal offense for medicaid fraud.   Section 7 would be codified in the criminal code, Title 45, which has separate definitions of the applicable mental states, purposely and knowingly.   The intent of the bill is that the stricter criminal code mental state requirements would apply in the criminal context.   Section 45-2-103, MCA states that a person is not guilty of a criminal offense unless, with respect to each element of the offense, the person acts while having one of the mental states as described in the criminal code.   The bill is not intended to hold anyone criminally liable for the criminal acts of another, nor do we believe the bill or other law would permit it.

We look forward to the committee's fair consideration of Senate

EXHIBIT ___2___
DATE ___3-22-95___
X ___5B 293___

Bill 293 and a do-pass recommendation.

Sincerely,

Nancy Ellery, Administrator
Medicaid Services Division

3

# Exhibit 4

-1958-

BEFORE THE DEPARTMENT OF SOCIAL
AND REHABILITATION SERVICES OF THE
STATE OF MONTANA

| | | |
|---|---|---|
| In the matter of the amend-<br>ment of Rules 46.12.102,<br>46.12.702 and 46.12.703<br>pertaining to Medicaid<br>reimbursement for multi-<br>source drugs | )<br>)<br>)<br>)<br>)<br>)<br>) | NOTICE OF PUBLIC HEARING<br>PERTAINING TO THE PROPOSED<br>AMENDMENT OF RULES<br>46.12.102, 46.12.702 AND<br>46.12.703 PERTAINING TO<br>MEDICAID REIMBURSEMENT FOR<br>MULTI-SOURCE DRUGS |

TO:  All Interested Persons

1.  On November 18, 1987, at 1:30 p.m., a public hearing
will be held in the auditorium of the Social and Rehabilita-
tion Services Building, 111 Sanders, Helena, Montana, to
consider the proposed amendment of Rules 46.12.102, 46.12.702
and 46.12.703 pertaining to Medicaid reimbursement for multi-
source drugs.

2.  The rules as proposed to be amended provide as
follows:

46.12.102 MEDICAL ASSISTANCE, DEFINITIONS  Subsections
(1) through (20) remain the same.
(21)  Maximum allowable cost (MAC) is the upper limit the
department will pay for multi-source drugs. in accordance with
42 CFR 447.331 which is a federal regulation dealing with
limits of payment.  In order to establish base prices for
calculating the maximum allowable cost, Tthe department hereby
adopts and incorporates by reference the methodology for
limits of payment set forth in 42 CFR 447.331 by reference.
and 447.332.  The maximum allowable cost for multiple source
drugs will not exceed the total of the dispensing fee estab-
lished by the department and an amount that is equal to 120
percent of the price established under the methodology set
forth in 42 CFR 447.331 and 447.332 for the least costly
therapeutic equivalent that can be purchased by pharmacists in
quantities of 100 tablets or capsules or, in the case of
liquids, the commonly listed size.  If the drug is not common-
ly available in quantities of 100, the package size commonly
listed will be the accepted quantity.  A copy of the above-
listed regulations may be obtained from the Department of
Social and Rehabilitation Services, Economic Assistance
Division, 111 Sanders, P.O. Box 4210, Helena, Montana, 59601
59604.
(22)  Estimated acquisition cost (EAC) is the cost of
drugs for which no MAC price has been determined.  The EAC is
the department's best estimate of what price providers are
generally paying in the state for a drug in the package size
providers buy most frequently.  The EAC for a drug is the
direct price (DP) charged by manufacturers to retailers.  If

-1959-

there is no available DP for a drug or the department deter-
mines that the DP is not available to providers in the state,
effective January 1, 1988, the EAC is the average wholesale
price (AWP), less 10 percent. The department uses the DP and
AWP as weekly reported or calculated by the American druggist
blue book data center or any other industry accepted data
center under contract with the department or its fiscal agent.

