**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) |
| | ) Civil Action No. 01-CV-12257-PBS ) |
| THIS DOCUMENT RELATES TO | ) Judge Patti B. Saris ) ) |
| *State of Montana v. Abbott Labs Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM | ) ) ) ) ) |

**LOCAL RULE 56.1 COUNTERSTATEMENT OF UNDISPUTED FACTS IN SUPPORT OF NOVARTIS PHARMACEUTICALS CORPORATION'S OPPOSITION TO THE STATE OF MONTANA'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CERTAIN DEFENDANTS**

Defendant Novartis Pharmaceuticals Corporation ("NPC") respectfully submits the following Counterstatement of Undisputed Facts as to NPC pursuant to Local Rule 56.1. These undisputed material facts, and the undisputed material facts in Defendants' Joint Response to the State of Montana's Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment Against Certain Defendants and Supplemental Statement of Undisputed Facts, which NPC incorporates by reference, demonstrate that the Court should deny Montana's motion for partial summary judgment on its Medicaid fraud claim as to NPC as a matter of law. Deposition transcripts and documents cited herein are attached to the Affidavit of Samuel N. Lonergan, Esq. in support of NPC's opposition to The State of Montana's Motion for Partial Summary Judgment Against Certain Defendants ("Lonergan Aff.").

**A.     The Parties**

1.      Plaintiff Montana purports to bring claims on behalf of the Montana Medicaid agency and other third-party payors located in Montana, asserting that these payors overpaid doctors and pharmacies ("Providers") for prescription drugs dispensed or administered to Medicaid and private insurance beneficiaries. (Mont. Sec. Amend. Compl. ¶ 8.)

2.      Defendant NPC is a Delaware corporation with headquarters in East Hanover, New Jersey, that was formed by merger effective January 1, 1997. (Affidavit of Michael Conley ("Conley Aff.") ¶ 5, attached as ¶ 2, Ex. 1 to Lonergan Aff.)[1] NPC manufactures and markets Brand Name prescription drugs ("Brand Name drugs"). (*Id.* ¶ 6.) It does not market and sell generic drugs. (*Id.*)

---

[1] Michael Conley is Executive Director for U.S. Managed Markets, Trade Corporate Accounts, and Customer Service at NPC. (Conley Aff. ¶ 1.)

1

**B.     NPC's Answer to Montana's Second Amended Complaint**

3.      NPC's Answer states that, "certain drug reimbursement systems reimburse physicians and pharmacies for prescription drugs based upon AWPs as published and reported by third party publications." (Answer of Defendant Novartis Pharmaceuticals Corporation to the State of Montana's Second Amended Complaint ¶ 5.)

**C.     The Products at Issue**

4.      In this action, Brand Name drugs fit into two relevant categories: physician-administered, which must be administered by a health-care professional (usually either a doctor or a nurse working with a doctor), and self-administered, which patients pick up at pharmacies and take on their own. (Declaration of Gregory K. Bell ("Bell Decl.") ¶¶ 5-7, attached as ¶ 3, Ex. 2 to Lonergan Aff.)

5.      A physician-administered drug ("PAD") is purchased by a physician, who then "sells" and administers (or has an assistant administer) the drug to the patient. (*Id*. ¶ 8, attached as ¶ 3, Ex. 2 to Lonergan Aff.) The physician chooses which drug to administer. (*Id*.)

6.      By contrast, a self-administered drug ("SAD") is purchased by a pharmacy and then "sold" to the patient, who takes the drug himself. (*Id*. ¶¶ 6-7, attached as ¶ 3, Ex. 2 to Lonergan Aff.) The patient's physician determines which drug the patient takes. (*Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris,* for purposes of the motion for class certification, in *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass.) ("Berndt Report") ¶ 42, attached as ¶ 4, Ex. 3 to Lonergan Aff; Bell Decl. ¶ 10, attached as ¶ 3, Ex. 2 to Lonergan Aff.) If the physician prescribes a Brand Name SAD, the pharmacy must dispense that product. (*Id*.) The pharmacy may not substitute another

2

product, even if the alternative is approved by the U.S. Food and Drug Administration for the same illness or condition, unless it obtains a new prescription from the prescribing doctor.  (Bell Decl. ¶ 10, n. 8.)

