63. Another comment suggests that the final regulation be amended to substitute the term "drug product" for the term "drug" in section 19.2(a) and elsewhere in the regulation to avoid confusion with the different and more expansive meaning of the term "drug" as defined in the Federal, Food, Drug, and Cosmetic Act.

The Secretary concludes that little would be gained by substituting the term "drug product" for the term "drug" in the final regulation. The definition of "drug" in the MAC regulation incorporates by reference the term "drug product". By so doing, items which would not normally be prescribed by physicians (e.g., antiperspirants, fluoride toothpastes, etc.) but which would be included under the definition of the term "drug" under the Federal Food, Drug, and Cosmetic Act are excluded from the MAC regulation's definition of "drug".

64. One comment recommends that the definition of "multiple-source drug" in section 19.2(b) of the proposed regulation be amended in the final regulation to provide that it means a drug marketed or sold by two or more formulators or labelers, chemically equivalent, and demonstrated to be bioequivalent.

The Secretary concludes that it would be inappropriate and unnecessary to amend section 19.2(b) of the proposed regulation in the manner suggested. As noted in paragraph 89, Food and Drug Administration advice is solicited by the Pharmaceutical Reimbursement Board, prior to making any lowest-unit price determinations in accordance with section 19.5(c), for the Food and Drug Administration's assurance that all drugs to be proposed for MAC listing are both safe and effective. It is sufficient that the Board is assured by the Food and Drug Administration in accordance with section 19.5(b), as amended in the final regulation, that present Food and Drug Administration regulatory control, including its procedures for establishment of a bioequivalence requirement, assures the safety, effectiveness and quality of MAC listed drugs.

65. One comment suggests that the proposed definition of "multiple-source drug" in section 19.2(b) be amended in the final regulation to include the situation where a manufacturer markets its own drug product under both a brand name and a generic name.

The Secretary concurs. The suggested language defining a "multiple-source drug" as: "a drug marketed or sold by two or more formulators or labelers, or a drug marketed or sold by the same formulator or labeler under two or more different proprietary names or both under a proprietary name and without such a name" is added in the definition of the term "multiple-source drug" in section 19.2(d) of the final regulation.

66. A comment suggests that the definition of "provider" in section 19.2(c) of the proposed regulation be amended to read: "one who furnishes medical *or pharmaceutical services or supplies* * * *" (new language italicized). The suggestion is made to clarify that reimbursement or payment under the MAC regulation is for pharmaceutical services and supplies.

The Secretary agrees and the final regulation is so amended.

67. Many comments criticize the proposed MAC regulation as it relates to reimbursement on the basis of "actual acquisition cost", as defined in section 19.2(d) of the proposed regulation, and urge that an "actual acquisition cost" limitation not be adopted in the final regulation. Numerous reasons for this view are cited.

Comments suggest that "actual acquisition cost" is difficult, if not impossible, to determine because of deferred and cumulative discounts to providers and frequently changing sources of supply. Other comments assert that pharmacists would be required to develop extensive and complex record-keeping and invoicing procedures to accommodate a reimbursement program of this kind. These procedures, according to proponents of this view, would be more comprehensive than those ordinarily needed to conduct a professional pharmaceutical practice. Several comments suggest that a reimbursement program based on "actual acquisition cost" would necessitate additional and more frequent auditing by reimbursement programs, and therefore cause administrative costs to increase. Other comments suggest that incentives to purchase efficiently would be reduced if reimbursement were based on "actual acquisition cost" because all savings would be passed through to medical assistance programs. Several comments note that reimbursement systems based on "actual acquisition cost" have been attempted and abandoned by some State Medicaid programs because of these difficulties.

Still other comments suggest that an "actual acquisition cost" limitation be adopted in the final regulation but recommend that its definition in section 19.2(d) as proposed be modified. A number of modifications are suggested.

One comment suggests that "actual acquisition cost" be based solely on the invoice price of the drug product dispensed. Many comments recommend that "actual acquisition cost" be defined as the average wholesale price (AWP) published in specified nationally distributed drug price catalogs. Others recommend defining such cost as average wholesale price less a fixed or variable percentage related to the volume of product dispensed under a particular program. One comment suggests that "actual acquisition cost" be based on wholesale prices supplied to the Federal government by manufacturers, and another comment suggests that this cost be based on a manufacturer's price to a wholesaler plus a fixed wholesaling allowance.

Still other comments suggest replacing "actual acquisition cost" in the final regulation with some other type of reimbursement mechanism. Several comments suggest that providers ought to be reimbursed under a schedule of estimated costs. Reimbursement would be based on this schedule of costs notwithstanding a provider's actual cost. A number of these comments suggest that the schedule apply to only some specific number of the most frequently (e.g., top 500) dispensed drugs. One of these comments suggests that cost estimates to be included in the schedule be determined on a regional basis, and another comment suggests that reimbursement be based on the greater of "actual acquisition cost" and scheduled estimated cost. One comment urges that "actual acquisition cost" be replaced in the final regulation by a reimbursement system under which a drug's cost would be billed directly to the reimbursing program at the same prices charged to direct government purchasers and supplied to providers without charge.

A number of comments also suggest that an "actual acquisition cost" limitation (as defined in section 19.2(d) of the proposed regulation) should be adopted in the final regulation but only if equitable dispensing fees are mandated.

After considering these comments, the Secretary concludes that the "actual acquisition cost" limitation in the proposed regulation should be amended. The Secretary agrees that "actual acquisition cost" limitations have been difficult to administer at the State level, and that an "actual acquisition cost" limitation would therefore be difficult to adopt on a nation-wide basis at this time. The Secretary disagrees, however, that average wholesale price should be used as the basis for "actual acquisition cost" determinations. Average wholesale price is not currently determined by surveying drug marketing transactions (i.e., by determining the actual price a pharmacist pays to a manufacturer or wholesaler for a particular drug product), and thus published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers.

The Secretary believes, however, that the objectives of an "actual acquisition cost" policy (i.e., increased savings on reimbursement or payment for prescribed drugs dispensed under Federally subsidized programs) can be achieved efficiently by using acquisition cost estimates. Accordingly, the Secretary advises that the "actual acquisition cost" limitation is amended in the final regulation to base reimbursement or payment for prescribed drugs furnished under Federally subsidized health care programs, where appropriate, on "aquisition cost" plus a reasonable dispensing fee.

"Acquisition cost", as defined in section 19.2(f) of the final regulation, "means the price generally and currently paid by providers for a drug marketed or sold by a particular formulator or labeler in the package size of drug most frequently purchased by providers."

Under section 19.3(b) of the final regulation estimates of acquisition costs are to be made by each program agency. To assist program agencies in making acquisition cost estimates, the Department will make available drug price information which will cover the most frequently purchased drugs, will reflect the drug prices generally and currently paid by

HeinOnline -- 40 Fed. Reg. 32293 1975

providers, classified by providers' total dollar volume drug sales, and will be issued with sufficient frequency to be current with drug prices existing in the marketplace.

The exact method for determining acquisition cost estimates is left to the discretion of program agencies. Program agencies are expected to use all available drug price information, including the drug price information furnished to them by the Department, in making these estimates. As also provided in section 19.3 (b), estimates of acquisition costs should be consistent with any drug price information furnished to the program agency by the Department. Accordingly, the Department expects that program agencies will make their estimates of acquisition cost with as much precision as possible, consistent with drug price information furnished to them by the Department.

68. A number of comments object to the warehousing and distributional cost allowance in section 19.2(d) of the proposed regulation. Of these comments, many assert that the allowance arbitrarily discriminates among and between those providers who maintain a warehouse separate from their retail place of business and purchase drugs in bulk quantities, and those who do not.

The Secretary concludes that the proposed warehousing and distributional cost allowance should be deleted in the final regulation in light of the new "acquisition cost" limitation noted in paragraph 67 above. As "acquisition cost" is defined in section 19.2(f) of the final regulation, warehousing and distributional cost alowances may be reflected in the program agencies' estimates of the drug price generally and currently paid by providers. The Secretary therefore believes that it would be inappropriate to recognize any additional allowance for drug warehousing and distribution.

COST LIMITATION

69. As originally proposed section 19.3 (a) of the MAC regulation would limit amounts to be recognized for reimbursement or payment for prescribed drugs furnished under Federally subsidized health care programs, and for prescribed drugs purchased directly by the Department, to the cost of the drug plus a reasonable dispensing fee. Cost, as determined in accordance with section 19.3 (b) of the proposed regulation, is "actual acquisition cost" or, for each multiple-source drug for which a maximum allowable cost (MAC) has been established, the lower of (1) the MAC or (2) the actual acquisition cost.

70. A number of comments recommend that the "cost plus fee" method of reimbursement for pharmaceutical services outlined in section 19.3(a) of the proposed regulation be abandoned in the final regulation and be replaced by some other type of reimbursement mechanism for these services. Some comments suggest that reimbursement be based on a percentage of acquisition cost. Others recommend that the final regulation be amended to provide that reimbursement for pharmaceutical services shall not be greater than the "usual and customary charge" to the general public. One comment urges that reimbursement should be limited to a 50 cents claims processing cost, plus the lower of cost plus a dispensing fee, and the "usual and customary charge" to the general public.

The Secretary concludes that the "cost plus fee" method of reimbursement should not be abandoned in the final regulation because it assures that reimbursement or payment for pharmaceutical services will be based on the services actually provided by implicitly recognizing that the costs of pharmaceutical services involves two principal elements—the cost of the drug to the provider, and the provider's charge for dispensing the drug. At the same time, however, the Secretary agrees that the amount of reimbursement or payment for pharmaceutical services provided under Federally subsidized health care programs should not be greater than the amount the provider usually and customarily charges to the general public for these services.

Accordingly, the Secretary advises that section 19.3(a) is amended in the final regulation to limit the amount of reimbursement or payment to be recognized for any prescribed drug furnished under Federally subsidized health care programs to the lowest of: (1) the MAC established for the drug, if any, established in accordance with section 19.5 plus a reasonable dispensing fee; (2) the acquisition cost of the drug plus a reasonable dispensing fee; or (3) the provider's usual and customary charge to the general public for the drug. The Secretary additionally notes that, as in the proposed regulation, the new section 19.3 (a) provides that where compensation for drug dispensing is included in some other amount payable to the provider by the reimbursing or paying program agency, a separate dispensing fee will not be recognized.

