# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 <br><br> CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: <br><br> *State of Montana v. Abbott Labs., Inc., et al.,* <br> Cause No. CV-02-09-H-DWM (D. Mont.) | Judge Patti B. Saris |

## PLAINTIFF STATE OF MONTANA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION .................................................................................................1

II.   SUMMARY JUDGMENT STANDARDS .........................................................3

III.  THE STATE OF MONTANA'S COUNTER-STATEMENT OF
      MATERIAL FACTS ...........................................................................................4

      A.    Montana's State Plan for Medicaid Pharmacy Reimbursement
            Complied With Federal Regulation and Guidelines ................................5

      B.    Montana Medicaid and Other Payors Reasonably Relied on AWP
            as a Benchmark Reimbursement...............................................................7

      C.    Montana Medicaid Expected AWP to Bear a Rational Relationship
            to Underlying Drug Acquisition Costs ...................................................10

      D.    There Is No Evidence That Montana Medicaid Had Access to True Data,
            Evidence of Spreads or Knowledge of Costs of Specific Drugs or
            Defendants' Manipulation of the Spread ...............................................11

            1.    The State lacked generalized knowledge of industry pricing
                  and spreads...................................................................................11

            2.    The State lacked specific knowledge of subject drug spreads...................14

      E.    There Is No Evidence That Montana Medicaid Allowed Benefit Access
            or Budget Considerations to Dictate Its Reimbursement Methodology ...............15

      F.    Given the Pervasiveness of AWP, Montana Relies on It........................17

IV.   LEGAL ARGUMENT........................................................................................17

      A.    Defendants Are Not Entitled to Summary Judgment on Montana's
            Unfair Trade Practices Claim.................................................................17

            1.    Montana's reliance on the AWP benchmark as a surrogate for
                  costs in the market does not defeat its MUTPA claim..............................19

                  a.    Montana reasonably relied on AWPs and was not aware
                        of Defendants unfair or deceptive schemes ...................................19

                  b.    Defendants' "government knowledge" contentions provide
                        no basis for summary judgment as to Montana's *parens
                        patriae* claims................................................................21

001534-15  155971 V1

2. The State's participation in the federal rebate program does not negate its damages as a result of Defendants unfair or deceptive acts and practices ..................................................................................21

3. The Montana Attorney General does not seek to recover damages suffered by Montana consumers and TPPs in Montana............................22

B. Defendants Are Not Entitled to Summary Judgment on Montana's Medicaid Fraud Claim ............................................................................23

1. Defendants submitted information to Montana Medicaid under the meaning of the Medicaid Fraud Act ......................................................23

2. The Medicaid fraud statute does not apply exclusively to providers.........25

3. The States can meet the statutory standard by showing that Defendants knowingly submitted false information ...................................25

C. Defendants Are Not Entitled to Summary Judgment on Montana's False Claims Act Count ..........................................................................27

D. Defendants Are Not Entitled To Summary Judgment On Montana's Claims Related To Multi-Source Drugs .................................................33

1. FULs are linked to AWP, and J-Code reimbursement is not an impediment to recovery for physician-administered drugs ......................34

2. Montana did not have "direct knowledge" of Average Manufacturer Prices for multi-source drugs ................................................................35

E. Montana's Claims Are Not Barred by the Statute of Limitations ........................37

F. Civil Penalties Are Appropriate to Remedy Defendants' Willful Conduct..........38

G. Defendants Acted With Actual Fraud or Malice, Justifying an Award of Punitive Damages ..............................................................................41

V. CONCLUSION...............................................................................................41

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aetna Casualty & Sur. Co. v. Gulf Resource & Chem. Corp.*,
  600 F. Supp. 797 (D. Idaho 1985) ...................................................................................38

*Barbour v. Dynamics Research Corp.*,
  63 F.3d 32 (1st Cir. 1995) .........................................................................................3, 4

*Chen-Cheng Wang ex rel. United States v. FMC Corp.*,
  975 F.2d 1412 (9th Cir. 1992) .....................................................................................33

*DeSario v. Thomas*,
  139 F.3d 80 (2d Cir. 1998) ............................................................................................6

*Gillette Co. v. Energizer Holdings, Inc.*,
  2005 U.S. Dist. Lexis 34122 (D. Mass. Dec. 19, 2005) ................................................3

*Gregory v. Forsyth*,
  609 P.2d 248 (Mont. 1980) ..........................................................................................37

*Osterman v. Sears*,
  80 P.3d 435 (Mont. 2003) ......................................................................................37, 38

*People ex rel. Levenstein v. Salafsky*,
  2003 Ill. App. Lexis 560 (Ill. App. Ct. May 5, 2003) ..............................................28, 29

*People v. Bestline Products, Inc.*,
  61 Cal. App. 3d 879 (Cal. Ct. App. 1976) ....................................................................40

*People v. Superior Court*,
  507 P.2d 1400 (Cal. 1973) ...........................................................................................40

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  321 F. Supp. 2d 187 (D. Mass. 2004) ...........................................................................24

*Plath v. Schonrock*,
  64 P.3d 984 (Mont. 2003) ............................................................................................40

*Rogers v. Fair*,
  902 F.2d 140 (1st Cir. 1990) ..........................................................................................3

*United States ex rel. Butler v. Hughes Helicopters*,
  71 F.3d 321 (9th Cir. 1995) ....................................................................................32, 33

001534-15  155971 V1

*United States ex rel. Durcholz v. FKW Inc.,*
    189 F.3d 542 (7th Cir. 1999) .......................................................33

*United States ex rel. Franklin v. Parke-Davis,*
    147 F. Supp. 2d 39 (D. Mass. 2001) ...............................................28, 29, 30, 31

*United States ex rel. Hagood v. Sonoma County Water Agency,*
    929 F.2d 1416 (9th Cir. 1991) .....................................................32, 33

*United States ex rel. Lamers v. City of Green Bay,*
    998 F. Supp. 971 (E.D. Wis. 1998)..................................................33

*United States ex rel. Yesudian v. Howard Univ.,*
    153 F.3d 731 (D.C. Cir. 1998) .....................................................29

*United States v. Lucas W. Corp.,*
    237 F.3d 932 (8th Cir. 2001) .....................................................30, 31

*United States v. Phelps Dodge Indus., Inc.,*
    589 F. Supp. 1340 (S.D.N.Y. 1984)................................................39

*United States v. President & Fellows of Harvard College,*
    323 F. Supp. 2d 151 (D. Mass. 2004) ...........................................31, 32

*United States v. Zan Mach. Co.,*
    803 F. Supp. 620 (E.D.N.Y. 1992) ..............................................40

*Wilder v. Virginia Hosp. Ass'n,*
    496 U.S. 498 (1990)...............................................................6

## FEDERAL STATUTES

31 U.S.C. § 3729(c) ...................................................................30

42 C.F.R. §§ 430.10, 447.201 ..........................................................6

42 C.F.R. § 433.136(3) ...............................................................24

42 C.F.R. § 433.137 ..................................................................24

42 C.F.R. § 433.138 ..................................................................24

42 C.F.R. § 447.331 ...................................................................6

42 C.F.R. § 447.332 ..................................................................................................6, 7

42 C.F.R. § 447.333(a)..................................................................................................6

42 C.F.R. § 50.504(b)(1)...............................................................................................7

42 U.S.C. § 1396a(a)......................................................................................................6

31 U.S.C. § 3729 .........................................................................................................28

## STATE STATUTES

Mont. Admin. R. 37.86.1101 (2006) ..................................................... *passim*

Mont. Code Ann. § 1-1-201(1)(b)...............................................................................25

Mont. Code Ann. § 17-8-231 ........................................................................................1

Mont. Code Ann. § 17-8-231(1) .....................................................................25, 27, 40

Mont. Code. Ann. § 27-1-221 .....................................................................................41

Mont. Code Ann. § 27-2-211(1)(c) .............................................................................37

Mont. Code Ann. § 30-14-103 ..................................................................................1, 21

Mont. Code Ann. § 30-14-133(1) ...............................................................................21

Mont. Code Ann. § 30-14-142(2) ...............................................................................39

Mont. Code Ann. § 30-14-142(4) ...............................................................................39

Mont. Code Ann. § 53-6-155(13) ...............................................................................25

Mont. Code Ann. § 53-6-155(7) .............................................................................25, 26

Mont. Code Ann. § 53-6-160(1) ........................................................................ *passim*

Mont. Code Ann. § 53-6-160(3) .............................................................................25, 26

001534-15  155971 V1

# I.      INTRODUCTION

Attorney General Mike McGrath brings this action to enforce state laws and to protect the State's Medicaid program and the well-being of Montana citizens who make prescription drug payments or co-payments based on Average Wholesale Prices (AWPs).  Evidence shows that (i) published AWPs were a component of pharmacy reimbursement by the State and other payors; (ii) Defendants controlled the published AWPs; (iii) unbeknownst to payors, those AWPs were inflated and did not reflect averages of real prices in the marketplace; and (iv) each defendant in this lawsuit secretly and covertly manipulated and marketed the spreads on their drugs that are at issue in this lawsuit ("Subject Drugs") in order to protect or gain market share. As a result of these factors, Montana payors substantially overpaid for Subject Drugs.  The State alleges that Defendants' conduct, as described, is both deceptive and unfair as a matter of law under the Montana Unfair Trade Practices and Consumer Protection Act ("MUTPA").  Mont. Code Ann. § 30-14-101 *et seq.*[1]  The State further alleges that Defendants' conduct violated the State's Medicaid fraud statute, Mont. Code Ann. § 53-6-160(1); and the State's False Claims Act.  Mont. Code Ann. § 17-8-231.

Defendants now claim that summary judgment in their favor is appropriate against the State on all claims because the State could not have been deceived.  Defendants say that the State ***knew all along*** that Defendants had artificially inflated the AWPs reported by the national publishers to create significant spreads and ***the State*** – not Defendants – exploited that knowledge and the spreads to overpay Medicaid drug providers in order to encourage their

---

[1] For the Court's convenience, the State of Nevada has compiled all the Nevada statutes and administrative codes cited herein and have attached them at Ex. 14 to the Declaration of Jeniphr Breckenridge in Support of the State of Nevada's Opposition to Defendants' Joint Motion for Summary Judgment ("Breckenridge Decl. Ex. __").

participation in the State's Medicaid program.  In essence, Defendants say, it was the State that gamed the system – not them.

