**BRECKENRIDGE DECL. EXHIBIT 4**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x

IN RE:   PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION,) MDL DOCKET NO.

- - - - - - - - - - - - - - - - -x  CIVIL ACTION

THIS DOCUMENT RELATES TO:            )   01CV12257-PBS

ALL ACTIONS                          )

- - - - - - - - - - - - - - - - -x


DEPOSITION OF NANCY ELLERY

April 11, 2006

9:14 a.m.

Held at:

Hampton Inn & Suites

155 Southwest Peacock Boulevard

Port St. Lucie, Florida


Reporter:   Tamra K. Piderit, RPR, CRR

Page 34

1  last page of the document. Do you see that?
2    A. Yes.
3    Q. That is a map of the State of Montana; is
4  that correct?
5    A. Yes.
6    Q. That identifies the various counties in
7  the state?
8    A. Yes.
9    Q. And the --
10    A. It's very hard to read. The photocopy
11  that I have is very hard to read. The black is hard
12  to read the counties, but it appears to be counties
13  of Montana, yes.
14    Q. And does this reflect what you described
15  before, that there are many rural counties in
16  Montana that have only a single or few licensed
17  community pharmacies?
18       MR. GAUDET: Objection.
19    A. If the numbers on this are pharmacies,
20  yes.
21    Q. Do you see the title?
22    A. It's very hard to read.

Page 35

1    Q. Can you read the title, though?
2    A. "Licensed Community Pharmacies by County."
3    Q. And part of your role as administrator of
4  the Medicaid program in Montana was to assure that
5  pharmacies were available for Medicaid recipients in
6  as many of the counties as possible; is that
7  correct?
8    A. We could not generate pharmacies if they
9  weren't there. We were concerned if there weren't
10  enough pharmacies, but we didn't have control over
11  who came into the program.
12    Q. Did you try to set reimbursement for
13  pharmaceuticals at a level that would assure that
14  there were pharmacies available for Montana Medicaid
15  recipients in as many of the counties in Montana as
16  possible?
17       MR. GAUDET: Objection.
18    A. That's part of what you do when you set
19  reimbursement is to try to be sure that your
20  reimbursement rates will allow for access similar to
21  the private pay population. That's what we do in
22  every service in Medicaid. It's not possible in all

Page 36

1  cases, but that's the overall goal.
2    Q. And if you believed that pharmacies in
3  counties where there were relatively few pharmacies
4  would leave the Montana Medicaid program if
5  reimbursements were lowered, would that affect your
6  decision about reimbursement levels?
7       MR. GAUDET: Objection.
8    A. Would you repeat the question.
9       MR. EVERETT: Would the court reporter
10  read it back, please.
11       (Question read)
12    A. We had to set reimbursement that would
13  meet the needs of most of the population. Montana
14  is a rural state, you cannot generate pharmacies.
15  So, you know, you took it in consideration, but you
16  didn't have direct control over it.
17    Q. Did you expect that the pharmacies that
18  participated in the Montana Medicaid program earned
19  some profit on sales of pharmaceutical products that
20  they sold to Montana Medicaid recipients?
21    A. The pharmacies?
22       MR. GAUDET: Objection.

Page 37

1    A. You know, that didn't enter into the
2  equation, whether they were earning a profit or not.
3  We wanted them to provide a service.
4    Q. And how did you --
5    A. These are businessmen, obviously. They
6  are in it for business, but that is not something
7  that we took into consideration.
8    Q. You didn't take into consideration the
9  possibility that Montana Medicaid -- I'm sorry,
10  Montana pharmacies would be earning a profit on
11  pharmaceutical -- let me start over.
12       Did you -- you just said that Montana
13  pharmacies were businessmen; is that correct?
14    A. Correct.
15    Q. And you would expect businessmen only to
16  participate where they were making a profit; is that
17  right?
18    A. Do what they do to stay in business.
19    Q. So you wouldn't want to set reimbursement
20  levels at levels where profits couldn't be made?
21    A. Medicaid was a small portion of a
22  pharmacy's business, so we could not control their

Page 38

1  overall business. Medicaid was just a portion of
2  what they did. So, no, we didn't look at the amount
3  of profit they were making at the time, because we
4  paid for the Medicaid recipients. They had private
5  pay, they had other payers.
6      Q. It was not required that all Montana
7  pharmacies participate in the Montana Medicaid
8  program?
9      A. It's not required. It's an individual
10 choice.
11     Q. When you were the administrator of the
12 Montana Medicaid program, did you have meetings with
13 employees of the Health Care Finance Administration
14 or the centers for Medicaid and Medicare services?
15     A. Yes.
16     Q. How often?
17     A. There were meetings, I would say, maybe
18 two or three a year on average.
19     Q. Were these scheduled periodic meetings?
20     A. HCFA, now CMS, would be represented at the
21 biannual Medicaid directors meetings. That's twice
22 a year the Medicaid directors would get together and

