**BRECKENRIDGE DECL. EXHIBIT 5**

247

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

In re: PHARMACEUTICAL,           MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE       CIVIL ACTION

PRICE LITIGATION                 01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Volume II

DEPOSITION OF JEFF BUSKA

Taken at

Law Offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

December 14, 2005

9:00 a.m.

### 316

1  Montana considered in setting its reimbursement rate
2  was the economics of the provider community.
3     A. Uh-huh.
4     Q. I believe that is what you said. What did
5  you mean by that?
6     A. We have discussions with providers. You
7  often talk to them about the -- in the association
8  about the proposed changes in the reimbursement rates,
9  as to whether, you know, what kind of impact would the
10 proposed rates have on their businesses in terms of
11 the economics of the payment rates.
12    Q. Which association are you referring to?
13    A. I believe there is an association of --
14    Q. Montana pharmacy?
15    A. Montana Pharmacy Association, I believe,
16 yeah.
17    Q. What are the potential impacts of a change
18 in reimbursement rate on providers?
19    A. Potential impact would be, of course, is,
20 you know, will your payment rate be able to cover
21 their cost of providing services. Not necessarily do
22 we have to cover all their costs of providing

### 317

1  services, but are the payment rates reasonable and
2  adequate to assure access to -- that the provider will
3  continue to provide access to our beneficiaries for
4  prescription drugs.
5     Q. So is that really a fourth and related
6  factor that Montana Medicaid considered in setting its
7  reimbursement rate, was maintaining access to care for
8  Medicaid beneficiaries?
9     A. It's always a concern that we have in
10 setting payment rates.
11    Q. I would like to turn, then, to
12 physician-administered drugs. What are the factors
13 considered in setting the reimbursement rate for
14 physician-administered drugs?
15    A. I don't know the details about those
16 factors, but I believe oftentimes, what they try to do
17 is, they try to -- some of the physician-administered
18 drugs, they are reimbursed based on what is called J
19 codes. And there's -- CPT 4 or HCPCS codes is the
20 coding structure for those physician-administered
21 drugs. They are typically injectable drugs.
22       And some J codes are 1 to 1 relationship

### 318

1  between the J code and NDC; some are 1 to many,
2  meaning there are many types of drugs that are
3  included in the J code.
4        The biller of the J code, when they are
5  billing for the J code, it's kind of 1 to many,
6  meaning there could be multiple NDCs billed under that
7  one J code.
8        So I believe they try to take a look at
9  least at the pricing and update the pricing. I think
10 they try to take a look at what Medicare is also
11 pricing for the drugs, and then they take a look at
12 what the Medicaid pharmacy program pays for maybe on
13 some average basis of AWP minus the current outpatient
14 hospital or outpatient pharmacy program that AWP minus
15 a percentage for setting those rates.
16    Q. When you said you don't know the details --
17    A. I don't know the details of the
18 calculations exactly how they do that.
19    Q. Who would?
20    A. Denise Brunett would know that, or Mary
21 Angela Collins, would probably be the two I would
22 identify as probably knowing how those J code rates

### 319

1  are set.
2     Q. Mary Angela Collins is the head of the
3  managed care bureau?
4     A. She is its bureau chief, yes. Or she would
5  be able to identify the staff person who would know
6  the most about it.
7     Q. I think I'm going to get back to the
8  question of what factors were considered in the rate
9  once I understand what the reimbursement rate was. So
10 how does Montana Medicaid reimbursement physicians for
11 physician-administered drugs?
12    A. How we reimburse for physician-administered
13 drugs is, the physician will bill a CMS 1500 claim
14 form, identify the CPT or HCPCS code which for these
15 drugs would be J codes, I don't know if there are
16 other codes that would be utilized. And it would then
17 apply the lower of logic that we have of their bill
18 charges or the fee that we have on file for that
19 service.
20    Q. Those are physician fee schedules?
21    A. Physician fee schedule.
22    Q. Who at Montana Medicaid sets those

**344**

1    A. Did not use AWP pricing.
2    Q. Turning to outpatient hospital services, it
3 says when take-home drugs are dispensed as part of or
4 incident to an outpatient diagnostic or therapeutic
5 service, then they are billed with revenue code 253
6 and paid as part of the outpatient hospital claim.
7         Pharmacy items supplied above, excuse me,
8 pharmacy items supplied alone are not a covered
9 benefit of the outpatient hospital program and may not
10 be billed using revenue code 253.
11        What I'm trying to figure out is whether
12 these take-home drugs dispensed as part of outpatient
13 hospital services, were they reimbursed by Montana on
14 the basis of AWP or not?
15        MS. BRECKENRIDGE: If you know.
16    A. The drugs are, like I indicated before,
17 bundled into, if it was a prospective paid hospital,
18 bundled into the prospective payment methodology, it
19 does not use AWP pricing. For those critical access
20 facilities it's based on percentage of the billed
21 charges which, again, does not use AWP pricing.
22        BY MS. O'SULLIVAN:

