**BRECKENRIDGE DECL. EXHIBIT 6**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------

IN RE: PHARMACEUTICAL    )

INDUSTRY AVERAGE         )

WHOLESALE PRICE          )

LITIGATION               )MDL Docket No.

                         )Civil Action 01CV12257PBS

------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

------------------------------------------------------

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington   98101


REPORTED BY:  Judith A. Robinson, CCR #2171

**74**

1   Q. The second reason listed on page MT004042.
2   It says:
3       "Second, the current methodology provides
4   an automatic provider increase by paying pharmacies
5   more as drug prices increase."
6       Did that mean, the more expensive the
7   drug, the higher the reimbursement to the provider?
8   A. Ask me the question again.
9       MS. O'SULLIVAN: Maybe the court reporter
10  can read it back.
11      (Requested testimony was read.)
12  BY MS. O'SULLIVAN:
13  Q. Okay.
14  A. It doesn't actually mean that. The more
15  expensive drug, the more expensive drug may be more
16  expensive to the pharmacy. So it's the difference
17  between what the pharmacy has to pay and what we
18  reimbursed.
19      But if you -- if you have only a steady
20  discount of 10%, well, my rationale at that point in
21  time was that because the discount didn't vary, that
22  if -- if drug prices went up, that relative to what

**75**

1   they went up, we would be -- they would be getting
2   more because our increase wasn't going up with that
3   increase. Now, whether that's a -- I'm pretty sure
4   that I had figured this out on paper. But you know,
5   I don't remember now how I figured it out.
6   Q. But as you've just explained it to me
7   right now, this was another reason Montana Medicaid
8   chose not to change to AWP minus 8.5%?
9   A. Yes.
10      MR. LOPEZ: Object to the form.
11  BY MS. O'SULLIVAN:
12  Q. The third reason listed here on Exhibit
13  Poulsen 005 says:
14      "Third, applying the increase to the
15  dispensing fee provides the most equitable
16  compensation for services, since it applies to each
17  prescription dispensed. In this way the Department
18  ensures that a pharmacy dispensing a low cost
19  generic drug receives a provider increase."
20  A. Right.
21  Q. That was the third reason not to change to
22  AWP minus 8.5%?

**76**

1   A. Yes. The pharmacy program differed from
2   other provider groups, in that most providers,
3   doctors and dentists and so forth are reimbursed for
4   their services.
5       The pharmacy program was set up so that
6   the reimbursement was set up for a product. This
7   dispensing fee was the only way they were paid for
8   their services. And that was an issue that -- that
9   I talked to pharmacists, the Pharmacy Association at
10  great length with. Because what we should be paying
11  for, what would be the most logical and reasonable
12  for them is to be paid for their services. Not for
13  -- not for their services to be paid through their
14  best dealing with -- their best acquisition of
15  drugs. You know, they're trying to make their money
16  by buying drugs cheaply.
17  Q. And the system that was in place while you
18  worked for Montana Medicaid, was that providers were
19  in essence rewarded for buying drugs cheaply?
20  A. Yes. And it wasn't Montana Medicaid.
21  That was true of all states and I think of all
22  pharmacies.

**77**

1   Q. Because the reimbursement methodology was
2   not based on actual acquisition costs?
3   A. Right.
4   Q. Is it fair to say that the Federal OIG
5   study -- well did the Federal OIG study of 1996
6   conclude that Montana Medicaid was over reimbursing
7   or underreimbursing providers for drugs?
8       MR. LOPEZ: Object to the form. Speaks
9   for itself.
10      THE WITNESS: And I didn't look at it.
11  But before I answered that, I want to look at how
12  Terry Krantz and Jeff Ireland responded back.
13  Because the OIG report doesn't take into
14  consideration all aspects of the pharmacy program.
15  BY MS. O'SULLIVAN:
16  Q. And I'm happy to show you that letter
17  again. But right now my question goes to, not the
18  criticism of the study but what the study said. And
19  then the criticism may be a separate topic.
20  A. Yeah. And I didn't read through it.
21      MR. LOPEZ: Same objections.
22      THE WITNESS: I didn't read through it, so

