**BRECKENRIDGE DECL. EXHIBIT 7**

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

| | |
|---|---|
| In re: PHARMACEUTICAL, | MDL DOCKET NO. |
| INDUSTRY AVERAGE WHOLESALE | CIVIL ACTION |
| PRICE LITIGATION | 01CV12257-PBS |

THIS DOCUMENT RELATES TO:

ALL ACTIONS

DEPOSITION OF DANIEL WADE PETERSON

Taken at

Law Offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

December 15, 2005

9:00 a.m.

Page 86

1  with actual drug costs.
2      Q.  What is meant by that sentence?
3      A.  Just what it says, to use reimbursement
4  methodologies more in line with the actual drug
5  costs or acquisition costs.
6      Q.  How does using reimbursement methodologies
7  more in line with actual drug costs control costs?
8      A.  If the cost of drugs is less than what we
9  reimburse for, we would like to get as close to
10 that as possible without -- without limiting access
11 for our clients.
12     Q.  Did Montana consider lowering the
13 reimbursement formula for generic multiple source
14 drugs to AWP less a percentage greater than
15 25 percent?
16         MS. BRECKENRIDGE:  Objection.
17     A.  Not that I can recall.
18         BY MS. SMITH-KLOCEK:
19     Q.  Same page, 00040, last paragraph.
20     A.  Uh-huh.
21     Q.  Could you please read that sentence, the
22 first sentence of the last paragraph.

Page 87

1      A.  Starting with the OIG?
2      Q.  Yes.
3      A.  The OIG studied actual acquisition costs in
4  Montana and found that overall estimate of the
5  discount below AWP on invoice prices was
6  19.71 percent for brand name drugs and
7  65.37 percent for generic drugs.
8      Q.  Okay.  Did the state of Montana consider
9  lowering the formula of reimbursement for generic
10 drugs to AWP minus a percentage closer to
11 65.37 percent?
12     A.  Not that I can remember.
13     Q.  Do you know why this proposal was not
14 implemented?
15     A.  Our main concern from what I can remember
16 at that time was -- was access issues for our
17 clients.
18         In a rural state like Montana, access is
19 very important that we have plenty of pharmacies
20 willing to participate and accept reimbursement for
21 our Montana Medicaid clients for our low income.
22         Another consideration was a report

Page 88

1  submitted by the Montana Pharmacy Association
2  saying that it was -- instead of going after
3  pharmacy providers, we should look at recouping
4  money somehow from the pharmaceutical
5  manufacturers, because they said the pharmaceutical
6  manufacturer profits as the number one cost driver
7  for drugs within the state.
8      Q.  Were there any other considerations for why
9  this proposal was not implemented?
10     A.  Access is always an issue.  Of course, that
11 report that I just mentioned.  And that is all I
12 can think of right now, off the top of my head.
13         MS. SMITH-KLOCEK:  Are we up to Exhibit
14 Peterson 010?
15         (Whereupon, Deposition Exhibit Peterson 010
16 was marked for identification.)
17         MS. SMITH-KLOCEK:  For the record, Exhibit
18 Peterson 010 is Bates labeled MT 005768 through MT
19 003771.  It's entitled Department Testimony, April
20 14, 2004.
21         (Witness examines document.)
22     A.  Okay.

Page 89

1          BY MS. SMITH-KLOCEK:
2      Q.  Are you familiar with this document?
3      A.  Yes.
4      Q.  What is it?
5      A.  It's the testimony I gave, I believe it was
6  for the administrative rule regarding the preferred
7  drug list.
8      Q.  Where was this testimony provided?
9      A.  At the Department of Public Health and
10 Human Services building at the auditorium.
11     Q.  Who was present?
12     A.  Well, myself, supervisor, various members
13 of the community, Montana Pharmacy Association.  I
14 believe there were folks there from AARP.  And I
15 don't know who else.
16     Q.  On the first page, carrying over into the
17 second page, there is a sentence that begins the
18 department.  Do you see that sentence?
19     A.  Uh-huh.
20     Q.  Could you please read that?
21     A.  Sure.  The department decided not to pursue
22 this reduction after considering testimony and

**114**

1  A. Yes.
2  Q. Have you gone through and destroyed any
3  documents since you started in your position?
4  A. No.
5  Q. You don't keep every document, though, do
6  you?
7  A. No. Some things that I will -- I'll get
8  rid of or destroy would be any protected health
9  information from clients with Social Security
10 numbers, those type of things, where I just
11 wouldn't want them falling into anybody else's
12 hands, because I have a duty to protect health
13 information for somebody.
14 Q. Okay. And as far as the document retention
15 schedule that you were asked about earlier, does it
16 fall within your job responsibilities to handle
17 document retention?
18 A. No, it doesn't.
19 Q. Have you had occasion to archive any of
20 your documents since you began in your position?
21 A. Before I heard from you, I kind of ran out
22 of room for my filing cabinet. So I went ahead and

**115**

1  prepared eight or nine boxes for archiving, was
2  getting ready to do the paperwork on that. Then I
3  found out about the lawsuit, so they had to stay.
4  Q. When you say you were getting ready to
5  archive documents, archive is not another word for
6  destroy, is it?
7  A. No. It's just to go into storage off site,
8  or away from my cubicle, or my area.
9  Q. Would you, yourself, handle the details of
10 the archiving?
11 A. No.
12 Q. Would you, yourself, handle the details of
13 records retention?
14 A. No.
15 Q. Is there someone within your department you
16 would or could contact if you wanted to archive or
17 store documents?
18 A. I would rely on Jean Robinson, our
19 administrative assistant, just to let me know what
20 I needed to do to get those into archive.
21 Q. You wouldn't take it upon yourself to do
22 it?

**116**

1  A. No.
2  Q. Are you aware of anyone else within the
3  state Medicaid who has destroyed documents since
4  you began?
5  A. No, I do not.
6  Q. In terms of your role assisting counsel and
7  participating in the response to discovery, no one
8  has told you that they have destroyed documents
9  that you were searching for, have they?
10 A. No.
11    MS. BRECKENRIDGE: I have no further
12 questions.
13    MS. SMITH-KLOCEK: I have a couple.
14    FURTHER EXAMINATION BY COUNSEL FOR
15    DEFENDANTS PFIZER AND PHARMACIA
16    BY MS. SMITH-KLOCEK:
17 Q. A moment ago your counsel asked questions
18 about destruction of documents.
19 A. Uh-huh.
20 Q. When I use that term I also mean throw away
21 documents?
22 A. Right.

**117**

1  Q. As in discard.
2  A. Uh-huh.
3  Q. Earlier, you testified that you threw away
4  certain notes from meetings you attended with Mr.
5  Preshinger; is that correct?
6  A. I did say that, uh-huh.
7  Q. Are there --
8  A. Handwritten, like notes to myself,
9  reminders or points I would make on whatever
10 project I was working on.
11 Q. Are there any other handwritten notes that
12 you create that you have thrown away since you
13 started in 2002?
14 A. Gosh, that's -- I -- I don't know. I do so
15 much every day, it's just hard for me to remember.
16 I've got to write notes to myself, reminders,
17 little sticky notes. I got stuff laying all over
18 the place.
19 Q. Have you kept all your handwritten notes
20 since 2002?
21 A. No.
22 Q. Other than the ones that you --