**BRECKENRIDGE DECL. EXHIBIT 8**

Shannon E. Marr          HIGHLY CONFIDENTIAL          March 29, 2006
                              Billings, MT

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - x

IN RE PHARMACEUTICAL         : MDL 1456

INDUSTRY AVERAGE WHOLESALE   : Master File No.

PRICE LITIGATION             : 01-CV-12257-PBS

- - - - - - - - - - - - - x

Great Falls, Montana

Wednesday, March 29, 2006

Deposition of SHANNON E. MARR, a witness herein, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice and the Federal Rules of Civil Procedure, the witness being duly sworn, by agreement, by CRAIG KNOWLES, a Notary Public in and for the State of Colorado, taken at La Quinta Inn, Great Falls, Montana, at 9:00 a.m., on Wednesday, March 29, 2006, and the proceedings being taken down in Stenotype by CRAIG KNOWLES and transcribed under his direction.

Shannon E. Marr          HIGHLY CONFIDENTIAL          March 29, 2006
Billings, MT

12 (Pages 42 to 45)

```
                                                42
 1      A.  I think Maggie reported to, I think it was
 2   Gail Gray at the time, the director.
 3      Q.  Did Ms. Bullock review this document?
 4      A.  I don't know that.
 5      Q.  Turning to page 2 of this document, MT
 6   029008, if we look at the -- if you just take a
 7   moment to familiarize yourself with the language
 8   there.
 9      A.  On the whole page?
10      Q.  Yeah, why don't you just read the whole
11   thing.
12      A.  Okay.
13      Q.  I'll throw out my question so as you read
14   it you can keep it in mind.
15         It appears the OIG report we were just
16   looking at was used as a rationale for this, and
17   that is what I'm going to be asking you about.
18      A.  Okay.
19          (Witness examines document.)
20          THE WITNESS: Okay.
21   BY MR. DILLON:
22      Q.  Would you agree that the OIG report was
```

```
                                                43
 1   part of the rationale for this rule change?
 2      A.  Yes.
 3      Q.  In the second paragraph on this page it
 4   indicates that the EAC methodology has been in place
 5   since 1988, and then cites to a couple of OIG
 6   studies, one in 1997 that states OIG issued a report
 7   that showed average discounts of 18.30 percent below
 8   AWP.
 9      A.  Uh-huh.
10      Q.  And 42.45 percent below AWP respectively.
11   And I believe that is referring to brand, generic
12   names, from the previous sentence.
13         Then it says again in 2000 the OIG
14   conducted another study which showed nationally that
15   the actual cost was an average of 21.84 percent
16   below AWP.
17         Did you at the time you were drafting this
18   go back and look at those studies?
19      A.  I don't recall.
20      Q.  Do you agree that in some form you had
21   available to you the results of those studies?
22      A.  Yes.
```

```
                                                44
 1      Q.  While you were working at the Montana
 2   Medicaid program, was there a file or other type of
 3   organizational structure of OIG reports?
 4      A.  I believe they were probably filed within,
 5   yeah, the files maintained by the pharmacy program
 6   officer.
 7         Not -- well, I don't recall if there was
 8   an actual place within Medicaid that all of the OIG
 9   reports were filed. I know that there were probably
10   copies of these reports in the pharmacy section.
11      Q.  So somewhere within the pharmacy section
12   there were copies of these reports that are cited to
13   on page MT 029008?
14      A.  Yes.
15      Q.  And then skipping down to the paragraph
16   that begins additionally, it says here, it refers to
17   the Montana specific study that I believe we were
18   just looking at, indicating that the discount below
19   AWP was 19.71 for brand name drugs and 65.37 percent
20   for generic drugs.
21      A.  Uh-huh.
22      Q.  Is that correct, that that's the Montana
```

```
                                                45
 1   study we were looking at earlier?
 2      A.  Yes.
 3      Q.  I want to direct your attention to the
 4   next paragraph there. It says: It's important to
 5   note that while OIG claims the discount below AWP is
 6   19.71 and 65.37, the department does not wish to
 7   reduce reimbursement to those exact levels. The
 8   department believes that the study failed to account
 9   for the cost of professional services and the cost
10   of dispensing which includes supplies and staff.
11         Therefore, the department bases its
12   recommendations in part on the OIG study, as well as
13   analysis of the implications to the overall pharmacy
14   budget.
15      A.  Uh-huh.
16      Q.  Do you agree with that statement?
17      A.  Yes.
18      Q.  Is it fair to say that, although you
19   agreed that the OIG study accurately identified the
20   discount at which pharmacists were acquiring the
21   drug, that there were costs for dispensing the drug
22   that had not been taken into account by the OIG
```

