UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| *State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) | Judge Patti B. Saris |

DECLARATION OF DOROTHY POULSEN IN SUPPORT OF THE
STATE OF MONTANA'S OPPOSITION TO DEFENDANTS'
JOINT MOTION FOR SUMMARY JUDGMENT

I, Dorothy Poulsen, under the penalty of perjury, hereby declare as follows:

1.  I am above the age of 18 years and I am otherwise competent to make this declaration. The following is based on my personal knowledge.

A.  **Educational and Professional Background**

2.  I served as the pharmacy program officer for Montana Medicaid for approximately 5 years, from about July 1996 to June 2001. I resigned from the position and from Montana state government employment to move to Seattle, Washington. Jeff Ireland and, later, Jeff Buska supervised me in the pharmacy program officer position. I was the only pharmacy program employee during my tenure. There was also one employee who worked exclusively in the rebate area. As pharmacy program officer, my responsibilities included oversight of all aspects of the Montana Medicaid pharmacy program. This included everything that is required under federal regulations for the pharmacy program – setting the reimbursement

- 1 -

rates for providers, helping to ensure that there was access to care for Medicaid beneficiaries, drug utilization review, and review and approval of rebate information.

3. I received my Bachelor's degree from the University of New Mexico. I received my Master's degree from the University of Colorado. I received my PhD from the University of Colorado in 1977.

4. In February 2006, I gave deposition testimony in this case. This declaration supplements my deposition testimony.

**B.    The State's Understanding and Use of AWP**

5. It was always my understanding that Average Wholesale Price – commonly known as "AWP" – was a price assigned to a drug by the pharmaceutical company and represented an average of the prices at which the company sold its products.

6. We were never privy to the manner in which the pharmaceutical companies calculated the AWP, that was proprietary information. It was my understanding that the companies reported the AWPs to First DataBank, an outside publisher, from whom the State obtained the information through the State's fiscal intermediary, a separate entity, contracted to process the program's prescription drug claims.

7. We assumed that there was a direct and reasonable relationship between the actual acquisition cost to the pharmacies and the AWP the State used for reimbursement purposes. For example, we assumed that if the AWP increased, this meant that the price to the provider had also increased at a similar rate. The State's assumption was that the AWP actually represented the price at which the drug manufacturers sold the drugs to wholesalers.

8. We did understand that AWP *did not equal* actual acquisition costs. I testified to this at my deposition. An "average" is not the same as "actual." This is why we used a 10%

discount off of AWP to estimate acquisition costs for reimbursement purposes during my entire tenure with the Medicaid pharmacy program. We believed that by applying a 10% discount to AWP we were approximating acquisition costs. This is what I meant when at my deposition, I testified that "we understood that AWP didn't reflect the average wholesale price."

9. The State of Montana was using a system that basically used AWP as a basis. Pursuant to federal and State regulations, Montana Medicaid was obligated to approximate acquisition costs as part of our reimbursement of drugs for the Medicaid pharmacy program. Like most states at that time, Montana did this through the use of AWP. During my tenure, it was Medicaid's good faith belief that a discount of 10% off of AWP was a close approximation of provider acquisition costs.

10. Because Montana Medicaid believed that a discount of 10% off of AWP approximated actual acquisition costs, we certified to the federal government, as required, that we were approaching the Estimated Acquisition Cost (EAC) with our reimbursement methodology.

11. I am confident that if we knew that AWP was not linked to acquisition costs, we would not have used it as a basis of reimbursement. As I testified at my deposition, in our role as Medicaid staff, we served three constituencies. These three constituencies were the Medicaid beneficiaries, the providers and the taxpayers. In serving the taxpayers we were the stewards of their money. It would have been fiscally irresponsible on our part to use a payment basis that had no link to real costs. Moreover, it would have enhanced the budget pressures on the Medicaid program.

### C. Knowledge of Spreads Between Acquisition Costs and AWP

12. At the time I was employed by Montana Medicaid, we were not aware of the inflationary spreads created by the drug manufacturers' covert drug pricing practices. I did not learn about these spreads or their magnitude until I became a witness in this lawsuit.

13. I was aware of the 1996 OIG report which discussed Montana's Medicaid pharmacy program, among those for other states. The study of Montana pharmacy data took place prior to my tenure with the Montana Medicaid pharmacy program. I have been reminded that the title of this report is *Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services,* A-06-95-00068) (July 1996). Aside from my deposition, I have not seen this report for many years. Thus, I do not profess to be familiar with all of its details. I do recall, however, that there was *nothing* in the report that would have put us on notice of systemic problems with Montana Medicaid's drug reimbursement methodology. At best, the report advised the State of problems with specific invoices or drugs. It did not provide the State with notice of any sort of systemic problem.

### D. Alternatives to the Use of AWP

14. I understand that the defendant drug manufacturers suggest that the State should have been using something other than AWP as a basis for reimbursement. From the State of Montana's viewpoint, that was not possible. In making that assertion, the Defendants have not considered how complicated such an undertaking would be. We contracted with Consultec as our fiscal intermediary. This meant that we bought into the system that Consultec provided. The system was based on data obtained from First DataBank. The State was too small from a population and resource standpoint to justify developing our own system.

15. Deviating from the existing system would have been prohibitively expensive and labor-intensive. It is difficult even to think about how complicated it would be. The necessary components that I can think of, based on my five year experience in the department, were the following: a pricing mechanism, the development of pricing data for every drug, updates on the pricing data, a computer system to process the claims, and the federal government's approval.

16. This would be impractical for any number of reasons, including the facts that during my tenure I was the pharmacy program's sole employee and Montana Medicaid was processing over one million claims for pharmacy reimbursement each year.

17. Aside from the economic and time resources required to change, it is important to remember that Montana Medicaid had no evidence that AWPs were inflationary and that they should not be used as a basis for reimbursement. Montana Medicaid relied on the AWPs on the good faith belief that they were reasonably related to actual costs and that their use with a discount closely approximated actual acquisition costs.

E.   **The State of Montana Did Not Deliberately Overpay Providers**

18. I understand that Defendants allege that the State used AWP as part of a deliberate scheme to overpay pharmacists and other providers. Nothing could be further from the truth. The State did not choose to overpay providers while I was there. I think this would be true for any state, but particularly a small state like Montana. While I was at Montana Medicaid, we were acutely aware of the State's budget pressures. Furthermore, as discussed above, I and others within the agency believed that we were stewards of the taxpayers' money. With these two factors in mind, it would have made no sense for us to overpay for anything intentionally. We made our best calculation at how we could get the closest possible to acquisition costs. We did so by using AWP.

I swear under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

                                                     _/s/ Dorothy Poulsen_
                                                          Dorothy Poulsen

_3/20/2007_
Date and Place of Execution

- 7 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF DOROTHY POULSEN IN SUPPORT OF THE STATE OF MONTANA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 22, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By  **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292