UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| *State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) | Judge Patti B. Saris |

## DECLARATION OF JEFF BUSKA IN SUPPORT OF STATE OF MONTANA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

I, Jeff Buska, under the penalty of perjury, hereby declare as follows:

1. I am above the age of 18 years and I am otherwise competent to make this statement. This statement is based on my personal knowledge.

A. **Educational and Professional Background**

2. I am currently serving as Administrator for the Quality Assurance Division of the Department of Public Health and Human Services in the State of Montana ("State"). I have held this position since March 2006.

3. I graduated from the University of Montana at Missoula with a bachelor's of science degree in business administration, emphasis in accounting, in March 1983. I have been employed by the State continuously since 1985. During that time, I have held various jobs within the State government, including several jobs within the Medicaid Bureau. The first position I held in the Montana Medicaid Bureau was in 1988. I was an auditor in the Medicaid unit of the Department of Social and Rehabilitative Services. In 1989, I became the review auditor for the same unit. In 1990, I became the program manager for long-term care policy and

reimbursement for nursing facilities. In 1993, I became the program manager for policy and reimbursement for hospital services.

4.     In 1998, I became the supervisor of the acute services section. I held this position until December 2001. This was the first position I held that involved Medicaid drug reimbursement. The acute services section at that time managed several Medicaid programs that included the pharmacy program; drug rebate; durable medical equipment; transportation; and all therapies and various other Medicaid services. The next position I took in 2001, I became the Medicaid Bureau Chief and I held that position until November 2003. I continued to have direct supervisory responsibility for all the areas identified above. I then went to work as the Senior Medicaid Policy Analyst, working with the State Medicaid director coordinating all activities for State Medicaid. I held that position until March 2006. All of these positions were within Montana Medicaid. The first position that involved Medicaid drug reimbursement was the acute services supervisor position.

5.     In my various capacities, in addition to the pharmacy responsibilities identified above. I have directly or indirectly supervised several pharmacy program officers, including Dorothy Poulsen (1995 to 2001); Shannon Marr (October 2001 to June 2002) and Dan Peterson (2002 to 2003).

**B.   INVOLVEMENT IN THIS LAWSUIT**

6.     I was consulted by attorneys representing the State at the outset of this lawsuit.

7.     I have given depositions in this case on three occasions. On October 19, 2005 and December 14, 2005, I gave testimony as the State's Fed. R. Civ. P. 30(b)(6) designee. A year later, on December 15, 2006, I gave testimony as the State's Fed. R. Civ. P. 30(b)(6) designee related to Bayer Corporation. To my knowledge, Defendants in this case never requested my

deposition as an individual. This declaration supplements my previous deposition testimony on behalf of the State.

## C. THE STATE'S UNDERSTANDING AND USE OF AWP

8. Until this litigation my understanding of AWP had been that AWP was a base price – a wholesale price being made available by the drug manufacturers. The State expected that this was a price at which pharmacies and other providers were able to purchase drugs for sale.

9. The State expected that the AWP was a meaningful benchmark and that it bore a direct and reasonable relationship to the actual acquisition costs to pharmacies, physicians and other providers.

10. Based on that expectation, the State felt confident relying on AWPs provided by drug manufacturers to determine the Estimated Acquisition Cost (EAC), as required by federal regulations and Montana's reimbursement methodology, set forth in the State's Administrative Rules. Federal regulations require the State to determine the EAC for providers participating in the State's Medicaid program. Montana regulations include the same requirement.

11. Montana has a formula for determining the EAC. Up until 2002, that formula was AWP - 10%. In 2002, the reimbursement formula changed to AWP - 15%. I explain the thought process behind the 2002 change below. In both cases, the discount off of AWP was designed to approximate providers' actual acquisition costs – or EAC – as required by the regulations. Montana Medicaid thought that by taking a discount of 10% or 15% off of AWP, we were accurately approximating the EAC.

12. I do not know how the State's use of AWP got started, as that was before my tenure with Medicaid. I do know why the State used AWP, however, and why we continued to

use AWP as a component of our reimbursement methodology. The State used AWP because it was the standard price mechanism out there – provided by the drug manufacturers, made available to the states, nationally supported, updated regularly and available for all drugs rather than just a handful. In short, we used AWP because there was no other readily-available pricing data, it was administratively convenient, the numbers were updated on a regular basis (multiple times a month, I believe) and AWP was supported by the industry.

