# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| *State of Nevada v. Abbott Labs., Inc. et al.*, Case No. CV-2-00260 (Nevada I), and | Judge Patti B. Saris |
| *State of Nevada v. American Home Products, et al.*, CA No. 02-CV-12086-PBS (Nevada II) | |

# MEMORANDUM IN SUPPORT OF THE STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ....................................................................................................1

II.     SUMMARY JUDGMENT STANDARDS ...............................................................3

III.    THE STATE OF NEVADA'S COUNTER-STATEMENT OF MATERIAL
        FACTS ......................................................................................................................4

        A.      The Nevada Medicaid Program ....................................................................4

        B.      Nevada Medicaid and Most Other States Have Used AWPs to
                Estimate Acquisition Costs With Drug Manufacturer Knowledge........................6

        C.      Nevada Medicaid Expected AWP to Bear a Rational Relationship
                to Underlying Drug Acquisition Costs ...................................................9

        D.      There Is No Evidence that Nevada Medicaid Had Access to True
                Data or Knowledge of Costs of Specific Drugs or Defendants'
                Manipulations of the Spread ...............................................................10

        E.      Medicaid Personnel Did Not Communicate With Non-Medicaid State
                Entities Regarding Pharmacy Reimbursement ......................................12

        F.      There Is No Evidence that Nevada Medicaid Allowed Benefit Access
                or Budget Concerns to Dictate Its Reimbursement Methodology.........................13

        G.      Given the Availability of AWP, Nevada Relies on It...........................................14

        H.      Nevada's Receipt of Actual Sales Prices (ASPs) and Other Pricing
                Information From Select Defendants....................................................14

        I.      The Record Is Devoid of Any Evidence that Nevada Residents Had
                Knowledge About AWPs or Defendants' Scheme .................................15

        J.      There Is Sufficient Data Available to Prove the State's Claims...........................15

IV.     LEGAL ARGUMENT................................................................................................15

        A.      Defendants Are Not Entitled to Summary Judgment on Nevada's
                Deceptive Trade Practices Act Claim ....................................................15

                1.      Nevada's reliance on the AWP benchmark as a surrogate for
                        costs in the market does not defeat its DTPA claims.................................16

a. Nevada reasonably relied on AWPs and was not aware of true pharmaceutical pricing or Defendants' deceptive schemes ...................................................................17

b. Nevada Medicaid did *not* premise its reimbursement methodology on the existence of spreads ......................................18

c. The drug reimbursement and purchasing practices of non-Medicaid state entities did not put Nevada Medicaid on notice that "it could reimburse providers less" ..........................18

d. Select Defendants' periodic provision of Average Sales Price did not put the State on notice that all Subject Drug AWPs were false ..............................................................................19

e. Defendants' "government knowledge" argument does not apply to Nevada's *parens patriae* claims ......................................20

2. The Attorney General may bring a *parens patriae* claims under DTPA on behalf of Nevada citizens .........................................21

3. The Nevada Attorney General does not seek to recover restitution on behalf of Nevada residents ...................................................23

4. The civil penalties that the State of Nevada seeks are permitted by statute and supported by the evidence .......................................23

B. Defendants Are Not Entitled to Summary Judgment on Nevada's Medicaid Fraud Claim ...............................................................................24

1. The evidence shows that Defendants submitted false statements or representations regarding AWP with the intent to defraud the State and other payors ....................................................................25

2. The statements or representations were used to obtain goods or services pursuant to the State Medicaid Plan ...............................26

3. Defendants are liable for penalties under the statute ................................26

C. Nevada's Claims Are Not Barred by the Statute of Limitations ..........................28

D. Nevada Has Not "Abandoned" Aspects of Its Case and Can Prove the Damages It Alleges .................................................................................29

V. CONCLUSION ................................................................................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982)........................................................................................22

*Barbour v. Dynamics Research Corp.*,
    63 F.3d 32 (1st Cir. 1995)...............................................................................3

*Gillette Co. v. Energizer Holdings, Inc.*,
    2005 U.S. Dist. Lexis 34122 (D. Mass. Dec. 19, 2005) .......................................3

*Nevada Power Co. v. Monsanto Co.*,
    955 F.2d 1304 (9th Cir. 1992) .......................................................................28

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    321 F. Supp. 2d 187 (D. Mass. 2004) ..........................................................4, 27

*Rogers v. Fair*,
    902 F.2d 140 (1st Cir. 1990)...........................................................................3

*Wilder v. Virginia Hosp. Ass'n*,
    496 U.S. 498 (1990)........................................................................................4

### FEDERAL STATUTES

42 C.F.R. § 447.201 ................................................................................ *passim*

42 C.F.R. § 447.332 ................................................................................ *passim*

42 C.F.R. § 50.504(b)(1)...................................................................................5

42 U.S.C. § 1396...............................................................................................5

### STATE STATUTES

Nev. Rev. Stat. § 193.130 ..............................................................................28

Nev. Rev. Stat. § 228.170(1)...........................................................................21

Nev. Rev. Stat. § 228.410 ..............................................................................20

Nev. Rev. Stat. § 422.490(1)...........................................................................27

Nev. Rev. Stat. § 422.530 ..............................................................................26

001534-13  158624 V1

Nev. Rev. Stat., § 422.540 ................................................................................24

Nev. Rev. Stat. § 422.580 ................................................................................27

Nev. Rev. Stat. § 422.590 ................................................................................28

Nev. Rev. Stat. § 598.0923 ..............................................................................16

Nev. Rev. Stat. § 598.0999 ........................................................................22, 23

Nev. Rev. Stat. § 598.0903 ..............................................................................22

Nev. Rev. Stat. § 598A.160 .............................................................................21

Nev. Rev. Stat. Ann. § 11.190 .........................................................................28

Nev. Rev. Stat. Ann. § 422.480 .......................................................................24

Nev. Rev. Stat. Ann. § 422.525(1) ...................................................................24

Nev. Rev. Stat. Ann. § 422.590 .......................................................................28

Nev. Rev. Stat. Ann. § 598.0915 .....................................................................16

001534-13  158624 V1

# I.     INTRODUCTION

The Attorney General of Nevada brings this law enforcement action to enforce state laws and to protect the State's Medicaid program and the well-being of Nevada citizens who make prescription drug payments or co-payments based on Average Wholesale Prices ("AWP"). Evidence shows that (i) AWP was the reimbursement benchmark for pharmacy reimbursement by the State and other payors; (ii) Defendants controlled the AWPs that were published; (iii) unbeknownst to payors, those AWPs did not reflect averages of real prices in the marketplace; and (iv) each Defendant in this lawsuit secretly and covertly manipulated and marketed the spreads on their drugs at issue in this lawsuit ("Subject Drugs") in order to protect or gain market share.  As a result of these factors, Nevada payors substantially overpaid for Subject Drugs.  The State of Nevada ("State") alleges that the conduct described is deceptive as a matter of law under the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903 *et seq.*[1]  The State further alleges that Defendants' conduct violated the State's Medicaid fraud statute, Nev. Rev. Stat., §§ 422.540 and 422.580.

Defendants now claim that summary judgment in their favor is appropriate against the State on all claims because the State could not have been deceived.  Defendants say that the State knew all along that the Defendants had artificially inflated the AWPs reported by the national publishers to create significant spreads and ***the State*** – not Defendants – exploited that knowledge and the spreads to overpay Medicaid drug providers in order to encourage their participation in the State's Medicaid program.  In essence, Defendants say, it was the State that gamed the system – ***not them***.

