**BRECKENRIDGE DECL. EXHIBIT 4**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____        MDL DOCKET NO.

                               CIVIL ACTION

                               01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/


VOLUME I

DEPOSITION OF CHARLES DUARTE

NOVEMBER 15, 2005

CARSON CITY, NEVADA


REPORTED BY:  STEPHANIE ZOLKOWSKI CCR 283

COMPUTER-ASSISTED TRANSCRIPTION BY:  caseCATalyst

f2f1e4f2-1e09-4e88-8215-14efca5379bf

12

1    two or three.

2        Q    And are those instances where you've

3    testified regarding rebates, those also occurred here

4    in Nevada?

5        A    Yes.

6        Q    Have you ever worked on preparing legislative

7    testimony for someone else with regard to prescription

8    drug reimbursement issues?

9        A    Yes.

10       Q    Would you please describe your efforts in

11   that area.

12       A    I prepared testimony which discussed

13   primarily our cost saving initiatives in the Medicaid

14   pharmacy area and prepared testimony along that line.

15       Q    Who actually gave that testimony before the

16   legislature?

17       A    My boss, the Director of the Department of

18   Health and Human Services.  His name is Michael

19   Wilden.

20       Q    Have you ever provided testimony before the

21   legislature in connection specifically with AWP?

22       A    Not to my recollection.

Duarte, Charles - Vol. I

November 15, 2005

Carson City, NV

13

1          Could I clarify that?

2      Q    Sure.

3      A    Only in the context that it was a part of the

4  overall discussion of cost containment.   The term was

5  used but the purpose of the testimony was not

6  specifically to discuss AWP.

7      Q    Would this have been in connection with the

8  State's change in its definition of estimated

9  acquisition costs from AWP minus 10 percent to AWP

10  minus 15 percent?

11     A    Yes.

12          In other context as well.

13     Q    What other context?

14     A    In terms of what we actually pay pharmacies

15  and how we do that.   On several occasions I have to

16  describe and redescribe to different legislative

17  bodies.

18     Q    You say you need to describe to different

19  legislative bodies.

20          What legislative bodies have you testified

21  before?

22     A    In this context?

Duarte, Charles - Vol. I                    November 15, 2005
                    Carson City, NV

51

1        Q    Is there a third party administrator that the

2    State is contracted with to deal with physician

3    administered drugs and the medical benefit?

4        A    Yes.   Benefit Planners.   They're the claims

5    administrator.

6        Q    Do you know if prescription drugs that the

7    State reimburses for in connection with the Public

8    Employee Benefit Fund, whether that reimbursement is

9    based on AWP?

10       A    I do not know.

11       Q    Who would know the answer to that?

12       A    Woody Thorn who is the Executive Officer for

13   the Public Employee Benefit Plan.

14       Q    In addition to the Public Employee Benefit

15   Fund do you serve on any other boards that involve in

16   any way issues relating to prescription drug

17   reimbursement?

18       A    No.

19       Q    In your position as board member of the

20   Public Employee Benefit Fund have you ever had

21   discussions with Woody Thorn about AWP?

22       A    Not to my recollection.

58

Q    How about the provision of prescription drugs
for Nevada's Native American population?  How does
that work?

A    I believe they do that directly.  I'm not
involved with the purchase or reimbursement of their
drugs.  I do provide reimbursement, pass through
reimbursement.  Whether it included any reimbursement
for prescription drugs, I'm not sure.

Q    Does the Public Employee Benefit Fund that
you mentioned, does that cover essentially all Nevada
State public employees, teachers, other government
workers or are there different funds for different
groups?

A    There are a few excluded groups or groups
that are not affiliated.  But for the most part they
cover Nevada's public employees.  The majority of the
employers, the State and local county agencies,
participate in PED.

Q    You mentioned the Governor's Drug Summit in
Las Vegas and the presence of representatives from at
least some of these entities at that Summit.

Are there other opportunities where

representatives from Nevada Medicaid and some of these other entities get together to discuss prescription drug issues?

    A   Not specifically.

    There are opportunities for the Division administrators to get together on at least a monthly basis. Not specifically to discuss prescription drug issues.

    Q   What are those opportunities that are available for the directors to get together?

    A   We have a monthly administrators meeting with the Director to talk about the Department and Agency specific issues.

    There is, of course, I forgot to mention, I'm sorry, where a number of us are involved jointly in preparing for implementation of the Medicare Prescription Drug Plan Part D and so we have a number of conference calls and planning meetings associated with that. None of which is really related to purchasing but more of how we transition people that we are responsible for to the Medicare Program.

    Q   Do you know where Catalyst RX is based?

1    term, metric.

2            And, again, my familiarity with these issues

3    is probably more in depth related to the time frame of

4    my tenure as Nevada State Medicaid Administrator 2000,

5    to the current time.

6        Q    Are you knowledgeable regarding the items

7    listed in 1 (d), documents created by or received from

8    Federal agencies or the National Association of

9    Medicaid Fraud Control Units, National Association of

10   Attorneys General or PAL relating to prices, costs or

11   reimbursements for pharmaceutical products from

12   January 1985 to the present?

13       A    No.  Not to any degree.  I don't normally see

14   these publications.

15           I'm not sure what PAL means.  Could you

16   define that for me?

17       Q    It's Prescription Access Litigation, I

18   believe.

19       A    No.  I'm not familiar with it.

20       Q    Ms. Lawrence I believe had identified you as

21   the person most knowledgeable or at least she thought

22   was most knowledgeable related to the National

Duarte, Charles - Vol. I                    November 15, 2005
                    Carson City, NV

1    Association or documents created by or received by the

2    National Association of Medicaid Fraud Control Units.

3            If that's not the case do you know who would

4    be a person who would be knowledgeable about that area

5    that we could talk to?

6        A    I believe that's Mr. Terry's area of purview.

7             Sorry, Mr. Terry.

8        Q    Other than Mr. Terry is there anyone else

9    that you think would have knowledge in this area?

10       A    In terms of?

11       Q    In terms of documents created by or

12   received --

13       A    For all of those associations?

14       Q    No.   Just the National Association of

15   Medicaid Fraud Control Units.

16       A    Not to my knowledge.

17       Q    1 (e), are you knowledgeable regarding

18   Plaintiff's internal or external assessments, studies,

19   analyses, reviews or audits conducted by or on behalf

20   of Plaintiff regarding drug pricing or reimbursement

21   amounts or rates of subject drugs from January 1985 to

22   the present?

1  State funded programs related to Health and Human

2  Services.

3      Q   And then focussing on the Division of Health

4  Care Financing and Policy what is that Division

5  responsible for?

6      A   My Division is responsible for the

7  administration of the State of Nevada Medicaid

8  Program.  The State Children's Health Insurance

9  Program called Nevada Check Up.  And for other

10  sections of the State Statute associated with hospital

11  cost containment and reporting.

12     Q   You mentioned State Statutes relating to

13  hospital cost containment.

14         Are there particular State Hospitals in

15  Nevada?

16     A   Yes.

17     Q   That are actually run by the State?

18     A   Yes.

19         They're primarily mental health facilities.

20     Q   Do you know if these mental health facilities

21  purchase prescription drugs?

22     A   Yes.

Duarte, Charles - Vol. I                    November 15, 2005
                      Carson City, NV

Page 103

1    or from a physician complaining about reimbursement

2    for prescription drugs and how it's hurting them in

3    some way, where is that complaint directed?

4        A    Most of the time the complaint comes through

5    my office.  Then I will refer it to staff to follow up

6    and review and respond inappropriate.

7        Q    When you say refer it to staff, would you

8    refer it to the Rates and Costs Containment Unit or

9    would you refer it to Colleen in Pharmacy or what

10   would you do?

11       A    Refer to Colleen in the Pharmacy Unit.

12            She would work with Personnel Services

13   Corporation and also First Health Services Corporation

14   and also Mr. MacNab in the Rates Unit or his staff.

15            They may do more of the analysis, for

16   example, if it's called for of a specific

17   reimbursement method.  Some of the hard analysis would

18   be done outside of Colleen's unit.

