**BRECKENRIDGE DECL. EXHIBIT 5**

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

| | |
|---|---|
| In Re: Pharmaceutical Industry Average Wholesale Price Litigation | MDL No. 1456<br>Civil Action No.<br>01-CV-12257-PBS |
| This Document Relates to State of Nevada v. Abbott Laboratories, et al., (Nevada I), and | CA No. 02-CV-00260-ECR |
| State of Nevada v. American Home Products, et al., | CA No. 02-CV-12086-PBS (Nevada II) |

VOLUME 1 OF THE DEPOSITION OF

COLEEN LAWRENCE

August 15, 2005

Carson City, Nevada

REPORTED BY:   DEBORAH MIDDLETON GRECO, CCR #113, RDR, CRR

## 122

1  (Exhibit Lawrence 008 marked for identification)
2  BY MR. DOVE:
3  Q  Miss Lawrence, you were employed by the Medicaid
4  agency as of the date of this report, correct?
5  A  Correct.
6  Q  And if you could just take a brief moment to look at
7  it, my question for you is going to be have you seen this report
8  before?
9  A  Yes.
10  Q  Did Nevada participate in the preparation of this
11  report?
12  A  I honestly do not remember if we participated in this
13  particular report. I would have to check in the references.
14  Q  Do you remember having any conversations with
15  the -- with OIG, or with anyone else regarding the subject
16  matter of this report?
17  A  I don't remember on this particular report having
18  conversations with them.
19  Q  Do you know if Nevada took any steps in response to
20  recommendations made in this report?
21  A  In regards to just pricing recommendations or all the
22  cost savings initiatives?

## 123

1  Q  In connection with all the cost savings initiatives
2  about which you were involved.
3  A  In 2003, we were already undergoing some of the cost
4  initiatives. We had just changed our pricing recommendations,
5  so we had been looking at the whole gamut of changes.
6     So there were things that we implemented, not just
7  specifically because of this report, but this helped supplement
8  it.
9  Q  What sorts of changes did Nevada make during that time
10  period?
11  A  During --
12  Q  Just in general.
13  A  How about after or prior to the report? Obviously
14  nothing was generated right at the time of this report.
15  Q  Well, we'll start with before this report was issued,
16  what sorts of changes were implemented?
17  A  Nevada implemented a change in their AWP to 15 percent
18  in July of 2002.
19     We also implemented step therapy protocols for two
20  major therapeutic classes of drugs, actually three, in July of
21  2002.
22     And then after this report, we had implemented, if

## 124

1  they were not already implemented, some of the additional
2  savings, which is preferred drug list, supplemental rebates,
3  maximum allowable cost program.
4     And I believe that was it right now.
5  Q  So I take it you can state definitively that the state
6  did receive a copy of this particular document from the OIG,
7  correct?
8  A  Yes.
9  Q  Miss Lawrence, has the Medicaid agency received any
10  documents from the National Association of Medicaid Fraud
11  Control Units regarding the reimbursement of prescription drugs?
12  A  We received a letter, I don't honestly remember the
13  date of it, regarding AWP, the inflation of AWP. It was
14  received prior to my time. I just had it in my files when I
15  began work.
16  Q  Do you know if that document was -- that you're
17  referring to was produced in this litigation?
18  A  I believe so.
19  Q  Is that the only document that you recall receiving
20  from the National Association of Medicaid Fraud Control Units?
21  A  Yes.
22  Q  Who else would have been knowledgeable about that

## 125

1  particular document?
2  A  Within our agency?
3  Q  Within the agency, yes.
4  A  I don't know because the time frames it was at, I
5  wasn't even here.
6  Q  We don't recall seeing that document in the production
7  set. It's possible it's there, we just didn't see it.
8     But what we would ask, that you review your files. If
9  you have not produced that particular document, that you produce
10  it to us, and any other documents from the National Association
11  of Medicaid Fraud Control Units that are responsive to our
12  document requests.
13     Do representatives of the state Medicaid department
14  attend meetings of the National Association of Medicaid Fraud
15  Control Units?
16  A  I do not. I do not. No, I don't.
17  Q  And do you know of anybody who does?
18  A  No. If anybody did, it would be John Liveratti.
19  Q  Have you ever seen any notes from meetings with the
20  National Association of Medicaid Fraud Control Units?
21  A  No.
22  Q  Do you know if anyone from Nevada Medicaid attended a

### Page 138

1  A   He is now with the Board of Pharmacy, but used to be
2  with Medicaid. I don't know what capacity he was with Medicaid,
3  though.
4  Q   What was the nature of this study?
5  A   Just the ingredient cost study.
6  Q   But you don't know the year of this study?
7  A   No.
8  Q   Was this study produced to defendants in this
9  litigation?
10 A   Yes.
11 Q   Were there any other -- do you know if any other
12 documents in addition to that -- well, strike that.
13     Do you know what the conclusion of that study was?
14 A   I do not know. I know we had a change in
15 reimbursement methodology. I don't know what it was prior to
16 the change, though.
17 Q   Just, I guess, I would ask that -- it sounds like the
18 study has already been produced, but if it hasn't been produced,
19 or if there are drafts of the study, or if there are underlying
20 documents in support of this study that are responsive to our
21 requests, that you search for those and produce those documents,
22 as well.

