**BRECKENRIDGE DECL. EXHIBIT 6**

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-oOo-

| | |
|---|---|
| In re:   PHARMACEUTICAL | MDL DOCKET NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | CIVIL ACTION |
| PRICE LITIGATION | 01-CV-12257-PBS |

THIS DOCUMENT RELATES TO:

ALL ACTIONS

DEPOSITION OF KEITH W. MACDONALD

March 24, 2006

Reno, Nevada

BE IT REMEMBERED that on Friday, the 24th day of

March, 2006, at the hour of 9:10 a.m. of said day at

the offices of Lionel, Sawyer & Collins, 50 West

Liberty Street, Suite 1100, Reno, Nevada, before me,

DEBORA L. CECERE, a notary public, personally

appeared KEITH W. MACDONALD, who was by me first duly

sworn, and was examined as a witness in said cause.

REPORTED BY: DEBORA L. CECERE, NV CCR #324, RPR

COMPUTER-ASSISTED TRANSCRIPTION:   CHEETAH-TURBOCAT

**Page 30**

1  A. Okay. Okay.
2     Just finished looking at that.
3  Q. Okay. Bet you never thought you'd see
4  this again, did you?
5  A. As a matter of fact, I can't recall the
6  letter even though it's --
7  Q. From you?
8  A. It says it's from me. It's signed by
9  Mr. Bill Engel.
10 Q. Who is Bill Engel?
11 A. He was an employee in the Medicaid
12 program. At this time I would have been deputy
13 administrator for welfare, I think, as it's
14 titled, yes.
15 Q. And this --
16 A. And I probably reviewed the letter
17 before it was sent out.
18 Q. And this is a letter that's from you to
19 John O'Hara at the Health Care Financing
20 Administration?
21 A. Um-hum.
22 Q. Is that correct?

**Page 31**

1  A. Um-hum.
2  Q. I'd like to direct your attention to the
3  first paragraph of the letter.
4  A. Um-hum.
5  Q. Do you see that paragraph refers to a
6  EAC survey report dated March 14th, 1986?
7  A. Um-hum.
8  Q. Which claims an aggregate drug purchase
9  price of 18.85 percent below AWP realized by
10 pharmacies in Nevada?
11 A. Um-hum.
12 Q. Do you see that?
13 A. Um-hum.
14 Q. Do you recall seeing that survey?
15 A. I don't.
16 Q. Would it be fair to say based on this
17 letter that you did see that survey at some point?
18 A. I would assume so.
19 Q. Do you recall any -- other than the
20 survey referred to here, do you recall any other
21 surveys that were done of pharmacy acquisition
22 costs in Nevada?

**Page 32**

1  A. I don't recall. There may have been
2  some, but I don't recall any.
3  Q. During your time at Nevada Medicaid,
4  did, did the Medicaid program conduct any studies
5  to determine the pharmacies' acquisition costs for
6  drugs in Nevada?
7  A. I don't recall they did. They may have.
8  But I don't recall that specifically.
9  Q. You're familiar with the term AWP or
10 average wholesale price, correct?
11 A. Yes, uh-huh.
12 Q. And when did you first hear that term?
13 A. I can't recall when I first heard it.
14 Q. Was it going back to your time as a
15 pharmacist?
16 A. I would assume so, yes.
17 Q. And during your time at Nevada Medicaid,
18 what did you understand average wholesale price to
19 mean?
20 A. Generally speaking a published price
21 that someone had, it's kind of like gas mileage on
22 a car or horsepower. It was a target someone put

**Page 33**

1  out there, and it was probably somewhere around
2  the average price.
3     Of course, we're all aware of classes of
4  trade. We're all aware that whether you're buying
5  from Eastman Kodak or from a pharmaceutical
6  company, if you had purchasing power, you could
7  obtain discounted prices at different amounts.
8     And of course in the pharmaceutical
9  business at that time there were offers of goods
10 sold by quantity, one free with 12, another thing.
11    So the estimated acquisition -- or the
12 average wholesale price was just a -- I think a
13 kind of a targeted figure.
14    And to be quite honest with you, many of
15 us in the business called it artificial wholesale
16 price, because you received discounts. If the
17 average wholesale price was X, if you paid your
18 bill on time, you got a different discount. If you
19 paid your bill early, you got discounts. If you
20 were late paying your bills, you paid more.
21    So prices floated around, depending upon
22 your ability to reimburse quickly to the

