**BRECKENRIDGE DECL. EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

IN RE: PHARMACEUTICAL INDUSTRY : MDL DOCKET NO.
AVERAGE WHOLESALE PRICE : CIVIL ACTION
LITIGATION : 01CV12257-PBS
-------------------------------- :
THIS DOCUMENT RELATES TO :
ALL ACTIONS :
- - - - - - - - - - - - - - - - X

Monday, March 6, 2006

Washington, D.C.

Deposition of LAURIE SQUARTSOFF, commencing at 8:07 a.m., held at the offices of Covington & Burling, 1201 Pennsylvania Avenue, N.W., Washington, D.C., before Keith Wilkerson, a notary public in and for the District of Columbia.

budget.
Q. And who set that budget?
A. The legislature. Before the budgets are presented for the state agencies to the legislature, it goes through the internal process, so the pharmacy manager would present the information to the hospital administrator. That information would go to the department of mental health, and then that would be included as part of the budget to the legislature, who would approve the appropriation of funds.
Q. Do you recall whether the Nevada State Hospital got any discounts or cheaper prices for drugs because it was a state entity?
A. The state belongs to the Minnesota cooperative, which is a multistate buying group with Minnesota as the lead state, and the State of Nevada is a participant in that buying group.
Q. And was it a part of that buying group during the 1980s?
A. I believe so.
Q. And so what does that mean? If you're



part of a buying group, does that get you better prices?
A. The collective group would negotiate prices with manufacturers, but I was not involved in that process.
Q. I understand you were not involved in the process of negotiating those prices, but would you have known what the prices ultimately were for each medication?
A. I would have known at the time that the prescriptions were being dispensed, but I don't recall what those amounts were. And in the course of filling a prescription, the price of the medication wasn't something that was regularly thought about.
Q. But you would have had access to the prices of each drug as part of fulfilling your budget. Correct?
A. Yes.
Q. I take it that most of the prescriptions you dispensed in your role as staff pharmacist at the state hospital were self-administered drugs. Is



that correct?
A. Yes.
Q. Did you also have to deal with physician administered drugs at that time?
A. There were medications that were on the units that were either administered by nurses or perhaps by a physician, yes.
Q. And did your job differ in any way in connection with acquiring those physician administered drugs?
A. No.
Q. Let's move now to your next position which, as I understand it, you were a pharmacy consultant for Nevada Medicaid. Is that correct?
A. That's correct.
Q. And for how long did you hold that position?
A. From 1989 until the year 2000 or 1999.
Q. Just so I'm clear of the timing, from 1986 to 1989, that's when you worked at the state hospital. Correct?
A. Yes, and there was a time between '86 and



'89 when I worked part time in the morning at the state hospital and part time in the afternoon at Nevada Medicaid. I'm not certain on the time frame, but there was a time when I worked in the mornings at the hospital, drove to Carson City on my lunch and worked in Carson City after lunch. Then my position in Carson City gradually increased to three-quarter time and ultimately became a full time position.
Q. For how long generally was your pharmacy consultant position a three-quarter position?
A. Many months.
Q. And when it was a three-quarter position were you also employed at the state hospital?
A. No.
Q. Just so I get this straight, it sounds like from 1986 to 1989 you were am employed at the state hospital, but that during much of that time you also worked part time at Nevada Medicaid. Is that right?
A. Between '86 and '89 I worked at the state hospital. Then there was a period when I worked at

94

the welfare board for public comment and then would have been modified by the programmers who would make those computer changes. Providers would be notified with a bulletin of the rate change and the new rate when it was adopted.

Q. Would the providers be given an opportunity to comment on a proposed new dispensing fee, or is it kind of just enacted?

A. There may have been times when it was just included as part of the budget that may have had a rate increase, and how that notification was given to providers, I believe, would have been standardized, but I don't recall if there was an additional time period for public comment. In general, most often there may have been, if memory serves me correctly.

Q. Who were the key decision-makers in deciding whether to amend the dispensing fee?

A. They would have been the director, the deputy director. I think those would be the key people who would be involved. Perhaps someone from the rate unit may be involved in that process.

95

Q. Would they receive input from the legislature or the legislative staff?

A. I don't know.

Q. Would they receive input from the governor's office or the governor's staff?

A. I don't know.

Q. Would they receive pressure from providers or pharmacies who want the dispensing fee to be increased?

MS. BRECKENRIDGE: Objection.

A. They may have had conversations with providers about reimbursement rates, but what they were individually, I don't recall.

