**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| *State of Nevada v. American Home Products, et al.,* CA No. 02-CV-12086-PBS (Nevada II) | |

**DECLARATION OF CHARLES DUARTE IN SUPPORT OF STATE OF NEVADA'S**
**OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

I, Charles Duarte, under the penalty of perjury, hereby declare as follows:

1.      I am over the age of 18 years and I am otherwise competent to make this

statement.  This statement is based on my personal knowledge.

**A.      EDUCATIONAL AND PROFESSIONAL BACKGROUND**

2.      I am currently serving as Administrator of the Division of Health Care Financing

and Policy (DHCFP) of the State of Nevada ("State").  I have held the position since 2000.

DHCFP is also known as Nevada Medicaid.  I will use the term "Nevada Medicaid" in this

declaration.  My title means that I am the director of Nevada Medicaid.

3.      Prior to my current position, I served as Administrator for the State of Hawaii

Medicaid program.  I held this position from 1997 to 2000.  Hawaii Medicaid is known as Med-

quest.

4.      In my capacity as the Medicaid Administrator for Nevada, I indirectly supervise

the pharmacy program.  By this I mean that I work closely with the chief of the pharmacy

- 1 -

program, Coleen Lawrence, although she technically reports to my Deputy Administrator, Mary Wherry.

5.      I hold a Bachelor of Science Degree in Medical Technology, Clinical Laboratory Science from the University of Hawaii.  I have a Masters Degree in Business Administration from the University of Hawaii.

6.      Between college and taking the Hawaii Medicaid Administrator position, I held a number of positions.  I worked as a clinical laboratory scientist.  I worked for Blue Cross Blue Shield, also known as Hawaii Medical Services Association, and was the director of a medical resident teaching clinic.  I also served as the executive director of the Kalihi-Palama Health Center.

## B.      INVOLVEMENT IN THIS LAWSUIT

7.      I have given depositions in this case on numerous occasions.  On November 15 and 16, 2005, I gave testimony as the State's Fed. R. Civ. P. 30(b)(6) designee.  On March 22 and 23, 2006, I gave testimony in my individual capacity.  On January 10, 2007, I also gave testimony in my individual capacity.

8.      I also assisted in preparing the State's answers to interrogatories and requests for production.

## C.      NEVADA SPECIFIC MEDICAID HISTORY

9.      Nevada has one of the smallest populations of the fifty states and its Medicaid program reflects its population.

10.      Nevada Medicaid is a relatively small program by national Medicaid standards.

11.      This small size is reflected in the program's staffing.  Nevada Medicaid has always been leanly staffed.

12.     The pharmacy program of the Nevada program is significant.  Yet, at most relevant times, the pharmacy program was in the hands of one staff member for self-administered drugs and one staff member for physician-administered drugs.

13.     The Nevada Medicaid program is subject to chronic pressure between the demand for services and a limited budget.

14.     After September 11, 2001, this demand became particularly great when the nation's economy faltered and resulted in an increased demand for Medicaid benefits.  The problem was particularly acute in Nevada because of the State's dependence on the recreation and gaming industries.

15.     In Nevada, as in other states, the escalating demands included an increase in the demand for pharmacy services.  At the same time, Nevada Medicaid experienced downward pressure on the state component of its budget.  Staffing did not increase.

D.      THE STATE OF NEVADA'S UNDERSTANDING AND USE OF AWP

16.     I first heard the term "Average Wholesale Price" or AWP early in my career as a basis for reimbursement.  At the time, I did not work for any Medicaid program.  I became more familiar with the term when I became involved in administering state Medicaid programs.

17.     My original understanding was that AWP represented a mathematical determination of the actual wholesale prices for drugs.  I understood that AWP was provided by the drug manufacturers for use by governments and other payors as a basis for reimbursement.  I believed that AWP was directly related to the prices that providers paid to acquire the drugs. Based on my experiences, I do not think that mine was an uncommon interpretation of the term.

