UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION. 01-CV-12257-PBS |
| *State of Nevada v. American Home Products, et al.,* CA No. 02-CV-12086-PBS (Nevada II) | Judge Patti B. Saris |

**DECLARATION OF COLEEN LAWRENCE IN SUPPORT OF STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

I, Coleen Lawrence, under the penalty of perjury, hereby declare as follows:

1.      I am above the age of 18 years and I am otherwise competent to make this statement. This statement is based on my personal knowledge.

**A.      EDUCATIONAL AND PROFESSIONAL BACKGROUND**

2.      I hold a bachelor's degree in health care administration from the University of Nevada, Las Vegas.

3.      I am currently serving as Chief Program Services for the Division of Health Care Finance and Policy ("DHCFP"), also known as Nevada Medicaid. I have been employed by the State of Nevada since 2001. I have held the position of Chief or Acting Chief since I was hired. I report to Mary Wherry, the deputy administrator for DHCFP. Ms. Wherry reports to Chuck Duarte, DHCFP Administrator.

4.      My job responsibilities include oversight of the medical coverage policies and programs for Nevada Medicaid for multiple providers. The providers include physicians,

hospitals, pharmacies, durable medical equipment, outpatient providers, radiology, lab, therapists, and behavioral health.

5.      My job functions include responsibility for Nevada Medicaid's pharmacy medical coverage policies, both self-administered drugs and physician-administered drugs. In this capacity, I have responsibility for the State Plan Amendments related to pharmacy. I describe this responsibility below.

**B.      INVOLVEMENT IN THIS LAWSUIT**

6.      I have given depositions in this case on numerous occasions. On August 15 and 16, 2005, I gave testimony as the State's Fed. R. Civ. P. 30(b)(6) designee. On March 23, 2006, I gave testimony in my individual capacity. On January 9, 2007, I also gave testimony in my individual capacity.

7.      I have been involved in the search for and production of relevant documents.

8.      I also assisted in preparing the State's answers to Defendants' interrogatories and requests for production.

**C.      SETTING NEVADA MEDICAID'S REIMBURSEMENT METHODOLOGY**

9.      Nevada Medicaid sets the reimbursement methodology to be used for its pharmacy program through a process that is used for any change to the State Plan for Medicaid. It involves both interaction between Nevada Medicaid and the federal government and Nevada Medicaid and the public. When the change affects the Medicaid pharmacy program, I am involved in the process. The process I describe here is as I understand it from being involved in changes to the pharmacy program.

10.     First, Nevada Medicaid makes the policy decision that a change to the pharmacy program is necessary. Once a policy change is decided on, federal regulations require Medicaid to submit a State Plan Amendment to CMS and the public. We draft language. We contact

interested parties and set up public workshops to educate the public and to seek comment. Examples of parties that might be interested in changes to the pharmacy program might be the National Association of Chain Drug Stores or the Retail Association of Nevada.

11.     We then submit draft language to CMS informally for comment and concerns. We accept the CMS comment and concerns, if any, and address them prior to publishing the State Plan Amendment. This takes place prior to any publication or public hearing.  We then publish the State Plan Amendment, with the implementation date.  Next, hearings are held and public comments are gathered.  At the hearings, we seek public comment on any concerns or questions related to the State Plan.  We consider those before proceeding.

12.     After, we submit the package to CMS and seek their more formal review and comments.

13.     We address any comments or concerns they may have.  Ultimately, we must obtain CMS's approval before the State Plan Amendment may be enacted.

14.     In Nevada, the legislature takes a role in State Plan changes if those changes impact the budget.  This was true in 2002 when Nevada Medicaid changed its reimbursement methodology from AWP -10% to AWP -15%.  I testified about this at my deposition.  In 2002, Nevada Medicaid presented various alternatives to the legislative budget staff.  We also submitted the margin analysis study Meyers & Stauffer complete on behalf of the State.  This was, in part, how the AWP -15% was decided upon.

