UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re Pharmaceutical Industry Average Wholesale Price Litigation | MDL No. 1456 Master File No. 01-12257-PBS |
| This document relates to: STATE OF CALIFORNIA, *ex rel.* VEN-A-CARE OF THE FLORIDA KEYS, INC. | |
| Plaintiff, | |
| v. | (Original Central District of California No. 03-CV-2238) |
| ABBOTT LABORATORIES, INC., *et al.* | |
| Defendants. | |
| CIVIL ACTION NO. 03-11226-PBS | |

**MEMORANDUM AND ORDER**

March 22, 2007

Saris, U.S.D.J.

**I. INTRODUCTION**

This case involves a *qui tam* action brought by relator-plaintiff Ven-A-Care of the Florida Keys, Inc., a pharmacy licensed to dispense prescriptions drugs and pharmaceutical products, on behalf of the State of California against thirty-nine defendant pharmaceutical companies,[1] alleging that these

_____

[1]Abbott Laboratories, Inc.; Amgen, Inc.; Armour Pharmaceutical Co.; Aventis Behring, L.L.C.; Aventis Pharmaceuticals, Inc.; B. Braun Medical, Inc.; B. Braun of America, Inc.; Baxter Healthcare Corp.; Bedford Laboratories; Ben

defendants violated the California False Claims Act, Cal. Gov't Code § 12650 *et seq.* (2006).

Collectively, the defendants have moved to dismiss every claim in the First Amended Complaint-in-Intervention pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).  In addition, several defendants have moved separately to dismiss the claims as they specifically relate to them; only one of these motions is addressed in this opinion.  After oral argument on these motions, this Court **ALLOWS**, in part, and **DENIES**, in part, the joint motion to dismiss the First Amended Complaint-In-Intervention ("FAC").  Abbott Laboratories' separate motion to dismiss is **DENIED**.

## **II. BACKGROUND**

### **A. Medi-Cal and Drug Pricing**

Medi-Cal is California's version of Medicaid, a joint federal-state health benefits program for the poor, needy, elderly, and disabled.  The Medi-Cal program serves as the main

---

Venue Laboratories, Inc.; Boehringer Ingelheim Corp.; Boehringer Ingelheim Pharmaceuticals Inc.; Briston-Myers Squibb Company a/k/a Bristol-Myers Oncology Division/HIV Products; C.H. Boehringer Sohn Grundstucksverwaltung GMBH & Co. KG; Dey, Inc.; Dey, L.P.; EMD, INC.; Geneva Pharmaceuticals Inc.; Gensia Inc.; Gensia Sicor, Inc.; Glaxo Wellcome INC. f/k/a Burroughs Wellcome Co.; GlaxoSmithKline PLC; Hoechst Marion Roussel, Inc.; Immunex Corp.; Lipha, S.A.; McGaw, Inc.; Merck KGaA; Mylan Laboratories, Inc.; Mylan Pharmaceuticals, Inc.; Novartis AG; Pharma Investment, Ltd.; Roxane Laboratories, Inc.; Sandoz, Inc.; Schering-Plough Corp.; Sicor, Inc. f/k/a Gensia Pharmaceuticals, Inc.; Smithkline Beecham Corporation d/b/a GlaxoSmithKline; Teva Pharmaceutical Industries, Ltd.; Warrick Pharmaceuticals Corp.; ZLB Behring.

source of health insurance for about 6.5 million Californians, draws nearly $19 billion in federal funds into the state's health care system, and accounted for fourteen percent of California's General Fund spending in fiscal year 2005-2006.  Medi-Cal is the largest state-run Medicaid program in terms of people served, the second largest in terms of dollars spent, and the primary source of health coverage for one in six Californians under 65, one in four of the state's children, and the majority of Californians living with HIV/AIDS.

California administers Medi-Cal through two systems: a fee-for-service plan and a managed care plan.  <u>See</u> Cal. Wel. & Inst. Code § 14016.5 (2006).  Under the traditional, fee-for service program, California reimburses providers a certain amount for each service they perform.  In an attempt to control Medi-Cal expenditures, California requires certain Medi-Cal beneficiaries to enroll in a managed care program.  <u>See</u> Cal. Wel. & Inst. Code § 14200 <i>et seq</i>. (2006).  California contracts with private third parties to administer these managed care plans.  These third-party managed care plans establish their own drug formulary and set their own drug reimbursement formulae.  <u>Id.</u>  Accordingly, the allegations in the FAC apply only to the fee-for-service program.

As part of the coverage provided to Medi-Cal recipients, California offers prescription drug coverage.  Included in this

coverage are payments for drug products, including single-source drugs and multi-source drugs.  In 2002 alone, Medi-Cal spent more than $3.4 billion for drugs on behalf of over 2.65 million Medi-Cal beneficiaries.

The federal Medicaid program requires state Medicaid programs that provide a prescription drug benefit to beneficiaries, such as Medi-Cal, to reimburse drug providers for their prescription products at the Cost of the Drug Product ("CDP").  CDP is defined as equal to the lower of the Estimated Acquisition Cost ("EAC"), the Federal Allowable Cost, the Maximum Allowable Ingredient Cost ("MAIC") for the standard package size, or the amount billed by the provider.  <u>See</u> Cal. Code Regs. Tit. 22, § 51513 *et. seq.* (2006) (discussing how Medi-Cal reimburses drug providers).

For purposes of determining CDP, the EAC for a drug product is set at the Direct Price ("DP") or the Average Wholesale Price ("AWP"), less a fixed percentage.[2]  Cal. Wel. & Inst. Code § 14105.45.  Beginning in 2004, AWP and DP were defined by statute as:

(2) "Average wholesale price" means the price for a drug

---

[2]This memorandum assumes familiarity with the basic concepts underlying AWP and other drug pricing methodologies.  For a detailed discussion of these methods of pricing and an overview of the structure of the pharmaceutical industry, see <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 263 F. Supp. 2d 172 (D. Mass. 2003); <u>see also In re Pharm. Indus. Average Wholesale Price Litig.</u>, 307 F. Supp. 2d 196 (D. Mass. 2004).

