**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| *State of Nevada v. Abbott Labs., Inc. et al.*, Case No. CV-2-00260 (Nevada I), and | Judge Patti B. Saris |
| *State of Nevada v. American Home Products, et al.,* CA No. 02-CV-12086-PBS (Nevada II) | |

**THE STATE OF NEVADA'S OBJECTIONS TO REPORT AND
RECOMMENDATION RE: DEFENDANTS' JOINT MOTION
FOR REDRESS FOR SPOLIATION OF EVIDENCE**

Pursuant to Fed. R. Civ. P. 72(a), the State of Nevada ("State") respectfully submits the following objections to the Report and Recommendation Re:  Defendants' Joint Motion For Redress For Spoliation of Evidence (March 14, 2007) (Dkt. No. 3843) ("Report and Recommendation" or "Report").  The State incorporates the facts and evidence originally filed in opposition to the Defendants' Motion for Redress[1] and in addition states the following.

**A.      Facts**

The Nevada II Defendants filed Defendants' Joint Motion for Redress for Spoliation of Evidence (Dkt. No. 2900) ("Def. Mot.") on July 21, 2006.[2]  Defendants based the motion on five document types as "having likely been in Nevada's possession during the relevant time period." Def. Mot. at 3.  As sanctions, Defendants' sought extreme "fact admissions" that exceeded any

---

[1] *See* State of Nevada's Opposition to Defendants' Joint Motion For Redress For Spoliation of Evidence (Dkt. No. 2961) (attached hereto as Ex. 1) ("Nev. Opp.").

[2] Notably, the motion was brought in the name of the Nevada II Defendants only.  The Nevada I Defendants did not join in the motion, even though they had joined in the original Emergency Motion for an Order Holding Plaintiffs in Contempt, for Preservation of Potentially Relevant Documents, and for an Account of Spoliated Documents filed against the States of Nevada and Montana on December 7, 2005 (Dkt. No. 1941).

proof that could reasonably have been found among the documents.  The most egregious example of Defendants' over-reaching was the request that the Court enter a finding that the State "received, reviewed, and considered" the actual sales price information from ***all drug manufacturers from 2001 to the present**.  Def. Mot., Ex. A.  Defendants did not allege that the State actually ever had pricing information from all Defendants.  In fact, the only support for the inference sought was evidence that **four** defendants submitted some pricing information to the State at various times beginning in 2002.  To date, there is no evidence that other drug manufacturers sent prices to the State ever.  Among the other sanctions, Defendants sought was a fact admission that Nevada Medicaid "had information" regarding how other non-Medicaid state agencies reimbursed and/or acquired drugs (a fact belied by Nevada Medicaid personnel testimony) and a finding that the State participated in an email distribution list and through that list received information regarding other states' Medicaid reimbursement methodologies.

On October 23, 2006, Chief Magistrate Judge Bowler heard argument on the motion. The Report and Recommendation, issued five months later, granted the Nevada II Defendants' Motion and imposed five sanctions sought by Defendants including the recommendation that a "fact admission" be entered that the State received average sales price information for **all** Nevada II Defendants beginning in 2001.  The Report recommended "establishing as a fact for all purposes in this litigation" that:[3]

> 1.      After May 2000, Nevada had a practice of maintaining OIG Reports relating to pharmacy reimbursement and circulating them among employees with responsibilities for the State's Medicaid pharmacy reimbursement rate.  *See* (Docket Entry # 2900, Ex. E for relevant OIG Reports).

---

[3] For purposes of this submission, the State refers to Magistrate Judge Bowler's sanctions in this form:  "Fact Admission No. __".

2.      After May 2000, Nevada had a practice of maintaining CCH and federal GAO publications relating to pharmacy reimbursement issues and circulating them among employees with reimbursement rate.  *See* (Docket Entry # 2900, Ex. I for relevant CCH publications and GAO Reports).

3.      After May 2000, Nevada participated in an e-mail distribution with other Medicaid programs, and received e-mails from this list relating to Medicaid pharmacy reimbursement rates, including the reimbursement rates of other States' Medicaid programs.  *See* (Docket Entry # 2900, Ex. O for relevant e-mails).

4.      After May 2000, Nevada had information regarding how three other Nevada pharmacy programs, namely the Department of Mental Health, Public Employee Benefits, and Senior Rx, acquired and/or reimbursed drugs.

5.      From 2001 to the present, Nevada received from defendants communications stating the actual sales price information from the manufacturers and that this sales price was different from AWP.

Report and Recommendation at 26-27.

## B.      Objections and Discussion

The State objects to Report and Recommendations Fact Admission Nos. 3, 4 and 5.[4]  The

Report's finding that the State spoliated evidence and thus deserves the sanctions outlined is

clearly erroneous, as it is unsupported by the facts on the record and the law.  The State

respectfully submits that the Report may have overlooked certain facts and law.

In addition, the Report overlooks the purposes of sanctions for spoliation of evidence,

which are threefold:  deterring parties' from destroying evidence, placing the risk of erroneous

judgment on the party who wrongfully created the risk, and restoring the prejudiced party to the

---

[4] The State does not contest Fact Admission Nos. 1 and 2 and did not challenge such findings in its opposition to the Motion for Redress.  *See* Nev. Opp. at 10 (Ex. 1) (Defendants accuse the State of destroying OIG and other federal government reports "ask the Court to resolve issues that could more simply be resolved by the parties conferring. . . .  ***[I]f they had asked, defendants would have learned that the State does not argue that federal reports were not received by the State and circulated among State Medicaid employees.  This was established via Medicaid employee testimony and common sense.***") (emphasis added) (footnotes and citations omitted).  By limiting its objections, the State does not concede any wrongdoing.

position it would have been in had the misconduct not occurred.  *Phoenix Four v. Strategic Resources Corp.*, 2006 U.S. Dist. Lexis 32211 (S.D.N.Y. May 22, 2006); *West v. Goodyear Tire & Rubber Co.*, 167 F. 3d 776, 779 (2d Cir. 1999).  A sanction should not reward a party who claims to be aggrieved by placing that party in a better position than the evidence itself would have cast the party.  The consequence of the Report's recommendations here, however, is just that - Defendants will be placed in a better position than any evidence could have established.

