# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| | : |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-A-Care of | : Judge Patti B. Saris |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc., | : Chief Magistrate Judge |
| No. 06-CV-11337-PBS | : Marianne B. Bowler |

-----------------------------X

HIGHLY CONFIDENTIAL

Videotaped Deposition of JULIE CAROLYN BOUGHN, held at the Law Offices of Jones Day, 51 Louisiana Avenue, Northwest, Washington, D.C. 20001-2113, before Cindy L. Sebo, RMR, CSR, CRR, RPR, of Henderson Legal Services, Notary Public in and for District of Columbia.

Boughn, Julie Carolyn   HIGHLY CONFIDENTIAL                January 16, 2007
                              Washington, DC

Page 206

 1  the phone -- the phone switches that are in those
 2  buildings.
 3      Q.  Are you aware of any e-mail-based
 4  voice mail being used at CMS, where people get an
 5  e-mail with an attachment, for example, of their
 6  voice message?
 7      A.  No.  And I'm only hesitating because I
 8  think in one of the buildings, GSA was looking at
 9  something for one of the regional offices that had
10  that capability, but it's not in place yet that I
11  know of.
12      Q.  Are there any servers that you're
13  aware of within CMS that have copies of voice
14  mails on the server?
15      A.  No.
16      Q.  Stepping slightly away from document
17  retention policies and looking at litigation hold
18  policies, are you aware of any litigation hold
19  policies that are in effect at CMS?
20      A.  I'm not aware of -- of general ones.  I
21  know that, to the extent that I've been involved
22  in specific litigations, I've always had the

Page 207

 1  attorneys from OGC or DOJ remind me specifically
 2  about that one, that I need to maintain everything
 3  pertaining to that.
 4      Q.  Okay.  So step away from the specific,
 5  but to the general, there's not someplace on the
 6  intranet that you're aware of that I could go to -
 7  -
 8      A.  Not that I'm aware of.
 9      Q.  -- right -- might exist, but -- what
10  specific litigation hold -- first of all, have you
11  ever been involved in implementing a litigation
12  hold at CMS?
13      A.  You mean me, specifically, because I'm
14  being --
15      Q.  Yes.
16      A.  Yes.
17      Q.  And -- and I might be using the wrong
18  terminology.  Is -- what terminology is used at
19  CMS for describing preserving data relevant to a
20  piece of litigation?
21      A.  I -- I'm not sure that it's a specific
22  terminology.  I just think that -- I think the

Page 208

 1  place that we're -- if we're miscommunicating
 2  here, that, for me, it's been -- there's been a
 3  specific case --
 4      Q.  Right.
 5      A.  -- that I'm getting, you know, asked
 6  questions about for one reason or another because
 7  of my knowledge of it or something --
 8      Q.  Um-hum.
 9      A.  -- and so it's, you know -- then I'm,
10  you know, basically reminded at that stage of the
11  game everything that you have pertaining to this
12  or pertaining to anything around that, you need to
13  maintain kind of a separate file of, so -- you
14  know, just to make sure that we have all the
15  records pertaining to that.
16      Q.  I just know in some organizations they
17  have a formalized name for it, whether --
18      A.  Um-hum.
19      Q.  -- it's a legal hold or a litigation
20  hold, or -- I didn't know if there was a
21  terminology that I needed to -- to figure out.
22          You say that you've had certain

Page 209

 1  specific instances in which you've been involved
 2  in where you've received requests to preserve
 3  certain information --
 4      A.  Um-hum.
 5      Q.  -- or documents.
 6      A.  Um-hum.
 7      Q.  How often have you personally been
 8  involved in -- in that sort of situation?
 9      A.  I've had specifically one --
10      Q.  One.
11      A.  -- since I've been at CMS.
12      Q.  And when was that?
13      A.  It's actually going on right now.
14      Q.  And does it relate to this case?
15      A.  No, it's related to the implementation
16  of the prescription drug benefit.
17      Q.  Okay.  When did you first learn of --
18  and -- and I'm going to tread lightly here because
19  I don't want to -- to get into a case that,
20  frankly, you don't have anything to do with.  But
21  can you tell me very generally what that case is
22  about?

