EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------x

IN RE: PHARMACEUTICAL      : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION

PRICE LITIGATION           : 01-CV-12257-PBS

       vs.              :

THIS DOCUMENT RELATES TO   : HIGHLY

U.S. ex rel. Ven-A-Care of : CONFIDENTIAL

The Florida Keys, Inc.     :

v. Abbott Laboratories,    :

Inc., No. 06-CV-11337-PBS  :

---------------------------x

      Oral Deposition of NANCY MOLYNEAUX, was taken pursuant to notice at the Law Offices of Morgan Lewis, 1701 Market Street, Philadelphia, Pennsylvania, on Thursday, January 11, 2007, beginning at 10:00 a.m., before Jeanne Christian, Court Reporter-Notary Public, there being present.

d35eef33-262d-44a5-ba27-3955dc624463

Page 26

1  to the secondary file.
2      A.  The primary file would be destroyed, and
3  so would the secondary file.
4      Q.  And are the documents shredded?
5      A.  Yes.
6      Q.  Is there any other record kept of what
7  was in those primary files?
8      A.  I don't think so.
9      Q.  What happens to the secondary file after
10 five years?
11     A.  It is destroyed.
12     Q.  And is there any place where information
13 contained in that file would be?
14     A.  No.
15     Q.  Who destroys the files?
16     A.  We used to have it done by the Federal
17 Records Center, and last time, it was destroyed by
18 our contractor that we had to shred documents.
19     Q.  Could you explain what mail surveys are?
20     A.  It is a survey document that we would
21 send to respondents in the mail.
22     Q.  Would it also include the responses to

Page 27

1  the surveys?  What would you do with the responses
2  you got to the mail surveys?
3      A.  We would probably input the data and
4  then put the actual physical survey in a secondary
5  file.
6      Q.  In a secondary file.
7          And where would you input the data?
8      A.  Into a computer program.
9      Q.  And what computer program would you use?
10     A.  At this stage, usually Access.
11     Q.  When you say at this stage, do you mean
12 as of today?
13     A.  Yes.
14     Q.  And what was used -- when did you start
15 using Access?
16     A.  About, I'm going to say between five and
17 eight years ago.
18     Q.  So, roughly, around the year 2000?
19     A.  Yeah.
20     Q.  What computer program did you use prior
21 to that?
22     A.  We used D-Base.

Page 28

1      Q.  What is D-Base?
2      A.  It is a database program.
3      Q.  Do you still use D-Base today?
4      A.  No.
5      Q.  Do you have any records relating to D-
6  Base?
7      A.  No.
8      Q.  Do you know if anyone else at OIG has
9  records relating to D-Base?
10     A.  I don't know.
11     Q.  Who would know the answer to that
12 question?
13     A.  I don't know.
14     Q.  Explain what telephone surveys are as
15 you intended in your resume here.
16     A.  That would be a survey conducted over
17 the telephone.
18     Q.  And you conducted those -- you conducted
19 surveys of that type?
20     A.  Yes, I have.
21     Q.  And would you record the results of your
22 surveys in any way?

Page 29

1      A.  Yes, by hand.
2      Q.  So you would take handwritten notes?
3      A.  Yes.
4      Q.  Would you later type up the summary of
5  the telephone survey that you had?
6      A.  Yes.
7      Q.  And where would those go?
8      A.  Into a computer program.
9      Q.  In the same computer program that we
10 talked about previously?
11     A.  Yes, or it would depend on the nature of
12 the information that we were gathering.
13     Q.  Where could I find telephone surveys for
14 reports that you were involved in in the mid
15 1990s?
16         MR. NEAL:  I object to the form.  You
17 can answer.
18         THE WITNESS:  They have probably been
19 destroyed by now.
20 BY MR.TORBORG:
21     Q.  Have you ever been given a direction to
22 retain documents relating to any of the reports

8 (Pages 26 to 29)

Henderson Legal Services, Inc.
(202) 220-4158

Page 30

```
 1  that you have worked on?
 2      A.  Retained forever?
 3      Q.  Yes, retained until further notice.
 4      A.  Beyond our policies for retaining
 5  records, no.
 6      Q.  The next bullet point, "Interviewing a
 7  wide variety of respondents, such as program
 8  staff, State and local government officials,
 9  physicians and other health care providers,
10  insurers, grantees and beneficiaries."
11          Do you see that?
12      A.  Yes.
13      Q.  How are your interviews that you do in
14  connection with reports typically done, in person
15  or on the phone?
16      A.  On the phone.
17      Q.  Have you ever done an in-person
18  interview?
19      A.  Yes.
20      Q.  How many in-person interviews have you
21  done?
22      A.  I don't know.
```

