UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| IN RE: PHARMACEUTICAL INDUSTRY ) | M.D.L. No. 1456 |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | CIV. ACTION NO. 01-12257-PBS |
| ) | |

---

## AFFIDAVIT OF KATHERINE KINSELLA

---

I, Katherine Kinsella, being duly sworn, hereby declare as follows:

1. I am President of Kinsella/Novak Communications, LLC ("KNC"), an advertising and notification consulting firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs to reach unidentified putative class members primarily in consumer and mass tort litigation. My business address is 2120 L Street, NW, Suite 205, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2. I submit this affidavit at the request of Plaintiffs' Counsel in connection with *In Re: Pharmaceutical Industry Average Wholesale Price Litigation* pending in the United States District Court, District of Massachusetts.

3. This affidavit is based upon my personal knowledge and upon information provided by Plaintiff's Counsel, my associates and staff.  The information is of a type reasonably relied upon in the fields of advertising, media and communications.

4. My qualifications were previously submitted to the Court in an affidavit on May 31, 2006, which described components of the Notice Program.

5. KNC was retained to design and implement the Class Action Pendency Notice Program to Consumers and Third-Party Payors in this litigation.  I submit this affidavit to describe the implementation of the Court-Approved Notice Program.

## Court-Approved Notice Program

6. The objective of the Notice Program was to provide adequate notice of the Class Action Pendency to potential Consumer Class Members in Class 1 ("Consumers") and Third-Party Payor Class Members in Classes 2 and 3 ("TPPs") as defined in the Consolidated Order Re: Motion for Class Certification dated January 30, 2006.

7. A four-part notification program was designed and implemented, as follows:

   (a.) Direct notice by first-class mail to all Consumers or TPPs whose names and addresses were readily identifiable and to all callers to the toll-free information line who requested the *Notice of Class Action Pendency* as a result of seeing the Publication Notice.

   (b.) Broad notice through the use of paid consumer media, including magazines and newspaper supplements as well as trade publications to supplement the direct notice to TPPs.

   (c.) Earned media notice through a press release sent to major national print and electronic outlets.

   (d.) Electronic notice through a dedicated Web site.

8. The Court-approved Notice Program used different long form and publication notices tailored to either the TPPs or Consumers. The *Notice of Class Action Pendency* designed specifically for TPPs was sent to them. The *Notice of Class Action Pendency* designed specifically for Consumers was to them. For complete information on the direct notice to TPPs and Consumers, please see the affidavit of Charlene Young of Complete Claim Solutions, LLC.

9. KNC designed two Publication Notices. The Publication Notice that appeared in publications targeting TPPs ("TPP Publication Notice") is attached as Exhibit A. The Publication Notice that appeared in publications targeting Consumers ("Consumer Publication Notice") is attached as Exhibit B. The Publication Notice was translated into Spanish where appropriate.

10. To design the paid media segment of the notice plan to reach Consumers, KNC selected demographics that encompass the characteristics of these Class Members. Media vehicles were then analyzed and selected for their strength and efficiency in reaching this demographic target.

11. To develop profiles of the demographics and media habits of Consumer Class Members, KNC analyzed syndicated data available from the *2005 Doublebase Survey*[1] from MediaMark Research, Inc. ("MRI"). MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising. MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

12. MRI provides specific data on medical insurance coverage. Based on this information, audiences were chosen that encompass Medicare Part B Beneficiary Class Members. All media purchased was measured against these targets as indicated below.

---

[1] MRI produces an annual *Doublebase Survey*, a study of 50,000+ adults consisting of two full years of data. The MediaMark sample consists of 26,000+ respondents. Fieldwork is done in two waves per year, each lasting six months and consisting of 13,000 interviews. At the end of the interview, the fieldworker presents a self-administered questionnaire that measures approximately 500 product/service categories, 6,000 brands, and various lifestyle activities. Resulting data is weighted to reflect the probabilities of selection inherent in the sample design and then balanced so that major study demographics match the most recent independent estimates.

