UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456 <br><br> Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ) ) | Judge Patti B. Saris |
| *State of Montana v. Abbott Labs., Inc., et al.*, D. Mont. Cause No. CV-02-09-H-DWM ) ) ) ) | |

**DEFENDANTS' JOINT MOTION TO STRIKE THE DECLARATION OF DOROTHY POULSEN SUBMITTED IN SUPPORT OF STATE OF MONTANA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Nonmoving parties are not permitted to defeat summary judgment by manufacturing issues of factual dispute through the submission of a declaration that contradicts the witness's prior deposition testimony.  The State of Montana has attempted to do just that by submitting a declaration of Dorothy Poulsen that contradicts her deposition testimony and includes speculation not based on personal knowledge.  Defendants, therefore, move to strike the Poulsen declaration submitted in support of the State's opposition to Defendants' joint motion for summary judgment.

## II.  ANALYSIS

**A.  A Party Opposing Summary Judgment Cannot Manufacture a Factual Dispute by Submitting a Declaration Contradicting the Witness's Deposition Testimony**

The federal courts have "repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed." *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4 (1st Cir.

1994)); *see also Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 35 (1st Cir. 2001) ("We have refused to allow issues of fact to be created simply by subsequent contradictory affidavit."); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991) (holding that a party cannot avoid summary judgment by submitting a contradictory affidavit that is a sham, as opposed to an affidavit that contradicts deposition testimony as a result of an honest discrepancy, mistake, or newly discovered evidence).[1]  Confusion or the existence of newly discovered evidence may constitute a legitimate explanation for inconsistent testimony.  *See Colantuoni*, 44 F.3d at 5 (rejecting proffered explanation that affiant was confused during deposition); 11 James Wm. Moore, et. al., *Moore's Federal Practice* § 56.14[1][f] (3d ed. 2006).  Application of the rule is particularly appropriate when the contradictory affidavit is submitted after a motion for summary judgment is filed.  *Orta-Castro v. Merck, Sharp & Dohme Química P.R.*, 447 F.3d 105, 110 (1st Cir. 2006) ("In both *Colantuoni* and *Torres* we found such a chronology probative of the fact that the non-movant was merely attempting to create an issue of fact.") (citations omitted).

The rationale for the rule is straightforward.  For one, it protects the integrity and utility of the summary judgment procedure.  "If testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.  A party should not be allowed to create issues of credibility by contradicting his own earlier testimony."  *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983); *see also Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

---

[1] The same rule applies to nonparty witnesses.  *See Torres v. E.I. DuPont de Nemours & Co.*, 219 F.3d 13 (1st Cir. 2000); *Garnac Grain Co. v. Blackley*, 932 F.2d 1563, 1568 (8th Cir. 1991); *Adelman-Tremblay v. Jewel Cos. Inc.*, 859 F.2d 517, 521 (7th Cir. 1988).

In addition, deposition testimony is generally more reliable than an affidavit or declaration, because "[d]epositions are adversarial in nature and provide the opportunity for direct and cross-examination." *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994) ("Inherently depositions carry an increased level of reliability."). By contrast, affidavits "are typically . . . written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.2d 621, 623 (7th Cir. 2002). During depositions, witnesses typically have counsel present who can ensure there is opportunity to clarify any incorrect impressions. *See Orta-Castro*, 447 F.3d at 110; *Colantuoni*, 44 F.3d at 5.

