# EXHIBIT 1

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS    **CERTIFIED COPY**

-------------------------------------------------------

IN RE: PHARMACEUTICAL      )

INDUSTRY AVERAGE           )

WHOLESALE PRICE            )

LITIGATION                 )MDL Docket No.

                           )Civil Action 01CV12257PBS

-------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

DOROTHY POULSEN

-------------------------------------------------------

9:00 a.m

February 22, 2006

PERKINS COIE

1201 Third Avenue, #4800

Seattle, Washington   98101

REPORTED BY:  Judith A. Robinson, CCR #2171

Dorothy Poulsen                                February 22, 2006

Seattle, WA

17

1    going to go through your employment history and

2    prior jobs and I'll address that in a few minutes.

3              Do you recall how you learned when you

4    were the Montana Medicaid pharmacy program officer

5    that AWP did not represent actual acquisition cost?

6              MR. LOPEZ:  Object to the form.

7              THE WITNESS:  It -- through discussions

8    with other pharmaceutical people -- through

9    discussions with other program officers in other

10   states.  Through -- I mean, I guess it was not

11   anything specific.  It was just a general

12   understanding.

13   BY MS. O'SULLIVAN:

14        Q.   It was a general understanding among State

15   pharmacy program officers that AWP didn't represent

16   actual acquisition cost?

17        A.   Right.

18        Q.   We'll talk a few minutes about the topic

19   of deposition preparation.

20              Did you meet with Mr. Lopez to prepare for

21   this deposition?

22        A.   Yes.

Dorothy Poulsen                                 February 22, 2006
                        Seattle, WA

18

1      Q.    When was that?

2      A.    Friday.

3      Q.    Who was present, if anyone else?

4      A.    Jennifer Breckenridge.

5      Q.    How long did that meeting take place?

6      A.    About an hour.

7      Q.    Did you look at any documents during that

8   preparation session?

9      A.    No.

10     Q.    Did you bring any documents related to

11  Montana Medicaid to the deposition today?

12     A.    No.

13     Q.    Have you spoken to anyone else in

14  preparation for this deposition?

15     A.    No.

16     Q.    Did you prepare any notes in preparation

17  for this deposition?

18     A.    No.

19     Q.    Next topic is your background.

20     A.    Okay.

21     Q.    I said I was going to get there.  I read

22  somewhere that you were trained as a scientist.

Dorothy Poulsen                                    February 22, 2006
                          Seattle, WA

47

1       A.    I --

2             MR. LOPEZ:  Object to the form.  And let

3    me also say, you can take your time to -- to look at

4    this document.

5             THE WITNESS:  Okay.

6    BY MS. O'SULLIVAN:

7       Q.    **Please do that with every exhibit, Mrs.**

8    **Poulsen. Take as long as you need.**

9             MR. LOPEZ:  I'll also note for the record,

10   this appears to be some sort of a compound document.

11   There is some sort of prefatory memorandum at the

12   beginning.  And there's some sort of documented

13   report that begins, "Review of Pharmacy Acquisition

14   Costs," in terms of this title.

15            THE WITNESS:  This particular document

16   would have been -- would have been received, I'm

17   pretty sure, prior to my taking the position or

18   maybe just around the time of my taking the

19   position.  And so I'm -- I'm sure I've seen it and

20   read it and had it in my files.  But I wouldn't have

21   been responding to it because I wouldn't have known

22   at that point in time what it was they were talking

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

57

1    be reimbursed our actual acquisition cost plus a fee

2    equivalent to the amount we receive for other state

3    facility prescriptions."

4         A.    Right.

5         Q.    Did you agree that the change to

6    reimbursement methodology from AWP minus 10% to

7    actual acquisition cost occur for MedManagement?

8              MR. LOPEZ:  Object to the form.

9              THE WITNESS:  Yes.

10   BY MS. O'SULLIVAN:

11        Q.    Is it fair to say, that as of this time in

12   1997, you understood that AWP minus 10% did not

13   represent actual acquisition cost?

