# UNITED STATES DISTRICT COURT
## THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

NO. 1456

Civil Action No. 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:

Judge Patti B. Saris

*State of Montana v. Abbott Labs Inc., et al.,*
D. Mont. Cause No. CV-02-09-H-DWM

## DEFENDANTS' REPLY TO THE STATE OF MONTANA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION ............................................................................................... 1

II.     ARGUMENT ...................................................................................................... 3

        A.      The State Is No Longer Pursuing Its *Parens Patriae* Claim, So Count I
                Should Be Dismissed ............................................................................... 3

        B.      The Two-Year Statute of Limitations Is Fatal to Montana's Case. ..................... 3

        C.      The State's Choice to Continue to Base Some Reimbursements on AWP,
                Despite Knowing Actual Prices, Is Fatal to the State's MUTPA Claim. .............. 7

                1.      The State makes no showing that Defendants engaged in a
                        "deceptive" practice. .................................................................... 7

                2.      The State makes no showing that Defendants engaged in an
                        "unfair" practice ......................................................................... 10

                3.      The State's failure to show any net loss in light of rebates paid by
                        Defendants precludes liability. ....................................................... 11

        D.      The State's Medicaid Fraud Claim Fails to Meet the Essential Elements of
                the Statute. ......................................................................................... 12

                1.      A claim for over-reimbursement must be brought against a
                        "provider" for submission of claims to a "Medicaid agency." .............. 12

                2.      An "indirect" representation must nonetheless come on behalf of
                        someone with authority or responsibility to make claims, and
                        Defendants have neither. .............................................................. 13

                3.      The State has not shown that Defendants knowingly submitted
                        false information to Montana Medicaid. ........................................... 15

        E.      The State Fails to Meet the Essential Elements of the False Claims Act. ........... 15

                1.      The State has not met the statute's causation requirement. .................. 15

                2.      The State has not shown that submission of pricing information to
                        a third party is a "claim" submitted to Montana Medicaid. .................. 18

        F.      The State Has No Basis for Liability as to Multi-Source Drugs, Which Do
                Not Fit the State's Paradigm for Fraud. ...................................................... 19

                1.      The State has failed to tie AWP to a specific manufacturer for
                        multi-source drugs. ..................................................................... 19

                2.      The State admitted it had sufficient pricing data from multi-source
                        manufacturers to calculate AWPs. .................................................. 21

        G.      The State's View of Penalties Is Unsupported by the Law and the United
                States' Position in the AWP Litigation ........................................................ 21

III.    CONCLUSION ................................................................................................. 23

## I.   INTRODUCTION

Defendants' Joint Motion for Summary Judgment presented undisputed evidence that Montana Medicaid chose to use, and continues to use, AWP as a benchmark for reimbursement for some drug claims knowing that AWP was well above actual acquisition cost.  It did so because of the need to offset the persistent under-reimbursement of providers for their costs of dispensing drugs to Medicaid beneficiaries, to whom Montana Medicaid owed a federal duty to provide "equal access" to care.  In response, as it must, the State admitted the following facts:

- Montana Medicaid knew that AWP did not represent actual acquisition cost.  State's Resp. to Statement of Undisputed Material Facts in Support of Defs.' Jt. Mot. for Summary Judgment (Docket No. 3903) ("State 56.1 Stmt.") ¶ 36.

- Montana Medicaid has elected to retain an AWP-based system.  *Id.* ¶ 78.

- Terry Krantz, Supervisor of Montana DPHHS Health Maintenance Section, participated in a meeting in September 1995 with the OIG and representatives of other states also involved in OIG pharmacy acquisition cost studies.  *Id.* ¶ 23.

- On October 5, 1995, Krantz wrote to Montana Medicaid Director Nancy Ellery to report on preliminary results presented at the meeting:  "While AWP is a national standard it is apparent from the results of the survey that it has little to do with the acquisition cost of pharmacy products." *Id.* ¶ 24.

- Montana Medicaid officials routinely received OIG reports relating to pharmacy acquisition costs.  *Id.* ¶ 32.

- The number of rural pharmacies participating in the Medicaid program continues to be a vital concern to Montana Medicaid.  *Id.* ¶ 17.

- Access to care is a federal requirement for state Medicaid programs.  *Id.* ¶ 41.

- First DataBank determines the AWPs it publishes based upon surveys of wholesalers, and Montana had access to and received pricing information from First DataBank.  *Id.* ¶¶ 84-85.

- Montana Medicaid received actual Average Sales Price ("ASP") data provided by three defendants:  AstraZeneca, Bayer, and TAP, but did not use the data for Medicaid reimbursements.  *Id.* ¶¶ 117, 119.

Despite these admissions, the State attempts to avoid summary judgment by inventing other facts unsupported by the record and contradicted by the evidence before the Court. In particular, the State purports to deny the voluminous record of evidence – *from the State's own witnesses and files* – that Montana used AWP-10% (and later 15%) to make up for the inadequate dispensing fee. Despite the undisputed evidence that Montana Medicaid knew no later than 1995 that AWP "has little to do with the acquisition cost," the State contends 12 years later that Montana Medicaid believed AWP had a "rational and direct relationship to the underlying cost for [] drugs." Montana's Memo. in Opp. to Defs.' Mot. for Summary Judgment ("Opp.") (Docket No. 3902) at 10. The State does not support this self-serving assertion with record evidence, instead relying on a last-minute declaration tendered to recant prior deposition testimony and salvage the State's claims. But, as set forth above, the State has admitted the facts needed to grant summary judgment in Defendants' favor and the State may not create a factual issue on summary judgment by presenting declarations contrary to deposition testimony.[1]

None of the State's arguments in opposition to summary judgment credibly suggests otherwise. First, because Montana Medicaid knew no later than 1995 that AWP had "little to do with [] pharmacy acquisition cost," all of its claims are barred by Montana's two-year statute of limitations. Second, the State argues that its MUTPA claim is not barred because it need not show that Defendants "intended" to deceive Montana Medicaid. This argument misses the point; Montana Medicaid was not deceived *at all*, so the State's lack of evidence that Defendants intended any deception is simply irrelevant. Third, the State argues that the Montana Medicaid fraud act permits a claim against a non-"provider," for information submitted to a non-"Medicaid agency," that results in reimbursement to someone other than Defendants. For reasons explained in Defendants' opposition to the State's motion for partial summary judgment on that claim, the Medicaid fraud act does not permit this kind of overreaching. *See* Docket No. 3731. Fourth, the State fails to establish the essential elements under the Montana False Claims Act ("MFCA"),

---

[1] *See* Defendants' Motion to Strike the Declaration of Dorothy Poulsen, also filed today.

that Defendants "caused" a "claim" to be submitted to Montana Medicaid.  Fifth, as to multi-source drugs, the State rests only on the *possibility* that it *could* provide evidence, not evidence itself, that reimbursement for those drugs fits within the State's paradigm for liability.  This hypothesis is not enough to avoid summary judgment.  Finally, the State maintains that it can seek "penalties" even though it has suffered no "damage," a backwards position that is not supported by the law or the record.

