# EXHIBIT B

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,            )
          Plaintiff,         )
                             )
VS.                          )      NO. CV-2005-0219-PR
                             )
ABBOTT LABORATORIES,         )
INC., et al,                 )
          Defendants.        )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


     IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
        IN AND FOR THE COUNTY OF MARICOPA


ROBERT J. SWANSTON,          )    NO. CV 2022-004988
individually and on behalf   )
of himself and all others    )
similarly situated,          )
          Plaintiff,         )    (Assigned to the
                             )    Honorable Janet
VS.                          )    Barton)
                             )
TAP PHARMACEUTICAL PRODUCTS, )
INC.; et al.,                )
          Defendants.        )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


          ORAL AND VIDEOTAPED DEPOSITION OF

                HARVEY J. WEINTRAUB

                September 22, 2006

                    Volume 5


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 812

```
1        UNITED STATES DISTRICT COURT
              DISTRICT OF ARIZONA
2
3   THE STATE OF ARIZONA      ) Cause No. 2:06-cv-00045-ROS
    ex rel. TERRY GODDARD,    )
        Plaintiff,            )
4                             )
    VS.                       )
5                             )
    ABBOTT LABORATORIES;      )
6   et al.,                   )
        Defendants.           )
7
8   *******************************************
9
10    IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
              FIFTH DIVISION
11
12  STATE OF ARKANSAS,        )
                              )
13  VS.                       ) CASE NO. CIV 2004-634
                              )
    WARRICK PHARMACEUTICALS   )
14  CORPORATION; SCHERING-PLOUGH )
    CORPORATION; and SCHERING )
15  CORPORATION.              )
16
17  *******************************************
18  DOCKET NO. X07-CV-03-0083296S (CLD)
19  STATE OF CONNECTICUT    ) SUPERIOR COURT
                            ) COMPLEX LITIGATION DOCKET
20                          ) AT TOLLAND
    VS.                     )
21                          )
    DEY INC., ET AL         )
22
23
    *******************************************
24
25
```

Page 813

```
1   IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR
              LEON COUNTY, FLORIDA
2
3   THE STATE OF FLORIDA      )
    Ex rel.                   )
4   VEN-A-CARE OF THE         ) CIVIL ACTION NO.
    FLORIDA KEYS, INC.,       ) 98-3032A
5   et al.,                   )
        Plaintiffs,           )
6                             )
    VS.                       )
7                             )
    BOEHRINGER INGELHEIM      )
8   CORPORATION; DEY, INC.; DEY, )
    L.P.; et al.,             )
9       Defendants.           )
10  *******************************************
11    IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF HAWAII
12
13  STATE OF HAWAI'I,      ) CIVIL NO. 06-00437
        Plaintiff,         ) DAE/BMK
14                         )
    VS.                    )
15                         )
    ABBOTT LABORATORIES INC.; )
16  ALPHARMA USPD, INC.; et al., )
        Defendants.        )
17
18  *******************************************
19   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
        COUNTY DEPARTMENT, CHANCERY DIVISION
20
21  THE PEOPLE OF THE STATE OF )
    ILLINOIS,              )
22      Plaintiff,         )
                           )
23  VS.                    ) Case No. 05 CH 02474
                           )
24  ABBOTT LABORATORIES, et al., )
        Defendants.        )
25
```

Page 814

```
1        COMMONWEALTH OF KENTUCKY
           FRANKLIN CIRCUIT COURT
2              DIVISION TWO
3        CIVIL ACTION NO. 03-CI-1135
4
    COMMONWEALTH OF KENTUCKY   )
5   ex rel. GREGORY D. STUMBO, )
    ATTORNEY GENERAL,          )
6       Plaintiff,             )
    VS.                        )
7                              )
    WARRICK PHARMACEUTICALS     )
8   CORP., et al.,             )
        Defendants.            )
9
10  *******************************************
11    UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
12
13  THE COMMONWEALTH OF   )
    MASSACHUSETTS,        )
14      Plaintiff,        )
                          )
15  VS.                   ) Case No. 03-CV-11865-PBX
                          )
16  MYLAN LABORATORIES,   )
    INC., et al.,         )
17      Defendants.       )
18
19  *******************************************
20    UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
21
22  IN RE PHARMACEUTICAL   ) MDL No. 1456
    INDUSTRY AVERAGE       ) Civil Action No. 01-12257-PBS
23  WHOLESALE PRICE        ) Judge Patti B. Saris
    LITIGATION             ) Magistrate Judge
24                         ) Marianne B. Bowler
25
```

Page 815

```
1   IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
        OF HINDS COUNTY, MISSISSIPPI
2
3   STATE OF MISSISSIPPI,   )
        Plaintiff,          )
4                           )
    VS.                     ) CIVIL ACTION NO:  G2005-2021
5                           )
    ABBOTT LABORATORIES,    )
6   INC., et al.,           )
        Defendant.          )
7
8   *******************************************
9    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
              STATE OF MISSOURI
10
11  STATE OF MISSOURI, ex rel. )
    JEREMIAH W. (JAY) NIXON,   )
12  Attorney General,          )
                               )
13  AND                        )
                               ) Case No: 054-1216
14  MISSOURI DEPARTMENT OF     )
    SOCIAL SERVICES, DIVISION OF )
15  MEDICAL SERVICES,          ) Division No. 31
        Plaintiff,             )
16                             )
    VS.                        )
17                             )
    DEY, INC., DEY, L.P., MERCK )
18  KGaA, et al.,              )
        Defendant.             )
19
20  *******************************************
21
22
23
24
25
```

2 (Pages 812 to 815)

## Page 816

```
1        SUPERIOR COURT OF NEW JERSEY
              UNION COUNTY
2              LAW DIVISION
           DOCKET NO.: UNN-L-2329-04
3
  CLIFFSIDE NURSING HOME, INC.,    )
4 on behalf of itself and all      )
  other similarly situated, as     )
5 defined herein,                  )
        Plaintiffs,                 )
6                                    )   Civil Action
  VS.                               )
7                                    )
  DEY, INC., WARRICK               )
8 PHARMACEUTICALS CORPORATION,     )
  et al.,                          )
9        Defendants.               )
10 *******************************************
11       SUPERIOR COURT OF NEW JERSEY
              MONMOUTH COUNTY
12             LAW DIVISION
           DOCKET NO.: MON-L-3136-06
13
  INTERNATIONAL UNION OF          )
14 OPERATING ENGINEERS,           )
  LOCAL 68 WELFARE FUND,          )   Civil Action
15      Plaintiffs,                )
                                   )
16 VS.                            )
                                   )
17 ASTRAZENECA, PLC, et al.,      )
        Defendant.               )
18
   *****************************************
19
  STATE OF NEW YORK
20 SUPREME COURT : COUNTY OF ERIE
21
  THE COUNTY OF ERIE,            )
22      Plaintiff,                )
                                  )
23 VS.            )  Index No. 12005-2439
                                  )
24 ABBOTT LABORATORIES,          )
  INC. ET AL.,                   )
25      Defendants.              )
```

## Page 817

```
1  STATE OF NEW YORK
   SUPREME COURT        COUNTY OF OSWEGO
2
3  THE COUNTY OF OSWEGO,   )
        Plaintiff,          )
4                           )
   -against-                )  Index No. 06-0697
5                           )
   ABBOTT LABORATORIES,     )
6  INC., AGOURON            )
   PHARMACEUTICALS, INC.,   )
7  ET AL.,                  )
        Defendants.         )
8
9  *****************************************
10 STATE OF NEW YORK
   SUPREME COURT        COUNTY OF SCHENECTADY
11
12 THE COUNTY OF OSWEGO,   )
        Plaintiff,          )
13                          )
   -against-                )  Index No. 2006-886
14                          )
   ABBOTT LABORATORIES,     )
15 INC., AGOURON            )
   PHARMACEUTICALS, INC.,   )
16 ET AL.,                  )
        Defendants.         )
17
   *****************************************
18
19       COUNTY OF COMMON PLEAS
          HAMILTON COUNTY, OHIO
20
   STATE OF OHIO,      ) Case No. A0402047
21      Plaintiff,      )
                        )  Judge Myers
22      -vs-            )
                        )
23 DEY, INC., et al.,   )
        Defendant.      )
24
25
```

## Page 818

```
1        IN THE COMMONWEALTH COURT OF PENNSYLVANIA
2
   COMMONWEALTH OF PENNSYLVANIA  )
3  by Thomas W. Corbett, Jr.,    )
   in his capacity as Attorney   )
4  General of the Commonwealth   )
   of Pennsylvania,              )  No. 212 MD 2004
5       Plaintiff,                )
                                  )
6  VS.                           )
                                  )
7  TAP PHARMACEUTICAL PRODUCTS,  )
   INC., et al.,                 )
8       Defendant.               )
9
   *****************************************
10
11 STATE OF SOUTH CAROLINA  IN THE COURT OF COMMON PLEAS
12 COUNTY OF RICHLAND       FOR THE FIFTH JUDICIAL CIRCUIT
13 STATE OF SOUTH CAROLINA,  )
   and HENRY D. McMASTER,    )
14 In His Official Capacity as )   Civil Action No.
   Attorney General for the  )   06-CP-40-4390
15 State of South Carolina,  )
        Plaintiff,           )
16                           )
   VS.                       )
17                           )
   WARRICK PHARMACEUTICALS   )
18 CORPORATION, SCHERING-PLOUGH )
   CORPORATION, and SCHERING  )
19 CORPORATION,              )
        Defendants.          )
20
21 *****************************************
22
23
24
25
```

## Page 819

```
1  STATE OF SOUTH CAROLINA  IN THE COURT OF COMMON PLEAS
2  COUNTY OF RICHLAND       FOR THE FIFTH JUDICIAL CIRCUIT
3  STATE OF SOUTH CAROLINA,  )
   and HENRY D. McMASTER,    )
4  In His Official Capacity as )   Civil Action No.
   Attorney General for the  )   06-CP-40-4399
5  State of South Carolina,  )
        Plaintiff,           )
6                            )
   VS.                       )
7                            )
   WARRICK PHARMACEUTICALS   )
8  CORPORATION, SCHERING-PLOUGH )
   CORPORATION, and SCHERING  )
9  CORPORATION,              )
        Defendants.          )
10
11 *****************************************
12 STATE OF WISCONSIN   CIRCUIT COURT    DANE COUNTY
                BRANCH 7
13
14 STATE OF WISCONSIN,    )
        Plaintiff,         )
15                         )
   VS.              )   Case NO. 04-CV-1709
16                         )
   AMGEN, INC., et al.,   )
17      Defendants.        )
18 *****************************************
19
20
21
22
23
24
25
```

3 (Pages 816 to 819)

## Page 820

1        On the 22nd day of September, 2006,
2  between the hours of 9:03 a.m. and 1:19 p.m., at the
3  Hamilton Park Hotel and Conference Center, Ashton
4  Springfield Conference Room, 175 Park Avenue, Florham
5  Park, New Jersey, before me, CYNTHIA VOHLKEN, a
6  Certified Shorthand Reporter for the State of Texas,
7  appeared HARVEY J. WEINTRAUB, who, being by me first
8  duly sworn, gave an oral deposition at the instance of
9  the Defendants Schering Corporation, Schering-Plough
10  Corporation and Warrick Pharmaceuticals Corporation in
11  said cause, pursuant to the Rules of Civil Procedure
12  and Federal Rules of Civil Procedure.

## Page 821

APPEARANCES

FOR THE PLAINTIFF THE STATE OF ALABAMA:
MR. ROGER L. BATES
Hand Arendall L.L.C.
1200 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203
(205) 324-4400

FOR THE PLAINTIFFS ALABAMA, MISSOURI, SOUTH CAROLINA
and HAWAII:
MR. CLINT CARTER
Beasley, Allen, Crow, Methvin, Portis
& Miles, P.C.
272 Commerce Street
Montgomery, Alabama 36103-4160
(334) 269-2343

FOR THE PLAINTIFF THE STATE OF ARKANSAS:
MR. BRADFORD J. PHELPS
Assistant Attorney General
Office of Attorney General Mike Beebe
Antitrust Division
323 Center Street, Suite 1100
Little Rock, Arkansas 72201
(501) 682-3625

FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
MR. NICHOLAS PAUL
Supervising Deputy Attorney General
MR. TIMOTHY C. FOOTE
Deputy Attorney General
Civil Prosecutions Unit
BMFEA
110 West A Street, Suite 1100
San Diego, California 92186
(619) 688-6099

## Page 822

APPEARANCES (CONTINUED)
FOR THE PLAINTIFFS STATE OF CONNECTICUT and the MDL
CLASS PLAINTIFFS in MASSACHUSETTS:

MR. HUGH E. McNEELY
Hagens Berman Sobol Shapiro LLP
One Main Street, Fourth Floor
Cambridge, Massachusetts 02142
(617) 482-3700

FOR THE PLAINTIFF THE STATE OF FLORIDA:

MS. SHACHI MANKODI
Assistant Attorney General
Office of the Attorney General
Medicaid Fraud Control Unit
PL-01, The Capitol
Tallahassee, Florida 32311
(850) 414-3600

FOR THE PLAINTIFF VEN-A-CARE OF THE FLORIDA KEYS:

MR. JARRETT ANDERSON
Attorney at Law
2411 Hartford Road
Austin, Texas 78703
FOR THE PLAINTIFFS WISCONSIN, ILLINOIS, KENTUCKY,
HAWAII, MISSISSIPPI, CITY OF NEW YORK AND COUNTIES OF
NEW YORK REPRESENTED BY KIRBY MCINERNEY & SQUIRE:
MR. MICHAEL WINGET-HERNANDEZ
Winget-Hernandez, LLC
3112 Windsor Road, No. 228
Austin, Texas 78703
(512) 474-4095
FOR THE PLAINTIFF THE COMMONWEALTH OF MASSACHUSETTS:
MR. RICHARD C. HEIDLAGE
MS. COLLEEN A. McCARTHY
Assistant Attorneys General
The Commonwealth of Massachusetts
Office of the Attorney General
Medicaid Fraud Control Unit
One Ashburton Place, Room 1813
Boston, Massachusetts 02108-1598
(617) 727-2200

## Page 823

APPEARANCES (CONTINUED)
FOR THE PLAINTIFF THE STATE OF MISSOURI:
MS. JAN ADAMS
Assistant Attorney General
Missouri Attorney General's Office
Medicaid Fraud Control Unit
720 Olive Street, Suite 2150
St. Louis, Missouri 63101
(314) 340-4764
FOR THE PLAINTIFFS THE CITY OF NEW YORK and VARIOUS
NEW YORK COUNTIES:

MR. JAMES P. CARROLL, JR.
Kirby McInerney & Squire
830 3rd Avenue, 10th Floor
New York, New York 10022
(212) 371-6600

FOR THE PLAINTIFFS ERIE COUNTY, SCHENECTADY COUNTY AND
OSWEGO COUNTY:
MR. DANIEL C. BURKE
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
(212) 558-5811
FOR THE PLAINTIFF THE STATE OF OHIO:
MR. ROBERT HEUCK, II,
Waite, Schneider, Bayless & Chesley
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
FOR THE PLAINTIFF THE COMMONWEALTH OF PENNSYLVANIA:
MR. JOSEPH L. RODA
RodaNast, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
(717) 892-3000

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

## Page 824

```
1          APPEARANCES (CONTINUED)
2   FOR THE PLAINTIFF SOUTH CAROLINA ATTORNEY GENERAL:
3       MR. WILLIAM E. HOPKINS, JR.
        (Not Present)
4       McCutchen Blanton Johnson & Barnette, LLP
        1414 Lady Street
5       Columbia, South Carolina  29201
        (803) 799-9791
6
7   FOR THE PLAINTIFF SOUTH CAROLINA:
8       MR. W. JONATHAN HARLING
        Mike Kelly Law Group, LLC
9       500 Taylor Street
        Columbia, South Carolina  29202
10      (803) 726-0123
11
    FOR THE DEFENDANTS SCHERING CORPORATION,
12  SCHERING-PLOUGH CORPORATION and WARRICK
    PHARMACEUTICALS CORPORATION:
13
14      MR. C. MICHAEL MOORE
        Locke Liddell & Sapp, LLP
15      2200 Ross Avenue, Suite 2200
        Dallas, Texas  75201-6776
16      (214) 740-8000

17      -and-

18      MS. HEATHER S. CRALL
        Ropes & Gray LLP
19      One International Place
        Boston, Massachusetts  02110-2624
20      (617) 951-7000

21      -and-

22      MR. JAMES G. LONG, III
        (By Telephonic Means)
23      Nexsen Pruet, LLC
        1441 Main Street
24      Columbia, South Carolina  29201
        (803) 771-8900
25
```

