UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Civil Action No.<br>01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | Judge Patti B. Saris |
| *State of Nevada v. American Home Products, et al.*<br>CA No. 02-CV-12086-PBS (Nevada II) | |

**THE JOHNSON & JOHNSON DEFENDANTS' INDIVIDUAL RESPONSE TO "ADDITIONAL FACTS RELIED UPON BY [NEVADA] IN RESPONSE TO DEFENDANTS['] MOTION FOR SUMMARY JUDGMENT"**

In its Response to Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment, the State of Nevada ("Nevada" or the "State") attempts to inject certain, and inaccurate, "Additional Facts Relied Upon By [Nevada] in Response to Defendants['] Motion for Summary Judgment."[1]

Pursuant to Local Rule 56.1, Johnson & Johnson, Centocor, Inc., Janssen Pharmaceutica Products L.P., McNeil-PPC, Inc., and Ortho Biotech Products, L.P. (the "J&J Defendants") hereby respond to the misstatements of fact as they relate to the J&J Defendants.[2]

---

[1] *See* State of Nevada's Response to Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment, ¶¶ 137-144 (March 22, 2007) (Docket No. 3909).

[2] Because the State simply regurgitates [mis]statements of fact that the MDL Class Action Plaintiffs submitted in connection with their previous motion for partial summary judgment against all Track 1 Defendants, the J&J Defendants incorporate and refer to The Johnson & Johnson Defendants' L.R. 56.1 Counter-Statement of Disputed Material Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment Against All Track 1 Defendants ("The J&J Defendants' Track 1 Counter-Statement") filed on April 7, 2006.  The J&J Defendants also incorporate and refer to the specific materials cited in support of the referenced counter-statements.  Because these materials were filed under seal they have not been attached hereto but the J&J Defendants will provide courtesy copies, should the Court request them.

The J&J Defendants also incorporate by reference the Defendants' Joint 56.1 Reply to Additional Facts Relied Upon by Nevada in Response to Defendants' Motion for Summary Judgment.

## RESPONSE TO ADDITIONAL FACTS RELIED UPON BY NEVADA

**Statement 137:** Each of the Defendants caused AWPs to be published for their Subject Drugs in one of two ways: (i) by sending an AWP or "suggested" AWP directly to a publisher; or (ii) by submitting wholesale list price ("WLP"), wholesale acquisition cost ("WAC") or Direct Price ("DP") to the publisher – with the knowledge that the publisher would mark that price up (usually by 20% or 25%) to achieve the reported AWP. . . . J&J predecessor CNTO knew that publishers would simply republish what CNTO provided them. . . . OBI witnesses testified that they could not recall a single instance when the actual AWP prices provided by OBI were not published.

**Response:** As to the J&J Defendants, disputed. The J&J Defendants did not "cause" (a legal term) AWPs to be published for their Subject Drugs. Johnson & Johnson itself, which does not manufacture or sell drugs, does not submit AWPs.[3]

Ortho Biotech submitted AWPs, or recommended AWPs for Procrit equal to 120% of Procrit's list prices to the independent publishers, who usually, but not always, published the AWPs or recommended the AWPs that Ortho Biotech submitted. Ortho Biotech stopped submitting AWPs or recommended AWPs for Procrit to the independent publishers when it raised selected list prices on Procrit in 2004, but the independent publishers have continued to publish AWPs for Procrit, although one publisher – First DataBank – began publishing AWPs for Procrit that were 125% of its list prices, notwithstanding that the AWPs

---

In addition, the J&J Defendants incorporate and refer to The Johnson & Johnson Defendants' Proposed Findings of Fact Relating to Procrit and Remicade ("The J&J Defendants' PFOF") filed on January 19, 2007 (Dkt. No. 3560) (attached hereto as Exhibit 1). The J&J Defendants also incorporate and refer to certain materials cited in support of the specific paragraphs cited herein (attached as Exhibit 2).

[3] *See* The J&J Defendants' Track 1 Counter-Statement, Counter-Statement 3; *see also* materials cited in support of Counter-Statement 3 (Declaration of Thomas C. Hiriak in Support of the Johnson & Johnson Defendants' Motions for Summary Judgment as to Class 1 and Class 2 ("Hiriak Decl."), ¶¶ 2, 38, 41; Declaration of John Hoffman in Support of the Johnson & Johnson Defendants' Motion for Summary Judgment as to Class 1 and Class 2 ("Hoffman Decl."), ¶ 3 n.1, 15-16).

