# EXHIBIT 2

# Trial Transcripts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                              )
PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE             ) MDL No. 1456
LITIGATION                          ) Pages 5-1 - 5-167



BENCH TRIAL - DAY FIVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 14, 2006, 9:20 a.m.






LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 58

1  product; and also recognizing because we were introducing a
2  new service into the specialist's office that they had to
3  become comfortable with, that it was going to be financially
4  viable for them to be able to offer this service and not lose
5  money, that they had to understand what their total
6  reimbursement would be. So we took both of those factors
7  into consideration, as well as, as I mentioned --
8      THE COURT: You're trying to woo the doctor into
9  using the drug.
10     THE WITNESS: I wouldn't say woo the doctor into
11 using the drug. I would say make them comfortable that they
12 weren't going to lose money and that this was going to be
13 financially viable.
14     THE COURT: Well, did they tell you 25 percent
15 would lose money?
16     THE WITNESS: We didn't have that conversation
17 specifically with them. We did an analysis based on what we
18 thought would be appropriate. And, as I mentioned, we looked
19 at several other drugs that were in the biologics class and
20 looked at the ratio of what we believed their acquisition
21 price was for providers versus their AWP. And those ratios
22 ranged all the way up into the 40 or 50, you know, even 80
23 percent in some cases. We picked something that we thought
24 was at the reasonable, the low to middle range of that
25 survey.

Page 59

1      THE COURT: So it was primarily by looking at
2  comparables rather than doing an actual, what does it cost
3  the physician?
4      THE WITNESS: At the time of launch, yes.
5      MR. MACORETTA: You shortened up my outline
6  considerably, your Honor.
7  Q. Let's just be clear on a couple of other terms right at
8  the beginning. The AWP price, Centocor never sells any
9  Remicade at that price, right?
10 A. That's correct.
11 Q. The highest price you ever sell Remicade to anybody is
12 WAC, right?
13 A. That's correct.
14 Q. Okay. And if I were to go to a wholesaler and purchase
15 Remicade from that wholesaler, I'd buy it at WAC or something
16 very close, right?
17 A. Yes.
18 Q. So if I were to ask you what the wholesale cost of
19 Remicade was, your answer would be WAC?
20 A. WAC or something with plus or minus.
21 Q. Do you have any understanding of whether or not there
22 was any kind of retail price above that for Remicade?
23 A. Remicade really doesn't have a retail outlet because it
24 is, as you mentioned, dispensed via a physician's office. It
25 really isn't, quote/unquote, a "retail" price.

Page 60

1  Q. So looking at Exhibit 825, in, let's say, a month after
2  you launched, in October of 1998, physicians would typically
3  go to a wholesaler and buy it at somewhere around $450 a
4  vial?
5  A. There's a range. It depends on, you know, what
6  relationship they have with the specialty distributor who
7  sold to the physician, depending on their volume of
8  purchases, et cetera, their payment terms, et cetera. I
9  don't know what exactly the price was, but --
10 Q. But they wouldn't likely be buying it for much above
11 $450 a vial?
12 A. "Much" is a relative term.
13 Q. Five percent?
14 A. It's tough to say, given their payment terms and their
15 volume, et cetera.
16 Q. You understand that wholesalers typically work on a
17 markup of less than 5 percent, right?
18 A. First of all, let's get our terms straight here.
19 Specialty distributors are who we're talking about selling to
20 physicians. Wholesalers by contract cannot sell to
21 physicians for Remicade.
22 Q. Okay. Specialty distributors, you sell it to them at a
23 price below WAC typically, don't you?
24 A. Slightly below WAC.
25 Q. Okay. And that's because you're giving them a prompt

Page 61

1  pay discount of up to 2 percent, right?
2  A. That's correct.
3  Q. And some of those distributors are also getting
4  additional discounts for providing you with certain data,
5  correct?
6  A. Data and other services.
7  Q. What other services are you talking about?
8  A. They would provide information to the physicians. They
9  would do blast faxes. They would provide information --
10     THE COURT: What?
11     THE WITNESS: They would do blast faxes out to all
12 the physicians when --
13     THE COURT: What's that?
14     THE WITNESS: They have a mechanism where they
15 could automatically send a fax to every physician that they
16 distribute to. If we had a clinical update to our product
17 that we wanted to get the information to the physicians
18 quickly, we could hire the specialty distributors, and they
19 would send a fax out so that every physician got it
20 immediately with any kind of product updates or any other
21 information we want the physicians to get immediately related
22 to our product.
23 Q. You also understand that specialty wholesalers or
24 specialty providers were not selling Remicade to anybody at
25 AWP, right?

## Page 62

1  A.  I would guess that they weren't.
2  Q.  And I think in response to a question Judge Saris asked
3  you about payors, you said that many private payors were
4  reimbursing based on AWP as well, right?
5  A.  That's correct.
6  Q.  And it's your understanding that Medicare reimburses, at
7  least until a year or so ago, on AWP as well?
8  A.  That's correct, in a physician office.
9      THE COURT:  So you sold directly to physicians?
10  You had marketing teams going out to the physicians?
11     THE WITNESS:  Your Honor, we didn't sell directly
12  to physicians.  We only sold through two channels:
13  wholesalers, who then sold to hospitals or any other outlet,
14  and we sold to specialty distributors, who in turn sold to
15  physicians.
16     THE COURT:  But did you have your sales team out to
17  doctors?
18     THE WITNESS:  Our sales team would talk to doctors
19  about the clinical benefits of the product to make them
20  familiar with the product, to identify which patients were
21  appropriate candidates for the product, but our sales reps
22  did not sell --
23     THE COURT:  So they would go and talk about the
24  characteristics of the product and the price, et cetera, but
25  if they wanted to buy, the doctors, they had to go through

## Page 63

1  the distributors; is that right?
2      THE WITNESS:  That's correct, and just one
3  clarification:  The sales reps did not talk about the price
4  because they wouldn't know what the price was going to be
5  because that was determined by the specialty distributor.
6      THE COURT:  So your sales team never mentioned
7  price?  Is that right?
8      THE WITNESS:  They didn't understand -- they didn't
9  know what the price was.
10     THE COURT:  Are the specialty distributors your
11  agents, or are they completely independent?
12     THE WITNESS:  They're independent.  We sold the
13  product to them, they took title, and then they in turn sold
14  it to physicians.
15     THE COURT:  And the wholesalers can't sell to them,
16  so they only sell to hospitals, as I understand it?
17     THE WITNESS:  Hospitals and then specialty
18  pharmacies and infusion centers, et cetera; anything that's
19  not a physician office.
20     THE COURT:  So who decided discounts and that sort
21  of thing, rebates, or you didn't have any?
22     THE WITNESS:  We do not have any to physicians.
23  Q.  Mr. Hoffman, let's talk about the sales reps' efforts.
24  If you could return to Exhibit 252, which is closer to the
25  back of your set of tabs there, the "Office Based Infusion

## Page 64

1  Guide," your Honor.
2      THE COURT:  At tab what?
3      MR. MACORETTA:  252.
4  Q.  First of all, I want to talk to you about the last page
5  of that document.  You've seen this before, correct?
6  A.  Correct.
7  Q.  Okay.  I want to talk to you about the last page of that
8  document.  Down at the bottom it says "Centocor," and there's
9  a little IN number.  Do you see that at the bottom left
10  side?  IN99058 and 7/99?
11  A.  Yes.
12  Q.  Okay, that number means that this document was approved
13  by Centocor's Promotions Review Committee or whatever
14  committee approves marking materials, right?
15     THE COURT:  Where am I looking?
16     MR. MACORETTA:  The last page of Exhibit 252, your
17  Honor.
18     THE COURT:  And you're saying there's a --
19     MR. MACORETTA:  Look on the bottom left-hand side
20  side under the little Centocor logo.  It's mostly blank.
21     THE COURT:  All right, all right.
22  Q.  Okay.  That number down there at the bottom means it was
23  approved by the Promotions Review Committee at Centocor; is
24  that right?
25  A.  That's correct.

## Page 65

1  Q.  And the idea is that none of your reps should be giving
2  out marketing materials unless they're approved by the
3  Promotions Review Committee, right?
4  A.  That's correct.
5  Q.  So this document was given to physicians, right?
6  A.  Yes.
7  Q.  Okay.  And the concept of this document is to help
8  physicians understand the mechanics and finances of doing
9  Remicade infusions in their office, right?
10  A.  It was intended to show the overall logistics of
11  offering infusions.  Finances were a part of it, but as you
12  can see as you go through the guide, there are many other
13  logistical instructions as well as practical considerations
14  that they had to evaluate.
15  Q.  But finance was a part of it?
16  A.  It was one of the parts of it, yes.
17  Q.  Absolutely.  And in fact if you look at Page 4 under the
18  heading "Introduction," the first paragraph talks about the
19  purpose of the guide, and the paragraph ends with "The
20  benefits of providing Remicade infusion in the office setting
21  include," and could you read the last bullet point.
22     THE COURT:  So where are we, what page?
23     MR. MACORETTA:  We're on Page 4, which ends in
24  Bates No. 481.
25  Q.  So "The benefits of providing Remicade infusion in the

Page 86

1   would I be correct that in this document --
2       THE COURT: Actually, you know what? I hate to cut
3   you off so soon, but we could all use a break.
4       MR. CAVANAUGH: That's fine.
5       THE COURT: So what do you think you need,
6   like --
7       MR. CAVANAUGH: A half hour.
8       THE COURT: A half an hour? Go to noon. You think
9   you'll do what?
10      MR. BERMAN: Twenty, twenty-five minutes.
11      THE COURT: It's always my fault because I just
12  jump in, but assuming that's roughly right, we'll try and get
13  the next witness out of here.
14      MR. CAVANAUGH: So we're going to break until noon,
15  Judge?
16      THE COURT: No, no, 11:30, all right? I think you
17  could probably use a break, and we'll get you out of here
18  today.
19      THE WITNESS: Thank you, your Honor.
20      (A recess was taken, 11:00 a.m.)
21
22
23
24
25

