# EXHIBIT 1

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


In Re:                              )
PHARMACEUTICAL INDUSTRY              ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE              ) MDL No. 1456
LITIGATION                           ) Pages 9-1 - 9-144




                    BENCH TRIAL - DAY NINE

              BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE




                              United States District Court
                              1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
                              November 21, 2006, 9:10 a.m.




                        LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 3205
                       Boston, MA  02210
                         (617)345-6787

1  A P P E A R A N C E S:

2  For the Plaintiffs:

3       STEVE W. BERMAN, ESQ. and SEAN R. MATT, ESQ.,
   Hagens Berman Sobol Shapiro LLP, 1301 5th Avenue, Suite 2900,
4  Seattle, Washington, 98101-1090.

5       THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
   Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge,
6  Massachusetts, 02142.

7       JENNIFER FOUNTAIN CONNOLLY, ESQ., Wexler Toriseva
   Wallace, One North LaSalle Street, Suite 2000, Chicago,
8  Illinois, 60602.

9       DONALD E. HAVILAND, ESQ., The Haviland Law Firm, LLC,
   740 S. Third Street, Third Floor, Philadelphia, Pennsylvania,
10 19102.

11 For the Defendants:

12      JOHN T. MONTGOMERY, ESQ. and STEVEN A. KAUFMAN, ESQ.,
   Ropes & Gray, LLP, One International Place, Boston,
13 Massachusetts, 02110, appearing for Schering and Warrick.

14      D. SCOTT WISE, ESQ. and KIMBERLEY D. HARRIS, ESQ., and
   MICHAEL S. FLYNN, ESQ., Davis, Polk & Wardwell, 450 Lexington
15 Avenue, New York, New York, 10017, appearing for AstraZeneca.

16      NICHOLAS C. THEODOROU, ESQ., Foley Hoag, LLP,
   155 Seaport Boulevard, Seaport World Trade Center West,
17 Boston, Massachusetts, 02210, for AstraZeneca.

18      WILLIAM F. CAVANAUGH, JR., ESQ. and ADEEL A. MANGI,
   ESQ., Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of
19 the Americas, New York, New York, 10036-6710, appearing for
   Johnson & Johnson.
20
        STEVEN J. EDWARDS, ESQ., LYNDON M. TRETTER, ESQ.,
21 HOA HOUNG, ESQ., SANDHYA KAWATRA, ESQ., and
   THOMAS J. SWEENEY, III, ESQ., Hogan & Hartson,
22 875 Third Avenue, New York, New York, 10022, appearing for
   Bristol-Myers Squibb.
23

