# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | Judge Patti B. Saris |

TRIAL OF CLASS 2 AND 3 CLAIMS

# THE JOHNSON & JOHNSON DEFENDANTS' PROPOSED FINDINGS OF FACT RELATING TO PROCRIT® AND REMICADE®

Johnson & Johnson, Centocor, Inc., and Ortho Biotech Products, L.P. ("the J&J Defendants") respectfully submit these Proposed Findings of Fact relating to Procrit® and Remicade®.

### Proposed Findings Relating to Procrit

1.  Procrit (epoetin alfa) is a natural human hormone used to treat anemia. It is sold by Ortho Biotech Products, L.P., a subsidiary of Johnson & Johnson. (Trial Declaration of Cathleen Dooley ("Dooley Direct"), ¶ 3; Dooley, Nov. 16 Tr. 17).

2.  Ortho Biotech obtained the right to sell Procrit under a Product License Agreement (PLA) with Amgen, Inc., the company that manufacturers epoetin alfa. Amgen sells epoetin alfa under the brand name Epogen. Except for the difference in brand names, Procrit and Epogen are identical. (Id.; Dooley, Nov. 16 Tr. 51) They have the same FDA-approved indications for use.

3.  Under the PLA, Amgen has the exclusive right to promote epoetin alfa in the United States for use in the treatment of anemia in dialysis patients. Ortho Biotech has the exclusive right to promote epoetin alfa for use in the treatment of anemia caused by conditions other than dialysis. (Id. at ¶ 4; Dooley, Nov. 16 Tr. 51-53).

4.  Although Amgen and Ortho Biotech are each obliged to promote epoetin alfa only for their reserved medical indications, physicians are not bound by the terms of the PLA, and are therefore free to administer either company's product to any patients they choose. Thus, physicians may administer Procrit to dialysis patients, and Epogen to non-dialysis patients. (Id. at ¶ 5; Dooley, Nov. 16 Tr. 51-52).

5.  Procrit was launched in January 1991, approximately 18 months after Amgen launched Epogen. (Dooley Direct ¶ 14; Dooley, Nov. 16 Tr. 54). When Procrit was

1337243v1

launched, Epogen's list price (WAC) was already established at $10 per 1000 units; Epogen's AWP was 20% above its WAC price, i.e., $12 per 1000 units. (Id.; Dooley, Nov. 16 Tr. 57-58).

6. At launch, Ortho Biotech set the WAC price and recommended AWP for most Procrit NDCs equal to those previously established for Epogen, i.e., $10 per 1000 units, and $12 per 1000 units. The WAC price and AWP for Procrit's 10,000 unit vial were slightly below Epogen's, i.e., $9.50 per 1000 units, and $11.40 per 1000 units. (Id.).

7. When Procrit was launched, physicians were using Epogen to treat both dialysis and non-dialysis patients. (Id.). In order to encourage physicians to use Procrit instead of Epogen for anemia in non-dialysis patients, Ortho Biotech offered discounts below the WAC price to non-dialysis providers. (Id.). During the class period, these price incentives generally ranged between 5% and 10% off of the WAC price for qualifying purchasers. (Dooley Direct ¶ 15; Dooley, Nov. 16 Tr. 58-59).

8. There is no evidence that Ortho Biotech made any attempt to keep its discounts secret. Ortho Biotech advertised its discounts on Procrit by means of promotional flyers, (e.g., DX 2758) (8% physician rebate offer in 1993), and it discussed them with HCFA officials and Congressional staff members. (Dooley, Nov. 16 Tr. 20-22, 59-61).

9. Ortho Biotech advised providers that its rebates represented "discounts on PROCRIT for Medicare, Medicaid and certain third-party healthcare programs and as such should be properly disclosed and reflected when making claims." (DX 2758; see also DX 2765 at MDL-OBI00032470).

