# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                    )
IN RE PHARMACEUTICAL INDUSTRY        )   MDL No. 1456
AVERAGE WHOLESALE PRICE                  )
LITIGATION                                          )   Civil Action No. 01-CV-12257-PBS
_____)
THIS DOCUMENT RELATES TO              )
                                                    )   Judge Patti B. Saris
*State of Nevada v. American Home Prods.*     )
*Corp., et al.,*                                    )
D. Nev. Cause No. CV-N-02-0202-ECR         )
_____)

# DEFENDANTS' JOINT REPLY
# IN FURTHER SUPPORT OF THEIR
# MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ........................................................................................................... 3

I.   JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS BECAUSE
     THERE IS A LACK OF EVIDENCE THAT ANY CLAIMS WERE
     REIMBURSED ON THE BASIS OF AWP. ..................................................... 3

     A.   The State Has No Evidence Whatsoever Relating To PADs,
          Medicare Claims Or Private Claims. ..................................................... 3

     B.   Nevada Has No Evidence That Medicaid Claims For SADs Were
          Reimbursed On The Basis Of AWP. ...................................................... 4

II.  THE STATE'S EVIDENCE OF FRAUD AND DECEPTION IS
     INSUFFICIENT TO WITHSTAND SUMMARY JUDGMENT .......................... 6

     A.   Nevada Has Not Proffered A Standard For Determining Falsity. ............. 6

     B.   Nevada Was Not Deceived Or Defrauded About The Meaning Of
          AWP. ................................................................................................... 8

          1.   Nevada's declarations are legally irrelevant. ............................... 8
          2.   The overwhelming record evidence establishes that Nevada
               was not deceived. ...................................................................... 11

     C.   Nevada's Refusal To Change Reimbursement To Address The
          Average "Spreads" About Which It Was Aware Shows That
          Nevada Never Relied On AWP's Bearing A Particular
          Relationship To Acquisition Cost. ......................................................... 13

     D.   The Summary Judgment Record Demonstrates That No
          Reasonable Fact-Finder Could Conclude That Defendants
          Intentionally Deceived The State. .......................................................... 14

III. THE STATE HAS NO CLAIM FOR RESTITUTION OR PENALTIES
     AGAINST THE DEFENDANTS UNDER THE DTPA. ..................................... 16

IV.  THE STATE HAS NO CLAIM AGAINST DEFENDANTS UNDER THE
     MEDICAID FRAUD STATUTE. .................................................................... 17

     A.   No Defendant, With Intent To Deceive, Made Knowingly False
          Statements Or Representations Concerning AWP. .................................. 18

**TABLE OF CONTENTS (CON'T)**                    Page(s)

B.      Defendants' Statements Regarding AWP Were Not Made For Use
         By Another To Obtain Goods Or Services. ................................................ 18

C.      Defendants Are Not "Providers" Who Received Payments To
         Which They Were Not Entitled. ............................................................... 19

         1.      *Defendants are not providers* ....................................................... 19
         2.      *No Defendant "receive[d] payment to which he is not
                 entitled."* ...................................................................................... 20

V.      ALL CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.......... 20

CONCLUSION  . ........................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Alaska Department of Health & Social Services v. Ctrs. for Medicare &
    Medicare Services*, 424 F.3d 931 (9th Cir. 2005).......................................................21

*Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1 (1st Cir. 1994)............................10

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..............15

*Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105 (1st
    Cir. 2006) ..................................................................................................................10

### STATE CASES

*Pacific Maxon, Inc. v. Wilson*, 619 P.2d 816 (Nev. 1980).................................................14

*Siragusa v. Brown*, 114 Nev. 1384 (1998).......................................................................21

### FEDERAL STATUTES

42 C.F.R. § 447.332(b) .....................................................................................................11

### STATE STATUTES

Nev. Rev. Stat. § 422.490(1)...............................................................................................19

Nev. Rev. Stat. § 422.540 ..................................................................................14, 17, 18, 20

Nev. Rev. Stat. § 422.580 ..................................................................................................17, 19

Nev. Rev. Stat. § 598.0915 .................................................................................................14

Nev. Rev. Stat. § 598.0999 .................................................................................................17

## PRELIMINARY STATEMENT

Nevada admits in its opposition that it now pursues only claims relating to self-administered drugs reimbursed by the Nevada Medicaid program from 1991-2002; all other claims originally asserted have been abandoned.  Because Nevada has produced no evidence to support its remaining claims, and because they rest on an unsupportable and illogical premise, those claims should be dismissed.  The premise of Nevada's case is that Defendants inflated AWPs to induce "providers . . . to make secret profits through overcharges to patients, their insurers, and other end payors, including Medicaid" by providing "the drugs with the most inflated AWPs, resulting in increased market share and profit for the defendants . . .."  Nev. Am. Compl. ¶ 8.  There is no evidence whatsoever that drugs with higher AWPs were favored by providers over drugs with lower AWPs; moreover, where, as here, the drugs in question were prescribed by doctors who had no economic interest in which drug was dispensed to the patient, and they were dispensed by pharmacies who had no choice but to dispense what the doctors prescribed, the State's premise defies logic and had to fail.

Owing to the illogic of the State's case, it was inevitable that the State would fail to adduce evidence to support it.  Since there is no evidence that any Defendant acted irrationally to manipulate or market spreads on self-administered drugs, and no evidence that any Defendant increased market share through this alleged scheme; therefore, judgment should be entered in favor of the Defendants on Nevada's remaining claims.

