UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** ) ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** ) ) ) | Judge Patti B. Saris |
| STATE OF NEVADA V. AMERICAN HOME PRODUCTS, ET AL., CA NO. 02-CV-12086-PBS (Nevada II) ) ) ) ) ) ) ) | Chief Magistrate Judge Marianne B. Bowler |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO STRIKE THE DECLARATIONS OF CHARLES DUARTE AND COLEEN LAWRENCE SUBMITTED IN SUPPORT OF STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**</u>

Nevada's opposition to Defendants' motion for summary judgment rests almost entirely on two self-serving declarations by current State employees who, while acknowledging they were aware that AWP exceeded acquisition cost, contend that neither they nor their predecessors at Nevada Medicaid were aware of the magnitude of the excess for the drugs at issue in this action. As demonstrated below, these declarations by Charles Duarte and Coleen Lawrence are inconsistent with the declarants' prior deposition testimony, based on speculation and surmise about events beyond their personal knowledge, and insufficient to overcome the extant contemporaneous evidence of what Nevada Medicaid knew and did during the relevant period when viewed in light of the facts established by the Court as a sanction for the State's destruction

1

of evidence.  Accordingly, Defendants have moved to strike the incompetent portions of these declarations.

Charts listing which portions of these declarations should be stricken on what grounds are attached hereto as Attachment A (relating to the Duarte declaration) and Attachment B (relating to the Lawrence declaration).  As those Attachments reveal, once the offending material is stricken from the Duarte and Lawrence declarations, what remains is little more than background information regarding the declarants and Nevada Medicaid, none of which counters the Defendants' arguments for summary judgment.

I.     **MATERIAL CONTRADICTING FACTS DEEMED ESTABLISHED AS A SANCTION FOR THE STATE'S DESTRUCTION OF EVIDENCE SHOULD BE STRICKEN FROM THE DECLARATIONS.**

As a sanction for the State's spoliation of evidence, the Court has deemed five facts to be established.  *See* Rep. and Recs. re: Defs.' Joint M. for Redress for Spoliation of Evidence at 27 (Mar. 14, 2007) ("Spoliation Op.") (Docket No. 3843, adopted by the Court on March 29, 2007). These facts cover the entire period during which Mr. Duarte and Ms. Lawrence worked at Nevada Medicaid, from 2000 in the case of Mr. Duarte and 2001 in the case of Ms. Lawrence. Testimony inconsistent with those facts has no legal significance and should be stricken.[1]  *C.f. Transportes Aereos de Angola v. Ronair, Inc.*, 693 F. Supp. 102, 107 (D. De. 1988) ("When a court imposes an order pursuant to Rule 37(b) deeming certain facts to be taken established and precluding the introduction of any evidence or testimony to contradict those facts, there can be no challenge as to such facts.").  The established facts are:

---

[1] As discussed in Section III below, to the extent Mr. Duarte and Ms. Lawrence speculate regarding events occurring prior to their tenure at Nevada Medicaid, that testimony should be stricken for lack of personal knowledge.

1. *After May 2000, Nevada had a practice of maintaining OIG Reports relating to pharmacy reimbursement and circulating them among employees with responsibilities for the State's Medicaid pharmacy reimbursement rate.*[2]

2. *After May 2000, Nevada had a practice of maintaining CCH and federal GAO publications relating to pharmacy reimbursement issues and circulating them among employees with responsibilities for the State's Medicaid pharmacy reimbursement rate.*

3. *After May 2000, Nevada participated in an e-mail distribution with other Medicaid programs, and received e-mails from this list relating to Medicaid pharmacy reimbursement rates of other States' Medicaid programs.*

4. *After May 2000, Nevada had information regarding how three other Nevada pharmacy programs, namely the Department of Mental Health, Public Employee Benefits, and Senior Rx, acquired and/or reimbursed drugs.*

5. *From 2002 to the present, Nevada received communications from Tap, Bayer, Schering Plough and Warrick stating their actual sales price information and that these sales prices were different from AWP.*

*See* Spoliation Op. at 26-27.

A.      Receipt Of OIG And Other Federal Reports

By virtue of established fact 1, Mr. Duarte and Ms. Lawrence are deemed to have received and reviewed the fourteen OIG reports relating to pharmacy reimbursement that are listed in Attachment C:  All of those listed reports are "OIG Reports relating to pharmacy reimbursement"; Mr. Duarte and Ms. Lawrence were "employees [of Nevada Medicaid] with responsibilities for the State's Medicaid pharmacy reimbursement rate" when those reports were distributed; therefore, Mr. Duarte and Ms. Lawrence are among the State employees who are deemed to have received and reviewed the listed reports.  Their assertions in their newly-filed declarations to the effect that the OIG reports they reviewed did not suggest a systemic problem regarding the use of AWP in estimating acquisition costs are inconsistent with the cumulative

---

[2] A list and short summary of OIG, CCH, and federal GAO reports included in these fact admissions are attached hereto as Attachment C.

content of the listed OIG reports.  In particular, the following assertions in their declarations are belied by those reports:

- "I recall and acknowledged (in my deposition testimony) receiving some OIG and other federal reports related to Medicaid and Medicare prescription drug pricing. There was nothing in the reports that suggested to me or to others that the problems identified went beyond the drugs the report identified.  In other words, there was nothing in the reports that suggested to me or others within Nevada Medicaid that the problems went beyond the drugs identified."  Duarte Decl. ¶ 32.

