Attachment A

Charles Duarte Declaration

| ¶ | Declaration language | Reasons to Strike |
|---|---|---|
| 18 | "One or two years into my first Medicaid Administrator position I came to the conclusion that AWP was not necessarily a mathematical calculation, but I did still believe that it represented a meaningful benchmark—a benchmark that bore a direct and reasonable relationship to the actual acquisition costs to pharmacies, physicians and other providers." | • Inconsistent with deposition testimony at Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4):<br>"[the conclusion of the OIG reports that discussed states' use of AWP as a surrogate for estimated acquisition cost was that] it wasn't a very good surrogate."<br>• Inconsistent with deposition testimony at Duarte Dep. Vol. V, pp. 28-31 (Tab 7):<br>"[t]he OIG published a report that indicated that there was probably a larger range of discounts that could be applied by state Medicaid agencies to purchase the drugs."<br>• Inconsistent with deposition testimony at Duarte Dep. Vol. V, p. 45 (Tab 7):<br>"Q: At the time that you were implementing the rate change or having these meetings with Mr. Willden, did you understand that even after Nevada changed its reimbursement formula from AWP 10 to AWP minus 15, that pharmacists would still be, for the ingredient portion, would still be profitable? : Yes. Q: And is your understanding as to the relative level of that profitability reflected by the numbers that we just discussed on this chart, Exhibit Duarte 007 [Myers & Stauffer margin analysis]? A: In general, yes."<br>• Inconsistent with deposition testimony at Duarte Dep. Vol. V, p. 27 (Tab 7):<br>"Q: Where did you learn Wal-Mart bought generic drugs at AWP 90 percent? A: From the former Arkansas Medicaid director, and I can't recall his name. Q: Ray Hanley? A: Ray. Q: Do you recall when you |

|  |  | learned that? A: I was at a National Association of State Medicaid Directors meeting, it was probably sometime in 2001, where Ray mentioned that in one of his comments."<br>• Inconsistent with deposition testimony at Duarte Dep. Vol. II, pp. 10 (Tab 4):<br>    "Q: For how long has it been your understanding that AWP and actual acquisition costs are two entirely separate concepts? A: About six years, seven years."<br>• Inconsistent with deposition testimony at Duarte Dep. Vol. II, pp. 87-88 (Tab 2):<br>    "A: . . . . I think from my own perspective, I already testified that I was aware personally that there were spreads, and not insignificant ones, between actual acquisition costs and actual wholesale price going back to my tenure as state of Hawaii Medicaid director approximately seven years.  A year or so after I started there, I became aware of these issues." Q: And your knowledge in that regard was not just with respect to Bayer drugs but with—with respect to other drugs as well? A: Yes."<br>• Inconsistent with established fact n.1: After May 2000, Nevada had a practice of maintaining OIG Reports relating to pharmacy reimbursement and circulating them among employees with responsibilities for the State's Medicaid pharmacy reimbursement rate.<br>• Inconsistent with established fact n. 2: After May 2000, Nevada had a practice of maintaining CCH and federal GAO publications relating to pharmacy reimbursement issues and circulating them among employees with responsibilities for the State's Medicaid pharmacy reimbursement |

10483810_2

| | | |
|---|---|---|
| | | rate.<br>• Inconsistent with established fact n. 3: After May 2000, Nevada had information regarding how three other Nevada pharmacy programs, namely the Department of Mental Health, Public Employee Benefits, and Senior Rx, acquired and/or reimbursed drugs.<br>• Inconsistent with established fact n. 4: From 2002 to the present, Nevada received communications from Tap, Bayer, Schering Plough and Warrick stating their actual sales price information and that these sales prices were different from AWP.<br>• Incompetent owing to lack of established foundation for this belief. |
| 19 | "During my tenure, Nevada Medicaid expected the same—that AWP bore a direct and reasonable relationship to the actual acquisition cost to pharmacies, physicians and other providers. I have never heard—nor do I have any reason to believe—that Nevada Medicaid held a different expectation prior to my tenure" | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |

