**Tab 103**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____        MDL DOCKET NO.

CIVIL ACTION

01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____


DEPOSITION OF

COLEEN LAWRENCE


JANUARY 9, 2007


CARSON CITY, Nevada


REPORTED BY:  STEPHANIE ZOLKOWSKI CCR 283

COMPUTER-ASSISTED TRANSCRIPTION BY:  caseCATalyst

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL   January 9, 2007
Carson City, NV

Page 5

1              E X H I B I T S   C O N T.

2    Exhibit Lawrence 010 Email chain                      054

3    Exhibit Lawrence 011 Average Margins 1-15-03          059

4    Exhibit Lawrence 012 Average Margins 12-4-02          061

5    Exhibit Lawrence 013 Average Margins 12-2-02          061

6    Exhibit Lawrence 014 Average Margins 7-24-02          061

7    Exhibit Lawrence 015 Email chain                      084

8    Exhibit Lawrence 016 Memo printed 6-19-06 to
9                         Cates from Perry                 086

10   Exhibit Lawrence 017 Email chain                      110

11   Exhibit Lawrence 018 Untitled- A Request for
12                        Progress                         116

13   Exhibit Lawrence 019 Drug Policy Makers Summit        122

14   Exhibit Lawrence 020 Email from Lawrence 2-13-02      124

15   Exhibit Lawrence 021 Provider Type 20 Physicians
16                        Rates                            128

17   Exhibit Lawrence 022 Document to Liveratti from
18                        Lawrence 10-29-03                135

19

20

21

22

Henderson Legal Services, Inc.
(202) 220-4158

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL      January 9, 2007
                         Carson City, NV

Page 6

1          BE IT REMEMBERED that on TUESDAY, the 9th day

2      of JANUARY, 2007, at the hour of 9:10 AM of said day,

3      at the offices of THE ATTORNEY GENERAL, 100 North

4      Carson Street, Carson  City, Nevada, before me,

5      STEPHANIE ZOLKOWSKI, a notary public, personally

6      appeared COLEEN LAWRENCE, who was by me first duly

7      sworn and was examined as a witness in said cause.

8

9                             -oOo-

10

11                     COLEEN LAWRENCE,

12          called as a witness herein, having been

13          duly sworn, testified as follows:

14

15              (Exhibit Lawrence 001 marked for

16      identification)

17

18                        EXAMINATION

19

20      BY MR. DILLON:

21          Q.   I'm going to hand you a document that has

22      been marked as Exhibit Lawrence 001 to your

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL    January 9, 2007
Carson City, NV

Page 7

1    deposition.  If you wouldn't mind taking a quick

2    read through it.  I'm just going to ask you to

3    identify it when you have a chance.

4            This memorandum was produced from

5    your files and emails and electronic documents.

6            Is this a document you recognize?

7        A.    I do have a recollection of it.  I don't

8    remember what we utilized it for, though.

9        Q.    If I could direct your attention to the

10    very last paragraph that might assist you in figuring

11    out what the purpose of it was.

12            Just for the record, while you're looking

13    at it it's a document untitled.  It begins Nevada

14    Medicaid Pharmacy - this is an optional program

15    under the Nevada Medicaid state plan.

16            Do you recognize this document?

17        A.    Yes.

18            I believe I wrote it as a summary document

19    of our program.

20        Q.    You wrote it?

21        A.    I believe so.

22            Is there a file name it was saved under?

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
Carson City, NV

Page 8

1    The name had to have been saved on an

2    electronic file. That would actually give me a

3    better reference.

4         Q.   I don't think we have that here with us if

5    it's not saved on the bottom of the document and

6    it does not appear to be.

7              Do you know who you wrote this to?

8         A.   I do not actually.

9         Q.   The last paragraph there's a reference to

10   someone as you.

11        A.   Right.

12             That's why I would need the file name.

13   Because most likely it was forwarded to staff.

14   But we have had two staffs since I have been in

15   this position.

