# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————— ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | CIVIL ACTION NO. 01-CV-12257-PBS |
| ———————————————— ) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ) | |
| ALL ACTIONS ) | |
| ———————————————— ) | |

## DEFENDANT ASTRAZENECA PHARMACEUTICAL LP'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE

AstraZeneca Pharmaceuticals LP ("AstraZeneca") respectfully submits this consolidated opposition to the eight motions in limine filed by Plaintiffs. Plaintiffs' *in limine* motions (collectively, "Plaintiffs' MILS") are as follows:

- **Motion 1**: Motion *In Limine* precluding introduction of evidence regarding the government's purported "knowledge";

- **Motion 2**: Motion *In Limine* precluding introduction of evidence regarding purported "knowledge" of third party payors;

- **Motion 3**: Motion *In Limine* precluding AstraZeneca from calling Stanley Weintraub at trial;

- **Motion 4**: Motion *In Limine* to exclude evidence regarding AstraZeneca's meeting competition defense;

- **Motion 5**: Motion *In Limine* precluding evidence regarding the efficacy of Zoladex;

- **Motion 6**: Motion *In Limine* precluding introduction of evidence regarding AMP and IMS data;

- **Motion 7**: Motion *In Limine* precluding introduction of evidence regarding AstraZeneca's Managed Acquisition Program; and

- **Motion 8**: Motion *In Limine* precluding introduction of evidence regarding AstraZeneca's Patient Assistance Program.

## PRELIMINARY STATEMENT

Plaintiffs' MILS should be denied.  All of the evidence Plaintiffs seek to preclude through their MILS is relevant to elements of Plaintiffs' claims, AstraZeneca's defenses, or both. None is more prejudicial than probative.

Motions 1, 3 and 6 (the "Government Knowledge Motions") should be denied because AstraZeneca is entitled to rebut any suggestion to the jury that third-party publications of AWPs for Zoladex were not what the government thought they were.  In addition, AstraZeneca is entitled to establish its own lack of intent to deceive Medicare beneficiaries by presenting evidence concerning its understanding of the government's knowledge of AWP.  In any event, it is entirely premature – before Plaintiffs have even presented a trial plan, much less their case – to rule now that evidence of the government's knowledge must be excluded from the trial.  If past is prologue, Plaintiffs –either through their experts or otherwise – may seek to introduce evidence they will argue proves that AstraZeneca deceived beneficiaries by deceiving the government and other industry participants regarding AWP.  Putting aside the legal implications and problems with such a theory, AstraZeneca is certainly entitled to present evidence, if it so chooses, challenging factual underpinnings of any Plaintiffs' theory.

Motions 2 and 7 ("Third-Party Payor Motions") are likewise misplaced and premature. AstraZeneca submits that it is entitled to convince a jury that it did not intentionally deceive Mr. Howe or Mr. Townsend by presenting evidence demonstrating that it was actively informing TPPs of the return-to-practice dynamic created by the Medicare system.  In addition, the likelihood that AstraZeneca was engaged in the scheme of deception vis-à-vis Medicare beneficiaries that Plaintiffs allege is significantly undercut by the high level of TPP knowledge regarding AWP.  Again, depending on the evidence Plaintiffs ultimately seek to adduce

regarding AstraZeneca's motives and conduct, it would be extremely unfair at this point to force AstraZeneca to try this case with one-hand tied behind its back.

Motion 4 (the "Lupron Competitive Dynamic Motion") is a further example of Plaintiffs' effort to curtail inappropriately AstraZeneca's defense and prevent the jury from hearing why AstraZeneca made the pricing decisions it made and what it understood were the implications of those decisions. There is no more basic and central evidence to AstaZeneca's defense than the evidence Plaintiffs seek to exclude through this motion.

Motion 5 (the "Zoladex Clinical Background Motion") aims to preclude background testimony about Zoladex and its clinical profile. This information is important to assist in providing the jury with context about the nature of the product, how and why it is sold the way it is, and how it is administered. Again, before Plaintiffs present their case it would be extremely unfair to hamstring AstraZeneca by issuing a ruling that would preclude it from countering arguments, like those made by Plaintiffs and their experts in the past, that AstraZeneca's sales and marketing activities colored clinical judgments.

Motion 8 (the "Patient Assistance Program Motion") impermissibly seeks to prevent AstraZeneca from portraying itself in the appropriate light regarding its conduct to patients. Plaintiffs will certainly be seeking to convince the jury that AstraZeneca did not care for the welfare of patients. AstraZeneca is entitled to present evidence to the contrary.

## **ARGUMENT**

I. **Plaintiffs' MILS Seek to Preclude Evidence that AstraZeneca May Choose To Introduce To Challenge Opinions and Information Put Forth By Plaintiffs' Experts.** *(Motions 1, 2, 3, 6, and 7)*

In her expert opinions, Dr. Rosenthal relies on the concept that spreads were secret. (See, e.g., Decl. of Meredith Rosenthal at ¶ 49 (Dec. 15, 2005) (citing "opaque discounting practices"

as a reason the alleged fraud occurred).)  Dr. Hartman does as well.  (See, e.g., Rept. of

Raymond S. Hartman Regarding AstraZeneca With Respect to Class 1 at ¶ 25 (Mar. 16, 2007)

("The spread competition alleged in this matter was successful precisely because competing

suppliers actively and secretly suppressed information **from end payors** about the lower prices

offered providers.") (emphasis in original).)  Even in her recently submitted tutorial for Class 1,

Dr. Rosenthal continues to make this argument.  (Amended Written Tutorial of Dr. Meredith

Rosenthal to Reflect Matters Relevant to AstraZeneca and Class 1 at ¶¶29-31 (Mar. 16, 2007).)

