UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
ASTRAZENECA PHARMACEUTICALS LP'S MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE RELATING TO GUILTY PLEAS,
<u>CIVIL SETTLEMENT AND SAMPLING ACTIVITY</u>**

# TABLE OF CONTENTS

**PAGE**

I.      FACTUAL BACKGROUND ............................................................................................1

II.     ARGUMENT .............................................................................................................9

        A.      The Guilty Plea is Admissible and Relevant to the Issues in This Case................10

                1.      The guilty plea is admissible as a statement of a party-opponent..............10

                2.      The guilty plea is admissible as a "prior bad act".....................................12

                3.      The guilty plea is admissible as a judgment of previous conviction .........14

        B.      Because It is Not Necessary That Class Representatives Have Identical
                Damages to Other Class Members, the Class Representatives Need Not
                Show That They Were Charged for Samples for the Guilty Plea to be
                Admissible ....................................................................................................15

        C.      Documents Relating to the Government's Allegations of AWP Fraud
                and Illegal Spread Marketing are Relevant.............................................................17

        D.      The Guilty Pleas of Drs. Antoun, Hopkins and Berkman, and TAP, are
                Relevant .......................................................................................................17

III.    EVIDENCE OF THE GUILTY PLEA AND RELATED MATERIALS IS NOT
        UNFAIRLY PREJUDICIAL TO ASTRAZENECA.......................................................18

IV.     RULE 408 DOES NOT ACT AS A BAR ON ASTRAZENECA'S CIVIL
        SETTLEMENT AGREEMENT AND CIA.....................................................................19

V.      CONCLUSION..........................................................................................................20

001534-16 163201 V1

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*Allapattah Servs. v. Exxon Corp.*,
  157 F. Supp. 2d 1291 (S.D. Fla. 2001) ............................................................16

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946)............................................................................................16

*Bower v O'Hara*,
  759 F.2d 1117 (3d Cir. 1985)............................................................................10

*Jenkins v. Raymark Indus., Inc.*,
  782 F.2d 468 (5th Cir. 1986) ............................................................................15

*Estate of Spinosa*,
  621 F.2d 1154 (1st Cir. 1980) ..........................................................................20

*United States v. Carpenter*,
  2002 U.S. App. Lexis 1236 (8th Cir. Jan. 29, 2002) .......................................13

*United States v. Slim*,
  168 F.3d 504 (9th Cir. 1999) ............................................................................13

*United States v. Smith*,
  605 F.2d 839 (5th Cir. 1979) ............................................................................12

*Williams v. Drake*,
  146 F.3d 44 (1st Cir. 1998)...............................................................................18

## FEDERAL STATUTES

21 U.S.C. § 333(b)(i)(B) (2003) ...............................................................................11, 14

21 U.S.C. § 331(t) .....................................................................................................1, 11

21 U.S.C. § 353(c) .....................................................................................................1, 11

001534-16  163201 V1

Class Plaintiffs respectfully submit this Memorandum of Law in Opposition to AstraZeneca's motion *in limine* to exclude evidence relating to the guilty pleas of AstraZeneca, TAP Pharmaceutical Products ("TAP"), and Drs. Saad Antoun, Stanley Hopkins, and Robert Berkman.  The evidence of these pleas is admissible under numerous Federal Rules of Evidence, including Rules 404(b), 801(d)(2), and 803(22). Rules 402 and 403 do not make the evidence otherwise inadmissible because, as explained herein, the evidence of the guilty pleas is relevant to the issues in this proceeding.  Nor does Rule 408 make AstraZeneca's Civil Settlement and Corporate Integrity Agreements inadmissible, since they both are an integral part of AstraZeneca's guilty plea.

Further, evidence of the government's charges that led to the guilty plea are also highly relevant.  The government charged AstraZeneca with publishing phony AWPs and illegal spread marketing and the case was not just about free samples.  The exact charges made in this case. These charges are relevant to AstraZeneca's 130 plus proposed trial exhibits that AstraZeneca seeks to prove that the government knew and approved of its AWP and spread marketing practices.  To not allow these materials in light of AstraZeneca's "government knew" or "government approved defense" would be prejudicial.  The charges demonstrate that the government neither knew or opposed of AstraZeneca's practices.

## I.    FACTUAL BACKGROUND

On June 20, 2003, AstraZeneca pled guilty in the District of Delaware to conspiracy to violate the Prescription Drug Marketing Act ("PDMA"), 21 U.S.C. §§ 353(c), 331(t), and 333(b)(i)(B), "by causing the sale of [Zoladex] drug samples."[1] *See* Memorandum of Plea

---

[1] As AstraZeneca acknowledges in its Memorandum, three physicians, Drs. Saad Antoun, Stanley Hopkins, and Robert Berkman, also pled guilty to violating the PDMA by seeking reimbursement for free samples of Zoladex. Interestingly, while AstraZeneca's motion seeks to suppress, minimize, and otherwise avoid evidence of its own corporate culpability, the judge who presided over the criminal proceedings made it clear that, in his opinion, the

