UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) Civil Action No. 01-12257-PBS ) |
| **THIS DOCUMENT RELATES TO:** | ) Hon. Patti B. Saris ) |
| *United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.*, CIVIL ACTION NO. 06–CV-11337-PBS | ) Magistrate Judge Marianne B. Bowler ) ) ) ) |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS
SECOND MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS
FROM ABBOTT LABORATORIES**

The United States of America, through its undersigned counsel, respectfully files this Second Motion to Compel the Production of Documents from Abbott Laboratories, Inc. ("Abbott").[1]  Relator, Ven-A-Care, consents to and joins the filing of this Motion.

**I.   STATEMENT OF FACTS**

   **A.   Background**

This case is brought by the United States against Abbott under the civil False Claims Act ("FCA") and the common law, for Abbott's allegedly fraudulent scheme at the expense of Medicare and Medicaid, federal programs which provide for the health care needs of the poor, the elderly and the disabled.  As part of its scheme, from at least 1991 to 2001, Abbott reported

---

[1] The United States filed its First Motion to Compel Abbott to produce documents on January 9, 2007.  *See* United States' Motion to Compel Abbott to Produce All Discovery Required by CMOs 5 and 10.  (Dkt. No. 3529).  That motion is still pending, and Judge Saris has established a procedure to resolve the dispute, which relates directly to a specific document request (#2) from the United States' First Request For Production of Documents.  *See* CMO 29, ¶ 7 (Dkt. No. 3956) entered on March 23, 2007.

inflated prices to pricing compendia for certain drugs (dextrose solutions, sodium chloride solutions, sterile water, and Vancomycin products) knowing that Medicare and Medicaid relied upon the reported prices to set reimbursement rates for those drugs. Abbott reported inflated prices and marketed the spread on these drugs to its customers to increase sales of the drugs, thereby boosting Abbott's profits. Under the FCA, if it is established that Abbott has submitted or caused others to submit false or fraudulent claims to the United States, the United States can recover treble damages and penalties for each false or fraudulent claim submitted. 31 U.S.C. §§ 3729-3733.

The Court has ordered that discovery be completed by December 31, 2007. Abbott provided its initial Rule 26(a)(1) disclosures on or about August 9, 2006. Fed. R. Civ. P. 26(a)(1). Abbott's initial disclosures to the United States were cherry-picked from among its earlier document productions to other plaintiffs in average wholesale price ("AWP") litigation. The initial disclosures omitted many relevant documents produced in those other AWP cases.

On July 19, 2006 and November 17, 2006, respectively, the United States served its first two sets of document requests on Abbott. Abbott has refused to produce entire categories of documents responsive to those requests arguing that they are irrelevant and that it would be burdensome to produce the documents. Indeed, in the eight and a half months since the United States served its First Request For Production, Abbott has produced only around 2,000 pages of documents beyond its incomplete initial disclosures.

The United States asks this Court to compel Abbott to produce the following categories of relevant documents:

    (1) <u>Average Manufacturer's Price ("AMP") data</u>: Abbott claims that the AMPs

reported to the United States for Medicaid Rebate Program purposes accurately reflect the actual acquisition cost of its drugs.  *See* Abbott's Motion to Dismiss at 12.  The United States seeks the data underlying these AMPs to verify this claim.  Abbott refuses to provide the underlying data.

(2) <u>Alternate Site sales force compensation and employment review documents</u>:  The majority of claims at issue in this case arise from the sales and marketing efforts of the Alternate Site business unit of Abbott' Hospital Products Division ("Alternate Site").  The Alternate Site sales personnel marketed Abbott's drugs to non-hospital customers (*e.g.*, long-term care facilities, nursing homes and home infusion therapy companies) that were reimbursed by Medicaid and Medicare for the pharmaceuticals at issue in this case.  The United States seeks sales compensation and evaluation documents to determine whether Alternate Site's sales force was incentivized to or rewarded for marketing the spread on Abbott's drugs.  Abbott refuses to produce such documents.

