# EXHIBIT 8, PART 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

UNITED STATES OF AMERICA
<u>ex rel.</u>

    VEN-A-CARE OF THE FLORIDA
KEYS, INC., a Florida corporation, by
and through its principal officers and
directors, ZACHARY T. BENTLEY and
T. MARK JONES,

                    Plaintiff,

v.

ABBOTT LABORATORIES, INC. and
HOSPIRA, INC.,

                   Defendants.

Case No.: 06-CV-21303-ASG

Hon. Alan S. Gold

**ABBOTT LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR**
**ADMISSION TO PLAINTIFF UNITED STATES OF AMERICA**
<u>**AND RELATOR VEN-A-CARE OF THE FLORIDA KEYS, INC.**</u>

      Defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Rule 36 of the Federal Rules

of Civil Procedure, submits the following requests for admission to Plaintiff the United States of

America and Relator Ven-A-Care of the Florida Keys, Inc. to be answered under oath within 30

days after service.

      The Definitions and Instructions contained in Defendant Abbott Laboratories, Inc.'s First

Set of Requests for the Production of Documents and Tangible Things to Plaintiff United States

of America and Defendant Abbott Laboratories Inc.'s First Set of Requests for the Production of

Documents and Tangible Things to Relator Ven-A-Care of the Florida Keys, Inc. are hereby

incorporated by reference.

## REQUESTS FOR ADMISSION

1.      The term "Average Wholesale Price" or "AWP" is not defined in any federal statute or regulation.

2.      During the Relevant Claim Period, the term "Average Wholesale Price" or "AWP" was not defined in any state statute or regulation.

3.      During the entire Relevant Claim Period, no federal statute or regulation required Medicare Part B to provide payment to Providers based on or in any way using AWP.

4.      Before the effective date of the Balanced Budget Act of 1997, no federal statute or regulation required Medicare Part B to provide payment to Providers based on or in any way using AWP.

5.      After the effective date of the Balanced Budget Act of 1997, no federal statute or regulation required Medicare Part B to provide payment to Providers based on or in any way using AWP.

6.      After the effective date of the Balanced Budget Act of 1997, one or more federal statutes or regulations did require Medicare Part B to provide payment to Providers based on or using AWP.

7.      During the entire Relevant Claim Period, no federal statute or regulation required Medicaid to provide payment to Providers based on or in any way using AWP.

8.      During the entire Relevant Claim Period, no statute or regulation required Medicaid to provide payment to Providers based on or in any way using AWP.

9.      During the entire Relevant Claim Period, no federal statute or regulation prohibited Medicare Part B from providing payment to Providers at the amount that Providers paid to acquire drugs.

10.     During the entire Relevant Claim Period, the U.S. Government had authority to seek information from Providers about their acquisition costs for the Subject Drugs.

11.     During the entire Relevant Claim Period, Medicare Part B could have required Providers to indicate their actual acquisition cost for drugs on the claim forms submitted for payment.

12.     During the entire Relevant Claim Period, Providers could have provided their actual acquisition cost for drugs on the claim forms submitted for payment under Medicare Part B.

13.     During the entire Relevant Claim Period, Medicaid could have required Providers to indicate their actual acquisition cost for drugs on the claim forms submitted for payment.

14.     During the entire Relevant Claim Period, Providers could have provided their actual acquisition cost for drugs on the claim forms submitted for payment under Medicaid.

15.     During the Relevant Claim Period, Medicare Part B could have paid for drugs at an EAC that was not based upon or in any way related to AWP.

16.     During the Relevant Claim Period, State Medicaid Programs could have paid for drugs at an EAC that was not based upon or in any way related to AWP.

17.     During the Relevant Claim Period, Medicare Part B could have paid for drugs at an EAC determined by surveys or studies of Provider acquisition costs.

18.     During the Relevant Claim Period, State Medicaid Programs could have paid for drugs at an EAC determined by surveys or studies of Provider acquisition costs.

19.     During the Relevant Claim Period, State Medicaid Programs were encouraged by HCFA/CMS to base payment for drugs at an EAC determined by surveys or studies of Provider acquisition costs.

20.     During the entire Relevant Claim Period, no federal statute or regulation prevented Providers from seeking payment from Medicare Part B at the price they paid to acquire drugs.

