# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                            )
PHARMACEUTICAL INDUSTRY            ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE            ) MDL No. 1456
LITIGATION                         ) Pages 1 - 49


MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 27, 2007, 10:10 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   It's been fully briefed.

2           THE COURT:  Oh, well, I didn't know that.

3           MS. BROOKER:  Yes.

4           MR. DALY:  It's before Judge Magistrate Bowler,
5   your Honor.

6           THE COURT:  So why don't you just let her decide?
7   Why am I even ruling on it?

8           MR. BREEN:  Your Honor, without the suggestion you
9   made, I can't file the documents, and this is an important
10  point.  Let me just add -- can I ask one question to make
11  sure I -- can I serve the government with this motion and
12  including the sealed documents?

13          MR. DALY:  You know, it's hard for me to say in
14  terms of whatever it is that you're doing, Mr. Breen.  I
15  mean, our problem is this, Judge:  I mean, there are temporal
16  problems.  The government is only suing us up until 2001.
17  They cut off their complaint thereafter.  Mr. Breen in Texas
18  is suing us up to the present day.  Every hour that goes by
19  is part of Mr. Breen's suit there.

20          THE COURT:  Is this based on AWP?

21          MR. BREEN:  Yes, your Honor, the same case.

22          THE COURT:  Let me just say, in one of my many
23  other suits, I cut things off at 2003 because at that point
24  the Medicare Modernization Act came through, so that's where
25  I cut it off.  I don't know where the -- that strikes me as a

1  reasonable cutoff, at least for the time being. That's when
2  the ASP came into play and the whole world knew about
3  inflated AWPs, or at least anyone who was part of this world
4  knew probably by 2001, but certainly by the time Congress
5  passed the statute, right, everybody knew? So that would be
6  one compromise date, a couple of years after the ending of
7  your class. I mean, some of this should just be worked out.
8         MS. BROOKER: Judge, we have been trying to work
9  this out for three months, and let me just explain. Here's
10 the problem: The government, we are just standing still. We
11 are prevented from moving further. Here's what we cannot do.
12        THE COURT: What do you want me to do now? I
13 haven't read these motions to compel? I walked in here
14 thinking I was just going to set deadlines. You may be right
15 or wrong. I'm trying to cut through this, okay?
16        MS. BROOKER: Yes, your Honor. We're just asking
17 for, frankly, what all the CMOs have said, even your most
18 recent --
19        THE COURT: I can't rule off the bench. I haven't
20 even read my CMOs. I don't remember what the debate was. I
21 don't know. So I'm happy to rule. I can't do it right this
22 second, that's all. I think this compromise will get you
23 through a lot. And so I am suggesting that what -- you may
24 win. You may win. I haven't read anything. I don't know
25 about you; I don't know how you rule off the bench when you

1   the federal government without his approval.

2   THE COURT: Or you come back to me. That's why I
3   am here.

4   MR. BREEN: Judge, I understand fully.

5   THE COURT: And so you can come to me. Connolly
6   can come to me.

7   MR. BREEN: I understand.

8   THE COURT: You are in a great position because
9   you've seen it all, so you actually know what's out there
10  rather than some hypothetical thing. I've given you two
11  polar extremes: an individual contract with an individual
12  doctor over X, Y, Z which may show a charge-back or a rebate
13  or something. That seems too narrow and too specific.
14  Anything coming out of the sales and marketing team talking
15  about how you market stuff during the relevant time period
16  should be produced. And then the temporal scope should at
17  least be up to 2003 because that's when the MMA kicked in,
18  right? Is that right?

19  MR. DALY: Yes.

20  MR. BREEN: Correct. Well, that's when they passed
21  it.

22  THE COURT: Right, and then they do 85 percent of
23  AWP, and everybody in the world knew AWP did not reflect cost
24  at that point. That's actually not accurate, since I
25  actually saw some third-party payors here who still believed

1   it two years after the fact.  But any sophisticated market
2   player knew -- I'll added "sophisticated," and I put the
3   government in that category because they were part of it --
4   knew in 2003 there a was different situation.  And when did
5   you switch to ASP, 2004?
6           MR. BREEN:  It took about a year to get it up and
7   running.
8           THE COURT:  All right, so through 2003.  And when
9   do you claim that it starts?  1991 was when Medicare started
10  using AWP.
11          MR. BREEN:  No, Judge.  '91 was when they started
12  the regulations, but this is a Medicare/Medicaid case, number
13  one.
14          THE COURT:  So when did Medicaid start using it?
15          MR. BREEN:  Medicaid started using AWP back in the
16  late '70s and the '80s.  So that's one of the other issues
17  here, because Abbott has set another unilateral early point
18  on discovery, and we got a lot of the preparatory stuff.  You
19  know how this works.  I mean, you want to see the stuff that
20  they were --
21          THE COURT:  I mean, I don't know.  That's why I
22  don't know your complaint well enough.  So Medicare started
23  this regulation in '91, so I don't know about Medicaid.  I
24  know it started in the '60s in California somewhere, so --
25          MR. BREEN:  Before our damage period begins,