# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| *State of Nevada v. American Home Products, et al.*, CA No. 02-CV-12086-PBS (Nevada II), and | |
| *State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) | |

## MONTANA AND NEVADA'S JOINT OPPOSITION TO DEFENDANT ASTRAZENECA PHARMACEUTICALS LP'S MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

I.   MONTANA'S AND NEVADA'S SUPPLEMENTAL STATEMENT
     OF MATERIAL FACTS ................................................................3

     A.   The States Have Refined Their Claims for Damages ...............................3

     B.   Evidence on the Record of AZ's Deceptive and Unfair Conduct............................4

          1.   AZ knew that AWP was the reimbursement benchmark used
               by the Montana and Medicaid programs, among other payors...................4

          2.   AZ caused AWPs to be published for its Subject Drugs .............................4

          3.   AstraZeneca's AWPs for its Subject Drugs were false in that
               they did not include relevant discounts nor reflect an average,
               and AstraZeneca manipulated its AWPs and spreads.................................6

               a.   AstraZeneca knew that its AWP was a fictitious number...............6

               b.   AstraZeneca refrained from making AWP a meaningful
                    number ............................................................7

     C.   AZ Provided ASPs for Just One Subject Drug to Montana – and That
          Drug Is No Longer in the Case ..............................................8

II.  DISCUSSION ....................................................................11

     A.   AZ's Unfair and Deceptive Conduct Violated the States' Statutes ......................11

     B.   Evidence Shows That AZ Did Manipulate the Spread With Respect to
          Its Self-Administered Drugs ...............................................13

     C.   AZ's Reporting of ASPs to Montana Medicaid (If Any) Does Not
          Negate AZ's Deceptive and Unfair Practices .......................................15

     D.   Dr. Hartman's "Expectation Yardstick" Is Not A Factor In These Cases.............15

     E.   The Evidence Shows That the State Suffered Ascertainable Losses as
          a Result of AZ Conduct ...................................................17

III. CONCLUSION....................................................................17

001534-15 164771 V1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cambridge Plating Co. v. Napco, Inc.*,
  85 F.3d 752 (1st Cir. 1996)..................................................................................12

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
  460 F. Supp. 2d 277 (D ......................................................................................1

*Roeder v. Alpha Indus., Inc.*,
  814 F.2d 22 (1st Cir. 1987)............................................................................11, 12

*V.S.H. Realty, Inc. v. Texaco, Inc.*,
  757 F.2d 411 (1st Cir. 1985)...........................................................................11

## RULES/STATUTES

Mt. Admin. R. 37.86.1101 .................................................................................12

Nevada Medicaid Services Manual Ch. 1200................................................12

The States of Montana and Nevada ("States"), by their counsel, hereby respond to AstraZeneca Pharmaceuticals LP's ("AZ") motions for summary judgment in the Montana and Nevada cases.[1]  The States also adopt and incorporate the submissions made on behalf of each of them in opposition to the defendants' joint motions for summary judgment and their responses to each of the defendant's individual motions.

AstraZeneca asks the Court to single it out for particular treatment on summary judgment on these bases:  (i) its claim that "AstraZeneca did not have any incentive to increase pharmacy margins," AZ Mont. Mem. at 7; AZ Nev. Mem. at 7; (ii) its provision of ASP data to the State for "certain," but not all, drugs since November 2003, AZ Mont. Mem. at 8; (iii) its opinion that the spreads were "within the bounds of what would have been expected" by the States, AZ Mont. Mem. at 10; AZ Nev. Mem. at 9; and (iv) AZ's remittance of rebates to the states pursuant to federal statute.  AZ Mont. Mem. at 10-11; AZ Nev. Mem. at 9-10.  For these reasons, AZ says, its conduct was never unfair nor deceptive and never harmed Montana or Nevada; thus, the conduct could not have violated the statutes under which the States bring their claims.

AZ's fails to address the well-supported central allegations of the States' cases:  AZ reported average wholesale prices that were neither averages nor prices charged to any customer, knowing that the Montana and Nevada state Medicaid programs and other payors would rely on them as a basis for reimbursement and thus pay more than they should have out of the public coffers.  This Court previously held, in the MDL case, that "AWP means the average price at which wholesalers sell drugs to their customers, including wholesalers and pharmacies."  *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 278 (D. Mass.

---

[1] AZ submitted separate motions on virtually identical briefs, expert and lawyer declarations and L.R. 56.1 statements in the Montana and Nevada cases.  To preserve the time and resources of the Court and the parties, Montana and Nevada respond jointly to the motions and, where necessary, identify any differences by State.  The States respond separately to AZ's L.R. 56.1 Statements.

2006.[2]  Applying the same definition here, as the States submit is appropriate,[3] demonstrates the unfair and deceptive nature of AZ's Subject Drug prices.  Evidence shows that internally, AZ personnel referred to the AWP as a "misnomer"[4] and "an artificial number that doesn't give an accurate picture of the actual cost of these drugs "[5] and that the AWP was "supposed to represent the cost to the retailer."[6]  AZ knew that Medicaid programs and other payors naively relied on AWP as the basis for reimbursement.[7]  Still, AZ continued to cause the publication of AWPs exclusively.  Reporting prices that differed from the plain meaning of "average wholesale price" under the label AWP would mislead a reasonable payor.

