UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br>*State of Nevada v. American Home Products, et al.*, CA No. 02-CV-12086-PBS (Nevada II), and<br>*State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) | CIVIL ACTION: 01-CV-12257-PBS |

**NEVADA AND MONTANA'S OPPOSITION TO NOVARTIS PHARMACEUTICALS CORPORATION'S MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**


I. SUMMARY JUDGMENT STANDARDS .................... 3

II. BACKGROUND .................... 3

A. The States Have Refined Their Claims for Damages .................... 3

B. The Novartis Subject Drugs at Issue Here and the Relevant Time Period .................... 4

C. Novartis Acknowledges That It Calculated And Reported AWPs for Its Products to First DataBank .................... 4

D. Novartis Controlled the AWPs First DataBank Published for its Products Throughout the Relevant Time Period .................... 6

III. ARGUMENT .................... 7

A. Novartis's Reporting of Inflated Average Wholesale Prices Violated the Montana and Nevada Consumer Protection Acts .................... 7

1. Novartis's AWPs deceived the States .................... 7

2. Novartis's conduct damaged Montana and Nevada .................... 10

B. Novartis Violated the States' Medicaid Fraud Acts by Reporting Inflated AWPs .................... 11

C. Novartis Violated Montana's False Claims Act by Reporting Inflated AWPs .................... 11

IV. CONCLUSION .................... 12

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Pharm. Indus. Average Wholesale Price Litig.*,
460 F. Supp. 2d 277 (D. Mass 2006) ........ 1, 2, 9

*Roeder v. Alpha Indus., Inc.*,
814 F.2d 22 (1st Cir. 1987) ........ 9

*V.H.S. Realty, Inc. v. Texaco, Inc.*,
757 F.2d 411 (1st Cir. 1985) ........ 9

## STATE CASES

*Baird v. Norwest Bank*,
255 Mont. 317, 843 P.2d 327 (1992) ........ 8

*Challinor v. Swenson*,
1998 Mont. Dist. Lexis 689 (Mont. Dist. Ct. Mar. 1998) ........ 8

*Ragsdale v. Kennedy*,
286 N.C. 130, 209 S.E.2d 494 (1974) ........ 9

## STATUTES/CODES

MONT. CODE ANN. § 17-8-231 (2005) ........ 11

MONT. CODE ANN. § 30-14-103 ........ 7

MONT. CODE ANN. § 30-14-104 ........ 8

MONT. CODE ANN. § 53-6-160(1) ........ 11

NEV. REV. STAT. § 422.540 ........ 11

NEV. REV. STAT. § 598.0915(13) ........ 8

NEV. REV. STAT. § 598.0915(15) ........ 8

15 U.S.C. § 45(a)(1) ........ 8

The States of Nevada and Montana ("States"), by their counsel, hereby respond to Novartis Pharmaceuticals Corporation's ("Novartis") motions for summary judgment in the Nevada and Montana cases.[1] The States also adopt and incorporate the submissions made on behalf of each of them in opposition to the Defendants' joint motions for summary judgment and their responses to each of the defendants' individual motions.

Novartis seeks summary judgment on several bases in addition to those in which it joined in the Defendants' joint motions for summary judgment.[2] Like other defendants, Novartis purports to submit the best evidence distinguishing it for particular treatment on summary judgment. Novartis argues that the Court should grant judgment in its favor principally because (i) Novartis "accurately described" the AWPs it provided to the publishers; and (ii) Novartis did not market the spread for the Subject Drugs. Mont. Novartis Mem. at 1-2; Nev. Novartis Mem. at 1-2. For these reasons, Novartis says, its conduct was never unfair nor deceptive and thus it could not have violated the statutes under which the States bring their claims.

Novartis's arguments fail on summary judgment because they do not resolve the central allegations of the States' cases: Novartis reported average wholesale prices that were neither averages nor prices charged to any customer, knowing that the State Medicaid programs and other payors would rely on them as a basis for reimbursement. This Court has held in connection with the MDL case that "AWP means the average price at which wholesalers sell drugs to their customers, including wholesalers and pharmacies." *In re Pharm. Indus. Average Wholesale*

---

[1] Novartis submitted separate motions on virtually identical briefs in the Montana and Nevada cases. (Dkt. Nos. 3723 and 3714.) To preserve the time and resources of the Court and the parties, the States respond jointly and will, where necessary, identify any differences by State. The States respond separately to Novartis's L.R. 56.1 Statements.

