**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| *State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) | |

**MONTANA'S OPPOSITION TO DEFENDANT TAP PHARMACEUTICAL PRODUCTS INC.'S MOTION FOR SUMMARY JUDGMENT**

The State of Montana, by its counsel, hereby responds to TAP Pharmaceutical Products Inc.'s ("TAP") motion for summary judgment.  Montana also adopts and incorporates the submissions made on its behalf in opposition to the defendants' joint motions for summary judgment and in responses to each of the Defendant's individual motions.

TAP is the manufacturer of one Subject Drug in this lawsuit:  Prevacid.  According to Dr. Hartman, TAP's misconduct in connection with Prevacid alone violated state statutes and resulted in penalties of between $163,000,000 to $222,000,000.  Hartman Mont. Decl., Table 6 (Breckenridge Decl. Ex. 1).[1]  But TAP urges the Court to single it out from its co-defendants for special treatment and to enter judgment in its favor.  TAP cites three principal bases:  (i) Montana was not "duped;" (ii) Montana has no evidence that TAP marketed the spread for

---

[1] All exhibits referenced herein unless otherwise indicated are attached to the Declaration of Jeniphr Breckenridge in Support of the States of Nevada and Montana's Memoranda in Opposition to the Individual Defendants' Motions for Summary Judgment ("Breckenridge Decl.").

Prevacid; and (iii) there is no evidence to support the penalties claimed. TAP is wrong on each account. Summary judgment should be denied as to TAP.[2]

## I. BACKGROUND

The claims and scope of the lawsuit have been refined since its initial filing. At this juncture, the State pursues monetary damages on behalf of the State Medicaid programs only and only for the damages and penalties calculated by Ray Hartman, Ph.D, the State's expert, and set forth in his Declarations ("Hartman Decl.") (Exs. 1-2). The damages the State claims constitute penalties for violations of Montana state statutes.[3] *Id*. These are the only damages the State now claims. TAP and its co-defendants have had this information since June 2006, when Dr. Hartman's declarations were submitted. TAP and its co-defendants had the opportunity to examine Dr. Hartman on his calculations, the State's damages and other related issues at his deposition in the Montana and Nevada state cases in August 2006.

## II. ANALYSIS

**A.     Montana Was Defrauded As To The Pricing For TAP's Drug Prevacid**

TAP alleges that Montana could not have been "duped" as to the inflated AWPs for TAP's Prevacid because it had notice of the true nature of TAP's AWP for the product from several sources: TAP provided ASPs to Montana for its products pursuant to a legal settlement, TAP Mem. at 2-3; Montana Medicaid had "actual knowledge" regarding Prevacid because non-Medicaid state entities enjoyed such discounts, TAP Mem. at 4-5; some Prevacid units

---

[2] TAP also argues that summary judgment should be granted as to Montana's claims for Medicare co-payments and Montana's claims on behalf of state employees, state agencies, consumer and private payor claims. TAP Mem. at 9-10. As discussed below, however, Montana is only pursuing the claims for which Dr. Hartman has calculated damages. *See infra.* at § I. TAP and its co-defendants have had Dr. Hartman's report for ten months. It is not clear why they continue to raise these arguments. Because they are moot, Montana will not address them here.

[3] Dr. Hartman has calculated defendant-specific overcharges or restitution damages only for certain Defendants because of the State's inability to obtain data from other drug manufacturers. *See* Ex. 1 (Hartman Mont. Decl. (June 13, 2006), Tables 1-2). Dr. Hartman did not calculate any damages for Prevacid. *See id.* Dr. Hartman has also not calculated damages of any type for physician-administered drugs. *See id.* at ¶¶ 22(c), 28-30, 33(b).

reimbursed by Medicaid were sold to the retail trade at WAC, TAP Mem. at 6-7; and Montana Medicaid received rebates for Prevacid, TAP Mem. at 7-8.  Below, Montana describes the numerous issues of material fact that exist for each of these contentions.  TAP has not met its summary-judgment burden.

