UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| *State of Montana v. Abbott Labs., Inc., et al.*,        Cause No. CV-02-09-H-DWM (D. Mont.) | |

**MONTANA'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF
DEFENDANTS BRISTOL-MYERS SQUIBB COMPANY, ONCOLOGY
THERAPEUTICS NETWORK CORPORATION AND APOTHECON, INC.**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND ..................................................................................................2

III.  ANALYSIS ...........................................................................................................3

  A.    BMS Caused Fictitious AWPs for All of Its Drugs to Be Published ......................3

    1.    BMS controlled the AWPs for its subject drugs by reporting WLPs with full knowledge of the mark-up factors that the publishers would use to create the AWPs..........................................................................................3

    2.    BMS knew that Montana Medicaid based reimbursement for BMS Subject Drugs on the BMS AWPs and BMS understood the impact it could have on reimbursement........................................................................................4

    3.    BMS Controlled and "Owned" the AWPs for its Drugs and Published AWPs .................................................................................................5

    4.    BMS knew that AWPs did not reflect the prices at which BMS oncology drugs were sold ...........................................................................................6

  B.    The Provision of List Prices by BMS Does Not Relieve It of Liability .................8

    1.    WLPs and AWPs are formulaic equivalents; by reporting one, BMS effectively reports the other ........................................................................8

    2.    BMS's reporting of WLPs, knowing full well how they would translate into AWPs published by BMS and others, legally obligated BMS to take steps to ensure that the AWPs for its drugs were not unfair or deceptive ...9

    3.    BMS Overplays its List Price "Defense"..................................................12

  C.    BMS's Argument That it did not Market the Spread for its Self-Administered Drugs is not Dispositive of Montana's Claims .......................................................16

IV.   BMS'S CAUSATION ARGUMENTS DO NOT ENTITLE  IT TO SUMMARY JUDGMENT ........................................................................................................16

V.    CONCLUSION...................................................................................................18

# TABLE OF AUTHORITIES

<u>**PAGE**</u>

## FEDERAL CASES

*Augat, Inc. v. Collier*,
  1996 U.S. Dist. Lexis 2702 (D. Mass. Jan. 22, 1996)......................................................10

*Bonilla v. Volvo Car Corp.*,
  150 F.3d 62 (1st Cir. 1998)................................................................................................13

*Cashman v. Allied Prods. Corp.*,
  761 F.2d 1250 (8th Cir. 1985) ..........................................................................................10

*Langford v. Rite Aid of Ala., Inc.*,
  231 F.3d 1308 (11th Cir. 2000) ........................................................................................13

*In re Lupron Mktg. & Sales Practices Litig.*,
  245 F. Supp. 2d 280 (D. Mass. 2003) .................................................................................4

*In re Lupron Mktg. & Sales Practices Litig.*,
  295 F. Supp. 2d 148 (D. Mass. 2003) .................................................................................4

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  230 F.R.D. 61 (D. Mass 2005)............................................................................................8

*Roeder v. Alpha Indus., Inc.*,
  814 F.2d 22 (1st Cir. 1987)..........................................................................................9, 10

*Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.*,
  246 F.3d 64 (1st Cir 2001)................................................................................................10

*Turner v. Johnson & Johnson*,
  809 F.2d 90 (1st Cir. 1986)...............................................................................................10

*Union Pac. Resource Group, Inc. v. Rhone-Poulenc, Inc.*,
  247 F.3d 574 (5th Cir. 2001) ............................................................................................10

*V.H.S. Realty, Inc. v. Texaco, Inc.*,
  757 F.2d 411 (1st Cir. 1985).......................................................................................9, 10

## STATE CASES

*Ragsdale v. Kennedy*,
  286 N.C. 130, 209 S.E.2d 494 (1974)...............................................................................10

*Underwood v. Risman*,
    414 Mass. 96, 605 N.E.2d 832 (1993) ...............................................................................10

*Zwiercan v. GMC*,
    58 Pa. D. & C. 4th 251 ....................................................................................................10

## STATE STATUTES

MONT. CODE ANN. § 30-14-103 .................................................................................................2

MONT. CODE ANN. § 17-8-231 ...................................................................................................2

MONT. CODE ANN. § 53-6-160(1) ..............................................................................................2

001534-15  163839 V1

The State of Montana ("State") respectfully submits its opposition to the Motion for

Summary Judgment of Defendants Bristol-Myers Squibb Company, Oncology Therapeutics

Network Corporation and Apothecon (collectively "BMS").  Montana also adopts and

incorporates its summary judgment submissions in opposition to the Defendants' joint motions

and in opposition to each defendant's individual motions.[1]

## I.       INTRODUCTION

BMS seeks summary judgment on the bases that it merely sent "real," "truthful" list

prices to industry publications and had no control over AWPs, BMS Br. at 9-13, and that the law

permits it to report list prices without disclosing discounts.  *Id*.  These grounds are virtually

identical to those submitted in the BMS Defendants' motion for summary judgment in the class

case.[2]  In addition, BMS argues here that its conduct could not have violated state statutes with

respect to "self-administered brand name drugs" because – unlike BMS's physician-administered

drugs – there was no "actionable spread," and BMS was just conveying "truthful information in

response to customer questions."  BMS Br. at 2.

