UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| *State of Nevada v. American Home Products, et al.*, CA NO. 02-CV-12086-PBS (Nevada II), and | Judge Patti B. Saris |
| *State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) | |

**NEVADA AND MONTANA'S JOINT OPPOSITION
TO THE JOHNSON & JOHNSON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

The States of Nevada and Montana ("States") submit this joint opposition to the Johnson & Johnson Defendants' motions for summary judgment.[1] The States also adopt and incorporate the summary judgment submissions made on behalf of each them in opposition to the Defendants' joint motions and in opposition to each defendant's individual motions.

## I.  INTRODUCTION

J&J's individual motions for summary judgment are a transparent attempt to re-litigate the damages models and methodologies used in the MDL trial.[2] There, the Court heard

---

[1] The Johnson & Johnson Defendants ("J&J Defs.") include Johnson & Johnson, Centocor, Inc., Janssen Pharmaceutica Products L.P., McNeil-PPC, Inc., and Ortho Biotech Products, L.P. The J&J Defs. submitted separate motions for summary judgment against Nevada and Montana, one memorandum in support of the motions ("J&J Mem."), one L.R. 56.1 statement and other declarations. Because the motions, 56.1 Statement and related submissions raise identical points, the States respond jointly. Counter-designations of deposition transcripts and documents cited herein are attached to the Declaration of Jeniphr Breckenridge in Support of the States of Nevada and Montana's Memoranda In Opposition to the Individual Defendants' Motions for Summary Judgment and are referred to as "Breckenridge Decl., Ex. __."

[2] The J&J Defendants' reliance on MDL trial materials is ironic given their joinder in the Defendants' Joint Opposition to the State of Montana's Motion for Partial Summary Judgment Against Certain Defendants (Dkt. No. 3884) (Defs' Jt. Opp. to MT Partial Summ. J. Mot."). There, the J&J Defendants and others strenuously objected to Montana's use of "testimony from the MDL trial in which there has not yet been a decision . . ., documents that are not communications or evidence related to the State . . ., and *proposed* findings of fact from

- 1 -

extensive testimony about the health care industry's and private payors' uses and interpretations of AWP and, relevant to the J&J Defendants, about Procrit and Remicade. J&J Defs' Mem. at 1. The basis of the States' claims in these cases is the same fraudulent reporting of AWPs that is at issue in the MDL. Despite any similarities, however, the state damages models cannot be dismissively treated as clones of those in the class case as the J&J Defendants would have it. There are significant differences. The Nevada and Montana state Medicaid programs and their use and understanding of AWPs, not private payors, are the focus here. The underpinnings of the States' cases are state regulations that base the Medicaid reimbursement methodologies on determining the Estimated Acquisition Cost ("EAC") using AWP and the related expectation that AWP bore a rational relationship to ASP.

## II.   BACKGROUND

The claims and the scope of the lawsuit have been refined since its initial filing, a circumstance Dr. Hartman's June 2006 declarations make clear but that the J&J Defendants' arguments ignore. At this juncture, the States pursue damages on behalf of the State Medicaid programs only and solely for the overcharges and penalties calculated by Dr. Hartman. The damages are principally overcharges for select drugs and penalties for violations of the Montana and Nevada state statutes. Dr. Hartman has calculated defendant-specific overcharges only for certain defendants because of the States' inability to obtain data from other drug manufacturers.[3]

---

different plaintiffs in another case." *Id*. at 2 n.1 (emphasis in original). The J&J Defendants and their co-defendants argued that inclusion of such materials "flouts the rules and serves as an independent basis to deny its Motion." *Id*. The J&J Defendants do not distinguish their use of materials from the same forum. In any event, the J&J Defendants and others are wrong about the propriety of including materials from the MDL proceedings in these cases. It would be a waste of resources to expect every factual point to be re-established in every AWP case consolidated before the Court.

[3] Hartman Mont. Decl. at Tables 1-2 (Breckenridge Decl., Ex. 1); Hartman Nev. Decl. at Table 1 (Breckenridge Decl., Ex. 3).

Dr. Hartman has calculated for J&J Subject Drugs Procrit and Remicade.[4]  *Id*.  J&J and its co-defendants have had this information since Dr. Hartman submitted his declarations in June 2006 and had the opportunity to examine Dr. Hartman on these opinions in August 2006 at his deposition in these cases.

