# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| *State of Nevada v. American Home Products, et al.*, CA No. 02-CV-12086-PBS (Nevada II), and *State of Montana v. Abbott Labs., Inc., et al.*, Cause No. CV-02-09-H-DWM (D. Mont.) |  |

## MONTANA AND NEVADA'S OPPOSITION TO SCHERING-PLOUGH CORPORATION AND WARRICK PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT AS TO NEVADA AND MONTANA ACTIONS

**TABLE OF CONTENTS**

<u>PAGE</u>

I.      INTRODUCTION ................................................................................1

II.     SUMMARY JUDGMENT STANDARDS .......................................2

III.    BACKGROUND ................................................................................3

        A.      The States Have Refined Their Claims for Damages ...............3

        B.      The Record Establishes SPW's Deceptive and Unfair Conduct – and
                it is, Far From an "Innocent Practice" ....................................3

                1.      Schering and Warrick:  the ties that bind....................3

                2.      Schering-Plough and Warrick knew that AWP was the
                        reimbursement benchmark used by many payors...........4

                3.      The Schering-Plough Group caused AWPs to be published
                        for its Subject Drugs ...................................................5

                4.      The Schering-Plough Group's AWPs for its Subject Drugs
                        did not include relevant discounts nor reflect an average, and
                        the Schering-Plough Group manipulated its AWPs and spreads................7

                    a.      The Schering-Plough Group knew that its Subject Drugs
                            were purchased at prices well below AWP....................7

                    b.      Recognizing the importance of spreads, the Schering-
                            Plough Group created spreads through confidential
                            contract pricing, rebates, and other forms of discounting...............8

                        (1)     The importance of reimbursement ......................8

                        (2)     Initial spreads and typical increases to the spreads............11

                        (3)     Using nominal pricing for Schering-Plough and
                                Warrick drugs as a means of avoiding Medicaid
                                rebates created enormous spreads......................14

                        (4)     Use the Integrated Therapeutics Group ............17

                5.      Individual brand and price histories reveal the Schering-Plough
                        Group's manipulation of spreads................................18

                    a.      Albuterol sulfate (generic) ...........................................18

|  | b. | Intron-A | 18 |
|  | c. | Proventil (branded albuterol) | 19 |
| IV. | ANALYSIS | | 20 |
|  | A. | The Evidence Shows That Warrick Manipulated the Spread for Its Drugs | 20 |
|  | B. | The States' Reimbursement for Warrick Drugs Was Based on AWP | 22 |
|  | C. | Record Evidence Shows That Schering Manipulated *and* Marketed the Spreads for Its Subject Drugs | 24 |
| V. | CONCLUSION | | 25 |

001534-13  164485 V1

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*In re Pharm. Indus. Average Wholesale Price Litig.*,
        460 F. Supp. 2d 277 (D. Mass. 2006) ............................................................................1, 2

## FEDERAL STATUTES

42 C.F.R. § 447.332 ..............................................................................................................22

42 C.F.R. § 447.332(b) ..........................................................................................................22

42 U.S.C. §§ 1396, *et seq.* ..............................................................................................14, 15

## I.    INTRODUCTION

Montana and Nevada ("States"), by their counsel, hereby respond to Schering-Plough Corporation and Warrick Pharmaceutical Corporation's Motion for Summary Judgment As To Nevada and Montana Actions.[1]

Generic drug manufacturer Warrick asks the Court to distinguish it for treatment on summary judgment because of its "innocent practice."  SPW Mem. at 3.  In particular, Warrick contends, judgment should be entered in its favor because it did not market or manipulate spreads for its Subject Drugs to "gain market share," SPW Mem. at 2-4; it competed only on price, SPW Mem. at 5; and, according to Warrick, the States cannot demonstrate that they reimbursed providers for Warrick drugs based on AWP.  SPW Mem. at 6-7.[2]  Schering seeks judgment on similar grounds:  there is no evidence Schering manipulated spreads *or* marketed them, it says.  SPW Mem. at 11-12.

In addition to common themes, Schering and Warrick share the common ground of selective ignorance.  Each fails to address the well-supported central allegations of the States' cases against it.  Each reported average wholesale prices that were neither averages nor prices charged to any customer, knowing that the Montana and Nevada state Medicaid programs, and other payors, would rely on them as a basis for reimbursement and thus pay more than they should have out of the public coffers.  This Court previously held, in the MDL case, that "AWP means the average price at which wholesalers sell drugs to their customers, including

---

[1]  Schering-Plough Corporation will be referred to as "Schering-Plough" or "Schering."  Warrick Corporation will be referred to as "Warrick."  Collectively the two will be referred to as "SPW" or the "Schering-Plough Group."  Their motion for summary judgment will be referred to as "SPW MSJ" and the memorandum in support of the motion will be referred to as "SPW Mem."

[2]  Warrick additionally moves to dismiss the States' Medicare claims for generic drugs.  SPW Mem. at 9-11.  The States will not pursue damages for their Medicare claims, as revealed in the Hartman Reports which Warrick and its co-defendants have had since June 2006.  Warrick's point is thus moot and will not be addressed by the States.

wholesalers and pharmacies." *In re Pharm. Indus. Average Wholesale Price Litig.,* 460 F. Supp. 2d 277, 278 (D. Mass. 2006).[3]  Applying the same definition here, as the States submit is appropriate,[4] demonstrates the unfair and deceptive nature of Schering and Warrick's Subject Drug prices.  Reporting prices that differed from the plain meaning of "average wholesale price" under the label AWP forseeably misled reasonable payors such as the States.

SPW does not submit sufficient evidence to refute the States' position regarding the unfair and deceptive nature of SPW conduct.  On the record before the Court, none of the bases SPW argues mandates dismissal of the States' claims against the two.  At a minimum, SPW's arguments raise numerous issues of material fact, as detailed below.  SPW has not met the standard for summary judgment.  Its motion should be denied.

## II.  SUMMARY JUDGMENT STANDARDS

The State incorporates the summary judgment standards set forth in its Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment ("MT Opp. To Defs' Jt. Summ. J. Mot.") (Dkt. No. 3902) and the summary judgment standards well known to the Court and to the parties.  The States also adopt and incorporate the submissions made on behalf of each of them in opposition to the defendants' joint motions for summary judgment and their responses to each of the defendant's individual motions.[5]

---

[3] The State of Montana previously argued this point in its Motion for Partial Summary Judgment (Feb. 8, 2007) at § III  (Dkt. No. 3731) ("Mont. Summ. J. Mot.").  Nevada adopts the arguments.  They are incorporated here by reference.

[4] *See* State of Montana's Memorandum In Support of Motion for Partial Summary Judgment (Dkt. No. 3732) at 8-17 ("Mont. Summ. J. Mem.").  Nevada adopts these arguments by reference.

[5] Deposition excerpts and trial exhibits referenced herein were originally cited to in Plaintiffs' Post-Trial Proposed Findings of Fact dated Jan. 19, 2007 (Dkt. No. 3553), the States incorporate them by reference, but do not append them to the Declaration of Jeniphr Breckenridge In Support of Nevada and Montana's Memoranda In Opposition to the Individual Defendants' Motions for Summary Judgment ("Breckenridge Decl.") unless otherwise indicated.  At the Court's request, a separate appendix will be provided.

