# Exhibit 7

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

----------------------------X

In re: PHARMACEUTICAL,        )        MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE    )        CIVIL ACTION

PRICE LITIGATION              )        01CV12257-PBS

----------------------------)

THIS DOCUMENT RELATES TO:     )

ALL ACTIONS                   )        CERTIFIED COPY

----------------------------X


DEPOSITION OF DUANE PRESHINGER

Taken at:

Law offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

April 20, 2006

9:00 a.m.

Duane Preshinger                                                            April 20, 2006

Helena, MT

33  (Pages 126 to 129)

---

**126**

1    OIG?
2        A.  Yes.
3        Q.  Dan Peterson, at this time, directly
4    reported to you?
5        A.  Yes.
6            (Document marked Deposition Exhibit
7    Preshinger 022 for identification.)
8            MS. SMITH-KLOCEK:  What's been marked as
9    Exhibit Preshinger 022 is Exhibit MT 023670 through
10   MT 023700. It's entitled "Office of Inspector
11   General, Medicaid Pharmacy - Additional Analyses of
12   the Actual Acquisition Cost of Prescription Drug
13   Products", dated September 2002, I believe.
14           THE WITNESS:  (Perusing document) -- okay.
15   BY MS. SMITH-KLOCEK:
16       Q.  Are you familiar with this document?
17       A.  I don't recall it specifically, no.
18       Q.  In your position as Acute Services section
19   manager -- I'm sorry, section chief and Acute
20   Services bureau chief, do you receive OIG reports
21   regarding prescription drug surveys?
22       A.  Typically, yes.

---

**127**

1        Q.  Do you receive OIG reports regarding
2    acquisition costs of prescription drugs?
3        A.  Typically, yes.
4        Q.  In your time at Acute Services in Montana
5    Medicaid, do you recall how many OIG reports you've
6    received?
7        A.  I do not.
8        Q.  How do you receive these OIG reports?
9        A.  Typically, on paper; although more
10   recently, I think they have sent some
11   electronically.
12       Q.  Who do you receive them from?
13       A.  It depends.  Typically, from like John
14   Chappuis, the State Medicaid Director, or whoever
15   gets them sometimes.
16       Q.  Who else at Montana Medicaid gets them?
17       A.  You would probably be surprised on random
18   people they send things to.  I'm sure Jeff Buska
19   probably got some, Gail Gray, Maggie Bullock.
20       Q.  When you say "they" send, are you
21   referring to CMS or OIG?
22       A.  Right.

---

**128**

1        Q.  Which entity?
2        A.  Both of them.
3        Q.  Okay.  When you receive the OIG reports,
4    do you review them?
5        A.  Sometimes, yes.
6        Q.  If you do not personally review them, do
7    you assign a staff member to review them?
8        A.  Yes; yes, I do.
9        Q.  Is there one person on your staff that you
10   tend to assign to review the OIG reports as they
11   come in?
12       A.  It would be specific of the program that
13   they supervise, that they manage.
14       Q.  If an OIG report regarding pharmacy came
15   in, who would you assign it to?
16       A.  At this time, it would go to Dan.
17       Q.  Dan Peterson?
18       A.  Correct.
19       Q.  Was there someone before Dan that you
20   would have assigned to review it?
21       A.  Shannon Marr, Shannon Marr.
22       Q.  In the executive summary of this document

---

**129**

1    on the third page, which is MT 023672, do you see in
2    the middle of the page were there are bullet points?
3        A.  Yes.
4        Q.  Where it says, "For single source
5    innovator drugs: pharmacies purchase the drugs at an
6    estimated discount of 17.2 percent below AWP" --
7        A.  Yes, I see that.
8        Q.  -- are you familiar with that finding from
9    the OIG in 2002?
10       A.  I don't recall.
11       Q.  And then, "For multiple source drugs
12   without FULs," and I believe "FUL" stands for
13   federal upper limit? Please correct me if you
14   disagree.
15       A.  Yes.
16       Q.  It states: "Pharmacies purchased the
17   drugs at an estimated discount of 42.2 percent below
18   AWP."
19           Are you familiar with that finding from
20   the OIG in 2002?
21       A.  Not that I can recall specifically.
22           (Document marked Deposition Exhibit

---

Duane Preshinger                                    April 20, 2006

Helena, MT

146

1    that?

2              THE WITNESS:  Prudent Rx.

3         Q.   (By Ms. Smith-Klocek) Are you familiar

4    with a list of AWPs from the Department of Justice

5    that were reduced-rate AWPs for certain drugs?

6         **A.   Vaguely, I recall something like that.**

7         Q.   Do you know if these are commonly referred

8    to as DOJ AWPs?

9         **A.   That doesn't ring a bell, no.**

10        Q.   If you need a break, let me know.

11        **A.   No.**

12        Q.   Are these AWPs established by the State

13   Medicaid Fraud Control Unit --

14             MS. BRECKENRIDGE:  Objection.

15        Q.   -- those AWPs that you were referring to?

16             MS. BRECKENRIDGE:  Objection; foundation.

17             THE WITNESS:  I said -- I didn't refer to

18   anything.  I said I was aware of them.  I don't know

19   who does them or what.

20        Q.   (By Ms. Smith-Klocek) Do you know if

21   Montana Medicaid currently uses those AWPs?

22        **A.   I'm not aware of that.**

Duane Preshinger                                    April 20, 2006

Helena, MT

147

1           MS. SMITH-KLOCEK:  Exhibit Preshinger 027.

2                (Document marked Deposition Exhibit

3    Preshinger 027 for identification.)

4           MS. SMITH-KLOCEK:  Exhibit Preshinger 027

5    is a one-page page document, Bates-stamped MT

6    013843.

7           THE WITNESS:  (Perusing document) -- okay.

8    BY MS. SMITH-KLOCEK:

9       Q.   By July 1 of 2002, you were within the

10   Acute Services Division, correct?

11      A.   Correct.

12      Q.   If you'd look to the third bullet on this

13   document where it says:

14           "Medicaid AWP reimbursement (revised AWPs

15   that were established by the State Medicaid Fraud

16   Control Unit) no longer applies to any product."

17           Do you recall ending use of those AWPs on

18   July 1, 2002?

19      A.   Not specifically, no.

20      Q.   Have you seen this document, Exhibit

21   Preshinger 027, before?

22      A.   I don't know if I have or not.  It doesn't

**Exhibit 8**



EXHIBIT
9
3/17/66   KRANTZ

July 24, 1992

TO: Nancy Ellery, Administrator
    Mary Dalton, Chief

FR: Terry Krantz, Supervisor

RE: Direct vs Average Wholesale Pricing

Currently, we have 7 or 8 Drug manufacturers who supply products directly to Pharmacies. All others sell products to wholesalers who in turn supply to pharmacies.  Pharmacies in Montana complain that minimum order make it difficult to obtain discounts from direct manufacturers and that we should use average wholesale prices for all pricing and remove the direct pricing from our system.  This method has been evaluated and I estimate that this system would result in increasing reimbursement to the providers by $281,392 annually.  Based on this evaluation, I do not think it is feasible to make this change without legislative approval and considering current budget constraints, I do not believe that this change is possible in the foreseeable future.

