# Exhibit 61

# Business *to Business*

A quarterly newsletter from Centeon's Corporate Accounts and Sales Operations

*April 1996*          *Number 1*

REDACTED

*In This Issue:*

√ MediSpan: Who are they and how do they work with home care pharmacies?

√ Current IGIV and Coagulation AWP Lists

REDACTED

CTPaC

C4IG/8:00003

ABAWP 000846
HIGHLY CONFIDENTIAL

# MediSpan

Drug files, such as MediSpan, Red Book Drug Topics, and First Data Bank, publish pharmaceutical product pricing information (average wholesales prices). Product and pricing information is obtained from the pharmaceutical manufacturer either at the time the product is launched or when there is a pricing change.

Average wholesale price (AWP) is common language among all insurance carriers. AWPs are set by manufacturers as a "suggested retail" for the products they produce. These figures represent a reasonable profit margin to healthcare providers and as such are widely referenced by insurance carriers (Medicare, Medicaid, and third-party payers) when establishing reasonable and customary allowables.

Both Red Book Drug Topics and First Data Bank serve as data resources to all state Medicaid programs. Each publication lists drugs by brand name in alphabetical order with its corresponding descriptions.    AWPs listed by these publications do not reflect actual reimbursement allowables by any specific carrier and should not be quoted as such to any healthcare provider.    *"We are not a provider, they need to confirm reimbursement with individual carriers." J. Pugliese.*

AWPs differ from DP (direct price). The DP is the amount charged to the provider. A growing trend in the insurance arena, especially among state Medicaid programs, is reimbursement methodologies based on acquisition cost. Providers are required to submit actual invoices showing manufacturer DP. The DP becomes the actual reimbursed allowable.

In the past several months there have been a number of incidences of home care pharmacies quoting AWP differentials from MediSpan.  Traditionally, MediSpan has been referenced by hospital pharmacies. Home care pharmacies track AWPs as listed in Red Book, First Data Bank, and MediSpan for identification of the most profitable reference. Centeon supplies all data banks with consistent AWP information for our product line. In the case of MediSpan, who at the request of a manufacturer, may increase the AWP by a *traditional mark-up factor* of 1.25%. This mark-up is reserved for wholesaler pricing, but may influence other AWPs as well.

Regarding the IGIV market, Centeon does not hold the highest AWP, this is held by Venoglobulin S 5% at $76.15 per 1 gram. It is important, when analyzing AWP differentials, that you only consider like products, such as 5% solutions should not be compared to 10% and vise versus. A complete AWP listing for both IGIV and coagulation products follow. There are two separate lists; one representing MediSpan and the other Red Book.

All inquiries requesting specific reimbursement allowables should be directed to the Reimbursement Answerline for handling.

C4IG/8:00004

ABAWP 000847
HIGHLY CONFIDENTIAL

# INTRAVENOUS IMMUNE GLOBULIN
# 1996 MediSpan PRICES

| PRODUCT | NDC | SIZE | AWP |
|---|---|---|---|
| Gamimar P J V | 00053-7486-01 | 1.0 gram | $ 68.00 |
|  | 00053-7486-02 | 2.5 gram | $ 170.00 |
|  | 00053-7486-05 | 5.0 gram | $ 340.00 |
|  | 00053-7486-10 | 10.0 gram | $ 680.00 |
|  | 00053-7486-06 | Bulk Pack | $ Not on file |
| Gamimune N-5% | 00192-0640-12 | .5 gram | $ 45.60 |
|  | 00192-0640-20 | 2.5 gram | $ 142.80 |
|  | 00192-0640-71 | 5.0 gram | $ 285.60 |
|  | 00192-0640-25 | 12.5 gram | $ 714.00 |
| Gamimune N-10% | 00192-0649-12 | 1.0 gram | $ 75.00 |
|  | 00192-0649-20 | 5.0 gram | $ 375.00 |
|  | 00192-0649-71 | 10.0 gram | $ 750.00 |
|  | 00192-0649-24 | 12.5 gram | $1500.00 |
| Gammagard SD | 00944-2620-01 | .5 gram | $ 54.92 |
|  | 00944-2620-02 | 2.5 gram | $ 156.62 |
|  | 00944-2620-03 | 5.0 gram | $ 317.98 |
|  | 00944-2620-04 | 10.0 gram | $ 640.71 |
| Iveegam | 54129-0233-10 | 1.0 gram | $ 65.00 |
|  | 54129-0233-25 | 2.5 gram | $ 162.00 |
|  | 54129-0233-50 | 5.0 gram | $ 325.00 |
| Polygam SD | 52769-0471-72 | 2.5 gram | $ 145.00 |
|  | 52769-0471-75 | 5.0 gram | $ 290.00 |
|  | 52769-0471-80 | 10.0 gram | $ 580.00 |
| Sandoglobulin | 00078-0120-58 | 1.0 gram | $ Inactive 12/95 |
|  | 00078-0120-59 | 3.0 gram | $ Not on file |
|  | 00078-0120-60 | 6.0 gram | $ Not on file |
| Venoglobulin I | 49669-1600-01 | .5 gram | $ 37.00 |
|  | 49669-1602-01 | 2.5 gram | $ 152.05 |
|  | 49669-1603-01 | 5.0 gram | $ 304.10 |
|  | 49669-1604-01 | 10.0 gram | $ 608.20* |
| Venoglobulin S 5% | 49669-1612-01 | 2.5 gram | $ 190.38 |
|  | 49669-1613-01 | 5.0 gram | $ 380.75 |
|  | 49669-1614-01 | 10.0 gram | $ 761.50 |
| Venoglobulin S 10% | 49669-1622-01 | 5.0 gram | $ 400.00 |
|  | 49669-1623-01 | 10.0 gram | $ 800.00 |
|  | 49669-1624-01 | 20.0 gram | $1600.00 |
| WinRho SD | 60492-0081-01 |  | $ 103.00* |
|  | 60492-0082-01 |  | $ 235.00* |

CTPaC

C4IG/8:00005

ABAWP 000848
HIGHLY CONFIDENTIAL

# COAGULATION PRODUCTS
## 1996 MediSpan PRICES

| PRODUCT | NDC NUMBER | AWP (per iu) |
|---|---|---|
| AHF-M | 52769-0460-01 | .83 |
| Hemofil-M | 00944-2935-01 | .90 |
| Humate P | 00053-7605-01 | 1.30 |
| | 00053-7605-02 | 1.30 |
| | 00053-7605-04 | 1.30 |
| Koate HP | 00192-0664-20 | .90 |
| | 00192-0664-30 | .90 |
| | 00192-0664-40 | .90 |
| | 00192-0664-60 | .90 |
| Alphanate | 49669-4500-01 | .70 |
| Monoclate P | 00053-7656-01 | .90 |
| | 00053-7656-02 | .90 |
| | 00053-7656-04 | .90 |
| Profilate OSD | 49669-4300-01 | .60 |
| | 49669-4300-02 | .60 |
| AlphaNine SD | 49669-3800-01 | 1.00 |
| | 49669-3800-02 | Not on file |
| AlphaNine | 49669-3900-01 | .85 |
| | 49669-3900-02 | 1.40 |
| Konyne 80 | 00192-0626-20 | .35 |
| | 00192-0626-50 | .35 |
| Mononine | 00053-7668-01 | 1.10 |
| | 00053-7668-02 | 1.10 |
| | 00053-7668-04 | 1.10 |
| Profilnine | 49669-3700-01 | .35 |
| | 49669-3700-02 | .35 |
| Proplex T | 00944-0581-01 | .25 |
| Autoplex T | 00944-0650-01 | 1.30 |
| Bioclate | 00053-8110-01 | 1.18 |
| | 00053-8110-02 | 1.18 |
| | 00053-8110-04 | 1.18 |
| Feiba VH | 54129-0222-04 | 1.30 |
| Helixate | 00053-8120-01 | 1.18 |
| | 00053-8120-02 | 1.18 |
| | 00053-8120-04 | 1.18 |
| HYATE:C | 55688-1060-02 | Not on file |
| Kogenate | 00192-0670-20 | 1.18 |
| | 00192-0670-30 | 1.18 |
| | 00192-0670-50 | 1.18 |
| Recombinate | 00944-2938-01 | 1.18 |
| | 00944-2938-02 | 1.18 |
| | 00944-2938-03 | 1.18 |
| Sumate | 00053-2453-00 | 525.00 |

