# Exhibit 81

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------x

In Re: PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE    )    MDL DOCKET NO.

PRICE LITIGATION                 )    CIVIL ACTION

--------------------------------x    01CV12257-PBS

THIS DOCUMENT RELATES TO      )

ALL ACTIONS                      )

--------------------------------x

        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


                    August 18, 2005

                    9:23 a.m.


        Deposition of DENISE M. KASZUBA,

    held at the offices of Hogan & Hartson,

    L.L.P., 875 Third Avenue, New York, New

    York, pursuant to notice, before Cary N.

    Bigelow, RPR, a Notary Public of the State

    of New York.

Denise M. Kaszuba     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     August 18, 2005
New York, NY

---

**42**

1  this is a computer database, correct?
2  A.  It is DB2 legacy, yes.
3  Q.  Is DB2 the name of the software?
4  A.  Yes.
5  Q.  Is that on a mainframe?
6  A.  It is on a mainframe.
7  Q.  Is the mainframe housed in Plainsboro?
8  A.  Today, no. I think it is housed with IBM.
9  Q.  In the past has it been —
10  A.  Evansville, Indiana.
11  Q.  Do you have a terminal on your desk
12  which can access the list price master file?
13  A.  I do.
14  Q.  Do the pricing coordinators have that
15  as well?
16  A.  They do.
17  Q.  Who are the current pricing coordinators?
18  A.  There are none at this point in time.
19  Q.  So you don't have any assistants at
20  the moment?
21  A.  No.
22  Q.  Do you work with COPS, the customer

---

**43**

1  order processing system?
2  A.  I do not have access to the COPS
3  database now.
4  Q.  Who maintains that?
5  A.  That would be customer service.
6  Q.  Do you have communications with
7  wholesalers?
8  A.  I do communicate, yes.
9  Q.  About what topics?
10  A.  Product launches, new products,
11  notification of products, the list price
12  changes.
13  Q.  When you say list price changes, do
14  you communicate list price changes to the
15  wholesalers?
16  A.  I do.
17  Q.  Is that in the form of letters?
18  A.  In the form of a letter.
19  Q.  Do you ever have telephone
20  conversations with any representatives of
21  wholesalers?
22  A.  Very infrequently, but I do.

---

**44**

1  Q.  Even though they are infrequently, do
2  you remember the topics you would discuss?
3  A.  Topics, they would like a copy of the
4  most current price list.
5  Q.  In that instance would they call you,
6  would they be calling you for a copy?
7  A.  Yes, they may, or they may call trade
8  operations.
9  Q.  Have you sent list price increases to
10  wholesalers throughout the time that you worked
11  in pricing support?
12  A.  Yes, I have.
13  Q.  What does the phrase AWP mean to you?
14  A.  It means average wholesale price.
15  Q.  Can you define that any further?
16  A.  It's actually a price established by
17  our, by our third party data services and that
18  price is established by using our list price as
19  a base.
20  Q.  Do you know how AWP is used in the
21  industry as a pricing term?
22  MR. EDWARDS: Used by whom?

---

**45**

1  MR. MATT: Used by insurance
2  companies.
3  A.  I don't know the end result of how
4  they use that AWP.
5  Q.  Do you know that insurers can base
6  their reimbursement payments based on AWP?
7  MR. EDWARDS: Objection.
8  A.  Yes, I do.
9  Q.  Are you aware that until recently
10  Medicare based payments for Part B drugs on AWP?
11  A.  Yes.
12  Q.  Are you aware that some Medicaid
13  programs based payments on AWP for drugs?
14  A.  No.
15  Q.  Over the years you have worked in
16  pricing support, what are some of the uses that
17  you have made of AWP in your area of responsibility?
18  A.  Just my area of responsibility is
19  actually just getting them from the data
20  services and having them available on an
21  internal price list document, so ad hoc requests
22  from marketing analysts who may request products

---

Denise M. Kaszuba   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   August 18, 2005
New York, NY

46

1  list pricing and AWP pricing information from
2  the data services.
3      Q.  You referenced internal price list.
4      What is that?
5      A.  The internal price list is a document
6  that we have all our products that we
7  commercially sell that contains all -- that
8  contains or did contain the wholesale direct
9  hospital pricing, it had the federal supply
10 schedule pricing, it had the Public Health
11 Service pricing, AWP pricing from all three
12 services.
13     Q.  Is this called the internal price
14 list, is that the official --
15     A.  Yes.
16     Q.  How long has that been maintained?
17     A.  We started doing that maybe in '95.
18     Q.  So '95 to the present?
19     A.  That is an approximate date.  It may
20 be later, I am not certain.
21     Q.  And that price list is still in
22 existence at BMS?

47

1      A.  No, we no longer produce it as of last
2  year because of resources and the product line
3  has subsequently been reduced of BMS.
4      Q.  When you say resources, what are you
5  referring to?
6      A.  Staff.
7      Q.  As in lack of?
8      A.  Lack of.
9      Q.  You are a department of one right now?
10     A.  Yes.
11     Q.  You said there are fewer BMS products
12 now; is that correct?
13     A.  Yes.
14     Q.  Can you be more specific as to how the
15 product line has contracted?
16     A.  We no longer sell them commercially,
17 they are no longer part of our portfolio.
18     Q.  Can you give us some examples of
19 specific drugs?
20     A.  Capoten, Corgard, Pronestyl recently,
21 Serzone, Stadol NS.
22     Q.  Did the internal price list, did you

48

1  have the responsibility for maintaining that?
2      A.  I did.
3      Q.  Was that maintained in an Excel
4  spreadsheet format?
5      A.  The internal was actually maintained
6  by -- we actually had a vendor who actually did
7  the internal -- we communicated the information,
8  but they housed that in their database and they
9  produced it for us.
10     Q.  Who was the vendor?
11     A.  Anro, Anro today is the vendor.
12     Q.  How do you spell that?
13     A.  A-n-r-o.
14     Q.  In the past was it someone else?
15     A.  Not for the internal price list, no.
16     Q.  Do you know what format they
17 maintained it in or did maintain that in?  Was
18 that Excel?
19     A.  No.  It's a home-grown system that
20 they had.
21     Q.  How would they communicate the
22 internal price list to you?

49

1      A.  They would either do a PDF or print
2  hard copies for us.  PDF was the later medium.
3      Q.  You said you supplied Anro with
4  information for them to build this internal
5  price list?
6      A.  Yes.
7      Q.  What did BMS supply Anro with?
8      A.  BMS supplied the price presentation of
9  the product, which is the records that identify
10 the product; we provided them with all of the
11 levels of pricing contained in that document.
12     Q.  So you provided them with WLP?
13     A.  WLP.
14     Q.  And the AWP from the three publications?
15     A.  Yes.
16     Q.  What else?
17     A.  The FSS, PHS, hospital and physician
18 pricing.
19     Q.  I think I may have a couple of
20 examples of those to look at and for you to
21 identify it a little bit later.
22        What was the purpose for including

Denise M. Kaszuba    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 18, 2005
New York, NY

50

1    AWPs on that report?
2        A.  . Actually, to provide that to the
3    analyst, the marketing analyst.
4        Q.   Do you know why they would be
5    interested in seeing AWP information in that
6    report?
7        A.   I just know that they requested AWPs.
8        Q.   Did they tell you why they were
9    requesting AWPs?
10       A.   They may have.  Again, they needed our
11   AWPs and they also may have requested
12   competitors' AWPs.  Exactly what they did do
13   with that --
14       Q.   Based on your experience working in
15   the pricing field for several years for BMS, do
16   you believe they would be interested in AWPs
17   because some customers ultimately pay for BMS
18   products based on AWP?
19       A.   I knew that AWPs were in some
20   instances a factor of what a customer may
21   reimburse.
22       Q.   Do you believe that may be why

51

1    marketing was interested in having the AWPs on
2    the internal price list?
3        A.   Yes.
4        Q.   You also mentioned ad hoc requests
5    from marketing personnel.
6        A.   Yes.
7        Q.   Can you be more specific what that means?
8        A.   Ad hoc requests, they would actually
9    provide me a list of products that they would
10   like to see product and pricing information.
11       Q.   Ad hoc meaning this was not a
12   periodically established schedule?
13       A.   No, no.
14       Q.   And the pricing information they would
15   request in an ad hoc manner would include
16   wholesale list price and AWPs?
17       A.   Sometimes.
18       Q.   And sometimes would they request the
19   same information about competitors?
20       A.   Yes.
21       Q.   What would be your source of
22   information on competitive drugs?

52

1        A.   Software applications, Price-Chek,
2    Price Probe.
3        Q.   Those were accessed by you?
4        A.   Correct.
5        Q.   Tell me about Price-Chek.
6        A.   Price-Chek is owned by MediSpan,
7    Price-Chek is a PC software package.
8        Q.   Did BMS license that from MediSpan?
9        A.   Yes, they did.
10       Q.   Did you have that available to you on
11   your computer at your desk?
12       A.   Yes, I did.
13       Q.   What information does Price-Chek show?
14       A.   Price-Chek actually contains all
15   active pharmaceutical products, it contains
16   historical pricing, current pricing of list,
17   wholesale price, direct price and AWP.
18       Q.   And you said historical.  How far back?
19       A.   As long as the product -- it's
20   relative to the -- it could be eight buckets,
21   eight price changes.
22       Q.   Eight different columns in the report?

53

1        A.   Yes.
2        Q.   So it can --
3        A.   I mean, eight different buckets per
4    price type.
5        Q.   So let's take AWP as a price type.
6            It would be able to show the eight
7    different prior periods?
8        A.   Correct.
9        Q.   What is Price Probe?
10       A.   Price Probe is actually a PC software
11   package licensed from First Data Bank.
12       Q.   Is that on your desktop?
13       A.   Yes.
14       Q.   Does that contain all active
15   pharmaceutical products?
16       A.   Yes.
17       Q.   It contains wholesale list prices,
18   direct prices --
19       A.   Direct prices and AWP.
20       Q.   For what time frame?
21       A.   At one point they could only provide
22   three buckets, so three price changes.  I

54

1   believe they are increasing it as the database ages.
2       Q.   Besides the fact that Price-Chek has a
3   longer historical profile, would there be one
4   reason why you would access Price-Chek --
5       MR. MATT:  Strike that.
6       Q.   When do you actually use Price-Chek
7   and Price Probe, under what circumstances, why
8   do you use them?
9       A.   My major functionality with them is to
10  actually look at the product and prices that we
11  provide MediSpan to ensure that the product
12  information is correct and the list price is
13  correct.
14      Q.   So as an auditing type function?
15      A.   Yes.
16      Q.   Do you access them from time to time
17  in response to ad hoc pricing requests?
18      A.   I do.
19      Q.   When you receive an ad hoc request
20  from marketing and you want to access one of
21  these databases, do you have preference of one
22  over the other?

55

1       A.   I do have a preference over Price-Chek.
2       Q.   A preference for Price-Chek?
3       A.   Correct.
4       Q.   Why is that?
5       A.   Because the history is all in one row
6   and with Price Probe, actually, the history is
7   in multiple rows.
8       Q.   How long has BMS licensed Price-Chek?
9       A.   I don't recall.
10      Q.   Was that available to you in 1992?
11      A.   No.
12      Q.   How about 1995?
13      A.   It may have been.
14      Q.   Do you recall at some time in the
15  mid-nineties it became available?
16      A.   Yes, I do.
17      Q.   The same question for Price Probe.  Do
18  you know approximately when that became
19  available, approximately when BMS began
20  licensing it?
21      A.   In the mid-nineties also.
22      Q.   The ad hoc request we discussed

56

1   earlier from marketing, who would make those
2   requests?
3       A.   It would -- it could vary.  The
4   marketing research analyst that supported the
5   marketing group and at times the product manager
6   may request or a manager supporting a product
7   may request information.
8       Q.   Is it your understanding that a
9   product manager manages a single drug product?
10      A.   Or two, yes.
11      Q.   And works with pricing.
12      Does the product manager have input
13  regarding the price charged on the drug products
14  for which he or she is a manager?
15      A.   The list price?
16      Q.   Yes.
17      A.   If -- again, when we implemented price
18  increases, it was not via the product manager.
19      Q.   Did they have input at some --
20      A.   They may have input behind the scenes,
21  but when we went in, when we increased the
22  price, they did not even know we were -- there

57

1   was a secrecy because we did not want our
2   customers to know the price increase was
3   occurring until the day of our major customers,
4   wholesalers.
5       Q.   So product manager wasn't under the
6   chain of authority that signed off?
7       A.   No, they did not.
8       Q.   The research analysts you referenced,
9   what is your understanding of their function?
10      A.   Their function is actually to support
11  pricing issues.
12      Q.   Within the marketing department?
13      A.   Within the marketing department.
14      Q.   Just so I understand, the Price-Chek
15  and Price Probe products, they contain price
16  information for all drugs, not just BMS drugs?
17      A.   Correct.
18      Q.   Is it your understanding that
19  wholesalers purchase drugs from BMS at wholesale
20  list price?
21      A.   Yes.
22      Q.   Is it your understanding that

Denise M. Kaszuba    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 18, 2005
New York, NY

58

1  wholesalers frequently obtain a discount for
2  paying promptly, a discount from BMS for paying
3  promptly?
4    A.  Correct.
5    Q.  Can that be one to two percent?
6    A.  Yes.
7    Q.  Is it your experience that they
8  usually take advantage of that?
9    A.  I don't know.
10    Q.  You know that it is offered, that
11  discount?
12    A.  I know that it is offered, correct.
13    Q.  Are you aware that BMS contracts with
14  GPOs and institutions?
15    A.  Yes, I am.
16    Q.  Are you aware that those contracts
17  typically contain prices that are lower than
18  wholesale list price?
19    A.  Correct, I am.
20    Q.  Are you familiar with the charge-back
21  system?
22    A.  I am familiar with it.

59

1    Q.  Can you describe your familiarity, please?
2    A.  The charge-back system actually is an
3  EDI functionality of BMS in which we have
4  relationships with wholesalers who sell to our
5  customers we contract with and again,
6  wholesalers pay the list and for those customers
7  who have contracts and purchase through the
8  wholesalers, they actually pay the contract
9  price and to make a wholesaler whole, they
10  submit those claims via EDI and we, in turn,
11  credit the wholesaler.
12    Q.  Are you involved in that process at all?
13    A.  No.
14    Q.  In other words, you don't process
15  charge-backs, that is not your area?
16    A.  I do not process them.
17    Q.  But you are familiar with them —
18    A.  Correct.
19    Q.  — based on your years of experience
20  in pricing support?
21    A.  Correct.
22    Q.  Are you also aware that BMS pays

60

1  rebates to some purchasers of BMS drugs?
2    A.  Excuse me?
3    Q.  Are you also aware that BMS pays
4  rebates to some purchasers of BMS drugs?
5    A.  Yes, I am aware.
6    Q.  What is your knowledge regarding rebates?
7    A.  Just that I know they do exist.
8    Q.  Do you know what types of customers
9  receive rebates?
10    A.  At a high level, GPOs.
11    Q.  PBMs?
12    A.  PBMs.
13    Q.  Do you have any individual
14  responsibility for processing rebates?
15    A.  No, I do not.
16    Q.  Are you aware of any transaction in
17  which the end purchaser of a BMS drug ever paid
18  more than AWP for that drug?
19    A.  No.
20    Q.  Is it because you are just not aware
21  or because you don't believe that anyone would
22  have paid more than AWP for a BMS drug?

61

1    A.  I am not aware.
2    Q.  Do you believe that anyone has ever
3  paid AWP for a BMS drug?
4    A.  I am not aware.
5    Q.  Do you have a belief one way or the other?
6    A.  No.
7    Q.  Why is that?
8    A.  I don't know the end results.
9      MR. MATT:  This will be Exhibit Kaszuba 003,
10  please.
11      (Exhibit Kaszuba 003, documents bearing
12  production Nos. BMSAWP/0000597 through
13  BMSAWP/0000617, marked for identification,
14  as of this date.)
15    Q.  The court reporter has marked as
16  Exhibit Kaszuba 003 to your deposition a series of
17  documents produced from your files containing
18  the Bates numbers 0000597 to 617.
19    I would like to draw your attention to
20  the page which has the number in the lower
21  right-hand corner of 612.
22      MR. EDWARDS:  You are making a

Denise M. Kaszuba   HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY   August 18, 2005

## New York, NY

62

1 representation this was produced from
2 Ms. Kaszuba's files?
3     MR. MATT: Correct.
4     MR. EDWARDS: Did we tell you that at
5 some point?
6     MR. MATT: Yes. The document
7 custodian list. These pages were combined
8 in this manner and in this order.
9   Q. Can you identify what you see on the
10 page which has the Bates numbers ending in 612?
11   A. Yes. This is a memo from Tim Crew to
12 me with appropriate signatures and that is
13 addressing Atenolol.
14   Q. Can you read into the record the
15 paragraph titled "Background."
16   A. Okay.
17     "In order to accomplish a speedy
18 market introduction of Atenolol 50-milligram
19 1,000s, a wholesale list price needs to be
20 created, the price is set to establish an AWP
21 that is competitive with other generic
22 offerings. Please note that this wholesale

63

1 price will not reflect actual selling price
2 since Apothecon sells Atenolol primarily at
3 contractor special offer pricing."
4   Q. Would you turn to the next page.
5 That reflects the new list price,
6 correct, $500?
7   A. Correct.
8   Q. And it also says Apothecon anticipated AWP.
9   A. Yes.
10   Q. How do you believe that was calculated?
11   A. Actually, it was calculated by the
12 product manager by using a factor of between 20
13 to 25 percent.
14   Q. Is that the typical market factor
15 applied by one of the publications?
16   A. That range, they may.
17   Q. In this case it is 20 – is it 20 or
18 25 percent in this instance?
19   A. I don't know.
20   Q. 25 percent, it looks like.
21     Then if you can look at the letters
22 which have your name on them from the Bates

64

1 numbers in the lower right-hand corner of 597 to
2 606, can you tell me what these letters are
3 doing?
4   A. These letters are actually providing
5 information to the various data services of the
6 introduction of a new product and it is
7 providing the list price, wholesale price,
8 direct price and the approximate first ship date
9 of the product.
10   Q. These are letters you prepared?
11   A. Yes.
12   Q. Did you provide them to the
13 organizations that appear in the addressee lines?
14   A. Yes.
15   Q. Was this done under your area of
16 responsibility as a senior pricing analyst?
17   A. Correct.
18   Q. Do you know why BMS in this particular
19 instance communicated a wholesale list price of
20 $500 when the memo that you reviewed at page 612
21 states that it won't reflect actual selling
22 price?

