# Tab D-2

479

1                    THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF MASSACHUSETTS

3                              ---oOo---

4        -------------------------X

5    In Re:  PHARMACEUTICAL        )    MDL DOCKET NO.

6    INDUSTRY AVERAGE WHOLESALE )    CIVIL ACTION

7    PRICE LITIGATION             )    01CV12257-PBS

8        -------------------------X

9    THIS DOCUMENT RELATES TO:  )

10   ALL ACTIONS                  )

11       -------------------------X

12                    HIGHLY CONFIDENTIAL

13           VIDEOTAPE 30(b)(6) DEPOSITION OF

14                 JEFF BUSKA, VOLUME III

15

16        Taken at 33 South Last Chance Gulch

17                    Helena, Montana

18        Friday, December 15, 2006 - 9:05 a.m.

19

20   Reported by Mary R. Sullivan, RPR, RMR, Freelance

21   Court Reporter, Notary Public, residing in Missoula,

22   Montana.

```
1              A P P E A R A N C E S

2       ALI BOVINGTON, ESQ.

3       Attorney General's Office

4       215 North Sanders

5       Helena, Montana 59601

6           Appearing on behalf of the Plaintiff

7           State of Montana

8

9       MICHAEL P. DOSS, ESQ.

10      Sidley Austin LLP

11      One South Dearborn

12      Chicago, IL 60603

13          Appearing on behalf of the Defendant

14          Bayer Corporation

15

16      KIM B. NEMIROW, ESQ.

17      Ropes & Gray LLP

18      One International Place

19      Boston, Massachusetts 02110-2624

20          Appearing telephonically on behalf of

21          the Defendant Warrick Pharmaceuticals

22          and Schering-Plough
```

481

```
 1           A P P E A R A N C E S   (CONTINUED)

 2

 3       JAMES J. DUFFY, ESQ.

 4       Davis, Polk & Wardwell

 5       450 Lexington Avenue

 6       New York, New York 10017

 7            Appearing telephonically on behalf of

 8            the Defendant AstraZeneca Pharmaceuticals

 9

10       KATHLEEN M. O'SULLIVAN, ESQ.

11       Perkins Coie LLP

12       1201 Third Avenue, Suite 4800

13       Seattle, Washington 98101

14            Appearing telephonically on behalf of

15            the Defendant Immunex Corp.

16

17       KATHERINE POLDNEFF, ESQ.

18       Kelley Drye & Warren LLP

19       101 Park Avenue

20       New York, New York 10178

21            Appearing telephonically on behalf of

22            the Defendant Dev Pharmaceuticals
```

482

1              A P P E A R A N C E S   (CONTINUED)

2

3       JEREMY P. COLE, ESQ.

4       and GABRIEL H. SCANNAPIECO, ESQ.

5       Jones Day

6       77 West Wacker Drive

7       Chicago, Illinois 60601

8              Appearing telephonically on behalf of

9              the Defendants Abbott Laboratories and

10             TAF Pharmaceuticals.

11

12

13      Also Present:   Ken Zoetewey, Videographer.

14

15

16

17

18

19

20

21

22

483

```
1                    I N D E X

2   WITNESS: JEFF BUSKA                           PAGE

3     Examination by Mr. Doss........................ 486

4

5                    E X H I B I T S

6   NUMBER                 DESCRIPTION              PAGE

7   Exhibit Buska 050 - Defendant Bayer Corporation's

8                       Notice of 30(b)(6) Deposition

9                       to State of Monana........... 487

10  Exhibit Buska 051 - MT 038340 to 8359............ 495

11  Exhibit Buska 052 - MT 076330 to 6361............ 506

12  Exhibit Buska 053 - MT 038297 to 8329............ 508

13  Exhibit Buska 054 - MT 038594 to 8626............ 508

14  Exhibit Buska 055 - MT 076440 to 6448............ 526

15  Exhibit Buska 056 - Objections and Responses to

16                      Defendant Bayer Corporation's

17                      First Set of Interrogatories. 551

18  Exhibit Buska 057 - MT 076251.................... 573

19  Exhibit Buska 058 - Letter dated January 29, 2001 578

20  Exhibit Buska 059 - Email dated 2/13/2002........ 582

21  Exhibit Buska 060 - Email dated November 19, 2002 582

22  Exhibit Buska 061 - Email dated November 22, 2002 582
```

487

1    activities, prior-- third-party liability unit, as

2    well as the Medicaid Quality Control Review.

