# EXHIBIT 9

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

UNITED STATES OF AMERICA
ex rel.

       VEN-A-CARE OF THE FLORIDA
KEYS, INC., a Florida corporation, by
and through its principal officers and
directors, ZACHARY T. BENTLEY and
T. MARK JONES,

             Plaintiff,

v.

ABBOTT LABORATORIES, INC. and
HOSPIRA, INC.,

          Defendants.

Case No.: 06-CV-21303-ASG

Hon. Alan S. Gold

## DEFENDANT ABBOTT LABORATORIES INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS TO PLAINTIFF UNITED STATES OF AMERICA

Defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Rule 34 of the Federal Rules

of Civil Procedure, requests that Plaintiff the United States of America produce the documents

requested herein by making them available for inspection and copying at the offices of Jones

Day, 51 Louisiana Ave., NW, Washington, DC 20001, or at such other place and in such manner

as may be mutually agreed upon between counsel for the parties, within thirty (30) days from the

date of service of these Requests.

## DEFINITIONS

1.    "Abbott" means Abbott Laboratories, Inc. and Abbott Laboratories and any of
their past or present officials, officers, representatives, agents, assigns, attorneys, employees,
divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or
purporting to act on their behalf or under their control.

2.    "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

3.    "Arkansas HHS Medicaid Determination" means and refers to a determination by HHS to disapprove of Amendment 88-05 to the Arkansas state Medicaid plan (*see* 53 Fed. Reg. 45,587 (Nov. 10, 1988), and subsequent proceedings before and decisions of the HHS Department Appeals Board on August 22, 1991 (Decision No. 1273) and April 29, 1992 (Decision No. 1329)).

4.    "AWP" or "Average Wholesale Price" shall have the meaning ascribed in paragraphs 44 and 50 of the Complaint.

5.    "Best Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(c)(1)(C).

6.    "Between," when used in regard to the transmittal of information, shall mean any communication by, to, from, among, and for any individual(s) or entity(ies) specified in a particular request.

7.    "CHAMPUS" means Civilian Health and Medical Program of the Uniformed Services and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

8.    "CMS" means "Centers for Medicare and Medicaid Services," its predecessor agencies and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

9.    "Communication" means any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise.  All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

10.    "Complaint" means and refers to the Complaint filed on or around March 17, 2006 by which the United States of America intervened in certain portions in Case No. 95-1354-CIV-GOLD (severed to a new case number, 06-CIV-21303), pending in the United States District Court for the Southern District of Florida.

11.    "Concern," "concerning," "relating to," or "relate to" means refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly,

as required by the context to bring within the scope of the requests in this request for production of documents any documents that might be deemed outside their scope by another construction.

12.    "Congress" means the legislative branch of the U.S. Government, individual members of Congress, and any congressional committees or subcommittees, including but not limited to the Congressional Budget Office, Senate Finance Committee, the House Committee on Ways and Means, the House Committee on Energy and Commerce, the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, and all other branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

13.    "Customers" has the meaning ascribed to it in paragraph 3 of the Complaint.

14.    "Defendant" refers to Abbott.

15.    "Documents" means all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, communications, computer printouts, computer stores data, conferences, or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies, recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegraphs, telephone logs, telex messages, transcripts, website postings, and work papers, which are in the possession of the Carrier as defined above.  A draft or non-identical copy is a separate document within the meaning of this term.

16.    "DOJ" means the United States Department of Justice and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

17.    "EAC" or "Estimated Acquisition Cost" shall have the meaning set forth in 42 C.F.R. § 447.301  *See also* paragraph 39 of the Complaint.

18.    "Equivalent Drugs" means those drugs that contain the same active chemical compound or are considered to be therapeutically equivalent to the Subject Drugs.

19.    "FSS" means and refers to the Federal Supply Schedule and shall have the meaning ascribed to that program pursuant to 41 U.S.C. 259(b)(3)(A).

20.    "FUL" means the Federal Upper Limit, the ceiling established by the U.S. Government for reimbursement of certain drugs dispensed to Medicaid beneficiaries. *See* 42 CFR § 447.332.

21.    "GAO" means General Accounting Office and all its employees, agents, attorneys, agencies, committees, or affiliates.

22.    "HCFA" means the United States Health Care Financing Association, its predecessor and successor agencies and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing. "CMS" and "HCFA" mean the same agency and are used interchangeably throughout these Requests.

23.    "HCPCS" means Healthcare Common Procedural Coding System, the medical code set used by CMS that identifies health care procedures, equipment, and supplies for claim submission purposes.

24.    "HHS" means the United States Department of Health and Human Services and all its employees, agents, attorneys, agencies, committees, or affiliates.

25.    "HHS-OIG" means the Office of Inspector General for HHS and all its employees, agents, attorneys, agencies, committees, or affiliates.

26.    "Identify" or "state"

(a)    when used with reference to an individual person, means to state his full name, his position and business affiliation at the time referred to, his last known position and business affiliation, and his last known residence and business address;

(b)    when used with reference to an entity, means to state the entity's full name, last known address(es), telephone number(s), and organizational form (*e.g.*, corporation, sole proprietorship, partnership, joint venture, etc.); and

(c)    when used with reference to a document, means to state the nature of the document (*e.g.*, memorandum, letter, notes, etc.), its author(s), addressee(s), recipient(s), title, subject matter, date, present location, and custodian.

27.    "J Code" refers to the subset of the HCPCS code set with a high-order value of "J" that has been used to identify certain drugs and other items.

28.    "List Price" or "Direct Price" shall have the meaning ascribed to those terms in the Complaint. *See* Complaint, ¶ 59.

