# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel.<br><br>VEN-A-CARE OF THE FLORIDA KEYS, INC., a Florida corporation, by and through its principal officers and directors, ZACHARY T. BENTLEY and T. MARK JONES,<br><br>                    Plaintiff,<br>v.<br><br>ABBOTT LABORATORIES, INC. and HOSPIRA, INC.,<br><br>                    Defendants. | Case No.: 06-CV-21303-ASG<br><br>Hon. Alan S. Gold |

**DEFENDANT ABBOTT LABORATORIES, INC.'S FIRST SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS
TO RELATOR VEN-A-CARE OF THE FLORIDA KEYS, INC.**

Defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, requests that Relator Ven-A-Care of the Florida Keys, Inc. produce the documents requested herein by making them available for inspection and copying at the offices of Jones Day, 51 Louisiana Ave., NW, Washington, DC 20001, or at such other place and in such manner as may be mutually agreed upon between counsel for the parties, within thirty (30) days from the date of service of these Requests.

**DEFINITIONS**

1. "Abbott" means Abbott Laboratories, Inc. and Abbott Laboratories and any of their past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on their behalf or under their control.

2. "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

3. "AWP" or "Average Wholesale Price" shall have the meaning ascribed in paragraphs 44 and 50 of the Complaint.

4. "Best Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(c)(1)(C).

5. "Between," when used in regard to the transmittal of information, shall mean any communication by, to, from, among, and for any individual(s) or entity(ies) specified in a particular request.

6. "CMS" means "Centers for Medicare and Medicaid Services," its predecessor agencies and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

7. "Communication" means any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise. All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

8. "Complaint" means and refers to the Complaint filed on or around March 17, 2006 by which the United States of America intervened in certain portions in Case No. 95-1354-CIV-GOLD (severed to a new case number, 06-CIV-21303), pending in the United States District Court for the Southern District of Florida.

9. "Concern," "concerning," "relating to," or "relate to" means refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly, as required by the context to bring within the scope of the requests in this request for production of documents any documents that might be deemed outside their scope by another construction.

10. "Congress" means the legislative branch of the U.S. Government, individual members of Congress, and any congressional committees or subcommittees, including but not limited to the Congressional Budget Office, Senate Finance Committee, the House Committee on Ways and Means, the House Committee on Energy and Commerce, the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, and all other branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

11. "Customers" has the same meaning ascribed to it in paragraph 3 of the Complaint.

12. "Defendant" refers to Abbott.

13. "Documents" means all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, communications, computer printouts, computer stores data, conferences, or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies, recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegraphs, telephone logs, telex messages, transcripts, website postings, and work papers, which are in the possession of the Carrier as defined above. A draft or non-identical copy is a separate document within the meaning of this term.

14. "DOJ" means the United States Department of Justice and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

15. "EAC" or "Estimated Acquisition Cost" shall have the meaning set forth in 42 C.F.R. § 447.301 *See also* paragraph 39 of the Complaint.

16. "Equivalent Drugs" means those drugs that contain the same active chemical compound as the Subject Drugs.

17. "FSS" means and refers to the Federal Supply Schedule program and shall have the meaning ascribed to that program pursuant to 41 U.S.C. 259(b)(3)(A).

18. "FUL" means the Federal Upper Limit, the ceiling established by the U.S. Government for reimbursement of certain drugs dispensed to Medicaid beneficiaries. *See* 42 CFR § 447.332.

19. "GAO" means General Accounting Office and all its employees, agents, attorneys, agencies, committees, or affiliates.

20. "HCFA" means the United States Health Care Financing Association, its predecessor and successor agencies and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing. "CMS" and "HCFA" mean the same agency and are used interchangeably throughout these Requests.

21. "HCPCS" means Healthcare Common Procedural Coding System, the medical code set used by CMS that identified health care procedures, equipment, and supplies for claim submission purposes.

22. "HHS" means the United States Department of Health and Human Services and all its employees, agents, attorneys, agencies, committees, or affiliates.

23. "HHS-OIG" means the Office of Inspector General for HHS and all its employees, agents, attorneys, agencies, committees, or affiliates.

