UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

**CLASS PLAINTIFFS' OFFER OF PROOF**
**REGARDING TESTIMONY OF STUART FULLERTON**

# TABLE OF CONTENTS

**Page**

I.   OFFER OF PROOF ........................................................................................................1

    A.   Fullerton Background .........................................................................................1

    B.   Letters Between AstraZeneca and United States Department of Justice ................2

    C.   Communications with TAP Regarding the Illegality of "Return to Practice".........6

    D.   OIG Guidelines .................................................................................................6

    E.   Mr. Fullerton's Knowledge of AWP ...................................................................8

II.   ARGUMENTS FOR ADMISSION OF MR. FULLERTON'S TESTIMONY .................8

    A.   The Evidence is Admissible to Show AstraZeneca's Intent....................................8

    B.   The Evidence is Admissible to Refute AstraZeneca's "Evidence" That the
        Government "Knew" About Its Conduct .................................................................9

    C.   The Evidence Plaintiffs Seek to Admit Is Not Protected by Privilege .................10

        1.   None of Fullerton's testimony is protected by the attorney-client
                privilege ................................................................................................10

        2.   None of Fullerton's testimony is protected by the work-product
                doctrine ..................................................................................................12

        3.   AstraZeneca can assert any applicable privilege on a
                question-by-question basis.......................................................................13

    D.   It Would Be Improper to Bar the Testimony Simply Because Fullerton May
        Chose to Assert His Fifth Amendment Privilege Against Self Incrimination .......14

III.   CONCLUSION..............................................................................................................14

## TABLE OF AUTHORITIES

### CASES

**Page**

*ABB Kent-Taylor, Inc. v. Stallings & Co., Inc.*,
    172 F.R.D. 53 (W.D.N.Y. 1996) ....................................................................................12

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    190 F.R.D. 287 (D. Mass. 2000) ..........................................................................10, 12, 13

*B.F.G. of Illinois, Inc. v. Ameritech Corp.*,
    No. 99 C 4604, 2001 U.S. Dist. Lexis 18930 (N.D. Ill. Nov. 8, 2001) ............................12

*Borase v. M/A COM, Inc.*,
    171 F.R.D. 10 (D. Mass. 1997) ....................................................................................11

*City of Springfield v. Rexnord*,
    196 F.R.D. 7 (D. Mass. 2000) ..................................................................................12, 13

*In re Grand Jury Subpoena*,
    925 F. Supp. 849 (D. Mass. 1995) ................................................................................10

*In re Grand Jury Subpoena*,
    220 F.R.D. 130 (D. Mass. 2004) ..................................................................................13

*Ken's Foods, Inc. v. Ken's Steak House, Inc.*,
    213 F.R.D. 89 (D. Mass. 2002) ....................................................................................11

*In re Lernout & Hauspie Secs. Litig.*,
    222 F.R.D. 29 (D. Mass. 2004) ....................................................................................13

*In re Lupron Mktg. & Sales Practices Litig.*,
    313 F. Supp. 2d 8 (D. Mass. 2004) ..............................................................................10

*Moloney v. United States*,
    204 F.R.D. 16 (D. Mass. 2001) ....................................................................................13

*Oil Chemical & Atomic Workers Int'l Union v. American Home Prods.*,
    790 F. Supp. 39 (D.P.R. 1992) ....................................................................................12

*United States v. Bartos*,
    417 F.3d 34 (1st Cir. 2005) ........................................................................................8, 9

### STATUTES

21 U.S.C. § 331(t) ..............................................................................................................1

21 U.S.C. § 333(b)(i)(B) ....................................................................................................1

21 U.S.C. § 353(c) ..............................................................................................................1

001534-16  168315 V1

Pursuant to this Court's request at the April 11, 2007 Pretrial Conference, Plaintiffs, by their undersigned counsel, submit the following Offer of Proof regarding the proposed trial testimony of Stuart L. Fullerton.  Mr. Fullerton was an AstraZeneca in-house lawyer who interacted with TAP and the United States Department of Justice ("DOJ") with respect to the legality of AstraZeneca's published AWPs and its marketing of the spread.  These activities and his interactions with TAP and the DOJ are not privileged and are directly on point as to AstraZeneca's intent.  It would be unfair to allow AstraZeneca to parade employees before the jury saying "no *mens rea*," "we didn't know AWP was supposed to be AWP," the "government knew of our practices," when the government and TAP were directly questioning their legality and Mr. Fullerton is the most knowledgeable AstraZeneca employee with respect to those facts.

