# Exhibit D

Redacted

# FAX TRANSMISSION

### UNITED STATES ATTORNEY'S OFFICE
CHASE MANHATTAN CENTRE
1201 Market Street, Suite 1100, Wilmington, Delaware 19899-2046
302-573-6277
Fax: 302-573-6220

Redacted

**DATE:**   October 17, 2000

Redacted

Reda

**TO:**   Stuart Fullerton
Senior Litigation Counsel
AstraZeneca
1800 Concord Pike
Wilmington, DE 19850
FAX: 886-8037

**FROM:**   Virginia Gibson-Mason
Assistant U.S. Attorney

Redacted

**PAGES:**   3 (including cover page)

**CONTENTS:**   Copy of a letter dated 10/12/00 to Eric Kraeutler, Esq..

Redacted

HIGHLY CONFIDENTIAL

AZ0425819



**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

Chase Manhattan Centre                    (302) 573-6277
1201 Market Street, Suite 1100            FAX (302) 573-6220
P.O. Box 2046
Wilmington, Delaware 19899-2046

October 12, 2000

<u>Via facsimile and United States mail</u>
Eric Kracutler, Esquire
Morgan Lewis & Bockius
1701 Market Street
Philadelphia PA 19103-2921

Re: <u>AstraZeneca</u>

Dear Eric:

We have further reviewed the CD Rom of the AstraZeneca invoice data and find an additional problem. It appears that certain data that was previously produced in paper form is missing from the database. For seven trade classes in which we understood Zeneca to maintain invoice data, there is no record of any invoices issuing. These classes are:

BL  Blank
01  Wholesaler
20  Extended Care Facility
28  Home Healthcare
30  Oncology Center/Network
31  Provider/Insurer
50  Doctor NEC/Doubtful

The data also show that on Zeneca document numbered 01-27-0344 through 0350 there were 281,668 units of Zoladex 9.6 mg invoiced for 1996. But on the invoice data CDRom, only 174,265 units of Zoladex 3.6 mg were invoiced. I enclose a summary of these data differences, and a copy of the Zeneca document 01-27-0344 through 0350 that shows additional invoice data for these trade classes. Conversely, the data on the CDRom show invoices in trade classes for which the other document shows no invoices: Class 02-Retailer/Mail Order and Class 25 - No Trade Description. Perhaps you could

HIGHLY CONFIDENTIAL                                              AZ0425820

Eric Krasutler, Esquire
October 12, 2000
Page 2

explain if invoice data from other trade classes was simply reassigned to a different trade class in this CDRom database.

Finally, the formatting error in some of the 1995 and 1996 data in which the field five data is merged into field four data, making it difficult to sort the data in those categories. I enclose a page that illustrates this error.

Thank you for your attention to these matters.

Very truly yours,

CARL SCHNEE
United States Attorney

By: _____
Virginia Gibson-Mason
Assistant United States Attorney

cc: Jack Dodds
    Stuart Fullerton
    AUSA Michael Loucks

HIGHLY CONFIDENTIAL

AZ0425821

10-17-2000 15:43          302 573 6220          USA DE          P.02

First 15 Lines of Data for Each Year of Avta Dawn Data, 1993-1997
As Found in Files on CD

HIGHLY CONFIDENTIAL

AZ0425822

10-17-2000 15:44      302 573 6220           USA DE                    P.03

HIGHLY CONFIDENTIAL

AZ0425823

# Exhibit E



**AstraZeneca**

Legal Department
Wilmington, DE 19850

**DATE:**    April 2, 2002

**TO:**    Glenn Engelmann (61578)

**FROM:**    Stuart Fullerton (302) 886-5319; (302) 886-8037 (fax)

**RE:**

Number of Pages including cover sheet:    *9*

PRIVILEGED AND CONFIDENTIAL / ATTORNEY-CLIENT COMMUNICATIONS / ATTORNEY WORK PRODUCT

HIGHLY CONFIDENTIAL                                    AZ0425748

Redacted

Redacted

Redact

HIGHLY CONFIDENTIAL

AZ0425749

APR-02-2002 TUE 03:04 PM                   FAX NO.              ı ı ı v      P. 03



**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

*Chase Manhattan Centre*                        *(302) 573-6277*
*1201 Market Street, Suite 1100*              *FAX (302) 573-6220*
*P.O. Box 2046*
*Wilmington, Delaware 19899-2046*

March 29, 2002

Via facsmile and United States mail
Jack C. Dodds, Esquire
Morgan Lewis & Bockius
1701 Market Street

HIGHLY CONFIDENTIAL

AZ0425750

**Redacted**

**Redacted**

HIGHLY CONFIDENTIAL

AZ0425751

APR-02-2002 TUE 03:04 PM                        FAX NO.                          P. 05

**RECEIVED** APR - 2 .2002



**U.S. Department of Justice**

*United States Attorney's Office
District of Delaware*

Chase Manhattan Centre                          (302) 573-6277
1201 Market Street, Suite 1100              FAX (302) 573-6220
P.O. Box 2046
Wilmington, Delaware 19899-2046

March 29, 2002

**Via facsimile and United States mail**
Jack C. Dodds, Esquire
Morgan Lewis & Bockius
1701 Market Street
Philadelphia PA 19103-2921

    Re: AstraZeneca

Dear Jack:

    We have reviewed your proposed response schedule and find it unacceptably drawn out. In order to give your client more certainty and to speed its response to our presentations at the end of January, we wish to record for you the necessary elements of the civil portion of a global settlement of this matter.

