# Exhibit J

# Pharmaceutical Regulatory and Compliance Congress and Best Practices Forum

Overview | Agenda | Continuing Education | Past Conferences
Privacy Policy | Administration | Contact Us | Past Home | Main Home



## PHARMA CONGRESS SPRING 2003: HHS OIG COMPLIANCE GUIDANCE FOR THE PHARMACEUTICAL INDUSTRY: KEY INSIGHTS FROM REGULATORS AND COMPLIANCE EXPERTS

Omni Shoreham Hotel
Washington, DC

**June 8-9, 2003**

**Sponsored by**

**Pharmaceutical Compliance Forum**

**Supported by**




GlaxoSmithKline

---

### STREAMING VIDEO OF PRESENTATION BY OIG CHIEF COUNSEL LEW MORRIS

**As Seen on Pharma Congress CD-ROM Described below.**

Click here to view now!

---

### NOW AVAILABLE!

**Purchase a CD-ROM which includes video of all speakers plus synced powerpoint presentations.**

**PharmaCongress Spring 2003:
HHS OIG Compliance Guidance for the Pharmaceutical Industry: Key Insights from Regulators and Compliance Experts**

The video, synchronized with the speaker presentations, can easily be viewed using your computer. You can instantly navigate to the presenter and the exact content you wish to view.



**Ensure your team's knowledge is current.**

Click here for more details
and to order your copy today!

### Keynote Speakers:

Lewis Morris, Esq.
*Chief Counsel to the Inspector General
Office of Inspector General
Department of Health and Human Services
Washington, DC*

Charles Tetzlaff, Esq.
*General Counsel, U.S. Sentencing Commission
Washington DC*

Susan Winkler, Esq.
*Assistant U.S. Attorney and Deputy Health Care Fraud Chief
Boston, MA*

**PRICEWATERHOUSECOOPERS** 🏦

Davis Wright Tremaine LLP



**For future information about The Pharmaceutical Regulatory and Compliance Congress and Best Practices Forum, please complete the form below.**

First Name: [            ]

Last Name: [            ]

Email: [            ]

Submit





We subscribe to the HONcode principles. Verify here.

Jeffrey B. Kindler, Esq.
*Senior Vice President and General Counsel*
*Pfizer Inc.*
*New York, NY*

## Featured Faculty:

John Bentivoglio, Esq.
*Partner, Arnold and Porter*
*Former Special Counsel for Healthcare*
*Fraud and Chief Privacy Officer*
*United States Department of Justice*
*Washington, DC*

Patrick Davish
*Executive Director, Public Affairs & Policy*
*Merck & Co, Inc.*
*North Wales, PA*

Hugh M. Donnelly
*Vice President, Audit*
*Pfizer Inc,*
*New York, NY*

Janice Forsyth
*Vice President & Chief Compliance Officer*
*Express Scripts, Inc.*
*St. Louis, MO*

Stuart Fullerton
*Senior Litigation Counsel, AstraZeneca*
*Pharmaceuticals, LLP*
*Wilmington, DE*

Jeff Greenman
*Chief Compliance Officer*
*Bayer Pharmaceuticals Corporation*
*West Haven, CT*

Robert G. Homchick, Esq.
*Partner, Davis Wright Tremaine*
*Seattle, WA*

Paul Kalb, MD, JD
*Partner, Sidley Austin Brown & Wood*
*Washington, DC*

Bradford W. Kling
*Alcon Laboratories, Inc.*
*Vice President, Corporate Audit*
*Fort Worth, TX*

Douglas Lankler, Esq.
*Senior Corporate Counsel*
*Deputy Corporate Compliance Officer*
*Pfizer Inc.*
*New York, NY*

Beth Levine, Esq.
*General Counsel, U.S. Pharmaceuticals*
*Pfizer Inc.*
*New York, NY*

Ann E. Lewis
*Senior Corporate Counsel*
*Pfizer Inc.*
*New York, NY*

Karen R. Lines, Esq.
*Associate General Counsel, Genentech Inc.*

*San Francisco, CA*

Lori Quelsser, CPA
*Vice President and Chief Compliance Officer*
*Eli Lilly and Company*
*Indianapolis, IN*

Arjun Rajaratnam, Esq.
*Compliance Officer, Global Pharmaceuticals*
*GlaxoSmithKline*
*Research Triangle Park, NC*

Mary E. Riordan, Esq.
*Senior Counsel*
*Office of Counsel to the Inspector General*
*Office of Inspector General*
*Department of Health and Human Services*
*Washington, DC*

Brenton Saunders, JD, MBA
*Partner, PricewaterhouseCoopers*
*Past President, Health Care Compliance*
*Association*
*Founder and Chair-elect, International*
*Association of Privacy Officers,*
*Washington, DC*

Jeff Stewart
*Vice President, Compliance*
*Ortho Biotech, a Johnson & Johnson*
*Company*
*Raritan, NJ*

Janice Toran
*Vice President, Compliance*
*Fujisawa Healthcare, Inc.*
*Deerfield, IL*

Bert Weinstein
*Vice President and Assistant General*
*Counsel*
*Merck & Co.*
*Whitehouse Station, NJ*

---

All material on this website is protected by copyright.
Copyright @ 1999-2003 by Health Care Conference Administrators, LLC.
All rights reserved.

# Exhibit K

*Pharmaceutical Compliance Congress*

*Washington, DC*

*June 9, 2003*

# The HHS OIG Guidance: An In-Depth Analysis of Risk Areas

Panelists:

Patrick Davish, Merck

Stuart Fullerton, AstraZeneca

Beth Levine, Pfizer

Karen Lines, Genentech

John Bentivoglio, Arnold & Porter

# Disclaimers

- The following comments are intended to summarize the HHS OIG Compliance Program Guidance for Pharmaceutical Manufacturers (the "Guidance").

- These comments are not intended to provide interpretive guidance or legal advice.

- The statements in this slide deck and comments during the discussion do not necessarily represent the views of any Company (and maybe not even individual panelists).

# Summary of Presentation

- Government price reporting and AWP (Stuart Fullerton)

- Gifts, business courtesies, and consulting arrangements (Beth Levine)

- Relationships with PBMs (Karen Lines)

- Education and research funding (Pat Davish)

- Discussion, Questions & Answers

# Government Price Reporting

- Integrity of data reported "directly or indirectly" by manufacturers is a key risk area

- Compliance = Policies + Training + Auditing

- What the Guidance says:

  – "Where appropriate," manufacturers' reported prices should take into account discounts, rebates, "free goods contingent on a purchase agreement . . . up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits" offered to purchasers

  – Accurate net prices must be calculated in bundled sales: "any discount…offered on purchases of multiple products should be fairly apportioned among the products."

# Government Price Reporting (cont'd)

- OIG position: Knowing or reckless failure to report accurate information can result in FCA liability

- Two types of cases

  – *Front-end liability*: inaccurate data in

    • Systems/process issue: SOP + training + auditing

  – *Back-end liability*: recharacterized payments

    • Anti-kickback violations often lead to Best Price claims

# Average Wholesale Price (AWP)

- "It is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if *one purpose is to manipulate the 'spread'* to induce customers to purchase its product."

