**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Chief Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, | ) | |
| No. 06-CV-11337-PBS | ) | |

**ABBOTT LABORATORIES INC.'S RESPONSE IN OPPOSITION TO
THE UNITED STATES' MOTION TO COMPEL ABBOTT LABORATORIES INC.
TO RESPOND TO THE UNITED STATES' FIRST SET OF INTERROGATORIES**

Plaintiffs' motion ("Mot.") (Dkt. No. 4061) should be denied. This is a suit brought by plaintiffs (the "United States" or "Government"), against Abbott, alleging fraudulent pricing of certain pharmaceutical products. The Government drew its complaint-in-intervention narrowly, limiting its allegations to four families of pharmaceutical products (sterile water, Vancomycin, sodium chloride, and dextrose), over a ten-year period (January 1, 1991 through January 31, 2001) (the "Relevant Claims Period").

The parties have engaged in almost half a year of mutual discovery on the complaint's allegations (beyond the ten years of one-way discovery that the Government conducted while keeping its complaint under seal). During that time, Abbott has – consistent with Judge Saris's admonitions – produced information (i) specifically mentioning the four specific product families alleged in the Complaint, and (ii) pertaining to those product families, even if they are not specifically mentioned. Abbott has reasonably accommodated every legitimate request from the Government for discovery. Simply put, that discovery is proving that the Government's complaint is baseless.

So, now, the Government is trying to save its lawsuit with a fishing expedition. The instant motion only underscores the Government's desperation: The Government is trying to use the discovery rule of "relevance" to leverage its narrow complaint into a tool justifying access, through its First Set of Interrogatories (the "Interrogatories"), to a staggering array of information. Specifically, despite having sued on only four products, all of which were manufactured by only one division of Abbott (the former Hospital Products Division, or "HPD"), the Government now wants information pertaining *exclusively* to products *not* at issue in this case, many of which were made by *entirely different* Abbott divisions. And, despite having claimed damages only for 10 years (itself a significant span of time), the Government now wants information spanning a period nearly twice that length.

What the Government does not tell the Court, however, is that under the Federal Rules of Civil Procedure in force today (as opposed to those predating the 2000 amendments, which are the subject of the authorities on which the Government relies), such broad discovery is not available as a matter of right, but instead must be supported by a showing of "good cause." The Government has not even attempted that here, and accordingly its motion should be denied.

## BACKGROUND

The Government's factual recitation is both one-sided and misleading. The full story of this case begins back in 1995, when relator Ven-A-Care of the Florida Keys, Inc. filed an under-seal *qui tam* lawsuit in the U.S. District Court for the Southern District of Florida against, among others, Abbott, alleging pharmaceutical pricing fraud. The particulars of what transpired over the next 11 years are unclear, since the Government has steadfastly refused to disclose what it filed with the Court in that timeframe. (It appears that Judge Saris will force the recalcitrant Government to expose its investigation to the light of day shortly. *See* Dkt. No. 4080.) What is

clear, though, is that the Government kept the case under seal for *over a decade*, all the while conducting one-way discovery of Abbott through its civil investigative powers – requesting and receiving literally tens of thousands of documents from Abbott.

The Government finally intervened and unsealed the Complaint against Abbott on March 17, 2006. The Complaint's allegations are limited to four Subject Drugs (marketed and sold by Abbott's HPD), and the claimed damages are limited to injuries allegedly occurring between January 1, 1991 and January 31, 2001. (*See* Cmplt. ¶¶ 31, 35, 51-52, 65, 69, 83-84.)

Later, in the fall of 2006, mutual discovery finally commenced. As part of that discovery, the Government served its Interrogatories on November 17, 2006. Instead of seeking information (i) regarding the Subject Drugs (ii) during the Relevant Claims Period, the Government's Interrogatories sought responsive information relating to (i) all Abbott drugs (ii) for a 21-year "time period," from "January 1, 1985 to the present." (*See* Dkt. No. 4061, Ex. 1 at 3-4.) In response, Abbott provided from its HPD, which made the four product families at issue, marketing and sales information mentioning those specific drugs. In addition, Abbott provided sales and marketing information that was not specific to those drugs, but that pertained to the *entire class* of drug products of which they are a part. In other words, Abbott provided both the specific and general information in its possession about the products at issue in this case during the Relevant Claims Period.

