**EXHIBIT 5**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                              )
PHARMACEUTICAL INDUSTRY              ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE              ) MDL No. 1456
LITIGATION                           ) Pages 1 - 49


MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 27, 2007, 10:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

514bf967-2d22-4082-baaa-b8173ddef2eb

Page 2

```
 1  APPEARANCES:
 2  For the Plaintiffs:
 3      RENEE' BROOKER, ESQ. and GEJAA T. GOBENA, ESQ., United
        States Department of Justice, Civil Division, Commercial
 4      Litigation, Fraud, 601 D Street, N.W., Washington, D.C.,
        20004.
 5
        JAMES J. BREEN, ESQ., 3562 Old Milton Parkway,
 6      Alpharetta, Georgia, 30005, for the Relator, Ven-A-Care of
        the Florida Keys.
 7
 8  For the Defendants:
 9      JAMES R. DALY, ESQ., Jones Day,
        77 West Wacker, Chicago, Illinois, 60601-1692, for Abbott
10      Laboratories.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          PROCEEDINGS
 2      THE CLERK: In re: Pharmaceutical Industry Average
 3  Wholesale Price Litigation, Civil Action 01-12257, will now
 4  be heard before this Court. Will counsel please identify
 5  themselves for the record.
 6      MS. BROOKER: Good morning, your Honor. Renee'
 7  Brooker on behalf of the United States. I'm from the
 8  Commercial Litigation Branch in Washington, D.C. at Main
 9  Justice.
10      MR. BREEN: Jim Breen on behalf of the Relator,
11  Ven-A-Care of the Florida Keys.
12      MR. GOBENA: Gejaa Gobena on behalf of the United
13  States.
14      MR. DALY: Good morning, your Honor. Jim Daly on
15  behalf of Abbott Laboratories.
16      THE COURT: Now, this is just against Abbott?
17      MR. DALY: Yes, your Honor.
18      MS. BROOKER: This particular case, yes, your
19  Honor.
20      THE COURT: That sends chills down my spine. So
21  are there others? I know I've got a couple of other
22  intervenor cases.
23      MS. BROOKER: That's right, your Honor.
24      THE COURT: And what do those involve?
25      MS. BROOKER: They involve the same issues,
```

Page 4

```
 1  obviously different pharmaceutical manufacturers, different
 2  drugs, but those are Dey and Roxane, and I do not believe
 3  that Roxane is before the Court. The United States did file
 4  an unopposed motion -- I believe it may have been Friday --
 5  to transfer a third case before your Honor.
 6      THE COURT: Now, does it make some sense -- how old
 7  are those other two cases?
 8      MS. BROOKER: They're about the same age, your
 9  Honor, as the Abbott case.
10      THE COURT: Does it make some sense to put you all
11  into some sort of a lockstep?
12      MS. BROOKER: It does make sense to us, your Honor,
13  yes.
14      MR. DALY: From our perspective, it does not,
15  Judge, for the following main reason: I mean, we've been at
16  this since the spring. We have a discovery cutoff of the end
17  of this year to 12/31/07. My understanding, although I'm not
18  directly privy to the conversations that the United States
19  has had with the other defendants, but I believe they are
20  agreeing to much longer time periods to deal with their case.
21      THE COURT: So you think it's -- so bring me up
22  to -- this is why I brought you all in here.
23      MR. DALY: Right.
24      THE COURT: This is somewhat, I have to say I'm
25  sorry, a court mistake. This somehow ended up in purgatory
```

Page 5

```
 1  between the United States Magistrate Judge and me, with me
 2  thinking she was going to handle it and she thinking that I
 3  was going to handle it. And the reality is that we both
 4  talked, and I brought it back up here because I understood it
 5  was part of a bigger picture, so --
 6      MS. BROOKER: It is, your Honor.
 7      THE COURT: So I probably should hear what's been
 8  happening so far, you know, like, what needs to happen to
 9  bring this case to the point where --
10      MS. BROOKER: Yes, your Honor, and I think I can
11  give you a brief overview of where the parties are at.
12      The United States and Abbott and relator Ven-A-Care
13  have been proceeding with discovery in this case. A couple
14  depositions have been taken. There are deposition notices
15  outstanding, document requests, interrogatories. Requests
16  for admissions have been served. At the time that Dey joined
17  a few months ago, we have been attempting to, and Dey has
18  been cooperative, in trying to coordinate at least with
19  respect to the deposition discovery that's being taken
20  against the United States.
21      THE COURT: Let me stop you right there. When you
22  say Dey joined, it's a separate action against Dey?
23      MS. BROOKER: Yes, it is.
24      THE COURT: So you just mean sort of informal
25  coordination?
```

Page 6

1    MS. BROOKER: Yes, we have been coordinating. Dey
2 has been coordinating. We have been notifying Dey about
3 depositions against government witnesses. They have
4 appeared, I believe, at the first two depositions. We also,
5 the United States, whenever we serve documents pursuant to
6 document requests upon Abbott, we also send a copy to Dey,
7 and so there has been some coordination going on.
8    Now, I will tell the Court that the parties, Abbott
9 and the United States and relator, came here this morning
10 with the intent of informing the Court in the first instance
11 that we believe we have substantially, although I want to
12 carve out a big significant issue, but we have substantially
13 agreed upon a case management order. We've been working on
14 this for the last several months. We were working on it all
15 the way up until the time, you know, ten minutes outside of
16 the courthouse. I think that we, again, carving out one
17 issue that we would like to raise, we can present the Court
18 with a proposed CMO that does just apply to this case.
19    THE COURT: Okay.
20    MR. DALY: That's correct, your Honor.
21    THE COURT: So what's the big remaining issue?
22    MS. BROOKER: Okay, this is the big remaining
23 issue, your Honor.
24    THE COURT: Of course, without knowing the rest of
25 what you agreed on, it might be --

Page 7

1    MR. DALY: We'll walk through that with your Honor
2 and make sure your Honor agrees.
3    MS. BROOKER: Yes, basically just to summarize, we
4 have largely agreed to parameters for discovery; you know,
5 discovery limitations, numerical limitations largely. We've
6 agreed to deposition protocols, document production protocols
7 primarily.
8    The significant issue that we would like to bring
9 to the Court's attention today is an issue that has prevented
10 the United States from moving forward with discovery. Abbott
11 has served initially in this case a set of initial
12 disclosures. The United States has been attempting for
13 months now, since we appeared before your Honor on
14 August 26 when your Honor said, "I'm going to open up
15 everything that's happened in the MDL proceeding," we served
16 document requests, and we've asked repeatedly Abbott to
17 provide to us a set of materials that it has produced in
18 other AWP cases, including in this case pursuant to CMO 5 and
19 pursuant to CMO 7. We have a small subset of those
20 materials. Abbott has obstructed us from --
21    THE COURT: Well, without using the verbs, why
22 don't you produce them?
23    MR. DALY: Your Honor, the reason for it is that
24 the United States has only sued us for four drugs. This
25 court has -- they talk about CMO 5 and 10, but they never

