UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
In re Pharmaceutical Industry  )
Average Wholesale Price        )
Litigation                     )  MDL No. 1456
                               )  Master File No. 01-12257-PBS
This document relates to:      )
UNITED STATES OF AMERICA       )
ex rel. VEN-A-CARE OF THE      )
FLORIDA KEYS, INC.             )
                               )
          Plaintiff,           )
                               )
     v.                        )  (Original Southern District of
                               )   Florida No. 95-1354-CIV-GOLD)
ABBOTT LABORATORIES, INC.,     )
                               )
          Defendant.           )
                               )
CIVIL ACTION NO. 06-11337-PBS  )
                               )
_____)
```

**MEMORANDUM AND ORDER**

May 8, 2007

Saris, U.S.D.J.

## I. INTRODUCTION

In this *qui tam* action, the United States[1] seeks to recover

losses to the Medicare and Medicaid programs caused by allegedly

fraudulent average wholesale prices reported by defendant Abbott

Laboratories, Inc., a drug manufacturer, with respect to four of

_____

[1]The complaint was initially brought by Ven-A-Care of the
Florida Keys, Inc. on behalf of the United States.  The United
States ultimately intervened in the case against Abbott.  On May
15, 2006, the United States District Court for the Southern
District of Florida unsealed the portion of the government's
complaint relating to Abbott, and the case was transferred to
this Court handling the multi-district litigation.

its multi-source generic drugs.  The crux of the government's

complaint is that Abbott fraudulently inflated the "average

wholesale price" ("AWP") that it reported to drug pricing

compendia used by the government to set reimbursement rates for

pharmaceuticals, and that as a result of the publication of these

inflated prices, the government over-paid medical providers for

Abbott's drugs.  The government alleges that Abbott violated the

False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) & (2), and

common law by fraudulently inflating the AWP of its drugs.  The

defendant has moved to dismiss.  After oral argument, the Court

**DENIES** Abbott's motion to dismiss.

## II.  FACTUAL BACKGROUND[2]

The government's complaint against Abbott alleges that the

defendant engaged in a fraudulent scheme that caused the Medicare

and Medicaid programs to pay excessive reimbursement to Abbott's

customers, who are medical providers such as pharmacies,

physicians, hospitals, and clinics.  In order to perpetrate this

scheme of fraud, the complaint alleges that Abbott reported false

or misleading pricing information - generally in the form of

---

[2] This memorandum assumes familiarity with the basic concepts
underlying AWP and other drug pricing methodologies.  For a
detailed discussion of these methods of pricing and an overview
of the structure of the pharmaceutical industry, see In re Pharm.
Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172 (D.
Mass. 2003).  See also In re Pharm. Indus. Average Wholesale
Price Litig., 307 F. Supp. 2d 196 (D. Mass. 2004); In re Pharm.
Indus. Average Wholesale Price Litig., 460 F. Supp. 2d 277 (D.
Mass. 2006) (defining AWP under federal statute).

AWPs - about its products to several price reporting services that the Medicare and Medicaid programs relied upon to set reimbursement rates for Abbott's customers.  The government, in turn, utilizes these reporting publications to determine its reimbursement prices.  In order to compile their pricing compendia, publishers receive drug pricing information from the manufacturers of the various drugs, such as Abbott, and then base their published pricing data on this information.  Thus, the complaint alleges that the drug manufacturers control the prices that are reported by the compendia.  As a result, drug makers can effectively fix the AWP of their own drugs.

In general, this pricing scheme allows drug manufacturers to set reimbursement prices to levels well above the providers' acquisition costs.  The difference between the reported AWP of a prescription drug and the drug's actual acquisition cost is referred to as the drug's "spread."  By inflating the prices provided to the compendia, and thus pumping up the AWP of the drug, pharmaceutical manufacturers increase a drug's spread.  Plaintiff alleges that this increase in spread consequently magnifies a drug's profitability to the financial benefit of the providers, like pharmacies.  The complaint alleges that Abbott marketed these inflated spreads to its customers.

