## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Chief Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, | ) | |
| No. 06-CV-11337-PBS | ) | |

## ABBOTT LABORATORIES, INC.'S REPLY TO UNITED STATES' RESPONSE TO DEFENDANT ABBOTT'S MOTION TO COMPEL A SUPPLEMENTAL RESPONSE TO ABBOTT'S INTERROGATORY NO. 7

## INTRODUCTION

This lawsuit is premised on the notion that the United States Government—through officials at the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") who administered the Medicare and Medicaid programs—was misled into paying "excessive reimbursement" for four families of Abbott generic drugs.  Compl. ¶ 3.  The Government alleges that the prices for these Abbott products reported in publications such as *Red Book* and *Blue Book* were "false, fraudulent, and inflated," and that the "Medicare and Medicaid programs relied upon [these prices] to set reimbursement rates for Abbott's customers."  *Id*. at ¶¶ 3, 59-60.  Likewise, in support of its common law fraud claim, the Government alleges that it "acted in justifiable reliance upon Abbott's misrepresentations," and that it would not have paid for the drugs at issue "[h]ad the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States."  *Id*. at ¶¶ 113-14.[1]

---

[1] The prices at issue in this suit are primarily "average wholesale prices" (or "AWPs").  All the Government's Medicare-related claims concern the alleged use of AWP in determining reimbursement.  *See id*. at ¶¶ 46-48.  The Government's Medicaid-related claims also stem largely from the alleged use of AWP.  *See id*. at ¶ 43 ("While a majority of states used published AWPs to calculate reimbursement, approximately nine states … use wholesale acquisition cost ("WAC") to set the EAC.").

While the gravamen of the Government's case is that CMS officials were misled about published AWPs, the Complaint never explicitly states whether these officials actually believed that the AWPs reported for the products at issue equaled or even approximated actual, average market prices.[2]  Nor does the Complaint set forth any standard or definition regarding what the AWPs reported in the pricing compendia, or the prices allegedly communicated by Abbott to the compendia, should have been.  The closest the Complaint comes to addressing those two critically important issues is the language of paragraph 42.  That is why Abbott has filed the instant motion.

In paragraph 42, the Government states:

> AWP is used to refer to the *price* at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient.

Compl. ¶ 42 (emphasis added).  Applying the standard set forth in paragraph 42, the Government then seeks recovery for the difference between published AWPs and "the prices at which Abbott actually sold its products."  *Id*. at ¶ 3; *see also id*. at ¶ 103 (alleging Abbott caused submission of claims for reimbursement that were "substantially higher than providers' actual acquisition costs").  Cobbling the Complaint's various allegations together, the Government's apparent assertion is that CMS officials actually believed that the AWPs published for the drugs at issue equaled or approximated the price that providers paid for those drugs.

At some point, the Government will have to put forth a witness or witnesses from CMS who will testify that they believed the AWPs reported for these Abbott drugs actually represented actual, average prices at which retail customers purchased these products.  In short,

---

[2] The Government's allegation in paragraph 38 of the Complaint that "[n]o government payor knew of or sanctioned Abbott's conduct as set forth in the Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products" does not directly address the factual issue of whether the Government was aware that published AWPs for the drugs at issue did not equal or approximate actual, average market prices.  Rather, that paragraph sets forth the Government's claimed unawareness concerning alleged price "manipulation" and marketing of the spread.

in this fraud-based FCA case, the Government will need to provide substantive evidence that sets forth the "manner in which [the reported AWPs] misled the plaintiff." *United States ex rel. Clausen v. Laboratory Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002). *See also Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (same); *Cf. United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 227-228 (2004) ("We do not agree with [plaintiff] that 'the False Claims Act is not a 'fraud' statue' and therefore does not fall within the scope of Rule 9(b).").  The purpose of Abbott's Interrogatory No. 7 is straight forward:  Abbott wants to know *who* those witnesses will be—who was allegedly misled. Abbott wants to question those individuals about what they really thought the term "AWP" meant, *and* whether they really believed the AWPs reported in the pricing compendia for the drugs at issue approximated what providers paid to acquire those drugs.

