UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| *State of Montana* v. *Abbott Labs., Inc.*, et al., D. Mont. Cause No. CV-02-09-H-DWM | ) ) ) ) Civil Action No. 01-CV-12257-PBS |
| AND | ) ) Judge Patti B. Saris |
| *State of Nevada* v. *American Home Prods. Corp.*, et al., D. Nev. Cause No. CV-N-02-0202-ECR | ) ) ) ) ) |

**MEMORANDUM IN FURTHER SUPPORT OF SCHERING-PLOUGH CORPORATION AND WARRICK PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT AS TO NEVADA AND MONTANA ACTIONS**

## PRELIMINARY STATEMENT

Schering and Warrick separately moved for summary judgment because the evidentiary record contained *no* evidence that Warrick or Schering "manipulated" or "inflated" AWPs; *no* evidence that they marketed spreads; and *no* evidence that they gained market share as a result of increasing AWPs. These are the central contentions in the case, and the States have no evidence to support them.

In their 25-page opposition to Schering and Warrick's individual motion, the States discuss issues that have been dismissed (*e.g.*, best price rebate manipulation), repeatedly refer to settlements of unrelated matters, and belabor points that have never been in contention (*e.g.*, Schering's and Warrick's knowledge that their AWPs were not averages of wholesale prices). What they do not do is explain why they have no evidence for the contentions they continue to assert in this litigation.

Five years after filing suit, the States have:

- no theory of what makes Schering's and Warrick's AWPs false;
- no evidence that either company intentionally manipulated AWPs and no coherent theory as to why they would have done so;
- no evidence that Warrick or Schering marketed spreads in Montana or Nevada or elsewhere (or that conditions existed that would have made it rational for them to have done so); and
- no evidence that the alleged scheme increased market shares.

In short, the States have no evidence that Schering or Warrick did anything wrong; no account of why either company would have done what the States allege was done; and no

evidence that either company benefited from the alleged scheme. The lack of proof on these central points warrants summary judgment for Warrick and Schering on all remaining counts.

I.  THERE IS NO EVIDENCE THAT WARRICK OR SCHERING INTENDED TO MISLEAD OR DEFRAUD THE STATES BY REPORTING FALSE AWPS.

   A.  The States Have Failed To Establish That Warrick's And Schering's AWPs Were False.

Although the States assert that Warrick's and Schering's AWPs are false and fraudulent, they have not provided any criteria for assessing what the subject AWPs should have been – what "true" AWPs would have been. At various points, the States have asserted that AWP was supposed to be an average of wholesale prices, within 10% of acquisition cost, or "directly and rationally" related to acquisition cost; but they cannot justify any of these assertions. The States cannot point to a statute, regulation, or industry practice that supports any of their assertions, or any that Warrick and Schering have violated. The States admit that they do not define "AWP" and that the term is not defined by federal Medicaid statutes or regulations.[1] Nevada Statement of Undisputed Facts ("NSOF"), Docket No. 3637, ¶ 17; Mon. Am. Compl. ¶ 151. The States do not claim that Warrick and Schering made direct representations to the States regarding AWP that were false. And the States have not submitted evidence to establish that Warrick and Schering used the term in a manner different from its customary use.

---

[1] Montana concocts a plain meaning argument based on the inclusion of the term "AWP" in a statute that relates to the State's Prescription Drug Plus Discount Program, which by its terms does not apply to Montana Medicaid reimbursement, and was not enacted until over a year *after* the filing of this lawsuit. *See* Defs. Joint Opp. to Mon. Mot. for Partial Summary Judgment ("Mon. Defs. Joint Opp."), Docket No. 3884, at 10-11. Montana argues for a plain meaning of "AWP" by reference to its EAC regulation by assuming a plain meaning of "EAC" and equating that with "AWP," which results in a construction that is inconsistent with other Montana and federal Medicaid regulations and the undisputed testimony of Montana Medicaid officials. *See id.* at 11-14. It also alludes to this Court's interpretation of a federal Medicare statute as if it were an interpretation of a Montana Medicaid statute, which plainly it was not. *See id.* at 14-18. All of these efforts are unavailing, as demonstrated in Defendants' joint opposition to Montana's motion for summary judgment. *See id.* at 10-18. To the extent Nevada incorporates this plain meaning analysis into its own arguments, while not even attempting to identify a Nevada statute or regulation on which to base the analysis, its position is even more incredible than Montana's and should be disregarded.

