UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL NO. 1456

Civil Action No. 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:

Judge Patti B. Saris

*State of Montana v. Abbott Labs Inc., et al.,*
02-CV-12084-PBS


**DEFENDANT TAP PHARMACEUTICAL PRODUCTS INC.'S
REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


Dated: May 10, 2007

James R. Daly
Lee Ann Russo
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Chicago IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 7828585

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone:  (212) 326-3939
Facsimile: (212) 755-7306

**Counsel for Defendant
TAP Pharmaceutical Products Inc.**

In its Memorandum In Support Of Its Motion For Summary Judgment ("TAP Br.") (Dkt No. 3782), Defendant TAP Pharmaceutical Products Inc.'s ("TAP") presented uncontroverted evidence that, as to the sole TAP drug at issue—the branded, self-administered drug Prevacid®—there was no fraud because:

- the State of Montana ("Montana") often reimbursed for Prevacid® at other than its Average Wholesale Price ("AWP");

- when Montana did reimburse for Prevacid® at AWP, it did so despite knowing the drug's Average Sales Price ("ASP");

- nearly all the Prevacid® units reimbursed by Montana were purchased by pharmacies at the drug's published Wholesale Acquisition Cost ("WAC") (and the MDL court has ruled that, as a matter of law, there can be no claim for the "spread" between WAC and AWP); and

- the rebates paid by TAP to Montana eliminate any of its alleged damages, i.e., Montana's net effective outlay for Prevacid® reimbursements was far less than what the pharmacies actually paid for the drug.

Any one of these four undisputed facts, standing alone, entitles TAP to summary judgment.

Unable to counter this evidence, Montana responds with indirection and diversion. At bottom, Montana argues that TAP is somehow liable for statutory penalties[1] simply because Montana *chose* to ignore Prevacid®'s true pricing and instead reimburse at a discounted AWP. Undaunted, Montana wants $38 million[2] from TAP even though it paid substantially less for

---

[1] No doubt because Montana's net reimbursement expenses for Prevacid® were well below Medicaid providers' acquisition costs, Montana's expert abandoned any effort at calculating damages based on over-payment. Instead, Montana seeks only statutory penalties. *See* Opp. at 1, 8-9. Montana claims that it "calculated defendant-specific overcharges or restitution damages only for certain Defendants because of the State's inability to obtain data from other drug manufacturers." Opp. at 2 n. 2. Montana does not contend that TAP is one of those "other drug manufacturers." Nor could it. Montana received the Prevacid® sales data it requested over two years ago.

[2] The State's initial request for penalties of $222 million for Prevacid®-based reimbursement was over four-times the amount of the State's entire expenditure for <u>all</u> Medicaid covered drugs in 2001 (*see* Cmplt. at ¶ 28 ("in 2001 pharmacy costs exceeded $51 million dollars")) even though Montana Medicaid reimburses "over 400 drug manufacturers with thousands of NDCs" of which Prevacid® is only one drug sold by one manufacturer. (Buska Dep. (Dec. 15, 2006) at 558:16-17.) After Montana's expert conducted his "sensitivity analysis," that number was reduced to a still untenable $38,007,000 for this single drug.

Prevacid® than provider costs (after rebates).  Montana's long effort to force TAP to finance this windfall should end.  Summary judgment should be entered for TAP on Montana's claims.

## ARGUMENT

I.   **MONTANA KNEW PREVACID®'S ACQUISITION COST.**

Montana's knowledge of Prevacid®'s acquisition cost undermines any claim that it was duped by TAP.

