<pre>
1                   IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
2

3
     In Re:                       )
4    PHARMACEUTICAL INDUSTRY      ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE      ) MDL No. 1456
5    LITIGATION                   ) Pages 1 - 68
6

7

8                       PRETRIAL CONFERENCE
9             BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
10

11

12

13
                              United States District Court
14                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
15                            April 11, 2007, 3:05 p.m.
16

17

18

19

20

21

22
                         LEE A. MARZILLI
23                    OFFICIAL COURT REPORTER
                   United States District Court
24                 1 Courthouse Way, Room 3205
                     Boston, MA  02210
25                      (617)345-6787
</pre>

```
1   A P P E A R A N C E S:
2   For the Plaintiffs:
3       STEVE W. BERMAN, ESQ. Hagens Berman Sobol Shapiro LLP,
    1301 5th Avenue, Suite 2900, Seattle, Washington, 98101-1090.
4
        THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
5   Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge,
    Massachusetts, 02142.
6
        DONALD E. HAVILAND, ESQ., The Haviland Law Firm, LLC,
7   740 S. Third Street, Third Floor, Philadelphia, Pennsylvania,
    19102.
8
    For the Defendants:
9
        MICHAEL B. KEATING, ESQ. and MICHAEL P. BOUDETT, ESQ.,
10  Foley Hoag, 155 Seaport Boulevard, Seaport World Trade Center
    West, Boston, Massachusetts, 02210, for AstraZeneca.
11
        D. SCOTT WISE, ESQ., KIMBERLEY D. HARRIS, ESQ., and
12  AIMEE HECTOR, ESQ., Davis, Polk & Wardwell, 450 Lexington
    Avenue, New York, New York, 10017, for AstraZeneca.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  In Re:  Pharmaceutical Industry Average
 3     Wholesale Price Litigation, Civil Action No. 01-12257, will
 4     now be heard before this Court.  Will counsel please identify
 5     themselves for the record.
 6              MR. SOBOL:  Good afternoon, your Honor.  Thomas
 7     Sobol for the class plaintiffs.
 8              MR. BERMAN:  Good afternoon, your Honor.  Steve
 9     Berman.
10              THE COURT:  Yes.
11              MR. MATT:  Good afternoon, your Honor.  Sean Matt.
12              MR. NOTARGIACOMO:  Ed Notargiacomo.
13              MR. HAVILAND:  Don Haviland, Judge.
14              MR. KEATING:  Michael Keating, your Honor, for the
15     defendant AstraZeneca.
16              MS. HECTOR:  Amy Hector.
17              MR. BOUDETT:  Michael Boudett.
18              MR. WISE:  Scott Wise from Davis Polk for
19     AstraZeneca.
20              MS. HARRIS:  Kim Harris for AstraZeneca.
21              THE COURT:  Well, let me start off by saying
22     "welcome," but I'm not sure I have good news for you, in
23     that the criminal case looks as if it's going to be going to
24     trial.  The defense attorneys gave me a 98 percent chance of
25     going to trial.  I've been told that before and had them all
```

1     plead the week before.

2          So the first question out of the box is -- I've

3     reserved for you the month of June, and I know somebody has a

4     graduation, et cetera.  I mean, we'll accommodate that.  But

5     the real question I have is, if in fact the criminal case

6     pleads or ends substantially shorter than predicted, which is

7     about three weeks, do you want to be -- I'm just trying to

8     figure out -- on a rolling list and come in earlier?  I mean,

9     what does that do to you?  Or do you prefer the 4th?

10          MR. KEATING:  I think, if I could speak for the

11     defendant, your Honor, I think our preference would be a date

12     certain, and probably the 4th of June, if that's still a

13     viable --

14          THE COURT:  That's a Monday still, right?

15          MR. KEATING:  That's a Monday.  I mean, we're not

16     married to the 4th, but it's, I think, important for us to

17     know for witness presentation, for out-of-state lawyers to

18     get rooms and whatever.  So our preference would be a date

19     certain, and if the 4th is the earliest of the dates certain,

20     that's what our preference would be.

21          THE COURT:  Now, suppose next week the criminal

22     case folds altogether.  I mean, they're now focusing big

23     time, all right, and that always brings some immediacy to

24     things.  So if they plead out -- I should know it within the

25     next week or two -- then I won't want to lose the whole month

1    of May.  So my theory is, once the criminal case starts, I'm

2    going to make it June 4th.  If I find out within the next

3    week or so that it pleads out and I've got that whole month

4    of May, I'm not going to pop it on you, "Be here tomorrow,"

5    but I might give you a week or two notice so I can just start

6    it a little earlier.  So, I mean, this is going to happen, I

7    apologize, but that case has been pending a very long time,

8    and I have the Speedy Trial Act, and it has to go.

9              MR. BERMAN:  Don't we have the "speedy civil act"?

10             THE COURT:  You've had more process than anybody.

11             (Laughter.)

12             THE COURT:  You've had a bigger chunk of this

13   session than many cases, let's just put it that way.

14             MR. SOBOL:  On the scheduling issue, may I just

15   bring to your attention one point?

16             THE COURT:  Yes.

17             MR. SOBOL:  In the event that -- I know that we

18   would impanel on a Monday and begin the trial on a Monday.

19   There's one timing problem that we have with respect to

20   Professor Rosenthal, who you will recall the plaintiffs would

21   like to call first to give a tutorial presentation and

22   outline at the beginning of the case.  She has prior

23   professional engagements in Orlando, Florida, in very early

24   June.  She can fly back on June 5, the evening of June 5.

25   The earliest she can be here in June is June 6 in the

1    morning.

2              THE COURT:  Which is the morning you have to be

3    gone?  Is there a morning you cannot be here?

4              MR. KEATING:  I think it's the Thursday, graduation

5    day, your Honor, which is, I think, the 7th.

6              THE COURT:  The 7th.

7              MR. KEATING:  Yes.

8              MR. SOBOL:  So we were thinking about one of two

9    possibilities:  Either the trial starts June 4 and we skip

10   the Tuesday, because that's the 5th when she can't be here,

11   or, alternatively, we would begin Monday, June 11, in which

12   case she would be here the next day, or even June 11, if the

13   witnesses started on that day.

14             THE COURT:  Why don't you start off with a few of

15   those individual people that you want to bring in, if you

16   have to, and then do the tutorial when she can get here.

17             MR. BERMAN:  We could do that.  I think it would be

18   easier for the jury to understand it if they knew what AWP

19   was and they knew the context that these --

20             THE COURT:  I agree, I agree.  On the other hand,

21   maybe we would go a full day on the 4th.  How many hours

22   would you want?

23             MR. SOBOL:  She'll be in Florida on the 4th, your

24   Honor.  She comes back the evening of the 5th, so her first

25   time to be here is June 6, that Wednesday.  That's the point

1    that I was trying to make, that's all.

2              THE COURT:  Let me just tell you -- let me hold on

3    that -- the only thing harder than impaneling Christmas week

4    is impaneling for people over the July 4 week.  I will lose

5    everybody.  And it's not just that week.  It's that first two

6    weeks of July, it's brutally difficult to get a jury.  So I'm

7    not going to answer that question.  I may make you do a

8    filler, and it just won't be the ideal way.

9              How long do you think the plaintiffs' case will

10   be?

11             MR. BERMAN:  Well, you've given us time limits of

12   five days each, so we should not wind up here July 4.

13             THE COURT:  Five days?  I actually --

14             MR. BERMAN:  I believe so.  It's five days apiece.

15             THE COURT:  Five full days?  I didn't even remember

16   it was that tight.  I was assuming it was a three-week

17   trial.  No?

18             MR. BERMAN:  No.  Excluding jury selection, the

19   plaintiffs will have five --

20             THE COURT:  All right, so you're reminding me.  So

21   maybe that's excluding all those things.  So you're just

22   saying five full days of --

23             MR. BERMAN:  I didn't know if you meant to include

24   openings and closings, but you say, "Excluding jury

25   selection, the plaintiffs will have five days, the defendant

1  will have five days."

2          THE COURT:  That's right, so it's a three-week

3  trial.  That's fair enough.  That's roughly where I thought

4  it would be.  So we would be done then if we started on the

5  4th.

6          MR. BERMAN:  Right.

7          THE COURT:  All right, well, we'll think about

8  that.

9          Let's start going through, and I'm looking directly

10  at you.  When I certified the class, I did so on the express

11  understanding that you'd limited yourself to deceptive

12  conduct, intent to deceive, and unfair conduct only in the

13  sense that if you're deceptive, it's unfair.  So my intent on

14  entering this was simply to give a jury, really much shorter

15  than all of you have thought about, is a fraud instruction,

16  maybe right out of the Restatement, intent to deceive,

17  reliance, causation, materiality.

18          So why did you give me such a long jury form?  I'm

19  not going to charge on unfairness because that is the kind of

20  issue where it varies from state to state.  I don't know of a

21  state -- and maybe I'll turn to the defendants -- a state in

22  the United States where fraud is not an unfair or deceptive

23  act, right?  With that huge binder that you gave me, did you

24  find one state in the United States of America where fraud is

25  not an unfair and deceptive act?  Probably not.

1        MR. BOUDETT:  Well, yes, your Honor, in the states

2    where -- I think any number of us could answer this

3    question.  We're looking at each other.  The answer would be,

4    yes, there are states in which the law enumerates certain

5    listed instances.  And if you're buying a boat and it's fraud

6    and it falls under the boat subsection, then that's a

7    violation.  If you're not buying a boat and it's a general

8    fraud not covered by the list, then the fraud would not be a

9    violation of the Consumer Protection Act.

10        THE COURT:  Okay, you view it as a matter of law,

11    right?

12        MR. BOUDETT:  Yes, and our brief does that, that's

13    right, your Honor.

14        THE COURT:  So I plan on charging them on fraud,

15    deception, intent to deceive.  And I really was planning on a

16    very brief -- and to the extent that you're right and it's

17    only against the law to be fraudulent for a boat and not for

18    drugs, we'll carve it out.  I can do that afterwards.  Now,

19    so that's what I'm planning on charging.

20        Now, you seem to be backing down from what I

21    thought was such a wise stipulation, trying to get me into

22    the area of unfair.  As I know in Massachusetts, unfair is

23    different from deceptive.  Sometimes -- I mean, deceptive

24    conduct and fraudulent conduct is probably always unfair, but

25    the reverse isn't true, so I'm just going to charge on

1    fraud.

