## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) ) ) | Judge Patti B. Saris |
| *State of Montana v. Abbott Labs., Inc., et al.. 02-CV-12084-PBS* | ) ) ) | |
| *State of Nevada v. Abbott Labs., Inc., et al.. D. Nev. Cause No. CV-12086-PBS (Nevada II)* | ) ) ) | |

## REPLY DECLARATION OF ANDREW D. SCHAU

ANDREW D. SCHAU, declares as follows:

1.     I am a member of the law firm of Patterson Belknap Webb & Tyler LLP, attorneys for Johnson & Johnson, Centocor, Inc., Janssen Pharmaceutica Products L.P., McNeil-PPC, Inc., and Ortho Biotech Products, L.P. (the "J&J Defendants").  I submit this reply declaration in support of the J&J Defendants' Individual Motion for Summary Judgment Against the States of Nevada and Montana.

2.     Attached hereto are true and correct copies of the following exhibits:

| Designation | Description |
|---|---|
| Exhibit 1 | Transcript excerpts from proceedings in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 01-CV-12257-PBS, MDL 1456 on April 11, 2007 |
| Exhibit 2 | *Ideal Electric Co. v. Flowserve Corp*. No. CV-S-1092 DAE, 2006 WL 3434745 (D. Nev. 2006). |

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 10, 2007                    /s/ Andrew D. Schau
                                        Andrew D. Schau

# Exhibit 1

1                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MASSACHUSETTS

2

3

       In Re:                        )

