UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*State of Montana v. Abbott Labs Inc., et al.,*<br>D. Mont. Cause No. CV-02-09-H-DWM | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) MDL No. 1456<br><br>Master File No. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**INDIVIDUAL REPLY OF DEFENDANT
ASTRAZENECA PHARMACEUTICALS LP
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...................................................................................................................................3

    A.    AstraZeneca Should be Granted Summary Judgment on All of the State's Claims Because the State Cannot Establish That It was Deceived .........................3

    B.    The Spreads Between Acquisition Costs and AWPs for AstraZeneca's Products Are Within Plaintiff's Expert's Expectation Yardstick ...........................7

    C.    AstraZeneca Should be Granted Summary Judgment on All of the State's Claims Because the State Cannot Prove That It Suffered an Ascertainable Loss ................................................................................................................... 10

CONCLUSION ............................................................................................................. 13

## TABLE OF AUTHORITIES

PAGE

### Cases

*Arzoomanian v. British Telecom., Plc.*, No. 03-374 (PGS), 2007 U.S. Dist. LEXIS 2715 (D.N.J. Jan. 11, 2007) .................................................................................................. 12

*Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443 (1st Cir. 1995) ...................................................... 10

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................ 10

*Graffam v. Town of Harpswell*, 250 F. Supp. 2d 1 (D. Me. 2003) .............................................. 10

*Harris v. Horne*, No. ADV-91-1564, 1994 Mont. Dist. LEXIS 159 (Lewis and Clark County District Court, October 6, 1994) ............................................................. 3, 4

*In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740 (E.D.N.Y. 1984) .................................. 5

*In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ................ 7

*In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, CIV. A. No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 26242 (D. Mass. April 2, 2007) .................................... 9

*Lee v. Stockmen's Nat'l Bank*, 207 P. 623 (Mont. 1922) .............................................................. 3

*Spence v. Yocum*, 651 P.2d 1022 (Mont. 1982) ...................................................................... 3, 4

*United States v. Various Slot Machines*, 658 F.2d 697 (9th Cir. 1981) ...................................... 11

### Statutes and Rules

42 C.F.R. § 447.333(c) .................................................................................................................. 8

42 U.S.C. § 1396a(a)(30)(A) ...................................................................................................... 12

**PRELIMINARY STATEMENT**

Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") respectfully submits this individual reply in further support of its motion for summary judgment.  As set forth in the Defendants' Memorandum in Support of Their Joint Motion for Summary Judgment (Docket No. 3631) ("Joint Memorandum" or "Joint Mem.") and Defendants' Reply to the State of Montana's Opposition to Defendants' Joint Motion for Summary Judgment (Docket No. 3631) ("Joint Reply"), Defendants are entitled to summary judgment on all claims brought by the State of Montana (the "State" or "Plaintiff") in its Second Amended Complaint.[1]

In its opposition to AstraZeneca's motion for summary judgment, Montana does nothing more than repeat its unsupported theory of liability and the allegations contained in its Second Amended Complaint:  "[AstraZeneca] reported average wholesale prices that were neither averages nor prices charged to any customer, knowing that the Montana … state Medicaid program[] and other payors would rely on them as a basis for reimbursement and thus pay more than they should have out of the public coffers."  Montana and Nevada's Joint Opposition to Defendant AstraZeneca Pharmaceuticals LP's Motions for Summary Judgment ("Pls.' Opp.") at 1.  The State goes on to assert that "[r]eporting prices that differed from the plain meaning of

