# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
IN RE PHARMACEUTICAL INDUSTRY      )
AVERAGE WHOLESALE PRICE            )    MDL NO. 1456
LITIGATION                        )    CIVIL ACTION NO.
                                   )    01-12257-PBS
                                   )
                                   )
THIS DOCUMENT RELATES TO:          )
                                   )
State of Nevada v. Abbott          )
Labs., Inc., et al., C.A. No.      )
02-00260-ECR (NEVADA I), and       )
                                   )
State of Nevada v. American        )
Home Products, et. al., C.A. No.   )
02-12086-PBS (Nevada II)           )
                                   )
```

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' JOINT MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE**
**(DOCKET ENTRY # 2899)**

**March 14, 2007**

**BOWLER, U.S.M.J.**

Pending before this court is a joint motion by the Nevada II
defendants ("defendants") seeking sanctions against the State of
Nevada ("Nevada"), a plaintiff in this multidistrict action
number 1456, Civil Action No. 01-12257-PBS ("the MDL action")
that alleges fraudulent overstatement of the published "average
wholesale price" ("AWP") of various prescription drugs.  (Docket
Entry # 2899).  Defendants seek sanctions under Rule 37, Fed. R.
Civ. P. ("Rule 37") arising from Nevada's alleged destruction of
relevant evidence in violation both of Case Management Order No.
2 ("CMO No. 2") and Nevada's legal obligations prior to CMO No.
2.  After conducting a hearing on October 23, 2006, this court

took the motion (Docket Entry # 2899) under advisement.

## BACKGROUND

In May 2000, Nevada's Senior Deputy Attorney General Timothy Terry ("Terry") sent letters of inquiry from the Nevada Medicaid Fraud Control Unit to defendants.  (Docket Entry # 2900, Ex. B.1 & B.2).  These letters requested information on the disparity between certain prescription drugs' AWP and their true market price.  Id.  In June 2000, defendants responded to the letters, acknowledging a disparity between AWP and true market price.  (Docket Entry # 2900, Ex. C.1 & C.2).   Nineteen months after receiving defendants' responses, Nevada filed suit in state court ("AWP state action") against defendants on January 17, 2002, alleging that defendants defrauded, deceived and misled Nevada by manipulating AWP.  On the same day, attorneys for the Nevada Department of Health Care Finance Policy ("DHCFP" a/k/a "Nevada Medicaid") notified Nevada Medicaid employees of the suit by circulating a press release from the Nevada Attorney General regarding the filing of the suit.  (Docket Entry # 2961).

At the time the lawsuit was filed, Nevada Medicaid had in place a Records Retention and Disposition Schedule which included requirements for how long documents must be preserved.  (Docket Entry # 2961, Ex. D).  The schedule typically called for retention of documents for three years and 30 days unless longer periods were specified.  The schedule also provided for a

2

litigation disposition hold which requires that after an agency receives notification of the filing of a lawsuit on its behalf, "[a]ll records pertaining to the litigation should be identified, separated from other files and protected.  All destruction of records pertaining to the lawsuit must be stopped until the legal action has been resolved."  (Docket Entry # 2900, Ex. D, p. 1). Nevada did not enact a litigation disposition hold and identify and preserve relevant documents when it received notice of the filing of the lawsuit on January 17, 2002.  (Docket Entry # 2961).  Instead, Nevada continued document retention as specified in the Retention and Disposition Schedules, which permit destruction of documents after three years and 30 days.  Id.

Ten months later, in October 2002, this case was removed to federal court and consolidated with the MDL action, at which time Nevada became subject to CMO No. 2, which had been issued in July 2002.  CMO No. 2 states that, "All parties acknowledge their responsibilities to take reasonable steps to comply with the law regarding preservation of documents."  (Docket Entry # 135, ¶ 9). Despite being subject to CMO No. 2, Nevada again did not enact a litigation disposition hold or begin document preservation. Rather, Nevada Medicaid acknowledged that it preserved only whatever documents individual employees retained as being "important or useful to them for work."  (Docket Entry # 2961).

Over two years after issuance of CMO No. 2, defendants filed

3

their first discovery request in January 2005 and Nevada began
producing evidence but again did not take steps to prevent
document destruction.  (Docket Entry # 2961).  The parties
proceeded with discovery and in November 2005 defendants deposed
certain key Medicaid personnel, including Charles Duarte
("Duarte"), the Nevada Medicaid Director from 2000 to the
present, Mel Rosenberg ("Rosenberg"), Nevada Medicaid's
Information Systems Manager since 2003, and John Liveratti
("Liveratti"), DHCFP's Chief Compliance Officer since 2003.
(Docket Entry # 2900).  All three of these key Medicaid officials
testified they were unaware of any litigation disposition hold
requiring a preservation of AWP related documents, despite the
filing of the lawsuit nearly four years earlier.  Id.  Following
these depositions, Duarte enacted a litigation disposition hold
and circulated a document preservation notice to Medicaid
employees for the first time on November 30, 2005.  Id.  This
first litigation disposition hold came nearly four years after
Nevada initially filed the lawsuit and, given Nevada's retention
policy that documents only need to be preserved for three years
and 30 days, any AWP related documents that Nevada may have had
when it filed its claim could have been destroyed in the interim.
(Docket Entry # 2900).

In light of the likely destruction of documents created by
Nevada's failure to preserve, defendants filed an emergency
motion in December 2005 requesting that Nevada be held in

contempt for not complying with its obligation to preserve
evidence and that Nevada be ordered to take immediate steps to
preserve relevant documents and provide an accounting of the
documents destroyed.  (Docket Entry # 1941).  This court did not
grant the relief requested and defendants continued to depose
Nevada witnesses.  In deposing these witnesses, defendants
discovered that as late as May 22, 2006, witnesses who had
possessed relevant AWP documents had not been told to retain
them.  (Docket Entry # 2900).  After determining that as late as
May 2006 a number of individuals with relevant documents still
had not been told to preserve them, defendants filed this motion
in July 2006 requesting sanctions against Nevada for the
prejudicial destruction of evidence.  (Docket Entry # 2899).

