# EXHIBIT 11



AstraZeneca

February 3, 2006

Department of Public Health and Human Services
Attn: State Pharmacy Manager
1400 Broadway
P.O. Box 202951
Helena, MT 59620

Re:    4Q05 Average Sales Price
       Labelers 00186 and 00310

In accordance with Section III (D)(2) of the June 2003 Corporate Integrity Agreement between AstraZeneca Pharmaceuticals LP and the Office of Inspector General (OIG), enclosed are the 4th Quarter 2005 Average Sales Prices for Covered Products identified in Appendix A of the CIA along with a description of the methodology used to calculate the Average Sales Price and Requisite Certification.

In an effort to keep our files current, we are requesting that you email any address changes and your contact person's telephone number (for Fed Ex deliveries) to:

       Ryan.Bruce@astrazeneca.com

If you have any questions or concerns relating to these Average Sales Prices, please contact Ryan Bruce at (302) 886-3956 or myself at (302) 886-8503 and we will provide further details.

Sincerely,

Joseph Myer,
Senior Manager, Government Pricing and Analytics
AstraZeneca Government Operations

**MT 037916**

Enclosures (3)



RECEIVED
FEB 08 2006
HEALTH RESOURCES
DIVISION

**AstraZeneca LP**
1800 Concord Pike  PO Box 15437  Wilmington DE  19850-5437

Tel        302 886 3000
www.astrazeneca-us.com

## ATTACHMENT 'A' CERTIFICATION FORM

## **CERTIFICATION**

The undersigned, a high managerial agent of AstraZeneca Pharmaceuticals LP, hereby certifies that the attached average sale price information has been communicated to First DataBank and to the State Medicaid programs indicated below and that it has been calculated in accordance with the requirements of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, as they may be refined by the Secretary of the Department of Health and Human Services through regulations or written directives.  I further acknowledge that the average sale prices so reported will be filed with and used in the administration of the _____Montana_____ State Medicaid program(s).

Signed _____
(Joseph Myer

Title:   Sr. Manager, Government Pricing and Analytics

Date:

**MT 037917**

## 4Q2005 Smoothed Calculation

$$\frac{(Accounts\ Receivable\ \$ - Exempt\ Sales\ \$_{SMOOTHED} - Price\ Concession\ _{SMOOTHED})}{(Accounts\ Receivable\ Units - Exempt\ Sales\ Units_{SMOOTHED})\ *\ Units\ Per\ Package}$$

For the Total Sales and Total Units basis in the smoothing methodology, AstraZeneca utilizes direct non-contracted transactions. This provides a consistent and appropriate basis for smoothing the price concession components of the calculation. Steps followed in the smoothing methodology are listed below:

- Step 1 in the price concession methodology is to calculate two totals as follows [4Q 2005 ASP calculation example]:

  - **Exempt Sales $\$_{1Q\ 2005-4Q\ 2005}$ = (Chargeback Sales$_{1Q\ 2005-4Q\ 2005}$ @ WAC $) * 0.98**

  - **Price Concessions $\$_{1Q\ 2005-4Q\ 2005}$ = Accounts Receivable Price Concessions $\$_{1Q\ 2005-4Q\ 2005}$ + Chargeback Discounts Price Concessions $\$_{1Q\ 2005-4Q\ 2005}$ + Managed Care Discount Price Concessions $\$_{1Q\ 2005-4Q\ 2005}$**

- Step 2 is to calculate two ratios as follows:

  - **Exempt Sales Ratio$_{4Q\ 2005}$ = Exempt Sales $\$_{1Q\ 2005-4Q\ 2005}$ / Direct Non Contracted Sales $\$_{1Q\ 2005-4Q\ 2005}$**

  - **Price Concession Ratio$_{4Q\ 2005}$ = Price Concession $\$_{1Q\ 2005-4Q\ 2005}$ / Direct Non Contracted Sales $\$_{1Q\ 2005-4Q\ 2005}$**

- Step 3 is to apply the two ratios against the current quarter's direct non-contracted sales/units as follows:

  - **Smoothed Exempt Sales $\$_{4Q\ 2005}$ = Direct Non-Contracted Sales $\$_{4Q\ 2005}$ * Exempt Sales Ratio$_{4Q\ 2005}$**

  - **Smoothed Exempt Sales Units$_{4Q\ 2005}$ = Direct Non-Contracted Units$_{4Q\ 2005}$ * Exempt Sales Ratio$_{4Q\ 2005}$**

  - **Smoothed Price Concession $\$_{4Q\ 2005}$ = Direct Non-Contracted Sales $\$_{4Q\ 2005}$ * Price Concession Ratio$_{4Q\ 2005}$**

- Step 4 is to calculate the ASP with the smoothed exempt sales and smoothed price concessions as follows:

*Average Sale Price$_{4Q\ 2005}$ =*

$$\frac{(Accounts\ Receivable\ \$_{4Q\ 2005} - Smoothed\ Exempt\ Sales\ \$_{4Q\ 2005} - Smoothed\ Price\ Concession\ \$_{4Q\ 2005})}{(Accounts\ Receivable\ Units_{4Q\ 2005} - Smoothed\ Exempt\ Sales\ Units_{4Q\ 2005})\ *\ Units\ Per\ Pkg}$$

