# Exhibit F

479

```
 1              THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3                       ---oOo---

 4   ---------------------------X

 5   In Re:  PHARMACEUTICAL      )   MDL DOCKET NO.

 6   INDUSTRY AVERAGE WHOLESALE  )   CIVIL ACTION

 7   PRICE LITIGATION            )   01CV12257-PBS

 8   ---------------------------X

 9   THIS DOCUMENT RELATES TO:   )

10   ALL ACTIONS                 )

11   ---------------------------X

12                 HIGHLY CONFIDENTIAL

13          VIDEOTAPE 30(b)(6) DEPOSITION OF

14               JEFF BUSKA, VOLUME III

15

16         Taken at 33 South Last Chance Gulch

17                   Helena, Montana

18       Friday, December 15, 2006 - 9:05 a.m.

19

20   Reported by Mary R. Sullivan, RPR, RMR, Freelance

21   Court Reporter, Notary Public, residing in Missoula,

22   Montana.
```

501

1    Q.   Well, it--perhaps under--maybe we'll--
2    don't want to fight about the language. Is it
3    correct that under the terms of the settlement
4    agreement between the State of Montana and Bayer
5    Corporation, Bayer was obliged to provide to the
6    state Medicaid program average sale price
7    information for all Bayer products sold in the
8    United States--
9    A.   Yes.
10   Q.   --all pharmaceutical products?
11   A.   That's what this says.
12   Q.   Such Bayer average sale price
13   information was provided to the State of Montana
14   on a quarterly basis from the date of this
15   agreement until the present; is that correct?
16   A.   I do recall seeing some of those
17   reports, yes.
18   Q.   But on--on behalf of the State of
19   Montana, are you able to testify that Bayer
20   provided to the State of Montana quarterly average
21   sale price reports for all of its Bayer products
22   from the date of this settlement agreement up to

1  the present time?
2      A.   Yes, I believe those were sent.
3      Q.   Sir, is it fair to say that the
4  principal benefit to the state Medicaid program
5  arising from the Bayer Montana settlement
6  agreement in 2001 was the provision of the Bayer
7  average sale price information?
8      A.   Could you restate the question?
9      Q.   Yeah.
10     A.   Benefit?
11     Q.   Was--was the principal benefit to the
12 state of Montana the provision of the Bayer
13 average sale price information?  I--I note that--
14 I'm referencing, in part, the fact that the
15 payment to the state Medicaid program was a little
16 bit over $6,000, so is it fair to say that the
17 principal benefit arising from the settlement
18 agreement that we're currently reviewing was Bayer
19 providing to the State of Montana the average sale
20 price information for all of its products?
21         MS. BOVINGTON:  I'm going to object that
22 that calls for a legal conclusion.  Mr. Buska

1  received; is that correct?

2     A.  It would indicate that it was sent to

3  them, yes, or it was addressed to them.

4     Q.  The average sale price--I'll call these

5  average sale price reports.  Is that a--

6     A.  That's fine.

7     Q.  --understandable for you?  The average

8  sale price reports that we've just been reviewing,

9  which are Exhibit Buska 052, Exhibit Buska 053 and

10 Exhibit Buska 054, is it correct that those

11 document Bayer's average sale price for all of its

12 pharmaceutical products to the State of Montana

13 for the dates that are reflected on the documents?

14    A.  I don't know if it's for all the

15 pharmaceutical products submitted by Bayer,

16 because I would imagine that Bayer probably has a

17 lot more NDCs than what's in this report, so I

18 can't confirm that it's all of them.

19    Q.  Well, you're--you--you understand that

20 under the settlement agreement between the State

21 of Montana and Bayer, Bayer's required to provide

22 to the State of Montana average sale price

```
1   information for all of the Bayer pharmaceutical

2   products that are reimbursed by the State.

3       A.   Drugs and biologicals, yes, but--so

4   perhaps it is all of them, yes.

5       Q.   Well, do you have any reason to

6   challenge that it's all of them?

7       A.   No, I don't, but I don't know if it's

8   all of them.

9       Q.   Well, you're the State of Montana

10  testifying today.

11      A.   Yes.

12      Q.   Have you ever made any complaint to

13  Bayer that the--

14      A.   No, I haven't.

15      Q.   --reports do not include all the Bayer--

16      A.   No.

17      Q.   --pharmaceutical products?

18      A.   No.

19      Q.   So you have no reason to doubt that

20  these are not all of the--

21      A.   No--

22      Q.   --pharmaceutical--
```

515

1    A.    --I have no reason to doubt, but I don't
2    know.
3    Q.    Okay.
4          THE COURT REPORTER: We need one at a
5    time, please.
6    Q.    (By Mr. Doss) I'm sorry. So you have
7    no reason to doubt that these are all of the Bayer
8    pharmaceutical products that are reimbursed by the
9    State of Montana?
10   A.    No, I don't.
11   Q.    If we could, let's go through the
12   documents just to identify the relevant
13   information and the relevant apportions of the--
14   these average sale price reports, and first--the
15   first document we referenced was Exhibit Buska
16   052. The actual average sale price information,
17   is that's what is--excuse me. Does the actual
18   average sale price information for the average
19   sale price reports appear on MT 76333 through MT
20   07635--35?
21   A.    Yes.
22   Q.    And so that includes a listing of Bayer

517

1  exhibits I've presented to you, Exhibit Buska 053

2  and Exhibit Buska 054?

