**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO<br><br>*State of Montana v. Abbott Labs. Inc., et al.,* D. Mont. Cause No. CV-02-09-H-DWM | Civil Action No. 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**NOVARTIS PHARMACEUTICALS CORPORATION'S REPLY TO THE STATE OF MONTANA'S OPPOSITION TO NOVARTIS PHARMACEUTICALS CORPORATION'S SUMMARY JUDGMENT MOTION**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ............................................................................................................. 3

I. Montana Medicaid Directly Received NPC's AWP Statement ......................................... 3

II. The Undisputed Evidence Establishes that FDB – and FDB Alone – Controlled the AWPs it Published for NPC Drugs ........................................................................ 6

III. Montana Medicaid Knew that NPC's AWPs Exceeded Providers' Acquisition Costs ..... 8

CONCLUSION .......................................................................................................... 11

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Carroll v. Xerox Corp.*,
294 F.3d 231 (1st Cir. 2002) .......... 6

*F.T.C. v. Publishing Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997) .......... 6

*Halverson v. Turner*,
268 Mont. 168, 885 P.2d 1285 (Mont. 1994) .......... 5

*Hartfield v. City of Billings*,
246 Mont. 259, 805 P.2d 1293 (Mont. 1990) .......... 6

*Hughes v. U.S.*,
953 F.2d 531 (9th Cir. 1992) .......... 5

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
460 F. Supp. 2d 277 (D. Mass. 2006) .......... 10

### STATUTES AND RULES

42 U.S.C. § 1395(u)(o) (1997) .......... 10

D. Mass. R. 56.1 .......... 1 *et passim*

### MISCELLANEOUS

HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services* (A-06-95-00068) (July 1996) .......... 9

HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services* (A-06-0 l-00005) (February 2002) .......... 9,10

Defendant Novartis Pharmaceuticals Corporation ("NPC") submits this reply memorandum in further support of its Motion for Summary Judgment dismissing the Complaint of Montana ("Plaintiff") as to NPC.

**PRELIMINARY STATEMENT**

In its opening memorandum in support of its Motion for Summary Judgment ("Opening Br."), NPC demonstrated that (i) there are no disputed material facts which, if found in Plaintiff's favor, would entitle Plaintiff to judgment against NPC and (ii) the absence of *any* facts of record supporting Plaintiff's claims against NPC requires dismissal of those claims. NPC also demonstrated, as did the Memorandum in Support of Defendants' Joint Motion for Summary Judgment, that Plaintiff at all relevant times knew that for Brand Name drugs of the type marketed by NPC the benchmark known as "Average Wholesale Price" ("AWP") was just that – a reference that was between twenty and thirty percent more than the actual price paid for Brand Name drugs dispensed by the pharmacies and doctors who serve Medicaid recipients – and that Plaintiff used that knowledge to pay those pharmacies and doctors a reimbursement adequate to assure that they would remain within the Medicaid system and continue to serve Medicaid recipients. In short, NPC demonstrated that there was no "overpayment" by Plaintiff, no "fraud" or "deceit" by NPC, and no damage suffered by Plaintiff by reason of any conduct by NPC.

In response, Plaintiff's opposition offers *no* evidence as to NPC, let alone any evidence that could create a triable issue of material fact. In fact, Plaintiff's opposition is completely unsupported by any record evidence that Plaintiff could contend creates "a genuine issue to be tried," as required by District of Massachusetts Local Rule 56.1 ("D. Mass. L.R. 56.1"). Having proffered no factual support for its original claims, Plaintiff's opposition to

NPC's motion is based on speculation and hyperbole, rather than fact, and for that reason alone, NPC's motion for summary judgment should be granted.

Plaintiff attempts to defeat NPC's motion by arguing that: (1) NPC's written statement in its price lists accurately describing its AWPs ("NPC's AWP statement") is not relevant because, Plaintiff asserts, that statement never reached Montana Medicaid; (2) NPC "controlled" the AWPs published by First DataBank ("FDB"), the pricing service Plaintiff used; and (3) none of the record evidence that demonstrates Plaintiff was well aware that AWP exceeded Providers' acquisition costs refers specifically to an NPC drug at issue. The first two arguments are contrary to fact; the third is simply without credibility in light of the wealth of Plaintiff's knowledge about pricing demonstrated in the testimony of Plaintiff's own employees.

