# EXHIBIT 4

## TO SUPPLEMENTAL DECLARATION OF SAMUEL N. LONERGAN

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05 - 11148 DPW**

NEW ENGLAND CARPENTERS
HEALTH BENEFITS FUND; PIRELLI
ARMSTRONG RETIREE
MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE
FUND OF PHILADELPHIA AND
VICINITY; and PHILADELPHIA
FEDERATION OF TEACHERS HEALTH
AND WELFARE FUND,

        Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri
Corporation; and McKESSON
CORPORATION, a Delaware Corporation,

        Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

RECEIPT # _____
AMOUNT $ 250
SUMMONS ISSUED 4/2
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY CLK. _____
DATE 6/2/05

CLASS ACTION COMPLAINT

1821.10 0006 BSC.DOC

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following:  unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2005 by Steve W. Berman and Hagens Berman Sobol Shapiro LLP. Steve W. Berman and Hagens Berman Sobol Shapiro LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of Steve W. Berman and Hagens Berman Sobol Shapiro LLP is prohibited.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................ 1

II.     JURISDICTION AND VENUE .................................................................. 6

III.    PARTIES .................................................................................................... 7

     A.      Plaintiffs .......................................................................................... 7

     B.      Defendants ...................................................................................... 9

IV.    STATEMENT OF FACTS ........................................................................ 9

     A.      Drug Manufacturers and NDCs ...................................................... 10

     B.      The Wholesale Acquisition Cost .................................................... 11

     C.      The Average Sale Price ................................................................... 12

     D.      The Average Wholesale Price .......................................................... 12

     E.      The AWP/WAC Spread ................................................................... 13

     F.      Drug Wholesalers ........................................................................... 14

     G.      Wholesaler Sales Transactions ....................................................... 16

     H.      Retail Pharmacy Channel ................................................................ 16

     I.      The Private End-Payors for Prescription Drugs ............................. 18

     J.      End Payors Drug Reimbursements Are AWP-Based ....................... 18

     K.      Medicaid Drug Reimbursements Are AWP-Based ......................... 21

     L.      Medicare Drug Reimbursements Were AWP-Based ....................... 21

     M.      Private and Public End Payors Rely on Published Drug
          Pricing Compendia .......................................................................... 23

     N.      The Emergence of First Data and MediSpan as Electronic
          Data Publishers ............................................................................... 24

     O.      The Merger of First Data and MediSpan Systems ........................... 27

     P.      First Data Gains the Trust of the Pharmaceutical Industry .............. 29

|  | Q. | First Data's Representation to Gain Pharmaceutical Reliance | 30 |
|  | R. | In the Late 1990's, Retailers and McKesson Looked to the AWP/WAC Spread to Increase Margin | 34 |
|  | S. | By 2001, First Data AWP/WAC Markups Were Susceptible to Abuse | 35 |
|  | T. | Implementation of the Five Percent Spread Scheme | 38 |
|  | U. | Branded Manufacturers' in Action in Response to the McKesson/First Data Scheme | 51 |
|  | V. | First Data's 2005 Capitulation | 53 |

V.    CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME....................54

COUNT I ...........................................................................................................57
Violations of 18 U.S.C. § 1962(C)
(Against Defendant Drug Manufacturers Identified Herein
For Unlawful Conduct Associated With AWP Drug)

COUNT II ..........................................................................................................64
Untrue And Misleading Advertising
(Business and Professions Code §§ 17500, *et seq.*)

COUNT III.........................................................................................................65
Violations of Unfair Competition Law
(Business and Professions Code §§ 17200, *et seq.*)

COUNT IV.........................................................................................................66
Violations of the Consumers Legal Remedies Act
(Cal. Civ. Code §§ 1750, *et seq.*)

COUNT V ..........................................................................................................67
Negligent Misrepresentation

COUNT VI.........................................................................................................68
Civil Conspiracy

VI.    DEMAND FOR JUDGMENT.....................................................................69

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I.   INTRODUCTION

1.   This is a proposed national class action brought on behalf of consumers, self-insured employers, health and welfare plans, health insurers and other end payors of prescription drugs ("End Payors") against First DataBank ("First Data") and McKesson Corporation ("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby causing members of the proposed Class, whose payments for pharmaceuticals are tied to AWP, to make billions of dollars of excess payments for those pharmaceuticals.

