element in the campaign by drug wholesalers like McKesson to build the kind of customer loyalty in retailers that will help them to shore up their own sagging profit margins. McKesson offers dozens of value added programs to retail pharmacies, including technology and care management solutions that it offers to "25,000 retail and 5,000 health systems pharmacies nationwide."[3] McKesson's customers for these programs include "large national chains and community drugstores, as well as hospital pharmacies, outpatient clinics, and other institutional providers."[4] If McKesson could cause First Data to report a higher AWP, McKesson could use this to curry favor with retailers who use McKesson as their wholesaler or other services and to further establish or maintain business ties between retailers and McKesson. As noted in McKesson's 2004 Annual Report, in recent years a significant portion of its revenue growth came from large customers, including such large retail pharmacy chains like Rite-Aid. Rite-Aid represented 8% of McKesson's 2003 revenues. In 2003, Rite-Aid named McKesson its wholesaler of the year. In a 2003 article in Chain Drug Review, McKesson executive Pat Blake described McKesson and retailers as "we're really positioned to be a business partner" due to the company's automation and information technology offered to retailers as well as its Access Health Programs linking retailers with third-party payors. Indeed, Rite-Aid was one of the companies that had asked, without success, certain of the defendant manufacturers to increase the WAC/AWP spread by 5%. McKesson agreed to the 5% Scheme when the manufacturers apparently would not (notwithstanding the manufacturers' own inflation of AWPs and WACs for drugs specified in the ongoing AWP litigation and their, at a minimum, acquiescence to the results of the Scheme), McKesson offered large retail pharmacy chains a chance to make a profit

---

[3] McKesson website: http://www.pharmaceutical.mckesson.com/wt/home.php.

[4] *Id.*

- 46 -

off the increased spread. Thus, the 5% Spread Scheme was a benefit to McKesson's largest clients, many of whom had previously approached the drug manufacturers seeking imposition of the 5% increase.

(b)    The Scheme also directly benefited McKesson's own pharmacy business. McKesson has an operation called McKesson Valu-Rite, which consists of a nationwide network of independent pharmacies that are connected to McKesson. McKesson manages 275 pharmacies in 35 states and employs 900 pharmacists. Again, an increase in the spread was a direct benefit to these pharmacies by increasing profits off the spread. This in turn also increased McKesson's profits from its Valu-Rite program.

(c)    Further, by simply raising the spread on hundreds of drugs, McKesson saved money from reductions in administrative expenses in reporting AWPs to First Data. It was far easier to simply flip a switch converting hundreds of drugs from 20% to 25% over WAC than to deal with the drugs one at a time. Thus McKesson had its own interests that were served by the 5% Scheme.

125.    First Data also saw advantages to participating in the 5% Scheme:

(a)    First Data too could reduce its administrative costs by virtue of eliminating the costs associated with limited surveys and variation in spreads, which would otherwise have to be tracked in order to be "accurate."

(b)    Second, by virtue of reporting a higher AWP, First Data incentivized other powerful forces in the distribution chain to use First Data's AWP as the pricing standard and thereby created greater demand for First Data's reporting services. For example, PBMs in their contracts with end payors often designate which publisher's AWP will be used to set the AWP. PBMs frequently take a percentage of the spread between AWP and acquisition cost so the larger

- 47 -

the spread the more profit they make. As of 2002, many if not most of the major PBMs specified the use of First Data. In addition, by virtue of its partnership with McKesson, McKesson designated First Data's AWP to be the pricing standard for the Together Rx program, a prescription drug savings program for Medicare enrollees, thereby again increasing the use of First Data's services. Thus First Data, like McKesson, had its own interests that were served by the 5% Scheme.

          (c)     At some point in 2002-2003, certain manufacturers and wholesalers refused to provide First Data with pricing information. If First Data publically revealed that certain manufacturers and wholesalers were disavowing AWP, the use of the AWP system could be threatened. By participating in the Scheme and continuing the illusion of surveys, First Data maintained the demand for its services.

