## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| *State of Montana v. Abbott Labs., Inc., et al.*,           Cause No. CV-02-09-H-DWM (D. Mont.) | |

### MONTANA'S SUPPLEMENTAL RESPONSE TO BAYER'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF BAYER'S MOTION FOR SUMMARY JUDGMENT

Montana, by its counsel, hereby supplements its response to the Local Rule 56.1

Statement of Undisputed Facts in Support of Bayer's Motion for Summary Judgment.[1]

Montana's responses to paragraphs 1 through 105 are set forth in Montana's original response

(Dkt. No. 4091).

106.    Deny.  Montana counter-designates that Shannon Marr was deposed and was not

asked about the document.  Rule 30(b)(6) witness Jeff Buska, when asked about the document,

testified about what he ***imagined*** Shannon Marr did.  Bayer L.R. 56.1 Ex. D-2 at 531.  There is

no evidence on the record as to what the purpose of the handwritten notes was.  Montana further

counter-designates evidence that the notes were something that Shannon Marr undertook

personally rather than at the direction of Medicaid personnel or on behalf of Montana Medicaid.

The comparison was not something that was routinely done – or ever done before or after – with

Bayer average sale price reports and there were no discussions among Medicaid personnel

concerning the comparison.  Buska Dep. at 532-33 (attached hereto as Ex. A).

---

[1]  This supplement is occasioned, in part, by a May 1, 2007 letter from Bayer counsel to Montana counsel advising that Montana had overlooked ¶¶ 110 through 118 in Bayer's original L.R. 56.1 submission.

107.    Deny.  Montana counter-designates that it never evaluated the precise difference between Bayer's reported ASP for all its drugs and the corresponding AWPs for the same products published in First DataBank.  The State counter-designates that the testimony cited by Bayer establishes only that Ms. Marr personally did a comparison one time.  She was not asked about this at her deposition.  Montana counter-designates that Rule 30(b)(6) witness Jeff Buska, when asked about the document, testified about what he *imagined* Shannon Marr did.  Bayer L.R. 56.1 Ex. D-2 at 531.  There is no evidence on the record as to what the purpose of the handwritten notes was.  Montana further counter-designates evidence that the notes were something that Shannon Marr undertook personally rather than at the direction of Medicaid personnel or on behalf of Montana Medicaid.  The comparison was not something that was routinely done – or ever done before or after – with Bayer average sale price reports and there were no discussions among Medicaid personnel concerning the comparison.  Buska Dep. at 532-33 (attached hereto as Ex. A).

108.    Admit that the document was produced from Montana Medicaid files.  Otherwise deny.  The State counter-designates that there is no definitive evidence in the record establishing Bayer's description of the document, Ms. Marr was not asked about the document at her deposition and Mr. Buska testified about what he *"imagined"* the document showed.  Bayer L.R. 56.1 Ex. D-2 at 531

109.    Deny.  Montana counter-designates that there is no evidence in the record about what Shannon Marr or other author was doing with the handwritten notes.  Ms. Marr was not asked about the document at her deposition and Mr. Buska testified about what he *"imagined"* the document showed.  Bayer L.R. 56.1 Ex. D-2 at 531.  Montana further counter-designates that

- 2 -

the document speaks for itself; the AWP numbers quoted have not been verified; there is no information concerning their source or accuracy.

110.     Admit that the numbers quoted appear to be an accurate reproduction of numbers in the document.  Montana counter-designates that there is no evidence in the record about what Shannon Marr or other author was doing with the handwritten notes.  Ms. Marr was not asked about the document at her deposition and Mr. Buska testified about what he *imagined*  the document showed.  Bayer L.R. 56.1 Ex. D-2 at 531.  Montana further counter-designates that the document speaks for itself; the AWP numbers quoted have not been verified; there is no information concerning their source or accuracy.

111.     Admit that the communications cited took place.  Deny that any other communications on this topic took place.  Montana designates the absence of any other evidence of communications on this topic and Mr. Buska's testimony that he did not discuss the comparisons with Ms. Marr and there were no discussions among Medicaid personnel concerning the comparison.  Buska Dep. at 532-33 (attached hereto as Ex. A).

112.     Admit.

113.     Admit, but the State counter-designates that the evidence cited does not support the proposition.  Bayer has cited a page that contains no question and answer, but consists primarily of a long monologue by Bayer's counsel.

114.     Deny.  The reference to "same circumstances" is improperly broad and potentially misleading.  Montana cannot decipher what Bayer intends by the "same circumstances."

