# Exhibit 1, Part 2

1    sales documents, they should all be produced.

2         MR. DALY:  That's the effort we've made, Judge.  If

3    we missed a few, and I believe that Mr. Breen -- well, you

4    laugh, but you brought forward a hundred documents that you

5    said weren't produced.  We showed you that about half of them

6    in fact had been produced, and we're still talking about the

7    other half of them.  Isn't that correct?

8         MR. BREEN:  I don't think that's --

9         MR. DALY:  I mean, it's not like we're not working

10   through this.  And one thing I want to correct, Judge, is any

11   misimpression that they are stymied in their discovery.  We

12   produced -- we've made our 26(a)(1) disclosures.  We've

13   produced our other documents.

14        THE COURT:  I tell you what, since you have them,

15   we actually have a way of breaking through this.  You come up

16   with every document you want to produce and show it to them.

17   To the extent there are disagreements -- I mean, this is

18   actually easier than most of my cases; you actually have

19   them.  Put them together, show them to him, and to the extent

20   there are objections, you'll see what you really care about,

21   and then we'll have a debate over it.

22        MS. BROOKER:  Your Honor, that's just the Texas

23   set.  There are 650,000 of them that were produced.  There's

24   also the MDL set.  We cannot contact Jennifer Connolly.  In

25   fact, Abbott has threatened sanctions if we speak with them

1    about what documents they have.  They've already gone through

2    a set of documents.  We can't coordinate --

3            THE COURT:  You can call up Jennifer Connolly and

4    ask her, "What documents do you have relating to your drugs

5    or to general sales practices?"

6            MR. BREEN:  Can we see them?

7            MS. BROOKER:  Can she provide those to us?  I mean,

8    that's what we're asking for.

9            THE COURT:  Have her file a motion to open the

10   protective order.  Is she the -- who's she?  She's the --

11           MR. BREEN:  Class.

12           MS. BROOKER:  We're all under a protective order in

13   this case.  The issue is --

14           THE COURT:  So have her file a motion to allow you

15   to see the documents which she believes -- you tell her what

16   the issues are in your case which you believe are

17   crosscutting and apply to your case.  She works for the U.S.

18   Attorney's office, doesn't she?

19           MS. BROOKER:  Oh, no.  I'm referring to plaintiffs'

20   class counsel.

21           THE COURT:  Who's Jennifer Connolly?

22           MS. BROOKER:  She represents the private plaintiffs

23   in the class action suit, and all I'm saying is, we can't

24   even coordinate --

25           THE COURT:  Which firm is she with?

1          MR. BREEN:  The Chicago firm, Wexler's firm.

2          MS. BROOKER:  But it's just an example, your

3     Honor.  We thought we were in an MDL proceeding when we got

4     here, and we thought we understood your Honor's October 26

5     ruling from the bench.

6          THE COURT:  You are in an MDL, which is why I can

7     do these things.  If she wants to show you documents relating

8     to their sales marketing efforts that are across the board,

9     all she needs to do is -- that's why I'm here, that's

10    exactly -- bingo, file a motion to allow her to show you the

11    documents.  Of course you can call her.

12         MR. BREEN:  Your Honor, I know this is frustrating,

13    but we're getting somewhere.  If I can just ask one more

14    question.

15         THE COURT:  Yes.

16         MR. BREEN:  The problem is, if I call Jennifer

17    Connolly and I say, "I need these documents," then I've got

18    to take the working set of documents, the hottest documents.

19    Do I have to go to Mr. Daly and say, "Can we have these

20    documents?"  That's part of the problem because we're taking

21    our work product and taking our --

22         THE COURT:  You can go one of two ways:  You can

23    move to open the protective order so that you can see them.

24         MR. BREEN:  Okay.

25         THE COURT:  And have her gather what's relevant to

1    your claims, which is some work on her part, so you may have

2    to pay her for the work, I mean, it's not part of -- or you

3    can go and get consent from him.  But you can come directly

4    to me.  That's why you are here.  But I can't -- I'm not

5    simply going to say you're across the board entitled to every

6    document they produced in every suit, even if it involves

7    drugs that have nothing to do with yours.  I can't say that

8    across the board.  That may be overly broad.  It may be

9    unreasonable.  And, as you know, for example, the Rules of

10   Civil Procedure have been changed, so it's got to be likely

11   to lead to relevant evidence.

