


# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## MEMORANDUM OF NAMED CLASS REPRESENTATIVE, M. JOYCE HOWE, IN OPPOSITION TO THE JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED NATIONWIDE SETTLEMENT WITH ASTRAZENECA

## I.  INTRODUCTION

Joyce Howe, one of the two consumers certified by this Court to serve as a representative of the Medicare Part B beneficiaries who purchased AstraZeneca's drug, Zoladex,[1] objects to the proposed settlement with AstraZeneca and urges that the settlement not be preliminarily approved.  Settling Counsel[2] and the court-appointed mediator, Eric Green, were informed two weeks ago by the undersigned counsel for Mrs. Howe, that numerous aspects of the proposed settlement are objectionable and that Mrs. Howe would oppose preliminary approval. Among other things, Mrs. Howe opposes the "claims made" structure and the Class Claims Process set

---

[1] By Order dated January 30, 2006, this Court certified Mrs. Howe, both individually and on behalf of the Estate of her late husband, Robert Howe, as a representative of the AstraZeneca subclass.

[2] The MDL plaintiffs' counsel who support the proposed settlement and whose names are included on the supporting papers are Steve W. Berman, Thomas M. Sobol, Edward Notargiacomo, Sean R. Matt, Robert F. Lopez, and Elizabeth A. Fegan of Hagens Berman Sobol Shapiro LLP; Eugene A. Spector and Jeffrey Kodroff of Spector, Roseman & Kodroff, P.C.;  Kenneth A. Wexler and Jennifer Fountain Connolly of Wexler Toriseva Wallace LLP; and Marc H. Edelson of Edelson & Associates LLC ("Settling Counsel").




forth in the Settlement Agreement. As explained below, if the proposed settlement were to be approved, most consumer class members would receive no compensation whatsoever; and many of those who were compensated would be substantially underpaid, including Mrs. Howe. Still others, like Mr. Townsend, would be substantially overpaid, drawing necessary funds out of the consumer settlement pool.

Despite their knowledge that Mrs. Howe does not consent to the proposed settlement agreement, Settling Counsel nonetheless represent "that they are fully authorized to conduct settlement negotiations with defense counsel on behalf of the Class Representatives and Class 1 members and to enter into, and to execute, this Agreement on behalf of the Class Representatives and Class 1 members, subject to Court approval pursuant to Fed R. Civ. P. 23(e)." *See* Settlement Agreement and Release of AstraZeneca at ¶ 25. Settling Counsel also includes the undersigned's name and law firm on the motion papers as one of the counsel supposedly supporting the settlement, when they know this not to be the case. By making these representations, by omitting any reference to the lack of consent by Mrs. Howe or her counsel, and by filing their motion for preliminary approval only one day before seeking a hearing on their joint motion for preliminary approval, Settling Counsel obviously hope to accomplish a *fait accompli* without the Court ever hearing about the fundamental flaws in the proposed settlement. Accordingly, Mrs. Howe and her counsel respectfully urge this Court to deny preliminary approval of the proposed settlement.

## FACTUAL BACKGROUND

This litigation was commenced in 2001 against several drug manufacturers, including AstraZeneca. At that time, all of the plaintiffs were insurance companies and other third party




payors ("TPPs"), and consumer advocacy members of the "Prescription Action Litigation" ("PAL") organization formed by certain Settling Counsel. None of the plaintiffs were consumers. This Court organized the litigation to proceed in tracks, with AstraZeneca among the defendants included in Track I.

The TPPs and PAL member plaintiffs moved for certification of a nationwide class against all of the Track I defendants. They proposed to include consumers in the nationwide class. This Court questioned whether TPPs could adequately represent consumers, stating that there is a "possible conflict between TPPs and Medicare Part B beneficiaries with respect to possible settlements, given the different economic interests of the groups." *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 80 (D.Mass. 2005). The Court also held that the PAL member plaintiffs had no standing to represent consumer plaintiffs for money damages. For this and other reasons, the Court denied the motion for a nationwide class, and certified a Massachusetts-only class outside the Medicare context. This Court did, however, leave open the possibility of a nationwide consumer class if adequate consumer class representatives could be found.

