# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re*: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>) |
| | ) MDL No. 1456 |
| | ) Civil Action No. 01-12257-PBS |
| | ) |
| **THIS DOCUMENT RELATES TO:** | ) Hon. Patti Saris |
| | ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.* CIVIL ACTION NO. 06-11337-PBS | ) Magistrate Judge Marianne Bowler<br>)<br>)<br>) |

# MEMORANDUM  BY THE UNITED STATES
## IN OPPOSITION TO ABBOTT'S MOTION TO COMPEL
### ADEQUATE RESPONSES TO ABBOTT'S DISCOVERY REQUESTS

At this point in the litigation, defendant Abbott Laboratories, Inc. (Abbott) has served the United States with 142 Requests for Production of Documents ("RFPs") and 18 Interrogatories. Abbott has now filed a motion to compel against the United States covering four categories of material or information.  The motion should be denied in its entirety.  First, with regard to Abbott's discovery requests relating to the identity of persons who worked on or received Government drug pricing reports, the Government has produced and continues to produce documents containing this information.  Second, with respect to Abbott's request for information relating to the Government's investigation of relator's allegations while this case was under seal, the Government has been and is continuing to produce information in this category.  However, certain information and documents are not being produced because they are irrelevant and protected from disclosure by doctrine and privilege.  Third, as for the false statements and false claims alleged in this case, Abbott's discovery is premature given that the Government is actively attempting to obtain this type of information in discovery from Abbott.  Nonetheless, the United

States is producing responsive information.  The fourth item covered by Abbott's motion to compel, relator's disclosure statement, has been withheld because it is both irrelevant and attorney work product.

I.    **Introduction**

This case is brought by the United States against Abbott under the civil False Claims Act ("FCA") and the common law, for Abbott's fraudulent scheme at the expense of Medicare and Medicaid, federal programs which provide for the health care needs of the poor, the elderly and the disabled.  As part of its scheme, from at least 1991 to 2001, Abbott reported inflated prices to pricing compendia for certain drugs knowing that Medicare and Medicaid relied upon the reported prices to set reimbursement rates for those drugs.  Abbott reported inflated prices and marketed the "spread" on these drugs to its customers to increase sales of the drugs, thereby boosting Abbott's profits.  This case relates to just four drugs or pharmaceutical products sold by Abbott.  They are dextrose solutions, sodium chloride solutions, sterile water and the drug Vancomycin.

Notwithstanding that claims by the United States are very narrow in terms of the Abbott products that are covered by the Complaint in this action, Abbott has served exceedingly broad discovery on the Government.  Abbott is not entitled to much of the discovery it seeks for two principle reasons.  First, the discovery Abbott seeks calls for information that is far broader than the specific conduct alleged in the Complaint.  Second, the information will not support any legitimate defense Abbott may attempt to assert.  For example, with respect to Abbott's broad requests for all material and information regarding the Government's attempts to analyze pricing issues that affected Medicare and Medicaid expenditures for pharmaceutical products, none of

that material is relevant in this case.

In certain, very particular circumstances, evidence of what Government officials knew about a defendant's conduct may be relevant to the question of whether the defendant possessed the requisite scienter under the FCA.  Under the FCA, to negate scienter, Abbott must show (1) that the Government was fully informed by Abbott concerning its creation and use of AWP spreads for its own marketing purposes and (2) that the Government approved of the conduct at issue.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 WL 861178, at *7 (D. Mass. March 22, 2007) (denying motion to dismiss California False Claims Act claim, noting that government approval of the particulars is necessary to negate scienter).  Mere acquiescence is not enough to constitute approval negating FCA scienter.  *See United States ex rel. Tyson v. Amerigroup*, 2007 WL 781729, at *20  (N.D. Ill. March 13, 2007).  The United States has served discovery requests for evidence of such disclosures and approval.  Abbott has failed to  produce any such evidence.  Moreover, any document or information that Abbott were to acquire now through discovery would have no bearing on defendant's scienter during 1991-2001.  Hence, much of the discovery propounded by Abbott does not pertain to admissible evidence and is not reasonably calculated to lead to admissible evidence.

In spite of the lack of relevance and the considerable burden associated with Abbott's discovery, the Government has refrained from standing on relevance and burdensomeness objections and, rather, has been diligently working to produce documents and information responsive to Abbott's 142 RFPs and 18 Interrogatories.  To date, the Government has produced in excess of 55,000 pages of material in response to discovery requests in this case.  Separate and apart from that production, the Government had already produced in excess of 114,000 pages and

3,800 electronic files in response to defense subpoenas in the MDL prior to the Government's intervention in the above-captioned case (which material was then produced to Abbott again as part of the Government's initial disclosures in this case).  The Government is continuing to search for, and to produce, material and information as this brief is being filed.

II.     **Abbott's Motion to Compel**

Each of the four categories or items covered by Abbott's Motion to Compel will be addressed separately below.

A.     **Preparers and Recipients of Government Drug Pricing Studies**

Over the years, the Office of the Inspector General for the Department of Health and Human Services (OIG-HHS) has conducted audits and inspections relating to Medicare and Medicaid's reimbursement for prescription drugs.  Reports relating to the audits and inspections have always been publicly available and for many years have been readily accessible via the internet on the OIG-HHS web site.  Abbott's Interrogatory number Three inquired about the identity of Government personnel who either worked on, or received, the reports.  According to Abbott, the Government has "refused to identify the individuals who were involved in, or received copies of, relevant drug pricing studies."  *See* Memorandum in Support of Abbott's Motion to Compel ("Abbott Mem.") at 3.  This statement is demonstrably false.

Indeed, Abbott's motion to compel this category of information is inexplicable in light of the information which the Government has been producing in response to Interrogatory number Three and related RFPs.  The identity of the persons who worked on or were consulted regarding the OIG-HHS inspections can be found in the reports, the inspection work papers, a list of OIG-HHS personnel compiled for Abbott, or by inquiring of the OIG-HHS personnel whom Abbott

has noticed for deposition.

