UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

**CLASS COUNSEL'S OPPOSITION TO MOTION OF NAMED CLASS
REPRESENTATIVE M. JOYCE HOWE FOR RECONSIDERATION OF
PRELIMINARY APPROVAL OF PROPOSED NATIONWIDE
SETTLEMENT WITH ASTRAZENECA**

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT .......................................................................................................2

      A.    The Proposed Settlement Is Fair, Reasonable and in the Best Interests
           of the Class and Will Likely Provide Class Members Like Mrs. Howe,
           Who Had Supplemental Insurance Coverage, With <u>More</u> Than Their
           Out-Of-Pocket Damages ...........................................................................2

           1.    The Settlement will provide substantial compensation to the
                Class Members ...........................................................................2

           2.    Persons who incurred enforceable obligations to make co-payments
                are eligible to make a claim .......................................................4

           3.    Class Members like Mrs. Howe will not receive a "shortfall" ...................5

           4.    Expanding the certified class is in the interests of all Medicare
                Part B beneficiaries who were administered Zoladex® ..............................6

      B.    The Claims Made Structure Is Fair and Reasonable.................................................7

           1.    The process has been implemented to improve the claims rate..................7

           2.    Sending checks to all would compensate those who were not
                out-of-pocket and would be unprincipled....................................................8

           3.    The Settlement is for a large portion of the damages .................................9

      C.    The Fe Amount was Agreed to Only After Agreement on the Settlement
           Amount was Obtained...........................................................................................10

      D.    Mr. Haviland is Using Mrs. Howe's Objection as a Vehicle to Engage in
           Gamesmanship......................................................................................................12

      E.    Lead Counsel and Mr. Townsend Support the Proposed Settlement.....................16

III.   CONCLUSION...................................................................................................18

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*In re Airline Ticket Comm'n Antitrust Litig.*,
  953 F. Supp. 280 (D. Minn. 1997) .................................................................................18

*Alliance to End Repression v. City of Chicago*,
  91 F.R.D. 182 (N.D. Ill. 1981) .......................................................................................9

*Argo v. Harris*,
  84 F.R.D. 646 (E.D.N.Y. 1979) ....................................................................................10

*City of Philadelphia v. Chas. Pfizer & Co., Inc.*,
  345 F. Supp. 454 (S.D.N.Y. 1972) ................................................................................11

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) .......................................................................................17

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) .........................................................................................10

*Evans v. Jeff D.*,
  475 U.S. 717 (1986) .......................................................................................................11

*Flinn v. FMC Corp.*,
  528 F.2d 1169 (4th Cir. 1975) .......................................................................................17

*Hawkins v. Commissioner of the N.H. HHS*,
  2004 U.S. Dist. Lexis 807 (D.N.H. 2004) .....................................................................17

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) .........................................................................................10

*Kincade v. General Tire & Rubber Co.*,
  635 F.2d 501 (5th Cir. 1981) .........................................................................................18

*Lazy Oil, Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) .........................18

*In re Lupron Mktg. & Sales Practices Litig.*,
  228 F.R.D. 75 (D. Mass. 2005) ................................................................................15, 16

*In re Lupron® Mktg. & Sales Practices Litig.*,
  2004 U.S. Dist. Lexis 26461 (D. Mass. Dec. 21, 2004) ..............................................14, 15

*Maywalt v. Parker & Parsley Petroleum Co.*,
   155 F.R.D. 494 (S.D.N.Y. 1994) ....................................................................17

*Maywalt v. Parker & Parsley Petroleum Co.*,
   864 F. Supp. 1422 (S.D.N.Y. 1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995) ........................18

*Parker v. Anderson*,
   667 F.2d 1204 (5th Cir. 1982) ....................................................................18

*Patterson v. Stovall*,
   528 F.2d 108 (7th Cir. 1976) ......................................................................9

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)................................10

*United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*,
   447 F.2d 647 (7th Cir. 1971) ......................................................................9

## MISCELLANEOUS

A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS, § 15:32 (4th ed. 2002) .................11, 17

MANUAL FOR COMPLEX LITIGATION, § 30.42 (3d ed 1995) ........................................17

# I.      INTRODUCTION

On May 22, 2007, the Court appropriately approved, on a preliminary basis only, the Proposed Settlement with Defendant AstraZeneca on behalf of a class of Medicare Part B beneficiaries who were administered Zoladex® during the Class Period.[1]  Shortly after the conclusion of the Preliminary Approval Hearing, and despite his presence at and participation in the mediation leading to the Settlement, Attorney Don Haviland, on behalf of Joyce Howe, one of the Class Representatives in this action, submitted an objection to the preliminary approval of the proposed nationwide settlement (Dkt. No. 4243).  The next day, on May 23, 2007, that objection was filed as a motion for reconsideration of the preliminary approval order (Dkt. No. 4250).

