# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>*THE CITY OF NEW YORK v. ABBOTT LABORATORIES, INC., et al.*<br>S.D.N.Y. Case No. 04-CV-06054<br><br>*COUNTY OF ALBANY v. ABBOTT LABORATORIES, INC., et al.*<br>N.D.N.Y. Case No. 05-CV-0425<br><br>*COUNTY OF ALLEGANY v. ABBOTT LABORATORIES, INC., et al.*<br>W.D.N.Y. Case No. 05-CV-0236<br><br>*COUNTY OF BROOME v. ABBOTT LABORATORIES, INC., et al.*<br>N.D.N.Y. Case No. 05-CV-0145<br><br>*COUNTY OF CATTARAUGUS v. ABBOTT LABORATORIES, INC., et al.*<br>W.D.N.Y. Case No. 05-CV-0256<br><br>*COUNTY OF CAYUGA v. ABBOTT LABORATORIES, INC., et al.*<br>N.D.N.Y. Case No. 05-CV-0423<br><br>*COUNTY OF CHAUTAUQUA v. ABBOTT LABORATORIES, INC., et al.*<br>W.D.N.Y. Case No. 05-CV-0214<br><br>*COUNTY OF CHEMUNG v. ABBOTT LABORATORIES, INC., et al.*<br>W.D.N.Y. Case No. 05-CV-6744<br><br>*COUNTY OF CHENANGO v. ABBOTT LABORATORIES, INC., et al.*<br>N.D.N.Y. Case No. 05-CV-0354<br><br>*COUNTY OF COLUMBIA v. ABBOTT LABORATORIES, INC. et al.*<br>N.D.N.Y. Case No. 05-CV-0867<br><br>*COUNTY OF DUTCHESS v. ABBOTT LABORATORIES, INC. et al.*<br>S.D.N.Y. Case No. 05-CV-6458<br><br>*COUNTY OF ESSEX v. ABBOTT LABORATORIES, INC. et al.*<br>N.D.N.Y. Case No. 05-CV-0878<br><br>*COUNTY OF FULTON v. ABBOTT LABORATORIES, INC. et al.*<br>N.D.N.Y. Case No. 05-CV-0519<br><br>*COUNTY OF GENESEE v. ABBOTT LABORATORIES, INC., et al.*<br>W.D.N.Y. Case No. 05-CV-00267 | Civil Action No. 01-CV-12257-PBS<br><br>Judge Patti B. Saris<br><br>**JURY TRIAL REQUESTED**<br><br>**FIRST AMENDED CONSOLIDATED COMPLAINT** |

*COUNTY OF GREENE v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0474

*COUNTY OF HERKIMER v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 04-CV-06054

*COUNTY OF JEFFERSON v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0715

*COUNTY OF LEWIS v. ABBOTT LABORATORIES, INC. et al.*
N.D.N.Y. Case No. 05-CV-0839

*COUNTY OF MADISON v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No.05-CV-0714

*COUNTY OF MONROE v. ABBOTT LABORATORIES, INC., et al.*
W.D.N.Y. Case No. 05-CV-1648

*COUNTY OF NASSAU v. ABBOTT LABORATORIES, INC., et al.*
E.D.N.Y. Case No. 04-CV-5126

*COUNTY OF NIAGARA v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-6296

*COUNTY OF ONEIDA v. ABBOTT LABORATORIES, INC. et al.*
N.D.N.Y. Case No. 05-CV-0489

*COUNTY OF ONONDAGA v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0088

*COUNTY OF ONTARIO v. ABBOTT LABORATORIES, INC. et al.*
W.D.N.Y. Case No. 05-CV-6373

*COUNTY OF ORLEANS v. ABBOTT LABORATORIES, INC. et al.*
W.D.N.Y. Case No. 05-CV-6371

*COUNTY OF PUTNAM v. ABBOTT LABORATORIES, INC. et al.*
S.D.N.Y. Case No. 05-CV-4748

*COUNTY OF RENSSELAER v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-04224

*COUNTY OF ROCKLAND v. ABBOTT LABORATORIES, INC., et al.*
S.D.N.Y. Case No. 03-CV-7055

*COUNTY OF ST. LAWRENCE v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0479

*COUNTY OF SARATOGA v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0478

*COUNTY OF SCHUYLER v. ABBOTT LABORATORIES, INC., et al.*
*W.D.N.Y. Case No. 05-CV-6387*

*COUNTY OF SENECA v. ABBOTT LABORATORIES, INC., et al.*
*W.D.N.Y. Case No. 05-CV-6370*

*COUNTY OF STEUBEN v. ABBOTT LABORATORIES, INC.*, *et al.*
*W.D.N.Y. Case No. 05-CV-6223*

*COUNTY OF SUFFOLK v. ABBOTT LABORATORIES, INC., et al.*
*E.D.N.Y. Case No. 03-CV-229*

*COUNTY OF TOMPKINS v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0397

*COUNTY OF ULSTER v. ABBOTT LABORATORIES, INC., et al.*
*N.D.N.Y. Case No. 06-CV-0123*

*COUNTY OF WARREN v. ABBOTT LABORATORIES, INC. et al.*
N.D.N.Y. Case No. 05-CV-0468

*COUNTY OF WASHINGTON v. ABBOTT LABORATORIES, INC., et al.*
N.D.N.Y. Case No. 05-CV-0408

*COUNTY OF WAYNE v. ABBOTT LABORATORIES, INC., et al.*
W.D.N.Y. Case No. 05-CV-6138

*COUNTY OF WESTCHESTER v. ABBOTT LABORATORIES, INC., et al.*
S.D.N.Y. Case No. 03-CV-6178

*COUNTY OF WYOMING v. ABBOTT LABORATORIES, INC., et al.*
*W.D.N.Y. Case No. 05-CV-6379*

*COUNTY OF YATES v. ABBOTT LABORATORIES, INC., et al.*
W.D.N.Y. Case No. 05-CV-06172

*COUNTY OF YATES v. ABBOTT LABORATORIES, INC., et al.*
W.D.N.Y. Case No. 05-CV-06172

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................
        1

        A.      DEFENDANTS' FRAUDULENT INFLATION OF MEDICAID
                REIMBURSEMENT
                BENCHMARKS.....................................................................................2

        B.      FRAUDULENT UNDERPAYMENT OF REBATES.........................................10

II.     JURISDICTION AND VENUE ...................................................................12

III.    PARTIES ...................................................................................................14

IV.     ALLEGATIONS APPLICABLE TO ALL
        DEFENDANTS.............................................33

        A.      THE MEDICAID STATUTORY SCHEME.........................................................33

                1.      New York Medicaid Reimburses Pharmacy Providers Based
                        on AWP and FUL.........................................................................34

                2.      New York's Source for FULs and
                        AWPs...................................................38

                3.      Defendants Are Required To Report Accurate Prices to
                        the Government.............................................................................39

                4.      Medicaid Rebates Are Based on Best Price, AMP and the CPI...............40

        B.      DEFENDANTS' FRAUDULENT CONDUCT....................................................46

                1.      Intentionally False and Inflated AWPs.......................................................46

                2.      The Role of PBMs in the AWP Scheme.....................................................50

                3.      Failure to Report Best Prices and Pay Proper Rebates.............................52

V.      GOVERNMENT INVESTIGATIONS.............................................................54

VI.     ALLEGATIONS PARTICULAR TO THE COUNTIES AND THE INDIVIDUAL
        DEFENDANTS.......................................................................................61

A.    ABBOTT ................................................................62

B.    THE ALPHARMA GROUP ..............................................70

C.    ALPHA THERAPEUTICS ..............................................72

D.    THE AMGEN GROUP ................................................74

E.    ASTRAZENECA ....................................................79

F.    BARR ..........................................................84

G.    BAXTER ........................................................87

H.    BAYER ..........................................................90

I.    BIOGEN  IDEC ....................................................94

J.    BOEHRINGER GROUP ..............................................96

K.    THE BMS GROUP..................................................101

L.    CHIRON..........................................................105

M.    DEY ............................................................109

N.    ELI LILLY ......................................................116

O.    ENDO PHARMACEUTICALS..........................................119

P.    ETHEX ..........................................................121

Q.    THE FOREST GROUP ..............................................124

R.    THE FUJISAWA GROUP ............................................125

S.    THE GSK GROUP ................................................128

T.    THE HOFFMAN-LAROCHE GROUP ....................................134

U.    THE IVAX GROUP ................................................135

V.    JOHNSON & JOHNSON GROUP ......................................139

W.     THE KING GROUP ........................................................................143

X.     MEDIMMUNE ..............................................................................146

Y.     MERCK ........................................................................................147

Z.     THE MYLAN GROUP ..................................................................150

AA.    THE NOVARTIS GROUP ............................................................152

BB.    ORGANON ...................................................................................155

CC.    PAR .............................................................................................156

DD.    THE PFIZER GROUP ..................................................................158

EE.    THE PURDUE GROUP ................................................................164

FF.    SANOFI-AVENTIS GROUP ........................................................166

GG.    THE SCHERING GROUP ............................................................172

HH.    SERONO .....................................................................................178

II.     TAP PHARMACEUTICAL ..........................................................180

JJ.     TEVA GROUP .............................................................................184

KK.    THE WATSON GROUP ...............................................................189

LL.    WYETH .......................................................................................192

VII.    DAMAGES TO THE COUNTY MEDICAID PROGRAMS .........................................195

VIII.   FRAUDULENT CONCEALMENT .................................................................196

COUNT I VIOLATION OF FEDERAL MEDICAID STATUTE, 42 U.S.C. § 1396r-8
(FAILURE TO COMPLY WITH FEDERAL MEDICAID REBATE
PROVISION)................199

COUNT II VIOLATION OF N.Y. SOCIAL SERVICES LAW § 367(A)(7)(d)
(FAILURE TO COMPLY WITH STATE MEDICAID REBATE
PROVISION)....................200

COUNT III  VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-b
(OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS)................................................201

COUNT IV  VIOLATION OF NEW YORK DEPARTMENT OF HEALTH
REGULATIONS 18 N.Y.C.R.R. § 515.2(b)(4) and (5)..............................................................202

COUNT V  BREACH OF CONTRACT....................................................................................203

COUNT VI  UNFAIR TRADE PRACTICES (Violations of N.Y.  Gen.  Bus.
Law § 349 et seq.)...................................................................................................................205

COUNT VII  FRAUD.............................................................................................................208

COUNT VIII  UNJUST ENRICHMENT.................................................................................209

PRAYER FOR
RELIEF...................................................................................................................................209

The City of New York ("the City") and all New York Counties identified herein except the County of Nassau, by their attorneys, KIRBY McINERNEY & SQUIRE, LLP, and the County of Nassau, by its attorneys MILBERG WEISS & BERSHAD LLP (hereinafter "the Counties") for their First Amended Consolidated Complaint against the herein-named defendants, allege, on information and belief, as follows:

## I.     INTRODUCTION

1.     The Counties bring this action against the defendant manufacturers of prescription drugs to recover monetary damages, and for civil penalties, declaratory and injunctive relief, restitution, disgorgement of profits, and treble and punitive damages suffered by them and by the State and federal governments from 1992 to the present as a result of defendants' fraudulent and misleading schemes that overcharge the New York State Medicaid Program ("Medicaid Program") for prescription drugs bought on behalf of City and County residents who receive Medicaid benefits.  The specific prescription drugs at issue are identified by their unique national drug codes or "NDCs" (hereinafter the "at issue NDCs") and listed in Exhibits B1-B40 hereto, which are incorporated by reference in this First Amended Consolidated Complaint.

2.     The Counties, in their roles as Local Social Services Districts, play an integral part in the administration of the Medicaid Program in New York State, and pay approximately 25 percent of the Medicaid costs of New York residents.  N.Y. Soc. Serv. L. §§ 367-a and 368-a; 42 U.S.C. §1396d(b).  The State pays another 25 percent, and the federal government pays 50 percent.  Collectively, the County Medicaid Programs paid in excess of $20 billion for the at-issue NDCs between 1992 and 2005 alone.  *See* Exhibit A hereto.

3.      There are two relevant components of the price New York Medicaid pays for the prescription drugs at issue in this case.  The first is the price initially paid by Medicaid to the Pharmacy Provider, defined below, for the drug.  This price is determined by a formula contained in New York State law, and is based on wholesale price information provided by the manufacturers.  N.Y. Soc. Serv. L. §367-a(9).  The second component is a rebate that drug manufacturers pay to the states pursuant to a federal statutory formula, 42 U.S.C. § 1396r-8 (the "Medicaid Rebate Statute"), and pursuant to statutorily mandated Medicaid rebate contracts that each manufacturer executes with the Secretary of Health and Human Services "on behalf of the States."  Model Rebate Agreement at 1.[1]  The amount of the rebate is calculated by each manufacturer based on the manufacturer's own price information and utilization data compiled by the State Medicaid Plans

4.      Defendants' fraudulent schemes involve both components.  Their manipulation of the Medicaid program through intentional fraudulent inflation of the various reported wholesale prices that form the bases for each of these two components has resulted in overcharges of many millions of dollars to the County Medicaid Programs.

## A.      DEFENDANTS' FRAUDULENT INFLATION OF MEDICAID REIMBURSEMENT BENCHMARKS

5.      Federal regulations require State Medicaid Programs to reimburse providers for Medicaid covered drugs at the "lower of the 1) estimated acquisition costs plus reasonable dispensing fees established by the [Single State Medicaid Agency] or 2) providers' usual and customary charges to the general public."  42 C.F.R. § 447.331.

---

[1]  *See* 56 FR 7049 (Feb. 21, 1991) (reprinting text of the Model Rebate Agreement); 60 FR 48442 (Sept. 19, 1995) (discussing Model Rebate Agreement).  A copy of the current standard Model Rebate Agreement, available at http://www.cms.hhs.gov/medicaid/drugs/drebate.asp, and substantially similar to that executed by each defendant named herein, is Exhibit E hereto.

6.      New York Social Service Law provides that if the drug dispensed is a multiple source prescription drug for which a federal upper limit ("FUL") has been set by the Federal Centers for Medicare and Medicaid Services ("CMS"), reimbursement to Pharmacy Providers, defined below, generally will be at an amount equal to the FUL[2].  N. Y. Soc. Serv. L. §367-a(9).

7.      New York Social Services Law further provides that if the drug dispensed is a multiple source prescription drug or a brand-name prescription drug for which no FUL has been set by CMS, reimbursement to Pharmacy Providers will be at

> the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. For sole and multiple source brand name drugs, estimated acquisition cost means the average wholesale price ("AWP") of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the [New York State Department of Health], less [a certain percentage] thereof, and updated monthly by the department .

*Id.*

8.      At all times relevant hereto, First Data Bank has been the prescription drug pricing service used by New York State Medicaid.

9.      Defendant drug manufacturers control and unlawfully inflate the AWP and FULs that serve as the benchmarks for New York Medicaid reimbursements.

10.      Manufacturers set AWP.  They do this by (a) directly supplying AWP to publishers, (b) supplying publishers with a wholesale acquisition cost ("WAC") or WAC

---

[2] There is one important caveat to this.  New York Social Services Law §367-a(9)(c) requires that if the prescribing physician certifies that the Medicaid beneficiary must receive the brand version of the multi-source drug (by writing "brand necessary" and "DAW" on the prescription), then reimbursement to the Pharmacy Provider is based on AWP, not the FUL.   Defendants' own documents make clear that manufacturers of innovator multi-source drugs actively encourage physicians to write DAW in order to secure AWP-based reimbursement for pharmacies.

equivalent such as direct price or list price to which the publisher applies a standard 1.2 or 1.25 mark up and/or (c) by supplying both AWP and WAC or WAC equivalent.

11.     Until recently it was generally accepted that a true WAC should be 20-25% lower than AWP.  This was understood to constitute the wholesaler mark up.  This case is not about the 20-25% mark up between a true WAC and AWP to the extent that that range accurately reflects the true wholesaler mark up.

12.     This case concerns, *inter alia,* that, (a) WAC itself is false and inflated and drug manufacturers know that by reporting a false and inflated WAC or WAC equivalent they can trigger the publication of a false and inflated AWP on which reimbursements are made and (b) in many cases the spread between the published WAC and the published AWP exceeds the 20-25% range.  Exhibit F hereto provides examples of defendants' drugs for which AWP exceeds 1.2 or 1.25 WAC.  Even these examples may be understated to the extent the WACs themselves were false.

13.     Defendant drug manufacturers also control the FUL.  This is because CMS establishes the FUL for multi-source drugs that have three or more manufacturers based on the lowest price reported by a manufacturer to any of the publishing compendia for a particular drug type .  Specifically, CMS sets the FUL at "150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size."  42 CFR §447.332.  Importantly, the FUL is a per-unit price that applies to all NDCs for a particular multi-source drug.  In other words, if a FUL is in place for a particular multi-source drug, all NDCs for that drug will be reimbursed at that FUL.

14.     Defendants' failure to submit accurate pricing data to the publishing compendia can cause false and inflated FULs to issue.  It is clear that, in many instances, had defendants submitted accurate prices to pricing compendia, the FULs set by CMS would have been lower and New York State Medicaid Programs would have paid less.

15.     Exhibit B to this complaint details the many examples where a specific defendant's failure to report an accurate price for its drug resulted in a false and inflated FUL being set.  In each example of "FUL fraud" set forth in Exhibit B, the Counties allege that defendant's true price (or the "actual acquisition cost" "ACC") for the NDC at issue *was more than 50% lower* than the established FUL.  Had the defendant reported its true price for that NDC, the operative FUL would have been based on that defendant's true price and would have been lower than it was.   In such case, the County Medicaid Program's FUL-based reimbursement for that particular multi-source drug would have been less.  Thus, the Counties allege FUL fraud for every NDC listed in Exhibit B where the defendant's AAC is more than 50% below the established FUL.

16.     Defendants submit false and inflated price information to the publishing compendia in order to "create a spread" between the AAC of a drug and the amount at which the drug is reimbursed.

17.     Defendants know that by creating a spread they can incentivize pharmacists (both mail-order and traditional retail), Group Purchasing Organizations ("GPOs"), pharmacy benefit managers ("PBMs"), Hospital Out-Patient Pharmacies, Nursing Homes and various other Medicaid Pharmacy Providers who select among competing drugs and/or develop formularies to purchase or give preferential treatment to their products.

18.     Entities who can select among competing drug products or create formularies have substantial influence over which drug a patient ultimately receives. Entities who possess formulary power select the drug for their formularies based on spread and rebate. This is true whether the drug is single or multi-source.  Geri-Med, for example, a GPO serving long term care pharmacies makes clear in its marketing materials to its customers that one of the "Keys to Unlocking Profits" with respect to "Single Source Medications" is to "BUY THE PACKAGE SIZE WITH THE BEST AWP SPREAD".

19.     The pharmacist plays a role in deciding which drug a patient receives primarily by selecting among competing generic drugs.  The pharmacist stocks the generic option with the largest spread.  Often, PBMs operate mail order pharmacies and make similar drug selection choices.  By selecting a drug with the greatest spread between actual acquisition cost and reimbursement rate, the PBM mail order pharmacy can collect both the PBM's profit and the pharmacist's.

20.     The Wall Street Journal described one set of contracts involved in the sale of the antidepressant and antiobsessional generic drug fluoxetine, one of the drugs at issue here (reimbursed on AWP, not FUL) and manufactured by Defendants Barr, Novartis, Par and Teva. *See Rx for Margins:  Hired to Cut Costs, Firms Find Profits In Generic Drugs, Pharmacy-Benefit Managers Can Take Huge Markups And Still Offer 'Discounts,' Making $170 On Just 90 Pills*, WSJ., March 31, 2003, at A1.  The AWP for fluoxetine was $2.66 per pill.  The pharmacist could purchase fluoxetine for approximately 5 cents per pill.  According to the Wall Street Journal, the health plan paid AWP minus 73%, or 60 cents per pill, to a PBM, ExpressScripts, which in turn contracted with dispensing pharmacists approved by it to pay them 25 cents per

pill, or AWP minus 94%.  The PBM's profit was 35 cents per pill, and the pharmacist's profit was 20 cents per pill.

21.     In 2003 alone, the Counties spent over $8.2 million on fluoxetine manufactured by these defendants.  Exhibit B reveals fluoxetine spreads as high as 25,581%.  *See, for example*, Exhibit B-6.

22.     Wholesalers likewise establish formularies and auto-substitution programs (often on behalf of retail pharmacists) and otherwise make efforts to promote particular drugs so as to maximize their profits.

23.     By secretly polluting the entire reimbursement system with false and inflated prices, defendants improperly and unlawfully have caused the Medicaid Program to subsidize these improper incentives for the purchase of defendants' products.

24.     Defendants long have deliberately concealed that they create the spread in this way, and have deliberately concealed that the reason they cause false and inflated published reimbursement prices to issue is to create spreads between actual cost and reimbursement amounts that permit defendants to influence market share.  As recently as in 2003, for example, the CEO of defendant GlaxoSmithKline ("GSK") denied any benefit from spread manipulation.  In a conversation with shareholders GSK CEO J.P. Garnier stated that GSK "[has] never benefited from the spread becoming bigger or smaller."  Garnier stated that the reimbursement system "has a big loophole and can create confusion.  We don't like it one bit."   This was deliberately and entirely false as evidenced by the GSK spreads across the GSK product line (brand and generic alike) set forth in Exhibit B-19 hereto.  GSK and its constituent predecessors Glaxo Wellcome and SmithKline Beecham long competed on spread and benefited from the increased market share permitted by the incentives the spread created.

25.     As stated, Defendants create, inflate, manipulate and market the spread for both brand name and generic drugs.    With generic drugs, direct competition among bioequivalents provides an obvious motive to increase the spread.    With brands, creating incentives for formulary placement, as noted in the Geri-Med example, provides the same obvious motive.  In both scenarios, Defendants compete on reimbursement and profit rather than cost.

26.     There is on average more divergence between the actual price and the AWP for generic drugs than there is for brand name drugs.  A 2002 government report analyzing 1999 data found that pharmacists paid on average only 34.1% of AWP for generic drugs.  For brand name drugs pharmacists paid on average only 78.2% of AWP.  *See* Department of Health and Human Services, Office of Inspector General of the ("HHS OIG"), Medicaid Pharmacy-Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (Sept. 16, 2002) (A-06-02-00041).

27.     On December 7, 2004, the House Subcommittee of Oversight and Investigation of the Commerce and Energy Committee conducted a hearing on "Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much."  In his opening remarks, Chairman Joe Barton (R-TX) stated:

> Data obtained by the committee from five of the largest retail pharmacy chains reveals that during the period of July 1, 2002 to June 20, 2003, the average acquisition costs for seven widely prescribed generic drugs was 22 cents, while the average Medicaid reimbursement just for those drugs alone was 56 cents, more than double the cost . . . .

Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much: Hearing Before the House Subcomm. on Oversight and Investigations, 108th Cong., December 7, 2004

(hereinafter "House Hearing") Tr. at 3-4, 5 (statement of Joe Barton, Chairman, House Subcomm. on Oversight and Investigations).

28.     It has only recently become clear that these OIG, Congressional and other estimates of the extent of defendants' intentional AWP inflation were grossly understated—both as to generic and brand drug spreads-- as the data set forth in the Exhibits B hereto demonstrate. Thus, it has only recently become clear that States' efforts to estimate EAC through a reimbursement formula that discounted 10, 12 or 15 percent off AWP were ineffective given the extent of defendants' fraud.

29.     No government report has ever addressed the falsity of WAC. Only through extensive investigation have the Counties learned that the WACs defendants reported or caused to be reported are false and inflated as alleged herein.  Indeed, the fact that State Medicaid reimbursement formulas have historically been either [WAC + a certain %] or [AWP-a certain %] reveals the traditional belief in the reliability of WAC.  Under either a "WAC plus" or "AWP minus" formula, the States were endeavoring to approximate EAC.  Defendants' unlawful and undisclosed manipulation of the price reporting system as a whole has rendered States' efforts in this regard futile.  And, as stated above, the publication of a false WAC leads to the publication of a false AWP.

30.     Similarly, through their own extensive investigation the Counties have learned that defendants' pricing misconduct has caused the false and inflated FULs to issue.  The Counties' investigation has revealed numerous examples where defendants' failures to report accurate prices for particular multi-source drugs have resulted in inflated FULs to be set resulting in substantial overpayments to the County Medicaid programs.  *See* Exhibit B.

**B.      FRAUDULENT UNDERPAYMENT OF REBATES**

31.     The second component of County Medicaid Programs' prescription drug costs concerns the federally mandated rebate that drug manufacturers are required to pay based on price information provided quarterly by the manufacturers.  42 U.S.C. § 1396r-8.  The rebate for brand name drugs (defined as "single source drugs" or "innovator multiple source drugs") is the lesser of the difference between the Best Price and the Average Manufacturer's Price ("AMP")[3] or 15% of AMP.  Best Price is the lowest price paid by any purchaser.  "Wholesaler, retailer, provider, health maintenance organization, non-profit entity or governmental entity within the United States," with certain exclusions.  AMP is the average price paid to the manufacturer by wholesalers after any prompt-pay discounts (typically 2%).  *See* 42 U.S.C. § 1396r-8(c)(1)(C) (defining Best Price); 42 U.S.C. § 1396r-8(k)(1) (defining AMP).  The lower the Best Price for a particular drug, the greater the rebate will be.

32.     Defendants unlawfully reduce the amounts of rebates they pay for brand name drugs by omitting from their computations of Best Price statutorily and contractually required information.  For example, defendants omit from their rebate calculations, cash payments, free goods, bundling of other free drugs, tying arrangements that are retroactive rebates, in-kind services, routine discounts (such as volume discounts, and the customary prompt pay discount), chargebacks, rebates, free samples and other off-invoice transactions and inducements offered to create market share and demand for their products.

33.     Defendants, including Merck for its drug Pepcid and TAP for its drug Prevacid (to select two examples), make unlawful use of the so-called "nominal price" exception by omitting certain deeply discounted commercial sales from their Best Price calculation on the

---

[3]   The rebate for other drugs is 11.1% of AMP.  42 U.S.C. § 1396r-8(c)(3); N.Y. Soc. Serv. L. § 367 (a)(7)(d).

grounds that such fall within "nominal price."   The nominal price exception, however, is intended to apply to non-commercial sales.[4]

34.     A 2001 report issued by the Department of Health and Human Services ("HHS") found that many manufacturers had excluded from their Best Price calculations the discounted prices paid by HMOs, which were as much as 75 percent below the reported Best Price.   *See* Medicaid Drug Rebates – Sales to Repackagers Excluded From Best Price Determinations, HHS Office of the Inspector General (Mar. 27, 2001).

35.     In 2003, two defendants herein, Bayer and GSK, agreed to pay $346 million to resolve allegations that they defrauded Medicaid and Medicare by engaging in a scheme known as "lick and stick," wherein they relabeled their products before selling them to Kaiser Permanente Medical Care Program (the nation's largest HMO) at deep discounts, in order to exclude these discount-priced sales in computing and reporting their Best Prices.

36.     Numerous federal criminal and civil prosecutions illustrate that fraud with respect to both components of Medicaid pricing is pervasive among defendants.   Defendant Abbott is paying $621 million in criminal and civil penalties for defrauding Medicare and Medicaid and has affirmatively acknowledged its involvement in the fraud.   Defendant Bristol Myers is under investigation in connection with its pricing practices for drugs covered by Medicare and Medicaid.   Defendant AstraZeneca paid $355 million to settle federal fraud charges that it induced doctors to falsely bill Medicare and Medicaid.   Defendant Schering-Plough has agreed to pay nearly $350 million in fines and damages, and to plead guilty to criminal charges that it defrauded Medicaid.   Defendant TAP Pharmaceuticals paid $875 million

---

[4] The Medicaid statute permits pharmaceutical manufacturers to exclude from their Best Price calculations drugs with prices less than 10% of AMP.   42 U.S.C. § 1396r-8(c)(1)(C)(ii)(III).   This exception permits drug manufacturers to continue to sell drugs at nominal prices *to entities serving the public good* without including those sales in their Best Price calculations (and therefore without causing defendants to pay higher rebates).   However, certain manufacturers have abused the exception to hide commercial discounts.

in connection with its fraudulent pricing practices respecting Lupron.  Defendant Warrick paid $27 million to the state of Texas to resolve allegations that it reported fraudulent price information to Medicaid.  Defendant Dey paid $18 million to settle similar claims of defrauding Medicaid in Texas.  *See* Exhibit D (detailing investigations and lawsuits against defendants named herein for unlawfully inflating Medicaid prices based on AWP and understating the true amounts of Medicaid rebates owed).

37.     As a result of defendants' fraudulent and illegal manipulation of drug prices, defendants have reaped billions of dollars in illegal profits.  By this action, the Counties seek (1) recovery of the excessive Medicaid pharmacy costs paid by the City, the Counties, the State of New York, and the United States as a result of defendants' intentional misconduct; (2) an accounting for and payment of the full amount of rebates owed; (3) disgorgement of defendants' unlawful profits; (4) punitive damages; and (5) entry of an order directing defendants henceforth to report accurate wholesale price information, AMPs and Best Prices and pay correct rebates in compliance with federal and state statutes.

## II.     JURISDICTION AND VENUE

38.     Plaintiffs claim violations of, *inter alia*, the Social Security Act, 42 U.S.C. § 1396 *et seq*, N.Y. Social Services Law §§ 145-b and 367a, and N.Y. General Business Law § 349, and breach of contract, unjust enrichment, and common law fraud.

39.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action alleges violations of the Social Security Act, 42 U.S.C. § 1396 *et seq*. and breach of the federal Medicaid Rebate Contract, 42 U.S.C. §1396r-8.   This Court has supplemental jurisdiction over the Counties' state law claims pursuant to 28 U.S.C. § 1367.

40.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because each of the captioned matters has been transferred by the Judicial Panel on Multi District

Litigation to this district for pre-trial purposes pursuant to 28 U.S.C. §1407. The City and Counties originally filed cases in each of their respective federal district courts as noted in the caption.  Venue in such courts is proper because defendants do business and are qualified to do business in such districts; certain acts giving rise to the claims asserted in this complaint occurred within such districts; and the illegal actions of defendants, as alleged in this complaint, caused damage to plaintiffs within such districts.

### III.    PARTIES

41.    The City of New York and every County represented by Kirby McInerney & Squire, LLP (i.e., all Counties except Nassau) is a municipal corporation organized pursuant to the laws of the State of New York.  By statute, each plaintiff pays 25% of its County Medicaid Program's Medicaid prescription drug costs.  N.Y. Soc. Serv. L. §§ 367-a and 368-a.  Each plaintiff has paid for the subject drugs manufactured and marketed by each defendant.

42.    Plaintiff, the County of Nassau, New York is a municipal corporation organized pursuant to the laws of New York State.  Nassau County maintains its principal place of business at One West Street, Mineola, New York.  The County is statutorily required to pay 25% of its County Medicaid program's Medicaid prescription drug costs to the State for reimbursement of the State's expenditures under N.Y. Soc. Serv. Law §§ 367-68.  Plaintiff has paid for the subject drugs manufactured and marketed by each defendant.

43.    Each plaintiff brings suit against each defendant named herein with the following exceptions:  The City of New York asserts no claims against the Pfizer Group defendants.  The County of Onondaga asserts no claims against the Bristol Myers Squibb defendants.  The County of Suffolk, in this complaint, asserts claims only against Alpharma, Alpha Therapeutics, Dey, Endo, Ethex, Hoffman-LaRoche, The King Group, The Mylan Group, Organon and Serono.[5]

44.    Defendants are manufacturers and sellers of prescription drugs.  Each defendant conducts extensive business in the State of New York, including in the City of New

---

[5] Suffolk has already asserted claims against the remaining defendants named herein.  See Suffolk's Amended Complaint filed August 3, 2003.  Those claims have been sustained in part and dismissed in part.  Suffolk presently will file a motion for leave to join in this Consolidated Complaint with respect to those defendants.

York and in the Counties.  Each defendant manufactures, markets and sells prescription drugs with false and inflated wholesale prices that are paid for by the County Medicaid Programs.

45.     Defendant **ABBOTT LABORATORIES, INC.** ("Abbott") is an Illinois corporation engaged in the business of manufacturing and selling pharmaceuticals.  Abbott's principal place of business is located at 100 Abbott Park Road, Abbott Park, IL.  Abbott Pharmaceuticals ("Abbott Pharm") is the pharmaceutical division of Abbott.  Defendant Abbott Laboratories, Inc., doing business as itself, "Abbott Sales Marketing and Distributing Company" or the personal products unit, enters into co-promotion agreements and strategic alliances with other pharmaceutical companies, including but not limited to the MedImmune and Purdue Group defendants to promote their products through the same fraudulent scheme as described herein.

46.     The following two defendants are hereinafter referred to as the **ALPHARMA GROUP OR ALPHARMA**:

(a)             Defendant Alpharma, Inc. ("Alpharma") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Alpharma's principal place of business is located at One Executive Drive, Fort Lee, NJ 07024.

(b)             Defendant Purepac Pharmaceutical Co. ("Purepac"), a wholly owned subsidiary of Alpharma, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Purepac was acquired by Alpharma in December 2001.  According to the SEC, Purepac's principal place of business is located at One Executive Drive, Fort Lee, NJ  07024.

47.     Defendant **ALPHA THERAPEUTICS** ("Alpha Therapeutics") is a California corporation and the subsidiary of Prohibitas Pharma, and is currently doing business

15

as Grifols.  Alpha Therapeutics is in the business of manufacturing and selling pharmaceuticals with its principal place of business located at 2410 Lillyvale Avenue, Los Angeles, CA 90032.

48.     The following two defendants are hereinafter referred to as the **AMGEN GROUP OR AMGEN**:

(a)     Defendant Amgen, Inc.("Amgen, Inc.") is a Delaware corporation in the business of manufacturing and selling pharmaceuticals.  Amgen, Inc.'s principal place of business is located at One Amgen Drive, Thousand Oaks, CA 91320-1799.

(b)     Defendant Immunex Corporation ("Immunex"), a wholly owned subsidiary of Amgen, Inc. since July 2002, is a Washington State corporation engaged in the business of manufacturing and selling pharmaceuticals.  Immunex's principal place of business is located at 51 University Street, Seattle, WA 98101.

49.     The following three defendants are hereinafter referred to as the **ASTRAZENECA GROUP OR ASTRAZENECA:**

(a)     AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership engaged in the business of manufacturing and selling pharmaceuticals. AstraZeneca's principal place of business is located at 1800 Concord Pike, Wilmington, DE 19850-5437.

(b)     Defendant, AstraZeneca LP ("AstraZeneca LP"), is a Delaware limited partnership engaged in the business of manufacturing and selling pharmaceuticals. AstraZeneca LP's principal place of business is located at 725 Chesterbrook Boulevard, Wayne, PA.  AstraZeneca LP is a wholly-owned subsidiary of AstraZeneca PLC.

50.     Defendant **BARR LABORATORIES, INC**. ("Barr") is a New York corporation engaged in the business of manufacturing and selling pharmaceuticals.  Barr's

16

principal place of business is located at 2 Quaker Road, P.O. Box 2900, Pomona, NY 10970-0519.

51.     Defendant **BAXTER INTERNATIONAL, INC**. ("Baxter") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Baxter's principal place of business is located at One Baxter Parkway, Deerfield, Illinois.  In 1997, Baxter acquired Immuno International AG, a Swiss corporation, and is therefore its successor in interest.  Defendant Baxter Healthcare Corporation is the principal domestic operating subsidiary of Baxter International and located at the same address.  Baxter International and Baxter Healthcare are collectively referred to herein as "Baxter."

52.     Defendant **BAYER CORPORATION** ("Bayer Corp.") is an Indiana corporation engaged in the business of manufacturing and selling pharmaceuticals.  Bayer Corp.itself is a wholly owned United States subsidiary of a German corporation, Bayer AG. Bayer Corp.'s principal place of business is located at 100 Bayer Road, Crafton, PA 15205-9741. Bayer's Pharmaceutical subsidiary ("Bayer Pharm") is located at 400 Morgan Lane, West Haven, Connecticut.  Bayer Corp. and Bayer Pharm are collectively referred to as "Bayer."

53.     Defendant **BIOGEN IDEC, INC**.("Biogen Idec, Inc.") is a Delaware Corporation engaged in the business of developing, manufacturing and selling pharmaceuticals. Biogen Idec, Inc.'s principal place of business is 14 Cambridge Center, Cambridge, MA 02142. Biogen Idec, Inc. was formed through the November 2003 merger of Biogen, Inc. and IDEC Pharmaceuticals Corporation.  Biogen Idec., Inc. and IDEC Pharmaceutical are hereinafter referred to as "Biogen Idec."

54.     The following five defendants are hereinafter referred to as the **BOEHRINGER GROUP:**

17

(a)      Defendant Boehringer Ingelheim Corporation ("Boehringer") is a Nevada corporation engaged in the business of manufacturing and selling pharmaceuticals. Boehringer's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877.

(b)      Boehringer is a United States subsidiary of Pharm Investment Limited of Burlington, Canada which, in turn, is a division of C.H. Boehringer Sonn Grundstucksverwaltung GmbH & Co. KG of Ingelheim, Germany, a German corporation with its principal offices in Ridgefield, CT.

(c)      Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Pharm"), a wholly owned subsidiary of Boehringer, is a Connecticut corporation engaged in the business of manufacturing and selling pharmaceuticals.  Boehringer Pharm's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877.

(d)      Defendant Roxane Laboratories, Inc. ("Roxane"), a wholly owned subsidiary of Boehringer, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Roxane's principal place of business is located at 1809 Wilson Rd., Columbus, OH 43216-6532.

(e)      Defendant Ben Venue Laboratories, Inc. ("Ben Venue"), a wholly owned subsidiary of Boehringer, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ben Venue's principal place of business is located at 300 Northfield Road, Bedford, OH 44146.

(f)      Defendant Ben Venue was founded in 1938.  In 1993, Ben Venue created a separate division called Bedord Laboratories ("Bedford") to market and sell its own generic formulas.  In December 1997, Ben Venue was acquired by Boehringer.

55.     The following two defendants are hereinafter referred to as the **BMS GROUP:**

(a)     Defendant Bristol-Myers Squibb Company ("Bristol-Myers") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Bristol-Myers' principal place of business is located at 345 Park Avenue, New York, NY 10154-0037.  Westwood-Squibb ("Westwood") is a division of BMS.  BMS is not being sued by the County of Onondaga.

(b)     Defendant Oncology Therapeutics Network Corp. ("OTN"), a wholly owned subsidiary of Bristol-Myers, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  OTN's principal place of business is located at 395 Oyster Point Boulevard, Suite 405, South San Francisco, CA 94080.

56.     Defendant **CHIRON CORPORATION** is a Delaware Corporation engaged in the business of manufacturing and selling pharmaceuticals.  Chiron Corporation's principal place of business is located at 4560 Horton St., Emeryville, CA 94608-2916.  Chiron Corporation is also being sued for the conduct of its subsidiaries, divisions and predecessor corporations, including but not limited to Cetus Oncology Corp.  These entities are referred to herein as "Chiron".

57.     Defendant **DEY, L.P.** is a Delaware limited partnership with its principal offices in Napa, California. Defendant Dey, Inc., formerly known as Dey Laboratories, Inc., ("Dey Inc."), is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals and the general partner of Dey L.P.  Dey L.P. and Dey Inc. are collectively referred to herein as "Dey."  Dey's principal place of business is located at 2751 Napa Valley

Corporate Drive, Napa, CA 94558.  At all times relevant and hereto, all acts committed by or on behalf of Dey, Inc. were also committed by or on behalf of Dey, L.P.

58.     Defendant **EMD, INC.** ("EMD") is a corporation with headquarters in Durham, North Carolina and is the sole shareholder of Dey.  In 1998, Dey became a subsidiary of Lipha, S.A., based in Lyon, France.  In 1991, Merck KGaA acquired the majority share of Lipha, S.A.  Defendant Merck KGaA is a German company based in Darmstadt, Germany.  Dey L.P., Dey, Inc. and EMD are together referred to as "Dey."

59.     Defendant **ELI LILLY AND COMPANY** ("Eli Lilly") is an Indiana corporation engaged in the business of manufacturing and selling pharmaceuticals.  Eli Lilly's principal place of business is located at Lilly Corporate Center, Indianapolis, IN 46285.

60.     Defendant **ENDO PHARMACEUTICALS INC.** ("Endo"), a subsidiary of Endo Pharmaceuticals Holding Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmacueticals.  Endo's principal place of business is located at 100 Painters Drive, Chadds Ford, PA  19317.

61.     Defendant **ETHEX CORPORATION** ("Ethex"), a wholly owned subsidiary of KV Pharmaceutical Company ("KV"), is a Delaware corporation with its principal place of business at 10888 Metro Court, St. Louis, MO.  KV is also a Delaware corporation with its principal place of business at 2503 South Hanley Road, St. Louis, MO.  Ethex is in the business of manufacturing, marketing and selling prescription pharmaceuticals.

62.     The following two defendants are hereinafter referred to as the **FOREST GROUP**:

(a)     Defendant Forest Laboratories, Inc. ("Forest") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Forest's principal place of business is located at 909 Third Ave, New York, NY 10022.

(b)     Defendant Forest Pharmaceuticals, Inc. ("Forest Pharm") is a corporation engaged in the business of manufacturing and selling pharmaceuticals.  Forest Pharm is headquartered in St. Louis, Missouri and is a wholly owned subsidiary of Forest Laboratories, Inc.  Forest Pharm's principal place of business is located at 13600 Shoreline Drive, St. Louis, MO 63045.

63.     The following two defendants are hereinafter referred to as the **FUJISAWA GROUP**:

(a)     Defendant Fujisawa Healthcare, Inc. ("Fujisawa") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Fujisawa's principal place of business is located at Three Parkway North, Deerfield, IL 60015.

(b)     Defendant Fujisawa USA, Inc. ("Fujisawa USA") was a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Fujisawa USA's principal place of business was located at Three Parkway North, Deerfield, IL 60015.

64.     The following three defendants are hereinafter referred to as the **GSK GROUP**:

(a)     Defendant GlaxoSmithKline P.L.C. ("GSK"), created through the merger of Glaxo Wellcome, P.L.C. and SmithKlineBeecham P.L.C., is a British corporation engaged in the business of manufacturing and selling pharmaceuticals.  GSK's principal place of business is located at 980 Great West Road, Brentford, Middlesex, EN, TW8 9, U.K.  Cerenex Pharmaceuticals ("Cerenex") is a division of GSK

(b)     Defendant     SmithKline     Beecham     Corporation     d/b/a
GlaxoSmithKline ("SmithKline"), a wholly owned subsidiary of the former SmithKlineBeecham
P.L.C., is a Pennsylvania corporation engaged in the business of manufacturing and selling
pharmaceuticals.  SmithKline's principal place of business is located at One Franklin Plaza, 16th
and Race Streets, Philadelphia, PA 19102.

(c)     Defendant GlaxoWellcome, Inc. ("Glaxo"), a wholly-owned
subsidiary of GlaxoSmithKline, is a North Carolina corporation with its principal place of
business at 5 Moore Drive, P.O. Box 13398, Research Triangle Park, NC.   Cerenex
Pharmacueticals ("Cerenex"), a division of Glaxo prior to the merger, was responsible for
Glaxo's central nervous system drugs, including Zofran.

65.     The following two defendants are hereinafter referred to as the **IVAX
GROUP**:

(a)     Defendant Ivax Corporation ("Ivax") is a Florida (formerly
Delaware) corporation engaged in the business of manufacturing and selling pharmaceuticals.
Ivax's principal place of business is located at 4400 Biscayne Blvd., Miami, FL, 33137.

(b)     Defendant Ivax Pharmaceuticals Inc. ("Ivax Pharm") (formerly
Zenith Goldline Pharmaceuticals, Inc.), a wholly owned subsidiary of Ivax, is a Florida
corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ivax Pharm's
principal place of business is located at 4400 Biscayne Blvd., Miami, FL, 33137.

66.     The following eight defendants are hereinafter referred to as the
**JOHNSON & JOHNSON GROUP**:

(a)      Defendant Johnson & Johnson ("J&J") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  J&J's principal place of business is located at One Johnson & Johnson Plaza, New Brunswick, NJ, 08933.

(b)      Defendant Janssen Pharmaceutica Products, LP ("Janssen"), a wholly owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals.  Janssen's principal place of business is located at 1125 Trenton-Harbourton Road, Titusville, NJ 08560.

(c)      Defendant Ortho-McNeil Pharmaceutical, Inc. ("Ortho McNeil"), a wholly owned subsidiary of J&J, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ortho McNeil's principal place of business is located at 1000 U.S. Route 202 South, Raritan, NJ 08869.

(d)      Defendant Ortho Biotech Products, LP ("Ortho Biotech"), a wholly owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals.  Ortho Biotech's principal place of business is located at 700 U.S. Highway 202, Raritan, NJ 08869.

(e)      Defendant McNeil-PPC, Inc. ("McNeil"), a wholly owned subsidiary of J&J, is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  McNeil's principal place of business is located at 7050 Camp Hill Road, Fort Washington, PA 19034.  McNeil Consumer & Specialty Pharmaceuticals ("McNeil Cons") is a division of McNeil.

(f)      Defendant Alza Corporation ("Alza"), is a Delaware Corporation engaged in the business of manufacturing and selling pharmaceuticals.  Alza's principal place of

business located at 1900 Charleston Road, Mountain View, CA.   J&J acquired Alza from Defendant Abbott in 2000.

(g)     Defendant Centocor, Inc. ("Centocor"), is a Pennsylvania Corporation engaged in the business of manufacturing and selling pharmaceuticals.  Centocor's principal place of business located at 244 Great Valley Parkway, Malvern, PA.

(h)     Defendant Ethicon, Inc. ("Ethicon"), is a New Jersey Corporation, engaged in the business of manufacturing and selling pharmaceuticals.  Ethicon's principal place of business is located at Route 22 West, Somerville, NJ.

67.     The following three defendants are hereinafter referred to as the **KING GROUP**:

(a)     Defendant King Pharmaceuticals, Inc. ("King") is a Tennessee corporation in the business of manufacturing and selling pharmaceuticals.  King's principal place of business is located at 501 Fifth St., Bristol, TN 37620.

(b)     Defendant Monarch Pharmaceuticals, Inc. ("Monarch"), a wholly owned subsidiary of King, is a Tennessee corporation in the business of manufacturing and selling pharmaceuticals.  Monarch's principal place of business is located at 501 Fifth Street, Bristol, TN 37620.

(c)     Defendant King Research and Development ("King R&D"), a wholly owned subsidiary and successor to Jones Pharma Incorporated, is a Tennessee corporation in the business of manufacturing and selling pharmaceuticals.  King R&D's principal place of business is located at 501 Fifth Street, Bristol, TN 37620.

68.     Defendant **MEDIMMUNE, INC.** ("MedImmune") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.

MedImmune's principal place of business is located at One MedImmune Way, Gaithersburg, MD 20878.  Since at least 1998, Medimmune has had a co-promotion and marketing agreement with defendant Abbott's Ross Products Unit.

69.   Defendant **MERCK & CO., INC.** ("Merck") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  Merck's principal place of business is located at One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 08889-0100.

70.   The following three defendants are hereinafter referred to as the **MYLAN GROUP**:

(a)   Defendant Mylan Laboratories Inc. ("Mylan") is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals, mainly through its subsidiaries.  Mylan's principal place of business is located at 1500 Corporate Drive, Suite 400, Canonsburg, PA 15317.

(b)   Defendant Mylan Pharmaceuticals Inc. ("Mylan Pharm"), a wholly owned subsidiary of Mylan, is a West Virginia corporation engaged in the business of manufacturing and selling pharmaceuticals.  Mylan Pharm's principal place of business is located at 1500 Corporate Drive, Suite 400, Canonsburg, PA 15317.

(c)   Defendant UDL Laboratories, Inc. ("UDL"), a wholly owned subsidiary of Mylan, is an Illinois corporation engaged in the business of manufacturing and selling pharmaceuticals.  UDL's principal place of business is located at 1500 Corporate Drive, Suite 400, Canonsburg, PA 15317.

71.   The following three defendants are hereinafter referred to as the **NOVARTIS GROUP**:

(a)     Defendant Novartis Pharmaceuticals Corporation ("Novartis") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Novartis' principal place of business is located at One Health Plaza, East Hanover, NJ 07936.

(b)     Defendant Sandoz, Inc. ("Sandoz") is a wholly owned subsidiary of Novartis.  Sandoz is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Sandoz's principal place of business is located at 506 Carnegie Center, Suite 400 Princeton, NJ 08540.

(c)     Defendant Geneva Pharmaceuticals was incorporated in 1991 under the laws of Colorado with its principal offices in Plainsboro, NJ.  On December 1, 2003, Geneva was acquired by Sandoz.

72.     Defendant **ORGANON   PHARMACEUTICALS   USA,   INC.** ("Organon") is a Delaware corporation, a subsidiary of Akzo Nobel, NV and is engaged in the business of manufacturing and selling pharmaceuticals.  Organon's principal place of business is located at 56 Livingston Ave., Roseland, NJ 07068.

73.     The following two defendants are hereinafter referred to collectively as the **PAR GROUP**:

(a)     Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation in the business of manufacturing and distributing generic drugs in the United States and maintains its principal place of business located at One Ram Ridge Road, Spring Valley, NY 10977.  Defendant Par Pharmaceutical Companies, Inc. is being sued for the conduct of its subsidiaries and/or division, including but not limited to, Par Pharmaceutical, Inc.

(b)     Defendant Par Pharmaceutical, Inc., a wholly owned subsidiary of Par Pharmaceutical Companies, Inc., is in the business of manufacturing and distributing generic

drugs in the United States and maintains its principal place of business located at One Ram Ridge Road, Spring Valley, NY 10977.

74.      The following four defendants are hereinafter referred to as the **PFIZER GROUP**:

a)      Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Pfizer's principal place of business at 235 East 42nd Street, New York, NY 10017.

b)      Defendant Pharmacia Corporation ("Pharmacia") is a wholly-owned Pfizer subsidiary engaged in the business of manufacturing and selling pharmaceuticals. Pharmacia's principal place of business is located at 100 Route 206 North, Peapack, NJ 07977.

c)      Defendant Agouron Pharmaceuticals, Inc. ("Agouron") is a California corporation engaged in the business of manufacturing and selling pharmaceuticals, and a wholly owned Pfizer subsidiary.  Agouron's principal place of business is located at 10777 Science Center Dr., San Diego, CA 92121.

d)      Defendant Greenstone, LTD ("Greenstone") is a Delaware corporation engaged in the business of manufacturing and or selling pharmaceuticals. Greenstone LTD is a wholly owned Pfizer subsidiary.  Greenstone's principal place of business is located at 100 Route 206 North, Peapack, NJ 07977.

75.      The following three defendants are hereinafter referred to as the **PURDUE GROUP**:

(a)      Defendant Purdue Pharma, L.P. ("Purdue L.P.") is a Delaware limited partnership engaged in the business of manufacturing and selling pharmaceuticals.

Purdue L.P.'s principal place of business is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT.

(b)      Defendant The Purdue Frederick Company ("Purdue Frederick") is a New York corporation engaged in the business engaged in the business of manufacturing and selling pharmaceuticals.  Purdue Frederick's principal place of business is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT.

(c)      The Purdue Pharma Company ("Purdue Co.") is a Delaware general partnership engaged in the business of manufacturing and selling pharmaceuticals. Purdue Co's principal place of business is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT.  Defendants Purdue L.P. and Purdue Frederick are general partners of Purdue Co.

76.      The following five defendants are hereinafter referred to as the **SANOFI-AVENTIS GROUP**:

(a)      Defendant Sanofi-Aventis ("Sanofi-Aventis"), formerly known as Aventis Pharmaceuticals, Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Aventis Pharm's principal place of business is located at 55 Corporate Boulevard, Bridgewater, NJ 08807.  Sanofi-Aventis was created as a result of a merger between Aventis Pharmaceuticals and Sanofi-Synthelabo in August 2004.

(b)      Defendant Dermik Laboratories, Inc. ("Dermik"), a wholly owned subsidiary of Aventis Pharm, is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals.  Dermik's principal place of business is located at 1050 Westlakes Drive, Berwyn, PA 19312.

(c)      Defendant Aventis Behring L.L.C. ("Aventis Behring"), is an Illinois limited liability corporation with its principal place of business located at 1020 First

Avenue, King of Prussia, PA.  Aventis Behring LLC is the successor-in-interest to Centeon, LLC and Armour Pharmaceuticals.

(d)    Defendant Hoechst Marion Roiussel, Inc. ("Hoechst"), is a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, MO.

77.    The following two defendants are hereinafter referred to as the **HOFFMAN-LAROCHE GROUP**:

(a)    Defendant Hoffman-La Roche, Inc. ("Hoffman-LaRoche") is a New Jersey corporation.  Hoffman-LaRoche is the U.S. prescription drug unit of the Roche Group and is engaged in the business of manufacturing and selling pharmaceuticals.  Roche's principal place of business is located at 340 Kingsland Street, Nutley, NJ 07110-1199.

(b)    Defendant Roche Laboratories, Inc. ("Roche"), a wholly owned subsidiary of Roche, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Roche principal place of business is located at 340 Kingsland Street, Nutley, NJ 07110-1199.

78.    The following three defendants are hereinafter referred to as the **SCHERING GROUP:**

(a)    Defendant Schering-Plough Corp. ("Schering-Plough") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  Schering's principal place of business is located at 2000 Galloping Hill Rd., Kenilworth, NJ 07033.

(b)    Schering Corporation ("Schering") is a corporation organized under the laws of New Jersey with it principal offices located at 1 Giralda Farms, P.O. Box 1000,

Madison, New Jersey 07940.   Schering-Plough and Schering are the actual manufacturers, marketers, sellers, and/or suppliers of the products involved in this litigation and are Warrick's actual parent(s) or shareholder(s).

(c)   Defendant Warrick Pharmaceuticals Corporation ("Warrick"), a wholly owned direct subsidiary of Schering-Plough and Schering, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.   Warrick's principal place of business allegedly is located at 12125 Moya Boulevard, Reno, NV 89506.   However discovery in the matter styled the *State of Texas ex rel. Ven-a-Care of the Florida Keys, Inc., v. Warrick Pharmaceuticals Corp*, *Schering Plough Corp, et al.*, No GV002327 (D. Ct., Travis Co., Tex.), led the State of Texas to conclude that Warrick's principal offices and operations are actually in the State of New Jersey, where its direct parents Schering-Plough and Schering are located.

79.   Defendant **SERONO, INC.** ("Serono") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.   Serono's principal place of business is located at One Technology Place, Rockland, MA 02370.

80.   Defendant **TAP PHARMACEUTICAL PRODUCTS, INC.** ("TAP"), a joint venture between defendant Abbott and Takeda Chemical Industries, Ltd., of Osaka, Japan, is a corporation engaged in the business of manufacturing and selling pharmaceuticals.   TAP's principal place of business is located at 675 North Field Drive, Lake Forest, IL 60045.

81.   The following four defendants are hereinafter referred to as the **TEVA GROUP**:

(a)   Defendant Teva Pharmaceuticals Industries, Ltd. ("Teva Ltd.") is an Israeli corporation engaged in the business of manufacturing and selling generic and

30

proprietary branded pharmaceuticals and active pharmaceutical ingredients.  Teva's principal

place of business is located at 5 Basel St., Petach Tikva 49131, Israel.

(b)      Defendant Teva Pharmaceutical USA ("Teva USA") is a Delaware

corporation engaged in the business of manufacturing and selling of pharmaceuticals.  Teva

USA's principal place of business is located at 1090 Horsham Rd., North Wales, PA 19454.

Teva USA is a wholly-owned subsidiary of Teva Ltd.

(c)      Sicor, Inc., f\k\a Gensia Sicor Pharmaceuticals, Inc. f/k/a Gensia

Laboratories Ltd**.** ("Sicor") is a Delaware corporation with its principal offices in Irvine,

California.  Gensia was founded in 1986 to manufacture and sell pharmaceutical products

primarily related to cariovascular disceases.  In 1997 Gensia and Rakepoll Finance merged and

the corporate name became Gensia Sicor.  In 1999, Gensia Sicor changed its name to Sicor, Inc.

In 2003, Teva Pharmaceuticals, Inc. acquired Sicor.  Sicor's principal place of business is located

at 19 Hughes, Irvine, California 92618.  Sicor is a wholly-owned subsidiary of Teva Ltd.

(d)      Defendant Novopharm USA, In. ("Novopharm") is a Delaware

corporation engaged in the business of manufacturing and selling of pharmaceuticals.

Novopharm's principal place of business is located at 165 East Commerce Drive, Suite 100-201,

Schaumburg, Illinois 60173.  Novopharm is a wholly owned subsidiary of Teva Ltd.

82.     The following two defendants are hereinafter referred to as the **WATSON

GROUP**:

(a)      Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada

corporation engaged in the business of manufacturing and selling pharmaceuticals.  Watson's

principal place of business is located at 311 Bonnie Circle, Corona, CA 92880.

(b)     Defendant Watson Pharma, Inc., formerly known as Schein ("Watson Pharma"), a wholly owned subsidiary of Watson since 2000, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Watson Pharma's principal place of business is located at 311 Bonnie Circle, Corona, CA 92880.

83.     Defendant **WYETH**, formerly American Home Products Corp., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Wyeth's principal place of business is located at Five Giralda Farms, Madison, NJ 07940.

84.     Wyeth-Ayerst is a division of Wyeth.  Wyeth Pharmaceuticals, Inc., headquartered in Collegeville, Pennsylvania, is the major division of Wyeth manufacturing and distributing pharmaceuticals.

## AS YET UNNAMED CO-CONSPIRATORS AND DOE DEFENDANTS

85.     Various other individuals, partnerships, sole proprietors, business entities, companies, and corporations, presently unknown to the Counties and not named as defendants in this Complaint, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  Such unknown persons or entities acted as co-conspirators and aided, abetted, or participated with defendants in the commission of the wrongful acts alleged herein or otherwise caused the damages suffered by the Counties.

86.     Except as described herein, the Counties are, as yet, ignorant of the true names, capacities, nature and extent of the participation in the course of conduct alleged herein of the persons sued as DOES 1-100 inclusive and, therefore, sue these defendants by such fictitious names.  The Counties will amend this Complaint to allege the true names and capacities of the Doe defendants when ascertained.

87.     Defendants unknown at this time may include independent pharmacies, dispensers, and other Pharmacy Providers who prescribed drugs and received inflated Medicaid reimbursements and engaged in fraudulent billing practices, as well as various other persons, wholesalers, publishers, partnerships, sole proprietors, firms, corporations and individuals that may have participated as co-conspirators with defendants in the offenses alleged in this complaint and may have performed acts and made statements in furtherance of the alleged illegal conduct.

88.     Each of the defendants designated herein as a Doe defendant is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiffs will seek leave of Court if necessary to amend this Complaint to reflect the true names and capacities of the defendants designated herein as Does when such identities become known.

## IV.    ALLEGATIONS APPLICABLE TO ALL DEFENDANTS

### A.    THE MEDICAID STATUTORY SCHEME

89.     Medicaid was established by Title XIX of the Federal Social Security Act (the "Act"), 42 U.S.C. §§ 1396 *et seq*. (the "Medicaid Program").  The Act mandates the establishment of minimum health and safety standards that must be met by providers and suppliers, such as defendants, participating in the Medicaid Program.

90.     State participation in Medicaid is voluntary, but once a state agrees to participate, as New York has (*see* N.Y. Social Services Law § 363 *et seq*.), the state must comply with all federal statutory requirements.  The Medicaid plan proposed by each state must be approved by the federal government.  *Se*e 42 U.S.C. § 1396a(a) and (b).  New York State's Medicaid plan has been expressly approved by the federal government.  42 C.F.R. § 433.32, at 79-29, 42 C.F.R. § 433.33, at 80-84.

91.     New York State's Medicaid plan requires that local social service districts, such as the Counties, pay one half of the district's costs for drugs covered by Medicaid, after first deducting the federal share.  N.Y. Social Services Law § 368-a.  The federal share is generally 50 percent of the cost, 42 U.S.C. § 1396(d)(b), leaving the remaining 50 percent to be split equally between the State and the Counties.

92.     Federal Medicaid law requires states and localities to seek recovery of the full amount of any overcharge to the Medicaid program, including the federal and state shares of such overcharges.  42 U.S.C. § 1396a(a)(25)(A) & (B); 42 U.S.C. § 1396b(d)(3)(A).  New York law implements these federal statutory requirements by providing treble damages for any knowing overcharge of the Medicaid program, and further providing to "the local social services district or the state" a cause of action for recovery of such damages.  N.Y. Soc. Serv. L. § 145-b(2).  Under the New York statute, "[a]mounts collected pursuant to a judgment under this section shall be apportioned between the local social services district and the state."  *Id.*

## 1.  New York Medicaid Reimburses Pharmacy Providers Based on AWP and FUL

93.     As stated, New York State Statute provides that, in general, if CMS has established a FUL for a particular multi-source drug, New York Medicaid will reimburse Pharmacy Providers for that drug based on the FUL. N.Y. Soc. Serv. L. §367-a(9)(b)(i).

94.     The one exception to the above rule is that even where a FUL is in place, "if a qualified prescriber certifies 'brand medically necessary' or 'brand necessary' in his or her own handwriting directly on the face of a prescription for a multiple source drug for which a specific upper limit of reimbursement has been established by the federal agency, in addition to writing 'd a w' in the box provided for such purpose on the prescription form, reimbursement for that innovator multisource drug will be made based on AWP."  N.Y.Soc. Serv.L. §367-a(9)(c).

95.     If no FUL is in place for particular drug, New York Statute provides for reimbursement at estimated acquisition cost or EAC.  New York Statute defines EAC at AWP less a percentage discount.  N.Y. Soc. Serv. L. §367-a(9)(b)(ii).

88.96.  Prior to April 15, 2003, the formula was AWP minus 10%.  From May 15, 2003 to April 1, 2004, the formula was AWP minus 12%.  N.Y. Soc. Serv. L. § 367-a(9)(b)(ii)[6]; *see* N.Y Laws 2003, Ch. 62, Part Z2 (decreasing reimbursement from AWP minus 10% to AWP minus 12%).

89.97.  In 2004, N.Y. Soc. Serv. L. § 367-a(9) was amended, effective April 1, 2004, to provide that brand name drugs are reimbursed through Medicaid at the rate of AWP minus 12.75%[7] and generic drugs for which no FUL has been established are reimbursed at AWP minus 16% or at a maximum price determined by the New York State Commissioner of Health using "a similar methodology as that utilized by the Centers for Medicare and Medicaid Services in establishing the federal upper payment limit."  N.Y. Soc. Serv. L. § 367-a(9)(e) and Laws 2004, Ch. 58, Part C, §36.

90.98.  In addition, New York law has at all relevant times provided for a dispensing fee of between $3.50 and $4.50 to be added to all reimbursements.  N.Y. Soc. Serv. L. § 367-a(9)(d).

99.     The Medicaid reimbursements at issue in this litigation are those made on the basis of AWP and FUL.  Every drug listed in Exhibit B to this complaint, regardless what type of drug it is or what form it takes  (i.e. tablet, vial, inhalant, injectible, syringe, solution, etc)

---

[6] The alternative measure of reimbursement for brand name drugs set forth in subsection (ii), the "usual and customary price charged to the general public," is not used because the necessary data are not available.  This alternative measure has been retained in the 2004 amendment.

[7] The 2004 amendment creates one exception to the reimbursement formula:  "specialized HIV pharmacies", as defined by N.Y. Soc. Serv. L §367-a(9)(f), are reimbursed for all drugs without FULs at AWP minus 12%. N.Y. Soc. Serv. L. §367-a(9)(b)(ii).

*or whether it could also be identified as or labeled "physician administered"* has been reimbursed by New York Medicaid based on AWP or FUL.

100.    By way of background, every prescription drug in the United States is assigned a National Drug Code ("NDC codes"), also known as a formulary code. The United States Food and Drug Administration publishes such codes for each of the various dosages and packagings of each drug.

101.    While New York has at all times relevant hereto maintained an open formulary, since at least 1991, the New York State Department of Health has maintained a "List of Medicaid Reimbursable Drugs". This List identifies - by NDC - all drugs for which New York Medicaid will reimburse Pharmacy Providers when they submit a claim for reimbursement. It is, in fact, a list of every Medicaid covered drug.

102.    Every drug listed in Exhibit B to this Complaint has appeared on this List of Medicaid Reimbursable Drugs.

103.    The List of Medicaid Reimbursable Drugs sets forth, for each NDC, the "MRA Cost" (or Maximum Reimbursement Amount Cost) that New York Medicaid will pay.

104.    At all times between 1992 and September 5, 2006, the MRA Cost has been based upon either the drug's reported AWP or any FUL that was in place.[8]

105.    Any licensed Pharmacy Provider enrolled in the New York Medicaid program who submits a claim for any drug on the List of Medicaid Reimbursable Drugs is reimbursed at the MRA Cost. Since the MRA cost is based on AWP or FUL, this means that between 1992 and September 5, 2006, the Pharmacy Provider was reimbursed based on AWP or

---

[8] From September 5, 2006 to the present, the MRA Cost has been based upon either the drug's reported AWP, any FUL that has been in place or the newly-implemented New York State Maximum Allowable Cost (SMAC).

FUL when the Provider submitted a claim for any drug on the List of Medicaid Reimbursable Drugs.

106.    Every drug listed in Exhibit B to this complaint has appeared on the List of Medicaid Reimbursable Drugs and was reimbursed based on AWP or FUL when the claim for that drug was submitted by a Pharmacy Provider.

107.    Pharmacy Providers are all forms of licensed pharmacies enrolled in the New York Medicaid Program.  This includes all forms of retail pharmacies, chain pharmacies, specialty pharmacies, home infusion companies, long term care pharmacies, out-patient hospital pharmacies, out-patient clinic pharmacies or any other licensed and enrolled Pharmacy Provider.

108.    Pharmacy Providers have routinely submitted claims for all of the drugs listed in Exhibit B, be that drug a tablet, syringe, vial, inhalant, injectible drug or otherwise. And, when a Pharmacy Provider submits such claim, that Pharmacy Provider is reimbursed based on AWP or FUL.

109.    *The type or form of of drug, i.e. tablet, syringe, vial, inhalant, injectible drug or otherwise, has no relevance whatsoever in the New York Medicaid statutory scheme. The label "Physician Administered Drug" has no meaning in the New York Medicaid statutory scheme.*  Thus, if a home infusion pharmacy, one type of Pharmacy Provider, submits a claim for an injectible drug on the List of Medicaid Reimbursable Drugs, that home infusion pharmacy is reimbursed based on AWP or FUL.

110.    Between 1997-2004 alone, New York Medicaid has reimbursed Pharmacy Providers based on AWP or FUL for the injectibles, syringes, inhalants and vials listed in the Exhibits hereto in an amount that exceeds $2.4 billion.

111.    New York Medicaid only reimburses for drugs based on actual (or invoice) cost when the drug is "provided by a medical practictioner and claimed separately by the practioner".  N.Y. Soc. Serv. Law §367-a(9)(a).  Medicaid practictioners are not Pharmacy Providers under New York Medicaid; Pharmacy Providers are not medical practitioners.

### 2.  New York's Source for FULs and AWPs

112.    AWPs and FULs are published and reported by non-party publishing compendia such as First Data Bank's Blue Book ("FDB") based on pricing information supplied by defendant drug manufacturers.  At all times relevant hereto, New York has used FDB as its source for FULs and AWPs.

113.    States must rely on AWP and FUL as proxies for EAC in large part because defendants purposefully and fraudulently conceal their true prices claiming they are proprietary trade secrets.  Even at the time when the Medicaid rebate provision was enacted, the manufacturers made sure that pricing information would not be disclosed to the states.  As Representative Henry Waxman explained during the December 2004 House Committee or Energy and Commerce hearings, or Medicaid pricing practices.

> the drug industry was powerful, and they succeeded in securing a
> provision in the basic legislation that kept the Best Price and the
> AMP information a secret.  Can you imagine that?  The federal
> government knew this information, but we kept it a secret from the
> states.  This has proved to be a costly error.  Without this crucial
> piece of information, states who were, after all, responsible
> establishing the reimbursement rate for prescription drugs could
> not set their reimbursement rates appropriately.  As a result, [the
> states] continued to rely on the average wholesale price minus the
> arbitrary amount because they did not have the information needed
> to set a more appropriate reimbursement rate.
>
> *House Hearing* Tr. at 23.

### 3.  Defendants Are Required To Report Accurate Prices to the Government

114.   The federal government has emphasized the importance of accurate reported prices.  In its April 2003 report, "Compliance Program Guidance for Pharmaceutical Manufacturers," the HHS OIG reaffirmed that the "government sets reimbursement with the expectation that the data provided are complete and accurate."  The OIG made clear that "manufacturers reported prices" must be meaningful figures that are tethered to actual prices:

> Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers.  Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues).  Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

Off. of Inspector Gen., Dep't of Health and Human Services, *Compliance Program Guidance for Pharmaceutical Manufacturers*, at 12 (2003).  Defendants routinely and consistently violate this.  They sell the vast majority of their drugs at prices that bear little or no relation to the reimbursement prices they report to the publishing compendia.

115.   The OIG has rejected the notion that purposeful manipulation of reimbursement prices generally, and AWP in particular, is a lawful practice:

> The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer.  In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed.  To the extent that a manufacturer controls the "spread," it controls its customer's profit.

Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike bona fide discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business. **In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.**

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process. Furthermore, manufacturers should review their marketing practices. **The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute.** Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product.

*Id*. at 26-27 (2003) [emphases added].

## 4. Medicaid Rebates Are Based on Best Price, AMP and the CPI

116.    The second component of the price that Medicaid pays for prescription drugs is determined by the federally mandated rebate provision. Under the Medicaid rebate provision, 42 U.S.C. § 1396r-8, a manufacturer of a drug that wishes to have its products paid for

by Medicaid must enter into a rebate agreement with the Secretary of Health and Human Services.

117.    The rebate for brand-name drugs (defined as "single source drugs" or "innovator multiple source drugs") is the difference between the AMP and the Best Price, or 15% of the AMP, whichever is greater.  42 U.S.C. §§ 1396r-8(c)(1) – (2); N.Y. Soc. Serv. L. § 367 (a)(7)(d).  Thus, the lower the Best Price, the greater the rebate.

118.    The statute requires each manufacturer of single source or brand name innovator drugs to report to Medicaid its Best Price and its AMP and to pay rebates to state Medicaid programs based on its own accurate determination of Best Price and AMP.  42 U.S.C. § 1396r-8(b)(1)(A).[9]

119.    Where the cost of a drug has outpaced the increase in the consumer price index over a period of time, the Medicaid rebate provision requires each drug manufacturer to pay an additional rebate.  42 U.S.C. § 1396r-8(c)(2),

120.    The Medicaid rebate provision contains precise specifications concerning how Best Price is to be calculated.  It defines Best Price as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, non-profit entity or governmental entity in the United States," with certain enumerated exceptions.  42 U.S.C. § 1396r-8(c)(1)(C)(i).

121.    After excluding the prices given to certain drug purchasers from the definition and including others explicitly, the Statute states:

the term "Best Price" –

(I)      shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section);

---

[9] The rebate for other drugs is 11.1% of AMP.  42 U.S.C. § 1396r-8(c)(3); N.Y. Soc. Serv. L. § 367 (a)(7)(d).

(II)     shall be determined without regard to special packaging, labeling, or identifiers on the dosage form or product or package; and

(III)    shall not take into account prices that are merely nominal in amount.

42 U.S.C. § 1396r-8(c)(1)(C)(ii).

122.    AMP is defined as the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.  42 U.S.C. § 1396r-8(k)(1).

123.    Congress passed the rebate provision expressly to help reduce state Medicaid drug expenditures.  H.R. Rep. No. 101-881 at 96-8 (1990), U.S.C.C.A.N. 1990, 2017, 2108-2110.

124.    New York Social Service Law § 367-a(7)(d) expressly incorporates the rebate requirements of 42 U.S.C. § 1396r-8 and provides that where a manufacturer has entered into a rebate agreement, as outlined above, reimbursement to the New York State Medicaid program shall be made only pursuant to the terms of that rebate agreement.

125.    New York Social Service Law also requires that the State return to the local social service district, such as the Counties, the local district's *pro rata* share of any rebate received.  New York's Medicaid plan was approved expressly by the federal government.  Each plaintiff here is within the class of entities for whose benefit the Medicaid rebate provision was enacted.

126.    To effectuate the purpose of the statute, manufacturers are required to report their Best Prices and AMPs to the Secretary of HHS, who is required to keep the information confidential.  42 U.S.C. §§ 1396r-8(b)(3)(A), (D).

127.    The states are required to report to the manufacturers, as well as to HHS, the "information on the total number of units of each dosage strength and package size of each

42

covered outpatient drug . . . for which payment was made under the plan during the period."  42 U.S.C. § 1396r-8(b)(2).

128.     The Secretary calculates the rebates according to the statutory formulas and reports to each state a Unit Rebate Amount ("URA"), which is "the amount calculated by the Health Care Financing Administration to which the Medicaid utilization information may be applied by states in invoicing the Manufacturer for the rebate payment due."  The rebate then is paid to the state Medicaid program by the defendant drug manufacturer.

129.     States thus are provided with URAs, not the AMPs or Best Prices.  *See* Brief of the United States as *Amicus Curiae* filed in *In re: Pharmaceutical Industry Average Wholesale Price Litigation* (No. 01-CV-12257-PBS) (MDL No. 1456 D. Mass.) at 15 (arguing that the federal rebate provision, 42 U.S.C. § 1396r-8, does not preempt state law fraud claims based on fraudulent reporting of rebate data) (hereinafter "*Amicus* brief").  Like HHS, States are also required to keep confidential the rebate-related information that they receive.  42 U.S.C. § 1396r-8(b)(3)(D).

130.     The Secretary relies entirely on the manufacturers for Best Price and AMP data.

131.     At all times, the manufacturers have ultimate responsibility to correctly calculate the rebate:

> A State may, at its option, compute the total rebate anticipated, based on its own records, *but it shall remain the responsibility of the labeler* to correctly calculate the rebate amount based on its correct determination of AMP and, where applicable, Best Price.

Model Rebate Agreement, annexed hereto and incorporated herein, at I(n).

132.     Each defendant and the Secretary of Health and Human Services "on behalf of the Department of Health and all States and the District of Columbia . . . which have a

Medicaid State Plan approved under 42 U.S.C. § 1396a" has executed a Rebate Agreement that is in all material respects identical to the Model Rebate Agreement (Exhibit E).

133. While the Model Rebate Agreement largely tracks the statutory rebate provision, it also goes beyond it in some respects. The Model Rebate Agreement defines Best Price as "the lowest price at which the manufacturer sells . . .to any purchaser in the United Sates in any pricing structure." Model Rebate Agreement, at I(d).

134. The Model Rebate Agreement provides also that "[f]or bundled sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled arrangement." *Id.*, at I(d).

135. Bundled discounts are defined in the Model Rebate Agreement as "the packaging of drugs of different types where the condition of rebate or discount is that more than one type of drug is purchased, or where the resulting discount or rebate is greater than that which would have been received had the drug products been purchased separately." *Id.* at I(e).

136. The Model Rebate Agreement defines "State Medicaid Agency" as "the agency designated by a state under Section 1902(a)(5) of the Act to administer or supervise the administration of the Medicaid program." Model Rebate Agreement at I(bb).

137. Under New York law, the Counties are local social services districts within New York State. N.Y. Soc. Serv. L. §§ 56, 61-62. Within the State scheme, and subject to State supervision, the City and Counties play a significant role in administering the Medicaid program for the Counties' residents. Each has its own fraud and overpayments unit, determines eligibility, and performs other important functions. Numerous Counties likewise engaged in these critical functions.

138.    The Medicaid Rebate statute further provides that "the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties for any overcharges and submit to the Secretary of Health and Human Services a plan for pursuing such claims."  42 U.S.C. § 1396a (a)(25)(A).

139.    In any case where such a legal liability is found to exist and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek such reimbursement to the extent of such legal liability.  42 U.S.C. 1396a (a)(25)(B).

140.    Under the Medicaid rebate provision, any manufacturer that knowingly provides false information "is subject to a civil money penalty in an amount not to exceed $100,000 for each item of false information."  "[S]uch civil money penalties are in addition to other penalties as may be prescribed by law."  42 U.S.C. § 1396r-8(c)(ii) (emphasis added).

141.    New York Social Services Law § 145-b expressly provides for other penalties where false information, such as inaccurate Best Prices, is provided and Medicaid overpays as a result.  Section 145-b expressly provides further that a local social services district has "a right to recover civil damages equal to three times the amount which any figure is falsely overstated. . ."

142.    In his *Amicus* brief, at 8, the Secretary of HHS wrote:

> States obviously have a direct and compelling interest in accurate Best Price reporting and the rebate program, which helps to reduce the costs the states themselves incurred for drugs purchased by Medicaid patients.  It is within their [the state's] statutory authority to investigate and prosecute Medicaid best price violations as alleged in this case.

143.     Because the Counties, like the State, are Medicaid payors and receive their share of any Medicaid rebate paid, the Counties also have a direct and compelling interest in accurate Best Price reporting and the rebate program.

## B.     DEFENDANTS' FRAUDULENT CONDUCT

### 1.   Manufacturers Reported Intentionally False and Inflated Prices

144.     At all times relevant hereto, each defendant has intentionally reported, or caused to be reported, to industry publications wholesale pricing information that it knew to be false and inflated, with the intention and knowledge that the published information would be relied upon by CMS for FUL calculation and by Medicaid, and private payors for calculating drug payments and reimbursements.  Defendants' own marketing and sales materials show that defendants market their products based on the spread between reimbursement (based on AWP, FUL, WAC or a WAC equivalent) and actual acquisition cost. Defendants' own marketing documents make clear that they create spread and induce provider purchases based on inflated reimbursement whether their products are single or multi-source.  Defendants create spread for their drugs even when they are competing for formulary placement or competing with over-the-counter alternatives.   Thus, the motivation to improperly inflate reimbursement prices exists whether a drug is brand name, single source, multi-source or generic.

145.     Exhibit B hereto lists the drugs that are at issue in this litigation.  Every drug listed in Exhibit B was paid for by the County Medicaid Programs based on either AWP or FUL.  Exhibit B sets forth, for each drug:  (a) the drug's NDC; (b) the drug Name; (c) the reported AWP; (d) the FUL, if one was in place; (e) whether the drug was reimbursed by New York Medicaid based on AWP or FUL; (e) the Actual Acquisition Cost ("AAC") of the drug to entities who are considered Pharmacy Providers by New York Medicaid (i.e. entities that are

reimbursed based on AWP or FUL by New York Medicaid); and (f) the spread between the reimbursement amount and the AAC.

146.    Exhibit B notes specifically when a defendants' failure to report accurate prices resulted in a false and inflated FUL to be set.

147.    Exhibit B demonstrates that the prices at which drugs were actually sold to Pharmacy Providers were much lower than the AWPs, WACs, or other wholesale prices reported or caused to be reported by defendants and used by Medicaid for reimbursement.

148.    The spreads on Exhibit B make clear that even a 10 or 12 or 12.75 percent discount off AWP, or reimbursement at the FUL, as New York's Medicaid law provides does not eliminate the damage resulting from defendants' purposeful submission of false and inflated reimbursement price information.  The spreads make clear that, by submitting false and inflated data, defendants entirely undermined New York Medicaid's effort to reimburse at EAC.

149.    Exhibit B also demonstrates that defendants routinely submitted fraudulent prices for both brand and generic products.

150.    Each of the generic or multi-source drug manufacturer defendants are aware of the reimbursement prices reported by their competitors, the actual price of their generic competitors' products, their own sale prices to Medicaid providers, and the FUL.  Generic drug manufacturer defendants manipulate their own reported reimbursement prices in order to gain or maintain a competitive advantage in the market for their generic products.

151.    The natural and expected result is that multi-source drugs have some of the highest spreads of any drugs, sometimes resulting in an AWP exceeding actual costs by over 50,000%.  A few examples from defendants herein collected by the DOJ in a September 2000 study, are set forth below:

| Defendant | Multi-source Drug | *RedBook* AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Baxter* | Dextrose** | $ 928.51 | $ 2.25 | 41,167% |
| Baxter* | Sodium Chloride** | $ 928.51 | $ 1.71 | 54,199% |
| Boehringer* | Leucovorin Calcium** | $ 184.40 | $ 2.76 | 6,581% |
| B. Braun* | Sodium Chloride | $ 11.33 | $ 1.49 | 660% |
| Bristol-Myers Group* | Etoposide (Vepesid) ** | $ 136.49 | $ 34.30 | 298% |
| Dey* | Albuterol Sulfate** | $ 30.25 | $ 9.17 | 230% |
| Immunex* | Leucovorin Calcium** | $ 137.94 | $ 14.58 | 846% |
| Pharmacia* | Etoposide | $ 157.65 | $ 9.47 | 1,565% |
| Sicor Group* | Tobramycin Sulfate** | $ 342.19 | $ 6.98 | 4,802% |
| Watson* | Vancomycin HCL | $ 70.00 | $ 3.84 | 1,567% |

* Defendants herein
**At issue drugs

152.   These reported AWPs are far in excess of the amounts that the manufacturers charged to wholesalers or providers, indeed far higher than any purchase price paid by any participant in the drug distribution chain.  In fact, defendants' AWPs are completely fictitious prices that no one ever actually pays.  They are created out of thin air based on false pricing data and for the sole purpose of creating a marketable spread as described herein.

153.   These facts are confirmed by investigations by Congress, the General Accounting Office ("GAO") and the HHS OIG, and by litigations by the Department of Justice ("DOJ"), various state Attorneys General and U.S. Attorneys, as detailed below.

154.   The HHS OIG has emphasized that "manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers."

155.    Defendants report wholesale price information that they know does not comply with the HHS OIG's guidelines, in that they do not account for routine prompt pay discounts, bundled discounts, chargebacks, rebates, free samples, off invoice pricing and other discounts and inducements they routinely offer to wholesalers, chain pharmacies, group purchasing organizations, pharmacists, nursing homes, hospitals, and other distributors who are in a position to increase sales of defendants' products.

156.    For example, defendants regularly pay "chargebacks" that are not accounted for in their reported prices.  Chargebacks are payments by defendants to drug wholesalers to compensate the wholesaler for its sales of defendants' drugs to an indirect purchaser to whom the manufacturer has agreed to sell its drugs at a deep discount.

157.    Defendants also routinely pay prompt pay discounts to wholesalers that are not accounted for in their reported price.  Prompt pay discounts are given when the purchaser pays the drug manufacturer within a prescribed period of time.  Wholesalers uniformly avail themselves of prompt pay discounts.  Other credits, rebates, hidden discounts and financial incentives likewise are routinely provided and not included in the AWPs or other wholesale pricing data reported by defendants.

158.    By increasing the spread on its drugs, each defendant seeks to influence drug-selecting entities such as physicians, pharmacies, Nursing homes, long-term care facilities, PBMs and/or others in the drug distribution chain to increase their purchases of its drugs. Defendants engage in this purposeful manipulation for the sole and express purpose of creating the spread to create demand for their products.  Manufacturers market the spread to PBMs to gain inclusion into a PBM's formulary, and to wholesalers and pharmacists to be the exclusive supplier of a multi-source drug or to otherwise incentivize them to distribute defendants'

products.  PBMs and pharmacists benefit by pocketing the difference between the reported AWP and the actual cost they pay for the drug.

### 2.       The Role of PBMs in the AWP Scheme

159.    PBMs specialize in the administration and management of prescription benefit programs.  Their clients include HMOs, employers, preferred provider organizations and other health insurers.  Three PBMs, AdvancePCS/Caremark, Express Scripts and Medco Health, together control eighty percent of the PBM market and supply the prescription drugs of approximately 210 million people in the United States.

160.    PBMs operate in two primary businesses:  First, PBMs contract with pharmaceutical manufacturers, retail pharmacies, and health plans to decide which drugs should be included in formularies, to bill health plans for prescription drug payments on behalf of plan participants, and to pay the pharmacies.  Second, PBMs operate their own proprietary mail order pharmacies.

161.    PBMs' historic business model was to procure drugs for their health plan client in exchange for administrative fees.  According to the Wall Street Journal, "[t]raditionally, PBMs received only modest administrative fees for arranging prescriptions at cost."  Barbara Martinez, *Rx for Margins:  Hired to Cut Costs, Firms Find Profits In Generic Drugs, Pharmacy-Benefit Managers Can Take Huge Markups And Still Offer 'Discounts,' Making $170 on just 90 Pills*, WSJ, March 31, 2003, at A1.

162.    This model has changed in recent years such that PBMs now are "increasingly . . . reducing those fees and trying to take advantage of the "spread" between pharmacy prices and what corporate and government clients pay.  Express Scripts say most of its contracts now include spread pricing."  *Id.*

163.    The following is an example of a typical PBM transaction and a description of the contracts that underpin it.  A health plan participant is prescribed a drug by a physician.  The participant fills the prescription at a PBM-approved pharmacist, paying only the co-pay.  The pharmacist buys the drug either directly from the manufacturer or from a wholesaler.  The pharmacist then bills the PBM for the drugs it sells to the patient.  The PBM has a contract with the retail pharmacy to pay a price at a certain discount off AWP, *e.g.,* AWP minus 15%.  The PBM in turn bills the health plan for this drug.  However, the PBM has a separate contract with the health plan, entitling it to payment at a different, higher rate, e.g., AWP minus 10%.  Thus, in addition to any administrative fee the PBM receives, the PBM receives the spread between the contractual payment it receives from the health plan and the contractual payment it makes to the pharmacist.  Furthermore, if the PBM operates its own mail-order pharmacy that health plan members are required to use, the PBM reaps the pharmacist's share of the spread as well.

164.    In the Introduction to this Complaint, plaintiffs set forth an example of how PBMs and pharmacists profit from the spread in the case of Fluoxetine.

165.    PBMs select their formularies based on the profits they can make, including the spread between actual price and AWP, and taking into account rebates, discounts, chargebacks and other incentives that the manufacturers provide:

> PBMs develop relationships with manufacturers that provide lower pricing (through rebates) when a particular drug is on the formulary….  In general, the level of rebates increases if the PBM increases a greater market share for a drug within a defined class of prescriptions with similar therapeutic effects.

*Providing Prescription Drug Coverage Through Medicare: The Role of Pharmacy Benefit Managers*, U.S. Senate Committee on Finance (Mar. 29, 2000), at 4-5 found at http://www.senate.gov/~finance/3-29mcca.htm.

166.   Defendants know and understand that third-party payors and PBMs rely on the First Data Bank ("FDB") and other publishers to determine the reimbusement prices of the covered drugs, both brand name and generic.  Because defendants control the published reimbursement prices, defendants know and understand that they can manipulate the providers' and PBMs' profits, gained at the expense of third-party payors, including the Counties, to incentivize these providers and PBMs to prescribe their drugs and/or to include their drugs in a drug formulary by inflating the reimbursement prices.

167.   Because the PBMs consider their contracting relationship with retail pharmacies to be confidential, health plans are never informed of the reimbursement amount to pharmacies.  Nor are they informed of the actual prices that pharmacies pay for the drugs.

### 3.   Failure to Report Best Prices and Pay Proper Rebates

168.   At all times relevant hereto, each defendant executed a Rebate Agreement in which it promised to comply with its contractual terms and with the requirements of the Medicaid rebate provision, 42 U.S.C. § 1396-r-8.

169.   At all times relevant hereto, each defendant knew that the purpose of the rebate agreements it executed was to pass on Medicaid pharmacy cost savings to the State of New York and its local social service districts, including the Counties.

170.   At all relevant times hereto, each defendant knowingly calculated its Best Prices excluding factors that it was statutorily and/or contractually required to include, resulting in the payment of rebates that were less than required.

171.   The same routine discounts, rebates, free samples and other inducements offered to providers but excluded in setting AWP are also excluded from defendants' calculations of Best Price.  These include chargebacks, prompt pay discounts, free samples

distributed by sales representatives, and other credits, up front and back end rebatesoff invoice transactions, and hidden discounts and financial incentives.

172.    In addition, defendants routinely bundle deeply discounted or free drugs with other drugs.  The Model Rebate Agreement executed by every defendant herein expressly provides that for bundled sales the discount must be allocated proportionately to the dollar value of the units of each drug sold under the bundled arrangement.  Defendants do not properly allocate bundled discounts when calculating Best Price.

173.    Certain defendants also engage in re-labeling schemes to avoid reporting Best Price.  Federal law expressly prohibits this practice.  42 U.S.C. § 1396r-8(c)(ii).  For example, in 2003, two defendants herein, Bayer and GSK, agreed to pay $344 million to resolve allegations that they engaged in health care fraud against state programs by failing to report their Best Price for certain drugs.  In their wrongful scheme, known as "lick and stick," they sold drugs to Kaiser Permanente Medical Care Program (the nation's largest HMO) at deep discounts, but avoided including these discounts in their Best Price calculations by re-labeling the products with new NDC codes before sale.

174.    As described below, the HHS OIG has documented that such repackaging schemes are widespread.  OIG, Medicaid Drug Rebates – Sales To Repackagers Excluded From Best Price Determinations, at 1, 4 (March 2001).

175.    On information and belief, each of the defendant pharmaceutical companies has also utilized an array of other inducements to stimulate sales of their drugs. These inducements, including educational grants, volume discounts, and rebates or free goods, were designed to result in a lower net cost to the purchaser while concealing the actual cost price beneath a high invoice price.  A product invoiced at $100 for ten units of a drug might really

only cost the purchaser one-half that amount.  If one assumes a subsequent shipment of an additional ten units at no charge, or a "grant," "rebate" or "credit memo" in the amount of $50, the transaction would truly cost just $5 per unit net.  Through all these off-invoice means, drug purchasers are provided the substantial discounts that induce their patronage while maintaining the fiction of a higher invoice price – the price that corresponds to reported AWPs and inflated reimbursement from Medicaid.

176.    As detailed below, a number of defendants herein, including Merck, Tap and Eli Lilly, also are under investigation for abusing the nominal price exception to Best Price reporting, created by Congress as a public policy exception to encourage drug manufacturers to continue to sell drugs at nominal prices to entities serving the public good, without the manufacturer having to pay increased rebates because of those sales.  The exception allows drug companies to exclude from their Best Price calculations drugs with prices less than 10% of AMP. 42 U.S.C. § 1396r-8(c)(1)(C)(ii)(III).

## V.    GOVERNMENT INVESTIGATIONS

177.    DOJ, GAO, HHS OIG, and a number of Congressional and Senate committees have investigated and are continuing to investigate defendants for questionable practices regarding the reporting of wholesale pricing information, Best Price, and other non-compliance with Medicaid rebate provision.

178.    The House Committee on Energy and Commerce is conducting an investigation into pharmaceutical reimbursements and rebates under Medicaid.  On June 26, 2003, Chairman Billy Tauzin (R-La.) and Oversight and Investigations Subcommittee Chairman

James Greenwood (R-PA) wrote as follows to 26 drug companies, including many defendants herein:[10]

> The Committee on Energy and Commerce is conducting an investigation into pharmaceutical reimbursements and rebates under Medicaid. This inquiry builds upon the earlier work by this Committee on the relationship between the drug pricing practices of certain pharmaceutical companies and reimbursement rates under the Medicare program. In that investigation, the Committee uncovered significant discrepancies between what some pharmaceutical companies charged providers for certain drugs and what Medicare then reimbursed those providers for dispensing those drugs. This price difference resulted in profit incentives for providers to use the drugs of specific companies as well as higher costs to the Medicare system and the patients it serves. For example, we learned that one manufacturer sold a chemotherapy drug to a health care provider for $7.50, when the reported price for Medicare was $740. The taxpayer therefore reimbursed the doctor almost $600 for dispensing the drug and the cancer patient had a $148 co-payment. Such practices are unacceptable in the view of the Committee, which is why we are in the process of moving legislation to address these abuses.
>
> The Committee has similar concerns regarding drug prices in Medicaid, which has a substantially larger pharmaceutical benefit than Medicare.

House Committee on Energy and Commerce, June 26, 2003 Press Release, "Tauzin, Greenwood Expand Medicaid Fraud Investigation."

179.    The letter requests extensive and specific detail about the subject companies' sales, AWPs, AMPs, and their records relating to calculation of Best Prices and their use of the nominal price exception.

180.    This investigation is continuing.  At a hearing on December 7, 2004, Chairman Joe Barton noted the huge inflation of the prices paid by Medicaid, particularly for

---

[10] The targeted companies include defendants Abbott Labs; Alpharma; Aventis Pharmaceuticals; Barr Labs; Bristol Myers; Dey; Ethex; Eli Lilly; Geneva; GlaxoSmithKline; IVAX; Johnson & Johnson; Mylan Pharmaceuticals; Par Pharmaceuticals; Pfizer, Purepac; Roche; Roxane; Schering-Plough; TEVA; UDL Labs; Warrick Pharmaceuticals; and Watson.

generic drugs.  *House Hearing*, Tr. at 3-4,5 .  Defendant Dey's chief financial officer testified as follows:

> Why doesn't Dey lower its AWP on generic drugs?  The simple answer is that given the system that now exists our customers won't buy from us if we lower our AWP.

*Id.* at 117-118 (testimony of Pamela Marrs, Senior Vice President & CFO, Dey, Inc.).  Similarly, the Senior Product Manager for defendant Roxane Laboratories testified that no one would buy their product if the AWP was too low.  *Id.* at 134 (testimony of Leslie Paoletti, Roxane Laboratories, Inc.).  Many of the drugs under Congressional scrutiny, including Albuterol, Buspirone, Fluoxetine, Buspar, Celebrex, and Zyprexa, are drugs at issue here and for which the Counties' Medicaid Programs spend large sums.  *See* Exhibit A.

181.    On April 29, 2004, the Senate Finance Committee sent letters to 19 drug companies[11] focusing on whether those companies exploited the nominal price exception.  The Committee wrote:

> We understand that some drug manufacturers may be using the Nominal Price Exception as part of their commercial pricing practices.  These practices could undermine the purposes of the Medicaid Best Price policy and may be costing taxpayers hundreds of millions of dollars through reduced Medicaid rebates.

Senate Finance Committee Press Release, April 29, 2004, *Grassley, Baucus Ask Drug Manufacturers Question About How They Price Drugs For Medicaid*.

182.    The House and Senate Medicaid investigations described above follow comparable investigations regarding Medicare in 2000 – 2001.  Congressman Pete Stark (D-Ca.) chaired that investigation.

---

[11] Target companies include defendants GlaxoSmithKline, Johnson & Johnson, Merck & Co., Inc., AstraZeneca Pharmaceuticals LP, Bristol-Myers Squibb Company, Novartis Pharmaceuticals Corporation, Amgen, Inc., Pfizer, Wyeth Pharmaceuticals, Eli Lilly & Company, Aventis Pharmaceuticals, Inc., Abbott Laboratories, Hoffman-La Roche Inc., TAP Pharmaceutical Products Inc., Schering-Plough Corporation, Boehringer Ingelheim Pharmaceuticals, Inc., Forest Pharmaceuticals, Inc., and Sanofi-Synthelabo.

183.    In a letter dated September 28, 2000, Congressman Stark wrote to the president of the Pharmaceutical Research and Manufacturers of America ("PhRMA"), of which most of the Defendants are members, as follows:

> Drug company deception costs federal and state governments, private insurers and others billions of dollars per year in excessive drug costs.  This corruptive scheme is perverting the financial integrity of the Medicare program and harming beneficiaries who are required to pay 20% of Medicare's current limited drug benefit.  Furthermore, these deceptive, unlawful practices have a devastating financial impact upon the states' Medicare Program. . . .

> The evidence I have obtained indicates that at least some of your members have knowingly and deliberately falsely inflated their representations of the average wholesale price ("AWP"), wholesaler acquisition cost ("WAC") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.  The evidence clearly establishes and exposes the drug manufacturers themselves that were the direct and sometimes indirect sources of the fraudulent misrepresentation of prices.  Moreover, this unscrupulous "cartel" of companies has gone to extreme lengths to "mask" their drugs' true prices and their fraudulent conduct from federal and state authorities.  I have learned that the difference between the falsely inflated representations of AWP and WAC versus the true prices providers are paying is regularly referred to in your industry as "the spread." . . .

> The evidence is overwhelming that this "spread" did not occur accidentally but is the product of conscious and fully informed business decisions by certain PhRMA members. . . .

September 28, 2000 letter from House Committee on Ways and Means, Subcommittee on Health, to Alan F. Holmer, President, Pharmaceutical Research and Manufacturers of America, Washington, D.C.  Cong. Rec., Extension of Remarks at E1622.

184.    Congressman Stark came to the following five "shocking conclusions":

> First – Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.

Second – Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physicians and other healthcare provider customers.

Third – Certain drug manufacturers engage in the fraudulent price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.

Fourth – Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

Fifth – Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

*Id*. at E1623-24

185. The investigation led by Congressman Stark concluded that defendants employed a number of financial inducements to stimulate the sales of their drugs at the expense of both Medicare and Medicaid. Such inducements include the practices described herein, i.e., volume discounts, rebates, off-invoice pricing and free goods designed to lower the net cost to the purchaser while keeping high the cost of the drug to government programs:

Some drug companies have also utilized a large array of other impermissible inducements to stimulate sales of their drugs. These inducements, including bogus "educational grants", volume discounts, rebates or free goods, were designed to result in a lower net cost to the purchaser while concealing the actual cost price beneath a high invoice price. A product invoiced at $100 for ten units of a drug item might really only cost the purchaser half that amount. Given, for instance, a subsequent shipment of an additional ten units at no charge, or a "grant", "rebate" or "credit memo" in the amount of $50, the transaction would truly cost a net of only $5.00 per unit. Through all these "off-invoice" means, drug purchasers were provided the substantial discounts that induced their patronage while maintaining the fiction of a higher

58

invoice price-the price that corresponded to reported AWPs and inflated reimbursement . . .

Cong. Rec., Sept. 28, 2000, at E1623.

186.    A September 21, 2000 GAO Report determined that actual retail prices for top Medicaid/Medicare drugs, such as Albuterol and Ipratropium bromide, were 85 percent and 75 percent less than their AWPs.   Applying this range of percentages to New York City's Medicaid costs, the overcharges add up to millions of dollars annually.   GAO, *Payments for Covered Outpatient Drugs Exceed Providers' Cost*, Sept. 2001 (GAO-01-1118) at 4.

187.    That same GAO report found that:

Widely available discounts for 17 of the physician-billed drugs we examined averaged between 13 percent and 34 percent less than AWP.

For two other physician-billed drugs, Dolasetron mesylate and Leucovorin calcium, average discounts were considerably larger – 65 percent and 86 percent less than AWP.

GAO-01-1118 at 11-12.

188.    In 2002, the OIG issued a series of reports on pharmacy overcharges to the Medicaid program, based on data collected in 1994 and again in 1999.   In its September 2002 report, the OIG summarized its findings.   Pharmacies' actual acquisition cost for brand name prescription drugs was on average 21.8% below AWP.   For generic drugs, actual acquisition costs were 65.9% below AWP.   These numbers reflected considerably increased spreads as compared to the earlier data, which showed spreads of 18.3% and 42.5% for brand name and generic drugs respectively.   HHS OIG, *Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Costs of Prescription Drugs* (A-06-02-00041) (September 16, 2002), at 1.

189.    In 2003, the OIG warned that drug pricing practices in the private sector may have significant effects on Medicaid rebates:

> Discounting arrangements are prevalent in the pharmaceutical industry and deserve careful scrutiny particularly because of their potential to implicate the Best Price requirements of the Medicaid Rebate Program. Because the Medicaid Rebate Program in many instances requires that states receive rebates based on the Best Price offered by a pharmaceutical manufacturer to other purchasers, ***manufacturers have a strong financial incentive to hide de facto pricing concessions to other purchasers to avoid passing on the same discounts to the states***. Because of the potential direct and substantial effect of such practices on federal health care program expenditures and the interest of some manufacturers in avoiding price concessions that would trigger rebates to the states, any remuneration from a manufacturer to a purchaser, however characterized, should be carefully scrutinized.

OIG, *Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23,731-35 (May 5, 2003) (emphasis supplied).

190.    A March 27, 2001 report entitled *Medicaid Drug Rebates – Sales to Repackagers Excluded From Best Price Determinations* (A-06-00-00056), issued by the HHS OIG studied the rebate issues for the manufacturers of the top 200 Medicaid reimbursed drugs for Fiscal Year (FY) 1999. It found that many manufacturers failed to include in their Best Price calculations submitted to the federal government discounted sales to repackagers, which buy drugs in bulk and then repackage them in smaller quantities for distribution:

> 7 out of 53 manufacturers excluded sales to 8 repackagers, 3 of which were HMO repackagers. Sales to HMOs are specifically required by statue to be included in a drug manufacturer's best price determination. As a result, Medicaid drug rebates totaling $80.7 million for FY 1999 were lost because sales to HMOs were excluded from the best price determinations.

*Id.* at 1. The report found that "[i]n some instances the sales to the HMOs were at prices as much as 75 percent below the reported best price." *Id.* at 4. Given the Model Rebate Agreement definition of Best Price, quoted above, these sales to repackagers should be accounted for in Best Price calculations. Yet they routinely are not.

191.    The report went on to say that this review was a follow up to previous investigations conducted in response to congressional inquiries.  Based on a more limited number of drugs and repackagers it was found that that two "repackagers were HMOs and that they were purchasing drugs significantly below the manufacturers' reported best prices."  This limited study found a loss of $27.8 million in Medicaid rebates for FY 1998.  *Id* at 1.

192.    The report "recommended that the Health Care Financing Administration (HCFA) [now CMS] require drug manufacturers who excluded sales to HMOs from their Best Price to repay the lost rebates."  *Id.* at cover page.  Rep. Henry A. Waxman (D-CA), who requested the report, said "This report shows that drug manufacturers have used drug repackaging to evade paying rebates to Medicaid."  *Drug Companies' Repackaging Scheme Costs Taxpayers Over $100 Million In 1998 And 1999*, April 5, 2001, pg. 1 of 1, available at http://www.house.gov/reform/min/pdfs/pdf_inves/pdf_medi_drug_IG_press.pdf.

193.    The GAO, HHS OIG, and DOJ investigations of the fraudulent pricing practices undergirding this complaint are further described in the defendant-specific allegations below.

## VI.    ALLEGATIONS PARTICULAR TO THE COUNTIES AND THE INDIVIDUAL DEFENDANTS

194.    The following examples are merely illustrative of each defendant's unlawful activity, and are not intended to be an exact or exhaustive recitation of all of such activity engaged in by each defendant.  Instead, these allegations describe the wrongful conduct of each defendant in sufficient detail and particularity to support the liability allegations to each. The particular pharmaceutical products identified below are similarly not intended to be an exhaustive list as to all products or NDCs for which each defendant engaged in misconduct. Additional detail is peculiarly within defendant's control pending discovery**.**

195.        At all times relevant hereto, each of the following defendants entered into contracts with GPOs, hospitals, PBMs and other purchasers whereby such purchasers were guaranteed a price for defendants' drugs that was deeply discounted off the WACs, Direct Prices, AWPs and/or other reimbursement price information defendants supplied to publishers for reimbursement price reporting purposes.  At times these reduced prices were in the form of up front discounts.  At times, the reduced prices were in the form of guaranteed rebates.  The WACs, Direct Prices, AWPs and/or other reimbursement price information defendants supplied to publishers did not take into account these deeply discounted prices (referred to herein as "available prices")   Thus, the WACs, Direct Prices, AWPs and/or other reimbursement price information provided by defendants were false and inflated.   The purpose of the inflation was to create the marketable spread referred to herein, which defendants used to increase demand for their products at the expense of those who reimbursed for drugs based on AWP and FUL, such as the County Medicaid Programs.

196.         Exhibit A hereto presents a defendant-by-defendant summary of (a) the total expenditures at issue for that defendant; (b) the number of NDCs at issue for that defendant; (c) the number of NDCs at issue because of alleged AWP fraud; and (d) the number of NDCs at issue because of alleged FUL fraud.

## A.        ABBOTT

197.    As summarized in Exhibit A, the County Medicaid Programs spent over $825 million on the 685 at-issue Abbott NDCs between 1992 - 2005 alone.[12]   The specific Abbott NDCs for which the Counties seek relief are set forth in Exhibit B-1 hereto.   The Counties allege both AWP and FUL fraud claims against Abbott.

---

[12] The claims of the County Medicaid Programs are not confined to this time period.

198.    At all times relevant hereto, Abbott has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-1 hereto, Abbott has routinely created such spreads.

199.    Abbott has instructed its sales force to market the spread for its products. Abbott has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.   These worksheets also described the AWPs of Abbott competitors to demonstrate the advantage of purchasing Abbott products with their inflated AWPs.

200.    Abbott's upper level management, throughout the 1990s, engaged in a systematic and repeated pattern of conduct whereby they used the inflated reimbursement spread, resulting from Abbott's false reimbursement prices, as a marketing tool in order to persuade customers to purchase Abbott's products rather than its competitors.

201.    Abbott touted the efficacy of one of its customers' proprietary softwares that allowed providers, when evaluating which drug to use, to see lowest unit cost, best spread difference, incentive-based contracts and preferred products under contract.

202.    Abbott specifically promoted its injectibles as more profitable than competitors' because of the spread between AWP and acquisition cost.   Abbott specifically developed a plan for its field representatives to promote its products based on reimbursement and spread.   In a 1998 sales memo between two Abbott Alternate Site Product Sales representatives, they comment that a large customer wants them to participate in product promotions including a 10% free goods discount, 10% dividend program, and extended payment terms.   The Abbott representatives indicated there might be price increases and inquired about "sensitive areas."

The customers responded that price increases would be "sensitive" where they were not getting any reimbursement while they would be "less sensitive" where their customers would be getting reimbursed.

203.    Abbott deliberately tried to maximize the spread because it understood that its customers routinely engaged in "spread shopping" – comparing Abbott's AWPs with those of its competitors (including defendant Baxter), in order to determine the greatest spread. This practice dates back to late 1993 when Abbott compared its proposed contract price and published AWPs with those of Baxter's competing generic drugs.

204.    The fact of the improper Abbott spread is well established. In a 2000 report published by HHS[13,] the DOJ documented at least 81 instances where the published AWPs for various dosages of 16 subjectdrugs manufactured by Abbott were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth the 16 drugs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Abbott in the 2001 *RedBook*.

| Drug | Abbott's *RedBook* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Acetylcysteine | $ 35.87 | $ 21.90 | $ 13.97 | 64% |
| Acyclovir | $ 1047.38 | $ 349.05 | $ 698.33 | 200% |
| Amikacin Sulfate | $ 995.84 | $ 125.00 | $ 807.84 | 697% |
| Calcitriol (Calcijex) | $ 1,390.66 | $ 1079.00 | $ 311.66 | 29% |
| Cimetidine Hydrochloride | $ 214.34 | $ 35.00 | $ 179.34 | 512% |
| Clindamycin Phosphate | $ 340.52 | $ 75.35 | $ 265.17 | 352% |

---

[13] "An Additional Source of Average Wholesale Price Data In Pricing Drugs and Biologicals Covered by the Medicare Program," (Sept. 8, 2000).

| Drug | Abbott's *RedBook* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Dextrose | $ 239.97 | $ 3.91 | $ 236.06 | 6,037% |
| Dextrose Sodium Chloride | $ 304.38 | $ 1.93 | $ 302.45 | 15,671% |
| Diazepam | $ 28.50 | $ 2.03 | $ 26.47 | 1,304% |
| Furosemide | $ 74.52 | $ 14.38 | $ 60.14 | 418% |
| Gentamicin Sulfate | $ 64.42 | $ .51 | $ 63.91 | 12,531% |
| Heparin Lock Flush | $ 38.30 | $ 13.60 | $ 24.70 | 182% |
| Metholprednisol one Sodium Succinate | $ 34.08 | $ 2.30 | $ 31.78 | 1,382% |
| Sodium Chloride | $ 670.89 | $ 3.22 | $ 667.67 | 20,735% |
| Tobramycin Sulfate | $ 150.52 | $ 2.94 | $ 147.58 | 5,020% |
| Vancomycin Hydrochloride | $ 382.14 | $ 4.98 | $ 377.16 | 7,574% |

205.    In a letter to Abbott dated October 31, 2000, Congressman Stark wrote:

You should by now be aware of Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading data and has engaged in other deceptive business practices.  This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing public health . . . .

The price manipulation scheme is executed through [your company's] inflated representations of average wholesale price (AWP) and direct price ("DP") which are utilized by the Medicare and Medicaid Programs in establishing drug reimbursements to providers.  The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to in your industry as "the spread."  The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs.  The evidence further reveals that Abbott manipulated prices for the express purpose of

expanding sales and increasing market share of certain drugs.  This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims . . . .

Based on the evidence collected, Abbott should make arrangements to compensate taxpayers for the financial injury caused to federally funded programs.  Any refusal to accept responsibility will most certainly be indicative of the need for Congress to control drug prices.  If we cannot rely upon drug companies to make honest and truthful representations about their prices, then Congress will be left with no alternative but to take decisive action to protect the public.

October 31, 2000 letter from Hon. Fortney Pete Stark of California to Miles White, Chief Executive Officer, Abbott Laboratories, Abbott Park, Illinois.  Cong. Rec., Oct. 31, 2000, at E2037-38.

206.    With the exception of Dextrose Sodium Chloride and Metholprednisolone Sodium Succinate, all of the above-referenced drugs were paid for by the Counties in 2000 based on the above referenced fraudulent AWPs.

207.    Abbott has strategic alliances and marketing arrangements with Defendant Teva Group.

208.    Abbott's fraudulent pricing of Vancomycin is well documented in earlier years as well, as set forth below:

| 1995 | | NDC | AWP | AVAIL. PRICE | SPREAD |
|---|---|---|---|---|---|
| | Vancomycin Hydrochloride - Flip top vial 1gm/105 ea | 00074-6533-01 | 60.44 | 8.40 | 620% |
| | Vancomycin - 500 mg | 00074-4332-01 | 30.23 | 4.20 | 620% |

| 1996 | | NDC | AWP | AVAIL. PRICE | SPREAD |
|---|---|---|---|---|---|

| | | NDC | AWP | AVAIL. PRICE | SPREAD |
|---|---|---|---|---|---|
| | Vancomycin Hydrochloride - Flip top vial 1gm/105 ea | 00074-6533-01 | 61.86 | 7.95 | 678% |
| | Vancomycin - 500 mg | 00074-4332-01 | 31.44 | 3.95 | 696% |

| **1999** | | NDC | AWP | AVAIL. PRICE | SPREAD |
|---|---|---|---|---|---|
| | Vancomycin - 1 gm | 00074-6535-01 | 261.84 | 76.00 | 245% |

209.    The Counties spent over $3.5 million on Vancomycin between 1997 and 2003, based on the false and inflated Vancomycin AWPs.

210.    Abbott created spreads for Amikacin as well.  One report says "Amikacin, used to treat an infection that HIV+ people get and manufacturerd by Abbott, had an AWP of $54.56.  DOJ said the actual price was $6.75."  *See States Mull Suit Against Drug Companies*, www.stateline.org (April 2, 2001) Cong. Rec., Oct. 31, 2000 at E2038.  The County Medicaid Programs paid for Amikacin between 1997-2003 based on this fraudulent AWP.

211.    Abbott also has engaged in substantial off-invoice pricing and distribution of free goods neither of which were taken into account by Abbott when it reported WACs or AWPs.  Examples include Abbott billing one customer between April 2, 1998 through December 2, 1998 for sales in the gross amount of $447,877 while simultaneously providing 10% free goods in the amount of $44,788.

212.    A 1996 year-end invoice to another customer shows gross annual sales of $1,286,787 and a year end rebate of $110,679 in connection with Abbott wishes the customer "Merry Christmas."  On information and belief, Abbott did not account for these free goods in its calculation of AWP or Best Price.

213.    In connection with the wrongful conduct described herein, Abbott has been investigated by at least the United States Department of Justice, the United States Congress,

Commonwealth of Massachusetts, the Office of Inspector General of the Department of Health and Human Services, the Attorneys General of California, Florida, Illinois, Ohio, Texas and Wisconsin, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.  The publicly available results of these investigations confirm Abbott's routine practice of reporting false and inflated wholesale pricing information and non-compliance with rebate obligations.

214.    Abbott has been sued by the Department of Justice and the States of Alabama, California, Illinois, Kentucky, Montana, Pennsylvania, Texas, West Virginia and Wisconsin.

215.    The State of Illinois alleges that from 1998 – 2004 Abbott's AWPs were inflated on average as follows:

| YEAR | SPREAD |
|------|--------|
| 1998 | 423% |
| 1999 | 537% |
| 2000 | 586% |
| 2001 | 562% |
| 2002 | 173% |
| 2003 | 133% |
| 2004 | 108% |

216.    Illinois alleges that Abbott's maximum spreads during this time were:

| YEAR | SPREAD |
|------|--------|
| 1998 | 3805% |
| 1999 | 5171% |
| 2000 | 5040% |
| 2001 | 5040% |
| 2002 | 1866% |
| 2003 | 2014% |
| 2004 | 1520% |

217.    In July 2003, Abbott agreed to pay $622 million in criminal and civil penalties to resolve allegations that its Ross Products Unit defrauded Medicare and Medicaid by

failing to report Best Price.  In that proceeding, the U.S. Attorney's Office in the Southern District of Illinois probed whether Ross Products Unit failed to include in calculating Best Price that it had used kickbacks to boost sales and defraud government insurers by discounting or giving away products.  Providers thereafter would seek government reimbursements at higher prices.

218.    Since at least 1998, Abbott's Ross Products Unit has had a joint marketing agreement with defendant MedImmune.

219.    Abbott also was co-venturer with Japan's Takeda Chemical Industries, Ltd. in TAP Pharmaceuticals, which paid $875 million in a 2001 settlement of allegations that TAP provided free and unreported samples of Lupron, a prostate cancer drug, to physicians with the understanding that they would bill Medicaid and Medicare for reimbursement based on the inflated AWP.

220.    Abbott is among the pharmaceutical companies now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization date, drug price/reimbursement spreads, and other relevant information."

221.    Abbott also is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is improperly using the nominal price exception to the Best Price reporting requirements.  On information and belief, Abbott routinely offers its products to commercial customers for prices less than 10% AWP and (a) does

not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

## B.        THE ALPHARMA GROUP

222.    As summarized in Exhibit A, the County Medicaid Programs spent over $129 million on the 446 at-issue Alpharma Group NDCs between 1992 - 2005 alone.[14]   The specific Alpharma Group NDCs for which the Counties seek relief are set forth in Exhibit B-2 hereto.

223.    At all times relevant hereto, the Alpharma Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   Exhibit B-2 demonstrates that the Alpharma Group defendants routinely have created such spreads.

224.    At all times relevant hereto, Alpharma has known that it can promote its drugs by creating the spread and selling its products at substantial discounts off WAC, while at the same time maintaining a false and inflated AWP.  Alpharma has so marketed its products.

225.    In addition to the examples set forth in Exhibit B-2, other examples of Alpharma Group pricing fraud include Purepac's fraudulent pricing for the Alprazolam 0.5mg tablet (a subject drug).  From 2000 to 2002 Alpharma caused an AWP of $665.57 to be reported for Alprazolam 0.5mg (NDC 00228-2029-96) while simultaneously making that identical drug available for $43.94 (a spread of 1414%).

226.    Alpharma also engaged in fraudulent pricing for its Clobetasol 0.05% cream (a subject drug).  From 2001 to 2002, Alpharma caused an AWP of $23.17 to be reported for Clobetasol 0.05% cream (NDC 00472040015) while simultaneously making the identical drug available for $2.75 (a spread of 742.55%).  Further proof of the fraudulent nature of this

---

[14] The claims of the County Medicaid Programs are not confined to this time period.

drug's AWP can be found in the 2000 AWP reported by Alpharma.  Between 2000 and 2001 Alpharma caused the AWP to increase from $18.40 to 23.17, while the drug continued to be sold at the same price of $2.75 in 2001 as it was in 2000.

227.    While there was a FUL in place during at least some of the time period referred to above, Alpharma Group's failure to account for its deeply discounted prices resulted in that FUL being false and inflated.  For example, the FUL for Clobetasol 0.5% cream was $0.8315/unit in 2001.  Given that the FUL is set at 150% of the lowest reported price for therapeutic bioequivalents, this means the lowest reported price for Clobetasol 0.5% cream was $0.5543/unit.

228.    Alpharma Group sold Clobetasol 0.5% cream for $0.1833/unit in 2001, which is 202% less than the lowest reported price that generated the FUL.   If Alpharma Group properly reported this price, the FUL would have been $0.2749/unit instead of $0.8315/unit and the County Medicaid Programs would have reimbursed based on this lower FUL.   Thus, Alpharma Group's failure to report accurate prices resulted in a fraudulent FUL and damage to the County Medicaid Programs directly attributable to Alpharma Group.  Exhibit B-2 sets forth additional examples of FUL fraud for Clobetasol 0.5% cream.

229.    In connection with the wrongful conduct described herein, Alpharma's Purepac has been sued by the Massachusetts Attorney General.  Massachusetts alleges that Purpac reported to CMS or HCFA, on a quarterly basis, AWPs that were materially lower than its reported WACs,  AWPs and other prices, and these lower AMPs were used by CMS or HCFA in determing the URAs at which Alpharma's rebates to the County Medicaid Programs were based.  The result of the underreporting is that Alpharma underpaid Medicaid rebates properly owed the Counties.

71

230.    Alpharma has also been sued by Florida, which alleges the following fraudulent AWPs for Purepac's Isosorbide (a subject drug) over the four-year period 2001-2005.

| PUREPAC ISOSORBIDE 30MG NDC #00228-2713-11 | | | | | |
|---|---|---|---|---|---|
| DATE | FIRST DATABANK AWP | FIRST DATABANK WAC | RELATOR'S COST CONTRACT PRICE | SPREAD $ | SPREAD % (SPREAD $ ÷ RELATOR'S COST) |
| 11-12-2001 | $129.13 | $77.48 | $72.56 | $39.46 | 54% |
| 01-28-2002 | $129.13 | $77.48 | $72.56 | $39.46 | 54% |
| 03-10-2002 | $129.13 | $77.48 | $72.56 | $39.46 | 54% |
| 11-21-2002 | $144.81 | $77.48 | $10.06 | $72.84 | 724% |
| 11-05-2004 | $144.81 | $77.48 | $10.06 | $12.00 | 119% |
| 03-31-2005 | $144.81 | $77.48 | $10.06 | $12.00 | 119% |

231.    Alpharma is among the companies now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Medicaid Best Price and rebate requirements.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization date, drug price/reimbursement spreads, and other relevant information."

## C.    ALPHA THERAPEUTICS

232.    As summarized in Exhibit A, the County Medicaid Programs spent over $23 million for the 12 at-issue Alpha Therapeutics NDCs between 1992 - 2005 alone.[15]  The specific AlphaTherapeutics NDCs for which the Counties seek relief are set forth in Exhibit B-3 hereto.

---

[15] The claims of the County Medicaid Programs are not confined to this time period.

233.    At all times relevant hereto, Alpha Therapeutics has known that it can promote its drugs by selling them at substantial undisclosed discount, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-3 hereto, Alpha Therapeutics has routinely created such spreads.

234.    Alpha Therapeutics has instructed its sales force to market the spread for its products.  Alpha has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.  These worksheets also described the AWPs of Alpha Therapeutics' competitors to demonstrate the advantage of purchasing Alpha Therapeutics products with their inflated AWPs.  Alpha Therapeutics updated its sales staff when it changed an AWP and informed its sales staff that AWP was the basis of payment by to third party payors, such as Medicaid.

235.    Alpha Therapeutics communicated to Red Book the exact AWP of its products, including Venoglobulin.

236.    Red Book thereafter would provide Alpha Therapeutics a "product listing verification form," wherein Alpha Therapeutics could change the AWP that was about to be published, or confirm it as is.   This procedure reconfirms that Alpha Therapeutics at all times was in complete control of the AWPs reported for its products.

237.    Alpha Therapeutics' products routinely had spreads in excess of 150% of AWP.

238.    For example, Alpha Therapeutics set the AWP of Venoglobulin-S 5% (a subject drug) in 1995 at $70.00 per gram, while simulatenously making the drug available for $28.00 per gram, resulting in a spread of $42.00 or 150%. Similarly, Alpha Therapeutics set the

AWP of Venoglobulin-S 10% in 1995 at $80.00 per gram, while simulatenously making the drug available for $30.00 per gram creating a spread of $50.00 or 166%.

239.   In 2000 Alpha Therapeutics set the AWP for Venoglobulin-S 10% (a subject drug) at $70.00 per gram, while simulatenously making the drug available for $28.00 per gram creating a spread of $42.00 or 150%.

## D.   THE AMGEN GROUP

240.   As summarized in Exhibit A, the County Medicaid Programs spent over $348 million on the 60 at-issue Amgen Group NDCs between 1992 - 2005 alone.[16]  The specific Amgen Group NDCs for which the Counties seek relief are set forth in Exhibit B-4 and B-21 hereto.

241.   At all times relevant hereto, the Amgen Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining a false and inflated reimbursement prices.  As evidenced by Exhibit B-4 and B-21, the Amgen Group has routinely created such spreads.

242.   The Amgen Group actively manipulated and marketed the spread for its oncological drugs to influence customer choice.   In 2005, Amgen's Vice-President Edward Morrow confirmed the importance of Amgen's ability to market the spread in prior years for its oncological sales, and the success of such marketing.

243.   The Amgen Group revenues from oncology drug sales are the largest of any company "in the oncology market in the U.S. – based entirely on sales of supportive therapy products like the anemia agent Aransep (darbepoetin) and the febrile neutropenia therapies Neupogen (filgrastim) and Neulasta (pegfilgrastim)."   *See* the Pink Sheet, February 07, 2005,

---

[16] The claims of the County Medicaid Programs are not confined to this time period.

Volume 67, Number 006, page 13, *Oncologists Embrace Part B Demo, Amgen Says; Big Test In Two Months*.

244.    In 2005, Amgen V.P. Morrow described the Oncology field as moving from the "drug revenue model" to the "drug service model" as Amgen loses the ability to create whatever spread it likes by setting both the acquisition cost and the reimbursement rate for its oncology products.    Amgen noted that its past practice of spread-creating discounting, (i.e. "contracting and rebating") will be "less important on a going forward basis." *Id.*

245.    The Amgen Group has admitted marketing the spread for Aransep[17] and in 2005, called for a "ceasefire" in the spread war between Aransep and J&J competing product Procrit (both at issue here). Specifically, Amgen V.P. Morrow stated that "From October of last year through January of 2004, the Aranesp/Procrit market share was relatively stable. Since J&J rolled out their contract in February and we responded...we have gained five share points." *See EPO Ceasefire? Amgen Aranesp Price To Remain Stable Unless J&J Acts First*, The Pink Sheet, May 03, 2004, Volume 66, Number 018, page 10.

246.    The Amgen Group's aggressive discounting strategy for Aransep concerned J&J.   "We've seen recently much more aggressive pricing on the part of our competitor" with "discounting quite commonly in the order of magnitude of 40% off list. So this has become a very significant concern for us." *See J&J Draws Line On Procrit Price; Will Not Meet Amgen Aranesp 40% Discount,* The Pink Sheet, April 19, 2004, Volume 66, Number 016, page 11.

---

[17]In 2004, Amgen caused an AWP of $3172.50 to be reported for Aransep 150/0.3 mcg.    That same year, the Amgen Group sold this identical drug for $1340.93 (a spread of 137%) (NDC 55513004304).   The County Medicaid Programs reimbursed based on the false AWP.

247.    J&J maintained that the Amgen Group's pricing strategy for Aranesp includes bundled discounts on other key products.  "Some of that price discounting that is occurring with the competitive product is not just on their competing product, but other products that they are bundling with that product," VP-Investor Relations Helen Short said. "That is also entered into the mix of how their pricing competition is working."  *Id.*  J&J CFO Robert Daretta concurred.  "It's pricing that's coming about both directly by lowering their red blood cell product [Aranesp], as well as their giving preferred pricing on their white blood cell product," Neupogen/Neulasta (filgrastim/ pegfilgrastim), Darretta said. *Id.*

248.    Notably, during this "discounting war" between the Amgen Group and J&J, the AWPs for Procrit and Aransep did not decrease once.

249.    In addition to the Neupogen examples, in Exhibit B-4 and B-21, in 2003, the Amgen Group caused an AWP of $330.60 to be reported for subject drug Neupogen 480 mcg.  That same year, the Amgen Group sold this identical drug for $218.96 (a spread of 51%).

250.    Other evidence of Amgen Group Defendants routinely selling at deep discounts from list price include that during 1997 the Amgen Group admonished a customer service employee for an unnecessary error in charging list price (at the time, $110/unit) for subject drug Leucovorin 350 mg.  The Amgen Group reminded everyone in customer service that they should have been aware that no one ever pays list price for Leucovorin, and that the customer should at least get the benefit of distributor pricing, (at the time, ranging from $11.88/vial to $21/vial), a significant discount to the above-mentioned list price.  In 1997, the AWP for Leucovorin was $137.94.  Thus, the widely available wholesaler prices represented spreads between 500% and 1060%.

251.    In addition to the examples, set forth in Exhibit B-4 and B-21, the Amgen Group calculated 1995 Average Selling Prices net of chargebacks of $2.65 for subject drugs 50 mg Leucovorin, $4.80 for 100 mg Leucovorin, and $22.92 for 350 mg Leucovorin.  These sale prices compare to AWPs of $21.53, $39.41 and $137.94.  These AWPs resulted in spreads of 712%, 721% and 501%, respectively.

252.    Also in addition to the examples set forth in Exhibit B-4 and B-21, in 1998, the Amgen Group caused AWPs of $4.75, $8.50, $16.72 and $20.48 for subject drugs Methotrexate LP 50 mg (NDC 58406-0681-14), Methotrexate LP 100 mg (NDC 58406-0683-18), Methotrexate 200 mg (NDC 58406-0683-12) and Methotrexate LP 250 mg (NDC 58406-0683-16).  That same year, the Amgen Group listed these identical drugs through wholesalers at $3.00, $5.00, $6.00 and $7.90.  These prices created spreads of 58%, 70%, 179% and 159%.

253.    Upon information and belief, at all times relevant hereto the Amgen Group has known that price adjustments are required to retain the Amgen Group's market share and *profitability*.  Discounting alone may address market share, but not profitability.

254.    At all times relevant hereto the Amgen Group has known that its purchasers' profits depend on reimbursement rates for drugs, and that the Amgen Group's own sales and profits in turn depend on its customers' reimbursement payments and profits:

> Our sales depend on payment and reimbursement from third-party payors, and a reduction in the payment rate or reimbursement rate could result in decreased sales of our products.
>
> In … domestic …markets, sales of our products are dependent, in part, on the availability of reimbursement from third-party payors . . . we believe that sales of Aranesp and Neulasta are and will be affected by government and private payor reimbursement policies. . . .If reimbursement for our marketed products changes adversely or if we fail to obtain adequate reimbursement for our other current or future products, health care providers may limit how much or under what circumstances they will administer them, which could reduce the use of our products or cause us to reduce the price of

our products.  This could result in lower product sales or revenues . . . (Amgen 2002 Form 10-K at 43-44).

255.   The Amgen Group admits that it reports AWPs for each of its drugs to the publishers.  *See* Amgen's Answer to the AMCC's Second Amended Consolidated Complaint filed in *In re Pharmaceutical Industry Average Wholesale Price Litigation,* Civil Action 01-CV-12257-PBS (MDL No. 1456 D. Mass.) at p.10, ¶ 160.

256.   In connection with the wrongful conduct described herein, the Amgen Group has been investigated by the DOJ, the HHS OIG and the Attorneys General of the States of Pennsylvania and Wisconsin.

257.   The Amgen Group also is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is improperly using the nominal price exception to the Best Price reporting requirements.  On information and belief, Amgen routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

258.   In their March 9, 2005 10-K (for reporting period ending December 31, 2004) the Amgen Group disclosed the receipt of notices from the U.S. Department of Justice requesting it to produce documents in connection with a Civil False Claims Act investigation regarding the pricing of Immunex's current and former products for sale and eventual reimbursement by Medicare or state Medicaid programs. Immunex also received similar requests to procure documents from the U.S. Department of Health and Human Services and state agencies.

259.    The Amgen Group also disclosed that "[s]everal of Immunex's current and former products are or were regularly sold at substantial discounts from list price" 10-K (Period Ending December 31, 2004) at 24 (Mar. 9, 2005).

## E.    ASTRAZENECA

260.    As summarized in Exhibit A, the County Medicaid Programs spent over $988 million on the 158 at-issue AstraZeneca NDCs between 1992 - 2005 alone.[18]  The specific AstraZeneca NDCs for which the Counties seek relief are set forth in Exhibit B-5 hereto.  The Counties allege both AWP and FUL claims against AstraZeneca.

261.    At all times relevant hereto, AstraZeneca has known that it can promote its drugs by creating a spread and selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-5 hereto, AstraZeneca has routinely created such spreads. .

262.    AstraZeneca has consistently offered its drugs at prices significantly below the WAC and/or AWP that AstraZeneca caused to be reported.  For example, AstraZeneca offered a Performance Incentive Reimbursement contract to those of its customers who would commit to purchasing its drugs exclusively through the wholesaler Cardinal Health.   On information and belief, AstraZeneca did not take the rebates paid through this program into account in setting its WAC or AWP. On information and belief the Cardinal Performace Incentive Reimbursement is but one of many AstraZeneca incentive programs that reduced the actual cost of its products and was not accounted for in the setting of WAC or AWP.

263.    Another is the rebate program AstraZeneca offered through suppliers which existed "in lieu of upfront discounts" but had the same practical effect, i.e., "to earn additional savings on top of those resulting from direct contract pricing."

---

[18] The claims of the County Medicaid Programs are not confined to this time period.

264.     AstraZeneca has instructed its sales force to market the spread for its products.  AstraZeneca has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.   These worksheets also described the AWPs of AstraZeneca competitors to demonstrate the advantage of purchasing AstraZeneca products with their inflated AWPs.

265.     AstraZeneca specifically prepared reimbursement worksheets to demonstrate that greater profits could be earned from its Zoladex product as compared with TAP's Lupron.

266.     AstraZeneca has expressly stated that it was at a "competitive disadvantage" with its customers when its increased reimbursement prices (or AWPs) were not promptly published.

267.     In its agreements with PBMs, AstraZeneca guaranteed it would maintain a spread between AWP and actual cost for all products in order to ensure PBM profit.

268.     In connection with the wrongful conduct described herein AstraZeneca has been sued by Illinois, Kentucky and Wisconsin.

269.     Illinois alleges that in 2000, the AWP for AstraZeneca's Zestril 40mg/100s NOC 00310-0134-10 was $145.16 yet it was available for $88.91 (a spread of 63%).

270.     AstraZeneca also provided substantial volumes of free samples and engaged in off invoice transactions to lower providers' costs.

271.     AstraZeneca has been investigated by at least the United States Congress, the Department of Justice, the Office of the Inspector General of the U.S. Department of Health and Human Services and the U.S. Food and Drug Administration.

272.     There are three separate AstraZeneca investigations being conducted by the Boston U.S. Attorney's office.  In a March 2004 SEC filing, AstraZeneca disclosed the receipt of a subpoena related to sales and marketing practices to a physician's office in Worcester, Mass.  Separately AstraZeneca was subpoenaed regarding Prilosec promotions to New England Medical Center.  *See* "AstraZeneca subpoenaed", The Pink Sheet, March 01, 2004, Volume 66, Number 009.  Finally, AstraZeneca was subpoenaed for "documents relating to Prilosec purchasing and servicing agreements with AdvancePCS."  *See* AstraZeneca's 2002 20-F released March 25, 2003.

273.     AstraZeneca has also received a subpoena from the Massachusetts Attorney General's Office seeking documents relating to the sale and promotion of five products (Prilosec, Seroquel, Rhinocort Aqua, Toprol-XL and Zestril) within Massachusetts.  *See* AstraZeneca 2003 20-F released March 12, 2004.

274.     AstraZeneca has received an investigative demand from the Missouri Attorney General's Office for documents and information relating to agreements with drug retailers doing business within Missouri. *Id.*

275.     In January 2002, a federal grand jury in Wilmington, Delaware returned an indictment accusing a New Jersey doctor of conspiring with AstraZeneca to resell free samples of Zoladex, a drug paid for by the Counties, that an AstraZeneca sales representative had given the doctor.  The indictment alleged that AstraZeneca (i) sold Zoladex to the New Jersey doctor and others at prices substantially below the AWP reported by AstraZeneca, and (ii) provided the New Jersey doctor with materials showing how much more profit he could make by using Zoladex instead of its competitor, Lupron.

276.   In June 2003, AstraZeneca pled guilty and paid $291 million to settle the Zoladex charges.  The U.S. Food and Drug Administration said in its statement regarding the settlement, "AstraZeneca provided thousands of free samples of Zoladex to physicians knowing that they would charge their patients and insurance programs for the samples."

277.   On May 29, 2003, AstraZeneca entered into a Corporate Integrity Agreement ("CIA") with the OIG of the United States Department of Health and Human Services "to promote compliance" "with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs (as defined in 42 U.S.C.  1320a-7b(f))"  ("Federal Health Care Program Requirements").   Contemporaneously, AstraZeneca entered into a Settlement Agreement with the United States and various states.

278.   The CIA covers any individuals who sell or market government reimbursed products on behalf of AstraZeneca; calculate or report prices; and/or include, negotiate, implement or report information related to government contracts relating to federal health care programs, including Medicare and the Medicaid drug rebate program (codified at 42 U.S.C. § 1396r-8 et seq.)  The CIA also covers any AstraZeneca employee or agent responsible for "(1) sales and marketing activities for Government Reimbursed Products; (2) the calculation and reporting of prices for federal health care programs, including.  .  . Medicaid or (3) the negotiation, implementation, and any reporting of information related to government contracts."

279.   In addition to promising compliance with federal health care program requirements, the CIA requires AstraZeneca to establish a written code of conduct to be agreed to by each covered person that confirms AstraZeneca's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all

government contracting requirements and to market and sell its government reimbursed products in accordance with federal health care program requirements."

280.    The CIA requires further that AstraZeneca implement policies and procedures that address the code of conduct described above as well as:

(a)    the calculation and reporting of accurate prices for government reimbursed products to certain entities, including CMS, the State Medicaid programs, and the drug price reporting services on which government agencies now rely (First DataBank Inc., the *RedBook*, etc.) or shall rely in the future;

(b)    the proper calculation and reporting of all data and information reported to CMS and/or the State Medicaid programs in connection with the Medicaid drug rebate program, codified at 42. U.S.C. § 1396r-8;

(c)    the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 352; and

(d)    measures designed to promote marketing and sales practices that conform with all statutes, regulations and requirements applicable to government reimbursed products. The Policies and Procedures shall specify that AstraZeneca shall comply with the Federal anti-kickback statute, codified at 42 U.S.C. § 1320a-7b(1) & (2), and other applicable statutes, regulations or requirements.

281.    The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization, ("IRO"). The IRO shall perform two types of review: (1) a systems review of AstraZeneca's systems, processes, policies and practices relating to the Medicaid drug rebate program ("Medicaid Rebate Systems Review") and (2) a review of

specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with AstraZeneca's policies and procedures and Medicaid drug rebate program requirements.

282.    CIA notwithstanding, AstraZeneca now is the subject of an investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements.   On information and belief, AstraZeneca routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

## F.    BARR

283.    As summarized in Exhibit A, the County Medicaid Programs spent $125 million on the 272 at-issue Barr NDCs between 1992 - 2005 alone.[19]   The specific Barr NDCs for which the Counties seek relief are set forth in Exhibit B-6 hereto.   The Counties allege both AWP and FUL fraud claims against Barr.

284.    At all times relevant hereto, Barr has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-6 hereto, Barr has routinely created such spreads.

285.    Barr has instructed its sales force to market the spread for its products. Barr has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper

---

[19] The claims of the County Medicaid Programs are not confined to this time period.

calculation of spread.   These workheets also described the AWPs of Barr competitors to demonstrate the advantage of purchasing Barr products with their inflated AWPs.

286.   As part of its investigation of Barr, the Massachusetts Attorney General issued a subpoena to Barr for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

287.   The Massachusetts Attorney General subsequently brought suit against Barr, alleging that Barr's AMPs were materially lower than the wholesale prices Barr reported for reimbursement purposes and that Barr consequently had underpaid Medicaid rebates.

288.   To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Barr's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

289.   In connection with the wrongful conduct described herein, Barr also has been sued by the States of Alabama, Illinois, Kentucky and Wisconsin.

290.    Kentucky, Illinois and Wisconsin each report that for Barr's Chlordiazepoxide (25 cap) (Dosage 100s) (NDC 000555-01569-02) (a subject drug) 2000 AWP was $22.60 yet the available price was $4.09.  This represents a spread of $18.59 or 452%.

291.   In February 2001, the AWP for the same Barr's Chlordiazepoxide 25mg Capsule increased 50% to $34.02, however, the available price increased only 7% to $4.36. These price changes resulted in a new increased AWP spread of 680%.

292.   While there was a FUL in place during at least some of the time period referred to above, Barr's failure to account for its deeply discounted prices resulted in that FUL being false and inflated.  For example, the FUL for Chlordiazepoxide 25mg Capsule was $.1090/unit in 2001.  Given that the FUL is set at 150% of the lowest reported price for

therapeutic bioequivalents, this means the lowest reported price for Chlordiazepoxide 25mg Capsule was $.0726/unit.

293.    Barr sold Chlordiazepoxide 25mg Capsule for $.0436/unit in 2001, which is 67% less than the lowest reported price that generated the FUL.   If Alpharma Group properly reported this price, the FUL would have been $0.0654/unit instead of $.1090/unit and the County Medicaid Programs would have reimbursed based on this lower FUL.  Thus, Barr's failure to report accurate prices resulted in a fraudulent FUL and damage to the County Medicaid Programs is directly attributable to Barr.  Exhibit B-6 sets forth an additional examples of FUL fraud for Chlordiazepoxide 25 mg Capsule.

294.    Barr is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

295.    In its 10-K for the fiscal year ended June 30, 2003 at 26, Barr reported that the information request from it in connection with this House investigation concerns fluoxetine and oxycodone.  Both are among the subject drugs here for which the Counties have filed suit.

## G.    BAXTER

296.    As summarized in Exhibit A, the County Medicaid Programs spent over $22 million for the 86 at-issue Baxter NDCs between 1992 - 2005 alone.[20]   The specific Baxter NDCs for which the Counties seek relief are set forth in Exhibit B-7 hereto.

297.    At all times relevant hereto, Baxter has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-7, Baxter has routinely created such spreads.

298.    Baxter has instructed its sales force to market the spread for its products. Baxter has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.

299.     Baxter sales strategy has included monitoring the AWPs of competitors' products and raising its own AWPs in response, using a number of justifications unconnected to the market price of the product.

300.    Baxter's marketing and sales documents that compared the costs of their respective drugs to those of their respective competitors were specifically intended to induce providers to use Baxter drugs and shift market share in its favor.   Other documents created and disseminated by Baxter compared the AWP and the actual "cost" of their respective drugs, so that medical providers could easily see the different "return-to-practice".

301.    Baxter has strategic alliances and marketing arrangements with the Teva Group defendants.

---

[20] The claims of the County Medicaid Programs are not confined to this time period.

302.    Baxter cautioned its sales representatives not to demonstrate to its customers reimbursement scenarios where purchasing a competitor's product might be more profitable.

303.    On information and belief, in 1992 Baxter informed its employees how to respond to inquiries concerning AWP increases for Baxter products:

> If you receive inquiries from customers or payors questioning our rationale on this recent increase in Published AWP for Baxter products please communicate the following message and no more.  If any further information is needed please send the inquiry to me directly. A recent review of industry published direct prices and AWPs revealed that Baxter's published AWPs are significantly lower than competitive AWPs.  We have therefore adjusted our AWPs to meet competitive levels. Most of Baxter General Healthcare Division's products are sold to distributors at negotiated contract prices that are different from AWPs.  We do not have knowledge of or input to the actual prices charged to the provider by our distributors.  The contracted prices to our distributors will not be directly affected by this change in AWPs.

304.    In a 2000 report published by the DHHS, the DOJ documented at least 41 instances where the published AWPs for various dosages of drugs manufactured by Baxter were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the four drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular drug based upon wholesalers' price lists, with the AWP reported by Baxter in the *Red Book*.

| Drug in Lowest Dosage Form | *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Dextrose | $928.51 | $2.25 | $926.26 | 41,167% |
| Dextrose Sodium Chloride | $357.69 | $2.93 | $354.76 | 12,108% |
| Sodium Chloride | $928.51 | $1.71 | $926.80 | 54,199% |
| Factor VIII | $1.28 | $.92 | $.36 | 39% |

305.    With the exception of Factor VIII, the County Medicaid Programs paid for all of the above in 2001 based on Baxter's fraudulent AWPs.

306.     The states of Alabama, Illinois, Kentucky, Montana, Pennsylvania, Texas, and Wisconsin have filed lawsuits against Baxter in connection with the same wrongdoing at issue here.

307.     Illinois alleges that in 2000, Baxter and its affiliates published an AWP for Sodium Chloride Irrigation Solution 500 ml 18s (a subject drug) of $208.01, while the true market price was approximately $14.22, resulting in a spread of $193.79, or 1363%.

308.     Illinois alleges that in the year 2000, the average spread of 61 Baxter drugs was 830%.

309.     Wisconsin and Kentucky allege that in 2000 Baxter and its affiliates published an AWP for Dextrose 5% 25 ml 48s (a subject drug) of $542.88, while the true market price was approximately $86.40, resulting in a spread of $456.48, or 528%.

310.     The DOJ, HHS OIG, the Attorney General for the State of California, the Attorney General for the State of Texas, the Attorney General for the State of Illinois, and the Committee on Energy and Commerce of the House of Representatives have all investigated Baxter.

311.     In a September 28, 2000 letter to Alan F. Holmer, President, Pharmaceutical Research and Manufacturers of America Congressman Pete Stark made clear that Baxter inflated AWPs to increase government reimbursement to its customers and gave free drugs to customers in order that they could obtain government reimbursement for these free drugs.

312.     The purposeful inflation of AWP in order to manipulate reimbursement was made clear by Congressman Stark.  Internal Baxter documents stated that "[i]ncreasing AWPs was a large part of our negotiations with the large homecare companies." *See* September

28, 2000 letter from House Committee on Ways and Means, Subcommittee on Health, to Alan F. Holmer, President, Pharmaceutical Research and Manufacturers of America, Washington, D.C. Congressional Record, Extension of Remarks at E1622.

313.    The use of free goods to discount the price for Baxter's Recombinate was made clear by the following internal Baxter communication, disclosed by the Stark investigation:

> BAXTER: "The attached notice from Quantum Headquarters was sent on April 10th to all their centers regarding the reduction on Recombinate pricing. Please note that they want to continue to be invoiced at the $.81 price. They have requested that we send them free product every quarter calculated by looking at the number of units purchased in that quarter and the $.13 reduction in price . . . free product given to achieve overall price reduction."

September 28, 2000 letter from House Committee on Ways and Means, Subcommittee on Health, to Alan F. Holmer, President, Pharmaceutical Research and Manufacturers of America, Washington, D.C.  Congressional Record, Extension of Remarks at E1622.

## H.    BAYER

314.    As summarized in Exhibit A, the County Medicaid Programs spent over $165 million on the 72 at-issue Bayer NDCs between 1992 - 2005 alone.[21]   The specific Bayer NDCs for which the Counties seek relief are set forth in Exhibit B-8 hereto.

315.    At all times relevant hereto, Bayer has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining a false and inflated reimbursement prices.   As evidenced by Exhibit B-8 hereto, Bayer has routinely created such spreads.

316.    Bayer has instructed its sales force to market the spread for its products. Bayer has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper

---

[21] The claims of the County Medicaid Programs are not confined to this time period.

calculation of spread.  These workheets also described the AWPs of the Bayer competitors to demonstrate the advantage of purchasing Bayer products with their inflated AWPs.

317.    Bayer tracked Baxter's AWP for subject drug Recombinate and contemplated raising its own AWP to match a price increase by Baxter.  This was done out of concern that customers would receive a lower reimbursement under Bayer's AWP and hence not purchase Bayer's product.

318.    Bayer considered the process to change the Recombinate AWP to be very simple, and believed that the AWP could be changed overnight.

319.    Bayer's sales representatives stated that in 1996 and 1997 the best way to achieve Bayer's sales goals was to use off-invoice pricing.  Bayer customers like Quantum and Caremark preferred off-invoice pricing because it eliminated Medicaid risks.

320.    For instance, in a 1996 contract negotiation, Bayer planned on using an off-invoice pricing system, in which the hidden price reduction would come in the form of a marketing grant, special educational grant, or a data gathering fee paid to Quantum to make up for the falsely inflated invoiced charges.

321.    An example of how this false invoicing scheme functioned is contained in Bayer's 1994 pricing offer to Quantum for the subject drug Gamimune-N 10%.  Bayer offered to bill Quantum $30.00 per gram for Gamimmune (the invoice price) then at a later date issue Quantum a credit memorandum for $5.80 per gram thereby creating the true (off-invoice price) of $24.20

322.    Another example of the false invoicing scheme can be found in Bayer's 1994 pricing offer to Texas Health Resources.  Bayer offered to invoice Kogenate at $0.82 per unit, and then provide free goods until the per-unit price reached $0.55.

323.    Bayer believed that off-invoice pricing enabled Bayer to quickly lower its prices and maximize sales.

324.    In connection with the wrongdoing at issue, Bayer has been sued by the states of Alabama, Illinois, Kentucky, Montana, Pennsylvania and Wisconsin.

325.    Bayer also has been investigated by at least the United States Department of Justice, the United States Congress, the Commonwealth of Massachusetts, and the Office of Inspector General of the Department of Health and Human Services.

326.    The DOJ concluded that the AWPs for Bayer's Immune Globulin (a subject drug) was false and inflated.

327.    In January 2002, Bayer agreed to pay a total of $14 million to the United States and 45 states to settle allegations under the federal False Claims Act that the company caused physicians and other health care providers to submit fraudulently inflated reimbursement claims to state and federally funded Medicaid program.  Bayer reached the agreement with the Justice Department, the United States Attorney's Office for the Southern District of Florida in Miami, the Office of Inspector General for the Department of Health and Human Services, and a team of state negotiators from Maine, Nevada, New York and Washington representing the National Association of Medicaid Fraud Control Units.

328.    The government's investigation of the allegations, contained in a *qui tam* or whistleblower lawsuit in which the government intervened against Bayer, revealed that, beginning in the early 1990's, Bayer falsely inflated the reported drug prices referred to by the industry as the Average Wholesale Price (AWP), the Direct Price, and the Wholesale Acquisition Cost used by State Governments to set the reimbursement rate for the Medicaid program. According to the DOJ's January 23, 2001 press release, by setting an extremely high AWP, and

subsequently selling the product to doctors at a dramatic discount, Bayer induced physicians to purchase its products rather than those of competitors by enabling doctors to profit from reimbursement paid by the government.  The Bayer AWPs at issue in this settlement were Kogenate, Koate-HP, Gamimmune, which are widely used in treating hemophilia and immune deficiency diseases.

329.    The Bayer investigation revealed "marketing the spread," had the effect of discouraging market competition from manufacturers that do not inflate AWPs as a way of inducing doctors to purchase their products.  In addition to entering into the monetary settlement, Bayer reached a five year agreement with the OIG of HHS that the company's conduct will be monitored by the government under a corporate integrity agreement.  Under the compliance agreement, Bayer will provide the state and federal governments with the average selling prices of its drugs in order to facilitate the government's setting of fair reimbursement rates for the company's products, and potentially, the products of any competitors attempting to take advantage of Bayer's cooperation.

330.    This Bayer settlement also included settlement of allegations that Bayer knowingly underpaid the Medicaid program for rebates owed by it to the states.

331.    In April 2003, Bayer settled certain charges in connection with its efforts to evade paying rebates to states' Medicaid programs which were based on the lowest drug prices they were paying to an HMO, Kaiser Permanente, for Cipro and another Bayer drug, Adalat CC.  Bayer is to pay a total of $275 million to resolve criminal charges and civil liabilities in connection with the fraudulent drug pricing of Cipro and Adalat.  The criminal portion of the global agreement calls for Bayer to plead guilty to charges that it violated the Food, Drug and Cosmetic Act by failing to notify the FDA between August and December 1995, of its

production of private label Cipro for Kaiser.  Bayer has agreed to pay a criminal fine of $5.6 million and will admit that it engaged in this conduct with the intent to defraud or mislead.  In the civil portion of its global settlement, Bayer resolved its federal civil False Claims Act liabilities and pay the United States, 49 states, the District of Columbia, and Public Health Service Entities $251 million in civil damages for losses suffered by the Medicaid program and the Public Health Service entities due to Bayer's failure to report its Kaiser private label price to the government as the true Best Price for its drugs.

332.    The foregoing settlement implicates none of the Counties' AWP claims. To the extent it concerned Bayer's Best Price failures, at most, it may have some impact on two years' worth of rebate related damages.

## I.    BIOGEN IDEC

333.    As summarized in Exhibit A, the County Medicaid Programs spent over $46 million for the 2 at-issue Biogen Idec NDCs between 1992 - 2005 alone.[22]   The specific Biogen Idec NDCs for which the Counties seek relief are set forth in Exhibit B-9 hereto.

334.    At all times relevant hereto, Biogen Idec has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining a false and inflated reimbursement prices.  As evidenced by Exhibit B-9 hereto, Biogen Idec has routinely created such spreads.

335.    In the United States District Court for the D.C. Circuit, Biogen Idec has been sued by a former employee who was Associate Director for the company in the area of Medicare and Medicaid reimbursement.

336.    The case is *Blanton v. Biogen Idec US Corp.* Civil Action No. 1:05-CV-00354 (RMU) and the allegations include specific detail of Biogen noncompliance with the

---

[22] The claims of the County Medicaid Programs are not confined to this time period.

federal Medicaid rebate statute in respect of Biogen drugs Amevive, Zeralin and Avonex (each a subject drug).

337.    Ms. Blanton alleges that the discounted prices guaranteed to customers through Biogen's Amevive SPA (Security Program for Amevive), were not included in Biogen's calculation of Best Price and Average Manufacturers Price.

338.    Ms. Blanton also alleges misconduct in connection with the Amevive Free Sample program.  Ms. Blanton learned in Fall 2003 that

> Biogen was providing enormous amounts of Amevive samples to physicans, particularly those who already were among the top buyers of the drug, and incentivizing sales representatives to give these large numbers of sample to physicians quickly.  It was apparent that the Amevive sales team was providing samples to reimburse physicians for losses on prior purchases, a scheme that would work only if Biogen was allowing the physicians to charge for the samples and their administration. In fact, Biogen's customer service department and several National Account Mangeers informed Ms. Blanton that some physicians were charging payers and/or patients for the samples.  Ms. Blanton also learned that Biogen provided samples to physicians who were merely waiting on reimbursement from payers.

339.    When Ms. Blanton informed Biogen that the Amevive Free Sample Program exposed the company to significant liability, Biogen sent an email to the relevant group of managers, admonishing them to keep the number of free samples distributed confidential.

340.    In August 2004, Ms. Blanton alleges that Cardinal Health (Biogen's leading customer), returned large quantities of Avonex units to Biogen because the exceeded their use date.  Biogen credited Cardinal based on the Avonex WAC at the time of return, rather than at the time of initial sale.  The WAC of Avonex was higher at the time of return than at the time of initial sale, thus resulted in a defacto discount or rebate to Cardinal that was not properly accounted by Biogen in its calculation of Avonex Best Price.  On information and belief, the

foregoing are representative examples of a company-wide scheme to avoid Medicaid rebate obligations.

341.   To the extent Biogen did not account for those free samples in its Best Price, AWP or WAC calculations, Biogen violated the Medicaid rebate statute and the Counties have been damaged by Biogen's conduct.

## J.   BOEHRINGER GROUP

342.   As summarized in Exhibit A, the County Medicaid Programs spent over $1.5 billion for the 409 at-issue Boehringer Group NDCs between 1992 - 2005 alone.[23]   The specific Boehringer Group NDCs for which the Counties seek relief are set forth in Exhibit B-10 hereto.   The Counties allege both AWP and FUL fraud against the Boehringer Group defendants.

343.   At all times relevant hereto, the Boehringer Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-10, the Boehringer Group defendants have routinely created such spreads.

344.   The Boerhinger Group has instructed its sales force to market the spread for its products.   The Boerhinger Group has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.   These workheets also described the AWPs of the Boerhinger Group competitors to demonstrate the advantage of purchasing Boerhinger Group products with their inflated AWPs.

345.   The Boehringer Group has consistently offered its drugs and other solutions to its customers at prices significantly below the published AWP.   At all times relevant

---

[23] The claims of the County Medicaid Programs are not confined to this time period.

hereto, the Boehringer Group knew the spread was of great importance to its customers and it actively marketed and manipulated the spread.

346.    For example, in a report published by HHS, the DOJ documented at least 32 instances where the published AWPs for various dosages of nine drugs manufactured by the Boehringer Group were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth the nine subject drugs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by the Boehringer Group in the *RedBook*.

| Drug | The Boehringer Group's 2001 *RedBook* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Acyclovir Sodium | $ 528.00 | $ 207.00 | $ 321.00 | 155% |
| Amikacin Sulfate | $ 437.50 | $ 65.53 | $ 372.17 | 570% |
| Mitomicyn | $ 128.05 | $ 51.83 | $ 76.22 | 147% |
| Cytarabine | $ 62.50 | $ 3.55 | $ 58.95 | 1,661% |
| Doxorubicin HCL | $ 945.98 | $ 139.75 | $ 806.23 | 577% |
| Etoposide | $ 110.00 | $ 8.45 | $ 101.55 | 1,202% |
| Leucovorin Calcium | $ 184.40 | $ 2.76 | $ 181.64 | 6,581% |
| Methotrexate Sodium | $ 68.80 | $ 2.63 | $ 66.17 | 2,516% |
| Vinblastine Sulfate | $ 212.50 | $ 8.19 | $ 204.31 | 2,495% |

347.    Another example is the rebate program Boehringer offered through suppliers which existed "in lieu of upfront discounts" but had the same practical effect, i.e., "to earn additional savings on top of those resulting from direct contract pricing."

348.    In connection with the wrongful conduct described herein, the Boehringer Group has been investigated by the DOJ, the HHS OIG, the House Committee on Energy and Commerce, and the Attorneys General for the States of Nevada, Pennsylvania and Wisconsin.

349.    In connection with the wrongful conduct described herein, Boehringer has been sued by the States of Alabama, Illinois, Kentucky, Montana, Ohio, Pennsylvania, Wisconsin and Texas.

350.    Ohio alleges that in 1999, Boehringer Group's Roxane and its affiliates published an AWP for ipratropium bromide of $44.06, while the true wholesale price was approximately $12.25, resulting in a spread of $31.81, or 260%.

351.    In 2000, the spread for ipratropium bromide increased to 328% due to a decrease in true wholesale price but a purposeful failure to adjust the published AWP.

352.    From 1994 through 1996, Roxane and its affiliates disseminated an AWP for subject drug lithium carbonate of $7.99 while the available market price was approximately $2.30, resulting in a spread of $5.69 or 247%.

353.    Illinois alleges that in 2000, Roxane and its affiliates published an AWP for subject drug Furosemide 20 mg tablets of $36.05, while the available market price was approximately $8.30, resulting in a spread of $27.75, or 334%.

354.    In February 2001, the AWP for the same Boehringer Group's Furosemide 20mg Tablet [NDC 00054429731] was $139.90, an increase of 288%, while the available price increased only 7% to $8.84.  These price changes resulted in a new increased AWP spread of 1483%.

355.    While there was a FUL in place during at least some of the time period referred to above, Boehringer Group's failure to account for its deeply discounted prices resulted in that FUL being false and inflated.  As set forth in Exhibit B-10 hereto, in 2001  the FUL for Boehringer Group's Furosemide 20mg Tablet was $4.20 or $.0420/unit in 2001.  Given that the

FUL is set at 150% of the lowest reported price for therapeutic bioequivalents, this means the lowest reported price for Furosemide 20mg Tablet was $.0280/unit.

356.    Boehringer Group sold Furosemide 20mg Tablet for $.0088/unit in 2001, which is 218% less than the lowest reported price that generated the FUL.   If Boehringer Group properly reported this price, the FUL would have been $0.0132/unit instead of $.0420/unit and the County Medicaid Programs would have reimbursed based on this lower FUL.   Thus, Boehringer Group's failure to report accurate prices resulted in a fraudulent FUL and damage to the County Medicaid Programs directly attributable to Boehringer Group.

357.    Illinois alleges that in 2000, Ben Venue and its affiliates published an AWP for subject drug Haloperidol Decanoate 100mg/ml (a subject drug) of $576.00, while the available market price was approximately $150.00, resulting in a spread of $426.00, or 284%.

358.    Wisconsin alleges that in 2000, Roxane and its affiliates published an AWP for subject drug Prednisone 20 mg tablets of $57.72, while the available market price was approximately $18.31, resulting in a spread of $39.41, or 215%.

359.    Boehringer's failure to report accurate prices for its drug Prednisone 20 mg also caused an inflated FUL to be set for that drug in the years 2000 and 2001.  In addition to the examples given in Exhibit B hereto, in 2000 the FUL for Boehringer Group's Prednisone 20mg Tablet was $.0760/unit.  Given that the FUL is set at 150% of the lowest reported price for therapeutic bioequivalents, this means the lowest reported price for Prednisone 20mg Tablet was $.0506/unit.

360.    Boehringer Group sold Prednisone 20mg Tablet for $.0329/unit in 2000, which is 54% less than the lowest reported price that generated the FUL.   If Boehringer Group properly reported this price, the FUL would have been $0.0493/unit instead of $.0760/unit and

the County Medicaid Programs would have reimbursed based on this lower FUL.   Thus, Boehringer Group's failure to report accurate prices resulted in a fraudulent FUL and damage to the County Medicaid Programs directly attributable to Boehringer Group.   Exhibit B-6 sets forth how Boehringer's pricing resulted in FUL fraud for Prednisone 20 mg in 2001.

361.   Boehringer Group's Roxane is among the pharmaceutical companies referred to above now under investigation by the House Committee on Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.   The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.   The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

362.   Roxane also has been sued by Massachusetts in connection with the wrongdoing at issue here.

363.   As part of its investigation of Roxane, the Massachusetts Attorney General issued a subpoena to Roxane for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

364.   The Massachusetts Attorney General subsequently brought suit against Roxane, alleging that Roxane's AMPs were materially lower than the wholesale prices Roxane reported for reimbursement purposes and that Barr consequently had underpaid Medicaid rebates.

365.   To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Roxane's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

366.     Boehringer also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements. On information and belief, Boehringer routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

## K.    THE BMS GROUP

367.     As summarized in Exhibit A, the County Medicaid Programs spent over $288 million for the 528 at-issue BMS Group NDCs between 1992 - 2005 alone.[24]  The specific BMS Group NDCs for which the Counties seek relief are set forth in Exhibit B-11 hereto.  The Counties allege both AWP and FUL fraud claims against BMS.

368.     At all times relevant hereto, the BMS Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-11, BMS Group has routinely created such spreads.

369.     At all times relevant hereto, BMS has been aware that providers and other purchasers of its drugs were using the spread to determine whether to purchase its drugs and has marketed spread to its customers.  BMS was aware of and tracked the AWPs of its competitors in order to remain competitive.   For example, an internal BMS memorandum identifies its competitors who sell etoposide (Gensia, Phamacia, Abbott, Chiron, Ben Venue, Immunex and Alpha – all defendants herein), and their corresponding list prices and AWPs.

---

[24] The claims of the County Medicaid Programs are not confined to this time period.

370.    BMS created this AWP competitor analysis, tracked the AWPs of its competitors' relevant drugs and used the data internally to prepare suggested AWPs for gaining and maintaining market share.  For example, BMS informed physicians that they could take advantage of the growing disparity between BMS's Vepesid's listed AWP and the actual acquisition cost.  BMS knew if the acquisition cost approached its list prices, then the financial incentive to purchase BMS drugs diminished.

371.    For all the BMS drugs at issue here, BMS provided "wholesale prices" and "direct prices" to publishers with the knowledge and intent that these false and inflated prices would be converted to a false and inflated AWP.  Indeed, BMS specifically requested that its pricing information be so converted.

372.    BMS at all times relevant hereto tracked the amount by which the publishers would increase its direct price (i.e., either 1.20 or 1.25) markup.  On occasion, BMS instructed publishers to apply the 1.25 markup to the already false and inflated BMS direct price.

373.    In connection with its the wrongful conduct described herein, BMS has been investigated by the California Department of Justice Office of the Attorney General, State of California Department of Justice, Bureau of Medi-Cal Fraud and Elder Abuse, and the U.S. House of Representatives Committee on Commerce.

374.    For example, by letter dated February 27, 2001 to Bristol-Myers, Representative Stark outlined numerous examples of specific illegal practices by Bristol-Myers.  Referring to a letter from Denise Kaszuba, a senior pricing analyst at Bristol-Myers to Medispan dated August 10, 1992, Rep. Stark noted:

> Bristol has control over the AWPs, DPs, and WACs published for its drugs and directs national publishers to change their prices. Bristol directed a national publisher of drug prices to increase all of Bristol's AWPs for oncology drugs by multiplying Bristol's

supplied direct prices by a 25% factor rather than the previous 20.5% factor . . . Increasing the AWP created a spread that, in itself, provided a financial kickback to oncologists for prescribing Bristol's cancer drugs.

375.    In the same letter, Rep. Stark noted:

The evidence clearly shows that Bristol has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs.  The evidence further reveals that Bristol manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs where the arranging of a financial benefit or inducement would influence the decisions of healthcare providers submitting the Medicare and Medicaid claims.

147 Cong. Rec. E244-02, *E244 -E245 (2001).

376.    Ms. Kaszuba likewise communicated the specific product information necessary to establish the BMS AWPs to First Data Bank and other publishers.

377.    In connection with the same wrongdoing described herein, BMS has been sued by the states of Alabama, Illinois, Kentucky, Montana, Pennsylvania and Wisconsin.

378.    Illinois alleges that in 2000, BMS caused an AWP of $51.43 to be published for subject drug Cyclophosphamide (Cytoxan Lyophilized) IV, 1gm (NDC Code 00015-0548-41) while the available price was $23.19, resulting in a spread of 122%.

379.    Similarily in 2001, BMS routinely sold Cytoxan Lyophilized for deep discounts off "list price" or WAC.

380.    The February 27, 2001 letter from Rep. Stark to Bristol-Myers noted that ". . . the manipulated discrepancies between [BMS's] inflated AWPs and DPs versus their true costs are staggering.  For example, in the 2000 edition of the *Red Book*, Bristol reported an AWP of $1296.64 for . . . Vepesid (Etoposide) for injection . . . while Bristol was actually offering to

sell the exact same drug [to a large national group purchasing organization] for $70.00." The difference noted by Rep. Stark represents a 1,752% spread on Vepesid (a subject drug).

381.    In 1998, BMS sold subject drug Vepesid 5ml/100mg, 7.5ml/150mg, 25ml/500mg and 50ml/1gm (all dosages at issue here) at discounts of 71.5% to 75% off WAC/list price.

382.    In 1996, BMS increased its reported AWP for subject drug Blenoxane to $291.49, while continuing to sell the drug to oncologists at its 1995 price of $224.27.  In 1997, BMS reported that it had increased the AWP of Blenoxane to $304.60, when in fact, BMS had lowered the price to oncologists to $155.00.  In 1998, BMS again reported a false AWP for Blenoxane of $304.60 while further reducing the actual price to oncologists to $140.00.

383.    In 1998, BMS sold subject drug Amikin 500mg/2ml-10s and Amikin 1g/vial 4ml-10s at discounts of 66% and 66.8% off WAC or direct price. The Counties paid based on AWP.

384.    BMS is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

385.    BMS also is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements. On information and belief, BMS routinely

offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

## L.    CHIRON

386.    As summarized in Exhibit A, the County Medicaid Programs spent over $14 million for the 8 at-issue Chiron NDCs between 1992 - 2005 alone.[25]  The specific Chiron NDCs for which the Counties seek relief are set forth in Exhibit B-12 hereto.

387.    At all times relevant hereto, Chiron has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-12, Chiron has created such spreads.

388.    Chiron has instructed its sales force to market the spread for its products. Chiron has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.  These worksheets also described the AWPs of the Chiron competitors to demonstrate the advantage of purchasing Chiron products with their inflated AWPs.

389.    As set forth in the table below, Chiron aggressively sold its products at prices that were significantly lower than the spread.

| Defendant Chiron's Prices & Spread From 1995 Contract | | | | | |
|---|---|---|---|---|---|
| Drug | NDC | Contract Price | AWP | Provider's Gross Profit or "Spread" | Spread as a % of Contract Price |
| Cytarabine, Lyoph | 53905131-10 | $2.88/vial | $62.50 | $59.62 | 2070% |
| Cytarabine, | 53905132-10 | $8.75/vial | $250.00 | $241.25 | 2757% |

---

[25] The claims of the County Medicaid Programs are not confined to this time period.

| | | | | | |
|---|---|---|---|---|---|
| Lyoph | | | | | |
| Cytarabine, Lyoph | 53905133-01 | $21.50/vial | $508.00 | $486.50 | 2263% |
| Cytarabine, Lyoph | 53905134-01 | $43.00/vial | $98.90 | $55.90 | 130% |
| Doxorubucin, Solution | 53905235-10 | $13.92/vial | $47.37 | $33.45 | 240% |
| Doxorubucin, Solution | 53905236-10 | $27.26/vial | $94.70 | $67.44 | 247% |
| Doxorubucin, Solution | 53905237-01 | $68.15/vial | $236.74 | $168.59 | 247% |
| Doxorubucin, Solution | 53905238-01 | $283.50/vial | $945.98 | $662.48 | 234% |
| Leuvocorin, Lyoph | 53905051-10 | $2.30/vial | $184.38 | $182.08 | 7917% |
| Leuvocorin, Lyoph | 53905052-10 | $3.75/vial | $350.00 | $346.25 | 9233% |
| Leuvocorin, Lyoph | 53905053-01 | $9.51/vial | $78.00 | $68.49 | 720% |
| Methotrexate, PFS | 53905031-10 | $2.30/vial | $6.88 | $4.58 | 199% |
| Methotrexate, PFS | 53905032-10 | $3.22/vial | $8.75 | $5.53 | 172% |
| Methotrexate, PFS | 53905033-10 | $4.35/vial | $17.50 | $13.15 | 302% |
| Methotrexate, PFS | 53905034-10 | $4.60/vial | $26.88 | $22.28 | 484% |

390.    In 1995, Chiron aggressively marketed the spread for subject drugs Leucovorin Injection 200 mg (NDC 53905-0053-01) and for Doxorubicin HCL, sol, 200 mg MDV (NDC 53905-0238-01).  In an advertisement in 1995, Chiron offered both of these drugs at prices significantly discounted to AWP.  Chiron caused per vial AWPs of $78.00 and $945.98 to be reported for Leucovorin 200 mg and Doxorubicin, respectively, and highlighted this fact in their advertisement.    The advertisment also highlighted acquisition costs of $9.67 for 200mg Leucovorin and $259.00 for 200mg Doxorubicin.  These acquisition costs and AWPs result in spreads of 706% for Chiron's 200 mg Leucovorin, and 265% for Chiron's 200 mg Doxorubicin.

106

391.    This advertisement granted customers 2 free vials of Leucovorin 200 mg for every 10 ordered, and 1 free vial of Doxorubicin for every 10 ordered.  In addition to this example, Chiron has utilized other impermissible off-invoice inducements to stimulate sales of its drugs without accounting for them in its WAC, AWP, or Best Prices.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, Chiron provided purchasers with substantial discounts meant to gain their patronage while maintaing the fiction of a higher wholesale price.

392.    Chiron has routinely sold subject drugs Acetylcystine (NDC 53905-0211-03, 53905-0212-03), Doxorubicin (NDC 53905-0213-03, 53905-0214-03), Cytarbine (53905-0131-10, 53905-0131-20), and Doxorubicin HCL (NDC 53905-0231-10, 53905-0232-06) among others at spreads that ranged between 100 and 400 percent.

393.    Between 1995 and 1998, Chiron kept its AWP for Mitomycin 20 mg, NDCs 53905-0252-01 and 55390-0252-01 at $434.60, while its wholesale price decreased each year.

| PERCENTAGE OF "SPREAD "BETWEEN CHIRON'S REPORTED AWP AND THE TRUE COST FOR MITOMYCIN 20 MG, NDC#s 53905-0252-01 AND 55390-0252-01 | | | |
|---|---|---|---|
| Year | AWP | TRUE COST | Percent "Spread" |
| 1995 | $434.60 | $338.00 | 28% |
| 1996 | $434.60 | $260.00 | 67% |
| 1997 | $434.60 | 190.00 | 129% |
| 1998 | $434.60 | 152.95 | 184% |

394.    If the AWP stayed the same, but the price decreased as set forth below, the reported AWP cannot be an "average" wholesale price.

395.    Chiron is the target of multiple government investigations.  Chiron has received document subpoenas from the Office of the Inspector General of the United States Department of Health and Human Services.  The OIG is investigating pharmaceutical industry practices concerning reporting of average wholesale prices for products covered by Medicare and Medicaid.  Chiron stated that "the Office of the Inspector General's investigation is connected to a pending, but as yet unserved, qui tam (whistle blower) lawsuit, in which Chiron and other companies are named defendants."  Chiron 10-K (For the fiscal year ended December 31, 2003) at 20 (Mar. 3, 2004)

396.    Additionally, the Attorneys General of Florida and Kentucky informed Chiron in 2003 that they were investigating Chiron's calculation and reporting of the AMP and Best Price to the Center for Medicare and Medicaid Services and the Health Care Financing Administration. *Id.*   On information and belief those investigations are ongoing.

397.    In September 2000, the Office of the Attorney General of the State of California Department of Justice subpoenaed Chiron, focusing on pricing of certain generic oncology drugs sold by Cetus-Ben Venue under the Medi-Cal program.  On information and belief, that investigation is ongoing.

398.    Chiron's 2003 10-K reports:

"The Office of the Inspector General of the United States Department of Health and Human Services is investigating pharmaceutical industry practices concerning reporting of average wholesale prices for products covered by Medicare and Medicaid. Chiron and a number of companies have received document subpoenas in connection with that investigation.  Chiron has produced documents responsive to two subpoenas, which relate specifically to pricing of certain generic oncology drugs sold by Cetus-Ben Venue Therapeutics, a joint venture between Chiron and Ben Venue Laboratories.  Chiron sold its interest in that joint venture in 1996.  It appears that the Office of the Inspector General's investigation is connected to a pending, but as yet

unserved, qui tam (whistle blower) lawsuit, in which Chiron and other companies are named defendants.

Certain State Attorneys General also are investigating reporting of average wholesale prices related to State Medicaid programs.  In September 2000, the Office of the Attorney General of the State of California Department of Justice propounded a document subpoena to Chiron focused on pricing of certain generic oncology drugs sold by Cetus-Ben Venue under the Medi-Cal program.  In December 2003, the Attorneys General for the States of Florida and Kentucky informed Chiron that they were investigating Chiron's calculation and reporting of the average manufacturer price and best price to the Center for Medicare and Medicaid Services and the Health Care Financing Administration.

It is anticipated that additional lawsuits involving the average wholesale price issues for these and other products sold by Chiron through Medicaid and/or Medicare may arise.  If any such action resulted in a final judgment against Chiron, Chiron could face substantial damages exposure.  It is not currently possible to estimate the probability of loss or to estimate the amount of liability related to these matters."

## M.    DEY

399.    As summarized in Exhibit A, the County Medicaid Programs spent over $67 million on the 56 at-issue Abbott NDCs between 1992 - 2005 alone.[26]  The specific Dey NDCs for which the Counties seek relief are set forth in Exhibit B-13 hereto.  The Counties allege both AWP and FUL fraud claims against Dey.

400.    At all times relevant hereto, Dey has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-13, Dey has routinely created such spreads.

401.    For example, on May 30, 1995, Dey Marketing Director, Helen Burnham, issued a memo to Sales and Marketing which stated in part that WAC was not representative of

---

[26] The claims of the County Medicaid Programs are not confined to this time period.

Dey's published wholesale prices, but like AWP, was used for calculation of reimbursement. Helen Burnham has also stated that Dey's spread on the drug Metaproterenol (a subject drug) between pharmacy direct price and AWP remained very competitive even with the reduction in AWP.

402.    Robert P. Mozak, Executive Vice President of Sales and Marketing at Dey, has stated in regard to Albuterol pricing strategy that Dey should increase the spread in order to provide incentive to retail and chain providers.  Dey has admitted that increasing spread for retail will provide Dey with the highest profit.

403.    Rob Ellis, Dey Product Manager in the Marketing Department, has stated in reference to Albuterol sales, that an introductory offer will produce a larger spread than Dey currently offers, if the introductory discount is applied to the direct wholesale price.

404.    Dey Sales Representative, Ross Uhl, has made reference to a pricing formula that spread equals AWP minus cost.

405.    Dey has instructed its sales force to market the spread for its products. Dey has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.

406.    On information and belief, in an internal worksheet filled out by Dey in preparation for a bid of potential sales to one of its customers, Dey listed the current contract price of various products as well as a recommended new contract price.  In the notes next to these figures the worksheet states, "This account needs AWP-40% or better to see profit due to the employer groups they serve.  Have not made the switch to our product line due to the spread. . ."

407.    In another similar bid price worksheet for a different customer, the corresponding notes state "cromolyn pricing is at AWP-40% and 35% respectively – bear in mind that we are competing with the branded spread and the generic perception of [sic] everything should be AWP-60%"

408.    In its suit against First DataBank and Medi-Span, Dey admitted to controlling its published AWPs.  Specifically, Dey has an agreement with First DataBank and Medi-Span to provide the reporting services with AWP pricing information.  (¶¶ 26-32 of Dey Complaint.)

> In each case, until the events that have resulted in the present crisis, First DataBank has (except for some inadvertent errors) selected for listing in its published reports the AWP as suggested by Dey.  For over ten years, until April 2003, no prices other than those submitted by Dey have been listed by First DataBank as AWP for Dey products in its databases [even though Dey also reported declining WACs for the products]."

(¶ 32 of Dey Complaint; *see also* ¶ 36 of Dey Complaint for similar allegation against Medispan.).

409.    In connection with the wrongful conduct described herein, Dey has been investigated by the United States Department of Justice, United States Department of Health and Human Services, Office of Inspector General, the United States District Attorney for the District of Massachusetts, and the Attorneys General for the States of California, Minnesota, Montana, Ohio, Pennsylvania, Texas, West Virginia and Wisconsin.

410.    Dey has been sued by Alabama, Connecticut, Illinois, Massachusetts, Montana, Pennsylvania, Texas, West Virginia and Wisconsin.

411.    West Virginia alleges that Dey and others manipulated the AWP to significantly overcharge state agencies and residents for several drugs, including albuterol, from at least 1995 through 2000.

412.     Wisconsin alleges that in 2000 the Dey drug Metaproterenol Sulfate (.4% 2.5 ml 25s) (NDC 49502-0678-03) (a subject drug) had an AWP of $30.75 yet was available at $11.29, representing a spread of 172%.

413.     Illinois alleges an average AWP for the 23 Dey drugs at issue in its case for the years 1998-2004 as follows:

| YEAR | SPREAD |
|------|--------|
| 1998 | 20% |
| 1999 | 27% |
| 2000 | 274% |
| 2001 | 282% |
| 2002 | 246% |
| 2003 | 248% |
| 2004 | 46% |

414.     The Texas case concerned two of the Dey drugs at issue here, albuterol sulfate and ipratropium bromide, both drugs at issue here.  The Texas AG alleged that between 1995 and 1999 Dey defrauded the Texas State Medicaid program by reporting false wholesale pricing data for these drugs.  In June 2003, Dey settled the Texas allegations for $18 million.

415.     The Connecticut Attorney General sued Dey for AWP manipulation. Connecticut documented the following spreads between Dey's published AWPs and actual wholesale prices for many of its drugs.

| Drug | NDC# | Year | AWP | ACTUAL PRICE | SPREAD | % OVERCHARGE |
|------|------|------|-----|--------------|--------|--------------|
| ALBUTEROL | 49502-0303-17 | 1996 | $21.70 | $3.25 | $18.45 | 488% |
| IPATROPIUM BROMIDE | 49502-0685-03 | 2001 | $44.10 | $8.35 | $35.58 | 355% |
| IPATROPIUM BROMIDE | 49502-0685-03 | 2000 | $44.10 | $11.45 | $32.65 | 239% |
| IPATROPIUM BROMIDE | 49502-0685-03 | 1999 | $44.10 | $11.45 | $30.11 | 177% |

416.     Between 1996-2001, the County Medicaid Programs paid for each of the above drugs based on the false Dey AWPs.

417.    In a 2001 report published by HHS, the DOJ documented at least 15 instances where the published AWPs for various dosages of 4 drugs manufactured by Dey were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each of the 4 drugs.  These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Dey in the 2001 RedBook.

| Drug in Lowest Dosage Form | 2001 *RedBook* AWP | DOJ Determined AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Acetylcysteine | $59.88 | $25.80 | $34.08 | 132% |
| Albuterol Sulfate | $30.25 | $9.17 | $21.08 | 230% |
| Cromolyn Sodium | $42.00 | $23.01 | $18.99 | 82% |
| Metaproterenol Sulfate | $30.75 | $11.29 | $19.46 | 172% |

418.    The County Medicaid Programs paid for each of the above drugs based on Dey's false AWPs.

419.    Albuterol sulfate, a multisource drug at issue here and one of Dey's top selling products, was a focus of the federal government's investigation into AWP inflation.  OIG found that "Medicare's reimbursement amount for albuterol was nearly six times higher than the median catalog price" and that "Medicare and its beneficiaries would save between $226 million and $245 million a year if albuterol were reimbursed at prices available to suppliers."  *See* "Excessive Medicare Reimbursement for Albuterol," OEI-03-01-00410, March 2002.

420.    The OIG determined that the Medicare-allowed amount for albuterol sulfate in 1996 was $0.42.  However the actual wholesale price was $0.15, and the highest available wholesale price was $0.21.

421.  Dey's fraudulent practices extend back to the mid-1990s, at least.  Below is excerpted from a pricing proposal by Dey to McKesson Drug Company, one of the county's largest wholesalers, from December 20, 1995.

| Generic Name | Strength | Size | AWP | WAC | Suggested Sell Price | % Discount From WAC | % Spread |
|---|---|---|---|---|---|---|---|
| Acetylcysteine Solution | 10% | 4 mL | $67.80 | $25.80 | $18.00 | -40.0% | 277% |
| Acetylcysteine Solution | 10% | 10 mL | $40.26 | $15.27 | $13.50 | -30.0% | 198% |
| Acetylcysteine Solution | 10% | 30 mL | $110.48 | $41.97 | $33.50 | -35.0% | 230% |
| Acetylcysteine Solution | 20% | 4 mL | $81.36 | $31.08 | $21.50 | -40.0% | 278% |
| Acetylcysteine Solution | 20% | 10 mL | $48.66 | $18.57 | $16.20 | -30.0% | 200% |
| Acetylcysteine Solution | 20% | 30 mL | $133.43 | $50.64 | $39.90 | -35.0% | 234% |
| Acetylcysteine Solution | 20% | 100 mL | $92.21 | $75.90 | $59.90 | -40.0% | 54% |
| Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | $30.25 | $14.50 | $12.00 | -29.3% | 152% |
| Albuterol Sulfate Inhalation Soln | 0.083% | 3 mL | $36.30 | $17.40 | $14.40 | -29.3% | 152% |
| Albuterol Sulfate Inhalation Soln | 0.083% | 3 mL | $72.60 | $34.50 | $28.80 | -28.7% | 152% |
| Cromolyn Sodium Inhalation, USP | 20mg/2ml | 2 mL | $42.00 | $34.20 | $29.00 | -25.0% | 45% |
| Cromolyn Sodium Inhalation, USP | 20mg/2ml | 2 mL | $84.00 | $66.00 | $58.00 | -22.3% | 45% |
| Metaproterenol Sulfate Inhalation Soln. | 0.4% | 2.5 mL | $30.75 | $11.00 | $10.00 | -21.5% | 207% |
| Metaproterenol Sulfate Inhalation Soln. | 0.6% | 2.5 mL | $30.75 | $11.00 | $10.00 | -21.5% | 207% |
| Sodium Chloride Solution | 0.9% | 3 mL | $24.20 | $13.00 | $10.94 | -32.7% | 121% |
| Sodium Chloride Solution | 0.9% | 5 mL | $24.20 | $13.00 | $10.94 | -32.7% | 121% |

422.  Similarly, between 1993 and 1998, Dey kept its AWP for Albuterol Sulfate 0.083% NDC 4950-20687, at $32.25, while its wholesale price decreased each year.

| PERCENTAGE OF "SPREAD" BETWEEN DEY LAB'S REPORTED AWP AND THE ACTUAL WHOLESALE PRICE FOR ALBUTEROL SULFATE 0.083% NDC# 4950-20687-03, 3ML/25's | | | |
|---|---|---|---|
| Year | *Red Book*/First DataBank AWP | McKesson Wholesale Price | Percent "Spread" |
| 1993 | $30.25 | $25.39 | 16.1% |
| 1994 | $30.25 | $23.69 | 21.4% |
| 1995 | $30.25 | $15.26 | 49.6% |
| 1996 | $30.25 | $15.26 | 49.6% |
| 1997 | $30.25 | $11.84 | 60.9% |
| 1998 | $30.25 | $10.00 | 67.0% |

423.    The County Medicaid programs reimbursed for all of the above referenced Dey drugs based on the fraudulent Dey AWPs.

424.    The Red Book suggests Dey's fraudulent pricing scheme took root in the early 1990s.  In 1993, Dey's *Red Book* AWP for albuterol sulfate (.083% concentration, 3 ml) was $30.25, yet it was available from McKesson at the wholesale price of  $25.45 (a spread of 16.1%).  By 1998, Dey's *Red Book* AWP for the same concentration/dose of albuterol sulfate was still $30.25, yet the McKesson wholesale price had plummeted to $10.00  (creating a spread of 202%).  *See* September 25, 2000 letter from U.S. Rep. Bliley to Nancy-Ann Min DeParle.

425.    At all times relevant hereto, Dey has also utilized "off-invoice" pricing practices whereby Dey provides free goods for products.  On information and belief these free goods are not accounted for in Dey's computation of WAC or AWP resulting in further inflation of both.

426.    For example, in an announcement of a special incentive program to its customers to induce the purchase of its Ipratropium Bromide Inhalation solution (a subject drug), Dey sent its customers an offer sheet entitled "Profitability Enhancement For You" in which it stated "For every dollar of Dey Cromolyn Sodium unit-dose purchased, Dey will provide free goods of either:  Coromolyn Sodium Inhalation Solution 0.02%, 2.5ml, at 1.0 times the rebate amount -OR- Ipatropium Bromide Inhalation Solution 0.02% 2.5ml, when it launches, at a value of 1.5 times the rebate amount for Cromolyn."

427.    In an effort to conceal the existence of a spread, Dey concealed the true wholesale prices of its drugs.  For instance, in a handwritten memorandum to Dey's pricing committee a potential pricing structure with a customer was discussed:

> "I met with IPC to discuss our contract offer (illegible). . .Tom
> Konnelly (IPC) said he wanted to keep net pricing hidden from 3[rd]

parties by increasing in the purchase price on our offer by 25%. IPC then requires a 25% rebate back to IPC. . .I have remarked the pricing.  If this offer is accepted, the higher price will go into McKesson as a chargeback contract.  Dey will then rebate IPC 25% on contract purchases on a quarterly basis. . .'"

428.    Dey is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

429.    Dey's Chief Financial Officer, Pamela Marrs, testified on December 7, 2004 that Dey did not lower its AWPs because to do so would cause it to lose customers.  *House Hearing,* Tr. at 116-18.

## N.    ELI LILLY

430.    As summarized in Exhibit A, the County Medicaid Programs spent $1.3 billion on the 104 at-issue Eli Lilly NDCs between 1992 - 2005 alone.[27]  The specific Eli Lilly NDCs for which the Counties seek relief are set forth in Exhibit B-14 hereto.  The Counties allege both AWP and FUL fraud claims against Eli Lilly.

431.    At all times relevant hereto, Eli Lilly has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-14, Eli Lilly has routinely created such spreads.

432.    At all times relevant hereto, Eli Lilly has negotiated prices with its providers, PBMs, GPOs and other large purchasers at deep discounts off of WAC.  Thus, the WACs reported by Lilly are deliberately false and misleading.  Lilly reports false and misleading WACs in order to inflate the published AWPs for its products and enable Lilly to market spread.

---

[27] The claims of the County Medicaid Programs are not confined to this time period.

433.    In 1999, King Group purchased from Defendant Eli Lilly the U.S. and Puerto Rican marketing rights of Lorabid, an antibiotic used in the treatment of bacterial infections, for approximately $67.8 million.  Defendant Eli Lilly manufactures Lorabid for King Group and retains the right to receive additional payments if certain sales performance milestones are achieved.

434.    Based on pricing information provided to the House Committee of Energy and Commerce in July 2001, Lilly's 100ml vial of Vancocin 10gm (NDC 00002725501) had a reported AWP of $156.01.  The average of available prices for the same 100ml vial was $46.00 (a 182% discount from the reported WAC of $130.00).  The intentionally false and misleading AWP was 239% more than the available price.  The Counties reimbursed for Lilly's 100ml vial of Vancocin 10gm based on the fraudulent AWP.

435.    In addition, in December 2000, Lilly's Humalog Mix 75/25 Vial (NDC 00002751101) had a reported AWP of $47.70.  The available price for the same dosage was $6.70 (a 493% discount from the reported WAC of $39.75).   The intentionally false and misleading AWP was 612% more than the available price.  The Counties reimbursed for Lilly's Humalog Mix 75/25 Vial in 2000 based on this fraudulent AWP.  Additional examples of Lilly's false price reporting for the Humalog Mix 75/25 Vial are set forth in Exhibit B-14.

436.    In order to gain market share for its drugs, Lilly further perpetuated the false and misleading nature of its wholesale price information by offering or causing to be offered significant market share rebates and discounts as well as extended contracts with fixed pricing.   On information and belief Lilly never took these discounts and rebates into account in its calculation of AWP or WAC.

437.    For example, throughout 2004, Lilly had "Equal Access Upfront Discount Programs" for all doses of Zyprexa and Symbyax that it offered to members of certain group purchasing organizations ("GPOs").  Under these programs, Lilly provided an upfront discount of 8% off Lilly's Net Wholesale Price ("NWP") (Lilly's WAC equivalent) if in the previous 6 months the member had net purchases of antipsychotic medications exceeding $100,000.00.  In return for the discount, Lilly was guaranteed placement on the GPO's formulary.  On information and belief, Lilly did not account for these sorts of GPO discounts in its calculation of AWP or WAC.

438.    For example, contemporaneous with the above GPO discount, Zyprexa 15mg Tablet [NDC 00002441560] had an AWP of $935.19 and a NWP/WAC of $748.15 resulting in a 25% AWP spread.  The upfront 8% discount resulted in an available price of $688.30 and an AWP spread of 35%, an effective 10% increase in AWP spread.  The County Medicaid Programs did not have the benefit of this discount.  They paid for Zyprexa, one of their largest Medicaid expenditures, based on Lilly's fraudulent AWP.  The Counties' specific Zyprexa spreads are set forth in Exhibit B-14.

439.    Eli Lilly is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

440.     Eli Lilly also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements.  On information and belief, Eli Lilly routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

441.     In connection with the wrongdoing alleged herein, Eli Lilly has been sued by the state of Alabama.

442.     The U.S. Attorney's Office in Pennsylvania is investigating Eli Lilly's marketing practices of certain drugs, including Zyprexa, Prozac and Prozac Weekly, all drugs paid for the New York Counties and at issue here.

443.     Eli Lilly also is being investigated by the Department of Justice.  In July 2002, Lilly received a grand jury subpoena from DOJ related to the marketing of Evista.  In that investigation it is alleged that Lilly's communications with physicians constituted unlawful promotion of Evista for indications not approved by the FDA.  *See* Eli Lilly's 10-K for fiscal year ended December 31, 2002 at 12.  In its 2004 10-K Lilly reported that it was "possible other Lilly products, including Zyprexa, one of the drugs paid for by the New York Counties (and at issue here) could become subject to investigation."  Eli Lilly 10-K for fiscal year ended December 31, 2003 at 13 (3/15/04).

## O.     ENDO PHARMACEUTICALS

444.     As summarized in Exhibit A, the County Medicaid Programs spent over $90 million on the 95 at-issue Endo NDCs between 1992 - 2005 alone.[28]  The specific Endo

---

[28] The claims of the County Medicaid Programs are not confined to this time period.

NDCs for which the Counties seek relief are set forth in Exhibit B-15 hereto.  The Counties allege both AWP and FUL fraud claims against Endo.

445.    At all times relevant hereto, Endo has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-15, hereto Endo has routinely created such spreads.

446.    At all times relevant hereto, Endo has negotiated prices with providers, PBMs, GPOs and other large purchasers at deep discounts off of WAC.  Thus, the WACs reported by Endo are deliberately false and misleading.  Endo reports false and misleading WACs in order to inflate the published AWPs for its products and enable Endo to market spread. Endo, like all drug manufacturers, competes on spread and reimbursement.

447.    For example,

| Endo Drug | Year | AWP | WP | SPREAD |
|---|---|---|---|---|
| Selegeline  5mg | 2002 | $1015.25 | $82.62 | 1,128% |
| Catropril/Hetz 50/25 | 2002 | $123.90 | $13.01 | 852% |
| Oxycodone w/APAP 5/500 | 2002 | $81.30 | $12.14 | 569% |
| Cimetidine 400 mg | 2001 | $146.88 | $12.81 | 1,046% |
| Glipizide 10mg | 2001 | $63.77 | $6.58 | 869% |

448.    The County Medicaid programs reimbursed for the above based on Endo's fraudulent AWPs.  Additional actionable spreads for the above drugs are set forth in Exhibit B-15 hereto.

449.    In 2000, Endo caused an AWP of $815.06 to be issued for Cyclobenzaprine 10mg tablets, yet simultaneously made the drug available for $56.25 (a spread of 1,349%).

450.    While there were FULs in place for a number of Endo drugs during at least some of the relevant time period, Endo's failure to report its deeply discounted prices

resulted in some of those FUL being false and inflated.  Given that the FUL is set at 150% of the

lowest reported price per unit for therapeutic bioequivalents, a comparison of the unit price for

Endo drugs to the applicable FUL reveals the false and misleading nature of Endo's wholesale

price information, as indicated by the following examples; and those set forth in Exhibit B-15

| Defendant ENDO | | | | | | |
|---|---|---|---|---|---|---|
| Drug | Year | NDC Code | FUL price/unit | FUL Baseline Price (Lowest) | ENDO Contract Price | Spread % less than Baseline |
| Selegiline 5mg Tablets | 2002 | 60951-0620-85 | $0.7658 | $0.5105 | $0.1652 | 209% |
| Captopril-HCTZ 50/25 Tablets | 2002 | 60951-0731-70 | $0.3702 | $0.2468 | $0.1301 | 90% |
| Oxycodone W/APAP 5/500 Capsules | 2002 | 60951-0660-70 | $0.2250 | $0.1500 | $0.1214 | 24% |
| Cyclobenzaprine 10mg Tablets | 2001 | 60951-0767-90 | $0.0910 | $0.0606 | $0.0562 | 8% |
| Carbidopa/Levo 25/100 Tablets | 2001 | 60951-0605-68 | $0.3915 | $0.2610 | $0.1487 | 75% |

451.    Endo's failure to report accurate prices for the above drugs and those set

forth in Exhibit B-15 resulted in false and inflated FULs being issued, and overcharges to the

County Medicaid Programs directly attributable to Endo.

## P.    ETHEX

452.    As summarized in Exhibit A, the County Medicaid Programs spent over

$31 million on the 95 at-issue Ethex NDCs between 1992 - 2005 alone.[29]  The specific Ethex

NDCs for which the Counties seek relief are set forth in Exhibit B-16 hereto.  The Counties

allege both AWP and FUL fraud claims against Ethex.

---

[29] The claims of the County Medicaid Programs are not confined to this time period.

453.    At all times relevant hereto, Ethex has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-16 hereto, Ethex has routinely created such spreads.

454.    At all times relevant hereto, Ethex has negotiated prices with its providers, PBMs, GPOs and other large purchasers at deep discounts off of WAC.  Thus, the WACs reported by Ethex are deliberately false and misleading.  Ethex reports false and misleading WACs in order to inflate the published AWPs for its products and enable Ethex to market spread.  Ethex, like all drug manufacturers, competes on spread and reimbursement.

455.    In 2002, Ethex's Nitroglycerin 9mg caplets (NDC 51877-0006-04) (a subject drug) were available at a market price of $4.08, while Ethex reported an AWP of $24.90, creating a spread of over 510%.  The spreads for Nitroglycerin were similarly inflated in 2000 and 2001.

456.    In 2003, Ethex reported an AWP of $69.61 for Hyrdomorphone HCL 4mg tablets (NDC 51187-70299-04) (a subject drug) yet the drug was available for $15.98.  This translates into spread of 335% from AWP.  The spreads for Hydromorphone were similarly inflated in 2000 and 2001.

457.    While there was a FUL in place during at least some of the relevant time period for some of Ethex's drugs, Ethex's failure to report for its deeply discounted prices resulted in that FUL being false and inflated.  For example, as set forth in Exhibit B-16, the FUL for Ethex's Doxazosin Mesylate 4 Mg Tablet was $.6210/unit in 2002.  Given that the FUL is set at 150% of the lowest reported price for therapeutic bioequivalents, this means the lowest reported price for Doxazosin Mesylate 4 Mg Tablet was $.4140/unit.

458.    Ethex sold Doxazosin Mesylate 4 Mg Tablet for $.1522/unit in 2002, which is 172% less than the lowest reported price that generated the FUL.   If Ethex properly reported this price, the FUL would have been $0.2283/unit instead of $.6210/unit and the County Medicaid Programs would have reimbursed based on this lower FUL.   Thus, Ethex's failure to report accurate prices resulted in a fraudulent FUL and damage to the County Medicaid Programs directly attributable to Ethex.

459.    Ethex is among the pharmaceutical companies referred to above now under investigation by the House Committee on Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.   The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.   The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.   The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

460.    The Massachusetts Attorney General brought suit against Ethex, alleging that Ethex's AMPs were materially lower than the wholesale prices Ethex reported for reimbursement purposes and that Ethex consequently had underpaid Medicaid rebates.

461.    To the extent that the Counties' reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Ethex's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

## Q.    THE FOREST GROUP

462.    As summarized in Exhibit A, the County Medicaid Programs spent over $166 million on the 153 at-issue Forest NDCs between 1995 - 2005 alone.[30]  The specific Forest NDCs for which the Counties seek relief are set forth in Exhibit B-17 hereto.  The Counties allege both AWP and FUL fraud claims against the Forest Group defendants.

463.    At all times relevant hereto, Forest Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-17, the Forest Group has routinely created such spreads.

464.    An example is the rebate program the Forest Group offered through Linovatix suppliers which existed "in lieu of upfront discounts" but had the same practical effect, i.e., "to earn additional savings on top of those resulting from direct contract pricing."

465.    The Forest Group's fraudulent pricing of Levothroid is well documented. From July of 1997 through June of 1999 Forest caused an AWP of $19.18 to be reported for Levothroid .15 mg (NDC 00456-0325-01).  During that same period, the product was available from wholesalers for $8.65.  Forest specifically marketed the product based on spread, noting it would generate a profit per unit of $8.23 (based on reimbursement at AWP-12%), versus the profit per unit of only $0.08 for the competing product Synthroid.

466.    Illinois and Kentucky allege that in 2000 the Forest Labs drug Tiazac (120mg 30s) (NDC Code 00456-2612-30) (a subject drug) had an AWP of $30.66 yet was available at $19.75, representing a spread of 55%.

467.    Forest Pharm is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price

---

[30] The claims of the County Medicaid Programs are not confined to this time period.

exception to the Best Price reporting requirements.  On information and belief, the  Forest Group routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

468.    Forest Pharm is the subject of an investigation referred to above by the Office of the Inspector General of the Office of Personnel Management concerning marketing practices for mental health drugs.

## R.    THE FUJISAWA GROUP

469.    As summarized in Exhibit A, the County Medicaid Programs spent over $80 million on the 29 at-issue Fujisawa NDCs between 1992 - 2005 alone.[31]   The specific Fujisawa NDCs for which the Counties seek relief are set forth in Exhibit B-18 hereto.

470.    At all times relevant hereto, the Fujisawa Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-18 hereto, the Fujisawa Group has routinely created such spreads.

471.    The following documents show the Fujisawa Group competing on spread with Abbott.

> Many thanks to Rick and Bruce for adjusting the AWP on the five gram Vanco. This should lead to more business ..... I would have liked to see us match Abbott's AWP for our complete Vanco, and Cefazolin line. I will settle for the five gram at $1 below Abbott but that means that we will still have to compete at the other end of the equation. For example, if Abbott's AWP is $163 and their contract is $30 and if our AWP is 162 we will have to be at least $29 to have the same spread. Follow?" (F13206 & F13207)

Internal Fujisawa Document as quoted in the September 28, 2000 Testimony of Congressman Pete Stark, available at http://thomas.loc.gov/cgi-bin/query/R?r106:FLD001:E51623

---

[31] The claims of the County Medicaid Programs are not confined to this time period.

472. In connection with the wrongful conduct described herein, the Fujisawa Group has been investigated by at least the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and the Attorneys General for the States of Montana, Texas and California. The publicly available results of these investigations confirm the Fujisawa Group's routine practice of reporting false and inflated wholesale price information and non-compliance with rebate obligations.

473. The following price list dated August 24, 1995, reveals that the Fujisawa Group has been engaging in the fraudulent scheme at issue here since at least the mid-1990s.

| Drug | Contract Price | AWP | $ Diff AWP | % Spread |
|------|----------------|-----|------------|----------|
| Triamicinolone | $14.33 | $17.95 | $3.62 | 25% |
| Calcium Gluconate | $11.50 | $34.00 | $22.50 | 196% |
| Cefazolin Sodium | $139.00 | $367.13 | $228.13 | 164% |
| Ceftizoxime Sodium | $7.50 | $11.86 | $4.36 | 58% |
| Amcinonide | $41.50 | $52.13 | $10.63 | 26% |
| Doxycycline Hyclate | $15.00 | $73.75 | $58.75 | 392% |
| Fluphenazine Hydrochloride | $24.10 | $30.25 | $6.15 | 25% |
| Folic Acid | $7.25 | $11.85 | $4.26 | 63% |
| Levothyroxine Sodium | $3.90 | $38.43 | $34.53 | 885% |
| Lidocaine Hydrochloride | $17.00 | $24.50 | $7.50 | 44% |
| Magnesium Sulfate | $22.00 | $138.25 | $116.25 | 528% |
| Mannitol | $28.00 | $56.50 | $28.50 | 101% |
| Neostigmine Methylsulfate | $8.20 | $89.30 | $81.10 | 989% |
| Oxytocin | $13.50 | $24.50 | $11.00 | 81% |
| Potassium Acetate | $92.00 | $312.40 | $220.40 | 240% |
| Potassium Chloride | $12.25 | $30.50 | $18.25 | 149% |
| Potassium Phosphate | $30.25 | $133.75 | $103.50 | 342% |
| Pyridoxine Hydrochloride | $35.00 | $47.00 | $12.00 | 34% |
| Scopolamine Hydrbromide | $22.00 | $30.00 | $8.00 | 36% |
| Selenium | $18.25 | $195.25 | $177.00 | 970% |

474. The following Fujisawa Group price list date from November 5, 1996 and further, reveals that the Fujisawa Group consistently has offered drugs and other solutions to its

126

customers at prices significantly below the published AWPs that serve as the basis for Medicare and reimbursements.

| Drug | Wholesaler Price | AWP | $ Diff AWP | % Spread |
|------|------------------|-----|------------|----------|
| Adenocard IV | $21.95 | $26.34 | $4.39 | 20% |
| Adenoscan | $179.00 | $223.75 | $44.75 | 25% |
| Aristocort A | $7.05 | $8.46 | $1.41 | 20% |
| Atropine Sulfate Injection | $.64 | $1.12 | $.48 | 75% |
| Doxorubicin | $12.44 | $45.50 | $33.06 | 266% |
| Furosemide | $.74 | $.98 | $.24 | 32% |
| Hydroxyzine Hydrochloride | $.42 | $.65 | $.23 | 55% |
| Protamine Sulfate | $3.33 | $5.32 | $1.99 | 60% |
| Selepen | $18.24 | $29.93 | $11.68 | 64% |
| Sodium Acetate | $8.81 | $14.63 | $5.82 | 66% |
| Sodium Bicarbonate | $2.04 | $3.33 | $1.29 | 63% |
| Sodium Choride | $.68 | $1.40 | $.72 | 106% |
| Sodium Phosphate | $5.81 | $9.08 | $3.27 | 56% |
| Tracelyte | $8.26 | $11.57 | $3.31 | 40% |
| Vinblastine Sulfate | $26.50 | $43.23 | $16.73 | 63% |
| Water for Injection | $1.10 | $2.34 | $1.24 | 113% |

475. The County Medicaid Programs reimbursed for all the above based on the Fujisawa Group's fraudulent AWPs.

476. In a 2000 report published by the DHHS, the DOJ documented at least 35 instances where the published AWPs for various dosages of 6 drugs manufactured by the Fujisawa Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the 6 subject drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by the Fujisawa Group in the *Red Book*.

| Drug | *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|------|----------------|---------------------------|------------|-------------------|
| Acyclovir Sodium | $565.10 | $371.50 | $193.60 | 52% |
| Dexamethasone Sodium Phosphate | $1.04 | $.66 | $.38 | 58% |

| Fluorouracil | $2.87 | $1.20 | $1.67 | 139% |
|---|---|---|---|---|
| Gentamacin Sulfate | $12.64 | $5.40 | $7.24 | 134% |
| Pentamidine Isethionate | $98.75 | $36.00 | $62.75 | 174% |
| Vancomycin Hydrochloride | $10.97 | $7.00 | $3.97 | 57% |

## S.      THE GSK GROUP

477.     As summarized in Exhibit A, the County Medicaid Programs spent over $2.5 billion on the 384 at-issue GSK Group NDCs between 1992 - 2005 alone.[32]  The specific GSK Group NDCs for which the Counties seek relief are set forth in Exhibit B-19 hereto.  The Counties allege AWP and FUL fraud claims against the GSK Group defendants.  The Counties allege AWP and FUL fraud claims against the GSK Group defendants.

478.     At all times relevant hereto, the GSK Group has known that it can promote its drugs by selling them at substantial undisclosed discounts while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-19 hereto, the GSK Group has routinely created such spreads.

479.     Another is the rebate program the GSK Group offered through Linovatix suppliers which existed "in lieu of upfront discounts" but had the same practical effect, i.e., "to earn additional savings on top of those resulting from direct contract pricing."

480.     The GSK Group's misconduct has at all relevant times been pervasive throughout its product line, affecting single and multi-source products alike.

481.     GSK's constituent corporations Glaxo Wellcome and SmithKline Beecham competed vigorously in the anti-emetic market with their respective products Zofran and Kytril.  Each company caused false and inflated AWPs to be reported for these drugs, actively marketed the spread for them to their customers, tracked each others' AWP and

---

[32] The claims of the County Medicaid Programs are not confined to this time period.

acquisition costs, prepared reimbursement worksheets for use by its sales forces to demonstrate for its customers the greater profitability of their drugs.  Each company knew that its customers' product selection for these drugs was driven by reimbursement and spread.

482.    In an effort to build market share, in 1996 Glaxo increased Zofran's AWP while lowering the actual price paid by its customers, effectively increasing the profit per dose of Zofran.

483.    In evaluating whether to increase the AWP of Zofran, Glaxo considered the impact a price increase would have on the attention Glaxo received from the press and Congress.  Glaxo was concerned that since it was raising the price of one of its most expensive drugs, for the second time in a single year, and after the entrance of competitor in the market, it may have to explain its true pricing strategy, which was to increase the costs payors like Medicaid pay to retain its market share.

484.    Glaxo feared that an 8% increase in Zofran's AWP in just a nine month period would raise the suspicion of Congressional watchdogs, and that Glaxo would be unable to justify this cost-shifting at the expense of the government.

485.    While New York Medicaid has settled its Zofran and Kytril AWP fraud claims with GSK, plaintiffs describe GSK's unlawful conduct with regard to these drugs because (a) such misconduct was pervasive throughout GSK and infected all of its pricing activity and (b) such misconduct directly impacted GSK's unlawful marketing efforts regarding at-issue (unsettled) NDCs.  For example, GSK used its ability to influence product selection for Zofran and Kytril to influence purchasers to purchase other GSK drugs such as Zantac and Zovirax, both of which were coming off patent in the late 1990s, and both of which are subject drugs. Glaxo

Wellcome directly advertised that it would consider paying higher Zantac rebates to customers who put Zofran tablets or injectibles on their formularies or made them freely available.

486.    GSK competed based on spread and rebate for Zantac and other single source drugs.  GSK offered specific additional rebates for Zantac in response to direct marketing of Pepcid.

487.    GSK has deliberately concealed that it competes on spread or benefits from spread.  GSK CEO J.P. Garnier stated to investors in early 2003 that GSK "[has ] never benefited from the spread becoming bigger or smaller."  Garnier stated that the reimbursement systemt "has a big loophole and can create confusion.  We don't like it one bit."  These statements were purposefully misleading and false.  GSK in its current form and in years past as Glaxo Wellcome and SmithKline Beecham clearly have competed on spread and benefited from spread.  GSK has at all times relevant hereto utilized spread to influence demand for its products.

488.    In connection with the wrongful conduct described herein, the GSK Group has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and the Attorneys General for the States of California, Colorado, Nevada, New York, Pennsylvania, Texas and Wisconsin.

489.    GSK has been sued by Alabama, Illinois, Kentucky, and Pennsylvania in connection with the same wrongdoing as is at issue here.

490.    The GSK Group recently agreed to pay in excess of $87 million to settle federal False Claims Act allegations that GSK Group repackaged and privately labeled Paxil, an antidepressant and Flonase, a nasal spray for Kaiser at discounted prices, but failed to report these lower prices as Best Prices to the government.

491.   On April 13, 2003, SmithKline Beecham Corporation, d/b/a/ GlaxoSmithKline entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United Dates Department of Health and Human Services "to promote compliance" "with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)" ("Federal Health Care Program Requirements").   Contemporaneously GSK entered into a Settlement Agreement with the United States and various states.

492.   Persons covered by the "CIA" include all employees of the U.S. pharmaceuticals division of GSK responsible for the, *inter alia*, "reporting of pricing information for any products that are reimbursed by federal health care programs, including under the Medicaid drug rebate program, codified at 42.  U.S.C. § 1396r-8" and "obligations related to government contracts, including the agreements entered with the Department of Health and Human Services under the Medicaid drug rebate program and the drug pricing program under the Public Health Service (PHS) Act, 42 U.S.C. § 256."

493.   In addition to promising compliance with federal health care program requirements, the CIA requires GSK to establish a written code of conduct to be agreed to by each covered person that confirms GSK's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government contracting requirements and to market and sell its Government Reimbursed Products in accordance with federal health care program requirements."

494.   The CIA requires further that GSK implement policies and procedures that address:

(a)   The code of conduct described above as well as;

(b)     The methods for gathering, calculating, verifying and reporting the data and information reported to the Centers for Medicare and Medicaid Services ("CMS") and/or the state Medicaid programs in connection with the Medicaid drug rebate program;

(c)     Promotional practices that conform with all applicable federal health care program requirements, including the Medicaid drug rebate program and the Federal anti-kickback statute, codified at 42. U.S.C. § 1302a-7b; and

(d)     The requirements of all government contracts, including those under the Medicaid drug pricing program.

495.     The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization, ("IRO").  The IRO performs two types of review: (1) a systems review of GSK's systems, processes, policies and practices relating to the Medicaid drug rebate program ("Medicaid Rebate Systems Review") and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with GSK's policies and procedures and Medicaid drug rebate program requirements.

496.     CIA notwithstanding, GSK's wrongful price reporting continues.  GSK is among the pharmaceutical companies now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

497.     GSK Group also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements. On information and belief, GSK routinely offers its products to commercial customers for prices less than 10% AWP and

(a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

498.    This investigation complements documents that reveal widespread discounting of GSK's Zantac 150 mg tablet at prices that are a fraction of the reported AWP.

499.    Specifically in the year 2000 GSK sold 150 mg Zantac tablets to East Jefferson General Hospital for 14 cents per pill[33].   Yet, at the same time GSK's per pill AWP for 150 mg Zantac (NDC 00173-0344-47) was reported as $1.79 per pill.  The Counties also allege unlawful pricing activity and actionable spreads for Zantac 150 mg tablets in 1998 and 2002. *See* Exhibit B-19.

500.    On information and belief these deep discounts were not accounted for by GSK in its calucation of Zantac's 2000 AWP of $1.79 per pill, nor were they accounted for in GSK's calculation of Best Price.

501.    The Counties reimbursed based on the false Zantac 150 mg AWPs in 2000, paying $1.61 per pill (AWP –10%, excluding co-pays and dispensing fees) for a total of $4.1 million.  The Counties thus paid 1150% more for Zantac 150mg than was charged to East Jefferson General Hospital.

502.    On information and belief, at all times relevant hereto, 1) the deep discounting programs described here have been widely used by GSK; (2) the deeply discounted prices have not been included in GSK's AMP or Best Price calculations 3) these deeply discounted prices have not been included in the AWPs and other wholesale price information GSK reports or causes to be reported to publishers.

---

[33] *See* Exhibit B to Relator's Brief In Opposition To Motion To Dismiss, Filed July 16, 2003, *U.S. Ex. Rel. William St. John LaCorte, MD v. Merck and Company, Inc.,* CV 993807, (E.D.L.A.).

## T.    THE HOFFMAN-LAROCHE GROUP

503.    As summarized in Exhibit A, the County Medicaid Programs spent over $329 million on the 114 at-issue Hoffman La-Roche NDCs between 1992 - 2005 alone.[34]    The specific Hoffman La-Roche NDCs for which the Counties seek relief are set forth in Exhibit B-20 hereto.

504.    At all times relevant hereto, the Hoffman LaRoche Group has known that it can promote its drugs by selling them at substantial undisclosed discounts  while at the same time maintaining a false and inflated reimbursement prices.  As evidenced by Exhibit B-20 hereto, the Hoffman LaRoche Group has routinely created such spreads.

505.    In 2002, Hoffman-La Roche's Klonopin 1mg tablets (NDC 00004-0058-01) (a subject drug) were available were available at a market price of $85.80 while Hoffman-La Roche set an AWP of $105.78, creating a spread of over 27%.

506.    In 2002, Hoffman-La Roche's Kytril 1mg/ml vial (NDC 00029-4152-01) (a subject drug) was available at a market price of $379.14, while Hoffman-La Roche reported an AWP of $780.80, creating a spread of over 105%.

507.    Hoffman-LaRoche is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

---

[34] The claims of the County Medicaid Programs are not confined to this time period.

508.    Hoffman-LaRoche also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements. On information and belief, Hoffman-LaRoche routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

## U.    THE IVAX GROUP

509.    As summarized in Exhibit A, the County Medicaid Programs spent over $185 million on the 611 at-issue Ivax NDCs between 1992 - 2005 alone.[35]   The specific Ivax NDCs for which the Counties seek relief are set forth in Exhibit B-22 hereto.   The Counties allege both AWP and FUL claims against the Ivax Group defendants.

510.    At all times relevant hereto, the Ivax Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-22 hereto, the Ivax Group has routinely created such spreads.

511.    For example, in February 2000, the Ivax Group's 1000 count package of Methyldopa 250mg tablet had a reported AWP of $330.00.   The available price for the same 1000 count package was $60.18 (a 35% discount from the reported WAC of $92.59).   The intentionally false and misleading AWP was 448% over the generally available market price and 256% over the reported WAC.   The Counties reimbursed the Ivax Group's 1000 count package of Methyldopa 250mg tablet based on this false and misleading wholesale price information.

512.    Additionally, in March 2002, the Ivax Group's 100-count package of Buspirone 10mg tablet had a reported AWP of $136.25 and a reported WAC of $29.15.    The

---

[35] The claims of the County Medicaid Programs are not confined to this time period.

intentionally false and misleading AWP resulted in a 367% spread over WAC.  The Counties reimbursed the Ivax Group's 100 count package of Buspirone 10mg tablet based on this false and misleading wholesale price information

513.    On April 1, 2003, the available price for Ivax Group's 100 count package of Buspirone 10mg tablet was $17.75 (a 39% discount from the reported WAC of 29.15) and resulted in a 668% spread from the intentionally false and misleading AWP of $136.25.

514.    There was not a FUL for Buspirone 10mg tablet until December 2002. While there were FULs in place for the above drugs during at least some of the time period referred to above, Ivax Group's failure to account for its deeply discounted contract prices for these drugs resulted in such FUL being false and inflated.

515.    For example, on December 1, 2002, the FUL for Buspirone 10mg tablet was set at $0.3942/unit (which FUL continued unchanged through 2004).  Given that the FUL is set at 150% of the lowest reported price/unit for therapeutic bioequivalents, this meant the lowest reported price for Buspirone 10mg tablet was $0.2628/unit.

516.    Based on the above, in April 2003 Ivax Group sold Buspirone 10mg tablet for $0.1775/unit, which is 48% less than the lowest reported price that generated the FUL.  If Ivax Group properly reported this discounted price, the FUL would have been $0.2663/unit (150% of $0.1775/unit) instead of $0.3942/unit.  The County Medicaid Programs would have reimbursed based on this lower FUL.  Thus, Ivax Group's failure to report accurate price information resulted in a fraudulent FUL and damage to the County Medicaid Programs directly attributable to Ivax Group.

517.    The Ivax Group Ivax has been sued by Florida, Illinois, Kentucky, Massachusetts and Wisconsin in connection with the wrongdoing at issue here.

518.   Illinois, Kentucky and Wisconsin allege inflated and false wholesale pricing information for Ivax's Verapamil (a subject drug) as follows:

| **Defendants IVAX GROUP** | | | | | | |
|---|---|---|---|---|---|---|
| **Drug** | **Size** | **NDC Code** | **2000 AWP** | **2000 Price** | **Spread $** | **Spread %** |
| Verapamil HCL 240mg | 100s | 00172-4280-60 | $120.95 | $10.50 | $110.45 | 1052% |

519.   Florida alleges the following for Ivax's Clozapine 100mg (a subject drug) in 2000-2002.

| **Defendant IVAX/ZENITH-GOLDLINE** **Clozapine 100mg 100's** **NDC# 00172-4360-60** | | | | | |
|---|---|---|---|---|---|
| Date | First Databank AWP | First Databank WAC | Relator's Cost -------------------- Contract Price | Spread $ | Spread % (Spread $ / Relator's Cost) |
| 10-23-2000 | $316.95 | $245.85 | $165.08 | $109.87 | 67% |
| 12-12-2000 | $316.95 | $245.85 | $165.08 | $109.87 | 67% |
| 02-22-2001 | $332.80 | $245.85 | $148.73 | $126.22 | 85% |
| 04-20-2001 | $332.80 | $245.85 | $156.56 | $118.39 | 76% |
| 06-19-2001 | $332.80 | $245.85 | $148.73 | $126.22 | 85% |
| 08-09-2001 | $332.80 | $245.85 | $148.73 | $126.22 | 85% |
| 11-12-2001 | $332.80 | $245.85 | $148.73 | $126.22 | 85% |
| 01-28-2002 | $332.80 | $245.85 | $133.07 | $141.88 | 107% |
| 03-10-2002 | $332.80 | $245.85 | $133.07 | $141.88 | 107% |
| 05-08-2002 | $332.80 | $245.85 | $133.07 | $129.99 | 98% |
| 06-25-2002 | $332.80 | $245.85 | $133.07 | $129.99 | 98% |

520.   The Ivax Group admits it has been the target of government investigations into its AWP and wholesale pricing practices.  In its Form 10-K filed with the Securities and Exchange Commission on March 16, 2005, the Ivax Group acknowledged that they are among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce "in connection with the Committee's investigation into

certain industry and [Ivax Group] practices regarding AWP."  (Ivax SEC Form 10-K (FY 2005, 3/16/05) at 36).

521.    The Ivax Group also admits it is either being sued or is under investigation for improper pricing practices related to the average manufacturer price and best price calculations by the Office of Attorney General for at least 12 states.  (Ivax SEC Form 10-K (FY 2005, 3/16/05) at 36-37), including Massachusetts, Florida, Illinois, Wisconsin, Kentucky, Alabama and Nevada.

522.    The Ivax Group further admits that the "outcome of these investigations could include the imposition of substantial fines, penalties and injunctive or administrative remedies." (Ivax SEC Form 10-K (FY 2005, 3/16/05) at 37).

523.    As part of its investigation of the Ivax Group, the Massachusetts Attorney General issued a subpoena to Ivax Group for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

524.    The Massachusetts Attorney General subsequently brought suit against the Ivax Group, alleging that Ivax Group's AMPs were materially lower than the wholesale prices the Ivax Group reported for reimbursement purposes and that Ivax Group consequently had underpaid Medicaid rebates.

525.    To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Ivax Group's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

## V.    JOHNSON & JOHNSON GROUP

526.    As summarized in Exhibit A, the County Medicaid Programs spent over $1.6 billion on the 207 at-issue Johnson & Johnson Group NDCs between 1992 - 2005 alone.[36] The specific J&J GroupNDCs for which the Counties seek relief are set forth in Exhibit B-23 hereto.  The Counties allege both AWP and FUL fraud claims against the J&J defendants.

527.    At all times relevant hereto, the J&J Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-23 hereto, the J&J Group routinely has created such spreads.

528.    Wisconsin and Kentucky allege that in 2000 the McNeil drug Sod/Potass/K Cit/Sodium Cit (473ml) (NDC Code 17314-9322-01) (a subject drug) had an AWP of $25.44 yet was available at $19.09, representing a spread of 33%.

529.    Illinois, Wisconsin and Kentucky allege that in 2000 the Janssen drug Ketoconazole (200mg 100s) (NDC Code 50458-0220-10) (a subject drug) had an AWP of $351.11 yet was available at $281.33, representing a spread of 25%.

530.    Illinois alleges that in 2000 the McNeil drug Topamax (25mg 60s) (NDC Code 00045-0639-65) (a subject drug) had an AWP of $75.58 yet was available at $62.97, representing a spread of 20%.

531.    The J&J Group created promotional materials and worksheets to allow them to market the spread between the published AWP and the actual selling price to doctors. For example, a publication accessible through Defendants' web sites entitled "Office-Based Infusion Guide" demonstrates Defendants' aggressive marketing of this spread, specifically noting that, "[d]epending on reimbursement, office-based infusion may provide a financial

---

[36] The claims of the County Medicaid Programs are not confined to this time period.

impact to a physician's practice." Moreover, the "Financial Analysis" section of the guide includes a"REMICADE (infliximab) Financial Impact Worksheet," which enables doctors see in actual dollars how much additional revenue the use of Remicade would bring to their practice.

532.    At the same time, J&J deliberately marketed and promoted the sale of Remicade to physicians based on the availability of inflated payments made by Medicare, assuring them that they would make a significant profit from the purchase of Remicade as a result of the spread between the actual price to physicians and reimbursement based on the published AWP.

533.    At all times relevant hereto, the J&J Group has marketed its drugs based on reimbursement and spread.  For example, the J&J Group has been aggressively marketing Procrit in response to discounting by Amgen for its competing drug Aranesp.  J&J Vice President of Investor Relations, Helen Short, said J&J has been "implementing actions to ensure that we are on a level playing field [with our competitors] with respect to customer economics. . . The initial focus of our competition has been on capturing existing share from us through the implementation of discount...programs in both clinics and hospitals . . .  the focus has shifted to market share acquisition and protection" *See* The Pink Sheet, April 21, 2003, Volume 65, Number 016, page 13, "J&J Modifies Procrit Pricing Practices To Compete With Amgen's Aranesp."

534.    International Oncology Network, an Amerisource Bergen Company, published a document dated January 2004 entitled "Access to Care 2005" that confirmed Johnson & Johnson's statements that its discounting would increase in 2003.  The 15% discount from AWP for Procrit documented by the GAO in 2001 had grown to 54%, according to the

market prices listed by the International Oncology Network.  Under New York State's AWP –

10% reimbursement formula, the spread for Procrit was 39%.

535.   Johnson and Johnson competed through reimbursement and spread on all

drugs, not just Procrit.  J&J has discounted Procrit to many of its retail customers generally.

536.   At the prescription drug market trial, J&J attorney William Cavanaugh

stated, **"J&J initially refused to comply when managed care organizations asked for "deep

discount[s]" on oral contraceptives in the early 1980s, Cavanaugh said. As a result, J&J's OC

market share with DeanCare dropped from 51% to 2%. With United Health Care, J&J got back

on formulary after losing market share and "our sales [went] right back up." *See* The Pink Sheet,

"J&J Offers No Managed Care Discounts on Topamax - Pricing Trial" September 28, 1998,

Volume 60, Number 039, page 4.  On information and belief, J&J does not account for these

routine deep discounts in its calculation of WAC and AWP.  As a result both WAC and AWP are

false and inflated.

537.   In addition to admitting significant discounts off list price to certain

managed care customers, J&J has given a discount on Procrit to retailers since its launch in 1991

because it competes with Amgen's chemically equivalent Epogen. Cavanaugh said that because

Epogen's competition was chemically equivalent, "the retailer may have the ability to influence

sales".   On information and belief, J&J does not account for these retail discounts in its

calculation of WAC and AWP.

538.   On September 30, 2004, J&J Group's Ortho Biotech Inc. received a

subpoena from the U.S. Office of Inspector General seeking documents directed to sales and

marketing of Procrit (Epoetin alfa) from 1997 to the present. Ortho Biotech is responding to the

subpoena.  *See* J&J 2004 10-K.

539.   There are several other ongoing investigations of J& J and its subsidiaries.

540.   According to J&Js 2004 Annual Report on form 10-K

On December 8, 2003, the Company's Ortho-McNeil Pharmaceutical unit received a subpoena from the United States Attorney's office in Boston, Massachusetts seeking documents relating to the marketing, including alleged off-label marketing, of the drug TOPAMAX (topiramate). Ortho-McNeil is cooperating in responding to the subpoena. In October 2004, the U.S. Attorney's Office in Boston asked attorneys for Ortho-McNeil Pharmaceutical to cooperate in facilitating the subpoenaed testimony of several present and former Ortho-McNeil witnesses before a grand jury in Boston, for which cooperation is being provided.
*Id.*

541.   J&J is being sued by the Pennsylvania AG in connection with the same wrongdoing at issue here.

542.   J&J is among the pharmaceutical companies referred to above now under investigation by the House Committee on Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee's request focuses on the drug REMICADE (infliximab), marketed by the Company's Centocor, Inc. subsidiary.  The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

543.   On July 2, 2003, J&J received a request that it voluntarily provide documents and information to the criminal division of the U.S. Attorney's Office, District of New Jersey, in connection with its investigation into various Centocor marketing practices. Both the J&J and Centocor have responded to these requests for documents and information.

544.     J&J is one of the subjects of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements.

545.     Another is the rebate program J&J offered through Linovatix suppliers which existed "in lieu of upfront discounts" but had the same practical effect, i.e., "to earn additional savings on top of those resulting from direct contract pricing."

546.     Janssen is the subject of an investigation by the Office of the Inspector General of the Office of Personnel Management concerning marketing practices for mental health drugs.

## W.     THE KING GROUP

547.     As summarized in Exhibit A, the County Medicaid Programs spent over $95 million for the 159 at-issue King Group NDCs between 1992 - 2005 alone.[37]   The specific King Group NDCs for which the Counties seek relief are set forth in Exhibit B-24 hereto.   The Counties allege both AWP and FUL fraud claims against the King Group Defendants.

548.     At all times relevant hereto, the King Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-24 hereto, the King Group has routinely created such spreads.

549.     For example, in July 1999, the King Group (Monarch)'s 100 count package of Humantin 250mg Capsules had a published AWP of $262.44.   The generally available market price for the same 100 count package was $157.46 (a 25% discount from the reported WAC of $209.95).   The intentionally false and misleading AWP was 66% more than

---

[37] The claims of the County Medicaid Programs are not confined to this time period.

the generally available market price.  The Counties reimbursed this 100 count package of Humantin 250mg Capsules in 1999 based on this false and misleading wholesale price information that the King Group reported or caused to be reported.  Additional actionable spreads for Humantin 250 mg Capsules in 2001 are set forth in Exhibit B-24.

550.    In November 2000, the King Group (Monarch)'s 30 count package of Lorabid Pulv 400mg Capsule had a published AWP of $177.19.  The generally available market price for the same 30 count package was $113.22 (a 25% discount from the reported WAC of $141.75).  The intentionally false and misleading AWP was 57% more than the generally available market price.  The Counties reimbursed this 30 count package of Lorabid Pulv 400mg Capsule based on this false and misleading wholesale price information that the King Group reported or caused to be reported. *Id*  Additional actionable spreads for Lorabid Pulv 400 mg Capsule in 2001, 2002, 2004 are set forth in Exhibit B-24.

551.    In 2001 alone, the County Medicaid Programs spent over $ 3.5 million for the King Group's Altace.  The Counties' most popular dosage of Altace was the 10 mg capsule. In December 2001, the King Group (Monarch)'s 100 count package of Altace 10mg Capsule had a published AWP of $141.96.  The generally available market price for the same 100 count package was $46.93 (a 142% discount from the reported WAC of $113.57).  The intentionally false and misleading AWP was 202% more than the generally available market price.  The Counties reimbursed this 100 count package of Altace 10mg Capsule in 2001 based on this false and misleading wholesale price information that the King Group reported or caused to be reported.  *See* Exhibit B-24.  Additional actionable spreads for Altace in 2003 and 2004 are set forth in Exhibit B-24.

552.   Defendant King Group enters into co-promotion agreements, marketing agreements, strategic alliances, joint ventures and other similar mutually beneficial arrangements with other pharmaceutical companies for the sale and marketing of its and others' pharmaceutical products.

553.   Defendant King Group has a co-promotion agreement with Defendant Wyeth to promote and sell Monarch's Altace throughout the United States, including New York.

554.   In 1999, King Group purchased from Defendant Eli Lilly the U.S. and Puerto Rican marketing rights of Lorabid, an antibiotic used in the treatment of bacterial infections, for approximately $67.8 million.  Defendant Eli Lilly manufactures Lorabid for King Group and retains the right to receive additional payments if certain sales performance milestones are achieved.

555.   All participants, including Defendant Wyeth and Defendant Eli Lilly, market and sell or directly benefit from the marketing and sale of King Group drugs based on the false and inflated wholesale price information of King Group drugs.

556.   These co-promotion agreements, marketing agreements, strategic alliances, joint ventures or other similar mutually beneficial arrangements with Defendant King Group, including those with Defendant Wyeth and Defendant Eli Lilly, resulted in and continue to result in the reimbursement of pharmaceuticals by the County Medicaid Programs based on intentionally false and misleading wholesale pricing information.

557.   In connection with the wrongful conduct described herein, the King Group is being investigated by OIG-HHS, Department of Veterans Affairs, Department of Justice, Centers for Medicaid and Medicaid Services, the Public Health Service and the Securities and Exchange Commission.

558.    In March 2003, the SEC initiated a formal investigation of King Group relating to, among other topics, sales to VitaRx and Prison Health Services, "best price" lists, the pricing of pharmaceutical products provided to governmental Medicaid agencies, the accrual and payment of rebates on Altace, Fluogen and Lorabid (all subject drugs), the King Benevolent Fund, Inc., calculations related to Medicaid rebates, and the King Group Audit Committee's internal review of issues raised by the SEC investigation.

559.    On November 13, 2003, King Group received a subpoena from the OIG-HHS requesting the production of documents relating to some of the matters being investigated by the SEC and to King Group sales, marketing and other business practices for Altace, Aplisol and Levoxyl (all subject drugs).

560.    In its 2003 Annual Report, King disclosed that it owed Medicaid and other government health programs approximately $46.5 million in unpaid rebates.  King estimated that it underpaid Medicaid by $0.9 million from 1994-1997.   An internal audit found that an additional $18.9 million was due.

561.    In its SEC Form 10K filed on March 21, 2005, Defendant King Group disclosed that it underpaid amounts due under Medicaid and other governmental pricing programs during the period from 1998 to 2002.  Defendant King Group further disclosed that it previously accrued $130.4 million in respect of its estimated underpayments to Medicaid and other government pricing programs and estimated settlement costs with all relevant governmental parties.

## X.    MEDIMMUNE

562.    As summarized in Exhibit A, the County Medicaid Programs spent over

$120 million on the 7 at-issue Medimmune NDCs between 1992 - 2005 alone.[38]  The specific

Medimmune NDCs for which the Counties seek relief are set forth in Exhibit B- 25 hereto.

563.    At all times relevant hereto, MedImmune has known that it can promote

its drugs by selling them at substantial undisclosed discounts while at the same time maintaining

false and inflated reimbursement prices.  As evidenced by Exhibit B-25 hereto, MedImmune has

routinely created such spreads.

564.    MedImmune has conceded that it inflates its reported AWPs for Synagis

to compensate for administrative costs.  Specifically, in the Suffolk County AWP matter

MedImmune states "a physician administering Synagis encounters costs of administration which

Synagis AWP is used to cover."

565.    This admission confirms that competition is not the only reason

defendants improperly inflate their AWPs.

566.    MedImmune's Synagis faces competition from Immune Globulin and

alternative preventive therapies.

567.    Since at least 1998, MedImmune has had a joint marketing agreement with

Abbott's Ross Products Unit to promote Synagis.  Expenditures on behalf of County Medicaid

recipients have increased substantially in the years since this joint marketing agreement was

signed.  Abbott's Ross Products unit is the unit that causes Abbott to pay $622 million in

criminal and civil penalties in 2003 to resolve allegations that the Ross Products Unit defrauded

Medicaid.

## Y.    MERCK

568.    As summarized in Exhibit A, the County Medicaid Programs spent over

$1.2 billion on the 237 at-issue Merck NDCs between 1992 - 2005 alone.[39]  The specific Merck

---

[38] The claims of the County Medicaid Programs are not confined to this time period.

NDCs for which the Counties seek relief are set forth in Exhibit B-26 hereto.  The Counties allege both AWP and FUL fraud claims against Merck.

569.     At all times relevant hereto, Merck has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-26 hereto, Merck has routinely created such spreads.

570.     In connection with the wrongful conduct described herein, Merck has been investigated by the DOJ generally for its marketing and selling practices, and more recently for its activites related to sales of Pepcid.   Additionally, Merck has been investigated by the Attorney General of Texas and the Inspector General of the District of Columbia.

571.     Merck also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements.  On information and belief, Merck routinely offers its products to commercial customers for prices less than 10% of AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

572.     This investigation uncovered Merck documents that reveal widespread discounting of Merck products at prices that are a fraction of the reported AWP.  Merck has been named as a defendant in two Qui Tam actions in which the Attorney Generals of Louisiana and Nevada have elected to intervene.  These actions allege that Merck made sales of three of its products, Vioxx, Zocor, and Pepcid, at discounts of over 90% off of AWP.  The veracity of these allegations is confirmed by publicly filed exhibits, which the Counties have viewed, as well as a Wall Street Journal report that one of the products, Zocor, was being sold for less than 10% of

---

[39] The claims of the County Medicaid Programs are not confined to this time period.

the reported AWP.  See *Deep Discounts By Drug Firms Draw Scrutiny*, The Wall Street Journal, April 28, 2005, Page B1.  This was not only a significant discount to AWP.  Zocor's sales price (around .28 cents per pill) was also significantly lower than Merck's reported best price of $2.30 per pill. *Id.*

573.    The Louisiana action alleges that in the year 2000 Merck sold 20 mg Pepcid tablets to East Jefferson General Hospital for the nominal price of $0.10 per pill[40] as part of the "Flexible Nominal Pricing (Flex-NP) Program" for Pepcid.   Yet, at the same time Meck's per pill AWP for 20 mg Pepcid (NDC 00006096331) was reported as $1.95.

574.    On information and belief the deep discounts offered through Merck's nominal pricing program were not accounted for by Merck in its calucation of Pepcid's 2000 AWP of $1.95 per pill, nor were they accounted for in Merck's calculation of Best Price.  Exhibit B-26 contains examples of other actionable spreads for Pepcid 20 mg in 1996, 1999 and 2001.

575.    The Counties reimbursed based on the false Pepcid 20 mg AWPs in 2000, paying $1.76 per pill (AWP –10%, excluding co-pays and dispensing fees). The Counties thus paid 1700% more for Pepcid 20mg than was charged to participants in Merck's nominal pricing program, such as East Jefferson General Hospital.

576.    On information and belief, at all times relevant hereto, 1) the deep discounting programs as alleged in the Nevada and Louisiana actions have been widely used by Merck; (2) these deeply discounted prices have not been included in Merck's AMP or Best Price

---

[40] Merck defined nominal pricing as "a greater than ninety percent discount on the quarterly Average Manufacturer's Price (AMP).  AMP is the average unit price paid to a manufacturer for a drug by wholesalers for drugs distribute to the retail pharmacy class of trade… Merck reserves the right to provide additional rebates if, because of changes in the AMP, the nominal price offered does not meet this definition."   *See* Request for Enrollment into Merck's Flex NP program filled out by East Jefferson General Hospital, Exhibit P, Relator's Brief In Opposition To Motion To Dismiss, Filed July 16, 2003, *U.S. Ex. Rel. William St. John LaCorte, MD v. Merck and Company, Inc.,* CV 993807, (E.D.L.A.).

calculations 3) these deeply discounted prices have not been included in the AWPs and other wholesale price information Merck reports or causes to be reported to publishers.

577.    The Nevada action alleges that Merck sold Vioxx and Zocor (both subject drugs) to hospitals in Nevada and across the country at prices that were at least 92% less than Merck's list price.  These pricing levels were alleged to be part of the Zocor "Save" (Simvastatin Advanced Care Value Enhancement) program and the Vioxx "VIP" (Vioxx Incentive Program) marketing programs.  The Zocor Save program is alleged to have started in April 1998, and to continue to the present.

## Z.    THE MYLAN GROUP

578.    As summarized in Exhibit A, the County Medicaid Programs spent over $349 million on the 738 at-issue Mylan Group NDCs between 1992 - 2005 alone.[41]  The specific Mylan Group NDCs for which the Counties seek relief are set forth in Exhibit B-27 hereto.  The Counties allege both AWP and FUL fraud claims against the Mylan Group defendants.

579.    At all times relevant hereto, the Mylan Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-27 hereto, the Mylan Group has routinely created such spreads.

580.    An analysis of the 2002 published wholesale price information for Mylan Group UDL's drugs indicates examples of spreads between AWP and WAC that exceed the 20-25% range as follows:

| MYLAN GROUP(UDL) |
| --- |

---

[41] The claims of the County Medicaid Programs are not confined to this time period.

| Drug | Size | NDC Code | 2002 First DataBank AWP | 2002 First DataBank WHN/WAC | Spread $ | Spread % |
|------|------|----------|-------------------------|------------------------------|----------|----------|
| Hydrochlorothiazide 25mg Tablet | pkg | 51079004920 | $10.20 | $5.24 | $4.96 | 94% |
| Diphenhydramine 50mg Caps | pkg | 51079006620 | $13.45 | $7.38 | $6.07 | 82% |
| Dipyridamole 50mg Tablet | pkg | 51079006920 | $29.75 | $17.71 | $12.04 | 67% |
| Furosemide 40mg Tablet | pkg | 51079007320 | $16.79 | $4.68 | $12.11 | 259% |
| Hydroxyzine PAM 50mg Cap | pkg | 51079007820 | $62.72 | $12.31 | $50.41 | 410% |
| Amitriptyline HCL 100mg Tablet | pkg | 51079056320 | $111.24 | $12.05 | $99.19 | 823% |
| Albuterol Sulfate 4mg Tablet | pkg | 51079065820 | $47.13 | $8.76 | $38.37 | 438% |

581.    The fact that Mylan's AWPs have no connection to its true wholesale acquisition prices is reflected by the fact that at the beginning of 2002, Dipyridamole 25mg Tablet (a subject drug) had a published WAC of $8.02 and a published AWP of $17.30, resulting in a spread of $9.28 or 115%.  On June 1, 2002, UDL increased its Dipyridamole WAC 105% or to $16.52.  Notably, its AWP increased only 20% or to $20.00.

582.    The fact that WAC and AWP for Mylan's drug did not increase proportionally reveals the false and misleading nature of the wholesale prices.  If the pre- June 1, 2002 AWP accurately reflected the drug's price, then when the WAC increased 105% the AWP likewise should have increased 105%.  It did not.

583.    The foregoing illustrates that at the very least one element of the wholesale price information for Dipyridamole 25mg Tablet was false and either before or after the June 1, 2002 price increase.  Plaintiffs, however, contend that one or all elements of the

wholesale pricing information for Mylan Group drugs complained of herein are intentionally false and misleading.

584.   A particularly egregious example of Mylan's spread-marketing was highlighted in recently filed complaints.  Illinois, Wisconsin and Kentucky allege that in 2000 the Mylan drug Atenolol (25mg 100s) (NDC Code 00378-0218-01) (a subject drug) had an AWP of $74.00 yet was available at $1.60, representing a spread of 4525%.

585.   Mylan and its subsidiary UDL are among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

586.   As part of its investigation of Mylan, the Massachusetts Attorney General issued a subpoena to Mylan for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

587.   The Massachusetts Attorney General subsequently brought suit against Mylan, alleging that Mylan's AMPs were materially lower than the wholesale prices Mylan reported for reimbursement purposes and that Mylan consequently had underpaid Medicaid rebates.

588.   To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Mylan's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

## AA.   THE NOVARTIS/SANDOZ GROUP

589.   As summarized in Exhibit A, the County Medicaid Programs spent over

$926 million on the 1134 at-issue Novartis/Sandoz Group NDCs between 1992 - 2005 alone.[42] The specific Novartis/Sandoz Group NDCs for which the Counties seek relief are set forth in Exhibits B-28 and B-33 hereto.   The Counties allege both AWP and FUL fraud claims against the Novartis/Sandoz Group defendants.

590.    At all times relevant hereto, the Novartis/Sandoz Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibits B-28 and B-33, hereto, the Novartis/Sandoz Group has routinely created such spreads.

591.    The Novartis/Sandoz Group has instructed its sales force to market the spread for its products.  The Novartis/Sandoz Group has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.  These workheets also described the AWPs of the Novartis/Sandoz Group competitors to demonstrate the advantage of purchasing Novartis/Sandoz Group products with their inflated AWPs.

592.    Novartis has been sued by Florida, Illinois, Kentucky and Wisconsin in connection with the same wrongdoing as is at issue here.

593.    Illinois, Kentucky and Wisconsin allege the following 2000 spreads for subject drugs Tegretol and Clozeril (both subject drugs):

| Defendant NOVARTIS | | | | | | |
|---|---|---|---|---|---|---|
| Drug | Dose | NDC Code | 2000 AWP | 2000 Available Price | Spread $ | Spread % |
| Tegretol 200mg | 100s | 00083-0027-30 | $45.26 | $32.44 | $12.82 | 40% |

---
[42] The claims of the County Medicaid Programs are not confined to this time period.

| Clozeril 100mg | 100s | 00078-0127-05 | $352.26 | $249.52 | $102.74 | 41% |

594.    Florida alleges the following spreads for another subject drug, Novartis/Sandoz Group's Ranitidine:

| | | | | Defendant SANDOZ/GENEVA RANITIDINE TAB 300mg NDC# 00781-1884-10 | | |
|---|---|---|---|---|---|---|
| Date | First Databank AWP | First Databank WAC | Relator's Cost ------------- Contract Price | Spread $ | | Spread % (Spread $ / Relator's Cost) |
| 02-22-2001 | $2,687.00 | $712.50 | $97.88 | $585.12 | | 598% |
| 06-19-2001 | $2,687.00 | $712.50 | $97.88 | $585.12 | | 598% |
| 11-12-2001 | $2,687.00 | $712.50 | $97.88 | $585.12 | | 598% |
| 01-28-2002 | $2,687.00 | $712.50 | $126.81 | $191.19 | | 150% |
| 03-10-2002 | $2,687.00 | $712.50 | $126.81 | $191.19 | | 150% |
| 05-08-2002 | $2,687.00 | $712.50 | $126.81 | $191.19 | | 150% |
| 06-25-2002 | $2,687.00 | $712.50 | $126.81 | $191.19 | | 150% |

595.    In connection with the wrongful conduct described herein, the Novartis/Sandoz has been investigated by the Office of Inspector General of the Department of Health and Human Services.  The Office of the Inspector General published a report for the Department of Health and Human Services in 2000 documenting Novartis' inflated AWP for Aredia, its brand of pamidronate disodium.

596.    Novartis admits it has been the target of government investigation into its AWP and pharmaceutical pricing.  In its Form 20-F filed with the Securities and Exchange Commission filed on January 30, 2004, Novartis acknowledged that it "participated in an ongoing Congressional inquiry on the subject of AWP and pharmaceutical pricing."   (Novartis SEC Form 20-F (1/30/04) at p. 137).

597.    Novartis' Geneva (now Sandoz) is also among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

## BB.    ORGANON

598.    As summarized in Exhibit A, the County Medicaid Programs spent over $40 million on the 16 at-issue Organon NDCs between 1992 - 2005 alone.[43]   The specific Organon NDCs for which the Counties seek relief are set forth in Exhibit B-29 hereto.

599.    At all times relevant hereto, Organon has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.   As evidenced by Exhibit B-29 hereto, Organon has routinely created such spreads.

600.    For Example, in January of 2002, Organon's 30 count package of Remeron 15mg Tablet (NDC 00052-0105-30) had a reported AWP of $83.14.   The generally available market price for the same 30 count package was $54.24 (a 28% discount from the reported WAC of $69.29).   The intentionally false and misleading AWP was 53% more than the generally available market price.   The Counties reimbursed Organon's 30 count package of Remeron 15mg Tablet in 2002 based on this false and misleading wholesale price information. Additional fraudulent spreads for Remeron in the years 1998, 2001 and 2003 are set forth in Exhibit B-29.

601.    In order to gain market share for its drugs, Organon further perpetuated the false and misleading nature of its wholesale price information by offering or causing to be offered significant market share rebates and discounts.   As such, on the surface, Organon's

---

[43] The claims of the County Medicaid Programs are not confined to this time period.

wholesale price information sometimes appeared to show a 20% to 25% markup between AWP and WAC, however, the effect of the market share rebates and discounts resulted in for Organon drugs lower than the WAC, thus creating a greater AWP spread.

602.    For example, in the fourth quarter of 1998, Leader Drug Stores (a collection of thousands of independently owned pharmacies) could purchase Organon's 28 day package of Desogen 0.15mg Tablet, an oral contraceptive, and receive "up to [a] 15% Rebate" based upon market share incentive rebates.  During this same time frame, a six month supply of the identical Organon product was available from wholesalers at WAC or $119.62.  A 15% market rebate for a six month supply of Desogen was marketed to Leader Drug Stores as having a profit of $22.23 (with reimbursement at AWP-12%), versus a profit of $4.94 for the competing product Ortho Cept.  This 15% market share rebate resulted in an AWP spread of 38%.  This market share rebate was offered from January 1997 through December 1998.

603.    The Counties reimbursed a six month supply of Organon's 28 day package of Desogen .15mg Tablet based on false and misleading wholesale price information.  Particular actionable spreads for 28 day Desogen are set forth in Exhibit B-29.

## CC.    PAR

604.    As summarized in Exhibit A, the County Medicaid Programs spent over $111 million on the 324 at-issue Par NDCs between 1992 - 2005 alone.[44]  The specific Par NDCs for which the Counties seek relief are set forth in Exhibit B-30 hereto.  The Counties allege both AWP and FUL fraud claims against Par.

605.    At all times relevant hereto, Par has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and

---

[44] The claims of the County Medicaid Programs are not confined to this time period.

inflated reimbursement prices.   As evidenced by Exhibit B-30 hereto, Par has routinely created such spreads.

606.   For Example, in February 2000, PAR's 100 count package of PAR's Dexamethasone 4mg Tablet (a subject drug) had a reported AWP of $182.00.   The generally available market price for the same 1000 count package was $6.02 (a 28% discount from the reported WAC of $7.72).   The intentionally false and misleading AWP was a 2923% over the generally available market price and 2258% over the reported WAC.   Additional fraudulent spreads for Dexamethasone 4 mg Tablet are set forth in Exhibit B-30.

607.   In connection with the wrongful conduct described herein, PAR has also been sued by the Massachusetts, Alabama, Illinois and Kentucky.

608.   Illinois and Kentucky allege the following spreads for PAR's Ranitidine (one of the subject drugs) in 2000:

| Defendant PAR | | | | | | |
|---|---|---|---|---|---|---|
| Drug | Size | NDC Code | 2000 AWP | 2000 Available Price | Spread $ | Spread % |
| Ranitidine 150mg | 100s | 49884-0544-01 | $148.80 | $3.10 | $145.70 | 4700% |
| Ranitidine 150mg | 1000s | 49884-0544-10 | $1480.00 | $27.70 | $1452.30 | 5243% |

609.   As part of its investigation of PAR, the Massachusetts Attorney General issued a subpoena to PAR for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

610.   The Massachusetts Attorney General subsequently brought suit against PAR, alleging that PAR's AMPs were materially lower than the wholesale prices PAR reported for reimbursement purposes and that Barr consequently had underpaid Medicaid rebates.

611.    To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by PAR's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

612.    PAR admits it has been the target of government investigations into its AWP and wholesale pharmaceutical pricing practices.  In its Form 10-K filed with the Securities and Exchange Commission on March 15, 2004, PAR acknowledged that in June 2003, it was among the pharmaceutical companies targeted by the House Committee of Energy and Commerce "investigation into pharmaceutical reimbursements and rebates under Medicaid." (Par Pharmaceutical Companies Inc. SEC Form 10-K (FY 2003, 3/15/04).

613.    On June 26, 2003, as part of its investigations, the House Committee of Energy and Commerce requested information from the three largest pharmaceutical wholesalers (Cardinal Health, Inc., AmerisourceBergen Corporation and McKesson Drug Co.) about matters related to pricing, sales and marketing of several generic drugs, some of which are manufactured by PAR.

614.    On January 14, 2004, as part of its investigations, the House Committee of Energy and Commerce requested information from the five largest retail pharmacies (Walgreens, Eckerd, CVS, Rite-Aid and Walmart Stores) about matter related to about matters related to pricing, sales and marketing of several pharmaceutical manufacturers, including PAR.

## DD.    THE PFIZER GROUP

615.    As summarized in Exhibit A, the County Medicaid Programs spent over $3 billion on the 632 at-issue Pfizer Group NDCs between 1992 - 2005 alone.[45]  The specific Pfizer Group NDCs for which the Counties seek relief are set forth in Exhibit B- 31 hereto.  The Counties allege both AWP and FUL fraud claims against the Pfizer Group defendants.

---

[45] The claims of the County Medicaid Programs are not confined to this time period.

616.    At all times relevant hereto, the Pfizer Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-31 hereto, the Pfizer Group has routinely created such spreads.

617.    The Pfizer Group has instructed its sales force to market the spread for its products.  The Pfizer Group has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.  These worksheets also described the AWPs of the Pfizer Group competitors to demonstrate the advantage of purchasing Pfizer Group products with their inflated AWPs.

618.    Between 1996 and 1998, Pharmacia increased its AWP for Bleomycin 15u (NDC #00013-1616-78) from $292.43 in 1996 to #309.98, while its true cost decreased each year.

| PERCENTAGE OF "SPREAD" BETWEEN PHARMACIA'S REPORTED AWP AND THE TRUE COST FOR BLEOMYCIN 15U, NDC# 00013-1616-78 | | | |
|---|---|---|---|
| Year | AWP | TRUE COST | Percent "Spread" |
| 1996 | $292.43 | $198.00 | 48% |
| 1997 | $292.43 | $175.00 | 67% |
| 1998 | $309.98 | $158.00 | 96% |
| 1998 | $309.98 | $154.85 | 101% |

619.    If the AWP stayed the same, but the price decreased as set forth above, the reported AWP cannot be an "average wholesale price.

620.    In addition to marketing the spread, Pharmacia has utilized other impermissible inducements to stimulate sales of its drugs without accounting them in its WAC or AWP.  These inducements were designed to result in a lower net cost to the provider while

concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, Pharmacia provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of ahigher wholesale price.

621.    In connection with the wrongful conduct described herein, members of the Pfizer Group have been investigated as follows:

622.    Pfizer has been investigated by the HHS OIG and has entered into a $49 million settlement arising from illegal practices with respect to Lipitor.  The OIG found that Pfizer had been providing unrestricted educational grants and rebates that were in fact discounts off the purchase price of Lipitor.  Pfizer concealed these discounts from states who were entitled to receive the "Best Price" for Lipitor.

623.    On October 24, 2002, Pfizer entered into a CIA with the HHS OIG "to promote compliance" "with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs (as defined in 42 U.S.C.  1320a-7b(f))" ("Federal Health Care Program Requirements").  Contemporaneously Pfizer entered into a Settlement Agreement with the United States and various states.

(a)    The CIA applies specifically, to, *inter alia*, "all employees of the Pfizer Pharmaceuticals Group whose job responsibilities directly relate to the gathering, calculation, verification or reporting of information for purposes of the Medicaid Drug Rebate program" (codified at 42 U.S.C. 1396r-8 et seq.)

(b)    In addition to promising compliance with federal health care program requirements, the CIA requires Pfizer to establish a written code of conduct to be agreed to by each covered person that confirms Pfizer's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government

contracting requirements and to market and sell its Government Reimbursed Products in accordance with federal health care program requirements."

(c)     The CIA requires further that Pfizer implement policies and procedures that address: The code of conduct described above as well as; The methods for gathering, calculating, verifying and reporting the data and information reported to the CMS and/or the state Medicaid programs in connection with the Medicaid Drug Rebate Program; and Promotional practices that conform with all applicable federal health care program requirements, including the Medicaid Drug Rebate Program and the Federal Anti-Kickback Statute, codified at 42 U.S.C. 1302a-7b.

(d)     The CIA contemplates monetary penalties for non-compliance, and the retention of an IRO.  The IRO shall perform two types of review: (1) a systems review of Pfizer's systems, processes, policies and practices relating to the Medicaid Drug Rebate program ("Medicaid Rebate Systems Review") and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with Pfizer's policies and procedures and Medicaid Drug Rebate program requirements.

624.     Pfizer and Pharmacia are among the pharmaceutical companies referred to above now under investigation by the House Committee on Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

625.     Pfizer also is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is improperly using the Nominal Price Exception to the Best Price reporting requirements.  On information and belief, the Pfizer Group routinely offers its products to commercial customers for prices less than 10% AWP and

(a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

626.    The Department of Justice has initiated an investigation into "marketing and sale of Genotropin and Bextra, as well as certain managed care payments," according to Pfizer's 10-K filing with SEC March 10, 2004.

627.    Pharmacia and its subsidiaries have been investigated by the DOJ, the Texas Attorney General, the California Attorney General, the Massachusetts Attorney General, the Attorney General of the State of Connecticut, the Attorney General of the State of New York, the HHS OIG and the U.S. Congress.

628.    Pharmacia was among the drug companies to which Congressman Stark sent the following September 28, 2000 letter.   "The manipulated disparities between your company's reported AWPs and DPs [Direct Prices] are staggering.   For example, in 1997, Pharmacia & Upjohn reported an AWP for its Chemotherapy drug Vincasar of $741.50 when in truth its list price was $593.20."

629.    This manipulation was not limited to brand name drugs.   Pharmacia aggressively marketed the spread on generic drugs by informing one of its customers that

> Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over $8,000,000 profit when reimbursed at AWP. The spread from acquisition cost to reimbursement on the multisource products offered on the contract give AOR a wide margin for profit.
> *Id.*

630.    Pharmacia's marketing of Adriamycin was not limited to this customer. Documents describing Pharmacia's pricing strategy note that since Adriamycin's AWP exceeds

that of its generic competitors, a higher reimbursement is available. This same document advocates that the catalog price be maintained for reimbursement purposes.

631.   These spreads were not aberrations. AWPs routinely exceeded Pharmacia contract prices by more than 100%.

| PHARMACIA 1995 Toposar Marketing | | | |
|---|---|---|---|
| **Toposar** | **NDC** | **AWP** | **DP** |
| 100 mg | 0013-7336-91 | $ 136.49 | $ 109.91 |
| 200 mg | 0013-7346-94 | $ 272.98 | $ 218.38 |
| 500 mg | 0013-7356-88 | $ 665.38 | $ 532.30 |

632.   In fact, Pharmacia sold the 100, 200, and 500 mg vials of subject drug Toposar to Texas Oncology Pharmacy Services in 1995 at deeply discounted prices of $35.00/vial, $70.00/vial, and $175/vial. These prices resulted in spreads of over 280%.

633.   Pharmacia tried to induce potential customers to purchase these 100, 200, and 500 mg vials of Toposar to other customers at prices of $65, $130, and $325 per vial. When offering these higher prices, Pharmacia made sure that it prominently displayed the AWP next to the contract price, making the spreads, all of which exceeded 100%, hard to miss.

634.   Also in 1995, Pharmacia sold its 10, 20, 50, and 150 mg vials of Pharmacia's Adriamycin RDF at prices of $10.20/vial, $20.40/vial, $51.00/vial, and $153.00/vial (NDCs 00013-1086-91, 00013-1096-91, 00013-1106-79, and 00013-1116-83). At the time, Pharmacia caused AWPs of $46.00, $92.00, $230.00 and $676.19 to be reported for these products. These AWPs resulted in spreads of 350.98%, 350.98%, 350.98% and 341.95%.

| PHARMACIA 1995 Adriamycin RDF Marketing | | | | |
|---|---|---|---|---|
| **Adriamycin RDF** | **NDC** | **LP** | **AWP** | **SPREAD** |
| 10 mg | 0013-1086-91 | $ 10.20 | $ 46.00 | 350.98% |
| 20 mg | 0013-1096-91 | $ 20.40 | $ 92.00 | 350.98% |
| 50 mg | 0013-1106-79 | $ 51.00 | $ 230.00 | 350.98% |
| 150 mg | 0013-1116-83 | $ 153.00 | $ 676.19 | 341.95% |

635.    In addition to these large spreads, Pharmacia also provided the purchaser with an unrestricted educational grant of $35,000, in addition to $12,000 worth of free goods. On information and belief, these items were never accounted for in Pharmacia's Best Price Calculations.

636.    Because of Pharmacia's use of free goods as a means of discounting, even these contract prices are not necessarily indicative of the true prices paid for Pharmacia drugs.

## EE.    THE PURDUE GROUP

637.    As summarized in Exhibit A, the County Medicaid Programs spent over $98 million for the 39 at-issue Purdue Group NDCs between 1992 - 2005 alone.[46]  The specific Purdue Group NDCs for which the Counties seek relief are set forth in Exhibit B-32 hereto.

638.    At all times relevant hereto, the Purdue Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-32, hereto, the Purdue Group has routinely created such spreads.

639.    For example, in October 2000, the Purdue Group's (Purdue Frederick) 100 count package of MS Contin 100mg Tablet SA had a published AWP of $546.99.  The generally available market price for the same 100 count package was $355.07 (a 23% discount from the reported WAC of $437.59).  The intentionally false and misleading AWP was 54% more than the generally available market price.  The Counties reimbursed this 100 count package of MS Contin 100mg Tablet SA in 2000 based on this false and misleading wholesale price information that The Purdue Group reported or caused to be reported.  Additional fraudulent spreads for MS Contin 100 mg Tablet are set forth in Exhibit B-32.

---

[46] The claims of the County Medicaid Programs are not confined to this time period.

640.    Also, in October 2000, the Purdue Group's (Purdue Pharma) 100 count package of Oxycontin 80mg Tablet SA had a published AWP of $793.34.   The generally available market price for the same 100 count package was $551.23 (a 15% discount from the reported WAC of $634.67).   The intentionally false and misleading AWP was 44% more than the generally available market price.   The Counties reimbursed this 100 count package of Oxycontin 40mg Tablet SA in 2000 based on this false and misleading wholesale price information that The Purdue Group reported or caused to be reported.   Additional fraudulent spreads for Oxycontin 80 mg Tablet are set forth in Exhibit B-32.

641.    Defendant Purdue Group collectively designed, manufactured, patented, developed, marketed, distributed and sold OxyContin throughout the United States, including New York.

642.    Defendant Purdue Group has a co-promotion agreement with Defendant Abbott Group (doing business as Abbott Sales Marketing and Distribution Company) to promote and sell OxyContin to hospitals, acute care and free-standing ambulatory care facilities throughout the United States, including New York.

643.    Defendant Purdue Group enters into co-promotion agreements, strategic alliances, joint ventures and other similar mutually beneficial arrangements with other pharmaceutical companies, including Defendant Abbott Group, for the sale and marketing of its pharmaceutical products.   As such, all participants, including Defendant Abbott Group, market and sell Purdue Group drugs with knowledge of or reckless disregard of the false and misleading nature of the wholesale price information of Purdue Group Drugs.

644.    These co-promotion agreements, strategic alliances, joint ventures or other similar mutually beneficial arrangements with Defendant Purdue Group, including that with

Defendant Abbott Group, resulted in and continue to result in the reimbursement of Purdue Group pharmaceuticals by the NY County Medicaid Programs based on intentionally false and misleading wholesale pricing information.

645.    Defendant Purdue Group acknowledges the false and misleading nature of the wholesale price information of its pharmaceutical products in responding to an AARP survey noting a 10.7% increase in AWPs for Purdue Group products.  Purdue Group spokesman Robert Hogen responded that Oxycontin had been sold for an average price increase of 4.3 percent per year since it was introduced in 1996. Mr. Hogen specifically pointed out that the AARP survey based on AWP was "quite deceptive" because no one pays AWP for pharmaceutical products because of rebates and discounts.  (*Drug Prices Rose Average 7.1 in '04: AARP Survey Says Increase Was Twice The Inflation Rate*, The Boston Globe, April 13, 2005).

646.    Defendant Purdue Group is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

## FF.    SANOFI-AVENTIS GROUP

647.    As summarized in Exhibit A, the County Medicaid Programs spent over $600 million for the 234 at-issue Sanofi-Aventis Group NDCs between 1992 - 2005 alone.[47]  The specific Sanofi-Aventis NDCs for which the Counties seek relief are set forth in Exhibit B-34 hereto.   The Counties allege both AWP and FUL fraud claims against the Sanofi-Aventis defendants.

648.    At all times relevant hereto, the Sanofi-Aventis Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same

---

[47] The claims of the County Medicaid Programs are not confined to this time period.

time maintaining a false and inflated reimbursement prices.  As evidenced by Exhibit B-34 hereto, the Sanofi-Aventis Group has routinely created such spreads.

649.    Aventis was marketing the spread of Anzement at least since 1997.  In 1997, Aventis (then Hoescht Marion Roussel) caused an AWP of $149.88 to be reported for Anzement 100mg IV in 5 ml vial.  That same year, Amgen sold this identical drug for $70 (a spread of 114%).  The County Medicaid Programs reimbursed in 1997 based on this false AWP.  Additional fraudulent spreads for Anzement are set forth in Exhibit B-34.

650.    The Sanofi-Aventis Group (at the time Hoechst Marion Roussel), aggressively marketed this spread.  First, the Sanofi-Aentis Group highlighted the spread in advertisements in trade publications for Anzemet in which it displayed the price per unit next to the AWP, making the spread obvious.

651.    Further, the Sanofi-Aventis Group intentionally and routinely marketed the spread to its customers.  Sanofi-Aventis Group instructed its sales representatives to market the spread by comparing the spreads of Sanofi-Aventis Group drugs to the spreads of competitors. The Sanofi-Aventis Group instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and prepared worksheets demonstrating the proper calculation of spread.  These workheets also described the AWPs of the Sanofi-Aventis Group competitors to demonstrate the advantage of purchasing Sanofi-Aventis Group products with their inflated AWPs.

652.    Specifically, Sanofi-Aventis Group sales representatives were instructed to 1) understand the similarities and differences between Sanofi-Aventis Group drugs and competing products, 2) compute the reimbursement amounts for all the competing products, 3) discern whether the sales target was sensitive to reimbursement-based incentives and if so, 4)

induce the sales target to purchase the Sanofi-Aventis Group product over its competitors' product based on the benefits of Sanofi-Aventis Group reimbursement.

653.   When Sanofi-Aventis Group products had the largest spread, sales representatives were provided spread comparisons of all competing drugs, and informed that reimbursement would likely determine drug selection.

654.   Sanofi-Aventis Group marketed their spread, even when it was equal to its competitors.  Under such circumstances, Aventis sales representatives were instructed to explain that Aventis' lower AWP meant that drug purchasers had to "invest" less money to get the same spread, granting the providers a greater return on investment ("ROI").  Specifically, Aventis representatives were instructed to highlight that where two products have the same spread (e.g. $50) the greater ROI is associated with the lower priced product.   For example,

| **Product 1** | | **Product 2** | |
|---|---|---|---|
| AWP = | $100 | AWP = | $100 |
| Acquisition Cost = | $50 | Acquisition Cost = | $40 |
| Spread= | $50 | Spread = | $50 |

655.   With product 1, the provider has to pay $50 to make $50, or a 100% ROI. With Product 2, the provider has to pay only $ 40 to make $50, or to get 125% ROI.    In addition, Aventis' sales representatives were instructed to highlight the lower opportunity cost of purchasing Aventis drugs.

656.   In a 2000 report published by the DHHS, the DOJ documented at least 15 instances where the published AWPs for various dosages of 4 drugs manufactured by the Sanofi-Aventis Group (each drug is at issue in this litigation) were substantially higher than the actual prices listed by wholesalers.  The chart below sets forth the 4 subject drugs identified by the DOJ and the spread associated with one particular dosage of each drug.  These figures compare the

DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Aventis in the 2001 *RedBook*.

| Drug | 2001 *RedBook* AWP | DOJ Determined Actual AWP | Difference | Prcentage Spread |
|---|---|---|---|---|
| Anzemet Injectable (dolasetron Mesylate) | $ 166.50 | $ 74.08 | $ 92.42 | 125% |
| Factor VIII/ Bioclate | $ 1.25 | $ 0.91 | $ 0.34 | 37% |
| Factor VIII/ Helixate | $ 1.18 | $ 0.78 | $ 0.40 | 51% |
| Gammar (immune globulin) | $ 400.00 | $ 296.67 | $ 103.33 | 35% |

657.    A 2001 OIG report (*See* "Medicare Reimbursement of Prescription Drugs," OEL-03-00-00310, Jan. 2001) further revealed that: (i) that AWP for all immune globulin 5mg doses listed in the 1997 *RedBook* were inflated by an average spread of 32.21%; (ii) a 10mg dose of Anzemet had a Medicare Median of $14.82 and a Catalog Median of $8.29, resulting in a spread of 78%; and (iii) a 20mg dose of Taxotere had a Medicare Median of $283.65 and a Catalog Median of $8.29, resulting in a spread of 18.75%.

658.    In connection with the wrongful conduct described herein the Aventis Group has been investigated by at least the United States Department of Justice, the United States Congress, the Office of Inspector General of the Department of Health and Human Services, the Attorneys General for the States of California, Florida, Illinois, Montana, Pennsylvania, Texas and Wisconsin, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

659.    Aventis Pharm is among the pharmaceutical companies now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.  The Committee has

requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.  The basis of this investigation is "indicia from a number of source, including utilization date, drug price/reimbursement spreads, and other relevant information."

660.    Sanofi-Aventis Group also is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements. On information and belief, Sanofi-Aventis Group routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

661.    Various details of these investigations have been disclosed in Sanofi's-Aventis' Group recent SEC filings.

662.    Sanofi's form 20-F for the year 2004 discloses that the U.S. Attorney's office in Boston recently expanded its investigation to the topic of whether Aventis "directly or indirectly made payments to customers or to those in a position to influence sales of [Aventis] pharmaceuticals in order to obtain or keep drug business and to evade Medicaid best price reporting requirements".  The U.S. Attorney served Sanofi-Aventis with a subpoena demanding "documents related to [Sanofi's-Aventis's] interactions with and payments to managed care customers, formulary placement, sales and marketing of specific products to those managed care customers, as well as contracts with wholesalers and distributors and payments to non-Aventis employees."

663.    The U.S. Attorney is also conducting a civil and criminal investigation of Sanofi-Aventis Group misconduct similar to that which was involved in the Bayer and GSK

repackaging "lick and stick" settlements described herein.  Boston's U.S. Attorney is examining "whether sales by Aventis … of certain products to managed care organizations for resale under those organizations' own private labels should have been included in the 'best price' calculations that are used to compute the Medicaid rebates for API products."  *Id.*

664.    The U.S. Attorney's Office in Chicago is conducting a civil and criminal investigation with regard to Aventis' Lovenox sales and marketing practices from January 1, 1999 to the present.  *Id.*  (Lovenox is among the drugs at issue in this complaint.)

665.    There are several ongoing investigations into the Aventis Group's reporting of AWP for certain products.  Sanofi's 2004 20-F stated that

> The Department of Justice is reviewing the merits of a qui tam action filed in 1995 in federal court in Florida, which alleges that the Average Wholesale Prices ("AWP") of certain pharmaceutical products, which are used to set Medicare reimbursement levels, were improperly established and used by API, Aventis Behring, and Armour Pharmaceutical Company in the marketing of their products. API and Aventis Behring also received subpoenas from the states of California and Texas with respect to such issues in 2000. API received a similar subpoena from the state of Massachusetts in April 2001.

666.    In 2002, Aventis disclosed that "U.S. Centers for Medicare & Medicaid Services ("CMS") has indicated that it will seek repayment of amounts it alleges should have been included in rebates paid by [Aventis] to the various states as part of the Medicaid program.  CMS claims that sales of certain products to managed care organizations for distribution by such organizations should have been included in [Aventis]'s "best price" calculations, which are used to compute the rebates."  Aventis 20-F (For the fiscal year ended December 31, 2002).

## GG.   THE SCHERING GROUP

667.   As summarized in Exhibit A, the County Medicaid Programs spent over $813 million on the 249 at-issue Schering Group NDCs between 1992 - 2005 alone.[48]   The specific Schering Group NDCs for which the Counties seek relief are set forth in Exhibit B-35 hereto.    The Counties allege both AWP and FUL fraud claims against the Schering Group defendants.

668.   At all times relevant hereto, the Schering Group defendants have known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-35 hereto, the Schering Group defendants have routinely created such spreads..

669.   As alleged by the Texas Action, the following allegations support piercing the corporate veil for the Schering Group entities under any or all of these theories. Warrick could not exist without Schering/Schering-Plough. Warrick has only a handful of employees, yet Warrick generates annual sales of over $150M. Warrick depends upon Schering/Schering-Plough's manufacturing, distribution, accounting and administrative departments for all of these internal functions. Warrick apparently does not even employ persons with those traditional business responsibilities. The only personnel Warrick allegedly employs are those who market and sell Schering/Schering-Plough's generic products. Warrick's business offices are within the offices of Schering/Schering-Plough. Warrick does not conduct its corporate business in Reno, Nevada as its letterhead represents. Instead, Schering/Schering-Plough and Warrick operate from the same office space in New Jersey, use the same computer systems, telephone systems, employees, and centralized departments, and apparently use each other's letterhead interchangeably.

---

[48] The claims of the County Medicaid Programs are not confined to this time period.

670.     The State of Texas when conducting depositions in the Texas Action discovered that the founder of Warrick did not know whether his "Warrick" consulting contract is with Warrick or Schering/Schering-Plough. These companies are not operated as separate entities, but rather integrate their resources to achieve a common business purpose to sell Schering/Schering-Plough's generic products. Whether express or implied, Warrick and Schering/Schering-Plough agreed that Warrick would act as Schering/Schering-Plough's marketing unit for generic products, with the common purpose of selling more of Schering/Schering-Plough's and Warrick's products and with Schering/Schering-Plough's having at least an equal right to direct and control the operation of the enterprise.

671.     Further alleged in the Texas Action, Schering/Schering-Plough's brand version of Albuterol Sulfate, Proventil, was sold in conjunction with Warrick's generic Albuterol Sulfate. When Warrick's customers purchased enough Warrick generic Albuterol Sulfate, Warrick would then give that customer a credit to obtain Proventil. These companies acted as one rather than as two independent drug manufacturers.

672.     Furthermore, Schering/Schering-Plough may have purposefully under capitalized Warrick in light of the nature and risk of its business in order to avoid financial responsibility and allow Schering/Schering-Plough to break the law without suffering the consequences. Allowing the corporate structure to protect Schering/Schering-Plough from these wrongful acts would lead to injustice. In light of the above allegations, Warrick and Schering/Schering-Plough should be treated as one entity for liability purposes in order to insure Plaintiff can fully and completely recover any judgment rendered in its favor in this matter. Also, Schering/Schering-Plough sells Warrick products to large market segments with full knowledge of the false price representations, and, therefore, benefits from them.

673.    In 1994 to1995, Schering formulated a plan to avoid Medicaid Best Price requirements through the creation of a generics subsidiary which would sell a generic line of products which mirrored Schering's branded line.  The plan specified that these generics would only be sold in markets where Schering branded line would have to be discounted.  The role of the generics subsidiary is currently being filled by Warrick.

674.    Schering's plan was designed to segment the Medicaid and contract markets, thereby reducing rebates without having to lower contract pricing.

675.    On July 16, 2004 Schering agreed to pay $350 million in fines and plead guilty to criminal charges that it cheated Medicaid.  The settlement stems from a six-year probe prompted by three whistleblowers who accused Schering of selling its products to private health-care providers for far less than it sold them to Medicaid.  As part of the settlement, Schering is expected to admit it gave grants to private providers to conduct patient education and marketing programs as part of a scheme to induce them to buy the company's drugs at relatively high prices.  Schering-Plough then billed Medicaid at these high prices without accounting for the offsetting grants.

676.    In April 2004, Schering announced that it was paying $27 million to settle charges brought in 2000 by the Texas Attorney General which revealed that Schering-Plough, with its subsidiary Warrick, had defrauded the State of Texas.   Investigators determined that Schering-Plough provided the greatest "spread" amongst the drug companies selling Albuterol (one of the drugs paid for by the County Medicaid Programs) in Texas, and thereby obtained the largest market share for Albuterol.  Schering-Plough sold a box of Albuterol to pharmacies for $13.50, while it charged the Texas Medicaid program $40.30, a 200% increase.  *See* Cornyn

Sues Three Drug Companies for Medicaid Fraud, Press Release by the Office of the Attorney

General, State of Texas, September 7, 2000 (www.oag.state.tx.us.gov).

677.    This follows a 2003 announcement by Schering that it was the subject of a

federal grand jury investigation and criminal investigation led by the U.S. Attorney for the

District of Massachusetts.  The investigation concerned (i) providing remuneration, such as drug

samples, to providers to induce the purchase of Schering products for which payment was made

through federal health care programs; (ii) selling misbranded or unapproved drugs; (iii)

submitting false wholesale pricing information for its pharmaceutical products to the

government; and (iv) destroying evidence and obstructing justice relating to the government's

investigation.  *See* Schering-Plough Press Release dated May 30, 2003, "Schering Plough

Provides Update on Previously Reported Investigation by U.S. Attorney for District of

Massachusetts."  Schering's Form 10-K for the year 2000 stated that this investigation focused

on "whether the AWP set by pharmaceutical companies for certain drugs improperly exceeds the

average prices paid by dispensers. . . and other pricing and/or marketing practices."

678.    Schering took charge of $150 million for the fourth quarter of 2002 to

reflect its estimate of the likely legal liability from the above government probe.  The primary

basis for the government investigation was the federal anti-kickback statute, which prohibits

pharmaceutical companies from giving money or other items of value to doctors in exchange for

prescribing particular products to Medicaid patients.   Schering's bundled discount practices for

seven drugs at issue in this litigation are the subject of an investigation by the Boston U.S.

Attorney.   Those drugs are Proventil, Vanceril, Vancenase, Notro-Dur, Imdur, K-Dur And

Claritin.

679.    Schering received a grand jury subpoena in April 2004 requesting documents relating to all contracts where the price of one drug is dependent on another.

680.    Both Schering and Warrick are among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements. The Committee has requested reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid.   The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

681.    Schering also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements.

682.    On information and belief, Schering routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

683.    The Schering Group is being sued by the States of Alabama, Connecticut, Florida, Illinois, Massachusetts, Missouri, Montana, Nevada, Pennsylvania, Texas, West Virginia, and Wisconsin in connection with the wrongdoing alleged herein

684.    The Schering Group is also under investigation by the Attorneys General of California, and Ohio.

685.    Schering was among the drug companies Congressman Stark investigated for improper Medicare/Medicaid pricing practices.

686.    Warrick being sued by the States of Alabama, Connecticut, Florida, Illinois, Massachusetts, Missouri, Montana, Nevada, Pennsylvania, Texas, West Virginia, and Wisconsin in connection with the wrongdoing alleged herein.

687.    As part of its investigation of Warrick, the Massachusetts Attorney General issued a subpoena to Warrick for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

688.    The Massachusetts Attorney General subsequently brought suit against Warrick, alleging that Warrick's AMPs were materially lower than the wholesale prices Warrick reported for reimbursement purposes and that Barr consequently had underpaid Medicaid rebates.

689.    To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Warrick's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

690.    Warrick's practice of falsely inflating AWPs required it to create false invoices on its sales to contract customers, such as Bindley Western, and then provide a chargeback to allow for massive discounting.  Bindley Western protested to Warrick in 1999 that it wished to discontinue the practice of false invoicing.

691.    In 1997, Warrick drugs were generally available at a deep discount off AWP.

| PRODUCT | AWP | INVOICE PRICE | NET PRICE (AFTER REBATE) | DIFFERENCE BETWEEN AWP AND INVOICE PRICE | PERCENTAGE SPREAD |
|---|---|---|---|---|---|
| Clotrimazole | $22.25 | $7.77 | $6.99 | $14.48 | 186% |
| Perphenazine | $78.00 | $19.53 | $17.58 | $58.47 | 299% |

692.    In 2002, Warrick's drugs were generally available at deep disount off AWP.

| Product | Minimum PBM/Mail Order/ Staff Price Guide | Target PBM/Mail Order/ Staff Price Guide | Minimum GPO Price Guide | Target GPO Price Guide | AWP | Difference | % Spread |
|---|---|---|---|---|---|---|---|
| ISMN | 4.48 | 4.93 | 5.15 | 5.38 | 117.40 | 112.02 | 2,082% |
| Oxaprozin | 11.42 | 12.56 | 13.13 | 13.70 | 117.40 | 103.70 | 757% |
| Potassium Chloride | 9.67 | 10.64 | 11.12 | 11.60 | 65.00 | 53.40 | 460% |
| Sodium Chloride | 6.12 | 6.73 | 7.04 | 7.34 | 24.30 | 16.96 | 231% |
| Sulcrafate Tablets | 45.15 | 49.67 | 51.92 | 54.18 | 353.71 | 299.53 | 553% |

693.     Wisconsin alleges that in 2000, Warrick published an AWP for Albuterol Sulfate 3 ml 60s (a subject drug) of $72.90, while the true market price was approximately $86.40, resulting in a spread of $50.68 or 231%.

694.     Connecticut alleges the following fraudulent AWPs for subject Warrick drugs over a four-year period.

| DRUG | NDC # | YR | AWP | ACTUAL | SPREAD | % OVERCHARGE |
|---|---|---|---|---|---|---|
| ISOSORBIDE MONONITRATE | 59930-1549-01 | 1999 | $ 117.40 | $ 27.60 | $ 89.80 | 274% |
| ISOSORBIDE MONONITRATE | 59930-1549-01 | 2000-2001 | $ 117.40 | $ 27.68 | $ 89.72 | 273% |
| ALBUTEROL | 59930-1560-01 | 1998 | $ 21.41 | $ 2.95 | $ 18.46 | 539% |
| ALBUTEROL | 59930-1560-01 | 1999 | $ 21.41 | $ 2.79 | $ 18.62 | 575% |
| ALBUTEROL | 59930-1560-01 | 2000 | $ 21.41 | $ 5.26 | $ 16.15 | 258% |

## HH.   SERONO

695.     As summarized in Exhibit A, the County Medicaid Programs spent over $192 million on the 13 at-issue Serono NDCs between 1992 - 2005 alone.[49]  The specific Serono NDCs for which the Counties seek relief are set forth in Exhibit B-36 hereto.

---

[49] The claims of the County Medicaid Programs are not confined to this time period.

696.    At all times relevant hereto, Serono has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices .  As evidenced by Exhibit B-36 hereto, Serono has routinely created such spreads.

697.    In January 2004, Serono announced that it was under investigation by federal and state officials in respect of its marketing practices for its AIDS-related drug Serostim, one of the subject drugs for which New York seeks damages.  Serono stated that the investigation focuses on possible improper sales, improper billing of State Medicaid programs and improper financial incentives to encourage doctors and pharmacists to prescribe the drug.

698.    Serono received a subpoena from the U.S. Attorney's office in Boston in 2001 requesting nearly 10 years worth of documents pertaining to Serostim.  In 2002 the company received similar requests from authorities in California, Florida, Maryland and New York.  The criminal and civil investigations focus on whether the company violated federal and state false claims acts or anti-kickback laws, which prohibit drug companies from offering incentives to doctors to prescribe a drug covered by the government, individuals familiar with the investigations say, according to the Journal.

699.    This subpoena was followed by an indictment from the same office in April of 2005.  The indictment charged that Serono, through its Metabolic and Immune Therapy business unit ("MIT"), marketed and sold Serostim by conditioning free travel on physician's writing additional prescriptions of Serostim as part of the "$6m-6 Day Plan."  According to the U.S.              Attorney's              indictment              (available              at http://www.thepinksheet.com/nr/FDC/SupportingDocs/pink/2005/050418_Serostim_indictment. pdf), Serono MIT executives, Regional Directors and Sales Representatives conspired to "offer

to selected physicians an all-expenses paid trip to the Cannes Conference in return for the physicians writing additional prescriptions of Serostim for patient." (Indictment at 9). The indictment further charges that these planned offers were made and accepted, with Serono paying for various travel, meals, and entertainment expenses for the targeted prescribers and their guests. (*Id*. at 10-16). Finally, the indictment charges that MIT employees also purchased gifts for the targeted employees. On information and belief, all of these payments were never included in Serono's best price calculations.

## II.    TAP PHARMACEUTICAL

700.   As summarized in Exhibit A, the County Medicaid Programs spent over $396 million on the 23 at-issue TAP NDCs between 1992 - 2005 alone.[50]   The specific TAP NDCs for which the Counties seek relief are set forth in Exhibit B-37 hereto.

701.   At all times relevant hereto, TAP has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices. As evidenced by Exhibit B-37 hereto, TAP has routinely created such spreads.

702.   In connection with the wrongful conduct described herein, TAP has been investigated by the Department of Justice. In addition, on October 13, 2001, the United States Attorney in Boston, Massachusetts announced that TAP, a corporation that arose from a partnership between Takeda Chemical Industries Ltd. and Abbott Laboratories, a defendant herein, had agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing and marketing practices for the drug named Lupron. As part of the agreement:

---

[50] The claims of the County Medicaid Programs are not confined to this time period.

703.    TAP agreed to plead guilty to a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), and to pay a $290 million criminal fine, the largest criminal fine ever in a health care fraud prosecution.  The plea agreement between the United States and TAP specifically stated that TAP's criminal conduct caused the Government losses of $145,000,000;

704.    TAP agreed to pay the United States Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct;

705.    TAP agreed to pay the fifty states and the District of Columbia $25,516,440 for filing false and fraudulent claims with the States, as a result of TAP's drug pricing and marketing misconduct, and for TAP's failure to provide state Medicaid programs TAP's Best Price for Lupron, as required by law;

706.    TAP agreed to comply with the terms of a sweeping Corporate Integrity Agreement that, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff and ensures that TAP will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs;

707.    Abbott and Takeda (the TAP co-venturers) agreed to cooperate fully with the ongoing government investigation of TAP and its former officers and employees in exchange for the United States declining prosecution of Abbott and Takeda for conduct relating to Lupron.

708.    An indictment was unsealed in the District of Massachusetts against six current or former TAP employees (including an account executive, three District Managers, a National Accounts Manager and the former Vice President of Sales), and a urologist, alleging

that they conspired to (i) bill Medicare for free samples of Lupron and (ii) market Lupron using the "spread" and the "return to practice" program.

709.    At a hearing in the criminal matter, which has an extensive record, United States District Court Judge William G. Young found:

> This has been a gross abuse of the Medicare/Medicaid repayment system, knowing, intelligent. You have demonstrated, and it's all been confirmed in open court, and I don't want anyone forgetting about the fact that this company, not under its present management, knowingly abused the public trust in a most, and I use my words carefully, despicable way.

*United States v. TAP Pharm. Prods., Inc.*, No.  CR-01-10354-WGY (D. Mass. Dec. 6, 2001).

710.    The TAP Defendants also have been sued in connection with their fraudulent pricing and marketing practices for Lupron, one of the drugs at issue here. *Russano v. Abbott Laboratories*, No. 01-6982 (N.D. ILL., filed Sept. 7, 2001).

711.    TAP also is the subject of the investigation referred to above led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements.

712.    This investigation complements documents from the Specialty Hospital of New Orleans that reveal widespread discounting of TAP products Prevacid 15 and 30 mg tablets at prices that are a fraction of the reported AWP.  TAP has been named as a defendant in a Qui Tam action[51] alleging that TAP made sales of these 2 products at discounts of over 90% off of AWP.  The veracity of these allegations is confirmed by publicly filed exhibits which the Counties have viewed.

---

[51] *U.S. Ex. Rel. William St. John LaCorte, MD v. TAP Pharmaceuticals, Inc.,* CV 03-1483, (E.D.L.A.).

713.    The Louisiana action alleges that in the year 2002 Tap sold 15 and 30mg Prevacid tablets to the Specialty Hospital of New Orleans for .24 per dose.[52] Yet, at the same time TAP's per pill AWPs for 15 and 30mg Prevacid (NDCs 00300730930 and 00300304613) were reported or caused to be reported as $4.20 and $4.28 per pill.  Additional fraudulent spreads for Prevacid 15 and 30 mg Tablets are set forth in Exhibit B-37.

714.    On information and belief these deep discounts offered by TAP were not accounted for by TAP in its calucation of the year 2002 $4.20 per pill AWP, nor were they accounted for in TAP's calculation of Best Price.

715.    The Counties reimbursed based on the false Prevacid 15 and 30 mg AWPs in 2002, paying $3.78 and $3.85 per pill (AWP –10%, excluding co-pays and dispensing fees) for a total of $55.4 million.  The Counties thus paid over 1500% more for Prevacid 15 and 30 mg than what was charged to the Specialty Hospital of New Orleans.

716.    On information and belief, at all times relevant hereto, 1) the deep discounting programs as alleged here have been widely used by TAP; (2) these deeply discounted prices have not been included in TAP's AMP or Best Price calculations 3) these deeply discounted prices have not been included in the AWPs and other wholesale price information TAP reports or causes to be reported to publishers.

717.    In connection with the wrongful conduct described herein, TAP has been sued by the Attorneys General of the States of Illinois, Kentucky, Pennsylvania and Wisconsin.

718.    Illinois, Wisconsin and Kentucky allege that in 2000 the TAP drug Lupron (22.5mg) (NDC Code 00300-3336-01) (a subject drug) had an AWP of $1,605.56 yet was available at $1,147.60, representing a spread of 40%.

---

[52] *See* Oral Proton Pump Inhibitors Cost Analysis, Exhibit L, Complaint For Money Damages and Civil Penalties under the False Claims Act, Filed May 23, 2003, *U.S. Ex. Rel. William St. John LaCorte, MD v. TAP Pharmaceuticals, Inc.,* CV 03-1483, (E.D.L.A.).

## JJ.   TEVA GROUP

719.   As summarized in Exhibit A, the County Medicaid Programs spent over $361 million on the 832 at-issue Teva NDCs between 1992 - 2005 alone.[53]   The specific Teva NDCs for which the Counties seek relief are set forth in Exhibit B-38 hereto. The Counties allege both AWP and FUL fraud claims against the Teva Group defendants.

720.   At all times relevant hereto, the Teva Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining false and inflated reimbursement prices.  As evidenced by Exhibit B-38 hereto, the Teva Group has routinely created such spreads.

721.   The Teva Group has instructed its sales force to market the spread for its products.  The Teva Group has specifically instructed sales staff to use the difference between AWP and actual acquisition cost as a selling point, and has prepared worksheets demonstrating the proper calculation of spread.  These workheets also described the AWPs of the Teva Group competitors to demonstrate the advantage of purchasing Teva Group products with their inflated AWPs.

722.   In addition to the examples in Exhibit B-38, in April 2003, Teva Group's 1000 count package of Glyburide 5mg Tablet (NDC 00093-8344-10) had a reported AWP of $660.54.  The available price for the same 1000 count package was $89.77 (a 120% discount from the reported WAC of $197.75).  The intentionally false and misleading AWP was 636% over the available price and 234% over the reported WAC.  The Counties reimbursed for Teva Group's 1000 count package of Glyburide 5mg Tablet in 2003 based on the false and misleading

---

[53] The claims of the County Medicaid Programs are not confined to this time period.

wholesale price information.  Additional fraudulent spreads for Glyburide 5 mg Tablet are set forth in Exhibit B-38.

723.   The vast majority of Teva Group spread percentages between AWP and the available price as well as the spread percentages between AWP and WAC (irrespective of the available price) are consistently more than 100% and sometime in the thousands of percent.  *See* Exhibit B.  For example, in July 2002, Teva Group's 100 count package of Piroxicam 20mg Capsule (NDC 00093075701) had a reported AWP of $263.90.  The available price for the same 100 count package was $3.57 (a 177% discount from the reported WAC of $9.89).  The intentionally false and misleading AWP was 7292% over the available price and 2568% over the reported WAC.  The Counties reimbursed Teva Group's 100 count package of Piroxicam 20mg Capsule in 2002 based on this false and misleading wholesale price information.  Additional fraudulent spreads for Piroxicam 20 mg are set forth in Exhibit B-38.

724.   The Teva Group defendants facilitated the false and misleading nature of its wholesale pricing information by reporting or causing to be reported a deceptive 20% mark-up spread from WAC to AWP to hide the true wholesale pricing of certain of its drugs.  For example, in April 2003, Teva Group's 5ml vial of  Haloperidol DEC 100mg/ml (NDC 00703-7023-01) had a reported AWP of $144.00.  The available price for the same 5ml vial was $43.11 (a 178% discount from the reported WAC of $120.00).  The intentionally false and misleading AWP was a whopping 234% over the generally available market price, yet on the surface the AWP deceptively appeared to be only 20% over the reported WAC.  The Counties reimbursed Teva Group's Haloperidol DEC 100mg/ml 5ml Vial in 2003 based on this false and misleading wholesale price information.  Additional fraudulent spreads for Haloperidol are set forth in Exhibit B-38.

725.   In addition to the above, Plaintiffs have also continued to obtain information relating to Teva Group's wholesale pricing information of their drugs, including material obtained by the original *qui tam* whistleblower (Ven-A-Care), complaints in various state government actions discussed herein and prices available to buyers other than NY Counties' Medicaid Programs, and have found that the evidence uniformly supports the conclusion that Teva Group has pervasively inflated the wholesale pricing information of their drugs.

726.   In connection with the wrongful conduct described herein, Teva Group, or its constituent parts, has been sued by Massachusetts, California, Alabama, Illinois and Wisconsin in connection with the wrongdoing alleged herein.

727.   Illinois and Wisconsin allege the following spreads:

| Defendant TEVA GROUP | | | | | | |
|---|---|---|---|---|---|---|
| Drug | Size | NDC Code | 2000 AWP | 2000 Available Price | Spread $ | Spread % |
| Naproxen 500mg | 100s | 00093-0149-01 | $113.70 | $6.75 | $106.95 | 1584% |
| Ranitidine 150mg | 500s | 55953-0544-70 | $740.00 | $40.00 | $700.00 | 1750% |
| Fluphenazine 25mg/ml | 5ml | 00703-5003-01 | $52.56 | $5.53 | $47.03 | 850% |
| Etoposide 20ml/ml | 25ml | 00703-5646-01 | $209.00 | $40.00 | $169.00 | 423% |

728.   In 2000, the Counties reimbursed Teva Group's 100 count and 1000 count packages of Ranitidine 150mg based on the same intentionally false and misleading wholesale price information.

729.    As part of its investigation of Teva Group, the Massachusetts Attorney General issued a subpoena to Teva Group for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

730.    The Massachusetts Attorney General subsequently brought suit against Teva Group, alleging that Teva Group's AMPs were materially lower than the wholesale prices Teva Group reported for reimbursement purposes and that Teva Group consequently had underpaid Medicaid rebates.

731.    To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Teva Group's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

732.    The Teva Group is among the pharmaceutical companies referred to above now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

733.    In addition, on June 26, 2003, as part of its investigations, the House Committee of Energy and Commerce requested information from the three largest pharmaceutical wholesalers (Cardinal Health, Inc., AmerisourceBergen Corporation, McKesson Drug Co.) about matters related to pricing, sales and marketing of several generic drugs, some of which are manufacturer by Teva Group.

734.    On January 14, 2004, as part of its investigations, the House Committee of Energy and Commerce requested information from the five largest retail pharmacies (Walgreens, Eckerd, CVS, Rite-Aid and Walmart Stores) about matter related to about matters related to pricing, sales and marketing of several pharmaceutical manufacturers, including Teva Group.

735.    During 2004, 29% of Teva USA's sales were made to drug store chains, 40% to drug wholesalers, 21% through partner marketing arrangements, 5% to generic distributors, hospitals and affiliated organizations and 5% to others, including mail order distributors, governmental institutions and managed care institutions.  (Teva Ltd. SEC Form 20-F (FY 2004, 3/17/05).)

736.    The Teva Group markets and sells its drugs to chain drug stores, drug wholesalers, health maintenance organizations, pharmacy buying groups and nursing homes. The Teva Group also contacts its retail customers and supports its wholesale selling effort with telemarketing as well as professional journal advertising and exhibitions at key medical and pharmaceutical conventions.  *See Id.*

737.    In marketing its drugs to its customer, Teva Group instructed its sales force to reference and rely on the AWP information published in industry compendia, including those published by Medi-Span's *Red Book* and First DataBank's *NDDF Pricing File.*

738.    The Teva Group further masks the false and misleading nature of its wholesale pricing information through the off-invoice, market share rebates, volume discounts and free goods.  For example, documents obtained by the federal government, show that Teva Group's Sicor implemented the strategy of targeting top 40 AIDS hospitals with a "$54.00 price in conjunction with a 10% free goods program, which masked the final price" and resulted in an effective price of $48.60.  *See* September 28, 2000 letter from U.S. Rep. Pete Stark to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America

739.    The Teva Group has strategic alliances and marketing arrangements with Defendant Abbott, Defendant Baxter and Defendant Alpharma, among others.

740. On information and belief, the wrongful conduct complained of herein permeates to and from each defendant participating in these mutually beneficial agreements and alliances resulting in the knowingly sale and marketing of pharmaceutical products based on false and misleading wholesale price information.

741. Teva is among the pharmaceutical companies now under investigation by the House Committee of Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements. The Committee has requested detailed reports on pricing practices, including records concerning the "spread" between actual market prices and payments by Medicaid. The basis of this investigation is "indicia from a number of sources, including utilization data, drug price/reimbursement spreads, and other relevant information."

## KK.   THE WATSON GROUP

742. As summarized in Exhibit A, the County Medicaid Programs spent over $282 million for the 1485 at-issue Watson Group NDCs between 1992 - 2005 alone.[54]   The specific Watson NDCs for which the Counties seek relief are set forth in Exhibit B-39 hereto. The Counties allege both AWP and FUL fraud claims against the Watson Group defendants.

743. At all times relevant hereto, the Watson Group has known that it can promote its drugs by selling them at substantial undisclosed discounts, while at the same time maintaining a false and inflated reimbursement prices. As evidenced by Exhibit B-39, hereto, the Watson Group has routinely created such spreads.

744. In connection with the wrongful conduct described herein, Watson has been investigated by at least the DOJ, the HHS OIG, and the Attorneys General for the states of California, Montana, Pennsylvania and Wisconsin. Schein, Watson's subsidiary since 2000, has

---

[54] The claims of the County Medicaid Programs are not confined to this time period.

been investigated by the Office of the Attorney General of Texas in connection with a state investigation of "possible false reporting of information regarding the marketing of and prices for drugs" used to establish reimbursement rates for Texas Medicaid drugs, and has received notices or subpoenas from the attorneys general of various other states, including Florida, Nevada, California, Texas and New York.

745.    In a 2000 report published by the DHHS, the DOJ documented at least 12 instances where the published AWPs for various dosages drugs manufactured by Watson were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug.

746.    The below table is an analysis of certain dosages of Watson drugs (when Watson was called Schein), from a Schein Product Status Report, dated February 1996

| Drug | AWP | WAC | % Spread |
|------|-----|-----|----------|
| Fluphenazine HCL 1mg | $46.08 | $15.71 | 193% |
| Gemfibrozil 600mg | $55.65 | $7.95 | 600% |
| Imipramine HCL 10mg | $4.45 | $1.32 | 237% |
| Nadolol 20mg | $85.32 | $42.95 | 98% |
| Perphenazine 2mg | $42.53 | $19.76 | 115% |

747.    The Watson Group has been sued by Illinois, Kentucky, Massachusetts and Wisconsin in connection with the wrongdoing alleged herein.

748.    Illinois alleges that in 2000 Watson sold Dicyclomine 20mg (a subuject drug) for $7.31 per pack of hundred, while reporting an AWP of $33.11 creating a spread of 353%.

749.   Kentucky and Wisconsin allege that in 2000 Watson sold Methylphenidate 10mg tablets (a subject drug) for $23.52 per pack of hundred, while reporting an AWP of $47.40 creating a spread of 103%.

750.   As part of its investigation of Watson, the Massachusetts Attorney General issued a subpoena to Watson for documents related to pricing, Medicaid rebate compliance and Medicaid reimbursement.

751.   The Massachusetts Attorney General subsequently brought suit against Watson, alleging that Watson's AMPs were materially lower than the wholesale prices Watson reported for reimbursement purposes and that Barr consequently had underpaid Medicaid rebates.

752.   To the extent that the Counties reimbursement is based on the same fraudulent AMP and AWP data, the Counties have been damaged by Watson's false reporting of inflated wholesale price information for reimbursement purposes and under-reporting of AMP.

753.   Watson's Schein reported in its 10-Q for the quarterly period ended June 24, 2000, that it was a defendant in a federal *qui tam* action brought in 1995 under the U.S. False Claims Act in the Federal District Court for the Southern District of Florida.  Schein stated that it "believe[d] that the matter relates to pharmaceutical pricing issues and whether 19 allegedly improper efforts by pharmaceutical manufacturers led to increased payments by Medicare and/or Medicaid."

754.   Watson also is among the pharmaceutical companies referred to above now under investigation by the House Committee on Energy and Commerce for possible improper pricing practices and failures to comply with Best Price rebate requirements.

## LL.   WYETH

755.    As summarized in Exhibit A, the County Medicaid Programs spent over $415 million on the 453 at-issue Wyeth NDCs between 1992 - 2005 alone.[55]  The specific Wyeth NDCs for which the Counties seek relief are set forth in Exhibit B- 40 hereto. The Counties allege both AWP and FUL fraud claims against Wyeth.

756.    At all times relevant hereto, Wyeth has known that it can promote its drugs by selling them at substantial undisclosed discounts while at the same time maintaining a false and inflated reimbursement prices.   As evidenced by Exhibit B-40 hereto, Wyeth has routinely created such spreads. .

757.    Wyeth's marketing strategy for Protonix makes clear the degree of falsity of its reported wholesale price information.  In order to compete in the crowded protor pump inhibitor field, Wyeth devised a strategy whereby it would set AWPs (through its reporting of other wholesale price information) at a level below its competitors in order to appeal to the managed care customers.  Next, Wyeth prepared to offer its sales force the option of offering discounts of up to 25% off of Protonix's list price/WAC, resulting in a significant discount of around 40% off of AWP.  However, as shown below, Wyeth later offered much greater discounts on Protonix.  The Counties' specific fraudulent spreads for Protonix are set forth in Exhibit B-40.

758.    At all times relevant hereto, Wyeth has known that it can promote its drugs by creating the spread and selling its products at substantial discounts off WAC, while at the same time maintaining a false and inflated AWP.  Wyeth

759.    Defendant King Group has a co-promotion agreement with Defendant Wyeth to promote and sell Monarch's Altace throughout the United States, including New York.

---

[55] The claims of the County Medicaid Programs are not confined to this time period.

760.    The California Attorney General sued Wyeth for AWP manipulation. California documented the following acquisition costs, which resulted in the following spreads between Wyeth's published AWPs and actual wholesale prices for many of its drugs.

### Defendant Wyeth's Prices & Spreads for Attivan

| Drug | NDC | Blue Book AWP | AC's (Provider) acquisition fee | Provider's Gross Profit or "Spread" | Spread as a % of VAC Price |
|------|-----|------|------|------|------|
| Ativan 2mg/ml 10ml vial | 00008-0581-01 | $87.74 | $11.20 | $76.54 | 683.39% |
| Ativan 2mg/ml 10ml vial | 00008-0581-02 | $126.70 | $20.08 | $106.62 | 530.98% |
| Ativan 2mg/ml 1ml 25s | 00008-0581-15 | $209.25 | $28.75 | $180.50 | 627.83% |
| Ativan 2mg/ml 10mls 10s | 00008-0581-13 | $745.80 | $110.00 | $635.80 | 578.00% |
| Ativan 2mg/ml 10mls 10s | 00008-0581-52 | $126.70 | $20.08 | $106.62 | 530.98% |
| Ativan 2mg/ml 1ml 10s | 00008-0581-53 | $126.70 | $20.08 | $106.62 | 530.98% |
| Ativan 2mg/ml 1ml 10s | 00008-0581-04 | $9.85 | $1.40 | $8.45 | 603.57% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-02 | $126.70 | $31.40 | $95.30 | 303.50% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-15 | $256.00 | $53.75 | $202.25 | 376.28% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-50 | $126.70 | $31.40 | $95.30 | 303.50% |
| Ativan 4mg/ml 1ml 10s | 00008-0570-51 | $126.70 | $31.40 | $95.30 | 303.50% |
| Ativan 4mg/ml 10ml ea | 00008-0570-01 | $109.66 | $16.00 | $93.66 | 585.38% |
| Ativan 4mg/ml 1ml ea | 00008-0570-04 | $12.05 | $2.15 | $9.90 | 460.47% |

761.    The Counties' fraudulent spreads for Attivan are set forth in Exhibit B-40.

762.    Wyeth is the subject of the investigation by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is inappropriately using the nominal price exception to the Best Price reporting requirements.

763.    This investigation complements documents from the Specialty Hospital of New Orleans that reveal widespread discounting of Wyeth products Protonix 40 mg tablets at prices that are a fraction of the reported AWP.  These documents are part of an exhibit in a in a Qui Tam action naming TAP as a defendant.[56]

764.    Exhibits filed in the Louisiana action show that in the year 2002 Wyeth sold 40mg Protonix tablets to the Specialty Hospital of New Orleans for .16 per dose.[57] Yet, at the same time Wyeth's per pill AWPs for 40 mg Protonix (NDCs 00008-0841-81 and 00008-0841-99) were reported or caused to be reported as $3.13 per pill.  *See also* Exhibit B-40 for particular Prontonix spreads.

765.    On information and belief these deep discounts offered by Wyeth were not accounted for by Wyeth in its calucation of the year 2002 $3.13 per pill AWP, nor were they accounted for in Wyeth's calculation of Best Price.

766.    The Counties reimbursed based on the false Protonix 40mg AWPs in 2002, paying $2.82 per pill (AWP –10%, excluding co-pays and dispensing fees). The Counties thus paid over 1760% more for Protonix 40 mg than the amount charged to the Specialty Hospital of New Orleans.

767.    On information and belief, at all times relevant hereto, 1) the deep discounting programs as alleged here have been widely used by Wyeth; (2) these deeply

---

[56] *U.S. Ex. Rel. William St. John LaCorte, MD v. TAP Pharmaceuticals, Inc.,* CV 03-1483, (E.D.L.A.).
[57] *See* Oral Proton Pump Inhibitors Cost Analysis, Exhibit L., Complaint For Money Damages and Civil Penalties under the False Claims Act, Filed May 23, 2003, *U.S. Ex. Rel. William St. John LaCorte, MD v. TAP Pharmaceuticals, Inc.,* CV 03-1483, (E.D.L.A.).

discounted prices have not been included in Wyeth's AMP or Best Price calculations 3) these deeply discounted prices have not been included in the AWPs and other wholesale price information Wyeth reports or causes to be reported to publishers.

768.     On information and belief, Wyeth routinely offers its products to commercial customers for prices less than 10% of AMP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price.

769.     Wyeth also is the subject of an investigation by the Office of the Inspector General of the Office of Personnel Management concerning marketing practices for mental health drugs.

## VII.   DAMAGES TO THE COUNTY MEDICAID PROGRAMS

770.     The County Medicaid Programs spent over $20 billion for defendants' drugs from 1992 - 2005.  A substantial portion of this huge sum is the result of the inflation of prescription drug prices pursuant to the false price reporting scheme alleged herein, and the failure to pay the full rebate amounts required by law.

771.     Applying even the most conservative estimates of improper AWP/FUL spread and failures to report accurate Best Prices or pay proper rebates, these abuses result in millions of dollars in excessive payments by the County Medicaid Programs for Medicaid-covered drugs.

772.     The Counties now seek, *inter alia*, to recover the overpayment. Defendants' misconduct has unjustly enriched the defendants at the expense of New York's health care system, and ultimately, taxpayers in the Counties and State and nationwide.

## VIII.   FRAUDULENT CONCEALMENT

773.   By controlling the process by which the AWPs and other reimbursement price information for subject drugs were inflated and reported falsely to publishers, each defendant concealed its fraudulent conduct from the Counties.  Each defendant prevented the Counties from knowing what the actual pricing structures for the covered drugs were, and concealed the standard discounts, chargebacks, off-invoice transactions, free samples and other financial incentives routinely provided to lower the actual costs for its drugs.

774.   Each defendant who reported WAC or Direct Price or other reimbursement price information to the publishers concealed that the reimbursement prices did not accurately reflect the true prices at which defendants' products were sold.

775.   Each defendant concealed that it sold the vast majority of its drugs pursuant to negotiated contracts at discounts off of WAC.

776.   Each defendant concealed its fraudulent conduct by instructing drug distribution chain intermediaries not to report the prices they paid for the covered drugs.

777.   Each defendant worked with and motivated provider and drug distribution chain intermediaries to halt investigations or changes in the AWP/ reimbursement price system.

778.   Each defendant concealed that its calculation of Medicaid rebates, based on Best Price and AMP, did not account for all discounts, rebates or incentives as required by law.

779.   Each defendant concealed that it was selling substantial quantities of its drugs for less than 10% of AWP to commercial entities to avoid Best Price reporting obligations, an abuse of the Nominal Price exception.

780.   Each defendant further concealed the true Best Prices from the federal agencies to which it reports those data.

781.    Each defendant concealed that it was not paying proper rebates to the states.

782.    Each defendant purposely concealed its pricing structures, promotional practices and sales figures for the covered drugs.

783.    Each defendant concealed that it purposely inflated its reimbursement price information in order to create a marketable spread.

784.    Each defendant's efforts to conceal its pricing structures for the drugs at issue is evidence that it knew that its conduct was fraudulent.

785.    Thus, each defendant concealed that (i) its AWPs  and Direct Prices and other reported wholesale prices were highly inflated for the express purpose of causing the Counties to overpay for the subject drugs, (ii) it was manipulating the AWPs of the subject drugs, (iii) the AWPs bore no relationship to the prices paid for, or the pricing structure of, the subject drugs and (iv) it was not accurately reporting its Best Prices and not accurately calculating its Medicaid rebates.

786.    Deutsche Bank's Barbara Ryan, a large-cap pharmaceutical analyst concurs:

>    "[W]e all look at list price, because it's the only thing that is known to us.  But list price is increasingly absolutely irrelevant.  It's [more important] what goes on behind the curtain. Now we don't know what goes on behind the curtain, we can only imagine, but we can judge the results.  So we see that some companies, like Pfizer, have been more successful behind the curtain than others.  The breadth of your product portfolio and the importance of that portfolio to any payor certainly plays a role.  If you have a one-off drug that you're trying to position and it might be in a therapeutic category that's quite crowded, it is very difficult to have any traction."

*The Pink Sheet* 2004/2005 Almanac.

787.    Unaware of the true facts about the pricing of the covered drugs, and statutorily obligated to a 25% Medicaid contribution, the Counties have paid and continue to pay for them based upon and in reliance on the AWPs.

788.    The Counties have been diligent in pursuing an investigation of the claims asserted in this Complaint.  Only in the wake of recent Congressional hearings, DOJ, OIG and HHS reports, and settlements have the Counties become informed of or placed on notice regarding the extent of defendants' fraudulent conduct.

789.    The Counties have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on its part.  The Counties could not reasonably have discovered the fraudulent nature of the published AWPs and of the Medicaid rebate amounts calculated by defendants.  Because of their knowing, affirmative, and active concealment of the fraudulent nature of pricing information, defendants are estopped from relying on any statutes of limitations.

790.    Any applicable statutes of limitations have been tolled by defendants' knowing and active concealment and denial of the facts alleged herein.  At all times relevant the defendants have been and are under a continuing duty to disclose to the Counties that the AWPs they reported or caused to be reported bear no relationship to the actual prices paid for their drugs, that defendants manipulated the AWPs to create a spread, and that the Medicaid rebates that they pay are reduced by the use of false and inaccurate pricing information, and abuse of the Nominal Price exception.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF FEDERAL MEDICAID STATUTE, 42 U.S.C. § 1396r-8 (FAILURE
TO COMPLY WITH FEDERAL MEDICAID REBATE PROVISION)**

791.    The Counties reallege and incorporate the preceding paragraphs as if fully set forth herein.

792.    Each of the defendant pharmaceutical companies is a manufacturer of a drug covered by Medicaid.

793.    Pursuant to 42 U.S.C. § 1396r-8, each of the defendant pharmaceutical manufacturers of single source and brand name innovator drugs entered into a rebate agreement with the Medicaid program pursuant to which the defendant agreed to report its Best Price.

794.    In keeping with their artificial price inflation scheme, each defendant did not report the actual Best Price but instead reported incorrect Best Prices by, *inter alia,* excluding routine discounts (*e.g.,* volume and prompt pay discounts and discounts to repackagers), rebates, off-invoice transactions, free samples and other inducements offered to participants in the drug distribution chain that resulted in lower prices than the prices reported to the Medicaid Program.

795.    Each of the defendants violated 42 U.S.C. § 1396r-8 by their systematic submission of untrue, incomplete, inaccurate, and misleading information used to determine the amount of rebates under the Medicaid program.

796.    As set forth herein, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to provide specific goods, each defendant made or caused to be made false statements and incorrect payments while promising that it would comply with the mandates of 42 U.S.C. § 1396r-8.

797.    Defendants knew, or by virtue of their position, authority or responsibility should have known, of the falsity of pricing information submitted and that the rebates they were paying were incorrectly calculated.

798.    As a result of defendants' inaccurate reporting of Best Price, defendants did not comply with their obligations pursuant to the Federal Medicaid rebate provision and the Counties were deprived of a portion of the rebates to which it was entitled.

799.    The Counties are within the class of entities for whose benefit the rebate provision was enacted.

800.    Medicaid pharmacy costs for Counties residents are higher than they would have been if defendants had accurately reported Best Price.  The Counties have therefore suffered actual injury as a direct result of defendants' misconduct.  That injury would be redressed through a favorable decision on this claim.

## COUNT II

## VIOLATION OF N.Y.  SOCIAL SERVICES LAW § 367-a(7)(d)  (FAILURE TO COMPLY WITH STATE MEDICAID REBATE PROVISION)

801.    The Counties reallege and incorporate the preceding paragraphs as if fully set forth herein.

802.    Each of the defendant pharmaceutical companies is a manufacturer of a drug covered by Medicaid.

803.    The rebate provision, 42 U.S.C. § 1396r-8, is incorporated by New York State's Medicaid statute.  *See* New York Social Services Law § 367-a(7)(d).  New York law expressly provides that each of the defendants who have executed a rebate agreement are to be paid pursuant to that agreement.

804.    As set forth herein, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to provide specific goods, each defendant made or caused to be made false statements and incorrect payments while promising that it would comply with the mandates of 42 U.S.C. § 1396r-8.

805.     Each defendant thereby violated N.Y.Soc. Serv. L. § 367-a(7)(d) in that it submitted untrue, incomplete, inaccurate, and misleading information used to determine the amount of reimbursement under the Medicaid program and in that it paid incorrectly calculated rebates to the states.

806.     Defendants knew, or by virtue of their position, authority and responsibility should have known, of the falsity of the pricing information submitted and that the rebates they were paying were incorrectly calculated.

807.     As a result of defendants' inaccurate reporting of Best Price, defendants did not comply with their obligations pursuant to the State Medicaid rebate provision and the Counties were deprived of a portion of the rebates to which it was entitled.

## COUNT III

## VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-b  (OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS)

808.     The Counties reallege and incorporate the preceding paragraphs as if fully set forth herein.

809.     New York Social Services Law § 145-b provides that "[i]t shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for ...  supplies furnished ...  pursuant to" the Medicaid Program.

810.     By engaging in the acts and practices described above, defendants have knowingly made false statements and representations or engaged in a fraudulent scheme on behalf of themselves and others, resulting in the overpayment of public funds for defendants'

prescription drugs covered by the New York Medicaid Program in violation of Soc. Serv. L. §
145-b.

811.    Defendants' conduct violated and continues to violate Social Services Law
§ 145-b because defendants, and each of them, by means of their false statements and
representations and deliberate concealment of material facts attempted to obtain and did in fact
obtain payment from public funds for supplies furnished pursuant to this chapter.  Defendants
made false "statements or representations" under § 145-b(1)(b) because they gave "a [false]
report of data which serves as the basis for a claim or a rate of payment."

812.    Defendants have "attempted to obtain and did obtain payment from public
funds for supplies" under § 145-b(1)(c) because they obtained a portion of public funds from
which payment was made, and because "public funds [we]re used to reimburse ...  an entity from
which payment was obtained."  N.Y. Soc. Serv. L. § 145-b.

813.    Defendants also have made false statements or representations "on behalf
of others...to obtain payment from public funds in violation of N.Y. Soc. Serv. L. § 145-b.

## COUNT IV

### VIOLATION OF NEW YORK DEPARTMENT OF HEALTH REGULATIONS 18 N.Y.C.R.R. § 515.2(b)(4) and (5)

814.    The Counties reallege and incorporate the preceding paragraphs as if fully
set forth herein.

815.    The Regulations of the New York City Department of Health, 18
N.Y.C.R.R. § 515.2(b)(4), provide that "[c]onversion of a medical assurance payment, or any
part of such payment, to a use or benefit other than for the use and benefit intended by the
medical assistance program," is an "unacceptable practice" within the New York Medicaid
Program.

816.     The Regulations of the New York Department of Health, 18 N.R.C.R.R. §
515.2(b)(5) provide that an "Unacceptable Practice" within the Medicaid program is committed
by "offering or paying either directly or indirectly any payment (including any kickback, bribe,
… rebate or discount), whether in cash or in kind, in return for purchasing, … ordering or
recommending any medical care, services or supplies for which payment is claimed under the
program," "[u]nless the discount or reduction in price is disclosed to the client and the
department and reflected in a claim,"

817.     By engaging in the acts and practices described above, defendants have
engaged in and continue to engage in Unacceptable Practices within the New York Medicaid
Program as defined at 18 N.Y.C.R.R. § 515.2(b)(4) and (5).

## COUNT V

## BREACH OF CONTRACT

818.     The Counties reallege and incorporate by reference the preceding
paragraphs as if fully set forth herein.

819.     As required by 42 U.S.C. § 1396r-8, and to effectuate its purpose of
reducing state Medicaid drug expenditures, each defendant entered into a Rebate Agreement
with the Secretary of HHS.

820.     The Secretary of HHS entered into this Rebate Agreement, "on behalf of
the States."

821.     The Medicaid statute provides that "the State *or local agency*
administering such plan will take all reasonable measures to ascertain the legal liability of third
parties for any overcharges and submit to the Secretary of Health and Human Services a plan for
pursuing such claims.  42 U.S.C. § 1396a (a)(25)(A) (emphasis added).

822.     In any case where such a legal liability is found to exist . . . and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek reimbursement for such reimbursement to the extent of such legal liability.  42 U.S.C. 1396a (a)(25)(B).

823.     New York's plan requires local social service districts to pay 25 percent of their Medicaid pharmacy costs, N.Y. Soc. Serv. L. §§ 360a, 363.  It expressly authorizes local social service districts to file suit and seek treble damages for any knowing overcharge the Medicaid program, N.Y. Soc. Serv. L. § 145-b, and  provides that amounts collected under that provision shall be apportioned between the local social service district and the state.  N.Y. Soc. Serv. L. § 145-(b)(2) ("Amounts collected . . . shall be apportioned between the local services district and the state.").

824.     At the time each defendant entered into a Rebate Agreement, the Secretary of HHS expressly had approved New York State's Medicaid plan, including these provisions that authorize local social service districts, like the Counties, to sue for Medicaid fraud and that expressly impose a 25% contribution on the Counties.

825.     New York Social Services Law § 367-a(7)(D) expressly states that if any defendant has entered into such rebate agreement with HHS, reimbursement for covered outpatient drugs shall be made only subject to 42 U.S.C. § 1396r-8.

826.     The Counties, like New York State, were intended third-party beneficiaries of these rebate agreements.

827.     The Secretary of HHS acted as the Counties' and State's agent in executing the rebate agreements.  The rebate agreements expressly provide that the Secretary is entering into the agreements "on behalf of the states."  The Counties are local social services

districts for the purposes of administration of the State Social Services Law, N.Y. Soc. Serv. L. §§ 55, 61-62, and is therefore subsumed under the State in New York's statutory scheme.

828.   As set forth herein, contrary to the express requirements of the Rebate Agreements, each defendant did not report accurate Best Prices for its drugs or pay correct Medicaid rebates.

829.   Rather, each defendant reported false and inflated Best Prices that, among other things, excluded routine discounts including prompt pay and bundled discounts, rebates, chargebacks and other inducements and incentives offered to drug selecting entities to create market share, and abused the nominal price exception.

830.   Defendants have therefore breached their rebate agreements and caused massive foreseeable damage to the Counties, intended third-party beneficiaries of the rebate agreement.

## COUNT VI

### UNFAIR TRADE PRACTICES
### (Violations of N.Y.  Gen.  Bus. Law § 349 *et seq*.)

831.   The Counties reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

832.   As set forth with particularity herein and in the Exhibits hereto, defendants have intentionally and wrongfully reported inaccurate, false and misleading wholesale pricing information for the covered drugs.

833.   As alleged herein, this pricing scheme was designed to increase demand for defendants' products and is consumer oriented.

834.    Defendants' intentional wrongful acts caused direct damage to tax paying consumers and the Counties by wrongfully increasing Medicaid expenditures on behalf of the Counties' Medicaid Programs.

835.    The defendants' intentional misconduct directly has damaged the public and the Counties.  The Counties are statutorily required to pay 25% of the Medicaid pharmacy costs attributable to its Medicaid recipients.  N.Y. Soc. Serv. L §§ 367-b, 363-b(2).

836.    New York's Medicaid statute expressly states, *inter alia*, that "[m]edical assistance for needy persons is hereby declared to be a matter of public concern and a necessity in promoting the public health and welfare."  N.Y. Soc. Serv. L 363.  Defendants' deceptive acts, as described herein, are in direct contravention of this statutorily articulated public policy. Defendants' practices were consumer-oriented and continue to have a broad impact on consumers and the taxpaying public.

837.    The Counties are required by State law to balance its budget.  Every dollar spent on Medicaid is a dollar that cannot be spent elsewhere.

838.    Defendants' conduct as alleged in this Complaint constitutes deceptive acts or practices in that:

(a)    Defendants have failed to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the wholesale pricing information they submit does not reflect the true wholesale prices of the drug products they sell, and that the Best Prices they report are not the actual Best Prices offered to other commercial entities, but are instead inflated in order to drive up the prices paid for medications by the Counties and deny the Counties proper Medicaid rebates;

(b)     Defendants have made false or misleading statements of facts concerning the price of goods in that they have lied about the true wholesale pricing information and true Best Prices paid for their medications, which they know are the bases of the Coounties' Medicaid pharmacy cost payments, in order to drive up the prices paid by the Counties through Medicaid and deny the Counties proper Medicaid rebates;

(c)     Defendants have knowingly made false representations in a transaction by representing that the wholesale pricing information provided is an accurate reflection of the  wholesale prices paid for their drugs, and that their reported Best Prices are in fact the Best Prices offered to a commercial entity for their drugs; and

(d)     Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the Best Price requirement of the Medicaid statute, New York's Social Services Law, § 367-a, and § 145-b.  These statutory and regulatory violations serve, at minimum, as predicates for the violation of New York's Gen. Bus. Law § 349.

839.    The wrongful conduct alleged in this Complaint occurs and continues to occur in the ordinary course of defendants' business and has caused great harm to the Counties and the consumers who live there.  The Counties have suffered actual damages because it has had to overpay millions of dollars in Medicaid pharmacy costs as a direct and proximate result of defendants' misleading and deceptive practices.

## COUNT VII

## FRAUD

840.    The Counties reallege and incorporate the preceding paragraphs as if fully set forth herein.

841.     As detailed in the Complaint and Exhibits hereto, defendants have engaged in actual fraudulent reporting of pricing information on which Medicaid reimbursements are based, and have acted intentionally and with actual malice.

842.     Defendants have made false representations with knowledge of their falsity, have concealed material facts with the purpose of overcharging the Counties and the Counties have relied upon such misrepresentations.  Direct, proximate and foreseeable injury has occurred as a result of such foreseeable and statutorily required reliance.

843.     Defendants also had knowledge of facts or intentionally disregarded facts that created a high probability of injury to the Counties, and deliberately proceeded to act in conscious or intentional disregard of, or with indifference to, the high probability of this injury.

844.     New York's Social Service Law § 366-b expressly provides that "any person who, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise, or who knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise, or knowingly submits false information for the purpose of obtaining authorization of furnishing services or merchandise under this title, shall be guilty of a class A misdemeanor…".

845.     Defendants' knowing and intentional submission of inflated AWPs or other wholesale pricing data to publishers for the express purpose of effectuating the AWP scheme alleged herein, and their knowing and intentional failures to report accurate Best Prices and failure to pay correct Medicaid rebates constitute intentional frauds pursuant to common law and New York Social Services Law § 366-b.

## COUNT VIII

## UNJUST ENRICHMENT

846.    The Counties reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

847.    To the extent the court determines there is no contractual relationship between the Counties and the defendants, as a direct and proximate result of the unlawful conduct described above, defendants have been and will continue to be unjustly enriched.

848.    Defendants have benefited from their unlawful acts through the increased sale of covered drugs with the greatest spread.  It would be inequitable for defendants to retain any of their ill-gotten gains earned as a result of the scheme alleged herein, which gains would not exist but for the overpayments made by the Counties' Medicaid Programs and other Medicaid payors.

849.    The Counties are entitled to an accounting and the establishment of a constructive trust consisting of all overcharges paid by the Counties' Medicaid Programs for covered drugs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff the Counties pray for judgment against each and every defendant, jointly and severally, as follows:

850.    Adjudging and decreeing that defendants engaged in the intentional fraudulent conduct alleged herein in violation of N.Y.  Soc. Serv. L. §§ 367-a(7)(d), 366-b, 145-b and 42 U.S.C. § 1396r-8 and 18 N.Y.C.R.R. 515.2(b)(4) and (5).

851.    Awarding the Counties actual, statutory, treble and all other available money damages, with interest, for defendants' violation of N.Y. Gen. Bus. Law § 349 in an amount to be determined at trial;

852.    Awarding the Counties actual, statutory, treble, punitive and all other available money damages, with interest, for defendants' violation of N.Y. Soc. Serv. L. § 145-b in an amount to be determined at trial;

853.    Awarding the Counties actual and compensatory damages in an amount to be determined at trial, with interest, for defendants' breach of contract;

854.    Awarding the Counties actual and punitive damages in an amount to be determined at trial, with interest, for defendants' intentional fraud in respect of matters of significant public interest;

855.    Ordering defendants each to prepare an accounting to determine the amounts defendants have illegally profited at the Counties' Medicaid Programs' expense, and disgorgement of such monies, with interest;

856.    Imposing a constructive trust and ordering defendants to pay restitution to the Counties' Medicaid Programs in the amount the Counties' Medicaid Programs have been overcharged for covered drugs, with interest;

857.    Awarding plaintiff the costs of the suit, including reasonable attorneys' and experts' fees pursuant to N.Y. Gen. Bus. Law § 349, N.Y. Soc. Serv. L. § 145-b, and any other applicable federal and state statutes or common law.

858.    Such other further and different relief as the Court deems just and proper.

Dated: June 8, 2007.

Respectfully submitted,

KIRBY McINERNEY & SQUIRE, LLP
Attorneys for the City of New York and all
Captioned New York Counties Except Nassau
830 Third Avenue
New York, New York 10022
(212) 371-6600

By: _____
        Joanne M. Cicala (JC 5032)
        James P. Carroll Jr. (JPC 8348)
        Aaron D. Hovan (AH 3290)


For the City of New York

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
John R. Low-Beer (JL 3755)
Richard J. Costa (RC 7278)
Assistant Corporation Counsels
100 Church Street, Room 3-162
New York, New York 10007
(212) 788-1007

**LORNA B. GOODMAN**
Peter J. Clines
Nassau County Attorney, by

MILBERG WEISS BERSHAD
  & SCHULMAN LLP
Melvyn I. Weiss
Ross Brooks
One Pennsylvania Plaza
New York, New York 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Special Counsel for the County of Nassau

211