(a)--Notwithstanding--the--above,--effective--December--1,
1986,-the-EAC--for-these-drugs-determined-by-the-department-to
be-unavailable-at-direct--prices-will--mean-the-AWP-calculated
by---the--American---druggist--blue--book---data--center---for
November-30,-1986.--This--EAC-will--remain-in-effect-until-such
time-as-the-increases-in-the--AWP-for-a-drug-exceed-10-percent
of--the--AWP--in--effect--on--November-30,--1986.---After--the
increases-in-the-AWP-exceed-the--10-percent-limit,--the-EAC-of
the--drug-will-be-allowed-to--increase--by-the-amount-that-the
sum-of--the-increases-exceeds-the-10-percent-of-the-AWP-deter-
mined-for-November-30,-1986.

Subsections (23) through (38) remain the same.

AUTH:  Sec. 53-6-113 MCA; AUTH Extension, Sec. 2, Ch. 77,
L. 1985, Eff. 10/1/85; Sec. 4, Ch. 329, L. 1987, Eff. 10/1/87
IMP:   Sec. 53-6-101, 53-6-131 and 53-6-141 MCA

46.12.702   OUTPATIENT DRUGS, REQUIREMENTS   (1) These
requirements are in addition to those contained in ARM
46.12.301 through 46.12.308.
(2) Drugs may not be filled or refilled without the
authorization of the physician, or other licensed practitioner
who is authorized by law to prescribe drugs and is recognized
by the medicaid program.
Subsections (3) through (6)(b) remain the same.

AUTH:  Sec. 53-6-113 MCA; AUTH Extension, Sec. 2, Ch. 77,
L. 1985, Eff. 10/1/85; Sec. 4, Ch. 329, L. 1987, Eff. 10/1/87
IMP:   Sec. 53-6-113, 53-6-101 and 53-6-141 MCA

46.12.703   OUTPATIENT DRUGS, REIMBURSEMENT   (1) Drugs
will be paid for on the basis of the Montana "estimated ac-
quisition cost" or the "maximum allowable cost", plus a dis-
pensing fee established by the department, or the provider's
"usual and customary charge", whichever is lower; except that
the "maximum allowable cost" limitation shall not apply in
those cases where a physician or other licensed practitioner
who is authorized by law to prescribe drugs and is recognized
by the medicaid program certifies in writing their own hand-
writing that in his their medical judgement a specific brand
name drug is medically necessary for a particular patient. An
example of an acceptable certification would be the notation
"brand necessary", or "brand required". A check-off box on a
form or a rubber stamp is not acceptable.

-1960-

Subsections (2) and (3) remain the same.
(4) "Unit dose" prescriptions will be paid by a separate dispensing fee assigned to that pharmacy. This "unit dose" dispensing fee will be based upon the average additional cost of packaging supplies and materials which are directly related to filling "unit dose" prescriptions, and are documented by each individual pharmacy, plus the regular dispensing fee allowed. Only one unit dose dispensing fee will be allowed each month for prescriptions for chronic conditions.

AUTH: Sec. 53-6-113 MCA; AUTH Extension, Sec. 2, Ch. 77, L. 1985, Eff. 10/1/85; Sec. 4, Ch. 329, L. 1987, Eff. 10/1/87
IMP: Sec. 53-6-101, 53-6-113 and 53-6-141 MCA

3. This proposal would: (1) assure the federal government that the federal reimbursement limits for multisource (generic) drugs are not being exceeded; (2) provide a less complicated and more accurate payment procedure for drugs based upon average wholesale price; (3) recognize that Medicaid providers other than physicians (i.e., dentists and podiatrists) can and do prescribe drugs; and (4) clarify rule language prohibiting certain additional frequent reimbursement to pharmacies which dispense drugs to nursing home residents.

These changes are proposed as cost containment measures. The data is not yet available to reliably estimate financial and budgetary impacts.

Copies of this notice are available for review at local human services offices and county welfare offices.