7. Because physicians alone determine which Brand Name SADs patients take, pharmacies have little to no influence over a given Brand Name SAD's sales volume.  (Berndt Report ¶ 42, attached as ¶ 4, Ex. 3 to Lonergan Aff.; Bell Decl. ¶ 10, attached as ¶ 3, Ex. 2 to Lonergan Aff.; *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999) (Posner, CJ).)

8. Because retail pharmacies cannot influence which Brand Name SADs physicians prescribe, manufacturers generally do not give retail pharmacies discounts on purchases of Brand Name SADs.  (*Id.*)

9. Because retail pharmacies cannot influence which Brand Name SADs physicians prescribe, NPC would have no reason to attempt to increase the difference between Average Wholesale Price ("AWP") and acquisition cost (*i.e.*, the "spread") on its drugs to benefit the pharmacies.  NPC would also have no reason to increase the "spread" to induce physicians to prescribe its Brand Name SADs, as physicians are not involved in the financial aspects of the transaction.  (Bell Decl. ¶ 10, ¶ 10 n. 9, attached as ¶ 3, Ex. 2 to Lonergan Aff.)

10. The following NPC drugs at issue here are entirely self-administered:  Clozaril, Combipatch, Comtan, Diovan, Diovan HCT, Elidel, Estraderm, Exelon, Famvir, Femara, Focalin, Lamisil, Lamprene, Lescol, Lescol XL, Lotensin, Lotensin HCT, Lotrel, Miacalcin SPR, Parlodel, Rescula, Ritalin, Ritalin LA, Starlix,

Tegretol, Tegretol XR, Trileptal, Vivelle, Vivelle-DOT, Voltaren Ophthalmic, Zaditor, and Zelnorm.  (Conley Aff. ¶ 7, attached as ¶ 2, Ex. 1 to Lonergan Aff.)

11. The other two NPC drugs at issue here are Miacalcin Injection and Aredia.  (Mont. Sec. Amend. Compl., Ex. A.)

12. Miacalcin Injection is generally a SAD but may in rare cases be physician-administered, either to demonstrate to a patient how to self-administer the drug or where a patient is either incapacitated or too ill to self-administer the drug.  (Affidavit of Bette Schultz ("Schultz Aff.") ¶¶ 3-4, attached as ¶ 5, Ex. 4 to Lonergan Aff.)[2]

13. Miacalcin Injection faced no competition, either brand or generic, until after Montana filed its first Complaint naming NPC on August 1, 2003.  (*Id.* ¶¶ 6-9, attached as ¶ 5, Ex. 4 to Lonergan Aff.)  Because patients prefer to take a tablet or an oral solution rather than to inject themselves with a drug, a physician typically will prescribe Miacalcin Injection only when a patient is medically unable to take a drug indicated for the same condition that comes in tablet or oral solution form.  (*Id.* ¶¶ 7-8.)

14. Aredia is a PAD.  (Affidavit of Thomas Held ("Held Aff.") ¶ 4, attached as ¶ 6, Ex. 5 to Lonergan Aff.)[3]  Aredia faced no competition, either brand or generic, until July 2001, when NPC introduced Zometa.  (*Id.* ¶ 5.)  Aredia faced no competition from a non-NPC drug until December 2001, when a generic version was introduced.  (*Id.* ¶¶ 5, 7.)

---

[2] Bette Schultz is Vice President for Business Development and Licensing & Mature Products at NPC.  (Schultz Aff. ¶ 1.)

[3] Thomas Held was brand director of Aredia at NPC from 1998 to 2002.  (Held Aff. ¶ 1.)