71. Many comments assert that the dispensing fee provision in section 19.3(a) of the proposed regulation does not provide adequate guidelines to assure equitable reimbursement for dispensing services. Some of these comments suggest that the section be amended in the final regulation to require States periodically to review and re-evaluate dispensing fees for equity, and to be required to increase or decrease the fee should such review reveal increases or decreases in the cost of dispensing a prescription.

Other comments suggest that the Department establish minimum fees in the final regulation. One of these comments recommends that the minimum fee be set at the 90th percentile of prevailing fees in each State.

Still other comments suggest that a variable fee approach be taken in section 19.3(a) of the final regulation. One comment recommends that the fee vary on the basis of operating data submitted by providers to reimbursing programs. Another comment suggests that the final regulation mandate a variable fee based on a provider's operating costs, allowing providers to retain 50 percent of any reduction in operating costs as a part of the dispensing fee and as an incentive to reduce their costs. A few comments urge that the fee vary in the final regulation according to the level of professional services provided, such as, hours of service, free delivery, continuing postgraduate education of practitioners, maintenance of patient records, and participation in drug utilization review.

Several comments recommend that the final regulation authorize separate and additional fees for special services, and some comments recommend adjusting fees according to the cost of living index.

The Secretary concludes that because dispensing fees relate primarily to the Medicaid and Public Health Service programs, procedures pertaining to dispensing fees are appropriately included in the conforming MAC regulations of the Social and Rehabilitation Service and the Public Health Service, and not in the Department's MAC regulation. Accordingly, comments and regulatory procedures relating to dispensing fees are more fully addressed in these regulations.

The Secretary notes, with respect to comments suggesting Federally mandated minimum fees, that under existing legislation the Department may only establish upper limits on Federal reimbursement or payment for pharmacy services. The Department may not therefore mandate minimum dispensing fees.

The Secretary recognizes, however, that pharmacists may be receiving inadequate compensation for their professional services in dispensing drug products. Accordingly, the Secretary advises that the Social and Rehabilitation Service's final MAC conforming regulation is amended to require State agencies to conduct periodic surveys of the costs of dispensing drug products. In determining fees, States should review data obtained through these surveys as well as other available information to assure that established fees are equitable.

The Secretary additionally notes that Departmental assistance will be available to the reimbursing or paying program agencies for the purpose of establishing equitable dispensing fees.

72. One comment suggests that the phrase "reasonable dispensing fee" in section 19.3(a) of the proposed regulation be amended in the final regulation to read: "reasonable fee for professional services." The reasons given for the suggested language are that it is more consistent with the terminology used to describe other professional practitioner services and that it is broad enough to encompass the time when pharmacists will be compensated for professional services other than the dispensing of drug products (*i.e.*, rendering advice concerning non-use of a drug product).

The Secretary concludes that issues relating to compensation or reimbursement for professional services in cases where a drug product is not dispensed requires consideration beyond the scope of the MAC regulation. The Secretary further concludes that the term "dispensing fee" is appropriately descriptive for the purposes of reimbursement or payment of total drug costs.

73. Several comments additionally recommend that section 19.3(a) be amended

HeinOnline -- 40 Fed. Reg. 32294 1975

# EXHIBIT D

## Department of Health and Human Services

# OFFICE OF INSPECTOR GENERAL

# MEDICAID PHARMACY - ACTUAL ACQUISITION COST OF PRESCRIPTION DRUG PRODUCTS FOR BRAND NAME DRUGS

**JUNE GIBBS BROWN**
**Inspector General**

**APRIL 1997**
**A-06-96-00030**

## INTRODUCTION

At HCFA's request, the OIG, Office of Audit Services (OAS), conducted a nationwide review of pharmacy acquisition costs for drugs reimbursed under the Medicaid prescription drug program. The objective of our review was to develop an estimate of the difference between actual acquisition costs of drugs by the retail pharmacy and AWP for brand name drugs.

## BACKGROUND

Medicaid regulations provide for the reimbursement of drugs using two methods. If a drug is a multiple source (generic) drug, then reimbursement is based on the lower of the pharmacist's usual and customary charge to the general public or an upper limit amount plus a dispensing fee. The Federal upper limit amounts are established by HCFA. If a drug is a single source (brand name) drug, or a generic drug for which an upper limit amount has not been established, then the reimbursement is the lower of the pharmacist's usual and customary charge to the general public or the estimated acquisition cost (EAC) plus a reasonable dispensing fee. The State agencies are responsible for determining the EAC and the dispensing fee.

The EAC for most States is calculated by using AWP for a drug less a discount percentage. The AWP is the price assigned to the drug by its manufacturer and is listed in either the **Red Book**, **Medispan,** or the **Blue Book**--publications universally used in the pharmaceutical industry. Prior to 1984, most States used 100 percent of AWP for reimbursement of acquisition costs. However, OIG issued a report in 1984 which stated that, on average, pharmacies purchased drugs for 15.9 percent below AWP. In 1989, OIG issued a follow-up report which concluded that pharmacies were purchasing drugs at discounts of 15.5 percent below AWP. Both the 1984 and 1989 reports combined brand name and generic drugs in calculating the percentage discounts and included a comparison of 3,469 and 4,723 purchases, respectively.

In 1989, HCFA issued a revision to the State Medicaid Manual which pointed out that a preponderance of evidence demonstrated that AWP overstated prices that pharmacies actually paid for drugs by as much as 10 to 20 percent. The Manual issuance further provided that, absent valid documentation to the contrary, it would not be acceptable for a State to make reimbursements using AWP without a significant discount.

In November 1990, the Omnibus Budget Reconciliation Act of 1990 was passed which placed a 4-year moratorium on changes to States' reimbursement policies. The moratorium expired on December 31, 1994 and HCFA requested that we, once again, determine the difference between AWP and actual pharmacy acquisition cost.

An article in the June 10, 1996 issue of **Barron's** entitled, "*Hooked on Drugs,*" focused additional attention on AWP and its relationship to actual acquisition cost. **Barron's** compared about 300 dose forms of the top 20 Medicare drugs and concluded that the true cost was 10 to 20 percent below AWP for brand name drugs and 60 to 85 percent below AWP for generic

# EXHIBIT E

Case 1:01-cv-12257-PBS Document 3636-6 Filed 02/08/2007 Page 2 of 3

federal register

FRIDAY, AUGUST 15, 1975

PART III:

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

## Social and Rehabilitation Service

■

# MEDICAL ASSISTANCE PROGRAMS

## Limits on Payments for Drugs

HeinOnline -- 40 Fed. Reg. 34515 1975

Case 1:01-cv-12257-PBS Document 3636-6 Filed 02/08/2007 Page 3 of 3

## Title 45—Public Welfare

### CHAPTER II—SOCIAL AND REHABILITATION SERVICE (ASSISTANCE PROGRAMS), DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

### PART 250—ADMINISTRATION OF MEDICAL ASSISTANCE PROGRAMS

#### Limits on Payments for Drugs

Notice of proposed rule making was published in the FEDERAL REGISTER on November 27, 1974 (39 FR 41480), amending the provisions governing the upper limit for payment for prescribed drugs in the Medicaid program. The notice:

(1) Specified that, for a list of selected multiple source drugs, cost would be limited to the lower of maximum allowable cost (MAC) established by a Pharmaceutical Board appointed by the Secretary or actual acquisition cost plus 25 percent of the differential between actual acquisition cost and the established maximum allowable cost;

(2) Provided that the upper limit would be based on cost plus a dispensing fee, with cost specified as actual acquisition cost (AAC); and

(3) Clarified the use of a dispensing fee for drugs furnished recipients of medical assistance in long-term care facilities by pharmacies employing a unit dose system.

The proposed requirements conformed to the November 15, 1974 proposed regulations governing all departmental programs (39 FR 40302).

The purpose of these regulations is to prescribe an upper limit on payments in the Medicaid (title XIX) program for selected multiple-source prescribed drugs (except where otherwise specified in writing by a physician) and to require that payments for other drugs prescribed under title XIX be determined on the basis of acquisition cost as estimated by the State plus a dispensing fee, or the provider's usual and customary charge to the general public, whichever is lower. The basis of these regulations is the Secretary's strong belief that such upper limits will result in substantial savings in the title XIX program while continuing to assure that high quality drugs are available to title XIX recipients.

Comments were received from 150 respondents. The following is a listing of the major areas of expressions of opinion and the Department's responses:

#### DISPENSING FEE

Comment: The regulations should require dispensing fee indexing for inflation (or regular updating). (5 hospitals, 16 pharmacy associations, 11 individual pharmacists and 2 State Medicaid agencies); they should set the fee at the 90th percentile (2 pharmacy associations); payment levels of other third-party payors should not be used as a criterion (5 pharmacy associations); the dispensing fee should not be lower than that paid by other State, Federal, and third-party reimbursement programs unless the State can provide data to support a lower fee (1 pharmacy association).

Response: The Secretary has no authority to establish a floor for State reimbursement of drugs. The regulations can only specify the upper limit which a State may pay.

Comment: The regulations will require an increase in dispensing fees if the average wholesale price is discarded for AAC or MAC. (9 pharmacy associations and 2 State Medicaid agencies).

Response: The regulations recommend the use of pharmacy operational data in establishing a dispensing fee. The regulations also require the States to conduct periodic surveys of pharmacy operational data. It is believed that such surveys will contribute to the efficient administration of State plans and it is further expected that States will use these surveys to assure equitable fees. It is the Department's intention to work closely with States in furnishing guidance and encouragement toward the objective of having the cost plus a dispensing fee represent equitable reimbursement.

Comment: The fee should be same for legend and non-legend drugs (1 hospital and 2 pharmacy associations).

Response: The Secretary has no authority to prohibit States from varying fees according to legend and non-legend drugs. This is a State decision.

Comment: The term "Professional service fee" should be used instead of "dispensing fee" and a wider role given professional pharmacists. (2 hospitals, 3 pharmacy associations, and 2 individual pharmacists).

Response: The term "dispensing fee" includes "professional services" and other items, thus it is a broader concept than would be indicated by using the term "professional services." The Department advocates a wide role for the pharmacist as a professional. However, the extent to which this is done depends upon State law.

Comment: Use of a variable dispensing fee concept was opposed by some (6 pharmacy associations, 4 State Medicaid agencies, 4 individual pharmacists) and advocated by others (7 State Medicaid agencies and 6 individual pharmacists).