The evidence does not support Defendants' revisionist history of the facts.  No state witness has testified to knowledge of specific spreads between AWPs and drug acquisition costs for the subject drugs or knowledge of defendants' marketing of the spread.  There is also neither testimony nor documents showing that the State knowingly took advantage of the spreads.  To the contrary, Montana Medicaid staff submit that the State's Medicaid reimbursement methodology was based on the expectation that the AWPs bore a reasonable relationship to actual prices.  The evidence shows that Montana Medicaid relied on the AWP benchmark as a reasonable surrogate for costs in the marketplace because actual prices were not made available to State payors.  The State did not "use" the spread.  In fact, State employees now say that if they had known about the inflation, they would not have used AWP or they would have discounted it more deeply.  At a minimum, then, multiple questions of material fact regarding knowledge remain and thus Defendants have not met their summary judgment burden.

Further, even if Defendants could demonstrate State knowledge (which they cannot), Defendants have made no pretense of linking that knowledge to the State's citizens.  There is no basis to attribute so-called government knowledge to Montana citizens.  Therefore, Defendants also do not meet the summary judgment standard as to the *parens patriae* claims.

Defendants' other bases for summary judgment also fail.  Defendants' purely legal argument that judgment should be entered in its favor on the Medicaid Fraud statute claims is based on a restrictive interpretation of the plain language of the statute that should be rejected.  Defendants urge the Court to enter judgment on the False Claims Act claims in their favor based on their similarly narrow interpretation of that Act.  But, as the State explains below, the Act is

- 2 -

meant to protect the Montana Medicaid program from the drug manufacturers' knowing submission of false information, among other things.

Finally, the State's claims are not time-barred.  The question of when a Plaintiff discovered a Defendant's wrongdoing for purposes of triggering the statute of limitation is a fact – intensive inquiry, resolved on summary judgment only under unusual circumstances. Defendants have not demonstrated any facts sufficient to trigger the State's obligation to discover the facts underlying this lawsuit earlier than it did nor facts demonstrating that the State did not exercise reasonable diligence under the circumstances.  This complaint was timely filed.

For all of these reasons, Defendants' joint motion should be denied.

## II.      SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Barbour v. Dynamics Research Corp*., 63 F.3d 32, 36 (1st Cir. 1995) (citing Fed. R. Civ. P. 56(c)).  To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position.  *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  *Gillette Co. v. Energizer Holdings, Inc.*, 2005 U.S. Dist. Lexis 34122, at *6 (D. Mass. Dec. 19, 2005) (Saris, J.) (quoting *Barbour*, 63 F.3d at 37).  "There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Id.* (quoting *Rogers*, 902

- 3 -

F.2d at 143).  The Court must "view the facts in the light most favorable to the non-moving

party, drawing all reasonable inferences in that party's favor."  *Id.* (quoting *Barbour*, 63 F.3d

at 36).

These standards mandate rejection of Defendants' joint motion for summary judgment.

### III.     THE STATE OF MONTANA'S COUNTER-STATEMENT OF MATERIAL FACTS

The State incorporates by reference here the following factual submissions:

> State of Montana Response to Statement of Undisputed Material
> Facts in Support of Defendants' Joint Motion for Summary
> Judgment ("Mt. Resp. to Def. L.R. 56.1 Stmt.") (filed herewith);
>
> State of Montana's L.R. 56.1 Statement of Undisputed Material
> Facts in Support of Motion for Partial Summary Judgment against
> Certain Defendants (Dkt. No. 3737); and
>
> Plaintiffs' Post-Trial Findings of Fact (Dkt. No. 3553).

The State also incorporates its responses to the L.R. 56.1 statements filed by individual

defendants and the facts statements set forth in Montana's opposition briefing to the individual

summary judgment motions filed by individual defendants.[2]  Montana further designates the

Declaration of Raymond S. Hartman Calculation of Damages and Penalties for the State of

Montana dated June 13, 2006 ("Hartman Decl.") attached as Ex. 1 to the Declaration of Jeniphr

Breckenridge In Support of Plaintiffs' Opposition to Defendants' Joint Motion for Summary

Judgment ("Breckenridge Decl.")[3] and Supplementary Declaration of Raymond S. Hartman

---

[2] The State requested a four week extension of time to respond to the defendants' individual motions for summary judgment and defendants consented.  The unopposed motion is currently pending before the Court (Dkt. No. 3864).

[3] Deposition transcripts and documents cited herein are attached to the Declaration of Jeniphr Breckenridge in Support of the State of Montana's Opposition to Defendants' Joint Motion for Summary Judgment and are referred to as "Breckenridge Decl. Ex. __".  The State incorporates and refers herein to the declarations of Dorothy Poulsen ("Poulsen Decl."), Jeff Buska ("Buska Decl."), John Chappuis ("Chappuis Decl."), and Betty DeVaney ("DeVaney Decl.") In Support of the State of Montana's Opposition to Defendants' Joint Motion For Summary Judgment. These declarations are submitted herewith.

Calculation of Damages and Penalties for the State of Montana dated June 20, 2006 ("Hartman Supp. Decl." (Breckenridge Decl. Ex. 2) as setting forth material facts and opinions in opposition to this motion.

In addition, Montana submits the following statement of facts.

## A.      Montana's State Plan for Medicaid Pharmacy Reimbursement Complied With Federal Regulation and Guidelines

The Montana Medicaid program is administered by the Montana Department of Public Health and Human Services ("DPHHS").  Deposition of John Chappuis dated April 21, 2006 ("Chappuis Tr.") at 41:1-9, 42:1-7 (Breckenridge Decl. Ex. 3); Declaration of John Chappuis at ¶ 5 ("Chappuis Decl.").  Montana has one of the smallest populations of the fifty states and its Medicaid program reflects its population.  Montana Medicaid is a relatively small program by national Medicaid standards.  Chappuis Decl. at ¶ 7.  This small size is reflected in the program's staffing.  *Id*. at ¶ 8.  Montana Medicaid has always been leanly staffed.  *Id*.  The pharmacy portion of the Montana program is significant.  In 2000, the total Medicaid budget was approximately $250 million and the pharmacy budget was between $40 and $50 million.  *Id*. at ¶ 9; *see also* Deposition of Nancy Ellery dated April 11, 2006 ("Ellery Tr.") at 77:9-11 (Breckenridge Decl. Ex. 5).  "It was big."  *Id*. at 77:12.  Yet, at most relevant times, the pharmacy program was in the hands of one staff member for self-administered drugs and one staff member for physician-administered drugs.  Chappuis Decl. at ¶ 10.  At the same time, the Montana Medicaid program is subject to the same pressures as other states' programs, including the tension between the demand for services and a limited budget.  *Id*. at ¶ 11.  After September 11, 2001, this demand became particularly acute when the nation's economy faltered and resulted in an increased demand for Medicaid benefits.  *Id*. at ¶ 12.  In Montana, as in other states, the escalating demands included an increase in the demand for pharmacy services.  At the

- 5 -

same time, Montana Medicaid experienced downward pressure on the state component of its budget. *Id*. at ¶ 13. Staffing did not increase. *Id*.

DPHHS's administration of the State's is guided by federal regulations. Ellery Tr. at 42:18-43:21 (Breckenridge Decl. Ex. 4). It is undisputed that Montana complied with all federal requirements. Each state's participation in Medicaid is voluntary, but participating states must comply with federal and statutory requirements. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). Similarly, the provision of a pharmacy benefit as part of a state Medicaid program is voluntary, but participating states must require with all federal and statutory requirements. *Id*. All states provide a Medicaid pharmacy benefit. *Id*.

Under the federal requirements, each state must submit for approval to the Secretary of U.S. Health and Human Services ("HHS") a "State Plan" that sets forth the methods for reimbursing health care providers for goods and services. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. at 502; 42 U.S.C. § 1396a(a); 42 C.F.R. §§ 430.10, 447.201. The Secretary, through the Centers for Medicare and Medicaid Services (CMS – formerly HCFA), reviews the State Plan and determines whether it conforms to the requirements of the statutes and regulations. *DeSario v. Thomas*, 139 F.3d 80, 96 (2d Cir. 1998) (quoting 42 U.S.C. § 1316 (1994)).

Each state must submit a plan to CMS describing its payment methodology for covered drugs. The plan must "describe comprehensively the agency's payment methodology for prescription drugs." 42 C.F.R. § 447.333(a). State payments include payment for the acquisition cost of the drug plus a dispensing fee. The federal government places limits on the reimbursement levels that the states may adopt. 42 C.F.R. § 447.331-32 (setting Federal Upper Limits for Medicaid use and setting EAC plus a dispensing fee as an acceptable basis for Medicaid reimbursement). Pursuant to federal regulations, reimbursement for brand name drugs

- 6 -

must not exceed, in the aggregate, the estimated acquisition costs ("EAC") plus reasonable

dispensing fees.  42 C.F.R. § 50.504(b)(1).  The standard for multi-source drugs is a reasonable

dispensing fee plus an amount established by the federal Centers for Medicare and Medicaid

Services ("CMS") that is equal to 150% of the published price for the least costly therapeutic

equivalent (the Federal Upper Limit or "FUL") – again "in the aggregate." *See* 42 C.F.R.

§ 447.332.  Most state Medicaid programs reimburse for drugs at the lower of the state's EAC,

the Federal Upper Limit, or the state maximum allowable cost.

**B.     Montana Medicaid and Other Payors Reasonably Relied on AWP as a Benchmark
Reimbursement**

Each state Medicaid agency sets its own reimbursement methodology, subject to the

federal requirements described.  States vary in their definition of EAC, but most base it on a

discount from AWP.  Historically, most states have based their EAC determination on AWP.

Montana Medicaid's use of AWP as the basis of drug reimbursement is governed by

administrative rules enacted to administer the State's Medicaid Program.  Mont. Admin. R.

37.86.1101 (2006) currently provides that:

> "Estimated acquisition cost (EAC)" means the cost of drugs for
> which no maximum allowable cost (MAC) price has been
> determined.  The EAC is the department's best estimate of what
> price providers are generally paying in the state for a drug in the
> package size providers buy most frequently.  The EAC for a drug
> is:
>
> (a)  the direct price (DP) charged by manufacturers to retailers;
>
> (b)  if there is no available DP for a drug or the department
> determines that the DP is not available to providers in the state, the
> EAC is the average wholesale price (AWP) less 15%; or
>
> (c)  the department may set an allowable acquisition cost for
> specified drugs or drug categories when the department determines
> that acquisition cost is lower than 1(a) or (b) based on data
> provided by the drug pricing file contractor.