Page 39

1  HCFA representation would be there.
2      Q. Did you separately meet with HCFA
3  employees at those meetings?
4      A. No.
5      Q. Other than at the biannual Medicaid
6  directors meetings, did you meet with employees of
7  HCFA or CMS?
8      A. I did.
9      Q. About how often?
10     A. I don't recall how often. They would come
11 and do site visits and monitoring. I would say a
12 couple times a year maybe.
13     Q. Did you meet with HCFA or CMS employees
14 about pharmacy issues?
15     A. Not that I recall.
16     Q. So there were biannual meetings of the
17 Medicaid directors from around the country; is that
18 right?
19     A. Right.
20     Q. Was there a formal organization of
21 Medicaid directors?
22     A. National Association of Medicaid

Page 40

1  Directors.
2      Q. And you were a member of that association?
3      A. Yes.
4      Q. For the entire time that you were the
5  administrator of the Montana Medicaid program?
6      A. Yes.
7      Q. What sorts of issues were discussed at the
8  biannual Medicaid directors meetings?
9      A. Whatever issue was current at the time
10 over that period. Every year there was another
11 burning issue of some kind; managed care, long-term
12 care, it varied by year. Some years, you know, it
13 was federal changes that were happening that were
14 discussed.
15     Q. Do you remember discussions about
16 pharmaceutical reimbursement?
17     A. Not specific discussions. I'm sure that
18 since they were part of the Medicaid budget and the
19 cost they were discussed, but I don't remember
20 specific times or dates in regards to those
21 discussions.
22     Q. Do you remember specific issues discussed

Page 41

1  in relation to pharmacy reimbursement?
2      A. Just the general overall escalating cost
3  and what cost containment measures states were
4  doing.
5      Q. What were some of the cost containment
6  measures that states were using?
7      A. Back in the early '90s they were doing
8  drug utilization review, they were doing
9  formularies, rebates were starting. There was a lot
10 of discussion when rebates were implemented.
11     Q. By rebates what do you mean?
12     A. Rebates are what the state gets back from
13 manufacturers based on volume of drugs that are used
14 in the Medicaid program.
15     Q. Is this the Best Price Program?
16     A. I don't recall it being called that.
17     Q. When did Montana Medicaid start getting
18 rebates?
19     A. I believe it was in the early '90s, '92,
20 '91. It was as a result of FOBRA 90, which is the
21 Federal Omnibus Budget Reconciliation Act.
22     Q. Did Montana Medicaid have difficulties

                                                                    Page 70

1      Q.    Do you remember a discussion of the bulk
2   purchase of prescription drugs?
3      A.    No, I don't recall.
4      Q.    Do you remember a discussion of adequate
5   reimbursement for accessibility to pharmacists?
6            MR. GAUDET:  Objection.
7      A.    No, I don't remember specific discussion.
8   Again, I don't know which group I participated in.  I
9   just remember having the groups and there being
10  minutes reflected, but I don't remember specific
11  discussions.
12           MR. EVERETT:  Let's take a short break
13  here.
14           THE WITNESS:  Okay.  Fine.
15           (Recess taken from 10:54 a.m. to
16  11:00 a.m.)
17           BY MR. EVERETT:
18     Q.    Ms. Ellery, when you were the director of
19  the Montana Medicaid program, is it fair to say that
20  you were aware of the reimbursement rates that other
21  states used for their Medicaid programs?
22     A.    Not specifically.

1    Q.   Is that information something that you
2    would have considered in setting reimbursement rates
3    for Montana Medicaid?
4    A.   That is a factor.
5    Q.   Did you do anything to keep up with
6    changes that other states made in their
7    reimbursement systems?
8    A.   I attended meetings, as I mentioned
9    earlier, with other Medicaid directors.  They would
10   talk about what they were doing; it was information
11   sharing among directors.
12   Q.   Other than the biannual meetings of the
13   association of Medicaid directors, did you have
14   communications regarding reimbursement rates that
15   other states' Medicaid programs used?
16   A.   For prescription medicine or Medicaid
17   rates in general?
18   Q.   Let me ask the general question first.
19   A.   Yeah.  We would sometimes in trying to
20   evaluate whether our reimbursement was equitable, we
21   would survey other states.  Not me particularly
22   survey them, but staff would find out what other