**345**

1    Q. We are finally going to leave that topic,
2 3B. You know we covered 3C. 3D to 3G I'm going to
3 address later because they are related.
4         So I would like to turn to 3I. I think
5 this relates to, we just went through what is all the
6 reimbursement methodology, and 3I is identify the
7 circumstances surrounding each change in the state's
8 reimbursement rate for subject drugs. Do you see
9 that?
10   A. Okay.
11   Q. You testified earlier about changes in 2000
12 and 2002, correct?
13   A. Yeah. Yes.
14   Q. I would like to take them separately.
15        Do you know where the idea came for
16 amending the reimbursement rate in 2000?
17   A. Where the idea came? No, I don't recall.
18   Q. Do you know where there would be any
19 documents regarding the genesis of the 2000
20 reimbursement rate change?
21   A. It would be with the pharmacy program, they
22 have -- any documents regarding that change. Could be

**346**

1 also contained in the files for the Office of Legal
2 Affairs where, if there was any rule change that
3 accompanied that, and then the documents related to it
4 also would be contained in the state plan file.
5    Q. Do you know whether the files from the
6 Office of Legal Affairs were searched for this
7 litigation?
8    A. I believe that we did notify the Office of
9 Legal Affairs to produce documents regarding the
10 outpatient pharmacy program.
11        Do I have personal knowledge of whether
12 those were delivered? I don't. I know they were
13 requested.
14   Q. Focusing again on the reimbursement rate
15 change that happened in 2000, do you know who was
16 involved in drafting the proposed change?
17   A. No, I'd have to see some document
18 specifically as to in terms of who was the pharmacy
19 manager at that time.
20        MS. O'SULLIVAN: Erica, do you have your
21 documents?
22        MS. SMITH-KLOCEK: I don't have copies of

**347**

1 that. Why don't we take a short break and get some
2 copies made. Come back to it after lunch.
3         MS. O'SULLIVAN: We can come back to it. I
4 apologize. I'll go out of order.
5         THE WITNESS: I just don't recall the
6 specific dates when positions changed for that
7 program.
8         BY MS. O'SULLIVAN:
9    Q. I'll ask the same series of questions,
10 then, about 2002.
11        The 2002 change was to change from AWP
12 minus 10 percent to AWP minus 15 percent, right?
13   A. That's correct.
14   Q. Do you know where that idea came from?
15   A. That idea was part of our process when we
16 were having to implement budget reductions for the
17 state of Montana due to a budget crisis in state
18 fiscal year 2002.
19   Q. Do you know if there are any documents
20 regarding, again I'll use the word, the genesis for
21 that change?
22   A. I believe you provided one of those

**348**

1  earlier. It was one of those OIG reports that
2  identified the acquisition cost, if you will, for
3  pharmacies purchasing drugs as a percentage off AWP.
4      Q. Do you know of any other documents that
5  formed the basis to propose the 2002 reimbursement
6  rate change?
7      A. Very well could have been what a lot of
8  other states are doing. I think a lot of other states
9  at the same time were changing the payment
10 methodologies to a higher percentage off AWP.
11     Q. Do you know who was involved in drafting
12 the proposed reimbursement rate change in 2000?
13     A. I know that I was involved --
14     MS. BRECKENRIDGE: 2000?
15     MS. O'SULLIVAN: I meant to say 2002.
16 Thanks.
17     THE WITNESS: I assumed you meant 2002. So
18 I know I was involved in that process. I believe that
19 Duane Preshinger was also involved. I'm not sure if
20 Dan was here then or not. I don't recall.
21     BY MS. O'SULLIVAN:
22     Q. Since you did work on it personally, do you

**349**

1  know whether there are any documents regarding
2  internal analysis of the proposed change?
3      A. Internal -- yeah, there was -- probably
4  trying to identify an estimated impact of the, you
5  know, the budget savings related to that proposed
6  change.
7          And, again, that would be probably
8  contained within the files for during the budget cuts,
9  and -- that particular rule change with the pharmacy
10 program.
11     Q. Do you know whether any analysis was done
12 regarding the impact the rule change would have on
13 providers?
14     A. Specific analysis would have been related
15 to the budget impact of the change of reimbursement
16 rates for the state. The impact on providers probably
17 was related to some testimony regarding the rule
18 change, would probably reflect some testimony by
19 pharmacy providers, if they testified on the rule.
20     Q. So you are not aware of any internal
21 analysis the state did regarding an impact or
22 potential impact on the providers?