Page 78

1  I'm not sure what they concluded.
2  BY MS. O'SULLIVAN:
3      Q. But as a general matter, do you understand
4  that it concluded that Montana Medicaid was
5  overreimbursing or underreimbursing providers for
6  drugs?
7      MR. LOPEZ: Object to the form.
8      THE WITNESS: Yeah. I don't -- I think
9  that what they were concluding -- and I would have
10 to look at it again. But I think what they were
11 concluding was that, we were paying more for the
12 drug. Our discount on the drug was not -- was --
13 the pharmacist's discount on the drug was greater
14 than the discount that we were making for
15 reimbursement purposes. That's not same to say that
16 we were overreimbursing pharmacists.
17 BY MS. O'SULLIVAN:
18     Q. But you were aware generally of the
19 conclusion that Montana Medicaid's acquisition costs
20 -- strike that.
21     That the pharmacies' actual acquisition
22 costs were less than Montana Medicaid's

Page 79

1  reimbursement?
2      MR. LOPEZ: Object to the form.
3      THE WITNESS: From my own experience and
4  from what I had been told, in -- for many drugs that
5  could be the case. For some drugs, no. It varied,
6  depending upon the drug and the way in which the
7  pharmacy was able to obtain the drug. And
8  especially in Montana, where you had a lot of little
9  private pharmacies. You didn't have Bartell's and
10 Rite-Aid in those small communities. Their access
11 to best pricing by wholesalers was not at the same
12 level as -- I mean, there were differences among the
13 pharmacies in terms of their ability to obtain drugs
14 cheaply.
15 BY MS. O'SULLIVAN:
16     Q. I want to go back to the question I asked
17 a minute ago. I think I just don't understand your
18 answer to my question of whether your understanding
19 was that the OIG study didn't conclude that Montana
20 Medicaid overreimbursed or underreimbursed providers
21 for drugs?
22     A. And what I'm --

Page 80

1      MR. LOPEZ: Object to form.
2      THE WITNESS: What I'm saying is that, I
3  think that what that report says is that the
4  discount, from their study, the discount that
5  pharmacies were receiving from the discount on AWP
6  that the pharmacies were receiving was greater than
7  the discount that we were making in our
8  reimbursement. So it was greater than AWP minus
9  10%. That is not the same as talking about
10 reimbursing for services.
11 BY MS. O'SULLIVAN:
12     Q. Did the 1998 provider increase go into
13 effect?
14     A. Yes.
15     Q. And so, is it true that after receiving
16 the 1996 OIG study, Montana Medicaid actually
17 implemented an increase in the level of
18 reimbursement to providers?
19     A. Yes. Well, for the dispensing fee, yes.
20     Q. I have a few more questions about this
21 document and then we'll take a break.
22     Turning to the prior page, MT004041,

Page 81

1  there's a third full program where it starts:
2      "The proposed rule change in ARM
3  46.12.703(5) is necessary because the Medicaid
4  pharmacy program participates in the state's
5  contract for pharmacy services for people in the
6  state institutions."
7      Do you know which institutions that's
8  referring to?
9      A. This is the MedManagement.
10     Q. That would be the Department of
11 Corrections, the developmentally disabled and was it
12 the mental health?
13     A. Yes. The mental health. Long-term care
14 in Louis Town. Yes. But it had to do with mental
15 health programs. The institutional mental health
16 programs, corrections and developmentally disabled.
17 And actually, what was one? It was something up
18 north that had to do with veterans.
19     Q. The Montana Veterans Home?
20     A. I think so.
21     Q. Are any of those institutions run by
22 Medicaid?

**Page 86**

-- and the institutions. The institutions came together under the Department of Corrections and they ran that show. So, I think -- so it wasn't a contract that I had input into.

Q. On the last line of that paragraph, the full sentence is:

"Analysis by the department prior to entering into the contract showed that the 2 reimbursement methodologies resulted in comparable costs to the outpatient drug program."