**Page 46**

1  study?
2      MS. BRECKENRIDGE: Objection. There is no
3  -- you haven't established that she knew if the
4  discounts were accurate.
5  BY MR. DILLON:
6      Q. Let's start with that. Do you have any
7  reason to believe that the OIG findings regarding
8  the discount below AWP at which Montana pharmacies
9  were acquiring drugs was inaccurate?
10     MS. BRECKENRIDGE: Objection.
11     A. I don't know. I don't.
12 BY MR. DILLON:
13     Q. Is it fair to say that for purposes of
14 this report, you give a fair amount of credibility
15 to those findings or that study?
16     MS. BRECKENRIDGE: Objection.
17     A. I believe that we relied on the OIG
18 reports to provide information that we could
19 determine reimbursement rates. So to that extent,
20 we utilized the reports to some degree.
21 BY MR. DILLON:
22     Q. Are you aware of any other studies

**Page 47**

1  regarding the acquisition costs of drugs by Montana
2  pharmacies?
3      A. No.
4      Q. Do you have any reason to doubt findings
5  of the study?
6      MS. BRECKENRIDGE: Objection.
7      A. I -- no, I don't think I do.
8  BY MR. DILLON:
9      Q. Is it also fair to say that with respect
10 to dispensing costs, that it was your understanding
11 that the OIG report had not adequately captured the
12 dispensing costs associated with the pharmacies,
13 with the retail pharmacy?
14     A. From what I recall, and just briefly
15 reviewing the reports, there wasn't anything --
16 there wasn't anything stated about the dispensing
17 costs. So they didn't address that at all.
18     Q. And so although the state --
19     MR. DILLON: Strike that.
20 BY MR. DILLON:
21     Q. And because this study did not address
22 dispensing costs, the Montana Medicaid program did

**Page 48**

1  not want to establish a reimbursement formula that
2  was based on the precise discounts identified by the
3  OIG study?
4      MS. BRECKENRIDGE: Objection.
5  BY MR. DILLON:
6      Q. Is that fair?
7      MS. BRECKENRIDGE: I'm sorry. Objection.
8      A. I believe what this refers to is that the
9  department thought that this study didn't account
10 for all of the factors, and so we were utilizing the
11 information about the AWP that the OIG studied, but
12 that we felt there were other issues to also
13 consider.
14 BY MR. DILLON:
15     Q. So in order to set a fair reimbursement
16 rate, you needed to account for those other issues?
17     A. That's what I would recall the rationale
18 for that, yes.
19     Q. Just looking at the last paragraph on that
20 page, it indicates that many states are heeding the
21 recommendations of the OIG study and are changing
22 their reimbursement rates, including Florida, West

**Page 49**

1  Virginia, Texas, Indiana and Wisconsin.
2      Did you have communications with these
3  other states regarding their response to the OIG
4  study or changes to reimbursement?
5      A. I don't recall whether I had conversations
6  with people in these specific states. I know that I
7  spoke with Medicaid pharmacy program officers in
8  other states, and I don't recall which actual states
9  they were.
10     Q. I think I have some correspondence I might
11 be able to show you a little bit later.
12     A. Okay.
13         (Whereupon, Deposition Exhibit Marr
14 006 was marked for identification.)
15 BY MR. DILLON:
16     Q. You have been handed what has been marked
17 Exhibit Marr 006. And it's a document identified by
18 Bates Number MT 023789. At the top of the document
19 it has a title, Budget Reduction Options, Addictive
20 and Mental Disorders Division.
21     This has some very small font, and I'm not
22 going to ask you to read the whole thing. You are

**Page 50**

1 welcome to do so.
2 　　My questions are going to center under
3 item number 6.
4 　A. Uh-huh.
5 　Q. There is a description there regarding a
6 change in the discount rate for pharmaceutical
7 drugs. And under the general fund for 2002 and 2003
8 it says delete. Then there is a comment to the
9 right of that that says, "Why?"
10 　　My first question is, could you just tell
11 me what this document is, if you know?
12 　A. I -- I don't know.
13 　Q. Do you recall ever seeing this?
14 　A. I don't recall seeing it.
15 　Q. Do you recognize the handwriting on it?
16 　A. No. It's not mine.
17 　Q. To your knowledge is this a document that
18 is created in the process of the rule-making
19 changes?
20 　A. No.
21 　Q. You can put it aside.
22 　　MS. BRECKENRIDGE: He said --

**Page 51**

1 　　THE WITNESS: I'm sorry?
2 BY MR. DILLON:
3 　Q. You can put it aside.
4 　A. Oh. Okay.
5 　　(Whereupon, Deposition Exhibit Marr
6 007 was marked for identification.)
7 　　(Discussion off the record.)
8 BY MR. DILLON:
9 　Q. Ms. Marr, you have been handed what has
10 been marked Exhibit Marr 007 to your deposition. It
11 begins with the Bates Number MT 02554.
12 　　It's identified as the Title Department
13 Testimony, May 16th, 2002, Public Hearing on
14 Amendment of ARM 37.86.1101 and 37.86.1105?
15 　　Do you recognize this document?
16 　A. Yes.
17 　Q. Is this a document you created?
18 　A. Yes.
19 　Q. What was the purpose of creating this
20 document?
21 　A. Part of the rule change process is that
22 you had to have a public hearing. And because I was

**Page 52**

1 the person that filed the ruling, was the program
2 officer in charge of the rule, I was in charge of
3 presenting the testimony. So it was just my actual
4 written testimony that I was going to be sharing
5 with the public.
6 　Q. So is it fair to say that you drafted this
7 sometime prior to the hearing?
8 　A. Yes.
9 　Q. Then is this the testimony you gave at the
10 hearing?
11 　A. Yes. My recollection of the hearing,
12 however, was that I actually did not read this
13 testimony, because there was only one person that
14 showed to the hearing. So it was a very casual
15 encounter, and we more had a conversation than
16 actual reading this testimony.
17 　Q. As part of that conversation did you
18 generally share the information --
19 　A. Yes.
20 　Q. -- that is within this?
21 　　Who was the person that showed up to the
22 hearing?