13.     The fact that the drug manufacturers made AWP available for all drugs rather than a subset of drugs was also important because anything short of this would result in a piecemeal and administratively-intensive approach to Medicaid drug reimbursement rather than the relatively automated approach of using AWP. Because of the State's limited Medicaid resources and staff, it was important to have a reimbursement methodology that was easy to administer.

14.     The State also used AWP because it provided an automatic update to our Medicaid drug reimbursement rate without administrative intervention. In other words, Montana Medicaid understood that pharmaceutical prices could change radically and quickly due to shifting market conditions. An AWP provided and updated by the drug manufacturers would be responsive to these changes – reasonably accommodating for market changes, we thought were reasonable, because we believed that there was a relationship between the AWPs and actual acquisition costs.

15.     As a result of this lawsuit and other information that has been developed since its filing, I have learned that AWPs used by the State of Montana were inflated. It is my opinion that if accurate AWPs were provided by Defendants, the State would have paid less for its reimbursement of prescription drugs than it did using the inflated AWPs provided.

001534-15 157152 V1

16. Each time an inflated AWP was provided to the State, it was the equivalent of providing false data to Medicaid for purposes of making a claim.

## D. The Role of Access to Care and Budget in Setting Reimbursement Methodology

17. I understand that Defendants have focused on the role that access to care and State budget issues played in the setting of the State Medicaid's reimbursement methodology. It is true that every state Medicaid agency is responsible for certifying that the state's residents have reasonable and adequate access to care. It is also true that the State of Montana, including Montana Medicaid, has faced budget pressures. Although State Medicaid is always working to balance the fine line between access to drugs and other services and accurate reimbursement rates, it is not true that Montana Medicaid has allowed other concerns to interfere with its obligation to set a reimbursement methodology that Montana Medicaid believes approximated the EAC through the use of AWP as a component of the reimbursement methodology. At all times, it was Montana Medicaid's objective to approximate EAC as accurately as possible and to limit the State's drug expenditures.

18. I have learned that the example Defendants use to demonstrate that budget concerns drove the reimbursement methodology is the 2002 change in the reimbursement formula from AWP - 10% to AWP - 15%. The timing of the budget pressure all State agencies underwent that year and the change in the reimbursement methodology were coincidental. We considered changes in the formula prior to the announcement of the budget pressure.

## E. Montana Medicaid Knowledge of Specific Spreads

19. Neither I nor any other Medicaid personnel had knowledge of the spreads for specific drugs that have become apparent as a result of this lawsuit.

20. I recall the OIG report which analyzed select Montana pharmacy invoices, among invoices for other states. This was the report entitled Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services, A-06-01-00005 (Feb. 2002). At the time, I was the acute services supervisor and had responsibility for the pharmacy program of Montana Medicaid. When the report first came out, I recall that my thought was that it was based on a simple calculation comparing actual acquisition costs to AWP for a sample for drugs. There were many, many other factors that were not taken into consideration. This included other costs to the pharmacy. There was nothing in the report that suggested to me or to others that the problems identified went beyond the drugs the report identified. In other words, the report did not suggest to me or others within Montana Medicaid that the problem was systemic rather than limited to the isolated instances featured.

21. In fact, Montana considered this OIG report in making a change in its pricing reimbursement methodology shortly after the OIG report was issued. I understand that John Chappuis, Deputy Director of the Department of Public Health and Human Services, testified in his deposition that shortly after the report was issued, the State changed its Medicaid reimbursement methodology by increasing the discount off of AWP to - 15% from - 10%. Mr. Chappuis recalled that I had overseen this change. Both of these statements are true. Coincident with the release of the report, the State had been actively considering increasing the discount off of AWP to reach an EAC that more closely approximated the actual acquisition costs of providers. The State was doing so based on what it had learned from other states. The OIG report seemed to be supportive of a modest increase in the discount off of AWP, so we went

with it. We did not increase the discount to the full amounts discussed by the reports because of our understanding of the pharmacy climate in Montana.