---

[1] For the Court's convenience, the State of Nevada has compiled the Nevada statutes and administrative codes cited herein and attached them at Ex. 9 to the Declaration of Jeniphr Breckenridge in Support of the State of Nevada's Opposition to Defendants' Joint Motion for Summary Judgment.  Exhibit references to the Breckenridge Declaration are indicated as "Breckenridge Decl. Ex. __".

This is revisionist history, unsupported by the record.  No State witness has testified to knowledge of specific spreads between drug acquisition costs and AWPs for Subject Drugs or Defendants' marketing of those spreads.  The State's Medicaid reimbursement methodology was based on the expectation that the AWPs bore a reasonable relationship to actual prices.  This was the State's understanding when it used AWP as a surrogate for acquisition costs in its Medicaid pharmacy reimbursement formula.  There is also no testimony or documents showing that the State knowingly took advantage of the spreads.  To the contrary, State employees now say that if they had known about the inflation, they would not have used AWP or they would have discounted it more deeply.  At a minimum then, multiple questions of material fact regarding so-called "government knowledge" knowledge remain.  Defendants have not met their summary judgment burden.

Even if Defendants could demonstrate State knowledge (which they cannot), Defendants have made no pretense of linking that knowledge to the State's citizens.  There is no basis to attribute so-called government knowledge to Nevada citizens.  Therefore, Defendants also do not meet the summary judgment standard as to the *parens patriae* claims.

Defendants' request for summary judgment on other bases also fails.  The State has submitted adequate data to support its claims.  In addition, Defendants' interpretation of the State's Medicaid fraud statute is unnecessarily restrictive and unsupported by the plain meaning of the statute's language.

Finally, the State's claims are not time-barred.  The question of when a Plaintiff discovered a Defendant's wrongdoing for purposes of triggering the statute of limitations is a fact-intensive inquiry, resolved on summary judgment only under unusual circumstances.  Defendants have not demonstrated any facts sufficient to trigger the State's obligation to

discover the facts underlying this lawsuit earlier than it did nor facts demonstrating that the State

did not exercise reasonable diligence under the circumstances.  This complaint was timely filed.

For all of these reasons, Defendants' joint motion should be denied.

## II.     SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the pleadings and evidence demonstrate that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law.  *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995) (citing

Fed. R. Civ. P. 56(c)).  To succeed, the moving party must show that there is an absence of

evidence to support the nonmoving party's position.  *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.

1990).

"Once the moving party has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial."  *Gillette Co.

v. Energizer Holdings, Inc.*, 2005 U.S. Dist. Lexis 34122, at *6 (D. Mass. Dec. 19, 2005)

(Saris, J.) (quoting *Barbour*, 63 F.3d at 37).  "There must be sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable

or is not significantly probative, summary judgment may be granted."  *Id.* (quoting *Rogers*, 902

F.2d at 143).  The Court must "view the facts in the light most favorable to the non-moving

party, drawing all reasonable inferences in that party's favor."  *Id.* (quoting *Barbour*, 63 F.3d

at 36).

Based on these standards Defendants' joint motion for summary judgment should be

rejected.

### III.   THE STATE OF NEVADA'S COUNTER-STATEMENT OF MATERIAL FACTS

The State incorporates by reference here the following factual submissions:

> State of Nevada Response to Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment ("Nev. Resp. to Def. L.R. 56.1 Stmt.") (filed herewith);
>
> State of Montana's L.R. 56.1 Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment Against Certain Defendants (Dkt. No. 3737); and
>
> Plaintiffs' Post-Trial Proposed Findings of Fact (Jan. 19, 2007) (Dkt. No. 3553).

The State also incorporates its responses to the LR 56.1 Statements filed by individual defendants and the fact statements set forth in Nevada's responses to the individual summary judgment motions filed by individual defendants.[2]  Nevada further designates the Declaration of Raymond S. Hartman Calculation of Damages and Penalties for the State of Nevada ("Hartman Decl.") (June 13, 2006) (Breckenridge Decl. Ex. 1) and Supplementary Declaration Calculation of Damages and Penalties for the State of Nevada (June 19, 2006) ("Hartman Supp. Decl.") (Breckenridge Decl. Ex. 2) as setting forth material facts and opinions in opposition to this motion.

In addition, Nevada submits the following facts.

### A.   The Nevada Medicaid Program

The relationship between federal and state authority for State Medicaid programs has been extensively briefed by the parties in this and related cases and acknowledged by the courts. *See*, *e.g.*, *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990).  *In re Pharm. Indus.*

---

[2] Nevada requested a four week extension of time of respond to Defendants' individual motions for summary judgment.  Defendants consented.  The unopposed motion is currently pending before the court (Dkt. No. 3864).

*Average Wholesale Price Litig.*, 321 F. Supp. 2d 187 (D. Mass. 2004).  The authority is not in dispute here.  Therefore, the State limits its discussion to the most pertinent authority.

Each of the fifty states has a Medicaid program in place and provides pharmacy benefits. The responsibility for administering the State Medicaid programs falls to the State and is subject to federal guidelines.  42 U.S.C. § 1396.

As part of the federal oversight, states must submit a "State Plan" for approval to the Secretary of the U.S. Health and Human Services.  42 U.S.C. § 1396(a); 42 C.F.R. §§ 470.10, 447.201.  The State Plan sets for the methods for reimbursing health care providers for goods and services, including pharmacy.  *Id*.  Each State Medicaid agency must submit its pharmacy reimbursement methodology in a state plan for approval.  The methodology is spelled out in regulations.  Reimbursement for brand name drugs must not exceed, in the aggregate, the estimated acquisition costs ("EAC")  plus reasonable dispensing fees.  42 C.F.R. § 50.504(b)(1). The standard for multi-source drugs is a reasonable dispensing fee plus an amount established by CMS that is equal to 150% of the published price for the least costly therapeutic equivalent (the Federal Upper Limit or "FUL") – again "in the aggregate."  *See* 42 C.F.R. § 447.332.  It is undisputed that Nevada complied with these requirements, certified its compliance to CMS.  And CMS – after reviewing Nevada's reimbursement methodology – approved it.

In Nevada, the Department of Health and Human Services ("NDHHS") through its Division of Health Care Financing and Policy ("DHCFP") is responsible for the administration of the Medicaid program.  Nevada has one of the smallest populations of the fifty states and its Medicaid program reflects its population.  Nevada Medicaid is a relatively small program by national Medicaid standards.  Duarte Decl. at ¶ 10.[3]  This small size is reflected in the program's

---

[3] The declarations of Charles Duarte and Coleen Lawrence are submitted herewith in support of the State of Nevada's Opposition to Defendants' Joint Motion for Summary Judgment.

staffing.  *Id*. at ¶ 11.  Nevada Medicaid has always been leanly staffed.  *Id*.  The pharmacy

program of the Nevada Medicaid program is significant.  Yet, at most relevant times, the

pharmacy program was in the hands of one staff member for self-administered drugs and one

staff member for physician-administered drugs.  *Id*. at ¶ 12.  At the same time, the Nevada

Medicaid program is subject to the same pressures as other states' programs, including the

tension between the demand for services and a limited budget.  *Id*. *at ¶* 13.  After September 11,

2001, this demand became particularly great when the nation's economy faltered and resulted in

an increased demand for Medicaid benefits.  *Id*. at ¶ 14; *see also* Duarte Tr. Vol. 1 at 219-20, 247

(Breckenridge Decl. Ex. 4).  The problem was particularly acute in Nevada because of the State's

dependence on the recreation and gaming industries.  Duarte Decl. at ¶ 14.  In Nevada, as in

other states, the escalating demands included an increase in the demand for pharmacy services.

*Id*. at ¶ 15.  At the same time, Nevada Medicaid experienced downward pressure on the state

component of its budget.  *Id*. at ¶ 15.  Staffing did not increase.  *Id*.