19       Q    Eric King is no longer with Nevada Medicaid;

20   is that right?

21       A    That's correct.

22       Q    Do you know where he is now?

f2f1e4f2-1e09-4e88-8215-14efca5379bf

134

And I don't know who Laurie directly reports to.  It

may be Michael Wilden.  It may also be Mary Liveratti,

the Deputy Director of Health and Human Resources.

    Q    **Is Mary Liveratti related to John Liveratti?**

    A    Yes.

    Q    **Husband and wife?**

    A    Yes.

    Q    **Who is the Division -- who is the head of the**
**Division of Mental Health and Developmental Services?**

    A    The Administrator is Carlos Brandenberg,

B-r-a-n-d-e-n-b-e-r-g.

    Q    **Is he the person who would have the most**
**knowledge regarding the purchase or reimbursement of**
**prescription drugs by the Division of Mental Health**
**and Developmental Services?**

    A    I believe the individual who would probably

have the most knowledge is Dr. Emanuel Ebo, E-b-o.  He

is a doctor of pharmacy.  What's the designation?

Capital R Ph.D.

    Q    **Other than Dr. Ebo is there anyone else at**
**the Division of Mental Health and Developmental**
**Services who you think would be knowledgeable about**

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

Page 177

1    15 percent relate?

2        A    Yes, we did.

3            Again, this letter is related more to the

4    concerns they had with change in physician fee

5    schedule.

6        Q    Was part of what the State was trying to do

7    when it set the AWP rate minus 15 percent, was the

8    State trying to cover both the cost of the drug and

9    the cost to administer the drug to the patient?

10       A    Yes.

11           Keep in mind this service is provided by a

12   physician and physician's office so what they're

13   particularly concerned about and complaining about is

14   the physician's office visit reimbursement associated

15   with the delivery of these medications and the overall

16   treatment of the cancer patient.

17           So if I recall the context of the discussion,

18   and I did speak to I don't know if it was Sheila

19   Barilla or Dr. Moas, but the issue was the overall

20   impact on their practice revenues and they were more

21   concerned about the change in RBRVS fee schedule.

22           As I said, we addressed that with a rate

f2f1e4f2-1e09-4e88-8215-14efca5379bf

Duarte, Charles - Vol. I                                    November 15, 2005
                        Carson City, NV

202

1    to AWP minus 15.

2           Our next approach was really go at the, again

3    at the, pharmacies, through the generic pricing and

4    establishing a MAC price schedule.

5           Third, really to deal with the manufacturers

6    and probably the more important aspect of it looking

7    at preferred drug pricing introduction of supplemental

8    rebate and introduction of appropriate clinical

9    protocols to reduce excess utilization of drugs which

10   may not be medically necessary.

11          So as I said, our first actions were to go at

12   pharmacy level which we did.  And then our subsequent

13   actions.  And some of these occurred simultaneously

14   going after reducing our cost through efforts directed

15   more at manufacturers.

16   BY MR. DOVE:

17      Q    **Does the State receive documents from the**

18   **National Association of Medicaid Fraud Control Unit?**

19      A    I believe so.

20      Q    **Do you know where those documents are kept?**

21      A    I believe the Attorney General's office

22   retains those.

Duarte, Charles - Vol. I

November 15, 2005

Carson City, NV

203

1       Q   Do you know who reviews those documents when

2  they're received?

3       A   I really don't know.

4       Q   Do you review those documents?

5       A   I do not.

6       Q   Do you know who would have knowledge about

7  where those documents are located?

8       A   I assume Mr. Terry would.

9       Q   Do representatives of the State Medicaid

10  Department ever attend meetings of the National

11  Association of Medicaid Fraud Control Unit?

12      A   I don't believe we have.

13      Q   Do you know whether anyone from Nevada

14  Medicaid attended a National Association of Medicaid

15  Fraud Control Unit meeting in 1999 at which AWP,

16  alleged AWP, fraud was discussed?

17      A   I do not know.

18      Q   Do you know who would know that answer?

19      A   I assume the AG's office.

20      Q   Mr. Terry?

21      A   I assume so.

22      Q   Does the State receive documents from the

1     National Association of Attorneys General relating to

2     Medicaid?

3          A    Yes, it does.

4          Q    Do you know where those documents are kept?

5          A    I do not.

6          Q    Do you know who reviews those documents?

7          A    I assume the AG office staff.

8          Q    Do you know who would have knowledge about

9     these documents?

10         A    Not specifically.  No.

11         Q    Do you know whether the State has received

12    documents from the Prescription Access Litigation

13    relating to the Medicaid Program?

14         A    I don't know.

15         Q    Mr. Duarte, do you have communications with

16    people in your same position or similar position as

17    you in other states?

18         A    Yes.

19         Q    What sort of communications do you have?

20         A    Email and verbal and face-to-face.

21         Q    Do you ever discuss or are prescription drug

22    reimbursement issues ever discussed as part of those

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

Page 219

1           I believe we provided that to you in

2    documents where we presented information to the joint

3    money committees of the legislature regarding our

4    overall pharmacy initiatives.

5        Q    Are you ever given directives from your

6    supervisor or for people in the executive branch who,

7    at a more senior level, to the effect of we need you

8    to do what you can to reduce prescription drug costs

9    as an example?  Is that the sort of directive you

10   might get from higher levels of the executive branch?

11           MS. BRECKENRIDGE:  I'm going to allow him to

12   answer but we're going kind of far afield from the

13   Deposition Notice.

14           THE WITNESS:  Specifically to the request to

15   reduce prescription drug expenditures the answer is

16   no, I did not receive a specific order from my boss

17   the Director, Michael Wilden, or his predecessor or

18   the Governor's office to do so.

19           Yes, we have been directed particularly in

20   2002, to reduce overall expenditures by approximately

21   three percent in response to a shortfall of State

22   revenues associated with the impact on the economy of

f2f1e4f2-1e09-4e88-8215-14efca5379bf

Duarte, Charles - Vol. I                    November 15, 2005
                          Carson City, NV

---

Page 220

1    911 and increase in our Medicaid case load which

2    resulted in us moving toward exceeding our budget

3    authority.

4    BY MR. DOVE:

5        Q    So was this decrease in the reimbursement

6    rate one of several measures you enacted in an attempt

7    to address that three percent budget consideration?

8        A    It wasn't specifically directed at that.

9             We had intentions of increasing the discount

10   already.  My recollection was that was already in the

11   works prior to the request by the Governor's office

12   for a three percent reduction.

13       Q    If you turn to page NV 0018, please.

14            What's the Legislature Counsel Bureau?

15       A    Legislature Counsel Bureau are staff to the

16   Nevada State Legislature.

17       Q    They would have received a copy of this State

18   Plan Amendment?

19       A    I assume so.  They routinely receive copies

20   of State Plan Amendments.

21       Q    If you could turn with me to NV 00191.

22            The first paragraph of that first full

---

f2f1e4f2-1e09-4e88-8215-14efca5379bf

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

Page 228

1          Does that ring a bell?  Is that July 8th

2    meeting the meeting you had with NACDS?

3          A    I don't recall.

4              I think this had to do more with retroactive

5    collection related to the change in policy.  As I said

6    while they objected to the overall change they agreed

7    to it in a meeting with the Director.

8              I think what they were concerned with was

9    retro activities with respect to implementation of

10   policy as soon as CFS approves it which often occurs

11   90 to 120 days to 180 days after it's submitted.

12         Q    Was the retroactivity concern ever addressed?

13         A    I can't recall whether we did or not.

14         Q    Have you met with John Coster before?

15         A    No, I have not.  I have not met him.

16         Q    Sitting here today you don't have any

17   recollection of the July 8th meeting referred to on NV

18   00195?

19         A    It may be referring to the same meeting we

20   had with the Director.  I am just not certain.  I'd

21   have to go back and check.

22         Q    Turn with me, please, to NV 00196.

f2f1e4f2-1e09-4e88-8215-14efca5379bf

Duarte, Charles - Vol. I                    November 15, 2005
                        Carson City, NV

Page 247

1    Q    Half the savings would come in the State

2    General Fund Budget, the other half of the savings

3    would go to the Federal government?  Is that what you

4    meant by that?