### Page 139

1      In addition to the Macdonald study, is there any other
2  internal study that the state of Nevada has conducted on drug
3  pricing and reimbursement that you're aware of?
4  A   We did a kind of comparison for the 2003 legislative
5  session for the legislators to decide where they wanted to
6  change AWP towards.
7  Q   When you say "comparison," what do you mean by that?
8  Comparison of savings or --
9  A   Yes.
10 Q   And what was the finding of that study?
11 A   It was changed to AWP minus 15 percent.
12 Q   And was part of the reason for that is the
13 conclusion --
14 A   And I apologize. That was the 2001 session,
15 legislative session.
16 Q   Was the conclusion that by changing from AWP minus ten
17 to AWP minus 15 percent, that the state would achieve
18 significant savings?
19 A   I don't --
20     MS. BRECKENRIDGE: Objection.
21     THE WITNESS: I don't -- would not say significant.
22 There was other cost containment efforts going on at the exact

### Page 140

1  same time, but there was an increase in savings that was
2  projected.
3  BY MR. DOVE:
4  Q   But you did not represent to the state legislature
5  that these savings would be significant in changing from AWP
6  minus ten percent to AWP minus 15 percent?
7  A   I don't honestly know what we testified. We just said
8  there would be a change in savings.
9  Q   If you could turn back to Exhibit Lawrence 008,
10 Exhibit Lawrence 008, for a minute, please. This is that OIG report
11 from October of 2003.
12     Just I guess to refresh your recollection, if you
13 could turn to -- first to page 8.
14     That is a discussion, under the topic heading 17
15 states lowered their estimates of pharmacy acquisition costs.
16     And page 8, about four sentences into the first full
17 paragraph, it says, for example, Nevada revised its estimated
18 acquisition costs formula from AWP minus 10 percent to AWP minus
19 15 percent.
20     Do you see that?
21 A   Yes.
22 Q   And then if you could turn to page 12, to table three,

### Page 141

1  savings from reductions in EAC reimbursement formulas. And do
2  you see where Nevada is listed as one of the states on that
3  chart?
4  A   Yes.
5  Q   And do you see where the estimated savings as percent
6  of the state's fiscal year 2001 drug expenditures, 21.3 percent?
7      Do you see that?
8  A   Uh-huh (affirmative).
9  Q   Would you consider that to be a significant savings?
10     MS. BRECKENRIDGE: Objection.
11     THE WITNESS: Well, it also says that it was an
12 estimate on its annual savings, so this wasn't exactly what we
13 had estimated, the bottom source.
14     And I'd have to check and see what our documents in
15 our budget actually said to see if this reflects a correct
16 amount or not.
17 BY MR. DOVE:
18 Q   Would you agree that compared to every other state
19 listed there, that 21.3 percent was a substantially greater
20 savings figure than all the various other states reported?
21 A   No. Arizona was high, also.
22     MS. BRECKENRIDGE: Objection.



                                                                            212

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                              -oOo-

4    In Re: Pharmaceutical Industry

5    Average Wholesale

6    Price Litigation                        **CERTIFIED COPY**

7

8                                             MDL No. 1456

9                                             Civil Action No.

10   This Document Relates to State of        01-CV-12257-PBS

11   Nevada v. Abbott Laboratories, et al.,

12         and                                CA No. 02-CV-00260-ECR (Nevada I)

13   State of Nevada v. American Home

14   Products, et al.,                        CA No. 02-CV-12086-PBS (Nevada II)

15

16

17              VOLUME 2 OF THE DEPOSITION OF

18                     COLEEN LAWRENCE

19                    August 16, 2005

20                    Carson City, Nevada

21

22      REPORTED BY:  DEBORAH MIDDLETON GRECO, CCR #113, RDR, CRR

228

1  reimbursement is based upon AWP, not actual acquisition costs.

2     A    Right.  Because our estimated acquisition costs is

3  AWPs minus a percentage.  Therefore, AWP cannot equal

4  acquisition cost.

5     Q    And that would be true whether it's AWP minus 15

6  percent or AWP minus ten percent or AWP minus five percent?

7          Your point is that, like my definition, as long as

8  there is a discount off of AWP, obviously AWP does not equal

9  actual acquisition cost.

10    A    Can you rephrase your question?

11    Q    I think I understand what you're saying is that

12 because AWP -- because you're trying to -- it's like a

13 definition issue.

14         Because you're trying to approximate estimated

15 acquisition cost because estimated acquisition cost does not

16 equal AWP, but rather equals AWP minus a discount.

17         By definition, AWP -- you know, the state is aware

18 that AWP does not equal actual acquisition cost; is that

19 correct?

20    A    Correct.

21    Q    Point number three on this document refers to public

22 comment.

1   contract would be.

2           Record read by the reporter as follows:

3           "QUESTION:  Does the state have any contracts with any

4   pharmacy or other providers that refer or relate to AWP?"