**42**

1  dispensing fee adequate to cover the cost of
2  dispensing drugs?
3        MS. BRECKENRIDGE: Objection, form.
4  Foundation.
5  BY MR. LITOW:
6     Q. You can answer it.
7     A. It depends on the operation of running
8  the sales. I don't know whether it would be
9  sufficient or not. Depending upon the store.
10       Some stores make it efficient enough.
11 Some stores will not accept Medicaid reimbursement
12 at all. For example like Costco, maybe they don't
13 find it profitable so they refuse to accept it at
14 least in his area. I don't know nationwide but
15 in this area.
16    Q. I'd like to direct your attention to the
17 second page of the letter.
18    A. Sure.
19    Q. And do you see the -- I guess it's the
20 second full paragraph that begins with inclusion.
21       Do you see that paragraph I'm referring
22 to there?

**43**

1     A. Um-hum.
2     Q. And in the first sentence you write:
3        Inclusion in the study of cost data
4  derived from drugs purchased directly from the
5  manufacturer and antibiotics skewed the results
6  and should be disregarded.
7        Do you see that?
8     A. Um-hum.
9     Q. And then down at the next paragraph you
10 say:
11       If direct purchase drugs and antibiotics
12 are eliminated, a more realistic and universally
13 applicable difference between AAC and AWP for
14 drugs purchased by Nevada pharmacies may be
15 realized.
16       Do you see that?
17    A. Um-hum.
18    Q. Do you know what is meant there by a
19 more realistic and universally applicable
20 difference?
21    A. Well, I think the consideration in this
22 paragraph is that if indeed this survey that was

**44**

1  taken by this estimated acquisition cost survey
2  included direct purchases, most small pharmacies
3  which you have to make inclusive in your program,
4  particularly in a city like Reno, did not do
5  direct purchasing. They had to buy their
6  purchases from the wholesaler and the majority of
7  their purchases are from wholesalers.
8        So indeed on a national basis with large
9  drugstores and multiple drugstore chains, if this
10 estimated acquisition cost was included, it would
11 certainly skew the reimbursement for small stores
12 in a rural state.
13    MR. LITOW: Why don't we take a short
14 break?
15       (Whereupon a recess was taken.)
16    MR. LITOW: Back on the record, please.
17 BY MR. LITOW:
18    Q. Mr. MacDonald, I'm going to direct your
19 attention back to Exhibit MacDonald 001 that we
20 were looking at earlier.
21    A. Um-hum.
22    Q. And in particular I guess the second to

**45**

1  last full paragraph. And there you write:
2        It appears a more equitable definition
3  of EAC might be AWP minus 10 percent in lieu of
4  our current AWP minus 5 percent.
5        Do you see that?
6     A. Um-hum.
7     Q. So HCFA in their EAC survey has
8  suggested that EAC in Nevada was 18.3 percent,
9  correct -- excuse me, 18.85 percent, correct?
10    A. Correct.
11    Q. In here you're suggesting that a more
12 equitable estimated acquisition cost would be AWP
13 minus 10 percent, is that correct?
14    A. Um-hum.
15    Q. And this would be more equitable because
16 pharmacies would still be able to receive enough
17 of a profit to stay in business at that rate, is
18 that correct?
19       MS. BRECKENRIDGE: Objection.
20       THE WITNESS: I don't know if they'd be
21 profitable enough to stay in business. We would
22 assume so, writing that letter, that it was fair

46

1  reimbursement considering the marketplace.
2      But I don't know whether we'd keep them
3  in business.
4  BY MR. LITOW:
5      Q. If pharmacies were being reimbursed less
6  for drugs than the costs in acquiring and
7  dispensing it, what would be the result for the
8  Medicaid program?
9      A. Well, in many instances pharmacists
10 claimed as a community service they would give
11 these low prices, and they couldn't operate an
12 entire pharmacy on this reimbursement by itself.
13 You didn't see any places open up and call
14 themselves Medicaid pharmacies.
15     And indeed one time one of the directors
16 of the Welfare Division, George Miller, was mad at
17 a reimbursement circumstance in a small community,
18 and said I'll go out there and open a pharmacy.
19 After he looked at the reimbursement abilities, he
20 changed his mind very quickly.
21     So we're attempting to make a reasonable
22 and fair reimbursement.