Q. In general, what considerations go into determining the appropriate dispensing fee?

MS. BRECKENRIDGE: Objection.

A. The original report that was done that to the best of my knowledge was just giving percentage increases was a study that was done by Myers and Stauffer, and I don't recall when that study was done. It was an older report. Based on that original analysis, that was the starting point for

96

the dispensing fees. When I was in the position as a pharmacy consultant, it was just a percentage increase to whatever the previous dispensing fee had been.

Q. Did budgetary concerns come into play when deciding to increase a dispensing fee?

A. Yes.

Q. How so?

A. Well, if there was money in the budget for an increase for providers, then that was up for discussion on how much those rate increases would be, but if the budget didn't allow for any increases in the dollars available to the agency, there were times when there weren't rate increases. They didn't happen automatically.

Q. Concerns about pharmacy access, was that part of the equation as well?

A. Not that I recall.

Q. Let me put it another way. Was one of the reasons that Nevada Medicaid would increase the dispensing fee to ensure that the pharmacies in the program were adequately compensated for the costs of

97

dispensing the medication?

A. Generally the rate increases were across the board for all providers, so it was for physicians and pharmacists and dentists, and all the outpatient services would have those rate increases generally at the same time.

Q. But part of the reason for those increases was to keep those providers happy. Wouldn't that be true?

MS. BRECKENRIDGE: Objection.

A. I don't know if there was happiness involved in the definition of the reimbursement. It was important to help keep reimbursement along with inflation, the costs of doing business, and so those to the best of my knowledge were considered when rate increases were discussed.

Q. And you said it was important. Why was it important to keep reimbursement along with inflation and cost increases?

A. Well, while I don't recall having conversations about losing providers, it was important to maintain providers.

114

A. That would have been the Minnesota Multistate Buying Group.
Q. And what was the nature of those discussions?
A. Well, there were conversations about ways to save costs, and an idea that was talked about included utilizing the state pharmacies to dispense medications to the Medicaid recipients. That was a long time ago.
Q. This idea about using the Minnesota state buying cooperative, this idea was a long time ago? I'm not sure I understand.
A. I don't remember exactly when I had that conversation with April, but it would have been a long time ago.
Q. In the early 1990s or --
A. It could have been.
Q. And I guess I'm not completely clear. Maybe you could tell me again. What was the idea that you were discussing? What was the proposal on the table?
MS. BRECKENRIDGE: Objection.

115

A. If memory serves me correctly, the conversation would have been to look at the possibility of utilizing those state pharmacies for dispensing prescriptions.
Q. And why would that save costs, to utilize the state pharmacies for dispensing prescriptions to Medicaid recipients?
A. Well, the buying power with the Minnesota multistate would have been expanded and would have allowed -- it would just have expanded the pool of patients that would be covered under that buying group.
Q. And why would that have made a difference, to expand the pool of buyers?
A. If the contracted price with the Minnesota Multistate was sufficient, there may have been a savings to the state on the medications.
Q. It would cost less to acquire the drugs?
A. Correct.
Q. But I take it this idea was not accepted. Correct?
A. Correct.

116

Q. And why not?
A. I don't recall exactly, but it may likely have been due to resources within the state hospital, they only had a few pharmacists, and the restrictions from the buying group on who the participating pharmacies could be.
Q. Did you ever speak about prescription drug purchasing or reimbursement with anyone at Corrections during your time at Nevada Medicaid?
A. I may have. I don't recall any direct conversations with anyone at Corrections. It would have been with Elliott King, who was the director of pharmacy.
Q. Did you have discussions with Elliott King about prescription drug purchasing generally, even if that's outside of your specific tasks at Nevada Medicaid?
A. I don't recall that. I was only at Corrections maybe twice in the pharmacy ever, so I don't recall the particulars of those conversations and whether they specifically talked about the cost of medications.

117

Q. How about with the state hospital? If I remember your testimony correctly, at least for a time you were the pharmacist at the state hospital.
A. Correct.
Q. I don't know if you had a conversation with yourself or not on this, but after you left the state hospital did you have any conversations with the next pharmacist at the state hospital about drug reimbursement or acquisition issues?
A. I may have. The pharmacist who was there at the same time I was there, so there was more than one pharmacist, just for point of clarification, his name is John Warren, and I may have had conversations with him about the cost of prescriptions. It wouldn't be extraordinary in the course of pharmacy to have those kinds of conversations, but I can't pinpoint a date and a time and what the content of that conversation may have been.
Q. You mentioned John Warren. Is he still employed at the state hospital?
A. No.