18.     One or two years into my first Medicaid Administrator position I came to the conclusion that AWP was not necessarily a mathematical calculation, but I did still believe that it

001534-13  158832 V1

represented a meaningful benchmark – a benchmark that bore a direct and reasonable

relationship to the actual acquisition costs to pharmacies, physicians and other providers.

19.     During my tenure, Nevada Medicaid expected the same – that AWP bore a direct

and reasonable relationship to the actual acquisition costs to pharmacies, physicians and other

providers.  I have never heard – nor do I have any reason to believe – that Nevada Medicaid held

a different expectation prior to my tenure.

20.     Neither my interpretation nor the State's expectation changed until after this

lawsuit was brought.

21.     Based on the expectation that AWP had a reasonable relationship to actual

provider acquisition costs, the State felt confident relying on AWPs provided by drug

manufacturers to determine the Estimated Acquisition Cost (EAC), as required by federal

regulations and Nevada's reimbursement methodology, set forth in Chapter 1200 of the State's

Medicaid Services Manual.

22.     Nevada has a formula for determining the EAC.  Up until 2002, that formula was

AWP - 10%.  In 2002, the reimbursement formula changed to AWP - 15%.  In both cases, the

discount off of AWP was designed to approximate providers' actual acquisition costs – or EAC –

as required by the regulations.  Nevada Medicaid thought that by taking a discount of 15% off of

AWP, we were accurately approximating the EAC.

23.     I do not know how the State's – or, for that matter, any state's – use of AWP got

started, as that was before my tenure with any Medicaid program.  I do know why the Nevada

used AWP, however, and why we continued to use AWP as a component of our reimbursement

methodology.  The State used AWP because it was the standard price mechanism out there –

provided by the drug manufacturers, made available to the states, nationally supported, updated

- 4 -

regularly and available for all drugs rather than just a handful.  In short, we used AWP because there was no other readily-available pricing data, it was administratively convenient, the numbers were updated on a regular basis (multiple times a month, I believe) and AWP was supported by the industry.  In this, Nevada Medicaid was not alone.  The vast majority of other state Medicaid agencies in the country, use AWP as a surrogate for acquisition cost.

24.     The State also used AWP because it provided an automatic update to our Medicaid drug reimbursement rate without administrative intervention.  In other words, Nevada Medicaid understood that pharmaceutical prices could change quickly due to changes in market conditions.  We believed that an AWP provided and updated by the drug manufacturers would be responsive to these changes.

25.     I realized that AWP did not equal acquisition cost.  That is why Nevada – and Hawaii – set its EAC as a discount off of AWP.

26.     As a result of this lawsuit and other information that has been developed since its filing, I have learned that the AWPs used by the State of Nevada were inflated.  It is my opinion that if accurate AWPs were provided by Defendants, the State would have paid less for its reimbursement of prescription drugs than it did using the inflated AWPs provided.

27.     Each time an inflated AWP was provided to the State, it was the equivalent of providing false data to Medicaid for purposes of making a claim.

E.     **THE ROLE OF ACCESS TO CARE IN SETTING REIMBURSEMENT METHODOLOGY**

28.     I understand that Defendants have focused on the role that access to care and pharmacy profit played in the setting of the State's reimbursement methodology.  It is true that every state Medicaid agency is responsible for making every effort to assure that the state's residents have access to care.  Pharmacy revenue is one consideration related to access to care.

001534-13  158832 V1

Nevada was no different.  It is not true, however, that Nevada Medicaid allowed access to care or pharmacy revenue to interfere with our obligation under federal regulations and our own State policy to set a reimbursement methodology that Nevada Medicaid believes approximates EAC through the use of AWP as a component of the reimbursement methodology.  In fact, I am not aware of any pharmacy access to care issues that have arisen during my tenure.

29.      At all times, it was Nevada Medicaid's objective to approximate EAC as accurately as possible and to limit the State's drug expenditures.

**F.      NEVADA MEDICAID KNOWLEDGE OF SPECIFIC SPREADS**

30.      Neither I nor any other Medicaid personnel had knowledge of the spreads for specific drugs that have become apparent as a result of this lawsuit.

31.      As an initial matter, "spread" is not a term used by me or others reporting to me in the course of our Medicaid duties.