15.     Once the State Plan Amendment is approved by CMS, the change formally becomes part of our State Plan for Nevada Medicaid and becomes part of our Nevada Medicaid policy book, the Nevada Medicaid Services Manual, as a mandatory requirement.

16.     To my knowledge, these procedures have always been followed by Nevada Medicaid – during my tenure and before.

**D.      THE STATE'S UNDERSTANDING AND USE OF AWP**

17.     Until this lawsuit my understanding of AWP had been that AWP meant what it said – that it was really an average of prices.

18.     As I testified at one of my depositions:

> Q:     Is it your understanding that AWP is an average wholesale price for those drugs?
>
> A:     It's my understanding that AWP is an average wholesale price for those drugs.

Lawrence Dep. Vol. 3 at 400:10-14. A copy of this testimony is attached to this declaration as Ex. 1.

19.     I understand that Defendants did not submit this testimony, or any by me like it, with their motion for summary judgment to the Court. I am surprised, because I gave the same testimony more than once. Specifically, I was asked "And what's your understanding of what AWP is?" and I testified as follows: "[B]y the semantics of the name, average wholesale price, I would assume that it is the wholesale price that is given for the drugs." Lawrence Dep. Vol. 3 at 396:7-11. A copy of this testimony is attached to this declaration as Ex. 1.

20.     As part of this understanding, I believed that AWP bore a rational and direct relationship to actual acquisition costs. The State expected that this was a price at which pharmacies and other providers were able to purchase drugs for sale. The State believed that the AWP was a meaningful benchmark and that it bore a direct and reasonable relationship to the actual acquisition costs to pharmacies, physicians and other providers. I testified about this at my deposition too.

21.     This is not the same as believing that AWP equaled acquisition costs. I knew that AWP did not equal actual acquisition costs. That is why Nevada Medicaid discounted AWP to determine Estimated Acquisition Cost ("EAC") for each drug. I testified about this more than once in my depositions. Nevada calculated the EAC by applying a discount to the AWP.

22.     EAC is best defined as the State's estimation of acquisition costs for the pricing reimbursement methodology of a drug.

23.     Based on the expectation described above, during my tenure, the State has always been confident that the use of AWP was a proper method to determine EAC as required by federal regulations and the State's reimbursement methodology, set forth in Chapter 1200 of the Medicaid Services Manual, which set forth our State policies and regulations. Federal regulations require the State to determine the EAC for providers participating in the State Medicaid program. Nevada regulations include the same requirements.

24.     At one of my depositions, I also made the point that Nevada Medicaid was not privy to actual prices. These were kept confidential by the drug manufacturers. We would never know the actual prices because the drug manufacturers did not provide them to us or – to my understanding – to anyone. Actual prices were a closely guarded secret.

25.     I do not know how the State's use of AWP got started, as that was before my tenure with Medicaid. I do know why the State used AWP, however, and why we continued to use AWP as a component of our pricing mechanism. The State used AWP because it was the standard price mechanism available – provided by the drug manufacturers, made available to the states, nationally supported, updated regularly and available for all drugs. AWP is the data made available through First Data Bank and this is how our reimbursement system is set up – to use data provided by FDB. In short, we used AWP because no other alternative has been available.

26.     The State also used AWP because it provided an automatic update to our Medicaid drug reimbursement rates without administrative intervention.  In other words, Nevada Medicaid understood that pharmaceutical prices could change radically and quickly due to shifting market conditions.  An AWP provided and updated by the drug manufacturers would be responsive to these changes – reasonably accommodating the changes, we thought, because we believed that there was relationship between the AWPs and actual acquisition costs.

E.     **THE ROLE OF ACCESS TO CARE AND BUDGET IN SETTING REIMBURSEMENT METHODOLOGY**

27.     I understand that Defendants have focused on the role that access to care and State budget issues played in the setting of the State Medicaid's reimbursement methodology.  It is true that every state Medicaid is responsible for certifying that the State's residents have adequate access to care.  It is also true that the State of Nevada, including Nevada Medicaid, has faced budget pressures.