4

> product listed in the department's primary price
> reference source.
>
> (3) "Direct price" means the price for a drug product
> purchased by a pharmacy directly from a drug manufacturer
> listed in the department's primary reference source.

Cal. Wel. & Inst. Code § 14105.45(a). AWP was also the pricing

benchmark in the federal Medicare statute. 42 U.S.C. § 1995u(0)

(West 1998). The definition of "DP," which is unique to

California, was governed by Cal. Code Regs. tit. 22, § 51513,

which required that California reimburse the dispensing and

administration of certain manufacturers' drugs on the basis of

DP. Over that period, the text of this regulation provided:

> The estimated acquisition cost of all of the drug
> products manufactured or distributed by a pharmaceutical
> company listed in paragraph (b) shall be the <u>direct price</u>
> for a standard package in the Department's primary
> reference source; or for products not listed in the
> Department's primary reference source, the direct price
> listed in the secondary price source; or, if not listed
> in the secondary price source, the principal labeler's
> catalogue.

Cal. Code Regs. tit. 22, § 51513.5 (emphasis added). This DP was

to be in line with "the price generally and currently paid by

providers for a standard package." Cal. Code Regs. tit. 22, §

51513.5(a)(6).

According to federal regulation, EAC represents the

government's "best estimate of the price generally and currently

paid by providers for a drug marketed or sold by a particular

manufacturer or labeler in the package size of drug most

frequently purchased by providers." 42 C.F.R. § 447.301 (2006).

The California term Federal Allowable Cost means the price established for a generic drug by the Centers for Medicare & Medicaid Services ("CMS") formerly the Health Care Financing Administration ("HCFA") of the Federal Department of Health and Human Services.  Cal. Wel. & Inst. Code § 14105.45(a)(5).  The price for generic drugs established by CMS is known generally as the Federal Upper Limit ("FUL").  CMS establishes the FUL, and consequently the Federal Allowable Cost, for some generic drugs based on the lowest price reported by a manufacturer to price reporting services for a particular drug type.  Id.  As the Federal Allowable Cost and FUL are mathematical equivalents, this memorandum will refer to these terms interchangeably.

The AWP, DP, and FUL are published in various price reporting services, known as compendia, such as First DataBank, a publishing division of the Hearst Corporation.  Medi-Cal utilizes First DataBank's publication to determine its reimbursement prices.  In order to compile its pricing compendium, First DataBank receives drug pricing information from the manufacturers of the various drugs, and then bases its published pricing data on this information.  Thus, the FAC alleges that the drug manufacturers control the prices that are reported by First DataBank.  As a result, drug makers can effectively fix the AWP and DP of their own drugs.

In particular, this pricing scheme allows drug manufacturers to set reimbursement prices to levels well above the providers'

acquisition costs.  The difference between the CDP of a prescription drug and the drug's actual acquisition cost, is referred to as the drug's "spread."  By inflating the prices provided to First DataBank, and thus pumping up the CDP of the drug, pharmaceutical manufacturers increase a drug's spread. Plaintiff alleges that this increase in spread consequently magnifies a drug's profitability to the financial benefit of the drug providers, like pharmacies and doctors who prescribe and administer these drugs.

## B. Procedural History

Relator-plaintiff filed the instant suit under seal in July 1998 under the *qui tam* provisions of California's False Claims Act.  See Cal. Gov't Code § 12652(c).  On August 13, 2002, while the action was still under seal, Ven-A-Care filed an amended complaint, which alleged that pharmaceutical companies caused Medi-Cal to overpay for drugs.  On January 3, 2003, the Attorney General filed a notice of partial intervention against three defendants, Abbott Laboratories, Wyeth, Inc., and one of Wyeth's corporate affiliates, which removed the action to the United States District Court for the Central District of California.  In June 2003, while a motion to remand the case to California's state court was pending, the Judicial Panel on Multidistrict Litigation transferred the action to this Court as part of this Court's ongoing MDL.  On September 18, 2003, this Court denied the motion for remand and advised California that it had six

months to decide whether to intervene on the still-sealed
portions of the complaint.

On August 25, 2005, California filed the FAC against
thirty-nine defendants, alleging five counts: that the defendants
knowingly caused providers to submit false claims to Medi-Cal, in
violation of Cal. Gov't Code § 12651(a)(1) (Count I); that
defendants knowingly caused false records or statements to be
used by Medi-Cal to pay false claims submitted by providers, in
violation of Cal. Gov't Code § 12651(a)(2) (Count II);  that
defendants were beneficiaries of submissions of false claims to
Medi-Cal, subsequently discovered the falsity of the claims, yet
failed to disclose the false claims to California within a
reasonable time, in violation of Cal. Gov't Code § 12651(a)(8)
(Count III); that defendants violated the California
anti-kickback statute, Cal. Welf. & Inst. Code § 14107.2, which,
in turn, caused providers to submit false claims, in violation of
Cal. Gov't Code § 12651(a)(1) (Count IV); and that defendants
violated the California anti-kickback statute, which, in turn,
caused false records or false statements to be used by Medi-Cal
to pay false claims submitted by providers, in violation of Cal.
Gov't Code § 12651(a)(2) (Count V).