1.     **The State objects to Fact Admission No. 3 related to an e-mail distribution with other states' Medicaid programs**

The State objects to Fact Admission No. 3 as it does not take into consideration electronic evidence provided to Defendants in August 2006.  At the time Defendants' motion was filed, the State had not completed the majority of its electronic discovery production, which was the subject of a pending motion to compel.  The bulk of the State's electronic production took place pursuant to Court order in August 2006, ending weeks after the briefing on this spoliation motion closed.  Defendants were also granted leave to take a limited number of half-day depositions to address this evidence and did so in January 2007.  The Report recognizes that Nevada did not deny the existence of the communications, but contended that they were produced within the hundreds of thousands of electronic files turned over pursuant to the Court's order.  Report at 7.  No revised submissions were made to the Court after the discovery was completed.  Specific proof that the evidence Defendants claimed was "missing" was found in the electronic production and used in the January 2007 depositions, including emails reflecting distribution list communications among the Medicaid agencies of Nevada and other states now exists on the record in the form of exhibits to the January 2007 depositions.[5]

---

[5] *See, e.g,* Ex. 4 (Duarte Dep. (Jan. 10, 2007)); Ex. 2, Ex. 10, Ex. 20 (Lawrence Dep. (Jan. 9, 2007)).  The State will provide copies of these exhibits at the Court's request.

The State respectfully objects that Fact Admission No. 3 is over broad and uncalled for in light of the State's August 2006 production.

> **2.**     **The State objects to Fact Admission No. 4 related to communications between Nevada Medicaid and other Nevada agencies**

The State objects to Fact Admission No. 4 on the grounds that this finding is not supported by the evidence.  The Report's analysis of whether a sanction should be imposed in connection with this category of documents focuses on the "discoverability" of the information. Report at 13-15.  The Report concludes that because the Court already ruled on the discoverability of information related to reimbursement programs of Nevada's Medicaid state agencies when it "limited [Defendants'] discovery to three non-Medicaid entities of defendants' choice," if other elements of a spoliation claim are met, a sanction is appropriate.  *Id.* at 13-14.

The State respectfully submits that this focus is misplaced.  The discoverability or – what some courts call "relevance" – standard for spoliation sanctions is higher than that for discovery. "The concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."  *Heng Chan v. Triple 8 Palace,* 2005 U.S. Dist. Lexis 16520 (S.D.N.Y. Aug. 11, 2005).  The evidence that the Report and Recommendations now states the State should have "preserved" was not at all obvious at the time this lawsuit was brought.  Even if Nevada Medicaid regularly communicated with the Department of Mental Health, the Public Employee Benefits Fund and Senior Rx, (an allegation the State submits is contraindicated by the record), the relevance of such communications to a lawsuit involving the use of AWP by Nevada Medicaid would not have been reasonably foreseeable.

The State's position is corroborated by the fact that the Court previously limited discovery from non-Medicaid sources to three agencies, *see* Report at 14, combined with

unequivocal State testimony that Medicaid personnel did **not** have regular formal or informal communications with the three non-Medicaid agencies from which the Court allowed discovery establishes the fact that the relevance or discoverability of this information was not necessarily foreseeable.

### 3. The State objects to Fact Admission No. 5 related to Defendants' pricing communications

The State objects to Fact Admission No. 5 because it so grossly overstates the facts available to any party at any point in time. Defendants' own submissions support the State's objection. The State will be acutely prejudiced if Fact Admission No. 5 is adopted. In support of its objection, the State submits that not even Defendants' themselves have argued that from 2001 to the present, Nevada received *from each and every defendant* communications stating the actual sales price information from the manufacturers and that this sales prices was different from AWP.

The very best evidence that Defendants have been able to adduce in connection with its motion for redress suggests that just *four* drug manufacturers supplied Nevada with sales prices – the earliest in 2002.[6] Months later, Defendants presumably submitted their best evidence of sales price submissions in connection with their summary-judgment motion. Again, the drug manufacturers' own evidence shows that *beginning in 2002* (not 2001 as the Report recommends), as the result of a settlement between Bayer Corporation and Nevada, among other states, Bayer begin to provide ASPs. TAP began reporting ASPs to Nevada as a result of its own settlement with the State around the same time. Later, Warrick and Schering began providing

---

[6]   *See* Def. Mot. at 19 ("Similarly, *many of the Defendants,* including Warrick Pharmaceuticals Corp. ("Warrick"), Schering-Plough Corp. ("Schering-Plough"),AstraZeneca Pharmaceuticals PLC ("AstraZeneca"), and Bayer Corporation ("Bayer") were reporting their sales prices to the Plaintiffs before and during this litigation.) (emphasis in original).

ranges of prices (not ASPs).[7]  In total, then, according to the Defendants' best evidence from their own internal files, *four* drug manufacturers submitted prices directly to the State – none beginning before 2002.[8]

In light of the drug manufacturers' own inability to furnish evidence that the vast majority of them submitted pricing information to Nevada – and the lack of direct evidence that Nevada destroyed such evidence, acceptance of the Report's over-broad Fact Admission No. 5 would grossly prejudice the State.  For all of these reasons, the State submits that Fact Admission No. 5 should not be adopted.

### 4. The State objects that no documents have been destroyed as a general proposition

The destruction of documents is a *sine qua non* of sanctions for spoliation.  The State respectfully objects that the Report reaches an unsupported conclusion with respect to the purported destruction of documents.  The State continues to maintain that ***no documents have been destroyed*** and respectfully submits that neither the Report nor Defendants have adduced adequate evidence to the contrary.  The Report identifies three examples of documents that purportedly provide "substantial uncontroverted evidence that documents have in fact been destroyed."  Two of the examples support only portions *of the Report to which the State does not object*.[9] The conclusion that these documents were "destroyed" should not be allowed to taint other categories of documents for which no such evidence exists.

---

[7] *See* Defendants' Joint Local Rule 56.1 Statement of Undisputed Material Facts In Support of Their Joint Motion For Summary Judgment at ¶ 109 (citing the fact that "several defendants reported actual sales prices" and then identifying Warrick and Schering as providing "a monthly report of their high-low range of prices for the drugs at issue" beginning in 2002 and TAP and Bayer as reporting actual sales prices to Nevada since February 2002).

[8] *See* Defendants' Joint Memorandum of Law in Support of Their Motion For Summary Judgment at 29-30 (Dkt. No. 2631).  Notably, in the motion for summary judgment, Defendants abandoned the allegation made in connection with the spoliation motion that AstraZeneca had reported its sales prices to Nevada.