Boughn, Julie Carolyn   HIGHLY CONFIDENTIAL                January 16, 2007
                              Washington, DC

Page 210

1   A.   Yeah.  That's a -- an advocacy group
2   for Medicare beneficiaries and Medicaid
3   beneficiaries, specifically dual eligible
4   beneficiaries, who are suing the Agency over not
5   providing the -- the right coverage for the people
6   who went from Medicaid to Medicare for Part D last
7   January 1st.
8       Q.   Okay.  In what capacity are you
9   involved in -- in that?
10      A.   Well, I'm responsible for all the data
11  systems that made that happen, the information
12  systems, and so we -- at issue in the case is, you
13  know, was the information being thrown around --
14  thrown around is a technical term -- timely enough
15  to make sure that those folks had the coverage
16  that they needed when they had it.
17      Q.   And so are you involved in that as the
18  -- the director of the Office of Information
19  Services or because you had a -- a prior, more
20  specific role specific to Medicare Part D?
21      A.   It's really related more to my prior,
22  more specific role, but the -- the same -- I mean,

Page 211

1   in this role, I have a very large responsibility
2   for that as well.  So it's kind of both roles.
3       Q.   What have you done in connection with
4   preserving information and data in that case?
5       A.   I've created a folder in my -- in my
6   in box that I -- you know, literally every kind of
7   e-mail I have on the topic goes into that folder,
8   and that folder's archived to the -- to the IXOS
9   archiving solution.
10      Q.   Did you automate that or do you
11  physically put it into the folder each time?
12      A.   Well, I put it in the folder
13  physically each time, but after that, the
14  archiving's automated.
15      Q.   But you haven't set up an automated
16  system that every time it sees a particular word,
17  it -- the program sweeps it into that folder?
18      A.   No.
19      Q.   How did you come up with that
20  particular way to preserve your documents that
21  relate to that litigation?  Was that your own
22  idea, or was it a procedure that was given to you?

Page 212

1       A.   No, it's basically the standard way
2   that you would use the -- use the e-mail system
3   and the archiving solution.  I don't have the kind
4   of time that I used to have to play around with
5   the technologies.
6       Q.   Your -- your obligation -- obligations
7   -- your involvement in preserving this
8   information, how was that communicated to you?
9       A.   It was --
10      Q.   I mean, I don't want to hear about
11  conversations with counsel.
12      A.   It was -- it was the attorneys, saying
13  --
14      Q.   Okay.
15      A.   -- reminding us to do that.
16      Q.   Okay.  Did you receive a memo of any
17  sort or is it -- were -- or were they oral
18  communications?
19      A.   No, it was a -- it was an e-mail, kind
20  of was combined with oral.
21           MR. COOK:  Without going into the --
22  to the -- well, first of all, are you all

Page 213

1   asserting, just so I know whether to dance around
2   it, is that e-mail communication privileged?
3            MR. NEAL:  I think the substance of it
4   would be privileged.  The fact that it was an e-
5   mail is not, obviously, but I think the substance
6   would be privileged; so I'll ask you to tread
7   lightly here.
8   BY MR. COOK:
9       Q.   In that case, I'm not going to ask you
10  --
11      A.   Okay.
12      Q.   -- they're asserting a privilege as to
13  the contents of the e-mail, so I don't want you to
14  tell me what's in that -- what's in that e-mail.
15           One e-mail or a lot of e-mails?
16      A.   In this case, it was one.
17      Q.   And if I understand correctly, that's
18  the only such sort of litigation preservation e-
19  mail you've ever received, or am I wrong about
20  that?
21      A.   Me personally, yes.
22      Q.   Okay.  Do you know how many people

54 (Pages 210 to 213)