Page 31

```
 1      Q.  You can't ballpark at all?
 2      A.  In person interviews?  I guess -- I'm
 3  going to say about maybe 75.
 4      Q.  Have you conducted any in-person
 5  interviews in connection with Medicare, Medicaid
 6  reimbursement of drugs?
 7      A.  No.
 8      Q.  Have you conducted any telephone
 9  interviews relating to that topic?
10      A.  I have collected information by
11  telephone, not necessarily an interview.
12      Q.  What do you mean by collected
13  information?  Data?
14      A.  Data, yes.
15      Q.  What do you consider to be data?
16      A.  Prices for drugs.
17      Q.  Do you know if you have in your files
18  today any telephone interviews that were done in
19  connection with Medicaid and Medicare's
20  reimbursement of drugs?
21          MR. NEAL:  I object to the form.
22          THE WITNESS:  Do I know?
```

Page 32

```
 1  BY MR.TORBORG:
 2      Q.  Yes.  Do you know if you have any?
 3      A.  I know I don't have any.
 4      Q.  You don't have any.
 5          And how do you know that you don't have
 6  any?
 7      A.  Because those things have been
 8  destroyed.
 9      Q.  Have you undertaken any search in the
10  last five years to search for telephone -- the
11  records of telephone interviews relating to
12  Medicare and Medicaid reimbursement of drugs?
13      A.  No.
14      Q.  Has anyone asked you to conduct such a
15  search?
16      A.  No.
17      Q.  Are there protocols at the Office of
18  Inspector General's Office regarding how to record
19  the results of interviews?
20      A.  Yes.
21      Q.  And what are those protocols?
22      A.  To record them verbatim.
```

Page 33

```
 1      Q.  What do you mean by verbatim?
 2      A.  To write down exactly what the person
 3  said.
 4      Q.  Do you tape-record them?
 5      A.  Not usually.
 6      Q.  Have you ever tape-recorded any?
 7      A.  Yes.
 8      Q.  Can you recall today which interviews
 9  you have tape-recorded?
10      A.  Interviews for the study that I am
11  working on right now.
12      Q.  Did you tape-record any interviews ever
13  with respect to Medicare and Medicaid's
14  reimbursement of drugs?
15      A.  No.
16      Q.  Did you ever take verbatim notes
17  relating to that topic?
18      A.  Yes.
19      Q.  Do you recall of who?
20      A.  Pharmacies.
21      Q.  Do you recall which pharmacies?
22      A.  No.
```

Page 102

1  Probably about 150.
2      Q.  And then there is 18 in the Office of
3  Evaluation and Inspection?
4      A.  That's correct.
5      Q.  Have your offices moved in the last 15
6  years?
7      A.  Yes.
8      Q.  And when did those -- when did that move
9  or moves take place?
10     A.  I think -- I can never remember.
11     Q.  It is not a memory test.  Do the best
12 you can.
13     A.  About ten years.
14     Q.  Ten years ago from today?
15     A.  Approximately.
16     Q.  And where did you move from?
17     A.  We moved from 36th and Market Street to
18 our current location at 6th and Chestnut.
19     Q.  And was there any -- what happened to
20 your documents during the move?  Did they just go
21 straight from your office in the old place to your
22 office in the new place or did you clean house

Page 103

1  like one does when they -- as I am doing right
2  now, doing the basement over?
3      A.  I myself cleaned house.
4      Q.  And by clean house, you mean you
5  destroyed or got rid of those documents that you
6  were no longer working with currently?
7      A.  That's correct.
8      Q.  Is Philadelphia one of the larger OIG
9  offices?
10     A.  I think so.
11     Q.  Are you aware of any other offices
12 throughout OIG that have any particular expertise
13 in the area of Medicare and Medicaid reimbursement
14 of drugs?
15     A.  No.
16         MR. NEAL:  Is this a good time for a
17 break?
18         MR. TORBORG:  Sure, we can take a break.
19         MR. MERKL:  I would like to make a
20 request.  It is a little unusual, and directed to
21 OIG counsel.  The witness has indicated that there
22 is kind of an orderly, regular procedure for

Page 104

1  destroying documents over ten years.  I notice one
2  of the reports in question she has testified
3  concerning is dated '06.  Another one we had some
4  testimony on is dated '07.  It doesn't sound like
5  the witness has any familiarity with litigation
6  hold, so I would ask counsel to please take
7  reasonable steps to make sure that none of the
8  working files we have heard discussed today about
9  any of the reports discussed today are destroyed
10 and that steps be taken to preserve or call them
11 back if they are on that pathway, and then,
12 Monday, I will send you a letter that identifies
13 any other reports that we have an interest in.  I'm
14 not asking you to give you your formal response
15 now.
16         MR. NEAL:  Understood.
17         THE VIDEO TAPE OPERATOR:  This completes
18 Video Tape Number 1.  The time is 10:56.  We are
19 now off the record.
20         (Whereupon a short break was taken
21 at this time.)
22         (Whereupon the court reporter