13. The demographic targets as defined by MRI are as follows:

    (a.)   Individuals with medical insurance through Medicare ("Medicare Beneficiaries").

    (b.)   Adults 18 years of age and older ("Adults 18"), which encompasses any heirs of Medicare Beneficiaries.

14. The Consumer Publication Notice appeared in national newspaper supplements as follows:

    (a.)   A half-page ad (4-3/4" x 10-1/2") appeared on page 20 of the November 26, 2006 issue of *Parade*, with an estimated circulation of 32,700,000.

    (b.)   A half-page ad (4-5/8" x 10-1/2") appeared on page 18 of the November 26, 2006 issue of *USA Weekend*, with an estimated circulation of 22,700,000.

15. The Consumer Publication Notice appeared in the following national consumer magazines:

    (a.)   A full-page ad (4-5/16" x 6-1/2") appeared on page 15 of the January 8, 2007 issue of *Jet*, which went on sale January 1, 2007, with an estimated circulation of 900,000.

    (b.)   A full-page ad (5-3/4" x 9") appeared on page 163 of the December issue of *National Geographic*, which went on sale November 28, 2006, with an estimated circulation of 5,00,000.

    (c.)   A full-page ad (7" x 10") appeared on page 64 of the December 4, 2006 issue of *Newsweek*, which went on sale November 27, 2006, with an estimated circulation of 3,100,000.

    (d.)   A full-page ad (7" x 10") appeared on page 70 of the January 15, 2007 issue of *Newsweek*, which went on sale January 8, 2007, with an estimated circulation of 3,100,000.

    (e.)   A full-page ad (7" x 10") appeared on page 94 of the December 11, 2006 issue of *People*, which went on sale December 1, 2006, with an estimated circulation of 3,400,000.

    (f.)   A full-page ad (7" x 10") appeared on page 44 of the January 15, 2007 issue of *People*, which went on sale January 5, 2007, with an estimated circulation of 3,400,000.

    (g.)   A full-page ad (4-3/4" x 6-3/4") appeared on page 212 of the December issue of *Reader's Digest*, which went on sale November 21, 2006, with an estimated circulation of 10,000,000.

    (h.)   A full-page spread ad (4-3/4" x 6-3/4" – each page) appeared on page 140-141 of the December issue of *Selecciones*, which went on sale November 21, 2006, with an estimated circulation of 375,000.

    (i.)   A full-page ad (7" x 10") appeared on page 85 of the December 4, 2006 issue of *Sports Illustrated*, which went on sale November 29, 2006, with an estimated circulation of 3,150,000.

(j.)   A full-page ad (7-3/4" x 10-1/2") appeared on page 31 of the December 4, 2006 issue of *US News & World Report*, which went on sale November 27, 2006, with an estimated circulation of 2,000,000.

(k.)   A full-page ad (7-3/4" x 10-1/2") appeared on page 11 of the January 15, 2007 issue of *US News & World Report*, which went on sale January 8, 2007, with an estimated circulation of 2,000,000.

16. To supplement direct notice to TPPs, the TPP Publication Notice was placed in the following trade publications:

(a.)   A full-page ad (8" x 10-7/8") appeared on page 144 of the September issue of *HR Magazine*, which went on sale September 1, 2006, with an estimated circulation of 195,528.

(b.)   A full-age (7" x 10") appeared on page 53 of the August 21/28, 2006 issue of *National Underwriter Life & Health*, which went on sale August 21, 2006, with an estimated circulation of 50,195.

17. True and correct copies of the Consumer Publication and TPP Publication Notice, as they appeared in the individual publications, are attached as Exhibit C.