**B.    The Court Should Strike the Declaration of Dorothy Poulsen**

### 1.    Poulsen's Declaration Contradicts her Deposition Testimony

Recognizing the damage done to its case by Poulsen's deposition testimony, the State has submitted a declaration that contradicts Poulsen's prior testimony and fails to provide a credible explanation for the change.[2]

At the time of Poulsen's February 2006 deposition, for which she had met with counsel for "[a]bout an hour" in preparation, Declaration of Kathleen M. O'Sullivan in Support of Defendants' Joint Motion to Strike Declaration of Dorothy Poulsen ("O'Sullivan Decl."), Ex. 1 (Poulsen Tr. 17:20-18:6),[3] Poulsen's testimony made clear that during her tenure as Montana Medicaid's pharmacy program officer she understood AWP was a benchmark that did not represent providers' actual acquisition costs for drugs, and she further "understood that AWP minus 10% did not represent actual acquisition cost." O'Sullivan Decl., Ex. 1 (Poulsen Tr. 17:3-

---

[2] By moving to strike the Poulsen declaration, Defendants do not concede the admissibility or relevance of other evidence submitted by the State in opposing summary judgment.

[3] For the Court's convenience, Defendants attach to the O'Sullivan Declaration all cited excerpts from Poulsen's deposition testimony, even though Defendants previously submitted many of the excerpts in support of Defendants' Joint Motion for Summary Judgment.

17, 57:11-14). For example, Poulsen testified that there was a "general understanding" among pharmacy program officers of state Medicaid agencies that AWP did not represent pharmacies' actual acquisition cost. O'Sullivan Decl., Ex. 1 (Poulsen Tr. 17:3-17). Poulsen testified that "we understood that AWP didn't reflect the average wholesale price" and admitted that "we always understood" that "AWP also didn't reflect the actual acquisition cost." O'Sullivan Decl., Ex. 1 (Poulsen Tr. 122:17-123:4); *see also* O'Sullivan Decl., Ex. 1 (Poulsen Tr. 119:10-16) ("[T]he common knowledge was that AWP was, again, as I've said before, *not what it sounded like*.") (emphasis added).

Shortly following her deposition, on April 17, 2006, Poulsen provided *three pages of handwritten corrections* to her deposition, noting as the reasons either "accuracy" or "clarification." But the meticulous Poulsen made no changes to the substance of her testimony at that time. Because, as she declared under penalty of perjury, she had read the deposition transcript and "the same is true and accurate, save and except for [the] changes and/or corrections" she had "indicated . . . on the change sheet page." O'Sullivan Decl., Ex. 2.

Now, nearly one year later, after Defendants filed the motion for summary judgment, Poulsen has submitted a contradictory declaration that attempts to explain away her prior—and more reliable—deposition testimony.[4] For example, in her recently filed declaration, Poulsen insists:

---

[4] Counsel's substantial role in the drafting of declarations in this action is undeniably apparent by comparing the structure of, and nearly identical language used in, the declaration of Jeff Buska submitted in the Montana action and the corresponding declaration of Buska's Nevada Medicaid counterpart, Charles Duarte, submitted in the Nevada action. *Compare* Declaration of Jeff Buska in Support of State of Montana's Opposition to Defendants' Joint Motion for Summary Judgment ¶¶ 10-31, *with* Declaration of Charles Duarte in Support of State of Nevada's Opposition to Defendants' Joint Motion for Summary Judgment ¶¶ 21-32, 37-47. For example, Paragraphs 12 and 23, respectively, read (with bracketed language indicating differences in the Duarte declaration):

> I do not know how the State's [—or for that matter, any state's—] use of AWP got started, as that was before my tenure with [any] Medicaid [program]. I do know why the State [Nevada] used AWP, however, and why we continued to use AWP as a component of our reimbursement methodology. The State used AWP because it was the standard price mechanism out there—provided by the drug manufacturers, made available to the states, nationally supported, updated regularly and available for all drugs rather than just a handful. In short, we used

- She always understood that AWP "represented an average of prices at which the company sold its products." Poulsen Decl. ¶ 5.

- "The State's assumption was that the AWP actually represented the price at which the drug manufacturers sold the drugs to wholesalers." Poulsen Decl. ¶ 7.

- The State believed that there was a direct relationship between AWP and pharmacies' actual acquisition cost and that AWP-10% was a close approximation of actual acquisition costs. Poulsen Decl. ¶¶ 7-10.