14        A.    Yes.

15        Q.    The court reporter has handed you Exhibit

16   Poulsen 004 Bates numbered MT018455, a 1-page

17   document dated July 30, 1997.

18             Is this a letter that you sent to Al Stark

19   of MedManagement?

20        A.    Yes, it is.

21        Q.    And comparing Exhibit Poulsen 003 to this

22   document has Exhibit Poulsen 004, is this your

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

                                                                  80

1            MR. LOPEZ:  Object to form.

2            THE WITNESS:  What I'm saying is that, I

3       think that what that report says is that the

4       discount, from their study, the discount that

5       pharmacies were receiving from the discount on AWP

6       that the pharmacies were receiving was greater than

7       the discount that we were making in our

8       reimbursement.  So it was greater than AWP minus

9       10%.  That is not the same as talking about

10      reimbursing for services.

11      BY MS. O'SULLIVAN:

12           Q.   Did the 1998 provider increase go into

13      effect?

14           A.   Yes.

15           Q.   And so, is it true that after receiving

16      the 1996 OIG study, Montana Medicaid actually

17      implemented an increase in the level of

18      reimbursement to providers?

19           A.   Yes.  Well, for the dispensing fee, yes.

20           Q.   I have a few more questions about this

21      document and then we'll take a break.

22           Turning to the prior page, MT004041,

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                  February 22, 2006
Seattle, WA

1   what you believe. Not what the report said but what

2   you believe.

3           Did you believe that providers were being

4   overreimbursed?

5           MR. LOPEZ:  Object to the form.

6           THE WITNESS:  I guess, generally, I didn't

7   think my providers were being overreimbursed.

8   BY MS. O'SULLIVAN:

9      Q.   Did you think that providers were at times

10  undercompensated for their services?

11          MR. LOPEZ:  Object to the form.

12          THE WITNESS:  Since they weren't being --

13  since they weren't being reimbursed or paid

14  specifically for their services, their services were

15  not being paid for.  It wasn't a system of

16  reimbursement that I thought was in the best

17  interest of the pharmacies in the long-term.

18  Because I assumed that eventually there would be

19  concern about the cost of the drug, which were

20  always going up.  And if, for instance, we said to

21  the pharmacists, you have to charge us only your

22  acquisition costs and we had some mechanism to

Dorothy Poulsen                                February 22, 2006

Seattle, WA

103

1    "AWP"?

2              MR. LOPEZ:  Object to the form.

3              THE WITNESS:  Okay.  So let me ask the

4    question back.  You're asking me whether my

5    understanding is that the manufacturer listed

6    average wholesale price and that might differ from a

7    retail price or what my reimbursement system was?

8    BY MS. O'SULLIVAN:

9         Q.   Yes.

10        A.   Yes.  I knew that.  You know, it's -- it's

11   like most retail products, you see the manufacturer

12   suggested retail price and then you see our store's

13   price.

14        Q.   **Your understanding, if I have it right,**

15   **AWP was the suggested price?**

16             MR. LOPEZ:  Object to form.

17             THE WITNESS:  I guess that's what I always

18   took it as is the manufacturer's suggested price.

19   BY MS. O'SULLIVAN:

20        Q.   **Exhibit Poulsen 007 is a 2-paged document,**

21   **Bates numbered MT016117 to 118.  It appears to be**

22   **some Emails.**

Dorothy Poulsen                                February 22, 2006
                          Seattle, WA

115

1    "Prescription Drug Reimbursement?

2         A.   Yes.

3         Q.   And does this Email that was forwarded

4    appear to have come from Ray Hanley at Arkansas

5    Medicaid?

6              MR. LOPEZ:  Objection.

7              THE WITNESS:  This is very confusing,

8    isn't it?  Well, the return path on it is Ray

9    Hanley.

10   BY MS. O'SULLIVAN:

11        Q.   Do you also see there on the third page of

12   the received from, for nellery at mt.Gov again?

13        A.   Yes, I see that.  On March 12th.  Which is

14   -- okay.  Okay.  This must be just -- yes.  Anyway,

15   what is your question?