## II.   ARGUMENT

### A.    The State Is No Longer Pursuing Its *Parens Patriae* Claim, So Count I Should Be Dismissed.

In Count I of the Complaint, Montana asserted a claim under MUTPA for AWP-related damages to "Montana residents."  Compl. ¶¶ 654-660.  The "Montana residents" on whose behalf the State purported to sue included Medicare Part B beneficiaries and Montana third-party payors ("TPPs") who allegedly paid for Defendants' drugs on the basis of AWP.  Defendants moved for summary judgment on this Count on various grounds.  Defs.' Joint Mot. for Summ. Judg. ("Mot.") (Docket No. 3647) at 27-31, 41.  In response, Montana explains that it "does not seek to recover damages on behalf of either" TPPs or Montana consumers and that its case is "limited to damages incurred by the Montana Medicaid Program."  Opp. at 22.[2]  In light of that nail in the coffin of the State's *parens patriae* claims, the Court should grant summary judgment for Defendants on Count I.

### B.    The Two-Year Statute of Limitations Is Fatal to Montana's Case.

The State concedes that the statute of limitations on all its claims is two years; the State concedes that the statute of limitations applies to the State; and the State concedes that the standard for triggering the statute is "inquiry notice."  Opp. at 37.  The State filed its original

---

[2] Despite this clear statement on page 22, the State vaguely suggests elsewhere in its opposition brief that the State is still pursuing its *parens patriae* claim.  Opp. at 1 (referring to "payors"), 38 (referring to "Montana citizens").  Summary judgment is also warranted for Defendants on Count I because the State has put forth no evidence in response to the overwhelming record of TPP knowledge regarding AWP, and has not responded to any of Defendants' arguments that the MUTPA claim on behalf of TPPs and unidentified individuals is barred as a matter of law.  *See* Mot. at 27-30.

Complaint on February 25, 2002, so the dispositive date for determining whether the State's case is barred is February 25, 2000. But the State ignores in its opposition brief – and does not deny in its 56.1 statement – the critical evidence that triggered the statute of limitations years in advance of that date. As explained in Defendants' Motion, Montana Medicaid participated in an Office of Inspector General ("OIG") report published in draft form in 1995 (and in final in 1996), which identified substantial difference between acquisition cost and AWP. Mot. at 13; Defs.' Joint 56.1 Stmt. ¶ 24, Ex. 36 (Docket No. 3648) ("While AWP is a national standard it is apparent . . . that *it has little to do with the acquisition cost of pharmacy products*.") (emphasis added). Compare that statement to one found in the State's initial Complaint: "[T]he purported AWP reported by the defendant pharmaceutical manufacturers bears *little or no relationship to the price actually paid by physicians and pharmacies*." Supplemental Declaration of Kathleen M. O'Sullivan in Support of Defendants' Joint Summary Judgment Reply ("O'Sullivan Supp. Decl.") Ex. 1 (Compl. ¶ 10) (emphasis added). In essence, the Complaint alleges what Krantz reported over six years earlier.

The State now contends – mainly by the declaration of Dorothy Poulsen that is contradicted by her prior deposition testimony – that the OIG report that was finalized in 1996 only placed the State on notice of "certain, specific invoices or drugs." Opp. at 12. These self-serving statements are belied by the report itself, however, which clearly states that the federal Office of Inspector General, Department of Health & Human Services, analyzed *thousands* of invoices it collected from a "selected [] random sample" of five types of Montana pharmacies, rural-chain, rural-independent, urban-chain, urban-independent, and non traditional pharmacies (nursing home, hospital, and home IV pharmacies). Defs.' Joint 56.1 Stmt. ¶ 26, Ex. 35 at 3. In 1996, the OIG informed Montana Medicaid that its conclusions were an "overall estimate of the extent that AWP exceeded invoice prices." *Id.*, Ex. 33 at 4 (calculating a 16.2% differential for brand name drugs and 48.5% for generics, i.e., 94% using the misleading calculations of the State's expert). Montana Medicaid witnesses testified that they understood the results of the

OIG study were accurate, and did not testify that the results were limited to the specific drugs studied.  O'Sullivan Supp. Decl., Exs. 2 and 3 (Preshinger Tr. 140:6-14; Ireland Tr. 88:12-18).[3]

The State's statute of limitations argument is further discredited by Montana law on "inquiry notice," which is the standard the State agrees applies here.  Opp. at 37.  The "inquiry notice" standard does not require that a plaintiff have complete information about the extent of the alleged injury, but rather, requires only information sufficient to prompt a further inquiry into that injury.  In *Mobley v. Hall*, 657 P.2d 604, 606-07 (Mont. 1983), for example, the Montana Supreme Court affirmed summary judgment on statute of limitations grounds, relying on the rule that inquiry notice does not require the plaintiff to know the extent of the claimed injury to trigger the statue of limitations.[4]  In *Mobley*, the plaintiff became aware in 1976 that there was some discrepancy between what defendants had represented as the acreage of useable cropland on a parcel sold to him by defendants and the actual amount of that acreage.  *Id.* at 604-05.  He did not learn the full extent of the difference until a land survey was completed in November 1977. *Id.* at 606.  He filed suit in October 1979.  *Id.* at 605.  On these facts, summary judgment was granted for defendants.  The court explained:

> While mere suspicion may not constitute discovery there is ample evidence in the record to support the District Court's determination of discovery within the meaning of the statute.  "The law does not

---

[3] The testimony the State cites as identification of "criticisms" of the OIG reports contains no scientific or mathematical basis to criticize the OIG's analysis, which "review was performed in accordance with generally accepted government auditing standards."  Defs.' 56.1 Stmt., Ex. 33 at 8.  Rather, the only criticism of the study identified in the testimony cited by the State was that the OIG report did not account for dispensing fees, the under-reimbursement of which caused Montana Medicaid to retain AWP-based reimbursement for some drugs, but that is not a critique of the data or methods used by the OIG.  *See* Mont.'s Resp. to 56.1 Stmt., ¶ 25 (Marr Tr. 48; 53-55 (Breckenridge Decl. Ex. 8) (testimony regarding dispensing fees); Ireland Tr. 89:10-90:1 (no testimony that study did not reflect pricing disparity in the State generally); Buska Tr. 363 (discussing a "possible" study to counter the conclusions of the 2002 OIG report, but did not "recall if [it] was ever done").

[4] Although the State maintains that "issues of fact" remain as to the application of the statute of limitations, Opp. at 38, whether there were sufficient facts to put the State on notice that there was a disparity between AWP and actual acquisition cost is unquestionably an issue to resolve now.  Statute of limitations issues are addressed at summary judgment under Montana law.  *Holman v. Hansen*, 773 P.2d 1200, 1203 (Mont. 1989) ("[Plaintiff] first contends that the District Court 'usurped' his right to a jury trial by resolving questions of fact in order to grant summary judgment …. Under Mont. Code Ann. § 27-203, whether there has been a 'discovery' of facts sufficient to start the running of the statute of limitations is a question of law.") (affirming summary judgment).