## Page 825

```
1          APPEARANCES (CONTINUED)
2
    FOR THE DEFENDANT DEY, INC.:
3
        MR. PHILIP D. ROBBEN
4       Kelley Drye & Warren LLP
        101 Park Avenue
5       New York, New York  10178
        (212) 808-7800
6
7   FOR THE DEFENDANT PAR PHARMACEUTICAL INC. AND PAR
    PHARMACEUTICAL COMPANIES, INC.:
8
        MR. PAUL K. DUEFFERT
9       (By Telephonic Means)
        Williams & Connolly LLP
10      725 12th Street, N.W.
        Washington, DC  2005
11      (202) 434-5097
12
    ALSO PRESENT:
13
        Dr. John Lockwood, Ven-A-Care
14      Ms. Peggy Forrest, The Breen Law Firm
        Mr. Brian Bobbitt, Videographer
15      Ms. Angie Smith, Court Reporter
        Mr. Ricky Acker, Videographer
16
17          *-*-*-*-*
18
19
20
21
22
23
24
25
```

## Page 826

```
1              INDEX
    Appearances.......................... 821
2
    HARVEY J. WEINTRAUB
3     Examination (Cont.) by Mr. Winget-Hernandez. 831
      Examination by Mr. McNeely.................. 871
4
    Signature and Changes.......................... 978
5   Reporter's Certificate......................... 980
6
    VIDEOTAPE NUMBER
7
        13 ................................. 829
8       14 ................................. 871
        15 ................................. 902
9       16 ................................. 946
10
            EXHIBITS
11
    NO.  DESCRIPTION                         PAGE
12
            (Previous Exhibits)
13
      7 ............................ 889
14    16 ........................... 871
      69 ........................... 841
15    71 ........................... 844
16          (New Exhibits)
17    83 ........................... 831
        August 12, 1999 Letter from Richard Zahn
18      to Honorable Thomas Bliley, Re:  Letter
        dated July 19, 1999 Requesting Information
19      Concerning the Pricing for Albuterol
        Sulfate .083%, with attachment
20      (RGS 0315084-315141) Highly Confidential
      84 ........................... 853
21      August 1, 1997 Memo from Linda Zhou to
        Distribution, Subject:  Managed Care/ITG
22      Reporting Package, with attachment
        (RGX 0154625-154648) Highly Confidential
23    85 ........................... 854
        Integration of Warrick Into Managed Care
24      (SP 0013796-13797) Confidential
25
```

## Page 827

```
1   NO. DESCRIPTION                          PAGE
2     86 ........................... 861
        October 12, 1993 Letter from Harvey
3       Weintraub to Martha McNeil asking to
        change the AWP on the albuterol sulfate
4       solution 0.083%; advertisement for
        Albuterol Sulfate; October 12, 1993 Letter
5       from Harvey Weintraub to Don Rodriguez,
        asking to change the AWP on the albuterol
6       sulfate solution 0.083% (WP000000065A-67A)
        Confidential
7     87 ........................... 871
        Warrick Pharmaceuticals Policy and
8       Procedure Manual (WP 0032456-32622)
        Highly Confidential
9     88 ........................... 874
        Schering International (SW0638402-638595)
10      Highly Confidential
      89 ........................... 880
11      Corporate Data Sheet, Schering Corporation
        June 24, 1991; Warrick Pharmaceuticals
12      Corporation May 29, 1998 (SP 0012427-12430)
        Confidential
13    90 ........................... 883
        State of Delaware 1993 Annual Franchise
14      Tax Report
      91 ........................... 886
15      State of Delaware - Annual Franchise Tax
        Report, Tax Year 2004
16    92 ........................... 891
        Medical Reimbursement for Drugs by State
17      from Redbook 1998, Redbook 1999, Redbook
        2000
18    93 ........................... 895
        Web pages from National Pharmaceutical
19      Council, About NPC
      94 ........................... 897
20      Extracts from the Pharmaceutical Benefits
        Under State Medical Assistance Programs
21      2000 Published by the National
        Pharmaceutical Council, Inc.
22    95 ........................... 898
        2000-08-14 E-mail from Dan Valerio to
23      Harvey Weintraub, Subject:  Redbook
        Omissions Letter with attachments
24      Catalogue-Redbook Prices.xls, Redbook
        Additions.doc  (SPF0084328-84333)
25      Highly Confidential
```

## FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911   -   HOUSTON (713) 572-8897   -   SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 828

```
 1  96 ................................ 901
       Schering Laboratories Generic Strategy
 2     (WAR0005993-6097) Highly Confidential
       (WPX0006057-6161) Confidential
 3  97 ................................ 910
       August 9, 1993 Memo from Harvey Weintraub
 4     to Mr. Zahn, Subject:  Status Report -
       Warrick Pharmaceuticals (WCT0031786-31790)
 5     Highly Confidential (SP 0012800-12806)
       Confidential
 6  98 ................................ 913
       February 2, 1995 Letter to Fallon Clinic
 7     Pharmacy, offering products for contract;
       E-mail thread, October 28, 1999 E-mail
 8     from Patty Burke to Kathleen Flynn,
       Subject:  RE:  Fallon Clinic - albuterol
 9     (WAR0043141-43148, 43124) Highly
       Confidential (SP 0001454-1461, 1436)
10     Confidential Attorneys' Eyes Only
       99 ............................... 916
11     October 15, 1992 Memo from Carolyn Kocis
       to Distribution, Subject:  Nominal Pricing
12     Meeting, Reference:  Executive Summary and
       Minutes October 15, 1992 Meeting
13     (SP 000939-949) Confidential
       (TX-D&W 78023-78033)
14  100............................... 932
       January 4, 1993 Memo from E.P. Desimone,
15     R.W. Zahn to Raul E. Cesan, Subject:
       Strategic Issues (SPW0039672-39674)
16     Highly Confidential (WPX0006048-6050)
       Confidential
17  101............................... 935
       January 3, 1996 Memo from Mark Calabrese,
18     etc., to Managed Care Director's and MCAMs,
       Subject:  PROVENTIL, Inhaler/Albuterol
19     Generic Managed Care Action Plan
       (WAR0001434-1441) Highly Confidential
20     (WPX0001432-1439) Confidential
       102............................... 948
21     December 11, 1997 Memo from Linda Zhou to
       R. Cesan & R. Zahn, Subject:  PacifiCare
22     Proposal (RGX 0198854-198855) Highly
       Confidential
23  103............................... 952
       Schering/Warrick Albuterol Inhaler Action
24     Plan, Prepared by:  Steve Cooper, Mark
       Calabrese (WAR0001510-1527) Highly
25     Confidential (WPX0001508-1525) Confidential
```

Page 829

```
 1            (Exhibit 83 marked)
 2            THE VIDEOGRAPHER:  Stand by.  We are on
 3   the record September 22nd, 2006.  The time is 9:03
 4   a.m.  This is the beginning of Tape 13.
 5            Will counsel identify themselves for the
 6   record, please.
 7            MR. MOORE:  Mike Moore, for Schering and
 8   Warrick.
 9            MS. CRALL:  Heather Crall with Ropes &
10   Gray for Schering and Warrick.
11            MR. HEUCK:  Bob Heuck for the State of
12   Ohio.
13            MR. WINGET-HERNANDEZ:  Michael
14   Winget-Hernandez for the City of New York, the New
15   York counties represented by KMS, Wisconsin, Illinois,
16   Kentucky, Mississippi and Hawai'i.
17            MS. ADAMS:  Jan Adams for the State of
18   Missouri.
19            MR. HEIDLAGE:  Richard Heidlage and
20   Colleen McCarthy for the Commonwealth of
21   Massachusetts.
22            MR. ROBBEN:  Philip Robben, Kelley, Drye
23   & Warren representing Dey.
24            MR. CARROLL:  James Carroll, Kirby
25   McInerney & Squire, representing the City of New York
```

Page 830

```
 1   and various New York counties.
 2            MR. PHELPS:  Brad Phelps from the
 3   Arkansas Attorney General's Office representing the
 4   State of Arkansas.
 5            MR. BURKE:  Daniel Burke from Weitz &
 6   Luxenberg representing Erie County, Schenectady County
 7   and Oswego County.
 8            MR. ANDERSON:  Jarrett Anderson, counsel
 9   for Ven-A-Care.
10            DR. LOCKWOOD:  John Lockwood.  I'm an
11   employee of Ven-A-Care.  I'm not an attorney.
12            MR. PAUL:  Nick Paul and Tim Foote for
13   California with the California AG.
14            MR. BATES:  Roger Bates, Hand Arendall,
15   the State of Alabama.
16            MR. CARTER:  Clint Carter, Beasley
17   Allen, the State of Alabama.
18            MR. HARLING:  Jonathan Harling for the
19   State of South Carolina.
20            MR. McNEELY:  Hugh McNeely, State of
21   Connecticut, the MDL class plaintiffs.
22            MR. MOORE:  On the phone, please.
23            MR. RODA:  Joseph Roda, Commonwealth of
24   Pennsylvania.
25            MS. MANKODI:  Shachi Mankodi for the
```

Page 831

```
 1   Florida Attorney General's Office.
 2            MR. LONG:  James Long from Warrick and
 3   Schering in South Carolina, Nexsen Pruet law firm.
 4            MR. MOORE:  Okay.
 5            HARVEY WEINTRAUB,
 6   having been previously duly sworn, testified further
 7   as follows:
 8            EXAMINATION (CONTINUED)
 9   BY MR. WINGET-HERNANDEZ:
10       Q.  Mr. Weintraub, did you bring the Warrick
11   price file with you this morning?
12       A.  No.
13       Q.  You can still get an electronic copy of the
14   Warrick price file from Schering Finance in a few
15   minutes, couldn't you?
16            MR. MOORE:  Object to --
17       A.  I couldn't --
18            MR. MOORE:  Excuse me, Mr. Weintraub.
19   Give me a chance to make my objections today.
20            Object to the form of the question.
21       A.  I cannot.  I doubt it because I do not work
22   for Warrick Pharmaceuticals.
23            (Discussion off the record)
24       Q.  (BY MR. WINGET-HERNANDEZ)  I would like to
25   hand you, Mr. Weintraub, what's been marked as Exhibit
```

6 (Pages 828 to 831)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 868

1    Q.  Of the first product that you were involved
2  in.
3         MR. MOORE:  I object to the form of the
4  question.
5    A.  I -- will you rephrase that, please?
6    Q.  (BY MR. WINGET-HERNANDEZ)  You knew upon
7  launch of the first -- well, let's talk specifically
8  about the inhaler.  You were involved in the launch of
9  inhaler, right?
10    A.  Yes.
11    Q.  And you knew when the inhaler launched that
12  you were going to rely on generic industry practice
13  and not lower the AWP after the launch; isn't that
14  correct?
15         MR. MOORE:  Objection, form, repetitive,
16  asked and answered.
17    A.  I didn't know that.  It was my -- by that
18  time I knew that it was not the industry practice.  I
19  didn't know whether the price was going to go -- which
20  way it was going to go, obviously down, but I had no
21  specific intent to lower it as it went down.
22    Q.  (BY MR. WINGET-HERNANDEZ)  In any case --
23    A.  Nor did I have any intent to raise it if it
24  went up, if all the competitors went up.  I was going
25  to leave it in place.  I think I've testified to that

Page 869

1  point.
2    Q.  Isn't it true, Mr. Weintraub, that your
3  rejection of the brand industry practice of lowering
4  the AWP proportionately as market prices declined was
5  based, as you've testified, on something that you
6  heard sometime from someone that you don't remember?
7         MR. MOORE:  Object to the form of the
8  question.  It's repetitive, asked and answered and
9  argumentative.
10    A.  Not from someone sometime.  By then it became
11  widespread information to me that one didn't lower it.
12  It wasn't one person one time.  I picked it up just as
13  a matter of experience over the months.
14    Q.  (BY MR. WINGET-HERNANDEZ)  But you don't
15  remember who -- from who; isn't that right?
16    A.  No.
17         MR. MOORE:  Objection, repetitive, asked
18  and answered.
19         MR. WINGET-HERNANDEZ:  Reserving
20  objections and -- and other rights to be stated later,
21  I'm going to pass the witness under protest to Hagens
22  Berman.
23         MR. McNEELY:  If we could go off the
24  record for -- allow me to take a position at the table
25  and move my exhibits.

Page 870

1         MR. MOORE:  Before we go off the record,
2  just -- I'm curious to know, just on your statement,
3  what does it mean "under protest to Hagens Berman"?
4         MR. WINGET-HERNANDEZ:  I don't -- I'm
5  not finished with this witness.  That's what it means.
6  I have more work to do and I don't have time, but
7  I'm -- I'm ceding the witness.
8         MR. MOORE:  Okay.  Well, it's our
9  position, just -- I thought that's what you meant, or
10  I wasn't quite sure, but it's our position that you're
11  passing the witness.  You're -- you're done.
12         MR. WINGET-HERNANDEZ:  Well, I'm not
13  done, but --
14         MR. MOORE:  Well, I know you're --
15         MR. WINGET-HERNANDEZ:  -- but I'm ceding
16  the witness.
17         MR. MOORE:  That's your position
18  since --
19         MR. WINGET-HERNANDEZ:  I don't want to
20  argue about it.  I'm going to talk about it later.
21         MR. MOORE:  I'm not arguing about it.
22  You stated your position.  I'm stating my position.
23         MR. WINGET-HERNANDEZ:  Very well.
24         MR. MOORE:  Thank you.
25         Let's take a break.

Page 871

1         THE VIDEOGRAPHER:  Stand by.  The time
2  is 9:54 a.m.  We're off the record.  This concludes
3  Tape 13.
4         (Recess from 9:54 to 10:06)
5         THE VIDEOGRAPHER:  Stand by.  The time
6  is 10:06 a.m.  We are back on the record.  This is the
7  beginning of Tape 14.
8              EXAMINATION
9  BY MR. McNEELY:
10    Q.  Good morning, Mr. Weintraub.
11    A.  Good morning.
12    Q.  My name is Hugh McNeely.  I'm with the law
13  firm of Hagens Berman Sobol Shapiro.  I'm out of the
14  Cambridge office and I'll be asking questions on
15  behalf of certain of the AWP-MDL class plaintiffs that
16  is going on in Massachusetts, as well as on behalf of
17  the State of Connecticut.
18         And what I would like to do is address
19  some of the things that perhaps have already been
20  discussed just briefly.  There was a question about
21  Exhibit -- Exhibit 16 being a complete document of the
22  Warrick Pharmaceuticals policy and procedures.  And
23  I'm going to have marked as Exhibit 87 a Warrick
24  Pharmaceuticals Policy and Procedure Manual that was
25  produced as a result of a 30(b)(6) deposition in this

16 (Pages 868 to 871)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 872

1  matter.
2          (Exhibit 87 marked)
3          MR. MOORE:  We are getting some paper
4  rustling noises.  If someone who's doing that could
5  just put on the mute button, it would help.
6      Q.  (BY MR. McNEELY)  If you would, take a look
7  and review that.  It's your -- and see if that -- if
8  you can tell me that is something you recognize?
9      A.  (Witness reviewing document)  Yes, it's a
10  Warrick policy and procedure manual.  That's what the
11  title page says and the rest of the documents look
12  like they belong to it.
13      Q.  This particular manual, which is Exhibit 87,
14  has certain dates as far as effective dates.  I would
15  ask if you could just go through and -- and review
16  some of the effective dates and if that is something
17  that you recall seeing in the manual that you are
18  familiar with when you were with Warrick.
19      A.  The effective dates?
20      Q.  Yes.
21      A.  Periodically sections were changed and
22  inserted.  So there would be an effective date and
23  then a new document or replacement document for a
24  section would be issued and it would have a date on
25  it.