2

and recommended AWPs previously submitted by Ortho Biotech were 120% of the list prices. For a time, Centocor submitted AWPs or recommended AWPs that were 130% of the Remicade list prices to the independent publishers. In the case of Remicade, the independent publishers elected to publish the AWP figures that Centocor submitted, although both First DataBank and Redbook ceased doing so in or about November 2005.[4]

The State cites no supporting evidence with respect to any other J&J Defendant. Other J&J Defendants did not control AWP because the publishing services sometimes published AWPs that were different than those submitted.[5]

**Statement 138:** The reporting practices of other, non-trial drug manufacturer defendants were the same.

**Response:** Not applicable to the J&J Defendants.

**Statement 139:** Through this system, each Defendant directly controlled what the AWP would be.

**Response:** As to the J&J Defendants, disputed as written. Johnson & Johnson does not submit AWPs or recommended AWPs, and as such, could not possibly "control" them, however the word "control" is defined.[6]

Ortho Biotech submitted AWPs or recommended AWPs for Procrit equal to 120% of Procrit's list prices to the independent publishers. Based on the publishers' historical practice of publishing the AWPs and recommended AWPs submitted to them by manufacturers, Ortho Biotech had no reason to believe that the AWPs or recommended AWPs that it submitted

---

[4] *See id.*

[5] *See* Deposition of William Parks ("Parks Depo. Tr.") at 70-73, 83-84, 86 (Aug. 2, 2004) (attached as Exhibit 3).

[6] *See* The J&J Defendants' Track 1 Counter-Statement, Counter-Statement 28; *see also* materials cited in support of Counter-Statement 28 (Hiriak Decl., ¶¶ 2, 38-41; Hoffman Decl., ¶¶ 3 n.1, 15-16; Deposition of Christine Poon at 18-20 (Nov. 30, 2004)).

would not be published. That changed when Ortho Biotech learned that in 2002 First DataBank had published AWPs that were different from, and higher than, those that were submitted for other products sold by other Johnson & Johnson operating companies. Thereafter, starting in June 2004, Ortho Biotech did not submit AWPs or recommended AWPs to anyone.[7] Therefore, Ortho Biotech did not "control" the AWP for Procrit.

For a time, Centocor submitted AWPs or recommended AWPs to the independent publishers that were 130% of Remicade's list prices. Like Ortho Biotech, Centocor had no reason to believe that the AWPs or recommended AWPs it submitted would not be published. That changed when Centocor learned that in 2002 First DataBank had published AWPs that were different from, and higher than, those that were submitted for other products sold by other Johnson & Johnson operating companies.[8] Although the independent publishers elected to publish the AWP figures that Centocor submitted, in or about November 2005, both First DataBank and Redbook began publishing AWPs for Remicade that were different from those submitted by Centocor. Therefore, Centocor did not "control" the AWP for Remicade.

The State cites no supporting evidence with respect to any other J&J Defendant. Other J&J Defendants did not control AWP because the publishing services sometimes published AWPs that were different than those submitted.[9]

---

[7] *See* The J&J Defendants' Track 1 Counter-Statement, Counter-Statement 28; *see also* materials cited in support of Counter-Statement 28 (Hiriak Decl., ¶¶ 38-41; Plaintiffs' Supplemental Response to the J&J Defendants' Request for Admission and Interrogatories Concerning Procrit, Request to Admit No. 2; Deposition of John Dempsey at 95-96 (Aug. 5, 2005)); Exhibit 3 (Parks Dep. Tr. at 70-73, 83-84, 86).

[8] *See* The J&J Defendants' Track 1 Counter-Statement, Counter-Statement 28; *see also* materials cited in support of Counter-Statement 28 (Hoffman Decl., ¶¶ 15-16; Plaintiffs' Supplemental Response to the J&J Defendants' Request for Admission and Interrogatories Concerning Procrit, Request to Admit No. 2; Deposition of John Dempsey at 95-96 (Aug. 5, 2005)); Exhibit 3 (Parks Dep. Tr. at 70-73, 83-84, 86).