Page 87

1       (11:30 a.m.)
2           IN OPEN COURT
3       THE CLERK: Please be seated.
4       THE COURT: We've got a big problem in that I
5   didn't mean to give carte blanche never introduce an exhibit.
6   I don't want them all coming in lump at the end. Introduce
7   them as they go and then if you forget one, there's some
8   largesse there, all right? Otherwise, it's too hard to keep
9   up with, okay?
10      You may be seated.
11      So what does that mean for you?
12      MR. MACORETTA: That means I would now like to read
13  in the exhibits we would like to introduce for Mr. Hoffman.
14      THE COURT: All right. Read them now, but it's
15  easier for me if they come in as they go. I'm just giving
16  you a safety valve.
17      MR. MACORETTA: Fair enough, your Honor.
18      THE COURT: Otherwise, Mr. Alba is here at the end
19  with a pile and they don't necessarily come in on the record
20  and that sort of thing.
21      MR. MACORETTA: Fair enough. And Mr. Cavanaugh has
22  agreed that they have no objection to these.
23      THE COURT: All right. So they are?
24      MR. MACORETTA: They are Plaintiffs' Exhibits 261,
25  285, Defendants' Exhibit 2835, Plaintiffs' Exhibit 254,

Page 88

1   Plaintiffs' Exhibit 252, Plaintiffs' Exhibit 289, and
2   Plaintiffs' Exhibit 825.
3       THE COURT: Are those all that you read on your --
4       MR. MACORETTA: These were all the exhibits I
5   referred to and talked about with Mr. Hoffman.
6       THE COURT: You're not shoveling in because it
7   looks interesting?
8       MR. MACORETTA: If you want me to, your Honor, the
9   book is much bigger and --
10      THE COURT: All right. So that's what you've
11  actually referred to.
12      MR. MACORETTA: Yes.
13      THE COURT: Fine.
14      MR. CAVANAUGH: No objection.
15      THE COURT: Okay. Go for it.
16      MR. CAVANAUGH: Thank you, your Honor.
17          CROSS-EXAMINATION
18  BY MR. CAVANAUGH:
19  Q. Mr. Hoffman, let's pick up where Plaintiffs left off.
20  They were referring to a submission to HCFA in order to
21  secure a J-Code for Remicade. In this submission, did
22  Centocor disclose Remicade's AWP and Remicade's list price?
23  A. Yes, they did.
24  Q. So Medicare had both pieces. They had the AWP and they
25  knew what Remicade's list price was.

Page 89

1   A. That's correct.
2   Q. And I believe the judge asked you this question: Were
3   any discounts offered to physicians off of Remicade's list
4   price?
5   A. No.
6   Q. Would you consider Remicade's pricing to be transparent
7   then?
8   A. Yes.
9   Q. Let me turn to --
10      THE COURT: Well, this is confusing.
11      MR. CAVANAUGH: It is, your Honor.
12      THE COURT: As I'm looking at -- I'm glad you
13  flagged answer 12, 11 and 12.
14      So you're saying here that the retail cost is less
15  than the wholesale cost.
16      THE WITNESS: And that's illogical, as I'm sure
17  you're ascertaining.
18      THE COURT: I'm just noticing.
19      THE WITNESS: So I think as Mr. Cavanaugh is
20  pointing out in his question to me, the intention of this
21  document is to provide HCFA with both the WAC and the AWP,
22  and the AWP is obviously the reference price that's used for
23  the reimbursement by law and so we provided both. The
24  questions were a little confusing as to where you provided
25  each one, but both were provided in the document.

Page 90

1  BY MR. CAVANAUGH:
2  Q.  And just so we're clear, I believe what Judge Saris has
3  just pointed out is, your retail cost wouldn't be below a
4  wholesale cost.
5  A.  Right.
6  Q.  Let's turn to Remicade.  What physician specialty treats
7  Crohn's disease?
8  A.  Gastroenterologist.
9  Q.  When Centocor launched Remicade in 1998 for Crohn's
10  disease, were gastroenterologists infusing drugs?
11  A.  Not to any great extent.
12  Q.  As a result, Judge Saris asked you questions about
13  direct costs associated with infusing Remicade.  Are there
14  also capital costs for a doctor that was not infusing drugs?
15  A.  Yes.
16  Q.  Could you explain to the judge what those capital costs
17  would entail?
18  A.  Sure.  It requires a dedication of office space to set
19  up infusion rooms, the purchase of infusion chairs, the
20  purchase of intravenous equipment, poles, bags, supplies,
21  et cetera.  In many cases it may require the hiring of
22  additional staff, an infusion nurse, that does not -- that is
23  trained differently than your typical office nurse, as well
24  as perhaps additional what I'll call back-room office staff
25  because of the complexity of the reimbursement and the

Page 91

1  insurance coverage.  And then there's also a lot of costs
2  associated with the procurement.  You probably had to buy
3  refrigeration for storage, et cetera.
4  Q.  Now, when Judge Saris asked you questions about direct
5  costs and you referred to a time-and-motion study, did that
6  time-and-motion study and the numbers you provided include
7  the capital costs that a physician would incur if he was
8  going to undertake infusion?
9  A.  It included some of them, but not all of them.  As I
10  mentioned, we used the Government Accounting Office
11  methodology.  Some of those costs were included in the study,
12  some of them were not.
13  Q.  And what about indirect costs?  Were those included in
14  the figure you provided?
15  A.  Once again, some of them were, some of them were not.
16  Q.  Let me -- we've had testimony in this case about copays
17  made by patients who received Remicade or any of the other
18  physician-administered drugs we're talking about in this
19  case.
20        Has Centocor looked at the level of nonpayment of
21  copays for Remicade?
22  A.  Yes, we have.
23  Q.  And what figures have you come up with?
24  A.  Our analysis indicates that an average of about 20
25  percent of the copays actually end up not being collected by

Page 92

1  the physicians.
2  Q.  So if a physician was looking at the cost structure for
3  infusing Remicade, would he or she have to look at some
4  portion of reimbursement not being received?
5  A.  Yes, a bad debt expense, if you will.
6  Q.  Did you take your bad debt expense into account in
7  looking at the time-and-motion study?
8  A.  No.  As a matter of fact, that's one of the ones that
9  specifically was not included, because it wasn't in the GAO
10  methodology.
11  Q.  So if we were trying to take -- when you said to the
12  judge, if you look at all of the costs, you would have to add
13  bad debt, additional capital expenses, as well as additional
14  indirect expenses that weren't covered by your
15  time-and-motion study?
16  A.  That's correct.
17  Q.  What physician specialty treats rheumatoid arthritis?
18  A.  Rheumatologists.
19  Q.  When Centocor launched Remicade for rheumatoid arthritis
20  in 1999, were rheumatologists infusing drugs?
21  A.  Not to a great extent.
22  Q.  Had rheumatologists had any bad experiences with
23  infusion drugs in the past?
24  A.  Yes, they did.
25  Q.  And what was that bad experience?

Page 93

1  A.  They had an experience with a product called Synvisc,
2  which was administered in the office, and they had a lot of
3  complications with coverage from payors, with reimbursement
4  from payors, not knowing which codes to use, et cetera, as
5  well as, as we mentioned before, the bad debt expense.  So as
6  a result of that, many rheumatologists ended up losing money
7  on administering that drug and decided to no longer offer
8  that service in their office.
9  Q.  What role, if any, did that play in how Centocor --
10        THE COURT:  Was that your drug or someone else's?
11        THE WITNESS:  It was someone else's drug, your
12  Honor.
13  Q.  That experience, what role, if any, did that play in how
14  Centocor approached pricing for Remicade?
15  A.  We knew that -- as I mentioned in my earlier testimony,
16  when you looked at all the components of pricing, the payor
17  implications, but we also had to make sure that there was
18  appropriate reimbursement for the provider in his or her
19  office, because if that didn't exist, there was a hurdle that
20  was going to have to be overcome, especially with the
21  experience that the rheumatologists had, and we had to
22  convince them that it was going to be financially viable and
23  they weren't going to lose money on us.
24  Q.  Can Remicade also be infused in hospitals?
25  A.  Yes.

Page 102

1  greater than the percentages expressed here?
2  A.  Right.
3  Q.  If rebates were being --
4  A.  Right, and that's why I was hesitated in answering your
5  Honor's question in that the average selling price would
6  include rebates.  This is just what's going to providers.
7       THE COURT:  And this is primarily hospitals.
8       MR. CAVANAUGH:  Yes.
9  BY MR. CAVANAUGH:
10  Q.  There's a handwritten note "and pharmacies," but is it
11  your understanding that these drugs are often administered in
12  hospitals?
13  A.  Yes.
14  Q.  Something like Epogen.  You're familiar with Epogen,
15  right?
16  A.  Yes.
17  Q.  That is administered in hospitals?
18  A.  And physician offices.
19  Q.  And physician offices.
20       Let me -- has Centocor worked with third-party
21  payors with respect to site of care?
22  A.  Yes.
23  Q.  And can you explain to the judge --
24       THE COURT:  Can I just go back to this document?
25       MR. CAVANAUGH:  Oh, sure.