24

25

```
 1                      I N D E X

 2 WITNESS                DIRECT   CROSS    REDIRECT   RECROSS

 3 Raymond S. Hartman              9-11
                                   9-76
 4                                 9-119

 5

 6 EXHIBITS                PAGE

 7 1881                    9-20

 8 2158                    9-105

 9 2176                    9-105

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 Q.   Which it is under the Medicare Modernization Act,
2 correct?
3 A.   Correct.
4 Q.   And I take it you haven't done any analysis to determine
5 whether or not that's happening in the marketplace, correct?
6 A.   Whether in light of going to the new -- the MMA pricing
7 procedures of 106 percent ASP, whether manufacturers are
8 wholesale raising the ASPs overall or whether they're
9 raising --
10 Q.   We're talking about ASPs here.  You haven't done an
11 analysis of that, right?
12 A.   No.
13         THE COURT:  Thank you.  That's it.  All right,
14 we've been sitting here long enough.  Ideally what I'd like
15 is 25 minutes apiece so he can have his fifteen minutes at
16 the end and we can all say "good-bye" for Thanksgiving.
17         THE CLERK:  Court is in recess.
18         (A recess was taken, 11:05 a.m.)
19         (Resumed, 11:35 a.m.)
20 CROSS-EXAMINATION BY MR. FLYNN:
21 Q.   Good morning, Dr. Hartman.  I'm Michael Flynn for
22 AstraZeneca.
23 A.   Good morning.
24 Q.   Dr. Hartman, am I correct that your methodology, you
25 developed a methodology for comparing AWP for a drug to your

1  calculated ASP for that drug, correct?
2  A.    That's correct.
3  Q.    And that comparison, what you call "spread," is the
4  basis for your finding of causation and liability in this
5  matter, correct?
6  A.    Correct.
7  Q.    And your theory of causation and liability, Dr. Hartman,
8  does not address the cost of particular drugs in an absolute
9  sense; is that correct?
10 A.    In an absolute sense --
11 Q.    In other words, your theory of liability and causation
12 as we've just discussed is a comparison theory in which you
13 compare the AWP for a drug with the ASP for that drug,
14 correct?
15 A.    That's correct.
16 Q.    And your theory of comparison, Dr. Hartman, is that the
17 relevant markets viewed AWP as a signal for the ASP for a
18 drug, and if it exceeds your liability thresholds, you find
19 causation and liability, correct?
20 A.    That's correct, more or less.
21 Q.    And to determine spread, Doctor, which you use as your
22 liability threshold, you had to calculate, as we discussed
23 yesterday with Mr. Sobol and with Mr. Edwards, the ASP for a
24 particular drug, correct?
25 A.    Correct.

1 Q.   Now, you submitted two liability reports in this matter,
2 correct?
3 A.   Two liability reports --
4 Q.   Well, you submitted an initial liability report on
5 causation and liability in December of 2005, and you followed
6 that up with a supplemental report in February of '06,
7 correct?
8 A.   That's correct.
9 Q.   And in each of those reports, you calculated an ASP for
10 AstraZeneca's drug Zoladex, correct?
11 A.   Correct.
12 Q.   And you compared that ASP for Zoladex on an annual basis
13 to the AWP for Zoladex on an annual basis, as you've -- when
14 you picked it in the middle of the year, correct?
15 A.   Correct.
16 Q.   And in your February, 2006 report, you slightly revised
17 the manner in which you calculated ASPs; is that correct?
18 A.   Correct.
19 Q.   And for Zoladex as well, correct?
20 A.   Correct.
21 Q.   And you discussed both your December 15 methodology for
22 calculating ASPs for Zoladex and your February, 2006
23 methodology for calculating ASPs for Zoladex in the
24 deposition that you've gone over significantly, let's put it
25 that way, with Mr. Edwards, correct?

1  A.    That's correct.
2  Q.    Now, Doctor, in your expert disclosures that we just
3  talked about, your December report, your February report,
4  when you calculated ASPs for Zoladex that you need to
5  establish your spreads which are the basis of your causation
6  and liability findings, you did not include any approximation
7  in those calculations of the number of Zoladex samples; is
8  that correct?
9  A.    That's correct.
10 Q.    Doctor, you submitted your trial testimony, your direct
11 testimony, which is the evidence you're presenting to this
12 Court, on November 1; is that correct?
13 A.    I think that's right.
14 Q.    Now, for the first time when you submitted that direct
15 testimony, your ASP calculations include some measure of
16 samples of Zoladex; is that correct?
17 A.    That's correct.
18 Q.    You did this for the first time in connection with your
19 November direct testimony, and as we just established, you
20 didn't do it in your February report or your December report,
21 correct?
22 A.    Correct.
23 Q.    Now, Doctor, let me show you --
24       MR. FLYNN:  I want to hand up, your Honor, may I
25 approach?

1  Q.   Doctor, what I've handed you is a motion in limine filed
2  by my client, AstraZeneca, on October 10, 2006, about two
3  weeks before you submitted your direct testimony in this
4  matter.  If you turn, Doctor, to Page 5 of that document --
5  are you with me?
6  A.   I'm at Page 5, yes.
7  Q.   If you go a couple lines down, do you see the sentence,
8  "Despite having access to data and documents from
9  AstraZeneca on samples, plaintiffs' expert -- upon whom they
10 rely to establish liability and causation on a classwide
11 basis -- does not offer any analysis or opinion on the impact
12 of billed samples on the average selling price or the spread