10. Massachusetts third-party payors, including Blue Cross Blue Shield of Massachusetts (BCBS/MA), Cigna, Fallon, and Harvard Pilgrim, were aware of the discounts on Procrit, or should have been aware of the discounts on Procrit, because Procrit was one of the

drugs they purchased for use at their staff model HMOs at prices approximately equal to Dr. Hartman's calculation of Procrit's ASP. (DX 1373; 1375; 1379; 1383; 1387; 2001; see generally Gaier, Nov. 29 Tr. 34-36).[1] In fact, the difference between the prices paid by these third-party payors and Procrit's published AWPs were roughly equivalent to Dr. Hartman's calculation of Procrit's "spread." (Compare Written Direct Testimony of Raymond S. Hartman ("Hartman Direct"), Attachments G.3.c with DX 1390; 1394; 1398; 1402).

11. BCBS/MA specifically reviewed Procrit's average selling price as published by CMS before making the decision to continue to reimburse Procrit and other physician-administered drugs at 95% of the published AWP. (Mulrey, Nov. 8 Tr. 11-13; DX 990).

12. The government was also made aware of Procrit's discounted prices. In May 1990, even before Procrit was introduced to the market, the Office of Technology Assessment to the United States Congress issued a report that detailed several different reimbursement options for epoetin alfa, including reimbursement based on AWP. The OTA advised Congress that "[a]verage wholesale prices, however, are usually list prices instead of the transaction prices that providers actually pay for pharmaceuticals." (DX 1046 at 21). The OTA predicted that when Procrit was introduced, Ortho Biotech would likely need to offer "price

---

[1] Dr. Gaier's charts comparing Dr. Hartman's ASPs to the prices paid for Procrit by BCBS/MA, Cigna, Fallon, and Harvard Pilgrim, are based on the ASPs Dr. Hartman submitted with his expert report in December 2005, rather than on the corrected ASPs submitted with Dr. Hartman's trial testimony and admitted into evidence. (Gaier, Nov. 29 Tr. at 35-36). For example, Dr. Hartman's revised ASP calculations correct the ASP for 1996, which was significantly lower than his other ASPs. (Id.; compare DX 1375 (showing Procrit ASP < $1000) with Hartman Direct, Attachment G.3.a (showing same Procrit ASP > $1100)). With this correction it is clear that Massachusetts insurers did not pay more than ASP for Procrit in 1996 or in any other year. (Id.).

3

concessions and other benefits" to overcome Epogen's "brand loyalty" from being the "first brand on the market." (Id. at 71).

13. A second report addressing Procrit's pricing was issued in 1997 by the Office of Inspector General. (DX 1075; Dooley Direct ¶¶ 25-32; Hartman, Nov. 21 Tr. 123-24; see generally Bell Direct, Appendix A at ¶ 20). The OIG looked at market pricing with respect to 22 Part B drugs, including Procrit, in order to determine the savings that might be achieved if HCFA reimbursed based on "acquisition cost" rather than AWP. Although "acquisition cost" includes discounts, the OIG concluded that the percentage savings that could be achieved for Procrit were the lowest or among the lowest of any of the 22 drugs studied. (DX 1075 at C-2, C-3).

14. Procrit's market pricing was also studied by the General Accounting Office in 2001. (DX 1098; Dooley Direct ¶¶ 33-35; see generally Bell Direct, Appendix A at ¶ 36). The GAO study looked at 31 Part B drugs, including Procrit. (DX 1098, pp. 11-14 at Tables 4 and 5). Based on its review of wholesale price lists, the GAO calculated an "Average widely available discount from AWP." In addition, the GAO used physician invoices to calculate a "Low volume [physician] billers' average discount from AWP." (Id.).

15. The GAO report confirmed the OIG's earlier finding that Ortho Biotech's discounts were comparatively modest, resulting in relatively small spreads. The "Average widely available discount from AWP" for Procrit was 15.2% [a "spread" of 17.9%]. (Id. at Table 4). The comparable range of discounts below AWP for all drugs was 12.8% to 85.6% ["spreads" of 14.8% to 606%]. The "Low volume [physician] billers' average discount from AWP" for Procrit was 22.1% [a "spread" of 28.3%]. (Id. at Table 5). The comparable range of discounts below AWP for all drugs was 15.7% to 90.4% ["spreads" of 18.8% to 943.5%].