Nevada's theory begins and ends with the allegation that Defendants' AWPs do not equal providers' acquisition costs.  But this is not the substance of a fraud:  There is nothing that requires AWP to relate to provider acquisition cost.  Nevada has known for decades that there is no such relationship, as it has admitted in its opposition papers.  Nevada has admitted and the Court has established for purposes of this litigation numerous facts that belie the notion that

Nevada could have been deceived by the lack of relationship between AWP and provider acquisition cost:

- Nevada did not define AWP and Medicaid officials joked about its undefined character as being "artificial wholesale price"; "ain't what's paid"; and "Avg. WHIMSICAL Price";

- Beginning no later than 1984, Nevada participated in or received the results of numerous federal investigations documenting large spreads between AWP and provider acquisition cost;

- Nevada engaged Myers & Stauffer in 2002 to analyze pharmacy profit margins and learned from that analysis that acquisition costs for some classes of drugs (*i.e.*, generics with Federal Upper Limits) *averaged* 83% less than AWP;

- Throughout the 1990s and later, Nevada reimbursed generic drugs on the basis of Federal Upper Limits (FULs), which were discounted from AWPs far more than the formulaic discounts (10% until 2002, then 15%) specified by Nevada's Medicaid rate and signaled clearly that AWP (and 90% and 85% of AWP) far exceeded provider acquisition cost;

- Plaintiff knew that three other Nevada state programs reimbursed generic drugs at discounts of up to 55% off AWP.

- The Governor, the Attorney General and the Secretary of State of Nevada all reviewed and approved PBM and insurer contracts reimbursing drugs at rates far below AWP;

- Various Defendants reported to Nevada that AWP was not formulaically related to provider acquisition cost.

Nevada's opposition rests almost entirely on two self-serving declarations by current employees who, while acknowledging they were aware that AWP exceeded acquisition cost, contend that they were not aware of the precise magnitude of the excess for specific drugs. As set forth in the accompanying motion to strike, these self-serving declarations are inconsistent with the witnesses' deposition testimony. In addition, as set forth in the motion to strike and below, these self-serving declarations are insufficient to overcome the extant contemporaneous evidence of what Nevada Medicaid knew and did during the relevant period, especially when that extant evidence is viewed in conjunction with the facts established by the Court as a

sanction for the State's destruction of other evidence that also likely would have contradicted the

proffered declarations.[1]

## ARGUMENT

I.   JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS BECAUSE THERE IS A
     LACK OF EVIDENCE THAT ANY CLAIMS WERE REIMBURSED ON THE BASIS
     OF AWP.

   A.   <u>The State Has No Evidence Whatsoever Relating To PADs, Medicare Claims Or
        Private Claims.</u>

The parties agree that Nevada now proceeds only on claims relating to self-administered

drugs reimbursed by the Nevada Medicaid program from 1991-2002.  As to other claims,

Nevada admits that "[d]uring the discovery period, defendants sought discovery on Nevada's

allegations and claims for recovery regarding physician administered drugs, co-payments made

to physicians under the Medicare Part B program, self-administered drugs before 1991, and self-

administered drugs after 2002."  NSOF ¶ 119; State of Nevada's Response to Statement of

Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment

("Nev. Resp.") at ¶ 119 ("Admitted").  The State further admits that it did not provide the

requested discovery and consequently has abandoned the subject claims, acknowledging:

- Nevada is not proceeding on its *parens patriae* claims.  Nev. Resp. at ¶ 123 ("The State
  does not pursue damages for its *parens patriae* claims.").  *See also* Memorandum in
  Support of the State of Nevada's Opposition to Defendants' Joint Motion for Summary
  Judgment ("Nev. Opp'n") at 23 ("Dr. Hartman's damages model . . . is limited to
  damages in the form of civil penalties incurred by the Nevada Medicaid program").

- Nevada is not proceeding on physician-administered drug claims.  NSOF ¶ 120 ("Nevada
  does not have any claims data or other reimbursement evidence for any physician
  administered drugs.")  Nev. Resp. at ¶ 120 ("Admitted").

---

[1] Since Defendants filed their motion for summary judgment the Court has established certain facts, as a sanction
for the State's spoliation of evidence.  *See* Rep. and Recs. re: Defs.' Joint M. for Redress for Spoliation of Evidence
at 26 (Mar. 14, 2007) (Docket No. 3843, adopted by the Court on March 29, 2007) ("Spoliation Op.").  Defendants
hereby incorporate those established facts (including the documents that are referenced in the Court's decision and
found at Docket No. 2900) into the summary judgment record.  These established facts are addressed in more detail
in Defendants' accompanying motion to strike.

- Nevada is not proceeding on its Medicare Part B claims.  Nev. Resp. at ¶ 121 ("The State states that it is not pursuing claims data or other reimbursement evidence for Medicare Part B co-payments.")

- Nevada is not proceeding on Medicaid claims before 1991 or after 2002.  NSOF ¶ 122 ("Nevada does not have any claims data or other reimbursement evidence for provider reimbursement prior to 1991 or after 2002.")  Nev. Resp. at ¶ 122 ("Admitted").

Accordingly, the Court should enter judgment in favor of the Defendants on Counts I and II (*parens patriae* claims on behalf of Nevada residents and the elderly) and limit the scope of Counts III and V, brought pursuant to Nevada's Deceptive Trade Practices Act ("DTPA") and Medicaid Fraud statutes, to claims for self-administered drugs reimbursed by the Nevada Medicaid program from 1991-2002.

For the reasons set forth below, Nevada's remaining claims are not supported by evidence, and judgment should be entered for Defendants dismissing the Complaint with prejudice.