- "There was also nothing in the OIG and other federal reports that suggested the magnitude of spreads that were eventually revealed as a result of this lawsuit and other investigations.  *I had no idea.*"  Duarte Decl. ¶ 33

- "I have seen certain OIG and other federal reports that Defendants claim put the State on notice of systemic, industry-wide problems with the use of AWP as a basis for reimbursement.  I disagree.  The reports identified at most a handful of drugs for which an investigation revealed problems.  There was nothing in those reports that put me or others within Nevada Medicaid on notice of the types of problems that have been revealed as a result of this lawsuit." Lawrence Decl. ¶ 37.

These assertions are contradicted by the OIG Reports themselves.  Even the cover letters and executive summaries of these short reports (only about 20 pages apiece) make clear that the methodology employed by the OIG in compiling the reported information was intended to and did ensure that the results were representative of drug pricing generally.  The following reports are illustrative:

- *August 2001 OIG Report re: Medicaid Pharmacy—Actual Acquisition Cost of Brand Name Prescription Drug Products* (OIG study of 16,204 invoices from 216 pharmacies in eight states showed an average discount of 21.84% below AWP for brand name drugs; OIG estimated Medicaid could have saved $1.08 billion if reimbursement had been set at AWP-21.84% for the 200 most popular brand name drugs;  the study also summarized a 1984 OIG study that found an average discount from  AWP of 15.9%, a 1989 OIG study that found an average discount from AWP of 15.5%, a 1997 OIG study that found an average discount from AWP of 18.3% for branded drugs and a 1997 OIG study that found an average discount from AWP of 42.45% for generic drugs). (Docket # 2900 Ex. E.19.)

- *September 2001 OIG Report re: Medicaid's Use of Revised Average Wholesale Prices* (OIG report concludes:  "Over the last several years, the OIG has produced a significant body of work that clearly demonstrates the inflated nature of reported

average wholesale prices.  Because most States base their reimbursement for drugs on average wholesale prices, this inflation has caused Medicaid to pay too much for certain products.") (Docket # 2900 Ex. E.20.)

- *March 2002 OIG Report re: Medicaid Pharmacy—Actual Acquisition Cost of Generic Prescription Drug Products* (OIG study of 8,728 invoices from 217 pharmacies in 8 states showed an average discount of 65.93% below AWP for generic drugs; the OIG estimated that Medicaid could have saved $470 million for the 200 generic drugs with the greatest amount of Medicaid reimbursements if reimbursement had been set at AWP-65.93% for those drugs;  and the study also summarized earlier OIG reports going back to 1984). (Docket # 2900 Ex. E.28.)

- *September 2002 OIG Report re: Medicaid Pharmacy—Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products* (OIG study of invoices from 8 states showing that in 1999 pharmacies acquired single source drugs at average discounts of 17.2% below AWP (comparing 12,685 invoice prices to AWP), drugs without FULs at average discounts of 27.2% below AWP (19,357 invoice prices), multi-source drugs without FULs at average discounts of 44.2% below AWP (6,672 invoice prices), multi-source brands at average discounts of 24.4% below AWP (2,503 invoice prices), multiple source non-brand drugs at average discounts of 54.2% below AWP (4,169 invoice prices), and multi-source drugs with FULs at average discounts of 72.1% below AWP (5,575 invoice prices). (Docket # 2900 Ex. E.30.)

These reports utilized thousands of invoices from hundreds of pharmacies concerning hundreds of drugs in several states over several years.  By no stretch of imagination can they properly be characterized as representing isolated instances of ideosyncratic pricing.  The phenomena they describe, in the words of the authors themselves, affected Medicaid systemically and added hundreds of millions of dollars to the systemic cost of the Medicaid program.  Consequently, the Court should strike Duarte Decl. ¶¶ 32-33 and Lawrence Decl. ¶ 37.

B.     Programs Other Than Nevada Medicaid

Mr. Duarte's disavowal of knowledge of non-Medicaid pharmacy programs in Nevada during his tenure with Nevada Medicaid contradicts established fact 4 (as well as other sections of his declaration), which conclusively establishes that "after May 2000, Nevada had information regarding how three other Nevada pharmacy programs, namely the Department of Mental

Health, Public Employee Benefits, and Senior Rx, acquired and/or reimbursed drugs." These

facts leave no room for Mr. Duarte's assertions that:

- "I do not know how entities other than Nevada Medicaid purchase or reimburse for drugs." Duarte Decl. ¶ 50.