|    |                                                                                                                                                                                                                                                  |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
|----|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    |                                                                                                                                                                                                                                                  | • Incompetent owing to lack of established foundation for this belief.                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |
| 20 | "Neither my interpretation nor the State's expectation changed until after this lawsuit was brought"                                                                                                                                             | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 21 | "Based on the expectation that AWP had a reasonable relationship to actual provider costs, the State felt confident relying on AWPs provided by drug manufacturers to determine the Estimated Acquisition Cost (EAC)...." | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, 27 (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was                                                                                                                                                                                                                                                                  |

| | | |
|---|---|---|
| | | personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 22 | "Up until 2002, that formula was AWP-10%. In 2002, the reimbursement formula changed to AWP-15%. In both cases, the discount off of AWP was designed to approximate providers' actual acquisition costs—or EAC—as required by the regulations. Nevada Medicaid thought that by taking a discount of 15% off of AWP, we were accurately approximating the EAC." | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V p. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 24 | "Nevada Medicaid understood that pharmaceutical prices could change quickly due to changes in market conditions. We believed that an AWP provided and updated by the drug manufacturers would be responsive to | • Incompetent owing to lack of personal knowledge. |

| | | |
|---|---|---|
| | these changes." | |
| 26 | "I have learned that the AWPs used by the State of Nevada were inflated. It is my opinion that if accurate AWPs were provided by Defendants, the State would have paid less for its reimbursement of prescription drugs than it did using the inflated AWPs provided." | • Incompetent owing to speculation, offering legal opinions. |
| 27 | "Each time an inflated AWP was provided to the State, it was the equivalent of providing false data to Medicaid for purposes of making a claim" | • Incompetent owing to speculation, offering legal opinions. |
| 28 | "It is not true, however, that Nevada Medicaid allowed access to care or pharmacy revenue to interfere with our obligation under federal regulations and our own State policy to set a reimbursement methodology that Nevada Medicaid believes approximates EAC through the use of AWP as a component of the reimbursement methodology." | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, 27 (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 29 | "At all times, it was Nevada Medicaid's objective to approximate EAC as accurately as possible and to limit the State's drug expenditures" | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated |

| | | |
|---|---|---|
| | | acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 9-10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 30 | "Neither I nor any other Medicaid personnel had knowledge of the spreads for specific drugs that have become apparent as a result of this lawsuit." | • Incompetent owing to lack of personal knowledge. |
| 31 | "As an initial matter, "spread" is not a term used by me or others reporting to me in the course of our Medicaid duties." | • Incompetent owing to lack of personal knowledge. |
| 32 | "There was nothing in the [OIG and other federal reports] that suggested to me or to others that the problems identified went beyond the drugs the report identified." | • Inconsistent with established facts n. 1 (receipt of OIG reports) and n. 2 (receipt of CCH and GAO reports)<br>• Incompetent owing to lack of personal knowledge. |
| 33 | "There was also nothing in the OIG and other federal reports that suggested the magnitude of spreads that were eventually revealed as a result of this lawsuit and other investigations.  I had no idea." | • Inconsistent with established facts n. 1 (receipt of OIG reports) and n. 2 (receipt of CCH and GAO reports)<br>• Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated |

10483810_2

| | | |
|---|---|---|
| | | acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, p. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid) |
| 34 | "The point is that there was nothing available at that time to put me or Nevada Medicaid or Hawaii Medicaid on notice of the systemic problems and truly gross spreads for drugs that were later revealed." | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, p. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 35 | "When we became aware of discrepancies between acquisition | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. |