16        Q.   Maybe we could put the date on it.  The

17   document is not dated.  But if we can look on

18   page 4 of this document there's a section at the

19   bottom under Meyers & Stoffer, LLC.

20             And if you look down about the 7th line,

21   6th and 7th line, there's a reference there to the

22   current status on this is in October 2001 an

Lawrence, Coleen   HIGHLY CONFIDENTIAL     January 9, 2007
                        Carson City, NV

Page 9

1    inflationary rate increase was given.

2          So it appears to have been written after

3    October 2001.

4          And then just below that it says January

5    1st, 2002, new methodologies will be

6    implemented for LTC facilities.

7          So if at the time this was accurate it

8    would appear to have been written some time between

9    those dates.

10          Does that help you to place who this memo

11    might have been written for?

12     A.   It most likely was written for Dionne

13    Coston.

14          But I don't want to -- I'm not comfortable

15    on the time frame with that.  But the staff person

16    would have been Dionne.  She would have been

17    the new one coming in around that time.

18     Q.   Do you agree that the document was

19    written in that time frame that I just identified,

20    somewhere between October 2001, and January

21    of 2002?

22          Please take your time to look at the whole

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
Carson City, NV

Page 10

1   document if that would help you to place the

2   date.

3       A.   Actually, I'm sorry.  It doesn't make me

4   comfortable enough to say it was written within

5   those 3 months time period.

6       Q.   My colleague just pointed out to me the

7   title of this document we believe was Dionne's

8   cheat sheet.

9       A.   Oh, then, yes.  I feel more comfortable. It

10  was for my new staff.

11      Q.   Did Miss Coston start work -- when did

12  Miss Coston start work?

13      A.   I don't recall those time frames.

14      Q.   If we would turn your attention to the first

15  page of the document there's a section entitled

16  pharmacy reimbursement.

17      A.   Okay.

18      Q.   If you could just read that paragraph

19  first.  I'm going to ask you some questions about

20  it.

21      A.   Okay.

22      Q.   About the 5th line down there's a sentence

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
Carson City, NV

Page 11

1    one item we will be exploring is raising the 10

2    percent.

3              Do you know what that's referencing?

4       A.    Raising the 10 percent for the AWP.

5       Q.    When did that occur?

6       A.    When did we raise it?

7       Q.    Yes.

8       A.    In July of 2002.

9       Q.    So this would have been written some

10   time before that time?

11      A.    Prior to it.  Yes.

12      Q.    There's a reference there to an office of

13   the Inspector General study.

14              Do you see that reference?

15      A.    Yes.

16      Q.    Is it fair to say that at the time you

17   wrote this memo you were aware of this Office of

18   Inspector General study?

19      A.    Yes.

20      Q.    There's a line here where it says this is

21   a highly controversial study from manufacturers.

22   There are several positions on this paper with the

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
                   Carson City, NV

Page 12

1    end conclusion being that their study may not

2    have been valid.

3              Was there some discussion within your

4    own office of this Office of Inspector General

5    study?

6         A.    Regarding the actual deliverance of the

7    study itself.  I was given the study.

8         Q.    You were given a copy of the study?

9         A.    Uh-huh.

10        Q.    There's some reference here in this

11   paragraph to people having different positions

12   with respect to that study.

13        A.    Correct.

14        Q.    Who are those people that you're referring

15   to?

16        A.    Just within the industry itself.  We had

17   heard comments at different times from other

18   pharmacy programs, I don't recall which ones

19   specifically, and other manufacturers.  I do not

20   recall specifically. They all didn't agree with the

21   study.

22        Q.    Was this a topic of discussion within the

Lawrence, Coleen     HIGHLY CONFIDENTIAL     January 9, 2007
Carson City, NV

Page 13

1    Nevada Medicaid office?

2    A. I don't recall if the controversialness of it

3    was discussed or not.

4          Q.   Was the study itself discussed?

5          A.   I don't recall our actually -- our actual

6    discussion of it.  I was given the study.