She opines that:

> The actual acquisition cost ("AAC") of a drug is known by each drug
> manufacturer, *but is not published or made public*. . . . The average sales price
> ("ASP") is meant to be the net price after all forms of discount, rebate, purchasing
> allowances or any other forms of economic consideration have been taken into
> account.  Because drug manufacturers consider the discounts proprietary and
> confidential, the relationship of AAC or ASP to either AWP or WAC was *not*
> *predictable from public data sources in general, or for specific classes of trade*
> until a recent Medicare reform that required manufacturers to report ASP.

Id. (emphasis added).

If it chooses, AstraZeneca may decide to challenge—either on cross-examination

or after Plaintiffs have rested their case or both—such assertions and attack the credibility

and bona fides of such opinions by presenting what it believes is widespread knowledge

about spreads and what AWP is and is not, as reflected in OIG reports, documents given

to TPPs, Congressional reports and testimony, documents internal to TPPs, testimony

from TPP representatives, AMP and IMS data, and the MAP program.  Such information,

if presented and/or used to confront Plaintiffs' experts, may reasonably cause a juror or

jurors to question the testimony of Dr. Rosenthal and Dr. Hartman about secrecy and

undermine the persuasiveness of their opinions as well as their credibility.

II.  **Plaintiffs' MILS Impermissibly Seek To Curtail Evidence That May Appropriately Be Used to Show That AstraZeneca Did Not Intend To Deceive Class 1.**  *(Motions 1, 2, 3, 6, and 7)*

Relying on misplaced agency arguments, Plaintiffs state that Medicare beneficiaries cannot be charged with the knowledge that the government or third parties possessed, and that this knowledge is, accordingly, irrelevant.[1]  However, Plaintiffs' single-minded focus on Medicare beneficiaries' knowledge misses the point.  This is a case about intentional misrepresentation.  Hr'g Tr. at 15:14-16 (Mar. 26, 2007); In re Pharmaceutical Industry Average Wholesale Price Litigation, 230 F.R.D. 61, 85 (D. Mass. 2005).  AstraZeneca will not offer evidence of government and industry knowledge to show that Medicare Part B beneficiaries understood AWP.[2]  Rather, government and industry knowledge is relevant to AstraZeneca's intent.  See, e.g., United States v. Westinghouse Savannah River Co., 305 F.3d 284 (4th Cir. 2002).

In Westinghouse, the plaintiff brought suit under the False Claims Act ("FCA"), alleging that the defendant had used government funds for an unauthorized purpose.  However, the Department of Energy had directed the defendant to change the cost reporting codes at issue.  Id. at 287.  Because the Department of Energy had the same information that the defendant did regarding Congressional authority for changing the codes, the court held that "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter

---

[1] (Pls.' Mem. Supp. Mot. *In Limine* Regarding Government's Knowledge at 2, Pls.' Mem. Supp. Mot. *In Limine* Regarding Knowledge of Third Party Payors 1, Pls.' Mem. Supp. Mot. *In Limine* Regarding MAP at 2, Pls.' Mem. Supp. Mot. *In Limine* To Preclude Stanley Weintraub at 1-2, Pls.' Mem. Supp. Mot. *In Limine* Regarding AMP And IMS Data at 1.)

[2] To that end, Plaintiffs' reliance on Santos v. Sunrise Med. HHG, Inc., 351 F.3d 587 (1st Cir. 2003), is misplaced. First, the case does not stand for the proposition that knowledge that was unavailable to claimants is inadmissible. Santos involved an allegedly defective hydraulic lift that injured two assistants at a nursing home.  The First Circuit upheld the trial court's decision to exclude a letter that Plaintiffs' attorneys had written to OSHA complaining about the lift and about safety standards at the nursing home.  Concerned that the letter would be "cumulative, confusing, and perhaps unfairly prejudicial to the extent that it was a statement by counsel, but not necessarily by the Plaintiffs," the court excluded it.  Id. at 592.  This is entirely distinct from the situation here.

required for an FCA violation." Id. at 289-90.  In so deciding, the court in Westinghouse followed at least four other circuits.  Id. at 289.[3]

### A.      Government Knowledge  *(Motions 1,3 and 6)*

What the government knew about AWP may matter in this case.  This Court has previously acknowledged as much.[4]  Evidence about government knowledge, including the testimony of Stanley Weintraub, goes to whether AstraZeneca's conduct was intentionally deceptive.  Medicare, as insurer of Part B beneficiaries, made policy decisions to safeguard the interest of Plaintiffs.  It is the role of CMS, and previously HCFA, to make judgments about how to administer a system for the benefit of Medicare beneficiaries.[5]  AstraZeneca believed HCFA, and later CMS, understood the AWP system and worked within it in order to protect the interests of Medicare beneficiaries.

Government knowledge also may be an underpinning to additional, specific defenses under certain state consumer protection laws.  Some states have laws that make government regulation or oversight particularly critical in determining whether the alleged act even falls under the consumer protection statute.  In Rhode Island, for example, government regulation of a

---

[3] The cases cited, in which other circuit courts held that "prior government knowledge of an alleged false claim can negate the scienter required for an FCA violation" include, United States ex rel. Durcholz v. FKW, 189 F.3d 542 (7th Cir. 1999); United States ex rel. Kreindler v. United Techs. Corp., 985 F.2d 1148 (2d Cir. 1993); United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416 (9th Cir. 1991); and Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000).