- 1 -

Agreement in *United States v. AstraZeneca Pharmaceuticals, LP*, Criminal Action No. 03-55

(D. Del) ("AZ Plea Agreement"), attached as Ex. A to the Declaration of Katherine

Schmeckpeper in Suppport of AstraZeneca Pharmaceuticals LP's Memorandum of Law in

Support of Its Motion in Limine to Exclude Evidence Relating to Guilty Pleas, Civil Settlement

and Sampling Activity ("Schmeckpeper Decl."), at ¶ 1.  In so doing, AstraZeneca admitted the

following facts set forth in the single-count Information to which AstraZeneca pled guilty:

- "AstraZeneca PLC was formed in 1999 through the merger of Zeneca PLC with Astra AB," *see* ¶ 1;

- "Prior to that time, and during most of the time period relevant to this Information, the United States operating subsidiary of Zeneca PLC was Zeneca Inc., which had its headquarters in Wilmington, Delaware," *see* ¶ 1;

- "In the marketing of Zoladex, Zeneca employed and maintained extensive marketing and sales departments,"  *see* ¶ 2;

- "Since at least early 1990s, Zeneca has sold and provided the drug Zoladex to urologists across the country," *see* ¶ 2;

- "It was typical that a patient whose prostate cancer was being treated with Zoladex would receive regular injections of that drug for an extended period of time, often for the remainder of his life," *see* ¶ 3;

- "At all times material to this Information, Zeneca sold Zoladex directly to urologists," *see* ¶ 4;

- "[I]t was a crime…for an employee of a company engaged in the lawful distribution of drugs to provide a drug sample free of charge to a physician with the intention and expectation that the physician would use that sample in the treatment of a patient and thereafter bill either the patient or the patient's insurance company for that drug sample," *see* ¶ 5;

---

true perpetrator of the criminal activity was AstraZeneca and its sales representatives.  *See* Sentencing Hearing Transcript of Robert A. Berkman, M.D., dated November 6, 2003 (*United States of America v. Robert A. Berkman, M.D.*, No.: 03-CR-45-1(JJF) (D. Del.), attached hereto as Ex. A, at 7.  The Court later wrote to the State Medical Board of Ohio on Dr. Berkman's behalf, repeating his view that AstraZeneca was the true perpetrator of the criminal activity.  *See* Hon. Joseph A. Farnan, Jr.'s Feb. 5, 2004 letter to Ohio Medical Board, attached hereto as Ex. B.

- "Beginning in or about 1993, and continuing to at least July, 1996, the defendant, Zeneca, through its employees, provided a total of thousands of free samples of Zoladex to physicians knowing and expecting that certain of those physicians would prescribe and administer drug samples to their patients and thereafter seek and receive reimbursement for those samples," *see* ¶ 6;

- "From in or around 1993, through in or around at least July, 1996, in the District of Delaware and elsewhere throughout the United States, the defendant, Zeneca, together with certain of its employees, certain urologists, and others known and unknown to the Acting United States Attorney, did knowingly and willfully combine, conspire and agree to violate 21 U.S.C. §§ 353(c), 331(t), and 333(b)(i)(B), by submitting, and causing to be submitted, claims for payment for the prescription of Zoladex which had been provided as free samples to the urologists," *see* ¶ 8;

- "It was an objective of Zeneca in this conspiracy to provide free samples of Zoladex to physicians as an inducement to those physicians to order Zoladex," *see* ¶ 9; and

- "It was an objective of some of the physicians participating in the conspiracy to bill for the free samples in order to increase their income," *see* ¶ 9.

*See* Schmeckpeper Decl., Ex. Q (Information filed in *United States v. AstraZeneca Pharmaceuticals, LP*, Criminal Action No. 03-55 (D. Del.)).

The transcript of the hearing on AstraZeneca's guilty plea and sentencing sets forth additional statements made on AstraZeneca's behalf by Glen Engelmann, AstraZeneca's vice president, general counsel, and compliance officer. *See* Schmeckpeper Decl., Ex. G (Transcript of the June 20, 1993 Plea and Sentencing Hearing in *United States v. AstraZeneca Pharmaceuticals, LP*, Criminal Action No. 03-55 (D. Del) ("AZ Plea and Sentencing Hearing"), at 2). After establishing that he was authorized to act on behalf of AstraZeneca, *see id.* at 3-4, Mr. Engelmann stated that he understood that the Information "broadly charges a conspiracy" under Title 18, Section 371. *Id.* at 7. In response to the Court's request that he explain "in his