(3) <u>Documents reflecting the impact of the TAP Pharmaceuticals settlement of spread marketing allegations on Abbott's drug pricing policies and conduct</u>:  TAP Pharmaceuticals is a joint venture between Abbott and Takeda Pharmaceutical Company Limited.  In 2001, TAP Pharmaceuticals paid $875 million as part of a criminal plea and civil settlement of various allegations, including allegations of illegal marketing of the spread. The same year the TAP claims were being resolved, Abbott began reporting lower prices for the drugs at issue in the United States' Complaint to the pricing compendia relied upon by Medicare and Medicaid to set reimbursement amounts.  The United States seeks documents discussing or reflecting the impact of the TAP investigation, settlement and plea on Abbott's pricing policies and conduct.  Abbott claims that these documents sought by the United States are not relevant and refuses to produce them.

(4) <u>Vancomycin documents</u>:  Abbott will not search for documents related to the sales and marketing of Vancomycin prepared or generated before January 1, 1991.  Vancomycin is a key drug in the United States' Complaint.  Abbott's generic version of the drug went on the market in August 1988.  The United States wants all documents related to the sales and marketing of Vancomycin, including documents (such as marketing plans) pre-dating the launch of Abbott's Vancomycin in 1988.  Abbott claims it produced some Vancomycin documents in response to an investigative document demand issued by the United States in 1996.  It will not verify that it produced all Vancomycin documents going back to the drug's launch in response to that demand 11 years ago and refuses to conduct further searches.

(5) <u>Alternate Site customers' documents</u>:  Abbott is willing only to produce documents relating to 80 percent of Alternate Site's customers.  This is a case

3

about a nationwide sales and marketing scheme based on Abbott's fraudulent price reporting. The United States seeks and is entitled to documents covering sales and marketing efforts to all Abbott Alternate Site customers. These customers constituted a discrete customer base. According to Abbott itself, all Alternate Site customers make up, at most, 3 percent of Abbott's total customer base (600 out of upwards of 19,000 total individual customers). Abbott has not established that it would be burdensome to produce these documents.

### B. Meet and Confer Efforts

On July 19, 2006, the United States served its First Request For Production of Documents. United States' First Request For Production at 11-12. Ex. 1. On Dec. 11, 2006, Abbott served its responses to the United States' First Request For Production. Ex. 2. In its response, Abbott asserted a number of general and broad based objections. The United States and Abbott held telephonic conferences to narrow and discuss these document requests on December 15, 18, and 19, 2006. Ex. 5-1. On Dec. 22, 2006, the United States sent a letter to Abbott counsel confirming Abbott's representation that it would begin producing additional documents, on a rolling basis, in January, and that Abbott would produce a privilege log to the United States in early January. Ex. 5-6.

On November 17, 2006, the United States served its Second Request For Production of Documents. Ex. 3. On January 5, 2007, Abbott served its responses, asserting the same general objections. Ex. 4. The United States and Abbott again engaged in telephonic meet and confer sessions to narrow and discuss the United States' Second Request For Production. The United States sent follow-up correspondence on January 19, January 24, February 1, March 7, March 28 and April 3, 2007, to clarify its specific requests for certain categories of documents, some of which are sought in this motion. Ex. 5-7-20, 5-25-27, 5-38-41, 5-47-50. The United States has repeatedly reminded Abbott of its outstanding requests. *See* Ex. 5-28-33 (e-mail reminders dated

March 9, March 12, March 19, and March 23, 2007). Notwithstanding the promises in its correspondence (Exs. 5-20-24, 5-34-37, 5-44-46 ), Abbott has virtually ignored the United States' document requests. To this date, the United States has not received a privilege log from Abbott, and Abbott has produced no more than approximately 2,000 pages in response to the United States' First and Second Requests For Production.