21.     During the entire Relevant Claim Period, no federal statute or regulation prevented Providers from seeking payment from Medicaid at the price they paid to acquire drugs.

22.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug knowing it would be paid at an amount that exceeded its acquisition cost submitted a false claim under the False Claim Act.

23.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug knowing it would be paid at an amount that exceeded its acquisition cost did not submit a false claim under the False Claim Act.

24.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug when it knew its acquisition cost for the drug was "far lower" (*see* Complaint, ¶ 3) than the AWP then published for the drug submitted a false claim under the False Claim Act.

25.   It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug when it knew its acquisition cost for the drug was "far lower" (*see* Complaint, ¶ 3) than the AWP then published for the drug did not submit a false claim under the False Claim Act.

26.   It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug when it knew its acquisition cost for the drug was "far lower" (*see* Complaint, ¶ 3) than the AWP then published for the drug, and did not return the difference to the Medicare or Medicaid program, submitted a false claim under the False Claim Act.

27.   For at least some of the false claims Plaintiff alleges Abbott caused to be filed, it is Plaintiff's position that the Provider who filed the claim submitted a false claim under the False Claims Act.

28.   For all of the false claims Plaintiff alleges Abbott caused to be filed, it is Plaintiff's position that the Provider who filed the claim submitted a false claim under the False Claims Act.

29.   During the Relevant Claim Period, no federal statute or regulation provided that Abbott or other Manufacturers must report prices for drugs.

30.   During the Relevant Claim Period, no federal statute or regulation defined the prices that Abbott or other Manufacturers must report to Publishers.

31.   During the Relevant Claim Period, no federal statute or regulation defined the prices that Abbott or other Manufacturers reported to Publishers.

32.   During the Relevant Claim Period, no federal statute or regulation regulated the prices that Abbott or other Manufacturers reported to Publishers.

33.   During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to disclose their average sales prices to Publishers.

34.   During the entire Relevant Claim Period, HCFA/CMS was aware that the term "Average Wholesale Price" or "AWP" referred to figures reported by Publishers.

35.   During the entire Relevant Claim Period, Ven-A-Care was aware that the term "Average Wholesale Price" or "AWP" referred to figures reported by Publishers.

36.   During the entire Relevant Claim Period, HCFA/CMS was aware that AWP generally did not reflect discounts, rebates, and chargebacks associated with the sale of drugs by Manufacturers to wholesalers, distributors, and at least some Providers. (Throughout these

requests, the word "generally" should be construed as it is used in paragraphs 35 and 50 of the Complaint.)

37.     During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all discounts available to certain wholesalers, distributors, or purchasers of drugs.

38.     During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all rebates available to certain wholesalers, distributors, or purchasers of drugs.

39.     During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all chargebacks available to certain wholesalers, distributors, or purchasers of drugs.

40.     During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all discounts, rebates, and/or chargebacks available to certain wholesalers, distributors, or purchasers of drugs.

41.     During the Relevant Claim Period, no federal statute or regulation prohibited Abbott or other Manufacturers from offering discounts, rebates, and or chargebacks to wholesalers, distributors, or purchases of drugs.

42.     During the Relevant Claim Period, Medicare Part B reimbursed for one or more units of a Subject Drug based on or in reference to the Provider's cost to acquire that drug.

43.     During the Relevant Claim Period, at least one State Medicaid Program reimbursed for one or more units of a Subject Drug based on or in reference to the Provider's cost to acquire that drug.

44.     During the Relevant Claim Period, Medicare Part B reimbursed for one or more units of a Subject Drug based on or in reference to the Provider's Usual and Customary Charges.

45.     During the Relevant Claim Period, Medicaid reimbursed one or more units of a Subject Drug based on or in reference to the Provider's Usual and Customary Charges.

46.     During the Relevant Claim Period, the U.S. Government purchased one or more units of each of the Subject Drugs based on an amount arrived at through negotiations with Abbott.

47.     Throughout the Relevant Claim Period, the U.S. Government purchased Vancomycin from Abbott at a price at least ten times less than the AWP then published by First DataBank.

48.     By at least the end of 1994, the U.S. Government had purchased Vancomycin from Abbott at a price at least ten times less than the AWP then published by First DataBank.

49.     Throughout the Relevant Claim Period, the U.S. Government purchased sodium chloride from Abbott at a price at least ten times less than the AWP then published by First DataBank.