AZ does not submit evidence to refute the States' position regarding the unfair and deceptive nature of AZ's conduct.  At a minimum, AZ's arguments raise numerous issues of material fact, detailed below.  AZ concedes a spread between acquisition costs and AZ provided AWPs used by the States as a basis for reimbursement – "the 'spread' for all of AstraZeneca's Medicaid-covered drugs was either 20 or 25 percent" during the relevant time period.[8]  The States submit additional evidence showing that AZ reported the ASP to Montana for just one Subject Drug – beginning years after this lawsuit was filed – and that it is not even clear whether the Montana Medicaid program received the information.  Together with the well-developed

---

[2] The State of Montana previously argued this point in its Motion for Partial Summary Judgment (Feb. 8, 2007) (Dkt. No. 3731).

[3] *See* State of Montana's Memorandum In Support of Motion for Partial Summary Judgment (Dkt. No. 3732) at 8-17.  Nevada adopts these arguments by reference.

[4] Declaration of Jeniphr Breckenridge In Support of The States of Nevada and Montana's Memoranda In Opposition To The Individual Defendants' Motions For Summary Judgment ("Breckenridge Decl."), Ex. 50 at AZ0565612.

[5] Breckenridge Decl., Ex. 51 at AZ0445640.

[6] *Id.*

[7] *See, e.g.*, Breckenridge Decl., Ex. 50 at AZ0565612.

[8] AZ Mont. Mem. at 10; AZ Nev. Mem. at 8-9.  The State disputes this range and counter-designates evidence that the spreads for some drugs were as high as 169.31%.  *See* Mont. Resp. to AZ L.R. 56.1 Stmt. at ¶ 5; Nev. Resp. to AZ L.R. 56.1 Stmt. at ¶ 7.

evidence of AZ's pricing practices on the record, this establishes AZ's unfair and deceptive conduct.

AZ additionally seeks judgment in its favor on Montana's Medicaid claims related to Zoladex because such claims are barred by a 2003 settlement agreement between AstraZeneca and the State. AZ Mont. Mem. at 16. Montana does not contest AZ's position on this issue and will not pursue its Zoladex-related claims in Montana.

## I.  MONTANA'S AND NEVADA'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS

### A.  The States Have Refined Their Claims for Damages

The claims and the scope of the lawsuits have been refined since their initial filing. At this juncture, the States pursue monetary damages on behalf of the State Medicaid programs only and only for the damages and penalties calculated by Ray Hartman, Ph.D, the States' expert, and set forth in his Declarations. Breckenridge Decl., Exs. 1-4. The damages the States claim constitute penalties for violations of Montana and Nevada state statutes.[9] *Id*. These are the only damages the States now claim. AZ and its co-defendants have had this information since June 2006, when Dr. Hartman's declarations were submitted. AZ and its co-defendants had the opportunity to examine Dr. Hartman on his calculations, the States' damages and other related issues at his deposition in the Montana and Nevada state cases in August 2006.

___

[9] Dr. Hartman has calculated defendant-specific overcharges or restitution damages only for certain defendants because of the States' inability to obtain data from other drug manufacturers. *See* Hartman Mont. Decl. (June 13, 2006), Breckenridge Decl., Ex. 1, Tables 1-2; Hartman Nev. Decl. (June 13, 2006) Breckenridge Decl., Ex. 3, Table 1; Hartman Nev. Supp. Decl. (June 19, 2006) Breckenridge Decl., Ex. 4. Dr. Hartman calculated overcharge damages for two AZ Subject Drugs: Pulmicort Respules and Zoladex. *See id*. Dr. Hartman has also not calculated damages of any type for physician-administered drugs. *See* Hartman Mont. Decl. at ¶¶ 22(c), 28-30, 33(b); Hartman Nev. Decl. at 23(c), 30. As noted above, AZ and other defendants have had this information since Dr. Hartman submitted his declarations in June 2006. AZ and its co-defendants had the opportunity to examine Dr. Hartman on his calculations at Dr. Hartman's August 22-23, 2006 depositions in the Montana and Nevada cases.

**B.      Evidence on the Record of AZ's Deceptive and Unfair Conduct**

**1.      AZ knew that AWP was the reimbursement benchmark used by the Montana and Medicaid programs, among other payors**

AZ has acknowledged that AWP was the reimbursement mechanism for government entities.  At the highest levels of the Company, AstraZeneca's executives knew and expected that AZ drugs would be billed to and paid for by the government, insurers and individual patients based on AWP.[10]

**2.      AZ caused AWPs to be published for its Subject Drugs**

AstraZeneca acknowledges that, before 2002, and even later, pharmaceutical manufacturers set the AWPs for their respective drugs.[11]  As AZ's Director of Pricing Strategy likewise explained:  "[u]p until the last year or so manufacturers basically decided what the AWP should be – in other words they recommended a spread over the WAC (catalog) price which results in the Average Wholesale price (AWP)."[12]  AstraZeneca's marketing teams, product managers, and pricing strategy managers made recommendations to management