[2] Memorandum In Support of Defendants' Joint Motion for Summary Judgment (Montana) (Dkt. No. 3647); Defendants' Joint Memorandum of Law In Support of Their Motion for Summary Judgment (Nevada) (Dkt. No. 3631).

*Price Litig.*, 460 F. Supp. 2d 277 (D. Mass 2006) (Nov. 2, 2006 Order) at 1 (Dkt. No. 3299).[3] Applying the same definition here, as the States submit is appropriate, demonstrates the unfair and deceptive nature of Novartis's Subject Drug prices. Reporting prices that differed from the plain meaning of "average wholesale price" under the label "AWP" would foreseeably mislead reasonable payors and did mislead the Montana and Nevada Medicaid programs. As a result, the programs suffered damages when they overpaid for prescription drugs for their participants.

Novartis submits no evidence to refute the States' position. Novartis has conceded that it calculated AWPs and reported them to publishers such as First DataBank ("First DataBank") as prices that were 20 to 25% above Wholesale Acquisition Cost ("WAC") during the relevant time period. Mont. Mem. at 4-5; Nev. Mem. at 4-5. And although the record Novartis submits is ambiguous as to whether it discontinued submitting its own AWP calculations at some point, *see infra* at 5-7, it is clear that Novartis never relinquished control over the numbers and continued to report to First DataBank prices that it knew First DataBank would use to calculate and report AWPs for the use of the State Medicaid programs and others. Mont. Mem. at 5; Nev. Mem. at 5. Novartis's reporting of false AWPs alone subjects it to liability under the State statutes, whether or not it "marketed the spread."

Novartis's motions raise numerous issues of material fact, as described more fully below. Furthermore, the arguments are weakly supported by testimony by one of its lawyers[4] rather than "undisputed fact." Novartis has not met the standard for summary judgment. Novartis's motions should be denied.

---

[3] The State of Montana previously argued this point in its Motion for Partial Summary Judgment at 8-17 (Feb. 8, 2007) (Dkt. No. 3732). Nevada adopts these arguments by reference.

[4] The States object to the Affidavit of Samuel Lonergan in support of the Novartis Mont. Mot. ¶¶ 1-10 and the Affidavit of Samuel Lonergan in support of the Novartis Nev. Mot. ¶¶ 1-12. Mr. Lonergan's sworn statements consist principally of his own legal explanations and interpretations of data. This is not proper content for an affidavit in support of a motion for summary judgment.

## I. SUMMARY JUDGMENT STANDARDS

The States incorporate the summary judgment standards set forth in its Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment (Dkt. No. 3902) and the summary judgment standards well known to the Court and to the parties.

## II. BACKGROUND

### A. The States Have Refined Their Claims for Damages

The Attorneys General of Montana and Nevada originally brought this action to enforce state laws and to protect the States' Medicaid program and the well-being of the citizens who make prescription drug payments or co-payments based on Average Wholesale Prices AWPs. The claims and the scope of the lawsuits have been refined since their initial filing. At this juncture, the States pursue monetary damages on behalf of the States Medicaid programs only and only for the damages and penalties calculated by Dr. Hartman, and set forth in his Declarations. *See* Breckenridge Decl., Exs. 1-4. The damages the States claim constitute penalties for violations of Montana and Nevada state statutes and overcharge damages for select drugs.[5] *Id.* These are the only damages the States now claim. Novartis and its co-defendants have had this information since June 2006, when Dr. Hartman's declarations were submitted. Novartis and its co-defendants had the opportunity to examine Dr. Hartman on his calculations, the States' damages and other related issues at his deposition in the Montana and Nevada state cases in August 2006.

---

[5] Dr. Hartman has calculated defendant-specific overcharges or restitution damages only for certain defendants because of the States' inability to obtain data from other drug manufacturers. *See* Hartman Mont. Decl. Tables 1-2 (Breckenridge Decl., Ex. 1); Hartman Mont. Supp. Decl. (Breckenridge Decl., Ex. 2); Hartman Nev. Decl. Table 1 (Breckenridge Decl., Ex. 3); Hartman Nev. Supp. Decl. (Breckenridge Decl., Ex. 4). Dr. Hartman did not calculate overcharges for Novartis. *See id.* Dr. Hartman has also not calculated damages for physician-administered drugs for Nevada. *See* Hartman Nev. Decl. at ¶¶ 23(c), 29-31, 34(b).