### 1. TAP's provision of ASPs pursuant to a settlement agreement does not constitute knowledge for the relevant time period

By 2001, TAP and several TAP executives were the subject of criminal charges and civil liability for its fraudulent drug pricing and marketing conduct with regard to Lupron, a drug sold by TAP primarily for the treatment of advanced prostate cancer in men.[4]  TAP and the individuals agreed to settle the charges by paying hundreds of millions of dollars to various government entities.[5] As part of the agreement, TAP also agreed to provide Medicaid and Medicare with average sales prices for the drugs for which these programs reimbursed.[6]  The latter began later that year.

The evidence is equivocal as to whether the Montana Medicaid program received on a regular basis the ASPs TAP issued pursuant to the agreement.[7]  Even if they did, however, it is undisputed that TAP did not provide ASPs to Montana Medicaid prior to the 2001 settlement.  The relevant time period for this lawsuit is 1991 to the present.  At best, then, the ASPs have been provided to Montana Medicaid for the past six years.  No ASPs were provided for the first 10 years covered by the lawsuit.

TAP criticizes Montana for not using the TAP ASP data once received.  TAP Mem. at 3-4.  It is undisputed that doing so would have required manual intervention on the part of

---

[4] *See* Ex. 62 (U.S. DOJ Press Release, "TAP Pharmaceutical Products Inc. and Seven Others Charged With Health Care Crimes; Company Agrees to Pay $875 Million To Settle Charges" (Oct. 3, 2001) at 1).
[5] *Id.*
[6] *Id.*
[7] *See* Mont. Resp. to Def. Jt. L.R. 56.1 Stmt. at ¶ 117; Mont. Resp. to TAP L.R. 56.1 Stmt. at ¶ 19.

Montana.[8]  This was a prohibitively expensive and time-consuming requirement for a Medicaid program staffed as leanly as Montana Medicaid.[9]  Moreover, questions arose over the completeness and accuracy of the ASPs the program received from the handful of drug manufacturers who provided them.[10]  In 2006, TAP eventually acknowledged problems with the ASP data provided to Montana Medicaid going back several years.[11]

For these reasons, the provision of ASPs may go to reducing the penalties claimed by the State, it does not resolve any of the State's claims on summary judgment.

### 2. Discounting of Prevacid to non-retail purchasers does not constitute "actual knowledge" of Montana Medicaid

TAP alleges that the Prevacid acquisition practices of three non-Medicaid state agencies put Montana Medicaid on notice of the availability of "significant discounts through direct contracts with TAP."  TAP Mem. at 4-5.  Presumably, TAP's unstated point is that this alleged "actual knowledge" should have alerted Montana Medicaid that the AWPs on which it was naively basing its reimbursement were fake because they did not incorporate these and/or other discounts.  This requires a stunning leap of logic that is contra-indicated by the record.

The three agencies, who TAP submits without independent support, allegedly enjoyed direct purchases and discounts are the Department of Corrections, the Department of Public Health, and the Department of Veterans Affairs.[12]  The evidence on the record that TAP and other Defendants choose to ignore is that there is no formal or informal pathway of communication between Montana Medicaid and other State entities who are involved in

---

[8] *See* Mont. Resp. to TAP L.R. 56.1 Stmt. at ¶ 19.
[9] *See* Mont. Resp. to Def. Jt. L.R. 56.1 Stmt. at ¶ 117.
[10] *See* Ex. 58 (Buska Dep. (Dec. 15, 2006) at 513-15).
[11] *See* Ex. 63 (Letter from G. Weiglein, Director, Contracts and Pricing, TAP, to State Pharmacy Manager (Montana) (May 15, 2006).
[12] TAP implies that the knowledge of these entities should be imputed to Montana Medicaid.  This argument is not legally supportable and that is probably why TAP does not come out and make it overtly.

providing pharmaceutical drugs.[13]  The knowledge of the three entities TAP cites here can be even more sharply distinguished from that of Montana Medicaid than even the lack of communication among them.  TAP describes programs through which the non-Medicaid entities *purchased* drugs.  Montana Medicaid does not *purchase* drugs for recipients; it *reimburses* for drug purchases.  These are two very different functions.  There is no evidence on the record that these direct purchase programs were even relevant to reimbursement programs or available to Montana Medicaid.  Furthermore, there is no evidence that the prices for these programs had anything to do with AWP.