The Court denied summary judgment in the class case.  *See* Electronic Order dated

Mar. 21, 2007.  On the common issues, summary judgment should be denied in this case for the

same reasons.  The BMS Defendants' narrow focus once again ignores the pervasive fraud

challenged in these cases.  The State does not simply allege that BMS publicized list prices yet in

some instances charged less.  Rather, the State challenges a pervasive scheme whereby BMS

reported list prices that ***most*** buyers did not pay, knowing full well that the list prices would be

used to create AWPs that BMS published for use by the Montana Medicaid program and others

---

[1] To avoid duplication in light of the extensive briefing already submitted, Montana dispenses with the discussion of summary judgment standards and relies on BMS facts found in Plaintiffs' Proposed Post Trial Findings of Fact in the Class 2 and 3 MDL trial (Dkt. No. 3553).

[2] *See* the BMS Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (Mar. 15, 2006).  In fact, the briefing is also nearly identical to that BMS submits here.

in reimbursing pharmacies, physicians and other providers and that those same providers would

be purchasing the drugs at prices not just significantly lower than AWPs, but oftentimes nowhere

near the list prices that formed the basis of the AWPs.

Summary judgment should also be denied on BMS's argument that it did not market the

spread in connection with its self-administered drugs.  Even if the proof fails as to BMS's spread

marketing as to self-administered drugs, the evidence is clear on BMS's submission of false

AWPs for all categories of drugs.  This alone is enough to establish "unfair" conduct by BMS

under the Montana Unfair Trade Practices Act, MONT. CODE ANN. § 30-14-103, and the

submission of false statements under the Medicaid fraud statute, MONT. CODE ANN.

§ 53-6-160(1), and the Montana False Claims Act, MONT. CODE ANN. § 17-8-231 (2005).

## II.     BACKGROUND

Attorney General Mike McGrath originally brought this action to enforce state laws and

to protect Montana's Medicaid program and the well-being of the citizens who make prescription

drug payments or co-payments based on AWPs.  The claims and the scope of the lawsuits have

been refined since their initial filing.  At this juncture, Montana pursues monetary damages on

behalf of the State Medicaid program only and only for the damages and penalties calculated by

Dr. Hartman and set forth in his Declarations.  *See* Declaration of Jeniphr Breckenridge in

Support of the States of Nevada and Montana's Memoranda in Opposition to the Individual

Defendants' Motions for Summary Judgment ("Breckenridge Decl."), Exs. 1-2.  The State claims

constitute overcharges for select drugs and penalties for violations of Montana state statutes.[3]  *Id.*

Dr. Hartman has calculated overcharge damages for select BMS drugs.  *Id.*, Ex. 1, Tables 1-2.

BMS and its co-defendants have had this information since June 2006, when Dr. Hartman's

---

[3] Dr. Hartman has calculated defendant-specific overcharges or restitution damages only for certain defendants because of the States' inability to obtain data from other drug manufacturers.  *See* Breckenridge Decl., Ex. 1 (Hartman Mont. Decl., Tables 1-2).

reports were submitted.  BMS and its co-defendants had the opportunity to examine Dr. Hartman

on his calculations, the Montana damages and other related issues at his deposition in the

Montana and Nevada state cases in August 2006.

### III.   ANALYSIS

**A.   BMS Caused Fictitious AWPs for All of Its Drugs to Be Published**

**1.   BMS controlled the AWPs for its subject drugs by reporting WLPs with full knowledge of the mark-up factors that the publishers would use to create the AWPs**

BMS argues that it did not control or inflate AWPs, because "BMS does not report AWPs

to the publications; ***it reports list prices***."  BMS Br. at 9-10 (emphasis added).  To the contrary,

the evidence demonstrates that BMS tightly controlled its AWPs through the reporting of the list

prices.  The manner in which they did it constitutes unfair and deceptive acts in violation of

Montana statutes.

Denise Kaszuba, BMS's Associate Manager of Pricing Support was the person

responsible for reporting WLPs to the publishers and reviewing and confirming the AWPs the

publishers calculated based on the WLPs.  She readily admitted that the publishers reported an

AWP using BMS WLPs as the base.  Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 44).  As BMS

describes the process, it sent to the publishers a wholesale list price ("WLP") or direct price,

from which the publishers predictably calculated the AWPs.  *See*, *e.g.*, Trial Ex. 177 (Response

to Interrog. No. 11).  The publication of the AWPs was predictable not only because that was the

principal purpose of the national compendia, but also because of the continuing exchange

between BMS and the publishers.  At times, BMS specifically instructed the publishers to

"[p]lease supply AWP's for these products once they have been processed through your

database." *See*, *e.g.*, Trial Ex. 179.[4]   At other times, BMS confirmed the AWPs before

publication.  The publishers sent a report back to BMS showing the AWPs that were to be

printed from the WLPs,[5] and BMS Pricing Support reviewed the AWPs for reasonability and to

audit the markup factor applied.  Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 105-06).[6]

BMS also did not leave the mark up to publisher discretion.  Very early in the time period

at issue, BMS instructed the publishers to use a 25% mark-up factor for BMS oncology products:

"Effective immediately, Bristol-Myers Oncology Division products factor used in determining

the AWP should be changed from 20.5% to 25%." *See*, *e.g.*, Trial Ex. 183.  The *Red Book* made

this change as BMS directed.  Kaszuba Aff., ¶ 2 (Dkt. No. 2269).[7]  Thereafter, the *Red Book*

always used a 25% mark-up factor on BMS oncology drugs.