### III.    DISCUSSION

J&J's principal argument here is that judgment should be entered in its favor on the States' claims because spreads for J&J's Subject Drugs fall within 13.4% and 20.8% while "Dr. Hartman admitted that 'spreads' up to 30% were legitimate and not fraudulent" in connection with the private payor MDL case.  J&J Mem. at 1.  J&J continues by describing the state damages theory as a "dramatic but silent shift in Dr. Hartman's liability theory."  *Id*. at 2.  This is not the case.  J&J's arguments are misleading in two respects.  First, J&J radically mischaracterizes Dr. Hartman's expectation theory and the 30% liability yardstick used in the MDL case.  Dr. Hartman's supporting opinion testimony in that case was not that 30% spreads were "legitimate" in all circumstances or "not fraudulent," but that they fell within the *private market's* expectations.[5]  Government markets are not mentioned.  Second, the States do not rely on Dr. Hartman's MDL reports to support the States' cases.  As J&J is well aware, Dr. Hartman has submitted a total of four independent declarations in the Montana and Nevada state cases.[6]  Dr. Hartman's yardstick theory is not mentioned.  Contrary to the J&J Defendants arguments, the States' cases do ***not*** depend upon Dr. Hartman's 30% liability yardstick and the expectations of the private reimbursement market – whether or not the 30% liability yardstick applies to these

---

[4] *Id.*

[5] Dr. Hartman's supporting opinions in the MDL case are, of course, more extensive than the summary given, but further explanation is not required here because the States do not rely on the theory in these cases, as described *infra*.

[6] *See* Dr. Hartman's Mont. and Nev. Decls. (Breckenridge Decl., Exs. 1-4).

- 3 -

markets. The measure in the state markets is different. In essence, the discount each state applied to the AWP to reach what they believed to be a reasonable approximation of EAC or other threshold is comparable to the 30% yardstick Dr. Hartman applied in the MDL cases. The standards Dr. Hartman appropriately applies here are the reimbursement rate set by the Montana or Nevada rules and regulations or other threshold relevant to the Medicaid system. The purpose of the rules and regulations is, as explained in Dr. Hartman's declarations, to have the EAC as close to the price paid by the provider.[7] These, and not the private markets' expectations, are the relevant measure.

Furthermore, the only relevant inquiry is whether the J&J Defendants published false AWPs to be used by the Montana and Nevada Medicaid programs; the record evidence here says that they did.[8] The State will prove injury as a result of the J&J Defendants' misreporting of AWP by demonstrating the gap between the AWPs and the ASPs for the relevant time period. The difference is the amount the States overpaid and is the basis for the States' claim that the J&J Defendants and other drug manufacturers are subject to penalties under State statutes.

The J&J Defendants secondarily argue that the federal rebates received by the States pursuant to the Omnibus Budget Reconciliation Act of 1990 ("OBRA 1990") for J&J Subject Drugs should be incorporated in Dr. Hartman's calculations as an offset to the prices paid by states before any penalty is assessed. *See* Jayson S. Dukes Declarations.[9] These arguments are unavailing. Mr. Dukes was asked "to determine the extent to which rebates paid by the J&J

---

[7] *See* Hartman Mont. Decl. at ¶ 8 (Breckenridge Decl., Ex. 1); Hartman Nev. Decl. at ¶ 8 (Breckenridge Decl., Ex. 3).

[8] *See* Plaintiffs' Post-Trial Proposed Findings of Fact (Jan. 19, 2007, Dkt. No. 3553) ("PFOF") at ¶¶ 148-253 (and evidence cited therein). References to this memorandum are in the form of "PFOF ¶ __."

[9] The J&J Defendants have not provided the States with the materials relied on by Mr. Dukes. The materials are otherwise unavailable to the States. Thus, the States have not been able to evaluate his calculations and conclusions. This is not necessary for the reasons stated above: rebates should not be applied as an offset to penalties.

Defendants offset or exceed the damages allegedly incurred by [Montana and Nevada] as a result of alleged 'overcharges.'" Dukes Mont. Decl. at ¶ 6; Dukes Nev. Decl. at ¶ 6.[10]  But here, the States are claiming penalties arising from J&J's reporting of false AWPs.  Rebates should not be applied as an offset to reduce the net levels for statutory *penalties*, as Mr. Dukes suggests, because the States seek penalties and not overcharge damages.  Applying the rebates to reduce the net difference between ASPs and AWPs, as advocated by the J&J Defendants, would give the J&J Defendants an unfair advantage for doing what they were statutorily required to do *and*, *more importantly,* undermines the role of the statutory penalty which is to punish a wrongdoer.[11]  In other words, the States were entitled to rebates at the same level, whether J&J's AWPs were inflated or not.  The States were also entitled to apply those rebates to the non-inflated prices to achieve an even lower net price than merely deflating AWPs would have given them.  The J&J Defendants should not be able to reduce the penalties to be paid in this manner.