- 2 -

## III.    BACKGROUND

### A.    The States Have Refined Their Claims for Damages

The claims and the scope of the lawsuits have been refined since their initial filing.  At this juncture, the States pursue monetary damages on behalf of the State Medicaid programs only and only for the damages and penalties calculated by Dr. Hartman and set forth in his Declarations ("Hartman Decl.") attached to the Breckenridge Decl., Exs. 1-4.  The damages the States claim constitute penalties for violations of Montana and Nevada state statutes and overcharge damages where calculated.[6]  *Id.*  SPW and its co-defendants have had this information since June 2006, when Dr. Hartman's reports were submitted.  SPW and its co-defendants had the opportunity to examine Dr. Hartman on his calculations, the States' damages and other related issues at his deposition in the Montana and Nevada state cases in August 2006.

### B.    The Record Establishes SPW's Deceptive and Unfair Conduct – and it is, Far From an "Innocent Practice"

A well-established record belies SPW's portrayal of its pricing and marketing practices as industry models for clean-cut and ethical business.  To the contrary, Schering and Warrick have long, well-documented histories of price and market manipulations that caused the Montana and Nevada Medicaid programs to overpay for drugs.

### 1.    Schering and Warrick:  the ties that bind

Defendant Schering is a New Jersey corporation.  Defendant Warrick is a Delaware corporation with its current principal place of business purportedly at 12125 Moya Boulevard,

---

[6] Dr. Hartman has calculated defendant-specific overcharges or restitution damages only for certain defendants because of the States' inability to obtain data from other drug manufacturers.  *See* Hartman Mont. Decl. (June 13, 2006) Tables 1-2 (Breckenridge Decl., Ex. 1); Hartman Nev. Decl. (June 13, 2006) Table 1 (Breckenridge Decl., Ex. 3); Hartman Nev. Supp. Decl. (June 19, 2006) (Breckenridge Decl., Ex. 4).  Dr. Hartman calculated overcharge damages for the following SPW drugs in Montana:  albuterol, intron, proventil, temodar and perphenazine.  *See* Hartman Mont. Decl. Table 1 (Breckenridge Decl. Ex. 1).  Dr. Hartman calculated overcharge damages for the following SPW drugs in Nevada:  intron, perphenazine, proventil, temodar and albuterol.  *See* Hartman Nev. Decl. Table 1 (Breckenridge Decl. Ex. 3).

Reno, Nevada.[7]  The Nevada address is the site of a warehouse.[8]  Warrick is a wholly owned

subsidiary of Schering Corporation and is one of the subsidiaries by and through which

Schering-Plough conducts its business.[9]  Schering-Plough formed Warrick in 1993.[10]  Warrick

markets generic pharmaceutical products manufactured by Schering-Plough or entities controlled

by Schering-Plough.[11]  The Subject Drugs at issue for the two companies in the Montana and

Nevada lawsuits include Schering-Plough's albuterol solution known as albuterol solution as a

branded product (Proventil), Intron-A (interferon alfa-2b recombinant), and Temodar

(temozolomide).[12]  Warrick sold generic albuterol and albuterol sulfate solutions under the

Warrick name.[13]

### 2.    Schering-Plough and Warrick knew that AWP was the reimbursement benchmark used by many payors

Schering-Plough reported AWPs for its branded drugs with the full expectation that they

would be published and later relied upon by payors for reimbursement purposes.[14]  Warrick

reported AWPs for its generic drugs with the full expectation that they would be published[15] and

later relied upon by payors for reimbursement purposes.  Harvey J. Weintraub, a Schering-

Plough vice-president, and later, a Schering-Plough consultant, who was assigned to Warrick by

---

[7] Warrick Pharmaceutical Corporation's Answer to Intervenors' Amended Master Consolidated Class Action Complaint ("Warrick Answer"), ¶ 118 (Dkt. No. 776).

[8] Deposition of Harvey J. Weintraub, September 18-22, 2006 ("Sept. 2006 Weintraub Dep.") at 576:1-10, 883:19-884:25; Deposition of Harvey J. Weintraub, November 7-8, 2001, at 76:1-24.

[9] Warrick Answer, ¶ 118.

[10] Warrick Answer, ¶ 118.

[11] Sept. 2006 Weintraub Dep. at 104:13-22.

[12] Schering Plough Answer, ¶ 119 (Dkt. No. 777).

[13] Sept. 2006 Weintraub Dep. at 99:14-101:1, 106:19-23, 390:20-391:21.

[14] Deposition of Richard W. Zahn, January 15, 2003 ("Zahn Dep.") at 173:1-23; Deposition of Debra Kane, June 15, 2004 ("Kane Dep.") at 34:7-11 ("[AWP] is a price that is used for reimbursement purposes. . . ."); Trial Ex. 809 (RGX0315084-141, at 0315084).

[15] *E.g.*, Trial Tr. Day 18 at 29 (Weintraub); Deposition of Harvey J. Weintraub, February 12, 2003 ("Feb. 2003 Weintraub Dep.") at 655:10-13.

Schering-Plough, is on the record acknowledging that when the AWP for Warrick's products were raised, payor payments would be impacted.[16]

### 3.      The Schering-Plough Group caused AWPs to be published for its Subject Drugs

Schering-Plough reported the AWPs for its branded drugs to the Publishers of pharmaceutical industry pricing guides for publication.[17]  Specifically, Schering-Plough reported AWPs for the subject branded drugs at 20% above the so-called direct price (sometimes referenced as "net direct price"), which was Schering-Plough's analogue for wholesale acquisition cost ("WAC") or list price.[18]

Warrick also reported the AWPs for its generic drugs to the Publishers of pharmaceutical industry pricing guides for publication in those guides.  Specifically, Warrick caused AWPs to be published for the subject generic drugs marketed under the Warrick name (albuterol sulfate and perphenazine) at values slightly below the AWPs for the branded counterparts to those generic drugs.[19]  According to Weintraub, his duties included the reporting of AWPs for Warrick-labeled drugs to the Publishers.[20]

In general, the specific AWPs that Warrick reported for its generic drugs were, when Warrick started as a company, pegged at 10-15% off the corresponding brand drugs' AWPs,[21]

---

[16] Trial Tr. Day 18 at 25-26 (Weintraub).

[17] Feb. 2003 Weintraub Dep. at 429:23-431:1; Trial Ex. 492 (SPF0241686) ("As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement purposes.  Most manufacturers (including Schering) report AWPs at NDP [net direct price] plus 20%.").

[18] Trial Ex. 492; Zahn Dep. at 176:4-24; Kane Dep. at 34:7-35:21 ("The company published AWP prices at 120 percent of the net direct price or list price. . . . Q. So net direct price is the same as list?  A. Yes.  Yes. . . ."), 36:5-8; *see also* Trial Ex. 809 (RGX0315084-141, at 0315085) ("As a matter of general practice, Schering-Plough sets AWP at 20% over the published Net Direct Price for the drug [referring to albuterol .083%].").

[19] Deposition of Harvey J. Weintraub, August 25, 2005 ("Aug. 2005 Weintraub Dep.") at 30:2-17; Feb. 2003 Weintraub Dep. at 485:1-6, 494:17-495:6.

[20] *Id*. at 472:10-16.