I would like to note that this project was performed in less than two days using information that was obtained from First Data Bank and our Rebate System.  This included learning to use new equipment and software..  This type of analysis would not have been feasible for our unit using equipment and information available six months ago.  Progress is wonderful!

MT 005440

# Exhibit 9

Diane

-1-

BEFORE THE DEPARTMENT OF PUBLIC
HEALTH AND HUMAN SERVICES OF THE
STATE OF MONTANA

In the matter of the          )          NOTICE OF AMENDMENT
amendment of ARM 37.86.1101   )
and 37.86.1105 pertaining to  )
medicaid outpatient drug      )
reimbursement                 )

    TO:  All Interested Persons

    1.    On April 25, 2002, the Department of Public Health and
Human Services published notice of the proposed amendment of the
above-stated  rules  at  page  1257  of  the  2002  Montana
Administrative Register, issue number 8.

    2.    The Department has amended ARM 37.86.1101 as proposed.

    3.    The  Department  has  amended  the  following  rule  as
proposed with the following changes from the original proposal.
Matter to be added is underlined.  Matter to be deleted is
interlined.

    37.86.1105 OUTPATIENT DRUGS, REIMBURSEMENT  (1) remains as
proposed.
    (2)  The dispensing fee for filling prescriptions shall be
determined for each pharmacy provider annually.
    (a)  remains as proposed.
    (b)   The dispensing fees assigned shall range between a
minimum of $2.00 and a maximum of $4.35 $4.70.
    (c) and (d) remain as proposed.
    (3)   In-state  pharmacy  providers  that  are  new  to  the
Montana medicaid program will be assigned an interim $3.50
dispensing fee until a dispensing fee questionnaire, as provided
in (2) above, can be completed for six months of operation.  At
that time, a new dispensing fee will be assigned which will be
the lower of the dispensing fee calculated in accordance with
(2) for the pharmacy or the $4.35 $4.70 dispensing fee.  Failure
to comply with the six months dispensing fee questionnaire
requirement will result in assignment of a dispensing fee of
$2.00.
    (4) through (5)(b) remain as proposed.

    AUTH:  Sec. 53-2-201 and 53-6-113, MCA
    IMP:   Sec. 53-6-101, 53-6-113 and 53-6-141, MCA

    4.    The  Department  has  reviewed  and  considered  the
comments regarding the proposed change in the maximum dispensing
fee.   In response to comments received, the Department has
decided to change the proposed increase to the dispensing fee.
Whereas the Department planned to raise the maximum dispensing
fee from $4.20 to $4.35, the Department agrees that the increase
is  too  minimal  to  account  for  the  cost  of  dispensing  a

Montana Administrative Register No. 37-233

MT 013531

prescription. Providers strenuously objected to the notion that an increase of only $.15 would make the change to reimbursement more "palatable". Providers also regarded the insignificant increase as offensive, especially in light of dispensing fees in surrounding states. Upon further research, the Department has found that although the national average dispensing fee is $4.35, the average fee in surrounding states is much higher. Dispensing fees in Washington, Idaho, Wyoming, North Dakota and South Dakota average $4.67 (this average excludes Oregon because their dispensing fee of $3.50 is significantly lower than Montana's current fee). Therefore, the Department proposes to increase the maximum dispensing fee by $.50, which results in a maximum fee of $4.70. This change will more appropriately align Montana with surrounding states as well as recognize the cost to dispense a prescription. Additionally, the Department plans to undertake other significant cost containment measures that will require cooperation from pharmacy providers. The Department feels it is important to accurately compensate providers for the services they provide, especially when cost containment measures are enacted that may require additional assistance and time. Therefore, the Department feels the investment towards pharmacist's reimbursement is well worth the additional cost.

5. The Department has thoroughly considered all commentary received. The comments received and the Department's response to each follow:

COMMENT #1: The change to reimbursement will negatively affect all pharmacies, particularly independent, rural pharmacies. Concern was expressed about the potential impact to rural communities if pharmacies are forced out of business. Another person argued that the Office Of Inspector General (OIG) study has serious flaws and should not be considered as a basis for changes. This individual feels the change to reimbursement will negatively affect rural communities by forcing pharmacies out of business because Medicaid clients comprise nearly 40% of most pharmacies' business.

RESPONSE: The Department has considered the impact this change will have on all pharmacies in Montana, including rural pharmacies. However, the OIG Report included rural pharmacies in the study and the OIG believes that the sample design took into account the number of chain pharmacies and the number of independent pharmacies in the State and appropriately weighed the sample results.

COMMENT #2: The validity of the estimate of Average Wholesale Price (AWP) is questioned. The provider indicates he is unable to purchase drugs at the proposed levels.

RESPONSE: The Department understands that not all pharmacies may be able to purchase drugs at AWP less 15%, however, when considering all pharmacies as an aggregate, the Department is heeding the recommendation of the OIG to more accurately reflect

MT 013532

-3-

acquisition cost.

COMMENT #3: The Department is asking pharmacy providers to sell their merchandise at cost and subsidize the Medicaid reductions with sales on other products.

RESPONSE: The Department has no intention to force providers to subsidize Medicaid reductions with sales of other products. The Department can only be concerned about the actual acquisition cost for drugs.

COMMENT #4: The increased demand for services should result in a corresponding increase in reimbursement for providers.

RESPONSE: The Department understands that increased utilization of services requires more work for Medicaid providers. As noted above, the Department has reconsidered the increase to the dispensing fee and has approved a new maximum of $4.70.

COMMENT #5: Recipients who require expensive medications may cause the Department's budget challenges.

RESPONSE: There is no doubt that a smaller percentage of utilizing members cause the largest percentage of expenditures. However, generally, high utilizers are often most in need of medical services, including drugs. It is important to note that Medicaid exists to help serve not only the financially needy, but also the medically needy who truly have expensive health care needs. Additionally, the Department is continually striving to monitor and control high utilizers by recommending alternative and less expensive courses of treatment.

COMMENT #6: All Medicaid agencies should be subject to salary reductions to offset the budget deficit.

RESPONSE: The Department has made internal reductions in order to contain costs. Those reductions have included elimination of travel and equipment and leaving vacant positions unfilled for a period of time to restore vacancy savings. This requires consolidation of duties and requires existing staff to shoulder more of the workload at a time when administrative requirements have increased due to the demands of implementing cost containment measures.

COMMENT #7: Pharmacy providers have not had a raise in reimbursement in over ten years.

RESPONSE: The Department has increased dispensing fees twice in the last ten years: once in July 1997 when the fee increased to $4.14 and again in July 1998 when the fee increased to $4.20.

COMMENT #8: The reduction of 5% will negatively impact the discount already in place by distributors and wholesalers.