CTPaC

C4IG/8:00006

ABAWP 000849
HIGHLY CONFIDENTIAL

# INTRAVENOUS IMMUNE GLOBULIN
## 1996 Red Book Drug Topic PRICES

| PRODUCT | NDC | PACKAGE | AWP |
|---|---|---|---|
| Gammar-IV | 00053-7486-01 | 1.0 gram | $ 68.00 |
| | 00053-7486-02 | 2.5 gram | $ 170.00 |
| | 00053-7486-05 | 5.0 gram | $ 340.00 |
| | 00053-7486-10 | 10.0 gram | $ 680.00 |
| | 00053-7486-06 | Bulk Pack | $2040.00 |
| Gamimune N-5% | 00192-0640-12 | .5 gram | $ 47.50 |
| | 00192-0640-20 | 2.5 gram | $ 148.75 |
| | 00192-0640-71 | 5.0 gram | $ 297.50 |
| | 00192-0640-25 | 12.5 gram | $ 743.15 |
| Gamimune N-10% | 00192-0649-12 | 1.0 gram | $ 75.00 |
| | 00192-0649-20 | 5.0 gram | $ 375.00 |
| | 00192-0649-71 | 10.0 gram | $ 750.00 |
| | 00192-0649-24 | 12.5 gram | $1500.00 |
| Gammagard SD | 00944-2620-01 | .5 gram | $ 54.92 |
| | 00944-2620-02 | 2.5 gram | $ 156.62 |
| | 00944-2620-03 | 5.0 gram | $ 317.98 |
| | 00944-2620-04 | 10.0 gram | $ 640.71 |
| Iveegam | 54129-0233-10 | 1.0 gram | $ 49.00 |
| | 54129-0233-25 | 2.5 gram | $ 122.00 |
| | 54129-0233-50 | 5.0 gram | $ 244.00 |
| Polygam SD | 52769-0471-72 | 2.5 gram | $ 145.00 |
| | 52769-0471-75 | 5.0 gram | $ 290.00 |
| | 52769-0471-80 | 10.0 gram | $ 580.00 |
| Sandoglobulin | 00078-0120-58 | 1.0 gram | $ 70.02 |
| | 00078-0120-59 | 3.0 gram | $ 133.20 |
| | 00078-0120-60 | 6.0 gram | $ 252.00 |
| Venoglobulin I | 49669-1600-01 | .5 gram | $ 37.00 |
| | 49669-1602-01 | 2.5 gram | $ 152.05 |
| | 49669-1603-01 | 5.0 gram | $ 304.10 |
| | 49669-1604-01 | 10.0 gram | $ 608.20* |
| Venoglobulin S 5% | 49669-1612-01 | 2.5 gram | $ 190.38 |
| | 49669-1613-01 | 5.0 gram | $ 380.75 |
| | 49669-1614-01 | 10.0 gram | $ 761.50 |
| Venoglobulin S 10% | 49669-1622-01 | 5.0 gram | $ 400.00 |
| | 49669-1623-01 | 10.0 gram | $ 800.00 |
| | 49669-1624-01 | 20.0 gram | $1600.00 |
| WinRho SD | 60492-0081-01 | | $ 103.00* |
| | 60492-0082-01 | | $ 235.00* |

CTPaC

C4IG/8:00007

ABAWP 000850
HIGHLY CONFIDENTIAL

# COAGULATION PRODUCTS
## 1996 Red Book Drug Topics PRICES

| PRODUCT | NDC NUMBER | AWP (per iu) |
|---|---|---|
| AHF-M | 52769-0460-01 | .83 |
| Hemofil-M | 00944-2935-01 | .90 |
| Humate P | 00053-7605-01<br>00053-7605-02<br>00053-7605-04 | 1.30 |
| Koate HP | 00192-0664-20<br>00192-0664-30<br>00192-0664-40<br>00192-0664-60 | 1.08 |
| Alphanate | 49669-4500-01 | .70 |
| Monoclate P | 00053-7656-01<br>00053-7656-02<br>00053-7656-04 | .90 |
| Profilate OSD | 49669-4300-01<br>49669-4300-02 | .90 |
| AlphaNine SD | 49669-3800-01<br>49669-3800-02 | 1.00 |
| AlphaNine | 49669-3900-01<br>49669-3900-02 | .80 |
| Konyne 80 | 00192-0626-20<br>00192-0626-50 | .35 |
| Mononine | 00053-7668-01<br>00053-7668-02<br>00053-7668-04 | 1.10 |
| Profilnine | 49669-3700-01<br>49669-3700-02 | .35 |
| Proplex T | 00944-0581-01 | .25 |
| Autoplex T | 00944-0650-01 | 1.30 |
| Bioclate | 00053-8110-01<br>00053-8110-02<br>00053-8110-04 | 1.18 |
| Feiba VH | 54129-0222-04 | 1.25 |
| Helixate | 00053-8120-01<br>00053-8120-02<br>00053-8120-04 | 1.18 |
| HYATE:C | 55688-1060-02 | 1.61 |
| Kogenate | 00192-0670-20<br>00192-0670-30<br>00192-0670-50 | 1.18 |
| Recombinate | 00944-2938-01<br>00944-2938-02<br>00944-2938-03 | 1.18 |
| Stimate | 00053-2453-00 | 525.00 |

CTPaC

C4IG/8:00008

ABAWP 000851
HIGHLY CONFIDENTIAL

Last 5 pages are redacted

C4IG/8:00009

ABAWP 000852
HIGHLY CONFIDENTIAL

# Exhibit 62



FOR IMMEDIATE RELEASE

CIV

WEDNESDAY, OCTOBER 3, 2001

(202) 514-2007

WWW.USDOJ.GOV

TDD (202) 514-1888

### TAP PHARMACEUTICAL PRODUCTS INC.
### AND SEVEN OTHERS CHARGED WITH HEALTH CARE CRIMES;
### COMPANY AGREES TO PAY $875 MILLION TO SETTLE CHARGES

Boston, MA... United States Attorney Michael J. Sullivan, Department of
Health and Human Services Inspector General Janet Rehnquist, Assistant
Inspector General for Investigations and Director of the Department of
Defense Criminal Investigation Service Carol Levy, and Special Agent in
Charge of the Federal Bureau of Investigation in New England Charles S.
Prouty, announced today that:

(1) **TAP Pharmaceutical Products Inc.** ("**TAP**"), a major American
pharmaceutical manufacturer, has agreed to pay $875,000,000 to resolve
criminal charges and civil liabilities in connection with its fraudulent
drug pricing and marketing conduct with regard to Lupron, a drug sold by
**TAP** primarily for treatment of advanced prostate cancer in men. The
global agreement includes:

(a) **TAP** has agreed to plead guilty to a conspiracy to violate the
PrescriptionDrug Marketing Act and to pay a $290,000,000 criminal fine,
the largest criminal fine ever in a health care fraud prosecution. The
plea agreement between the United States and **TAP** specifically states that
**TAP**'s criminal conduct caused losses of $145,000,000.

(b) **TAP** has agreed to settle its federal civil False Claims Act
liabilities and to pay the U.S. Government $559,483,560 for filing false
and fraudulent claims with the Medicare and Medicaid programs as a result
of **TAP**'s fraudulent drug pricing schemes and sales and marketing
misconduct.

(c) **TAP** has agreed to settle its civil liabilities to the fifty states
and the District of Columbia and to pay them $25,516,440 for filing false
and fraudulent claims with the states, as a result of **TAP**'s drug pricing
and marketing misconduct, and from **TAP**'s failure to provide the state
Medicaid programs **TAP**'s best price for those drugs as required by law.

(d) **TAP** has agreed to comply with the terms of a sweeping corporate

integrity agreement which, among other things, significantly changes the manner in which **TAP** supervises its marketing and sales staff, and ensures that **TAP** will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs.