65

1   A. Because actually what we communicated
2 to the data services from the inception of my
3 responsibility was to communicate the wholesale
4 list price.
5   Q. You don't know why, then, BMS was
6 communicating a wholesale list price when it
7 would not reflect the actual selling price of
8 this particular drug at this particular time?
9     MR. EDWARDS: Objection.
10   A. Other than what was communicated in
11 this memo from Tim Wert.
12   Q. I believe you testified earlier AWP is
13 calculated from wholesale list price; is that
14 correct?
15   A. Correct.
16   Q. In this instance, do you recognize
17 that no one would have paid AWP for this
18 particular drug at this particular time because
19 they wouldn't have even paid the list price for
20 this drug, correct?
21   A. Correct.
22     (Exhibit Kaszuba 004, documents bearing

**70**

1  provide you with AWPs based on the data you have
2  provided them, correct?
3  A.  That is correct.
4  (Exhibit Kaszuba 005, documents bearing
5  production Nos. BMSAWP/0000574 through
6  BMSAWP/0000587, marked for identification,
7  as of this date.)
8  Q.  The court reporter has marked as
9  Exhibit Kaszuba 005 to your deposition a series of
10  documents I believe were produced from your
11  files and contain the Bates numbers 0000574
12  through 587.
13  I will draw your attention to the
14  specific page bearing Bates number 583 in the
15  lower right-hand corner.
16  On this page is that your name written
17  in cursive in the upper right-hand corner, does
18  that say Denise?
19  A.  You know, it may. I can't make it out.
20  Q.  And the first question on this
21  document is do you believe you received this
22  document on or about the time that it was

**71**

1  created in August of 1996?
2  A.  I believe I did.
3  Q.  Can you read the paragraph that says
4  "Background" out loud?
5  A.  "To accomplish a rapid market
6  introduction of albuterol, wholesale list prices
7  must be established. Those wholesale prices do
8  not reflect the actual selling prices as
9  albuterol will be sold primarily in contractor
10  special offer pricing. Apothecon's wholesale
11  special offer pricing for albuterol matches
12  Warrick and Zenith, the two albuterol market
13  leaders."
14  Q.  Is this memorandum communicating the
15  price changes that are found in the following
16  page bearing the Bates number 584?
17  A.  They are communicating prices, so I
18  can assume they are the price changes.
19  Q.  Would you have communicated these
20  price changes to publishers?
21  MR. EDWARDS:  Which ones?
22  MR. MATT:  The ones direct list price

**72**

1  and wholesale list price.
2  A.  I would.
3  Q.  I don't have any more questions on
4  that document.
5  (Exhibit Kaszuba 006, documents bearing
6  production Nos. BMSAWP/0000095 through
7  BMSAWP/0000120, marked for identification,
8  as of this date.)
9  Q.  The court reporter has marked as
10  Exhibit Kaszuba 006 to your deposition another set of
11  documents I believe were produced from your
12  files and they bear Bates numbers 0000095 to 120.
13  I would like to draw your attention to
14  the memorandum found on page 105.
15  Do you believe this is a memorandum
16  that you would have received in the course of
17  your responsibilities at BMS?
18  A.  I do believe.
19  Q.  Could you read out loud the paragraph
20  entitled "Background," please.
21  A.  "To accomplish rapid introduction of
22  Trimox capsules 500-milligram 3,000s into the

**73**

1  market wholesale list prices must be
2  established. It is prudent to point out at this
3  that these wholesale prices do not reflect
4  actual selling prices as Trimox capsules
5  500-milligram 3,000s will be sold primarily at
6  contract or special offer pricing. The proposed
7  pricing is prorated directly from the 500-count
8  bottle prices."
9  Q.  Is this memorandum referring to the
10  next page which bears Bates number 106?
11  A.  Yes.
12  Q.  So $961.58 was the new direct list price?
13  A.  Correct.
14  Q.  $913.50 was the new wholesale list price?
15  A.  Correct.
16  Q.  And the anticipated AWP was $1,141.86,
17  correct?
18  A.  As listed on this document, yes.
19  Q.  Would you have communicated a direct
20  list price and wholesale list prices to the
21  publishers?
22  A.  Yes, I would.

Denise M. Kaszuba    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 18, 2005
New York, NY

74

1  Q.  On the first page of this document,
2  the Bates number ending in 95, is that your
3  signature?
4  A.  Yes, it is.
5  Q.  And Beth Radar is an employee of First
6  Data Bank at this time?
7  A.  Yes.
8  Q.  This time being 1992?
9  A.  Yes.
10  Q.  Did you prepare this letter?
11  A.  Yes, I did.
12  Q.  And the next page, the Bates numbers
13  ending in 96, could you identify this for us?
14  A.  This is a document containing Trimox,
15  which contains wholesale direct First Data
16  Bank's AWP, MediSpan's AWP and Red Book's AWP.
17  Q.  Is this a Price-Chek report?
18  A.  No, this is not.
19  Q.  Would it be a price alert — I am
20  sorry, a Price Pro report?
21  A.  No, it is not.
22  Q.  The file name says AWP 93.

75

1       Is this something that you prepared?
2  A.  I may have.
3  Q.  If you did, where would you have
4  obtained that information?
5  A.  The wholesale and direct price would
6  have been obtained from the price master file,
7  price authorization system, and then the various
8  AWPs would have been obtained from the various
9  data services.
10  Q.  The next page marked Bates number 97,
11  is this an e-mail that you received from Joseph
12  Grotzinger?
13  A.  It is an e-mail I received from him, yes.
14  Q.  If you know, what was his title at
15  that time?
16  A.  Pardon me?
17  Q.  Do you know what his title was at that
18  time?
19  A.  He was product manager — I don't know
20  exactly.
21  Q.  Would he have been in marketing?
22  A.  He would have been in marketing.

76

1       Q.  Do you see in the text he says,
2  "Wal-Mart is starting to buy the unit of use and
3  we need AWPs established for their third-party
4  reimbursement to work properly."
5       Do you see that sentence?  That is the
6  last sentence of the e-mail, right before it
7  says "Please advise."
8  A.  Yes, I do see that.
9  Q.  How is an AWP established in this
10  instance for this particular drug?  Was this a
11  new line of drug?
12       I am sorry, I just referenced the
13  first sentence, which says it was a price
14  increase.
15       I will ask you a broader question.
16       What would you have done in response
17  to this e-mail?
18  A.  In response to this e-mail I would
19  have done nothing only because, again, when we
20  implement price increases, I cannot respond to a
21  product manager's request.
22  Q.  You need to have multiple manager

77

1  sign-off?
2  A.  Correct.
3  Q.  He is not on the official list, correct?
4  A.  Correct.
5  Q.  SMZ/TMP suspension, is that Trimox?
6  A.  Excuse me?
7  Q.  Is that another way of referring to Trimox?
8  A.  SMZ?
9  Q.  Yes.
10  A.  No.
11  Q.  Can you look at the page that follows,
12  the Bates numbers ending with 98.
13  A.  Yes.
14  Q.  Can you read that paragraph out loud
15  that starts with "Background."
16  A.  "Background:  We were successful in
17  using our unit of use packaging to secure the
18  Trimox capsule business at Wal-Mart.  It is
19  necessary to furnish wholesale pricing to the
20  pricing publishers to enable them to establish
21  AWPs for third-party reimbursement purposes.  It
22  is prudent to point out at this time that these

Denise M. Kaszuba    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 18, 2005
New York, NY

78

1  wholesale prices do not reflect actual selling
2  prices as Trimox unit of use would be sold
3  primarily at contractor special offer pricing."
4      Q.  It looks like the next page is another
5  copy of the same memo, correct?
6      A. · Yes.
7      Q.  Then the next page with the Bates
8  numbers ending in 100, that says "SMZ/TMP oral
9  suspension."
10      My question is, does that relate to
11  discussion of Trimox?
12      A.  No, it does not.
13      Q.  Thanks for clarifying that point.
14      Would you look at the two pages ending
15  in Bates numbers 101 and 102, please.
16      A.  Yes.
17      Q.  On 102, would you please read out loud
18  the paragraph entitled "Background."
19      A.  "SMZ/TMP oral suspension is currently
20  manufactured by ALPharma and Teva, implementing
21  price increases in the range of 67 to 83 percent
22  for this product. Commodity pricing is

79

1  increasing proportionately. While these
2  wholesale list prices do not reflect actual
3  selling prices, we need to increase our ASP
4  pricing across all areas — wholesale list,
5  direct list, wholesale special offer, bid
6  pricing -- to maintain profit parity."
7      Q.  Do you believe that the page we just
8  looked at with the Bates number ending in 100
9  pertains to the documents found on pages 101 and
10  102?
11      A.  It may.
12      Q.  Looking at page 102, would you have
13  implemented this price increase on the SMZ/TMP
14  oral suspension?
15      A.  Not based on this documentation,
16  because there are no signatures, so I would not
17  have.
18      Q.  Thank you. Those are all of the
19  questions that I have on that one.
20      Let's talk about the process of
21  communicating prices to others.
22      The plaintiffs in this case served an

80

1  interrogatory, which means a question, to BMS as
2  a corporation and BMS, through its lawyers,
3  responded.
4      I would like to have that marked as an
5  exhibit and I will ask you some questions about
6  that.
7      (Exhibit Kaszuba 007, two-page excerpt ·
8  from interrogatories containing
9  interrogatory number 5 and answer, marked
10  for identification, as of this date.)
11      Q.  This is actually an excerpt from a
12  larger set of interrogatories and the court
13  reporter has marked that indicated by the E
14  stamp as E served on January 19, 2004,
15      Interrogatory number 5 asks, "With
16  respect to each AWPID, please describe how you
17  calculate the prices and/or data reported to
18  Medical Economics, Red Book, First Data Bank or
19  MediSpan or any other such entity that gathers
20  and publishes either average wholesale prices or
21  wholesale acquisition costs."
22      Underneath that is the answer in which

81

1  BMS interposes an objection·and then subject to
2  that objection provides an answer beginning with ·
3  "Generally speaking."
4      I would like you to read out loud the
5  entire paragraph that begins "Generally speaking,"
6  please.
7      A.  "Generally speaking, there is a
8  multistep information flow between BMS and the·
9  above publications. In step 1, someone from the.
10  finance department within BMS sends to the
11  pricing administration department either a price
12  or new drug or a price increase on an existing
13  drug, the latter usually expressed as a
14  percentage figure, five percent increase from
15  the earlier price.
16      "In step 2, pricing administration
17  inputs the information into the BMS internal
18  computer system and in step 3 customers are
19  notified of the new prices. This is done via
20  Western Union, mailgram and fax or e-mail.
21      "In step 4, the publications are
22  notified. Prior to August 2001, pricing

98

1  any time other than August 10, 1992?
2     A.  Not that I recall.
3     Q.  Are you familiar with the markup
4  factors First Data Bank uses for BMS products?
5     A.  Yes, I am.
6     Q.  What are they today?
7     A.  First Data Bank's, I think they are 25
8  percent.
9     Q.  That is 25 percent for all BMS labeled
10 products; is that correct?
11    A.  I'm assuming.
12    Q.  At some point, as we've seen earlier,
13 at least for some labeler codes, it was 20
14 percent, correct?
15    A.  Correct.
16    Q.  Do you know when they were all changed
17 to 25 percent?
18    A.  In 2000 at some point. Not the year
19 2000, but 2001-2002. I am not quite certain.
20    Q.  When that change occurred, did you
21 notice that it had occurred?
22    A.  It was brought to my attention that it

99

1  had occurred.
2     Q.  How was that brought to your attention?
3     A.  It was brought to my attention by a
4  trade operations manager who was notified by a
5  customer who was upset.
6     Q.  Who was the trade operations manager
7  that you spoke with?
8     A.  Wayne Roberts.
9     Q.  So when you heard about this, what did
10 you do?
11    A.  I contacted First Data Bank.
12    Q.  Who did you contact specifically?
13    A.  Kay Morgan.
14    Q.  What did she say?
15    A.  Kay Morgan just said their pricing
16 policy had changed and they were changing the
17 factor to 25 percent.
18    Q.  Did she have any other explanation?
19    A.  Not that I -- she did mention that she
20 was -- she gave an explanation in the sense that
21 it affected a lot of pharmaceutical products,
22 pharmaceutical companies.

100

1     Q.  Did she tell you why the policy that
2  she referenced had changed?
3     A.  Actually, she sent me a document, and
4  I don't recall the content of it, a letter that
5  she sent out to customers, I think. I think she
6  sent that to our customers following --
7     Q.  With an explanation?
8     A.  With an explanation, and I don't
9  recall the details of the letter.
10    Q.  Let's talk about Red Book.
11        What is presently the markup Red Book
12 applies to the wholesale list prices of BMS drugs?
13    A.  I don't know today.
14    Q.  Historically, do you know?
15    A.  It ranged from 20 to 25 percent.
16    Q.  At points in time in history, were you
17 generally aware of what that markup was?
18    A.  Yes.
19    Q.  Same question for First Data Bank, you
20 were generally aware at the time --
21    A.  Yes.
22    Q.  And MediSpan?

101

1     A.  Yes.
2     Q.  The same question, you were generally
3  aware of the markups at the time?
4     A.  Yes.
5     Q.  What were they at MediSpan?
6     A.  They also ranged between 20 and 25
7  percent.
8     Q.  At any time did you or anyone under
9  your supervision conduct any sort of a study
10 into what the wholesalers were charging for BMS
11 products?
12    A.  No.
13    Q.  Did it ever occur to you that BMS
14 should do that?
15    A.  No.
16        MR. EDWARDS:  We have been going for
17 quite a while now, two hours, I think, at
18 least.
19        Could we take a break?
20        MR. MATT:  Let's go off the record, we
21 will take a break.
22        (Recess taken.)

Denise M. Kaszuba    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 18, 2005
New York, NY

102

1   BY MR. MATT:
2      Q.  Ms. Kaszuba, before our break, we were
3   discussing Exhibit Kaszuba 008. I would like you to take
4   a look at that again.
5          Looking at the page with the Bates
6   number ending 246, it says at the bottom there,
7   the last paragraph of this office dispatch says,
8   "I will pick up this to do another survey in 90
9   days just in case the wholesalers/competition
10  have been slow to make changes to their pricing."
11         Do you know whether within three to
12  six months of your letter which you sent on
13  August 10th that the markups on BMS oncology
14  drugs were changed to 25 percent?
15     A.  Could you just restate that question?
16  I am sorry.
17     Q.  Sure.
18         I think you testified that you didn't
19  believe that they made any changes based
20  on this, correct?
21     A.  MediSpan, correct.
22     Q.  And then together we explored whether

103

1   the labeler 0003 had a 1.25 markup, and it did,
2   according to the office dispatch letter.
3          What I am getting at is this:  Did any
4   changes occur subsequent to September 19th?
5      A.  Did any changes occur in MediSpan's
6   database subsequent to this?
7      Q.  Just on the BMS oncology drugs.
8      A.  No.
9          Again, there are only two products
10  within the labeler code 0003 and they were
11  Squibb's and they may have already had a factor
12  of 25 percent.
13     Q.  You don't know for certain if they had
14  a factor of 25 percent at the time?
15     A.  I don't know for sure.
16     Q.  It's your understanding that for other
17  BMS oncology drugs, MediSpan did not make the
18  change to 25 percent?
19     A.  It is my understanding that they did not.
20     Q.  What I am trying to find out is, at
21  some point thereafter, in the following three to
22  six months, was a change made?

104

1      A.  No, not that I know of.
2      Q.  Let's talk about First Data Bank.
3          Did First Data Bank make the change
4   from 20.5 percent to 25 percent that you
5   requested?
6      A.  No, they did not.
7      Q.  The same follow-up question, do you
8   know whether in a subsequent time period of
9   about three to six months later, did they make
10  the change to 25 percent?
11     A.  No, they did not.
12     Q.  Have you ever communicated any markup
13  factor changes to wholesalers?
14     A.  No.
15     Q.  At any point in time you don't recall
16  ever doing that?
17     A.  No, I do not recall.
18     Q.  Let's talk about for a moment the
19  information sent back to BMS by the publications
20  after you provide the wholesale list prices.
21         I think you testified earlier that
22  they sent back AWPs.

105

1      A.  Correct.
2      Q.  Does your department review those AWPs
3   for reasonability?
4      A.  On sporadic we may review them.
5      Q.  And when you review them, what are you
6   looking for?
7      A.  The information that they provide back
8   to us?
9      Q.  Correct.
10     A.  We are looking to ensure that the
11  product information is the correct presentation.
12  We are looking to ensure that the WLP or DP is
13  correct. Then we are actually extracting and
14  taking the AWP historically to put on our
15  internal price list.
16     Q.  And do you review the AWP itself for
17  reasonability as well?
18     A.  On a sporadic basis, we had.
19     Q.  And when you say you would
20  sporadically review it, what do you mean by that?
21     A.  Again, based on the AWPs from a prior
22  publication, internal price list, we may compare

Denise M. Kaszuba   HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY   August 18, 2005
New York, NY

106

1    the AWP.
2        Q.   Okay.
3            Do you also review the new AWP to
4    determine what markup factor was applied to the WLP?
5        A.   I had done.  It was not a consistent
6    practice, but --
7            (Exhibit Kaszuba 009, documents bearing
8    production Nos. BMS/AWP/000186646 through
9    BMS/AWP/000186649, marked for
10   identification, as of this date.)
11       Q.   The court reporter has marked as
12   Exhibit Kaszuba 009 to your deposition a document entitled
13   "Price Increase/Decrease Notification Process,"
14   and it contains the Bates numbers 000186646 to 49.
15           Do you recognize this document?
16       A.   Yes, I do.
17       Q.   Take a moment to review that and let
18   me know when you are ready for some more questions.
19       A.   Okay.
20       Q.   Do you recognize this document?
21       A.   I do.
22       Q.   Is this something that you prepared?

107

1        A.   No, it is not.
2        Q.   Do you know who prepared that?
3        A.   I believe it was Mimi Leake, who was a
4    pricing analyst.
5        Q.   At the time she prepared it, it was
6    under your supervision, correct?
7        A.   Correct.
8        Q.   Can you give us an approximate time at
9    which this was created?
10       A.   I don't know exactly when, but it had
11   to be in the time period, you know, she
12   supported this activity, so it's like late 2001
13   to 2003.
14       Q.   Can we narrow that further by
15   concluding, based on the information in
16   paragraph 5, that it was created back when BMS
17   reported two separate prices, the wholesale
18   price list and direct price?
19       A.   It was definitely when we had two-tier
20   pricing, correct.
21       Q.   Do you believe, based on your review
22   of the document, that this document accurately

108

1    described the price increase/decrease
2    notification process at that time?
3        A.   It is pretty consistent in what we do.
4        Q.   Is there anything that jumps out at
5    you as being incorrect on this document?
6        A.   Nothing that jumps out.
7        Q.   I would like to draw your attention at
8    the last page, paragraph 18.
9            Can you read that out loud for us,
10   please?
11       A.   "Obtaining AWPs from the data services
12   First Data Bank and Red Book approximate
13   turnaround time is two to three days.  Review
14   AWPs for reasonability, i.e. 20 to 25 percent
15   higher than the new wholesale price.  AWPs are
16   for internal use only."
17       Q.   That is consistent with the testimony
18   you gave just before we introduced this exhibit,
19   correct?
20       A.   Correct.
21       Q.   And number 19 says update internal
22   price lists with new AWPs?

109

1        A.   Correct.
2        Q.   Is that a reference to the internal
3    price list we talked about earlier?
4        A.   Yes.
5        Q.   On the prior page, with the Bates
6    numbers ending in 648, there is a paragraph that
7    says sales force communications.
8        A.   Correct.
9        Q.   And little letter C references NID
10   sales forces.
11           What does NID refer to?
12       A.   Neuro infectious and dermatology, it
13   is a group within primary care.
14       Q.   Did your department ever send AWPs to
15   BMS oncology sales representatives?
16       A.   We did.
17       Q.   You did?
18       A.   Yes.
19       Q.   What form would they be in?
20       A.   It was a price list, a pocket reference.
21       Q.   What information -- pocket reference,
22   was that the name you called it, you used?

110

1   A.   Yes, Bristol-Myers Squibb pocket
2   reference.
3   Q.   What information was contained in the
4   pocket reference?
5   A.   The information found on it was the
6   product and pricing information, the wholesale
7   price, direct price, and I am not certain if we
8   had two columns for wholesale and direct. We
9   also had the AWPs from all three data services.
10   Q.   During what time period -- first of
11   all, back up.
12        The BMS pocket reference was sent by
13   your department?
14   A.   It was, yes.
15   Q.   It was put together by your department
16   as well?
17   A.   Yes.
18   Q.   What time period was this done?
19   A.   It was in the nineties.
20   Q.   Was there a point in time in which you
21   stopped, your department stopped sending the BMS
22   pocket reference to the oncology sales persons?