3        Q.   Mr. Buska, I don't intend to go back

4    over your work history for the State of Montana,

5    but is it fair to say that you've worked within

6    the State's Medicaid program for over 15 years?

7        A.   That would be correct, yeah, over 15.

8             MR. BUSKA:  I'll first ask that this

9    document be marked as Exhibit Buska 050, 5-0.

10       Q.   (By Mr. Doss)  And I've already provided

11   a copy to your counsel.

12   EXHIBIT:

13             (Exhibit Buska 050 marked for

14   identification.)

15       Q.   (By Mr. Doss)  Mr. Buska, I've provided

16   to you a document marked for identification as

17   Exhibit Buska 050, and for the record, this

18   document is entitled Bayer Corporation's Notice of

19   Rule 30(b)(6) Deposition to State of Montana.  Sir,

20   I'll direct your attention to the second page of

21   this document, and specifically to the paragraphs

22   that are listed under the heading Areas of

488

1  Inquiry. Do you see that?

2      A.   Yes.

3      Q.   And first, sir, I'll--I'll--I'll read

4  these to you and then I'll ask you questions

5  relating to this.  First, in--directing your

6  attention to paragraph No. 1, Plaintiff--the--

7  well, let me go ahead and read the introductory

8  phrasing as well.  "Plaintiff is requested to

9  designate one or more persons who consent to

10 testify on its behalf concerning the following

11 matters:  1., Plaintiff's use or consideration of

12 Bayer ASP Information, including how or if such

13 Bayer ASP Information has been used, relied upon,

14 referenced or considered in evaluating, revising,

15 or setting payments to Providers under Plaintiff's

16 Medicaid Program."  Did you see that entry?

17     A.   Yes.

18     Q.   And are you today here to testify as the

19 Montana State representative on that topic?

20     A.   Yes, I am.

21     Q.   Sir, the--the second paragraph I'll read

22 as well.  "Communications between Plaintiff and

500

1   the next page which is Page 10 and paragraph--

2   subparagraph b), so this is 8)b), and specifically

3   to the entry Average Sale Price Reporting

4   Procedure.  Do you see that paragraph?

5       A.   Yes.

6       Q.   Rather than reading this entire

7   paragraph, if you could read it to yourself for a

8   moment, and then I'll--I'll have a couple of

9   questions relating to it.

10      A.   Just b)?  Yes.

11      Q.   Yeah, just b).  Sir, is it correct that

12  the State of Montana under the settlement

13  agreement that we're currently reviewing required

14  that Bayer provide to the State on a quarterly

15  basis average sale price information for all Bayer

16  products under a methodology that's described in

17  paragraph b)?

18      A.   I would state the State did not require

19  that it be reported, but the settlement agreement

20  with the National Association of State Medicaid

21  Fraud Control Units required that it be sent to us

22  and all states.

1       Q.     Well, it--perhaps under--maybe we'll--

2    don't want to fight about the language.  Is it

3    correct that under the terms of the settlement

4    agreement between the State of Montana and Bayer

5    Corporation, Bayer was obliged to provide to the

6    state Medicaid program average sale price

7    information for all Bayer products sold in the

8    United States--

9       A.     Yes.

10       Q.    --all pharmaceutical products?

11       A.    That's what this says.

12       Q.    Such Bayer average sale price

13    information was provided to the State of Montana

14    on a quarterly basis from the date of this

15    agreement until the present; is that correct?

16       A.    I do recall seeing some of those

17    reports, yes.

18       Q.    But on--on behalf of the State of

19    Montana, are you able to testify that Bayer

20    provided to the State of Montana quarterly average

21    sale price reports for all of its Bayer products

22    from the date of this settlement agreement up to

1  Then Shannon Marr had the position for a while,

2  and then--in an acting role, then Duane

3  Preshinger, and then Dan Peterson.

4      Q.   And so Dan Peterson is as of today?

5      A.   No.

6      Q.   Oh.

7      A.   Dan Peterson supervises that unit now.

8  He's the section supervisor, and quite frankly, I

9  don't know the name of the current pharmacy

10 administrator, I don't believe I've met her.