29.    "Louisiana HHS Medicaid Determination and Appeal" means and refers to the May 12, 1998 determination by HHS to disapprove of Amendment 87-33 to the Louisiana state Medicaid plan (*see* Administrative Record ("A.R.") 1142); the August 4, 1998 notice of reconsideration of that determination (*see* 53 Fed. Reg. 29,381); the December 29, 1988 hearing officer decision (*see* A.R. 2); the June 9, 1989 final HHS decision upholding disapproval of Amendment 87-33; and the subsequent appeal in the Court of Appeals for the Fifth Circuit, Case No. 89-4566, *The State of Louisiana vs. The United States Dep't of Health and Human Services, Appeal from The Final Decision of the Secretary of Health and Human Services Disapproving Louisiana State Plan Amendment No. 87-33, HHS #88-11* (decision published at 905 F.2d 877 (5th Cir. 1990)).

30.    "MAC" or "Maximum Allowable Cost" shall have the meaning set forth in 42 C.F.R. § 447.332. *See also* paragraph 40 of the Complaint.

31.    "Manufacturer" shall have the meaning set forth in 42 U.S.C. § 1396r-8.

32.    "Medicaid" means and refers to the jointly-funded Federal-State health insurance program enacted in 1965 as an amendment to the Social Security Act to pay for the costs of certain medical services and care.

33.    "Medicaid Intermediary" means and refers to any insurance company or other entity that has contracted with any State Medicaid Program to process claims for reimbursement of drugs, develop preferred drug lists, provide guidance on changes to reimbursement methodologies, or provide advice on cost savings, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

34.    "Medicaid Drug Rebate Program" means and refers to the program established by the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396r-8, as amended by the Veterans Health Act of 1992, whereby drug manufacturers have national drug rebate agreements with HHS and a pricing agreement with HHS for the Public Health Service Section 340B Drug Pricing Program.

35.    "Medicare" means and refers to the Federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain medical services and care.

36.    "Medicare Carrier" means and refers to any insurance company or other entity that has contracted with HCFA or CMS to process claims submitted under Part B of the Medicare program by any Provider, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

37.    "MFCU" means individual state Medicaid Fraud Control Units, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

38.   "MedPac" means Medicare Payment Advisory Commission and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

39.   "NAMFCU" means National Association of Medicaid Fraud Control Units and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

40.   "NDC" means "National Drug Code," the code set maintained by the Food and Drug Administration and adopted by the federal Secretary of Health and Human Services as the standard for reporting drugs and biologics on standard transactions.

41.   "OMB" means the Office of Management and Budget and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

42.   "Oklahoma HHS Medicaid Determination" means and refers to a June 1988 determination by HHS to disapprove of an Oklahoma state Medicaid plan submitted in October 1987 and revised in March 1988 concerning drug reimbursement, and subsequent proceedings before and decision of the HHS Department Appeals Board on August 13, 1991 (Decision No. 1271).

43.   "OPA" means the Office of Pharmacy Affairs, the previous name of the PAB, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

44.   "PAB" means the Pharmacy Affairs Branch, which administers the Public Health Service 340B Drug Discount Program, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

45.   "Person" means any natural person or any business, legal, or governmental agency or association.

46.   "Plaintiff" refers to the United States of America.

47.   "Provider" or "Providers" means and refers to any and all persons or entities that render health care services, including but not limited to pharmacists, physicians, nurses, nurse practitioners, physicians' assistants, specialty pharmacy, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

48.   "Publisher" or "Publishers" refers to Red Book, First DataBank, Blue Book, and Medi-Span, their predecessors and successors, and all employees, agents, consultants, accountants, or attorneys of any of the foregoing.

49.   "PSSC" means Pharmacy Services Support Center, which provides assistance to the PAB in administering the Public Health Service 340B Drug Discount Program, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

50.   "Relator" refers to Ven-A-Care.

51.   "Relevant Claim Period" shall refer to the period of January 1, 1991 to January 31, 2001 or any other time period for which Plaintiff is seeking damages or penalties. *See* Complaint, ¶ 51.

52.   "State Medicaid Program" means the state agency responsible for carrying out the Medicaid Program in a particular state and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing

53.   "Subject Drugs" means and refers to those drugs listed in paragraphs 31 and 35 of the Complaint.

54.   "Texas HHS Medicaid Determination" means and refers to a determination to disallow federal funds claimed by Texas under the Medicaid program for the period March 1, 1986 through December 31, 1987, and subsequent proceedings before and decision of the HHS Department Appeals Board on June 9, 1988 (Decision No. 961).

55.   "U.S. Government" means and refers to the all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.  U.S. Government includes but is not limited to CMS/HCFA, Congress, Department of Commerce, Department of Defense, DOJ, HHS, HHS-OIG, GAO, MedPac, OMB, OPA/PAB, PSSC, VA and any other agency, department, or committee of the U.S. Government that Plaintiff knows or believes has materials discoverable in this litigation.

56.   "VA" means the United States Department of Veterans Affairs, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

57.   "Ven-A-Care" means Ven-A-Care of the Florida Keys, Inc., a corporation organized under the laws of Florida, and all predecessor or successor corporations, and any of its past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on its behalf or under its control.

58.   "Ven-A-Care Qui Tam Complaint" refers to the Complaint filed under seal in the United States District Court for the Southern District of Florida, Case No. 95-1354-CIV (Gold), including all amended complaints.

59.     "WAC" or "Wholesale Acquisition Cost" shall have the meaning ascribed to that term in the Complaint.

60.     "You" and "Your" means and refers to Plaintiff the United States of America.

61.     "340B Provider" means and refers to any provider described in Section 340B of the Public Health Act, 42 U.S.C. § 256(b).

62.     The terms "and" and "or" shall mean "and/or."

63.     Any word written in the singular shall include the plural and vice versa.

64.     In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each," and "every," the intended meaning is inclusive rather than exclusive.