24. "Identify" or "state"

   (a) when used with reference to an individual person, means to state his full name, his position and business affiliation at the time referred to, his last known position and business affiliation, and his last known residence and business address;

   (b) when used with reference to an entity, means to state the entity's full name, last known address(es), telephone number(s), and organizational form (*e.g.*, corporation, sole proprietorship, partnership, joint venture, etc.); and

   (c) when used with reference to a document, means to state the nature of the document (*e.g.*, memorandum, letter, notes, etc.), its author(s), addressee(s), recipient(s), title, subject matter, date, present location, and custodian.

25. "J Code" refers to the subset of the HCPCS code set with a high-order value of "J" that has been used to identify certain drugs and other items.

26. "List Price" or "Direct Price" shall have the meaning ascribed to those terms in the Complaint. *See* Complaint, ¶ 59.

27. "MAC" or "Maximum Allowable Cost" shall have the meaning set forth in 42 C.F.R. § 447.332. *See also* paragraph 40 of the Complaint.

28. "Manufacturer" shall have the meaning set forth in 42 U.S.C. § 1396r-8.

29. "Medicaid" means and refers to the jointly-funded Federal-State health insurance program enacted in 1965 as an amendment to the Social Security Act to pay for the costs of certain medical services and care.

30. "Medicaid Intermediary" means and refers to any insurance company or other entity that has contracted with any State Medicaid Program to process claims for reimbursement of drugs develop preferred drug lists, provide guidance on changes to reimbursement

4

methodologies, or provide advice on cost savings, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

31.     "Medicaid Drug Rebate Program" means and refers to the program established by the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396r-8, as amended by the Veterans Health Act of 1992, whereby drug manufacturers have national drug rebate agreements with HHS and a pricing agreement with HHS for the Public Health Service Section 340B Drug Pricing Program.

32.     "Medicare" means and refers to the Federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain medical services and care.

33.     "Medicare Carrier" means and refers to any insurance company or other entity that has contracted with HCFA or CMS to process claims submitted under Part B of the Medicare program by any Provider, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

34.     "MFCU" means individual state Medicaid Fraud Control Units, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

35.     "MedPac" means Medicare Payment Advisory Commission and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

36.     "NAMFCU" means National Association of Medicaid Fraud Control Units and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

37.     "NDC" means "National Drug Code," the code set maintained by the Food and Drug Administration and adopted by the federal Secretary of Health and Human Services as the standard for reporting drugs and biologics on standard transactions.

38.     "OMB" means the Office of Management and Budget and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

39.     "OPA" means the Office of Pharmacy Affairs, the previous name of the PAB, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

40.     "PAB" means the Pharmacy Affairs Branch, which administers the Public Health Service 340B Drug Discount Program, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

41. "Person" means any natural person or any business, legal, or governmental agency or association.

42. "Plaintiff" refers to the United States of America.

43. "Provider" or "Providers" means and refers to any and all persons or entities that render health care services, including but not limited to pharmacists, physicians, nurses, nurse practitioners, physicians' assistants, specialty pharmacy, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

44. "Publisher" or "Publishers" refers to Red Book, First DataBank, Blue Book, and Medi-Span, their predecessors and successors, and all employees, agents, consultants, accountants, or attorneys of any of the foregoing.

45. "PSSC" means Pharmacy Services Support Center, which provides assistance to the PAB in administering the Public Health Service 340B Drug Discount Program, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

46. "Relator" refers to Ven-A-Care.

47. "Relevant Claim Period" shall refer to the period of January 1, 1991 to January 31, 2001 or any other time period for which Plaintiff is seeking damages or penalties. *See* Complaint, ¶ 51.

48. "State Medicaid Program" means the state agency responsible for carrying out the Medicaid Program in a particular state and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing

49. "Subject Drugs" means and refers to those drugs listed in paragraphs 31 and 35 of the Complaint.

50. "U.S. Government" means and refers to the all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing. U.S. Government includes but is not limited to CMS/HCFA, Congress, Department of Commerce, Department of Defense, DOJ, HHS, HHS-OIG, GAO, MedPac, OMB, OPA/PAB, PSSC, VA and any other agency, department, or committee of the U.S. Government that Plaintiff knows or believes has materials discoverable in this litigation.