## I.     OFFER OF PROOF

### A.     Fullerton Background

Mr. Fullerton is Senior Litigation Counsel at AstraZeneca Pharmaceuticals LP.[1]  He joined one of AstraZeneca's predecessor companies, Zeneca, Inc. ("Zeneca") in July 1995.[2]  At the time Mr. Fullerton joined Zeneca, Glenn Engelmann was General Counsel and headed the Legal Department.  *Id.*  Mr. Engelmann is the AstraZeneca representative who, on behalf of the company, pled guilty in June 2003 to violating the Prescription Drug Marketing Act ("PDMA"), 21 U.S.C. §§ 353(c), 331(t), and 333(b)(i)(B).[3]  As set forth more fully below, Mr. Fullerton himself was intricately and extensively involved in the OIG investigation into AstraZeneca's marketing and pricing practices for Zoladex®.[4]

---

[1] *See* Ex. A (Declaration of Stuart Fullerton (Feb. 24, 2005) ("Fullerton Decl."), ¶ 1).

[2] *Id.*, ¶ 2.

[3] *See* Ex. B (Transcript of the June 20, 2003 Plea and Sentencing Hearing in *United States v. AstraZeneca Pharmaceuticals, LP*, Criminal Action No. 03-55 (D. Del), Plaintiffs' Trial Ex. 3).

[4] *See* Ex. A (Fullerton Decl., ¶ 7).

**B.    Letters Between AstraZeneca and United States Department of Justice**

Even though Mr. Fullerton has stated under oath that he began working on the OIG

investigation of AZ's marketing and sales practices for Zoladex® in November 1997 (*see* Ex. A,

Fullerton Decl., ¶ 7), AstraZeneca's privilege logs show that Mr. Fullerton was involved in the

government's investigation since at least January 1997.[5]  Mr. Fullerton can be examined as to the

fact of the government investigation as early as 1997 without running afoul of the attorney-client

privilege.

While AstraZeneca withheld the vast amount of correspondence relating to the OIG

investigation on the basis of privilege, the limited documents Plaintiffs do have show that

Mr. Fullerton received correspondence from representatives of the DOJ showing that

Mr. Fullerton knew that:  (1) the government deemed AstraZeneca's AWP inflation and

marketing the spread activities to be illegal, (2) the government did not, prior to its investigation,

know actual acquisition prices for Zoladex®, and (3) the government believed it had been

damaged by AZ's failure to publish an AWP that was based on actual wholesale prices.

For example, on October 17, 2000, Virginia Gibson-Mason, an Assistant U.S. Attorney,

forwarded a letter initially sent to AZ's outside counsel, Eric Kraeutler of the law firm Morgan

Lewis & Bockius to Mr. Fullerton.  Mr. Fullerton is also copied on the Kraeutler letter.[6]  This

letter requested additional invoice data from AstraZeneca.

The apparent purpose for requesting this data was to assist the United States in

calculating the damages attributable to AstraZeneca's publication of a false AWP for Zoladex®.

On April 2, 2002, Stuart Fullerton forwarded to Glenn Engelmann a March 29, 2002 letter to

---

[5] *See* Ex. C (SECOND REVISED Privilege Log for Documents Withheld From Bates Stamp Range AZ0423372-466415 (Mar. 18, 2005) (containing Fullerton entries "concerning government investigation" as early as Jan. 14, 1997)).

[6] *See* Ex. D (Facsimile dated Oct. 17, 2000, AZ0425819-23, Plaintiffs' Trial Ex. 23).