**The Average Wholesale Price Scheme**

    AstraZeneca has caused physicians to present false or fraudulent claims for payment to Medicare under 31 U.S.C. §3729(a)(1), "caused to be used a false record or statement to get a false or fraudulent claim paid by the Government," 31 U.S.C. §3729(a)(2), by setting an artificially inflated Average Wholesale Price ("AWP") for Zoladex and it conspired to defraud Medicare by instructing physicians to use the false or fraudulent AWP on their claims to Medicare rather than the discounted price the physicians paid.  This frustrated Medicare's lawful function to pay only for the reasonable and necessary costs of medical care for Medicare beneficiaries. 55 Fed. Reg. 25792, 25801.  AstraZeneca knew Medicare was ignorant of the actual acquisition cost of Zoladex.

HIGHLY CONFIDENTIAL                                                    AZ0425752

Jack C. Dodds, Esquire
March 29, 2002
Page 2

By 1997, the AWP was 187% of average price to the wholesale class of trade. In 1998 it was 203.9% and in 1999 it was 202%. The loss to the Medicare program from this false statement of price can be calculated in a number of ways. The true "average wholesale price" should have been charged to the Medicare and Medicaid programs instead of the artificial AWP AstraZeneca instructed physicians to use on the HCFA form 1500. Using the actual average price to wholesalers as the true AWP for the time period 1993 through 1999, the single damages are

$528,751,796.

(See Attachment 1). Using the average sales price AstraZeneca discounted to urologists as the true AWP, the single damages are

$204,410,208.

(See Attachment 2). The government considers that AstraZeneca's liability for single damages ranges between $204,410,208 and $528,751,796.

Because AstraZeneca caused the use of a falsely inflated AWP in Medicaid billings, the single damages to Medicaid programs was at least

$500,000

(with data from at least 12 states still outstanding). (See Attachment 3)

<u>False Statement of Best Price</u>

AstraZeneca "knowingly made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. §3729(a)(7), when it submitted false statements of the Zoladex best price to the government Medicaid program in all 24 quarters from 1994 through 1999 for which we now have data. In 19 of these 24 quarters, the best price was actually zero because of the gifts of free Zoladex samples AstraZeneca distributed, knowing the recipients billed for them. These false statements of best price decreased AstraZeneca's Medicaid rebate obligations in at least 38 states by at least $2,685,234.

HIGHLY CONFIDENTIAL                                    AZ0425753

Jack C. Dodds, Esquire
March 29, 2002
Page 3

## Civil Penalties under the False Claims Act and Medicaid Rebate Program

The number of false Form 1500's that were caused to be submitted for Zoladex reimbursement is astronomical.  The United States could recover from $5,500 to $11,000 in penalties for each of these "false claims," which are mandatory in a False Claims Act lawsuit.  If a settlement is reached, the United States will treat these penalties as the "litigation risk" factor in this matter and not pursue them.

Under the Medicaid Rebate Statute, AstraZeneca is liable for a civil monetary penalty in an amount not to exceed $100,000 for each item of false information it submitted. 42 U.S.C. §1396r-8(b)(3)(C)(ii)  The evidence shows AstraZeneca submitted at least 50 items of false information each quarter to HCFA and each of the state Medicaid agencies for all 24 quarters of the years 1994 through 1999.  This makes AstraZeneca liable for at least 1200 penalties of $100,000 each, or

$120,000,000.

The National Association of Medicaid Fraud Control Units (NAMFCU) is our contact for reaching unanimity in settlement with each of the fifty state Medicaid programs.  We do not yet have any signal from the "NAMFCU" of a willingness to waive these penalties.

## Sampling and Educational Grants Kickback Schemes

Aside from the criminal theories of liability for AstraZeneca's use of free samples as kickbacks to induce purchases of Zoladex and billing of the samples to Medicare, AstraZeneca is exposed to liability under the False Claims Act and common law theories of disgorgement and unjust enrichment. The Zoladex purchases by each urologist who received an incentive of free samples, educational grants or other inducement were tainted. From 1994 through 1999, AstraZeneca derived $132,233,496 in sales tainted by these kickbacks ( $91,680,126 from the samples scheme and $40,553,370 from the other inducement schemes).  It should repay Medicare for them under the common law.  Under the False Claims Act, that amount would be trebled.