- "We recommend that manufacturers review their AWP reporting practices and methodology *to confirm that marketing considerations do not influence the process.*"

- "Manipulation of the AWP to induce customers to purchase a product with *active marketing of the spread* is strong evidence of unlawful intent."

# AWP -- Analysis

- Are sales representatives actively marketing the spread?
  - "actively marketing the spread includes ... promoting the spread as a reason to purchase the product"

- Is there a spread guarantee?
  - "actively marketing the spread includes ... guaranteeing a certain profit or spread in exchange for purchase"

- Do "marketing considerations" influence AWP reporting practices or methodology?

- Is AWP set in a manner intended to "manipulate the spread"?

# Gifts, Business Courtesies and Consultants

- Gifts, entertainment and personal services compensation have a *"high potential for fraud and abuse"*

- Is the manufacturer providing a valuable tangible benefit to physician with intent to induce or reward referrals?

  - Offered to eliminate business/overhead expense?

  - Provided at less than fair market value?

  - Tied to federal healthcare program business?

- Single Purpose Rule

  - A legitimate purpose will not protect remuneration if there is also an illegal purpose (i.e., inducement)

- Arrangements should fit into personal services or employee safe harbors

# Gifts, Business Courtesies and Consultants (cont'd)

- The PhRMA Code "will substantially reduce the risk of fraud and abuse and help demonstrate a good faith effort to comply with the applicable federal health care program requirements"

- Gifts & Entertainment
  - Gifts must primarily benefit patients and must not have substantial value ($100 or less)
  - No cash (unless FMV compensation for services)
  - Items of minimal value may be offered if they're primarily associated with a physician's practice (e.g. pens)
  - Items for personal benefit of physician should not be given (e.g. tickets to sporting events, golf etc.)
  - Modest meals with presentation OK if conducive to scientific or educational exchange

# Gifts, Business and Consultants (cont'd)

- Service (Consulting) arrangements:

  – Written agreement

  – Need for services/Appropriate qualifications

  – Actual provision of services

  – Fair market value

  – Documentation prior to payment

# Gifts, Courtesies & Consulting -- High Risk Areas

- Gifts and Entertainment
  - Entertainment, travel, meals & gifts "potentially implicate anti-kickback statute"
  - Compliance with PhRMA code "should substantially reduce a manufacturer's risk"

- Service Agreements
  - Switching Arrangements
    - Cash payments to physicians or pharmacists to change a prescription are "suspect"
  - Consulting and Advisory Payments
    - FMV payments for bona fide services vs. compensation for "passive" participation
  - Marketing & Sales Activities
    - Speaking, preceptorships "pose a risk of fraud and abuse"
    - Disclosure helps, but doesn't eliminate risk
  - Payments for Detailing
    - Compensation for listening to sales reps or accessing websites is "strongly discouraged"

# Formularies and Formulary Support Activities

- **Relationships with formulary committee members**
  - Payments to influence formulary decisions are suspect
  - Price negotiations should not influence PBM's decisions on clinical safety/efficacy

- **Payments to PBMs**
  - Payments to PBMs based on/related to members purchases potentially implicate anti-kickback statute
  - Use of GPO safe harbor or managed care safe harbors
  - Transparency to actual buyer is the key

- **Formulary placement payments**
  - Lump-sum payments for formulary inclusion or exclusive/restricted formulary are potentially problematic

# Group Purchasing Organization (GPO)

An entity authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services for which payment may be made in whole or in part under Medicare or a State health care program, and who are neither wholly owned by the GPO nor subsidiaries of a parent corporation that wholly owns the GPO (either directly or through another wholly-owned entity).



# GPO Safe Harbor (cont'd)

- GPO must have written agreement with each member that provides:

  – Vendors will pay fee to GPO of 3% or less of purchase price of goods/services provided by vendor

  – If administrative fee not fixed at 3% or less, then the agreement between the GPO and its members must specify the amount the GPO is to be paid by vendor or the maximum amount (fixed sum or percentage)

- If member is a HCP, GPO must disclose in writing to member at least annually, and to the HHS Secretary upon request, the amount received from each vendor with respect to purchases made by that member

# PBMs -- Practical Implications

- **Agreements between manufacturers and PBMs should include:**

  – Representation that the PBM has appropriately contracted with its employers/plans regarding the fees it will be paid by the manufacturer

  – Covenant that PBM shall make the required disclosures to the employers/plans and Secretary of HHS

# PBMs -- Practical Implications (cont'd)

- **PBM agreements that include discount/rebate component should meet the requirements of the discount safe harbor:**

  - Manufacturer may have duties of seller if selling to PBM for mail-order business

  - Manufacturer may have duties of offeror if providing discount/rebate to employers/plans

  - Duties depend upon status of buyer: HMO/CMP with risk contract, cost reporter, claims submission

  - Seller/offeror duties include reporting discount to buyer, and refraining from impeding buyer in meeting its obligations

# Educational and Research Grants

- Covered in two separate areas of the Guidance:

  – "Relationships w/Purchasers & Their Agents"

  – "Relationships w/Physicians and Others in a Position to Make or Influence Referrals"

- Substantial overlap in the sections:

  – Several references in both places on separating educational and research funding functions from sales and marketing functions within the manufacturer

# Research Contracts with Physicians

- Research contracts w/physicians should fit within personal services safe harbor if possible

- Payments for research should be FMV and for "fair, reasonable and necessary services."

- Contracts originating in sales/marketing or in connection with sales contacts particularly suspect

- Indicia of suspect research: initiated by sales or marketing agents, not submitted to or reviewed by research dept., duplicative or not actually needed

# Educational Funding

- Is grant for bona fide educational purpose or related to physician prescribing practices?

- Unrestricted educational grant to medical professional org. poses little risk of fraud/abuse

- CME should not be used to channel funds to physicians or to influence control of content

- Reminder of adherence to FDA regulations

- ACCME and other guidelines are a "useful starting point"

# Purchasers and Their Agents

- Grants to purchasers, GPOs, PBMs raise concerns under the antikickback statute

- Funding contingent on purchase of product implicates statute even with a legitimate purpose

- Establish objective criteria for the award of grants that take no account of purchase volume or value

- Monitor and document compliance w/ procedures

- No control over speaker or content in educational presentations

# Exhibit L

Overview | Agenda | Continuing Education | Promotional Opportunities
Past Conferences | Privacy Policy | Administration | Contact Us | Home





## PHARMACEUTICAL REGULATORY AND COMPLIANCE CONGRESS AND BEST PRACTICES FORUM

Philadelphia Downtown Marriott Hotel
Philadelphia, PA

### November 13 - 15, 2002

### Sponsored by
### *Pharmaceutical Compliance Forum*

### Supported by
### *PricewaterhouseCoopers*

**For future information about The Pharmaceutical Regulatory and Compliance Congress and Best Practices Forum, please complete the form below.**

First Name: [ ]

Last Name: [ ]

Email: [ ]

Submit

---

### SAVE THE FOLLOWING DATE!

**THE FOURTH ANNUAL PHARMACEUTICAL REGULATORY AND COMPLIANCE CONGRESS**
*Sponsored by Pharmaceutical Compliance Forum and PricewaterhouseCoopers*
**Washington, DC**
**November 12 - 14, 2003**

### Keynote Speakers:

Fred Hassan
*Chairman & Chief Executive Officer
Pharmacia Corp
And Chairman, Pharmaceutical
Research & Manufacturers of America
(PhRMA)
Peapack, NJ*

Janet Rehnquist
*Inspector General
Department of Health & Human
Services
Washington D.C.*

Uwe E. Reinhardt, Ph.D.
*James Madison Professor of Political
Economy
Woodrow Wilson School
Princeton University
Princeton, NJ*

Barrett Toan
*President & Chief Executive Officer
Express Scripts, Inc.
St. Louis, MO*

**SAVE THE FOLLOWING DATES:**



 

We subscribe to the
HONcode principles.
Verify here.