The Government, however, presses this Court for more. Obviously distraught at how little the facts established in discovery resemble the allegations of its complaint, the Government now asks Court to make Abbott produce information about *all* of its products for a time period

lasting nearly *two decades*, apparently hoping it will find something to substantiate its crumbling case. That is an abuse of the discovery process, and should be rejected.[1]

## ARGUMENT

It is black-letter law that "[t]he party seeking information in discovery over an adversary's objection has the burden of showing its relevance." *Caouette v. Officemax, Inc.*, 352 F. Supp. 2d 134, 136 (D.N.H. 2005); *Daniels v. Am. Power Conversion Corp.*, No. 05-459ML, 2007 U.S. Dist. LEXIS 10858, at *3-4 (D.R.I. 2007) (same). Moreover, the Federal Rules, as amended in 2000, delineate a much narrower scope of appropriate discovery than the Government seeks. Parties to a civil action "have no entitlement to discovery to develop new claims or defenses that are not already included in the pleadings." Fed. R. Civ. P. 26(b)(1), Advisory Comm. Note (2000). Instead, discovery is limited *only* to those matters that are "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1).[2] Here, the Government's complaint is limited to *four enumerated products*, marketed and sold by Abbott's HPD, and seeks damages only for conduct spanning from 1991 to 2001. That is the universe of relevance under the Rules, against which the Government's current motion must be measured.

The Government reaches far beyond that, however, and now seeks to compel: (i) information regarding non-Subject Drugs, (ii) information regarding sales to hospitals and reimbursements by non-Medicaid or Medicare providers; and (iii) information predating and

---

[1] In addition, the Government – despite having had over a decade to discover its case (contrasted with the six months Abbott has had) – is transparently trying to bootstrap its fishing expedition into an extension of the discovery deadline. (*See* Mot. at 1.) That, too, is improper.

[2] Regrettably, much of the Government's relevancy argument turns on authorities decided before the 2000 Amendment – and indeed, as long ago as 1947. (Mot. at 3, citing *Hickman v. Taylor*, 329 U.S. 495 (1947); *Wittingham v. Amherst College*, 164 F.R.D. 124 (D. Mass. 1995); *Atchison Casting Corp. v. Marsk, Inc.*, 216 F.R.D. 225, 227 (D. Mass 2003) (*quoting* the 1947 *Hickman* opinion.) These authorities, decided under a no-longer current version of the rules, have no bearing here. The remaining case, *Matthews v. Allen*, 2006 WL 2228845, at *1 (D. Mass. 2006), provides no support for the Government's out-dated position and is cited only for its quotation to the text of FED. R. CIV. P. 26(b)(1).

postdating the Relevant Claims Period. Such information is not "relevant to the claim or defense of any party"; at best, it could be argued to be "relevant to the *subject matter* involved in the litigation." Fed. R. Civ. P. 26(b)(1) (emphasis added). Even that is a stretch, but it need not be addressed here, because under the post-2000 Rules, such broad discovery is only available upon a showing of "good cause" that the Government has not even tried to make. *Id.*

The Government's motion is not candid on this point. To the contrary, it squarely argues (from pre-2000 precedents) that relevance, even in the absence of a showing of good cause, still extends to "any matter that is or may become an issue in the litigation." (*E.g.*, Mot. at 3 (citing *Wittingham v. Amhurst College*, 164 F.R.D. 124, 126-27 (D. Mass. 1995).)[3] That is not the law. And, because the Government has not even attempted a good cause showing (nor could it), its motion must be denied.