Page 8

1 talk about CMO 9 which the Court entered, which very clearly
2 states in Paragraph 3 that any governmental plaintiff that
3 comes into these cases gets what has been produced in other
4 cases to the extent they relate to the drugs that the
5 governmental entity has sued upon. Our problem with this is
6 that if you take Texas, for example, the state court action
7 in Texas, they've sued Abbott for all kinds of drugs, branded
8 drugs. The government suit is only four generics. Texas has
9 sued for hundreds of drugs.
10    THE COURT: Well, I suppose you both have a good
11 point, but what about what I would call crosscutting
12 documents about, you know, like mode of operation and
13 marketing techniques or something?
14    MR. DALY: Right, and your order provides for that,
15 Judge. I didn't mean that -- I wasn't done, but it talks
16 about drugs that have been sued on or otherwise relevant to
17 the complaint, and we have not withheld the kind of documents
18 that the Court just described.
19    MS. BROOKER: We take great issue with that, your
20 Honor. If I may --
21    THE COURT: But you're not entitled to every drug
22 if you haven't sued on it.
23    MS. BROOKER: Well, your Honor, two points I would
24 like to make. First, I'd like to address that. I'd also
25 like to say that Mr. Breen, who is the relator in a Texas

Page 9

1 state action, would like to address the Court on this issue
2 because he has information that he needs to provide the Court
3 on this. But we do believe, your Honor, we have two problems
4 with this. Number one, the MDL private plaintiffs in this
5 case have a set of documents that we know are relevant in
6 this litigation. All Abbott has to do is burn a copy of the
7 CD-ROMs and provide it to us.
8    THE COURT: Well, like what? What do you know
9 you --
10    MS. BROOKER: Well, I would allow Mr. Breen to
11 address that because he is also in the Texas case. And in
12 the Texas case, the relator and the State of Texas had to
13 move to compel Abbott to produce documents on numerous
14 occasions. Abbott attempted to vacate the trial court's
15 order by seeking several writs of mandamus that went all the
16 way up to the Supreme Court of Texas on two occasions.
17 That's how much --
18    THE COURT: What are the documents? In other
19 words, let me put it this way. I generally believe the
20 following: You're not entitled to documents on any single
21 drug if you haven't charged it. You are entitled to do
22 discovery beyond the four drugs to the extent it shows that
23 there's some practice or pattern of conduct.
24    MS. BROOKER: That's right.
25    THE COURT: Now, where it falls in between, I'm not

Page 10

1  sure how to do that. Perhaps one thing would be --
2          Yes? You're in the other case?
3          MR. BREEN: Yes, your Honor, and that's why I think
4  it might be helpful if I can just go over a couple of points.
5          THE COURT: All right.
6          MR. BREEN: Mr. Daly is one of lead counsels for
7  Abbott in the Texas litigation. We've been litigating it --
8          THE COURT: In state court, is that it?
9          MR. BREEN: State court, Judge. We've been
10 litigating it for three years now?
11         MR. DALY: It seems.
12         MR. BREEN: It seems longer? It seems longer, and
13 it is for more drugs. But the documents -- and I'm kind of
14 in a unique position because I see both sides, and I've
15 got --
16         THE COURT: The documents do what?
17         MR. BREEN: Pardon me, your Honor?
18         THE COURT: What do the documents do? What do they
19 say?
20         MR. BREEN: A number of things. There's about
21 three times more documents that have been produced in the
22 Texas case than have been produced here.
23         THE COURT: Sure, because there are more drugs, but
24 what are the crosscutting issues?
25         MR. BREEN: But that's not why.

Page 11

1          THE COURT: Why?
2          MR. BREEN: Number one, the crosscutting issues
3  are -- and there's, like, categories, if I can just break
4  them down. One is, Abbott has taken a position regarding
5  temporal scope in this case. It tried to take a similar
6  position in Texas, lost at the trial level, lost at the
7  appellate level, lost at the Supreme Court level. And so
8  we've got a broader temporal scope that covers the drugs at
9  issue in this case. So that's number one. And there's lots
10 of documents, and when I say "lots" --
11         THE COURT: So you're saying that it relates to
12 these drugs?
13         MR. BREEN: These drugs, and I've already got the
14 documents, so there's no burden whatsoever.
15         THE COURT: Have you conferred with him on those?
16         MR. BREEN: Your Honor, we have, and we've made
17 some progress on temporal scope but not -- but it's still the
18 same issue. What Abbott says is --
19         THE COURT: All right, so temporal scope. What's
20 the next one?
21         MR. BREEN: The next issue, your Honor, is, there's
22 just flat-out held-back documents. And I'm not going to
23 suggest it's by intent. We're talking about millions of
24 documents here.
25         THE COURT: All right, and what's --

Page 12

1          MR. DALY: Not that they have been held back but
2  millions of documents.
3          MR. BREEN: Right. I'm saying -- I'm not saying --
4          THE COURT: So what's the third one? Just held
5  back. And they may relate to these drugs?
6          MR. BREEN: These drugs that we've used as recently
7  as two weeks ago in a 30(b)(6) deposition in Texas to make
8  critical points.
9          THE COURT: And what's the third one?
10         MR. BREEN: The third issue, your Honor, is other
11 drugs but either the same practice, or it demonstrates
12 Abbott's overall business practice in how it reports its
13 prices. And so Texas has sued on more drugs, but to the
14 extent that Abbott's --
15         THE COURT: I tell you what, why don't we do this.
16 This is a unique situation.
17         MR. BREEN: And I've already got the documents.
18         THE COURT: Why don't you take fifty, a hundred
19 representative documents from each of those categories. You
20 gave me three: A, temporal scope, B, just plain old didn't
21 produce them, and, C, sort of they show business practice
22 during a relevant time period. You confer with him, show
23 him, because you luckily have two hats, so I don't have to
24 operate off of some blinders. You take those. You show it
25 to Mr. Daly. If he's persuaded, then you'll produce.

Page 13

1  Otherwise you're going to submit them in camera to me or
2  Magistrate -- is Judge Bowler involved in this case?
3          MR. DALY: Yes.
4          THE COURT: And if you win on the fifty documents
5  apiece you choose, I'm just going to say "Produce the CD."
6  So, in other words, if you're not being reasonable about
7  this, you're just going to lose. I'm not going to look at
8  millions of documents.
9          MR. BREEN: And, your Honor, may I just add one
10 request?
11         THE COURT: Yes.
12         MR. BREEN: Because understand that these documents
13 are subject to the Texas protective order. I can see them, I
14 can use them, but I cannot show them to my co- --
15         THE COURT: I understand you can.
16         MR. BREEN: But hold on, your Honor. Mr. Daly has
17 got to consent to my showing them to your Honor in camera,
18 and I just need their consent.
19         MR. DALY: I consent, your Honor.
20         MR. BREEN: And I've asked that before and have not
21 gotten an answer yet. That's the first time I got that
22 answer.
23         THE COURT: And it may be, just out of respect to
24 the Texas court, you may need to sort of file some sort of
25 a --