The effect that increasing a drug's reported AWP has on the price paid by the federal government depends on whether the drug is a single-source drug or a multi-source drug.  For single-

source drugs, the government's reimbursement rates for Medicare
were set by statute at 95% of AWP from 1998 until 2003; before
1998, rates were set at 100% of AWP or estimated acquisition
cost.  42 U.S.C. § 1395u(o) (West 1998).  For multi-source drugs,
like the ones at issue here, the government set its reimbursement
figures from 1998 to 2003 at 95% of the lesser of the median of
all generic AWPs or the lowest branded AWP for a given drug;
before 1998, multi-source drugs were reimbursed at 100% of the
median generic AWP.  <u>Id.</u>; 42 C.F.R. § 405.517 (2003); <u>see also</u> <u>In
re Pharm. Indus. Average Wholesale Price Litig.</u>, 230 F.R.D. 61,
70 (D. Mass. 2005).

    For instance, the complaint alleges that in 2001, Abbott
sold several drugs with grossly inflated AWPs: Vancomycin, an
antibiotic (NDC: 00074653501), a 5% Dextrose Solution (NDC:
00074792336), and a 0.9% Sodium Chloride Solution (NDC:
00074798436).  For Vancomycin, the AWP reported by Abbott was
$274.91.  However, the actual acquisition cost of this drug was
$67.95.  Therefore, the "spread" was 304.57%.  The Dextrose
Solution and the Sodium Chloride Solution both had similarly
inflated spreads; the Dextrose Solution was marked up by 917.22%,
whereas the Sodium Chloride Solution had a profit margin spread
of 1046.92%.  The complaint alleges that Abbott reported these
false inflated prices to the compendia, knowing that the
government would use this information to set its reimbursement

4

rates.  As a result, the government charges that it overpaid for Abbott's drugs.

### III. <u>DISCUSSION</u>

The complaint states four causes of action against Abbott. Count 1 alleges that Abbott violated the FCA, 31 U.S.C. § 3729(a)(1), by presenting or causing to be presented a false claim to the federal government.  In addition, Count 1 asserts that Abbott contravened the FCA by violating the Anti-Kickback Statute.  Count 2 alleges that Abbott violated 31 U.S.C. § 3729(a)(2) by making or using false records and statements to cause claims to be paid.  Count 3 states a cause of action for unjust enrichment.  Count 4 states a claim for common law fraud.

### A.   <u>The False Claims Act</u>

The defendant first argues that it is not liable under the FCA because there are no allegations that it presented any false claims to the federal government.  Rather, as Abbott points out, medical providers submit the claims for reimbursement to the government.  The government argues that though Abbott did not itself submit false claims, it violated the FCA because it <u>caused</u> false claims to be presented.

The FCA establishes liability for any person or organization that:

> (1) knowingly <u>presents</u>, or <u>causes to be presented</u>, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval

31 U.S.C. § 3729(a)(1) (emphasis added).  To state a claim under this section, plaintiff must allege that the drug manufacturer caused "to be presented" a false or fraudulent claim for payment. The FCA reaches "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." <u>United States ex rel. Marcus v. Hess</u>, 317 U.S. at 544-45 (1943).  Under a broad interpretation of the FCA, "a defendant may be liable if it operates under a policy that causes others to present false claims to the government." <u>United States v. President & Fellows of Harvard Coll.</u>, 323 F. Supp. 2d 151, 186-87 (D. Mass. 2004).  As most courts agree, the FCA covers indirect bilking of the federal government.  <u>Id.</u>

The complaint alleges that Abbott knew that the government calculated its payments based upon prices reported to the pricing compendia, and marketed the spread between the reimbursement rate and the acquisition cost of the provider.  (<u>See, e.g.</u>, Compl. ¶ 3 ("Abbott then sold the drugs for far lower prices, and marketed to existing and potential Customers the government-funded 'spread' between the inflated reimbursement amounts and the actual acquisition costs of the drugs"); Compl. ¶ 37 ("documents also show that the company actively marketed the government-funded profits or 'spreads' on its drugs created by its false [AWP] price representations."); Compl ¶ 74 ("Abbott actively knew about and marketed the large spreads on several of its drugs.")

6

Thus, as alleged, the submission by doctors and pharmacists of false pharmaceutical claims to Medicare and Medicaid was not only a foreseeable and substantial factor in the government's loss, but also it was "an intended consequence of the alleged scheme of fraud."  <u>California ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs., Inc.</u>, No 01-cv-12257, slip op. at 8-11 (D. Mass. March 22, 2007) (quoting <u>United States ex rel. Franklin v. Parke-Davis</u>, 147 F. Supp. 2d 39, 53 (D. Mass. 2001)).