As expected, the evidence adduced to date indicates that CMS officials simply did not believe that the AWPs reported for these products even remotely approximated provider acquisition costs.  For example, last Friday, Bruce Vladeck, the CMS Administrator from May 1993 to September 1997, testified that he knew providers were purchasing "commodity drugs" like large volume parenteral drugs ("LVPs") at discounts of up to 99% (three of the four families of drugs at issue in this case, saline solutions, dextrose solutions, and sterile water, are LVPs). *See* B. Vladeck Dep. Tr. at 142-46 (excerpts attached as Ex. A).  *See also* Abbott Dep. Ex. 82, *Cost of Dialysis-Related Drugs*, A-01-91-00526 at 6 (Oct. 1992) (finding estimated acquisition cost of Vancomycin, the fourth drug at issue, to be four times less than the median of published AWPs) (copy attached as Ex. B).  Abbott is entitled to know who—if anyone—at CMS will support the Government's allegation that it was misled.

The Government's initial response to Interrogatory No. 7 obfuscated these core questions.  That response stated, with no support whatsoever, the indisputably factual contention

3

that "the general concept that the AWP refers to the price at which a pharmaceutical firm or a wholesaler sells a drug to its customers is commonly understood in the industry." Dkt. No. 3850 Ex. C at 35. Abbott had hoped the promised verification to Interrogatory No. 7 might lead to information on *who* exactly within the Government shares the DOJ's view of how AWP was "commonly understood in the industry." But then something odd happened: in connection with its response to Abbott's motion to compel, the Government filed a "supplemental response" to Interrogatory No. 7 that deleted the previously unsworn contention about how AWP was "commonly understood in the industry." Thus, the Government has not yet identified anyone at CMS or the federal government to support its factual allegation that "AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient." Compl. ¶ 42.

The Government's three-pronged response to Abbott's motion to compel is neither credible nor adequate. *First*, the Government contends that paragraph 42 of the Complaint is not a factual allegation at all, but, rather, merely "statutory and regulatory background of the Medicare and Medicaid programs" such as the "different business actors (e.g. wholesalers selling to pharmacies) that are referred to by the term AWP." U.S.' Response to Def. Abbott's Mot. to Compel a Suppl. Response to Abbott's Interrog. No. 7 at 5-6 ("Gov. Resp. Br.") (Dkt. No. 4059). For the reasons discussed below, that contention is untenable.

*Second*, the Government tries the diversionary tactic of not only failing to verify its first response, but dropping it entirely—then subbing in a new response, verifying it, and declaring Abbott's motion "moot." That is incorrect as well. Abbott's motion is not moot because the Government has still not provided what Abbott asked for in Interrogatory No. 7: the names of those persons—at least within the federal government—who actually believed or used the term AWP as stated in paragraph 42 of the Complaint.

*Finally*, the Government repeats its tired refrain that what the Government knew and did while consciously basing Medicare and Medicaid reimbursement on AWP for decades, knowing full well that published AWPs did not equal acquisition cost, is irrelevant.  As this Court has repeatedly recognized, what the Government knew and why it continued to use published AWPs is highly relevant to this suit.  What CMS and HHS officials understood about the term AWP, and what those officials understood about published AWPs, are factual issues critical to the questions of falsity, reliance, and causation.

In addition, the Court should require the Relator to provide an adequate response to Abbott's Interrogatory No. 7.  The Relator has provided no legal precedent excusing its obligation to respond to the interrogatory.

## ARGUMENT

### I.   PARAGRAPH 42 IS NOT MERELY "BACKGROUND," BUT CONTAINS FACTUAL ALLEGATIONS CONCERNING ISSUES OF FALSITY, FRAUD, AND RELIANCE THAT ARE CRITICAL TO THE GOVERNMENT'S CLAIMS.

The Government's first attempt to justify its wholly inadequate responses to Interrogatory 7 is to claim that paragraph 42 of the Complaint is merely "background" to describe relevant industry actors and terms, and does not "make a specific allegation about the precise numerical value that is meant by AWP."  *See* Gov. Resp. Br. at 4-6.  That is facially implausible. Paragraph 42 does not speak to business relationships.  It makes a contention about what AWP is, and that contention relates to a "price."