All of the evidence shows that "AWP" was not intended by the States to be, or understood by them as, a literal average of wholesale prices. Defendants have, in their joint summary judgment papers, exhaustively chronicled the record evidence that both Nevada[2] and Montana[3] understood that AWPs were not actual averages but were, instead, pricing benchmarks that bore little resemblance to acquisition cost. *See* Mem. in Supp. of Defs. Joint Mot. for Summary Judgment in Montana ("Mon. Joint Mem."), Docket No. 3647, at 3-12; Mon. Defs. Joint Opp. at 2-5; Mon. Joint Reply at 1; Nev. Joint Mem. at 14-31; Defs. Joint Reply in Supp. of Mot. for Summary Judgment in Nevada ("Nev. Joint Reply"), Docket No. 4019, at 6-14.[4]

Nor does the States' expert, Dr. Hartman, provide a basis for requiring AWPs to be actual averages of wholesale prices. Dr. Hartman calculates penalties whenever Defendants' AWPs were more than 10% above acquisition cost. However, he admits that the States' lawyers have

---

[2] Nevada has known for decades that there was no such relationship between AWP and provider acquisition cost, and it has admitted as much in its opposition papers. Mem. in Supp. of Nev. Opp. to Defs. Joint Mot. for Summary Judgment ("Nev. Opp."), Docket No. 3910, at 8 ("Nevada Medicaid personnel understood that AWP *did not* equal acquisition costs."). Dating back to the 1980s, Nevada received and even commissioned studies (including reports from the OIG and Myers & Stauffer) that showed AWP was substantially higher than acquisition costs. *See* Defs. Joint Mem. in Supp. of Mot. for Summary Judgment in Nevada ("Nev. Joint Mem."), Docket No. 3631, at 15-18. Nevada Medicaid personnel testified, and their documents confirmed, that they understood how AWP was used in the pharmaceutical industry, that it did not reflect actual acquisition costs, and that actual acquisition costs could in fact be substantially lower than AWP. *See id.* at 23-25. And Nevada itself purchased drugs for other programs and operated other pharmacy reimbursement programs that applied even greater discounts than did Nevada Medicaid. *See id.* at 25-26.

[3] Montana has admitted that Montana Medicaid knew AWP did not represent actual acquisition cost, and that it knew in October 1995 that "[w]hile AWP is a national standard it is apparent from the results of the survey that it has little to do with acquisition cost of pharmacy products." Defs. Reply to Mon. Opp. to Defs. Joint Mot. for Summary Judgment ("Mon. Joint Reply"), Docket No. 4002, at 1. Montana understood AWP not as an actual average of sales prices, but as "the pricing information supplied by First Databank." Mon. Defs. Joint Opp. at 2. In 2001, Montana Medicaid proposed and then rejected a reduction in reimbursement for generic drugs from AWP-15% to AWP-25%, despite its knowledge that actual acquisition costs in Montana for those drugs were 65% less than AWP. Mon. Defs. Joint. Opp. at 2.