    A.   **Montana Knew But Chose to Ignore Prevacid®'s Average Sales Price.**

TAP's Brief and supporting Statement of Undisputed Facts ("SOF") (Dkt. No. 3781-1) establish that Montana could not have been defrauded by Prevacid®'s compendia-determined AWP, if at all, after the fall of 2001, for that was when TAP began providing Prevacid®'s ASP directly to Montana Medicaid.  (Br. at 3, SOF ¶ 17).  Interestingly, in response to the same summary judgment argument by Bayer, which also provided Montana ASPs for its drugs beginning in 2001, "Montana earlier acknowledged that it does not pursue claims for Bayer drugs for which Bayer provided ASPs."  Montana's Opposition To Bayer's Motion For Summary Judgment at 2 ("Opp.") (Dkt. No. 4090).  For the same reasons Montana abandoned these claims against Bayer, summary judgment must be entered on its claims against TAP.  Thus. even though Montana Medicaid received the TAP and Bayer ASPs, it consciously decided not to adjust its reimbursement methodology both because it wanted to assure that Medicaid providers were reimbursed at levels that incentivised continued coverage of Medicaid patients, (*see generally* Joint Memorandum) (Dkt. No. 3647), and it did not want to go to the trouble to enter the ASP data into its reimbursement system.  (Br. at 3-4; SOF ¶¶ 18-19; Opp. at 4.)

Montana attempts to avoid its own fault in continuing to use the compendia-reported AWP to reimburse Prevacid® by asserting that: (i) the evidence is "equivocal" as to whether TAP

submitted ASP data,[3] (ii) Montana had financial and logistical reasons to ignore the data, and (iii) the data was not complete or accurate.  (Opp. at 3-4.)  These contentions are both unsupported by the evidence and are unresponsive to the issue of Montana's knowledge of Prevacid®'s ASP.

*First*, Montana's claims about the irregularity of TAP's ASP submissions are unsupported by record evidence.  Montana asserts that it "is equivocal" whether Montana received TAP's ASPs.  (Opp. at 3.)  In support, Montana references unrelated testimony regarding Montana's conscious choice to ignore ASP submissions.  Indeed, the cited testimony speaks only to what "Montana would have to do . . . to manually enter [ASP] information" and that it "w[as] not using the . . . TAP ASP information."  (Opp. at 3 (citing Buska Dep. at 557-558, 583-584)).  Not only does Montana's reference to the cited testimony fail to speak to the regularity of TAP's ASP submissions, it also contradicts further testimony, *from the same Medicaid official*, that he recalled "receiving" and "seeing" submissions from TAP, and that he had "no reason to doubt" Montana received the ASP data.  (Buska Dep. at 514:3-515:10; 534:20-21; 571:20-572:5; Appendix at B, n.4.)  Montana's claim is equally contradicted by *its own production* of *every* TAP ASP report from the fourth quarter of 2001 through the first quarter of 2006.[4]  In sum, Montana fails to present any evidence contradicting the fact that TAP regularly submitted ASPs since the end of 2001.  (Br. at 3, SOF at ¶ 17.)

---

[3] Montana "admit[s] that the State received ASP data provided by TAP on a periodic basis."  Montana's Response to TAP's Local Rule 56.1 Statement (Docket No. 4104) at ¶¶ 15-19.  This is more than enough to establish that it wasn't defrauded by any Prevacid® AWPs published by the pricing compendia.

[4] TAP's Letters to the Montana State Pharmacy Manager and attached [quarterly] Average Sales Reports and Detailed Methodologies were produced by the State for: 4Q-2001 (MT 038252-263); 1Q-2002 (MT 038627-638); 2Q-2002 (MT 038581-593); 3Q-2002 (MT 038114-126); 4Q-2002 (MT 038069-081); 1Q-2003 (MT 038507-519); 2Q-2003 (MT 038460-472); 3Q-2003 (MT 038027-038); 4Q-2003 (MT 038891-903); 1Q-2004 (MT 038868-880); 2Q-2004 (MT 038904-917); 3Q-2004 (MT 038706-718); 4Q-2004 (MT 038677-688); 1Q-2005 (MT 038639-649); 2Q-2005 (MT 038440-450); 3Q-2005 (MT 038049-057); 4Q-2005 (MT 038414-421); 1Q-2006 (MT 037975-982).

*Second,* Montana's financial and logistical "justifications" for ignoring Prevacid® ASP data (Opp. at 3-4) are irrelevant to its knowledge that Prevacid®'s ASPs were different from AWP.  Regardless of what Montana Medicaid chose to do with the pricing information, it is undisputed that it received and was aware of Prevacid®'s pricing data,[5] therefore vitiating any finding of "falsity," much less intent by TAP to defraud.  (Br. at 4; *United States ex rel. Lambers v. City of Green Bay*, 998 F. Supp. 971, 988 (E.D. Wis. 1998); *In re Estate of Kindsfather*, 326 Mont. 192, 196-97 (2005)).