2              And I went back and reread my class cert.  I didn't

3    go back and read your corrected memo that I got it out of

4    when I said you were so wise to limit yourself to that, but

5    it's certainly been two years, and you didn't disabuse me of

6    that basic notion, because what I'm not giving is -- some

7    poor associate probably died over that, the differences --

8              MR. BERMAN:  Mr. Matt, your Honor, and he's still

9    alive.

10             MR. MATT:  I'm still alive, your Honor.

11             THE COURT:  You can do a Law Review article

12   together with someone here, okay, do a Law Review article,

13   okay?  My vision of this is a fraud instruction, and then

14   we'll back out of it things like you just said where it's

15   only the boat.  You'll make your argument on reliance, but

16   we're dealing with poor sick people here.  So, as a practical

17   matter, we're not going to have an issue of, should they have

18   known about the violation, unlike the third-party payor?  I

19   mean, I'd never heard of it until it unfortunately got

20   assigned to me, so we're not going to have those issues with

21   this class.

22             What we might have on the statute of limitations

23   point is, there are some states you've told me about where

24   there's a fraudulent concealment saving -- there's three

25   different ways, am I right, that you can -- some of it is,

1     the statute of limitations runs upon discovery.  Now, for the

2     old people, that probably just means when the suit was

3     brought it would start to run.  But then some of it runs from

4     when the injury is, right, regardless of when you discovered

5     it, right?  Do I have this right?  Am I right that some of it

6     runs from injury?  And there's no tolling, you told me,

7     right?

8               MS. HECTOR:  Yes.  And also, I mean, there's also

9     reliance issues and transaction requirements that we have

10    briefed in the --

11              THE COURT:  Right, but all of that's going to be

12    law, whether there's a transaction.  We know what happened

13    here, okay?  So the transaction I'll worry about afterwards.

14    If there's no finding and no intent to deceive, we all don't

15    have to spend our life doing this.  If there's an intent to

16    deceive, I have some image of a settlement coming to the

17    fore.  Maybe not.

18              So I'm just worrying now about what I have to give

19    to the jury.  We have to give them intent to deceive.  We

20    have to give them whether they've proven up a fraud claim,

21    right?  Transaction is just a question of law.  I think

22    reliance is just a question of law, whether or not when these

23    people --

24              MS. HECTOR:  Well, I think it's a mixed question of

25    fact and law.

1          THE COURT:  Okay, why?

2          MS. HECTOR:  Perhaps you could find that on these

3    facts there cannot be reliance because no individual actually

4    saw or heard this and make that determination --

5          THE COURT:  You may be right, yes, that's law.

6          MS. HECTOR:  -- which is briefed in our memorandum

7    accompanying our jury instructions.

8          THE COURT:  That's law, that's law.  Okay, so tell

9    me, the one other fact issue I thought of that has to go to a

10   jury was, as I read through your tombs (Sic) -- I probably

11   should say "tomes" is probably a better way of saying it --

12   statute of limitations runs from injury, is one choice.  One

13   choice is when they discovered it, and then the third choice

14   is whether there's fraudulent concealment, right?

15         MR. MATT:  Or equitable tolling.

16         THE COURT:  Well, equitable tolling because of

17   fraudulent concealment, right?

18         MR. MATT:  They're closely related.

19         THE COURT:  Let me just say, I think fraudulent

20   concealment would have to go to a jury because that's an

21   intent issue.  I think that's a disputed issue of fact.  So

22   the things I was thinking of sending to the jury is the fraud

23   claim, the basic fraud claim, and fraudulent concealment as a

24   possible tolling mechanism.  Is there anything else that has

25   to go to the jury that's a fact question other than the fraud

1    claim and the fraudulent concealment?  Oh, damages, damages.

2    So that's what I'm planning.  And I'm planning on something

3    like an hour charge and maybe about --

4            Now, on damages, the question is, do I have to do

5    damages state by state?  Will I need 42 states?  Are you

6    going to divvy it up state by state or use just one aggregate

7    pool, and we'd worry about it afterwards?

8            MR. BERMAN:  Well, we had done it state by state

9    where we were tracking our forum, which groups all the

10   state.  If you're going to have one overriding intent

11   instruction, then we don't need to break up the states.

12           MR. KEATING:  Well, how do you deal with damages if

13   you're going to --

14           THE COURT:  I'm thinking out loud.  I don't know.

15           MR. KEATING:  Well, let me just speak to that

16   because if you are going to exclude certain states, and what

17   I'm not clear about is if you intend to do that before or

18   after the jury decides --

19           THE COURT:  After, after.

20           MR. KEATING:  Okay, so let's assume there's a state

21   that requires a transaction, let's assume there's a state

22   that requires some form of reliance or whatever -- and this

23   is a question, not an argument -- is it your intention to

24   take the fraud finding and say, "Now I'm going to go through

25   the standards of the 42 states and lop off whatever number,"

1    don't -- to have other requirements in addition to the fraud

2    requirement?

3              THE COURT:  Right, like as a boat, so that would

4    argue for having it state by state.

5              MR. KEATING:  I don't know otherwise how you can

6    determine the damages because otherwise you're going to take

7    a percentage or something of the -- you know, you have 42

8    states, you'd knock off 21, and you'd get a 50 percent, which

9    I don't think is probably the correct way to do it.

10             THE COURT:  It probably isn't, I agree.  So, I

11   mean, I don't see a way around that.

12             MR. WISE:  Actually, we have some papers in on this

13   subject in one of the motions in limine that relates to the

14   propriety of the plaintiffs seeking an aggregate damage

15   award.

16             THE COURT:  Well, they've got to do that state by

17   state, at the very least.

18             MR. WISE:  And they can't even do it state by

19   state, it seems to us, because there really is not an

20   adequate and will not be an adequate factual basis to

21   aggregate any claims in the situation where we don't know

22   whether these individuals were billed on an AWP basis or paid

23   on an AWP basis.

24             THE COURT:  You know, I'm not going to --

25             MR. WISE:  Let me just finish the thought because

1    what you can do and what we would suggest is more like a sort

2    of damage ribbon concept.  If the jury determines that there

3    has been something that produces liability, they can

4    determine what the basis of the damages would be; you know,

5    the difference between this price and that price, if that's

6    their determination.

7              THE COURT:  And then do what?

8              MR. WISE:  And then leave it for another day how

9    many people actually --

10             THE COURT:  No other day.

11             MR. WISE:  Well, you've got to have a claims

12   process at some point.

13             THE COURT:  Right, right, so that's what I'm

14   planning on doing is do an aggregate state by state.  I think

15   I've got to do that or I can't back things out afterwards.

16   And then to the extent that -- it comes up every day in a

17   class action -- if not enough people qualify, for reasons you

18   explain, then I have some money at the end, and I could

19   either do a -- what do you call it, a cy pres? -- a pool kind

20   of thing, or I can give it back to you.

21             MR. WISE:  I commend the papers to you on the

22   subject because this case is not like an antitrust case where

23   purchases can be proved on a mathematical basis, and you can

24   know from listening to an expert who's looked at purchase

25   data how many sales took place at what price.  We don't even

1   know, and we will not know until the claims procedure, how

2   many people actually were billed for a prescription in this

3   case.

4        THE COURT:  You know, I understand what you're

5   saying, but I don't --

6        MR. WISE:  This is an important point because the

7   factual basis --

8        THE COURT:  But there is going to be no other --

9   you know, if you're right, you're only going to be liable to

10  the extent that people come in and claim, and I'll have to

11  decide what to do with the overage.  So if people don't claim

12  because they were never billed, maybe that goes back to

13  AstraZeneca rather than into a cy pres fund.  I can decide

14  that afterwards, but I don't see how I can't do it.  There is

15  going to be no other jury.  This is it.

16       MR. WISE:  I'm not suggesting there needs to be

17  another jury or that there would be more to do, but what I am

18  suggesting, and I think when you read the papers you'll see

19  the point better than I'm making it orally, that in this

20  particular case, there is not an adequate evidentiary showing

21  that would justify a damage award in the aggregate because

22  there is no scientific way for the jury to have any basis to

23  determine how many people were injured, how much their injury

24  was on an aggregate basis.

25       THE COURT:  Okay, thank you for that, but at least

```
1        I've got to do state by state, right?

2             MR. WISE:  You certainly have to do that, but we

3    would say --

4             THE COURT:  Well, why do you care?

5             MR. WISE:  Because the law does not permit a

6    judgment to be awarded against my client in the aggregate,

7    giving you what you would say is your cy pres power to do

8    what you will with money that's not claimed, because that

9    money is not being awarded in a way that is legal.  I mean,

10   there is not enough evidence --

11            THE COURT:  Well, your expert in the last trial

12   said that a certain percentage of doctors will never collect,

13   but we have no way of knowing what that is.

14            MR. WISE:  We don't, that's exactly my point.

15            THE COURT:  It could be one percent, or it could

16   be --

17            MR. WISE:  That's exactly my point.

18            THE COURT:  But his number is sky-high in ways that

19   you could never support.

20            MR. WISE:  That's exactly my point.  This is not an

21   antitrust case where you know there were 100 machines sold at

22   an overcharged price.  This is a case where you can tell how

23   many prescriptions were prescribed.  You have no way of

24   knowing how many were actually billed to the consumer or how

25   many were paid by the consumer.  And therefore there is not
```

1       an adequate legal basis to make an award on that aggregate

2       number.

3              THE COURT:  Well, what do you say to that?  I mean,

4       the issue is, usually if people don't come to claim because

5       they're dead or something like that, you give it to charity,

6       you do something with it.  But what about his point?

7       Wouldn't that money go back to AstraZeneca?

8              MR. SOBOL:  Well, the answer to that is "no."

9       First, to back up, the class is defined not just as those

10      persons who paid but those persons who incurred a debt still

11      legally enforceable at the time that the judgment gets

12      entered.  So it's not simply a matter of who paid but also

13      who incurred the debt.  We learned from the Class 2 and

14      Class 3 trial that there's more than sufficient adequate

15      factual basis upon which experts can credibly testify as to

16      what the aggregate damages are incurred to the class as a

17      whole.  The defendants' arguments in response to that during

18      Class 2 and Class 3 were simply around the edges:  Well,

19      there may have been some situations where there was no

20      collection of a debt that the doctors were statutorily

21      obligated to charge.  But they never came forward with

22      evidence in that regard.