4      PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS

       AVERAGE WHOLESALE PRICE       ) MDL No. 1456

5      LITIGATION                    ) Pages 1 - 68

6

7

8                     PRETRIAL CONFERENCE

9           BEFORE THE HONORABLE PATTI B. SARIS

                  UNITED STATES DISTRICT JUDGE

10

11

12

13

                          United States District Court

14                        1 Courthouse Way, Courtroom 19

                          Boston, Massachusetts

15                        April 11, 2007, 3:05 p.m.

16

17

18

19

20

21

22

                       LEE A. MARZILLI

23                  OFFICIAL COURT REPORTER

                 United States District Court

24             1 Courthouse Way, Room 3205

                    Boston, MA  02210

25                    (617)345-6787

```
 1    A P P E A R A N C E S:
 2    For the Plaintiffs:
 3         STEVE W. BERMAN, ESQ. Hagens Berman Sobol Shapiro LLP,
      1301 5th Avenue, Suite 2900, Seattle, Washington, 98101-1090.
 4
           THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
 5    Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge,
      Massachusetts, 02142.
 6
           DONALD E. HAVILAND, ESQ., The Haviland Law Firm, LLC,
 7    740 S. Third Street, Third Floor, Philadelphia, Pennsylvania,
      19102.
 8
      For the Defendants:
 9
           MICHAEL B. KEATING, ESQ. and MICHAEL P. BOUDETT, ESQ.,
10    Foley Hoag, 155 Seaport Boulevard, Seaport World Trade Center
      West, Boston, Massachusetts, 02210, for AstraZeneca.
11
           D. SCOTT WISE, ESQ., KIMBERLEY D. HARRIS, ESQ., and
12    AIMEE HECTOR, ESQ., Davis, Polk & Wardwell, 450 Lexington
      Avenue, New York, New York, 10017, for AstraZeneca.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURT:  Tell me what "it" is.

2          MR. BOUDETT:  Spreads, that the spreads were

3   secret.

4          THE COURT:  Let me tell you, having just been

5   through this, everyone knew about a 20 to 25 percent spread,

6   maybe 30 percent.  Everyone knew, everyone.  This is why I

7   found your papers so difficult to follow.  If all he's going

8   to say is everyone knew about a spread, for want of a better

9   word, within the speed limit, if that's all he's going to

10  say, that's not a problem because it would almost be

11  stipulated to.

12         MR. BOUDETT:  No, your Honor.

13         THE COURT:  All right, what will he say?

14         MR. BOUDETT:  He will testify as to knowledge of

15  discounting off of WAC creating spreads larger than the

16  Hartman speed limit.

17         THE COURT:  What were the Zoladex spreads?  I don't

18  remember.

19         MR. BOUDETT:  Well, it depends what year you ask

20  about.  At their height, they were, I think, 142 percent,

21  according to the Hartman calculation, 140 to 150 percent.

22         THE COURT:  Is he going to say the government knew

23  that?

24         MR. BOUDETT:  He is going to say the government

25  knew of spreads well in excess of the Hartman speed limit.

1    His testimony would not be specific to Zoladex.  It was not

2    one of the top five blockbuster, budget-buster drugs that the

3    regulators were paying attention to, which --

4              THE COURT:  So as I understand it, the OIG reports,

5    were any of them referencing Zoladex?

6              MR. BOUDETT:  Yes, your Honor.

7              THE COURT:  Which ones?

8              MR. BOUDETT:  The '92 certainly listed Zoladex

9    among the 30 drugs that was listed and gave a spread in

10   excess of 30 percent, if I recall correctly.

11             THE COURT:  What was it, Zoladex?  I remember

12   Hartman saying that all the 1992 ones were roughly in the

13   speed limit zone.

14             MR. BOUDETT:  I don't believe that's the case.

15             MR. BERMAN:  It was within the speed limit.

16             THE COURT:  What?

17             MR. BERMAN:  It was within the speed limit.

18             MR. BOUDETT:  I would have to follow up on that

19   one, your Honor.

20             MR. BERMAN:  We have an exhibit that shows that

21   from the trial.

22             THE COURT:  Let me put it this way:  Why don't you

23   make me a proffer as to what he would say in writing.  They

24   are very hot and bothered by the notion that the government

25   approved the mega spreads.  My sense is that to the extent

1    that he is going to testify about what he knew, it would be

2    relevant but only as it affected AstraZeneca.  That's why I

3    needed a proffer.  I don't know why, if he knew about some

4    other company's spread, why that would be so relevant.  I'm

5    not saying I'm not.  I was going to say here today, yes, if

6    he knew about the spreads, if he was told specifically about

7    the Zoladex spreads or about the battle going on, that might

8    be relevant to lack of intent to deceive.  I don't know that

9    I'll let you say that the government "approved" it unless you

10   say specifically he has letters or he said, "That's okay, go

11   ahead, guys, do the 600 percent spread."  I don't think you

12   have that, right?

13            MR. BOUDETT:  Not with regard to AstraZeneca

14   specifically, but can I make two quick points in response to

15   what you just said?  We will make the proffer, and I know

16   you're going to think about this issue more, but my two

17   points are these:  First of all, the approval issue that the

18   plaintiffs are trying to set up is a straw man, I would

19   suggest.  Our case is not that the government approved of

20   mega spreads, endorsed them, liked them.  Some people in the

21   government may have done so, others didn't, but that's not

22   our burden.  Our case is that the government knew of the

23   spreads and didn't change the system until 2003.  That's

24   different than approval, so --

25            THE COURT:  Let me just say, they for sure knew,

1    and I would allow it to come in, about spreads in the

2    30 percent range.

3            MR. BOUDETT:  We will prove well beyond the

4    30 percent, they knew and didn't change the system.

5            THE COURT:  But you can only put it in if it

6    affects Zoladex, or possibly, possibly Lupron, I mean,

7    because that's part of the same tale; but not if it's about

8    albuterol sulfate because that everyone knew, right?  Because

9    that was a multi-source and it was a different animal.  I

10   mean, I've been struggling with them one by one.  Each one

11   has a different story.  Each drug within the company has a

12   different story.  So you make the proffer, but I'm not saying

13   "no" in general.  And he's not going to say the government

14   approved it.  I think that would be wrong.  He's not here as

15   a spokesman for the government, and he's not been designated

16   as such.

17           MR. BOUDETT:  Correct.

18           THE COURT:  What he knew might be relevant but only

19   if it's about this company and these drugs.

20           MR. BOUDETT:  This is my second point.  It's very

21   brief, your Honor.  I would urge your Honor to wait to make

22   that ruling until you hear the plaintiffs' expert testimony

23   and rule on this during cross, and we can have a side bar on

24   this issue before cross --

25           THE COURT:  Okay.

# Exhibit 2

Westlaw.

Slip Copy                                                         Page 1
Slip Copy, 2006 WL 3434745 (D.Nev.)
(Cite as: 2006 WL 3434745 (D.Nev.))

▷
Only the Westlaw citation is currently available.

United States District Court,
D. Nevada.
IDEAL ELECTRIC COMPANY, Plaintiff,
v.
FLOWSERVE CORPORATION and Lake Mead
Constructors, Defendants.
Gilbert Western Corp. and Kiewit Western Co.,
Delaware corporations doing
business as Lake Mead Constructors, a joint venture,
Counterclaimants,
v.
Ideal Electric Company, Counterdefendant.
Gilbert Western Corp. and Kiewit Western Co.,
Delaware corporations doing
business as Lake Mead Constructors, a joint venture,
Cross-claimants,
v.
Flowserve Corporation, A New York corporation,
Safeco Insurance Company of
America, a Washington corporation, Cross-
defendants.
Flowserve Corporation, et al., Third-Party Plaintiff,
v.
Travelers Casualty & Surety Company of America,
Third-Party Defendant.
No. CV-S-02-1092-DAE(LRL).

Nov. 22, 2006.

Jeffrey T. Golenbock, Golenbock, Eiseman, Assor,
Bell & Peskoe, New York, NY, William R. Urga,
Jolley Urga Wirth Woodbury & Standish, Las Vegas,
NV, for Plaintiff and Counterdefendant.

Shawn Preston Ricardo, Golenbock, Eiseman, Assor,
Bell & Peskoe, New York, NY, for Plaintiff.

Leroy M. Gire, Law Office of Leroy M. Gire,
Glendale, CA, for Defendants.

George F. Ogilvie, III, McDonald Carano Wilson,
Las Vegas, NV, for Defendants, Third-Party
Defendant, Counterclaimants and Cross-claimants.

Christopher M. Bechhold, Thompson Hine & Flory
LLP, Cincinnati, OH.

Corby D. Arnold, Corby D. Arnold, P.C., Las Vegas,

NV.

*FINDINGS OF FACT AND CONCLUSIONS OF
LAW*

DAVID ALAN EZRA, District Judge.

*1 The Court conducted a bench trial for the above-
captioned matter on January 9-12, March 27-April 4,
and May 30-June 1, 2006.

*BACKGROUND*

The Southern Nevada Water Authority (the
"SNWA") engaged in a $2 billion capital
improvements program to increase the reliability and