---

[1] AstraZeneca incorporates by reference (1) Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, February 8, 2007 (Docket No. 3648) ("Joint 56.1 Stmt."); (2) Defendants' Joint Response to the State of Montana's Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment Against Certain Defendants and Supplemental Statement of Undisputed Facts, March 22, 2007 (Docket No. 3886) ("Joint Response 56.1 Stmt."); (3) Defendants' Joint Response to the State of Montana's Additional Facts Relied Upon by Montana in Response to Defendants' Motion for Summary Judgment, April 5, 2007 (Docket No. 4004) ("Joint Reply 56.1 Stmt."); (4) Local Rule 56.1 Statement of Undisputed Material Facts in Further Support of Defendant AstraZeneca Pharmaceutical LP's Motion for Summary Judgment, February 8, 2007 (Docket No. 3697) ("AstraZeneca 56.1 Stmt."); (5) Defendant AstraZeneca Pharmaceuticals LP's Counter Statement of Disputed Facts in Response to the State of Montana's L.R. 56.1 Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment Against Certain Defendants, March 22, 2007 (Docket No. 3893) ("AstraZeneca Counter 56.1 Stmt."); and (6) Defendant AstraZeneca Pharmaceuticals LP's Individual Rule 56.1 Response to the Additional Facts Relied Upon by the State of Montana in Response to Defendants' Motion for Summary Judgment, April 5, 2007 (Docket No. 4025) ("AstraZeneca Reply 56.1 Stmt.").

'average wholesale price' under the label of AWP would mislead a reasonable payor." *Id.* at 2. Finally, the State concludes that such purported actions by AstraZeneca "demonstrate[] the unfair and deceptive nature of [AstraZeneca's] subject drug prices." *Id.*

Whatever the import may be of merely parroting conclusory allegations in connection with a motion to dismiss, the summary judgment stage is different. It requires proof and support in the factual record. The State's allegations do not suffice. Indeed, the record does not establish basic elements of the State's claims against AstraZeneca; for example, that (1) the AWPs for AstraZeneca's products reported in various pricing compendia were false; deceptive, or misleading; (2) AstraZeneca was responsible for the publication of AWPs in these pricing compendia; and (3) the State set its Medicaid reimbursement formula based on the plain meaning of AWP.

To the contrary, there is an abundance of evidence in the record demonstrating that the State knew for many years that AWP was a pricing benchmark, rather than an *actual* average of wholesale prices for prescription drugs. In addition, the spreads between acquisition costs and AWPs for AstraZeneca's products were within the State's expert's expectation yardstick. Finally, the record does not establish that the State suffered, or that AstraZeneca caused, any ascertainable losses, as is required in order for the State's claims to proceed.

# ARGUMENT

A. **AstraZeneca Should be Granted Summary Judgment on All of the State's Claims Because the State Cannot Establish That It was Deceived.**

The State does not dispute—nor can it—that AstraZeneca is entitled to summary judgment on all of the State's claims as a matter of Montana law if the State is unable to establish that it was deceived by AstraZeneca's purported misconduct. *See* Individual Memorandum of Law in Further Support of Defendant AstraZeneca Pharmaceuticals LP's Motion for Summary Judgment, February 8, 2007 (Docket No. 3696) ("AstraZeneca Mem."), at 4-5; *see also Lee v. Stockmen's Nat'l Bank*, 207 P. 623, 630 (Mont. 1922) ("[O]ne can secure no redress for a misrepresentation, which he knew to be false, nor for failure to disclose facts which he knew to exist. *If the representee knew the truth, it is obvious that he was neither deceived nor defrauded, and that any loss he may sustain is not traceable to the representations, but is in effect self-inflicted.*") (emphasis added); *Spence v. Yocum*, 651 P.2d 1022, 1025 (Mont. 1982). Moreover, the State is barred from claiming it was deceived if it had the means to ascertain the truth of any supposedly fraudulent or deceptive representation. *See Spence*, 651 P.2d at 1025 (quoting *Lee*, 207 P. at 630) ("When it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself or that the means were at hand to ascertain the truth … of any representation made to him, his reliance upon such representation made to him, however false they may have been, affords no grounds of complaint."); *Harris v. Horne*, No. ADV-91-1564, 1994 Mont. Dist. LEXIS 159, at *8 (Lewis and Clark County District Court, October 6, 1994) (finding that plaintiffs who had the means to investigate a representation could not hold a party "liable for their own inaction").