In the motion, defendants established four primary
categories of documents which they allege were destroyed.  The
categories of documents are:

> 1) Office of the Inspector General ("OIG") Reports
> discussing AWP, dating from May 1996 to September 2002, and
> other AWP related federal government reports;
>
> 2) documents relating to changes in and assessments of
> Nevada's reimbursement formula;
>
> 3) communications between Nevada and other third parties
> regarding AWP; and
>
> 4) communications between Nevada and defendants in which
> defendants reported their sales prices to Nevada, dating
> from both before litigation and after the filing of the
> claim.

(Docket Entry # 2900).

The first category of documents consists largely of AWP related government reports.  Nevada does not dispute that OIG and other reports from the first category were destroyed but argues instead that the documents can be recreated from other sources and thus there is no prejudice to defendants.  (Docket Entry # 2961).

The second category of documents had consisted of two AWP related studies.  Nevada produced one study, the Myers & Stauffer study, thereby leaving only the Keith MacDonald study ("the MacDonald Study").  (Docket Entry # 2961).  Nevada argues that the latter study predates the litigation and is irrelevant to the case.  (Docket Entry # 2961).  Defendants argue that the study is relevant because it was created in the late 1980s by Keith MacDonald ("MacDonald"), Nevada's Medicaid Director at the time.  (Docket Entry # 2900).  MacDonald testified at deposition that he knew in the 1980s that AWP did not represent actual market price, which supports defendants' contention that Nevada knew of the disparity between AWP and actual market price and could not therefore have been defrauded.  (Docket Entry # 2900).  Defendants also cite deposition testimony that copies of the MacDonald study were still in Nevada's files between 2001 and 2005 and should have been preserved and produced.  Id.

The third category of documents includes communications between Nevada Medicaid and other agencies.  Defendants, who are also involved in similar litigation with the State of Montana,

6

received discovery of AWP related e-mail communications between
Montana and external state Medicaid agencies, as well as AWP
related communications between Montana Medicaid and other
internal Montana state agencies.  (Docket Entry # 2900).  Based
upon these Montana e-mail communications, with respect to which
Nevada Medicaid employees were occasionally copied, defendants
sought copies of similar communications from Nevada.  Id.  Nevada
does not deny that such communications exist and contends that
they were produced within 160,000 electronic files turned over
pursuant to this court's March 30, 2006 Order.  (Docket Entry #
2961).  Nevada's only evidence supporting this assertion,
however, is the affidavit of Nevada's counsel which provides no
examples of the allegedly produced e-mails.  Id.

Finally, the fourth category of documents that defendants
allege were destroyed are pricing letters that defendants sent to
Nevada that show the sales price of their products.  (Docket
Entry # 2900).  Defendants contend that these letters preclude
the allegation they defrauded, deceived or misled Nevada because
the letters illustrate the difference between AWP and actual
cost.  Id.  Nevada concedes it received these letters and claims
to have produced some of these letters to defendants.  (Docket
Entry # 2961).  Just as with the interstate e-mails, however,
Nevada provides no evidence that these letters were produced,
citing only cover letters attached to undefined documents
produced to defendants.  (Docket Entry # 2962, Ex. 10).

Alternatively, Nevada argues that defendants are not prejudiced because defendants can recreate the missing letters from their own files.  (Docket Entry # 2961).

     In the present motion, defendants seek sanctions against Nevada that would establish as fact for the purposes of this litigation that Nevada possessed the documents in the above four categories and considered the information in those documents in setting its Medicaid reimbursement policy.  (Docket Entry # 2900, Ex. A).

DISCUSSION

     Defendants assert that Nevada failed to preserve certain documents related to AWP reimbursement.  Defendants further maintain that this failure constitutes spoliation of evidence and that the spoliation is prejudicial to them and can be remedied only by the establishment of certain facts which they claim the documents would have proven.  Defendants rely on Rule 37 and this court's inherent power to impose these sanctions.

I.  Authority to Remedy Spoliation of Evidence

     The threshold question is the source of this court's authority to impose sanctions for spoliation of evidence.  This question requires examination of two time periods, namely the period after October 2002, when the parties became subject to CMO No. 2 and the Federal Rules of Civil Procedure, as well as the

time period before the issuance of CMO No. 2.

Under Rule 37(b), this court has the ability to levy sanctions if "a party . . . fails to obey an order to provide or permit discovery . . . or if a party fails to obey an order . . .." Under Rule 37(b), "a court order must be in effect, and then violated, as a prerequisite for the imposition of sanctions thereunder." Thiebeault v. Square D. Co., 960 F.2d 239, 245 (1st Cir. 1992). In October 2002, when the AWP state action was consolidated with the MDL action, Nevada became subject to CMO No. 2, which mandated that all parties "take reasonable steps to comply with the law regarding preservation of documents." (Docket Entry # 135, ¶ 9). Thus, after October 2002 any failure to preserve discoverable documents relevant to the litigation would violate this Order and permit this court to impose sanctions under Rule 37. Thiebeault, 960 F.2d at 245.

In addition to the ability to sanction under Rule 37, this court has broad inherent powers, not governed by rule or statute, that permit it to sanction parties. See Chambers v. NASCO, Inc., 501 U.S. 32 (1991) (courts are invested with inherent powers to manage their own affairs so as to achieve expeditious disposition of cases). Under these powers, this court has the ability to dismiss cases, exclude evidence, or impose other sanctions as warranted by the conduct in question. See Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 363-65 (D.Mass. 1991). In applying

9

inherent powers to spoliation cases, this court can "impose
sanctions against a litigant 'who is on notice that documents and
information in its possession are relevant to litigation or
potential litigation, or are reasonably calculated to lead to the
discovery of admissible evidence, and destroys such documents and
information.'"  McGuire v. ACUFEX Microsurgical, Inc., 175 F.R.D.
149, 153 (D.Mass. 1997) (quoting ABC Home Health Services v.
International Business Machines Corp., 158 F.R.D. 180, 182
(S.D.Ga. 1994)).