**MT 037918**

# ASP Report - Addendum A

| Manufacturer's Name | National Drug Code | Manufacturer's Average Sales Price | Comments |
|---|---|---|---|
| AstraZeneca LP | 00186190601 | $ 1,465.95 | |
| AstraZeneca Pharmaceuticals LP | 00038004910 | $ - | Last Payable Date:08/31/2000 |
| AstraZeneca Pharmaceuticals LP | 00310032111 | $ - | Last Payable Date:06/01/2004 |
| AstraZeneca Pharmaceuticals LP | 00310032115 | $ - | Last Payable Date:01/01/2005 |
| AstraZeneca Pharmaceuticals LP | 00310032130 | $ 360.26 | |
| AstraZeneca Pharmaceuticals LP | 00310032511 | $ - | Last Payable Date:11/30/2004 |
| AstraZeneca Pharmaceuticals LP | 00310032515 | $ - | Last Payable Date:06/01/2004 |
| AstraZeneca Pharmaceuticals LP | 00310032520 | $ 170.52 | |
| AstraZeneca Pharmaceuticals LP | 00310037510 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037561 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037610 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037611 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037631 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037660 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037661 | $ - | Last Payable Date:08/01/2003 |
| AstraZeneca Pharmaceuticals LP | 00310037720 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037721 | $ - | Last Payable Date:04/01/2005 |
| AstraZeneca Pharmaceuticals LP | 00310037732 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037761 | $ - | Last Payable Date:04/30/2003 |
| AstraZeneca Pharmaceuticals LP | 00310037762 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310037851 | $ 304.06 | |
| AstraZeneca Pharmaceuticals LP | 00310037951 | $ 609.63 | |
| AstraZeneca Pharmaceuticals LP | 00310072025 | $ 762.70 | |
| AstraZeneca Pharmaceuticals LP | 00310072050 | $ 765.46 | |
| AstraZeneca Pharmaceuticals LP | 00310095036 | $ 212.48 | |
| AstraZeneca Pharmaceuticals LP | 00310095130 | $ 537.73 | |
| AstraZeneca Pharmaceuticals LP | 00310096036 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca Pharmaceuticals LP | 00310096130 | $ - | WAC pricing listed on Addendum A1 |

**MT 037919**

| Manufacturer's Name | National Drug Code | Manufacturer's Average Sales Price | Comments |
|---|---|---|---|
| AstraZeneca LP | 00186011001 | $ 1.44 | |
| AstraZeneca LP | 00186011201 | $ 4.49 | |
| AstraZeneca LP | 00186011291 | $ 31.94 | |
| AstraZeneca LP | 00186011401 | $ 5.93 | |
| AstraZeneca LP | 00186011412 | $ 16.79 | |
| AstraZeneca LP | 00186011491 | $ 29.57 | |
| AstraZeneca LP | 00186011501 | $ 1.35 | |
| AstraZeneca LP | 00186011512 | $ 8.01 | |
| AstraZeneca LP | 00186011701 | $ 5.61 | |
| AstraZeneca LP | 00186011712 | $ 20.69 | |
| AstraZeneca LP | 00186011791 | $ 33.65 | |
| AstraZeneca LP | 00186011801 | $ - | Last Payable Date:12/31/2004 |
| AstraZeneca LP | 00186012001 | $ 1.84 | |
| AstraZeneca LP | 00186012201 | $ 5.28 | |
| AstraZeneca LP | 00186012212 | $ 17.01 | |
| AstraZeneca LP | 00186012291 | $ 30.60 | |
| AstraZeneca LP | 00186012501 | $ 1.69 | |
| AstraZeneca LP | 00186013501 | $ 3.45 | |
| AstraZeneca LP | 00186013701 | $ 4.92 | |
| AstraZeneca LP | 00186014001 | $ 2.81 | |
| AstraZeneca LP | 00186014501 | $ 3.32 | |
| AstraZeneca LP | 00186015001 | $ 4.00 | |
| AstraZeneca LP | 00186015501 | $ 4.21 | |
| AstraZeneca LP | 00186016001 | $ 4.72 | |
| AstraZeneca LP | 00186016601 | $ - | Last Payable Date:12/31/2004 |
| AstraZeneca LP | 00186016701 | $ - | Last Payable Date:9/30/2002 |
| AstraZeneca LP | 00186016801 | $ - | Last Payable Date:05/31/2004 |
| AstraZeneca LP | 00186016901 | $ - | Last Payable Date:01/31/2005 |
| AstraZeneca LP | 00186021003 | $ 11.37 | |
| AstraZeneca LP | 00186021203 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca LP | 00186021503 | $ 17.78 | |
| AstraZeneca LP | 00186023003 | $ 13.98 | |
| AstraZeneca LP | 00186023203 | $ 18.45 | |
| AstraZeneca LP | 00186024002 | $ - | Last Payable Date:03/31/2005 |
| AstraZeneca LP | 00186024012 | $ - | Last Payable Date:06/30/2005 |
| AstraZeneca LP | 00186024044 | $ 15.74 | |
| AstraZeneca LP | 00186024113 | $ 13.24 | |
| AstraZeneca LP | 00186024213 | $ 14.04 | |
| AstraZeneca LP | 00186024312 | $ 9.38 | |
| AstraZeneca LP | 00186024444 | $ 13.06 | |
| AstraZeneca LP | 00186024554 | $ 32.31 | |
| AstraZeneca LP | 00186025002 | $ 31.66 | |
| AstraZeneca LP | 00186025502 | $ 27.49 | |
| AstraZeneca LP | 00186026002 | $ 41.93 | |
| AstraZeneca LP | 00186026092 | $ - | WAC pricing listed on Addendum A1 |
| AstraZeneca LP | 00186026502 | $ 41.56 | |
| AstraZeneca LP | 00186026503 | $ 16.60 | |
| AstraZeneca LP | 00186027512 | $ 6.55 | |
| AstraZeneca LP | 00186027613 | $ 10.24 | |
| AstraZeneca LP | 00186027713 | $ 13.93 | |
| AstraZeneca LP | 00186027844 | $ 14.83 | |
| AstraZeneca LP | 00186032001 | $ 11.94 | |
| AstraZeneca LP | 00186190501 | $ - | WAC pricing listed on Addendum A1 |