3      A.   Yes, it has the same information in both

4  of those documents.

5      Q.   So for each quarterly average sale price

6  report, the State of Montana received a list of

7  the Bayer average sale prices for its products as

8  well as a document describing to the State the

9  methodology used for determining that average sale

10 price?

11     A.   Yes.

12     Q.   And to your knowledge, that continued

13 from August of 2001 up to the present.

14     A.   To my knowledge, yes.

15     Q.   We've--we've touched on this, but let's

16 go back over this a bit.  I'd like to go through

17 what happens to these Bayer average sale price

18 reports after they're received by Montana Medicaid

19 or representatives of Montana Medicaid.  First,

20 depending on the date of the particular average

21 sale price report, who would initially receive

22 these average sale price reports within Montana

1    A.   Yes.

2    Q.   Mr. Buska, did--did you participate in

3  responding to the interrogatory I just read,

4  Interrogatory No. 1?

5    A.   No, I did not.

6    Q.   To your knowledge, did you review the

7  interrogatory response that's reflected here that

8  I just read before it was delivered to Bayer

9  Corporation?

10   A.   No.

11   Q.   I'd like to go through the answer in

12 your representative capacity to the extent you're

13 able to provide an answer.  First, in the first

14 sentence of the answer, "The State of Montana

15 receives Bayer ASP Information," and--and that's

16 correct--

17   A.   That's correct.

18   Q.   Yeah.  And you've testified that is

19 correct that Bayer average sale price information

20 was provided on a quarterly basis to the State of

21 Montana from the date of the Bayer settlement up

22 to the present; is that right?

1  A. That's correct.

2  Q. Now, the second sentence I'll reference

3 here states, "The Bayer ASP Information is not

4 used as a benchmark in evaluating, revising or

5 settling payments to providers under the Montana

6 Medicaid program." Do you see that entry?

7  A. Yes.

8  Q. Now, is that--you had previously

9 testified that the Bayer average sale price

10 information was not used in the Montana Medicaid

11 reimbursement methodology for estimated

12 acquisition costs, correct?

13  A. That's correct.

14  Q. Is that what this entry is--is--means?

15  A. This--that's what this entry means is

16 that ASP information is not used in evaluating or

17 revising the Medicaid payment rates. I think this

18 is meant to say not "settling" but "setting"

19 payments--

20  Q. Uh-huh.

21  A. --to providers under the Montana

22 Medicaid program as indicated in the previous

```
 1   "Incorporating the Bayer ASP information into the
 2   logarithm would require a manual process."  Do you
 3   see that?
 4        A.   Yes.
 5        Q.   What does that mean?
 6        A.   What he's referring to there is that
 7   this information is--from Bayer was for NDCs
 8   provided by--by Bayer.  The information that we
 9   get from First DataBank is electronically,
10   although the information was submitted on a
11   diskette with this--with this data. What the State
12   of Montana would have to do is--is pay--or have
13   staff access our pricing system and manually enter
14   that information into our state's pricing system
15   for this one--one drug manufacturer.  We receive
16   AWP information for over--I would guess over 400
17   drug manufacturers with thousands of NDCs done
18   electronically.  Entering this information and
19   utilizing this would have required staff resources
20   to manually enter it, verify its accuracy in order
21   to establish the payment rates.
22        Q.   Well, First DataBank received this same
```

1   Bayer average sale price information in electronic

2   form in the same way that the State of Montana

3   did; is that right?

4       A.   That's correct.

5       Q.   And did Montana ever speak to First

6   DataBank about providing the Bayer average sale

7   price information to Montana in electronic form so

8   that Montana could use it?

9       A.   No.

10      Q.   And is it correct to say that the reason

11  Montana did not contact First DataBank for that

12  purpose was because the Montana regulations did

13  not require that it use the Bayer average sale

14  price information in setting--determining an

15  estimated acquisition cost.

16      A.   That's correct.

17      Q.   If the Montana regulations did require

18  that it utilized the Bayer average sale price

19  information in determining a--an estimated

20  acquisition cost, the State of Montana would have

21  undertaken whatever was necessary in order to meet

22  that obligation; is that right?

1   information.

2       Q.   And that's what I'm getting at.  The law

3   didn't require that you undertake the effort of

4   incorporating the Bayer average sale price

5   information into your determination of the

6   estimated acquisition cost, and so you did not

7   undertake that effort.

8       A.   We did not undertake that effort.

9       Q.   Did Montana ever evaluate what the costs

10  would be to incorporate the Bayer average sale

11  price information into its determination of an

12  estimated acquisition cost?

13      A.   What do you mean by the--what the costs

14  would be?  Costs would be to--

15      Q.   The--the manual process that's reflected

16  in this interrogatory response, did Montana

17  Medicaid ever evaluate precisely--

18      A.   No, not to my knowledge.

19      Q.   Yeah.  And I'll now read the last

20  sentence to you in this same answer:  "Because

21  Montana Medicaid is a relatively small program

22  with limited resources, it is not able to