First, NPC, in fact, provided its AWP statement accurately describing its AWPs to Plaintiff whenever it introduced a new product. Second, not only is there absolutely no evidence that NPC "controlled" FDB's AWPs, the undisputed evidence establishes the contrary – that NPC did not control FDB's AWPs. Finally, Plaintiff's assertion that its admitted knowledge of the industry-wide pricing of Brand Name drugs somehow did not apply to NPC's products at issue here because those products were not specifically named or referenced is not only unsupported by any record evidence, but completely disingenuous. Plaintiff is no novice to pharmaceutical industry practices – it is a sophisticated entity that knows what a Brand Name drug is, knows who manufactures and sells them, and, in fact, directly participated in at least two government studies concerning pharmaceutical acquisition costs for Brand Name drugs in Montana. Any claim that it somehow thought that NPC's Brand Name drugs were different or were somehow excluded from the industry-wide study results is ludicrous, especially in light of the fact that not a single piece of contemporaneous evidence supports such a notion.

Plaintiff also argues that NPC should be held liable merely because NPC reported AWPs that were "neither averages nor prices charged to any customer." (Nevada and Montana's Opposition to Novartis Pharmaceuticals Corporation's Motions for Summary Judgment ("Pl. Opp.") at 1.) However, the undisputed evidence establishes that everyone – including Plaintiff – understood that AWP represented a benchmark and not an actual average or a price. Thus, after speaking the same pricing language as NPC for decades, Plaintiff now asks this Court to retroactively change the terms on which the discourse was held. The Court should decline the invitation to write fiction in the face of contrary fact.

In light of the complete absence of any factual support for any claim of wrongdoing by NPC, and the overwhelming evidence that Plaintiff was never deceived by anything NPC did, the Court should grant summary judgment dismissing Plaintiff's claims against NPC.[1]

**ARGUMENT**

**I. Montana Medicaid Directly Received NPC's AWP Statement**

D. Mass. L.R. 56.1 sets forth the standard for determining whether facts are deemed admitted for summary judgment purposes. Parties opposing summary judgment must provide a "concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other

[1] In addition to offering no factual support for its liability theories, Plaintiff concedes that it has provided no basis for a finding of damages based on NPC's alleged conduct. (Pl. Opp. at 3, n.5.) It attempts to excuse its failure by asserting that it was unable "to obtain data" from NPC. (*Id*.) The record of Plaintiff's own conduct in discovery says otherwise. After NPC responded to Plaintiff's discovery requests, Plaintiff never sought to compel further responses from NPC in the above-captioned case. (*See* Local Rule 56.1 Supplemental Statement of Undisputed Facts in Further Support of Novartis Pharmaceuticals Corporation's Motion For Summary Judgment ("NPC Mont. Supp. 56.1"), ¶ 9.) Now that discovery is closed and dispositive motions are before the Court, Plaintiff may not undo its choices during discovery by asking the Court to excuse its failure of proof on the basis of an alleged lack of information.

documentation . . . . Material facts of record [in the moving party's statement] will be deemed . . . to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." (D. Mass L.R. 56.1.) Given that Plaintiff has failed to provide any record evidence that contradicts the facts contained in NPC's D. Mass. L.R. 56.1 Statement, those facts must be deemed to be admitted.

As set forth in NPC's opening brief, NPC's D. Mass. L.R. 56.1 Statement establishes that NPC accurately described the AWPs it reported on its price lists in a statement making clear that those AWPs were simply a mathematical calculation applied to NPC's price to its customers (NPC's "Wholesale Acquisition Cost" or "WAC") and was "not intended to be a price charged by Novartis for any product to any customer." (Opening Br. at 8-9.) Rather than challenging the truth of NPC's AWP statement, Plaintiff attempts to attack NPC's "sincerity" by arguing that NPC did not provide the same statement to Plaintiff. *(Id.* at 6.) The facts establish otherwise.

As set forth in the Declaration of Richard Knapp, NPC's Executive Director, State Government Affairs, NPC provided the very same information to Plaintiff – indeed, directly to its Medicaid Agency – when NPC advised Plaintiff of the availability of a new product and transmitted product and pricing information to each state's Medicaid agency directly. (*See* Local Rule 56.1 Supplemental Statement of Undisputed Facts in Further Support of Novartis Pharmaceuticals Corporation's Motion For Summary Judgment ("NPC Mont. Supp. 56.1") ¶¶ 1, 2.) Thus, when NPC sent new product introduction letters to Plaintiff, the information generally also included a statement that was the same as, or similar to, the AWP statement that appeared on NPC broadcast faxes to wholesalers and price reporting agencies. (*Id.* ¶ 2.) For example,

NPC's October 28, 1999 letter announcing the availability of Comtan®, one of the drugs at issue here, states:

> As used in this letter, the term AWP or Average Wholesale Price constitutes a reference for each Novartis product, and in keeping with current industry practices, is set as a percentage above the price at which each product is offered generally to wholesalers. Notwithstanding the inclusion of the term price, in Average Wholesale Price, AWP is not intended to be a price charged by Novartis for any product to any customer.