2.   In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals on the basis of WAC, they *get paid* (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, the average wholesale price or "AWP." As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.   Each year more than three billion prescriptions are written in the United States. Because the majority of pharmaceutical reimbursements are tied to the AWP, end payors must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are therefore compiled and published by several

- 1 -

publishing companies, including First Data. Through these compilations, which are available in both hard copy or electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement to retailers accordingly.

4.   Health and welfare plans, health insurers and other end payors for prescription drugs use and rely on AWP as a reasonable and accurate indicator of the underlying transaction prices for almost all drugs. Virtually all these entities' contracts governing pharmaceutical reimbursement use AWP as a pricing standard.

5.   First Data, McKesson and pharmaceutical companies know that end payors utilize AWP as a pricing benchmark and view AWP as a reasonably accurate measurement of list and transaction prices in order to negotiate payment terms for drugs used by their constituents.

6.   Until March 15, 2005, First Data represented that it derived the WAC/AWP markup either from manufacturers or by conducting "a survey" of wholesalers. First Data further represented throughout the Class Period that AWP represents the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing." McKesson is one of the wholesalers who was "surveyed" by First Data.

7.   Historically, in order to arrive at the AWP for branded drugs, manufacturers and wholesalers applied a markup of 20% or 25% to WAC. Whatever markup was given to a particular branded drug "stuck" with that drug indefinitely. Until 2002, there was variation, supposedly based on manufacturer direction or on First Data's surveys, in the difference between the WAC to AWP spread for hundreds of brand-name drugs. For example, manufacturer A might have a markup of 20%, while manufacturer B might utilize a markup of 25%.

- 2 -

8.     In approximately late 2001 or early 2002, unknown to payors in the pharmaceutical marketplace, First Data and McKesson reached agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs. As part of this agreement, First Data, to the extent it relied upon information other than that provided directly from various drug manufacturers for certain drugs, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not "survey" any other wholesalers.

9.     And at the same time, McKesson, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount. To conceal the scheme, McKesson typically effectuated this change only when some other WAC-based price announcement was made by a drug maker. This camouflaged both the associated increase in the markup and WAC-to-AWP spread McKesson as the source of the increased markup. McKesson then communicated these new WAC-to-AWP spreads to First Data. First Data, without regard to any change in the actual average wholesale prices occurring in the pharmaceutical marketplace, and without reference to the manufacturers' suggested AWPs (or WACs) for these drugs, then published new AWPs with the new WAC-to-AWP markup. First Data's action had the effect of raising the WAC-to-AWP spread by additional percentage points so as to have a 25% difference between pharmaceutical companies' reported WAC and the First Data published AWP. First Data did so despite receipt of information, in some instances, directly from manufacturers specifying or suggesting a 20% markup as appropriate. On some occasions, some of the manufacturers secretly questioned this increase, but First Data refused to change the published AWP and the manufacturers failed to take any action to remedy defendants' unjustified raise in AWP.

- 3 -

10.     This collaboration between First Data and McKesson to raise the WAC-to-AWP spreads is referred to as the "Five Percent Spread Scheme" or "Scheme." The dramatic nature of the Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the conspiracy in 2002 and 2003:

**Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004**



**Note**: "NDC" means National Drug Code and refers to a number assigned to each drug.

11.     Once First Data and McKesson raised the WAC-to-AWP spread to 25% on a given drug, that spread remained in place and still remains in place to this day.