      126.    McKesson and First Data also agreed to hide the Scheme by implementing the WAC-to-AWP increases only when the manufacturer increased WAC. McKesson and First Data were fearful to implement the Scheme without such an increase because such action "would trigger a lot of questions on why there was a change to the item when the MFG (manufacturer) hasn't sent any price changes." To avoid having end payors ask questions, McKesson and First Data camouflaged the Scheme by imposing the 5% increase when other price changes were reported, thus in effect compounding price increases. This part of the Scheme is depicted by the following chart showing a dramatic increase in the number of 25% spreads associated with price changes in 2002 and 2003:

- 48 -



First Data Bank Number of Reported Price Changes at
25% and 20% AWP/WAC Spread Levels, 1989 - 2004

DRAFT 5 19 06                          Privileged and Confidential                          Page 2 of 5

127.    After the scheme was implemented (and despite the flack from some drug manufacturers), First Data and McKesson continued their collaboration to ensure that First Data's WAC/AWP markups mimicked those of McKesson, and vise-versa. On numerous occasions in recent years, First Data and McKesson have exchanged comparative AWP, WAC, and WAC/AWP markup information in order to ensure that the forced markups continue to prevail in the marketplace.

128.    These post-2001 communications were in no sense a "survey" being conducted by First Data. Indeed, the communications were bilateral, with First Data equally enforcing the new WAC/AWP markup protocol. And even when disparities were shown in the databases, First Data would counsel against making changes because "it would trigger a lot of questions on why

- 49 -

there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changed."

129. At times, when McKesson was "catching some flack from our large retail friends," McKesson would ensure that both it's and First Data's databases contained the higher WAC/AWP markup. At other times, a large national chain pharmacy would call "complaining about" the particular AWP for a product, and McKesson, in turn, would contact First Data in order to get it "fixed."

130. When in 2003 one manufacturer indicated that it would "no longer report average wholesale prices (AWP) for its products", First Data reported to McKesson that this manufacturer appeared "to be playing hard ball and [First Data] just won't play." First Data indicated that it would, then, "just assume the markup is 1.25." In this situation, when the manufacturer wanted to be assured that any disclosure of an AWP associated with its product was a price that "has not been authorized" by it, First Data wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below."

131. Many insiders in the pharmaceutical industry recognized that the extraordinary, across-the-board increase in the number of drugs that were increased in the WAC/AWP spread from 20 to 25% was a "change... being driven at wholesaler lever" in order to accommodate the large drug retail chains.

132. First Data's participation in the Scheme is also evidenced, in part, by its conduct with respect to AWPs reported to First Data from certain manufacturers. For example, in *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), Novartis filed declarations stating that Novartis regularly communicated its AWP to the Publishers,

- 50 -

including First Data and that for the period March 27, 2000 through August 21, 2002, the AWP published for its drugs was 20% higher than the WAC Novartis reported. Novartis then stated in its declaration that since January 18, 2002, First Data has consistently published an AWP that was 5% higher than the AWP reported by Novartis, or 25% over WAC. However, the Novartis declaration did not describe anything Novartis had done to remedy First Data's fraudulent reporting of Novartis' AWP.

## U.    Some Branded Manufacturers' Response to the McKesson/First Data Scheme

133.    Some branded manufacturers noticed implementation of the Scheme and immediately appreciated its purpose – to provide additional profit to the wholesalers and retailers in the pharmacy class of trade. One branded company commented that "First Data, at the direction of the wholesale industry, has begun to change all branded pharmaceutical products to a 25 % markup… and that "the spread will be changed as product price changed…." The same company observed that the "largest negative factory is publicity" since the increase in AWP would increase end payors prices (even though it may not increase that revenues to manufacturers).

134.    A different branded manufacturer also observed that the changed WAC/AWP markup for many branded drugs was "being driven at wholesaler level" and that they are "reporting 1.25 when companies take a price increase…."