115.     Admit.

116.     Admit.

- 3 -

117.     Deny.  Montana counter-designates Hartman Dep. at 502-05 (attached hereto as Ex. B).  Dr. Hartman testifies that "In the fraudulent claims analysis, there's not really a but-for worked.  It's just looking at the world as it is and what the claimed amount was versus . . . a measure of what the acquisition cost was.  It's not a but-for world in the same way that it would be in a traditional type of legal analysis or a counter-fact analysis absent the violations."  *Id.* at 502-03.

118.     Admit that the quotations cited are accurate reproductions of the deposition transcripts.  Otherwise deny.  Montana counter-designates that Dr. Hartman also testified that there are a variety of factors (as many as eight) that would have to be considered in assessing "whether and the extent to which [the provision of ASPs] changed things."  *Id.* at 509.  Dr. Hartman explained that the factors required a legal interpretation.  *Id.* at 510-512:4.  Montana further counter-designates Hartman Dep. at 506-512:4 as evidence of information putting this "fact" in dispute by putting Dr. Hartman's testimony in context.

By____/s/ Steve W. Berman_____                    DATED:  May 17, 2007
    Steve W. Berman
    Sean R. Matt
    Jeniphr A.E. Breckenridge
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

    Mike McGrath
    Attorney General of Montana
    Ali Bovingdon
    Assistant Attorney General
    Justice Building
    215 North Sanders
    P.O. Box 201401
    Helena, MT  56920-1402
    (406) 444-2026

    COUNSEL FOR PLAINTIFF
    STATE OF MONTANA

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **MONTANA'S SUPPLEMENTAL RESPONSE TO BAYER'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT BAYER CORPORATION'S MOTION FOR SUMMARY JUDGMENT,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on May 17, 2007, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By      **/s/ Steve W. Berman**
      Steve W. Berman
      **HAGENS BERMAN SOBOL SHAPIRO LLP**
      1301 Fifth Avenue, Suite 2900
      Seattle, WA  98101
      (206) 623-7292

001534-15  171934 V1

# Exhibit A

Page 479

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

-------------------------X

In Re:  PHARMACEUTICAL     )   MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE )   CIVIL ACTION

PRICE LITIGATION           )   01CV12257-PBS

-------------------------X

THIS DOCUMENT RELATES TO:  )

ALL ACTIONS                )

-------------------------X

HIGHLY CONFIDENTIAL

VIDEOTAPE 30(b)(6) DEPOSITION OF

JEFF BUSKA, VOLUME III


Taken at 33 South Last Chance Gulch

Helena, Montana

Friday, December 15, 2006 - 9:05 a.m.


Reported by Mary R. Sullivan, RPR, RMR, Freelance

Court Reporter, Notary Public, residing in Missoula,

Montana.

Page 532

1    officer's files.
2        Q.   Well, is it fair to say that this
3    document reflects Montana Medicaid's comparison of
4    Bayer's reported average sale price information to
5    the AWP information that the Medicaid department
6    has access to for each of the reference products?
7        A.   Yeah, it would be a comparison.
8        Q.   Were other similar comparisons made for
9    other time periods and other Bayer average sale
10   price reports?
11       A.   Not to my knowledge.
12       Q.   Were there any discussions within
13   Montana Medicaid concerning Exhibit Buska 055?  In
14   other words, concerning the comparison of the
15   Bayer average sale price information to the AWP
16   information for the same product?
17       A.   Could you clarify your question?  Is
18   that there was a discussion?
19       Q.   Any internal discussion within Montana
20   Medicaid concerning the comparison of the AWP
21   information and the Bayer average sale price
22   information.

Page 533

1        A.   No, I'm not aware of any discussion
2    regarding it.
3        Q.   And by discussion, I'm including e-mail
4    communications or telephone conversations or in-
5    person meetings.  Are you aware of--
6        A.   I'm not aware of anything like that, no.
7        Q.   You mentioned that you're not aware of
8    any similar comparison documents that compare the
9    average sale price reported figures to the AWP
10   figures for those same products.  Is it fair to
11   say, though, that anyone at Montana Medicaid could
12   have performed the same comparison at any time
13   during the time that Bayer was reporting the
14   average sale price information?
15       A.   Yes, somebody could have, but likely,
16   no, because the document, as I indicated earlier,
17   wasn't given to anybody else.
18       Q.   Well, any--any of the pharmacy program
19   officers could have done such comparisons at any
20   point in their time; is that right?
21       A.   They could have, yes.
22       Q.   Well, I'm going to be the one to ask for