12            On the other hand, I don't know why it isn't just

13   simpler for you to hand over the CDs.

14            MR. BREEN:  Let me do it.  I've got them.  Just let

15   me show them to the government.  He doesn't have to do

16   anything but say "OK," two letters, O-K.

17            MR. DALY:  There have to be limits, Judge.  I mean,

18   even if they ask the MDL plaintiffs, I mean, they can't ask

19   them for stuff that they're not entitled to that go beyond

20   even the temporal limits that your Honor is suggesting or

21   drugs.  We agree that if there are documents relating to

22   general marketing practices that would apply, that we should

23   be producing those, and we made a good-faith effort to do

24   that.

25            THE COURT:  For example, so it's not too narrow on

1    your part, let's assume there's a marketing document for

2    Drug X, Y, Z, all right?

3              MR. DALY:  Right.

4              THE COURT:  And that's not one of the drugs here,

5    and it says, "What I want you to do is go out and market the

6    spread, and this is how the --" see, I'm going through these

7    documents now, like, last night -- "and here's what the

8    doctors will get reimbursed at, and here's what the return to

9    practice is, and here's what the copay will be, and here's

10   your profit."  Even if it's Drug X, Y, Z which isn't one of

11   the drugs here, that should be produced.

12             MR. DALY:  I agree, and we have done that.  There

13   are no such documents, I don't believe, but anything that's

14   related to that we've given them.

15             THE COURT:  Now, if it's an individual contract

16   with an individual doctor about a drug which does not have

17   general marketing language, I don't expect those all to be

18   produced.

19             MR. BREEN:  I understand, Judge, but the issue is,

20   every document that we're talking about here I've got in a

21   database because we litigated this to the Supreme Court twice

22   to get them in Texas, okay?  I've got them in a database.

23             THE COURT:  Good.

24             MR. BREEN:  And there's three times as many as they

25   produced to the federal government, but I can't show them to

1    the federal government without his approval.

2          THE COURT:  Or you come back to me.  That's why I

3    am here.

4          MR. BREEN:  Judge, I understand fully.

5          THE COURT:  And so you can come to me.  Connolly

6    can come to me.

7          MR. BREEN:  I understand.

8          THE COURT:  You are in a great position because

9    you've seen it all, so you actually know what's out there

10   rather than some hypothetical thing.  I've given you two

11   polar extremes:  an individual contract with an individual

12   doctor over X, Y, Z which may show a charge-back or a rebate

13   or something.  That seems too narrow and too specific.

14   Anything coming out of the sales and marketing team talking

15   about how you market stuff during the relevant time period

16   should be produced.  And then the temporal scope should at

17   least be up to 2003 because that's when the MMA kicked in,

18   right?  Is that right?

19         MR. DALY:  Yes.

20         MR. BREEN:  Correct.  Well, that's when they passed

21   it.

22         THE COURT:  Right, and then they do 85 percent of

23   AWP, and everybody in the world knew AWP did not reflect cost

24   at that point.  That's actually not accurate, since I

25   actually saw some third-party payors here who still believed

1    it two years after the fact.  But any sophisticated market

2    player knew -- I'll added "sophisticated," and I put the

3    government in that category because they were part of it --

4    knew in 2003 there a was different situation.  And when did

5    you switch to ASP, 2004?

6            MR. BREEN:  It took about a year to get it up and

7    running.

8            THE COURT:  All right, so through 2003.  And when

9    do you claim that it starts?  1991 was when Medicare started

10   using AWP.

11           MR. BREEN:  No, Judge.  '91 was when they started

12   the regulations, but this is a Medicare/Medicaid case, number

13   one.

14           THE COURT:  So when did Medicaid start using it?

15           MR. BREEN:  Medicaid started using AWP back in the

16   late '70s and the '80s.  So that's one of the other issues

17   here, because Abbott has set another unilateral early point

18   on discovery, and we got a lot of the preparatory stuff.  You

19   know how this works.  I mean, you want to see the stuff that

20   they were --

21           THE COURT:  I mean, I don't know.  That's why I

22   don't know your complaint well enough.  So Medicare started

23   this regulation in '91, so I don't know about Medicaid.  I

24   know it started in the '60s in California somewhere, so --

25           MR. BREEN:  Before our damage period begins,

1   Medicaid was already doing it, but there's some late '80s

2   documents --

3            THE COURT:  When does your damage period begin?

4            MR. DALY:  '91 to 2001.

5            MS. BROOKER:  Except that we would have go back

6   prior to 1991 because there are definitely relevant

7   documents, particularly with respect to the subject drugs in

8   this case.