The undersigned and his firm, Kline & Specter, had consumer clients whom they had represented in connection with similar litigation regarding the drug Lupron. Many of these consumers had purchased drugs at issue in this litigation, and had claims against one or more defendants.[3] One of these consumers, Robert Howe, had been prescribed and purchased Zoladex, which was manufactured and sold by AstraZeneca. On October 17, 2005, a Third

---

[3] In the end, the undersigned proffered eight of the nine Class 1 consumer class representatives in this case.




Amended Master Consolidated Class Action Complaint ("TAMCC") was filed which included Mr. Howe as a named class representative, along with his counsel, the undersigned.

Plaintiffs renewed their motion for certification of a nationwide class of consumers against the Track 1 defendants. Mr. Howe and his wife, Joyce Howe, were proposed as consumer representatives with claims against AstraZeneca. On January 30, this Court granted plaintiffs motion, and certified a nationwide class of consumers with claims against the Track I defendants, including AstraZeneca. Mrs. Howe was certified as a Class 1 consumer representative, Mr. Howe having died one month before the Court's ruling. This Court also appointed Kline & Specter as one of the lead counsel in this case.

The undersigned left Kline & Specter in the fall of 2006. Mrs. Howe and all of the other class representatives in this litigation who had retained Kline & Specter elected to have the undersigned continue representing them in this litigation. Kline & Specter then filed a Notice of Withdrawal from this case.

This Court ordered counsel for AstraZeneca and the plaintiffs to discuss settlement with the assistance of the Court appointed mediator, Eric Green. On behalf of Mrs. Howe, the undersigned objected to numerous aspects of the settlement as it was negotiated and ultimately agreed to by plaintiffs' counsel, including:

- making modifications to the existing class definition to exclude some class members, while broadening the definition to include class members from additional states, without considering how these changes affect the interests of the excluded class members or the appropriate range of consideration from AstraZeneca;

- penalizing consumers with supplemental insurance by deducting their insurance benefits from their payments, paying all consumers who had supplemental insurance as if they all received the same percentage amount of insurance benefits, and making full payments to people who submit




incomplete insurance or prescription information while denying full payments to people who submit complete records;

- requiring class members to file claims as part of a "claims made" process, and providing AstraZeneca with an effective reversion of undistributed funds, rather than simply calculating appropriate payments from available CMS data and sending checks to class members;

- "guaranteeing" ten million dollars for a *cy pres* distribution to the extent claims do not reach $24 million, rather than simply increasing payments to class members; and

- intermingling settlement and fee negotiations.

Although the undersigned voiced these concerns to co-lead counsel and Mr. Green, the parties nonetheless negotiated and ultimately agreed to a settlement with these and other objectionable aspects. Moreover, Settling Counsel have represented to this Court that Mrs. Howe and her counsel, the undesigned, agree to and support this proposed settlement, when Settling Counsel know this not to be the case. Accordingly, Mrs. Howe and her counsel oppose preliminary approval of the proposed settlement.

## ARGUMENT

Although the overall amount of the proposed settlement may fall within the range of reasonableness worthy of classwide review and comment, the structure and plan of allocation of the settlement are unfair and therefore inadequate. Accordingly, consistent with her fiduciary obligation to the class she agreed to represent, Mrs. Howe objects to the settlement as proposed and urges this Court to deny preliminary approval.

**I.     Mrs. Howe Has The Right To Object To Any Proposed Settlement That Is Unfair In Any Respect.**

The class representative owes a fiduciary obligation to class members, which requires that he or she engage in vigorous, informed negotiations. *See, e.g., Butterworth v. Quick &*




*Reilly, Inc.*, 171 F.R.D. 319, 322 (M.D. Fla. 1997) (collecting cases in which "courts have held that a plaintiff that does not understand the facts of the case or her own claim cannot fulfill the role of the class representative"); *Coates v. Kelley*, 957 F.Supp. 1080, 1085 (E.D. Ark. 1997) (adequacy of named plaintiffs evidenced by "their vigorous negotiations on behalf of the national class"). Conversely, if counsel proposes a settlement that is inadequate or otherwise unfair to class members, the class representative has the right to object to the proposed settlement.