1.    <u>Background - The Production by the United States</u>

In its first Request for Production of Documents and Tangible Things (RFPs), Abbott requested production of all reports relating to pharmaceutical pricing and all documents which relate to those reports, including 76 reports particularly identified by Abbott.  Abbott subsequently pared down the list and requested priority handling for approximately 30 OIG-HHS reports and associated documents. As of the date of this brief, the Government has produced well in excess of 30,000 pages of material consisting of the OIG-HHS reports and associated inspection work papers (this page count does not include other CMS and OIG material the Government has been producing in addition to the reports and work papers).  The work papers for the inspections, and indeed the ensuing reports themselves, contain information regarding the staff who worked on the inspections as well as the names of persons outside of OIG-HHS to whom the reports were disseminated.  As will be demonstrated below, Abbott has the information which it claims the Government has refused to produce.

The OIG-HHS reports requested by Abbott come from two separate offices at OIG – the Office of Evaluations and Inspections (OEI) and the Office of Audit Services (OAS).  With respect to the reports by OEI, that office uses a format in which, in almost all cases, it lists the OEI staff who worked on the inspections.[1]  For example, in 1997 OEI's Regional Office in

---

[1]  There are several OEI reports which do not list the inspection staff.  However, testimony from OEI witnesses indicates that the group of employees who have worked on drug pricing inspections is fairly discrete and constant.  Therefore, it seems almost certain that the same core group of individuals worked on the few inspections for which the associated report does not list participating staff.  Additionally, the work papers relating to the inspections which have been produced include memoranda and other documents from which the identity of the OEI staff who were involved can

Philadelphia prepared a report entitled "Excessive Medicare Payment for Prescription Drugs" which sets out the following information in its opening pages:

> OEI's Philadelphia Regional Office prepared this report under the direction of Robert A. Vito, Regional Inspector General, Principal OEI staff included:

| REGION | HEADQUARTERS |
|---|---|
| Linda Ragone, *Project Leader* | Lisa Foley |
| David Tawes | |
| Nancy J. Molyneaux | |
| Lauren McNulty | |
| Amy Sernyak | |
| Cynthia R. Hansford | |
| Brijen Shaw | |

*See* Exhibit 1.  Most OEI's reports follow this format.  *See* Exhibit 2 (collecting examples).  With this information in hand, at an early stage Abbott served deposition notices for the OEI staff who worked on those reports which are of interest to Abbott.  For example, with respect to the above-noted inspection, Abbott has deposed, or noticed the deposition of, most of the OEI staff who were listed in the associated report, including: Robert Vito, Linda Ragone, David Tawes, Nancy Molyneaux, Amy Sernyak, and Cynthia Hansford.

Reports by OAS, on the other hand, generally do not list the staff who were involved in the audits covered by the reports.  Therefore, the Government compiled this information through interviews with OAS staff and provided it to Abbott in early April.  *See* Letter from A. Martinez to C. Cook dated Apr. 9, 2007 (Exhibit 3).  Abbott's motion to compel on this point is spurious given the information with which they have been provided.

As for Abbott's interest in learning the identity of CMS personnel who were involved in those reports, that information can be found in the inspection work papers which the Government

---

be determined.

has been producing.  In the course of preparing an inspection report, OEI holds both entrance and

exit conferences with personnel from the relevant component within DHHS.  Additionally,  prior

to public release of an inspection or evaluation report, a draft is sent to the relevant component

(which, in the case of drug pricing reports, is CMS) for comment.  Any roster which lists the

persons who attended the entrance or exit conferences that exists will generally be found in the

work papers.[2]  Examples of such participant lists are appended at Exhibit 4.  That Abbott knows

it already has the material it wants in hand is clear from the fact that Abbott has questioned OEI

staff at deposition about the participant lists in the work paper files.

All that being said, at this point the Government's search for additional material which

contains information about the dissemination of the OIG-HHS reports remains on-going.  In the

event any additional such material is located, it will be produced to defendants.

> 2.    Abbott's Motion to Compel the Identification of Persons
>        <u>Who Prepared or Received the Reports Should be Denied</u>

In support of its motion to compel, defendant states: "Abbot is entitled to know exactly

which Government employees prepared the [pricing] studies and which HCFA/CMS employees

were made aware of them."  Abbott Mem. at 3.  Abbott already has this information.  The names

of the staff who worked on the OEI reports are listed at the beginning of the reports.  *See*

Exhibits 1 and 2.  The names of principle OAS staff along with a catalogue of the reports on

---

[2]    Although the Government is withholding documents which reflect the deliberations by
Government personnel pursuant to the Deliberative Process privilege including minutes of the exit
conferences, documents setting out the identities of the participants are being produced.  Moreover,
with respect to the documents withheld based on privilege, the Government privilege log sets out
the identities of both the authors and recipients of the documents in question – which is the focus
of the motion to compel in any event.

which each employee worked was compiled and given to Abbott's counsel in early April. *See*

Exhibit 3.  The inspection work papers, which reference persons outside of OIG-HHS who were

consulted about an inspection either have been, or are being, produced in this case.  The

participant lists in those files set out the identity of the program personnel who were involved in

the studies. *See* Exhibit 4.  Given that Abbott has questioned OIG-HHS witnesses during multi-

day depositions on this very topic and interrogated them about pages from the inspection work

papers, including participant lists for exit conferences as well as emails and correspondence with

CMS personnel, Abbott's motion to compel on this point was completely unnecessary.

To the extent that Abbott is suggesting that the United States has located additional

documents which contain the information which Abbott seeks and has elected to withhold them,

that is simply not the case.  With regard to the particular information on which Abbott has moved

to compel, Abbott has in hand the OIG-HHS work paper files which appear to be the best and

most direct source for the information that Abbott wants.  Additionally, Abbott has access to the

reports themselves and the list of OAS personnel sent to Abbott in April.  Abbott can also inquire

of the OIG-HHS personnel who have been noticed for deposition.

As is clear from the examples of documents appended to this brief, the United States has

not refused to produce this category of information and Abbott's motion should be denied.

## B.      Materials Relating to the Government's Investigation

Abbott has moved to compel the Government to produce documents received or

generated by the Department of Justice ("DOJ") during its investigation in addition to various

other categories of material or information.  *See* Abbott Mem. at 8-9.  For the purposes of this

opposition brief, the items covered by Abbott's motion to compel the production of investigative

material and information can essentially be further grouped into three more discrete categories of material. Those categories are: (1) documents obtained by DOJ and its investigators from third parties during its investigation; (2) witness statements, testimony, and affidavits in DOJ's possession; (3) material and information reflecting DOJ's work product, including a list of individuals interviewed by DOJ and its investigators, investigative subpoenas, and a list of government personnel who "received or were made aware of Ven-A-Care's complaint and disclosure statement prior to May 16, 2006." *Id.* The Government has been producing material in the categories one and two. The only real dispute between the parties relates to the attornrney work product and privileged information covered by category three.