The motion, which is unsupported by any sworn declaration, is replete with factual misrepresentations and displays a fundamental misunderstanding of the process leading up to the Proposed Settlement, as well as the terms of the Proposed Settlement itself.  Furthermore, the objections contained therein are premature and, if they are to be considered at all, should be evaluated at the Final Approval Hearing.  The Court should not reconsider its Preliminary Approval Order and should instead permit the notice and claims process to continue uninterrupted.

---

[1] The Settlement Class is more completely defined as:  "All natural persons nationwide who made a co-payment based on AWP for Zoladex® under the Medicare Part B Program during the period from January 1, 1991 through December 31, 2004.  Excluded from the Settlement Class are those who made flat co-payments, who were reimbursed fully for any co-payments, or who have the right to be fully reimbursed, as well as AstraZeneca and its officers, directors, management, employees, subsidiaries, and affiliates."  Preliminary Approval Order, ¶ 2.

## II.     ARGUMENT

**A.     The Proposed Settlement Is Fair, Reasonable and in the Best Interests of the Class and Will Likely Provide Class Members Like Mrs. Howe, Who Had Supplemental Insurance Coverage, With <u>More</u> Than Their Out-Of-Pocket Damages**

Mrs. Howe's objections are largely based on a misunderstanding of the Settlement Terms and the process leading up to the agreement on the proposed settlement.  Lead Counsel address those objections below.

### 1.     The Settlement will provide substantial compensation to the Class Members

The Proposed Settlement is structured so that all Class Members making claims will ***at least*** receive their out-of-pocket damages, including prejudgment interest.  Indeed, depending on how many Class Members file claims, Class Members may very well receive ***more*** than their out-of-pocket damages plus interest.

The amount that a Class Member will be eligible to receive will be based on the number of months that he or she was prescribed Zoladex®.  Dr. Hartman has calculated estimated overcharges associated with the alleged price inflation for Zoladex® plus pre-judgment interest. The alleged overcharge varies based on the year and whether the Class Member had supplemental insurance that paid part of the Medicare Part B co-pay.  The amount to which a Class Member who filed a valid Claim Form will be entitled to receive is to be calculated by taking the number of months that the Class Member took Zoladex® and multiplying that number by the alleged overcharge that applies for that year.  The total amount would then be doubled.

The tables below, based on Dr. Hartman's damages model, are used in the foregoing calculation:

| Table 1:  Monthly Amounts, Including Interest, by Year for Class Members Who Made Medicare Part B Co-Payments for Zoladex and Did Not Have Private Third-Party Supplemental Insurance | | | |
|---|---|---|---|
| 1991: $23.88 | 1992: $22.92 | 1993: $18.97 | 1994: $19.41 |
| 1995: $32.86 | 1996: $37.89 | 1997: $50.48 | 1998: $67.43 |
| 1999: $72.15 | 2000: $67.94 | 2001: $65.56 | 2002: $62.81 |
| 2003: $61.30 | 2004: $59.73 | | |

| Table 2:  Monthly Amounts, Including Interest, by Year for Class Members Who Made Partial Medicare Part B Co-Payments because They had Private Supplemental Insurance Polices that Covered Part of the Co-Payment | | | |
|---|---|---|---|
| 1991: $4.78 | 1992: $4.58 | 1993: $3.79 | 1994: $3.88 |
| 1995: $6.57 | 1996: $7.58 | 1997: $10.10 | 1998: $13.49 |
| 1999: $14.43 | 2000: $13.59 | 2001: $13.11 | 2002: $12.56 |
| 2003: $12.26 | 2004: $11.95 | | |

As an example, a Class Member without MediGap insurance who took Zoladex® for the entirety of 2002, 2003 and 2004 would be eligible to receive $4,408 calculated as follows:

| | | | |
|---|---|---|---|
| 2002 overcharge per month | $62.81 | = | $753 annually |
| 2003 overcharge per month | $61.30 | = | $735 annually |
| 2004 overcharge per month | $59.73 | = | $716 annually |
| Total Recognized Claim | | = | $2,204 |
| Total Claim Would be Doubled | | = | $4,408 |

Had that Class Member been covered by private, supplemental insurance during the entire three year period, the Class Member would be entitled to a lower, yet still substantial amount, given that he or she would have incurred significantly less out-of-pocket damage:

| 2002 overcharge per month | $12.56 | = | $150.72 annually |
| 2003 overcharge per month | $12.26 | = | $147.12 annually |
| 2004 overcharge per month | $11.95 | = | $143.40 annually |
| Total Recognized Claim | | = | $441.24 |
| Total Claim Would be Doubled | | = | $882.48 |

In light of these generous settlement terms that were established to encourage Class Members to make claims, it is impossible to fathom how Mrs. Howe can assert that "most consumer class members would receive no compensation whatsoever." Opp. at 2. We can only conclude that Mr. Haviland has not properly explained the settlement to Mrs. Howe.