4. Interested parties may submit their data, views, or arguments either orally or in writing at the hearing. Written data, views, or arguments may also be submitted to the Office of Legal Affairs, Department of Social and Rehabilitation Services, P.O. Box 4210, Helena, Montana 59604, no later than November 26, 1987.

5. The Office of Legal Affairs, Department of Social and Rehabilitation Services has been designated to preside over and conduct the hearing.

Director, Social and Rehabilita-
tion Services

Certified to the Secretary of State _October 19_, 1987.

# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05 - 11148 DPW**

NEW ENGLAND CARPENTERS
HEALTH BENEFITS FUND; PIRELLI )
ARMSTRONG RETIREE )
MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE )
FUND OF PHILADELPHIA AND )
VICINITY; and PHILADELPHIA )
FEDERATION OF TEACHERS HEALTH )
AND WELFARE FUND, )
)
       Plaintiffs, )
)
v. )
)
FIRST DATABANK, INC., a Missouri )
Corporation; and McKESSON )
CORPORATION, a Delaware Corporation, )
)
      Defendants )

Civil Action No.

RECEIPT #
AMOUNT $ 250
SUMMONS ISSUED 425
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
DATE 6/8/05

CLASS ACTION COMPLAINT

18:1  0 0006 BSC.DOC

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I.    INTRODUCTION

1.    This is a proposed national class action brought on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors of prescription drugs ("End Payors") against First DataBank ("First Data") and McKesson Corporation ("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby causing members of the proposed Class, whose payments for pharmaceuticals are tied to AWP, to make billions of dollars of excess payments for those pharmaceuticals.

2.    In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals on the basis of WAC, they *get paid* (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, the average wholesale price or "AWP." As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.    Each year more than three billion prescriptions are written in the United States. Because the majority of pharmaceutical reimbursements are tied to the AWP, end payors must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are therefore compiled and published by several

- 1 -

# Exhibit 6

discretionary requirement for public health inspections,
modifying the enforcement provisions.

## Proponents' Testimony:

Dale Taliaferro, Administrator of Health Services Division.
EXHIBIT 1

## Opponents' Testimony:  None

## Informational Testimony:  None

## Questions From Committee Members and Responses:  None

## Closing by Sponsor:

SEN. CRISMORE said that SB 124 was a simple bill and would make
it easier for the health departments to do their jobs.


## EXECUTIVE ACTION ON SB 124

Motion/Vote:  REP. BRUCE SIMON MOVED THAT SB 124 BE CONCURRED IN.
The motion carried unanimously.

*{Tape: 1; Side: A; Approx. Counter: 120; Comments: NA.}*


## HEARING ON SB 293

## Opening Statement by Sponsor:

SEN. ETHEL HARDING, SD 37, Polson, stated that SB 293 would
revise the laws related to Medicaid fraud and abuse and
establish a Medicaid fraud control unit in the Department of
Justice.

## Proponents' Testimony:

Nancy Ellery, Administrator of the Medicaid Services Division.
EXHIBIT 2

Mike Batista, Administrator of the Law Enforcement Services
Division, said that his division works on fraud including welfare
and workers' compensation fraud. There currently is a five-to-one
return on investment on workers' compensation fraud.  For every
dollar invested in the enforcement program there is a $5 savings.
The program has been in effect for one and a half years and has
saved over $2 million for State Fund.  Over 400 felony
investigations have taken place in the area of welfare fraud with
cases totalling over $4 million.  Social and Rehabilitation
Services (SRS) came to their bureau to take on the fraud
enforcement function.  This is important for the cost savings but
also as a deterrent.

**Opponents' Testimony:**   None

**Informational Testimony:**   None

*(Tape: 1; Side: A; Approx. Counter: 400; Comments: NA.)*

**Questions From Committee Members and Responses:**

**REP. BRUCE SIMON** clarified that doctors' offices have all the welfare information available, but they keep changing what is required.  Are they going to be held responsible when the rules are changed and they haven't been able to keep up with all the information switches.  He asked where the dividing line would be between false reporting and honest mistakes in paperwork.