4

15. NPC has not promoted Aredia to physicians since the time NPC introduced Zometa in July 2001. (*Id.* ¶ 6.)

**D.     NPC's Marketing and Sales Methods**

16. Because physicians choose whether to prescribe an NPC drug or a competing Branded therapeutic alternative, NPC markets its products' benefits to physicians, even though, for most prescriptions (*i.e.*, when they prescribe SADs), physicians do not actually buy the products. (Bell Decl. ¶¶ 7, 10, attached as ¶ 3, Ex. 2 to Lonergan Aff.; Arena Dep. at 12:22-13:4, attached as ¶ 7, Ex. 6 to Lonergan Aff.)  To that end, NPC has a sales force that calls upon physicians to provide research and other information about the products, explain their benefits, and answer questions. (Arena Dep. at 12:22-13:4.)

17. NPC markets drugs based primarily on their clinical efficacy and safety. (*Id.* at 20:21-21:4, attached as ¶ 7, Ex. 6 to Lonergan Aff.)  NPC's sales representatives do not market to Providers the difference between a drug's AWP and the Provider's acquisition cost. (*Id.* at 156:14-157:6.)  Any sales force member who deviates from the authorized message may be terminated. (*Id.* at 69:21-70:4; 70:13-71:13.)

**E.     NPC's Pricing and Price Reporting**

18. NPC generally sells its prescription pharmaceuticals to wholesalers and warehousing retail chains (*i.e.*, drugstore chains of ten or more stores that have their own warehouses that provide wholesaler-type services for the chain) at a price referred to as Wholesale Acquisition Cost ("WAC"), minus a two percent prompt pay discount. (Conley Aff. ¶ 9, attached as ¶ 2, Ex. 1 to Lonergan Aff.)  When NPC launches a new product or changes the price of an existing one, it provides pricing information to wholesalers, warehousing retail chains, and independent price-reporting services such as

First DataBank by issuing a "broadcast fax." (*Id.* ¶ 14.) A broadcast fax is a letter under the name of an NPC executive that lists the WAC, AWP, or both for one or more drugs. (*Id.*)

19. Beginning in January 1997, NPC's broadcast faxes that included AWP information also contained the following disclosure:

> As used in this letter, the term AWP or Average Wholesale Price constitutes a reference for each Novartis product, and in keeping with current industry practices, *is set as a percentage above the price at which each product is offered generally to wholesalers*. Notwithstanding, the inclusion of the term price, in Average Wholesale Price, AWP is not intended to be a price charged by Novartis for any product to any customer.

NPC Broadcast Fax, January 31, 1997 (emphasis added). (Conley Aff. ¶ 16, Ex. 2, attached as ¶ 2, Ex. 1 to Lonergan Aff.) The disclosure's exact wording changed slightly over time; however, the disclosure's central message – that AWP is not intended to reflect a price charged by NPC to anyone – remained constant. (*Id.* ¶ 15.)

20. Consistent with this disclosure, NPC calculated the AWP it reported for any given product by applying a percentage markup to that drug's WAC. (Conley Aff. ¶ 17, attached as ¶ 2, Ex. 1 to Lonergan Aff.) For all but four NPC drugs at issue here, the AWP is equal to WAC plus 20 percent, which, put differently, means that the WAC is equal to AWP minus 16.66 percent. (*Id.*) For Diovan, Diovan HCT, Famvir, and Zaditor, the AWP is WAC plus 25 percent, which, put differently, means that the WAC is equal to AWP minus 20 percent. (*Id.*)

F. **First DataBank's AWP and Settlement of Class Action**

21. First DataBank is an independent, third-party, pharmaceutical price-reporting service. (*Id.* ¶ 19, attached as ¶ 2, Ex. 1 to Lonergan Aff.) Patricia Kay

6

Morgan, Manager, Product Knowledge-based Services at First DataBank, has testified that First DataBank during the relevant period published two AWPs for a given pharmaceutical drug: a "Suggested Wholesale Price" reported by the manufacturer, and a "Blue Book" AWP that First DataBank determined independent of what the manufacturer reported and that had "become synonymous with AWP to many of our customers." (Morgan Dep. at 36:3-19, attached as ¶ 8, Ex. 7 to Lonergan Aff.)  Morgan testified:

> Q. Okay.  SWP, what does that refer to?
>
> A. It's the suggested wholesale price, and it's populated if the manufacturer suggests an AWP.
>
> Q. Some manufacturers include an AWP on their price lists; is that correct?
>
> A. A suggested AWP, yes.
>
> Q. And that's where you put that into what you call the SWP field?
>
> A. That's correct.
>
> Q. What is Blue Book price?
>
> A. Blue Book is what's become synonymous with AWP to many of our customers, so it is the average wholesale price, so it's the price that includes the markup after our wholesaler survey, if the product's available through the wholesaler.