Response: The method for determining the dispensing fee, fixed or variable, is optional with the State Medicaid agency. SRS regulations encourage use of a variable dispensing fee by providing guidance on elements to be considered in establishing such fees.

Comment: Respondents request more guidance or technical assistance in setting of a dispensing fee. (5 pharmacy associations, 3 State Medicaid agencies, and 11 individual pharmacists).

Response: Regulations contain advice and guidance on elements of cost to be considered in the establishment of dispensing fees. In addition, more detailed guides will be issued after the final policy is published.

Comment: The setting of a variable dispensing fee will increase State administrative or audit costs, and mechanized claims processing costs. (13 State Medicaid agencies and 3 individual pharmacies).

Response: The regulations do not mandate a variable fee. This is optional with States. Those States which now employ a variable fee have reported a very modest administrative cost attributable to the variable fee.

Comment: The dispensing fee should include an additional fee for claims processing and special services (2 State Medicaid agencies and 3 individual pharmacies).

Response: This is unnecessary since billing costs as well as other overhead costs are included in the computation of the dipensing fee.

Comment: The method of determining a dispensing fee should be based on percentage mark-up rather than on a fixed fee basis. (1 State Medicaid agency).

Response: This is not acceptable since a percentage mark-up would be an incentive to use higher cost drug items and thus it would run counter to the objectives of the regulations. A GAO study in 1966 strongly recommended against this method.

Comment: The regulations should allow a dispensing fee for dispensing physicians (1 individual pharmacist).

Response: This is an area of State discretion. Medicaid guidelines recommend that payment for drugs dispensed by physicians be limited to not more than the cost of the drug. Physicians are professionals who gain their livelihood from the practice of medicine. Accordingly, it may be held that they should not also profit from a pharmacy practice, particularly when the drugs they sell are also prescribed by them.

Comment: Large chains will set dispensing fee patterns. (2 individual pharmacists).

Response: States are responsible for setting dispensing fees. The dispensing fee should be ascertained by analysis of pharmacy operational data which include such components as overhead, professional services, and profit. Thus, States may recognize differences in size of operation by setting variable fees.

#### UNIT DOSE SYSTEM

Comment: The unit dose system is expensive. (1 hospital, 4 State Medicaid agencies and 6 individual pharmacists).

Response: Dollar savings result from paying only for drugs which are actually consumed. Savings also result from reduced personnel costs in long-term care facilities but these may be offset to some extent by the relative increase in the dispensing cost paid to the pharmacy. In any case the Department is not mandating the use of a unit dose system, but is merely specifying the reimbursement limit where such a method is used.

Comment: Clarification is needed to define the quantity involved in a unit dose system (1 hospital, 2 drug manufacturers, 1 pharmacy association) and State agencies should be given technical assistance in reimbursement for a unit dose system (2 State Medicaid agencies).

Response: Detailed guides will be issued on the unit dose system after the final policy is published and technical

HeinOnline -- 40 Fed. Reg. 34516 1975

# EXHIBIT F

28648 Federal Register / Vol. 52, No. 147 / Friday, July 31, 1987 / Rules and Regulations

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Care Financing Administration**

**42 CFR Parts 413, 430 and 447**

**45 CFR Parts 1 and 19**

**[BERC-356-F]**

**Medicare and Medicaid Programs; Limits on Payments for Drugs**

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule.

**SUMMARY:** This rule eliminates current Departmental procedures for setting limits on payments for drugs supplied under certain Federal health programs; and revises Medicaid rules concerning the methodology for determining upper limits for drug reimbursement. This rule enables the Federal and State governments to take advantage of savings that are currently available in the marketplace for multiple source drugs. It also maintains State flexibility in the administration of the Medicaid program.

**EFFECTIVE DATE:** The regulations are effective October 29, 1987. State agencies have 90 days from the publication date of this regulation until the effective date in which to submit a State plan amendment and the required attachment.

**FOR FURTHER INFORMATION CONTACT:** Anthony Lovecchio, (301) 594-4010.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### *A. Existing System*

In 1976, the Department implemented drug reimbursement rules at 45 CFR Part 19 under the authority of statutes pertaining to upper payment limits for Medicaid and other programs. The authority to set an upper payment limit for services available under the Medicaid program is provided under section 1902(a)(30)(A) of the Social Security Act.

The Department rules are intended to ensure that the Federal government acts as a prudent buyer of drugs under certain Federal health programs. The rules set limits on payments for drugs supplied under Medicaid and other programs. Of the Federal programs involved, these rules have the greatest impact on the Medicaid program. Specifically, these regulations provide that the amount the Department recognizes for drug reimbursement or payment purposes will not exceed the lowest of—

- The maximum allowable cost (MAC) of the drug, as established by HCFA's Pharmaceutical Reimbursement Board for certain multiple source drugs (generic drugs), plus a reasonable dispensing fee;
- The estimated acquisition cost (EAC) of the drug (the price generally and currently paid by providers for a particular drug in the package size most frequently purchased by providers), as determined by the program agency, plus a reasonable dispensing fee; or
- The provider's usual and customary charge to the public for the drug.

The regulations provide that the MAC will not apply if the prescriber has certified in his own handwriting that a specific brand of that drug is medically necessary for the patient.

The regulations at 45 CFR Part 19 also establish within HCFA a Pharmaceutical Reimbursement Board (PRB). The PRB identifies multiple source drugs for which significant amounts of Federal funds are or may be expended and is responsible for establishing the MAC for those drugs. The process by which a MAC is established includes PRB consultation with the Food and Drug Administration (FDA), opportunity for public comment on a proposed notice of the MAC limit published in the **Federal Register**, a public hearing, and publication of the final MAC determination in the **Federal Register**. The PRB sets the MAC at the lowest unit price at which the drug is widely and consistently available. In addition to limiting the level of payment for multiple source drugs, the MAC program tends to promote substitution of lower cost (generic) drug products for brand-name drugs, since the latter are frequently available only at prices higher than the MAC limits.

Similar to the Department regulations (45 CFR Part 19) that set limits to Federal payments for drugs are the Medicaid regulations at 42 CFR 447.331 through 447.334. The regulations at §§ 447.331 through 447.334 limit the amounts that State Medicaid agencies may claim for Federal matching purposes under the Medicaid program. These limits are the same as those specified in 45 CFR Part 19. Thus, the Medicaid agency must claim no more for each drug than the lowest of—

- The MAC of the drug, as established by the HCFA PRB for certain multiple source drugs, plus a reasonable dispensing fee;
- The EAC of the drug (that is, the Medicaid State agency's best estimate of the price generally paid by providers) plus a reasonable dispensing fee; or
- The provider's usual and customary charge to the public for the drug.

The Medicaid regulations also provide that the MAC will not apply if the prescriber has certified in his own handwriting that a certain brand of that drug is medically necessary for the patient.

### *B. Problems and Concerns*

In 1983, a Departmental Task Force was established to review the Department's drug reimbursement regulations at 45 CFR Part 19. Specific concerns presented to the Task Force included—

- The quality of multiple source drugs;
- The interpretation of "widely and consistently available" as related to the process used by the PRB in setting MAC limits;
- The adequacy of drug reimbursement; and
- Problems in administering the MAC and EAC programs (for example, the short time that the Medicaid agencies have to implement MAC limits once they become effective, and the lack of a mechanism for raising the MAC limits quickly when necessary due to changes in the market).

We agree that the process of approving a MAC for a specific drug is lengthy. This has been of concern particularly since the passage of the Drug Price Competition and Patent Term Extension Act of 1984 (Pub. L. 98-417). This law streamlines the FDA approval process for certain drugs. The result of this law is that therapeutically equivalent (generic) drugs will be coming into the marketplace more quickly than in the past. As evidenced by the current MAC program, we are interested in encouraging the use of therapeutically equivalent drugs. We would like to adopt a Medicaid drug policy that would allow us promptly to adjust payment upper limits to reflect the availability of new drug equivalents as they enter the marketplace.

Based on the concerns addressed above and the Department's desire to take advantage of savings that are currently available in the marketplace for multiple source drugs, we published a Notice of Proposed Rulemaking (NPRM) on August 19, 1986 (51 FR 29560). The NPRM announced proposed revisions to our procedures for establishing upper limits for drug payments and provided a 30-day public comment period. On September 18, 1986, we published a second notice in the **Federal Register** (51 FR 33086) announcing an extension of the comment period, the availability of new data to anyone wishing to perform an

[ ]n lower cost therapeutically equivalent drugs.

*B. State Plans*

*Comment:* Many commenters thought that if a State agency wished to use an alternative payment system to the one that would be established as the upper limit standard, the agency would have to secure a program waiver under the provisions of section 1915 of the Act. The perception was that this process was very rigorous and entailed considerable State efforts for justifying the waiver.

*Response:* It was our intent that, regardless of whether a State agency follows the approach established by HCFA or uses an alternative drug payment system, a State agency would not be required to obtain a program waiver The NPRM proposed a process under which a State agency would be free to establish any payment system it would choose (except when freedom of choice or provider contracting is involved which would then require a waiver). The State agency must describe the methodology in its State plan which is subject to the usual State plan approval process.

Because the proposed language regarding the State plan approval process caused some confusion, we are revising it to make clear that drug payment methodologies must conform to all State plan requirements as must any other service. Under this final rule, we are clarifying that all State agencies are required to: (1) Describe comprehensively the agency's payment methodology for prescription drugs in its State plan; (2) make two findings, one for therapeutically equivalent multiple source drugs and one for all other drugs, through mathematical computation, analysis and comparison to determine that the payment levels under its payment methodology will not exceed the payment levels that would result from the application of the system promulgated by HCFA as the upper limit; (3) make an assurance to us that it has made such findings; and (4) maintain and make available to HCFA, upon request, documentation to support the finding.

The agency's assurance will serve as the basis for the approval of the State plan. The agency findings will be monitored through State assessments and other evaluations or auditing procedures to review the State documentation underlying the assurance without the need for specialized annual reporting by the States. Consistent with other aspects of the Medicaid program, if HCFA finds a problem with a State's assurance, HCFA can request the State to provide data to support its assurance and, if appropriate, HCFA will disallow FFP or consider whether the State ought to be subject to the statute's compliance procedures.

*C. Implementation of PhIP or CIP*

*Comment:* Many commenters expressed confusion or raised questions about the absence of operational details for PhIP and CIP. States were particularly concerned about the significant changes that would occur in current operations (for example, data collection, programming modifications, payment screens, monitoring price changes) and accompanying costs, to implement PhIP or CIP.