- 7 -

The rules are set by Montana Medicaid through a process that includes the drafting of the rule, notice to the public of the rule, public hearings, and – ultimately – approval by the federal government through a State Plan Amendment.  The Administrative Rule governing Medicaid pharmacy reimbursement has changed only slightly over the years.  The current reimbursement rate of AWP-15% was established in 2002 through the described rule change process.  Buska Decl. at ¶¶ 11-12.

There are clear reasons why most states and numerous other payors have used AWP as the basis for reimbursement.  Montana used AWP because it was the standard price mechanism available.  Jeff Buska Decl. at ¶ 12.  AWP was provided by the drug manufacturers or derived from information they provided to national publishers.  *Id.*; MT Resp. to Def. L.R. 56.1 Stmt. at ¶¶ 137-39 (collecting evidence of drug manufacturer control of AWP reporting).  The AWP numbers were available to the states, nationally-supported, updated regularly (as often as every week) and automatically.  *Id.*  Importantly, AWPs were consistently available for all drugs, and not just a subset of the drugs for which state Medicaid programs reimbursed.  Buska Decl. at ¶ 13.  The regularly-updated numbers provided by the drug manufacturers through the national publishers also assured automatic updates to Montana's reimbursement pricing without administrative intervention.  Buska Decl. at ¶ 14.  Because of the State's limited Medicaid resources and staff, it was key to have a reimbursement methodology that was easy to use. Buska Decl. at ¶¶ 13-14.

The record shows that drug manufacturers were aware of Montana's and other states' use of AWP for reimbursement purposes.  MT Resp. to Def. L.R. 56.1 Stmt. at ¶¶ 140-42 (collecting evidence of drug manufacturer knowledge of government use of AWP as reimbursement basis). The record contains no evidence that AWPs served any purpose other than as a basis for

- 8 -

reimbursement or that the drug manufacturers discouraged its use at any time prior to the filing
of this and other related lawsuits.

Montana Medicaid's consistent and overarching goal in setting Montana's reimbursement
methodologies has been to estimate a reimbursement level for a particular drug as close as
possible to "what price providers are generally paying in the state for a drug in the package size
providers are generally paying in the state for a drug in the package size providers buy most
frequently" or actual acquisition costs.  Mont. Admin. R. 37.86.1101 (2006).  Dan Peterson,
Montana Medicaid's current pharmacy program supervisor, describes the objective as to "control
costs" by using "reimbursement methodologies more in line with the actual drug costs or
acquisition costs . . . [i]f the cost of drugs is less than what we reimburse for, we would like to
get as close to that as possible."  Peterson Tr. at 86:3-5; 8-10 (Breckenridge Decl. Ex. 7).  Other
pharmacy personnel agree.  Buska Decl. at ¶ 11; Poulsen Decl. at ¶¶ 8-10.

Montana Medicaid personnel understood that AWP *did not equal* acquisition costs.
Poulsen Decl. at ¶ 8.  Because of this understanding, the State used a 10% or, later, a 15%
discount off of AWP.  Poulsen Decl. at ¶ 8; Poulsen Tr. at 119:10-12 (Breckenridge Decl. Ex. 6).
("Yes.  I mean, the common knowledge was that AWP was, again, as I've said before, not what
it sounded like.  *That's why it was discounted*.") (emphasis added).  Poulsen explained the
State's position.

> Q.  And the AWP also didn't reflect the actual acquisition costs?
>
> A.  Which we always understood that to be the case.  You can't
> have an average and have that be the same as actual.  Because the
> *average presumably is the average of actuals*.  So assuming that
> you're selling drugs to different pharmacies at different amounts,
> the actual is what you actually do it and sell it for and the average
> is an average of those amounts.  At least that was my
> interpretation.  I never took a class on pricing of drugs.  But – but
> that is what I intuited from my years of working in the program.

*Id*. at 122:21-123:11 (emphasis added).  Until this lawsuit was filed, according to pharmacy personnel, Montana Medicaid held a good faith belief that by applying the discounts, the State was approximating acquisition costs accurately.  Poulsen Decl. at ¶¶ 8, 11; Buska Decl. at ¶¶ 8-9.  This was very different from what was eventually revealed to be the truth – gross spreads frequently equaling many multiples of the modest discounts off of AWP Montana Medicaid personnel believe would be adequate to approximate EAC.

C.  **Montana Medicaid Expected AWP to Bear a Rational Relationship to Underlying Drug Acquisition Costs**

State Medicaid personnel responsible for Medicaid pharmacy reimbursement policy and administration believed that they were estimating acquisition costs carefully by using AWP because ***they believed that AWP bore a rational and direct relationship to the underlying cost for the drugs***.  This is what State expert Raymond S. Hartman, Ph.D refers to as the expectation that AWP provided a reasonable "signal" for ASPs and EACs.  Hartman Decl. at ¶ 8(a).  The evidence shows that Medicaid staff involved in pharmacy reimbursement believed that AWP was "a base price – a wholesale price being made available by the drug manufacturers," Buska Decl. at ¶ 8, or "a price assigned by the pharmaceutical company [that] represented an average of the prices at which the company sold its products," Poulsen Decl. at ¶ 5, Poulsen Tr. at 122-23 (Breckenridge Decl. Ex. 6).  Montana Medicaid expected that this was a price at which pharmacies and other providers were able to purchase drugs for sale.  Buska Decl. at ¶ 9.  Although the State understood that the AWP was not the actual acquisition cost, it always assumed that there was a direct and reasonable relationship between the actual acquisition cost to the pharmacies and other providers and the AWP the State used for reimbursement purposes.  Poulsen Decl. at ¶ 7.  Buska Decl. at ¶ 9.  Importantly, the State assumed that if the AWP increased, the price to the provider had also increased at a similar rate, *id*.; or that if the

- 10 -

provider's acquisition cost increased, there would be an increase in AWP that would compensate the provider for the increased cost.  Poulsen Tr. 74:3-75:3 (Breckenridge Decl. Ex. 6).

Based on this expectation, the State felt confident relying on AWPs provided by drug manufacturers to determine the EAC as required by federal regulations and Montana's reimbursement methodology.  Buska Decl. at ¶ 10.  Again, the expectation that the two numbers were rationally related and that the difference could be bridged by a modest discount off of the larger number, is very different from the reality later revealed – that AWP was typically significantly higher, up to thousands of percent.

**D.      There Is No Evidence That Montana Medicaid Had Access to True Data, Evidence of Spreads or Knowledge of Costs of Specific Drugs or Defendants' Manipulation of the Spread**

Montana Medicaid never had access to true drug pricing data or evidence that Defendants' manipulated the spread between provider acquisition costs and AWP.  Therefore, the State could not have "studied the extent of the difference" and employ it.  Def. Mem. at 12.  Defendants' argument suggests that the there was a spread between acquisition cost and AWP, one that was applicable in every instance.  If the State was on notice of one spread, the logical extension of Defendants' argument suggests, it was on notice of all spreads.  Of course, this was not the case.

**1.      The State lacked generalized knowledge of industry pricing and spreads**

Drug pricing is a closely held industry secret.  MT Resp. to Def. L.R. 56.1 Stmt. at ¶ 137.  Pricing varies from product to product and drug manufacturers give limited access to pricing information.  *Id.*  The fact that drug manufacturers marketed the spread to providers was just as closely guarded.  *Id.*  Not surprisingly then, the concept of a "spread" between the acquisition costs and AWP was foreign to Montana Medicaid.  State testimony contradicts Defendants'

argument that Montana Medicaid was well aware that AWP meant "Ain't What's Paid" and knowingly embraced the inflated numbers provided by the drug manufacturers.

> Q.  Could you explain it to me again, how you used the term while you were with Montana Medicaid?
>
> A.  I don't know that I ever used the term.  This is a football team phraseology.  You hear about betting on teams with a spread.  It's not – it is not the kind of terminology I would have ever used.

Poulsen Tr. at 123:13-20 (Breckenridge Decl. Ex. 6); Buska Decl. at ¶¶ 8-10.

Even after the extraordinary volume of discovery in this case – depositions of state personnel, the production of tens of thousands of hard documents and electronic discovery – Defendants submit no dispositive evidence of the State's knowledge of the gross spreads it turned out existed for Defendants' drugs.  At most, Defendants have identified discrete instances where the State may have received evidence of inordinate spreads for certain drugs.  No witness has testified to the plenary knowledge of Defendants' pricing schemes that would be required in order for summary judgment to be entered in Defendants' favor.  Defendants' principal evidence consists of two federal reports and several deposition statements taken out of context.

Current and former Montana Medicaid employees maintain that the reports did **not** put them on notice of the magnitude of the spreads on specific drugs or that there were systemic problems with the use of AWP.  Dorothy Poulsen recalled the 1996 report after it was shown to her at her deposition.  Her recollection is that there was nothing in the report that put the State on notice of systemic problems with average wholesale pricing or the State's Medicaid pharmacy reimbursement methodology.  Poulsen Decl. at ¶ 13.  At most, the 1996 report put the State on notice of problems with certain, specific invoices or drugs.  *Id*.  Significantly, in response to defense questioning at her deposition, Ms. Poulsen testified that she did not think that the State's

- 12 -

Medicaid providers were being over-reimbursed, even after she read the 1996 OIG report on which Defendants rely to demonstrate knowledge. Poulsen Tr. at 95 (Breckenridge Decl. Ex. 6).

Jeff Buska recalls the 2002 OIG report. Buska Decl. at ¶ 18. At the time he was the acute services supervisor and had overall responsibility for the Medicaid pharmacy program. *Id*. Nothing in the report suggested to Montana Medicaid that the problems the report identified went beyond the drugs the report identified. *Id*. As with the 1996 report, the contents of the 2002 report did not suggest to Montana Medicaid that the problem was systemic rather than limited to the isolated instances featured. *Id*.