**Page 74**

1  be involved if we changed our overall policy, but
2  not to the degree of the individual details of a
3  particular drug.
4      Q. Were there different pricing methodologies
5  used for different drugs?
6      A. No. We had an overall, like I said, the
7  lower of those three things.
8      Q. To change that policy you would have had
9  to have been involved; is that correct?
10     A. Yes.
11     Q. Did you participate in the Western
12 Medicaid Pharmacy Administrators Association?
13     A. No. I think staff did.
14     Q. How about the National Association of
15 Pharmacy Administrators?
16     A. No. Maybe staff did.
17     Q. You did, though, if I'm remembering
18 correctly, participate in the National State
19 Medicaid Directors Association meetings?
20     A. Yes.
21     Q. Did you participate in meetings of the
22 National Association of Health Data?

**Page 75**

1      A. No.
2      Q. Do you know what that organization is?
3      A. No.
4      Q. Was there an e-mail list for the National
5  State Medicaid Directors list?
6      A. Yes.
7      Q. And were there communications over that e-
8  mail list?
9      A. Yes.
10     Q. Were there communications about
11 pharmaceutical reimbursement issues?
12     A. Not that I recall.
13     Q. Was anyone on your staff other than
14 yourself a member of the National State Medicaid
15 Directors lists?
16     A. I may have had a staff person that was
17 part of the -- there was a Pharmacy Technical
18 Advisory Group as kind of a subgroup of the Medicaid
19 directors. I believe one of my staff might have
20 been involved in that. That would have either been
21 Jeff Ireland or Dorothy, I think. They may have had
22 a list serve relating to the pharmacy TAG.

**Page 76**

1      Q. Did you yourself participate in the
2  pharmacy TAG?
3      A. No.
4      Q. Do you know what types of issues were
5  discussed in the Pharmacy Technical Advisory Group?
6      A. I would anticipate, I don't know exactly,
7  but I would anticipate there would be discussions of
8  the increase in drug costs and cost containment
9  measures.
10     Q. Did your staff make you aware of any
11 particular discussions of the Pharmacy Technical
12 Advisory Group?
13     A. I'm sure they did, but I don't recall the
14 specifics.
15     Q. What types of issues would your staff make
16 you aware of relating to pharmaceutical
17 reimbursement?
18     A. Very, very big issues that affect the
19 budget and statewide policy. The division, you
20 know, as I said, was very big, so only big issues
21 came to my attention.
22     Q. If an issue related to pharmaceutical

**Page 77**

1  reimbursement was going to affect the budget that
2  Montana Medicaid needed to provide services to its
3  recipients, that's an issue that would have been
4  brought to your attention?
5      A. In a general way, yeah.
6      Q. About how big of a portion of the Montana
7  Medicaid budget was comprised of the pharmaceutical
8  benefit?
9      A. When I left our total budget was, I would
10 say, about 250 million, and our pharmacy budget was
11 40, 50 million. Those are just general estimates.
12 It was big.
13     Q. It was a substantial portion of the
14 budget. About how much of your time do you think
15 that you spent on issues related to the pharmacy
16 benefit?
17     A. That's very hard to say. You know, it
18 depends on what issue was big at the time. I had
19 responsibility for all the other Medicaid programs
20 and public health, so percentagewise it wouldn't be
21 near as much as the percentage of the budget, that's
22 for sure.

110

1  Q. Did you believe that Ms. Poulsen was
2  approaching the issue appropriately?
3  A. I didn't make a judgment about it. I was
4  thanking her for her take on the issue.
5  Q. Would you have sent her a note of
6  appreciation if you thought that she was not doing
7  her job correctly?
8  MR. GAUDET: Objection.
9  A. I don't understand your question. Would
10 you repeat it.
11 (Question read)
12 A. I think those are two separate issues.
13 You know, I was thanking her for the information.
14 That has nothing to do with whether I thought she
15 was doing a good job or not.
16 Q. Didn't you tell her that you appreciated
17 her thoughtful and creative approach?
18 A. Yes, I did. That's one part of doing a
19 job. I happened to think she did a good job.
20 Q. As we just discussed, Mr. Hanley's
21 approach to pharmacy costs in Arkansas was a two-
22 tiered program with different reimbursement levels

111

1  for chain and independent pharmacies; is that
2  correct?
3  MR. GAUDET: Objection.
4  A. That was my understanding.
5  Q. And in reading this e-mail, did you
6  understand Ms. Poulsen to be giving her views on
7  that approach?
8  MR. GAUDET: Objection.
9  A. It's hard to tell from this memo if that's
10 what's -- that's what he is talking about. Ray had
11 a lot of opinions about pharmacy costs, and I don't
12 see where this relates to the two-tier issue that
13 you refer to. It could have been any one of Ray's
14 approaches that she was commenting on.
15 Q. Do you understand her to be talking about
16 an attack on pharmacy reimbursement?
17 MR. GAUDET: Objection.
18 A. No. That's her words, that isn't how I
19 would refer to it, no. That's, I don't think, how -
20 - I don't know how Ray would refer to it.
21 Q. What did you understand Ms. Poulsen to be
22 talking about?