**350**

1      A. I don't recall any specific analysis,
2  whether it was done or not on the providers. Very
3  possible there is. I just don't recall.
4      Q. Who did the state solicit comments from
5  regarding the 2002 proposed change?
6      A. As part of our required for the
7  administrative rule changes, we obtained comments from
8  providers. It's noticed out to the public of the rule
9  change. And so we have a rule hearing. We probably
10 have comments on a wide variety of providers that
11 testified at that hearing.
12         And then there would be a comments and
13 response document prepared as part of that rule change
14 in our Office of Legal Affairs.
15         A lot of this information regarding the
16 specific rules is also contained within the secretary
17 of state's office as part of the Montana
18 Administrative Procedures Act. They have a lot of
19 this documentation, too, in terms of what was filed
20 with our office and what was issued.
21     Q. So I understand, does the secretary of
22 state have the actual comments, or do they have the

**351**

1  procedural rules that guide --
2      A. They have the rules for what was submitted
3  for changes and then published. They are the entity
4  that publishes the first notice and publishes the
5  second notice, and they also publish the final rules.
6      Q. I'll ask first about written comments from
7  any providers.
8      A. Uh-huh.
9      Q. Did any providers provide written comments
10 on the 2002 proposed rule change?
11     A. Specifically do I recall any written
12 comments? No. But that information would be
13 contained within the documents of the Office of Legal
14 Affairs.
15     Q. Do you know roughly how many providers
16 testified regarding the proposed rule change?
17     A. I do not recall that. The reason that I
18 don't recall the specifics of it is that sometimes we
19 will have rule hearings on proposed changes and there
20 are no commenters that come. There are sometimes we
21 have rule hearings where a handful of providers or
22 associations will show up. Then sometimes we have

                                                                    360
1  received in response to this proposed reimbursement
2  change?
3      A. Yes.
4      Q. Do you know the general nature of those
5  comments?
6      A. I don't recall the specific comments on
7  those.
8      Q. Do you know whether comments were more
9  favorable or were more in opposition?
10     A. I think probably for something like this we
11 would have received more comments in opposition to the
12 rule.
13     Q. Why is that?
14     A. Because it's reducing the payment rates to
15 health care providers. It's a negative impact to the
16 health care provider.
17         (Whereupon, Deposition Exhibit Buska 032
18 was marked for identification.)
19         BY MS. O'SULLIVAN:
20     Q. Exhibit Buska 032 is a two-page document
21 Bates-numbered MT 005658 to 5659. Would you please
22 take a look at it.

                                                                    361
1          (Witness examines document.)
2      A. Okay.
3          BY MS. O'SULLIVAN:
4      Q. What is this document?
5      A. I believe this is a letter that is
6  typically done when we are doing rule changes to
7  accompany -- to the program that is given to the
8  director of the program that summarizes the proposed
9  rule change.
10         I believe at this time that we were doing
11 this, this was also then forwarded by the director to
12 our governor's office so they would have knowledge of
13 rule changes.
14     Q. Just to be clear, this is a memo from
15 Maggie Bullock, Administrator, Health Policies and
16 Services Division, to Gail Gray, Director, DPHHS dated
17 April 1, 2002?
18     A. Yes, it is.
19     Q. Does this document also reflect the
20 rationale for the proposed rule change in 2002
21 regarding the reimbursement rate?
22     A. Yes.

                                                                    362
1      Q. Turning the second page, 005659 toward the
2  bottom is an underlining, and then the paragraph
3  expected controversy regarding rule. Do you see that?
4      A. Yes.
5      Q. It states: In light of recent changes for
6  pharmacists, including the change to cost sharing, the
7  division expects opposition to the proposed rule.
8  What does that mean, changed cost sharing?
9      A. Okay. As part of the budget situation for
10 the department during state fiscal year 2002, we had
11 to implement another cost savings measure which
12 changed our methodology for co-payments and cost
13 sharing that clients are required to pay for receiving
14 health care services. It's their contribution towards
15 the cost of the health care services.
16         And we implemented some changes in the
17 co-payments, if you will, the cost sharing amounts for
18 the prescription drugs.
19     Q. I think I have an exhibit that I'm going to
20 ask about the cost sharing later.
21         I will turn to the next sentence: In fact,
22 the division expects the Montana Pharmacy Association,

                                                                    363
1  MPA, to undertake another acquisition cost study that
2  could possibly refute the findings of the OIG study.
3         Did I read that accurately?
4      A. Yes.
5      Q. Where it says another acquisition cost
6  study, do you know what the first study was that the
7  Montana Pharmacy Association did regarding acquisition
8  costs?
9      A. They were probably taken in terms of
10 another acquisition cost study that they are going to
11 do something different than what the OIG did. I don't
12 think it means that they had done one before, but they
13 are going to do their own.
14     Q. Do you know whether the Montana Pharmacy
15 Association did, in fact, undertake another
16 acknowledge situation cost study?
17     A. I don't recall if that was ever done.
18     Q. Where it said in the first sentence I read
19 that the division expects opposition to the proposed
20 rule, is it fair to say that the division did receive
21 opposition to this proposed rule change?
22     A. Like I had indicated earlier, when I