A. Right.

Q. Do you have any reason to believe that statement was not accurate?

A. No. I'm pretty sure that one is accurate because I did do the analysis.

Q. My question was going to be, who did it? How did you make that analysis?

A. Again, remembering that this is a good number of years ago. But as I recall, I looked at what we had paid them.

Q. "Them," meaning?

A. MedManagement. For the prescriptions they

**Page 87**

provided to Medicaid recipients. Looked at the number of prescriptions and separated it out from the amount -- the drug costs, which would have been easy because we were paying the same dispensing fees. I just had to subtract it out. And then said, okay, now, if we do it this other way, if pay acquisitions cost plus this higher dispensing fee would it come out the same. They had their acquisition costs, so I could compare. I could set it up and compare AWP minus 10% to their acquisition costs and see what the differences where and then add in the dispensing fee. So I could determine that the cost to the program would be no greater under the new way of doing it than the old way of doing it.

Q. Do you remember what the form of your analysis took? Was it a memo? Do you remember what it looked like?

A. Spreadsheet, probably. I mean, no, I don't remember.

Q. Do you remember who you shared that analysis with?

**Page 88**

A. Not specifically. My best guess would be, it would have been a supervisor. John Chappuis.

Q. C-H-A-P-P-U-I-S. So your supervisor would have been Mr. Ireland or Mr. Buska?

A. Yes.

Q. Mr. Chappuis, at that point, was he the Medicaid director for Montana?

A. No. He was in charge of the financial budget aspect.

Q. I saw you, perhaps, looking at the date of the document, the last page of Exhibit Poulsen 005, dated December 1, 1997.

Is it fair to say that, at least as of December 1, 1997, Montana Medicaid was aware of the reimbursement methodology used by Montana state other than Medicaid?

MR. LOPEZ: Object to the form.

THE WITNESS: Well, we knew about -- we knew about these. And well, we knew about MedManagement's system.

BY MS. O'SULLIVAN:

Q. Which encompassed, as you testified, the

**Page 89**

Department of Corrections, the Veterans Home, Mental Health and several others?

A. Frankly, I was -- I was never -- I was not part of the contract discussions. I was not part of the decision-making within the Department of Corrections. So I only knew what they told me. And so to the extent that what I have here, this is -- was my understanding of what they were getting paid or how they were getting paid. That's what I knew.

Q. So if I understand it right, you weren't involved in the contract negotiations for this MedManagement contract; right?

A. Right.

Q. But you ultimately learned of the contract terms?

A. This was a very difficult issue because the person in corrections had a different perspective about pharmacy. And I mean, she was -- she was basically only doing this from a budgeting perspective. She didn't know or in my estimation, she didn't understand how billing systems typically worked or how -- how we typically paid or how

94

1   anyway, so it was an acceptable thing for us to do.
2   It was that or interdepartmental warfare.
3        MS. O'SULLIVAN: Let's take a short break.
4        (Off the record.)
5   BY MS. O'SULLIVAN:
6        Q. I wanted to follow up on 2 topics you
7   testified about earlier.
8        One is, you testified you received
9   MedManagement acquisition costs related to generic
10  drugs and you compared those to Montana Medicaid's
11  costs.
12       Did you also compare acquisition costs
13  from non-generic drugs?
14       A. If they used them. I mean, I honestly
15  don't remember specifically what I looked at. There
16  were probably some non-generics that they used.
17       Q. And so there the comparison would have
18  been to AWP minus 10%?
19       A. Yes.
20       Q. I asked you those questions about the OIG
21  report about underreimbursed or overreimbursed and I
22  think I may have confused you. I'm now asking for

95

1   what you believe. Not what the report said but what
2   you believe.
3        Did you believe that providers were being
4   overreimbursed?
5        MR. LOPEZ: Object to the form.
6        THE WITNESS: I guess, generally, I didn't
7   think my providers were being overreimbursed.
8   BY MS. O'SULLIVAN:
9        Q. Did you think that providers were at times
10  undercompensated for their services?
11       MR. LOPEZ: Object to the form.
12       THE WITNESS: Since they weren't being --
13  since they weren't being reimbursed or paid
14  specifically for their services, their services were
15  not being paid for. It wasn't a system of
16  reimbursement that I thought was in the best
17  interest of the pharmacies in the long-term.
18  Because I assumed that eventually there would be
19  concern about the cost of the drug, which were
20  always going up. And if, for instance, we said to
21  the pharmacists, you have to charge us only your
22  acquisition costs and we had some mechanism to