**Page 53**

1 　A. I believe he was a pharmacist. I believe
2 his name was Peter. I don't remember his last name.
3 But he owned a couple of pharmacies in the state. I
4 think one was in Townsend and one in Butte, maybe,
5 or around Butte. I believe it was he and Jeff Buska
6 and I were the only ones at the hearing.
7 　Q. Okay. Then as part of this process do you
8 file your testimony anywhere?
9 　A. I don't remember. My guess is that it
10 would be incorporated into the file.
11 　Q. Turning to the third page of your
12 testimony, this appears to be similar to the
13 rationale or explanation you gave in that ARM
14 checklist?
15 　A. Uh-huh.
16 　Q. Is that a fair statement?
17 　A. Uh-huh. Yes.
18 　Q. Do you recall conveying this information
19 at the hearing of one?
20 　A. Yes.
21 　Q. I want to turn to the second full
22 paragraph on page MT 025556, the paragraph beginning

**54**

1  the OIG is charged.
2      A. Okay.
3      Q. Skip down to the third sentence, which is
4  on the sixth line, that states: The department
5  recognizes that some entities have criticized the
6  OIG investigation as being flawed.
7      A. Uh-huh.
8      Q. The department agrees the study failed to
9  account for the cost of professional services and
10 the cost of dispensing, which includes supplies and
11 staff.
12         Did you see that language?
13     A. Yes.
14     Q. Is it fair to say that, again, the
15 criticisms of this report centered on the fact that
16 the cost to dispense a drug is more than just the
17 cost to acquire the drug, but includes some fees and
18 professional services provided by the pharmacist?
19        MS. BRECKENRIDGE: Objection.
20     A. I understood that to be the critique of
21 the study.
22 BY MR. DILLON:

**55**

1      Q. What did you understand to be the critique
2  of the study?
3      A. Just what you stated, that there were
4  other costs associated with dispensing medication
5  that wasn't accounted for in the study.
6      Q. So the challenge wasn't to the acquisition
7  cost so much as it was the dispensing costs?
8      A. No, actually, my recollection is there was
9  challenge to the cost. Specifically, there were
10 pharmacists that didn't quite understand how those
11 numbers were arrived at, but that there were also
12 other factors associated with dispensing that the
13 OIG study did not account.
14        Did I not answer your question?
15     Q. I'm just not sure I understood it. You
16 said that there were some criticisms of the OIG's
17 study regarding the acquisition cost; is that
18 correct?
19     A. I'm sorry. The percentage that they
20 arrived at, I guess, was the --
21     Q. Okay. In the next sentence you say:
22 However, because there has not been an auditable

**56**

1  counter-study conducted, we must base our decisions
2  on the information provided to us.
3         Is it fair to say there was no other
4  information available at the time regarding the
5  acquisition costs other than the OIG study?
6         MS. BRECKENRIDGE: Objection.
7         MR. DILLON: Let me rephrase that.
8  BY MR. DILLON:
9      Q. That there was no other auditable counter-
10 study available other than the OIG study?
11     A. That's what I would guess that statement
12 indicates, yes, there was no other study.
13     Q. Is it fair to say that the Montana
14 Medicaid program's best understanding of acquisition
15 cost at this time was that pharmacists could acquire
16 brand name drugs at a discount of AWP minus 19.71
17 percent?
18        MS. BRECKENRIDGE: Objection.
19     A. It is fair to say that Medicaid understood
20 the acquisition cost as told in the study? Yeah.
21 BY MR. DILLON:
22     Q. And, again, that was, for brand name

**57**

1  drugs, a discount of 19.71 percent; is that correct?
2      A. Yes.
3      Q. And for generics a discount of AWP minus
4  65.37 percent?
5      A. Yes.
6         (Whereupon, Deposition Exhibit Marr
7  008 was marked for identification.)
8  BY MR. DILLON:
9      Q. You have been handed what has been marked
10 as Exhibit Marr 008. It's a document entitled
11 Presiding Officer's Report, and it bears the Bates
12 MT 025552.
13        What is this document?
14        (Witness examines document.)
15     A. It is the minutes, for lack of a better
16 word, about what happened at the hearing.
17 BY MR. DILLON:
18     Q. Is this the hearing you just mentioned you
19 gave the testimony at?
20     A. Yes.
21     Q. It's signed by the presiding officer, Dawn
22 Sliva. Who is Ms. Sliva?