### 1. Spreads for specific drugs

22. I have been provided with a copy of a table comprised of "spreads" for Dey drugs which are Subject Drugs in this litigation. A copy of that table is attached to this Declaration as Exhibit A. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. It has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 44.1% to a high of 17871.7%. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

23. I was also provided with a document showing spreads for AstraZeneca. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit B. Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 20.89% to a high of 169.31%. My reaction to these spreads was identical to my reaction to the

Dey spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

24. I was also provided with a document showing spreads for Bristol-Myers Squibb. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit C. Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 1.8% to a high of 6621.9%. My reaction to these spreads was identical to my reaction to the Dey spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

25. I was also provided with a document showing spreads for Johnson & Johnson. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit D. Again, it has been explained to me that the term "spread" as used in this context means the difference between the

001534-15 157152 V1

actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 17.6% to a high of 31.9%. My reaction to these spreads was identical to my reaction to the Dey spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

26. I was also provided with a document showing spreads for Schering-Plough. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit E. Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 12.3% to a high of 1052.8%. My reaction to these spreads was identical to my reaction to the Dey and other spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

27. I was also provided with a document showing spreads for Aventis. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert

witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit F. Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 22.4% to a high of 137.2%. My reaction to these spreads was identical to my reaction to the Dey and other spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

28. I was also provided with a document showing spreads for Immunex. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit G. Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 0% to a high of 1666.4%. My reaction to these spreads was identical to my reaction to the Dey and other spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that

001534-15 157152 V1

there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

29.     I was also provided with a document showing spreads for Pfizer. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial. A copy of that table is attached to this Declaration as Exhibit H. Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time. I reviewed the data contained in the document carefully. The spreads varied from a low of 1% to a high of 2144.4%. My reaction to these spreads was identical to my reaction to the Dey and other spreads. I had never before seen this information. I had *never* been aware that spreads of this magnitude existed. There was nothing in my experience as a Montana Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

### 2.     The State's knowledge of Defendants' use of the spreads

30.     Defendants also did not ask me in any of my depositions what my knowledge was of their efforts to market the spreads between actual acquisition costs and AWPs to providers. If they had asked, I would have told them that I did not have any knowledge of any instances of such practices. I did not learn about such practices by drug manufacturers until this lawsuit was brought. I have never heard that any Montana Medicaid personnel had knowledge of such practices.

### 3. The State's use of the spreads

31. I understand that Defendants have alleged the State used the spreads to create an "economic incentive" for providers to participate in the State Medicaid program. This never happened. The State never knowingly used the spread. The State could not have done so. As discussed above, Montana Medicaid was not aware of the breadth of the spreads. Moreover, even if we had been – we were under an obligation to estimate EAC as accurately as possible and we are always stewards of the taxpayers' money. It would not have made any sense for us to intentionally overpay providers using taxpayer money when already we were under pressure to provide more benefits and reduce the budget.

### F. The State's Receipt and Use of Average Sales Prices From Select Defendants

32. At my deposition in December 2006, Bayer Corporation lawyers examined me at length regarding the State's handling and disposition of Average Sales Prices (ASPs) provided by Bayer as a result of the 2001 settlement agreement between Bayer and Montana. The State did not use the ASP data provided by Bayer because the State's reimbursement methodology formula was set to use AWP. We also had concerns that the ASP's provided did not cover all the Bayer drugs included in the State's drug reimbursement program. It would have been difficult to incorporate ASP data for some drugs and AWP for others. Moreover, State Medicaid personnel had concerns regarding the ASP data's reliability and the frequency of updates Bayer provided. Overall, it was unusual to receive data directly from a drug manufacturer and the State was not prepared to handle it.

33. I understand that Defendants allege that Montana also received similar data from AstraZeneca and TAP, but I do not recall this information, it was not presented to me in any deposition and I have been told that it was not part of the record on summary judgment.

I swear under penalty of perjury under the laws of the State of Montana and the United States of America that the foregoing is true and correct.

_____
Jeff Buska

3/22/07   Helena, MT
Date and Place of Execution

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF JEFF BUSKA IN SUPPORT OF THE STATE OF MONTANA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on _____, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By_____ **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

001534-15 157152 V1