**B.    Nevada Medicaid and Most Other States Have Used AWPs to Estimate Acquisition Costs With Drug Manufacturer Knowledge**

Nevada and the most other states have used Average Wholesale Prices (AWP) provided

by drug manufacturers through national publishers as the basis for drug reimbursement for

decades.  The AWPs are used as surrogates for actual acquisition costs in determining EAC as

required by federal and state regulation.  AWP is one component of the reimbursement

methodology and is almost always used with a discount.

The current EAC calculation in Nevada is AWP-15%.  Medicaid Services Manual

Ch. 1200 (Breckenridge Decl. Ex. 3).  This reimbursement formula was set in 2002 by Nevada

Medicaid through the submission of a State Plan and a public hearing process and federal

approval.  Lawrence Tr. Vol. 1 at 139 (Breckenridge Decl. Ex. 5).  Prior to this time, the formula

- 6 -

calculation was AWP-10%.  Lawrence Decl. at ¶ 14.  Even earlier, the reimbursement formula was AWP-5%.  Macdonald Tr. at 44-45 (Breckenridge Decl. Ex. 6).

The States are consistent in their explanation for why they use manufacturer-controlled AWP: it was available for all drugs and updated on a regular basis.  Like most states, Nevada's use of AWP was a policy decision that was submitted to the federal government for review and approval.  Lawrence Decl. at ¶¶ 9-16.  Once approved, its use became a part of Nevada's State Plan and is mandated by Nevada Medicaid's policy book, the Nevada Medicaid Services Manual.  *Id.* at ¶ 15.  Medicaid Services Manual at 1203.150 (Breckenridge Decl. Ex. 3).

As noted above, the majority of other states and numerous third party payors used AWP as the basis for pharmacy reimbursements.  The states and other payors used AWP because it has been the standard price mechanism available.  Duarte Decl. at ¶ 16; Lawrence Decl. at ¶ 25.  AWP is provided by the drug manufacturers or derived from information they provided to national publishers.  Duarte Tr. Vol. 3:104-105 (Breckenridge Decl. Ex. 4).  *See also* Nevada Response to Defendants L.R. 56.1 Stmt. at ¶¶ 137-39 ("Nev. Resp. to Def. L.R. 56.1 Stmt.") (evidence reflecting drug manufacturer control of pricing).  The drug manufacturers have traditionally not made their actual sales prices available for the States and other payors to use. Duarte Tr. Vol. 3 at 16, 19 (Breckenridge Decl. Ex. 4); *Id.* Vol. 4 at 44-46; Lawrence Tr. Vol. 3 at 397 (Breckenridge Decl. Ex. 5).  *See also* Nev. Resp. to Def. L.R. 56.1 Stmt. at ¶ 143.  The manufacturers did not provide other data on a regular basis.  AWP numbers, on the other hand, were available to the states, nationally-supported, updated regularly and automatically.  Duarte Decl. at ¶ 16; Lawrence Decl. at ¶¶ 23-24.  Importantly, AWPs were consistently available for all drugs, and not just a subset of the drugs for which the Nevada Medicaid program reimbursed. Lawrence Decl. at ¶ 25.  The regularly-updated numbers provided by the drug manufacturers

through the national publishers also assured automatic updates to Nevada's reimbursement pricing without administrative intervention.  Duarte Decl. at ¶ 16; Lawrence Decl. at ¶ 26. Because of the State's limited Medicaid resources and staff, it was key to have a reimbursement methodology that was easy to use.  *See generally* Duarte Decl. at ¶¶ 9-13, 23.

Evidence shows that drug manufacturers were aware of Nevada's and other states' use of AWP for reimbursement purposes.  Nev. Resp. to Def. L.R. 56.1 Stmt. at ¶¶ 140-42.  There is no evidence that AWPs served any purpose other than as a basis for reimbursement or that the drug manufacturers discouraged its use at any time prior to the filing of this and other related lawsuits.

Nevada Medicaid's ultimate goal in setting and administering Nevada's reimbursement methodologies is and has been to estimate a reimbursement level for a particular drug as close as possible to the prices providers are generally paying in the state for a drug in the package size providers buy most frequently, otherwise known as "actual acquisition cost."  Duarte Tr. Vol. 3 at 50 (Breckenridge Decl. Ex. 4); Duarte Decl. at ¶ 15, 28.

Until this lawsuit was filed, Nevada Medicaid believed that it was estimating provider acquisition costs in the state as accurately as possible.  Nevada Medicaid personnel understood that AWP ***did not equal*** acquisition costs.  Duarte Tr. at Vol. 2 at 8 (Breckenridge Decl. Ex. 4); Lawrence Tr. Vol. 1 at 228 (Breckenridge Decl. Ex. 5); Duarte Decl. at ¶ 25; Lawrence Decl. at ¶ 21.  Because of this understanding, Nevada used a discount off of AWP.  Lawrence Tr. Vol. 2 at 228 (Breckenridge Decl. Ex. 5); Duarte Decl. at ¶ 22; Lawrence Decl. at ¶ 21; Macdonald Tr. at 44-45 (Breckenridge Decl. Ex. 6).  According to Nevada Medicaid personnel, Nevada held a good faith belief that by applying the discounts, the State was approximating acquisition costs accurately.  Duarte Decl. at ¶ 21-22; Lawrence Decl. at ¶ 21-23.  The State's belief was very different from what was eventually revealed to be the truth – gross spreads frequently equaling

many multiples of the modest discounts off of AWP that Nevada Medicaid personnel believed would be adequate to approximate EAC.

## C.  Nevada Medicaid Expected AWP to Bear a Rational Relationship to Underlying Drug Acquisition Costs

State Medicaid personnel responsible for State Medicaid pharmacy reimbursement policy and administration believed that they were estimating acquisition costs carefully by using AWP for one important reason: ***they assumed that AWP bore a rational and direct relationship to the underlying cost for the drugs***.  Duarte Tr. Vol. 4 at 23, 18-21; 24:13-17 (Breckenridge Decl. Ex. 4); Lawrence Tr. Vol. 3 at 585 (Breckenridge Decl. Ex. 5); Squartsoff Tr. at 124, 128 (Breckenridge Decl. Ex. 7).  Duarte Decl. ¶¶ 18-19; Lawrence Decl. ¶ 20.  The evidence shows that Medicaid personnel involved in pharmacy reimbursement believed that AWP was an average.  Squartsoff Tr. at 80 (Breckenridge Decl. Ex. 7).  Nevada Medicaid expected that this was approximately a price at which pharmacies and other providers were able to purchase drugs for sale.  Duarte Decl. at ¶¶ 17-18; Lawrence Decl. at ¶ 19.  Although the State understood that the AWP was not the actual acquisition cost, it always assumed that there was a direct and reasonable relationship between the actual acquisition cost to the pharmacies and other providers and the AWP the State used for reimbursement purposes.  Duarte Decl. at ¶ 18-19; Lawrence Decl. at ¶ 9.  For example, the State assumed that if the AWP increased, the price to the provider had also increased at a similar rate, *id.*, or that if the provider's acquisition cost increased, there would be an increase in AWP that would compensate the provider for the increased cost.  Duarte Decl. at ¶ 24; Lawrence Decl. at ¶ 26.

This belief was based in part in the terminology: ***average*** wholesale price.  The meaning suggested by the plain and ordinary definitions of the words influenced Nevada Medicaid's understanding.  *See*, *e.g.*, Willden Tr. Vol. 1 at 83 (thought AWP was an "arithmetic" calculation

of average) (Breckenridge Decl. Ex. 8); Lawrence Tr. Vol. 3 at 396, 417 (Breckenridge Decl. Ex. 5).