5    A    Yes.

6    Q    Then the second clause of that sentence says

7    "which is facing a $27 million shortfall next year

8    because of unanticipated growth in the Medicaid case

9    load, Duarte said."

10        Do you see that?

11   A    Yes.

12   Q    In addition to the or maybe as part of the

13   September 11th aftermath there was a significant

14   budget shortfall?  Is that what that means?

15   A    Yes.

16        We had an unanticipated large increase in

17   Medicaid caseload which drove up our expenditures and

18   required us to implement budget savings initiative.

19   Q    That was because of perhaps a decline in

20   tourism, for example, in Las Vegas?

21   A    Yes.

22        MS. BRECKENRIDGE:  Objection.

f2f1e4f2-1e09-4e88-8215-14efca5379bf

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

———————————————                    MDL DOCKET NO.

CIVIL ACTION

01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

———————————————————————/


VOLUME II

DEPOSITION OF CHARLES DUARTE

NOVEMBER 16, 2005

CARSON CITY, NEVADA


REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

**6**

1  agencies.
2  Q   Is that division within the executive branch?
3  A   Yes, it is.
4  Q   Where does the Purchasing Division fall
5  within the organizational structure of the executive
6  branch?
7  A   It falls within the -- it's the Division of
8  Purchasing within the Department of Administration.
9  Q   And is that separate from the Department of
10  Health and Human Services?
11  A   Yes, it is.
12  Q   Do you know if the Purchasing Division is
13  involved in the purchase of prescription medications?
14  A   I don't know whether they're involved in
15  purchasing prescription medications. I don't believe
16  they are, but I can't be certain.
17  Q   Who at the Purchasing Division would -- might
18  be able to answer that question?
19  A   Greg Smith is their administrator. And to
20  clarify, they may -- they may procure vendor services
21  associated with the purchasing of prescription drugs.
22       For example, they may be involved in the

**7**

1  request for proposal process, RFP, associated with
2  bringing in a vendor, like a pharmacy benefit manager,
3  but not in the direct purchasing of drugs.
4  Q   Are you familiar with the University and
5  Community College System?
6  A   Somewhat; not very well familiar with that.
7  Q   Do you know if Nevada's University and
8  Community College System is involved in the purchase
9  of prescription drugs?
10  A   I do not know.
11  Q   Do you know if employees of the University
12  and Community College System are covered by the public
13  employee benefit fund?
14  A   Yes, they are.
15  Q   Do you know who at the Nevada University and
16  Community College System would be able to answer the
17  question whether they are involved in the purchase or
18  reimbursement of prescription drugs?
19  A   No, I don't.
20  Q   Who at Nevada Medicaid would be the person
21  most knowledgeable with regard to the agency's
22  policies regarding the reimbursement of

**8**

1  physician-administered drugs from 1991 to the present?
2  A   I think Miss Lawrence, Colleen Lawrence,
3  would be most familiar, at least for her tenure in
4  Nevada Medicaid.
5  Q   Do you know who would be most knowledgeable
6  regarding the reimbursement of physician-administered
7  drugs prior to Miss Lawrence's tenure?
8  A   Carol Tilstra may have some knowledge of
9  that, and then I think the list of names that we gave
10  you who are involved with the pharmacy program in
11  Medicaid prior to Miss Lawrence's tenure may have some
12  information.
13  Q   If I could direct your attention back to
14  Exhibit Duarte 016, specifically to page zero zero two
15  one seven.
16       MS. BRECKENRIDGE: I'm sorry, I wasn't
17  listening.
18       MR. DOVE: Two one seven.
19  BY MR. DOVE:
20  Q   If I can direct your attention specifically
21  to point number one in this -- on this page, second to
22  the last sentence where it says as our reimbursement

**9**

1  is based upon AWP and not actual acquisition costs,
2  Nevada Medicaid believes a five-percent reduction in
3  our reimbursement to outpatient pharmaceutical
4  providers is acceptable. Do you see that?
5  A   Yes.
6  Q   Do you see in the first clause of that
7  sentence where it says our reimbursement is based upon
8  AWP and not actual acquisition costs?
9  A   Yes.
10  Q   So would you agree that the State was aware,
11  at least at the time of this document, that AWP was
12  not reflective of actual acquisition costs?
13  A   Yes.
14       MS. BRECKENRIDGE: Objection.
15       THE WITNESS: I'm sorry.
16  BY MR. DOVE:
17  Q   Your answer is yes?
18  A   My answer is yes.
19  Q   And has that always been your understanding,
20  that AWP and actual acquisition costs are two entirely
21  separate concepts?
22       MS. BRECKENRIDGE: Objection.

Duarte, Charles - Vol. II                          November 16, 2005
Carson City, NV

---

Page 86

1   Fraud Control Units.
2         The document that I'm referring to, Counsel,
3   is a document from the National Association of
4   Medicaid Fraud Control Units.
5         And I'm asking whether -- based on the
6   State's receipt of this document and the nature of the
7   contents of this document, whether the State was
8   aware -- and I would ask that the court reporter
9   repeat the original question that I asked her to
10  repeat.
11  (Previous question read back by reporter.)
12        MS. BRECKENRIDGE: And I repeat my objection.
13        THE WITNESS: Again, I don't know what the
14  State understood. I can tell you what I understood
15  the settlement to include.
16  BY MR. DOVE:
17  Q    Why don't you tell me that.
18  A    Okay. The settlement was based on the
19  fact -- or the finding that there were differences
20  between the actual acquisition cost of Bayer products
21  and what was actually being represented to the average
22  wholesale price.

Page 87

1         And the result of that was a settlement
2   agreement that resulted in some monies coming to the
3   plaintiffs in order to settle it.
4   Q    Would you agree that by early 2000, the State
5   was aware that in many instances, there were large
6   spreads between AWP and actual acquisition costs?
7         MS. BRECKENRIDGE: Objection.
8         THE WITNESS: I don't know to what extent
9   we -- we knew what the spreads were with respect to
10  actual acquisition costs and AWP all products.
11        I think this specifically spoke -- this
12  letter that you referred me to specifically spoke to
13  Bayer products.
14        I think from my own perspective, I already
15  testified that I was aware personally that there were
16  spreads, and not insignificant ones, between actual
17  acquisition costs and actual wholesale price going
18  back to my tenure as state of Hawaii Medicaid director
19  approximately seven years. A year or so after I
20  started there, I became aware of some of these issues.
21  BY MR. DOVE:
22  Q    And your knowledge in that regard was not

Page 88

1   just with respect to Bayer drugs, but with -- but with
2   respect to other drugs as well?
3   A    Yes.
4         MS. BRECKENRIDGE: Objection, far beyond the
5   scope of this deposition and really not relevant to
6   the state of Nevada.
7   BY MR. DOVE:
8   Q    Would you agree that at least by the time of
9   the filing of the Complaint in this case, in January
10  2002, the State was aware that there was no link
11  between AWP and actual acquisition costs?
12        MS. BRECKENRIDGE: Objection.
13        THE WITNESS: I don't know if the State was
14  aware that there was no link between actual
15  acquisition costs and average wholesale price.
16  BY MR. DOVE:
17  Q    Do you know -- would you agree that at least
18  by the time of the filing of the Complaint, the State
19  was aware that AWP did not equal actual acquisition
20  cost?
21        MS. BRECKENRIDGE: Objection.
22        THE WITNESS: Yes.