5           MS. BRECKENRIDGE:  Objection.

6           THE WITNESS:  I'm still unclear as to what the

7   contract would be.  You say relate to AWP.

8   BY MR. DOVE:

9      Q    For example, does the state have a contract with, you

10  know, PBM Express Scripts or PBM that refers in the context

11  itself to the term AWP?

12          MR. TERRY:  You're asking for the state in its

13  entirety or for the Medicaid program?

14          MR. DOVE:  For the Medicaid program.

15          MS. BRECKENRIDGE:  Objection.

16          THE WITNESS:  Not that I'm aware of.

17  BY MR. DOVE:

18     Q    I'd like to mark as Exhibit Lawrence 015 a collection

19  of documents that appears to relate to a state plan amendment

20  pertaining to a change in dispensing fee.

21          (Exhibit Lawrence 015 marked for identification)

22  BY MR. DOVE:

357

1   BY MR. DOVE:

2       Q    Are you aware of those general requirements that I
3   just read?

4       A    Not the specific requirements. I have heard some of
5   the language before.

6       Q    Do you know what steps, if any, the state has taken to
7   ensure compliance with the equal access provision of the federal
8   Medicaid statute?

9       A    In relation to which program?

10      Q    Well, in relation to reimbursement prescription drugs.

11      A    I do know that we, to my knowledge, have not had any
12  providers drop or stop seeing Medicaid recipients in lieu of any
13  of our changes that we have made.

14           And during public comment, we have never had a
15  provider stop seeing a patient that I know of due to any of the
16  changes. I think that would be the end tail result of whether
17  or not there was open access or not.

18           MR. TERRY: The plan has also been approved by CMS and
19  prior to CMS, HCFA, on a continual basis since enactment of the
20  Medicaid statutes in the '60s.

21  BY MR. DOVE:

22      Q    Okay.

391

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____     MDL DOCKET NO.

THIS DOCUMENT RELATES TO:       CIVIL ACTION

Abbott Laboratories, et al.,    01CV12257-PBS

CA No. 02-CV-00260-ECR

(Nevada I) and State of

Nevada V American Home

Products, et al., CA No.

02-CV=12086-PBS (Nevada II)

_____/

VOLUME III

DEPOSITION OF

COLEEN LAWRENCE

March 23, 2006

Carson City, Nevada

REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst 4

**396**

1  talking about the term average wholesale price or
2  AWP. Do you recall that?
3    A.  Yes.
4    Q.  And you're familiar with that term,
5  correct?
6    A.  Correct.
7    Q.  And what's your understanding of what AWP
8  is?
9    A.  Well, by the semantics of the name,
10  average wholesale price, I would assume that it is
11  the wholesale price that is given for the drugs.
12    Q.  And when you say you assume it's the
13  wholesale price for drugs, are you assuming that
14  it's the price at which wholesalers purchase the
15  drugs or the price at which they sell the drugs to,
16  you know, pharmacies, for example?
17    A.  Can you repeat the question.
18    Q.  Sure. You said that you assume that
19  average wholesale price was an average wholesaler
20  price. And my question to you is that the price at
21  which the wholesalers purchase the drugs or is it a
22  price at which pharmacies for example purchase drugs

**397**

1  from the wholesaler?
2    A.  It's the wholesale price of the drug. So
3  whichever way is going to process, whether it's
4  giving or taking on the drug, it is the price of
5  that drug.
6    Q.  When you say you would assume that that's
7  what it means, I mean, do you have any reason to
8  believe that in practice that it is not that?
9    A.  Well, from our different pricing
10  initiatives that we've had to implement over time,
11  average wholesale price, we try to estimate what
12  that is because we do not know what the actual price
13  is. We're not privy are to that information. So
14  without validation, I would not know that actual
15  price.
16    Q.  When you refer to pricing initiatives,
17  what are you referring to?
18    A.  Items such as MAC pricing, initiatives on
19  generic multisource drugs or utilizing the
20  supplemental rebate programs and utilizing OBRA
21  rebates.
22    Q.  And how does use of those pricing

**398**

1  initiatives help you -- by you, I mean the Medicaid
2  Department, sorry, determine the wholesale price of
3  the drug? Is that what you -- is that what you
4  testified?
5    A.  Actually, what we're testifying is that we
6  are required to use EAC estimated acquisition costs,
7  for the pricing reimbursement methodology of a drug.
8       In order to do that, we utilize AWP minus
9  fifteen percent. However, we have had to initiate
10  other pricing initiatives to try to come closer to
11  EAC, because obviously by allowing those other
12  initiatives to occur, it implies that we are still
13  not at estimated acquisition cost.
14    Q.  Okay. So your understanding is that AWP
15  minus fifteen percent is not actually estimated
16  acquisition cost; is that correct?
17    A.  It is our estimation of what EAC is;
18  however, since we do not have information of what
19  the actual AWP is, it is always going to be an
20  estimation.
21    Q.  And is it your understanding AWP minus
22  fifteen percent is a good representative of the