47

1      Q. And EAC of AWP minus ten percent would
2  be reasonable and eq- -- fair, because you're
3  aware that many pharmacies could purchase
4  pharmaceuticals at, at, at least AWP minus ten
5  percent or less, correct?
6      A. Maybe if they had the purchasing power
7  and the strength to do that or they bought direct,
8  yeah, that's a possibility.
9      Again, I mentioned to you that there are
10 many pharmacies in Nevada, if you look at the very
11 rural and nonurban areas that we have, and the
12 very rural communities, they didn't have the
13 purchasing power to buy direct and/or to buy in
14 quantities. So I think we were trying to
15 establish a reimbursement that was fair to all
16 pharmacies in Nevada.
17     Another thing, that -- I don't know if
18 it was observed or mentioned here. I don't know
19 if you recall the inflationary period of the late
20 1980s. It was astronomical. Many small pharmacies
21 went broke fairly quickly because what they
22 purchased a drug for, when they replaced it, the

48

1  increase in inflationary costs were more than the
2  profits they made. So after repeated sales of two
3  or three of those inflationary leaps, they lost
4  money.
5      Q. Okay.
6      A. Not due to anything to do with pricing.
7  But most of you are too young to remember those
8  years. That was a very drastic inflationary
9  period during that time, when the marketplace as
10 well as interest rates were in the double digits.
11 And inflation had a big effect and toll on
12 business at that time.
13     Q. You refer to AWP as artificial wholesale
14 price, do you recall that?
15     A. Yes.
16     Q. Was it the understanding of others in
17 the Medicaid department at that point that AWP was
18 artificial wholesale price?
19     MS. BRECKENRIDGE: Objection.
20     THE WITNESS: We joked about that.
21 BY MR. LITOW:
22     Q. When you say "we" you mean people in the

49

1  Medicaid?
2      A. Yeah, the people in the Medicaid
3  department.
4      Q. Okay.
5      A. It's a target.
6      Q. I'm sorry?
7      A. It's not a fixed term. I mean, you
8  can't say that will be the price of all items
9  bought in a certain way.
10     Q. Is it fair to say that AWP was a, a
11 benchmark or a target from which discounts were
12 sometimes negotiated?
13     A. I would say it's a -- yes, I think
14 that's a fair description.
15     Q. And that was -- I'm sorry.
16     A. Yes, my understanding at that time.
17     Q. That was your understanding at the time
18 you were at Medicaid, correct?
19     A. Um-hum, um-hum.
20     Q. In the letter here you, you refer to
21 potentially changing the EAC from AWP minus 5
22 percent to AWP minus 10 percent --

Keith W. MacDonald                                          March 24, 2006
                              Reno, NV

14 (Pages 50 to 53)

---

Page 50

1   A. Um-hum.
2   Q. -- is that correct?
3       Do you recall when AWP was first used as
4   a basis for reimbursement in Medicaid?
5   A. I can't recall.
6   Q. Did that predate your tenure at
7   Medicaid?
8   A. I don't recall.
9   Q. And AWP minus ten percent did become the
10  reimbursement rate, correct?
11  A. I assume it did.
12  Q. Okay.
13  A. I don't have knowledge of that
14  occurring, but I assume it did.
15  Q. Besides yourself, who at Nevada Medicaid
16  at that time would have been involved in
17  determining the, what the reimbursement rate
18  should be?
19  A. I don't recall how it was determined, to
20  be honest with you. I think much like average
21  wholesale price or, we were probably taking a
22  guess of a fair and reasonable reimbursement that

Page 51

1   people could live with by political influences, by
2   input from other parties, and what would be fair
3   and equitable.
4   Q. Was there any consideration of moving
5   from an AWP based system to another system based
6   on some other system's just WAC or some other
7   terminology?
8       MS. BRECKENRIDGE: Objection, form.
9       THE WITNESS: I don't recall those
10  discussions.
11  BY MR. LITOW:
12  Q. You never considered not using AWP, is
13  that correct?
14  A. I don't think there were any other
15  pricing targets if you had to, to judge the price
16  with.
17      This may have been part of an evolution,
18  prior to my time in Medicaid, the reimbursement
19  system was a group of pharmacists sitting around
20  with the red book. I don't know if you're
21  familiar with that document?
22  Q. Um-hum.