option?
A. I don't recall if there were conversations specifically about another option other than AWP prior to the year 2000 that I would have been involved with at Nevada Medicaid.
MR. DOVE: I think now is as good a time to stop as any.
MR. DAVIS: Before we go off the record, Ms. Squartsoff has got to leave no later than 3:30 to make her flight. You might want to confer with the people on the phone or Ms. Breckenridge just to make sure that if anybody else has questions we'll get enough time, because we're not going to bring her back another time. Can we agree on a --
MR. DOVE: I'm comfortable with taking --
MR. DAVIS: We can go off the record now.
(Lunch recess.)
MR. DOVE: I'd like to mark as Exhibit Squartsoff 005 a document from the Department of Health and Human Services dated May 31st, 1996 attaching an Office of Inspector General report entitled Review of Pharmacy Acquisition Costs for



Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services.
(Exhibit Squartsoff 005 was marked for identification.)
BY MR. DOVE:
Q. Ms. Squartsoff, if you could take a look at this document and tell me if you recall having seen it before.
A. I may have seen this report before, yes.
Q. If I could direct your attention to the cover memo of this document, the third paragraph, the third sentence, where it states: The overall estimate of the extent that AWP exceeded pharmacy purchase invoice prices was 17.5 percent for brand name drugs and 41.4 percent for generic drugs. The national estimates are 18.3 and 42.5 percent respectively.
Do you see that?
A. Yes.
Q. And if you could then turn with me to page six of the underlying OIG report entitled



Conclusions and Recommendations, in particular the first two sentences, which state: Based on our review, we have determined there is a significant difference between AWP and pharmacy acquisition costs. The difference between AWP and pharmacy acquisition costs is significantly greater for generic drugs than for brand name drugs.
Do you see that?
A. Yes.
Q. Were you aware at your tenure at Nevada Medicaid that there was a significant difference between AWP and pharmacy acquisition costs?
A. I knew there was a difference. I don't know that I would necessarily characterize it as a significant difference.
Q. Were you aware during your time at Nevada Medicaid that the difference between AWP and pharmacy acquisition cost is significantly greater for generic drugs than for brand name drugs?
MS. BRECKENRIDGE: Objection.
A. There's a difference, yes.
Q. Would you agree that at least as of the



time of this report in 1996 that you would -- that the state would have been aware that there was a significant difference between AWP and pharmacy acquisition costs as stated in this report?
A. Well, not knowing who you're including in the definition of state, I'm not certain that they would have known that there were differences, but if you're asking did I know that there were differences as the pharmacy consultant for Nevada Medicaid, the answer is yes. I don't know who else you're including in the definition of state, so I don't know what the answer is.
Q. Let me stick with your knowledge for the moment. Would you agree that at least as of the time of this report in 1996 that you were aware of the conclusion of this report, that there was a significant difference between AWP and pharmacy acquisition costs?
MS. BRECKENRIDGE: Objection. This report for California? Are you then talking about California price? That's what this report's about. Right?

126

THE WITNESS: Yes.
Q. If you could elaborate on your answer.
MR. DOVE: Yes, this report is about California, but this witness testified that she reviewed this report, and so I'm trying to get a sense of what her understanding is based on that.
MS. BRECKENRIDGE: Just to clarify, objection, then. I'm objecting to this witness's foundation to testify about a report that deals with California prices, because that's not involved in the case and there's been no demonstration that she has a foundation to testify about a report that draws conclusions and recommendations regarding California prices. That's a foundational objection.
Q. You may have lost the question.
A. Did you want to explain something?
MR. DAVIS: I have a question also. Is it true this is just California, because it says they looked at ten or 11 states?
MR. DOVE: What page are you referring to, counsel?
MR. DAVIS: I'm just reading throughout

127

the document. It does have California data, but I'm looking at the summary on little i, and it says, the second paragraph, to accomplish our objective we selected a random sample of 11 states. You guys know this document better than me. I don't know if it's true it's just California, but I don't know.
Q. Let me back up and ask it this way so as not to confuse the record. You testified earlier about reviewing documents regarding drug reimbursement issues. Isn't that correct?
A. Yes.
Q. And would it be fair to say that you reviewed documents not just about Nevada's drug reimbursement system but about drug reimbursement issues from other states. Correct?
A. Yes.
Q. And why would a person in your position want to do that, review documents from other states?
A. To see if you were managing your program in a manner comparable to other states.
Q. So you would agree, would you not, that conclusions and recommendations reached in a report