32.      I recall and acknowledged (in my deposition testimony) receiving some OIG and other federal reports related to Medicaid and Medicare prescription drug pricing.  There was nothing in the reports that suggested to me or to others that the problems identified went beyond the drugs the report identified.  In other words, there was nothing in the reports that suggested to me or others within Nevada Medicaid that the problems went beyond the drugs identified.

33.      There was also nothing in the OIG and other federal reports that suggested the magnitude of spreads that were eventually revealed as a result of this lawsuit and other investigations.  *I had no idea.*

34.      I gave deposition testimony consistent with this view.  When defense counsel asked me whether I "would agree that by early 2000, the State was aware that in many instances, there were large spreads between AWP and actual acquisitions costs."  Duarte Dep. Vol. 2 at 87:4-6.  I responded that I did *not* know what the spreads were for all products, that the products

- 6 -

reflected in the document he showed me were Bayer products.  *Id.* at 87:8-13.  Of course, this was just before or during my earliest days with Nevada Medicaid.  The point is that there was nothing available at that time to put me or Nevada Medicaid or Hawaii Medicaid on notice of the systemic problems and truly gross spreads for drugs that were later revealed.

35.     I also testified that "I would qualify that I don't know if we were aware of the actual spreads between actual acquisition costs and AWP for all subject drugs.  But in general terms, we were aware that there were differences between actual acquisition costs and average wholesale price, which prompted us to take some actions with respect reducing the discount from AWP."  *Id.* at 91:7-15.  When we became aware of discrepancies between acquisition costs and AWPs, we tried to address them.

36.     This testimony is very different from Defendants' suggestion that the State had notice of systemic problems and gross differences between AWP and acquisition costs for all Subject Drugs in the Amended Complaint.  Defendants' suggestion is simply not true.

## 1.     Specific Spreads For Subject Drugs

37.     I have been provided with a copy of a table comprised of "spreads" for Dey drugs which are Subject Drugs in this litigation.  A copy of that table is attached to this Declaration as Exhibit A.  It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  It has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I reviewed the data contained in the document carefully. The spreads varied from a low of 44.1% to a high of 17871.7%.  I had never before seen this information.  I had *never* been aware that spreads of this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on

001534-13  158832 V1

notice of spreads at this level.  I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

38.     I was also provided with a document showing spreads for AstraZeneca.  It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  A copy of that table is attached to this Declaration as Exhibit B.  Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I reviewed the data contained in the document carefully.  The spreads varied from a low of 250.89% to a high of 169.31%.  My reaction to these spreads was identical to my reaction to the Dey spreads.  I had never before seen this information.  I had *never* been aware that spreads of this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on notice of spreads at this level.  I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

39.     I was also provided with a document showing spreads for Bristol-Myers Squibb. It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  A copy of that table is attached to this Declaration as Exhibit C.  Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I reviewed the data contained in the document carefully.  The spreads varied from a low of 1.8% to a high of 6621.9%.  My reaction to these spreads was identical to my reaction to the Dey

001534-13  158832 V1

spreads.  I had never before seen this information.  I had *never* been aware that spreads of this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on notice of spreads at this level.  I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

40.     I was also provided with a document showing spreads for Johnson & Johnson.  It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  A copy of that table is attached to this Declaration as Exhibit D.  Again, It has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I reviewed the data contained in the document carefully.  The spreads varied from a low of 17.6% to a high of 31.9%.  My reaction to these spreads was identical to my reaction to the Dey spreads.  I had never before seen this information.  I had *never* been aware that spreads of this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on notice of spreads at this level.  I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

41.     I was also provided with a document showing spreads for Schering-Plough.  It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  A copy of that table is attached to this Declaration as Exhibit E.  Again, it has been explained to me that the term "spread" as used in this context means the difference between the

001534-13  158832 V1

actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I

reviewed the data contained in the document carefully.  The spreads varied from a low of 12.3%

to a high of 1052.8%.  My reaction to these spreads was identical to my reaction to the Dey

spreads.  I had never before seen this information.  I had *never* been aware that spreads of this

magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in

anything I had ever read that put me on notice of spreads at this level.  I told counsel that there

was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed

for drugs.