28.     The fact is that access to care has never been a problem in connection with the pharmacy program.  I have not received any factual data that a pharmacy provider stopped seeing a patient or stopped providing services or goods, including drugs, as a result of any changes to the AWP reimbursement methodology.

29.     Nevada Medicaid also has a provider rate appeal process.  If a provider did not feel that the rate was sufficient, there is a process that the provider could use to submit any evidence that the rate was not sufficient to allow access.  To my knowledge, we have received no such complaints.  To me, this is a further indication that Nevada Medicaid has not had access issues.

- 6 -

30.     And, during my tenure, although access to care has been discussed, the consideration has never dominated the reimbursement methodology or EAC determination decisions.

31.     The same may be said for profit to pharmacies or budget considerations. Profit to the pharmacies, physicians and other providers does not play a significant role in the setting of Nevada Medicaid's drug reimbursement rate.

## F.     THE STATE'S USE OF THE SPREAD BETWEEN ACQUISTION COSTS AND AWP

32.     I understand that the Defendants have suggested that Nevada Medicaid has exploited the difference between acquisition costs and AWP to encourage providers to participate in the Nevada Medicaid program. This is not true and I have never even heard the prospect discussed formally or informally during my tenure with the State. And as the Chief Program Services, with my responsibilities for the Nevada Medicaid pharmacy program, I would have heard this if it was considered.

33.     Defendants' argument makes no sense for many reasons. First, it has not been necessary. Second, I and others have testified repeatedly that we were not privy to the actual drug purchase prices – the drug manufacturers would not share them. Thus, we had no way of exploiting the spreads, as suggested by Defendants.

34.     Finally, the suggestion is insulting to me and the others who are working hard to provide benefits to Nevada citizens who need Medicaid. On more than one occasion, I testified in response to defense questions that at Nevada Medicaid we considered ourselves stewards of taxpayer money and that "it should not be a cost to the taxpayers to pay a profit for the actual ingredient cost of the drug." Lawrence Dep. Vol. 3 at 410:5-7. A copy of this testimony is attached as Ex. 1. This testimony was made under oath and I believed it. I still believe it.

- 7 -

35.     At all times, Nevada Medicaid has been dedicated to maximizing the resources available to it by minimizing expenditures. We aimed to reduce drug costs to the program, not enhance them by providing profit to pharmacies and other providers by overpaying for prescription drugs.

G.     **KNOWLEDGE OF SPECIFIC SPREADS**

36.     Neither I nor any other Medicaid personnel had knowledge of the spreads for specific drugs that have become apparent as the result of this lawsuit.

37.     I have seen certain OIG and other federal reports that Defendants claim put the State on notice of systemic, industry-wide problems with the use of AWP as a basis for reimbursement. I disagree. The reports identified at most a handful of drugs for which an investigation revealed problems. There was nothing in those reports that put me or others within Nevada Medicaid on notice of the types of problems that have been revealed as a result of this lawsuit.

38.     For example, I have recently been shown a series of spreadsheets – by defendant – showing the percentage difference between the acquisition costs and AWPs for various years relevant to the lawsuit. I was surprised. The defendants included AstraZeneca, Aventis, Bristol-Myers Squibb, Dey, Immunex, Johnson & Johnson, Pfizer and Schering Plough. I was told that the spreads had been calculated and provided as an exhibit to the Direct Testimony of Raymond S. Hartman in the MDL trial. Copies of the spreadsheets are also attached to the declaration of Nevada Medicaid Administrator Chuck Duarte as Exhibits A to H.

39.     I was surprised to see the size of the spreads. Nothing I had encountered or been told gave me notice of the spreads presented by those spreadsheets. I think my colleagues at Nevada Medicaid would be equally surprised as the spreads in those sheets are beyond anything

we could have expected based on the information we had before this lawsuit or outside of this lawsuit at any time.

40.     It is my opinion that if accurate AWPs were provided by Defendants, the State would have paid less for its reimbursement of prescription drugs than it did using the inflated AWPs provided.