## III. DISCUSSION

### A. Rule 9(b) Specificity

The defendants argue that the entire FAC does not adequately

8

plead the circumstances of fraud with specificity pursuant to
Fed. R. Civ. P. 9(b), which mandates that "in all averments of
fraud or mistake, the circumstances constituting fraud or mistake
shall be stated with particularity."  The underlying purpose of
this specificity requirement is:

> (1) to place defendants on notice and enable them to
> prepare meaningful responses to charges of fraud brought
> against them; (2) to provide defendants with adequate
> notice of the basis of the claims brought against them,
> thereby protecting them from unfair surprise; (3) to
> provide some ground for believing that the suit is not
> simply a "strike suit"; and (4) to protect defendants
> from groundless charges which might damage their
> reputation.

Kuney Int'l, S.A. v. DiIanni, 746 F. Supp. 234, 237 (D. Mass.
1990) (citing New England Data Servs., Inc., v. Becher, 829 F.2d
286, 289 (1st Cir. 1987)).

Qui tam actions under the federal False Claims Act must
comply with Fed. R. Civ. P. 9(b).  See United States ex rel.
Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir.
2004) ("underlying schemes and other wrongful activities that
result in the submission of fraudulent claims are included in the
'circumstances constituting fraud or mistake' that must be pled
with particularity pursuant to Rule 9(b).").  Rule 9(b)
requirements are also applicable to diversity actions brought
under California's False Claims Act.  See County of Santa Clara
v. Astra U.S., Inc., 428 F. Supp. 2d 1029, 1036 (N.D. Cal. 2006)
(applying Fed. R. Civ. P. 9(b) to California False Claims Act
claim).  As a result, the courts have held that "such pleadings

invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of [a False Claims Act] *qui tam* action." <u>Karvelas</u>, 360 F.3d at 232. The heightened pleading standard of Rule 9(b) "means that a relator must provide details that identify particular false claims for payment that were submitted to the government." <u>Id.</u> The plaintiff must, at a minimum, set forth the "who, what, when, where, and how" of the fraud. <u>United States ex rel. Walsh v. Eastman Kodak Co.</u>, 98 F. Supp. 2d 141, 147 (D. Mass. 2000) (quoting <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899, 903 (5th Cir. 1997)).

Strict application of the requirements of Rule 9(b) may be relaxed in some circumstances.  For instance, an alleged scheme of fraud may involve numerous transactions that occur over a long period of time, and pleading the precise specifics with regard to every instance of fraudulent conduct may be impractical.  <u>See Corley v. Rosewood Care Ctr., Inc.</u>, 142 F.3d 1041, 1050 (7th Cir. 1998) (applying relaxed standard to allegations of fraud in plaintiff's racketeering complaint); <u>see also United States ex rel. Johnson v. Shell Oil Co.</u>, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) (collecting cases that apply relaxed standard).  Given the sheer volume of drug reimbursements involved in this case, Rule 9(b) will be satisfied if the complaint alleges the basic framework, procedures, and the nature of fraudulent scheme that

give rise to California's belief that false claims have been
submitted.   See United States ex rel. Thompson v. Columbia/HCA
Healthcare Corp., 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998)
(holding relator satisfied Rule 9(b) by alleging the "basic
framework, procedures, the nature of fraudulent scheme, and the
financial arrangements and inducements among the parties and
physicians that give rise to Relator's belief that fraud has
occurred"); see also United States v. Kensington Hosp., 760 F.
Supp. 1120, 1125 (E.D. Pa. 1991) (requiring government in FCA
action to plead only the time-frame, the clinics involved, and
the types of kickbacks involved).

The plaintiff has complied with this Court's prior opinion
requiring a plaintiff to state the specific drugs sold by each
defendant by alleging the fraudulent scheme, specifying the
alleged fraudulent AWP figures for each drug, and attaching
exhibits to the complaint to demonstrate the spread for each
drug.   See In re Pharm. Indus. Average Wholesale Pricing Litig.,
321 F. Supp. 2d 187, 207 (D. Mass. 2004).


**B. Falsity and False Claims**

California's False Claims Act, in relevant part, imposes a
civil penalty on any party who:

> (1) Knowingly presents or causes to be presented to an
> officer or employee of the state or of any political
> subdivision thereof, a false claim for payment or
> approval.

11

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a <u>false claim</u> paid or approved by the state or by any political subdivision....

(8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the <u>false claim</u> to the state or the political subdivision within a reasonable time after discovery of the <u>false claim</u>.

Cal. Gov't Code § 12651(a)(1-2, 8) (2006) (emphasis added).

Because the California False Claims Act is modeled after the federal counterpart, California courts have recognized that federal decisions are persuasive as to the meaning of California's law. <u>Am. Contract Servs. v. Allied Mold & Die, Inc.</u>, 94 Cal. App. 4th 854, 860 (Cal. Ct. App. 2001) (citing <u>Etcheverry v. Tri-Ag Service, Inc.</u>, 22 Cal. 4th 316, 320 (2000)).

Not surprisingly, a "false claim" is a required element of a False Claims Act suit. <u>See</u> <u>Am. Contract Servs.</u>, 94 Cal. App. 4th at 864 (affirming a dismissal of a *qui tam* action for want of a false claim). However, under California law, "the claim itself need not be false but only be underpinned by fraud." <u>City of Pomona v. Superior Court</u>, 89 Cal. App. 4th 793, 802 (Cal. Ct. App. 2001). <u>See also</u> <u>United States v. Rivera</u>, 55 F.3d 703, 709 (1st Cir. 1995) (stating that the Federal False Claims Act covers "a false statement made with the purpose and effect of inducing the Government immediately to part with money") (quoting <u>United States v. Neifert-White</u>, 390 U.S. 228, 230 (1968)).