[9] The first is the federal reports related to AWP.  The State admitted that such reports were not maintained in Medicaid files, but were accessed on the Internet when needed.  The State further "admitted" that it received such

The third example cited by the Report is broadly identified as "numerous AWP related e-mails sent to Nevada Medicaid personnel from third parties (Dkt. Entry 2890)" and the Court concludes that they "inarguably existed but were not preserved and have not been produced, and that this is "sufficient to demonstrate an act of destruction and satisfy the first element of a spoliation claim."  Report at 12.  But such vague allegations by Defendants as those the Report apparently relies on cannot be said to demonstrate destruction.  The State had not even produced its electronic files, mail or documents, until *after* Defendants' motion was filed.  Defendants made the allegation before they received the Nevada Medicaid electronic mail and electronic document files.  Even if the vague allegations in the Report did somehow support the inference of destruction (which it does not), that inference should be limited to the category of documents to which it relates – here, electronic mail and the e-mail distributions that Defendants allege the State received from other Medicaid pharmacy programs and, again, should not be allowed to taint other categories of documents.

> **5.**    **The State objects that the obligation to preserve documents was triggered by the filing of the lawsuit, not before**

In addition to the specific objections detailed above, the State respectfully objects that the Report sets the trigger date for the State's obligation to preserve documents too early.  Report at 20.  The obligation was *not* triggered by the May 2000 Nevada Medicaid Fraud Control Unit ("NMFCU") letters.  Under *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) a party's obligation to preserve documents is triggered by the filing of the lawsuit or at a time when the party is on notice that evidence may be relevant to potential litigation.  Whether or

---

reports and circulated such reports and never contested the "fact."  Thus there is no issue.  Thus, it is not at all clear why a "sanction" was required.  As for the second example given in the Report, a pre-1991 study once "seen" in Nevada Medicaid files – "the Macdonald study, compiled in the 1980s, *was already excluded from discovery by this court when it ruled in March 2006 that pre-1991 documents were not discoverable*."  Report at 13 (emphasis added).

not that timing is deemed to be when litigation is "reasonably foreseeable," *McGuire v. Acufex Microsurgical*, 175 F.R.D. 149, 154 (D. Mass. 1997), or when the filing of a suit is "imminent," *id.* at 153.  In this case, the obligation arose when the State filed the lawsuit in January 2002, or in the quarter leading up to the filing; there is no evidence of litigation or legal claims supporting an earlier date.  The Report's finding that the obligation was triggered in May 2000, 20 months before this lawsuit was filed, when NMFCU issued letters to certain drug manufacturers misapprehends the relationship between the NMFCU and Nevada Medicaid.  Report at 16-20.  At the time the letters cited by the Report and Recommendations were issued, Mr. Terry was acting in his capacity as the chief of Nevada's Medicaid Fraud Control Unit and not as counsel for Nevada Medicaid, which was represented by the Division of Human Resources of the Attorney General's Office.  The Medicaid Fraud Control Unit is created by state statute as an independent unit.  Nev. Stat. Ann. § 228.410.  Its purpose is to investigate Medicaid fraud independently of the Medicaid agency, including investigation of the state agency itself if necessary.  It does ***not*** include representing State Medicaid.  At the time he issued the letters, Mr. Terry was acting solely in his capacity of the NMFCU chief.  He had no authority to order State Medicaid to preserve documents.  His communications with the drug manufacturers confidential and not shared with State Medicaid personnel.  The letters did not mention legal claims.

## C.    Conclusion

For all the foregoing reasons, the State respectfully asks that the Court decline to adopt Magistrate Judge Bowler's Report and Recommendations dated March 14, 2007 and strike the sanctions set forth at pages 26-27 of the Order.

In the alternative, the State seeks the following modifications to the Report and Recommendation:  (2) rejecting Fact Admission No. 5; and (2) declaring that the remaining Fact

Admissions apply to the Nevada II Defendants only as they are the only defendants that joined in the motion.

By_____/s/ Steve W. Berman_____          DATED:  March 26, 2007
   Steve W. Berman
   Sean R. Matt
   Jeniphr A.E. Breckenridge
   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Thomas M. Sobol
   Edward Notargiacomo
   HAGENS BERMAN SOBOL SHAPIRO LLP
   One Main Street, 4th Floor
   Boston, MA  02142
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003

   Catherine Cortez Masto
   Attorney General of the State of Nevada
   L. Timothy Terry
   Deputy Attorney General
   100 N. Carson Street
   Carson City,  NV 89701-4714

   COUNSEL FOR PLAINTIFF
   STATE OF NEVADA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **STATE OF NEVADA'S OBJECTIONS TO REPORT AND RECOMMENDATION RE: DEFENDANTS' JOINT MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on March 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, | MDL No. 1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | Judge Patti B. Saris |
| *State of Nevada v. Abbott Labs., Inc. et al.*, Case No. CV-02-00260 (Nevada I), | |
| *State of Nevada v. American Home Products, et al.*, CA NO. 02-CV-12086-PBS (Nevada II) | |

**STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT**
**MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE**

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND ..................................................................................2

    A.   Procedural History ........................................................................................2

III. LEGAL ARGUMENT .............................................................................................5

    A.   The State's Obligation to Preserve Documents in this Case Was Triggered No Earlier Than the Filing of the Complaint ...............................6

    B.   Where, As Here, There is No Bad Faith, Willful or Intentional Destruction of Evidence; the Burden Shifts to Defendants ........................7

    C.   Defendants Cannot Meet Their Burden to Demonstrate a Nexus Between the Negative Inferences Sought and the Lost Evidence ...............9

    D.   There Is No Evidence of the Link Required Between the Contents of the Lost Documents and the Sanctions Sought .............................................9

        1.   The OIG ("Office of the Inspector General") reports and other federal government reports ......................................................10

        2.   Documents relating to Nevada's reimbursement formula .........................11

            a.   The Keith MacDonald study ...........................................11

            b.   Myers & Stauffer survey ...............................................12

        3.   Communications between Nevada and others related to AWP .................13

            a.   Communications with other State Medicaid programs ..................13

            b.   Communications between Medicaid and non-Medicaid agencies regarding pharmacy ......................................................14

        4.   Communications with defendants ............................................16

    E.   Defendants Have Suffered No Prejudice .................................................17

IV.  CONCLUSION .....................................................................................................17

001534-13  122197 V1

# TABLE OF AUTHORITIES

## CASES

*Bass-Davies v. Davis*,
    134 P.3d 103 (Nev. 2006) .......................................................................................17

*Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*,
    133 F.R.D. 166 (D. Colo. 1990) .............................................................................6, 8

*McGuire v. Acufex Microsurgical, Inc.*,
    175 F.R.D. 149 (D. Mass. 1997).............................................................................5, 6

*Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*,
    692 F.2d 214 (1st Cir. 1982)...................................................................................9