Page 105

1  marked document as Exhibit Abbott 005 for
2  identification.)
3         THE VIDEO TAPE OPERATOR:  We are on the
4  record.  This is the beginning of Video Tape
5  Number 2.  The time is 11:09.  You may begin the
6  questioning.
7         MR. NEAL:  Before you get started, I
8  would just like to make one remark on the record
9  in response to Mr. Merkl's comment before the
10 break.  I can represent that steps have been taken
11 to preserve relevant documents in this litigation,
12 and I look forward to responding to your letter
13 when you send that out on Monday.
14 BY MR.TORBORG:
15     Q.  Welcome back, Ms. Molyneaux.
16         One other clarification for everyone on
17 the phone, I have withdrawn exhibit  -- Exhibit
18 Abbott 002 and replaced it with a version of the
19 Medicare report that has exhibits that I printed
20 off the web site, so that is now the official
21 exhibit, Exhibit Abbott 002. Everyone here has a
22 corrected copy of it, so -- one thing I wanted to

27 (Pages 102 to 105)

Page 174

1  process claims for Part B.
2      Q.  Again, "The Secretary or the DMERCs
3  could use their, 'inherent reasonableness,'
4  authority to reduce reimbursement to more
5  appropriate levels."
6          Do you see that?
7      A.  Yes.
8      Q.  What was the Secretary and the DMERCs'
9  inherent reasonableness authority?
10     A.  It was a provision that under certain
11 circumstances, and I don't remember the exact
12 circumstances, that they could reduce payment for
13 a particular item.
14     Q.  Do you recall under what circumstances?
15     A.  No, I don't.
16     Q.  Do you recall what was necessary to
17 invoke or use the inherent reasonableness
18 authority?
19     A.  I don't remember.
20     Q.  Do you recall any discussions following
21 up on this report regarding the use of inherent
22 reasonableness authority to reduce reimbursement

Page 175

1  levels for parenteral nutrition to more
2  appropriate levels?
3      A.  After the report was issued?
4      Q.  Before or after.
5      A.  Say your question again.
6      Q.  Do you recall any discussions with
7  anyone, either before or after this report was
8  finalized, to use inherent reasonableness
9  authority to reduce reimbursement levels for
10 parenteral nutrition?
11     A.  I don't recall a particular discussion,
12 no.
13     Q.  Do you recall any general discussions?
14     A.  No.
15     Q.  No discussions at all?
16     A.  It is not that there weren't any
17 discussions.  I just don't remember.
18     Q.  You believe there probably were
19 discussions?
20     A.  Yes.
21     Q.  You just can't remember them, because it
22 has been ten years?

Page 176

1      A.  Yes.
2      Q.  Which has been the case for a lot of the
3  questions I have asked today; correct?
4      A.  Yes, that's true.
5      Q.  Passage of time, particularly, ten
6  years, has made it more difficult for me to obtain
7  your recollection of events; correct?
8          MS. POLLACK:  Objection to the form of
9  the question.
10         MR. HAVILAND:  Objection to form.
11         MR. NEAL:  Objection to form. You can
12 answer.
13         THE WITNESS:  That's correct.
14 BY MR.TORBORG:
15     Q.  Without a doubt, right?
16         MR. HAVILAND:  Objection to form.
17         MS. POLLACK:  Objection to form.
18         MR. NEAL:  Objection to form.  You can
19 answer.
20         THE WITNESS:  Yes.
21 BY MR.TORBORG:
22     Q.  Do you recall what happened with respect

Page 177

1  to the reimbursement of the four B codes at issue
2  in this report after this report was issued?
3      A.  I do not recall.
4      Q.  Do you know how Medicare reimburses for
5  parenteral nutrition today?
6      A.  No, I do not.
7      Q.  Have you ever studied this issue again
8  after this report?
9      A.  No.
10     Q.  The second recommendation contained in
11 the report states that, "HCFA could base its
12 reimbursement on suppliers' acquisition costs.
13 There is evidence that acquisition costs for
14 parenteral nutrition are far below Medicare's
15 current reimbursement."
16         Do you recall any discussions, either
17 before or after this report, regarding this
18 recommendation?
19     A.  No, I don't.
20     Q.  And in this instance, this would have
21 caused -- this recommendation would have caused
22 Medicare to significantly reduce its reimbursement

45 (Pages 174 to 177)