18. For the purpose of evaluating the strength and efficiency of the media, the newspaper supplements and consumer magazines were measured against the demographic targets to establish the following *reach*[2] and *frequency*[3] estimates[4]:

(a.)   An estimated 73.0%[5] of Medicare Beneficiaries were reached with an average estimated frequency of 2.0 times, delivering approximately 32,256,268 gross impressions[6].

(b.)   An estimated 71.8% of Adults 18+ were reached with an average estimated frequency of 2.1 times, delivering approximately 315,549,480 gross impressions.

19. The reported reach and frequency estimates are exclusive of the reach attained through direct notice.

20. The Notice Program also included earned media notice to augment the paid media program. A press release, attached hereto as Exhibit D, was distributed on December 4, 2006 to US

---

[2] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

[3] Frequency is the estimated average number of times an audience is exposed to an advertising vehicle carrying the message.

[4] MRI is a sample-based survey. Therefore, estimates of audience and/or demographics from these surveys are subject to sampling and non-sampling error. The use of mathematical values from those surveys should not be regarded as a representation that they are exact to the precise mathematical value stated.

[5] The readership estimates for *Parade* and *USA Weekend* are reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A recent custom study conducted by MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains the accredited methodology and standard of the industry according to MRI and the Media Research Council.

[6] Gross impressions are the total number of times a media vehicle containing the Publication Notice is seen. This is a duplicated figure, as some viewers (readers) will see several media vehicles (publications) that contain the Publication Notice.

4

Newswire's Full National Circuit reaching over 2,000 media outlets. The press release highlighted the toll-free telephone number and Web site address that Class Members can call or visit for complete information.

21. Third-Party Notice consisted of distributing the press release to organizations that provide information on diseases and conditions for which some of the Defendants drugs are used. The press release was distributed, and follow-up phone calls were made to these organizations, between December 4, 2006 and December 7, 2006. A complete list of organizations is attached as Exhibit E.

22. An informational Web site was established and listed with major search engines to enable Class Members to get information on the litigation. For complete details about the informational Web site, please see the affidavit of Charlene Young of Complete Claim Solutions, LLC.

23. It is my opinion that the reach of the target audiences and the number of exposure opportunities to the notice information, in combination with the extensive direct mail notice to TPPs and Consumers, is more than adequate and reasonable under the circumstances, and consistent with the standards employed by KNC in notification programs designed to reach identified and unidentified members of a litigation. The Notice Program as designed and implemented is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.

I declare under penalty of perjury that the foregoing is true and correct. If called as a witness, I could and would competently testify thereto.

_Katherine Kinsella_                      _March 23, 2007_
Katherine Kinsella                         Date

SUBSCRIBED and SWORN before me on the 23rd day of _March_ 2007.

_Debra L. Vaughan_

Notary Public In and For the District of Columbia

Debra L. Vaughan
Notary Public District of Columbia
My Commission Expires April 14, 2008

# EXHIBIT A

Legal Notice

# If You Are a Third-Party Payor Based In Or With Beneficiaries In Massachusetts and You Made Reimbursements For Any of the Drugs Listed Below,

## Class Action Lawsuits May Affect Your Rights.

There are class action lawsuits pending in the U.S. District Court for the District of Massachusetts under the name *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, Docket No. 01-CV-12257-PBS.

The lawsuits claim that certain drug companies intentionally reported false and inflated average wholesale prices ("AWP") for certain types of outpatient drugs. The reported AWPs may be used to set prescription drug prices that are paid by insurers and other Third Party Payors ("TPPs"). The lawsuits ask the Court to award money damages to some TPPs who made reimbursements for the drugs. Defendants deny that they are responsible for any of the claims in the lawsuits. A series of trials and hearings will determine the claims in this lawsuit. An initial trial involving all Defendants will begin in November 2006.