- "[I]f we knew that AWP was not linked to acquisition costs, we would not have used it as a basis of reimbursement." Poulsen Decl. ¶ 11.

- "At the time I was employed by Montana Medicaid, we were not aware of the inflationary spreads created by the drug manufacturers' covert drug pricing practices." "Montana Medicaid had no evidence that AWPs were inflationary and that they should not be used as a basis for reimbursement." Poulsen Decl. ¶¶ 12, 17.

To the extent Poulsen offers *any* explanation for contradicting her testimony, it lacks credibility. Poulsen now insists that she did in fact view AWP as an average of prices at which manufacturers sold drugs to wholesalers. Poulsen Decl. ¶¶ 5, 7. She insists that when she testified that "we understood that AWP didn't reflect the average wholesale price," she merely meant that a 10% discount was required to estimate pharmacies' acquisition costs. Poulsen Decl. ¶ 8. But that of course contradicts her testimony that she "understood that AWP minus 10% did not represent actual acquisition cost." O'Sullivan Decl., Ex. 1 (Poulsen Tr. 17:3-17, 57:11-14).

---

AWP because there was no other readily-available pricing data, it was administratively convenient, the numbers were updated on a regular basis (multiple times a month, I believe) and AWP was supported by the industry.

(Paragraph 23 of the Duarte declaration continues with two additional sentences.)

And more fundamentally, Poulsen's declaration contradicts her deposition testimony that she understood what Arkansas Medicaid Director, Ray Hanley, meant when he wrote emails that Poulsen saw in 1998 and 2000 referring to AWP as a "bogus mark" and "Ain't What's Paid." O'Sullivan Decl., Ex. 1 (Poulsen Tr. 115:16-116:18, 118:4-119:10).

At no point in her deposition did Poulsen indicate that she understood AWP to represent actual prices or an average of prices at any level (manufacturer to wholesaler or wholesaler to provider).[5]  Such an assertion in her declaration contradicts her testimony cited above (as well as other examples cited in Defendants' briefing in support of their summary judgment motion), and Poulsen made no attempt to advance such an assertion or offer such clarification during her deposition (despite having Montana counsel present) or in her three-page deposition correction sheet.  In fact, at her deposition, Poulsen testified that she "always" understood AWP to be "the manufacturer's suggested price," O'Sullivan Decl., Ex. 1 (Poulsen Tr. 103: 4-18)—i.e., not an average of actual prices.  *See also* O'Sullivan Decl., Ex. 1 (Poulsen Tr. 116:14-18) ("I generally understood [that] average wholesale price wasn't average wholesale price[, but t]hat it came much closer to what I was talking about before, the manufacturer's recommended price but that it was called AWP.").

The notion in her declaration that Poulsen had "no evidence that AWPs were inflationary" is also false.  During her tenure as pharmacy program officer, Poulsen was familiar with the 1996 Montana-specific study by the Office of Inspector General ("OIG") estimating that, on average, AWP exceeded pharmacy invoice prices by 16.2% for brand-name drugs and by

---

[5] In its opposition brief, the State cites Poulsen's deposition testimony in support of an argument that Montana Medicaid officials believed AWP was an average of drug prices.  *See* Montana's Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment ("Opp.") at 10 (citing Poulsen Tr. 122-23).  The cited testimony does not support the proposition.  After testifying that Montana Medicaid "understood that AWP didn't reflect average wholesale price" and "always understood" that AWP did not reflect actual acquisition costs, Poulsen stated (and Montana's opposition brief quotes): "You can't have an average and have that be the same as actual.  Because the *average presumably is the average of actuals*."  O'Sullivan Decl., Ex. 1 (Poulsen Tr. 122:17-123:4) (cited by Opp. at 9 (emphasis in Opp.)).  The State's reading of Poulsen's testimony is not only strained, it is a mathematical impossibility: an average of values that are not actual prices would not result in an "average of actuals."