16        Q.   Did you receive this Email from Nancy

17   Ellery dated March 17, 1998, that was forwarding a

18   message from Ray Hanley?

19        A.   Since I printed it out and it says at the

20   top, April 3rd, I must have received it.

21        Q.   I'd like you to turn to page MT016359.

22        A.   Uh-huh.

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                          February 22, 2006

Seattle, WA

116

1       Q.    Where it begins:

2             "We, and almost all states."  The second

3   or last full paragraph --

4       A.    Uh-huh.

5       Q.    -- it says:

6             "We, and almost all states pay a

7   percentage off of AWP, we pay AWP less 10.5% plus

8   fee in Arkansas.  Our research suggests AWP is

9   increasing a bogus mark.  The Wholesaler Acquisition

10  Cost (WAC) that we have access to is often half or

11  less of the AWP."

12            Did you understand what Mr. Hanley was

13  referring to by calling AWP a bogus mark?

14      A.    Well, yes.  I generally understood,

15  average wholesale price wasn't average wholesale

16  price.  That it came much closer to what I was

17  talking about before, the manufacturer's recommended

18  price but that it was called AWP.

19      Q.    And then it goes on to say in this Email

20  from Mr. Hanley:

21            "When we pay off AWP, we pay the single

22  independent retailer the same as the chain who gets

Dorothy Poulsen                                    February 22, 2006
                            Seattle, WA

118

1        A.    I understood that from his perspective or

2   at least in his mind, chain retailers were able to

3   buy drugs at much less than or much less than AWP.

4        Q.    Mrs. Poulsen, the court reporter has

5   handed you Exhibit Poulsen 010, which is Bates

6   numbered MT028841 to MT028855. It starts off as an

7   Email from David Shepherd to the NMPAA

8   talk@listbot.com and addressed June 23, 2000.

9              Will you please take a look at this

10  document?

11       A.    Okay.

12       Q.    Mrs. Poulsen, Exhibit Poulsen 010 has your

13  name on the top left-hand corner.

14             Do you know why that is?

15       A.    I would have printed it out, I think.

16       Q.    So is it fair to say, you received this

17  Email which is Exhibit Poulsen 010?

18       A.    Yes.

19       Q.    Turning to the second page of Exhibit

20  Poulsen 010 MT028842, the paragraph that begins:

21             "There is no doubt in my mind."  It's kind

22  of in the middle of the page.

Dorothy Poulsen                                    February 22, 2006
Seattle, WA

119

1           Do you see that?

2       A.   Yes.

3       Q.   Do you see the third sentence where it

4   says:

5           "Almost everyone who is familiar with

6   pharmacy reimbursement knows that AWP, 'Ain't What's

7   Paid'"?

8       A.   Yes.

9       Q.   Did you know that?

10      A.   Yes.  I mean, the common knowledge was

11  that AWP was, again, as I've said before, not what

12  it sounded like. That's why it was discounted.

13      Q.   And you knew that while you were the

14  pharmacy provider for Montana Medicaid?

15      A.   Yes.  I wouldn't have been paying

16  attention if I didn't know that.

17      Q.   Turning to the last paragraph on the same

18  page and the second full sentence:

19          "It is true that ingredient reimbursement

20  is supposed to be based on estimated acquisition

21  cost.  The ancillary costs of dispensing the drug

22  are supposed to be accounted for by the dispensing

Dorothy Poulsen                                February 22, 2006
                      Seattle, WA

                                                          122

1    pharmacy programs for Medicaid across the country

2    did talk?

3              MR. LOPEZ:  Objection.

4              THE WITNESS:  No.  Actually, in -- in what

5    terms?  No.  I mean, I don't know that I had ever

6    heard "Ain't What's Paid" before I read here.  And

7    no, we didn't usually talk in these terms.  This was

8    the -- in -- in any discussions that there may have

9    been about pricing, the -- the way that it would

10   have been phrased would not have been as informal as

11   this.