> contemplate such discovery as would give positive knowledge of the fraud, but such discovery as would lead a prudent man to inquiry or action. *To hold that discovery must amount to absolute knowledge of the fact of the fraud would be to render the statute practically inoperative, since such knowledge is rarely had before the facts are established by adjudication.*"

*Id.* at 607 (quoting 37 Am.Jur. *Fraud & Deceit* § 410, at 556) (emphasis added). *See also Mont. Pole & Treating Plant v. Lf. Laucks & Co.*, 93 F.2d 676, 678-79 (9th Cir. 1993) ("[T]he critical determination [under Montana law] of when an action accrues is knowledge of the facts essential to the cause of action. This does not mean that a party must know *every fact* relating to the claim before the statute begins to run.") (emphasis added) (internal citations omitted); *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 213 (1st Cir. 1999) (an action accrues where an injured party, "in the exercise of reasonable diligence, should have known the factual basis of the cause of action").[5] Thus, even if the Court were to accept Poulsen's about-face on her deposition testimony that she "understood that AWP minus 10% did not represent actual acquisition cost," Defs.' 56.1 Stmt., Ex. 14 (Poulsen Tr. 57:11-14), the State cannot escape the fact that on October 5, 1995, Krantz wrote to the Montana Medicaid Director to report on the OIG meeting and clearly explained, "While AWP is a national standard it is apparent from the results of the survey that it has little to do with the acquisition cost of pharmacy products."[6] State 56.1 Stmt. ¶ 24. Thus, in 1995, Montana Medicaid certainly knew enough about the extent of the difference between AWP and acquisition cost to file its Complaint. It did not do so until nearly seven years later, and so the statute of limitations bars all the State's claims.

---

[5] Moreover, to avoid the statute of limitations the State must show it exercised "diligence" in investigating the alleged fraud. *Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435, 441 (Mont. 2003) ("For purposes of tolling the statute of limitations in an action for fraud or unfair trade practices, ordinary diligence must be exercised by the aggrieved party in the discovery of the facts constituting the fraud or deceptive practice."). The State blithely contends that it did not have "access" to information regarding spreads, but makes no showing that it attempted to do *anything* to get such access. Opp. at 11. This total failure to act is not diligence at all, much less "reasonable diligence." *Johnson v. Barrett*, 983 P.2d 925, 928 (Mont. 1999) (affirming summary judgment on statute of limitations grounds due to plaintiff's failure to investigate his claim).

[6] Notably, the State did not submit a Declaration from Krantz in opposition to Defendants' motion, to try to "clarify" what he meant in that memorandum – most likely because the language and its import are clear on the central fact the State now strains to claim it did not understand.

**C.     The State's Choice to Continue to Base Some Reimbursements on AWP, Despite Knowing Actual Prices, Is Fatal to the State's MUTPA Claim.**

**1.     The State makes no showing that Defendants engaged in a "deceptive" practice.**

The State raises one legal and two factual arguments to try to escape summary judgment under the MUTPA as to its claim of a "deceptive practice."   The State argues that (1) Montana law does not require it to show intentional deception; (2) it did not have sufficient knowledge of the extent of the difference between AWP and acquisition cost to warrant summary judgment; and (3) despite the regulatory freedom to select a reimbursement methodology of its choosing, it was compelled to use AWP because of its administrative ease.  Opp. at 17-20.  The State's legal argument is irrelevant and its factual arguments are unsupported and contradicted by the record.

Relying on one unpublished trial court case, the State argues that it has no burden to prove that Defendants' alleged deceptive conduct was intentional.  *Challinor v. Swenson*, 1998 Mont. Dist. *Lexis* 689 (Mont. Dist. Ct. Mar. 1998).  This argument misses the point.  Summary judgment is warranted because the State was not deceived *at all*; the State had knowledge of the significant disparity between acquisition costs and AWP.  Mot. at 12-18; Defs.' Joint Stmt. ¶¶ 21-40.  *Challinor* does not stand for the proposition that a plaintiff can maintain a MUTPA deceptive practices claim where the plaintiff was not deceived.  In *Challinor*, the defendant inadvertently failed to disclose that the vehicle it sold to plaintiff had a salvage title; the plaintiff did not learn the car had a salvage title until after the transaction.  *Challinor*, 1998 Mont. Dist. *Lexis* 689 at *10.  Because plaintiff did not know this fact, the trial court found for plaintiffs on their MUTPA claim, albeit narrowly.  *Id.* ("[T]he Court would have preferred it if this case had been pleaded and proved under [] a breach of an implied warranty or failure of consideration … .[Plaintiffs] came close to not carrying their burden in this case.").[7]  The Montana Medicaid

---

[7] The State notes that the MUTPA, Mont. Code Ann. § 30-14-104, allows Montana courts to give "due consideration and weight" to interpretations of the Federal Trade Commission Act ("FTCA"), and that the MUTPA is to be "liberally construed with a view to effect its object and to promote justice."  *Baird v. Norwest Bank*, 843 P.2d 327 (Mont. 1992).  This is true as far as it goes, but it does not go nearly far enough.  The State does not point to any FTCA case that has found a deceptive practice to lie where a defendant gives information to a third party that

agency with its $250 million budget (in 2000, Opp. at 5), and its knowledge that AWP had "little to do with the acquisition cost of pharmacy products," is not even close to the unsuspecting vehicle buyer in *Challinor*.[8]   Here, the State was not deceived in using AWP; it *chose* to use AWP to achieve its policy goals.  Mot. at 9-12; Defs.' Joint 56.1 Stmt. ¶¶ 41-79.  No Montana case supports a MUTPA claim on such facts.  Indeed, Montana law bars the claim.  Mot. at 21-22 (discussing *Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435 (Mont. 2003)).[9]

Next, the State contends that if it knew that AWP was not tied to acquisition costs, "it would not have used it as a basis for reimbursement."  Mot. at 20; Poulsen Decl. ¶ 11; Buska Decl. ¶ 15.[10]   This naked assertion is contradicted by the undisputed fact that the State has chosen over the five years since this suit was filed to continue to use AWP as a reimbursement benchmark, a fact that the State fastidiously avoids in its 41-page brief.  *But see* MT Resp. to Def. L.R. 56.1 Stmt. ¶ 78 ("Admitted that Montana Medicaid has elected to retain an AWP-based system.").  Similarly, in its opposition brief, the State fails to address the State's receipt, for nearly five years, of Average Sales Price ("ASP") data from three Defendants – prices tied to actual acquisition costs – yet Montana Medicaid has chosen not to use that data as a basis for reimbursement, instead using the higher AWPs.  *Id.* ¶¶ 117, 199.

---

the plaintiff later consults, with knowledge of what that information is (a pricing benchmark) and is not (an estimate of the average of acquisition costs).  *See* Defs.' Joint 56.1 Stmt. ¶¶ 37-40 (detailing Montana Medicaid's understanding of AWP).  *Baird* merely holds that the defendant mortgage lender, whose direct transaction with the plaintiff was the subject of the litigation, provided a "service" under the MUTPA.  843 P.2d at 328.

[8] Although not touched on in the *Challinor* decision, Montana law provides that the sale of a vehicle with structural defects is an unfair or deceptive practice under the MUTPA.  *See* A.R.M. 23.19.204(5) (unlawful to "represent that a motor vehicle has not sustained substantial structural or skin damage unless such statement is made in good faith and unless such vehicle has been inspected by the dealer, his agent or representative to determine whether or not such vehicle has incurred such damage in the past").