Page 873

1      Q.  Okay.
2      A.  So that the manual was constantly being
3  updated.
4      Q.  And so you might have sections that have an
5  effective date of -- for one year and then you might
6  also have -- it replaces another section with a --
7  with a date following that; is that correct?
8      A.  That is correct.
9      Q.  On the very first page, which is labeled the
10  "Index" to the Warrick Pharmaceuticals Policy and
11  Procedure Manual, do you -- do you see towards the
12  bottom of that index there are also sections labeled
13  "Schering Plough Finance Manual" and "Schering Plough
14  Corporate Policy and Procedure," do you see that?
15      A.  Yes.
16      Q.  And is it your recollection that the Warrick
17  Pharmaceutical policy had Schering-Plough procedures
18  in -- within the Warrick manual?
19      A.  It had certain Schering-Plough procedures in
20  the manual.  They were usually procedures that were
21  not subject to a change by the individual subsidiary.
22  For example, equal employment opportunity and sexual
23  harassment, which is on the bottom, applied to
24  everybody.  So that would be in the manual.  And so
25  that would be part of our manual, that portion of the

Page 874

1  Schering-Plough procedures manual.
2      Q.  And when you say that it applies to everyone,
3  does that mean that applies to all units of
4  Schering-Plough?
5      A.  That is correct.  I'm sorry, I was not
6  precise.
7          MR. McNEELY:  Also in the prior
8  questioning there have been -- or at least there were
9  several organizational charts that were put into
10  evidence, but I would like to submit another
11  organizational chart and -- and employ directly of
12  what purports to be Schering-Plough International's
13  organizational charts and -- or Schering-Plough
14  Corporation's and have that marked as Exhibit 88.
15      Q.  (BY MR. McNEELY)  And if you would, please,
16  take the time to review that.
17          (Exhibit 88 marked)
18          MR. MOORE:  It's an unfair tactic to
19  give me all these big ol' documents before I've got to
20  go catch a plane this afternoon.
21          MR. McNEELY:  Well --
22          MR. WINGET-HERNANDEZ:  I was just
23  thinking the same thing.
24          MR. McNEELY:  I figured you would know
25  how to handle it.

Page 875

1          MR. MOORE:  Is there a trash can around
2  here?
3          MR. McNEELY:  I'll take it back.
4          MR. MOORE:  Okay.
5      A.  (Witness reviewing document).  It's a
6  Schering Corporation organization chart that
7  apparently was issued in approximately April of 2000.
8      Q.  (BY MR. McNEELY)  And with regard to this
9  Schering-Plough organizational chart, I would like to
10  refer you to -- first of all to Chart 12.90.
11          MR. MOORE:  Do you have a Bates for
12  that?
13          MR. McNEELY:  Yes.  It's -- the Bates
14  number is -- the last three are 539.
15          MR. MOORE:  Okay.
16      Q.  (BY MR. McNEELY)  Do you have that before
17  you, Mr. Weintraub?
18      A.  Yes.
19      Q.  Can you identify what that Chart 12.90
20  represents?
21      A.  It's a chart for the subsidiary or unit
22  called Worldwide Generics.
23      Q.  And is that not, in fact, an organizational
24  chart for the unit known as Warrick Pharmaceuticals?
25      A.  It incorporates Warrick and Kenilworth

17 (Pages 872 to 875)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 876

1  Pharmaceuticals.
2      Q.  Would you identify those -- that part of the
3  chart which is the -- Kenilworth?
4      A.  The three blocks toward the left that say
5  "Degen," "Hart" and "Erpa."
6      Q.  And would you identify those -- those
7  organizational blocks that represent Warrick?
8      A.  "Graf," "Gough," "Sherman," "D'Ambrosio" and
9  "Open."
10     Q.  Is this consistent with your understanding
11 that both Kenilworth and Warrick were under Worldwide
12 Generics headed by Raman Kapur as the president?
13     A.  Yes.
14     Q.  I would like to next refer you to -- it's
15 Chart 12.00, which is -- the Bates label, the last
16 three is 501.
17     A.  Yes.
18     Q.  And what does that Chart 12.00 represent?
19     A.  That's a chart that represents the
20 organization for Schering Laboratories.
21     Q.  And who is represented as the president of
22 Schering lab?
23     A.  Rich Zahn.
24     Q.  And is -- is the Warrick unit represented on
25 this chart?

Page 877

1      A.  Yes, it is.
2      Q.  And -- and how is it represented?
3      A.  In the bottom left block where it says
4  "President Generics" and "Kapur."
5      Q.  And was Raman Kapur, did his -- did he, in
6  fact, answer to Richard Zahn, the president of
7  Schering Laboratories?
8      A.  Yes, he did.
9      Q.  And I also note in this particular chart
10 there is a block for -- it has a vice-president of
11 Schering sales.  Do you see that?  It's -- I guess
12 it's the first row to your -- to the extreme right.
13     A.  Yes.
14     Q.  Now, I believe during your -- in your resume
15 and your former -- your earlier testimony is that you
16 were vice-president of sales at one point in Schering
17 Laboratories; is that correct?
18     A.  That is correct.
19     Q.  And this particular -- the VP at this time,
20 for this chart is -- it looks like Foil?
21     A.  Frank Foil.
22     Q.  Frank Foil.  Would this be the same position
23 that you held earlier?
24         MR. MOORE:  Objection, form, no
25 foundation.

Page 878

1      A.  It was the same position in terms of title.
2  Since I don't know, without looking at Chart 12.40,
3  what reported to it, I couldn't say it was identically
4  the same position, but for the most part it would be
5  the same position.
6      Q.  (BY MR. McNEELY)  Well, let's take a look at
7  Chart 12.400 (sic), if you would.  It's -- the last
8  three Bates is 525.  Do you see that?
9      A.  Yes.  I did not have a -- I didn't have the
10 title of sales and development, as Frank Foil had.  I
11 had a title vice-president of sales.  I did not have
12 an intermediary between me and the regional directors.
13     Q.  So your position would have been more in
14 keeping with the -- at least it looks like the
15 position of the vice-president of Schering sales held
16 by Segarra?
17         MR. MOORE:  Objection, form.  No
18 foundation.
19     A.  In terms of the sales -- field force sales,
20 in terms of the other portions reporting in, I'm not
21 quite sure.  Because these were obviously not the only
22 things -- I think, were not the only things reporting
23 in to Frank Foil.  I'm not sure.
24     Q.  (BY MR. McNEELY)  When you were a
25 vice-president of sales, was the -- the unit that you

Page 879

1  worked in also known as Schering Sales Corporation?
2         MR. MOORE:  Objection, form.
3      A.  It was not -- I don't know how it was set up
4  for compensation or for other purposes.  It was called
5  Schering Sales, Schering Corporation or Schering
6  Laboratories.  It had -- depending upon where we were,
7  we had all three names going.
8      Q.  (BY MR. McNEELY)  I'm having trouble to
9  understand.  Did you say that it was known as Schering
10 Sales Corporation --
11     A.  Well, we --
12     Q.  -- the particular unit that you were a VP in?
13     A.  I was a VP for Schering Laboratories.
14 Schering Sales Corporation was an entity set up by
15 finance department, I believe.  I'm not quite sure
16 exactly what -- what it encompassed.
17     Q.  Do you know who was the -- the -- was there a
18 president or vice-president who was in charge of
19 Schering Sales Corporation that you can recall?
20     A.  I'm not familiar with that.
21     Q.  Did you ever work with anyone from Schering
22 Sales Corporation?
23     A.  Not under the title of Schering Sales
24 Corporation.  People I worked with were from Schering
25 Laboratories or other sections of Schering.

18 (Pages 876 to 879)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 880

1    Q.  Mr. Weintraub, there's been some testimony
2  previously concerning Schering Corporation and Warrick
3  Pharmaceuticals relative to their corporate
4  organization and -- the -- any board members and
5  officers.  Do you recall that?
6    A.  Yes.
7    Q.  Can you identify all of the officers who held
8  the position of either president or vice-president or
9  other officers in -- in Warrick Pharmaceuticals
10  Corporation for any year?
11    A.  No, I cannot.
12       (Exhibit 89 marked)
13    Q.  (BY MR. McNEELY)  The document that has been
14  marked Exhibit 89, would you review that briefly and
15  identify it, if you can?
16    A.  (Witness reviewing document).  It appears to
17  be a list of all of the subsidiaries and officers of
18  Schering Corporation.
19    Q.  Have you ever seen that document before?
20    A.  No.
21    Q.  Well, if we could start on the first page of
22  Exhibit 89 with the Bates number 0012427 and at the
23  top do you see it's entitled "Corporate Data Sheet
24  Schering Corporation"?
25    A.  Yes.

Page 881

1    Q.  And prior to reviewing this corporate data
2  sheet were you aware that Raul Cesan was both a
3  director, president and chairman of the board of
4  Schering Corporation?
5    A.  No, I did not.
6    Q.  You knew Raul Cesan as the president of
7  Schering Corporation though; is that correct?
8    A.  I knew Raul -- I can't recall his exact
9  title, he had several titles, and I only reported to
10  him a very short period of time.  So I don't know
11  exactly what titles he had.  Here is a title where it
12  says "Director."  I don't know that he was a director
13  of Schering Corporation.  I just did not -- I
14  associated with him in terms of Schering Laboratories.
15    Q.  Did you ever associate with him as
16  Schering-Plough Corporation?
17    A.  No.  He may have had some title then, but I
18  didn't associate with him with respect to that title.
19    Q.  Okay.  Now, with regard to -- it's Bates
20  number 12430 and the corporate data sheet for Warrick
21  Pharmaceuticals Corporation.
22    A.  Incidentally, if I might ask, what year is
23  this?  1998 is it?
24    Q.  Yes.  Well, it's entitled -- it's dated --
25  there's different dates.  On the Schering Corporation

Page 882

1  data sheet there's a date of June 24, 1998 and for
2  Warrick Pharmaceutical Corporation there's May 29,
3  1998.  And it's my understanding that these corporate
4  data sheets were produced by Warrick in connection
5  with your deposition.
6    A.  Okay.  I just want to reiterate that I was
7  not employed as an employee after 1993 or 1994.  This
8  is a 1998 document.
9    Q.  Yes.  I understand that.
10       Now, referring to the Warrick corporate
11  data sheet.  You have that before you?
12    A.  Yes, I see it.  Warrick -- Warrick
13  Pharmaceuticals Corporation?
14    Q.  Yes, sir.  If you would, take a look at the
15  list of directors and officers.
16    A.  Yes.
17    Q.  Is that your understanding of the directors
18  and officers of the Warrick Pharmaceutical Corporation
19  for the period of 1998, if you know?
20    A.  I don't know.  That's what's listed here, but
21  again, I did not interact with people in this
22  capacity, as officers of the board.
23    Q.  Warrick Pharmaceuticals was created in 1993;
24  is that correct?
25    A.  I don't know the exact year that it was

Page 883

1  created.  I know that I came to work for Warrick in
2  1993.
3    Q.  And I believe your testimony was that you
4  left Warrick in 2004; is that correct?
5    A.  As a consultant, yes.
6    Q.  As a consultant.  From 1993 through 2004 when
7  you left as a consultant, was there any time in which
8  you met with the board of directors of Warrick
9  Pharmaceuticals?
10    A.  No.
11    Q.  Is there any time for that -- for that same
12  time period that -- can you even name any of the
13  directors for Warrick Pharmaceuticals?
14    A.  No, I cannot.  Not -- I don't know who the
15  directors were.  I may have interacted with them in
16  some other capacity, but not as a member of the board.
17       (Exhibit 90 marked)
18    A.  (Witness reviewing document).
19    Q.  (BY MR. McNEELY)  Mr. Weintraub, you've been
20  handed a two-page exhibit that has been marked as
21  Exhibit 90?
22    A.  Yes.
23    Q.  And have you ever seen this document before?
24    A.  No, I have not.
25    Q.  And would you just -- well, I can -- on the

19 (Pages 880 to 883)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 884

1   very first page at the top it's -- it reads "State of
2   Delaware 1993 Annual Franchise Tax Report"; is that
3   correct?
4       A.  That is correct.
5       Q.  And this is a -- the annual tax report for
6   Warrick Pharmaceutical Corporation.  Do you see that?
7       A.  Yes.
8       Q.  And the date of incorporation is March 15,
9   1993?
10      A.  That is correct.
11      Q.  On the second page it lists the nature of the
12  business being the sale of pharmaceutical products; is
13  that correct?
14      A.  That is correct.
15      Q.  And also the principal place of business
16  outside of Delaware is 7500 North Natchez Avenue,
17  Niles, Illinois; is that correct?
18      A.  That is correct.
19      Q.  And as I understand, the Niles, Illinois
20  address, as well as ultimately the Reno, Nevada
21  address, was never the corporate headquarters for the
22  officers or any of the actual administration of the
23  corporation known as Warrick Pharmaceutical; is that
24  correct?
25      A.  To the best of my knowledge.

Page 885

1       Q.  And, again, it also lists directors; is
2   that -- is that correct?
3       A.  Yes.
4       Q.  Raul Cesan, Donald Conklin and John Nine; is
5   that correct?
6       A.  That is correct.
7       Q.  What did John Nine do relative to Warrick
8   Pharmaceuticals, to your knowledge?
9       A.  He was a senior vice-president in charge of
10  manufacturing operations.
11      Q.  And he was an employee of Schering-Plough?
12      A.  How he -- how he was designated with the
13  corporation, I don't know, but he was a Schering
14  employee.
15      Q.  And who was Donald Conklin?
16      A.  Donald Conklin was a senior vice-president, I
17  can't recall the exact title, at the corporate office.
18      Q.  And what corporate office?
19      A.  He was in Schering-Plough headquarters.
20      Q.  And also the officers, at least for this
21  initial tax report, is -- shows a president, Eugene P.
22  Desimone.  Do you see that?
23      A.  Correct.
24      Q.  And who is Eugene P. Desimone?
25      A.  I knew Eugene Desimone as the vice-president

Page 886

1   for finance assigned to Schering.
2       Q.  And the assistant treasurer, Donald J.
3   Soriero or Soriero?
4       A.  Soriero.  Soriero.
5       Q.  Thank you.  And -- and who is he?
6       A.  I know how to pronounce the name and I don't
7   know who he is.
8       Q.  Okay.  Now, as I understand your previous
9   testimony, you never interacted with any of these list
10  of directors or officers in their capacity as working
11  with Warrick; is that correct?
12      A.  I never interacted with them in their
13  capacity as directors or officers of Warrick.  I
14  interacted with them with their normal capacity as I
15  knew it.  Like on occasion with Mr. Desimone as the
16  vice-president for finance, with Mr. Cesan as the
17  president of the overall organization for Schering
18  Laboratories, and so on.
19          (Exhibit 91 marked)
20      A.  (Witness reviewing document).
21      Q.  (BY MR. McNEELY)  Mr. Weintraub, you've been
22  handed the -- this next document that has been marked
23  as Exhibit 91.  Can you identify that document?
24      A.  It's an annual franchise tax report from the
25  State of Delaware for the year 2004.