[9] *See* Exhibit 3 (Parks Depo. Tr. at 70-73, 83-84, 86).

4

1358722v1

**Statement 140**:  The record shows that drug manufacturers were aware of [Nevada's] and other states['] use of AWP for reimbursement purposes.

**Response:**  As to the J&J Defendants, disputed.  The record evidence cited by the State as to the J&J Defendants is entirely deficient to establish that the J&J Defendants were aware of Nevada's or any other state's use of AWP.  The deposition testimony relied on by Nevada only indicates, at best, that certain employees who were deposed may have been aware that Medicare or certain private entities used AWP as a reimbursement benchmark.  Nothing cited as to the J&J Defendants establishes any knowledge or awareness by them that Nevada or any other state used AWP for reimbursement purposes.

Moreover, as stated in Defendants' moving papers, Nevada reimburses claims based on AWP *only* when a discounted use of that benchmark results in the lowest charge to the State among several reimbursement formulas.[10]  Nevada expressly admits that this is the case.[11]

**Statement 141:**  All Defendants shared the same understanding that States and payors based their drug reimbursement on reported AWP[s].  This is reflected in Defendants' Answers to this lawsuit.

**Response:**  As to the J&J Defendants, disputed.  The record evidence cited by the State as to the J&J Defendants is entirely deficient to establish that the J&J Defendants were aware of Nevada's or any other state's use of AWP.  Nevada relies on certain paragraphs contained in the J&J Defendants' Answer to the State of Montana's Second Amended Complaint, which merely indicate that the J&J Defendants admit that some private and public drug reimbursement systems reimburse based on AWP and that Montana's reimbursement

---

[10] *See* Defendants' Joint Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Joint Motion for Summary Judgment, ¶ 8 (February 8, 2007) (Dkt. No. 3637).

[11] *See* State of Nevada's Response to Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment, ¶ 8 (March 22, 2007) (Docket No.3909).

5

methodology for certain prescription drugs covered by Montana Medicaid is set forth pursuant to regulation. *See also* the J&J Defendants' response to Statement 140, *supra*.

**Statement 142:** This understanding is also reflected in other internal defense documents.

**Response:** Not applicable to the J&J Defendants.

**Statement 143:** The State could not have determined the spreads between acquisition costs and AWP because true drug prices were considered confidential by the defendant drug manufacturers that were neither publicly revealed nor disclosed to the government or other payors. Defendants' marketing of the spread to providers was also treated as confidential information.

**Response:** As to the J&J Defendants, disputed. Johnson & Johnson does not manufacture, market or sell drugs.[12] Consequently, it could not "market" any spreads. Ortho Biotech did not keep its prices secret. Ortho Biotech advertised its discounts on Procrit by means of promotional flyers, and it discussed them with HCFA officials and Congressional staff members. Ortho Biotech also advised providers that its rebates represented "discounts on PROCRIT for Medicare, Medicaid and certain third-party healthcare programs and as such should be properly disclosed and reflected when making claims." Therefore, the true drug prices offered by Ortho Biotech were not considered confidential and Nevada could have determined the spreads between acquisition cost and AWP.[13]

Ortho Biotech also had a policy that its representatives should not sell Procrit by marketing the difference between AWP and acquisition price.[14]

---

[12] *See* The J&J Defendants' Track 1 Counter-Statement, Counter-Statement 67; *see also* materials cited in support of Counter-Statement 67 (Hiriak Decl., ¶¶2; Hoffman Decl., ¶¶ 3 n.1).

[13] *See* Exhibit 1 (The J&J Defendants' PFOF, ¶¶ 7-9); *see also* Exhibit 2 (Trial Declaration of Cathleen Dooley ("Dooley Direct"), ¶ 15 (Nov. 11, 2006); MDL Track 1 Trial Transcript ("Trial Tr.") at 20-22, 58-61 (Nov. 16, 2006); DX 2758; DX 2765 at MDL-OBI00032470).

[14] *See* Exhibit 1 (The J&J Defendants' PFOF, ¶¶ 20-21); *see also* Exhibit 2 (DX 2767; Trial Tr. at 69 (Dec. 7, 2006); Trial Tr. at 23 (Dec. 8, 2006); Deposition of Thomas Hiriak at 424 (Nov. 10, 2004)).