Page 103

1       THE COURT:  So when you say average wholesale
2  price is the price at which wholesalers list their product,
3  this adds to the confusion.  Do you have a separate meaning
4  for it within your company?
5       THE WITNESS:  No.  I think this -- your Honor, this
6  document is saying that AWP is basically the list -- the
7  price -- the AWP, the wholesaler, the list that the
8  wholesalers -- if you look at the Red Book and First
9  Databank, there's a WAC, which --
10       THE COURT:  Wholesale acquisition cost?
11       THE WITNESS:  -- is the wholesale acquisition cost,
12  and then there's the AWP.
13       THE COURT:  So you understand this to mean at least
14  as what's put in the Red Book.
15       THE WITNESS:  That's correct.  Because the purpose
16  of this was to look at the difference between the
17  reimbursement level and the acquisition cost.
18       THE COURT:  All right.
19       MR. CAVANAUGH:  Your Honor, did you have any
20  further --
21       THE COURT:  No.
22       MR. CAVANAUGH:  Okay.
23  BY MR. CAVANAUGH:
24  Q.  Let me move to a different subject, which is:  Did
25  Centocor work with third-party payors with respect to the

Page 104

1  site of care for the infusion of Remicade?
2  A.  Yes, we did.
3  Q.  Can you explain to the judge those efforts?
4  A.  Yes.  A couple examples come to mind.
5       The first one was with Aetna.  They had identified
6  that there was a significant amount of Remicade infusions
7  happening in the hospital and that, as I mentioned before,
8  they were significantly more costly than the physician
9  office.  So they called us in and told us that as a result of
10  that, they were actually threatening to put severe
11  restrictions on Remicade access, prior authorizations,
12  et cetera.  And as we discussed it with them and understood
13  what their issue was, that it was really about the hospital
14  infusions, we told them that we had the ability through
15  information that we gathered through our verification of
16  benefits service that we could identify which physicians were
17  actually referring to which hospitals.
18       And so they gave us I think it was their top ten
19  hospitals that had the highest utilization, and we came back
20  with the analysis and showed which physicians were referring
21  to the hospitals.  And one of the interesting things that we
22  found in there was that in many cases, these were not
23  physicians who didn't infuse in their office.  These were
24  physicians who actually did in-office infusion, but they were
25  infusing Medicare parents, they were infusing other

Page 105

1  commercial payor patients in their office, but they were
2  sending their Aetna patients to the hospital.  And when Aetna
3  asked that question, they found in most cases it was because
4  the reimbursement that they were receiving from Aetna wasn't
5  adequate for them to infuse in the office.
6       MR. MACORETTA:  Your Honor, I hate to object, but
7  that's all hearsay.
8       THE COURT:  Sustained.  Hearsay.
9       Well, actually, I'm going to take that back.  I'm
10  going to sustain it as hearsay, but because state of mind is
11  part of this, I will allow it in for the corporate state of
12  mind as to why they were doing certain things.  I think
13  that's the best resolution of this.
14       MR. CAVANAUGH:  That's fine, your Honor.
15       THE COURT:  So that's something that you heard?
16       THE WITNESS:  They told us directly.  Aetna told us
17  directly --
18       THE COURT:  That's still hearsay, but that's
19  something that you used in your decisionmaking in pricing is
20  that fact?  Why is it relevant to you?
21       THE WITNESS:  It's relevant in terms of our
22  decision to work with payors to try to help them to continue
23  the support that the physician office should be the best site
24  of care from a cost perspective as well as many other
25  perspectives, and that pricing and reimbursement needed to be

27  (Pages 102 to 105)

## Page 106

1  aligned to support making the physician office the
2  appropriate site of care. And that affected pricing
3  decisions, it affected reimbursement decisions.
4  BY MR. CAVANAUGH:
5  Q.  Did you work with any other third-party payors?
6  A.  Yes, there was also High Mark, which is a regional plan
7  in western Pennsylvania, that had a similar concern about
8  hospital utilization. So what they did is, they took a
9  different approach. They set up a -- basically, they moved
10  away from the buy-and-bill model where physicians purchased
11  the drug and then billed the health plan, and put in a
12  managed injectable program through a specialty pharmacy, but
13  they created an infusion fee. They worked with physicians
14  rather and created an infusion fee that the physicians agreed
15  upon --
16         THE COURT: What was that?
17         THE WITNESS: It was about between 450 and $500 per
18  infusion, and as a result of that, over time their hospital
19  utilization continues to decline.
20         THE COURT: And did you work with Aetna directly to
21  bring patients back into the --
22         THE WITNESS: Your Honor, this one was High Mark,
23  which was a different one I just referred to.
24         But on Aetna, just to close that story, once we
25  shared with Aetna what was going on, they then took it upon

## Page 107

1  themselves and they actually created a case manager. And any
2  time a physician wanted to send a patient to the hospital,
3  they had to go through this case manager and the case manager
4  actually intervened and had a conversation with the physician
5  and said, "Why do you want to send them to the hospital
6  instead of infusing in your office?" And it's my
7  understanding the case manager actually had authority within
8  a range to negotiate reimbursement levels with the physicians
9  to try to keep it in the physician office.
10  BY MR. CAVANAUGH:
11  Q.  And you also worked with High Mark, which ultimately set
12  an infusion fee of $450?
13  A.  450 to $500, yes.
14         THE COURT: For what?
15         THE WITNESS: Per infusion.
16         THE COURT: For a three-vial infusion?
17         THE WITNESS: For a three-vial infusion, yes.
18  BY MR. CAVANAUGH:
19  Q.  And if we looked at current reimbursement under
20  Medicare, ASP+6, plus administration fee, how would that 450
21  compare?
22  A.  It would be about $300.
23  Q.  So under Medicare it would be 300, High Mark is paying
24  450?
25         THE COURT: Say that again.

## Page 108

1  A.  If you look at the total net reimbursement for Medicare,
2  which is the difference between the ASP+6 and the acquisition
3  cost, plus the administration reimbursement that they get on
4  the codes, they get about $300 for a three-vial, two-hour
5  infusion versus the case rate that they get from High Mark,
6  between 450 and $500.
7  Q.  When the MMA and ASP went into effect, was there an
8  increase in the administration fee for Remicade?
9  A.  Yes.
10  Q.  And what did it increase?
11         MR. MACORETTA: Your Honor, object to the relevance
12  of this. The class ends when the MMA goes into effect.
13         THE COURT: What's the question again? I missed
14  it. I'm looking at numbers. I'm not moving as fast as you
15  are.
16         MR. CAVANAUGH: I understand. When ASP went into
17  effect, your Honor, was there an increase in the
18  administration fee for Remicade, and your Honor has asked
19  questions on this very subject.
20         THE COURT: I'll allow that. That's fair.
21  A.  Yes, there was.
22  Q.  And what was that increase?
23  A.  It went from about $60, as I referred to earlier, it
24  went up to about $240 and subsequently dropped down to about
25  $220.

## Page 109

1  Q.  What effect on physician reimbursement was there when
2  you went to ASP+6 with the higher administration fee compared
3  to the AWP reimbursement that was then in effect?
4         MR. MACORETTA: Your Honor --
5         THE COURT: Overruled.
6  A.  It was pretty close to a wash at the time, because the
7  reduction in drug reimbursement was pretty much offset by the
8  increased administration fees.
9  Q.  Have most carriers moved to ASP?
10  A.  No.
11  Q.  Of those that have moved to ASP, have they strictly
12  followed Medicare and AWP+6?
13  A.  No.
14  Q.  What have they done?
15  A.  We've seen ranges. We've seen ASP+6, +8, +10, all the
16  way up to +12 percent.
17  Q.  Does Centocor offer rebates to managed care
18  organizations for Remicade?
19  A.  Yes, we do.
20  Q.  Let me show --
21         THE COURT: Just so I can understand the dynamics,
22  currently the physician is getting 220 for his administration
23  costs for Remicade, is that right?
24         THE WITNESS: That's correct.
25         MR. CAVANAUGH: 240, your Honor.

Page 110

1       THE COURT:  No, he said 220.
2       THE WITNESS:  220 for two hours.
3       THE COURT:  Okay.  And then what is the cost of the
4  drug now for the three vials?
5       THE WITNESS:  It ranges depending on the vial, but
6  let's say an average of about 517 per vial, so about sixteen
7  -- let's say $1600.
8       THE COURT:  For what, for each infusion?
9       THE WITNESS:  Yes, for a three-vial infusion.  Most
10 infusions are three or four vials.
11      THE COURT:  So a doctor is getting -- currently is
12 being reimbursed what, about 18, 20?
13      THE WITNESS:  No.  Our ASP+6 right now is about
14 537, so that times three is a little over 1600.
15      THE COURT:  All right, plus the administrative
16 fees.  How much does a doctor get per sitting?
17      THE WITNESS:  They get about an $80 differential on
18 the drug and about 220 on the administration fee, for a total
19 of about 300.
20      THE COURT:  I'm not following that math.  I want to
21 understand, because this goes to if there are damages, so I'm
22 just trying to understand.  You're saying -- so do the math
23 for me.
24      THE WITNESS:  Okay.  The reimbursement for Medicare
25 is based on ASP+6, which right now I believe is for Remicade

Page 111

1  $537 a vial.  Let's do them on a per vial basis and then
2  we'll multiply it.
3       THE COURT:  Okay.
4       THE WITNESS:  The average acquisition cost for
5  Remicade right now I think is in the, say, 515 range, so
6  there's a net $22 per vial differential on the drug.  Let's
7  use three vials per infusion, so 22 times three is 66, and
8  they're getting about $220 for a two-hour -- the
9  administration that they get using the codes, the infusion
10 codes.  So when you add the 220 plus the 66, you're just
11 short of $300.
12      THE COURT:  And that's what the Federal Government
13 is paying right now.
14      THE WITNESS:  That's correct.
15      THE COURT:  So in the olden days, they were paying
16 more.
17      THE WITNESS:  That's correct.
18      THE COURT:  In the olden days they were paying
19 roughly 387.
20      THE WITNESS:  That's correct.
21      THE COURT:  Okay.  So basically, the difference to
22 the Government from doing it this way as opposed to the old
23 way is about $87 a sitting, is that right?
24      THE WITNESS:  Roughly.
25      THE COURT:  I understand.  Thank you.