13 between average selling price and AWP.  In fact, Dr. Hartman
14 does not discuss free samples at all in connection with his
15 evaluation of AstraZeneca's alleged AWP 'inflation,'"
16           Do you see that doctor?
17 A.   I do.
18 Q.   Were you made aware by plaintiffs' counsel that
19 AstraZeneca had filed this motion in limine?
20 A.   No.
21 Q.   And so is your testimony that it was pure coincidence
22 that for the first time two weeks later, you have changed
23 your methodology for calculating ASPs for Zoladex?
24 A.   Well, I mean, I guess in terms of the legal issues of
25 what's a motion in limine, I don't, you know, quite know --

1 they would never say, "Oh, we filed a motion in limine,"
2 because I wouldn't know what that meant, but --
3 Q.   You've never seen this document before?
4 A.   No, but I can give you the background of why I did it,
5 if you'd like, why I included samples.
6 Q.   Were you made aware that AstraZeneca told the Court, in
7 trying to keep out evidence of samples, that you, their
8 expert, had not analyzed samples and adopted that in your
9 methodology for calculating ASPs in this matter?
10 A.   In -- when -- just to go back to the earlier
11 calculations, as I --
12 Q.   If you could answer my question because we are on a
13 strict time --
14 A.   Okay, could you repeat it?
15 Q.   Were you made aware that AstraZeneca had represented to
16 the Court, based on the February deposition you gave, based
17 on both of your expert disclosure reports, the true statement
18 that you had not included in your methodology for calculating
19 ASPs anything to do with samples?
20 A.   I didn't know that counsel had done that before the
21 Court.
22           MR. FLYNN:   I'm going to approach again, your
23 Honor, if I may.
24 Q.   Dr. Hartman, what I've given you is plaintiffs'
25 opposition to AstraZeneca's motion in limine.  Do you see

1 that?

2 A.   I do.

3 Q.   If you'll turn with me to Page 7 and look at
4 Footnote 4 --

5          THE COURT:  Well, let me just -- have you now taken
6 into account sampling?

7          THE WITNESS:  I was asked -- I received information
8 that they were involved, there were free samples given
9 billed, which I didn't know before, and to be conservative, I
10 didn't include.

11         THE COURT:  Well, have you recalculated based on
12 samples?

13         THE WITNESS:  I have included some samples, yes.
14 In the most recent calculations, they --

15         THE COURT:  Well, how did you know how many samples
16 there were?

17         THE WITNESS:  I arbitrarily assumed half of them
18 were.  It was before I said none, and I didn't want to --

19         THE COURT:  So how did you come up with
20 50 percent?

21         THE WITNESS:  It was the best estimate I could come
22 up with.

23         THE COURT:  From where?

24         THE WITNESS:  It was a coin toss, so it was --

25         THE COURT:  So if we backed out the samples --

 1           THE WITNESS:  If we backed out the samples, we'd be
 2 back where we were before.
 3           THE COURT:  Okay, is that the point you're getting
 4 me to?
 5           MR. FLYNN:  Well, your Honor, I have a larger
 6 point.  I think we can cut through it now.  I will move to
 7 strike Dr. Hartman's testimony as it relates to Zoladex.  He
 8 just testified, your Honor heard, that key to his
 9 methodology, his calculating ASPs, and that's the basis for
10 his causation and liability threshold.  He did not submit
11 that methodology to us until the eve of trial.  I could go
12 through more of it, your Honor, but we couldn't even tell
13 when we submitted his direct testimony that he had done
14 that.  We had to get the backup data, which we didn't get for
15 weeks.
16           THE COURT:  So had you ever disclosed to them
17 before AstraZeneca's spreads?
18           THE WITNESS:  I had been disclosing the spreads in
19 all of my declarations, and I did not include free samples in
20 the first two, and then in the third one, I did --
21           THE COURT:  So I strike anything having to do with
22 samples, all right, but not the full methodology.  We're
23 going back to the part that was disclosed.  So I don't know
24 what that actually means.
25           MR. FLYNN:  Your Honor, there is no testimony now

Page 84

1 before you, your Honor, given that record, of any record for
2 AstraZeneca, and so I think --
3            THE COURT:  I'm not doing that, but what I will do
4 is limit it to what they disclosed to you in a timely
5 fashion.  So how am I going to get that?
6            THE WITNESS:  Well, it's already been provided.
7            MR. SOBOL:  Yes, if I may, your Honor, there are a
8 couple of things going on here.
9            THE COURT:  I tell you what, we'll do it
10 afterwards, because I don't want you to waste your 25 or 30
11 minutes on this.  You've made your point.  Anything new that
12 was disclosed with respect to sampling is struck on two
13 grounds:  One is it's new and undisclosed, and, second, is
14 it's a coin toss, so --
15            MR. FLYNN:  Your Honor, just for the record, I
16 understand the Court's ruling.  I have a memo of law to
17 support the motion to strike the entire testimony which I'd
18 like to submit.  I understand --
19            THE COURT:  It would have been nice to have had it
20 beforehand.  It's untimely, untimely.  But I am striking the
21 new stuff.
22            MR. FLYNN:  Okay, your Honor, I'll move on.
23            THE COURT:  And I've got to at least know what the
24 new stuff is, so you'll supplement.  I mean, this is the old
25 stuff, what they had fair notice of.