16. In the mid 1990's Cathleen Dooley, Johnson & Johnson's Executive Director of Federal Affairs, discussed Procrit's market prices with several HCFA officials, including Nancy-Ann Min DeParle and others. (Dooley, Nov. 16 Tr. 20-21, 59-62, 70-71; Dooley Direct ¶ 36). She explained to them that Ortho Biotech offered discounts in the range of 5% to 10% below the published WAC price and, consequently, Procrit did not have a large spread. (Id.). Ms. Dooley testified that her discussions with HCFA officials were designed to assure them that AWP-based reimbursement worked for Procrit, because Procrit's spread was not excessive. (Id.).

17. During Ms. Dooley's discussions with government officials, no one suggested to her that Ortho Biotech needed to report an AWP that reflected discounts and rebates, or that Procrit's AWP, which remained fixed at 20% above the WAC price, was unlawful or improper. (Dooley, Nov. 16 Tr. 71-72; Dooley Direct ¶¶ 40-41).

18. When Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act (MMA), the government defined ASP, invited comment and provided regulatory guidance concerning how ASP should be calculated. See 69 Fed. Reg. 17935, 17936 (Apr. 6, 2004) (interim final rule); 69 Fed. Reg. 55763, 55764 (Sept. 16, 2004) (final rule). Nevertheless, the switch to ASP, which Dr. Rosenthal described as a "major change[]" from the previous AWP-based system, resulted in "issues in implementation that have yet to be worked out," including a dispute between CMS and the OIG as to how ASP should be calculated. (Rosenthal, Nov. 15 Tr. 13-14; Rosenthal Rebuttal ¶ 16; PX 4091). In contrast, when Congress passed the Balanced Budget Act (BBA) of 1997, the government did not define AWP, invite comment or provide regulatory guidance concerning how AWP should be calculated. (Dooley,

5

Nov. 16 Tr. 72). Pharmaceutical manufacturers and payors did not interpret the BBA to implement a change in the meaning of AWP. (Id.; Bell, Nov. 28 Tr. 138).

19. Because Ortho Biotech's discounts on Procrit were modest, the spreads on Procrit never exceeded 30%. (Hartman Direct, Attachments G.3.c and I.3; Hartman, Nov. 21 Tr. 121-22; see also DX 2873 (weighted average spreads)). Dr. Hartman made a total of 114 spread calculations on Procrit and found that none of them exceeded 30%. (Hartman Direct, Attachment G.3.c). Ninety one of these 114 spreads were between 20.1% and 25%. (Id.).

20. Throughout the class period, Ortho Biotech had a policy that its sales representatives should not sell Procrit by marketing the difference between AWP and acquisition price. (DX 2767; Bell. Dec. 7 Tr. 69, Dec. 8 Tr. 23; Deposition of Thomas Hiriak, Nov. 10, 2004 ("11/10/04 Hiriak Dep."), at 424). The cost calculators Ortho Biotech distributed in 2002 were consistent with this policy. The spreadsheet it gave to doctors contained information about the cost of acquiring Procrit, but did not reference reimbursement rates or permit physicians to calculate spreads. (PX 368; Bell, Dec. 8 Tr. 28; 11/10/04 Hiriak Dep. at 404-05, 421-23; Deposition of Thomas Hiriak, Jul. 28, 2004 ("7/28/04 Hiriak Dep."), at 176). The company distributed a different spreadsheet to third-party payors showing that the cost of reimbursing Procrit based on AWP was lower than the cost of reimbursing a competing product. (PX 370, Bell, Dec. 8 Tr. 29-30; 7/28/04 Hiriak Dep. at 121-22). Neither spreadsheet can be used calculate the difference between acquisition cost and AWP. (Id.).