      B.      <u>Nevada Has No Evidence That Medicaid Claims For SADs Were Reimbursed On The Basis Of AWP.</u>

For Nevada to prove that Defendants' AWPs caused it to overpay providers, it must first show that the State in fact used Defendants' AWPs to reimburse providers.  Defendants' moving papers demonstrated that Nevada has not established this foundational fact.  *See* Defendants' Joint Memorandum of Law in Support of their Motion for Summary Judgment ("Joint Mem.") at 9-10.  In response, Nevada is silent.  Nevada has produced no evidence or argument that it reimbursed any claims on the basis of AWP.  NSOF ¶ 133; Nev. Resp. ¶ 133.  The alternative non-AWP based reimbursement mechanisms are well-established in the law and testimony: FULs, usual and customary charges, State MACs and DOJ AWPs, being chief among them. NSOF ¶ 8; Joint Mem. at 9-10.  Because Nevada cannot show which claims were reimbursed on

the basis of which reimbursement methodology, Nevada's claims for penalties and damages stemming from those reimbursement transactions must be dismissed with prejudice.

The only evidence Nevada offered in discovery to show the basis for its reimbursement is a single CD of archived claims data.  As set forth in Defendants' moving papers, this data does not identify which claims were reimbursed on the basis of AWP.  *See* Joint Mem. at 9-10. Moreover, if the testimony of Mr. Ronald Swenson (Nevada's Rule 30(b)(6) designee regarding the claims data) is accurate – and Nevada has put forth no evidence showing it is not – 97% of Nevada Medicaid's claims during the relevant period were reimbursed based on a State Upper Limit –  SUL – and not on the basis of AWP.  Nevada's response fails to address this central failure, and instead belittles the matter by suggesting that this is a discovery matter or that Defendants are confused about what the data means.  The matter is critical, and it cannot be dismissed with the back of the hand.  Nevada's claims data do not meet the State's burden to prove which claims, if any, were reimbursed on the basis of AWP.

In its response to Defendants' questions regarding the claims data, the State conceded that "there is no additional field in the claims data to capture the basis of the amount Nevada Medicaid paid."  Nev. Resp. ¶¶  128-29; NSOF ¶¶  128-29; Swenson Decl. at Ex. A, Q.3 (Tab 26).  Nevada asserts that the basis of reimbursement "can be determined," Nev. Resp. ¶ 129, but it does not show how, and it does not provide evidence that any claim was in fact reimbursed on the basis of AWP.  Dr. Hartman testified that he did not make any such determination; he simply *assumed* that all claims were paid using the EAC formula.[2]  NSOF ¶ 133; Hartman Dep. at 79-80 (Tab 89).  *Assumptions and promises of future proof cannot defeat summary judgment:*  At

---

[2] Defendants' expert Dr. Gaier conducted a preliminary analysis of the Nevada claims data and found that 75 percent of Nevada's generic drug claims as to which Dr. Hartman assessed penalties could not have been reimbursed based on the AWP-based EAC rate.  Declaration of defense expert Dr. Eric M. Gaier, Ph.D at ¶ 49.

summary judgment, Nevada must proffer evidence to establish which claims were reimbursed on the basis of AWP, and it has not done so.  Therefore, summary judgment is required as to all remaining claims.

## II.    THE STATE'S EVIDENCE OF FRAUD AND DECEPTION IS INSUFFICIENT TO WITHSTAND SUMMARY JUDGMENT.

### A.    Nevada Has Not Proffered A Standard For Determining Falsity.

Although Nevada asserts that Defendants' AWPs are false and fraudulent, it has not provided any criteria for assessing what the subject AWPs should have been – what "true" AWPs would have been.  Nevada cannot point to a statute, regulation, or industry practice that Defendants have violated.  The State admits that it does not define AWP and that AWP is not defined by federal Medicaid statutes or regulations.  NSOF ¶17.  Nevada does not claim that Defendants made direct representations to the State regarding AWP that were false.  Nevada does not now claim that it was deceived into thinking that an AWP was an average of wholesale prices.  And Nevada has not submitted evidence to establish that Defendants have failed to comply with any custom concerning the use of the term.  In short, Nevada, has proffered no evidence that would permit this Court to establish what Defendants should have been reporting as their AWPs.

Nevada began this litigation by asserting that the words "average wholesale price" were used by Nevada to mean an actual average of wholesale prices, Nev. Am. Compl. ¶ 97 ("AWP is intended to be a national average of list prices charged by wholesalers to pharmacies"), but the testimony of Nevada Medicaid officials, and documents in their files, conclusively belied that assertion and established beyond any doubt that Nevada Medicaid officials knew that AWPs were not averages of wholesale prices.  In 1984, Nevada received a federal report showing that 3,455 of the 3,469 surveyed drug purchases (99.6%) were made below AWP.  NSOF ¶¶ 26, 28.

In 1986, Nevada received another report showing that pharmacies in Nevada acquired drugs on average at 18.85% below AWP.  And Nevada Medicaid's pharmacy consultant during that time, Keith MacDonald, referred then to AWP as "artificial wholesale price."  NSOF ¶ 45.  Since the 1980s Nevada has reimbursed pharmacies for drugs at discounts of at least 10% from AWP, thus precluding any contention that the State believed pharmacies paid AWP for the drugs for which they were reimbursed at least 10% less.  Faced with this insurmountable evidence, the State has now abandoned the position stated in its complaint:  In the words Nevada's lawyers now use: "Nevada Medicaid personnel understood that AWP *did not* equal acquisition costs."  Nev. Opp'n at 8 (emphasis in original).