- "I can say that Defendants' argument reflects a fundamental misunderstanding of how State Medicaid programs generally operate and how Nevada's Medicaid program in particular operates" Duarte Decl. ¶ 51.

- "As I testified repeatedly, I did not know the rates at which non-Medicaid entities in Nevada were purchasing or reimbursing drugs because we did not get together to discuss prescription drug issues.  This is true for others within Nevada Medicaid as well." Duarte Decl. ¶ 57.[3]

The information Mr. Duarte is deemed to have about Nevada's non-Medicaid drug

programs includes:

- Public Employees Benefits: Since 1998, PEBs reimbursed mail order drugs at discounts off AWP of at least 20.5% for branded and 55% for generics. NSOF ¶ 97.

- Senior Rx:  From 1999 through 2004, Senior Rx used an insurance company, PRAM. NSOF ¶ 95. PRAM reimbursed mail order drugs at discounts off AWP of 20% for brands and 50% for generics. *See* Willden Dep. at 89-93 (Tab 1); Willden Ex. 3 (Tab 27).[4]  In 2005, Senior Rx switched to a PBM, Catalyst Rx, which reimbursed mail order drugs at discounts off AWP of 55% for generics.  NSOF ¶¶ 95, 97.

- Department of Mental Health:  Mental Health purchased drugs through MMCAP since at least the early 1990s.  NSOF ¶¶ 62-68.  Since May 2000, Mental Health has also reimbursed drugs through the use of a PBM, Catalyst Rx, at the same general rates as Senior Rx.  NSOF ¶ 95.

This information is flatly inconsistent with Mr. Duarte's assertions in ¶¶ 50, 51, and 57 of his

declaration.  This same information also belies his statements, further addressed in Section II

---

[3] Mr. Duarte later contradicts himself when he declares that he "knows for a fact that many options that are available to pharmacy programs outside of Medicaid are not available to Medicaid," Duarte Decl. ¶ 53.  He describes two other options (MMCAP purchasing pool, *see* Duarte Decl. ¶ 54-55, and Pharmacy Benefit Managers (PBMs), *see* Duarte Decl. ¶ 56) and explains that Nevada Medicaid did or could not implement those options.

[4] Citations to "(Tab __)" refer to the exhibits that are attached to the Declaration and Supplemental Declaration of John H. Ray, III, Docket Nos. 3632 and 3634, which were submitted with Defendants' moving papers or the Declaration of Carisa A. Klemeyer Dated April 5, 2007 (Tabs 102-05).

below, that he believed there was a direct and reasonable relationship between AWP and acquisition cost, that he believed AWP-15% accurately estimated pharmacy acquisition costs, and that he was unaware of the systemic nature and magnitude of spreads greater than 10% - 15%.  Consequently, the Court should strike Duarte Decl. ¶¶ 50-51 and 57.

      C.     <u>Pricing Information From Defendants</u>

Mr. Duarte's and Ms. Lawrence's declarations assert that Nevada Medicaid had to continue using AWP because they lacked access to drug manufacturers' actual pricing information:

> • "[A]ctual prices are the closely-guarded province of the manufacturers themselves.  It is my understanding that no one gets those prices.  I have been told this by a pharmacy industry representative.  Drug manufacturers consider drug pricing proprietary and only share the prices at the highest levels of the company."  Duarte Decl. ¶ 58.

> • "Nevada Medicaid was not privy to actual prices.  These were kept confidential by the drug manufacturers.  We would never know the actual prices because drug manufacturers did not provide them to us or—to my understanding—to anyone.  Actual prices were a closely guarded secret."  Lawrence Decl. ¶ 24

These statements are largely irrelevant; the relevant pricing information is what pharmacies pay, not what wholesalers pay, and Nevada Medicaid did have access to information regarding pharmacy acquisition cost from, among other sources, the reports and studies described in Section I.A above and Section II below.  However, to the extent they wanted to know what wholesalers paid, it is an established fact that four companies provided that pricing information to Nevada Medicaid on scores of drugs.[5]  For that reason, the Court should strike Duarte Decl. ¶ 58 and Lawrence Decl. ¶ 24.

---

[5] Moreover, Coleen Lawrence's own declaration goes on to state that she did receive drug pricing information from several Defendants.  *See* Lawrence Decl. Section H.  And Ms. Lawrence testified that she received this information. *See* Lawrence Dep. Vol. III at 520-36 (Tab 16); Lawrence Dep. Vol. IV at 125-26 (Tab 17).  Her explanations regarding the State's failure to utilize this information, *see* Lawrence Decl. ¶¶ 43-50, do not change the fact that she admittedly received it.