10483810_2

| | | |
|---|---|---|
| | costs and AWPs, we tried to address them." | II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, p. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 36 | "This testimony is very different from Defendants' suggestion that the State had notice of systematic problems and gross differences between AWP and acquisition costs for all Subject Drugs in the Amended Complaint. Defendants' suggestion is simply not true" | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 |

| | | |
|---|---|---|
| | | (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants). |
| 37-44 | Duarte states that he was shown various spreads for Subject Drugs in this litigation:<br>Dey (44.1% to 17,871.7%); AstraZeneca (250.89% to 169.31%); Bristol-Myers Squibb (1.8% to 6,621.9%); Johnson & Johnson (17.6% to 31.9%); Schering-Plough (12.3% to 1,052.8%); Aventis (22.4% to 137.2%); Immunex (0% to 1,666.4%); Pfizer (1% to 2,144.4%)<br><br>"I had never been aware that spreads of this magnitude existed. There was nothing in my experience as a Nevada Medicaid employee or in anything I had ever read that put me on notice of spreads at this level. I told counsel that there was also nothing in the federal OIG reports that suggested that spreads of this magnitude existed for drugs." | • Incompetent owing to hearsay.<br>• Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants). |
| 46 | "The State never knowingly used the spread. The State could not have done so. As discussed above, Nevada Medicaid was not aware of the breadth of the spreads." | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol. V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, p. 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (understood |

| | | |
|---|---|---|
| | | AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 4) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |
| 48 | "When I finally saw the spreadsheets described above, I told the lawyer that showed them to me that I could kick myself. I had no idea that these were the spreads across the board. Again, I had no idea." | • Inconsistent with deposition testimony quoted above at ¶ 18: Duarte Dep. Vol. II, pp. 22, 24-25 (Tab 4) (OIG concluded AWP not a good surrogate for estimated acquisition cost); Duarte Dep. Vol. V, pp. 28-31 (Tab 7) (OIG report indicated larger range of discounts could be applied); Duarte Dep. Vol V, p. 45 (Tab 7) (understood pharmacists still profitable at AWP-15%); Duarte Dep. Vol. V, 27 (Tab 7) (in 2001 learned Wal-Mart purchased generics at AWP-90%); Duarte Dep. Vol. II, pp. 10 (Tab 4) (understood AWP and actual acquisition cost were two entirely separate concepts since 1998/99); Duarte Dep. Vol. II, pp. 87-88 (Tab 7) (was personally aware of spreads, not insignificant, since his tenure at Hawaii Medicaid)<br>• Inconsistent with established facts n. 1 (receipt of OIG reports), n. 2 (receipt of CCH and GAO reports), n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement), and n. 4 (actual sales price information from four Defendants). |
| 50 | "I do not know how entities other than Nevada Medicaid purchase or reimburse for drugs." | • Inconsistent with established fact 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement). |
| 51 | "I can say that Defendants' argument | • Inconsistent with established fact 3 |

10483810_2

| | | |
|---|---|---|
| | reflects a fundamental misunderstanding of how State Medicaid programs generally operate and how Nevada's Medicaid program in particular operates." | (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement). |
| 55 | "Defendants state that Nevada Medicaid considered joining MMCAP at some point.  If so, this was before my tenure,  I do not know how seriously Nevada considered this option or if it was even realistic. . . . I also understand that Defendants have submitted absolutely no evidence of how consideration of such a plan gave the State notice of the spreads between actual acquisition costs and AWPs." | • Incompetent owing to lack of personal knowledge. |
| 57 | "As I testified repeatedly, I did not know the rates at which non-Medicaid entities in Nevada were purchasing or reimbursing drugs because we did not get together to discuss prescription drug issues.  This is true for others within Nevada Medicaid as well." | • Inconsistent with established fact n. 3 (Mental Health, Senior Rx, and PEBs drug acquisition and reimbursement).<br>• Incompetent owing to lack of personal knowledge. |
| 58 | "The manufacturers' criticism ignores the numerous good reasons why we continue to use AWP.  The manufacturers themselves know why we do so. . . .  By this I meant that actual prices are the closely-guarded province of the manufacturers themselves.  It is my understanding that no one gets those prices.  I have been told this by a pharmacy industry representative.  Drug manufacturers consider drug pricing proprietary and only share the prices at the highest levels of the company." | • Incompetent owing to hearsay.<br>• Inconsistent with established fact n. 5 (actual sales price information from four Defendants).<br>• Incompetent owing to lack of personal knowledge. |

10483810_2