7          Q.   Who were you given the study by?

8          A.   A copy was given by my administrator.

9          Q.   Is that Mr. Duarte?

10         A.   Yes.

11         Q.   There's a reference here that says the way

12   we can assist providers is to increase the

13   percentage but to also increase the handling fee.

14              What do you mean by that?

15         A.   If we -- it says the way we can assist

16   providers is to increase the percentage but to also

17   increase the handling fee.

18              If the percentage increases on the AWP

19   then we have to look at the dispensing fee also

20   because our ideal is to get to an estimated

21   acquisition cost plus a reasonable dispensing fee.

22   So we have to look at both ends of pharmacy

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL    January 9, 2007
Carson City, NV

Page 14

1  reimbursement.

2      Q.    So they're related, the dispensing fee and

3  the ingredient cost?

4      A.    I wouldn't say they're related.

5            I would say that you have to look at both

6  of them when you are looking at this picture.

7      Q.    There's a reference on the line just above

8  that where it says even though we do not want to

9  go to that extreme it will be beneficial for us to

10 look at a minimal increase.

11           What's the reference to that extreme?

12     A.    The 21 percent mark up.

13           There was a difference between the brand

14 and the generic mark up in the OIG report.  I

15 don't recall which one this was attributed to.  We

16 knew that that would be too large of an increase

17 for our providers.

18     Q.    Why is that?

19     A.    Just because of the feedback we had been

20 receiving.  We hadn't done a study.  We didn't

21 want to go to that extreme.  We don't want to --

22 we wanted to make sure that we're not impeding

Henderson Legal Services, Inc.
(202) 220-4158

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
                    Carson City, NV

1    on access to care.

2         Q.    If you had gone to I guess it would be

3    AWP minus 21 there was concern that level of

4    discount would impact access to care?

5         A.    We didn't make that conclusion.  We did

6    not review the 21 percent.

7         Q.    When you say we didn't review the 21

8    percent, what did you review?

9         A.    The AWP minus 10 percent.  And as you

10   saw the Meyers & Stoffer in a previous Exhibit

11   they had different scenarios and we looked at

12   those different scenarios.

13        Q.    And we'll come back to those later.  We

14   have some documents on those.

15             The last line of that paragraph says this

16   is a highly controversial area with some big ticket

17   players.

18             Who are these big ticket players you're

19   referring to?

20        A.    Whether it's providers or pharmaceutical

21   companies.  Both of them.

22        Q.    And what were their interests in I guess

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL     January 9, 2007
Carson City, NV

1    this issue here of pharmacy reimbursement?

2         A.   I don't know what each one of their

3    specific interests are.

4         Q.   It says this is highly controversial.

5              What was the controversy from providers

6    or drug manufacturers?

7         A.   Any time we are to change a rate of

8    reimbursement to a provider it becomes

9    controversial.

10        Q.   If you could turn to the third page of the

11   document in the middle of the long paragraph

12   there's a sentence that reads this process led an

13   average of anywhere from 9 to 15 percent of

14   rebates collected from total drug expenditures.

15   The national average is 20 percent.

16              What is this referring to?  Can you explain

17   what the issue is you're addressing here?

18        A.   Let me read it.

19        Q.   Sure.

20              (Exhibit Lawrence 002 marked for

21   identification.)

22              THE WITNESS:  Can you repeat the

Henderson Legal Services, Inc.
(202) 220-4158

Lawrence, Coleen    HIGHLY CONFIDENTIAL    January 9, 2007
Carson City, NV

Page 17

1      question?

2      BY MR. DILLON:

3          Q.    There's a reference to the sentence I read.

4                What does that refer to?

5          A.    Starting with this process?

6          Q.    Sure.

7          A.    It is referring to the rebate collection of

8      underneath over 90 rebates.

9          Q.    I take it from this the national average for

10     collection of rebates from manufacturers is about

11     20 percent.

12         A.    At that time.

13         Q.    And within Nevada at that time you were

14     collecting somewhere between 9 and 15 percent?