[4] (Trial Tr. at 6:17-25 (Nov. 21, 2006)).  See also id. at 9:15-17 (stating that such testimony is "heartland information"), Hr'g Tr. at 19:25-20:7(Aug. 3, 2000) (noting that such testimony would be "worthwhile"); Pre-Trial Hr'g Tr. at 37:21-38:1, 39:16-20, 44:9-45:2 (Oct. 31, 2006) (stating that such testimony could be relevant to industry knowledge, unfairness, and deceptiveness); Trial Tr. at 7:8-14 (Nov. 13, 2006) (suggesting need for such testimony and that the government's withholding of former employees was similar to "cat-and-mouse").

[5] See, e.g., Robert Wood Johnson Univ. Hosp., Inc. v. Thompson, No. 04-142 (JWB), 2004 U.S. Dist. LEXIS 8498 at *15 (D. N.J. Apr. 15, 2004) (noting that CMS must ensure that changes in reimbursement do not adversely affect the quality of Medicare services); Vencor, Inc. v. National States Ins. Co., No. 97-2350-PHX-ROS, 1999 U.S. Dist. LEXIS 21461 at *18 (D. Ariz. July 9, 1999) (quoting letter that a certain interpretation of the Medigap policy "is consistent with the description of the Medicare program to protect beneficiaries against the costs of hospital care"); Papendick v. Bowen, 658 F. Supp. 1425, 1431 (W.D. Wis. 1987) ("[T]he government has an interest in protecting Medicare beneficiaries from substandard care and enforcing the Medicare program at the lowers possible cost.").

field takes that field outside the subject matter jurisdiction of the consumer protection statute.

Lynch v. Conley, 853 A.2d 1212 (R.I. 2004) (holding that potential violation of lead paint

disclosure requirements in real estate transactions were outside the jurisdiction of the consumer

protection statute because the conduct was regulated by the department of health).  Other states

have similar exemptions for conduct regulated by the government.[6]

 Government knowledge may also help establish a lack of causation defense by

AstraZeneca.[7]  It is undisputed that the federal government, not AstraZeneca, required Plaintiffs

to make Medicare Part B co-payments on the basis of AWP.  See 42 U.S.C. § 1395u(b)(3)

(2007) (requiring the Secretary to set fees under Medicare Part B).  Plaintiffs may argue at trial

that they were "foreseeable" victims of a fraud perpetrated by AstraZeneca on the federal

government.

 As a general principle, a plaintiff cannot establish causation if the recipient of the

challenged statements knew the truth.  (See Mem. of Law in Supp. of Track 1 Defs.' Joint Mot.

for Summ. J. at 17-19, and authorities cited therein.)  This same principle applies where indirect

causation is alleged.[8]  Thus, Plaintiffs must prove that the third-party intermediary—here, the

federal government—was deceived and that Plaintiffs suffered injury as a result of that

---

[6] See, e.g., MCLS § 445.904(1)(a) (2007) (exempting transactions and conduct "specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States"); Nev. Rev. Stat. § 598.0955 (2007) (exempting "conduct in compliance with the orders or rules of, or a statute administered by, a federal, state or local governmental agency" from the Nevada Deceptive Trade Practices Act); Wy. Stat. Ann. § 40-12-110(a)(i) (2006) (stating that "nothing in" the Wyoming Consumer Protection Act "shall apply to acts or practices required or permitted by state or federal law, rule or regulation or judicial or administrative decision").

[7] See, e.g., Cal. Civ. Code § 1780(a) (2007) (authorizing private right of action for loss suffered "as a result of" prohibited conduct); Conn. Gen. Stat. § 42-110g(a) (2007) (same); Tenn. Code Ann. § 47-18-109(a)(1) (2007) (same); see also Market Am., Inc. v. Christman-Orth, 520 S.E.2d 570, 579 (N.C. Ct. App. 1999) (requiring defendant's unfair or deceptive conduct to have proximately caused plaintiff's injury); Valente v. Sofamor, S.N.C., 48 F. Supp. 2d 862, 874 (E.D. Wis. 1999) (requiring "causal connection" to state claim under Wisconsin act).

[8] Some courts have suggested that consumer fraud actions may exist under an indirect causation theory; however, the idea has not been widely embraced.  (See Mem. of Law in Supp. of Track 1 Defs.' Joint Mot. for Summ. J. at 17.)

deception.  In this case, the argument that the intermediary's knowledge matters is particularly strong because the government is specifically tasked with protecting Plaintiffs' interests as Medicare beneficiaries, as described above.  If the evidence shows that the federal government was not deceived about AWP, Plaintiffs' claims must fail for lack of causation.  If there is evidence showing that the federal government understood that AWP was not a reliable indicator for acquisition cost, AstraZeneca is entitled to present that evidence to the jury to rebut any argument by Plaintiffs that the federal government was deceived.  See Shannon v. Boise Cascade Corp., 805 N.E.2d 213 (Ill. 2004) (rejecting claim of deception where evidence insufficient to prove that defendant deceived builders and contractors, who served as third-party intermediaries in plaintiff's decision to purchase defendant's product); Valente v. Sofamor, S.N.C., 48 F. Supp. 2d 862, 873 (E.D. Wis. 1999) (finding that third-party intermediary doctors were not deceived by defendant's representations regarding medical device therefore, "the plaintiffs cannot show a causal connection between the defendants' alleged conduct and any pecuniary loss suffered").