own words what AstraZeneca did that makes it believe it's guilty of the offense charged in the Information," Mr. Engelmann affirmed that AstraZeneca that "beginning in or about 1993, and continuing at least until July 1996, some Zeneca employees provided free samples of Zoladex to physicians, knowing and expecting that certain of those physicians would prescribe and administer samples to their patients and thereafter seek reimbursement, in violation of the Pharmaceutical [sic] Drug Marketing Act," that "when this was done, one of the objectives was to induce the physicians to order Zoladex," and that "it was  an objective of the physicians to bill for the free samples in order to increase their income."  *Id*. at 7-8.  Mr. Engelmann also agreed with the government's proffer that Zoladex "***was marketed, sold and provided to urologists across the country***"; that Zeneca, "through its employees, ***provided thousands of free samples of Zoladex to physicians knowing*** and expecting that certain of those physicians would prescribe and administer those drug samples to their patients and thereafter seek and receive reimbursement for the free samples;" that "the objective for Zeneca was to obtain money from the increased sales of Zoladex, while the objective for the physicians was to obtain money for reimbursement for the samples of Zoladex;" that "it was an objective of Zeneca in this conspiracy to provide free samples of Zoladex to induce the urologists to order Zoladex;" and that "it was an objective of some of the physicians participating in the conspiracy to bill for the free samples in order to increase their income."  *Id*. at 9-10.

The Court accepted and imposed the provisions of the Plea Agreement requiring that AstraZeneca pay a criminal fine of $63,872,156 for committing the offense charged in the Information.  *See* AZ Plea Agreement, ¶ 3(a); Plea and Sentencing Hearing at 18-20.  This amount was calculated based on a loss to the United States of $39,920,098, and reflected a deduction from AstraZeneca's culpability score because AstraZeneca "clearly demonstrated

- 4 -

recognition and affirmative acceptance of responsibility for its criminal conduct."  AZ Plea

Agreement, ¶ 2(a).  The prosecutor further stated at the sentencing hearing that "the lower

multiplier is appropriate here because of the lack of involvement in the illegal marketing scheme

by **AstraZeneca** upper-level management . . ."  AZ Plea and Sentencing Hearing at 18 (emphasis

added).  Before sentencing, Mr. Engelmann stated that "we accept responsibility for and we

regret the improper sampling activity that took place years ago and has led to this guilty plea

today.  **AstraZeneca** has made compliance and accountability a major focus of our ***new***

***company***." AZ Plea and Sentencing Hearing at 16 (emphasis added).

The Plea Agreement also specifically required that AstraZeneca comply with the

provisions of a Civil Settlement Agreement, which was incorporated into the Plea Agreement

and made a condition of AstraZeneca's probation.  *Id.* at ¶¶ 5, 10-12; AZ Plea and Sentencing

Hearing at 13 (statement of Mr. Engelmann that he understood that the AZ Plea Agreement

incorporated the Civil Settlement Agreement, and that "by incorporating, it means that it's

enforceable through this plea, and through this memorandum of plea agreement during any

supervision by the Court of the company.").  The Civil Settlement Agreement required

AstraZeneca to pay $291,027,844 to the United States and to the various state Medicaid

programs.  In exchange, the United States agreed to stop prosecuting the following matters:

- "conduct which falls within the scope of the conspiracy which is charged in the Information;"

- "conduct falling within the scope of the grand jury investigation conducted by the United States Attorney's Office for the District of Delaware with respect to . . . the marketing, sale and pricing of Zoladex in all its dose forms for the treatment of prostate cancer;"

- "the resale by physicians and others of Zoladex to the Medicare, TriCare, Railroad Retirement Board, state Medicaid programs, and any other payor;"

001534-16 163201 V1

- "provision of remuneration in cash or in kind to induce the purchase or prescription of, or the recommendation to anyone that they purchase or prescribe Zoladex for the treatment of prostate cancer;" and

- "violation of any provision of the [PDMA] in the marketing and sale of Zoladex in all its dose forms;" and

- for other conduct known to the United States Attorney's Offices for the Districts of Delaware and Massachusetts "which concerned the sale and marketing of Zoladex in all its dose forms."

AZ Plea Agreement, ¶¶ 4(a)-(c), 10.  The Plea Agreement also acknowledged that attempting to "fashion a proper restitution order outweighs the need to provide restitution to the victims in this case, where, as here, the loss suffered by each of the federal health care programs will be recompensed fully from amounts that will be paid as part of the Civil Settlement Agreement." *Id*. at 3(c).

The Civil Settlement Agreement further describes the conduct alleged by the United States which was resolved by the Civil Settlement Agreement.  This conduct, which spanned the time period from January 1991 through December 31, 2002, included the following:

- Providing free samples to physicians "knowing and expecting" those physicians would bill for the samples;

- knowingly and willfully paying "illegal remuneration" to physicians and others in the form of "free Zoladex, unrestricted educational grants, business assistance grants and services, travel and entertainment, consulting and audit services, and honoraria;"

- ***knowingly and willfully paying "illegal remuneration" to physicians and others by "marketing Zeneca's 'Return to Practice' program to physicians to unlawfully induce orders to purchase Zoladex, which program consisted of "inflating the Average Wholesale Price ("AWP") used by Medicare and others for reimbursement of the drug, deeply discounting the price paid by physicians to Zeneca for the drug ("the discounted price"), and marketing the spread between the AWP and the discounted price to physicians as***