Abbott has claimed repeatedly in its reply correspondence that its production is substantially completed, and that its initial disclosures – made *prior to receiving any document request from the United States* – complete its discovery obligations in this case. *See e.g.*, Ex. 5-44-46 ("Abbott has made substantial progress in completing its document production, and has produced the majority of relevant, responsive documents."). This claim is spurious given the absence of any privilege log from Abbott, and the fact that entire categories of documents are intentionally being withheld by Abbott on the basis of "relevance" objections.

In short, Abbott has refused to produce entire categories of documents that are clearly responsive to the United States' document requests, and relevant to this case. In doing so, Abbott has flouted its discovery obligations. Abbott's conduct seriously jeopardizes the parties' ability to meet this Court's discovery deadlines, and prejudices the United States' ability to prepare its case for trial. Abbott's stated grounds for objecting to the production of these categories of documents are relevance and burdensomeness. The documents sought in this motion are plainly relevant. Moreover, Abbott's relevance objections are especially premature given that Abbott has not yet answered the Complaint.[1] Further, Abbott makes conclusory

---

[1] Because a motion to dismiss is pending, Abbott has not yet filed an answer to the Complaint.

5

allegations of burden, but has supplied no information to the United States or Relator that could be used to evaluate its claim that production of these materials is unduly burdensome. For these reasons, any claims that production would be unduly burdensome should be overruled, and Abbott should be required to produce these specific categories of relevant materials.[2]

## II.     ARGUMENT

The United States seeks to compel Abbott to produce five very specific categories of relevant documents: (1) AMP data; (2) Alternate Site sales force compensation and employment review documents; (3) TAP settlement impact documents; (4) all responsive Vancomycin documents; and (5) all responsive Alternate Site customer documents.

Abbott's primary objections is that the documents sought are not relevant. Notwithstanding the fact that it is self-evident why these documents are relevant, these objections must fail under the broad definition of relevance for purposes of discovery. It is well settled that parties may obtain discovery regarding any matter, not privileged, which is "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1); *Matthews v. Allen*, 2006 WL 2228845 at *1 (D. Mass. 2006). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947); *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 227 (D. Mass. 2003) (quoting *Hickman*). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

---

[2]The United States and Abbott continue to meet and confer on numerous other categories of documents that Abbott has not produced to date. To the extent that a motion is necessary to compel other categories of documents, the United States will bring one when all efforts to resolve those issues are exhausted. Ex. 5-47.

without the evidence." Fed. R. Evid. 401. "As a general matter, relevancy must be broadly construed at the discovery stage, that is, information is discoverable if there is any possibility it might be relevant to the subject matter of the action . . . . 'Relevant information includes any matter that is or may become an issue in the litigation.'" *Whittingham v. Amherst College*, 164 F.R.D. 124, 126-27 (D. Mass. 1995) (internal citations omitted). Information is discoverable if it is reasonably calculated to lead to the discovery of admissible evidence.

The basis of many of Abbott's objections to producing documents is rooted in the incorrect claim that discovery must be limited to the precise parameters of the allegations of the complaint. *See e.g.,* Ex. 5-21-24, 5-35. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("[D]iscovery is not limited to issues raised by the pleadings . . . . Nor is discovery limited to the merits of a case. . . ."). Such limitations are especially inappropriate in this matter where Abbott has not yet filed an answer, and a specific need for the categories of documents has been shown.

Abbott's fallback objection is burdensomeness. Abbott has identified no undue burden to the narrow requests described below except in vague conclusory terms. *See e.g.,* Ex. 5-23, 5-36, 5-40. *See AAB Joint Venture v. United States*, 2007 WL 646158 at *11 (Ct. Fed. Cl. 2007) ("[A] mere statement that the interrogatory . . . is burdensome . . . has been held inadequate. Some court[s] have even required the objecting party to produce affidavits or offer other evidence to show the nature of the burden."); *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982) ("[T]he mere statement by a party that the interrogatory was . . . 'burdensome'. . . is not adequate to voice a successful objection to an interrogatory. On the contrary, the party resisting discovery 'must show specifically how . . . each question is overly broad, burdensome, or oppressive.'").