50.     By at least the end of the 1994, the U.S. Government had purchased sodium chloride from Abbott at a price at least ten times less than the AWP then published by First DataBank.

51.     Throughout the Relevant Claim Period, the U.S. Government purchased dextrose in water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

52.     By at least the end of the 1994, the U.S. Government had purchased dextrose in water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

53.     Throughout the Relevant Claim Period, the U.S. Government purchased sterile water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

54.     By at least the end of 1994, the U.S. Government had purchased sterile water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

55.     During the Relevant Claim Period, Plaintiff is unaware of any evidence that Abbott submitted an AWP to any Publisher for any of the Subject Drugs.

56.     During the Relevant Claim Period, Ven-A-Care is unaware of any evidence that Abbott submitted an AWP to any Publisher for any of the Subject Drugs.

57.     During the Relevant Claim Period, neither HCFA nor CMS relied on any statement made directly to it by Abbott in setting payment rates or methodologies under Medicare Part B for any of the Subject Drugs.

58.     During the Relevant Claim Period, no Medicare Carrier relied on any statement made directly to that Medicare Carrier by Abbott in providing payment or setting payment rates or methodologies under Medicare Part B for any of the Subject Drugs.

59.     During the Relevant Claim Period, no Medicaid Intermediary relied on any statement made directly to that Medicaid Intermediary by Abbott in providing payment or setting payment rates or methodologies under Medicaid for any of the Subject Drugs.

60.    Before filing the Complaint, Plaintiff did not seek information from wholesalers or distributors about the price(s) that Providers paid for any of the Subject Drugs.

61.    During the entire Relevant Claim Period, in connection with the Medicaid Drug Rebate Program, HCFA/CMS received data from Abbott that set forth AMPs for all of the Subject Drugs.

62.    During some part of Relevant Claim Period, in connection with the Medicaid Drug Rebate Program, HCFA/CMS received data from Abbott that set forth AMPs for all of the Subject Drugs.

63.    The AMP information provided to HCFA/CMS by Abbott for each of the Subject Drugs during the Relevant Claim Period was accurate.

64.    The AMP information provided to HCFA/CMS by Abbott for Abbott Vancomycin during the Relevant Claim Period was accurate.

65.    The AMP information provided to HCFA/CMS by Abbott for Abbott sodium chloride during the Relevant Claim Period was accurate.

66.    The AMP information provided to HCFA/CMS by Abbott for Abbott sterile water during the Relevant Claim Period was accurate.

67.    The AMP information provided to HCFA/CMS by Abbott for Abbott dextrose in water during the Relevant Claim Period was accurate.

68.    Neither Plaintiff nor the Relator contend that AMP information provided to HCFA/CMS by Abbott for any of the Subject Drugs during the Relevant Claim Period was inaccurate.

69.    Plaintiff contends in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid by all wholesalers for that drug.

70.    Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid by all wholesalers for that drug.

71.    Plaintiff contends in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices charged by all wholesalers for that drug.

72.    Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices charged by all wholesalers for that drug.

73.     Plaintiff contends in this litigation that the published AWP for a Subject Drugs should have reflected the average of all prices paid by all Providers for that drug.

74.     Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid by all Providers for that drug.

75.     Plaintiff contends in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid to Abbott for that drug.

76.     Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid to Abbott for that drug.

77.     The Subject Drugs are multiple source drugs.

78.     The HCPCS code for a multiple source drug does not identify the Manufacturer of such drug.

79.     The HCPCS code for Vancomycin did not identify the Manufacturer of the drug.

80.     The HCPCS codes for the sodium chloride solutions at issue in this litigation did not identify the Manufacturer of the solutions.

81.     The HCPCS codes for the sterile water at issue in this litigation did not identify the Manufacturer of the sterile water.

82.     The HCPCS codes for the dextrose in water solutions at issue in this litigation did not identify the Manufacturer of the solutions.

83.     The J Code for a multiple source drug does not identify the Manufacturer of such drug.

84.     The J code for Vancomycin did not identify the Manufacturer of the drug.

85.     The J codes for the sodium chloride solutions at issue in this litigation did not identify the Manufacturer of the solutions.

86.     The J codes for the sterile water at issue in this litigation did not identify the Manufacturer of the sterile water.

87.     The J codes for the dextrose in water solutions at issue in this litigation did not identify the Manufacturer of the solutions.