---

[10] Trial Tr. Day 5 at 13 (Buckanavage) ("THE COURT:  Excuse me.  Did you understand that Medicare beneficiaries paid 20 percent of AWP?  THE WITNESS:  Yes.  They paid 20 percent out of pocket.  THE COURT:  So you understood that every time you raised AWP, they had to pay 20 percent of the increase?  THE WITNESS:  Yes.  Whenever we took a price increase, it would raise the copay and also raise the reimbursement.") and 15:5-16 (admitting same); Trial Ex. 143 at AZ0044010 (presentation recommending price increase for Zoladex 10.8 mg depot listing only downside as "slightly higher co-pay for patient").  Direct Testimony Decl. of Julie-Ann G. Tracy, ¶ 6 ("I have always understood the term Average Wholesale Price or 'AWP' to be a reference price that is used by the government and private insurers to calculate reimbursement for pharmaceuticals.").  Iacono Dep. I at 126:21-127:16 (testifying that it is his "general understanding" that AWP was the benchmark for reimbursement from third-party payors), Breckenridge Decl., Ex. 59.

[11] Trial Tr. Day 5 at 14 (Buckanavage) ("Q:  And so you felt that AstraZeneca had the ability to set its own AWP, correct?  A:  At that time we submitted those prices to the pricing services."), and at 34:3-9 ("THE WITNESS:  At that time we reported both to the pricing services.  THE COURT:  You reported - THE WITNESS:  Both WAC and AWP.  THE COURT:  So you decided what AWP was, not the publication?  THE WITNESS:  At that time, that's correct.").  *See also* Trial Ex. 131 at AZ0419345 (Document entitled Medicare Review stating that "To date, Medicare has not influenced the AWP of any medication that qualifies for reimbursement.  Companies have the latitude to set AWP as they wish.").

[12] Trial Ex. 17 (Nov. 30, 2001 John Freeberry email, AZ0465663-65).

- 4 -

regarding whether, when, and how much the AWP for its drugs should be raised.[13]  Approvals of

new or revised AWPs came from top AstraZeneca employees.[14]  Once a new or revised AWP

was approved, AstraZeneca would inform the Publishers.[15]  AstraZeneca's communications to

the Publishers were, as a general practice, made in written form.[16]

       After 2001, AstraZeneca set the WAC and furnished it to First DataBank with knowledge

that First DataBank would publish AstraZeneca's AWP at 125% of WAC.[17]  When AZ raised

WAC, AZ directed the Publishers to raise the AWP as well.

> We raise WAC prices for – you know, as inflation is up, we raise
> our prices occasionally, as most companies do.  And up until a
> couple of years ago, we would send communications out to First
> Databank – we see our WAC price went from a $1 to 1.05, we
> would use their AWP price and say that that also went up to a
> dollar.
>
> So we would provide the new AWP price for them.  We calculate
> it for them, essentially, based on whatever markup they were
> applying for us.[18]

There is evidence that AZ entered into this relationship with First DataBank to distance itself

from reporting AWPs and any legal liability associated with the reporting of prices it knew to be

---

[13] *See, e.g.,* Trial Ex. 45 (former Product Manager recommending AWP increase); Trial Ex. 78 (Oncology Product Manager recommending that AWP be increased).  *See also* Direct Testimony Decl. of Stephen P. Buckanavage, ¶¶ 10-14 (Market Development manager describing pricing scenarios that included raising AWP).

[14] *See* Direct Testimony Decl. of Robert C. Black, ¶¶ 13-14 (Former President of Zeneca, Inc. testifying that "[p]ricing recommendations generally originated from the Product Manager, and were elevated through the Marketing Team.  From 1991 until my retirement from the Company, I had the final authority to approve price increases.").  Trial Ex. 19 at AZ0021763 (Jan. 23, 1996 memorandum stating: "[t]he Zoladex marketing team sought to derive a pricing strategy which would allow for: 1) an improved competitive position relative to Return To Practice, and 2) realization of a 4% increase in net revenue. In order to achieve both of the above stated objectives it is recommended that a 7% price increase be instituted, raising both the AWP and AWC in parallel."); Freeberry Dep. I at 109:2-11 (testifying that, prior to the time that WAC became the only price term reflected on the pricing spreadsheets sent to pricing services, AZ also included a "suggested AWP price") Breckenridge Decl., Ex. 57.

[15] Trial Tr. Day 5 at 17 (Buckanavage) (Q:  "Now you understood then that your AWP price would be reported by AstraZeneca to the Red Book, correct?  A:  Yes.").

[16] *See, e.g.,* Trail Ex. 29, at AZ0036585 (Jan. 29, 1996 Sample Letter from Paula Jordan to advise Publishers of price increases).

[17] *See* Trial Ex. 167 (describing First DataBank's 2002 action raising WAC-AWP mark-up from 20% to 25%).

[18] Freeberry Dep. I at 25:5-17.