### B. The Novartis Subject Drugs at Issue Here and the Relevant Time Period

Novartis's discussion of the Subject Drugs at issue in these cases and the dates Novartis marketed and sold them requires clarification. The Montana Second Amended Complaint and the Nevada Amended Complaint identify the same thirty-two self-administered drugs that are Novartis Subject Drugs for purposes of these lawsuits.[6] In addition, there are two other Novartis Subject Drugs: Miacalcin Injection and Aredia.[7] Novartis asserts that it has been responsible for the marketing and sales of some of these products for less than the entire time period relevant to the States' claims. Novartis Mont. Mem. at 4 n.1; Novartis Nev. Mem. at 4 n.1. If provide, this fact relates to the calculation of damages. Alone it does not mandate dismissal of any of the States' claims. Novartis does not dispute that it was legally responsible for each of the Novartis Subject Drugs at some point during the time period relevant to these lawsuits. Further, Novartis does not contend that Dr. Hartman's calculations are erroneous based on the timing of Novartis's ownership of any of the Subject Drugs. Therefore, Novartis's points concerning its ownership of certain product lines does not dispose of any claims on summary judgment.

### C. Novartis Acknowledges That It Calculated And Reported AWPs for Its Products to First DataBank

The Montana and Nevada Medicaid programs based their reimbursements for pharmaceutical products on the AWPs published by First DataBank. This fact is undisputed. Novartis also does not dispute that it understood that the state Medicaid programs and other payors relied on the AWPs reported by First DataBank and others as a basis for reimbursement.

---

[6] *See* Montana Second Am. Compl., Ex. A (Breckenridge Decl., Ex. 5); Nevada Am. Compl., Ex. A (Breckenridge Decl., Ex. 6).

[7] *Id.* Novartis's assertion that the Montana and Nevada Medicaid programs paid "extremely low total reimbursements to Providers for Aredia and Miacalcin Injection during the relevant period" is immaterial to summary judgment. Novartis Mont. Mem. at 4; Novartis Nev. Mem. at 4-5. There is no threshold requirement for damages. Low total reimbursements do not negate the fact that Novartis's conduct with respect to these drugs damages the states.

Novartis reported AWPs directly to First DataBank. According to Novartis, it "calculated the AWP that it reported" to First DataBank for publication by applying a percentage markup to each drug's WAC – usually either 20% or 25%. Novartis Mont. Mem. at 5; Novartis Nev. Mem. at 5. In this way, Novartis controlled AWPs for its products. By this calculation, Novartis ensured that the AWPs published would not represent actual acquisition costs, but would include an arbitrary boost by the manufacturer.

Novartis denies none of this. Instead, Novartis attempts to defend its provision of the illusory AWP by citing a disclaimer it says it began including in 1997 in its "broadcast fax," a pricing communication that "lists AWP, WAC or both" to "wholesalers, warehousing retail chains, and independent reporting services, like First DataBank." *Id.* [8] The language described AWP as "consitut[ing] a reference for each Novartis product . . . set as a percentage above the price at which each product is offered generally to wholesalers . . . AWP is not intended to be a price charged by Novartis for any product to any customer." *Id.* There is no evidence that Novartis ever publicly disclosed the disclaimers or communicated to the State Medicaid programs or other payors. The fact that Novartis does not disclose in its briefs to the Court is that the faxes were circulated solely to wholesalers and retailers and publishers. The letters themselves establish the limited distribution.[9] Also, there is no evidence that Novartis directed First DataBank or others to publicize this information along with the publication of the AWPs. And the publishers did not.

---

[8] Evidence on the record shows that the broadcast faxes with the language quoted went solely to third party journals between 1997 and 2003. There is no evidence that the faxes were sent to wholesalers or warehousing retail chains. *See* Affidavit of Michael Conley in support of Novartis's motions for summary judgment, Exhibits 1-29 (collecting broadcast faxes).