Finally, TAP's argument is particularly misplaced with respect to the Department of Veterans Affairs' pricing.  The Veterans Healthcare Act is its own animal – subject to regulations that have nothing to do with Medicaid.  As TAP well knows, Veteran drug pricing has a unique and independent history, subject to numerous specific regulations.  Its character makes it a particularly *in apropos* comparator here.  Furthermore, the suggestion that Montana Medicaid personnel should have protected itself from TAP's misconduct in reporting inflated AWPs by jumping through mathematical calculations to detect a fraud it did not know existed is absurd.

At a minimum, too many genuine issues of material fact exist with respect to Montana Medicaid's "actual knowledge" of Prevacid pricing.  Summary judgment cannot be granted on this basis.

### 3. TAP's focus on Prevacid's price to the "retail class of trade" is misplaced

TAP further argues that Montana Medicaid could not have been duped because "[d]irect sales of Prevacid from TAP to retail pharmacies . . . are made at WAC."  TAP Mem. at 6.  TAP's focus on the pharmacy's purchase price is misplaced.  The issue here is the price at which

---

[13] Mont. Resp. to Def. Jt. L.R. 56.1 Stmt. at ¶ 7.

Montana Medicaid reimbursed for the drug and whether TAP reported false data that went into the calculation of that reimbursement price through the program's estimation of EAC as required by the State's rule.  It is undisputed that the Montana Medicaid reimbursement formula required the use of one of three bases for EAC:  direct price, AWP less a fixed discount, or an acquisition cost fixed by the Department.  MONT. ADMIN. R. 37.86.1101 (2006).  The allowed factors did not include WAC.  The price the pharmacist pays is *not* "the only relevant price for purposes of Montana's claims."  TAP Mem. at 6.  The prices that pharmacies pay to acquire drugs for resale are relevant relative to two other prices:  the AWP supplied by TAP and the price the Medicaid program reimburses the pharmacy for a drug transaction based on AWP.  It is the *gap* between the price pharmacists and other providers pay and the AWP furnished by TAP through national compendia that is the point and underlies the State's claims.

TAP's argument concerning the price pharmacies pay to acquire drugs does not provide a basis for summary judgment.

### 4. Any rebates TAP paid Montana Medicaid are irrelevant to the penalties the State claims for overpaying for Prevacid

Like a handful of its co-defendants, TAP argues that any rebates it paid Montana Medicaid for Prevacid under the Omnibus Budget Reconciliation Act of 1990 (the federal rebates statute) should be "factored into Montana Medicaid's bottom line costs" before penalties are assessed against TAP for its misconduct.[14]  TAP Mem. at 7-8.  This treatment of the rebates is not warranted.  Dr. Hartman explains the "net out" of rebate payments in his report.  Ex. 1 at 14-15.  Because rebates are based on Average Manufacturer Price ("AMP"), which purports to be the drug manufacturer's approximation of ASP, the rebates themselves are independent of

---

[14] Significantly, not all Defendants have argued that rebates should be applied as an offset to penalties.

001534-15 166708 V1

AWP and should be the same whether the AWPs are inflated or actually average wholesale prices. *Id.* In essence, the same rebate would be applied under either scenario. *Id.*

An additional reason the rebates should not be applied to grant TAP relief from the penalties is the very concept of penalty. TAP and its co-defendants are ***obligated*** under federal law to provide rebates to Montana Medicaid and other Medicaid programs if they want their drugs to be available to Medicaid recipients. The rebates are calculated pursuant to federal guidelines. The rebates are based on the AMPs reported by drug manufacturers, not AWPs. The rebates, then, would be the same whether or not the AWPs were inflated.