In sum, BMS well understood the markup factors applied by the publishers to the BMS

WLPs.

### 2. BMS knew that Montana Medicaid based reimbursement for BMS Subject Drugs on the BMS AWPs and BMS understood the impact it could have on reimbursement

It is undisputed that BMS understood that Montana Medicaid and "various other

participants in the prescription drug reimbursement system relied on AWPs to reimburse

---

[4] *See also* Trial Ex. 179.

[5] Trial Ex. 177.

[6] *See also* Trial Ex. 180 at 000186649 ("Review AWP's for reasonability, i.e. 20%-25% higher than new wholesale price…."); Trial Ex. 181 and Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 149-50); Trial Ex. 182 and Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 151-52).

[7] *In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 159 (D. Mass. 2003).  As Judge Stearns has twice found, the *Red Book* never undertook an independent verification of the actual AWP.  *In re Lupron® Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 285 n.7 (D. Mass. 2003); *In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.  The other publishers used a markup factor of 20% for most BMS drugs until 2002, when *First DataBank* changed it to 25% (Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 98-99); Kaszuba Aff., ¶ 4 (Dkt. No. 2269)), and BMS was always aware of the markups being used by all three publishers.  Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 100-01).

- 4 -

physicians and pharmacies."[8]  Numerous senior BMS managers have confirmed this understanding through their testimony.[9]

It is also undisputed that BMS understood how to effect changes to AWP and how this would directly affect reimbursement regimens based on AWP.  For example, an internal Apothecon memo from 1993 discussing pricing strategy for two different lines of antibiotics explained how to set a new AWP "that maximizes its Marketing efforts":

> Mechanically the way to accomplish this is to raise the list price (list price + 25% = AWP) of Trimox, Veetids and Betapen.  This is a list price change only.  The average selling price of the products will not change.  However, the data services will report this as a Bristol-Myers Squibb list price increase.

Trial Ex. 185 at 0041865.  Other documents clearly demonstrate that BMS knew that it could effect precise changes in AWP through changes in its reported WLPs.[10]

### 3.    BMS Controlled and "Owned" the AWPs for its Drugs and Published AWPs

In addition to controlling the AWPs reported by the major publications by providing list prices for BMS drugs, BMS itself was a ***direct*** publisher of AWPs.  From 1995 through 2004, BMS produced an Internal Price List that contained various prices including AWPs, Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 46-47).  AWPs were included in the request of

---

[8] BMS Answer to Montana Second Amended Complaint, ¶¶ 154-63, 166 (Dkt. No. 914).

[9] The following testified that they understood that government and private reimbursement schemes were based on AWP:  Dianne Ihling, BMS's former Director of Pricing and Institutional Operations (Breckenridge Decl., Ex. 82 (Ihling Dep. at 90-93); Christof Marre, BMS's former Director of Marketing, Oncology (*Id.*, Ex. 83 (Marre Dep. at 49); Denise Kaszuba (*Id.*, Ex. 81 (Kaszuba Dep. at 44-45); John Akscin, OTN's Vice President of Government Relations and Managed Care Services (*Id.*, Ex. 84 (Akscin Dep. at 26-27); and Marsha Peterson, OTN's Western Sales Manager (*Id.*, Ex. 85 (Peterson Dep. at 10) (Until 2005, OTN was a wholly-owned subsidiary of BMS and sales agent for BMS oncology products.)

[10] *See, e.g.*, Trial Ex. 186 (the proposed price increase would result in a 111% increase in reimbursement amount based on AWP-15%); Trial Ex. 187 (recognizing that a 25% markup to WLP is applied and that, consequently, a 7% price increase on Plavix translates into an 11% AWP increase and a 13% MCO increase based on a typical reimbursement formula of AWP – 13%); Trial Ex. 188 and Breckenridge Decl., Ex. 81 (Kazuba Dep. at 117-20 ("If we never sell these multi source products at the High Billing Category 51 price, why not reduce the bc 51, 56, 57, 58, 59 price?  Since the AWP (Average Wholesale Price) is calculated based on the wholesale list – retailers benefit from a High AWP price under the reimbursement policies of Insurers.")); Trial Ex. 189 (further confirming that BMS well knows how AWPs are set based on BMS WLPs).

marketing personnel, who were interested in AWPs because customers reimbursed based on

AWP (*id.* at 50-51).  Pricing Support would occasionally field calls from marketing personnel

with requests for AWP information on both BMS drugs and the drugs of competitors.  *Id*. at 50-

55.  Furthermore, throughout the 1990s, Pricing Support provided the BMS oncology sales force

with a Pocket Reference Guide that contained AWPs from all three data services.  *Id*. at 110-12.