Moreover, there is a genuine dispute between the experts as how the rebates should be treated.  The States do not "ignore the rebates they receive from manufacturers," as the J&J Defendants charge.  J&J Mem. at 4.  Rather, the states submit that the rebates "net out," and should not be part of the equation.  As Dr. Hartman explained in his State declarations, "If properly paid in the actual world, Medicaid rebates net out of the damage calculation."

---

[10] Mr. Dukes was told to assume that this Court had "ruled" that "any damages allegedly incurred by the states as a result of alleged overcharges under their respective Medicaid programs 'will necessarily be reduced by the rebates the state received," and, therefore, 'may play a role in determining the correct amount of damages in the case.'" Dukes Mont. Decl. at ¶ 5; Dukes Nev. Decl. at ¶ 5.  The declarations cite *In re Pharm. Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 65, 74-75 (D. Mass. 2006) (Saris, J.) as authority.  The States defer to the Court as to the interpretation of the relied upon passage.  The States respectfully submit that the first sentence quoted by the J&J Defendants and other defendants refers to the defendants' argument at the hearing and the second sentence suggests that the Court had not ruled definitively on how rebates would be treated because the issue was not before the Court.  The matter before the Court was the State of Florida's motion to remand, which was granted.  *Id.* at 67.  In any event, for the reasons set forth above and more fully in the Hartman Declarations, the rebates are not relevant to the statutory penalties the States seek here.

[11] "Penalty: 1. Punishment imposed on a wrongdoer, esp. in the form of imprisonment or fine.  Though usually for crimes, penalties are also sometimes imposed for civil wrongs."  BLACK'S LAW DICTIONARY (Garner, Brian, ed.) (7th ed.) (1999).

001534-15 163421 V1

Breckenridge Decl., Ex. 1 at ¶¶ 32-33; Breckenridge Decl., Ex. 3 at ¶ 33.  At best, the Dukes Declarations and calculations concerning the rebates create a battle of the experts:  should the rebates be applied in the manner employed by Mr. Dukes or excluded from the calculations as they will ultimately net out, as Dr. Hartman and the States submit.  This "battle" creates a genuine issue as to material fact which cannot be resolved at the summary judgment stage.

By focusing on Dr. Hartman's calculations as a basis for judgment in its favor, J&J avoids the wealth of evidence in the record of its misconduct.  The evidence shows that J&J set inflated AWPs,[12] knowing them to be false[13] and reported them knowing that the States and other payors would rely on them in providing reimbursements.  Furthermore, J&J manipulated the spread between the AWPs and the acquisition costs to market J&J Subject Drugs.[14]  This misconduct subjects them to penalties under the Montana and Nevada statutes.  Similarly, J&J does not address the plain and ordinary meaning of AWP and the disconnect between this meaning and J&J AWPs.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277 at 278 (D. Mass. 2006).  The States rely on the briefing within Montana's Motion for Partial Summary Judgment on these points.[15]

## CONCLUSION

The J&J Defendants failed to meet the standard for summary judgment.  The motion should be denied.

---

[12] *See* PFOF at ¶¶ 182-90.

[13] *Id*. at ¶¶ 191-243 (The PFOF details the ways in which the J&J Defendants falsified the reported AWPs, including the exclusion of discounts in its reported AWP and failure to report an actual average.  Part of the pattern was to conceal the spreads from the government and others, ¶¶ 202-38.  Another important factor was J&J's concealment of the true price of its products.  *See* ¶¶ 239-43.)

[14] *See* PFOF at ¶¶ 213-43 (describing ways in which J&J marketed the spreads for its drugs to providers).

[15] Montana Memorandum in Support of Motion for Partial Summary Judgment at § III (Dkt. No. 3732).

- 7 -

By    /s/ Steve W. Berman    DATED:  April 26, 2007
Steve W. Berman
Sean R. Matt
Jeniphr A.E. Breckenridge
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol
Edward Notargiacomo
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Boston, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

COUNSEL FOR PLAINTIFFS
STATES OF MONTANA AND NEVADA

Mike McGrath
Attorney General of Montana
Ali Bovingdon
Assistant Attorney General
Justice Building
215 North Sanders
P.O. Box 201401
Helena, MT  56920-1402
(406) 444-2026

COUNSEL FOR PLAINTIFF
STATE OF MONTANA

Catherine Cortez Masto
Attorney General of the State of Nevada
L. Timothy Terry
Assistant Attorney General
100 N. Carson Street
Carson City, NV  89701-4714

COUNSEL FOR PLAINTIFF
STATE OF NEVADA

- 8 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **NEVADA AND MONTANA'S JOINT OPPOSITION TO THE JOHNSON & JOHNSON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By     **/s/ Steve W. Berman**
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA 98101
    (206) 623-7292