[21] Trial Ex. 425 (WAR0006155-156, at 0006155).

supposedly "[b]ecause a product is not considered to be a generic unless it is 10 to 15% away [meaning lower in terms of AWP] from the brand."[22]  There was no impediment to setting much lower AWPs for Warrick generic drugs; Warrick simply chose to set AWPs for its generic drugs at levels very close to those for its corporate parent's branded drugs.[23]  There was no requirement that a generic drug have an AWP within 10-15% of its branded counterpart.  Mr. Weintraub also admitted that if the AWP for a given generic drug were set, for example, at 50% off of the corresponding brand drug's AWP, the drug indeed would be considered a generic.[24]

In other instances, where one or more competitor generic products were already on the market, Warrick simply would look to see where the competitor or competitors had set the AWP(s) for the competitor product or products and "slot" the AWP for its own product "somewhere in the pack."[25]  That was a conscious choice, too, and it was made "to save . . . a lot of time and trouble."[26]

In addition to causing specific AWPs for its branded drugs to be reported in widely circulated industry pricing guides, Schering-Plough also republished its AWPs via its sales force.[27]  Schering-Plough "issued a price list to its accounts" that included AWPs for its branded drugs.[28]

---

[22] Feb. 2003 Weintraub Dep. at 472:10-16, 494:17-495-6; Trial Tr. Day 18 at 29 (Weintraub).

[23] Trial Tr. Day 18 at 30 (Weintraub).

[24] Feb. 2003 Weintraub Dep. at 495:7-9.

[25] Sept. 2006 Weintraub Dep. at 527:6-528:8.

[26] *Id*. at 526:22-528:8; Trial Tr. Day 18 at 30-31 (Weintraub).

[27] Deposition of Gary Bishop, July 27, 2005 ("Bishop Dep.") at 30:22-31:12, 33:5-12, 54:11-56:1-4, 56:13-57:7.

[28] Feb. 2003 Weintraub Dep. at 429:23-431:1; Trial Tr. Day 18 at 32 (Weintraub).

Warrick caused specific AWPs for its generic drugs to be reported in industry pricing guides, and it also republished those AWPs.[29]

**4.      The Schering-Plough Group's AWPs for its Subject Drugs did not include relevant discounts nor reflect an average, and the Schering-Plough Group manipulated its AWPs and spreads**

   **a.      The Schering-Plough Group knew that its Subject Drugs were purchased at prices well below AWP**

Schering-Plough knew that providers or their agents purchased Schering-Plough subject drugs at prices well below the AWPs that Schering-Plough caused to be published for those drugs.[30] For example, Schering-Plough entered into contracts with certain providers or provider-agents below the wholesale level, so it knew the prices those entities would pay for Schering-Plough drugs.[31]

Warrick knew that providers and retailers, including chain pharmacies that sold Warrick Subject Drugs, purchased Warrick subject drugs at prices well below the AWPs that Warrick caused to be published for those drugs.[32] Warrick's AWPs never reflected an actual average of what customers were paying for the product.[33]

---

[29] Deposition of Jerome A. Sherman, March 6, 2002 ("Mar. 2002 Sherman Dep.") at 45:12-14; Manfredi Dep. at 116:2-13, 117:17-119:8 ("It would not be uncommon to have an AWP listed on an ad [directed to retail pharmacies, managed care, buyers at chains, and wholesalers . . . .]."); Sept. 2006 Weintraub Dep. at 408:21-409:22, 512:12-513:15, 516:19-519:17; Trial Ex. 719 (various price notices, including AWPs, direct prices, and references to actual price diminishments of many sorts).

[30] Schering-Plough Answer, ¶ 3 ("Schering-Plough further admits that AWPs for its medicines published in trade publications are typically higher than the prices ultimately paid by providers purchasing such medicines from wholesalers and distributors.") (Dkt. No. 777).

[31] Deposition of Thomas Kelly ("Kelly Dep."), July 15, 2004 at 27:5-28:8, 28:12-22, 29:22-30:5, 31:20-32:1, 72:11-22; see also Trial Ex. 718 (WCT0133861-867, at 0133861-863) (showing knowledge of "dead net" prices for "superchains'" following price change, and after rebates).

[32] Warrick Answer, ¶ 3 ("Warrick further admits that AWPs for its medicines published in trade publications are typically higher than the prices ultimately paid by providers purchasing such medicines from wholesalers and distributors.") (Dkt. No. 776); see also, e.g., Trial Ex. 421 (WCT0031786-790, at 0031786-788) (showing intention to sell directly to chains at prices well below AWP); Sept. 2006 Weintraub Dep. at 526:2-21, 761:23-766:10; Trial Ex. 709 (WCT0133861-67).

[33] Trial Tr. Day 18 at 31 (Weintraub).

### b. Recognizing the importance of spreads, the Schering-Plough Group created spreads through confidential contract pricing, rebates, and other forms of discounting

### (1) The importance of reimbursement

Schering-Plough was aware that purchasers of its products were interested not only in whether they would be reimbursed for its branded products,[34] but also in the level of reimbursement.  Higher reimbursement levels translate to higher profits for the providers. Purchasers were interested in how much profit they could make on Schering-Plough branded drugs, and Schering-Plough knew that.[35]

An example of Schering-Plough's knowledge of profits to be made on the spread is found in a message between Schering-Plough executives regarding the "Retail Pharmacy Trade."[36] This communication, dated December 10, 2002, was sent by Brian Longstreet, then-Director of Managed Care Marketing for Schering-Plough's Oncology and Biotech Business Unit ("OBBU"), to the General Manager of the OBBU, Olav Hellebo, and to Mr. Longstreet's direct supervisor within OBBU, James Robinson.[37]  The communication reads in pertinent part:

> [] As previously discussed there are a few stakeholders in the
> process of drug distribution (wholesalers-pharmacies-doctors-
> patients-managed care/insurance companies).  When it comes to
> pharmacies, they are driven by Managed Care or insurance
> reimbursement, profit motive, and state law.  A Managed Care
> organization (MCO) can mandate reimbursement of a product vs.
> another similar product; if a generic is available, either the MCO or

---

[34] Bishop Dep. at 85:11-86:8, 98:17-99:17; Deposition of Mark Flynn, July 29, 2005 ("Flynn Dep.") at 15:14-18:9.

[35] Bishop Dep. at 89:9-90-4, 113:1-114:15 ; Deposition of James Butler, Aug. 11, 2005 ("Butler Dep.") at 7:2-9, 26-21, 33:2-20, 42:4-43:6, 60:5-12, 61:5-12; Trial Ex. 713 (RGX 0255855-876, at 0255875) (discussing potential changes to Medicaid and Medicare Part B payments and opining that "[t]he reduction or elimination of the 'spread' is likely to have a significant effect on choices of Medicare Part B drugs and on utilization in areas of treatment where generic and brand drugs are available. . . ."); Trial Ex. 721 (SPF0011695-696, at 0011695) (expressing concern at "negative impact on physician reimbursement" because Caremark had received their own NDC numbers for repackaging and distributing Intron and had published AWPs that were lower than Schering's AWP for Intron).

[36] Trial Ex. 497 (SPF00017394-395).