Montana Administrative Register No. 37-233

MT 013533

-4-

RESPONSE: The Department cannot comment on the discounts that each pharmacy may receive from their individual wholesaler or supplier because those discounts vary. The Department can only control the discount taken off the AWP.

COMMENT #9: The $.15 increase in dispensing fee is not enough to make up for the loss imposed by the change to AWP. The Department should raise the dispensing fee to the average fee found in the Northwest ($4.68). Additionally, an incentive should be provided to pharmacies for generic dispensing by paying a higher dispensing fee for generic drugs.

RESPONSE: The Department has studied the matter and has adjusted the dispensing fee as addressed in paragraph 4 of this notice.

COMMENT #10: The Department should re-evaluate who the reduction is targeted towards; pharmacists are not the reason for increased drug costs. Drug prices are falsely blamed for much of the increase in health care expenditures. However, the real reason for increase in drug expenditures is a result of the new and expensive drugs used to treat chronic diseases and the reduction in the industries' AWP. Neither of these factors can be controlled by retail or home infusion pharmacies.

RESPONSE: The Department understands that high drug costs are not the fault of pharmacies, however, only the federal government has the power to regulate the cost of drugs. The Department continues to do all we can to contain costs, including prior authorization, drug utilization review, mandatory generic substitution, tab splitting and coverage of less expensive over-the-counter drugs. Additionally, the Department continues to explore other cost saving measures to be implemented in the near future.

COMMENT #11: The profit margins for most pharmacies are only 1/3 of 1%, and that will be worsened by the Medicaid reductions. Acquisition costs of the newer, expensive drugs and highly utilized drugs are generally very high and profit margins are very low because reimbursement by insurers is low; another cut to reimbursement will cause reimbursement to be significantly below acquisition cost.

RESPONSE: The Department understands that profit margins are low for pharmacy providers just as they are for other kinds of healthcare providers. The Department would argue that we are not changing reimbursement to below cost for pharmacies; we are only trying to bring reimbursement more in line with actual acquisition costs.

COMMENT #12: It does not make sense for the Department to reduce payments to pharmacy providers because the savings the Department will gain are automatically eliminated when considering all of the factors in provider reimbursement

MT 013534

(federal matching dollars, state income taxes, etc).

RESPONSE: In light of the OIG study, the Department is only concerned about accurately reimbursing pharmacists based on actual acquisition cost. Although revenue is an important part of the budget equation, the Department does not have the ability to collect revenue (beyond funds we already collect from manufacturers for drug rebates).

COMMENT #13: The Department should focus on the cost of drugs or amounts of drugs utilized in order to gain cost savings.

RESPONSE: The Department is pursuing a cost containment measure to help control high utilizing clients, who typically contribute to the high expenditures in the drug program. The Department plans to implement an intensive case management model whereby we can help control drug utilization for those clients who are receiving more drugs than necessary as well as recommend (in consultation with their physician and pharmacist) less costly alternatives.

COMMENT #14: This reduction will only create more hardship for the uninsured population that is already in a difficult position.

RESPONSE: Although the Department has an interest in the overall health of all of Montana's citizens, Medicaid has an obligation to control costs for our own clients. Therefore, the Department can only try to impact those clients who are insured by Medicaid.

COMMENT #15: The Department should focus on the pharmaceutical manufacturers to cut costs, rather than providers.

RESPONSE: This comment was already addressed in Response to Comment #10. However, even though a few other states have recently pursued the development of Medicaid preferred drug lists and supplemental rebates from manufacturers, their experiences have been mired in legal controversy. At this time, the State of Montana is not willing to pursue supplemental rebates as another way to generate revenue because we are certain the State would need to spend more in legal fees trying to defend the plan than we would make in cost savings.

COMMENT #16: Strenuous objections were made to the use of the OIG reports by the Department because there are too many problems with the report including the age of the report, the small number of sample pharmacies and the urban slant on the report.

RESPONSE: As noted in a previous response and in the Department's testimony, we recognize that some entities have criticized the OIG investigation as being flawed. We agree that the OIG failed to account for the cost of professional services

Montana Administrative Register No. 37-233

MT 013535

and the cost of dispensing which includes supplies and staff. However, because there has not been an auditable counter-study conducted, we must base our decisions on the information provided. Because Medicaid is a public insurance benefit and is funded by both federal and state monies, one can understand how important it is that we heed the recommendations made by the OIG.

COMMENT #17:   Some pharmacies indicate that the reimbursement for certain drugs are actually lower than the acquisition cost, particularly products by Pfizer and Abbott.

RESPONSE:  The Department understands that pharmacies have been reimbursed below their cost for a select number of drugs made by Pfizer and Abbott.   The reason for the underpayment is because selected drugs have continued to be reimbursed at direct price, when in fact direct prices are not available for the majority of pharmacies in the state, that is, pharmaceutical companies are not selling these drugs to pharmacies in Montana at the direct price.   ARM 37.86.1101(1)(b) currently provides that if the direct price is not available to providers in the state, the estimated acquisition cost (EAC), on which reimbursement may be based, will be the AWP minus the discount specified in the rule. Thus,  at the present time the EAC used to calculate reimbursement should be based on the AWP rather than the direct price.

For that reason, the Department has eliminated direct pricing from the reimbursement methodology effective June 5, 2002.  This change will enable pharmacies to be paid at the lower of the EAC, Federal Maximum Allowable Cost (FMAC), or their usual and customary charge.   Subsection (1)(a) of ARM 37.86.1101, which defines the EAC as the direct cost, is being left in the rule because the direct price may be available to pharmacies in the state at some time in the future.   The Department regrets not being able to change the reimbursement methodology sooner and will allow providers who have been paid incorrectly in the past year to reverse and resubmit those claims which were previously subjected to direct pricing.

COMMENT #18:  There was a time when few pharmacies participated as Medicaid providers.  This reduction will again force many pharmacies to withdraw from the Medicaid system.

RESPONSE:   The Department feels it is important to emphasize that we do not intend to alienate providers.   The Department understands that reductions in reimbursement rates may be difficult for Medicaid providers.  However, the Department does not expect the reduction in reimbursement to result in a significant impact on access to pharmacy services.

COMMENT #19:   Limits should be placed on the number of people enrolled in Medicaid.   Eligibility requirements should be changed, particularly so people moving from other states cannot

MT 013536

immediately qualify for Medicaid.

RESPONSE:  In an effort to control costs throughout Medicaid, the Department will continue to examine eligibility requirements and determinations to determine who should most appropriately qualify for benefits.  Additionally, the Department does undertake efforts to ensure those utilizing their health benefits are not abusing the benefits.  One way the Department pursues stricter control of Medicaid individuals' care seeking is through the Restricted Card Program.  Under the Restricted Card Program, Medicaid individuals who overuse the program are restricted to one physician and one pharmacy and action is taken to limit the number of unnecessary emergency room visits.  If further actions are required, the Medicaid Fraud Control Unit is notified and the situation is pursued by the Department of Justice.  Federal law does not permit waiting periods for medicaid recipients establishing state residency.

COMMENT #20:  The number of prescriptions a person can receive in a given month should be limited.