(2) A federal grand jury returned an indictment unsealed today, charging one physician and six **TAP** managers with conspiracy to pay kickbacks to doctors and other customers, conspiracy to defraud the state Medicaid programs on **TAP**'s obligation to sell products to those programs at its best price, and conspiracy to violate the Prescription Drug Marketing Act by causing free samples to be illegally billed to the Medicare program. The indictment charges that the **TAP** defendants offered to give things of value, including free drugs, so-called educational grants, trips to resorts, free consulting services, medical equipment, and forgiveness of debt, to physicians and other customers to obtain their referrals of prescriptions for Lupron to Medicare program beneficiaries, in violation of the anti-kickback statute. The indictment also charges that the **TAP** defendants aided and abetted, and caused the billings to hundreds of elderly Medicare program beneficiaries and to the Medicare program directly, for thousands of free samples of Lupron, used in the treatment of prostate cancer, in violation of the Prescription Drug Marketing Act.

The seven individuals charged in the indictment unsealed today are:

(1) **ALAN MACKENZIE**, age 49, of 27068 Wellington Court, Barrington, Illinois, and formerly Vice President of Sales for **TAP**.

(2) **JANICE SWIRSKI**, age 40, of 6 Bellingham Drive, Chestnut Hill, Massachusetts, and formerly a National Account Manager with **TAP**.

(3) **HENRY VAN MOURICK**, age 43, of 23 Golfwood Court, Roseville, California, and currently a District Manager employed by **TAP**.

(4) **DONNA TOM**, age 37, of 141 East 56th Street, New York, New York, and formerly a District Manager employed by **TAP**.

(5) **KIMBERLEE CHASE**, age 35, of 108 Dedham Street, Dover, Massachusetts, and formerly a District Manager employed by **TAP**.

(6) **DAVID GUIDO**, age 30, of 131 New London Road, Colchester, Connecticut, and currently a Hospital Account Executive employed by **TAP**.

(7) **DR. JOHN ROMANO**, age 48, of 110 Long Pond Road, Plymouth, Massachusetts, an urologist with a practice in Plymouth, Massachusetts.

Prior to yesterday's indictment, four other physicians have been charged and have pleaded guilty in this investigation: Dr. Rodney Mannion, a urologist practicing in LaPorte and Michigan City, Indiana, was charged on February 28, 2000 with healthcare fraud. Dr. Mannion pleaded guilty to that charge on April 25, 2000. Dr. Jacob Zamstein, a urologist practicing in Bloomfield, Connecticut, was charged on November 3, 2000 with healthcare fraud and pleaded guilty on December 27, 2000. Dr. Joseph Spinella, a urologist practicing in Bristol, Connecticut, was charged on December 8, 2000 with healthcare fraud and pleaded guilty on March 29, 2001. Dr. Joel Olstein, a urologist practicing in Lewiston, Maine, was charged on April 11, 2001 with healthcare fraud and pleaded guilty on July 18, 2001.

Lupron is marketed by **TAP** primarily for the treatment of prostate cancer. Lupron is identical in effectiveness to the drug Zolodex, produced by a competitor, which was also available for prescription in the 1990s. While Medicare does not pay for most drugs needed by Medicare beneficiaries, Medicare does cover drugs, such as Lupron, that must be injected under the supervision of a physician. Medicare paid for 80% of either the urologist's charge for Lupron or the average wholesale price reported by **TAP**, whichever was lower, and the patient was responsible for the remaining 20% as a copayment.

As part of its civil allegations, the Government alleged that throughout the1990s, **TAP** set and controlled the price at which the Medicare program reimbursed physicians for the prescription of Lupron by reporting its average wholesale price ("AWP"). The AWP reported by TAP was significantly higher than the average sales price **TAP** offered physicians and other customers for the drug. The Government alleged that **TAP** marketed the spread between its discounted prices paid by physicians and the significantly higher Medicare reimbursement based on AWP as an inducement to physicians to obtain their Lupron business. The Government further alleged that **TAP** concealed the true discounted prices paid by physicians from Medicare, and falsely advised physicians to report the higher AWP rather than their real discounted price for the drug. The Government further alleged that **TAP** set its AWPs of Lupron at levels far higher than the price for which wholesalers or distributors actually sold the drug, resulting in falsely inflated prices that were neither the physician's actual cost nor the true wholesaler's average price.

"The Medicare and Medicaid drug programs are bulwarks against the financial hardship that can be caused by the need for life-saving medical treatments," said Robert D. McCallum, Jr., Assistant Attorney General for the Justice Department's Civil Division. "These programs cannot afford abuses that enrich doctors or drug companies at the expense of taxpayers and patients. This settlement agreement and the compliance steps that TAP has agreed to take will reinforce the government's long-standing objective of paying Medicare and Medicaid providers for the reasonable costs of the drugs they administer."

"The urologists and the TAP employees who knowingly participated in this broad conspiracy took advantage of older Americans suffering from prostate cancer. The indictment unsealed today alleges that TAP employees sought to influence the doctors' decisions about what drug to prescribe to patients by giving them kickbacks and bribes, from free samples to free consulting services to expensive trips to golf and ski resorts to so-called educational grants," said U.S. Attorney Sullivan. "In all instances where the kickbacks worked to ensure the prescription of TAP's product Lupron, the Medicare Program and the elderly Americans suffering from prostate cancer paid more for their care than if the doctor had prescribed the competitor's product."

"Medicare beneficiaries and all American patients need to get the right pharmaceuticals, based on medical criteria, and at a fair price. This is crucial both to ensure good quality health care and to use our resources effectively. Today's settlement is a clear message that the federal government will protect the best interests of beneficiaries and taxpayers," said HHS Secretary Tommy G. Thompson.

"This prosecution has resulted in the largest criminal and civil recoveries in any health care fraud case in the country. The fraud schemes used by TAP Pharmaceuticals and others impacts significantly on

the integrity of TRICARE, the Department of Defense's healthcare system,"
stated DCIS Special Agent in Charge Edward Bradley. "Healthcare fraud
increases patients' costs and negatively effects the delivery of health
care services to over 8 million military members, retirees, and their
dependents."

The indictment unsealed today against the seven individuals alleges that
inducements to physicians included free products; free consulting
services; trips to expensive golf and ski resorts; money disguised as
"educational grants," but in fact was used and intended to be used for
many purposes, including cocktail party bar tabs, office Christmas
parties, medical equipment, travel expenses for urologists and their
staff to attend conferences; and discounts on Lupron sold to treat
endometriosis in women to effect a lower price on Lupron used in the
treatment of men with prostate cancer.

The investigation commenced in the District of Massachusetts in 1997
after a urologist employed by Tufts Associated Health Maintenance
Organization ("Tufts HMO") in Waltham, Dr. Joseph Gerstein, reported to
law enforcement authorities that he had been offered an educational grant
if he would reverse a decision he had made on behalf of Tufts that it
would only cover the less expensive drug Zoladex. As charged in the
indictment, **SWIRSKI** and **CHASE** met with Dr. Gerstein after he began
working with the FBI and the Office of Inspector General, and during
those meetings, offered him $65,000 in educational grants that he could
use for any purpose "whatever," together with discounts on other
products, if he would reverse Tufts' decision not to include Lupron on
its formulary for treating patients that it insured who were suffering
from prostate cancer. The investigation was also triggered by a civil
False Claims Act suit filed in 1996 by Douglas Durand, after he had quit
his employment at TAP as Vice President of Sales, after just one year
because of his concerns about the illegal marketing conduct of some of
**TAP**'s employees.

The civil False Claims Act provides that where persons submit, cause
others to submit, or conspire to submit, false or fraudulent claims to
the United States Government, including its federal health care programs,
the Government is entitled to recover treble damages and $5,500 to
$11,000 for each false or fraudulent claim submitted. Private
individuals, like Dr. Gerstein and Douglas Durand, are allowed to file
whistleblower suits under the False Claims Act to bring the government
information about wrongdoing, and if the government is successful in
resolving or litigating their claims, to share in the recovery by
receiving generally 15% to 25% of the amount recovered. As a part of
today's resolution, those two individuals together with Tufts Associated
HMO will share as whistleblowers, pursuant to the Congressional directive
in the False Claims Act, 17% of the civil recovery, or an amount of
approximately $95 million.