111

1   A.   We stopped -- I don't recall when we
2   stopped. We stopped doing a lot of official
3   publications. We weren't turning around list
4   price and so the pocket reference was part of
5   that official public documentation that we stopped.
6   Q.   You do recall you stopped, that your
7   area stopped providing the pocket reference at
8   some point?
9   A.   At some point, yes.
10   Q.   And you believe that that postdates
11   the 1990s?
12   A.   You know, I don't recall when we
13   actually stopped producing them.
14   Q.   Did you provide those to counsel in
15   this litigation?
16   A.   Yes.
17   Q.   Did you have all the copies of those?
18   A.   Probably not.
19   Q.   Why not?
20   A.   You know, if we had produced two or
21   three within the year, there may have been one
22   copy that we had run out of inventory, so again,

112

1   we used it and we never replenished it because
2   we never went back to reprint it.
3   Q.   Was this something that was produced
4   on a periodic basis such as quarterly or
5   annually?
6        What determined when a BMS pocket
7   reference was sent?
8   A.   Initially it was consistent when we
9   did list price changes, you know, at the time
10   we -- at the time we did list price changes and
11   if we were doing a commercial price list then we
12   would incorporate their pocket reference, but if
13   we didn't do a commercial price list, when we
14   did price increases, we did not do a pocket
15   reference. It was part of that.
16   Q.   So is it fair to say, then, that the
17   creation and dissemination by your department of
18   a BMS pocket reference usually corresponded to
19   list process changes?
20   A.   Correct.
21   Q.   Does it say BMS pocket reference on it?
22   A.   It says pocket reference. It may say

113

1   Bristol-Myers Squibb oncology pocket reference
2   or, you know, whatever --
3        MR. MATT:   Off the record.
4        (Discussion off the record.)
5   Q.   The first page of this document,
6   Exhibit Kaszuba 009, talks about the price authorization
7   system.
8   A.   Correct.
9   Q.   What is that?
10   A.   Price authorization system is the data
11   results for our list price system. Again, this
12   is what COPS uses for invoicing purposes.
13   Q.   Is the price authorization system
14   something different from the list price master
15   file?
16   A.   No, it is the same.
17   Q.   It is the same?
18   A.   Different -- yeah, it is the same.
19   Q.   And below, back to paragraph number 5
20   on the first page, it talks about a markup factor?
21   A.   Yes.
22   Q.   That is a markup factor applied to the

Denise M. Kaszuba       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       August 18, 2005
New York, NY

114

1    wholesale list price for one, for the
2    wholesaler, it doesn't have anything to do -- it
3    is not a markup factor that is used to determine
4    an AWP, correct?
5        A.   No, it is not.
6        Q.   Other than the BMS pocket reference
7    that we just went over, are there any other
8    pricing materials that your department sends
9    oncology salespeople?
10       A.   No.
11           The sales force?
12       Q.   Yes, the sales force.
13       A.   No.
14       Q.   I have a number of policy and
15   procedure documents I need your help with.
16           I am going to mark these as three
17   separate exhibits.
18           (Exhibit Kaszuba 010, documents bearing
19           production Nos. BMS/AWP/00337637 through
20           BMS/AWP/00337641, marked for identification,
21           as of this date.)
22           (Exhibit Kaszuba 011, documents bearing

115

1    production Nos. BMS/AWP/00912299 through
2    BMS/AWP/00912305, marked for identification,
3    as of this date.)
4            (Exhibit Kaszuba 012, documents bearing
5            production Nos. BMS/AWP/00337310 through
6            BMS/AWP/00337315, marked for identification,
7            as of this date.)
8        Q.   The court reporter has marked as
9    Exhibit Kaszuba 010, Exhibit Kaszuba 011 and
10   Exhibit Kaszuba 012 to your deposition
11   documents that I would characterize as
12   substantially similar but not necessarily
13   identical, and just for the record, I am going
14   to associate Bates numbers with the exhibit
15   numbers.
16       A.   Okay.
17       Q.   Exhibit Kaszuba 010 is Bates numbered 00337637
18   to 641.
19           Exhibit Kaszuba 011 has a cover page that says
20   "Policy and Procedures" and that is Bates
21   numbered 00912299 to 305 and Exhibit Kaszuba 012
22   also has a cover page on it that says "Policy

116

1    and Procedures" and its Bates numbers are
2    00337310 to 315.
3            My first question to you, Ms. Kaszuba,
4    is do you recognize any of these three documents?
5        A.   I do recognize the documents.
6        Q.   What are they?
7        A.   They are actually procedure for
8    pricing support.
9        Q.   Do you know who prepared them?
10       A.   I did.
11       Q.   Do you know when they were prepared?
12       A.   Over, I think, a period from, like,
13   1999 until maybe 2001-2002.  I am not certain.
14       Q.   Are these three different iterations?
15       A.   Three different, appears to be.
16       Q.   Over time, you think?
17       A.   Over time, yes.
18       Q.   Do you have the ability to determine
19   which was the first one that you prepared?
20       A.   No, I don't.
21       Q.   Do you have the ability to determine
22   which the last one was that you prepared?

117

1        A.   No, I don't.
2        Q.   Why did you prepare these?
3        A.   Instructional for the pricing support
4    coordinators.
5        Q.   So you provided that to the pricing
6    support coordinators?
7        A.   Correct.
8        Q.   Did you provide that to anyone else?
9        A.   Not that I recall.
10       Q.   At the time that you prepared these,
11   were they accurate reflections of the policies
12   and procedures in pricing support?
13       A.   They may have been.  Notifications may
14   have been made because -- yes, this -- you know,
15   again, this is a guide to the pricing support
16   coordinator.
17       Q.   Let me ask the question a little more
18   precisely, then.
19           At the time you prepared what has been
20   marked as Exhibit Kaszuba 010, at the time it was
21   prepared, was it an accurate reflection of the
22   pricing procedures employed by pricing support

118

1    at the time?
2        A.   It is a fair, accurate guide.
3        Q.   Exhibit Kaszuba 010, looking at the second
4    page, the Bates numbers ending 38, the first two
5    paragraphs, that tells me that this was created
6    during the time BMS had two-tier pricing; is
7    that correct?
8        A.   That is correct.
9        Q.   Paragraph 4 references Apothecon list
10   prices.
11       A.   Correct.
12       Q.   Were the Apothecon list prices always
13   found under billing category 51?
14       A.   No.
15       Q.   What other billing categories applied
16   to Apothecon drugs then?
17       A.   Other billing categories that applied
18   to Apothecon were 51, 56, 57, 58, 59, and then
19   41 through 4-G.
20       Q.   And then do you know what purchasers
21   billing category 51 referred to?
22       A.   51 was a wholesaler billing category.

119

1        Q.   What was 56?
2        A.   56 was a nonretail.
3        Q.   What was 57?
4        A.   57 was retail.
5        Q.   And 58?
6        A.   And 58 was nonretail.
7        Q.   What does nonretail mean?
8        A.   It is a hospital or clinic.
9        Q.   And 59, billing category 5, what was
10   that?
11       A.   59 is physician.
12       Q.   Could you read the sentence beginning
13   "If we never."
14       A.   "If we never sell these multisource
15   products at the high billing category 51 price,
16   why not reduce the bill cap 51, 56, 57, 58 and
17   59 price."
18       Q.   Can you read the next paragraph,
19   please.
20       A.   "Since the AWP, average wholesale
21   price, is calculated based on the wholesale
22   list, retailers benefit from a high AWP price

120

1    under the reimbursement policies of insurers."
2        Q.   What was the source of your
3    information for that?
4        A.   I don't recall the persons or the
5    department.
6        Q.   But you would have obtained that
7    information from somewhere outside of pricing
8    support?
9        A.   Yes, I would have.
10       Q.   Could you please turn forward now to
11   page 640.
12            Number 3 says "Package Insert."
13       A.   Correct.
14       Q.   Could you read beginning with "If
15   product is not added, the following occurs."
16       A.   "The AWP, average wholesale price, is
17   not established, reimbursement of drug costs by
18   insurance companies directly or through third
19   party insurers is denied without product
20   information. NAWP products will not be added to
21   state formularies."
22       Q.   When you reference state formularies,

121

1    what does that refer to?
2        A.   That refers to Medicaid, state
3    agencies.
4        Q.   Exhibit Kaszuba 011 is another policy and
5    procedures document.
6            At the time you prepared this document
7    which has been marked as Exhibit Kaszuba 011 to your
8    deposition, do you believe that it represented a
9    fair and accurate representation of the pricing
10   support policies and procedures?
11       A.   Yes.
12       Q.   This appears to be from the time
13   period in which BMS employed two-tier pricing,
14   correct?
15       A.   Correct.
16       Q.   Those are all of the questions I have
17   on that one.
18            Exhibit Kaszuba 012, another policy and
19   procedures document, at the time you prepared
20   this document represented as Exhibit Kaszuba 012, did
21   you believe that it was a fair and accurate
22   representation of the policy and procedures of

146

1    Q.   So this is an example of the printout
2  from the Red Book showing discontinued products?
3    A.   They are asking us to verify whether
4  these products are discontinued or we still sell
5  them.
6    Q.   What would you do with this once you
7  received it?
8    A.   Actually, we would just identify if
9  these products were still being sold, and if
10  they weren't, we would just tell them to
11  discontinue them.  We would give her the last
12  ship date.
13    Q.   Exhibit Kaszuba 024 to your deposition is a
14  document that's marked with Bates numbers
15  0000478 to 482, and my question is, is this an
16  example of the use of Western Union mailgram?
17    A.   It is.
18    Q.   This was something that you created,
19  correct?
20    A.   Correct.
21    Q.   Do you know who this was sent to?
22    A.   This was sent to customers other than

147

1  wholesalers.
2    Q.   How were you able to make that
3  determination from looking at the document?
4    A.   The direct price per unit, the column
5  heading.
6    Q.   Because if it was wholesalers, it
7  would say --
8    A.   At this point, if it was wholesalers,
9  and at this point in time it would have said
10  wholesale list price per unit or wholesale price
11  per unit.
12    Q.   When did BMS begin using the phrase
13  Westwood-Squibb Pharmaceuticals?
14    A.   Westwood-Squibb?
15    Q.   Yes.
16    A.   In the '96-'97-'98, in that area.
17       Again, Squibb, prior to '95, was
18  actually distributed out of Buffalo and even
19  though it was always a subsidiary of
20  Bristol-Myers, they brought the order to cash
21  process to Plainsboro, New Jersey.  That's when
22  I know we started to address it as Westwood-Squibb,

148

1  Westwood Pharmaceuticals-Squibb.
2    Q.   Is Westwood in New Jersey, does it
3  have any geographical significance?
4    A.   Westwood is the dermatology products
5  and pretty much what does remain is out of
6  Plainsboro.
7    Q.   Exhibit Kaszuba 025 to your deposition is a
8  document which contains the Bates numbers
9  0011236 to 240.  It looks like a fax from Terri
10  Dunn to Larry Taylor.
11       The third page in, Bates number 238,
12  is this a fax that you received from Larry
13  Taylor at First Data Bank?
14    A.   We would have received these
15  sporadically, correct.
16    Q.   He is asking you to verify a shipment?
17    A.   Correct.
18    Q.   Indeed, it says, "To avoid any
19  inconsistencies with your pricing, either
20  wholesale, net, direct and/or AWP pricing,
21  please verify and document and necessary
22  corrections."

149

1       What action did you take in response
2  to this letter?
3    A.   Just by the checkmarks, I can see that
4  she was verifying the wholesale list price.
5    Q.   That isn't your checkmark?
6    A.   No, that's not mine.  This isn't --
7  this looks like Terri Dunn.
8    Q.   She was a project coordinator,
9  correct, pricing coordinator?
10    A.   Correct.
11    Q.   Exhibit Kaszuba 026 is a Red Book product
12  listing verification.  This has the Bates
13  numbers 0005609 to 5622.
14       What is this document?
15    A.   This document is actually provided
16  from the Red Book database and they provide it
17  annually or semiannually and what they are
18  doing, they request the pharmaceutical companies
19  to verify product, product and pricing
20  information.
21       Our role was to verify the product
22  information and plus list price or actually

**150**

1 wholesale list at this time and direct price and
2 product if it's active or not.
3    Q.  The copy that we have, the column
4 headings didn't turn out. The first column that
5 has 82 – the column which has 8278 in it on the
6 first page, do you see that column right here?
7    A.  Yes.
8    Q.  What is that? Is that the AWP?
9    A.  I don't know, I have no idea.
10    Q.  What about the column, it says 6616.
11       Do you know what column that is?
12    A.  No. Without the headings, I would not
13 know.
14    Q.  Is that Barbara Goetz' signature at
15 the very bottom of each page?
16    A.  Yes.
17    Q.  What does that signify?
18    A.  Actually what it is signifying, she is
19 proofing the product information and she is
20 proofing the list price information.
21    Q.  Take a look at Exhibit Kaszuba 027 next.
22    A.  Sure.

**151**

1    Q.  This is also a Red Book product
2 listing and it contains the Bates numbers
3 0005571 to 5608.
4       If you will look at page 597, it looks
5 like we can read the column headings.
6    A.  Okay.
7    Q.  The last column is price effective
8 date, correct?
9    A.  Correct.
10    Q.  The next column, what does that say,
11 based on your experience with these reports?
12    A.  The one preceding that?
13    Q.  Yes.
14    A.  You know, I don't know.
15    Q.  SWP?
16    A.  It's been years since I have looked at
17 these documents, so I really –
18    Q.  The column next to that is WAC, correct?
19    A.  Correct.
20    Q.  And the one next to that, do you
21 believe that is direct price?
22    A.  I believe it is direct, just by

**152**

1 looking at it.
2    Q.  The one after that says AWP; is that
3 correct?
4    A.  It could.
5    Q.  I guess if we had a calculator we
6 could probably figure that out because you could
7 multiply WAC times the market factor, right?
8    A.  Yes.
9    Q.  Exhibit Kaszuba 027 also has Barbara Goetz'
10 signature, correct?
11    A.  Correct.
12    Q.  She is signing that in the course of
13 her responsibilities as a BMS employee; is that
14 correct?
15    A.  She is.
16    Q.  The same question with respect to
17 Exhibit Kaszuba 026, did Barbara Goetz sign that in her
18 role as a BMS employee?
19    A.  Yes, she did.
20    Q.  Thank you.
21       Going now to Exhibit Kaszuba 028, this is a
22 document with Bates numbers 0005551 to 570.

**153**

1       Is this a fax from Wyndy Jones of
2 MediSpan to yourself?
3    A.  It is.
4    Q.  What information is she transmitting?
5    A.  She is transmitting NDC, product name,
6 unit of measure, she is providing WAC, direct
7 price, AWP, effective date and another date I
8 can't read.
9    Q.  Did you request this information?
10    A.  I am assuming I did.
11    Q.  For what purpose would you have
12 requested this?
13    A.  The purpose is for product information
14 verification, that she has actually input the
15 correct wholesale price, and also I am assuming
16 for the AWP to include on an internal price
17 list.
18    Q.  Exhibit Kaszuba 029 is Bates numbered 0005237.
19 This is a May 13, 1997 letter from Barbara Goetz
20 to Carol Flanagan at Medical Economics.
21    A.  Correct.
22    Q.  Was Barbara Goetz acting under your

# Exhibit 82

Dianne C. Ihling                                    August 12, 2005

New York, NY

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL Docket No. 01Cv12257-PBS

-------------------------------*

In re:  PHARMACEUTICAL INDUSTRY )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------*

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS                      )

-------------------------------*


                Friday, August 12, 2005

                New York, New York

                Time:  9:06 a.m.



        Deposition of DIANNE C. IHLING, held at

the offices of Hogan & Hartson, LLP, 875 Third

Avenue, New York, New York, as taken before

Josephine H. Fassett, a Shorthand Reporter and

Notary Public of the State of New York.

Dianne C. Ihling

August 12, 2005

New York, NY

90

1  whether it was 20 or 25 percent?
2  A    No.
3  Q    How about for Redbook, are you
4  familiar with the markup factor applied by
5  Redbook?
6  A    I always assumed that it was the
7  same but I don't know, I don't know specifically.
8  Q    Okay. And did you at any point in
9  time in your responsibilities as Director of
10 Pricing and Institutional Operations work with the
11 publications on determining that markup factor?
12 A    No, never.
13 Q    How are AWPs used in the industry
14 based on your experience?
15       MR. EDWARDS: Object to the form.
16 Used by who?
17       MR. MATT: Just, you know,
18 industry -- well, strike that, I'll be more
19 specific.
20 BY MR. MATT:
21 Q    Would you agree that during the time
22 you were employed by BMS that governmental and

91

1  private payers had adopted an industry practice of
2  using AWPs as a benchmark for determining
3  reimbursement rates?
4        MR. EDWARDS: Object to the form.
5  It assumes facts not in evidence.
6        Go ahead.
7        THE WITNESS: Go ahead?
8        MR. EDWARDS: Yes.
9  A    Okay. During the time that I was
10 employed by Bristol-Myers Squibb and prior to that
11 the figure known as Average Wholesale Price was
12 used as, to my knowledge, as a benchmark when
13 reimbursing when -- sorry -- when people went to
14 the pharmacy to buy their drug product.
15 Q    So you're familiar that Medicare
16 used it as a reimbursement?
17 A    I don't have specific knowledge.
18       MR. EDWARDS: Object.
19 Let's hear the end of the
20 question. You sort of mumbled at the end
21 of your question and I want to make sure
22 I understand the question.

92

1        MR. MATT: I didn't finish it.
2  BY MR. MATT:
3  Q    Are you aware that Medicare used it
4  as a reimbursement benchmark in its formula
5  reimbursing for Part B drugs?
6        MR. EDWARDS: Objection.
7  A    I'm vaguely aware of that, I don't
8  have specific knowledge of it.
9  Q    So you're more familiar with the use
10 of AWP to have at the pharmacy level because of
11 your prior experience working at CareMark or, I'm
12 sorry, PCS?
13 A    I am more familiar with the
14 reimbursement constructs of a large PBM.
15 Q    In your experience they were all
16 based on AWP, correct?
17 A    To the best of my recollection.
18       MR. EDWARDS: Objection. Note my
19 objection.
20       Go ahead.
21 Q    To the best of your recollection
22 yes?

93

1  A    To the best of my recollection most
2  pharmacy, most PBM formulas are an AWP-based
3  formula.
4  Q    Did you or anyone under your
5  supervision ever conduct a survey of wholesalers
6  in order to determine whether the market factors
7  applied by the publishers to the BMS list prices
8  were accurate in that they reflected the real
9  prices in the marketplace?
10       MR. EDWARDS: Objection. Assumes
11 facts not in evidence.
12       Go ahead.
13 A    I don't believe so.
14 Q    You just don't recall whether that
15 was ever done under your supervision?
16 A    I don't recall and I don't believe
17 that -- I don't believe that was done by anyone in
18 my department.
19 Q    Okay. Is there a particular reason
20 why it was not done?
21 A    I don't -- I mean, the company
22 doesn't set AWP so I --

# Exhibit 83

Christof A. Marre    HIGHLY CONFIDENTIAL    August 26, 2005
Cambridge, MA

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

In re: PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )

                                )

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS                     )

                                )

DEPOSITION of CHRISTOF A. MARRE,

called as a witness by and on behalf of the

Plaintiffs, pursuant to the applicable provisions

of the Federal Rules of Civil Procedure, before P.

Jodi Ohnemus, Notary Public, Certified Shorthand

Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of

Hagens, Berman, Sobol, Shapiro, LLP, One Main

Street, Cambridge, Massachusetts, on Friday, 26

August, 2005, commencing at 8:40 a.m.

Christof A. Marre     HIGHLY CONFIDENTIAL     August 26, 2005
Cambridge, MA

26

1  BMS. We discussed pricing for other multisource
2  products. We discussed private label strategies.
3  We also discussed generic defense strategies for
4  Paraplatin.
5      Q. How often would you communicate with these
6  individuals at OTN?
7      A. Typically, once or twice a week.
8      Q. Have you heard of the phrase One BMS?
9      A. Yes.
10     Q. And what does that mean to you?
11     A. I believe this phrase was coined by Peter
12  Dolan shortly after he became CEO, and the idea was
13  to have the different parts that make up BMS work
14  together as one company.
15     Q. And is it your understanding that applied
16  to BMS and OTN?
17     A. Yes.
18     Q. OTN was a wholly-owned subsidiary of BMS
19  at the time you worked there, right?
20     A. Right.
21     Q. Did you work with the BMS oncology sales
22  force?

27

1      A. I did.
2      Q. And can you please describe the nature of
3  your work with the sales force.
4      A. In which of my capacities?
5      Q. Start with the first one, marketing
6  manager.
7      A. As a marketing manager, one of my roles
8  was to create tactics and programs that could be
9  used by our sales force. The main interaction with
10  the sales force was during the POA meetings, which
11  are the sales meetings which take place twice a
12  year where I would present the tactics and programs
13  to them. I would also interact on an ad hoc basis
14  to communicate the availability of new tactics and
15  programs. I would also spend time with individual
16  members of the sales force during field trips, on
17  sales force advisory boards, or if they contacted
18  me with questions.
19     Q. "Field trips," what does that mean?
20     A. That is the name for somebody from the
21  home office spending time with somebody in the
22  field. It's a ride-along with the sales rep.

28

1      Q. Oh, ride-along --
2      A. Yes.
3      Q. -- to visits with the clients?
4      A. Correct.
5      Q. So, have you visited clients with
6  office-based oncology clients before?
7      A. Yes, both office-based and hospital-based
8  oncology.
9      Q. On the visits that you were participating
10  in, what did you learn about the concerns of the
11  office-based oncology physicians and staff?
12     A. In which of my functions?
13     Q. Still sticking with the marketing manager
14  function.
15     A. Okay. We would learn more about how
16  physicians make decisions when they treat patients
17  with any of the tumor types that I was responsible
18  for.
19     Q. Did you discuss pricing?
20     A. No.
21     Q. No. When you use the acronym, "POA," is
22  that an acronym for plan of attack?