11     Q.   Why don't we go ahead and move on to the

12 other two documents I've asked that were

13 previously marked for identification, and the

14 first one, which has been presented to you, Mr.

15 Buska, is marked Exhibit Buska 053, and it bears

16 Bates label MT 038297 through MT 038329 and has a

17 cover page that's dated October 30th, 2001. The

18 second document that I've asked be presented to

19 you is marked Exhibit Buska 054.  That bears Bates

20 label MT 038594 through MT 038626, and it has a

21 cover--cover letter dated July 30th, 2002.  If you

22 could, sir, if you could review both of these

512

1  documents and identify them for us.

2      A.   Yeah, the document Exhibit Buska 053 is

3  a report from Bayer to the State of Montana or

4  received by the State of Montana, it's not

5  addressed to us.  It was received by the Health

6  Policy and Services Division on November 5th,

7  2001; and the Exhibit Buska 054, again, is a

8  report on the average sales price that the State

9  of Montana received and date stamped August 2nd,

10  2002 by the Health Policy and Services Division.

11      Q.   I'll direct your attention to the first

12  cover page and--reflecting on our earlier

13  discussions.  Do you see that one of the

14  addressees of this document is Mr. Joseph Palermo,

15  First DataBank in California.  Do you see that?

16      A.   Yes.

17      Q.   So--and these--these documents come from

18  Montana Medicaid's files; is that correct?

19      A.   Yes.

20      Q.   So from these documents, it's clear that

21  First DataBank received a copy of the same average

22  sale price information that Montana Medicaid

513

1  received; is that correct?

2      A.   It would indicate that it was sent to

3  them, yes, or it was addressed to them.

4      Q.   The average sale price--I'll call these

5  average sale price reports.  Is that a--

6      A.   That's fine.

7      Q.   --understandable for you?  The average

8  sale price reports that we've just been reviewing,

9  which are Exhibit Buska 052, Exhibit Buska 053 and

10  Exhibit Buska 054, is it correct that those

11  document Bayer's average sale price for all of its

12  pharmaceutical products to the State of Montana

13  for the dates that are reflected on the documents?

14      A.   I don't know if it's for all the

15  pharmaceutical products submitted by Bayer,

16  because I would imagine that Bayer probably has a

17  lot more NDCs than what's in this report, so I

18  can't confirm that it's all of them.

19      Q.   Well, you're--you--you understand that

20  under the settlement agreement between the State

21  of Montana and Bayer, Bayer's required to provide

22  to the State of Montana average sale price

514

1    information for all of the Bayer pharmaceutical

2    products that are reimbursed by the State.

3        A.   Drugs and biologicals, yes, but--so

4    perhaps it is all of them, yes.

5        Q.   Well, do you have any reason to

6    challenge that it's all of them?

7        A.   No, I don't, but I don't know if it's

8    all of them.

9        Q.   Well, you're the State of Montana

10   testifying today.

11       A.   Yes.

12       Q.   Have you ever made any complaint to

13   Bayer that the--

14       A.   No, I haven't.

15       Q.   --reports do not include all the Bayer--

16       A.   No.

17       Q.   --pharmaceutical products?

18       A.   No.

19       Q.   So you have no reason to doubt that

20   these are not all of the--

21       A.   No--

22       Q.   --pharmaceutical--

519

1   individuals would receive the reports to them

2   personally; is that right?

3       A.   Yes.

4       Q.   They would review these Bayer average

5   sale price reports?

6       A.   They would look at it, yes.

7       Q.   What happened after it was received by

8   the Medicaid program director--what's the proper

9   title?

10      A.   Program officer.

11      Q.   Program officer.

12      A.   They were put in a file.

13      Q.   Do you know whether they were

14  distributed within any other Montana Medicaid

15  representatives?