## INSTRUCTIONS

1.     These requests are not limited to documents in the possession of the United States Department of Health and Human Services ("HHS") or the central and regional offices of the Centers for Medicare & Medicaid Services ("CMS"), but include all responsive documents in the possession of Plaintiff the U.S. Government's executive, administrative, and legislative offices and agencies, including but not limited to those agencies and departments specified in the above definition of "U.S. Government," as well as all Medicare Carriers and Medicaid Intermediaries who served as agents of the U.S. Government throughout times relevant to the Complaint. In addition to these agencies, departments, and entities, Plaintiff is requested to search for and produce responsive documents from all other agencies or departments of the U.S. Government that Plaintiff has reason to believe may have documents responsive to these requests. In light of the short time available for fact discovery, Plaintiff is requested to inform counsel for Abbott immediately if it is unwilling to coordinate the search for and production of responsive documents to all such agencies, departments, or entities (*i.e.*, please do not wait until the time period for responding to the requests).

2.     *Time Frame.* Unless otherwise specified, these requests seek Documents that were prepared during, or relate to, the Relevant Claim Period *or* that correspond to the events, reports, laws, determinations, or documents referred to in particular requests.

3.     If any document was but is no longer in your possession, custody, or control, or was known to You, but is no longer in existence, state, as to each document, its date, author(s), recipient(s) and what disposition was made of it or what became of it.

4.     When an objection is made to any request or any subpart thereof, state with specificity the part or subpart of the document request considered to be objectionable and all grounds for the objection.

5.      If You find the meaning of any term in these document requests to be unclear, then You should assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

6.      Each request for documents seeks production of the document in its entirety, without abbreviation or redaction, including all attachments or other matters affixed thereto.

7.      With respect to each document that is withheld from production for any reason, or any portion of any document that has been redacted for any reason in connection with the production of a document, provide a statement setting forth:

(a)     its date;
(b)     its title;
(c)     its author;
(d)     its addressee;
(e)     the identify of each person who received and/or saw the original or any copy of such document
(f)     the specific privilege under which it is withheld;
(g)     its general subject matter;
(h)     its present custodian; and
(i)     description of it that you contend is adequate to support your contention that it is privileged.

8.      With respect to any conversation for which a privilege is being asserted, identify by stating the following:

(a)     when and where the conversation occurred;
(b)     the name, title and job or position of each person who present at or during the conversation whether or not such conversation was in person or by telephone;
(c)     a brief description of the conversation's subject matter;
(d)     the statute, rule or decision that is claimed to give rise to the privilege; and
(e)     the name, title and job or position of all persons on whose behalf the privilege is asserted.

9.      All documents are to be produced as they are kept in the usual course of business, their relative order in such files, and how such files were maintained. All electronic files should be produced where possible in electronic form, along with any software needed to access the information contained in the file and appropriate legends, keys, or other information needed to access and understand the data.

## DOCUMENTS REQUESTED

### *Category 1:  General*

     1.     All Documents mentioned in or referred to in preparing Your response to any set of interrogatories or requests for admission served by Abbott in this case.

     2.     For the period January 1, 1980 to the end of the Relevant Claim Period, Documents, such as current or historical organizational charts, sufficient to identify all individuals involved in establishing the methodologies, policies, and procedures used in determining payment of drugs under Medicare Part B.

     3.     For the period January 1, 1980 to the end of the Relevant Claim Period, Documents, such as current or historical organizational charts, sufficient to identify all individuals involved in establishing the methodologies, policies, and procedures used in determining payment of drugs under Medicaid.

     4.     For the period January 1, 1980 to the end of the Relevant Claim Period, Documents, such as current or historical organizational charts, sufficient to identify all individuals involved in establishing the price at which the U.S. Government (*e.g.*, VA, Department of Defense) purchased drugs directly or indirectly from Manufacturers, distributors, or wholesalers.

     5.     For the period January 1, 1980 to the end of the Relevant Claim Period, Documents, such as current or historical organizational charts, sufficient to identify all individuals involved in establishing the price at which state governments purchased drugs directly or indirectly from Manufacturers, distributors, or wholesalers.

### *Category 2:  Claims Data and Processing*

     6.     For each Medicare and Medicaid transaction during the Relevant Claim Period relating to the Subject Drugs and Equivalent Drugs, complete claims data with related field definitions, data dictionaries, source tables, relationship tables, and business rules for all populations for which damages are being alleged.  This data is requested in electronic form used by SQL Server, Microsoft Access, Microsoft Excel, or a delimited file that can be readily uploaded into one of those programs.  The complete claims data requested includes all fields, other than individual patient identifiers, contained on the Provider's claim submission and all additional fields added to process the claim, including:

     (a)     *Identifier*:  claim number, sequence number representing each line item of the claim, and other identifying information;

     (b)     *Claim Type*:  physician supplier, outpatient hospital, physician crossover, etc.;

(c)   *Transaction Type*: all available transaction type information, such as correction, cancellation, etc., identifiers, and source transaction information (*e.g.*, if one claim corrects another claim, information about which claim is being corrected);

(d)   *Status*: all status information, including the payment code indicating whether the claim has been accepted, processed, and/or paid and the type of program the claim will be processed under (*e.g.*, Medicaid, Managed Care, etc.);

(e)   *Dates*: all available dates, including the date service was provided, the date the claim was received, and the date the claim was paid;

(f)   *Basis of payment*: coding within the claim payment transaction which identifies the reference point from which the claim payment amount is determined (*e.g.*, AWP, usual & customary);

(g)   *Provider*: all information for all relevant Providers, including Provider type (*e.g.*, hospital, retail pharmacy, etc.), number, name, address, contact information, and area/field of practice (where relevant);

(h)   *Product*: all product information, including:

    (i)   HCPCS code where applicable;

    (ii)   NDC whenever available, including where available for non-pharmacy claims (*e.g.*, from memo field, supplemental provider submissions and/or HCPCS code translations).  Provide all 11 digits (do not drop leading or trailing 0's) and ideally in three separate fields – labeler (first five digits), product (next four digits) and package size (final two digits);

    (iii)   Name;

    (iv)   Type (*e.g.*, single source, multi-source);

    (v)   Therapeutic class; and

    (vi)   Related items like diagnosis codes, place of service, and type of service (where relevant).