51. "VA" means the United States Department of Veterans Affairs, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

52. "Ven-A-Care" means Ven-A-Care of the Florida Keys, Inc., a corporation organized under the laws of Florida, and all predecessor or successor corporations, and any of its past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on its behalf or under its control.

53. "Ven-A-Care Qui Tam Complaint" refers to the Complaint filed under seal in the United States District Court for the Southern District of Florida, Case No. 95-1354-CIV (Gold), including all amended complaints.

54. "WAC" or "Wholesale Acquisition Cost" shall have the meaning ascribed to that term in the Complaint.

55. "You" and "Your" means and refers to Ven-A-Care.

56. "340B Provider" means and refers to any provider described in Section 340B of the Public Health Act, 42 U.S.C. § 256(b).

57. The terms "and" and "or" shall mean "and/or."

58. Any word written in the singular shall include the plural and vice versa.

59. In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each," and "every," the intended meaning is inclusive rather than exclusive.

## INSTRUCTIONS

1. ***Time Frame.*** Unless otherwise specified, these requests seek Documents that were prepared during, or relate to, the Relevant Claim Period *or* that correspond to the events, reports, laws, determinations, or documents referred to in particular requests.

2. If any document was but is no longer in your possession, custody, or control, or was known to You, but is no longer in existence, state, as to each document, its date, author(s), recipient(s) and what disposition was made of it or what became of it.

3. When an objection is made to any request or any subpart thereof, state with specificity the part or subpart of the document request considered to be objectionable and all grounds for the objection.

4. If You find the meaning of any term in these document requests to be unclear, then You should assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

5.    Each request for documents seeks production of the document in its entirety, without abbreviation or redaction, including all attachments or other matters affixed thereto.

6.    With respect to each document that is withheld from production for any reason, or any portion of any document that has been redacted for any reason in connection with the production of a document, provide a statement setting forth:

    (a)    its date;
    (b)    its title;
    (c)    its author;
    (d)    its addressee;
    (e)    the identify of each person who received and/or saw the original or any copy of such document
    (f)    the specific privilege under which it is withheld;
    (g)    its general subject matter;
    (h)    its present custodian; and
    (i)    description of it that you contend is adequate to support that contention that it is privileged.

7.    With respect to any conversation for which a privilege is being asserted, identify by stating the following:

    (a)    when and where the conversation occurred;
    (b)    the name, title and job or position of each person who present at or during the conversation whether or not such conversation was in person or by telephone;
    (c)    a brief description of the conversation's subject matter;
    (d)    the statute, rule or decision that is claimed to give rise to the privilege; and
    (e)    the name, title and job or position of all persons on whose behalf the privilege is asserted.

8.    All documents are to be produced as they are kept in the usual course of business, their relative order in such files, and how such files were maintained. All electronic files should be produced where possible in electronic form, along with any software needed to access the information contained in the file and appropriate legends, keys, or other information needed to access and understand the data.

## **DOCUMENTS REQUESTED**

1. All Documents mentioned in or referred to in preparing Your response to any set of interrogatories or requests for admission served by Abbott in this case.

2. The disclosure statement filed by Ven-A-Care pursuant to 31 U.S.C. § 3730(b)(2), and all Documents relating to the transmission or communication of that statement.

3. From any time period, all disclosure statements filed by Ven-A-Care in any state or federal qui tam action.

4. From any time period, all qui tam complaints or disclosure statements pursuant to 31 U.S.C. § 3730(b)(2) provided to the U.S. Government or any state government relating to reimbursement of drugs under Medicare Part B or Medicaid, and all Documents relating to the transmission or communication of that statement.

5. From any time period, all Communications between Ven-A-Care and the U.S. Government concerning the prices paid by Providers for drugs and/or payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

6. From any time period, all Communications between Ven-A-Care and any government or governmental entity regarding any subject relevant to the Complaint or any governmental investigation regarding drug pricing.

7. All recordings (video or audio), transcripts, interview memoranda, depositions, notes, or other record of Communication made in the course of any investigation regarding drug pricing.