Jack C. Dodds at Morgan Lewis & Bockius from Virginia Gibson, an Acting U.S. Attorney.[7]
That letter set forth the government's positions regarding the required elements of any proposed
global civil settlement with AstraZeneca.[8]  Under a section entitled "The Average Wholesale
Price Scheme," the government said:

> AstraZeneca has caused physicians to present false or
> fraudulent claims for payment to Medicare under 31 U.S.C.
> § 3729(a)(1), 'caused to be used a false record or statement to get a
> false or fraudulent claim paid by the Government,' 31 U.S.C.
> § 3729(a)(2), *by setting an artificially inflated Average Wholesale
> Price ('AWP'), for Zoladex* and it conspired to defraud Medicare
> by instructing physicians to use the false or fraudulent AWP on
> their claims to Medicare rather than the discounted price the
> physicians paid.  This frustrated Medicare's lawful function to pay
> only for the reasonable and necessary costs of medical care for
> Medicare beneficiaries.  55 Fed. Reg. 25792, 25801.  *AstraZeneca
> knew Medicare was ignorant of the actual acquisition cost of
> Zoladex.*

(Emphasis added.)  The Department of Justice thereafter set forth its estimate of damages:

> By 1997, the AWP was 187% of average price to the
> wholesale class of trade.  In 1998 it was 203.9% and in 1999 it was
> 202%.  The loss to the Medicare program from this false statement
> of price can be calculated in a number of ways.  *The true 'average
> wholesale price' should have been charged to Medicare and
> Medicaid programs instead of the artificial AWP AstraZeneca
> instructed physicians to use on the HCFA form 1500.*  Using the
> actual average price to wholesalers as the true AWP for the time
> period 1993 through 1999, the single damages are
>
> $528,751,796.
>
> (See Attachment 1).  Using the average sales price AstraZeneca
> discounted to urologists as the true AWP, the single damages are
>
> $202,410,208.

---

[7] This document was produced to Plaintiffs in a partially-redacted form.

[8] *See* Ex. E (AZ0425748-58, Plaintiffs' Trial Ex. 21).

(See Attachment 2).  The government considers that AstraZeneca's
liability for single damages ranges between $204,410,208 and
$528,751,796.

*Id*. at AZ0425752-53 (emphasis added).

Attachment 1 to the government's letter to AstraZeneca set forth the following

itemization of Medicare's damages based on AZ's own invoice data.

| Year | Medicare Reimbursement | AWP Overstatement | Medicare Loss |
|---|---|---|---|
| 1993 | $26,166,359 | 20.6% | $5,390,270 |
| 1994 | $36,902,408 | 20.6% | $7,601,896 |
| 1995 | $51,670,237 | 25.5% | $13,175,910 |
| 1996 | $66,455,902 | 26.2% | $17,411,446 |
| 1997 | $103,582,505 | 82.9% | $85,869,897 |
| 1998 | $182,677,537 | 103.9% | $189,801,961 |
| 1999 | $204,790,240 | 102.3% | $209,500,416 |
| **Totals** | **$672,245,188** | | **$528,751,796** |

*See id.* at AZ0425756. Mr. Fullerton likewise, based on AstraZeneca's source list, had within his

files a May 20, 2002 letter to Jack C. Dodds from Virginia Gibson-Mason, Acting U.S. Attorney,

setting forth the methods by which the above-set forth tables were calculated.[9]  The letter

explained that, for Attachment One:

> The damage calculations in Attachment One is a summary of two
> large data sets and comparison across those data sets.  **In it we
> assumed that the 'true 'average wholesale price' that should have
> been charged' to Medicare was the 'actual average price' that
> wholesalers paid AstraZeneca for Zoladex, as reflected in
> AstraZeneca's own sales data recording the invoices of actual
> sales to wholesalers.**  This data came from the invoice data
> diskettes, Wholesale Class of Trade 01 for the years 1993 through
> 1999.  The data in Attachment One is given by year.  The second
> column of that attachment gives the actual Medicare reimbursement
> for all units of Zoladex in that year.  The source of that Data is the
> Centers for Medicare and Medicaid Services database for Medicare
> reimbursements.  The third column, labeled 'AWP Overstatement',
> gives a comparison of the AWP for a single unit of Zoladex from
> the RedBook to the actual average unit price charged to wholesalers

---

[9] *See* Ex. F (AZ0425759-62, Plaintiffs' Trial Ex. 18).

as stated in the invoice data disks.  For example, the RedBook AWP
in 1993 was 20.6% higher than the actual average unit wholesale
price AstraZeneca charged.  The loss to Medicare was calculated by
applying the percentage AWP overstatement to the Medicare
reimbursement in the second column.  In 1993, applying 20.6% to
$26,166,359 yielded a loss of $5,390,270.  The data concerning the
actual Medicare reimbursement and the total number of units
reimbursed comes from CMS's Medicare reimbursement database.
The actual average price to wholesalers comes from AstraZeneca
invoice data, trade class 01.