HIGHLY CONFIDENTIAL

AZ0425754

APR-02-2002 TUE 03:05 PM                         FAX NO.                          P. 08

Jack C. Dodds, Esquire
March 29, 2002
Page 4

## General Principles of Civil Resolution

We will seek treble damages. Only if a criminal resolution is reached will the criminal fine be taken into account as a credit toward a final civil settlement amount. Where conduct is both criminal and civil, the False Claims Act penalties can be covered by a multiplier of 3.6 times the loss, where there is full cooperation and no obstruction of justice. Civilly, the United States releases only conduct encompassed by the settlement amount. Payment over time requires interest and security. If there is a criminal plea, the civil settlement must contain an admission of the fact of the plea. There can be no release for individuals who are charged criminally. The exclusion and compliance issues are addressed separately with the Office of Counsel to the Inspector General for the Department of Health and Human Services. Finally, all federal programs affected by the conduct must be compensated. Tricare, the Department of Defense, Medicaid, the Railroad Retirement Board and Federal Employee Health Benefits are still being examined.

We hope this enables your client to make a timely response, which we expect no later than six weeks from today.

Very truly yours,

RICHARD G. ANDREWS
Acting U. S. Attorney

By: _____
Virginia Gibson
Assistant United States Attorney

HIGHLY CONFIDENTIAL                                    AZ0425755

APR-02-2002 TUE 03:05 PM                    FAX NO.                           P. 09

| Year | Medicare Reimbursement | AWP Overstatement | Medicare Loss |
|------|------------------------|-------------------|---------------|
| 1993 | $26,166,359 | 20.6% | $5,390,270 |
| 1994 | $36,902,408 | 20.6% | $7,601,896 |
| 1995 | $51,670,237 | 25.5% | $13,175,910 |
| 1996 | $66,455,902 | 26.2% | $17,411,446 |
| 1997 | $103,582,505 | 82.9% | $85,869,897 |
| 1998 | $182,677,537 | 103.9% | $189,801,961 |
| 1999 | $204,790,240 | 102.3% | $209,500,416 |
| Totals | $672,245,188 | | $528,751,796 |

Source: AstraZeneca Invoice Data, 1993 - 1999, Wholesale Trade Class 01.

Attachment 1

HIGHLY CONFIDENTIAL                                          AZ0425756

## Medicare Single Damages

| Year | Avg. Wholesale Price (AWP) | Avg. Sales Price (ASP) | Avg. Medicare Price (AMP) | Medicare Units Reimbursed | Value of Difference Between AMP and ASP |
|------|------|------|------|------|------|
| 1993 | $318.75 | $255.46 | $258.61 | 107,060 | $315,670 |
| 1994 | $331.58 | $253.71 | $266.02 | 145,912 | $921,343 |
| 1995 | $358.65 | $251.48 | $265.45 | 196,197 | $2,696,070 |
| 1996 | $383.65 | $259.69 | $280.41 | 237,973 | $4,982,101 |
| 1997 | $410.51 | $227.91 | $302.77 | 342,115 | $25,611,125 |
| 1998 | $439.25 | $175.23 | $308.38 | 582,377 | $77,496,882 |
| 1999 | $468.99 | $182.39 | $333.81 | 612,494 | $92,697,008 |
| Total |  |  |  |  | $204,410,208 |

Attachment 2

HIGHLY CONFIDENTIAL

AZ0425757

APR-02-2002 TUE 03:05 PM          FAX NO.          P. 11

## Medicaid Reimbursement Analysis



| Year | A Amount Reimbursed[1] | B Units Reimbursed[1] | C (A/B) Avg. Medicaid Reimbursement | D Avg. AAC | E (C-D) Difference | (B×E) Value of Difference (>0) |
|---|---|---|---|---|---|---|
| 1993 | $632,509.44 | 568 | $192.83 | $255.50 | (992.90) | $0.00 |
| 1994 | $405,656.71 | 1,902 | $213.28 | $254.42 | (941.14) | $0.00 |
| 1995 | $803,283.35 | 3,162 | $255.62 | $261.65 | $4.07 | $0.00 |
| 1996 | $1,028,498.99 | 4,578 | $240.90 | $262.88 | (648.78) | $12,882.25 |
| 1997 | $1,321,271.87 | 5,281 | $251.62 | $231.95 | $19.67 | $0.00 |
| 1998 | $1,053,083.22 | 4,166 | $268.74 | $173.40 | $80.34 | $103,289.23 |
| 1999 | $1,414,829.68 | 8,361 | $169.19 | $182.39 | (813.20) | $335,321.29 |
| Total/s | $3,193,920.16 | 28,429 | | | | $452,492.83 |

Attachment 3

HIGHLY CONFIDENTIAL

AZ0425758

# Exhibit F

Redac

Redacted

Redacted

Redacted

Redacted

HIGHLY CONFIDENTIAL                                                                AZ0425759

# FAX TRANSMISSION

**UNITED STATES ATTORNEY'S OFFICE**
CHASE MANHATTAN CENTRE
1201 MARKET STREET, SUITE 1100, WILMINGTON, DELAWARE 19899-2046
302-573-6277
FAX: 302-573-6220