**Featured Faculty:**

Thomas Abrams
*Director, Division of Drug Advertising*
*Marketing & Communications*
*U.S. Food and Drug Administration*
*Rockville, MD*

William Altman
*Vice President, Compliance*
*Kindred Healthcare*
*Louisville, KY*

Valli Baldassano
*Senior Director Global Compliance*
*Associate General Counsel, Pharmacia*
*Peapack, NJ*

John Bentivolglio, Esq.
*Partner, Arnold and Porter*
*Former Special Counsel for Healthcare Fraud*
*Chief Privacy Officer, United States*
*Department of Justice*
*Washington, DC*

Jacqueline Brevard, Esq.
*Chief Ethics Officer*
*Merck & Co.*
*Whitehouse Station, NJ*

Gary Brewster
*Director, Applied Decision Analysis*
*Standard & Poor's Corporate Value Consulting*
*New York, NY*

Charles Brock
*Chief Ethics and Compliance Officer*
*Abbott Laboratories*
*Abbott Park, IL*

The Honorable Ruben Castillo
*Vice Chair, United States Sentencing*
*Commission*
*Chicago, IL*

Eve Costopoulos, Esq.
*Senior Legal Director, Compliance*
*Schering-Plough Corporation*
*Kenilworth, NJ*

Stuart Fullerton
*Sr. Litigation Counsel*
*AstraZeueca Pharmaceuticals, LLP*
*Wilmington, DE*

David I. Greenberg, Esq.
*Senior Vice President & Chief Compliance*
*Officer*
*Philip Morris Companies, Inc.*
*New York, NY*

setup

Fred Hassan
*Chairman and Chief Executive Officer,*
*Pharmacia Corporation*
*Chairman, Pharmaceutical Research &*
*Manufacturers of America (PhRMA)*
*Peapack, NJ*

Robert Homchick, Esq.
*Partner*
*Davis Wright Tremaine*
*Seattle, WA*

Paul Kalb, M.D., J.D.
*Partner, Sidley Ausitn Brown & Wood*
*Washington, DC*

Mark Allen Kleiman, Esq.
*Partner , Law Offices of Mark Allen Kleiman*
*Los Angeles, CA*

Douglas Lankler, Esq.
*Corporate Counsel, Compliance*
*Pfizer, Inc.*
*New York, NY*

Ron Lee
*Director, 21 CFR Part 11/Annex 11 Program*
*Office*
*Chiron*
*San Francisco, CA*

Michael K. Louchs, Esq.
*Assistant United States Attorney*
*Chief, Health Care Fraud Task Force*
*Department of Justice*
*Boston, MA*

John Markus
*Senior Vice President for Compliance*
*Fresenius Medical Care North America*
*Lexington, MA*

Carolyn McElroy
*Of Counsel, Mintz Levin Cohn Ferris Glousky &*
*Popeo*
*and Former, Director Maryland Medicaid Fraud*
*Control Unit*
*Washington, DC*

Stephen Meagher, Esq.
*Partner, Phillips & Cohen*
*San Francisco, CA*

Tom Merchant
*R&D Legal Operations US*
*GlaxoSmithKline*
*Philadelphia, PA*

Joseph Metro, Esq.

Partner, Reed Smith
Washington, DC

Saverio Mirarchi
Managing Director and Chief Compliance
Officer
The Bank of New York
New York, NY

Lewis Morris, Esq.
General Counsel
Office Of Inspector General, Department of
Health and Human Services
Washington, DC

Diane Nobles
Senior Vice President for Compliance and
Integrity
Caremark Rx
Chicago, IL

Steve Priest
President
Ethical Leadership Group
Chicago, IL

Tom Puglisi, Ph.D.
Manager, PricewaterhouseCoopers
Former, Director of Human Subject
Protections for the Office for Human Research
Protections
Department of Health & Human Services
Washington, DC

Arjun Rajaratnam, Esq.
Compliance Officer, Global Pharmaceuticals
GlaxoSmithKline
Research Triangle Park, NC

Janet Rehnquist
Inspector General
Department of Health & Human Services
Washington, DC

Uwe E. Reinhardt, Ph.D.
James Madison Professor of Political Economy
Woodrow Wilson School
Princeton University
Princeton, NJ

Brenton Saunders, JD, MBA
Partner, PricewaterhouseCoopers
Past President, Health Care Compliance
Association
Founder and Chair-elect, International
Association of Privacy Officers
Washington, DC

James Sheehan, Esq.

*Assistant U.S. Attorney*
*Chief, Civil Division*
*Eastern District of Pennsylvania*
*Philadelphia, PA*

Dalton Smart
*Director, International Compliance*
*Schering-Plough Corporation*
*Kenilworth, NJ*

Robert Steinmeier
*21 CFR Part 11 Program Manager*
*Abbott Laboratories*
*Abbott Park, IL*

Craig Stewart
*Arnold & Porter*
*New York, NY*

Michael P. Swiatocha
*Director*
*PricewaterhouseCoopers LLP*
*Florham Park, NJ*

Eugene Thirolf
*Director*
*Office of Consumer Litigation, Civil Division*
*U.S. Department of Justice*
*Washington, DC*

Barrett Toan
*President and Chief Executive Officer*
*Express Scripts, Inc.*
*Maryland Heights, MO*

David Waterberry, Esq.
*Senior Counsel & Director*
*Washington State Attorney General's*
*Office, Medicaid Fraud Control Unit*
*Tocoma, WA*

Bert Weinstein
*Vice President and Assistant General Counsel*
*Merck & Co.*
*Whitehouse Station, NJ*

Seth Whitelaw
*Compliance Officer, Global R&D*
*GalaxoSmithKline*
*Philadelphia, PA*

Gretchen A. Winter
*Vice President and Counsel, Business Practices*
*Baxter International Inc.*
*Deerfield, IL*

Overview | Agenda | Continuing Education | Promotional Opportunities | Travel | Registration
Past Conferences | Privacy Policy | Administration | Contact Us | Home

## Agenda: Pre-Conference
## Wednesday, November 13, 2002

Pre-
Conference/
Day One

Day Two

Day Three

**PRECONFERENCE SYMPOSIA**
**OPTIONAL CONCURRENT SESSIONS - Choose One - 9 a.m. to Noon**

9:00 a.m.     **Special Pre-Conference Symposium on OIG Model**
                  **Compliance Guidance**

Marc Farley
Assistant General Counsel
Compliance Officer
Berlex Laboratories, Inc.
Montville, NJ

Stuart Fullerton, Esq.
Senior Litigation Counsel
AstraZeneca Pharmaceuticals, LLP
Wilmington, DE