I.   **THE GOVERNMENT'S "RELEVANCY" ARGUMENTS ARE MERITLESS.**

   A.   **The Government Cannot Satisfy Its Burden Of Demonstrating That The Information Regarding Non-Subject Drugs Is Relevant To This Case.**

The Government first asserts that "restriction of discovery to the four specific drugs named in the complaint is too limited." (Mot. at 6.) That contention is unavailing. To begin with, the Government's contention completely ignores Abbott's actual Interrogatory responses. Abbott has only one division under which it marketed and sold drugs relevant to the Complaint, and that is its former HPD.[4] Abbott's responses covered *both* information specific to the Subject Drugs, *and* information more broadly relevant to both the Subject Drugs and other drugs marketed and sold by HPD – that is, information relating to the general sale or marketing for

---

[3] The Government's lack of candor on this point is particularly troubling, given that Judge Saris herself warned the Government, in a hearing held almost two months before the Government filed its motion, that "the Rules of Civil Procedure have been changed" with respect to what constitutes "relevant evidence." (Hr'g. Tr. 29 (Feb. 27, 2007), attached as Ex. 1.)

[4] On April 30, 2004, Abbott divested itself of its HPD resulting in a new corporation. Abbott no longer sells or markets products under a hospital products division.

*entire classes of drug products* that would include the Subject Drugs. That information includes not just detailed interrogatory responses, but also thousands of pages of documents produced that are responsive to the Government's Interrogatories. The only thing that Abbott has not done is produce information relating *exclusively* to non-Subject Drugs and non-HPD sales and marketing. Abbott should not have to do so, as Judge Saris has already confirmed.

Indeed, in a February 27, 2007 hearing, Judge Saris made it abundantly clear that the Government is "not entitled to every drug if you haven't sued on it." (Hr'g. Tr. 8 (Feb. 27, 2007), attached as Ex. 1.) She reminded the Government that it "[had] to be able to have a good-faith basis for saying they were defrauded or there w[ere] false claims with respect to [other] drugs." *Id.* at 16. She then repeatedly warned the Government that, without such a good faith basis, the Government could not "use discovery as a fishing expedition," noting "[t]hat's the big bottom line." *Id.* at 15 ("You can't use a lawsuit as a fishing expedition for ten more drugs that you're interested in. . . . [you] can't use the discovery . . . to get another fifteen drugs."); *id.* at 34 ("I have to say, it can't be a fishing expedition to find a hundred more drugs to sue on.").[5]

It is into the teeth of Judge Saris' admonitions regarding the breadth of the Government's requests – having elected to bring suit on only four drugs, and being warned by Judge Saris that "the Rules of Civil Procedure have been change[d], so it's got to be likely to lead to relevant evidence," (*id.* at 29) – that the Government asserts, based on no more than its own say-so, that

---

[5] Judge Saris expressed similar concerns regarding the Government's broad document requests, stating that "You can't have a hundred documents relating to a hundred drugs when you're suing for four." Hr'g. Tr. 25 (Feb. 27, 2007). Citing the empirical irrelevancy of similar Government requests, she noted that in a case regarding Zoladex, that "I've seen these documents on Zoladex" that the Government alleged were relevant, and "you go thousands and thousands of pages that would not have relevance to your issues." *Id.* at 23. Given its history of overly-broad requests, Judge Saris stated that the Government was not entitled to "every internal document about every drug" concluding that such discovery is "overly broad." *Id.* at 24. She went on, warning the Government that it was not entitled to discovery regarding "drugs that have nothing to do with yours" stating that it "may be overly broad. . . . unreasonable." *Id.* at 29.

it is entitled to information relating to *every* drug, "regardless of the drugs at issue." (Mot. at 6.) The Government is wrong, and this Court, confirming Judge Saris's already expressed opinions on the matter, should so hold.