Page 14

1  MR. BREEN: Not without his consent, Judge. And
2  that's the critical point. All he has to do is say
3  "I consent" and --
4  THE COURT: So he's consented. So what you need to
5  do is just -- I can't rule off the cuff on this. That's
6  going to be impossible. What you need to do is, you have
7  three categories you've very neatly, succinctly set out. You
8  show him representative documents from -- you've seen them --
9  from each of those categories by yourself as intervenor. You
10 try and confer and see what you can work out. If you can't,
11 come up with a timetable, briefing timetable, motion to
12 compel, response. You probably need to file it under seal,
13 right?
14 MR. DALY: I think that's probably appropriate,
15 Judge.
16 THE COURT: And I'll either refer it to
17 Judge Bowler or take it myself, likely refer to
18 Judge Bowler. And because neither Judge Bowler nor I with
19 all these cases have time to go through a million documents
20 apiece, I'll look at the representative ones; and if you win
21 most of them, I'll just say "Turn over the CD." If you only
22 win a small fraction and I think you're overreaching, I'm
23 just going to say "Denied." So it's in everybody's interest
24 to try and work this out. Take your best documents.
25 MR. BREEN: But, your Honor, we will do that

Page 15

1  exactly as you say, but I just want to emphasize, the whole
2  point here is to streamline discovery. We've got a
3  December 7 deadline. We have been involved in years of --
4  we've already fought this battle, and it's done. This is an
5  MDL.
6  THE COURT: I understand, but neither can you use a
7  lawsuit as a fishing expedition for ten more drugs that
8  you're interested in. So one possibility would be an
9  agreement that you're not going to sue for the other drugs,
10 and I'll order you to turn over all the CDs right now. But
11 you can't use discovery as a fishing expedition. That's the
12 big bottom line. On the other hand, you can't barnstorm and
13 just say it's just the four drugs, if in fact they show some
14 overarching business principle, and I -- because they get to
15 prove their case as to what management was thinking and
16 doing, you know, prior bad acts kind of evidence.
17 MR. BREEN: Your Honor, can I respectfully address
18 the fishing expedition issue and we can't prove our case
19 through fishing for the drugs, just very briefly? I just
20 want to emphasize that this is an intervening case by the
21 United States. And we're not fishing. I've got the boat.
22 The boat's got the fish in it. I just want to bring it to
23 the dock.
24 THE COURT: With those four drugs, but what you
25 can't use the discovery for is to get another fifteen drugs.

Page 16

1  MR. BREEN: Your Honor, a relator can't, and I
2  wouldn't.
3  THE COURT: But neither can they. Unless they want
4  to do it under the auspices of administrative subpoenas,
5  neither can they. They've got to be able to have a
6  good-faith basis for saying they were defrauded or there was
7  false claims with respect to the other fifteen drugs. If
8  they do, amend your complaint. And you might already have
9  that. Do you? I don't know.
10 MS. BROOKER: Your Honor, can I just briefly
11 address your Honor's two points about the fishing
12 expedition? And, also, I don't want to leave the Court with
13 the impression that this is just unique to Texas. So the
14 solution that your Honor has proposed is not going to solve
15 the issue, and the problem is --
16 THE COURT: I can't rule off the bench like this,
17 so that's unrealistic. You haven't filed a motion to
18 compel. He hasn't filed an opposition. It's a huge issue.
19 I'm trying to cut through it right now thinking out loud. So
20 if you feel really strongly, you file a motion to compel, but
21 I can't resolve it. Right now I'll -- do you have a typed-up
22 scheduling order that I can look at?
23 MS. BROOKER: We don't, your Honor, because we just
24 agreed to some things in the hallway.
25 THE COURT: Frankly, if you agree, I'm

Page 17

1  overwhelmingly likely to agree unless it essentially taxes my
2  resources too much, given the other cases that I'm trying to
3  handle here.
4  MS. BROOKER: But just a couple issues, your
5  Honor. With respect to -- we are just talking about the
6  state of Texas. In your Honor's CMOs 5 and 7, you made
7  available to the plaintiffs, the MDL plaintiffs, all
8  materials without respect to the subject drugs, all materials
9  that any defendant provided in any investigation, any prior
10 state court proceeding. The United States for some reason is
11 getting less discovery than a private commercial plaintiff.
12 We don't understand why that is.
13 THE COURT: Maybe it wasn't opposed. I don't
14 remember. They tended to come in by agreement as well. I
15 don't remember if this was opposed. I don't remember what
16 the debate was. I don't remember what the drugs were. You
17 cite my CMOs as if I've got them memorized. Between the
18 Neurontin case and this case, I have no memory, no present
19 memory of what the debate was, so that's why I can't rule off
20 the bat. If you want to move to compel, move to compel.
21 This is going to be a shortcut in this case.
22 MS. BROOKER: I do understand, your Honor. And let
23 say, first of all, we have, in addition to raising this issue
24 in the CMO, since it wasn't being addressed, we also filed a
25 motion to compel. That motion to compel is still pending.

Page 18

1  It's been fully briefed.
2      THE COURT: Oh, well, I didn't know that.
3      MS. BROOKER: Yes.
4      MR. DALY: It's before Judge Magistrate Bowler,
5  your Honor.
6      THE COURT: So why don't you just let her decide?
7  Why am I even ruling on it?
8      MR. BREEN: Your Honor, without the suggestion you
9  made, I can't file the documents, and this is an important
10 point. Let me just add -- can I ask one question to make
11 sure I -- can I serve the government with this motion and
12 including the sealed documents?
13     MR. DALY: You know, it's hard for me to say in
14 terms of whatever it is that you're doing, Mr. Breen. I
15 mean, our problem is this, Judge: I mean, there are temporal
16 problems. The government is only suing us up until 2001.
17 They cut off their complaint thereafter. Mr. Breen in Texas
18 is suing us up to the present day. Every hour that goes by
19 is part of Mr. Breen's suit there.
20     THE COURT: Is this based on AWP?
21     MR. BREEN: Yes, your Honor, the same case.
22     THE COURT: Let me just say, in one of my many
23 other suits, I cut things off at 2003 because at that point
24 the Medicare Modernization Act came through, so that's where
25 I cut it off. I don't know where the -- that strikes me as a

Page 19

1  reasonable cutoff, at least for the time being. That's when
2  the ASP came into play and the whole world knew about
3  inflated AWPs, or at least anyone who was part of this world
4  knew probably by 2001, but certainly by the time Congress
5  passed the statute, right, everybody knew? So that would be
6  one compromise date, a couple of years after the ending of
7  your class. I mean, some of this should just be worked out.
8      MS. BROOKER: Judge, we have been trying to work
9  this out for three months, and let me just explain. Here's
10 the problem: The government, we are just standing still. We
11 are prevented from moving further. Here's what we cannot do.
12     THE COURT: What do you want me to do now? I
13 haven't read these motions to compel? I walked in here
14 thinking I was just going to set deadlines. You may be right
15 or wrong. I'm trying to cut through this, okay?
16     MS. BROOKER: Yes, your Honor. We're just asking
17 for, frankly, what all the CMOs have said, even your most
18 recent --
19     THE COURT: I can't rule off the bench. I haven't
20 even read my CMOs. I don't remember what the debate was. I
21 don't know. So I'm happy to rule. I can't do it right this
22 second, that's all. I think this compromise will get you
23 through a lot. And so I am suggesting that what -- you may
24 win. You may win. I haven't read anything. I don't know
25 about you; I don't know how you rule off the bench when you