B.   **Anti-Kickback Violations**

The government contends that Abbott violated the federal Anti-Kickback Statute when it fraudulently published a false AWP and then marketed the "spread" between the reimbursement rate and the provider's acquisition cost.  The federal Medicare/Medicaid Anti-Kickback Statute provides that:

> (2) whoever knowingly and willfully <u>offers or pays</u> any <u>remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind</u> to any person <u>to induce</u> such person--
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2) (emphasis added).

The government argues that Abbott's violations of this statute triggers civil liability under the FCA.  The seminal case on point is <u>United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.</u>, 423 F.3d 1256, 1259-60 (11th Cir. 2005) where the Eleventh Circuit held that a defendant who made a false certification of compliance with the Anti-Kickback Statute when submitting claims for Medicare reimbursement and can be held liable under the FCA.  It explained, "When a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [False Claims] Act, for its submission of those false claims."  <u>Id.</u> at 1259.

Many courts have recognized that a false certificate of compliance with federal health care law, such as the Anti-Kickback Statute, creates FCA liability.  <u>See</u> <u>United States ex rel. Schmidt v. Zimmer, Inc.</u>, 386 F.3d 235, 345 (3d Cir. 2004) ("A certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare program."); <u>see also</u> <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899, 902 (5th Cir. 1997) ("Thus, where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or

8

regulation."). While the First Circuit has not directly addressed the issue, it noted, "A number of courts have also found FCA liability violations where a defendant falsely certifies compliance with certain conditions required as a prerequisite for a government benefit or payment in order to induce that benefit. In such cases, false certification for the purpose of receiving a payment or benefit becomes the practical equivalent of a statutory false claim." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004) (citation omitted) (involving FCA claims for Medicare and Medicaid benefits).

Some courts have adopted a theory of implied certification which imposes liability under the FCA: "Where the government pays funds to a party and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent." United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 258, 264 (D.D.C. 2002) (listing courts that have also adopted some form of this so-called implied certification theory). However, many courts have also held, "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA." United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996) (holding that these regulatory violations do not give rise to a viable FCA action); see also United States ex rel.

<u>Hendow v. Univ. of Phoenix</u>, 461 F.3d 1166, 1170-71 (9th Cir. 2006) (discussing "false certification" theory of liability under FCA).  The Second Circuit has cautioned that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid."  <u>Mikes v. Straus</u>, 274 F.3d 687, 700 (2d Cir. 2001) (rejecting argument that a claim for reimbursement for bad quality medical services violated the FCA) (Emphasis in original)

As Abbott correctly notes, the Medicare program requires providers to affirmatively certify that they have complied with the Anti-Kickback Statute; failure to comply with the kickback laws, therefore, is, in and of itself, a false statement to the government.  <u>See Pogue</u>, 238 F. Supp. 2d at 264 (discussing kickback certifications under Medicare and holding that failure to comply with the kickback laws implicates the FCA).  Thus, the government can state a claim under the FCA for an antecedent violation of the Anti-Kickback Statute for claims submitted through the Medicare program.

The government's complaint also alleges that the submissions of false claims based on fictitious AWPs to state Medicaid programs caused the federal government to pay for the false claims.  (<u>See, e.g.</u>, Compl. ¶ 82 (alleging that New York's reimbursement rates for Abbott's Vancomycin, which were

10

subsidized by the United States Medicaid program, were inflated by Abbott's false reporting), Compl. ¶ 6 ("To get fraudulent claims paid by the United States, Abbott also routinely made false statements directly to state Medicaid programs."))   There is no parallel allegation that Medicaid, like Medicare, requires affirmative certification of compliance with anti-kickback laws. The fact that the claim for Medicaid reimbursement is made to the states, which then obtain reimbursement from the federal government, makes the case for liability under the FCA and Anti-Kickback Statute more complex.   The parties have cited no federal caselaw that applies an implied certification theory in the federal Medicaid context, and the issue has not been extensively briefed.   Because the FCA is a remedial statute that must be broadly read and compliance with the anti-kickback statute is a prerequisite to payment in the Medicare program, I conclude that the FCA is violated when a Medicaid claim is presented to the state government in violation of the Anti-Kickback statute, even if there is no express certification of compliance with the statute.   United States v. Neifert-White, 390 U.S. 228, 232 (1968) (stating that the FCA should be read broadly because it is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."); see also United States v. Lagerbusch, 361 F.2d 449, 449 (3d Cir. 1966) (the FCA covers "indirect mulcting of the [federal] government").