This case is premised on the notion that the Government paid "excessive reimbursement" because AWPs reported for certain Abbott generic drugs were "false, fraudulent, and inflated." Compl. ¶ 3.  Paragraph 42 is the one and only place in the Complaint that sets forth any standard or definition for the term "AWP."  Without it, there is no standard in the Complaint with which to judge or compare the AWPs reported for the Abbott drugs at issue, and no way to state or

quantify the extent to which those AWPs were allegedly "false, fraudulent, and inflated." *Id*. Moreover, paragraph 42 is the only place in the Complaint that clearly and directly alleges—albeit in passive voice—what Government officials actually believed about the AWPs reported in the pricing compendia for the drugs at issue.  Paragraph 42 thus contains factual allegations bearing on falsity, fraud, and reliance that are critical and essential to the Government's claims.

Rule 9(b) mandates that "[i]n all averments of fraud …, the circumstances constituting the fraud … shall be stated with particularity."  "[E]very circuit court that has addressed this issue has concluded that the heightened pleading requirements of Rule 9(b) apply to claims brought under the FCA."  *Karvelas*, 360 F.3d at 228 (collecting cases).  The Government "has an obligation to explain what is untrue about each of the challenged statements and cannot merely quote a statement and assert that it is untrue."  *Loan v. Fed. Deposit Ins. Corp.*, 717 F. Supp. 964, 967 (D. Mass. 1989).  *See also Williams v. WMX Tech., Inc*., 112 F.3d 175, 177 (5th Cir. 1997) (plaintiff must "specify the statements contended to be fraudulent … and explain why the statements were fraudulent").  If it is the Government's contention that the AWPs reported in pricing compendia were false, fraudulent, and inflated because they did not equal actual, average market prices, the Government should say so and allow Abbott to explore the ramifications and credibility of that position in discovery.

Moreover—and particularly important here—a plaintiff must specify "the manner in which [alleged fraudulent statements] *misled the plaintiff*."  *Clausen*, 290 F.3d at 1310.  *See also Sanderson*, 447 F.3d 873 at 877 (holding that, "in *qui tam* actions, the heightened pleading requirements of Rule 9(b) are met by a complaint that sets out … the content of [misleading] statements and the manner in which they misled the government") (internal punctuation marks omitted); *Cf. Karvelas*, 360 F.3d at 227 (noting "[w]e do not agree with [plaintiff] that 'the False

Claims Act is not a 'fraud' statute'").[3]  Rule 9(b)'s heightened requirements apply to each of counts 1, 2, and 4 of the Complaint.

In short, unless the Complaint did not sufficiently plead issues of falsity, fraud, and reliance, paragraph 42 must contain factual allegations critical to the Government's claims.  The Court should order the Government to support those allegations.

## II.    ABBOTT'S MOTION TO COMPEL IS NOT MOOT.

The Government next contends that, by subbing in a new, verified response for its old, unverified response, it has somehow "mooted" Abbott's motion to compel.  To the contrary, the Government has actually made things worse.

Because the overwhelming evidence demonstrates that AWP was widely understood by government and industry officials *not* to have the meaning ascribed by the Government in paragraph 42 of the Complaint, Abbott's Interrogatory No. 7 asks the Government to identity the persons who believed or used the term AWP as defined in the Complaint, and the basis for those beliefs.  In its initial response to Interrogatory No. 7, the Government claimed that "[t]he general concept that the AWP refers to the price at which a pharmaceutical firm or a wholesaler sells a