[4] While the States have submitted declarations asserting that individual Medicaid personnel believed there was a rational and direct relationship between AWP and actual acquisition costs, those subjective beliefs are irrelevant. No basis has been given for these subjective beliefs or assumptions, and they do not change the well-established evidence of Nevada or Montana Medicaid's understanding of AWP. Additionally, as argued in Defendants' motions to strike the declarations, they should be stricken because they contradict prior deposition testimony and established fact, and to the extent the declarants make assertions as to statements or events to which they lack personal knowledge. *See* Defs. Joint Mem. in Supp. Mot. to Strike Decls. of Charles Duarte and Coleen Lawrence, Docket No. 4023; Defs. Joint Mot. to Strike Decl. of Dorothy Poulsen, Docket No. 3997.

instructed him to assume that liability attaches when this occurs and that he is not offering an opinion regarding liability. *See* Nev. Joint Reply at 5. Dr. Hartman's calculations therefore do not represent an expert opinion that AWP was to be equivalent to acquisition cost, nor could they be in light of his testimony to the contrary in other AWP litigation. *See id.* Instead, Dr. Hartman merely parrots the States' *theory* of liability, while providing no substantive support of *actual* liability.

In sum, the States are unable to provide any standard for determining what AWPs give rise to liability and what AWPs do not. Given such a failure, they cannot possibly prove that Warrick's or Schering's AWPs were false.

> B.   The States Have No Evidence That Warrick Or Schering Intended To Report False AWPs.

Had the States mustered even a scintilla of evidence for the proposition that the reported AWPs were "false," their case would still founder because they have utterly failed to establish that Warrick and Schering *knew* that their AWPs were false. Knowledge of falsity is an essential element of Montana's claims for penalties under its Unfair Trade Practices Act, Medicaid Fraud Act, and False Claims Act, *see* Mont. Code Ann. § 30-14-142(2); Mon. Joint Mem. at 32; Mon. Joint Reply at 15, and of Nevada's claims for penalties under its Medicaid Fraud Statute and Deceptive Trade Practices Act, *see* Nev. Joint Reply at 14-16. Nevertheless, the only evidence the States have proffered regarding Warrick's or Schering's knowledge of falsity is their knowledge that their AWPs were not actual averages of their wholesale prices. Mon. and Nev. Opp. to Schering-Plough Corp. and Warrick Pharmaceuticals Corp. Mot. for Summary Judgment ("Opp. to Schering and Warrick Mot."), Docket No. 4111, at 7. This point is not in contention; Warrick and Schering did not report averages of wholesale prices, because they – along with everyone else in the pharmacy industry – did not understand AWPs to be actual averages; nor did

they understand AWP to be 10% above or "rationally and directly" related to acquisition cost. The States' inability to identify a customary understanding of AWP makes it impossible for the States to show Warrick and Schering intended to violate it.[5]

Moreover, as discussed in Warrick and Schering's moving papers (at p. 3, n.2), far from intentionally deceiving the States regarding the meaning of AWP or the difference between AWP and their actual sales prices, Warrick and Schering reported those actual sales prices to the States. Since January 2002, Schering and Warrick have sent letters to Nevada and Montana on a quarterly (Schering) or monthly (Warrick) basis informing the states as to the actual prices at which they are then selling their drugs. These voluntary reports included their high-low range of prices for the drugs at issue – specifically, Warrick's and Schering's high and low contract prices for the previous month or quarter for each of these drugs, net of described discounts, to each of three main classes of trade: wholesalers, pharmacy chains and generic distributors. This information clearly showed the States that there was a difference between AWP and actual acquisition costs. NSOF ¶ 109. Both Nevada and Montana have acknowledged receiving such letters, and in Nevada it is a judicially established fact (entered by virtue of Nevada's spoliation of documents that likely would have proved the fact), that "[f]rom 2002 to the present, Nevada received from [Schering-Plough and Warrick] communications stating the actual sales price information from the manufacturers and that this sales price was different from AWP." Rep. and Recs. re: Defs.' Joint Mot. for Redress for Spoliation of Evidence at 27 (Mar. 14, 2007) ("Spoliation Op.") (Docket No. 3843, adopted by the Court on March 29, 2007). Despite

---

[5] The States' references to rebates and nominal pricing, at pp. 14-19 of their opposition brief, relate to Best Price allegations that have been dismissed from the Complaint and are irrelevant to the present motion. To the extent that the States argue such practices increased the spreads for Warrick or Schering drugs, those arguments are similarly irrelevant—such a concededly "unintended consequence" does not go to Warrick's or Schering's intent, and the mere existence of a spread is not actionable.

receiving such pricing information, the States did not change the reimbursement for Warrick's or Schering's drugs. Sending the States regular letters showing the difference between AWP and actual sales is hardly consistent with an intent to defraud the States regarding the AWP spread.