*Third*, Montana's assertion that questions arose over the completeness or accuracy of the ASPs is a blatant mischaracterization of the evidence.  (Opp. at 4.)  In reality, the testimony Montana cites actually provides evidence to support TAP's comprehensive ASP submissions. (*See* Buska Dep at 514:3-515:10 (Montana Medicaid "had no reason to doubt" the completeness of ASP submissions, no reason to challenge that it received data on "all" NDCs submitted, and never made any complaint regarding the content of the submissions.).[6]

Finally, Montana grudgingly half-concedes that its receipt of Prevacid® ASPs eliminates its post 2001 claims, while continuing to pursue penalties for post 1991 reimbursements. Forgetting that Prevacid® wasn't even launched until 1995, Montana also fails to explain why its failure to use TAP's Prevacid® ASPs after 2001 does anything but establish that it wouldn't have

---

[5] Montana also admits that its claims processor had a direct price for Prevacid in its reimbursement table. (SOF at ¶ 31.) But Montana didn't trouble to change its reimbursement logarithm to utilize this lower price either. In failing to do so, Montana also violated its own statute.  By statute, Montana Medicaid reimburses at the lower of (1) usual and customary charge; (2) maximum allowable charge; or (3) estimated acquisition cost.  Estimated acquisition cost is defined as the direct price charged by manufacturers to retailers, or if no direct price is available, AWP-10% prior to July 2002 and AWP-15% after July 2002.  *Id.* at ¶ 30.  Under this statute, Montana should have used the published direct price for Prevacid® which it admits was available.

[6] Montana's reference to TAP's acknowledgement of "problems with the ASP data" is unresponsive to the undisputed factual issue of Montana's knowledge that ASP's were lower than AWP.  Even if there were minor inaccuracies in pricing, they fell in Montana's favor, averaging a 0.15% *understatement* of Prevacid®'s ASP.  *See* Letter from G. Weiglein to State Pharmacy Manager (Montana) at MT 037948 (May 15, 2006) (Dkt. No. 4113-11).

troubled to use them before 2001 either.  Summary judgment should be entered for TAP on this basis alone.

        B.      **Montana Knew Or Should Have Known Prevacid®'s Price To Non-Retail Government Purchasers.**

Not only has Montana not troubled to use the ASPs TAP has delivered it since 2001, but it also has not troubled to change its reimbursement formula despite its access to a wealth of other information showing that other government entities in Montana were paying less than AWP for Prevacid.  (Br. at 4-5.)  Montana had available Prevacid® pricing data from various other Montana Departments *within its same agency* that both (i) highlighted Montana's acquisition of Prevacid® at prices substantially lower than AWP and (ii) provided Montana with accurate pricing data from which it could determine Prevacid®'s actual acquisition costs to the retail class of trade and non-Federal customers.[7]  (Br. at 5; SOF ¶¶ 21-23.)

In response to this record evidence, Montana pleads ignorance.[8]  It asserts Montana Medicaid had no way of knowing what other Montana departments were doing because there was "no formal or informal pathway of communication[.]"  (Opp. at 4.)  However, the record is replete with evidence that Montana officials, contrary to the claims of their lawyers, were not ignorant, and indeed made informed and reasoned reimbursement decisions based on a wide array of information, agendas and concerns.  (*See generally* Joint Memorandum.)  Montana's claim that Montana Medicaid ignorantly went about its business is not supported by the evidence

---

[7] The State's contention that "Department of Veterans Affairs' pricing. . . . is subject to regulations that have nothing to do with Medicaid" is irrelevant.  (Opp. at 5.)  The State's argument based on the "unique and independent history" of the VA does not contest relevant facts that (i) VA pricing was lower than AWP, (ii) that the State had access to that pricing information, and (iii) that the State knew the price was set at 24% below that at which Prevacid® was sold to non-Federal customers.  All that matters is that the State knew that Prevacid® was sold at a non-AWP price and that it knew the methodology behind that price; a point which the State concedes.

[8] Montana's related argument that, unlike Medicaid, the other Montana departments purchased, rather than reimbursed for, drugs completely misses the point.  (Opp. At 5)  These purchases established, at the very least, that the State could purchase Prevacid® at far less than its AWP.

and, even if true, could not subject TAP to liability.  *See Barrett v. Holland & Hart*, 845 P.2d 714, 717 (Mont. 1992) (where plaintiff "chose not to use the means available to him to investigate the truth of the representations made to him, his claim for fraud must fail.)