23              So our position, first, before we get to the

24      cy pres issue in a moment, is that under the law and the

25      facts, that there's more than an adequate basis upon which

1    the experts can testify regarding what the aggregate damages

2    are to the class, both in terms of what they paid and what

3    they legally incurred as a debt.

4           THE COURT:  Let me jump back to you, Mr. Wise.

5    What about the argument that the class includes people who

6    incurred a debt?

7           MR. WISE:  You know, we have no idea what that

8    means on a state-by-state basis and what's enforceable and

9    what's distinguished by law instead of by  time --

10          THE COURT:  Okay --

11          MR. WISE:  Let me just say, we have briefed this

12   issue.  This is a significant issue.

13          THE COURT:  I've at least skimmed all the papers.

14          MR. WISE:  Okay.

15          THE COURT:  A lot of it's come in.  I'm on trial in

16   another case.  I'm always on trial.  But, in any event, I at

17   least know what the issues are, and luckily they're not

18   strange to me because I'm working them through in the bench

19   trial.  I mean, most of these are very familiar issues to me.

20          MR. WISE:  Our only point is that you could do what

21   would be necessary in a kind of damage ribbon approach

22   showing a difference over time; you know, in 1998 the AWP was

23   this, the ASP was this, therefore for any --

24          THE COURT:  I'm not going to ask this jury to do

25   it.  This is going to be a straightforward fraud case.  I've

1    been persuaded I'd probably have to do state by state to back

2    it out.  And we're going to have a two- to three-week jury

3    trial.

4           Now, let's just start going through some of the big

5    issues, the huge issues.

6           MR. SOBOL:  On the cy pres issue briefly?

7           THE COURT:  No, we don't need to.  We have a lot on

8    our plate today, a huge amount.  We have at least, roughly,

9    this is a case involving deceptive conduct, alleged deceptive

10   conduct.  You have to prove that AstraZeneca intended to

11   deceive when it published the AWP price.  I think the object

12   of that sentence is, intended to deceive whom?  The

13   government.  So if you all think this is wrong, you're going

14   to need -- because that's the reimbursement mechanism, not at

15   third-party payors, the government, so that it's the state of

16   mind of the corporate entity or their agents or employees

17   when it published the AWP.

18          So if that is the case, I want to walk through

19   Weintraub for a minute.  Weintraub is going to say what?  I

20   don't have a deposition.  What will he say?  Who's the

21   Weintraub man?  You are?

22          MR. BOUDETT:  I get that assignment.

23          THE COURT:  Is he going to say -- it was very vague

24   in the papers as to exactly what he would say.

25          MR. BOUDETT:  Well, we made a proffer in that

1    regard, your Honor, I believe, during the bench trial.

2              THE COURT:  I just don't remember.

3              MR. BOUDETT:  Okay.  Mr. Weintraub is going to say

4    essentially that he was one of the guys who was dealing with

5    drug companies.  He was the regional head for a period of

6    time.

7              THE COURT:  Did he deal with AstraZeneca?

8              MR. BOUDETT:  His testimony would not be specific

9    to Zoladex, your Honor.  It would be about knowledge of

10   spreads and the AWP system.

11             THE COURT:  But let's be very clear here.  I do not

12   believe in general, with the exception of maybe TAP and

13   Lupron, in general, AstraZeneca will not be smeared by what

14   happened in other companies.  On the other hand, it's not

15   clear to me that knowledge of spreads in other companies is

16   going to be relevant either.  One thing I learned from the

17   bench trial is how specific this is company by company.  Each

18   company has a different tale.  And so will Weintraub be able

19   to say anything about dealings with AstraZeneca?

20             MR. BOUDETT:  No, your Honor.

21             THE COURT:  Well, then why is he relevant?

22             MR. BOUDETT:  Your Honor, I think that it goes to

23   rebut the plaintiffs' expert testimony that this was all a

24   secret, which is a cornerstone of the liability opinion

25   that's been put forward.

1          THE COURT:  Tell me what "it" is.

2          MR. BOUDETT:  Spreads, that the spreads were

3   secret.

4          THE COURT:  Let me tell you, having just been

5   through this, everyone knew about a 20 to 25 percent spread,

6   maybe 30 percent.  Everyone knew, everyone.  This is why I

7   found your papers so difficult to follow.  If all he's going

8   to say is everyone knew about a spread, for want of a better

9   word, within the speed limit, if that's all he's going to

10  say, that's not a problem because it would almost be

11  stipulated to.

12         MR. BOUDETT:  No, your Honor.

13         THE COURT:  All right, what will he say?

14         MR. BOUDETT:  He will testify as to knowledge of

15  discounting off of WAC creating spreads larger than the

16  Hartman speed limit.

17         THE COURT:  What were the Zoladex spreads?  I don't

18  remember.

19         MR. BOUDETT:  Well, it depends what year you ask

20  about.  At their height, they were, I think, 142 percent,

21  according to the Hartman calculation, 140 to 150 percent.

22         THE COURT:  Is he going to say the government knew

23  that?

24         MR. BOUDETT:  He is going to say the government

25  knew of spreads well in excess of the Hartman speed limit.

1    His testimony would not be specific to Zoladex.  It was not

2    one of the top five blockbuster, budget-buster drugs that the

3    regulators were paying attention to, which --

4                THE COURT:  So as I understand it, the OIG reports,

5    were any of them referencing Zoladex?

6                MR. BOUDETT:  Yes, your Honor.

7                THE COURT:  Which ones?

8                MR. BOUDETT:  The '92 certainly listed Zoladex

9    among the 30 drugs that was listed and gave a spread in

10   excess of 30 percent, if I recall correctly.

11               THE COURT:  What was it, Zoladex?  I remember

12   Hartman saying that all the 1992 ones were roughly in the

13   speed limit zone.

14               MR. BOUDETT:  I don't believe that's the case.

15               MR. BERMAN:  It was within the speed limit.

16               THE COURT:  What?

17               MR. BERMAN:  It was within the speed limit.

18               MR. BOUDETT:  I would have to follow up on that

19   one, your Honor.

20               MR. BERMAN:  We have an exhibit that shows that

21   from the trial.

22               THE COURT:  Let me put it this way:  Why don't you

23   make me a proffer as to what he would say in writing.  They

24   are very hot and bothered by the notion that the government

25   approved the mega spreads.  My sense is that to the extent

1     that he is going to testify about what he knew, it would be

2     relevant but only as it affected AstraZeneca.  That's why I

3     needed a proffer.  I don't know why, if he knew about some

4     other company's spread, why that would be so relevant.  I'm

5     not saying I'm not.  I was going to say here today, yes, if

6     he knew about the spreads, if he was told specifically about

7     the Zoladex spreads or about the battle going on, that might

8     be relevant to lack of intent to deceive.  I don't know that

9     I'll let you say that the government "approved" it unless you

10    say specifically he has letters or he said, "That's okay, go

11    ahead, guys, do the 600 percent spread."  I don't think you

12    have that, right?

13          MR. BOUDETT:  Not with regard to AstraZeneca

14    specifically, but can I make two quick points in response to

15    what you just said?  We will make the proffer, and I know

16    you're going to think about this issue more, but my two

17    points are these:  First of all, the approval issue that the

18    plaintiffs are trying to set up is a straw man, I would

19    suggest.  Our case is not that the government approved of

20    mega spreads, endorsed them, liked them.  Some people in the

21    government may have done so, others didn't, but that's not

22    our burden.  Our case is that the government knew of the

23    spreads and didn't change the system until 2003.  That's

24    different than approval, so --

25          THE COURT:  Let me just say, they for sure knew,

1    and I would allow it to come in, about spreads in the

2    30 percent range.

3              MR. BOUDETT:  We will prove well beyond the

4    30 percent, they knew and didn't change the system.

5              THE COURT:  But you can only put it in if it

6    affects Zoladex, or possibly, possibly Lupron, I mean,

7    because that's part of the same tale; but not if it's about

8    albuterol sulfate because that everyone knew, right?  Because

9    that was a multi-source and it was a different animal.  I

10   mean, I've been struggling with them one by one.  Each one

11   has a different story.  Each drug within the company has a

12   different story.  So you make the proffer, but I'm not saying

13   "no" in general.  And he's not going to say the government

14   approved it.  I think that would be wrong.  He's not here as

15   a spokesman for the government, and he's not been designated

16   as such.

17             MR. BOUDETT:  Correct.

18             THE COURT:  What he knew might be relevant but only

19   if it's about this company and these drugs.

20             MR. BOUDETT:  This is my second point.  It's very

21   brief, your Honor.  I would urge your Honor to wait to make

22   that ruling until you hear the plaintiffs' expert testimony

23   and rule on this during cross, and we can have a side bar on

24   this issue before cross --

25             THE COURT:  Okay.

1          MR. BOUDETT:  -- just because I submit to you that

2      the plaintiffs' expert's opinions talk about secrecy in

3      general regarding spreads as part of their whole economic

4      incentives model, and if the spreads were not secret -- I'm

5      talking about spreads in excess of 30 percent -- were not

6      secret, those opinions fall apart.  And we're entitled to

7      make that point, and I think you could rule on that during

8      cross.

9          THE COURT:  Well, sure, if they knew about the

10     spreads in Zoladex.  So, I mean, the OIG report strikes me as

11     relevant to rebut secrecy if in fact in 1992 -- but not every

12     OIG on every single drug.  I mean, this is going to be about

13     your company -- the battle you had with TAP and Lupron, I'm

14     not going to exclude that -- and what happened to you, what

15     you did.  For example, I think it's appropriate for them to

16     put in, if they published IMS data to show that they weren't

17     trying to keep it a secret, it rebuts your point that it was

18     all a big secret.  So it's about your company and what you

19     did.  And I don't think it's relevant what the third-party

20     payors necessarily knew and did.  It's really about what the

21     government knew.

22          MR. BOUDETT:  On that point, your Honor --

23          THE COURT:  Assuming, by the way, no beneficiaries

24     knew and --

25          MR. BOUDETT:  That's stipulated.  I mean, they

1    didn't know one way or the other.  That's understood.