capacity of the water system that provides potable
water from the Colorado River to the Las Vegas
metropolitan area. One component of the program
was the Raw Water Pumping System Project ("Raw
Water Project"). In October 1998, the SNWA entered
into Contract No. SNWA 070-B ("Prime Contract")
with Defendant Lake Mead Constructors ("LMC"),
under which the parties agreed that LMC would serve
as the general contractor for the Project. The Prime
Contract provided for a substantial completion date
of June 29, 2001, and a final completion date of
November 1, 2001.

In its capacity as general contractor, LMC entered
into a contract ("Material Contract") with Ingersoll-
Dresser Pump Company ("IDP"), the predecessor in
interest to Defendant Flowserve Corporation
("Flowserve"). FN1 IDP had previously submitted
pump performances curves to the engineering
consultant for SNWA in order to be named as an
approved pump manufacturer in bid documents for
the Raw Water Project. Pursuant to the Material
Contract, Flowserve agreed to provide sixteen
custom-engineered pumps for the Raw Water Project.
These included six vertical turbine ("VT") and ten
horizontal split case ("HSC") pumps. The pumps
were to be distributed to three separate pumping
stations, Intake Pump Station 2 ("IPS-2"), Booster
Pump Station 1 ("BPS-1"), and Booster Pump Station
2 ("BPS-2"). FN2 The contract called for LMC to
pay Flowserve $12.6 million for the purchase and
delivery of the pumps.

FN1. In August 2000, Flowserve purchased
the stock of IDP and assumed any
obligations owed by IDP to LMC relative to

the Materials Contract and the Raw Water
Project.

> FN2. The six vertical turbine pumps were to
> be used at IPS-2, while the horizontal split
> case pumps were to be divided between
> BPS-1 (4,000 horsepower pumps) and BPS-
> 2 (3,000 horsepower pumps).

In February of 1999, Flowserve entered into a sub-
contract ("Motor Contract") with Plaintiff Ideal
Electric Company ("Ideal") to provide 16 electric
motors for the pumps for a purchase price of
$3,150,000. Ideal had previously been named as an
approved motor manufacturer for the large induction
and synchronous motors by SNWA. After a long and
tumultuous path culminating in a settlement
agreement between SNWA and LMC, SNWA finally
approved completion of the Raw Water Project in
November 2002.

Notwithstanding problems associated with the
testing of the motors, Ideal manufactured and shipped
the motors to the project site. However, due to LMC's
contention that Flowserve untimely delivered the
pumps coupled with its claim that it suffered
damages, including but not limited to, liquidated
damages assessed by SNWA, it has withheld the
balance of payment to Flowserve of $6,088,795.27.
Flowserve has in turn withheld payment to Ideal for
the ·remaining $1,626,676.55 under the Motor
Contract. As a result, Ideal brought suit against
Flowserve asserting claims for: (1) breach of
contract; (2) quantum meruit; (3) unjust enrichment;
and (4) negligence. Ideal also asserted claims against
LMC for: (1) third-party beneficiary; (2) quantum
meruit; (3) unjust enrichment; and (4) negligence.

**\*2** Based on Flowserve's contention that LMC has
wrongfully refused to pay more than $6 million owed
under the Material Contract, Flowserve asserted
cross-claims against LMC for: (1) breach of contract;
(2) quantum meruit; (3) unjust enrichment; (4)
indemnification; and (5) contribution.

In turn, LMC has brought counterclaims against
Ideal for: (1) negligent interference with prospective
economic advantage;   [FN3] (2) intentional
misrepresentation;   and   (3)   negligent
misrepresentation. LMC has also set forth cross-
claims against Flowserve for: (1) indemnification; (2)
breach of contract; (3) breach of the implied covenant
of good faith and fair dealing; (4) intentional
misrepresentation;   and   (5)   negligent
misrepresentation.

> FN3. In this Court's February 1, 2005 Order
> (Doc. # 173), this Court granted Ideal's
> motion for partial summary judgment as to
> LMC's claim for negligent interference with
> prospective economic advantage.

The Court has carefully considered the testimony
and evidence presented at trial along with the briefs
of counsel and the voluminous exhibits. For the
reasons set forth below, the Court now enters the
following Findings of Fact and Conclusions of Law
in accordance with its obligations under Federal Rule
of Civil Procedure 52(c). [FN4]

> FN4. Whenever, in the following discussion,
> this court has mistakenly designated as
> conclusions of law what are really findings
> of fact, and vice versa, the court's statements
> shall have the effect they would have if
> properly designated.

*FINDINGS OF FACT*
*Facts Related To The Pumps Provided By Flowserve*

1. In the Spring of 1998, Ingersoll-Dresser Pump
Company ("IDP"), the predecessor in interest to
Flowserve, submitted pump performance curves to
the engineering consultant for the SNWA. These
included pump performance curves for the 3000
horsepower HSC pumps to be installed at BPS-2. IDP
submitted the curves in order to be named as an
approved pump manufacturer for the Raw Water
Project. [FN5]

> FN5. For facts not disputed by the parties,
> the Court will not provide citations to the
> trial transcripts or the evidentiary record.

2. To be named as an approved pump manufacturer,
SNWA's engineer required that prospective bidders
show that they could meet the proposed performance
curve for the HSC pumps to be installed at BPS-1
and BPS-2.

3. IDP had never constructed the pumps required
under the Raw Water Pumping Project. Therefore,
IDP was unable to test a curve from an existing
pump. (Tr. 11:95)

4. Instead, IDP's engineers used mathematical
models to demonstrate that they could build the HSC
pumps as required under SNWA's specifications. (Tr.
11:95).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3434745 (D.Nev.)
**(Cite as: 2006 WL 3434745 (D.Nev.))**

5. The pump curves originally submitted by IDP to SNWA's engineers were not approved. As of March 1, 1998, SNWA still had not approved IDP as an approved pump manufacturer due to problems with the pump curves. At this point, time was running out for IDP to obtain approval as an approved pump manufacturer. (Ex. L15); (Ex. L16); (Tr. 11:123-124).

6. In early March 1998, IDP submitted a pump performance curve for the 3000 horsepower HSC pumps to be installed at BPS-2, and stated that it had designed Impeller C to meet SNWA's specifications. (Ex. L16); (Ex. L17); (Ex. L18); (Ex. L19).

7. IDP had not in fact designed Impeller C. (Tr. 11:139); (Tr. 11:149).

8. In addition, the pump curve submitted to SNWA had not been adequately approved by the IDP design center and was based in large part on the performance requirements outlined in the specification developed by the SNWA's consulting engineer. Furthermore, the curves were adapted from those used by Mitsubishi Electric, which had already been approved as a pump manufacturer. (Ex. L15); (Ex. L19); (Ex. L27); (Ex. L32); (Tr. 11:133-138).

*3 9. IDP submitted the pump curves with the intention that SNWA would name IDP in its bid specifications as an approved pump manufacturer for the 3000 horsepower pumps. (JSUF 7); (Tr. 11:119-1120).

10. At the time, IDP submitted the curves, it believed that it could build the curves consistent with SNWA's specifications, however it had not designed pump curves that demonstrated such an ability. (Tr. 11:107).

11. Based in part upon the review of IDP's pump performance curves by the SNWA's engineering consultant, the SNWA named IDP as an approved pump manufacturer for the Raw Water Project.

12. In submitting the pump curves, IDP knew that the contractors submitting bids to SNWA would rely on its status as an approved pump manufacturer in rendering their bids.

13. In submitting its bid to SNWA, LMC relied on IDP's status as an SNWA approved pump manufacturer. LMC also relied on IDP's status as an approved pump manufacturer when entering into the Material Contract. (Tr. 9:9-11).

14. In mid-August 1998, the original curves were sent to the IDP design center for review to prepare for the September SNWA bid. The design center responded with new curves, however, these curves were not used in the bid, but IDP instead submitted the same curves that were originally drafted in March 2000. (Ex. L32).

15. On September 16, 1998, LMC was named the general contractor and IDP was awarded the order for the ten HSC pumps. (Ex. L27).

16. On June 16, 1999, LMC and Flowserve entered into the Material Contract under which Flowserve was to furnish sixteen pumps with electric motors and nine variable frequency drives in compliance with the Prime Contract's specifications. Ten of the sixteen pumps were to be HSC pumps, and the remaining six pumps were to be vertical turbine ("VT") pumps.

17. As per the Material Contract, the delivery dates for the pumps were as follows:
-- Five HSC pumps were to be delivered to BPS-2 by February 1, 2000. These five pumps were the 3000 horsepower pumps.
-- The other five HSC pumps were to be delivered to BPS-1A by March 1, 2000. These were to be 4000 horsepower pumps.
-- The six VT pumps were to be delivered to Intake Pumping Station 2 ("IPS-2") by October 1, 2000.