As discussed in Defendants' Joint Memorandum and Joint Reply, the State was not deceived regarding AWP.  The record establishes that AWP was known to be a pricing benchmark or sticker price, rather than an *actual* average of wholesale prices.  *See* Joint Mem. at 3-20; Joint Reply at 1-2.  Indeed, the evidence is overwhelming that Montana Medicaid knew that its reimbursement formula and calculation of an estimated acquisition cost ("EAC") for prescription drugs resulted in payments to providers well above their acquisition costs, but it chose to reimburse at these levels to compensate providers for the State's persistent under-payment of dispensing fees and to ensure that enough providers would remain in its pharmacy network to meet its federal statutory obligations.  *See* Joint Mem. at 6-12, 14-16; Joint Reply at 1-2.  Moreover, Montana Medicaid officials have testified that they received the numerous government reports distributed to state Medicaid programs over the last thirty years concerning the relationship between AWP and the actual acquisition costs of providers.[2]  *Id.*  Thus, because the State's essential allegation of deception cannot be established through evidence, summary judgment is warranted for all Defendants on all of Montana's claims.

With respect to AstraZeneca's drugs, the record also establishes that the State could not have been deceived into believing that the published AWPs for AstraZeneca products were the equivalent of the actual acquisition costs for those products because AstraZeneca provided the State with average sales prices ("ASPs") for certain products.  *See* AstraZeneca Mem. at 7-9.

---

[2] As Magistrate Judge Bowler has already ruled in the case of Nevada, state Medicaid agencies cannot "believably maintain that policymakers failed to consider the dozens of AWP related documents" that they would have received from the federal government.  Report and Recommendation re: Defendants' Joint Motion For Redress For Spoliation of Evidence, March 14, 2007 (Docket No. 3843), at 26, Declaration of James J. Duffy in Support of the Individual Reply of Defendant AstraZeneca Pharmaceuticals LP in Further Support of Its Motion for Summary Judgment ("Montana Duffy Decl.") ¶ 2, Ex 1.  The same holds true for Montana Medicaid.  Moreover, such documents provided a readily-available means by which the State could have ascertained the truth regarding the alleged misrepresentations by Defendants, which also defeats the State's claims.  *See Yocum*, 651 P.2d at 1025; *Horne*, 1994 Mont Dist. LEXIS 159, at *8.

Indeed, the State concedes that it is undisputed that Montana Medicaid did not use the ASPs that AstraZeneca provided, *see* Pls.' Opp. at 10, and continued to reimburse for these products based on an AWP methodology even after receiving ASP data.[3]

Plaintiff argues that AstraZeneca's reporting of ASPs to the State is irrelevant to the issue of whether the State was deceived or defrauded as to the prices of AstraZeneca's drugs. *See* Pls.' Opp. at 8-11. Specifically, the State contends that "[i]n fact, the evidence shows that at most, [AstraZeneca] submitted ASPs for just one subject drug—Zoladex—a drug the State concedes is no longer in the case." *Id.* at 8.

The record demonstrates that, since November 2003, AstraZeneca has reported to Montana on a quarterly basis ASPs for eight of its products: Cefotan, Elavil Injection, Faslodex, Foscavir, Merrem, Tenormin Injection, Xylocaine Injection, and Zoladex.[4] *See* AstraZeneca 56.1 Stmt. ¶ 20. While it is correct that of these drugs, only Zoladex has ever been the subject of this litigation, this does not mean that AstraZeneca's reporting of ASP data is not relevant to the issue of the State's knowledge concerning the prices of AstraZeneca's products. To the contrary,

---

[3] In addition, it is clear the State was not deceived regarding the prices of AstraZeneca's products because non-Medicaid State entities were purchasing various AstraZeneca drugs at prices *below* the Montana Medicaid ingredient cost reimbursement rate, *see* AstraZeneca 56.1 Stmt. ¶ 21, and this knowledge can be imputed to Montana Medicaid. *See In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 796 (E.D.N.Y. 1984) (finding that knowledge of one state agency can be imputed to other state agencies).