Thus, under Rule 37(b) this court possesses the power to
sanction parties for destruction of evidence occurring after the
parties were subject to CMO No. 2 in October 2002.  Thiebeault,
960 F.2d at 245.  At the same time, this court has the inherent
power to sanction parties for destruction of evidence occurring
prior to CMO No. 2, provided the destroying party was on notice
that the destroyed documents were relevant to litigation or
potential litigation.  See Zubulake v. UBS Warburg, LLC, 220
F.R.D. 212, 216 (S.D.N.Y. 2003).

Should this court determine that sanctions are appropriate,
a range of options is available, including the sanction specified
under Rule 37(b)(2)(a), namely:  "An order that the . . .
designated facts shall be taken to be established for the
purposes of the action in accordance with the claim of the party
obtaining the order."  This is the remedy requested by
defendants, to wit, that this court deem a series of facts as

established for all purposes in this litigation.

II.  Elements of the Claim

     To determine if defendants are entitled to the sanctions
they seek, it is necessary to evaluate the individual elements
of a spoliation claim.  There are five elements:  (1) an act of
destruction; (2) discoverability of the evidence; (3) an intent
to destroy the evidence; (4) occurrence of the act at a time
after suit has been filed, or, if before, at a time when the
party is on notice that evidence may be relevant to potential
litigation; and (5) prejudice to the moving party.  See
Zubulake, 220 F.R.D. at 216; McGuire, 175 F.R.D. at 154.

III.  Destruction of Evidence

     Claiming that "*no documents have been destroyed*," Nevada
argues that defendants' motion should be denied for failure to
satisfy the first requirement that there be an act of
destruction.  (Docket Entry # 2961) (emphasis in original).
Nevada's assertion is counterfactual, however, because
defendants provided substantial uncontroverted evidence that
documents have in fact been destroyed.  For example, Duarte
testified that he deleted AWP related OIG reports, while former
DHCFP staff pharmacist Laurie Squartsoff and current Nevada
Medicaid Social Services Chief Coleen Lawrence ("Lawrence") both
testified that they maintained copies of OIG and other relevant

11

government reports, none of which have been produced to
defendants. (Docket Entry # 2980); see also (Docket Entry #
2961, wherein Nevada admits that Duarte and Lawrence did not
maintain hard copies of OIG reports and that the reports were
not produced).  Lawrence also testified that some time between
2001 and 2005 she had seen a copy of the AWP related MacDonald
study in Nevada's files.  (Docket Entry # 2980).  As previously
noted this study was not produced to defendants.  Defendants
have also identified numerous AWP related e-mails sent to Nevada
Medicaid personnel from third parties, but these e-mails were
not produced.  (Docket Entry # 2980).

    Despite Nevada's conclusory argument to the contrary, a
failure to preserve documents is the same as destroying them.
Destruction of records includes "physical destruction,
discarding, failure to retain in . . . possession, and . . .
erasure of records."  William T. Thompson Co. v. General
Nutrition Corp., 593 F.Supp. 1443, 1446 (C.D.Cal. 1984).  The
mere fact that these documents inarguably existed but were not
preserved and have not been produced is therefore sufficient to
demonstrate an act of destruction and satisfy the first element
of a spoliation claim.  Id.


IV.  Discoverability of Evidence

    The second factor to be considered is the discoverability
of the evidence.  McGuire, 175 F.R.D. at 154.  Some of the

destroyed documents are discoverable, a fact implicitly admitted by Nevada because it claims to have produced government reports from the first category, interstate e-mail communications from the third category, and communications with defendants from the fourth category.  The only issue as to discoverability arises from the MacDonald study and intrastate communications between Nevada Medicaid and non-Medicaid Nevada agencies.

The MacDonald study, compiled in the late 1980's, was already excluded from discovery by this court when it ruled in March 2006 that pre-1991 documents were not discoverable. Defendants argue that the study should be discoverable because a copy of the study was seen in Nevada's files between 2001 and 2005, and that "Presumably, the study was a relevant factor in Nevada's decision not to change its [reimbursement] rate until 2002."  (Docket Entry # 2980).  Defendants have provided no evidence, however, that the study was in fact used in setting the drug reimbursement rate, and the study is not made discoverable by defendants' presumption.  Furthermore, the mere fact that the study was seen in Nevada's files sometime between 2001 and 2005 does not make it discoverable.  Therefore, since the MacDonald study was already held to be non-discoverable, there can be no sanction for destroying it.

Similarly, this court has already ruled on the discoverability of evidence relating to reimbursement programs of Nevada's non-Medicaid state agencies.  Defendants had sought

unrestricted discovery of all documents concerning the Nevada
Drug Rebate Program, including non-Medicaid programs.  (Docket
Entry # 1623).  This court limited discovery to three non-
Medicaid entities of defendants' choice.  Defendants selected
Public Employee Benefits, Senior Rx and the Mental Health and
Developmental Services as the non-Medicaid Authorities.  Having
previously limited discovery to these agencies, drug
reimbursement documents from other non-Medicaid Nevada agencies
are not discoverable.  Therefore, there can be no sanction for
spoliation of any communication with any state agency other than
these three, and any sanction must be limited to AWP related
communications between Nevada Medicaid and the aforementioned
agencies.

    Nevada contends that Medicaid employees only **"may have had"**
discussions with other non-Medicaid agencies regarding drug
reimbursement rates and based on that "flimsy evidence" there
should be no sanctions.  (Docket Entry # 2961) (emphasis in
original).  Conversely, defendants have cited deposition
testimony confirming drug reimbursement communications between
Nevada Medicaid personnel and employees of the three non-
Medicaid Nevada agencies subject to discovery.  (Docket Entry #
2980, Ex. R.1, R.2 & R.3).  Because this court ruled that
defendants could discover evidence of communication between
Nevada Medicaid and these three other agencies, evidence of such
communications is discoverable and its destruction is

sanctionable if the remaining conditions for a spoliation claim
are satisfied.