**MT 037920**

# AstraZeneca Addendum A.1

| Manufacturer's Name | National Drug Code | Wholesaler Acquistion Cost | | Number of Units | Comment |
|---|---|---|---|---|---|
| AstraZeneca LP | 00186021203 | $ | 99.73 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca LP | 00186026002 | $ | 61.56 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca LP | 00186190501 | $ | 849.09 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037510 | $ | 709.14 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037561 | $ | 656.70 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037610 | $ | 117.00 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037611 | $ | 122.00 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037631 | $ | 303.25 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037660 | $ | 103.00 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037720 | $ | 234.00 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037732 | $ | 606.50 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310037762 | $ | 206.00 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310096036 | $ | 375.99 | 0 | Zero Sales - Reporting WAC |
| AstraZeneca Pharmaceuticals LP | 00310096130 | $ | 1,127.98 | 0 | Zero Sales - Reporting WAC |

**MT 037921**

**AstraZeneca Confidential**          10/25/2005

# EXHIBIT 12

 AstraZeneca

May 10, 2006

Department of Public Health and Human Services
Attn: State Pharmacy Manager
1400 Broadway
P.O. Box 202951
Helena, MT 59601



RECEIVED

MAY 11 2006

HEALTH RESOURCES
DIVISION

Re:    1Q 2006 Average Sales Price
       Labelers 00186 and 00310

In accordance with Section III (D)(2) of the June 2003 Corporate Integrity Agreement (CIA) between AstraZeneca Pharmaceuticals LP and the Office of Inspector General (OIG), enclosed are the 1st Quarter 2006 Average Sales Prices for Covered Products identified in Appendix A of the CIA which have been calculated in accordance with the requirements of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, as they may be refined by the Secretary of the Department of Health and Human Services through the issuance of regulations or written directives.

In an effort to keep our files current, we are requesting that you email any address changes and your contact person's telephone number (for Fed Ex deliveries) to:

       Deborah.Saez@astrazeneca.com

If you have any questions or concerns relating to these Average Sales Prices, please contact Debbe Saez at (302) 886-8589 or me at (302) 886-8503 and we will provide further details.

Sincerely,

Joseph Myer
Senior Manager, Government Pricing and Analytics
AstraZeneca Government Operations

Enclosures (3)

**MT 037957**

**AstraZeneca LP**
1800 Concord Pike  PO Box 15437  Wilmington DE  19850-5437

Tel     302 886 3000
www.astrazeneca-us.com

# ATTACHMENT 'A' CERTIFICATION FORM

## CERTIFICATION

The undersigned, a high managerial agent of AstraZeneca Pharmaceuticals LP, hereby certifies that the attached average sale price information has been communicated to First DataBank and to the State Medicaid programs indicated below and that it has been calculated in accordance with the requirements of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, as they may be refined by the Secretary of the Department of Health and Human Services through regulations or written directives.  I further acknowledge that the average sale prices so reported will be filed with and used in the administration of the   Montana   State Medicaid program(s).