(*Id*.) It is thus clear that NPC periodically sent the NPC AWP statement to Plaintiff in connection with communicating new product and pricing information directly to Plaintiff and its Medicaid Agency.

Nor does Plaintiff's naked assertion that NPC's AWP statement was somehow inadequate (Pl. Opp. at 9), create a triable issue of fact. Plaintiff has not only failed to submit any evidence in support of that assertion, it has failed to specify how or why the statement is not "complete and accurate." *See Hughes v. U.S.*, 953 F.2d 531, 542 (9th Cir. 1992) (argument and characterizations of evidence insufficient to defeat summary judgment). NPC's AWP statement plainly described NPC's AWPs as simply a mathematical extension of its WAC that was not intended to represent an actual price charged by NPC to any customer – and nothing more. NPC never represented – to Plaintiff or anyone else – that its AWPs were an average of actual transaction prices paid by Providers. In fact, it is beyond dispute that Plaintiff always knew that they were not. Those undisputed facts rebut what Plaintiff itself refers to as the "central allegations" of its case, namely, that NPC "reported average wholesale prices that were neither averages nor prices charged to any customer" knowing that "the State Medicaid programs" would use them for reimbursement. (Pl. Opp. at 1.)

Further, as a matter of law, NPC's AWP statement put Montana Medicaid on inquiry notice that NPC's AWPs were not actual average acquisition costs. *See Halverson v.*

*Turner*, 268 Mont. 168, 172-73, 885 P.2d 1285, 1288 (Mont. 1994) (granting summary judgment against landowner who denied existence of easement, where property documents were sufficient to put landowner on inquiry notice of easement); *Hartfield v. City of Billings*, 246 Mont. 259, 265, 805 P.2d 1293, 1297 (Mont. 1990) (rejecting plaintiff's constructive fraud claim relating to Worker's Compensation settlement, where plaintiff had sufficient knowledge to be on inquiry notice that settlement would lead to lower monthly payments). Indeed, as set forth below in Point II, it is undisputed that not only was Plaintiff on record notice, it knew that its AWP-based reimbursement rate exceeded Providers' average actual acquisition costs for NPC drugs because during the time period at issue, the Montana Mental Health Nursing Care Center, which is overseen by the very same department as Montana Medicaid, acquired four NPC drugs at prices that, on average, were significantly below Montana Medicaid's reimbursements to Providers for these drugs. (Opening Br. at 7.) Accordingly, Plaintiff cannot defeat summary judgment merely by asserting, with no evidentiary basis, that NPC's AWP statement was somehow inadequate.

## II. The Undisputed Evidence Establishes that FDB – and FDB Alone – Controlled the AWPs it Published for NPC Drugs

Plaintiff also asserts – without any supporting evidence whatsoever – that NPC controlled the AWPs reported by FDB, the pricing service upon which Plaintiff admits it relied (Pl. Opp. at 4, 6-7.) Settled law requires Plaintiff to offer more than mere assertions to defeat summary judgment. *See Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) ("'[N]either conclusory allegations [nor] improbable inferences' are sufficient to defeat summary judgment") (citations omitted); *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (conclusory, self-serving statements are insufficient to create a genuine issue of material fact). Accordingly, Plaintiff's effort to create a triable issue of fact as to FDB's control over the AWPs it reported should be rejected.

Moreover, the undisputed record evidence establishes that contrary to Plaintiff's assertions, FDB – and only FDB – controlled the AWPs it reported. As NPC's opening brief established, Kay Morgan, FDB's Manager of Product Knowledge-based Services, testified that FDB based its published AWPs on surveys that it independently conducted of wholesalers to determine the "markup [wholesalers] were applying to a manufacturer's line [of products]." (Opening Br. at 5-6.) Morgan's testimony was corroborated by Ramon Crusit, a former business analyst for the pharmaceutical wholesaler McKesson Corporation ("McKesson"), who testified that Morgan contacted him regularly to determine McKesson's markups on manufacturers' products. (NPC Mont. Supp. 56.1 ¶ 3.) Further, Robert James, McKesson's Vice President of Brand Rx Pharmaceutical Product Management, testified that the markups McKesson provided to FDB were not based on any AWPs listed by the manufacturers. (*Id*. ¶ 4.)