12.     Both McKesson and First Data had economic and business reasons for reaching an understanding that McKesson would artificially raise the WAC-to-AWP spread and that First Data would publish the increased AWPs. A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients. McKesson

- 4 -

implemented this Scheme in order to provide a benefit to those important retail pharmacy clients as well as its own pharmacy related business. For sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and their acquisition cost for a drug. Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies. Thus, an increase in the WAC-to-AWP markup results in larger profits for retailers and McKesson's pharmacy-related businesses. First Data agreed to this Scheme in order to ease the burden of having to actually establish accurate spreads and to curry favor with McKesson so that McKesson would utilize First Data as the pricing source in has in some of its contracts with pharmaceutical companies and others in the distribution chain, as well as in the pricing database that it provides to its customers, thereby increasing First Data's business. First Data also agreed to the Scheme as part of an effort to increase the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP. McKesson in turn where it could do so, specified in its dealings with pharmaceutical companies, that First Data's AWP would be the AWP used for contract pricing purposes as opposed to the other published AWPs. Thus, each defendant shared multiple common purposes and each acted to achieve those purposes by implementation of the 5% Scheme.

13.    Health and welfare funds, insurance companies and thousands of third-party payors have contracts that expressly tie their payment for pharmaceuticals to First Data's published AWPs.

14.    As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, thousands of third-party payors and consumers have had their drug prices

- 5 -

increased by a Scheme that directly contravenes market expectations concerning the establishment, meaning and publication of AWPs.

15. Among the drugs whose prices are artificially inflated by the Scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium. Given the billions of dollars spent on prescription drugs, a 5% increase in the WAC-to-AWP spread results in a substantial increase in payments for pharmaceuticals. For example, AstraZeneca's Nexium had annual sales in 2004 of almost $4 billion. A bump of 5% in the WAC-to-AWP spread results in an increase of over $100 million per year in reimbursements for just one drug. Another such drug is Pfizer's Lipitor, whose annual sales in 2004 exceeded $10 billion. As a result of the 5% increase imposed by First Data and McKesson, hundreds of millions per year was spent on Lipitor that would not have been absent the Scheme.

16. In this action, plaintiffs and the Class seek to recover damages incurred from defendants' unlawful acts and practices.

## II. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any Defendants" and the aggregated amount in controversy exceeds five million dollars ($5,000,000). *See* 28 U.S.C. §§ 1332(d)(2)

- 6 -

and (6). This Court has personal jurisdiction over the parties because plaintiffs submit to the
jurisdiction of the Court and defendants systematically and continually conduct business
throughout the Commonwealth of Massachusetts, including marketing, advertising, and sales
directed to Massachusetts residents.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) because
defendants as corporations are "deemed to reside in any judicial district in which [they are]
subject to personal jurisdiction" and because the misrepresentation and material omissions
"giving rise to claim[s] occurred" in this District as well as throughout the State of
Massachusetts.

## III.   PARTIES

### A.   Plaintiffs

19.     Plaintiff New England Carpenters Health Benefits Fund ("Carpenters") is an
employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of
ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As
such, Carpenters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C.
§ 1132(d). Carpenters maintains its principal place of business in Wilmington, Massachusetts. It
provides comprehensive health coverage for over 22,000 participants and beneficiaries in the
states of Main, New Hampshire, Vermont, and Massachusetts. During the Class Period,
Carpenters has been billed for and paid charges for drugs. It reimburses retail pharmacies for
pharmaceuticals on the basis of the published AWPs (minus a fixed percentages) and those
AWPs are published by First Data.

20.     Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust
("PMBT") is a voluntary employee benefits association maintained pursuant to the federal

- 7 -

1821.10 0006 BSC.DOC

Employee Retirement Security Act, 29 U.S.C. § 1132, *et seq.* and to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. ("Pirelli") in the early 1990s by many Pirelli retirees for the purpose of providing health and medical benefits to eligible participants and beneficiaries. PBMT maintains its principal place of business in Goodlettsville, Sumner County, Tennessee. During the Class Period, PMBT has been billed for and has paid charges for drugs based on AWP. Since May 1, 2001, PMBT has contracted with ACS/Caremark, a PBM, to administer its drug program for its members. PMBT's contract with its PBM provides that reimbursement is to be based on First Data's published AWP.