135.    Because branded and generic manufacturers have historically established AWPs for their NDCs either directly (by suggesting and AWP that was incorporated by First Data and wholesalers) or indirectly (by setting a WAC and setting or knowing of the markup factor to be applied to that WAC), manufacturers whose NDCs had been affected by the McKesson/First Data Scheme, asked First Data for answers as to why the markups had changed for selected

- 51 -

branded products in 2002. In response, First Data generally pushed them off, giving different answers to different manufacturers. To make matters worse, First Data had counsel for its parent, the Hearst Corporation, write letters to various branded manufacturers' representatives. In these letters, Hearst's lawyers made claims which were false.

136. Ultimately, brand-name manufacturers did nothing in response to the Scheme. First Data and McKesson kept their scheme secret, and almost universally branded manufacturers acquiesced to the results of McKesson/First Data Scheme. Moreover, branded manufacturers took no action to disclose the existence of the inflated AWPs which had been effectuated by the Scheme to change the WAC/AWP markup. As a result, while First Data and McKesson as insiders to the Scheme were well aware of the changed markup factor (and corresponding increase in reimbursement payments being made throughout the country), and while some branded manufacturers were similarly aware that many of their branded products had experienced the WAC/AWP markup change without their explicit request, none of them disclosed this to the marketplace at large. Indeed, some manufacturers republished or utilized the new First Data AWPs in communications to customers or other publishers. In a market where billions of prescriptions are filled each year, where over 65,000 NDCs are actively in the marketplace, and where the WAC/AWP Scheme was sequentially implemented during the course of 2002 and later as price increases imposed by the manufacturers were effectuated, the Scheme went unnoticed to the marketplace at large. Indeed, even when players in the pharmaceutical marketplace noticed the increases in the WAC/AWP spread, they assumed by virtue of the manufacturers' silence that those increases were the result of the actions of those manufacturers.

- 52 -

## V.   First Data's 2005 Capitulation

137.   Then, in a March 15, 2005 letter, First Data announced that the unreliable surveys

would be discontinued.  Reviewing its past practices with respect to establishing AWP, First

Data restated that it had conducted surveys to establish AWPs:

> March 15, 2005
>
> ### Re: First DataBank's Blue Book AWP Data
>
> Dear Customer:
>
> It is our pleasure to serve you as a customer of First DataBank.
> We are writing to make you aware of upcoming changes to First
> DataBank's National Drug Data File Plus™ database, or NDDF
> Plus™, that may impact your use of our products.
>
> In order to publish various drug pricing data fields available
> through its NDDF Plus database and related products, *First
> DataBank has historically relied on drug manufacturers and
> wholesalers to report or otherwise make available information
> concerning their list price for drugs.*  Unfortunately, First
> DataBank is no longer able to obtain information relating to list
> prices directly from wholesalers in a manner that is consistent with
> First DataBank's editorial standards and policies.  In fact, it is our
> understanding that some wholesalers often do not use catalog or
> list prices as a basis for determining actual transaction prices.  As a
> result, First DataBank must implement certain changes to its
> publication of the "Blue Book AWP" pricing data field.  Effective
> immediately, First DataBank will no longer survey drug
> wholesalers for information relating to their catalog or list prices.
>
> First DataBank historically relied upon wholesalers to provide
> information relating to their catalog or list prices for purposes of
> publishing the Blue Book AWP data field.  *First DataBank
> periodically surveyed full-line national wholesalers to determine
> the average markup applied to a manufacturer's line of products.
> The average markup of the wholesalers responding to the survey
> was applied against the Wholesale Acquisition Cost (the
> manufacturer's list price to wholesalers, also commonly referred
> to as WAC)* or, if a Wholesale Acquisition Cost was not available,
> the Direct Price (the manufacturer's list price to non-wholesalers),
> with the resulting value populating the Blue Book AWP field.  In

- 53 -

certain instances, wholesalers would accept a manufacturer's
suggested wholesale price, in which case the Blue Book AWP and
Suggested Wholesale Price data fields would reflect the same
value. [Emphasis added.]