Page 534

1    a break now.
2            MS. BOVINGTON:  Okay.
3            MR. DOSS:  I should have gone earlier.
4            THE VIDEOGRAPHER:  Off the record--I'm
5    sorry. Off the record at 10:19.
6            (Whereupon, the deposition was in
7    recess at 10:19 a.m., and subsequently reconvened
8    at 10:26 a.m., and the following proceedings were
9    had and entered of record:)
10           THE VIDEOGRAPHER:  On the record at
11   10:26.
12       Q.   (By Mr. Doss)  Mr. Buska, did--did
13   Montana receive average sale price information
14   from any other pharmaceutical manufacturers--
15       A.   Yes.
16       Q.   --other than Bayer?
17       A.   Yes, I believe we did.
18       Q.   And what other manufacturers did Montana
19   receive average sale price information?
20       A.   I believe I recall seeing stuff from TAP
21   Pharmaceuticals, but I can't recall any others.
22       Q.   Mr. Buska, I'd like to--I've asked to

Page 535

1    be--or have handed to you three different
2    documents which have--were previously marked
3    during an earlier deposition of you in this
4    matter, and for the record, one is marked Exhibit
5    Buska 022, and it bears Bates label MT 005760.
6    The second is marked Exhibit Buska 023, which does
7    not bear Bates labeling, but is identified on the
8    first page as a transmittal and notice of approval
9    of a state plan material, again, marked in a
10   previous deposition of yours; and the third one is
11   Exhibit Buska 024, which bears Bates labeling MT
12   005648 through -5651, and it has a cover page
13   dated October 3rd, 2002.  Sir--Mr. Buska, is it--
14   is it correct that these three different exhibits
15   reflect Montana's Medicaid's reimbursement
16   methodology for pharmaceutical products for
17   different periods of time?
18       A.   Yes, they're all documents related to
19   the state plan for the Medicaid services for the
20   State of Montana.
21       Q.   For the Montana Medicaid state plan.
22       A.   Montana Medicaid state plan.

e5fb5e94-8668-4b15-8631-ed12d30c1451

# Exhibit B

277

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

In re:  PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE        )        **ORIGINAL**

PRICE LITIGATION                  )

_____ )

THIS DOCUMENT RELATES TO:         )   VOLUME II

STATE OF MONTANA V. ABBOTT        )

LABS, INC., ET AL., D. MONT.      )

CAUSE NO. CV-02-09-H-DWM          )

          -and-                   )

STATE OF NEVADA V. AMERICAN       )

HOME PRODUCTS, ET AL., CA NO.     )

02-CV-12086                       )

_____ )

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

RAYMOND S. HARTMAN, Ph.D.

WEDNESDAY, 23 AUGUST, 2006

9:32 AM

502

1    transparency that you've referred to?

2        A.    It would certainly provide the information

3    for the Medicaid agencies to make an informed

4    decision about the -- the lesser of the -- of a

5    variety of the alternative bases for reimbursement.

6        Q.    Well -- and, in fact, it would provide the

7    state with an average of actual sales prices from

8    the manufacturer, would it not?

9        A.    To -- as a -- as a measure of the cost to

10   their -- to the providers, that's right.

11       Q.    This is, in fact, your but-for world,

12   isn't it?

13       A.    The -- the but-for world -- what -- what I

14   have done in the overcharge analysis is pose a

15   but-for world that is -- that relied -- that takes

16   account of the ASPs.  In the fraudulent claims

17   analysis, there's not really a but-for world.  It's

18   just looking at the world as it is and what the

19   claimed amount was versus a -- a measure of what

20   the acquisition cost was.  It's not a but-for world

21   in the same way that it would be in a traditional

22   type of legal analysis or a counter-fact analysis

503

1    absent the violations.  But the -- the ASP in the

2    overcharge analysis is the but-for world for the

3    drugs for which I was able to get ASPs.

4        Q.    In the situation that I have hypothesized

5    to you where a manufacturer is reporting its ASPs

6    routinely to a state, do you think it is still

7    reasonable to assume that fraud occurs and

8    statutory penalties are applied where the allowed

9    amount is greater than, say, AWP minus some

10   percentage?

11       MR. NOTARGIACOMO:   Objection.

12       A.    It's -- you're asking me a legal question

13   that is -- is a good one, but it's a legal one, and

14   so I -- I mean, my expertise has not gone to that

15   kind of calculation here or that kind of analysis

16   here and I haven't been asked to.