9            THE COURT:  Going back how far?

10           MS. BROOKER:  Well, we have served document

11   requests.  I mean, Abbott should not --

12           THE COURT:  Going back to when?

13           MS. BROOKER:  At least back to 1988.  And the

14   reason is --

15           THE COURT:  So talk about this possible temporal

16   scope between '88 and 2003.  I can't -- you're asking me to

17   microscript something I haven't seen any briefings on, and

18   I'm suggesting a few ways of doing it.  Like, I look at you

19   and I say "You're golden."  You've actually got these

20   documents, so tell me what you want to show her and try and

21   work it out with him.  And if you can't agree, that's why

22   we're here.

23           MR. BREEN:  Your Honor, your comments up to this

24   point in time, believe me, okay, you cut through a lot of it

25   already that I think we're going to be able to --

Page 34

1          THE COURT:  And with respect to Connolly, have her

2     move for an opening of the protective order with respect to

3     certain kinds of documents.  You of course can talk to

4     whoever you want.  No, you shouldn't be thrown out of a

5     deposition, and none of this is so super secret.  On the

6     other hand, I have to say, it can't be a fishing expedition

7     to find a hundred more drugs to sue on.  So that's sort of

8     where I'm trying to think about.  Once I get into specifics,

9     I will get to specifics.

10          Now, let me get to Part B, which is, when are you

11     doing the depositions of the government people?

12          MS. BROOKER:  We are doing them on an ongoing

13     basis.  We're in the process of this right now.

14          MR. DALY:  We've had a couple, your Honor.  I think

15     we have four noticed.

16          THE COURT:  Like who?  Who?

17          MS. BROOKER:  Well, Abbott has largely sought to

18     notice topics which they would call spoliation issues, your

19     Honor.  There haven't been very many substantive depositions

20     that have taken place or that are noticed.  They are seeking

21     to depose every individual that we put in an interrogatory to

22     find out whether their documents were preserved.  For

23     example, there was a broad request for individuals who are

24     responsible or knowledgeable about the reimbursement process

25     in general; and then there are 30(b)(6) depositions going

Page 35

1    forward over where are their files, people who left years

2    ago.  So there are not that many substantive government

3    depositions.

4              THE COURT:  Let me say this on the flip side of

5    this issue, which is, I was somewhat frustrated over the

6    refusal of the U.S. government to produce witnesses in the

7    big trial that I just went through.  It all came up sort of

8    too late, and it wasn't specific enough, at least for the

9    issues there.  To the extent -- Abbott, you're in Class 2?

10             MR. DALY:  Yes, your Honor.

11             THE COURT:  To the extent there are depositions on

12   a substantive basis, they should be open to everyone.

13   Everyone has the right to understand what the government was

14   doing during the time period.

15             MS. BROOKER:  Your Honor, we have actually been

16   doing that.  In fact, more than that, and there hasn't been

17   an opposition to this, but we've been insisting that everyone

18   join the depositions so that we only need to offer a witness

19   one time.  So when there is a deposition notice, it is served

20   on LexisNexis, and we encourage and almost insist that other

21   parties appear so that we don't have to recall over and over

22   again a government witness.  That's just not been an issue.

23             THE COURT:  Because at some point I anticipate in

24   this case under the False Claims Act -- and I don't remember,

25   I think there are very complicated legal issues, very

1    complicated legal issues -- but, in any event, what Centers

2    for Medicare and Medicaid services understood and knew and

3    what they agreed to and what they didn't.

4        MS. BROOKER:  And with respect to Abbott's conduct

5    and the Abbott drugs at issue in this case or the Dey drugs

6    and the Dey conduct.

7        THE COURT:  Yes, and in general -- I mean, I'm

8    probably now more steeped in this than most people, but it

9    came -- the Office of the Inspector General was actually

10   quite persistent in trying to flag some of these issues.  I

11   don't know if it's Abbott drugs or not.  I just don't know.