Mrs. Howe pledged to represent consumer class members to the best of her ability. She was not personally included in the negotiations, but she has reviewed the terms of the proposed settlement with her counsel and has found it to be infirm in many respects. For this reason, she does not support the proposed settlement, and in fact objects to preliminary approval of it, for the reasons stated herein.

## II.     Standard For Preliminary Approval.

In deciding whether to grant preliminary approval to a proposed settlement, the Court must consider "whether the proposed settlement [is] within the range of possible final approval, and whether class members should be notified of the terms of the proposed settlement and the date of a final fairness hearing to determine whether the court should grant final approval." *White v. National Football League*, 822 F. Supp. 1389, 1399 (D. Minn. 1993). To enable a court to decide these questions, the settlement proponents must present sufficient factual bases for allocations of the settlement proceeds among class members. *See In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048 (slip copy E.D.N.Y. April 19, 2007) at * 2.

The proposed settlement has numerous apparent flaws that are not adequately explained by the proponents of settlement. Settling Counsel have agreed to changes in the class definition,




without adequately explaining why the new definition excludes one category of existing class members or the effect of including additional class members from other states. The proposed plan of allocation ignores existing law and treats class members with supplemental insurance unfairly. The claims made structure unfairly rewards AstraZeneca for dragging out this litigation for years, by paying AstraZeneca a reversion for unclaimed settlement funds. And, the settlement process was tainted by improper negotiations between the parties about fees, at the same time they negotiated other settlement terms.

## III.   The Proposed Settlement Is Unfair And Should Not Receive Preliminary Approval.

The proposed settlement is unfair and does not fall within an appropriate range of recovery for many class members. The settlement class definition abandons one category of existing consumer class members without explanation, and adds other consumers as class members without adequately considering the effect this will have on payments to individual consumers. The proposed Class Claims Process unfairly deducts insurance benefits from recoveries of class members with supplemental insurance, and provides full payments to class members with incomplete or nonexistent records while denying full payments to persons with exemplary records. The "claims made" process adds a layer of complexity that will almost certainly suppress claims to AstraZeneca's benefit, when sufficient information exists to calculate each class member's settlement benefit and simply send a check to his or her last known address, without any need for claims or other information from class members. Finally, because the settlement was tainted by intertwining negotiations about consumer benefits with negotiations over fees, it should not receive this Court's stamp of approval.




**A.      The Class Definition Has Been Altered in Impermissible Ways.**

Settling Counsel represent that the definition of the Proposed Settlement Class is "consistent with the Court's January 30, 2006 Consolidated Order Re: Class Certification."  In reality, the two are not consistent.  First, Settling Counsel make no mention of the fact that the class definition set forth in the Court's January  30, 2006 Order included "all natural persons nationwide who made, or who incurred an obligation enforceable at the time of judgment to make, a co-payment based on AWP for [Zoladex]."  In contrast, the current Proposed Settlement Class is limited only to persons who made co-payments, and does not include persons who incurred enforceable obligations to make such payments.  No explanation is given in the proposed Notice or elsewhere for carving the latter class members out of the settlement, or for the anticipated disposition of their claims if the proposed settlement is approved.

Second, Settling Counsel agreed to broaden the class to include consumers from nine states:  Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana, and Virginia.  Consumers in these states are properly given an exclusion right, since they were not included in the original certification and received no notice of it.[4]  But because the Hartman damages analysis upon which the proposed settlement is based does not include these states, it is unknown what effect claims from these states will have in reducing the *pro rata* share of each settling class member.  Settling Counsel make no effort to explain this impact, or justify this change, which at least should be done for the Court to determine whether the proposed settlement is within an acceptable range and is otherwise worthy of preliminary approval.

---

[4]Consumers who were part of the original certification are not given a second exclusion right.  This is itself sufficient reason to deny preliminary approval.  *See* Fed. R. Civ. P. 23 (e)(3).




**B.      The Proposed Class Claims Process Is Unfair.**

A plan of allocation is subject to the same approval standard applicable to the settlement as a whole, i.e. the distribution plan must be fair, reasonable and adequate.  *In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (quotation omitted). Thus, the adequacy of an allocation plan "turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."  *In re Paine Webber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 132 (S.D.N.Y. 1997), *aff'd*, 117 F.2d 721 (2d Cir. 1997).