    1.    Background - The Government's Production of Documents and Information

Abbott asserts that the Government has "provided no substantive response whatsoever" to its requests for information relating to the Government investigation. Abbott's assertion is incorrect. Although the fifteen exhibits appended to Abbott's motion contain six letters from Abbott's attorneys to DOJ and a document that purports to be a summary of the parties' respective positions on discovery issues, Abbott completely omitted all of the Government's responses to Abbott's correspondence. Contrary to Abbott's assertions, the United States has advised defense counsel concerning precisely what types of documents and information the Government is willing to produce and the particular information that it will not produce. *See* Letters from J. Draycott to D. Torborg dated Jan. 5, 2007 and Mar. 7, 2007 (Exhibits 5 (a) and (b). A description of the current status of each of the three categories noted above follows.

a.     Documents Obtained from Third Parties

From the outset of discovery the Government informed Abbott that it would produce

material from third parties it had obtained during its investigation responsive to Abbott's

discovery requests regardless of how the information was obtained. This, of course, is subject to

whatever procedures are necessary to protect the dissemination of a third party's confidential

proprietary information (in the same manner that Abbott would want its material protected). *See*

*e.g.* Letter from J. Draycott to D. Torborg dated Mar. 7, 2007 (Exhibit 5 (b)) and Letter from M.

Lavine to C. Cook dated Oct. 17, 2006 (Exhibit 5 (c)).  Consistent with this position, the

Government has been producing third party documents on a rolling basis including, for example,

material from pharmaceutical wholesalers and a company which publishes a compendium of

AWPs.  *See* Transmittal letters from M. Lavine to C. Cook dated Dec. 14, 2006, Jan. 31, 2007,

Jan. 31, 2007, Feb. 21, 2007, Feb. 22, 2007, and Feb. 27, 2007 (collected at Exhibit 6).

Moreover, as recently as early May, Government counsel wrote to defense counsel

concerning documents in the Government's possession which had been obtained from other third

parties.  *See* Letter from J. Draycott to D. Torborg dated May 4, 2007 (Exhibit 5 (d)).  As

explained in that letter, the documents include compilations by pharmacies of prices from various

drug companies including, but not limited to, defendants Abbott, Dey and Roxane.  The

Government requested defendants' respective positions on whether the material sought by Abbott

was confidential and proprietary such that any of the defendants would object to the release of its

own pricing information.  *See* Exhibit 5 (d).  As of the filing of this brief, the Government has

received no response from any of the defendants.  Without any basis, Abbott complains that the

Government is refusing to produce evidence.  This allegation is false, as is clear from just the

10

partial record attached to this brief.

From the outset, the Government has clearly stated what type of material would be produced and what type would be withheld and has consistently maintained that position in subsequent discussions with Abbott's counsel. *See* Exhibits 5 (a)-(c). The Government advised that it would produce documents in its possession that are responsive to defendants' discovery requests regardless of how the Government obtained the documents – subject to resolving proprietary issues that may impact on other parties. The Government has produced, and is continuing to produce, documents in this category. The production process has been somewhat time-consuming because of the need to redact potentially proprietary information relating to other drug manufacturers from the documents that are being produced

b.     Witness Statements; Affidavits; Testimony

Abbott has been provided with all witness statements and testimony that the Government has which relate to the instant AWP spread litigation. The bulk of the statements were obtained as "Examinations Under Oath" (or "EUOs") that were taken by the Office of the Texas Attorney General (A.G.) pursuant to the State of Texas' own false claims act. This material has been produced by the Texas Attorney General's Office in the course of the ongoing AWP litigation in Texas state court. The subject of witness statements was discussed in a teleconference between Abbott's counsel and DOJ counsel on or about March 2nd. At that time, Government counsel stated his understanding that Abbott had already obtained the extant witnesses statements from the Texas Attorney General's office. Since that teleconference, that belief has been confirmed. In addition to the EUOs, there are six other witness statements of which DOJ is aware. Each of those statements has also been provided to Abbott in the Texas litigation. At this point, the

11

Government is not aware of any statements, affidavits, or testimony that Abbott has not already been provided or as to which it does not have access.

c.   Investigative Subpoenas; Identity of Interviewees;
Identity of Personnel With Whom DOJ Conferred

The material in the third category of investigative material sought by Abbott is protected by the attorney work product doctrine and the law enforcement investigative files privilege and, for these reasons, the United States advised Abbott that it would not produce the material. Moreover, the material and information sought by Abbott is irrelevant to the claims in and defenses to the complaint of the United States.  In discussions with DOJ about the relevance of the subpoenas (as distinct from the documents that were produced in response thereto), Abbott has admitted that it wants copies of Government subpoenas served on third parties because those documents would reveal what categories of information *the Government's attorneys and investigators believed may be pertinent* to the allegations in the *qui tam* action.  *See* Exhibit 5 (b). Under this reasoning, Abbott's discovery requests are plainly inappropriate.  Abbott's request for a list of Government personnel who were shown copies of relator's complaint while this matter was under seal similarly pertains to information that is both irrelevant and privileged.

Moreover, the arguments stated by Abbott with regard to the Government's assertion of privilege for DOJ investigative material conflict with Abbott's position on whether the corresponding type of information in the case files of Abbott's lawyers is privileged.  The existence of the Government's AWP investigation has been known to Abbott since 1996 when it received its first subpoena relating to this matter.  There can be no doubt that Abbott and its counsel, for their own part, have been investigating and analyzing the issues in this case since

12

then.  Abbott's position is that it will be unwilling to produce a list of the people Abbott's attorneys or investigators interviewed after learning of the Government investigation in 1996 and will not disclose the contents of communications by its counsel seeking information from third parties about issues in this case which occurred during the same period as the Government's investigation.  Abbott asserts that such material is privileged.