**2.      Persons who incurred enforceable obligations to make co-payments are eligible to make a claim**

Mrs. Howe contends that the settlement abandons Medicare Part B beneficiaries who, despite never making their co-payments for Zoladex®, remain liable to do so. Opp. at 8. This is false. To the contrary, the Settlement expressly provides these consumers with an opportunity to participate in the claims process once they pay their debts and demonstrate that they have done so. As both the proposed Notice and Claim Form explain:

> If, **after** receiving this Notice, you make a percentage co-pay for Zoladex® under Medicare Part B based on a bill that you received from a doctor or clinic related to taking Zoladex® from January 1, 1991 through December 31, 2004, you may submit a claim but **must** submit a receipt, cancelled check, or credit card statement evidencing the payment and proof that the payment was for Zoladex® taken between January 1, 1991 and December 31, 2004 in order to be eligible to participate in the Settlement.

Thus, Class Members who have incurred a legally enforceable obligation to make a co-payment for Zoladex® are eligible to participate in the substantial fruits of the Proposed Settlement.

### 3. Class Members like Mrs. Howe will not receive a "shortfall"

Mrs. Howe also objects to the Proposed Settlement on the basis that she will purportedly receive a "shortfall" when compared to Class Members who did not have supplemental insurance. Opp. at 13. But this contention once again betrays a fundamental misunderstanding of the Proposed Settlement.

Class Members who had private supplemental insurance policies that covered a portion of the Class Members' Medicare Part B co-pay do receive less under the Proposed Settlement than those without supplemental insurance coverage and for good reason: ***they paid less to begin with and therefore have incurred a lesser amount of damage***. Mrs. Howe concludes that this "penalizes" those Class Members who had insurance, Opp. at 4, but this is not the case. Recognizing that Class Members, like Mrs. Howe, who have supplemental insurance coverage pay only a portion of the 20% Medicare Part B co-pay, Dr. Hartman's damages model did not include payments made by the private insurance carriers, ***who are members of another Class*** (Class 2). Therefore, Dr. Hartman's Table 2 does not include over-payments that a Class Member with supplemental insurance ***never*** made.

Because the most common form of supplemental Medicare Part B insurance pays 80% of the 20% Medicare Part B co-pay, Dr. Hartman's damages model (and Table 2) assumes that Class Members covered by supplemental insurance made an out-of-pocket co-payment of 20% of 20%. While there may be some Class Members, like Mrs. Howe, who had supplemental coverage that required them to pay more than 20% of 20%, Dr. Hartman utilized a standardized formula that would apply to ***most*** Class Members with supplemental coverage instead of attempting to divine slight variations that may or may not apply.

Even though the Howes paid more than 20% of the 20% under the terms of Mr. Howe's private supplemental insurance policy, because the Proposed Settlement predicates recovery on a

- 5 -

doubled amount, it is very likely that Mrs. Howe will nonetheless receive back *all* of the Howes' out-of-pocket co-payments if not more.  Seen in this light, then, Mrs. Howe is really objecting to not being eligible to recover co-payments *that she never made* because her supplemental insurer made them for her.  This hardly makes the Proposed Settlement unfair.  The Proposed Settlement is fair, reasonable and will provide substantial monies – if not more than a full recovery – to all Class Members.

Citing the collateral source rule, Mrs. Howe points out that tort law provides her with the legal right to recover that portion of the damage incurred by her supplemental insurer.  Opp. at 9-12.  Even if this were true, Plaintiffs' damages model focuses only on out-of-pocket payments.  Furthermore, Mrs. Howe expresses concern that she and others may be exposed to subrogration claims from supplemental insurers, Opp. at 2, but it is difficult to see how this could ever happen given that the Settlement does not provide Class Members with compensation for co-payments that they did not make and that were, instead, made by their supplemental insurance coverage.  In fact, the risk of a subrogation claim would actually increase substantially if Mrs. Howe's argument for recovering money incurred by her supplemental insurer were to prevail.  Thus, this argument, like so many others advanced in the motion, is a red herring.