**Mr. Batista** replied that it was often the defense in Medicaid fraud cases that there was not enough education about the changes in the process.  State investigators would take that under advisement before taking it to court for prosecution.

**Greg Gould, Legal Counsel for SRS,** clarified that the section in the bill they were referring to is not a criminal section.  There are separate standards in the criminal code.  These would be intentional cases where they knew and intended to defraud the programs.  Medicaid statute provisions work to tell providers that they have a certain responsibility to be honest and submit correct documentation in cases where there were overpayments that they were not entitled to.

**REP. SIMON** asked for an explanation on what the terminology means when a person "purposely" and "knowingly" commits fraud.  **Mr. Gould** said that the definitions were included in the bill on page 12, line 21, and on page 16, line 11.

**REP. ELLEN BERGMAN** asked what was done previously in the area of Medicaid fraud and is it separate from the work done on the Workers' Compensation fraud.

**Ms. Ellery** stated that there has always been limited resources to investigate fraud.  The Surveillance and Utilization Review Unit, within the Medicaid Division, works with referrals and investigations.  They need to devote maximum resources to the recoveries of Medicaid fraud.  Workers' Compensation has their own fraud unit.

**REP. BERGMAN** inquired if they have more staff.  **Ms. Ellery** said that the federal government required that seven additional positions be dedicated to the unit.

**REP. LOREN SOFT** asked what the liability of a board of directors of a private entity would be if fraud was committed either knowingly or unknowingly.

Mr. Gould clarified that the section referred to is not part of the criminal code so the person would not be liable criminally. The section is intended to clarify when a provider is participating in the program, it is their responsibility to supervise all those who work on the forms.

REP. SOFT asked if the supervisor would be liable for a person who made a fraudulent claim. Mr. Gould answered that the supervisor would not be liable but whoever the provider was that received the payment from Medicaid would be liable in the sense that they would have to pay the money back, but there would be no personal liability.

REP. SIMON questioned why the Abortion Control Act was brought into this bill.

*{Tape: 1; Side: B; Approx. Counter: 00; Comments: NA.}*

Mr. Gould explained that there was no substantial change in the section, but the criminal statute that is added for Medicaid fraud had some definitions that went along with it. These were inserted into the section in the criminal code and caused the renumbering of the sections.

REP. SIMON wanted to know if an office manager in a doctor's office had the information, would they, by virtue of their position, be knowingly committing fraud? Mr. Gould stated that the controlling definition of the term "knowingly" would be in the section contained in the criminal code that was discussed earlier. He said that it is not the intent of the bill to leapfrog from this section over to establishing criminal intent.

REP. SIMON asked Mr. Gould if he was an attorney and he said he was.

REP. SIMON asked for expansion on the terms he was having difficulty with. David Niss, Legislative Council, explained that what would be in question is the state of mind of someone defrauding the system and the degree of criminal intent. He noted the penalty for purposely or knowingly committing fraud as related beginning on page 7, line 15 of the bill, focusing on page 8, line 15.

Mr. Gould stated that an interpretation would be contrary to the specific definition of knowingly that occurs in the criminal statute. The criminal statute definition of knowingly specifically defines the term "highly probable" and the presumption of the mental state would be unconstitutional.

REP. JOHN BOHLINGER wondered if such language existed in other states' laws dealing with fraud. Mr. Gould replied that the language used in Montana was modeled after language from another state's statute. The Workers' Compensation fraud unit

legislation has some provisions that addressed some of the basic responsibilities of providers and claimants to be truthful.

**REP. SIMON** asked for clarification as to the purpose of section 6, especially subsection (3). **Mr. Gould** reiterated that it is not the intent to overreach and the purpose is to address the problem of supervisors attempting to escape the responsibility of repaying overpayment. It is important to show that they have a responsibility to supervise their employees who submit claims on their behalf.