(*Id*.)  Morgan testified that First DataBank determined the "Blue Book" AWP used by customers by surveying wholesalers:

> A. I assume you're asking how we determined the markup, is that the question?
> Q. Yes.
> A. We basically contacted the national wholesalers to find out what markup they were applying to a manufacturer's line, or we could to a specific NDC, if necessary, and then that number was entered into a table.  And that's pretty much it.
> Q. So you were asking the wholesalers for a markup factor that they applied to a company's products?
> A. Correct.

(Morgan Dep. at 47:8-20.)

7

22. Beginning in January 2002, First DataBank unilaterally changed the markup factor it used to calculate AWPs for NPC drugs to 25 percent, which had the effect of making First DataBank's published AWPs higher than NPC's reported AWPs for the following NPC drugs at issue here: Aredia, Clozaril, Combipatch, Comtan, Elidel, Estraderm, Exelon, Femara, Focalin, Lamisil, Lamprene, Lescol, Lescol XL, Lotensin, Lotensin HCT, Lotrel, Miacalcin Injection, Miacalcin SPR, Parlodel, Rescula, Ritalin, Ritalin LA, Starlix, Tegretol, Tegretol XR, Trileptal, Vivelle, Vivelle-DOT, Voltaren Ophthalmic, and Zelnorm. (Conley Aff. at ¶¶ 19-22, attached as ¶ 2, Ex. 1 to Lonergan Aff.)

23. In *Citizens for Consumer Justice* (*i.e.*, the private payor class in *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass.)), plaintiffs sued Together Rx LLC and its members, including NPC, alleging that they conspired to raise the "spread" between WAC and AWP to WAC plus 25 percent for drugs in the Together Rx program (a discount program for the indigent elderly) ("the Together Rx claim"). (*See* Second Amended Master Consolidated Class Action Complaint in *In Re Pharm. Indus. Average Wholesale Price Litig.*, filed under seal on February 24, 2004, at ¶¶ 542-46, 590-92.)

24. In connection with the Together Rx claim, Defendants took discovery of First DataBank (*see*, *e.g.*, deposition of Patricia Kay Morgan, taken on January 11-12, 2005, in *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass.), attached as ¶ 8, Ex. 7 to Lonergan Aff.)

25. After discovery was taken of First DataBank, the *Citizens for Consumer Justice* plaintiffs dismissed the Together Rx claim by filing an amended complaint that did not include the Together Rx claim (*See* Third Amended Master Consolidated Class Action Complaint in *In Re Pharm. Indus. Average Wholesale Price Litig.,* MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass.), filed on October 17, 2005; Consolidated Order re: Motion for Class Certification in *In re Pharm. Indus. Average Wholesale Price Litig.*, dated January 30, 2006, at p. 8.)

26. In *New England Carpenters Health Benefits Fund, et al v. First DataBank, Inc. and McKesson Corp.* ("*New England Carpenters*") – a separate litigation to which NPC is not a party – a purported class consisting of health plans and other payors for pharmaceutical drugs alleged that First DataBank and a pharmaceutical wholesaler had agreed to increase the difference between WAC and AWP for numerous drugs beginning in late 2001 without regard to the manufacturers' reported AWPs and to publish such AWPs as First DataBank's regularly-published "Blue Book" AWP. (*See* Complaint in *New England Carpenters Health Benefits Fund, et al v. First DataBank, Inc. and McKesson Corp.*, Civ. Action No. 1:05-CV-11148-PBS (D. Mass.), filed June 2, 2005, at ¶¶ 1, 8-9, attached as ¶ 9, Ex. 8 to Lonergan Aff.)