*Response:* We deliberately did not include specific technical details in the NPRM because the objective of the proposals was to establish a methodology for setting a standard for Medicaid upper payment limits for purposes of FFP. We did not intend to set forth or describe the intricate details of a particular payment system. Nonetheless, we did set forth a sufficient amount of technical detail to allow commenters to identify potential problems and solutions, and we took these into account in reaching the final decision. We do not intend to impose unnecessary or expensive operational requirements on States. Rather, it was our intent to permit State agencies to exercise maximum flexibility in designing a payment system subject only to the maximum payment levels established by this regulation.

*D. Availability and Quality of Drugs*

*Comment:* Several commenters wrote requesting that we demonstrate that the availability and quality of drugs would not be adversely affected under the proposed Medicaid drug reform alternatives.

*Response:* It is our belief that the application of the 150 percent upper limit standard that we are adopting for certain multiple source drugs will yield a payment level that will be great enough to assure widespread availability of drug products. Furthermore, because we are implementing aggregate upper limit standards on the State's Medicaid payments (expenditures) for drugs, a State will have the ability to make payment at levels above the specific standard for certain drugs, provided that the agency makes the payment at levels below the specific standard for other drug products. This added State flexibility will virtually guarantee widespread availability of all affected drugs provided that the State agency can determine that in the aggregate for those drugs, the State achieved savings equal to or greater than the HCFA upper limit standard.

In reference to the quality of those multiple source drugs to which we will apply the 150 percent markup, we believe that the FDA assurance that all of the formulations it has approved have been evaluated as therapeutically equivalent in the most current edition of their publication "Approved Drug Products with Therapeutic Equivalence Evaluations" is adequate.

*E. Additional Compendia*

*Comment:* One commenter requested inclusion of its publication, which is a national compendium of drug cost information, among the publications that will be used in determining the upper limit payment for multiple source drugs.

*Response:* We agree with the commenter that publications other than the *Red Book* and *Blue Book*, which were the only sources we proposed to use, can be used Thus, we are revising the regulations. The final rules will state that in determining the upper limit payment levels for multiple source drugs, we will select from all available national compendia of drug cost information that reflect drug prices and availability on a national level. As we publish these upper limits in State Medicaid program issuances, we will identify the source of our drug price information. We periodically will publish these upper limits in our *Medicaid Manual* to assure comprehensive knowledge of upper limits for multiple source drugs and to reduce the need for State agencies to do independent research and computation

*F. Dispensing Fees*

*Comment:* Several commenters suggested that either we delete the requirement in current regulations for State surveys of dispensing fee costs or require State agencies to update these fees in a periodic manner.

*Response.* In the interest of State flexibility and to avoid imposing unnecessary Federal procedural requirements as to how State agencies establish such fees, we are deleting the current requirement at § 447.333 regarding dispensing fees. State agencies will still be required to determine reasonable dispensing fees or, if dispensing fees are not paid separarely, to impute an amount equivalent to a reasonable dispensing fee, in order to include those amounts in the calculations and comparisons they make to meet the upper limit standard for FFP. We expect that most States will continue their present activities to establish a reasonable dispensing fee

Case 1:01-cv-12257-PBS Document 3830-7 Filed 02/28/2007 Page 4 of 7

level and will document these and any new activities in their State plan. Such activities could include: (1) Audits and surveys of pharmacy operational costs; (2) compilation of data regarding professional salaries and fees; and, (3) analysis of compiled data regarding pharmacy overhead costs, profits, etc.

*G. Use of "Smart Cards" and "Vouchers"*

*Comment:* Several commenters suggested that HCFA adopt the use of a "smart card" or "voucher" payment system for payment of prescription drug claims. These commenters indicated that these systems would save significant amounts of expenditures.

*Response:* As we noted in the preamble to the NPRM, the use of a voucher or bank draft payment (smart card) system by State agencies was not one of the issues addressed in the proposal to establish upper payment limits. The methodology of determining an upper limit for prescription drug payments was the subject of the NPRM, not the claims payment process. The use of a voucher or "smart card" claims payment system is something which State agencies may do at present. If State agencies determine that such a system to process claims is workable, efficient and more cost-effective than their current system, and that system meets Medicaid program requirements, then, indeed, we encourage the individual agencies to adopt such a claims payment system.

*H. Physician's Override*

*Comment:* Several commenters recommended that we delete the physician override requirement while one State agency recommended that we strengthen the requirement.

*Response:* We are retaining the physician override requirement as proposed in the NPRM. This requirement is a safeguard that assures that the physician can select the drug that is medically necessary and best suited for his or her patient. This means that the upper limits established for specific (listed) multiple source drugs will not apply if the prescribing physician certifies that a brand name drug is medically necessary. These payments will not be included in the calculation for compliance with the upper limit for multiple source drugs. Instead, in these instances, the upper limit for all other (non-listed) drugs will apply. As under current regulations, a State agency may choose to elaborate and be more stringent regarding this standard if it chooses.

*I. Acceptable Upper Limit Assurance*

*Comment:* Several State agencies asked for guidance in making annual findings regarding the upper limit determinations and in deciding what constitutes an adequate assurance regarding the upper limit determinations when proposing State plan amendments.

*Response:* We are requiring in the final rule two findings. We are requiring an annual finding relating specifically to the multiple source drugs which HCFA will identify through Medicaid program issuances.

We also are requiring a separate triennial finding relating to the category of "other drugs".

The finding for the listed multiple source drugs will confirm that the agency's payment rates for these drugs do not exceed the aggregate payment levels determined by applying the upper limit formula plus a dispensing fee. The finding for the category of "other drugs" will confirm that a State agency's aggregate expenditures for these drugs under their chosen payment methodology, will not exceed aggregate payment under the EAC criteria that are retained for this rule. (Under this rule, the EAC criteria are applied as an upper limit on an aggregate basis rather than on a prescription by prescription basis.) The findings for both the listed multiple source drugs or "other drugs" can be supported by any documented acceptable method of sampling, imputation and statistical analysis that the State agency uses in making its determination. The State agency will then make an assurance to HCFA that it has made the required findings. That assurance to HCFA will constitute a presumption of validity of the findings and will serve as the basis for approval of the State plan.

*J. Phase-In Upper Limit Standard for Multiple Source Drugs*

*Comment:* One State agency recommended that the upper limit standard for multiple source drugs consist of between 15–20 specific limits established at 60 day intervals. The agency is concerned about having sufficient lead-time for wholesalers and pharmacies to adjust inventories to comply with the upper limit standard.

*Response.* We believe that we are providing an adequate period of time for these adjustments to occur. These regulations are effective October 29, 1987. This allows State agencies 90 days from the date of publication to the effective date of these final regulations in which to submit their plan amendment and required attachment.

*K. Impact Analysis*

*Comment:* Several commenters criticized us for not providing sufficient detail in our impact analysis to permit a comparison of the relative effects of the three alternatives presented in the NPRM. In particular, one commenter stated that we failed to support our contentions that all three proposals would reduce "disruptions" of drugs to retail outlets and achieve substantial savings through encouraging the use of low cost generic substitutions.

*Response:* As we explain in section V. of this preamble, the combination of having to analyze an extremely complex industry with very little data makes it difficult to formulate a comprehensive empirically grounded impact analysis. Based on the information available to us at the time of the NPRM, we did not expect any of the three proposals offered in the NPRM to have an annual effect on the economy of $100 million or more. Thus, we were not required under Executive Order 12291 to propose an impact analysis. Yet, because we were concerned, at the time the NPRM was published, that one or more of the proposals might have an annual effect of $100 million or more, and because we expected our proposals to generate considerable public debate, we voluntarily prepared an analysis that met the criteria of the Executive Order.

*Comment:* One commenter claimed that in our impact analysis, we failed to evaluate the effects of our proposals on the research and development of new drugs.

*Response:* It is far from clear to us what impact our proposals would have on the research and development of new drugs. These proposals are attempts on our part to take advantage of the competitive forces at work in the marketplace.

Companies that develop new drugs are provided protection under patent from competition for a certain period of time during which they may charge prices high enough, presumably, to recover their development costs associated with the drug in question or to subsidize the research and development costs of other drugs. Once the patent expires, however, other pharmaceutical firms may copy the drug, and once approved by the FDA, they may market the same drug and set their own price. Our proposals were designed to take advantage of this competition among drugs that are no longer under patent and not intended to prevent the development of new drugs. We were merely seeking to participate in the market as prudent buyers.

*L. Application to Medicare*

*Comment:* One commenter specifically requested clarification that the alternative selected by the Department for the final rule would not apply to the Medicare program and that hospitals and hospital-based skilled nursing facilities would be exempt under Medicare.

*Response:* As we stated in the NPRM, we are deleting the references to the MAC program contained in the Medicare regulations concerning allowable costs for drugs. (In the NPRM, we noted that we would delete § 405 433. However, that regulation has since been redesignated and is now located at § 413.110. Thus, in this final rule, we are deleting § 413.110.) The upper limits for drugs contained in this final rule pertain only to the Medicaid program. They do not apply to hospitals and hospital-based skilled nursing facilities under Medicare.

IV. Provisions of the Final Regulations

In this final rule, we have attempted to: (1) Respond to the public comments on the NPRM; (2) provide maximum flexibility to the States in their administration of the Medicaid program; (3) provide responsible, but not burdensome Federal oversight of the Medicaid program; and (4) take advantage of savings resulting from the availability of less costly, but safe and effective, generic drug substitutes.

To accomplish this, we are drawing from various aspects of the proposals. The Federal upper limit standard we are adopting for certain multiple source drugs is based on the application of a specific formula similar to that described in the NPRM. The upper limit for other drugs is similar to that in the NPRM in that it retains the EAC limits as the upper limit standard that State agencies must meet. However, this standard is applied on an aggregate rather than on a prescription specific basis.