Importantly, Montana Medicaid weighed the findings of the 2002 report and adjusted its reimbursement methodology based on the report and other factors. Montana Medicaid personnel evaluated the information contained in the report in the context of the Montana pharmacy program. It was Medicaid's judgment in 2002 – ***after reading the report*** – that the proper reimbursement algorithm would be AWP-15%. Buska 30(b)(6) Tr. Vol. 2 at 347:9-348:3 (Breckenridge Decl. Ex. 5), Chappuis Tr. at 85:2-15 (Breckenridge Decl. Ex. 3). *See also* Buska Decl. at ¶ 19; Marr Tr. at 43 (Breckenridge Decl. Ex. 8). Coincidently, with the release of the report, the State had been considering increasing the discount off of AWP to reach an EAC that more closely approximated the actual acquisition costs of state providers. Buska Decl. at ¶ 19. State Medicaid's professional judgment was that the OIG report at most supported a modest increase in the discount off of AWP, but not an overhaul of the entire state system. *Id*.

The OIG reports themselves do not establish Defendants' point any more convincingly. The reports suffer from numerous infirmities that undermine their use to prove Defendants' arguments. Each of the federal "surveys" of Montana data was based on a limited sampling of invoices from a small number of Montana pharmacies. Neither the pharmacies nor the drugs

- 13 -

were identified and the data was not provided and thus could not be verified or audited by the

State or others.  In 2002, Montana Medicaid immediately expressed its concerns regarding the

report, beginning with the courtesy draft the OIG provided the State.  Marr Tr. at 48

(Breckenridge Decl. Ex. 8), Ireland Tr. at 90-93 (Breckenridge Decl. Ex. 9).  The State was

concerned that the OIG study did not account for all of the factors that should have been

considered.  Marr Tr. at 48:8-14 (Breckenridge Decl. Ex. 8).  Jeff Ireland, pharmacy program

officer from 1992 to 1996, described the State's weighing of the report the data underlying the

1996 report as just one more source of information.

> Q.      Would it be fair to say that in light of the fact that this was
> done by the OIC [sic], that that [sic] was the most reliable source
> of data recording acquisition costs of Montana Medicaid
> providers?
>
> A.      [T]here would have not been likely an assumption that this
> was the most accurate or the only accurate information.  It would
> have been viewed as a piece of information that could have been
> used by the State to help them to determine a decision that they
> made or may not make as they move forward.

Ireland Tr. at 89:10-90:1 (Breckenridge Decl. Ex. 9).

Other non-government representative of Montana's pharmacy community also criticized

the 2002 OIG investigation as being flawed.  Marr Tr. at 54 (Breckenridge Decl. Ex. 8).  The

criticisms included challenges to the acquisition costs.  *Id*. at 55:6-13.  In 2002, The Montana

Pharmacy Association and the National Association of Chain Drug Stores specifically criticized

the OIG's findings regarding drug acquisition costs available to Montana pharmacies.  Buska Tr.

at 362-63 (Breckenridge Decl. Ex. 5), Marr Tr. at 48, 53-55 (Breckenridge Decl. Ex. 8).

### 2.    The State lacked specific knowledge of subject drug spreads

Despite the number of depositions taken over the last two years, Defendants have ***never***

asked any non-party or State witness whether they were aware that the spreads between provider

- 14 -

acquisition costs and AWP often reached the 100% range and could even go as high as 17,000%. No defendant showed any witness in this case the spreads for its Subject Drugs and asked about the State's knowledge of those spreads.  This is not surprisingly because the Defendants would not want the response on the record:  no one outside the industry knew the truth.

Jeff Buska was shown evidence of spreads, as developed by the State experts in this case for Jeff Buska definitively stated that he had never before seen such information.  Buska Decl. at ¶¶ 19-29.  Prior to the lawsuit, he had not been aware that spreads of that magnitude existed.  *Id*. Buska Decl. at ¶ 25.

At best, Defendants have pointed to scattered evidence that State personnel may have received isolated reports identifying instances where spreads existed between the AWP and acquisition cost.  Dorothy Poulsen confirmed that this was her understanding as the State's Medicaid Pharmacy Officer:  "It varied, depending upon the drug and the way in which the pharmacy was able to obtain the drug."  Poulsen Tr. at 79:5-9 (Breckenridge Decl. Ex. 6).  *See also* Poulsen Decl. at ¶¶ 12-13; Buska Decl. at ¶¶ 20-21.  However, knowledge that in *some* instances there were *some* spreads between AWP and acquisition cost does not mean that Montana was on notice of Defendants' AWP manipulations and spread marketing.

**E.      There Is No Evidence That Montana Medicaid Allowed Benefit Access or Budget Considerations to Dictate Its Reimbursement Methodology**

There is no convincing evidence that Montana Medicaid allowed considerations other than establishing EAC's as close as possible to acquisition costs to dictate the pharmacy reimbursement methodology.  Nevertheless, Defendants make this argument – as if it were the State's own deliberate actions that led the Medicaid program to overpay for prescription drugs. Def. Mem. at 6-9.

Setting pharmacy reimbursement methodologies is only one of the Medicaid agency's responsibilities.  Dorothy Poulsen, Montana Medicaid's pharmacy manager from 1996 to 2001, described the competing interests:  "I wanted to make sure that we had access to the drugs needed by our client.  We have three constituency [sic] in that position; you have the client, the providers with whom you want to have a good relationship and cooperative relationship, and you have the taxpayer.  You have a responsibility, you are the State, in balancing those three roles was always what you tried to do."  Poulsen Tr. at 233:18-234:3 (Breckenridge Decl. Ex. 6); *see also* Ellery Tr. at 159:17-160:1-7 (Breckenridge Decl. Ex. 4).  In balancing these interests, Montana Medicaid took into account numerous factors.  At the same time the State *always* remained interested in obtaining the lowest cost available for drugs.

> Q.   [I]s it also fair to say, you were not interested in the lowest cost you could possibly acquire drugs?
>
> A.   No.  That's not – that would not be true.  I was very interested in having the lowest cost we could get drugs at.

Poulsen Tr. at 233:13-15 (Breckenridge Decl. Ex. 6).

Defendants' argument that Montana Medicaid allowed the financial interests of providers to dominate their reimbursement policy is illogical and unsupported by the evidence.  It makes no sense to suggest that a program dedicated to providing benefits to a State's neediest populations and chronically in need of funds would deliberately set up a system to ***overpay*** certain private, commercial entities.  Nancy Ellery, Medicaid director and administrator from 1989 to 2000, rebutted the suggestion and testified that a pharmacy's profit on Medicaid drug sales was not a dominant factor in setting reimbursement.  "You know," she testified, "[Pharmacy profit] didn't enter into the equation, whether they were earning a profit or not.  We wanted them to provide a service. . . .  These are businessmen, obviously.  They are in it for

business, but that is not something that we took into consideration. . . . Medicaid was just a portion of what they did." Ellery Tr. at 37-38 (Breckenridge Decl. Ex. 4). In Ellery's words, Montana Medicaid did not allow the fear of "alienating" providers to dictate the policy. "There are many things that you do in Medicaid that alienate providers. We can't let that determine what we do. We try to do the right thing. We don't want to alienate them, but everything you do in Medicaid can alienate a provider in some way or another. I would agree that we would not want to have providers withdraw from the Medicaid program, but that doesn't mean that we weren't going to alienate them at any time." Ellery Tr. at 113-14 (Breckenridge Decl. Ex. 4).

**F.     Given the Pervasiveness of AWP, Montana Relies on It**

Given the availability and accessibility of AWP figures, Montana Medicaid continues to rely on them to approximate EAC. The considerations Jeff Buska articulated for the pre-lawsuit period still apply today. *See supra*. at § III.B. Given the limited staff and budget resources available to Montana Medicaid, it is the only feasible option for drug reimbursement. Buska Decl. at ¶¶ 12-14. It is absurd for Defendants to suggest that instead of having drug manufacturers report accurate, meaningful pricing benchmarks, it should be incumbent upon Montana and other states to increase staffing to audit the accuracy of information the industry provides *or* to increase their budgets to create a manual process of culling by-transaction data. The better alternative, and the alternative the State hopes will be one result of this lawsuit, is to have Defendants provide accurate and regularly updated data.

## IV.     LEGAL ARGUMENT

**A.     Defendants Are Not Entitled to Summary Judgment on Montana's Unfair Trade Practices Claim**

The Montana Unfair Trade Practices and Consumer Protection Act ("MUTPA") declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of

any trade or commerce" are unlawful.  Mont. Code Ann. § 30-14-103.  There is little case law

interpreting the MUTPA, but "[b]ecause of the similarity between the language of the Montana

[Act] and the consumer protection acts enacted by the various states and the federal government,

the case law interpreting the similar statutes in other jurisdictions is helpful in determining what

constitutes an unfair *or* deceptive act or practice under the Montana [Act]."  *Challinor v.

Swenson*, 1998 Mont. Dist. Lexis 689, at *8 (Mont. Dist. Ct. Mar. 1998).  Further, the MUTPA is

based on the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)) (the "FTCA") and directs

courts to consider FTC and federal court interpretations of the FTCA when construing the

MUTPA.  Mont. Code Ann. § 30-14-104.  In doing so, the MUTPA "should be liberally

construed with a view to effect its object and to promote justice."  *Baird v. Norwest Bank*, 255

Mont. 317, 327, 843 P.2d 327 (1992).

Whether or not that deception was intentional is immaterial for liability purposes under

MUTPA.[4]  The Montana courts do not require the representation to be intentional, "it is not

necessary for a defendant to make an intentional misrepresentation; it is sufficient if the

defendant merely fails to disclose a material fact, and that omission is likely to mislead a

reasonable consumer to the consumer's detriment.  A consumer need not prove that the

defendant's failure to disclose a fact was intended to deceive, or even that the consumer was

actually deceived. This standard is intended to equalize the bargaining positions of the parties

---

[4] Defendants' cases do not help them.  Unlike the plaintiff in *Osterman v Sears*, No. BDV-99-522 (Cascade County Dist. Ct. Aug. 30, 2000) (O'Sullivan Decl. ¶ 80 Ex. 80), the State has met its burden to specify misrepresentations made by defendants.  They misrepresentations are the false AWPs the defendants provided.  The present case is also dissimilar to *Emick v. Koch*, 739 P.2d 947, 948 (Mont. 1987).  In *Emick*, the plaintiff car purchaser had an opportunity to inspect and discover the purported defects which would have been apparent.  Here, the State had no opportunity to examine true drug prices and could not have discovered the misrepresentations because the drug manufacturers controlled the necessary information and did not disclose that information to payors, including Montana and the public.

when the defendant has knowledge of a material fact not known to the consumer." *Challinor*,

1998 Mont. Dist. 689, at *8-9.

1.      **Montana's reliance on the AWP benchmark as a surrogate for costs in the market does not defeat its MUTPA claim**

Defendants assert that Montana could not have been deceived because it was aware of a

"significant disparity between AWP and actual acquisition cost" and nonetheless chose to

reimburse on the basis of the AWPs published by First DataBank.  Defs. Mem. at 21-25.