112

1  A. I don't remember what the context of this
2  was, to tell you the truth. Ray, as I said before,
3  had -- pharmacy was a big issue with him, and she
4  could have been talking about many of his opinions
5  on pharmacy programs and costs. I don't get that
6  this was just related to the two-tier approach.
7  (Document marked as Exhibit Ellery
8  010 for identification)
9  Q. The court reporter has handed you a
10 document marked as Exhibit Ellery 010. It's a
11 document bearing Bates numbers MT 16117 through MT
12 16118. Is this an e-mail that was forwarded by you
13 on January 25, 2000, to, among others, Dorothy
14 Poulsen?
15 A. That appears to be the case.
16 Q. And the e-mail that is forwarded is from
17 Mr. Hanley; is that correct?
18 A. Right.
19 Q. Do you see in the first paragraph of Mr.
20 Hanley's e-mail a discussion of a two-tiered
21 reimbursement policy for pharmacy?
22 A. Yes.

113

1  Q. Does that refresh your recollection about
2  your understanding of the issue that Ms. Poulsen was
3  discussing in Exhibit Ellery 007?
4  A. I think these may have been entirely two
5  different issues. Ray had a lot of issues. This
6  one clearly is about two-tiered reimbursement. I'm
7  not sure that the other one was.
8  Q. Returning to Exhibit Ellery 007, what
9  group of providers do you understand that Ms.
10 Poulsen was discussing when she wrote that "By
11 attacking pharmacy reimbursement, he will be
12 alienating a group of providers who could be very
13 helpful to him in managing appropriate drug use."
14 A. What's the number of exhibit? That's not
15 in Exhibit Ellery 007.
16 Q. I may have lost track of the numbers.
17 Exhibit Ellery 009, MT 16093.
18 A. She was talking about pharmacy providers.
19 Q. Okay. Did you agree with Ms. Poulsen that
20 it would be important not to alienate pharmacies?
21 A. There are many things that you do in
22 Medicaid that alienate providers. We can't let that

**114**

1  determine what we do. We try to do the right thing.
2  We don't want to alienate them, but everything you
3  do in Medicaid can alienate a provider in some way
4  or another.
5      I would agree that we would not want to
6  have providers withdraw from the Medicaid program,
7  but that doesn't mean that we weren't going to
8  alienate them at any time.
9      Q. Did you consider whether adopting a two-
10 tiered reimbursement policy for pharmacies would
11 lead Montana pharmacies to withdraw from the Montana
12 Medicaid program?
13     A. I don't recall those discussions and what
14 we considered at the time.
15     Q. Are you familiar with the term "direct
16 price"?
17     A. No.
18         (Document marked as Exhibit Ellery
19 011 for identification)
20     Q. The court reporter has handed you a
21 document marked as Exhibit Ellery 011; it's a
22 document bearing the Bates No. MT 5440. Do you see

**115**

1  this document?
2      A. Yes.
3      Q. This was a memo that was sent to you on
4  July 24, 1992?
5      A. Yes.
6      Q. In the re: line it reads, "Direct versus
7  "Average Wholesale Pricing." Do you see that?
8      A. Yes.
9      Q. Does this memo refresh your recollection
10 at all as to what is meant by direct price?
11     A. This was 1992, and I have to say it does
12 not. Let me read it. (Witness reviews document)
13         Your question?
14     Q. Does this refresh your recollection at all
15 as to what is meant by direct price?
16     A. No, it does not. I can't tell you what
17 direct pricing is.
18     Q. Do you recall whether direct pricing,
19 whatever it was, was publicly available information?
20         MR. GAUDET: Objection.
21     A. I don't recall.
22     Q. Do you recall a discussion of using direct