96

1   determine whether or not they were actually doing
2   that and we were paying them $4.14 for dispensing,
3   they would not have been reimbursed adequately.
4   BY MS. O'SULLIVAN:
5        Q. They would have lost money on every drug
6   they dispensed?
7        MR. LOPEZ: Object to the form.
8        THE WITNESS: They would have lost money
9   on their business, yes.
10  BY MS. O'SULLIVAN:
11       Q. And that would have harmed access to
12  Medicaid beneficiaries?
13       MR. LOPEZ: Objection.
14       THE WITNESS: Yes. Well, it would have
15  done worse than that.
16  BY MS. O'SULLIVAN:
17       Q. What would it have done?
18       A. In many instances, it would have closed
19  pharmacies in small towns and it would have hurt the
20  population as a whole.
21       Q. Mrs. Poulsen, the court reporter has
22  handed you what has been marked Exhibit Poulsen 006,

97

1   Bates numbered MT015624 to 15628. The last page of
2   which has your name on it. And it appears to be
3   stamped, "Received March 6th, 1999, Health Policy
4   and Service."
5        Will you please take a look at this
6   document and tell me whether you believe you
7   received it?
8        A. Yes. It looks like a newsletter that Mark
9   would have -- was producing under the contract for
10  DUR and being sent to pharmacies and physicians in
11  the state of Montana. I would have received a copy.
12       Q. And the "Mark" is --
13       A. Mark Eichler.
14       Q. How often did you receive these
15  newsletters?
16       A. I think they were supposed to be produced
17  on a quarterly basis. So sometimes they were
18  produced on a quarterly basis and sometimes I
19  received them. But -- but generally, the idea was
20  that they were to be done quarterly.
21       Q. Where it says on the first page of the
22  document under, "WINTER 1999":

118

1    A.  I understood that from his perspective or
2  at least in his mind, chain retailers were able to
3  buy drugs at much less than or much less than AWP.
4    Q.  Mrs. Poulsen, the court reporter has
5  handed you Exhibit Poulsen 010, which is Bates
6  numbered MT028841 to MT028855. It starts off as an
7  Email from David Shepherd to the NMPAA
8  talk@listbot.com and addressed June 23, 2000.
9       Will you please take a look at this
10 document?
11   A.  Okay.
12   Q.  Mrs. Poulsen, Exhibit Poulsen 010 has your
13 name on the top left-hand corner.
14      Do you know why that is?
15   A.  I would have printed it out, I think.
16   Q.  So is it fair to say, you received this
17 Email which is Exhibit Poulsen 010?
18   A.  Yes.
19   Q.  Turning to the second page of Exhibit
20 Poulsen 010 MT028842, the paragraph that begins:
21      "There is no doubt in my mind." It's kind
22 of in the middle of the page.

119

1       Do you see that?
2    A.  Yes.
3    Q.  Do you see the third sentence where it
4  says:
5       "Almost everyone who is familiar with
6  pharmacy reimbursement knows that AWP, 'Ain't What's
7  Paid'"?
8    A.  Yes.
9    Q.  Did you know that?
10   A.  Yes. I mean, the common knowledge was
11 that AWP was, again, as I've said before, not what
12 it sounded like. That's why it was discounted.
13   Q.  And you knew that while you were the
14 pharmacy provider for Montana Medicaid?
15   A.  Yes. I wouldn't have been paying
16 attention if I didn't know that.
17   Q.  Turning to the last paragraph on the same
18 page and the second full sentence:
19      "It is true that ingredient reimbursement
20 is supposed to be based on estimated acquisition
21 cost. The ancillary costs of dispensing the drug
22 are supposed to be accounted for by the dispensing