Based on this expectation, the State felt confident relying on AWPs provided by drug manufacturers to determine the EAC as required by federal regulations and Nevada's reimbursement methodology. Duarte Decl. at ¶ 21; Lawrence Decl. at ¶ 23. The expectation that the two numbers were rationally related and that the difference could be bridged by a modest discount off of the larger number, is very different from the reality later revealed – that AWP was typically significantly higher, up to thousands of percent.

**D.    There Is No Evidence that Nevada Medicaid Had Access to True Data or Knowledge of Costs of Specific Drugs or Defendants' Manipulations of the Spread**

Nevada Medicaid never had access to true drug pricing data or evidence that Defendants manipulated the spread between provider acquisition costs and AWP or to actual drug pricing data that would have exposed the gross falsity of the AWPs. Duarte Tr. Vol. 3 at 16, 19 (Breckenridge Decl. Ex. 4); *Id*. Vol. 4 at 44; Lawrence Tr. Vol. 3 at 442, 584 (Breckenridge Decl. Ex. 5). Drug pricing is closely held information within the industry. Nev. Resp. to Def. L.R. 56.1 Stmt. at ¶ 143. For competitive reasons disclosure of true prices was often limited to the highest levels of the company. *Id*. It is equally well-established that evidence that drug manufacturers marketed the spread to providers was just as closely guarded and has only come to light as a result of this and other lawsuits and investigations. *Id*. As a result, the concept of a "spread" between provider acquisition costs and AWP was foreign to Nevada Medicaid prior to this lawsuit's filing. Duarte Decl. at ¶¶ 30-45. Unsurprisingly, in light of the secrecy, Nevada Medicaid personnel now say that they had no idea about the spreads. Duarte Decl. at ¶¶ 30-44; Lawrence Decl. at ¶¶ 36-41.

- 10 -

After an extraordinary volume of discovery, State Medicaid witness depositions, tens of thousands of pages of documents produced, hard drives of electronic information, non-Medicaid State agency depositions and document production, and non-party depositions and document production, Defendants still cannot offer witness testimony or documents regarding specific spreads because it does not exist.  Defendants' principal evidence consists of federal reports analyzing discrepancies between AWPs and actual acquisition costs for certain drugs.  The State does not contest that the reports were issued by HCFA or CMS or that the State received and circulated the reports.  The evidence is, however, equivocal as to whether particular employees read them.  And no witness has testified to the plenary knowledge of Defendants' pricing schemes that would be required in order for summary judgment to be entered in Defendants' favor.  And current and former Nevada employees maintain that the reports did ***not*** put them on notice of the magnitude of the spreads on specific drugs or that there were systemic problems with the use of AWP, even when they learned about spreads for select drugs.  Duarte Decl. at ¶¶ 30-44; Lawrence Decl. at ¶¶ 36-41; Duarte Tr. Vol. 2 at 91 (Breckenridge Decl. Ex. 4).

Despite the number of depositions Defendants have taken over the last two years, Defendants have ***never*** asked any non-party or State witness whether they were aware that the spreads between provider acquisition costs and AWP often reached the 100% range and could even go as high as 17,000%.  No defendant has shown any witness in this case the spreads for its Subject Drugs and asked about the State's knowledge of those spreads.  In fact, Defendants have not asked state witnesses about specific spreads at all.  Could it be because the Defendants did not want the response on the record?  Perhaps the Defendants did not want the Court to hear that no one outside the industry knew the truth.  If they had asked, Medicaid witnesses would have told them that the Medicaid program both did not know about the spreads and, naturally, thus did

- 11 -

not know about the Defendants use of those spreads as a marketing tool to increase profit and

move market share.  Duarte Decl. at ¶¶ 30-44; Lawrence Decl. at ¶ 36-41.

When presented with evidence of spreads developed by the State experts in this case for

certain defendants, Chuck Duarte, the director of Nevada Medicaid, definitively stated that he

had never before seen such information – either in his current position or in his previous position

as the director of Hawaii Medicaid.  Duarte Decl. at ¶¶ 30-44.  Prior to the lawsuit, he had not

been aware that spreads of that magnitude existed.  *Id*.; Duarte Tr. Vol. 2 at 87, 91 (Breckenridge

Decl. Ex. 4); *Id*. Vol. 4 at 38-39.

At best, Defendants have pointed to scattered instances where State personnel may have

received isolated reports identifying instances where spreads existed between the AWP and

acquisition cost.  However, knowledge that in ***some***  instances there were ***some*** spreads between

AWP and acquisition cost does not mean that Nevada was on notice of Defendants' AWP

manipulations and spread marketing.

**E.     Medicaid Personnel Did Not Communicate With Non-Medicaid State Entities
         Regarding Pharmacy Reimbursement[4]**

Medicaid personnel have testified that they did not have notice of the drug purchasing or

reimbursement practices of non-Medicaid state entities.  Duarte Tr. Vol. 5 at 51, 58-59, 68;

Lawrence Tr. Vol. 2 at 256 (Breckenridge Decl. Ex. 5); *Id*. Vol. 3 at 444; Duarte Decl. ¶¶ 49-57.

Medicaid did ***not*** have formal communications with non-Medicaid state entities regarding the

agencies' respective drug purchasing or reimbursement practices.  Duarte Decl. ¶ 57.  Even if

they had relevant contact, the information to be shared would not necessarily be useful or put the

---

[4] Magistrate Bowler submitted a Report and Recommendation Re: Defendants' Joint Motion for Redress for
Spoliation of Evidence (Dkt. No. 3843), which addresses, in part, imposed Nevada Medicaid's post May 2000
knowledge of how the Dept. of Mental Health, Public Employee Benefits and Senior Rx acquired and/or reimbursed
for drugs.  The State will object to Magistrate Bowler's report and recommendation by March 26, 2007, the date for
response.

Medicaid program on notice of alternatives to AWP.  Duarte Decl. ¶¶ 51-56.  Medicaid is subject to its own unique federal and state regulations.  *Id*. at ¶ 52.  The purchasing opportunities available to other entities are often not available to Medicaid programs.  *Id*. at ¶ 53; Squartsoff Tr. at 115 (Breckenridge Decl. Ex. 7).  In addition, an important distinction must be made between agencies that purchase drugs and agencies that reimburse for drugs, such as Medicaid.  Any comparison between those different types of programs thus misplaced.  Duarte Decl. ¶ 53.

**F.      There Is No Evidence that Nevada Medicaid Allowed Benefit Access or Budget Concerns to Dictate Its Reimbursement Methodology**

There is no credible evidence that Nevada Medicaid allowed considerations other than establishing EAC's as close as possible to acquisition costs to dictate the pharmacy reimbursement methodology.  Nevertheless, Defendants make this argument – as if it was the State's own fault that it was duped into paying too much for prescription drugs.

Obviously Medicaid agencies have responsibilities other than setting pharmacy reimbursement methodologies.  Medicaid agencies are responsible for balancing multiple, often competing interests.  In balancing these interests, the Nevada Medicaid program took into account numerous factors.  Even in balancing these interests, however, the State *always* remained interested in obtaining the lowest cost available for drugs.  Lawrence Tr. Vol. 3 at 410 (Breckenridge Decl. Ex. 5).  The record reflects that in setting Medicaid reimbursement methodology, Medicaid personnel did not know the provider's financial situation and "provider happiness" was not a factor in setting reimbursement policy.  *Id*. Vol. 3 at 549; Squartsoff Tr. at 97 (Breckenridge Decl. Ex. 7).