Page 89

1         MS. BRECKENRIDGE: Are you asking about --
2   I'd like to know, are you asking about information
3   that went into the Complaint which was drafted by
4   lawyers?
5         You're now asking about the Complaint.
6   You're getting very close to privileged information.
7   How we developed the Complaint with the state of
8   Nevada --
9         MR. DOVE: I'm not asking how --
10        MS. BRECKENRIDGE: Then I object.
11  BY MR. DOVE:
12  Q    Have you reviewed the Complaint in this case?
13  A    Not in its entirety.
14        MS. BRECKENRIDGE: You've asked him that. We
15  had a whole line of questions about this yesterday.
16        MR. DOVE: Are you finished with your
17  objections, Counsel?
18        MS. BRECKENRIDGE: No, probably not, unless
19  you're finished with this objectionable line of
20  questioning.
21        MR. DOVE: If you don't want him to answer
22  the question, simply direct him not to answer and

Duarte, Charles - Vol. II

November 16, 2005

Carson City, NV

---

**90**

1  we'll move on.
2       MS. BRECKENRIDGE: I'm about to. It's the
3  only one I will, because I think you're getting very
4  close to how this Complaint came together, and that is
5  something you know as a representative of the
6  pharmaceutical companies that you're not allowed to
7  ask about, and as a member of the bar, you know you're
8  not allowed to ask about that.
9  BY MR. DOVE:
10   Q   I'm not asking about any privileged
11  communications you've had with counsel. I'm asking
12  simply, would you agree that by the time of the filing
13  of the Complaint, the date that the Complaint was
14  actually filed with the Court as a public document, by
15  that time, that the State was aware that AWP did not
16  equal actual acquisition cost as to the drugs at issue
17  in the Complaint?
18       MS. BRECKENRIDGE: Objection.
19       THE WITNESS: May I answer?
20       MS. BRECKENRIDGE: Yes, you may.
21       THE WITNESS: When was the Complaint filed?
22  BY MR. DOVE:

---

**91**

1   Q   January of 2002. The initial Complaint was
2  filed in January of 2002, and then there was a First
3  Amended Complaint which was filed in 2003.
4   A   Yes.
5   Q   Yes, State was aware at that time that AWP
6  did not equal actual acquisition cost?
7   A   Yes, and I would qualify that that I don't
8  know if we were aware of the actual spreads between
9  actual acquisition costs and AWP for all subject
10  drugs.
11       But in general terms, we were aware that
12  there were differences between actual acquisition
13  costs and average wholesale price, which prompted us
14  to take some actions with respect to reducing the
15  discount from AWP.
16   Q   I can represent to you that in the Complaint,
17  there are in fact listings of, you know, a large
18  number of -- I mean, listings of various drugs and
19  then listing of the spreads of those drugs. Do you
20  recall seeing those tables?
21   A   Actually, I don't; I'm sorry. I probably
22  have reviewed them, but I don't recall the specific

---

**92**

1  drugs or the specific spreads.
2   Q   I can represent to you that in the Complaint,
3  there are -- there are spreads identified for a large
4  number of drugs, and that the vast majority of those
5  spreads are well in excess of fifteen percent. Will
6  you accept my representation?
7       MS. BRECKENRIDGE: Objection, I won't. I
8  mean, I think it's dangerous to sit here and
9  characterize something that's in a written document.
10       MR. DOVE: Off the record.
11       (Off-the-record discussion.)
12  BY MR. DOVE:
13   Q   Yesterday we spent some time talking about
14  documents relating to the State's decision to change
15  its reimbursement from AWP minus ten percent to AWP
16  minus fifteen percent. Do you remember that
17  testimony?
18   A   Yes.
19   Q   And do you remember the documents that we
20  discussed?
21   A   Yes.
22   Q   Do you know if there are any documents that

---

**93**

1  exist that relate to the State's consideration of any
2  other alternative methodologies for reimbursement?
3       For example, are there documents that exist
4  relating to the State considering perhaps basing
5  reimbursement on a benchmark other than AWP; are there
6  any documents that exist on that point?
7   A   I recall discussions, as well as national
8  materials that I've received over several years with
9  respect to using other standards, including average
10  sale price and average manufacturer's price.
11       Additionally, we have been discussing
12  internally and with staff of First Health Services
13  implementation of proposed congressional changes to
14  the Medicaid pricing schedule to AMP, average
15  manufacturer's price, or RAMP, which is what the House
16  is proposing. And I don't know what that acronym
17  stands for. But we have been in discussion about
18  using other methodologies associated with that.
19       We have also discussed the process of
20  implementing a California-like system of using average
21  sales price; however, it's rather staff intensive and
22  would require investment up front.

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

MDL DOCKET NO.

CIVIL ACTION

01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

VOLUME III

DEPOSITION OF

CHARLES DUARTE

MARCH 22, 2006

CARSON CITY, NEVADA

REPORTED BY:  STEPHANIE ZOLKOWSKI CCR 283

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst

Charles Duarte, Vol. III                    March 22, 2006
                    Carson City, NV

5  (Pages 14 to 17)

---

**14**

1  damages in the case.
2      MR. LITOW: I'm asking if he contacted any
3  Nevada residents about any damages they suffered.
4  He may have done that at the direction of counsel,
5  he may not have done it at the direction of counsel,
6  he may have done it on his own.
7      MS. BRECKENRIDGE: If you would like to
8  rephrase the question, you may, to exclude efforts
9  in connection with this lawsuit.
10      So that's an objection to form and
11  substance based on privilege.
12      MR. LITOW: You're instructing him not to
13  answer that question?
14      MS. BRECKENRIDGE: As phrased.
15      There's certainly ways around it if you
16  want to rephrase your question.
17  BY MR. LITOW:
18      Q.  Mr. Duarte, outside the context of this
19  lawsuit have you ever contacted any Nevada residents
20  about their use of AWP?
21      A.  No.
22      MS. BRECKENRIDGE: Objection. Vague.

---

**15**

1  BY MR. LITOW:
2      Q.  Outside of the context of this lawsuit
3  have any Nevada residents contacted you about the
4  use of AWP?
5      MS. BRECKENRIDGE: Objection. Form.
6      THE WITNESS: No.
7  BY MR. LITOW:
8      Q.  Has the Medicaid program ever made any
9  efforts to obtain information from any of the
10  Defendants in this case as to what providers were
11  paying to acquire any of their drugs?
12      A.  Can you please say that again?
13      Q.  Sure.
14      Has Medicaid ever attempted to obtain
15  information from any of the Defendants in this case
16  about the prices at which providers are acquiring
17  their drugs?
18      A.  Not to my knowledge.
19      MS. BRECKENRIDGE: Objection. Foundation.
20  BY MR. LITOW:
21      Q.  Have you ever contemplated doing that?
22      A.  No.

---

**16**

1      Q.  Why not?
2      A.  I have been repeatedly told that that type
3  of information is privileged or confidential from
4  the standpoint of manufacturers and their contracts.
5      Q.  Who told you that?
6      A.  Tom Woods, who was the former PHRMA
7  representative for the State of Nevada
8      Q.  I would like to direct your attention now
9  to paragraph 4 of Exhibit Duarte V3 001.
10      That paragraph states "AWP's are not
11  independently determined by the Publishers. Rather,
12  as part of the AWP Inflation Scheme described in
13  this Amended Complaint, pharmaceutical companies
14  self report the AWP to Publishers, who then publish
15  the purported AWP exactly as provided to them by the
16  pharmaceutical companies."
17      Do you see that?
18      A.  Yes.
19      Q.  Do you agree with the allegation that
20  AWP's are not independently determined by the
21  publishers?
22      A.  I don't know whether they are or not.

---

**17**

1      Q.  Are you aware of any documents that might
2  support this allegation?
3      A.  No.
4      Q.  Are you aware that many pharmaceutical
5  companies do not report AWP at all to publishers?
6      A.  I'm not aware of that.
7      Q.  Are you aware that pharmaceutical
8  companies report other pricing information such as
9  WAC to publishers?
10      A.  Yes.
11      Q.  When did you become aware of that?
12      A.  I can't remember the exact date. Perhaps
13  2 years ago.
14      Q.  How did you become aware of that?
15      A.  I don't recall.
16      Q.  Did you read about it or did somebody
17  mention it to you?
18      A.  I don't recall.
19      Q.  What other pricing information did you
20  learn that drug manufacturers reported to
21  publishers?
22      A.  I think that's -- that was about it.