**399**

1  average acquisition cost?
2    A.  It is what our current estimate is.
3  Unfortunately, like I said, I do not have validation
4  of what true AWP is.
5    Q.  And is it your understanding is that AWP
6  is a number that can be calculated by someone?
7    A.  Well, by the basis of the name, average
8  wholesale price, I'm assuming there is a definition
9  of it. OBRA 90 has definitions of what the pricing
10  methodologies are, and they rely on information
11  that's given from the drug manufacturers.
12    Q.  And is it your understanding that OBRA 90
13  defines AWP?
14    A.  I'd have to relook at it. It defines best
15  price, and I'd have to look at it again to see if it
16  defines actual specifics of AWP.
17    Q.  And what's your understanding of what best
18  price is?
19    A.  What's listed out in the federal
20  regulations.
21    Q.  And do you know what that is?
22    A.  I never assume what the federal

### Page 400

1  regulations are. I always go back and quote them
2  directly.
3     Q. And how does the State use best price?
4     A. In accordance with section nineteen
5  twenty-seven of the Social Security Act.
6     Q. What does section nineteen twenty-seven of
7  the Social Security Act cover?
8     A. The OBRA rebates and the pharmacy
9  regulations for Nevada -- or for Medicaid in itself.
10    Q. Is it your understanding that AWP is
11 related to the cost -- actual cost at which
12 pharmacies purchase drugs?
13    A. It's my understanding that AWP is an
14 average wholesale price for those drugs.
15    Q. If AWP is the average price at which
16 pharmacies are purchasing drugs, why would the State
17 discount fifteen percent off of that?
18    A. If --
19       MS. BRECKENRIDGE: Objection. Go ahead.
20       THE WITNESS: It's the average wholesale
21 price. We don't have the specific information as to
22 what the actual acquisition cost is and we have to

### Page 401

1  have the acquisition cost of the drug. That is our
2  regulations.
3  BY MR. LITOW:
4     Q. Do you ask the pharmacies to provide the
5  acquisition cost for their drugs?
6     A. No, we do not right now. We do during a
7  MAC appeal.
8     Q. And why don't you ask them for the
9  acquisition cost?
10    A. Because we use a standardized pricing
11 methodology that's given through First Data Bank and
12 with the regulations of how that information's
13 supposed to be sent to First Data Bank.
14    Q. When you say standard pricing methodology,
15 who decides that pricing methodology?
16    A. The pricing methodology or how we obtain
17 that pricing methodology?
18    Q. The pricing methodology itself.
19    A. It's average wholesale price minus fifteen
20 percent. It was determined through a public hearing
21 process.
22    Q. Is it your understanding that pharmacies

### Page 402

1  generally purchase drugs at average wholesale price?
2     A. I do not know what they are purchasing the
3  price of the drugs at. That's why we have a problem
4  trying to understand what EAC is.
5     Q. But is Medicaid's program best estimate
6  that pharmacies purchase drugs at AWP minus fifteen
7  percent?
8     A. That was an estimation of --
9        MS. BRECKENRIDGE: Objection.
10 BY MR. LITOW:
11    Q. Go ahead.
12    A. That was an estimation of how they closest
13 to EAC because of what other national standards are
14 happening throughout other states. But we also know
15 that with our other programs, we have had to
16 implement other pharmacy initiatives.
17    Q. You say you had to implement them. What
18 do you mean you had to implement them?
19    A. Because being stewards of taxpayer dollars
20 --
21       MS. BRECKENRIDGE: You have to slow down.
22       THE WITNESS: Can you repeat the question,

### Page 403

1  please?
2        MR. LITOW: Sure. Can you read back the
3  question, please.
4           (Previous question read back by
5  reporter.)
6        THE WITNESS: Our pharmacy expenditures
7  were increasing as they are nationally, so we had
8  implemented multiple programs at one time with
9  pharmacy to try to decrease the rate of increase of
10 the trend of pharmacy expenditures.
11    Q. Are you aware there's sometimes a
12 difference between the average wholesale price -- or
13 AWP and the price at which pharmacies purchase
14 drugs?
15    A. I am aware of that. I don't know what the
16 actual cost of what they purchase the drugs, but I
17 do know from common sense that they are able to
18 negotiate the price of their drugs, and we do not
19 have the resources to do an acquisition study for
20 every drug that is delivered in the state of Nevada.
21    Q. And for how long have you been aware of
22 this difference between the AWP and the price at

### Page 408

1  fee, they had just requested -- assured that we
2  would not touch the dispensing fee because that's
3  the actual cost of their service, not the actual
4  cost of their drug.
5      So when we went out and did our public
6  forum for that, we did the AWP minus fifteen. And
7  since then, we have not had any providers that we
8  know that have left the market or decided not to
9  participate.
10     In addition to that, we have done other
11 initiatives, such as our MAC program and
12 supplemental rebate programs, and providers have not
13 stopped taking Nevada Medicaid due to it.
14 Q.  I'm sorry, maybe you didn't understand the
15 question. My question was, what steps has the
16 Medicaid program taken to determine the price -- the
17 actual price at which pharmacies are purchasing
18 drugs?
19 A.  What we utilized was the survey that you
20 had during my last deposition as an exhibit from
21 Myers and Stauffer.
22     And then like any other type of provider