Page 52

1   A. And they would sit around and reimburse
2   from AWP in the red book. And when the, the State
3   was smaller than 140 pharmacies, this committee
4   met, and they would sit around at a table such as
5   this, and they'd open the red book, and they would
6   reimburse.
7       They would sit with all these claim
8   stacks in front of them and sit there and go
9   (gestures.) That's when the State was very small.
10      And there was a committee of pharmacists
11  that priced their competitors, if you will, and
12  they sat down and used the AWP out of the red
13  book. So the use of AWP was probably an evolution
14  over a period of time.
15  Q. And what was your understanding of how
16  the red book determined the AWP number to be
17  published?
18  A. I have no understanding how they did
19  that.
20      MR. LITOW: I'd like to ask the court
21  reporter to mark as Exhibit MacDonald 002 a
22  document Medicaid Action Transmittal Number 84-12.

Page 53

1       (Exhibit MacDonald 002 was marked
2   for identification.)
3       THE WITNESS: You don't want me to read
4   the whole document, do you?
5       If you do, we'll be here a long time.
6   I'm not a fast reader.
7   BY MR. LITOW:
8   Q. No, just review it.
9       During your time at Medicaid did you
10  review Federal reports discussing Medicaid drug
11  reimbursement?
12  A. I assume that I did, probably part of my
13  work objectives.
14  Q. And do you recall this particular
15  report?
16  A. No.
17  Q. Is this the type of report that the
18  Medicaid program was receiving around that time?
19  A. Oh, I'm sure. Hundreds of them. You
20  know, I, I have no idea how often or how frequent
21  they were, but, you know, this style of document
22  looks familiar to me.

## 54

1  Q. There's no reason to believe that the
2  Medicaid program did not receive this document, is
3  that correct?
4  A. No, I'm sure it did.
5  Q. Okay.
6  A. Whether or not I saw it I can't tell
7  you.
8  Q. Okay.
9  A. And I -- the date is 1984, there would
10 probably be more opportunity for me to see it at
11 that time than there would be even in '86. So I
12 assume I may have seen it.
13 Q. Okay. I'd like to direct your attention
14 to the cover page of the document.
15 A. Um-hum.
16 Q. Next to the word "Attachment" which
17 reads:
18     The attachments provide States with the
19 recent OIG report that considerable savings will
20 accrue to the States and the Government if States
21 will make a greater effort to determine more
22 closely the price pharmacists pay for drugs rather

## 55

1  than using AWP.
2     Do you see that?
3  A. Um-hum.
4  Q. Were you aware that as early as
5  September 1984 that HHS was making the statement
6  that prices pharmacists pay for drugs is not the
7  same as AWP?
8  A. Um-hum.
9  Q. And did the Nevada Medicaid program re-
10 examine its reimbursement rate in light of that?
11 A. I don't know that it did at that time.
12 Obviously not. They're still using AWP in 1988.
13 Q. I'll direct your attention to page 4 of
14 the report itself.
15 A. Um-hum.
16 Q. And particularly the first sentence of
17 the third full paragraph.
18     Do you see that?
19 A. Um-hum.
20 Q. Were you aware that as early as 1984 the
21 Federal government was notifying state Medicaid
22 programs that actual drug purchases were being

## 56

1  made at prices averaging at about 16 percent below
2  AWP?
3     MS. BRECKENRIDGE: I'm sorry. Where are
4  you?
5     MR. LITOW: First sentence of third
6  paragraph.
7     MS. BRECKENRIDGE: Okay.
8  BY MR. LITOW:
9  Q. You can answer the question.
10 A. Go ahead and ask the question again.
11 Q. Sure. Were you aware that the Federal
12 government was notifying state Medicaid programs
13 that drug purchases were being made at prices
14 averaging about 16 percent below AWP?
15 A. That the Federal government was saying
16 that?
17 Q. Yes.
18 A. If I had acknowledged this document and
19 read it, I would be aware that they were saying
20 that.
21     Do I believe everything the OIG puts
22 out?