128

regarding other states might very well be equally applicable to the State of Nevada. Correct?
A. I think that you can say that they draw the conclusions for that particular state, and then you need to make the comparison between that state and your state, for example whether or not the state is primarily urban or if it's rural, how many recipients you have, what the nature of your patient population is, but you can certainly use that as part of the consideration when looking at the comparisons between different programs.
Q. Going back to my original question, and I'm really not tying it to this report, but just more generally, were you aware of, at least as of the time of this report in 1996, that there was a significant difference between AWP and pharmacy acquisition costs?
MS. BRECKENRIDGE: Objection.
A. I can tell you that there are differences between AWP and pharmacy acquisition costs, but whether or not they were significant, if you need to put a number to that, which I think would be helpful

129

for clarification purposes, but there are differences. Whether they were significant or not would depend on whether or not it was a brand name product or a generic product and which generic product it might be, because there are variations obviously within those different products.
Q. So you would agree that -- well, let's take that point. You would agree that the spreads for generic drugs, there were differences among the generic drugs. Is that correct?
A. For average wholesale price, yes, and for acquisition cost, yes.
Q. And to try to put a number on it, would you agree, again looking at the cover page of this report as a reference, that at least as of 1996 that there was a difference between AWP and pharmacy acquisition costs ranging from 17.5 percent for brand name drugs and 41.4 percent for generic drugs and that there were national estimates of 18.3 percent for brand name drugs and 42.5 percent for generic drugs?
MS. BRECKENRIDGE: Objection.

do more of an inquiry to find out if there's an attorney-client privilege.

Q. Could you tell me more, not getting into the subject matter of what you actually spoke with with Mr. Terry, but could you describe your understanding of the nature of those conversations? Was it as a result of your relationship as attorney-client or was it some other relationship?

A. It would have always been under that relationship, because he was the attorney general assigned to the Medicaid Fraud Control Unit.

MR. DOVE: Ms. Breckenridge, I'm assuming you're directing the witness not to answer the question?

MS. BRECKENRIDGE: I'm not going to direct the witness, because I'm going to ask you as lawyer to lawyer, since she has basically demonstrated an attorney-client relationship, I would ask you not to inquire further. I would not presume to instruct, but yes, we presume there is a privilege.

Q. While you were at Nevada Medicaid, Ms. Squartsoff, were evaluations or audits of the



Medicaid program performed that related to prescription drugs in any way?

A. Could you clarify your question for me? Any audits?

Q. Yes, any audits.

A. If there were any audits done, they would have been done either by the business side of Medicaid or by the surveillance and utilization review section of Medicaid.

Q. And so you weren't personally aware of any evaluations or audits of the Medicare program that related to prescription drugs. Is that correct?

A. I don't recall any audits. Well, let me stand corrected. There was one, and it was done by an auditor from Region 9, who did an audit of the rebate program, and that would have been in 1991, I believe.

Q. Do you recall what the conclusions of that audit were?

A. I believe there were several things contained in that audit. It wasn't just related to the rebate program. It's my recollection that it



included a recommendation to increase the number of staff dedicated to the rebate program and to look at a system for tracking the invoices for the rebate program.

Q. And as a result of that audit, did Nevada indeed increase the number of staff dealing with the rebate program?

A. Yes.

Q. And did Nevada Medicaid implement the system for tracking invoices that was suggested?

A. The answer to getting the employees is yes. The answer to implementing the new software system for tracking the invoices, to the best of my knowledge, until I left they were still working on a system that was burdensome, so how it was tracked on the accounting side, there are people in accounting who could better answer that. That was up to the accountants. It was my job to make sure that the invoices were generated and sent out, adjudicated appropriately, and that the funds went to the accounting department. How all that was tracked, someone from accounting will have to answer that



question for you.

Q. You said the system was burdensome. In what way was it burdensome?

A. It wasn't easy to keep track of the information, which is my understanding from the people in the accounting department.

Q. Ms. Squartsoff, have you heard of the term EAC or estimated acquisition cost before?

A. Yes.

Q. What is EAC?

A. EAC is an estimated acquisition cost. In the case of Nevada Medicaid, EAC was defined as average wholesale price minus ten percent.

Q. And was that formula the same whether the drugs were purchased at a pharmacy or administered in a physician's office?

A. I don't know that they had a definition of EAC for physician administered meds. I can only address that I do know that EAC is defined as AWP minus ten percent.

Q. Do you know who the key decision-makers were for determining how Nevada calculated the EAC?