        42.      I was also provided with a document showing spreads for Aventis.  It is my

understanding that these spreads have been calculated by Ray Hartman, the State's expert

witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the

MDL trial.  A copy of that table is attached to this Declaration as Exhibit F.  Again, it has been

explained to me that the term "spread" as used in this context means the difference between the

actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I

reviewed the data contained in the document carefully.  The spreads varied from a low of 22.4%

to a high of 137.2%.  My reaction to these spreads was identical to my reaction to the Dey and

other spreads.  I had never before seen this information.  I had *never* been aware that spreads of

this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or

in anything I had ever read that put me on notice of spreads at this level.  I told counsel that there

was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed

for drugs.

        43.      I was also provided with a document showing spreads for Immunex.  It is my

understanding that these spreads have been calculated by Ray Hartman, the State's expert

001534-13  158832 V1

witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  A copy of that table is attached to this Declaration as Exhibit G.  Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I reviewed the data contained in the document carefully.  The spreads varied from a low of 0% to a high of 1666.4%.  My reaction to these spreads was identical to my reaction to the Dey and other spreads.  I had never before seen this information.  I had *never* been aware that spreads of this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on notice of spreads at this level.  I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs.

44.     I was also provided with a document showing spreads for Pfizer.  It is my understanding that these spreads have been calculated by Ray Hartman, the State's expert witness and were provided as an exhibit to Direct Testimony of Raymond S. Hartman in the MDL trial.  A copy of that table is attached to this Declaration as Exhibit H.  Again, it has been explained to me that the term "spread" as used in this context means the difference between the actual acquisition cost for a particular drug at a given time and the AWP at the same time.  I reviewed the data contained in the document carefully.  The spreads varied from a low of 1% to a high of 2144.4%.  My reaction to these spreads was identical to my reaction to the Dey and other spreads.  I had never before seen this information.  I had *never* been aware that spreads of this magnitude existed.  There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on notice of spreads at this level.  I told counsel that there

001534-13  158832 V1

was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed

for drugs.

### 2. The State's Knowledge of Drug Manufacturers' Use of The Spread As A Marketing Tool

45. Defendants also did not ask me in any of my depositions what my knowledge was

of their efforts to market the spreads between actual acquisition costs and AWPs to providers. If

they had asked, I would have told them that I did not have any knowledge of any instances of

such practices. I did not learn about such practices by drug manufacturers until this lawsuit was

brought. I have never heard that any Nevada Medicaid personnel had knowledge of such

practices.

### 3. The State's Use of the Spread

46. I understand that Defendants have alleged the State used the spreads to create an

"economic incentive" for providers to participate in the State Medicaid program. This never

happened. The State never knowingly used the spread. The State could not have done so. As

discussed above, Nevada Medicaid was not aware of the breadth of the spreads. Moreover, even

if we had been – we were under an obligation to estimate EAC as accurately as possible and we

are always stewards of the taxpayers' money.

47. It would not have made any sense for us to intentionally overpay providers using

taxpayer money when already we were under pressure to provide more benefits and reduce the

budget.

48. When I finally saw the spreadsheets described above, I told the lawyer that

showed them to me that I could kick myself. I had no idea that these were the spreads across the

board. *Again, I had no idea*.

- 12 -

## G.   COMMUNICATIONS WITH NON-MEDICAID ENTITIES

49.     I understand that one of the allegations that Defendants make in this case is that Nevada Medicaid personnel should have been aware that AWPs were inflated because, among other reasons, Nevada purchased drugs for use in state hospitals and certain non-Medicaid State programs reportedly paid less than Medicaid for drugs.

50.     I do not know how entities other than Nevada Medicaid purchase or reimburse for drugs.  Therefore I cannot address Defendants' specific points about how other entities' reimbursement rates or purchasing practices.  That is why I say above that "and certain non-Medicaid State programs reportedly paid less than Medicaid for drugs."  I just cannot say if that is true or not.