41.     The pharmaceutical representatives were aware that Nevada Medicaid was utilizing AWP as a source to reimburse for pharmaceutical services under the Medicaid Federal Program.  The false data provided has led to inaccurate reimbursement levels.

**H.     THE STATE'S USE OF AVERAGE SALES PRICE**

42.     At my March 23, 2006 deposition, Defendants questioned me about certain defendants providing drug pricing information directly to the State.  I am only aware of four drug manufacturers providing drug pricing information to the States.  I am aware that Bayer Corporation sends pricing information directly to the State as a result of a settlement agreement between Nevada and Bayer.  I am aware of TAP providing direct pricing information to the State.  I have seen occasional letters from Schering and Warnick.  I am not aware of other drug manufacturers providing direct pricing information to the State, although I have looked for such information in our files.

43.     I told Defendants at my deposition that we did not use the information TAP, Bayer, Schering and Warrick provided because they were not useful to Nevada Medicaid.

44.     The earliest instance I am aware of that the State received direct pricing information was from Bayer in 2001, as a result of the settlement of a lawsuit.

45.     The State did not use the ASP data provided by Bayer because the State's reimbursement methodology formula was set to use AWP.  The same would be true for TAP.

46.     Our system is set up to obtain drug pricing information from First Data Bank. There is no manual intervention. Bayer data came in on a hard copy and on a diskette. In order to use the Bayer data, manual intervention would have been required.

47.     The data that Schering and Warrick supplied were particularly useless because it provided a range of numbers rather than a data point for a specific drug. In the case of Warrick, the cover letter accompanying the data described these numbers as a "high/low net price range in effect for the period." The cover letter also warned that the data constituted "proprietary, privileged, and/or confidential business information" and should be treated as confidential. With that warning, I was not even sure what use we could make of the data.

48.     The Nevada Medicaid drug reimbursement system is based on AWP. I needed AWP. In addition, the system cannot handle a range of numbers of a price reimbursement. It needs to be specific.

49.     Overall, it was unusual to receive data directly from a drug manufacturer and the State was not prepared to handle it.

50.     Again, if the State received such data from other drug manufactures, I am not aware of it.

**I.      THE STATE'S CONTINUED USE OF AWP AS A BASIS FOR
        REIMBURSEMENT**

51.     I understand that the drug manufacturers involved in this lawsuit have criticized Nevada Medicaid's continued use of AWP as a basis for reimbursement after the filing of this lawsuit. We continued to use AWP for several good reasons – many of them the same reasons we began to use AWP in the first place.

52.     To date, there is still no viable alternative data to be used. To my knowledge and to the State of Nevada's knowledge, AWP remains the only pricing data that drug manufacturers

provide and update on a regular basis. The principal reasons we continue to use AWP is for administrative convenience and the lack of any viable alternative.

53.     Nevada is a small state with a small Medicaid staff. We do not have the resources to conduct pricing surveys and update them for every drug Medicaid reimburses. This would not be feasible. We also cannot afford to modify our system only to find out later that it is not acceptable when we seek approval from the federal government.

54.     As a result of the information that has been developed since this lawsuit was filed, both through litigation and other channels, I would have to characterize this as a period of drug pricing ambiguity on the federal and state levels. Nobody other than the drug manufacturers themselves know what the actual prices for particular drugs are. Not even CMS has made a decision as to what is the appropriate basis for drug reimbursement. The State cannot practically move forward to change its drug reimbursement basis until we get some direction from CMS because it is so clear that there is no definitive way to address this or consensus on how it should be addressed.

55.     The Deficit Reduction Act may address the issue. One alternative being discussed is a nationwide retail survey that would provide pricing information by-drug. It is my understanding, that this alternative has not progressed beyond the proposal stage.

I swear under the penalty of perjury under the laws of the State of Nevada and the United States of America that the foregoing is true and correct.

_____ /s/ Coleen Lawrence_____
Coleen Lawrence

___March 22, 2007, Carson City, Nevada___
Date and Place of Execution

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF COLEEN LAWRENCE IN SUPPORT OF THE STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 22, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By_____**/s/ Steve W. Berman**_____

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292