Defendants assert that the claims submitted to the

12

government by providers do not contain any false pricing
information because the allegedly inflated AWPs or DPs for
defendants' drugs are not included on the claim form submitted to
Medi-Cal.  Although it is true that the claim form that the
providers submit to the state does not require the provider to
insert a price for the drug, this fact does not require dismissal
of a claim under § 12651(a).  Plaintiff's theory is that the drug
manufacturers report false prices for a particular drug to Medi-
Cal via the publishing compendium knowing full well that the
provider will be reimbursed based on that inflated price when he
submits his claim to Medi-Cal for a particular drug.  (See, e.g.,
FAC ¶ 36 ("The Defendants reported or caused to be reported false
or misleading prices to Medi-Cal by providing false or misleading
price information...with knowledge that they in turn would
utilize such false and misleading price information in
determining the AWPs and DPs that were reported to Medi-Cal.");
FAC ¶ 42 ("Medi-Cal, through its fiscal agents, approved and paid
claims to providers based on the false and inflated
representations of prices knowingly reported or caused to be
reported by Defendants."))  Thus, although the claim itself may
not contain a fraudulent price, it is predicated on an underlying
fraudulent pricing scheme.  As such, under California law, the
allegation that the claim is underpinned by fraud is sufficient.

Next, the defendants argue that AWP and DP are not false
because they are defined by state law as the price reported in

the drug pricing compendia.  Under this view, no matter what
price defendants report as the AWP or DP, it cannot be false.  As
the defendants' emphasize, Cal. Wel. & Inst. Code §
14105.45(a)(2) recites that "Average Wholesale Price" is "the
price for a drug product listed in the department's primary price
reference source [the compendia]."  Likewise, California
regulations describe "Direct Price" as the direct price for a
standard package in the Department's primary reference source,
such as a pricing compendium.  Based upon these definitions, the
defendants contend that "an AWP or DP listed in the pricing
compendia could never be 'false' as a matter of law because AWP
and DP are defined as what is listed in the pricing compendia."
(Def.'s Mem. Supp. Mot. Dismiss 19.)

Plaintiff argues that its reliance on the compendia to
determine reimbursement figures does not give the pharmaceutical
companies free rein to falsify those numbers.  Rather, the state
argues the evident purpose of the law is that the state would be
directed to rely on this compendium because it would provide "the
best estimate of the price generally and currently paid by
providers."  Cal. Code Regs. tit. 22, § 51513(a).

Plaintiff has the better argument.  Defendants'
interpretation that they have *carte blanche* to publish sky-high
prices unmoored from the acquisition costs of providers leads to
absurd results.  Dep't of Alcoholic Beverages Control v. Alcohol
Beverage Control Appeals Bd., 128 Cal. App. 4th 1195, 1209 (Cal.

Ct. App. 2005) (deciding that courts should eschew a narrow or literal reading of a law where such an interpretation would lead to an absurd result); <u>see</u> <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, No. 01-12257, 2006 U.S. Dist. LEXIS 80083, at *36 (D. Mass. November 2, 2006) (holding that "the term 'average wholesale price' in the Medicare statute is not a term of art for any price the pharmaceutical industry places in the industry publication and will be construed under the plain language doctrine of statutory construction"); <u>see also</u> <u>Kelly v. United States</u>, 924 F.2d 355, (1st Cir. 1991) (stating that "unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result").

As a fallback, defendants argue that the terms AWP and DP are ambiguous.  However, ambiguity does not necessarily foreclose a finding of falsity under the FCA.  <u>See</u> <u>United States ex rel Walker v. R&I Props.</u>, 433 F.3d 1349, 1356-57 (11th Cir. 2005) (explaining that ambiguity in the term "incident to the services as a physician" did not necessarily preclude liability).  The drug prices alleged by plaintiff cross any reasonably drawn line between estimates which reasonably reflect prices paid by providers and estimates which are so grossly inflated when compared to actual acquisition costs that they are by their very nature fraudulent.  <u>See</u> <u>United States v. White</u>, 765 F.2d 1469,

1481 (11th Cir. 1985).

Lastly, the defendants argue that California cannot now successfully recover because it possessed knowledge of the fraud and approved of the defendants' actions.  In support of this position, defendants ask this Court to take judicial notice of selected public documents, in particular, a 1996 audit by the United States Department of Health and Human Services Office of Inspector General ("OIG"), which concluded that pharmacies were purchasing drugs at substantial discounts off AWP.  Moreover, they show that in 1998, Ven-A-Care filed its complaint under seal disclosing to the state its actual acquisition costs, and yet the state continued to approve claims.

This argument presents a difficult legal question.  In some circumstances, the government's "knowledge [of a fraud] effectively negates the fraud or falsity required by the FCA." Am. Contract Servs., 94 Cal. App. 4th at 864.  Some courts have held that governmental knowledge will vitiate a possible FCA claim where "the government knows and approves of the particulars of a claim for payment before that claim is presented." United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999) (emphasis added).  In these instances, "the presenter cannot be said to have knowingly presented a fraudulent or false claim." Id.  Thus, there may be "occasions when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law

16

possess the requisite state of mind to be liable under the FCA."
Id.; see also United States ex rel. Hagood v. Sonoma County Water
Agency, 929 F.2d 1416, 1421 (9th Cir. 1991) (holding that
knowledge by federal officials may "show that the defendant did
not submit its claim in deliberate ignorance or reckless
disregard of the truth").  However, government knowledge is not
an automatic bar to suit under the FCA.  United States ex rel
Butler v. Hughes, 71 F.3d 321, 327 (9th Cir. 1995); Shaw v. AAA
Eng'g & Drafting, Inc., 213 F.3d 519, 534-535 (10th Cir. 2000).

     As California alleges it did not know the extent of false
drug prices, or approve them, dismissal is inappropriate.  See
also United States v. Hoyts Cinemas Corp., 380 F.3d 558, 570 (1st
Cir. 2004) (quoting Lussier v. Runyon, 50 F.3d 1103, 1114 (1st
Cir. 1995)) ("Rule 201 is applied with some stringency, because
accepting disputed factual propositions about a case 'not tested
in the crucible of trial is a sharp departure from standard
practice.'").