*Sacramona v Bridgestone/Firestone, Inc.*,
    106 F.3d 444 (1st Cir. 1997)...................................................................................5, 7

*Turner v. Hudson Transit Lines, Inc.*,
    142 F.R.D. 68 (S.D.N.Y. 1991) ...........................................................................7, 8, 9

*Vasquez Corales v. Sea-Land Serv.*,
    172 F.R.D. 10 (D.P.R. 1997) ..................................................................................5, 6

*Wm. T. Thompson Co. v. GNC*,
    593 F. Supp. 1443 (C.D. Cal. 1984) .......................................................................6, 8

*Zubulake v UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ...........................................................................6, 7

*Zubulake v UBS Warburg LLC*,
    229 F.R.D. 422 (S.D.N.Y. 2004) ...........................................................................6, 7

001534-13  122197 V1

## I.     INTRODUCTION

Defendants accuse the State of destroying documents and seek severe sanctions that, if imposed, could alter the outcome of the case.  The motion should be denied because it is unsupported by (i) any confirmation that the State destroyed even one document; (ii) evidence that many of the documents *ever* existed in the State's files or elsewhere; (iii) any extrinsic evidence of the contents of the documents defendants contend have been destroyed; and (iv) a demonstrated nexus between the documents allegedly destroyed and the negative inferences defendants seek.  The motion is also untimely as it was brought before defendants reviewed the tens of thousands of electronic witness files the State has or will produce.

This is the second time that the State has been forced to respond to defendants' *unsupported* document destruction claims.  Defendants began their campaign to establish spoliation in November 2005, before full discovery had taken place and without presenting any evidence beyond their own speculation.  *See* Defendants' Motion for an Order Holding Plaintiffs in Contempt, for Preservation of Potentially Relevant Documents, and For An Accounting of Spoliated Documents (Dkt. No. 1941).[1]  Eight months, more than one dozen state witnesses and tens of thousands of documents later, defendants' claims that the State destroyed important, relevant evidence remain unsupported.  The reason for the void is simple and dispositive of the motion before the Court:  *no documents have been destroyed*.

The true purpose of the motion lays within the negative inferences defendants seek as sanctions.  Defendants seek factual admissions they need to defend the case but have been unable to obtain from witness testimony and the thousands of documents the State has produced.

For all of these reasons and the reasons stated more fully below, the motion should be denied in its entirety.

---

[1] The original motion is pending.

1

## II.     FACTUAL BACKGROUND

### A.     Procedural History

The State takes defendants' accusations very seriously.  Nearly all of the documents defendants accuse the State of destroying relate to Department of Health Care Finance and Policy ("DHCFP") (also known as "Nevada Medicaid") business.  DHCFP is comprised of professionals and staff dedicated to public service.  Because Medicaid is a public entity, much of the information the Medicaid staff handles is publicly available.  Thus Nevada Medicaid personnel have no incentive to hide or destroy documents.  To the knowledge of key individuals in the organization, many of whom have been deposed, there has been no destruction of documents since the lawsuit was filed.[2]

In January, 2002, the State filed this lawsuit against the drug manufacturers alleging that the defendant drug manufacturers defrauded, deceived, and misled the State by manipulating the published AWP ("Average Wholesale Price").  DHCFP lawyers notified the department of the filing of the lawsuit on January 17, 2002, by circulating the Attorney General press release regarding the suit.  Breckenridge Decl., Ex. 2.  This was the first notice of the lawsuit most DHCFP employees received.

The State had not been involved in any litigation related to AWP prior to filing the complaint.  Drug manufacturer use of AWP had, however, been in the public eye as a target of media reports and Congressional attention.  In May, 2000, the State's Medicaid Fraud Control Unit ("MFCU") through Tim Terry, its senior attorney, had contacted certain drug manufacturers to request information regarding their AWP practices.  *See*, *e.g.*, Defs. Ex. B.  MFCU was and is independent of the Nevada DHCFP.  MFCU does not represent DHCFP or Nevada Medicaid.

---

[2] *See*, *e.g.*, Declaration of Jeniphr Breckenridge in Support of State of Nevada's Opposition to Defendants' Joint Motion for Redress for Spoliation of Evidence ("Breckenridge Decl."), Ex. 1 (Chuck Duarte Dep., Vol. 1 at 117-23) (Mr. Duarte has been the Medicaid Administrator in Nevada since 2001); Breckenridge Decl., Ex. 12 (Coleen Lawrence Dep., Vol. 3 at 596-97).

DHCFP has its own counsel.  Neither DHCFP nor its counsel were copied on the letters to the drug manufacturers.

The sole purpose of the letters was to gather information.  Breckenridge Decl. at ¶ 2.  The letters did not threaten litigation.  At the time, no litigation was contemplated.  The drug manufacturers responded to the letters by denying any fraudulent practices that could lead to legal charges or litigation.  *See*, *e.g.*, Defs. Ex. C.  In both of the examples cited by defendants, the drug companies responded through their presidents and CEOs, not lawyers.  *Id*.  The president and CEO of Dey acknowledged the generic interest in the topic.  *Id*.  There was no litigation pending or planned and thus no obligation to preserve documents on the part of the State had been triggered.

Between May, 2000 and the lawsuit filing, additional information regarding drug manufacturer misconduct and AWP was developed from a variety of sources.  Authorized Records Retention and Disposition Schedules were in place throughout this time and continue today.  *See*, *e.g.*, Defs. Ex. D.  In addition, individual Medicaid employees had their own document retention practices that included retaining copies of material that was important or useful to them in their work.  Often this meant that documents were retained longer than the formal retention policy.[3]  Medicaid Administrator Chuck Duarte testified that he was not aware of any instances where the document retention policy was violated and that his department had acted to identify and protect documents relevant to the litigation.[4]  Nevada Medicaid witness

---

[3] *See*, *e.g.*, Vicki Langdon Dep. at 51-52 (Breckenridge Decl., Ex. 3); Carol Tilstra Dep. at 41-44 (Breckenridge Decl., Ex. 4).

[4] *See* Breckenridge Decl., Ex. 1 (Chuck Duarte Dep., Vol. 1 at 117-23).  *See also* Breckenridge Decl., Ex. 12 (Coleen Lawrence Dep., Vol. 3 at 596-97).

testimony **not cited by defendants** has been consistent that no witness is aware of any instance where employees destroyed documents.[5]

Defendants waited until three years after the lawsuit was filed to serve their first discovery requests. The discovery requests were overbroad and burdensome and requested virtually every piece of paper that had passed through Nevada Medicaid during the relevant time period (1991 to the present). The State worked to produce the requested information.