### What Drugs are Covered by the Litigation?
Certain dosages of the following Covered Drugs made by the Defendants AstraZeneca, Bristol-Myers Squibb Group, Johnson & Johnson Group and Schering Plough Group are covered: **Albuterol Sulfate**, **Blenoxane** (bleomycin sulfate), **Cytoxan** (cyclophosphamide), **Etopophos** (etoposide phosphate), **Intron A** (interferon alfa-2b), **Paraplatin** (carboplatin), **Perphenazine**, **Procrit** (epoetin alfa), **Proventil** (albuterol sulfate), **Remicade** (infliximab), **Rubex** (doxorubicin hcl), **Taxol** (paclitaxel), **Temodar** (temozolomide), **VePesid** (etoposide) and **Zoladex** (goserelin acetate). These are referred to in this Notice as the "Covered Drugs." For a complete list of the dosages by drug visit the Web site or call or write as indicated below for a detailed Notice.

### What do the Defendants say about the Litigation?
The Defendants say they didn't do anything wrong. Defendants deny that they are responsible for any of the claims made in the lawsuits and will vigorously defend against these claims. The Defendants deny the factual allegations being made; contend that the lawsuits and damages are precluded under the law; and that even if the alleged conduct is proven by the Plaintiffs it does not violate the law.

### Which TPPs Are Involved in the Litigation?
The Court has ruled that there are two different types of Classes for TPPs who reimbursed for Covered Drugs: a MediGap TPP Class and a Private Payor TPP Class. A TPP could be a member of one or both Classes against one or more Defendant.

• A TPP is a member of the MediGap TPP Class against one or more Defendant if it made reimbursements for all or part of its insured's 20% co-payment under Medicare Part B for Covered Drugs anytime between January 1, 1991 and January 1, 2005, or

• A TPP is a member of the Private Payor TPP Class against one or more Defendant if it reimbursed for Covered Drugs outside of Medicare Part B based on a contract that uses AWP as a reimbursement benchmark anytime between January 1, 1991 and January 30, 2006.

In order to be a member of either a MediGap TPP Class or a Private Payor TPP Class against one or more Defendant, the reimbursements must have been for a beneficiary in Massachusetts or the TPP must have its principal place of business in Massachusetts.

### What Are a TPPs' Rights as a Member of Either or Both of the Classes?
• If a TPP wishes to remain a member of either or both of the Classes, it doesn't need to do anything at this time. If it doesn't exclude itself, as a member of either Class it will be bound by whatever happens in the lawsuit against the Defendant, and it won't be able to sue the Defendant on its own about the claims in the lawsuit. Court-appointed Counsel will represent all Class Members and will ask the Court to pay their fees and expenses out of any recovery they achieve for the Classes. Class Members may also hire their own attorney at their own cost to speak or appear on their behalf.

• If a TPP does not wish to participate in either or both of the Classes, it must mail a signed, written request to be excluded, to the address below, indicating from which of the two types of Classes and from which Defendant Class or Classes the TPP wishes to be excluded. A TPP may also request to be excluded from the lawsuit against one or more Defendants and remain in the litigation against the other Defendants. The request must be received by October 1, 2006. If a TPP excludes itself from one or more of the Classes, it can't participate in any recovery for the Class, if there is one, but keeps its right to sue the Defendant(s) on its own.

## For a Detailed Notice Form and Further Information on the Covered Drugs and AWP

### Call toll-free: 1 800-419-5391 or Visit: www.AWPlitigation.net

### Or Write: AWP Litigation Administrator, c/o Complete Claim Solutions, LLC P.O. Box 24654, West Palm Beach, FL 33416

# EXHIBIT B

Legal Notice

# If You Are a Medicare Part B Beneficiary or Heir of a Beneficiary Who Made, or is Obligated to Make a Co-Payment Through Medicare Part B For the Drugs,

**Blenoxane** *(bleomycin sulfate)*
**Cytoxan** *(cyclophosphamide)*
**Etopophos** *(etoposide phosphate)*
**Paraplatin** *(carboplatin)*
**Procrit** *(epoetin alfa)*

**Remicade** *(infliximab)*
**Rubex** *(doxorubicin hcl)*
**Taxol** *(paclitaxel)*
**VePesid** *(etoposide)*
**Zoladex** *(goserelin acetate)*

## A Class Action Lawsuit May Affect Your Rights

There are class action lawsuits pending in the U.S. District Court for the District of Massachusetts. The name of the lawsuits are *In re: Pharmaceutical Industry Average Wholesale Price Litigation,* Docket No. 01-CV-12257-PBS.