48.5% for generic drugs.  Defs.' Joint 56.1 Stmt. ¶ 21, Ex. 33 (Docket 3648) (HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services*, A-06-95-00068 (July 1996)); O'Sullivan Decl., Ex. 1 (Poulsen Tr. 47:19-20) ("I'm sure I've seen it and read it and had it in my files.").  In fact, Poulsen quoted the 1996 study and its overall finding in a document she authored and that was the subject of deposition inquiry.  Defs.' Joint 56.1 Stmt. ¶ 27, Ex. 27 (Docket 3648) (Dorothy Poulsen, *Medicaid Services Prescription Drug Program* (Dec. 6, 1999)); O'Sullivan Decl., Ex. 1 (Poulsen Tr. 133:22-134:21).  In her deposition, Poulsen testified that it was her recollection that the 1996 OIG study concluded that "the discount on AWP that the pharmacies were receiving was greater than the discount that we were making in our reimbursement."  O'Sullivan Decl., Ex. 1 (Poulsen Tr. 80:5-8).  By contrast, with no credible explanation, in her recently filed declaration Poulsen now claims that Montana Medicaid was unaware of "inflationary spreads," that the 1996 OIG statistical study simply "advised the State of problems with *specific invoices or drugs*," and that the State believed that AWP-10% closely approximated acquisition costs.  Poulsen Decl. ¶¶ 8-13, 17 (emphasis added).  On its face, the OIG report explains that it was based on *thousands* of invoices.

       The statement in Poulsen's declaration that she was "not aware of the inflationary spreads" "until [she] became a witness in this lawsuit," Poulsen Decl. ¶ 12, is also flatly contradicted by evidence that Poulsen learned in mid-February 2000 of a "national investigation of the misrepresentation of average wholesale prices and wholesale acquisition cost by some drug manufacturers."  O'Sullivan Decl., Ex. 3 (February 28, 2000, Letter from Poulsen to Patrick Lupinetti, Office of the Attorney General of New York, Medicaid Fraud Control Unit, responding to Lupinetti's letter of February 16, 2000).  Because the State failed to produce this letter in its document production and because it was not produced by third party National Association of Medicaid Fraud Control Units until February 8, 2007, the summary judgment deadline, Defendants were unable to include it in their moving papers, but it certainly identifies the falsity of paragraphs 12 and 17 of Poulsen's declaration.  Poulsen's letter of February 28,

2000, also demonstrates her concern—on behalf of Montana Medicaid—for access to care for Montana Medicaid beneficiaries in rural areas and the need for a "profit margin" to providers, both themes consistent with her deposition testimony and at odds with her recent declaration.

Also at odds with her deposition testimony is Poulsen's insistence that "if we knew [the truth about] AWP . . . , we would not have used it as a basis of reimbursement." Poulsen Decl. ¶ 11. As Poulsen testified, Montana Medicaid recognized that its dispensing fee was far below the actual cost of providers to dispense drugs to Medicaid beneficiaries, and its use of AWP-10% was partly intended to make up for the inadequate dispensing fee. Poulsen herself estimated in 1999 that the dispensing fee covered only one-fourth to one-half the cost incurred by pharmacies. Defs.' Joint 56.1 Stmt. ¶ 55, Ex. 27 (Docket 3648) (Dorothy Poulsen, *Medicaid Services Prescription Drug Program* (Dec. 6, 1999)); O'Sullivan Decl., Ex. 1 (Poulsen Tr. 128:2-17). Asked if it was her "understanding that [a] Montana [p]harmacy would lose money on every drug it dispensed, unless it received some additional reimbursement from Medicaid," Poulsen responded: "That was my rationale for paying them . . . AWP less 10%, rather than some other amount, is that otherwise, they would not be paid sufficiently to provide services to our clients." O'Sullivan Decl., Ex. 1 (Poulsen Tr. 131:21-132:7); *see also* O'Sullivan Decl., Ex. 1 (Poulsen Tr. 132:19-133:2) ("I'm not sure which is the chicken and which is the egg. Did we pay a low dispensing fee because we thought that they [pharmacies] were making money on the drug? Or did we let them have money on the drug because we were paying them a low dispensing fee? I don't know."); Memorandum in Support of Defendants' Joint Motion for Summary Judgment at