12   BY MS. O'SULLIVAN:

13       Q.   But you did testify a few minutes ago,

14   that it was common knowledge that AWP was, "Ain't

15   What's Paid"?

16             MR. LOPEZ:  Object to form.

17             THE WITNESS:  Colloquially, yes.  I mean,

18   we understood that AWP didn't reflect the average

19   wholesale price.

20   BY MS. O'SULLIVAN:

21       Q.   And the AWP also didn't reflect the actual

22   acquisition costs?

Dorothy Poulsen

Seattle, WA

February 22, 2006

123

1       A.     Which we always understood that to be the

2   case. You can't have an average and have that be the

3   same as actual.   Because the average presumably is

4   the average of actuals.

5         So assuming that you're selling drugs to

6   different pharmacies at different amounts, the

7   actual is what you actually do it and sell it for

8   and the average is an average of those amounts.   At

9   least that was my interpretation.   I never took a

10  class on pricing of drugs.   But -- but that is what

11  I intuited from my years of working in the program.

12      Q.   **I want to go back to this term, "spread."**

13        **Could you explain it to me again, how you**

14  **used the term while you were with Montana Medicaid?**

15      MR. LOPEZ:   Objection.

16      THE WITNESS:   I don't know that I ever

17  used the term.   This is a football team phraseology.

18  You hear about betting on teams with a spread.   It's

19  not -- it is not the kind of terminology I would

20  have ever used.

21  BY MS. O'SULLIVAN:

22      Q.   **You can put Exhibit Poulsen 010 away.**

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                    February 22, 2006
                          Seattle, WA

128

1   BY MS. O'SULLIVAN:

2        Q.    Exhibit Poulsen 012 is a document with a

3   Bates range of MT006626 to 6642, entitled, "Medicaid

4   Services Prescription Drug Pricing," with your name

5   on it, "Dorothy Poulsen, Program Officer" and the

6   date, "December 6, 1999."

7            Will you please take a look at this

8   document and my question is, did you prepare this

9   report?

10       A.    I did.

11       Q.    What is it?

12       A.    It's a summary or review of the Medicaid

13  drug program.  This, I believe, was more than likely

14  done for the legislative session.  So this was one

15  of those informative documents, so that legislators

16  would understand how the program works and what it

17  was that we did.

18       Q.    So this document was sent by Montana

19  Medicaid to Montana State legislators?

20       A.    You know, I don't know how it was used.

21           Normally when they did things like that,

22  my name wouldn't have appeared on it.  I'm not sure

Dorothy Poulsen                        February 22, 2006
                    Seattle, WA

131

1    have been $16 or, you know, between $8 and $16 per

2    prescription and we were paying $4.20.

3           When we used our methodology to determine

4    what our dispensing fee should be, the amount we

5    came up with was invariably higher than what the

6    capped dispensing fee was. So virtually everyone had

7    the capped dispensing fee.

8        Q.    Did you do the analysis that led to this

9    conclusion that the dispensing fee only covered one-

10   quarter to one-half of the cost?

11       A.    I believe so.

12       Q.    Do you know where those dispensing fees

13   are located at Montana Medicaid?

14       A.    In a file folder.

15       Q.    Who keeps that file?

16       A.    The pharmacy program officer or in

17   archives.  Or at this point in time, they may have

18   done many things differently.  But at the time I was

19   doing it, it would have been in a file folder.

20       Q.    Based on this analysis that you did in

21   Exhibit Poulsen 012, was it your understanding that

22   Montana Pharmacy would lose money on every drug it

Dorothy Poulsen                                    February 22, 2006
                        Seattle, WA

132

1    dispensed, unless it received some additional

2    reimbursement from Medicaid?

3              MR. LOPEZ:  Objection.

4              THE WITNESS:  That was my rationale for

5    paying them is AWP less 10%, rather than some other

6    amount, is that otherwise, they would not be paid

7    sufficiently to provide services to our clients.