[9] The State also cannot claim it was unaware of the degree of the difference between published AWPs and its providers' actual acquisition costs, because it has an obligation to estimate its providers' actual acquisition costs under the federal Medicare statute.  *See Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicare Servs.*, 424 F.3d 931, 940 (9th Cir. 2005) (explaining that state Medicaid agencies must conduct provider cost surveys in setting reimbursement rates).

[10] Neither Buska nor Poulsen provides any facts to support their speculation that Montana Medicaid would have changed its reimbursement regulations if it had known of the allegations in the Complaint.  Hypotheses do not

In the alternative, the State argues that it knew that AWP did not equal actual acquisition cost, but its percentage discount off AWP was meant to account for that differential.  Opp. at 19-20; Poulsen Decl. ¶ 8.  But the State's current reimbursement regulation of AWP-15% for branded drugs is not consistent with the differential of AWP-19.7% reported by the OIG in 2002, and is not even in the ballpark for multi-source drugs, where Montana Medicaid knew in 1996 that the *average* discount off AWP was nearly 50% for multi-source drugs (and in 2002, over 65%).  Mot. at 14; Defs.' Joint 56.1 Stmt. ¶¶ 28, 30, Ex. 33, 36, 38.  This evidence destroys the mythical suggestion that Montana Medicaid assumed that there was "a direct and reasonable relationship between the actual acquisition costs to the pharmacies and the AWP."  Poulsen Decl. ¶ 7; Buska Decl. ¶ 9.  The evidence is that the State used AWP to maintain provider participation, compensating for under-reimbursement of dispensing fees, and enabling Montana Medicaid to fulfill the equal access requirement.  Mot. at 6-12; Defs.' Joint 56.1 Stmt. ¶¶ 41-79.[11]

Because it cannot argue that any statute or regulation required the use of AWP, the State instead claims that it used AWP because it was the "only feasible option."  Opp. at 17.  Even a superficial examination of the State's argument requires its rejection.  There is no evidence that Montana Medicaid considered other options, no evidence that other options were infeasible, and no evidence that other options exceeded the budgetary or personnel capacity of Montana Medicaid; it is only one declarant's unsupported say-so.  Opp. at 17; Buska Decl. ¶¶ 12-14.  Moreover, the impossibility of non-AWP-based reimbursement is disproved by the regulations of other states.  As noted in Defendants' moving papers, Texas and Massachusetts Medicaid use

---

defeat summary judgment. *Brothers v. Gen. Motors Corp.*, 658 P.2d 1108, 1110 (Mont. 1983) ("Speculative statements are insufficient to raise a genuine issue of material fact.").

[11] Even the deposition testimony relied on by the State to support its "if we had only known" defense confirms that Montana Medicaid took access concerns into account when setting its reimbursement rates.  Opp. at 9 (citing Peterson Tr. 86: 8-10 ("If the cost of drugs is less than what we reimburse for, we would like to get as close to that as possible – *without limiting access for our clients*.")) (emphasis added).  The portion of Peterson's testimony in italics was misleadingly deleted by the State in its opposition brief.  Indeed, the State admits that it did not increase the discount off AWP to AWP-19% and AWP-65% "because of our understanding of the pharmacy climate in Montana."  Buska Decl. ¶ 21.

WAC-based reimbursement instead of AWP, and California Medicaid (like Medicare) now uses ASP as a basis for reimbursement.  Mot. at 4 n.3; Cal. Welf. & Inst. Code § 14105.45 (2006).  This argument is further contradicted by Montana Medicaid's own reimbursement regulations, which do not rely exclusively on AWP as a reimbursement benchmark.  It uses a number of different pricing mechanisms (including Direct Price as the first option, the usual and customary charge, and allowable acquisition cost) and bases reimbursement on AWP only when that produces the lowest charge to the State.  *See* A.R.M. 37.86.1101.

### 2.   The State makes no showing that Defendants engaged in an "unfair" practice.

Having failed to demonstrate that Montana Medicaid was deceived, the State contends as a vague alternative that Defendants have not addressed "unfairness" under the MUTPA.  Opp. at 20-21.  This is untrue.  Despite the State's failure to plead or identify in discovery any purported unfair practice, Defendants' moving papers explained why summary judgment was warranted even if the State belatedly attempted to reconstitute their MUTPA claim as one concerning an unfair practice.  Mot. at 23-24.  The State does not bother to identify any evidence to support its newly-raised "unfairness" claim.[12]  Opp. at 20-21.  Nor does the State address the requirement that the purported unfair practice be connected "by causative evidence" to the harm suffered by the plaintiff.  *In re: Firearm Cases*, 126 Cal. App. 4th 959, 981 (2005) (granting summary judgment to defendant on unfair practices claim due to lack of showing of causation).  Defendants' reporting of AWPs to First DataBank is not, as the evidence demonstrates, what caused Montana to reimburse for some drugs using that benchmark.  Mot. at 6-12.  Rather, they chose to do so because it furthered the requirement to provide equal access and because AWP-

---

[12] The State's cited authority merely stands for the proposition that it is possible for an act to be "unfair" but not "deceptive."  *Woock v. Gebhardt Post Plant & Sawmill*, 2001 Mont. Dist. *Lexis* 2964 (Mont. Dist. Ct. Oct. 23, 2001).  It does not support the proposition that defendants who communicate information to a third-party, but are not otherwise involved in any transaction with the plaintiff, can be deemed to have engaged in an "unfair" practice.  *Id.* at *3-*4, *10 (potentially an unfair practice for defendant to sell non-conforming goods to plaintiff, and then refuse to accept return of those goods).

based reimbursement subsidized under-reimbursement of providers' actual dispensing costs.[13]

*Id.*

### 3.   The State's failure to show any net loss in light of rebates paid by Defendants precludes liability.

In their moving papers, Defendants explained the basic principle that for a plaintiff to recover on a MUTPA claim, it must establish that it "suffer[ed] any ascertainable loss of money or property." MONT. CODE ANN. § 30-14.133(1).  Defendants further explained that the State could not do so here because it was ignoring the evidence of substantial rebates that Defendants paid to Montana Medicaid, undermining the State's claim that it overpaid for drugs.  The State's response:  its damages theory is one based on "penalties" not "damages."  Opp. at 22.  The State does not deny that Montana Medicaid received those rebates.  *Id.*  Rather, it argues that a lack of evidence on damages is immaterial to summary judgment.  This is incorrect.  The State cannot avoid summary judgment unless it offers proof of damage.  *Starr v. Summit, Inc.*, 2003 Mont. Dist. *Lexis* 2451, at *28 (Mont. Dist. Ct. 2003) ("[Plaintiff] has failed to submit any admissible evidence of a deceptive or unfair practice on the part of any [] defendant.  *Nor has she provided any evidence of ascertainable loss of money or property ...Consequently, [plaintiff] has failed to establish by admissible evidence the necessary elements to state a claim for relief under the [MUTPA].*") (emphasis added) (granting summary judgment).