Page 887

1       Q.  Now, 2004 was your last year with Warrick
2   Pharmaceuticals as a consultant; is that correct?
3       A.  That is correct.
4       Q.  And this -- do you see that this annual
5   report shows the principal place of business outside
6   of Delaware as Reno, Nevada; is that correct?
7       A.  That is correct.
8       Q.  And, again, in fact, the -- there was no
9   administrative offices or officers or the main work of
10  Warrick Pharmaceuticals done in Reno, Nevada; is that
11  correct?
12      A.  That was a shipping facility.
13      Q.  Okay.  And is it also correct that neither
14  you or any of the officers of Warrick Pharmaceuticals
15  ever stepped foot in those shipping facilities in
16  Reno, Nevada, to the best of your knowledge?
17      A.  I can't speak for the other officers of
18  Warrick, as you've delineated the officers in the
19  previous documents.  I can only speak for myself in
20  that case, and, no, I was never there in Reno.  I was
21  on the phone with them fairly often.  We talked a
22  great number of times about correspondence that had
23  come in there and they didn't want to take the time to
24  send it back up to New Jersey, so they would call me
25  and I would talk to them about shipping matters, and

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911   -   HOUSTON (713) 572-8897   -   SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 888

1  so on.
2      Q.  Okay.  The -- the form has changed somewhat
3  from the original annual report, but you see in the
4  bottom block for "Officer/Director" they have listed
5  Steve C. Chellevold?
6      A.  Chellevold.  Chellevold.
7      Q.  And who is he?
8      A.  He has since passed away, unfortunately.  He
9  was part of the manufacturing and -- contract
10 manufacturing and the regular manufacturing operation
11 of Schering.
12     Q.  And how did you -- what business did you have
13 with Mr. Chellevold relative to the business of
14 Warrick Pharmaceuticals?
15     A.  I don't recall any contact with him in 2004.
16 Prior to that I talked to him about a number of
17 matters with respect to third-party manufacturer, to
18 manufacturing, and so on.  I don't recall the exact
19 years.  He was not in this country all that time.  At
20 some point he was in South Africa, came back.  Was
21 assigned to a South Africa branch and came back, but
22 over the years.  I knew him from manufacturing
23 production planning and third-party manufacture.
24     Q.  They have his address listed as Reno, Nevada.
25 Was he, in fact, placed or working for Warrick in

Page 889

1  Reno, Nevada?
2      A.  I don't know.  In the year 2004 I wouldn't
3  know.
4      Q.  At any time prior to that would you know?
5      A.  I cannot recall that.  I don't know how he
6  was headquartered.
7      Q.  The officer -- only one officer is listed and
8  that is Arthur --
9      A.  Ceconi.
10     Q.  -- Ceconi.  Who is he?
11     A.  I don't know.
12     Q.  Mr. Weintraub, I would like for you to, if we
13 could, have Exhibit 7.  If you take a -- review
14 Exhibit 7.  I believe the document, sir --
15     A.  Should be on the bottom here, I would think.
16 Sorry.
17     Q.  Do you have that before you, Mr. Weintraub?
18     A.  Yes, I do.
19     Q.  Do you recall this is a chart that was
20 introduced while Mr. Moore was taking or asking direct
21 questions?
22     A.  Yes.
23     Q.  Okay.  Did you have anything at all to do
24 with the preparation of this exhibit and that chart?
25     A.  I did not.

Page 890

1      Q.  Okay.  Can you explain why the year 1997
2  is -- is missing from this chart?
3      A.  I didn't prepare it, so I don't know.
4      Q.  Okay.  Did you extract any information from
5  the attached Redbook sections?
6      A.  Did I extract any information?  I didn't
7  prepare the chart and I believe that the Redbook, if I
8  remember correctly, formed the basis for the cover
9  sheet.
10     Q.  Okay.  Did you verify any of the information
11 on the chart compared to the Redbook material?
12     A.  When we went through this the other day, yes,
13 it appeared to be correct.
14     Q.  Okay.  And with regard to the -- actually,
15 the Redbook material for the years, at least, 1996 to
16 2002, with the exception of 1997, are those the
17 Redbooks that you were familiar with and working as a
18 consultant for Warrick?
19     A.  Yes.  I didn't work with these too often.
20 These look like they are the annual report.  At least
21 they appear to be.  I worked with the one that came
22 out every month.  Now, these may be the -- well, since
23 they're extracted from the books, I currently can't
24 tell.  Yeah.  This says "annual" on the page.  And I
25 didn't work with the annuals very often.  I worked

Page 891

1  primarily with the books that came out, as I say,
2  every month.
3      Q.  Okay.  Well, with regard to these -- the
4  annual books that were used to compile, or at least
5  extract information to support this Exhibit 7 chart,
6  those were -- that was -- the Redbooks were something
7  that you had available to you in the Warrick offices?
8      A.  Yes.  They were mailed in to us every month
9  from Redbook.
10     Q.  And you would also receive the annual reports
11 as well?
12     A.  Yes.
13     Q.  And you're generally familiar with -- with
14 the contents and how those books are set up?
15     A.  Yes, generally.
16     Q.  Okay.  The Redbooks are something that --
17 that Warrick employees or Warrick salespeople, and
18 also yourself, would rely on for -- for a variety of
19 information; is that correct?
20     A.  The salespeople out in the field didn't use
21 it too often.  It was primarily an office book.  I
22 don't know if the salespeople ever got a copy of it.
23         (Exhibit 92 marked)
24     Q.  (BY MR. McNEELY)  Mr. Weintraub, you have
25 been handed an Exhibit 92, which I will represent to

21 (Pages 888 to 891)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 892

1  you as the cover page and one page out of that annual
2  book for the years 1998, 1999 and 2000.  Do you see
3  that?
4     A.  Yes, I do.
5     Q.  Okay.  Now, these are -- you would have had
6  access to these Redbooks in your offices in -- for
7  Warrick; is that correct?
8     A.  Yes, we had access to them.
9     Q.  Okay.  And I would ask that you look at the
10 second page or the one page behind the cover page for
11 those three years.
12    A.  Yes.
13    Q.  Can you identify that, starting with the 1998
14 year?
15    A.  It's a Medicaid reimbursement for drugs by
16 state.
17    Q.  And this is a -- a regular section in the --
18 at least in the annual books for Redbook; is that not
19 correct?
20    A.  That is correct.
21    Q.  And this is something you were familiar with;
22 is that correct?
23    A.  By "familiar with," I think I told you I
24 hardly ever looked at the annual book.  I used the
25 monthly books.

Page 893

1     Q.  I understand that.
2     A.  I'm familiar with it.  I don't even recall
3  going into this particular page.
4     Q.  Okay.  And if you would, look at that -- at
5  least for the 1998 Redbook the page for Medicaid
6  reimbursements.  That has the formula for
7  reimbursement either with using WAC or AWP for all of
8  the states; is that not correct?
9     A.  That appears to be correct.
10    Q.  And that would also be true for the annual
11 report 1999, the drug reimbursement rates and related
12 information for 1999; is that not correct?
13    A.  That's correct.
14    Q.  And the same would be true relative to the
15 2000 Drug Topics Redbook regarding Medicaid
16 reimbursements?
17    A.  That is correct.
18    Q.  So for -- strike that.
19       For the entire period that you were with
20 Warrick, you had similar annual books available to you
21 in your offices at Union; is that correct?
22    A.  That is correct.  We had -- they were
23 available to us.
24    Q.  And with regard to Redbook and the other
25 pricing compendia for the pharmaceutical industry,

Page 894

1  Redbook was actually a vehicle or a tool that you and
2  Warrick used to publish the AWP prices; is that not
3  correct?
4     A.  That is correct.
5     Q.  And if I would -- if you would, please, could
6  you refer to Exhibit 92, the Redbook exhibits.  And if
7  you would, just turn back to the 1998 Redbook Medicaid
8  reimbursement formulas or reimbursement rates and
9  related information from 1997.
10    A.  I have 1998.  What do you want, 1997?
11    Q.  Well, it actually -- under the -- the header
12 or the title "Medicaid Reimbursement For Drugs by
13 State" the following sentence is as follows, if you
14 would just follow with me.
15    A.  Okay.
16    Q.  It begins with "This table shows."  Do you
17 see that?
18    A.  Yes.
19    Q.  "This table shows Medicaid prescription drug
20 reimbursements rates and related information for 1997.
21 The information was provided courtesy of the National
22 Pharmaceutical Council, Reston," Virginia; is that
23 correct?
24    A.  That's correct.
25    Q.  Are you familiar with the National

Page 895

1  Pharmaceutical Council?
2     A.  I'm familiar with the name.  I don't deal
3  with the organization.
4     Q.  Are they not, in fact, a -- an organization
5  that is sponsored by the major pharmaceutical
6  companies, including Schering-Plough?
7     A.  I don't know.  I'm really not -- I said I'm
8  familiar with the name, not with the organization.
9     Q.  Did any officer or Schering office concerning
10 Medicaid or Medicare reimbursement ever provide
11 information from the National Pharmaceutical Council
12 documents or reports to you?
13    A.  I don't recall receiving any.
14       (Exhibit 93 marked)
15    Q.  (BY MR. McNEELY)  Mr. Weintraub, you've been
16 handed an exhibit that is marked Weintraub 93.  And
17 would you please review that and perhaps maybe see if
18 that refreshes any memory regarding the organization
19 of National Pharmaceutical Council?
20    A.  (Witness reviewing document).
21    Q.  And particularly I will refer you to the
22 second page of that document where it reflects the
23 members of the counsel.
24    A.  Yes.
25    Q.  Do you see where Schering-Plough Corporation,

22 (Pages 892 to 895)

Page 896

1  2000 Galloping Hill Road, Kenilworth, New Jersey is
2  listed as a member?
3      A.  Yes, I do.
4      Q.  Do you recall seeing any of the publication
5  or reports that are provided by the National
6  Pharmaceutical Council --
7      A.  I don't recall receiving them.  I may have,
8  but I don't recall any.  You are talking about my term
9  with Warrick, are you not?
10     Q.  Well, you have been noticed and cross --
11 this -- this particular deposition has been cross
12 noticed in the MDL cases as well as a variety of
13 states relative to the people I represent.  I would
14 like to also, if there's any information from your
15 days as a -- on the brand side, on the Schering-Plough
16 as a Schering-Plough employee or Schering Corporation
17 employee, I would like your testimony on that as well.
18     A.  I may remember having some interaction with
19 National Pharmaceutical Council when I was with
20 Schering back in the '70s or '80s.
21     Q.  And what kind of interaction are you talking
22 about?
23     A.  I believe that the president of NPC came to
24 Schering, talked to us, and I can't remember the
25 subject matter, but I remember meeting the president

Page 897

1  at one time or another.
2      Q.  And at that time Schering-Plough was -- was a
3  sponsor or member of the council at that time?
4      A.  I don't know.
5          (Exhibit 94 marked)
6      Q.  (BY MR. McNEELY)  You have been handed an
7  exhibit, which really -- it's one exhibit.  There are
8  two sections, which I will represent that they are
9  extracts from a larger document entitled
10 "Pharmaceutical Benefits Under State Medical
11 Assistance Programs 2000 Published by the National
12 Pharmaceutical Council, Inc."  Do you see that?
13     A.  Yes.  Yes.
14     Q.  During your tenure with Schering Corporation
15 or Warrick, having this document in front of you, does
16 it refresh any of your recollection concerning having
17 reviewed the type of information that is represented
18 in this Exhibit 94?
19     A.  I don't recall ever reviewing this
20 information.
21     Q.  Would you agree that as a member of -- that
22 Schering-Plough being a member or sponsor of the
23 National Pharmaceutical Council and as well as your
24 time at Schering Corporation, as -- also as with
25 Warrick as a unit of the Schering family,

Page 898

1  Schering-Plough family, that this information was
2  available to Warrick during the -- from '93 to 2004?
3          MR. MOORE:  Object to form.
4      A.  To the extent that it was lodged at Schering
5  it was available to us, if it was there.  I don't -- I
6  can't attest to that.
7          (Exhibit 95 marked)
8      Q.  (BY MR. McNEELY)  Mr. Weintraub, you've been
9  handed Exhibit Number 95, and if you would, please,
10 review that document and tell me if you can identify
11 it.
12     A.  Yes.  It's a document from me to -- from --
13 to me from Dan Valerio and the subject is Redbook's
14 omissions letter received in August of 2000.
15     Q.  And I believe this is a -- apparently a
16 computer-generated document and -- actually, the
17 letter that is mentioned as an attachment is on the
18 very last page.  Do you see that?  It's a letter from
19 Daniel Valerio to Linda Panke at the Redbook update?
20     A.  Yes.
21     Q.  And it's dated August 14, 2000?
22     A.  Yes.
23     Q.  And I would refer you to the middle paragraph
24 or it begins with "The enclosed list of products."  Do
25 you see that?

Page 899

1      A.  Yes.
2      Q.  And for the record, I'm going to read that.
3  "The enclosed list of products are currently not
4  listed and we would appreciate it if you would arrange
5  to include them in future issues of Redbook UPDATE.
6  This is very important to us because many of our
7  generic competitors are listed and we have been
8  getting questions as to why these Warrick products are
9  not included.  It is costing us business."
10         Did I read that correctly?
11     A.  Yes.
12     Q.  And as you were copied with this letter, did
13 you have any input into the drafting of this letter?
14     A.  No.  Was this letter attached to the document
15 or were they all together?
16     Q.  That's my understanding.  That's how they
17 were produced.
18     A.  Okay.
19     Q.  And the subject of the cover page is the
20 Redbook omissions letter.  Do you have any reason to
21 believe that that letter is not part of this e-mail?
22         MR. MOORE:  Object to form.
23     A.  That was an e-mail or was it a letter?
24     Q.  (BY MR. McNEELY)  It looks like --
25     A.  An e-mail?

23 (Pages 896 to 899)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911  -  HOUSTON (713) 572-8897  -  SAN ANTONIO (210) 222-9161

Page 900

1    Q.  It looks like an e-mail to me.
2    A.  Okay.
3         MR. MOORE:  I object to the form of the
4  question.  He can answer, I just object to it.
5         THE WITNESS:  Okay.
6    Q.  (BY MR. McNEELY)  Do you -- did you -- do you
7  recall this letter to begin with?
8    A.  I don't recall it specifically.
9    Q.  Okay.  Can you explain to me what -- the
10 language that the omissions of the Warrick products
11 was "costing us business"?
12        MR. MOORE:  Objection as to form with
13 respect to this particular document.
14   A.  For those -- I would expect that for those
15 products that were not listed and for those
16 organizations that utilized Redbook as the means of
17 getting reimbursed for products, since it wasn't
18 listed, it wasn't reimbursable or it made great
19 difficulties for them.
20        If I might append that, also.
21   Q.  (BY MR. McNEELY)  Yes, sir.
22   A.  What's listed, also, are the -- are the
23 ratings for the product.  And if a product wasn't
24 rated equivalent to another product, then the drug
25 store would not use it or the -- or the dispensing

Page 901

1  pharmacy would not use it.  They had to make sure that
2  it was substitutable.  So the rating was with that,
3  also.
4    Q.  Thank you.  Now, I'm going to shift a little
5  bit in the time frame and I would like to ask some
6  questions regarding the genesis or the creation of
7  Warrick as -- as an entity -- entity within the
8  Schering-Plough organization.  And with regard to
9  developing any generic strategies for the creation of
10 Warrick, were you involved in any of the early
11 meetings regarding generic strategies?
12   A.  I was involved in some meetings.
13   Q.  And in any of those meetings or during that
14 time period before Schering created Warrick, were you
15 provided with various reports, strategy papers
16 regarding the creation of a generic strategy and the
17 creation of Warrick?
18   A.  I may have been provided with them.  I would
19 have to see them, see whether I was copied on them or
20 not.
21   Q.  Yes, sir.
22        (Exhibit 96 marked)
23   Q.  (BY MR. McNEELY)  Would you briefly review,
24 or take as long as you need, what -- the exhibit that
25 has been marked as Exhibit 96.  Tell me if you can

Page 902

1  identify that document.
2    A.  The document is a Schering Laboratories
3  generic strategy.
4    Q.  And is that a strategy paper that you have
5  seen before?
6    A.  I don't recall seeing it.  When was it
7  issued, do you know?
8    Q.  I don't know.  Do you -- do you recognize the
9  document and can you place it in a time frame?
10   A.  No.  That's why I'm asking.  I don't know.  I
11 don't recall it.
12   Q.  Do you recall seeing this document before?
13   A.  I don't recall it.
14        MR. McNEELY:  Can we go off the record
15 just -- just briefly?  I need to --
16        MR. MOORE:  Certainly.
17        THE VIDEOGRAPHER:  Stand by.
18        MR. McNEELY:  -- find a document.
19        MR. MOORE:  Certainly.
20        THE VIDEOGRAPHER:  The time is 11:02
21 a.m.  We are off the record.  This concludes Tape 14.
22        (Recess from 11:02 to 11:15)
23        THE VIDEOGRAPHER:  Stand by.  The time
24 is 11:15 a.m.  We are back on the record.  This is the
25 beginning of Tape 15.