6

Centocor did not offer discounts or rebates to physicians administering Remicade. Because there were no discounts, physicians could only purchase Remicade at or about the published list price, which was public. As a result, the spread between Remicade's acquisition cost and AWP was public knowledge "available for all to see", including Nevada. In addition, Centocor disclosed the difference between its list price and AWP – which was the same as the difference between acquisition cost and AWP – to HCFA when it applied for a J-Code.[15] Therefore, the true drug prices offered by Centocor were not confidential and Nevada could have determined the spreads between acquisition cost and AWP.

Centocor also did not market the spread in any manner that was illegal or otherwise improper but merely provided accurate information on pricing and reimbursement.[16]

The State does not cite supporting evidence relating to any other J&J Defendant.

**Statement 144:** Nevada Medicaid had no knowledge of the magnitude of the spreads between acquisition cost and AWP until months after this lawsuit was filed.

**Response:** As to the J&J Defendants, denied. In support of this [mis]statement, Nevada relies exclusively on the declarations of Charles Duarte and Coleen Lawrence, Nevada Medicaid employees.[17] Mr. Duarte states that he had "never been aware that spreads of this magnitude existed."[18] Mr. Duarte is referring to "spreads" as commonly used by Dr. Hartman and defined as the difference between acquisition cost and AWP reflected as a percentage of the

---

[15] *See* Exhibit 1 (The J&J Defendants PFOF, ¶¶ 44, 46-47); *see also* Exhibit 2 (Trial Tr. at 59, 63, 88-89, 112-15 (Nov. 14, 2006); Trial Tr. at 128-29 (Nov. 21, 2006); Trial Tr. at 73-74, 77 (Nov. 27, 2006); Trial Tr. at 136-37 (Nov. 28, 2006); DX 2782; PX 261).

[16] Exhibit 1 (The J&J Defendants PFOF, ¶¶ 39, 41-42); *see also* Exhibit 2 (Trial Tr. at 58, 93, 102-107 (Nov. 14, 2006)

[17] These declarations are presently subject to a motion to strike as they are inconsistent with prior deposition testimony and contradicted by fact admissions entered by the Court. *See* Defendants' Memorandum in Support of its Joint Motion to Strike Declarations of Charles Duarte and Coleen Lawrence.

[18] Declaration of Charles Duarte, ¶ 40 (March 22, 2007) (Dkt. No. 3912)

7

acquisition cost. With respect to the J&J Defendants, he states that "the spreads varied from a low of 17.6% to a high of 31.9%."[19] Elsewhere in his declaration, Mr. Duarte states that "Nevada Medicaid thought that by taking a discount of 15% off of AWP, we were accurately approximating the EAC."[20] A 15% discount off of AWP is the same as a 17.6% "spread" over acquisition cost. Thus, in the case of drugs sold by the J&J Defendants, Nevada's reimbursement formula did approximate acquisition cost. Nevada's expert, Dr. Hartman, concedes that spreads of 30% are lawful and appropriate.[21]

Dated:  April 5, 2007                               Respectfully submitted,


                                                    /s/ William F. Cavanaugh, Jr.
                                                    William F. Cavanaugh, Jr.
                                                    Andrew D. Schau
                                                    Erik Haas
                                                    Adeel A. Mangi
                                                    **PATTERSON BELKNAP WEBB & TYLER LLP**
                                                    1133 Avenue of the Americas
                                                    New York, New York  10036-6710
                                                    (212) 336-2000

                                                    Attorneys for the Johnson & Johnson Defendants

---

[19] *Id.*

[20] *Id.*, ¶ 22.

[21] *See* Deposition of Raymond S. Hartman at 31-32 (Vol. I, Aug. 22, 2006) (attached as Exhibit 4).

## CERTIFICATE OF SERVICE

I certify that on April 5, 2007, a true and correct copy of The Johnson & Johnson Defendants' Individual Response To "Additional Facts Relied Upon By [Nevada] In Response To Defendants['] Motion For Summary Judgment" was served on all counsel of record via LexisNexis File & Serve.

/s/ Andrew D. Schau
Andrew D. Schau