Page 112

1  BY MR. CAVANAUGH:
2  Q.  I've marked this as Defendants' Exhibit 2804.  Can you
3  identify this document?
4  A.  Yes.  This is a managed care -- amendment, actually, to
5  a managed care contract that we offer.
6       THE COURT:  Where are we now?
7       MR. CAVANAUGH:  2804, your Honor, which I believe
8  was handed to you.
9  Q.  Why does Centocor contract with managed care
10 organizations?
11 A.  Because managed care organizations have the ability to
12 control access to the product through formularies and
13 utilization management measures.
14 Q.  And there's a reference here on the first page, if we
15 could bring it up, to two different rebate levels.  Can you
16 explain to the judge -- now, just so we're all on the same
17 page, these would be reimbursements -- Health Net would
18 reimburse physicians for administering Remicade, correct?
19 A.  That's correct.
20 Q.  So you would contract with Health Net that Health Net
21 would get a rebate of some -- to some extent?
22 A.  That's correct.
23 Q.  Now, you have two different level rebates here, level
24 one, six percent; level two, eight percent.  Can you explain
25 to the judge why there are two different levels?

Page 113

1  A.  Yes.  Your Honor, when we originally went out with our
2  offerings to managed care, we recognized that some health
3  plans were interested in creating a non-buy-and-bill type of
4  arrangement where the physicians didn't buy and bill the
5  product.  They wanted them to have a flat infusion fee
6  similar to the example I used with High Mark, and in order to
7  support that, we offered two different contracts.
8       The first one is the level one, which as you see
9  says no infusion fee, which means it's basically the
10 traditional buy-and-bill offering, so any health plan that
11 continued to offer the buy-and-bill option, they got a six
12 percent rebate.
13      Those health plans that wanted to put in the
14 infusion fee, flat infusion fee basis, we offered them an
15 additional two percent rebate provided that they follow the
16 process whereby they convened a panel of physicians and
17 discussed and negotiated an appropriate infusion fee for
18 reimbursement.  And as long as they followed that process --
19 we didn't say what that fee had to be.  We just required them
20 to follow a process so that the physicians were getting an
21 appropriate reimbursement.
22 Q.  And when did Centocor start offering these -- proposing
23 rebate agreements with managed care?
24 A.  I believe early 2000.
25 Q.  All right.  This is a contract -- the original contract

29 (Pages 110 to 113)

## Page 114

1  effective date in Exhibit 2804 is April 1, 2000, correct?
2  A. Yes, it is.
3        MR. CAVANAUGH: Your Honor, we would move 2804 into
4  evidence.
5        MR. MACORETTA: No objection, your Honor.
6  Q. Do you interact a lot with third-party payors?
7  A. Yes, I do.
8  Q. How many meetings have you had with third-party payors
9  since you assumed your job in 2002?
10  A. Hundreds.
11  Q. In the course of those discussions, do third-party
12  payors question you about physician acquisition costs?
13  A. Not really, because, you know, it's not really relevant
14  to them. What's relevant to them is what their cost is.
15        MR. MACORETTA: Objection, your Honor.
16        THE COURT: Sustained.
17  Q. Do they raise physician -- what the physician
18  acquisition cost is with you?
19  A. Not really.
20        THE COURT: When you say you meet with third-party
21  payors, do they tend to be the Aetnas and the Blues or the
22  little labor plans?
23        THE WITNESS: The Aetnas and the Blues and the
24  regional health plans primarily, your Honor.
25        THE COURT: What's a regional health plan, like

## Page 115

1  Fallon here or --
2        THE WITNESS: Yes, exactly.
3        THE COURT: -- Harvard Pilgrim --
4        THE WITNESS: Harvard Pilgrim, Tufts.
5  Q. Do you understand when you meet with Blue Cross and
6  others that they're acting as representatives of smaller
7  plans, like labor plans?
8  A. Yes.
9        MR. MACORETTA: Objection.
10        THE COURT: Overruled.
11  A. Yes.
12  Q. If a rebate is paid to a management care organization
13  that's reimbursing the doctor, what's the effect of that
14  rebate on the cost to the carrier for reimbursing the doctor?
15  A. It reduces their net cost of the drug.
16  Q. So when we talk about spreads in this case, from the
17  payor's perspective, the spread is smaller?
18  A. Yes.
19  Q. Does Centocor have programs to assist patients with
20  respect to copays?
21  A. Yes, we do.
22  Q. Could you explain to the judge what those programs are?
23  A. We really have two types of programs.
24        The first is what we call our patient assistance
25  program. Basically, any patient who applies for the program

## Page 116

1  whose income is 300 percent or less of the federal poverty
2  level, they are eligible to receive free drug for infusion,
3  and we have a vendor that ships the drug to physicians and
4  the physicians infuse the patients.
5        THE COURT: When did that start?
6        THE WITNESS: That's been an exception I think
7  pretty much since the beginning. I don't know exactly, your
8  Honor.
9        THE COURT: But at the poverty level --
10        THE WITNESS: Three hundred percent of the federal
11  poverty level.
12        THE COURT: Well, what does that mean?
13        THE WITNESS: That means if the federal poverty
14  level --
15        THE COURT: What is it? I don't even know.
16        THE WITNESS: It depends on the region. But let's
17  say it's $20,000. Then if their income is 60,000 or less,
18  they would qualify.
19        THE COURT: All right.
20  BY MR. CAVANAUGH:
21  Q. Is there a second program?
22  A. Yes. We also contribute to independent foundations to
23  help patients who don't qualify, who have, you know, greater
24  income than 300 percent of the federal poverty level, but
25  might still have difficulty meeting some of the out-of-pocket

## Page 117

1  costs. We make significant contributions to independent
2  foundations who then help provide financial support to
3  patients with their out-of-pocket costs. And these
4  foundations, they don't have to give it for even our product.
5  They can -- they're done on a disease-state basis, so it
6  might be a rheumatoid arthritis foundation and they can
7  provide support whether they're on our products, or
8  competitors' products, whatever, but we just give an
9  unrestricted contribution to help do that.
10        THE COURT: When did that start?
11        THE WITNESS: We've been doing that for the last
12  several years. I'm not sure exactly when it started.
13        THE COURT: Two or three?
14        THE WITNESS: At least three.
15        THE COURT: And how much do you give annually?
16        THE WITNESS: I don't have that figure with me off
17  the top of my head, but --
18        THE COURT: Thousands, millions?
19        THE WITNESS: Millions. Tens of millions.
20  BY MR. CAVANAUGH:
21  Q. Have the sales of Remicade been growing each year?
22  A. Yes, they have.
23  Q. At roughly what?
24  A. Three to $400 million per year.
25  Q. Let me take you to -- when did you first start working

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 7-1 - 7-156

BENCH TRIAL - DAY SEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 16, 2006, 9:15 a.m.

LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 18

1 Johnson & Johnson?
2         MR. BERMAN:  We named it as a subsidiary.
3         THE COURT:  You named it as a subsidiary.
4         MR. BERMAN:  Yes.
5 Q.  Okay, we're at Page 1805, and I'd like to ask you some
6 questions about the paragraph that I've highlighted on the
7 screen, but you're welcome to look at it in hard copy.  You
8 write, "A drug survey is imminent, and it would show that no
9 physicians are paying AWP in the marketplace.  A survey would
10 look at average acquisition price and associated overhead
11 costs.  If there was a significant difference between AWP and
12 acquisition price (which there would be) the reimbursement
13 rate would be lowered.  Again, reimbursement rates can be
14 lowered by survey or an arbitrary pricing decision."
15        What was your understanding with respect to what
16 type of survey could be done and by who?
17 A.  My understanding was that because there had been a lot
18 of discussion on Capitol Hill with CMS, that CMS could decide
19 to authorize a survey to actually get what the drug pricing
20 was for physicians; and CMS could authorize that survey when
21 they wanted to or instruct their local Medicare carriers to
22 do that.
23 Q.  Okay, when you write here, "If there was a significant
24 difference between AWP and acquisition price (which there
25 would be) the reimbursement rates would be lowered," is it

Page 19

1 correct to say, at that time you felt that if CMS found out
2 there was a difference, that they could lower the prices?
3 A.  Well, CMS knew that there was a difference.  And I know
4 personally, I had a number of conversations with
5 different people at CMS --
6         THE COURT:  Who?
7         THE WITNESS:  I'm sorry, with -- it would have been
8 CMS, or the Centers for Medicare Services, which was the old
9 HCFA, the Health Care Finance Administration.
10        THE COURT:  Right, and who was the person you would
11 talk to?
12        THE WITNESS:  Oh, I spoke to a number of people
13 over the course of the time.  Nancy-Ann min DeParle.
14        THE COURT:  What did you tell her was happening?
15        THE WITNESS:  I can actually specifically remember
16 talking to her about this in the 1997 time frame because we
17 were talking about the difference of how the government
18 reimbursed EPO, or, you know, erythropoietin, two different
19 ways, one being in the end-stage renal disease population, or
20 people on dialysis, and the other being in oncology people
21 who had cancer.  And because they were separate government
22 programs, she was very interested in why the government was
23 reimbursing the same drug differently, and that led to a
24 discussion about the fact that in oncology, there had been a
25 lot of discussion on Capitol Hill about the need to reform

Page 20

1 average wholesale price.  And what we talked to Nancy about
2 was the fact that at that point, Procrit in the oncology
3 population was being reimbursed at, depending on the period
4 of time, either 100 percent or 95 percent of AWP, and that
5 suddenly physicians were buying at less than the list price.
6 So they knew that.  In our case, the discounts varied, you
7 know, 5 --
8         THE COURT:  When you say list price there, you mean
9 they knew people were purchasing less than AWP?
10        THE WITNESS:  They knew that people were,
11 absolutely, and they knew that --
12        THE COURT:  But you weren't referring them to the
13 WAC and then reductions below that, right?
14        THE WITNESS:  Actually we were, because when I
15 talked personally to Nancy-Ann min DeParle and Kathy King,
16 who was her special assistant, we talked about the fact that
17 actually physicians when they bought the drug, they were
18 buying the drug less than what the list price was, and then
19 they were reimbursing off of AWP.  And she was very
20 interested, for example, in, if Medicare was paying 80
21 percent, how often did the physicians collect the 20 percent
22 copay?  So she wanted to know what was that margin or what
23 was the dollar amount that they would get from what they
24 bought the drug for versus what Medicare would reimburse.
25        And she actually also asked, you know, were we a