21. In 1996, a former District Manager in Minnesota wrote a memo to the ten sales representatives in his District stating that they could discuss profit with physician offices if pressed, but that the numbers should written on "scratch paper." (PX 268; Deposition of John Hess, Mar. 24, 2006, ("Hess Dep."), at 34-35). Notwithstanding that he wrote the memo, the

former manager testified that he never discussed profits with any of the physicians he called upon, and he did not observe any sales representatives in his District doing so. (Hess Dep. at 69-70). A more senior Ortho Biotech executive described the memo as an unauthorized departure from Ortho Biotech policy. (Deposition of James Robbins, Mar. 22, 2006, at 462-63).

22. Plaintiffs submitted no evidence pertaining to Ortho Biotech's sales practices in Massachusetts.

23. Ms. Dooley wrote memos in the mid-1990's in which she commented that, because AWP exceeds acquisition cost, physicians earned a "windfall" on Part B drugs, including Procrit, and the government was therefore considering adopting alternatives to AWP-based reimbursement. She also noted that HCFA had not surveyed drug prices in order to establish Estimated Acquisition Costs, and, consequently, did not know what physicians were actually paying for Part B drugs. (PX 369A; PX 259; Dooley Direct ¶¶ 64-73; Dooley, Nov. 16 Tr. 40-41, 70).

24. Ms. Dooley explained that these memos merely stated the obvious: the reimbursement amount for Part B drugs was greater than acquisition cost, this premium was partly offset by chronic shortfalls in service reimbursement, and HCFA did not know precisely what physicians paid for Part B drugs because it had not conducted surveys. (Dooley Direct ¶¶ 72-73). Ms. Dooley testified: "I did not mean to suggest, nor did I believe, that the government was not aware that physicians were earning positive margins on Part B drugs, including Procrit, or that the government was unaware of the fact that Procrit was sold for less than AWP." (Dooley Direct ¶ 73; see also id. ¶¶ 39-40).

25. In 2002, Amgen introduced Aranesp, a competing drug that Amgen promotes for the treatment of anemia in dialysis and non-dialysis patients. The WAC-to-AWP

spread on Aranesp is 25%, rather than 20%. From a reimbursement standpoint, this put Procrit at a competitive disadvantage. (DX 2774; Dooley Direct ¶¶ 50-53).

26. In response, Ortho Biotech executives met with officials from CMS and local Medicare Carriers to urge them to adopt what is known as a Least Costly Alternative (LCA) policy with respect to Procrit and Aranesp. (Dooley Direct ¶¶ 55-62). Under a LCA policy, payors reimburse therapeutically similar therapies at the lowest applicable reimbursement rate. (Id. at ¶ 56; Hartman Direct ¶ 17, n.17). LCA policies result in savings to CMS and to Medicare beneficiaries and curb any incentive that providers might have to choose between therapies based on economic considerations. (Dooley Direct ¶ 58; DX 2774; Hartman Direct ¶ 17, n.17).

27. Ortho Biotech's efforts to persuade CMS and Medicare Carriers to adopt LCA policies were not successful. The only local Medicare Carrier to adopt such a policy was the Carrier in Utah, but Utah's policy was rescinded by CMS. (Dooley Direct ¶ 61). The local Medicare Carrier in Massachusetts refused even to meet with Ortho Biotech to discuss the benefits of adopting a LCA policy. (Id. at ¶ 60; DX 2774 at MDL-OBI00043362).

28. Ortho Biotech was told by CMS officials in Washington, D.C. that CMS would not implement a LCA policy because it was "a local issue" for the State Medicare Carriers. (Dooley Direct ¶ 62; DX 2774 at MDL-OBI00043372.) Some local Medicare Carriers told Ortho Biotech that they would not implement LCA "because that is direction that comes from CMS-central office," or "it was up to CMS to decide LCA." (Id.).

29. Under Ortho Biotech's patient assistance programs, the company has given individuals of limited means about $200 million in free Procrit (valued at the WAC price).

(Dooley, Nov. 16 Tr. 85). In addition it made donations to not-for-profit foundations that help indigent Medicare beneficiaries meet their co-pay obligations. (Id.).