Having abandoned anything like a "plain meaning" interpretation of the phrase "AWP," the State needed to come forward with evidence to establish a standard for a "false" AWP, but it has not done so.  Nevada's expert has expressly acknowledged that he has not been asked to provide testimony regarding "expectations" or "yardsticks" for determining AWPs.  Hartman's 6/13/06 Decl. at ¶ 14 (Tab 91)[3]; Hartman Dep. at 78-79 (Tab 89).  Instead, Dr. Hartman calculated penalties whenever Defendants' AWPs were more than Nevada's EAC; however, Dr. Hartman admits that this rule of calculation was given to him by Nevada's lawyers and does not represent an expert opinion on his part, as it could not possibly be in light of his testimony to this Court in other cases that participants in the pharmaceutical market knew that AWP exceeded WAC by 20% - 25% for branded drugs, more for generics, and they expected it to exceed acquisition cost by about 30%  for branded drugs and more for generics.  Hartman's 6/13/06 Decl. at ¶ 23(a), n. 27 (Tab 91).  In its summary judgment papers, Nevada has not established why manufacturers should be liable when AWP exceeds ASP by more than 10%:  It has simply

---

[3] Citations to "(Tab __)" refer to the exhibits that are attached to the Declaration and Supplemental Declaration of John H. Ray, III, Docket Nos. 3632 and 3634, which were submitted with Defendants' moving papers or the Declaration of Carisa A. Klemeyer Dated April 5, 2007 (Tabs 102-05).

assumed it.  Nor has Nevada explained why Defendants' Subject Drugs should be singled out, when the AWP for every drug sold in America is, by Dr. Hartman's account, expected to be 30% or more above ASP.  Hartman's 6/13/06 Decl. at ¶ 23(a), n. 27 (Tab 91).

Nevada has not offered a standard for determining falsity; thus, it cannot establish that Defendants' AWPs were false.

> B.      Nevada Was Not Deceived Or Defrauded About The Meaning Of AWP.

> > 1.      *Nevada's declarations are legally irrelevant.*

In its opposition, Nevada asserts that "it was estimating provider acquisition costs in the state as accurately as possible" and that it "assumed that AWP bore a rational and direct relationship to the underlying cost for the drugs."  Nev. Opp'n at 8-9.  In support of these points, Nevada submits declarations from Mr. Duarte and Ms. Lawrence.[4]  Neither declaration explains the basis for the witness's *assumption* that AWP had a rational and direct relationship to actual cost.  Moreover, these declarations should be disregarded to the extent they contradict prior testimony, contain assertions that are not based on personal knowledge (in particular, where they speculate regarding events occurring prior to their tenure at Nevada Medicaid or purport to equate their subjective views with "the State's" or "Nevada Medicaid's"), contradict the facts admissions entered as a sanction against the State for its destruction of documents, or offer opinion testimony or hearsay.  Once the offending material is stripped out, the declarations have little that is relevant to the issues presented in Defendants' summary judgment motion and nothing that establishes fraud or deception.

*First*, Mr. Duarte's and Ms. Lawrence's subjective states of mind do not establish a standard for when AWPs are "true" or "false."  Nevada must establish that Defendants violated

---

[4] As noted in the accompanying motion to strike, these affidavits are nearly identical to those executed by the Montana employees.

an objective standard for falsity, which it has utterly failed to do.  Nevada has not established

that Defendants' representations regarding AWP violated any statute, regulation, or industry

custom, practice or understanding.  Nor has the State introduced evidence that Defendants made

false representations to them regarding the meaning of AWP or the pricing of their drugs.  The

State's case rests solely on the notion that the AWPs for the Subject Drugs violated some

standard regarding what an AWP is suppose to be; however, the State has introduced no

evidence as to that standard.

*Second*, Mr. Duarte began working at Nevada Medicaid in 2000 and Ms. Lawrence in

2001.  Their declarations do not address the period before 2000.  Evidence from as far back as

1986 establishes that Nevada Medicaid officials were aware that the State's EAC was in excess

of acquisition cost.  Ms. Lawrence was of course well aware of this fact, as she wrote an e-mail

to Mr. Duarte in 2002, stating:

> Just as a side note, Dionne had heard that there has become
> increasing concern by the feds of what the states say is the actual
> estimated actual cost (AWP-%) of drugs. In regs we are suppose to
> be reimbursing by that EAC. Supposedly this has made it to one of
> the President's action items to further look into how each state is
> hitting that target. We would not actually know until we had a
> dispensing survey completed. . . .  Or the other option is, CMS is
> conducting a review currently on eight states and is suppose to be
> releasing those results this year. *I agree with reducing the
> reimbursement, heck in '86 when we raised it to 10% the feds told
> us then they didn't think we were in line with EAC.*

(Tab 105) (emphasis added).

*Third*, as a matter of law, the declarations may not serve to contradict the facts the Court

has deemed to be true as a sanction for Nevada's spoliation of evidence.  As the State

acknowledges, it was aware of studies dating back to the 1980s showing the difference between

AWP and acquisition cost.  *See* Joint Mem. at 15-18.  It is now an indisputable fact that the OIG

reports showing these differences were maintained and circulated among Nevada officials from

May 2000 onward.  *See* Rep. and Recs. re: Defs.' Joint M. for Redress for Spoliation of Evidence at 26 (Mar. 14, 2007) (Docket No. 3843, adopted by the Court on March 29, 2007). The State asserts, without evidence, that all Defendants have done is "point[] to scattered instances where State personnel may have received isolated reports identifying instances where spreads existed between the AWP and acquisition cost."  *See* Nev. Opp'n at 12.  But the "scattered" nature of this evidence is the State's own fault because of its wanton destruction of evidence.  It is to be taken as true now that the reports were maintained "and *circulat[ed] among employees with responsibilities for the State's Medicaid pharmacy reimbursement rate.*"  *See* Spoliation Op. at 26.  The very people responsible for drug reimbursement rates received numerous reports showing large spreads.