## II.   MATERIAL CONTRADICTING DEPOSITION TESTIMONY SHOULD BE STRICKEN.

### A.   Declarations Contradicting The Declarants' Deposition Testimony Are Inadmissible In Opposition to Summary Judgment

The State cannot create issues of fact by filing declarations that contradict a witness's prior deposition testimony:  "We have repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed.").  *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4 (1st Cir. 1994)).  Here, the application of the rule is particularly appropriate as the State's contradictory declarations are submitted after a motion for summary judgment was filed.  *Orta-Castro v. Merck, Sharp & Dohme Química P.R.*, 447 F.3d 105, 110 (1st Cir. 2006).

In this action, each of Mr. Duarte and Ms. Lawrence was deposed on three occasions spanning more than a year:  Mr. Duarte in November 2005, March 2006, and January 2007; Ms. Lawrence in August 2005, March 2006, and January 2007.  On each occasion, counsel was present for the witness.  *See Orta-Castro*, 447 F.3d at 110; *Colantuoni*, 44 F.3d at 5 (noting the presence of plaintiff's counsel as factor for rejecting affidavits).  There was ample opportunity to correct errors; none were identified.

The deposition testimony of Mr. Duarte and Ms. Lawrence was in their words and was subject to clarification by counsel or witness if either believed more clarity was needed.  In contrast, their recent declarations are written in the words of their counsel.[6]  *Beckel v. Wal-Mart*

---

[6] Counsel's authorship of the subject declarations is apparent from the identity of structure and language in the declarations of Charles Duarte in the Nevada action and his counterpart, Jeff Buska, in the Montana action. *Compare* Declaration of Charles Duarte in Support of State of Nevada's Opposition to Defendants' Joint Motion for Summary Judgment ¶¶ 21-32, 37-47, *with* Declaration of Jeff Buska in Support of State of Montana's Opposition to Defendants' Joint Motion for Summary Judgment ¶¶ 10-31.  For example, Paragraph 12 of Duarte's declaration is identical to Paragraph 23 of Buska's declaration except for the names of the States involved in the two actions and two additional sentences at the end of Duarte's paragraph.

*Assocs., Inc.*, 301 F.2d 621, 623 (7th Cir. 2002) ("[affidavits] are typically . . . written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy.")  They are not amenable to cross-examination and are for that reason, among others, uniformly rejected to the extent they are inconsistent with the declarants' prior deposition testimony.  *See, e.g., Abreu-Guzman v. Ford*, *supra,* 241 F.3d at 74.

      B.    <u>The Declarations Contradict Prior Deposition Testimony</u>

              *1.    Mr. Duarte's testimony establishes that he did not believe AWP bore a direct and reasonable relationship to actual acquisition cost.*

Mr. Duarte's declaration states that he believed, prior to this lawsuit, that AWP bore a direct and reasonable or rational relationship to actual acquisition cost:

- "One or two years into my first Medicaid Administrator position I came to the conclusion that AWP was not necessarily a mathematical calculation, but I did still believe that it represented a meaningful benchmark—a benchmark that bore a direct and reasonable relationship to the actual acquisition costs to pharmacies, physician and other providers."  Duarte Decl. ¶ 18

- "During my tenure, Nevada Medicaid expected the same—that AWP bore a direct and reasonable relationship to the actual acquisition cost to pharmacies, physicians and other providers.  I have never heard—nor do I have any reason to believe—that Nevada Medicaid held a different expectation prior to my tenure." Duarte Decl. ¶19

- "Neither my interpretation nor the State's expectation changed until after this lawsuit was brought."  Duarte Decl. ¶ 20

Mr. Duarte's testimony at his three prior depositions consistently contradicted these statements.

- In March 2006, Mr. Duarte testified:

    Q.  What do you recall of that [OIG] report?

    A.  The discussion was around states' use of AWP as a surrogate for estimated acquisition cost.

Q.   Do you recall if the report reached any conclusions about the states' use of AWP as surrogate for estimated acquisition cost?

A.   Yes.  That it wasn't a very good surrogate.

Q.   Was that new information to you or did you --

A.   That was not new information.  I think we agreed with that conclusion, the findings.

\* \* \*

Q.   In this particular OIG report which we're discussing here was that the first OIG report you had seen which discussed states use of AWP as a surrogate for estimated acquisition cost?

A.   No.

Q.   When was the first time you had seen such a report?

A.   I don't recall the exact date.

Q.   More than 5 years ago?  Less than 5 years ago?

A.   It was when I was Administrator in Hawaii Medicaid Program there.  And that had to be longer than 5 years ago.

Q.   What dates were you Administrator in Hawaii?

A.   I was Administrator in Hawaii from 1997, to 2000.

Q.   What do you recall about the report you had seen about use of AWP as a surrogate for estimated acquisition cost during that time?