15         A.    Correct.

16         Q.    Why was Nevada collection different than

17     the national average?

18         A.    As that was explained in the previous part

19     of this paragraph, it's because we had a manual

20     process. Our system was not automated at that

21     time.  And then we had considerable staff

22     turnover during that time.

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL   January 9, 2007
Carson City, NV

Page 18

1          The manufacturers were aware of this.  We

2     were working with the manufacturers at the same

3     exact time.  And CMS was also aware of that.

4          Q.   Was there an audit at some time of the

5     rebate program?

6          A.   Yes.

7          Q.   What were the conclusions of that audit?

8          A.   I actually don't have the specific

9     conclusions in front of me.

10         Q.   Were you involved in that process?

11         A.   Actually, no, I was not.

12         Q.   Was that before your involvement?

13         A.   I don't remember the time frame.  But I

14    was not involved with it.

15         Q.   I hand to you what has been marked as

16    Exhibit Lawrence 002.  It's an email purportedly

17    from yourself to Mr. Duarte dated May 31, 2002,

18    at 7:18 p.m.

19         A.   Uh-huh.

20         Q.   Take a quick read through this.

21         A.   Okay.

22         Q.   What is this document?

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL      January 9, 2007
                    Carson City, NV

Page 19

1        A.    It's an email from myself to my

2    administrator, Mr. Chunk Duarte.

3        Q.    Do you recall sending this document?

4        A.    I don't recall actually sending it.

5        Q.    Do you have any reason to believe you

6    didn't send this?

7        A.    No.

8        Q.    There's a reference here to an increasing

9    concern by the Feds regarding state's EAC's.

10             Do you know what you were referring to at

11   the time you sent this?

12       A.    Actually, I don't recall what had prompted

13   that request.

14       Q.    In the very last sentence you say I agree

15   with reducing the reimbursement, heck in 86

16   when we raised it to 10 percent the Feds told us

17   then they didn't think we were in line with EAC.

18             What are you referring to here regarding

19   1986?

20       A.    There was a previous Exhibit by Mr.

21   Keith MacDonald when they had changed their

22   reimbursement methodology at that time.

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
                    Carson City, NV

Page 20

1            And within there there was a statement that

2    they had agreed to pass it.  The change in AWP.

3    But they were questionable on it still.

4                    (Exhibit Lawrence 003 marked for

5    identification.)

6    BY MR. DILLON:

7        Q.   I have handed you what has been marked

8    as Exhibit Lawrence 003.  It's a letter dated April

9    18, 1986.  It is signed by William Engel for Mr.

10   Keith MacDonald and it's addressed to John

11   O'Hara at the Health Care Financing

12   Administration.

13           Is this the document you were referring to

14   just a moment ago when you testified about the

15   change in 1986?

16       A.   This isn't the actual approval of the state

17   plan letter from CMS.  The study was conducted

18   by Mr. MacDonald.

19           But the document I was talking about was

20   where CMS agreed to have the change in rate to

21   AWP minus 10 percent.

22           This is the letter supporting it.

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL    January 9, 2007
Carson City, NV

Page 21

1        Q.    So this was sent before the state plan

2    amendment or was it after?  Do you know?

3        A.    It would have to be sent in before.

4        Q.    So --

5        A.    This is a request to change it.

6        Q.    So the first paragraph says we have

7    reviewed your EAC survey report.

8             I take it by the your he's referring to HCFA

9    dated March 14, 1986, so about a month before

10    this document, which claims an aggregate drug

11    purchase price of 18.85 percent below AWP

12    realized by pharmacies in Nevada.

13             And then after a healthy discussion, at

14    The end of this letter, the second to last paragraph,

15    It says it appears a more equitable definition of

16    EAC might be AWP minus 10 percent in lieu of

17    our current AWP minus 5 percent.  Then you

18    mention a State Plan Amendment.

19             Would that document have been created

20    then after HCFA responded to this letter or would

21    the State Plan Amendment have gone with this

22    letter?