Plaintiffs' arguments to exclude government knowledge evidence are unavailing. Plaintiffs assert that many of the government documents would not have been made public but-for this litigation.  Whether or not that statement is true, it simply has no bearing on whether the documents should be admitted.  Plaintiffs also contend that the jury may be misled into believing that government knowledge was available to beneficiaries.  To the extent Plaintiffs' counsel perceives any such confusion at trial, they may use the tools of cross-examination to make clear any distinction they believe the evidence supports and, at the end of the day, request a clarifying instruction from the Court.  In any event, now is not the time to exclude this evidence wholesale based on this unfounded speculation of possible confusion.

**B.**     **AMP Data Was Known to the Government, And Is Relevant
To Intent.** *(Motion 6)*

The fact that AstraZeneca reported AMP data directly to the government supports the

argument that AstraZeneca had no deceptive intent.  AstraZeneca has reported an Average

Manufacturer's Price ("AMP") for Zoladex to the federal government quarterly since 1991 in

connection with the Medicaid program.  The Zoladex AMPs reported by AstraZeneca reflect all

discounts received by customers in the retail distribution chain, including physician practices.

AMP data are a close proxy for average sales prices.

Plaintiffs have argued that use of AMP data is restricted to the Medicaid side of CMS,

and that, therefore, they are not relevant.  AstraZeneca acknowledges that, according to statute,

AMP data are confidential.  42 U.S.C.S. § 1396r-8(b)(3)(D) (2007).  However, the government

has access to AMP data and makes use of them.  For example, the Congressional Budget Office

published a comparison of AMP data to AWP data in January, 1996.  (Defs.' Trial Ex. 1944.)

That publication demonstrated that AMP was significantly lower than both AWP and WAC.

Also in 1996, the OIG published another report comparing Medicare reimbursement rates for

physician-administered drugs, including specifically Zoladex, to the amounts paid for those

drugs under the Medicaid program.  The report determined that Medicare could have saved $122

million in 1994 alone, including $5.5 million on Zoladex, if it had used AMP-based rather than

AWP-based reimbursement. (Defs.' Trial Ex. 1061.)  Furthermore, the fact that AstraZeneca

reported AMP data directly to the federal government demonstrates both that AstraZeneca did

not intend to deceive the government, and that the government was capable of obtaining

whatever price information it so chose.

C.     Mr. Weintraub *(Motion 3)*

Along with their general attack on the relevancy of government knowledge, Plaintiffs raise specific objections to the proffered testimony of Stanley Weintraub. None is availing. Mr. Weintraub was a Branch Chief and later a Senior Policy Advisor at HCFA, the agency then in charge of Medicare, from 1984 to 1998. While at HCFA, Mr. Weintraub was directly involved in the development and implementation of physician reimbursement policies under the Medicare Part B program.

Plaintiffs cite cases they claim hold that Mr. Weintraub cannot interpret HCFA's actions or speak on behalf of HCFA or the federal government. The argument is misplaced. First, AstraZeneca does not seek to have Mr. Weintraub interpret HCFA's actions, nor are HCFA's actions under review. Therefore, the cases that Plaintiffs cite in support of their argument that courts should confine themselves to the administrative record when reviewing an agency action are inapposite.[9] Second, Plaintiffs mischaracterize the nature and purpose of Mr. Weintraub's prospective testimony. AstraZeneca does not seek to offer Mr. Weintraub as a government authority to speak on behalf or HCFA or the entire federal government. Depending on the evidence Plaintiffs adduce through their experts or otherwise regarding the government's use of AWP and the industry understanding of AWP, AstraZeneca may have Mr. Weintraub testify about his knowledge and observations regarding industry understanding and usage of AWP both during and after his tenure at HCFA. Courts have allowed government employees and former

---

[9] In fact, many courts have authorized the testimony of agency decision-makers in reviewing agency action. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971) (authorizing the taking of testimony of agency decision-makers where there was a lack of contemporaneous administrative explanation of a relevant agency action); Kelly v. United States, 924 F.2d 355, 361 (1st Cir. 1991) (accepting agency officials' uncontradicted testimony about the meaning and operation of agency regulations); Gulf Oil Corp. v. Schlesinger, 465 F. Supp. 913, 916 (E.D. Pa. 1979) (allowing the taking of depositions of former agency officials where the privilege traditionally given to agency decision-makers was outweighed by the need for the information sought, and noting that no absolute privilege attaches to the administrative decision-making process).

government employees to testify at depositions and trials.  <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>,

455 F.3d 195, 217-18 (3d Cir. 2006) (considering testimony of former SEC attorney regarding

"accepted practice in the securities industry"); <u>Stacey v. Caterpillar, Inc.</u>, 901 F. Supp. 244, 247

(E.D. Ky. 1995) (allowing the deposition of a government employee due to the importance of the

testimony to the case and its unavailability from other sources).[10]

Plaintiffs also contend that Mr. Weintraub should not be permitted to testify because he

was retained as an expert by a defendant in another AWP-related litigation.  (Pls.' Mem. Supp.