> ***additional profit to be returned to the physician's practice from Medicare reimbursement for Zoladex;"* and**
>
> - ***engaging in a marketing scheme where AstraZeneca "set an AWP for Zoladex at levels far higher than the majority of its physician customers actually paid for the drug when purchasing from Zeneca. As a result, the United States contends that Zeneca's customers received reimbursement from Medicare and state medicaid programs and others at levels significantly higher than the physicians' actual costs or the wholesalers' average price."***

*See* Schmeckpeper Decl., Ex. E (Settlement Agreement and Release ("AZ Civil Settlement Agreement")) at ¶ G(i)-(iv) (emphasis added).  This and other related conduct, including the conduct alleged in the criminal action, are referred to in the AZ Civil Settlement Agreement as "Covered Conduct."  *Id.* at ¶ G.  In exchange for a specified $291,027,844 in payments and the Court's acceptance of AstraZeneca's guilty plea, the United States agreed to release AstraZeneca from any civil or administrative claims the United States or its agencies had or may have had for the Covered Conduct.  *Id.* at ¶¶ 2, 4-6.

Both the Plea Agreement and the Civil Settlement Agreement also refer to and incorporate a Corporate Integrity Agreement ("CIA") between AstraZeneca and the United States.  *See* AZ Plea Agreement, ¶¶ 5, 13; AZ Civil Settlement Agreement, ¶ 22.  The CIA requires that over a period of five years, AstraZeneca must:

- redistribute a written Code of Conduct mandating its employees' compliance with all federal health care program requirements, see ¶ B(1);

- implement written policies and procedures addressing federal health care program requirements, ***including but not limited to calculation and reporting of accurate prices for products reimbursed by the government***, proper uses and tracking of drug samples, and measures designed to promote lawful marketing and sales practices, *see* ¶ B(2) (emphasis added);

- provide specified minimum levels of compliance training to sales and marketing personnel, and other persons covered by the CIA, *see* ¶ C;

- for each quarter, report pricing information for Zoladex and all other government-reimbursed products which "accurately reflects prices at which actual purchasers buy the Covered Products sold by Astra Zeneca," *see* ¶ D;

- for each quarter, report the "Average Sale Price" for Covered Products, which is defined as "the average of all final sales prices charged by AstraZeneca for the product in the United States to all purchasers," subject to certain exclusions not pertinent here. Specifically, the "prices identified in the calculation of the ***Average Sale Price should be net of all of the following" volume discounts, prompt pay discounts, cash discounts, chargebacks, short-dated product discounts, free goods, rebates, and all other price concessions provided by Astra Zeneca to any Relevant Purchaser that result in a reduction of the ultimate cost to the purchaser***," *see* ¶ D(1) (emphasis added);

- conduct annual audits of AstraZeneca's drug price reporting systems and practices and its sales and marketing practices, *see* ¶ E;

- maintain a Disclosure Program to facilitate communications relating to compliance with the law and AstraZeneca's policies, *see* ¶ F;

- employ a Compliance Officer "to oversee the development of and coordination of policies, procedures, and practices designed to ensure compliance with the requirements set forth in the CIA and with federal health care program requirements," *see* ¶ A.

*See generally* Schmeckpeper Decl., Ex. F (Corporate Integrity Agreement ("CIA")) at 1-17.

Under the heading "Implementation and Annual Reports," the CIA further requires that

AstraZeneca periodically certify and otherwise report on the status of AstraZeneca's compliance

with the CIA.  *See id.* at 20-26.

## II.     ARGUMENT

Class Plaintiffs will prove at trial that AstraZeneca engaged in an unlawful scheme to induce physicians to purchase and prescribe Zoladex, by offering physicians various forms of discounts, including lower prices, free products, kickbacks, and other financial remuneration. Plaintiffs will show that AstraZeneca and its predecessor, Zeneca, instructed physicians to seek reimbursement from Medicare based on the published Average Wholesale Price ("AWP") for Zoladex which was always far in excess of the discounted prices AstraZeneca charged physicians.  Moreover, because the discounted prices were not included in reporting pricing information used by pricing compendia to publish the AWP for Zoladex, Medicare and co-payors paid far more than they should have paid for Zoladex.

*The criminal and civil proceedings brought by the United States against AstraZeneca made these same allegations*.  To resolve the government proceeding, AstraZeneca pled guilty to one felony count of providing free samples to physicians "knowing and expecting" that they would bill for, and receive, reimbursement from Medicare and patients, and pay a criminal fine of almost $64 million.  AstraZeneca also agreed to pay over $291 million to resolve the government's civil claims seeking damages for the other facets of the alleged scheme.  And, AstraZeneca agreed to implement an extensive Corporate Integrity Agreement designed to prevent future misconduct by AstraZeneca's sales and marketing employees.