The party opposing discovery – Abbott in this instance – has the burden of demonstrating that the discovery is unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. *Alexander v. Federal Bureau of Investigation*, 194 F.R.D. 316, 325-26 (D. D.C. 2000) (the party objecting bears the burden of showing why relevant discovery should not be permitted); *Bennett v. La Pere*, 112 F.R.D. 136, 140 (D. R.I. 1986). Abbott has clearly not met its burden.

The United States has repeatedly asked Abbott for information supporting its burdensomeness objections. Abbott has never responded, nor offered any evidence that the United States' requests for the specific categories of documents sought by this motion are unduly burdensome. The United States attempted to obtain this same information at the recent deposition of Abbott's corporate designee on Abbott's document preservation and production efforts in this case. *See* Deposition of Ellen Klaus, Mar. 15, 2007, Ex. 9. However, Abbott's outside counsel repeatedly instructed Ms. Klaus not to respond to questions related to the burden associated with Abbott's document searches or production. Ex. 9 at 280-92, 372-79. Thus, the United States has never been in a position to evaluate Abbott's conclusory claims of burden.

For these reasons, the following categories of documents are relevant, responsive to the United States' requests, and not unduly burdensome for Abbott to produce.

### A.     Average Manufacturer's Price Data

The United States has requested that Abbott produce AMP data. Ex. 3 (Second Request For Production) ¶¶ 12, 19, 20-22, 26-27, 35-36, 42. A manufacturer's calculation of an AMP for each drug reimbursed by Medicaid is a requirement of the Medicaid Rebate Statute. 42 U.S.C. § 1396r-8(b)(3). This data is relevant for several reasons.

First, Abbott has asserted that because it reported AMPs to the Medicaid Bureau of the Centers for Medicare and Medicaid Services ("CMS"), the United States is somehow estopped from bringing its claims against Abbott. *See* Abbott's Memorandum of Law in Support of its Motion to Dismiss ("Mot. to Dismiss") at 12, filed in the Southern District of Miami on July 6, 2006. Specifically, Abbott contends that its reporting of the AMPs: (1) fully informed the CMS officials responsible for reimbursement of Abbott's inflated AWPs; (2) fully informed those officials that Abbott was inflating its AWPs for the express purpose of generating higher reimbursement for its customers; and (3) prove that those officials explicitly approved of Abbott's conduct. Mot. to Dismiss at 11-13.

Second, on July 12, 2006, Abbott served, and later withdrew, its First Set of Requests For Admission. Ex. 8 (Abbott's First Requests For Admission). Abbott specifically requested that the United States admit that "[t]he AMP information provided to HCFA/CMS by Abbott for [each Abbott drug alleged in the Complaint] during the Relevant Claim Period was accurate." Ex. 8 (Abbott's First Requests For Admission) ¶¶ 63-67. Therefore, Abbott has put at issue the accuracy of its AMPs reported to CMS. The United States could not conceivably admit or deny the accuracy of Abbott's AMP with respect to any drug without the underlying AMP data showing how Abbott calculated it. The United States is entitled to the information necessary to evaluate Abbott's AMP methodology and reporting practices.

Abbott objects on the grounds that documents relating to Abbott's calculations of AMP are overly broad, unduly burdensome, and have no relevance to the current litigation because the Government's claims do not relate to AMP. Ex. 4 (Abbott's Response to the United States' Second Request For Production) at 3. Abbott further argues that the fact that Abbott was

9

required by statute to report its AMP, and did so, alone is relevant to show the Government's knowledge regardless of the AMP figure itself or how it was calculated. Ex. 5-24 (Feb. 5, 2007 Letter to Renée Brooker).

Abbott's decision to withhold production of AMP data is puzzling and reflects many of the internal contradictions afflicting Abbott's objections and decisions to withhold relevant documents from the United States in this litigation. On the one hand, Abbott seeks to use its AMPs to support a defense and will probably seek to have the United States admit the accuracy of the AMPs. Yet, on the other hand, Abbott claims that the data underlying its AMPs (data that would allow the United States to verify Abbott's AMP claims) is irrelevant and producing it would be burdensome. Unfortunately, these contorted positions of Abbott, and its failure to produce evidence in this matter, requires the United States to seek relief from this Court.