88. During the Relevant Claim Period, Medicare Part B generally used the HCPCS to reimburse for drugs.

89. During the Relevant Claim Period, Medicare Carriers generally reimbursed for drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

90. During the Relevant Claim Period, Medicare Carriers generally reimbursed for the Subject Drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

91. During the Relevant Claim Period, Medicaid Intermediaries generally reimbursed for physician-administered drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

92. During the Relevant Claim Period, Medicaid Intermediaries generally reimbursed for the Subject Drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

93. During the Relevant Claim Period, Medicaid Intermediaries generally did not reimburse for physician-administered drugs by NDC.

94. During the Relevant Claim Period, Medicaid Intermediaries generally did not reimburse for the Subject Drugs by NDC.

95. Plaintiff is seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicare by Providers contained a HCPCS Code or J Code but did not contain an NDC.

96. Plaintiff is not seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicare by Providers contained a HCPCS Code or J Code but did not contain an NDC.

97. Plaintiff is seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicaid by Providers contained a HCPCS Code or J Code but did not contain an NDC.

98. Plaintiff is not seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicaid by Providers contained a HCPCS Code or J Code but did not contain an NDC.

99. During the Relevant Claim Period, for purchases of drugs made pursuant to Section 340 of the federal Public Health Act, 340B Providers were required to submit their actual acquisition cost of a drug to Medicaid when seeking reimbursement of such drug.

100.     During the Relevant Claim Period, for purchases of drugs made pursuant to Section 340 of the federal Public Health Act, 340B Providers submitted their actual acquisition cost of a drug to Medicaid when seeking reimbursement of such drug.

101.     During the Relevant Claim Period, State Medicaid Programs were aware of the actual acquisition cost of drugs to 340B Providers.

102.     During the Relevant Claim Period, State Medicaid Programs were aware of the actual acquisition cost of the Subject Drugs to 340B Providers.

103.     During the Relevant Claim Period, State Medicaid Programs were aware that the actual acquisition cost of drugs to 340B Providers was less than the published AWP for those drugs.

104.     During the Relevant Claim Period, State Medicaid Programs were aware that the actual acquisition cost of the Subject Drugs to 340B Providers was less than the published AWP for those drugs.

105.     During the Relevant Claim Period, HCFA/CMS could have been aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs.

106.     During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs.

107.     During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs.

108.     During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin.

109.     During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin.

110.     During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride.

111.     During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride.

112.     During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water.

113.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water.

114.    During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water.

115.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water.

116.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs with the amount paid by Medicare Part B.

117.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs with the amount paid by Medicaid.

118.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin with the amount paid by Medicare Part B.

119.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin with the amount paid by Medicaid.

120.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride with the amount paid by Medicare Part B.

121.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride with the amount paid by Medicaid.

122.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water with the amount paid by Medicare Part B.

123.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water with the amount paid by Medicaid.

124.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water with the amount paid by Medicare Part B.

125.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water with the amount paid by Medicaid.

126.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for at least some drugs did not represent the average drug acquisition costs paid by Providers.

127.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for at least some drugs exceeded the average drug acquisition costs paid by Providers.

128.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for the Subject Drugs did not represent the average drug acquisition costs paid by the Customers (*see* Complaint, ¶ 3) who submitted the claims Plaintiff alleges were false.

129.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for the Subject Drugs exceeded the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

130.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott Vancomycin did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

131.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott Vancomycin exceeded the average acquisition cost paid by the Customers who submitted the claims Plaintiff alleges were false.

132.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott Vancomycin exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

133.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott sodium chloride did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

134.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sodium chloride exceeded the average acquisition cost paid by the Customers who submitted the claims Plaintiff alleges were false.

135.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sodium chloride exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

136.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott sterile water did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

137.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sterile water exceeded the average acquisition cost paid by the Customers who submitted the claims Plaintiff alleges were false.

138.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sterile water exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

139.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott dextrose in water did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

140.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott dextrose in water exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

141.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott dextrose in water exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

142.    During at least some part of the Relevant Claim Period, HCFA/CMS was aware that a reimbursement methodology based upon AWP could lead Manufacturers to market the "spread" between the acquisition costs paid by Providers and reimbursement under Medicare Part B or Medicaid.