"artificial" or a "misnomer."  A 2001 internal e-mail string references a "legal issue re AZ

providing its AWPs to Red Book."[19]  Regardless, holding First DataBank out as the front man

for the AZ AWPs was a legal fiction.  In the same e-mail string, John Freeberry wrote about this

technicality:

> Redbook still does not force a spread but accepts what the
> manufacturer reports.  So while we are not ***technically*** developing
> the spread [FDB is] I feel comfortable with reporting the spread
> determined by First DataBank.[20]

In this way, AstraZeneca exerted further ownership over the AWPs First DataBank published for

it by using the AWPs from First DataBank and communicating those AWPs as their own to Red

Book.[21]  And AZ never distanced itself too far from the setting of its AWPs.  In late 2002, AZ

was contacting Red Book to confirm that Red Book was carrying correct AWPs for its drugs.[22]

AstraZeneca knew that the AWPs reported by Red Book were the AWPs that government payors

like Medicaid and others used.[23]

### 3. AstraZeneca's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and AstraZeneca manipulated its AWPs and spreads

#### a. AstraZeneca knew that its AWP was a fictitious number

AstraZeneca's AWP has not reflected a true average wholesale price since at least 1994,

when AstraZeneca's current Director of Pricing Strategy, John Freeberry, was asked by the

---

[19] Breckenridge Decl., Ex. 52 at AZ0465663.

[20] *Id.* (emphasis added).

[21] *See, e.g.*, Trial Ex. 167 (2002 *Pricing News* publication explaining that "FirstDataBank, with input from wholesalers, sets the AWP for each product.  Redbook on the other hand does not set AWP prices but reports the manufacturers [*sic*] suggested AWP.").

[22] Breckenridge Decl., Ex. 53.

[23] *See* Trial Ex. 14 at AZ0237145 ("It is imperative that we get our price increase into the January Redbook, because the Regional Medicare Carriers typically will change their reimbursement for products based on the January and July Redbooks."); Trial Ex. 133 at AZ0080410 (same); Trial Ex. 78 at AZ0013235 (same).

Company to research whether to change the spread on Company drugs from 25 to 20 percent.[24]
During the course of that research, Freeberry realized that AWP was "fictitious."[25]  He reported
this up the chain of command.[26]  But despite his discovery, neither he nor AstraZeneca did
anything to make the published AWP accurate.[27]

AZ has acknowledged that AWP is not tied to what wholesalers actually pay.[28]  AZ has
also acknowledged that AWP did not reflect discounts given to physicians.[29]  AZ knew that
AWP was an "artificial number."[30]

At trial, Steve Buckanavage, former Market Development manager, testified that when,
for example, he recommended that AWP be increased by 8.2%  he just made that number up
"[a]s part of the evaluating scenarios."[31]

> **b.** **AstraZeneca refrained from making AWP a meaningful number**

AstraZeneca did not take any steps to make AWP a meaningful number.  This was to
preserve and expand its market share.[32]  AstraZeneca took affirmative steps to prevent Medicare
from making reimbursements based on actual net sales prices and was pleased when it succeeded

---

[24] *See generally* Freeberry Dep. I at 167-76.

[25] Freeberry Dep. I at 168:6-20.

[26] *Id*. at 172:19-173:8.

[27] *Id*. at 173:18-174:11.

[28] *See* Trial Ex. 167 (2002 AZ *Pricing News* publication explaining that "[o]bviously the AWP is currently not that actual average price that wholesalers charge.").

[29] Trial Tr. Day 5 at 50 (Buckanavage) ("Q:  All right.  And the AWP that was out there in the marketplace and reported to the government did not include taking into account the discounts that you were offering doctors, correct?  A:  It never would."); Trial Tr. Day 11 at 31 (Milbauer) ("Q:  And that formula [AWP] did not include the discounts and other incentives that were being provided to physicians, correct?  A:  That's correct.").

[30] *See* Trial Ex. 41.

[31] Trial Tr. Day 5 at 14:5-8 (Buckanavage).

[32] *See* Freeberry Dep. I at 175:11-20 and 176:3-6 ("So if we set our AWP at 2 percent, obviously they would lose money, and they wouldn't use our products.").

in maintaining the AWP system for doctors so that they could realize a greater Return To Practice.[33]

When Congress enacted the Balanced Budget Act in 1997 and thereafter reduced the Medicare Part B reimbursement rate to 95% of AWP, AstraZeneca implemented a price increase for Zoladex that compensated the physician for that lost 5%, effectively negating the effect of the statutes.

## C.   AZ Provided ASPs for Just One Subject Drug to Montana – and That Drug Is No Longer in the Case

AZ's argument that "AstraZeneca's reporting of ASP data demonstrates that the State was not deceived as the prices of AstraZeneca's drugs and that AstraZeneca's AWPs did not case any alleged harm to the State" is outright misleading.  AZ Mont. Mem. at 7.  In fact, the evidence shows that at most AZ submitted ASPs for just one Subject Drug – Zoladex – a drug the State concedes is no longer in the case.