[9] *See* Conley Decl. Ex. 1-29 [Novartis declaration].

To disclaim something is to deny or renounce its validity or to disown it.[10] What good is a disclaimer if it never reaches the ultimate user of the information? Clearly, Novartis's disclaimer of its AWPs was nominal in that it never reached the ultimate AWP consumers – the States and other payors. If Novartis's concern had been sincere, it easily could have ensured proper communication of its so-called disclaimer.

The undisputed evidence shows that any Novartis disclaimer was limited to the selling side of the market and withheld from the reimbursing side. This is not a basis for summary judgment.

### D. Novartis Controlled the AWPs First DataBank Published for its Products Throughout the Relevant Time Period

Novartis argues that it is entitled to summary judgment in part because it merely reported prices to First DataBank and what happened next was up to First DataBank and beyond Novartis's "control."[11] This is far from the truth. Novartis semantics aside, Novartis continued to submit its prices – WAC or AWP – to the publisher to report. Whether or not First DataBank reported the exact prices supplied by Novartis, First DataBank used the data supplied by Novartis – First DataBank published Novartis AWPs with Novartis knowledge. First DataBank's handling of the Novartis prices were foreseeable and predictable. If at any point Novartis wanted the process to stop, it could have discontinued providing any pricing information to the publisher. This reflects Novartis control of the AWPs.

[10] "Disclaim" - **1.** To deny or renounce any claim to or connection with; disown. **2.** To deny the validity of; repudiate. **3.** *Law* To renounce one's right or claim to. The American Heritage Dictionary of the English Language: Fourth Edition. 2000.

[11] Aventis Mem. at 5-6. The record Novartis submits on this issue is at best ambiguous and at worst internally inconsistent. Novartis alternately asserts that ***it*** "calculated the AWP that it reported for any given product," Novartis Mont. Mem. at 5, Novartis Nev. Mem. at 6, and that "First DataBank set and published AWPs for [Novartis] drugs." *Id.* at 6.

Novartis's reliance on a limited excerpt from First DataBank manager Kay Morgan deposition – calling it "undisputed fact" – does not prove otherwise. Novartis Mont. Mem. at 5-6, Novartis Nev. Mem. at 5-6. Kay Morgan has testified numerous times in AWP-related cases. The excerpt relied upon is too vague to prove whether or how First DataBank set prices – and certainly does not explain how First DataBank handled pricing information supplied by Novartis. Novartis Nev. L.R. 56.1 at ¶ 26. The Morgan testimony does not establish the proposition proffered. Novartis Mont. L.R. 56.1 at ¶ 26. Finally, First DataBank has admitted no wrongdoing in the handling of Novartis AWPs. Novartis attempt to use a settlement agreement between First DataBank and others (none of whom is a party to the State cases) to bolster its otherwise unsupported assertions regarding First DataBank's role. Novartis Mont. Mem. at 6, n.4. Novartis Nev. Mem. at 6 n.4. This is improper. Settlement agreements may not be used of evidence of wrongdoing, particularly where, as here, there is language stating that First DataBank disclaims any wrongdoing.[12]

## III. ARGUMENT

### A. Novartis's Reporting of Inflated Average Wholesale Prices Violated the Montana and Nevada Consumer Protection Acts

#### 1. Novartis's AWPs deceived the States

The Montana's Unfair Trade Practices Act ("MUTPA") declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful." MONT. CODE ANN. § 30-14-103. There is little case law interpreting the MUTPA, but "[b]ecause of the similarity between the language of the Montana [Act] and the consumer protection acts enacted by the various states and the federal government, the case law interpreting the similar statutes in other jurisdictions is helpful in determining what constitutes an

[12] Lonergan Mont. Affidavit Ex. 8 at 3, Lonergan Nev. Affidavit Ex. 9 (First DataBank settled the matter "despite its belief that it has valid and complete defenses to the claims asserted against them in the Class Action.").

unfair ***or*** deceptive act or practice under the Montana [Act]." *Challinor v. Swenson*, 1998 Mont. Dist. Lexis 689, at *8 (Mont. Dist. Ct. Mar. 1998) (emphasis added). Further, the MUTPA is based on the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)) (the "FTCA") and directs courts to consider FTC and federal court interpretations of the FTCA when construing the MUTPA. MONT. CODE ANN. § 30-14-104. In doing so, the MUTPA "should be liberally construed with a view to affect its object and to promote justice." *Baird v. Norwest Bank*, 255 Mont. 317, 327, 843 P.2d 327 (1992). As discussed more fully in Montana's Opposition to Defendants' Joint Motion for Summary Judgment at 18 (Dkt. No. 3902), the conduct may be unfair ***or*** deceptive to give rise to liability and the misrepresentations giving rise to claims under the Act need not be intentional. *Challinor*, 1998 Mont. Dist. 689, at *8-9.