TAP argues that this rebate should be applied to offset the net reimbursements Montana Medicaid made for Prevacid based on the inflated AWPs. The net effect would be a reduction of Montana's "bottom line" costs for Prevacid and, TAP says, a related reduction of penalties. But the AMP-based rebate to which Montana was entitled would have been the same even if TAP had not inflated the AWPs. In that case, Montana would have enjoyed the benefit of the rebate on top of lower, non-inflated reimbursements for Prevacid.

A penalty is "a punishment established by law or authority for a crime or offense."[15] TAP should not be allowed to avoid the punishment for its offenses here by using the rebate it was obligated to provide to the State whether or not it inflated its AWP to reduce the penalties for which it is liable.

### 5. The fact that some reimbursements to providers of Prevacid were based on non-AWP pricing does not entitle TAP to judgment

TAP contends that because Montana did not reimburse for each and every Prevacid transaction based on AWP, judgment should be entered in its favor. TAP Mem. at 8-9. This lawsuit is about TAP's AWP-based pricing and whether it was unfair or deceptive under State

---

[15] American Heritage Dictionary of the English Language (1969).

statutes proscribing such conduct. To the extent that TAP can demonstrate that certain transactions were not based on AWP, they would not be included as part of the TAP damages. At the same time, the fact that on occasion the State may have reimbursed on a basis other than AWP does not "negate[] any allegation of fraud." *Id.* TAP does not draw any link between the two. This is probably because to do so would contradict evidence regarding the Montana Medicaid program's reimbursement operations. Montana Medicaid's drug reimbursement is – and has always been – handled by its fiscal intermediary, an outside vendor. The actual reimbursement for drugs is automated. Therefore, if discrete transactions were occasionally based on something other than AWP, it is unlikely that Medicaid personnel would ever know. The truth – both about the bases for individual payments and the systemic industry-wide inflation of AWP – had to be unraveled through the examination of data after the fact.

This is not a basis for summary judgment.

**B.     Dr. Hartman's Calculations Are Sound And Support Penalties For Prevacid Transactions**

TAP's attack on Dr. Hartman's calculations of penalties for Prevacid reimbursement by Montana Medicaid is based on a restatement of its previous arguments. TAP Mem. at 11-12. First, TAP says that Dr. Hartman calculates some penalties "for some retailers who purchased Prevacid at or around its published WAC." This contention is more than a little confusing because there are no penalties for retailer purchases. The penalties are based on reimbursements based on AWP and the penalties are charged to TAP. This TAP argument fails. Second, TAP says, Dr. Hartman failed to recognize many of the State's reimbursements for Prevacid were at less than AWP and thus provide no basis for any penalties. Montana addresses this argument above at § A.5. Third, says TAP, Dr. Hartman "cannot determine [] pharmacies acquisition costs from TAP's sales data." TAP Mem. at 12. Dr. Hartman does not base his determination of

acquisition cost on TAP sales data.  He does describe how he has estimated acquisition costs.  Ex. 1 (Hartman Mont. Decl. at ¶ 22).  This is a reasonable and accepted method for calculating acquisition cost.  Fourth, TAP reargues its point on rebates.  TAP Mem. at 13.  Montana responds to the same argument above at § A.4.

At most, TAP has assailed Dr. Hartman's damages methodologies and created a genuine question of material fact as to how damages should be calculated.  None of its arguments, though, mandate judgment in its favor.

### III.   CONCLUSION

For the foregoing reasons and the reasons set forth more fully in the State's opposition to Defendants' joint motions, TAP's motion for summary judgment should be denied.

By    /s/ Steve W. Berman                    DATED:  April 26, 2007
Steve W. Berman
Sean R. Matt
Jeniphr A.E. Breckenridge
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594


Mike McGrath
Attorney General of Montana
Ali Bovingdon
Assistant Attorney General
Justice Building
215 North Sanders
P.O. Box 201401
Helena, MT  56920-1402
(406) 444-2026

COUNSEL FOR THE
STATE OF MONTANA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **MONTANA'S OPPOSITION TO DEFENDANT TAP PHRAMACEUTICAL PRODUCTS INC.'S MOTION FOR SUMMARY JUDGMENT,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By         /s/ Steve W. Berman
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292