OTN continually republished the AWPs for BMS Subject Drugs.  For example, the OTN

periodic publication *The Network News* reported the AWPs taken from the *Red Book*.[11]  As

explained in the back of *The Network News* under the caption "Reimbursement":

> The Average Wholesale Prices (AWPs) and HCPCS codes for drugs commonly
> used in cancer treatment are provided for your use as a reimbursement
> resource. . . .  The AWPs are obtained from the *1998 Red Book* and the *November
> 1998 Red Book Update*.  For drugs that have multiple manufacturers, the AWP for
> the product most commonly stocked by OTN is listed.  For ease of use, we list the
> AWP information in the first three columns.

OTN also published numerous online reports to which customers subscribed, including:

the "AWP Report," which contained a list of current AWPs for drugs that the client has

previously purchased; the "AWP/Price Report," which contained the AWP for drugs that the

client purchases and the billing unit for each particular drug (Trial Ex. 193); and the Purchase

History Report, which also showed AWP and OTN prices in side-by-side columns (Trial

Ex. 848).

### 4.    BMS knew that AWPs did not reflect the prices at which BMS oncology drugs were sold

BMS controlled and published AWPs and understood that Medicaid reimbursements

were based on AWP, yet at the same time knew that its AWPs were fictitious.  BMS never

conducted a study of wholesalers to determine what they charged for BMS drugs prior to

---

[11] *See* Trial Ex. 192 (May/June 1994; November/December; 1994; date unclear but Spring 1994); *Id*. (various issues from 1997-2000).

directing the publications to use a 25% mark-up factor.  *See, e.g.,* Breckenridge Decl., Ex. 81

(Kaszuba Dep. at 101); *Id*., Ex. 82 (Ihling Dep. at 93).  But BMS probably thought that this was

unnecessary, ***because it knew that wholesalers did not charge anything near AWP for BMS***

***drugs***.  For instance, Oncology Marketing Director Christof Marré admitted that purchasers in

the marketplace would not actually buy BMS drugs at the AWP because wholesalers would buy

at list price less a 1 or 2 percent prompt payment discount and would not be able to command a

25 or 30% margin.  *Id.*, Ex. 83 (Marré Dep. at 42-44).  Marré also recognized that customers

buying under contracts purchased well below WLP.  *Id.* at 48.[12]

Documents, such as the "Executive Summary," also recognized that no one pays AWP:

"As previously discussed, by convention all manufacturers sell to wholesalers at prices 2%

below the list price.  Wholesalers then sell medicines to retail pharmacies at prices significantly

below the published AWP."  Trial Ex. 194 at 00469291.  An internal document titled "AWP

(Ain't What's Paid)" declares that the *First DataBank* 20-25% AWP markup is an "artificially

inflated number" but that reimbursement formulas were still based on AWP because "it is the

only easily obtained published price source."  Trial Ex. 195.  Notably, First Data Bank was the

published source used by Montana Medicaid for reimbursement.

So, did BMS take any action to publicize that the AWPs for its drugs were artificially

inflated?  ***It is an undisputed fact that BMS took no such action***.  For example, at no time did

Marré move to correct the AWPs that were being published, Breckenridge Decl., Ex. 83 (Marré

Dep. at 45-46), notwithstanding his knowledge that AWP was used as a reimbursement term by

payors.  *Id*. at 49.  Instead, BMS continued to report WLPs to be marked-up to AWP; published

---

[12] For her part, Pricing Support Manager Kaszuba was aware that wholesalers typically purchase at WLP less 1-2% for a prompt payment discount, *id.*, Ex. 81 (Kaszuba Dep. at 58), and that end-purchasers of BMS drugs can purchase at contract pricing less than WLP and also receive rebates from BMS.  *Id.* at 58-60.  Nonetheless, Kaszuba attempted to feign ignorance as to whether anyone ever pays AWP for BMS drugs, *id.* at 60-61, but later admitted in response to at least one document that no one paid AWP for that particular drug.  *Id.* at 65.

AWPs; and used AWPs in its marketing efforts (*see infra*).  Moreover, BMS never went back to the *Red Book* to retract BMS's directive that the *Red Book* use the 25% mark-up factor that the *Red Book* adopted at BMS's behest.

**B.      The Provision of List Prices by BMS Does Not Relieve It of Liability**

> **1.      WLPs and AWPs are formulaic equivalents; by reporting one, BMS effectively reports the other**

In addition to the substantial record evidence demonstrating that BMS controlled and published the AWPs for its Subject Drugs, market behavior demonstrates that WLP and AWP are "formulaic equivalents" such that reporting a WLP is the same as reporting an AWP.  The Court previously considered this proposition, finding that "[t]he AWP, or its formulaic equivalent the WAC (Wholesale Acquisition Cost), is interpreted by industry as the signal for the underlying structure of list and transaction prices for almost all drugs."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (D. Mass 2005) (quoting Hartman at 3).[13]

Dr. Hartman explains the link between the two:

> [A]s a matter of economics, list prices are some of the most important signals that all drug manufacturers, particularly innovator drug manufacturers, use to strategically place drug products in the market.  The two most important list prices are the AWP and the WAC (or WLP). . . .  Since there is a well understood formulaic relationship between AWP and WAC, . . . reporting **either** to the price reporting services implies that **the other list price is set automatically**.