[37] Id.

state can mandate generic substitution.  In addition, Pharmacies are paid a dispensing fee, plus the margin of whatever they purchase the product minus the reimbursement rate (usually AWP minus a %).  ***With generics the acquisition cost is usually much lower than the published AWP and creates a very favorable "spread" particularly when multiple generics exist and the acquisition price drops dramatically (and the published AWP does not).***

Having a higher AWP and having reimbursement being paid on a % of AWP can be favorable to the Pharmacies.  For example, our recommended strategy of keeping the AWP (and the NDP) higher if Roche comes in with a lower Net Direct Price (NDP) for [a competitor drug] actually could create a favorable situation because the reimbursement rate will be higher for our product. Simple example, if the reimbursement rate is AWP-15%, for a $100 AWP product the reimbursement is $85 compared to a $70 AWP product where the reimbursement is $59.50. . . .[38]

Warrick was similarly aware that purchasers of its products were interested not only in whether they would be reimbursed for its generic products,[39] but also in the level at which they would be reimbursed.  Purchasers were interested in how much profit they could make on Warrick generic drugs, and Warrick knew that.[40]

Warrick would send its new AWPs to the publishers.[41]  At the same time it would send, often on the same day, the AWP to retail accounts, also showing the "new direct price"[42] – AWP

---

[38] *Id*. at SPF00017395 (emphasis added); Deposition of Brian Longstreet ("Longstreet Dep.") at 85:1-88:18; *see also* Declaration of G. Raymond Pironti, Jr. (Dkt. No. 3274) ("Pironti Decl.") (trial declaration of Schering-Plough whistleblower), ¶ 14 ("The comments in [Trial Ex. 497] regarding creating favorable reimbursement spreads through manipulations of AWP and sales pricing for both branded and generic products reflect a well-known strategy by SP senior management in the marketing of SP products.").

[39] Feb. 2003 Weintraub Dep. at 515:20-516:18, 578:4-10.

[40] Trial Ex. 772 (RGXA0098615-623, at 00986620 and 00986620) (showing Warrick's interest in, and knowledge of, various effects on retailer/provider profit depending on Warrick's increase in AWP for albuterol solution versus post-rebate prices for product, after reimbursement based on AWP); Sept. 2006 Weintraub Dep. at 460:2-464:10; Trial Ex. 779 (SP 0000749-753) (letter to Warrick from retail pharmacy buying group, indicating that Warrick has been chosen to be an "endorsed generic contract vendor" and indicating further that the group looks forward to developing a long-term working relationship with Warrick based upon the attached "Generic Vendor and Product Selection Criteria"; attached document includes the criterion "AWP Spread; MAC" under the heading "Generic Product Selection Criteria").

[41] *See, e.g.*, Trial Ex. 4080.

[42] Trial Ex. 4081.

- 9 -

of $13.95 with "new direct price of $6.68."[43]  Over time the difference between AWP and the

direct price increased.  So by 1997 with an AWP of $14.95 the price offers were at $3.95,[44] by

1999 they were at $2.75.[45]  Publishers were not informed of these discounts.[46]

It was important to Warrick's clients, retail pharmacies, to earn a spread.  The spread was

a factor in their choice of which generic drug to use.[47]  Professor Berndt spelled out the role of

the pharmacist in the generic retail market and the relationship between this role and the generic

drug manufacturer's marketing of the spread:

> For any given prescription drug available from more than one
> generic manufacturer, the retail pharmacy buyer (particularly when
> organized into chains or other large buying groups) can stimulate
> price competition among the generic manufacturers.  This occurs
> since the retail pharmacist can credibly threaten to substitute
> between any of the FDA-certified bioequivalent generic versions
> of a drug, choosing the particular version having the most
> favorable price comparison, thereby stimulating price competition
> among generic manufacturers.

Berndt Report ¶ 41.

Dr. Kolassa, Warrick MDL trial expert, wrote in a book he published that "many generic

companies have taken advantage of this use of AWP by substantially inflating their published

AWPs."[48]  He also wrote that "an artificially high AWP provides the retailer with greater

profits"[49] and some retailers used AWP as a basis to charge cash customers.[50]  Professor Kolassa

---

[43] *See also* Trial Exs. 4082-84.

[44] Trial Ex. 4086.

[45] Trial Ex. 4088; *see also* Trial Tr. Day 18 at 39:22-25 (Weintraub) (THE COURT:  "In other words the differences between your direct price and the AWP is increasing over this period of time, right?  THE WITNESS:  That is correct.").

[46] Trial Tr. Day 18 at 41:16-22 (Weintraub).

[47] Trial Tr. Day 18 at 42-43 (Weintraub) ("That was their criteria.").  *See* Trial Ex. 779.

[48] Trial Tr. Day 18 at 105 (Kolassa).

[49] *Id*. at 108:20-109:4.

[50] *Id*. at 111:18-112:5.

- 10 -

recognized that the alternate approach to boosting provider profits:  "It is also common for the AWP of a generic product to remain stable while the actual selling price declines."  The result is the same.[51]

### (2)    Initial spreads and typical increases to the spreads

Schering-Plough representatives admit that they set and caused to be published AWPs for Schering-Plough branded subject drugs that did not reflect actual average wholesale prices, *i.e.*, an average of prices charged by wholesalers to retailers or providers for those drugs.[52]  Rather, Schering-Plough simply set its AWPs at 20% above Schering-Plough's direct prices – prices analogous to undiscounted wholesale acquisition costs, or WACs.[53]

Schering-Plough's direct prices for its branded drugs were subject to substantial discounts,[54] and chargebacks.[55]  In addition, customers enjoyed free goods,[56] grants,[57] and bundling with steeply discounted generic goods, which bundling had the effect of lowering the

---

[51] Berndt Report, ¶ 44 (quoting E.M. Kolossa, Elements of Pharmaceutical Pricing, Binghamton, NY:  the Pharmaceutical Products Press, 1997).

[52] Sept. 2006 Weintraub Dep. at 134:19-135:1.

[53] Feb. 2003 Weintraub Dep. at 427:20-428:3; Zahn Dep. at 176:4-24; *see also* Trial Ex. 809 (RGX0315084-141, at 0315085).

[54] *E.g.*, Trial Ex. 453 (SW0736212-217, at 0736213) (offering 25% market-share discount on Proventil solution if Proventil/generic albuterol market share target is met); Trial Ex. 455 (WPX0011864); Deposition of Peter Kamins, July 19, 2005 ("Kamins Dep.") at 44:6-16; Kelly Dep. at 45:18-46:2, 46:18-47:8, 72:9-12.

[55] Kelly Dep. at 27:5-28:22, 72:9-12.

[56] Trial Ex. 381 (SPF00013329-331) (regarding deals to dispensing doctors: "[i]n the US we always went with free goods whenever possible. . . ."); Trial Ex. 505 (WAR0072317-WAR0072336) ("Free Goods Summary" for Schering-Plough branded and Warrick generic products); Deposition of Portia Edens, Aug. 9, 2005 ("Edens Dep.") at 64:15-19 (acknowledging sampling program); Flynn Dep. at 69:2-70:3 (acknowledging the provision of samples, including Intron-A).  Schering-Plough also provided doctors with tickets to professional football games.  Butler Dep. at 68:1-9.