RESPONSE:  Although some states have effectively instituted script limits for their Medicaid clients, Montana Medicaid is choosing to examine a more proactive approach at this time.  In the near future, the Department plans to implement an intensive case management system for high utilizing clients so we can better monitor and control drug usage.  Often, there is a clinical need for a client to have more than the average number of scripts so the Department believes script limits may be more punitive than necessary.  However, the Department feels that the changes to cost sharing, effective April 1, 2002, have provided incentive to clients to make informed health care choices, including how many drugs they really need.

COMMENT #21:  The Department should change the cost sharing requirements so the first two prescriptions would require a 5% coinsurance.  The next three prescriptions would require a 33% coinsurance and the next three would be 66%.  After six prescriptions, the client would be required to pay the entire amount of the prescription.

RESPONSE:  The suggestion to model cost sharing in Medicaid after a private insurance plan is a good idea. However, because Medicaid is a joint federal and state funded program, we are obligated to abide by strict regulations regarding cost sharing. Within the current Code of Federal Regulations, states may only impose cost sharing requirements up to a certain limit (5% is the maximum coinsurance amount).  Therefore, we are unable to impose greater coinsurance amounts at this time.

COMMENT #22:  Prescription amounts should be limited to only a 30-day supply.

RESPONSE:  The Department has examined and plans to implement a

MT 013537

-8-

change to the day supply in the near future.  We agree that
because eligibility is determined monthly, it makes the most
sense to limit prescriptions to only a 30-day supply.

COMMENT #23:  Time limits should be placed on expensive
medications, like Prilosec. After 90 days of therapy, a less
expensive generic medication should be dispensed.

RESPONSE:  In the next couple of months, the Department plans to
implement a step therapy program for one expensive class of
drugs, Proton Pump Inhibitors (PPIs).  This step therapy will
allow the Department to realize cost savings at the same time we
will be better controlling the drug regimens of the large number
of people taking those expensive medications. Additionally, the
Department already requires prior authorization on a number of
expensive medications and the mandatory generic substitution
program requires prescribers and pharmacies to prescribe and
dispense a generic form of a drug, whenever possible.

COMMENT #24:  Initial prescriptions for expensive medications
(particularly mental health drugs) should be limited in order to
avoid expensive waste because of when a client must change
dosages or strengths.

RESPONSE:  The Department is also investigating the idea of
limiting the day supply on certain classes of drugs,
particularly mental health drugs.  The Department hopes that by
requiring smaller day supplies on drugs for which the strength
often changes, we can realize cost savings and prevent waste of
unused medications.

COMMENT #25:  More strenuous education should be provided for
physicians so they better understand how to save money, and
physicians who do not cooperate should be dropped from Medicaid.

RESPONSE:  The Department agrees that physician education is a
key component to help contain costs in the pharmacy program.
Although the Department does not have the authority to terminate
a Medicaid provider based on their prescribing habits, the
Department can target those providers and demand (by way of
audits and information) changes in behavior.

COMMENT #26:  Mandatory generic dispensing should be enacted and
physicians should not be allowed to write "Dispense As Written"
on a prescription.

RESPONSE:  The Department has already instituted mandatory
generic substitution (effective June 2001). However, physicians
will always have the ability to indicate Dispense As Written and
the Department can only control that dynamic by requiring prior
authorization before Medicaid will pay for a brand name drug.

COMMENT #27: Direct-to-consumer advertising should be banned in
the State of Montana because recipients are using that

Montana Administrative Register No. 37-233

MT 013538

-9-

information to demand unneeded drugs.

RESPONSE:  The Department has no control over direct-to-consumer advertising in the State of Montana.

COMMENT #28:  The Governor and the Governor's Budget Office do not understand the value of pharmacy in the total health care picture.  These reductions may result in immediate savings but will not result in long term solutions.

RESPONSE:   Although the Department cannot comment on the position of the Governor or her Budget Office, the Department does understand the positive impact pharmacotherapy has on the overall well being of any individual.  Although optional under the federal requirements, Montana Medicaid has chosen to provide a pharmacy benefit because we recognize the benefit to all Medicaid recipients.  Furthermore, the Department believes that we can achieve long term savings from the proposed changes to reimbursement and other program areas.


    Dawn Sliva
    Rule Reviewer                              Director, Public Health and
                                               Human Services

Certified to the Secretary of State June 17, 2002.

**Exhibit 10**

**FAX** from the desk of:

Shannon Marr
Pharmacy Program Officer
Medicaid Services Bureau
e-mail: smarr@state.mt.us
phone: (406) 444-2738
fax: (406) 444-1861

Date:   May 21, 2002

To:     Karen & Kip, Corvallis Drug

Fax:    961-4344                          Phone: 961-3221

Re:     Direct Pricing                    No. of pages, including cover: 2

As I mentioned on the phone, I am trying to resolve this direct pricing issue as soon as possible.

As you'll find in both the provider manual and the administrative rules (37.86.1101), reimbursement for covered drugs is the lessor of:

- The provider's usual and customary charge
- The estimated acquisition cost (EAC) plus a dispensing fee
- The maximum allowable cost (MAC) plus a dispensing fee

The EAC is the Department's best estimate of providers' cost for a drug in the package size most frequently purchased.  <u>The Department uses the direct price charged by manufacturers to retailers as the EAC.</u> If the direct price is not available to providers in the state, the Department uses the average wholesale price (AWP) less 10 percent or the Department may set an allowable acquisition cost when the department determines that acquisition cost is lower than either the direct price or AWP less 10 percent (this is the case for some 400 drugs that are assigned Medicaid AWP prices).

We understand that pharmacies are no longer able to purchase direct. We are working to eliminate direct pricing from the reimbursement methodology for the remaining five labels. The drugs affected include <u>any manufactured under the following labels:</u>

- Pfizer 00049. Examples include: Geodon, Unasyn, Geocillin, Glucotrol, Antivert, Cardura, Diflucan, Trovan, Glucotrol, Zoloft, Sinequan, Vistaril, Atarax, Navane)
- Pfizer 00069. Examples include: Vibramycin, Norvasc, Procardia, Zithromax, Diabinese, Viagra, Zyrtec
- Abbott 00074. Examples include: Colchicine, Sodium Chloride, Heparin, Demerol, Morphine, Norvir, Talwin, Lorazepam, Ketorolac, Biaxin, Hytrin, Gabitril, Depaene, Cylert, Depakote,
- Pfizer 00063 and Pfizer 00995 are also subject to direct pricing. However, we have not had any claims submitted under these NDCs in the past year.

This change is scheduled to be effective July 1, 2002. At that time, direct pricing will be removed from the following labels. Additionally, the Department plans to remove Medicaid AWP prices and change the reimbursement methodology to AWP less 15% (see Provider Notice dated May 1, 2002 for more information about the proposed rule). However, I am working with our contractor in Atlanta to see if we can remove the direct pricing methodology sooner than July 1.