"The payment by TAP of nearly $900 million including the highest criminal
fine ever imposed on any health care company, and the indictment of the
six TAP employees sends a very strong signal to the pharmaceutical
industry that it best police its employees' conduct and deal strongly
with those who would gain sales at the expense of the health care
programs for the poor and the elderly and the persons insured by those
programs," said U.S. Attorney Sullivan.

As part of a condition for doing business in the future with providers
who are members of the Medicare and Medicaid programs, **TAP** agreed to

enter into an extensive Corporate Integrity Agreement. That agreement
provides for significant training of **TAP**'s sales and marketing employees
and changes in supervision and controls. It also requires **TAP** to report
to the Medicare and Medicaid programs accurate pricing information
showing **TAP**'s true average sales price.

"In recent years, the pharmaceutical industry has come under increasing
scrutiny for its pricing, sales, and marketing practices. The OIG,
together with other government agencies, will use all available
enforcement authorities, where appropriate, to address these practices,"
said HHS Inspector General Janet Rehnquist.

The entire amount of the $290 million criminal fine paid by TAP will go
to the Department of Justice's Crime Victims Fund. The Fund was
established in 1984 by the Victims of Crime Act ("VOCA") and serves as a
major funding source for victim services throughout the country. Each
year, millions of dollars are deposited into this fund from criminal
fines, forfeited bail bonds, penalty fees, and special assessments
collected by U.S. Attorney's Offices, U.S. Courts, and the Bureau of
Prisons. State assistance programs use VOCA funds to provide or contract
for services to victims of rape, drunk driving, child abuse, domestic
violence, homicide, and other crimes. Victims of federal, as well as
state crimes, are eligible to receive VOCA-funded services.

The investigation is continuing.

The investigation has been conducted by the agents from the Federal
Bureau of Investigation, the Office of Investigations for the Office of
Inspector General for the Department of Health and Human Services, the
Food and Drug Administration's Office of Criminal Investigations and the
Department of Defense's Defense Criminal Investigation Service. On the
criminal side, the investigation and prosecution are being handled by
Assistant U.S. Attorney Michael K. Loucks, Health Care Fraud Chief. On
the civil side, the investigation and prosecution are being handled by
Assistant U.S. Attorney Susan Winkler, assisted by Department of Justice
Trial Attorney T. Reed Stephens. The Corporate Integrity Agreement was
negotiated by Office of General Counsel, Office of Inspector General
Assistant Counsel Mary Riordan.

Press Contact: Samantha Martin, (617) 748-3139

###

01-513

# Exhibit 63

 **TAP PHARMACEUTICALS INC.**   Confidential

675 North Field Drive
Lake Forest, IL 60045

May 15, 2006



State Pharmacy Manager
Department of Public Health
and Human Services
1400 Broadway, P.O. Box 202951
Helena, MT 59620

Re:   <u>ASP Reporting Under TAP's Corporate Integrity Agreement</u>

Dear State Pharmacy Manger,

For the past several years, TAP has been submitting reports to you that reflect TAP's average sales price ("ASP") for each of its products by NDC code. These reports are submitted pursuant to TAP's Corporate Integrity Agreement, dated September 28, 2001.

During the testing of a new computer system used by TAP to calculate ASP starting in the third quarter of 2005, TAP discovered three types of errors in the way that TAP calculated the ASP in the prior quarters. They are as follows,

1.   Government chargeback sales should be excluded from the ASP calculation at WAC amount, <u>less</u> prompt pay discounts and other applicable fees. In the old system, the other applicable fees were manually calculated and mistakenly <u>added</u> to the WAC amount.
2.   Administration fees were mistakenly included in the sums of rebates for the most recent 12-month period, which were used to calculate the 12-month rolling average price concession percentages and to determine the rebate estimates for the quarter.
3.   For the first quarter of 2005, the ASP calculations of two products (NDC 0300-3663-01 and 0300-3683-01) received incorrect allocation of additional discounts.

In addition, TAP has identified two errors that affect its submissions for the first three quarters of 2005. The errors were as follows,

4.   In excluding the TRICARE sales from ASP calculation, TAP used the prompt pay discount percentage related to the reporting quarter rather than the quarter when they are invoiced.
5.   TAP excluded the discount from Cash Card programs in the sums of rebates for the most recent 12-month period, which were used to calculate the 12-month rolling average price concession percentages and to determine the rebate estimates for the quarter.

**MT 037947**

 **TAP PHARMACEUTICALS INC.**     Confidential

875 North Field Drive
Lake Forest, IL  60045

The combined affects of these five miscalculations produced reported ASPs that were lower than (understatement) as well as higher than (overstatement) the actual ASPs. These variances ranged from an understatement of 1.29% to an overstatement of 0.61% with an average of a 0.15% understatement.  The exception is one product in the first quarter of 2005 (NDC 00300-1541-11), the reported ASP was $323.23, which understated the actual ASP by 5.26%..

The last error was found in the fourth quarter of 2005, which was as follows:

6.   Some chargeback transactions that are excluded from the ASP calculation were not accounted for. The effects of this miscalculation produced reported ASPs in fourth quarter of 2005 that were higher than (overstatement) the actual ASPs. The variances ranged from 0.01% to 0.95% with an average of 0.17%.  The exception is one product (NDC 0300-3954-25), the reported ASP was ($1.16), which understated the actual ASP of ($1.65) by -29.70%.

We very much regret these errors but can assure you that TAP has taken appropriate measures by incorporating the corrected formulation and automating them in our new system and also activating data verification systems to ensure that we do not make these errors in subsequent reports.

Very truly yours,

Glenn Weiglein
Director, Contracts and Pricing

**MT 037948**

CONFIDENTIAL

Page: 1

# TAP Pharmaceutical Products Inc.
## Average Sale Price Report
### Year 2004  Qtr 1  Restatement

| NDC | Product | Average Sale Price |
|---|---|---|
| 00300-1541-19 | PREVACID 15MG 1000CT | $3,360.39 |
| 00300-1541-30 | PREVACID 15MG 30CT | $86.49 |
| 00300-3048-19 | PREVACID 30MG 1000CT | $3,395.47 |
| 00300-3346-01 | LUPRON DEPOT 3-MONTH, 22.5MG | $734.37 |
| 00300-3612-28 | LUPRON 2 WEEK 2.8ML | $366.27 |

MT 037949

CONFIDENTIAL
Page: 1

# TAP Pharmaceutical Products Inc.
## Average Sale Price Report
### Year 2004 Qtr 2 Restatement

| NDC | Product | Average Sale Price |
|---|---|---|
| 00300-1541-11 | PREVACID 15MG HUD | $324.96 |
| 00300-1541-19 | PREVACID 15MG 1000CT | $3,218.69 |
| 00300-2108-01 | LUPRON DEPOT 7.5MG PED | $509.66 |
| 00300-2282-01 | LUPRON DEPOT 11.25MG PED | $926.02 |
| 00300-3046-11 | PREVACID 30MG HUD | $355.24 |
| 00300-3046-13 | PREVACID 30MG 100CT | $309.52 |
| 00300-3046-19 | PREVACID 30MG 1000CT | $3,460.78 |
| 00300-3346-01 | LURPON DEPOT 3-MONTH, 22.5MG | $694.23 |
| 00300-3612-24 | LUPRON 6 PACK 2.8ML | $363.27 |
| 00300-3641-01 | LUPRON DEPOT 3.75MG | $419.71 |
| 00300-3842-01 | LUPRON DEPOT 7.5MG | $297.73 |
| 00300-3663-01 | LUPRON DEPOT 3-MONTH, 11.25MG | $1,206.03 |
| 00300-3683-01 | LUPRON DEPOT 4-MONTH, 30MG | $710.02 |
| 00300-7311-30 | PREVACID ORAL SUSP 30MG DELAYED RELEASE ORAL SUSP | $103.03 |

MT 037950

TAP Pharmaceutical Products Inc.