29

1      A. Plan of action.
2      Q. Plan of action. In your role as marketing
3  manager, when you said you create programs for use
4  by the sales force, can you give some examples?
5      A. Yes. We would, for one, offer training to
6  the sales force on the disease state and on
7  different drugs used to treat those tumors and on
8  the outcome of different trials with different
9  drugs in those tumor types.
10        We would also offer education, educational
11  programs that our sales force could then roll out
12  to their customers. We also put together medical
13  information to answer requests by physicians on
14  these tumor types.
15     Q. And that medical information is in
16  documents that a salesperson can leave with a
17  physician?
18     A. No, these were documents that physicians
19  could request and that would be sent directly to
20  the physician from our medical information
21  department.
22     Q. In your role as a marketing manager, did

Christof A. Marre          HIGHLY CONFIDENTIAL          August 26, 2005
Cambridge, MA

34

1  using contracts an advantage?
2      A.  Typically, hospitals and office-based
3  oncologists don't buy directly from a manufacturer.
4  They buy their products from a wholesaler or
5  distributor.  The fact that we have a sales force
6  that calls on oncologists, however, gives us direct
7  access to these customers.  And we were competing
8  with generic manufacturers who, for the most part,
9  had to rely on distributors and wholesalers,
10  because they didn't have a sales force or didn't
11  have a large sales force with the reach that we
12  did.  So, this was a competitive advantage for
13  Bristol-Myers Squibb that we wanted to leverage.
14      Q.  So, is the advantage then in having a
15  direct relationship through the contract, even
16  though the drugs are still purchased by the
17  customer through a wholesaler?
18      A.  That's correct.
19      Q.  Is that accurate?
20      A.  So, they continue to buy the drug from the
21  wholesaler, but the wholesaler will respect and
22  apply whatever price we've negotiated directly with

35

1  the customer.
2      Q.  Was it your goal to have BMS sign
3  contracts with most of the large hospitals in the
4  country?
5      A.  Yes.
6      Q.  And were you successful in that goal?
7      A.  I believe we were successful.  I can't say
8  exactly how many contracts we signed, but it must
9  have been in the 50s.
10      Q.  Percentile?
11      A.  No, 50 contracts with 50 institutions.
12      Q.  And do you have any sort of an
13  appreciation for what percentage of the market for
14  hospital oncology drugs those 50 or so institutions
15  represented?
16      A.  I don't recall the exact percentage for
17  that segment of the market.  Our overall share of
18  the Paclitaxel business, for example, or for other
19  products that had generic competition must have
20  been around 50 percent.
21      Q.  And are you speaking specifically to the
22  hospital market?

36

1      A.  No, the overall market.
2      Q.  The overall market.  What are some of the
3  largest hospitals that BMS had contracts with?
4      A.  Memorial Sloan Kettering, M.D. Anderson,
5  University of Michigan, Fox Chase Cancer Center.
6      Q.  Those are the big ones that come to mind?
7      A.  Yeah.
8      Q.  Where is Fox Chase located?
9      A.  Philadelphia.
10      Q.  M.D. Anderson's in Houston, right?
11      A.  Right.
12      Q.  Memorial Sloan Kettering is New York?
13      A.  New York City.
14      Q.  And Michigan is in Ann Arbor?
15      A.  Yeah.
16      Q.  Do you know what percentage of the sales
17  of BMSO drugs were done under contract?
18      A.  No.
19      Q.  No?  Do you know the approximate
20  percentage of all oncology customers that purchased
21  BMSO drugs under a contract with BMS?
22      A.  No.

37

1      Q.  No.  So, is it just too general a question
2  for you to be able to answer?
3      A.  Yeah.
4      Q.  How did BMS determine which organizations
5  to sign contracts with?
6      A.  The primary determinant was the sales
7  volume, and I guess the second determinant was
8  their willingness to do contracting.
9      Q.  And when you say, "sales volume," what do
10  you mean?
11      A.  Number of units they buy.
12      Q.  So, that's another way of saying --
13  targeting the larger organizations?
14      A.  Yeah.  Uh-huh.
15      Q.  And the contracts, did they always contain
16  pricing that was lower than the wholesale list
17  price that BMS offered products at, right?
18      A.  Yes, although there were some products
19  that we would not offer contract pricing on.
20      Q.  And what products -- and what products
21  were they and at what point in time?
22      A.  Uh-huh.  Well, Paraplatin was the main

Christof A. Marre    HIGHLY CONFIDENTIAL    August 26, 2005
Cambridge, MA

38

1  product that for a long time we didn't offer
2  discounts to most customers. And only when it came
3  closer to losing exclusivity did we start
4  considering offering some small discounts.
5      Q.  So, you didn't offer discounts before the
6  time that you got close to the loss of exclusivity,
7  because it was – the only product in – in other
8  words, it didn't have any competition at that point
9  in time, right?
10     A.  That's correct. But we did have some
11 customers who did receive discounts or some other
12 price consideration even before that.
13     Q.  And the contract – the prices contained
14 in contracts between BMS and customers, those are
15 confidential and not publicly available, correct?
16     A.  Yeah.
17     Q.  I'll just make sure I understand the
18 contracting process with office-based oncologists.
19     A.  Uh-huh.
20     Q.  Those were signed through OTN?
21     A.  Uh-huh.
22     Q.  Okay. But the contracts that OTN would

39

1  offer its customers originated in your department,
2  right?
3      A.  The way I would put it was the contract
4  was written by OTN, because they represented many
5  different manufacturers and had many types of
6  contracts, but whenever the contracts included BMS
7  products, we would get involved in revising the
8  contract language and approving the terms and
9  conditions.
10     Q.  Including price.
11     A.  Right.
12     Q.  And was there a specific person at OTN you
13 would work with on that one issue?
14     A.  I think there were a number of people
15 involved with that. The one person who I
16 interacted with the most until he left OTN was
17 Sandy McMahon.
18     Q.  And do you know when he left OTN?
19     A.  I don't recall the exact date.
20     Q.  Was it before you left BMS?
21     A.  Yes.
22     Q.  Okay. And the POA meetings you talked

40

1  about earlier, were the average wholesale prices of
2  drugs generally discussed?
3      A.  Which meetings?
4      Q.  At the POA meetings.
5      A.  No.
6      Q.  Were there any discussions of the
7  differences between the AWPs and actual – actual
8  acquisition costs of drugs?
9      A.  Well, when we became more involved with
10 contracting, we would talk about the price erosion
11 of the price for Taxol, for example.
12     Q.  And how would that relate to AWPs?
13     A.  When almost any drug has exclusivity, you
14 sell the drug at list price. But once you face
15 generic competition, the generics try to gain
16 market share by bringing the price down and
17 offering discounts to their customers. So, as the
18 branded company, your choice is either to quickly
19 lose business if you don't bring your contract
20 prices in line with the market, or to offer
21 competitive prices and hope to maintain a
22 significant volume share of the market.

41

1      Q.  Okay. Has that – I discern from an
2  earlier answer that there was some relation between
3  that and AWP, and that's what I'm trying to follow
4  up. I believe my initial question asked whether
5  there were any discussions between – about the
6  difference between the average wholesale price for
7  a drug and its actual acquisition cost.
8      A.  I think we were more interested in the
9  difference between the price that we offered to our
10 customers and the price that the generic
11 competitors would offer to the customers.
12     Q.  Does that mean that you've never discussed
13 AWP with anyone at BMS?
14     A.  No. Of course, where relevant, we are
15 going to discuss AWP.
16     Q.  Let me then explore with you the use of
17 AWP –
18     A.  Uh-huh.
19     Q.  – that you made when you were director of
20 marketing.
21     A.  Uh-huh.
22     Q.  Let me lay some foundations first. What

Christof A. Marre        HIGHLY CONFIDENTIAL        August 26, 2005
Cambridge, MA

---

42

1   is your understanding of the term "AWP"?
2       A.  Average wholesale price.
3       Q.  Is it an average of wholesale prices in
4   the market?
5       A.  It's a price that gets published in
6   Redbook and First Data Source that we don't have
7   direct control over.
8       Q.  And that was your understanding when you
9   were marketing director back in 2000 —
10      A.  That was my understanding, yeah.
11      Q.  And do you understand the relationship
12  between BMS wholesale list price —
13      A.  Uh-huh.
14      Q.  — and AWP?
15      A.  Well, my understanding is that we
16  controlled our list price, and we would submit our
17  list prices to these different publications, and
18  they would then apply some kind of formula to
19  arrive at AWP, which would then — they would then
20  publish.
21      Q.  And are you familiar with what that
22  formula was?  Was it a markup factor?

---

43

1       A.  Yes, it was always confusing to me, and it
2   wasn't really relevant to my activities, so my
3   understanding is that the factor was 1.25 or 1.3,
4   but it wasn't clear to me which factor applied to
5   which company to which publication.
6       Q.  Did you believe that there were purchasers
7   in the marketplace that would actually buy BMS
8   drugs at the AWP?
9       A.  I don't have evidence of that.  The price
10  that most wholesalers and distributors would apply
11  would be our list price.
12      Q.  Do you have any insight into whether
13  wholesalers actually sold their products to
14  customers at the AWPs that were reported by these
15  publications?
16      A.  No, because we sold our products at our
17  list price to the wholesaler, and it was up to them
18  at which price they would sell it on to their
19  customers.  But since there's competition between
20  different wholesalers and different distributors,
21  they wouldn't be able to command a 25 or 30 percent
22  margin.  They would quickly be turned down by the

---

44

1   other wholesalers or distributors.
2       Q.  So, you don't believe then that the
3   wholesalers were selling those drugs at those
4   margins?
5       A.  I don't believe that, no.
6       Q.  And were the margins — what do you
7   believe the wholesaler margins are?
8       A.  They're minimal.
9       Q.  It's 1 to 3 percent, right?
10      A.  Yeah, I think the wholesaler margin is
11  primarily the prompt payment discount that we
12  provide.
13      Q.  And is that usually 1 or 2 percent?
14      A.  I think those are typical prompt payment
15  discounts.
16      Q.  And just so the record's clear, those are
17  discounts that BMS offers to wholesalers if they
18  pay within a certain time period, right?
19      A.  Right.
20      Q.  Is that usually 30 days?
21      A.  It can be staggered, 30, 60, 90 days, and
22  the sooner you pay, the higher the prompt payment

---

45

1   discount.
2       Q.  Okay.  As director of marketing, did it
3   ever concern you that there were average wholesale
4   prices being reported for BMS oncology drugs that
5   did not reflect the margins actually realized by
6   wholesalers?
7       A.  I never understood the term "average
8   wholesale prices," because as we just discussed,
9   those weren't average prices.
10      Q.  But did it ever concern you, though, was
11  my question?
12      A.  No, I wouldn't say it concerned me.
13      Q.  And is there a particular reason why it
14  didn't concern you, or did you just never think
15  about it?
16      A.  I'm sorry?
17      Q.  Or did you just never think about it?
18      A.  It's one of those things that someone who
19  joined the market in 2001 was probably a — had a
20  historic basis.  So, it may have been true at some
21  point in time and was no longer true, and I know
22  that in other markets I've been in in Mexico, there

---

Henderson Legal Services
(202) 220-4158

Christof A. Marre     HIGHLY CONFIDENTIAL     August 26, 2005
Cambridge, MA

46

1   was a true wholesaler markup of 18, 20 percent.
2   So, I assumed that maybe historically that's how it
3   had operated in the US, and that competition just
4   had driven down those markups. That was — if you
5   had asked me then, that's probably how I would have
6   answered it.
7       Q. So, at no time did you think to take any
8   action to try and correct the average wholesale
9   prices that were being published.
10      A. (Witness nods.)
11          MR. EDWARDS: Object to the form. Assumes
12  facts not in evidence.
13      Q. I saw you shaking your head. I want to
14  make sure that comes out on the record. Was that a
15  no?
16      A. I think we had an objection, right?
17      Q. Yeah. I was going to let the question
18  stand if you understand it.
19      A. Uh-huh.
20      Q. Do you want the court reporter to read it
21  back?
22      A. So, can you repeat the question.

47

1           MR. MATT: Why don't you go ahead.
2       (Question read back.)
3       A. Yeah, that's correct.
4       Q. Is that no?
5       A. I did not —
6       Q. You did not, okay.
7       A. — take any action.
8       Q. And did you have any discussions with
9   anyone else at BMS about average wholesale prices?
10      A. Yes, when I took on this responsibility
11  for customer marketing, as part of understanding
12  the environment, I had discussions with different
13  people to understand how all of this worked.
14      Q. Okay. And who, if you can recall, were
15  you having those discussions with?
16      A. Having discussion with my predecessor in
17  the senior marketing role.
18      Q. And who was that?
19      A. Michael Talomie.
20      Q. And can you specifically recall what Mr.
21  Talomie told you about AWP?
22      A. Well, I was interested to find out where

48

1   the wholesalers made their money, and we discussed
2   how — at which price we sell a product to the
3   wholesaler, at which price they sell it on to their
4   customers and where they make their margin.
5       Q. And you have experience with contracts,
6   so, you know, in at least some cases, the customers
7   are purchasing BMS products well below wholesale
8   list price.
9       A. Yes.
10      Q. And that generates a charge-back that goes
11  to the wholesaler?
12      A. Yes.
13      Q. So, you're familiar with the charge-back.
14      A. Yeah.
15      Q. And are there any other discussions that
16  you can recall specifically having with people at
17  BMS or OTN about AWPs?
18      A. Well — well, I learned more about the
19  role of AWPs, ah, you know, what the real
20  significance is, not as an average price at which
21  the wholesaler sells, but as a price which is used
22  to determine reimbursement, of course.

49

1       Q. So, you understand that, until recently,
2   AWP was used in the reimbursement form or for
3   Medicare Part B drugs, correct?
4       A. Yes.
5       Q. And that it was also utilized by private
6   insurers, correct?
7       A. That's my understanding.
8       Q. And what about Medicaid programs, are you
9   aware the Medicaid programs utilize AWP in their
10  reimbursement formulas?
11      A. I'm not that familiar with Medicaid
12  reimbursement.
13      Q. And who educated you, so-to-speak, about
14  these reimbursement concepts based on AWP?
15      A. I attended a seminar provided by NOCR,
16  network for — I don't know exactly what it means
17  — NOCR.
18      Q. NOCR?
19      A. Yeah.
20      Q. Is that a —
21      A. I did my own reading, different sources,
22  like the ACCC publications. I — as part of my

Christof A. Marre       HIGHLY CONFIDENTIAL       August 26, 2005
Cambridge, MA

78

1    A.  Uh-huh.
2    Q.  Do you remember that question?
3    A.  Yes.
4    Q.  And I believe one of your answers was the
5    competitive intelligence, if you were – that you
6    were receiving on contract prices?
7    A.  Yeah.  Uh-huh.
8    Q.  Did you also look at the competitor's
9    AWPs?
10   A.  No.
11   Q.  Or the competitor's WACs?
12   A.  No.
13   Q.  So, your focus was on contract pricing.
14   A.  Yeah.
15   Q.  For my work in this case, I'm familiar
16   with the different ways in which BMS provided
17   discounts off of wholesale list price.
18   A.  Uh-huh.
19   Q.  And I want to just see if you're familiar
20   with the same contracts.  We have contract prices
21   that we've already discussed today, right?
22   A.  Yeah.

79

1    Q.  Are you familiar with rebates –
2    A.  Yes.
3    Q.  – okay, and administration fees –
4    A.  Yes.
5    Q.  – and marketing fees?
6    A.  Yes.
7    Q.  And BMS offered all of these to its
8    customers, correct?
9    A.  Yeah.
10   Q.  And rebates, what's your familiarity with
11   rebating?
12   A.  Well, unlike a discount, a rebate is
13   typically not applied at the time of purchase but
14   at some later point in time.  And typically, it's
15   tied to certain criteria, certain performance
16   criteria of the contract.
17   Q.  Usually volume?
18   A.  Volume, growth, market share.
19   Q.  And the contracts with which you had
20   involvement, were rebates sometimes included in the
21   provisions?
22   A.  Yes.

80

1    Q.  Administration fees.  What is an
2    administration fee?
3    A.  Well, the way I understand it, it's a
4    percentage of your sales that you pay to a GPO as a
5    consideration for being included on their list.
6    Q.  And are there a typical range of fees that
7    you're familiar with?
8    A.  I think a typical range would be anywhere
9    from .25 to 3 percent.
10   Q.  Have you seen administration fees paid by
11   BMS that exceeded 3 percent?
12   A.  I recall that the way it was explained to
13   me, there was a maximum of 3 percent for
14   administration fees.
15   Q.  Do you know why that was a maximum?
16   A.  I believe there's a legal maximum.
17   Q.  And you're familiar with marketing fees.
18   A.  Uh-huh.
19   Q.  What is a marketing fee?
20   A.  It's a fee for services or value that goes
21   beyond being included on a contract or on a list of
22   contracted products.

81

1    Q.  Can you think of an example of a service?
2    A.  Yes.  We discussed with Novation a private
3    label arrangement whereby we would be allowed to
4    manufacture and supply Novation with our drugs
5    under their brand name, under the Nova Plus brand,
6    and we would pay a marketing fee in exchange for
7    the exclusive right to be allowed to use that brand
8    name.
9    Q.  And what drugs did BMS sell under this
10   Nova Plus arrangement?
11   A.  Depends on the period of time that you're
12   looking at.  Before I came on board, there had been
13   a very comprehensive Nova Plus arrangement between
14   BMS and Novation, which covered, I think, almost
15   all of our brands that had generic competition, and
16   then something happened in the relationship between
17   BMS and Novation where that was discontinued, and
18   then we reapproached the opportunity to include our
19   brand on Nova Plus with Novation under my
20   leadership in 2004, maybe 2003, 2004.
21   Q.  Okay.  And do you have any recollection of
22   what a typical marketing fee was?

Christof A. Marre    HIGHLY CONFIDENTIAL    August 26, 2005
Cambridge, MA

82

1    A. From some documents that we reviewed
2  yesterday that refreshed my memory. —
3      Q. Yeah.
4      A. — I remember seeing 8 percent.
5      Q. I may have one in this stack.
6      A. Yeah.
7      Q. I've got a bunch of contracts I pulled.
8      A. Yeah.
9      Q. And if I see one, I'll ask you about it.
10     A. Okay.
11     Q. Okay. So, contract prices, rebates,
12  administration fees, and marketing fees. They
13  would be reflected — and all those would be
14  reflected in a contract, right?
15     A. Yes.
16     Q. You wouldn't pay an admin fee without a
17  contract.
18     A. Correct.
19     Q. You wouldn't pay a marketing fee without a
20  contract.
21     A. Right.
22     Q. You wouldn't pay a rebate without a

83

1  contract.
2      A. Right.
3      Q. And those types of discounts are not made
4  public by BMS, right?
5      A. Yeah. I think it's unusual that they
6  would be made public.
7      Q. They're not published in any compendia
8  that you're aware of?
9      A. No. I think we have an obligation to the
10  government to disclose if any of these prices are
11  below prices that we offer the government for
12  certain types of transactions.
13     Q. Okay.
14     A. So, when that's the case, obviously, we
15  have to report that.
16     Q. But beyond that one example, you're not
17  aware of any effort by BMS to make public these
18  various discounts that we were just discussing?
19     A. Correct.
20     Q. And those various discounts are not
21  reflected in the wholesale list price. That's
22  what --

84

1      A. Yes, correct.
2      Q. No, they're not?
3      A. They're not reflective of list price.
4  List price stays the same.
5      Q. Okay. I wanted to talk to you about
6  specific products now.
7      A. Uh-huh.
8      Q. I'm going to ask you the same series of
9  questions for each specific drug and find out what
10  information you have. Blenoxane, that is a
11  multisource drug, correct?
12     A. Correct.
13     Q. Was it multisource for the entire time you
14  were at BMS?
15     A. Yes.
16     Q. And do you know when BMS first sold it?
17        MR. EDWARDS: Sold it?
18     Q. First sold it, period. I mean marketed
19  it.
20        MR. EDWARDS: You mean as a brand?
21        MR. MATT: Yes.
22     A. My understanding, it was in the early

85

1  '80s.
2      Q. Okay. So, it's certainly before your time
3  at BMS?
4      A. Yes.
5      Q. Do you recall any specific marketing
6  programs that BMS had under your tenure for
7  Blenoxane?
8      A. No, no specific Blenoxane programs other
9  than addressing requests for price matching for
10  Blenoxane. If you call that a marketing program,
11  then that was the extent of our marketing program.
12     Q. And do you have -- said price
13  matching, right?
14     A. Yes.
15     Q. And that's what we discussed earlier --
16     A. Yeah.
17     Q. -- in terms of someone presenting you with
18  a price from a distributor --
19     A. Correct.
20     Q. -- and asking BMS to match it.
21     A. Correct.
22     Q. All right. Do you have any recollections

Christof A. Marre    HIGHLY CONFIDENTIAL    August 26, 2005
Cambridge, MA

86

1  about if there was a pricing trend with Blenoxane
2  over time while you were at BMS?
3      A.  Yes, the Blenoxane price continued to --
4  to drop.
5      Q.  And was that the wholesale list price that
6  continued to drop or the contract price?
7      A.  The contract price.
8      Q.  The wholesale would probably stay
9  constant, right?
10     A.  Correct.
11     Q.  Do you know why the wholesale list price
12 reported by BMS didn't decline?
13         MR. EDWARDS: Can I have that question
14 back. I'm sorry.
15         (Question read back.)
16         MR. EDWARDS: For what?
17         MR. MATT: For Blenoxane. We're sticking
18 with Blenoxane.
19     A.  I believe it's an industry standard that
20 once a drug was generic, the list price stays
21 wherever it was when it went generic and is not
22 updated.