16      A.   No, I believe they were not.

17      Q.   And whose files were they put in?

18      A.   The Medicaid pharmacy program officer.

19      Q.   Is that where the exhibits that we've

20  just been reviewing, the Exhibit Buska 052,

21  Exhibit Buska 053 and Exhibit Buska 054, those

22  documents came out of the Medicaid pharmacy

1  program officer's files?

2       A.   Yes.

3       Q.   Were they in anybody else--were copies

4  of these reports found in anyone else's files, to

5  your knowledge?

6       A.   To my knowledge, no.

7       Q.   I'll--I'll direct your attention to two

8  of the materials.  This cover page appears very

9  similar, Exhibit Buska 053 and Exhibit Buska 054,

10  and I'll just read into the record the paragraph

11  1.  Each of these letters has the same entry cover

12  letters.  "Report of Average Sale Price for the

13  third quarter of 2001 (Section III(D)(2)(b)).

14  This information is also included on the enclosed

15  diskette." Do you see that?

16       A.   Yes.

17       Q.   Were diskettes of the Bayer average sale

18  price information received by the State of

19  Montana?

20       A.   I would imagine that it probably did

21  come with these--these letters, yes.

22       Q.   Were the--and by diskette, does that

526

1  EXHIBIT:

2              (Exhibit Buska 055 marked for

3  identification.)

4      Q.   (By Mr. Doss)  Mr. Buska, if you could

5  take a moment and review what's been marked for

6  identification as Exhibit Buska 055, and for the

7  record, while you're doing that, Exhibit Buska 055

8  is marked with Bates labeling MT 076440 through MT

9  076448.  The first two pages appear to be a Bayer

10 average sale price report with some handwritten

11 entries, and then the last five pages appear to

12 include a cover letter dated August 30th, 2001

13 reflecting the enclosure of Bayer Corporation's

14 average sale price report.  My question, sir, will

15 be focusing on the first few pages, but if you

16 could review this document and identify it for us,

17 please.

18      A.   This document is a report on the average

19 selling price Bayer Pharmaceuticals quarter

20 2001/02 quarterly report.  It has listing of the

21 number of NDCs, product code, product name, the

22 average sales price with some handwritten notes of

1   AWP, and then later on, then it has the cover

2   letters from previous documents that we've

3   reviewed dated August 30th, 2001 received by the

4   State of Montana Health Policy and Services

5   Division September 14th, 2001.

6       Q.  Did Exhibit Buska 055, did that come out

7   of Montana Medicaid files?

8       A.  Yes.

9       Q.  And specifically, did Exhibit Buska 055

10  come from the Medicaid pharmacy program officer

11  files that you were referencing earlier?

12      A.  Yes.

13      Q.  The average sale price reports that

14  Montana received from Bayer did not include

15  handwriting in the average sale price report

16  itself; is that right?

17      A.  That's correct.

18      Q.  Are you able to tell us how the

19  handwriting that appears on Exhibit Buska 055 came

20  to appear on that document?

21      A.  It would have been handwritten--it is

22  the handwriting of Shannon Marr who was the

528

1   pharmacy program officer at that time.

2        Q.   And so that the record is clear, what

3   I'm referencing in terms of handwriting initially

4   is--do you see in the very first page, which is

5   Montana 076440, I'm looking at a column that is--

6   has handwriting AWP.  Do you see that?

7        A.   Yes.

8        Q.   And then under that column, there's a

9   series of entries in--in--in handwriting.  Do you

10  see those?

11       A.   Yes, to the left of the Average Sales

12  Price.

13       Q.   Yes.

14       A.   Yes.

15       Q.   So--and to the left of the typed-in

16  average sale price information.

17       A.   Yes.

18       Q.   And so you're able to today testify for

19  Montana that--whose--whose handwriting is--is

20  this?

21       A.   This is Shannon Marr's handwriting.

22       Q.   And remind me who Shannon Marr was--

1       A.    Shannon Marr was the pharmacy program

2    officer at the time.

3       Q.    What are the handwritten entries?

4       A.    The handwritten entries, I would imagine

5    what she did is she went into our claims payment

6    system and looked up the NDC for every one of

7    these--these drugs and indicated the--what the

8    average wholesale price was probably for the

9    current time period, and when she did this, it's

10   not dated as to when she did this, these hand--

11   these entries on here, but would have been the

12   average sales price--or average wholesale price at

13   that time that was in our reimbursement system.