(i)   *Units*: all units information with decimals in the correct position, including submitted units, allowed units, and unit of measure (*e.g.*, capsule vs. bottle, milliliter, etc.);

(j)   *Other Data for Payment*: any other data used to determine the amount of the payment not listed above (*e.g.*, channel of procurement, etc.);

(k)     *Payments*: all fields related to billed amounts, payment limit amounts, allowed amount, and actual amounts paid along with the bases for the payment, all with decimals in the correct position, including:

  (i)     Drug cost (basis of payment might include EAC, FUL, MAC, Billed Amount, Charges, Cost, AWP, WAC, etc.);

  (ii)    Dispensing fee;

  (iii)   Service administration fee (*e.g.*, provider service fees);

  (iv)    Any other payment amount (*e.g.*, inventory management fee/profit factor, delivery fee, generic incentive fee, etc.); and

  (v)     Any amounts used to reduce amount paid (*e.g.*, payments received from other payors and the number, name, and other information associated with such payors).

(l)     *Comments*: all other memo or free-form fields (*e.g.*, Item 19 of the HCFA-1500).

7.     For each year and for each time within each year that a calculation was made, all Documents concerning how each Medicare Carrier calculated the median AWP or, when applicable, the "lowest branded AWP" for the Subject Drugs. *See* 42 C.F.R. 405.517(c).

8.     For each year and for each time within each year that a calculation was made, all Documents concerning how each Medicare Carrier and Medicaid Intermediary determined payment amounts for the Subject Drugs and the Equivalent Drugs.

9.     For each Medicare and Medicaid claim You allege to have been inflated and for which You are seeking damages or statutory penalties, all Documents concerning how You determined the Provider's actual acquisition cost and/or the amount by which the claim was inflated.

10.    All drug fee schedules concerning the Subject Drugs and the Equivalent Drugs, including all updates, revisions, or corrections.

11.    To the extent not requested above, all Documents that reflect the losses, damages, or alleged overpayments made by the U.S. Government as a result of Abbott's alleged conduct.

12.    From January 1, 1965 to the end of the Relevant Claim Period, all Documents relating to any Communications between the U.S. Government and Medicare Carriers, State Medicaid Programs, Medicaid Intermediaries, NAMFCU, MFCUs, the National Association of State Medicaid Directors, or the National Governors Association concerning the methodologies, policies, and procedures to be used in determining payment for drugs under Medicare Part B or

Medicaid, including but not limited to Medicare Part B Newsletters, Program Memoranda, National Coverage Decisions, Local Medical Review Policies, Bulletins, meetings, seminars, circulars, governmental reports, or any transmission of data.

13.     All State Medicaid Program plans, under 42 U.S.C. § 1396(a), and other documents concerning how Medicaid Intermediaries or State Medicaid Programs calculated or determined payment amounts for the Subject Drugs or the Equivalent Drugs, including all policy and procedure manuals, proposals, drafts, and working papers.

14.     To the extent not requested above, all Documents concerning the methodologies, policies, and procedures to be used in determining payment for drugs under Medicare Part B or Medicaid.  Such documents should include the source (*e.g.*, Red Book, Blue Book, Medispan) of AWP, WAC, or other figure if reimbursement was based on such figures.

15.     All Documents concerning how State Medicaid Programs paid 340B Providers for supplying or administering drugs to Medicaid beneficiaries.

16.     For each quarter during the Relevant Claim Period, Documents sufficient to identify the Federal Medical Assistance Percentage ("FMAP") applicable to each State Medicaid Program.

17.     For each quarter during the Relevant Claim Period, Documents sufficient to show how Medicare Carriers or Medicaid Intermediaries calculated any FUL applicable for the Subject Drugs or the Equivalent Drugs.

18.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning any audit, report, study, analysis, or survey (whether completed or not) concerning the differences in the amounts that Medicare Carriers or Medicaid Intermediaries paid for the Subject Drugs or Equivalent Drugs under Medicare Part B or Medicaid, including but not limited to all Documents concerning differences in how Medicare Carriers or Medicaid Intermediaries calculated the median AWP or "lowest branded AWP." *See* 42 C.F.R. 405.517(c).

### *Category 3: Government Drug Payment Analyses and Contracts*

19.     From January 1, 1965 to the end of the Relevant Claim Period, all Communications involving any Person working for or on behalf of the U.S. Government, any state government or State Medicaid Program, MedPac, NAMFCU or any MFCU, any Provider, any Publisher, or any Manufacturer concerning (i) the methodologies, policies, and procedures to be used in determining payment for drugs under Medicare Part B or Medicaid, (ii) drug pricing, or (iii) the acquisition costs of Providers for drugs.

20.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents relating to any report, memorandum, audit, study, analysis, or survey (whether completed or not) concerning (i) the methodologies, policies, and procedures to be used in determining

reimbursement for drugs under Medicare Part B or Medicaid, (ii) drug pricing, or (iii) the acquisition costs of Providers for drugs, including but not limited to the reports included on the attached Schedule A.

21.    Documents, such as distribution lists, sufficient to show every Person who was sent or received any of the reports identified in response to Request No. 20, including but not limited to those listed on Schedule A.

22.    From January 1, 1965 to the end of the Relevant Claim Period, all Documents that mention, refer to, or discuss the relationship between AWP, WAC, List Price, Direct Price or any other figure and (i) the actual or average acquisition cost of Providers and/or (ii) the amount paid by Medicare Part B or Medicaid.

23.    All Documents identified in Attachment B to Joan M. Hollenbach's February 20, 2004 letter to Joshua T. Buchman, Esq. (copy attached at Tab 1).