8. From any time period, all Communications relating to any interview, meeting, or conference involving Ven-A-Care relating to drug pricing or the reimbursement of drugs by Medicare Part B or Medicaid.

9. From any time period, all Documents or data concerning the acquisition costs of Providers.

10. From any time period, all Communications between Ven-A-Care and the U.S. Government concerning Ven-A-Care's efforts to persuade the U.S. Government to intervene in any drug pricing litigation.

11. All Communications referenced in an October 2, 1996 letter from Ven-A-Care to Dr. Bruce Vladeck (attached at Tab 1), all Documents relating to those Communications, and all Documents relating to the transmission or communication of the October 2, 1996 letter.

12. From any time period, all Communications between Ven-A-Care and any State Medicaid Program, NAMFCU or any MFCU, or any state governmental agency, entity, employee, consultant, or attorney concerning the prices paid by Providers for drugs and/or payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

13. From any time period, all Communications between Ven-A-Care and any state government or agency concerning Ven-A-Care's efforts to persuade any state government or agency to intervene in any drug pricing litigation.

14. From any time period, all Communications between Ven-A-Care and any Medicare Carrier or Medicaid Intermediary concerning the prices paid by Providers for drugs and/or payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

15. From any time period, all Communications between Ven-A-Care and any Publisher concerning the prices paid by Providers for drugs and/or the payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

16. From any time period, all Communications between Ven-A-Care and any Provider concerning the prices paid by Providers for drugs and/or the payment of drugs under Medicare Part B or Medicaid, including all presentations, questionnaires, or exchanges of data.

17. All Documents contained at any time on any privilege log submitted by Ven-A-Care in any litigation relating to drug reimbursement.

18. All facsimile cover sheets, facsimile confirmations, enclosures, attachments, and any other Documents associated with any Documents contained at any time on any privilege log submitted by Ven-A-Care in any litigation concerning drug reimbursement.

19. All Documents concerning:

(a) the price Ven-A-Care paid for the Subject Drugs or the Equivalent Drugs;
(b) all claims for payment submitted by Ven-A-Care to Medicare Part B or Medicaid for the Subject Drugs or the Equivalent Drugs;
(c) all payments made to Ven-A-Care by Medicare Part B or Medicaid for the Subject Drugs or the Equivalent Drugs;
(d) any repayments made by Ven-A-Care to Medicare Part B or Medicaid relating to the Subject Drugs or the Equivalent Drugs; and

    (e)    all contracts or agreements between Abbott and Ven-A-Care for the Subject Drugs.

20. Documents sufficient to show the cost of Ven-A-Care in providing care to Medicare or Medicaid beneficiaries, including the extent to which payment for drugs was used to offset that cost.

21. All pleadings or other Documents filed in *United States ex rel. Ven-A-Care vs. Abbott Labs., et al.*, Case No. 95-1354-CIV-GOLD, United States District Court for the Southern District of Florida.

22. From any time period, all Documents concerning any effort by Ven-A-Care to influence laws or regulations concerning payment for drugs under Medicare Part B or Medicaid.

23. For the time period January 1, 1989 to March 17, 2006, Documents evidencing the steps taken by Ven-A-Care to insure that discoverable information with respect to litigation concerning payment for drugs by Medicare Part B or Medicaid has not been destroyed or otherwise made unavailable.

24. From January 1, 1965 to the end of the Relevant Claim Period, all Documents that mention, refer to, or discuss the relationship between AWP, WAC, List Price, Direct Price or any other figure and (i) the actual or average acquisition cost of Providers and/or (ii) the amount paid by Medicare Part B or Medicaid for drugs.

25. From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning any audit, report, study, analysis, or survey (whether completed or not) of drug prices.

26. From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning any audit, report, study, analysis, or survey (whether completed or not) of actual or average acquisition prices by Providers of drugs and the amounts paid under Medicare Part B or Medicaid for drugs.

27. To the extent not requested above, from January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning the meaning and calculation of AWP, WAC, EAC, List Price or Direct Price and/or the decision of whether to use AWP, WAC, EAC, List Price or Direct Price in calculating payment under Medicare Part B or Medicaid.