*See id.* at AZ0425761 (emphasis added).  Attachment 2 to the government's letter set forth

Medicare's Single Damages[10]:

### Medicare Single Damages

| Year | Avg-Wholesale Price (AWP) | Avg-Sales Price (ASP) | Avg-Medicare Price (AMP) | Medicare Units Reimbursed | Value of Difference Between AMP and ASP |
|------|---------|---------|---------|---------|---------|
| 1993 | $318.75 | $255.46 | $258.41 | 107,060 | $315,670 |
| 1994 | $331.50 | $253.71 | $260.02 | 145,912 | $921,343 |
| 1995 | $358.55 | $251.46 | $265.15 | 196,197 | $2,686,070 |
| 1996 | $383.65 | $259.59 | $280.11 | 237,973 | $4,882,101 |
| 1997 | $410.51 | $227.91 | $302.77 | 342,115 | $25,611,125 |
| 1998 | $439.25 | $178.23 | $308.38 | 592,377 | $77,096,882 |
| 1999 | $469.99 | $182.39 | $333.81 | 613,494 | $92,897,008 |
| Total | | | | | $204,410,208 |

In a May 20, 2002 letter (Ex. F), the DOJ explained this Attachment as follows:

The number of Medicare units reimbursed in Attachment 2 comes
from the CMS Medicare Reimbursement database.  The Average
Sales Price comes from AstraZeneca's invoice data diskettes and
uses the average sales price to the urologist trade class number 21.
The diskettes show a quarterly average sales price.  We calculated
the yearly average sales price by totaling the four quarters and
dividing that number by the total number of units sold to that class
of trade in that year.  The fourth column in the attachment is
labeled 'Average Medicare Price,' which we derived from the
CMS Medicare reimbursement database, to get the average price
per unit of Zoladex, converting all units to the 3.6 mg size.[11]

---

[10] *See* Ex. E (AZ0425757).

[11] *See id.* at AZ0425762.

Thus, based on his receipt of these letters, Mr. Fullerton knew not only that the government did not endorse AZ's conduct, but also that it believed it had been damaged in an amount related to what Medicare would have based had AZ published a truthful AWP.  Notably, the DOJ's damages calculation is remarkably similar to Dr. Hartman's methodology, a methodology that Track 1 Defendants, including AstraZeneca, have argued to this Court is so unreliable that it should be stricken under *Daubert*.

## C.     Communications with TAP Regarding the Illegality of "Return to Practice"

Mr. Fullerton was also a point of contact with TAP when TAP had issues with AstraZeneca's conduct.[12]  Mr. Greisman, an in-house attorney for TAP had as many as 20-25 conversations with AstraZeneca.[13]  He specifically raised the issue of AstraZeneca's marketing of the spread so that the "legal department knew about the conduct so that they could make their own judgment about whether it was appropriate or inappropriate."[14]  This issue was raised directly with Mr. Fullerton.[15]  Mr. Fullerton did not take any responsive action that TAP's counsel was aware of.[16]

## D.     OIG Guidelines

AstraZeneca has argued that the OIG Guidelines are not relevant to this litigation. However, AZ itself considered them relevant and also did not consider them to involve any additional legal obligations than the company had been under prior to their enactment. Mr. Fullerton can testify to this.

---

[12] *See* Ex. O (Greisman Dep. (Mar. 26, 2004) at 15:14-16:23).

[13] *Id.* at 19:14-24.

[14] *Id.* at 33:19-34:19, 38:11-39:17.

[15] *Id.* at 41:13-21.