**DATE:**      May 20, 2002

**TO:**        Jack C. Dodds, Esquire
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
FAX: 215-963-5299

**FROM:**    Virginia Gibson-Mason
Executive United States Attorney

**PAGES:**    3 (including cover page)

**SUBJECT:**  AstraZeneca

**CONTENTS:**    Letter

HIGHLY CONFIDENTIAL

AZ0425760



**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

---

Chase Manhattan Centre
1201 Market Street, Suite 1100
P.O. Box 2046
Wilmington, Delaware 19899-2046

(302) 573-6277
FAX (302) 573-6220

May 20, 2002

<u>Via facsmile and United States mail</u>
Jack C. Dodds, Esquire
Morgan Lewis & Bockius
1701 Market Street
Philadelphia PA 19103-2921

Re: AstraZeneca

Dear Jack:

In response to your letter of April 8, 2002, I provide the following information:

1. <u>Attachment One</u>. The damage calculations in Attachment One is a summary of two large data sets and comparison across those data sets. In it we assumed that the " true 'average wholesale price' that should have been charged" to Medicare was the "actual average price" that wholesalers paid AstraZeneca for Zoladex , as reflected in AstraZeneca's own sales data recording the invoices of actual sales to wholesalers. This data came from the invoice data diskettes, Wholesale Class of Trade 01 for the years 1993 through 1999. The data in Attachment One is given by year. The second column of that attachment gives the actual Medicare reimbursement for all units of Zoladex in that year. The source of that Data is the Centers for Medicare and Medicaid Services database for Medicare reimbursements. The third column, labeled "AWP Overstatement", gives a comparison of the AWP for a single unit of Zoladex from the RedBook to the actual average unit price charged to wholesalers as stated in the invoice data disks. For example, the RedBook AWP in 1993 was 20.6% higher than the actual average unit wholesale price AstraZeneca charged. The loss to Medicare was calculated by applying the percentage AWP overstatement to the Medicare reimbursement in the second column. In 1993, applying 20.6% to $26,166,359 yielded a loss of $5,390,270. The data concerning the actual Medicare reimbursement and the total number of units reimbursed comes from CMS's Medicare reimbursement database. The actual average price to wholesalers comes from AstraZeneca invoice data, trade class 01.

HIGHLY CONFIDENTIAL

AZ0425761

Jack Dodds, Esq.
May 20, 2002
Page 2

2. Attachment Two. The number of Medicare units reimbursed in Attachment 2 comes from the CMS Medicare Reimbursement database. The Average Sales Price comes from AstraZeneca's invoice data diskettes and uses the average sales price to the urologist trade class number 21. The diskettes show a quarterly average sales price. We calculated the yearly average sales price by totaling the four quarters and dividing that number by the total number of units sold to that class of trade in that year. The fourth column in the attachment is labeled, "Average Medicare Price," which we derived from the CMS Medicare reimbursement database, to get the average price per unit of Zoladex, converting all units to the 3.6 mg. size.

3 and 4. Providers who received 25 or more samples and/or other inducements. We are not prepared to give you this information at this time.

Very truly yours,

RICHARD G. ANDREWS
Acting United States Attorney

BY: Virginia Gibson
Virginia Gibson
Executive United States Attorney

cc: Beth Moskow-Schnoll

HIGHLY CONFIDENTIAL                                    AZ0425762

# Exhibit G

From:      Alverson, Jeffrey

To:        Alverson, Jeffrey;Brady, James A;Davis, Chip Jr.;
           Diggin, Michael P;Featherstone, Nancy;Fullerton, Stuart L;
           Harsh, Nicholas;Holbein, Krista;Karwath, Kevin R;
           Maillet, Paul A;McCourt, Marion;Shaughnessy, Robert J;
           Skelly, Richard;Wilkinson, Nancy

Subject:   CARP AGENDA ITEM #1: HHS OIG Draft Compliance Program - FR
           Notice - Comments Due Dec. 2

Date:      10/17/2002 10:24:34 (GMT-05:00)

Redacted

Attachments:
           HHS OIG Draft Compliance Program Guidance FR Notice 100302
           .pdf;HHS OIG - Bentivoglio Slides 100202.PPT;

HIGHLY CONFIDENTIAL                                      AZ0689632

HHS OIG - DAVIS WRIGHT TREMAINE Analysis.doc

AZ0689633

# Exhibit H

April 11, 2002
New York, NY

**How to Implement the OIG Guidance and Make them "Workable" for Your Company**

*Ted Acosta*
Senior Manager
Ernst & Young, LLP (New York, NY)

*W. Charles Lucas*
Vice President & Associate General Counsel
Pharmacia Corporation (Peapack, NJ)

*Stuart A. Fullerton*
Senior Litigation Counsel
AstraZeneca Pharmaceuticals, LP (Wilmington, DE)

*Edward Miller*
Executive Counsel, Litigation & Compliance
Boeringer Ingelheim Pharmaceuticals, Inc. (Ridgefield, CT)

HIGHLY CONFIDENTIAL

AZ0705390

## How to Implement the OIG Guidance and Make Them Workable for Your Company

## *Discussion Points*

➤ Sales and Marketing Compliance Infrastructure in the Pharmaceutical Company Environment