Michael P. Swiatocha
Director
PricewaterhouseCoopers, LLP
Florham Park, NJ

**Chaired by:**
John Bentivoglio, Esq.
Partner, Arnold & Porter
Former Special Counsel for Health Care Fraud
Chief Privacy Officer, Department of Justice
Washington, DC
**Presentation Material (Acrobat)**
**Presentation Material (Powerpoint)**
**Presentation Material (Acrobat)**
**Presentation Material (Powerpoint)**

9:00 a.m.     **Special Pre-Conference Symposium on Privacy**

Tom Merchant
R&D Legal Operations US
GlaxoSmithKline
Philadelphia, PA

Leigh-Ann Patterson
Partner
Nixon Peabody LLP
Boston, MA
**Presentation Material (Acrobat)**
**Presentation Material (Powerpoint)**

**Chaired by:**
Brent Saunders, JD, MBA
Partner, PricewaterhouseCoopers, LLP
Founder and 1st VP, International Association of Privacy Officers

Past President, Health Care Compliance Association
Florham Park, NJ
**Presentation Material (Acrobat)**
**Presentation Material (Powerpoint)**

Noon          **Pre-Conference Adjourns; Lunch on your Own**

## Agenda: Day 1
## Wednesday, November 13, 2002

### PHARMACEUTICAL REGULATORY AND COMPLIANCE CONGRESS AND BEST PRACTICES FORUM

1:30 p.m.      **Welcome and Introduction**

Bert Weinstein, Esq.
Vice President and Assistant General Counsel
Merck & Co.
Whitehouse Station, NJ
(Conference Co chair)

1:45 p.m.      **The OIG's Enforcement Initiatives and Model Guidance in the Pharmaceutical Industry**

Janet Rehnquist
Inspector General
Department of Health & Human Services
Washington, DC

2:15 p.m.      **Insights into the Department of Justice**

Eugene Thirolf
Director
Office of Consumer Litigation, Civil Division
U.S. Department of Justice
Washington, DC
**Presentation Material (Acrobat)**
**Presentation Material (Powerpoint)**

3:00 p.m.      **Insights into the FDA's DDMAC**

Thomas Abrams
Director, Division of Drug Advertising
Marketing & Communications
U.S. Food and Drug Administration
Rockville, MD
**Presentation Material (Acrobat)**
**Presentation Material (Powerpoint)**

3:45 p.m.      **Break**

4:00 p.m.      **Regulator Roundtable**

Michael Loucks, Esq.
Chief of the Health Care Fraud Unit
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Massachusetts
Boston, MA

Lewis Morris, Esq.
General Counsel
Office Of Inspector General
Department of Health and Human Services
Washington, DC

James Sheehan, Esq.
Chief of the Civil Division
Assistant U.S. Attorney
U.S. Attorney's Office for the Eastern District of Pennsylvania
Philadelphia, PA

David Waterbury, Esq.
Senior Counsel and Director
Washington State Attorney General's Office
Medicaid Fraud Control Unit
Tacoma, WA

John Bentivoglio, Esq.
Partner, Arnold & Porter
Former Special Counsel for Health Care Fraud
Chief Privacy Officer, Department of Justice
Washington, DC
(Moderator)

5:30 p.m.    **Adjournment**

top of page

Copyright @ 1999-2002 by Health Care Conference Administrators, LLC.
Contact Webmaster

# Exhibit M

Page 1

H I G H L Y   C O N F I D E N T I A L

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------X

IN RE PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE        ) CIVIL ACTION:

LITIGATION                     ) 01-CV-12257-PBS

                               ) Judge Patti B. Saris

------------------------------X
THIS DOCUMENT RELATES TO       )

01-CV-12257-PBS and 01-CV-339 )
------------------------------X


                    THURSDAY, MAY 20, 2004


          Deposition of JOHN RICHARD FREEBERRY, held

at the Law Offices of McCarter & English, 919 North

Market Street, Suite 1800, Wilmington, DE, before

Cindy Sebo of Spherion Deposition Services, Notary

Public in and for the State of Maryland.

39b4e154-9b8d-41d9-8a5b-4f4a764c09ba

John Richard Freeberry Highly Confidential          May 20, 2004
                    Wilmington, DE

Page 98

1    A    I don't know.
2    Q    Are follow-up documents sent after a
3  meeting summarizing --
4    A    Not generally.
5    Q    Are there other meetings that you
6  attend on a regular basis?
7    A    On a regular basis?  I have my personal
8  staff meetings.
9    Q    How often do you hold your personal
10  staff meetings?
11    A    Once a month, once every other month.
12    Q    Do you prepare agendas for those
13  meetings?
14    A    Sometimes; sometimes not.
15    Q    Do others prepare agendas for those
16  meetings?
17    A    No.
18    Q    Are minutes taken of those meetings?
19    A    No.
20    Q    Are any kind of follow-up documents
21  prepared after the meetings have occurred that
22  would --

Page 99

1    A    Sometimes.
2    Q    Okay.
3    A    We have actionable things that we're
4  doing.
5    Q    Would those documents be maintained
6  electronically?
7    A    Yes, um-hum.
8    Q    I believe that you stated that
9  E-mail -- you use E-mail -- well, I believe that
10  you testified that your group would use E-mail to
11  communicate with customers, which you identified
12  as the Brand Leaders.
13         For what other purposes does your
14  department use E-mail?
15    A    Gosh, that's our primary mode of
16  communication within the organization and with --
17  outside the organization, too.  And we're
18  E-mailing our suppliers back and forth to the
19  questions on projects, using E-mail to receive
20  information from various sources in the company,
21  you know, newsline inquiries, things like that.
22    Q    Do you communicate with what you termed

Page 100

1  as "pricing services" by E-mail?
2    A    Yes, we -- we do.
3    Q    What types of communications do you
4  have with what you referred to as pricing services
5  by E-mail?
6    A    Well, the routine communications are
7  notification of price changes or new product
8  launches.
9    Q    What format does or do notifications of
10  price changes take that you exchange with price
11  services?
12    A    We send them a -- a brief note, plus
13  a -- typically a spreadsheet that we have -- we
14  have the new WAC prices when we make changes.
15    Q    What else do those spreadsheets
16  reflect?
17    A    The product name, NDC number, package
18  size, as I recall.
19    Q    Other than the WAC, are there any
20  other -- is there any other information on there
21  related to price?
22    A    No, the only thing we send now is the

Page 101

1  WAC.
2    Q    And as of what date did the spreadsheet
3  only reflect WAC?
4    A    Since probably 2002, I think --
5  probably early 2002, as I recall, maybe --
6    Q    Can you recall -- I'm sorry.
7    A    It's been a couple of years.  I can't
8  recall the exact date.
9    Q    Do you recall approximately what month?
10    A    I think it was -- I'm not sure.  The
11  beginning of the year, I think, but I'm -- I'm
12  guessing at that.  It's been a couple of years.
13    Q    How did it come about that WAC would be
14  the only price reflected on the spreadsheet?
15    A    I think it surfaced -- it had to do
16  with the OIG investigation that raised the --
17  heightened our concern about providing AWP.
18    Q    Who did you -- did you make the
19  decision to only reflect WAC on the spreadsheets?
20    A    As I recall, I consulted with counsel,
21  AstraZeneca counsel.
22    Q    Do you recall who you consulted with

26 (Pages 98 to 101)

39b4e154-9b8d-41d9-8a5b-4f4a764c09ba

# Exhibit N

**Saylor, Michelle A**

**From:**   Schultz, Erik (US Marketing & Pricing)
**Sent:**   Thursday, October 17, 2002 10:49 AM
**To:**   Freeberry, John
**Subject:** FW: AWP white paper

This is the only white paper we did.. the other became the newsletter - AWP  - nothing as far as pricing or the industry.