> **B.   Discovery Outside Of The Ten-Year Window Of The Relevant Claims Period Is Irrelevant, Unlikely To Lead To The Discovery Of Relevant Evidence, And In Any Event, Unduly Burdensome.**

The Government next seeks to extend the temporal scope of discovery well beyond even the decade-long Relevant Claims Period asserted in its complaint. The Government apparently now seeks discovery starting from 1988 and ranging, "at a minimum, [through] 2003." (Mot. at 5.) Strikingly, the Government does not even argue that that extended time period, itself, would produce "relevant" evidence – nor could it. Rather, the Government weakly argues that such a broad sweep *might* lead to the discovery of admissible evidence. (*Id.* at 4.) That is wrong, and the discovery should not be permitted in any event, because it would be unduly burdensome. *See Briddell v. St. Gobain Abrasives Inc.*, 233 F.R.D. 57, 60 (D. Mass. 2005) (relevant information, which is otherwise discoverable, may be limited "temporally" in order to avoid overly broad and unduly burdensome requests . . . a plaintiff will not be permitted an open-ended review of corporate records" in order to establish unlawful corporate practices) (citing *Glenn v. Williams*, 209 F.R.D. 279, 281-82 (D.D.C. 2002)).

Abbott has already provided the Government with a decade's worth of information. Any discovery allowed beyond 2001 will not provide any relevant information to any alleged damages occurring before January 2001, which is where the Government's claims cut off – nor has the Government explained how it could. The Government itself alleges that AWPs at issue here declined dramatically after 2001. (*See* Cmplt. ¶¶ 84, 88.) And the Government's own actions show that it could not possibly have been relying upon the pricing-compendia published AWPs in 2001, when the Government published a list of "true" AWP prices for various drugs,

including the Subject Drugs at issue here.  (Dep't of Health and Human Serv., Health Care Financing Admin., *Program Memorandum: An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program* (Sept. 8, 2000), attached as Ex. 2.)

At the other end of the spectrum, the Government asserts that it is entitled to information about at least one of the Subject Drugs, Vancomycin, from before 1991.  (Mot. at 5.)  It is important to remember, however, that the Government has already put Abbott through this exercise once.  In 1996, the Government served Abbott with a Civil Investigative Demand ("CID") seeking, among other things, marketing and sales documents relating to Vancomycin dating back to 1986.  (*See* Civil Investigative Demand 95-125 (Jan. 22, 1996), attached as Ex. 3.)  Abbott responded to this CID in a timely manner and produced documents to the Government.  Abbott also has agreed to provide Plaintiffs in this case with any pre-1991 Vancomycin documents that have been produced in other litigation matters.  There is no reason, however, why Abbott should be compelled now, more than 10 years later, to go back and search again for decades-old information that pre-dates the start of the alleged misconduct charged by the Government.  In sum, there is no need for (let alone "good cause" for) any additional information pre-1991 and post-2001, and the Government's efforts to compel this information should be rejected.

> **C.    The Government Cannot Satisfy Its Burden Of Demonstrating That Discovery Of HPD Sales To Hospitals Or Third-Party Payors Is Relevant To This Case.**

Finally, the Government contends that it should be permitted discovery of HPD sales to hospital customers and documents relating to private third-party payor reimbursements.  (Mot. at 5-6.)  The Government essentially admits, *sub silentio*, that these materials are not relevant, under the standard set out above.  That is clearly correct.  Hospitals are reimbursed based on

Diagnosis Related Groups ("DRGs")—a figure determined wholly separate from the published AWP for Abbott's products. Thus, documents relating to Abbott's sales to hospitals would contain *zero* information about Abbott's alleged practice of marketing its products based on AWP spreads. Similarly, reimbursement by private third-party payors was based on formulas independent from those used for Medicare Part B and Medicaid, and thus this avenue would not yield information relevant to the Government's allegations – which focus exclusively on those two programs.

While the Government weakly contends that this information will (somehow) "lead to the discovery of relevant evidence," it has not explained why this is so, even as a logical matter, let alone faced with the facts set out above. (Mot. at 5-6.) This case is based on the Government's incorrect assertion that Abbott allegedly manipulated the AWP of its drugs in order to dupe Medicare Part B and Medicaid payors into over-reimbursing for Abbott's drugs. Discovery regarding reimbursements that were in no way based on AWP, or that had nothing to do with Medicare Part B or Medicaid, simply has no connection to these allegations.

### D. The Government Cannot Satisfy Its Burden Of Demonstrating That Discovery About PPD Products Is Relevant To This Case.