Page 20

1  haven't read anything. I don't remember the CMOs. I don't
2  know what the issues are. I haven't read your full-blown
3  recent complaint. I don't know the case. This is my fault
4  that I thought the CMO had been entered a millennia ago.
5  I'll enter your agreed-upon CMO. Then I promise to get to
6  your issues as soon as I read the briefs. I just don't know.
7      What I do know is, I can cut through a fair amount
8  of this if I'm going to have you show to the other side the
9  documents that you -- I'm sure you're a fine attorney, and I
10 don't know whether at this point we need to get agreement to
11 show it to the government or not. And if in fact you can't
12 resolve it based on that, then what I'm going to do is, I
13 will either -- I will forward all the documents over to
14 Judge Bowler, and hopefully she'll rule on it. Does she
15 know -- when was it fully joined, the motion to compel?
16     MS. BROOKER: The last time we had appeared before
17 Judge Bowler it had already been fully briefed. Do you
18 recall --
19     MR. DALY: It was in January.
20     THE COURT: She's away now, I think.
21     MS. BROOKER: Yes, that's partly the reason, I
22 believe, for the delay.
23     THE COURT: She's been away for a couple of weeks,
24 so --
25     MS. BROOKER: Yes, but in the meantime, just

Page 21

1  providing the status, we just wanted the Court to know that
2  the discovery clock is ticking, and we can't speak with
3  plaintiff's counsel in this case about this case. We can't
4  speak with our own co-plaintiff in this case about any
5  documents or any discovery in the case. Abbott has told us
6  that when we cross-notice depositions in this MDL proceeding
7  or in other cases, they're probably going to kick us out
8  whenever they deem something irrelevant.
9      MR. DALY: I haven't said that, your Honor.
10     MR. BREEN: Counsel, your cocounsel has said that
11 on a couple of occasions.
12     MS. BROOKER: Repeatedly.
13     THE COURT: Let me say this, that you're precluded
14 from doing that. Okay, so we're going to go through this.
15 We're not going to stop depositions. We're going to keep
16 this thing going. Nothing is so sacrosanct that --
17     MR. DALY: Judge, we haven't thrown anybody out.
18     THE COURT: Everybody can stay in.
19     MS. BROOKER: We don't have the documents is the
20 problem.
21     THE COURT: All right, you don't have the
22 documents. We need to proceed with discovery. You need to
23 put together all the documents that you think -- do you have
24 some team of paralegals or someone --
25     MR. BREEN: Your Honor, we put so much money into

Page 22

1  this. I've got two huge databases of the federal documents
2  that they produced, the Texas documents. I've cross-walked
3  them. If I can show you that chart, you'll see that they're
4  providing -- you know, but my point is, my question is,
5  because this is not just Texas: Do you want me to include --
6  for example, you've got the state of Pennsylvania, and
7  they've got documents. Can I include some of their documents
8  in this too so you'll see the whole picture? Because there's
9  a lot of folks doing discovery --
10     THE COURT: I don't know enough is the thing. You
11  can include what you think you need to include. I am telling
12  you I am working -- I have thousands of documents right now
13  that I'm reviewing based on the bench trial that I've done.
14  I have the Neurontin case. I have twelve state Attorney
15  General cases. I have the second stage of the AWP case.
16  I've got these. I know the issues, so in some sense it makes
17  sense, but I can't sit and go through thousands of
18  documents. That's what I can't do.
19     MR. BREEN: I know, Judge. That's what we're
20  trying to prevent, and that's the point. That is the point.
21  We're trying to prevent that from ever happening because
22  these plaintiffs have done all this discovery. It's there.
23  Rather than be moving to compel every week to get these
24  documents --
25     THE COURT: I tell you what, you two confer.

Page 23

1     MR. BREEN: We will.
2     THE COURT: And give him a hundred of your best
3  documents from all the categories. And then if you can't
4  agree on what should be produced, either I or Judge Bowler
5  will go through it as soon as possible and jump-start this.
6  I will simply say this: If the issue is temporal, produce
7  them. I don't know what the big issue is. If the issue is
8  it's the drugs in issue in this, produce them. The problem
9  for me is, if it's unique to some individual drug that's
10  another drug -- and how many other drugs involved in the
11  other litigation?
12     MR. DALY: Over a hundred, Judge.
13     MR. BREEN: Well, there's multiple indices, but,
14  Judge --
15     THE COURT: So you need to be reasonable. You need
16  to do the crosscutting documents, and maybe you can come up
17  with a thousand that you think are crosscutting as opposed to
18  every -- I've seen these documents on Zoladex and -- you go
19  thousands and thousands of pages that would not have
20  relevance to your issues.
21     MS. BROOKER: We can't do that, your Honor, because
22  we don't have access to the documents, so we don't know
23  what's relevant.
24     THE COURT: I know. I'm simply saying there's
25  something called overly burdensome and overly broad. Overly

Page 24

1  burdensome does not apply because it's already on a CD.
2  Overly broad might. So I think what needs to happen is any
3  sales and marketing documents that relate to other drugs in
4  the time period which basically talk about marketing the
5  spread -- is that your big issue right now?
6     MR. BREEN: That's it.
7     THE COURT: Okay. I've seen these documents in my
8  other litigation. There are documents that are put out by
9  sales teams: "This is how you put together the spread. This
10  is how you put together --" That should come out, but not
11  every internal document about every drug. I mean, that's
12  overly broad.
13     Now, I've seen these kinds of documents, not from
14  Abbott, in fairness, from Glaxo, Bristol, Johnson & Johnson,
15  AstraZeneca, and Schering-Plough. I've seen the differences
16  in the kinds of documents, and there are crosscutting, you
17  know, message-to-sales-team kinds of documents, which in
18  general should be produced. There's very specific stuff to
19  each document which doesn't need to be; you know, debates
20  about the --
21     MS. BROOKER: We understand. I think we
22  understand, your Honor. Our concern is just, again, the
23  discovery clock is ticking. All the motions to compel have
24  already happened, and now the documents are just waiting for
25  us to use. And we are going to reinvent the wheel. We are

Page 25

1  going to be filing, I can tell you now, based on Abbott's
2  conduct in Texas and in this case, we are going to be filing
3  motion to compel after motion to compel to get the same exact
4  set of documents that they've already produced.
5     THE COURT: Do you feel like you now have a
6  good-faith basis for amending your complaint to add any
7  drugs?
8     MS. BROOKER: Well, your Honor, I think the problem
9  is that we're not necessarily using some of those documents
10  to amend the complaint. That's not the issue. Abbott, and
11  particularly even with the drugs at issue here, Abbott
12  markets drugs in a broad way. There are no carved-out subset
13  of documents on marketing, for example, that only talk about
14  this drug or that. It's a broad-based set of marketing
15  documents.
16     THE COURT: And to the extent that there are, you
17  should have them produced. To the extent that they're very
18  unique to a particular drug and a particular doctor in a
19  particular location, it may be overly broad if it's not one
20  of the drugs you're suing about.
21     MS. BROOKER: I understand, but this will require
22  motion, motions practice.
23     THE COURT: I can't help that. What can I do? You
24  can't have a hundred documents relating to a hundred drugs
25  when you're suing on four. But if there are crosscutting