The Court now turns to the difficult issue of whether the government has properly pled a violation of the Anti-Kickback Statute.  The government argues that Abbott violated the Anti-Kickback Statute because the publication of inflated AWPs constitutes an "offer" of illegal "remuneration" to its customers in the form of the promise of inflated reimbursement from the government.  The government further argues that Abbott marketed the spreads of its drugs to medical providers in order to induce them to purchase its products.  Defendant contends that while providers do receive an economic benefit from government reimbursement based on AWP, publication of false prices in the compendia, without more, cannot be viewed as an offer, even an indirect offer, of remuneration by Abbott.  Abbott also contends that because the drugs are multi-source, and Medicare reimbursement is based on a median AWP for all sources, rather than the AWP published for the manufacturer's product, that such publication of inflated AWPs cannot be considered an offer or payment of remuneration.

The novel legal question is whether reporting a fraudulent AWP to publishers, without more, is an offer or payment of remuneration under the Anti-Kickback Statute.  The First Circuit has had occasion to address the meaning of remuneration under the kickback statute in another context.  The First Circuit used the dictionary definition of "'Remunerates' as meaning 'to pay an equivalent for service.'"  <u>United States v. Bay State Ambulance</u>

12

and Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989)
(citing United States v. Greber, 760 F.2d 68, 71 (3d Cir. 1985)).
The Court held, "By including such items as kickbacks and bribes,
the statute expands 'remuneration' to cover situations where no
service is performed.  *That a particular payment was a*
*remuneration ... rather than a kickback, does not foreclose the*
*possibility that a violation nevertheless could exist*."  Id.
(emphasis in original) (upholding conviction of defendant for
giving a hospital official two cars, one of which was actually
purchased through an agent of the sales corporation but
ultimately titled to the agent, because such a transfer was an
indirect form of remuneration).

Based on the requirement in the Anti-Kickback Statutes of an
"offer" or "payment" of "remuneration," defendant has the better
argument that mere publication of a false AWP, without more, does
not constitute an offer of remuneration where reimbursement is
based on a median of AWPs, as it is with Abbott's multi-source
drugs.  The Court does not address the harder question of whether
the publication of a false AWP with the specific intent to induce
purchase of its branded drug in conjunction with a strategy of
"marketing the spread" to the providers constitutes an indirect
offer or payment of remuneration.  See, e.g., 68 Fed. Reg. 23731,
23736 (May 5, 2003) (Office of the Inspector General for Health
and Human Services opining that "If a pharmaceutical manufacturer

purposefully manipulates the AWP to increase its customers'
profits by increasing the amount the federal health care programs
reimburse its customers, the anti-kickback statute is implicated
... In other words, it is illegal for a manufacturer knowingly to
establish or inappropriately maintain a particular AWP if one
purpose is to manipulate the 'spread' to induce customers to
purchase its product ... The conjunction of manipulation of the
AWP to induce customers to purchase a product with active
marketing of the spread is strong evidence of the unlawful intent
necessary to trigger the anti-kickback statute.").

As alleged, however, Abbott also directly offered kickbacks
to providers with an allegedly improper intent to induce purchase
of the drugs.  This alone is sufficient to overcome the motion to
dismiss.  A determination of whether these rebates and discounts,
together with marketing the spreads, trigger liability under the
Anti-Kickback Statute in this gray area will inevitably be highly
fact specific.

Therefore, the Court **DENIES** the motion to dismiss the Anti-
Kickback claims under the False Claims Act.

C.   **Miscellaneous**

The Court **DENIES** the motion to dismiss the claims under Rule
9(b) because the allegedly fraudulent AWP and spread for each
drug was pleaded with particularity, see California ex rel. Ven-
A-Care, slip op. at 8-11; **DENIES** the motion to dismiss based on

14

the government's knowledge of the fraud, <u>see</u> <u>id.</u> at 16-17; **DENIES**
the motion to dismiss because there was no false claim, <u>see</u> <u>id.</u>
at 11-17.; **DENIES** the motion to dismiss the fraud claim, <u>see</u> <u>id.</u>;
and **DENIES** the motion to dismiss the unjust enrichment claim, <u>see</u>
<u>Massachusetts v. Mylan Labs.</u>, 357 F. Supp. 2d 314, 324 (D. Mass.
2005).

## IV. ORDER

Defendant's motion to dismiss [Case No. 06-CV-11337, Docket
No. 43, Attachment No. 39] is **DENIED**.


                                        <u>S/PATTI B. SARIS</u>
                                        United States District Judge

15