---

[3] *See also United States v. President and Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 181 (D. Mass. 2004) ("In addition to the FCA's explicit requirements, courts have inferred a requirement that the false statement or claim be material."); *Driscoll v. Landmark Bank for Sav.*, 758 F. Supp. 48, 52 (D. Mass. 1991) (in securities fraud case, stating "a complaint must make some step toward explaining how and why the statements made by the defendants were false and misleading when made"); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) ("The government's knowledge [of an allegedly false claim] effectively negates the fraud or falsity required by the FCA."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (finding no FCA falsity because, among other reasons, "the [Government] was fully apprised [of the alleged falsehoods] and never complained about them in the least"); *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. (Fla.) 1977) (noting plaintiff in FCA case "must demonstrate that the government was misled by Equifax's application for the reporting business," and concluding "Equifax's application did not make a material misrepresentation, did not mislead the government, and did not defraud the government within the meaning of the False Claims Act"); *United States ex rel. Gudur v. Deloitte Consulting LLP*, Slip Copy, Civil Action No. H-00-1169, 2007 WL 836935, *11 (S.D. Tex. Mar. 15, 2007) ("no violation exists where relevant government officials are informed of the alleged falsity, thus precluding a determination that the government has been deceived"); *United States ex rel. Englund v. Los Angeles County*, Slip Copy, No. Civ. S-04-282 LKK/JFM, 2006 WL 3097941, *8 (E.D. Cal. Oct. 31, 2006) (same); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("no violation [of the FCA] exists where the government has not been deceived"); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 809 (D. Utah 1988) ("Only if the government gets something less than or different from that which expected can it be said to have suffered the kind of injury necessary to invoke FCA liability.").

drug to its customers is *commonly understood in the industry*," without providing any factual support for, or verifying, its assertion.  Dkt. No. 3850 Ex. C at 35 (emphasis added).  The Government failed to identify a single individual—even within the federal government—who actually believed or used the term AWP in that fashion.  *Id*.

Then, in connection with its response to Abbott's motion, the Government attached a "supplemental response" to Interrogatory No. 7.  Interestingly, this "supplemental response" *completely omitted* any reference to the Government's earlier, factual contention that AWP was "commonly understood in the industry" to mean the price at which pharmaceutical companies and wholesalers sell drugs to retail customers.  *Compare id*. *with* Dkt. No. 4059 Ex. A at 4-6.  Instead, the Government now asserts that its reference to AWP in paragraph 42 was merely a legal, "plain-meaning" interpretation of that term, rather than the fact-based contention the Government *clearly* propounded in its first answer to Abbott's interrogatory.  Further, the Government asserts that "the point of paragraph 42 was not to make a statement about the beliefs of anyone in the industry" (Gov. Resp. Br. at 5) despite its unequivocal statement to the contrary in its initial interrogatory response.  In short, the Government wants to substitute this Court's plain-meaning interpretation of AWP for an apparent lack of evidentiary support for the critical factual allegations contained in paragraph 42 of the Complaint and the Government's initial interrogatory response.

The Court should not permit this bait-and-switch approach.  The implicit allegation of paragraph 42—made explicit elsewhere in the complaint, in the motion to dismiss briefing, and in the Government's original interrogatory response—is that, as a factual matter, Government and industry officials believed and used the term AWP to refer to the average price that a

pharmacy paid for a drug at retail.[4]  The Government's introduction of a "supplemental response" that effectively withdraws that allegation *sub silentio* should not be allowed.  If the Government no longer takes the position that its statement in paragraph 42 is factually true, then it should respond to Interrogatory No. 7 by stating that it cannot identify any person who believes the allegation of paragraph 42, and withdraw that allegation from the Complaint.  If the Government does indeed still believe that the factual allegation of paragraph 42 is true, then it should be required to provide the information called for in Interrogatory No. 7.  In either event, Abbott's motion to compel a response is not moot.  Abbott is entitled to know who within the federal government—besides lawyers—will support the Government's assertion that AWP was understood to be an actual, average price prevailing in the market.[5]

Nor does the Government's identification in its supplemental response of two statements in the pricing compendia that refer to AWP as the average price which a wholesaler would charge a pharmacy (Dkt. No. 5049 Ex. A at 5-6) provide an adequate response to Interrogatory No. 7.  The Government fails to affirm that the authors of these documents are the only individuals who believe or use AWP in the sense described in paragraph 42 of the Complaint, and the Government fails to state the basis for these two authors' understanding of such a definition.  Instead, the Government explicitly refuses to identify the beliefs of "all Persons" with such knowledge.  *Id*. at 9.