II.     WARRICK DID NOT MARKET OR MANIPULATE "SPREAD" TO GAIN MARKET SHARE.

   A.   It Is Illogical To Manipulate Or Market AWP For SADs.

"If the claim is one that *simply makes no economic sense*," plaintiffs are obliged to "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis added). As set forth in the moving papers, there is no reason for Warrick or Schering to have intentionally manipulated the AWPs of self-administered drugs (SADs). The entities that profit from the alleged spread between AWP and acquisition cost (pharmacies) have no control over what drugs are prescribed by physicians (who are indifferent to the spread since they do not profit from it). Thus, Warrick (and Schering) cannot use AWP to create an incentive to prescribe or to create an incentive to dispense SADs.[6]

In response, the States appear to argue that for multi-source drugs, pharmacies can choose among manufacturers and that pharmacies choose the version with the greatest AWP spread. The States have no evidence to support this *assumption*, and it is illogical to think that pharmacies (or doctors) would purchase multi-source drugs on the basis of AWP spread, when they are generally not reimbursed on that basis.

---

[6] Nevada does not assert any claims against Warrick (or Schering) for physician-administered drugs (PADs). In Montana, the State asserts some claims against Warrick for PADs; however, since all versions of competing multi-source PADs are reimbursed by Montana Medicaid using a single J-Code at a single reimbursement level, *see* Mon. Joint Mem. at 37, there is no incentive for physicians to choose a multi-source PAD on the basis of AWP spread.

Generally, as even the States' expert has acknowledged in other contexts, multi-source drugs are reimbursed on the basis of a rate that applies to all drugs within the class (*e.g.,* a MAC), and not on the basis of a particular manufacturer's AWP.  *See* Hartman MDL Direct Testimony, Docket No. 3296, at ¶ 155 ("For multi-source drugs, I assume MAC pricing is in use; I assume that the MAC pricing does not reference AWP; and therefore the drugs are not subject to damages.").  When a pharmacy purchases a drug, it does not know to whom it will be dispensed or how it will be reimbursed.  Even if a pharmacy served a high percentage of Medicaid clients, however, it still would not have an incentive to purchase drugs with high AWP spreads, as Medicaid also reimburses on the basis of a rate that applies to all drugs within the class, to wit, the Federal Upper Limit or state-specific MACs.[7]  If the reimbursement is generally the same for each manufacturer's version of a drug, a pharmacist would have no incentive to purchase any particular manufacturer's drugs on the basis of its AWP spread.  That is why the pharmacists who were deposed in this case testified that they purchased on the basis of price, not AWP spread.  *See* Mem. in Supp. of Schering-Plough Corp. and Warrick Pharmaceuticals Corp. Mot. for Summary Judgment ("Schering and Warrick Mem."), Docket No. 3631, at 4.  The States have no evidence to the contrary.

      B.      The States Have No Evidence That Pharmacists Purchase Drugs On The Basis Of AWP Spread.

Applied here, *Matsushita* requires the States to come forward with particularly persuasive evidence for their economically implausible theory.  *Matsushita*, 475 U.S. at 587.  But the States have come forward with *no* evidence that any Nevada or Montana pharmacist chose multi-source

---

[7] In Nevada, the State has no evidence regarding the basis of its Medicaid reimbursement.  *See* Nev. Joint Mem. at 9-10.  In Montana, the State has not analyzed which multi-source drugs its Medicaid program reimbursed on the basis of AWP; however, Dr. Gaier has determined that overall at least 75% of the Medicaid multi-source drugs were not reimbursed on the basis of AWP, and, as noted in the moving papers, most of Warrick's products were subject to a Federal Upper Limit. *See* Nev. Joint Reply, at p.5, n.2.

drugs on the basis of AWP spread. The States' papers do not cite to the affidavits, depositions, or documents of any Nevada or Montana pharmacist to support their theory. And, of course, there is no evidence specific to Warrick or Schering. The gravamen of the States' case regarding SADs and multi-source drugs – pharmacists purchase these drugs on the basis of AWP spread – is utterly unsupported; and, thus, the Court should enter judgment for Warrick and Schering.