Whether or not Montana actually reviewed different agency pricing and performed its responsibilities in a competent manner is beside the point.  What is clear is that Montana Medicaid, at the very least, should have known that other government entities in Montana were paying less than AWP for Prevacid®.  Moreover, the fact that the information was so widely available itself belies any claim of fraud or fraudulent intent on the part of TAP.  Judgment should be entered for TAP on Montana's claims.

## II. THERE IS NO FALSITY – PREVACID®'S WAC ACCURATELY REFLECTS ACQUISITION COST.

Montana cannot reasonably dispute that the vast majority of TAP's direct sales of Prevacid® to retail pharmacies and its sales to wholesalers are at WAC, a price that "accurately reflects [the] drug's acquisition cost to pharmacies." (Br. at 6; SOF ¶¶ 10-11; *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 74 (D. Mass. 2005) (Saris, J.) (for sales of branded drugs [like Prevacid®] "[t]he invoice price usually refers to WAC, rather than AWP, and pharmacies typically acquired the drug at or around WAC")).  Montana also concedes that TAP reported its WAC to the pricing compendia.  Thus, it is undisputed that TAP reported the actual price at which it sold Prevacid® to the pharmacies from which Medicaid beneficiaries obtained the drug.

In response, Montana argues that since it purposefully decided to reimburse providers at a price which "did not include WAC"—the true acquisition cost for Prevacid®—TAP is somehow

liable for fraud. (Opp. at 6)  Montana is wrong.[9]  Even if Montana could miraculously substitute for its current claims a newly created strict liability cause of action based on reimbursement at "fraudulent" AWP, Montana offers no evidence that Prevacid®'s AWP is fraudulent.

Montana does not contest that the "spread" between WAC and AWP for self-administered, brand name drugs (like Prevacid®) is consistently between 20 and 25 percent. (SOF ¶ 7.)  The MDL Court has repeatedly noted that "spreads" of 20 to 25 percent are not actionable.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, 2007 U.S. Dist. LEXIS 26242, at *126 n.9 ("Only those drugs for which the plaintiffs have alleged a spread greater than the 20-25% mark up between WAC and AWP survive."); Pre-Trial Conf. Tr. 22 (Apr. 11, 2007) (Saris, J.) ("everyone knew about a 20 to 25 percent spread, maybe 30 percent.  Everyone knew, everyone") (attached as Ex. 1); *id* at 24-25 (with respect to government knowledge specifically, the court observed that "they for sure knew . . . about spreads in the 30 percent range").  Because the "spread" between WAC and AWP for Prevacid® is not actionable, the State's claims as to TAP must fail.

### III. MONTANA FAILS TO OFFER ANY EVIDENCE OF INJURY.

#### A. Net Reimbursement Cost For Prevacid Was *Lower* Than Provider Cost.

Montana's claims fail for the additional reason that it suffered no injury from any over-reimbursement for Prevacid®.[10]  Montana offers no effective counter to the undisputed fact that TAP paid it federally mandated rebates that allowed its Medicaid Program to procure Prevacid® at a price far lower than the average price paid by the providers it was reimbursing. (Br. at 7-8;

---

[9] In a last-ditch effort to save its claims, Montana tries to simulate a genuine issue of fact through its repeated and un-supported mantra that Montana based its reimbursement on AWPs "supplied . . . . [and] furnished by TAP." (Opp. At 6.)  Unsurprisingly, Montana offers no record evidence to support this futile claim. (*See id.*) Nor does Montana dispute that Prevacid®'s *reported* WAC was published alongside the *compendia-generated* AWP. (Br. at 6, SOF ¶ 19.)

[10] In fact, Montana does not even claim over-reimbursement damages for Prevacid®.  *See supra* n. 1.

-7-

SOF ¶¶ 28-29.)  Nor can Montana contest that it entered into a supplemental rebate agreement with TAP that, when combined with the preexisting federal rebates, achieved a "Net Effective Payment of up to 62% below Prevacid®'s WAC."  (Br. at 8; SOF ¶¶ 27, 29.)  Montana's damages are therefore illusory, because, as Montana effectively concedes, the rebate subsidies it received from TAP exceeded the alleged over-reimbursement by a substantial margin.  (*See* SOF ¶¶ 28-29; Appendix at B-C.)