2            Just on the third-party payors argument, your

3    Honor, I see where the Court is coming from.  The thing to

4    keep in mind is that many of these third-party payors were

5    also the Medicare carrier, like Blue Cross-Blue Shield of

6    Massachusetts, and were agents of Medicare and the CMS.

7            THE COURT:  That's a good point.  What about that,

8    the ones that were the carriers?

9            MR. BERMAN:  I don't think it's relevant.  Well,

10   first of all, if the secrecy part of the opinion, that the

11   company's tried to keep this stuff secret, is the linchpin to

12   get all this in, our experts won't say that.  We don't need

13   that.

14           THE COURT:  Well, okay, I'm just simply saying all

15   of this will be as it plays out, but that is what it would be

16   fair to rebut, because if you're going to say everything was

17   kept secret and that's how this fraud was allowed to -- I

18   mean, isn't that part of your case?

19           MR. BERMAN:  But don't they have to show to make

20   this relevant that that TPP would somehow be in communication

21   with the beneficiary?  Because you stated, your Honor -- and

22   this is where I'm going to for the first time today quarrel

23   with something you said, and I apologize in advance for doing

24   so -- but you said that the intent instruction that you're

25   going to issue is whether AstraZeneca intended to defraud the

1   government.  Well, the trial here is whether they intended to
2   defraud consumers who were also part of the scheme.
3         THE COURT:  All right, so that's a good push-back
4   point, so --
5         MR. BERMAN:  So if we start from that premise, that
6   the issue here is whether consumers were deceived and whether
7   they intended to deceive consumers, then the question is, how
8   does government knowledge play into this?
9         Let's take Mr. Weintraub, for example.
10  Mr. Weintraub is just one person at the government.  We know,
11  we've seen other documents in which the government says it's
12  supposed to be an average.  We know that you ruled --
13        THE COURT:  Well, wouldn't it be intent to deceive
14  both?  I'm thinking out loud through all these issues, so
15  this is why we're doing this because you were all off in 42
16  different states and boats and unfair practice.  So once I'm
17  focused on intent to deceive --
18        MR. BOUDETT:  Well, this goes to the heart of it,
19  your Honor.
20        THE COURT:  Yes, yes, but let him finish his
21  thought, and then I'll let you come back.
22        MR. BERMAN:  So we have Mr. Weintraub come up, and
23  you've already ruled what AWP is, what it was supposed to
24  mean, and I think the jury needs to be instructed on that,
25  okay?

1              THE COURT:  I will.

2              MR. BERMAN:  So once that instruction goes out,

3      then Mr. Weintraub's testimony, to me, is going to be

4      completely confusing to the jury.

5              THE COURT:  No, hold it.  But what I find Congress

6      meant is different from whether there's an intent to

7      deceive.  I keep coming back to my touchstone.  We can argue

8      about whether it's the government because they're getting

9      80 percent on that or the consumer because it's 20 percent.

10             MR. BERMAN:  But Mr. Weintraub can't -- if

11     AstraZeneca never told the government what they were doing,

12     and the government had general knowledge that maybe there was

13     some spread stuff going on but they didn't know who, how does

14     that have anything to do with AstraZeneca's intent?

15             THE COURT:  Well, it may not.

16             MR. BERMAN:  It doesn't.  Furthermore, that leads

17     to another point, and that is -- and we didn't do this in the

18     trial and we should have, but I think we must do it in this

19     trial -- while they're saying that they had no intent to

20     deceive the government and Mr. Weintraub is going to come and

21     testify about that, on the very same years -- and we're going

22     to introduce this testimony, so if you're going to let it in,

23     it's got to come in on our side -- the Department of Justice

24     is writing Mr. Fullerton, who's in the courtroom right here,

25     and Mr. Engelmann, the general counsel for AstraZeneca,

```
1    demanding to know whether they were engaging in the exact
2    practices that we're complaining about.  And we designated
3    these as trial exhibits, the correspondence.  And the
4    government is accusing AstraZeneca of AWP fraud and getting
5    in the exact formula that Mr. Hartman did.  So if this is
6    going to come in that they had no intent vis-a-vis people
7    like Weintraub, then we get to bring in the Department of
8    Justice saying, "We think you committed a crime."
9              THE COURT:  Maybe you get to do that anyway.
10             MR. BERMAN:  Maybe we get to do it anyway.
11             THE COURT:  I mean, it's all about the intent of
12   the corporation.  That's what this is focused on.
13             MR. BERMAN:  If they want to bring Weintraub in,
14   they want to bring this government evidence in, bring it in,
15   as long as we can bring in the government's response.
16             THE COURT:  You might be able to.
17             MR. SOBOL:  Because we have prepared the case as if
18   the case is to be tried on intent to deceive consumers.  And
19   if the case were limited to intent to deceive consumers, then
20   there wouldn't be -- I'm not saying you'd limit it that way,
21   but the witness list and everything is not intended right now
22   to be a debate as to what happened either, you know, at CMS
23   or at the DOJ or at the prosecuting states' attorneys general
24   over the past twelve years.  But if AstraZeneca is intending
25   that to be its defense -- i.e., that the government in some
```

1    way acquiesced, and implicitly therefore our conduct can't be

2    intent to deceive -- as Mr. Berman put out, we should be able

3    to squarely then point out what the government --

4            THE COURT:   -- I was thinking about intent to

5    deceive whom?  And the reality is that there are two

6    potential victims on this piece of it, which is the

7    government and the consumer.  Eighty percent of it goes to

8    the government, so you can't carve out what happened with the

9    government in understanding what the intent of the

10   corporation was, I mean, either what they thought the

11   government knew and approved or what -- I mean, I'm assuming

12   we'll hear from people from the company who will say they

13   thought it was okay.

14           MR. BOUDETT:  Absolutely, your Honor.

15           THE COURT:  And you want to be able to put in your

16   case, right?

17           MR. BOUDETT:  Yes, your Honor.

18           THE COURT:  I mean, it's your corporate state of

19   mind that's at issue here.

20           MR. BOUDETT:  Exactly, and the evidence will all be

21   tied to that state of mind, not to the outcome of dealings

22   with the government, but what was the company's state of mind

23   as to what the government knew and didn't know.

24           THE COURT:  So if you got notice from the

25   Department of Justice that the Department of Justice thought

```
 1    it was illegal, that must have been something.  I'm not

 2    saying you get to, by the way, interrogate the corporation

 3    counsel.  That's another issue altogether.  But that seems

 4    fair game for them to put in and fair game as to why you

 5    thought that they knew.

 6            MR. BOUDETT:  Your Honor, and Mr. Keating is ready

 7    to speak to this as well, but let me just touch on it.  The

 8    fact that there were investigations and requests for

 9    information may come in, depending on certain other

10    evidence.  I think you may need to rule on that during trial

11    and see how that comes in.  I don't think that's a ruling you

12    need to make pretrial.  Mr. Berman has used the words

13    "accused, found."  All that happened on the issue of spreads

14    is, there was an investigation.  There were subpoenas served

15    in 1997, that's correct.  And eventually there was a civil

16    settlement in which AstraZeneca denied liability, and that is

17    inadmissible.  That's what happened on spreads.

18            THE COURT:  Is that the one that was incorporated

19    into the plea agreement?

20            MR. KEATING:  Yes.

21            MR. BOUDETT:  They cross-reference each other, yes,

22    your Honor, but --

23            THE COURT:  That's a tough legal issue.

24            MR. BOUDETT:  No, the plea agreement was on the

25    sampling, and you know our position on that.  That's
```

1    completely separate.

2              THE COURT:  Well, let's get to that.  Why

3    wouldn't -- well, it's clearly admissible as an admission of

4    a party opponent, so now the question is whether or not it's

5    relevant.

6              MR. KEATING:  Well, I don't think it would be

7    admissible if it's -- you're talking about the plea itself

8    now?

9              THE COURT:  The plea itself.

10             MR. KEATING:  Well, I mean, it would seem to me

11   that, A, it involves incidents that are not the subject

12   matter of this particular case.  It involves strictly the

13   sampling.  There's nothing that I've heard from the

14   plaintiffs' side about their damage theory that involves some

15   assertion of damages based on sampling misconduct by

16   AstraZeneca.  It's clear it was not conduct that AstraZeneca

17   condoned.  That was clear from the plea agreement that --

18             THE COURT:  I'm just simply saying it's admissible,

19   right, admission of a party opponent?

20             MR. KEATING:  But not as a plea.

21             THE COURT:  Yes, it is.

22             MR. KEATING:  I would say -- well, I would say it

23   is not admissible certainly if it's not relevant, and I would

24   say my first point is, it's not relevant.  Secondly, as you

25   know that it's also our contention that the prejudice of

1    letting in a guilty plea in a case like this would overwhelm

2    any possible relevance that the issue --

3              THE COURT:  Well, why wouldn't it go to state of

4    mind?  In other words, not what TAP did and not what the

5    three doctors did.  I understand that.  And the civil piece

6    is a separate piece.

7              MR. KEATING:  I realize that.

8              THE COURT:  But why wouldn't it be a sort of

9    404(b), which is pattern, plan, motive, that kind of thing?

10             MR. KEATING:  Well, I think there's a risk that

11   they're trying to use it to demonstrate a prior misconduct is

12   evidence of the existence of misconduct in the case in chief,

13   so I think for that reason it's actually improper.

14             THE COURT:  Isn't it the state of mind to get the

15   return to practice out to the physicians?  I mean, it's not

16   so unrelated.

17             MR. KEATING:  Well, I think it would be a harder

18   case for me to argue if the conduct that the company pleaded

19   guilty to, which was essentially the sampling misconduct, or

20   however way you want to put it -- and we've submitted the

21   papers to you on the plea colloquy -- was the same conduct

22   that's at issue in this case.  This issue involves spread, it

23   involves the marketing the spread, it involves the alleged

24   fraud, if you will, of what the articulate AWP is.

25             In their experts' reports, their experts concede

1    that they are not relying on the sampling misconduct as any

2    element that gave rise to financial damages to their

3    clients.  Their experts say, "We have no idea how the

4    sampling might have impacted."  One late expert report they

5    submit, their expert, Mr. Hartman, I think says it's a guess,

6    it's a coin flip.

7          THE COURT:  But isn't this part of the

8    Lupron-Zoladex battle, the sampling piece, just to grab

9    market share?