18. The Material Contract contained a pass-through provision, which provided that liquidated and actual damages for delay shall be assessed against Flowserve only if and to the extent that liquidated damages are assessed against LMC by SNWA due to Flowserve's unexcused delay in delivery or nonperformance. (Ex. L7).

19. Section 5 of the Material Contract also provided that Flowserve is liable to LMC for any increased costs or other damages that LMC may sustain as a result of delay attributable to Flowserve. (*Id.*)

20. In negotiating the Material Contract, the parties added Supplemental Sheet 1. Section E of Supplemental Sheet 1 amended the provision in Section 5 of the Material contract to limit the assessment of liquidated damages against Flowserve to those assessed against LMC by SNWA. It also capped the accrual of liquidated damages at $37,000 per day and $5 million in total. (*Id.*)

*4 21. Section J of Supplemental Sheet 1 added a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

limitation of liability provision, which stated that Flowserve and its suppliers shall in no event be liable to LMC and/or SNWA for any consequential, incidental, or indirect damages of an economic nature, such as loss of profit, loss of revenue, loss of production and the like. (*Id.*)

22. The Court finds that the provision in Section J was not meant to replace the language in Section 5 regarding the increased costs and damages that LMC would incur as a result of Flowserve's delay in delivering pumps. Rather, the damage provisions were meant to be added and read in conjunction with provisions in Section 5. (Ex. L7), (Ex. L12), (Ex. L263), (Tr. 4:20-21); (4:29- 32).

23. Therefore, increased costs and overhead sustained by LMC resulting from the delay in the pumps is recoverable as direct damages under the Material contract and outside the prohibition set forth in Section J. (Tr. 4:17-26); (Tr. 11:47-51); (Tr. 11:105); (Ex. L185); (Ex. L189); (Ex. L280).

24. The Prime Contract called for a substantial completion milestone of June 29, 2001, and a final completion date of November 1, 2001.

25. In December 1999, Floweserve determined that the 3000 horsepower pumps it had manufactured did not meet the contract specifications as required under the Prime Contract. (Ex. L24); (Ex. L25); (Ex. L26); (Ex. L27); (Tr. 11:158-160).

26. Flowserve had begun manufacture of the pumps without obtaining prior approval of the pump designs as required under contract. (Tr. 4:85-87).

27. In February 2000, Flowserve began to redesign the 3000 horsepower pumps, but determined that the new design still would not produce a pump performance curve that met the contract specifications. (Ex. L26); (Ex. L27); (Tr. 11:53- 60).

28. In March 2000, Flowserve informed LMC and SNWA for the first time that it could not manufacture a 3000 horsepower pump that met contract performance specifications. In particular, Flowserve was experiencing problems with the torsional analysis for the HSC pumps. (Ex. L32); (Ex. L45).

29. At the same time that Flowserve was experiencing problems with the design of the 3000 horsepower pumps, LMC and SNWA were also concerned about cavitation issues that the 4000 horsepower pumps were exhibiting in factory tests,

which occurred in September 2000. (Ex. L55).

30. As a result, in April 2000, Flowserve submitted a request for substitution for the 3000 horsepower pumps. SNWA approved the request for substitution through Change Order 23. (Ex. L28); (Ex. L30); (Ex. L33).

31. Through Change Order 23, SNWA accepted the substitute pump curves in exchange for a reduction in the contract price of $27,500. The $27,500 reduction was then passed along to LMC.

32. The first thee VT pumps for IPS-2 were delivered to the project on January 3, 2001. The remaining three were delivered on March 30, 2001. (JSUF 31).  [FN6]

> FN6. JUSF refers to the joint statement of undisputed facts submitted to the Court as part of the parties Proposed Joint Pretrial Order filed on December 6, 2005.

33. The first two HSC pumps for BPS-1 were delivered to the project on January 5, 2001. Another pump was delivered to BPS-1 on January 24, 2001. The final two HSC pumps were delivered on February 5, 2001. (JSUF 32).

**\*5** 34. The first three HSC pumps were delivered to BPS-2 were delivered to the project on April 23, 2001. The remaining two HSC pumps were delivered to BPS-2 were finally delivered on May 10, 2001.

35. Despite the untimely delivery of the Flowserve pumps, LMC was experiencing a number of problems unrelated to the delivery of the pumps that precluded their installation. Specifically, SNWA required the sole plates at IPS-2 to be replaced. In addition, the crane used to install the pumps was inoperable at IPS-2 due to the fact that LMC had constructed the building too narrowly for the crane to fit inside.

36. During the second quarter of 2001, other issues precluded the installation of the pumps. These included the necessity to rework the cone valve pedestals in BPS-1A, misalignment of surge tanks in BPS-1A and BPS-2, problems with LMC's electrical subcontractor, Sachs Electric. Based on these problems, LMC was not ready to install the pumps upon delivery.

37. Upon start up of the pumps in September 2001, the HSC pumps experienced bearing overheating and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had to be returned to Flowserve. This resulted from the confluence of several problems. One problem was the design of the piping system by SNWA's engineer, which caused excessive nozzle loading on the pumps. (Tr. 12:21-27). Another reason was Flowserve's choice to use Teflon material in for the design of the bearings. (Tr. 12:52)

38. In October 2001, SNWA expressed concern regarding a number of areas including: (1) quality issues including code violations by LMC and its subcontractors; (2) LMC's failure to manage and control both the quality and progress of subcontractors and vendors; (3) problems with the pumps; (4) the pursuit of frivolous and unsupportable claims by LMC; (5) the substitution of significant members of LMC and subcontractor staff; and (6) LMC's failure to engage in and participate in PCIS Task Force efforts. Aside from the pumps, the other concerns were the responsibility of LMC.

39. After meeting with representatives of LMC and SNWA in January 2002, Flowserve secured authorization from SNWA to resolve the bearing issue by redesigning the bearing to, inter alia, eliminate the teflon.

40. Flowserve replaced the bearings and returned the pumps to the project site by early April 2002.

41. On April 23, 2002, LMC commenced the seven-day test, which was a prime contract requisite to satisfy the substantial completion milestone.

42. On April 11, 2002, SNWA agreed for the first time that SNWA would not require all PCIS documentation before the seven-day test commenced, but would require completion before approval of substantial completion.

43. The seven-day test was successfully completed on April 30, 2002. However, despite the successful completion, SNWA refused to award substantial completion on the basis that, among other things, LMC had not met it contractual obligations to submit acceptable PCIS loop drawings. (J19, Tr. 7-182).

44. In October 2001, SNWA suspended progress payments to LMC on the basis that LMC had not met milestones regarding the progress of the Raw Water Project.

*6 45. Based on LMC's failure to meet the substantial completion milestone, SNWA took the position that $21,286,000 of liquidated damages had

accrued as of June 30, 2002. As of August 21, 2002, this number had increased to $23,617,900. (J8, L207, L208). SNWA asserted that liquidated damages against LMC were accruing at $2 million per month.

46. At no point did SNWA collect liquidated damages from LMC prior to September 11, 2002. Rather, it merely took the position that it was entitled to such amounts as a result of LMC's delays with the project.

47. During this period, LMC took the position that SNWA was not entitled to any liquidated damages. Rather, delays were in the delivery of the pumps and other matters were irrelevant as a result of problems caused by SNWA, which resulted in substantial delays to the program.

48. As of September 11, 2002, SNWA still had not accepted the pumps primarily due to concerns regarding cavitation issues.

49. On September 11 and 12, 2002, LMC and SNWA voluntarily mediated their disputes regarding the Raw Water Project and the related River Mountains Project. Flowserve did not participate in the mediation. During the mediation, LMC claimed that due to concurrent delays caused by SNWA, it was, at most, responsible for 22 days of delay caused by the late delivery and performance of the pumps.

50. In addition to the liquidated damages stemming from the Raw Water Project, SNWA also claimed $7 million in liquidated damages against LMC stemming from River Mountains Contract.

51. During this mediation, LMC countered that it was entitled to $18,819,656.00 from SNWA due to cost overruns that were the responsibility of SNWA. (Ex. L257).

52. Ultimately, the parties agreed on a settlement, which provided for a payment of $307 million for the combined Raw Water Project and the River Mountains Project. This figure represented the full contract price for the two projects plus an additional $10.4 million. SNWA and LMC did not allocate the amounts between the two projects, nor did they clarify how much, if any liquidated damages, were to be offset against the money that LMC claimed it was owed.