[4] The State also argues that there is a dispute as to whether Montana Medicaid ever received the ASP data reported by AstraZeneca. *See* Pls.' Opp. at 9-10. Contrary to the State's argument, however, the record establishes that Montana Medicaid did in fact receive these data. First, the settlement agreement entered into between AstraZeneca and the State requires that the ASP data be provided to the State Pharmacy Manager, Montana Department of Public Health and Human Services, which is the supervisory agency for Montana Medicaid. *See* AstraZeneca 56.1 Stmt. ¶ 20. Second, the cover letters transmitting these data indicate that the data were in fact sent to the Montana Department of Public Health and Human Services. *See* Defendant AstraZeneca Pharmaceuticals LP's 56.1 Statement of Additional Facts in Support of Its Reply to Montana and Nevada's Joint Opposition to Its Motion for Summary Judgment ("AstraZeneca Reply II 56.1 Stmt.") ¶ 1. Third, most of the cover letters transmitting these data indicate that they were received and stamped by the State of Montana, either by Montana Child & Adult Health Resources or Montana Health Resources. *See id.* Finally, the State's own cover letter producing these ASP transmittals in this litigation indicates that the data were "located in the State of Montana's files." *See id*.

5

the reporting of these ASPs to the State establishes that Montana was aware of the differences or spreads between the actual sales prices and AWPs of AstraZeneca's drugs. Again, even after receiving these ASP data, the State has never altered the way it reimburses for these AstraZeneca drugs, despite the fact that Medicaid regulations permit the State to do so. *See* AstraZeneca Mem. at 8-9. Furthermore, the State has never requested information from AstraZeneca concerning the ASPs for its other products.

In addition, the record demonstrates that the underlying economics and distribution mechanics for AstraZeneca's drugs render the State's theory of liability nugatory as to AstraZeneca's branded pharmacy-dispensed products, which are at the core of the State's claims against AstraZeneca. As discussed in AstraZeneca's opening brief, *see* AstraZeneca Mem. at 2, 6-7, a spread on branded outpatient drugs could not result in additional sales or expanded market share for a manufacturer because pharmacists have no power to influence the prescribing decisions of doctors.

In its opposition, the State attempts to refute such an argument by creating a purported issue of material fact with respect to whether AstraZeneca had an incentive to manipulate the spread on its self-administered drugs ("SADs"). *See* Pls.' Opp. at 13-14. The internal AstraZeneca documents cited by the State, however, create no such issue of fact.[5] To the

---

[5] The internal AstraZeneca documents cited by the State do not establish any rationale for why AstraZeneca would endeavor to manipulate the spreads on its branded outpatient drugs that are compensated for under the Montana Medicaid program. The State relies primarily on a pricing strategy document for a single drug (Atacand) that, in fact, concludes that "rewarding [retailers] with an increase in AWP is *illogical*" given their marginal influence on prescribing decisions and the impact that such a change would have on other market participants. Breckenridge Decl., Ex. 54 at AZ0463900 (emphasis added). The State also cites to a document that states that altering the relationship between AWP and Wholesale Acquisition Cost ("WAC") would economically benefit pharmacists, *see* Breckenridge Decl., Ex 50 at AZ0565612, but this document fails to provide a reason why AstraZeneca would have an economic incentive to create such a spread on its products. Finally, the State cites to a document that instructs AstraZeneca's sales representatives on how to interact with pharmacists with respect to the drug Entocort EC, including remembering to inquire as to whether pharmacists are stocking the drug and how to review patient education information. *See* Breckenridge Decl., Ex. 55 at AZ0619990-93. Again, this document is

6

contrary, it is evident—as the MDL Court has recognized—that retail pharmacies cannot impact market share for branded outpatient drugs. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 74 (D. Mass. 2005).

B.  **The Spreads Between Acquisition Costs and AWPs for AstraZeneca's Products Are Within Plaintiff's Expert's Expectation Yardstick.**

As discussed in AstraZeneca's opening brief, the State's own expert—Dr. Raymond Hartman—has concluded that payers are aware that AWPs are greater than ASPs, and these payers rely on AWPs to bear a predictable relationship to ASPs. *See* AstraZeneca 56.1 Stmt. ¶ 23. Dr. Hartman went on to determine what the expectation was for that relationship, finding a reasonable expectation to be a 30 percent spread between AWP and ASP, which he described in the class case as a liability threshold. *See id.* ¶ 24.