V.   Intent to Destroy Evidence

     Willful or purposeful destruction of relevant evidence can
lead to the "ultimate" sanction of dismissing a claim.  See
Thompson, 593 F.R.D. at 1456.  Courts may also impose the lesser
sanction of an adverse inference in cases of willful destruction
of documents.  See Turner, 143 F.R.D. at 74.  In addition, both
Nevada and defendants correctly point out that mere negligence
in the destruction of evidence is sufficient to merit sanctions.
See Sacramona v. Bridgestone/Firestone Inc., 106 F.3d 444, 447
(1st Cir. 1997).  In addressing the issue of negligence, Nevada
maintains, in contravention of the record, that no documents
were destroyed but does acknowledge that "it is evident based on
defendants' submission that any loss after the filing of the
lawsuit was the result of State 'carelessness or negligence.'"
(Docket Entry # 2961).  Nevada was undoubtedly negligent and its
conduct is arguably worse than negligent, as evidenced by Nevada
Medicaid's persistent failure to place a litigation disposition
hold until November 2005, three years and ten months after the
filing of the lawsuit in state court.

     Furthermore, the litigation disposition hold was only put
in place after defendants deposed Nevada Medicaid employees and
questioned them about evidence preservation.  (Docket Entry #

15

2900).  Based on such conduct, defendants submit that Nevada's
destruction of evidence both before and after the filing of the
lawsuit was willful.  Nevada's admission of negligence
forecloses the need to address willfulness inasmuch as this
court, with some limitations, recommends imposition of the
sanctions requested by defendants.  As fully discussed infra, a
negligence finding fully supports the issuance of the requested
sanctions.[1]

VI.   Time at Which Obligation to Preserve Evidence Was Incurred

     Having satisfied the first three elements of the claim,
this court turns to the fourth element, i.e., occurrence of the
destruction after the suit has been filed, or, if before, at a
time when the party is on notice that evidence may be relevant
to potential litigation.  Zubulake, 220 F.R.D. at 216.  As
previously discussed, any destruction of evidence occurring
after the parties were subject to CMO No. 2 is sanctionable
under Rule 37(b).  Similarly, any destruction occurring after
Nevada incurred an obligation to preserve documents is
sanctionable under this court's inherent powers.  The parties
disagree, however, as to when Nevada incurred an obligation to

_____

     [1]  Rule 37(f) states that there can be no sanctions for the
spoliation of evidence resulting from the routine, good faith
operation of an electronic information system.  Rule 37(f) does
not apply to this case, however, because it was not effective
until December 1, 2006, after the acts of spoliation took place
in this case.

preserve documents.

In arguing when Nevada's obligation to preserve evidence began, both parties cite McGuire and both parties derive a different conclusion.  Defendants argue that the duty to preserve evidence begins when litigation is "reasonably foreseeable."  McGuire, 175 F.R.D. at 154 (citing treatise stating that parties have been deemed to know that documents are relevant to litigation when it is reasonably foreseeable that a lawsuit will ensue).  Conversely, Nevada cites the portion of McGuire stating that a prerequisite for the imposition of sanctions is an act of destruction after the filing of the suit is fairly perceived as "imminent."  Id. at 153.  Examining a number of other cases reveals the weakness of Nevada's position.

Defendants cite cases that find that the duty to preserve documents arises when a party is on notice of "potential" litigation[2] or when a party "should have known that the evidence may be relevant to future ligation."[3]  The weight of authority indicates that a duty to preserve evidence arises when a party

_____

[2]   Thompson, 593 F.Supp. 1455.

[3]   Zubulake, 220 F.R.D. at 216 (quoting Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2nd Cir. 2001)); see also Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) ("duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation"); Kronisch v. U.S., 130 F.3d 112, 126 (2nd Cir. 1998) (holding that spoliation sanctions are appropriate when a party "should have known that the evidence may be relevant to future litigation").

17

knows or should know about potential litigation, which is a far
broader time period than the "imminent" standard urged by
Nevada.   Further, as a matter of policy, adopting the standard
urged by Nevada would permit any plaintiff to freely destroy
whatever evidence it chose and then file a claim without fear of
sanction.   Therefore, while Nevada correctly points out that
there is no duty to preserve evidence while parties are in "pre-
litigation limbo," that limbo ceases to exist when parties know
or should know of potential litigation.   See Thompson, 593
F.Supp. 1455.

        Given this standard, it is necessary to determine at what
point Nevada knew or should have known of potential litigation.
Id.  As plaintiff in this case, Nevada's assertion that it did
not know of the potential litigation until the day the case was
filed is patently unreasonable.   (Docket Entry # 2961).   Nevada
must have made some preparation for the litigation before filing
its claim thus putting it on notice of the litigation well
before the filing date and simultaneously incurring an
obligation to preserve evidence.   See Zubulake, 220 F.R.D. at
216.  Citing Turner, defendants correctly argue that the Nevada
Medicaid employees' lack of knowledge of potential litigation is
no defense:

        It is no defense to suggest . . . that particular
        employees were not on notice.  To hold otherwise would
        permit an agency, corporate officer, or legal
        department to shield itself from discovery obligations
        by keeping employees ignorant.  The obligation to

18

> retain discoverable materials is an affirmative one; it
> requires that the agency or corporate officers having
> notice of discovery obligations communicate those
> obligations to employees in possession of discoverable
> materials.

Turner, 142 F.R.D. at 68.  Therefore, while it is not

certain at precisely what point Nevada knew or should have

known of the potential litigation, it is undeniably at a

time before the claim was filed in January 2002.  See

Zubulake, 220 F.R.D. at 216.

     Defendants allege that Nevada was on notice of potential

litigation 20 months before the claim was filed when, in May

2000, Terry, Nevada's Senior Deputy Attorney General with the

Medicaid Fraud Control Unit, sent letters of inquiry to

defendants requesting information regarding the disparity

between AWP and true market price.  (Docket Entry # 2900, Ex.