Signed   _____
        Joseph Myer

Title:   Sr. Manager, Government Pricing and Analytics

Date:   5/10/06

**MT 037958**

## 1Q 2006 Smoothed Calculation

$$\frac{(\text{Accounts Receivable \$} - \text{Exempt Sales \$}_{SMOOTHED} - \text{Price Concession }_{SMOOTHED})}{(\text{Accounts Receivable Units} - \text{Exempt Sales Units}_{SMOOTHED}) * \text{Units Per Package}}$$

For the Total Sales and Total Units basis in the smoothing methodology, AstraZeneca utilizes direct non-contracted transactions. This provides a consistent and appropriate basis for smoothing the price concession components of the calculation. Steps followed in the smoothing methodology are listed below:

- Step 1 in the price concession methodology is to calculate two totals as follows [1Q 2006 ASP calculation example]:

  o **Exempt Sales $\$_{2Q\ 2005\text{-}1Q\ 2006}$ = (Chargeback Sales$_{2Q\ 2005\text{-}1Q\ 2006}$ @ WAC $) * 0.98**

  o **Price Concessions $\$_{2Q\ 2005\text{-}1Q\ 2006}$ = Accounts Receivable Price Concessions $\$_{2Q\ 2005\text{-}1Q\ 2006}$ + Chargeback Discounts Price Concessions $\$_{2Q\ 2005\text{-}1Q\ 2006}$ + Managed Care Discount Price Concessions $\$_{2Q\ 2005\text{-}1Q\ 2006}$**

- Step 2 is to calculate two ratios as follows:

  o **Exempt Sales Ratio$_{1Q\ 2006}$ = Exempt Sales $\$_{2Q\ 2005\text{-}1Q\ 2006}$ / Direct Non Contracted Sales $\$_{2Q\ 2005\text{-}1Q\ 2006}$**

  o **Price Concession Ratio$_{1Q\ 2006}$ = Price Concession $\$_{2Q\ 2005\text{-}1Q\ 2006}$ / Direct Non Contracted Sales $\$_{2Q\ 2005\text{-}1Q\ 2006}$**

- Step 3 is to apply the two ratios against the current quarter's direct non-contracted sales/units as follows:

  o **Smoothed Exempt Sales $\$_{1Q\ 2006}$ = Direct Non-Contracted Sales $\$_{1Q\ 2006}$ * Exempt Sales Ratio$_{1Q\ 2006}$**

  o **Smoothed Exempt Sales Units$_{1Q\ 2006}$ = Direct Non-Contracted Units$_{1Q\ 2006}$ * Exempt Sales Ratio$_{1Q\ 2006}$**

  o **Smoothed Price Concession $\$_{1Q\ 2006}$ = Direct Non-Contracted Sales $\$_{1Q\ 2006}$ * Price Concession Ratio$_{1Q\ 2006}$**

- Step 4 is to calculate the ASP with the smoothed exempt sales and smoothed price concessions as follows:

*Average Sale Price$_{1Q\ 2006}$ =*

$$\frac{(\text{Accounts Receivable \$}_{1Q\ 2006} - \text{Smoothed Exempt Sales \$}_{1Q\ 2006} - \text{Smoothed Price Concession \$}_{1Q\ 2006})}{(\text{Accounts Receivable Units}_{1Q\ 2006} - \text{Smoothed Exempt Sales Units}_{1Q\ 2006}) * \text{Units Per Pkg}}$$

**MT 037959**

**1Q06 ASP Data**
**Labelers 00186 and 00310**

05/09/2006

| NDC | PKG ASP |
|---|---|
| 00186011001 | 1.65 |
| 00186011201 | 4.88 |
| 00186011291 | 31.79 |
| 00186011401 | 6.1 |
| 00186011412 | 18 |
| 00186011491 | 28.59 |
| 00186011501 | 1.6 |
| 00186011512 | 8.02 |
| 00186011701 | 6.09 |
| 00186011712 | 20.4 |
| 00186011791 | 36.3 |
| 00186011801 | Last Payable Date: 12/31/2004 |
| 00186011891 | Last Payable Date: 02/28/2005 |
| 00186012001 | 2 |
| 00186012201 | 5.95 |
| 00186012212 | 17.71 |
| 00186012213 | Last Payable Date: 08/31/2002 |
| 00186012291 | 33.79 |
| 00186012501 | 2 |
| 00186012512 | Last Payable Date: 04/30/2003 |
| 00186013501 | 3.56 |
| 00186013701 | 5.5 |
| 00186014001 | 3.14 |
| 00186014501 | 3.54 |
| 00186015001 | 4.24 |
| 00186015501 | 4.47 |
| 00186016001 | 5.03 |
| 00186016601 | Last Payable Date: 12/31/2004 |
| 00186016801 | Last Payable Date: 05/31/2004 |
| 00186016901 | Last Payable Date: 01/31/2005 |
| 00186021003 | 12.42 |
| 00186021203 | 99.73 |
| 00186021503 | 18.29 |
| 00186022503 | Last Payable Date: 09/30/2003 |
| 00186023003 | 15.3 |
| 00186023203 | 20.66 |
| 00186024002 | Last Payable Date: 03/31/2005 |
| 00186024012 | Last Payable Date: 06/30/2005 |
| 00186024044 | 15.79 |
| 00186024113 | 15.41 |
| 00186024213 | 14.95 |
| 00186024312 | 9.64 |
| 00186024412 | Last Payable Date: 03/31/2005 |
| 00186024444 | 15.82 |
| 00186024502 | 42.22 |
| 00186024554 | 33.08 |
| 00186025002 | 34.25 |
| 00186025502 | 28.93 |
| 00186025592 | Last Payable Date: 02/01/2004 |
| 00186026002 | 43.46 |
| 00186026092 | 61.56 |