The Morgan and McKesson testimony is uncontradicted in the record and is anything but "vague" or "ambiguous," as Plaintiff asserts. (Pl. Opp. at 6 n. 11, 7.) Indeed, following the Morgan and McKesson depositions, which made clear that NPC and the other manufacturers had no control over FDB's AWPs, Plaintiff's counsel properly withdrew the frivolous antitrust claims asserted against Together Rx LLC and its member companies (including NPC) in the Second Amended Master Consolidated Class Action Complaint in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass.) (the "Together Rx Claims"). (NPC Mont. Supp. 56.1 ¶¶ 5-7.) In the Together Rx Claims, plaintiffs – represented by the same counsel as Plaintiff here – alleged that, in connection with the founding of the Together Rx program for uninsured low-income senior citizens, the member companies conspired to harmonize the markups used to determine the AWPs of the products that would be discounted under the program. (*Id*. ¶¶ 5, 8.) Morgan's

testimony led plaintiffs to dismiss the Together Rx Claims and, instead, commence separate litigation against FDB, *New England Carpenters Health Benefit Fund, et al. v. First DataBank, Inc.*, Civ. Action No. 1:05-CV-11148-PBS (D. Mass.). (*Id.* ¶¶ 6-7.) Further, as part of a settlement of that litigation, FDB agreed to reduce the AWPs it reports in the future, without regard for whatever manufacturers report to it. (Opening Br. at 6 n. 4.) In the face of this undisputed record evidence that FDB – not NPC – controlled the AWPs on which Plaintiff relied, Plaintiff's naked assertion to the contrary hardly satisfies the evidentiary standard Plaintiff must meet to defeat summary judgment.

## III. Montana Medicaid Knew that NPC's AWPs Exceeded Providers' Acquisition Costs

The undisputed evidence establishes that Plaintiff knew during the entire relevant period that AWP and Plaintiff's AWP-based reimbursement rate exceeded Providers' average actual acquisition costs. (*See* Local Rule 56.1 Statement of Undisputed Facts in Support of Novartis Pharmaceuticals Corporation's Motion for Summary Judgment, filed with this Court on February 8, 2007 ("NPC Mont. 56.1"), ¶ 30.)[2] Plaintiff attempts to sweep that mountain of evidence aside by asking the Court – without any factual support – to disregard the extensive record evidence of Plaintiff's knowledge because the federal reports and government documents in question do not refer specifically to NPC drugs. (Pl. Opp. at 10-11.) Rather than citing any record evidence which raises "a genuine issue to be tried," Plaintiff also seeks to overcome the

[2] Further, Plaintiff must also be deemed to have admitted the facts that establish that NPC had no incentive to report deceptive AWPs. (*See* D. Mass. L.R. 56.1.) Plaintiff has failed to rebut the evidence that because retail pharmacies dispense nearly all of the NPC Brand Name drugs at issue and must dispense the Brand Name drug that a physician prescribes, they therefore have little or no influence over market share, and NPC lacked any motivation to report deceptive AWPs or to "market the spread" to increase market share. (NPC Mont. 56.1, ¶¶ 2, 6, 10.) Plaintiff has similarly failed to rebut the record evidence that NPC's other two drugs at issue – Aredia, which is physician-administered, and Miacalcin Injection, a self-administered drug that may, in rare circumstances, be physician-administered – either faced no competition or were not actively marketed during the relevant period. (*Id.* ¶¶14-17.)

dispositive effect of the record evidence of its knowledge by arguing that NPC should be held liable because the AWPs it reported allegedly "did not comport with the plain and ordinary meaning of the term." (Pl. Opp. at 9.) Plaintiff's arguments in this regard should be rejected for the reasons set forth below.

First, the record evidence establishes – and Plaintiff has submitted no evidence to the contrary – that Plaintiff knew that its AWP-based reimbursement rate exceeded Providers' average actual acquisition costs specifically with respect to NPC drugs. The Montana Mental Health Nursing Care Center, which is overseen by the same department as Montana Medicaid, acquired four NPC drugs at issue during the relevant period at prices that, on average, were significantly below Montana Medicaid's reimbursements to Providers for these drugs. (Opening Br. at 7.)