21.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, THWF is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). THWF maintains its principal place of business at Fourth & Cherry Streets, Philadelphia, Pennsylvania 19106. It provides comprehensive health coverage for over 28,000 participants and beneficiaries in parts of Pennsylvania, New Jersey and Delaware. During the Class Period, THWF has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

22.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code for the purpose of providing health benefits to eligible participants and

- 8 -

1821.10 0006 BSC.DOC

beneficiaries. PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 20,000 active participants, and their spouses and dependents. During the Class Period, PFTHW has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

**B.      Defendants**

23.      Defendant First Data ("First Data") is a Missouri corporation with its principal place of business at 1111 Bayhill Drive, San Bruno, California 94066. First Data is a subsidiary of the Hearst Corporation and is the leading provider of electronic drug information to the healthcare industry.

24.      Defendant McKesson Corporation is a Delaware corporation with its principal place of business at McKesson Plaza, One Post Street, San Francisco, California 94101. McKesson Corporation is the leading provider of supply, information and care management products and services designed to reduce costs and improve quality across healthcare. Founded in 1833, with annual revenues of more than $50 billion, McKesson ranks as the 16th largest industrial company in the United States.

## IV.      STATEMENT OF FACTS

25.      This case involves the unlawful inflation of the "markup" factor between the so-called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or "AWP") of a large number of prescription pharmaceutical products, a scheme implemented in late 2001 and 2002 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's most widely used and "trusted" electronic drug data publisher).

- 9 -

## A.    Drug Manufacturers and NDCs

26.    Drug makers manufacture brand name and generic drugs. Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug. After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand name itself remains with the original manufacturer. Drug products not covered by patent protection and produced and/or distributed by many firms are generic drugs. Manufacturers tend to be either brand name manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

27.    There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug. Prescription drugs are dispensed to patients primarily through four different drug distribution channels: (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion; and (d) other medical providers. This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

28.    All drugs intended for retail pharmacy sale are identified by a National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA") and contains eleven digits. The NDC is used to identify the drug delivered to the patient. The first five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills). While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (in large part because over the years many drugs and associated NDCs have been phased out).

- 10 -

## B.   The Wholesale Acquisition Cost

29.   Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand. (Generic makers, of course, use more commodity pricing approaches). Once an introductory price has been set, the branded manufacturer establishes the wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject to many adjustments, as will be seen). The WAC for branded drugs is then published by the manufacturer.

30.   Manufacturers establish the WAC as a baseline for sales to wholesalers and others in the distribution chain. Thus, while WAC may not represent *actual* acquisition cost (as wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may receive other price concessions charged back to the manufacturers), it is the baseline for most branded drug sales by manufacturers to national wholesalers. In addition, WAC is a publicly available price for most branded drugs and is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product. And because the wholesalers' price to the retail class of trade is also typically based on, or is a function of, the WAC, a change in WAC generally results in a similar percent change in price to both wholesalers and to retail pharmacies.

31.   WACs are typically reported on invoices between the manufacturer and the drug wholesaler (and as between the wholesaler and the retailer, or between the manufacturer direct to the retailer). Some drug manufacturers have other names for the WAC price such as list price, catalog price, direct price, wholesale net price, or book price.

- 11 -

## C.    The Average Sale Price

32.    After all price concessions are considered, a manufacturer achieves a net sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug product from either a drug manufacturer or wholesaler. The net sales price takes into account the invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration.

33.    Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products, and the average of those net sales prices is usually called the average sales price (or "ASP"). While net acquisition prices and associated ASPs are known to each drug manufacturer, they are not typically published or made public.[1] Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria. Because ASP is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to ASP are considered proprietary and confidential by drug manufacturers. As a result, for retail pharmaceutical products the exact relationship of ASP to WAC (or to the average wholesale price or AWP, discussed below) for a particular drug at a particular point in time is not publicly known.

## D.    The Average Wholesale Price

34.    In addition to causing to be published a wholesale acquisition cost or WAC for branded drugs, over the years branded (and generic) manufacturers have also caused to be

---

[1]  The important exception to this is Congress' recent enactment of the Medicare Modernization Act of 2003, in which Congress changed the Medicare reimbursement system for drugs and biologicals from an AWP-based system to an ASP-based system physician-administered. This exception is not relevant here.