## V.    CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

138.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on behalf of themselves and the Class comprised of:

*AWP McKesson/First Data Class:*

All persons or entities who, for purposes other than resale and
during the Class Period, paid any portion of the purchase for a
prescription drug at a price calculated by reference to the AWP
published by First Data during the Class Period.  The drugs
purchased subject to this class are all drugs identified in
Exhibit A.[5]

Excluded from the Class are:  (a) each defendant and any entity in which any defendant has a

controlling interest, and their legal representatives, officers, directors, assignees and successors;

(b) any co-conspirators; and (c) any governmental entities who purchased such drugs during the

Class Period.  Included in the Class are end payors and consumers who made a pro rata co-

payment or who paid cash.

139.    The Class Period is January 1, 2002 to March 15, 2005, when First Data disclosed

that it had stopped surveying wholesalers.[6]

140.    The exact identity of the drugs covered by this lawsuit is capable of being

discovered from the records of First Data.  Based on an investigation of First Data's databases,

the list of such drugs is attached as Exhibit A.

---

[5] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits
discovery.

[6] The exact dates for the Class Period may be refined based upon discovery.

- 54 -

141.    The Class consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

142.    The claims of the representative plaintiffs are typical of the claims of the Class, as required by Rule 23(a)(3), in that the representative plaintiffs include people and entities who, like all Class Members, purchased drugs whose prices were inflated by the 5% price increase. Such representative plaintiffs, like all Class Members, have been damaged by defendants' misconduct because, among other things, they paid prices for these drugs that were higher than they would have been but for defendants' improper actions.

143.    The Class representatives for the Class are all of the plaintiffs.

144.    The factual and legal bases of each defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to plaintiffs and members of the Class.

145.    There are many questions of law and fact common to plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class Members, within the meaning of and fulfilling Rules 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

    a.    Whether AWPs published by First Data are used as a benchmark for negotiating payments by third-party payors for drugs;

    b.    Whether defendants engaged in a course of conduct that improperly inflated the WAC-to-AWP markup and the ultimate AWPs used by plaintiffs and Class Members as the basis for reimbursement;

- 55 -

        c.      Whether defendants artificially inflated the published AWPs for the drugs that are the subject of this complaint;

        d.      Whether defendants engaged in a pattern and practice that caused plaintiffs and Class Members to make inflated payments for the AWPs;

        e.      Whether defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud plaintiffs and the Class Members;

        f.      Whether defendants formed enterprises for the purpose of carrying out the 5% Scheme;

        g.      Whether defendants used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

        h.      Whether defendants' conduct violated RICO and various California statutes and common law;

        i.      Whether defendants are liable to plaintiffs and the Class Members for damages for conduct actionable under the various state consumer protection statutes.

    146.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither plaintiffs nor their counsel have any interest adverse to those of the Class.

    147.    Plaintiffs and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost

- 56 -

of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, defendants have acted and failed to act on grounds generally applicable to plaintiffs and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

## COUNT I

### Violations of 18 U.S.C. § 1962(C)

148.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

149.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the defendants on behalf of the Class.

150.    Plaintiffs, the members of Class, and the defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

151.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the defendants conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

#### The McKesson-First Data Enterprise

152.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) First Data and (b) McKesson, including its directors, employees and agents.

- 57 -

These associations-in-fact are sometimes collectively referred to herein as the "McKesson – First Data Enterprise." The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the 5% Spread Scheme; (c) deriving increased profits from the activities of the Enterprise; and (d) perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry. First Data and McKesson each has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry and a common purpose in inflating the AWPs by 5%. *See infra* ¶ 125 (describing common purposes).

153.    The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between McKesson and First Data. There is a common communication network by which McKesson and First Data shared and continue to share information on a regular basis. Typically this communication occurred and continues to occur, by use of the wires and mails in which McKesson and First Data will discuss and agree on an AWP. McKesson and First Data functioned as a continuing unit for the purposes of implementing the 5% Scheme.