17       Q.    Well, you testified yesterday that you

18   made certain assumptions, and that, in particular,

19   you -- you adopted a trigger point, if you will,

20   where the allowed amount was greater than the

21   EAC -- penalties were to kick in.  And you

22   testified further that you felt that that was a

Hartman, Ph.D., Raymond - Vol. II HIGLY CONFIDENTIAL           August 23, 2006
Boston, MA

504

1    reasonable assumption, in light of what you knew

2    about the programs and about the economics of the

3    market.  And so what I'm asking you now is whether

4    you would still consider that a reasonable

5    assumption to make in the situation where a

6    manufacturer is, in fact, reporting ASPs to the

7    state?

8         A.    Again, I -- I find it calls for a legal

9    conclusion.  But as a matter of economics, the

10   informational issues that are raised in the OIG

11   pricing guide -- the guidance for pricing

12   compliance or whatever the title is, the 2003

13   report, certainly that is requesting all

14   information for all price set -- offsets to get to

15   ASP.  And if -- if that is being provided, that is

16   moving in the direction that is -- has been laid

17   out as providing a safe harbor from an

18   anti-kickback kind of statute or an implication of

19   that.

20        But, you know, really, I can say that much

21   as an economist and what information is known.  But

22   at the end of the day, what gets triggered by what,

505

1    I -- I do feel reluctant to try and -- I feel like

2    you're asking to take it a step further to go

3    beyond the economics of it and say as a matter of

4    law that's the case.  I -- I -- I -- I think that's

5    what you're asking for.  It's not something that

6    I've been asked to do or really can do.

7         Q.   That's not what I'm asking.  What I'm

8    asking is about the reasonableness of one of the

9    assumptions you make, I think, which is something

10   that you testified about yesterday.

11        And I'm really not trying to pin you down

12   on any legal conclusion at all.  The question again

13   is whether you would still consider the assumption

14   that fraud occurs at a point where the actual --

15   the allowed amount is greater than the EAC in a

16   situation where ASPs are being reported.  Does that

17   still remain, in your mind, a reasonable

18   assumption?

19        MR. NOTARGIACOMO:  Objection.

20        Q.   In your response to me just now, you cited

21   the OIG report, and you noted that reported prices

22   ought to include price concessions, discounts, and

506

1    the like.  And for purposes of my hypothetical, I

2    --  I want you to assume that the ASPs that are

3    being reported are ASPs, as we've been using that

4    term, as Medicare uses that term, as you've been

5    using that term in your report, and then, in fact,

6    they are averages of real transactions with -- with

7    -- net of discounts and price concessions.

8         A.    Everything that the OIG is asking for.

9         Q.    Exactly.

10             MR. NOTARGIACOMO:   Same objection.

11        A.    The -- certainly the hypothetical that

12   you've given me says that if -- in that -- such a

13   world such a manufacturer would have -- would have

14   complied with the OIG guidelines, and, you know,

15   that's about as far, you know, as I can --

16             (Discussion off the record.)

17        A.    So, you know I -- the -- that has -- the

18   -- the argument that there -- where the conjunction

19   of marketing on spread with a nontransparency of

20   pricing that the OIG is getting at in their -- in

21   their guidelines and they're worried about is

22   clearly that by supplying that information, that's

507

1    certainly gone to solving that aspect of what the

2    OIG is getting at.  And as an economist, that would

3    provide the information, if communicated, to make

4    informed decisions.

5         Whether -- what that means about fraud and

6    nonfraud, that's now stepping -- you know, I -- the

7    -- I don't -- I'm not an expert of what's fraud and

8    nonfraud or whatever.  And I'm just talking about

9    what information is there, what's reasonable, and

10   what informs people, and you've -- you've described

11   a market to me where all the information in the OIG

12   report that they're requesting is provided, and in

13   -- that's what has been requested, and that,

14   obviously, would mitigate the nontransparency.

15        Now, beyond that, you know, I -- I'd hate

16   to -- I feel like I'm being drawn into a legal

17   conclusion.

18        MR. NOTARGIACOMO:  Just before you go --

19   continue with this, counsel for TAP and Abbott who

20   just finished questioning wanted me to get on the

21   record that Plaintiffs don't have any direct --

22   redirect of the witness based on his questions.  I

508

1    believe he wants to catch a plane.

2              MR. DALY:  Thank you.

3              MR. NOTARGIACOMO:  You can continue.

4         Q.   Very good.  So you would allow then that

5    the reporting of ASPs would cure any concern about

6    price transparency?