12   And at some point, at least Mr. Scully and other people were

13   testifying on the Hill about this stuff.  And so it's

14   relevant, not only to statute of limitations, but it's also

15   relevant to -- I think a very difficult area of the law is

16   when the government knows about a fraud, let's say, knows

17   about a fraud and it continues.  I don't know what happens

18   when -- the solution is a very complicated one.  In other

19   words, when the solution has to do with increasing

20   administrative fees and getting something through Congress, I

21   don't know what the answer is under False Claims Act, but at

22   least we need a factual record.

23       MS. BROOKER:  Certainly, your Honor, and government

24   intends to be very open about the process.  And I will remind

25   the Court that, you know, the United States has not sued the

1    entire pharmaceutical industry, and we have not sued Abbott

2    on all of its drugs.  We are really focused on very discrete

3    conduct of a very discrete company or, you know, an

4    additional two companies.  So we believe that the proper

5    focus is on what the reimbursement officials at CMS knew

6    about these thousand plus percent spreads by Abbott on these

7    particular drugs.

8             THE COURT:  Are they cancer drugs?

9             MS. BROOKER:  Some of those are.  There's a large

10   antibiotic and then there are water solubles that are

11   generally at issue.

12            THE COURT:  Are they generics?

13            MR. DALY:  Yes, they're all generics, Judge.

14            THE COURT:  Are they part of Track 2?

15            MR. DALY:  We're in Track 2, your Honor.  Yes, what

16   we're hearing again is that they're suggesting without coming

17   out and saying it that they want to try to limit us, that we

18   can ask the CMS people and the OIG people what they knew and

19   understood, but only if they knew and understood about a

20   5-milliliter bag of saline solution.  Our position, of

21   course, and we talked about this when we were here in the

22   fall, is much broader than that.  And we need to find out

23   what the government knew about spreads and mega spreads and

24   cross-subsidization and all of this information.  And counsel

25   is correct that, you know, we're going to go ahead and we're

Page 38

1   going to be talking to Mr. Scully; we're going to notice him

2   up for a deposition as well as other people.  The other

3   defendants in both cases before your Honor have cross-noticed

4   those, so, yes, everybody is very interested in getting to

5   the bottom of this, and we'll be doing that.

6           THE COURT:  Because it's really not so relevant to

7   my case that I just finished the trial on.  It might be quite

8   relevant to this case.

9           MR. DALY:  Yes, your Honor, absolutely.

10          THE COURT:  I mean, it might have some relevance

11  but not as heartland as here.

12          Now, let me go off the record for a minute.

13          (Discussion off the record.)

14          MR. DALY:  Judge, I wanted to correct a couple of

15  things, I mean, just to make sure to clarify.  The Court has

16  already entered dates on this matter.

17          THE COURT:  Right.

18          MR. DALY:  You did this in October, so that's going

19  to be part of what we submit jointly to the Court today.  I

20  think we also agreed on a mediation, but we'll have to check

21  that, but we'll talk about that.

22          MS. BROOKER:  I feel like we did as well.

23          MR. DALY:  Yes.  Now, Judge, in terms of the

24  briefing that was submitted, we submitted a brief, I think

25  yesterday actually around -- yes, no, Sunday.  And we have

460ee1f0-cf84-45cd-99ad-fa6fb0ad7437

1   been able to agree on most of the stuff that was in the

2   brief, in both parties' briefs back in September that we've

3   been fighting about.  So we've agreed on the number of

4   interrogatories that each side can ask.  We've agreed on the

5   request-to-admit issue about how many each side can

6   propound.  I mean, I think we're going to have a situation

7   there, just to get the Court's approval, where we can do 150

8   sort of regular requests to admit that are really

9   substantive, and then otherwise where you can do additional

10  requests to admit where we actually admit that senator

11  so-and-so said X as stated in the Federal Register, attach

12  the document --

13          THE COURT:  How many of them?

14          MR. DALY:  Those will be unlimited because you have

15  to actually attach the document.  We've agreed to that,

16  Judge.

17          THE COURT:  You know, I was -- I don't know if you

18  know this -- back in the day, I was actually in the Civil

19  Division of the U.S. Attorney's office.  I agreed to

20  something -- like, back in 1981, we had a superfund case

21  involving New Bedford Harbor.  We agreed to that, thousands,

22  thousands.  It filled Judge Young's conference room.  There's

23  got to be a limit on it, or I know what will happen.