Settling Counsel's proposed allocation is flawed on several levels. The allocation improperly distinguishes between class members with and without insurance, based on the mistaken notion that those with insurance are entitled to less than those without insurance.  Even if it appropriate to make this distinction, the proposed allocation fails to account for differences among those with insurance that, if Settling Counsel's logic were to be followed, affect the size of each class member's potential claim. What's more, no provision is made for potential subrogation rights held by TPPs (some of whom are clients of Settling Counsel), which exposes class members to claims from TPPs.

**1.      The proposed allocation ignores the effect of the collateral source rule by penalizing insured class members for having insurance.**

The proposed allocation improperly deducts insurance benefits from each insured's claim. The traditional common law rule regarding benefits from collateral sources is that payments or benefits to an injured party from sources other than the tortfeasor are not credited against the tortfeasor's liability, even if the payments cover all or a part of the harm for which the tortfeasor is liable.  *See* Restatement (Second) of Torts, § 920A(2) (2005).  The collateral source




rule is intended to apply to insurance policy benefits, gratuitous payments, and "social legislation benefits." Restatement (Second) of Torts, §920A, Comment c (1), (4).

For a source of benefits to be considered "collateral," it must be wholly separate from the tortfeasor. *See William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 941 (2d Cir. 1984) ("the essence of the collateral source rule is the independence of the transaction giving rise to the collateral source, such as the insurance policy"). In determining whether the source of payments is "independent," courts consider such factors as whether the plaintiff or defendant contracted for the payments; whether the purpose for securing the benefits was to assist the plaintiff or the defendant; and whether the plaintiff contributed to the fund that issues the payments. *See, e.g.*, *Silverson v. United States*, 710 F.2d 557, 559 (9th Cir. 1983) (court should consider whether the injured party contributed to the fund that is making the payments at issue); *Webber v. International Paper*, 307 F. Supp. 119, 125 (D. Me. 2004) (benefits are collateral if they were intended to assist the plaintiff, rather than alleviate the defendant's liability); *Nunsuch v. ex rel. Nunsuch v. United States*, 221 F. Supp. 1027, 1036 (D. Ariz. 2001) (where the funds are supplied in part by the beneficiary, they are considered to be collateral) (citations omitted); *Taylor v. American Fabritech*, 132 S.W.2d 613, 626 (Tex. Ct. App. 2004) (holding that benefits provided by a third party are considered collateral if the purpose for securing the benefits was to protect the plaintiff, rather than the defendant); *Atlantic Express Corp. v. Stamp*, 832 So.2d 829, 830 (Fla. Ct. App. 2002) (courts should consider whether the benefit was in the nature of a fringe benefit to the plaintiff, or an effort by the tortfeasor to anticipate potential legal liability).




Courts acknowledge that the collateral source rule can lead to a double recovery for a plaintiff whose losses were paid entirely by a third party. *See Clausen v. Sea-3, Inc.*, 21 F.3d 1181, 1192 (1st Cir. 1994). Nevertheless, courts apply the rule for policy reasons. As the First Circuit has observed, "the wrongdoer does not deserve to benefit from the fortuity that the plaintiff has received or will receive compensation from a[n] independent source'. . . . Since one party or the other will receive a windfall in such a situation, it is intuitively more just that the windfall accrue to the injured person as opposed to the wrongdoer." *Reilly v. U.S.*, 863 F2d 149, 165 & n.13 (1st Cir. 1988). The Comment to the Restatement explains:

> …it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers….One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives.

Restatement (Second) Torts § 920A, Comment b. The rule also advances the goals of full compensation, deterrence, and punishment in cases involving intentional torts. *See, e.g., St. Francis De Sales federal Credit Union v. Sun Ins. Co of N.Y.*, 802 A.2d 982, 2002 WL 1770709 at *4 (Me. 2002) (holding that collateral source payments are irrelevant in a case involving punitive damages, because "punitive damages are awarded to deter a defendants' intolerable conduct and are not based on the financial or insurance status of the plaintiff"); *Carson v. Webb*, 486 N.W.2d 278, 280 (Iowa 1992) (statutory rule allowing evidence of collateral source




payments for medical expenses not applicable in case of intentional tort) (applying Iowa Code section 668.14 (1987)).