2.      The Motion to Compel Production of Investigative Material
        Should be Denied

According to Abbott, "[i]t is unfair for the Government to have collected [] evidence for more than a decade, yet now refuse to share it with Abbott when discovery at last moves forward."  Abbott Mem. at 8.  The statement in Abbott's brief is not correct.  The Government has clearly stated its willingness to produce the material in categories one and two since the outset of discovery and has been producing it on a rolling basis for a number of months.  *See* Exhibits 6 and 5 (d).  Abbott's motion to compel the production of material obtained from third parties should be denied because it is founded on the false premise that the Government either has failed to produce, or refused to produce, these documents.  As explained above, the same is true with respect to Abbott's requests for witness statements and testimony.

Abbott's motion to compel, in so far as it relates to the third category, which includes investigative subpoenas, a list of persons who were interviewed, and the identities of agency personnel with whom DOJ conferred, should be denied.  This material is protected from disclosure by the attorney work product doctrine and the law enforcement investigative files privilege and, in any event, is irrelevant to any claims or defenses in this case.

13

a.    Work Product Doctrine Shields Information that
Will Reveal Attorney Thought Process and Opinion

The investigative material and information now sought by Abbott is protected from disclosure by the attorney work product doctrine.  Information concerning the names of persons who, in the judgment of DOJ counsel, should be interviewed, as well as the identities of agency officials with whom DOJ counsel consulted regarding intervention in this case is protected attorney work product.  *See In re Grand Jury Subpoena Dated November 8, 1979,* 622 F.2d 933, 935 (6th Cir. 1980) ("[w]ork product consists of tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions"); *United States v. One Tract of Real Property*, 95 F.3d 422, 427 (6th Cir. 1996) (applying work product doctrine to work of Government attorney).  Disclosure of the material now sought by Abbott would reveal the thought processes of  DOJ counsel.  For example, the specifications in the subpoenas will lay out what categories of material DOJ considered relevant.  Indeed, Abbott has stated that it wants the material in question precisely for this reason.

Significantly for this case, the fact that subpoenas were served on third parties does not vitiate the protection afforded to this material by the work product doctrine.  In this respect the doctrine is unlike the attorney-client privilege.  *See Goff v. Harrah's Operating Co., Inc.,* 240 F.R.D. 659, 661 (D. Nev. 2007) ("work product rule is not based on confidentiality of the attorney-client relationship and does not disappear when the balloon wall of confidentiality is breached"); *Chase v. City of Portsmouth*, 236 F.R.D. 263, 269 (E.D. Va. 2006) ("[u]nlike the attorney-client privilege, disclosure of work product does not automatically waive the doctrine's

14

protections;" rather, to "waive work product protection, the party must produce complete documents or attempt to make testimonial use of the work product"); *U.S. ex rel Fago v. M & T Mort. Corp.*, 235 F.R.D. 11, 17 (D.D.C. 2006) (for attorney work product, "subject matter waiver is only applied only when ordering additional disclosure would be consistent with the purpose of the work product doctrine, which is the promotion of the adversary system by safeguarding the fruits of an attorney's trial preparations from the opponent"); *B.H. ex rel. Holder v. Gold Fields Mining Corp.*, 239 F.R.D. 652, 655 (N.D. Okla. 2005) (waiver of work product protection can occur "where fairness mandates," such as where a party invoking the doctrine "injects the substance of work-product into litigation or other adversary proceedings"); *Ramon Peralta v. Cendant Corp.* 190 F.R.D. 38, 41 (D.Conn. 1991) (holding that no inquiry would be allowed concerning pre-deposition communications between attorney and non-party witness where answers might reveal counsel's legal theories and opinions even though the witness was not a client of the attorney); *Morals v. United States,* 1997 WL 223080 (S.D.N.Y.) (holding that conversations between defendant's counsel and non-party witness were protected by work product doctrine*),reconsideration denied,* 1997 WL 375738 (S.D.N.Y. 1997).  Notably, defendant cites no case law in support of the argument that work product protection should not apply to the investigative material prepared by DOJ attorneys.

Abbott cannot make a sufficient showing to overcome work product protection in light of the other on-going discovery.  A party seeking production of work product material such as interview memoranda and notes, must demonstrate "extraordinary circumstances" in order to warrant production.  *In re Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d at 936. "Rare and exceptional circumstances" is "a far stronger showing [than] 'substantial need and

'without undue hardship' standard." *In re Sealed Case*, 676 F.2d 793, 809-10 (D.C. Cir. 1982) (interpreting "extraordinary justification" standard for release of attorney interview notes).  As noted above, Abbott is being provided with the material obtained from third parties during the Government's investigation.  In this situation, Abbott cannot establish sufficient need for the investigative subpoenas which reflect the thought processes of the Government's attorneys.

Abbott complains that the United States has not described material relating to its investigation on a privilege log and argues the Government has waived the protection afforded to attorney work product.  *See* Abbott Mem. at 10-11.  (Abbott also argues waiver in connection with the issue of whether the material is protected by the law enforcement investigative files privilege – which is an issue that will be addressed in a later section of this brief.)  Inexplicably, Abbott fails to inform the Court that at the outset of discovery Abbott and the United States reached a particular agreement that neither side would be required to create and maintain privilege log entries for material in the respective attorney's files.

Consistent with that agreement, from the review of the privilege log served by Abbott last month, it appears that Abbott has refrained from logging its attorneys' witness interview memoranda, case notes, written correspondence with counsel, emails with counsel, emails or correspondence between Abbott's counsel and the attorneys for other defendants in the MDL, or any of the other material that would unquestionably be found in counsel's case files.  *See* Abbott Privilege Log (Exhibit 7).  In fact, the log contains a mere 33 entries and there is not an entry among those 33 which mentions a single attorney at Jones Day or, in fact, *any law firm whatsoever*.  The lack of entries for this type of material is not surprising given the agreement reached in December by all parties.  One of Abbott's counsel, early on, stated to his DOJ

16

counterparts that the common practice is that litigators are not required to create logs covering their own files.  Abbott's waiver argument based on the lack of a privilege log is inapposite in any event.  *See, e.g., American Society For Prevention of Cruelty To Animals v. Ringling Brothers and Barnum & Bailey Circus,* 233 F.R.D. 209, 212-13 (D.D.C. 2006) (finding no waiver of work product protection for documents gathered by party's counsel even though documents were not listed on privilege log, where party had pending objection to production as non-responsive).