### 4. Expanding the certified class is in the interests of all Medicare Part B beneficiaries who were administered Zoladex®

Mrs. Howe, who seeks to be the watchdog for all consumers and previously sought certification of a nationwide class, objects to inclusion of consumers from nine states in the Settlement Class, contending that they were not previously included in the certified class and should remain excluded.  Opp. at 8.  While it is true that more money would be available for distribution to Class Members if residents of nine states that were excluded from membership in the litigation class were likewise excluded from the Settlement Class, as is common in

- 6 -

nationwide class actions AstraZeneca bargained for "total peace."  This was a negotiated term

that was agreed to in the give-and-take and will provide the greatest number of Zoladex® users

with an opportunity to participate in the Settlement.  Again, Lead Counsel struck the best bargain

that they believed could be obtained, one that is fair, reasonable and provides substantial benefits

to all Class Members.

**B.      The Claims Made Structure Is Fair and Reasonable**

      **1.       The process has been implemented to improve the claims rate**

Without any support, Mrs. Howe contends that "the anticipated claims rate is likely to be

very low."  Opp. at 15.  And pointing to the alleged confusion that Lead Counsel asserts has

occurred with respect to the mailing of the notice of pendency in this case, Mrs. Howe contends

that a claims process should not be utilized.  Opp. at 15.  She is wrong on both counts.

At the outset, we note that Mr. Haviland supported the claims-made settlement against

another defendant in this action, GSK.  Further, as Mrs. Howe's counsel is well aware, the

confusion associated with the notice of pendency in the instant case and to which Mrs. Howe

now cites was primarily the result of including an exclusion form with the notice sent to all Class

Members.  As we have submitted to the Court, the Claims Administrator, based on

communications with actual Class Members, has preliminarily concluded that large numbers of

Class Members mistakenly believed that they were somehow *making a claim* when sending in

the exclusion form and not opting out of the class.  Thus, far from demonstrating that Medicare

Part B beneficiaries will not take action in response to a proposed notice, the experience with the

notice of pendency suggests that they are *motivated to take action* but need to clearly understand

the process.  Lead Counsel have gone to great pains to recommend a proposed Notice that is

simple, concise and written in plain English.  We have also obtained AstraZeneca's agreement to

a simplified claims process in which the Class Member, at a bare minimum, need only represent

that he or she made a co-payment for Zoladex® at some point during the Class Period.  Thus, if

the Class Member cannot locate paperwork for treatments that may, in many cases, have been

administered a *very* long time ago, he or she can still participate in the Settlement.  This is very

consumer friendly and was a major concession on AstraZeneca's part and one that Lead Counsel

are very pleased was obtained.

### 2. Sending checks to all would compensate those who were not out-of-pocket and would be unprincipled

Mrs. Howe next contends that the Proposed Settlement should require AstraZeneca to

simply send a payment to each Class Member.  Opp. at 16-17.  Would it be simpler if

AstraZeneca just cut checks to all Class Members?  Sure it would.  Would it be fairer?  Not

necessarily.  Plaintiffs do not have access to patient utilization data, making it impossible to craft

a distribution plan tailored to the precise circumstances of each Class Member.  Thus, without

having a Class Member report on a claim form the time period(s) during which he or she was

administered Zoladex®, a distribution process that simply mails checks to all Class Members

would require every Class Member to receive an equal share of the settlement proceeds.  This

would lead to inequities, as a Class Member who took Zoladex® for a short period of time would

receive the same amount as a Class Member who incurred a longer course of treatment and,

therefore, suffered more out-of-pocket damages.

The same would be true for Class Members who had supplemental insurance and those

who did not.  One of the problems associated with a settlement procedure based on simply

paying Class Members affirmatively is that it is not possible to know with any degree of

certainty which Class Members had supplemental insurance and, for those who did, which Class

Members, like Mrs. Howe, did not have a standard policy covering 80% of the co-payment.  In

light of this observation, which was considered by the parties during the negotiations, Mrs. Howe

is suggesting that one settlement that treats Class Members differently but roughly equal based on out-of-pocket damages (as the instant settlement does) be scrapped in favor of one that treats them all the same, even though Class Members with supplemental insurance would have incurred less damage.  In other words, Mrs. Howe is advocating a result that favors her more narrow interests over those of the Class Members at large.  As her counsel, Mr. Haviland fails to resolve this concern in advocating for a different – although not necessarily "better" – deal.

Given these concerns, among others including the risks of the impending trial, Lead Counsel ultimately concluded that a claims-made settlement within the parameters and incentives agreed to was in the best interests of the Class.  Indeed, even the Court itself envisioned that a claims process would follow any trial judgment in favor of the class.  *See* April 11 Pre-Trial Conference Hearing Tr. at 14-15.