**REP. SIMON** voiced his opinion that there would not be a need for subsection (3). **Mr. Gould** stated that the subsections cover different aspects of the problem. Subsections (1) and (2) cover the ability of collecting an overpayment back. If there are providers abusing the program there may be sanctions and then it becomes important to look at whether the person was aware of what they were doing. This is intended to make the supervisors more aware and responsible.

**REP. SIMON** asked if he would be willing to submit a statement for the committee record that would help clarify the intent of section 6. **Mr. Gould** stated that he would be glad to.

*{Tape: 1; Side: B; Approx. Counter: 560; Comments: NA.}*

**REP. LIZ SMITH** voiced her concerns about what Medicaid was doing to inform people of the frequent changes that occur. **Ms. Ellery** explained that her department spends a lot of time on educating providers of the frequent changes in requirements. They give out provider manuals and have a toll-free number as well as provider training.

**Mr. Batista** cited an example of a fiscal manager of a non-profit organization that was turning over a huge profit over the course of five years. He knowingly double-billed the Medicaid office and committed fraud. It was an example that showed intent and where the term knowingly would be applicable.

**REP. SOFT** stated that in Title 45 a person could be defined as a corporation or partnership and was concerned that the word "incomplete" was included in regard to fraudulently filling out a Medicaid claim. **Mr. Gould** explained that many staff members fill out the claims and it is actually the provider who receives payment. There is a misconception that sections 6 and 7 of the bill are related and they are not. For there to be a criminal offense it has to be by purposefully or knowingly obtaining a payment, not just an error or mistake.

**REP. SOFT** asked what would happen when a provider would take advantage of a gray area. **Mr. Gould** said that there were areas in which the rules were not entirely clear. The provider should inquire about the circumstance and when they disregard the risk that is not a criminal liability situation but falls under the

category of abuse.  Providers would be sanctioned if patterns of misconduct were found.

**REP. DEB KOTTEL** asked if a director of a corporation would be personally liable through the imputed knowledge theory for the nonpayment of payroll taxes.  **Mr. Gould** stated that the private provider was responsible for the payroll tax.  They can't get out of it just because they said they didn't know.

**REP. KOTTEL** asked if there was a trend in the laws becoming tougher when there are public policy reasons such as Medicaid fraud.  **Mr. Gould** stated his surprise that there has not been a more specific statement of the policy in the Montana code prior to this time.

**REP. KOTTEL** said that principals are liable civilly for the actions of their agents as long as they acted under the scope of their employment.  **Mr. Gould** remarked that there are around 250,000 claims per month.  If those claims are facially correct they will be processed and paid.  If through further investigation there is found to be an overpayment, then repayment will be due.

**REP. L. SMITH** felt that too much pressure was being placed on the supervisors to make accurate decisions if they are not fully informed of the rules and regulations that are supposedly being followed by their employees.  She wanted to see a better way to alert providers of information that comes to them that they are required to read and understand right away.

**Ms. Ellery** clarified that there is a section in the bill for providers and submitting information and that section has nothing to do with the recipient and whatever fraud they might commit.  They sign a statement that says they are submitting the most accurate information possible.

**REP. SIMON** asked if the people who process Medicaid claims make mistakes and to what standard are those people going to be held in comparison to those who fill out the claims.  **Ms. Ellery** said they do make mistakes and part of their contract with the fiscal agent provides penalties for not having good performance standards.  Those individuals are targeted and the department tries to educate or train them if it is a problem of simply not understanding the process.

**Closing by Sponsor**:

**SEN. HARDING** stated that fraud control is funded 75% federally and 25% from the general fund.  The cost recoveries and cost avoidance will begin to occur in SRS during the second year of the program operation.  The cost savings is expected to be $3.00 for each $1.00 invested in the fraud control program and the program will eventually pay for itself.