27. As part of a pending Settlement Agreement and Release ("Settlement") in *New England Carpenters*, First DataBank has agreed to reduce its "Blue Book" AWP to WAC plus 20 percent for all pharmaceuticals subject to the Settlement, which include NPC drugs. ("Settlement Agreement and Release" in *New England Carpenters Health Benefits Fund, et al v. First DataBank, Inc. and McKesson*

9

*Corp.*, Civ. Action No. 1:05-CV-11148-PBS (D. Mass.), submitted for court approval on October 4, 2006, at p. 19, attached as ¶ 10, Ex. 9 to Lonergan Aff.)

28.  Plaintiff Montana's outside counsel in *State of Montana v. Abbott Labs. Inc., et al* is the law firm of Hagens Berman Sobol Shapiro LLP.  (The State of Montana's Memorandum in Support of Motion for Partial Summary Judgment Against Certain Defendants at p. 18.)  Plaintiffs' counsel in *New England Carpenters* include the law firm of Hagens Berman Sobol Shapiro LLP.  (*See* Complaint in *New England Carpenters Health Benefits Fund, et al v. First DataBank*, *Inc. and McKesson Corp.*, Civ. Action No. 1:05-CV-11148-PBS (D. Mass.) at p. 70, attached as ¶ 9, Ex. 8 to Lonergan Aff.)

G.  **Montana's Medicaid Obligations and Objectives**

29.  Providers voluntarily participate in Medicaid and are therefore free to deny services to Medicaid beneficiaries, just as they are free to deny services to any person.  ("Statement of Undisputed Material Facts in Support of Defendants' Motion For Summary Judgment," docket no. 3648, filed on February 8, 2007 ("Defs. Joint Mont. 56.1 stmt.") ¶¶ 47, 49.)  Under federal law, a state that participates in Medicaid must maintain a State Plan that establishes reimbursement rates that "are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."  (*See* 42 U.S.C. §1396a(a)(30)(A); *see also* Defs. Joint Mont. 56.1 stmt. ¶ 42.)

30.  To comply with 42 U.S.C. §1396a(a)(30)(A), Montana established a reimbursement rate for Brand Name drugs that would offer Providers a sufficient

incentive (*i.e.*, profit) to participate in its Medicaid program. (Defs. Joint Mont. 56.1 stmt. ¶¶ 45, 50, 53, 64, 72.) Montana Medicaid reimbursed at a percentage discount off AWP – which Montana Medicaid knew, since at least 1995, exceeded Providers' acquisition cost. (*Id.* ¶¶ 22-24.) Montana Medicaid also knew that its AWP-based reimbursement rate exceeded Providers' acquisition cost. (*Id*. ¶¶ 63-64, 66.)

31. Montana Medicaid based its reimbursement for pharmaceutical drugs on the AWPs published by First DataBank. (Mont. Sec. Amend. Compl. at ¶ 162; The State of Montana's Motion for Partial Summary Judgment Against Certain Defendants at p. 4.)

Dated: Boston, Massachusetts
       March 22, 2007

                                               Respectfully submitted,

                                               /s/ Karen F. Green
                                               Karen F. Green, BBO # 209050
                                               WILMER CUTLER PICKERING HALE AND DORR LLP
                                               60 State Street
                                               Boston, Massachusetts 02109
                                               (617) 526-6000

                                               Jane W. Parver (admitted *pro hac vice*)
                                               Saul P. Morgenstern (admitted *pro hac vice*)
                                               Samuel Lonergan (admitted *pro hac vice*)
                                               Charles Graybow (admitted *pro hac vice*)
                                               KAYE SCHOLER LLP
                                               425 Park Avenue
                                               New York, New York 10022
                                               (212) 836-8000

                                               *Attorneys for Defendant*
                                                  *Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of March, 2007, a true and accurate copy of Local Rule 56.1 Counterstatement of Undisputed Facts in support of Novartis Pharmaceuticals Corporation's Opposition to the State of Montana's Motion for Partial Summary Judgment Against Certain Defendants was served via the Lexis-Nexis Filing System:

Dated: Boston, Massachusetts
       March 22, 2007

                                                                 /s/ Brett Budzinski