We want to emphasize that as a result of our adopting aggregate limits as the upper limit standards, State agencies are encouraged to exercise maximum State flexibility in establishing their own payment methodologies. We do not intend that our adoption of the formula approach to set limits for multiple source drugs be construed as an indicator of the Federally preferred payment system. The use of the formula approach is primarily due to the straight-forward application and administrative ease in setting upper limits. We encourage State agencies to establish any program that will substitute lower-priced alternatives for drugs. We hope that the State agencies will be innovative in these programs and find ways to assure the availability at reasonable prices of multiple-source drugs. One way they could do this would be to encourage retail pharmacy participation in the Medicaid program by permitting them to retain profits from the sale of listed drugs to Medicaid recipients. Other alternative payment systems could include, for example, contracting on a competitive basis for pharmaceutical services with selected pharmacies to which recipients may go for drugs without incurring a copayment or a system which entails charge screens and/or mandatory discounts. Additionally, State agencies may initiate or retain already existing so-called "mini-MAC" programs, which they have established on specific drugs either at levels lower than those established under the current Federal MAC limits or on drugs not now covered by MAC limits. This system of aggregate upper limits will allow State agencies to alter payment rates for specific listed drugs without first having to obtain permission from HCFA. The agencies then will be able to respond rapidly to sudden price fluctuations, which may threaten the supply of specific drugs on the HCFA list, without having to pursue a cumbersome approval process. A final advantage of the aggregate limit methodology is the ease of administration at the Federal level and the lack of administrative burden on State programs.

*A. Multiple Source Drugs*

The Federal upper limit standard that we have adopted for certain multiple source drugs is based on an aggregate payment amount equal to an amount that includes the ingredient cost of the drug calculated according to the formula described below and a reasonable dispensing fee. HCFA will determine to which drugs the formula will be applied. The listing of these drugs and any revisions to the list will be provided to State agencies through Medicaid program issuances on a timely, periodic basis (possibly semi-annually). The effective date of the new prices will be subsequent to the issuance of the listing. As did the NPRM, the final rule will specify that the drugs to which this formula will be applied must have been evaluated as therapeutically equivalent by the FDA. Similar to the NPRM, the final rule will specify that at least three suppliers list the drug in a national compendium. The NPRM stated that three suppliers would advertise the drug in the *Red Book* or *Blue Book*.

The formula to be used in calculating the upper limit of payment for certain multiple source drugs will be 150 percent of the least costly therapeutic equivalent that can be purchased by pharmacists in quantities of 100 tablets or capsules (or if the drug is not commonly available in quantities of 100, the package size commonly listed), or in the case of liquids, the commonly listed size. As we stated in the NPRM, we chose the markup of 150 percent in order to meet the following two objectives: (1) That the markup be high enough to assure that pharmacists can normally obtain and stock an equivalent product without losing money on acquisition costs of incurring the expense of departure from normal purchasing channels, and (2) that the markup not be so high as to cost the Medicaid program unnecessary money. In other words, the 150 percent is intended to balance the interests of both pharmacists and the government in achieving efficiency, economy and quality of care as specified in section 1902(a)(30) of the Act.

In the NPRM, we stated that we would use the *Red Book* or *Blue Book* to determine the least costly therapeutic equivalent that can be purchased by pharmacists. In this final rule, however, we are deleting the reference to these specific sources and are specifying that we will publish and use the list of all current editions (or updates) of acceptable published drug compendia available for sale nationally. Although State agencies will need to calculate or impute a dispensing fee (if they do not pay for the dispensing fee separately) in order to determine if they meet the upper limit standard for certain multiple source drugs, we are deleting the current § 447.333 that recommends how agencies are to establish the dispensing fee.

As originally proposed under all options, this final rule will provide that if a physician certifies that a brand name drug is medically necessary, the upper limit for payment based on the formula will not apply. The upper limit for payment of "other drugs" (discussed in section IV.B ) will apply.

In the future, the formula approach to setting an upper limit will be evaluated. We are aware of several State agencies now in the process of negotiating competitive bids for discounts or rebates from drug manufacturers and suppliers. Other agencies are considering selective contracting with providers or pharmacies (preferred provider organizations). Additionally, the interaction of competitive pricing and creative marketing may cause dynamics in the market that would necessitate a revision of our policy. Thus, we will monitor the implementation of this

Case 1:01-cv-12257-PBS Document 3836-7 Filed 02/28/2007 Page 6 of 7

policy, as well as the various payment systems used by State agencies and the dynamics of the marketplace, in order to make timely revisions to the policy for Medicaid upper limits for drug payments.

*B. Other Drugs*

In this final rule, we specify that the agency payment for certified brand name drugs and drugs other than multiple source drugs for which a specific limit has been established must not exceed, in the aggregate, the level of payment calculated by applying the lower of (1) the EAC plus a dispensing fee; or (2) the provider's usual and customary charges to the general public.

Under these rules, the Federal requirement for States to use the EAC method of payment will be eliminated. However, because the rule merely establishes an upper limit concept and does not describe the specific methodology for payment, State agencies may continue their practice of establishing EACs for the ingredient costs and adding to it a dispensing fee. Such practices will be acceptable, as will a system of establishing charge/payment screens based on Statewide or regional customary and usual prices.

The State's findings in regard to whether the Statewide aggregate upper limit test is met must demonstrate that aggregate payments do not exceed payment as calculated under the EAC principles.

*C. State Plan Requirements, Findings and Assurances*

We are revising the proposed language concerning State agency assurances regarding drug payment systems. We are clarifying that all agencies, regardless of the payment system used, will be required, in accordance with § 447.333(b)(1) of this final rule, to make two separate and distinct findings that expenditures for listed multiple source drugs on the one hand, and for all other drugs on the other, under their payment methodology will not exceed the upper limits established by HCFA. All State agencies will be required to maintain the supporting documentation and to provide HCFA with an assurance that they have made the required findings.

We note that we also have changed the requirements for findings and assurances to differ with regard to each drug category. We will require an annual finding for multiple source drugs and a triennial finding for all other drugs. The findings for multiple source drugs will be required at least annually because the State agencies efforts will be directed primarily at comparing State payments, in the aggregate, to the maximum ingredient costs published by HCFA. However, for all other drugs, State agencies will first have to determine the estimated acquisition costs before making comparisons on the aggregate basis. It is because of the various activities States will need to pursue in order to make the findings for all other drugs that we are requiring that this be done at least every three years. We anticipate that the triennial findings and assurances for all other drugs will lessen the administrative/reporting burdens on State agencies and maintain a level of accountability for purposes of FFP.

Apart from the initial plan submission, and subsequent assurances, an agency, which has determined that it is adopting a new methodology or making significant changes in its payment rates or to its existing system, will be required to provide HCFA with the requisite State plan amendments and the assurance that it has made the necessary findings.

*D. Other Changes*

As proposed, this final rule will remove the Departmental rules at 45 CFR Part 19 that limit drug reimbursement under certain Federal health programs. These rules have little impact upon programs other than Medicaid, and the Medicaid regulations concerning upper limits for drug payments are being revised under this final rule. We also are deleting cross references to 45 CFR Part 19 contained in 42 CFR 430.0(b)(2)(ii) and 45 CFR 1.2, and the reference to MAC limits in 42 CFR 433.110.

## V. Regulatory Impact Statement

*A. Introduction*

Executive Order (E.O.) 12291 requires us to prepare and publish a final regulatory impact analysis for any final regulation that meets one of the E.O. criteria for a "major rule"; that is, that would be likely to result in: An annual effect on the the economy of $100 million or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets.

The local character of retail pharmaceutical markets, the large number of parties that participate in those markets, the variety of products sold, the numerous distribution channels through which these products flow, and a general lack of data adequately describing these various aspects of the market all make it extremely difficult for us to determine how and to what degree this final rule will affect market participants. For these reasons, we cannot say with any degree of certainty whether this rule will meet or exceed the Executive Order's criteria for a major rule. However, because of its controversial nature, we are providing a regulatory impact analysis.

In addition, we generally prepare a final regulatory flexibility analysis that is consistent with the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 through 612), unless the Secretary certifies that a final regulation will not have a significant economic impact on a substantial number of small entities. Although the most direct effect of this rule will be on States, States are not small entities under the RFA. The economic size of Medicaid participating retail pharmacies range from large national corporate chains to small independent single-owner outlets. Yet because retail pharmaceutical markets appear to be largely local in nature, retail pharmacies operate in these markets as small entities. For purposes of the RFA, therefore, we consider pharmacies to be small entities. Other entities that may be affected by this final rule, for example, wholesale distributors and manufacturers, also may qualify as small entities under the RFA, but are more likely to participate in regional or national markets, and thus, are more likely to take on the characteristics of large firms. For this reason, plus the fact that this rule is not explicitly directed at these other entities or expected to affect them directly, we are not considering them as small entities for purposes of this rule.

*B. Objectives*

Through promulgation of this final rule, we hope to achieve several objectives we view as essential for providing acceptable care to Medicaid recipients and for increasing the efficiency with which pharmaceutical products and services are delivered to recipients. These objectives are to:

• Establish simple, administrable methods of applying two separate and distinct upper limits on State Medicaid expenditures: one for certain therapeutically equivalent multiple source drugs, and one for all other drugs.

• Promote wider and more efficient distribution of pharmaceutical products and services, and avoid potential disruptions in the supply of drug

products that appear to be a major drawback of the present method of reimbursing retail pharmacists under the MAC program.

• Conserve scarce Federal and State resources through encouraging the more judicious purchasing of pharmaceuticals on behalf of Medicaid recipients, thus achieving some budget savings, while preserving or enhancing current levels of service.

In pursuing these objectives, we also wish to give State agencies the incentive to encourage prudent purchasing practices on the part of retail pharmacists and foster price competition among wholesale suppliers and manufacturers of multiple source drugs.

*C. Impact on State Agencies*

The aggregate payment limit on HCFA listed drugs as well as the general limit on sole-source and non-listed multiple source drugs, afford State agencies wide latitude in developing their own payment schemes to suit local conditions and unusual circumstances that may arise from time to time. For example, State agencies may retain already existing so called "mini-MAC" programs, which they have established on specific drugs either at levels lower than those established under the Federal MAC limits or on drugs not now covered by MAC limits. Also, under the aggregate limits, State agencies are free to experiment with alternative payment systems, for example, letting contracts on a competitive basis for pharmaceutical services with selected pharmacies to which recipients may go for drugs without incurring a copayment, or systems identical or similar to PhIP or CIP. This system will also allow States to alter payment rates for specific listed drugs without first having to obtain permission from HCFA. States then will be able to respond rapidly to sudden price fluctuations which may threaten the supply of specific drugs on the HCFA list without having to pursue a cumbersome approval process. A final advantage of the aggregate limit methodology is ease of administration at the Federal level and the lack of administrative burden on State programs.