However, knowledge that in *some* instances there were *some* spreads between AWP and

acquisition cost does not mean that Montana was on notice of Defendants' AWP spreads and

marketing of the spreads.  Moreover, Defendants' argument outright ignores the unfairness prong

of the Act.

a.      **Montana reasonably relied on AWPs and was not aware of Defendants unfair or deceptive schemes**

Defendants' principal argument is that the State could not have been deceived because its

purported knowledge of the true nature of the AWPs.  But the record shows that the State did not

have the knowledge Defendants claim.  Montana Medicaid's reliance on Defendants' AWPs was

reasonable based on their understanding that the AWPs bore a rational relationship to real prices.

*See supra* at § III.C.  Based on this expectation, the State believed AWPs to be a sound

barometer of acquisition costs.  The State felt confident relying on AWPs provided by drug

manufacturers.  Buska Decl. at ¶¶ 9-10.  State Medicaid took their responsibility for determining

the EAC very seriously.  To Montana Medicaid staff, it was important to come as close to

acquisition costs as possible.  Peterson Tr. at 86: 3-15, 8-10 (Breckenridge Decl. Ex. 7).

Medicaid understood that AWP did not equal acquisition costs.  Poulsen Decl. at ¶ 8.  Therefore,

like the vast majority of other Medicaid programs in the country, Montana applied a discount to

- 19 -

AWP to calculate EAC.  For a program with limited staff and resources, having data that they could rely on to estimate EAC was important.  Buska Decl. at ¶ 13-14.  The states used AWP because it was the standard price mechanism available, the data was regularly and automatically updated.  *Id*. at ¶¶ 12-13.  This assured automatic updates to the State's reimbursement pricing without administrative intervention.  Buska Decl. at ¶ 14; Poulsen Decl. at ¶ 7.  Montana Medicaid believed that by applying the discounts, the State was approximating acquisition costs accurately.  Poulsen Tr. at 119, 122:21-123:11 (Breckenridge Decl. Ex. 7); Poulsen Decl. at ¶¶ 8, 11; Buska Decl. at ¶ 11.  When Montana Medicaid did learn about differences between acquisition cost and average wholesale prices, the department acted to increase the discount.  Buska Decl. at ¶¶ 11-12.  Montana Medicaid even considered one of the reports Defendants' rely on to demonstrate knowledge, the 2002 OIG report.  Buska testified that the report confirmed a deeper discount off of AWP, one the State was already considering.  The State proceeded to increase the discount from 10% to 15%, the relatively modest amount that in their professional judgment was indicated by the study.  *Id*. at 21.

When Jeff Buska later discovered the truth about AWP – specifically the breadth of the problems and the magnitude of the spreads, he stated that if Montana Medicaid had known earlier, they would not have used the data. Buska Decl. at ¶¶ 15.  The evidence shows that Montana Medicaid was deceived by Defendants.

Even if Defendants' argument regarding deception was persuasive (it is not), Defendants' MUTPA argument completely ignores the "unfairness prong" of the Act.  Even if Montana had the knowledge that Defendants claim the State possessed (and Montana did not), such knowledge would not preclude a claim of ***unfair*** acts or practices under the MUTPA.  *Woock v. Gebhardt Post Plant & Sawmill*, 2001 Mont. Dist. Lexis 2964, at *12 (Mont. Dist. Ct. Oct. 23, 2001)

- 20 -

(rejecting defense claim that plaintiff's knowledge negates MUTPA claim and noting that deceit or scienter is not relevant to unfairness finding).  Under Montana law, some practices may be unfair without being deceptive.  *Id.*; Mont. Code Ann. § 30-14-103.

>           **b.      Defendants' "government knowledge" contentions provide no basis for summary judgment as to Montana's *parens patriae* claims**

Defendants' "government knowledge" defense does not apply to the States' *parens patriae* claims.  Defendants fail to explain why the States' *parens patriae* claims are subject to dismissal based on a purported government knowledge defense, where the test is whether Defendants' conduct has the capacity or tendency to deceive ***consumers***.  For instance, Defendants provide no hint as to how the "public" – and particularly elderly Medicare Part B co-payors – are supposed to have known that their 20% co-payments are actually inflated as a result of Defendants' AWP Inflation Scheme.  The State's knowledge simply cannot taint consumers, and Defendants present no authority to the contrary.

>           **2.      The State's participation in the federal rebate program does not negate its damages as a result of Defendants unfair or deceptive acts and practices**

It is undisputed that Defendants paid rebates to the State pursuant to the federal Medicaid statutes.  Defendants' contention that the receipt of rebates negates the State's ability to show that it "suffer[ed] any ascertainable loss of money or property" (Mont. Code Ann. § 30-14.133(1)), however, is unsupported.  Relying on the Gaier Declaration, Defendants argue that Montana has presented no evidence indicating that its net reimbursement costs – including rebates – were higher than Dr. Hartman's estimate of provider acquisition costs, meaning that Montana has failed to show damage.  Defs. Mem. at 26-27.  This is untrue.  Montana has shown the damages set forth in the Hartman declarations and disputes Gaier's opinions.

- 21 -

Defendants' and Dr. Gaier's supporting declaration misapprehend the State's damages calculations under MUTPA.  The State's damages model is based on civil penalties.  The purpose of a penalty[5] is to punish the wrongdoer for misconduct in violation of the statute.  The assessment of civil penalties is not dependent on net reimbursement or any other measure reflective of the amount the State of Montana overpaid as a result of Defendants' over-stated AWPs.  Rather, the civil penalties are assessed on a per violation basis.  As such, the amount of the State rebates on Subject Drugs has no bearing on the State's damages.  If the Court determines that the civil penalties due to the State should be subject to an offset based on the rebates it received – although the State does not believe this should be the case – summary judgment is not the proper forum for this calculation.  This can be done through a simple supra calculation after liability is established and damages are fixed.

**3.      The Montana Attorney General does not seek to recover damages suffered by Montana consumers and TPPs in Montana**

Defendants challenge the Attorney General's power to recover ***damages*** on behalf of TPPs, Defs. Mem. at 27-28, and Montana consumers, Defs. Mem. at 29.  However, Montana does not seek to recover damages on behalf of either; recovery of these monies are ***not*** included in Dr. Hartman's damages model, which is limited to damages incurred by the Montana Medicaid Program.  Thus, this is not an issue, and it is unclear why Defendants have even raised it.

---

[5] Penalty:  1. A punishment established by law or authority for a crime in offense.  2.  Something, especially a sum of money required as a forfeit.  American Heritage Dictionary 968 (1st ed. 1970).

**B.      Defendants Are Not Entitled to Summary Judgment on Montana's Medicaid Fraud
Claim**

Defendants seek summary judgment in their favor on Montana's claim for violations of

the State Medicaid fraud statute, Mont. Code Ann. § 53-6-160(1),[6] on four grounds:

(i) Defendants did not submit any claim or AWP to Montana Medicaid; (ii) Defendants were not

"providers," and the statute is limited to submissions made by providers; (iii) Montana cannot

prove fraud because it purportedly was aware of spreads; and (iv) the definition of "fraud" under

the statute is limited and cannot apply to this case.  Defs. Mem. at 31-33.  Each fails.[7]

Like many other states, Montana prohibits misrepresentations and misleading statements

made in connection with payments made under the Medicaid program.

> A person who submits to a medicaid agency . . . information that is
> or may be used to determine eligibility for medicaid benefits, . . .
> or the amount of payment under the medicaid program is
> considered to represent to the department, to the best of the
> person's knowledge and belief, that the item is genuine and that its
> contents, including all statements, claims and representations
> contained in the document, are true, complete, accurate, and not
> misleading.

Mont. Code Ann. § 53-6-160(1).

**1.      Defendants submitted information to Montana Medicaid under the meaning
of the Medicaid Fraud Act**

Defendants first contend that they could not have violated the statute because "[they]

have never submitted AWPs to Montana's Medicaid agency."  Def. Mem. at 31.  What

Defendants mean, of course, is that *they* did not submit the AWPs to Montana Medicaid *directly*;

they submitted AWPs to publishers who then provided them to Montana Medicaid.

---

[6] The State also seeks summary judgment in its favor in connection with its Medicaid Fraud Act claims.  *See*
State of Montana's Motion for Partial Summary Judgment Against Certain Defendants (Dkt. No. 3731).

[7] Notably, each of these arguments is a legal argument not based on facts adduced during discovery, yet
Defendants did not raise these arguments in their comprehensive motions to dismiss filed at the outset of this
litigation.

- 23 -

It is immaterial that Defendants submitted pricing information to the Publishers and not directly to Montana, the "statements, claims and representations" fall within the purview of the act.[8]  Defendants made a similar argument in connection with their motion to dismiss the State's Best Price claims under the statute.  In that motion, Defendants argued that they submitted any false information to the Secretary of HHS, not to Montana Medicaid directly, and therefore could not be held liable under the State's Medicaid fraud statute.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187, 203 (D. Mass. 2004).  But this a technicality addressed by the statute.  *Id.*  Section 53-6-160(4) provides that:  "[a] person is considered to have made or to have authorized to be made a claim, statement, or representation if the person . . . exercised . . . authority or responsibility [for making a claim, statement or representation] and, as a direct *or indirect* result, the false statement was made . . . ."  (Emphasis added.)  Here, the State contends that the defendants control the AWPs that the State receives – either by publishing them directly or allowing them to be published.  MT Resp. to Def. L.R. 56.1 Stmt. at ¶ 137-39.  Montana Medicaid then used the AWPs as a basis for reimbursement.  If the AWPs were false, as Montana contends the record shows, then the submissions to Medicaid were false as a result of Defendants' actions.  Medicaid personnel believe that the submission of false AWPs falls within this statute and constitutes a violation.  Buska Decl. at ¶¶ 15, 17-18.

---

[8] *See also* the False Claims Act cases cited infra in Section IV.C. holding that claims need not be submitted directly to the State as long as there is a nexus between the information provided and the expenditure of State funds. Defendants also overlook relevant federal regulations mandating that each state plan contain provisions for identifying and pursuing "third parties liable for payment of services under the plan and for payment of claims involving third parties."  42 C.F.R. § 433.137; *see also* 42 C.F.R. § 433.138 (entitled "Identifying liable third parties" and specifying:  "The [state] agency must take reasonable measures to determine the legal liability of the third parties who are liable to pay for services furnished under the plan.").  "Third party" is broadly defined as "any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan."  42 C.F.R. § 433.136(3).