**116**

1  versus average wholesale pricing?
2         MR. GAUDET: Objection.
3      A. I do not recall that discussion.
4      Q. Who is Terry Krantz?
5      A. He supervised the pharmacy person at the
6  time. In '92 I can't even tell you who the pharmacy
7  person was, but he was the supervisor at the time.
8      Q. Do you recall pharmacies in Montana
9  complaining that minimum orders make it difficult to
10 obtain discounts from direct manufacturers and that,
11 therefore, Montana Medicaid should use Average
12 Wholesale Prices for all pricing and remove the
13 direct pricing in their system?
14        MR. GAUDET: Objection. Compound.
15     A. Yeah, separate that out.
16     Q. Sure. Do you recall complaints by
17 pharmacies that minimum orders made it difficult for
18 them to obtain discounts from direct manufacturers?
19     A. They would not have complained to me, so I
20 don't recall that. They would have complained to
21 the drug person at the time or the supervisor.
22     Q. And do you recall any discussions with

**117**

1  your staff about such complaints by Montana
2  pharmacies?
3      A. They sent me a memo, but I don't recall
4  those discussions.
5      Q. Do you recall any communications from
6  Montana pharmacies urging Montana Medicaid to use
7  Average Wholesale Prices for all pharmaceutical
8  pricing?
9      A. I don't recall.
10     Q. Do you know if Montana Medicaid used
11 direct prices for reimbursing of some pharmacies in
12 July of 1992?
13        MR. GAUDET: Objection.
14     A. I don't recall.
15     Q. Do you recall ever seeking legislative
16 approval for adopting a system of pharmaceutical
17 reimbursement that was based exclusively on Average
18 Wholesale Prices?
19     A. I don't recall.
20     Q. Do you have any reason to doubt that what
21 Mr. Krantz writes in this July 24, 1992, memo is
22 incorrect?

**158**

1   A. No. As I said earlier, there are very
2   strict retention schedules for files that I assume
3   continued after I left. The files had to be kept
4   for a certain number of years, and that's how long
5   they were kept.
6   Q. Can you explain what the document
7   retention policy was?
8   A. No, I can't. It varied by the type of
9   document. Every document had a retention period,
10  and everyone was instructed to keep files until the
11  retention period.
12  Q. To your knowledge did the State of Montana
13  have an official definition of AWP?
14  A. I assume that we did in our administrative
15  rules.
16  Q. Who would be the person most knowledgable
17  about that definition?
18  A. The pharmacy manager.
19      MS. NEMIROW: Can we go off the record for
20  just a minute.
21      (Discussion held off the record)
22  Q. I have one last thing. You testified that

**159**

1   Dorothy Poulsen was the pharmacy manager for a
2   significant portion of your tenure; is that correct?
3   A. That's not what I said. Dorothy was the
4   program manager at the time that I left.
5   Q. Okay.
6   A. I don't recall how long she was the
7   manager, but she was the pharmacy manager at the
8   time that I left.
9   Q. As the pharmacy manager she would be the
10  person most knowledgable about pharmacy related
11  issues?
12  A. Absolutely.
13  Q. I'm going to read you a section of the
14  deposition transcript from Ms. Poulsen's February
15  22nd transcript.
16  A. Okay.
17  Q. "I wanted to make sure that we had access
18  to the drugs needed by our client. We have three
19  constituency in that position; you have the client,
20  the providers with whom you want to have a good
21  relationship and cooperative relationship, and you
22  have the taxpayer. You have a responsibility, you

**160**

1   are the State, in balancing those three roles was
2   always what it was you tried to do."
3       Do you agree with that statement?
4   A. Yes.
5   Q. Do you have anything to add to that
6   statement?
7   A. It was well stated.
8       MS. NEMIROW: I have nothing further.
9       MR. CLARK: No questions.
10
11      CROSS EXAMINATION
12  BY MR. KATZ:
13  Q. My name is Clifford Katz, and I represent
14  Dey. Have you heard of the pharmaceutical company
15  called Dey?
16  A. No.
17  Q. Ms. Ellery?
18  A. No. I'm sorry, I will get closer to the
19  phone. I have not heard of that company.
20  Q. So is it safe to say you have never had
21  any communications with any representatives of Dey?
22  A. That's correct.

**161**

1   Q. I'm sorry, I didn't hear an answer.
2   A. I don't recall any discussions with
3   representatives of that manufacturer.
4   Q. Okay. Do you recall ever seeing a letter
5   from Dey to the State of Montana or the Montana
6   Medicaid program?
7   A. I don't recall that.
8   Q. Are you aware of any representations made
9   by Dey to the State of Montana or the Montana
10  Medicaid program?
11  A. I don't recall any.
12  Q. I couldn't hear the answer.
13  A. I don't recall any.
14  Q. Okay.
15      MR. KATZ: I have nothing further.
16      MS. NEMIROW: Anybody else?
17
18      CROSS EXAMINATION
19  BY MR. GAUDET:
20  Q. I have some questions. This is Robert
21  Gaudet, on behalf of the State of Montana.
22      Mrs. Ellery, a short while ago you said