120

1  fee. If the AWP spread disappears, the dispensing
2  fee may have to be increased, especially for many of
3  the 428 drugs currently in question."
4       Would you agree with that statement that:
5       "If the AWP spread disappears, the
6  dispensing fee may have to be increased"?
7    A.  Yes.
8       MR. LOPEZ: Object to the form.
9       THE WITNESS: Yes. That was -- that was
10 exactly my point I tried to make. That was the same
11 argument I always used with pharmacists is that,
12 their way of being reimbursed didn't make sense
13 because exactly of this thing. That if states were
14 to change the way they were paying for drugs, then
15 pharmacies simply would not be reimbursed for the
16 services they provided or minimally reimbursed for
17 the services they were providing and that wasn't a
18 rational system. However, that was the system that
19 50 states were using.
20 BY MS. O'SULLIVAN:
21   Q.  Exhibit Poulsen 010, the portion that I
22 just read from, used the term, "spread."

121

1       Are you familiar with that term?
2    A.  Just in a layman's perspective. Just in
3  normal, everyday use.
4    Q.  And what's your understanding of that
5  everyday use?
6    A.  There is a difference between one -- the
7  ACC and AWP price and one value and another value.
8    Q.  Sorry. Did you say the difference between
9  ACC?
10   A.  Well, that's the one that's listed here.
11 It wouldn't make any difference. Just a difference
12 between 2 values.
13   Q.  Was that term used at Medicaid for the
14 difference between acquisition cost on the one hand
15 and reimbursement on the other?
16   A.  No, it was not. This Email was an
17 informal Email or written in an informal way by Cody
18 when it was sent out. Formally, one would never
19 include in an Email that AWP is being what's paid.
20 So all of this was as though if you were talking to
21 people, rather than an official document.
22   Q.  That is how people who are involved in

**122**

1  pharmacy programs for Medicaid across the country
2  did talk?
3      MR. LOPEZ: Objection.
4      THE WITNESS: No. Actually, in -- in what
5  terms? No. I mean, I don't know that I had ever
6  heard "Ain't What's Paid" before I read here. And
7  no, we didn't usually talk in these terms. This was
8  the -- in -- in any discussions that there may have
9  been about pricing, the -- the way that it would
10 have been phrased would not have been as informal as
11 this.
12 BY MS. O'SULLIVAN:
13    Q. But you did testify a few minutes ago,
14 that it was common knowledge that AWP was, "Ain't
15 What's Paid"?
16     MR. LOPEZ: Object to form.
17     THE WITNESS: Colloquially, yes. I mean,
18 we understood that AWP didn't reflect the average
19 wholesale price.
20 BY MS. O'SULLIVAN:
21    Q. And the AWP also didn't reflect the actual
22 acquisition costs?

**123**

1     A. Which we always understood that to be the
2  case. You can't have an average and have that be the
3  same as actual. Because the average presumably is
4  the average of actuals.
5         So assuming that you're selling drugs to
6  different pharmacies at different amounts, the
7  actual is what you actually do it and sell it for
8  and the average is an average of those amounts. At
9  least that was my interpretation. I never took a
10 class on pricing of drugs. But -- but that is what
11 I intuited from my years of working in the program.
12    Q. I want to go back to this term, "spread."
13        Could you explain it to me again, how you
14 used the term while you were with Montana Medicaid?
15     MR. LOPEZ: Objection.
16     THE WITNESS: I don't know that I ever
17 used the term. This is a football team phraseology.
18 You hear about betting on teams with a spread. It's
19 not -- it is not the kind of terminology I would
20 have ever used.
21 BY MS. O'SULLIVAN:
22    Q. You can put Exhibit Poulsen 010 away.

**124**

1  This is Exhibit Poulsen 011.
2         It's a multi-page document Bates numbered
3  MT008640 to 8646. It's faxed to you from Jeff
4  McClellan, Healthcare Exec.
5         Will you please take your time and look at
6  this exhibit?
7     A. (Witness complies.) Okay.
8     Q. Did you receive this fax from Mr.
9  McClellan?
10    A. "Ask Mark about Coumadin" is my writing.
11    Q. Mark Eichler?
12    A. Yes.
13    Q. The first paragraph third sentence, he
14 wrote:
15        "There actually is net gain in cost for
16 Coumadin on all strengths that are currently being
17 utilized for the State Medicaid program."
18        Do you know what he meant by "net gain in
19 cost" for this drug?
20     MR. LOPEZ: Object to the form.
21     THE WITNESS: No.
22 BY MS. O'SULLIVAN:

**125**

1     Q. Were you familiar generally with the idea
2  that some drugs could have a negative net cost to
3  Montana Medicaid, when you took into account the
4  Federal matching amount and the rebate from the
5  manufacturer?
6      MR. LOPEZ: Object to the form.
7      THE WITNESS: You know, I don't -- I never
8  -- I don't know if this was the first example. But
9  it wasn't something I thought that was the case. It
10 was probably the reason I said, "Ask Mark about
11 Coumadin."
12 BY MS. O'SULLIVAN:
13    Q. Were you aware that Montana Medicaid
14 received a higher rebate percentage for brand name
15 drugs than for generic drugs?
16    A. Yes.
17     MR. LOPEZ: Object to the form.
18 BY MS. O'SULLIVAN:
19    Q. Did Montana Medicaid prefer some brand
20 name drugs to generic drugs because of the impact on
21 rebates?
22    A. No.

 1   Describe the different methodologies that Montana
 2   Medicaid used to calculate EAC while you were a
 3   pharmacy program officer?
 4           MR. LOPEZ:  Objection.
 5           THE WITNESS:  The ones that I can remember
 6   would be the AWP minus 10% plus the dispensing fee.
 7           That's the one we would have used or were
 8   using, in terms of the estimated cost.
 9   BY MS. O'SULLIVAN:
10      Q.   And looking again at Exhibit Poulsen 015,
11   below where I was reading from before and it says:
12           "The EAC, which includes single source,
13   brand necessary and drugs other than multi-source,
14   is established using the following methodology:
15           "Drugs paid by their Average Wholesale
16   Price (AWP) will be paid at AWP less 10.%.  The
17   policy for the reimbursement of Direct Price, (DP)
18   drugs (the price charged by manufacturers to
19   retailers) is the current direct price (the direct
20   price in effect on the date of service for the
21   claim.)"
22           Does this refresh your recollection that

Dorothy Poulsen
Seattle, WA
February 22, 2006

Page 152

1   Montana Medicaid also had direct price as one of its
2   reimbursement benchmarks?
3       A.   Not really.  Because I never used direct
4   price.  It wasn't something that was, you know, on a
5   day-to-day basis, it was not something we used or
6   referred to.  I'm sure if I had read the state plan.
7   I'm sure it must be in the rules.  Because I see on
8   Exhibit Poulsen 014 it says, what is your current
9   reimbursement formula, that I include direct price
10  there.
11          There would have been so few instances
12  where there would have been a direct price from the
13  manufacturer to the pharmacist.  I wouldn't have
14  known it was a direct price without the pharmacy
15  telling me.  I would have taken it for the usual and
16  customary.
17      Q.   I have a couple sections later about
18  direct price specifically.  I think I'll ask you
19  more questions about that later.  You just mentioned
20  usual and customary.
21          Was that one of the other reimbursement
22  benchmarks used by Montana Medicaid?

Page 182

1    Q.    Were you familiar with the survey
2    conducted by the pharmacy coordinating committee and
3    the University of Montana School of Pharmacy to
4    determine the extent to which pharmacies acquired
5    drugs directly from manufacturers?
6    A.    I don't know.  I don't remember whether I
7    had any input in the survey or whether I had that or
8    even saw the survey.  Although, I'm sure I must have
9    seen it at some point in time or whether I saw the
10   results of the survey. So far as I remember, I
11   certainly wasn't instrumental in doing the survey or
12   conducting the survey.
13   Q.    Does the letter that you wrote that's
14   Exhibit Poulsen 022 reflect that you were familiar
15   with the results of the survey?
16   A.    Yes.  I mean, it does suggest that I was
17   familiar with the results of the survey.  However, I
18   don't know what the results were.  I mean, I can't
19   determine from this letter what the results were or
20   why I thought this was a good idea at the time.
21   Q.    Do you know whether the survey also looked
22   at whether Montana pharmacies could acquire any

Page 183

1   drugs at published direct prices?