From a policy standpoint alone, Defendants' suggestion that Medicaid's reimbursement policy setting became dominated by an interest in providing a financial incentive fails on logic.  The suggestion that a program dedicated to providing benefits to a State's neediest populations

- 13 -

and chronically in need of funds would deliberately set up a system to *overpay* certain private,

commercial entities simply makes no sense.  Moreover, the argument is rebutted by Medicaid

personnel testimony.  Both Duarte and Lawrence testified that they and other Nevada Medicaid

personnel considered themselves "stewards" of taxpayer money.  Duarte Tr. Vol. 4 at 37-38

(Breckenridge Decl. Ex. 4); Lawrence Tr. Vol. 3 at 400 (Breckenridge Decl. Ex. 5)

**G.     Given the Availability of AWP, Nevada Relies on It**

Given the availability and accessibility of AWP figures, Nevada Medicaid continues to

rely on AWP to approximate EAC.  Duarte Decl. at ¶¶ 58-60.  The considerations Chuck Duarte

articulated for the pre-lawsuit period still apply today.  *Id*. at ¶¶ 23-25.  Given the limited staff

and budget resources available to Nevada Medicaid, it is still the only feasible option for drug

reimbursement.  Duarte Decl. at ¶¶ 58-60; Lawrence Decl. at ¶¶ 51-53.  Indeed, Pharmacy

Program Officer Coleen Lawrence points out that not even the federal government can currently

determine what the appropriate basis of reimbursement should be based on the information about

AWP that has been developed in recent years.  Lawrence Decl. at ¶ 54.  It is absurd for

Defendants to suggest that instead of having drug manufacturers report accurate, meaningful

pricing benchmarks, it should be incumbent upon Nevada and other states to increase staffing to

audit the accuracy of information the industry provides *or* to increase their budgets to create a

manual process of culling by-transaction data.  The better alternative, and the alternative the

State hopes will be one result of this lawsuit, is to have Defendants provide accurate and

regularly updated data.

**H.     Nevada's Receipt of Actual Sales Prices (ASPs) and Other Pricing Information
        From Select Defendants**

Nevada received actual sales prices from just two Defendants and other pricing

information from two others.  At the earliest, ASPs were provided by the manufacturers – Bayer

- 14 -

Corporation and TAP – in 2002 as a result of settlement agreements.  The settlement agreements were limited to these defendants and their data, near the time this lawsuit was filed and did not suggest that the problem with the Bayer AWPs was industry-wide.  The same is true for TAP.  *It is undisputed that no other Defendants provided ASPs directly to Nevada ever.*  Def. L.R. 56.1 Stmt. at ¶ 109.  The State did not use the ASPs Bayer and TAP submitted because they were not in a usable format.  Lawrence Decl. at ¶¶ 42-90.  *See also infra*, at § IV.A.1.e.

## I.      The Record Is Devoid of Any Evidence that Nevada Residents Had Knowledge About AWPs or Defendants' Scheme

Defendants submit extensive argument regarding alleged government knowledge of the defendant drug manufacturers' AWP pricing scheme.  The record is absolutely devoid of any facts linking any government knowledge to Nevada residents, including TPPs.

## J.      There Is Sufficient Data Available to Prove the State's Claims

The State submits that there is sufficient data available to prove the State's claims.  *See* Hartman Decl. (Breckenridge Decl. Ex. 1); Hartman Supp. Decl. (Breckenridge Decl. Ex. 2). The State's damages claims are outlined in the calculation of Damages and Penalties for the State of Nevada, Hartman Decl. (June 13, 2006) (Breckenridge Decl. Ex. 1) and the Hartman Supp. Decl. (June 19, 2006) (Breckenridge Decl. Ex. 2).  The State limits its claims for damages to those identified by the Hartman Declarations.  Dr. Hartman carefully delineates the areas on which damages are sought.  The State submits that there is sufficient date to pursue the damages claimed.

## IV.      LEGAL ARGUMENT

## A.      Defendants Are Not Entitled to Summary Judgment on Nevada's Deceptive Trade Practices Act Claim

Defendants claim that they are entitled to summary judgment on Nevada's DTPA claims on four grounds:  (i) Nevada has had knowledge of Defendants' wrongdoing for a quarter of a

- 15 -

century and thus could not be deceived (Def. Mem. at 12-31); (ii) the Attorney General has no authority under the DTPA to bring *parens patriae* claims (Def. Mem. at 34-35); (iii) the State cannot recover restitution under the DTPA (Def. Mem. at 35-37); and (iv) the civil penalties the State seeks are neither permitted by statute nor supported by evidence.  Each argument fails.[5]

The Nevada Deceptive Trade Practices Act (DTPA)("Act"), Nev. Rev. Stat. Ann. § 598.0915 provides, *inter alia*, that "[a] person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he . . .  [m]akes false or misleading statements of act concerning the price of goods or services for sale or lease, or the reasons for, existence of our amounts of price reductions . . . knowingly makes any other false representations in a transaction."  Section 598.0923 of the Act provides that a person engages in a "'deceptive trade practice' when in the course of his business or occupation he knowingly . . . violates a state or federal statute or regulation relating to the sale of lease of goods or services."  There are few cases interpreting the Act; therefore, courts must interpret the plain and unambiguous language of the statute in construing claims.  The State submits that each Defendant violated the Act and deceived the State each time it submitted an AWP that did not reflect an average price or incorporate the numerous confidential discounts manufacturers granted to certain providers because the AWPs were "false or misleading statements" concerning the price of goods.  The State was deceived.

1.    **Nevada's reliance on the AWP benchmark as a surrogate for costs in the market does not defeat its DTPA claims**

Defendants principal assertion is that Nevada could not be deceived because the State "knew what AWP represented" and this "precluded any claims of deception or fraud."  Def.

---

[5] Curiously, arguments (ii) through (iv) are legal arguments not based on evidence developed during discovery, yet Defendants did not raise these arguments in their comprehensive motions to dismiss at the outset of the cases.

Mem. at 12-31.  Defendants allege various sources for the knowledge which, when examined with other evidence, create numerous questions of material fact as to this alleged "government knowledge."  The State's use of AWP and its knowledge is discussed extensively *supra*, at § III.  In summary, Nevada Medicaid personnel have testified that they did ***not*** have the knowledge Defendants describe until after this lawsuit was filed.  Duarte Decl. at ¶¶ 20-44; Lawrence Decl. at ¶¶ 36-39.  In fact, Nevada Medicaid had never seen any spreads like the ones for the Subject Drugs of this lawsuit until he saw the tables prepared by State expert Ray S. Hartman.  Duarte Decl. at ¶¶ 30-44; Lawrence Decl. at ¶¶ 36-41.

### a.   Nevada reasonably relied on AWPs and was not aware of true pharmaceutical pricing or Defendants' deceptive schemes

Defendants' principal argument is that the State could not have been deceived because it knew the true nature of the AWPs.  But the record shows that the State did not have the knowledge Defendants claim.  Nevada Medicaid's reliance on Defendants' AWPs was reasonable based on their understanding that the AWPs bore a rational relationship to real prices.  *See supra*, at § III.C.; Duarte Decl. at ¶¶ 19-21; Lawrence Decl. at ¶¶ 20.  Based on this expectation, the State believed AWPs to be a sound barometer of acquisition costs.  The State felt confident relying on AWPs provided by drug manufacturers.  *Id*.  State Medicaid took their responsibility for determining the EAC very seriously.  To Nevada staff, it was important to come as close to acquisition costs as possible.  Duarte Decl. at ¶ 22.  Medicaid understood that AWP did not equal acquisition costs.  Duarte Decl. at ¶ 25; Lawrence Decl. at ¶ 21.  Therefore, like the vast majority of other Medicaid programs in the country, Nevada applied a discount to AWP to calculate EAC.  For a program with limited staff and resources, having data that they could rely on to estimate EAC was important.  The states used AWP because it was the standard

price mechanism available, the data was regularly and automatically updated.  Duarte Decl. at

¶ 24; Lawrence Decl. at ¶ 25-28.