---

Charles Duarte, Vol. III                                  March 22, 2006
                        Carson City, NV

6 (Pages 18 to 21)

---

18

1    Well, I take that back.
2        The only other thing for multi-source
3    products and generics specifically that on occasion
4    information on wholesale pricing is provided to I
5    believe CMS and fiscal agents such as the one we
6    work with.
7        But I don't see that directly.
8    Q.  I'm sorry.  You say you learned that
9    approximately 2 years ago?
10   A.  2 years ago.
11   Q.  Were you aware that publishers such as
12   First Data Bank and Red Book publish what they said
13   were AWP's or average wholesale prices?
14   A.  Yes.
15   Q.  What was your understanding of where that
16   number came from?
17   A.  That information I believe or what I
18   understood came from the manufacturers.  And I had
19   thought that they were validated by CMS.  Centers
20   for Medicare and Medicaid Services.
21   Q.  When you say you had believed that is that
22   no longer your belief?

---

19

1    A.  I don't know.  It's a black box to me.
2    Q.  What made you think those prices were
3    verified by CMS?
4    A.  Because CMS has the information.  And
5    besides First Data Bank I think they're the only
6    ones that hold it.
7        I do recall reading an OIG report that
8    their overview, that CMS, I don't know whether they
9    still do this or only did it periodically, reviewed
10   and validated that information.
11   Q.  Would you recall when you read that OIG
12   report?
13   A.  Some time in 2004, is when I read it.  I
14   don't know when it was actually published.
15   Q.  How did you receive that report?
16   A.  Electronically.  I believe it was
17   forwarded to me by CMS staff and later I received a
18   hard copy.
19   Q.  You had a copy emailed to you from CMS and
20   you received a hard copy later?
21   A.  Yes.
22   Q.  What did you do with the copy that you

---

20

1    received electronically?
2    A.  I don't recall.
3    Q.  How about --
4    A.  I'm sorry.  It is public information.  I
5    believe it's on the OIG website.
6        So normally I wouldn't keep large PDF
7    files around because they crowd my computer.  If
8    they're public information I would just get rid of
9    it.
10   Q.  Delete it?
11   A.  Yeah.
12       They give it to me as an advance, I
13   believe.  It's what their practice is.
14   Q.  How about the hard copy report?  Do you
15   recall what you did with that?
16   A.  Probably filed someplace in the office.
17   Q.  Do you know where it would be filed in the
18   office?  Is there a particular file for these sort
19   of reports?
20   A.  It may be in the library.
21       I have to ask my assistant what heading it
22   was filed and where it might be held.

---

21

1    Q.  You say the library.
2        Are you referring to the Medicaid library?
3    A.  Yes.
4        Either there or it may have been shipped
5    to State Archives.  I don't know.
6    Q.  Do you recall receiving other electronic
7    copies of OIG reports other than the one we just
8    discussed?
9    A.  Yes.
10   Q.  Is it generally your practice with those
11   as the one we discussed to delete it because it's a
12   large PDF file?
13   A.  Yes.
14       If it's a public document I delete it.
15       Let me explain.  If it's a public document
16   maintained by another public agency and available to
17   -- through them, I don't have a reason for keeping
18   the electronic file copy.
19   Q.  Because you could always, if you needed to
20   see it again you could always, access it on their
21   website?
22   A.  Usually if someone asks for it I refer

---

Charles Duarte, Vol. III

March 22, 2006

Carson City, NV

14  (Pages 50 to 53)

---

50

1    Q.  Is it what the wholesalers pay for drugs
2    that they buy from manufacturers?
3    A.  Yes.
4    Q.  So it's not what pharmacies pay for drugs
5    that they purchase from wholesalers?
6    A.  I actually don't know.
7    Q.  Is the intention for Medicaid
8    reimbursement to reimburse pharmacies as close as
9    possible to the cost that they paid for drugs?  Or
10   is there some intention to give them a margin of
11   profit?
12       MS. BRECKENRIDGE:  Objection.
13       THE WITNESS:  Our intention is to try to
14   get as close as possible to what they acquire the
15   drug, the price they acquire the drug.
16   BY MR. LITOW:
17   Q.  I believe you also testified you had
18   discussions about these price differences with Mr.
19   Wilden.
20       Do you recall that testimony?
21   A.  Yes.
22   Q.  What do you recall about your discussions

---

51

1    with Mr. Wilden?
2    A.  The discussion was similar to what I
3    described with Miss Lawrence.
4        It was around the possibility of getting
5    better net pricing through program initiatives like
6    preferred drug list, supplemental rebate program,
7    national Medicaid pooling initiatives, the maximum
8    allowable cost program.
9    Q.  Did you ever discuss with Mr. Wilden
10   increasing the discount AWP in the Medicaid
11   reimbursement rate?
12   A.  Yes.
13   Q.  What do you recall about those
14   discussions?
15   A.  We actually had a meeting in his offices
16   with representatives of the National Association of
17   Chain Drug Stores and representatives of large
18   retail pharmacies.
19   Q.  When was that meeting?
20   A.  I don't recall the exact date.  It was
21   some time in 2002, I believe.  Perhaps 2003.  It was
22   prior to our implementation of our change to AWP

---

52

1    minus 15 percent from 10 percent.
2    Q.  What do you recall about that meeting
3    other than who was there?
4    A.  I don't know if I recall who was there
5    except for a few individuals.
6        But the purpose of the discussion was to
7    seek their comment and concerns around the proposed
8    revision of our reimbursement methodology for drug
9    ingredient costs.
10   Q.  Was there any representatives from the
11   Governor's office at that meeting?
12   A.  No.  I don't believe so.
13   Q.  Did you take notes at that meeting?
14   A.  I don't recall.
15   Q.  Do you recall the distribution of any
16   documents at that meeting?
17   A.  I believe we passed out the proposed
18   Medicaid State Plan change that was previously
19   published for public hearing.
20   Q.  Did the individuals you mentioned at the
21   meeting, representatives from the National Chain
22   Drugs Stores, for example, did they offer any

---

53

1    concerns or comments regarding that proposed State
2    Plan Amendment?
3    A.  Yes.
4    Q.  What concerns did they have?
5    A.  They didn't want us to implement the
6    change.  They felt their margins would be impacted.
7    Q.  Did you agree with that concern?
8    A.  No.
9    Q.  What was your basis for your opinion that
10   their margins would not be adversely affected?
11   A.  We conducted a margin analysis.  We had a
12   consultant, Myers & Stauffer, conduct that margin
13   analysis.
14       And through that review we believe our
15   proposal was within a reasonable range of discounts.
16       Additionally, one of the representatives
17   of a local chain pharmacy told me they were fine
18   with it in a side comment during that meeting.  I
19   trusted their judgment.
20   Q.  Who was that?
21   A.  Either a representative from Raley's or
22   Scolari's.  I don't know which one.

---

Charles Duarte, Vol. III

March 22, 2006

Carson City, NV

27 (Pages 102 to 105)

---

**102**

1    Q. How do retail pharmacy companies that you
2 reimburse through the Medicaid program, how do they
3 acquire their drugs?
4    A. You have to ask them. I'm not sure.
5    Q. Are you familiar with how Warrick or
6 Schering distribute their drugs --
7    A. No.
8    Q. -- to customers?
9      You were asked earlier about terms
10 including AWP and WAC.
11      Do you understand where in the
12 distribution chain those particular terms are
13 supposed to apply?
14    A. I know the general definition of AWP. I'm
15 not as familiar with the definition of WAC.
16      My recollection of the definition of
17 average wholesale price is it applies to wholesalers
18 and other purchasers.
19    Q. Is that the price at which the wholesalers
20 acquire the drug or the price at which wholesalers
21 resell the drug to a retailer or other customer?
22    A. I don't know.