### Page 409

1  rate-setting methodology, we go out in a public
2  forum and say this is what the rates are going to
3  be.
4      And if there's any feedback at that time
5  that is negative or if it seems like there being an
6  access to care issue, then we have to reconsider the
7  rates.
8      When we had our public forum, that didn't
9  occur. So those were the steps, because our job is
10 to make sure there's access to services.
11 Q.  So based on that, the Medicaid program's
12 understanding is that average wholesale price minus
13 fifteen percent is a -- apparently a good
14 representative of the actual acquisition cost of
15 drugs to pharmacies; is that correct?
16 A.  No, that's not what I said. I would say
17 that it did not impede access to care by lowering
18 the rate to AWP minus fifteen percent.
19 Q.  I mean, is the Medicaid program's goal in
20 setting an EAC to find a rate that doesn't impede
21 access to care or is it to find what it estimates to
22 be the acquisition cost of drugs?

### Page 410

1  A.  You do the estimated acquisition cost of
2  drugs, but they're not say lows. They have to work
3  together.
4      You have estimated acquisition costs,
5  because it should not be a cost to the taxpayers to
6  pay a profit for the actual ingredient cost of the
7  drug.
8      So if they are -- if we establish EAC and
9  we -- say we miss it and it's below their actual
10 acquisition cost, then the pharmacies cannot afford
11 to stay in business and provide that drug at a cost
12 to them. So if that was to occur, then there would
13 be an access to care issue.
14 Q.  So based upon the State's review of when
15 it was -- strike that. So the State's under --
16 State Medicaid program's understanding is that
17 average wholesale price minus fifteen percent is the
18 -- the best reimbursement rate it can offer without
19 creating an access to care issue; is that correct?
20 A.  No, that was a point in time when we had
21 tried AWP minus fifteen; however, other initiatives
22 since then have demonstrated that we are still not

### Page 411

1  at EAC, so we implemented other measures.
2  Q.  So if the State had reimbursed just the
3  AWP without -- you know, minus an amount of
4  discount, would there be access to care issue there?
5      MS. BRECKENRIDGE:  Objection.
6      THE WITNESS:  My logic would tell me if we
7  are offering an AWP minus fifteen and there's not an
8  access, if we paid more money for the service, there
9  would not be access issue.
10 BY MR. LITOW:
11 Q.  What if the State were to reimburse AWP
12 minus twenty-five percent; would there be an access
13 issue?
14     MS. BRECKENRIDGE:  Objection.
15     THE WITNESS:  I do not know. We have not
16 changed our policies to AWP minus twenty-five
17 percent or held public forums on it.
18 BY MR. LITOW:
19 Q.  You talked about the change from AWP minus
20 ten percent to AWP minus fifteen percent. Where did
21 that idea generate? Let me phrase it a different
22 way. Where did the idea of changing the

**416**

1   A.   Right now I can remember behavioral
2   health. Any time we have legislative session and
3   they have any type of inquiry -- communications
4   regarding our full-time equivalent staffing
5   positions that we may ask for, they will ask for
6   information.
7   Q.   And when you were -- around the time when
8   you were considering the change in the reimbursement
9   rate, were you aware that other states -- that some
10  other states did not use an AWP-based system at all?
11  A.   Correct.
12  Q.   You were aware of that?
13  A.   Yes.
14  Q.   And what were some of the other systems
15  that -- non-AWP-based systems that you were aware?
16  A.   The only one I know at the time was
17  wholesale acquisition cost, WAC, plus a percentage.
18  Q.   And what's your understanding of what WAC
19  means?
20  A.   Just from the definition, it's a wholesale
21  acquisition cost.
22  Q.   And what's your understanding about the

**417**

1   difference between WAC and AWP?
2   A.   Well, my understanding is just based upon
3   the names that the wholesale acquisition cost is
4   what they're actually acquiring the drug for and
5   average wholesale price is the actual average of
6   what their wholesale price is for.
7   Q.   When you say the price -- wholesale
8   acquisition price which they are acquiring the drug,
9   who is they?
10  A.   The pharmacies.
11  Q.   And I'm sorry, I may have missed your
12  answer at the end. You said you thought average
13  wholesale price was the average of the prices that
14  they were acquiring the drug?
15  A.   The average wholesale price.
16  Q.   Did the Medicaid program consider using a
17  WAC-based system?
18  A.   At the time and still is consistent with
19  now, we have our information base from First Data
20  Bank from average wholesale price, so we didn't
21  explore looking at WAC.
22  Q.   I'm sorry, you did not explore using WAC