## 57

1  Q. I don't know.
2  A. Do you want to ask that question?
3     It's, it's difficult to say where they
4  got their information that the prices were 16
5  percent lower, and then in this document they say
6  they were 18 percent below.
7  Q. Right.
8  A. Surprisingly in a very inflationary time
9  it looks like the prices are going down, doesn't
10 it? Interesting. But I have no idea where they
11 got their prices.
12     And keep in mind that geographically,
13 the State of Nevada is a much more expensive place
14 than Alabama or Mississippi. And I don't know if
15 you're familiar with prices today in this country
16 relative to drug purchases, but you'll find a
17 difference if you go to the Midwest and South,
18 Midwest, prices are considerably different than
19 they are on the West Coast.
20     Now how that affects whether or not -- I
21 don't think the pharmacies are specifically
22 getting markups. I would think geographically

**58**

1   maybe at that time, and at this time, wholesalers
2   charge different prices in different areas.
3       And I don't know that this 16 percent
4   reflected what occurred in the Western United
5   States or Nevada in particular.
6       Q. But the Exhibit MacDonald 001, the
7   letter that we --
8       A. Yes.
9       Q. -- we looked at earlier, referred to a,
10  a HCFA Survey Report addressing acquisition costs
11  to Nevada pharmacies, is that correct? If I can
12  refer you to the first paragraph.
13      A. Yes. That's a report they wrote. Yes.
14      Q. Okay.
15      A. I don't know where they got their
16  information.
17      Q. Well, did the Nevada Medicaid program at
18  that time have any better sources of information
19  regarding drug acquisition costs other than
20  Federal reports?
21      A. Not to my knowledge.
22      MR. LITOW: Let's take another quick

**59**

1   break. Thank you.
2       (Whereupon a recess was taken.)
3       MR. LITOW: Back on the record.
4   BY MR. LITOW:
5       Q. You testified earlier, Mr. MacDonald,
6   that you and other employees at Nevada Medicaid
7   joked that AWP was artificial wholesale price, do
8   you recall that?
9       A. I said that we used that term.
10      Q. Okay.
11      A. In a jocular way.
12      Q. Okay.
13      A. Yes, from time to time.
14      Q. Could you be specific about which
15  individuals at Medicaid --
16      A. Well, the pharmaceutical consultant, a
17  man named Steve Bradford at that time. And
18  others. And he may have been the coiner of the
19  phrase at that time for that matter.
20      Q. When you say others, can you be specific
21  about who else?
22      A. I can't be.

**60**

1       Q. You don't recall?
2       A. I don't recall who they may have been.
3   It was just lighthearted remarks.
4       Q. Who was -- you mentioned that Bill Engel
5   was an employee of Medicaid, is that correct?
6       A. Um-hum.
7       Q. What was his job?
8       A. His title might have been chief at that
9   time, chief of Medicaid. I think it might have
10  been.
11      Q. And who was chief of Medicaid before
12  you, if you remember?
13      A. Minor Kelso.
14      Q. Is that M-I-N-O-R?
15      A. Um-hum. K-E-L-S-O.
16      Q. And do you know where he is today?
17      A. If he's still alive he's in Reno,
18  Nevada.
19      Q. Do you know if he's still alive?
20      A. I don't know that.
21      Q. How about Steve Bradford?
22      A. He's passed away.

**61**

1       Q. Okay.
2       A. Four of my administrators, only one's
3   alive yet. I'm outdistancing them all.
4       Q. And who is the one that's alive?
5       A. Sharon Ross-Gold. (Phonetic spelling.)
6   I don't know her -- I think she may have another
7   name now. I don't know.
8       Q. Is she in the Reno area as well to your
9   knowledge?
10      A. She was from Carson City, but I think
11  she may be in San Francisco.
12      Q. And what was her job at Medicaid?
13      A. She was -- no, she was the welfare
14  administrator.
15      Q. Oh, I see.
16      A. She was my boss.
17      Q. And when you became welfare
18  administrator, who took over as chief of Medicaid?
19      A. Deputy administrator.
20      Q. I'm sorry?
21      A. Mr. Engel.
22      Q. Mr. Engel.