51.     I can say that Defendants' argument reflects a fundamental misunderstanding of how State Medicaid programs generally operate and how Nevada's Medicaid program in particular operates.

52.     State Medicaid programs are subject to regulation by the federal government, specifically by CMS and previously HCFA.  The web of regulations governing Medicaid is complex and unique to Medicaid.  I would imagine that the same could be said of the other programs that Defendants' reference, but I do not know.

53.     In comparing the drug reimbursement practices of Medicaid to those of other state entities, Defendants compare an apple to oranges.  I know for a fact that many options that are available to pharmacy programs outside of Medicaid are not available to Medicaid.  I can give two examples of that.

54.     First, I understand that Defendants insinuate that Nevada Medicaid should have used the Minnesota Multi-State Contracting Alliance for Pharmacy (MMCAP) to purchase drugs.  MMCAP is a multi-state purchasing pool for entities that purchase drugs to provide to

- 13 -

their beneficiaries.  MMCAP is a *purchasing alliance* only.  Nevada Medicaid does not purchase

drugs.

55.     Defendants state that Nevada Medicaid considered joining MMCAP at some

point.  If so, this was before my tenure.  I do not know how seriously Nevada considered this

option or if it was even realistic.  I do know that this would have been an extreme departure from

the way in which Nevada and nearly every other state handles their Medicaid pharmacy

programs.  Nevada Medicaid would have had to make the radical change from a drug

reimbursement system to a drug purchase system.  I also understand that Defendants have

submitted absolutely no evidence of how consideration of such a plan gave the State notice of the

spreads between actual acquisition costs and AWPs.

56.     As a second example, I was involved in investigating Nevada Medicaid's use of a

Pharmacy Benefit Manager (PBM).  I submitted the idea to CMS for approval.  Although I

investigated this possibility personally, nothing involved in the investigation gave me notice of

the gross spreads between AWP and actual acquisition costs that I have since learned exist.

57.     Nevada has no formal procedure in place for communicating among entities

purchasing and reimbursing for drugs.  As I testified repeatedly, I did not know the rates at

which non-Medicaid entities in Nevada were purchasing or reimbursing drugs because we did

not get together to discuss prescription drug issues.  This is true for others within Nevada

Medicaid as well.

## H.     NEVADA MEDICAID'S CONTINUED USE OF AWP

58.     Nevada Medicaid continues to use AWP as a basis of reimbursement today.  I

understand that the drug manufacturers criticize this fact.  The manufacturers' criticism ignores

the numerous good reasons why we continue to use AWP.  The manufacturers themselves know

why we do so.  The number one reason is that to this day the drug manufacturers provide no

001534-13 158832 V1

other readily-available and regularly-updated  data.  In my depositions, I repeatedly referred to

drug manufacturer pricing as a "black box."  By this I meant that actual prices are the closely-

guarded province of the manufacturers themselves.  It is my understanding that *no one* gets those

prices.  I have been told this by a pharmacy industry representative.  Drug manufacturers

consider drug pricing proprietary and only share the prices at the highest levels of the company.

59.     Our drug reimbursement system is based on AWP.  We cannot easily change that.

We are reliant on pricing data provided by First DataBank.  That data is still AWP.

60.     I understand that California went to an Average Sales Price system.  California

collects the ASPs itself and uses them in the state's Medicaid system.  Nevada Medicaid is a

small program.  At most, at any given time, we have two employees in our pharmacy program.

We could not afford to provide a pharmacy benefit – which is a non-mandatory benefit – if we

had to implement a system like California's.  It would be fiscally and physically impossible.

61.     Under my guidance, the Nevada Medicaid pharmacy program has never wavered

from its goal of providing benefits to qualified Nevada citizens at the lowest price possible.

I swear under the penalty of perjury under the laws of the State of Nevada and the United

States of America that the foregoing is true and correct.


                                                    /s/  Charles Duarte
                                                    Charles Duarte

  March 22, 2007, Carson City, Nevada
        Date and Place of Execution

001534-13  158832 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF CHARLES DUARTE IN SUPPORT OF THE STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 22, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.


By        **/s/ Steve W. Berman**
   Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

001534-13 158832 V1