**C. Presenting a False Claim**

     The defendants argue that medical providers - not the
manufacturers - submitted the allegedly false claims to the
state, and therefore the manufacturers are not liable under the
FCA.  Counts I and IV of the FAC allege violations of Cal. Gov't
Code § 12651(a)(1), which bars an individual or organization
from:

     (1) Knowingly present[ing] or caus[ing] to be presented

17

to an officer or employee of the state or of any
political subdivision thereof, a false claim for payment
or approval.

Cal. Gov't Code § 12651(a)(1) (2006) (emphasis added).

Interpreting this provision, California courts have
established that the False Claims Act's "reach extends to 'any
person who knowingly assisted in causing the government to pay
claims which were grounded in fraud.'" Pomona, 89 Cal. App. 4th
at 802 (quoting United States ex rel. Marcus v. Hess, 317 U.S.
537, 544 (1943)).  In order to state a claim for relief under
this law, a plaintiff must allege a causal nexus between the
defendants' actions and the resulting harm to the government.
For purposes of the FCA, the actions of medical professionals in
presenting a claim as part of a drug pricing scheme do not
necessarily sever a causal chain.  See United States ex rel.
Franklin v. Parke-Davis, 147 F. Supp. 2d 39, 52 (D. Mass. 2001);
cf. United States ex rel. Cantekin v. Univ. of Pittsburgh, 192
F.3d 402, 416 (3d Cir. 1999) (applying intervening cause analysis
to claim under the FCA).  See generally Rodriquez-Cirilo v.
Garcia, 115 F.3d 50, 54 (1st Cir. 1997) (Campbell, J.,
concurring) (distinguishing between causation in fact or actual
causation and proximate or legal causation).

As alleged, the participation of doctors and pharmacists in
the submission of Medi-Cal claims was not only a foreseeable and
substantial factor in California's loss, but indeed it was "an
intended consequence of the alleged scheme of fraud." Parke-

18

<u>Davis</u>, 147 F. Supp. 2d. at 53.  As the defendants knew that Medi-Cal calculated its payments based upon prices reported to First DataBank, it is reasonable and foreseeable that an overpayment by the state would necessarily result from such false reporting by doctors.  Therefore, the FAC makes sufficient allegations of causation.

**D. Beneficiary Claim**

The third Count of the FAC alleges a violation of Cal. Gov't. Code § 12651(a)(8), which imposes civil liability on any party who:

> (8) Is a <u>beneficiary</u> of an inadvertent submission of a
> false claim to the state or a political subdivision,
> subsequently <u>discovers</u> the falsity of the claim, and
> fails to disclose the false claim to the state or the
> political subdivision within a reasonable time after
> discovery of the false claim.

Cal. Gov't. Code § 12651(a)(8) (2006) (emphasis added).  Under California case law, the beneficiary can be any individual or organization that receives benefits or money from the state.  <u>See</u> <u>Pomona</u>, 89 Cal. App. 4th at 802-03 (stating that the False Claims Act can create liability even if the defendant is not the immediate recipient of a false claim benefit).

Plaintiff argues that even though the drug manufacturers did not directly receive money from the state coffers, they should be deemed beneficiaries because they financially benefitted when they received a higher market share by promoting their products with the spread.  The defendants, the FAC alleges, "understood

that a higher spread in their product meant customers would make more money using their product," and they further recognized that "their product would sell over their competitors' whenever their product as compared to competitors offered a higher spread." (FAC ¶ 53.)  This pricing scheme, therefore, allowed each defendant to "seize market share and thereby...fraudulently increase [its] profits."  (FAC ¶ 1.)  The question is whether this increased market share resulting from the false price reporting makes a drug manufacturer a "beneficiary of an inadvertent submission of a false claim."

Defendants argue that a beneficiary is the actual recipient of government funds like the Medi-Cal provider, or perhaps the person on whose behalf the payment was made.  Under any reasonable interpretation, defendants contend, a "beneficiary" cannot be read as anyone who indirectly benefits from a government payment.  The defendants assert that the defendant drug manufacturers are not "beneficiaries" of inadvertent submissions, who "discovered" false claims made to the state.

Plaintiff responds that the False Claims Act should be more broadly read.  The False Claims Act is "obviously designed to prevent fraud on the public treasury."  <u>S. California Rapid Transit Dist. v. Superior Court</u>, 30 Cal. App. 4th 713, 725 (Cal. Ct. App. 1994).  As such, this statute "plainly should be given the broadest possible construction consistent with that purpose." <u>Id.</u>  Stated otherwise, the False Claims Act "must be construed

20

broadly so as to give the widest possible coverage and effect to
the prohibitions and remedies it provides."  LeVine v. Weis, 68
Cal. App. 4th 758, 764 (Ca. Ct. App. 1998); see also
Neifert-White Co., 390 U.S. at 232 (stating that the Federal
False Claims Act, upon which the California act is based, is
"intended to reach all types of fraud, without qualification,
that might result in financial loss to the Government").

While the FCA should be liberally read, plaintiff's claim is
a round peg in a square hole.  The alleged fraud is that the
manufacturers intentionally induced doctors and other providers
to submit false claims to get inflated reimbursements.  Thus,
even if drug manufacturers are considered beneficiaries in a
broad sense because they profit from increased market share,
these manufacturers cannot be said to be beneficiaries of an
inadvertent submission of a false claim they "subsequently
discovered."  The count is dismissed.