Almost as soon as the State began its document production, defendants accused the State of destroying documents. In November 2002, defendants filed their original spoliation motion. Defendants could not articulate specific examples of documents that were supposedly destroyed, when they were destroyed or who destroyed them. The State nonetheless took the allegations very seriously. In response to the motion, Mr. Duarte, with counsel, circulated a memorandum reminding Medicaid employees of their obligations to preserve documents for the litigation. Breckenridge Decl., Ex. 6. The memorandum also asked employees who had questions about the document preservation order or had knowledge that documents had been destroyed to contact counsel. *Id*. None came forward. Breckenridge Decl. at ¶ 3. In addition, the State's outside counsel conducted extensive interviews of key Medicaid fileholders regarding the department's document handling and destruction practices. Breckenridge Decl. at ¶ 4. No evidence of document destruction was uncovered.

Defendants immediately went on the offensive, determined to develop support for their spoliation accusations *ex post facto*. Defendants examined every State deposition witness exhaustively on document destruction. In many instances the depositions became a spoliation witch hunt, with defendants' document destruction accusations dominating the record to the

---

[5] *See*, *e.g.*, Chuck Duarte Dep., Vol. 3 at 70-75 (Breckenridge Decl., Ex. 5).

4

exclusion of inquiries relevant to case issues. Despite the zeal of the hunt, defendants were not able to confirm their spoliation accusations. Presumably defendants have presented their best evidence of spoliation to the Court. The record defendants submit confirm that no employee testified to knowledge that any document was destroyed. Similarly, with few examples, defendants could not elicit regarding any specific documents that were destroyed or even lost or the contents of such documents. The motion is baseless; there is no evidence of spoliation.

Defendants' demand for sanctions is also untimely. In March 2006, Magistrate Judge Bowler ordered the State to provide extensive electronic discovery to the defendants. The process has been laborious and time consuming, involving the review of hundreds of thousands of electronic files by the State to identify information to be produced.[6] The State has just begun to produce the bulk of the files. Defendants renewed their motion without reviewing electronic files produced or without waiting to see what will be produced. Certain of the categories of information defendants claim were destroyed will be located within the electronic files.

### III.    LEGAL ARGUMENT

Courts have the authority to consider allegations of spoliation and, if appropriate, sanction a party's misconduct. *McGuire v. Acufex Microsurgical, Inc.*, 175 F.R.D. 149, 153 (D. Mass. 1997). The principal purpose of the sanction is remedial. *Sacramona v Bridgestone/Firestone, Inc.*, 106 F.3d 444, 446 (1st Cir. 1997); *Vasquez Corales v. Sea-Land Serv.*, 172 F.R.D. 10, 11 (D.P.R. 1997). Courts assess whether to impose sanctions by considering three elements: (1) whether the party having control over the evidence had an obligation to preserve the evidence; (2) whether the records were destroyed with a "culpable state of mind"; and (3) whether the destroyed evidence was "relevant" to the party's claim or

---

[6] In just one production earlier this week, the State produced approximately 85,000 electronic files for just four witnesses. Breckenridge Decl., Ex. 13

defense such that a reasonable trier of act could find that it would support that claim or defense. *Zubulake v UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*").[7] Relevance in this context is also known as "corroboration." The process is left to the court's discretion and the elements are not a rigid test. *Vasquez Corales*, 172 F.R.D. at 11. Although courts may express the elements slightly differently,[8] the elements are essentially the same. Before sanctions are actually imposed, an additional element "is in a sense always required, namely prejudice to the opposing party." *McGuire*, 175 F.R.D. at 154.

When these elements are applied to the facts defendants bring before the Court here, two conclusions emerge: the State has not engaged in any actionable misconduct and there has been no prejudice to the drug manufacturers.

**A.  The State's Obligation to Preserve Documents in this Case Was Triggered No Earlier Than the Filing of the Complaint**

The obligation to preserve documents attaches when the lawsuit is filed or when the filing of the suit is imminent.[9] *McGuire*, 175 F.R.D. at 153. Anything short of this has been called "pre-litigation limbo" and too indefinite to trigger any legal obligations. *Id.* In this case, the obligation arose when the State filed the lawsuit in January, 2002. There is no evidence of litigation or legal claims supporting the earlier date cited by the defendants. Defs. Mem. at 7

---

[7] Defendants' motion refers to *Zubulake v UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*") and *Zubulake v UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ("*Zubulake V*") interchangeably. To avoid confusion here, the State refers to the cases as *Zubulake IV* and *Zubulake V*.

[8] *Compare McGuire v. Acufex*, 175 F.R.D. at 154 (citing Jamie S. Gorelick, *et al.*, DESTRUCTION OF EVIDENCE, §§ 3.8-3.12).

[9] As a practical matter, there is no evidence that any relevant documents were destroyed between the time MFCU sent the letters and the filing of the lawsuit, before or after. In fact, the State has produced volumes of information pre-dating May 2000 - all the way back to 1991, the dates the States' claims begin. For this reason, the discussion of the State's "obligation" to preserve documents is largely moot. The State preserved documents regardless of when its legal obligation attached.

Analyzing spoliation in the absence of proof that document destruction has taken place is awkward. In each of the cases cited by defendants, the party advocating a spoliation sanction had adduced clear evidence that documents had been destroyed. *See, e.g., McGuire*, 175 F.R.D. 149; *Wm. T. Thompson Co. v. GNC*, 593 F. Supp. 1443 (C.D. Cal. 1984); *Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166 (D. Colo. 1990). For purposes of discussing the relevant legal authority, then, the State will ignore the requirement that documents actually have been lost or destroyed before the analysis takes place.

6

("[t]his litigation was reasonably foreseeable to Nevada in May 2000 *at the latest.*"). The communications between MFCU and the drug manufacturers do not mention legal claims. In fact, the drug manufacters deny any conduct that might subject them to legal action. Defs. Ex. C. Thus, at the earliest, the State was under an obligation to preserve documents when Attorney General del Papa filed the suit in January 2002. The State met this obligation.

**B.** **Where, As Here, There is No Bad Faith, Willful or Intentional Destruction of Evidence; the Burden Shifts to Defendants**

Once an obligation to preserve evidence is established, courts must assess whether the party's conduct warrants an adverse inference or other sanction. *Zubulake IV*, 220 F.R.D. at 221. Courts usually consider the second (the "culpable mind") and third (relevance or corroboration) elements together.