The lawsuits claim that certain drug companies intentionally reported false and inflated average wholesale prices ("AWP") for certain types of outpatient drugs. The reported AWPs are used to set prescription drug prices that are paid by Medicare and consumers making Medicare Part B co-payments. The lawsuit asks the Court to award money damages to people who made Medicare Part B co-payments for the drugs. The Court has certified separate Classes against each Defendant. A series of trials will determine the claims against each Defendant. An initial trial involving all Defendants began on November 6, 2006.

### What Drugs are Covered by the Litigation?
Certain dosages of the drugs listed above made by the Defendants **AstraZeneca, Bristol-Myers Squibb Group** and **Johnson & Johnson Group** are part of the lawsuit ("Covered Drugs"). For a list of the dosages, by drug, visit the Web site or call or write as indicated below.

### What do the Defendants say about the lawsuits?
The Defendants say they didn't do anything wrong. Defendants deny that they are responsible for any of the claims made in the lawsuit and will vigorously defend against these claims. The Defendants deny the factual allegations being made; contend that the lawsuits and damages are precluded under the law; contend that the alleged conduct, if proved, does not violate the 44 consumer protection laws, and that many class members will not be able to prove they paid a doctor for the subject drugs.

### Am I Involved in the Litigation?
• You are a member of one or more of the Classes if you made a co-payment under Medicare Part B from January 1, 1991 to January 1, 2005 or have an obligation to make such a co-payment for a Covered Drug, or you are the legal heir of, or legal successor to the rights of a Medicare Part B beneficiary who made such a co-payment.
• You are not included in the Classes if you were a resident of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana or Virginia at the time you made the Medicare Part B co-payment.
• You are also excluded from the Classes if you made flat co-payments (a co-payment that does not differ with the cost of the drug), or you were reimbursed for co-payments or have the right to be reimbursed.

*The Court is not suggesting, requesting, or requiring that Medicare Part B beneficiaries who were not billed by their doctors, or who were billed but did not pay, should pay their doctors now or that they are obligated to do so under the Medicare statute.*

### What are My Rights as a Member of one or more of the Classes?
• **If you wish to remain a member of the Classes,** you don't need to do anything at this time. If you don't exclude yourself, as a member of one or more of the Classes you'll be bound by whatever happens in the lawsuit, and you won't be able to sue the Defendants on your own about the claims in the lawsuit. Court-appointed Counsel will represent all members of the Classes and will ask the Court to pay their fees and expenses out of any recovery they achieve for the Classes. You may also hire your own attorney at your own cost to speak or appear on your behalf.
• **If you do not wish to participate in one or more of the Classes,** you must mail a personally signed, written request to be excluded to the address below. A mail-in opt-out form is available at www.AWPlitigation.net. You may also request to be excluded from the lawsuit against one or more Defendants and remain in the litigation against the other Defendants. The request must be postmarked by February 19, 2007. If you exclude yourself from one or more of the Classes the lawsuits will not affect you. This means that you will not share in any recovery, if there is one, but you can sue the Defendants about the same claims.

## For a Detailed Notice about the Covered Drugs and AWP Litigation
### Call toll-free: 1-866-903-1204 (Se Habla Español)
### or Visit: www.AWPlitigation.net
Or Write: AWP Litigation Administrator, c/o Complete Claim Solutions, LLC
P.O. Box 24654, West Palm Beach, FL 33416