7-12. Although she may have preferred another system,[6] Poulsen understood how it worked—greater reimbursement for drug costs compensated for under-reimbursement for services.[7]

By submitting a declaration that contradicts Poulsen's deposition testimony, without satisfactory explanation for the change, the State seeks to manufacture a factual dispute to avoid summary judgment. Defendants ask that the Court apply a well-established rule and strike the Poulsen declaration, which lacks the reliability of her deposition testimony. *See, e.g.*, *Abreu-Guzman*, 241 F.3d at 74; *Colantuoni*, 44 F.3d at 4; *Darnell*, 16 F.3d at 176; *Kennedy*, 952 F.2d at 266-67.

### 2. The Declaration Fails to Comply with Rule 56(e) Admissibility Requirements

Many portions of Poulsen's declaration also fail to comply with the admissibility requirements of Rule 56(e), which requires the following: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). "[T]he requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." *Perez v. Volvo Car Corp.*, 247 F. 3d 303, 315-16 (1st Cir. 2001) (holding that, at summary judgment stage, court should disregard portions of affidavit that did not comply with Rule 56(e)).

---

[6] Poulsen was directly asked, "Did you believe that providers were being overreimbursed?" [Objection] A: "I guess, generally, I didn't think my providers were being overreimbursed." Q: "Did you think that providers were at times undercompensated for their services?" [Objection] A: "Since they weren't being – since they weren't being reimbursed or paid specifically for their services, their services were not being paid for. It wasn't a system of reimbursement that I thought was in the best interest of the pharmacies in the long-term." O'Sullivan Decl., Ex. 1 (Poulsen Tr. 95:3-17).

[7] In her declaration, Poulsen denies that Montana Medicaid chose to overpay pharmacists and other providers, but instead that the State used AWP in order to get the closest possible to acquisition costs. Poulsen Decl. ¶ 18. By ignoring the interrelationship between dispensing fees and drug reimbursement, the paragraph attacks a straw man.

Numerous paragraphs in Poulsen's declaration purport to offer "the State's assumption" or what "Montana Medicaid believed."  Poulsen Decl. ¶¶ 7, 10; *see also id.* ¶12 ("*we* were not aware of the inflationary spreads") (emphasis added)).  The fact that Poulsen was not willing to say, in these instances, "I believed" this or "I was not aware of" that speaks for itself.  Her speculation and assumptions as to the knowledge of other State employees violates Rule 56(e).  Defendants therefore move to strike, at a minimum, those paragraphs for which Poulsen's declaration is not based on the witness's personal knowledge.  Poulsen Decl. ¶¶ 7-12, 17-18.

### III.  CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and strike the declaration of Dorothy Poulsen submitted in support of Montana's opposition to Defendants' motion for summary judgment.

DATED this 5th day of April, 2007.

**PERKINS COIE LLP**
**ON BEHALF OF ALL DEFENDANTS**

By: /s/ *Kathleen M. O'Sullivan*
David J. Burman
Kathleen M. O'Sullivan
Charles C. Sipos
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206-359-8000
Fax:  206-359-9000
Email:  DBurman@perkinscoie.com
E-mail:  KOSullivan@perkinscoie.com
E-mail:  CSipos@perkinscoie.com

Thomas J. Sartory, BBO #442500
**GOULSTON & STORRS, P.C.**
400 Atlantic Avenue
Boston, MA  02110-3333
Telephone: (617) 482-1776
Email: tsartory@goulstonstorrs.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of April, 2007, a true and accurate copy of the Memorandum in Support of the Motion to Strike Declaration of Dorothy Poulsen was served via the Lexis-Nexis Filing System.

DATED: April 5, 2007

                          Kathleen M. O'Sullivan