8    BY MS. O'SULLIVAN:

9        Q.   Was it your understanding that the

10   reimbursement methodology of AWP minus 10% was in

11   part intended to make up for the lack of

12   reimbursement for the dispensing fee?

13             MR. LOPEZ:  Objection.

14             THE WITNESS:  That was my assumption.

15   When I came into the position, this was a system

16   that was set up. This was how it was set up.  What I

17   then tried to determine or figure out over the years

18   is why we would set things up this way.  So that was

19   my understanding is we paid this way because -- I'm

20   not sure which is the chicken and which is the egg.

21   Did we pay a low dispensing fee because we thought

22   that they were making money on the drug?  Or did we

Dorothy Poulsen                                    February 22, 2006
                         Seattle, WA

133

1    let them have money on the drug because we were

2    paying them a low dispensing fee?  I don't know.  I

3    just came into it and that's where that was.

4    BY MS. O'SULLIVAN:

5        Q.    Have you ever hear of the term, "cross-

6    subsidization"?

7        A.    No.  Not that I know of.

8        Q.    Let's turn to MT6627 of Exhibit Poulsen

9    012.

10             Did you write in the last paragraph:

11             "Drug pricing is a prime example of free

12   market capitalism at work in the United States,

13   manufacturers set the price of their drugs

14   independent of any regulation or guideline.  When

15   there is competition, the prices of drugs decreases;

16   without competition, the pharmaceutical company

17   charges whatever the market will bear"?

18       A.    Yes.  I would have written that.

19       Q.    And you thought it was accurate when you

20   wrote it?

21       A.    Yes, I did.

22       Q.    Page 6629.  And the second full paragraph

Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                February 22, 2006

Seattle, WA

134

1    that starts off, "The local pharmacy," in the second

2    sentence there did you write:

3            "Perhaps surprisingly, profit margins are

4    generally greater on generic products than brand

5    name products"?

6        A.    Yes.  I would have written that.

7        Q.    How did you learn that?

8        A.    Frankly, probably in talking with Mark

9    Eichler.  I don't know of anywhere else that I would

10   have.

11       Q.    The sentence that follows you wrote:

12           "A 1996 report by the Office of Inspector

13   General estimated that overall in Montana, the AWP

14   exceeded invoice prices by 16.2% for brand name

15   drugs and 48.5% for generic drugs."

16           So is it fair to say, that one source that

17   you learned that pharmacy profit margins are greater

18   on generics than brand name products was the 1996

19   OIG report?

20       A.    Well, it's certainly part of the evidence

21   that I presented for the first statement.

22       Q.    Looking --

Henderson Legal Services
(202) 220-4158

# EXHIBIT 2

RECEIVED

APR 2 6 2006

PERKINS COIE

April 19, 2006

**In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL 1456**

February 22, 2006

**DOROTHY POULSEN**

Enclosed is the signed signature page and errata sheet of DOROTHY POULSEN.

Thank you for your attention to this matter and please feel free to call us with any questions or concerns.

Sincerely,

Henderson Legal Services



Henderson Legal Services
(202) 220-4158

Dorothy Poulsen                                    February 22, 2006

Seattle, WA

280

1  just want to thank you for your time.  I have no

2  questions at this time.

3           THE WITNESS:  Thank you.

4           MR. LOPEZ:  We'll reserve signature.

5                (Whereupon, the deposition of Dorothy

6  Poulsen was concluded at 6:09 p.m.)

7

8

9           S I G N A T U R E

10 I declare under penalty of perjury under the laws of

11 the State of Washington that I have read my within

12 deposition.  And the same is true and accurate, save

13 and except for changes and/or corrections, if any, as

14 indicated by me on the change sheet page hereof.

15

16     Signed in *Seattle*............, Washington, on

17 the *17th* ........ Day of *April*......, 2006.