The statutory language of the MUTPA demonstrates that a plaintiff cannot leapfrog a showing of damages and skip directly to penalties.  The section of the MUTPA relied on by the State, MONT. CODE. ANN. § 30-14-142(2) (*see* Compl. ¶ 667.E.; Opp. at 39), is a provision that provides for an enhancement of damages, allowing recovery for a $1,000 fine if the violation of

---

[13] Moreover, for self-administered pharmacy drugs reimbursed by Montana Medicaid, there is no opportunity or incentive to "market the spread."  The physician prescribes the self-administered drug, but it is the pharmacist who dispenses and is reimbursed for it.  *See, e.g.*, Schering-Plough Corp. and Warrick Pharm. Corp. Motion for Summary Judgment as to Nevada and Montana Actions (Docket No. 3663) at 12.  The physician who writes the prescription therefore has no incentive to choose one drug over another based on spread.  And the pharmacist is obligated to dispense whatever prescription the physician writes, so also has no opportunity to choose a drug with a greater spread.  *Id.*

the MUTPA is proven to be willful.  ("[I]f the court finds that a person is willfully using or has

willfully used a method, act, or practice declared unlawful by 30-14-103, the department, upon

petition to the court, may recover on behalf of the state a civil fine of not more than $1,000 for

each violation.").  This provision is not a stand-alone damages remedy.  The *damages* provision

of the MUTPA is found at MONT. CODE. ANN. § 30-14-133(1), and states in material part:

> A consumer *who suffers any ascertainable loss of money or property, real
> or personal*, as a result of the use or employment by another person of a
> method, act, or practice declared unlawful by 30-14-103 may bring an
> individual but not a class action under the rules of civil procedure in the
> district court of the county in which the seller, lessor, or service provider
> resides or has its principal place of business or is doing business *to
> recover actual damages* or $500, whichever is greater.

Because the State has not come forward with evidence that its *net* reimbursement costs were

higher than its expert's estimate of provider acquisition costs for any drug, the State can show no

loss, and thus, no damage, resulting from any of Defendants' drugs.

**D.     The State's Medicaid Fraud Claim Fails to Meet the Essential Elements of
        the Statute.**

**1.     A claim for over-reimbursement must be brought against a
        "provider" for submission of claims to a "Medicaid agency."**

The arguments raised by the State in opposition to Defendants' motion for summary

judgment on Montana's Medicaid fraud claim are largely addressed in Defendants' Opposition to

the State's Motion for Partial Summary Judgment on that claim.  Most fundamentally, the State

lacks any evidence of a "fraud," especially given its admission that "Montana Medicaid

personnel understood that AWP *did not equal* acquisition costs."  Opp. at 9.  Moreover, the

State has failed to show that Defendants are "providers" under the statute, or that they submitted

information to a "Medicaid agency."  *See* Defs.' Joint Opp. to State Mot. for Part. Sum. Judg. at

6-8; MONT. CODE ANN. § 53-6-155(13); § 53-6-160(1); § 53-6-160(2)(a)-(b).  None of the

additional arguments raised in the State's opposition brief compels a different result.

The State argues that the Medicaid fraud act applies to "persons" as well as "providers."

Opp. at 25.  But a careful reading of the statute rejects the notion that a non-"provider" can be

liable for a provider's allegedly fraudulent claim for reimbursement. The statute contemplates liability for the acts of "persons" in certain circumstances because it covers activity such as submitting fraudulent information in order to "determine eligibility for medicaid benefits [or] eligibility to participate as a provider." MONT. CODE. ANN. § 53-6-160(1). The statute's separate codification of liability for submission of fraudulent claims for reimbursement, however, deals with providers. MONT. CODE ANN. § 53-6-160(2)(a)-(b). The State recognizes this distinction in the statute, but argues (without supporting evidence) that Defendants could nonetheless qualify as "providers" by participating in the rebate program. Opp. at 25 n.10. The record is clear on this point – the State has already admitted that Defendants are not providers. Defs.' Joint 56.1 Stmt. ¶ 105, Ex. 82.

> **2.      An "indirect" representation must nonetheless come on behalf of someone with authority or responsibility to make claims, and Defendants have neither.**

The State also argues that it does not need to show that Defendants were providers who submitted claims for reimbursement to Montana Medicaid because the statute refers to claims submitted as the "indirect result" of a false statement. Opp. at 24; Mont. Code Ann. § 53-6-160(4)(b). This "indirect result" language is contained in a sub-part of MONT. CODE ANN. § 53-6-160(4), a conjunctive provision that is only operative if the conditions of MONT. CODE ANN. § 53-6-160(4)(a) are also satisfied:

> (4) A person is considered to have made or to have authorized to be made a claim, statement, or representation if the person: (a) had the authority or responsibility to; (i) make the claim, statement, or representation; (ii) supervise another who made the claim, statement or representation; or (iii) authorize the making of the claim, statement, or representation, whether by operation of law, business or professional practice, or office policy or procedure; ***and*** [the requirements of § 53-6-160(4)(b) are met].

Defendants are not providers, so they have no "authority or responsibility" to make any claims, nor do they "supervise another" who does so. The State's evidence to further this argument merely describes some Defendants' reporting of prices to First DataBank (which, as the State admitted, independently surveyed wholesalers to determine the AWPs they published). Opp. at

24; MT Resp. to Def. L.R. 56.1 Stmt. ¶¶137-139.  Even taking this "evidence" for all its worth, it does not remotely demonstrate that Defendants were authorized to make claims to Montana Medicaid or that they supervised those who were.[14]

Defendants also submitted evidence of Montana Medicaid's understanding of the scope of the Medicaid fraud statute, an understanding that confirms that MONT. CODE ANN. § 53-6-160(4) does not attach liability to non-providers uninvolved with the claims process.  Defs.' Joint Opp. to State Mot. for Part. Sum. Judg. at 6-8.  Writing in support of the Medicaid fraud statute, former Medicaid Director Nancy Ellery explained that this subsection was meant to address employees ("persons") acting at the direction of a provider to submit a claim.

> The third key element in this statement of responsibility is the principle that the *provider*, who receives the benefit of the Medicaid payment, *must exercise supervision over and take responsibility for the acts of their employees that bill the Medicaid program on the provider's behalf*. Without such a responsibility it is too easy for a *provider* to accept the benefit of improper or even dishonest billing, but then when confronted with the impropriety or dishonesty, to disclaim knowledge and responsibility … Subsection (4) would prevent a person from avoiding responsibility if the person's failure to exercise actual authority or responsibility caused the improper conduct to occur.

Defs.' Opp. 56.1 Stmt. ¶ 6, Ex. 3 (Docket No. 3886) (Mar. 13, 1995 Letter from Nancy Ellery to Representative Duane Grimes) (emphases added).[15]  This evidence was the pre-enactment, presuit statement of the Medicaid Director, not a declaration obtained by lawyers containing statements uttered for the first time in opposition to summary judgment.

---

[14] The State's only additional support for its argument that Defendants violated the Medicaid fraud statute is the "opinion" of a non-lawyer, non-expert, Montana Medicaid employee.  Opp. at 24; Buska Decl. ¶ 16.  Clearly, this opinion is of no use to the Court on this legal question.

[15] The State is wrong to assert that Ellery's related written statement pertained only to establishment of a Medicaid Fraud Control Unit and not the Medicaid fraud statute.  The Medicaid Fraud Control Unit was called into being pursuant to the same bill, as Ellery's statement reflects.  State 56.1 Statement ¶ 106, Ex. 14 ("The other major provision of the bill is the revision of current Medicaid law concerning Medicaid overpayment, recovery and policy relating to sanctions for Medicaid fraud and abuse[.]").