Page 903

1    Q.  (BY MR. McNEELY)  Mr. Weintraub, before we
2  took a -- just a short break so I could find what was
3  sitting on the floor right beside me, we were talking
4  about the Exhibit 96, which is the Schering
5  Laboratories generic strategy.
6    A.  Right.
7    Q.  There is apparently no date on this
8  particular document, but it was produced by Warrick in
9  the course of the discovery and there was several
10 references that would perhaps date it, but I would
11 like to cover some of the content with you.
12   A.  If I could help you.  I noticed before I left
13 that there was one chart from -- it says 1992 to 1996,
14 so it has to be subsequent to that.  Figure 3, on Page
15 3, says 1992 to 1996.  So it came after 1996, I guess.
16   Q.  Well, would you take -- what page was that?
17   A.  I just happened to look at Page 3.  As a
18 matter of interest, while I was looking, I thought
19 Page 54 was interesting.  It says, "Since we do not
20 have personnel with this experience in Schering at the
21 moment, we will have to recruit from the outside."  So
22 I guess I didn't come from the outside.
23   Q.  Okay.  Well, I believe Page 3 may be
24 projections or anticipated impacts from --
25   A.  Oh, that's right.

24 (Pages 900 to 903)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 904

1    Q.  -- losing patent protection.
2    A.  Yeah, that's right. But --
3        MR. MOORE: Mr. Warrick -- I mean,
4   Mr. Weintraub, thank you for your assistance here.
5   Let Mr. McNeely ask --
6        THE WITNESS:  Sure.
7        MR. MOORE:  -- you questions and you
8   answer.
9        THE WITNESS:  Okay.
10   Q.  (BY MR. McNEELY) Let's go through this --
11  this Schering Laboratories generic strategy and see if
12  you have any understandings or comments relative to
13  its content.  And I would refer you to it.  It is
14  Bates number - and I'm going to be using the far
15  bottom right set of Bates numbers - ending with 5995.
16  It's about the third page in the -- in the exhibit.
17  5995.  And are you on that -- that page,
18  Mr. Weintraub?
19   A.  Yes.
20   Q.  And do you see there's a heading that says
21  "Recommendation"?
22   A.  Yes.
23   Q.  I'm going to read into the record that
24  paragraph and then the three bullet points, if you'll
25  follow me.  "To successfully protect against the

Page 905

1   inevitable sales and share erosion of our branded
2   products and to leverage up our branded products in
3   the Managed Care environment, it is recommended that
4   Schering Laboratories establish a position in the
5   generic marketplace.  The strategy necessary to
6   achieve entry focuses on the following objectives:
7            "Protect and extend the life cycle of
8   our branded products as patents expire.
9            "Seek to create" -- "create leverage for
10  our Managed Care business with value added generics.
11           "Provide Schering with an effective
12  defensive position to protect our multi-source
13  portfolio from generic and therapeutic substitution."
14           Did I read that correctly,
15  Mr. Weintraub?
16   A.  Yes, you did.
17   Q.  Is that not, in fact, the -- the strategy and
18  the goals or objectives of that -- of Schering
19  relative to the creation of Warrick?
20       MR. MOORE:  Objection to form.  No
21  foundation with respect to this document.
22   A.  That's what's expressed here.  I only know
23  that as far as I was concerned my strategy was as
24  mandated by Mr. Cesan, get up and running so that when
25  the Proventil inhaler comes into place where it says

Page 906

1   generic competition we are able to recoup the monies
2   lost as a result of that.
3    Q.  (BY MR. McNEELY)  I would next refer you
4   to -- it's -- again, this is, I believe, an executive
5   summary and it doesn't have the pages, but the Bates
6   number ends with 5996.
7    A.  Yes.
8    Q.  And there is a paragraph heading, it says,
9   "Protect and extend the life cycle of our branded
10  products."  Do you see that?
11   A.  Yes.
12   Q.  And in the middle of that paragraph there is
13  a sentence that begins, "By introducing lower-priced
14  private label (generic)."  Do you see that?
15   A.  Yes.
16   Q.  I'm going to read into the record and if you
17  would follow with me, please.  "By introducing
18  lower-priced private label (generic) versions of our
19  own branded products, such as Proventil Inhaler, we
20  will successfully be able to extend their life cycle
21  and profit stream beyond the point with which we are
22  normally familiar."
23   A.  Correct.
24   Q.  I read that correctly?
25   A.  Yes.

Page 907

1    Q.  And is that not, in fact, the -- the goal of
2   Warrick as you expressed it a moment ago?
3        MR. MOORE:  Same objection.
4    A.  Yes.  We will recoup the dollars lost that
5   otherwise would have gone entirely to generic
6   competition.  We would have accumulated some of those
7   dollars for our own product.
8    Q.  (BY MR. McNEELY)  And in that same paragraph
9   two sentences from -- from where I've left off, do you
10  see the language "By having our own private label"?
11   A.  Yes.
12   Q.  I'm going to read that sentence for the
13  record, if you would follow with me.  "By having our
14  own private label versions we will also be able to
15  maintain, if not increase, prices on the branded
16  versions."  Did I read that correctly?
17   A.  Yes, you did.
18   Q.  And is that not, in fact, a goal, in fact,
19  that occurred with the creation by Schering of
20  Warrick?
21       MR. MOORE:  Same objections.
22   A.  That was not a goal, to my understanding.
23  All I know is that the brand prices, regardless of
24  whether there is generic competition or not, tend to
25  rise.  I don't know who wrote this or where they got

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911   -   HOUSTON (713) 572-8897   -   SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 908

1  the information from, but the fact that Warrick
2  existed had nothing to do with any increases or
3  decreases on the price of the brand.  We were not
4  involved in that in any way.
5      Q.  (BY MR. McNEELY)  Also I would like to -- the
6  last sentence on that page, which ends in 5996,
7  continuing to the next page, I would like to also read
8  into the record that language.  Would you follow along
9  with me?
10     A.  Yes.
11     Q.  "In addition, we could further enhance the
12  profits of branded products in the near term by using
13  the Warrick entity as a vehicle to minimize certain
14  rebates.  Specifically under current Medicaid
15  legislation, by establishing separate NDC codes for
16  the same product, i.e., one for Schering and one for
17  Warrick, we believe they would be treated as distinct
18  products for filing purposes.  Thus, we could move
19  deep discounted business for products with minimal
20  full price spillover into Warrick and not be forced to
21  provide large 'best price' rebates in the retail
22  Medicaid market."
23         Did I read that correctly?
24     A.  Yes, you did.
25     Q.  Is that not, in fact, what has occurred in

Page 909

1  the past with the creation of Warrick by the Schering
2  company?
3         MR. MOORE:  Same objections.
4      A.  I don't know how best price affected the
5  Proventil brand.  I did not do any of those
6  calculations.  I was not involved with them.
7      Q.  (BY MR. McNEELY)  Mr. Warrick -- I mean,
8  excuse me.  That probably is correct.  But,
9  Mr. Weintraub, I apologize.  I'll try to get it right.
10     A.  Don't apologize.
11         MR. MOORE:  I did it first, so ...
12     A.  The Warrick name is a pretty -- a name with a
13  lot of integrity, so I'll take it.
14     Q.  (BY MR. McNEELY)  There was -- there's
15  already been some testimony concerning the integration
16  of Warrick into Schering managed care; is that
17  correct?
18     A.  That is correct.
19     Q.  And in connection with -- and you had some --
20  some connection and -- and -- and work with the shared
21  managed care relative to that integration of the
22  Warrick products into their sales; is that not
23  correct?
24     A.  That really never came to pass in terms of
25  full integration.  Warrick products were sold by

Page 910

1  managed care.  We never got involved in the process to
2  any degree, any great degree.  I certainly never did.
3  Our contact with managed care was essentially that of
4  having to follow up on state issues, such as are we
5  listed on the formulary, and so on.
6         So the integration -- as a matter of
7  fact, years later we were still trying to get
8  so-called integrated, but we never really did.
9         (Exhibit 97 marked)
10     Q.  (BY MR. McNEELY)  Mr. Weintraub, you've been
11  handed a document which has been marked as Exhibit 97.
12  If you would, just take a moment to review it and
13  then, if you can, identify it for the record.
14     A.  (Witness reviewing document).  It's a
15  document that I wrote to Mr. Zahn in August of 1993 on
16  the status of where Warrick was at the time in terms
17  of being established and functioning.
18     Q.  Now, there's a -- on the first page, the
19  third bullet point, there is a paragraph which states
20  as follows:  "Clarification of independence of Warrick
21  activity/pricing vis-a-vis PROVENTIL brand was
22  obtained.  This is still a matter of concern to Brand
23  Management and to Trade Sales."
24         What clarification of independence was
25  needed relative to your comments on Bullet Point

Page 911

1  Number 3?
2      A.  I think I testified to the fact that I was
3  regarded as the enemy at one point by the -- not by my
4  management, but by the brand people.  The brand people
5  were very much concerned that I was going to
6  cannibalize their product.  And, indeed, I did and I
7  wanted to be absolutely sure that Mr. Zahn understood
8  that I was going to price my product to get the
9  business without regard to the brand.  And that was
10  the clarification.  And he had to tell his brand
11  people, who did not report to me, that that was going
12  to be the case.
13     Q.  The -- that -- your stated objective of
14  competing against the brand, was that -- wasn't that
15  outside your instructions relative to the object and
16  purpose of the creation of Warrick in the first place?
17     A.  No.  The object and purpose, I think I've
18  stated, was to recoup the dollars lost as a result of
19  the product getting generic competition, that is, the
20  Proventil brand.  In order to do that I had to be
21  competitive in the marketplace to get business for the
22  Warrick product.  The brand business was going to
23  disappear.  I don't think the brand people understood
24  that.  They regarded me as the competition and not
25  necessarily the other competition the competition.

Page 912

1     Q.  I would like to refer you to the second page
2  of Exhibit 97, and refer you under "Comments" to which
3  is numbered 5.  Do you see that?
4     A.  Yes.
5     Q.  And I'm going to read it for the record as
6  follows: "A Managed Care strategy and implementation
7  plan should be developed as soon as possible.  This
8  should include a bidding strategy for state
9  institutions."
10        Did I read that correctly?
11     A.  Yes, you did.
12     Q.  And in this document you were advocating the
13  managed care strategy; is that correct?
14     A.  I was advocating a managed care strategy.
15     Q.  And a managed care strategy would have
16  necessarily involved working with the brand side of
17  the Schering Corporation; is that correct?
18     A.  It would have -- it would have -- I consider
19  that a managed care strategy to sell Warrick product
20  because I certainly couldn't do it on my own in the
21  managed care arena.
22     Q.  Did Warrick Pharmaceuticals, during the time
23  that you were a consultant, use bundling and nominal
24  pricing to sell packages to customers, physician
25  groups or any of your classes of trades?

Page 913

1     A.  I was not involved in any nominal pricing.  I
2  think you've shown me documents where that may have
3  occurred, I think, but I was not involved in any.
4        Bundling, would you define "bundling"
5  for me?
6     Q.  Is "bundling" not a term of marketing that
7  you're familiar with?
8     A.  It has different meanings to different
9  people.  "Bundling" means that you can -- that you
10  must buy one product to get another, so you bundle
11  them together.  We never had that situation, the terms
12  that you must buy in order to get another product.
13        (Exhibit 98 marked)
14     Q.  (BY MR. McNEELY)  And you've been handed a
15  document that has been marked Exhibit 98 and -- but
16  I'm going to ask you if you will keep the -- the other
17  exhibit in front of you --
18     A.  Sure.
19     Q.  -- because I'll be asking questions on that a
20  little bit further.
21        Can you identify what Exhibit 98 is?
22     A.  It's an offer of products contractual to the
23  Fallon Clinic in Worcester, Massachusetts.
24     Q.  And, also, there is a -- a separate -- it's
25  not part of that letter contract, I will represent to

Page 914

1  you, the very last page of this exhibit.  Can you
2  identify that?
3     A.  That is a page from Patty Burke to Kathy
4  Flynn and it has to do with changing a price.
5     Q.  Okay.  Now, was going back to the -- to the
6  letter dated February 2nd, 1995, which is part of
7  Exhibit 98.
8        MR. McNEELY:  And for the benefit of the
9  record it's Bates labeled WAR0043141.  And that
10  exhibit -- that letter part of this exhibit goes
11  through WAR0043148.  And the e-mail from Miss Flynn is
12  a one-page e-mail chain from -- and its Bates range is
13  WAR0043124.
14     Q.  (BY MR. McNEELY)  Now, getting back to the
15  letter, and it's on Warrick letterhead; is that
16  correct?
17     A.  Yes, it is.
18     Q.  And are you familiar with the Fallon Clinic
19  Pharmacy in Worcester, Massachusetts?
20     A.  I'm familiar with it.
21     Q.  You recognize them as a customer of Warrick
22  Pharmaceuticals?
23     A.  I recognize them as a customer of Warrick
24  Pharmaceuticals.  We did not, to my memory, sell them
25  directly.  We did not as Warrick contract with them.

Page 915

1  I believe this was done by managed care.
2     Q.  Okay.  And on the second -- at least on the
3  second page of this exhibit there is a list of three
4  Warrick products and their NDCs.  Do you see that?
5     A.  Yes, I do.
6     Q.  And those are all albuterol products?
7     A.  Yes, they are.
8     Q.  And -- and under the "Price," do you see
9  that?
10     A.  Yes.
11     Q.  Would 30 cents on these three products be
12  considered nominal pricing?
13     A.  I believe that it would.  I would have to
14  take a look at the price in effect at that time.
15     Q.  Have you yourself ever set up a contract or
16  agreement using nominal pricing?
17     A.  Absolutely not.
18     Q.  Have you ever participated in any Warrick or
19  Schering group to develop any nominal pricing
20  strategies?
21     A.  Not me.
22     Q.  And relative to the -- to the last page of
23  the e-mail from Ms. Flynn, can you -- from reading
24  that e-mail, that chain, where they apparently have
25  dropped the price in the contract down to eight cents

27 (Pages 912 to 915)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 916

1  for those products, can you -- do you have any
2  understanding of what they were doing?
3            MR. MOORE:  Object --
4    A.  I do not.
5            MR. MOORE:  Excuse me.  Excuse me.
6  Objection, form.  No foundation.  Go ahead.
7    A.  I do not.  I have never seen the document.
8  I'm not copied on the document.  I really can't
9  comment on the intent of the document.
10           (Exhibit 99 marked)
11   Q.  (BY MR. McNEELY)  Okay.  You should have been
12  handed just one document.  There may have been two.
13  Do you have just one document before you dated October
14  15th, 1992?
15   A.  Yes, I do.
16   Q.  And that's been marked as Exhibit 99?
17   A.  Yes.
18   Q.  And if you would, please, could you review
19  that and identify that document?
20   A.  It's a document entitled "Nominal Pricing
21  Meeting," an executive summary of that meeting.
22   Q.  Okay.  Are you familiar with this document?
23  Have you seen it before?
24   A.  I don't recall seeing it.
25   Q.  Who is Carolyn -- is it Kocis?

Page 917

1    A.  Kocis.
2    Q.  Kocis.
3    A.  Carolyn Kocis.
4    Q.  Kocis.
5    A.  My mispronunciation.  I'm sorry.
6    Q.  Who is she?
7    A.  She is a person who works in the managed care
8  arena.
9    Q.  Is she also -- the managed care arena.  Is
10  she also associated with ITG?
11   A.  ITG was established after I left Schering, I
12  believe.  The integrated therapeutics group.  I'm not
13  really familiar with that group.
14   Q.  Okay.  And the distribution list for this
15  report I believe is on the second page, but I'm not --
16  I'm not certain of that, what the distribution list
17  is.  Do you see a distribution list on here?  No
18  matter.
19           Let's go -- let's start on the first
20  page.  Do you remember attending a nominal pricing
21  meeting on October the 15th?
22   A.  I don't recall doing it, no.
23   Q.  Okay.  Let's look at the second paragraph on
24  the first page.  And I'm going to read for the record.
25  "Mr. Weintraub has made arrangements for discussion of

Page 918

1  the Nominal Pricing Strategy to be added to
2  Mr. Cesan's staff meeting agenda.  This meeting will
3  be held on Thursday, October 22.  Mr. Cesan has
4  requested that the executive summary be sent to him in
5  France early next week so that he can prepare for the
6  meeting."
7            Did I read that correctly?
8    A.  You did.
9    Q.  Having read that, does that refresh your
10  memory concerning this meeting?
11   A.  Not the meeting.  You have to recognize, when
12  I made arrangements for discussion of the nominal
13  pricing strategy to be added to Mr. Cesan's staff
14  meeting, it was not in the context of nominal pricing
15  procedure.  I ran Mr. Cesan's staff meetings and
16  settled the agenda for him.  So this was -- when they
17  said -- they said I have made arrangements, it was in
18  my duties with respect to running Mr. Cesan's staff
19  meeting.
20   Q.  Thank you.  Let's -- now I'm referring --
21   A.  And that's how it got added and that's why my
22  name is in that spot.  I did that for several months
23  before I retired.
24   Q.  And let's go to the second page, which has a
25  Bates range SP 000940.