Page 21

1 drug that had a high difference on that?  And we happened to
2 be a drug that didn't have a high difference.  It was, I
3 don't know, 5 to 10 or 4 to 8 or somewhere in that discount
4 range.  And she was well aware because she had attended
5 hearings on Capitol Hill where they had displays that talked
6 about different drugs that had different margins.
7         So it was important for us to explain to her two
8 things: one, the difference of how our drug was reimbursed
9 in oncology, and, secondly, the fact that the discount that
10 we had was a small discount, and certainly at that time, you
11 know, oncologists needed some revenue to take care of
12 administering the cost of the drugs.
13        And that was, I would say, your Honor, one of
14 several conversations, not just with Nancy-Ann min DeParle,
15 but over the course of time, you know, Tom Scully, who was
16 another administrator --
17        THE COURT:  Did you talk personally to Tom Scully?
18        THE WITNESS:  Oh, numerous times, numerous times,
19 in both meetings, you know, on his cell phone.  You know,
20 you'd see him at meetings, so there were formal times that we
21 talked to him and laid things out, and there was informal
22 times.  Bob Neiman, who was a senior administrator up at CMS,
23 we had a lot of conversations about exactly what the
24 reimbursement for Procrit was because --
25        THE COURT:  And that would be, you said, in the

Page 22

1  1997-1998 time frame?
2       THE WITNESS:  Definitely with Bob Neiman.
3  Nancy-Ann min DeParle in that same time frame.
4       THE COURT:  The late '90s?
5       THE WITNESS:  It's like '96, '97, '98, that time
6  frame.  Tom Scully would have been later.
7  Q.  And so you say you had these discussions with CMS.
8  Isn't it true, ma'am, that you were writing your superiors at
9  the same time you now claim you had these discussions telling
10 your superiors that "It's fortunate for us that they do not
11 know what the cost is for different providers"?
12 A.  Are you looking at this memo?
13 Q.  No, I'm not, but do you recall informing your superiors
14 that it was fortunate for J & J, or Ortho, that CMS did not
15 know the cost for the providers of Procrit?
16 A.  If I recall correctly, what I --
17      THE COURT:  Where are you reading from, Mr. Berman?
18 Q.  Well, let's take a look at Exhibit 259.
19 A.  I'm sorry, 259?
20 Q.  Yes.
21      MR. BERMAN:  Before I do that, I move for admission
22 of the prior exhibit.
23      THE COURT:  What number?
24      MR. BERMAN:  What number was that?
25      THE COURT:  339?

Page 23

1       MR. BERMAN:  339.
2       (Exhibit 339 received in evidence.)
3  Q.  Now we're at 259, and is this a memo that you wrote or
4  an E-mail that you wrote?
5  A.  It is.
6  Q.  Okay, let's go through this.  At the very beginning you
7  say, "They initiated a pricing survey in 1994 that was
8  canceled midway, as there was a regulatory glitch that they
9  did not take into effect.  This was fortunate for us."  And
10 then in the second paragraph you talk about the pricing
11 survey is one of the ways the Secretary can set a price.
12 Then you go down to the paragraph second to the last to the
13 bottom:  "The only way that they could correct the current
14 system is to require an invoice be submitted with each
15 Medicare claim that is sent in.  This would be very
16 cumbersome, and the medical providers and the Medicare
17 carriers have rejected this (with 39 million recipients, the
18 number of claims is significant).  Right now they do not know
19 what the cost is for different providers."
20      Did you write that?
21 A.  I did write that.
22 Q.  And do you have -- I mean --
23 A.  But I guess without --
24 Q.  Excuse me, ma'am.
25 A.  I'm sorry.

Page 24

1  Q.  Do you have with respect to these meetings a meeting
2  with --
3       MR. CAVANAUGH:  Your Honor, the witness was
4  answering the question.
5       THE COURT:  No, no.  What's the next?  There was no
6  question.
7  Q.  Do you have with respect to these meetings -- I mean,
8  when you meet with Mr. Scully, he was head of the agency,
9  right?
10 A.  When I met with Mr. Scully, he was the CMS
11 administrator.
12 Q.  Okay, so he's the top dog?
13 A.  No.  That would be incorrect.
14 Q.  All right, but he's an important high-level official
15 there, correct?
16 A.  Yes.
17 Q.  And do you have any contemporaneous memo that you
18 created reporting to your superiors, as you are doing here,
19 reflecting your conversations with Mr. Scully in which
20 Mr. Scully said, "I know all about how much doctors are
21 acquiring Procrit at"?  Do you have any memo that you wrote?
22 A.  I don't have a memo that I wrote, but certainly in --
23 Q.  That's all I asked was what you wrote, ma'am.  Do you
24 have a memo that you wrote?
25 A.  I don't have a memo that I wrote, no.

Page 25

1  Q.  Do you have any contemporaneous notes that you took of
2  these meetings?
3  A.  Not that I'm aware of.
4  Q.  And are you aware that your lawyers in this case
5  subpoenaed CMS, CMS produced millions of documents, and you
6  have not seen any notes from CMS of your meetings with them,
7  have you?
8  A.  I haven't had -- I have not.
9  Q.  Nothing has been brought to your attention in that
10 regard?
11 A.  Not that I'm aware of.
12 Q.  And looking at that memo, let's turn to Page 2 for a
13 second, and could you take a look at the two last bullet
14 points there.
15      THE COURT:  Well, let me ask you this:  Did you
16 ever get concerned about the copayments that people were
17 making based on AWP, that that was a fictitious price?
18      THE WITNESS:  Absolutely.  And, as a matter of
19 fact, we were very concerned about that and did several
20 things to try to address that.  We had a very extensive
21 patient assistance program that would try to find if people
22 had supplemental insurance; for example, if somebody had a
23 spouse that had insurance from, you know, a past government
24 job or a railroad job so that it would pick up some of the
25 copay.  We also instituted a foundation that would help

Page 58

1    A.   Procrit's list price was $10 per 1,000 units.
2    Q.   And what was Procrit's AWP?
3    A.   Procrit's AWP was list plus 20 or $12 per 1,000 units.
4    Q.   Was there any exception to the $10 per 1,000-unit list
5    price for any of the Procrit vial sizes?
6    A.   There was.  For the 10,000-unit vial size, which we
7    would expect to be the one that would be used in indication,
8    there was a discount offered off of that, so that was $9.50
9    per 1,000 units.
10   Q.   And was the AWP on that 10,000-unit vial size
11   correspondingly lower?
12   A.   Yes, it would.  It would be list plus 20 again.
13   Q.   When Ortho came to market at that list price, what
14   happened next to the Ortho price?
15   A.   Initially when Ortho Biotech came to market, they didn't
16   offer discounts for the first couple of months, but found,
17   just like the OTA report had said, that to establish
18   themselves, they would need to offer some discounts.  So some
19   discounts, minimal, 5, 10 percent, somewhere in there -- it
20   could vary by provider -- were put into the marketplace.
21   Q.   And what was the purpose of offering those initial
22   discounts?
23   A.   Well, because, as we mentioned, those two drugs are
24   exactly the same and you were the second drug into the
25   marketplace, you needed to offer a discount to get physicians

Page 59

1    to try the new drug that was on the market, which was the
2    exact same drug that was already on the market.
3    Q.   And over the course of Procrit's history prior to the
4    introduction of competition later on, what was the general
5    range of discounts that Ortho Biotech offered on Procrit?
6    A.   General range was somewhere between 5 and 10 percent.
7    Q.   Okay, I think you were shown a document that suggested
8    that at one point the range went as high as 12 percent?
9    A.   There definitely could have been providers that got
10   12 percent, just like there could have been providers that
11   got 3 percent.  You could have certain providers that got a
12   better discount but still in that ballpark.
13   Q.   Now, you had an opportunity to describe for the Judge a
14   little bit about your conversations with HCFA about Procrit
15   and Procrit reimbursement.  Did you have any conversations
16   with HCFA about Procrit's acquisition price other than the
17   ones you described earlier this morning?
18   A.   Absolutely.  One of the ones that's most vivid in my
19   mind is one with Dr. Jeffrey Kang who was a director of
20   coverage at then HCFA, now CMS, and we had several meetings
21   with Dr. Kang.
22         THE COURT:  How do you spell that?
23         THE WITNESS:  K-a-n-g, and he's an M.D. and Ph.
24   And we were talking to him initially about the new surgery
25   indications, so this would have been in the '97 time frame.