30. The J&J Defendants supported AWP reform in the months leading up to the enactment of the MMA. (DX 2776; see also DX 2775 and 2777; Dooley Direct ¶ 63; Dooley, Nov. 16 Tr. 47). In particular, Johnson & Johnson supported the move to "an ASP-based methodology" that would reimburse physicians at a set margin above ASP. (DX 2776).

31. Under the MMA, reimbursement for most Part B drugs was reduced in 2004 to 85% of AWP. Procrit's reimbursement was reduced to 87% of AWP. (Dooley Direct ¶ 24). As of 2005, reimbursement for all Part B drugs was set at ASP+6%. (Id.). This decrease in drug reimbursement was partly offset by an increase in administration fees. (Id.). In the case of Procrit, the administration fee was increased from $4.41 to $24. (Dooley, Nov. 16 Tr. 41). Medicare's percentage savings for Procrit were modest in comparison to the savings for other Part B drugs. (See Hartman Rebuttal Testimony, Attachment C).

32. Procrit's pricing and marketing were not deceptive or unfair under Ch. 93A.

### Proposed Findings Relating to Remicade

33. Remicade (infliximab) is manufactured and sold by Centocor, Inc., a subsidiary of Johnson & Johnson. (Hoffman, Nov. 14 Tr. 54).

34. Remicade was approved for sale in 1998. (Id. at 53). It was initially approved for the treatment of Crohn's Disease, and, later, for the treatment of rheumatoid arthritis and other conditions. (Id.). Remicade faces therapeutic competition in the treatment of rheumatoid arthritis from several other drugs, but is not available as a generic. (Id. at 53-54).

35. Remicade is administered by infusion, a process that typically lasts about two to three hours, including the time needed to prepare the patient for the infusion and monitor the patient afterwards. (Id. at 76).

36. Remicade can be administered in a physician office, provided the office is equipped to provide infusion services, or it can be administered in hospitals. (Id. at 90-94). The cost of infusing Remicade in hospitals typically runs several thousand dollars more than the cost of infusing Remicade in a physician's office. (Id. at 94-96). Whereas the cost of infusing Remicade in a physician's office was approximately $2000, Centocor's studies showed that the cost of administering Remicade in the hospital was typically three to five times that amount, and in some instances more. (Id.).

37. When Remicade is used to treat Crohn's disease, it is usually done under the care and supervision of a gastroenterologist. (Id. at 90). Patients with rheumatoid arthritis are typically cared for by rheumatologists. (Id. at 92).

38. When Centocor brought Remicade to market in 1998, gastroenterologists and rheumatologists were not very experienced with infusion drugs and would not have been able to administer Remicade in the office without incurring the capital costs associated with providing infusion services. (Id. at 90-91). These capital costs can include the cost of acquiring dedicated office space for infusion rooms, the purchase of infusion equipment and refrigerators, additional nursing and back office staff, and additional insurance. (Id.). Physicians purchasing infusion drugs also needed to assume the risk that they would not be adequately reimbursed. (Id.). Rheumatologists, in particular, had previously experienced losses due to inadequate reimbursement on a drug called Synvisc, and consequently had stopped administering the drug in their offices. (Id. at 92-93).

39. Centocor recognized that gastroenterologists and rheumatologists would be unwilling to provide infusions services in their offices unless they were satisfied that it was financially viable to do so. (Id. at 58, 93). It distributed materials that addressed these concerns by discussing the practical and financial implications of providing Remicade infusions in the office. (E.g., PX 252). For example, Centocor's "Office-Based Infusion Guide" listed five "benefits or providing REMICADE™ infusions in the office setting," the first of which was that in-office infusion was "consistent with government and private payors goals of providing health care in the most cost-appropriate setting." (Id. at MDL-CEN00003481).

40. Centocor's materials also mentioned the potential "financial benefit" to the physician of providing in-office infusion services. (Id.). It provided a worksheet that the physician could use to ascertain whether the revenue from reimbursement would result in "income or loss" to the physician's particular practice. (Id. at MDL-CEN00003485).

41. The materials Centocor made available to physicians contained accurate information on pricing and reimbursement and, therefore, were not "deceptive" within the meaning of Ch. 93A.