*Fourth*, the declarations may not contradict the sworn deposition testimony of the affiants, *see Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.,* 447 F.3d 105, (1st Cir. 2006); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994), which establishes that Mr. Duarte and Ms. Lawrence were in fact aware that their reimbursement formula was in excess of acquisition cost.  For example, prior to the 2002 rate change, Mr. Duarte and Ms. Lawrence reviewed the Myers & Stauffer margin analysis study, which estimated that in Nevada AWP exceeded acquisition cost by 19.3% for brand drugs, by 35.1% for generic drugs without a FUL, and by 83.1% for generic drugs with a FUL.  NSOF ¶ 81.  In the face of this information regarding acquisition costs, Mr. Duarte and his staff changed Nevada Medicaid's discount from AWP to 15%, where it stands today.  In addition, in its response to Defendants' statement of facts, Nevada has admitted or not introduced evidence contesting the following:

- As of the summer of 2001, Mr. Duarte was aware that Wal-Mart purchased generic drugs at AWP-90%.  NSOF ¶ 57.

- A March 5, 2002, e-mail informed Coleen Lawrence, the Social Services Chief primarily responsible for Nevada Medicaid's prescription drug reimbursement, that the State of Washington was changing its reimbursement rate to AWP-50% for multi-source drugs as the result of a recent OIG study. NSOF ¶ 106; Nev. Resp. ¶ 106 ("Admitted")).

As set forth in the accompanying motion to strike, both Mr. Duarte and Ms. Lawrence were well aware of and testified about the spreads of which they now profess ignorance.

    2.    *The overwhelming record evidence establishes that Nevada was not deceived.*

The undisputed evidence conclusively establishes that Nevada was not deceived about AWPs. Beyond the government studies discussed above, Nevada's own reimbursement under Medicaid and other programs establishes that Nevada was aware that AWP was not formulaically related to acquisition cost.

Nevada Medicaid's own reimbursement methodologies demonstrate beyond any doubt that the State knew that there was a greater difference between AWP and acquisition cost than was assumed in the State's EAC reimbursement methodology. For the many multi-source drugs at issue in this litigation with FULs established by CMS, Nevada's reimbursement structure required that it reimburse providers at FUL. In their moving papers, Defendants produced evidence that AWP bears no formulaic relationship to the FUL,[5] and by implication acquisition cost (pharmacists will not continue to dispense drugs at reimbursement levels that do not cover their costs). *See* Joint Mem. at 20. Defendants submitted a chart showing the FUL rates and average AWPs for a number of the generic Subject Drugs in 1996, which showed that the FUL

---

[5] Dr. Hartman is wrong as a matter of indisputable fact in his assertion that the FUL is based on AWP. An examination of the FULs for the subject drugs demonstrates that they are not based on AWP and that there is no relationship between FUL and AWP. *See* Bell Decl. ¶ 18 (Docket No. 3636). Federal regulations require CMS to calculate a FUL based on the "lowest published *price*" for the least costly multi-source drug in a group of equivalents. 42 C.F.R. § 447.332(b). It is uncontested that Wholesale Acquisition Cost ("WAC") and Direct Price ("DP") are lower than AWP and therefore AWP is rarely, if ever, the lowest published price used to set the FUL. This is proven by the examples below in which the AWP is significantly higher than the FUL – thus, it would be impossible for 150% of such an AWP to be the FUL. *See infra* at 12; Bell Decl. Ex. F.

was on average 49.1 percent below AWP, and in one instance was 91.3 percent below AWP. *See* Exhibit F to the Declaration of defense expert Gregory K. Bell, Ph.D.  In its opposition, Nevada does not respond to this argument; nor does it provide rebutting evidence.[6]

Other Nevada State agencies were reimbursing the same drugs dispensed by the same Nevada pharmacies at much steeper discounts from AWP throughout the period for which the State claims that it was deceived.  *See* Joint Mem. at 25-28.  Nevada admits that through PBMs and insurers Nevada has reimbursed at rates far below the Medicaid reimbursement rate:  PEBs (1996) generics AWP-45%; PEBs (1998) branded AWP-20.5%, generics, AWP-55%; Senior Rx (2004) generics AWP-55%.  NSOF ¶ 97; Nev. Resp. ¶ 97 ("Admitted")**.**  The State's only response is that there is no evidence that State Medicaid officials communicated with any of these other agencies about drug reimbursement.  But Nevada's response ignores, among other things, that:

- Nevada Medicaid pharmacy consultant Laurie Squartsoff was periodically asked to provide information concerning reimbursement formulas used by others Nevada agencies to her supervisor, Social Services Chief Peggy Epidendio.  NSOF ¶ 103; Nev. Resp. ¶ 103 ("Admitted").

- Ms. Squartsoff prepared a memorandum in 1995 listing Nevada worker's compensation program reimbursement for generic drugs at a rate of AWP-40%.  NSOF ¶ 104; Nev. Resp. ¶ 104 ("Admitted").

- The PBM contracts for PEBs and other State programs with steep discounts from AWP were reviewed and approved by the Board of Examiners, which consists of the Governor of Nevada, the Attorney General, and the Secretary of State.  NSOF ¶ 102; Nev. Resp. ¶ 102 ("Admitted").

Moreover, it is now established fact that from 2000 onward, Nevada Medicaid knew the discounts at which other State agencies were reimbursing and purchasing drugs.  *See* Spoliation Op. at 27.  Because Nevada Medicaid had this information, no finder of fact could reasonably

---

[6] The State's use of FUL – rather than AWP – as a basis for reimbursing multi-source drugs, suggests that the State had no reason to be concerned with the large spreads for multi-source drugs if they were reimbursed on a different basis.  As noted above, Nevada has not produced claims data to identify the basis of its reimbursement.

conclude that Nevada Medicaid officials believed that the difference between AWP and provider acquisition cost was no greater than 10% or 15%.