A.   Basically that the conclusions reached in the last OIG report I reviewed were the same as those presented in prior reports.

Q.   And that was that AWP was not a very good surrogate for estimated acquisition cost; is that correct?

A.   Yes.

Duarte Dep. Vol. III at 22, 24-25 (Tab 5).

o   In January 2007, Mr. Duarte testified that "[t]he OIG published a report that indicated that there was probably a larger range of discounts that could be applied by state Medicaid agencies to purchase the drugs."  Duarte Dep. Vol. V at 28-31 (Tab 7).

He later went on to say:

"Q: At the time that you were implementing the rate change or having these meetings with Mr. Willden, did you understand that even after Nevada changed its reimbursement formula from AWP 10 to AWP minus 15, that pharmacists would still be, for the ingredient portion, would still be profitable?

A: Yes.

Q: And is your understanding as to the relative level of that profitability reflected by the numbers that we just discussed on this chart, Exhibit Duarte 007 [Myers & Stauffer margin analysis]?

A: In general, yes."  Duarte Dep. Vol. V at 45 (Tab 7).

"Q: Where did you learn Wal-Mart bought generic drugs at AWP [minus] 90 percent?

A: From the former Arkansas Medicaid director, and I can't recall his name.

Q: Ray Hanley?

A: Ray.

Q: Do you recall when you learned that?

A: I was at a National Association of State Medicaid Directors meeting, it was probably sometime in 2001, where Ray mentioned that in one of his comments."  Duarte Dep. Vol. V at 27 (Tab 7).

o   In December 2005 Mr. Duarte testified:

"Q: For how long has it been your understanding that AWP and actual acquisition costs are two entirely separate concepts?

A: About six years, seven years." Duarte Dep. Vol. II at 10 (Tab 4).

Mr. Duarte testified later in the same day that "I think from my own perspective, I already testified that I was aware personally that there were spreads, and not insignificant ones, between actual acquisition costs and actual wholesale price going back to my tenure as state of Hawaii Medicaid director approximately seven years.  A year or so after I started there, I became aware of these issues.

Q: And your knowledge in that regard was not just with respect to
Bayer drugs but with—with respect to other drugs as well?

A: Yes." Duarte Dep. Vol. II at 87-88 (Tab 4).

This testimony belies Mr. Duarte's assertion in his declaration that he believed there was a

reasonable and direct relationship between AWP and acquisition costs. As a result, ¶¶ 18-20 of

his declaration should be stricken.

2. *Ms. Lawrence's testimony establishes that she did not believe AWP bore a direct and reasonable relationship to actual acquisition cost.*

Ms. Lawrence's declaration states that she believed prior to this lawsuit that AWP bore a

direct and reasonable or rational relationship to the actual acquisition cost:

- "As part of this understanding, I believed that AWP bore a rational and direct relationship to actual acquisition costs. The State expected that this was a price at which pharmacies and other providers were able to purchase drugs for sale. The State believed that the AWP was a meaningful benchmark and that it bore a direct and reasonable relationship to the actual acquisition costs to pharmacies, physicians and other providers." Lawrence Decl. ¶ 20[7]

Her deposition testimony regarding the Myers & Stauffer study and her review of OIG reports

completely undermines that assertion.

In 2002, Nevada Medicaid commissioned its rates consultant Myers & Stauffer to

conduct a pharmacy margin analysis study. Ms. Lawrence worked directly with the consultant

---

[7] Coleen Lawrence's declaration and deposition testimony are internally inconsistent and self-contradictory regarding her understanding of AWP and should be disregarded for that reason. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 505 n. 5 (7th Cir. 2004) ("Internally contradictory affidavits are generally disfavored."); *Cooper Cameron Corp. v. Department of Labor*, 280 F. 3d 539, 550 (5th Cir. 2002) (concluding that "[t]he government cannot meet its burden with an internally inconsistent, self-contradictory affidavit"); *United States v. 1980 Red Ferrari*, 827 F.2d 477, 480 n. 3 (9th Cir. 1987) (holding that internally contradictory deposition testimony created no issue of material fact). Ms. Lawrence testified that she knew AWP did not represent actual acquisition cost, *see* Lawrence Dep. Vol. II at 228 (Tab 15), and she reiterates this knowledge in her declaration: "I knew that AWP did not equal actual acquisition costs. That is why Nevada Medicaid discounted AWP to determine Estimated Acquisition Cost ("EAC") for each drug." Lawrence Decl. ¶ 21. However, she also declares that "[u]ntil this lawsuit my understanding of AWP had been that AWP meant what it said—that it was really an average of prices," Lawrence Decl. ¶ 17, and references similar deposition testimony to that effect, Lawrence Decl. ¶¶ 18-19. If Ms. Lawrence knew that AWP did not equal actual acquisition costs (and therefore Nevada Medicaid discounted AWP by 10-15% to determine EAC), then she could not logically think that AWP was an actual average of wholesale prices. This internally inconsistent testimony should be disregarded.