Lawrence, Coleen   HIGHLY CONFIDENTIAL   January 9, 2007
Carson City, NV

Page 79

1    that we were looking at before --

2         A.    For which ingredient reimbursement?

3         Q.    Single source.

4         A.    90 percent?  85 percent?

5         Q.    I'm sorry.  For the 90 percent.

6              To be clear, dispensing fee $4.76,

7    ingredient reimbursement 90 percent.

8              If we come across to the set of columns

9    under single source product the average paid

10   there is $77.99.

11             Do you see that?

12        A.    $77.99.  Yes.

13        Q.    If you look back at the assumptions page

14   that's the same number that's being used there for

15   single source average paid?

16        A.    Correct.

17        Q.    If you look for the column we were

18   looking at under multi source no FUL, for

19   average paid for that same row of information,

20   dispensing fee $4.76 ingredient reimbursement

21   90 percent, the average paid there is $26.86.

22             Do you see that?

Henderson Legal Services, Inc.
(202) 220-4158

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen   HIGHLY CONFIDENTIAL      January 9, 2007
Carson City, NV

Page 80

1       A.   Yes.

2       Q.   Is that the same number that is on

3    assumptions page for multi source no FUL drugs?

4       A.   Yes.

5       Q.   Just below that section we were looking at

6    on the assumptions page there is item entitled

7    dispensing fee corresponding with claims $4.76.

8            Do you know what that reflects?

9       A.   Just that it's a dispensing fee.

10      Q.   Then there's a section with a bold

11   underline titled average acquisition cost as

12   percentage of price type.

13           Do you see that?

14      A.   Yes.

15      Q.   There are two columns.  There's an AWP

16   column and FUL column.

17           Do you see that?

18      A.   Yes.

19      Q.   Under the AWP column for single source

20   drugs it listed 81.7 percent.

21           What does the 81.7 percent reflect?

22      A.   I do not know.

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL      January 9, 2007
                    Carson City, NV

Page 81

1       Q.   Fair to say you knew what you meant at

2   the time you received the document and were

3   working with it?

4       A.   Yes.

5            And I actually had technical assistance

6   from the consultants who created the document at

7   the time, too.

8       Q.   5 years later you don't recall specifically

9   what this reflects?

10      A.   No.

11      Q.   I want to go back one page to the last set

12  of columns, the one that is titled all drug product

13  types.

14           Do you see that?

15      A.   Uh-huh.

16      Q.   If we can go down 6 rows which will I

17  believe correspond to the row of $4.76 dispensing

18  fee and ingredient cost of 90 percent that we find

19  on the page before, do you see that where --  what

20  is the number you're seeing?

21      A.   The first one actually changes is $12.72

22  under multi source.  Or you under --

Henderson Legal Services, Inc.
(202) 220-4158

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91

Lawrence, Coleen    HIGHLY CONFIDENTIAL    January 9, 2007
Carson City, NV

Page 82

1      Q.    Just all drug product types.

2      A.    36.79, 42.76, 5.97 and 14 even.

3      Q.    Right.  What does the average margin of

4   5.97 represent in that column?

5      A.    Looks like it's the difference between

6   average cost and average paid.

7      Q.    This is under the scenario that existed

8   before the reimbursement rate changed where

9   AWP was 90 percent, dispensing fee was $4.76

10  and under that set of conditions for across all

11  drug types the amount in excess of

12  reimbursement is $5.97; is that correct? The

13  amount of reimbursement in excess of average

14  cost to acquire the drug is $5.97?

15     A.    Correct.

16     Q.    The percent of that is 14 percent?

17     A.    Correct.

18     Q.    Going down to the row $4.76 dispensing

19  fee where ingredient reimbursement is at 85

20  percent or AWP minus 15 percent, again for all

21  drug product types what are the numbers you're

22  seeing there?

Henderson Legal Services, Inc.
(202) 220-4158

ae29c848-5f7c-4fa3-aeaa-1f5a69969f91