Mot. *In Limine* To Preclude Stanley Weintraub at 1.)  Plaintiffs are essentially asking the court to

exclude a witness because of a supposed bias.  This remedy is inappropriate.  Any biases that

Plaintiffs think might exist can be addressed sufficiently on cross-examination of the witness.[11]

Finally, Plaintiffs claim that Mr. Weintraub's testimony should be precluded because

defendants have offered to reimburse him for the value of time lost in testifying and for expenses

incurred in testifying.  Plaintiffs are simply mistaken.  Such compensation is clearly permitted

under the Massachusetts Rules of Professional Conduct and in the First Circuit.[12]  When a

---

[10] <u>See also</u> <u>In re PE Corp. Secs. Litig.</u>, No. 3:00cv705 (CFD) (TRS), 2005 U.S. Dist. LEXIS 7569 at *11-14 (D. Conn. Apr. 8, 2005) (allowing the deposition of a government employee where the government had failed to show how allowing the testimony would be an undue burden on the witness or the government); <u>United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.</u>, No. 01-50 (RCL), 2007 U.S. Dist. LEXIS 8279 at *12-*13 (D.D.C. Feb. 7, 2007) (noting that there is "no authority indicating that HHS can block *all* testimony by a *former* employee as to that individual's personal opinions and observations, absent the assertion of a specific privilege") (emphasis in original); <u>Gulf Oil Corp. v. Schlesinger</u>, 465 F. Supp. 913, 915-16 (E.D. Pa. 1979) (explaining that its denial of the government's motion for protective order based on the deliberative process privilege, was based on its recognition of the fact that no absolute privilege attaches to the administrative decision-making process and that the testimony sought was relevant to the litigation).

[11] FED. R. EVID. 607; <u>Udemba v. Nicoli</u>, 237 F.3d 8, 17 (1st Cir. 2001) (defining bias as the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party, and stating that bias is fertile territory for cross-examination).  <u>See also</u> <u>U.S. v. Akitoye</u>, 923 F.2d 221, 225 (1st Cir. 1991) (stating that "[b]ecause objectivity is always material to the assessment of credibility, we, and other federal courts, have been hospitable to the point of liberality in admitting evidence relevant to a witness' bias."); <u>U.S. v. Cresta</u>, 825 F.2d 538, 545-46 (1st Cir. 1987) (holding that the district court did not commit reversible error by declining to exclude the non-expert testimony of an informant who was paid on a contingent basis, relying instead on cross-examination to ferret out any false testimony, rather than adopt an exclusionary rule).

[12] Mass. R. Prof'l Conduct 3.4(g) ("[A] lawyer may advance, guarantee, or acquiesce in the payment of . . . reasonable compensation to a witness for loss of time in attending or testifying."); <u>U.S. v. Davis</u>, 261 F.3d 1, 38 (1st

witness is employed, the reasonable value of that witness's time is his hourly rate.  *See* MBA

Ethics Opinion No. 91-3 (1991); Committee on Professional Ethics, New York State Bar Ass'n,

Op. 547 (1982).  This is consistent with Mass. R. Prof. Conduct 3.4(g) and its aim of

compensating the witness for loss of time.  A witness who is employed would be earning that

salary if not testifying.  Moreover, if Plaintiffs are concerned that such permitted compensation

could result in bias, they are not without recourse.  As discussed above, Plaintiffs can address

any such perceived bias through cross-examination of Mr. Weintraub.  There is no basis for

exclusion of this relevant evidence.

## III.    **Private Third Party Payor Knowledge Is Also Relevant.** *(Motions 2 and 7)*

AstraZeneca recognizes the fact that the knowledge of private third party payors

("TPPs") plays a different role in the Class 1 trial than it did in the trial of Class 2 and Class 3.

But that does not mean that TPP knowledge is inadmissible.  The knowledge of TPPs is relevant

to AstraZeneca's intent, and other elements of AstraZeneca's defense.  Plaintiffs argue that

AstraZeneca "intends to make this a trial about TPP knowledge." (Pls.' Mem. Supp. Mot. *In*

*Limine* Regarding Knowledge of Third Party Payors at 2.)  To the contrary:  AstraZeneca intends

to make this a trial about its own good faith.  Just as the government's understanding and use of

AWP helps determine whether AstraZeneca made any intentional misrepresentations, so does

TPP understanding.  If the industry knew that AWP was not an actual average, and AstraZeneca

was aware of this knowledge, this supports the notion that AstraZeneca had no intent to deceive

anyone through its AWP.  This is especially so in a context where many private TPPs have

served or are currently serving as Medicare carriers—i.e., explicit agents of the federal

---

Cir. 2001) (affirming lower court's admittance of witness who was compensated by the hour even where he was unemployed at time of trial).

government.  BCBSMA, for instance, was the Massachusetts Medicare carrier from 1991 to 1997.

Plaintiffs argue that TPP knowledge is irrelevant because, "under the applicable state law, a 'deceptive act' is simply one that has the capacity to deceive."[13]  This argument might assist the Plaintiffs if the applicable state law were only that of Massachusetts.  It is not.  This case is being tried under the laws of 42 states, some of which have stricter requirements for showing deception.  See, e.g., Balthazar v. Verizon Haw., Inc., 123 P.3d 194, 202 (Haw. 2005) (practice is deceptive if it "caus[es], as a natural and probable result, a person to do that which he [or she] would not otherwise do"); Shannon v. Boise Cascade Corp., 805 N.E.2d 213, 217 (Ill. 2004) ("[D]eceptive advertising cannot be the proximate cause of damages [and therefore actionable] under the [Illinois] Act unless it actually deceives the plaintiff.").  However, even under the definition Plaintiffs select, TPP knowledge is certainly relevant to whether AstraZeneca's statements had the "capacity to deceive."  The TPPs were the ones actually receiving these statements, and are in an especially good position to shed light on their alleged deceptiveness.