The unlawful sampling to which AstraZeneca pled guilty was but one of several types of discounts that AstraZeneca and Zeneca used as part of the overall scheme to unlawfully induce physicians to purchase and prescribe Zoladex for their own personal financial interests. AstraZeneca, however, asserts that because its guilty plea allegedly "involves limited instances of sampling," it is completely irrelevant to the Class 1 claims in this case.  AstraZeneca contends that there is no evidence that the unlawful practice of its predecessor, Zeneca, was widespread,

despite AstraZeneca's own admission in its guilty plea and the sentencing hearing that Zeneca improperly provided thousands of samples to doctors throughout the country.  AstraZeneca asserts that there is no way for Class Plaintiffs to prove damages from improper sampling, ignoring the fact that AstraZeneca's agreed-upon criminal fine was calculated from the government's damages, which loss represents 80% of the total amount of the injury caused by Zeneca's misconduct – the remaining 20% being the injury suffered by the Class.  AstraZeneca also contends that the guilty plea is irrelevant because there is no evidence that the Class Representatives were charged for samples, despite the fact that this Court has already certified the Plaintiffs as representatives for the entire Class, including Class members who were charged for samples. AstraZeneca further asserts that any probative value of the guilty plea "is substantially outweighed by the danger of unfair prejudice," without identifying or explaining this alleged danger.  AstraZeneca makes similar contentions with respect to the Civil Settlement Agreement and CIA, and further argues that these two documents are somehow excluded by Federal Rule of Evidence 408, despite the fact that they are integral parts of the guilty plea, and that they can be used for impeachment.  Accordingly, AstraZeneca's arguments fail, and its Motion *in Limine* should be denied.

## A.    The Guilty Plea is Admissible and Relevant to the Issues in This Case

### 1.    The guilty plea is admissible as a statement of a party-opponent

A plea of guilty to a charge may be admitted into evidence in a subsequent civil action as an admission of the act charged.  The guilty plea constitutes a judicial admission by a party-opponent, and is therefore admissible under Federal Rule of Evidence 801(d)(2).  *See, e.g.*, *Bower v. O'Hara*, 759 F.2d 1117, 1127 (3d Cir. 1985).

The guilty plea is relevant to this case because offering free product was one of several forms of discounts AstraZeneca offered physicians as part of its overall scheme to use financial

incentives to induce physicians to purchase and prescribe Zoladex.  As part of its guilty plea, AstraZeneca admitted to facts demonstrating that the improper sampling scheme involved the same drug (Zoladex), the same co-conspirators (urologists), the same geographic area ("throughout the United States"), and had the same purpose (to induce Zoladex sales) as the scheme alleged in this case.  The improper sampling occurred during the time period at issue in this case (1993-1996), and it worked the same way:  urologists billed Medicare and their patients in excess of what they paid for Zoladex, and pocketed the difference to "increase their income" (quoting Mr. Engelmann from the Plea and Sentencing hearing).  In sum, the fact that AstraZeneca induced physicians with 100% discounts makes it more probable than not that the company also induced physicians with discounts of lesser value, regardless of whether the sampling is seen as part of the conspiracy alleged in this case or as an entirely separate conspiracy.

AstraZeneca, however, accuses Plaintiffs of "manufacturing" a connection between the guilty plea and this case "by suggesting that plea concerns nationwide activity pursuant to company policy."  To the contrary, the Information to which AstraZeneca pled guilty states that "in the District of Delaware *and elsewhere throughout the United States*, the defendant, Zeneca, together with certain of its employees, certain urologists, and others known and unknown to the Acting United States Attorney, did knowingly and willfully combine, conspire and agree to violate 21 U.S.C. §§ 353(c), 331(t), and 333(b)(i)(B), by submitting, and causing to be submitted, claims for payment for the prescription of Zoladex which had been provided as free samples to the urologists."  *See* Information, ¶ 8 (emphasis added).  Moreover, although AstraZeneca attempts to make much of the fact that the prosecutor found a "lack of involvement in the illegal marketing scheme by *AstraZeneca* upper-level management," *see* AZ Mem. at 5,

Mr. Engelmann reminded the Court and the government at the Plea and Sentencing hearing that it was not AstraZeneca, but Zeneca, a predecessor company, who had committed the admitted misconduct, over seven years before the guilty plea was taken.  Indeed, Mr. Engelmann affirmed that "*AstraZeneca* has made compliance and accountability a major focus of our *new company*" (emphasis added).  This fact, and the fact that AstraZeneca is now obligated to comply with a Corporate Integrity Agreement which mandates extensive training, reporting, and other measures, explains why current AstraZeneca employees deny any knowledge of improper sampling by Zeneca in the past, and attest to AstraZeneca's present compliance with federal health care program requirements.  *See id*. at 6.