**B.     Alternate Site Sales Force Compensation and Employment Review Documents**

The United States has requested that Abbott produce information relating to compensation and employment reviews of its Alternate Site sales personnel. Ex. 3 (Second Request For Production) ¶¶ 41, 43, 50-51. Such materials would inform the United States how Abbott evaluated and compensated Alternate Site sales personnel, and are therefore highly relevant to the inquiry of the means by which Abbott actively encouraged and rewarded its employees for effectively marketing the spread in order to encourage sales of the Subject Drugs. Such documents are relevant to the extent that they could demonstrate marketing incentives given to Abbott's sales force, whether spread marketing was compensated or encouraged, and whether any changes to practice or policy in marketing Abbott's drugs occurred. Ex. 5-15 (Jan.

24, 2007 Letter to Jason Winchester). In addition, these documents would allow the United States to examine the means by which employees were actually compensated by Abbott, Abbott's marketing incentives to employees, any recognition of the spread by management and any directives to employees on how to present the spread to customers.

Abbott objects to these requests on the basis that they are "overly broad and unduly burdensome to the extent they require Abbott to search the notes and files of numerous Abbott field sales force and employees." Ex. 4 (Abbott's Response to the United States' Second Request For Production) at 4. Abbott has indicated that it will provide general policy-only documents concerning compensation of work-force personnel. Ex. 5-26 (Mar. 7, 2007 Letter to Jason Winchester) at 2. General policies, however, may not indicate the actual incentives Abbott provided to its employees or the manner in which Abbott actually conducted evaluations of individual sales force members.

In addition, Abbott's mere statement that producing relevant personnel documents is unduly burdensome, without more, does not suffice to allow it to refuse to search for and produce those documents that may be responsive to the Government's requests, particularly where, as here, the United States agreed to limit document production to a certain category of personnel. Ex. 5-8 (Jan. 19, 2007 Letter to Jason Winchester). Further, where the United States is not requesting the entire file for the employees at issue, but rather, merely those documents within the file that reflect the "pay, incentives, and evaluations given to the sales force who sold the Abbott drugs at issue in the case," Abbott should not be permitted to withhold production on the basis of a vague burden objection. Ex. 5-10 (Jan. 19, 2007 Letter to Jason Winchester).

### C.     TAP Settlement Impact Documents

The United States requested "[a]ll documents relating to or otherwise regarding the impact of the 2001 TAP Pharmaceuticals criminal plea and civil settlement on the prices or pricing practices for [Abbott's] Pharmaceuticals." Ex. 3 (United States' Second Request For Production) ¶ 30. Abbott was a part of the TAP pharmaceuticals joint venture that paid $875 million as part of a criminal plea and civil settlement involving a variety of fraud claims, including allegations that TAP *marketed the spread* on Lupron, a cancer drug:

> The United States contends that TAP knowingly and willfully offered and paid illegal remuneration to physicians by marketing TAP's "Return-to-Practice" program to physicians to unlawfully induce orders to purchase the drug Lupron for treatment of prostate cancer, which drug TAP knew was largely paid for by the Medicare program. The United States further contends that TAP's Return-to-Practice program consisted of inflating the Average Wholesale Price ("AWP") used by Medicare and others for reimbursement of the drug Lupron, deeply discounting the price paid by physicians to TAP for the drug ("the discounted price"), and marketing the spread between the AWP and the discounted price to physicians as additional profit to be returned to the physician's practice from Medicare reimbursements for Lupron. The United States further contends that TAP concealed the discounted price from Medicare and governmental agencies by omitting material information in response to Medicare carriers' requests for information about physicians' actual cost, by falsely advising physicians that the discounted price could not and should not be reported to Medicare, and by auditing physicians to ensure the claims for payment were submitted at the inflated AWP rather than the discounted price paid by the physician.