143.    A Medicare Carrier may consult a variety of industry publications and other sources for the AWP for both single and multi-source drugs.

144.    During the Relevant Time Period, different Medicare Carriers calculated different median AWPs for the same drug at the same time.

145.    Abbott did not receive a kickback, as that term is used in 42 U.S.C. s. 1320a-7b(b) and paragraphs 5 and 17 of the Complaint, in connection with the misconduct alleged in the Complaint.

146.    In an August 6, 1968 memorandum authored by Irwin Wolkstein, Assistant Director, Division of Policy and Standards, United States Department of Health, Education and Welfare, Mr. Wolkstein stated that the "Red book" is a "listing of prices of manufacturers which is often violated by volume and other discounts" and "would be subject to abuse by manufacturers setting prices high to advantage retailers." Attached at Tab 1 is a true and accurate copy of that memorandum. The memorandum was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the memorandum, and was made and kept in the course of regularly conducted business activity.

147.    In December 1968, a Task Force of the United States Department of Health, Education and Welfare published a background paper on payment for prescription drugs, which stated, among other things: "The Red Book and Blue Book do not reflect the actual manufacturers' prices to wholesalers and retailers, which are determined by the amounts of various kinds of discounts."

148.    Medicaid is jointly financed by the federal and state governments and is administered by the states. While the Medicaid program is voluntary, states which choose to participate must submit a state plan that fulfills requirements imposed by the Medicaid statute and other requirements imposed by the Secretary of the United States Department of Health and Human Services. State Medicaid plans must be approved by the Secretary of the United States Department of Health and Human Services. If approved, the state becomes entitled to reimbursement by the federal government for a portion of its payments to providers furnishing services to Medicaid recipients.

149.    In October of 1987, the state of Louisiana proposed an amendment to Louisiana's state Medicaid plan. The Louisiana amendment proposed to define the Estimated Acquisition Cost (EAC) for drugs as "the Average Wholesale Price of the drug dispensed, as reported by the American Druggist Blue Book or other national compendia of drug prices."

150.    In a letter dated December 11, 1987, the HCFA regional office processing the Louisiana amendment requested the Louisiana state Medicaid agency to "explain how you concluded that AWP is your best estimate of the price generally and currently paid by providers for drug products."

151.    On May 16, 1988, the HCFA Administrator informed the state of Louisiana that its October 1987 proposed state plan amendment was being disapproved for lack of compliance with federal regulations. The Administrator explained the basis for the disapproval as follows: "We believe there is a preponderance of evidence that demonstrates that AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not 'the price generally and currently paid by providers.' The continued use of AWP results in significant potential overpayments to pharmacy providers."

152.    The HCFA Administrator sustained HCFA's May 16, 1998 disapproval of Louisiana's October 1987 proposed amendment to its state plan after a reconsideration hearing.

The state of Louisiana appealed the decision to the United States Court of Appeals for the Fifth Circuit.

153.    Attached at Tab 2 is a true and correct copy of a brief filed on or about January 12, 1990 by the Department of Health and Human Services in the United States Court of Appeals for the Fifth Circuit in *The State of Louisiana v. The United States Department of Health and Human Services*, Case No. 89-4566 (5th Cir., July 13, 1990).  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the record, and was made and kept in the course of regularly conducted business activity.

154.    The United States Court of Appeals for the Fifth Circuit affirmed the decision of the HCFA Administrator that disapproved Louisiana's October 1987 proposed amendment to its state Medicaid plan.

155.    On August 24, 1990, the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit returned to the General Counsel for HHS the three volume record submitted to the Court in *The State of Louisiana v. The United States Department of Health and Human Services*, No. 89-4566 (5th Cir., July 13, 1990).

156.    In November 1974, HCFA issued a draft regulation calling for states to pay the lesser of a federally-set MAC or EAC plus a dispensing fee to Providers dispensing Medicaid-covered drugs.  39 Fed. Reg. 41,480 (Nov. 27, 1974).  In that draft regulation, HCFA expressly rejected AWP as the benchmark for reimbursement because AWPs "are frequently in excess of actual acquisition cost to the retail pharmacist."

157.    Commenting on the final regulation setting Medicaid reimbursement in July 1975, HCFA stated that "published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers."  40 Fed. Reg. 32,293 (July 31, 1975).