AZ and its co-defendants have repeatedly asserted that Montana Medicaid programs had knowledge of the falsity of AWPs in part because AZ and other drug manufacturers submitted

---

[33] Ware Dep. at 119:5-20, 120:4-20, and 121:5-9, Breckenridge Decl., Ex. 60, ("As I remember the specific issue now with Doctor Steffan (a Medicare reimbursement officer) wanting to – or changing the basis of reimbursement from AWP to invoice costs, based on some information he had obtained.  Q. And what was S&FA – or – sorry – well, Parexel's response to that?  A. We wanted to correct that situation.  Q. Why?  A. It could result in incorrect payment of claims across – across the state.  Q. And what do you mean by "incorrect payment of claims"?  People – doctors would be paid too much money?  A. Doctors would not be paid according to average whole price, which was the basis of reimbursement.  Q. All right.  So – okay.  And why was it important that doctors be paid on the basis of average wholesale price?  What was your understanding of why that was important?  A. Mine was just in keeping with accepted practice, as much as I understood.  Q. Did you understand that doctors would make more money if they were reimbursed based on average wholesale price, as opposed to estimated acquisition costs?  A. Yes, I understood that.").  *See also* Trial Ex. 46 (letter from President of S&FA to AZ Oncology Product Manager reporting that "[t]he Office of Budget and Management has tied the hands of the Medical Directors, preventing them from surveying for prices or using invoices on which to base their payments.  This circumstance paves the way for us to accomplish the goals that we originally set for our contract. . . . We have a communication in one of the Medicare bulletins which I think is going to be helpful in turning the other states around.  It very succinctly states that communication from HCFA regarding using surveys and invoices and I think it will move others to average wholesale price (AWP)"); Trial Ex. 48 (communicating to AZ the "great news" of accomplishing same).

ASPs directly "as early as 2001."[34]  AZ Mont. Mem. at 8.  On examination, this evidence fails – at least as to AZ – because *the only ASPs relevant to this lawsuit that AZ even potentially provided to Montana Medicaid was for Zoladex and those were provide in November 2003 at the earliest*.

AZ proffers just one document to "prove" AstraZeneca's reporting of ASP data:  a cover letter purporting to show that on November 14, 2003, AZ submitted ASPs "for Covered Product identified in Appendix A of the [Corporate Integrity Agreement ("CIA")] to the Child & Health Resources agency of the State of Montana ( a non-Medicaid entity).[35]  There are no ASPs attached.[36]  In order to determine what products AZ might have provided to the Child & Health Resources agency, it is necessary to cross-reference the June 2003 CIA Appendix A which lists the drugs for which AZ was required to provide ASPs:  ceftoan, elavil injection, faslodex, foscavir, merrem, tenormin injection, xylocaine injection, and zoladex.[37]  *The only one of these that is identified in the list of AZ Subject Drugs here is Zoladex, a drug Montana now concedes is no longer in the lawsuit*.

Equivocation over whether even these AZ ASPs were ever received by the Montana Medicaid program undermines AZ's ASP "facts" even further.  There is no direct evidence that Montana Medicaid ever received AZ ASPs.  No documents reflect their receipt; no Medicaid

---

[34] AZ now apparently asserts the ASP "facts" in connection to the Montana Medicaid program only.  Earlier, AZ and its co-defendants told the Court that AZ submitted ASPs to the Montana *and* Nevada Medicaid programs. Defendants' Memorandum In Support of Defendants' Motion for Redress for Spoilation (Dkt. No. 2900) at 19. Nevada is aware of no evidence that AZ submitted ASPs to Nevada and AZ does not raise the point here.

[35] *See* Mont. Def. Jt. L.R. 56.1 at Ex. 56.

[36] Montana produced the document to defendants with the ASP list attached.  Mont. Resp. to AZ LR 56.1 at ¶ 20.

[37] The Corporate Integrity Agreement also required AZ to provide ASPs for "all other newly developed injectible products primarily marketed and sold by AstraZeneca to individual medical practitioners/clinics for in-office administration and directly billed by the practitioners/clinics to health care insures, including Federal health care programs."  Corporate Integrity Agreement Appendix A (Breckenridge Decl., Ex. 39).  Zeneca agreed to provide ASPs for the same list of drugs in its September 2003 Settlement Agreement with Montana.  *See*, *e.g.*, Duffy Decl. (Dkt. No. 3707) Ex. 5 at 14-15.

personnel testified to knowledge of them.  Jeff Buska, who has held positions related to Montana Medicaid drug reimbursement for nearly ten years, was one of the only witnesses asked about AZ ASPs.  He does not recall the Montana Medicaid program receiving ASPs from AZ or TAP. Declaration of Jeff Buska In Support of Montana's Opposition to Defendants' Joint Motion for Summary Judgment (Dkt. No. 3906) ("Buska Decl.") at ¶ 33.