The Nevada Deceptive Trade Practices Act ("NDTPA") similarly prohibits deceptive acts. Liability arises under the NDTPA for "[m]ak[ing] false or misleading statements," NEV. REV. STAT. § 598.0915(13), or "[k]knowingly mak[ing] any other false representation," NEV. REV. STAT. § 598.0915(15). Like the Montana statute, there is little case law interpreting the NDTPA.

Here, Novartis's conduct in reporting false AWPs with the knowledge that payors, including Montana and Nevada Medicaid programs, would use them as a basis for reimbursement. Novartis was not required to volunteer its prices to publishers such as First DataBank. But once Novartis chose to do so, it became obligated to ensure that its representations were accurate. Providing exculpatory language that will never reach the ultimate and known user of the information, such as that found in the Novartis broadcast faxes, does not nullify this responsibility.

It is axiomatic under statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." *V.H.S. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (RICO and securities claims). Indeed, the First Circuit has specifically held that "[w]hen a corporation does make a disclosure – ***whether it be voluntary or required*** – there is a duty to make it complete and accurate." *Roeder*, 814 F.2d at 26 (emphasis added). "'Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies. . . ." *V.H.S. Realty*, 757 F.2d at 414-15 (quoting *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708 (1969)). Thus, if a drug manufacturer "chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth." *Roeder*, 814 F.2d at 26 (quoting *Grossman v. Waste Mgmt., Inc.*, 589 F. Supp. 395, 409 (N.D. Ill. 1984)); *see also*, *e.g.*, *Ragsdale v. Kennedy*, 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974) ("The rule is that even though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair disclosure as to the matters he discusses.").

In light of these authorities, Novartis's claims that it did not "control" the published AWPs and that it bears no responsibility for the false statements of the publishers is unavailing. Novartis elected to provide pricing data to national compendia. Novartis assumed responsibility for the accuracy of the information. The pricing provided, which was then directly reported as AWP or calculated in a predictable fashion to create AWPs was not accurate to the extent it did not comport with the plain and ordinary meaning of the term "average wholesale price." *In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277 (D. Mass 2006) (Nov. 2, 2006 Order).

**2. Novartis's conduct damaged Montana and Nevada**

Novartis further attempts to avoid liability by arguing that even if it did report false AWPs to First DataBank, First DataBank was an intervening cause of the damage. Novartis argues that even if its conduct is adjudged to be unfair and deceptive, it was not Novartis conduct but First DataBank conduct that harmed Montana and Nevada. This is not the case. As discussed above – and conceded by Novartis – Novartis calculated and supplied AWPs that were 20 to 25% above WAC to be published by First DataBank, knowing that Montana and Nevada Medicaid and others would use the inaccurate data as a basis for reimbursement.

Novartis further contends that the Montana and Nevada Medicaid programs had knowledge that the AWPs for Novartis exceed the providers' actual acquisition costs for Novartis Subject Drugs and that this precludes Novartis conduct from damaging the States. The joint defendants' "government knowledge" defense is rebutted fully in the Montana and Nevada oppositions to the defendants' joint motions for summary judgment.[13] Of especial importance to Novartis's claims here is the undisputed fact that Novartis does not point to any evidence in the record that Montana or Nevada had any knowledge prior to this lawsuit that the AWP-based reimbursement rate for Novartis Subject Drugs exceeded the providers' acquisition costs for those same drugs. If Novartis seeks judgment in its favor on grounds unique to it, it must show particular proof. Novartis has not done so here. Novartis should not be allowed to rely on general allegations regarding unspecified drugs for unnamed and unrelated drug manufacturers. At best Defendants have collectively been able to show reports of discrete instances where the State may have learned that the AWP for a specific drug exceeded the provider acquisition price for that drug. As discussed more fully in the States' oppositions to the defendants' joint motions

[13] Mont. Opp. To Defs' Jt. Mot. For Summ. J. at 11-14 (Dkt. No. 3902); Nev. Opp. To Defs' Jt. Mot. For Summ. J. at 10-12 (Dkt. No. 3910).

for summary judgment, there was no evidence of the systemic problems that were revealed just prior to the filing of these lawsuits. And, importantly here – ***none of these instances that Defendants cite relates to Novartis Subject Drugs***.