April 6, 2006 Declaration of Raymond S. Hartman in Opposition to Defendants' Motion for Summary Judgment ("April 6, 2006 Hartman Decl."), ¶ 27 (footnotes omitted; emphasis in original); *see also* Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification ("Hartman Class Cert. Decl."), Attachment D, ¶ 1 (explaining that AWP and WAC

---

[13] So, too does, Dr. Berndt (Berndt Report at 6) and even defense expert Young (Oct. 25, 2004 Young Rebuttal Report at ¶ 134).

are "interchangeable" since "the two list prices are usually related by a constant ratio [and] convey the same information to purchasers and other entities that rely on published price data.").

The evidence above reveals BMS's understanding of the interchangeability of WLP and AWP.  Try as it may to distance itself from the BMS AWPs that were published in the market, BMS's act of reporting WLPs resulted directly and predictably in the creation of AWPs.  As Dr. Hartman amplifies, "[t]he argument that BMS would report only its WAC (WLP) and pay no attention to the resulting AWP set by the pricing services is implausible and disingenuous, as a matter of economics and the business practices in this industry and market."  April 6, 2006 Hartman Decl., ¶ 27 (footnote omitted).

> **2.    BMS's reporting of WLPs, knowing full well how they would translate into AWPs published by BMS and others, legally obligated BMS to take steps to ensure that the AWPs for its drugs were not unfair or deceptive**

BMS was not required to volunteer its WLPs to pricing compendia, like First DataBank, which supplied AWPs to Montana Medicaid.  Nor was it required to direct compendia such as the *Red Book* to apply a 25% mark-up factor to WLP to get the AWP.  But once BMS chose to do so – knowing fully that Medicaid and other payors would be reimbursing at those inflated prices and that "AWP can confuse the understanding of pricing within the US pharmaceutical system"– BMS became obligated to ensure that its representations were accurate.

It is axiomatic under statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  *V.H.S. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (RICO and securities claims).  Indeed, the First Circuit has specifically held that "[w]hen a corporation does make a disclosure – ***whether it be voluntary or required*** – there is a duty to make it complete and accurate."  *Roeder*, 814 F.2d at 26 (emphasis added).  "'Fragmentary information may be as

misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . ."
*V.H.S. Realty*, 757 F.2d at 414-15 (quoting *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d
708 (1969)).  Thus, if a drug manufacturer "chooses to reveal relevant, material information even
though it had no duty to do so, it must disclose the whole truth."  *Roeder*, 814 F.2d at 26 (quoting
*Grossman v. Waste Mgmt., Inc*., 589 F. Supp. 395, 409 (N.D. Ill. 1984)); *see also*, *e.g.*, *Ragsdale
v. Kennedy*, 286 N.C. 130, 139-40, 209 S.E.2d 494, 501 (1974) ("The rule is that even though a
vendor may have no duty to speak under the circumstances, nevertheless if he does assume to
speak he must make a full and fair disclosure as to the matters he discusses."); *Underwood v.
Risman*, 414 Mass. 96, 99, 605 N.E.2d 832 (1993) ("A duty exists under c. 93A to disclose
material facts known to a party at the time of a transaction.") (citations omitted).[14]  Furthermore,
as the First Circuit explained in *Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.*, 246 F.3d 64,
73 (1st Cir 2001), the methods, acts, and practices deployed by a defendant must be assessed "'in
their factual setting,'" *id.* (citations omitted), not in terms of some cynical parsing of the overall
scheme.  *See also id.* at 73 (in interpreting ch. 93A "'[w]e focus on the nature of the challenged
conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. 93A
fairness determination'") (citations omitted).

---

[14] *See also Zwiercan v. GMC*, 58 Pa. D. & C.4th 251, 2002 Pa. D. & C. Lexis 74, at *9-10 (2002) (discussing
contexts in which there may be a duty to disclose under consumer protection acts and noting Illinois CFA decisions
holding that omissions or concealment of a material fact in the conduct of trade or commerce constitutes fraud.")
(citing *Connick v. Suzuki Motor Company Ltd.*, 174 Ill. 2d 482, 504, 675 N.E.2d 584, 595 (1997)); *Cashman v.
Allied Prods. Corp.*, 761 F.2d 1250, 1255 (8th Cir. 1985) (approving jury instruction under state consumer
protection act providing in pertinent part that "[s]ilence . . . may be a misrepresentation if it relates to a material fact
and there is a duty to disclose the matter.  This duty may arise out of a relationship of trust or confidence, an
inequality of bargaining position, an awareness that the undisclosed fact would prevent a previous representation
from being misleading or an unequal access to information."); *Turner v. Johnson & Johnson*, 809 F.2d 90, 100 (1st
Cir. 1986) (finding that "an incomplete or partial statement may be the basis for fraud when only full disclosure
would avoid deception"); *Augat, Inc. v. Collier*, 1996 U.S. Dist. Lexis 2702, at *47 (D. Mass. Jan. 22, 1996) (noting
that disclosure of partial information may be fraudulent); *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247
F.3d 574, 586 (5th Cir. 2001) (finding disclosure of "some but less than all material facts" may be actionable where
"partial disclosure convey[s] a false impression.").