[57] Trial Ex. 572 (SPF00017238-SPF00017279) ("[A]ll grants over 5000 given by OBBU last two years."); Bishop Dep. at 43:15-44:1, 44:7-12.

actual acquisition cost of the Schering-Plough drugs.[58]  All of these had the effect of amplifying the spread between net acquisition costs and AWPs for Schering-Plough's branded products.[59]

Warrick representatives admit that they set and caused to be published AWPs for Warrick generic subject drugs that did not reflect actual average wholesale prices, *i.e.*, an average of prices charged by wholesalers to retailers or providers for those drugs.[60]  Rather, Warrick simply set its AWPs for its subject generic drugs at 10-15% below the AWPs that Schering-Plough had set for its corresponding branded drugs.[61]

Moreover, Warrick knew exactly what true average wholesale prices were to chain retailer pharmacies such as Walgreens, CVS, or Long's.[62]  It knew that these prices were nowhere near its published AWPs, and it also knew that as net acquisition costs inevitably decreased over time, given the trend of ever-lowering prices in the generic market, reimbursement to the pharmacies would grow in situations where AWP was the basis for reimbursement and where, as was Warrick's practice, it did not lower AWPs to reflect lower net acquisition costs.  Warrick did, however, ***raise*** the AWP for its 20 ml albuterol solution product

---

[58] Pironti Decl., ¶ 12 (explaining bundling and referring to Trial Exs. 418 and 470) (Dkt. No. 3274) and Trial Exs. 418 (WCT0144924-WCT0144928) and 470 (WAR0036807-WAR0036809); *see also* Trial  Ex. 772 (WP0004815A-WP00048178A, at 0004817A) (showing effect of bundling of cheaper Warrick generic product with Proventil in lowering Proventil's "effective list price" to chain).

[59] Recently, Schering-Plough agreed to pay hundreds of million of dollars to settle claims by the United States and certain of its agencies that it had marketed Temodar improperly by offering and paying "various forms of illegal remuneration to physicians and physicians' practices to induce utilization of Temodar . . . , including, for example, improper preceptorships, advisory boards, entertainment, and placement of clinical studies . . . ."  Trial Ex. 559 at 6-7.  Schering-Plough's provision of these inducements had the effect of amplifying Temodar spreads by reducing the actual cost of the drug, to the detriment of the States in this case.  Schering-Plough settled similar allegations with regard to marketing of Intron-A for superficial bladder cancer, *id.* at 7-8, together with allegations pertaining to free goods and "vial overfill," and insofar as Schering-Plough's marketing practices resulted in increased spreads for Intron-A, they had a detrimental effect on the States in this case.

[60] Sept. 2006 Weintraub Dep. at 134:19-135:1, 760:16-761:15; Oct. 2004 Weintraub Dep. at 130:10-18, 130:24-25-131:9.

[61] Feb. 2003 Weintraub Dep. at 494:17-495:9.

[62] *E.g.*, Sept. 2006 Weintraub Dep. at 526:2-21; Trial Ex. 432 (WAR0029661); Trial Ex. 433 (WAR0015167-0015010) (discussing and illustrating chargeback arrangement with Rite-Aid, and illustrating that Warrick knew the prices at which Rite-Aid pharmacies were buying its products, given that Rite-Aid was buying Warrick drugs on the basis of a contract price that Warrick knew); Trial Ex. 461 (WAR0002533).

in 1995, supposedly to track higher net direct prices.[63]  But as numerous records show, the

increase in AWP certainly did not track actual acquisition costs, which remained subject to

various diminishments, including discounts, rebates, price protection, and on-hand inventory

adjustments.[64]  Thus, in practice, the increase in AWP only served to amplify already large

spreads.[65]

Warrick's direct prices for its generic drugs were subject to substantial discounts[66] and

chargebacks.[67]  In addition, customers enjoyed free goods.[68]  All of these had the effect of

amplifying the spread between net acquisition cost and AWP for Warrick-labeled generic

products.

---

[63] Sept. 2006 Weintraub Dep. at 462:17-463:4.

[64] *E.g.*, Trial Ex. 719 (various Bates numbers) (showing AWP for 20 ml solution at $12.50 (*e.g.*, WCT0020159), then at $13.95 (*e.g.*, WCT0012419A), then at $14.99 (*e.g.*, WCT0033782) and showing various adjustments to actual acquisition costs (*e.g.*, WCT0033782, WCT0012073, WCT0134418).

[65] Sept. 2006 Weintraub Dep. at 761:23-766:10; *see also id.*, 866:23-867:4 ("Q. And when Warrick's prices fell, Warrick chose not to proportionally lower the AWPs; isn't that right?  A. That is correct.") (objections omitted) and 868:11-869:1; Feb. 2003 Weintraub Dep. at 548:15-18 (in witness's experience, AWP on generic drugs does not tend to erode with the erosion of market prices); July 2005 Sherman Dep. at 42:9-43:4 (Warrick did not lower AWPs on generic drugs once established); Manfredi Dep. at 132:16-22; Mar. 2002 Sherman Dep. at 132:13-18 ("Q. Is it the policy of Warrick to keep AWP and direct prices the same?  A. We keep the AWP the same and we lower the contract prices to meet competition whenever necessary.").

[66] *E.g.*, Trial Ex. 612 (RGX 0001225-RGX 0001231) (showing discounts to match competitor's prices), Ex. 618 (WP00012330A) (showing planned 20% discount to chains); Trial Ex. 619 (WP00012629A-WP00012633A) (showing discounted direct prices to chains, among other classes of trade); Trial Ex. 638 (SPW013819) (showing provision of "instant rebate," *i.e.*, discount, in addition to regular rebate, to chain); Trial Exs. 434, 438, 499 (cataloguing types of available rebates), 501, 502, 503, 504, and 718; Manfredi Dep. at 153:21-23, 155:13-21.

[67] *E.g.*, Trial Exs. 432 and 433.

[68] *E.g.*, Trial Ex. 441 (noting re: free goods: "This is a standard practice . . . ."); Trial Ex. 505 (WAR0072317-WAR0072336) ("Free Goods Summary" for Schering-Plough branded and Warrick generic products); Trial Ex. 443 (WAR0025195) ("Warrick will adjust on-hand inventory in the event of a market price decrease. . . ."); Trial Ex. 469 (WAR0027852).

(3)     **Using nominal pricing for Schering-Plough and Warrick drugs as a means of avoiding Medicaid rebates created enormous spreads**

Schering-Plough and Warrick both employed so-called "nominal pricing" to avoid paying best-price rebates under the Medicaid program.  Selling their products at nominal prices created enormous spreads vis-à-vis the products' static AWPs.[69]

Medicaid provides health care coverage primarily to low-income families with dependent children and low-income aged or disabled individuals.  Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.  The federal government and the states share funding for the program.  Each state has established outpatient Medicaid prescription drug coverage.  Accordingly, Medicaid drives high volumes of prescription drug sales.

If a drug manufacturer wants its products to be covered by Medicaid, the federal government requires that manufacturer to sign a rebate agreement.  42 U.S.C. §§ 1396a(a)(1)(A), 1396d(a)(12), and 1396r-8(a)(1).  The basic rebate contemplated by the agreement ensures that Medicaid pays manufacturers no more – and sometimes less – than any private purchaser in the United States for outpatient prescription drugs.  42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  The manufacturer directly pays the Medicaid rebate on outpatient prescription drugs to each state Medicaid agency.  42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  All forms of the Medicaid rebate are based on the average manufacturer price ("AMP") paid by wholesalers, inclusive of all discounts and price reductions for drugs distributed to the retail pharmacy class of trade.  42 U.S.C. § 1396r-8(c)(1).