Once the direct pricing change is effective, the Department will allow providers to reverse and resubmit any affected claims within the last year. We will follow up with all providers in an official Provider Notice once the change is made.

I apologize for the inconvenience this has caused. Even though direct pricing has been used for several years, I understand that it has become more of an issue recently because other reductions are now in effect (such as the 2.6% reduction and changes to cost sharing).

Please let me know if you have any other questions or concerns.

MT 005359

# Exhibit 11

EXHIBIT

22

2/22/06 Poulsen

# DEPARTMENT OF
# PUBLIC HEALTH AND HUMAN SERVICES
### HEALTH POLICY & SERVICES DIVISION



**MARC RACICOT**
**GOVERNOR**

**LAURIE EKANGER**
**DIRECTOR**

## STATE OF MONTANA

COGSWELL BLDG., 1400 BROADWAY
PO BOX 202951
HELENA, MONTANA 59620-2951

April 15, 1999

Jim Smith
Montana State Pharmaceutical Association
PO Box 4718
Helena, MT 59604

Dear Jim:

As you know, the Pharmacy Coordinating Committee conducted a survey of pharmacies with the University of Montana School of Pharmacy and Allied Health Sciences to determine the extent to which pharmacies acquired drug products directly from manufacturers. The survey showed that responding pharmacies purchase through drug wholesalers rather than directly from manufacturers. As a result of this survey, the Committee asked that Medicaid consider changing its reimbursement methodology for those labelers that currently pay at the direct price to average wholesale price less 10%.

We now have an opportunity to implement a change in the direct price methodology. The 1999 Legislature has authorized a 1% provider increase for each year of the next biennium. I propose that we use this increase to fund a change in the reimbursement methodology.

I recently completed an analysis of the direct price manufacturers to determine the program cost of changing from direct price (DP) reimbursement to average wholesale price (AWP) less 10%. Using product utilization from 7/1/97 through 6/30/98, I calculated the cost difference between the two reimbursement methods using the most current rates for AWP and DP. These cost differences are an estimate of program cost because they do not take into account recipient copay, maximum allowable cost (MAC) pricing on generics, and differences in submitted charges. The results of this analysis are shown below.

As you can see, removing all the labels from direct price would result in an increased cost of approximately $335,868 per year. The amount available to the program for a provider increase is approximately $48,817 in the first year, and $99,391 in the second year for a total of $148,208 for the biennium. These amounts were calculated by applying the 1% increase in each year of the coming biennium to the pharmacy dispensing fee. (Calculation: 1,162,310 scripts x .042 + 1,183,232 scripts x .084)

Page Two
April 15, 1999

| Label | AWP- 10% | Direct Price | Difference/Year |
|---|---|---|---|
| 00005 | $163,253 | $146,954 | $16,300 |
| 00008 | $533,954 | $479,977 | $53,977 |
| 00009 | $236,015 | $209,561 | $26,454 |
| 00662-00663 | $3,363 | $3,167 | $196 |
| 00049 | $1,434,053 | $1,348,153 | $85,900 |
| 00069 | $805,650 | $758,464 | $47,186 |
| 00074 | $1,749,271 | $1,643,416 | $105,855 |
| **TOTAL** | $4,925,559 | $4,589,692 | $335,868 |

I propose that we phase in elimination of direct price reimbursement by removing labels 00005, 00008, 00009, 00662 and 00663 from this methodology for the 2000-2001 biennium. The analysis shows that this will result in approximately $193,854 greater cost to the Medicaid pharmacy program. If the legislature authorizes another provider increase next biennium, we would continue to eliminate the labels subject to direct price.

Please share this proposal with members of the Montana State Pharmaceutical Association and let me know if it is acceptable. If so, I will initiate the changes to become effective July 1, 1999. If you or anyone else have questions or comments, please feel free to contact me at (406) 444-2738 or dpoulsen@state.mt.us.

Sincerely,

*Dorothy*

Dorothy Poulsen
Pharmacy Program Officer
Medicaid Services Bureau

7.2.24.4
c: Mary Dalton, Jeff Buska

**MT 005371**

1,078,663
$\frac{}{4I}$                    ×2

| | | | |
|---|---|---|---|
| 70005 | 16,146 | 15,993 | — Ledule |
| 70009 | 26,237 | 26,020 | — Upjohn |
| 70049 | 84,960 | 84,021 | Pfizer |
| 70069 | 46,499 | 45,812 | Pfizer |
| 662 + 663 | 193 | 190 ✓ | Pfizer |
| 0008 | 53,516 | 53,054 | Wyeth |
| 0074 | 104,852 | 103,848 | Abbott |
| | 332,403 | 328,938 | 661,341 |

diff between AWP & Dir Price          DP          AWP

| | | | | |
|---|---|---|---|---|
| 0005 | 16,300 | | 146954 | 163253 |
| 0074 | 105,855 | | 1643416 | 1749271 |
| 0049 | 85,900 | | 1348153 | 1434053 |
| 662-663 | 196.27 | | 3169 | 3363 |
| 0008 | 53,477 | | 479,977 | 533954 |
| 0009 | 26,454 | 22,263 | 209561 | 236015 |
| 069 | 47,186 | 32016 | 758,464 | 805650 |
| | 335,868 | 285,868 | 4589692 | 4925559 |

335,868

4587 +                           .02

Total Dir price = 4589,692   4681486  (91,794)
Total AWP price = 4925,559
                  413,072  (.093)

MT 005372

# Exhibit 12

## Recent Changes to the Montana Medicaid Prescription Drug Program

**June 5, 2002**
Direct pricing reimbursement no longer applies to any product.

**July 01, 2002**
- The Estimated Acquisition Cost changed from AWP less 10 % to AWP less 15%
- The Maximum Dispensing fee for in-state providers changed from $4.20 to $4.70
- Medicaid AWP reimbursement (revised AWPs that were established by the State Medicaid Fraud Control Unit) no longer applies to any product.

**August 01, 2002**
Client cost sharing changed to: 5% of Medicaid allowable or $1.00 whichever is greater, capped at $5 per Rx, and $25 per month.

**September 01, 2002**
Client cost sharing exemption extended to clients under age 21 (formerly Medicaid clients under age 18)

**January 10, 2003**
Provider notifications and manual updates changed from individual provider mailings to a listing of recent publications and the date they were published in the *Montana Medicaid Claim Jumper*. The *Claim Jumper* will be mailed monthly to keep providers updated on changes in the Medicaid program. Medicaid reimbursement and program coverage changes can be found by visiting the Department website at http://www.dphhs.state.mt.us and select *Medicaid Program Changes*.

**February 01, 2003**
- Weight reduction drugs were terminated from coverage.
- Dispensing limitations changed to a maximum 34-day supply, from a 34-day or 100-dose supply, whichever was greater.
- Prescriptions may be refilled after 75% of the estimated therapy days have elapsed. Refills prior to 75% of the estimated therapy days must be prior authorized by the Drug Prior Authorization Unit. The only circumstance that will allow for early refill is if the prescriber has changed the dosage and the client needs a refill at the new dosage.