Average Sale Price Report

Year  2004  Qtr 3  Restatement

CONFIDENTIAL

Page: 1

| NDC | Product | Average Sale Price |
|---|---|---|
| 00300-1541-11 | PREVACID 15MG HUD | $324.18 |
| 00300-1541-19 | PREVACID 15MG 1000CT | $3,152.54 |
| 00300-1543-30 | PREVACID SOLUTAB 15MG 30 CT | $19.27 |
| 00300-1544-30 | PREVACID SOLUTAB 30MG 30 CT | $45.98 |
| 00300-2108-01 | LUPRON DEPOT 7.5MG PED | $523.48 |
| 00300-2282-01 | LUPRON DEPOT 11.25MG PED | $951.62 |
| 00300-2440-01 | LUPRON DEPOT 15MG PED | $1,054.24 |
| 00300-3046-11 | PREVACID 30MG HUD | $364.04 |
| 00300-3046-13 | PREVACID 30MG 100CT | $313.66 |
| 00300-3046-19 | PREVACID 30MG 1000CT | $3,482.49 |
| 00300-3346-01 | LURPON DEPOT 3-MONTH, 22.5MG | $667.73 |
| 00300-3641-01 | LUPRON DEPOT 3.75MG | $431.22 |
| 00300-3642-01 | LUPRON DEPOT 7.5MG | $269.64 |
| 00300-3663-01 | LUPRON DEPOT 3-MONTH, 11.25MG | $1,225.35 |
| 00300-3683-01 | LUPRON DEPOT 4-MONTH, 30MG | $730.52 |
| 00300-7309-30 | PREVACID ORAL SUSP 15MG DELAYED RELEASE ORAL SUSP | $107.37 |
| 00300-7311-30 | PREVACID ORAL SUSP 30MG DELAYED RELEASE ORAL SUSP | $107.31 |

MT 037951

| | | | |
|---|---|---|---|
| TAP Pharmaceutical Products, Inc. | 00300154111 | $405.14 | (1,412) |
| TAP Pharmaceutical Products, Inc. | 00300154119 | $3,307.16 | 3,701 |
| TAP Pharmaceutical Products, Inc. | 00300154130 | $96.86 | 266,611 |
| TAP Pharmaceutical Products, Inc. | 00300154530 | $99.37 | 129,491 |
| TAP Pharmaceutical Products, Inc. | 00300154630 | $99.45 | 431,598 |
| TAP Pharmaceutical Products, Inc. | 00300210801 | $533.00 | 4,507 |
| TAP Pharmaceutical Products, Inc. | 00300228201 | $958.96 | 6,942 |
| TAP Pharmaceutical Products, Inc. | 00300244001 | $1,064.90 | 7,426 |
| TAP Pharmaceutical Products, Inc. | 00300304611 | $441.56 | (5,241) |
| TAP Pharmaceutical Products, Inc. | 00300304613 | $332.91 | 1,020,328 |
| TAP Pharmaceutical Products, Inc. | 00300304619 | $3,368.61 | 45,263 |
| TAP Pharmaceutical Products, Inc. | 00300334601 | $549.93 | 48,576 |
| TAP Pharmaceutical Products, Inc. | 00300361224 | $373.79 | 398 |
| TAP Pharmaceutical Products, Inc. | 00300361228 | $369.72 | 5,024 |
| TAP Pharmaceutical Products, Inc. | 00300364101 | $422.73 | 53,969 |
| TAP Pharmaceutical Products, Inc. | 00300364201 | $247.58 | 47,168 |
| TAP Pharmaceutical Products, Inc. | 00300366301 | $1,199.93 | 11,733 |
| TAP Pharmaceutical Products, Inc. | 00300366301 | $702.93 | 91,262 |
| TAP Pharmaceutical Products, Inc. | 00300370201 | $234.07 | 87,607 |
| TAP Pharmaceutical Products, Inc. | 00300730930 | $108.70 | 26,067 |
| TAP Pharmaceutical Products, Inc. | 00300731130 | $111.34 | 41,500 |

**MT 037952**

| | | | |
|---|---|---|---|
| TAP Pharmaceutical Products, Inc. | 00300154111 | $341.16 | 675 |
| TAP Pharmaceutical Products, Inc. | 00300154119 | $3,320.95 | 3,588 |
| TAP Pharmaceutical Products, Inc. | 00300154130 | $98.16 | 383,086 |
| TAP Pharmaceutical Products, Inc. | 00300154330 | $78.06 | 113,506 |
| TAP Pharmaceutical Products, Inc. | 00300154430 | $70.63 | 324,204 |
| TAP Pharmaceutical Products, Inc. | 00300154530 | $55.64 | 865 |
| TAP Pharmaceutical Products, Inc. | 00300154630 | $73.27 | 7,111 |
| TAP Pharmaceutical Products, Inc. | 00300210801 | $532.56 | 5,009 |
| TAP Pharmaceutical Products, Inc. | 00300228201 | $961.73 | 6,284 |
| TAP Pharmaceutical Products, Inc. | 00300244001 | $1,062.15 | 7,311 |
| TAP Pharmaceutical Products, Inc. | 00300304611 | $377.44 | 32,541 |
| TAP Pharmaceutical Products, Inc. | 00300304613 | $334.99 | 1,554,370 |
| TAP Pharmaceutical Products, Inc. | 00300304619 | $3,406.46 | 46,949 |
| TAP Pharmaceutical Products, Inc. | 00300334601 | $642.11 | 60,208 |
| TAP Pharmaceutical Products, Inc. | 00300361224 | $373.91 | 837 |
| TAP Pharmaceutical Products, Inc. | 00300361228 | $369.89 | 4,153 |
| TAP Pharmaceutical Products, Inc. | 00300364101 | $422.30 | 45,362 |
| TAP Pharmaceutical Products, Inc. | 00300364201 | $251.03 | 51,629 |
| TAP Pharmaceutical Products, Inc. | 00300366301 | $1,165.98 | 8,515 |
| TAP Pharmaceutical Products, Inc. | 00300368301 | $695.01 | 94,644 |
| TAP Pharmaceutical Products, Inc. | 00300370201 | $232.21 | 124,114 |
| TAP Pharmaceutical Products, Inc. | 00300395425 | $7.67 | 627,794 |
| TAP Pharmaceutical Products, Inc. | 00300730930 | $109.55 | 37,128 |
| TAP Pharmaceutical Products, Inc. | 00300731130 | $111.65 | 22,941 |

**MT 037953**

| | | | |
|---|---|---|---|
| TAP Pharmaceutical Products, Inc. | 00300154111 | $370.89 | 5,549 |
| TAP Pharmaceutical Products, Inc. | 00300154119 | $3,237.95 | 5,409 |
| TAP Pharmaceutical Products, Inc. | 00300154130 | $95.18 | 312,095 |
| TAP Pharmaceutical Products, Inc. | 00300154330 | $72.63 | 107,742 |
| TAP Pharmaceutical Products, Inc. | 00300154430 | $70.06 | 372,194 |
| TAP Pharmaceutical Products, Inc. | 00300154530 | $106.45 | 2,940 |
| TAP Pharmaceutical Products, Inc. | 00300154630 | $106.20 | 11,024 |
| TAP Pharmaceutical Products, Inc. | 00300228201 | $962.30 | 7,078 |
| TAP Pharmaceutical Products, Inc. | 00300304611 | $379.72 | 44,443 |
| TAP Pharmaceutical Products, Inc. | 00300304613 | $329.20 | 1,525,159 |
| TAP Pharmaceutical Products, Inc. | 00300304619 | $3,391.05 | 79,770 |
| TAP Pharmaceutical Products, Inc. | 00300364101 | $424.82 | 53,393 |
| TAP Pharmaceutical Products, Inc. | 00300366301 | $1,196.91 | 12,752 |
| TAP Pharmaceutical Products, Inc. | 00300370201 | $231.16 | 104,764 |
| TAP Pharmaceutical Products, Inc. | 00300730930 | $109.13 | 43,528 |
| TAP Pharmaceutical Products, Inc. | 00300731130 | $112.23 | 35,381 |