87

1      Q.  Do you know why that's the case?
2      A.  I don't know why that's the case.
3      Q.  You don't know. And then how do you know
4  it's an industry standard? Is that something just
5  based on your observation?
6    · A.  Yeah, based on my observation, yeah.
7      Q.  Do you believe that it -- the wholesale
8  list price did not decline because BMS did not want
9  people to know the prevailing prices that it was
10 actually charging?
11     A.  No, I don't think there was any major
12 thought given to it.
13     Q.  Okay. So, you are not aware of any
14 discussions -- did you ever have a discussion with
15 anyone at BMS in which you discussed dropping the
16 wholesale list price for Blenoxane?
17     A.  No.
18     Q.  Cytoxan. Did I pronounce that correctly?
19     A.  Yeah, Cytoxan.
20     Q.  That's also under your responsibility --
21     A.  Right. Yeah.
22     Q.  -- as director. Oh. I'm sorry. I have

88

1  to go back to Blenoxane. Who were the competitors
2  to Blenoxane?
3      A.  I don't recall who the specific
4  competitors were.
5      Q.  But Blenoxane is the brand name for
6  bleomycin sulfate, right?
7      A.  Yeah.
8      Q.  Were there several competitors --
9      A.  Yes.
10     Q.  -- you just don't recall any specific
11 names. Okay. I'll move to Cytoxan now.
12     A.  Uh-huh.
13     Q.  Cytoxan is the brand name for the BMS drug
14 known as cyclophosphamide?
15     A.  Cyclophosphamide, correct.
16     Q.  And that is a multisource drug, correct?
17     A.  Well, it's a drug that lost its
18 exclusivity and became a multisource drug as
19 generic competitors entered the market. But what I
20 noticed through my tenure was that both the
21 competitors that we were facing started exiting the
22 market. They no longer had a supply of Cytoxan.

89

1  So, de facto, we became the sole source supplier of
2  injectable Cytoxan.
3      Q.  Do you know when approximately the
4  competitors exited that market?
5      A.  I think it was towards the end of 2002,
6  beginning of 2003. ·
7      Q.  And do you know when Cytoxan lost its
8  exclusivity?
9      A.  I don't recall the exact date.
10     Q.  Was it a multisource when you started at
11 BMS?
12     A.  Yes.
13     Q.  And do you have any insight as to why the
14 competitors exited that market?
15     A.  They had manufacturing issues, it's my
16 understanding.
17     Q.  Is that in reference to quality problems
18 with the actual drug they were producing?
19     A.  It's -- Cytoxan lyophilized -- as the name
20 implies, it's a lyophilized product, and
21 lyophilization is an unstable step in the
22 manufacturing process. And some competitors had

90

1  lyophilized Cytoxan. Others had powder Cytoxan.
2  And my understanding is that both of those
3  processes were not well controlled by some of our
4  competitors. So, they decided to exit the market.
5     Q.  Okay. Do you recall any specifics
6  regarding the wholesale list price for Cytoxan over
7  time?
8     A.  What do you mean "over time"?
9     Q.  Did it stay -- did the wholesale list
10  price stay constant during the time you were at
11  BMS?
12    A.  Yes, I believe it did.
13    Q.  And the same question for contract
14  pricing. Was there a trend for contract?
15    A.  Well, when I realized that we were de
16  facto sole source, I tried to raise our contract
17  prices.
18    Q.  So, did contract pricing decrease over
19  time until you realized that Cytoxan was sole
20  source?
21    A.  I don't recall that.
22    Q.  Okay. But at the point in time when you

91

1  realized that BMS was the sole supplier, contract
2  prices increased, is that --
3     A.  Yes.
4     Q.  Did you have any specific marketing
5  programs for Cytoxan when you were at BMS?
6     A.  Other than pricing and contracting, no.
7     Q.  Let's talk about VePesid next.
8     A.  Uh-huh.
9     Q.  VePesid was BMS's brand name for
10  Etoposide, correct?
11    A.  Correct.
12    Q.  At the time you started working at BMS,
13  was VePesid an exclusive drug?
14    A.  Yes. We had two formulations, injectable
15  and oral. I know the injectable was heavily
16  genericized. I don't recall whether the oral was
17  to the same extent.
18    Q.  So, by the time you started at BMS United
19  States --
20    A.  Uh-huh.
21    Q.  -- VePesid, the injectable version, was --
22  had already lost its exclusivity?

92

1     A.  Yes.
2     Q.  And the oral formulation, do you know when
3  it lost exclusivity?
4     A.  Don't recall.
5     Q.  Did you have any responsibility for the
6  oral formulation?
7     A.  Yes, it was part of my portfolio.
8     Q.  Did you have a different pricing strategy
9  for the injectable version of VePesid than you did
10  for the oral formulation of VePesid?
11    A.  Yes, each of them had its own set of
12  competitors.
13    Q.  And can you recall specifics about pricing
14  over time for both forms? Let's say -- let's start
15  with wholesale list price.
16    A.  Yeah.
17    Q.  Did it stay constant?
18    A.  Yes.
19    Q.  Okay, for both formulations?
20    A.  Yes. Ah. No, we may have taken a price
21  increase for the tablets. This is based on the
22  review of documents we had yesterday.

93

1     Q.  Okay. And why would you have done that?
2     A.  I don't recall.
3     Q.  So, to your knowledge, the wholesale list
4  price stayed constant for the injectable version?
5     A.  Correct.
6     Q.  But you may have had a wholesale list
7  price increase at some point for the oral
8  formulation?
9     A.  Correct.
10    Q.  Let's talk about contract prices now.
11    A.  Uh-huh.
12    Q.  And let's focus on the injectable. Do you
13  have an understanding if there was a trend in
14  contract pricing for the injectable version of
15  VePesid during the time you were marketing
16  director?
17    A.  Yes, I remember new low prices being set
18  by some of our competitors.
19    Q.  You would then -- then BMS would be
20  presented with requests to --
21    A.  Correct.
22    Q.  -- lower its pricing, right?

Christof A. Marre   HIGHLY CONFIDENTIAL   August 26, 2005
Cambridge, MA

94

1    A.  Yes.
2    Q.  And did that, in fact, occur?
3    A.  With VePesid we had a problem in that the
4    price had deteriorated very massively compared to
5    other generic drugs.  So, I recall that we weren't
6    always willing to continue matching those low
7    prices.  It was already so low.
8    Q.  Nonetheless, was the trend still downward?
9    A.  Yeah.  The trend was downward.  I believe
10   we discontinued some formulations of VePesid,
11   because they were no longer profitable for us.
12   Q.  Do you know at what point in time that
13   occurred?
14   A.  I don't recall that.  Actually, no.
15   Sorry.  I think it was Cytoxan that we
16   discontinued.  One of the two.  We discontinued
17   some of the formulations —
18   Q.  Okay.
19   A.  — of the smaller formulations.
20   Q.  Let's talk about the oral version of
21   VePesid.
22   A.  Uh-huh.

95

1    Q.  Do you have any recollection if there was
2    a trend downward in contract prices for oral
3    VePesid over time?
4    A.  I don't recall specifically.
5    Q.  Just don't remember?
6    A.  Don't remember.  That was less —
7    certainly less visible than the injectable.  I
8    think it was used less than the injectable.
9    Q.  And did you have any marketing programs
10   for VePesid, either the injectable or oral
11   formulations?
12   A.  No.  Again, no specific marketing
13   programs, other than pricing and contracting.
14   Q.  Let's talk about Etopophos.
15   A.  Uh-huh.
16        MR. EDWARDS:  Would this be a good time
17   for a break?
18        (Discussion off the record.)
19        (Recess was taken.)
20   Q.  Back on the record after a break.  We were
21   talking about specific drugs, and I was going to
22   ask you about Etopophos next.

96

1    A.  Okay.
2    Q.  That's a — Etopophos is an exclusive
3    drug, isn't it?
4    A.  Correct.
5    Q.  And when — was it offered — was it sold
6    by BMS when you first came to BMS US?
7    A.  It was.
8    Q.  It was.  So, it has not lost its
9    exclusivity, correct?
10   A.  Correct.
11   Q.  And do you have — do you recall any
12   specifics about what has happened with the
13   wholesale list price for Etopophos over the time
14   that you were marketing director?
15   A.  I believe we took the occasional increase,
16   but I don't specifically recall what percentage we
17   took and when and how often.
18   Q.  What about contract pricing?  When you
19   were there did BMS offer contract pricing for
20   Etopophos?
21   A.  We may have considered it for some
22   accounts.  It wasn't a major focus of what we did.

97

1    Q.  And is that because it had no competition?
2    A.  It had no competition, and it wasn't a
3    large brand.  So, it wouldn't offer a lot of value
4    to our customers from a discounting perspective.
5    Q.  What tumors does it treat?
6    A.  I believe it's primarily in hematology.
7    Q.  Is it safe to say that you didn't have any
8    marketing programs for it while you were marketing
9    director?
10   A.  That's correct.  Sorry.  Hematology and
11   lung cancer, I think, as well.
12   Q.  VePesid, do you recall the competitors —
13   who the competitors were of VePesid?
14   A.  To VePesid?
15   Q.  Yeah.
16   A.  VePesid had numerous generic competitors,
17   which is part of the reason why the price had been
18   driven down so much.  I don't recall the specifics.
19   Q.  Okay.  Let's talk next about Rubex.  Do
20   you know when that was first sold by BMS?
21   A.  I don't recall.
22   Q.  Was it sold by BMS when you joined BMS

Christof A. Marre      HIGHLY CONFIDENTIAL      August 26, 2005
Cambridge, MA

.98

1  oncology?
2      A.  We phased it out.  We stopped
3  manufacturing it, but there was still inventories
4  left at wholesalers, and I guess, in our own
5  warehouse.  So, we discontinued Rubex, but it was
6  still being sold as we depleted inventories.
7      Q.  And do you know approximately when you
8  discontinued it?
9      A.  I don't recall exactly.
10     Q.  Was it — it was before you left BMS,
11  though, correct?
12     A.  Yeah, I think so.
13     Q.  And at the time you were at BMS, Rubex was
14  a multisource drug, right?
15     A.  Yes.
16     Q.  And do you recall any specifics with
17  respect to what happened with the wholesale list
18  price of Rubex over time while you were at BMS?
19     A.  No.
20     Q.  Do you recall that it stayed constant?
21     A.  It wasn't my focus, because it had been
22  discontinued.

99

1      Q.  Does that mean you don't have a
2  recollection?
3      A.  Correct.
4      Q.  Okay.  What about contract pricing?  Were
5  you involved in contract negotiations involving
6  Rubex?
7      A.  I believe we took it off our contracts
8  because it had been discontinued.
9      Q.  And prior to taking it off contracts, do
10  you have a recollection that the contract prices
11  decreased over time for Rubex?
12     A.  I don't know.
13     Q.  You just don't remember?
14     A.  Don't remember.
15     Q.  Okay.  Let's talk about Taxol.  Taxol was
16  an exclusive drug until 2002, correct?
17     A.  2001.
18     Q.  And do you know approximately when in 2001
19  it lost its exclusivity?
20     A.  I don't recall the exact date.
21     Q.  And Taxol was sold by BMS when you joined
22  oncology, correct?

100

1      A.  Yes.
2      Q.  And drugs that could be considered
3  competitive drugs to Taxol, what are they?
4      A.  Onxol, which is manufactured by Ivax, and
5  then two or three generic versions.  So, they're
6  called paclitaxel — manufactured by Bedford,
7  Mylan, and Abbott, if my recollection is correct.
8      Q.  We talked about Taxotere earlier.
9  Taxotere is not the same chemical formulation as
10  Paclitaxel, correct?
11     A.  Correct.  It's Docetaxel.
12     Q.  And that also could be viewed as a
13  competitor, I think you said?
14     A.  As I mentioned earlier, it could be seen
15  as a therapeutic substitution for Paclitaxel.
16     Q.  So, a physician treating a certain tumor
17  type with Taxol may also treat it with Taxotere
18  instead of Taxol, is that what you —
19     A.  For the most part, yes.
20     Q.  Okay.  The wholesale list price for Taxol
21  remained constant over time, correct?
22     A.  Yes.

101

1      Q.  However, after its loss of exclusivity,
2  the contract prices decreased, correct?
3      A.  Yes.
4      Q.  And over time they decreased
5  substantially, right?
6      A.  Yes.
7      Q.  And while you were at BMS, there were a
8  number of marketing programs related to Taxol,
9  right?
10     A.  Yes.
11     Q.  Are you familiar with the Taxol
12  opportunity program?
13     A.  Yes.
14     Q.  Could you describe that for me in your own
15  words.
16     A.  It was a program executed by OTN whereby
17  customers were classified into different segments
18  and each segment had a different value proposition.
19     Q.  And there were three segments, right?
20     A.  Yes, and we called them buckets.
21     Q.  Okay.  Was Bucket 1 referred to at one
22  point in time as the Taxol preferred brand program?

Christof A. Marre      HIGHLY CONFIDENTIAL      August 26, 2005
Cambridge, MA

122

1  referring to here.
2     Q. Okay. Could you please turn to Page 740.
3  This is a graphic representation of your marketing
4  team, correct?
5     A. Correct.
6     Q. And do you know about what point in time
7  this was?
8     A. This was in early 2003.
9     Q. And to whom was this presentation being
10  made?
11     A. This was a POA presentation to our sales
12  force.
13     Q. Okay. No further questions on that
14  document. Thank you. There's one more document
15  remaining in your stack that we did not discuss,
16  and that is Exhibit Marre 007.
17     A. Uh-huh.
18     Q. Which is a Power Point titled "Scenarios
19  Leading Up to Generic Carboplatin Introduction."
20  Bates Nos. 01123925 to 956. Is this a document
21  that you recognize?
22     A. No.

123

1     Q. The lower right-hand corner, each slide
2  has "OTN." Do you believe this could have been
3  prepared, I assume, at OTN?
4     A. Probably.
5     Q. Okay. And is this the type of document
6  that you would receive in the ordinary course of
7  your responsibilities at BMS?
8     A. I could have.
9     Q. I can represent -- at least it's been
10  represented to me -- that this did come from your
11  files.
12     A. Sure.
13     Q. Page 934 describes Paraplatin/Taxol
14  loyalty program, and I was wondering if this
15  program was implemented?
16     A. (Witness reviews document.) I don't
17  recall whether we did go ahead with this
18  two-dimensional rebate grid or not.
19     Q. Are you -- okay. You're referring to Page
20  940, is that correct?
21     A. 938.
22     Q. Okay. Look at 940: So, you're not sure

124

1  whether this grid itself was implemented?
2     A. I'm not sure.
3     Q. This looks somewhat similar to an earlier
4  grid that we saw associated with, I think, the
5  Paraplatin-Taxol earned --
6     A. It does.
7     Q. -- discount. Okay. Do you think the
8  program was ultimately called the earned discount
9  program or the loyalty program?
10     A. As I said, I'm not sure this program
11  actually got implemented.
12     Q. Okay. Is -- I'm trying to alleviate some
13  confusion in my mind with nomenclature. We have
14  the earned discount program out there that we
15  discussed, and then we have this loyalty program
16  here set forth in Exhibit Marre 007. The earned discount
17  program was implemented, correct?
18     A. That seems to be the case based on this --
19  the notes from the sales conference call.
20     Q. Okay. Do you think that perhaps what's
21  depicted on Exhibit Marre 007 may have been an early draft
22  of that program?

125

1     A. Yeah, I believe that this was too complex
2  -- the first version that we saw had this grid with
3  40 different fields or something. This had fewer
4  fields, but it was still deemed too complicated.
5     Q. Okay. Thanks for clarifying that for me.
6  On Page 954 it discusses private label option for
7  Paraplatin.
8     A. Uh-huh.
9     Q. And I've seen some reference to that in
10  some of the documents. Can you discuss what that
11  is all about.
12     A. As part of our Paraplatin generic defense
13  strategy, we evaluated whether it would make sense
14  to allow OTN to sell both branded Paraplatin and a
15  nonbranded Paraplatin. But we wanted the
16  nonbranded Paraplatin to be a BMS product rather
17  than product manufactured by a generic competitor
18  so that we would still benefit from getting the
19  entire OTN business. So, that was the essence of
20  the private label program.
21     Q. So, the -- Paraplatin lost its exclusivity
22  when?

Christof A. Marre       HIGHLY CONFIDENTIAL       August 26, 2005
Cambridge, MA

126

1    A. I believe it was November of 2004, late
2    2004.
3    Q. Up until that time — strike that. During
4    your tenure at BMS, the wholesale list price for
5    Paraplatin, do you recall whether it remained
6    constant?
7    A. No, we took price increases.
8    Q. So, the wholesale list price increased
9    over time. Did that — did the increases in
10   wholesale list price continue after the loss of
11   exclusivity?
12   A. I don't recall. I wasn't with BMS at that
13   time.
14   Q. Okay. So, you had left. That's right.
15   And prior to your departure, did BMS offer contract
16   pricing discounts on Paraplatin?
17   A. Yes.
18   Q. And were they associated with the various
19   programs that we just discussed?
20   A. Correct.
21   Q. And you were responsible for putting
22   together the generic strategy, so-to-speak, for

127

1    Paraplatin when it lost exclusivity, right?
2    A. Yeah, in association with OTN.
3    Q. Okay. I'm sorry. Did I ask you whether
4    you prepared Exhibit Marre 007?
5    A. I don't know whether you asked me, but I
6    can tell you I didn't.
7    Q. Okay. You did prepare it?
8    A. I did not prepare this.
9    Q. You did not prepare it. So, maybe it
10   would be best for me just to ask you what was —
11   what were the plans — what were BMS's plans for
12   Paraplatin to deal with the loss of exclusivity on
13   that drug?
14   A. The plan was to start thinking about how
15   to defend our market share well ahead of the loss
16   of exclusivity, so, to take advantage of the fact
17   that we were the incumbent and secure business that
18   would make it more difficult for the entrants to
19   take market share away from us.
20   Q. Okay. And so, part of the plan was to
21   create a private label.
22   A. That was part of the plan.

128

1    Q. Okay. And what was the pricing strategy
2    associated with the private label?
3    A. The strategy was for the private label to
4    be a fast follower. So, we understood that the
5    generics would drive the price down and that we
6    needed to be competitive in order not to lose
7    business, and that the private label would not
8    leave but it would follow the price set by the
9    generics.
10   Q. And "following" meaning if the generics
11   were lower in price, the private label price would
12   be lowered by BMS?
13   A. Correct.
14   Q. And what was the name of the private label
15   product?
16   A. OTN Paraplatin.
17   Q. So, OTN was the brand?
18   A. Yeah, I'm not sure what it finally ended
19   up being, because it was launched after I left the
20   company.
21   Q. And then under the strategy before you
22   left, what was the strategy with respect to the

129

1    price of Paraplatin, the branded BMS drug?
2    A. The idea was for the branded Paraplatin
3    through OTN to maintain a price premium over both
4    the generics and our private label.
5    Q. And do you know what happened to that
6    price over time?
7    A. No.
8    Q. Because you —
9    A. I left the company.
10   Q. You were gone, okay. So, you wouldn't
11   have any insights into volume of sales of
12   Paraplatin post loss of exclusivity?
13   A. No.
14   Q. And the same question for the OTN private
15   label Paraplatin.
16   A. No.
17         (BMS/AWP 01123962-974 marked Exhibit Marre 014.)
18   Q. The court reporter has marked as Exhibit Marre 014
19   an e-mail to yourself and others from Mayank Patel, and it
20   has an attachment. The exhibit itself has Bates Nos. 01123962
21   to 74. Do you believe that this is an e-mail that you received
22   in the ordinary course of your responsibilities at BMS?