14      Q.    Well, let's just take a for example.

15   The--the last entry on the first page, do you see

16   that? It's the product name is Ciprofloxacin HCL

17   750 milligrams, 100s, UD?

18      A.    Yes.

19      Q.    And that--that has under the AWP column-

20   -the entry is 4.82740; is that right?

21      A.    That's correct.

22      Q.    And then the typed-in average sale price

530

1   for that same product is 3.42934; is that right?

2       A.   No.

3       Q.   Oh, did I say--

4       A.   3.429394.

5       Q.   Thank you for the correction.   Then--

6   now, the average sale price information comes from

7   Bayer Corporation; is that right?

8       A.   That's correct.

9       Q.   The AWP information that appears comes

10  from what source?

11      A.   Comes from a hand entry by the pharmacy

12  program manager by looking up the reimbursement

13  rates, the AWP prices that we have in our claims

14  processing system.

15      Q.   And that AWP information is available by

16  any one of the Medicaid--Montana Medicaid

17  representatives?

18      A.   Yes.

19      Q.   They can access that?

20      A.   Yes.   Individuals that have security

21  clearance to access the claims file--the claims

22  payment system can look this up.

1      Q.    When were these hand--handwritten

2  entries reflected in Exhibit Buska 055 made?

3      A.    The document doesn't indicate a date,

4  but it would have been sometime after September

5  14th, 2001.

6      Q.    During what period--you mentioned that

7  the handwriting is Shannon Marr's; is that right?

8      A.    That's correct.

9      Q.    And during what period was Shannon Marr

10  in a position at Montana Medicaid to have been

11  able to make those entries?

12      A.    Would have been during her employment

13  with the State of Montana, which was a very short

14  period of time.  I do not recall the dates of

15  this, but I believe she was hired sometime around

16  the summer, spring, summer of 2001, and I think

17  the following summer she left.

18      Q.    The document we--we've been reviewing,

19  Exhibit Buska 055, was this document found in the

20  same place as the other Bayer average sale price

21  reports were found?

22      A.    I believe so, in the pharmacy program

532

1    officer's files.

2         Q.   Well, is it fair to say that this

3    document reflects Montana Medicaid's comparison of

4    Bayer's reported average sale price information to

5    the AWP information that the Medicaid department

6    has access to for each of the reference products?

7         A.   Yeah, it would be a comparison.

8         Q.   Were other similar comparisons made for

9    other time periods and other Bayer average sale

10   price reports?

11        A.   Not to my knowledge.

12        Q.   Were there any discussions within

13   Montana Medicaid concerning Exhibit Buska 055?   In

14   other words, concerning the comparison of the

15   Bayer average sale price information to the AWP

16   information for the same product?

17        A.   Could you clarify your question?   Is

18   that there was a discussion?

19        Q.   Any internal discussion within Montana

20   Medicaid concerning the comparison of the AWP

21   information and the Bayer average sale price

22   information.

555

1    testimony because we pay according to our state

2    plan.

3         Q.   One point I'll push on.  You've

4    previously testified that the Montana pharmacy

5    program director compared Bayer ASP information to

6    the corresponding AWP information for the

7    particular Bayer product; is that right?

8         A.   Yes, there's that document that

9    indicates that.

10        Q.   So is it fair to say that Montana

11   Medicaid considered the Bayer average sale price

12   information in evaluating its payment methodology

13   that was in existence at the time?

14        A.   No, I wouldn't say that--that document

15   would indicate that.

16        Q.   Well, what does that document indicate

17   to you?

18        A.   That document that we previously

19   referred to would indicate somebody did a

20   comparison of the AWP price to the average sales

21   price, not what we would pay for that particular

22   drug to the average sales price, because the

558

1   "Incorporating the Bayer ASP information into the

2   logarithm would require a manual process." Do you

3   see that?