24.    All Documents concerning the revised AWP data referred to in Program Memorandum AB-00-86, *An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program*, including all drafts, working papers, transmittal letters, notes, edits, and supporting data.

25.    From any time period, all Documents from the files of the following individuals concerning drug pricing, drug reimbursement under Medicare or Medicaid, or the actual or average acquisition costs of Providers:

(a)    Dr. Bruce Vladeck (CMS);
(b)    Dr. Donna E. Shalala (CMS);
(c)    Thomas A. Scully (CMS);
(d)    Robert Neiman (CMS/HCFA);
(e)    Gail Wilensky (CMS/HCFA);
(f)    Kathleen Buto (CMS/HCFA);
(g)    Bernie Patashnek (CMS/HCFA);
(h)    Stanley Weintraub (CMS/HCFA);
(i)    Tom Ault (CMS/HCFA);
(j)    Charles Booth (CMS/HCFA);
(k)    Ira Burney (CMS/HCFA);
(l)    Mike Hash (CMS/HCFA);
(m)    Richard Kucerow (HHS-OIG);
(n)    Dr. Barton McCann (HHS-OIG);
(o)    June Gibbs Brown (HHS-OIG);
(p)    Dr. Jack Hoadley (HHS/HCFA);
(q)    Mark B. McClellan (CMS);
(r)    Peter Rodler (CMS/HCFA);
(s)    Robert Helms (HHS);
(t)    Don Hearn (CMS/HCFA);

(u)   J.D. Sconce (CMS/HCFA);
(v)   Nancy Saltzman (CMS/HCFA);
(w)   Lawrence L. McDonough (CMS/HCFA);
(x)   Loius B. Hays (CMS/HCFA);
(y)   Carol Walton (CMS/HCFA);
(z)   Frank J. Camozzi (CMS/HCFA);
(aa)  Dr. Grant E. Steffen (CMS/HCFA);
(bb)  Grace Witles (CMS/HCFA); and
(cc)  Nancy-Ann Min DePerle (HHS).

26.    All Documents concerning or referring to December 13, 1997 remarks by President William Jefferson Clinton regarding the systematic overpayment for prescription drugs, including but not limited to all Documents relied upon or referenced in Mr. Clinton's remarks. *See* White House Office of Press Secretary, Remarks by the President in Radio Address to the Nation (Dec. 13, 1997).

27.    To the extent not requested above, from January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning the meaning and calculation of AWP, WAC, EAC, List Price or Direct Price and/or the decision of whether to use AWP, WAC, EAC, List Price or Direct Price in calculating payment under Medicare Part B or Medicaid.

28.    All Documents concerning the meaning of AMP; the calculation of AMP; the relationship of AMP to AWP, WAC, EAC, List Price or Direct Price; and/or the decision of whether to use AMP in calculating reimbursement under Medicare Part B or Medicaid.

29.    To the extent not requested above, from January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning why Medicare Part B and Medicaid did not use Providers' actual acquisition cost in calculating payment under Medicare Part B and/or Medicaid.

30.    From January 1, 1965 to the end of the Relevant Claim Period, all Communications between HCFA/CMS, HHS, or HHS-OIG and VA, CHAMPUS/Tricare Department of Defense, or any 340B Provider concerning the payment, purchase price, or expenditure of VA, CHAMPUS/Tricare, Department of Defense, or any 340B Provider for the Subject Drugs.

31.    To the extent not requested above, copies of all Federal Supply Schedules listing the Subject Drugs.

32.    To the extent not requested above, all pricing data received or calculated by the U.S. Government or its agents concerning AMP, Best Price, Medicaid Unit Rebate Amount, Non-Federal Average Manufacturers Price, Federal Ceiling Price, Medicare Average Selling Price, or Average Selling Price Provided Under a Corporate Integrity Agreement.

33.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents relating to any report, memorandum, audit, study, analysis, or survey (whether completed or not) concerning the adequacy of reimbursement of professional services associated with the dispensing or administration of drugs under Medicare Part B or Medicaid.

34.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning whether the payment formula for the drug ingredient cost could serve as a means of subsidizing, or as a means of offsetting perceived or asserted under-reimbursement for, professional services associated with the dispensing or administration of drugs under Medicare Part B or Medicaid, or as a mechanism to encourage treatment outside of the hospital setting.

35.     All Documents concerning any increase in Medicare Part B reimbursement for professional services associated with the dispensing or administration of drugs, including but not limited to Documents relating to the increase in the administration fee associated with the Medicare Modernization Act.

36.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning whether the payment formula for the drug ingredient cost could serve as a means of ensuring equal access to care for Medicaid beneficiaries under 42 U.S.C. § 1396a(a)(30).

## *Category 4: HHS Regulations and Prior Determinations*

37.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning the promulgation of any contemplated, proposed, or actual federal legislation, regulation, or policy concerning payment for drugs under Medicare or Medicaid, including any comments, suggestions, criticisms, surveys, studies, or data related to such legislation, regulation, or policy, including but not limited to those listed on the attached Schedule B.

38.     All Documents relating to actions taken or considered by You to change the methodology to pay for drugs under Medicare Part B or Medicaid after becoming aware that AWP exceeded the average acquisition costs of Providers for drugs, including the Subject Drugs.

39.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning the purpose, motive, or policy behind establishing the FUL program.

40.    All Documents or Communications concerning why no FUL was calculated for one or more of the Subject Drugs.

41.    All Documents concerning the purpose, motive, or policy behind establishing the MAC program. *See* Program Memorandum AB-02-174 (Dec. 3, 2002).

42.    All Documents concerning the purpose, motive, or policy behind establishing the Single Drug Pricer methodology. *See* Program Memorandum AB-02-174 (Dec. 3, 2002).