28. All Documents concerning the meaning of AMP; the calculation of AMP; the relationship of AMP to AWP, WAC, EAC, List Price or Direct Price; and/or the decision of whether to use AMP in calculating payment under Medicare Part B or Medicaid.

29. From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning whether the U.S. Government, any state government, any Medicare Carrier or Medicaid Intermediary, governmental payor, or private insurer knew that Manufacturers marketed the "spread" (as that term is used in paragraph 3 of the Complaint) and/or the difference between payment under Medicare Part B or Medicaid and actual or average acquisition costs of Providers.

30. From January 1, 1965 to the end of the Relevant Claim Period, all Documents concerning the "spread" (as that term is used in paragraph 3 of the Complaint) and/or the difference between payment under Medicare Part B or Medicaid and actual or average acquisition costs of Providers.

31. All Documents concerning any investigation, lawsuit, judicial proceeding, or settlement regarding allegedly false claims filed by any Provider related to payment for drugs by Medicare Part B or Medicaid, including but not limited to all governmental audit information regarding the allegedly false claims.

32. All Documents identified in any initial disclosure provided by Ven-A-Care under FRCP 26(a)(1).

33. In paragraph 3 of the Complaint, Plaintiff states that "Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 31 and 35 below) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Abbott's customers." Produce all Documents that support, concern, or refute that contention.

34. In paragraph 3 of the Complaint, Plaintiff states that Abbott "marketed to existing and potential Customers the government-funded 'spread' between the inflated reimbursement amounts and the actual acquisition costs of the drugs to boost its sales and profits." Produce all Documents that support, concern, or refute that contention.

35. In paragraph 6 of the Complaint, Plaintiff states that "Abbott also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states." Produce all Documents that support, concern, or refute that contention.

36. In paragraph 37 of the Complaint, Plaintiff states: "The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining reimbursement rates for prescription drugs." Produce all Documents relating to instances where third party payor insurance companies did not use information contained in the published pricing compendia in determining reimbursement rates for prescription drugs.

37. In paragraph 37 of the Complaint, Plaintiff states that "Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs." Produce all Documents that support, concern, or refute that contention.

38. As to the Subject Drugs and Equivalent Drugs, produce all Documents relating to the use of MAC or the "providers' usual and customary charges" in determining the amount of reimbursement under Medicaid. *See* paragraph 40 of the Complaint.

39. In paragraph 42 of the Complaint, Plaintiff states that "AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient." Produce all Documents that support, concern, or refute that contention.

40. In paragraph 42 of the Complaint, Plaintiff states that "WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail customer." Produce all Documents that support, concern, or refute that contention.

41. In paragraph 45 of the Complaint, Plaintiff states that "some State Medicaid programs also received price representations directly from manufacturers, and relied upon these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts." Produce all Documents that support, concern, or refute that contention.

42. In paragraph 46 of the Complaint, Plaintiff states: "In general, Medicare relied on median AWPs to set reimbursement rates." Produce all Documents relating to instances where Medicare did <u>not</u> rely on median AWPs to set reimbursement rates.

43. In paragraph 56 of the Complaint, Plaintiff states: "The Customers purchased the products directly from Abbott, through a GPO contract or through wholesalers." Produce all Documents concerning the amounts that Customers actually paid for the Subject Drugs.

44. In paragraph 59 of the Complaint, Plaintiff states that a "DP is supposed to reflect the price paid by a Customer that buys drugs directly from Abbott and not through a wholesaler." Produce all Documents that support, concern, or refute that contention.

45. In paragraph 60 of the Complaint, Plaintiff states: "Abbott was aware of how the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that its DPs ultimately controlled the AWP reported by the Price Publications for many of its products." Produce all Documents that support, concern, or refute that contention.

46. In paragraph 61 of the Complaint, Plaintiff states: "In some circumstances, Abbott itself calculated and supplied the AWP which it sought to have published." Produce all Documents that support, concern, or refute that contention.

13

47. In paragraph 65 of the Complaint, Plaintiff states: "Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices Abbott actually charged to its Customers decreased or remained the same." Produce all Documents that support, concern, or refute that contention.