[16] *Id.* at 42:16-22.

- 6 -

At the same time Mr. Fullerton was receiving the above-cited letters from the DOJ, he was also involved in training AstraZeneca employees on how to comply with the anticipated OIG Guidelines.  AstraZeneca's own documents as well as publicly-available documents show that Mr. Fullerton was involved in training AZ personnel, as well as other pharmaceutical companies, on complying with the OIG Guidelines.[17]

But in addition to training AZ's own employees, Mr. Fullerton spoke to other members of the pharmaceutical industry regarding how to comply with the proposed and then actual OIG Guidelines.[18]

Importantly, for the presentations Mr. Fullerton made *outside* the company, Mr. Fullerton has already stated under oath that he appeared at those conferences only in his personal capacity. Specifically, he said that:

> Finally, plaintiffs have requested documents relating to any presentations I have made to external audiences relating to pharmaceutical sales., marketing or pricing.  I have on multiple occasions presented at various health care conference.  ***At each of these conferences, I was appearing in a personal capacity, not as a representative, spokesman or agent of AstraZeneca***.  At each conference, as is typical,  a disclaimer to this effect was made at the beginning of the presentation.

Ex. A (Fullerton Decl., ¶ 14 (emphasis added)).

---

[17] *See* Ex. G (E-mail entitled CARP AGENDA ITEM#1:  HHS OIG Draft Compliance Program – FR Notice – Comments Due Dec. 2 dated Oct. 17, 2002) (AZ0689632-AZ0689633)).

[18] *See* Ex. H (How to Implement the OIG Guidance and Make Them "Workable" for Your Company (Apr. 11, 2002) (Stuart L. Fullerton listed as speaker) (AZ0705390-98)); Ex. I (The PhRMA Code and the OIG Draft Guidance, How to Implement Them and Make Them "Workable" for Your Company (Oct. 17, 2002) (AZ0705380-89) (Stuart L. Fullerton listed as speaker) (listing as "surprise" the fact that the *draft* OIG Guidelines provided "No advice on how to deal with AWP")).  *See also* Ex. J (Agenda for Pharma Congress of Spring 2003:  HHS OIG Compliance Guidance for the Pharmaceutical Industry:  Key Insights from Regulators and Compliance Experts (June 8-9, 2003) (Fullerton listed as panelist)); Ex. K (The HHS OIG Guidance:  An In-Depth Analysis of Risk Areas (June 9, 2003) (Fullerton listed as panelist)); Ex. L (Agenda for Pharmaceutical Regulatory and Compliance Congress and Best Practices Forum (Nov. 13-15, 2002) (Fullerton listed as speaker on OIG Model Compliance Guidance)).

### E.      Mr. Fullerton's Knowledge of AWP

Mr. Fullerton's combined involvement in the OIG investigation, on one hand, and

training AZ's employees on the OIG guidance, on the other hand, is particularly important given

his knowledge of AWP and his role within the company of imparting that knowledge to

AstraZeneca employees.[19]

In 2002, AZ stopped reporting AWPs to the Publishers.[20]  Instead, in early 2002, AZ

began to just report WAC on spreadsheets sent to the Publishers.  *Id.*  Mr. Freeberry made that

decision together with Mr. Fullerton.  *Id.* at 102.  In addition, one document shows that

Mr. Fullerton revised a draft of John Freeberry's (the AZ Pricing Director's) "white paper"

regarding AWP.[21]

## II.      ARGUMENTS FOR ADMISSION OF MR. FULLERTON'S TESTIMONY

### A.      The Evidence is Admissible to Show AstraZeneca's Intent

Mr. Fullerton's testimony regarding AstraZeneca's correspondence with the Department

of Justice relating to its investigation into AstraZeneca's pricing and marketing of Zoladex® is

relevant to AZ's intent in inflating its AWP and marketing the spread for Zoladex®.  *See* Fed. R.