➤ Scope of the Compliance Efforts

➤ Compliance Policies, Procedures and other Directives

➤ Compliance Training and Education

➤ Compliance Auditing and Monitoring

➤ Compliance Enforcement, Discipline and Corrective Action

➤ On the OIG's Expected Model Compliance Guidance

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

2

AZ0705391

**How to Implement the OIG Guidance and Make Them "Workable" for Your Company**

## Sales and Marketing Compliance *Infrastructure* in the Pharmaceutical Company Environment

- **Is there a need for an OIG-styled "program"? What are the alternatives?**
  - The "requirement" of a formal compliance program and its benefits
  - How much of a choice does the industry have at this point?
    - Adopting forthcoming guidance vs. Corporate Integrity Agreements ("CIAs)
    - Document the company's compliance efforts and their infrastructure

- **What compliance "models" work better for pharmaceutical companies?**
  - Observing the traditional, "fundamental elements" of compliance (e.g., Federal Sentencing Guidelines)
  - How much flexibility does a company have?

- **How can compliance activities be integrated into the company's structure?**
  - Integration into preexisting compliance efforts
  - The compliance "function": centralized vs. decentralized

- **Who can/should be in charge? Where should the compliance function be housed?**
  - Legal department vs. finance department vs. standalone
  - General counsel as compliance officer

- **Who should "champion" the compliance "project"?**
  - Chief Executive Officer vs. compliance officer
  - Creating program champions at different managerial levels
  - "Packaging" the compliance program

**ERNST & YOUNG**
*FROM THOUGHT TO FINISH™*

3

HIGHLY CONFIDENTIAL

AZ0705392

**How to Implement the OIG Guidance and Make Them "Workable" for Your Company**

*Scope* of the Compliance Efforts

- What risk areas/legal obligations should be covered?  Compliance with what?
  - o Fraud and abuse
  - o State anti-kickback and bribery laws (all payor laws)
  - o Internal business ethics policy
  - o FDA/promotional issues
  - o Operational (GMP, GLP) issues
  - o Antitrust
  - o EEOC
  - o Insider Trading
- Which activities should be covered?
  - o Gifts and entertainment
  - o Consulting agreements
  - o Continuing medical education
  - o Charitable donations
  - o Grants
- What divisions and which employees should be covered?
  - o Generally-who interacts with your customers?
  - o Functions: sales, marketing, senior executives, medical, managed care, market research, medical liaisons
  - o Third parties: co-promotion partners; contract sales organizations ("CSO") vendors
- What should be the compliance "approach"?
  - o "Bright line" – Concrete, specific rules
  - o "Good judgment" – Instructed by risk factors
  - o Approval and review process
  - o Homogeneous or functionally differentiated rules

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

4

AZ0705393

**How to Implement the OIG Guidance
and Make Them "Workable" for Your Company**

## Compliance *Policies*, *Procedures* and other *Directives*

- **Drafting/Revising**
  - Getting to know your company before sitting down to draw up policies
  - Who should draft/revise the policies?
    - The role of operations and business personnel
    - The role of upper management; the message from "above"
    - Whose should be responsible for updating them?
    - Benefits of giving employees an avenue to propose new policies
  - The process of drafting and revising policies
    - Standing "committee" with regular meetings vs. an individual
    - Altogether drafted by business units?  With business unit input?

- **Substance and audience**
  - Corporate wide vs. subsidiary; one size fits all vs. customized
  - The extent to which the number of policies affects how they will be communicated, how employees can find out what they are, and how to train on them
  - Pros and cons of separate "compliance policies"
  - What role do the laws play?
    - At what sources should the drafters look (e.g., law, enforcement actions, statements by government officials, hearsay, rumors and innuendo)?
    - Using the law to shape or to drive company policies
    - Perils of "reacting to the headlines"

- **Communication, training, and enforcement of policies**
  - Who should have responsibility for these aspects?
  - Methods (Electronic transmission, hard copy, meetings, word of mouth, etc.)
  - Enforcement
    - Part of performance goals?  A factor in compensation?  Incentives?
    - How do you discipline?  How do you ensure consistent discipline?
    - Perils of treating some policies as "real policies", perils of overlooking policy violations for "the stellar performer"

**ERNST & YOUNG**
*FROM THOUGHT TO FINISH™*

5

HIGHLY CONFIDENTIAL

AZ0705394

**How to Implement the OIG Guidance and Make Them "Workable" for Your Company**

## Compliance *Training and Education*

- **Scope of training**
  - Background legal issues, political and public relations issues
  - Business ethics policy
  - Promotional policy
  - Hotline procedures

- **What are potential training alternatives?  How to reach geographically-dispersed employees?**
  - Dissemination of written policies for individual review; dissemination of written materials
  - Live training:  Didactic lecture, scenario-based training
  - Employee newsletter
  - Technology:  Internet/intranet, CD-Rom, audiotapes