-----Original Message-----
**From:** Freeberry, John
**Sent:** Friday, March 01, 2002 10:18 AM
**To:** Schultz, Erik (US Marketing & Pricing)
**Subject:** FW: AWP white paper

I believe this is the latest- same as what I sent


John R. Freeberry
Pricing Strategy Director
Marketing & Pricing
302-886-1457

-----Original Message-----
**From:** Fullerton, Stuart L
**Sent:** Tuesday, February 12, 2002 10:09 AM
**To:** Freeberry, John
**Cc:** Shaughnessy, Robert J; Stripling, Kathryn S; Engelmann, Glenn M
**Subject:** AWP white paper

John:  I have made revisions to the draft white paper (attached).  I think that the revised version still communicates your intended message.

1/29/2004

-----CONFIDENTIAL-- ·                                        AZ0461108

## Background/Terminology

The price of pharmaceuticals is often compared using either WAC or AWP as measures of cost. WAC or Wholesale Acquisition Cost reflects the price wholesalers pay to the manufacturer (excluding discounts for prompt pay). It is also known in the industry as the Ex-Manufacturer price. The Average Wholesale Price or AWP is an industry reference price which is typically 15-25% over WAC. The spread between WAC and AWP for AstraZeneca varies between 20 and 25%.

Certain private payers and state Medicaid organizations may use AWP as a basis for reimbursing retail/mail order pharmacists for providing RX's to patients with insurance. The Federal Government uses AWP as a basis for reimbursing physicians for drugs covered under Medicare Part B.

## Current Situation

FirstDataBank and Redbook are the two primary companies that collect and report pharmaceutical prices to the industry. FirstDataBank is the larger player and provides prices to most payers, state Medicaid systems, Medicare (for Part B reimbursement) and others for pharmacy reimbursement. FirstDataBank sets the AWP for each product. Redbook's reported AWP prices are most often identical to FirstDataBank's, but variances exist.

Recently, FirstDataBank has independently begun to revise the AWP for all branded pharmaceutical products to a 25% markup over WAC. We have been informed that FirstDataBank is taking this action to create consistency in price reporting. For AstraZeneca products with a 20% spread, the spread will increase to 25% at the time of any WAC price change, beginning on January 1, 2002, or by the end of the 1st Qtr 2002, even if the price was not changed. We have seen the change for AZ and other companies' products that have had price changes in 2002.

## How the spread changes could impact the industry and healthcare system

- Price Perceptions- AWP is sometimes used to compare prices so a higher spread appears to inflate the prices of pharmaceutical products. As an example, the new AWP price for Nexium 40mg capsules is $4.32 -- it would have been $4.14 without the spread change.
- Pharmacy reimbursement- a higher spread can translate into higher reimbursement to retailers and mail order pharmacies to the extent a reimbursement formula for private third party and Medicaid RX's is anchored off of AWP.
- Contracting Rebates- if contracts specify rebates as a percent discount off of AWP vs. WAC, the rebate dollars will be impacted. An increase from 20% to 25% will represent a 4.2% increase in rebates for these contracts. Also, it is possible the increased spread can affect "best price" by increasing the rebates on contracts based on AWP.
- Price Comparisons- since the AWP is sometimes used to compare the prices of competing products the change in spread will cause price differences to appear greater or lesser depending on the specific situation. For example, for competing products , any price difference will be exacerbated if the spread changed for only one product. For example, the AWP for Nexium was 5.6 % greater than Aciphex. After the spread change it is 10.2% higher because Aciphex have not yet raised prices in 2002 and the spread remains at 20%. However, according to FirstDataBank the spread for all branded products will changed to 25% by the end of the 1st Qtr 2002.

CONFIDENTIAL                                                    AZ0461109

## Impact of Changing the Spread from 20% to 25%

### Short Term Impact

A potential negative factor is publicity that will misrepresent the actual amount of price increase that is occurring in the pharmaceutical industry. Families USA and other groups will likely compare the AWP of products last year to the AWP this year and claim that the industry has raised prices by an inflated amount.

Also, to the extent that contracts discounts are anchored off of AWP, increased rebates (and/or best price penalties are a possibility)?. (We are currently assessing AZ contracts in this regard)

CONFIDENTIAL

AZ0461110

# Exhibit O

```
                          Greisman 032604 deposition.txt
0001
 1           STATE OF NORTH CAROLINA IN THE GENERAL COURT
 2                  NEW HANOVER COUNTY OF JUSTICE
 3                     SUPERIOR COURT DIVISION
 4
 5   HARRY E. STETSER, DALE E. NELSON,     )
     and MICHAEL deMONTBRUN, Individually)
 6   and on behalf of themselves and      )
     all others similarly situated,       )
 7            Plaintiffs,                  )
          vs.                              )No. 1-CV-5268
 8   TAP PHARMACEUTICAL PRODUCTS, INC.;    )
     ABBOTT LABORATORIES; TAKEDA           )
 9   CHEMICAL INDUSTRIES, LTD.,            )
     JOHNSON & JOHNSON ETHICON             )
10   ENDO-SURGERY, INC.; INDIGO LASER      )
     CORPORATION; DAVID JETT;              )
11   CHRISTOPHER COLEMAN; SCOTT HIDALGO;   )
     and EDDY JAMES HACK,                  )
12            Defendants.                  )
13           The videotaped deposition of KENNETH GREISMAN,
14   taken in the above-entitled cause, before Gina M.
15   Callahan, a notary public of Iroquois County,
16   Illinois, on the 26th day of March, 2004, at
17   77 West Wacker Drive, Suite 3500, Chicago,
18   Illinois, at 9:07 a.m. pursuant to Notice.
19
20
21
22
23   REPORTED BY:  Gina M. Callahan, CSR
24   LICENSE NO.:  084-003623
0002
 1        APPEARANCES:
 2             KLINE & SPECTER, by
               MR. DONALD E. HAVILAND, JR. and
 3             MR. DEVON SNELL
               1525 Locust Street, 19th Floor
 4             Philadelphia, Pennsylvania  19102
               (215) 772-1000
 5                  Representing the Plaintiffs;
 6
 7             JONES DAY, by
               MR. DANIEL E. REIDY
 8             77 West Wacker Drive, Suite 3500
               Chicago, Illinois  60601
 9             (312) 782-3939
                    Representing TAP Pharmaceuticals;
10
11             McDERMOTT, WILL & EMERY, by
               MS. RACHAEL M. TRUMMEL
12             227 West Monroe Street, Suite 4400
               Chicago, Illinois  60606
13             (312) 984-7600
                    Representing Abbott Laboratories;
14
15             JENNER & BLOCK, by
               MR. ROBERT R. STAUFFER
16             One IBM Plaza, 45th Floor
               Chicago, Illinois  60611
17             (312) 222-9350
                    Representing Takeda Chemical
18                  Industries Limited;
                                             Page 1
```