Finally, to the extent the Government seeks discovery relating *exclusively* to products marketed by Abbott's Pharmaceutical Products Division ("PPD"), beyond that which Abbott has already agreed to provide, the Government fails to articulate even an arguable basis to receive such discovery. Products marketed and sold by Abbott's PPD are almost exclusively single-source, self-administered drugs (*e.g.*, branded pills) that are prescribed by a physician to an eligible patient, who then takes the prescription to be filled by a third-party (typically a pharmacist who has no discretion to alter the physician's prescription). Medicare Part B does not cover PPD drugs, and to the extent Medicaid reimburses third-party pharmacists for PPD drugs,

such reimbursement occurs only *after* the third-party pharmacist fills the physician's *binding* prescription. Thus, these PPD drugs were not, indeed could not have been, sold, marketed, and/or reimbursed in a way consistent with the Government's alleged scheme. For single-source, self-administered drugs (like Abbott's PPD drugs), it was not Abbott's customer – the administering physician or hospital – that received reimbursement under Medicaid. It was instead the third-party pharmacist, with whom Abbott had no dealings, and who has little or no discretion regarding what products to dispense in any event.

Simply put, the Government's theory that Abbott unlawfully marketed a "spread" to its existing and potential customers in an effort to get those customers to administer or use Abbott drugs fails on its face with respect to PPD drugs, because Abbott's customers neither sought nor received reimbursement from any Government program. Hence, material exclusively relating to PPD drugs could never reap the "pattern or practice" evidence sought by the Government.[6] Accordingly, none of the Government's arguments sufficiently articulate why any additional discovery exclusively relating to PPD drugs would either be admissible evidence or be reasonably calculated to lead to admissible evidence.

## II. ABBOTT'S INTERROGATORY RESPONSES ARE APPROPRIATE AND SUFFICIENT.

Not content to lob meritless, overarching complaints at Abbott's Interrogatory responses, the Government then proceeds, over the course of 14 pages, to reiterate its substantive gripes on an Interrogatory-by-Interrogatory basis. The discussion adds nothing and can be summarily ignored. To the extent the Court wants a point-counterpoint, however, it is provided below.

---

[6] Indeed, the Court's own expert doubts that any alleged "spread" with respect to PPD drugs was the result of *any* unlawful conduct. (*See* Berndt Report, Dkt. No. 1384 at ¶ 23 ("The evolution of the AWP – WAC "spread" for branded self-administered pharmaceuticals is therefore, as best I can tell, quite understandable, and apparently not the result of any sinister or nefarious conspiracies.").)

One preliminary point: The Government's Interrogatory-by-Interrogatory discussion flatly ignores Abbott's specific objections to the various requests for which the Government seeks to compel an answer. The motion, therefore, concedes Abbott's objections. To the extent that the individual interrogatory requested responses subject to these objections, Abbott was not required to submit responses. *See* Fed. R. Civ. P. 33(b)(1). Whenever Abbott could respond to any non-objectionable portion of the interrogatory it did so, as described below.

### A. Abbott Cannot, and Should Not Be Required To, Answer Interrogatories 4, 17 and 18.

Interrogatories 4, 17 and 18 demand that Abbott identify each occasion when an Abbott employee "marketed the spread" or "used the spread." Although the Government throws these terms around as if they have a commonly-understood meaning, that is just not the case. These are terms the Government coined from allegations in its Complaint in order to attach some pejorative umbrella to an unidentified group of actions. But the Government has never even attempted to define what these terms mean. For example, if a customer asked an Abbott salesperson what the publicly-available, published AWP was for a particular product and the salesperson provided that information, is that "marketing" or "using" the spread? How is Abbott to make a determination of what falls within the scope of this request, since the very terminology is a creature of the Government's own invention? Abbott ought not to be forced to define or adopt the Government's pejorative phraseology in order to answer an interrogatory. This puts Abbott in an utterly untenable position. Abbott is providing to the Government all relevant documents regarding the marketing, pricing and sale of its products, and the Government is certainly taking advantage of its opportunity to depose current and former Abbott employees. These avenues of discovery are more than sufficient to satisfy the Government's legitimate

investigative needs without forcing Abbott to respond to interrogatories that are hopelessly vague.  *See* Fed. R. Civ. P. 33(b)(1).