Page 26

1  sales documents, they should all be produced.
2      MR. DALY: That's the effort we've made, Judge. If
3  we missed a few, and I believe that Mr. Breen -- well, you
4  laugh, but you brought forward a hundred documents that you
5  said weren't produced. We showed you that about half of them
6  in fact had been produced, and we're still talking about the
7  other half of them. Isn't that correct?
8      MR. BREEN: I don't think that's --
9      MR. DALY: I mean, it's not like we're not working
10 through this. And one thing I want to correct, Judge, is any
11 misimpression that they are stymied in their discovery. We
12 produced -- we've made our 26(a)(1) disclosures. We've
13 produced our other documents.
14     THE COURT: I tell you what, since you have them,
15 we actually have a way of breaking through this. You come up
16 with every document you want to produce and show it to them.
17 To the extent there are disagreements -- I mean, this is
18 actually easier than most of my cases; you actually have
19 them. Put them together, show them to him, and to the extent
20 there are objections, you'll see what you really care about,
21 and then we'll have a debate over it.
22     MS. BROOKER: Your Honor, that's just the Texas
23 set. There are 650,000 of them that were produced. There's
24 also the MDL set. We cannot contact Jennifer Connolly. In
25 fact, Abbott has threatened sanctions if we speak with them

Page 27

1  about what documents they have. They've already gone through
2  a set of documents. We can't coordinate --
3      THE COURT: You can call up Jennifer Connolly and
4  ask her, "What documents do you have relating to your drugs
5  or to general sales practices?"
6      MR. BREEN: Can we see them?
7      MS. BROOKER: Can she provide those to us? I mean,
8  that's what we're asking for.
9      THE COURT: Have her file a motion to open the
10 protective order. Is she the -- who's she? She's the --
11     MR. BREEN: Class.
12     MS. BROOKER: We're all under a protective order in
13 this case. The issue is --
14     THE COURT: So have her file a motion to allow you
15 to see the documents which she believes -- you tell her what
16 the issues are in your case which you believe are
17 crosscutting and apply to your case. She works for the U.S.
18 Attorney's office, doesn't she?
19     MS. BROOKER: Oh, no. I'm referring to plaintiffs'
20 class counsel.
21     THE COURT: Who's Jennifer Connolly?
22     MS. BROOKER: She represents the private plaintiffs
23 in the class action suit, and all I'm saying is, we can't
24 even coordinate --
25     THE COURT: Which firm is she with?

Page 28

1      MR. BREEN: The Chicago firm, Wexler's firm.
2      MS. BROOKER: But it's just an example, your
3  Honor. We thought we were in an MDL proceeding when we got
4  here, and we thought we understood your Honor's October 26
5  ruling from the bench.
6      THE COURT: You are in an MDL, which is why I can
7  do these things. If she wants to show you documents relating
8  to their sales marketing efforts that are across the board,
9  all she needs to do is -- that's why I'm here, that's
10 exactly -- bingo, file a motion to allow her to show you the
11 documents. Of course you can call her.
12     MR. BREEN: Your Honor, I know this is frustrating,
13 but we're getting somewhere. If I can just ask one more
14 question.
15     THE COURT: Yes.
16     MR. BREEN: The problem is, if I call Jennifer
17 Connolly and I say, "I need these documents," then I've got
18 to take the working set of documents, the hottest documents.
19 Do I have to go to Mr. Daly and say, "Can we have these
20 documents?" That's part of the problem because we're taking
21 our work product and taking our --
22     THE COURT: You can go one of two ways: You can
23 move to open the protective order so that you can see them.
24     MR. BREEN: Okay.
25     THE COURT: And have her gather what's relevant to

Page 29

1  your claims, which is some work on her part, so you may have
2  to pay her for the work, I mean, it's not part of -- or you
3  can go and get consent from him. But you can come directly
4  to me. That's why you are here. But I can't -- I'm not
5  simply going to say you're across the board entitled to every
6  document they produced in every suit, even if it involves
7  drugs that have nothing to do with yours. I can't say that
8  across the board. That may be overly broad. It may be
9  unreasonable. And, as you know, for example, the Rules of
10 Civil Procedure have been changed, so it's got to be likely
11 to lead to relevant evidence.
12         On the other hand, I don't know why it isn't just
13 simpler for you to hand over the CDs.
14     MR. BREEN: Let me do it. I've got them. Just let
15 me show them to the government. He doesn't have to do
16 anything but say "OK," two letters, O-K.
17     MR. DALY: There have to be limits, Judge. I mean,
18 even if they ask the MDL plaintiffs, I mean, they can't ask
19 them for stuff that they're not entitled to that go beyond
20 even the temporal limits that your Honor is suggesting or
21 drugs. We agree that if there are documents relating to
22 general marketing practices that would apply, that we should
23 be producing those, and we made a good-faith effort to do
24 that.
25     THE COURT: For example, so it's not too narrow on

Page 30

your part, let's assume there's a marketing document for Drug X, Y, Z, all right?

MR. DALY: Right.

THE COURT: And that's not one of the drugs here, and it says, "What I want you to do is go out and market the spread, and this is how the --" see, I'm going through these documents now, like, last night -- "and here's what the doctors will get reimbursed at, and here's what the return to practice is, and here's what the copay will be, and here's your profit." Even if it's Drug X, Y, Z which isn't one of the drugs here, that should be produced.

MR. DALY: I agree, and we have done that. There are no such documents, I don't believe, but anything that's related to that we've given them.

THE COURT: Now, if it's an individual contract with an individual doctor about a drug which does not have general marketing language, I don't expect those all to be produced.

MR. BREEN: I understand, Judge, but the issue is, every document that we're talking about here I've got in a database because we litigated this to the Supreme Court twice to get them in Texas, okay? I've got them in a database.

THE COURT: Good.

MR. BREEN: And there's three times as many as they produced to the federal government, but I can't show them to

Page 31

the federal government without his approval.

THE COURT: Or you come back to me. That's why I am here.

MR. BREEN: Judge, I understand fully.

THE COURT: And so you can come to me. Connolly can come to me.

MR. BREEN: I understand.

THE COURT: You are in a great position because you've seen it all, so you actually know what's out there rather than some hypothetical thing. I've given you two polar extremes: an individual contract with an individual doctor over X, Y, Z which may show a charge-back or a rebate or something. That seems too narrow and too specific. Anything coming out of the sales and marketing team talking about how you market stuff during the relevant time period should be produced. And then the temporal scope should at least be up to 2003 because that's when the MMA kicked in, right? Is that right?

MR. DALY: Yes.

MR. BREEN: Correct. Well, that's when they passed it.

THE COURT: Right, and then they do 85 percent of AWP, and everybody in the world knew AWP did not reflect cost at that point. That's actually not accurate, since I actually saw some third-party payors here who still believed

Page 32

it two years after the fact. But any sophisticated market player knew -- I'll added "sophisticated," and I put the government in that category because they were part of it -- knew in 2003 there a was different situation. And when did you switch to ASP, 2004?

MR. BREEN: It took about a year to get it up and running.

THE COURT: All right, so through 2003. And when do you claim that it starts? 1991 was when Medicare started using AWP.

MR. BREEN: No, Judge. '91 was when they started the regulations, but this is a Medicare/Medicaid case, number one.