---

[4] *See also* Brief of the United States as Amicus Curiae at 15 (9/15/06) (Dkt. No. 3104 at 20) (stating "the final rule [56 Fed. Reg. 59502 (Nov. 25, 1991)] reflected the Secretary's continued belief, as of 1991, that the wholesale price data published in Red Book and other national drug listings generally represented a comprehensive source and indicia of market prices").

[5] Furthermore, the Government's assertion that it has now verified its interrogatory responses, rendering Abbott's request for such verification moot, is likewise untrue.  The verification provided by Curtis L. Collison, a Special Agent in the Department of Health and Human Services' Office of the Inspector General (Dkt. No. 5049 Ex. A at 7), pointedly omits any verification of the original factual assertion made by the Government in its original response to Interrogatory No. 7.  Mr. Collison verified only "the facts provided in the December 2006 responses of the United States to Defendant Abbott's Interrogatories numbers 1, 5, 6, 8, 9 and 13, and the facts provided in the April 2007 response of the United States to Defendant Abbott's Interrogatory number 7."  *Id*. (emphasis added).

Significantly, the Government fails to identify a single governmental official who believes the assertion in paragraph 42 to be true.  If this is because the Government *cannot* identify any such official, and the Government's two citations to pricing compendia (albeit without context) are the only evidence supporting paragraph 42, then the Government should say so, and certify that its response is complete.

Abbott's Interrogatory No. 7 also demands that Plaintiffs provide "any statement, representation, or action by Abbott" that would "cause anyone to believe that AWP was used to refer to a price at which Abbott sold drugs to a retail Customer."  Dkt. No. 3850 Ex. B at 9.  The Government's response fails to identify any statements or actions by Abbott that would cause any person to believe that paragraph 42 is true, but instead generally refers to the fact that Abbott reported "direct price," "list price," "wholesale acquisition cost," and "average wholesale price" numbers to various price publications.  Dkt. No. 5049 Ex. A at 6.  If the mere reporting of prices are the only "statements or actions" by Abbott that would lead a person to believe that AWP means the price paid by a retail customer, then the Government should be required to say so, and verify its answer.  If not, a responsive answer to this Interrogatory should contain the specifics of the responsive statements attributed to Abbott, including the recipient, the date, the time, and any other specific identifying information.

## III.   ABBOTT'S INTERROGATORY IS RELEVANT AND NOT BURDENSOME, AND PLAINTIFFS ARE REQUIRED TO RESPOND.

Finally, Plaintiffs contend that Interrogatory No. 7 is irrelevant and burdensome, and that it is not required to respond because Interrogatory 7 is a "contention interrogatory."  These propositions are both incorrect as a matter of law.

*First*, for the reasons already detailed in Abbott's initial brief (at 8-11), this Court's ruling on the meaning of AWP in Medicare statutes and regulations in a separate case does not provide

the Government with an excuse to ignore Interrogatory No. 7.  The Court's ruling applied only to the parties before it, and the Court held only that the Defendants had not yet shown that the term "'average wholesale price' had an established and settled meaning in the industry as a term of art."  Dkt No. 3299 at 19.

Every federal government witness deposed to date, including the CMS Administrator from May 1993 to September 1997 (Mr. Vladeck), has testified unequivocally that he or she understood the term "AWP," including as used in Medicare statutes and regulations, to refer to prices reported in the pricing compendia.[6]  Not a single witness from the federal government has provided testimony consistent with the DOJ's September 15, 2006 amicus brief.[7]  For the reasons set forth in Abbott Laboratories, Inc.'s Memorandum in Opposition to the United States' Motion for a Protective Order Relating to the Deposition of Government Counsel (Dkt. No. 3597), Abbott is entitled to know if the Government has a witness who will testify that AWP meant something different from what was in the pricing compendia—such as "the *price* at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient."  Compl. ¶ 42.  *See King v. E.F. Hutton & Co., Inc.*, 117 F.R.D. 2, 6-7 n.5 (D.D.C. 1987) ("Obtaining answers to contention interrogatories early on during the pretrial stage can expose a substantial basis for a motion under Rule 11 or Rule 56, and thus lead to an expeditious and inexpensive determination of the lawsuit.").