        C.       The States Have No Evidence That Warrick Manipulated Or Marketed AWPs.

For the same reasons it would be illogical for a pharmacist to purchase drugs on the basis of AWP spread, it would be illogical for Warrick to manipulate AWP or market the AWP spread. When viewed through the *Matsushita* heightened standard, the absence of proof on several fronts warrants summary judgment.

*First*, the States have no evidence that Warrick manipulated spread. The States concede that Warrick has not changed its AWPs in over a decade.[8] The States assert that Warrick manipulated the AWP spread by dropping its prices. But it is an odd fraud by which a party seeks to make more by charging less. The obvious explanation is the innocent one: pharmacists and Warrick cared about price, not AWP spread.

*Second*, the States have no evidence that Warrick marketed the AWP spread. They put forward two Schering documents to evidence marketing spreads (the irrelevance of which is discussed below, *infra* at 11-12) and none as to Warrick. The States' papers do not cite to the affidavits, depositions, or documents of anyone – whether a Nevada or Montana pharmacist or a Warrick employee – to prove that Warrick ever marketed its drugs on the basis of AWP spread.

---

[8] Indeed, as demonstrated in Warrick and Schering's opening brief (at p. 3), the AWPs for Warrick drugs stayed the same over time except for one isolated instance, in 1995, where Warrick raised the AWP for one type of Albuterol. Such an isolated instance cannot be evidence of a practice to strategically manipulate AWP to increase market share and, in any event, an FUL was in place for that particular drug since 1997. *See* Schering and Warrick Mem. at 8.

*Third*, the States proffer no evidence that conditions existed that would have made it possible for Warrick to market spreads; they cannot prove that Warrick's spreads were larger than those of competitors and thus potentially attractive to the (non-existent) pharmacist who cared about spreads. As set forth in Warrick's moving papers, Warrick's AWPs were generally at or below the median of its competitors. *See* Schering and Warrick Mem. at 5. Thus, if pharmacists cared about AWP spreads, then they would buy competitive products rather than Warrick's. There is no answer to this conundrum: Warrick cannot market AWPs to gain market share when its AWPs are lower than those of its competitors.

*Fourth*, the States have no evidence that Warrick gained market share with increases in spreads. As noted above, the States argue that Warrick increased spreads by decreasing prices (as American economic principles and legal doctrine encourage competitors to do), and they assert that this led to increased market share. There is no evidence that it did.

In sum, there is no evidence that Warrick manipulated or marketed AWPs; no evidence that pharmacists purchased on the basis of AWP; no evidence that Warrick's spreads were larger than its competitors'; and no evidence that increased spreads led to increased market shares. Accordingly, the Court should grant summary judgment for Warrick on all remaining counts.

III.   SCHERING DID NOT MARKET OR MANIPULATE "SPREAD" TO GAIN MARKET SHARE.

The reasons for judgment as to Schering SADs are the same as for Warrick SADs, and they are compelling. In Nevada, only SADs are at issue; therefore, the reasons given above suffice to require judgment for Schering in Nevada.