In response, Montana argues that, despite Montana Medicaid paying a fraction of provider costs, TAP should be "penalized" because Montana could have paid even less than a 62% discount off Prevacid®'s WAC if Montana had not reimbursed based on AWP.  Thus, because Montana could theoretically pay a lower price, TAP should not be credited with its rebates, because the purpose of penalties is not to redress alleged losses, but to punish the alleged wrong-doer.  (Opp. at 7.)  It is true that damages and penalties serve different purposes, but the distinction should not matter here.  Montana cannot recover either damages or penalties unless it first establishes liability.  To establish liability, Montana must prove injury, because injury is one of the elements needed to prove fraud.  *See Sisler v. Bennett-Ames,* 149 P.3d 914 (Mont. 2006) ("Damages are an essential element to a fraud claim."); *In re Kindsfather*, 108 P.3d. 487 (fraud requires "consequent and proximate injury or damages"); Mont. Code Ann. § 30-14-133(1).  Here, Montana paid substantially less for Prevacid than the pharmacies paid for it; *i.e.,* Montana was not paying for any "spread."  Absent injury, there is no fraud, and, absent fraud, Montana cannot recover penalties.  And the undisputed factual record establishes that, once rebates are considered, there is no injury.

CHI-1588140v1

### B. A Substantial Number Of Montana's Reimbursements For Prevacid® Were Based On Non-AWP Pricing.

Montana concedes that its claims should be dismissed and any potential penalties decreased to the extent Montana did not reimburse based on Prevacid®'s AWP. (Opp. at 8.) However, the burden is on Montana—as the plaintiff—to prove its damages by presenting evidence establishing the percentage of reimbursements processed by its "fiscal intermediary" that *were* based on AWP. *See Crystal Springs Trout Co. v. First State Bank*, 225 Mont. 122, 138 (Mont. 1987) ("the burden of proof on damages resides with the plaintiff"). Because Montana has presented no such evidence, summary judgment should be entered for TAP for this reason also.

## IV. MONTANA'S CALCULATION OF PENALTIES FAILS.

TAP's Brief explains why, for various reasons, Montana's penalties provisions cannot apply to TAP. (Br. at 11-13.) In lieu of providing evidence or law to the contrary, Montana's Opposition provides rhetoric. At summary judgment, rhetoric cannot stand in place of evidence. *See e.g. Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

Penalties are only applicable where there has been a showing of willfulness. (Br. at 11.) Because Montana's theory of the case is nonsensical as to Prevacid®—a self-administered product that is marketed to doctors, but purchased and dispensed by pharmacists and for which there is thus no incentive, reason, or chance to "market the spread"—Montana has utterly failed to meet its burden of providing evidence of willfulness. (*Id.* at 9-11) Penalties cannot apply. Montana's Opposition fails to even address this point, and thus Montana certainly has created no genuine issue of material fact.

Moreover, it is inappropriate to calculate penalties for retailers that purchased Prevacid® at or around WAC. (Br. at 12; *see In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 U.S.

-9-

Dist. LEXIS 26242.)  Montana's Opposition blithely dismisses TAP's simple argument as "confusing," and proceeds to describe an irrelevant distinction between pharmacist purchases and pharmacist reimbursements.  (Opp. at 8 ("penalties are based on reimbursements," and that there "are no penalties for retailer purchases").)  But for every reimbursement, there was a purchase, and Montana's entire case is based on the erroneous premise, for which Montana offers no evidence to support, that the retail purchase price was far below reimbursement as a result of alleged fraud.