10         MR. KEATING:  I mean, I think in the context of

11    what you could relate the conduct to, you could relate the

12    conduct to the battle that was going on on marketing; but you

13    have to, I think, your Honor, at least acknowledge that the

14    conduct by these salespeople was totally at odds with what

15    the company's directives to them were.

16         THE COURT:  That would be fair, but I'm just simply

17    saying, you all want to put in the whole battle.  They've

18    sought to exclude it.  I don't see how I exclude it.  It's

19    like directing a verdict.  That's their story.  That's why

20    they were doing it.  I'm not going to exclude the battle with

21    Lupron and TAP.  You might as well ask for summary judgment

22    on the point.  So that's part of it.  But if it is part of

23    it, why isn't sampling part of that battle?

24         MR. KEATING:  Because I think they must demonstrate

25    that the sampling activity that was the focus of the plea

1    agreement gave rise to the kind of damages and the cause of

2    action that they're asserting in this case.  They're

3    asserting here, frankly, that the AWP was not accurate

4    because it didn't reflect the deep discounts and other

5    things.

6            THE COURT:  And samples.

7            MR. KEATING:  But there's no evidence as to the

8    impact of the sampling.  All I can rely on is what their own

9    witnesses say.

10           THE COURT:  Well, they can't use that in damages,

11   right?

12           MR. BERMAN:  Yes, that's correct.

13           MR. KEATING:  And therefore if they're not used in

14   damages, it seems --

15           THE COURT:  It goes to the state of mind of the

16   corporation.  It's part of that battle.  All is fair in love

17   and war.  Why isn't it part of the battle?

18           MR. KEATING:  Well, what they did in the sampling

19   area, I mean, conceivably would be.  But to introduce a

20   guilty plea to a certain conduct that the company in the plea

21   agreement said never should have occurred, was not part of

22   what we asked our salespeople to do, would seem to me to be

23   so overwhelmingly, I would say, prejudicial to our case

24   here.  I mean, in their papers they say, well, I don't know,

25   why does the plaintiff -- the defendants assume that a guilty

1    plea is going to make any difference?

2           THE COURT:  Of course it's prejudicial, but it's

3    also probative of a corporate state of mind.

4           MR. KEATING:  Well, it seems to me that if it

5    involves conduct that the company itself did not permit and

6    was, as Mr. Engelmann said in his plea colloquy, that it was

7    not part of their articulated policy with salespeople, and

8    perhaps marketing the spread was in other respects,

9    discounting and whatever was, number one, it involved conduct

10   that is not the core issue that they're raising here, that

11   gives it to me extremely narrow relevance here.  And then if

12   you balance that against the impact -- I mean, I wouldn't say

13   it's summary judgment as you just mentioned to them, but it's

14   getting darn close to it.  As a practical matter, if this

15   jury hears that the company entered a guilty plea in a

16   Federal Court for conduct that these very able lawyers will

17   say is part of and closely related to the whole issue that's

18   before them, which is did this company intend to defraud

19   either the government or the consumers, I don't -- I mean, it

20   seems to me inconceivable that the jury could put that plea

21   in any reasonable context in weighing whether or not there

22   was an intent to defraud.  And that's really our --

23          THE COURT:  But I don't know how you can go into

24   the battle with Lupron and explain it and use that as an

25   excuse, if you will, like this is somehow legitimate

1    competition, which is essentially what I heard here.  I mean,

2    all the folks up here essentially justified it by saying,

3    "Well, what else did you expect us to do?"  Basically, "We

4    tried to do it the right way, and we were losing out to them,

5    and so now we had to get back to where they were to win the

6    market share."

7              MR. KEATING:  Your Honor, my understanding is, and

8    I'm not as conversant with these facts as you are, but my

9    understanding is that no part of our defense to this case, in

10   terms of competition with TAP and Lupron, is going to be a

11   suggestion that we told doctors that they could take these

12   free samples and bill Medicare for it.  That's no part of our

13   case.  Our case is:  We told them that they're entitled to

14   discounts.  We told them perhaps that they could recover more

15   through AWP, a substantial profit, and that profit might come

16   close to what they make by selling the more expensive drug

17   like Lupron.  But there will be no offer of evidence in this

18   case from us that sampling was a technique that we used with

19   these doctors and told them that they should bill for free

20   samples as a way of competing with Lupron.  And that's why I

21   think it's not relevant, plus that's really, frankly, no part

22   of the damages that they're going to introduce in this case.

23             THE COURT:  Well, that's right, just because they

24   can't come up with a number.  They flipped a coin, was that

25   what Mr. Hartman said?

1              MR. KEATING:  Yes.

2              THE COURT:  Let me ask you this.  On the civil

3    side, I was torn about the civil piece of it because

4    generally civil settlements are not admissible.  And I know

5    you had the interesting comeback, "But this was incorporated

6    into the plea agreement."

7              MR. BERMAN:  Correct, and it's admissible we think

8    in this context for intent.

9              THE COURT:  But when did it -- that's like your

10   situation with the OIG Guidelines.  When was this plea?

11             MR. BERMAN:  The plea was in --

12             MS. HARRIS:  June of 2003, your Honor.

13             MR. BERMAN:  June of 2003.

14             THE COURT:  So that's the issue with the OIG

15   Guidelines, it was basically when it was all over, so --

16             MR. BERMAN:  But the OIG made it clear that they

17   weren't imposing what they felt was any new obligation.

18             THE COURT:  I'd have to hear -- I don't want you

19   mentioning that in the opening.  That would have to be purely

20   in terms of possible refutation if there's an argument that

21   the government approved this.

22             MR. BERMAN:  But getting to his point --

23             THE COURT:  But I'm just sort of --

24             MR. BERMAN:  Start with the plea agreement, okay?

25   And it seems to us that this is kind of critical because if

1    you go back to the original trial, what they got up and said

2    was, "Look, we tried to be the good guy.  We tried to have a

3    lower-cost drug, and we found out we were competing against

4    TAP."  So what did they do?  They engaged in a scheme to

5    return money to doctors, to give them a profit to induce them

6    to use Zoladex.  That scheme had two forms.  One was

7    sampling.  Although they get up here and say it wasn't part,

8    the corporate officer admitted at Paragraph 6 of Exhibit Q to

9    the information attached to their papers that there were

10   thousands of free samples across the country, that their

11   purpose was to induce use of Zoladex and to increase the

12   income to doctors.  Those are his words, that's our scheme.

13             Now, if they're going to get up here and say, "We

14   were the good guy, we always intended to do right by the

15   federal government," when they hatched the scheme way back

16   when, it's admissible to motive, intent, and a common plan.

17             THE COURT:  All right, let me ask you this:  How do

18   you get in the settlement agreement?  You sort of threw in a

19   paragraph about Federal Rule of Evidence 408.

20             MR. BERMAN:  Well, the settlement agreement, again,

21   it was attached to the plea.  The plea is an admission, and I

22   think we get it in that way.

23             THE COURT:  I don't have to do all or nothing,

24   though, right?

25             MR. BERMAN:  No, you don't have to do all or

1  nothing.

2          THE COURT:   I mean, I worry about throwing those

3  kinds of numbers before a jury for starters.

4          MR. BERMAN:   Well, again, I think, you know, in the

5  context of where you have a company that's going to bring in

6  a Mr. Weintraub and say, "We never intended to defraud, we

7  didn't do anything wrong, and the government said it was

8  okay," or they're going to introduce these government reports

9  to try to argue it was okay, and they turn around and are

10  charged by the government, and they plead, they enter into a

11  settlement that incorporates those very charges, that's

12  relevant to offset what they're saying about the government

13  and its approval.

14          THE COURT:   Well, what if I exclude Weintraub?   The

15  only reason I say it, Weintraub may have nothing to say about

16  AstraZeneca or Zoladex.   That's what it sounds like here.   I

17  mean, he doesn't know anything specific to the company.   He

18  never spoke directly to the company.

19          MR. BERMAN:   I certainly have my cross planned

20  based on that because he doesn't have anything relevant to

21  say about Zoladex.

22          THE COURT:   Then what's there to rebut?   If they

23  don't put in an argument of approval or government

24  knowledge --

25          MR. BERMAN:   Well, they're going to.   They have

1    Mr. Milbauer get up and say, you know, "I talked to people at

2    the government, and they said this was A-OK with them."  To

3    the extent that they keep introducing this, "The government

4    knew what we were doing, the government blessed it --"

5              THE COURT:  Is Milbauer going to say that, do you

6    know?

7              MR. BOUDETT:  He's going to say the government knew

8    about this and didn't change the system until 2003, which is

9    when these events happened.  So he's saying that we get to

10   rebut with what the government did to them when they found

11   out.  Well, that's at the end of the day when the policy

12   changed.

13             MR. BERMAN:  It's not at the end of the day.  1998

14   was the first --

15             THE COURT:  All right, I hear the debate.  Let's go

16   through some of the other ones.  Were you planning on putting

17   in anything about other companies?

18             MR. BERMAN:  Yes.

19             THE COURT:  Why?  Why is that relevant?

20             MR. BERMAN:  Well, Dr. Bell got up at the last

21   trial and said, "Hey, marketing the spread, A-OK," in his

22   opinion.  It's relevant to his credibility that two other

23   companies have a practice saying you can't do it, it's wrong.

24             THE COURT:  I will exclude it unless it comes up in

25   some sort of rebuttal form, any other company, except TAP.

1    That's part of this battle.

2           MS. HARRIS:  Well, your Honor, if I could just

3    speak to that for one moment.  As we clearly discussed here

4    today, the issue for this trial is AstraZeneca's intent, not

5    TAP's intent and not TAP's conduct.  And while what

6    AstraZeneca believed and reacted to the competition from TAP

7    is relevant to AstraZeneca's conduct, what TAP thought and

8    how TAP reacted to AstraZeneca's competition is completely

9    irrelevant to any judgment by the jury as to what

10   AstraZeneca's intent was.

11          THE COURT:  For sure, it has to come in admissibly,

12   and I know there's a debate about whether that other

13   deposition qualifies as an unavailable witness with adequate

14   cross-examination, and I haven't read it yet, and I'm going

15   to have to worry about that.  But if you put in the battle

16   with TAP, as long as it's otherwise admissible, it's relevant

17   to your theory.