53. The Settlement Agreement between the parties states that liquidated damages were offset, but does not provide any indication of the amount of those

damages. Furthermore, LMC sought and was responsible for inclusion of the phrase after "offsetting liquidated and delay damages." (Ex. F30); (Tr. 12:117- 19).

54. LMC, and in particular, John Jennings, unilaterally determined how to allocate the settlement funds. In doing so, he subtracted $2.3 million from the Raw Water Contract Price and allocated the remaining $12 million to the River Mountains Contract. He allocated these amounts based solely on his opinion of the proper apportionment. (Tr. 8:148-53)

55. LMC never informed SNWA, nor did SNWA ever agree to LMC's internal designation of certain amounts to the two contracts.

56. During the mediation, SNWA offered to move the substantial completion milestone to September 2002, which would have obviated any claim for liquidated damages. However, LMC refused. (Ex. F27); (Tr. 12:125-29).

*7 57. LMC believed at the time of the mediation that they were not liable for liquidated damages to SNWA resulting from delay from the pumps. However, based in part on continuing issues with acceptance of the pumps, and the threat of further exposure to liquidated damages, LMC made a business judgment to accept the terms of the settlement agreement. (Ex. L257)

58. At no point prior to or during the mediation did LMC concede that it was liable for liquidated damages. Rather, the evidence suggests SNWA agreed to surrender its claim for purported cost over-runs due to the threat that it could later be found liable for liquidated damages.

59. Although the SNWA Board approved the Settlement Agreement on November 21, 2002, they did not accept and approve any specific amount of liquidated damages as assessed against LMC for late delivery of the pumps. (Tr. 12:17)(Tr. 12:113- 14); (Tr. 12:124).

60. Based on a careful finding of the facts including the credibility of witnesses, the Court finds that LMC sought to include language in the Settlement Agreement regarding the offset of liquidated damages specifically to enable it to obtain damages for delay against Flowserve. However, as a result of the mediation, there was no assessment of liquidated damages as set forth in the Material Contract.

61. In conjunction with the Settlement Agreement, SNWA entered into an agreement directly with Flowserve ("Flowserve Warranty Agreement"), whereby Flowserve agreed to provide a 4,000 hour inspection and additional warranties on the HSC pumps that were the subject of the cavitation concerns. This Agreement was attached to the settlement terms. (Ex. J4).

62. Pursuant to the Flowserve Warranty Agreement, LMC was relieved of all contractual obligations regarding the pumps unless Flowserve failed to perform its warranty obligations. (*Id.*).

63. SNWA has not asserted any claims against LMC resulting from the Flowserve Warranty Agreement, and there is no evidence that Flowserve has in any manner failed to perform its obligations pursuant to this Agreement.

*Findings of Fact Pertaining To The Motors Supplied By Ideal*

64. Based on prior submissions to SNWA, Ideal was named as an approved manufacturer of large induction and synchronous motors for the Raw Water Pumping Project.

65. Ideal submitted quotes to IDP in September 1998 to supply the motors for the sixteen pumps including the HSCs and the VTBs. The quotes to IDP were in the form of three scope letters dated September 11, 1998, September 15, 1998, and September 16, 1998.

66. The Prime Contract contained a number of specifications regarding the motors for the pumps including requirements regarding the "radial shaft runout." In particular, the Contract required that the motors manufactured by Ideal have a radial shaft runout of less than .25 mils peak-to-peak when operated at a slow roll speed of 100 rpm or less. The Material Contract incorporated the prime contract specifications for the manufacture and testing of the motors.

*8 67. Ideal's September 16, 1998 Scope Letter to Flowserve took exception to the Prime Contract's radial shaft runout limitation at slow roll speeds of less than 100 rpm. Ideal believed that the maximum radial shaft runout specifications was unnecessarily stringent for the motors.

68. In December 1998, SNWA agreed to substitute Ideal for TECO/Westinghouse, who was listed as the

Slip Copy                                                                                             Page 7
Slip Copy, 2006 WL 3434745 (D.Nev.)
**(Cite as: 2006 WL 3434745 (D.Nev.))**

original motor manufacturer in LMC's bid to SNWA. At the time, neither SNWA nor LMC was aware that Ideal had informed Flowserve of its exception to the radial shaft run out specification.

69. On February 5, 1999, IDP issued purchase orders to Ideal for sixteen electric motors for a price of $3,150,000.

70. Between January and August 2000, Ideal conducted factory tests on the motors it had manufactured. However, despite its contractual obligation to do so, it did not conduct slow roll tests at less than 100 rpms. Rather, Ideal conducted slow roll tests at speeds between 200 and 300 rpms. (JUF 24).

71. Ideal was prepared to deliver the motors to the project site in early 2000, but did not do so because Flowserve had not yet delivered the pumps. (Tr. 2:156-57); (Tr. 1:116; Tr. 6:19-21).

72. Ideal eventually delivered the motors to the project site between late 2000 and early 2001. The first delivery was to IPS-2 on December 12, 2000; the second was to BPS-1A on December 29, 2000; and the third was to BPS-2 on January 26, 2001. (Tr. 1:48; Tr. 1:116).

73. On January 24, 2001, after the motors had been delivered, LMC learned for the first time that the factory performance tests of the motors' radial shaft runout was not conducted at speeds of less than 100 rpms.

74. LMC would not have accepted delivery of the motors had Flowserve disclosed that the factory performance test results were not in compliance with the contract specifications. (Tr. 2:178).

75. However, at no point did Ideal represent to LMC that it had undertaken the performance tests at slow roll speeds. In addition, the Court finds a lack of evidence of fraudulent intent on the part of Ideal.

76. On February 9, 2001, Ideal submitted six Requests for Substitution to Flowserve to modify the motor specifications. In particular, Ideal sought to relax the radial shaft runout specifications at slow roll speeds. Flowserve forwarded these requests to LMC on March 17, 2001. (JSUF 26, 27).

77. Between January and April 2001, representatives of Ideal, LMC, and MW/Hill, SNWA's engineering consultant, met to discuss the relaxation of the slow

roll specifications from 0.25 mils at 100 rpms or less to 0.60 mils at 100 rpms or less. (JSUF 27).

78. The radial shaft runout does not affect the functionality of the motors. Rather, SNWA's concerns about the radial shaft runout had to do with the motors' longevity.

79. In June 2001, the Ideal and SNWA agreed in principle that SNWA would agree to accept motors with radial shaft runout between 0 .26 and 0.50 mils peak-to-peak at slow roll speeds at 100 rpms, on the condition that Ideal would extend the warranty from five years to ten years with respect to any motor that measured within that range.

*9 80. During late September 2001, the motors were tested at the project site at 100 rpms. The tests showed that 13 of the 16 motors met the original specification of a radial shaft runout of 0.25 mils.

81. The fourteenth and fifteenth motors had radial shaft runout measurements of 0.29 mils and 0.31 respectively. The sixteenth motor met the .25 mils requirement after it was repaired.

82. Although Ideal failed to perform the required factory tests for radial shaft runout at the designated slow roll speeds in contravention of its contractual obligations, the evidence does not show that this failure materially delayed the project.

83. The slow roll tests would have to be performed on site in any event, and therefore, neither LMC nor Flowserve suffered any additional costs associated with the September 2001 tests.

84. The pumps were fully operational at all times following their delivery.   [FN7] Furthermore, the project was plagued by a number of other issues that were unresolved and prevented the project's completion. The motors themselves were not responsible for any on-site testing delays. Indeed, the issues regarding the pumps themselves were not resolved until 2002.

> FN7. One pump had to be returned to Ideal to undergo repairs as a result of rain damage sustained during storage. Ideal repaired the pump at a cost of $17,400.

85. After the parties formalized the agreement to amend the slow roll specifications in August 2001, there were no further issues relating to the motors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86. On February 14, 2002, SNWA approved fifteen of the sixteen motors, but was unable to approve the last one as it was undergoing repairs at the time for water damage. By April 2002, the final motor had been repaired and returned to the site for testing.

87. SNWA had finally accepted all 16 motors and indicated that it has approved full payment for the motors. (F18 at pp. 23, 33; F20 at p. 16; J4).