The spreads on AstraZeneca's self-administered drugs that are the subject of this case are well within the 30 percent threshold identified by Dr. Hartman. Indeed, over the period of the State's allegations, the spread between AWP and WAC for all of AstraZeneca's Medicaid-covered drugs was either 20 or 25 percent. *See id.* ¶ 5. Because the spreads between the AWPs and the actual acquisition costs (using WAC as a proxy) of AstraZeneca's drugs were within the bounds of what would have been expected by the State—as acknowledged by the State's own expert—the State cannot establish that it has been deceived or that the AWPs for AstraZeneca's drugs caused the State any loss.

The State responds that Dr. Hartman's 30 percent "expectation yardstick" is not applicable in this case because "[t]he Medicaid market at issue here is different from the private

---

irrelevant to the issue of whether AstraZeneca had an incentive to manipulate and market the spread on its branded outpatient drugs.

7

payor market about which Dr. Hartman opined in the class case," and that "[t]he measurement in the Medicaid markets, according to Dr. Hartman, is the calculation used to approximate EAC." Pls.' Opp. at 16.

Such unsupported allegations by the State, however, are directly contrary to the testimony of Dr. Hartman himself in this case.[6] As acknowledged by the State, Dr. Hartman testified that not only would his 30 percent "expectation yardstick" apply to third-party payers, but he specifically testified that state Medicaid agencies are market participants and would have such an expectation. *See* AstraZeneca 56.1 Stmt. ¶ 25. Moreover, as the MDL Court noted during the April 11, 2007 pre-trial conference, "everyone knew about a 20 to 25 percent spread, maybe 30 percent. *Everyone* knew, *everyone*." April 11, 2007 Pre-Trial Conference Transcript, *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, CIV. A. No. 01-12257-PBS (Saris, J.), at 22, Montana Duffy Decl. ¶ 15, Ex 14. Specifically with respect to government knowledge, the Court observed that "they for sure knew … about spreads in the 30 percent range." *Id.* Thus, the record contains overwhelming proof, as the State's own expert explicitly acknowledges, that Montana Medicaid must have known that AWPs were substantially higher than pharmacies' actual acquisition costs.

Plaintiff also argues that, "[e]ven if Dr. Hartman's 30% expectation theory for the private payor markets applied here, the evidence is in dispute as to whether [AstraZeneca's] spreads fall below this level." Pls.' Opp. at 16. The State, however, cites to no credible facts or evidence to support this proposition and, therefore, it should not be accepted by this Court.

---

[6] Furthermore, the State's calculation of EAC is clearly not a reliable proxy for its expectations of this relationship because the State has continued to use the same EAC, even after it initiated this lawsuit and was certainly aware that its EAC significantly understates the relationship between AWP and WAC. In addition, under the Medicaid regulations, EAC should be based on provider cost studies, *see* 42 C.F.R. § 447.333(c), which the State has failed to undertake.

The State first contends that the conclusion of AstraZeneca's expert Joel Winterton that the spread between AWP and WAC for all of AstraZeneca's Medicaid-covered drugs was either 20 or 25 percent is "based on his analysis of just five of [AstraZeneca's] Medicaid products for the period 1991 to 2004." *Id.* As an initial matter, this is not true. Over the period of Plaintiff's allegations, the spread between AWP and WAC for *all* of AstraZeneca's Medicaid-covered outpatient drugs was either 20 or 25 percent. *See* AstraZeneca 56.1 Stmt. ¶ 5. Moreover, the five AstraZeneca drugs that Mr. Winterton focuses on in his expert report comprised over 82 percent of the State's total Medicaid expenditures for AstraZeneca drugs from 1991 to 2004. *See id.* ¶ 4.