B.1 & B.2).  Defendants conclude on the basis of these letters

that Nevada was contemplating litigation and thereby incurred

an obligation to begin preservation of relevant evidence.  It

is a reasonable inference that 20 months prior to filing a

claim of this size and scope that a letter from the current

plaintiff's Medicaid Fraud Control Unit to the current

defendants, requesting information about the AWP pricing that

is the subject of this litigation indicates that there was a

"potential" for litigation.  This inference is further

bolstered by defendants' responses to the letters, some of

which were sent by defendants' counsel or after conferring
with counsel, leading to the conclusion that defendants
recognized the potential for litigation.  (Docket Entry #
2980).  Defendants' proposed date for the incurrence of
Nevada's duty to preserve documents is therefore eminently
reasonable.  Accordingly, Nevada's obligation to preserve
documents arose in May 2000.


VII.   Prejudice to Defendants

        Having established all the other elements of a spoliation
claim, this court addresses the fifth and final element of
prejudice to defendants.  McGuire, 175 F.R.D. at 154.  Nevada
argues that there has been no prejudice and "[n]o unique or
even critical evidence has been lost."  (Docket Entry # 2961).
In support of this argument, Nevada correctly submits that the
OIG and other federal reports may be recreated from various
websites and libraries and that the information defendants
sent to Nevada may be recreated from defendants' own records.
Id.  Notably, Nevada does not address potential prejudice
caused by the allegedly destroyed internal communications and
communications between Nevada Medicaid and other external
Medicaid agencies and non-Medicaid Nevada agencies.  Id.

        Nevada incorrectly concludes, however, that defendants
suffered no prejudice simply because evidence can be
recreated.  Contrary to Nevada's position, at the motion

hearing before this court defendants correctly argued that
even if they are able to reproduce the allegedly destroyed
evidence from outside sources and their own files, they are
prejudiced by the loss of any discoverable marginalia or
annotations made on Nevada's copies of the evidence.
Defendants also convincingly argue that they are prejudiced by
the loss of other documents, like Nevada's internal
communications, that are known to exist but cannot be
recreated, and which would help prove that Nevada was aware of
the disparity between AWP and actual drug cost.  (Docket Entry
# 2980).  Defendants also logically assert prejudice because
they will not be able to introduce Nevada's copies of the
allegedly destroyed documents into evidence, thus permitting
Nevada to more plausibly deny any knowledge of their contents.
Id.

     All of these harms serve to prejudice defendants' case,
which is largely based on the allegation that Nevada had in
its possession relevant information that AWP is not the same
as actual cost and therefore defendants could not have
defrauded, deceived or misled Nevada into thinking otherwise.
(Docket Entry # 2900).  Nevada's destruction of evidence
purported to support that very allegation cannot be anything
but prejudicial.  Due to Nevada destroying these documents,
defendants are more than likely prejudiced because, even if
they could obtain other copies, they may be unable to prove

                              21

that relevant Nevada Medicaid personnel read the documents and
could be unable to counter the assertion that Nevada did not
know the difference between AWP and actual market price.
Defendants' inability to use hard evidence in proving that
Nevada possessed and used documents – which Nevada admits to
having possessed – is severely detrimental to defendants, and
therefore prejudicial, making sanctions appropriate.  See
McGuire, 175 F.R.D. at 154.

VIII.   Appropriateness of Defendants' Requested Sanctions

        Because defendants satisfy all the elements of a
spoliation claim, this court turns to the imposition of
sanctions against Nevada.  In its arguments, Nevada seeks to
create an insurmountable catch-22 by claiming that defendants
are not entitled to the sanctions they seek without producing
evidence about what the destroyed evidence would prove.  For
example, Nevada contends that it should not be sanctioned for
destroying e-mail communications because defendants can
produce no evidence about the contents of those e-mails.
(Docket Entry # 2961).  Thus, under Nevada's argument, it may
destroy documents with impunity because destroying documents
prevents their discovery thereby denying defendants the
necessary information about the documents.  Without that
information, Nevada maintains there can be no sanctions.  The
implausibility of such a scenario is apparent and illustrates

the very situation that spoliation sanctions are designed to remedy.  Accordingly, Nevada's argument is not well taken.

Defendants request that this court establish certain facts for the purposes of this litigation.  Nevada's discussion of these sanctions is inherently flawed because it repeatedly miscategorizes defendants' proposed sanction as an adverse inference.  (Docket Entry # 2961).  An adverse inference is a permissive instruction which allows but does not require the trier of fact to infer that the destroyed evidence was harmful to the spoliating party.  See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1159 (1st Cir. 1996) (an adverse inference is a permissive instruction allowing, but not mandating, the trier of fact to draw an inference that destroyed evidence would have been harmful to the destroyer); Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd., 348 F.Supp.2d 332, 334 (D.N.J. 2004).

Within defendants' proposed sanction to establish certain facts, however, the only inference to be drawn is that Nevada "considered these documents in setting and/or assessing its Medicaid pharmacy reimbursement rate."  (Docket Entry # 2900, Ex. A).  Such an inference holds none of the negative connotation contained in an adverse inference because there is no instruction that the trier of fact may infer that the allegedly destroyed evidence would have been harmful to Nevada.  See Blinzler, 81 F.3d at 1159.  Thus, defendants'

requested sanction is wholly different from an adverse
inference thereby rendering Nevada's argument about the
propriety of an adverse inference instruction immaterial.

     Indeed, defendants' requested sanction to establish facts
is less severe than an adverse inference.  Whereas an adverse
inference serves to prove facts that cannot be known because
of the spoliation, a number of fact admissions primarily seek
to establish the existence of documents that Nevada concedes
it possessed but merely has not produced.  For example, Nevada
does not claim it did not possess relevant OIG reports or e-
mails from Medicaid programs in other states.  (Docket Entry #
2961).  In any event, the requested sanction is appropriate
because Nevada's destruction was only negligent and
establishing facts is a wholly appropriate remedy for such
negligence.  See Pressey v. Patterson, 898 F.2d 1018, 1023-24
(5th Cir. 1990) (rejecting an adverse inference sanction as too
severe a remedy for negligent spoliation but suggesting
deeming facts as established was appropriate given negligent
conduct).