**MT 037960**

**PRIVILEGED AND CONFIDENTIAL**
**Page 1 of 2**

Contacts:  Debbe Saez (302) 886-8589
Joe Myer (302) 886-8503

**1Q06 ASP Data**
**Labelers 00186 and 00310**

05/09/2006

| NDC | PKG ASP |
|---|---|
| 00186026502 | 42.97 |
| 00186026503 | 16.82 |
| 00186027512 | 7.17 |
| 00186027613 | 10.64 |
| 00186027713 | 14.5 |
| 00186027812 | Last Payable Date: 10/31/2005 |
| 00186027844 | 16.23 |
| 00186027854 | Last Payable Date: 09/30/2005 |
| 00186190501 | 849.09 |
| 00186190601 | 1557.62 |
| 00186602001 | 111.82 |
| 00186604001 | 98.37 |
| 00310004910 | Last Payable Date: 09/01/2005 |
| 00310010810 | 37.8 |
| 00310032111 | Last Payable Date: 06/01/2004 |
| 00310032115 | Last Payable Date: 01/01/2005 |
| 00310032130 | 351.47 |
| 00310032511 | Last Payable Date: 11/30/2004 |
| 00310032515 | Last Payable Date: 06/01/2004 |
| 00310032520 | 178.59 |
| 00310037510 | 709.14 |
| 00310037561 | 656.7 |
| 00310037610 | 117 |
| 00310037611 | 122 |
| 00310037631 | 303.25 |
| 00310037633 | Last Payable Date: 09/30/2005 |
| 00310037634 | Last Payable Date: 09/30/2005 |
| 00310037660 | 103 |
| 00310037720 | 234 |
| 00310037721 | Last Payable Date: 04/01/2005 |
| 00310037732 | 606.5 |
| 00310037733 | Last Payable Date: 09/30/2005 |
| 00310037734 | Last Payable Date: 09/30/2005 |
| 00310037762 | 206 |
| 00310037851 | 307.98 |
| 00310037951 | 619.4 |
| 00310072025 | 759.83 |
| 00310072050 | 763.5 |
| 00310095036 | 208.02 |
| 00310095130 | 531.91 |
| 00310096036 | 375.99 |
| 00310096130 | 1127.98 |
| 00310328610 | Last Payable Date: 12/31/1999 |

**MT 037961**

**PRIVILEGED AND CONFIDENTIAL**
**Page 2 of 2**

Contacts:  Debbe Saez (302) 886-8589
Joe Myer (302) 886-8503

# EXHIBIT 13



HEATHER M. WESTRE
DIRECT • (206) 268-9316
HEATHERW@HBSSLAW.COM

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

June 8, 2006

## *Via E-Mail & First Class Mail*

Ms. Kimberly D. Harris
Davis Polk & Wardwell
450 Lexington Ave
New York, NY  10017

Re:   Montana AWP Litigation

Dear Kimberly:

Enclosed you will find the following bates numbered documents:  MT 037916-037946, MT 037957-037961, MT 037983-037988, MT 038039-038047, MT 038451-038459, MT 038689-038691, MT 038697-038705, MT 038743-038752, MT 038881-038889, MT 038951-038959.  These AstraZeneca documents were located in the State of Montana's files.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

Sincerely,

HAGENS BERMAN SOBOL SHAPIRO LLP

Heather M. Westre
Assistant to Jeniphr A.E. Breckenridge

Enclosure

ATTORNEYS AT LAW                    SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
T 206.623.7292     F 206.623.0594
1301 FIFTH AVENUE   SUITE 2900   SEATTLE, WASHINGTON 98101
www.hbsslaw.com

001534-15  112618 V1

EXHIBIT 14

1                 IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF MASSACHUSETTS

2

3

      In Re:                       )

4     PHARMACEUTICAL INDUSTRY      ) CA No. 01-12257-PBS

      AVERAGE WHOLESALE PRICE      ) MDL No. 1456

5     LITIGATION                   ) Pages 1 - 68

6

7

8                     PRETRIAL CONFERENCE

9              BEFORE THE HONORABLE PATTI B. SARIS

                    UNITED STATES DISTRICT JUDGE

10

11

12

13

                              United States District Court

14                            1 Courthouse Way, Courtroom 19

                              Boston, Massachusetts

15                            April 11, 2007, 3:05 p.m.

16

17

18

19

20

21

22

                         LEE A. MARZILLI

23                    OFFICIAL COURT REPORTER

                   United States District Court

24                 1 Courthouse Way, Room 3205

                     Boston, MA  02210

25                       (617)345-6787

1361551v1

1   regard, your Honor, I believe, during the bench trial.

2           THE COURT:  I just don't remember.

3           MR. BOUDETT:  Okay.  Mr. Weintraub is going to say

4   essentially that he was one of the guys who was dealing with

5   drug companies.  He was the regional head for a period of

6   time.