Second, the federal reports and other record evidence clearly disclosed that AWP exceeded Providers' acquisition costs for Brand Name drugs on an industry-wide basis, and not merely in "discrete instances . . . for a specific drug" as Plaintiff asserts. (Pl. Opp. at 10-11.) For example, the Office of Inspector General ("OIG") reported that "For Montana, the overall estimate of the extent that AWP exceeded invoice prices was 16.2 percent for brand name drugs . . . ." (HHS-OIG Report, Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services (A-06-95-00068) (July 1996), at i; emphasis added.) In 1997, the OIG essentially noted evidence of systemic problems when it reported that "[W]e obtained 18,973 invoice prices for brand name drugs. We estimated that actual acquisition cost was a national average of 18.3 percent below AWP." (HHS-OIG Report, Medicaid Pharmacy -- Actual Acquisition Cost of Prescription Drug Products (A-06-96-00030) (April 1997), at i.) In 2002,

the OIG noted, with respect to Montana, that it had "obtained 1,675 invoice prices for brand name drugs . . . . For Montana, our estimate of the overall discount below AWP for the invoice prices was 19.71 percent for brand name drugs." (HHS-OIG Report, Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services (A-06-0 l-00005) (February 2002), at i.) Plaintiff cites no basis in the record or otherwise for concluding that the NPC drugs at issue were somehow excluded from the term "brand name drugs" in the government's analysis of industry-wide pricing practices, and accordingly, Plaintiff's assertions in this regard do not create a triable issue of fact.

Finally, as to Plaintiff's assertion that the AWPs NPC reported "differed from the plain meaning" of the term AWP (Pl. Opp. at 2, 9, 11-12), Plaintiff simply asks the Court to assume that Montana Medicaid understood the term to have the same "plain meaning" as the Court held it did when the Court construed the term under the 1997 Medicare statute, 42 U.S.C. § 1395(u)(o). *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 460 F. Supp.2d 277, 284 (D. Mass. 2006). Such an assumption would be inappropriate. First, as the Court noted in its ruling, "[s]tatutory construction ordinarily begins *with the plain language of the statute*." *Id*. (citations omitted; emphasis added). Thus, the Court there was construing a specific statute which is wholly inapplicable here. In this case, the Court is not being asked to construe a statutory term. Instead, it must look to the undisputed facts to understand the parties' intent and understanding. Second, to make such an assumption, the Court would have to blind itself to the undisputed facts demonstrating that Montana Medicaid had a wholly different understanding from what the Court construed was intended in the 1997 Medicare statute. Third, in the very ruling upon which Plaintiff relies, the Court acknowledged that by a certain time, the

term's "plain meaning" under the Medicare statute no longer applied and it was understood that "AWP was different than average sales price and was not reflective of actual prices in the marketplace." *Id*. at 288. Thus, the parties' understanding of the term is relevant to determining whether anyone was deceived or damaged, and Montana Medicaid's undisputed understanding defeats any possible inference of deception or damage.

The evidence indisputably and overwhelmingly establishes that Plaintiff was fully aware that AWP was in excess of the actual average *transaction* prices that the Providers typically paid for the NPC drugs they dispensed to Medicaid recipients. Under such circumstances, there can be no fraud or deception because Plaintiff was not defrauded or deceived. Adopting Plaintiff's theory would allow a party to utilize for years terminology that it and everyone with whom it deals understands to have a particular meaning and then, after the fact, ask a court to impose a different meaning – a result that is neither fair nor appropriate. Accordingly, Plaintiff's plain meaning argument should therefore be rejected.

**CONCLUSION**

For the reasons set forth above and in NPC's opening brief, as well as in the Memorandum in Support of Defendants' Joint Motion for Summary Judgment and Defendants' Reply brief, summary judgment should be granted to NPC on all of Plaintiff's claims.

Dated: Boston, Massachusetts
May 10, 2007

Respectfully submitted,

/s/ Karen F. Green______

Karen F. Green, BBO # 209050
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Jane W. Parver (admitted *pro hac vice*)

Saul P. Morgenstern (admitted *pro hac vice*)
Samuel Lonergan (admitted *pro hac vice*)
Charles Graybow (admitted *pro hac vice*)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of May, 2007, a true and accurate copy of Novartis Pharmaceuticals Corporation's Reply to the State of Montana's Opposition to Novartis Pharmaceuticals Corporation's Summary Judgment Motion was served via the Lexis-Nexis Filing System:

Dated: Boston, Massachusetts
May 10, 2007

/s/ Brett Budzinski
Brett Budzinski