- 12 -

published an average wholesale price (or "AWP") for prescription pharmaceuticals. The average
wholesale price or AWP is a list price used for invoices between drug wholesalers and
pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered
drugs) and is typically used as a benchmark for the reimbursement by end-payors for the
dispensers' (*e.g.*, retail pharmacies or doctors) acquisition of the drug product. Historically, the
AWP is set directly or indirectly by the drug manufacturer, with an effective date and remains in
effect until a change in price is published.

35.    WAC and AWP differ in that they represent list prices at different levels in the
market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a
list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

### E.    The WAC-to-AWP Spread

36.    In the pharmaceutical industry, the amount by which the AWP exceeds the WAC
is sometimes known as the WAC/AWP "markup" or "spread" for a particular drug product.

37.    The relationship between AWP and WAC is sometimes expressed as the
percentage by which the difference is above WAC (*e.g.*, 20% or 25% above WAC, usually called
"the markup") rather than the percentage in which the difference is measured as an amount under
AWP (*e.g.*, 16.7% or 20% off AWP, sometimes called the "spread"). In this complaint, we
usually refer to the WAC-to-AWP markup in the first sense, *i.e.*, as expressed as a percentage
above WAC.

38.    For many years preceding the Scheme alleged in this complaint, the WAC-to-
AWP spread for branded drugs had predictably set patterns, and the competitive pricing
marketplace for pharmaceuticals had adjusted and accommodated for the patterns. For branded
pharmaceuticals, the WAC/AWP spread tended to fall in two quantum places:  20%, and 25%.

- 13 -

In other words, in the many years preceding the Scheme alleged in this case, a particular branded drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP at either 1.16 or 1.20, or 1.25 of the WAC (*e.g.*, $120).

39.     These steps in the WAC/AWP spreads 20%, and 25%, percentages known to McKesson, First Data and others in the pharmaceutical industry as the WAC/AWP markup factors – were commonly associated with particular divisions of pharmaceutical companies. For example, a pharmaceutical division might be designated as a "20% markup" company, while another company working in a different therapeutical area, would be designated as a "25% markup" company.

40.     Another part of the predictable aspects of the WAC/AWP spreads over the years was the *unchanging* nature of the WAC/AWP markup for a particular NDC. In other words, if a particular NDC first launched at a 20% markup value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the generic code for that NDC. Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same markup factor associated with that NDC. Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP spread to be changed for any particular NDC, and in the few isolated situations where that did occur, a particular market-based reason existed which was known to all participants in the marketplace (*e.g.*, a merger of drug companies necessitating uniformity of particular prices).

## F.     Drug Wholesalers

41.     Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell direct to retail pharmacy chains, mail-order pharmacies,

- 14 -

hospital chains and some health plans. Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

42.    Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers. Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

43.    The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased. The manufacturer may quote a wholesaler a price close to or at WAC, but typically there will also be a small volume discount or early cash payment discount off that price.

44.    National wholesalers are the primary intermediate level in the retail channel of distribution process accounting for 45.7% of prescription drugs ($98.5 billion) in 2002. Other intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

45.    Wholesale drug distribution is heavily concentrated. The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution. Collectively they account for about 97% of drug sales that flow through national wholesalers, and collectively they account for more than 80% of all drug wholesalers (national, regional, and specialty).

- 15 -

## G.    **Wholesaler Sales Transactions**

46.    National drug wholesaling is generally perceived as price competitive, with
McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers
(primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and
mail orders). As a result, sell-side national drug wholesaler margins to retailers tend to be thin
(even at times non-existent), with a significant portion of national drug wholesaler revenue
instead being derived from buy-side prompt pay discounts received from manufacturers and from
wholesaler inventorying measures that anticipate price increases.

47.    National drug wholesalers sell branded drugs to the retail class of trade based on
prices pegged to the WAC. Given the tendency for narrow margins in the national drug
wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is
not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also
expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side
costs charged by national wholesalers of branded drugs to major pharmacy retailers.

## H.    **Retail Pharmacy Channel**

48.    The retail pharmacy channel (including chain drug store companies, independent
pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the estimated market
share of dollars for prescription drugs. Currently, the four largest drug store chains account for
most of the retail pharmacy market share today, and the recent consolidation trend appears to be
continuing. Some large national or regional retail chains (including pharmacy, supermarket,
mass merchandiser chains) purchase drugs in large enough volumes so that they can bypass the
wholesaler and buy directly from the manufacturer, but these direct purchases remain a small
portion of the overall picture.