154.    At all relevant times, First Data was aware of McKesson's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. First Data was aware that the published AWPs were inflated by the 5% Scheme. This awareness comes from the following sources: First, at some point prior to 1992, First Data in some instances obtained markups from wholesalers, which made First Data aware that the reported AWPs were not accurate even absent the 5% Scheme. Second, as various congressional bodies and

- 58 -

government agencies reported on AWP inflation, First Data did not change or challenge manufacturers regarding the self-reported WAC and AWPs, or the markups that First Data used. Third, First Data stopped even the limited surveys other wholesalers and simply accepted the 5% Scheme, when it knew there was no basis for this bump and actually received letters from certain manufacturers stating that the 5% increase in AWP was not justified. McKesson and First Data initiated the 5% Scheme in 2001-2002 and continued in force in 2003-2004 where additional 5% increases were instituted. Fourth, McKesson and First Data regularly discussed the Scheme.

155.    The impacts of the Scheme are still in place, *i.e.*, the 5% increased spreads are still being maintained. As described earlier, for sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on their spread between AWP and the actual acquisition cost for the drug. Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies. Thus, McKesson and First Data could help deliver greater profits to pharmacies by conspiring to increase AWPs.

156.    The foregoing evidences that First Data and McKesson each was a willing participant in the enterprise; had a common purpose in the Scheme; and their agreement to a structure wherein First Data and McKesson agreed on the operation of the Enterprise. This structure was the basis in which the enterprise operated.

### The Defendants' Use of the U.S. Mails and Interstate Wire Facilities

157.    The Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: The transmission and publication of false and misleading information concerning AWPs.

- 59 -

158.    During the Class Period, the defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

159.    The nature and pervasiveness of the Scheme, which was orchestrated out of the corporate headquarters of each defendant, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

160.    Many of the precise dates of defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these defendants' books and records. Indeed, an essential part of the successful operation of the Scheme alleged herein depended upon secrecy. However, plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme; plaintiffs describe this below.

161.    The defendants' use of the U.S. mails and interstate wire facilities to perpetrate the 5% Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

    (a)    Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

    (b)    Written representations and telephone calls between McKesson and First Data regarding markups and AWPs, which occurred on a regular basis each year;

    (c)    Hundreds of e-mails between McKesson and First Data agreeing to or effectuating the implementation of the Scheme;

- 60 -

1821.10 0006 BSC.DOC

(d) Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(e) Receipts of increased profits sent through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Scheme; and

(f) In addition to the above-referenced RICO predicate acts, it was foreseeable to each defendant that First Data would distribute publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, each defendant has, in furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Complaint.

**Conduct of the RICO Enterprises' Affairs**

162. During the Class Period, the defendants have exerted control over the Enterprise and, in violation of Section 1962(c) of RICO, the defendants have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a) Each of the defendants had a degree of control concerning the WAC-to-AWP spread and each had AWPs that First Data reported;

(b) First Data has directly controlled the creation and distribution of marketing, sales, and other materials used to inform members of the Class as to the value of its services;

- 61 -

(c)     McKesson intended that First Data would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(d)     First Data has allowed McKesson to exert control over its organization knowing that the AWPs were inflated as a result of the 5% Scheme and were not real numbers. First Data did so because the reporting of AWPs was, and is, a major part of its business, and McKesson was integral to First Data's AWP reporting and to increasing FDB's profits for the reasons set forth herein.

163.    The Enterprise had a hierarchical decision-making structure headed by McKesson. McKesson issued instructions on how the WAC-to-AWP spread was to be reported and each Publisher accepted those instructions despite knowing of their falsity.

164.    In violation of Section 1962(c) of RICO, each defendant conducted the affairs of the Enterprise with which it associated by establishing a phony extra 5% WAC-to-AWP spread that First Data then published and disseminated nationwide.