7         **A.   It is certainly -- it is certainly what**

8    **the OIG has asked for, and it would make -- a full**

9    **understanding of those prices would make the**

10   **pricing transparent to the market if it were**

11   **provided to the market.**

12        Q.   Now, looking at your reports in which you

13   calculate overcharges for some Defendant

14   manufacturers and penalties for, I believe, all

15   Defendant manufacturers --

16        **A.   Are we in Montana now or in Nevada?**

17        Q.   Well, for present purposes we're in both.

18        **A.   Okay.**

19        Q.   But let's take a look at Montana.  If you

20   were to learn that one of the manufacturers for

21   whom you calculated damages or penalties had, in

22   fact, been reporting ASPs to the State of Montana

Hartman, Ph.D., Raymond - Vol. II HIGLY CONFIDENTIAL
                    Boston, MA

                                                    August 23, 2006

                                                              509

1    during the time period in question, would that

2    cause you to change your analysis in any way for

3    that manufacturer?

4         A.    I would -- I would want to reflect on the

5    -- on whether and to the extent to which it would

6    change things.  It would be something that I would

7    -- I would -- I would introduce into my analysis.

8         Q.    Okay.  So in reflecting on it, what would

9    you -- what would you look to?

10        A.    How the information was disseminated, the

11   nature in which the information was communicated,

12   the degree to which the economics of the

13   interpretation of that additional information would

14   be guided by legal concerns or legal issues of --

15   of the law, among others.  I mean, I would just --

16   I would want to -- since the analysis was designed

17   assuming that is not the case, that would mean that

18   I'd -- I would want to rethink that, and there are

19   probably five other things -- ways I'd want to look

20   at it.  But it would be something that I would -- I

21   would look at.

22        Q.    So would it be fair to summarize that if

Hartman, Ph.D., Raymond - Vol. II HIGLY CONFIDENTIAL
Boston, MA

August 23, 2006

510

1    those facts were presented to you as to a

2    particular manufacturer, that it would cause you to

3    want to revisit your analysis, but you can't say

4    right now whether it would cause you to change the

5    outcome of your analysis.

6         A.    I think that's fair.

7         Q.    Let me build on my hypothetical a bit.

8    The manufacturer's reporting ASPs to the state, the

9    state is receiving the ASPs; they're calculated in

10   a way that we've talked about; the state decides to

11   continue to reimburse the manufacturer according to

12   the same statutory regulatory formula that it has

13   generally applied to other manufacturers -- in

14   other words, not to utilize the ASPs as the basis

15   for reimbursement.

16        A.    I'm following you.

17        Q.    Do those additional facts cause any -- if

18   those additional facts were presented to you, would

19   it make it easier to reach your conclusion as to

20   whether these facts change the outcome of your

21   analysis and require a change in your report?

22        A.    I think those do require more of a -- of a

511

1    legal interpretation.  And I mean, this is not

2    unlike the questions that were posed where

3    information was made clear by the OIG that

4    acquisition costs were -- were less -- that -- that

5    were less than AWP by a certain percentage, and

6    there's deposition testimony that there were

7    trade-offs and considerations of

8    cross-subsidization.  And I don't know whether

9    legally that -- as a matter of the implementation

10   at the state level, whether that triggers a finding

11   of -- of changing the threshold or whatever.

12           So I -- it seems that that's something

13   that I -- the -- the economics of -- and how the

14   behavior would -- and what -- that -- what would be

15   implied for the agencies in knowing that would be

16   something that I would analyze.  Whether that would

17   change thresholds of legality -- of what's

18   fraudulent or not fraudulent or legal or illegal

19   for different manufacturers that provided different

20   amounts of information, I -- you know, that's --

21   that seems legal to me.  I -- you know, what binds

22   for everybody, what -- you know, what's -- what are

512

1   safe harbors for some.  I don't -- it seems to -- I

2   don't -- I -- that's not my area of expertise such

3   that I could render a conclusion or an answer to

4   that.

5        Q.   Have you or your staff been provided with

6   the State of Montana's discovery responses to

7   discovery requests submitted to the state by Bayer?

8        A.   I would have to check.

9        Q.   Do you know whether you were ever advised

10  or your staff was ever advised to exclude post 2001

11  claims relating to Bayer for either Nevada or

12  Montana?

13       A.   I'm trying to see if any of this provides

14  information.  (Witness reviews document.)  I don't

15  recall a direction of that sort.

16       Q.   Okay.

17       A.   But that could be something that was

18  communicated by -- counsel works closely, as --

19  with some of my staff, rather than going through

20  me.  They -- there may have been some communication

21  in that regard.  So I -- I'd have to check.

22       Q.   I want to switch gears for a second and