24          MS. BROOKER:  Okay.  We were pushing for

25  limitations in general.  And the other issue that is --

Page 40

1      THE COURT:  If it's a hundred, I don't have a

2  problem with it, but just I would think that that wouldn't --

3  I'll read through it, but I would think that that was not a

4  good idea.

5      MS. BROOKER:  Okay.

6      MR. DALY:  Well, what we have, Judge, is, you've

7  seen -- you know, you get all the defendants' motions to

8  dismiss -- for example, all those appendices of famous things

9  that, you know, the President of the United States said this,

10  Congressmen said that, OIG.  All we've done is taken those

11  things, and because it's from the government, we've simply

12  asked them to authenticate it.  That's what we're talking

13  about, and we've already done this.

14      MS. BROOKER:  We can do that by stipulation as

15  well.

16      THE COURT:  Let me just simply say, unlimited is

17  not a good thing, not in a case of this magnitude.  A hundred

18  sounds right to me with no subparts.

19      MS. BROOKER:  Okay.

20      THE COURT:  Because I don't see how -- you can

21  produce all the documents and say, do you have an objection

22  to the authenticity of any?  And then you can do the -- you

23  know, like, I think it's crazy to do it that way.  Unlimited

24  is never a good idea.

25      MS. BROOKER:  I agree, your Honor.  We can agree to

1    one hundred.

2            THE COURT:  Yes, that makes sense.

3            MS. BROOKER:  And the last remaining issue --

4            MR. DALY:  But before we move off of that, we had

5    also agreed -- I want to make sure this is okay with the

6    Court -- that -- those are the authentication ones -- we had

7    agreed also to 150 regular requests to admit; in other words,

8    that don't attach the documents.

9            MS. BROOKER:  But what I hear your Honor saying is,

10   you need to have it under limitation.

11           THE COURT:  Yes, if you agree, I agree, but not

12   infinite.

13           MR. DALY:   Right, I understand.

14           THE COURT:  What I'm not going to do is what

15   Judge Young did, which is find a storage room for the

16   thousands and thousands of requests to admit.  It got to the

17   point of ludicrous, and so limits are good.

18           MS. BROOKER:  Limits are good, your Honor.  We have

19   been pushing limits.

20           The last remaining area are depositions.  In the

21   initial proposal, we asked for 250 hours for each side to

22   take in deposition hours.  Instead of, you know, full days,

23   we just said, "Use your hours however you want.  You might

24   want to depose this person for two hours, someone else for

25   twenty-one hours."  They said "500 hours."  Now Abbott wants

Page 42

1    no deposition limitation.  And I think 500 hours, which is 70

2    days for each side, between now and eight months from now is

3    not good enough.  We want some sort of limitation.

4              THE COURT:  Yes, you need a limit.

5              MR. DALY:  Judge, here's our problem with that.

6    They've sued us for ten years of Medicaid.  That's fifty

7    states.  Each of those states has a financial intermediary.

8    They've sued us for ten years of Medicare.  We have about

9    fifty Medicare carriers that we're seeking discovery from.

10   We've got ten years of CMS, HCFA, and other federal

11   employees, present and former.  Five hundred hours is only 70

12   depositions of one day.

13             MS. BROOKER:  Each side.

14             MR. DALY:  Well, I'm only talking about what I need

15   to do.

16             THE COURT:  Listen, just come up with a reasonable

17   calculation of, let's say, four hours per person or eight

18   hours per person and come up with an hour limit.

19             MS. BROOKER:  Your Honor, what we --

20             THE COURT:  Not unlimited.  Just come up with a

21   reasonable calculation, and then you'll have to economize

22   internally.  So let's say fifty states?  So let's say eight

23   hours for each administrator?  So that's 400 right there,

24   right?

25             MR. DALY:  Right.

Page 43

1        THE COURT:  So let's say you need to do how many

2    officials at Medicare?

3        MR. DALY:  We're not sure.  They've listed about 35

4    in their 26(a)(1) disclosures.  I don't know if those will be

5    the ones we depose.

6        THE COURT:  So maybe four hours apiece.

7        MS. BROOKER:  Well, they recommended 500 hours, and

8    we said 250, and today outside the courtroom we said, "Okay,

9    we'll go with your highest number."  Five hundred hours, your

10   Honor, for each side between now and the end of the month is

11   not even feasible.