Studies show that a large percentage of Medicare beneficiaries had some form of supplemental insurance.[5] Insured class members should not be punished for having the foresight to arrange (and often pay) for supplemental insurance benefits. Insurance benefits would not be deducted from the claims of insured class members at trial. Nor should they be deducted from the claims of insured class members in settlement. This Court should not grant preliminary approval to a proposed allocation plan that ignores the collateral source rule and arbitrarily favors uninsured class members overinsured class members, like Mrs. Howe.

### 2.     The proposed allocation unfairly ignores significant differences in coverage among class members.

Even if it were proper to deduct insurance benefits from each class member's claim, the proposed allocation treats all insured class members as if they received the same percentage amount of benefits, when the undisputed evidence shows that that they did not.

The proposed allocation provides that all supplementally-insured class members are to receive 20% of the 20% that Medicare did not pay for Zoladex. In other words, the settlement assumes that every class member with supplemental insurance received reimbursement for 96% of the cost of his or her Zoladex, counting benefits from Medicare and the supplemental insurance carrier. *See* Settlement Agreement at 11.

---

[5] In 1996, 89% of all Medicare beneficiaries had some form of supplemental insurance coverage. *See* Pourat et al., *Socioeconomic Differences in Medicare Supplemental Coverage*, 19 Health Affairs (2000). The Rand Corporation reports that in 2003, 86% of Medicare recipients had supplemental insurance coverage. *See* Rand Corporation, *Rand study finds HMOs protect Medicare beneficiaries from high out of pocket costs* (press release May 6, 2003).




But the evidence shows that this was not always the case.  For example, pursuant to their employer-sponsored supplemental insurance plan, the Howes paid 50% of the unreimbursed cost for the Zoladex prescribed to Mr. Howe in the years 2003 and 2004. *See* December 15, 2005 Declaration of Donald E. Haviland, Jr. Esquire in  Support of Plaintiffs' Memorandum In Support of Proposed Consolidated Class Certification Order, at ¶¶ 40-42.  Thus, between Medicare and their supplemental insurance plan, the Howes received reimbursement for 90% of their Zoladex charges, not 96%.  If Mrs. Howe were to be treated like other class members and paid two times the entire amount of overcharge not covered by insurance, she would receive $1,452.36 ((735.60 + 716.76) x 2 = 2,904.72 x .5 = 1,452.36).   The proposed allocation, however, only pays her $581.04 (147.12 + 143.40 = 581.04), a mere 40% of the amount she would receive if treated like other class members who will receive two times the entire amount of overcharge not covered by insurance.  This equates to a shortfall of $871.32 for Mrs. Howe.

The Howes were not alone in paying a larger share of the cost of Zoladex than is assumed in the proposed allocation plan.  According to the Rand Corporation, 32% of Medicare beneficiaries received supplemental insurance benefits through an employer-sponsored plan.  These plans generally paid lower percentages than private Medigap insurance.   But Settling Counsel ignore the fact that a large number of class members are underpaid by the proposed allocation plan, and simply cite Mrs. Howe's incentive award payment as a mitigating factor in her case.  This does not adequately resolve the issue for the absent class members Mrs. Howe has promised to represent.

The inequity of the situation is compounded by the fact that in their brief in support of the proposed settlement, settling counsel assert that class members who admit to having




supplemental insurance but don't know when they were covered will be treated as if they had no supplemental insurance at all, and their allocated damages will be paid in full.[6] This is the proper way to treat all persons with supplemental insurance, not just those who claim they don't know when they had it.  It is unfair to those who spend the time and resources searching their records to accurately set forth the dates of their supplemental insurance, while those who undertake no such effort are rewarded by receiving the highest level of payment for their damages.

Finally, at the same time the allocation improperly withholds supplemental insurance benefits from payments to class members, it makes no provision whatsoever for resolving subrogation claims that may be brought by supplemental insurance carriers against class members.  Thus, class members with supplemental insurance are not only underpaid, they are exposed to future claims from their supplemental carriers.[7]  It is also noteworthy that several of the Settling Counsel represent supplemental carriers in this and other litigation, imposing upon them a separate fiduciary duty to advance the claims of subrogation against the proceeds of the consumer settlement fund.[8]  It is a disservice to class members to ignore this issue, especially when the allocation fails to treat insured class members fairly under the facts and applicable law.