Notwithstanding the extensive arguments in Abbott's brief asserting that the sought-after material should not be deemed protected by doctrine or privilege, the most significant statement Abbott has made concerning whether this type of material should be discoverable occurred during a teleconference with opposing counsel.  In early March, Abbott asked to meet and confer regarding the discovery directed at DOJ's investigative material.  During the ensuing teleconference, Abbott's counsel inquired regarding the material now sought by Abbott's instant motion to compel.  Significantly, when defense counsel was asked if Abbott would produce the same type of material that it was requesting of DOJ, he declined and asserted that the information in question was privileged.  (The question was repeated in a subsequent letter, s*ee* Exhibit 5(b), however, Abbott's counsel never answered the letter.)  It is inexplicable that material, when held by Abbott's attorneys, is deemed by Abbott to be work product, but when held by DOJ, is unilaterally deemed by Abbott to be discoverable.

Abbott has known about the DOJ investigation since 1996.  Accordingly, Abbott's attorneys have been investigating and analyzing the issues and conduct in this case for virtually as long as DOJ and the case files of Abbott's attorneys doubtless contain information that has

been collected over the course of the investigation.  Additionally, Abbott has been actively litigating an AWP case in the MDL since before the United States intervened in the Ven-A-Care *qui tam* action.  When considering the arguments in Abbott's motion to compel, the Government respectfully suggests the Court determine whether Abbott will produce the same type of information it now seeks, or its functional equivalent.  For example, Abbott demands a list of persons interviewed by DOJ during its investigation.  Will Abbott produce a list of all persons, both inside and outside of the company, interviewed by its lawyers after Abbott learned that it was the subject of a Government investigation and later after it became a defendant in the MDL? So far, Abbott has stated that it will not agree that it is subject to reciprocal discovery from the Government with respect to the steps its counsel undertook to analyze and investigate the conduct covered by the subpoenas it has received since 1996.  Accordingly, Abbott's position here is not only that it is entitled to information in the files of DOJ, but also that the production obligation it seeks to enforce is entirely unilateral.  The Court should be especially skeptical of any argument by defendant that discovery with respect to any category of material be wholly one-sided.

b.   <u>The Material Sought by Abbott is Not Relevant</u>

The material sought by Abbott is not discoverable because, in addition to being protected attorney work product, it is irrelevant to any claim or defense in this case.  It bears re-emphasizing that the dispute here is not about the documents or other evidence that the Government has collected - and which it has agreed to produce.  Furthermore, it does not involve material or information originating with HCFA/CMS regarding reimbursement for drugs and pharmaceutical products – that type of material is also being produced.  Rather, the focus of

Abbott's motion is on DOJ's investigative efforts.  The specifications in an investigative

subpoena are not evidence in this case.  Nor is the identity of agency personnel with whom DOJ

attorneys conferred prior to intervention relevant.  Indeed, in conferrals with opposing counsel

prior to the motion being filed, one of Abbott's attorneys expressly stated that he wanted to

obtain this material because it would reveal what DOJ attorneys saw as potentially pertinent in

this case.  What DOJ attorneys think about a case is not evidence in that case.  With respect to

the identity of the officials with whom DOJ conferred pre-intervention, there is plainly no

legitimate purpose behind that request.

c. Abbott is Seeking Material Protected by the Law<br>Enforcement Investigatory Files Privilege

Relevant jurisprudence confirms and recognizes the Government's need to preserve the

confidentiality of  law enforcement techniques and investigatory strategies.  *See, e.g., Black v.*

*Sheraton Corp. of America,* 564 F.2d 531, 541 (D.C. Cir. 1977) *cited in Association for*

*Reduction of Violence v. Hall*, 734 F.2d 63, 66 (1st Cit. 1984).  The D.C. Circuit explained that

the contours of this privilege are shaped by "drawing broadly on various executive privilege

decisions and precedents, without exact refinement, for discerning a sound approach that will

adjust the needs of both the judicial process and the executive branch." *Black,* 564 F.2d at 542.

The purpose of the law enforcement privilege is not merely to protect material which contains

confidential information or which reflects the deliberative process, it is to prevent harm to future

law enforcement efforts that would result from public disclosure of the Government's methods.

*Id*. at 541.  The D.C. Circuit specifically endorsed "the proposition that there is indeed a public

interest in minimizing disclosure of documents that would tend *to reveal law enforcement*

19

*investigative techniques* or sources**.**" *Id.* at 545 (emphasis added).  Significantly, and contrary to Abbott's argument, the court also *rejected* the "contention that the public interest in non-disclosure *can be disregarded simply because the principal investigation . . . has been concluded*." *Id.* at 546 (emphasis supplied).

Other jurisdictions also recognize the sensitive nature of information in the Government's investigative files.  *See, e.g., United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 902 F. Supp. 189, 192 (E.D. Mo. 1995) (denying a motion to unseal Government's applications for extensions of seal where "the sealed materials before this Court do provide some substantive details regarding the Government's methods of investigation" and that "[t]here would be some harm associated with the disclosure of such details"); *United States ex rel. Stephens v. Prabhu*, 1994 WL 761236, at *1 (D. Nev. 1994) (denying a motion to unseal and noting that "as the Government correctly summarizes, the documents filed under seal 'concern the diligence of the Government's investigation, its investigative strategy, and its need for additional time to investigate'").

The arguments in Abbott's brief in support of its motion to compel information relating to the Government's investigation are largely inapposite.  Abbott focuses most of its argument on the lack of a privilege log by the Government.  The lack of a log is explained first by the fact that the parties agreed that one would not be required for the attorney's files.  Second, as explained above, the Government is producing material obtained from third parties while this matter was under investigation.  Hence there was no need to prepare a log for that which is being produced. As for the subpoenas that have been withheld from production, those are plainly the central investigative tools that can used by Government investigators and, as such, should not be subject

20

to discovery by the very parties who have been investigated.

### C.   **The United States Has Identified False Claims and Statements**

In its motion to compel, Abbott asserts that the United States should identify (1) all false

claims for which Abbott is responsible and (2) all false statements related to those claims, and (3)

the prices which should have been reported by Abbott for its drugs.  *See* Abbott Mem. at 4-8.