### 3.    The Settlement is for a large portion of the damages

The proposed Settlement Amount represents approximately 42% of total damages as calculated by Dr. Hartman, including pre-judgment interest, and about 62% if estimated Notice and administration costs and attorneys' fees and costs are included in the analysis.  Courts routinely approve class action settlements with much lower payouts.  Furthermore, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.[2] *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976); *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971).  Accordingly, the Court is not called upon to determine whether the settlement reached by the parties is the best possible deal,

---

[2] Judge Getzendanner explained in *Alliance to End Repression v. City of Chicago*, 91 F.R.D. 182, 201 (N.D. Ill. 1981):  "Some objectors argue that both settlement agreements are fatally defective because they lack more extensive admissions or finding of wrongdoing by the Court.  As the Court stated at the March 13 hearing:  ... 'the whole purpose of the settlement is to avoid adjudication with respect to the activity which is the basis of the complaint.  I think the parties would be stunned if in submitting a class action settlement to the Court, the Court started to decide the issues.  That's why people enter into settlements and I am not going to interfere in the settlement process.'"

nor whether Class Members will receive as much from a settlement as they might have recovered

from victory at trial.  *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp.

450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons,*

*Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  It is not the Court's function to reopen and enter into

negotiations with the litigants in the hope of improving the terms of the settlement or to

substitute its business judgment for that of the parties who worked out the settlement.  *Argo v.*

*Harris*, 84 F.R.D. 646, 648 (E.D.N.Y. 1979) (quoting *Levin v. Mississippi River Corp.*, 59

F.R.D. 353, 361 (S.D.N.Y 1973), *aff'd on op. below sub nom. Wesson v. Mississippi River Corp.*,

486 F.2d 1398 (2d Cir. 1973), *cert. denied*, 414 U.S. 1112 (1973)).  Courts challenged with

evaluating a proposed class action settlement recognize that the "essence of settlement is

compromise" and will not represent a total win for either side.  *Isby v. Bayh*, 75 F.3d 1191, 1200

(7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

Lead Counsel believe that they were able to garner the best deal possible for the Class.

**C.      The Fee Amount was Agreed to Only After Agreement on the Settlement Amount**
**        was Obtained**

        Subject to Court approval, AstraZeneca has agreed to pay attorneys' fees of $6,500,000

and costs of $2,100,000.  These amounts, which were negotiated after the $24,000,000

Settlement Amount was agreed to, will not come out of the Settlement Amount.

        In assertions unsupported by a sworn declaration, Haviland claims that the settlement was

"tainted" by fee negotiations.  Opp. at 17-18.  This assertion is false, both as a matter of

procedure and substance.

        First, the Class will achieve a greater recovery by having AstraZeneca pay the fees and

costs agreed to separately from the Settlement Amount.  Had the $8,600,000 in fees and costs

been added to the Settlement Amount of $24,000,000, Class Counsel would have been able to

apply for a standard 33 1/3% fee of the common fund, which would have totaled $32,600,000.

Under this scenario, fees and costs could have totaled over $9.7 million.  But by having

AstraZeneca pay a separate amount of fees and costs on top of the Settlement Amount, the Class

Members benefited, and Class Counsel, if the fee petition is ultimately approved by the Court,

will receive less than they could have received.

Second, discussing fees as part of the overall settlement package is appropriate.  While it

is true that fee discussions should not drive the settlement negotiations, discussing fees is not

prohibited.  In *Evans v. Jeff D.*, 475 U.S. 717 (1986), the Ninth Circuit had reversed the district

court's approval of a settlement, holding that negotiations as to the settlement of class member

claims should not be simultaneous with negotiations over the payment of attorneys' fees.  The

Supreme Court reversed, explaining "that when the parties find such negotiations conducive to

settlement, the public interest, as well as that of the parties, is served by simultaneous

negotiations."  *Id.* at 738 n.30.

And although Mrs. Howe cites NEWBERG in support of her position, she neglects to point

out that NEWBERG recognizes that simultaneous merits and fee settlement negotiations are proper

in statutory fee cases, like the instant one.  Conte & H. Newberg, NEWBERG ON CLASS ACTIONS,

§ 15:32 at 109 (4th ed. 2002).[3]  Moreover, NEWBERG recognizes that obtaining a defendant's

agreement to pay reasonable attorneys' fees "gives the defendant a predictable measure of

exposure of total monetary liability for the judgment and fees in a case [and] facilitates

completion of settlements . . . ."  *Id.* at 112.