*D. Small Entities Affected*

The drug industry is highly complex and multi-layered, with a variety of manufacturing, distribution, and retail sales arrangements that not only differ according to geographic location, but also vary by product. Further, under the Medicaid program, the immediate payor (that is, the State) is distinct from the purchaser (usually the recipient) or the orderer (the physician), both of whom are key decision makers for each specific purchase of drugs. These rules will directly affect only the State, and even then, these rules do not control the option available to the State, but establish limits on the extent that we will share in the State's overall expenditures for covered drugs. It is each State's actions, taken in some measure in response to these upper limits, that will in turn affect other parties.

As a result, it is difficult for us to clearly identify the entities affected by these regulations, and nearly impossible to fix the magnitude of any impact. At best, we can only identify broad categories of small entities that may be affected in some fashion by this rule, such as retail drug outlets and pharmacists, wholesale drug distributors, and manufacturers.

Through requiring States to establish programs to make payments which reflect the availability of lower cost alternatives when three or more therapeutically equivalent generic alternatives are available, this rule will affect the behavior of retail pharmacists who receive Medicaid payments. As a result of the response of pharmacists to State programs, we expect there to be effects on drug manufacturers and wholesale distributors. Also, it is conceivable that this rule might make physicians more aware of the availability of low cost generic drugs that could be substituted for higher cost leading brand drugs, and thus produce changes in physician prescribing practices. Furthermore, by making payments more prudent, we hope to affect Medicaid recipients positively by improving the States' and Federal government's financial ability to provide for needed services.

*E. Expected Impact of Limits Placed on Listed Drugs*

1. Increased State Flexibility

As described in section IV of this preamble and in §§ 447.332(a) and 447.331 of the rule, HCFA will prescribe aggregate upper limits on certain therapeutically equivalent multiple-source drugs we determine to be readily available, and on sole source and other multiple-source drugs. The limit for readily available drugs is to be based on 150 percent of the lowest known price for each drug on the list. The limit for sole source and other multiple-source drugs will be based on the amounts paid by other payors. Since we are setting separate aggregate limits on what we are calling "listed drugs" and on "other drugs", States will be free to make payments for individual drugs on any reasonable basis as long as total payments for each group of drugs do not exceed the aggregate limit on that group. This approach should help avoid disruptions in the supply of listed drugs in circumstances in which acquisition costs may exceed the listed price used in establishing the HCFA limits.

State agencies should determine, independent of the 150 percent formula, appropriate payment levels for the listed multiple-source drugs. We would not expect a State agency to adopt directly the upper limit methodology as a payment method because it does not gear payments to markups appropriate to the actual costs of acquiring and dispensing these drugs. Under these final regulations, State agencies will be able to make higher payments for some listed drugs as long as they pay at rates lower than those listed for other drugs on the list. By providing this measure of flexibility, we expect that State agencies will be able to ensure that listed drugs will be generally available to recipients.

As a counterpart to allowing State agencies the freedom to set their own minimum price floor on drugs in order to cover pharmacists' ingredient costs, they also have the authority to set an upper limit on the mark-up of specific drugs on the HCFA list. Since we are not placing maximum payment limits on individual drugs, drugs with high compendia prices could generate extremely high payment levels. Unless an agency's payment methodology ensured otherwise, a Medicaid agency could end up paying inappropriately high rates for some drugs while still being in compliance with the aggregate upper limit. Nevertheless, we believe States may establish maximum payment limits in order to offset the minimum payment levels necessary to ensure reasonable compensation for very low priced drugs.

Similarly, State agencies may employ essentially the same approach in meeting the limits for all other drugs. That is, the same principel of balancing payment increases for some drugs with decreases for other drugs also applies in determining whether aggregate payments exceed the limit. For reasons of economy, availability, or therapeutic efficacy, a State agency may want to raise or lower the amount it pays for certain drugs in efforts to influence the supply of specific drugs. Under the aggregate limit methodology any change in payments above or below the lower of the EAC or customary charges for specific drugs must be balanced with a corresponding reduction or increase in payments for other drugs within the all "other" drug payment category.

# EXHIBIT G



Abt Associates Inc.

# Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices

*Final Report*

Cambridge, MA
Lexington, MA
Hadley, MA
Bethesda, MD
Washington, DC
Chicago, IL
Cairo, Egypt
Johannesburg, South Africa

**Contract #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**
**Task Order 1**

August 30, 2004

*Prepared for*
Deirdre Duzor
Centers for Medicare and Medicaid Services
Mailstop s2-01-16
7500 Security Boulevard
Baltimore, MD 21244

*Prepared by*
Stephen W. Schondelmeyer
*PRIME Institute,*
*University of Minnesota*
Marian V. Wrobel
*Abt Associates Inc.*

Abt Associates Inc.
55 Wheeler Street
Cambridge, MA 02138

## Contents

1.0 Introduction and Background ... 1

2.0 Overview of Recent Drug Pricing Issues and Current Medicaid and Medicare Policy ... 1
- 2.1 Overview of Recent Drug Pricing Issues ... 1
- 2.2 Signals of a Need for Change ... 2
- 2.3 Medicaid Drug Program and Expenditures ... 2
- 2.4 Medicare Part B Drug Program and Expenditures ... 7

3.0 Structure of the Pharmaceutical Market ... 9
- 3.1 Channels of Distribution ... 9
- 3.2 Sources of Payment for Pharmaceuticals ... 11

4.0 Structure of Pharmaceutical Prices and Payments ... 13
- 4.1 Pricing Terms and Definitions ... 13
- 4.2 Price Variation in the Market ... 16

5.0 Options for Estimating Acquisition Costs ... 18
- 5.1 Evaluation Criteria ... 18
- 5.2 Sources for Drug Price Data ... 21
- 5.3 Description and Evaluation of Options ... 23

6.0 Recommendations and Directions for Further Work ... 28
- 6.1 Recommendation ... 28
- 6.2 The Texas Vendor Drug Program ... 29
- 6.3 Directions for Further Work ... 30
- Endnotes ... 32

Appendix A: Members of the Expert Panel ... A-1

Appendix B: Themes from Expert Panel Meeting ... B-1
- Desirable Features of Payment Methodology and Policy ... B-1
- Estimation of Acquisition Costs ... B-5

Appendix C: Texas Correspondence ... C-1

Case 1:01-cv-12257-PBS Document 3636-8 Filed 02/08/2007 Page 4 of 4

**Exhibit 2: U.S. Medicaid Drug Expenditures Percent Change in Major Components: 1992 to 2002 in Inflation Adjusted $**

| Component | Percent Change |
|---|---|
| Medicaid Drug Expenditures | 221.3% |
| Drug Recipients | 5.6% |
| Rx's/ Drug Recipient/ Yr | 46.8% |
| Avg $ Payment/ Rx | 107.3% |
| Drug Product Payment/ Rx | 137.3% |
| Disp. Fee Payment/ Rx | -20.2% |
| General Inflation | 0.0% |

SOURCE: Compiled by Stephen W. Schondelmeyer, PRIME Institute, University of Minnesota from data found in CMS/HCFA-2082 Reports (adjudicated & paid claims), CMS/HCFA-64 Reports (budgeted and expended funds), CMS/HCFA Medicaid Drug Utilization public use files, and the annual volumes of Pharmaceutical Benefits Under State Medical Assistance Programs (Reston, VA: National Pharmaceutical Council, 1990 to 2002).

There are two lessons here. First, drug product prices at the manufacturer level are the major source of increase in Medicaid drug program expenditures. Thus, it is important to focus on this component of the payment policy. Second, these data suggest that pharmacy dispensing fees have not been a source of growth in drug program expenditures and that reductions to pharmacy dispensing fees have not been an effective way to reduce prices at the manufacturer level. Medicaid programs do not purchase drug products directly from manufacturers, but rather prescriptions are purchased through local pharmacies. If management of growth in drug product costs is the desired outcome, the efforts to manage this cost must be focused primarily at the manufacturer level.

# EXHIBIT H

Case 1:01-cv-12257-PBS Document 3636-9 Filed 02/08/2007 Page 2 of 7

# *Pharmaceutical Benefits under State Medical Assistance Programs*

***2000***

***Published by the***
***National Pharmaceutical Council, Inc.***
***1894 Preston White Drive***
***Reston, VA 20191-5433***

***©2000 by the National Pharmaceutical Council***

# MARYLAND

## A. BENEFITS PROVIDED AND GROUPS ELIGIBLE[1]

| Type of Benefit | Categorically Needy | | | | Medically Needy (MN) | | | | | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| | OAA | AB | APTD | AFDC | OAA | AB | APTD | AFDC | Children <21 | SFO* |
| Prescribed Drugs | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | | |
| Inpatient Hospital Care | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | |
| Outpatient Hospital Care | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | |
| Laboratory & X-ray Service | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | |
| Skilled Nursing Home Services | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | |
| Physician Services | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | |
| Dental Services | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | |

[1]See Appendix E, page E-29, for a list of acronyms.
*Effective December 1, 1992, all State-Only services except subsidized adoptions were discontinued. Prescription services for these recipients were transferred to Pharmacy Assistance Program.

## B. EXPENDITURES FOR DRUGS

| | 1998* | | 1999* | |
|---|---|---|---|---|
| | Expended | Recipients | Expended | Recipients |
| **TOTAL** | **$148,532,940** | **176,403** | | |
| RECEIVING CASH ASSISTANCE, TOTAL | | | | |
| Aged | | | | |
| Blind / Disabled | | | | |
| AFDC-Child | | | | |
| AFDC-Adult | | | | |
| AFDC-Unemployed-Child | | | | |
| AFDC-Unemployed-Adult | | | | |
| MEDICALLY NEEDY, TOTAL | | | | |
| Aged | | | | |
| Blind / Disabled | | | | |
| AFDC-Child | | | | |
| AFDC-Adult | | | | |
| POVERTY RELATED, TOTAL | | | | |
| Aged | | | | |
| Blind / Disabled | | | | |
| AFDC-Child | | | | |
| AFDC-Adult | | | | |
| OTHER | | | | |

Source: HHS State HCFA-2082 Reports, Sections A-4 and B-4.
*1998 and 1999 expenditures broken down by maintenance assistance status and basis of eligibility are unavailable.