**2.     The Medicaid fraud statute does not apply exclusively to providers**

Defendants also interpret the Medicaid Fraud statute too narrowly in arguing that Mont.

Code Ann. § 53-6-160(1) applies only to "providers" in the traditional sense and thus they cannot

be liable.  The statute is not so limited, given that its prohibitions extend to any "person," not to

any "provider."[9]  The term "person" is interpreted broadly to include "corporations."  Mont.

Code Ann. § 1-1-201(1)(b).

Defendants cite to language referring to the use of the term "providers" elsewhere in the

statute to support its restrictive construction.  Def. Mem. at 31 (quoting Mont. Code Ann. §§ 53-

6-160(a)-(b)).  All this shows is that when the Montana legislature wanted to distinguish the

narrower term "provider " from the broader term "person," it did.  In the case of § 53-6-160(1),

however, it did not.[10]

**3.     The States can meet the statutory standard by showing that Defendants knowingly submitted false information**

Defendants finally attempt to avoid liability under the fraud statute by claiming also that

they could not have committed fraud as that word is defined in Mont. Code Ann. § 53-6-155(7),

yet all Montana has to prove in order to recover under § 53-6-160 is that Defendants knowingly

submitted inaccurate information.  In this case, that inaccurate information is the false AWPs that

were used to determine the amount of payment under the Medicaid Program.  Section 53-6-

160(3) provides that "[a] person is considered to have known that a claim, statement, or

---

[9] Section 53-6-160(1) imposes a duty on "person[s] . . . to represent to the department . . . that the [item's] contents, including all statements, claims, and representations contained in the document, are true, complete, accurate, and not misleading" and the absence of the term "provider" in that section.

[10] Even if the statute were limited to "providers," Defendants would fall within its reach "Provider" is defined as an individual, company, partnership, corporation, institution, facility, or other entity or business association that has enrolled or applied to enroll as a provider of services or items under the medical assistance program established under this part.  Mont. Code Ann. § 53-6-155(13).  The drug manufacturers have "enrolled" as a provider of services through the rebate program of Montana Medicaid.

representation related to the medicaid program was false if the person knew, or by virtue of the person's position, authority, or responsibility should have known, of the falsity of the claim, statement, or representation."  Mont. Code Ann. § 53-6-160(3).  The State does not have to prove criminal fraud as contemplated by § 53-6-155(7).

Montana brings claims against each Defendant for its submission of untrue, incomplete, inaccurate and misleading information used to determine the amount of payment under the Montana Medicaid program.  Each time Defendants submitted an AWP price,  the Defendants represented to Montana Medicaid that the AWP price submitted is "genuine and that is contents are true, complete, accurate, and not misleading."  Mont. Code Ann. § 53-6-160(1).  In reality, however, Defendants allowed prices to be reported to State Medicaid that were not wholesale averages and did not bear any relationship to any real market prices – every time it allowed AWPs to be published.

The falsity of the information is demonstrated by two sources of information.  First, the words "average," "wholesale," and "price" are so plain and ordinary, that the meaning of the term was manifest from the inception of the term's usage in drug pricing statutes and rules.  The plain meaning of the statutory term "AWP" is "the average price at which wholesalers sell drugs to their customers, including physicians and pharmacies."  Nov. 2, 2006 Plain Meaning Order at 1-2.  The analysis of the AWPs conducted by State Expert, Ray Hartman, has analyzed for each Defendant and found that the AWPs reported did not comport with the plain meaning.[11] Pursuant to the governing plain meaning rules of construction – and common sense – the drug

---

[11] *See* Breckenridge Decl. Ex. 1 (Hartman Decl., Tab 7) and Breckenridge Decl. Ex. 2 (Hartman Supp. Decl. at Tab 7A).

- 26 -

manufacturers could not have interpreted AWP any differently as they disseminated AWPs for use by the States and others.

Second, Defendants' own position confirms that falsity of the information.  Defendants admit that the AWPs they reported did not reflect true averages, but rather characterized them as "sticker prices."  Here, Defendants clearly knew or should have known that the AWPs they provided were false in that they were not average wholesale prices as contemplated by the State rules.  Thus, the State was not paying a fair price.

By providing false information, each Defendant violated the Medicaid Fraud Statute every time it reported an AWP.  And each time the State paid a Medicaid claim based on the untrue and inaccurate AWP, it overpaid and thus was damaged.[12]

## C.   Defendants Are Not Entitled to Summary Judgment on Montana's False Claims Act Count

Defendants seek summary judgment on Montana's False Claims Act count on bases nearly identical to those submitted in connection with the Medicaid fraud count:  (i) providers, not Defendants, submitted the claims to the Medicaid program; and (ii) the State's knowledge negates the falsity of the submitted claims.  Defs. Mem. at 33-34.  The arguments fail a second time for the same reasons.

Mont. Code Ann. § 17-8-231(1) establishes liability for the submission of false claims to any State agency:[13]

> A person who knowingly presents or ***causes*** to be presented a
> false, fictitious, or fraudulent claim for allowance or payment to
> any state agency or its contractors forfeits the claim, including any

---

[12] In addition to the foregoing, Montana incorporates by reference Section III.C. of its Memorandum in Support of Motion for Partial Summary Judgment Against Certain Defendants.

[13] In 2005, the Montana Legislature amended the Montana False Claims Act.  *See* Mont. Code Ann. § 17-8-231 *et seq*.  As Defendants' conduct took place under the earlier False Claims Act, the State refers to the earlier statute.

portion that may be legitimate, and in addition is subject to a
penalty not to exceed $2,000 plus double the damages sustained by
the state as a result of the false claim, including all legal costs.
[Emphasis added.]

Montana alleges that Defendants violated the Montana False Claims Act by reporting inflated

AWPs that greatly exceeded the true average of wholesale prices based upon a good faith and

reasonable estimate utilizing the pricing and transaction information available to Defendants in

conducting their ordinary business affairs.  In making these false claims, each Defendant knew

that others, including providers, hospitals, pharmacies and other providers, would use the inflated

AWPs to make claims to, and obtain reimbursement from, the Montana Medicaid program.

Although no reported decisions under the Montana False Claims Act exist, this Court has

held under the analogous federal False Claims Act (31 U.S.C. § 3729-33) that it could be

unlawful for drug manufacturers to encourage doctors – that is, third-parties – to bill Medicaid

for off-label uses of the drug Neurontin.  As the Court explained, although "a pharmaceutical

manufacturer . . . did not itself submit false claims in the form of off-label prescriptions directly

to the government," the manufacturers' acts of inducement suffice to bring them within the False

Claims Act.  *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 51 (D. Mass.

2001); *see also id*. at 52-53 ("[T]he participation of doctors and pharmacists in the submission of

false Medicaid claims was not only foreseeable, it was an intended consequence of the alleged

scheme of fraud.").

Other courts agree that the route between the claim and the responsible party does not

have to be direct for false claims act claims.  The similar Illinois False Claims Act has been

construed in the same manner, with the court noting that "[t]he statute does not require that the

claim be submitted to the State or that the State pay the claimant directly" as long as "some

nexus between the claim and the State's funds or property" exists.  *People ex rel. Levenstein v.*

*Salafsky*, 2003 Ill. App. Lexis 560, at *15-16 (Ill. App. Ct. May 5, 2003) (upholding claim where complaint alleged that University was partially funded by the State);[14] *see also United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 738 (D.C. Cir. 1998) (upholding claim where there is a "sufficiently close nexus between the [grantee and the government] such that a loss to the former is effectively a loss to the latter").

Here, Defendants knew that Medicaid programs around the country, like the Medicare program, reimbursed providers and pharmacies using an AWP reported by the Publishers from pricing data supplied by Defendants.  MT Resp. to Def. L.R. 56.1 Stmt. at ¶ 140-42.  Defendants reported AWPs and other pricing information to the publications knowing full well that they would be used by Medicaid programs, including Montana's.  *Id.*  Like the actions described in the cases above, a nexus exists between the misrepresented AWPs and Montana Medicaid's over-reimbursement.  Defendants' AWPs had the "foreseeable" and "intended consequence" of causing a false, fictitious, or fraudulent claim to be presented for payment by the Medicaid Program as contemplated by Mont. Code Ann. § 17-8-231(1).  *See Parke-Davis*, 147 F. Supp. 2d at 52-53.  For these reasons, Defendants simply cannot successfully argue that there is no nexus between misrepresenting AWPs and the associated over-reimbursement by Montana Medicaid.

Defendants alternately assert that reporting AWPs to First DataBank cannot constitute a "claim" submitted to the government, Defs. Mem. at 35-36, but persuasive authority from this Court indicates otherwise.  The Montana False Claims Act does not define "claim," but under the federal act a claim "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States

---

[14] The Illinois act at issue in *Levenstein* imposed liability on any person who knowingly made, used, or caused to be made or used a false record or statement "to get a false or fraudulent claim paid or approved by the State."  *Id.*, at *7 (quoting 740 ILCS 175/3(a)(2)).

Government provides any portion of the money or property which is requested or demanded, or

if the Government will reimburse such contractor, grantee, or other recipient for any portion of

the money or property which is requested or demanded."  31 U.S.C. § 3729(c).  This Court has

noted that an action may be brought under the Act where there is "(1) . . . a false statement or

fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was

material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that

involved a 'claim')."  *Parke-Davis*, 147 F. Supp. 2d at 50 (quoting *Harrison v. Westinghouse*

*Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)).  Furthermore, the Court has emphasized

that the act reaches beyond "claims" to all fraudulent attempts to deprive the government of

monies:

> [*The False Claims Act is*] *intended to reach all types of fraud,*
> *without qualification, that might result in financial loss to the*
> *Government* . . .   The Act is broadly phrased to reach any person
> who makes or causes to be made any claim upon or against the
> United States . . .   The Court has consistently refused to accept a
> rigid, restrictive reading [of the Act] . . .   *This remedial statute*
> *reaches beyond "claims" which might be legally enforced, to all*
> *fraudulent attempts to cause the Government to pay out sums of*
> *money*.