2        A.   That was the issue, I believe, is that

3   pharmacies in Montana had a great difficulty

4   acquiring drugs at that price.  And -- and this is

5   speculation on my part.  It could be that our system

6   was set up.  Our reimbursement system, the PBM

7   system was set up to take the lower of direct price

8   or AWP minus 10%.  And so for those labels that's

9   what I'm guessing.  For those labels that were at

10  direct price, they were paying at the direct price

11  but our pharmacies were unable to get the drugs at

12  that cost.  That is -- I think that was the issue.

13       Q.   Does this letter that's Exhibit Poulsen

14  022 refresh your recollection in any way as to

15  whether Montana Medicaid eliminated the use of

16  direct price?

17       A.   I do remember that we removed -- we were -

18  - we removed labels from that -- from that pricing,

19  yes.

20       Q.   Looking at page 2 of Exhibit Poulsen 022 -

21  -

22       A.   Uh-huh.

230
1  Q. Exhibit Poulsen 036 is a 2-page document
2  Bates labeled MT018257 to 58.
3      Does this appear to be a series of Emails
4  between you and Shannon Marr, from your personal
5  Email account?
6  A. Yes.
7  Q. On the first page of Exhibit Poulsen 036,
8  about halfway down the first paragraph, did you
9  write:
10     "Everything I had should be in a file that
11 I was keeping in the bottom drawer of the file on
12 the right side of the desk. I had a file with the
13 Department of Corrections information and Ron's
14 stuff should be there also."
15 A. Yes, I wrote that.
16 Q. What were you referring to?
17 A. Ron Balas, who was the administrator of
18 the mental healthcare center in Louis Town was
19 disenchanted with the Department of Corrections'
20 solution to providing a medication management.
21     And so he found, as I recall, he found a
22 local pharmacy, something. The problem was Louis

231
1  Town was out in the middle of the state. And so by
2  the time they contacted Warm Springs to say, this is
3  what we need and -- and received the drugs, that
4  took a certain amount of time because there was a
5  lot of distance.
6      And so he wanted something that was close
7  and he could get drugs when he wanted it. That and
8  the fact they didn't include him in those
9  discussions that were mentioned before. So we were
10 working on a system for him to be able to do his
11 thing separately from the Department of Corrections'
12 contract. So that's what I remember.
13 Q. Did you have one file that you kept with
14 the Department of Corrections' pharmacy information
15 and another file you kept pertaining to the mental
16 health nursing care center pharmacy issues?
17 A. Either that or I kept it all together. It
18 wouldn't have been a very big file.
19 Q. Where you wrote at the beginning of the
20 second paragraph, first sentence:
21     "Don't feel bad about having a difficult
22 time understanding what I did with Ron or the

232
1  Department of Corrections. They were really screwy
2  in how they did things and generally I just went
3  along."
4      What did you mean by saying, "they were
5  screwy in how they did things"?
6  A. Well, they didn't do things the way we did
7  things. They really had a very different perspective
8  about providing pharmaceutical care. This is
9  Corrections, a prison setting.
10     Whereas, my perspective was that my
11 responsibility was to make sure that people had the
12 drugs that they needed for their healthcare. Their
13 perspective was they didn't want to give out any
14 more than they absolutely had to and they wanted to
15 give it at the lowest cost they possibly could. We
16 just had different perspectives on therapy and
17 therapeutic usefulness of drugs. And -- and the
18 person that I was working with there, the woman that
19 I -- that I don't remember the name of, I mean, her
20 focus was totally budgetary. It wasn't at all
21 health related. And so it was very difficult to
22 talk to them. And then they did things. You know,

233
1  the way they set things up or the way they had --
2  they made decisions without keeping everybody in the
3  loop and that sort of thing. That wasn't the way I
4  operated or Medicaid operated.
5  Q. As the pharmacy program officer for
6  Montana Medicaid, is it fair to say, your focus was
7  not totally budgetary?
8  A. Absolutely.
9  Q. And is it also fair to say, you were not
10 interested in the lowest cost you could possibly
11 acquire drugs?
12     MR. LOPEZ: Object to form.
13     THE WITNESS: No. That's not -- that
14 would not be true. I was very interested in having
15 the lowest cost we could get drugs at. But I wanted
16 to make sure that we had access to the drugs needed
17 by our clients.
18     You have 3 constituencies in that
19 position. You have the client whose healthcare is
20 dependant upon you. You have the providers, with
21 whom you want to have a good relationship and
22 cooperative relationship and you have the taxpayer.