> **b.** **Nevada Medicaid did *not* premise its reimbursement methodology on the existence of spreads**

Defendants also argue that it was Nevada Medicaid that gamed the system – overpaying

providers by exploiting the spread.  This argument is illogical.  First, Nevada Medicaid had no

knowledge of the spreads for specific drugs, so it could not have based its reimbursement scheme

on the existence of spreads.  *See supra*, at § III.D.  Second, Nevada Medicaid personnel have

carefully described how and why the program's reimbursement methodology was set the way it

was.  *See supra*, at § III.B.  Defendants do not explain why – if the State was interested in

exploiting the spread – the State cut the discount from AWP-10% to AWP-15% in 2002.  If the

State was truly interested in providing a windfall to providers, it would have continued to

reimburse at the higher rate.  Third, Medicaid staff has described their sincere belief that they are

the "stewards" of taxpayers money.  *See supra*, at § III.F.

Defendants' argument that Nevada struggled to ensure access to care and would overpay

to achieve it also falls flat.  Medicaid personnel have testified although access to care is a

Medicaid interest, access has not been a problem in the State and the program had no providers

leave the state Medicaid market when the reimbursement methodology was changed from AWP-

10% to AWP-15%.  Duarte Tr. Vol. 1 at 103, 177 (Breckenridge Decl. Ex. 4); Lawrence Tr.

Vol. 2 at 357 (Breckenridge Decl. Ex. 5); *Id*. at 408.

> **c.** **The drug reimbursement and purchasing practices of non-Medicaid state entities did not put Nevada Medicaid on notice that "it could reimburse providers less"**

Defendants promote the purchasing and reimbursement practices of non-Medicaid state

entities as evidence of Nevada Medicaid "knowledge," even after Nevada Medicaid employees

- 18 -

and employees of the other non-Medicaid state agencies explained that there was no formal communication channel related to pharmacy practices of state entities.  Duarte Decl. at ¶ 50.  As described above, the argument reflects a fundamental misunderstanding of how state Medicaid programs generally operate and how Nevada's program in particular operates.  Drug purchasing and reimbursement mechanisms available to one government program are not necessarily available to other government entities.  Duarte Decl. at ¶¶ 46-49 (describing two drug pricing programs cited by Defendants as examples of state knowledge that were not available to Nevada Medicaid).  Moreover, a drug purchasing program is distinct from a drug reimbursement program and the former will not be relevant to the latter.  *Id*. at ¶¶ 47-48.  Because of these factors, even if State Medicaid personnel did learn about the drug purchasing and reimbursement practices of other state entities, the information would not be relevant or put the program on notice of problems with the Medicaid pricing system.

> ### d.   Select Defendants' periodic provision of Average Sales Price did not put the State on notice that all Subject Drug AWPs were false

Defendants argue that because "certain defendants" provided average sales prices data directly to the State, the State "knew that Defendants were not representing that AWP was equivalent to provider acquisition cost."[6]  Def. Mem. at 29-30.  But the evidence shows that just four drug manufacturers submitted the information at random times.  This does not constitute notice that the entire system was flawed.  Bayer, Dey, Schering Plough Warrick and TAP only provided data at various times since 2001.  Bayer and TAP provided the data in response to settlement agreements between it and Nevada and other states.  Lawrence Decl. at ¶ 42.  Nevada Medicaid is not aware of any additional defendants who provided the State with pricing

---

[6] Magistrate Bowler imposed an evidentiary sanction on the State concerning the State's receipt of ASPs from manufacturers.  The State will object by March 26, 2007.  The date for the response.

information directly.  *Id*. at ¶ 50.  And Defendants have not submitted evidence otherwise.  Def. Mem. at 29-30 (and evidence cited therein).

Defendants also submit letters sent by two other drug manufacturers (Dey and Schering Plough Warrick) and the drug data provided directly by Schering and Warrick also provided motive.  Warrick provided a range of drug prices that was manifestly unusable because the Nevada Medicaid pricing system, as well as the pricing systems of every payor in the United States – as Warrick knew – required a price and not a range of prices.  Lawrence Decl. at ¶¶ 45-46.  The letters from these three entities were specific to these companies.  Again, there was nothing in the letters that suggested an industry-wide problem with the use of AWPs.

Moreover, at the earliest, the letters were sent in June 2000 *in response to an inquiry from the Nevada Medicaid Fraud Control Unit (MFCU), and not Medicaid*.  MFCU is a separate unit from Medicaid, formed by federal directive and subject to its own statutory authority in the State.  Nev. Rev. Stat. § 228.410.  Medicaid personnel have testified that they did not even receive or see those letters.  Duarte Tr. at Vol. 1 at 68-69, 202:17-204:10 (Breckenridge Decl. Ex. 4); Lawrence Tr. Vol. 1 at 124 (Breckenridge Decl. Ex. 5).  And, even if this letters were construed to be "notice" of a problem with respect to these defendants, this lawsuit was filed within the statute of limitations.

> ### e.   Defendants' "government knowledge" argument does not apply to Nevada's *parens patriae* claims

Defendants' "government knowledge" defense does not apply to the State's *parens patriae* claims.  Defendants fail to address how or why evidence of any knowledge of Defendants' scheme on the part of the State would be imputed to State consumers.  Ostensibly, Defendants' knowledge theory is that Nevada's alleged knowledge of "what AWP represented" precludes the State's claims of deception or fraud.  Even if the State did possess knowledge,

there is no logical link between such knowledge and Nevada citizens.  Defendants do not even

make a pretense of explaining how the "public" – and particularly elderly Medicare Part B co-

payors – are supposed to have known that their drug payments or co-payments were inflated as a

result of the drug manufacturers complicated scheme.  Any State knowledge cannot taint

consumers and Defendants present no authority to the contrary.

    **2.**        **The Attorney General may bring a *parens patriae* claims under DTPA on behalf of Nevada citizens**

The Attorney General brings this action pursuant to "the common law and statutory

authority of the Attorney General to represent the State of Nevada and its residents."  Amended

Complaint at ¶ 24.  The Attorney General's authority to bring *parens patriae* claims on behalf

of Nevada residents pursuant to the State's DTPA is derived from both statutory and common

law authority.  Defendants have not cited any direct authority that the Attorney General lacks the

proper authority.[7]  For example, Defendants cite the specific reference to *parens patriae*

authority in Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.160, as evidence that the State

legislature did not intend the Attorney General to have comparable authority in connection with

the DTPA.  This is not persuasive.  Defendants cite "safeguards" from the UTPA that it alleges

will be denied State residents if the Attorney General is allowed to proceed on a *parens patriae*

basis under the DTPA but the UTPA section cited contains no such "safeguards."

Nevada grants its Attorney General broad authority to investigate and prosecute statutory

violations, as well as to assert other claims on behalf of the State and its citizens.  The Attorney

General is an independent member of the State executive branch.  Nev. Rev. Stat. § 228.170(1)

expressly authorizes the Attorney General to commence or defend civil actions "[w]henever the

governor directs or when, in the opinion of the attorney general, to protect and secure the interest

---

[7] There is no relevant case law, probably because the Attorney General's authority is seldom challenged.

of the state it is necessary that a suit be commenced or defended in any federal or state court."

Further, under the DTPA, "[i]f the attorney general has reason to believe that a person has

engaged or is engaging in a deceptive trade practice, the attorney general may bring an action in

the name of the State of Nevada against that person to obtain a temporary restraining order, a

preliminary or permanent injunction, or other appropriate relief."  Nev. Rev. Stat. § 598.0963.