---

**103**

1    Q. Is it fair to say based on your lack of
2 understanding of the term WAC that you don't know
3 whether AWP is typically above or below the WAC
4 price for a particular drug?
5    A. I do not know whether it's higher or
6 lower. Whether WAC is higher or lower than AWP.
7    Q. Earlier you were asked about a term AMP.
8    A. Yes.
9    Q. Do you know whether the AMP for a drug is
10 typically above or below the AWP for a drug?
11    A. I don't know specifically. I assume it is
12 lower then AWP. Because the intent of Congress was
13 to reduce reimbursements to pharmacies to something
14 other than AWP.
15    Q. With respect to AWP, where does the Nevada
16 Medicaid Program get the data that it uses for AWP
17 as part of its reimbursement formula?
18    A. Ultimately from First Data Bank.
19    Q. Is there an intermediate step?
20    A. It goes through our information systems.
21 We get that information through First Health
22 Medicaid Management Information System. They query

---

**104**

1 First Data Bank.
2    Q. Are you aware of how First Data Bank
3 defines the term AWP?
4    A. I am not.
5    Q. Are you aware of how First Data Bank
6 acquires the information that they pass on to the
7 Nevada Medicaid program as AWP?
8    A. Only in general.
9    Q. What is your general understanding?
10    A. That they get that from manufacturers.
11    Q. What is your basis for believing they get
12 it from manufacturers?
13    A. Just what I've read in reports and other
14 documents.
15    Q. Are you aware that FDB purports to
16 calculate AWP?
17    A. FDB?
18    Q. Yes.
19    A. What is FDB?
20    Q. First Data Bank. I'm sorry. My
21 apologies. If there's any term I use --
22    A. I'm not aware they calculate AWP. I

---

**105**

1 assume that's not from whole cloth.
2    Q. With respect to FDB, are you aware of a
3 term that they used called suggested wholesale
4 price?
5    A. No.
6    Q. Are you aware of a term that they used
7 called Blue Book AWP?
8    A. I am aware of the term, yes.
9    Q. What is your understanding of the term
10 Blue Book AWP?
11    A. I believe that's just another published
12 resource where they may get some of that
13 information.
14    Q. Earlier with respect to the term average
15 wholesale price do you have any basis for believing
16 that it is a calculated price?
17    A. I think I've testified before that that
18 whole process of determining AWP is a black box and
19 we're not privy to that.
20    Q. My question, beyond just what the process
21 is is do you have any reason to believe that AWP is,
22 in fact, a number that is calculated by someone even

---

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____      MDL DOCKET NO.

THIS DOCUMENT RELATES TO:            CIVIL ACTION

Abbott Laboratories, et al.,         01CV12257-PBS

CA No. 02-CV-00260-ECR

(Nevada I) and State of

Nevada V American Home               **CERTIFIED COPY**

Products, et al., CA No.

02-CV=12086-PBS (Nevada II)

_____/

VOLUME IV

DEPOSITION OF

CHARLES DUARTE

MARCH 23, 2006

CARSON CITY, NEVADA

REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst 4

Charles Duarte, Vol. IV                          March 23, 2006
                        Carson City, NV

18

1        A.    I see several passages that are quoted,

2   yes.

3        Q.    And there's really no formal citation in

4   the footnote, is there?

5             MR. DILLON:   Objection.

6   BY MS. BRECKENRIDGE:

7        Q.    You can answer.

8        A.    I don't see any.

9        Q.    This letter is written by Charles Rice,

10   the president and CEO of Dey.  That's a drug

11   manufacturer, correct?

12       A.    Yes.

13       Q.    Do you have any understanding as you look

14   at this document today and yesterday for the first

15   time whether the information provided in footnote

16   one by Mr. Rice is accurate?

17       A.    Is accurate?

18       Q.    I mean, could you say as you sit here

19   today whether the information is accurate without

20   look back at the reports Mr. Rice purports to quote

21   in the footnote?

22       A.    In response to that second question, I'd

Charles Duarte, Vol. IV

Carson City, NV

March 23, 2006

19

1    have to answer that I'd have to look back at the

2    reports to determine whether or not they're

3    reflective of what was in those reports that are

4    noted here.

5        Q.   It wouldn't be reasonable to base your

6    understanding of the accuracy of statements on a

7    drug manufacturer's representations in a footnote,

8    would --

9            MR. DILLON:  Objection.

10           MS. BRECKENRIDGE:  I'm not finished.

11           MR. DILLON:  I'm sorry, I thought you were

12    finished.  My apologies.

13    BY MS. BRECKENRIDGE:

14       Q.   I'll start over.  Then would it be

15    reasonable in your mind to go by Mr. Rice's --

16           MS. BRECKENRIDGE:  And actually, I want to

17    get one thing straight.  I do know one of the ground

18    rules is one of you guys can object.  I was very lax

19    during -- yes, it is true and this is -- these are

20    the ground rules for these depositions.

21           MR. PALERMO:  That's fine, and I assume

22    one's objection stands for all?

Charles Duarte, Vol. IV

Carson City, NV

20

1          MS. BRECKENRIDGE:  Yes, absolutely, but

2     I'm not going to have the gang -- the chorus, the

3     Greek chorus, or the East Coast chorus over there as

4     I did in Miss Lawrence's deposition.

5     BY MS. BRECKENRIDGE:

6          Q.    Would it be reasonable in your experience

7     to --

8          MS. BRECKENRIDGE:  Do you need to confer?

9          MR. DILLON:  I'm sorry, I sis think it was

10    that loud.

11         MS. BRECKENRIDGE:  It was.  You can leave.

12    I think you're doing this deliberately, Mr. Dillon.

13         MR. DILLON:  No, actually, Miss

14    Breckenridge, I was asking for a clarification of

15    what the stipulation was so I can properly respond

16    to your questions.

17          And I sis want to leave the room so as to

18    take up any more of your time, so I was trying to do

19    it in the least obtrusive way possible.

20          I apologize if I interrupted your train of

21    thought; it was not my intention.  It was only to

22    make sure I was going to object in a proper way.

Charles Duarte, Vol. IV                    March 23, 2006
Carson City, NV

21

1              MS. BRECKENRIDGE:  You've used enough of

2       my time.  I have not been left enough time, and in

3       part, it's because of your repetitive questioning.

4              We can take this up off the record, and we

5       will take it up before the depositions resume in

6       Montana next week.

7              MR. DILLON:  I think you ought to just ask

8       your questions.

9       BY MS. BRECKENRIDGE:

10         Q.   I apologize, Mr. Duarte.  Would it be

11      reasonable, based on your experience, to assume the

12      accuracy of information provided in a footnote

13      without doing further investigation when it relates

14      to something as significant as drug reimbursement

15      rates for your Medicaid program?

16         A.   It would not.

17         Q.   Do you recall -- who made the first

18      contact with Myers and Stauffer?

19         A.   I don't recall.

20         Q.   Do you recall why Nevada Medicaid

21      contacted Myers and Stauffer?

22         A.   Yes.

Charles Duarte, Vol. IV

March 23, 2006

Carson City, NV

22

1    Q.   And why was that?

2    A.   Because we believe that we had an

3    opportunity to reduce our reimbursements to

4    pharmacies for the ingredient cost of drugs.

5    Q.   And --

6    A.   Oh, excuse me, and to finish, Myers and

7    Stauffer was a consulting firm already on contract

8    with Nevada, whose scope of work allowed us to use

9    them for this type of analysis, and they did have

10   experience in that as I understood.

11   Q.   And what led you to believe that you could

12   reduce the level of reimbursement?

13   A.   There were numbers of -- numerous reports

14   that we had received, including some of the OIG

15   reports that we've talked about frequently in the

16   depositions that suggested that we were -- we could

17   increase the discounts off of AWP to get closer to

18   EAC.

19   Q.   You've been a Medicaid director since

20   1997, correct?

21   A.   Yes.

22   Q.   What month in 1997 did you start?

Charles Duarte, Vol. IV                                    March 23, 2006
                        Carson City, NV

23

1        **A.    Gosh, I think it was July of 1997.**

2        Q.   And is that when you first became aware of

3    average wholesale pricing?

4        **A.    No, that wasn't my first order of**

5    **importance in the job.  It was really learning the**

6    **job.**

7        Q.   But sometime in 1997, you became aware of

8    AWP?

9        **A.    I -- yes, I did.**

10        Q.   And has your understanding of AWP evolved

11    since that time?