**418**

1   because you used First Data Bank to get AWP?
2   A.   We're utilizing AWP right now. That was
3   the methodology that was utilized. We did not look
4   at changing the entire reimbursement methodology.
5   Q.   Sorry if I wasn't clear there.
6   A.   That's okay.
7   Q.   Did you consider greater discounts off AWP
8   greater than fifteen percent?
9   A.   There were greater discounts on the actual
10  survey and we looked at the entire survey. But what
11  we went forward with was AWP minus fifteen.
12  Q.   You testified that the Medicaid program
13  did not consider changing its reimbursement rate
14  from the AWP-based system to some other based system
15  such as WAC, correct?
16  A.   Correct.
17  Q.   Could the Medicaid program had done so if
18  it had chosen?
19  A.   Could it have changed the reimbursement
20  system?
21  Q.   Yeah, to WAC.
22  A.   We didn't pursue it, because at the time,

**419**

1   the system we were utilizing was based on a cobalt
2   system, not a table driven system.
3       So we knew there was going to be lots of
4   programming changes if we ventured too far from our
5   current methodology.
6   Q.   Do you still have a cobalt-based system?
7   A.   No.
8   Q.   So you could change to WAC now if you
9   wanted to, correct?
10  A.   If it was deemed it was appropriate. We'd
11  have to look at how WAC is supplied. I don't know
12  if WAC is supplied through First Data Bank or what
13  mechanism it's supplied through and how it's
14  utilized.
15  Q.   Are you aware of any regulations, federal
16  or state regulations requiring the Nevada Medicaid
17  program to use AWP as a benchmark for reimbursement?
18  A.   Our current chapter twelve hundred, which
19  is our policies, which is our regulations, requires
20  AWP minus fifteen percent, so there would have to be
21  a regulation change on that side if they were to
22  change it.

**440**

1  one.
2     A.  Uh-huh.
3     Q.  That reads AWPs are not independently
4  determined by the publishers, rather as part of the
5  AWP inflation scheme described in this amended
6  Complaint, pharmaceutical companies, quote, self-
7  report, end quote, the AWP to publishers who then
8  publish the purported AWP exactly as provided to
9  them by the pharmaceutical manufacturers.  Do you
10 see that?
11    A.  Uh-huh.
12    Q.  Are you aware of any basis for the
13 allegation that AWPs are not independently
14 determined by the publishers?
15       MS. BRECKENRIDGE:  Objection.  To the
16 extent you're asking her about a legal document and
17 what went into the making the allegations in the
18 Complaint, I will remind you that that is improper.
19       To the extent she was involved in our
20 bringing of the lawsuit or the development of the
21 State's case, she may also not answer.  If you want
22 to ask her a different question, you may.

**441**

1  BY MR. LITOW:
2     Q.  Are you aware -- do you have any basis to
3  believe that AWPs are not independently determined
4  by the publishers other than what you've been told
5  by counsel?
6     A.  As I said, I don't recall ever seeing this
7  document, so my first question would be I don't even
8  know who the publishers are.
9     Q.  Fair point.  I'll refer you to paragraph
10 three of the Complaint, which reads:
11       Private and public drug reimbursement
12 systems, including private insurance companies,
13 Medicare and Medicaid, reimburse physicians and
14 pharmacies for hundreds of prescription drugs based
15 upon the average wholesale price, AWP, as published
16 and reported by third-party publications such as
17 First Data Bank, Red Book, Blue Book or Medispan,
18 paren, the, quote, publishers, end quote, end
19 parenthesis.
20       Does that help you understand what is
21 meant by the term publishers?
22    A.  Yes.

**442**

1     Q.  And are you aware -- do you have any basis
2  for believing that AWPs are not determined by
3  publishers?
4     A.  My knowledge of it is that I do not know -
5  - I cannot validate what the AWP is, so I do not
6  know how they validate the AWP.
7     Q.  So you don't know one way or the other
8  whether it's determined by publishers or by someone
9  else; is that correct?
10    A.  If it's determined or if it's validated;
11 which way?
12    Q.  Determined.
13    A.  Can you repeat the question; sorry.
14    Q.  Sure.  I asked whether -- do you have any
15 basis for believing that AWPs are not determined by
16 publishers; do you recall that?
17    A.  Yes.
18    Q.  And do you recall what your answer was?
19    A.  That I do not know how the information is
20 given to the publishers.
21    Q.  And my question is, since you don't know
22 how the information is given to them, you have no

**443**

1  way of knowing, you know, how the publishers
2  determine the AWP; is that correct?
3     A.  I specifically do not know how they
4  acquire their information.
5     Q.  Are you aware that many pharmaceutical
6  companies do not report AWP at all to publishers?
7        MS. BRECKENRIDGE:  Objection.
8        THE WITNESS:  I'm not aware.
9  BY MR. LITOW:
10    Q.  Are you aware of any pricing information
11 that manufacturers report to publishers?
12    A.  Any pricing information like
13 methodologies?
14    Q.  Like AWP or WAC or any other pricing.
15       MS. BRECKENRIDGE:  Objection.
16       THE WITNESS:  All I know is what they have
17 published in their books.  I don't know how they
18 acquire that information.
19 BY MR. LITOW:
20    Q.  Do you know whether any other state --
21 Nevada state agencies or entities use average
22 wholesale price in connection with drug