**E. Facts Supporting Anti-Kickback Claims (Counts IV and V)**

The FAC alleges violations of California's Anti-Kickback
statute, which provides that

> (b) Any person who offers or pays any remuneration,
> including, but not restricted to, any kickback, bribe, or
> rebate, directly or indirectly, overtly or covertly, in
> cash or in valuable consideration of any kind either:
>
> > (1) To refer any individual to a person for the
> > furnishing or arranging for furnishing of any
> > service or merchandise for which payment may be
> > made, in whole or in part, under [the Medi-Cal
> > program]; or
> > (2) To purchase, lease, order, or arrange for or

recommend the purchasing, leasing or ordering of
any goods, facility, service or merchandise for
which payment may be made in whole or in part under
[the Medi-Cal program],

is punishable upon a first conviction by imprisonment in
the county jail for not longer than one year or state
prison, or by a fine not exceeding ten thousand dollars
($10,000), or by both the imprisonment and fine. A second
or subsequent conviction shall be punishable by
imprisonment in the state prison.

Cal. Welf. & Inst. Code § 14107.2(b) (2006).

Under the statute, a "kickback" is defined as "a rebate or
anything of value or advantage, with a corrupt intent to
unlawfully influence the person to whom it is given in actions
undertaken by that person in his or her public, professional, or
official capacity." Cal. Welf. & Inst. Code § 14107.2(d) (2006).

Plaintiff alleges that defendants' violations of
California's anti-kickback laws constitute violations of the
California False Claims Act. Such claims have been permitted
under federal law. See McNutt v. Halleville Med. Supplies, Inc.,
423 F.3d 1256, 1257 (11th Cir. 2006) ("Because it is undisputed
that a violator of the [federal] Anti-Kickback Statute is
disqualified from participating in a Medicare program, the
government [could] state[] a claim, under the False Claims Act,
when it alleged that the [defendants] had submitted claims for
Medicare reimbursement with knowledge that they were ineligible
for that reimbursement.").

The defendants assert that reporting inflated drug prices to
the compendia does not constitute an "offer" or "payment" of

22

remuneration to purchasers of pharmaceuticals from defendants.
While that assertion may be true, the state also alleges that
drug manufacturers emphasized the spread between AWP and
acquisition cost by giving doctors direct and indirect covert
rebates and discounts in order to induce them to prescribe their
drugs.  For instance, the FAC alleges generally that "Defendants
gave providers contract terms that decreased the price of
prescription drugs, such as discounts, rebates, off-invoice
pricing, free goods, charge backs, volume discounts, credit
memos, 'consulting' fees, debt forgiveness, educational and
promotional grants, and other financial incentives given to
providers."  (FAC ¶ 45.)  These special incentives to drug
providers were designed, according to the FAC, to augment brand
loyalty and boost sales.  (FAC ¶ 45.)  Typically, these rebates
and other special incentives, if paid with corrupt intent, would
be paradigm instances of behavior prohibited by anti-kickback
legislation.  See California v. Duz-Mor Diagnostic Laboratory,
Inc., 68 Cal. App. 4th 654, 659-660 (Cal. Ct. App. 1998) (finding
that direct payment of commissions to a marketing contractor
violates state anti-kickback law); see also Black's Law
Dictionary 886 (8th ed. 2004) (defining kickback as "a return of
a portion of a monetary sum received, esp. as a result of
coercion or a secret agreement").  Because the allegations
suffice under the FCA, the Court need not address the closer
question of whether merely reporting a fraudulent AWP and then

marketing the spread without the concomitant offer of rebates would violate the anti-kickback statute.  See <u>Duz-Mor</u>, 68 Cal. App. 4th at 664 (finding no violation of state Anti-Kickback statute where medical providers offered discounted lab tests to certain groups of patients in order to obtain more patients or to solicit Medi-Cal business because the providers were not actually suffering a loss or offering consideration).

**F. Anti-Kickback Preemption**

Defendants next move to dismiss Counts IV and V of the FAC, arguing that the federal Anti-Kickback Statute preempts the state law because the federal statute, unlike its California counterpart, contains a "knowing and willful" mens rea requirement and a "safe harbor" provision.  Although the plaintiff agrees that the federal Anti-Kickback Statute differs from the California law, the state argues that the defendants cannot establish that federal law has preempted state law through implication.

The federal Medicare Anti-Kickback Statute sanctions any party who

> <u>knowingly and willfully</u> offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or services ... or (B) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item.

42 U.S.C. § 1320a-7b (2006) (emphasis added).  In order to

establish federal liability under this statute, the government
must establish that the individual acted knowingly and willfully.
See Duz-Mor, 68 Cal. App. 4th at 669.  In order to establish a
willful violation of a statute, the government must prove that
the defendant acted with knowledge that his conduct was unlawful.
Bryan v. United States, 524 U.S. 184, 192 (1998).  Moreover,
federal law provides certain 'safe harbor' provisions that
exclude certain types of payments from being considered illegal
remuneration.  See 42 U.S.C. § 1320a-7b(b)(3).

     Under the Supremacy Clause, a federal law may expressly or
impliedly preempt state law.  U.S. Const. art. VI, cl. 2 (stating
that federal law "shall be the supreme law of the Land").  Only
implied preemption is at issue here.  This Court must
consequently determine if "compliance with both state and federal
regulations is impossible" or if "state law interposes an
obstacle to the achievement of Congress's discernable
objectives."  Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of
Agric., Food & Rural Res., 232 F.3d 8, 15 (1st Cir. 2000) (citing
Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992)).

     In determining whether California's law has been preempted,
this Court assumes "that the historic police powers of the States
[are] not to be superceded by...Federal Act unless that [is] the
clear and manifest purpose of Congress."  Id. at 14-15 (citations
omitted).  This Court also "recognize[s] that federal preemption
of a state law is 'strong medicine,' and is 'not casually to be

dispensed.'"   Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 75 (1st Cir. 2001) (quoting Grant's Dairy, 232 F.3d at 18).  This presumption is "especially true when the federal statute creates a program, such as Medicaid, that utilizes 'cooperative federalism': 'Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one.'"   Id. (quoting Wash. Dep't of Soc. & Health Servs. v. Bowen, 815 F.2d 549, 557 (9th Cir. 1987).  Indeed, Congress requires states, as part of the federalist Medicaid and Medicare programs, to actively combat fraud.  See, e.g., Deficit Reduction Omnibus Reconciliation Act of 2005, Pub. L. No. 109-171, § 6023 (2005) (encouraging the enactment of state false claims acts to combat Medicare fraud).