The "culpable mind" refers to the purported spoliator's intention in destroying evidence. When evidence is destroyed in bad faith, either willfully or intentionally, that factor alone may be sufficient to demonstrate relevance. *Zubulake V*, 229 F.R.D. at 431. At the court's discretion, a finding of "bad faith" or intention to avoid evidence by destroying it can alone lead to harsh penalties such as an adverse inference or other sanction. *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 74-75 (S.D.N.Y. 1991) (discussing First Circuit law).

A "culpable state of mind" for purposes of a spoliation inference may also include carelessness or ordinary negligence. *Sacramona*, 106 F.3d at 448. Where the destruction results from ordinary negligence, the party seeking the sanction has a higher burden to meet; relevance must be proved by the party seeking the sanction. *Zubulake V*, 229 F.R.D. at 431. In such cases, the contents of the evidence destroyed becomes the paramount concern. *Turner*, 142 F.R.D. at 74-75. An adverse inference will not be drawn absent a demonstrated link between the proposed inference and the lost evidence. *Id*. The heightened burden on the accuser is required because

"it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." *Id*. at 77.

Importantly, in this case neither witness testimony nor defendants suggest that the State took any particular action to destroy evidence or that the State destroyed documents to avoid their use in this lawsuit. At the most, defendants allege, the State's "disregard of its obvious preservation obligations" constitutes willfulness – without any discussion of the State's actions Defs. Mem. at 9.

When examined, it is clear that the destruction allegations here fall short of "bad faith" or willfulness found by the Courts in cases relied on by defendants. The two principal cases defendants rely on are dissimilar to the facts before the Court. In both of the cited cases, *Wm. T. Thompson Co . v. GNC*, 593 F. Supp. 1443 (C.D. Cal. 1984) and *Computer Assocs. Int'l, Inc.* v. *American Fundware, Inc.*, 133 F.R.D. 166 (D. Colo. 1990), the destruction of evidence and the party's bad faith with respect to the destruction were unquestioned and resulted in the ultimate sanctions: default judgment against the spoliating party. In *Wm. T. Thompson*, for example, the court recited a long list of the evidence that defendant destroyed in defiance of a court order, suggesting that it was not only the "best objective evidence on many central issues," but the only evidence. *Wm. T. Thompson*, 594 F. Supp. at 1451. In *Computer Assocs.,* defendants intentionally destroyed irreplaceable computer code, without which the case could not be fairly tried. *Computer Assocs.*, 133 F.R.D. at 169.

Although the State denies that *any* evidence was lost or destroyed, it is evident based on defendants' submission that any loss after the filing of this lawsuit was the result of State "carelessness or negligence." The "carelessness or negligence" shifts to defendants the burden to demonstrate that the inferences sought bear a relationship to the lost evidence.

8

**C.    Defendants Cannot Meet Their Burden to Demonstrate a Nexus Between the Negative Inferences Sought and the Lost Evidence**

By contrast to the cases defendants cite, the court's analysis in *Turner v. Hudson Transit Lines*, 142 F.R.D. 68 apply here.  The *Turner* court concluded that the destruction of the documents was not intentional, but rather was negligent.  The court next considered whether an adverse inference was warranted.  The court considered whether there was any corroboration between the missing evidence and the negative inference sought.  Absent intentional conduct, the Court admonished, "[b]efore an adverse inference may be drawn, there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence."  *Id*. at 76 (citing 2 Wigmore on Evidence § 291 at 228 (Chadbourn rev. 1979)). The court concluded that ***no adverse inference*** was appropriate because there was "no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator."  *Id*. at 77.  *Compare Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 218 (1st Cir. 1982) (approving how much detail party had shown regarding contents of missing documents via direct and circumstantial evidence).

This is a case like *Turner.*  The lack of extrinsic evidence of the contents of documents defendants claim are missing renders the adverse inferences sought inappropriate.  In fact, here, the sanctions sought are even more egregious because through them defendants seek to go far beyond what any document could possibly show and to establish proof required for their defense.

**D.    There Is No Evidence of the Link Required Between the Contents of the Lost Documents and the Sanctions Sought**

Defendants have identified several categories of documents they claim have been destroyed without making any attempt to link the contents of the allegedly lost documents with the negative inferences they seek, as the case law requires.

9

1. **The OIG ("Office of the Inspector General") reports and other federal government reports**

Defendants accuse the State of destroying OIG and other federal government reports and ask for the negative inference found in Defs. Ex. A.1 and A.2 as sanctions.[10] *See generally* Defs. Mem. at 11-15. Defendants ask the Court to resolve issues that could more simply be resolved by the parties conferring. Defendants have presented absolutely no evidence that this category of documents was destroyed. And, if they had asked, defendants would have learned that the State does not argue that federal reports were not received by the State and circulated among State Medicaid employees. This was established via Medicaid employee testimony,[11] and common sense. Medicaid Director Chuck Duarte and Pharmacy Program Services director Coleen Lawrence both also testified that they did not maintain hard copies of the OIG reports because they were perpetually available on line.[12] In addition, many of the OIG reports defendants have asked about are found in the electronic files produced to defendants, particularly the files of witnesses Duarte and Lawrence. Breckenridge Decl. at ¶ 5.

Even if the reports had been lost, the sanction sought by defendants would be inappropriate. Adverse inferences imposed as a sanction must be commensurate with the lost missing evidence, relating to the information that would likely have been proved *through the document* if that document were available. To the contrary here, defendants asked the Court to enter "fact admissions" that Nevada had knowledge of the contents of the OIG Reports dated April 1996, through the present and relating to AWP and pharmacy reimbursement and CCH and other unspecified "federal government publications, such as GAO Reports," and considered

---

[10] The State will refer to the sanctions defendants call "Factual Admissions Requested by Defendants" in Exhibit A to their motion (usually referred to as "negative inferences" in spoliation case law) by the exhibit number ("A") with the specific negative inference's number.

[11] *See generally* Defs. Mem. at 12-13 (describing state witness testimony regarding federal reports).

[12] *See, e.g.*, Breckenridge Decl., Ex. 12 (Coleen Lawrence Dep., Vol. 1 at 26-27, 94-97 and Vol. 3 at 549-50); Breckenridge Decl., Ex. 7 (Chuck Duarte Dep., Vol. 2 at 46-49).

these documents in setting and/or assessing its Medicaid pharmacy reimbursement." Defs. Ex.
A.1 and A.2. This is overreaching. Knowledge or affirmative action such as "considering these
document in setting and/or assessing its Medicaid pharmacy reimbursement" is not something
that could be proved through documents issued by the federal government even if they were
available. Defendants would have had to establish the State's knowledge of or use of the
documents through testimony or internal analyses, which they have not been able to do.