18

19        *Dorothy Poulsen*

20        DOROTHY POULSEN

21        Taken: February 22, 2006

22        Judith A. Robinson, CCR

Henderson Legal Services
(202) 220-4158

1    ERRATA                                                    Page 1

2    CAPTION: _____

3    DATE: February 22, 2006

4    WITNESS: Dorothy Poulsen

5    I wish to make the following changes, for the following

6    reasons:

7    PAGE   LINE

8    20     5      CHANGE: famous to infamous REASON: accuracy

9    20     7      CHANGE: 1990 to 1985 REASON: accuracy

10   20     7      CHANGE: add "and then full REASON: accuracy

11   20     12     time until 1990." REASON: accuracy
                   CHANGE: SRSS to SRS

12   22     14     CHANGE: I worked with staff REASON: accuracy

13   24     13     in the community - based...
                   CHANGE: delete "I worked in the REASON: clarification

14   24     14     CHANGE: delete "about 5 years." REASON: clarification

15   25     11     CHANGE: Baska to Buska REASON: accuracy

16   26     11     CHANGE: "which is" to "in" REASON: clarification

17   30     7      CHANGE: "concerns" to "conferences" REASON: accuracy

18   30     10     CHANGE: "their" to "the" REASON: clarification

19   33     21     CHANGE: delete "of" REASON: clarification

20   34     7      CHANGE: "or the" to "of the" REASON: clarification

21   34     17     CHANGE: delete "a" REASON: clarification

22   34     18     CHANGE: to "generally about kinds REASON: clarification

Page 2

| 1 | PAGE | LINE | | |
|---|---|---|---|---|
| 2 | 35 | 5 | CHANGE: delete "coming out of" REASON: | duplication |
| 3 | 37 | 17 | CHANGE: "him" to "them and" REASON: | clarification |
| 4 | 56 | 14 | CHANGE: delete "and" REASON: | clarification |
| 5 | 58 | 20 | CHANGE: add "to legislative hearings" REASON: | clarification |
| 6 | 67 | 6 | CHANGE: "they" to "patients" REASON: | clarification |
| 7 | 67 | 6 | CHANGE: add "taking medications on an on-going basis" REASON: | clarification |
| 8 | 67 | 7 | CHANGE: add "unlike" REASON: | clarification |
| 9 | 68 | 3 | CHANGE: 409 or 408 to "4.09 or 4.08" REASON: | accuracy |
| 10 | 81 | 14 | CHANGE: "LouisTown" to Lewistown REASON: | accuracy |
| 11 | 81 | 17 | CHANGE: "what was one" to "there was another one" REASON: | clarification |
| 12 | 82 | 3-4 | CHANGE: "made indicated" to Medicaid REASON: | accuracy |
| 13 | 83 | 14 | CHANGE: "Louis Town" to Lewistown REASON: | accuracy |
| 14 | 83 | 14 | CHANGE: delete "outside of" and replace with "considered" REASON: | clarification |
| 15 | 84 | 9 | CHANGE: "LouisTown" to Lewistown REASON: | accuracy |
| 16 | 85 | 7 | CHANGE: building to billing REASON: | clarification |
| 17 | 87 | 6 | CHANGE: "we pay" REASON: | clarification |
| 18 | 87 | 7 | CHANGE: "acquisitions" to "acquisition" REASON: | clarification |
| 19 | 87 | 11 | CHANGE: "where" to "were" REASON: | clarification |
| 20 | 93 | 21 | CHANGE: "at" to "as" REASON: | clarification |
| 21 | 110 | 5 | CHANGE: regiment to regimen REASON: | clarification |
| 22 | 121 | 19 | CHANGE: "being" to "not" REASON: | clarification |