3.      **The State has not shown that Defendants knowingly submitted false information to Montana Medicaid.**

The State asserts that Defendants knowingly "submitted inaccurate information" to Montana Medicaid, but the State did not (and cannot) show that Defendants submitted *anything* to Montana Medicaid.  Opp. at 25-27.  This fact is undisputed.  Compl. ¶ 166; *see also id.* ¶ 151 ("Pharmaceutical companies do not report AWPs directly to the federal government [or to Montana].").  The State attempts to bootstrap this unsupported factual argument with a legal argument that a "plain meaning" analysis of the term AWP inexorably leads to summary judgment.  But as explained in response to the State's motion for partial summary judgment, the notion that Montana Medicaid understood AWP as having a "plain meaning" is overwhelmingly contradicted by the actual evidence regarding Montana Medicaid's understanding.  *See* Defs.' Joint Opp. to State Mot. for Part. Sum. Judg. at 9-16.  "[Montana Medicaid] understood that AWP didn't reflect the average wholesale price."  Defs' 56.1 Stmt. ¶ 37, Ex. 14; MT Resp. to Def. L.R. 56.1 Stmt. ¶ 37 ("Admitted that Montana Medicaid knew that AWP did not represent actual acquisition cost.");  Defs' 56.1 Stmt. ¶ 38, Exs. 14, 42 (describing AWP as "Ain't What's Paid").  Finally, the State's assertion that it need not prove criminal fraud to support its Medicaid fraud claim is a non sequitur, as the State's claim is for *civil* fraud and it has not put forth evidence of such a fraud.

E.      **The State Fails to Meet the Essential Elements of the False Claims Act.**

1.      **The State has not met the statute's causation requirement.**

The MFCA requires that the defendant "knowingly presents or causes to be presented a false, fictitious, or fraudulent claim for allowance or payment[.]"  MONT. CODE. ANN. § 17-8-231(1).  The State acknowledges that Defendants did not submit any claims to Montana Medicaid, instead arguing that they "caused" claims to be submitted.  The State relies almost exclusively on the decision in *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 51 (D. Mass. 2001) to support the notion that communicating pricing information to First

DataBank "caused" providers to seek reimbursement from Montana Medicaid.[16]  Opp. at 28.
The State's reliance on *Parke-Davis* is misplaced.

First, as the MDL Court is aware, the decision in *Parke-Davis* was rendered on a motion
to dismiss, with "all reasonable inferences drawn in favor of [the Plaintiff]."  *Parke-Davis*, 147
F. Supp. 2d at 52.  That procedural posture required the court to take as true the allegations that
the defendant had actively encouraged doctors to submit claims for reimbursement for off-label
uses of the drug Neurontin.  *Id.* at 51.  Here, the State must do more than allege – and have the
Court accept as true – that Defendants were involved in the submission of claims.[17]  The State
merely alleges that Defendants submitted AWPs to First DataBank (and it then admitted that
First DataBank surveyed wholesalers to determine the AWPs it published).  Opp. at 29.  The
State offers no evidence that Defendants encouraged Montana providers to submit claims using
AWP, or that they encouraged Montana Medicaid to use AWP as one of the benchmarks in its
reimbursement methodology.  The record demonstrates that what caused Montana Medicaid to
use AWP was its informed assessment that, to preserve access and arrive at an aggregate
reimbursement amount that fairly compensated providers, it needed to offset persistently low
dispensing fees.[18]  Mot. at 6-12; Defs.' 56.1 Stmt. ¶¶ 41-79, Exs. 8-15, 30, 43-48, 52-55.

---

[16] The State's only additional authority is unhelpful to its argument on causation.  The State seriously
distorts the decision in *People ex rel. Levenstein v. Salfsky*, 338 Ill. App. 3d 396, 789 N.E.2d 844 (2003).  The
*Salfsky* case does not concern causation under the Illinois False Claims Act at all; it addresses the question of
whether an Illinois university can be considered the State for purposes of the act.  789 N.E.2d at 846.  The out-of-
context quote in the State's brief is the court's discussion of that issue (the "nexus" between the university and the
state), not the causal link between a defendant's actions and the payment of a claim.  Compounding the deception,
the State misrepresents the holding of *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 738 (D.C. Cir.
1998), in the exact same way.  The issue there was also whether a claim submitted to a university sponsored by the
government was considered a claim submitted to the government.

[17] The MDL Court's recent opinion with respect to motions to dismiss the California AWP case can be
explained on the same basis.  *California v. Abbott Labs., et al.*, MDL No. 1456 (Mar. 22, 2007).  Summary
judgment requires the State to come forth with more than mere allegations that the Court must accept as true for
purposes of its decision.

[18] Defendants' joint motion cited to 42 C.F.R. § 50.504(b)(1), which defines dispensing fees to include
"overhead, professional services and profits."  Mot. at 3.  Although indicative of federal guidance on what is
included within dispensing fees, this regulation deals with dispensing fees under the Public Health Services
program.  Medicaid regulation 42 C.F.R. § 447.331 does not specifically define the components of dispensing fees,
although federal guidance makes clear that these same components are to be taken into account in establishing

Second, subsequent case law indicates that *Parke-Davis* does not lower the plaintiff's burden on the necessary causation element of the MFCA.  In *United States ex rel. Post v. Pfizer, Inc.*, 446 F. Supp. 2d 6, 27-28 (D. Mass. 2006), on facts nearly identical to those in *Parke-Davis* involving an alleged fraud for off-label prescriptions, the court dismissed the complaint due to adequately alleged causation.  The court wrote:

> Plaintiff instead speculates that Defendants' marketing activities must have caused physicians to prescribe Genotropin for off-label uses and that some of these prescriptions were inevitably reimbursed by federal and state government health care programs.  *The existence of conduct which may lead to false claims does not satisfy the heightened pleading requirement.  No matter how likely the existence of false claims, this court cannot speculate that such claims flowed inevitably from Defendants' activities.*

*Id*.  In dismissing the complaint, the court further noted that the arguably contrary decision in *Parke-Davis* was decided based on "relaxed [] pleading requirements …. before the First Circuit rejected any relaxation of the requirements in Rule 9(b) in FCA claims and before the First Circuit indicated its hostility to the complexity exception to the pleading requirement."  *Id.* at 27 (citing *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004)).  As the *Pfizer* case demonstrates, the State has fallen far short of its burden on summary judgment, where it must rest on more than mere allegations and present evidence of causation.  *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 189 (D. Mass. 2004) (summary judgment on FCA claim due to lack of evidence of causation).[19]

---

dispensing fees for Medicaid.  *See* 52 Fed. Reg. 28648 at 28651 (July 31, 1987) (Medicaid dispensing fees established by conducting "(1) Audits and surveys of pharmacy operational costs; (2) compilation of data regarding professional salaries and fees; and, (3) analysis of compiled data regarding pharmacy overhead costs, profits, etc.").