Page 919

1    A.  Yes.
2    Q.  Okay.  I'm going to read -- well, there's a
3  title, "Executive Summary Nominal Pricing Strategy."
4  Do you see that?
5    A.  Yes.
6    Q.  And I'll read the first paragraph for the
7  record.  "A meeting was held on Thursday, October 15
8  to discuss the implementation of the nominal pricing
9  strategy.  Present were W. Anderson, R. Baldini, R.
10  Bucko, E. Desimone, F. Foil, C. Kocis, P. Morgan, F.
11  Musat, R. Russo, P. Verstraete, E. Watson, H.
12  Weintraub and D. White.
13            "The meeting first focused on risks
14  associated with implementation of the strategy.  After
15  assessing the risks, the focus of the meeting moved to
16  how to implement the strategy if approved."
17            Did I read that correctly?  That's --
18   A.  You did.
19   Q.  -- that's two paragraphs.
20   A.  You did.
21   Q.  Who was W. Anderson?
22   A.  Wayne Anderson, if memory serves me
23  correctly, at that time was the vice-president in
24  charge of the oncology unit, I believe.
25   Q.  And R. Baldini?

28 (Pages 916 to 919)

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 920

1    A.  He was president of Key Pharmaceuticals.
2    Q.  R. Bucko?
3    A.  R. Bucko was vice-president of finance.
4    Q.  And E. Desimone?
5    A.  Was senior vice-president of finance.
6    Q.  F. Foil?
7    A.  F. Foil was vice-president for the Key field
8  force.
9    Q.  And C. Kocis we've identified already; is
10  that correct?
11    A.  That's correct.
12    Q.  Who is H. Weintraub?
13    A.  That was me.
14    Q.  And D. White?
15    A.  Dennis White was my managed care -- I can't
16  recall if he was director or vice-president at that
17  time.
18    Q.  Okay.  So having -- having read the
19  attendance list, does it refresh your memory that you
20  did, in fact, attend the nominal pricing strategy
21  meeting on October 15th?
22    A.  It says I was there.  I don't recall it.  I
23  really don't recall it.
24    Q.  Next -- regarding the next paragraph, the
25  "Implementation Strategy."  Do you see that?

Page 921

1    A.  Yes.
2    Q.  It's still on the same page.
3    A.  Yes.  Oh, yes, yes.  Yes.
4    Q.  I'm sorry.  And what are the three drugs that
5  appear to be addressed for this nominal pricing
6  strategy?
7    A.  Proventil inhaler, Vanceril and Proventil
8  Repetabs.
9    Q.  And on the next page I believe they have one
10  more.
11    A.  K-Dur.
12    Q.  And I would like to now refer you back to the
13  final page, which is SP 000949.  And do you see the
14  headings "Implementation," "Next Steps," and "Follow
15  Ups"?
16    A.  Correct.
17    Q.  And under "Next Steps" there are three bullet
18  points.  Do you see that?
19    A.  Yes.
20    Q.  The last two of those three bullet points
21  read as follows:  "Harvey Weintraub to arrange a
22  meeting with principals from Managed Care, Finance,
23  and Marketing and Mr. Cesan in order to gain his
24  approval of strategy.  Timing: ASAP following
25  Executive Summary approval."

Page 922

1    A.  Correct.
2    Q.  "Providing Mr. Cesan approves the strategy
3  and feels that corporate approval is needed, Harvey
4  Weintraub will coordinate required approvals."
5    A.  Correct.
6    Q.  Does that help you remember or refresh your
7  memory relative to participating in the nominal
8  pricing strategy?
9    A.  I don't remember participating in the
10  strategy or that meeting.  I do remember putting it on
11  Mr. Cesan's sales staff -- or sales meeting.  I can't
12  remember if I had the participants, the managed care
13  finance and marketing people all in there at that
14  time.  I would believe that the notes from his staff
15  meeting would reflect that.  I don't know.  I don't
16  know that I ever coordinated required approvals for
17  that.  I tend very much to doubt it.  If it was
18  approved.  I don't even know if it was approved.
19    Q.  Well, apparently some type of strategy
20  relative to nominal pricing was -- was put in place
21  with both Schering and Warrick; is that not correct?
22        MR. MOORE:  Objection, form.
23    A.  I do not know of any nominal pricing strategy
24  for Warrick.  I was not involved in it.
25    Q.  (BY MR. McNEELY)  I would -- turn your

Page 923

1  attention to -- it's SP 000944.  I guess that's about
2  the fifth page of that exhibit.
3    A.  I have it.
4    Q.  And I would refer you to the upper -- well,
5  that part of the paragraph that's on the top of that
6  page.  Let me -- now, tell you what.  Let me start on
7  the previous page.  Under the heading of "Current
8  Competitive/Legislative Environment."  And -- but it's
9  at the very bottom of the page.  It starts, "As an
10  alternative strategy."  Do you see that?
11    A.  Yes, I do.
12    Q.  I'm going to read that paragraph into the
13  record.  If you would follow with me.  "As an
14  alternative strategy, Glaxo they may choose to hold
15  prices and lose a portion of their contract business
16  in order to receive positive political press.  They
17  may then work with the state to reinstate the state's
18  right to implement a formulary.  They could try to
19  gain exclusive formulary status by illustrating how
20  much cheaper to Medicaid their product is than ours
21  due to their much higher rebates.  This would" be
22  effective -- "This would effectively shut us out of
23  Medicaid with the" product "we compete on.  Frank
24  Musat indicated that" he "had tried this tactic in
25  Illinois on the Proventil Solution generics and the

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911  -  HOUSTON (713) 572-8897  -  SAN ANTONIO (210) 222-9161

Page 924

1  State was not interested in the regalement."
2      Did I read that correctly?
3      A.  Yes, you did.
4      Q.  At that time what generics -- and this would
5  be October the 15th, 1992, what generics would Frank
6  Musat have to try the tactic in Illinois?
7          MR. MOORE:  Objection to form of --
8      Q.  (BY MR. McNEELY)  If you know.
9          MR. MOORE:  Objection to form as it
10  relates to this document.
11      A.  I don't know what he had.  The only
12  possible -- he says "Proventil Solution generics," so
13  there may have been a generic -- there may have been a
14  Warrick generic at that time.  I don't know.
15      Q.  (BY MR. McNEELY)  Well, you worked with Frank
16  Musat at that time; is that correct?
17      A.  By "worked with him," I worked with him in
18  '93.  I had worked with him over the years in various
19  functions.  But with respect to the generics, he was
20  working with the third-party operation with -- with
21  respect to the generics and I was not involved in
22  that.  I was out gathering information.  I think I've
23  indicated I did not establish the Proventil -- the
24  Warrick albuterol generics.  They were there when I
25  got there.

Page 925

1      Q.  Okay.  Let me refer you to that same page,
2  third bullet point under "Risks Associated With
3  Strategy."  Do you see that?
4      A.  Yes, I do.
5      Q.  I'm going to read into the record.  Would you
6  please follow me.  "Negative government attention:
7  Schering Plough could be singled out for trying to
8  avoid Medicaid rebates.  This could entail negative
9  press or being subpoenaed by Congress to give
10  testimony on our actions.  It was also noted that the
11  rate of our list price increase could further focus
12  government attention on us.  The group present at the
13  meeting did not feel that they could make a decision
14  on this risk factor.  It was felt that Corporate
15  management must be" -- "must be the final determinant
16  on whether this is an acceptable risk."
17          Did I read that correctly?
18      A.  Yes, you did.
19      Q.  Having read that, do you remember meeting
20  with this group on October the 15 to discuss the risk
21  factors involved with the strategy they were proposing
22  on nominal pricing?
23      A.  No, I do not.
24      Q.  Are you -- strike that.
25          What -- do you recall what your position

Page 926

1  on -- was on relative to nominal pricing?
2      A.  I had no position on nominal pricing.  I
3  wasn't involved in it.
4      Q.  I understand your answer, but is it not
5  correct that on many contracts with managed care
6  Warrick products were bundled with Schering products
7  and nominal pricing was provided?
8          MR. MOORE:  Objection, form.
9      A.  I did not see those contracts, so I can't
10  comment with any kind of assurance on whether there
11  were many of them, any of them, or whatever they were.
12  I did not have access to those contracts.  I was not
13  involved in negotiating them, I did not see them once
14  they got negotiated.
15      Q.  (BY MR. McNEELY)  Now, in reference to
16  Exhibit 98, that is a Warrick contract, is it not?
17  And it's in reference to the Fallon physician group.
18      A.  It's on Warrick stationery.  How the contract
19  was written, yes, I guess it probably is a Warrick
20  contract.
21      Q.  And that includes nominal pricing; is that
22  correct?
23          MR. MOORE:  Objection, form.
24      A.  I would have to -- it would appear to be, but
25  I would have to take a look at the pricing at that

Page 927

1  time to see if it was nominal pricing.  I don't -- I
2  think I've testified I can't recall individual prices
3  on a given day for a given product.  So I would have
4  to take a look at the price and then take a look at
5  this particular price and see if it met the definition
6  of nominal pricing.
7      Q.  (BY MR. McNEELY)  And what -- for the -- for
8  the benefit of the Court and jury, what is the
9  criteria for nominal -- being characterized or
10  classified as nominal pricing?
11          MR. MOORE:  Objection, form.
12      A.  My understanding is that nominal pricing is a
13  price 10 percent below your actual price.
14      Q.  (BY MR. McNEELY)  Did anyone --
15      A.  10 percent or below.
16      Q.  Okay.  Thank you.  Did anyone from Warrick as
17  part of a protocol between Schering, managed care, and
18  Warrick products pricing, was any person required to
19  be consulted with using Warrick products and nominal
20  pricing on those products in Schering managed care
21  contracts?
22          MR. MOORE:  Objection, form.
23      A.  As I understand your question, was Warrick
24  involved in nominal pricing for contracts?
25      Q.  (BY MR. McNEELY)  Was it -- was it a

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911   -   HOUSTON (713) 572-8897   -   SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 928

1  requirement or was it a -- in order for Warrick
2  products to be used in nominal pricing or bundled
3  managed care contracts, did anybody at Warrick have to
4  be consulted?
5        MR. MOORE: Objection, form.
6     A.  Not that I'm aware. I certainly wasn't or
7  anybody at my level or below was not consulted, to my
8  knowledge.
9        MR. MOORE: On the phone, we're having
10 some -- having a little noise factor on the phone
11 here, if someone could hit their mute.
12       MR. McNEELY: Is anybody on the phone?
13       MR. MOORE: Do we have anybody on the
14 phone?
15       MS. WILLIS: Yes.
16       MR. RODA: Joe Roda here.
17       MR. MOORE: Okay.
18       MR. RODA: We're still here.
19       MR. MOORE: Okay. Okay. It's stopped.
20       MR. ANDERSON: James Carroll and Jarrett
21 Anderson are here.
22       MR. MOORE: Okay. It sounded like
23 somebody was choking Jarrett or something. I'm not
24 sure.
25    Q.  (BY MR. McNEELY) Back to the exhibit

Page 929

1  relative to nominal pricing meeting.
2     A.  Yes.
3     Q.  I'll refer you to the page SP 000943. And
4  under -- again, under "Current Competitive/Legislative
5  Environment."
6     A.  Yes.
7     Q.  The first two bullet points under that
8  heading. I'm going to read the first one and -- for
9  the record. "Legislation was recently passed which
10 requires pharmaceutical companies to sell to Public
11 Health Services and disproportionate share hospital at
12 a price which equals that paid by Medicaid. This same
13 legislation exempts the Federal Supply Schedule and
14 other federal purchasers from best price
15 consideration. It also increased the minimum Medicaid
16 rebate from 15 percent to 15.7 percent. The estimated
17 impact to Schering is $15 million."
18       Did I read that correctly?
19    A.  You did.
20    Q.  And do you recall those changes in
21 legislations and the estimated impact of Schering as
22 represented in that paragraph?
23    A.  No.
24       MR. MOORE: Objection, form as to this
25 document.

Page 930

1     A.  No. I did not get involved in that.
2     Q.  (BY MR. McNEELY) And with regard to the
3  second bullet point, and I'll read that into the
4  record as well. "Congress concluded their session
5  without making any additional changes to the Medicaid
6  rebate legislation. There was no move to a flat rate
7  rebate, and no retroactive pricing. It currently
8  appears that congress is comfortable with the Best
9  Price legislation. However, this does not mean they
10 cannot change the legislation at some future date.
11 With the Presidential election pending, it is likely
12 that any future action would be at least 9 to 12
13 months in the future. This leaves an opening for us
14 to achieve savings in 1993. It was also noted that
15 1993 is a very challenging year for Schering and these
16 savings would be very welcome."
17       Having -- did I read that correctly,
18 Mr. Weintraub?
19    A.  Yes.
20    Q.  Can you tell me why 1993 was a very
21 challenging year for Schering and they were looking
22 to -- to come up with strategies to avoid rebate
23 payments?
24       MR. MOORE: Objection, form. No
25 foundation as to this document.

Page 931

1     A.  I cannot recall when 1993 would be any more
2  challenging than any other year. I can't recall that.
3     Q.  (BY MR. McNEELY) Would you agree that the
4  content --
5     A.  I was out of the sales operation at that
6  time, so I didn't have direct involvement in the sales
7  issues.
8     Q.  Okay. I'm sorry for interrupting you. Thank
9  you for your comments.
10       Now, with regard to this meeting in 1992
11 and what is being suggested or proposed in this --
12 this meeting as a -- the nominal pricing strategy and
13 the risks that are described, would you not agree that
14 this -- this would present potential large problems
15 for Schering and Warrick if they participate in this
16 type of strategy?
17       MR. MOORE: Objection to form. No
18 foundation.
19    A.  I don't know. I really don't know. I have
20 never given nominal pricing any thought. I -- until
21 this came up here at the moment. I haven't seen this
22 document. I don't know that I attended this meeting,
23 any or all of it -- or any part of it. I don't know
24 since there's no distribution list as to whether the
25 attendees' listing here has been -- meant for

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 932

1 distribution as well as attendees. I just don't know
2 that.
3    Q.  (BY MR. McNEELY) Would you not agree,
4 Mr. Weintraub, that the strategy that is proposed in
5 this memorandum and this meeting is basically a
6 formula for conspiracy to commit fraud in the Medicaid
7 arena?
8        MR. MOORE: Objection to the form of
9 that question. It's calling -- asking the witness for
10 a legal conclusion. There's no foundation as to this
11 document. Objection, form.
12    A.  Prior to counsel's interjection there, I was
13 going to say I have no knowledge as to whether this
14 would be legal or not legal.
15    Q.  (BY MR. McNEELY) And if I -- if you've
16 testified towards this, forgive me for being
17 repetitive, but do you recall what the outcome of the
18 meeting with Mr. Cesan was relative to approving and
19 implementing the nominal pricing strategy?
20    A.  I do not know.
21        MR. MOORE: Objection, form.
22        (Exhibit 100 marked)
23    Q.  (BY MR. McNEELY) Mr. Weintraub, you've been
24 handed a three-page document that has been marked as
25 Exhibit 100. We've reached the century mark. It's

Page 933

1 dated January 4th, 1993. I'm going to ask you to
2 review that and tell me if you can identify it,
3 please.
4    A.  It's a memorandum from Gene Desimone and Rich
5 Zahn to Raul Cesan on strategic issues. And the
6 issues are with respect to generic strategy and
7 managed care trends and legislative issues.
8    Q.  Do you recall ever receiving this particular
9 document concerning the generic strategy?
10    A.  I do not.
11    Q.  On the third page or last page of this
12 exhibit there is, in fact, a four-paragraph
13 description of what is entitled "Generic Strategy."
14 Do you see that?
15    A.  Yes, I do. Yes, I do.
16    Q.  And there is a -- there are three short lists
17 of what that strategy is. Do you see that?
18        MR. MOORE: Objection, form.
19    A.  I think it's a list of how a generic strategy
20 can achieve the following. It didn't say that it is
21 the strategy.
22    Q.  (BY MR. McNEELY) Well, let's -- let's take
23 that -- that first list and above it the paragraph
24 says, "A thorough analysis and strategic position will
25 be developed to determine how a generic strategy can

Page 934

1 achieve the following."
2    A.  "Can achieve."
3    Q.  "Can achieve." And there's five factors.
4        "1. extend life cycles
5        "2. protect prices
6        "3. minimize rebates
7        "4. support managed care
8 competitiveness
9        "5. better position Schering for the
10 next decade"
11        Did I read that properly?
12    A.  Yes, you did.
13    Q.  Now, is that not, in fact, your understanding
14 of what the strategy behind the formation of Warrick
15 was at the time you got involved with Warrick
16 Pharmaceuticals?
17        MR. MOORE: Objection -- excuse me,
18 Mr. Weintraub.
19        Object to the form of the question. No
20 foundation as to this document, asked and answered,
21 repetitive.
22    A.  Mr. Cesan never outlined a generic strategy
23 for me. He just told me to get the operation up and
24 running for the day that Proventil inhaler obtained
25 generic competition. That's the way I looked at it

Page 935

1 and that's what I did.
2    Q.  (BY MR. McNEELY) I understand that.
3    A.  I don't know that -- I did not see these
4 strategies or did I operate with respect to these
5 necessarily.
6        (Exhibit 101 marked)
7    Q.  (BY MR. McNEELY) Mr. Weintraub, you've been
8 handed a document that has been marked as Exhibit 101.
9 And it begins with Bates range WAR0001434 and ending
10 Bates ranges WAR0001441. If you would, please review
11 that and identify it for the record.
12    A.  It's a document from Mark Calabrese, Carolyn
13 Kocis and Kevin Cavanagh to Managed Care Directors --
14 Directors and MCAMs on Proventil inhaler/albuterol
15 generic managed care action plan.
16    Q.  And do you recall receiving a copy of this
17 document?
18    A.  No. I am not on the copy list.
19    Q.  Ray Kapur appears to be a recipient of this
20 or at least there is a transmittal note; is that
21 correct?
22    A.  That's correct.
23        MR. MOORE: Could someone on the phone
24 mute their -- hit their mute, please? We are getting
25 feedback on this end.