Page 60

1    And Dr. Kang, like many other people at HCFA, was trying to
2    understand the difference between reimbursement in the
3    end-stage renal disease and for the same drug in the
4    nondialysis population.  He actually felt that possibly --
5          MR. BERMAN:  Excuse me, your Honor.  This is
6    hearsay, what he felt.
7          THE COURT:  Yes, sustained, objection sustained.
8    Just what you said to him.
9    Q.   What did you tell Dr. Kang about the price of Procrit in
10   the marketplace?
11   A.   Dr. Kang asked what the price of Procrit was, and I told
12   him --
13         MR. BERMAN:  I object.
14         THE COURT:  No, what he asked isn't hearsay.  Go
15   ahead.
16   A.   He did ask what the price of Procrit was, and we
17   explained what the price was.  He asked specifically, why was
18   Procrit reimbursed differently?  And so I explained to him
19   why I thought the surgery indication in Procrit met the
20   criteria for Part B reimbursement, which would be that it
21   would be reimbursed incident to a physician's service.  And
22   he was interested, because surgeons didn't usually give drugs
23   in their office, what that would mean to physicians.  So he
24   asked, you know, the discounts in the marketplace, what were
25   they at that time?  So he understood from what --

Page 61

1          THE COURT:  No.
2    Q.   What did you tell him about the discounts available in
3    the marketplace at that time in response to his question?
4    A.   I told him they were 5 to 10 percent off of the list
5    price.  That's typically what physicians would have gotten.
6    Q.   Did you have conversations about Procrit reimbursement
7    and Procrit's price with an individual named Bob Neiman at
8    HCFA?
9    A.   I did.
10   Q.   And who is Bob Neiman?
11   A.   Bob Neiman was a senior policy person, very familiar
12   with erythropoietin at HCFA.
13   Q.   And when did you have those conversations?
14   A.   In the 1996 to 1998 time frame.
15   Q.   Did you have occasion in those conversations to speak
16   with Dr. Neiman about Procrit reimbursement and acquisition
17   prices?
18   A.   I did.
19   Q.   And what did you tell him?
20   A.   I talked specifically to Dr. Neiman and told him about
21   how Procrit was reimbursed in the Part B setting for
22   indications outside of dialysis.  And specifically he asked
23   what the difference was between what people would buy the
24   drug for and what they would get the drug --
25         MR. BERMAN:  Objection.

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2
3
     In Re:                      )
4    PHARMACEUTICAL INDUSTRY     ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE     ) MDL No. 1456
5    LITIGATION                  ) Pages 9-1 - 9-144
6
7
8               BENCH TRIAL - DAY NINE
9        BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
10
11
12
13
                      United States District Court
14                    1 Courthouse Way, Courtroom 19
                      Boston, Massachusetts
15                    November 21, 2006, 9:10 a.m.
16
17
18
19
20
21
22
                    LEE A. MARZILLI
23              OFFICIAL COURT REPORTER
             United States District Court
24            1 Courthouse Way, Room 3205
               Boston, MA  02210
25                (617)345-6787

Page 126

1   A.  Well, what you mischaracterize is that I abandoned my
2   33 percent yardstick.
3   Q.  Okay, you don't like the word "abandoned."  I
4   understand.
5   A.  I never embraced it, but --
6   Q.  You never embraced it, okay.
7   A.  So why don't we just leave it that way.
8   Q.  But at one point you had suggested 33 percent, maybe
9   kind of, but now it's 30.  And you said yesterday that one of
10  the things you were surprised to find is that you didn't find
11  physician rebates.  But there were physician rebates, weren't
12  there?
13       MR. SOBOL:  Objection.  I'm not sure which is the
14  question.
15       THE COURT:  Overruled.
16  A.  What I found, the types of rebates that I was talking
17  about were rebates to PBMs and to third-party payors and, I
18  applied ratios of rebates overall in my class cert
19  declaration to all spreads because I hadn't a full
20  understanding of how all the reimbursement worked and how all
21  the rebates were paid.  I have since then looked at
22  information that shows things that are called rebates are
23  called discounts to --
24  Q.  Let me ask it this way.
25  A.  -- to providers.

Page 127

1   Q.  Can we agree that when you went and you looked at the
2   available information, there were rebates provided to
3   physicians on physician-administered drugs?
4   A.  There -- whatever was paid --
5   Q.  Dr. Hartman, I have such limited time.  I think you
6   could answer that yes or no.
7   A.  I don't know what they were called.  We took all
8   negative offsets to providers, and if they were called a
9   rebate or in the rebate database, those weren't taken account
10  of.
11  Q.  Okay.  And would you agree with me that if you had
12  applied a 33 percent spread, that would be a more
13  conservative approach than 30 percent?
14  A.  If I had some reason to believe 33 percent was a real --
15  I could have applied 100 percent.  That would have been even
16  more conservative.
17  Q.  All right, let's go to your Remicade spreads, Hartman
18  Trial Declaration, Attachment G-3C.
19  A.  And is this in --
20  Q.  They're going to come up on the screen.
21  A.  It's easier for me to look at it in hard copy.  I mean,
22  can you just tell me what -- there it is, good.
23  Q.  All right, and it's the bottom, and if we could
24  highlight the bottom.  And it might be easier, why don't we
25  just pull up the demonstrative DD 6, please.  All right, so

Page 128

1   under your approach, there's two speeding tickets --
2       MR. CAVANAUGH:  Your Honor, that's demonstrative
3   DD 6.
4   A.  That's right.
5   Q.  Okay, so you would give Centocor speeding tickets in
6   1999 and 2001 but not in the other years, correct?
7   A.  When I see that any drug has exceeded what is a
8   conservative threshold, a speeding ticket is issued.
9   Q.  Now, you'd agree with me that the key to your -- one of
10  your findings here is that there was a lack of price
11  transparency in the physician-administered drug market,
12  right?
13  A.  That's correct.
14  Q.  And, in your view, the spread must be increased
15  secretly, right?
16  A.  The spread, the size of the spread, as quotes from your
17  own -- from the former Centocor marketing director, which I
18  cite in Paragraph 56 and 59 of my direct testimony, says:
19  Look, we want to move some market share, and let's not show
20  this to people that they get an idea of what's going on.  So
21  there's secrecy involved there.
22  Q.  Now, let's talk about what information was available.
23  You'd agree with me that throughout this period 1998 to 2003,
24  there was a published AWP and a published WAC for Remicade,
25  right?

Page 129

1   A.  Yes.
2   Q.  All right.  And there was a 30 percent difference
3   spread, right?
4   A.  That's correct.
5   Q.  So the 30 percent spread was publicly available?
6       THE COURT:  And what year is this?
7       MR. CAVANAUGH:  Throughout the entire period.
8       THE COURT:  Are these in the red books, you mean?
9       MR. CAVANAUGH:  Yes, and First Databank.
10  A.  That information would have been available to someone
11  who sought it out and didn't assume that the spread was
12  closer to Procrit.
13  Q.  But First Databank, Red Book, they're widely used
14  services, are they not?
15  A.  They are.
16       THE COURT:  So the spread in there was 30 percent?
17       THE WITNESS:  The spread in -- I believe the spread
18  was 30 percent with AWP and WAC spread for Remicade.
19  Q.  If we could go to DX 2782, which is the plaintiffs'
20  response to our request for admissions, at Page 3.  It's on
21  your screen, Dr. Hartman.  We asked the plaintiffs to admit
22  that "From 1998 to the present, the published AWP for
23  Remicade has been 130 percent of the published WAC for
24  Remicade."  And plaintiffs' response was that that was
25  admitted, right?

33 (Pages 126 to 129)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 10-1 - 10-149



BENCH TRIAL - DAY TEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 27, 2006, 9:10 a.m.








LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

272ee0c4-a034-4f53-a9c7-d0f67cbc85ba

Page 70

1  class period, there were hundreds of physician-administered
2  drugs sold?
3  A.  That's correct.
4  Q.  And there were thousands of self-administered drugs
5  sold?
6  A.  Correct.
7  Q.  And would you also agree with me that for all of those
8  drugs for which AWP works, if we looked at the published
9  AWPs, not one of those would be the same as the actual
10  average selling price of the drug?
11  A.  I don't know that not one of them.  It's a very strong
12  statement.  But it would be my understanding that that would
13  not ever happen.  If it did, it would be very rare.
14  Q.  So there would always be a difference with respect to
15  thousands of drugs?
16  A.  I believe that to be true.
17  Q.  All right.  And so Procrit would fall within that
18  99 percent, correct?
19  A.  There is a difference between AWP and ASP for Procrit,
20  yes.
21  Q.  But it would fall into it with respect to your statement
22  that AWP works for 99 percent of the drugs, and Procrit would
23  be within that 99 percent, correct?
24  A.  Adopting Professor Hartman's liability threshold, that
25  would be true.

Page 71

1  Q.  So, in your view, there's nothing inherently wrong with
2  a published AWP that is different from the actual selling
3  price of the drug, right?
4  A.  Well, again, I'm not an expert on right and wrong, but
5  the general issue is that they should track but not certainly
6  equal.
7  Q.  Your problem with it is when the spread becomes too big,
8  right?
9  A.  Yes.
10  Q.  But you don't have a specific opinion as to whether
11  Dr. Hartman's 30 percent spread is the right yardstick,
12  correct?
13  A.  That's correct.
14      THE COURT:  Do you believe that all the third-party
15  payors throughout the class period knew about the formulaic
16  20 to 25 percent markup between WAC and AWP?
17      THE WITNESS:  I believe the relationship between
18  those list prices, I believe that that was generally known.
19  I'm sure that not universally known, but I believe that that
20  information --
21      THE COURT:  I'm not talking about the consumers.
22      THE WITNESS:  Right, right, no, no, of course.
23      THE COURT:  But the third-party payors, was that
24  just universally known throughout the class period?
25      THE WITNESS:  I believe, for those that worked in

Page 72

1  the pharmaceutical end of the business, I believe that they
2  would have known about that difference between the list
3  prices.
4      THE COURT:  So that's the bulk of the markup of the
5  30 percent speed limit?
6      THE WITNESS:  Oh, right, not in the case of where
7  the spreads are very large, but in terms of the speed limit
8  itself, yes, that would be the large part of it, yes.
9      THE COURT:  Except for that final 3 to 5 percent.
10      THE WITNESS:  Right, yes.
11  Q.  And just to follow up on Judge Saris' question to you
12  and some questions Mr. Wise asked you, if, for example, you
13  had a difference between a published AWP and a published WAC
14  of 25 percent, if you offered a 3.84 percent discount, you
15  would be at Dr. Hartman's 30 percent speed limit, right?
16  A.  That's an average discount, of course.
17  Q.  Of course.  Now, let me turn to Remicade.  Now, your
18  view is that there was a general lack of price transparency
19  in the market, correct?
20  A.  That's correct.
21  Q.  The binder I've given you has your direct testimony.  If
22  we could turn to Paragraph 11 on Page 9.
23  A.  I'm sorry, is that the first tab, the second tab?
24  Q.  Yes, I believe it says --
25  A.  Yes, I'm catching up with you now.  Thanks.