42. Discussions relating to the financial aspects of Remicade infusion are not prohibited by Ch. 93A. As noted, in-office infusion is less costly than sending patients to the hospital for infusions. The physician's office, therefore, is the most "cost-appropriate setting." In fact, Centocor worked with payors to identify physicians who were sending Remicade patients to hospitals rather than infusing them in the office, where reimbursement costs were lower. (Hoffman, Nov. 14 Tr. 102-07). Centocor worked with Highmark, an insurer in Pennsylvania, to help Highmark establish a specialty pharmacy program that avoided AWP-based reimbursement

altogether. (Id.). In order to induce physicians to participate in the program, Highmark agreed to pay the physicians in its network an infusion fee of $450-$500 per administration. (Id. at 107).

43. Before passage of the MMA, Medicare paid an infusion fee of $60. (Id. 108). Centocor conducted a time and motion study in 2002 showing that this fee was inadequate inasmuch as the physician's cost of administering Remicade was between $185 and $215 per administration. (Id. at 77). Centocor's cost study was conservative because it adhered to a Government Accounting Office methodology that did not capture all of the direct and indirect costs associated with providing infusion services. (Id. at 78-79, 91-92). After passage of the MMA, Medicare's infusion fee was increased to about $240. Medicare's current infusion fee is about $220. (Id. at 108).

44. Centocor did not offer discounts or rebates to physicians. (Hoffman, Nov. 14 Tr. 63, 88-89, 112-15; Rosenthal, Nov. 27 Tr. 77). Because there were no discounts, physicians could only purchase Remicade at or about the published WAC price. (Hoffman, Nov. 14 Tr. 59).

45. Throughout the class period, the spreads on Remicade were 30% or less, and thus were within plaintiffs' estimate of what payors allegedly expected. Plaintiffs acknowledge that Remicade's spreads were 30% or less in 1998, 2000, 2002, and 2003. (Hartman Direct, Attachments G.3.c and I.3). They claim slightly higher spreads of 32.1% and 31.9% in 1999 and 2001, respectively, but these spreads are based on a biased calculation that compares Remicade's AWP as of June 30th to the average ASP for the entire year. When Remicade's ASP is compared to the average or weighted average AWP, the spreads on Remicade were 30% or less throughout the class period. (Trial Declaration of Jayson S. Dukes

("Dukes Direct"), ¶¶ 28-29; DX 2873; Dukes, Dec. 11 Tr. 108-09, 129-130). Thus, all of Remicade's spreads were within plaintiffs' estimate of what payors allegedly expected.

46. Remicade's spread was also transparent. Remicade's published AWP was 30% higher than its published WAC. (DX 2782 (Response to Request to Admit No. 2); Hartman, Nov. 21 Tr. 128-29; Rosenthal, Nov. 27 Tr. 73). The published difference between WAC and AWP, which was "available for all to see" in the publishers' electronic databases (Rosenthal, Nov. 27 Tr. 74; Bell, Nov. 28 Tr. 136-137), was equal to or greater than the difference between Remicade's ASP and AWP. (Hartman Direct, Attachment G.3.c (June 30th Spreads); DX 2873 (weighted average spreads); Rosenthal, Nov. 27 Tr. 77).

47. Centocor disclosed its WAC and AWP to HCFA when it applied for a J-Code. (Hoffman, Nov. 14 Tr. 88-89; PX 261). The 30% difference between WAC and AWP did not change during the class period. (Hoffman, Nov. 14 Tr. 55-56). The difference between ASP and AWP stayed "approximately 30 percent." (Rosenthal Direct ¶ 50). As such, there was a predictable relationship between Remicade's ASP and AWP. (Rosenthal, Nov. 27 Tr. 82).