Nevada knew of the difference between AWP and actual acquisition cost and maintained the "spread" to make up for the inadequacies in its dispensing fee and to sustain a robust provider network.  Nevada protests, but the undisputed facts are that Nevada was aware of the spread, the spread benefited providers, the dispensing fee was inadequate, providers would not participate if they did not make a profit, and Nevada was in control of its Medicaid reimbursement rates.   Defendants need not provide a motive for Nevada's actions; the evidence conclusively establishes that Nevada was aware of the difference between AWP and acquisition cost, and that suffices to undermine the State's remaining claims.

     C.    <u>Nevada's Refusal To Change Reimbursement To Address The Average "Spreads" About Which It Was Aware Shows That Nevada Never Relied On AWP's Bearing A Particular Relationship To Acquisition Cost.</u>

Over twenty years, Nevada changed its reimbursement discount from AWP only twice, moving from AWP-5% to AWP-10% in 1988 and then to AWP-15% in 2002, where it remains today (even though Mr. Duarte and Ms. Lawrence admit they now know what AWP represents). NSOF at ¶¶ 8, 47, 76; Nev. Resp. at ¶¶ 8, 47, 76.  While the State *used* AWP as part of its reimbursement formula, there is no evidence that the State relied upon AWP to bear any specific relationship to acquisition cost.  Quite to the contrary, the State's repeated failure to react to information showing that AWP did not bear a particular relationship to acquisition cost confirms that the State can never show reliance.  Each and every time that a State official received information showing the disconnection between AWP and acquisition cost, the State bypassed the opportunity to change its drug reimbursement formula to equal acquisition cost.

Mr. MacDonald admitted that in 1986 he received reports from the federal government showing that AWP exceeded acquisition costs by *on average* 18.85%, and he recommended a

discount of 10%.  NSOF at ¶¶ 46-47, 79; Nev. Resp. at ¶¶ 46-47, 79.  In 2002, Mr. Duarte and

Ms. Lawrence admitted that they received a study from Myers & Stauffer showing that AWP

exceeded acquisition costs by *on average* 19.3% for brand name drugs, 35.1% for drugs without

a FUL and 83.1% for drugs with a FUL, and they recommended a discount of 15% for branded

drugs and for generics.  NSOF at ¶¶ 38-39, 81; Nev. Resp. at ¶¶ 38-39, 81.  The State maintained

its 15% discount for all drugs.  Indeed, throughout the entire period for which Nevada claims

damages, its employees had access to the dozens of federal and private reports that Drs. Berndt

and Hartman have acknowledged made people in the industry well aware that AWP did not bear

a specific relationship to acquisition cost.  Nevertheless, Nevada not once considered

abandoning AWP-based reimbursement or modifying the AWP discount to match the

information available to it.  When it considered higher discounts from AWP, it considered them

only in the context of adopting a bargaining position against the provider network of pharmacists

it was afraid of losing.  NSOF ¶ 89.  Today, with full knowledge of the alleged fraud, Nevada

has maintained its reimbursement rates well above average acquisition costs.  The refusal, even

now, to change reimbursement to approach the "spreads" about which Nevada now complains

shows that the State did not rely on AWP in the way that it alleges.

> D.   The Summary Judgment Record Demonstrates That No Reasonable Fact-Finder
>       Could Conclude That Defendants Intentionally Deceived The State.

Consistent with Nevada's common law of fraud, *see Pacific Maxon, Inc. v. Wilson*, 619

P.2d 816, 871 (Nev. 1980), under both the DTPA and the Medicaid Fraud statute, the State is

obligated to show that Defendants intentionally and knowingly deceived it.  *See* Nev. Rev. Stat.

§§ 422.540 (requiring showing of "intention to defraud" for liability under Medicaid fraud

statute); 598.0915 (defining "deceptive trade practices").  The State has adduced *no* evidence

that permits even an inference that the Defendant drug manufacturers intentionally misled the State with respect to AWP.

"If the claim is one that *simply makes no economic sense*," plaintiffs are obliged to "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis added). *Matsushita* is a direct outgrowth of the familiar rule that summary judgment is required where no rational fact-finder could find for the plaintiff. In *Matsushita*, the plaintiff alleged that an antitrust defendant had refused to deal with it because of the defendant's participation in an illegal boycott. But the factual context showed that the defendant "lacked any rational motive to join the alleged boycott"; therefore, the Supreme Court held, the plaintiff's burden in opposition to summary judgment was that much heavier.

Here, there is no reason for Defendants to have intentionally manipulated the AWPs of the drugs remaining in the case. The only drugs remaining at issue in this case are self administered drugs. The entities that profit from the alleged spread between AWP and acquisition cost (pharmacies) have no control over what drugs are prescribed by physicians (who are indifferent to the spread since they do not profit from it). Thus, Defendants cannot use AWP to create an incentive to prescribe or to create an incentive to dispense the drugs remaining at issue. Therefore, they cannot use the AWP of these drugs as a competitive means of gaining market share. And, of course, there is no evidence that any defendant did in fact market the spread to pharmacies or increase its market share. NSOF ¶ 134; Nev. Resp. ¶ 134.