on this study.  Lawrence Dep. Vol. IV at 80-81 (Tab 103).  In her deposition, she was asked about the conclusions reached by Myers & Stauffer concerning pharmacy acquisition costs, and she testified that she was familiar with them.  *See id.*  Myers & Stauffer concluded that pharmacies in Nevada acquired drugs on average at a discount of 19.3% for brand drugs, 35.1% for generic drugs without a FUL, and 83.1% for generic drugs with a FUL.  *See* Hansen Dep. at 87-88, 94-97 (Tab 13); Duarte Vol. II Ex. 20 (Tab 28); Hansen Exs. 9 (Tab 58), 10 (Tab 59).  Thus, Ms. Lawrence knew in 2002 that AWP for generics with a FUL—using the method of calculating spreads advanced by Nevada's lawyers—exceeded acquisition cost by *on average* 592%.

Ms. Lawrence also knew that AWP bore no direct or reasonable relationship to acquisition cost because she, like Mr. Duarte, received and reviewed OIG studies that explicitly stated the systemic nature and wide variance of spreads.  Ms. Lawrence testified that she reviewed these reports (Q: Do you review federal government studies and policy statements about prescription drugs?  A: Yes; Lawrence Dep. Vol. I at 26. (Tab 16)), and, as discussed above, Ms. Lawrence is deemed to have done so in any event.  As already demonstrated above, anyone reading these reports would know that spreads can be large and are variable to the point that there is no direct or proximate relationship between AWP and acquisition cost.  Indeed, Ms. Lawrence testified that she authored a memo referring to OIG's projected "21 percent mark up" and that "we knew that that would be too large of an increase for our providers."  Lawrence Dep. Vol. IV at 6-15 (Tab 103); Lawrence Dep. Vol. IV Ex. 1 (Tab 104).  She also testified that, referring to a letter she had seen from CMS regarding approval of the State Plan, she wrote a 2002 email to Mr. Duarte, which stated "I agree with reducing the reimbursement, heck in '86

when we raised it to 10% the feds told us then they didn't think we were in line with EAC."
Lawrence Dep. Vol. IV. at 18-20 (Tab 103); Lawrence Dep. Vol. IV Ex. 2 (Tab 105).

Ms. Lawrence's deposition testimony makes clear that she did not believe AWP had a direct and reasonable relationship to actual acquisition costs.  Consequently, the Court should strike Lawrence Decl. ¶ 20.

> 3.   *The deposition testimony of Mr. Duarte shows he was aware of both the systemic nature and the magnitude of spreads between AWP and actual acquisition cost.*

Mr. Duarte's declaration states that he was not aware of "systemic problems" (i.e. that spreads existed for more than an isolated number of drugs) regarding the use of AWP, or the "magnitude of spreads."  *See* Duarte Decl. ¶¶ 30, 32-44, 46, 48.  For example, he states:

- "The point is that there was nothing available at that time to put me or Nevada Medicaid or Hawaii Medicaid on notice of the systemic problems and truly gross spreads for drugs that were later revealed."  Duarte Decl. ¶ 34.

To the contrary, Mr. Duarte was on notice of large and variable spreads throughout the pharmaceutical market by virtue not only of the OIG reports that he testified to having reviewed, and is conclusively deemed to have reviewed, but also by virtue of the Myers & Stauffer margin analysis study, which he testified to having reviewed.  Duarte Dep. Vol. V at 45 (Tab 7).  Mr. Duarte testified to having reviewed OIG reports while he was an administrator of the Hawaii Medicaid program from 1997 to 2000.  *See* Duarte Dep. Vol. I at 60-61 (Tab 3); Vol. III at 24 (Tab 5).  The following are typical of the numerous OIG reports during that time period, *see* Docket Entry # 2900 (Exhibits E.1-E.17):

> *April 1997 OIG Report re: Medicaid Pharmacy—Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs* (OIG study regarding brand name drugs utilized pricing information from 315 pharmacies in 11 States, obtained from 18,973 invoice prices for brand name products; OIG estimated that actual acquisition cost was a national average of 18.3 percent below AWP and calculated savings of as much as $225 million for

> 100 brand name drugs with the greatest amount of Medicaid reimbursements in 1994);
>
> *August 1997 OIG Report re: Medicaid Pharmacy—Actual Acquisition Cost of Generic Prescription Drug Products* (OIG study regarding generic drugs utilized pricing information from 314 pharmacies and 11 States, obtained from 9,075 invoice prices for generic drug products.  The report estimated that on average, actual acquisition cost of generic drugs was 42.5% below AWP.  Taking FUL into consideration, OIG calculated that "as much as $145.5 million could have been saved in 1994 and 1995 for 200 generic drugs with the greatest amount of Medicaid reimbursement." The report also referenced Barron's article comparing about 300 dose forms of top 20 Medicare drugs and concluded that the true cost was 10 to 20 percent below AWP for brand name drugs and 60 to 85 percent below AWP for generic drugs.)