Evidence of third party payor knowledge also goes to materiality.  Materiality is an element of deceptive intent in many states.[14]  For example, after Medicare decided to change its policies and implement the ASP program, BCBS evaluated AWP, with full knowledge of the spreads available, and decided to stay with AWP.  In fact, BCBS even expanded its use of AWP.  This is relevant to the materiality of AstraZeneca's alleged misrepresentation.  If other payors

---

[13] (Pls.' Mem. Supp. Mot. *In Limine* Regarding Knowledge of Third Party Payors at 4. (citing Ma. Superior Court Civil Practice Jury Inst'n § 164(2)(a)).)

[14] See, e.g., Holiday Resort Cmty. Ass'n v. Echo Lake Assocs., LLC, 135 P.3d 499, 507 (Wash. Ct. App. 2006) ("Implicit in the definition of 'deceptive' under the CPA is the understanding that the practice misleads or misrepresents something of material importance."); Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp., 247 F. Supp. 2d 987, 1000 (N.D. Ill. 2002) ("To state a cause of action under the ICFA, a plaintiff must allege: (1) a misrepresentation or concealment; (2) of a material fact; (3) made with the intent to induce reliance; and (4) in a course of conduct involving trade or commerce.").

who knew about AWP chose to maintain the system, there is no reason to believe that Medicare or Medicare beneficiaries would have acted differently had they known about AWP.  Evidence of TPP knowledge, including the AstraZeneca MAP program, should be admitted.

MAP, or the Managed Acquisition Program, is an example of AstraZeneca's lack of deceptive intent.  The program reflects, instead, AstraZeneca's express intent to make its AWP pricing transparent.  As the Court has heard, MAP was what is termed a "Bill to/Ship to" program.  Under MAP, AstraZeneca would enter into a contract with a managed care organization that allowed the organization to purchase Zoladex directly from AstraZeneca at discounts off of the Zoladex WAC.  Physicians who participated in the managed care organization's network would order Zoladex from AstraZeneca's distributor, who would then ship the drug to the physician. AstraZeneca would then bill the managed care organization directly at the contracted-for discounted prices.[15]  To sell the MAP program, AstraZeneca's sales employees demonstrated to the managed care organizations that they could save money by removing the financial incentive to the doctors that was caused by spread.  AstraZeneca sales people shared with managed care organizations information about widely-available discounts on Zoladex, and the difference between acquisition cost and AWP.  AstraZeneca even went so far as to provide managed care organizations with copies of the physician volume discount schedule.[16]

## IV.     IMS Data Demonstrate Transparency.  *(Motion 6)*

The fact that AstraZeneca provided pricing data to IMS is, yet again, relevant to AstraZeneca's lack of a deceptive intent.  Although Plaintiffs group AMP and IMS data together in their motion, IMS data occupy a different position in the marketplace than do AMP data.  Whereas, as explained above, AMP data are limited to government use, IMS data are publicly

---

[15] (Trial Tr. at 43:1-13 (Nov. 14, 2006); Trial Tr. 19:20-20:15 (Dec. 4, 2006).)

[16] (Trial Tr. at 34:11-36:9 (Dec. 4, 2006).)

available for purchase.  IMS publishes national pharmaceutical sales and pricing data for all pharmaceutical trade classes.  Medicare could have purchased the data, and other government agencies did so.  AstraZeneca was voluntarily making its pricing data publicly available.  This directly contradicts any inference of deceptive intent.

Plaintiffs' allegation that IMS data is irrelevant because the data do not include rebates is far off the point:  AstraZeneca rarely, if ever, provided rebates to physicians for Zoladex.  Nearly all price concessions were in the form of discounts, which even Plaintiffs do not dispute are reflected in IMS data.  Furthermore, Plaintiffs' argument that knowledge of IMS data cannot be imputed to Medicare and is therefore irrelevant is similarly misplaced.  AstraZeneca is not putting IMS data forth to demonstrate that Medicare had these data.  Rather, as explained, AstraZeneca is putting forth IMS data as yet another example of the fact that AstraZeneca made its information public, and therefore lacked deceptive intent.

## V.    AstraZeneca Is Entitled To Establish the Context In Which Its Conduct Occurred.  *(Motions 5 and 8)*

AstraZeneca's pricing of Zoladex did not exist in a vacuum.  In order to prove its defense, AstraZeneca must be permitted to establish the context in which it acted.  FED. R. EVID. 401 advisory committee's note ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding.").  Context matters when evaluating AstraZeneca's intent.  To evaluate whether an alleged failure to disclose information was intentional, reckless, or negligent, a court must consider a number of factors, including "the context in which the statement was made" and "any other indicia that the defendant acted with fraudulent intent."  In re GeoPharma, Inc. 411 F. Supp. 2d 434, 437 (S.D.N.Y. 2006) (dismissing securities litigation for failure to sufficiently

plead scienter).  Context also matters when evaluating a plaintiff's claim against the elements of a state consumer protection statute.[17]  Plaintiffs' arguments to the contrary are unavailing.[18]

### A.    Drug Efficacy  *(Motion 5)*

Plaintiffs' motions to preclude evidence regarding the efficacy of Zoladex and preclude introduction of evidence regarding AstraZeneca's Patient Assistance Program would prevent AstraZeneca from giving the jury any context.  AstraZeneca understands that this is not a trial about the efficacy of cancer drugs, and will tailor its presentation accordingly.  However, it is nonsensical that AstraZeneca should be expected to present a defense of its Zoladex pricing without ever explaining what Zoladex is, the nature of the investment AstraZeneca made in the drug, and the experience AstraZeneca had in the LHRH marketplace.