AstraZeneca also asserts that there is no connection between the guilty plea and Plaintiffs' allegations in this case of fraudulent AWP inflation.  *See* AZ Mem. at 5 ("The term 'AWP' is not even mentioned in document.").  AstraZeneca is incorrect.  AstraZeneca has never contended, nor is there any evidence to suggest, that Zeneca accounted for free samples in reporting pricing information to be used in calculating the AWP for Zoladex.  By omitting that information, Zeneca necessarily caused the reported price for Zoladex to be higher than it would have been had the free samples been part of the calculation.  Thus, unless AstraZeneca now contends that Zeneca somehow accounted for the improper samples when it calculated the pricing information it provided for published AWPs, the unlawful sampling is relevant to the issue of whether the AWP for Zoladex was inflated.  The press release issued by the agreement in the wake of AstraZeneca's plea also makes clear that the plea resolved overarching charges of the exact AWP fraud alleged in this case.  *See* Plaintiffs' Ex. 188 attached hereto as Ex. C.

   2.   **The guilty plea is admissible as a "prior bad act"**

A guilty plea may also be admissible as a "prior bad act" under Federal Rule of Evidence 404(b).  *See*, *e.g.*, *United States v. Smith*, 605 F.2d 839, 845-46 (5th Cir. 1979) (admitting prior

guilty plea, conviction, and sentence as evidence of motive and plan to use incarceration as a means of avoiding payment); *United States v. Carpenter*, 2002 U.S. App. Lexis 1236, at *1 (8th Cir. Jan. 29, 2002) (unpublished opinion) (holding that defendant's guilty plea to possessing marijuana and cocaine was directly relevant to whether defendant possessed and intended to distribute methamphetamine, where the admitted drugs were found simultaneously with the conduct underlying the offense being adjudicated); *United States v. Slim*, 168 F.3d 504 (9th Cir. 1999) (unpublished opinion) (holding that prior guilty plea and conviction for abusive sexual conduct was properly admitted at trial on charge of aggravated sexual abuse to prove plan, intent, absence of mistake, and lack of consent, because the factual allegations between the two cases were "nearly identical" and the prior conviction was not remote in time).

Even if offering free product as a form of discount was a separate conspiracy than that alleged in this case, it is sufficiently similar to offering discounts of lesser value for the guilty plea to be admissible under Federal Rule of Evidence 404(b) as evidence of AstraZeneca's plan, intent, motive, and lack of mistake in providing the lesser discounts. Again, the plan for improper sampling worked the same way as the other discounts alleged in this case: physicians were expected to, and did, bill for Zoladex in excess of their acquisition cost at the inflated AWPs. And, as in this case, AstraZeneca's admitted intent and motive in giving away free samples were to induce physicians to purchase and prescribe Zoladex, and bill for the same at the inflated AWPs. Presumably, this and other discounts offered by Zeneca over several years were no mistake: they evidence the company's willingness to forego higher short-term profitability in favor of more long-term sales and higher market share, to the increasing detriment of the Class consumers, as physicians were induced to prescribe and overcharge Zoladex to increasing numbers of patients.

- 13 -

The guilty plea and related documents are also relevant to the issue of the government's knowledge and motives, which AstraZeneca raises in defense to Plaintiffs' claims. The fact that the government brought a criminal proceeding against AstraZeneca, extracted a judicial confession of criminal misconduct, levied hundreds of millions of dollars in fines and other payments, and forced the company to implement an extensive "Corporate Integrity" program, contradicts the perverse notion that the government "approved" of AstraZeneca's unlawful scheme to defraud Medicare and hundreds of thousands of patients across the country. The express terms of the documents, including the specific payment obligations, the iterations of potential claims being investigated and released, and the multiple reinforcing provisions of the Plea Agreement and Civil Settlement Agreement, also help explain why, in AstraZeneca's words, "the government investigated possible AWP inflation claims, yet brought no such claim." *See* AZ Mem. at 5.

### 3.    The guilty plea is admissible as a judgment of previous conviction

Federal Rule of Evidence 803(22) provides that evidence of a final judgment entered upon a plea of guilty, adjudging a person guilty of a crime punishable by imprisonment in excess of one year, is admissible to prove any fact essential to sustain the judgment. *See* Fed. R. Evid. 803(22). The crime to which AstraZeneca pled guilty, a knowing and willful conspiracy to violate the Prescription Drug Marketing Act by submitting, or causing to be submitted, claims for payment for Zoladex which had been provided as free samples, so as to induce physicians to purchase more Zoladex and increase sales, was punishable by imprisonment for not more than ten years. *See* 21 U.S.C. § 333(b)(i)(B) (2003). The guilty plea and judgment help prove that Zeneca engaged in unfair competition, or unfair or deceptive acts, in violation of the state consumer protection laws at issue in this case. Among other things, the conviction helps prove

that Zeneca's actions in overbilling for Zoladex constituted unfair conduct, or had a tendency to

mislead, either of which are essential to a consumer protection violation.

**B.      Because It is Not Necessary That Class Representatives Have Identical Damages to Other Class Members, the Class Representatives Need Not Show That They Were Charged for Samples for the Guilty Plea to be Admissible**

AstraZeneca states that because there is no evidence that Messrs. Howe or Townsend

were charged for free samples, AstraZeneca's plea of guilty to conspiring with physicians to bill

for free samples is irrelevant in this proceeding.  Once again, AstraZeneca is incorrect.