Ex. 10 (Settlement Agreement Between the United States and TAP Pharmaceuticals) ¶ H(iii).[3]

Abbott asserts three general objections to producing the TAP documents. First, Abbott objects to the breadth and relevance of the information sought. Ex. 5-24 (Feb. 5, 2007 Letter to Renée Brooker). Abbott asserts that, because TAP has never been the subject of the current

---

[3] The same law firm representing Abbott in this matter also represented TAP Pharmaceuticals in that criminal plea and civil settlement.

litigation and because the TAP settlement involved the drug Lupron, which is not a Subject Drug in the current litigation, the documents are not relevant. Exhibit 5 (Feb. 5, 2007 Letter to Renée Brooker) 5-24.[4]  Second, Abbott objects to the production to the extent that it seeks information falling under the attorney-client privilege or work-product doctrine. Ex. 4 (Abbott's Response to the United States' Second Request For Production) at 23.  Third, Abbott objects that the information sought "is not in Abbott's care, custody, or control." *Id.*

Abbott's production objections fail for several reasons.  The TAP documents sought relate to the impact of the government investigations of TAP on Abbott Laboratories, Inc.'s (and/or any of Abbott's divisions) drug pricing policies.  It is a limited category of documents. Abbott lowered the reported prices for the drugs at issue in this case in 2001 (the same year as the TAP Pharmaceuticals settlement) which lowered the AWPs for those drugs.  Complaint ¶ 83. The relevance of the documents sought is self-evident.  The fact that TAP involved a different drug is meaningless; what is meaningful is that the TAP settlement involved a joint venture in which Abbott participated that was engaged in the same fraudulent conduct.  The same year those claims were being resolved, Abbott made a corporate decision to lower the reported prices for the drugs at issue in this case. *Id.*

In addition, there is no basis for withholding documents sought by the United States that have already been or are being produced to other plaintiffs in the MDL litigation, particularly where a court order explicitly makes the documents available to the plaintiffs.  Ex. 7 (Mar. 20, 2007 Letter to Lee Ann Russo and attached Arizona Superior Court Order) at 1-4.  The TAP documents sought are covered by protective orders from two state cases (*Walker v. TAP* (New

---

[4]*See also* Ex. 7 (Mar. 23, 2007 Letter to Donald A. Haviland, Jr.) at 5-6.

Jersey) and *Stetser v. TAP* (North Carolina)) and have been produced by TAP in other AWP cases that have been designated as "coordinated state court cases" with MDL 1456. Because these documents have already been produced to counterparts in the MDL litigation and have been ordered to be made available to the plaintiffs in MDL 1456 by an Arizona court, Abbott may not withhold documents sought by this Request. Ex. 7 (Mar. 20, 2007 Letter to Lee Ann Russo and attached Arizona Superior Court Order) at 1-4.

### D. Vancomycin Documents

The United States has requested that Abbott produce all information pertaining to its drug Vancomycin that are responsive to the United States' document requests. Ex. 3 (Second Request For Production) ¶¶ 15-34, 37-49, 52-62, 64-68. Abbott first introduced its generic drug Vancomycin in 1988. Complaint ¶ 69. The Complaint alleges that Abbott engaged in a "scheme to defraud the United States by causing inflated Vancomycin reimbursements" from approximately 1989 through 2001, during which time it reported increasingly higher prices for the drug while selling it at decreasing prices to its customers. *Id.* ¶¶ 69-70. Abbott fully controlled the drug's pricing to boost its sales at the expense of Medicare and Medicaid, as demonstrated in the pricing of Vancomycin 1GM FTV, for which the reported price, by 2001, was more than 18 times greater than the selling price. *Id.* ¶¶ 71-74. Abbott used this pricing scheme for Vancomycin in an effort to boost its market share, and continually reported higher prices for its products, despite decreasing the actual costs to its customers, in an effort to offer the expected inducement of higher price differentials to its customers. *Id.* ¶¶ 75-80. These prices impacted the amount that Medicaid and Medicare reimbursed for Vancomycin because state Medicare and Medicaid programs used the prices reported by Abbott as a baseline for their

reimbursement formula. *Id.* ¶¶ 81-82.  At one time, the difference between the reimbursement amount and the actual acquisition cost was more than 1,348 percent. *Id.* ¶ 82.