158.    As of August 15, 1975, the Secretary of HHS was aware that AWP data did not represent average acquisition costs of Providers.

159.    From 1975 through 1989, HCFA had a consistent policy to move states away from using published AWP as a basis for reimbursing providers for drugs under the Medicaid.

160.    In December 1977, HCFA issued a memorandum to state Medicaid agencies criticizing states' use of AWP as a reimbursement measure under Medicaid.  The memorandum stated, in part:  "The Department is not convinced that those states which continue to reimburse at [AWP] . . . have made a real effort to approach [actual acquisition cost]."  HCFA Action Transmittal 77-113 (MMB) (Dec. 13, 1977).

161.    As of December 1977, HHS was not convinced that states continuing to reimburse at AWP had made a real effort to approach Provider's actual acquisition costs for drugs reimbursed by Medicaid.

162.    An audit of six states conducted by HHS-OIG in 1983 found that Pharmacists' drug costs were, on average, about 16% below AWP, and that Providers paid AWP or higher in only 14 of 3,469 purchases (and on those occasions only for extenuating reasons).  Department of Health and Human Services, Departmental Appeals Board, Decision No. 1273 (Aug. 22, 1991).

163.    Prior to 1984, the Secretary of HHS lacked cumulative, well-documented evidence affirmatively demonstrating that AWP was in fact not an accurate measure of the prices generally paid by providers.

164.    After 1984, the Secretary of HHS was aware of a widening base of documented evidence demonstrating that AWP significantly overstated the Provider's acquisition costs.

165.    In or about 1984, HHS became convinced as a factual matter that there was a significant discrepancy between AWP and the actual purchase prices for drugs.

166.    In June 1984, HHS-OIG published a lengthy report of an audit of pharmacy drug purchases in six states, titled "Changes to the Medicaid Prescription Program Could Save Millions" (the "June 1984 HHS-OIG Audit Report").

167.    The June 1984 HHS-OIG Audit Report contained carefully documented evidence that average wholesale prices significantly overstated the prices that pharmacies actually paid for drugs.

168.    The June 1984 HHS-OIG Audit Report found that 99.6 percent of the 3,469 pharmacy purchases audited were made at prices averaging about 15.93 percent below AWP, as a result of purchase and trade discounts that were routinely available to purchasing pharmacies.

169.    In its June 1984 Report, the HHS-OIG recommended that HCFA revise the upper limit regulations applicable to Medicaid drug reimbursement to include a specific prohibition on use of AWP in establishing the EAC for those drugs.

170.    The June 1984 HHS-OIG Audit Report stated that "[w]ithin the pharmaceutical industry, AWP means undiscounted list price.  Pharmacies purchase drugs at prices that are discounted significantly below AWP or list price."  HCFA Medicaid Action Transmittal, No. 84-012 (Sept. 1984).

171.    The June 1984 HHS-OIG Report further advised state Medicaid agencies that "AWP cannot be the best—or even an adequate—estimate of the price providers generally pay for drugs.  AWP represents a list price and does not reflect several types of discounts."  HCFA Medicaid Action Transmittal, No. 84-012 (Sept. 1984).

172.    During the Relevant Claim Period, AWP was not an adequate estimate of the acquisition price paid for drugs by the Customers (*see* Complaint, ¶ 3) who submitted the claims Plaintiff alleges were false.

173.    During the Relevant Claim Period, AWP represented a list figure and did not reflect several types of discounts.

174.    In September 1984, HCFA sent the June 1984 HHS-OIG Audit Report to all state Medicaid agencies in order to make them aware of the potential savings that could result if states would make a greater effort to determine more closely the price pharmacists pay for drugs, rather than using AWP.

175.    In its Medicaid Action Transmittal dated September 1984 (No. 84-12), HCFA stated: "Excessive payments are being made nationwide for the ingredient cost of prescription drugs under the Medicaid program.  The purpose of this report is to alert Department management to the opportunity for significant reductions in program expenditures if actions are taken to stop the present widespread use of [AWP] in determining program reimbursement for prescription drugs."

176.    In or about 1984, staff in HCFA's Region VI Office (comprising Arkansas, Louisiana, New Mexico, Oklahoma, and Texas) conducted reviews of pharmacy purchasing prices in Louisiana, New Mexico, Oklahoma, and Texas that provided further evidence that AWP significantly overstated prices paid by providers.