In any event, it is undisputed that Montana Medicaid did not use the limited ASPs AZ provided.  Mr. Buska described the problems associated with using ASPs submitting directly by manufacturers.  The State did not use the ASPs directly provided because the State's reimbursement methodology was set to use AWP,  *Id.* at ¶ 32, and the system was automated and run by an outside vendor.  In the few instances Montana Medicaid received ASP lists directly from manufacturers, the program was concerned that ASP lists were not complete – *i.e.*, that they did not include data for all of a manufacturers drugs reimbursed by the Medicaid program.  *Id.*; Buska Dep. at 513:10-514:8, Breckenridge Decl., Ex. 58.  It would have been impractical to obtain pricing from a variety of sources for each manufacturer.  In the case of AZ, this concern was realized.  The list did not cover all AZ drugs.[38]

The Montana Medicaid program, among others, continued to reimburse based on AWP because it would have been extremely difficult for single Medicaid programs to begin basing their reimbursement on ASP or another benchmark – when the other benchmark was only irregularly provided by the industry.  Evidence developed in the MDL trial established that AZ itself, a multi-billion dollar pharmaceutical company, appreciated this fact and it did not think that it could change the system of AWP-based reimbursement on its own:

> We weren't lobbying against any changes because we still felt that, you know, *this was the system we, were only one company in this*.

---
[38] *Id.*

In fact, we were not a leader by a long shot.  We still only had, you know, perhaps 25, 30 percent of the share of this LhRh market, and there were many other products in this Part B coverage, chemotherapeutic agents, cytoxics.  As so we were a relatively small player in this, but we were monitoring. . . .  I'm saying, so we never felt that we could make that change by ourselves.  We were the smaller player, even within that market, and certain there were many, many other – . . . I mean, I'm just saying it because I think it's the kind of thing where all the powers that had the ability to make change, whether it was Congress or the Executive Branch, everyone recognized that this was not a perfect system, and they were concerned about it.  But, you know, through the period of the '90s, late '90s, and even into the early part of this century, they didn't make the change because of either competing factors or whatever they felt.  ***So that from an AstraZeneca point of view, we didn't think we could do that on our own***.[39]

## II.      DISCUSSION

### A.      AZ's Unfair and Deceptive Conduct Violated the States' Statutes

As described above, there is substantial evidence on the record that AZ's course of conduct was deceptive and unfair because it had the capacity to deceive.  In summary, AZ's deliberate decision to report AWPs to national pharmaceutical industry publications or list prices with knowledge of how they would be marked up to result in AWPs – knowing that these published AWPs would from the basis of an industry-wide reimbursement system – obligated AZ and its co-defendants by law to ensure that these pricing benchmarks were ***not*** misleading.  But the AWPs for the Subject Drugs were misleading.

For example, it is axiomatic under statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (RICO and securities claims).  Indeed, the First Circuit has specifically held that "[w]hen a

---

[39] Trial Tr. Day 11 at 20, 27-28 (Milbauer) (emphasis added).

corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *Roeder*, 814 F.2d at 26; *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769-70 (1st Cir. 1996) (seller's failure to disclose that a critical component was missing from system it sold to buyer and its misdirection of the buyer's attention to operator error as the source of the system's problems supported the District Court's conclusion that the seller behaved both unfairly and deceptively under Chapter 93A).[40]

AZ and its co-defendants were not required to volunteer their WLPs, WACs or AWPs to pricing compendia, like First DataBank, which supplied AWPs to Medicaid programs. But once AZ and other defendants decided to do so – knowingly fully that Medicaid and other payors would be reimbursing at those inflated prices – defendants became obligated to ensure that their representations were accurate. They were not. The AWPs did not reflect an actual average of prices in the marketplace, as the label "average wholesale price" suggested and payors expected. For this reason, the AWPs AZ supplied to the market were unfair and deceptive.

In addition, the AWPs did not constitute reasonable pricing signals as the State Medicaid programs expected them to be. It was widely known in the industry – and established by federal statute – that as part of their drug reimbursement programs, state Medicaids were required to approximate provider acquisition costs and the most common method for doing so was to use the published AWPs. The States' use of AWPs was generally codified by rule or statute. *See* Mt. Admin. R. 37.86.1101 (2006) (Declaration of Jeniphr A.E. Breckenridge In Support of Plaintiff's Opposition To Defendants' Joint Motion For Summary Judgment (Dkt. No. 3904), Ex. 14); Nevada Medicaid Services Manual Ch. 1200 (Declaration of Jeniphr A.E. Breckenridge In Support of Plaintiff's Opposition To Defendants' Joint Motion For Summary Judgment (Dkt.

---

[40] This argument is set forth more fully in Plaintiffs' Post-Trial Omnibus Trial Brief (Jan. 19, 2007) (Dkt. No. 3555) at 8-9.

No. 3911), Ex. 3).  These rules – rather than the 30% expectation "yardstick" employed in the MDL case – are the proper measure of the expectation for State Medicaid programs.

As with private payors, the States' use of inflated AWPs skewed their efforts to estimate acquisition costs and caused them to pay more for drugs than they would have had to if drug manufacturers had reported accurate AWPs.  This is the "ascertainable loss" AZ claims is missing from the States' cases.

For these reasons alone, its motions for summary judgment should be denied and the cases should proceed to trial.