**B. Novartis Violated the States' Medicaid Fraud Acts by Reporting Inflated AWPs**

Novartis's same unfair and deceptive conduct in reporting AWPs that were not average wholesale prices violated the Montana and Nevada Medicaid fraud acts. Novartis's individual arguments to the contrary are a reiteration of the arguments made by the joint defendants in their motions for summary judgment and addressed by the States in their oppositions and will not be repeated here.[14] The States' Medicaid fraud claims are based on the submission of misrepresentations and misleading statements in connection with payments under the States' Medicaid programs. MONT. CODE ANN. § 53-6-160(1); NEV. REV. STAT. § 422.540**.** It is Novartis's provision of false AWPs that the States contend violates the statutes. Novartis controlled the AWPs for its Subject Drugs. Novartis also knew that those AWPs would be used as the basis of reimbursement for the Montana and Nevada Medicaid programs, among other payors. If the AWPs were false, as the record shows, then the submissions to Medicaid were false and violated the Medicaid fraud statutes.

**C. Novartis Violated Montana's False Claims Act by Reporting Inflated AWPs**

Under Montana's False Claims Act, Novartis is liable if it "[k]nowingly present[ed] or cause[d] to be presented a false, fictitious, or fraudulent claim for allowance or payment by any state agency or its contracts." MONT. CODE ANN. § 17-8-231 (2005). Novartis argues that the "undisputed factual record establishes" that Novartis "accurately described its AWPs when it reported them and that Montana understood the nature of NPC's AWPs." Novartis Mont. Mem.

[14] Mont. Opp. To Def. Jt. Mot. For Summ. J. at 23-27; Nev. Opp. To Def. Jt. Mot. For Summ. J. at 24-27.

at 12. To the contrary, Montana has shown numerous issues of material fact on this point both here and in its opposition to Defendants' joint motions. Importantly, the so-called disclaimer never reached payors who relied on Novartis's AWPs and Novartis did nothing to ensure they would receive it.[15] There is a clear factual dispute as to the "accurate description" Novartis claims its provided – including the adequacy of the description, who received it and when. There is additionally a genuine issue of material fact as to the State of Montana's knowledge concerning Novartis's Subject Drug pricing. For these reasons, Novartis as the moving party has not met its burden on summary judgment. Judgment for Novartis must not be entered on Montana's False Claims Act.

## IV. CONCLUSION

For the preceding reasons, and the reasons set forth more fully in the States' oppositions to Defendants' joint motions, Novartis's motion for summary judgment should be denied.

By /s/ Steve W. Berman

DATED: April 26, 2007

Steve W. Berman
Sean R. Matt
Jeniphr A.E. Breckenridge
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

COUNSEL FOR PLAINTIFFS
STATES OF MONTANA AND NEVADA

[15] *See supra* at III D.

Mike McGrath
Attorney General of Montana
Ali Bovingdon
Assistant Attorney General
Justice Building
215 North Sanders
P.O. Box 201401
Helena, MT 56920-1402
(406) 444-2026

COUNSEL FOR PLAINTIFF
STATE OF MONTANA

Catherine Cortez Masto
Attorney General of the State of Nevada
L. Timothy Terry
Deputy Attorney General
100 N. Carson Street
Carson City, Nevada 89701-4714

COUNSEL FOR PLAINTIFF
STATE OF NEVADA

**CERTIFICATE OF SERVICE**

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **NEVADA AND MONTANA'S OPPOSITION TO NOVARTIS PHARMACEUTICALS CORPORATION'S MOTIONS FOR SUMMARY JUDGMENT**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By **/s/ Steve W. Berman**

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292