- 10 -

Still, BMS argues, it did not "control the way that publications report AWPs" and it bore no responsibility for the false statements of the publishers nor controlled their calculations because it did not "conspire" with the publishers' publications.  BMS Br. at 11-12.  This point is seriously undermined by the evidence.  Clearly, BMS did not need to control the operations of the publishers in a corporate or legal sense or conspire with them in order to control the published AWPs BMS benefited from using the AWPs that the publishers disseminated, because it understood that the publishers voluntarily would and did publish whatever AWPs that BMS wanted for their products.  BMS Br. at 5 ("The publications calculate AWPs on their own by multiplying the list price [reported to them by BMS] by a mark-up factor ranging from 20% to 25%."); Kaszuba Aff., ¶ 3 (admitting that the *Red Book* implemented BMS's command to use a 25% mark-up factor) (Dkt. No. 2269).  BMS could have halted the publication of its AWPs at any point by withholding its WLP's from the publishers.  Moreover, BMS *itself* published AWPs, thereby making affirmative misrepresentations itself.

BMS also appreciated the impact that creating spreads would have:  a growing disparity between WLP and AWP creates an incentive for providers to select the brand.  For example, BMS once explained with respect to its Vepesid drug:

> The Etopophos product file is significantly superior to that of etoposide injection. . . .  Currently, physician practices can take advantage of the growing disparity between VePesid's list price (and, subsequently, the Average Wholesale Price [AWP]) and the actual acquisition cost when obtaining reimbursement for etoposide purchases.  If the acquisition price of Etopophos is close to the list price, the physicians' financial incentive for selecting the brand is largely diminished.

Trial Ex. 208 at 0011221.  In order to promote Etopophos, a new BMS drug that was expected to cannibalize BMS's VePesid sales, the document suggested lowering VePesid's AWP in order to create sales for Etopophos:  the "AWP for Vepesid would be reduced from its current level to the

- 11 -

highest bid price currently in the marketplace." *Id.* Furthermore, "[s]ince the AWP . . . is calculated based on the wholesale list – retailers benefit from a High AWP Price under the reimbursement policies of Insurers." Trial Ex. 188; Breckenridge Decl., Ex. 81 (Kaszuba Dep. at 117-20); *see also* Trial Ex. 210 (acknowledging that the list price is set to establish an AWP hat is competitive with other offerings and will not reflect actual selling price since atenolol is sold primarily at contract pricing); Trial Ex. 210 at 0000583 ("To accomplish a rapid market introduction of albuterol, wholesale list prices must be established.  These wholesale prices do not reflect actual selling prices, as albuterol will be sold primarily at contract or special offer pricing. . . .").

### 3.  BMS Overplays its List Price "Defense"

BMS contends that it cannot be held liable for simply reporting list prices at which some sales were made, BMS Br. at 11, but this frames the issue too narrowly and at the expense of the larger picture.  The Court must evaluate the totality of BMS's conduct.  While applying the higher standard imposed under RICO, Judge Stearns in *Lupron* rejected a defense strategy nearly identical to that pressed by BMS here and distinguished several of the cases that BMS often relies in defending its list price practices:

> A good argument can go wrong when its fundamental premise is flawed.  It is true, as defendants contend, that no federal case or statute imposes a duty on a manufacturer to disclose to retail consumers the prices that it charges intermediate suppliers for its products, nor with a possible antitrust exception, is a seller required to charge the same price for a product to every consumer in every market.  This is true even where the seller derives a presumed benefit from the consumer's ignorance of what it actually paid for the products it sells.  *See Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d. 198, 212-214 (D. Mass. 2002) (Saris, J.), *aff'd*, 316 F.3d 290 (1st Cir. 2003). . . .  But this is not a case of nondisclosure.  Defendants did not stand mute. … [D]efendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud. Whether one views the defendants' actions as involving the

dissemination of information that was wholly false, or false because of an incomplete depiction of the truth, they are actionable under the mail and wire fraud statutes. . . .  This is not a case of a retailer failing to disclose the discounted prices that it offered to favored customers (*Langford*),[15] or a manufacturer the price differentials on its sales of the same product in different markets (*Bonilla*),[16] or a health plan the discounts it received on prescription drugs (*Alves*).[17]  Rather, this is a case of affirmative misrepresentation.  And because the alleged misrepresentations were knowing, deliberate, and made in furtherance of a scheme to defraud, they are sufficient to support the predicate acts of mail and wire fraud.