---

[69] *E.g.*, Trial Ex. 422 (showing contract price of $6.95 in February 2002 for albuterol solution, 20 ml., NDC 1515-4, discounted to $.30 and later discounted to $.08); Trial Ex. 431 (WAR0022429) (showing AWP for albuterol solution 20ml., NDC 1515-4, at $13.95 in February 2002); Trial Ex. 434 (showing AWP for albuterol solution, 20 ml., NDC 1515-4, at $14.99, after 1995 increase to AWP); *see also* Sept. 2006 Weintraub Dep. at 462:23-463:4 (affirming that Warrick raised AWP for 20 ml. albuterol solution to $14.99 in 1995).

The rebate for products marketed under a New Drug Application, or NDA, *i.e.*, branded drugs or non-branded versions of an NDA product[70] is equal to (1) the greater of 15.7% of AMP for the product or (2) the difference between AMP for the product and the lowest price at which the product is sold (the so-called "best price"), times the number of Medicaid units dispensed.[71] To minimize rebates, then, a manufacturer wants a spread that is as small as possible between the AMP and the best price for the drug.[72]  This means that the manufacturer has to discount carefully, lest the profit that would come from increased sales at the lower price be offset or exceeded by liability for Medicaid rebates.[73]

Schering-Plough saw a loophole in the rebate system that it sought to exploit.  Drugs sold at "nominal prices" (*i.e.*, at a discount of 90% or more) under certain circumstances need not be considered in determining the best price for a given drug.  42 U.S.C. § 1396r-8(c)(l)(C).  So as Schering-Plough admits, it undertook to sell Proventil inhalers at nominal prices to certain segments of the marketplace as to which it wanted to give discounts.[74]  In other words, instead of giving moderate-size discounts, or even large discounts, to those customers, Schering-Plough opted to sell its branded inhalers to them at next-to-nothing prices.[75]  Whatever money Schering-Plough lost in the process of discounting to such an extraordinarily high degree was made up for

---

[70] Trial Ex. 408 at WAR0006070.

[71] *See generally* Trial Ex. 523 (WTC0001679-87) (explaining how best-price rebates are calculated).

[72] Trial Ex. 408 at WAR0006070-6073.

[73] *Id.* at WAR0006071.

[74] Trial Ex. 714 (SP 000939-SP 000949) (discussing implementation of nominal pricing strategy); Trial Ex. 408 (WAR0005993-6097, at 0006072) (discussion of sale of Proventil inhalers at nominal prices); *see also* Longstreet Dep. at 38:12-39:3 ("When I was in the contracts and information group we did institute nominal pricing for [] Proventil inhaler.").

[75] Trial Ex. 408 at WAR0006072; Trial Ex. 714 at SP 000942 ("Nominal pricing is in some cases less than our standard cost and may be below the standard cost of a generic manufacturer.  Are we in danger of predatory pricing?").

in terms of savings as to the best-price rebates that it would have to pay if it had sold the products at more moderate discounts.[76]

A side-effect of this strategy was harm to the States in this case. Given that it was Schering-Plough's practice not to lower AWPs in tandem with price cuts, enormous spreads developed whenever Schering-Plough employed nominal pricing that were not reflected in the reported AWP.[77]

Furthermore, Warrick sold nominally priced drugs, too.[78] The additional profits that Schering-Plough gained by employing the nominal pricing strategy for its branded products were not enough. Even in the face of generic competition, Schering-Plough knew that it could continue to, and it wished to, sell quantities of its branded products at prices that were a good deal higher than the products' generic counterparts.[79] Accordingly, it sought out a way by which it could sell its branded product with relatively moderate discounts while serving customers who would buy product only if it were more heavily discounted.

Enter Warrick. Schering-Plough recognized that it could use Warrick to sell generic versions of its drugs to buyers demanding heavy discounts.[80] By employing this strategy, Schering-Plough could then figure best-price rebates for Schering-Plough branded and Warrick generic products separately, even though the products would be identical,[81] even though both

---

[76] *Id.*

[77] *E.g.*, Trial Ex. 408 at WAR0006072; Trial Tr. Day 7 at 104-115, 123, 128-29 (Pironti).

[78] *E.g.*, Trial Ex. 422 (WAR0043141-WAR0043148 and WAR0043124, at 0043124) (contract with pharmacy, listing contract price for albuterol sulfate solution at $11.50, and later reducing prices to $.30 and then $.08 for the same product); Sept. 2006 Weintraub Dep. at 914:5-915:14.

[79] Trial Ex. 409; Trial Ex. 418 (WCT0144924-928) ("Rather than lowering our Proventil prices, I recommend we offer a 2-year Warrick Solution and Syrup market share driven contract addendum to their existing GeriMed contract. . . .").

[80] Trial Ex. 409 (WAR0005957-77).

[81] Trial Ex. 408 (WPX0005993-6097, at 0006116).

- 16 -

would be manufactured by Schering-Plough or one of its wholly owned subsidiaries, and even though both sellers would be Schering-Plough entities.[82]

Like Schering-Plough itself, Warrick also could minimize Medicaid rebates by pushing certain sales into the nominal-price category, so as not to set a best price that would be significantly less than the AMP for its drugs.  But the states that were denied the best-price rebates they should have received, and the States here, definitely lost.  As for the States, they paid for Warrick nominally priced drugs at a much higher rate than they should have had to pay.[83]

### (4)    Use the Integrated Therapeutics Group

Yet another Schering-Plough subsidiary, Integrated Therapeutics Group ("ITG"), would also prove helpful to Schering-Plough in amplifying the spreads of its branded and generic drugs.[84]  In brief, among its many off-book inducements to purchase Schering-Plough drugs, ITG would give Schering-Plough customers unreported free or nominally priced drugs, including Proventil and Warrick-branded inhalers, as well as payments in the form of "administrative fees," "partnership fees," and "data fees."[85]  This led to a whistleblower suit and nearly $350 million in criminal fines and civil settlements.[86]

---

[82] Trial Ex. 408 (WAR0005993-6097, at 0006061 ("Specifically, under current Medicaid legislation, by establishing separate NDC codes for the same product, i.e., one for Schering and one for Warrick, we believe they would be treated as distinct products for filing purposes.  Thus, we could move deep discounted business for products with minimal full price spillover into Warrick and not be forced to provide large 'best price' rebates in the retail Medicaid market.[82]"); *id.* at WAR0006070 ("A nonbranded product marketed under a separate NDC remains subject to the best price formula; however, this nonbrand will establish a separate AMP and best price relative to the brand.").  *See* Trial Tr. Day 7 at 120-21 (Pironti).

[83] Trial Tr. Day 7 at 122, 124-25 (Pironti).

[84] *See generally* Pironti Decl.

[85] Pironti Decl., ¶¶ 7-9, 12-13 (Dkt. No. 3274).

[86] Pironti Decl., ¶ 5 (Dkt. No. 3274).

Where Schering-Plough/Warrick, via ITG, gave customers free or nominally priced subject branded and generic drugs, the provision of those free or nearly free products had the effect of decreasing actual acquisition prices for those drugs.[87]  This, in turn, increased spreads in light of Schering-Plough's and Warrick's policies not to lower AWPs even in the face of declining actual acquisitions prices, and Schering-Plough and Warrick exploited those increased spreads in their marketing.[88]

### 5.   Individual brand and price histories reveal the Schering-Plough Group's manipulation of spreads

#### a.   Albuterol sulfate (generic)

The annual spreads of reported/captured discounts and rebates is evidenced by the AWP/pricing spreads reflected in analysis of the transactional data that shows spreads ranging from 103.3%[89] to 1052.8%.[90]

Warrick created favorable marketing spreads by maintaining a fixed AWP and educing the acquisition price to move the market.