**April 2003 (proposed)**
Changing reimbursement on generic drugs without FULs to AWP less 25%.


DPHHS Medicaid Provider Information web site:
　　http://www.dphhs.state.mt.us/hpsd/medicaid/medpi/medpi.htm

MT 013843

# Exhibit 13

Helena, MT

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------

                          )

                          )        **CERTIFIED COPY**

IN RE: PHARMACEUTICAL     )

INDUSTRY AVERAGE          )

WHOLESALE PRICE           )

LITIGATION,               )Civil Action 01CV12257PBS

                          )

------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF

TERRY KRANTZ

------------------------------------------------

8:30 a.m.

March 17, 2006

GOUGH SHANAHAN JOHNSON & WATERMAN

33 South Last Chance Gulch

Helena, Montana  59601

REPORTED BY:  Judith A. Robinson, CCR #2171

Terry Krantz

March 17, 2006

Helena, MT

4  (Pages 10 to 13)

10

1   Industries as an accountant. I worked there for
2   approximately 2 years. Then I went to work for the
3   Department of Social & Rehabilitation Services as an
4   auditor.
5        After working as an auditor for several
6   years, I took a position with the Medicaid program
7   and worked as a hospital program officer. In about
8   1989 or 1990, I went to work as a supervisor for the
9   acute services section for Medicare. For the next
10  approximately 7 years, I worked as a supervisor for
11  Medicare in various capacities in both the acute
12  services and health maintenance sections.
13       In 1997 I moved to a position with the
14  special supplemental nutrition program for women,
15  infants and children and I was the State WICK
16  director until 2001.
17       In 2001, I took a position as bureau chief
18  of the communicable disease control prevention
19  bureau, also with the department of then Public
20  Health & Human Services. There was a reorganization,
21  changing the name from Social & Rehabilitation
22  Services to Public Health & Human Services.

11

1        In January of 2005, I resigned from State
2   government and went to work for Affiliated Computer
3   Services and that is my present position.
4        Q.  Just to recap, you worked for the State of
5   Montana in one capacity or another from 1980 to
6   2005?
7        A.  That's correct.
8        Q.  Do you recall, when was your first
9   position within Montana Medicaid?
10       A.  The position would have been the human
11  services program officer. It was probably about 4
12  years. But I don't recall the exact date.
13       Q.  I'm sorry. I thought you said your first
14  job within Medicaid was as a hospital program
15  officer.
16       A.  Yes.
17       Q.  And I'm trying to find out if you remember
18  what the start date was.
19       A.  I don't remember the start date.
20       Q.  But it was sometime between 1982 and 1989?
21       A.  Yes.
22       Q.  At one point I heard you say that you were

12

1   the supervisor of something having to do with
2   "Medicare." I assume you meant "Medicaid"?
3        A.  Yes, I did. I'm sorry.
4        Q.  That's why I was looking at the court
5   reporter's computer.
6        I believe I heard you say at one point
7   that you were the supervisor of the health
8   maintenance section and at another point you were
9   the supervisor of the acute services section.
10       A.  That's correct.
11       Q.  Which came first?
12       A.  Acute services section.
13       Q.  Was there a substantive difference between
14  those sections or was that a name change?
15       A.  It was a substantive difference. The
16  acute services section, I had responsibility for
17  facility-based services. Inpatient and outpatient
18  hospital services. In the health maintenance
19  section, the responsibilities were related to
20  individual providers, durable medical equipment,
21  pharmacy and transportation and things like that.
22       Q.  I'm going to change my --

13

1        (Exhibit Krantz 001 was marked.)
2   BY MS. O'SULLIVAN:
3        Q.  Mr. Krantz, the court reporter has handed
4   you what has been marked as Exhibit Krantz 001.
5   It's Bates numbered. That's what we call those
6   numbers at the bottom of the page, MT 008600 to
7   8604. The State of Montana produced this document
8   to us.
9        If you would please take a few minutes to
10  look at it?
11       A.  (Witness complies.)
12       Q.  Have you seen this document before?
13       A.  I don't recall seeing this document, no.
14       Q.  The reason I've shown it to you, if you
15  look at page MT 008602, the third page, about at the
16  middle of the page it says, "Terry Krantz,
17  Supervisor." It says, "Health Maintenance Section."
18  And then that's stricken out and it says "Acute
19  Services Section."
20       Do you see that?
21       A.  Yes.
22       Q.  Is it possible that your first supervisory

# Exhibit 14

DIRECT PRICING IMPACT
CREATED BY TERRY KRANTZ AUG 11, 1994
THIS WORKSHEET COMPUTES THE IMACT OF ELIMINATING
DIRECT PRICING AND USING AWP-10% FOR PHARMACY SERVICES

| LABEL CODE | MFG NAME | Q1/94 REIMBURSED | Q1/94 UNITS | ANNUALIZ ESTIMATE 5% IMPAC | ANNUALIZ ESTIMATE 7% IMPAC | ANNUALIZ ESTIMATE 9% IMPAC | ANNUALIZED ESTIMATE 11% IMPAC | ANNUALIZ MAJOR ND |
|---|---|---|---|---|---|---|---|---|
| 00003 | SQUIBB | $89,155 | 366,340 | $17,831 | $24,963 | $32,096 | $39,228 | 23448.99 |
| 00005 | LEDERLE | $77,264 | 211,329 | $15,453 | $21,634 | $27,816 | $33,996 | 34841.46 |
| 00008 | WYETH | $62,278 | 283,960 | $12,456 | $17,438 | $22,420 | $27,402 | 26483.05 |
| 00009 | UPJOHN | $88,013 | 165,590 | $17,603 | $24,644 | $31,685 | $38,726 | 41958.79 |
| 00049 | PFIZER | $164,533 | 100,356 | $32,907 | $46,069 | $59,232 | $72,395 | 43340.21 |
| 00063 | | | | $0 | $0 | $0 | $0 | 0 |
| 00069 | PFIZER | $72,077 | 49,972 | $14,415 | $20,182 | $25,948 | $31,714 | 578.2462 |
| 00074 | ABBOTT | -$196,520 | 464,916 | $39,304 | $55,026 | $70,747 | $86,469 | 42580.48 |
| 00662 | PFIZER | $8,227 | 18,751 | $1,645 | $2,304 | $2,962 | $3,620 | 1977.852 |
| 00663 | PFIZER | $2,841 | 1,931 | $668 | $795 | $1,023 | $1,260 | 859.8833 |
| 00995 | | | | $0 | $0 | $0 | $0 | 0 |
| | | $760,908 | 1663145 | $152,182 | $213,054 | $273,927 | $334,800 | $216,069 |

MT 005466

# Exhibit 15

AstraZeneca

November 14, 2003

RECEIVED
NOV 1 7 2003
CHILD & ADULT
HEALTH RESOURCES

Department of Public Health and Human Services
1400 Broadway, P.O. Box 202951
Helen, MT 59620

In accordance with Section III (D)(2) of the June 2003 Corporate Integrity Agreement between
AstraZeneca Pharmaceuticals LP and the OIG, enclosed are the Average Sale Prices for Covered
Products identified in Appendix A of the CIA along with a description of the methodology used
to calculate the Average Sale Prices and Requisite Certification.