**MT 037954**

| | | | |
|---|---|---|---|
| TAP Pharmaceutical Products, Inc. | 00300154111 | $289.45 | 2,117 |
| TAP Pharmaceutical Products, Inc. | 00300154119 | $3,175.99 | 4,248 |
| TAP Pharmaceutical Products, Inc. | 00300154130 | $95.30 | 221,852 |
| TAP Pharmaceutical Products, Inc. | 00300154430 | $70.18 | 438,583 |
| TAP Pharmaceutical Products, Inc. | 00300154530 | $109.11 | 9,261 |
| TAP Pharmaceutical Products, Inc. | 00300154630 | $108.70 | 26,910 |
| TAP Pharmaceutical Products, Inc. | 00300210801 | $539.91 | 4,603 |
| TAP Pharmaceutical Products, Inc. | 00300228201 | $979.02 | 7,109 |
| TAP Pharmaceutical Products, Inc. | 00300244001 | $1,081.96 | 8,459 |
| TAP Pharmaceutical Products, Inc. | 00300304611 | $212.26 | 10,942 |
| TAP Pharmaceutical Products, Inc. | 00300304613 | $336.15 | 1,330,270 |
| TAP Pharmaceutical Products, Inc. | 00300304619 | $3,366.18 | 54,205 |
| TAP Pharmaceutical Products, Inc. | 00300361224 | $379.31 | 820 |
| TAP Pharmaceutical Products, Inc. | 00300364101 | $431.58 | 51,824 |
| TAP Pharmaceutical Products, Inc. | 00300366301 | $1,197.25 | 11,526 |
| TAP Pharmaceutical Products, Inc. | 00300368301 | $701.93 | 85,957 |
| TAP Pharmaceutical Products, Inc. | 00300730930 | $112.36 | 33,604 |
| TAP Pharmaceutical Products, Inc. | 00300731130 | $114.02 | 25,117 |

**MT 037955**

| | | | |
|---|---|---|---|
| TAP Pharmaceutical Products, Inc. | 00300154111 | $223.54 | 2,117 |
| TAP Pharmaceutical Products, Inc. | 00300154119 | $3,134.84 | 4,248 |
| TAP Pharmaceutical Products, Inc. | 00300154130 | $92.85 | 221,852 |
| TAP Pharmaceutical Products, Inc. | 00300154330 | $74.27 | 127,696 |
| TAP Pharmaceutical Products, Inc. | 00300154430 | $70.16 | 438,583 |
| TAP Pharmaceutical Products, Inc. | 00300228201 | $968.98 | 7,109 |
| TAP Pharmaceutical Products, Inc. | 00300244001 | $1,090.44 | 8,459 |
| TAP Pharmaceutical Products, Inc. | 00300304611 | $331.36 | 10,942 |
| TAP Pharmaceutical Products, Inc. | 00300304613 | $328.91 | 1,330,270 |
| TAP Pharmaceutical Products, Inc. | 00300304619 | $3,356.49 | 54,205 |
| TAP Pharmaceutical Products, Inc. | 00300334601 | $669.56 | 57,312 |
| TAP Pharmaceutical Products, Inc. | 00300364101 | $435.40 | 51,824 |
| TAP Pharmaceutical Products, Inc. | 00300364201 | $271.67 | 50,011 |
| TAP Pharmaceutical Products, Inc. | 00300366301 | $1,217.04 | 11,526 |
| TAP Pharmaceutical Products, Inc. | 00300368301 | $729.89 | 85,957 |
| TAP Pharmaceutical Products, Inc. | 00300395425 | ($1.65) | 274,470 |
| TAP Pharmaceutical Products, Inc. | 00300731130 | $113.71 | 25,117 |

**MT 037956**

# Exhibit 64

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

**ORIGINAL**

In re:  PHARMACEUTICAL,                    MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE .        CIVIL ACTION

PRICE LITIGATION                              01CV12257-PBS

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____

HIGHLY CONFIDENTIAL

DEPOSITION OF JOHN CHAPPUIS

Taken at:

Law offices of

Gough, Shanahan, Johnson & Waterman

33 South Last Chance Gulch

Helena, Montana

April 21, 2006

8:50 a.m.

John Chappuis          HIGHLY CONFIDENTIAL          April 21, 2006
                              Helena, MT

77

1    digit growth, so it was one of the drivers in terms of

2    growth and overall cost.

3                    MS. SMITH-KLOCEK:   At this time if the

4    minutes from the health coalition meetings have not

5    already been produced, I would ask that they be

6    produced.

7                    MS. BOVINGDON:   I have written that down

8    already, and we'll look for them.

9                    MS. SMITH-KLOCEK:   Thank you.

10                   MS. BOVINGDON:   Yes.

11           Q.    (By Ms. Smith-Klocek) Have you had

12   communications with non-Medicaid agencies related to

13   pharmacy issues?

14           A.    I can't recall any personal discussions

15   that I participated in with non-Medicaid agencies.

16           Q.    Do you recall having any communications

17   with, for example, the bureau of prisons or employee

18   benefits or the state institutions regarding

19   prescription drug coverage?

20           A.    I have heard concerns expressed in

21   relation to one of our contracts at the state

22   institutions.   We use the McKesson Corporation for

John Chappuis         HIGHLY CONFIDENTIAL         April 21, 2006
Helena, MT

82

1    otherwise?

2          A.     It would be helpful if you would reflect

3    them as the Department of Corrections.

4          Q.     I'm sorry, with the Department of

5    Corrections.

6          A.     And the answer is:  I cannot recall any

7    other conversations or any conversations that dealt

8    with that issue.

9          Q.     I'd like to discuss your role in changes

10   to the Medicaid drug reimbursement rates for

11   pharmaceutical drugs.  In 1997, did you have any role

12   in changes to the reimbursement rate for outpatient

13   drugs under the Montana Medicaid program?

14         A.     I cannot remember being part of any

15   discussion related to that.  My only role would have

16   been in monitoring the budget with pharmacy at that

17   time.

18         Q.     In your role of monitoring the budget,

19   would you have participated or attended any public

20   hearings regarding rule changes to reimbursement rates

21   for pharmaceutical drugs?

22         A.     Not that I can recall.

John Chappuis          HIGHLY CONFIDENTIAL          April 21, 2006
                            Helena, MT

85

1    Federal Government that relate to AWP.

2          As I recall, and I did review this document

3    again as I mentioned, the options were somewhere

4    between 10 and 21-point-something percent.  Jeff felt

5    that 15 percent was the best way to go because those

6    ranges were between 10 percent and 21-something

7    percent nationally.  He felt in Montana, it was his

8    judgment to start with the 15 percent.

9          So we made a decision and discussed that with

10   our director, Gail Gray, and then went forward, or at

11   least we would have eventually discussed it with Gail

12   Gray and then with the budget office.  So we made that

13   recommendation. The budget office is OBPP, that I

14   mentioned earlier, Office of Budget and program

15   Planning.

16        Q.    Was the reason for the change from AWP

17   minus 10 -- I'm sorry.  Was the reason for the change

18   in reimbursement primarily to reduce costs to the

19   budget?

20        A.    I'm not sure of Jeff's reasoning on that.

21   Certainly, I was looking for options to reduce costs,

22   but legitimately, not just so reduce costs.  Anytime

Henderson Legal Services
(202) 220-4158

# Exhibit 65

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION,)   MDL DOCKET NO.

- - - - - - - - - - - - - - -x   CIVIL ACTION

THIS DOCUMENT RELATES TO:           )   01CV12257-PBS

ALL ACTIONS                         )

- - - - - - - - - - - - - - -x


DEPOSITION OF NANCY ELLERY

April 11, 2006

9:14 a.m.

Held at:

Hampton Inn & Suites

155 Southwest Peacock Boulevard

Port St. Lucie, Florida


Reporter:  Tamra K. Piderit, RPR, CRR

Page 70

```
 1        Q.    Do you remember a discussion of the bulk

 2   purchase of prescription drugs?

 3        A.    No, I don't recall.

 4        Q.    Do you remember a discussion of adequate

 5   reimbursement for accessibility to pharmacists?

 6             MR. GAUDET:   Objection.

 7        A.    No, I don't remember specific discussion.

 8   Again, I don't know which group I participated in.  I

 9   just remember having the groups and there being

10   minutes reflected, but I don't remember specific

11   discussions.

12             MR. EVERETT:   Let's take a short break

13   here.

14             THE WITNESS:   Okay.  Fine.

15             (Recess taken from 10:54 a.m. to

16   11:00 a.m.)

17             BY MR. EVERETT:

18        Q.    Ms. Ellery, when you were the director of

19   the Montana Medicaid program, is it fair to say that

20   you were aware of the reimbursement rates that other

21   states used for their Medicaid programs?

22        A.    Not specifically.
```

Nancy Ellery                                                                April 11, 2006
                              Port St. Lucie, FL

1        Q.    Is that information something that you

2   would have considered in setting reimbursement rates

3   for Montana Medicaid?