Christof A. Marre          HIGHLY CONFIDENTIAL          August 26, 2005
Cambridge, MA

---

**130**

1   A. Yes.
2   Q. And the VePesid injection analysis that's
3   attached, I draw your attention to the first page
4   of that analysis where it says, "2002 sales." The
5   gross sales exceed 45 million, correct?
6   A. That's what it says here.
7   Q. And where it says, "Prime vendors accrual
8   of 35,395,541," do you see that?
9   A. Yes.
10  Q. Does that indicate that most of BMS's
11  sales of VePesid were made at contract pricing at
12  this time, in 2002?
13  A. Yes.
14  Q. Okay. I wanted to make sure I was reading
15  that right. So, if we took the difference between
16  the gross sales and the prime vendor accrual, we
17  would determine the sales of VePesid that BMS made
18  that were made without contracts, correct?
19  A. Not quite. I don't think this analysis
20  would allow you to determine how big our sales
21  volume without contracts was --
22  Q. Okay.

---

**131**

1   A. -- 'cause this is averaging everything.
2   Q. But is it reliable to indicate the volume
3   of sales made at contracts?
4   A. Well, you would have to consider also the
5   OTN charge-backs, in addition to the prime vendor
6   accrual.
7   Q. Oh. Okay. So, the sales reflected here
8   that were made under contracts were the sales
9   reflected under the prime vendor accrual line and
10  the sales reflected under OTN charge-backs,
11  correct?
12  A. Yes.
13  Q. Okay. That's the only question I have
14  about that one. Part of your marketing strategies
15  targeted state society GPOs, right?
16  A. More than my marketing strategy, that was
17  the OTN marketing strategy.
18  Q. Did BMS try to sign contracts with GPOs
19  that were state societies?
20  A. I believe the contracts were actually
21  signed by OTN.
22  Q. Okay. But you would have had some

---

**132**

1   involvement in that, right?
2   A. Yes.
3   MR. MATT: Let's mark an exhibit.
4   (BMS/AWP 388534-536 marked Exhibit Marre 015.)
5   Q. Exhibit Marre 015 is an e-mail from Fred Wiseman
6   to yourself --
7   A. Uh-huh.
8   Q. -- dated November 14th. My only question
9   on this is whether it is an e-mail that you
10  received in the ordinary course of your
11  responsibilities?
12  A. Yes.
13  Q. Okay. Thank you. Do most major hospitals
14  belong to GPOs?
15  A. I'm sorry.
16  Q. Do most major hospitals belong to GPOs?
17  A. Yes.
18  Q. What are the major hospital GPOs?
19  A. The two leading ones are Premier and
20  Novation. Between them they have about 70 percent
21  of the market.
22  Q. Did you say 70 percent?

---

**133**

1   A. 70.
2   Q. And did BMS have contracts with Premier
3   and Novation for oncology drugs --
4   A. Yes.
5   Q. -- during the time you were there? Is
6   Consorta a hospital GPO?
7   A. Yes.
8   Q. And Cardinal-Owen, Cardinal-Owen?
9   A. Yes.
10  Q. And what about Broadlane?
11  A. Yes.
12  Q. MedAssets?
13  A. Yes.
14  Q. I'm actually reading some of these names
15  off of a Power Point that we'll mark.
16  (BMS/AWP 1124381-394 marked Exhibit Marre 016.)
17  Q. The court reporter has marked as Exhibit Marre 016,
18  a Power Point that says, "GPO Channel." I
19  believe this was produced from your files, and I
20  guess my question is, is this something that you
21  would have received in the ordinary course of your
22  responsibilities at BMS?

---

Henderson Legal Services
(202) 220-4158

Christof A. Marre   HIGHLY CONFIDENTIAL   August 26, 2005
Cambridge, MA

142

1    Q.  Yeah.  That's kind of an awkward question.
2    What I'm trying to figure out is did the templates
3    themselves usually become the final contracts?
4    A.  Yes.
5    Q.  Okay.  Thanks.
6    (BMS AWP 1124203-204 marked Exhibit Marre 022.)
7    Q.  Exhibit Marre 022 is an e-mail from Mayank Patel
8    to yourself and others, dated April 2, 2003.  Is
9    this an e-mail that you received in the ordinary
10   course of your responsibilities?
11   A.  Yes.
12   Q.  And I draw your attention to the second
13   page.  It's a comparison of pricing offer to OTN
14   and OS, correct?
15   A.  Yes.
16   Q.  There's a line that says, "OIT invoice."
17   What does that refer to?
18   A.  It's an off-invoice discount.  So, it's a
19   discount that's in the invoice.
20   Q.  Does that mean it was sold under a
21   contract?
22   A.  Yeah, and the discount is reflected in the

143

1    sales price.
2    Q.  Okay.  And then the line that says, "Cash
3    discount to wholesaler 2 percent for OTN," is that
4    a prompt pay discount?
5    A.  I believe so.
6    Q.  And then the "Cash discount OTN end
7    customer, 2 percent," do you know what that
8    discount is associated with?
9    A.  Whenever somebody sells a product to a
10   buyer, they tend to offer a discount for prompt
11   payment.  So, this would be the discount that OTN
12   offers for prompt payment its end customers.
13   Q.  Oh, okay.  And then what is a Taxol volume
14   purchase rebate at 1.6 percent to OTN?  What is
15   that?
16   A.  This reflects the — I don't recall.
17   Q.  You don't recall what that one is?
18   A.  No.
19   (BMS/AWP 217841-851 Marked Exhibit Marre 023.)
20   Q.  Let's go to the next document, which is
21   Exhibit Marre 023 to your deposition.  It's an e-mail from
22   yourself to Michelle Barnard with attachments.

144

1    It's dated December 19th, 2002.  Is this an e-mail
2    that you created in the ordinary course of your
3    responsibilities?
4    A.  Yes.
5    Q.  On the very last page of this exhibit
6    there is a spreadsheet that reflects Duke contract
7    pricing —
8    A.  Okay.
9    Q.  — and the percentage off WLPs, do you
10   believe that these were accurate at the time?
11   A.  Yes.
12   Q.  Okay.  And I notice the Blenoxane is a 71
13   percent discount.  VePesid is a 94 percent
14   discount —
15   A.  Yes.
16   Q.  — and — 95 percent.
17   A.  Yes.
18   Q.  Why were the discounts so high?
19   A.  It's driven by the competitive
20   environment.  We had multiple competitors for
21   VePesid.
22   Q.  Is the same true for Taxol at this point

145

1    in time as reflected in the 75 percent discounts?
2    A.  Is what true?
3    Q.  Were there also — the competitive
4    environment true of those discounts, correct?
5    A.  Yes, yes.
6    Q.  And was Duke a large purchaser?
7    A.  Yes.
8    Q.  Exhibit Marre 024 is a spreadsheet that says,
9    "Blenoxane contract sales, 3rd quarter and 4th
10   quarter of 2002," Bates Nos. 000212669 to 74.  Have
11   you seen this document before?
12   (BMS/AWP 212669-674 marked Exhibit Marre 024.)
13   A.  I don't specifically recall seeing this.
14   Q.  Have you seen a format like this before?
15   A.  Yes.
16   Q.  And is this a document that you reviewed
17   in the ordinary course of your responsibilities at
18   BMS?
19   A.  Yes.
20   Q.  And what would be the purpose of your
21   review?
22   A.  Well, in this case, Blenoxane was supplied

Christof A. Marre    HIGHLY CONFIDENTIAL    August 26, 2005
Cambridge, MA

**146**

1  to us by a Japanese company. And the price we paid
2  to the Japanese manufacturer was based on a formula
3  that reflected our own average selling price. So,
4  we needed to show them how our price had evolved to
5  justify what we were paying them. So, that's why
6  we did this analysis.
7      Q.  Okay.  So, the discounts off wholesale
8  list price that are reflected in this spreadsheet,
9  to the best of your knowledge, were accurate?
10     A.  Yes.
11     Q.  Okay.  And do these represent all contract
12  sales for Blenoxane for the time period?
13     A.  I don't know.
14     Q.  Okay.
15         MR. EDWARDS:  All contract sales to
16  hospitals or -- was that your question?
17         MR. MATT:  That's actually a good
18  qualifier.
19         MR. EDWARDS:  -- or all contract sales to
20  everybody?
21         MR. MATT:  Let's first ask the question to
22  everybody if the witness knows.

**147**

1      A.  This doesn't reflect OTN.
2      Q.  Okay.
3      A.  But it does reflect US oncology. So, US
4  oncology is not a hospital.
5      Q.  Okay.
6      A.  So, I don't want to speculate about this.
7      Q.  Yeah, we don't want to you speculate
8  either.  Thanks.
9         The next exhibit, Exhibit Marre 025 is an
10  oncology customer contract proposal --
11     A.  Uh-huh.
12     Q.  -- for Consorta, correct?
13     A.  Correct.
14     Q.  And is this something that you would have
15  received in the ordinary course of your
16  responsibilities at BMS?
17     A.  Yes.
18     Q.  In fact, you signed it on Page 2, correct?
19     A.  Yes.
20     Q.  And I just want to confirm that the
21  discounts presented begin on the third page,
22  discounts off of WLP. Were there the discounts

**148**

1  that were offered?
2         MR. EDWARDS:  To?
3      Q.  To Consorta.
4      A.  (Witness reviews document.)  Yes.
5      Q.  And the discounts it offered were a
6  reflection of the competitive environment, correct?
7      A.  Correct.
8      Q.  No more questions on that one.
9         (BMS/AWP 96291-300 marked Exhibit Marre 025.)
10        (BMS/AWP 96333-345 marked Exhibit Marre 026.)
11     Q.  Exhibit Marre 026 is an oncology customer
12  contract proposal to Owen Health Care?
13     A.  Uh-huh.
14     Q.  Is that your signature on the first page?
15     A.  Can you say that again.
16     Q.  Is that your signature on the first page?
17     A.  Yeah.
18     Q.  So, the discounts off of WLP that are
19  reflected on the second page of this document,
20  those were, in fact, offered to Owen, correct?
21     A.  Yes.
22     Q.  And if we review a couple of pages ahead

**149**

1  to Page 336, we have a proposal to Broadlane,
2  correct?
3      A.  Correct.
4      Q.  It looks like this one was not signed by
5  you -- at least this one back here. My question
6  is, do Owen and Broadlane, are these two separate
7  GPOs?
8      A.  Yes.
9      Q.  Okay. Thanks. Exhibit Marre 027 is an e-mail
10  from Michelle Barnard to yourself and others. Is
11  this something that you -- it's dated March 16th,
12  2003. Is this something that you would have
13  received in the ordinary course of your
14  responsibilities at BMS?
15     A.  Yes
16        (BMS/AWP 1124131-156 marked Exhibit Marre 027.)
17     Q.  And it looks like there was an attachment
18  that shows discounts being offered to various GPOs,
19  including Owen and Premier, correct?
20     A.  Yes.
21     Q.  And Pages 138 to 140 reflect --
22     A.  Actually, where do you see Owen?

# Exhibit 84

John F. Akscin          HIGHLY CONFIDENTIAL      August 11, 2005
New York, NY

HIGHLY CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------x

In Re: PHARMACEUTICAL           )

INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456

PRICE LITIGATION                ) CIVIL ACTION NO.

                                )  01-CV-12257-PBS                    )

-----------------------------)

THIS DOCUMENT RELATES TO        )

ALL ACTIONS                     )

-------------------------------x


DEPOSITION OF JOHN F. AKSCIN

New York, New York

Thursday, August 11, 2005

9:53 a.m.



Reported by:

Frank J. Bas, RPR

73585fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin          HIGHLY CONFIDENTIAL          August 11, 2005
                              New York, NY

Page 14

1    But I think I'm going to ask the witness to
2    go back and if there's any more
3    supplemental production, we'll make it at
4    that time.
5         MR. MATT:  Okay.  I just want to
6    make sure that an exhaustive search was
7    done.
8         MR. TRETTER:  And I understand
9    that.  And we are going to make sure that
10   that's the case.  I intend to ask the
11   witness to go back and in the fullness of
12   time make sure that he's done an exhaustive
13   search.
14        MR. MATT:  Okay.  Thank you.
15   BY MR. MATT:
16   Q.    What is your present position with
17   OTN?
18   A.    I am vice president of government
19   relations and managed care services for OTN.
20   Q.    How long have you held that
21   position?
22   A.    The government relations

Page 15

1    responsibility, about three years now.  The
2    managed care services responsibility just was
3    added this past year, earlier in 2005.
4    Q.    So prior to 2005 was your title vice
5    president of government relations?
6    A.    Prior to 2000 -- prior to August of
7    2004 my title was director of government
8    relations.
9    Q.    And when did you first attain that
10   title?
11   A.    The director of government
12   relations?
13   Q.    Yes.
14   A.    Okay.  Approximately 2000 -- late
15   2002.  October 2002, approximately.
16   Q.    And in approximately August 2004 the
17   title changed to vice president of government
18   relations and managed care services?
19   A.    It changed to vice president of
20   government relations in 2004, and then in March
21   of 2005 they added managed care services.
22   Q.    Okay.  Thank you.  If you could take

Page 16

1    me back through the history of your employment
2    with OTN and give me your titles and the
3    approximate time period.
4    A.    Okay.  I started with OTN in
5    December of 1999, in the position of director,
6    business development for office based oncology.
7         Pretty much stayed with that
8    position until the introduction of the
9    government relations role, on the date that I
10   provided you earlier.
11   Q.    Okay.
12   A.    Again, these dates are approximate.
13   Q.    That's good enough for our purposes,
14   I think.
15        When you were director of business
16   development for office based oncology -- first
17   of all, can we abbreviate that OBO for purposes
18   of our examination?
19   A.    We can.
20   Q.    What were your responsibilities in
21   that position?
22   A.    For the most part, my

Page 17

1    responsibilities were evaluating and developing
2    programs and services to support the success of
3    OBOs.
4    Q.    Did you have anyone working for you?
5    A.    I did not.
6    Q.    And who did you report to?
7    A.    A gentleman by the name of Brett
8    Brodowy.  B-r-o-d-o-w-y.
9    Q.    What was his position?
10   A.    He was vice president, business
11   development.
12   Q.    And where was he located?
13   A.    He was located at the OTN San
14   Francisco -- South San Francisco corporate
15   office.
16   Q.    Can you give us a flavor -- when you
17   say evaluating and developing programs and
18   services to support success of OBOs, could you
19   give us a flavor for what your daily work life
20   was like in that position?
21   A.    I worked in developing a
22   relationship with outside consultants to provide

5  (Pages 14 to 17)

73685fa1-6e65-4bac-a4e4-637042b5cb9e

John F. Akscin      HIGHLY CONFIDENTIAL      August 11, 2005
New York, NY

Page 18

1  in-depth consulting services to our customers.
2      I worked on evaluating new
3  technologies for work simplification for our
4  customers.
5      And then also worked on developing
6  customer communication programs.
7      Q.   Does that mean you were involved in
8  marketing, the preparation of marketing
9  materials?
10     A.   I worked very closely with marketing
11 and the sales team.
12     Q.   The outside consultants that you
13 referenced, can you list those for me, please?
14     A.   One was known at the time as
15 KR Johnson & Associates.  And the second
16 organization was an organization at the time
17 known as ProStat, P-r-o-S-t-a-t, Resources.
18     Q.   Just those two?
19     A.   Just those two, primarily.
20     Q.   KR Johnson & Associates, has that
21 name changed?
22     A.   It is now called Practice Expert.

Page 19

1      Q.   I've seen a reference to KR Johnson
2  before.  What did they do for OTN?
3      A.   Basically there was a relationship
4  that was twofold.  One was they provided
5  consulting services directly to OTN as a
6  company.  The second role was for them to be a
7  resource to our office based oncology customers
8  for consulting regarding general business
9  matters in the OBO environment.
10     Q.   Let's break those down.  The
11 consulting services to OTN, what kind of
12 consulting services did KRJ provide?
13     A.   For the most part, they were
14 training services for OTN employees.
15     Q.   What kind of training?
16     A.   Focused largely at the business of
17 office based oncology, how office based oncology
18 operates.  And the intent was to just provide
19 general knowledge to the OTN employees of what
20 our customers were like.
21     Q.   What were some of the topics then
22 that would be captured under the general

Page 20

1  description of how a business — how an OBO
2  operates?
3      A.   Generally speaking, the topics
4  included staffing.  Included clinical issues.
5  Included billing and reimbursement for services.
6      Q.   And would KRJ train OTN outside
7  salespeople?
8      A.   At times.
9      Q.   What about inside salespeople?
10     A.   At times.
11     Q.   Any other OTN employees?
12     A.   It was mostly focused on inside and
13 outside sales and some of the marketing folks.
14     Q.   And where are they located, KRJ?
15     A.   The KRJ Practice Expert location is
16 in Coeur D'Alene, Idaho.  That is a satellite
17 office, if you will, of Practice Expert.
18     Q.   Is that where KRJ was located?
19     A.   That's where KRJ was located until
20 they were acquired by Practice Expert.
21     Q.   And where is the home office of
22 Practice Expert, if you know?

Page 21

1      A.   I do not know exactly.
2      Q.   Do you have a primary contact there?
3      A.   At KRJ?
4      Q.   Yes.
5      A.   I do.
6      Q.   And who is that?
7      A.   Kim, that's K-i-m.  The last name is
8  Ransier, R-a-n-s-i-e-r.
9      Q.   Was Kim always your contact?
10     A.   For the most part.  She was
11 president of KRJ at the time KRJ was
12 independent.
13     Q.   Is it a coincidence that her
14 initials are KR?
15     A.   Actually KRJ.
16     Q.   You also mentioned that OTN made KRJ
17 available to its customers.  Correct?
18     A.   That is correct.
19     Q.   Under what terms?
20     A.   The terms of those consulting
21 relationships were a business transaction
22 between the customer and KR Johnson.  What I did

(Pages 18 to 21)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin         HIGHLY CONFIDENTIAL      August 11, 2005
New York, NY

---

**Page 22**

1  in my role at OTN was basically evaluate the
2  customer's need on a very high level on the
3  front end and then make the determination as to
4  what level of consulting advice and guidance the
5  customer needed, and then I would inform the
6  customer and KRJ that they should talk to each
7  other. That was the extent of the relationship.
8      Q.   So it was a referral basically?
9      A.   Referral based.
10     Q.   OTN didn't compensate KRJ for
11 working with OTN clients?
12     A.   Account agreement between KR Johnson
13 and OTN was that KR Johnson had a discounted fee
14 to OTN customers, but there was no cash involved
15 with the transactions.
16     Q.   In your experience how many
17 people -- how many OBOs have you referred to
18 KRJ?
19     A.   I could not answer that off the top
20 of my head.
21     Q.   Is it a substantial amount?
22         MR. TRETTER: Objection to the form.