4       A.   Yes.

5       Q.   What does that mean?

6       A.   What he's referring to there is that

7   this information is--from Bayer was for NDCs

8   provided by--by Bayer. The information that we

9   get from First DataBank is electronically,

10  although the information was submitted on a

11  diskette with this--with this data. What the State

12  of Montana would have to do is--is pay--or have

13  staff access our pricing system and manually enter

14  that information into our state's pricing system

15  for this one--one drug manufacturer. We receive

16  AWP information for over--I would guess over 400

17  drug manufacturers with thousands of NDCs done

18  electronically. Entering this information and

19  utilizing this would have required staff resources

20  to manually enter it, verify its accuracy in order

21  to establish the payment rates.

22       Q.   Well, First DataBank received this same

566

1  state program

2       Q.   I understand.  But Montana Medicaid

3  interprets its own regulations.

4       A.   We establish the regulations for the

5  State of Montana.

6       Q.   And it's fair to say you interpret your

7  own regulations; is that right?

8       A.   Yes.  We did not.

9       Q.   The--the circumstances that led Montana

10  Medicaid not to utilize the Bayer average sale

11  price information in determining estimated

12  acquisition costs, did those same circumstances

13  exist in 1999?

14       A.   Why are we asking about 1999?  In--in

15  terms of the circumstances, I'm not sure.

16       Q.   I'm trying to understand whether there's

17  anything new that happened in 2001 going forward

18  that caused the State to determine that it would

19  not use the average sale price information, or if

20  that's the same--the same facts and circumstances

21  existed in 1999, in 1998, in 1997 that would cause

22  the State not to use the Bayer average sale price

567

1    information had it been received.

2         A.    In 1999?

3         Q.    Right.

4         A.    Wouldn't have changed to my--to my

5    knowledge. It wouldn't have been any different.

6         Q.    The State would have done the same

7    thing.

8         A.    We would have paid according to our

9    state plan that we had at the time.

10        Q.    And at that time in, say, like, 1999,

11   the state plan would be that the estimated

12   acquisition cost would be determined by AWP minus

13   10 percent.

14        A.    Minus 10 percent, yes.

15        Q.    And that same reimbursement level--or

16   estimated--estimated acquisition cost level, I

17   should say, existed in 1997 and 1996; is that

18   right?

19        A.    At AWP--AWP minus 10 percent, yes.

20        Q.    The State of Montana would have used

21   that methodology for determining estimated

22   acquisition cost during those time periods.

1   regardless whether Bayer provided you ASP

2   information during that time period.

3        A.   Yes, I guess that would be fair to say.

4        Q.   If we could, sir, I'd like to just touch

5   on Exhibit Buska 022, and referencing back to the

6   entry that we've discussed before that concerns

7   the estimated acquisition cost calculation; and

8   first, I'll just read it--the relevant portion

9   that I'm interested in discussing with you.  "The

10  Estimated Acquisition Cost, which includes single

11  source, brand necessary and drugs other than

12  multi-source, is established using the following

13  methodology:  Drugs paid by their Average

14  Wholesale Price (AWP) will be paid at AWP less 10

15  percent.  The policy for the reimbursement of

16  direct price (DP) drugs (the price charged by

17  manufacturers to retailers) is the current direct

18  price (the direct price in effect on the date of

19  the service of the claim."  Sir, this is--reflects

20  what you've earlier testified that in setting the

21  estimated acquisition cost, Montana Medicaid, at

22  least during this period, would utilize their

573

1   EXHIBIT:

2                    (Exhibit Buska 057 marked for

3   identification.)

4      Q.   (By Mr. Doss)  For the record, Exhibit

5   Buska 057 is a document Bates labeled MT 076251.

6   It appears to be, at least initially, an e-mail

7   from Jeff Buska to Shannon Marr dated December 10,

8   2001, the subject line is a forward ASP

9   implementations.  Mr. Buska, can you identify this

10  document?

11     A.   Yes, it's an e-mail from--within the

12  State of Montana from me to Shannon Marr, and I

13  had received it from a Cynthia Denemark, and her

14  e--her e-mail address was

15  cynthia.denemark@eds.com.

16     Q.   And what is eds.com?

17     A.   I think EDS is the acronym for--EDS, I

18  don't know what EDS stands for.  It's a--it's a

19  private contractor out there that some states use.

20     Q.   Use--is it a Medicaid--provides Medicaid

21  management services?

22     A.   Not necessarily.  I think EDS is like