43.    All Documents concerning the Louisiana HHS Medicaid Determination and Appeal, including but not limited to:

(a)    a full and complete copy of the administrative record;

(b)    a full and complete copy of the record on appeal, including all documents sent to HHS by the Fifth Circuit on or about August 24, 1990;

(c)    all briefs, exhibits, appendices, and transcripts of oral argument;

(d)    all Documents specifically referenced in the brief filed by HHS filed on January 12, 1990 (attached at Tab 2) ("HHS Brief");

(e)    all Documents concerning the Task Force appointed to review prescription drug reimbursement (as referenced on page 11 of the HHS Brief);

(f)    all Documents concerning HCFA's exploration of alternative data sources for use in determining acquisition costs (as referenced on page 11 of the HHS Brief);

(g)    all Documents concerning HCFA's advice to states of the problems with AWP and suggestions for alternatives following the issuance of the June 1984 OIG Report (as referenced on page 11 of the HHS Brief);

(h)    all Documents sufficient to show or concerning to whom HCFA sent copies of the June 1984 OIG Audit Report in September 1984, including all of the state Medicaid agencies to which the report was sent (as referenced on page 11 of the HHS Brief);

(i)    all Documents concerning reviews conducted by HCFA regional offices, including the HCFA regional office for Region VI (comprising Arkansas, Louisiana, New Mexico, Oklahoma, and Texas), regarding pharmacy purchase prices (as referenced on page 12 of the HHS Brief);

(j)    all Documents concerning region-level work groups convened by HCFA regional offices (including the HCFA regional office for Region VI) in or about November 1984 and January 1995 to examine the use of AWP and to develop alternative methods that could be used in arriving at more accurate estimates (as referenced on page 12 of the HHS Brief);

(k)    all Documents concerning, including notes and documents sufficient to show the participants in, the September 4, 1985 conference call held between senior HCFA central office officials and the ten HCFA regional office administrators estimates (as referenced on page 12 of the HHS Brief); and

(l)    all data, mathematical and statistical computations, comparisons, and other pertinent records submitted by states to HCFA in support of the establishment of

an EAC as required by federal regulations estimates (as referenced on page 31 of the HHS Brief).

44.   All Documents concerning the Arkansas HHS Medicaid Determination, including but not limited to:

(a)   a full and complete copy of the administrative record;
(b)   a full and complete copy of the record on appeal;
(c)   all briefs, exhibits, appendices, and transcripts of oral argument;
(d)   all Documents specifically referenced (as Exhibits) in the HHS Department Appeal Board's August 22, 1991 decision (Decision No. 1273) (attached at Tab 3) and April 29, 1992 decision (Decision No. 1329) (attached at Tab 4);
(e)   all Documents concerning the audit conducted in 1983 by the HHS Office of the Inspector General in six states finding that pharmacists' drug costs averaged approximately 16% below AWP (as referenced in Decision No. 1273);
(f)   all Documents concerning HCFA's September 20, 1998 notice that it disapproved of State Plan Transmittal No. 88-05 (as referenced in Decision No. 1273); and
(g)   all Documents concerning the survey conducted by Myers and Stauffer for the state of Arkansas (as referenced in Decision No. 1273).

45.   All Documents concerning the Oklahoma HHS Medicaid Determination, including but not limited to:

(a)   a full and complete copy of the administrative record;
(b)   a full and complete copy of the record on appeal;
(c)   all briefs, exhibits, appendices, and transcripts of oral argument;
(d)   all Documents specifically referenced (as Exhibits) in the HHS Department Appeals Board's August 13, 1991 decision (Decision No. 1271) (attached at Tab 5);
(e)   all Documents concerning the federal audit conducted in six states finding that pharmacists' drug costs averaged approximately 16% below AWP (as referenced in Decision No. 1271); and
(f)   all Documents concerning the subsequent HCFA review of pharmacists' drug costs in Oklahoma in 1984 (as referenced in Decision No. 1271).

46.   All Documents concerning the Texas HHS Medicaid Determination, including but not limited to:

(a)   a full and complete copy of the administrative record;
(b)   a full and complete copy of the record on appeal; and
(c)   all briefs, exhibits, appendices, and transcripts of oral argument.

47.   To the extent not requested above, all Documents concerning any administrative or judicial proceeding involving actual or threatened action by CMS/HCFA to disapprove a State

Medicaid plan or plan amendment, or disallow federal financial participation, due to provisions regarding drug payment.

48.     All Documents concerning any decision to approve or disapprove a State Medicaid plan using a managed care program to control the cost of Medicaid payments for drugs.

49.     To the extent not requested above, all Documents concerning any administrative or judicial proceeding regarding the use of AWP or WAC in a methodology for drug payment under Medicare B or Medicaid.

50.     All Documents relating to a town hall-style meeting held in Bucks County, Pennsylvania in September 2002 involving Representative James C. Greenwood (R-PA) and CMS Administrator Thomas A. Scully at which the topic of drug payment under Medicare was discussed, including but not limited to any recordings, attendance lists, agendas, notes, or data.

### *Category 5:  Medicaid Drug Rebate Program*

51.     . All Documents concerning the purpose, motive, or policy behind establishing the Medicaid Drug Rebate Program.

52.     For the Subject Drugs and Equivalent Drugs, all Communications concerning the reporting of AMP in connection with the Medicaid Drug Rebate Program between and among Manufacturers, the U.S. Government, any State Medicaid Program, or any Medicare Carrier or Medicaid Intermediary, as well as Documents sufficient to identify which Persons within the U.S. Government received AMP information for the Subject Drugs and Equivalent Drugs.

53.     Documents sufficient to identify the amounts received each year by each state under the Medicaid Drug Rebate Program for the Subject Drugs and Equivalent Drugs.

54.     Documents sufficient to identify all Persons who had access to or actual knowledge of the AMPs for the Subject Drugs.

55.     All Documents that reflect any supplemental or additional rebates (*i.e.*, a rebate other than provided for under the Medicaid Drug Rebate Program) requested or received from any Manufacturer, including any legislative or regulatory proposal regarding supplemental or additional rebates from any Manufacturer.