48. In paragraph 69 of the Complaint, Plaintiff states: "Over that time period [1989 through 2001], Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin." Produce all Documents that support, concern, or refute that contention, including all documents indicating the U.S. Government paid over $75 million for Abbott's Vancomycin.

49. For the time period 1989 through 2001, all Documents concerning the actual acquisition costs that Abbott's Customers paid for Vancomycin that were reimbursed by Medicare or Medicaid.

50. In paragraph 74 of the Complaint, Plaintiff states that "the percentage of Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to approximately 70% in 2000." Produce all Documents that support, concern, or refute that contention.

51. Paragraphs 75 through 79 contain contentions regarding Abbott's pricing of Vancomycin. Produce all Documents from other Manufacturers concerning the pricing of Equivalent Drugs to Vancomycin.

52. In paragraph 77 of the Complaint, Plaintiff states that "Abbott received numerous complaints from Customers over the resulting decrease in the spread" of Vancomycin. Produce all Documents that support, concern, or refute that contention.

53. In paragraph 77 of the Complaint, Plaintiff states that "Abbott documents show Abbott's pricing personnel carefully considering the additional profits they could generate for Abbott's Customers if they artificially re-inflated the reported prices for Vancomycin 1 GM FTV at various levels." Produce all Documents that support, concern, or refute that contention.

54. In paragraph 83 of the Complaint, Plaintiff states: "Abbott tried to convince First DataBank personnel not to set Abbott's AWP by reference to these new, lower WACs; Abbott wanted First DataBank to continue to use Abbott's then still inflated DPs to maintain its inflated AWPs. First DataBank refused Abbott's request." Produce all Documents that support, concern, or refute that contention.

55. In paragraph 88 of the Complaint, Plaintiff states: "Abbott's share of the Medicaid market [for Vancomycin] has dropped steadily since the more accurate prices started being published in 2001 and thereafter from approximately 70% in early 2001 to approximately 20% in 2004." Produce all Documents that support, concern, or refute that contention.

56. In paragraph 100 of the Complaint, Plaintiff states: "Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement." Produce all Documents that support, concern, or refute that contention.

57. In paragraph 101 of the Complaint, Plaintiff states that "Abbott profited off the scheme by increasing its sales volume and profits." Produce all Documents that support, concern, or refute that contention.

58. In paragraph 101 of the Complaint, Plaintiff states that "Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount." Produce all Documents that support, concern, or refute that contention.

59. For the time period that you contend Medicare and Medicaid paid in excess of $100 million for Abbott's LVPs, all Documents concerning the actual acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

60. In paragraph 110 of the Complaint, Plaintiff states: "By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched." Produce all Documents that support, concern, or refute that contention.

Dated:  July 12, 2006

Respectfully submitted,

*/s/ James R. Daly by DST*
James R. Daly, Esq.
  Admitted *pro hac vice*
Daniel E. Reidy, Esq.
  Admitted *pro hac vice*
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jrdaly@jonesday.com
dereidy@jonesday.com

Mark P. Schnapp, Esq.
  Florida Bar No. 501689
Sabrina R. Ferris, Esq.
  Florida Bar No. 419273
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Telephone:  (305) 579-0541
Facsimile:  (305) 579-0717
SchnappM@gtlaw.com
FerrisS@gtlaw.com

R. Christopher Cook, Esq.
David S. Torborg, Esq.
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 216-4125

*Counsel for Defendant Abbott Laboratories, Inc..*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2006, a true and correct copy of the foregoing **ABBOTT LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO RELATOR VEN-A-CARE OF THE FLORIDA KEYS, INC.** was served upon:

James J. Breen, Esq. **(By Fed Ex)**
Alison Simon, Esq.
The Breen Law Firm
3350 S. W. 148th Avenue, Suite 110
Miramar, FL 33029

With a copy to:

Mark A. Lavine, Esq. **(By Fed Ex)**
United States Attorney's Office
99 N.E. 4 Street
Miami, FL 33132

Renée Brooker **(By Hand)**
Assistant Director
U.S. Department of Justice
Civil Division, Fraud Section
601 D Street NW
Suite 9918
Washington, DC  20004

/s/ James R. Daly/DST
James R. Daly, Esq.

17