Evid. 404(b) ("Evidence of other crimes, wrongs, or acts . . . may, however, be admissible for

other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake or accident.").  *See also United States v. Bartos*, 417 F.3d 34, 36

---

[19] Plaintiffs sought the deposition of Mr. Fullerton.  *See* Motion to Compel and for Finding that Documents and Testimony Related to AstraZeneca's Pricing, Marketing, and Sales of its Products are not Protected by the Attorney-Client Privilege (Feb. 3, 2005), Dkt. No. 1318.  After oral argument on Plaintiffs' Motion on May 17, 2005, Magistrate Judge Bowler ordered AstraZeneca to submit an affidavit from Mr. Fullerton setting forth the purported "undue burden" associated with Plaintiffs' request that Mr. Fullerton's files be searched and any privileged documents put on AstraZeneca's privilege log.  On May 31, 2005, AZ filed that affidavit.  *See* Dkt. No. 1543.  On September 29, 2005, Judge Bowler denied Plaintiffs' motion by minute order.

[20] *See* Ex. M (Deposition of John Freeberry (May 20, 2004), at 101).

[21] *See* Ex. N (Feb. 12, 2002 e-mail to John Freeberry from Stuart Fullerton re AWP white paper) (AZ0461108-10)).

(1st Cir. 2005) (holding trial court did not err in admitting evidence of defendant's intended use of gun because it was relevant to intent and knowledge and helped to explain why defendant committed crime).  At the April 11 pretrial conference, this Court acknowledged that Mr. Fullerton's testimony regarding AstraZeneca's correspondence with the Department of Justice might be relevant to the company's intent.  *See* 4/11/07 Tr. at 29:10-30:10.  In short, if the jury is going to hear evidence from AstraZeneca executives that the company did not intend to harm Medicare beneficiaries, then the jury should likewise get to hear that AZ knew the DOJ considered its conduct, in which it continued to engage throughout the OIG investigation, was wrong.

In fact, it would be manifestly unfair to not allow Mr. Fullerton to be called. AstraZeneca intends to call employees who will say that the government knew or opposed of its conduct.  They will have no knowledge of the DOJ/OIG investigation.  They will thus present a misleading account to the jury.  Mr. Fullerton is needed to counter act and balance the anticipated AstraZeneca testimony.[22]

Likewise Mr. Fullerton's testimony is relevant to intent vis-à-vis his communications with TAP.  As set forth above, TAP's counsel contacted Fullerton and put him on notice of AstraZeneca's questionable practices.[23]  AstraZeneca did not change its conduct.

## B.     The Evidence is Admissible to Refute AstraZeneca's "Evidence" That the Government "Knew" About Its Conduct

AstraZeneca has designated over 130 trial exhibits that go to government "knowledge" or "alleged approval" or "acceptance" of its phony AWPs and spread marketing practices.  As they did during the bench trial, AstraZeneca witnesses will testify that the government never told

---

[22] Class plaintiffs admit that they should have called Mr. Fullerton at the class 2/3 trial.

[23] *See infra* at I.C.

- 9 -

them that such practices were unfair or deceptive.  AstraZeneca also wishes to call Stanley

Weintraub, an ex-government employee, apparently to say the government knew and approved

of AZ's conduct.  To not allow Plaintiffs to call Mr. Fullerton, who had direct and unambiguous

knowledge that the government did not endorse AstraZeneca's conduct, would be prejudicial to

Plaintiffs in light of AstraZeneca's defense.

**C.    The Evidence Plaintiffs Seek to Admit Is Not Protected by Privilege**

      **1.    None of Fullerton's testimony is protected by the attorney-client privilege**

The attorney-client privilege protects communications made between an attorney and a

client for the sake of obtaining legal advice.  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190

F.R.D. 287, 289 (D. Mass. 2000) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

The party claiming that certain communications or documents are privileged (here, AstraZeneca)

must establish the following elements:  (1) Where legal advice is sought, (2) from a professional

legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in

confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by

himself or by the legal advisor, and (8) except the protection be waived.  *In re Grand Jury*

*Subpoena*, 925 F. Supp. 849, 854 (D. Mass. 1995) (Saris, J.).  Because Mr. Fullerton's

communications with the DOJ are not communications between an attorney and a client, it is

axiomatic that they are not privileged.[24]

Mr. Fullerton's communication with the DOJ and TAP are plainly not privileged.