- **Who should be responsible for training?  Who should conduct the training?**
  - Attorneys (in-house, outside)
  - Members of management
  - Training professionals

- **How to track employee compliance with training obligations/expectations?  Should there be certifications?**
  - Signed certifications; electronic acknowledgement
  - Attendee lists

- **Who should be trained?**
  - Existing employees; refresher/updates for existing employees; and new employees
  - Managers
  - Training by function

- **How to know employees actually *understand* the lessons?  How to measure effectiveness?**
  - Testing activities, workshops; Q&A sessions; focus groups
  - Compliance audits; disciplinary records

- **When to do training?  Competing for time with sales and other revenue generating activities?**
  - Separate meeting
  - Adjunct to other group activities

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

6

AZ0705395

# How to Implement the OIG Guidance and Make Them Workable for Your Company

## Compliance *Auditing and Monitoring*

- **When to audit, when to monitor?**
  - The need to have a formal audit plan as part of a compliance program
- **What to audit, what to monitor?**
  - Mandatory
    - Sales and marketing activities
    - Government price reporting
  - Other areas (depending on the scope of the compliance program)
    - Prescription Drug Marketing Act; promotional materials; DDMAC
    - Clinical trials
    - GMP/GLP
- **Types of Audits**
  - Systems/process audits vs. "back-end/outcome audits
  - Documentation and performance audits; (e.g., TAP Pharmaceuticals' CIA)
- **How to integrate monitoring, auditing and training? Who should be responsible for auditing?**
  - Internal audit vs. dedicated staff
    - Reporting relationship with compliance officer
    - Built-in audit systems
    - CIA obligations regarding Independent Review Organizations
- **Who should be responsible for monitoring?**
  - The role of the field force
- **What is the role of technology?**
  - Self-monitoring applications that track expenditures and their disadvantages
  - Solutions for tracking training efforts

ERNST & YOUNG
FROM THOUGHT TO FINISH™

7

AZ0705396

## How to Implement the OIG Guidance and Make them Workable" for Your Company

### Compliance *Enforcement*, *Discipline* and *Corrective Action*

- The need to establish the correct setting for enforcement, discipline and corrective action
  - o The need for good, workable policies
  - o The need to train on the policies and legal requirements
- Enforcement, discipline and corrective action have to be hand-in-hand
  - o Plan in advance, rather than in the "heat of moment"
  - o Policy violations need to be addressed appropriately
    - Cannot ignore policy violations when there are no bad results
    - How to deal with repeat offenders
    - How to deal with pushback from individual managers
  - o Who enforces? Legal department? Human resources ("HR") department? Business Unit?
  - o What happens when the business unit disagrees with legal, or HR? Who resolves?
  - o How do you ensure effective enforcement across departments? Across business units? Across the company? Does it matter?
  - o How to deal with the fact that competitors sanction what your company prohibits? (The "but Mommy, Jimmy gets to stay up until midnight, why can't I" argument)

**ERNST & YOUNG**
FROM THOUGHT TO FINISH.™

8

AZ0705397

## How to Implement the OIG Guidance and Make Them Workable for Your Company

On the OIG's Expected *Model Compliance Guidance*

- How to absorb guidance from the government, pharmaceutical groups and provider groups?
- What utility does it have internally in pushing compliance efforts (e.g., politically, getting "buy in")?
- What utility does following the guidance have when the Department of Justice shows up?
- How can government-style compliance help in Wall Street/consumer confidence?

**ERNST & YOUNG** FROM THOUGHT TO FINISH™

9

AZ0705398

# **Exhibit I**



October 17, 2002
New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

*Ted Acosta*
Senior Manager
Ernst & Young, LLP (New York, NY)

*John M. Spinnato*
Sr. Vice President and General Counsel
Sanofi-Synthélabo Inc. (New York, NY)

*W. Charles Lucas*
Vice President & Associate General Counsel
Pharmacia Corporation (Peapack, NJ)

*Stuart L. Fullerton*
Senior Litigation Counsel
AstraZeneca Pharmaceuticals LP (Wilmington, DE)

*Marc W. Farley*
Assistant General Counsel
Berlex Laboratories, Inc. (Montville, NJ)

*Howard Young*
Partner
Arent Fox (Washington, DC)

HIGHLY CONFIDENTIAL

AZ0705380



October 17, 2002
New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

## *Discussion Points*

⋏ Sales and Marketing Compliance Infrastructure in the Pharmaceutical Company Environment

⋏ Scope of the Compliance Efforts

⋏ Compliance Policies, Procedures and other Directives

⋏ Compliance Training and Education

⋏ Compliance Auditing and Monitoring

⋏ Compliance Enforcement, Discipline and Corrective Action

⋏ On the OIG's Compliance Guidance for Pharmaceutical Manufacturers

⋏ On PhRMA's Code on Interactions with Healthcare Professionals

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

2

HIGHLY CONFIDENTIAL

AZ0705381

October 17, 2002

New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

## Sales and Marketing Compliance *Infrastructure* in the Pharmaceutical Company Environment

- **Is there a need for an OIG-styled "program"?  What are the alternatives?**
  - The "requirement" of a formal compliance program and its benefits
  - How much of a choice does the industry have at this point?
  - Is it a "floor" or a "ceiling"?