Greisman 032604 deposition.txt

```
20  the full day each day?                              09:16:28
21      A.   No.                                         09:16:30
22      Q.   Can you give me an approximation of how     09:16:30
23  many -- what parts of each day you met?             09:16:33
24      A.   One day we met for the full day, one day    09:16:35
0013
1   we met for about a half a day, and this morning      09:16:38
2   Mr. Reidy and myself and for a brief period of time  09:16:41
3   Ms. Trummel met for a shorter period of time.        09:16:45
4   Mr. Reidy for about an hour; with Ms. Trummel        09:16:50
5   present, about 20 minutes, 15 minutes, perhaps.      09:16:53
6       Q.   So is it fair to say that during your       09:16:56
7   preparation to testify on behalf of Abbott, Jones,   09:16:57
8   Day lawyers were present throughout those            09:17:01
9   preparatory sessions?                                09:17:04
10      A.   Yes, that is correct.                        09:17:05
11      Q.   Did you undertake to do anything in          09:17:10
12  particular with respect to your preparation on       09:17:14
13  behalf of Abbott as opposed to TAP?  And let me      09:17:14
14  know if you don't understand the question.           09:17:21
15      A.   Well, I certainly looked at subpoenas that  09:17:23
16  were directed to Abbott Laboratories.  That would    09:17:25
17  be one thing that I did that was unique to my        09:17:28
18  preparation for my testimony for Abbott.             09:17:31
19           And to the extent that I met with the       09:17:34
20  lawyers representing Abbott, that would be another   09:17:34
21  thing that I did unique to my preparation for        09:17:43
22  Abbott.  Those are the things that I can think of    09:17:43
23  at the moment.                                       09:17:43
24      Q.   With respect to the settlement papers you   09:17:43
0014
1   described.                                           09:17:43
2       A.   Yes.                                         09:17:47
3       Q.   Was there any particular review that you    09:17:47
4   undertook on behalf of Abbott that was different     09:17:47
5   from the review that you undertook on behalf of      09:17:50
6   TAP?                                                 09:17:52
7       A.   No.                                          09:17:52
8       Q.   Let me ask you the same question with       09:17:52
9   respect to the other documents you described but     09:17:54
10  not in detail.                                       09:17:55
11           Was there specific documents you looked at  09:17:57
12  with respect to your preparation for Abbott and not  09:17:58
13  TAP?                                                 09:18:01
14      A.   No, none that I can recall.                  09:18:02
15      Q.   In your conversation with Ms. Bergan.       09:18:05
16      A.   Yes.                                         09:18:09
17      Q.   Could you tell me what that related to?     09:18:09
18      A.   Ms. Bergan has had some communications      09:18:10
19  with competitors regarding their marketing          09:18:13
20  activities.  And to the extent I'm designated to    09:18:15
21  testify in part on TAP's communications with        09:18:19
22  competitors, I wanted to get her information as      09:18:21
23  well as that of my own.  And I certainly searched    09:18:25
24  my own memory for that as I was preparing for this   09:18:28
0015
1   deposition as well.                                 09:18:31
2       Q.   So is it fair to say your conversation      09:18:32
3   with Ms. Bergan related specifically with respect   09:18:34
4   to category 9 of Schedule A in your testimony for   09:18:36
5   TAP?                                                 09:18:42
6       A.   Yes, that is correct.                        09:18:42
7       Q.   Was there anything else you did in          09:18:49
                          Page 6
```

Greisman 032604 deposition.txt

```
 8    particular with respect to category 9,              09:18:50
 9    communications between TAP and competitors other     09:18:52
10    than searching your own memory, speaking to          09:18:55
11    Ms. Bergan, and generally trying to refresh your     09:18:59
12    recollection about communications with competitors?  09:19:02
13         A.    Yes.                                       09:19:05
14         Q.    Can you tell me what you did?              09:19:05
15         A.    I looked at a few or some notes that I had 09:19:06
16    taken when I had had some conversations with          09:19:09
17    competitors and some correspondence between us and    09:19:12
18    a competitor.                                         09:19:15
19         Q.    Okay.  Can you describe for me the nature  09:19:17
20    of the notes you reviewed?                            09:19:19
21         A.    They were just notes that I had taken of   09:19:21
22    conversations I had for counsel with a competitor     09:19:23
23    of a number of different conversations.               09:19:28
24         Q.    Were they notes of conversations with one  09:19:34
0016
 1    competitor?                                           09:19:38
 2         A.    To the best of my recollection, yes.       09:19:39
 3         Q.    Who was the competitor?                    09:19:41
 4         A.    AstraZeneca.                               09:19:42
 5         Q.    All right.  And were they notes of         09:19:43
 6    multiple conversations?                               09:19:47
 7         A.    Yes.                                        09:19:48
 8         Q.    Who at the competitor did you have         09:19:49
 9    conversations with that were reflected in the         09:19:54
10    notes?                                                09:19:56
11         A.    Certainly with Stuart Fullerton, who is a  09:19:58
12    lawyer at AstraZeneca.  I don't recall whether the    09:20:01
13    notes reflect that I had an actual conversation       09:20:05
14    with Glenn Englemann, who is the General Counsel of   09:20:07
15    AstraZeneca, or who was and may still be.  But        09:20:10
16    certainly they referenced an attempt to reach         09:20:14
17    Mr. Engelmann.  And, again, I don't recall if I       09:20:16
18    actually reached him.                                 09:20:19
19         And there was another woman at AstraZeneca       09:20:20
20    in the legal department, I think her name was         09:20:23
21    Katherine Stripling, if I have the name correctly.    09:20:25
22    And I believe there was some reflection of notes of   09:20:29
23    conversations with her as well.                       09:20:33
24         Q.    Could you, if you can, try to spell that   09:20:33
0017
 1    name?                                                 09:20:34
 2         A.    I'm not certain I remember it correctly,   09:20:35
 3    but I think it is Stripling.  Perhaps                 09:20:37
 4    S-t-r-i-p-l-i-n-g.                                    09:20:41
 5         Q.    Okay.                                       09:20:42
 6         A.    But that's an -- I'm not certain I         09:20:42
 7    remember that.                                        09:20:43
 8         Q.    That's a phonetic spelling you're using?   09:20:45
 9         A.    I think so.                                 09:20:48
10         Q.    You understood her to be a lawyer at       09:20:48
11    Astra's in-house legal department?                    09:20:50
12         A.    Yes.                                        09:20:53
13         Q.    All right.  The same is true with respect  09:20:53
14    to Mr. Fullerton?                                     09:20:55
15         A.    Yes.                                        09:20:56
16         Q.    Did your notes reflect conversations with  09:20:58
17    anyone else at AstraZeneca -- strike that.            09:21:02
18         Did your notes reflect any conversation          09:21:05
19    with anyone else at Astra?                            09:21:06
20         A.    Well, again, I know -- excuse me.  I know  09:21:08
```