### B. Abbott Should Not Be Required to Provide Information About Its Calculation of AMP and/or Best Price in Response to Interrogatories 7 and 12.

Interrogatories 7 and 12 seek information relating to how Abbott calculates Average Manufacturer's Price ("AMP") and Best Price.  These are prices that Abbott is required by law to submit to the Government, 42 U.S.C. § 1396r-8, but they are totally irrelevant to this case.  The Government has made *no claim* in its Complaint based on Abbott's reporting of AMP or Best Price.  Nor has it articulated in its motion any basis for how Abbott's calculation of AMP or Best Price has any relevance here.  Absent such a showing, the Government's motion to compel this information must be denied.  *See, e.g.,* Fed. R. Civ. P. 26(b)(1), Advisory Comm. Note (2000) (parties to a civil action "have no entitlement to discovery to develop new claims or defenses that are not already included in the pleadings").

### C. In Response to Interrogatories 6, 7, 12, 13, 14, 15, 19, and 20, Abbott Has Agreed to Produce Documents As Permitted by the Rules.

For its answer to Interrogatories 6, 7, 12, 13, 14, 15, 19 and 20, Abbott agreed to produce documents, as permitted by Rule 33.  Abbott is conducting a diligent search for documents responsive to these Interrogatories, including (i) Abbott's communications with Congress, Medicare, Medicaid, and any lobbyists relating to reimbursement for the Subject Drugs during the Relevant Claim Period; (ii) documents relevant to Abbott's former Home Infusion Services department; and (iii) documents relating to Abbott's price changes for the Subject Drugs in 2001.  To the extent any non-privileged documents relating to these topics can be reasonably obtained and have not already been produced, Abbott will produce such documents to the Government.

### D.  Abbott Provided a Full and Complete Response to Interrogatories 1 and 2.

Interrogatories 1 and 2 ask, respectively, what prices Abbott reported to the third-party Price Publications, and what prices were actually published by those Price Publications. Notwithstanding its objections, Abbott answered these interrogatories fully and candidly. Abbott stated clearly that it provided "Catalogue/List Price" for its Subject Drugs to the Price Publications, and (unlike the Government) defined the meaning of these pricing terms as "represent[ing] the price at which Abbott generally sold the product to customers without a contract." (*See* Mot. at 8.) The Government's assertion that Catalogue/List Prices "likely represent a fraction of the market" has no bearing on the content or completeness of Abbott's response; those are the prices that Abbott reported to the Price Publications, which is what the Interrogatory requests. Moreover, to the extent that the Government asks in Interrogatory 2 for information about what prices actually were *published* by the third-party Price Publications, that information is publicly available and is just as easily discerned by the Government as by Abbott. *See* Fed. R. Civ. P. 26(b)(2) (discovery "shall be limited by the court if it determines that [] the discovery sought is . . . obtainable from some other source that is more convenient, less burdensome, or less expensive").

### E.  Abbott Provided a Full and Complete Response to Interrogatories 3 and 5.

Interrogatories 3 and 5 are duplicative, asking that Abbott identify each time it informed Medicare or Medicaid about the so-called "spread" on its products. Notwithstanding its objections, Abbott answered these interrogatories fully and candidly, detailing the nature of the pricing information that Abbott provided Medicare and Medicaid agencies (including the submission of Average Manufacturer Price to CMS), as well as the pricing provided to other government agencies under the Federal Supply Schedule (which is published on the VA's website). Abbott also referred the Government to the long line of publications and other

documents cited in Abbott's pending Motion to Dismiss – all of which prove beyond a doubt that the Government has known for decades that the published AWP it chose to erect and maintain as the standard for reimbursement under Medicare and Medicaid far exceeded the price for which pharmaceutical products could be obtained in the marketplace. This is exactly the kind of information that will "allow the United States to make a judgment as to whether further inquiry in this area is needed." The Government's motion to compel some further response by Abbott should be denied.