THE COURT: So when did Medicaid start using it?

MR. BREEN: Medicaid started using AWP back in the late '70s and the '80s. So that's one of the other issues here, because Abbott has set another unilateral early point on discovery, and we got a lot of the preparatory stuff. You know how this works. I mean, you want to see the stuff that they were --

THE COURT: I mean, I don't know. That's why I don't know your complaint well enough. So Medicare started this regulation in '91, so I don't know about Medicaid. I know it started in the '60s in California somewhere, so --

MR. BREEN: Before our damage period begins,

Page 33

Medicaid was already doing it, but there's some late '80s documents --

THE COURT: When does your damage period begin?

MR. DALY: '91 to 2001.

MS. BROOKER: Except that we would have go back prior to 1991 because there are definitely relevant documents, particularly with respect to the subject drugs in this case.

THE COURT: Going back how far?

MS. BROOKER: Well, we have served document requests. I mean, Abbott should not --

THE COURT: Going back to when?

MS. BROOKER: At least back to 1988. And the reason is --

THE COURT: So talk about this possible temporal scope between '88 and 2003. I can't -- you're asking me to microscript something I haven't seen any briefings on, and I'm suggesting a few ways of doing it. Like, I look at you and I say "You're golden." You've actually got these documents, so tell me what you want to show her and try and work it out with him. And if you can't agree, that's why we're here.

MR. BREEN: Your Honor, your comments up to this point in time, believe me, okay, you cut through a lot of it already that I think we're going to be able to --

Page 34

1     THE COURT: And with respect to Connolly, have her
2  move for an opening of the protective order with respect to
3  certain kinds of documents. You of course can talk to
4  whoever you want. No, you shouldn't be thrown out of a
5  deposition, and none of this is so super secret. On the
6  other hand, I have to say, it can't be a fishing expedition
7  to find a hundred more drugs to sue on. So that's sort of
8  where I'm trying to think about. Once I get into specifics,
9  I will get to specifics.
10    Now, let me get to Part B, which is, when are you
11 doing the depositions of the government people?
12    MS. BROOKER: We are doing them on an ongoing
13 basis. We're in the process of this right now.
14    MR. DALY: We've had a couple, your Honor. I think
15 we have four noticed.
16    THE COURT: Like who? Who?
17    MS. BROOKER: Well, Abbott has largely sought to
18 notice topics which they would call spoliation issues, your
19 Honor. There haven't been very many substantive depositions
20 that have taken place or that are noticed. They are seeking
21 to depose every individual that we put in an interrogatory to
22 find out whether their documents were preserved. For
23 example, there was a broad request for individuals who are
24 responsible or knowledgeable about the reimbursement process
25 in general; and then there are 30(b)(6) depositions going

Page 35

1  forward over where are their files, people who left years
2  ago. So there are not that many substantive government
3  depositions.
4     THE COURT: Let me say this on the flip side of
5  this issue, which is, I was somewhat frustrated over the
6  refusal of the U.S. government to produce witnesses in the
7  big trial that I just went through. It all came up sort of
8  too late, and it wasn't specific enough, at least for the
9  issues there. To the extent -- Abbott, you're in Class 2?
10    MR. DALY: Yes, your Honor.
11    THE COURT: To the extent there are depositions on
12 a substantive basis, they should be open to everyone.
13 Everyone has the right to understand what the government was
14 doing during the time period.
15    MS. BROOKER: Your Honor, we have actually been
16 doing that. In fact, more than that, and there hasn't been
17 an opposition to this, but we've been insisting that everyone
18 join the depositions so that we only need to offer a witness
19 one time. So when there is a deposition notice, it is served
20 on LexisNexis, and we encourage and almost insist that other
21 parties appear so that we don't have to recall over and over
22 again a government witness. That's just not been an issue.
23    THE COURT: Because at some point I anticipate in
24 this case under the False Claims Act -- and I don't remember,
25 I think there are very complicated legal issues, very

Page 36

1  complicated legal issues -- but, in any event, what Centers
2  for Medicare and Medicaid services understood and knew and
3  what they agreed to and what they didn't.
4     MS. BROOKER: And with respect to Abbott's conduct
5  and the Abbott drugs at issue in this case or the Dey drugs
6  and the Dey conduct.
7     THE COURT: Yes, and in general -- I mean, I'm
8  probably now more steeped in this than most people, but it
9  came -- the Office of the Inspector General was actually
10 quite persistent in trying to flag some of these issues. I
11 don't know if it's Abbott drugs or not. I just don't know.
12 And at some point, at least Mr. Scully and other people were
13 testifying on the Hill about this stuff. And so it's
14 relevant, not only to statute of limitations, but it's also
15 relevant to -- I think a very difficult area of the law is
16 when the government knows about a fraud, let's say, knows
17 about a fraud and it continues. I don't know what happens
18 when -- the solution is a very complicated one. In other
19 words, when the solution has to do with increasing
20 administrative fees and getting something through Congress, I
21 don't know what the answer is under False Claims Act, but at
22 least we need a factual record.
23    MS. BROOKER: Certainly, your Honor, and government
24 intends to be very open about the process. And I will remind
25 the Court that, you know, the United States has not sued the

Page 37

1  entire pharmaceutical industry, and we have not sued Abbott
2  on all of its drugs. We are really focused on very discrete
3  conduct of a very discrete company or, you know, an
4  additional two companies. So we believe that the proper
5  focus is on what the reimbursement officials at CMS knew
6  about these thousand plus percent spreads by Abbott on these
7  particular drugs.
8     THE COURT: Are they cancer drugs?
9     MS. BROOKER: Some of those are. There's a large
10 antibiotic and then there are water solubles that are
11 generally at issue.
12    THE COURT: Are they generics?
13    MR. DALY: Yes, they're all generics, Judge.
14    THE COURT: Are they part of Track 2?
15    MR. DALY: We're in Track 2, your Honor. Yes, what
16 we're hearing again is that they're suggesting without coming
17 out and saying it that they want to try to limit us, that we
18 can ask the CMS people and the OIG people what they knew and
19 understood, but only if they knew and understood about a
20 5-milliliter bag of saline solution. Our position, of
21 course, and we talked about this when we were here in the
22 fall, is much broader than that. And we need to find out
23 what the government knew about spreads and mega spreads and
24 cross-subsidization and all of this information. And counsel
25 is correct that, you know, we're going to go ahead and we're

Page 38

1  going to be talking to Mr. Scully; we're going to notice him
2  up for a deposition as well as other people. The other
3  defendants in both cases before your Honor have cross-noticed
4  those, so, yes, everybody is very interested in getting to
5  the bottom of this, and we'll be doing that.
6      THE COURT: Because it's really not so relevant to
7  my case that I just finished the trial on. It might be quite
8  relevant to this case.
9      MR. DALY: Yes, your Honor, absolutely.
10     THE COURT: I mean, it might have some relevance
11 but not as heartland as here.
12     Now, let me go off the record for a minute.
13     (Discussion off the record.)
14     MR. DALY: Judge, I wanted to correct a couple of
15 things, I mean, just to make sure to clarify. The Court has
16 already entered dates on this matter.
17     THE COURT: Right.
18     MR. DALY: You did this in October, so that's going
19 to be part of what we submit jointly to the Court today. I
20 think we also agreed on a mediation, but we'll have to check
21 that, but we'll talk about that.
22     MS. BROOKER: I feel like we did as well.
23     MR. DALY: Yes. Now, Judge, in terms of the
24 briefing that was submitted, we submitted a brief, I think
25 yesterday actually around -- yes, no, Sunday. And we have