*Second*, separate and apart from the correct legal meaning of AWP in Medicare and Medicaid statutes and regulations, how *federal government* employees construed the term AWP in those statutes and regulations *and* what they understood about published AWPs are factual

---

[6] The quoted testimony is provided in the chart attached as Exhibit C.  Excerpts of deposition transcripts containing the quoted testimony are also contained in Exhibit C.

[7] In its amicus brief submitted "on behalf of the Secretary of Health and Human Services," the Government argued, *inter alia*, that the "Defendants cannot credibly suggest that the 'well-defined' or 'well-accepted' definition of 'average wholesale price' within the pharmaceutical industry was that AWP was whatever was published in the national price listings."  Dkt. No. 3104 at 20.

questions that are critical to issues of reliance and causation.  The Government's argument that

such issues are "irrelevant" because Abbott cannot mount a "government knowledge" defense

here (a reprise of incorrect arguments made in the Government's motion to dismiss response) is

not only wrong, but has already been rejected by this Court.  *See In re Pharm. Indus. Avg.*

*Wholesale Price Litig.*, MDL No. 1456, No. 03-11226-PBS, 2007 WL 861178, at *7 (D. Mass.

Mar. 22, 2007) (noting government knowledge presents "a difficult legal question" which relies

heavily on factual assertions that the Court is reluctant to determine absent "'the crucible of

trial,'" and declining to rule on a "government knowledge" defense because the Government

"allege[d] it did not know the extent of false drug prices, or approve them"); Feb. 27, 2007 Hrg.

Tr. at 35-36 (commenting that "[e]veryone has a right to understand what the government was

doing during the time period" and recognizing the importance of "what Centers for Medicare and

Medicaid [S]ervices understood and knew and what they agreed to and what they didn't").[8]  If

knowledge is to be tested at trial, it must be surfaced in discovery.

As set forth in its opening brief (at 9-10), Abbott expects the evidence will show (it

already has) that HHS officials were well aware of the fact that published AWPs were in many

instances several times higher than market prices, but that those officials continued to use

published AWPs because they understood that the law provided them no choice but to do so.

*See, e.g.*, B. Vladeck Dep. Tr. at 182-83 (despite knowing that provider groups negotiated

---

[8] *See also United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (if "plaintiff cannot show that the government agency would have acted differently had it known of the omission, 'there is no false claim because [the agency's action] would have occurred regardless of [the defendant's] actions'") (quoting *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563 (8th Cir. 1997)); *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) ("Since the [False Claims] Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay."); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 n.8 (5th Cir. 2003) ("Inevitably, the extent of the government's knowledge is also bound up with whether the claim itself was false."); *United States v. Medica-Rents*, 285 F. Supp. 2d 742, 770 (N.D. Tex. 2003) ("the juxtaposition of the word 'false' with the word 'fraudulent,' plus the meanings of the words comprising the phrase 'false claim,'" suggest an improper claim is aimed at extracting money the government otherwise would not have paid") (quoting *Mikes*, 274 F.3d at 696); *supra* footnote 3.

discounts of up to 99% for products like sodium chloride, agreeing it was his "understanding …

that pursuant to regulation [42 C.F.R. § 405.517, his] only alternative between '93 and '97, while

[he was] administrator of HCFA, was to pay based upon the published average wholesale

price"); D. Tawes 4/25/07 Dep. Tr. at 379 (even though CMS knew published AWPs were many

times higher than acquisition costs, absent use of inherent reasonableness authority for claims

submitted by pharmacies, "the law [Balanced Budget Act of 1997] didn't allow [CMS] to pay

based on acquisition cost") (excepts attached as Ex. D).  Abbott is entitled to know if there is any

government witness who will support the Government's claim that it was misled by virtue of the

AWPs reported for the drugs at issue in this case.  An identification of individuals within the

federal government who believed the term AWP to have had the meaning ascribed to the term in

paragraph 42 of the Complaint is relevant to that inquiry, and should be provided.  *See King*, 117

F.R.D. at 6-7 n.5.