In Montana, the State asserts claims regarding a few Schering PADs. For these drugs, physicians choose the drugs and receive the reimbursement – avoiding the illogic of the States' theory as to SADs. Nevertheless, these claims, too, are baseless because, among other reasons,

the State has no evidence that physicians in Montana chose to buy any of these drugs on the basis of spread.  It is undisputed that Schering's AWPs were approximately 20% above net direct price (Schering's version of WAC, which is a list price to wholesalers).  *See* Opp. to Schering and Warrick Mot. at 5.  This comports with the States' expert Dr. Hartman's testimony in other contexts that participants in the pharmaceutical market knew that AWP exceeded WAC by 20-25% for branded drugs, and they expected it to exceed acquisition cost by about 30%.  *See* Nev. Joint Reply at 7.  Moreover, the Court repeatedly has noted that "spreads" of 20 to 25 percent are not actionable.  *See, e.g., In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, 2007 U.S. Dist. LEXIS 26242, at 126 n.9 ("Only those drugs for which the plaintiffs have alleged a spread greater than the 20-25% mark up between WAC and AWP survive.").  Montana's papers do not cite to any affidavits, depositions, or documents of any Montana physician who claims that Schering marketed its drugs on the basis of AWP or spread.  Nor have they proffered any evidence from Schering that it marketed its drugs to Montana physicians on the basis of AWP or spread.  Indeed, the State has utterly failed to establish a reason for Schering to do so; it has not shown that the AWPs or spreads on Schering's challenged drugs were higher than those of competitive products.  Montana has not shown that Schering manipulated its AWPs for PADs, or that it increased its market share on PADs, or that any Montana physician generally considers AWP spread when choosing which drug to administer to a Medicaid patient.  After five years of litigation, the State has no evidence on this fundamental point.

The States' evidence against Schering consists of two documents that have nothing to do with Montana and do not indicate manipulation or marketing of spreads. The first is an e-mail created after this litigation commenced that discusses a hypothetical situation that never

materialized involving a SAD product that is not at issue in this case. *See* Opp. to Schering and Warrick Mot. at 8-9. Specifically, the e-mail addressed hypothetical responses to the potential entry of a generic SAD that would compete with Schering's Rebetol, an event that never occurred. The second document is an e-mail related to sales of Schering's Intron-A in Florida – *not Montana* – that relates to Medicare reimbursement – *not Medicaid. See id.* at 18-19. The document does not compare reimbursement for Intron-A with that of any competitor; rather, it shows the difference between Medicare reimbursement for Intron-A and its acquisition cost (a spread of 14%) in comparison to the costlier alternative of surgery. In other words, it shows the margin that a Florida doctor would receive for dispensing Intron-A to a Medicare patient in lieu of subjecting the patient to surgery – which has no bearing whatsoever on Montana's claims relating to Medicaid reimbursement.[9]

In sum, there is no evidence that Schering manipulated or marketed AWPs; no evidence that pharmacists purchased on the basis of AWP; no evidence that Schering's AWPs or spreads were larger than its competitors'; and no evidence that increases in spreads led to increases in market shares. Accordingly, the Court should grant summary judgment for Schering on all remaining counts.

## CONCLUSION

For the foregoing reasons, those stated in Schering and Warrick's moving papers, and in the joint defendants' summary judgment filings, the Court should grant summary judgment in favor of Schering and Warrick.

---

[9] As discussed above, *see supra* at p. 6, n.5, the Court has already dismissed all claims as to Warrick and Schering related to Best Price and rebate claims, and should therefore ignore the States' extraneous allegations relating to nominal sales, Integrated Therapeutics Group, and rebates.

*Respectfully submitted,*

 /s/ Carisa A. Klemeyer
Steven A. Kaufman (BBO # 262230)
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
Carisa A. Klemeyer (BBO# 655045)
ROPES & GRAY LLP
One International Place
Boston, MA  02110
(617) 951-7000

*Attorneys for Schering-Plough Corporation & Warrick Pharmaceuticals Corporation*

Dated:  May 10, 2007

- 14 -

## **CERTIFICATE OF SERVICE**

I, Carisa A. Klemeyer, hereby certify that a true copy of the foregoing document was served upon all counsel of record electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 10th day of May, 2007, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.

      /s/ Carisa A. Klemeyer
   Carisa A. Klemeyer