Montana's expert compounds these errors by wildly over-applying the penalty provisions at issue.  Those penalty provisions allow a penalty only for a false claim.  (Br. at 11; Joint Memorandum at 21-23.)  Here, there is one drug at issue, Prevacid®, and the only "submissions" at issue are TAP's periodic submissions to the pricing compendia, which average one or two times per year.  (*Id.*)  Montana's expert disregards case law and treatises and instead erroneously applies the penalties *to TAP* for each of the thousands of claims submitted *by the provider pharmacies*.  This leads to incredible results, including that the amount of penalties Montana initially calculated for Prevacid® alone, was *four times the annual budget of Montana Medicaid.* (*See supra* n. 2.)  The law does not support such a treatment, and Montana's Opposition does not even bother to address the issue or lend support for its position other than to claim that its penalty calculations are a "question of material fact."  (Opp. at 8.)  To the contrary, such penalty provisions have been widely considered by courts and experts, none of which provides any support for Montana's bloodletting approach to penalties.  *See* Joint Memorandum at 21-23; *United States v. Bornstein*, 423 U.S. 303, 312 (1976) (if a defendant "commit[s] one act" which causes a third party to file multiple false claims, the defendant "[is] liable for only one forfeiture"); *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148,

-10-

(2d Cir. 1993) (the number of penalties is "not measured by the number of [resultant] contracts, but rather by the number of fraudulent acts committed by the defendant").

Because Montana's penalty provisions were misapplied as to TAP, Montana's claims for penalties should be summarily dismissed.

## CONCLUSION

For the foregoing reasons and as identified in TAP's opening Brief, and because Montana has failed to create any genuine issues of material fact, judgment should be entered for TAP on Montana's claims.

Dated: May 10, 2007

Respectfully submitted,

/s/ Lee Ann Russo
James R. Daly
Lee Ann Russo
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Chicago IL 60601
Telephone: (312) 782-3939
Facsimile: (312) 7828585

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

**Counsel for Defendant
TAP Pharmaceutical Products Inc.**

# APPENDIX

**Appendix Concerning Montana's Rule 56.1 Response**

Montana's Response to TAP's Local Rule 56.1 Statement of Undisputed Material Facts ("Opp. Statement") (Dkt. No. 4101) is riddled with deficiencies that TAP would be remiss to leave unaddressed. This appendix describes certain of those deficiencies.

**Facts Admitted**

Montana admits Paragraphs 1-3, 7-9, 16, & 33 of TAP's Statement of Undisputed Facts.[1]

**Facts Denied But Deemed Admitted**

*Paragraphs 4-6, 10-14, and 35 regarding Prevacid®'s sales at WAC.* Montana denies these paragraphs (i) without supporting the denials[2] with factual controversies and (ii) by asserting that TAP is not entitled to rely on the Young Declaration ("Young Decl.") (Dkt. No. 3781, Ex. 2). Denying facts or announcing a counter-designation without reference to affidavits, depositions, or other documents in the record does not satisfy Rule 56.1's requirements.[3] Moreover, it is entirely appropriate to rely on an expert affidavit in summary judgment. *See e.g.* Fed. R. Civ. P. 56(e); *see, also., Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 832 (9th Cir. 2001) (an expert report can be relied on in a Rule 56 motion if the expert "back[s] up his opinion with specific facts").[4] These facts are therefore admitted. *See Carreiro*, 68 F.3d at 1446.

---

[1] Montana does not deny these facts or provide any "affidavits, depositions and other documentation" contradicting these facts. *See Carreiro*, 68 F.3d at 1446. These facts are, therefore, deemed admitted.

[2] Montana also denies Paragraph 10 on the grounds that "Young Decl. ¶ 13" does not support the "preposition regarding 'direct sales of Prevacid.'" The citation should be to Young Decl. ¶ 14. This minor typo does not create a genuine issue of material fact, and because Montana submitted no evidence to the contrary, this fact should be deemed admitted.

[3] Parties opposing summary judgment must provide a "concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." Where the facts alleged to be in dispute are not supported with citations to record evidence, they are "deemed for purposes of the motion to be admitted." *See Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446 (1st Cir. 1995).

[4] The Young Declaration is not "opinion," but rather a heavily annotated factual explanation of the sale and reimbursement of Prevacid®. (*See generally* Young Decl.) Furthermore, the affidavit is based on claims data produced by TAP as well as *claims data produced by Montana*.[4] (*See id.*, Ex. 2 at 2; TAP's Reply Br. at 3, n.4.)