18          MS. HARRIS:  Well, but, your Honor, we're talking

19   about documents that were in TAP's files and were produced by

20   TAP that we don't even have copies of at this point.  We have

21   never been provided copies of those --

22          THE COURT:  Let me just put it this way:  In

23   general, other companies shouldn't come in other than TAP

24   because TAP is part of your defense that there was this

25   battle, and you actually had to do what you had to do because

1   of competition.  If it's not admissible because it's not

2   authentic or to somehow --

3          MS. HARRIS:  Well, there are numerous hearsay

4   objections, authenticity objections.

5          THE COURT:  Well, are you saying there are specific

6   documents that you say are not your documents so they

7   shouldn't be treated as admissions?  Is that it?

8          MS. HARRIS:  Well, your Honor, there are over a

9   hundred documents on plaintiffs' exhibit list that are TAP

10  documents, produced by TAP, generated by TAP.  I have no idea

11  whether they're even TAP business records because I've never

12  seen these documents.

13         THE COURT:  So they don't come in unless there's a

14  basis for authenticating them.  So how do you authenticate

15  them?

16         MS. HARRIS:  And for establishing a hearsay

17  exception.

18         THE COURT:  Right.

19         MR. KEATING:  But why against AstraZeneca?

20         MS. HARRIS:  Exactly, your Honor.

21         THE COURT:  If it's about -- you're putting in the

22  battle, right?

23         MS. HARRIS:  Yes, but we're putting in the

24  competition, the dynamic between AstraZeneca and TAP because

25  it's relevant to what AstraZeneca intended to do and how

```
 1    AstraZeneca priced its product.  But what TAP --

 2              THE COURT:  But if AstraZeneca sends TAP

 3    something --

 4              MS. HARRIS:  No, but we're talking about way beyond

 5    that.  We're not talking about --

 6              THE COURT:  You know what this is highlighting for

 7    me?  Unless I see the documents and the specifics, I'm not

 8    going to be able to do it.

 9              MS. HARRIS:  And I agree, your Honor.  We'd like to

10    see the documents as well because we've never seen them.

11              THE COURT:  Well, I assume --

12              MS. HARRIS:  No.  There are TAP documents on their

13    exhibit list which have never been provided to us.

14              THE COURT:  So you'll give them the specific

15    documents, and let's hear how you get it in through the

16    hearsay rule.

17              MR. HAVILAND:  Judge, I'll address that.  It's a

18    real simple issue.  TAP has claimed confidentiality, and

19    we've said, well, they're covered by various confidentiality

20    provisions which they should get if they're a defendant in

21    the case, so --

22              THE COURT:  Boy, I don't want to hear about this

23    now.  This trial is in a month.  Give it to them.

24              MR. HAVILAND:  Well, they're in the case, Judge, so

25    we're happy to turn them over, provided we don't hear from
```

 1  the TAP counsel that there's some violation by doing that.

 2          THE COURT:  I am ordering you to produce the

 3  documents subject to whatever protective order.  An

 4  overinclusive protective order has been signed somewhere,

 5  okay?  So then you can object specific document by document.

 6          MS. HARRIS:  Thank you, your Honor.

 7          THE COURT:  And maybe we can understand, is this

 8  one of your documents that made their way into TAP files, is

 9  it a letter from you, or is it just a separate internal

10  document to TAP, which is hearsay?

11          MS. HARRIS:  Exactly, your Honor.

12          THE COURT:  I don't know.

13          MS. HARRIS:  The same would go for the transcripts

14  of these depositions, your Honor, which we also don't have

15  any access to.  They weren't taken in litigations where we

16  were a defendant.

17          THE COURT:  Well, there's one where they said that

18  you did get notice and were invited to attend.

19          MS. HARRIS:  No, your Honor.  These depositions

20  were all taken in the context of Lupron-specific litigation.

21  TAP decided to cross-notice those depositions in the Swanson

22  case in Arizona because they were also a defendant in that

23  case.  At the time that that occurred, you had issued a stay

24  of any discovery in Swanson because you were considering the

25  remand motion at that period of time, and so we did not feel

1    that it was appropriate for that deposition to take place

2    with respect to any other defendant or any other drug other

3    than TAP or Lupron at the time.  So we made Mr. Haviland

4    aware of that objection that the stay was in place based on

5    your order in this courtroom, and he --

6              THE COURT:  So you might not be able to get that

7    in.

8              MR. HAVILAND:  Well, here's the problem, Judge.

9    Mr. Durand was the whistleblower against both companies, TAP

10   and AstraZeneca.  He was the pinnacle for why the government

11   prosecuted those companies.

12             THE COURT:  So bring him in.

13             MR. HAVILAND:  So we took the deposition, duly

14   noticed all counsel to attend --

15             THE COURT:  Bring him here.  He's a whistleblower.

16   They love to litigate.  Just bring him in as a witness.

17             MR. HAVILAND:  We'd love to.  I'm told that he's

18   difficult to get because he's in Florida.

19             THE COURT:  He's in all those states.  So bring him

20   in.  It sounds like they didn't have an opportunity to

21   cross-examine.  Okay?  If you want him, you've got to

22   supplement your witness list.

23             So where are we up to now?  We're up to Weintraub.

24   Why is knowledge of the third-party payors relevant, unless

25   they're Medicare carriers?

1          MR. BOUDETT:  Well, okay, my first argument is the

2    Medicare carrier issue, which includes Blue Cross-Blue Shield

3    of Massachusetts along with numerous other entities, but

4    overall, your Honor, it goes to rebut the secrecy point.  And

5    I think it does depend on what plaintiffs' experts say, both

6    on direct and on cross, because we will cross them with their

7    prior reports in which they said this whole thing was a

8    secret and unknown.

9          THE COURT:  Well, you can set it.  Just bring him

10   in.  So I'll wait on that.  But in general, under Rule 403, I

11   think it brings us pretty far afield to get into separate

12   contracts with third-party payors or anything like that.

13         MR. BOUDETT:  Carving out Medicare carriers, your

14   Honor?

15         THE COURT:  I don't know.  It's the first time I

16   thought of that, so maybe it's in here somewhere, but I

17   haven't thought about that --

18         MR. BOUDETT:  It's in our papers.

19         THE COURT:  Okay.  All right, Weintraub, you're

20   going to give me a proffer.  I'm not going to exclude meeting

21   competition defense.

22         Efficacy of Zoladex, I think you're entitled to do

23   something about what the drug is and how it's administered

24   and why you were competing with Lupron, but you've only got a

25   week.  I mean, I don't think we need to see like one of those

1    ads on TV, somebody dancing through a meadow.

2          MR. KEATING:  I think it's really going to be

3    offered in a brief way to give some context to what the case

4    is all about.

5          THE COURT:  Fine, that's fine, just like I'm going

6    to let plaintiffs put on whoever they want as members of

7    their class.  This is a trial.  You can paint your client a

8    little bit in sympathetic ways as long as it's not

9    overboard.

10          Similarly, if it goes to state of mind of

11   AstraZeneca, the fact that you disclosed certain things to

12   the IMS data seems relevant.  AMP, I'm not sure.  I'm not

13   sure.  That's the stuff that's done for Medicaid under seal?

14          MR. BOUDETT:  Your Honor, our point there, and this

15   is in the papers --

16          THE COURT:  That maybe under 403 more confusing

17   than it is helpful because they're not allowed to share

18   across entities, as I understand it.

19          MR. BOUDETT:  They actually are and they do, and

20   what we have are government reports in which the government

21   is looking at overpayments in the Medicare system and saying,

22   "How do we know how much we're overpaying?  Well, we're

23   comparing it to AMP and Medicaid, and look at the delta, and

24   this is how much money could be saved."  So they do use it

25   explicitly for cross-comparison, and that goes directly to

1    the company's state of mind.

2            THE COURT:  I don't have strong feelings about that

3    if you have a good-faith basis for saying there actually was

4    some sharing.  I heard some evidence to the contrary, so --

5            MR. BOUDETT:  What you're referring to, your Honor,

6    is the statute saying it's to be confidential and not used

7    outside Medicaid.  You're recalling that, and that's true on

8    the one hand, and it's meant to protect the manufacturer

9    primarily from disclosure of sensitive price data.  But when

10   the government wants to use it to understand what's going on

11   in the reimbursement world --

12           THE COURT:  Do you have an expert that will say

13   this?

14           MR. BOUDETT:  Yes, your Honor.  We'll have a report

15   in which they explicitly compare them.

16           MR. MATT:  Mr. Scully testified, your Honor, that

17   they didn't have access, that Medicare couldn't have access

18   to what Medicaid had because that's the way the law was set

19   up.  The law was changed.

20           THE COURT:  When?

21           MR. MATT:  The law was changed with the MMA.

22           THE COURT:  Oh, with the MMA.

23           MR. MATT:  Yes.  So access to that data legally and

24   formally is a late development.

25           MR. BOUDETT:  Your Honor, that's not true, and the

1    comparisons I'm talking about predate the MMA.

2              THE COURT:  Is this something that the industry

3    knew at the time so it would be relevant to what their state

4    of mind was?

5              MR. BOUDETT:  Yes, and it's published, your Honor,

6    exactly.  And Mr. Milbauer and others are going to tie that,

7    that they monitor what's going on with these reports, so,

8    yes.

9              THE COURT:  Maybe.  It's not a big point.

10             Now, going to the plaintiffs' -- did I miss any of

11   yours?  I'm going to --

12             MR. BERMAN:  You missed so far the MAP program.

13   Remember AstraZeneca spent a lot of time trying to show that

14   they --

15             THE COURT:  Yes, MAP and PAP?

16             MR. BERMAN:  MAP and PAP.  Again --

17             THE COURT:  I don't know how relevant that is.

18             MR. BERMAN:  It's marginal relevance.  This is a

19   case about what the consumers knew, and they have made no

20   showing that they intended when they went out and pitched MAP

21   to get to the consumers.

22             THE COURT:  The only reason the Patient Assistance

23   Program might come in is if there's any issue with respect to

24   damages.

25             MR. BOUDETT:  Willfulness, your Honor.

1              THE COURT:  Excuse me?

2              MR. BOUDETT:  Willfulness, among other things.

3              THE COURT:  Well, all right, that's a good point,

4     willfulness.  I'm glad you just raised that because I'd

5     forgotten to mention that.  So are any of these jurisdictions

6     ones that only a jury can double or treble, or is it all left

7     to a judge?

8              MR. BOUDETT:  No, your Honor.  In some of them it's

9     a jury issue, in some of them it's mandated a court issue,

10    and in some of them it's advisory, it's a mix.