88. The price of the motors, per Ideal's agreement with Flowserve, was $3,150,000. Ideal has only been paid $1,523,323.45 of this amount. (JUF 49-50).

### CONCLUSIONS OF LAW

*I. Ideal's Claims*

*A. Breach of Contract Against Flowserve*

89. Ideal manufactured, supplied, and delivered the motors pursuant to the terms of Flowserve Purchase Order numbers 49005 through 49012.

90. Aside from the issues regarding slow-roll testing, the motors were fully functional and met the specifications as set forth in the Motor Contract between Flowserve and Ideal.

91. Although Ideal breached its contract with Flowserve by: (1) failing to manufacture all of its motors to meet the 0.25 mils radial shaft runout at slow-roll speeds of less than 100 rpms, and (2) by failing to conduct factory slow-roll testing at these speeds, these breaches were not material and did not result in any damage to Flowserve. [FN8] Furthermore, the extended Warranty Agreement regarding motors that did not meet .25 mils radial shaft runout cured any breach of contract that Ideal committed in failing to manufacture all its motors to meet Prime Contract specification.

> FN8. As discussed further *infra*, LMC is not entitled to withhold liquidated damages from Flowserve on the basis of delay, and therefore, Flowserve may also not assert any such damages against Ideal.

92. SNWA has accepted all sixteen motors produced by Ideal, and has paid LMC for these motors.

*10 93. Accordingly, the Court concludes that Ideal is entitled to the full contract price and has been damaged in the amount of $1,626,676.55 ($3,150,000 minus $1,523,323.45, which Flowserve has already paid Ideal) plus interest.

94. Although the Motor Contract contained a "pari passu" provision, the Court interprets this phrase as applicable only if LMC has withheld payment from Flowserve related problems or delays stemming from the motors. As the Court finds that LMC's refusal to compensate Flowserve was based on problems with the pumps alone, Flowserve was not entitled to deny payment to Ideal. Therefore, Flowserve is liable for the accrual of interest beginning from the date in which final payment for the motors was due.

*B. Quantum Meruit and Unjust Enrichment Against Flowserve and LMC*

95. As the Court finds that Ideal is entitled to the full contract price based on Flowserve's breach of contract, it need not address Ideal's claims against Flowserve for quantum meruit and unjust enrichment.

96. The Court also determines that LMC has fully paid Flowserve for the motors.

97. As LMC has fully paid Flowserve for the motors, it has not retained a benefit which in equity belongs to another.

98. For the same reason, the Court DENIES Ideal's claim for quantum meruit against LMC.

*C. Negligence as to Flowserve and LMC*

99. The Court concludes that insufficient evidence exists to support Ideal's contention that Flowserve and/or LMC are liable for the alleged rain damage caused to the sixteenth motor, of which Ideal repaired at a cost of $17,400. Accordingly, Ideal's claim for negligence fails as to both parties.

*D. Third Party Beneficiary Claim as to LMC*

100. Under Nevada law, third party beneficiary status is created when two elements are present: (1) a clearly apparent promissory intent to benefit the third party, and (2) the third party's reliance is foreseeable. *Elizabeth E. v. ADT Sec. Sys. W.,* 839 P.2d 1308, 1311 (Nev.1992). The fact that a contract confers a benefit that is merely incidental on a third party is insufficient to create third party beneficiary status. *Olson v. Iacometti,* 91 533 P.2d 1360, 1363-64 (Nev.1975). Absent a clear intent by the promisor to benefit the third party, such third party does not have standing to assert a claim as a third party beneficiary. *Liphsie v. Tracy Inv. Co.,* 566 P.2d 819, 825 (Nev.1977).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101. The Court finds that Ideal has failed to adduce sufficient evidence at trial to show that, LMC, in entering into the Material Contract with Flowserve, clearly intended to benefit Ideal. Rather, the evidence suggests that although LMC was clearly aware that Ideal would supply the motors, any benefit that Ideal would receive as a result of its payment to Flowserve pursuant to the Material Contract was incidental. Therefore, Ideal's recovery of $1,626,676.55 is only cognizable against Flowserve and not LMC.

*II. Flowserve's Claims*

*A. Against LMC for Breach of Contract*

**\*11** 102. It is elementary contract law that a material breach by one party to a contract may excuse further performance by another party. _Crockett & Myers v. Napier, Fitzgerald & Kirby, LLP,_ 440 F.Supp.2d 1184, 1193 (D.Nev.2006). "If there is anything well settled, it is that the party who commits the first breach of the contract cannot maintain an action against the other for a subsequent failure to perform." _Bradley v. Nev.-Cal.-Ore. Ry,_ 178 P. 906, 908-09 (Nev.1919).

103. The Material Contract, via the Prime Contract, set forth a schedule in which Flowserve was required to deliver the pumps to the project site. Paragraph 5 of the Material Contract stated that time is of the essence. This was especially true in this case as SNWA could charge liquidated damages against LMC for delays in the project.

104. The Court finds that Flowserve materially breached the Material Contract by, *inter alia*, (1) failing to conduct factory performance testing as required under contract; (2) shipping equipment prior to submission and approval of factory performance testing results; (3) delivering the pumps to the site more than ten months late; and (4) failing to deliver the horizontal split case pumps that met the contract specifications, thereby increasing LMC's cost of performance.

105. The Court finds that these actions, especially the untimely delivery of the pumps, constituted a material breach of the contract and excused payment by LMC.

*B. Against LMC for Unjust Enrichment and Quantum Meruit*

106. Unjust enrichment is the unjust retention of a benefit, which in good conscience and equity belongs to another. _Mainor v. Nault,_ 101 P.3d 308 (Nev.2004). The elements for a claim of unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) appreciation of the benefit by such plaintiff, and (3) acceptance and retention by the defendant of such benefit. _Topaz Mut. Co. v. March,_ 839 P.2d 606, 613 (Nev.1992).

107. Nevada case law does not distinguish between principles governing recovery under quantum meruit and unjust enrichment. While the elements for asserting a claim are the same, under traditional principles, the difference lies in the calculation of damages. Quantum meruit focuses on the value of the goods and services received by the defendant while unjust enrichment is measured by the value of the benefit for which it would be unjust for the plaintiff to retain. *See Interform Co. v. Mitchell,* 575 F.2d 1270, 1278 (9th Cir.1978). However, in the instant case, the Court finds that either measure of recovery yields the same results.

108. Although Flowserve materially breached its obligations under the Material Contract, it provided the pumps to LMC, which have been employed by SNWA for the Raw Water Project.

109. SNWA has paid LMC in full for the Raw Water Project including the pumps delivered by LMC.

110. While SNWA has never officially accepted the pumps, pursuant to the Warranty Agreement with Flowserve, SNWA agreed with LMC to hold the Raw Water Project in Final Completion as of October 30, 2002.

**\*12** 111. Although the Flowserve Warranty Agreement does not absolve LMC of all liability with respect to the pumps, SNWA has not at any point asserted any claims for money or otherwise as a result of the pumps following the Settlement Agreement.

112. The Court finds that Flowserve's delivery of the pumps, while untimely and problematic, conferred a substantial benefit upon LMC in that LMC received payment for the pumps by SNWA. By failing to pay Flowserve the remainder of the contract price, LMC has unjustly retained such benefit.

113. The benefit conferred upon LMC is the remaining value of the contract minus the damages set forth below that LMC sustained as a result of Flowserve's untimely delivery of the pumps.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3434745 (D.Nev.)
(Cite as: 2006 WL 3434745 (D.Nev.))

*C. Against LMC for Indemnification and Contribution*

114. Flowserve's cause of action against LMC for indemnification and contribution are based on its prospective liability to Ideal for rain damage allegedly occurring to the 16th motor during storage. However, as noted above, this Court finds that Ideal has failed to present sufficient evidence that the motor was damaged by the actions of LMC or Flowserve. Therefore, the Court finds that Flowserve's claims for indemnification and contribution against LMC are moot.

*III. LMC's Claims Against Ideal*

*A. Intentional Misrepresentation*

115. In order to successfully assert a claim for intentional misrepresentation, a plaintiff must show:
**(1) a false representation made by the defendant;
(2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation;
(3) defendant intended to induce plaintiff to act or refrain from acting   based on the representation; and
(4) damage to plaintiff as a result of the misrepresentation.**
*Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev.1998).