Plaintiff secondly argues that "Mr. Winterton applied rebates to the State's reimbursements to achieve the price. Only through the offset of rebates does Mr. Winterton reach the sub-30% levels." Pls.' Opp. at 16. Again, this unsupported claim by the State is not true. In finding that the spread between AWP and WAC for *all* of AstraZeneca's Medicaid-covered outpatient drugs was either 20 or 25 percent, Mr. Winterton did *not* apply rebates. *See* AstraZeneca 56.1 Stmt. ¶ 5; *see also In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, CIV. A. No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 26242, at *126 (D. Mass. April 2, 2007) (noting that there is a standard 20 or 25 percent mark-up from WAC to AWP for brand name prescription drugs). The assertions of the State's lawyers to the contrary are not sufficient to create an issue of fact and to defeat a motion for summary judgment.

Finally, in attempting to refute Mr. Winterton's conclusion that, over the period of Plaintiff's allegations, the spread between AWP and WAC for *all* of AstraZeneca's Medicaid-covered drugs was either 20 or 25 percent, the State cites to competing spreads calculated by Dr.

9

Hartman that purportedly show that "the actual [AstraZeneca] spreads for the relevant time period were 20.89% -169.31%." Pls.' Opp. at 17.

The spreads cited to by the State, however, pertain only to the drug Zoladex. Spreads for Zoladex are not relevant to the issues in this litigation because—as the State acknowledges—any Medicaid-related claims relating to Zoladex are barred by the 2003 settlement between the State of Montana and AstraZeneca. *See* AstraZeneca 56.1 Stmt. ¶ 20; Pls.' Opp. at 9. Furthermore, the spreads contained in Dr. Hartman's table are inflated and based upon a faulty methodology and, therefore, were stricken by the MDL Court.[7] *See* AstraZeneca Reply 56.1 Stmt ¶ 144. These spreads should be similarly stricken by this Court.

C.  **AstraZeneca Should be Granted Summary Judgment on All of the State's Claims Because the State Cannot Prove That It Suffered an Ascertainable Loss.**

The State acknowledges that "[l]oss is a material element of all of the State's causes of action." Pls.' Opp. at 17. Notwithstanding such an acknowledgement, the State neglects to provide any support for its unsubstantiated conclusion that it has satisfied this element. Instead, the State's sole response to the numerous points raised by AstraZeneca regarding the State's failure to demonstrate loss is to cite to, in conclusory fashion, Dr. Hartman's calculation of damages.[8] *See id.*

---

[7] In calculating these spreads, Dr. Hartman calculated the ASP for Zoladex by incorporating 50 percent of the units of all Zoladex samples distributed by AstraZeneca in the relevant time period. *See* AstraZeneca Reply 56.1 Stmt. ¶ 144. When asked how he derived this 50 percent assumption, Dr. Hartman responded it was the product of "a coin toss." *Id.* Based on this unsupported assumption and faulty methodology, the MDL Court struck the spreads calculated by Dr. Hartman for Zoladex, *see id.*, which the State now seeks to reply upon.

[8] Thus, the State's failure to substantively address any of AstraZeneca's arguments regarding loss merits summary judgment on all of the State's claims. *See Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446 (1st Cir. 1995) ("Properly supported facts set forth by the moving party are deemed admitted unless controverted by the factual statement of the opposing party."); *Graffam v. Town of Harpswell*, 250 F. Supp. 2d 1, 7 (D. Me. 2003) ("The plaintiff does not respond to [defendant]'s argument on this claim and accordingly is deemed to have waived opposition."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial).

Dr. Hartman's report, however, is a purposefully circumscribed analysis of damages that is focused on the penalty provisions of the Montana statutes in question. Dr. Hartman specifically acknowledges that he is basing liability upon instructions from counsel: "I have been instructed by Counsel that liability occurs as a matter of law if AA [amount allowed as reimbursement] [is greater than] EAC [estimated acquisition cost]." AstraZeneca Reply II 56.1 Stmt. ¶ 2. Under such circumstances, where the parameters for establishing liability are predetermined by counsel, it is not surprising that Dr. Hartman arrived at a damages calculation that cannot be supported by any facts in the record.