IX.  Sanctions to be Imposed

     In light of the preceding analysis, defendants' requested
sanctions are appropriate albeit with the following
alterations.  Defendants seek documents from as early as 1996,
well before Nevada incurred an obligation to preserve AWP

                              24

related documents.  Defendants claim a right to these
documents based upon Nevada's three year and 30 day document
retention policy and also ask to add a "delay" to account for
potential inefficiency in document disposal.  (Docket Entry #
2900).  The time period and reach of the requested sanction is
overbroad.  Notwithstanding the document retention policy,
there was no legal obligation to preserve documents prior to
May 2000.  Because no legal obligation to preserve documents
arose until May 2000, it is inappropriate to establish facts
prior to this date.[4]

Additionally, defendants' sanctions overreach in
requesting this court to establish as fact that Nevada had
knowledge of the destroyed documents and "considered these
documents in setting and/or assessing its Medicaid pharmacy
reimbursement rate."  (Docket Entry # 2900, Ex. A).  While it
is a reasonable inference that Medicaid personnel read these
documents while they were in Nevada's possession, mere
possession does not establish with certainty that anyone read
the documents and also does not prove that Medicaid
policymakers considered the information in setting the
pharmacy reimbursement rate.  Such proof of knowledge and
consideration would have required testimony if the documents

---

[4] This ruling does not preclude the discovery or production
of other relevant documents created before May 2000, whether they
have already been produced or are still pending discovery.

had not been destroyed and still requires testimony now that
possession has been established.  While defendants fear that
Nevada can plausibly deny knowledge of the documents'
contents, this fear is unfounded because it seems unlikely
that Nevada can believably maintain that policymakers failed
to consider the dozens of AWP related documents that the trier
of fact will know were in Nevada's possession.

Finally, defendants' proposed sanctions seek to establish
that Nevada Medicaid had information about all other Nevada
agencies' drug reimbursement practices.  This court
specifically limited discovery to three non-Medicaid Nevada
agencies and defendants chose the Department of Mental Health,
Public Employee Benefits and Senior Rx.  The spoliation
sanction will accordingly limit the established facts about
Nevada's knowledge of non-Medicaid Nevada agencies' drug
reimbursement to these three agencies.

Thus, this court imposes the following sanctions,
establishing as fact for all purposes in this litigation that:

> 1.  After May 2000, Nevada had a practice of maintaining
> OIG Reports relating to pharmacy reimbursement and
> circulating them among employees with responsibilities
> for the State's Medicaid pharmacy reimbursement rate.
> See (Docket Entry # 2900, Ex. E for relevant OIG
> Reports).
>
> 2.  After May 2000, Nevada had a practice of maintaining
> CCH and federal GAO publications relating to pharmacy
> reimbursement issues and circulating them among employees
> with responsibilities for the State's Medicaid pharmacy
> reimbursement rate.  See (Docket Entry # 2900, Ex. I for
> relevant CCH publications and GAO Reports).

3.  After May 2000, Nevada participated in an e-mail distribution with other Medicaid programs, and received e-mails from this list relating to Medicaid pharmacy reimbursement rates, including the reimbursement rates of other States' Medicaid programs.  See (Docket Entry # 2900, Ex. O for relevant e-mails).

4.  After May 2000, Nevada had information regarding how three other Nevada pharmacy programs, namely the Department of Mental Health, Public Employee Benefits, and Senior Rx, acquired and/or reimbursed drugs.

5.  From 2001 to the present, Nevada received from defendants communications stating the actual sales price information from the manufacturers and that this sales price was different from AWP.


<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court

**RECOMMENDS**[5] that the motion for redress for spoliation of

evidence against Nevada (Docket Entry # 2899) be **ALLOWED**.


/s/   Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[5]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  <u>United States v. Valcencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>United States v. Escoboza Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982).

# EXHIBIT 2



November 14, 2003



Department of Public Health and Human Services
1400 Broadway, P.O. Box 202951
Helen, MT 59620

In accordance with Section III (D)(2) of the June 2003 Corporate Integrity Agreement between AstraZeneca Pharmaceuticals LP and the OIG, enclosed are the Average Sale Prices for Covered Products identified in Appendix A of the CIA along with a description of the methodology used to calculate the Average Sale Prices and Requisite Certification.

If you have any questions or concerns relating to these Average Sale Prices, please contact Esther Selvaggi at (302) 886-2268 or myself at (302) 886-8589 and we will provide further details.