7           THE COURT:  Did he deal with AstraZeneca?

8           MR. BOUDETT:  His testimony would not be specific

9   to Zoladex, your Honor.  It would be about knowledge of

10  spreads and the AWP system.

11          THE COURT:  But let's be very clear here.  I do not

12  believe in general, with the exception of maybe TAP and

13  Lupron, in general, AstraZeneca will not be smeared by what

14  happened in other companies.  On the other hand, it's not

15  clear to me that knowledge of spreads in other companies is

16  going to be relevant either.  One thing I learned from the

17  bench trial is how specific this is company by company.  Each

18  company has a different tale.  And so will Weintraub be able

19  to say anything about dealings with AstraZeneca?

20          MR. BOUDETT:  No, your Honor.

21          THE COURT:  Well, then why is he relevant?

22          MR. BOUDETT:  Your Honor, I think that it goes to

23  rebut the plaintiffs' expert testimony that this was all a

24  secret, which is a cornerstone of the liability opinion

25  that's been put forward.

1              THE COURT:  Tell me what "it" is.

2              MR. BOUDETT:  Spreads, that the spreads were

3      secret.

4              THE COURT:  Let me tell you, having just been

5      through this, everyone knew about a 20 to 25 percent spread,

6      maybe 30 percent.  Everyone knew, everyone.  This is why I

7      found your papers so difficult to follow.  If all he's going

8      to say is everyone knew about a spread, for want of a better

9      word, within the speed limit, if that's all he's going to

10     say, that's not a problem because it would almost be

11     stipulated to.

12             MR. BOUDETT:  No, your Honor.

13             THE COURT:  All right, what will he say?

14             MR. BOUDETT:  He will testify as to knowledge of

15     discounting off of WAC creating spreads larger than the

16     Hartman speed limit.

17             THE COURT:  What were the Zoladex spreads?  I don't

18     remember.

19             MR. BOUDETT:  Well, it depends what year you ask

20     about.  At their height, they were, I think, 142 percent,

21     according to the Hartman calculation, 140 to 150 percent.

22             THE COURT:  Is he going to say the government knew

23     that?

24             MR. BOUDETT:  He is going to say the government

25     knew of spreads well in excess of the Hartman speed limit.

1     His testimony would not be specific to Zoladex.  It was not

2     one of the top five blockbuster, budget-buster drugs that the

3     regulators were paying attention to, which --

4                THE COURT:  So as I understand it, the OIG reports,

5     were any of them referencing Zoladex?

6                MR. BOUDETT:  Yes, your Honor.

7                THE COURT:  Which ones?

8                MR. BOUDETT:  The '92 certainly listed Zoladex

9     among the 30 drugs that was listed and gave a spread in

10    excess of 30 percent, if I recall correctly.

11               THE COURT:  What was it, Zoladex?  I remember

12    Hartman saying that all the 1992 ones were roughly in the

13    speed limit zone.

14               MR. BOUDETT:  I don't believe that's the case.

15               MR. BERMAN:  It was within the speed limit.

16               THE COURT:  What?

17               MR. BERMAN:  It was within the speed limit.

18               MR. BOUDETT:  I would have to follow up on that

19    one, your Honor.

20               MR. BERMAN:  We have an exhibit that shows that

21    from the trial.

22               THE COURT:  Let me put it this way:  Why don't you

23    make me a proffer as to what he would say in writing.  They

24    are very hot and bothered by the notion that the government

25    approved the mega spreads.  My sense is that to the extent

# EXHIBIT 15



11522484

Jun 13 2006
7:31PM

**Calculation of Damages and Penalties for the State of Montana**

**Declaration of Raymond S. Hartman**

## I.  Introduction and Overview

1.     My name is Raymond S. Hartman.  I am Director and President of Greylock McKinnon Associates (GMA), an economic consulting and litigation support firm located in Cambridge, Massachusetts.  Since I have previously described my qualifications to this Court, I will not repeat them here.

2.     I have been asked by Counsel to the State of Montana to review the Complaint in this matter;[1] to review the allegations regarding fraudulent pricing practices on the part of Defendants; and to describe the formulaic methodologies I would use to calculate both the damages to the State and its consumers if the alleged fraudulent pricing practices are proved and the penalties to the Defendants arising from those fraudulent practices.

3.     The fraudulent pricing practices specifically alleged of twenty-one Defendant drug manufacturers[2] are characterized as the "AWP Inflation Scheme."[3]  Through the alleged "AWP Inflation Scheme" (or "AWP Scheme"), Defendant manufacturers fraudulently increased the AWPs of selected drugs (denoted by NDCs) above the provider acquisition costs (ACs) for which the AWPs were a market signal.[4]  Defendants reported the inflated AWPs to the standard national price compendia (*First DataBank (FDB), Red Book* and *Blue Book*), and the industry based reimbursement amounts on those AWPs.  Since providers acquired the drugs at acquisition cost (AC) while payors (Medicare, Medicaid, private Third-Party Payers (TPPs), and consumers) paid for the drugs at reimbursement rates based on the AWPs, the increased "spreads" (AWP – AC) caused by the AWP Scheme increased the profits earned by the providers of the drugs (pharmacies, physicians) at the expense of the payors.  The increased profits induced providers to move market share of the relevant drugs, the *raison d'etre* of the AWP Scheme to the drug manufacturers.[5]

---

[1]  State of Montana's Second Amended Complaint, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, United States District Court for the District of Massachusetts, August 1, 2003 (hereafter, *Complaint*).