- 16 -

1821.10 0006 BSC.DOC

49.     Regardless whether the retail pharmacy is large or small, its purchase of prescription drugs is typically based using WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

50.     When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates to selling specific volumes of drugs or achieving a certain share of a specified market. When purchasing drugs directly from manufacturers, pricing using the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

51.     Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power, and some of these groups further reduce their costs through direct rebate deals offered by manufacturers. In making purchases from wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC but, again, the actual transaction cost is highly variable due to the additional arrangements.

52.     In short, entities in the retail distribution chain (including wholesalers, resalers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC. While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

- 17 -

## I. The Private End-Payors for Prescription Drugs

53. At the most basic level, prescription drug expenditures are funded by either private or public sources. In the United States, more than $200 billion dollars is spent annually on prescription drugs, and about three quarters of this amount is privately funded.

54. Private payors for prescription drugs include drug benefit plan sponsors and consumers. The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs for their covered beneficiaries) include self-insured employers, health and welfare plans, health insurers and managed care organizations (MCOs). Most of these plan sponsors reimburse retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either health plans or pharmacy benefit management companies) who negotiate discounts with retail pharmacies and rebates from drug manufacturers. The vast majority of such purchases are for out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution channel.

## J. End Payors Drug Reimbursements Are AWP-Based

55. Although retail pharmacies *purchase* pharmaceutical products based upon pricing formulae that employ the WAC, retail pharmacies *get paid* (*i.e.* receive reimbursement) from plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee. This is fundamental anomaly of the retail distribution channel for drug products – that retail pharmacies' *purchases* are based on prices pegged to the published WAC, but retail pharmacies' *reimbursements* or charges are based on the published AWP.

56. Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter adjudicate the numerous transactions that occur during administration of a plan. Although the

- 18 -

PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders. In the contracts between PBMs and plan sponsors, the retail pharmacies drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

57.     Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure. For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank...." Similarly, Caremark's website states: "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads First Data's updated data into the system on a daily basis." Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

58.     The AWP-based reimbursement benchmark for private payments to the retail class of pharmaceutical trade has long been acknowledged. Most recently, at a hearing on December 7, 2004, before the United States House of Representatives Committee on Energy and Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has been codified as the benchmark price, by statute and regulations, in the public sector and by contract in the private sector."

59.     In addition to affecting the magnitude of plan sponsors' branded drug reimbursement to retail pharmacies for drug ingredient costs, the private sector AWP-based system also affects consumers. There are primarily two types of consumer: those who have

- 19 -

1821.10 0006 BSC.DOC

some type of pharmacy benefit coverage and pay a portion of the cost of a drug (co-payment, co-insurance, deductible), and those who have no coverage and pay the entire cost of the prescription drug at the retail pharmacy.

60.     Consumers that pay "co-insurance" are at risk for the delivery of their drug benefit ratably with their insurer; to the extent that the overall reimbursement amount unlawfully is inflated, the consumer group is co-insurance is proportionally injured.

61.     Consumers that do not have insurance are sometimes referred to as "cash-paying consumers," and they include many seniors who are eligible for Medicare. Recent estimates suggest that these consumers (*i.e.*, Medicare-eligible seniors who have no prescription drug coverage or who are covered by traditional indemnity plans and must therefore pay the full amount prior to reimbursement), amount to more than one-fifth of the private prescription drug expenditures at retail pharmacies. Most retail pharmacies based their price to cash payors on formulae tied to the AWP.

62.     Consumers who have insurance coverage and those who are eligible for government programs (such as Medicaid) typically pay less than consumers who do not have such coverage. Uninsured consumers, or cash payors, are disproportionately elderly and poor consumers.

63.     In summary, thousands of pharmaceutical reimbursement contracts are based on AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates. All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector and private drug benefit insurance plans are negotiated based upon AWP and discounts from AWP."

- 20 -