**The Defendants' Pattern of Racketeering Activity**

165.    Each of the defendants conducted and participated in the affairs of the above-referenced Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of

- 62 -

racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the defendants intended to defraud plaintiffs, members of the Class and other intended victims.

166.    McKesson and First Data calculated and intentionally crafted the Scheme to ensure that plaintiffs and members of the Class would be over-billed for the drugs. In designing and implementing the 5% Scheme, at all times the defendants were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies, wholesalers and Publishers in setting the AWPs, as reported by the Publishers.

167.    By intentionally and artificially inflating the AWPs by virtue of the increase in the WAC-to-AWP spread, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

168.    The defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiffs and members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities employed by the defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the Class. Each of the defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprise.

**Damages Caused by the Defendants' Five Percent Spread Scheme**

169.    The defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused plaintiffs and members of the Class to be injured in their business or property because plaintiffs and members of the Class have paid many hundreds of

- 63 -

millions of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.

170.  The defendants sent AWP information through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their 5% Scheme.  Plaintiffs and members of the Class have made inflated payments for drugs based on and/or in reliance on reported and false AWPs.

171.  Under the provisions of Section 1964(c) of RICO, the defendants are jointly and severally liable to plaintiffs and members of the Class for three times the damages that plaintiffs and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### Untrue and Misleading Advertising
### (Business and Professions Code § 17500, *et seq*.)

172.  The preceding paragraphs of this Complaint are realleged and incorporated by reference.  Plaintiffs assert this claim on behalf of themselves and the members of the Class.

173.  Bus. & Prof. Code § 17500 provides that "[i]t is unlawful for any ... corporation ... with intent ... to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, ... any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ...."

174.  First Data made a series of representations as to the meaning of AWP and how it was derived, all of which were false.  McKesson was aware of those representations.  Both First

- 64 -

Data and McKesson proceeded to implement a false advertising scheme designed to induce
payors to pay based on the inflated amount.

175.    Pursuant to Bus. & Prof. Code § 17535, plaintiffs and members of the Class are
entitled to the remedies set forth below.

## COUNT III

### Violations of Unfair Competition Law
### (Business and Professions Code § 17200, *et seq.*)

176.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and
incorporate herein by reference each of the allegations contained in the preceding paragraphs of
this Complaint.

177.    Defendants are incorporated, or maintain their principal places of business, in
California. California courts have ruled that California statutes apply on a nationwide basis to
the conduct of California corporations.

178.    Defendants' actions, as complained of herein, constitute unfair and deceptive
unlawful practices committed in violation of the Unfair Competition Law, Bus. & Prof. Code
§§ 17200 *et seq*.

179.    Defendants violated the "fraudulent" prong of § 17200, the "unfair" prong of
§ 17200, and the "unlawful" prong of § 17200 by engaging in the following conduct:

a.    Defendants' conduct was unfair, unlawful and deceptive in that knowing
of the use of AWP by payors, and despite knowledge as to representations that AWPs were
established in part by use of surveys, and were "reliable" and "accurate," defendants artificially
raised AWPs by increasing the WAC-to-AWP spread by 5% thereby allowing publication of
AWPs that were even more inaccurate and unreliable;

- 65 -

b. Defendants' conduct was unfair, unlawful and deceptive in that defendants knew that the 5% WAC-to-AWP increase was not based on any actual change in the average wholesale price, and knew that the increase did not have any other legitimate cost or pricing basis and was implemented solely for defendants' own purposes;

c. Defendants' conduct was unfair, unlawful and deceptive in that they suppressed, manipulated and conceded information that would reveal the lack of any economic basis in the 5% increase in the WAC-to-AWP spread; and

d. Defendants omitted material information known to them in order to induce payors to use an inflated AWP and pay an inflated price for drugs.

180. All of the conduct alleged herein occurs and continues to occur in defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

181. Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair practices, as provided in Bus. & Prof. Code § 17203 and Civil Code § 3345, and for such other relief as set forth below.