12       THE COURT:  I'm not disagreeing.  You need to come

13   up with a limit, or it will eat you.  And if you can't agree,

14   I'll come up with one.  You'll have to come up with an

15   estimate.  So it does strike me as fair, though, if you're

16   suing him for fifty Medicaid states, they have the right to

17   take fifty Medicaid administrators, right?

18       MS. BROOKER:  Well, I think, you know, there can be

19   a more efficient way than to depose fifty individuals.

20       THE COURT:  How?  I don't know.  I don't know

21   enough about it.

22       MR. DALY:  But our position, Judge, is, even if we

23   didn't do them all, we have to do enough to get a reasonable

24   cross-section to do it, and it might take more than one

25   person from each state.  We don't know.

1          THE COURT:  I'm not giving you unlimited.

2     Unlimited isn't happening.  You're finishing it by

3     December 7.  Even though it's the federal government, they

4     can't -- how many lawyers are working on this case?

5          MS. BROOKER:  For this side?  On our side, we have,

6     there's five or six of us.

7          THE COURT:  So it needs to be reasonable.

8          MS. BROOKER:  Yes.

9          THE COURT:  Because at the end of the day, it's not

10    going to come down to what each Medicaid administrator did.

11    It's going to be, was there a fraudulent marketing of the

12    spread, and was there knowledge?

13         MS. BROOKER:  And without the limitation, your

14    Honor, I mean, it's just going to cripple CMS.  It's already

15    been very difficult for CMS because we're pulling program

16    people trying to implement the program to prepare for

17    depositions to help us find 30(b)(6) information.  We've got

18    to limit.

19         THE COURT:  I'm not that sympathetic on that.  That

20    piece I'm not as sympathetic on.  You just have to do that.

21         MS. BROOKER:  Right, we've been doing that.

22         THE COURT:  All right, great.  Are we done?

23         MS. BROOKER:  Just two more tiny little things,

24    your Honor.

25         THE COURT:  Where are you from?  Are you from

1    Washington?

2              MS. BROOKER:  Yes.  I'm sorry, your Honor.

3              THE COURT:  No, no, that's okay.  Not "I'm sorry."

4              MR. BREEN:  Why are you sorry you're from

5    Washington?

6              MS. BROOKER:  No, no, I thought you said, "Oh,

7    okay, you're from Washington."

8              THE COURT:  No, no, no.  I just don't know you.

9              MS. BROOKER:  Yes, I'm with the Commercial

10   Litigation Branch in Washington.

11             THE COURT:  I see my local folks.  I just didn't

12   know.  All right, go ahead.

13             MS. BROOKER:  The other thing is, you know, we just

14   wanted to remind the Court that Abbott still hasn't answered

15   here.  So while we can speculate about, obviously, what some

16   of their answers will be --

17             THE COURT:  That's my fault, isn't it?  Isn't there

18   a motion to dismiss?

19             MR. DALY:  It's pending, your Honor, and we will

20   respond however the Court rules.

21             THE COURT:  Is there motions to dismiss?  I've got

22   like three Ven-A-Care cases, right?  I have New York,

23   California --

24             MR. BREEN:  No, your Honor, just two.

25             THE COURT:  California and Florida, right?

1          MR. BREEN:  Well, Florida is on a motion to remand

2     right now, but there's California, which we have actually

3     briefed and argued the motion in May.

4          THE COURT:  Right.

5          MR. BREEN:  That hasn't been ruled on yet.  And

6     then there is the federal cases, the three federal -- soon to

7     be three federal Ven-A-Care cases.

8          THE COURT:  And you've moved to dismiss?

9          MR. DALY:  We did, your Honor.  We argued that, I

10    believe, in the fall.