---

[6]Curiously, this aspect of the settlement claims process is not set forth anywhere in the Settlement Agreement.  If it is set forth in some other agreement in connection with the settlement, the other agreement must be disclosed to the class.  *See* Fed. R. Civ. P. 23(e)(2).

[7] *See Blue Cross & Blue Shield of New Jersey v. Phillip Morris USA Incorporated*, 344 F.3d 211, 217 (2nd Cir. 2003) (noting that even if a third party payor's direct claims are too remote to recover against the tortfeasor, the third party payor may still retain a subrogation claim).

[8] Recently, Settling Counsel began to advance these interests by filing a request for a further trial against AstraZeneca on behalf of the individual named representative TPP plaintiffs. This document, which listed the Haviland Law Firm as supposedly supporting it, was not sent to the Haviland Law Firm in advance of its filing, nor does the firm support the relief it seeks on behalf of individual TPP plaintiffs in this MDL class proceeding.




3.       The "claims made" structure is inadequate.

The proposed AstraZeneca settlement is on a "claims made" basis, with AstraZeneca only obligated to make payments to the extent class members claim funds.  This essentially means that unclaimed funds will revert back to AstraZeneca if class members do not exhaust the amount AstraZeneca has agreed to pay.  This is unlike the consumer settlement in the Lupron litigation, and the consumer settlement with GlaxoSmithKline in this case, where the defendants were required to pay a sum certain regardless of the amount of claims.

Overall, the anticipated claims rate is likely to be very low in comparison to the total amount of damages at issue in this case.  AstraZeneca's alleged scheme began over fifteen years ago, and was perpetrated against persons with prostate cancer, a terminal illness.  Indeed, one of the two original consumer representatives with claims against AstraZeneca, Mr. Howe, died in 2006 as a result of his illness.  It is reasonable to assume that many others have died as well, and their survivors may have moved or even died themselves.

Perhaps anticipating the difficulty of stimulating claims from deceased persons and their families, Settling Counsel tout their proposed Notice Plan, which they claim is estimated to cost three million dollars (with administration costs). *See* Memo in Support at 14.  Of course, even the first-class mail notice proposed by Settling Counsel in connection with the proposed Notice Plan will not necessarily alleviate the inherent confusion in sending notices to elderly and other persons who may not fully understand even a well-worded class notice.  Settling Counsel saw this themselves in connection with the original class certification order in this case, in which they contended that many of the over 22,000 persons who requested exclusion from this case did so mistakenly, despite a court-approved notice sent via first-class mail. *See* Plaintiffs' Motion for

 

Approval of Further Communication With Class 1 Consumers Who Filed Requests For Exclusion, at 2-3.

Settling Counsel further attempt to assuage the harsh effect of this proposed claims-made settlement by touting a "guaranteed" *cy pres* payment of up to ten million dollars, should claims not reach the $24 million AstraZeneca has agreed to pay. A tax-deductible contribution for cancer research may be a great public relations move for AstraZeneca, and it may even help some cancer patients, but it would not necessarily help the victims of AstraZeneca's alleged scheme to inflate drug prices.

### 4.    The Claims Administrator should simply calculate each class member's payment and issue a check.

AstraZeneca, which waited until the proverbial eve of trial to settle the claims against it, should not now reap the benefit of dragging out resolution of this case by enjoying a reversion of unclaimed funds. The fact is, even with a robust notice plan, and even with a ten million dollar cy pres payment, the claims made structure still rewards AstraZeneca for waging a war of attrition against class members.

To ensure that AstraZeneca pays the entire amount that it has agreed to pay, the Claims Administrator should calculate the proper benefit owed to each class member pursuant to Table 1 of the Hartman Analysis, using the same CMS data that Settling Counsel cite in support of their proposed notice plan. *See* Memo in Support at 6. Consistent with the applicable law, no deduction should be made for supplemental insurance benefits. Checks should be issued and sent to each class member, or his estate, at his or her last known address. Funds from returned or uncashed checks can be disposed of in any manner the Court sees fit, e.g. a second series of




checks sent to class members who cash their first checks, a cy pres distribution, or some combination of the two.