### 1.   Background - the United States' Production of Material and Information

#### a.   False Claims

Abbott contends that the United States has "refused to identify a single specific false

claim by Abbott."  Abbott Mem. at 4.  Abbott further contends that "after eleven years, it seems,

Plaintiffs have not had enough time to unearth one false claim submitted by Abbott." *Id*. at 5.

Abbott then argues "Plaintiffs must disclose every false claim they contend Abbott made." *Id*.

Abbott's argument is spurious.  The United States has informed Abbott on multiple

occasions that the false claims at issue are all the claims for Abbott drugs reimbursed by

Medicaid and Medicare for the NDCs and J-Codes identified in the complaint.  *See, e.g.,* United

States' Opposition to Abbott's Motion to Dismiss at 6-10 (Dkt 3110); Letter from J. Draycott to

D. Torborg of Apr. 13, 2007  (Exhibit 5 (e)).  Furthermore, the Government has agreed from the

outset of this case to produce Medicare and Medicaid claims data for the drugs covered by the

complaint and that will include data for claims submitted by Abbott and false claims that were

caused to be submitted by Abbott.

#### b.   False Statements

Abbott also demands, mid-way through discovery, that the United States identify all false

statements Abbott has made regarding the fraudulent conduct at issue in this case.  Abbott argues that the Government should be in possession of all such statements as a result of a protracted investigation.  *See* Abbott Mem. at 5.  Yet it is precisely with respect to the production of this type of information that the Government has encountered the greatest resistence from Abbott to the United States' discovery against defendant, and in fact, even to the pre-intervention investigative efforts by the Government.

The United States alleges that Abbott's fraudulent conduct cost the Medicare and Medicaid programs enormous sums of money.  As Congressman Pete Stark stated in a letter to Abbott's CEO, Miles White, "I urge Abbott to immediately cease reporting inflated and misleading price data.  Such action places the nation's health care at great risk and overcharges taxpayers."  *See* United States Opposition to Abbott's Motion for a Protective Order Barring the Deposition of Miles White (docket # 4252), Ex. 6 at 7.  Congressman Stark was especially concerned with the possibility that Abbott's aggressive marketing of the spread on Vancomycin, an antibiotic of last resort, was creating a public health crisis (*i.e.*, people dying from bacterial infections) due to over-prescription and the growth in the number of Vancomycin resistant bacteria in the mid-1990s.  *Id.* at 2.

The United States produced in its initial disclosures and subsequent document productions all the documents it had relevant to the case.  Abbott in effect asks the United States to identify every specific statement in the documents produced by or to the United States which it believes relates to the fraudulent scheme.  The United States has appropriately objected to that request as premature, overly broad, burdensome and asking for attorney work product.  *See* United States' Responses to Abbott First Set of Interrogatories at 10-12 (Exhibit 5 to Abbott's

Mem.).

As stated in the United States' Responses to Abbott First Set of Interrogatories the false prices Abbott reported to the pricing compendia both (1) inflated the reimbursement amounts for the NDCs and J-Codes at issue rendering the claims false and (2) constitute false statements that caused false or fraudulent claims paid or approved by the United States. *Id*. at 12-13. Abbott has the information concerning its own prices – both the inflated prices it reported to the compendia and the real prices it charged its customers.[3]

Furthermore, the United States' efforts to uncover Abbott's fraudulent conduct have been hampered by Abbott's persistent withholding of evidence of its misconduct both during the United States' investigation and during this litigation. Abbott's strategy in this litigation appears to consist of demanding that the Government identify "all false statements" Abbott made, while at the same time vigorously fighting the United States' efforts to get at discovery materials that would reveal "all" such information.

Until Abbott produces the documents and material that are the subject of the United States' discovery requests (and which should have been produced in response to investigative subpoenas), the United States cannot fully "identify all instances" where Abbott made false statements. Given that initial discovery in this case has revealed that Abbott has been

_____

[3] Abbott claims that the pricing compendia were responsible for determining the amounts reported as AWPs and that Abbott had no control over how the prices it submitted affected the published AWPs. However, Abbott was recently forced to produce under threat of compulsion documents related to its Medicare Working Group in Texas state litigation. Meeting minutes in those documents from a January 21, 1997 meeting reflect that Abbott explicitly understood that AWP is generally based upon the *manufacturer's* price plus a mark-up of 15-20%. The minutes further noted that AWP was used by Medicare, Medicaid and private insurance carriers to determine reimbursement levels. The Medicare Working Group documents that were withheld by Abbott have cast doubt on the veracity of statements made during this litigation by Abbott and its witnesses.

withholding relevant evidence for years, it appears that Abbott itself actually possesses much of the material responsive to the points in Abbott's motion to compel.  Indeed, the more appropriate motion to compel all information related to false statements made by Abbott should be directed at Abbott, not the United States – which is why the United States has twice had to move to compel the production of documents from Abbott.

c.   <u>False Prices</u>

Abbott's reported prices were fraudulent because they were many magnitudes higher than the actual prices Abbott charged its customers.  Abbott never disclosed to any governmental agency that the reported prices for the drugs identified in the United States' complaint were not reflective of the actual prices it charged its customers, or that it was using the resulting "spread" to market its products.[4]

To determine the full extent to which Abbott's reported prices were fraudulent, the United States requires complete pricing data from Abbott.  Abbott still has failed to produce complete transaction data for the drugs covered by the complaint.  After two months of Government requests for this data, Abbott produced six CDROMs that were supposed to provide data that was missing from a previous data set. Three of these CDs were blank.  Additionally,

---

[4] The United States is aware of at least one instance where a state directly asked for accurate pricing from Abbott.  On May 11, 2000, the State of Texas requested that Abbott submit current and accurate pricing information to set Medicaid reimbursement levels for Abbott drugs. On July 17, 2000, Abbott sent a response which included inflated prices for the drugs reimbursed by the Texas Medicaid program. That was a false statement which Abbott intended the State of Texas to use when reimbursing claims by providers for Abbott drugs. That letter was signed by Abbott attorney Stacy Chronis, although Ms. Chronis claimed in a recent deposition that the letter was prepared by outside counsel. Discovery in this case will assist in identifying other occasions when Abbott made similar false statements to other state Medicaid programs.