In any event, as Eric Green, the MDL Mediator, and other counsel present during the

mediation attest, the specific amount of attorneys' fees and costs were not discussed at the

---

[3] Mrs. Howe also cites *City of Philadelphia v. Chas. Pfizer & Co., Inc.*, 345 F. Supp. 454 (S.D.N.Y. 1972). However, that case was decided before the Supreme Court's decision in *Evans.*

- 11 -

mediation until *after* an agreement in principle on the $24,000,000 Settlement Amount was achieved.  Declaration of Kenneth A. Wexler in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with AstraZeneca ("Wexler Decl."), ¶ 7; Declaration of Jeffrey L. Kodroff in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with AstraZeneca ("Kodroff Decl."), ¶ 6.  To be sure, in the week leading up to the mediation, the parties exchanged fee numbers in an effort to see whether expectations were in the "ballpark."  Wexler Decl., ¶ 7.  There was nothing improper about doing so as AstraZeneca sought to determine what its total outlay under a potential deal would be.  Fee negotiations simply did not drive or taint the Proposed Settlement.  And, finally, although Mr. Haviland had objected to fees being discussed during settlement negotiations (and, again, there is no such bar), he never objected during the Mediation session once the topic turned to fees after the Settlement Amount was determined.

### D.   Mr. Haviland is Using Mrs. Howe's Objection as a Vehicle to Engage in Gamesmanship

Lead Counsel submit that the Howe objection is primarily driven by Mr. Haviland's own self-interest.  As the Court may recall, Haviland – who has defaulted on numerous occasions on co-lead payments required to fund the prosecution of this case and who joined the case only after other Co-Lead Counsel had invested years of work gathering evidence from the millions of documents and hundreds of witnesses that have been the subject of discovery – has had a motion pending to be appointed a Chair of the Lead Counsel Committee.  Yet Haviland's behavior here demonstrates not only the frivolity of this eleventh-hour objection, but precisely why Haviland should not become a Co-Lead.

Haviland was involved in negotiations leading up to the mediation and was present in person during the mediation session itself.  During and before the mediation, there was discussion and analysis of various different points of view by and among all Lead Counsel on both the content of discussions and style by which to proceed.  Mr. Haviland, as all counsel did throughout the course of this litigation generally and specifically during the settlement discussions with AstraZeneca, expressed different points of view and opinions on the best course of action.  Any and all discussions were always inclusive of everyone's thoughts, ideas and suggestions.  Ultimately, the end position taken by Lead Counsel at the mediation session was the result of the consensus of all counsel.  No one, including Mr. Haviland, objected to any part of the agreement that was ultimately reached at the end of the mediation held on May 4.

Despite being repeatedly asked during the May 4 mediation whether Haviland or his client had *any* objection to the terms of the settlement discussions, Haviland did not express any objections.  Indeed, Co-Lead Counsel Marc Edelson, as the mediation was winding down and at a time when it appeared that an agreement to settle was close, asked Haviland to call Mrs. Howe and obtain authorization to settle.  Haviland left the room and returned a short time later ***and declared that his client had approved of the settlement terms***, after which Haviland participated in discussions over the amount of incentive awards to the named plaintiffs.  Declaration of Marc H. Edelson in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca ("Edelson Decl."), ¶¶ 4-5; Wexler Decl., ¶ 5; Kodroff Decl., ¶ 5.

Once the substantive terms of the settlement were resolved, the discussion turned to fees, expenses and incentive awards for the named plaintiffs.  As with the substantive discussions, Mr. Haviland was actively involved with the negotiations for all these elements.  In fact, the most

ardent position taken by Mr. Haviland all day was his belief that the named plaintiffs, including Mrs. Howe, should receive an incentive award of $25,000.  Edelson Decl., ¶ 5; Wexler Decl., ¶ 5; Kodroff Decl., ¶ 6.  After the mediation, Haviland would later declare that he had no issue with the settlement.  Edelson Decl., ¶ 7.  Further, Mr. Haviland has had in his possession, since it was signed on May 4th, the Memorandum of Understanding ("MOU") containing the essential terms of the settlement.  Nonetheless, Haviland did not raise any objections to the MOU until filing a memorandum of objection *on the very morning of the preliminary approval hearing*.[4]

Thus, the Court should ignore Haviland's about-face and false statement – unsupported by any sworn declaration submitted by Haviland – that he informed Co-Lead Counsel and the Mediator that Mrs. Howe would oppose the settlement.  Mr. Haviland's participation in the discussion of fees, expenses and especially the incentive award for Mrs. Howe, as well as his failure to state that he opposed the settlement, establishes that his current protestations are *post-hoc* new and driven by some other agenda, namely, a misguided effort to gain entry to a Chair of the Co-Lead group.