Case 1:01-cv-12257-PBS Document 3636-9 Filed 02/08/2007 Page 4 of 7

## C. ADMINISTRATION

State Department of Health and Mental Hygiene.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Drug Benefit Product Coverage:* Products covered: prescribed insulin; disposable needles and syringe combinations used for insulin; and total parenteral nutrition. Products not covered: cosmetics; fertility drugs; experimental drugs; blood glucose test strips; urine ketone test strips; interdialytic parenteral nutrition; DESI drugs; prescriptions and injections for central nervous system; food supplements or infant formulas; products for which Federal Financial Participation is not allowed, i.e., "less than effective" drugs and products whose manufacturers have not signed rebate agreements; and (e) certain other items as specified in the state's Medicaid plan.

*Over-the-Counter Product Coverage:* Products covered: contraceptives; oral ferrous sulfide; and aspirin for arthritis. Products not covered: allergy, asthma and sinus products; analgesics; cough and cold preparations; digestive products (H2 and non-H2 antagonists); feminine products; topical products; and smoking deterrent products.

*Therapeutic Category Coverage:* Therapeutic categories covered: anabolic steroids; analgesics, antipyretics, NSAIDs; antibiotics; anticoagulants; anticonvulsants; antidepressants; antidiabetic agents; antihistamine drugs; antilipemic agents; anti-psychotics; anxiolytics, sedatives, and hypnotics; cardiac drugs; chemotherapy agents; prescribed cold medications; contraceptives; ENT anti-inflammatory agents; estrogens; hypotensive agents; misc. GI drugs; prescribed smoking deterrents; sympathominetics (adrenergic); and thyroid agents. Prior authorization required for: growth hormones. Therapeutic categories not covered: anorectics.

*Coverage of Injectables:* Injectable medicines reimbursable through the Prescription Drug Program when used in home health care, extended care facilities, and through physician payment when used in physician offices.

*Vaccines:* Vaccines reimbursable as part of the EPSDT service.

*Unit Dose:* Unit dose packaging reimbursable for nursing home patients only for commercially available products.

### Formulary/Prior Authorization

*Formulary:* Open formulary.

*Prior Authorization:* State currently as a Prior Authorization procedure. A general appeals procedure is required for appeal of prior authorization decisions.

Prior authorization required from the HealthChoice and Acute Care Administration when the usual and customary charge exceeds $100 and the prescribed amount is a 34-day supply or more. Preauthorization is needed for any prescription with a usual and customary charge exceeding $400. Prior authorization is also needed for early refills, nutritional supplements, and excessive quantities.

### Prescribing or Dispensing Limitations

*Prescription Refill Limit*: Maximum of two refills. The original prescription and its refills may not exceed a 100-day supply except for birth control pills and oral sodium fluoride preparations. Refills may not be dispensed after 100 days of date of original prescription except for birth control pills and oral sodium fluoride preparations

*Monthly Quantity Limit:* The amount of medication to be dispensed on a prescription at one time is limited to a less than 34-day supply except for specific maintenance drugs for chronic conditions, where up to a 100-day supply may be dispensed at one time.

### Drug Utilization Review

PRODUR system implemented January 1993. State currently has a DUR Board with a quarterly review.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $4.21 as of July 1, 1996.

*Ingredient Reimbursement Basis:* Estimated Acquisition Cost (EAC) equals/lowest of:

1. Wholesale Acquisition Cost (WAC) plus 10%.
2. Direct cost plus 10%.
3. Distributor's price plus 10%.
4. Average Wholesale Price (AWP) minus 10%.

*Prescription Charge Formula:* Reimbursement will be the lower of: (1) the calculated ingredient cost plus a dispensing fee; (2) the usual and customary fee.

*Maximum Allowable Cost:* State imposes Federal Upper Limits as well as state-specific limits on generic drugs. Approximately 1,000 drugs are listed on the state-specific MAC list. Override requires “Brand Medically Necessary” and a reason.

Case 1:01-cv-12257-PBS Document 3636-9 Filed 02/08/2007 Page 5 of 7

*Incentive Fee:* None.

*Patient Cost Sharing:* Copayment = $1.00. Does not apply to managed care, family planning, nursing home residents or recipients under 21 years old.

*Cognitive Services:* Does not pay for cognitive services.

## E. USE OF MANAGED CARE

Approximately 375,000 total unduplicated number of Medicaid recipients were enrolled in MCOs in FY 1999. Recipients receive pharmaceutical benefits through the state and managed care plans.

### Managed Care Organizations

| | |
|---|---|
| Chesapeake FamilyFirst<br>6300 Security Boulevard<br>Baltimore, MD 21207 | 68,785 |
| FreeState Health Plan<br>Blue Cross Blue Shield<br>10455 Mill Run Circle<br>Owings Mills, MD 21117-5559 | 97,363 |
| Helix Family Choice, Inc.<br>2330 W. Joppa Road<br>Suite 301<br>Lutherville, MD 21093 | 18,039 |
| Jai Medical Systems, Inc.<br>5010 York Road<br>Baltimore, MD 21212 | 4,817 |
| Maryland Physicians Care MCO<br>7106 Ambassador Road<br>Suite 100<br>Baltimore, MD 21244 | 28,958 |
| Prime Health Corporation<br>9602-C M.L.K., Jr. Hwy<br>Lanham, MD 20706 | 15,405 |
| Priority Partners MCO<br>The Candler Building<br>111 Market Place<br>Baltimore, MD 21202 | 55,349 |
| Ameri Group<br>857 Elkridge Landing Road, #300<br>Linthicum, MD 21040 | 85,393 |

## F. STATE CONTACTS

### State Drug Program Administrator

Mr. Frank Tetkoski
Pharmacy Services Manager
Division of Pharmacy and Clinic Services
201 West Preston Street
Baltimore, MD 21201
T: 410/767-1455
F: 410/333-7049
E-mail: tetkoskif@dhmh.state.md.us

### Prior Authorization Contact

Tuong Nguyen, P.D.
Pharmacist Consultant
DHMH-Office of Health Services
Division of Pharmacy and Clinical Services
201 W. Preston St., Rm. 132
Baltimore, MD 21201
T: 410/787-1455
F: 410/333-7049
E-mail: nguyent@dhmh.md.us

### DUR Contact

Judy Geisler, P.D.
Pharmacist Consultant
DHMH-Office of Health Services
Division of Pharmacy and Clinical Services
201 W. Preston Street
Baltimore, MD 212010
T: 410/767-1728

### DUR Board

Scott A. Spier, M.D., Chair
Medical Director
Outpatient Chemical Dependency Unit
Mercy Medical Center Professional Building
301 St. Paul Place, Room 812
Baltimore, MD 21202
410/332-9230

Bonnie Rosiak, Pharm.D., Chair
8809 Heron's Flight
Laurel, MD 20723

Barbara A. Bartman, M.D., M.P.H.
3972 Ducks Foot Lane
Ellicott City, MD 21042
410/955-1314

Krishna Chary, R.Ph.
804 Bear Cabin Drive
Forest Hill, MD 21050
800/380-9342

Babette S. Duncan, Pharm.D., BCPS
Senior Director, Clinical Services
Advance Paradigm, Inc.
11350 McCormick Road
Suite 1000, Executive Plaza II
Hunt Valley, MD 21031
410/785-2182

Michelle A. Forrest-Smith, Pharm.D.
1822 Chatfield Terrace
Severn, MD 21144
410/748-6291

Myron Miller, M.D.
8201 Spring Bottom Way
Baltimore, MD 21208
410/653-7952

Richard D. Moore, M.D.
Johns Hopkins Hospital
1830 E. Monument Street, 8th floor
Baltimore, MD 21205
410/955-2144

Jill RachBeisel, MD
University of Maryland Medical System
22 South Greene Street
S12A03
Baltimore, MD 21201

### Prescription Price Updating

First DataBank
1111 Bayhill Dr.
San Bruno, CA 94066
T: 415/588-5454
F: 415/827-4578

### Medicaid Drug Rebate Contacts

Technical: Jeffrey Gruel, 410/767-1455
Policy: Jeffrey Gruel, 410/767-1455
P/A: Lynette Lane, 410/767-1728
Audits: Kenneth Smoot, 410/767-5186
Disputes: Katherine Novak, 410/582-9305

### Claims Submission Contact

First Health DataBank
Division of Claims Processing
Charlotte Krueger, Chief
201 W. Preston St.
Baltimore, MD 21201
T: 410/767-5347
F: 410/333-7186

### Medicare Managed Care Contact

Rosalie Kosloff
Chief, Division of Health Choice Management
Office of Health Services
201 W. Preston St.
Baltimore, MD 21201
410/767-5690

### Elderly Expanded Drug Coverage Program

Paul Roeger
Manager, Pharmacy Assistance Program
Medical Care Operations and Eligibility
201 W. Preston St
Baltimore, MD 21201
T: 410/767-5394
F: 410/333-7290

### Physician-Administered Drug Program Contact

Edward Watters, M.D.
201 W. Preston Street
Baltimore, MD 21201
410/767-1482

### Health and Mental Hygiene Department Officials

Georges C. Benjamin, M.D.
Secretary
Department of Health and Mental Hygiene
201 W. Preston Street
Baltimore, MD 21201

Debbie I. Chang
Deputy Secretary
Health Care Financing
201 W. Preston Street
Baltimore, MD 21201

Joseph M. Millstone
Executive Director
Office of Health Services
201 W. Preston Street
Baltimore, MD 21201

Case 1:01-cv-12257-PBS Document 3636-9 Filed 02/08/2007 Page 7 of 7

Shelby Boggs
Director of Healthcare and Acute Care
Office of Health Services
201 W. Preston Street
Baltimore, MD 21201

Jeffrey Gruel
Chief
Division of Pharmacy and Clinic Services
Office of Health Services
201 W. Preston Street
Baltimore, MD 21201
410/767-1455

Joseph Fine, P.D.
Chief
Division of Recoveries
Medical Care Operations and Eligibility
201 W. Preston Street
Baltimore, MD 21201
410/767-5795

Paul Roeger
Program Manager
Pharmacy Assistance Program
PO Box 386
Baltimore, MD 21203
410/767-5392

**Medical Assistance Staff Committee Members**

Judy Geisler, P.D.
Division of Pharmacy and Clinic Services
201 W. Preston Street
Baltimore, MD 21201

Mr. Frank Tetkoski, P.D., Manager, Pharmacy Services
Division of Pharmacy and Clinic Services
201 W. Preston Street, Room 129
Baltimore, MD 21201

Tuong Nguyen, P.D.
Division of Pharmacy and Clinic Services
201 W. Preston St., Rm. 132
Baltimore, MD 21201