*Parke-Davis*, 147 F. Supp. 2d at 50-51 (emphasis added).  There is no reason for the Court to

interpret "claim" any more narrowly here.  Clearly, the spirit of the Montana False Claims statute

is intended to capture Defendants' concerted scheme to increase market share via AWP

manipulations and spread marketing, all at the expense of the Montana Medicaid Program.  *Id*. at

50.

        Defendant relies on two case citations that do not support judgment in their favor.  *United*

*States v. Lucas W. Corp.*, 237 F.3d 932 (8th Cir. 2001), does not apply here.  In that case, the

plaintiff brought a federal False Claims Act charge based on nothing more than the allegation

that the defendant had caused a false claim to be filed because the defendant failed to pay medical bills that it was ordered to pay by the California Workers' Compensation Board. *Id.* at 933. Defendant did nothing more and did not encourage the plaintiff to submit his medical bill claims to the government. *Id.* Those facts are inapposite to those at issue here, where Defendants were actively gaming the system by providing data to be used to cheat the State and other payors into grossly overpaying.

Likewise, the passage in *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151 (D. Mass. 2004), cited by Defendants does not help them. The defendant who was granted summary judgment had not submitted any false claims to the government either directly or indirectly through causing the submission of a claim, *id.* at 189,[15] unlike Defendants here who affirmatively submitted false AWPs indirectly.

Other portions of the opinion are instructive, highlighting the broad construction that courts give the FCA. For example, the court recognized that another defendant was liable under the FCA for causing false invoices to be submitted to a third party that was receiving federal funds under the program at issue. *Id.* at 188. Citing this Court's *Parke-Davis* holding with approval, Judge Woodlock held that "[i]t was foreseeable that the invoices and reports that [defendant] Hay saw would be submitted to the government." *Id.* Judge Woodlock expressly recognized the broad reach of the FCA:

> A "claim" includes "any request or demand, whether under
> a contract or otherwise, for money or property." 31 U.S.C.
> § 3729(c). In deciding whether a statement is a claim or demand
> for payment, "a court should look to see if, within the payment
> scheme, the statement has the practical purpose and effect, and

---

[15] Although this particular defendant was aware that others were going to submit false claims, the court found that his failure to ensure that no false claims were submitted did not constitute causation under the FCA. In other words, there needed to be an affirmative act committed by the defendant, and he did not affirmatively submit any claim either directly or indirectly. *Id.*

poses the attendant risk, of inducing wrongful payment." *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995). The term should be construed broadly to reach "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 233, 19 L. Ed. 2d 1061, 88 S. Ct. 959 (1968)).

*Id.* at 178-79.

Lastly, Defendants claim that no False Claims Act count can be maintained because Montana wanted and expected AWPs to generally exceed a provider's actual acquisition cost. Defs. Mem. at 36. Again, the record here at a minimum creates a fact question as to the extent of the State's knowledge, with substantial evidence Montana certainly did not expect Defendants to manipulate AWPs or market the spread. *See generally* § III. Even if Montana had known about Defendants' AWP inflation scheme (and it did not), the False Claims Act focuses on the ***defendant's*** knowledge of falsehood, not on the government's knowledge. *See* Mont. Code Ann. § 17-8-231(1). It is therefore well settled under the federal analogue that a defendant may be liable under the False Claims Act even if the government knew that the defendant submitted a false claim. The statutory language, legislative history and case law clearly establish that even when the government knows that the claim is false, the defendant may still be liable under the federal Act. *See, e.g.*, *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).

To be sure, government knowledge may be relevant to whether a defendant acted "knowingly," but a defendant is entitled to a judgment, as a matter of law, in only very limited fact-based circumstances not applicable here. For instance, courts have rejected FCA claims when the defendant provided complete cooperation and open sharing of the information at issue. *See, e.g.*, *United States ex rel. Butler v. Hughes Helicopters*, 71 F.3d 321, 327 (9th Cir. 1995) ("if the district court correctly found that the only reasonable conclusion a jury could draw from

the evidence was that [the defendant] and [the agency] had so completely cooperated and shared all information during the testing that [the defendant] did not 'knowingly' submit false claims, then we must affirm the directed verdict"); *Hagood*, 929 F.2d at 1421 (same); *Chen-Cheng Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) ("the fact that the government knew of [the defendant's] mistakes and limitations, and that [the defendant] was open with the government about them, suggests that while [the defendant] might have been groping for solutions, it was not cheating the government in [its] effort.").

Again, there is simply *no* evidence that Montana was aware that Defendants were artificially inflating AWPs for the Subject Drugs and marketing the spread or that Defendants shared this information completely and openly.  Without substantial evidence in the record of this precise level of knowledge and acquiescence to the scheme – and not one shred of such evidence exists – Defendants cannot obtain summary judgment in their favor on the False Claims Act count.[16]

## D.   Defendants Are Not Entitled To Summary Judgment On Montana's Claims Related To Multi-Source Drugs

Defendants assert that Montana's claims related to multi-source drugs should be dismissed because (i) Montana did not use AWP as the reimbursement benchmark for "most" multi-source drugs (Defs. Mem. at 36-38), and instead used the Federal Upper Limit ("FUL"); and (ii) Montana was aware of large spreads on generics and wanted those spreads to exist as a

---

[16] Defendants' two cases do not help them.  In *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999), the government knew about and indeed had requested the type of bidding that was challenged in the case (the use of excavation line items in the bid).  Nothing about the bidding process was hidden.  *Id.* at 545.  In *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971 (E.D. Wis. 1998), while the City of Green Bay did not fully comply with Federal Transit Administration ("FTA") rules, the City and FTA worked cooperatively in a continuing and open dialogue towards complete compliance, which was eventually attained.  *Id.* at 995-96.  Both of these cases are far afield from the facts at issue here, where Montana was not aware of, and did not approve, Defendants AWP manipulation and spread marketing activities.

- 33 -

cross-subsidy for administration fees (Defs. Mem. at 38-39). Defendants are wrong on both bases.

> **1.     FULs are linked to AWP, and J-Code reimbursement is not an impediment to recovery for physician-administered drugs**

As even Defendants concede, at least half of Montana's multi-source drug reimbursements were ***not*** made at the FUL, Defs. Mem. at 36, and were instead made based on AWP. Thus, by this fact alone, even if Defendants' argument in favor of summary judgment were correct it would fail as to ***half*** of the multi-source drug transactions at issue in this lawsuit.

In addition, even reimbursements made at the FUL are affected by AWP index. As Dr. Hartman explains, FUL is linked to the AWPs of the related drugs. June 13, 2006, Hartman Decl., ¶ 8(b) (Breckenridge Decl. Ex. 1). More specifically, the FUL price is set at an amount equal to 150 percent of the published price for the least costly generic substitute. *Id.*, n.10. Thus, incentives remain for generic manufacturers to manipulate AWPs such that the FUL itself becomes artificially inflated.

Defendants next highlight the fact that Montana reimburses for physician-administered drugs ("PADs") based on a single J-Code for all competing versions of a particular multi-source drug and that, consequently, Montana cannot tie its Medicaid reimbursements to any of the specific multi-source PADs at issue here, let alone to any changes in any AWPs. Defs. Mem. at 37-38. Dr. Hartman addresses the PAD damages at Hartman Decl., ¶ 22(c) (Breckenridge Decl. Ex. 1). Dr. Hartman's lays the methodology to be used for calculating damages. But, he states, because of the time consuming process of cross-walking the multi-source PAD J-Codes with specific manufacturers, he has not yet conducted the analysis. This does not, however, mean that it cannot be done. Defendants also allege that the pricing for the PADs was not updated on a regular basis and thus, the State cannot prove any damages. An argument concerning the update

- 34 -

of the AWPs for PADs is too general with respect to specific transactions to meet the burden on summary judgment. Defendants have not cited any data or made a particularized showing that for a specific PAD at a specific point of time the reimbursement price used by the State was not an updated AWP. Rather, Defendants' argument relies on a misstatement of the testimony of one State witness, Denise Brunett. What Mrs. Brunett actually testified was that she did not know the update schedules pre-2001, because it was before her date of employ. In fact, the numbers were updated. It is just that the schedule was not known. MT Resp. to Def. L.R. 56.1 Stmt. at 112. Even if the J-Code price lists were not updated on a regular basis between 1991 and 2002, the evidence shows that the pharmacy program did begin regular updates in 2002.

For all these reasons, the issue is not appropriate for resolution on summary judgment.

### 2. Montana did not have "direct knowledge" of Average Manufacturer Prices for multi-source drugs

Defendants further argue that Montana could not have been deceived by inflated AWPs on multi-source drugs because the State purportedly had "direct knowledge" of multi-source drug AMPs because "Montana possessed all the information it needed to determine each individual manufacturer's drugs' average prices including discounts, which the State could have used as a comparator to the published AWPs." Def. Mem. at 38-39. Defendants say that the State then exploited this knowledge to accomplish its (unidentified) policy goals. Defendants are wrong on both accounts.

The State did not have knowledge of the spreads and thus could not have exploited them to accomplish policy objectives. Buska Decl. at ¶¶ 19, 22-29; Poulsen Decl. at ¶ 12. Besides, the Montana Medicaid reimbursement methodology policy has been dominated by one principle: low prices to protect the State's fisc. *See supra* at § III.B.

- 35 -

Defendants' "government knowledge" argument regarding the availability of data through the rebate program totally mischaracterizes how the rebate program operates and to whom pricing data is furnished.  The Omnibus Budget Reconciliation Act of 1990 required that, beginning on January 1, 1991, drug manufacturers make available to all states a rebate for drugs reimbursed under Medicaid.  Omnibus Budget Reconciliation Act of 1990 ("OBRA 90"), DeVaney Decl. at ¶ 13.  OBRA '90 provides for the handling and confidentiality of the information.  *Drug manufacturers report their pricing data directly to CMS, not the states.* DeVaney Decl. at ¶ 9.  CMS, not the States, calculates the rebates based on a mathematical formula that includes Direct Price or Average Manufacturers' Price.  *Id*. at ¶ 7.  The States do not receive the data at all.  *Id*. at ¶ 8.  In fact, at the drug manufacturers' insistence, OBRA '90 contained a requirement that all the data be kept confidential.  *Id*. at ¶ 9.  On a quarterly basis, then, CMS provides the State agency with the Unit Rebate Amount (URA).  *Id*. at ¶ 5, 7.  This is the only data the State receive on a regular basis.  *Id*. at ¶ 8.  If the State wanted to, by knowing the formula and the URA, the State could probably "reverse engineer" the rebate formula to arrive at the AMP.  *Id*. at ¶ 10.  This never occurred to Montana Medicaid.  *Id*.  Because Montana Medicaid believed that AWPs were accurate barometers of acquisition pricing and because Montana Medicaid never saw the pricing data drug manufacturers provided in the course of the rebate process, the rebate process did not put Montana Medicaid on notice that it should "reverse engineer" the rebate formula and use the result as a "comparator" for AWPs.  It was reasonable to accept the results of the rebate process.