**234**

1  You have a responsibility your the State. And
2  balancing those 3 roles was always what it was you
3  tried to do.
4  BY MS. O'SULLIVAN:
5     Q. Where you wrote on this Email that's
6  Exhibit Poulsen 036:
7     "The view held by Mary Dalton and others
8  there during my time was that we should always let
9  the Federal government pay rather than use state
10 funds if we could do so. Thus, even when it was a
11 different agency we cooperated in leveraging funds."
12    A. Right.
13    Q. What did you mean by that?
14    A. Exactly that. If it was permissible under
15 Federal regulations to pay for services through
16 Medicaid, then it was best to pay through Medicaid
17 because the Federal government picked up 70% of the
18 cost for the state of Montana.
19    (Whereupon, Various Documents were
20 marked Exhibit Poulsen 037, Exhibit Poulsen 038,
21 Exhibit Poulsen 039, Exhibit Poulsen 040, Exhibit
22 Poulsen 041, Exhibit Poulsen 042, Exhibit Poulsen

**235**

1  043 for identification.)
2  BY MS. O'SULLIVAN:
3     Q. Mrs. Poulsen, I was asking about that
4  Email where you said you had a file of the
5  Department of Corrections and the mental health
6  nursing care center --
7     A. Uh-huh.
8     Q. -- stuff, so to speak, about pharmacy?
9     A. Right.
10    Q. I intend to ask you about this series of
11 documents.(Indicating)
12    A. Was this from that file?
13    Q. I'll take them one at a time to try to be
14 organized.
15    Exhibit Poulsen 037 is a multi-page
16 document Bates numbered MT018495 to 18504.
17    Is this a contract between the Montana
18 Department of Corrections and Human Services and HPI
19 Health Services, Inc.?
20    A. That's what the front page says, yes.
21    Q. Was this document in your file of DOC
22 pharmacy stuff?

**236**

1     MR. LOPEZ: Object to the form.
2     THE WITNESS: I would not be able to
3  remember whether I had a copy in my file or not.
4  BY MS. O'SULLIVAN:
5     Q. Do you remember ever seeing a copy of this
6  contract, this Exhibit Poulsen 037 before?
7     A. I don't remember. It's likely that I did
8  but I don't remember.
9     Q. Exhibit Poulsen 038 is Bates numbered
10 MT018394 to 18409.
11    Is this a pharmaceutical management
12 service agreement between -- oh, sorry. Is it
13 Exhibit Poulsen 038?
14    A. Exhibit Poulsen 039, yes.
15    Q. Is this a Pharmaceutical Management
16 Service Agreement between, with the Montana
17 Department of Corrections Department Public Health
18 and Human Services from 1997?
19    MR. LOPEZ: Objection.
20    THE WITNESS: This is an agreement between
21 Department of Corrections and DPHHS and
22 MedManagement.

**237**

1  BY MS. O'SULLIVAN:
2     Q. Was this agreement in your file relating
3  to Montana Department of Corrections' Pharmacy
4  issues?
5     MR. LOPEZ: Objection.
6     THE WITNESS: I don't know. This one
7  looks more familiar but I don't know.
8  BY MS. O'SULLIVAN:
9     Q. Do you --
10    A. Oh, actually, this one would have been
11 because I recognize the dispensing fees on page
12 018400.
13    Q. So you received this contract that is
14 Exhibit Poulsen 038?
15    A. A copy of it. Yes. I believe I --
16 actually, I don't know if I received a copy of all
17 of it or just a copy of parts of it. The only part
18 I would have been concerned about is the dispensing
19 fee that they agreed to.
20    Q. Exhibit Poulsen 039, will you pick that
21 up, please?
22    A. Uh-huh.