In addition, the DTPA also authorizes the Attorney General to bring actions and seek

civil penalties not to exceed $2500 for any action in addition to any other relief or reimbursement

and reasonable attorney's fees and costs, at the discretion of the court *in any action brought

pursuant to the provisions of Nev. Rev. Sat. 598.0903 to 598.0999*.  Nev. Rev. Stat. § 598.0999.

This range of statute sections includes the entire DTPA.

Defendants' argument misapprehend the *parens patriae* standing doctrine.  States may

bring a legal action on behalf of its citizens where state citizens have been harmed if the

wrongdoing "quasi-sovereign" interest of the State.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico*,

458 U.S. 592, 607 (1982).  Quasi-sovereign interest include protecting the health and well-being

– both physical and economic – of its residents is affected, or ensuring state residents receive

their rightful benefits under federal laws.  *Id.*  The State is deemed the best judge of those

interests.  *Id.* at 612 (Brennan, J. concur) ("[A] State is entitled to assess its needs, and decide

which concerns of its citizens warrant its protection and intervention.  I know of nothing – except

the Constitution or overriding federal law – that might lead a federal court to superimpose its

judgment for that of a State with respect to the substantiality or legitimacy of a State's assertion

of sovereign interest.").

Here, the Attorney General asserts its quasi-sovereign interest in the physical and

economic well-being of its residents in electing to prosecute their overpayment for drugs.  There

is no legitimate basis to exclude the DTPA from the Attorney General's *parens patriae* power. Summary judgment on this basis should be denied.

###### 3.     The Nevada Attorney General does not seek to recover restitution on behalf of Nevada residents

Defendants challenge the Attorney General's power to recover ***restitution*** on behalf of Nevada residents and the State.  Def. Mem. at 35-37.  However, Nevada does not seek to recover on these bases on behalf of these groups, recovery of these monies is not included in Dr. Hartman's damages model, which is limited to damages in the form of civil penalties incurred by the Nevada Medicaid Program.  *See* Hartman Decl. (Breckenridge Decl. Ex. 1); Hartman Supp. Decl. (Breckenridge Decl. Ex. 2).  Thus, this is not an issue and it is unclear why Defendants have even raised it.

###### 4.     The civil penalties that the State of Nevada seeks are permitted by statute and supported by the evidence

Defendants challenge Nevada's claims for civil penalties on behalf of itself and Nevada residents pursuant to Nev. Rev. Stat. § 598.0999(2) because the State will never be able to prove that Defendants' deceptive conduct was willful.  Def. Mem. at 37-38.  The question of willfulness is a fact intensive inquiry, appropriate for summary judgment only under unusual circumstances.  It would be inappropriate in instances where, as here, there is strong evidence of knowledge and intent on the part of the wrongdoer.  The record on drug manufacturer willfulness is clear.  The falsity of the AWPs and each Defendant's knowledge of the falsity has been the subject of extensive briefing in the MDL case.  *In re Pharm. Indus. Average Wholesale Price Litig.*, Memorandum & Order at 1 (Nov. 2, 2006) ("Plain Meaning Order") (Dkt. No. 3299). Like the Plaintiffs in the class case, the State here alleges that the definition of the term "average wholesale price" should be based on the plain and ordinary meaning of the words.  Instead, the AWP numbers Defendants allowed to be published were arbitrary, inflated numbers that had

- 23 -

nothing to do with actual acquisition costs.  The drug manufacturers were the only ones who knew this.  The State will support evidence supporting the falsity of more Defendant specific non-Track 1 Defendant AWPs will be set forth in the State's responses to the individual motions for summary judgment and is incorporated here by reference.

At a minimum, Defendants have not met their burden on summary judgment.  Judgment should not be granted.

**B.      Defendants Are Not Entitled to Summary Judgment on Nevada's Medicaid Fraud Claim**

Defendants seek judgment in their favor on Nevada's claim for violations of the State's Medicaid Fraud statute, Nev. Rev. Stat. §§ 422.540 *et seq.*, based on three arguments:  (i) no Defendant with intent to defraud made any knowingly false statement or representation concerning AWP; (ii) no person used AWP to obtain goods or services pursuant to the State Medicaid Plan, which Defendants maintain is required by the statute; and (iii) Defendants are not "providers" and thus cannot be liable for penalties under the statute.  Each fails.

Like many other states, Nevada prohibits misrepresentations and misleading statements made by any person in connection with claims and payments under its Medicaid program.  "A person, with intent to defraud, commits an offense if with respect to the plan he . . . (c ) makes or causes to be made a statement or representation for use by another in obtaining goods or services pursuant to the plan, knowing the statement or representation to be false, in whole or in part, by commission or omission."  Nev. Rev. Stat. § 422.540.  "'Plan' means the state plan for Medicaid established pursuant to NRS 422.271."  Nev. Rev. Stat. Ann. § 422.480.  "Statement or representation" is defined to include "without limitation, a report, claim, certification, acknowledgement or ratification of . . . financial information," among other information.  Nev. Rev. Stat. Ann. § 422.525(1).

- 24 -

1.     **The evidence shows that Defendants submitted false statements or representations regarding AWP with the intent to defraud the State and other payors**

Defendants allege that Nevada cannot produce any evidence that Defendants' reported AWPs were false because there is no evidence to support either the contention that AWP means an "average of wholesale prices" or intentional misrepresentation on the part of Defendants. Def. Mem. at 31.  The evidence demonstrates otherwise.

As discussed above, the State alleges that the evidence shows that the AWPs Defendants submitted were false and only Defendants knew this.  This Court has held that "average wholesale price" should be interpreted to mean "the average price at which wholesalers sell drugs to their customers, including physicians and pharmacies."  *In re Pharm. Indus. Average Wholesale Price Litig.*, Memorandum & Order at 1 (Nov. 2, 2006) ("Plain Meaning Order") (Dkt. No. 3299).  In Nevada, State Medicaid personnel believed that this the proper interpretation of "average wholesale price," was that the AWPs provided bore a reasonable relationship to actual acquisition prices.  *See supra*, at § III.C.

Later the State and other payors learned that AWPs the Defendants controlled and the States and other payors relied on were not average wholesale prices and actually bore no relationship to the acquisition costs, unlike what those outside the pharmaceutical industry believed.  Evidence and time have proved that despite the plan meaning of the words, Defendants' use of the term as a label for the prices reported by the national publishers was a misnomer.  The record also contains extensive evidence – much of it from Defendants' own files – that Defendants knew that Nevada and others relied on the reported AWPs for reimbursement, knew that the AWPs were not what the states believed them to be, yet caused or allowed them to be published anyway.  *See generally* Montana's Motion for Partial Summary Judgment (Dkt. No. 3630).

- 25 -

Additionally, the Medicaid Fraud statute imposes its own standard for determining whether a person had knowledge of the falsity of the information provided to Nevada Medicaid. Section 422.530 provides

> "[a] person shall be deemed to have known that a claim, statement or representation was false if he knew, or by virtue of his position, authority or responsibility had reason to know, of the falsity of the claim, statement or representation."

Defendants' argument ignores this standard.  Even if the record did not include Defendants' explicit knowledge that they were providing AWPs that did not reflect average wholesale prices, under § 422.530, the drug manufacturers are deemed to have known of the falsity of the information by virtue of their position in publishing the AWPs – or allowing them to be published by First DataBank and others.

There is substantive evidence supporting the State's argument that the AWPs were false and Defendants knew it.