12        **A.    Yes, it has.**

13        Q.   When you began -- in 1997, did you

14    understand that average -- did you have an

15    understanding regarding the relationship between

16    average wholesale pricing and pricing in general?

17        **A.    No, I did not.**

18        Q.   Over time, did you believe that average

19    wholesale pricing bore a reasonable relationship to

20    some pricing?

21        **A.    Yes.**

22             MR. DILLON:   Objection.

24

1           MR. PALERMO:  Object to form.

2           MS. BRECKENRIDGE:  Wait, they need to

3     object. They find this topic objectionable.

4     BY MS. BRECKENRIDGE:

5        Q.   To ask it again without interruption --

6           MS. BRECKENRIDGE:  Go ahead.

7           MR. PALERMO:  I don't believe we

8     interrupted you, but --

9           MS. BRECKENRIDGE:  That's fine, he has

10    something to say to you.  I can hear him.  For some

11    reason, your voice really carries.

12    BY MS. BRECKENRIDGE:

13       Q.   At any point in your career, did you have

14    an understanding that average wholesale pricing bore

15    a relationship to some sort of pricing by the drug

16    manufacturers?

17       **A.   Yes.**

18           MR. PALERMO:  Objection to the form.

19           MS. BRECKENRIDGE:  They do have to -- they

20    are entitled to object.

21    BY MS. BRECKENRIDGE:

22       Q.   And at some point, did that understanding

Charles Duarte, Vol. IV

March 23, 2006

Carson City, NV

1          MR. PALERMO:   Objection, Jeniphr, do you

2    mean the -- the defined term best price when you use

3    that question?

4    BY MS. BRECKENRIDGE:

5          Q.   I will restate the question.  Leaving the

6    OBRA 90 definition of best price aside -- let me go

7    at it another way.  Ms. Lawrence testified today

8    that she believed that your department has a duty to

9    be stewards of the State's taxpayers' money.  Do you

10   share that view?

11         **A.    Yes.**

12         MR. PALERMO:   Objection.

13   BY MS. BRECKENRIDGE:

14         Q.   As part of that stewardship of the

15   taxpayers' money, is it important to you as the

16   State Medicaid Department to obtain the best price

17   possible for the Medicaid Department in connection

18   with drug reimbursement?

19         MR. PALERMO:   Objection to the form.

20         THE WITNESS:   Yes, with the stipulation

21   that we don't affect -- we don't create problems

22   with access to care.

Charles Duarte, Vol. IV

Carson City, NV

March 23, 2006

38

BY MS. BRECKENRIDGE:

Q. Because access to care is one of the conversations?

A. **It's one of my responsibilities.**

Q. Better put. If a component of pricing was inflated, would that be significant to you?

MR. PALERMO: Objection.

THE WITNESS: Yes.

BY MS. BRECKENRIDGE:

Q. If you found out that -- an A-W-F is a component of the current pricing methodology for drug reimbursement for retail pharmacies, isn't it?

A. **Yes.**

Q. If you discovered that AWP was inflated, would that be significant to you in connection with state Medicaid?

A. **Yes.**

MR. PALERMO: Objection to the form.

BY MS. BRECKENRIDGE:

Q. And why is that?

A. **It tells me that I'm not doing the best job I can to steward the funds that are appropriated**

Charles Duarte, Vol. IV

March 23, 2006

Carson City, NV

39

1    **to us by the State Legislature and the people.**

2        Q.   And I have the same question with respect

3    to physician-administered drugs.  Would your

4    position be any different in connection with

5    physician-administered drugs?

6            With that prelude, I'll ask you would it

7    be important for you to know if a component of the

8    pricing for prescription -- sorry, for physician-

9    administered drugs for Nevada Medicaid was inflated?

10       **A.   Yes.**

11           MR. PALERMO:  Objection to the form.

12   BY MS. BRECKENRIDGE:

13       Q.   And why was that?  They do need their

14   grace period.

15       **A.   I understand.  For the same reason I**

16   **mentioned about retail prescription drugs; is that I**

17   **have to make sure that I'm trying to achieve the**

18   **best price possible without affecting access to**

19   **care.**

20       Q.   You testified about your conversation with

21   Mr. Jones regarding a proposal regarding --

22   regarding a proposal for a discount off certain

Charles Duarte, Vol. IV                    March 23, 2006

Carson City, NV

44

1      **A.    Yes.**

2      Q.    And you have them available, correct?

3      **A.    Yes.**

4      Q.    And can you describe how they're kept?

5   And by that, I mean are they long, narrative notes

6   or are they short abbreviated notes, is there -- is

7   there a way to -- I will withdraw all that.  Is

8   there a way to characterize your daily notes?

9      **A.    Yes, they are a part of my daily calendar.**

10  **I scribble notes on the side of one of my calendar**

11  **pages related to some of the meetings and some of**

12  **the phone calls I may get.**

13          **The degree to which I keep those notes in**

14  **terms of the level of detail, it greatly varies.**

15  **But in general, they are kind of cryptic and**

16  **descriptive, and often when I go back to them, I**

17  **have a difficult time understanding what I wrote as**

18  **well, especially if they go back a ways.**

19          **So they're generally a reminder for me to**

20  **do follow-up and -- or to respond to certain folks**

21  **that have requested a response.**

22      Q.    Just to confirm, did you ever have a

Charles Duarte, Vol. IV                    March 23, 2006
                    Carson City, NV

45

1    discussion with Tom Woods regarding drug pricing

2    information?

3         A.    Yes.

4         Q.    Did you have more than one conversation

5    with Tom Woods regarding pricing information?

6         A.    Yes.

7         Q.    Do you recall a conversation with Tom

8    Woods regarding Nevada Medicaid's access to drug

9    manufacturer pricing information?

10        A.    Yes.

11        Q.    Is that a specific conversation or is it a

12   melange of conversations on the topic?

13        A.    I think the description you use about

14   melange is probably more appropriate.  We've had --

15   there've been multiple occasions where that issue

16   has come up.

17        Q.    What did Tom Woods tell you regarding

18   access to pricing information from the drug

19   manufacturers?

20        A.    Tom as a representative of PHRMA, not his

21   role as a representative of Wyeth Pharmaceuticals,

22   often reminded me and Coleen that we were unable

Charles Duarte, Vol. IV                          March 23, 2006
Carson City, NV

46

1    through them to get pricing information.   That

2    wouldn't be shared in meetings where there were

3    multiple vendors present, multiple manufacturers

4    present.

5          He also was very insistent in not only

6    those meetings, but in public testimony at the

7    legislature that we were not -- and in fact in

8    legislation that was ultimately approved, that we

9    were not to utilize cost information in making

10   policy decisions related to prescription drugs.

11         And so anything that was -- any policy

12   decisions that were ever made, for example by our

13   PNT committee and the D-U-R board were -- had to

14   ultimately only deal with clinical information about

15   their efficacy and not cost.   And that was actually

16   passed in statute.

17         And so our vendor, First Health, retains

18   that information and is the only one that is allowed

19   to deal with that and cannot provide that to us nor

20   to the PNT committee nor the DUR committee.

21      Q.   Okay, thank you.   I'm not going to ask any

22   further questions.   I'm going to give an opportunity

Page 1

```
 1                    UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                            -o0o-

 5

 6    In re:  PHARMACEUTICAL            MDL DOCKET NO.

 7    INDUSTRY AVERAGE

 8    WHOLESALE PRICE LITIGATION.       CIVIL ACTION

 9                                       01CV12257-PBS

10

11    THIS DOCUMENT RELATES TO:

12    ALL ACTIONS.

13

14

15                      DEPOSITION OF

16                      CHARLES DUARTE

17                    January 10, 2007

18                    Carson City, Nevada

19

20

21

22    REPORTED BY: CONSTANCE S. EISENBERG, NV CCR #142, RMR
```

1    identification.)

2    BY MR. DILLON:

3        Q.    You are being handed a document marked

4    as Exhibit Duarte 003.  It is undated but the

5    address line is to yourself from Ms. Lawrence,

6    through Ms. Wherry.  And the title of the document

7    is, "Subject: Concept Paper Pharmacy Services."