### 444

1  reimbursement?
2      A.  Other agencies outside of Medicaid?
3      Q.  Yes.
4      A.  Nevada checkup does because they use our
5  same policies. Other than that, I do not know.
6      Q.  Do you have any information about the use
7  of AWP by other entities in the state of Nevada,
8  such as insurance companies?
9      A.  No.
10     Q.  Directing your attention back to paragraph
11 four of the Complaint of Exhibit Lawrence V3 001,
12 are you aware of any documents in the State's
13 possession to support that allegation?
14         MS. BRECKENRIDGE: Which allegation? I'm
15 sorry.
16         MR. LITOW: Four.
17         MS. BRECKENRIDGE: Paragraph four?
18         MR. LITOW: Yes.
19         MS. BRECKENRIDGE: Objection, she's
20 already told you she doesn't have any information.
21         THE WITNESS: You want to know if I have
22 information --

### 445

1  BY MR. LITOW:
2      Q.  Are you aware of any documents that would
3  support that allegation?
4      A.  The allegation that --
5      Q.  Okay, let's take it piece by piece then.
6  It looks like there's several here. First one, AWPs
7  are not independently determined by the publishers;
8  do you see that?
9      A.  Yes.
10     Q.  Are you aware of any documents in the
11 State's possession to support that allegation?
12         MS. BRECKENRIDGE: Objection.
13         THE WITNESS: I am not aware of any.
14 BY MR. LITOW:
15     Q.  And then it goes on:
16         Rather, as part of the AWP inflation
17 scheme described in this Amended Complaint,
18 pharmaceutical companies self-report the AWP to
19 publishers who then publish the purported AWP
20 exactly as provided to them by the pharmaceutical
21 manufacturers.
22         Are you aware of any documents in the

### 446

1  State's possession to support that allegation?
2          MS. BRECKENRIDGE: Objection.
3          THE WITNESS: Not to my knowledge.
4  BY MR. LITOW:
5      Q.  Do you have an opinion one way or the
6  other whether the allegations in that paragraph are
7  correct?
8          MS. BRECKENRIDGE: Objection.
9          THE WITNESS: I have no opinion.
10 BY MR. LITOW:
11     Q.  I'd like to direct your attention to
12 paragraph seven of the Complaint. It's on page two.
13 And that reads:
14         In some cases, as an integral part of the
15 scheme, utilized charge-backs, credits, rebates,
16 hidden price discounts and/or other unlawful
17 financial inducements, including free samples, that
18 are not included in the AWPs reported by defendants,
19 which consequently further reduce the provider's
20 cost while increase the provider's spread and their
21 incentive to prescribe a particular defendant's
22 products.

### 447

1          Do you see that?
2      A.  Yes.
3      Q.  Are you aware of any documents in the
4  State's possession to support that allegation?
5      A.  I guess I need further clarification on
6  the allegation. It doesn't say who is -- are we
7  saying the manufacturers are utilizing the charge-
8  backs?
9      Q.  Yes.
10     A.  Okay. And is it that they are utilizing
11 credits, rebates -- I mean --
12         MS. BRECKENRIDGE: There's lot there.
13 BY MR. LITOW:
14     Q.  Any of those.
15         MS. BRECKENRIDGE: Objection.
16 BY MR. LITOW:
17     Q.  Are you aware of any documents to support
18 the allegation that defendants utilize charge-backs?
19     A.  No, not to my knowledge.
20     Q.  Are you aware of any documents to support
21 the allegation that defendants utilize credits?
22     A.  Not to my knowledge.

**548**

1  you have where you can store documents?
2  A. None.
3  Q. Do you have a local drive for your own
4  computer?
5  A. Yes, but we don't encourage keeping State
6  documents on it, just because of a crash of a
7  computer.
8  Q. Do you ever keep pharmacy documents on
9  your local drive?
10 A. No, they're on my share drive.
11 Q. Do you think that pharmacists would
12 continue to participate in the Medicaid program if
13 they didn't earn a profit?
14     MS. BRECKENRIDGE: Objection.
15     THE WITNESS: I don't know what they would
16 do.
17 BY MR. DILLON:
18 Q. Based on your experience in working with
19 pharmacists, if the reimbursement amount dropped to
20 below their cost, would they continue to
21 participate?
22     MS. BRECKENRIDGE: Objection.

**549**

1      THE WITNESS: It would honestly depend on
2  how much of their business is comprised of it,
3  because we do have them that don't make a profit on
4  Medicaid.
5  BY MR. DILLON:
6  Q. And do you have some that do make a profit
7  on Medicaid?
8  A. I don't know their financial situation.
9  Q. Are you aware of any documents prior to
10 your involvement with the Nevada Medicaid program
11 related to the acquisition costs of drugs for the
12 Nevada Medicaid program?
13 A. From who?
14 Q. From anyone. Is there -- I'm just
15 wondering if there are any documents that may have
16 been created by your predecessors or received by
17 your predecessors that were there when you arrived
18 at the program.
19 A. The only document I know about, and I know
20 it's been presented as an exhibit, is the Keith
21 McDonald letter. That's the only one I know about.
22 Q. With respect to the OIG reports, is it