With this caselaw in mind, this Court turns to the ultimate question of whether California's law interposes an obstacle to the achievement of Congress's discernable objectives.  Defendants must show that there manifestly and clearly is an "actual conflict" between the state claims and the federal statute, Concannon, 249 F.3d at 76, and that any impediment is "severe," not merely "modest."   Pharm. Research & Mfrs. of Am. v. Walsh, 123 S. Ct. 1855, 1868, 1870 (2003).

Plaintiff argues that California's statute does not severely conflict with the federal law.  Several California courts have noted that "the California Legislature, when it enacted Welfare

and Institutions Code section 14107.2 [the Anti-Kickback
Statute], was adopting the federal statutes." <u>California v.
Palma</u>, 40 Cal. App. 4th 1559, 1566 (Cal. Ct. App. 1995).
However, the statutes are not the same.  The federal statute
includes a requirement that the conduct be "knowing and willful,"
but the California statute does not require a specific intent to
violate the law.  Under the California statute, where the
forbidden remuneration takes the form of a kickback, a "<u>corrupt
intent</u> to unlawfully influence the person to whom [the
remuneration] is given is required." <u>Duz-Mor</u>, 68 Cal. App. 4th
at 669 (citing Cal. Welf. & Inst. Code, § 14107.2, sub. (d))
(emphasis added).

Defendants contend that this different scienter threshold is
an actual conflict that requires a finding of preemption.  The
resolution of this debate is uncertain because California law has
different scienter requirements in its anti-kickback law
depending on the kind of remuneration.  While California has a
"corrupt intent" requirement for kickbacks, it does not otherwise
require the government to prove a specific intent to violate the
law with respect to other kinds of remuneration.  Nonetheless,
the statute does require the government to prove that the purpose
of the payment was primarily for inducement to purchase goods and
services.  <u>Id.</u>; <u>Cf.</u> <u>United States v. Bay State Ambulance & Hosp.
Rental Serv., Inc.</u>, 874 F.2d 20, 33 (1st Cir. 1989) (holding that
the requirement that an amount be paid 'to induce' another, found

in the Medicare fraud statute, "imposes a second and stronger
scienter requirement" than the knowing and willful requirement).
It is unclear whether the differing scienter arguments will
create an undue impediment to federal objectives.

Defendants point to only one state where the courts have
held that conflict between state and federal anti-kickback
statutes required preemption.  See Florida v. Harden, 873 So. 2d
352, 355 (Fla. App. 2004) (holding that "enforcement of the
Florida anti-kickback statute would stand as an obstacle to the
accomplishment and execution of the full purposes and objectives
of Congress").  Still, this holding by a Florida state court,
which involved a state statute that is somewhat different than
the California statute, has been limited by a subsequent decision
by the same court.  See Florida v. Wolland, 902 So. 2d 278, 286
(Fla. App. 2005) ("We conclude that notwithstanding the failure
of that subsection to contain the term 'willfully,' the federal
and state enactments regarding false claims are in harmony in
purpose and effect, and the charges at issue should not have been
dismissed as preempted by federal law.").  Another Florida court
seems to disagree with Wolland.  See Florida v. Rubio, 917 So. 2d
383 (Fla. App. 2005) (finding the Florida Medicare anti-kickback
statute is preempted because its scienter requirement conflicts
with the federal scienter requirement).  Thus, the law in Florida
on the question of preemption is still evolving.

Based on the allegations of actual kickbacks, the Court

28

concludes that no severe conflict exists between scienter
requirements in these statutes.  As such, California's law has
not been preempted at least with respect to this alleged
remuneration.[3]  On a fuller record, when plaintiff specifies the
specific theory of remuneration for each defendant after
discovery, the Court reserves the right to revisit the issue.

**G. Non-AWP and Non-DP Drug Reimbursement**

The defendants contend that the plaintiff has not alleged
the necessary causal link with respect to drugs reimbursed on the
basis of MAIC or FUL because there is no relationship between
these pricing standards and AWP and DP.

CMS determines FULs for certain multiple-source drugs
whenever the price compendia indicate there are at least three
suppliers of the same therapeutically equivalent drugs.  CMS
establishes the FUL based on the lowest price reported by the
manufacturer to the price reporting services for the particular
drug type.  (FAC ¶31).  More specifically, by federal regulation,
CMS's FUL price "is based on all listings contained in current
editions of published compendia of cost information for drugs
available for sale nationally."  42 C.F.R. § 447.332, subd.
(a)(1)(ii).  Plaintiffs allege that the FUL is formulaically set

---

[3] The briefing on the different safe harbor provisions in the
federal and state laws was inadequate.  The parties dispute,
without providing any citation, the content of the California
safe harbor provisions.  As such, this Court declines to resolve
whether the differences between the federal and state safe
harbors create a preemption problem for plaintiff.

based on wholesale acquisition cost (WAC), AWP, Direct Price, or other published prices.  (FAC ¶32).  Defendant claims the FUL has nothing to do with a generic drug's AWP or Direct Price; however, they concede that FUL is based on WAC.  Plaintiff has adequately specified a spread between the FUL and the actual provider acquisition costs.  Thus, the complaint adequately alleges a nexus between the alleged fraudulent reporting of prices to the compendia and the establishment of the FUL.