     **2.     Documents relating to Nevada's reimbursement formula**

     Defendants accuse the State of destroying one specific document related to Nevada's
Reimbursement formula and a broader destruction of a category of documents defendants believe
must exist. Defs. Mem. at 15-17.

     **a.     The Keith MacDonald study**

     Defendants accuse the State of destroying a study Medicaid Director Keith Macdonald
created at least fourteen years before this case was ever filed and ask for a negative inference that
would confirm both the specific data in the study ***and*** the use of that information by Nevada
Medicaid during as part of the rate setting process for the past 20 years even though most
Medicaid employees have never seen the document. Defs. Mem. at 15-17; Defs. Ex. A.3.

     As an initial matter, the study predates the State's claims. The study and other pre-1991
documents were one subject of the defendants' motion to compel. In March 2006, Magistrate
Judge Bowler ruled that the State did not have to produce documents from this time period.
Breckenridge Decl. at ¶ 6. On that basis alone, defendants' requested relief as to the study
should be denied.

     Further, defendants again seek too much in the way of sanction – even if the State had
been required to produce the document and was unable to do so. Defendants have not offered
any evidence as to the contents of the document nor could there have been any basis to conclude

11

from the document itself that it had been used "as part of all changes and/or assessments of its

Medicaid pharmacy reimbursement rate from 1988 through the present." Defs. Ex. A.3. At the

March 24, 2006 deposition of Mr. MacDonald, defendants did not even ask him about the survey

or its contents. Breckenridge Decl. at ¶ 7. The purpose of negative inferences when imposed as

a sanction is to allow the party sponsoring the negative inference to restore the benefit of any

negative information that would likely have been in the document if the document had been

produced. The purpose is ***not*** to improve the sponsoring party's position in the litigation beyond

what the document could have proved if available. A document created in the 1980's could

never be used to prove what future use was made of it.

### b.      Myers & Stauffer survey

Defendants accuse the State of destroying unspecified documents related to a margin

analysis study outside consultant Myers & Stauffer completed. Defendants complain that the

State has "only produced two versions of this margin analysis, a memorandum from Myers &

Stauffer discussing it, and a few other related documents." *Id*. at 16. Defendants cannot identify

any one document that the State did not produce or evidence that related documents were

destroyed – despite having deposed the State Medicaid Administrator,[13] State pharmacy director

Coleen Lawrence (the employee responsible for the survey)[14], two times and deposing a Myers

& Stauffer witness exclusively on the topic of the survey. There is no definitive evidence that

the documents defendants want to see ever existed.

The sanction defendants seek is unwarranted even if the documents had existed and were

lost. Defendants ask the Court to impose the inference that the State had knowledge of the

---

[13] *See* Chuck Duarte Dep. Vol. 2 at 37-38 (Breckenridge Decl., Ex. 7 (Mr. Duarte testifying that he knew of no other documents related to the survey)).

[14] Ms. Lawrence testified that defendants had all of the information related to the Myers & Stauffer survey. Coleen Lawrence Dep., Vol. 3 at 549-50 (Breckenridge Decl., Ex. 12).

information set forth in the Myers & Stauffer margin analysis, including one very specific

example extracted from seven pages of examples,[15] *and* used that knowledge to set its

reimbursement rate in 2002.  Defs. Ex. A.4.  Again, defendants are asking the Court to go

beyond what any document could show into what Medicaid personnel *did* with the information.

Even if available, the documents described by defendants could not demonstrate what

"knowledge" Medicaid had or whether "considered this information in setting its reimbursement

rate in 2002."  Defs. Ex. A.5.  At most, they would show what information the State was

provided.

### 3.       Communications between Nevada and others related to AWP

Defendants accuse the State of destroying communications between State Medicaid

employees and other state Medicaid program staff and between State Medicaid employees and

others.  Defs. Mem. at 17-20.  Defendants offer limited evidence of their accusations despite the

fact that they have had adequate opportunity to examine State Medicaid witnesses on the topic.

### a.       Communications with other State Medicaid programs

The State does deny that Medicaid personnel subscribe to list servs and communicate

with their counterparts in other states.  And defendants admit that the State has produced some of

these interstate communications, but they want more.  The evidence submitted by defendants,

however, does not support the negative inference sought.  Defendants have recently received

voluminous electronic communications among various state Medicaid programs.  Even if some

communications had been destroyed, an allegation contradicted by the contents of Coleen

Lawrence's electronic files alone,[16] this would be inadequate to support the sanction sought.

---

[15] *See* Defs. Ex. J.

[16] Ms. Lawrence produced over 160,000 electronic files for attorney review after Magistrate Bowler's
March 30, 2006 Order.  Among these files were dozens, if not hundreds, of list-serv emails among Medicaid staff
people in various states.  Breckenridge Decl. at ¶ 5.  It is expected that other employees, including Medicaid
Director Chuck Duarte, have a similar volume of interstate Medicaid communications.

Even if State Medicaid employees received interstate communications, there is no evidence that they read them, let alone considered them in setting Nevada Medicaid reimbursement rates. Yet, defendants seek the following inference: "Nevada had knowledge of, and considered in setting its Medicaid pharmacy reimbursement rate, *all of the reimbursement rates* used from January 1999, to the present, by the Medicaid programs for the states and jurisdictions that participated in the e-mail list identified in documents produced by the State of Montana in related litigation against the Defendants." Defs. Ex. A.5 (emphasis added). Further, there is nothing in the Montana documents or any other evidence that suggests the sweeping inference here: knowledge of all reimbursement rates, let alone the consideration of the same.

**b.      Communications between Medicaid and non-Medicaid agencies regarding pharmacy**

Defendants accuse the State of destroying communications between Medicaid and non-Medicaid agencies or about non-Medicaid entities pharmacy practices without ever establishing that the documents existed, let alone that they were destroyed.

Defendants' allegations that documents existed and were destroyed is based on speculation. For example, defendants allege communications witness Squartsoff "*may have had*" with individuals at the Nevada Department of Corrections, the Nevada state hospital, and the Southern Nevada Adult Mental Health Department about prescription drug acquisition or reimbursement issues," Defs. Mem. at 19 (emphasis added), and then complain because the State has not produced "any studies or internal communications" relating to discussions that only *may have happened*.