| | PAGE | LINE | | CHANGE | | REASON | |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | Page 3 |
| 2 | 123 | 7 | CHANGE: | "do" to "buy" | REASON: | clarification | |
| 3 | 126 | 12 | CHANGE: | delete "that was what" | REASON: | clarification | |
| 4 | 126 | 21 | CHANGE: | "were supposed" | REASON: | clarification | |
| 5 | 126 | 22 | CHANGE: | "to have a narrow..." | REASON: | clarification | |
| 6 | 139 | 5 | CHANGE: | "Drug" to "Blood" | REASON: | accuracy | |
| 7 | 139 | 12 | CHANGE: | "Drug" to "blood" | REASON: | accuracy | |
| 8 | 140 | 16 | CHANGE: | delete "to" add "could" | REASON: | clarification | |
| 9 | 148 | 22 | CHANGE: | "exercise" to "increase" | REASON: | clarification | |
| 10 | 160 | 19 | CHANGE: | "at" to "a" | REASON: | clarification | |
| 11 | 160 | 20 | CHANGE: | delete "don't" | REASON: | clarification | |
| 12 | 173 | 12 | CHANGE: | "have" to "ask" | REASON: | clarification | |
| 13 | 199 | 3 | CHANGE: | "to" to "through" | REASON: | clarification | |
| 14 | 200 | 5 | CHANGE: | "or" to "other" | REASON: | clarification | |
| 15 | 217 | 22 | CHANGE: | "Louis Town" to Lewistown | REASON: | accuracy | |
| 16 | 224 | 22 | CHANGE: | "from" to "for" | REASON: | clarification | |
| 17 | 230 | 18 | CHANGE: | Louis Town to "Lewistown" | REASON: | accuracy | |
| 18 | 230-231 | 22-1 | CHANGE: | Louis Town to Lewistown | REASON: | accuracy | |
| 19 | 234 | 1 | CHANGE: | "your" to "to" | REASON: | clarification | |
| 20 | 254 243 | 10 | CHANGE: | "counsel" to "council" | REASON: | clarification | |
| 21 | ___ | ___ | CHANGE: | _____ | REASON: | _____ | |
| 22 | ___ | ___ | CHANGE: | _____ | REASON: | _____ | |

# EXHIBIT 3

# DEPARTMENT OF
# PUBLIC HEALTH AND HUMAN SERVICES
### HEALTH POLICY & SERVICES DIVISION



MARC RACICOT
GOVERNOR

LAURIE EKANGER
DIRECTOR

## STATE OF MONTANA

COGSWELL BLDG., 1400 BROADWAY
PO BOX 202951
HELENA, MONTANA 59620-2951

February 28, 2000

**RECEIVED**

**MAR 03 2000**

**MFCU SPECIAL PROJECTS**

Patrick E. Lupinetti
Office of the Attorney General
Medicaid Fraud Control Unit
Special Projects Division
One Blue Hill Plaza PO Box 1747, Suite 1037
Pearl River, NY 10965-8747

Dear Mr. Lupinetti:

We received your letter of February 16, 2000, concerning the national investigation of the misrepresentation of average wholesale prices and wholesale acquisition costs by some drug manufacturers. I do have several questions about the anticipated process:

1) When will FDB plan to implement the new pricing?
2) Will the revised AWP take into account that most states discount the current AWP amounts? For pharmacies who buy through buying groups, the revised AWPs will probably still allow a profit margin. However, pharmacies who actually buy through wholesalers, for example, small, independent pharmacies found in rural areas, may lose money once the discount is applied. The result could be a loss of access for some Medicaid recipients.
3) In FDB's draft letter, they stated that "a designated representative of the state Medicaid agencies may change approximately 10% of the NDCs every six months." Who is the designated representative? How will states learn about changes? How will the NDCs be identified? How would a state refer an NDC for inclusion on the list?
4) Do you anticipate extending this process to more than 400 NDCs?
5) Has HCFA been apprised of this process?
6) Will you use the manufacturer's written certification of accurate pricing to police the industry?

I appreciate the effort taken on this project and certainly look forward to the effect on expenditures for the prescription drug program. At the same time, I anticipate that some system issues may need to be addressed and I would like to identify them as early as possible.

PHONE: (406) 444-4540    FAX: (406) 444-1861

I look forward to your response. If you have questions, please feel free to contact me at (406) 444-2738 or dpoulsen@state.mt.us

Sincerely,

*Dorothy Poulsen*

Dorothy Poulsen
Pharmacy Program Officer
Medicaid Services Bureau

7.2.24