[19] The State's attempt to simultaneously distinguish and rely on *Harvard College* falls flat.  Opp. at 31, ¶ 2.  The State first argues *Harvard College* is distinguishable because one of the defendants there did not submit false claims "either directly or indirectly" and thus causation was not established.  *Id.*  But the State nonetheless maintains that summary judgment should be denied for Defendants here even though they, in the State's own words, only submitted AWPs "indirectly."  *Id.*  Defendants' role here is as attenuated as the role played by the defendant in *Harvard College*.  ("I find that [defendant] Shleifer did not cause false claims to be submitted. He did not take any actions to have claims submitted to the government. The United States has not adduced any evidence that Shleifer approved expenses.") 323 F. Supp. 2d at 189.  The State offers no proof of Defendants' involvement in the claims submission process.

2.     **The State has not shown that submission of pricing information to a third party is a "claim" submitted to Montana Medicaid.**

Next, the state argues that Defendants' communications with First DataBank on pricing information qualify as a "claim" under the MFCA.  Opp. at 29-30.  The State relies principally on *Parke-Davis* for this argument as well, which, for reasons discussed above, does not provide support for a ruling on summary judgment in this case.  In fact, the passage in *Parke-Davis* cited by the State goes on to explain it was undisputed there that the activity complained of – submission of off-label prescriptions to Medicaid for reimbursement – constituted a "claim" under the FCA.  147 F. Supp. 2d at 51 ("Defendant does not dispute that an off-label prescription submitted by Medicaid is a false claim within the meaning of the FCA.").  Indeed, a specific regulation prohibited reimbursement for such prescriptions.  *Id.* (citing 21 U.S.C. § 331(a), (d)).  Here, the law is the opposite.  Submission of a claim that comports with Medicaid's regulatory requirements cannot and does not qualify as a false claim.  *United States v. Bruno's*, 54 F. Supp. 2d 1252, 1260 (M.D. Ala. 1999); *see* Mot. at 35.  The State does not even address, much less rebut, this dispositive argument.

Last, the State attempts to argue that it does not have to prove "falsity" – that the MFCA is violated even when the government has knowledge of the allegedly false claim, as the MDL Court has recognized.  *California v. Abbott Labs.,* MDL No. 1456 (Mar. 22, 2007) Order at 16 ("In some circumstances, the government's knowledge [of a fraud] effectively negates the fraud or falsity required by the FCA.") (internal citations omitted).  The line of authority relied on by the State regarding government knowledge does not support a denial of summary judgment here.

---

The State's attempt to shift gears and rely on *Harvard College* is equally unsuccessful.  Admittedly, the court determined that one defendant had "caused" a claim to be submitted, based on a broad conception of causation.  *Id.* at 178-79.  But as the court explained, that defendant was closely related to the party that submitted the claim and was involved in the claims submission process.  *Id.* at 187-88 ("[Defendant] approved [] expenses, and was aware that the Project was funded by USAID. [Defendant] signed invoices for payments due to ILBE, a USAID-funded subcontractor, to indicate that he reviewed them and agreed that they were proper and appropriately chargeable to HIID.  In addition, Grant Felgenhauer, a project assistant on the Russia Project, regularly created monthly and quarterly reports of the Legal Reform Project, sent drafts to [defendant], and solicited comments from [defendants] regarding the reports.").  The State has not come forward with any corresponding proof here to establish causation.

Opp. at 32-33.  The State's authority deals with the distinct issue of whether a whistleblower can maintain an action based on facts known to the government.  As explained in *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 326 (9th Cir. 1995), the FCA at one time imposed government knowledge as a jurisdictional bar to a FCA *qui tam* action, requiring automatic dismissal where the whistleblower relied on facts known to the government.  *Id.* Because government knowledge is no longer an automatic bar to suit, courts may inquire into the extent of the government's knowledge.  Here, that inquiry yields but one conclusion.  The State knew that AWP did not equal acquisition cost, a fact it admits.  *See* MT Resp. to Def. L.R. 56.1 Stmt. ¶ 37.  There is no evidence (beyond self-serving declarations) that the State believed that an AWP-based reimbursement was a reimbursement based on actual acquisition cost or an average of those costs.  Defs.' Joint 56.1 Stmt. ¶ 24, Ex. 36 (acknowledging that AWP "has little to do" with acquisition cost).[20]

**F.      The State Has No Basis for Liability as to Multi-Source Drugs, Which Do Not Fit the State's Paradigm for Fraud.**

As explained in Defendants' opening brief, the State's theory that Defendants manipulated AWPs fails for multi-source drugs because (1) in the vast majority of instances Defendants' multi-source drugs were not reimbursed by Montana Medicaid based on AWP, and (2) where claims data do indicate AWP-based reimbursement, that reimbursement was chosen with full understanding of what AWP represented.  The State's opposition does not just fail to rebut these points; it essentially concedes them.

**1.      The State has failed to tie AWP to a specific manufacturer for multi-source drugs.**

To begin with, Montana Medicaid based its payments on a lesser-of methodology, meaning that one of various benchmarks could actually be used as the basis for payment.  The State does not contest that the myriad claims reimbursed based on two such benchmarks, Direct

---

[20] Both *Hughes*, 71 F.3d at. 327. and *Chen-Chen Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992), concluded that the knowledge the government possessed barred the FCA claim.

Price and billed charges, were not tied to AWP.  Accordingly, summary judgment for
Defendants for such claims is required.  Mot. at 36-37.

Similarly, almost half of the multi-source claims were reimbursed based on FUL.  Mot. at
36-37.  The State argues that FUL "is set at an amount equal to 150 percent of the published
price for the least costly generic substitute" Opp. at 34, but that argument does not tie FUL to
AWP.  Nor could it:  the federal regulation states that FUL is "150 percent of the published price
for the least costly therapeutic equivalent (using all available national compendia) . . . ."  42
C.F.R. § 447.332(b).  That "price" is not necessarily an AWP; it could be WAC, List Price, or
some other price set out in the compendia.  The State's only evidence that "price" means AWP
comes from Dr. Hartman, but he can only speculate that, as a general matter, there is "conflicting
information as to whether FUL is set at 150% of the lowest AWP or 150% of other prices that
are published in national compendia."  (Breckenridge Decl. Ex. 1, ¶ 8(b).)  The State simply has
no evidence that any FUL used for reimbursement in Montana was based on AWP.  Summary
judgment on FUL-reimbursed claims is thus also required.

Finally, as to claims for multiple-source physician-administered drugs, which are
reimbursed based on J-Codes, the State forthrightly admits that it has no evidence tying a given
claim to any specific Defendant's drug.  Opp. at 34.  Moreover, Montana Medicaid reimbursed
*all* competing versions of a multi-source drug using a single J-Code at a *single* reimbursement
level; yet, the State has no evidence as to *which* AWP may have been used to reimburse a given
claim.  Mot. at 36-37.  While the State speculates that its expert *might* be able to provide such
evidence, it never says he actually *could* do so.  Indeed, at his deposition, Dr. Hartman testified
he had never even been *asked* to do so.  Opp. at 34-35 ; *see also* Hartman Dep. Vol. II, at 493:6-
12.  It is too late to do that now.  Discovery is closed, the expert deadline has passed, and this is
summary judgment:  the "put up or shut up moment in a lawsuit, when a party must show what
evidence it has that would convince a trier of fact to accept its version of events."  *Johnson v.
Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotations and citation

omitted).  With no evidence to support it, the J-Code reimbursed claims for multi-source drugs cannot survive summary judgment.