32 (Pages 932 to 935)

Page 936

1    Q.  (BY MR. McNEELY)  And if you would, please --
2  well, this -- do you recognize the authors of this --
3  or at least what appears to be the authors of this
4  particular memo?
5    A.  Mark Calabrese and Carolyn Kocis worked in
6  the managed care arena.  Kevin Cavanagh was a finance
7  individual who may or may not have been assigned to
8  managed care.  I don't know.  This was a 1996 memo.
9  That was after I had left Schering Labs.
10   Q.  Now, but this -- this memo does purport to
11  address albuterol generic with regard -- with regard
12  to the managed care plan; is that right?
13       MR. MOORE:  I object to the form.
14  There's no foundation with respect to this document.
15   A.  That's what it says.  Proventil inhaler and
16  generic albuterol inhaler, an action plan.
17   Q.  (BY MR. McNEELY)  Okay.  And I would refer
18  you to the second page of the document, WAR0001435.
19   A.  Yes.
20   Q.  And do you -- under the heading "Executive
21  Summary," do you see the paragraphs under there?
22   A.  Yes, I do.
23   Q.  And the first paragraph I'm going to read for
24  the record.  "Our objective in Managed Care is to
25  minimize the generic erosion of PROVENTIL Inhaler's

Page 937

1  retail market share while not facilitating the brand's
2  price destruction.  This plan will concentrate only on
3  our accounts with retail business (PBMs, IPAs and
4  Mixed Models HMOs)."
5       Did I read that correctly?
6    A.  Yes, you did.
7    Q.  And the second paragraph reads as follows:
8  "Although we will not follow the generics downward in
9  price, we have the latitude to increase the rebate on
10  PROVENTIL inhaler in the instances where our customers
11  agree not to apply a M.A.C." - MAC - "nor put in place
12  'hard' edits that compromise PROVENTIL's retail
13  reimbursability.  Additionally" we'll -- "we will
14  utilize, where applicable, the leverage that
15  nominal" -- "nominal PROVENTIL Inhaler affords us."
16       Did I read that correctly?
17   A.  Yes, you did.
18   Q.  Now, were you not, in fact, aware of what
19  managed care was doing relative to keeping the price
20  of Proventil high relative to these type of programs?
21       MR. MOORE:  Objection, form.  No
22  foundation.
23   A.  I do not.  I must say looking at this second
24  page where I said I did not recall this document, it
25  appears to me that my writing is on the -- on this

Page 938

1  second page.  So I did come across this document
2  having looked at it, the second page.
3    Q.  (BY MR. McNEELY)  Thank you for that.  And
4  also on the third page, is that also your writing?
5    A.  Yes, that is.
6    Q.  And with regard to that third page, your
7  handwritten comment, the first one, can you read that
8  for us?
9    A.  Which one?
10   Q.  It's the third page.  It's the top comment.
11   A.  "No longer true."
12   Q.  And what is that in reference to, if you
13  can -- if you can tell me today?
14       MR. MOORE:  Objection, form.  No
15  foundation.
16   A.  "The cost of the generic" --
17       MR. McNEELY:  You don't think he can
18  read his own writing?
19       MR. MOORE:  I think just relating it to
20  this document that he said he doesn't recall is the
21  objection that I have.  I think he can read his own
22  writing and I'm happy for him to ask (sic) the
23  question, Hugh.  I just want to preserve an objection
24  to it because he said he didn't recall the document.
25  That's all I'm doing.

Page 939

1    Q.  (BY MR. McNEELY)  Can you go ahead and -- can
2  you relate that to this document?
3       MR. MOORE:  Same objections.
4    A.  It would appear to me after all these years
5  that I said it is no longer true, that generics do not
6  offer immediate savings to most plans.  I think
7  generics would offer immediate savings.
8       "The cost of the generic to the plan may
9  initially be higher than the brand."  I don't know
10  what context that's made, but certainly the first part
11  of it, generics don't offer immediate savings, I would
12  think today looking at that after all these years that
13  my comment "no longer true" would hold.
14   Q.  (BY MR. McNEELY)  I would refer you to the
15  next page, which is -- the last four Bates numbers are
16  1437.
17       Okay.  Let me -- before we go to the
18  next page, can you go ahead and read the -- the other
19  handwritten comments on Page 1436?
20   A.  Certainly.  1430 -- okay.  I have difficulty
21  reading my own writing on the second comment.  In
22  1996, was this, I probably could have read it, but I
23  can't read it today.  I can't -- I cannot make it out.
24   Q.  Either one?  The last comment as well?
25   A.  It looks like it says I will -- "will inhaler

33  (Pages 936 to 939)

FREDERICKS-CARROLL REPORTING

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 940

1   be CFC free." That's all I can read at this point.
2      Q.   Okay. Let's go to the next page, which is
3   1437. And you see under "Plan Evaluation"?
4      A.   Yes.
5      Q.   And under "Plan Evaluation" there's an
6   introductory comment and bullet points; is that
7   correct?
8      A.   Yes.
9      Q.   And the introductory sentence is, "You should
10  conduct an evaluation of the plan's overall benefit
11  design. This" benefit -- or, excuse me, "This
12  evaluation should include," colon. And I'm going to
13  drop down to the one, two, three, four, fifth bullet
14  point and -- which reads as follows: "information on
15  pharmacy reimbursement (both brand and generic),
16  dispensing fees, and co-pay differentials."
17         Did I read that correctly?
18     A.   Yes.
19     Q.   And does not that type of information and
20  evaluation and factors for this type of action plan
21  typically include information on pharmacy
22  reimbursement?
23         MR. MOORE: Objection, form. No
24  foundation with respect to this document.
25     A.   I can't -- I can't comment about this

Page 941

1   document or general plans. That's a pretty broad
2   statement. I -- I wouldn't know that. Mr. Kapur must
3   have sent this on to me for review, not for action,
4   and these are just my comments on it, but I don't
5   recall much else about it.
6      Q.   (BY MR. McNEELY) Now, how many years were
7   you involved in setting up managed care programs?
8      A.   Managed care programs?
9      Q.   Yes, sir.
10     A.   I had managed care until the early '90s. We
11  established the unit sometime in the '80s. I can't be
12  precise. I know that when it was first established it
13  was a one-man operation. We didn't have programs as
14  much as accessing the managed care market.
15         In terms of setting up programs, again,
16  that's broad. We set up field staff call programs,
17  the organizational format in which to call upon the
18  managed care. But in terms of programs, not very much
19  when I was there.
20     Q.   In evaluating programs in managed care, isn't
21  it a fact that you would evaluate reimbursement, both
22  brand and generics, dispensing fees and co-pay
23  differentials on a regular basis?
24         MR. MOORE: Objection --
25     A.   When I --

Page 942

1         MR. MOORE: Objection, form.
2      A.   When I was there, generics did not exist. I
3   only looked at brands. That was all -- that was all
4   that was available to me at that time.
5      Q.   (BY MR. McNEELY) And with regard to brands,
6   would you evaluate pharmacy reimbursements for setting
7   up your plans?
8         MR. MOORE: Objection, form.
9      A.   We would set up -- we would look at them on
10  the basis of are we reimbursed or not when I was
11  there. That was the extent. We were not very
12  sophisticated at the outset.
13     Q.   (BY MR. McNEELY) With regard to the time
14  frame in which this -- this memo was sent or this
15  evaluation was being done, would someone from Warrick
16  assist in providing information on pharmacy
17  reimbursement dispensing fees and co-pay differentials
18  relative to the generic drugs?
19     A.   No.
20     Q.   If the Schering side of the managed care had
21  that information, to your knowledge, would they share
22  it with Warrick?
23         MR. MOORE: Objection, form.
24     A.   If they had it, they never did.
25     Q.   (BY MR. McNEELY) Your handwritten notes on

Page 943

1   that page, can you -- can you read those, please?
2      A.   This is Page 37, the Bates page?
3      Q.   Yes.
4      A.   It's just a remark to myself. It depends on
5   the account. I just wondered where they got some of
6   the ideas from. It says, "Share retention is defined
7   as eroding PROVENTIL Inhaler share more slowly than
8   the plan as historically moved brand share to
9   generic." And I said that depends upon the account
10  because certainly the accounts I dealt with were
11  absolutely intent upon moving share from brand to
12  generic as quickly as possible. Walgreens I know had
13  a policy of trying to get an 80 percent share in the
14  first 12 months when a generic came out in competition
15  with a brand. The chain drug stores, and to this day,
16  they attempt to move the generic as fast as they can.
17  So I just happened to make that comment, it depends on
18  the account. I knew of no account that wanted to
19  slowly have the generic cannibalize the brand.
20     Q.   What is considered -- what is -- from your
21  experience and also your work in -- with Warrick in
22  both brand and generics, what is the -- what is -- can
23  you describe what is meant by cannibalization of the
24  brand and what are the factors or numbers that -- that
25  demonstrate that a brand has been cannibalized?

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 944

1     A.  To the extent that the generic takes away the
2  market share.  Each unit of a generic sold in place of
3  a brand cannibalizes the brand to that extent.  That's
4  a very simple explanation.  If they take one unit
5  away, they've cannibalized it to the extent of one
6  unit.
7         But in actuality, generics eat away at
8  brands to a very rapid degree depending upon the
9  differential pricing of the number of competitors.
10  And today in today's market very often brand is
11  displaced by the generic 65 percent or more of the
12  time.
13     Q.  Well, let me ask you this:  Does -- does
14  that -- what you have just described, the
15  cannibalization, does that apply --
16         (Brief interruption)
17         MR. WINGET-HERNANDEZ:  Please mute your
18  phones.  Please mute your telephones.
19         MR. McNEELY:  Can you read that back?
20         (Requested portion was read)
21         MR. McNEELY:  Strike that.
22     Q.  (BY MR. McNEELY)  Your description of
23  cannibalization does not apply to the Schering/Warrick
24  albuterol, you know, either of their products, does
25  it?  Because it's the same product.  You have both --

Page 945

1  you just have two labels for the albuterol; isn't that
2  correct?
3         MR. MOORE:  Objection, form.
4     A.  No.  To me this cannibalization was selling a
5  product with one label in place of a product with
6  another label.  They may be made on the same lines,
7  they may be the same chemical entity.  It's certainly
8  marketed separately and they are priced separately.
9     Q.  (BY MR. McNEELY)  Well, Schering -- isn't it
10  a fact that Schering and Warrick are the same?
11         MR. MOORE:  Objection, form.
12     A.  Schering was the parent company of Warrick.
13  We operated with different products and we operated
14  with different pricing.
15     Q.  (BY MR. McNEELY)  Well, isn't it correct,
16  isn't it your understanding and a fact that Warrick
17  was created to serve Schering's objectives of
18  protecting Proventil prices?
19         MR. MOORE:  Objection, form.  It's been
20  asked and answered.  It's repetitive.
21     A.  I don't know that that was the case.  It was
22  formed, as I have been told and I repeatedly said, it
23  was formed so that I could recoup some of the dollars
24  that would be lost by Proventil inhaler when generic
25  competition came aboard.

Page 946

1         MR. MOORE:  Can we take a short break?
2     A.  I haven't finished.  I was going to say
3  that --
4         MR. MOORE:  I'm sorry.
5     A.  -- never had anything to do with the pricing.
6  I had to do what I had to do to get the -- to get the
7  company functioning.
8         MR. MOORE:  I would like to take a short
9  break.  Are you done with that answer?
10         THE WITNESS:  I suppose so.
11         MR. MOORE:  All right.  Let's take a
12  short break.
13         THE VIDEOGRAPHER:  Stand by.  The time
14  is 12:25 p.m.  We are off the record.  This concludes
15  Tape 15.
16         (Recess from 12:25 to 12:36)
17         THE VIDEOGRAPHER:  Stand by.  The time
18  is 12:36 p.m.  We are back on the record.  This is the
19  beginning of Tape 16.
20         MR. WINGET-HERNANDEZ:  In view of the
21  fact, Mike, that I would be objecting to the
22  limitations of time regardless of whether you stopped
23  at 1:00 or at 5:00 today, I will offer for benefit of
24  my clients to begin making my statement, as we
25  discussed, as soon as Hugh stops asking questions.  I

Page 947

1  think that that's probably going to be in just a few
2  minutes --
3         MR. MOORE:  Okay.
4         MR. WINGET-HERNANDEZ:  -- and before
5  1 o'clock.
6         MR. MOORE:  Yeah.  Just so everybody
7  knows, I'm not going to take the position, and I'll
8  say on the record, that because somebody stopped --
9  agreed to stop at a quarter 'til or 10 'til than 1:00
10  that I'm going to argue that that somehow is -- it has
11  any meaning at all because I think -- I think I know
12  what everybody's position is.  So I'm not -- that's
13  not a trick.
14         MR. WINGET-HERNANDEZ:  We don't want to
15  keep you from making your plane.
16         MR. MOORE:  Yeah.  Well, I appreciate
17  that.  Well, others have planes and --
18         MR. WINGET-HERNANDEZ:  And we are also
19  going to keep, as far as I've heard, it sounds like
20  we're going to keep our statements --
21         MR. MOORE:  Good.
22         MR. WINGET-HERNANDEZ:  -- short and
23  sweet as possible.
24         MR. MOORE:  Great.  And I will, too.
25         All right.  Let's go then.  Let Hugh

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 948

1  keep going.
2         Thank you.  Appreciate that.
3         (Exhibit 102 marked)
4     Q.  (BY MR. McNEELY)  Mr. Weintraub, glad to have
5  you back for a little while.
6     A.  Glad to be back.
7     Q.  You have in front of you a two-page document
8  which has been marked as Exhibit 102.  102.  You see
9  that?
10    A.  Yes, I do.
11    Q.  And would you please review it and identify
12  it, if you can?
13    A.  Well, I can identify it from the title and
14  from the authors and the recipients.  That's all I
15  know about the document.
16    Q.  Okay.  And it's -- at least it's entitled
17  "PacifiCare Proposal"; is that correct?
18    A.  That is correct.
19    Q.  And Mr. Cesan, Mr. Zahn, Mr. Bucko,
20  Mr. Desimone, I believe those -- those are all
21  officers of Warrick Pharmaceuticals according to the
22  documents that have been produced; is that correct?
23    A.  If they're in that listing you gave me, yes,
24  correct.
25    Q.  Okay.  And have you ever seen this document