Page 73

1      THE COURT:  Where are we?  This is on her
2  declaration?
3      MR. CAVANAUGH:  Yes, this is on her declaration.
4  I'll just put it up on the screen, your Honor.
5  A.  Page 6, yes.
6  Q.  And you speak about opaque discounting practices of the
7  defendants.  Now, you're aware, aren't you, that the
8  published spread between AWP and WAC for Remicade was
9  30 percent, right?
10  A.  I am, yes.
11  Q.  All right.  And if we could turn to Paragraph 50 of your
12  declaration, and if we could just focus on the first
13  sentence.
14  A.  Yes.
15  Q.  You say, "For Remicade, a J & J drug, the average
16  spreads over the damage period were approximately
17  30 percent."  Do you see that?
18  A.  Yes, I do.
19  Q.  So we can agree that over the class period, the
20  published spread for Remicade actually reflected the
21  difference between the AWP and its average selling price,
22  right?
23  A.  To the extent that a payor would have known that there
24  was this one drug with an anomalous 30 percent spread, I
25  guess, again, as we just talked about, the common knowledge

19 (Pages 70 to 73)

Page 74

was that those markups were 20 to 25 percent. The 30 percent is quite anomalous.
Q. Well, Dr. Rosenthal, you're aware that Dr. Hartman uses the numbers published in First Databank and Red Book to come to his expectation theory, right?
A. Right.
Q. So as Dr. Hartman sees it, payors would be looking to First Databank and Red Book to understand pricing, right?
A. The general 20 to 25 percent markups, I think you're construing it as looking drug by drug at each markup. It is quite anomalous to find one that's different than 20 to 25 percent.
Q. But that number was published and available to all, correct?
A. That is correct.
Q. And the spreads you have calculated are reflective of that published number, right?
A. That is correct.
Q. So would you agree with me that your opinions regarding price transparency and the opaqueness of discounting don't have any bearing on Remicade?
A. I believe that the situation is different in the case of Remicade for certain -- again, it's not clear that the third-party payors were aware of that 30 percent difference despite the fact that it's in the book.

Page 75

Q. Okay. Now --
THE COURT: Well, explain. Why not?
THE WITNESS: Well --
THE COURT: I understand that maybe they don't know whether it's 28 percent or 26 percent or 30 percent, but why wouldn't they have a sense that it was in that ballpark, at least over 20 percent?
THE WITNESS: Right, so, again, I think the third-party payors recognized that -- those that worked in pharmaceutical pricing recognized that there was typically this 20 to 25 percent markup. They probably didn't know which manufacturers were which. But then to find one drug where the 20 to 25 percent is 30 percent instead, and that five-percentage-point difference makes a big difference with an expensive drug, why would they know for one individual drug? Really, they would have to be tracking all of these drugs to know that one of them was somehow off to the left.
THE COURT: Well, could you always tell whether it was a 20 percent spread as opposed to a 25 percent spread? Was that always published in the Red Book or the --
THE WITNESS: You can tell from the book what the markup is.
THE COURT: So you always knew whether it was 20 or 20 percent?
THE WITNESS: I believe that -- I know there are

Page 76

different ways of listing it, depending on what the manufacturer reports versus what the publisher marks up, but I believe you could always tell what the markup is if you were to look carefully at the book, yes.
THE COURT: Okay, so that what you're saying -- it could be billions of dollars, I don't know, but you're saying the individual percentage spreads between 25 and 30 percent, which is within the speed limit, you may or may not know?
THE WITNESS: I'm sorry, maybe I wasn't clear.
THE COURT: So Hartman says 30 percent, right?
THE WITNESS: Right.
THE COURT: You're saying you'll know if it's 25 percent, right?
THE WITNESS: Right, you'll know from the book that it's at least 20 or 25 percent difference between AWP and WAC. You still don't know the actual spread for ASP, but in this case where the spread is largely determined by AWP to WAC differences, so then the payor could in theory have looked, and I do believe that 30 percent number would be found or could be calculated from what was in the book.
THE COURT: The 30 percent was in the book for Remicade?
MR. CAVANAUGH: Yes.
THE WITNESS: Or the two prices, and they could calculate the difference. But why would you expect one drug

Page 77

to be different from all the other drugs is all I was saying?
THE COURT: So but at least for Remicade, you could look in the book and see the 30 percent spread?
THE WITNESS: Between WAC and AWP. You still didn't know ASP, but you knew that.
Q. But as you've calculated the ASP, it was roughly, approximately the same as the WAC, right?
A. That appears to be true, and again that was the staff at GMA. I reviewed their calculations, but I didn't calculate it myself.
Q. So to the extent you're referring to opaque discounting and lack of price transparency, with respect to Remicade, those opinions wouldn't be relevant, correct?
A. I believe, again, it's a different situation. Clearly the information was published, but it's in such a way that it's not clear to me that the payors would have been aware of that.
Q. And you're also aware that Centocor didn't provide any discounts or rebates to physicians, correct?
A. That's what I understand, yes.
Q. Okay. Let me turn to the subject of price increases. You've given the opinion that the overriding reason for price increases was the ability to drive market share by increasing the spread, correct?

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                        )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 11-1 - 11-155

BENCH TRIAL - DAY ELEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 28, 2006, 9:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 134

1  relationship. And then the last one actually points out that
2  "It wouldn't have done me any good anyways."
3      MR. CAVANAUGH: I mean, for example, your Honor, if
4  you go to Slide 93, the testimony of an individual from John
5  Deere, he's expressly talking about price-specific drugs in
6  the physician's office and the pharmacies.
7      THE COURT: So which slide now?
8      MR. CAVANAUGH: Slide 93.
9      THE COURT: So that's the one you --
10     THE WITNESS: Well, I think that's just symptomatic
11  or representative. And, again, A, it's certainly, as I say,
12  no surprise to me that the payors all had this knowledge
13  because, you know, these are their positions, director OF
14  provider relations and pharmacy director. These are kind of
15  the folks that I'd be meeting with.
16     And then the second one is that they recognize,
17  because of the shared enterprises, the shared information,
18  the experience with the SADs, they recognize that there's
19  going to be price concessions where there's therapeutic and
20  generic competition. So you would not expect there to be a
21  reasonably predictable relationship between AWP and
22  acquisition cost --
23     THE COURT: So take this quote, the one you're
24  flagging for me, John Deere Health Care. If I go back to
25  your chart, which I was busily looking through, this one,

Page 135

1  John Deere, has a staff model HMO. So that's why you would
2  say he actually had direct knowledge?
3      THE WITNESS: He actually had direct knowledge.
4      THE COURT: That's not expectation. He knew?
5      THE WITNESS: Yes, yes, he knew. But I guess what
6  I would suggest is, even the ones who didn't have the staff
7  model but had the experience of the SADs knew --
8      THE COURT: SADs experience?
9      THE WITNESS: I'm sorry, the experience of the
10  self-administered drugs -- knew that among these
11  pharmaceutical manufacturers, where there's therapeutic
12  competition, there's going to be price competition. And
13  that's all I'm saying, that that would have been the
14  expectation in the physician-administered world as well.
15     THE COURT: All right.
16  Q.  So if we look at Slides 32 and 33, these are the
17  depositions referenced later on in the slide?
18  A.  That's correct.
19     MR. CAVANAUGH: Your Honor, we would move the
20  deposition testimony -- we haven't really come up with a
21  process for this yet, but certainly the deposition testimony
22  that we've designated we would offer.
23     MR. BERMAN: We have no objection, but as we get
24  into the cross, we counter-designated because there's other
25  testimony.

Page 136

1      THE COURT: Of course, of course.
2      MR. CAVANAUGH: That's fine.
3      THE COURT: So, you know, I don't know how to do
4  this. So just for my ease of reference, if you gave me
5  counter-designations, I'd just stick it right in behind that
6  exhibit.
7      MR. BERMAN: We will do that.
8      THE COURT: You know, you don't have to do it in
9  some fancy colored motif.
10     MR. BERMAN: We don't have color resources.
11     THE COURT: But if you just gave it to me, and I'd
12  just paper clip it so I would read the whole thing at the
13  same time when I go back to do this.
14     MR. CAVANAUGH: You don't have color?
15     MR. BERMAN: Not like you have.
16  Q.  Let me take you to a subject we had yesterday. Were you
17  here for Professor Rosenthal's testimony yesterday?
18  A.  Yes.
19  Q.  Did you see Mr. Sobol pointing out that the 2001
20  Red Book did not have a WAC listed for Remicade and perhaps
21  for other drugs?
22  A.  I remember that, yes.
23  Q.  By 2001, if you wanted to go look for AWPs or WACs for
24  the various pricing services, including Red Book, what would
25  you look at?

Page 137

1  A.  Well, one is the hard copies, but another principal
2  source and the one used by payors in general would be the
3  electronic versions because obviously the electronic stuff is
4  updated on a regular basis. You could get monthly
5  Red Books. They did come out monthly. But, you know,
6  electronics is just a lot easier to use.
7  Q.  Did both Red Book and First Databank have electronic
8  services?
9  A.  Certainly Red Book did because we've used it. I believe
10  First Databank did.
11  Q.  And if you looked at the electronic services, did they
12  have an AWP and a WAC?
13  A.  Certainly the products that I've looked at, yes.
14  Q.  And you looked at them yourself?
15  A.  Yeah. Well, again, this would be part of the general
16  issue of doing the business consulting because we'd be
17  talking about, well, you know, how are different products in
18  the therapeutic category priced compared to our product or
19  the product for the company that we're working for?
20  Q.  And in your experience, did payors subscribe to
21  electronic services offered by Red Book and First Databank?
22  A.  They certainly subscribed to electronic services around
23  this pricing information, yes.
24  Q.  Now, Dr. Bell, do you understand that Judge Saris has
25  ruled that under the Balanced Budget Act of 1997, when

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 15-1 - 15-120



BENCH TRIAL - DAY FIFTEEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 7, 2006, 11:40 a.m.





LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 66

1  contracting: Modeling provider economics." It's dated
2  August 5, 2002, and as I understand it, this is a project you
3  worked on, Dr. Bell, correct?
4  A.  That's correct, yes.
5  Q.  Now, unfortunately there's no page numbers, but if you
6  page through this --
7       THE COURT:  Now what am I looking at?
8       MR. BERMAN:  You're looking at Exhibit 344.  It's
9  in the big book that I gave you.
10  Q.  Okay, you recognize this, Dr. Bell?
11  A.  Yes.
12  Q.  All right.  And I'd like to turn to the page --
13  unfortunately there's no page numbers -- entitled "Examples
14  of potential visual aids: Physician practices."  Are you
15  with me?  You're at that page, correct?
16  A.  Yes.
17  Q.  And I take it that this is something that CRA was
18  presenting to Ortho Biotech and discussing what types of
19  marketing practices they might consider, correct?
20  A.  Right.  This was with respect to a potential project,
21  that this could be potential outputs from that potential
22  project.
23  Q.  Okay.  And Example 2 says: "Category AWP value versus
24  net cost."  And what difference between AWP value and net
25  cost to the doctor is what's referred to in this case as the

Page 67

1  spread, right?
2  A.  Yes, I believe so, yes.
3  Q.  Okay.  And then if you flip to the previous page --
4       THE COURT:  So where are we looking now?
5       MR. BERMAN:  Now I'm going to go forward three more
6  pages to a page entitled "Communicating the economic
7  message:  Provider financial model."
8  A.  I'm sorry, I'm just not sure.  Go forward or go back?
9  Q.  Back.  I'm sorry, for some reason this was not Bates
10  stamped.  All right, and then at the very top it says
11  "Communicating the economic message:  Provider financial
12  model.  One way to illustrate Procrit's economic benefits is
13  through a financial model," and then you recommend an
14  Excel-based tool that uses provider-specific inputs to
15  generate customized outputs."  Do you see that?
16  A.  Yes.
17  Q.  And what you were recommending was that they have a kind
18  of Excel sheet that would punch in numbers such as AWP costs,
19  practice costs and so forth, so the doctor could see what the
20  doctor was going to make, correct?
21  A.  Well, just to be clear, what they would punch in would
22  be the different reimbursement levels they might have for
23  different plans.
24  Q.  Are you aware in fact that Ortho Biotech did implement a
25  program where they would go to the doctor with the very type

Page 68

1  of Excel tool that you suggested?
2  A.  Well, what I'm aware of is that they went with a tool
3  that certainly spoke to costs and how different contracts
4  might affect the cost of acquisition for Procrit.  We
5  actually weren't involved in developing that.  Or by "we," I
6  mean CRA wasn't involved in developing that.
7  Q.  All right, so can we go back to that chart that you read
8  a minute ago entitled "Example, visual aid physician
9  practices."
10  A.  Yes.
11  Q.  So what you're suggesting here again is that the
12  salesperson discuss with the physician the difference between
13  AWP value and cost, right?
14  A.  Well, no.  This was a presentation about a model or a
15  tool.
16  Q.  Yes.
17  A.  And so in this tool, the physician would sort of plot
18  what their net costs might be for Procrit, and then you would
19  also have a line that says, and this is what the category
20  might be evaluated at AWP, where it would be based on,
21  obviously, that physician's total volume of business.
22  Q.  And the physician would be able to see how much he would
23  make?
24  A.  That would be one of the conclusions one could draw,
25  sure.

Page 69

1  Q.  And were you aware at the time that you were presenting
2  this to Ortho Biotech that it was against Ortho Biotech's
3  policy to sell product based on the difference between AWP
4  and acquisition price?
5  A.  I was certainly generally aware of that, and the issue
6  here was addressing how physicians, though, in fact in the
7  marketplace are making decisions between Procrit and Aranesp.
8  Q.  Can you take a look at 2767, please, that's in your
9  book.  And this is an Ortho Biotech document, and it says at
10  the first bullet point -- it's dated November 20, 2001 -- "It
11  is absolutely inappropriate to sell product based upon the
12  difference between AWP and acquisition price."  Do you see
13  that?
14  A.  I do.
15  Q.  Now, Dr. Bell, you were shown your presentation that you
16  gave to BMS about Paraplatin, correct?
17  A.  Yes, that was one of them, sure.
18  Q.  Yes.  And you testified a few moments ago that you
19  absolutely were not discussing in the page you were shown
20  spread marketing, correct?
21  A.  Correct.
22  Q.  Well, let's look at a page that counsel did not show
23  you.  Let's go to 226, and this is at 3120.
24  A.  Okay, hang on a second.
25  Q.  Page 3120, are you there?

18  (Pages 66 to 69)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 16-1 - 16-132



BENCH TRIAL - DAY SIXTEEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 8, 2006, 9:15 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 22

1  the start of the class period.
2  Q.  Do you have personal experience with Cigna?
3  A.  Yes.
4       THE COURT:  You know what, I'm just getting
5  confused here.  So you're jumping me back into the
6  self-administered world, right?
7       THE WITNESS:  With respect to these rebates and
8  discounts, those are on self-administered drugs, that's
9  correct.
10      MR. CAVANAUGH:  I'm sorry, your Honor, I should
11 have made that clear.
12 Q.  Now, with respect to Cigna, do you have personal
13 experience with Cigna?
14 A.  Yes.
15 Q.  In forming the opinions set forth in your affidavit with
16 respect to shared enterprise, were you relying upon your
17 personal experiences with entities such as Cigna and Aetna?
18 A.  Absolutely.
19 Q.  Let me turn now to yesterday's examination?
20      MR. CAVANAUGH:  And, your Honor, this will be in
21 the plaintiffs' cross-examination binder.  The first few
22 documents I'm going to reference.  I'm going to also put them
23 all up on the screen.
24      THE COURT:  No.  I've got to have them.
25      MR. CAVANAUGH:  I know, I know.  It's the large --

Page 23

1       THE COURT:  This one or the big thick one?
2       MR. CAVANAUGH:  It's the big thick one that
3  Mr. Berman gave you yesterday, as opposed to the big thick
4  one I gave you on direct.
5       THE COURT:  Which attachment is it?
6       MR. CAVANAUGH:  It's DX 2767.
7       THE COURT:  Good, all right.
8  Q.  If you could go to DX 2767, if we could put that up on
9  the screen, please.  Mr. Berman showed you this document
10 yesterday.  It's a November 20, 2001 memo at Ortho Biotech,
11 and he called your attention to the statement in there to the
12 Ortho Biotech field sales force with respect to Procrit:  "It
13 is absolutely inappropriate to sell product based upon the
14 difference between AWP and acquisition price."
15      Was it your understanding over the many years
16 you've dealt with OBI that this was their policy and
17 practice?
18 A.  Yes.
19 Q.  Did you actually accompany field salespeople on calls to
20 physicians?
21 A.  Yes.
22 Q.  Did you see them abiding by that practice and policy?
23 A.  The field sales reps, certainly, yes.
24      THE COURT:  Did they know that's why you were
25 there?

Page 24

1       THE WITNESS:  Well, I don't know if that's what
2  they thought.  I strongly doubt it because I was there in a
3  business consulting capacity observing the interaction
4  between the sales reps and the physicians and the hospitals
5  as well around the concerns that physicians were having about
6  their ability to use Procrit profitably within their
7  practices.
8       MR. CAVANAUGH:  Your Honor, if Mr. Berman did not
9  do so, I'd move 2767 into evidence.
10      MR. BERMAN:  No objection.  Thank you for following
11 up.
12      (Exhibit 2767 received in evidence.)
13 Q.  Let's turn to PX 344 --
14      THE COURT:  Well, actually, that rings a bell, no
15 pun intended.  Did you all move in the exhibits that you were
16 supposed to have?
17      MR. BERMAN:  No.  I was just handed a list.
18      THE COURT:  We just cannot forget, or we will lose
19 track of this.
20      MR. BERMAN:  Do you want me to do it now?
21      THE COURT:  Yes.  Just read them in.
22      MR. BERMAN:  344, which he's about to go to, 4016,
23 196, 4044, and 4043.
24      MR. CAVANAUGH:  Were any of those yours?
25      MR. TRETTER:  I have no objection.

Page 25

1       MR. CAVANAUGH:  I don't have any objection to them.
2       THE COURT:  All right, allowed in unless somebody
3  picks up a clerical mistake and there really was an
4  objection.  Just let me know within the morning.
5       MR. CAVANAUGH:  That's fine, your Honor.
6       (Exhibits 344, 4016, 196, 4044, 4043 received in
7  evidence.)
8  Q.  Staying in the same binder, your Honor, if we could turn
9  to PX 344.  This is the presentation to OBI, Ortho Biotech,
10 that Mr. Berman referred you to yesterday from August 5,
11 2002.  If you could turn to the second page of the document,
12 you see the point is made, "Procrit is available at a lower
13 cost.  Aranesp provides a larger margin to physician
14 practices."
15      Now, in 2002 Aranesp was coming onto the market?
16 A.  That's correct.
17 Q.  And Aranesp was the competing drug sold by Amgen?
18 A.  That's correct.
19 Q.  But Procrit was actually the lower-cost product?
20 A.  That's correct.
21 Q.  Now, did you make recommendations to how OBI should
22 respond to the competitive threat of Aranesp?
23 A.  Yes.
24 Q.  All right, let's go to Page 5.  The pages aren't
25 numbered, your Honor, I don't believe, but it's the one

415a11b6-df7d-4928-81c7-f5bfd0c50ac4