48. When Remicade was introduced to the market in 1998, Centocor recommended a 30% markup over WAC based, in part, on an assessment of the amount payors would be willing to pay for Remicade in light of its value compared to other therapies. (Hoffman, Nov. 14 Tr. 57-58, 97-98). Centocor also took account of the reimbursement amount it thought would be needed to ensure that it would be financially viable for physicians to provide infusion services in their offices. (Id.). Research conducted prior to launch showed that a 30% spread was not excessive compared to other products. (Id. at 58, 100-02; PX 2822). At least one insurer agreed to reimburse Remicade at 100% of AWP even though it reimbursed most other

physician-administered drugs at discounts of 15%, 20% or even 30% below AWP. (Hartman Direct, Attachment L at TCC 000359).

49. Under its Patient Assistance Program, Centocor provides free Remicade to patients with incomes of 300% or less of the federal poverty level. (Hoffman, Nov. 14 Tr. 115-17). In addition, it has donated tens of millions of dollars to independent foundations that provide financial assistance to Medicare beneficiaries who are required to make co-pays for Part B medications. (Id.).

50. As noted above, the J&J Defendants supported AWP reform and advocated adoption of reimbursement based on average selling price plus a defined margin. Under the MMA, Medicare currently pays a 6% margin over ASP. At that rate, the percentage savings on Remicade is modest in comparison to the savings on other Part B drugs. (See Hartman Rebuttal Testimony, Attachment C).[2] Most private payors have not adopted ASP as a reimbursement benchmark. (Hoffman, Nov. 14 Tr. 109). A number of those that have adopted ASP have chosen to pay for Remicade at rates of ASP+8%, ASP+10%, or ASP+12%. (Id.).

51. Remicade's pricing and marketing were not deceptive or unfair under Ch. 93A.

### Proposed Findings Relating to SMW and Pipefitters

52. Sheet Metal Workers' National Health Fund (SMW) represents Class 2 payors who provide Medigap supplemental insurance. SMW's trustee, Mr. Glenn Randle,

---

[2] Dr. Rosenthal erroneously concluded that the savings under the MMA were about $217 per administration but conceded on cross-examination that the correct figure is about $100 per administration. (Rosenthal, Dec. 18 Tr. at 50). This same error appears in the chart included within Attachment C to Dr. Hartman's Rebuttal Testimony.

14

1337243v1

testified that he had no personal knowledge of whether SMW reimbursed any subject drug. (Randle, Nov. 6 Tr. 209).

53. Plaintiffs submitted a summary chart purporting to identify the years in which each class representative paid for subject drugs based on AWP. (PX 4012; Hartman, Dec. 11 Tr. 53). According to the chart, SMW never paid for Remicade, and it did not pay for Procrit until 2004. (Id.). SMW's payment in 2004 took place after the expiration of the class period. (Nov. 7 Tr. 202; Nov. 20 Tr. 97).

54. Pipefitters Local 537 Trust Funds (Pipefitters) represents payors in Class 3. Pipefitters' Fund Administrator, Mr. Charles Hannaford, testified that he had no personal knowledge whether Pipefitters paid for any of the subject drugs listed in his trial affidavit. (Hannaford, Nov. 6 Tr. 184-185) (disclaiming personal knowledge of statements in paragraph 12).

55. According to plaintiffs' summary chart, Pipefitters paid for Procrit in 2000 and 2003, and it paid for Remicade in 2002 and 2003. (PX 4012). Plaintiffs do not claim liability either for Procrit or Remicade in any of the years in which Pipefitters allegedly made payments, because the spreads in those years did not exceed 30%. (Hartman Direct, Attachments G.3.c and I.3).

56. SMW, a Class 2 representative, did not purchase Procrit or Remicade during the class period applicable to Class 2. Pipefitters, a Class 3 representative, did not purchase Procrit or Remicade in years in which plaintiffs allege liability as to Class 3.

Dated:  January 19, 2006	Respectfully submitted,

/s/ William F. Cavanaugh, Jr.
William F. Cavanaugh, Jr.
Andrew D. Schau
Erik Haas
Adeel A. Mangi
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

Attorneys for the Johnson & Johnson Defendants

## Certificate of Service

I certify that a true and correct copy of the foregoing was served on all parties on January 19, 2007 via LEXIS/NEXIS.

                                                /s/ Andrew D. Schau
                                                   Andrew D. Schau

1337243v1