The State's case has collapsed to the proposition that some (but not all) officials responsible for making drug reimbursement decisions *assumed* that AWP bore an (unspecified) reasonable relationship to actual acquisition cost. There is no evidence in the record to support

the proposition that the Defendant drug manufacturers either knew about or would have expected the State to make such an assumption.  The State admits that there is no Nevada or federal regulation that defines the meaning of AWP.  *See* NSOF ¶ 17; Nev. Resp. ¶ 17.  The State likewise has been unable to explain in what way the AWPs reported to First DataBank were false.  *See supra* at 6-7.  It is hard, therefore, to imagine how Defendants *knowingly* could have reported AWPs that misled the State by being inconsistent with its still-undefined standard for accuracy.  Indeed, Defendants could not even have expected that the State would understand AWP in the way that it now claims because all evidence available to any participant in the industry showed that there were significant differences between AWP and actual acquisition costs (as the Nevada Medicaid officials knew quite well).  Nowhere is this more true than with respect to the difference between AWP and the FUL.  FULs were both significantly lower than AWP and related to them in an unpredictable fashion.  This one piece of knowledge, available to both the State and Defendants, renders incredible the supposition that Defendants could possibly have guessed that the State believed – as it now claims – that AWP bore a systematic relationship to acquisition costs.

III.    THE STATE HAS NO CLAIM FOR RESTITUTION OR PENALTIES AGAINST THE
        DEFENDANTS UNDER THE DTPA.

        As discussed above (*see supra* at Section I), while Nevada's Amended Complaint lists three counts under the DTPA, Nevada has abandoned its *parens patriae* claims on behalf of Nevada Residents (Count I) and the elderly (Count II); only the Count III claim for civil penalties on behalf of Nevada Medicaid remains in this case.  Thus, while Defendants dispute that the Attorney General has the authority to bring a *parens patriae* claim under the DTPA (*see* Joint Mem. at 34-35), the question is now moot.

The question of restitution is also moot because Nevada concedes that it is not seeking restitution under the DTPA. Defendants argued that Nevada cannot recover restitution (or damages in the guise of "restitution") under the DTPA, *see* Joint Mem. at 35-37; however, Nevada now disclaims damages and restitution and claims only "civil penalties" on behalf of Nevada Medicaid, *see* Nev. Opp'n at 23 (Defendants challenge the Attorney General's power to recover ***restitution*** on behalf of Nevada residents and the State. . . . However, Nevada does not seek to recover on these bases on behalf of these groups, recovery of these monies is not included in Dr. Hartman's damages model, which is limited to damages in the form of civil penalties incurred by the Nevada Medicaid Program.") (emphasis in original).

The only remaining element of Nevada's DTPA claim is for civil penalties for Medicaid claims for pharmacy-dispensed drugs from 1991 through 2002. These penalties are unsupported by the evidentiary record. To obtain civil penalties pursuant to Nev. Rev. Stat. 598.0999, Nevada must prove that Defendants willfully engaged in the deceptive trade practice. Nev. Rev. Stat. 598.0999(2). As discussed in Section II above, Nevada has not met its summary judgment burden to show that Defendants willfully engaged in deceptive trade practices.

IV.     THE STATE HAS NO CLAIM AGAINST DEFENDANTS UNDER THE MEDICAID FRAUD STATUTE.

To establish liability under the Medicaid Fraud statute, Nevada must show that Defendants "with intent to defraud . . . [made] or cause[ed] to be made a statement or representation for use by another in obtaining goods or services pursuant to the plan, knowing the statement or representation to be false, in whole or in part, by commission or omission." Nev. Rev. Stat. § 422.540(1)(c). If liability is established, civil penalties may be levied against a "provider who receives payment to which he is not entitled." Nev. Rev. Stat. § 422.580. Because this statute is addressed to Medicaid providers and Medicaid beneficiaries, it does not

apply to remote manufacturers who did not participate in Nevada's Medicaid program as provider or beneficiary.

In response to Defendants' argument to this effect in their opening brief, (*see* Joint Mem. at 31-33), Nevada makes four points in opposition: (1) Defendants knew "that the AWPs were not what the states believed them to be;" (2) Defendants' drugs are goods and services, and AWPs were used to obtain drugs; (3) Defendants are providers because they supply drugs that are used in the Medicaid Plan; and (4) Defendants received a payment in the form of increased market share as a result of the alleged fraud. Nev. Opp'n at 23-26. Nevada's contentions are unsupported by the record and incorrect as a matter of law.

A.      No Defendant, With Intent To Deceive, Made Knowingly False Statements Or Representations Concerning AWP.

As already shown, Nevada's Medicaid Fraud claims fail because Defendants' representations concerning AWP were not false (*see supra* at Section II); no Defendant believed or had any reason to believe its AWPs were false, or that they were different from what the State believed them to be (*see supra* at Section II.B.); and no Defendant had any intent to defraud, as there would have been no benefit to doing so because doing so could not have served a competitive objective, and, in particular, could not have increased market share (*see supra* at Section II.D.).

B.      Defendants' Statements Regarding AWP Were Not Made For Use By Another To Obtain Goods Or Services.

Section 422.540(1)(c)[7] limits liability to a person who "makes or causes to be made a statement or representation for use by another in obtaining goods or services pursuant to the plan." Defendants agree with Nevada that drugs could be a "good or service"; however, the "for

---

[7] As noted in Defendants' opening brief, see Joint Memo. at 31 n. 26, Nevada's claims pursuant to sections (a), (b), and (d) were premised on a "Best Price" theory and were dismissed as to all Defendants except AstraZeneca and Pfizer.

use" requirement makes it clear that the false statement must be made in connection with the consumer transaction and not in connection with the reimbursement transaction.  For example, this section would cover someone who created a false prescription or a false Medicaid identification card that a beneficiary used to obtain drugs to which they were not entitled.  Of course, that is not the case here:  No beneficiary used a false (or truthful) AWP to obtain drugs.  A drug's AWP is not used in the consumer transaction where goods or services are exchanged.  A drug's AWP is used, if at all, only in the reimbursement transaction between the pharmacy and the State.  Reimbursement is a payment, not a good or service under the Medicaid Plan, NSOF at ¶ 13; Nev. Resp. at ¶ 13;  thus any false statement with regard to an AWP would not be "for the use by another in obtaining a good or service."