Mr. Duarte's testimony makes clear that he was aware of large and variable industry-wide spreads between AWP and actual acquisition cost.  As a result, this Court should strike Duarte Decl. ¶¶ 30, 32-44, 46, 48.

> 4.    *The deposition testimony of Ms. Lawrence shows she was aware of both the systemic nature and the magnitude of spreads between AWP and actual acquisition cost.*

Ms. Lawrence's declaration states that she was not aware of systematic problems (i.e. that spreads existed for more than an isolated number of drugs) regarding the use of AWP, or the magnitude of spreads.  For example, she states:

> • "I have seen certain OIG and other federal reports that Defendants claim put the State on notice of systemic, industry-wide problems with the use of AWP as a basis for reimbursement.  I disagree.  The reports identified at most a handful of drugs for which an investigation revealed problems.  There was nothing in those reports that put me or others within Nevada Medicaid on notice of the types of problems that have been revealed as a result of this lawsuit."  Lawrence Decl. ¶ 37.
>
> • "I have recently been shown a series of spreadsheets- by defendant—showing the percentage difference between the acquisition costs and AWPs for various years relevant to the lawsuit. . . . I was surprised to see the size of the spreads.  Nothing I had encountered or been told gave me notice of the spreads presented by those spreadsheets ."  Lawrence Decl. ¶¶ 38-39.

As discussed above, Lawrence testified that she reviewed the Myers & Stauffer study and the OIG reports, all of which recognized large, industry-wide spreads between AWP and actual acquisition cost.  Consequently, the Court should strike Lawrence Decl. ¶¶ 36-39.

> 5. *Mr. Duarte's testimony establishes that he did not believe that AWP-15% approximated acquisition cost, especially for generic drugs.*

Mr. Duarte's declaration states:

- "Based on the expectation that AWP had a reasonable relationship to actual provider costs, the State felt confident relying on AWPs provided by drug manufacturers to determine the Estimated Acquisition Cost (EAC). . . ."  Duarte Decl. ¶ 21.

- "[T]he discount off of AWP was designed to approximate providers' actual acquisition costs—or EAC—as required by the regulations.  Nevada Medicaid thought that by taking a discount of 15% off of AWP, we were accurately approximating the EAC" Duarte Decl. ¶ 22

In addition to the reasons and testimony of Mr. Duarte cited above, Mr. Duarte knew that AWP-15% did not approximate acquisition cost because (1) he testified that he too reviewed the Myers & Stauffer study, which disclosed the big spreads on generics and showed pharmacists would still earn a substantial profit at AWP-15; (2) As discussed above, Mr. Duarte was aware that OIG studies showed that pharmacists acquired drugs at substantial amounts below AWP-15%; and (3) Mr. Duarte testified that he had no knowledge regarding whether Nevada was reimbursing at EAC from 1986 until 2002 (which encompasses the period that the State seeks penalties (1991-2002)).

Mr. Duarte testified that he reviewed the Myers & Stauffer report and that he was aware pharmacists would still earn an overall profit if the State changed to AWP-15% (which would yield pharmacists a margin estimated at 3.6% for brand name drugs, 19.3% for multi-source drugs without a FUL, and 9.7% across all categories of drugs):

Q: At the time that you were implementing the rate change or having these meetings with Mr. Willden, did you understand that even after Nevada changed its reimbursement formula from AWP 10 to AWP minus 15, that pharmacists would still be, for the ingredient portion, would still be profitable?

A: Yes.

Q: And is your understanding as to the relative level of that profitability reflected by the numbers that we just discussed on this chart, Exhibit Duarte 007 [Myers & Stauffer margin analysis]?

A: In general, yes.

Duarte Dep. Vol. V at 45 (Tab 7).  Mr. Duarte set these reasons down in an e-mail that he sent to

Mr. Willden and to which he testified at his deposition.  This e-mail states:

In their letter, the NACDS suggest that this reduction [from AWP-10 to AWP -15] was taken without any evaluation.  For your information, we initiated this with the support of OIG as well as Tom Scully, CMS Medicaid Administrator.  Mr. Scully, and the OIG, have been urging states to increase the discount up to as high as 21%.  Additionally, we had our rates contractor, Myers and Stauffer conduct a "margin" analysis to look into the continued profitability of pharmacies at the 15% discount level.  I've attached that analysis as well.  As you can see, pharmacies remain profitable at this discount rate.

Duarte Dep. Vol. V at 45 (Tab 7), Duarte Vol V. Ex.6 (Tab 31).