The more than twenty-year effort that AstraZeneca expended to invent Zoladex, to which Dr. Furr will testify, is also relevant to a jury asked to make a finding as to the willfulness of AstraZeneca's conduct.  The fact that AstraZeneca spent an enormous amount of time and energy to develop a cutting-edge cancer treatment militates against an inference of willful deception of consumers.  AstraZeneca's intent was not to harm consumers, but rather to put a lower-priced lifesaving drug on the market.

AstraZeneca's witnesses will testify that when Zoladex entered the market, the Zoladex sales force focused on the clinical efficacy of drug, and the clinical studies that were unique to

---

[17] See Cummings v. HPG Int'l., Inc., 244 F.3d 16, 25 (1st Cir. 2001) (holding that context is relevant for claims under Massachusetts consumer protection law); Bob Timberlake Collection, Inc. v. Edwards, 626 S.E.2d 315, 323 (N.C. App. 2006) (holding that plaintiff must show "substantial aggravating circumstances" to recover under trade practices statute for a breach of contract); State ex rel. Stovall v. ConfiMed.com, L.L.C., 38 P.3d 707, 713 (Kan. 2002) (stating that determining the unconscionability of acts depends on the particular circumstances of each case).

[18] Plaintiffs cite United States v. Cooper, 286 F. Supp. 2d 1283 (D. Kan. 2003) for the proposition that "evidence regarding the clinical aspects of Zoladex is not relevant."  In Cooper, the court excluded evidence that any customers of a medical supply company had suffered medical problems because of the company's alleged fraud. The court found that the evidence was of limited probative value because "the evidence does not tend to prove the existence of the financial motive behind the intent to defraud that is alleged in this case."  Id. at 1296.  However, in this case context *is* relevant to AstraZeneca's intent.  Part of this context is the efficacy of Zoladex and AstraZeneca's Patient Assistance Program.

Zoladex.  However, as explained more fully below, AstraZeneca had to match the Lupron profit

margin in order to sell Zoladex.  To the extent Plaintiffs will argue that AstraZeneca put profits

ahead of patients in encouraging physicians to switch from Lupron to Zoladex, AstraZeneca

must be able to demonstrate why it felt Zoladex was at least as good, if not better, than Lupron.

In a recent case related to Lupron, plaintiffs have also asserted that LHRH drug therapy is

inferior to orchiectomy, and that therefore drug manufacturers perverted doctors medical

judgment by encouraging them to make decisions on the basis of economics rather than patient

health.  The fact that Lupron and Zoladex are therapeutic equivalents, and that Zoladex is as

effective as orchiectomy, to which Dr. Roach will testify, are necessary to rebut these arguments,

and to understand why physicians were willing to switch based on profit.  Physicians were not

putting patients at any disadvantage by selecting Zoladex.

       AstraZeneca cannot establish therapeutic equivalency, which Dr. Hartman relies on, as

explained in Section IV *infra*, without talking about the efficacy of the drug.  Plaintiffs argue

"that AstraZeneca may have brought a good drug to market does not negate the fact that, for over

ten years, its conduct caused thousands of Medicare beneficiaries to overpay for that drug." (Pls.'

Mem. Supp. Mot. *In Limine* Regarding Efficacy of Zoladex at 3.)  However, the fact that

AstraZeneca brought a good drug to market is relevant to whether beneficiaries overpaid.

Because of AstraZeneca's competitive pricing, beneficiaries had access to Zoladex, a drug that

cost less than, but was just as effective as, Lupron.  Clinical efficacy is a part of this case and

related evidence should be admitted.

       **B.      The Patient Assistance Program  *(Motion 8)***

       Evidence of AstraZeneca's Patient Assistance Program ("PAP") also provides necessary

context, and insight into AstraZeneca's intent.  PAP allows low income individuals to receive

Zoladex free of charge.  The existence of the PAP program is contrary to the claim that AstraZeneca put dollars over patients and intentionally deceived patients to make greater profits. Although Plaintiffs protest AstraZeneca putting forth evidence that it is a good corporate citizen, such evidence is relevant to whether AstraZeneca had the intent to deceive with respect to its pricing, or whether, to the contrary, it was concerned about patients affording its products.  The good faith and beneficial actions of a defendant towards parties other than the plaintiff is relevant for evaluating the conduct of the defendant.  See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 390-91 (Conn. 2004) (concluding that plaintiff tenant's claim that defendant landlord had not fulfilled its obligations under the lease fails in light of significant evidence regarding defendant's conduct towards other tenants; moreover, trial court had concluded that defendant was "a good citizen of Hartford").[19]

There is no danger that this trial will devolve into a trial about the efficacy of Zoladex. No one contests the efficacy of Zoladex.  Rather, AstraZeneca should be permitted to introduce evidence about what Zoladex is in order to provide context for its actions, and explain its intent. Should the Court find any of Zoladex's presentation cumulative, the Court is, of course, free to limit the presentation at that time.