Moreover, the Class Representatives, like all other Class members, paid too much for Zoladex

because AstraZeneca conspired with physicians to bill in excess of the discounted price to

physicians, regardless of whether the discount came in the form of a free product, lesser

discount, rebate, kickback, or other discount.  The guilty plea is thus relevant evidence of one

facet of AstraZeneca's overall conspiracy with physicians to overbill for Zoladex.

It is well-established that the claims of a class representative need not be identical to the

claims of other class members, provided that the class representative's claims arise from the

same event or course of conduct and are based on the same legal theory as that of other class

members.  *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).  In opposing class

certification, AstraZeneca went to great lengths to attempt to demonstrate that the proposed Class

Representatives were not adequate to represent persons with different factual circumstances.  In

overruling AstraZeneca's objections and certifying Messrs. Howe and Townsend as Class

Representatives, this Court recognized the basic rule that the Rule 23 requirements of typicality

and adequacy do not demand that Class members be clones of each other.  Because the claims of

Messrs. Howe and Townsend arose from the same scheme by AstraZeneca and physicians to

overbill for Zoladex, Howe and Townsend were deemed adequate to represent all Class

members, including those whose physicians billed them after receiving different types of

- 15 -

discounts, and/or in different amounts, than the physicians who billed Howe and Townsend. Therefore, at the trial of this class action, it will not be only Howe and Townsend's claims, but the claims of all Class members that will be adjudicated, including those who were charged by their physicians for free samples. For this reason, the guilty plea is relevant evidence, despite the lack of evidence showing that the two Class Representatives were charged for free samples.

Moreover, Plaintiffs intend to prove Class member damages in the aggregate. It is perfectly acceptable in class action cases to prove damages on a class-wide basis. *See*, *e.g.*, *Allapattah Servs. v. Exxon Corp.*, 157 F. Supp. 2d 1291 (S.D. Fla. 2001) (collecting cases). *See also* Newberg & Conte, 3 NEWBERG ON CLASS ACTIONS § 10:5 at 486-87 (4th ed. 2002) ( "A valid class for nominal individual claims involves recognition at the outset that individual claim proofs of damages are not practical or economically feasible. Therefore, it is to be expected by all that any recovery for the class will involve aggregate proof"). Precision is not required, especially where the wrongdoer's own actions created uncertainty in calculating damages. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

In this case, aggregate proof of damages will take into account not only a conspiracy with physicians to bill in excess of acquisition cost, but also Zeneca's inflation of Zoladex AWPs by failing to account for the discounts in reporting published prices. These unreported discounts, which included free products, caused the AWP for Zoladex to be artificially inflated. Since all Class members were injured by this AWP inflation, AstraZeneca's guilty plea is relevant to the damages claims of all Class members, regardless of the form of discount enjoyed by their health care providers.

- 16 -

**C.      Documents Relating to the Government's Allegations of AWP Fraud and Illegal Spread Marketing are Relevant**

AstraZeneca has designated over 130 trial exhibits that go to government "knowledge" or "alleged approval" or "acceptance" of its phony AWPs and spread marketing practices. AstraZeneca witnesses will testify that the government told them all of this was fine with the United States of America.  AstraZeneca also wishes to call an ex-government employee apparently to say the government knew and approved of its conduct.

Yet in the same breath AstraZeneca seeks to exclude documents in which the government charged AstraZeneca with AWP fraud and illegal spread marketing.[2]  Such charges completely contradict the notion of government approval.  To not allow such evidence would be prejudicial in light of AstraZeneca's defense.

Further, such evidence also counters AstraZeneca's argument that AWP could mean whatever it wanted it to mean.  The government did not think so.

**D.      The Guilty Pleas of Drs. Antoun, Hopkins and Berkman, and TAP, are Relevant**

The guilty pleas of the physicians who conspired with AstraZeneca to overbill for Zoladex are relevant and admissible for the reasons set forth above.  The admitted conduct of these physicians corroborates facts admitted in AstraZeneca's guilty plea, and constitutes additional evidence of the alleged wrongdoing in this case.  Because AstraZeneca cannot show that no Class members were treated by any of these doctors, their guilty pleas are relevant to the claims in this case.  (Indeed, by the doctors' pleas, they admit having treated their patients with Zoladex and have billed them for free samples of Zoladex.)  As for TAP, Plaintiffs will present evidence showing that TAP and AstraZeneca, who had competing products, were aware of each others' improper marketing practices, and in fact accused each other of misconduct similar to

---

[2] *See* Plaintiffs' Ex. 188 attached hereto as Ex. C.

that alleged herein, before agreeing not to disclose the others' wrongdoing to the regulatory authorities.  The fact that TAP ultimately pled guilty to the precise misconduct to which AstraZeneca pled guilty is probative of the fact that AstraZeneca conspired with not only physicians, but other pharmaceutical companies (including its main competitor), to engage in the scheme alleged in this case.  TAP's guilty plea will thus be useful to the jury in determining whether AstraZeneca's conduct was merely a mistake, as well as whether the federal government accepted and approved of pharmaceutical companies encouraging physicians to overbill for Medicare Part B drugs, among other things.