Abbott's pricing scheme continued until 2001, when a change was made to the reporting of AWP which resulted in a drop in reimbursement from $76.42 per unit in early 2001 to $6.06 per unit in 2002, thereby reducing the spread to Abbott's customers. *Id.* ¶¶ 83-85.  Internal memoranda reveal that Abbott knew of the large spread on Vancomycin and the importance of that spread to customers purchasing Vancomycin. *Id.* ¶ 87.

As one of the Subject Drugs in this litigation, documents relating to the production, sale, pricing, and marketing of Vancomycin are highly relevant.  Although the time period listed in the Complaint extends from 1991 to 2001, the introduction of Vancomycin in the market in 1988 makes it likely that relevant marketing-related documents exist that pre-date 1991.  Ex. 5-14 (Jan. 24, 2007 Letter to Jason Winchester).  The broad definition of relevance in the discovery context, as well as the absence of a limitation on discovery as being bound by the specific parameters of the allegations in a complaint, further support the United States' request for these documents.  *See Oppenheimer Fund, Inc.*, 437 U.S. at 351.  This position is further supported by the determination of this Court that December 31, 2003, is a reasonable cut-off date for discovery.  Ex. 6 *(*Transcript, Feb. 27, 2007 hearing) at 18-19, 31-32.

Abbott objects to searching for additional Vancomycin documents responsive to the United State's request on the grounds that the time period during which the United States kept the case under seal created an unreasonable burden on Abbott to search anew for documents pre-dating 1991.  Ex. 4 (Abbot's Response to the United States' Second Request For Production) ¶ 1.  To that extent, Abbott indicates that it will not conduct new searches for relevant documents that

15

pre-date 1991. Ex. 5-22 (Feb. 5, 2007 Letter to Renée Brooker). In addition, Abbott stands by its other objections in its response to the United States' requests, including that "the Government's requests are so boundless as to make a reasoned analysis nearly impossible." Ex. 5-35 (Mar. 23, 2007 Letter to Renée Brooker).

Abbott's objection, again, is one of mere relevance and undue burden. As one of the Subject Drugs of the litigation, marketing data is clearly relevant to the United States' position that Abbott marketed the spread on its drugs to its customers. In addition, Abbott, in its correspondence, fails to provide any support for its vague assertions that searching for marketing-related documents for a specific drug for a three-year period would constitute an undue burden. *See Klein v. AIG Trading Group, Inc.*, 228 F.R.D. 418, 422 (D. Conn. 2005) ("[T]he objecting party must do more than 'simply intone [the] familiar litany that the [requests] are burdensome, oppressive, or overly broad.'") (internal citations omitted); *Josephs*, 677 F.2d at 992 ("[T]he mere statement by a party that the interrogatory was . . . 'burdensome'. . . is not adequate to voice a successful objection to an interrogatory. On the contrary, the party resisting discovery 'must show specifically how . . . each question is overly broad, burdensome, or oppressive.'").

It remains unclear whether Abbott has agreed to search for and produce all documents relating to the marketing, pricing and sale of Vancomycin without limitation, or on what basis Abbott is limiting its search for and production of these documents. For the United States to determine whether the basis of these objections is proper, it, at a minimum, needs to know specifically which documents relating to Vancomycin Abbott is withholding. The United States has tried in vain to get a clear answer for many months on what should be a straightforward issue from Abbott. Abbott's evasiveness and the limited discovery period in this case necessitates now

16

moving to compel production of these documents.