177.    The HCFA Region VI Office convened a region-level working group, composed of HCFA regional office staff and staff from state Medicaid agencies, which met in November 1984 and January 1985 to examine the use of AWP as the EAC and to develop alternate methods that could be used in arriving at more accurate estimates.

178.    During a September 4, 1985 conference call, senior officials from HCFA's central office reminded the ten HCFA regional office administrators of HCFA's policy that "states were to be free to develop and adopt any method of drug pricing that resulted in a more accurate reflection of providers' costs since no specific methodology developed at the federal level was mandated."

179.    On September 17, 1985, officials from HCFA's central office sent a model letter to regional offices, for transmittal to states, which warned: "States that rest solely on AWPs can no longer do so and still claim that they are applying their best estimate to determining prescription drug costs as required by [the EAC regulation] unless they can provide other evidence that supports a contrary conclusion."

180.    HCFA Region IX stated in a 1986 survey report on Hawaii's Medicaid Program that HHS (then known as HEW) "believed that published [AWPs], which were being used as a

major pricing reference for reimbursement of prescription drugs in the Medicaid program, were not representative of the prices pharmacists paid for drugs."

181.    In its 1986 survey report on Hawaii's Medicaid program, HCFA stated that the survey demonstrated that "pharmacies generally purchase drugs at prices that are discounted significantly below AWP" and that "AWPs are not determined by surveying market transactions and thus do not accurately reflect prices pharmacists pay for drug products."

182.    In its 1986 survey report on Hawaii's Medicaid program, HCFA also stated that "[i]t is apparent from this review that AWP, which is the basis for the State's EAC, is not a reliable predictor of the prices pharmacists actually pay for drugs."

183.    In 1987, the Under Secretary at HHS explained to an officer of a major pharmaceutical association that AWP seldom represents true costs.

184.    In a speech given on Sept. 28, 1987 at the Symposium on the New Medicaid Regulations on Drug Reimbursement, Robert Helms, Ph.D., Assistant Secretary for Planning and Evaluation at HHS, stated, among other things, that a 1982 Task Force appointed by Secretary Schweiker identified the "clear unworkability of the MAC process," "arbitrary and unfair results," and the "artificiality" of "Red Book prices." Attached at Tab 3 (HHC902-1078 through HHC902-1089) is a true and accurate copy of Mr. Helms' remarks. It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the remarks, and was made and kept in the course of regularly conducted business activity.

185.    On April 6, 1988, HHS' position was that AWP was a figure that did not represent the price generally paid by providers.

186.    On April 26, 1988, HCFA's Region VI chief state operations officer, Don Hearn, in a letter to the Office the Director, Bureau of Eligibility, Reimbursement and Coverage, stated: "It has been repeatedly shown that AWP is an inflated figure and does not comply with [statutory requirements] that Medicaid payments be consistent with efficiency, economy, and quality of care. We also believe that use of the AWP cannot meet the definition of EAC found at CFR 447.301, i.e. the 'agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size most frequently purchased by providers.'" Attached at Tab 4 (HHC011-0861 through HHC001-0862) is a true and accurate copy of that letter. It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

187.    On or about May 16, 1988, the HCFA Administrator stated in a letter disapproving Louisiana's State Plan Amendment No. 87-33: "We believe there is a preponderance of evidence that demonstrates that AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not 'the price generally and

currently paid by providers.'  The continued use of AWP results in significant potential overpayments to pharmacy providers."

188.    As of May 16, 1988, the HCFA Administrator was aware that AWP significantly overstated the price pharmacy providers actually paid for drug products.

189.    As of May 16, 1988, the continued use of AWP as the basis for reimbursing providers under Medicaid resulted in significant overpayments to pharmacy providers.

190.    On August 12, 1988, HCFA's Regional Administrator, J.D. Sconce, informed U.S. Senator Dale Bumpers in a letter that "[t]here is a preponderance of evidence that demonstrates that the published AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not 'the price generally and currently paid by providers." Attached at Tab 5 (HCC011-2189 through HHC001-2190) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

191.    On September 22, 1988, HCFA's Program Analysis Officer, Peter Rodler, testified under oath as follows: "In early November 1983, the Secretary of [HHS] appointed a, I believe, four member task force to conduct public hearings to obtain comments from concerned individuals as to ways in which the current Medicaid drug regulations could improve.  It was a three day session in which I was present and the executive's secretary of the National Wholesale Druggist Association, which is the professional association of wholesalers that sell drugs nationwide, testified that AWP is like the sticker price on an automobile.  It is the very highest price that anyone would be expected to pay for the drug product.  I remember that statement very clearly.  Obviously I spent twelve years in reimbursement policy for the Medicaid program, and that statement has significant meaning."