## B.    Evidence Shows That AZ Did Manipulate the Spread With Respect to Its Self-Administered Drugs

AZ argues that judgment should be entered in its favor because the States' theory "makes no sense" with respect to self-administered drugs (SAD) – there is no evidence that it manipulated the spread between pharmacy acquisition costs and AWP or "had economic incentive to do so."  AZ Mont. Mem. at 6-7; AZ Nev. Mem. at 6.  Record evidence shows differently.  AZ was as preoccupied by the spread for its pharmacy-distributed drugs as it was for its physician-administered drugs.  It is unquestioned that the market for pharmaceuticals is complex and competitive.  Retail pharmacies and pharmacists are part of the market web.  In an undated document, AZ discusses the AWP for Atacand, an AZ SAD.[41]  A proposal to lower the AWP for the product is considered, but rejected with detail that illuminates the drug manufacturer's economic incentive to boost AWPs for SADs:

> While initially an attractive proposal, this action would have the negative effect on retailers of lower profit margins.  All things being equal, a pharmacist would be more likely to implement

---

[41] Although Atacand is not a Subject Drug in these cases, evidence regarding AZ's marketing for this drug is directly relevant to AZ's defense that there is no evidence that with respect to SADs that it manipulated the spread or "had economic incentive to do so."  AZ Mont. Mem. at 6-7; AZ Nev. Mem. at 6.

switching, make calls to the physician, and intercede when doing
so proves financially favorable.[42]

A 2002 document discusses the advantage to retail pharmacies of higher spreads between

acquisition costs and AWP:  "[p]harmacy reimbursement – a higher spread translates into higher

reimbursement to retailers and mail order pharmacies."[43]

Published material for AZ SAD Entocort EC in 2001 advises its pharmacy sales force

how to market the product to pharmacists and offers insight into the "economic incentive" AZ

had for doing so.[44]  AZ recommended educating pharmacists as to the uses for the product,

providing lists of physicians who were "supportive' and had agreed to prescribe the product and

urging pharmacists to maintain a strong inventory of the drug.  Why?  It was important to the

success of Entocort EC that filling pharmacies had adequate product available "on the shelf" to

fill the prescriptions.[45]

Furthermore, AZ's argument misses the mark on summary judgment.  Even if there were

no evidence that AZ marketed the spread for its SADs (a point Montana and Nevada dispute), it

is undisputed that the AWPs AZ published or caused to be published were inflated at rates

comparable to those for its physician-administered drugs ***and*** – like the PAD AWPs, the SAD

AWPs did not reflect market rebates, discounts and other price concessions.  In other words, just

like the AZ PADs – the AZ SADs did not represent ***average wholesale prices*** despite their

"AWP" label.  This conduct alone constitutes unfair and deceptive conduct that violates the

Montana and Nevada statutes under which the Attorneys General have brought the States'

claims.

---

[42] Breckenridge Decl., Ex. 54 at AZ 0463899.

[43] *Id.* Ex. 50 at AZ0565612.

[44] Breckenridge Decl., Ex. 55.

[45] *Id.* at AZ0619990.

**C.     AZ's Reporting of ASPs to Montana Medicaid (If Any) Does Not Negate AZ's Deceptive and Unfair Practices**

AZ further argues that Montana could not have been deceived because it received ASPs from AZ and "the State has chosen not to change its reimbursement methodology or reimbursement rates" despite the filing of the lawsuit.  AZ Mont. Mem. at 7.  As detailed above, the evidence regarding AZ's provision of ASPs – whether they were provided to Montana Medicaid at all and whether they related to the AZ Subject Drugs at all – is in serious dispute.[46] For this reason alone, the "facts" alleged by AZ on this point should not be dispositive of Montana's claim.

As for AZ's charge that Montana could not be deceived because it did not alter its reimbursement practices as a result of the lawsuit, Jeff Buska articulated the difficulties inherent in a lone state adopting a new system where the data provided by the industry is still primarily limited to AWP, the state's system is AWP-based and the majority of payors still pay based on AWP.[47]  AZ itself came to this conclusion independently when it acknowledged that even with its resources, it could not change the industry-wide AWP-based system.[48]

**D.     Dr. Hartman's "Expectation Yardstick" Is Not A Factor In These Cases**

AZ invokes the expectation theory articulated by Dr. Hartman in the MDL case here and claims that because the spreads for its drugs fall below the 30% "yardstick" judgment should be entered in its favor.  This claim fails for two reasons.  First, as AZ knows, Dr. Hartman's 30% expectation yardstick does not apply here.  Although Dr. Hartman is both the plaintiffs' expert in

---

[46] AZ now also criticizes Montana for not affirmatively seeking out ASPs for its products, AZ Mont. Mem. at 9, but the impracticality of this is evident – particularly where AZ continued to report AWPs for the other drugs – with no disavowal of them as false.  If Montana Medicaid had even considered asking for pricing from any defendant rather than relying on First DataBank it would have been reasonable for them to conclude that the settlement agreement resolved all of AZ's fraudulent price reporting.

[47] Buska Decl. at ¶¶ 12-14.