295 F. Supp. 2d at 167-68 (footnote omitted).

BMS exaggerates the "truthfulness" of its list prices, BMS Br. at 11-12, and, in the process, underscores its pricing manipulation.  Once a BMS oncology drug is subject to competition – whether from another branded product or generic entrants – BMS offered confidential discounts,[18] with the effect that "average contract prices and floor prices for BMS drugs in the multi-source portfolio tended to trend down over the long term."[19]  The data reveal that those prices dropped sharply, while WLPs and AWPs did not decrease – at all.  In fact, there is no dispute that after BMS Subject Drugs faced therapeutic and/or generic competition, the actual prices at which physicians acquired those drugs decreased substantially and that, after

---

[15] *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308 (11th Cir. 2000).  BMS has invoked *Langford*, but its reliance thereon is risky given that the court in that decision went out of its way to limit its holding to the specific circumstances before it, finding that the uninsured consumer plaintiffs were perfectly able to shop for lower prices and that, had those consumers been "somehow less able to shop around and identify attractive drug prices than were other consumers, the situation may have demanded that Rite Aid make certain disclosures to them."  231 F.3d at 1314.  That very concern operates in the instant case where the plaintiff consumers had **no** shopping choices whatsoever because their physicians chose the medication to be administered in the provider's office, and either Medicare Part B or the consumer's insurance plan required the consumer to make a 20% co-payment.  There simply was no opportunity to "shop around," even if an elderly chemotherapy patient had wanted to.

[16] *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998).  Like the *Lupron* defendants, BMS has also errantly relied on *Bonilla*.

[17] Judge Stearns could have also distinguished *Alves* on the basis that this Court in *Alves* was balancing the policy factors employed to determine whether a plan sponsor breached its fiduciary duty under ERISA.  Such an inquiry under ERISA is not relevant here.

[18] Pasqualone Trial Aff., ¶ 17 (Dkt. No. 3339); Trial Tr. Day 5 at 129 (Marré).

[19] Marré Trial Aff., ¶ 9 (Dkt. No. 3337).

- 13 -

several years of generic competition, BMS did not make substantial sales at or near the WLPs that BMS continued to report for the Subject Drugs.

Furthermore, BMS's own expert Bell's concedes that the vast majority of BMS's revenues were generated at prices within 5% of WLP, which reinforces marketplace expectations of a rational relationship between costs and AWP.  BMS admits to creating that "marketplace expectation" by way of what it says are its customary WLPs.  It is another thing entirely for BMS to deviate grossly from the established course of dealing by unilaterally effecting spreads for some products at certain times that are many multiples of what had come to be expected, all without any sort of disclosure to payors, and patients.  Accordingly, the deception occurred in the maintenance of AWP within certain relatively narrow bands even while BMS decreased actual prices, thus increasing the amount that its customers would be reimbursed or otherwise paid for the products they dispensed to patients, all to the detriment of the Montana Medicaid Program.

Taxol is a plenary example.  Taxol was the oncology drug leader in 2000 with $805 million in sales.[20]  It lost exclusivity in 2000 when a competing brand entered the market, followed by generic competition in 2001.[21]  As a result, by 2003, BMS lost almost 50% of its market share of Taxol.[22]  The WLP for Taxol remained constant over time, and then, after loss of exclusivity, contract prices rapidly decreased.[23]  Spreads on some NDCs of Taxol were a stable 25%-27% until 2002 when they jumped to over 500%.[24]  The Taxol unit-weighted average spread percentage across all NDCs jumped nearly 100% between 2001 and 2002.[25]  By the

---

[20] Trial Ex. 215 at 000071259-60.

[21] Marré Trial Aff., ¶ 5 (Dkt. No. 3337); Hartman Direct, ¶ 48 (Dkt. No. 3296).

[22] Trial Ex. 215 at 000071270.

[23] Hartman Direct, ¶¶ 48-49 (Dkt. No. 3296); Trial Tr. Day 5 at 134-35 (Marré).

[24] Hartman Direct, Attach. G.2.c (Dkt. No. 3296).

[25] Hartman Direct, Attach. H.2 (Dkt. No. 3296).

fourth quarter of 2002, BMS was routinely providing very large discounts on Taxol to high volume customers, some as high as 80% off of WLP,[26] and even Bell confirms that virtually no sales were made at WLP.[27]  Indeed, only one-half a percent of sales were made within 5% of the WLP in 2002.[28]  Because BMS kept WLPs constant even as average actual sales prices dropped dramatically, Montana continued to reimburse for BMS Subject Drugs at artificially high prices.

Reporting of list prices cannot be assessed in isolation.  Whether they were "truthful" or not does not account for a pricing scheme whereby BMS could and did cause Montana to pay deceptively inflated prices.  The deception occurred in the larger scheme, of which list prices were only one part.  BMS used list prices to set up AWPs, but it did not use list prices to cause the reporting of lower AWPs when it offered mega price cuts on its products, which widened the spreads – even though BMS could have reported an accurate AWP in addition to its WLP.  The reason:  it would have lowered BMS revenues.[29]  Had BMS done so, AWP-based reimbursements would have been dramatically lower.[30]

In sum, BMS's deliberate decision to report pricing information to publications and itself become a publisher of AWPs, coupled with its thorough awareness of how AWPs were derived from its prices and that published AWPs would form the basis of an industry-wide reimbursement system, obligated BMS by law to ensure that these pricing benchmarks were not misleading.  Whether reported by the publishers or BMS itself, AWP was a BMS-controlled fiction used to artificially inflate and maintain drug prices as part of a scheme to induce

---

[26] Trial Ex. 203 at 000056988; *see also* Trial Ex. 204 at 000096293 (Consorta pricing at 82% off of WLP); Trial Ex. 205 (Owen pricing at 75% off of WLP); Trial Ex. 206 at 00979756 (Premier pricing at 75% off of WLP).