Warrick marketed the spread on generic albuterol by direct advertisement to customers by showing the fixed AWP juxtaposed with the acquisition price.[91]

#### b.   Intron-A

Marketing the profitability to physicians of Intron-A treatment for bladder cancer is demonstrated by a 1998 memorandum to oncology sales representatives.  The message was:

---

[87] Pironti Decl., ¶¶ 8-9, 13 (Dkt. No. 3274); Trial Tr. Day 7 at 129, 136 (Pironti).

[88] Pironti Decl., ¶¶ 12, 14 (Dkt. No. 3274); Trial Tr. Day 18 at  31, 36 (Weintraub).

[89] NDC 151504 for 1994.

[90] NDC 151701 for 2004Q1; Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

[91] *E.g.*, Trial Exs. 437, 443, 445, 719, 4079; *see also* Manfredi Dep. at 237:5-15 ("Q. How would a pharmacy benefit from receiving information from a telemarketer regarding Warrick's drugs that is comparing the cost on that product to the AWP on that same product?  A. Yeah.  I think a pharmacy would benefit from knowing on any product what the cost and AWP are.  Q. And that's what's known in the industry as the spread, right?  A. Yes.") (objection omitted).

"*Treating bladder patients with Intron is still very profitable!!*"  *One patient on Intron can represent $16,956.36 of incremental sales and $2,373.84 of profit for our physicians just on the drug alone.*  These figures are based on having your physicians buy Intron-A at Net Direct pricing and treating on high dose of Intron. . . ."[92]

Reported off-invoice discounts[93] and rebates are captured within the transactional databases produced to the States.  Calculations based on the Schering-Plough databases show spreads for Intron-A always exceeded 20%, and during certain periods exceeded 30%,[94] up to 132%.[95]

           **c.**       **Proventil (branded albuterol)**

The Schering-Plough albuterol line of products was marketed under the Schering Proventil and Warrick generic labels.  The products were identical and manufactured under the same NDA, but with different NDCs.[96]

In 1991, the start of the relevant time period, Proventil still enjoyed the price protection inherent to on-patent status, and the AWP/actual sales price spread generally reflected the standard AWP mark-up of 20%.  However, in anticipation of generic competition in 1992 and the launch of albuterol generics in 1993, Schering increased the spread in order to compete against other manufacturers.  Thus spreads were from 39.4% to 51.5% in 1997.[97]

---

[92] Trial Ex. 394 (SPF0104510-512) (emphasis added); *see also* Ex. 397 (SW0027026) ("Cost Analysis for Superficial Bladder Cancer," showing profitability of treatment using Intron-A).

[93] Schering had a standard form marketing Intron-A only by offering an off-invoice discount of 14% off NDP (~30% off AWP) if the quarterly utilization rate met or exceeded the quarterly national-market-share benchmark reported by NDC.  *See* Trial Ex. 395 (SPW0042545).

[94] For example, the spreads exceeded 30% on NDC 23501, in 2001-2004, NDC 4201, in 2001-2002, NDC 11101 in 2001, 2003, NDC 2003, in 1991-92, NDC 3901 in 1992, 1993, 2001-2004.

[95] Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

[96] Aug. 2005 Weintraub Dep. at 63:9-64:16.

[97] Hartman Direct (11/1/06) (Dkt. No. 3296), Attach. G.4.c.

- 19 -

# IV.   ANALYSIS

## A.   The Evidence Shows That Warrick Manipulated the Spread for Its Drugs

Warrick claims that because of the unique nature of the generic drug market and the way in which it set its drug prices, it could not have marketed the spread.  In summary, Warrick says, it set its prices at product launch and "left them alone thereafter."  SPW Mem. at 3.  However, the States submit evidence to the contrary and state that there is more than one way to skin a cat – or market a spread.

Record evidence shows that Warrick manipulated the spread[98] for its generic products both by setting artificially high AWPs and by lowering the acquisition costs to pharmacies and other providers.  Warrick did this by arbitrarily setting its launch AWPs at 10 to 15 % lower than its parent company's brand drug without any consideration as to whether a lower AWP would be justified by the drug's actually sales price.[99]  Alternately, Warrick would look at competitor products and peremptorily "slot" its market entrant "somewhere in the pack" of AWPs – again, with no consideration given as to the relationship between the AWP and the actual price.[100] Warrick also offered clients significant discounts on its products that were never reflected in its often-stagnant AWPs or even reported to publishers.[101]  At all times, Warrick remained mindful of its clients' hunger for profit which, of course, was achieved via the spread between acquisition cost and reimbursement price (usually AWP).[102]

These practices – far from "innocent," to use Warrick's term – fit neatly with the testimony of Walgreen's William E. Groth to illustrate the impact Warrick practices had on the

---

[98] *See supra*, at § II.B (*in passim*).

[99] *See supra* at 5-6.

[100]  *See supra* at 6.

[101] *See supra* at 13.

[102]  *See supra* at 9-10.

market.  As quoted by Warrick, Groth testified that *he* focused on purchasing the cheapest drugs available.[103]  Warrick complied by regularly lowering its acquisition price.  As Warrick's own statistics reflect, there is no comparable reduction in the AWP for the same products during this time period.  Even as the pharmacy providers enjoyed decreased acquisition costs for the Subject Drugs, the Montana and Nevada Medicaid programs continued to reimburse based on AWP – at rates that were artificially high to begin with and became even more artificially high as, unbeknownst to the Medicaid programs, Warrick dropped the acquisition costs to the providers.

"Warrick gained market share based on price, not spread," Warrick argues – but the two are linked.  Why would a pharmacy provider be attracted to the lowest price drug if it would simply pass the lower price along to a state or other payor?  The answer lays in the spread. Warrick ensured the savings would not be passed along to the payor by maintaining AWPs while dropping acquisition costs.  Logically, the relative level of the price mattered much less to a pharmacy than the potential profit – or spread – the sale of that product could bring.  This is why even if true, Warrick's argument that its AWPs were sometimes below the median is unavailing. SPW Mem. at 5.  Take the case of two competing generic products that may be substituted for one another.  Product x has an AWP of $ 2.00 and a cost to the pharmacy of $ 1.00.  Product y has an AWP of $ 3.00 and a cost to the pharmacy of $ 2.25.  The pharmacy profit is $ 1.00 on product x and $ .75 on product y.  Product x is reimbursed at a lower AWP, but because its acquisition cost is lower, the pharmacy enjoys a higher profit.

This is critical to moving market share for a generic manufacturer like Warrick. Warrick's arguments pretend the retail pharmacy has no role in shifting market share.  This is not true.  Professor Berndt discusses the role substitution by retail pharmacist plays in determining

---

[103] [SPW] Supp. Diederich Decl. Ex. 1 (Groth Dep. excerpt).  *See also* States' Resp. to SPW L.R. 56.1 Stmt. ¶ 8.

sales and market share.[104]  Contrary to Warrick's arguments, it ***does*** profit through enhanced

market share.  In many instances, pharmacists are able to substitute drugs.  The economic

incentive to substitute the drug with the biggest spread is widely recognized.[105]

**B.    The States' Reimbursement for Warrick Drugs Was Based on AWP**

Warrick argues that the Court should enter judgment in its favor because CMS

established a FUL for them at some point for 15 of its subject drugs.  It is undisputed that the

States' Medicaid reimbursement formulas were based on a number of factors – including the

Federal Upper Limits (FULs) established by CMS.[106]  The Federal Upper Limit is a price ceiling

set by CMS in reference to AWP.  The FUL is a measure developed by CMS for use by state

Medicaid programs in reimbursing drugs that have at least three generic equivalents or on the

EAC for the drug.[107]  The FUL has historically been no more than 150% of the lowest price for

the least costly therapeutic equivalent.[108]

Contrary to Warrick's arguments, FULs for certain drugs may also be based on AWP.