If you have any questions or concerns relating to these Average Sale Prices, please contact
Esther Selvaggi at (302) 886-2268 or myself at (302) 886-8589 and we will provide further
details.

Sincerely,

Deborah A Saez
Medicaid Pricing Coordinator
AstraZeneca

Enclosures (3)

**MT 038039**

**AstraZeneca Pharmaceuticals LP**
1800 Concord Pike  PO Box 15437  Wilmington DE 19850-5437

Tel        302 886 3000
www.astrazeneca-us.com

ZPH1001 (01/X0)

**3Q03 ASP Data**
**Labelers 00186 and 00310**

11/14/2003

| NDC | ASP |
|-----|-----|
| 00186-0110-01 | 0.078029 |
| 00186-0112-01 | 0.200274 |
| 00186-0112-91 | 0.245788 |
| 00186-0114-01 | 0.231653 |
| 00186-0114-12 | 0.33761 |
| 00186-0114-91 | 0.197404 |
| 00186-0115-01 | 0.095457 |
| 00186-0115-12 | 0.122281 |
| 00186-0117-01 | 0.247303 |
| 00186-0117-12 | 0.420082 |
| 00186-0117-91 | 0.266751 |
| 00186-0118-01 | 0 |
| 00186-0118-91 | 0 |
| 00186-0120-01 | 0.103416 |
| 00186-0122-01 | 0.398708 |
| 00186-0122-12 | 0.460078 |
| 00186-0122-13 | 0 |
| 00186-0122-91 | 0.397936 |
| 00186-0125-01 | 0.09795 |
| 00186-0125-12 | 0 |
| 00186-0135-01 | 0.063664 |
| 00186-0137-01 | 0.143179 |
| 00186-0140-01 | 0.071231 |
| 00186-0145-01 | 0.067352 |
| 00186-0150-01 | 0.082212 |
| 00186-0155-01 | 0.083674 |
| 00186-0160-01 | 0.093078 |
| 00186-0166-01 | 0.0344 |
| 00186-0168-01 | 0 |
| 00186-0169-01 | 0 |
| 00186-0210-03 | 0.609284 |
| 00186-0212-03 | 4.102608 |
| 00186-0215-03 | 0.808564 |
| 00186-0225-03 | 0 |
| 00186-0230-03 | 0.330403 |
| 00186-0232-03 | 0.482031 |
| 00186-0240-02 | 0 |
| 00186-0240-12 | 0 |
| 00186-0240-44 | 4.082956 |
| 00186-0241-13 | 0.735619 |
| 00186-0242-13 | 0.342786 |
| 00186-0243-12 | 0.16971 |
| 00186-0244-12 | 0 |
| 00186-0244-44 | 4.364056 |
| 00186-0245-02 | 0 |
| 00186-0245-54 | 6.763793 |
| 00186-0250-02 | 0.414771 |
| 00186-0255-02 | 0.214916 |
| 00186-0255-92 | 0 |
| 00186-0260-02 | 0.258652 |

**MT 038040**

**PRIVILEGED AND CONFIDENTIAL**
Page 1 of 2

Contacts: Deborah Saez (302) 886-8589
Esther Selvaggi (302) 886-2268

**3Q03 ASP Data**
**Labelers 00186 and 00310**

| NDC | ASP |
| --- | --- |
| 00186-0260-92 | 0.344043 |
| 00186-0265-02 | 0.246642 |
| 00186-0265-03 | 0.320767 |
| 00186-0275-12 | 0.13802 |
| 00186-0276-13 | 0.584103 |
| 00186-0277-13 | 0.320706 |
| 00186-0278-12 | 0 |
| 00186-0278-44 | 3.714129 |
| 00186-0278-54 | 5.383066 |
| 00186-1905-01 | 0.240538 |
| 00186-1906-01 | 0.236189 |
| 00310-0049-10 | 0 |
| 00310-0108-10 | 0.593155 |
| 00310-0321-11 | 0 |
| 00310-0321-15 | 0 |
| 00310-0321-30 | 31.837585 |
| 00310-0325-11 | 0 |
| 00310-0325-15 | 12.7759 |
| 00310-0325-20 | 13.319618 |
| 00310-0375-10 | 92.118827 |
| 00310-0375-61 | 71.406459 |
| 00310-0376-10 | 2.413271 |
| 00310-0376-11 | 0 |
| 00310-0376-31 | 8.242368 |
| 00310-0376-33 | 0 |
| 00310-0376-34 | 0 |
| 00310-0376-60 | 4.995784 |
| 00310-0376-61 | 0 |
| 00310-0377-20 | 14.802324 |
| 00310-0377-21 | 0 |
| 00310-0377-32 | 15.405069 |
| 00310-0377-33 | 0 |
| 00310-0377-34 | 0 |
| 00310-0377-62 | 4.205903 |
| 00310-0378-51 | 9.506693 |
| 00310-0379-51 | 18.43608 |
| 00310-0720-25 | 147.44042 |
| 00310-0720-50 | 148.90129 |
| 00310-0950-36 | 202.50532 |
| 00310-0951-30 | 537.06139 |
| 00310-0960-36 | 0 |
| 00310-0961-30 | 0 |
| 00310-3286-10 | 0 |

**MT 038041**

Contacts:  Deborah Saez   (302) 886-8589
Esther Selvaggi  (302) 886-2268

# Appendix A: Average Sale Price Calculation Methodology

**Average Sale Price =**

(Accounts Receivable $ - Chargeback Sales $ – Chargeback Discounts $ - Managed Care Discounts $)

/ (Accounts Receivable Units – Chargeback Sales Units)

**Accounts Receivable $ =**
(Total Direct Sales $ + Adjustments to Total Direct Sales $ - Early Pay Discount $ – SBC Direct Purchase Admin Fees)

- **Total Direct Sales $:** All direct sales $ from all Trade Classes & Market Segments as identified by the "Market Segment to Government Pricing Mapping" report. This value is for a calendar quarter, with the **Invoice Date** determining if a direct sale participates in this quarter's calculation. The majority of the direct sales are to wholesalers, retailers, and mail-order. Returns are excluded. Direct Federal & PHS/DSH sales are excluded.

- **Adjustments to Total Direct Sales $:** All direct sales adjustment $ from all Trade Classes & Market Segments as identified by the "Market Segment to Government Pricing Mapping" report. This value is for a calendar quarter, with the **Invoice Date** determining if a direct adjustment participates in this quarter's calculation. The majority of the direct adjustments are to wholesalers, retailers, and mail-order. Adjustments to returns are excluded. Direct Federal & PHS/DSH adjustments are excluded.

- **Early Pay Discount $:** early pay discount for Total Direct Sales $. The discount is calculated individually for each direct sale, but is usually 2%.