4        A.    That is a factor.

5        Q.    Did you do anything to keep up with

6   changes that other states made in their

7   reimbursement systems?

8        A.    I attended meetings, as I mentioned

9   earlier, with other Medicaid directors.  They would

10  talk about what they were doing; it was information

11  sharing among directors.

12       Q.    Other than the biannual meetings of the

13  association of Medicaid directors, did you have

14  communications regarding reimbursement rates that

15  other states' Medicaid programs used?

16       A.    For prescription medicine or Medicaid

17  rates in general?

18       Q.    Let me ask the general question first.

19       A.    Yeah.  We would sometimes in trying to

20  evaluate whether our reimbursement was equitable, we

21  would survey other states.  Not me particularly

22  survey them, but staff would find out what other

**Exhibit 66**

Coleen Lawrence

Carson City, NV

August 16, 2005

212

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              -oOo-

4    In Re: Pharmaceutical Industry

5    Average Wholesale

6    Price Litigation                    **CERTIFIED COPY**

7

8                                         MDL No. 1456

9                                         Civil Action No.

10   This Document Relates to State of    01-CV-12257-PBS

11   Nevada v. Abbott Laboratories, et al.,

12           and                          CA No. 02-CV-00260-ECR (Nevada I)

13   State of Nevada v. American Home

14   Products, et al.,                    CA No. 02-CV-12086-PBS (Nevada II)

15

16

17              VOLUME 2 OF THE DEPOSITION OF

18                     COLEEN LAWRENCE

19                     August 16, 2005

20                   Carson City, Nevada

21

22      REPORTED BY:  DEBORAH MIDDLETON GRECO, CCR #113, RDR, CRR

Coleen Lawrence                                          August 16, 2005
                        Carson City, NV

                                                                    256

1    contract would be.

2              Record read by the reporter as follows:

3              "QUESTION:  Does the state have any contracts with any

4    pharmacy or other providers that refer or relate to AWP?"

5              MS. BRECKENRIDGE:  Objection.

6              THE WITNESS:  I'm still unclear as to what the

7    contract would be.  You say relate to AWP.

8    BY MR. DOVE:

9         Q    For example, does the state have a contract with, you

10   know, PBM Express Scripts or PBM that refers in the context

11   itself to the term AWP?

12             MR. TERRY:  You're asking for the state in its

13   entirety or for the Medicaid program?

14             MR. DOVE:  For the Medicaid program.

15             MS. BRECKENRIDGE:  Objection.

16             THE WITNESS:  Not that I'm aware of.

17   BY MR. DOVE:

18        Q    I'd like to mark as Exhibit Lawrence 015 a collection

19   of documents that appears to relate to a state plan amendment

20   pertaining to a change in dispensing fee.

21             (Exhibit Lawrence 015 marked for identification)

22   BY MR. DOVE:

                    HENDERSON LEGAL SERVICES
                        (202) 220 - 4158

# Exhibit 67

391

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____          MDL DOCKET NO.

THIS DOCUMENT RELATES TO:      CIVIL ACTION

Abbott Laboratories, et al.,   01CV12257-PBS

CA No. 02-CV-00260-ECR

(Nevada I) and State of

Nevada V American Home

Products, et al., CA No.

02-CV=12086-PBS (Nevada II)

_____/

VOLUME III

DEPOSITION OF

COLEEN LAWRENCE

March 23, 2006

Carson City, Nevada

REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst 4

Coleen Lawrence, Vol. III                                    March 23, 2006

Carson City, NV

15  (Pages 444 to 447)

444

1  reimbursement?
2      A.  Other agencies outside of Medicaid?
3      Q.  Yes.
4      A.  Nevada checkup does because they use our
5  same policies. Other than that, I do not know.
6      Q.  Do you have any information about the use
7  of AWP by other entities in the state of Nevada,
8  such as insurance companies?
9      A.  No.
10     Q.  Directing your attention back to paragraph
11 four of the Complaint of Exhibit Lawrence V3 001,
12 are you aware of any documents in the State's
13 possession to support that allegation?
14     MS. BRECKENRIDGE:  Which allegation? I'm
15 sorry.
16     MR. LITOW:  Four.
17     MS. BRECKENRIDGE:  Paragraph four?
18     MR. LITOW:  Yes.
19     MS. BRECKENRIDGE:  Objection, she's
20 already told you she doesn't have any information.
21     THE WITNESS:  You want to know if I have
22 information.--

445

1  BY MR. LITOW:
2      Q.  Are you aware of any documents that would
3  support that allegation?
4      A.  The allegation that --
5      Q.  Okay, let's take it piece by piece then.
6  It looks like there's several here. First one, AWPs
7  are not independently determined by the publishers;
8  do you see that?
9      A.  Yes.
10     Q.  Are you aware of any documents in the
11 State's possession to support that allegation?
12     MS. BRECKENRIDGE:  Objection.
13     THE WITNESS:  I am not aware of any.
14 BY MR. LITOW:
15     Q.  And then it goes on:
16     Rather, as part of the AWP inflation
17 scheme described in this Amended Complaint,
18 pharmaceutical companies self-report the AWP to
19 publishers who then publish the purported AWP
20 exactly as provided to them by the pharmaceutical
21 manufacturers.
22     Are you aware of any documents in the

446

1  State's possession to support that allegation?
2      MS. BRECKENRIDGE:  Objection.
3      THE WITNESS:  Not to my knowledge.
4  BY MR. LITOW:
5      Q.  Do you have an opinion one way or the
6  other whether the allegations in that paragraph are
7  correct?
8      MS. BRECKENRIDGE:  Objection.
9      THE WITNESS:  I have no opinion.
10 BY MR. LITOW:
11     Q.  I'd like to direct your attention to
12 paragraph seven of the Complaint. It's on page two.
13 And that reads:
14     In some cases, as an integral part of the
15 scheme, utilized charge-backs, credits, rebates,
16 hidden price discounts and/or other unlawful
17 financial inducements, including free samples, that
18 are not included in the AWPs reported by defendants,
19 which consequently further reduce the provider's
20 cost while increase the provider's spread and their
21 incentive to prescribe a particular defendant's
22 products.

447

1      Do you see that?
2      A.  Yes.
3      Q.  Are you aware of any documents in the
4  State's possession to support that allegation?
5      A.  I guess I need further clarification on
6  the allegation. It doesn't say who is -- are we
7  saying the manufacturers are utilizing the charge-
8  backs?
9      Q.  Yes.
10     A.  Okay. And is it that they are utilizing
11 credits, rebates -- I mean --
12     MS. BRECKENRIDGE:  There's lot there.
13 BY MR. LITOW:
14     Q.  Any of those.
15     MS. BRECKENRIDGE:  Objection.
16 BY MR. LITOW:
17     Q.  Are you aware of any documents to support
18 the allegation that defendants utilize charge-backs?
19     A.  No, not to my knowledge.
20     Q.  Are you aware of any documents to support
21 the allegation that defendants utilize credits?
22     A.  Not to my knowledge.

# Exhibit 68

Laurie Squartsoff                                    March 6, 2006
                    Washington, DC

1

              IN THE UNITED STATES DISTRICT COURT

          FOR THE EASTERN DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

IN RE: PHARMACEUTICAL INDUSTRY  : MDL DOCKET NO.

AVERAGE WHOLESALE PRICE         : CIVIL ACTION

LITIGATION                      : 01CV12257-PBS

-------------------------------- :

THIS DOCUMENT RELATES TO        :

ALL ACTIONS                     :

- - - - - - - - - - - - - - - - X

                         Monday, March 6, 2006

                         Washington, D.C.