---

**Page 23**

1  BY MR. MATT:
2      Q.   I don't know how else to get an
3  estimate from you. I don't want you to guess.
4      A.   No, I understand that.
5      Q.   How often -- maybe that's a better
6  question. How often would you refer OBO
7  customers?
8      A.   It varied. It really varied. It
9  depended on what the issues were. I would say
10 that for the most part the majority of referrals
11 were for physicians wanting to start a new
12 practice.
13     Q.   Do you know the topics -- are you
14 familiar with the services that KRJ provided for
15 the customers that you referred to them?
16     A.   Somewhat.
17     Q.   And what's the nature of those
18 services?
19     A.   In the case of starting up a
20 physician new in practice, they encompassed
21 basically everything from helping the physician
22 find the location for the practice; helping the

---

**Page 24**

1  physicians staff their practice; setting up the
2  business operations of the practice; setting up
3  the clinical side of the practice; and setting
4  up the billing and reimbursement component for
5  the practice.
6      Q.   Did KRJ provide billing
7  reimbursement software to customers; do you
8  know?
9      A.   To my knowledge they had an offering
10 in that area.
11     Q.   Do you know whether that software
12 referenced average wholesale price at all?
13     A.   I do not know that.
14     Q.   Do you know if KRJ ever provided
15 consulting on AWP issues?
16     A.   To my --
17     Q.   To OBO clients?
18         MR. TRETTER: AWP issues?
19         MR. MATT: Yes. Any issues relating
20     to average wholesale price.
21         MR. TRETTER: Objection to the form.
22 BY MR. MATT:

---

**Page 25**

1      Q.   I'm going to let the question stand
2  unless you want me to clarify anything,
3  Mr. Akscin.
4      A.   I think that AWP issues is rather
5  broad, and I would like you to clarify.
6      Q.   Do you know whether KRJ provided any
7  consulting relating to how practices are
8  reimbursed, based on AWP, under Medicare?
9      A.   Not specifically. Not being an
10 integral part of KRJ, I am uncertain as to
11 exactly what information they provided their
12 clients.
13     Q.   But you did testify earlier that
14 they did consult on billing reimbursement
15 issues?
16     A.   Yes, they did. That was part of
17 their array of services.
18     Q.   Is KRJ, to your knowledge, familiar
19 with the reimbursement practices of private
20 insurers?
21     A.   Again, not being closely related to
22 their business operations, I couldn't -- I

---

7  (Pages 22 to 25)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin       HIGHLY CONFIDENTIAL       August 11, 2005
New York, NY

**Page 26**

1  couldn't specifically state that.
2      Q.   Okay.  What about -- taking you back
3  to your testimony about KRJ providing training
4  to OTN employees.
5      A.   Mm-hmm.
6      Q.   In the course of that training, was
7  AWP ever discussed?
8      A.   I believe so.
9      Q.   And in what context?
10     A.   In the context of very high level of
11  how office based oncology practices are
12  reimbursed in their environment.
13     Q.   Until recently oncology based
14  practices reimbursed under Medicare based on an
15  AWP benchmark, correct?
16     A.   To my knowledge, that's correct.
17     Q.   And that was 95 percent of AWP,
18  right?
19     A.   As the history developed, yes, at
20  one time.
21     Q.   And many insurers reimburse for
22  chemotherapy drugs based on AWP; is that

**Page 27**

1  correct?
2      A.   I would say a number of them do.
3      Q.   When you say a number, can you
4  quantify that, in terms of majority or minority?
5      A.   I would say a majority of private
6  payers, outside the Medicare system.
7      Q.   And has that been your observation
8  since you worked at OTN?
9      A.   Yes.
10     Q.   You also mentioned consultants named
11  ProStat Resources?
12     A.   Correct.
13     Q.   Is that spelled P-r-o-s-t-a-t?
14     A.   Correct.
15     Q.   And where are they located?
16     A.   Kansas City, Missouri.
17     Q.   Have they always been there?
18     A.   To my knowledge.
19     Q.   And what is the nature, if any, of
20  the consulting relationship between OTN and
21  ProStat?
22     A.   There's no formal relationship.

**Page 28**

1      Q.   Does ProStat offer consulting
2  services to OTN?
3      A.   Under a formal relationship, they do
4  not.
5      Q.   When you qualify it with "formal" --
6      A.   Mm-hmm.
7      Q.   -- what about informal?
8      A.   Informally, yes.
9      Q.   Can you please describe the nature
10  of the consulting?
11     A.   Again from a very, very high level
12  relationship, general support in the area of
13  reimbursement assistance services to our
14  customer community.
15         MR. TRETTER:  I think the question
16  was whether they provide any consulting
17  services to OTN as a corporate entity.  Not
18  to the customer.
19     A.   Okay.  Again, informally --
20  formally they do not, to OTN.  And informally,
21  high-level services, as I described.
22     Q.   So let me make sure I understand

**Page 29**

1  your testimony on this topic.
2         Has OTN engaged ProStat to consult
3  with OTN on specific projects?
4      A.   No, they have not.  To my knowledge
5  they have not.
6      Q.   So is this a referral relationship,
7  then, that OTN will from time to time refer OBO
8  customers to ProStat for consulting purposes?
9      A.   On occasion.
10     Q.   And how often does that occur?
11     A.   Infrequently.
12     Q.   And is there a financial
13  relationship between ProStat and OTN, to your
14  knowledge?
15     A.   There is not, that I know of.
16     Q.   And can you recall some specific
17  instances in which OTN has referred customers to
18  ProStat?
19     A.   No, I cannot.
20     Q.   Have you personally referred anyone
21  to ProStat?
22     A.   I have.

(Pages 26 to 29)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin      HIGHLY CONFIDENTIAL      August 11, 2005
New York, NY

---

Page 30

1    Q.   And who was that?
2    A.   Various practices over the years.
3    Q.   And for what purposes?
4    A.   For evaluation of new services.
5    Q.   Does ProStat do something
6    differently than KRJ?
7    A.   I wouldn't classify it as
8    differently. They work at a different level
9    than KRJ does, at a higher, broader level than
10   KRJ does.
11   Q.   Okay. Could you be more specific,
12   then, in how they differ?
13   A.   KRJ is more involved in day-to-day's
14   operational management of their client practices
15   and day-to-day billing and reimbursement issues.
16       ProStat tends to focus, as I just
17   tried to explain, on a broader concept of
18   program development; new service development
19   within office based oncology practices. ProStat
20   does not do any billing or collections. They
21   don't operate practices on a contractual basis.
22   Things like that.

---

Page 31

1        MR. TRETTER: Can I help? Does
2    ProStat do the ProCert program? Is that
3    theirs?
4        THE WITNESS: I am aware of a
5    program known as ProStat -- ProCert.
6        MR. TRETTER: Okay.
7        THE WITNESS: And ProCert is
8    managed, if you will, by ProStat.
9        MR. TRETTER: So does that give you
10   an idea, John?
11   BY MR. MATT:
12   Q.   ProCert is a reimbursement
13   assistance program?
14   A.   It's a reimbursement assistance
15   program. That is correct.
16   Q.   And that's offered through OTN
17   through its customers?
18   A.   That I am not certain of. I don't
19   believe it's offered through OTN.
20       MR. TRETTER: I think that's BMS.
21   A.   It's offered through BMS, I believe.
22   Q.   Okay. I want to come back to that.

---

Page 32

1        When you referenced just recently in
2    your testimony ProStat, they have a high-level
3    approach, and looks at new services, could you
4    give an example of new services?
5    A.   An example of new services would be
6    things like diagnostic imaging. Retail
7    pharmacy. Joint venture services with hospital
8    organizations.
9    Q.   Do you believe that ProStat, in its
10   consulting capacity, would deal with issues
11   relating specifically to average wholesale price
12   in reimbursement?
13   A.   To the extent of their reimbursement
14   assistance program? I would think possibly.
15   Q.   And the reimbursement assistance
16   program, I think you testified, is called the
17   ProCert program; is that correct?
18   A.   That's my understanding.
19       MR. TRETTER: That's one program.
20   BY MR. MATT:
21   Q.   That's one program?
22   A.   One program.

---

Page 33

1    Q.   And are there others that you're
2    aware of?
3    A.   To my knowledge at this point in
4    time, there aren't others.
5    Q.   And can you just describe what you
6    know about ProCert?
7    A.   ProCert was a program in which, when
8    office based oncology practices received a
9    denial from an insurer for the services and
10   drugs provided to treat that patient, they would
11   contact ProCert for assistance in managing that
12   claim denial.
13   Q.   And how would they provide
14   assistance, if you know?
15   A.   You know, I'm not that certain. I'm
16   not that certain on that. I was not integrally
17   involved with that program.
18   Q.   And was this something that was
19   offered through OTN to OTN's customers?
20   A.   No, it was offered by BMS.
21   Q.   Do you know the terms under which
22   that program was offered? In other words, did

---

9 (Pages 30 to 33)

Henderson Legal Services
(202) 220-4158

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin        HIGHLY CONFIDENTIAL        August 11, 2005
New York, NY

---

**Page 34**

1  BMS pay for it?
2      A.  I am not privy to any contractual
3  relationships between the two companies.
4      Q.  When an OBO receives a denial of a
5  reimbursement, does ProCert take the claim over
6  itself and see if it can get it reimbursed, or
7  does, in the alternative, ProCert offer advice
8  to the client on how --
9          MR. TRETTER:  Let me just get an
10  objection to the form.
11  BY MR. MATT:
12      Q.  Do you understand the question?
13      A.  I understand the question, but I do
14  not know.  I don't have direct relationship with
15  the program.
16      Q.  I have seen a reference to a firm
17  called DocuMedix?
18      A.  Correct.
19      Q.  Does that sound familiar?
20      A.  Mm-hmm.
21      Q.  Is that another consultant that OTN
22  has worked with in the past?

**Page 35**

1      A.  In the past, that is correct.
2      Q.  And in what capacity?
3      A.  There was a time when OTN had a
4  relationship with DocuMedix to provide
5  reimbursement assistance information.
6      Q.  Was that to OTN's customers?
7      A.  To OBO customers.  And that was in a
8  hot line format.
9      Q.  In other words, like a customer
10  would call the hot line --
11      A.  Would call.
12      Q.  -- and a DocuMedix employee would
13  answer?
14      A.  That is correct.
15      Q.  Did OTN have a financial
16  relationship with DocuMedix?
17      A.  We did.
18      Q.  And what was the nature of that
19  relationship?
20      A.  The relationship financial between
21  OTN and DocuMedix at that time was that OTN
22  essentially underwrote those services or paid

**Page 36**

1  for those services.
2      Q.  And how long did DocuMedix run a
3  reimbursement hot line for OTN customers?
4      A.  I think we exited the relationship
5  sometime in 2003.  The program was in existence
6  when I started with OTN back in 1999.
7      Q.  Where is DocuMedix located?
8      A.  DocuMedix no longer exists.
9      Q.  Was it purchased by some other
10  company?
11      A.  It was bought.
12      Q.  And who was it bought by?
13      A.  It was bought out by the Lash Group.
14      Q.  And who was your contact at
15  DocuMedix?
16      A.  Roberta Buell.  B-u-e-l-l.
17      Q.  I'm sorry.  B-u --
18      A.  B-u-e-l-l.
19      Q.  And was she always your primary
20  contact there?
21      A.  For the most part.
22      Q.  And do you know when the Lash Group

**Page 37**

1  purchased DocuMedix?
2      A.  I'm uncertain of that date.
3      Q.  Was it before 2003?
4      A.  No, it was after 2003.
5      Q.  So the program was always referred
6  to as DocuMedix during the time period that OTN
7  offered that?
8      A.  That is correct.
9      Q.  You said broadly reimbursement
10  assistance.  What does that mean?
11      A.  This was support through a hot line
12  program that for the most part answered customer
13  questions regarding which specific billing codes
14  to use not only on drugs but on services; which
15  specific disease classification codes to use;
16  and what billing units specifically were
17  involved in a drug.
18      Q.  It involved --
19      A.  In billing a drug.
20      Q.  -- HCPCS codes?
21      A.  Correct.  For drugs.
22      Q.  Would DocuMedix convey information

(Pages 34 to 37)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

**Page 38**

1 to customers about reimbursements based on AWP?
2    A. They might ask questions on an AWP,
3 for a drug.
4    Q. Does that mean that DocuMedix might
5 provide AWP information?
6    A. I believe so.
7    Q. To your knowledge, Mr. Akscin, did
8 DocuMedix ever assist customers with denial of
9 reimbursement issues?
10    A. To my knowledge they did not.
11    Q. So to your knowledge the service
12 that DocuMedix performed was different than what
13 ProCert would have performed for BMS customers?
14    A. To my knowledge.
15    Q. I forgot to ask you if you had a
16 primary contact at ProStat.
17    A. I do. A gentleman by the name of
18 Phil. The last name is Beard, B-e-a-r-d, as in
19 dog.
20    Q. And has that always been your
21 primary contact there?
22    A. For the most part.

**Page 39**

1    Q. And was OTN utilizing ProStat
2 Resources in 1999?
3    A. I started in December, so prior to
4 that I couldn't tell you.
5    Q. From when you started?
6    A. I believe that BMS had the business
7 relationship with ProStat at that time.
8    Q. When did OTN first develop a
9 relationship?
10    A. OTN never had a formal relationship
11 with ProStat.
12    Q. Okay. Was the relationship between
13 BMS and ProStat, to your knowledge, any
14 different than the relationship between OTN and
15 ProStat?
16    MR. TRETTER: Objection to the form.
17    A. I couldn't answer that.
18    MR. TRETTER: I don't think OTN had
19 any relationship.
20    A. We did not have a relationship.
21    Q. Okay.
22    A. Not a formal relationship.

**Page 40**

1    Q. Well, you referred customers, so it
2 was informal?
3    A. Yes.
4    Q. I understand that testimony. But
5 you referenced that BMS might have had a
6 relationship with ProStat, and I was wondering
7 if you knew what the nature of that relationship
8 was.
9    A. On a formal basis, I do not. I am
10 aware that there is a relationship.
11    Q. And do you still refer people to
12 ProStat?
13    A. On occasion.
14    Q. Do you know whether BMS had a
15 relationship with KRJ?
16    A. I do not.
17    Q. Did KRJ provide written materials to
18 OTN personnel in association with any training
19 exercises?
20    A. They may have. I'm uncertain.
21    Q. Do you know whether KRJ has at any
22 time provided any reports to OTN with regard to

**Page 41**

1 the work that KRJ had done with OTN customers?
2    A. The business relationship between
3 OTN and -- excuse me -- between KRJ and the
4 customer was just that, a business relationship.
5 We were not privy to any outcomes of those
6 consulting relationships.
7    Q. Okay. The same question for
8 ProStat.
9    A. Mm-hmm.
10    Q. The same answer?
11    A. Again, no formal relationship, so
12 no -- no formal feedback.
13    Q. Okay. So then ProStat wouldn't
14 provide to OTN reports regarding any work that
15 ProStat may have done with OTN customers?
16    A. That is correct.
17    Q. What about DocuMedix, did DocuMedix
18 ever provide any sort of written reports to OTN?
19    A. From DocuMedix we received on a
20 monthly basis a roster of customer contacts for
21 the reimbursement hot line.
22    Q. Does that mean an inventory of all

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin       HIGHLY CONFIDENTIAL       August 11, 2005
New York, NY

Page 42

1    the contacts that occurred that month?
2        A.   Basically it was a running list of
3    calls that they received from customers, the
4    nature of the call and the response to the call.
5        Q.   Did DocuMedix bill OTN on a per-call
6    basis?
7        A.   Not being privy to the actual
8    contract relationship, I can't answer that
9    specifically. I can tell you that OTN paid for
10   that service.
11       Q.   In your opinion did OTN customers
12   value the DocuMedix service that was offered?
13           MR. TRETTER: Objection to the form.
14   BY MR. MATT:
15       Q.   Do you understand the question?
16       A.   I do.
17           MR. TRETTER: I have no problem if
18   you want to ask did he ever hear from a
19   customer that they thought it was a good
20   service. How does that work?
21           MR. MATT: Let me actually rephrase
22   it differently.

Page 43

1    BY MR. MATT:
2        Q.   In your experience, based on
3    discussions with OTN clients, did they value the
4    DocuMedix service?
5        A.   We've been told at OTN that our
6    customers valued the service that DocuMedix
7    provided.
8        Q.   In fact, OTN marketed that service,
9    correct, to its clients and potential clients?
10       A.   We did, to the extent of informing
11   our customers that this service was available to
12   them.
13       Q.   Do you have any sort of estimate of
14   what percentage of OTN customers have at one
15   time used DocuMedix?
16       A.   I would put a very rough estimate at
17   10 percent.
18       Q.   In your discussions with OTN
19   customers, did you form an opinion as to whether
20   OTN customers valued the consulting services
21   provided by KRJ?
22       A.   It was reported to us by customers

Page 44

1    who used KRJ that they valued the services they
2    provided.
3        Q.   And do you have any estimate of what
4    percentage of OTN customers used KRJ's services,
5    pursuant to an OTN referral?
6        A.   Less than 10 percent.
7        Q.   We got onto the topic of consultants
8    because it was part of your responsibilities as
9    director of business development. I want to
10   take you back to other responsibilities you had
11   while you were in that position.
12           I think you said evaluating new
13   technologies was part of your bailiwick?
14       A.   Correct.
15       Q.   Why don't you flesh out a little
16   more in detail for us, please?
17       A.   During the term that I was in that
18   position, I was partially responsible for
19   evaluating specifically two new technologies.
20   One was a program offered by a company called
21   IntrinsiQ, and the program was called
22   Intellidose. And IntrinsiQ is spelled

Page 45

1    I-n-t-r-i-n-s-i-Q.
2        Q.   And what did that program do?
3        A.   Basically that program was a
4    software program to assist office based
5    oncologists in dose calculation for treatment of
6    their patients. Drug dose calculation in
7    treating their patients.
8        Q.   And is that a new technology that
9    OTN adopted?
10       A.   We have not.
11       Q.   And I think you referenced a second
12   technology. What was that?
13       A.   The second technology was an
14   electronic medical record offered by a company
15   at the time known as iKnowMed. I, and then the
16   rest of the company named was K-n-o-w-M-e-d.
17       Q.   What was the nature of that program?
18       A.   That program was a tiered or a
19   modular approach to the electronic health record
20   or the electronic medical record. At that time
21   there were three — three tiers to the offering,
22   a very, very basically EMR on this end and a

(Pages 42 to 45)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin       HIGHLY CONFIDENTIAL      August 11, 2005
                     New York, NY

Page 54

1    Q.   Okay.
2    A.   The chain is Pharma to middleman,
3  i.e., specialty distribution, to doctor.  And
4  there were a number of provisions in MMA that
5  had the potential for effect on the specialty
6  distribution environment.
7    Q.   Excluding your role as a member of
8  SBDA, in your capacity as an OTN employee have
9  you ever had discussions with CMS employees on
10 regulatory issues?
11   A.   From time to time.
12   Q.   What would be the nature of those
13 discussions?
14   A.   Once again, education on the role of
15 specialty distribution, and the supply channel.
16   Q.   Did those discussions ever reference
17 reimbursements based on AWP?
18   A.   Not to my knowledge.
19   Q.   In your role as an OTN employee,
20 have you ever had any discussions with
21 Congressmen or women or their staff related to
22 reimbursements based on AWP?

Page 55

1    A.   In – yes.
2    Q.   Can you describe more specifically
3  the nature of those conversations?
4    A.   The conversations predominantly were
5  at a very high level, focusing on the transition
6  under MMA from an AWP-based reimbursement system
7  to the current ASP-based reimbursement system.
8    Q.   And what is the current
9  reimbursement formula?
10   A.   The current reimbursement system, to
11 my knowledge, under Medicare is drugs
12 administered in the office-based physician
13 environment, or reimbursed at a formula of ASP,
14 average sales price, plus 6 percent.
15   Q.   And in the discussions that you just
16 referenced, did you ever take the position that
17 Congress should not change reimbursement from
18 AWP to ASP-based?
19   A.   No, we did not.
20   Q.   You testified you had conversations
21 with Congressional staff regarding transition
22 from AWP to ASP.  Can you be more specific about

Page 56

1  the nature of those discussions?
2    A.   Are you asking which specific
3  Congressional staff members, or more as to the
4  content of the discussion?
5    Q.   Content.
6    A.   Okay.  From the content perspective,
7  the discussions focused on how ASP was
8  calculated, okay, as well as the various pricing
9  concessions that are included in that
10 calculation.
11   Q.   Have you worked with anyone from BMS
12 on that issue?
13        MR. TRETTER:  Objection to the form.
14 BY MR. MATT:
15   Q.   Did any BMS employee participate in
16 those discussions?
17   A.   No.  Not at the SBDA level, they did
18 not.
19   Q.   When you were director of business
20 development for OBO, did you have opportunities
21 to speak with OTN clients?
22   A.   I did.