### *Category 6:  Relator/Ven-A-Care*

56.     The disclosure statement filed by Ven-A-Care pursuant to 31 U.S.C. § 3730(b)(2), as well as Documents sufficient to identify which Persons within the U.S. Government, any State Medicaid Program, NAMFCU, any MFCU, any Medicare Carrier, and/or any Medicaid

Intermediary received either that document or the Ven-A-Care Complaint, and when and under what circumstances such Persons received those documents.

57.     From any time period, all disclosure statements filed by Ven-A-Care in any state or federal qui tam action.

58.     From any time period, all qui tam complaints or disclosure statements pursuant to 31 U.S.C. § 3730(b)(2) provided to the U.S. Government or any state government relating to payment of drugs under Medicare Part B or Medicaid, as well as Documents sufficient to identify which Persons within the U.S. Government, state governments, Medicare Carriers, and Medicaid Intermediaries received those documents, and when and under what circumstances such Persons received those documents.

59.     From any time period, all Communications between Ven-A-Care and the U.S. Government concerning the prices paid by Providers for drugs and/or payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

60.     From any time period, all Communications between Ven-A-Care and the U.S. Government concerning Ven-A-Care's efforts to persuade the U.S. Government to intervene in any drug pricing litigation.

61.     All Communications referenced in an October 2, 1996 letter from Ven-A-Care to Dr. Bruce Vladeck (attached at Tab 6), and all Documents relating to that document and to those Communications.

62.     Documents sufficient to identify which Persons, including Persons within the U.S. Government, any state government, or any Medicare Carrier or Medicaid Intermediary, received the October 2, 1996 letter from Ven-A-Care to Dr. Bruce Vladeck (attached at Tab 6) or any similar letter provided to a different addressee.

63.     From any time period, all Communications between Ven-A-Care and any State Medicaid Program, any MFCU, any Medicare Carrier or Medicaid Intermediary, or any state governmental agency, entity, employee, consultant, or attorney concerning the prices paid by Providers for drugs and/or payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

64.     From any time period, all Communications between Ven-A-Care and any Publisher concerning the prices paid by Providers for drugs and/or the payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

65.     All pleadings or other Documents filed in *United States ex rel. Ven-A-Care vs. Abbott Labs., et al.*, Case No. 95-1354-CIV-GOLD, United States District Court for the Southern District of Florida.

## Category 7:  Medicare Carriers and Medicaid Intermediaries

66.    Documents sufficient to identify all Medicare Carriers, as well as the time period and geographical areas for which they served, including name, address, and contact information.

67.    Documents sufficient to identify all Medicaid Intermediaries and any other vendor used by State Medicaid Programs in connection with the payment of drugs, as well as the time period and geographical areas for which they served, including name, address, and contact information.

68.    Documents sufficient to identify the corporate structure of any Medicare Carrier or Medicaid Intermediary during the period that it acted as a Medicare Carrier or Medicaid Intermediary.

69.    Documents, such as employee directories or organizational charts, sufficient to identify the names, titles, and/or job descriptions of employees of any Medicare Carrier or Medicaid Intermediary during the period that it acted as a Medicare Carrier or Medicaid Intermediary.

70.    Documents sufficient to identify the members of each Medicare Carrier or Medicaid Intermediary's Carrier Advisory Committee (or other equivalent group or committee), including documents sufficient to identify each member's name, current or last known address, and, if the member is a physician, the member's specialty.

71.    From January 1, 1965 to the end of the Relevant Claim Period, all Communications between any Medicare Carrier or Medicaid Intermediary and Abbott regarding payment for drugs under Medicare Part B or Medicaid.

72.    From January 1, 1965 to the end of the Relevant Claim Period, all Communications between any Medicare Carrier or Medicaid Intermediary and any other Medicare Carrier, Medicaid Intermediary, or Provider concerning AWP, WAC, AMP, Direct price and/or List price, or the methodology to be used in calculating payment for drugs under Medicare Part B or Medicaid.

73.    From January 1, 1965 to the end of the Relevant Claim Period, all Documents relating to any discussions or meetings at any Medicare Carrier or Medicaid Intermediary concerning the use of some figure, price, or methodology other than AWP as a measure of reimbursement for drugs by Medicare Part B, Medicaid, or private insurers.

74.    From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning whether any Medicare Carrier or Medicaid Intermediary knew or was on notice that AWP exceeded the actual or average acquisitions costs of Providers.

75.     From January 1, 1965 to the end of the Relevant Claim Period, all Communications between any Medicare Carrier or Medicaid Intermediary and the U.S. Government or any state government concerning whether AWP exceeded the actual or average acquisition costs of Providers.

76.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning whether AWP exceeded the actual or average price at which private insurers or any governmental payor paid for drugs eligible for reimbursement under Medicare Part B or Medicaid.

77.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning whether the U.S. Government, any state government, any Medicare Carrier or Medicaid Intermediary, governmental payor, or private insurer knew that Manufacturers marketed the "spread" (as that term is used in paragraph 3 of the Complaint) and/or the difference between payment under Medicare Part B or Medicaid and actual or average acquisition costs of Providers.

78.     From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning the "spread" (as that term is used in paragraph 3 of the Complaint) and/or the difference between payment under Medicare Part B or Medicaid and actual or average acquisition costs of Providers.

79.     All Documents produced by any Medicare Carrier or Medicaid Intermediary to any governmental agency in connection with any investigation of drug pricing.

80.     All Documents produced by any Publisher to any governmental agency in connection with any investigation of drug pricing.

81.     All Documents given to Plaintiff through formal or informal requests to third parties concerning the prices, costs, or payments of the Subject Drugs.

82.     All Documents relating to any proceeding, including but not limited to lawsuits, administrative or legislative proceedings, and criminal or civil investigations, at which any Medicare Carrier or Medicaid Intermediary and/or its agents have testified concerning the pricing of pharmaceutical products.