Mr. Fullerton's knowledge of the OIG Guidelines, particularly as communicated to third parties

outside of AstraZeneca, is not protected by the attorney-client privilege either.  Communications

---

[24] Further, any document for which a party claims either attorney-client privilege or work-product privilege that has already been produced to the government during an investigation is discoverable in subsequent litigation.  *In re Lupron Mktg. & Sales Practices Litig.*, 313 F. Supp. 2d 8, 14 (D. Mass. 2004) (citing *United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 685 (1st Cir. 1997)).

otherwise protected by the attorney-client privilege are no longer protected if disclosed to a third party. *Ken's Foods, Inc. v. Ken's Steak House, Inc.*, 213 F.R.D. 89, 93 n.7 (D. Mass. 2002). AstraZeneca cannot, on one hand, in order to avoid discovery, claim that Mr. Fullerton's presentations on the OIG Guidelines were made in his personal capacity, but then, on the other hand, at trial, claim that those communications were somehow privileged.

Finally, Mr. Fullerton's communications with Mr. Freeberry or anyone else at AstraZeneca regarding the meaning of AWP are likewise not privileged because any communication on pricing would be business advice, not legal advice. The attorney-client privilege only protects communications made between an attorney and a client for the sake of obtaining legal advice; it does not apply to any non-legal work, such as business advice. *Borase v. M/A COM, Inc.*, 171 F.R.D. 10, 14 (D. Mass. 1997). Non-legal work includes business or technical advice unrelated to any legal issues. *Id*. at 12 (finding that simply because in-house counsel may have performed certain legal functions for the company, this does not necessarily render each communication made by or copied to the attorney privileged). Based on these principles, "if an in-house counsel has other nonlegal responsibilities, the party invoking the privilege has the burden of producing evidence in support of its contention that in-house counsel was engaged in giving legal advice and not in some other capacity at the time of the disputed conversations." *Borase*, 171 F.R.D. at 14 (citation omitted). In such situations, "[m]erely saying that he was [acting as an attorney instead of as a businessman] in a memorandum of law is patently insufficient to meet the burden. Neither can it be assumed." *Id*. at 14 (citing *S.E.C. v. Gulf & Western Indus., Inc.*, 518 F. Supp. 675, 683 (D.D.C. 1981)). In-house counsel's "day-to-day involvement in their employer's affairs may blur the line between legal and non-legal communications and thus require Judges to cautiously and narrowly apply the privilege in cases

- 11 -

involving corporate staff counsel lest the mere participation of an attorney be used to seal off disclosure." *ABB Kent-Taylor, Inc. v. Stallings & Co., Inc.*, 172 F.R.D. 53, 55 (W.D.N.Y. 1996) (internal quotations and citations omitted).

In determining whether the communication was primarily of a legal or a business character, the court may consider "whether the task could have been readily performed by a non-lawyer – as when facts are gathered for business decisions." *Oil Chemical & Atomic Workers Int'l Union v. American Home Prods.*, 790 F. Supp. 39, 41 (D.P.R. 1992). *See also City of Springfield v. Rexnord*, 196 F.R.D. 7, 9 (D. Mass. 2000) (finding that the fact that an in-house attorney "may have performed certain legal functions as part of that team does not render privileged each communication made by or copied to him, particularly if the communication could equally well have been made to or by an individual without a law degree"). Here, there is no evidence that the 2002 decision to stop publishing AWP and its implementation had to be made by a lawyer, particularly considering the pricing team's (which Mr. Freeberry led) prominent role as liaison with the Publishers. In fact, "when a corporation directs an in-house attorney to work with a business team [as Fullerton clearly did here], … there is a particular burden on that corporation to demonstrate why communications deserve protection and are not merely business documents…consistent with decisions of other federal courts, [it is improper to] use … in-house counsel to give a veneer of privilege to otherwise non-privileged business communications." *B.F.G. of Illinois, Inc. v. Ameritech Corp.*, No. 99 C 4604, 2001 U.S. Dist. Lexis 18930, at *15 (N.D. Ill. Nov. 8, 2001) (internal citations omitted).