- **What compliance "models" work better for pharmaceutical companies?**
  - Observing the traditional, "fundamental elements" of compliance (e.g., OIG Guidance, Federal Sentencing Guidelines)
  - How much flexibility does a company have?

- **How can compliance activities be integrated into the company's structure?**
  - Integration into preexisting compliance efforts
  - The compliance "function": centralized vs. decentralized

- **Who can/should be in charge? Where should the compliance function be housed?**
  - Legal department vs. finance department vs. standalone
  - General counsel as compliance officer (discouraged by OIG's model)

- **Who should be on the "compliance committee"?**
  - What should be its function?
  - How should it function?

- **Who should "champion" the compliance "project"?**
  - Chief Executive Officer vs. compliance officer
  - Creating program champions at different managerial levels
  - "Packaging" the compliance program

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

3

HIGHLY CONFIDENTIAL

AZ0705382

October 17, 2002
New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

## *Scope* of the Compliance Efforts

- **What risk areas/legal obligations should be covered?  In addition to elements in OIG's model, compliance with what?**
  - Fraud and abuse (in OIG model)
  - PhRMA Code (in OIG model)
  - PDMA/Sampling
  - Medicaid "Best Price"
  - State anti-kickback and bribery laws
  - Internal business ethics policy

  - FDA/promotional issues
  - Operational (GMP/Part 11, GLP, GCP) issues
  - Privacy (including HIPAA)
  - Antitrust
  - EEOC
  - Insider Trading / Foreign Corrupt Practices / Diversion

- **How to prioritize coverage of scrutinized activities?**
  - Research and educational grants
  - Post-approval studies
  - Discounting / pricing
  - Consulting agreements
  - Continuing medical education
  - Gifts and entertainment
  - Charitable donations
  - Off-label
  - Managed care contracting

- **What divisions and which employees should be covered?**
  - Generally–who interacts with your customers?
  - Functions: sales, marketing, senior executives, medical, managed care, market research, medical liaisons, customer service
  - Third parties: co-promotion partners; contract sales organizations ("CSO"), vendors

- **What should be the compliance "approach"?**
  - "Bright line" – Concrete, specific rules
  - "Good judgment" – Instructed by risk factors
  - Approval and review process
  - Homogeneous or functionally differentiated rules

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

4

HIGHLY CONFIDENTIAL

AZ0705383



October 17, 2002

New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

## Compliance *Policies*, *Procedures* and other *Directives*

- **Drafting/Revising**
  - o Getting to know your company before sitting down to draw up policies
  - o Who should draft/revise the policies?
    - The role of operations and business personnel
    - The role of upper management; the message from "above"
    - Whose should be responsible for updating them?
    - Benefits of giving employees an avenue to propose new policies
  - o The process of drafting and revising policies
    - Standing "committee" with regular meetings vs. an individual
    - Altogether drafted by business units?  With business unit input?

- **Substance and audience**
  - o Corporate wide vs. subsidiary: one size fits all vs. customized
  - o The extent to which the number of policies affects how they will be communicated, how employees can find out what they are, and how to train on them
  - o Pros and cons of separate "compliance policies"
  - o What role do the laws play?
    - At what sources should the drafters look (*e.g.*, law, enforcement actions, statements by government officials, hearsay, rumors and innuendo)?
    - Using the law to shape or to drive company policies
    - Perils of "reacting to the headlines"

- **Communication, training, and enforcement of policies**
  - o Who should have responsibility for these aspects?
  - o Methods (electronic transmission, hard copy, meetings, word of mouth, etc.)
  - o Enforcement
    - Part of performance goals?  A factor in compensation?  Incentives?
    - How do you discipline? How do you ensure consistent discipline?
    - Perils of treating some policies as "real policies", perils of overlooking policy violations for "the stellar performer"

- How to deal with "codes of conduct/ethics/corporate responsibility" from a corporate level and the pharmaceutical business level?

**ERNST & YOUNG**
FROM THOUGHT TO FINISH.™

5

October 17, 2002
New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

## Compliance *Training and Education*

- **Scope of training**
  - o Background legal issues, political and public relations issues
  - o Business ethics policy
  - o Promotional policy
  - o Hotline procedures (compliance questions, addressing non-compliant competitors)
- **What are potential training alternatives? How to reach geographically-dispersed employees?**
  - o Dissemination of written policies for individual review; dissemination of written materials
  - o Live training: Didactic lecture, scenario-based training
  - o Employee newsletter
  - o Technology: Internet/Intranet, CD-Rom, audiotapes
- **Who should be responsible for training? Who should conduct the training?**
  - o Attorneys (in-house, outside)
  - o Members of management
  - o Training professionals
- **How to track employee compliance with training obligations/expectations? Should there be certifications?**
  - □ Signed certifications; electronic acknowledgement
  - o Attendee lists
- **Who should be trained?**
  - o Existing employees; refresher/updates for existing employees; and new employees
  - o Managers
  - o Legal department
  - □ Training by function
- **How to know employees actually *understand* the lessons? How to measure effectiveness?**
  - o Testing activities, workshops; Q&A sessions; focus groups
  - o Compliance audits; disciplinary records
- **When to do training? Competing for time with sales and other revenue generating activities?**
  - o Separate meeting
  - o Adjunct to other group activities