                                Page 7

```
                              Greisman 032604 deposition.txt
21    my notes reflected an attempt to reach              09:21:13
22    Mr. Engelmann.  I don't recall if the notes that I  09:21:15
23    looked at reflected an actual conversation with     09:21:17
24    him.                                                09:21:19
0018
1         Q.    And why did you review those notes?       09:21:19
2         A.    In preparation for my designated testimony 09:21:21
3     on the topic of our -- our being TAP's             09:21:24
4     communications with competitors.                   09:21:27
5         Q.    Did those notes refresh your recollection 09:21:30
6     as to those conversations?                         09:21:31
7         A.    Yes.                                      09:21:34
8         Q.    Can you tell me in what time frame the    09:21:35
9     notes reflected the conversations?  I want to know  09:21:39
10    what time you had the conversations.               09:21:42
11        A.    Well, I think the earliest one was       09:21:46
12    sometime in 2000, the early part of 2000.  Perhaps 09:21:47
13    March or April.  And I don't recall when the latest 09:21:51
14    one was.  Sometime later.  Certainly in the year   09:21:56
15    2000, 2002, at least, and maybe later.  I simply   09:21:59
16    don't recall.                                      09:22:02
17        Q.    At least 2002, and possibly later?       09:22:08
18        A.    That is correct.                         09:22:12
19        Q.    From either your review of your notes or 09:22:18
20    your general recollection of the conversations, can 09:22:18
21    you tell me about how many conversations you recall 09:22:22
22    having with individuals at Astra?                  09:22:25
23        A.    Is your question limited to conversations 09:22:28
24    relating to products that are Medicare Part B      09:22:30
0019
1     reimbursed?                                        09:22:39
2         Q.    No.  I'd like to get a general sense of  09:22:39
3     the nature -- the number of conversations, and then 09:22:39
4     I can narrow it for you.                           09:22:39
5         A.    I don't really have a good grasp on the  09:22:43
6     number of conversations in total that I've had with 09:22:43
7     AstraZeneca counsel.                               09:22:46
8         Q.    Could you say in terms of a range?  Is it 09:22:49
9     more than ten?                                     09:22:51
10        A.    Yes, it would probably be more than ten. 09:22:53
11        Q.    Do you know if it is more than 20?       09:22:56
12        A.    I don't know for sure if it is more than 09:23:00
13    20.                                                09:23:01
14        Q.    Okay.  Does it comport with your         09:23:04
15    recollection that the range of the conversations   09:23:07
16    with AstraZeneca were between 10 and 20?           09:23:08
17        A.    That would be an approximation.          09:23:13
18        Q.    A fair approximation?                    09:23:15
19        A.    Yeah, it is possible there were a few more 09:23:17
20    than 20.  I doubt there were many more than that,  09:23:19
21    so that would be an approximation.  I would say no 09:23:21
22    more than 22 or 23 or 25, and perhaps less.        09:23:24
23        Q.    No greater than 25?                      09:23:27
24        A.    That would be my best recollection.      09:23:29
0020
1         Q.    And you said the earliest conversation   09:23:38
2     that you recall that you had with -- let me strike 09:23:39
3     that for a second.                                 09:23:42
4               You've said a few times in your answers  09:23:43
5     Astra, and I want to make sure that I have the     09:23:46
6     company correct that you were speaking with.  Was  09:23:48
7     it AstraZeneca Pharmaceuticals?                    09:23:50
8         A.    It was AstraZeneca.  And I don't know how 09:23:55
                              Page 8
```

Greisman 032604 deposition.txt
 24    about involving the claims of false advertisement?    09:37:42
0033
  1        A.   It is possible, but I don't recall.          09:37:46
  2        Q.   Do you recall if you've written or           09:37:49
  3    e-mailed or otherwise communicated in a written       09:37:51
  4    form to the AstraZeneca lawyers other than the        09:37:55
  5    situation we just described involving claims of       09:37:59
  6    false advertisement?                                  09:38:01
  7        A.   I don't recall.                              09:38:03
  8        Q.   It is possible, you just don't remember?     09:38:05
  9        A.   It is possible.  I think it is unlikely.     09:38:15
 10    I'm relatively sure the answer is no, but I'm not     09:38:15
 11    certain the answer is no.                             09:38:15
 12        Q.   Have you had e-mail communications with      09:38:15
 13    AstraZeneca?                                          09:38:15
 14        A.   Not that I recall.                           09:38:19
 15        Q.   Do you know if AstraZeneca has had e-mail    09:38:20
 16    communications with anyone at TAP for the time        09:38:22
 17    period you're testifying about?                       09:38:25
 18        A.   Not that I recall.                           09:38:28
 19        Q.   Can you tell me the situations that you      09:38:35
 20    can recall wherein you've raised with AstraZeneca     09:38:39
 21    issues about their sales and marketing practices?     09:38:43
 22        A.   And, again, are you asking generally or      09:38:49
 23    are you asking about products limited to those of     09:38:51
 24    the type involved in this lawsuit?                    09:38:53
0034
  1        Q.   Generally.                                   09:38:55
  2        A.   I recall raising with AstraZeneca issues     09:38:56
  3    about how they conducted some of their speaker        09:39:02
  4    programs.  I recall raising issues about, in a        09:39:05
  5    limited number of instances, their sales             09:39:13
  6    representatives discussing the difference between     09:39:17
  7    the reimbursement amount that they would make, that   09:39:18
  8    a physician would make for their Zoladex product      09:39:20
  9    versus the price paid for that product.              09:39:23
 10             And there were other issues I recall         09:39:26
 11    discussing related to entertaining of physicians or   09:39:28
 12    consulting programs that were run by AstraZeneca.     09:39:32
 13        Q.   And as to those issues, can you tell me      09:39:41
 14    why it is you contacted AstraZeneca?                  09:39:44
 15        A.   To raise with their lawyers the various      09:39:47
 16    conduct, to be sure that their legal department       09:39:52
 17    knew about the conduct so that they could make        09:39:52
 18    their own judgment about whether it was appropriate   09:39:55
 19    or inappropriate.                                     09:39:58
 20        Q.   Before raising those issues with             09:40:00
 21    AstraZeneca lawyers, did you discuss with anyone at   09:40:02
 22    TAP that you were going to raise these issues         09:40:07
 23    directly with AstraZeneca?                            09:40:11
 24        A.   I don't recall with certainty.               09:40:15
0035
  1        Q.   Okay.  It is possible, you just don't        09:40:20
  2    remember?                                             09:40:21
  3        A.   I remember in a general sense having         09:40:22
  4    discussions with people that when I learned of        09:40:25
  5    inappropriate or potentially inappropriate conduct    09:40:28
  6    by AstraZeneca, that I would be available to raise    09:40:31
  7    those issues with AstraZeneca's counsel.              09:40:37
  8             So I recall that conversation generally,     09:40:40
  9    which is different from a specific instance that I    09:40:42
 10    might learn about and then have a conversation with   09:40:45
 11    a TAP person about whether I would or wouldn't make   09:40:47
                              Page 14