### F. Abbott Provided a Full and Complete Response to Interrogatory No. 8.

This Interrogatory asks Abbott to identify all of its salespeople through the years who were responsible for the Subject Drugs. In response, Abbott has produced all relevant organizational charts during the Relevant Claim Period, which provide an annual list of individuals who held the final responsibility for marketing and selling these Abbott products. No more is required to answer the Government's inquiry.

### G. Abbott Provided a Full and Complete Response to Interrogatories No. 9 and 11.

The Government's assertion that Interrogatories No. 9 and 11 "cannot be unduly burdensome" is absurd. As worded, these interrogatories require Abbott to identify all firms, organizations, and/or individuals that Abbott hired to engage in *any* governmental lobbying and advocacy relating to *any* issues about *any* Abbott pharmaceutical product. Contrary to the Government's assertion, it bears the burden of demonstrating that this information is relevant. (*See* Section I, *supra.*) Furthermore, the Government has rejected Abbott's attempts to negotiate a compromise on the scope of Interrogatory 9. Specifically, the Government has refused to limit the scope of Interrogatory 9 to encompass only lobbying and advocacy efforts relating to reimbursement for Abbott's Subject Drugs. Therefore, Abbott stands by its objection that the

identification of all firms, organizations, and/or individuals that Abbott hired to engage in *any* governmental lobbying and advocacy relating to *any* issues about *any* Abbott pharmaceutical is overly broad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**H.     Abbott Provided a Full and Complete Response to Interrogatory No. 10**.

Interrogatory 10 is boundless – literally commanding that Abbott identify "all instances or occasions" on which it communicated in any way, or for any reason, with any Congressional, federal, or state office about *any* of Abbott's pharmaceutical products.  As Abbott noted in its response, this Interrogatory would literally force Abbott to disclose every communication it ever had with the Food and Drug Administration about any of its drugs over the course of at least a decade (and more if the Government has its way).  There is no possible way that such information is relevant to this case, and the Government does not contend otherwise.  Nevertheless it has refused to narrow the scope of its request to target information that actually might be relevant.  This belligerence highlights the true purpose of the Government's entire discovery plan, which is simply to heap unnecessary burden and expense on Abbott.

**I.     Abbott Provided a Full and Complete Response to Interrogatory No. 16**.

This catch-all request demands that Abbott identify all facts that it relies upon to support any denial of the Requests for Admission served by the Government.  This is effectively asking Abbott to produce now all of the evidence it will seek to introduce at trial, despite the fact that discovery in this case is ongoing and (given the Government's recalcitrance in producing any documents or information in response to Abbott's requests) far from over.  Despite the premature nature of this request, Abbott identified in its response a host of information that gives the lie to the assertions that the Government made in its RFAs, including Abbott's AMP submissions to CMS, Abbott's contracts with the Government to sell the Subject Drugs at discounted FSS prices,

and Abbott's contracts with various State entities for the sale of the Subject Drugs during the Relevant Claims Period as discussed above. Abbott's investigation of these issues continues, and Abbott is aware of its obligations under the Rules with respect to supplementing discovery responses.

## III.     ABBOTT PROPERLY INVOKED FEDERAL RULE OF CIVIL PROCEDURE 33(D) IN RESPONDING TO CERTAIN INTERROGATORIES.

Finally, the Government alleges a procedural deficiency in Abbott's Interrogatory responses, related to Rule 33(d). This is nothing more than a thinly-veiled attempt to force Abbott to undertake the Government's offensive document review by sorting out each referenced document according to the Government's own flawed theories of the case. Abbott should not be required to do so.

Rule 33(d) expressly allows a party faced with an Interrogatory to respond by producing documents from which the answer to that interrogatory "may be derived or ascertained." Abbott properly invoked this rule in responding to certain of the Government's Interrogatories, and it has produced, or agreed to produce, documents that will answer the Government's questions. The Government now balks at this, however, claiming that it ought not to have to review documents, and that Abbott has improperly relied upon Rule 33(d). This argument should be rejected for a variety of reasons.