Page 39

1  been able to agree on most of the stuff that was in the
2  brief, in both parties' briefs back in September that we've
3  been fighting about. So we've agreed on the number of
4  interrogatories that each side can ask. We've agreed on the
5  request-to-admit issue about how many each side can
6  propound. I mean, I think we're going to have a situation
7  there, just to get the Court's approval, where we can do 150
8  sort of regular requests to admit that are really
9  substantive, and then otherwise where you can do additional
10 requests to admit where we actually admit that senator
11 so-and-so said X as stated in the Federal Register, attach
12 the document --
13     THE COURT: How many of them?
14     MR. DALY: Those will be unlimited because you have
15 to actually attach the document. We've agreed to that,
16 Judge.
17     THE COURT: You know, I was -- I don't know if you
18 know this -- back in the day, I was actually in the Civil
19 Division of the U.S. Attorney's office. I agreed to
20 something -- like, back in 1981, we had a superfund case
21 involving New Bedford Harbor. We agreed to that, thousands,
22 thousands. It filled Judge Young's conference room. There's
23 got to be a limit on it, or I know what will happen.
24     MS. BROOKER: Okay. We were pushing for
25 limitations in general. And the other issue that is --

Page 40

1      THE COURT: If it's a hundred, I don't have a
2  problem with it, but just I would think that that wouldn't --
3  I'll read through it, but I would think that that was not a
4  good idea.
5      MS. BROOKER: Okay.
6      MR. DALY: Well, what we have, Judge, is, you've
7  seen -- you know, you get all the defendants' motions to
8  dismiss -- for example, all those appendices of famous things
9  that, you know, the President of the United States said this,
10 Congressmen said that, OIG. All we've done is taken those
11 things, and because it's from the government, we've simply
12 asked them to authenticate it. That's what we're talking
13 about, and we've already done this.
14     MS. BROOKER: We can do that by stipulation as
15 well.
16     THE COURT: Let me just simply say, unlimited is
17 not a good thing, not in a case of this magnitude. A hundred
18 sounds right to me with no subparts.
19     MS. BROOKER: Okay.
20     THE COURT: Because I don't see how -- you can
21 produce all the documents and say, do you have an objection
22 to the authenticity of any? And then you can do the -- you
23 know, like, I think it's crazy to do it that way. Unlimited
24 is never a good idea.
25     MS. BROOKER: I agree, your Honor. We can agree to

Page 41

1  one hundred.
2      THE COURT: Yes, that makes sense.
3      MS. BROOKER: And the last remaining issue --
4      MR. DALY: But before we move off of that, we had
5  also agreed -- I want to make sure this is okay with the
6  Court -- that -- those are the authentication ones -- we had
7  agreed also to 150 regular requests to admit; in other words,
8  that don't attach the documents.
9      MS. BROOKER: But what I hear your Honor saying is,
10 you need to have it under limitation.
11     THE COURT: Yes, if you agree, I agree, but not
12 infinite.
13     MR. DALY: Right, I understand.
14     THE COURT: What I'm not going to do is what
15 Judge Young did, which is find a storage room for the
16 thousands and thousands of requests to admit. It got to the
17 point of ludicrous, and so limits are good.
18     MS. BROOKER: Limits are good, your Honor. We have
19 been pushing limits.
20     The last remaining area are depositions. In the
21 initial proposal, we asked for 250 hours for each side to
22 take in deposition hours. Instead of, you know, full days,
23 we just said, "Use your hours however you want. You might
24 want to depose this person for two hours, someone else for
25 twenty-one hours." They said "500 hours." Now Abbott wants

Page 42

1  no deposition limitation. And I think 500 hours, which is 70
2  days for each side, between now and eight months from now is
3  not good enough. We want some sort of limitation.
4       THE COURT: Yes, you need a limit.
5       MR. DALY: Judge, here's our problem with that.
6  They've sued us for ten years of Medicaid. That's fifty
7  states. Each of those states has a financial intermediary.
8  They've sued us for ten years of Medicare. We have about
9  fifty Medicare carriers that we're seeking discovery from.
10 We've got ten years of CMS, HCFA, and other federal
11 employees, present and former. Five hundred hours is only 70
12 depositions of one day.
13      MS. BROOKER: Each side.
14      MR. DALY: Well, I'm only talking about what I need
15 to do.
16      THE COURT: Listen, just come up with a reasonable
17 calculation of, let's say, four hours per person or eight
18 hours per person and come up with an hour limit.
19      MS. BROOKER: Your Honor, what we --
20      THE COURT: Not unlimited. Just come up with a
21 reasonable calculation, and then you'll have to economize
22 internally. So let's say fifty states? So let's say eight
23 hours for each administrator? So that's 400 right there,
24 right?
25      MR. DALY: Right.

Page 43

1       THE COURT: So let's say you need to do how many
2  officials at Medicare?
3       MR. DALY: We're not sure. They've listed about 35
4  in their 26(a)(1) disclosures. I don't know if those will be
5  the ones we depose.
6       THE COURT: So maybe four hours apiece.
7       MS. BROOKER: Well, they recommended 500 hours, and
8  we said 250, and today outside the courtroom we said, "Okay,
9  we'll go with your highest number." Five hundred hours, your
10 Honor, for each side between now and the end of the month is
11 not even feasible.
12      THE COURT: I'm not disagreeing. You need to come
13 up with a limit, or it will eat you. And if you can't agree,
14 I'll come up with one. You'll have to come up with an
15 estimate. So it does strike me as fair, though, if you're
16 suing him for fifty Medicaid states, they have the right to
17 take fifty Medicaid administrators, right?
18      MS. BROOKER: Well, I think, you know, there can be
19 a more efficient way than to depose fifty individuals.
20      THE COURT: How? I don't know. I don't know
21 enough about it.
22      MR. DALY: But our position, Judge, is, even if we
23 didn't do them all, we have to do enough to get a reasonable
24 cross-section to do it, and it might take more than one
25 person from each state. We don't know.