## IV.    RELATOR VEN-A-CARE CANNOT REFUSE TO RESPOND TO INTERROGATORY NO. 7.

Relator Ven-A-Care, for its part, argues that it is under no compulsion to answer Abbott's

Interrogatory No. 7 because it is a contention interrogatory, and because its answers cannot bind

the United States.  *See* Ven-A-Care of the Florida Keys, Inc's Response to Abbott Laboratories,

Inc's Motion to Compel Supplemental Response to Interrogatory No. 7 at 2.  This argument is

puzzling, and Relator provides no case law supporting it.  In any event, it is false because *qui*

*tam* relators *are* under an obligation to respond to interrogatories, including contention

interrogatories, and including cases where the United States has intervened.  *See United States ex*

*rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 235 F.R.D. 521, 524 (D.D.C. 2006)

(holding, in *qui tam* action where the United States had intervened, that "[c]ontrary to Relator's

objections, the [defendant's] interrogatory may properly seek identification of documents and facts supporting a contention").

In any event, the Relator's observation regarding its inability to bind the United States with its admissions is wholly irrelevant.  The Relator expressly adopted the contention raised at paragraph 42 of the Complaint when it dismissed its prior complaint and amended it to incorporate the Government's Complaint.  Abbott's interrogatory asks for the *Relator's* evidence supporting this contention, not the United States'.  As such, the inability of the Relator to speak as to the evidence held by the United States has no bearing on its ability to disclose information within *its* possession (or the lack thereof) about its identical contention.  Relator should likewise be compelled to respond to the interrogatory and verify its response.

<u>**CONCLUSION**</u>

For the foregoing reasons, Abbott's Motion to Compel an Adequate Response to Abbott's Interrogatory No. 7 should be granted.  In particular, Abbott asks the Court to order the Government and Relator to provide the following information in an adequate response to Interrogatory No. 7:

- An identification of who within the United States Government or elsewhere believed or used the term AWP to "refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient";

- The specific basis of any identified Person's belief that "AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient";

- An identification of any statement, representation, or action by Abbott that would cause anyone to believe that AWP was used to refer to a price at which Abbott sold drugs to a retail customer; and

- The factual basis for the Government's assertion in its initial response to Interrogatory No. 7 that "[t]he general concept that the AWP refers to the price at which a pharmaceutical firm or a wholesaler sells a drug to its customers is commonly understood in the industry," coupled with a verification of that

statement, or a formal withdrawal of the Government's initial response to Interrogatory No. 7.

Finally, if Plaintiffs' responses are not sworn to by an individual with personal knowledge of the facts asserted in Plaintiffs' responses, Abbott asks that Plaintiffs be ordered to identify each person consulted or relied upon, or who provided documents or who otherwise constituted a source of factual information in connection with the preparation of Plaintiffs' responses to Interrogatory No. 7.

Dated:  May 9, 2007                    Respectfully submitted,

                                       /s/ R. Christopher Cook
                                       James R. Daly
                                       Tina M. Tabacchi
                                       Brian J. Murray
                                       JONES DAY
                                       77 West Wacker Drive, Suite 3500
                                       Chicago, Illinois  60601
                                       Telephone:  (312) 782-3939
                                       Facsimile:  (312) 782-8585

                                       R. Christopher Cook
                                       David S. Torborg
                                       JONES DAY
                                       51 Louisiana Avenue, N.W.
                                       Washington, D.C.  20001-2113
                                       Telephone:  (202) 879-3939
                                       Facsimile:  (202) 626-1700

                                       *Counsel for Defendant Abbott Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, David S. Torborg, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES, INC.'S REPLY TO UNITED STATES' RESPONSE TO DEFENDANT ABBOTT'S MOTION TO COMPEL A SUPPLEMENTAL RESPONSE TO ABBOTT'S INTERROGATORY NO. 7, and exhibits, to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 9th day of May, 2007.

/s/ David S. Torborg
David S. Torborg