A

*Paragraphs 15,17-19 regarding TAP's ASP submissions.*  Montana denies these paragraphs (i) by offering counter-designations regarding TAP's ASP submissions and (ii) reiterating its arguments about the Young Declaration.  As discussed in TAP's Reply brief, Montana's counter-designations regarding TAP's ASP submissions have zero factual basis and are therefore unresponsive to TAP's factual claims regarding ASP.[5]  Because Montana's remaining argument regarding the Young Declaration is misplaced, these facts are also deemed admitted.  *See Carreiro*, 68 F.3d at 1446.

*Paragraphs 20-23 regarding Montana's access to discounted Prevacid® pricing.*  Montana's counter-designations regarding notice, access, and "unrelated[ness]" do not dispute that Montana agencies purchased Prevacid® at significant discounts and that Prevacid®'s average price to non-Federal customers was publicly available to Montana Medicaid.  Moreover, Montana's counter-designations are unsupported by record evidence.[6]  Paragraphs 20-23 must, therefore, be deemed admitted.  *See Carreiro*, 68 F.3d at 1446.

*Paragraphs 24-29, 36 regarding federal rebates, supplemental rebates, and underpayment of pharmacy costs.*  Montana effectively admits that it was eligible for and received federally-mandated and supplemental rebates on Prevacid® and it underpaid retail

---

[5] *See* TAP's Reply Br. at 3-4.  Montana also submits the Declaration of Jeff Buska which contradicts his prior 30(b)(6) deposition testimony regarding ASP submissions.  The law is clear that Montana cannot manufacture a factual dispute by submitting a self-serving declaration that contradicts a deponent's prior sworn testimony.  *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001) (federal courts "have repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed"); *Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 35 (1st Cir. 2001) ("We have refused to allow issues of fact to be created by subsequent contradictory affidavit.").  The Court should therefore ignore Mr. Buska's declaration, which does nothing to create a genuine issue of fact.

[6] *See* Montana's Response to Defendant's Joint Local Rule 56.1 Statement at ¶¶ 7-8 (Dkt. No. 3903).  Montana's cites the depositions of Nancy Ellery and John Chappuis.  Ms. Ellery's deposition, however, relates to her communications with other states' Medicaid representatives, *not* internal discussions between Montana agencies.  *See* Ellery Dep. 70:18 - 71:11 ("Q. Did you do anything to keep up with changes that other states made in their reimbursement systems?  A. I attended meetings . . . . They would talk about what they were doing; it was information sharing among directors.").  Mr. Chappuis' deposition relates only to his personal experience.  Chappuis Dep. 77 (Apr. 21, 2006) ("I can't recall any personal discussion that I participated in with non-Medicaid agencies.").

B

pharmacies for their costs related to Prevacid®.  Montana denies the remaining facts by arguing (i) the appropriateness of TAP's citation to the Young Declaration, (ii) TAP's use of "legal" interpretations, and (iii) that the amount of rebates and payments is a "legal conclusion."[7]  None of these denials is supported by evidence or appropriate under Rule 56.1.  Paragraphs 24-29, 36 are therefore admitted.  *See id.*

*Paragraphs 30-31, 34 regarding direct price and "market[ing]" the "spread."*  Paragraphs 30-31 and 34 are denied with no citation to the record.  These denials are insufficient and the facts at issue should be deemed admitted.  *See* i*d*.  In addition, Montana's unsupported counter-designation in response to Paragraph 34 that "pharmaceutical manufacturers believed that pharmacists could influence the prescribing of drugs" is an improper denial.  *See id.*  Montana's reference to these additional unsupported "facts" does not refute the truthfulness of TAP's statement that "it is impossible to market any potential 'spread' on Prevacid®."

*Paragraph 32 regarding reimbursement on a non-AWP basis.*  Montana denies Paragraph 32 on the basis that TAP offers no evidence in support of this fact.  TAP, however, cites the Young Decl. at ¶ 22 (which references a scatter graph created using Montana claims data).  Montana's denial is baseless and Paragraph 32 is therefore deemed admitted.

---

[7] Whether Montana's reimbursement was less than provider cost is an issue of pure economic fact.

CHI-1588140v1

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2007, I caused a true and correct copy of the foregoing **Defendant TAP Pharmaceutical Products Inc.'s Reply In Support Of Its Motion For Summary Judgment** to be served on liaison counsel (identified below) via Federal Express next day delivery.

/s/ Lee Ann Russo_____
 Lee Ann Russo

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

CHI-1588140v1