11             THE COURT:  So I'm really glad you brought that

12    up.  So when we talk about what I have to send to the jury

13    now is fraud, fraudulent concealment, and possibly

14    willfulness?

15             MR. BOUDETT:  Yes, your Honor.

16             MR. MATT:  And damages.

17             THE COURT:  And damages.  So what do I do with

18    willfulness?  Should that be a bifurcated part two, as we

19    sometimes do like in patent trials or something like that?

20    What do you think?

21             MR. BOUDETT:  Your Honor, first of all, I'm saying

22    willfulness as a concept.  That is a many splendid thing.

23    There are states which require that to be proven by clear and

24    convincing evidence.  There are ones in which it's words

25    other than "willfulness."

1          THE COURT:  But it's a jury issue.  I mean, as a

2     judge, I could --

3          MR. BOUDETT:  In some of the states, yes.

4          THE COURT:  So when I ask the jury this, I'm going

5     to have to say, "Do you find by clear and convincing evidence

6     willfulness?"

7          MR. BOUDETT:  Under some states.

8          THE COURT:  And some we do preponderance,

9     willfulness, and that's where you say that the PAP and MAP

10    and all that kind of stuff come in?

11         MR. BOUDETT:  Yes, your Honor, among other reasons.

12         THE COURT:  So I'm really glad you raised that.

13    Should I be doing that as a bifurcated part two?

14         MR. BERMAN:  I think it should all go to the same

15    jury.

16         THE COURT:  It will be the same jury, of course,

17    but part two.  I mean, in other words, not put in --

18         MR. BOUDETT:  Certainly, your Honor, to the extent

19    the plaintiffs may try and put evidence of AstraZeneca's

20    overall wealth and profitability, if that --

21         THE COURT:  Well, we're not putting in

22    AstraZeneca's overall wealth and profitability.  That would

23    be inflammatory.  But I think with respect to the drug

24    Zoladex, it's relevant.

25         MR. BERMAN:  Well, certainly if they're going to be

1      able to do the PAP, the good corporate citizen stuff.  But I

2      do want to argue about the PAP issue.  Just because they

3      assisted some people, what relevance does that have on their

4      intent to deceive the rest?

5           THE COURT:  Well, it may not.  I'm just saying

6      that's why it would be part two.  In other words, if you're

7      thinking -- well, let me ask you, do you want double and

8      treble damages?

9           MR. BERMAN:  Of course.

10          THE COURT:  Of course.  So the question really is,

11     how do I do that?  It's a really good point that you've

12     raised.  And what I've done before in issues, whether it's in

13     1983 cases or sometimes patent willfulness cases or whatever,

14     you have the jury come back with a basic liability finding.

15     Then you do just a little bit of an additional trial, like

16     maybe a day or something, and you put in the extra stuff that

17     may not be relevant to intent to deceive, like you say, but

18     may be relevant to whether you want to double or treble.

19          MR. SOBOL:  But because the case is being tried on

20     an intent to deceive basis, it's hard, at least as I'm

21     standing here right now, to think of any additional evidence

22     at least that the plaintiffs would put forward on the issue

23     of willfulness that we would have held back on the intent to

24     defraud.

25          THE COURT:  It's a send-a-message kind of thing.

1    Aren't you going to want -- maybe you won't.

2          MR. SOBOL:  Well, in terms of the quantity, whether

3    to double or to treble, or to put a punitive damage award

4    that's not tethered to doubling or trebling but just tied to,

5    for instance, profits from Zoladex, we do intend to put that

6    information in there.  But even that information goes to the

7    intent to defraud.  How much money they could make from

8    Zoladex is relevant there too.

9          THE COURT:  It may.  I'm simply saying think about

10   it, I mean, whether or not I should do -- if there is

11   willfulness, one way to do it is to waive the jury claim on

12   it, and one way to do it is, if the jury can't do it, there's

13   a Part B stage, and one way to do it would be to blend it all

14   into one big trial.

15         MR. BOUDETT:  Your Honor, that's all correct, and

16   we should think about that and get back to you.  I just want

17   to raise, we don't agree that the Patient Assistance Program

18   only comes in on willfulness.  I was merely agreeing that

19   that's an obvious case in which it comes in.  We expect them

20   to argue that the company put profits ahead of patients.

21         THE COURT:  I don't think it's relevant to intent

22   to deceive on AWP.  I think it's quite relevant as to whether

23   or not you want to double or treble.

24         MR. BOUDETT:  It's also relevant, your Honor, to

25   damages, to the extent there were people not paying for

1    Zoladex because the company --

2          THE COURT:  Well, you may want to ask that needs to

3    be backed out of any -- to the extent any patient was

4    reimbursed through the program, you could ask the expert,

5    were those damages backed out?  That may be.

6          MR. BOUDETT:  On cross, for instance, yes.  And the

7    MAP program, your Honor --

8          THE COURT:  And what about MAP?  Why is that --

9          MR. BOUDETT:  That goes directly to intent, your

10    Honor.  If we're out there showing the spreads around to

11    payors who act on the interest of the consumer beneficiaries,

12    that goes to our intent.  It also goes to --

13          THE COURT:  The concern I run into there is, it's

14    not the government.  Did you ever offer that to the

15    government?

16          MR. BOUDETT:  Yes, your Honor, and only it was

17    called LCA.

18          THE COURT:  Well, then maybe that's what you

19    could --

20          MR. BOUDETT:  Well, the LCA I think clearly is

21    admissible.

22          THE COURT:  LCA again is?

23          MR. BOUDETT:  Least costly alternative, yes,

24    starting with South Carolina and then going to other states.

25          THE COURT:  That might be what is relevant.

1          MR. BOUDETT:  I think that certainly comes in, but

2    I think the MAP program also goes directly to intent, your

3    Honor, to the extent this is a secrecy-shrouded fraud.

4          THE COURT:  Well, I'll think about that.  So what

5    else?  Is there anything else that I've missed?

6          MR. BERMAN:  I don't see anything, your Honor.

7          THE COURT:  Have you all issued voir dire

8    questions?  Oh, that new thing that came in about corporation

9    counsel.  Were you planning on calling him?

10          MR. BERMAN:  Yes.

11          THE COURT:  On what?

12          MR. BERMAN:  Well, because he's the one most

13    knowledgeable about the letters that were sent from DOJ to

14    the company asking, are you committing AWP fraud?

15          THE COURT:  Well, what are you going to ask that

16    isn't privileged?

17          MR. BERMAN:  The letters are not privileged.  A

18    letter from DOJ to counsel?

19          THE COURT:  So admit them.

20          MR. BERMAN:  Through who?  He's the witness with

21    knowledge of the subject.  They're going to call these

22    salespeople and the VP, probably has no idea about the

23    documents.  But I can call him and say, "Did you get this

24    letter?"  The letter will be admissible, and the jury can see

25    the letter.

1          THE COURT:  If all you're going to ask is three

2     questions, I'll let you do it, but that's it.

3          MR. BERMAN:  Well, I've got to get these in.

4     They're critical documents.

5          THE COURT:  Maybe they'll stipulate.  Do they come

6     in?

7          MR. KEATING:  Well, I'd like to see what Mr. Berman

8     is talking about.

9          THE COURT:  Sure.

10         MR. KEATING:  I mean --

11         MR. BERMAN:  They're listed in the exhibit list.

12         THE COURT:  I know, but there are like a billion

13    exhibits.  So just show him what you're talking about.  Maybe

14    they can stipulate that they were sent to the company and

15    sent general counsel, and then the knowledge is imputed to

16    the company.

17         MR. BERMAN:  Well, no, I think I can then ask

18    him --

19         THE COURT:  Aha.

20         MR. BERMAN:  No, hold on.  It's not privileged.  If

21    he got a letter from the government, and their position is

22    that the government approved or they told the government

23    everything, I can ask him, "Sir, did you tell the Department

24    of Justice after you got this letter about return to

25    marketing practice?"  And I bet you the answer will be "No."

1    We can ask him now.

2              MR. KEATING:  Well, I'm going to object to it at

3    the trial, and I'm going to object to it now.  It doesn't

4    seem to me it's an appropriate question.  He's the general

5    counsel of the company.

6              MR. BERMAN:  He's the conduit, one of the conduits

7    with the government that they're now claiming knew

8    everything.

9              THE COURT:  Was it a criminal investigation?

10             MR. BERMAN:  It was a criminal and civil.

11             THE COURT:  "You have the right to remain silent.

12   Anything you say can and will be used against you."  I don't

13   know.  But you see the documents.  It strikes me that it is

14   relevant to state of mind if the Justice Department was

15   pursuing something, whether they knew that there was

16   something wrong about it.  It's a red flag anyway.  I don't

17   know whether, "Did you tell the Justice --"  I mean, I don't

18   know, that's part of -- "Were you cooperating with a criminal

19   investigation?" that's just a little iffy.  Was it a target

20   letter?  What was it?

21             MR. BERMAN:  No, it was not a target letter.  It

22   was a letter they were seeking information.  I have to go

23   back to whether it's criminal or civil, but they were seeking

24   to find out what this company was doing back in 1998 with

25   respect to AWP, and they sought information over a course of

1    years, and this gentleman was involved in that discourse with

2    the government.  That's not privileged.

3              THE COURT:  Well, it may not be privileged, but you

4    need to play it out for me.

5              MR. SOBOL:  It's interesting, though, your Honor.

6    I mean, in part, AstraZeneca's defense is, "We thought it was

7    legal."

8              THE COURT:  Well, that's why the letters may come

9    in, but what he did --

10             MR. SOBOL:  Right, and what I'm saying is, if

11   that's a part of the defense, or at least a reasonable

12   interpretation of the defense, it lends itself to a waiver

13   of -- in part, it's implicitly relying upon the advice of

14   counsel, and it's opening that issue up.  Well, it is in

15   part.  You know, if --

16             THE COURT:  Wait, wait, wait.  Has there been a

17   statement of reliance on advice of counsel?

18             MR. SOBOL:  No, no, no, there hasn't been.  All I'm

19   saying is, it suggests, depending upon the way that

20   AstraZeneca's defense unfolds itself, in part their

21   interpretation is, from here and there and whatever, "We

22   thought that our conduct was legal."  And if it turns out

23   that they say that, then they implicitly are opening up the

24   door to what it is that their lawyers were telling them at

25   the time.  I would suggest it would.