116. LMC's claim for intentional misrepresentation stems from its contention that Ideal intentionally misrepresented that it could manufacture motors, which met the specifications for radial shaft runout at slow-roll speeds of less than 100 rpms.

117. The Court finds that LMC has failed to show that it suffered any damages as a result of the alleged intentional misrepresentations.

118. Ideal was prepared to deliver the motors according to the schedule set forth by contract. Despite the alleged intentional misrepresentations, Ideal manufactured 14 of the 16 motors according to the specifications set forth in the Prime Contract.

119. Although SNWA did not accept the motors until August 2001, LMC was not assessed any liquidated damages for delays stemming from delays allegedly attributable to it and its subcontractors.

120. Aside from liquidated damages, LMC makes no claim that it suffered any direct damages as a result of Ideal's alleged intentional misrepresentations.

121. Therefore, the Court finds that LMC cannot state a claim against Ideal for intentional misrepresentation as it has not shown that is suffered any damages.

*B. Negligent Misrepresentation*

**\*13** 122. Under Nevada law, a party seeking to assert a claim for negligent misrepresentation must establish that it suffered pecuniary damages as a result of the misrepresentation. *See Bill Stremmel Motors v. First Nat'l Bank of Nevada*, 575 P.2d 938, 940 (Nev.1978).

123. For the same reasons, stated above, the Court finds that LMC did not suffer any damages as a result of the purported misrepresentations by Ideal.

*IV. LMC's Claims Against Flowserve*

*A. Indemnification*

124. As the Court finds that LMC is not directly liable to Ideal for damages, it has no claim against Flowserve for indemnification.

*B. Breach of Contract*

125. As noted above, the Court finds that Flowserve materially breached the Material Contract by, *inter alia*, (1) failing to conduct factory performance testing as required under contract; (2) shipping equipment prior to submission and approval of factory performance testing results; (3) delivering the pumps to the site more than ten months late; and (4) failing to deliver the horizontal split case pumps that met the contract specifications, thereby increasing LMC's cost of performance.

*C. Breach of the Covenant of Good Faith and Fair Dealing*

126. The covenant of good faith and fair dealing is implied into every commercial contract and essentially forbids arbitrary, unfair acts by one party that disadvantage the other. *A.C. Shaw. Constr. v. Washoe County*, 784 P.2d 9, 9-10, (Nev.1989); *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1015 (Nev.2004). However, the cause of action for violation of the covenant of good faith

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and fair dealing is generally meant to address situations where the terms of a contract are literally complied with, but one party to the contract deliberately countervenes the intention and spirit of the contract. *See J.A. Jones Constr. Co.,* 89 P.3d at 1016. Where the actions allegedly constituting a violation of the covenant of good faith and fair dealing are also a violation of the contract itself, those claims are properly asserted as a breach of contract claim. *See Id.; Hilton Hotels Corp. v. Butch Lewis Prods.,* 808 P.2d 919, 923-24 (Nev.1991).

127. As this Court finds that the actions by Flowserve breached the Material Agreement, LMC does not have a separate action for breach of the covenant of good faith and fair dealing.

*D. Intentional Misrepresentation*

128. In order to succeed on a claim for intentional misrepresentation, a party must show, *inter alia,* a false representation made by the defendant as well as the defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation. *Barmettler,* 956 P.2d 13 at 1386.

129. LMC's claim for intentional misrepresentation against Flowserve stems from its contention that Flowserve/IDP knew that they did not have the ability to manufacture the pumps as required under the Prime Contract, yet intentionally submitted incorrect information and pump curves to SNWA and LMC indicating that it had the capacity to build the pumps.

**\*14** 130. The Court finds that IDP did not intentionally misrepresent its ability to manufacture the pumps according the specifications set forth by SNWA. The pumps required by SNWA were custom to be custom built. In order to become an approved manufacturer, SNWA only required evidence that IDP could in fact build the pumps, not that IDP actually build and test the pumps.

131. IDP's engineers used mathematical models to demonstrate that they could build the HSC pumps as required under SNWA's specifications. (Tr. 11:94-95); (Tr. 11:130).

132. The pump curves and representations made by IDP to SNWA and LMC were done in good faith and with the belief that it could manufacture the pumps as per the specifications of the Prime Contract. (Tr. 11:95-96).

133. Therefore, the Court finds that LMC has not established that IDP knew it could not manufacture the pumps according to the required specifications when it sought to be named as an approved pump manufacturer or submitted its bid to LMC. Consequently, its claim for intentional misrepresentation fails.

*E. Negligent Misrepresentation*

134. Under Nevada law, which has adopted the definition set forth in Section of the Restatement (Second) of Torts, a party seeking to establish a claim for negligent misrepresentation must show that: (1) the defendant made a false statement for the guidance of others in their business transactions; (2) the defendant failed to exercise reasonable care in obtaining or relaying the information; (3) justifiable reliance on that statement; and (4) pecuniary loss. *Bill Stremmel Motors,* 575 P.2d at 940.

135. The Court finds that Flowserve/IDP made false representations to SNWA in its submission of the pump performance curves and statements regarding the design of Impeller C.

136. SNWA and consequently LMC relied on these representations in naming IDP/Flowserve as an approved pump manufacturer and agreeing to the Material Contract.

137. These representations were negligent in that IDP/Flowserve had failed to take reasonable steps to ensure that they could in fact manufacture pumps meeting SNWA's requirements.

138. Although Change Order 23 relieved Flowserve of its obligations to manufacture the pumps according to the specifications, the delays caused by the late delivery resulted in damage to LMC.

139. Nevada courts have not ruled on whether a negligent misrepresentation, which induces a party to enter into a contract is barred the economic loss doctrine. However, two federal district courts interpreting Nevada law have concluded that a negligent misrepresentation in the inducement of a contract that is independent from the performance of the contract provisions is not necessarily barred by the economic loss doctrine. *Yerrington Ford, Inc. v. General Motors Acceptance Corp.,* 359 F.Supp.2d 1075, 1083 (D.Nev.2004); *Wild Gaming NG, LLC v. Wong Int'l (USA) Corp.,* 2006 U.S. Dist. LEXIS 65838, \*9-10 (D.Nev. Sept. 14, 2006). However,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other jurisdictions finding that negligent inducement claims are not barred by the economic loss doctrine have limited its application to situations where the misrepresentation by the dishonest party does not concern solely the quality or character of the goods sold. Where the misrepresentation is limited to the quality or character of the goods, it is not independent of the contract, and therefore barred by the economic loss doctrine. *See Cerabio LLC v. Wright Med. Tech, Inc.,* 410 F.3d 981, 989-90 (7th Cir.2005) (applying Wisconsin law); *Huron Tool & Eng'g Co. v. Precision Consulting Servs.,* 532 N.W.2d 541, 545 (Mich.Ct.App.1995) (relied upon in the *Yerrington Ford* decision); *Werwinski v. Ford Motor Co,* 286 F.3d 661, 676- 81 (7th Cir.2002) (providing a thorough discussion of the rationale behind barring negligent misrepresentation claims where the subject concerns the quality or character of the goods sold); *but see Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 46-49 (Tex.1998). Under these circumstances, courts have found that the parties are free to negotiate warranties and other terms to account for possible defects in the goods, and therefore the economic loss doctrine limits liability to contract damages. *Id.*

**\*15** 140. The Court in *Wong* did not address whether a negligent representation prior to the formation of the contract that only went to the quality or character of the goods sold can sustain a claim for tort damages notwithstanding the economic loss doctrine. However, the Nevada Supreme Court made clear in *Calloway v. City of Reno,* 993 P.2d 1259, 1263 (Nev.2000), a tort must be a wrong independent of contract. Given the strong preference of Nevada courts to limit tort liability in claims interwoven with the contract, this Court predicts that Nevada courts would follow the above-noted jurisdictions in finding that a negligent misrepresentation occurring prior to the contract that only relates to the character and quality of the goods is not cognizable as an independent tort claim pursuant to the economic loss doctrine.

141. As IDP's misrepresentations only go to their ability to manufacture the pumps to the specifications provided in the material contract, the Court finds that the economic loss doctrine bars any recovery of tort damages.