The State has always claimed that the basis for its claims is that it was overpaying pharmacies and, thus, it should be able to demonstrate that Montana pharmacies were making large, unwarranted profits on the sale of AstraZeneca's drugs. Similarly, because the State has acknowledged that loss is a necessary element of all of its claims, it must be able to prove that—absent AstraZeneca's purported misconduct—it would have paid pharmacies less. Dr. Hartman's damages calculation, however, does not demonstrate either that pharmacies were being overpaid as a result of Defendants' misconduct or that Montana could have reimbursed pharmacies at a lower rate.

Moreover, a fundamental flaw in Dr. Hartman's analysis is that he fails to consider the effects of the dispensing costs incurred by Montana pharmacies in arriving at a damages calculation. *See* AstraZeneca Reply II 56.1 Stmt. ¶ 3. He also fails to consider the State's obligations under federal law, which sets a floor on the amount the State can reimburse for pharmaceutical drugs. *See id.* Indeed, the State completely ignores these crucial points in its opposition papers and—given these deficiencies—Dr. Hartman's expert opinion cannot serve as a proxy for the State's demonstration of loss. *See, e.g.*, *United States v. Various Slot Machines*,

11

658 F.2d 697, 699 (9th Cir. 1981) (holding that an expert opinion that is contrary to the facts of the case should not be given weight at summary judgment); *Arzoomanian v. British Telecom., Plc.*, No. 03-374 (PGS), 2007 U.S. Dist. LEXIS 2715, at *52 (D.N.J. Jan. 11, 2007) (same).

As discussed in AstraZeneca's opening brief, AstraZeneca's alleged misconduct could not have caused the State to suffer injury because, taking into account Medicaid rebates, the State's net costs for AstraZeneca's drugs were actually less than the acquisition costs of Montana pharmacies. *See* AstraZeneca Mem. at 10-11. In addition, AstraZeneca's expert, Mr. Winterton, demonstrates that, in most instances, pharmacies actually lost money in dispensing AstraZeneca's drugs to Montana Medicaid beneficiaries, and would have suffered substantial losses dispensing these drugs in Dr. Hartman's "but-for" world. *See* AstraZeneca 56.1 Stmt. ¶¶ 13-15. Because the State could not have realistically lowered its reimbursement rates for these products—without Montana pharmacies suffering a loss each time they dispensed an AstraZeneca product—there is no ascertainable loss suffered by the State. The State of Montana fails to address either of these arguments in its opposition to AstraZeneca's motion for summary judgment.

In sum, the State cannot adequately support its claims that it has suffered ascertainable losses as a result of AstraZeneca's alleged misconduct. The State presents no evidence whatsoever to demonstrate proof of loss, provides no explanation as to why Dr. Hartman failed to consider dispensing costs in his damages calculations, and simply ignores the mandates of the equal access provision of the Medicaid Act. *See* 42 U.S.C. § 1396a(a)(30)(A). As a result, AstraZeneca is entitled to summary judgment on all of the State's claims.

## CONCLUSION

For the foregoing reasons, as well as those set forth in AstraZeneca's opening brief, Defendants' Joint Memorandum, and Defendants' Joint Reply, AstraZeneca is entitled to summary judgment on all of the State of Montana's claims.

Dated: Boston, Massachusetts
       May 10, 2007

Respectfully Submitted,

By:  /s/ Katherine B. Schmeckpeper

Nicholas C. Theodorou (BBO # 496730)
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: (617) 832-1000

D. Scott Wise (admitted *pro hac vice*)
Michael S. Flynn (admitted *pro hac vice*)
James J. Duffy (admitted *pro hac vice*)
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212)-450-3800

*Attorneys for Defendant AstraZeneca Pharmaceuticals LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2007, I caused a true and correct copy of the foregoing, the Individual Reply of Defendant AstraZeneca Pharmaceuticals LP in Further Support of Its Motion for Summary Judgment, to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 in MDL No. 1456.

/s/ Katherine B. Schmeckpeper
Katherine B. Schmeckpeper