Sincerely,

Deborah A Saez
Medicaid Pricing Coordinator
AstraZeneca

Enclosures (3)

**MT 038039**

**3Q03 ASP Data**
**Labelers 00186 and 00310**

11/14/2003

| NDC | ASP |
|---|---|
| 00186-0110-01 | 0.078029 |
| 00186-0112-01 | 0.200274 |
| 00186-0112-91 | 0.245788 |
| 00186-0114-01 | 0.231653 |
| 00186-0114-12 | 0.33761 |
| 00186-0114-91 | 0.197404 |
| 00186-0115-01 | 0.095457 |
| 00186-0115-12 | 0.122281 |
| 00186-0117-01 | 0.247303 |
| 00186-0117-12 | 0.420082 |
| 00186-0117-91 | 0.266751 |
| 00186-0118-01 | 0 |
| 00186-0118-91 | 0 |
| 00186-0120-01 | 0.103416 |
| 00186-0122-01 | 0.398708 |
| 00186-0122-12 | 0.460078 |
| 00186-0122-13 | 0 |
| 00186-0122-91 | 0.397936 |
| 00186-0125-01 | 0.09795 |
| 00186-0125-12 | 0 |
| 00186-0135-01 | 0.063664 |
| 00186-0137-01 | 0.143179 |
| 00186-0140-01 | 0.071231 |
| 00186-0145-01 | 0.067352 |
| 00186-0150-01 | 0.082212 |
| 00186-0155-01 | 0.083674 |
| 00186-0160-01 | 0.093078 |
| 00186-0166-01 | 0.0344 |
| 00186-0168-01 | 0 |
| 00186-0169-01 | 0 |
| 00186-0210-03 | 0.609284 |
| 00186-0212-03 | 4.102608 |
| 00186-0215-03 | 0.808564 |
| 00186-0225-03 | 0 |
| 00186-0230-03 | 0.330403 |
| 00186-0232-03 | 0.482031 |
| 00186-0240-02 | 0 |
| 00186-0240-12 | 0 |
| 00186-0240-44 | 4.082956 |
| 00186-0241-13 | 0.735619 |
| 00186-0242-13 | 0.342786 |
| 00186-0243-12 | 0.16971 |
| 00186-0244-12 | 0 |
| 00186-0244-44 | 4.364056 |
| 00186-0245-02 | 0 |
| 00186-0245-54 | 6.763793 |
| 00186-0250-02 | 0.414771 |
| 00186-0255-02 | 0.214916 |
| 00186-0255-92 | 0 |
| 00186-0260-02 | 0.258652 |

**MT 038040**

**PRIVILEGED AND CONFIDENTIAL**
Page 1 of 2

Contacts:  Deborah Saez   (302) 886-8589
Esther Selvaggi  (302) 886-2268

**3Q03 ASP Data**
**Labelers 00186 and 00310**

11/14/2003

| NDC | ASP |
| --- | --- |
| 00186-0260-92 | 0.344043 |
| 00186-0265-02 | 0.246642 |
| 00186-0265-03 | 0.320767 |
| 00186-0275-12 | 0.13802 |
| 00186-0276-13 | 0.584103 |
| 00186-0277-13 | 0.320706 |
| 00186-0278-12 | 0 |
| 00186-0278-44 | 3.714129 |
| 00186-0278-54 | 5.383066 |
| 00186-1905-01 | 0.240538 |
| 00186-1906-01 | 0.236189 |
| 00310-0049-10 | 0 |
| 00310-0108-10 | 0.593155 |
| 00310-0321-11 | 0 |
| 00310-0321-15 | 0 |
| 00310-0321-30 | 31.837585 |
| 00310-0325-11 | 0 |
| 00310-0325-15 | 12.7759 |
| 00310-0325-20 | 13.319618 |
| 00310-0375-10 | 92.118827 |
| 00310-0375-61 | 71.406459 |
| 00310-0376-10 | 2.413271 |
| 00310-0376-11 | 0 |
| 00310-0376-31 | 8.242368 |
| 00310-0376-33 | 0 |
| 00310-0376-34 | 0 |
| 00310-0376-60 | 4.995784 |
| 00310-0376-61 | 0 |
| 00310-0377-20 | 14.802324 |
| 00310-0377-21 | 0 |
| 00310-0377-32 | 15.405069 |
| 00310-0377-33 | 0 |
| 00310-0377-34 | 0 |
| 00310-0377-62 | 4.205903 |
| 00310-0378-51 | 9.506693 |
| 00310-0379-51 | 18.43608 |
| 00310-0720-25 | 147.44042 |
| 00310-0720-50 | 148.90129 |
| 00310-0950-36 | 202.50532 |
| 00310-0951-30 | 537.06139 |
| 00310-0960-36 | 0 |
| 00310-0961-30 | 0 |
| 00310-3286-10 | 0 |

**MT 038041**

**PRIVILEGED AND CONFIDENTIAL**
Page 2 of 2

Contacts:  Deborah Saez   (302) 886-8589
Esther Selvaggi  (302) 886-2268

AstraZeneca Pharmaceuticals

*Average Sale Price Methodology*

## Appendix A: Average Sale Price Calculation Methodology

**Average Sale Price =**

(Accounts Receivable $ - Chargeback Sales $ – Chargeback Discounts $ - Managed Care Discounts $)

/ (Accounts Receivable Units – Chargeback Sales Units)

**Accounts Receivable $ =**
(Total Direct Sales $ + Adjustments to Total Direct Sales $ - Early Pay Discount $ – SBC Direct Purchase Admin Fees)

- **Total Direct Sales $:** All direct sales $ from all Trade Classes & Market Segments as identified by the "Market Segment to Government Pricing Mapping" report. This value is for a calendar quarter, with the **Invoice Date** determining if a direct sale participates in this quarter's calculation. The majority of the direct sales are to wholesalers, retailers, and mail-order. Returns are excluded. Direct Federal & PHS/DSH sales are excluded.

- **Adjustments to Total Direct Sales $:** All direct sales adjustment $ from all Trade Classes & Market Segments as identified by the "Market Segment to Government Pricing Mapping" report. This value is for a calendar quarter, with the **Invoice Date** determining if a direct adjustment participates in this quarter's calculation. The majority of the direct adjustments are to wholesalers, retailers, and mail-order. Adjustments to returns are excluded. Direct Federal & PHS/DSH adjustments are excluded.

- **Early Pay Discount $:** early pay discount for Total Direct Sales $. The discount is calculated individually for each direct sale, but is usually 2%.

- **SBC Direct Purchase Admin Fees:** Fee $ are earned on direct purchases from Sales-based contracts. The fee is attached to the SBC contract. Payments are made to the contract owner via check. These accounts are typically commercial buying groups. They are a flat % across all products and sales on the contract. This value is for a calendar quarter, with the admin fee **Date Paid** determining if a fee participates in this quarter's calculation. If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

© 2003, Company Confidential

11/14/2003

**MT 038042**

AstraZeneca Pharmaceuticals                                              Average Sale Price Methodology

**Accounts Receivable Units** =  All direct sales units from all Trade Classes & Market Segments as identified by the "Market Segment to Government Pricing Mapping" report.  This value is for a calendar quarter, with the **Invoice Date** determining if a direct sale participates in this quarter's calculation.  Returns are excluded.  Direct Federal & PHS/DSH sales are excluded.  (Note: The Units UOM is the Medicaid UOM.)