[2]  Identified and discussed in detail in the *Complaint* in ¶¶ 214-602.  I have been instructed by Counsel to exclude the GSK Group from my analysis.

[3]  *Complaint*, ¶¶ 5-10.

[4]  Market reliance upon reported AWPs is discussed in ¶¶ 169-172 of the *Complaint*.

[5]  A more complete discussion of the fraud and its market effects are developed in ¶¶ 173-213 of the *Complaint*.

manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product."

14.     For purposes of this discussion, I use ASP to denote the average sales price to the relevant class of trade (e.g., retail pharmacies, physicians), which is equivalent to the acquisition cost (AC) of that class of trade when properly measured (see footnote 8 above).  While the "spread" is often measured using the AWP and the ASP,[15] it can also be measured as the "spread" or difference between the reimbursement rates that are related to the AWPs and the ASPs which measure provider acquisition costs.

For purposes of this analysis, I make use of the latter definition of spread.  I focus upon the spreads between the amounts allowed to providers as drug reimbursement under the Medicaid and Medicare Programs relative to costs at which those providers acquire those drugs.  I have been advised by Counsel that if these spreads are larger than allowed by the relevant statute(s), the AWP Scheme led to excessive reimbursement for drug claims.  I can calculate the overcharge damages arising from that artificial AWP inflation. I can also determine whether the amounts allowed as reimbursement constitute an excessive amount deceptively charged to and/or falsely claimed in Medicaid and Medicare reimbursement claims.

### C.  Calculation of Overcharge Damages Under Medicaid and Medicare Arising from the AWP Inflation Scheme

15.     Under Medicaid and Medicare, the amount allowed (AA) as reimbursement is related formulaically to the actual (and allegedly artificially inflated) AWP.[16] Specifically, for a given claim, AA = "AWP − x%" + df$^{17}$ = (100% − x%)*AWP + df = p*AWP + df for any x%,[18] where the dispensing fee is designated as df and where p =

---

[15]  For example, it can be expressed as (AWP − ASP)/ASP, (AWP − ASP)/AWP, AWP/ASP, or (AWP − ASP).  I have addressed these other formulations in my earlier MDL analyses before this Court and in my Connecticut analysis.

[16]  As discussed below, the methodology accommodates the reliance upon FUL, U&C or amount billed when they are the basis for AA in the claims data.

[17]  Note that I use industry nomenclature to designate reimbursement off AWP as "AWP less some percent (x%)", which really means (100% - x%)*AWP.

[18]  According to CMS materials dated June 2004, the reimbursement formulation for self-administered drugs in Montana is AWP − 15% under Medicaid, for both branded and generic drugs.  The dispensing fee (df) is $4.70.  According to that source, Montana has no MAC; see Table D-1, Attachment D to my September 3, 2004 MDL Declaration in Support of the Certification of Class.  From 1991 through June 2002, I understand that the reimbursement formula was AWP − 10%.  Note that the *Complaint*, at ¶ 162, suggests that Montana does have a MAC, which diverges from the CMS information in my Table D-1. While this divergence may suggest the need for further scrutiny, if the claims are based upon a state MAC, they will be reflected in the average AA calculated from the claims data.

The amount allowed under Medicare is AWP − x%, where x% is designated over time as delineated in footnote 13 to my December 15, 2005 MDL Declaration on Liability and the Calculation of Damages.

$(100 - x)\%$.[19]  Denote the but-for allowed amount as $AA^{but\text{-}for}$.[20]  The difference between $AA$ and $AA^{but\text{-}for}$ can be used to calculate overcharge damages as follows.

16.    For each year of the period alleged to be subject to the AWP Inflation Scheme, State claims data summarize total number of claims and total dollar reimbursements paid by the State under the Medicaid Program and for drugs reimbursed for dual-eligibles (payment of Medicare supplemental insurance amounts (20%) for physician-administered drugs) by NDC and/or by J-Code.  For a given NDC or J-Code, those data would reflect the following:

(1a)    Actual Reimbursements $= \Sigma_i AA_i * q_i = \Sigma_i (p*AWP + df)_i * q_i = (p*AWP + df)*Q$,

where Actual Reimbursements is the total dollar amount of claims paid in a given year; $\Sigma_i$ is the summation of the allowed amount$_i$ ($AA_i$) times the number ($q_i$ = quantity$_i$) of claims (alternatively the units reimbursed per claim) reimbursed at $AA_i$; and $Q$ is the total claims or total units reimbursed by the State at an average allowed amount of $AA^{avg} = (p*AWP + df)$.[21]

Had these reimbursements been made at the but-for allowed amount per claim i ($AA^{but\text{-}for}{}_i$), the total reimbursements that should have been paid by the State in a given year would have been,

(1b)    But-For Reimbursements $= \Sigma_i AA^{but\text{-}for}{}_i * q_i = (AA^{but\text{-}for\text{-}avg})*Q$,

where the total number of units is assumed to be the same in the but-for and actual worlds.