## COUNT IV

### Violations of the Consumers Legal Remedies Act
### (Cal. Civ. Code § 1750, *et seq*.)

182. The preceding paragraphs of this Complaint are realleged and incorporated by reference. Plaintiffs assert this claim on behalf of themselves and the members of the Class against First Data.

- 66 -

183. Plaintiffs and the members of the Class are payors who are paying for consumers' purchase of goods for personal, family, or household purposes.

184. Representing that published AWPs have characteristics, uses, benefits, or qualities that they do not have, and advertising goods with intent not to sell them as advertised constitutes unfair or deceptive trade practices under the provisions of the CLRA, Civil Code § 1770 (a)(5), (7), (8), and (9).

185. Plaintiffs and the members of the Class have all been directly and proximately injured by First Data's conduct, and such injury includes payment for drugs inflated by the Scheme, which drugs plaintiffs and the members of the Class, would not have purchased at the inflated prices were they truthfully and fully informed of material facts concerning the product.

186. In accordance with Civil Code § 1780 (a), plaintiffs and members of the Class seek injunctive and equitable relief as to defendants' violations of the CLRA; however, in accordance with Civil Code § 1782(a) & (d), plaintiffs will subsequently amend this Class Action Complaint without leave of Court to include a request for damages. Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief as provided in Civil Code § 1780 and the Prayer for Relief.

## COUNT V

### Negligent Misrepresentation

187. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

188. During the Class Period, First Data made representations concerning its services, which were false and omitted disclosure of material facts as set forth above.

- 67 -

189.     Each Class Member's use of the AWPs published by First Data established the

Class' reliance on First Data.

190.     First Data, having issued representations as to its services had a duty to be

accurate and breached that duty thereby causing plaintiffs and Class Members to suffer damage.

## COUNT VI

### Civil Conspiracy

191.     The preceding paragraphs of this Complaint are realleged and incorporated by

reference and asserted by plaintiffs on behalf of themselves and members of the Class.

192.     The defendants joined in a conspiracy to raise the spread between reported AWPs

and WAC. Each defendant also agreed to publish or caused to be published AWPs that were

inflated as a result. Each defendant also knew that by agreeing to raise and fix AWPs in this

fashion, they were perpetuating the use of inflated AWPs on a nationwide basis.

193.     The defendants consciously conspired and deliberately pursued a common plan or

design to commit tortious acts, subjecting each to joint liability.

194.     Defendants each committed unlawful act or acts in furtherance of this conspiracy,

including acts violating RICO, state consumer protection laws, the common law and committed

acts of mail and wire fraud. All of these acts were in furtherance of the conspiracy.

195.     Plaintiffs are entitled to a presumption of reliance on the false representations,

concealments and nondisclosures by the defendants. Class Members were ignorant of

defendants' conduct and were ignorant of the full and true facts suppressed by them, and such

reliance was justified.

- 68 -

1821.10 0006 BSC.DOC

196.     As a direct, proximate result of this conspiracy, plaintiffs and Class Members
have been injured, as they have suffered and continue to suffer economic losses and general and
specific damages, all in an amount to be determined according to proof.

## VI.     DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs demand judgment as follows:

A.     The Court determines that this action may be maintained as a class action
pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs'
claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of
Civil Procedure with respect to the claims for damages, and declaring plaintiffs as
representatives of the Class and their counsel as counsel for the Class;

B.     The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.     Plaintiffs and the Class be granted an award of damages in such amount to be
determined at trial, with trebling under Count I;

D.     Plaintiffs and the Class be granted an award of punitive damages in such amount
to be determined at trial;

E.     Defendants be enjoined from continuing the illegal activities alleged herein;

F.     Plaintiffs and the Class recover their costs of suit, including reasonable attorneys'
fees and expenses as provided by law; and

G.     Plaintiffs and the Class be granted such other, further, and different relief as the
nature of the case may require or as may be determined to be just, equitable, and proper by this
Court.

- 69 -

DATED: June 2, 2005

By

Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 70 -

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

- 71 -

1821.10 0006 BSC.DOC