11         THE COURT:  So let me tell you the issue I'm

12    actually struggling with, since I've got law clerk drafts on

13    at least a couple of these.  I'm not sure it's critical, but

14    the issue is -- and I wasn't even sure how much it was being

15    pressed -- whether AWP, if you increase it to get more

16    remuneration for the doctor, is some sort of a kickback, it

17    violates the kickbacks, as opposed to offering discounts and

18    rebates, which strikes me as falling fully within it.  But

19    I'm not sure it matters, just so that you can know legally

20    where I'm struggling.  It wasn't briefed so clearly under the

21    various state statutes; in other words, whether or not -- I

22    think discounts offered to get someone to purchase may fall

23    within the kickback provisions, but simply publishing an

24    inflated AWP without a direct offer to the doctor strikes me

25    as an extremely close question, and I don't know what to do

Page 47

1   with that.  I'm not sure whether it matters that I deal with

2   it on a motion to dismiss because if you fall under one, I'm

3   not sure it's going to get you to Step B, but I'm struggling

4   with it.  I haven't found any case law on it.  I found no

5   regulatory guidance on it.  And even the OIG fudged it in its

6   compliance manuals.  So a heads-up, and I haven't forgotten

7   about you, but I'm --

8          MR. BREEN:  And that's definitely in the California

9   case and in this case, that issue.

10         THE COURT:  That issue is a big one, and I'm

11  worried about getting it wrong.  I'm not sure that I need to

12  get to it because, as I said, offering discounts, at least on

13  a motion to dismiss stage, might be enough.  But I'm having

14  trouble with, if you've got an AWP out there and you market

15  it -- in other words, you explain what the reimbursement

16  spread is -- but you're not actually the one paying the

17  amount of money and you're not actually offering the amount

18  of money, it's a very difficult question.

19         MR. BREEN:  Direct or indirect.

20         THE COURT:  Huh?

21         MR. BREEN:  Direct or indirect, in cash or in kind.

22         THE COURT:  I know that's your argument, but

23  there's not actually an offer of money.  So it's hard, and

24  it's hard under the state statutes, and it's hard under the

25  federal statutes.  Have you weighed in on this yet, the

1    government?

2            MR. GOBENA:  Yes, we have.

3            THE COURT:  And Your position is?

4            MR. GOBENA:  We take the position that, just as

5    Mr. Breen said, that it can be an offer that's direct or

6    redirect.  And remuneration, there's a broad definition of

7    what remuneration is.  It's not necessarily limited to a cash

8    transaction.  The offering of potential profit could

9    constitute remuneration under the statute, so --

10           THE COURT:  It's hard.  No case has gone that far,

11   at least that we can find.  No case has addressed this, so

12   that's the one I'm just worried about it because it could

13   have sweeping ramifications, if you want to know what's

14   holding it up.

15           MR. DALY:  I think that it stretches the

16   Anti-Kickback Statute too far, your Honor.

17           THE COURT:  I know you do, and can I say that you

18   both have fabulous arguments on this particular one, and I'm

19   sort of stuck on it.  But, in any event, it should not hold

20   up discovery.  Okay, thank you.

21           MR. BREEN:  But the point is, your Honor, the more

22   we can coordinate the California case with the federal case,

23   I think the better for everybody concerned.

24           THE COURT:  Say it again?

25           MR. BREEN:  The more we can coordinate the

Page 49

1   California Ven-A-Care case with the other Ven-A-Care cases,

2   it is going to expedite things because I've got the same

3   lawyers working --

4           THE COURT:  But nothing's being held up, right?

5   Discovery is happening while --

6           MR. BREEN:  No, it is.  You've got a stay.  There's

7   no stay on their intraparty discovery in the federal case,

8   but you stayed intraparty discovery in the California case.

9           THE COURT:  All right, so I should make that a

10  priority.

11          MR. BREEN:  And if we could at least get the

12  intraparty discovery issue resolved, we could at least

13  coordinate discovery on that.

14          THE COURT:  Okay, thank you.  Now, you'll give me

15  that stuff.  Whatever you can agree on, though, at least let

16  me enter as soon as possible.

17          MS. BROOKER:  Yes, we will submit it tomorrow.

18          THE COURT:  Good.  Thank you.

19          MR. DALY:  Thank you, your Honor.

20          MS. BROOKER:  Thank you.

21          (Adjourned, 11:05 a.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS     ) ss.
     CITY OF BOSTON                )
5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9    Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 49 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13   Industry Average Wholesale Price Litigation, and thereafter

14   by me reduced to typewriting and is a true and accurate

15   record of the proceedings.

16           In witness whereof I have hereunto set my hand this

17   5th day of March, 2007.

18

19

20

21

22

23   _____
     LEE A. MARZILLI, CRR
24   OFFICIAL FEDERAL COURT REPORTER

25