Distributing the settlement proceeds in this manner will accomplish several things. First, it is consistent with the law, including specifically the collateral source rule. Second, it will save millions of dollars in notice costs, dollars that can be put back into the overall settlement amount and used to enhance recoveries for individual consumer claimants. Third, it will pay all class members, rather than leave a significant portion of class members without any compensation whatsoever. Fourth, it will significantly alleviate the complexity and delay caused by the need to send notices, answer questions, set deadlines, rely on class members to submit information with their claims, request additional information, calculate claims, audit claims, and finally send checks. In a case where more class members are dying every day, this last aspect is especially beneficial.

**C.     The Settlement Was Tainted By Intertwining Settlement Negotiations With Fee Negotiations.**

Settlement negotiations should not be intermingled with fee negotiations. As Newberg states, "The simultaneous negotiation of a class settlement and attorney's fees seems wrong in principle and ought to be discouraged. 'However high-minded the parties may be, the appearances are frequently unfortunate.' To avoid unfortunate appearances, fee agreements should not be discussed until the parties have agreed on the terms of the settlement." Newberg & Conte, Newberg on Class Actions 4th, § 15.34 at 112 (quoting *City of Philadelphia v. Chas*. *Pfizer & Co., Inc.*, 345 F. Supp. 454, 471 (S.D.N.Y. 1972).

Settling counsel represent that attorneys fees were negotiated only after the settlement was obtained. *See* Memo in Support at 6. Unfortunately, this is not true. The fact is, fees were




negotiated concurrently with other settlement terms including the overall settlement amount, the structure of the settlement, and the calculation of individual recoveries.  The parties exchanged numerous fee proposals via Mr. Green, along with proposals regarding other aspects of the settlement.

As such, Settling Counsel's desire for fees permeated the discussions.  For example, the desire to protect fees was a factor in insisting on the "guaranteed" cy pres recovery, which set a minimum payment by AstraZeneca, instead of a purely claims made process.  Settling Counsel ultimately reached an agreement on fees when they reached agreement on the other terms of the proposed settlement.

Because Settling Counsel mixed fee negotiations with other terms, it would undermine confidence in the judicial process to grant preliminary approval to the resultant settlement. The combination of an unprecedented reversion (for a company who, the Court will recall, pled guilty to part of the scheme alleged herein) and intertwined fee and settlement negotiations creates, at a minimum, an appearance of impropriety.  This Court should not put its imprimatur of approval on the settlement process that allowed such impropriety, or the result.




## IV.  <u>CONCLUSION</u>

Settling Counsel hastily affixed the names of Mrs. Howe and her counsel to a settlement which they do not accept.  The proposed settlement is fundamentally flawed, not in overall amount, but in its class definition, structure, and plan of allocation.  The settlement is further flawed by a negotiation process that included simultaneous fee and settlement discussions.  Accordingly, Mrs. Howe and her counsel respectfully request that the Joint Motion for Preliminary Approval be denied.


Dated:   May 22, 2007                    <u>/s/ Donald E. Haviland, Esquire</u>
                                         Donald E. Haviland, Esquire
                                         The Haviland Law Firm
                                         740 South Third Street
                                         Third Floor
                                         Philadelphia, PA 19147
                                         Telephone: (215) 609-4661
                                         Facsimile: (215) 392-4400




## CERTIFICATE OF SERVICE

I, Donald E. Haviland, Jr., Esquire, hereby certify that on May 22, 2007, I electronically

filed the foregoing Memorandum of Named Class Representative, M. Joyce Howe, In

Opposition to the Joint Motion for Preliminary Approval of Proposed Nationwide Settlement

with AstraZeneca with the Clerk of this Court, using the CM/ECF system which will send

notification of such filing to all registered person(s) and that those person(s) not registered with

CM/ECF system were served by U.S. mail.


/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr.
The Haviland Law Firm
740 South Third Street
Third Floor
Philadelphia, PA 19147