24

information on the three CDs which actually had data – and which were produced, purportedly, to fill gaps where information was missing from previous data sets – was inconsistent with the data in those previously-produced data sets.  In light of the problems and inconsistencies with Abbott's production, the United States is not yet prepared to express an opinion about what prices Abbott should have reported. Simply put, Abbott must first produce complete and accurate transaction data.

2.      The Motion to Compel Further Responses Regarding False
Claims, Statements and Prices Should be Denied

Abbott contends that the United States has refused to produce claims data.  That is incorrect.  The claims data – *i.e.*, data identifying amounts paid by the Government for the NDCs or J-Codes at issue – is being produced in discovery.[5]  *See* Letter from J. Draycott to D. Torborg dated April 13, 2007 at 8-9 (Exhibit Twelve).  Thus, Abbott's motion to compel further information regarding the identification of false claims is both premature and, ultimately, without merit.[6]

With respect to Abbott's false statements, the United States has clearly explained that the false prices Abbott reported to the pricing compendia both (1) inflated the reimbursement

---

[5]  Abbott also notes that it believes Medicare J-Code reimbursement levels for Vancomycin varied from carrier to carrier. Whether one carrier included or failed to include certain prices in an array when selecting the median price does not go to liability and has no bearing on the fraudulent conduct at issue in this case. At most, variances in carrier reimbursement for a drug is a potential damages issue.  It does not excuse Abbott's fraudulent scheme.

[6]  Abbott contends that a relator must know the exact content of the tens of thousands of claims at issue here prior to filing its suit.  *See* Abbott Mem. at 6-7. It is not clear how that argument is relevant to a motion to compel directed at the United States.  There is nothing in the case law that stands for the proposition that prior to filing suit, the United States must identify every detail of tens of thousands of claims that arose from a complex and long-running fraud.

25

amounts for the NDCs and J-Codes at issue rendering the claims false and (2) constitute false statements that caused false or fraudulent claims paid or approved by the United States. *See* United States' Responses to Abbott First Set of Interrogatories at 10-12 (Abbott Mem. Ex. 5). There is no question that Abbott also has the information concerning the prices – both the inflated prices it reported to the compendia and the real prices it charged its customers. How those statements are false calls for a legal conclusion from the United States; that is not a proper area of fact discovery.

Furthermore, the United States' efforts to uncover Abbott's fraudulent conduct have been hampered by Abbott's withholding of evidence of its misconduct both during the United States' investigation and during this litigation. Until Abbott produces the documents and material that are the subject of the United States' discovery requests, the United States will not be in a position to "identify all instances" where Abbott made false statements. Given that Abbott has been withholding relevant evidence, it appears that Abbott itself actually possesses material responsive to the points in Abbott's motion to compel. Indeed, an order compelling production of all information related to false statements by Abbott would be more appropriately directed at Abbott, rather than the United States.

Finally, Abbott claims that the United States cannot "identify a single false price reported by Abbott." *See* Abbott Mem. at 5. However, the Complaint does exactly that. Abbott reported a price of $64 for a unit of 1 GM Fliptop Vancomycin in 1999 was false because Abbott was actually selling the drug to its customer at fraction of that price – approximately $4 a unit. *See* Complaint at ¶¶ 80-81. The $60 differential between the reported price and the actual selling price for that dose of Vancomycin indicates that the reported price was false. As noted above,

26

Abbott still has failed to produce complete transaction data for the drugs at issue.  Full

production of that information is a necessary prerequisite to the United States making an

informed assessment of the extent to which Abbott's reported prices departed from the range of

prices at which it was actually selling its drugs.

      **D.**      **Relator's disclosure Statement**

                1.      Background - Abbott's Request for Attorney Work Product

Abbott's RFP number 56 requests production of the disclosure statement in this case.

The Government has refused to produce it.  In this case, as in any *qui tam* action, Abbott's

defense must be against the allegations and claims in the complaint with which it has been

served.  The contents of the disclosure statement are irrelevant.  Additionally, relator's disclosure

statement is protected from disclosure by the attorney work product doctrine.

                2.      Abbott's Motion to Compel Production of Attorney Work
                       Product Should be Denied

When a *qui tam* suit is filed by a relator, the United States remains the real party in

interest.[7]  The FCA mandates that relators file their complaint under seal and simultaneously

submit to the United States with a "written disclosure of substantially all material evidence and

information [that they] possesses" concerning their allegations.  31 U.S.C. § 3730(b)(2).  *The*

*relator's statement of material evidence is not filed with the court or served upon the defendants*;

its function is solely to provide DOJ with a basis for commencing an investigation of relator's

---

    [7] *See, e..g., United States ex rel. Rodgers v. Arkansas*, 154 F.3d 865, 868 (8th Cir. 1998).

allegations, as expressly required by the FCA.  31 U.S.C. § 3730(a), (b)(2).[8]

The work product doctrine protects materials prepared in anticipation of litigation. *Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir. 1982);  *FTC v. Grolier Inc.*, 462 U.S. 19 (1983).  The relator's disclosure statement fits squarely within the definition of work product.  The statement was prepared by the relator's attorney in anticipation of the filing of this *qui tam* suit.  The disclosure statement does not merely contain a recitation of facts; rather, it constitutes relator's counsel's presentation of applicable legal theories.  Whatever facts may be included are inextricably intertwined with the attorney's legal conclusions and opinions.  Rule 26(b)(3) of the Federal Rules of Civil Procedure expressly "protect[s] against disclosure of the mental impressions, conclusions, opinions or other legal theories of an attorney or other representative of a party concerning the litigation."  The relator's disclosure statement in this case is therefore exempted from discovery.  *See, e.g., United States v. Pepper's Steel and Alloys, Inc.,*132 F.R.D. 695, 698 (S.D. Fla. 1990) ("work product consisting of mental impressions conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation . . . is absolutely immune from discovery"); *United States ex rel Burroughs v. DeNardi*, 167 F.R.D. 680, 683-4 (S.D. Cal. 1996) ("the materials containing mental impressions, conclusions, opinions, and legal theories of an attorney are discoverable only in rare and

---

[8]  Congress amended the FCA in 1986, specifically adding the requirement that *qui tam* cases be filed under seal and *in camera*, "to encourage more private enforcement suits."  S. Rep. No. at 23-24 (1986), reprinted in 1986 U.S.C.C.A.N. 5289.  Thus, "while the False Claims Act does not address production of this disclosure statement, the underlying policy concerns would support a conclusion that the disclosure statement should be kept confidential in order to encourage reporting of fraudulent schemes."  *United States ex rel. Weber v. Hughes Aircraft Co.*, No. CV 89-6517 JGD at 7 (C.D. Cal. Apr. 23, 1992) (Order denying motion for review and reconsideration of denial of motion to compel) (*Weber*).  A copy of this opinion is attached as Exhibit 8.

extraordinary circumstances"); *In re Murphy*, 560 F.2d 326, 336 (8th Cir. 1977) ("Opinion work product enjoys a nearly absolute immunity and can be discovered only in rare and extraordinary circumstances).