Mr. Haviland is no stranger to gamesmanship when it comes to advancing meritless objections to proposed settlements in drug pricing cases in order to further his own interests at the expense of consumers.  In *In re Lupron® Mktg. & Sales Practices Litig.*, Judge Stearns had to enjoin Haviland and his prior law firm, Kline & Specter ("K&S"), from engaging in deceptive conduct detrimental to the class.  Haviland, who had state cases pending in New Jersey and

---

[4] Haviland declares that, by filing the motion for preliminary approval the day before the preliminary approval hearing, Lead Counsel were hoping to accomplish a "*fait accompli*."  Opp. at 2.  Nothing could be further from the truth.  First, the very notion of a *fait accompli* necessarily recognizes that Lead Counsel would have something to keep from Haviland, which makes no sense since (i) Haviland already knew the terms of the deal and (ii) he never objected to those terms and indeed expressed his and his client's support for them.  Second, and further highlighting the contentious, arm's-length negotiation of the total package represented by the Proposed Settlement, the parties were ***still*** negotiating late into the evening on Sunday, May 21, over important details related to the notice campaign and the contents of the proposed notices to the Class.  In fact, it was still unclear just the evening before the papers were filed whether the deal would unravel.  So much for Haviland's conspiracy theory.

North Carolina, intervened in the *Lupron*® action for purposes of filing objections to a proposed

settlement.  Judge Stearns granted preliminary approval and authorized notice to the class, after

which Haviland set up a website that he then used, through the deployment of deceptive tactics,

to encourage class members to opt-out of the settlement.  As Judge Stearns explained:

> The court has undertaken its own review of the K&S
> websites, www.lupronlaw.com and www.lupronclass.com.  The
> court finds that the banner welcoming potential members to "the
> class" and inviting Lupron(R) purchasers "to register for the
> Lupron class action," is blatantly misleading and deliberately
> intended to deceive potential plaintiffs into believing that the
> websites are either court-sanctioned or sponsored by the MDL
> plaintiffs.  After clicking on the registration icon, the first field
> poses the following question.  "Did you or someone you know pay
> for Lupron(R) injections between 1985 and the present?"  If
> answered affirmatively, a second field prompts the user to fill out
> "registration" information.  The personal information section is
> immediately followed by the option, "I would like to decline the
> defendants' offer to settle and be included in litigation in the state
> courts."  The typical registrant would not know that he or she is not
> in fact registering as a plaintiff in the MDL action, or that if he or
> she elects to be included "in litigation in the state courts" there
> may be no recovery at all.  K&S and Attorney Haviland are
> perfectly free to criticize the proposed settlement agreement.
> However, they are not privileged to engage in deceptive conduct
> manipulating the very consumers they claim to protect.

2004 U.S. Dist. Lexis 26461, at *5-6 (D. Mass. Dec. 21, 2004).  Judge Stearns then ordered

Haviland to modify the website and provide the Court with a complete list of any "registrations"

that occurred prior to the issuance of the injunction.  *Id.* at *6.

Mr. Haviland had also sent "Dear Client" letters to every person that had registered on

the website, seeking their agreement to have Haviland represent them by, among other things,

"present[ing] a distorted picture of the MDL settlement, including the patently false statement

that MDL claimants would be paid only 3 cents for each dollar of their actual damages."  *In re

Lupron*® *Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 83 (D. Mass. 2005).  "Having found the

'Dear Client' letter to contain a number of ***deliberate*** misrepresentations and falsehoods," Judge

- 15 -

Stearns then ordered that K&S send a curative notice correcting the misinformation. *Id.* This order was followed by Judge Stearns sending letters to the presiding judges in two state-court Lupron actions in which K&S were counsel, advising those judges of the proposed settlement and notice campaign in the MDL action and of "the misinformation disseminated by [K&S]," and requesting that the judges, as a matter of comity, defer ruling on pending motions until Judge Stearns could rule on the fairness of the proposed MDL settlement. *Id.*

Undaunted, Haviland then filed a motion to disqualify Judge Stearns, claiming that he had "become fully engaged with the MDL litigants in their efforts to deprive [Haviland's clients] of their timely day in court." *Id.* Judge Stearns denied the motion and ultimately approved the settlement after considering all objections thereto. *Id.* at 98.

Unfortunately, Haviland is up to his old tricks, choosing to once again make deliberate misrepresentations in an effort to further his own interests at the expense of consumers. The Court should look past Haviland's ruse and promptly deny the motion for reconsideration.

**E.     Lead Counsel and Mr. Townsend Support the Proposed Settlement**

Mr. Leroy Townsend, the original named plaintiff for an AWP complaint against AstraZeneca filed in 2002, was kept fully informed of the settlement discussions and approves of the Proposed Settlement. Declaration of Leroy Townsend, ¶¶ 6-12.

In addition, with the exception of Mr. Haviland's reversal, all Co-Lead Counsel enthusiastically support the Proposed Settlement. Indeed, when preliminary approval papers were filed, we believed that Mr. Haviland and his client, Mrs. Howe, also supported the Proposed Settlement given that Mr. Haviland expressly declared that his client agreed to the settlement terms at the very mediation where the deal was struck, which was attended by Mr. Haviland.