**Executive Officers of State Medical and Pharmaceutical Societies**

*Medical/Chirurgical Faculty of Maryland*
T. Michael Preston
Executive Director
1211 Cathedral Street
Baltimore, MD 21201
410/539-0872

*Maryland Pharmacists Association*
Howard Schiff
Executive Director
650 West Lombard Street
Baltimore, MD 21201-1572

*State Board of Pharmacy*
LaVerne G. Naesea
Executive Director
4201 Patterson Avenue
Baltimore, MD 21215-2299
410/764-4755

*Maryland Osteopathic Association, Inc.*
Francisco E. Ward, D.O.
Secretary/Treasurer
P.O. Box 6314
Annapolis, MD 21401
800/664-4274

*The Maryland Hospital Association, Inc.*
Calvin M. Pierson, President
1301 York Road, Suite 800
Lutherville, MD 21093-6087
410/321-6200

# EXHIBIT I



CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE

A
CBO
PAPER

JANUARY 2007
Prescription Drug
Pricing in the
Private Sector

Case 1:01-cv-12257-PBS Document 3636-10 Filed 02/08/2007 Page 3 of 3

**Box 1.**

## The Average Manufacturer Price Is to Be Made Publicly Available

Currently, the average manufacturer price (AMP) for prescription drugs is not publicly available. That situation will change when the Centers for Medicare & Medicaid Services (CMS) publicly posts AMPs for both generic and brand-name drugs, as required under the Deficit Reduction Act, which the agency expects to do late in the spring of 2007.[1] The AMPs are being made publicly available in part to help implement Medicaid's new payment rate for multiple-source drugs, which was changed by the Deficit Reduction Act. That rate will be equal to 250 percent of the lowest AMP among generic drugs and their brand-name counterparts with the same active ingredients, dosage form, and strength. As part of implementing the new payment rate, CMS has issued a proposed rule that includes a new definition of the AMP.[2]

1. See Centers for Medicare & Medicaid Services, "Medicaid Drug Pricing Regulation Proposed" (fact sheet, December 15, 2006), available at www.cms.hhs.gov/apps/media/fact_sheets.asp.

AMPs do not reflect all pharmacies' acquisition costs because they do not include wholesalers' markups. Further, AMPs are average prices across all retail pharmacy channels and include discounts that may not be available to all pharmacies. Nonetheless, making AMPs public may help inform payments to pharmacies by third-party payers and particularly the upper limits that payers place on payments to pharmacies for multiple-source drugs. Making AMPs publicly available may also enable insurance companies, employers, and cash customers to determine whether they are paying appropriate amounts for particular drugs—thus, overall, bringing greater price transparency to the retail pharmacy market. This additional pricing information could lower what pharmacies and wholesalers are paid for prescription drugs. In addition, to the extent that different pharmacies currently pay different prices for the same prescription drugs, making AMPs public could narrow the range of prices that pharmacies pay.

2. The proposed rule is available at www.cms.hhs.gov/MedicaidGenInfo/downloads/AMP2238P.pdf.

The average manufacturer price is the average price paid by wholesalers to manufacturers or by retail pharmacies that buy directly from manufacturers for drugs distributed through retail pharmacies. It reflects all rebates paid by manufacturers to wholesalers and to retail pharmacies. It does not include rebates paid by manufacturers to PBMs, Medicaid, or to other third-party payers. Manufacturers are required to report the AMP to the Centers for Medicare & Medicaid Services, which uses it to calculate the rebates that the manufacturers are required to pay to state Medicaid programs for sales to beneficiaries.[11] Currently, the AMP is confidential, but, as required under the Deficit Reduction Act of 2005, it will be made publicly available by CMS, probably in the spring of 2007 (see Box 1).

11. The savings from those rebate payments are shared with the federal government.

The wholesale acquisition cost is a publicly available list price for sales by manufacturers to wholesalers. Manufacturers report the WAC to publications such as Thomson Micromedex's *Red Book* and First DataBank's *Blue Book*.[12] The WAC does not represent actual transaction prices, and it is not, despite its name, what wholesalers pay for drugs. However, for single-source brand-name drugs, the WAC approximates what retail pharmacies pay wholesalers. Perhaps because the WAC is a publicly available price that closely approximates what retail pharmacies pay for drugs, negotiated rebates for brand-name drugs between PBMs and manufacturers are sometimes based on it.[13]

12. This paper relies on the WAC for drugs reported in Thomson Micromedex's *Red Book*.

13. See Federal Trade Commission, *Pharmacy Benefit Managers*, p. 50.

# EXHIBIT J

**Exhibit J**
**Comparison of Average AWP to 1996 Federal Upper Limit for Selected Drugs**

| Generic Name | Form | Dosage | Package Size | Package Size Units | Federal Upper Limit | Average AWP | Difference (AWP - FUL) | Difference (Percentage of AWP) |
|---|---|---|---|---|---|---|---|---|
| APAP w/codeine | tab | 60 | 100 | pills | 10.43 | 18.89 | 8.46 | 44.8% |
| APAP w/codeine | tab | 30 | 100 | pills | 6.75 | 11.74 | 4.99 | 42.5% |
| APAP w/oxycodone | cap | 5 | 100 | pills | 34.88 | 50.19 | 15.31 | 30.5% |
| atenolol | tab | 100 | 100 | pills | 10.35 | 98.20 | 87.85 | 89.5% |
| carbamazepine | tab | 200 | 100 | pills | 15.53 | 24.71 | 9.18 | 37.1% |
| carbamazepine | tab/chewable | 100 | 100 | pills | 18.74 | 16.81 | -1.93 | -11.5% |
| clonidine HCL | tab | 0.3 | 100 | pills | 3.38 | 19.83 | 16.45 | 83.0% |
| diazepam | tab | 10 | 100 | pills | 2.60 | 16.45 | 13.85 | 84.2% |
| diazepam | tab | 5 | 100 | pills | 2.39 | 10.83 | 8.44 | 77.9% |
| diazepam | tab | 2 | 100 | pills | 2.19 | 7.28 | 5.09 | 69.9% |
| diltiazem HCl | tab | 30 | 100 | pills | 9.41 | 35.03 | 25.62 | 73.1% |
| diltiazem HCl | tab | 90 | 100 | pills | 23.10 | 79.58 | 56.48 | 71.0% |
| diltiazem HCl | tab | 60 | 100 | pills | 16.50 | 55.25 | 38.75 | 70.1% |
| diltiazem HCl | tab | 120 | 100 | pills | 33.00 | 104.08 | 71.08 | 68.3% |
| diltiazem HCl | cap ER | 90 | 100 | pills | 84.98 | 79.70 | -5.28 | -6.6% |
| diltiazem HCl | cap ER | 60 | 100 | pills | 74.30 | 69.40 | -4.90 | -7.1% |
| doxycycline | cap | 100 | 50 | pills | 11.25 | 28.69 | 17.44 | 60.8% |
| erythromycin | cap | 250 | 100 | pills | 19.13 | 26.64 | 7.51 | 28.2% |
| erythromycin | tab | 333 | 100 | pills | 34.49 | 34.48 | -0.01 | 0.0% |
| fluphenazine HCl | tab | 1 | 100 | pills | 23.63 | 45.78 | 22.15 | 48.4% |
| gemfibrozil | tab | 600 | 60 | pills | 34.13 | 56.39 | 22.26 | 39.5% |
| haloperidol | tab | 20 | 100 | pills | 12.00 | 107.66 | 95.66 | 88.9% |
| imipramine HCl | tab | 10 | 100 | pills | 2.03 | 4.28 | 2.25 | 52.6% |
| lorazepam | tab | 2 | 100 | pills | 2.28 | 26.35 | 24.07 | 91.3% |
| lorazepam | tab | 1 | 100 | pills | 2.07 | 18.56 | 16.49 | 88.8% |
| lorazepam | tab | 0.5 | 100 | pills | 1.73 | 13.39 | 11.66 | 87.1% |
| methylphenidate HCl | tab | 5 | 100 | pills | 28.47 | 27.71 | -0.76 | -2.7% |
| methylphenidate HCl | tab | 10 | 100 | pills | 39.83 | 38.55 | -1.28 | -3.3% |
| methylphenidate HCl | tab | 20 | 100 | pills | 58.28 | 55.73 | -2.55 | -4.6% |
| perphenazine | tab | 8 | 100 | pills | 50.25 | 71.08 | 20.83 | 29.3% |
| perphenazine | tab | 4 | 100 | pills | 41.93 | 58.95 | 17.02 | 28.9% |
| perphenazine | tab | 2 | 100 | pills | 31.43 | 42.96 | 11.53 | 26.8% |
| perphenazine | tab | 16 | 100 | pills | 80.78 | 97.32 | 16.54 | 17.0% |
| piroxicam | cap | 20 | 100 | pills | 19.40 | 212.37 | 192.97 | 90.9% |
| propranolol HCl | tab | 80 | 100 | pills | 2.63 | 18.35 | 15.72 | 85.7% |
| propranolol HCl | tab | 20 | 100 | pills | 1.65 | 8.59 | 6.94 | 80.8% |
| propranolol HCl | tab | 40 | 100 | pills | 2.46 | 12.50 | 10.04 | 80.3% |
| propranolol HCl | tab | 60 | 100 | pills | 2.78 | 13.66 | 10.88 | 79.7% |
| propranolol HCl | tab | 10 | 100 | pills | 1.43 | 6.01 | 4.58 | 76.2% |
| theophylline | tab ER | 200 | 100 | pills | 9.75 | 18.51 | 8.76 | 47.3% |
| theophylline | tab ER | 300 | 100 | pills | 12.38 | 21.61 | 9.23 | 42.7% |
| theophylline | tab ER | 100 | 100 | pills | 7.13 | 11.78 | 4.65 | 39.5% |
| tolmetin NA | cap | 400 | 100 | pills | 29.93 | 78.43 | 48.50 | 61.8% |
| tolmetin NA | tab | 600 | 100 | pills | 88.13 | 95.86 | 7.73 | 8.1% |
| verapamil HCl | tab | 80 | 100 | pills | 5.63 | 24.06 | 18.43 | 76.6% |
| | | | | | | | | |
| Average | | | | | | | | 50.3% |
| Maximum | | | | | | | | 91.3% |

Sources:
- 1996 Edition of Red Book
- National Pharmaceutical Council, *Pharmaceutical Benefits Under State Medical Assistance Programs,* 1996
- State of Montana's Second Amended Complaint, Exhibit A