For all of these reasons, the Court should not grant judgment in defendants' favor.

- 36 -

**E.     Montana's Claims Are Not Barred by the Statute of Limitations**

Invoking the two-year statute of limitations for statutory claims (*see* Mont. Code Ann.

§ 27-2-211(1)(c)), Defendants argue that Montana's claims are time-barred because it knew as

early as 1995 that published AWPs did not reflect average prices.  Defs. Mem. at 40-42.  But this

is not the proper inquiry.  Instead, when the focus is properly placed on when Montana became

aware of Defendants' wrongdoing, it becomes clear that this case was timely filed.

As Defendants recognize, the discovery rule applies to Montana's statutory claims.  The

statute begins to run when "the plaintiff, through the use of reasonable diligence, should have

discovered the facts" underlying the claim.  *Osterman v. Sears*, 80 P.3d 435, 441 (Mont. 2003)

(quoting *Johnson v. Barett*, 983 P.2d 925 (Mont. 1999)).  Ordinary diligence should be exercised

in discovery.  *Gregory v. Forsyth*, 609 P.2d 248, 251 (Mont. 1980).  The "test is whether the

plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has

the opportunity to obtain knowledge from sources open to his or her investigation."  *Osterman*,

80 P.3d at 441 (quoting *Johnson*, 983 P.2d at 927).[17]

Defendants point to reports received by Montana Medicaid revealing that actual

acquisition costs for *some* drugs were lower than AWP.  Defs. Mem. at 40.  But this hardly puts

Montana on notice of Defendants' scheme.  General knowledge that some spreads on some drugs

existed does *not* translate into knowledge of Defendants' manipulations of AWP nor their spread

marketing activities.  As discussed extensively above, *see supra*, at § III., Montana had no such

knowledge.

---

[17] The facts of *Osterman* do not help Defendants.  There, the court rejected the plaintiff's contention that she believed that Sears was installing the vinyl siding on her house, finding that the plaintiff had received numerous written materials disclosing K-Designers as the installing company and had, more than two years before the statute of limitations had begun to run, written a check to K-Designers.  *Id*. at 351.

As in its other arguments predicated on government knowledge, Defendants fail to explain how or why any State knowledge should be imputed to Montana citizens for purposes of the statute of limitations for the *parens patriae* claims.  Even if the State had knowledge of Defendants' practices at some time before this lawsuit was brought, reasonable Montana citizens who paid for drugs based on AWP cannot be said to  be put on inquiry notice or to have had "the opportunity to obtain knowledge from sources open to his or her investigation."  *Osterman*, 80 P.3d at 441 (quoting *Johnson*, 983 P.2d at 927).[18]  Defendants make no factual or legal argument to the contrary.

The Court should reject Defendants' unsupported statute-of-limitations defense.  At a minimum, material issues of fact remain for resolution at trial.

## F.    Civil Penalties Are Appropriate to Remedy Defendants' Willful Conduct

Dr. Hartman has calculated civil penalties by taking a conservative approach that imposes liability only for transactions exceeding AWP -9% or AWP -14% (thresholds corresponding to the two different reimbursement regimes in place during the time period at issue).  Hartman Supp. Decl., ¶ 5 (Breckenridge Decl. Ex. 2.)

Defendants argue that Montana incorrectly calculates the amount of civil penalties sought under the MUTPA and the Medicaid Fraud Act.  More specifically, Defendants claim that Dr. Hartman cannot base penalties on the number of TPP reimbursement claims, because the proper measure of penalties focuses on the Defendants' conduct – meaning that penalties should be based on the number of Defendants' allegedly misleading representations made to pricing

---

[18] Defendants do not cite any authority to the contrary.  The single out-of-state case Defendants cite, *Aetna Cas. & Sur. Co. v. Gulf Res. & Chem. Corp.*, 600 F. Supp. 797, 801 (D. Idaho 1985), does not apply here.  In *Aetna*, the court considered whether the State was subject to *any* statute of limitations in bringing a *parens patriae* case (it was), not whether State knowledge was sufficient to trigger the statute of limitations on behalf of the State residents on whose behalf the case was brought.

- 38 -

publications.  Defs. Mem. at 41.  Defendants similarly argue that, under the Medicaid Fraud

count, penalties should be based on claims submitted to intermediaries.  Defs. Mem. at 42.

Defendants are wrong on both counts.

Under the MUTPA, the State can recover from Defendants a civil penalty of up to $1,000

per each "willful" violation of the MUTPA.  Mont. Code Ann. § 30-14-142(2).  A "willful"

violation occurs when the party committing the violation knew or should have known that the

conduct was a violation of 30-14-103.  Mont. Code Ann. § 30-14-142(4).  In weighing civil

penalties under the analogous FTCA,[19] the Court enjoys wide discretion.  *United States v. Phelps*

*Dodge Indus., Inc.*, 589 F. Supp. 1340, 1362 (S.D.N.Y. 1984) (collecting cases).  Courts have

identified several factors to guide this discretion, including the good faith or bad faith of the

defendants, the injury to the public, the defendants' ability to pay and the extent to which

defendants have benefited from the violations.  *Id*. at 1362.  Courts also consider whether

continuing violations have a detrimental effect on the public and whether the defendant can

eliminate the effects of the violation if it were motivated to do so.  *Id*. at 1361 (assessing

penalties for violation of cease and desist order).  Importantly, the penalties awarded must result

in effective deterrence lest potential violators "regard the statutory penalty 'as nothing more than

an acceptable cost of violation.'"  *Id*. (quoting *United States v. ITT Continental Baking Co.*, 420

U.S. 223, 231 (1975)).

Here, awarding civil penalties for only a handful of misrepresentations made each year to

the Publications, as Defendants contend, results in **no** deterrence and would constitute "an

acceptable cost of violation."  In a context where each Defendant willfully gamed the Medicaid

---

[19] Section 5(l) provides for civil penalties of up to $10,000 for each violation against individuals or entities that violate final orders of the Federal Trade Commission.

system, such a narrow view of penalties is illogical, especially where Defendants alone had the power to stop scheme by simply choosing to report accurate AWPs.  Defendants' knew that both Medicare and Medicaid reimbursed based on AWP, that there were spreads created as a result of Defendants' direct pricing manipulations, and that Defendants pushed the spread.  Montana Medicaid was victimized each time it made a reimbursement for a Subject Drug, and the penalty should be calculated on this basis.[20]

The same conclusion obtains under the Montana False Claims Act, which provides for a penalty not to exceed $2,000 per false claim.  Mont. Code Ann. § 17-8-231(1).  In determining the amount of the penalty, the Court should focus on the Act's purposes of providing full restitution to the government, to punish and prevent frauds, and "to discourage the working of fraud upon the Government."  *United States v. Zan Mach. Co.*, 803 F. Supp. 620, 624 (E.D.N.Y. 1992).  The inquiry here should be consistent with these purposes, taking into consideration the totality of Defendants' conduct.  Again, Defendants knowingly and willingly engaged in an AWP inflation scheme that had as its natural and foreseeable result a multitude of Medicaid transactions infected by the scheme.  *Id*. at 625 (strong factor weighing in favor of liability is defendant's knowledge that false certificates were an essential element in subjecting the Government to a demand for money).  "Claim" is construed broadly to include all fraudulent attempts to cause the government to pay out funds, *id*., so it is wholly appropriate that penalties be assessed per reimbursement transaction.  Thus, each time Montana Medicaid made a reimbursement, an infected "claim" was involved.  Adopting Defendants' narrow construction

[20] Courts in California have employed a "per victim" or "per transaction" approach, resulting in penalties assessed for each time a customer is solicited, *see*, *e.g.*, *People v. Superior Court*, 507 P.2d 1400, 1404 (Cal. 1973), or each time a customer responds affirmatively to a sales pitch, *see*, *e.g.*, *People v. Bestline Prods., Inc.*, 61 Cal. App. 3d 879, 923-24 (Cal. Ct. App. 1976).  The only case that Defendants cite, *Plath v. Schonrock*, 64 P.3d 984, 996 (Mont. 2003), has nothing to do with an award of civil penalties under the MUTPA but instead concerns the principle of *pro tanto* reduction when a joint tort-feasor settles.  Therefore, *Plath* does not apply.

would not serve the purposes of the Montana False Claims Act.  Accordingly, Dr. Hartman's

approach is sound.

**G.      Defendants Acted With Actual Fraud or Malice, Justifying an Award of Punitive
Damages**

Defendants argue that summary judgment should be granted in their favor on Montana's

request for punitive damages because they did not act with actual fraud or malice as required by

Mont. Code. Ann. § 27-1-221.  Defs. Mem. at 42.  Montana has uncovered more than sufficient

evidence that Defendants did, in fact, act with actual fraud and malice.  Moreover, this is a

classic fact issue for the jury to decide.

<h3 style="text-align:center">V.      CONCLUSION</h3>

For the reasons set forth above, Defendants' motion for summary judgment should be

denied.  On each issue raised by Defendants, material issues of fact exist for resolution by the

jury.

By_____/s/ Steve W. Berman_____                    DATED:  March 22, 2007
   Steve W. Berman
   Sean R. Matt
   Jeniphr A.E. Breckenridge
   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Thomas M. Sobol
   Edward Notargiacomo
   HAGENS BERMAN SOBOL SHAPIRO LLP
   One Main Street, 4th Floor
   Boston, MA  02142
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003

Mike McGrath
Attorney General of Montana
Ali Bovingdon
Assistant Attorney General
Justice Building
215 North Sanders
P.O. Box 201401
Helena, MT  56920-1402
(406) 444-2026

COUNSEL FOR PLAINTIFF
STATE OF MONTANA

001534-15  155971 V1

**CERTIFICATE OF SERVICE**

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **PLAINTIFF STATE OF MONTANA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 22, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.


By_____/s/ Steve W. Berman_____
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292

- 43 -

001534-15  155971 V1