### 2. The statements or representations were used to obtain goods or services pursuant to the State Medicaid Plan

Defendants' argument that their AWPs were not made to obtain "goods and services pursuant to the State Medicaid Plan" is unsupported.  Defendants' AWPs were used to obtain drugs, which clearly constitute a "good" under the State Plan.  To refute this interpretation of the plain and ordinary meaning of the statute Defendants rely on just one document (which is actually three unrelated pieces of papers from different dates) that does not contain the information Defendants claim – in that it does not contain the of the exclusive list of Medicaid goods and services Defendants claim.  Def. Mem. at 32, s*ee also* Def. L.R. 56.1 Stmt. ¶ 13.

### 3. Defendants are liable for penalties under the statute

Defendants go to great lengths and many dictionaries to evade responsibility for penalties in connection with their violations of the Medicaid Fraud statute.  Defendants interpret Nevada's

Medicaid Fraud statute too narrowly in arguing that the statute imposes penalties solely on "providers" in the traditional sense and cannot include manufacturers.  Def. Mem. at 32-34.

The statute defines  "provider" as "a Person who has applied to participate or who participates in the plan as the provider of goods or services."  Nev. Rev. Stat. § 422.490(1).  Defendants argument that they do not "participate" in the Plan is belied by its own definitions.  *See* American Heritage Coll. Dict. 995 (3d ed. 2000).  The drug manufacturers *do* "take part in" the Medicaid program by providing drugs that are received by Medicaid recipients.  Defendants recognize the market in their internal documents.  Defendant drug marketing materials reflect the attention they have given to the Medicaid market.  And Defendants make a profit off of this market.

In enacting the statute, as this Court previously found, Nevada intended to preclude fraud by persons, including pharmaceutical manufacturers.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187, 205 (D. Mass. 2004).  In doing so, it appears clear that the State intended persons who committed fraud under the statute, as well as traditional providers, to be subject to the penalties outlined both in the statute and in Nev. Rev. Stat. § 422.580.  Section 422.580 provides for "(a) an amount equal to three times the amount unlawfully obtained; (b) not less than $5000 for each false claim, statement or representation; (c) treble the total of the reasonable expenses incurred by the state in enforcing the statute; and (d) interest on the amount of the excess payment.

Defendants did receive "payment[s] to which [they] were not entitled by reason" of their violation of the statute.  Nev. Rev. Stat. § 422.580(1).  The defendants received profits in the form of enhanced market share.[8]

---

[8] Even if the Court agrees that the statute does not allow the imposition of § 422.580 penalties on pharmaceutical manufacturers as opposed to traditional "providers," this does not leave the State without recourse

**C.      Nevada's Claims Are Not Barred by the Statute of Limitations**

Defendants invoke the four year statutes of limitations for claims arising from the DTPA, Nev. Rev. State Ann. § 11.190(2)(d), and for claims arising from the Medicaid fraud statute, Nev. Rev. Stat. Ann. § 422.590, claiming that all the State's claims are time-barred.  Def. Mem. at 38.

A cause of action under either statute accrues only when the aggrieved party discovers the facts constituting a violation of the statute, not before.  Nev. Rev. Stat. Ann. § 11.190(2)(d); Nev. Rev. Stat. § 422.590.  Nevada courts interpreting Nev. Rev. Stat. Ann. § 11.190 have interpreted the statute as beginning to run "from the date of the discovery of facts which in the exercise of proper diligence would have enabled the plaintiff to learn of the fraud."  *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1306 (9th Cir. 1992) (citations).  Defendants argue that the State's claims are time-barred because of its "25-year knowledge regarding the difference between AWP and acquisition cost and its conscious decision to set reimbursement above acquisition cost."  Def. Mem. at 38.  But this is not the proper inquiry.  Instead, the focus should be on when Nevada first became aware of Defendants' wrongdoing.  When the focus thus shifts, it becomes clear that the case was timely filed.

State Medicaid personnel persistently believed that the published AWPs bore a rational relationship to drug acquisition costs and that is why the Nevada Medicaid program felt confident using AWP as a component of its drug reimbursement program.  *See supra*, at § III.C.  The State did ***not*** have notice of the gross spreads between acquisition costs and AWPs

---

for its Medicaid Fraud statute claims.  Nev. Rev. Stat. § 422. 540 provides for other punishments, including a Category D felony charge, pursuant to Nev. Rev. Stat. § 193.130, if the amount of the claim or the value of the goods or services obtained or sought exceed or equaled $250.  Nev. Rev. Stat. § 422.540(2)(b).  Amounts in separate violations of the section committed pursuant to a scheme or continuing course of conduct may be aggregated in determining the punishment.  *Id.*  In addition to any other penalty for a violation of Nev. Rev. Stat. § 422.540(1), "the court shall order the person to pay restitution."

underlying many of the Subject Drugs.  Duarte Decl. at ¶ 30-44.  And the State did **not** have

knowledge of the Defendants' price manipulation and marketing of the spreads to physicians and

other providers.  Duarte Decl. at ¶ 45.  The State did not have any information that would have

put them on notice of Defendants' wrongdoing or triggered the statute of limitations.

Under Nevada law, "the party seeking summary disposition has an extremely difficult

burden to show that there exists no issue of material fact regarding notice."  *Id*. at 1308 (citations

and quotation marks omitted).  The question of sufficient notice "may be decided as a matter of

law only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should

have discovered the fraudulent conduct."  *Id*. at 1307 (citations and quotation marks omitted).

Clearly, with the record before the Court, this is not one of those cases.

Summary judgment should be denied.

## D.     Nevada Has Not "Abandoned" Aspects of Its Case and Can Prove the Damages It Alleges

The State's damages claims are set forth in the Hartman Declarations.  The State has

limited its claims for damages to these outlined by Dr. Hartman.  The State earlier stipulated that

it would not pursue claims on behalf of non-Medicaid state entities.

The State acknowledges that neither Defendants nor the State have claims data post 2002

as noted in the Hartman Declaration.[9]  But the State does not understand Defendants' argument

that the claims data they have in their possession is "not self-explanatory" or adequate.

Defendants complain about the quality of evidence **they** elicited Mr. Swenson, the State witness

on claims data, responded to the Defendants' own questions.  To date, then, Defendants have

enjoyed numerous formal and informal exchanges with Mr. Swenson and other State employees

---

[9] The Relevant Time Period for the lawsuit is 1991 to the present, so it is unclear what point Defendants attempt to make about the pre-1991 data.

in connection with the claims data usually with the participation Defendants' own expert.  The

State offered to make Mr. Swenson available again – informally – to answer Defendants'

questions regarding the data.  But Defendants' motion is the first notice the State has had that the

data was inadequate.

## V.      CONCLUSION

For the foregoing reasons, Defendants' joint motion for summary judgment should be

denied.  On each issue raised by Defendants, material issues of fact exist for resolution by a jury.


By_____/s/ Steve W. Berman_____        DATED:  March 22, 2007
    Steve W. Berman
    Sean R. Matt
    Jeniphr A.E. Breckenridge
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

    Thomas M. Sobol
    Edward Notargiacomo
    HAGENS BERMAN SOBOL SHAPIRO LLP
    One Main Street, 4th Floor
    Boston, MA  02142
    Telephone: (617) 482-3700
    Facsimile: (617) 482-3003


    Catherine Cortez Masto
    Attorney General of the State of Nevada
    L. Timothy Terry
    Deputy Attorney General
    100 N. Carson Street
    Carson City,  NV 89701-4714

    COUNSEL FOR PLAINTIFF
    STATE OF NEVADA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **THE STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 22, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By       **/s/ Steve W. Berman**
      Steve W. Berman
      **HAGENS BERMAN SOBOL SHAPIRO LLP**
      1301 Fifth Avenue, Suite 2900
      Seattle, WA  98101
      (206) 623-7292

001534-13  158624 V1