8    We had a chance yesterday to discuss this with Ms.

9    Lawrence, as her understanding that this was

10   drafted sometime in the January 2002 to July 2002

11   time frame, and she bases that on some of the

12   information that we're going to go over.

13              Do you recall seeing this document?

14       A.    Vaguely.

15       Q.    If I could direct your attention to page

16   3, the bottom of 2 and 3, I think the title is on

17   the bottom of page 2, Reimbursement Technology,

18   and the main discussion is carried over to page 3.

19              The first sentence indicates that the

20   reimbursement change has not quite yet occurred

21   because the current reimbursement methodology is

22   AWP minus 10.  And it's my understanding from

```
 1    other documents and discussions with Ms. Lawrence

 2    that the change to AWP minus 15 didn't occur until

 3    July or August of 2002; is that your

 4    understanding?

 5        A.   Oh, yes.

 6        Q.   In going through this I would like to

 7    turn your attention to the fifth line down in the

 8    first paragraph, Ms. Lawrence writes "Due to the

 9    national economic downturn most states are

10    evaluating the feasibility of increasing this

11    percentage."

12             I think that that's consistent with what

13    you were saying earlier that this was in part due

14    to budgetary concerns?

15        A.   Yes.

16        Q.   And Ms. Lawrence is saying here that

17    others are doing the same.  Would you agree that

18    that was a national trend at this time?

19        A.   I believe it was, as a result of 911,

20    that a number of states were experiencing revenue

21    shortfalls.

22        Q.   I think when we talked to Mr. Hillerby
```

 1          Q.   And that according to the letter, that

 2     the aggregate drug purchase price was 18.85

 3     percent below AWP?

 4          A.   That's what it says in the letter, yes.

 5          Q.   And that's all I'm asking for is just

 6     what the letter says at this point.

 7               In the second to the last paragraph that

 8     we just looked at on the second page it indicates

 9     that the Nevada Medicaid program is proposing to

10     change to AWP minus 10.  Is it true that in the

11     late 1980s the Nevada Medicaid program did change

12     its pharmacy rate from AWP minus 5 to AWP minus

13     10?

14          A.   I don't know the date that that state

15     plan amendment was implemented.

16          Q.   Do you have a general sense as to the

17     time of when that was?

18          A.   Actually not.  This is new to me.  I

19     knew it was before my tenure.

20          Q.   Are you aware of any documents between

21     the date of this one, in 1986, and Ms. Lawrence's

22     email in 2002, the 16 year period, the intervening

Page 55

```
 1    identification.)

 2    BY MR. DILLON:

 3         Q.    You've been handed what's been marked as

 4    Exhibit Duarte 012. It's a series of emails that -

 5    - the most recent being from yourself to Ms.

 6    Lawrence dated May 31st, 2002, at 7:16 p.m.

 7              Again, please take your time to review

 8    the entire chain.

 9         A.    Okay.

10         Q.    Starting with the last email on the

11    chain, the one that Ms. Lawrence writes to

12    yourself on May 30th, 2002, at 12:55 p.m., she

13    describes a meeting that occurred the day before

14    with various pharmacy reps.

15              Were you aware of that meeting?

16         A.    Yes.

17         Q.    Her description of that meeting is,

18    turning to the last page of the email, she says

19    "Yesterday I scared them all out of the room with

20    17 percent, then at the last 10 minutes of the

21    meeting told them 15 percent is the number they

22    need to work their numbers at and give me feedback
```

```
 1   on."
 2              We're trying to figure out why the
 3   initial presentation to the pharmacy group was at
 4   AWP minus 17 percent.  Do you know?
 5        A.   I think that was a negotiating strategy
 6   that we agreed to, that we would start high and
 7   work our way down.
 8        Q.   What was the target that you were
 9   seeking when you began this negotiation strategy?
10        A.   15 percent.
11        Q.   And I believe that we discussed earlier
12   that Ms. Lawrence had recommended initially 13
13   percent.  Do you recall her recommendation
14   initially at 13 percent?
15        A.   Yes.
16        Q.   And I believe from some of the emails
17   that we went through with her that she had
18   indicated, as is reflected in the second of the
19   emails in this chain, that the rates contractor,
20   Myers & Stauffer, has also recommended AWP minus
21   13 percent?
22        A.   Yes.
```

Page 57

```
 1        Q.     Were you aware of those recommendations?

 2               (Interruption by the Attorney General's

 3    staff.)

 4                      (A discussion was held off the

 5    record.)

 6               MR. TERRY:   Thanks for all your help.

 7    Could I have the last question read back, please.

 8                      (The question was read by the

 9    reporter.)

10    BY MR. DILLON:

11        Q.     Let me ask a new question.

12               We discussed the fact that Ms. Lawrence

13    initially recommended AWP minus 13.  In the second

14    of this email of this chain she indicates that

15    Myers & Stauffer had also recommended AWP minus

16    13.

17               Why was it that you were recommending

18    that the drop, stick with 15 percent, when the

19    rates contractor and Ms. Lawrence had been

20    recommending 13 percent?

21        A.     I had a budget target I needed to hit.

22        Q.     May I have P, please.
```

HIGHLY CONFIDENTIAL
Carson City, NV

```
 1                    (Exhibit Duarte 013 marked for

 2      identification.)

 3      BY MR. DILLON:

 4           Q.    You've been handed what's been marked

 5      Exhibit Duarte 013, is a letter from on the

 6      National Association of Chain Drug Stores

 7      letterhead, directed to Mr. Larry Reed, the Center

 8      for Medicare and Medicaid services, dated December

 9      17th, 2002 it's authored by John M. Coster.

10           A.    Okay.

11           Q.    This was a document we found in your

12      electronic files. Do you recall seeing this?

13           A.    Yes.

14           Q.    And why were you a recipient of this

15      letter?  It doesn't appear to be addressed -- my

16      apologies, you are cc'd.

17                 If I could direct your attention to the

18      last paragraph on the first page, the letter

19      states:  "In addition, we do not believe that the

20      state can or should simply reduce one component of

21      pharmacy reimbursement without considering whether

22      total reimbursement is adequate.  We do not
```

Page 59

```
 1    believe that the state has done this.  For

 2    example, while the state pays dispensing fee of

 3    $4.76, our data indicate that the average cost of

 4    dispensing a prescription in Nevada is $7.91.

 5    Actual cost to dispense Medicaid prescriptions may

 6    be anywhere from 30 to 50 percent higher than this

 7    amount."

 8              Do you recall ever having conversation

 9    with anyone at NACDS regarding the subject of that

10    paragraph?

11        A.   I recall having discussion with NACDS

12    regarding this letter.

13        Q.   Did you discuss their statement here

14    that their data showed that the average cost to

15    dispense a prescription in Nevada was $7.91?

16        A.   Yes.

17        Q.   And do you have any information, surveys

18    that you have conducted, that would indicate that

19    that information provided, that the average cost

20    to dispense prescription in Nevada is $7.91, is

21    incorrect?

22        A.   Could you please repeat that question.
```

Page 68

```
 1    Senior RX, Mental Health and Developmental

 2    Services, Medicaid, veteran services, et cetera.

 3    My specific questions were:  What state programs

 4    purchase prescription drugs, and two, do all of

 5    these programs participate in MMCAP?  If not, do

 6    they participate in other cost saving purchase

 7    programs?"

 8              Has Medicaid ever utilized MMCAP?

 9    A.    I don't know what MMCAP stands for.

10    Q.    Okay.  Are you familiar with the fact

11    that some programs within the State of Nevada

12    purchase pharmaceuticals?

13    A.    Yes.

14    Q.    And do you know how they purchase them?

15    A.    Not completely, but I do know how they

16    purchase drugs at some agencies.

17    Q.    Okay.  Which agencies are you familiar

18    with?

19    A.    Primarily Mental Health and

20    Developmental Services.

21    Q.    Do you know how Mental Health and

22    Developmental Services purchases drugs?
```