**550**

1  your practice to keep those reports or just to know
2  where you can access them on the OIG web site?
3  A. We just access them through the web site.
4  We don't keep them.
5  Q. Has that been your practice since you
6  arrived?
7  A. As long as they've been maintained
8  electronically.
9  Q. And how long has that been?
10 A. From OIG?
11 Q. Yes.
12 A. I don't know.
13 Q. Has it been throughout the time you've
14 been there?
15 A. I don't know.
16 Q. Do you recall a time when you would keep
17 paper copies of the OIG reports?
18 A. No.
19 Q. Other than these pricing letters we've
20 looked at from Warrick and Schering, have you had
21 any communications with either Warrick or Schering?
22 A. I may have possibly met a drug

**551**

1  manufacturer through one of our public hearing
2  processes, but I could not tell you who specifically
3  is with what manufacturer.
4  Q. Do you have any knowledge of how Warrick
5  or Schering sets the prices for its drugs?
6  A. No.
7  Q. Do you have any knowledge regarding how
8  Warrick or Schering markets their drugs?
9  A. No.
10 Q. Do you have any knowledge regarding how
11 Warrick or Schering distributes their drugs within
12 the state of Nevada?
13 A. No.
14 Q. Is it fair to say that you have no opinion
15 one way or the other regarding any allegations that
16 are in the Complaint as they respect Warrick or
17 Schering?
18     MS. BRECKENRIDGE: Objection.
19     THE WITNESS: I'd have to look at each one
20 of the allegations. I don't know what all the
21 allegations are.
22 BY MR. DILLON:

**Page 584**

1  cross; I didn't ask for her to come. But you can
2  object.
3       THE WITNESS: No, I do not have that
4  information.
5  BY MS. BRECKENRIDGE:
6     Q.  I can ask it a different way. What
7  information do you get from the drug manufacturers
8  regarding the pricing?
9     A.  **Their pricing of the drugs and how they**
10 **price it?**
11    Q.  The pricing of the drugs, yes. And
12 leaving aside how they price it, because I don't
13 want to have a compound question, of course. What
14 information do you get from the drug manufacturers
15 directly regarding pricing?
16    A.  **We do receive pamphlets every once in a**
17 **while that say what their average wholesale price**
18 **is.**
19    Q.  Do you have information on how their
20 average -- do you receive information from them
21 regarding how their average wholesale pricing is
22 derived?

**Page 585**

1     A.  No.
2     Q.  Do you receive information -- is that
3  information provided to another entity with whom you
4  contract, and you being Nevada Medicaid?
5     A.  **The AWP pricing is received by First Data**
6  **Bank, and that's what we rely on.**
7     Q.  Does First Data Bank then provide you
8  information regarding the pricing?
9     A.  Yes.
10    Q.  Do you receive information from First Data
11 Bank on how the pricing is established?
12    A.  No.
13    Q.  Mr. Duarte described AWP -- I'm sorry, Mr.
14 Duarte described the drug pricing as a black box.
15 Would you agree with that characterization?
16    A.  Yes.
17    Q.  What does that connote to you?
18    A.  **It means we don't know how it's derived,**
19 **we don't know the basis of any of the pricing.**
20    Q.  You did understand, however -- let me ask
21 it this way: Do you have an understanding that AWP
22 does have a relationship, a reasonable relationship

**Page 586**

1  to some sort of pricing?
2       MR. PALERMO: Objection to the form.
3       MR. LITOW: Form.
4       THE WITNESS: That's my understanding.
5  BY MS. BRECKENRIDGE:
6     Q.  Has that understanding changed over time -
7  - has your understanding of that changed over time?
8       MR. PALERMO: Objection.
9       THE WITNESS: That average wholesale --
10 I'm sorry, that average wholesale price has changed
11 over time?
12 BY MS. BRECKENRIDGE:
13    Q.  Yes.
14    A.  Yes.
15    Q.  Has your understanding of average
16 wholesale price changed over time?
17    A.  Yes.
18    Q.  Has it changed since you've been in your
19 position at Nevada Medicaid?
20    A.  Yes.
21    Q.  Average wholesale price is a -- let me
22 withdraw that question. I'll ask a different

**Page 587**

1  question.
2       Does the term best price have a meaning to
3  you in connection with your work for the Nevada
4  Medicaid pharmacy program?
5     A.  Yes.
6     Q.  And what does that term mean?
7     A.  **I'd have to look at the specific**
8  **definition of it, but it is defined under the OBRA**
9  **statutes for section nineteen twenty-seven, and**
10 **there's a pricing definition of what best price it**
11 **is underneath there.**
12      **But it's supposed to be the best price**
13 **that the manufacturer gives to such as a**
14 **governmental agency.**
15    Q.  What does that mean to you in your
16 position?
17    A.  **That that is what's supplied for the drug**
18 **rebates to help calculate our drug rebates.**
19    Q.  And you referred earlier to yourself and
20 your colleagues at Nevada Medicaid as stewards of
21 the taxpayers' money. Do you recall that --
22    A.  Yes.