Defendants argue that the plaintiff has not alleged or established a link between the alleged wrongdoing and the Maximum Allowable Ingredient Cost (MAIC) figure for drug reimbursement. Until September 2002, California law provided that "[DHS] shall base a MAIC on a reference drug brand which is generically equivalent to the innovator brand, and which is manufactured by a company with production capability to meet the statewide needs of the Medi-Cal program for that drug."  Cal. Welf. & Inst. Code § 14105.45 (b)(1) (2001).  Absent any further reimbursement formulae for determining a MAIC, California reimbursed based on AWP less 5 percent for the few drugs classified for reimbursement as MAIC, in accordance with Title 22 of the California Code of Regulations, § 51513.  Plaintiff has failed to allege which of the 174 drugs in the exhibits were reimbursed based on AWP.

After 2002, when MAIC was reset at the "mean of the wholesale selling prices of drugs generically equivalent to the particular innovator drug that are available in California from

30

wholesale drug distributors selected by the department," Cal.
Welf. & Inst. Code § 14105.45(b)(3)(A) (2003), plaintiff admits
that MAIC pricing ceased to be based on prices falsely reported
by defendants because California obtained the prices it used to
determine the MAIC directly from wholesalers.  Consequently, the
causal link between the defendants' actions and MAIC was broken
in September 2002.

The Court dismisses the FAC as it relates to the drugs
reimbursed on a MAIC methodology.

### IV. Abbott Laboratories' Individual Motion to Dismiss

Abbott argues that it never made any misrepresentation that
"direct price" is anything other than an undiscounted price.
Plaintiff responds that the term "direct price" should be
construed to mean the price "generally paid by providers."

Prior to 2002, the EAC was set at AWP or "such other price
as the Department determines to be the price generally paid by
providers for a standard package."  Cal. Code Regs. tit. 22,
§ 51513(a)(6) (emphasis added).  In turn, the state's Medi-Cal
regulations also provided EAC could be the DP listed for a
standard package in the Department's primary price reference
source.  See Cal. Code Regs. tit. 22, § 51513.5(a).

California alleges that "Defendant ABBOTT knowingly used or
caused the use of false statements about the prices of its drug
products resulting in Medi-Cal paying grossly excessive,
unreasonable and unlawful amounts for Defendant's drugs."  (FAC

31

¶50).  It offers a massive list of Abbott's drugs, which
contrasts the DPs paid by the state to the prices paid by the
market participants.  (<u>Id.</u> at Ex. A.)  For instance, plaintiff
alleges that "in 1999 California paid $0.1177 cents per unit of
Sodium Chloride of 0.9% solution (NDC 00074710123).  The contract
price or price at which this product was sold to a Group
Purchasing Organization (GPO) was $0.0119 cents per unit.
Medi-Cal paid 9.89 times more for this product than did a GPO
acting on behalf of its member doctors and/or pharmacists. The
reported DP for this product at the time was $0.1177 cents per
unit."  (<u>Id.</u> at ¶ 52.)  As with other Abbott products, the price
difference exhibited with this saline solution "demonstrates
significant spreads of its drugs."  (<u>Id.</u>)

     While DP is not a defined term, the Court needs a better
record to determine how regulators construed the term and how the
industry defined it.  <u>See</u> <u>Chevron U.S.A. Inc., v. Natural Res.</u>
<u>Def. Council</u>, 467 U.S. 837, 844 (1984) ("considerable weight
should be accorded to an executive department's construction of a
statutory scheme it is entrusted to administer").  Again,
Abbott's argument that DP should be defined as any price
published by Abbott regardless of the true prices actually
charged most providers would lead to absurd results.

     Next, Abbott contends that California's attempt to regulate
the term DP contravenes the dormant commerce clause of the
Constitution.  California argues that it is exempt from Commerce

Clause restrictions because it was acting as a "market participant." <u>See</u> <u>South-Central Timber Dev., Inc. v. Wunnicke</u>, 467 U.S. 82, 93 (1984) (plurality opinion) ("if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities"); <u>see also</u> <u>Nat'l Foreign Trade Council v. Natsios</u>, 181 F.3d 28, 62-65 (1st Cir. 1999) (discussing market participant exception).

The Supreme Court first recognized the domestic market participant exception in <u>Hughes v. Alexandria Scrap Corp.</u>, which upheld a state law that imposed extra documentation requirements on out-of-state metal processors seeking to receive bounties from the state for junking cars. 426 U.S. 794, 800-01 (1976). The Court reasserted this exception in <u>Reeves, Inc. v. Stake</u>, where the Court upheld South Dakota's decision to sell cement from a state-owned plant only to state residents during a materials shortage. 447 U.S. 429, 432-34 (1980).

Nevertheless, "the Supreme Court held that the domestic market participant doctrine has limits." <u>Natsios</u>, 181 F.3d at 63. This market participant exception "is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity." <u>South-Central Timber</u>, 467 U.S. at 97. The First Circuit has held that a state was not acting as a market participant when it tried to control the price paid for

33

prescription drugs by non-Medicare recipients.  <u>Concannon</u>, 249

F.3d at 80 ("Maine is not a market buyer of prescription drugs,

except as required by the Medicaid statute.  Its citizens will

continue to directly purchase prescription drugs as needed.

Nothing in the Act makes Maine a market participant.").  Here,

California is establishing a pricing benchmark for drugs it

directly pays for.  Because California is acting as a market

participant and not a market regulator, the state's actions could

not violate the Dormant Commerce Clause.

## V. ORDER

The joint motion to dismiss [Docket No. 2047] is **ALLOWED** as

it relates to all drugs for which California paid based on MAIC.

The motion to dismiss Count III is also **ALLOWED**.  The remainder

of the defendants' joint motion to dismiss is **DENIED**.  Abbott

Laboratories's motion to dismiss [Docket No. 2049] is **DENIED**.


**S/PATTI B. SARIS**
PATTI B. SARIS
United States District Judge