Defendants want the Court to impose the inference that Nevada Medicaid had knowledge as to how *all* other Nevada pharmacy programs, including SIIS, the Department of Corrections,

14

the State Hospital, the Department of Mental Health ("MMCAP")[17], Public Employee Benefits,

and Senior Rx, acquired and/or reimbursed drugs from April 1996 through the present, and

considered this information in setting and/or assessing its Medicaid pharmacy reimbursement

formula during this time period."  Defs. Mem. at 19; Defs. Ex. A.6.  The sanction to which

defendants claim that they are entitled based on this flimsy evidence is vastly broader than the

discussions that one or two witnesses recall Medicaid *may have had*.  It is also contradicted by

the testimony of numerous Medicaid and non-Medicaid witnesses that Medicaid does not

communicate with non-Medicaid entities regarding pharmacy issues[18] and certainly does not

consider those agencies' rates when setting their own reimbursement policies and rates.  Further,

This inference is not linked to any document defendants claim has been destroyed.  Many of

these entities were not even founded at the time Laurie Squartsoff was employed by the State.

Finally, it is no coincidence that defendants seek this sweeping inference in connection

with evidence related to entities from which Magistrate Judge Bowler denied them discovery.  It

is a blatant effort to obtain through inference discovery that they were denied (and does not exist

anyway).  Defendants attempted to obtain unrestricted discovery from Nevada non-Medicaid

agencies via a motion to compel.  The State objected to the production of the evidence as

irrelevant to the case because the State does not seek damages on behalf of the non-Medicaid

entities and documents from those witnesses files only.  Magistrate Bowler limited the

---

[17] The reference to "the Department of Mental Health (MMCAP)" is confusing.  The Department of Mental Health and Developmental Services ("DMHDS") is a non-Medicaid Nevada entity which provides certain pharmacy services to its clients.  MMCAP is the Minnesota Multistate Contracting Alliance for Pharmacy.  It is a Minnesota state entity which puts together purchasing consortiums for prescription drugs.  Nevada Medicaid has had no known contractual relationship with MMCAP.  As defendants are aware, no Nevada state entity has access to MMCAP documents.  MMCAP documents must be obtained from MMCAP directly.

[18] *See* Emmanuel Ebo Dep. at 95-97 (Dr. Ebo is a pharmacist with DMHDS and testified that he does not communicate with Medicaid regarding drug pricing and reimbursement.) (Breckenridge Decl., Ex. 8); Donna Lopez Dep. at 42-43, 159-63) (Ms. Lopez is with the Public Employees Benefit Program and testified that she does not work with Medicaid on drug pricing and reimbursement.) (Breckenridge Decl., Ex. 9).

defendants to three depositions of non-Medicaid entities in Nevada of their choosing. They selected PEBP, Senior Rx and the Mental Health and Developmental Services.

### 4. Communications with defendants

Defendants accuse the State of destroying communications between unidentified "many defendants" reporting sales prices.[19] Defendants cite no evidence that any of these documents were destroyed because they cannot. State witnesses have testified that some of the information was received.[20] The State has produced many documents from this category. Breckenridge Decl., Ex. 10. Moreover, this is not an instance where the evidence defendants contend is missing is unique and cannot be recovered via other methods. Presumably the defendants have copies of the information they complain is missing from States. As just one example, the State requested copies of the Bayer communications it could not find and Bayer provided the State with a complete set. Breckenridge Decl., Ex. 11.

The sanction sought is extreme given the circumstances: an inference that the State "received, reviewed, and considered" the actual sales price information from ***all drug manufacturers*** from 2001 to the present. There is no evidence that most drug manufacturers sent average sales price information to the State. And the suggestion that the State "received, reviewed, and considered" the actual sales price information is not supported by evidence of documents supplied from those that did is not supported by the testimony defendants elicited from state witnesses.

---

[19] Defendants identify only Warrick, Schering-Plough, AstraZeneca and Bayer as having reported their sales prices to the State before and during this litigation. The sanction they seek extends widely to the "manufacturers."

[20] *See* Coleen Lawrence Dep., Vol. 3 at 536-37, 608-10 (discussing Bayer sales data) (Breckenridge Decl., Ex. 12).

16

E.    **Defendants Have Suffered No Prejudice**

The final consideration is whether defendants have been prejudiced by the loss of any

evidence.  There has been no prejudice to defendants here.  No unique or even critical evidence

has been lost.  The OIG and other federal reports, if not produced in electronic witness files, may

be recreated from various websites or libraries.  The drug manufacturers' own information may

be recreated from their files and, in the case of Bayer, has been.  Nothing has precluded the

defendants from questioning state witnesses about the information defendants claim has been lost

– and they have.  Most importantly, the sanctions defendants seek go far beyond the objective

information that might have been contained in any of the documents and thus they are

inappropriate.  It has been incumbent upon defendants to develop this information themselves; it

simply would not have been found in the documents.

Finally, denying defendants' motion does not leave them without recourse.  If in the

unlikely even that down the road defendants can establish that there were specific responsive

documents in existence and in the State's hands that are no longer available and have not been

produced, defendants can introduce the facts at trial.  In many cases, such issues are dealt with

via jury instructions.  *Bass-Davies v. Davis*, 134 P.3d 103 (Nev. 2006).

## IV.    CONCLUSION

An adverse inference is an extreme sanction that should not be given lightly.  The

circumstances before the Court do not justify the imposition of sanctions, let alone the negative

inferences sought.  There is no evidence that the State destroyed documents – knowingly or at

all, that many of the document ever existed or that the documents if they had existed would have

contained the evidence defendants insist they claim.  Most importantly, there is absolutely no

nexus between the inferences defendants seek and the contents of documents defendants claim

were destroyed.  Defendants' motion is an opportunistic stretch designed to achieve proof that

they have been unable to secure via witness testimony and documentary evidence.  Granting the

motion would irreparably prejudice the State.

By_____/s/ Steve W. Berman_____          DATED:  August 4, 2006.
   Steve W. Berman
   Sean R. Matt
   Jeniphr A.E. Breckenridge
   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Thomas M. Sobol
   Edward Notargiacomo
   HAGENS BERMAN SOBOL SHAPIRO LLP
   225 Franklin Street, 26th Floor
   Boston, MA  02110
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003

   George J. Chanos
   Attorney General of the State of Nevada
   L. Timothy Terry
   Deputy Attorney General Attorney General
   100 N. Carson Street
   Carson City, Nevada 89701-4714

   COUNSEL FOR PLAINTIFF
   STATE OF NEVADA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on August 4, 2006, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By        **/s/ Steve W. Berman**        

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292