> **2.     The State admitted it had sufficient pricing data from multi-source manufacturers to calculate AWPs.**

Even for those claims where the State can come forward with some evidence that reimbursement for multi-source drugs was based on AWP, its claims must still fail.  The State does not dispute that it knew the *average* discount off AWP for multi-source drugs was close to 50% in 1995 and above 65% in 2001, and thus had the information to calculate the large spreads (in the hundreds of percent, in Dr. Hartman's method) on these drugs.  Mot. at 38-39.  Nor does the State seriously dispute that it chose to base at least some reimbursements on AWP for multi-source drugs to further various policy goals, including subsidization of inadequate dispensing fees and promoting the increased use of multi-source drugs.  *Id.* at 39.  These points are damning for the State's case, and they stand unrebutted.

In addition, as explained in Defendants' opening brief, the State had at its fingertips, through the AMP rebate formula established for Medicaid, all it needed to calculate the average prices of drugs to the retail class of trade, including discounts, for each manufacturer's multi-source drugs; in turn, the State could have used these as a comparator to published AWPs.  Mot. at 38-39.  The State not only does *not dispute* this, it *admits* that it "probably could 'reverse engineer' the rebate formula to arrive at the AMP."  Opp. at 36.  Its only (sheepish) rejoinder is: "This never occurred to Montana Medicaid."  *Id.*  That is not enough – not nearly enough – to show Montana was defrauded at the summary judgment stage.  *Cf. Osterman*, 80 P.3d at 443.  For these reasons, too, summary judgment as to claims for multi-source drugs is required.

**G.     The State's View of Penalties Is Unsupported by the Law and the United States' Position in the AWP Litigation.**

Defendants' moving papers demonstrated that the State's penalty claims are overstated in at least two ways.  First, Hartman's calculation ignores that a defendant is liable only for each false claim it directly submitted to an intermediary, not for the number of subsequent claims submitted by the intermediary to the government.  *United States v. Bornstein*, 423 U.S. 303, 312

(1976) (if a defendant "commit[s] one act" which causes a third party to file multiple false claims, the defendant "[is] liable for only one forfeiture"); *see United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (the number of penalties is "not measured by the number of [resultant] contracts, but rather by the number of fraudulent acts committed by the defendant").  Second, because civil penalties are based on the "willful" conduct of a defendant, *see* Mont Code Ann. § 30-14-142, the imposition of such penalties must only "penalize[] a person for his own acts, not for the acts of someone else."[21]  *Bornstein,* 423 U.S. at 312; *see also United States ex rel. Hays v. Hoffman,* 325 F.3d 982, 993 (8th Cir. 2003). Even the United States, which pays more than 69% of Montana Medicaid (70 Fed. Reg. 71857 (Nov. 30, 2005)) and is the Plaintiff in nearly identical AWP litigation against a few companies, recognized these principles, admitting that "the government must calculate the number of acts committed by the defendant that cause the false claims to be submitted, even though the number of claims actually submitted . . . was higher."  Pl. Sur-Rep. Mot Dis. 4 (*United States ex rel. Ven-a-Care of the Florida Keys, Inc., v. Dey, Inc.,* No. 05-11084-PBS (consolidated in *In re Pharm. Indus. AWP Litig.*, MDL No. 1456)).

Attempting to circumvent these established legal principles, the State first argues that "in order to discourage the working of fraud upon the Government" the Court must use its "wide discretion" and should penalize Defendants based on the number of alleged third-party submissions.  Opp. at 39-40 (citing *United States v. Phelps Dodge Indus., Inc.,* 589 F. Supp. 1340, 1362 (S.D.N.Y. 1984); *United States v. Zan Mach. Co.*, 803 F. Supp. 620, 624 (E.D.N.Y. 1992)).  The State's own cases reject this position.  *Phelps Dodge* recognizes that judicial discretion is limited to calculating the *amount* of each penalty (i.e., setting the dollar amount) as opposed to the *number* of penalties.  *See* 589 F. Supp. at 1368.  Moreover, *Zan* embraces the limitations of the "willfulness" requirement and states that in determining "how many . . . false []

---

[21]  In addition, the State's penalty claims are vastly overstated since they do not account for the 30% "yardstick" spread that the State's expert testified was the expectation of the "market as a whole," including Medicaid. Defs.' Opp. 56.1 Stmt. ¶ 14, Ex. 4 (Hartman Tr. 31:9–32:21).

statements were made," a court's "focus in each case [must] be upon the specific conduct of the person from whom the government seeks to collect." 803 F. Supp. at 624.[22]  Therefore, the State's plea for judicial "discretion" in determining the number of penalties for Defendants' alleged "willful" acts must be rejected.

The State next asserts that "Montana Medicaid was victimized each time it made a reimbursement for a Subject Drug." *See* Opp. at 40 n.20 (citing, *e.g., People v. Superior Court (Jayhill)*, 507 P.2d 1400, 1404 (Cal. 1973); *People v. Bestline Prods., Inc.*, 61 Cal. App. 3d 879, 923-24 (Cal. Ct. App. 1976)).  Not only do the State's cases pre-date the *Bornstein* decision, they also reject the State's "per transaction" approach.  *Bestline*, 61 Cal. App. 3d at 923; *Jayhill*, 507 P.2d at 1404.  Under these decisions,[23] the maximum number of civil penalties allowable against each Defendant for the combined number of claims allegedly submitted to Montana Medicaid is *one*.  *See id.*  Thus, even the most liberal interpretation of the law governing civil penalties exposes the grossly inflated nature of Hartman's penalty calculations.

## III.   CONCLUSION

For the foregoing reasons and those stated in Defendants' opening brief, the Court should grant the Defendants' Motion for Summary Judgment on all claims.

DATED this 5th day of April, 2007.

---

[22] A "willful" violation of MUTPA or the MFCA must stem from acts committed directly by the defendant. *See Bornstein*, 423 U.S. at 312-13; *Hays*, 325 F.3d at 993; *Zan*, 803 F. Supp. at 624; *see generally Plath v. Schonrock*, 64 P.3d 984, 986 (Mont. 2003).

[23] The State is defined as a "person" under MONT. CODE ANN. § 30-14-102(6).

**PERKINS COIE LLP**
**ON BEHALF OF ALL DEFENDANTS**

By: /s/ *Kathleen M. O'Sullivan*
David J. Burman
Kathleen M. O'Sullivan
Charles C. Sipos
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  (206) 359-8000
Fax:  (206) 359-9000
Email:  DBurman@perkinscoie.com
E-mail:  KOSullivan@perkinscoie.com
E-mail:  CSipos@perkinscoie.com

Thomas J. Sartory, BBO #442500
**GOULSTON & STORRS, P.C.**
400 Atlantic Avenue
Boston, MA  02110-3333
Telephone:  (617) 482-1776
Email:  tsartory@goulstonstorrs.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of April, 2007, a true and accurate copy of the Defendants' Reply to the State of Montana's Opposition to Defendants' Joint Motion for Summary Judgment was served via the Lexis-Nexis Filing System.

DATED:  April 5, 2007.


_Kathleen M. O'Sullivan_