Page 949

1  before?
2     A.  I think I've indicated I haven't.
3     Q.  And I would like to direct your attention to
4  the -- right above the bottom box on the first page.
5  Do you see that?
6     A.  Yes.
7     Q.  And -- well, actually, so that it makes sense
8  to the Court, some people that are listening to this
9  film, let me go back to the second paragraph and I'm
10  going to read that for the record.
11        "The account is prepared to accept an
12  HMR proposal for Allegra which requires NDC blocks
13  against Claritin.  PacifiCare will make a final
14  decision on the antihistamine class on Friday,
15  December" the 12th "and are willing to entertain a
16  nominal price strategy to allow formulary access for
17  Claritin.
18        "Product net sales and market share at
19  PacifiCare are as follows."  And then these are the
20  listings, the "Net Sales" and "Market Share."  Do you
21  see that?
22    A.  Yes.
23    Q.  And then it continues.  "As a result, we are
24  requesting your approval for the following nominal
25  strategies from which the customer may select one

Page 950

1  option."
2         Did I read that correctly?
3     A.  You did.
4     Q.  And the first option is Proventil CFC and
5  HFA, "Value" 10 million.  Do you see that?
6     A.  Yes.
7     Q.  And then they have the "Option II."  They
8  have the list of the drugs and value.  And then it
9  continues on in paragraph form.
10        "In addition to the above, we are
11  requesting your approval to substitute the above
12  products with nominal pricing for the following
13  products (if the aforementioned options are not
14  acceptable to the customer and as long as the total
15  value does" -- "does not exceed $10 million)."
16        And then it lists "Theo-Dur/Uni-Dur,
17  Proventil Repetabs"?
18    A.  Repetabs.
19    Q.  And "Warrick Inhaler (staff only)."
20    A.  Correct.
21    Q.  And this -- there is -- at least there are
22  signatures appearing to approve this proposal.  Do you
23  see that?
24    A.  Yes.
25    Q.  Do you recognize those signatures as Richard

Page 951

1  Zahn and Raul Cesan?
2     A.  Yes.
3     Q.  Were you consulted on this proposal?
4     A.  Never.
5     Q.  Now, with regard to Bucko, Desimone and
6  Mr. Zahn, who are officers of Schering -- excuse me.
7  Well, they are of Schering Corporation, but also for
8  the Warrick Corporation, did they ever discuss this
9  with you, to your recollection?
10    A.  No.
11    Q.  Were you aware that -- that Warrick inhalers
12  were part of this proposal to PacifiCare?
13    A.  I was not.
14    Q.  This is the first time you've ever seen this
15  document?
16    A.  To my knowledge.
17    Q.  What in the records of Warrick would reflect
18  the Warrick inhalers that were used to fulfill this
19  particular -- or any proposal or contract that
20  followed after this -- the approval of the proposal?
21    A.  At Warrick itself there probably would not
22  be.  It would all be in the contract administration
23  area.
24        (Exhibit 103 marked)
25    Q.  (BY MR. McNEELY)  Mr. Weintraub, you've been

FREDERICKS-CARROLL REPORTING

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 952

1  handed a document that has been marked as Exhibit 103.
2  103.
3      A.  Yes.
4      Q.  And could you review that and are you -- and
5  if you can, just identify it.
6      A.  It is a strategic plan issued by Steve Cooper
7  and Mark Calabrese working for Schering -- well, I
8  don't know -- Steve Cooper was with Schering.  He was
9  also with Warrick at one time.  I don't know for --
10  this was written at a time when he was with Warrick or
11  with Schering.  I'm not quite sure.
12     Q.  Now, this particular document, do you recall
13  receiving this document?
14     A.  I don't recall receiving it per se.  However,
15  I noticed that up in the corner I have written some
16  commentary, so -- and it's my handwriting, so I
17  probably did receive it.
18     Q.  Okay.  Please -- where is your handwriting?
19     A.  I think up on the top I wrote an "OK," but I
20  have crossouts in here somewhere.  I just came across
21  one.
22     Q.  Okay.  With -- the "OK," was that your
23  designation that you approve of this action plan?
24     A.  No.  I would have signed my initials if I
25  approved it.  "OK" was -- maybe okay to my secretary

Page 953

1  to stick it in a chron file or something of that sort.
2  If I approved it, then I would have put an initial on
3  it.
4      Q.  Okay.  If we can quickly try to move through
5  this document.  On the -- Page 1, at the bottom, the
6  last paragraph that begins -- and I'll read it for the
7  record, "Generic distributors and private labelers
8  will be utilized by Warrick to ensure success in the
9  independent segment of the market.  These distributors
10  currently comprise 40% of the generic market and
11  31" -- "31% of Warrick's albuterol sales.  Controlling
12  the price to these distributors will help ensure price
13  integrity, while allowing us to gain their commitment,
14  prior to any competitor."
15         Who were the private labelers that were
16  contracted with Warrick at this time?
17     A.  I can't remember at this time, but the
18  private labels that were -- I believe was contracted
19  over time were Rugby, Schein, Moore, Nova Pharm.  I
20  can't recall the others offhand.
21     Q.  For each of the private labelers that were --
22  Warrick was labeling product for them --
23     A.  Yes.
24     Q.  -- was there a written contract with each of
25  the private labelers?

Page 954

1      A.  I believe the third-party organization had a
2  contract with them.
3      Q.  What third-party organization?
4      A.  The manufacturing organization.  We call it
5  third-party manufacturing.  I should say for clarity
6  here it was the contract -- contract manufacturing
7  organization for Schering, but we called it third
8  party.
9      Q.  Okay.  So Schering was -- actually had the
10  contract or was the contractor with the third-party
11  labelers?
12     A.  I believe it was.
13     Q.  And did you -- do you agree with the -- with
14  the statement that, "Controlling the price to
15  these" -- "to these distributors will help ensure
16  price integrity, while allowing us to gain their
17  commitment, prior to any competitor" --
18         MR. MOORE:  Objection --
19     Q.  (BY MR. McNEELY) -- is that a statement that
20  you can agree to?
21         MR. MOORE:  Objection, form.  No
22  foundation.
23     A.  I can agree that if we committed -- committed
24  to manufacturing for them, that we would gain their
25  commitment prior to any competitor.  In other words, a

Page 955

1  competitor wouldn't private label for them.
2         But, very frankly, price is determined
3  by the marketplace.  There's no way you can control it
4  in the generic business.  I think we said that it
5  deteriorates quickly.  There's no controlling of
6  prices.
7      Q.  (BY MR. McNEELY) And, also, I would like to
8  refer you to Page 3.  The first paragraph under
9  "Pricing and Timing."  Do you see that?
10     A.  Yes.
11     Q.  And I'm going to read that first paragraph
12  for the record.  Please follow with me.  "The major
13  objectives in the development of our pricing and
14  timing strategies are to maximize our total Schering
15  Labs Albuterol Inhaler sales, maximize Proventil brand
16  sales, while ensuring that Warrick penetrates the
17  market and wherever possible, allowing Schering Labs
18  to become the accounts 'One Stop Shopping' place for
19  all their Albuterol Inhaler needs.  The additional
20  programs to maximize Proventil brand sales are covered
21  in the Proventil brand marketing plan."
22         Did I read that correctly?
23     A.  Yes, you did.
24     Q.  And isn't it a fact that what is being
25  expressed there is that -- that Schering and Warrick

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911  -  HOUSTON (713) 572-8897  -  SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 956

1 were combined in a marketing plan to maximize both
2 sales?
3        MR. MOORE: Objection, form. No --
4    Q. (BY MR. McNEELY) And by "both sales" I'm
5 talking about both the branded and the generic.
6        MR. MOORE: Objection, form. No
7 foundation for this document.
8    A. Both combined, yes. In other words, to the
9 extent that they bought Proventil and did not buy our
10 generic inhaler, we wouldn't have maximized sales. To
11 the extent they bought Proventil, which they
12 essentially had to do, if it was specified by brand,
13 and bought the inhaler, then we had maximized the
14 sales of both.
15    Q. (BY MR. McNEELY) Okay. And, also, quickly
16 I'll refer you to Page 5 under "Distribution" heading.
17 There is a Number 1 paragraph under -- under a heading
18 "Action." Do you see that?
19    A. Yes.
20    Q. And I'm going to read that for the record.
21        MR. ANDERSON: This is Jarrett Anderson.
22 May I interject something. Someone does not have
23 their phone on mute and we are receiving feedback that
24 sounds like children. Could whoever is doing that
25 please place their phone on mute or get off.

Page 957

1        MR. McNEELY: Thank you.
2    Q. (BY MR. McNEELY) Paragraph 1.
3    A. Yes.
4    Q. "Manufacturing will need to produce enough
5 Warrick Inhalers to meet the first four months
6 forecast."
7    A. Yes.
8    Q. "To accomplish this goal, manufacturing will
9 package 1 million units of Warrick inhalers and have
10 available at launch for immediate shipment to
11 customers. In addition, manufacturing should maintain
12 a supply of 4 million unlabeled canisters which can be
13 utilized as either Proventil or Warrick units as
14 needed to make certain we are never in a backorder
15 situation on Proventil or Warrick albuterol inhalers.
16 A backorder in this market would have disastrous
17 implications for either in a post-generic
18 marketplace."
19        Did I read that correctly?
20    A. You did.
21    Q. And were you a part of Warrick at the time of
22 the launch of the generic inhaler?
23    A. I was.
24    Q. And is it a fact that there was --
25 manufacturing maintained a supply of millions of

Page 958

1 unlabeled canisters that could have been used for
2 either Warrick or Proventil orders?
3    A. I don't know that.
4    Q. And, finally, on paragraph -- excuse me, Page
5 6 under the "Chain, Wholesaler, and Retail Buying
6 Groups" heading there is a Paragraph 2 at the bottom
7 of Page 6. Do you see that?
8    A. Yes.
9    Q. And I'm going to read it for the record. At
10 least I'm going to read the first sentence and it
11 says, "Warrick and Schering Trade Sales Directors
12 should begin to lay the groundwork for the launch of
13 the Warrick Inhaler"; is that correct?
14    A. Correct.
15    Q. And, in fact, that was -- that was, in fact,
16 done. Is that not true?
17    A. Laying the groundwork for the launching of
18 the inhaler?
19    Q. Yes.
20    A. Yes.
21    Q. Okay. And with that comment and the -- and
22 the express desire of everyone to -- to make airlines
23 connections, I will only introduce one more document
24 at -- or what I'm going to do is ...
25        After reading all -- or looking at

Page 959

1 these -- these different exhibits where Schering and
2 Warrick were working together to obtain a market share
3 jointly, is it not true that you were not the enemy to
4 Schering, that you were not competing with Schering,
5 but that Schering and Warrick were one entity, and
6 that is, they were Schering?
7        MR. MOORE: Objection, form.
8    A. Schering was the parent company, but we were
9 competing. There was no question about that. We
10 competed on price, we competed and we cannibalized to
11 a very rapid degree our own Proventil inhaler. The
12 brand people tried to do as much as they could to
13 retain the business on the inhaler. We tried to do as
14 much as we could getting the business on the Warrick
15 albuterol. We didn't punch each other, but we
16 certainly didn't hold back. When an account wanted to
17 buy an inhaler, we sold them an inhaler that was
18 generic. That was my business. I did not consult
19 with Warrick -- with Schering on pricing. I did not
20 consult with accounts. I could care less if they were
21 a Proventil account. I would take that business.
22    Q. (BY MR. McNEELY) Thank you. Mr. Weintraub,
23 so based on your testimony and your comments, am I to
24 understand that you're saying that -- that Warrick was
25 not Schering?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911  -  HOUSTON (713) 572-8897  -  SAN ANTONIO (210) 222-9161

64c199fc-9a95-4388-931e-7e8055cdd80e

Page 960

1          MR. MOORE:  Objection, asked and
2  answered.
3      A.  It was not Schering to the extent that we
4  tried to preserve the Proventil business.  I will say
5  that the trade directors went out with us on occasion
6  to introduce us to accounts so that we could sell the
7  Warrick inhaler and preserve market share for both
8  products together.
9      Q.  (BY MR. McNEELY)  Okay.  Thank you.  Do you
10  recall giving your deposition -- this is -- it would
11  have been February the 12th, 2003 in the Texas matter?
12      A.  I would like to see it.  I cannot recall it.
13      Q.  I would direct your attention particularly to
14  the comments on Page 87, beginning with Line 23,
15  concluding on the next page, Page 88 at Line 2.  And
16  it's -- this particular page from that deposition has
17  a Bates number of SPW 0037714.  And if you would,
18  could you just read -- I'll highlight it for you.  If
19  you would, for the record, please --
20      A.  Can I look at it in the context?
21      Q.  Sure.
22      A.  Sure.  (Witness reviewing document).  That
23  continues here to here (indicating)?
24      Q.  Yes.
25      A.  Yes.

Page 961

1      Q.  Okay.  Would you please read it for the
2  record?
3      A.  Again, it's a little bit out of context.
4          "Warrick marketed the generic albuterol
5  inhaler pursuant to a license with Schering?"  That's
6  my question I was asked.
7          I said, "I don't know that we had a
8  license with Schering.  We were Schering."  We didn't
9  need a license.
10      Q.  No.  Excuse -- the "We didn't need a license"
11  is not part of the transcript.  Just --
12      A.  Yes, it is.  "I don't know that we had a
13  license with Schering."  It said -- "Pursuant" -- the
14  question was "Pursuant to a license with Schering."
15  And I said, "I don't know that we had a license with
16  Schering.  We were Schering."
17      Q.  Thank you.
18      A.  We required no license.
19      Q.  The "We required no license" was -- was -- is
20  your comment.
21      A.  Yes.
22      Q.  The quote was, "We were Schering"; is that
23  correct?
24      A.  That's correct.  I just wanted to make sure
25  that -- that it's within context.

Page 962

1      Q.  Yes.  You didn't need a license because you
2  were Schering.
3      A.  We didn't need a license because we were a
4  part of Schering.  We didn't need an NDA.  We could
5  use the Schering NDA.
6          MR. McNEELY:  Thank you very much.
7          I will reserve the remainder of my
8  questioning until such time as this deposition is --
9  is reinitiated.
10          MR. MOORE:  Okay.  Well, let's stay --
11  we are going to stay on the record, but,
12  Mr. Weintraub, you can -- you can go.
13          And we can turn off the video and do
14  this just on the record.
15          MR. WINGET-HERNANDEZ:  That's fine with
16  me.
17          THE VIDEOGRAPHER:  Turn the video off?
18          MR. MOORE:  Yes.
19          THE VIDEOGRAPHER:  Okay.  The time is
20  12:58.  We are going off the video record.
21          (Discussion off the record)
22          MR. HEUCK:  I'll go first for the
23  plaintiffs and I'll try to be brief.
24          On behalf of the State of Ohio I
25  attended this deposition even though discovery has

Page 963

1  been stayed in our case and I did that based on
2  representations concerning Mr. Weintraub's health.
3  After observing Mr. Weintraub this week and hearing
4  his testimony, I don't believe there was any reason to
5  notice this deposition jointly and for our case early.
6  In our case this deposition is premature.  We never
7  would have noticed the head of a company as the first
8  deposition.  We came here at great expense this week,
9  spent the entire week here and, nevertheless, I have
10  not had any opportunity to cross-examine this witness
11  or otherwise participate.  I will, therefore, object
12  to any of the use of the deposition by Warrick in our
13  case.
14          The State of Ohio and its counsel has no
15  association or agreement with the other states
16  represented here.  There's no prosecution agreement,
17  no joint prosecution agreement.  No one has been
18  asking questions on my behalf.  What few questions I
19  did send over to try to provide some assistance were
20  not asked.  We had no control over the examination.
21  I'm not being at all critical of it, but we had no
22  means or procedure available to us to be able to have
23  sufficient time, indeed, any time, to cross-examine
24  this witness.
25          We will reserve our right to seek costs.

39  (Pages 960 to 963)

64c199fc-9a95-4388-931e-7e8055cdd80e