C.     <u>Defendants Are Not "Providers" Who Received Payments To Which They Were Not Entitled.</u>

Nev. Rev. Stat. § 422.580 authorizes the imposition of civil penalties upon a "provider who receives payment to which he is not entitled."  Here, Defendants are not providers, and Nevada has not established that Defendants received "payment[s]" to which they are not entitled.

1.     *Defendants are not providers*

A provider is a person "who has applied to participate or who participates *in the plan* as the provider of goods or services."  Nev. Rev. Stat. § 422.490(1) (emphasis added).  Nevada attempts to rewrite the statute; its argument that Defendants are providers because they manufacture drugs used in the Plan would require "provider" to be defined as one who "provides goods or services [used in the Plan]."  That is not the statutory definition, and it would be an unworkable one, including even power companies that provide electricity to pharmacies that serve Medicaid beneficiaries.

2.      *No Defendant "receive[d] payment to which he is not entitled."*

Nevada admits that no Defendant received a payment from Medicaid.  The relevant payments, reimbursement based on AWP, went to pharmacists.  NSOF at ¶ 12; Nev. Resp. at ¶ 12.  Nevada contends, however, that the payments to which Defendants were not entitled were "profits in the form of enhanced market share." Nev. Opp'n at 27.  First, there's no evidence of enhanced market share.  NSOF at ¶ 134; Nev. Resp. at ¶ 134.  Second, this tortures the term "payment" beyond recognition.  *See* Joint Mem. at 33-34.

## V.      ALL CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Nevada does not contest that its substantive claims are subject to a four-year statute of limitations or that its claims for penalties are subject to a two-year statute of limitations.  Nevada attempts to avoid application of these limitations periods by arguing that it was unaware of the extent of the "gross spreads between acquisition costs and AWPs underlying many of the Subject Drugs."  That attempt is inadequate as well as disingenuous.

The Amended Complaint alleges as misconduct reporting AWPs that were not actual averages of wholesale prices.  *See, e.g.*, Nev. Am. Compl. Count III (DTPA) ¶ 439 ("Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs"); Count V (Medicaid Fraud) ¶ 476 ("Each of the defendants also violated NRS 422.540(1)(c) in that, acting with intent to defraud, they made false statements by reporting inflated AWPs that greatly exceeded the average of wholesale prices").  Consistent with that theory, the State has claimed penalties and damages whenever AWP exceeds provider acquisition cost by more than 10% (and after July 2002 by 15%).  Hartman's 6/13/06 Decl. ¶¶ 15, 16, 23 (Tab 91).

Having asserted that liability accrues whenever spreads exceed 10%, the precise numerical amount of the spread beyond that point is irrelevant for statute of limitations purposes.

*See Siragusa v. Brown*, 114 Nev. 1384, 1394 n.7 (1998) ("[a]n action accrues when the litigant discovers, or should have discovered, the existence of damages, not the exact numerical extent of those damage."). Nevada has been aware that AWPs exceeded provider acquisition costs by more than 10% since at least 1986, when the Nevada Medicaid program received a report from the federal government stating that Nevada pharmacies realized "an aggregate drug purchase price of *18.85 percent below AWP*." NSOF ¶ 31. If, as Nevada alleges, such a state of affairs was deceptive or fraudulent, Nevada was obligated to bring an action to redress it in the 1980s.[8]

Insofar as Nevada still asserts claims based on allegations that Defendants were marketing spreads to pharmacists for self-administered drugs, the State has failed to proffer any evidence of such misconduct, and has not in any event limited its claims to instance of such misconduct. Thus, if the occurrence of such misconduct is an element of the State's claims, the claims fail for lack of evidence of that element; if it is not an element of the State's claims, the State was on inquiry notice of its claims without regard to notice of such misconduct, and the claims are barred by the applicable statutes of limitations.

---

[8] Moreover, to the extent knowledge of "gross spreads" is relevant, Nevada has been on inquiry – if not actual – notice about "gross spreads" since no later than 1997, when it received a federal report showing that the invoice price for generic drugs was on *average* 42.5% below AWP. NSOF ¶¶ 35, 36. Far from being "unknowable" the information to which Nevada professes ignorance was contained in the federal government reports it admittedly received and reviewed. Nevada cannot claim it was entitled to remain ignorant or indifferent on the difference between published AWPs and its providers' actual acquisition costs, because it has a legal obligation under the Medicaid statute to estimate its providers' actual acquisition costs. *See Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicare Servs.*, 424 F.3d 931, 940 (9th Cir. 2005) (explaining that state Medicaid agencies must conduct provider cost surveys in setting reimbursement rates).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant summary judgment against the State of Nevada on all of its claims, and award such further relief as the Court deems appropriate under the circumstances.

*Respectfully submitted on behalf of the Nevada II Defendants,*

/s/ Christopher R. Dillon
Steven A. Kaufman (BBO # 262230)
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
Carisa A. Klemeyer (BBO# 655045)
ROPES & GRAY LLP
One International Place
Boston, MA  02110
(617) 951-7000

*Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation*

Dated:  April 5, 2007

## CERTIFICATE OF SERVICE

I, Christopher R. Dillon, hereby certify that a true copy of the foregoing document was served upon all counsel of record electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 5th day of April, 2007, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.

  /s/   Christopher R. Dillon
Christopher R. Dillon