Mr. Duarte has admitted during his deposition that he does not have a basis for stating

that the State's EAC formula equaled acquisition cost.  During his deposition, Mr. Duarte was

shown Ms. Lawrence's e-mail stating that Nevada had not been reimbursing at EAC since 1986

and testified that he had no knowledge regarding whether Nevada was reimbursing at acquisition

cost.

Q.   Are you aware of any documents between the date of this one, in 1986, and Ms. Lawrence's email in 2002, the 16 year period, the intervening period, are you aware of any documents in that period that shows that the Nevada Medicaid program was reimbursing precisely at a pharmacist acquisition cost?

A.  I'm not aware of any documents.

Q.  Are you aware of any other information that would show that during that period from 1986 to 2002 the Nevada Medicaid program was reimbursing for the ingredient portion precisely at the pharmacist acquisition cost?

A.  I don't know.

Duarte Dep. Vol. V at 51-52 (Tab 7).

By submitting declarations that contradict Mr. Duarte's and Ms. Lawrence's deposition testimony, without satisfactory explanation for the change, the State and its counsel seek to manufacture a factual dispute to avoid summary judgment.  Defendants ask that the Court apply a well-established rule and strike the Duarte and Lawrence declarations, which lack the reliability of their deposition testimony.  *See, e.g.*, *Abreu-Guzman*, 241 F.3d at 74; *Colantuoni*, 44 F.3d at 4; *Darnell*, 16 F.3d at 176.

## III.    THE COURT SHOULD STRIKE THE DECLARATIONS OF CHARLES DUARTE AND COLEEN LAWRENCE TO THE EXTENT THEY FAIL TO COMPLY WITH RULE 56(E) ADMISSIBILITY REQUIREMENTS

In addition to contradicting prior deposition testimony and judicially established facts, several paragraphs of the Duarte and Lawrence declarations run afoul of the admissibility requirements of Rule 56(e), which provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed. R. Civ. P. 56(e).  Those assertions that are not based on personal knowledge, are hearsay, or are conclusions, assumptions, or surmises, should be stricken.  *See Perez v. Volvo Car Corp.*, 247 F. 3d 303, 315-317 (1st Cir. 2001) (holding that at summary judgment stage portions of affidavit that did not comply with Rule 56(e) should be disregarded).

According to their declarations, Mr. Duarte arrived at Nevada Medicaid in 2000, and Ms. Lawrence arrived in 2001.  *See* Duarte Decl.¶ 2; Lawrence Decl. ¶ 3.  To the extent that their assertions address statements or events at Nevada Medicaid prior to their tenure there, Mr. Duarte and Ms. Lawrence offer no basis for their competency to testify regarding those statements or events.  Speculation and surmise violate Rule 56(e), and their declarations should be confined to their tenure at Nevada Medicaid.  Moreover, Mr. Duarte and Ms. Lawrence can only testify as to their personal knowledge—not the knowledge of "the State," "Nevada Medicaid," other employees of the State or Nevada Medicaid, or drug manufacturers.

Specifically, the paragraphs for which Mr. Duarte lacks personal knowledge, relies on hearsay, or offers inadmissible speculation and/or legal opinion include:  Duarte ¶¶ 11-13, 19-24, 26-27, 28- 31, 35-36, 45-46, 52-55,57-58.  *See* Attachment A.  The paragraphs for which Ms. Lawrence lacks personal knowledge, relies on hearsay, or offers inadmissible speculation and/or legal opinion include: Lawrence ¶¶ 16, 20, 23- 26, 28, 35-37, 39-41, 47, 52, 54.  *See* Attachment B.  Consequently, these paragraphs should be stricken.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and strike the declarations of Charles Duarte and Coleen Lawrence submitted in support of Nevada's opposition to Defendants' motion for summary judgment.

*Respectfully submitted,*

 /s/ Carisa A. Klemeyer
Steven A. Kaufman (BBO # 262230)
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
Carisa A. Klemeyer (BBO# 655045)
ROPES & GRAY LLP
One International Place
Boston, MA  02110

(617) 951-7000

*Attorneys for Schering-Plough Corporation &*
*Warrick Pharmaceuticals Corporation on behalf of*
*the Defendants in Nevada I and Nevada II*

Dated:  April 5, 2007

**<u>CERTIFICATE OF SERVICE</u>**

I, Carisa A. Klemeyer, hereby certify that a true copy of the foregoing document was

served upon all counsel of record in Nevada I and Nevada II electronically pursuant to Fed. R.

Civ. P. 5(b)(2)(D) and CMO No. 2 on this 5th day of April, 2007, by causing a copy to be sent to

LexisNexis File & Serve for posting and notification to all counsel of record.


                                          <u>   /s/ Carisa A. Klemeyer   </u>
                                            Carisa A. Klemeyer