## VI.     The Lupron Competitive Dynamic Motion Must Be Denied.  *(Motion 4)*

AstraZeneca's defense is that its competitive pricing activity was not fraudulent, and that its intent was not to deceive, but to succeed in making its product available to patients as the lower priced alternative to Lupron.  It is impossible for AstraZeneca to explain Zoladex pricing without reference to the competition with Lupron.  While AstraZeneca has never argued that two

---

[19] Marshall v. Miller, 276 S.E.2d 397 (N.C. 1981) is not to the contrary.  In that case, the court found that intent and good faith were irrelevant where a consumer need only show that an act or practice possessed the tendency or capacity or mislead, or to create a likelihood of deception.  However, in this case, Plaintiffs are required to prove intentional misrepresentation.  Therefore, intent, and good faith, are relevant.

wrongs make a right, AstraZeneca has always stated that it was forced to increase discounts, thereby enlarging the spread, in order to compete in a market where low price alone was not advantageous.  (Trial Tr. at 11:20-12:15; 14:1-10; 16:5-23 (Nov. 28, 2006).)

By pursuing competitive pricing strategies, AstraZeneca actually saved the patients and the system money.  Every sale of Zoladex instead of Lupron resulted in savings.  In fact, certain Medicare carriers adopted a "Least Costly Alternative" ("LCA") plan, whereby they reimbursed for both Lupron and Zoladex at the Zoladex AWP, saving money.  The evidence will show that AstraZeneca went to various Medicare carriers and promoted LCA plans.  While doing so, AstraZeneca explained the spread incentive to these carriers, again negating any evidence that AstraZeneca had an intent to deceive payors with AWP.  In addition, the fact that Medicare Part B beneficiaries saved money by receiving Zoladex as opposed to Lupron is relevant to causation.

Plaintiffs claim that meeting industry practice is not a defense in fraud actions.[20] However, Plaintiffs confuse the ultimate persuasiveness of industry practice evidence (which is generally discounted in the prior decisions they cite) with the issue of *admissibility*.  In fact, numerous decisions support the relevance of such evidence to the fact-finder.[21]  Furthermore, industry practice is a defense under the consumer protection statute of at least one state.[22]

---

[20] (Pl.'s Mem. in Support of their Mot. *In Limine* to Exclude Evidence Regarding AstraZeneca's Meeting Competition Defense at 2.)

[21] See, e.g., Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 218-19 (3d Cir. 2006) ("The customs and business practices in the securities industry at the time the parties entered into the Agreement provides an important context which will aid the jury in determining whether [the defendant] had the requisite scienter at the time . . . ."); Messer v. E.F. Hutton & Co., 847 F.2d 673, 679 (11th Cir. 1988) (finding no scienter under Commodity Exchange Act, 7 U.S.C. § 60(1)(A), where "expert testimony at trial established that [the defendant's alleged conduct] is a common and accepted industry practice" and "it appears that [the defendant] made a reasonable decision well within the bounds of accepted industry practice"); State v. Biller, 462 A.2d 987, 1000 (Conn. 1983) ("[E]vidence of a common practice for public adjusters to overstate and for insurance company adjusters to understate such losses had some bearing on the question of [fraudulent] intent.").

[22] Rev. Code Wash. (ARCW) § 19.86.920 (2007) ("It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business. . . .").

Plaintiffs argue that Lupron is irrelevant to AstraZeneca's defense.  However, Plaintiffs clearly believe that Lupron is relevant to their case.  They include references to the competition between Zoladex and Lupron in their Complaint.  (See, e.g., Fourth Amended Class Action Compl. at ¶¶ 250-253, ¶ 257.)  Plaintiffs' own allegations—that AstraZeneca marketed the spread to move market share does not make sense without Lupron— there is no market.  (Rept. of Raymond S. Hartman Regarding AstraZeneca With Respect to Class 1 at ¶ 21 (Mar. 16, 2007) (describing allegations that pharmaceutical manufacturers used spread competition to increase market share).)  Dr. Hartman himself references the competition with Lupron to explain AstraZeneca's behavior with respect to Zoladex.  See, e.g., id. ¶¶ 22-24; ¶¶ 30-36.  It defies logic that Plaintiffs' own expert would harp on the competition between Lupron and Zoladex while Plaintiffs simultaneously argue that the competition story is an improper one for AstraZeneca to tell.  Lupron cannot be relevant for Plaintiffs and irrelevant for AstraZeneca, which should be permitted to put forth such evidence.[23]

## CONCLUSION

For all of the above reasons, Plaintiffs' Omnibus Motion in Limine should be denied.

Respectfully submitted,

By:   /s/ Katherine B. Schmeckpeper
Nicholas C. Theodorou (BBO # 496730)
Michael B. Keating (BBO # 263360)
Michael P. Boudett (BBO # 558757)
Katherine B. Schmeckpeper (BBO # 663200)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210

---

[23] Although AstraZeneca's understanding of and response to competition from Lupron is relevant to AstraZeneca's intent and its overall defense, Plaintiffs' efforts to introduce TAP's understanding of and response to competition from Zoladex, demonstrated by the numerous TAP documents and TAP testimony listed on their pre-trial disclosures, should be rejected.  TAP's conduct and state of mind has no bearing on or relevance to AstraZeneca's conduct or intent.

D. Scott Wise
Michael Flynn
Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017

Attorneys for AstraZeneca Pharmaceuticals LP

Dated: April 6, 2007

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered on April 6, 2007 to counsel for Plaintiffs and to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, via LexisNexis File & Serve.

By:  <u>/s/ Katherine B. Schmeckpeper</u>
Katherine B. Schmeckpeper