### III.  EVIDENCE OF THE GUILTY PLEA AND RELATED MATERIALS IS NOT UNFAIRLY PREJUDICIAL TO ASTRAZENECA

Admitting evidence of the guilty plea would not be unfairly prejudicial to AstraZeneca.  Although AstraZeneca devotes several pages of its brief quoting from opinions holding that evidence of prior criminal convictions in unrelated cases is not to be used in subsequent cases to attack a defendant's character before the jury, only one of these cases involved the issue of admissibility of a guilty plea in a related case.  *See Williams v. Drake*, 146 F.3d 44 (1st Cir. 1998).  In that case, the plaintiff, a prison inmate, brought a § 1983 claim against a prison guard for excessive use of force during an altercation.  The plaintiff had previously pled "guilty" to an administrative charge of inflicting bodily harm against another prison guard as part of the same altercation, but claimed that he had been confused and had not meant to do so.  *Id*. at 47.  The First Circuit upheld the trial court's exclusion of the plea in light of the plaintiff's explanation, as well as the procedural and substantive differences between the two proceedings.  The appellate court found it significant, however, that the trial court still allowed evidence of the administrative proceeding and all statements made by the plaintiff as part of that proceeding.  *Id*.

- 18 -

There is no reason to believe that AstraZeneca's guilty plea will inflame the jury against AstraZeneca.  This evidence may cause the jury to conclude that AstraZeneca's discounting extended to 100% in some cases, which is precisely what AstraZeneca admitted when it pled guilty to providing free samples "knowing and expecting" physicians to bill for them.  It may also cause the jury to conclude that the government was not aware, and did not consent, to AstraZeneca's unlawful conduct.  It may help the jury determine whether AstraZeneca's conduct was deceptive, unfair, or otherwise improper in violation of the consumer protection statutes at issue in this case.  The guilty plea, which sets forth the loss suffered by the government for AstraZeneca's criminal sampling conduct, may also help the jury adjudicate the commensurate loss to the Class.

In sum, while the evidence of AstraZeneca's guilty plea may be prejudicial to AstraZeneca's legal position, that is not the sort of "prejudice" which justifies excluding evidence under Rule 403.  Because AstraZeneca can point to no specific danger of *unfair* prejudice from the evidence of its guilty plea, the guilty plea and related documents are not rendered inadmissible by Rule 403.

### IV.    RULE 408 DOES NOT ACT AS A BAR ON ASTRAZENECA'S CIVIL SETTLEMENT AGREEMENT AND CIA

The Civil Settlement Agreement and CIA are not rendered inadmissible by Rule 408.  First, the Civil Settlement Agreement (with the incorporated CIA) was expressly made part of the Plea Agreement, and the Plea Agreement is contingent upon AstraZeneca performing its obligations under the Civil Settlement Agreement.  Among other things, the payments made under the Civil Settlement Agreement were intended to, and do, replace the restitutional payments that AstraZeneca would otherwise have been obligated to pay as part of the guilty plea.  Because restitution would have been part of AstraZeneca's sentence and therefore admissible as

part of the guilty plea, the mere fact that this compensation to the government is made as part of a civil settlement does not render the payments inadmissible.  Thus, it would be confusing and misleading to the jury to excise the Civil Settlement Agreement from the Plea Agreement.

Second, Rule 408 specifically provides that a settlement and/or its attendant negotiations can be used for impeachment purposes. *See Estate of Spinosa*, 621 F.2d 1154, 1158 (1st Cir. 1980); Fed. R. Evid. 408.  Accordingly, various portions of the Civil Settlement Agreement, including, for example, the iteration of misconduct alleged by the government, can be used to impeach any AstraZeneca witness who contends that the federal government knew about, agreed with, or approved AstraZeneca's conduct.  Similarly, any witness who contends for example that the government approved the reporting of pricing information without accounting for discounts, can be impeached with the CIA, which specifically requires AstraZeneca to report discounts.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that AstraZeneca's motion *in limine* to exclude evidence of guilty pleas and related documents be denied in its entirety.


DATED:  April 6, 2007

By____/s/ **Steve W. Berman**_____
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

001534-16  163201 V1

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth A. Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

001534-16  163201 V1

Donald E. Haviland, Jr.
The Haviland Law Firm, LLC
740 S. Third Street
Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  163201 V1

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>

Docket No. MDL 1456


I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on April 6, 2007, I caused copies of **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO ASTRAZENECA PHARMACEUTICALS LP'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO GUILTY PLEAS, CIVIL SETTLEMENT AND SAMPLING ACTIVITY** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis file & serve.


 /s/ Steve W. Berman_____
Steve W. Berman

001534-16 163201 V1