E.   **Alternate Site Customer Documents**

The United States has requested that Abbott produce information relating to customers of Abbott's Alternate Site business unit. Ex. 3 (Second Request For Production) ¶¶ 15-21, 40, 43-49, 52-54, 69-76. Purchasing information from Abbott's customer base is relevant to the extent that it would show the level of high-volume discounts given to Abbott's largest national customers and could be indicative of the extent to which a spread exists for those high-volume buyers as opposed to its low volume purchasers. Ex. 5-15 (Jan. 24, 2007 Letter to Jason Winchester). In addition, customer information from the bottom 20 percent of Abbott's Alternate Site customer base is further relevant because these small purchasers would presumably be the buyers who pay the highest prices for the Subject Drugs, and for whom the spread, therefore, would not likely be marketed. *Id*.

Abbott has stated that it will review and produce customer information documents of the approximately 100 to 150 "national account" customers representing approximately 80 percent of the volume of Abbott's sales. Ex. 5-22 (Feb. 5, 2007 Letter to Renée Brooker). Abbott has indicated that its total customer base is roughly 17,000 to 18,000 individual purchasers who participate in 5,400 group purchasing organizations (GPOs), and approximately 500 to 1,000 customers not affiliated with or purchasing through a GPO. Ex. 5-14 (Jan. 24, 2007 Letter to Jason Winchester). Abbott also indicated that the bottom 20 percent of its customers are comprised of approximately 450 purchasers, and other customers purchasing through approximately 100 other GPOs. *Id.* The 450 customers of whom the United States seeks discovery constitute approximately 2.3 percent of Abbott's total customer base (*i.e.*, the upwards

of 18,000 who purchase through GPOs and 1,000 that do not).

Abbott refuses to produce records concerning these bottom 20 percent on the grounds that these sales "are attributable to a group comprised of literally thousands of smaller accounts . . . [and] it would be a considerable burden to Abbott to search for and review documents for thousands of customers." Ex. 5-36 (Mar. 23, 2007 Letter to Renée Brooker). The United States seeks discovery of only the 450 Alternate Site customers; the United States does not seek discovery at this stage of the thousands of Abbott customers that might make up the company's entire customer base. Abbott has never meaningfully explained how the United States current, narrowed discovery request of Alternate Site customer documents is burdensome.

Abbott's burden objection must fail, not only because Abbott asserts it in vague terms, but also in light of the agreement by the United States that Abbott would provide the complete customer information documents only from its Alternate Site customers. Ex. 5-9 (Jan. 19, 2007 Letter to Jason Winchester). This limitation would greatly reduce the burden upon Abbott such that no undue burden in searching for and producing relevant customer information documents would exist.

## III.    CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court overrule Abbott's objections and order Abbott to produce the following five categories of documents within five business days from the entry of this Court's order: (1) AMP data; (2) Alternate Site sales force compensation and employment review documents; (3) TAP settlement impact documents; (4) all responsive Vancomycin documents; and (5) all responsive Alternate Site customer documents.

Respectfully submitted,

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3398
Fax: (617) 748-3272


R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St. Peter-Griffith
Special Assistant U.S. Attorneys
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL


/s/ Renée Brooker
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, DC  20044
Phone:  (202) 307-1088
Fax: (202) 307-3852


For the relator, Ven-A-Care of the Florida Keys, Inc.,

/s/ James J. Been
James J. Been
The Been Law Firm, P.A.
3350 S.W. 148th Avenue
Suite 110
Miramar, FL 33027
Tel:  (954) 874-1635
Fax: (954) 874-1705
Email: jbreen@breenlaw.com

Dated: April 9, 2007

## CERTIFICATION

The undersigned counsel certifies pursuant to LR 7.1(a)(2) that she and the Relator's counsel, James J. Breen, have conferred with counsel for the Defendant Abbott Laboratories, Inc. on the issues raised in this motion and have not been able to reach agreement.

Dated: April 9, 2007

/s/ Renée Brooker
Renée Brooker

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **United States' Second Motion to Compel Abbott to Produce Documents** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

/s/ Rebecca A. Ford

Dated: April 9, 2007