192.    Also on September 22, 1988, HCFA's Region VI Medical Policy Specialist, Nancy Saltzman, testified under oath as follows: "I don't think anyone has ever disputed the fact – or to my knowledge that I've spoken with, has ever disputed the fact that discounts are there.  I think there is – some people believe that those discounts are not available under certain circumstances, such as you have to buy "X" number of dollars to receive those or you have to pay your bills on time or what have you.  There are various types of discounts, and we found that before and we found that again.  The OIG found the same thing.  But they're always there and I will not say always available, but if a provider meets the criteria – let me put it this way, there are things, discounts that we call routine discounts, and to us, that means those discounts are always available to the pharmacists.  They're trade discounts, as Mr. Rodler testified earlier.  The wholesalers do not consider AWP to be the price that is paid by pharmacists routinely to purchase drug products.  There are instances, we have been told, where a provider may actually pay AWP.  I have had one or two providers tell me they'll pay AWP if they have to go down the street and buy it from another provider, that product from another provider.  If they need it today or overnight and they can't get it from their primary wholesaler or manufacturer, whoever they buy it from, they may get it from a secondary source that they don't do business with all the time

or very much dollar business with, and they may be charged and pay the AWP. But again, I would say, guessing, probably ninety to ninety-five percent of the purchases are made at prices below the AWP, and that's confirmed by what the wholesalers tell us. Interviews with wholesalers, interview with pharmacists, in prior years, in current years."

193.    In July 1989, HCFA's Associate Regional Director for Region IX, Lawrence L. McDonough, stated as follows in a letter to the Deputy Director of California's Department of Health Services, John Rodriguez: "While we can understand that the term 'average wholesale price' connotes what pharmacies pay for drug products, in the pharmaceutical industry it is commonly understood to be higher than actual costs. There have been a number of studies which indicate that the published AWP overstates actual prices paid by as much as 10-25 percent because of discounts, premiums, special offers or incentives." Attached at Tab 6 (HHC016-0747 through HHC016-0748) is a true and accurate copy of that letter. It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

194.    HCFA's Acting Administrator, Loius B. Hays, testified before the Senate Special Committee on Aging in 1989 that "[w]hile the term 'average wholesale price' is suggestive of the amount that pharmacies actually pay for the drugs, it is in fact significantly higher than actual costs. The average wholesale price is somewhat comparable to the manufacturer's sticker price on a new car." Mr. Hays' prepared written statement adds: "this is rarely the price actually paid for the car."

195.    In 1989, the Senate Special Committee on Aging issued a report stating that AWP exceeds actual drug prices. Majority Staff Report, Special Committee of Aging, United States Senate, *"Prescription Drug Prices: Are We Getting Our Money's Worth?,"* S. Rep. 101-49 at 11 (1989).

196.    In its 1989 Report, the Senate Special Committee on Aging stated that the Department of Veteran's Affairs received an average discount of 41% off of AWP for single source drugs and an average of 67% off of AWP for multiple source sources, and that hospitals, HMOs, and nursing homes that contract with wholesalers achieve discounts up to 99% off AWP.

197.    On or around July 31, 1989, Senator David Pryor (D-Ark) made statements in the U.S. Senate about Medicare reimbursement for drugs. Among other things, Senator Pryor commented: "After all the charts and all the graphs and all the words, it comes down to this: for the same bottle of prescription drugs, different buyers pay dramatically different prices. For example, if we look at the price of the brand-name painkiller 'Motrin,' the published list price is $32. If the new Medicare prescription drug benefit were currently in place, Medicare would pay $29. Mr. President, the Veterans' Administration has been smart. They have gone and dealt with drug manufacturers. They say, 'We want a better price.' The bottom line is that the Veterans' Administration pays a price of $5 for a bottle of capsules of Motrin. Medicare pays $29 for the same bottle." 135 Cong. Rec. 9059 (daily ed. July 31, 1989) (statement of Sen. Pryor).