[48] *See supra* at 11.

the class case and the States' expert here, he has submitted independent declarations for each. The Medicaid market at issue here is different from the private payor market about which Dr. Hartman opined in the class case.  AZ knows this and has known this at least since Dr. Hartman submitted his state declarations in June 2006.  Like payors in private markets, state payors "rely on AWPs to bear a predictable relationship to ASPs."  The expectation is different in the state market and the measurement in the Medicaid markets, according to Dr. Hartman, is the calculation used to approximate EAC.  For these States that is AWP less discount.  This is the expression of what the States expected the difference between AWP and the acquisition cost.

Even if Dr. Hartman's 30% expectation for the private payor markets applied here, however, the evidence is in dispute as to whether AZ's spreads fell below this level.  AZ contends that "over the period of Plaintiff's allegations, the 'spread' between AWP and WAC for all of AstraZeneca's Medicaid covered drugs was either 20 or 25 percent."  AZ Mont. Mem. at 10; AZ Nev. Mem. at 8-9.  The sole support for this "fact" is the opinion of AZ expert Joel Winterton.  Mr. Winterton drew his conclusion based on his analysis of just five of AZ's Medicaid products for the period 1991 to 2004.  Winterton Mont. Decl. at ¶¶ 30-40. Mr. Winterton applied rebates to the State's reimbursement to achieve the price.  Only through the offset of rebates does Mr. Winterton reach the sub-30% levels.  There is disagreement among the experts as to whether it is proper to apply the rebates in order to reach this figure. Dr. Hartman, the States' expert, submits that the rebates should not be considered as they will theoretically be the same regardless of whether the prices are inflated.  Hartman Mont. Decl. at ¶ 32; Hartman Nevada Decl. at ¶ 33.

The State counters Mr. Winterton's calculations with the submission of AZ spreads calculated by Dr. Hartman – which shows that the actual AZ spreads for the relevant time period were 20.89%-169.31%.[49]

Genuine issues of material fact related to AZ's spreads remain.  AZ's motion should be denied.

**E.    The Evidence Shows That the State Suffered Ascertainable Losses as a Result of AZ Conduct[50]**

AZ submits that judgment should be entered in its favor because Montana and Nevada cannot demonstrate that they have suffered loss or injury.  "Loss *is* a material element of all of the State's causes of action," AZ Mont. Mem. at 13; AZ Nev. Mem. at 13, and an element which the States have satisfied.  The Hartman declarations detail the States' damages claims.[51]

### III.    CONCLUSION

For the foregoing reasons and the reasons set forth  more fully in the States' oppositions to Defendants' joint motions, AZ's motion for summary judgment should be denied.

---

[49] Breckenridge Decl., Ex. 42.

[50] AZ asserts that the State has failed to produce data sufficient to show "an ascertainable loss" for certain "individual claims," and that Dr. Hartman has not provided an economic analysis to support damages on those claims.  AZ Mont. Mem. at 13-14.  As clarified above, the States only pursue those damages calculated by Dr. Hartman in his Montana and Nevada declarations.  AZ has had this information in the form of the declarations since June 2006 and had the opportunity to examine Dr. Hartman on the scope of the States' damages claims at his August 2006 deposition in the cases.  The States no longer seek damages related to Medicaid payments for Medicare Part B co-payments for dual-eligibles.  In addition, more than one year ago, Montana agreed to stipulate that it was not pursuing damages for non-Medicaid state agencies.  AZ Mont. Mem. at 14.  The States are not pursuing damages for uninsured individuals or unnamed third party payors.  *Id.*  Nevada's claims for damages are similarly limited.  It is not clear why AZ continues to raise these issues.

[51] Dr. Hartman has calculated penalties due to AZ misconduct in the range of $282,000,000 to $352,000,000 in Montana, Breckenridge Decl., Ex. 1, Table 3 and $581,000,000 to $583,000,000 in the Nevada case.  Breckenridge Decl, Ex. 3, Table 5.

By \_\_\_\_\_/s/ Steve W. Berman_____    DATED:  April 26, 2007
    Steve W. Berman
    Sean R. Matt
    Jeniphr A.E. Breckenridge
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

    COUNSEL FOR THE
    STATES OF MONTANA AND NEVADA

    Mike McGrath
    Attorney General of Montana
    Ali Bovingdon
    Assistant Attorney General
    Justice Building
    215 North Sanders
    P.O. Box 201401
    Helena, MT  56920-1402
    (406) 444-2026

    COUNSEL FOR THE
    STATE OF MONTANA

    Catherine Cortez Masto
    Attorney General of the State of Nevada
    L. Timothy Terry
    Deputy Attorney General
    100 N. Carson Street
    Carson City,  NV 89701-4714

    COUNSEL FOR PLAINTIFF
    STATE OF NEVADA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **MONTANA AND NEVADA'S JOINT OPPOSITION TO DEFENDANT ASTRAZENECA PHARMACEUTICALS LP'S MOTIONS FOR SUMMARY JUDGMENT,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By_____**/s/ Steve W. Berman**_____
          Steve W. Berman
          **HAGENS BERMAN SOBOL SHAPIRO LLP**
          1301 Fifth Avenue, Suite 2900
          Seattle, WA  98101
          (206) 623-7292

001534-15  164771 V1