[27] Trial Ex. 2524 (Bell).

[28] Trial Ex. 2524 (Bell).

[29] Trial Tr. Day 5 at 165 (Marré); Trial Tr. Day 15 at 38 (Bell).

[30] Trial Tr. Day 14 at 33-34 (Pasqualone).

physicians to prescribe BMS drugs and increase BMS's profits.  Both courses of conduct – the

reporting of fictitious AWPs and the marketing of the manipulated spread – were unfair and

deceptive as a matter of law.  At a minimum, there is at least a material issue of fact on these

issues such that the Court cannot conclude as a matter of law that summary judgment is due

BMS.

**C.      BMS's Argument That it did not Market the Spread for its Self-Administered Drugs
          is not Dispositive of Montana's Claims**

BMS asserts that as to self-administered drugs sold through retail pharmacies, it never

marketed the spread and it never gave "material discounts or rebates to retail pharmacies."  BMS

Br. at 13.  For this reason, BMS implies its conduct could not have been unfair or deceptive.

Even without proof that BMS marketed the spread for self-administered drugs, however,

Montana has met its burden to demonstrate BMS's unfair and deceptive conduct.  Montana's

allegations concerning BMS's wrongdoing in the record evidence is two-pronged.  First,

Montana alleges that BMS and its co-defendants violated state statutes by reporting AWPs that

did not comport with the plain meaning of the "AWP" label or the "average price at which

wholesalers sell drugs to their customers, including physicians and pharmacies," Nov. 2, 2006

Order at 1, knowing that Montana Medicaid and other payors would rely on them as a basis for

reimbursement.  Second, Montana alleges that BMS and its co-defendants violated state statutes

by marketing the spread between AWP and acquisition costs to providers.  The prongs are not

dependent on one another.  Either one alone establishes BMS's unfair and deceptive conduct.

**IV.      BMS'S CAUSATION ARGUMENTS DO NOT ENTITLE
          IT TO SUMMARY JUDGMENT**

BMS cites two cases for the unremarkable proposition that to state a claim under MUTPA,

a plaintiff "must show that the defendant's acts caused her damages, "and then states "[t]he State

cannot prove that here." BMS Br. at 14.  But, Montana *has* demonstrated causation.  By reporting

- 16 -

false and inflated AWP's as described in § III above, BMS caused Montana to over-reimburse

Medicaid drug transactions.  To support its causation argument, BMS contends that Montana had

"actual knowledge . . . that AWP was not equivalent to providers' acquisition cost" and that this

"precludes any argument that BMS's acts caused the State any injury."  *Id*.  An additional factor

breaking the causal chain, BMS says, is Montana's access to the acquisition costs of BMS's drugs

through ASPs for oncology drugs or the WLP's for self-administered drugs.  *Id*.  As to the latter

argument, BMS offers no evidence of sources available to Montana Medicaid for accessing

BMS's ASPs or WLP's.  In fact, the entire section of BMS's brief is devoid of facts.  *Id*. at 14-15.

It is BMS that has not met its burden on summary judgment; the motion should be denied.

As to BMS's other arguments concerning Montana's "actual knowledge," these are

redundant of the government knowledge arguments extensively briefed in the Defendants' joint

motion for summary judgment[31] and refuted by the State in its opposition to the motion[32]

Finally, BMS asserts that even if BMS marketed the spread, it "could not have caused the

State to suffer any loss" because "[m]arketing the spread has no impact on any amount the State

pays."  BMS Br. at 15.  This is not true; there is a direct correlation between the spread marketing

practices of the Defendants and damage to the State.  By marketing the spread, BMS and others

moved market share and influenced the volume of Subject Drugs purchased by Montana Medicaid

recipients and ultimately reimbursed by the State.  To the extent reimbursements for the higher

volume were based on inflated prices (provided by BMS), Montana overpaid and was thus

damaged.

---

[31] (Dkt. No. 3647) at § II and *in passim*.

[32] (Dkt. No. 3902) at 11-15.

## V.      CONCLUSION

For the reasons set forth above, BMS's motion for summary judgment should be denied.

On each issue raised by BMS, material issues of fact remain.


By_____/s/ Steve W. Berman_____                    DATED:  April 26, 2007
    Steve W. Berman
    Sean R. Matt
    Jeniphr A.E. Breckenridge
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

    Mike McGrath
    Attorney General of Montana
    Ali Bovingdon
    Assistant Attorney General
    Justice Building
    215 North Sanders
    P.O. Box 201401
    Helena, MT  56920-1402
    (406) 444-2026

    COUNSEL FOR PLAINTIFF
    STATE OF MONTANA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **MONTANA'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS BRISTOL-MYERS SQUIBB COMPANY, ONCOLOGY THERAPEUTICS NETWORK CORPORATION AND APOTHECON, INC.,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.


By  **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

001534-15  163839 V1