The best evidence that SPW has been able to adduce that this is not the case is the alternatives

used by CMS to calculate FUL.  The calculation is based on the "lowest published price" for the

least costly multiple source drugs in a group of equivalents.  42 C.F.R. § 447.332(b).  This price

---

[104] *See supra* at 10.

[105] *Id.*

[106]  Warrick also mentions the States' use of "alternative AWP calculations made by the Department of Justice – that are not made based on the manufacturer-reported AWPs," SPW Mem. at 6, but Warrick does not offer any evidence of Warrick transactions based on this "alternative AWP" and does not return to the allegation anywhere in its argument, so the States do not address it.

[107]  42 C.F.R. § 447.332 (upper limits for multiple source drugs; the FUL is "an amount established by CMS that is equal to 150 percent of the published price for the least costly therapeutic equivalent").  *See also* Jim Hahn, Ph.D, Health Economist, Domestic Social Policy Division, Congressional Research Service, RL33782-Federal Drug Price Negotiation: Implications for Medicare Part D (Jan. 7, 2007) (discussing historic calculation of FUL and recent changes as based on AWP).

[108]  Beginning January 1, 2007, for reasons not pertinent to this motion, the AWP will no longer be used as the basis for calculating the FUL or the EAC but instead will be calculated to equal 250% of the "average manufacturer price" (AMP).

- 22 -

may be AWP.  This argument is a reiteration of the argument set forth in Defendants' Montana Joint Memorandum In Support of Summary Judgment at 36-37 and was addressed in Montana's and Nevada's opposition to the joint motion.  *See* Mont. Opp. To Defs' Jt. Summ. J. Mot. at 33-35.  In this individual iteration, Warrick again does not proffer any evidence to show that the States reimbursed the 15 Warrick Subject Drugs on any basis other than AWP.  Even if the States did reimburse some transactions based on FUL, as explained in the Montana and Nevada oppositions to Defendants' joint motions for summary judgment, these transactions were affected by the inflated AWPs.  *Id*. at 34.

Dr. Hartman addressed the direct link between FUL and the AWPs of the related drugs. *See* Breckenridge Decl., Ex. 1 (Hartman Mont. Decl. at ¶ 8(b)); Breckenridge Decl., Ex. 3 (Hartman Nev. Decl. at ¶ 8(b)).  Dr. Hartman explains that the FUL price is set at an amount equal to 150 percent of the published price for the least costly generic substitute.  *Id*. at n.10. Not only does this link FULs to inflated AWPs and result in damages in the form of overpayments to the States, it also demonstrates the incentives that remain for generic manufacturers to manipulate the AWPs such that the FUL itself becomes artificially inflated.

Warrick's own discussion of FUL and its potential relationship to the Warrick Subject Drugs acknowledges that the issue is not fully dispositive of the States' claims here.  At most, CMS established FULs for 15 of the 25 Warrick drugs in this case – at varying times during the relevant time period.  SPW Mem. at 7-8. Two of the drugs did not have FULs calculated for them until 2000; for one of those, the CMS withdrew the FUL less than two years later.  *Id*. Even if the States reimbursed based on FUL during the time periods for which the FULs were available (a fact not in evidence), this would only go to a limitation on the amount of damages for which Warrick is liable.

- 23 -

The States submit that the States reimbursed for the Warrick Subject Drugs based on AWP in two ways – by direct use of AWPs and by use of FULs that were calculated based on AWPs. This is supported by the Hartman Declarations (Breckenridge Decl., Exs. 1-4). Warrick argues that in some instances, AWP was not the basis for reimbursement. A genuine issue of material fact exists. Summary judgment should not be granted on this basis.

**C.     Record Evidence Shows That Schering Manipulated *and* Marketed the Spreads for Its Subject Drugs**

Schering asserts that all the States' claims should be dismissed as to it because the record is devoid of any evidence that it manipulated and marketed the spreads for its Subject Drugs, but its analysis focuses ***not*** on its drug pricing and marketing conduct, but on the purported knowledge of the Montana and Nevada Medicaid programs. Notably, Schering's principal allegation in this regard, is unsupported by any reference to the record or any other evidence whatsoever.[109] Nevertheless, the States previously addressed the same arguments in opposing Defendants' joint motions for summary judgment.[110] In addition, the extensive factual discussions of Schering's practices in § II.B above refutes Schering's claims to the contrary.

Schering's argument regarding its lack of incentive to manipulate the spread for its drugs has also been previously addressed. As discussed above, drug manufacturers have an incentive to boost their AWPs or widen the spread between acquisition costs and the manufacturer-reported AWP. The incentive is to increase the profit to the pharmacies. Even if there were not evidence of this practice on the record, however, Schering's practice of reporting inflated AWPs

---

[109] SPW Mem. at 11 ("The Medicaid Directors of both States acknowledged that they were aware that AWP exceeded actual acquisition costs by more than the amount deducted in the regulatory scheme.").

[110] *See* Montana Opp. to Defs' Jt. Summ. J. Mot. at § III.D and *in passim*; Nev. Opp. to Defs' Jt. Summ. J. Mot. at § III.D and *in passim*.

for its drugs alone is sufficient evidence of unfair acts and practices in violation of Montana's

and Nevada's statutes.

## V.    CONCLUSION

For all of the foregoing reasons and the reasons set forth more fully in the States'

oppositions to Defendants' joint motions, SPW's motion for summary judgment should be

denied.

By_____/s/ Steve W. Berman_____                    DATED:  April 26, 2007
    Steve W. Berman
    Sean R. Matt
    Jeniphr A.E. Breckenridge
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

    COUNSEL FOR THE
    STATES OF MONTANA AND NEVADA

    Mike McGrath
    Attorney General of Montana
    Ali Bovingdon
    Assistant Attorney General
    Justice Building
    215 North Sanders
    P.O. Box 201401
    Helena, MT  56920-1402
    (406) 444-2026

    COUNSEL FOR THE
    STATE OF MONTANA

    Catherine Cortez Masto
    Attorney General of the State of Nevada
    L. Timothy Terry
    Deputy Attorney General
    100 N. Carson Street
    Carson City,  NV 89701-4714

    COUNSEL FOR PLAINTIFF
    STATE OF NEVADA

- 25 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **MONTANA AND NEVADA'S OPPOSITION TO SCHERING-PLOUGH CORPORATION'S AND WARRICK PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT AS TO NEVADA AND MONTANA ACTIONS,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 26, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.


By_____/s/ Steve W. Berman_____
      Steve W. Berman
      **HAGENS BERMAN SOBOL SHAPIRO LLP**
      1301 Fifth Avenue, Suite 2900
      Seattle, WA  98101
      (206) 623-7292

001534-13  164485 V1