- **SBC Direct Purchase Admin Fees:** Fee $ are earned on direct purchases from Sales-based contracts. The fee is attached to the SBC contract. Payments are made to the contract owner via check. These accounts are typically commercial buying groups. They are a flat % across all products and sales on the contract. This value is for a calendar quarter, with the admin fee **Date Paid** determining if a fee participates in this quarter's calculation. If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

© 2003, Company Confidential                    11/14/2003                                        1 of 5

MT 038042

**Accounts Receivable Units** = All direct sales units from all Trade Classes & Market Segments as identified by the "Market Segment to Government Pricing Mapping" report. This value is for a calendar quarter, with the **Invoice Date** determining if a direct sale participates in this quarter's calculation. Returns are excluded. Direct Federal & PHS/DSH sales are excluded. (Note: The Units UOM is the Medicaid UOM.)

**Chargeback Sales $ = 0.98 \* (Chargeback Sales @ WAC $)**

- **Chargeback Sales @ WAC $:** All chargeback (indirect) sales $ to the Federal Government, including PHS/DSH. Can be from any Federal contract, including but not limited to the FSS, BPAs, national contracts, and the PHS/DSH contracts. Each sale is priced at the WAC in effect as of the sale's invoice date. This value is for a calendar quarter, with the CB **Date Received** determining if a sale participates in this quarter's calculation. Returns are excluded.

**Chargeback Sales Units** = All chargeback (indirect) sales units to the Federal Government, including PHS/DSH. Can be from any Federal contract, including but not limited to the FSS, BPAs, national contracts, and the PHS/DSH contracts. This value is for a calendar quarter, with the CB **Date Received (or Date Paid)** determining if a sale participates in this quarter's calculation. Returns are excluded.

**MT 038043**

© 2003, Company Confidential                                *11/14/2003*

**Chargeback Discounts $ =**

(Total Commercial CB Credit $ + SBC Indirect Purchase Admin Fee $ + Non-Invoice Price Adjustment $)

- **Total Commercial CB Credit $:** Chargeback credit $ from all market segments that are not Federal, PHS, or Covered Entities. These customers are typically institutions. This value is for a calendar quarter, with the CB **Date Received** determining if a sale participates in this quarter's calculation. Returns are excluded.

- **SBC Indirect Purchase Admin Fee $:** Fee $ are earned on indirect purchases from Sales-based contracts. The fee is attached to the SBC contract. Payments are made to the contract owner via check. These accounts are typically commercial buying groups. They are a flat % across all products and sales on the contract. This value is for a calendar quarter, with the admin fee **Date Paid** determining if a fee participates in this quarter's calculation. If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

- **Non-Invoice Price Adjustment $:** Adjustment $ paid to institutional customers when the contracted product is not available for purchase and a substitute product is purchased. Adjustment $ from all market segments that are not Federal, PHS, or Covered Entities. These customers are typically institutions. This value is for a calendar quarter, with the **Invoice Date** determining if an adjustment participates in this quarter's calculation.

MT 038044

© 2003, Company Confidential

11/14/2003

**Managed Care Discounts $ =**

    **(SBC Performance Fee $ + SBC Rebate $ + UBC Admin Fee $ + UBC Performance Fee $ + UBC Rebate $)**

- **SBC Performance Fee $:**  Fee $ are earned by accounts (which own the contract) or customers (which are eligible members on the account's contract), depending upon the arrangement of the GPO.  These fees typically have performance requirements, so the account or some of the customers might not earn a fee.  The fee % is generally fixed.  The fee is calculated using a UBC rebate contract format, but with claim data provided by a "Sales Data Pull".  If the account earns a fee it is paid via check.  If the customers earn fees, then payment is via a wholesaler credit issued to the customer's preferred wholesaler in the name of the customer.  These accounts are typically commercial buying groups while the customers are institutions such as hospitals. This value is for a calendar quarter, with the fee **Date Paid** determining if a rebate participates in this quarter's calculation.  If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

- **SBC Rebate $:**  Rebate $ are earned by accounts (which own the contract) or customers (which are eligible members on the account's contract), depending upon the arrangement of the GPO.  These rebates typically have performance requirements, so the account or some of the customers might not earn a rebate.  The rebate can be variable, depending upon performance.  The rebate is calculated using a UBC rebate contract format, but with claim data provided by a "Sales Data Pull".  If the account earns a rebate it is paid via check.  If the customers earn rebates, then payment is via a wholesaler credit issued to the customer's preferred wholesaler in the name of the customer.  These accounts are typically commercial buying groups while the customers are institutions such as hospitals. This value is for a calendar quarter, with the rebate **Date Paid** determining if a rebate participates in this quarter's calculation.  If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

**MT 038045**

© 2003, Company Confidential

11/14/2003

- **UBC Admin Fee $:** Admin fee $ are earned by accounts which own the managed care contract. These fees are typically not based upon performance requirements, and are generally at a flat %. The fee is calculated using a UBC rebate contract format, with claim data provided through ECP or manual entry. If the account earns a fee it is paid via check. The account is typically a PBM, mail-order, or HMO. A managed care contract can contain multiple fees and one rebate. **"Flat Dollar"** fees, which are fees/rebates paid off-invoice, must not be selected for this value. This value is for a calendar quarter, with the fee **Date Paid** determining if a fee participates in this quarter's calculation.

- **UBC Performance Fee $:** Fee $ are earned by accounts which own the managed care contract. These fees typically have performance requirements, so the account might not earn a fee. The fee can be variable, depending upon performance. The fee is calculated using a UBC rebate contract format, with claim data provided through ECP or manual entry. If the account earns a fee it is paid via check. The account is typically a PBM, mail-order, or HMO. A managed care contract can contain multiple fees and one rebate. **"Flat Dollar"** fees, which are fees/rebates paid off-invoice, must not be selected for this value. This value is for a calendar quarter, with the fee **Date Paid** determining if a fee participates in this quarter's calculation.

- **UBC Rebate $:** Rebate $ are earned by accounts which own the managed care contract. These rebates typically have performance requirements, so the account might not earn a rebate. The rebate can be variable, depending upon performance. The rebate is calculated using a UBC rebate contract format, with claim data provided through ECP or manual entry. If the account earns a rebate it is paid via check. A managed care contract can contain multiple fees and one rebate. **"Flat Dollar"** fees, which are fees/rebates paid off-invoice, must not be selected for this value. This value is for a calendar quarter, with the rebate **Date Paid** determining if a rebate participates in this quarter's calculation.

© 2003, Company Confidential

11/14/2003

**MT 038046**

EXHIBIT 'A' CERTIFICATION FORM

**CERTIFICATION**

    The undersigned, an agent of AstraZeneca Pharmaceuticals LP, hereby certifies that the attached average sale price information has been communicated to First Databank or any successor or alternative reporting agency, and that it has been calculated in accordance with the methodology described in the State Settlement Agreement and as further described in AstraZeneca Pharmaceuticals LP's Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services.

Signed _Delma__ a. Saez_

Title _Medicaid Pricing Coord_

Date _11/14/03_

**MT 038047**