          Deposition of LAURIE SQUARTSOFF, commencing at

8:07 a.m., held at the offices of Covington &

Burling, 1201 Pennsylvania Avenue, N.W., Washington,

D.C., before Keith Wilkerson, a notary public in and

for the District of Columbia.

Laurie Squartsoff

March 6, 2006

Washington, DC

114

1    A.   That would have been the Minnesota
2  Multistate Buying Group.
3    Q.   And what was the nature of those
4  discussions?
5    A.   Well, there were conversations about ways
6  to save costs, and an idea that was talked about
7  included utilizing the state pharmacies to dispense
8  medications to the Medicaid recipients.  That was a
9  long time ago.
10   Q.   This idea about using the Minnesota state
11 buying cooperative, this idea was a long time ago?
12 I'm not sure I understand.
13   A.   I don't remember exactly when I had that
14 conversation with April, but it would have been a
15 long time ago.
16   Q.   In the early 1990s or --
17   A.   It could have been.
18   Q.   And I guess I'm not completely clear.
19 Maybe you could tell me again.  What was the idea
20 that you were discussing?  What was the proposal on
21 the table?
22        MS. BRECKENRIDGE:  Objection.

115

1    A.   If memory serves me correctly, the
2  conversation would have been to look at the
3  possibility of utilizing those state pharmacies for
4  dispensing prescriptions.
5    Q.   And why would that save costs, to utilize
6  the state pharmacies for dispensing prescriptions to
7  Medicaid recipients?
8    A.   Well, the buying power with the Minnesota
9  multistate would have been expanded and would have
10 allowed -- it would just have expanded the pool of
11 patients that would be covered under that buying
12 group.
13   Q.   And why would that have made a difference,
14 to expand the pool of buyers?
15   A.   If the contracted price with the Minnesota
16 Multistate was sufficient, there may have been a
17 savings to the state on the medications.
18   Q.   It would cost less to acquire the drugs?
19   A.   Correct.
20   Q.   But I take it this idea was not accepted.
21 Correct?
22   A.   Correct.

116

1    Q.   And why not?
2    A.   I don't recall exactly, but it may likely
3  have been due to resources within the state
4  hospital, they only had a few pharmacists, and the
5  restrictions from the buying group on who the
6  participating pharmacies could be.
7    Q.   Did you ever speak about prescription drug
8  purchasing or reimbursement with anyone at
9  Corrections during your time at Nevada Medicaid?
10   A.   I may have.  I don't recall any direct
11 conversations with anyone at Corrections.  It would
12 have been with Elliott King, who was the director of
13 pharmacy.
14   Q.   Did you have discussions with Elliott King
15 about prescription drug purchasing generally, even
16 if that's outside of your specific tasks at Nevada
17 Medicaid?
18   A.   I don't recall that.  I was only at
19 Corrections maybe twice in the pharmacy ever, so I
20 don't recall the particulars of those conversations
21 and whether they specifically talked about the cost
22 of medications.

117

1    Q.   How about with the state hospital?  If I
2  remember your testimony correctly, at least for a
3  time you were the pharmacist at the state hospital.
4    A.   Correct.
5    Q.   I don't know if you had a conversation
6  with yourself or not on this, but after you left the
7  state hospital did you have any conversations with
8  the next pharmacist at the state hospital about drug
9  reimbursement or acquisition issues?
10   A.   I may have.  The pharmacist who was there
11 at the same time I was there, so there was more than
12 one pharmacist, just for point of clarification, his
13 name is John Warren, and I may have had
14 conversations with him about the cost of
15 prescriptions.  It wouldn't be extraordinary in the
16 course of pharmacy to have those kinds of
17 conversations, but I can't pinpoint a date and a
18 time and what the content of that conversation may
19 have been.
20   Q.   You mentioned John Warren.  Is he still
21 employed at the state hospital?
22   A.   No.

# Exhibit 69

Page 1

1                    UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MASSACHUSETTS

3

4                              -o0o-

5

6    In re:  PHARMACEUTICAL           MDL DOCKET NO.

7    INDUSTRY AVERAGE

8    WHOLESALE PRICE LITIGATION.      CIVIL ACTION

9                                     01CV12257-PBS

10

11   THIS DOCUMENT RELATES TO:

12   ALL ACTIONS.

13

14

15                        DEPOSITION OF

16                        CHARLES DUARTE

17                        January 10, 2007

18                      Carson City, Nevada

19

20

21

22    ·   REPORTED BY: CONSTANCE S. EISENBERG, NV CCR #142, RMR

```
 1        Q.   And that according to the letter, that
 2   the aggregate drug purchase price was 18.85
 3   percent below AWP?
 4        A.   That's what it says in the letter, yes.
 5        Q.   And that's all I'm asking for is just
 6   what the letter says at this point.
 7             In the second to the last paragraph that
 8   we just looked at on the second page it indicates
 9   that the Nevada Medicaid program is proposing to
10   change to AWP minus 10.  Is it true that in the
11   late 1980s the Nevada Medicaid program did change
12   its pharmacy rate from AWP minus 5 to AWP minus
13   10?
14        A.   I don't know the date that that state
15   plan amendment was implemented.
16        Q.   Do you have a general sense as to the
17   time of when that was?
18        A.   Actually not.  This is new to me.  I
19   knew it was before my tenure.
20        Q.   Are you aware of any documents between
21   the date of this one, in 1986, and Ms. Lawrence's
22   email in 2002, the 16 year period, the intervening
```

Page 58

```
 1                    (Exhibit Duarte 013 marked for

 2       identification.)

 3       BY MR. DILLON:

 4            Q.    You've been handed what's been marked

 5       Exhibit Duarte 013, is a letter from on the

 6       National Association of Chain Drug Stores

 7       letterhead, directed to Mr. Larry Reed, the Center

 8       for Medicare and Medicaid services, dated December

 9       17th, 2002 it's authored by John M. Coster.

10            A.    Okay.

11            Q.    This was a document we found in your

12       electronic files. Do you recall seeing this?

13            A.    Yes.

14            Q.    And why were you a recipient of this

15       letter?  It doesn't appear to be addressed -- my

16       apologies, you are cc'd.

17                  If I could direct your attention to the

18       last paragraph on the first page, the letter

19       states:  "In addition, we do not believe that the

20       state can or should simply reduce one component of

21       pharmacy reimbursement without considering whether

22       total reimbursement is adequate.  We do not
```

Page 59

1    believe that the state has done this.  For

2    example, while the state pays dispensing fee of

3    $4.76, our data indicate that the average cost of

4    dispensing a prescription in Nevada is $7.91.

5    Actual cost to dispense Medicaid prescriptions may

6    be anywhere from 30 to 50 percent higher than this

7    amount."

8              Do you recall ever having conversation

9    with anyone at NACDS regarding the subject of that

10   paragraph?

11         A.    I recall having discussion with NACDS

12   regarding this letter.

13         Q.    Did you discuss their statement here

14   that their data showed that the average cost to

15   dispense a prescription in Nevada was $7.91?

16         A.    Yes.

17         Q.    And do you have any information, surveys

18   that you have conducted, that would indicate that

19   that information provided, that the average cost

20   to dispense prescription in Nevada is $7.91, is

21   incorrect?

22         A.    Could you please repeat that question.

Page 68

1    Senior RX, Mental Health and Developmental

2    Services, Medicaid, veteran services, et cetera.

3    My specific questions were:  What state programs

4    purchase prescription drugs, and two, do all of

5    these programs participate in MMCAP?  If not, do

6    they participate in other cost saving purchase

7    programs?"

8              Has Medicaid ever utilized MMCAP?

9         A.   I don't know what MMCAP stands for.

10        Q.   Okay.  Are you familiar with the fact

11   that some programs within the State of Nevada

12   purchase pharmaceuticals?

13        A.   Yes.

14        Q.   And do you know how they purchase them?

15        A.   Not completely, but I do know how they

16   purchase drugs at some agencies.

17        Q.   Okay.  Which agencies are you familiar

18   with?

19        A.   Primarily Mental Health and

20   Developmental Services.

21        Q.   Do you know how Mental Health and

22   Developmental Services purchases drugs?