Page 57

1    Q.   How often would you speak with OTN
2  clients?
3    A.   My interactions with OTN clients
4  predominantly came on a referral basis.
5    Q.   So someone would refer a client to
6  speak specifically to you; is that what you're
7  referring to?
8    A.   That is correct.
9    Q.   And who would be the person that
10 would refer clients to you?
11   A.   Typically it would be one of our
12 salespeople.
13   Q.   And can you give examples of general
14 topic matters for which an OTN salesperson would
15 refer a client to you?
16   A.   General topic matters would consist
17 of just general business issues and questions,
18 which could include things like staffing
19 patterns, and various benchmarks.  At times
20 there were questions that might be specifically
21 related to drug reimbursement.
22   Q.   What kind of drug reimbursement

15 (Pages 54 to 57)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin       HIGHLY CONFIDENTIAL       August 11, 2005
New York, NY

---

Page 58

1  questions would you get?
2     A.   Questions similar to those that were
3  handled by our agreement with the folks at
4  DocuMedix.
5     Q.   So, in other words, assistance in
6  billing codes?
7     A.   Coding questions.
8     Q.   Did you discuss AWPs at all?
9          MR. TRETTER:   You mean what the
10    number might be?
11 BY MR. MATT:
12    Q.   Specifically, yes.
13    A.   Specifically what the number might
14 be?
15    Q.   Correct.
16    A.   At times.
17    Q.   And what would be the source of your
18 AWP information?
19    A.   Publicly available information
20 predominantly through Micromedics and Red Book,
21 and the folks at First DataBank.  Blue Book.
22    Q.   When you were in your position as

Page 59

1  director of business development for OBO, how
2  frequently did you speak with OTN clients?
3     A.   I would say, on average, daily.
4     Q.   I think your next position you
5  testified was director of government relations
6  and that you attained that position in
7  approximately October of 2002.  Correct?
8     A.   I believe so.
9     Q.   And what were the nature of your
10 responsibilities in that position?
11    A.   For the most part it was just a
12 refocus of much of the work that I had been
13 doing since joining the company in 1999,
14 removing the responsibility for program
15 development and focusing more on the legislative
16 and regulatory environment.
17    Q.   Did you still speak with clients on
18 almost a daily basis?
19    A.   Based on referrals, yes.
20    Q.   Did they have the same questions
21 that they had before?
22    A.   Nothing changed.

Page 60

1          MR. TRETTER:   Off the record for a
2  second.
3          (Discussion off the record.)
4  BY MR. MATT:
5     Q.   The communications that you had with
6  OTN clients, did you have any practice of
7  documenting those conversations?
8     A.   Occasionally.
9     Q.   Was there a factor or set of factors
10 that would cause you to document a specific
11 conversation and choosing not to document them?
12 I'm just trying to figure out how you decided
13 whether to document one.
14    A.   Most frequently it was -- the
15 documentation was for two reasons:  Number one,
16 when a referral was made to one of our
17 consulting relationships, like KRJ.  Okay?
18    The second most frequent
19 documentation would be on issues where responses
20 included sending specific information to the
21 customer.
22    Q.   Your counsel provided me before the

Page 61

1  deposition started with a group of documents.  I
2  was wondering if you could go through these and
3  pull out any examples you find of documenting
4  conversations with clients.
5          (The witness complied.)
6          MR. TRETTER:   I would like to go on
7  the record.  While the witness is going
8  through the documents at the request of
9  Mr. Matt, I think it should be made clear
10 that these customer communications were
11 found in a file entitled AWP Issues, and
12 that this doesn't purport to represent
13 every communication that the witness ever
14 had with customers.  We went to the file
15 that we thought would be the most pertinent
16 to you.
17          MR. MATT:   Okay.
18 BY MR. MATT:
19    Q.   And how thick was that particular
20 file?
21    A.   Two inches, maybe.
22    Q.   And you reviewed that file for

---

(Pages 58 to 61)

Henderson Legal Services
(202) 220-4158

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin          HIGHLY CONFIDENTIAL          August 11, 2005
New York, NY

---

Page 86

1    MR. TRETTER: Okay. Maybe you want
2  to mark this one?
3    MR. MATT: Not yet.
4    MR. TRETTER: Okay.
5    MR. MATT: I actually have another
6  one I think I want to do first, I think,.
7  that's a little bit older than that one.
8  BY MR. MATT:
9    Q.   Before we move on to look at a
10 PowerPoint that I want to go over -- a couple of
11 PowerPoints that I want to go over with you,
12 Mr. Akscin, I want to double back for a second
13 on some earlier testimony.
14          You testified that you've had many
15 discussions with OBOs, and my question would be
16 who within an OBO office do you typically speak
17 to?
18    A.    That ranges, but typically it's with
19 what's commonly known in the industry the
20 practice manager or the practice administrator,
21 as well as from time to time with the, for lack
22 of a better term, the chief medical officer.

---

Page 87

1  The head doctor, so to speak.
2    Q.    And does the practice administrator
3  handle the business side?
4    A.    The practice administrator focuses
5  on the business side.
6    MR. MATT: Okay. I want to
7  introduce another exhibit, a PowerPoint,
8  that I would imagine you probably
9  recognize. That's actually for your
10 lawyer, Mr. Tretter, and then I'll have the
11 court reporter mark this as Exhibit Akscin 002.
12         (Exhibit Akscin 002, document headed
13 Reimbursement in Office Based Oncology,
14 Sales Meeting, July 11, 2000, Bates
15 numbered BMS/AWP/000096632 to 642, was
16 marked for identification.)
17 BY MR. MATT:
18    Q.    Why don't you go ahead and take a
19 moment to review what the court reporter has
20 marked as Exhibit Akscin 002, which for the record
21 is a PowerPoint titled Reimbursement in Office Based
22 Oncology, Sales Meeting July 11, 2000. John

---

Page 88

1  Akscin is the name on the first page.
2          And the Bates numbers are
3  BMS/AWP/000096632 to 6643.
4          After you've had an opportunity to
5  review this, let me know when you're ready for
6  some questions.
7          THE WITNESS: (Reviewing document.)
8  BY MR. MATT:
9    Q.    Are you ready?
10   A.    I am.
11   Q.    First of all, did you prepare this
12 based on your experience in researching to the
13 concerns of OBOs?
14   A.    It appears to be one of my
15 presentations.
16   Q.    Was it maintained in your files or
17 on your computer in the course of your
18 responsibilities with OTN?
19   A.    Most likely, yes.
20   Q.    And when you made this presentation,
21 did you strive to be as accurate as possible?
22   A.    I did.

---

Page 89

1    Q.    So on page 6636, in the middle slide
2  there it says "Top Three OBO Concerns"?
3    A.    Correct.
4    Q.    So when you wrote this, you
5  accurately presented the top three OBO concerns
6  as "Reimbursement, Today; Reimbursement,
7  Tomorrow; Reimbursement!" Correct?
8    MR. TRETTER: Objection to the form.
9    A.    The point of that specific slide,
10 "Top Three OBO Concerns," with "Reimbursement,
11 Today," "Reimbursement, Tomorrow," and
12 "Reimbursement" is a boil-down, if you will, of
13 what office based oncology customers were
14 telling OTN at that time.
15   Q.    Okay.
16   A.    It's not OTN's concern. It's what
17 our customers have told us is their concern.
18   Q.    Correct. Thank you for clarifying
19 that.
20          And who attended this sales meeting?
21   A.    This was a sales meeting that was
22 attended for the most part — it was a midyear

---

23  (Pages 86 to 89)

John F. Akscin       ·HIGHLY CONFIDENTIAL      August 11, 2005
New York, NY

## Page 90

1  sales meeting, going back five years, to July of
2  2000. Typically those sales meetings were
3  attended by OTN outside sales, OTN inside sales,
4  and some representatives of the OTN marketing
5  group.
6      Q.  Approximately how many people would
7  be at a meeting of that size?
8      A.  Sixty to seventy.
9      Q.  And do you have a recollection of
10 how many times you made this presentation?
11     A.  This specific presentation was made
12 once or twice to the company, to the sales group
13 as a whole.
14     Q.  Was it ever made to BMS sales
15 representatives?
16     A.  I believe that I may have made a
17 similar presentation to BMS sales meetings. Not
18 on a national basis, but more on a district
19 basis.
20     Q.  And would you have maintained copies
21 of all the PowerPoints you used in your
22 meetings?

## Page 91

1      A.  For the most part. I have, again,
2  to my knowledge on my laptop I do have copies of
3  most of the presentations I've made.
4      Q.  And you usually keep those on your
5  laptop as opposed to paper copies?
6      A.  That is correct.
7      Q.  Could you please reference page
8  6634. The middle slide references "OBO
9  Revenue"?
10     A.  Mm-hmm.
11     Q.  And the bullet point says "Highly
12 Medicare Driven" and one of the four dashes
13 under that bullet point says "Drugs - AWP."
14         Is this a reference to AWP as a
15 revenue source?
16     A.  The intent of the slide is to point
17 out a couple of things. Number one, the slide
18 indicates that as is publicly available
19 knowledge, office based oncology is --
20 represents approximately 50 to 55 percent
21 Medicare population. So that is the implication
22 of being highly Medicare driven. Again, 50 to

## Page 92

1  55 percent of office based oncology treats
2  Medicare patients. Nationally, very broad
3  scope. Again, publicly available information.
4          The further bullet points below that
5  are intended to point out that there are
6  specifically — there are specific services and
7  supply items that the Medicare system reimburses
8  for, and more specifically points out the
9  reimbursement system at that time, being July of
10 2000, as to the benchmark process that was used
11 for reimbursement.
12     Q.  And that's the reference to AWP?
13     A.  And that is the reference
14 specifically on drugs, the benchmark for
15 reimbursement at that time was AWP.
16     Q.  Okay. And then below that there's a
17 slide titled "Gross Revenue Mix"?
18     A.  Mm-hmm.
19     Q.  Is that 64 percent?
20         MR. TRETTER:  You have to say yes or
21 no.
22     A.  I'm sorry. Yes.

## Page 93

1      Q.  And is that 64 percent of revenues
2  at the time to OBOs came in the form of
3  reimbursement for drugs. Is that correct?
4      A.  That is correct. And again that was
5  based on nationally-published data by a number
6  of different resources.
7      Q.  Has that generally been your
8  experience since you've been an OTN employee?
9      A.  It was my experience as a practice
10 administrator, and up until 2005 it's
11 predominantly been the experience as reported by
12 office based oncology customers.
13     Q.  Could you please turn to page 6638.
14 There are three slides here. The middle one
15 says "Average Wholesale Price"?
16     A.  Yes.
17     Q.  And there's a bullet that says, "AWP
18 does not represent actual acquisition cost" and
19 then there's a dash, and it says "20 to 25
20 percent differential for sole source products."
21         When you use the word
22 "differential," does that refer to the

(Pages 90 to 93)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin       HIGHLY CONFIDENTIAL    August 11, 2005
New York, NY

Page 94

1  difference between AWP and actual acquisition
2  cost?
3      A.   At that time that's what that
4  referred to.
5      Q.   And are those differences
6  exemplified on the following page, 6639, in the
7  top slide that says "Drug Reimbursement Today"?
8      A.   The point of that slide, top slide
9  on page 6639 --
10     Q.   Yes.
11     A.   -- is to indicate a number of drugs,
12 as an example of many drugs whereby there is a
13 differentiation.
14     Q.   Okay. And the difference in this
15 slide specifically is between Medicare
16 reimbursement, which is a column, and estimated
17 acquisition cost, which is another column,
18 correct?
19     A.   That is correct.
20     Q.   And if you recall, what is the
21 source of the information in the estimated
22 acquisition column?

Page 95

1      A.   The source of the information on
2  estimated acquisition cost at that time was, to
3  my knowledge, predominantly OTN's pricing for
4  the drug.
5      Q.   The next slide on that same page
6  says "What is happening?"
7          Does this refer to the change we
8  were discussing earlier in which HCFA was
9  proposing to change the AWPs for fifty products?
10     A.   It does.
11     Q.   The last dash there says, "FDB to
12 collect information from wholesalers - OTN is
13 listed first."
14         Could you be more specific about
15 what that refers to?
16     A.   In support of some of the
17 information that was collected by government
18 resources, First DataBank, which is again one of
19 those resources that report AWP information, was
20 to survey certain wholesalers to obtain
21 additional information regarding pricing as it
22 relates to AWP.

Page 96

1      Q.   And did First DataBank in fact
2  survey OTN on these fifty drugs?
3      A.   I am not aware of whether they did
4  or not.
5      Q.   In the course of your
6  responsibilities at any time as an OTN employee,
7  did you have communications directly with First
8  DataBank personnel?
9      A.   I have not.
10         MR. MATT:  I think that's all the
11     questions I have on that one.  Thank you.
12         Mark this as the next exhibit,
13     please.
14         (Exhibit Akscin 003, document
15     entitled "Update on AWP," Bates numbered
16     BMS/AWP/000097165 to 171, was marked for
17     identification.)
18 BY MR. MATT:
19     Q.   The court reporter has handed to you
20 Exhibit Akscin 003 to your deposition, Mr. Akscin,
21 which relates to an Update on AWP PowerPoint.
22 The Bates numbers, for the record, are

Page 97

1  BMS/AWP/000097165 through 71.  Take an
2  opportunity -- or actually, after you've had an
3  opportunity to review that, let me know and I'll
4  ask you a few questions.
5          (Witness reviews documents.)
6  BY MR. MATT:
7      Q.   The court reporter -- I'm sorry.
8  Exhibit Akscin 003 that's before you, Mr. Akscin,
9  looks like an e-mail Mr. Brodowy sent to you.
10 Correct?
11     A.   It appears so.
12     Q.   And I noticed that some of these
13 slides look pretty similar to some of the slides
14 we just saw in Exhibit Akscin 002.
15     A.   Correct.
16     Q.   My question is:  Does Mr. Brodowy
17 give presentations?
18     A.   From time to time I understand he
19 did at meetings that I did not attend.
20     Q.   And was it your practice to assist
21 him in preparing slides for those presentations
22 from time to time?

25  (Pages 94 to 97)

John F. Akscin        HIGHLY CONFIDENTIAL        August 11, 2005
New York, NY

Page 110

1  may be interfaced to pass data collected through
2  the Lynx process to the practice's PMS system to
3  simplify -- simplify the billing process and ·
4  claims filing process.
5      Q.   Is Lynx predominantly a product,
6  ordering/inventory management type software?
7      A.   It is an inventory management or
8  pharmacy management system, correct.
9      Q.   The next bullet is "Documedics." We
10  discussed that earlier in your testimony?
11      A.   Yes.
12      Q.   The next bullet is KRJ. We've also
13  discussed that.
14      A.   Correct.
15      Q.   The next bullet is "Lynx2otn.com."
16  Can you describe that, could you describe the
17  Lynx2otn.com site generally for us?
18      A.   WWW.Lynx2otn.com is a customer
19  website maintained by OTN with the purpose of
20  providing information to our customer on issues
21  important in the office based oncology
22  environment.

Page 111

1          It also has a component for ordering
2  drugs on line, similar to an Amazon.com type of
3  component. Okay?
4      Q.   Are you familiar with a report that
5  used to be called the AWP Price Report?  ·
6      A.   A report somewhat similar to that,
7  yes.
8      Q.   And that was something that a
9  customer could view by accessing the Lynx2otn
10  website, correct?
11      A.   That is correct.
12      Q.   And that report is no longer used,
13  right?
14      A.   That report, as it was known at that
15  time, is no longer used.
16      Q.   And when I call it the AWP Price
17  Report, is that the title you're familiar with?
18      A.   For the most part, correct.
19      Q.   Okay. And did that report present ·
20  AWP reimbursement information in one column and
21  acquisition cost in another?
22      A.   To my knowledge, without having a

Page 112

1  report in front of me, on a high level we
2  reported in that report for the drugs purchased
3  by the practice, okay, information regarding
4  AWP, which was updated on a monthly basis for
5  the most part, and information based on the
6  pricing that that customer received for the
7  drugs that they purchased.
8      Q.   And in your conversations over time
9  with OTN customers, did they indicate to you
10  that they found that report useful?
11      A.   The entire intent of the report was
12  to assemble data that was available in the
13  public sector, available through Micromedics Red
14  Book, and to condense that data for the drugs
15  most frequently used by oncology practices, the
16  practices found that to be very valuable,
17  because if you've ever seen a Red Book, it's
18  like the Manhattan yellow pages.
19      Q.   I have seen it, and I agree.
20          I have one more question:  On page
21  826 is a slide relating to "Managed Care
22  Contracting."

Page 113

1      A.   Mm-hmm.
2      Q.   The third bullet says "Access Med:
3  Legal Review."
4      A.   Okay.
5      Q.   What does that refer to?
6      A.   Access Med -- excuse me, I want to
7  look at the date on this. This is '03, correct?
8  Yes, January of '03.
9          Access Med, at that time, okay, is
10  a division of ProStat Resources. We talked
11  about ProStat Resources earlier in my testimony.
12  Okay?
13          At that time Access Med, based on
14  referral, would review a managed care contract
15  of a customer, if the customer wanted that
16  service. It was a business transaction between
17  the customer and Access Med, and that was it.
18  OTN was not associated with that relationship.
19  We had no contractual relationship formally with
20  Access Med, again, a division of ProStat
21  Resources.
22      Q.   Would Access Med review those

29 (Pages 110 to 113)

73685fa1-6e65-4bac-a4e4-637042b5eb9e

John F. Akscin        HIGHLY CONFIDENTIAL        August 11, 2005
New York, NY

Page 122

1    Bates number on the bottom of the document for
2    purposes of identification, it would be helpful.
3         A.   Specifically pages 904 and 905.
4         Q.   And the exhibits beginning on page
5    908, are these kind of form marketing materials?
6    And what I mean by that question is, are these,
7    you know, pre-printed marketing materials that
8    are distributed to clients or potential clients
9    as opposed to being something specifically
10   prepared for this proposal?
11        MR. TRETTER:  Were these actually
12   used at the time?
13        MR. MATT:  Yeah.
14        A.   These, specifically page 909, 910,
15   874 and 912 --
16        MR. TRETTER:  874?
17        A.   I'm sorry. 911 -- I looked at the
18   wrong number, I'm sorry.
19        To repeat, specifically pages 909,
20   910, 911 and 912 are for the most part, based on
21   my recognition of the documents, mass produced,
22   commonly used marketing materials.

Page 123

1         Q.   Okay. Thanks. I have one other
2    question on this one.
3         On page 909 there's a bullet point
4    that references "Payer reimbursement
5    methodologies and allowables."
6         A.   Mm-hmm.
7         Q.   I was wondering if you could be more
8    specific about what is referenced there.
9         A.   That normally will be referencing
10   various payer resources, not just Medicare, but
11   other managed care and private insurance, as to
12   first of all which methodology might be used.
13   There are various methodologies that are used in
14   healthcare on which to base payments for drugs,
15   as well as services.
16        And then the allowables portion of
17   it would be the actual numbers associated with
18   this. And again, this was a service under this
19   side that was provided by DocuMedix.
20        Q.   Thank you.
21        MR. MATT:  Mark this as the next
22   exhibit.

Page 124

1         (Exhibit Akscin 007, document
2    entitled The Network News, January/February
3    1997, Bates numbered BMS/AWP/000095588 to
4    611, was marked for identification.)
5         Q.   The court reporter has marked as
6    Exhibit Akscin 007 to your deposition a
7    January/February 1997 issue of The Network News. It's
8    numbered 000095588 to 611.
9         Are you familiar with The Network
10   News?
11        A.   I am.
12        Q.   How often did OTN publish this?
13        A.   Not being with OTN back in 1997, I'm
14   unsure of that.
15        Q.   What about during the time you were
16   with OTN?
17        A.   We strove to produce this document
18   somewhere between bimonthly and quarterly.
19        Q.   And does OTN still produce The
20   Network News?
21        A.   Most recently we began producing
22   Network News again.

Page 125

1         Q.   So there was a time frame during
2    which it wasn't produced?
3         A.   That is correct.
4         Q.   And what's the approximate dates, if
5    you recall?
6         A.   Very little production in 2003 and
7    early 2004. I think we resurfaced this
8    communication tool to our customer base sometime
9    late 2004.
10        Q.   Is there a particular reason why
11   production slowed or decreased in 2003/2004?
12        A.   My understanding was it had to do
13   with marketing resources at the time.
14        Q.   If you could please turn to the page
15   that has the Bates number 604. There's AWP and
16   HCPCS information presented here, correct?
17        A.   That appears to be.
18        Q.   To your recollection was this
19   information included in every issue of The
20   Network News while you worked at OTN?
21        A.   In Network News issues published
22   during my tenure at OTN beginning in December of

(Pages 122 to 125)

73685fa1-6e65-4bac-a4e4-637042b5eb9e