### *Category 8:  Plaintiff's Allegations*

83.     All Documents identified in Your initial disclosures under FRCP 26(a)(1).

84.     In paragraph 3 of the Complaint, Plaintiff states that "Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 31 and 35 below) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set

reimbursement rates for Abbott's customers." Produce all Documents that support, concern, or refute your contention.

85.     In paragraph 3 of the Complaint, Plaintiff states that Abbott "marketed to existing and potential Customers the government-funded 'spread' between the inflated reimbursement amounts and the actual acquisition costs of the drugs to boost its sales and profits." Produce all Documents that support, concern, or refute your contention.

86.     In paragraph 6 of the Complaint, Plaintiff states that "Abbott also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states." Produce all Documents that support, concern, or refute your contention.

87.     In paragraph 37 of the Complaint, Plaintiff states:  "The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining reimbursement rates for prescription drugs." Produce all Documents relating to instances where third party payor insurance companies did not use information contained in the published pricing compendia in determining reimbursement rates for prescription drugs.

88.     In paragraph 37 of the Complaint, Plaintiff states that "Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs." Produce all Documents that support, concern, or refute your contention.

89.     As to the Subject Drugs and Equivalent Drugs, produce all Documents relating to the use of MAC or the "providers' usual and customary charges" in determining the amount of reimbursement under Medicaid. *See* paragraph 40 of the Complaint.

90.     In paragraph 42 of the Complaint, Plaintiff states that "AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient." Produce all Documents that support, concern, or refute your contention.

91.     In paragraph 42 of the Complaint, Plaintiff states that "WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail customer." Produce all Documents that support, concern, or refute your contention.

92.     In paragraph 45 of the Complaint, Plaintiff states that "some State Medicaid programs also received price representations directly from manufacturers, and relied upon these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts." Produce all Documents that support, concern, or refute your contention.

93.    In paragraph 46 of the Complaint, Plaintiff states: "In general, Medicare relied on median AWPs to set reimbursement rates." Produce all Documents relating to instances where Medicare did <u>not</u> rely on median AWPs to set reimbursement rates.

94.    In paragraph 56 of the Complaint, Plaintiff states: "The Customers purchased the products directly from Abbott, through a GPO contract or through wholesalers." Produce all Documents concerning the amounts that Customers actually paid for the Subject Drugs.

95.    In paragraph 59 of the Complaint, Plaintiff states that a "DP is supposed to reflect the price paid by a Customer that buys drugs directly from Abbott and not through a wholesaler." Produce all Documents that support, concern, or refute your contention.

96.    In paragraph 60 of the Complaint, Plaintiff states: "Abbott was aware of how the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that its DPs ultimately controlled the AWP reported by the Price Publications for many of its products." Produce all Documents that support, concern, or refute your contention.

97.    In paragraph 61 of the Complaint, Plaintiff states: "In some circumstances, Abbott itself calculated and supplied the AWP which it sought to have published." Produce all Documents that support, concern, or refute your contention.

98.    In paragraph 65 of the Complaint, Plaintiff states: "Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices Abbott actually charged to its Customers decreased or remained the same." Produce all Documents that support, concern, or refute your contention.

99.    In paragraph 69 of the Complaint, Plaintiff states: "Over that time period [1989 through 2001], Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin." Produce all Documents that support, concern, or refute your contention, including all documents indicating the U.S. Government paid over $75 million for Abbott's Vancomycin.

100.    For the time period 1989 through 2001, all Documents concerning the actual acquisition costs that Abbott's Customers paid for Vancomycin that were reimbursed by Medicare or Medicaid.

101.    In paragraph 74 of the Complaint, Plaintiff states that "the percentage of Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to approximately 70% in 2000." Produce all Documents that support, concern, or refute your contention.

102.    Paragraphs 75 through 79 contain contentions regarding Abbott's pricing of Vancomycin. Produce all Documents from other Manufacturers concerning the pricing of Equivalent Drugs to Vancomycin.

103.   In paragraph 77 of the Complaint, Plaintiff states that "Abbott received numerous complaints from Customers over the resulting decrease in the spread" of Vancomycin. Produce all Documents that support, concern, or refute your contention.

104.   In paragraph 77 of the Complaint, Plaintiff states that "Abbott documents show Abbott's pricing personnel carefully considering the additional profits they could generate for Abbott's Customers if they artificially re-inflated the reported prices for Vancomycin 1 GM FTV at various levels." Produce all Documents that support, concern, or refute your contention.

105.   In paragraph 83 of the Complaint, Plaintiff states: "Abbott tried to convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower WACs; Abbott wanted First DataBank to continue to use Abbott's then still inflated DPs to maintain its inflated AWPs. First DataBank refused Abbott's request." Produce all Documents that support, concern, or refute your contention.

106.   In paragraph 88 of the Complaint, Plaintiff states: "Abbott's share of the Medicaid market [for Vancomycin] has dropped steadily since the more accurate prices started being published in 2001 and thereafter from approximately 70% in early 2001 to approximately 20% in 2004." Produce all Documents that support, concern, or refute your contention.

107.   In paragraph 100 of the Complaint, Plaintiff states: "Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement." Produce all Documents that support, concern, or refute your contention.

108.   In paragraph 101 of the Complaint, Plaintiff states that "Abbott profited off the scheme by increasing its sales volume and profits." Produce all Documents that support, concern, or refute your contention.

109.   In paragraph 101 of the Complaint, Plaintiff states that "Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount." Produce all Documents that support, concern, or refute your contention.

110.   For the time period that you contend Medicare and Medicaid paid in excess of $100 million for Abbott's LVPs, all Documents concerning the actual acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

111.   In paragraph 110 of the Complaint, Plaintiff states: "By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched." Produce all Documents that support, concern, or refute your contention.