## 2. None of Fullerton's testimony is protected by the work-product doctrine

The work-product doctrine protects documents and other tangible things that are prepared by or for a party in anticipation of litigation. Fed. R. Civ. P. 26(b)(3); *see also Amgen Inc*., 190

- 12 -

F.R.D. at 290 (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).  Its purpose is to prevent attorneys from benefiting from the work of their adversary.  *City of Springfield*, 196 F.R.D. 7, 8 (D. Mass. 2000).  The First Circuit has held that in order to qualify for protection under the work-product doctrine, a document must have been prepared "because of actual or impending litigation."  *In re Lernout & Hauspie Secs. Litig.*, 222 F.R.D. 29, 36 (D. Mass. 2004) (citing *Maine v. United States DOI*, 298 F.3d 60 (1st Cir. 2002)).

Further, the work-product doctrine only applies to documents that have been prepared "because of actual or impending litigation."  *Id.* (citing *Maine v. United States DOI*, 298 F.3d 60 (1st Cir. 2003)).  In both situations, blanket assertions of privilege will not suffice.  *Moloney v. United States*, 204 F.R.D. 16, 20 (D. Mass. 2001) (quoting with approval 6 MOORE'S FEDERAL PRACTICE, § 26.90[1] (Matthew Bender 3d ed.)).  In this regard, Chief Judge Young of this District has adopted the following test for determining whether a document falls within the scope of the doctrine:  "[l]itigation need not be imminent … as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."  *In re Grand Jury Subpoena*, 220 F.R.D. 130, 148 (D. Mass. 2004).  Importantly, Judge Young made clear that any documents that were prepared prior to the initiation of a government investigation are not protected by the work-product doctrine, since there is "no authority suggesting that a government investigation itself constitutes litigation."  *Id*. at 147.

**3.**      **AstraZeneca can assert any applicable privilege on a question-by-question basis**

Finally, there are no grounds under which to prevent Mr. Fullerton from testifying at trial simply because he has had privileged communications related to the subject matter of this litigation.  Rather, the proper course of action is for AstraZeneca to assert, where needed, any applicable privilege on a case-by-case basis.  *See Moloney*, 204 F.R.D. at 20 (quoting with

- 13 -

approval 6 MOORE'S FEDERAL PRACTICE, § 26.90[1] (Matthew Bender 3d ed.) (blanket assertions of privilege will not suffice; privilege must be asserted for each communication where the protection is sought)).

**D.     It Would Be Improper to Bar the Testimony Simply Because Fullerton May Chose to Assert His Fifth Amendment Privilege Against Self Incrimination**

Plaintiffs anticipate that Mr. Fullerton may assert his privilege against self incrimination and that AstraZeneca may claim such an assertion is unduly prejudicial.  However, such an assertion, even if proper, does not bar calling Mr. Fullerton.  The situation of a witness taking the Fifth in a civil trial frequently occurs in antitrust, securities or RICO cases that follow criminal prosecutions.  Mr. Fullerton has been put on notice sufficiently in advance so that he has time to retain counsel to advise him on this issue.

## III.     CONCLUSION

The fact that Mr. Fullerton is a lawyer does not mean anything he did is cloaked in privilege.  The testimony and documents plaintiffs seeks to introduce does not intrude on the attorney-client privilege and is highly relevant to AstraZeneca's key defense..

DATED:  May 2, 2007                    By      /s/ Steve W. Berman
                                       Thomas M. Sobol (BBO#471770)
                                       Edward Notargiacomo (BBO#567636)
                                       Hagens Berman Sobol Shapiro LLP
                                       One Main Street, 4th Floor
                                       Cambridge, MA  02142
                                       Telephone: (617) 482-3700
                                       Facsimile: (617) 482-3003

                                       **LIAISON COUNSEL**

- 14 -

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Donald E. Haviland, Jr.
The Haviland Law Firm, LLC
740 S. Third Street
Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  168315 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **CLASS PLAINTIFFS' OFFER OF PROOF REGARDING TESTIMONY OF STUART FULLERTON** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on May 2, 2007, a copy to LexisNexis File and Serve for Posting and notification to all parties

By___/s/ Steve W. Berman_____
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

- 16 -