**ERNST & YOUNG**
FROM THOUGHT TO FINISH.™

6

HIGHLY CONFIDENTIAL

AZ0705385

October 17, 2002

New York, NY

The PhRMA code and the OIG Draft Guidance: How to Implement them and Make them Workable for Your Company

## Compliance *Auditing and Monitoring*

- **When to audit, when to monitor?**
  - The need to have a formal audit plan as part of a compliance program
- **What to audit, what to monitor?**
  - Mandatory
    - Sales and marketing activities
    - Government price reporting
    - Sampling
  - Other areas (depending on the scope of the compliance program)
    - Promotional materials; DDMAC
    - Clinical trials
    - GMP/Part 11, GLP, GCP
- **Types of Audits**
  - Systems/process audits vs. "back-end/outcome audits
  - Documentation and performance audits; (e.g., TAP Pharmaceuticals' CIA)
- **How to integrate monitoring, auditing and training? Who should be responsible for auditing?**
  - Internal audit vs. dedicated staff
    - Reporting relationship with compliance officer
    - Built-in audit systems
    - CIA obligations regarding Independent Review Organizations
- **Who should be responsible for monitoring?**
  - The role of the field force
- **What is the role of technology?**
  - Self-monitoring applications that track expenditures and their disadvantages
  - Solutions for tracking training efforts

**ERNST & YOUNG**
FROM THOUGHT TO FINISH™

7

HIGHLY CONFIDENTIAL

October 17, 2002
New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" for Your Company

## Compliance *Enforcement*, *Discipline* and *Corrective Action*

- **The need to establish the correct setting for enforcement, discipline and corrective action**
  - The need for good, workable policies
  - Clear consequences of noncompliance
  - Significant sanctions
  - The need to train on the policies and legal requirements

- **Enforcement, discipline and corrective action have to be hand-in-hand**
  - Plan in advance, rather than in the "heat of moment"
  - Policy violations need to be addressed appropriately
    - Cannot ignore policy violations when there are no bad results
    - How to deal with repeat offenders
    - How to deal with pushback from individual managers
  - Who enforces? Legal department? Human resources ("HR") department? Business Unit?
  - What happens when the business unit disagrees with legal, or HR? Who resolves?
  - How do you ensure effective enforcement across departments? Across business units? Across the company? Does it matter?
  - How to deal with the fact that competitors sanction what your company prohibits?
  - Reporting
    - Prompt reporting
    - What degree of "certainty"
    - Sixty (60) day "maximum" period

**ERNST & YOUNG**
FROM THOUGHT TO FINISH℠

8



October 17, 2002
New York, NY

# On the OIG's *Draft Compliance Program Guidance* (published September 30, 2002)

- **What does the draft Compliance Program Guidance mean for my organization?**

- **Does OIG Guidance Require Us to do anything we aren't already doing?**

- **Any Surprises in draft Guidance?**
  - Three risk areas: (1) integrity of payment data; (2) kickbacks; and (3) drug samples
  - No advice on how to deal with AWP
  - What are the implications on sales force incentive payments?
  - Restrictive definition of discounts safe harbor and bundling across product lines
  - Adopts PhRMA code related to gifts to health care providers
  - How easy is it to "comply" with the "ban" on excluded individuals and entities?
  - Admonishes manufacturers to report conduct, based upon credible evidence that may violate criminal, civil or administrative law within 60 days.
    - Any basis in law for such an admonishment?
    - Realistic time frame?
    - Any Fifth Amendment issues?

- **Should companies comment on the draft Guidance (due December 2nd)?**
  - Along what lines?

- **What utility does it have internally in pushing compliance efforts (i.e., politically, getting "buy in")?**

- **What utility does following the guidance have when the Department of Justice shows up?**

- **How can government-style compliance help in Wall Street/consumer confidence?**

**ERNST & YOUNG**
FROM THOUGHT TO FINISH.℠

9

AZ0705388



October 17, 2002
New York, NY

The PhRMA Code and the OIG Draft Guidance: How to Implement Them and Make Them "Workable" to Your Company

## On PhRMA's _Code on Interactions with Healthcare Professionals_ (effective July, 1, 2002)

- Is it compatible with the OIG Guidance?

- How can it be integrated into a company's compliance efforts?

- What if the company is NOT a member of PhRMA?

- OIG warns about giving anything of value to referral sources. The PhRMA code reads about items of no "substantial value" (i.e., $100 or less). What is the analysis?

**Ξ ERNST & YOUNG**
FROM THOUGHT TO FINISH™

10

HIGHLY CONFIDENTIAL

AZ0705389