Greisman 032604 deposition.txt

0038
```
 1   respect to prostate cancer treatments like Lupron    09:44:12
 2   and Zoladex?                                         09:44:12
 3        A.   I don't recall that, but it is possible.   09:44:12
 4        Q.   Can you tell me what products were         09:44:15
 5   implicated in the concern you had -- well, strike    09:44:16
 6   that.  I just read my notes.                         09:44:20
 7             You said the situation of the              09:44:23
 8   reimbursement that you had a concern about involved  09:44:24
 9   Zoladex; is that right?                              09:44:27
10        A.   That is correct.                           09:44:28
11        Q.   Can you describe that situation and what   09:44:29
12   was brought to your attention first?                 09:44:33
13        A.   I can recall a small number of instances   09:44:35
14   where it had come to my attention that one or more   09:44:38
15   AstraZeneca salespeople may have been discussing     09:44:41
16   with physicians the profitability that they could    09:44:45
17   earn, or perhaps I should say the difference         09:44:50
18   between the price they would pay for Zoladex and     09:44:52
19   the amount of money they would be reimbursed for     09:44:55
20   that product, and that is an issue that I brought    09:44:58
21   to the attention of the AstraZeneca lawyers for      09:45:01
22   them to determine whether it was inappropriate; and  09:45:03
23   if so, what action, if any, they might want to       09:45:05
24   take.                                                09:45:09
```
0039
```
 1        Q.   Do you recall if the discussion used the   09:45:10
 2   phrase return to practice?  And that's the           09:45:16
 3   discussion you're describing of the Zeneca sales     09:45:20
 4   reps.                                                09:45:23
 5        A.   I believe at least one of the discussions  09:45:24
 6   did use that phrase.                                 09:45:26
 7        Q.   You understood what return to practice     09:45:28
 8   was?                                                 09:45:29
 9        A.   I have an understanding of what it means   09:45:30
10   to me.                                               09:45:31
11        Q.   What is it?                                09:45:33
12        A.   I think there are people who use that      09:45:36
13   phrase to describe the difference between the        09:45:37
14   reimbursement amounts that a physician would         09:45:40
15   receive when injecting the product into a patient    09:45:42
16   and the price the physician pays to acquire the      09:45:44
17   product from the manufacturer.                       09:45:47
18        Q.   AstraZeneca has used that phrase?          09:45:50
19        A.   I don't know whether AstraZeneca has used  09:45:53
20   that phrase.                                         09:45:55
21        Q.   You are aware that at least some sales     09:45:56
22   reps at AstraZeneca use that phrase?                 09:45:58
23        A.   I don't know whether they have or not.     09:46:02
24        Q.   One of the pieces that was brought to your 09:46:06
```
0040
```
 1   attention in terms of reimbursement used that        09:46:08
 2   phrase?                                              09:46:12
 3        A.   I don't know if it used that phrase.  I    09:46:12
 4   know that it was about that subject area.            09:46:14
 5        Q.   I see.                                     09:46:16
 6             What was the concern that you had that you 09:46:24
 7   then raised with AstraZeneca concerning the          09:46:28
 8   profitability or the return to practice as we        09:46:32
 9   described?                                           09:46:34
10        A.   The subject area has come under scrutiny   09:46:37
11   from the government, from plaintiff's class action   09:46:41
12   lawyers such as yourself, and perhaps others, and    09:46:47
```
Page 16

Greisman 032604 deposition.txt

| | | |
|---|---|---|
| 13 | it has caused some negative media coverage about | 09:46:51 |
| 14 | the pharmaceutical industry. And I brought that to | 09:46:56 |
| 15 | the attention of AstraZeneca so they would be aware | 09:47:00 |
| 16 | that their salespeople were engaged in that type of | 09:47:02 |
| 17 | a discussion, as I mentioned, so that they could | 09:47:04 |
| 18 | decide whether it was appropriate or inappropriate | 09:47:08 |
| 19 | and so that they could make their own decision | 09:47:09 |
| 20 | about what action, if any, to take. | 09:47:13 |
| 21 | Q.    So you raised with AstraZeneca that the | 09:47:17 |
| 22 | issue of discussing profitability with physicians | 09:47:19 |
| 23 | or using return to practice was something the | 09:47:23 |
| 24 | government was scrutinizing, class action lawyers | 09:47:26 |

0041

| | | |
|---|---|---|
| 1 | were interested in, and it had a negative tone in | 09:47:29 |
| 2 | the media, if you will, for the pharmaceutical | 09:47:35 |
| 3 | industry? | 09:47:37 |
| 4 | MS. TRUMMEL:  Object to the form. | 09:47:39 |
| 5 | THE WITNESS:  I don't believe I indicated that | 09:47:40 |
| 6 | that's the nature of what I discussed with | 09:47:41 |
| 7 | AstraZeneca.  I believe I indicated that those were | 09:47:43 |
| 8 | the issues, and that I called AstraZeneca and | 09:47:45 |
| 9 | relayed to the lawyers at AstraZeneca or to a | 09:47:50 |
| 10 | lawyer at AstraZeneca that such discussions were | 09:47:53 |
| 11 | occurring. | 09:47:56 |
| 12 | BY MR. HAVILAND: | 09:47:56 |
| 13 | Q.    So you had the concerns you just | 09:47:56 |
| 14 | described, those three areas, and you had some | 09:47:58 |
| 15 | conversation with a lawyer at AstraZeneca about | 09:48:02 |
| 16 | those areas? | 09:48:04 |
| 17 | A.    That is correct. | 09:48:05 |
| 18 | Q.    Who did you speak with about those | 09:48:06 |
| 19 | subjects? | 09:48:08 |
| 20 | A.    To the best of my recollection, Stuart | 09:48:08 |
| 21 | Fullerton. | 09:48:10 |
| 22 | Q.    Can you tell me what you recall about that | 09:48:12 |
| 23 | conversation? | 09:48:14 |
| 24 | A.    I don't remember very much other than that | 09:48:18 |

0042

| | | |
|---|---|---|
| 1 | I raised this issue with Mr. Fullerton on one or | 09:48:20 |
| 2 | two or perhaps three occasions where a particular | 09:48:24 |
| 3 | individual at AstraZeneca had engaged in this | 09:48:26 |
| 4 | conduct. | 09:48:30 |
| 5 | Q.    What did Mr. Fullerton say to you about | 09:48:33 |
| 6 | the concerns you raised? | 09:48:36 |
| 7 | A.    I don't recall. | 09:48:39 |
| 8 | Q.    Did he tell you he was going to do | 09:48:43 |
| 9 | something about it? | 09:48:45 |
| 10 | A.    I don't really recall. | 09:48:47 |
| 11 | Q.    At any time in the one, two, or three | 09:48:50 |
| 12 | times you raised these concerns with Mr. Fullerton, | 09:48:52 |
| 13 | did he ever tell you that he was going to do | 09:48:56 |
| 14 | anything about your concerns? | 09:48:57 |
| 15 | A.    I don't recall. | 09:48:59 |
| 16 | Q.    Did he ever write to you to satisfy you | 09:49:00 |
| 17 | that he was going to do anything to satisfy -- | 09:49:03 |
| 18 | strike that. | 09:49:07 |
| 19 | Did he ever write to you that he was going | 09:49:07 |
| 20 | to do anything with respect to your concerns that | 09:49:09 |
| 21 | you raised with him? | 09:49:13 |
| 22 | A.    No. | 09:49:14 |
| 23 | Q.    Do you know if AstraZeneca today still | 09:49:16 |
| 24 | discusses with physicians profits or return to | 09:49:19 |

0043

Page 17