*First*, the Government's fundamental contention that it should not have to shoulder the work of reviewing documents is a non-starter. Indeed, courts have recognized that the very spirit and intent of Rule 33(d) is "to require the party seeking the discovery to expend the effort and expense to procure it." *Petroleum Ins. Agcy. v. Hartford Acc. & Indem. Co.,* 111 F.R.D. 318, 320 (D. Mass. 1983). When a defendant like Abbott produces documents in response to an

-16-

interrogatory, the plaintiff cannot simply wave its hands and shift the burden back to the defendant to analyze and distill those documents. Plaintiffs must do their own work.

*Second,* Abbott's election to produce documents under Rule 33(d) is not nearly as widespread as the Government implies. Abbott generally substituted reference to its business records in place of its individual interrogatory responses only in those instances where the Government's interrogatory asks Abbott to "identify" documents of a particular class. For the majority of responses, where Abbott simply answered the interrogatory without reference to documents, Rule 33(d) is not even an issue. The Government's entire argument relating to Rule 33(d) is, therefore, largely misplaced.

*Third,* in those instances where Abbott did reference documents as its answer to a particular interrogatory, its designations are entirely consistent with Rule 33(d). In situations like this one, where a party produces all records available and provides the opportunity for plaintiffs' counsel to ascertain the requested information, Rule 33(d) is satisfied. *See Mid-America Facilities, Inc. v. Arounaut Ins. Co.,* 78 F.R.D. 497 (1978).

*Fourth*, the law clearly instructs that, where information requested in discovery is contained in business records, and where the burden of searching the records is "substantially the same" for the party seeking discovery as for the responding party, the responding party may answer by specifying and making available the records from which the answer may be derived. Fed. R. Civ. P. 33(d); *Daiflon, Inc. v. Allied Chem. Corp.,* 534 F.2d 221, 225 (10th Cir. 1976); *Hickman v. Taylor,* 152 F.R.D. 216 (M.D. Fla. 1993). Rule 33(d) contemplates that the requesting party may have to do some abstracting, compiling, or summarizing of business records in order to derive the necessary answers.[7] In this case, the burden for the Plaintiffs to

---

[7] *Rule 33(d) Option to Produce Business Records:* Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an

undertake this task of reviewing and summarizing the documents at issue is no greater than the burden to Abbott; indeed, it may in fact be easier, since Plaintiffs know far better than Abbott what precise information they believe is germane to their case. Indeed, counsel for the relator admits that he has all of Abbott's responsive documents in a database. (*See* Hr'g. Tr. 30 (Feb. 27, 2007) ("[E]very document that we're talking about here, I've got a database because we litigated this to the Supreme Court [of Texas] twice. . . . I've got them in a database.")). Not only are all the documents contained in this one database, but the database also has the ability to search and compare the content of the documents. (*See* Transcript at 22 ("I've got two huge databases of the federal documents that they produced, the Texas documents. I've cross-walked them.").) Thus, it is clear that the necessary work is already far along on Plaintiffs' side.

In sum, then, there is no basis to find Abbott's Interrogatory responses insufficient based on the Government's misguided interpretation of Rule 33(d).

---

(continued…)

examination, audit or inspection of such business records, including a compilation, abstract or summary thereof and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit, or inspect such records and to make copies, compilations, abstracts, or summaries. *A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.* Fed. R. Civ. P. 33(d) (emphasis added).

## **CONCLUSION**

For these reasons, the Government's motion should be denied in its entirety.

Dated:  May 7, 2007                                          Respectfully submitted,

/s/  Brian J. Murray
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on May 7, 2007, the foregoing **ABBOTT LABORATORIES INC.'S RESPONSE IN OPPOSITION TO THE UNITED STATES' MOTION TO COMPEL ABBOTT LABORATORIES INC. TO RESPOND TO THE UNITED STATES' FIRST SET OF INTERROGATORIES** was served upon all counsel of record in this action electronically by posting a true and correct copy of same via Lexis-Nexis.

/s/ Carol P. Geisler