Page 44

1       THE COURT: I'm not giving you unlimited.
2  Unlimited isn't happening. You're finishing it by
3  December 7. Even though it's the federal government, they
4  can't -- how many lawyers are working on this case?
5       MS. BROOKER: For this side? On our side, we have,
6  there's five or six of us.
7       THE COURT: So it needs to be reasonable.
8       MS. BROOKER: Yes.
9       THE COURT: Because at the end of the day, it's not
10 going to come down to what each Medicaid administrator did.
11 It's going to be, was there a fraudulent marketing of the
12 spread, and was there knowledge?
13      MS. BROOKER: And without the limitation, your
14 Honor, I mean, it's just going to cripple CMS. It's already
15 been very difficult for CMS because we're pulling program
16 people trying to implement the program to prepare for
17 depositions to help us find 30(b)(6) information. We've got
18 to limit.
19      THE COURT: I'm not that sympathetic on that. That
20 piece I'm not as sympathetic on. You just have to do that.
21      MS. BROOKER: Right, we've been doing that.
22      THE COURT: All right, great. Are we done?
23      MS. BROOKER: Just two more tiny little things,
24 your Honor.
25      THE COURT: Where are you from? Are you from

Page 45

1  Washington?
2       MS. BROOKER: Yes. I'm sorry, your Honor.
3       THE COURT: No, no, that's okay. Not "I'm sorry."
4       MR. BREEN: Why are you sorry you're from
5  Washington?
6       MS. BROOKER: No, no, I thought you said, "Oh,
7  okay, you're from Washington."
8       THE COURT: No, no, no. I just don't know you.
9       MS. BROOKER: Yes, I'm with the Commercial
10 Litigation Branch in Washington.
11      THE COURT: I see my local folks. I just didn't
12 know. All right, go ahead.
13      MS. BROOKER: The other thing is, you know, we just
14 wanted to remind the Court that Abbott still hasn't answered
15 here. So while we can speculate about, obviously, what some
16 of their answers will be --
17      THE COURT: That's my fault, isn't it? Isn't there
18 a motion to dismiss?
19      MR. DALY: It's pending, your Honor, and we will
20 respond however the Court rules.
21      THE COURT: Is there motions to dismiss? I've got
22 like three Ven-A-Care cases, right? I have New York,
23 California --
24      MR. BREEN: No, your Honor, just two.
25      THE COURT: California and Florida, right?

Page 46

1    MR. BREEN: Well, Florida is on a motion to remand
2  right now, but there's California, which we have actually
3  briefed and argued the motion in May.
4    THE COURT: Right.
5    MR. BREEN: That hasn't been ruled on yet. And
6  then there is the federal cases, the three federal -- soon to
7  be three federal Ven-A-Care cases.
8    THE COURT: And you've moved to dismiss?
9    MR. DALY: We did, your Honor. We argued that, I
10 believe, in the fall.
11   THE COURT: So let me tell you the issue I'm
12 actually struggling with, since I've got law clerk drafts on
13 at least a couple of these. I'm not sure it's critical, but
14 the issue is -- and I wasn't even sure how much it was being
15 pressed -- whether AWP, if you increase it to get more
16 remuneration for the doctor, is some sort of a kickback, it
17 violates the kickbacks, as opposed to offering discounts and
18 rebates, which strikes me as falling fully within it. But
19 I'm not sure it matters, just so that you can know legally
20 where I'm struggling. It wasn't briefed so clearly under the
21 various state statutes; in other words, whether or not -- I
22 think discounts offered to get someone to purchase may fall
23 within the kickback provisions, but simply publishing an
24 inflated AWP without a direct offer to the doctor strikes me
25 as an extremely close question, and I don't know what to do

Page 47

1  with that. I'm not sure whether it matters that I deal with
2  it on a motion to dismiss because if you fall under one, I'm
3  not sure it's going to get you to Step B, but I'm struggling
4  with it. I haven't found any case law on it. I found no
5  regulatory guidance on it. And even the OIG fudged it in its
6  compliance manuals. So a heads-up, and I haven't forgotten
7  about you, but I'm --
8    MR. BREEN: And that's definitely in the California
9  case and in this case, that issue.
10   THE COURT: That issue is a big one, and I'm
11 worried about getting it wrong. I'm not sure that I need to
12 get to it because, as I said, offering discounts, at least on
13 a motion to dismiss stage, might be enough. But I'm having
14 trouble with, if you've got an AWP out there and you market
15 it -- in other words, you explain what the reimbursement
16 spread is -- but you're not actually the one paying the
17 amount of money and you're not actually offering the amount
18 of money, it's a very difficult question.
19   MR. BREEN: Direct or indirect.
20   THE COURT: Huh?
21   MR. BREEN: Direct or indirect, in cash or in kind.
22   THE COURT: I know that's your argument, but
23 there's not actually an offer of money. So it's hard, and
24 it's hard under the state statutes, and it's hard under the
25 federal statutes. Have you weighed in on this yet, the

Page 48

1  government?
2    MR. GOBENA: Yes, we have.
3    THE COURT: And Your position is?
4    MR. GOBENA: We take the position that, just as
5  Mr. Breen said, that it can be an offer that's direct or
6  redirect. And remuneration, there's a broad definition of
7  what remuneration is. It's not necessarily limited to a cash
8  transaction. The offering of potential profit could
9  constitute remuneration under the statute, so --
10   THE COURT: It's hard. No case has gone that far,
11 at least that we can find. No case has addressed this, so
12 that's the one I'm just worried about it because it could
13 have sweeping ramifications, if you want to know what's
14 holding it up.
15   MR. DALY: I think that it stretches the
16 Anti-Kickback Statute too far, your Honor.
17   THE COURT: I know you do, and can I say that you
18 both have fabulous arguments on this particular one, and I'm
19 sort of stuck on it. But, in any event, it should not hold
20 up discovery. Okay, thank you.
21   MR. BREEN: But the point is, your Honor, the more
22 we can coordinate the California case with the federal case,
23 I think the better for everybody concerned.
24   THE COURT: Say it again?
25   MR. BREEN: The more we can coordinate the

Page 49

1  California Ven-A-Care case with the other Ven-A-Care cases,
2  it is going to expedite things because I've got the same
3  lawyers working --
4    THE COURT: But nothing's being held up, right?
5  Discovery is happening while --
6    MR. BREEN: No, it is. You've got a stay. There's
7  no stay on their intraparty discovery in the federal case,
8  but you stayed intraparty discovery in the California case.
9    THE COURT: All right, so I should make that a
10 priority.
11   MR. BREEN: And if we could at least get the
12 intraparty discovery issue resolved, we could at least
13 coordinate discovery on that.
14   THE COURT: Okay, thank you. Now, you'll give me
15 that stuff. Whatever you can agree on, though, at least let
16 me enter as soon as possible.
17   MS. BROOKER: Yes, we will submit it tomorrow.
18   THE COURT: Good. Thank you.
19   MR. DALY: Thank you, your Honor.
20   MS. BROOKER: Thank you.
21   (Adjourned, 11:05 a.m.)

```
 1              CERTIFICATE
 2
 3
    UNITED STATES DISTRICT COURT )
 4  DISTRICT OF MASSACHUSETTS   ) ss.
    CITY OF BOSTON              )
 5
 6
 7
 8      I, Lee A. Marzilli, Official Federal Court
 9  Reporter, do hereby certify that the foregoing transcript,
10  Pages 1 through 49 inclusive, was recorded by me
11  stenographically at the time and place aforesaid in Civil
12  Action No. 01-12257-PBS, MDL No. 1456, In re: Pharmaceutical
13  Industry Average Wholesale Price Litigation, and thereafter
14  by me reduced to typewriting and is a true and accurate
15  record of the proceedings.
16      In witness whereof I have hereunto set my hand this
17  5th day of March, 2007.
18
19
20
21
22
23  _____
    LEE A. MARZILLI, CRR
24  OFFICIAL FEDERAL COURT REPORTER
25
```

514bf967-2d22-4082-baaa-b8173ddef2eb