1        THE COURT:  You do a proffer on what you'd would

2   want to ask him.  I do think the letters are probably

3   admissible unless -- I don't know how inflammatory they are.

4   Let Mr. Keating take a look at them.  Tell me what you want

5   to say, and then I'll worry about it.

6        You're going to all submit jury voir dire

7   questions?

8        MR. KEATING:  We would like to.

9        THE COURT:  How many jurors do you want in terms

10  of -- you know, in a typical jury trial, you only need to do

11  eight here in civil, so --

12       MR. KEATING:  I would probably be inclined to

13  suggest you impanel a couple extra.

14       THE COURT:  Maybe ten?  You have to do six plus two

15  alternates.  Maybe I'd do ten because it's a longer trial.

16  And there will be four or five peremptories apiece, so --

17       MR. KEATING:  Actually, this goes to, just as an

18  inquiry, to the voir dire questions.  Would you entertain any

19  questions that would be presented to the jury in a written

20  form not in open court?  And the reason I raise it is not for

21  one of these vast jury questionnaires about what newspapers

22  do they read and what organizations they're involved with,

23  but maybe pertaining to cancer or prostate cancer or other

24  issues that might have a sensitivity that they'd be reluctant

25  to raise their hand in the back of the room.

1          THE COURT:  Right, and particularly given the kind

2     of cancer, it might be embarrassing to people to say they

3     have prostate cancer.  I have done written questionnaires

4     but, like, one page.

5          MR. KEATING:  Well, that's what I'm thinking about,

6     not an extended one but one that might hit that particular

7     issue, the one that occurs to me now that might be sensitive

8     enough so that a juror might be reluctant to say publicly

9     they have prostate cancer or they had it or their spouse did,

10    or whatever.

11         THE COURT:  Yes, maybe something like that.  And

12    certainly I thought I would ask questions about, do you have

13    any views against class actions, or do you have any views

14    against pharmaceutical companies --

15         MR. KEATING:  That's a good question.

16         THE COURT:  -- that would interfere with your

17    ability to be fair and impartial?  I mean, I think I need to

18    ask both ends of that question.  One thought that occurred to

19    me was, anybody who did take either of these drugs probably

20    shouldn't be on the jury because they'd probably be members

21    of the class, at least with respect to Zoladex.  And if it

22    was Lupron, hearing about it may be a problem.  What do you

23    think about that?  I'm thinking out loud.

24         MR. BERMAN:  We think class members should sit in

25    the jury, always.

1          THE COURT:  The class members are out, but what

2   about people who took Lupron?  I'm thinking it may be a

3   little too close for comfort.

4          MR. KEATING:  I think it's too close for comfort,

5   and I think, truthfully, you don't know and no one could

6   predict how someone in that situation would react.

7          MR. BERMAN:  We agree.

8          THE COURT:  Another issue is -- of course, I'm

9   chugging along working on the mega treatise -- I will not

10  come out with an opinion before the trial, so people should

11  rest assured on that, that I won't do it.  Not that anyone's

12  been covering it.  I think it's too complicated for anyone

13  other than the industry perhaps, but whichever way I came

14  out, I wouldn't want any kind of publicity to affect the jury

15  pool.  It would have been impossible if it had been done next

16  month, and the following month would have been in the range

17  of possibility, but I'm not going to do it.

18          So let me just go off the record for a minute.

19          MR. KEATING:  Can I just stay on the record for

20  one --

21          THE COURT:  Yes.

22          MR. KEATING:  I don't mean to interrupt you, your

23  Honor.

24          THE COURT:  No, go ahead.

25          MR. KEATING:  But this is really just a procedural

1   point that I want to raise.  It's not to reargue anything

2   that Mr. Berman has suggested, but I want to be clear on the

3   record.  Because we had this dialogue earlier this afternoon

4   in terms of what you're going to instruct on and intent to

5   defraud and whatever, that I want to be clear that it is our

6   position in this case -- and certainly we said it two or

7   three times in the submissions to you -- that this is not a

8   claim brought under any generalized state fraud claim by the

9   plaintiffs.  And we actually think the appropriate way and

10  the only legally appropriate way to instruct the jury in this

11  case is under the 40 or how many statutes are left, consumer

12  protection laws precisely.  In other words, that's why we

13  submitted to you that stack of consumer protection laws.  I

14  recognize it was very lengthy and could probably be cut back,

15  but we do not accept, and therefore I have to put this on the

16  record, the notion that you can amalgamate an intent to

17  defraud instruction that covers the 42 states that may be

18  involved in this case.

19         THE COURT:  Well, the plaintiffs long ago -- maybe

20  they didn't want to remember it -- had basically conceded

21  that in order to get a national class action, they would

22  limit themselves to deception.  And so I threw the challenge

23  back to all of you, which is, if there's any state in which

24  deception is not an unfair or deceptive trade practice,

25  you've got to let me know.  You came back and said, well,

1    there's certain states where it carves off certain kinds of

2    transactions, which we all agreed then could be done as a

3    matter of law.  So unless you can find me a case that said

4    fraud doesn't violate some consumer protection law acts and

5    sort of as a general matter, in which case I just knock out

6    that state.

7              MR. KEATING:  You said that, and I'm not quarreling

8    with that, and I'm not quarreling with the fact that the

9    plaintiff on several occasions in your class certification

10   said that this was an intent to deceive case, not an

11   unfairness case or unconscionable conduct case.  That's not

12   what I'm raising.  I'm not really trying to reargue anything

13   here.

14             THE COURT:  You just want to preserve it.

15             MR. KEATING:  I want to preserve our point that the

16   only way this case could ever be tried appropriately as a

17   class action, if it ever could -- and we have some question

18   about that -- is if you were to instruct on each of the state

19   consumer protection law statutes.

20             THE COURT:  Okay, fair enough.  All right, so right

21   now you've flagged four things I need to send to this jury,

22   but you may think of others because I sort of surprised

23   everyone a little bit here.  It's the intent to deceive, the

24   basic fraud claim; B, fraudulent concealment.  I think that

25   only comes up under some statutes, and that's why, if you've

1   waived secrecy, that's a problem for you.  Three is damages

2   state by state; I've been persuaded that I've got to do it

3   that way.  And fourth is if there's a willfulness claim, and

4   you'd better look at that, how I do it.  If there's something

5   else that needs to go to the jury under all these myriad of

6   statutes, you need to let me know if there's something else

7   that really is going to be a fact question for them.  And I

8   don't mean to exclude causation or reliance or all that, but

9   I pick that up in the elements of a fraud claim.

10      MR. KEATING:  Is it your intention when we -- let's

11  assume we're going forward on the 4th, just for purposes of

12  argument.  Is it your intention that sometime in advance of

13  the 4th, between today and that date, we'll see you again, or

14  is it likely that the next time we see you we'll be

15  impaneling a jury?

16      THE COURT:  Well, it's a good question.

17      MR. KEATING:  I just didn't know whether some of

18  these items we're talking about today --

19      THE COURT:  I'll try and rule in the margins.  I'm

20  sure I won't be writing opinions.  I'll try and write in the

21  margins.  And if not, if something comes up and you think you

22  need to see me again, just ask me.

23      Let me ask you this:  There's a whole little rain

24  dance that I don't completely understand involving

25  plaintiffs' counsel.  Do I need to resolve that?  Yes, this

1    is on the record.  There's, like, a little not too nasty but

2    definitely not in agreement issue on the Lawyers Committee

3    and who's on it and who's cochair and all that kind of stuff.

4            MR. HAVILAND:  Judge, and we filed the motion

5    simply to try to clarify some things that have been

6    outstanding since we came into the case a year and a half

7    ago, and I was surprised by the opposition.  We're trying to

8    have it clarified, so going forward for the clients --

9            THE COURT:  Why does it matter?

10            MR. HAVILAND:  It just matters for purposes of

11    being able to be involved in the discussions about the case,

12    the trial management, the settlement, those types of things,

13    because right now there's not cohesion in terms of some of

14    those issues, and so we need to have --

15            THE COURT:  So does this make sense for me to do

16    just with you all, as opposed to not having defense here?

17            MR. HAVILAND:  I think so, Judge.  Since there

18    hasn't been an opposition filed by the defendant, I think

19    that's appropriate, Judge.

20            THE COURT:  Do you feel the need to be part of

21    this, anybody?  No.  All right, so at some point -- are you

22    coming in to see me soon on anything?  I don't want to bring

23    Mr. Berman back here.

24            MR. BERMAN:  I'm back here on First Databank on

25    May 22.

```
 1            THE COURT:  Do you want to just discuss it then?
 2   Mr. Haviland, I forget, where are you from?
 3            MR. HAVILAND:  Philadelphia, Judge.
 4            THE COURT:  Philly, not too bad.  It's not like
 5   Seattle.  So do you want to deal with it on the 22nd, or do
 6   you want to deal with it before then?
 7            MR. BERMAN:  Well, since we just got Mr. Haviland's
 8   reply and he raises some issues that we ought to talk
 9   about --
10            THE COURT:  Why don't you see if you can work it
11   out, and if you can't, I'll deal with it on the 22nd.
12            MR. HAVILAND:  The only trouble with that, it's the
13   one week in two years I'm taking my family away, Judge.
14            THE COURT:  Where are you going?
15            MR. HAVILAND:  Hilton Head.
16            THE COURT:  Just work out a date, and I'm sure
17   Mr. Sobol can do it so Mr. Berman doesn't have to fly across
18   the world to get here, okay?  So the next thing I want to go
19   off the record.
20            (Discussion off the record.)
21            (Adjourned, 4:25 p.m.)
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS      ) ss.

CITY OF BOSTON                )

5

6

7

8              I, Lee A. Marzilli, Official Federal Court

9     Reporter, do hereby certify that the foregoing transcript,

10    Pages 1 through 68 inclusive, was recorded by me

11    stenographically at the time and place aforesaid in Civil

12    Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13    Industry Average Wholesale Price Litigation, and thereafter

14    by me reduced to typewriting and is a true and accurate

15    record of the proceedings.

16              In witness whereof I have hereunto set my hand this

17    13th day of April, 2007.

18

19

20

21

22

23         _____

           LEE A. MARZILLI, CRR

24         OFFICIAL FEDERAL COURT REPORTER

25