142. With regard to Flowserve's failure to inform LMC of Ideal's exception to the Slow Roll specifications contained in the September 16, 2008 scope letter, the Court finds that this action constituted an omission sufficient to constitute a negligent misrepresentation. However, for the reasons stated above, LMC has not suffered any pecuniary damage stemming from the Flowserve's negligent omissions. Accordingly, LMC has failed to establish a claim for negligent misrepresentation based on these facts.

143. With respect to all other acts or omission allegedly undertaken Flowserve subsequent to the formation of the Material Contract, those acts or omissions may not form the basis of a negligent misrepresentation claim on the basis that they are precluded by the economic loss doctrine and are cognizable as a breach of contract claim.

*V. Damages.*

144. The Material Contract provided that Flowserve would be liable for actual damages regardless of whether they were caused by delay or reasons for which Flowserve was responsible. (Tr. 11:27-28) (L7).

145. The Materials Contract precluded LMC from recovering incidental, consequential, and indirect damages. However, based on the evidence presented at trial, the Court concludes that the parties did not intend this provision to preclude recovery for indirect costs and "actual damages" that LMC sustained on the project resulting from delays attributable to Flowserve. (Tr. 4:17-26); (Tr. 11:47-51); (Tr. 11:105); (Ex. L189). Therefore, the Court finds that Flowserve is liable for the following undisputed costs sustained by LMC as a result of its breach of the Material Contract:
A. $22,802 for damages sustained by LMC with regard to improper fittings stemming from the delay of the pumps. (Ex. L284, Tab A) (Ex. L209, Book 3 Tab A); (Tr. 6:7-15).
B. $3,365 as a result of corrective work that LMC performed to match the pumps at BPS-2 to the bases. (Ex. L284, Tab B); (Ex. L209, Book 3 Tab B); (Tr. 6:7-15).
**\*16** C. $148,988 resulting from costs associated with resolution of the defective bearing issue. (Ex. L189, Tabs W-9 and W-16), (Ex. L209A, Book 2); (Tr. 6:52-53).
C. $3,962 stemming from costs associated with returning the pumps to Flowserve in January 2001 for additional testing due to the fact that the initial tests did not meet the contract requirements. (Ex. L189); (Ex. L284, Tab E); (Ex. L209, Book 3, Tab E); (Tr. 6:23-24).
D. $1,757 for damages caused by Defective Pump Shaft Couplings. (Ex. L189); (Ex. L284, Book 3

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab F).

E. $15,767 for damages associated with replacement of the MCCs or electrical cabinets. (Ex, L284, Tab L); (Ex. L209A, Book 3, Tab L); (Tr. 6:25-26).

F. $134 for the purchase of bolts and plate washers. (Ex. L189); (Ex. L284, Tab P)

G. $150 to assist Ideal. (Ex. L189); (Ex. L285, Tab W-1).

H. $414 in connection with problems associated with Flowserve providing air-cooled VFD's instead of water cooled VDD as required under the Prime Contract. (Ex. L189); (Ex. L285 W11).

F. $8,766 stemming from LMC's costs in modifying the motor housing during the seven-day performance test. (Ex. L285, Tab W-18); (Ex. L209A).

146. The Court finds that pursuant to the terms of the Material Contract and the intention of the parties, the following costs sustained by LMC, but disputed by Flowserve are also recoverable:

A. $29,900 for damages incurred in installing and grouting the IPS-2 sole plates. As a result of Flowserve's untimely delivery of the pumps, LMC was forced to build a shelter and use space heaters for the pump installation.

B. $20,629 for LMC's costs incurred with respect to install ducting and other items as a result of Flowserve's failure to provide water cooled VFDs as opposed to air-cooled. (Ex. L284, Tab Q); (L209A, Book 3 Tab Q); (Tr. 6:28-29).

C. $1,600 for costs associated with the use of a roof crane to install the pumps. (Ex. L189); (Tr. 6:31-33).

D. $2,058 for miscellaneous work performed by LMC to supply missing parts, allow Ideal representatives to work on the motors, and other issues related to the VFDs. (Ex. 284, Tab Q); (Ex. L209, Vol. 1 Bates Nos. 00306-329).

E. $21,879 for Flowserve's failure to provide instrumentation loop drawings for the VFD equipment. Although SNWA ultimately rejected the initial loop drawings, LMC nevertheless incurred costs in producing drawings, which were Flowserve's responsibility under the Material Contract. (Ex. L209A, Book 1 Bates Nos. 00292-00302); (Tr. 6:47)

D. $38,024 with respect to the grievance award paid by LMC for work done by Robicon, a contractor of Flowserve, on the VFD cabinets. (Ex. L209, Book 1 Bates Nos. 00344 to 00352).

E. $45,191 for overtime costs assessed by SNWA for its own inspectors to oversee the problems with the bearings and supervise LMC's work. (Ex. L209, Book 1 Bates Nos. 00406 to 00524); (Ex. L209A,

Book 2).

F. $4,500 for cost associated with reviewing the structural modifications in Change Order 36 as a result of Flowserve's improper substitution of water cooled VFDs. (Ex. L285) (Ex. L209A, Book 1 Bates Nos. 00525 to 00540).

*17 G. $4,638 stemming from Flowserve's request that LMC labor be at its disposal during the seven day performance test in case problems occurred. (Ex. L285); (Tr. 6:55).

H. $476,192.80 for LMC's increased cost of performance stemming from Flowserve's ten month delay in delivering the pumps. The Court finds that although Flowserve delivered the pumps ten months late, LMC was responsible for a number of problems on the project site. (Ex. I18). At the same time, SNWA was making unreasonable demands with regard to the punchlist and other items. The Court finds that these issues would have resulted in concurrent delays and would have required LMC to remain on the site and incur additional overhead expenses, which it now seeks to attribute to Flowserve. Accordingly, the Court concludes that Flowserve's delayed delivery of the pumps required to LMC to incur roughly four months of additional costs, to which it otherwise would not have sustained. The amount of $476,192 .80 represents a fair apportionment of LMC's costs for those four months. (Ex. L286); (Ex. L287); (Ex. L209A, Bates Nos. 01646 to 01679).

147. The Court finds that the following costs are not properly attributable to Flowserve.

A. Travel costs associated with LMC personnel to Flowserve's manufacturing facilities in Europe and South Korea. Flowserve never requested this inspection. Given the evidence, the Court finds that the expenses for the trip and inspection of the pump were unnecessary in light of Flowserve's contractual obligations.

B. $4,850 in damages attributable to costs associated with performing the slow-roll tests in the field in September 2001. The Court concludes that LMC would have been required to test the motors in the field anyway pursuant to Section 3.3.7 of the Prime Contract. (Ex. L3); (Ryan Dep. at 55).

C. Costs allegedly owed to Sachs Electric for overhead and efficiencies. The Court finds that LMC had failed to provide sufficient documentation to substantiate these claims for damages. *See All Nite Garage, Inc. v. A.A.A. Towing, Inc.,* 452 P.2d 902 (Nev.1969).

148. As noted *supra,* LMC's settlement agreement with SNWA did not constitute an assessment of

Slip Copy
Slip Copy, 2006 WL 3434745 (D.Nev.)
**(Cite as: 2006 WL 3434745 (D.Nev.))**

liquidated damages as set forth in the Material Contract Court.

149. Based on the above discussion, the Court finds that Flowserve is liable to LMC for damages of $850,716.80 for its claim for breach of contract. Therefore, this amount is set off against the unjust enrichment amount of $6,088,795.27 to which LMC owes Flowserve. Therefore the Court finds that LMC is liable to Flowserve in the amount of $5,238,078.47. [FN9]

> FN9. It appears that SNWA has yet to accept the HSC pumps due to concerns regarding cavitation issues. Therefore, LMC could still be liable to SNWA notwithstanding the Flowserve Warranty Agreement. However, the potential existence of future liability to SNWA does not in and of itself permit LMC to withhold payment to Flowserve for the pumps. In the event that SNWA brings a claim against LMC regarding the pumps, LMC may then seek recovery against Flowserve.

150. In turn, Flowserve is liable to Ideal for $1,626,676.55, or the remaining amount under the Motor Contract.

151. Both Flowserve and LMC are liable for prejudgement interest pursuant to Section 17.130 of the Nevada Revised Statutes. Interest shall accrue from October 30, 2002, the date of final completion of the Raw Water Project.

*ORDER*

**\*18** Based on the above findings of fact and conclusions of law, this Court orders that judgment be entered (1) In favor of Ideal and against Flowserve in the amount of $1,626,676.55, and (2) in favor of Flowserve and against LMC in the amount of $5,238,078.47.

IT IS SO ORDERED.

Slip Copy, 2006 WL 3434745 (D.Nev.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>Certificate of Service</u>

I certify that a true and correct copy of the foregoing was served on all parties on

May 10, 2007 via LexisNexis File & Serve.

/s/ Andrew D. Schau
Andrew D. Schau