**Chargeback Sales $ = 0.98 * (Chargeback Sales @ WAC $)**

- **Chargeback Sales @ WAC $:**  All chargeback (indirect) sales $ to the Federal Government, including PHS/DSH.  Can be from any Federal contract, including but not limited to the FSS, BPAs, national contracts, and the PHS/DSH contracts.  Each sale is priced at the WAC in effect as of the sale's invoice date. This value is for a calendar quarter, with the CB **Date Received** determining if a sale participates in this quarter's calculation. Returns are excluded.

**Chargeback Sales Units** =  All chargeback (indirect) sales units to the Federal Government, including PHS/DSH.  Can be from any Federal contract, including but not limited to the FSS, BPAs, national contracts, and the PHS/DSH contracts.  This value is for a calendar quarter, with the CB **Date Received (or Date Paid)** determining if a sale participates in this quarter's calculation. Returns are excluded.

© 2003, Company Confidential

11/14/2003

**MT 038043**

**Chargeback Discounts $ =**
    **(Total Commercial CB Credit $ + SBC Indirect Purchase Admin Fee $ + Non-Invoice Price Adjustment $)**

- **Total Commercial CB Credit $:** Chargeback credit $ from all market segments that are not Federal, PHS, or Covered Entities. These customers are typically institutions. This value is for a calendar quarter, with the CB **Date Received** determining if a sale participates in this quarter's calculation. Returns are excluded.

- **SBC Indirect Purchase Admin Fee $:** Fee $ are earned on indirect purchases from Sales-based contracts. The fee is attached to the SBC contract. Payments are made to the contract owner via check. These accounts are typically commercial buying groups. They are a flat % across all products and sales on the contract. This value is for a calendar quarter, with the admin fee **Date Paid** determining if a fee participates in this quarter's calculation. If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

- **Non-Invoice Price Adjustment $:** Adjustment $ paid to institutional customers when the contracted product is not available for purchase and a substitute product is purchased. Adjustment $ from all market segments that are not Federal, PHS, or Covered Entities. These customers are typically institutions. This value is for a calendar quarter, with the **Invoice Date** determining if an adjustment participates in this quarter's calculation.

**MT 038044**

**Managed Care Discounts $ =**
(SBC Performance Fee $ + SBC Rebate $ + UBC Admin Fee $ + UBC Performance Fee $ + UBC Rebate $)

- **SBC Performance Fee $:** Fee $ are earned by accounts (which own the contract) or customers (which are eligible members on the account's contract), depending upon the arrangement of the GPO. These fees typically have performance requirements, so the account or some of the customers might not earn a fee. The fee % is generally fixed. The fee is calculated using a UBC rebate contract format, but with claim data provided by a "Sales Data Pull". If the account earns a fee it is paid via check. If the customers earn fees, then payment is via a wholesaler credit issued to the customer's preferred wholesaler in the name of the customer. These accounts are typically commercial buying groups while the customers are institutions such as hospitals. This value is for a calendar quarter, with the fee **Date Paid** determining if a rebate participates in this quarter's calculation. If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

- **SBC Rebate $:** Rebate $ are earned by accounts (which own the contract) or customers (which are eligible members on the account's contract), depending upon the arrangement of the GPO. These rebates typically have performance requirements, so the account or some of the customers might not earn a rebate. The rebate can be variable, depending upon performance. The rebate is calculated using a UBC rebate contract format, but with claim data provided by a "Sales Data Pull". If the account earns a rebate it is paid via check. If the customers earn rebates, then payment is via a wholesaler credit issued to the customer's preferred wholesaler in the name of the customer. These accounts are typically commercial buying groups while the customers are institutions such as hospitals. This value is for a calendar quarter, with the rebate **Date Paid** determining if a rebate participates in this quarter's calculation. If a sale is excluded from the ASP calculation, then the fee/rebate $ associated with this sale must also be excluded.

© 2003, Company Confidential

11/14/2003

**MT 038045**

- **UBC Admin Fee $:**  Admin fee $ are earned by accounts which own the managed care contract.  These fees are typically not based upon performance requirements, and are generally at a flat %.  The fee is calculated using a UBC rebate contract format, with claim data provided through ECP or manual entry.  If the account earns a fee it is paid via check.  **"Flat Dollar"** fees, which are fees/rebates paid off-invoice, must not be selected for this value.  A managed care contract can contain multiple fees and one rebate.  This value is for a calendar quarter, with the fee **Date Paid** determining if a fee participates in this quarter's calculation.

- **UBC Performance Fee $:**  Fee $ are earned by accounts which own the managed care contract.  These fees typically have performance requirements, so the account might not earn a fee.  The fee can be variable, depending upon performance.  The fee is calculated using a UBC rebate contract format, with claim data provided through ECP or manual entry.  If the account earns a fee it is paid via check.  The account is typically a PBM, mail-order, or HMO.  A managed care contract can contain multiple fees and one rebate.  **"Flat Dollar"** fees, which are fees/rebates paid off-invoice, must not be selected for this value.  This value is for a calendar quarter, with the fee **Date Paid** determining if a fee participates in this quarter's calculation.

- **UBC Rebate $:**  Rebate $ are earned by accounts which own the managed care contract.  These rebates typically have performance requirements, so the account might not earn a rebate.  The rebate can be variable, depending upon performance.  The rebate is calculated using a UBC rebate contract format, with claim data provided through ECP or manual entry.  If the account earns a rebate it is paid via check.  A managed care contract can contain multiple fees and one rebate.  **"Flat Dollar"** fees, which are fees/rebates paid off-invoice, must not be selected for this value.  This value is for a calendar quarter, with the rebate **Date Paid** determining if a rebate participates in this quarter's calculation.

© 2003, Company Confidential

11/14/2003

MT 038046

EXHIBIT 'A' CERTIFICATION FORM

**CERTIFICATION**

The undersigned, an agent of AstraZeneca Pharmaceuticals LP, hereby certifies that the attached average sale price information has been communicated to First Databank or any successor or alternative reporting agency, and that it has been calculated in accordance with the methodology described in the State Settlement Agreement and as further described in AstraZeneca Pharmaceuticals LP's Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services.

Signed _Deborah A. Saez_____

Title _Medicaid Pricing Coord_____

Date _11/14/03_____

**MT 038047**