Having calculated But-For Reimbursements, the damages to the State for reimbursements for drug j of Defendant k are

(1c)    Overcharge Damages$_{jk}$ = Actual Reimbursements$_{jk}$ – But-For Reimbursements$_{jk}$
$$= \Sigma_i AA_i * q_i - \Sigma_i AA^{but\text{-}for}{}_i * q_i$$
$$= (AA^{avg} - AA^{but\text{-}for\text{-}avg})Q.\text{[22]}$$

17.    Aggregate overcharge damages (1c) can be calculated for all units of drug j sold by Manufacturer k and reimbursed by the State as a whole for the Damage Period as a whole; alternatively, it can be calculated for some subset of NDCs of drug j for some subset of State reimbursements for some sub-period of the Damage Period.  The use of Equation (1c) is particularly straightforward.    The State has data for Actual

---

[19]  Of course, in the actual calculations the percentages are denoted as follows: $100\% = 1.00$; $15\% = 0.15$; $10\% = 0.10$; etc.

[20]  Which would be related to a but-for non-inflated AWP as $AA^{but\text{-}for} = AWP^{but\text{-}for} - x\% + df = (100\% - x\%)*AWP^{but\text{-}for} + df = p*AWP^{but\text{-}for} + df$.

[21]  The state data summarize reimbursement for all claims.  Hence, if some claims are determined by FUL, U&C or the amount billed (all of which I understand are related to AWP), the AA for those claims are specific to that definition and $AA^{avg}$ reflects those claims.

[22]  And if we make use of a but-for non-inflated AWP, Overcharge Damages$_{jk}$ = $(p*AWP + df)*Q - (p*AWP^{but\text{-}for} + df)*Q$.

Reimbursements$_{jk}$ for all relevant drugs and Defendant manufacturers, for the relevant Damage Period, for Medicaid and Medicare program reimbursements.  The But-For Reimbursements are determined by statute.

### D.   Calculation of Penalties for Deceptive Practices and False Claims Under the AWP Inflation Scheme

18.     Under Count II (¶¶ 662-667) of the *Complaint,* the claim is made for restitution of losses suffered by the State of Montana as a result of the AWP Scheme.  Defendants conduct as alleged constitutes deceptive acts or practices in violation of Mont. Code Ann. § 30-14-103 for those transactions in which the AWP was inflated; and for which Defendant manufacturer failed to disclose material facts that the AWP exceeded the average of the wholesale price based upon a good faith and reasonable estimate; and that the Defendant manufacturer knowingly made false representations by representing that the AWP was an accurate reflection of the average wholesale price.  Pursuant to Mont. Code Ann. § 30-14-142(2), the *Complaint* states that the Court can assess civil penalties of $1,000 from each defendant for each willful violation of Mont. Code Ann. § 30-14-103.

19.     Under Count IV (¶¶ 682-691) of the *Complaint*, a claim for forfeiture, civil penalties, double damages and legal cost pursuant to Mont. Code Ann. § 17-8-231 is made in  ¶ 691.  Accordingly, it is claimed (¶ 691.C) each defendant must forfeit the entirety of their claims and pay (i) civil penalties of $2,000 per false claim, (ii) double the damages sustained by the State as a result of the false claim, and (iii) the State's legal costs incurred in connection with this action.

20.     I have been directed by Counsel to assume that penalties of $3,000 can be assessed for each claim submitted for reimbursement under Medicaid and Medicare that was subject to a deceptive practice and was false.[23]  The number of such claims can be calculated as follows.

21.     As noted in ¶ 8 above, the allowed amount (AA) under Medicaid is to be the lesser of {the EAC, the Federal Upper Limit (FUL), the state maximum allowable cost (MAC), the Usual & Customary amount (U&C) charged by a pharmacy, or the amount billed}.  Likewise, as noted in ¶ 8 above, EAC is invariably the lowest price.

Hence, for any drug reimbursed under Medicaid, I have been instructed by Counsel that liability occurs as a matter of law if $AA_{jk} > EAC_{jk}$.  Furthermore, as discussed above (see footnote 8), $EAC_{jk} = ASP_{jk}$ to the relevant group of providers (pharmacies, physicians).  For self-administered drugs reimbursed under Medicaid, j denotes the NDC of the drug and k denotes the Defendant.  For physician-administered drugs, j denotes the NDC or the J-Code and k denotes the Defendant.

22.     I have been provided with information from the State sufficient to calculate $AA_{jk}$ by claim, net of the dispensing fee.  While I received from Defendants a variety of data

---

[23] My methodology focuses upon accurately calculating the number of complaints that were deceptive and false.  Should I receive alternative direction from the Court regarding the amount of the penalty to be assessed per false and deceptive claim, the calculation of aggregate penalties will be very easy to revise to accommodate those alternative directions.  The revised calculation is simple arithmetic.