Consistent with Rule 26, courts have consistently found that a relator's written disclosure statement is not subject to disclosure. *See, e.g., United States ex rel. Fallon v. Accudyne Corp.*, No. 93-C-801-S at 1 (W.D. Wis. Mar. 2, 1995) (Memorandum and Order denying motion to compel) (hereafter *Accudyne);*[9]  *United States ex rel. Taxpayers Against Fraud v. Teledyne Ind.*, No. CV 90-4996-Kn (C.D. Cal. Mar. 16, 1993) (hereafter *Teledyne);*[10] *United States ex rel. Weber v. Hughes Aircraft Co.*, No. CV 89-6517 JGD (C.D. Cal. Apr. 23, 1992) (Order denying motion for review and reconsideration of denial of motion to compel) (hereafter *Weber*) (work product protection "easily" applies to a relator's disclosure statement because the statement was "clearly prepared by a party in anticipation of litigation").  As the court in *Accudyne* recognized, "Common sense and general legal principles indicate that the disclosures remain protected." *Accudyne* at 2.

Moreover, in the unlikely event that the Court were to conclude that the disclosure statement in this case did not contain opinion work product,  Rule 26(b)(3) prevents discovery of an attorney's "fact" work product unless (1) the discovering party can demonstrate substantial need for the material and (2) the discovering party is unable to obtain the substantial equivalent of the material by other means without undue hardship.  Fed R. Civ. P.26(b)(3);  *Castle v. Sangamo Weston, Inc.,* 744 F.2d 1464, 1467, (11th Cir. 1984) (party seeking to compel

---

[9]  A copy of this decision is attached as Exhibit 9.

[10]  A copy of this decision is attached as Exhibit 10.

production "must show both substantial need and undue hardship"); *Grolier,* 462 U.S. at 25.

In this case, defendant cannot show that it has a substantial need for the production of relator's written disclosure statement or that it will be unable to obtain the equivalent of this information without undue hardship.  Abbott cannot show any need to review Relator's disclosure statement in order to understand the allegations made against it.  The Government has filed a detailed amended complaint in this case.  The complaint describes the nature of the allegations against defendants and the factual bases for the allegations.  Moreover, Abbott filed a motion to dismiss the Government's complaint, in response to which the Government filed an opposition brief.  Clearly, Abbott understands the allegations and claims pled against it in this case.  Finally, Abbott has no need to review the relator's disclosure statement in order to determine the facts that were known to the relator at the time it filed the complaint.  Moreover, defendant has already taken depositions of relator Ven-A-Care and its principals and may inquire of those witnesses regarding the facts which underlie the claims stated by relator in this case.  It is black letter law that "discovery of work product material will be denied if the party seeking discovery can obtain the desired information by taking the deposition of witnesses."  8 Wright & Miller § 2025;  *see also, Hickman v. Taylor*, 329 U.S. 495, 509 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witness for the asking."); *United States v. Chatham City Corp*., 72 F.R.D. 640 (S.D. Ga. 1976).  Accordingly, defendants' request for production of relator's written disclosure statement should be denied.

Finally, the protected status of the relator's disclosure statement under the work product doctrine is undiminished by communication of the statement to the United States.  The common interest rule operates as a shield to preclude waiver of protection when the disclosure of

confidential information is made to a third party who shares a community of interest.  *See In re Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042-43 (10th Cir. 1998)*; Frontier*, 136 F.3d at 705;  *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) ("[P]ersons who share a common interest in litigation should be able to communicate with each other to more effectively prosecute or defend their claims").  The joint prosecution/common interest doctrine derives from the joint defense privilege.  *Burroughs,* 167 F.R.D. at 685.  This privilege applies to work-product.  *Id.*  As a result, "sharing work product material with a friendly party does not waive the work product protection as it applies to an adverse third party."  *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 587 (N.D.N.Y. 1989);  *see also Western Fuels Ass'n v. Burlington N. R.R.*, 102 F.R.D. 201, 203 (D. Wyo. 1984) (disclosure . . . to others with friendly interests is not beyond the scope of such privilege and will not constitute a waiver of the same.");  8 Charles Alan Wright, *et al.,* Federal Practice and Procedure, § 2024 (2d ed. 1994) (same).

When a party seeks discovery of work product, Fed. R. Civ. P. 26(b)(3) requires a particularized inquiry as to whether the plaintiff has a substantial need for the information and whether it could obtain the information by other means without undue hardship.  Defendants cannot satisfy either prong of this test.  Accordingly, relator's written disclosure statement is protected by the work product doctrine and defendants' motion to compel its disclosure should be denied.

III.    **CONCLUSION**

Abbott's motion to compel should be denied in its entirety.  As demonstrated above, the Government has been working, and continues to work, diligently to produce documents and

information responsive to defendants' discovery requests.  The limited categories of material or information which the Government has withheld are not discoverable based on the attorney work product doctrine and the law enforcement investigatory files privilege, and because none of the sought-after material and information is relevant to a claim or legitimate defense in this case.

For the United States,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for
  the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

 /s/ Justin Draycott
Joyce R. Branda
Daniel Anderson
Renée Brooker
Justin Draycott
Gejaa T. Gobena
Rebecca Ford
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088
Fax: (202) 307-3852

Dated: June 1, 2007

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day caused an electronic copy of the above

MEMORANDUM  OF THE UNITED STATE IN OPPOSITION TO ABBOTT'S MOTION TO

COMPEL ADEQUATE RESPONSES TO ABBOTT'S DISCOVERY REQUESTS to be served

on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management

Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all

parties.


Date: June 1, 2007

/s/ Justin Draycott_____
Justin Draycott