- 16 -

There is a presumption of correctness attached to a Class settlement reached in arms-length negotiations between experienced, capable counsel. *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *see also Hawkins v. Commissioner of the N.H. HHS*, 2004 U.S. Dist. Lexis 807, at *15 (D.N.H. 2004); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also* NEWBERG, § 11.47, at 145-47. As the MANUAL FOR COMPLEX LITIGATION explains:

> In evaluating the settlement, the judge should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.

MANUAL FOR COMPLEX LITIGATION, § 30.42 (3d ed 1995).

While the views of the class representatives are taken into account, they do not trump those of class counsel, who owe a duty to the Class as a whole. As one court has explained, "the compelling obligation of class counsel in class action litigation is to the group which makes up the class. . . . To that end, Class Counsel must act in a way which best represents the interests of the 'entire class and is not dependent on the special desires of the named plaintiffs.'" *Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 496 (S.D.N.Y. 1994) (quoting *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982)). As another court has observed:

> Because the "client" in a class action consists of numerous unnamed class members as well as the class representatives, and because "[t]he class itself often speaks in several voices . . ., it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole . . . ." . . . Because of the unique nature of the attorney-client relationship in a class action, the cases cited by appellants holding that an attorney

> cannot settle his individual client's case without the authorization
> of the client are simply inapplicable.

*Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981).

Numerous courts have approved class action settlements notwithstanding objections from the named class representatives.  *See, e.g., Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 333 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999); *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 282 n.3 (D. Minn. 1997).  Thus, "agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable."  *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) (affirming approval of a class settlement opposed by all but one of the eleven named plaintiffs in the suit).  In approving a class settlement despite objections by four of five class representatives, the court in *Maywalt* warned of granting a class representative veto power:

> To empower the Class Representative with what would amount to
> an automatic veto over the Proposed Settlement does not appear to
> serve the bests interests of Rule 23 and would merely encourage
> strategic behavior "designed to maximize the value of the veto
> rather than the settlement value of their claims."

*Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. 1422 (S.D.N.Y. 1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995) (quoting *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1366 (2d Cir. 1991)).

Although Mrs. Howe has changed her mind and no longer approves of the settlement, her personal desires should not serve to trump the professional judgment of Class Counsel, who enthusiastically believe that the Proposed Settlement is in the best interest of all Class Members.

## III.    CONCLUSION

For the foregoing reasons, Lead Counsel respectfully request that the Court deny Mrs. Howe's motion for reconsideration, stand by its preliminary approval order and proceed

- 18 -

with notice to the Class.  If the Court wants to entertain Mrs. Howe's objection, it can do so at

the Final Approval Hearing, along with any other objections that may be filed.


DATED:  June 6, 2007.                              By____/s/ Steve W. Berman_____
                                                        Thomas M. Sobol (BBO#471770)
                                                        Edward Notargiacomo (BBO#567636)
                                                   Hagens Berman Sobol Shapiro LLP
                                                   One Main Street, 4th Floor
                                                   Cambridge, MA  02142
                                                   Telephone: (617) 482-3700
                                                   Facsimile: (617) 482-3003

                                                   **LIAISON COUNSEL**

                                                   Steve W. Berman
                                                   Sean R. Matt
                                                   Hagens Berman Sobol Shapiro LLP
                                                   1301 Fifth Avenue, Suite 2900
                                                   Seattle, WA  98101
                                                   Telephone: (206) 623-7292
                                                   Facsimile: (206) 623-0594

                                                   Elizabeth Fegan
                                                   Hagens Berman Sobol Shapiro LLP
                                                   820 North Boulevard, Suite B
                                                   Oak Park, IL  60302
                                                   Telephone: (708) 776-5600
                                                   Facsimile: (708) 776-5601

                                                   Jeffrey Kodroff
                                                   Spector, Roseman & Kodroff, P.C.
                                                   1818 Market Street, Suite 2500
                                                   Philadelphia, PA  19103
                                                   Telephone: (215) 496-0300
                                                   Facsimile: (215) 496-6611

                                                   Kenneth A. Wexler
                                                   Jennifer Fountain Connolly
                                                   Wexler Toriseva Wallace LLP
                                                   One North LaSalle Street, Suite 2000
                                                   Chicago, IL  60602
                                                   Telephone: (312) 346-2222
                                                   Facsimile: (312) 346-0022

- 19 -

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on June 6, 2007, I caused copies of **CLASS COUNSEL'S OPPOSITION TO MOTION OF NAMED CLASS REPRESENTATIVE M. JOYCE HOWE FOR RECONSIDERATION OF PRELIMINARY APPROVAL OF PROPOSED NATIONWIDE SETTLEMENT WITH ASTRAZENECA** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

<u> **/s/ Steve W. Berman**            </u>
Steve W. Berman

001534-16  173670 V1