**EXHIBIT 1**

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

West v. Ortho-McNeil Pharmaceutical Corp.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Edward WEST, Plaintiff,

v.

ORTHO-MCNEIL PHARMACEUTICAL CORPORATION, Defendant.
**No. 01 C 3724.**

Jan. 29, 2003.

*MEMORANDUM OPINION AND ORDER*
LEINENWEBER, J.

**\*1** Plaintiff Edward West ("West"), an African-American male born on September 5, 1938, filed a three-count complaint (the "Complaint") against Ortho-McNeil Pharmaceutical Corporation ("OMPC"), alleging that OMPC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S.C. § 621 *et seq.,* when it terminated him on July 11, 2000. Before this Court is Defendant OMPC's Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56. For the following reasons, the Court grants the motion in part and denies the motion in part.

*BACKGROUND*

In August 1997, Innovex, a company that provides pharmaceutical companies with contract sales representatives, hired Plaintiff Edward West ("West") and assigned him to OMPC. While working for Innovex, West was supervised by an employee from Innovex, and by Walter Pascale ("Pascale"), OMPC's District Manager for the Chicago South District. When OMPC's contract with Innovex expired in January 1999, Pascale and other members of the OMPC management team hired West, along with ten other Innovex employees, onto its direct payroll as sales representatives.

West's initial sales territory covered Naperville, Wheaton, St. Charles, Geneva, Aurora, Batavia, and Carol Stream, Illinois. In early 1998, while still an employee of Innovex, West was reassigned to a territory that included Orland Park, Palos, Blue Island, and the south side of Chicago. In or around October 1998, when OMPC decided to hire the Innovex employees, OMPC conducted a full territory realignment, which resulted, in part, in the reassignment of West's territory to Oak Lawn, Evergreen Park, and the southwest side of Chicago.

Both as an Innovex employee and as an OMPC employee, West was eligible for bonuses in addition to his salary. In calculating sales representatives' bonuses, OMPC's Sales Incentive Compensation Department used prior sales data to extrapolate performance estimates for each particular territory. From these estimates, OMPC established an expected performance baseline, or "quota" for each territory, and compared that quota to the sales representative's actual sales performances to determine the final bonus. If a representative changed territories mid-year, OMPC calculated bonuses by following this procedure for each territory in which the sales representative worked, and by then prorating the resulting bonus amounts according to the amount of time the representative spent in each territory. All bonuses were distributed in four installments throughout the year, with the initial three payments serving as "advances" based on performances to date. The final payment reconciled the advances with the year-end sales performance.

As a pharmaceutical company, OMPC is regulated extensively by the United States Food and Drug Administration (the "FDA"). Among other things, the FDA provides marketing standards for prescription drugs that companies such as OMPC must follow. OMPC, in turn, outlines some of these FDA rules and presents its own rules in a Sales Representative Policy Manual (the "Policy Manual") that it distributes to all sales representatives. Included in the Policy Manual is a bulletin titled "Unapproved Promotional Materials" that describes the FDA regulations on homemade marketing materials. (Taylor Aff., Ex. B.) This bulletin also includes a rule on

"Homemade Sales Materials" that prohibits "the cre- ation and use of unofficial sales materials." (*Id.*) This rule finishes with the warning that "SALES REP- RESENTATIVES FOUND TO HAVE ISSUED THEIR OWN SALES MATERIALS OF ANY KIND WILL BE SUBJECT TO TERMINATION." (*Id.*) (emphasis in original). Another bulletin in the manual provides a rule on "Disparagement of Competition" that states, in part, that "[i]t is against company policy to disparage any competitor of Ortho-McNeil Pharmaceutical." (*Id.* at Ex. C.) On November 30, 1998, West signed a "Professional Sales Representat- ives Pledge of Ethics" and pledged, in part, that he would not "alter, create, and/or distribute 'home-made' (not supplied by OMP) materials to health care professionals for any reason." (West Dep. Ex. 3.) Additionally, West received the Policy Manu- al in January 1999 when he was hired onto OMPC's direct payroll.

*2 Prior to receiving the Policy Manual, and while still employed through Innovex, on or about August 13, 1998, West prepared and submitted a letter to a physician in his territory regarding one of OMPC's products. OMPC claims that when Pascale, West's supervisor, learned of this unauthorized mailing, he reviewed OMPC's policies prohibiting the distribu- tion of "homemade" materials with West. In his de- position, West was unsure whether Pascale told him that the distribution was a violation or whether Pas- cale told him to run it by him before sending out such materials, but he formed the opinion that he needed to get management authorization before distributing such documents. On or around July 5, 2000, West again created and distributed a packet of materials to forty doctors and administrators at Holy Cross Hos- pital ("Holy Cross"), a customer in his territory. These materials included a cover letter written by West that disparaged a competitor's drug and that urged Holy Cross not to substitute that drug for OM- PC's product. Among other things, West's letter as- serted that the competitor product could inflict "instantaneous death" upon patients, and warned Holy Cross of the "huge punitive-damage award" that it could suffer if it replaced OMPC's product with the competing drug. West also included a petition sup- porting the retention of OMPC's drug on Holy Cross's

formulary, numerous articles, including two *Wall Street Journal* articles that discussed punitive damage awards, an FDA fax to OMPC's competitor on which West had noted that the FDA had fined the company for misrepresentation of its product, and a product in- sert for the competitor drug.

According to OMPC, Pascale learned about West's actions on July 7, 2000 and informed his immediate supervisor, Cathie Taylor, the Regional Business Dir- ector. Taylor in turn informed Timothy Gribbin, the acting Field Sales Director, of West's actions and, along with Pascale, contacted every Holy Cross re- cipient of West's materials to apologize for the distri- bution. On July 10, 2000, Taylor requested West's termination, which was authorized that day by Grib- bin. Pascale relayed news of the termination to West on July 11, 2000.

West, on the other hand, claims that Pascale was not merely a messenger in OMPC's termination process, but an active participant. West further alleges that Pascale had approved the dissemination of the Holy Cross materials before turning around and informing Taylor of West's "violation." West portrays Pascale as an invidious decision maker who punctuated West's employment with race-based and age-based remarks. He contends that in addition to playing an integral role in West's termination, Pascale discrimin- ated against West through territorial reassignments and the alleged impact those shifts had on his bo- nuses, and stymied West's promotional opportunities. On September 1, 2000, West filed a claim with the Equal Employment Opportunity Commission (the "EEOC") and with the Illinois Department of Human Rights alleging race, sex, and age discrimination. The EEOC issued West a right-to-sue letter on February 27, 2001 and on May 21, 2001, West filed this suit.

*DISCUSSION*

*Summary Judgment*

*3 Summary judgment is appropriate if "the plead- ings, depositions, answers to interrogatories, and ad- missions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

ment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1003 (7th Cir.2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989). It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). In the employment discrimination context, summary judgment is warranted where "the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1570 (7th Cir.1989).

### COUNT I-TITLE VII CLAIMS

Title VII makes it unlawful for an employer to terminate or otherwise to discriminate against an employee based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). In Count I, West charges that OMPC violated Title VII by discriminating against him based on his race and sex.

#### West's Sex Discrimination Claim

While West alleges discrimination based on his sex in his Complaint, OMPC does not address this allegation in its summary judgment papers and West

provides no evidence to support a sex-based discrimination claim in his response. Summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex,* 477 U.S. at 322. In such a situation, there can be " 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. As a result, West's sex-based discrimination claim must fail.

#### West's Racial Discrimination Claim

**\*4** West also asserts that OMPC violated Title VII in three race-based ways: (1) by subjecting him to multiple territory reassignments; (2) by diminishing his bonus payments; and (3) by terminating him.

#### Territory Reassignments

OMPC contends that West's allegations regarding territorial reassignments are time-barred and, therefore, cannot survive summary judgment. In Illinois, a plaintiff must file charges with the EEOC within three hundred days of the alleged discriminatory employment practice. 42 U.S.C. § 2000e-5(e)(1); *Koelsch v. Beltone Elecs. Corp.,* 46 F.3d 705, 707 (7th Cir.1995). In this case, West filed his charge with the EEOC on September 1, 2000 and, therefore, may not recover for acts which occurred prior to November 5, 1999 (not November 3, 1999, as both parties mistakenly agree). West does not dispute that the first of two (not three, as asserted in his Complaint) reassignments took place in late 1997 or early 1998 and that the second took place in October 1998. (Def.'s 56.1 Stmt. ¶¶ 77, 80; Pl.'s 56.1 Stmt. ¶¶ 77, 80; West Dep. at 71.) West fails to provide any evidence to combat OMPC's statute of limitations argument, let alone the requisite evidence to survive summary judgment. *Celotex,* 477 U.S. at 322. OMPC's motion for summary judgment with respect to the territory reassignments, therefore, is granted.

#### Bonus Payments

In his Complaint, West alleges that "[i]n or around November 1999 I received a smaller bonus than I had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

earned under [OMPC's] sales goals." (Compl. at Ex. A.) As detailed *supra* in the background section, OMPC makes bonus payments to sales representatives in four installments throughout the year. It is unclear whether West's allegations include all four bonus payments in 1999, or merely his final, November 18, 1999 payment. Lacking any guidance from West in either his Complaint or his brief, this Court nevertheless assumes that West extends his claim to all four of the 1999 bonus payments.

While OMPC concedes that West received the final installment of his 1999 bonus within the statute of limitations, it relies upon its bonus payment procedure to argue that the three initial installments occurred outside the statute of limitations and must be dismissed as time-barred. In making this argument, OMPC presumes that each bonus payment is a distinct act that may not be pulled within the statute of limitations by the final payment. *See Nat'l R.R. Passenger Corp. v. Morgan, 122 S.Ct. 2061, 2070-74 (2002)* (explaining that discrete discriminatory acts are "not actionable if time barred, even when they are related to acts alleged in timely filed charges.") Whether or not this representation is accurate is a question of fact. As a result, it is West's obligation to provide contrary facts if he wishes to contest dismissal of the pre-November 5, 1999 bonus payments. *See Celotex, 477 U.S. at 322.* West's response brief, however, entirely fails to address OMPC's statute of limitations arguments concerning these payments. Accordingly, West's discrimination claims for the first three bonus payments are time-barred.

**\*5** In order to survive summary judgment on the remaining bonus payment, West must demonstrate that his allegedly reduced bonus was an "adverse employment action." *Hunt v. City of Markham, 219 F .3d 649, 653 (7th Cir.2000).* It is well-established in this Circuit that " 'loss of a bonus is not an adverse employment action in a case ... where the employee is not automatically entitled to the bonus." ' *Miller, 203 F.3d at 1006* (quoting *Rabinovitz v. Pena,* 89 F.3d 488-89 (7th Cir.1996)); *see also Hunt, 219 F.3d at 654.* In neglecting his bonus claim in his response, West establishes neither that he received a reduced bonus nor that he was automatically entitled to receive a bonus. A reasonable jury could not find that

the bonus payment was discriminatory and, therefore, West's surviving bonus claim cannot survive OMPC's motion for summary judgment.

*Termination*

A plaintiff may prove unlawful discrimination in an employment discrimination action through either direct evidence of improper motive or the indirect burden shifting approach set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).* West asserts that he has both direct and indirect evidence of discrimination. Under either approach, the burden is on West, as the plaintiff, to show that genuine issues exist for trial. *Griffin v. City of Milwaukee, 74 F.3d 824, 827 (7th Cir.1996).*

*Direct Evidence Prior to November 5, 1999*

As direct evidence of discrimination, West points to eight race-based comments allegedly made by his superior, Pascale, throughout West's employment at OMPC. Seven of these comments were made prior to November 5, 1999 and OMPC correctly argues that these are time-barred. To circumvent this statute of limitations argument, West relies on the Supreme Court's recent *National Railroad Passenger Corp. v. Morgan* decision, in which the Court carved out an exception to the statute of limitations for hostile work environment claims where "all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan, 122 S.Ct. 2061, 2077 (2002).* West suddenly asserts a hostile work environment claim in his response to OMPC's motion for summary judgment and contends that because Pascale made his last race-based comment on or about March 2, 2000, this Court may consider all eight of Pascale's alleged derogatory statements.

Yet neither West's discrimination charge nor his Complaint referred, directly or indirectly, to a hostile work environment, and West may not casually throw in such a claim at this stage in order to bring the time-barred comments within the protective cover of *Morgan.* "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co., 31*

F.3d 497, 500 (7th Cir.1994). Recognizing that a discrimination charge is typically completed by a layperson, not a lawyer, courts are somewhat forgiving in the application of this rule. Regardless, a plaintiff may only bring claims "that are like or reasonably related to their EEOC charges and growing out of such charges." *Naylor v. Rockford Park Dist.,* No. 98-C-50315, 1999 WL 626762, at *2 (N.D.Ill. July 14, 1999). This rule has a dual purpose: (1) to give the EEOC and the employer the opportunity to settle the dispute, and (2) to provide the employer notice of the employee's claims. *Cheek,* 31 F.3d at 500.

**\*6** Even under the broadest reading, there is no suggestion in West's discrimination charge or in his Complaint, which merely incorporates the discrimination charge by reference, that he is bringing a hostile work environment claim against OMPC. Under Title VII, an employee faces a hostile work environment when "the conduct at issue unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment." *Naylor,* 1999 WL 626762, at *2. While Pascale's alleged comments may have created a hostile environment, West makes no mention of any of the comments in either his EEOC charge or in his Complaint. Indeed, West includes no descriptions whatsoever of his work environment. Instead, the allegations in West's EEOC charge, and by reference in his Complaint, relate to relocation, bonuses, promotions, and termination. As a result, neither document can be read as sufficient to have put the EEOC or OMPC on notice that West was charging a hostile work environment. *See Naylor,* 1999 WL 626762, at *2 (hostile work environment claim did not fall within the scope of discriminatory hiring and firing charges); *see also Cheek v. Peabody Coal Co.,* 97 F.3d 200, 202-03 (7th Cir.1996) (hostile work environment claim not within the scope of disparate treatment claims and theory waived because of omission from complaint); *Cheek,* 31 F.3d at 503 (hostile work environment claim cannot be inferred from charge of sex discrimination); *cf. Needy v. Vill. of Woodridge,* No. 96-C-5188, 1997 WL 461093, at *3 (N.D.Ill. Aug. 8, 1997) (hostile work environment claim alleged in charge even though no allegations of wrongful sexual conduct because charge specifically mentions hostile work en-

vironment). The statute of limitations extension provided in *Morgan,* therefore, is inapplicable in this case, and seven of Pascale's alleged comments are time-barred.

*Direct Evidence After November 5, 1999*

What remains available to West, therefore, is Pascale's March 2, 2000 comment, which occurred well within the statute of limitations. According to West, during a coaching session on or around that date, West presented Pascale with a revised routing list for doctors. Pascale rejected this list angrily and called West an "asinine nigger." While Pascale's comment, if true, was offensive and despicable, it is not direct evidence that West's termination was the result of intentional discrimination.

"Direct evidence is that which, 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." ' *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir.1998)(quoting *Hunt-Goliday v. Metro. Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1010 (7th Cir.1997)). As a result, to constitute direct proof of discrimination, isolated discriminatory statements must be made by the decision maker, *Stopka v. Alliance of Am. Insurers,* 141 F.3d 681, 688 (7th Cir.1998), or by "those who provide input into the decision." *Hunt,* 219 F.3d at 652. They must also be "contemporaneous with the discharge or causally related to the discharge decision making process." *Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir.1996).

**\*7** While OMPC portrays Pascale as a detached messenger in West's termination, West asserts that Pascale played a more active role in OMPC's decision. OMPC provides affidavits stating that Pascale was not the actual decision maker and that he had no authority to terminate West. OMPC also provides both Taylor's termination request memorandum and the Employment Termination Request. Neither of these documents includes Pascale's name. West does not provide contrary evidence to establish that Pascale was the actual decision maker or that he had actual authority to terminate West. West does, however, present sufficient evidence to establish that Pascale

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

had "input" into the decision making process. *See Hunt, 219 F.3d at 652.* West points primarily to OM-PC's answers to one of West's interrogatories, in which OMPC identified Pascale as one of the "individual(s) who decided and/or participated in and/or influenced the decision to terminate Plaintiff." (Pl.'s Resp. at 9.) OMPC explains that Pascale did indeed participate in the termination process by providing Taylor with information regarding West's Holy Cross distribution but that Pascale did not recommend or make the decision to discharge West. However, "an inference of discrimination may exist if the decision maker ... relied on information supplied by someone with [racial] animus." *Aguilera v. Vill. of Hazel Crest,* No. 01-C-5913, 2002 WL 31841023, at *7 (N.D.Ill.Dec. 18, 2002). If this were not the case, an employee would have no recourse under Title VII if a non-decision making employee who had asserted the most malignant discriminatory motive provided decision makers with the fuel for termination or otherwise influenced decision makers. *See, e.g., Maarouf v. Walker Mfg. Co.,* 210 F.3d 750, 754 (7th Cir.2000) ("[W]here the subordinate, by concealing relevant information from the decision-making employee or feeding false information to him, is able to influence the decision ... the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action.")(quoting *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir.1997) (internal citations omitted)).

West's direct evidence claim still fails, however, because Pascale's statement was neither contemporaneous with nor causally related to West's termination. While the Seventh Circuit has not established a definitive window for contemporaneity, Pascale's alleged comment came over four months prior to West's termination and under the facts of this case, the two episodes cannot be viewed as temporally related. *See, e.g., Markel v. Bd. of Regents of the Univ. of Wisc. Sys.,* 276 F.3d 906, 910 (7th Cir.2002)(statements made two months prior to adverse action not contemporaneous); *Kennedy,* 140 F.3d at 724 (statement made five months prior to adverse action not temporally related); *but cf. Bellaver v. Quanex Corp.,* 200

F.3d 485, 493 (7th Cir.2000)(evidence of discriminatory motive that occurred three or four months prior to termination could be viewed as sufficiently related). Indeed, West establishes no causal nexus between Pascale's comment and West's termination. Pascale's remark, if made, was a vile response that has no place in any work environment. However, it does not rise to the level of direct evidence of discrimination. "[B]igotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir.2001)(providing as an example of direct evidence the statement "I fired Judy because she was an old woman.") In this case, Pascale's comment was made in response to West's suggested routing list, an event unrelated to West's eventual termination. West has not alleged that any OM-PC employee arguably involved in his termination, including Pascale, made any discriminatory comments at the time of his termination. As a result, West has failed to establish the necessary nexus between Pascale's comment and his own termination and has failed to adduce direct evidence of discriminatory termination. West may, of course, still rely on Pascale's alleged comment to prove pretext under the *McDonnell Douglas* approach.

### Indirect Evidence

**\*8** To succeed under the *McDonnell Douglas* burden-shifting approach, West must first establish a *prima facie* case of discrimination by demonstrating that: (1) he was a member of a protected class; (2) he performed his job according to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees outside of his protected class. *See, e.g., Markel,* 276 F.3d at 911; *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 885-86 (7th Cir.2001). West need not present overwhelming evidence on the *prima facie* case; he merely needs to show that "there is some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion." *Leffel v. Valley Fin. Servs.,* 113 F.3d 787, 793 (7th Cir.1997). If West meets this low burden and establishes a *prima facie* case, a presump-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

tion of discrimination arises, and OMPC must produce evidence of a legitimate, nondiscriminatory reason for West's termination. *Gordon,* 246 F.3d at 886. If OMPC is successful, the obligation shifts to West to show that OMPC's proffered reason for termination was pretextual. *Id.* West need not provide direct evidence of discrimination, but must merely meet his respective burdens. *Id.*

OMPC does not contest that West, who is African-American, is a member of a protected class or that West suffered an adverse employment action when he was terminated. The parties disagree on the second and fourth prongs of the *McDonnell Douglas* analysis, namely, whether West performed his job according to OMPC's legitimate expectations and whether OMPC treated similarly situated employees outside of West's protected class more favorably.

Under the second prong of *McDonnell Douglas,* West must demonstrate that "he was performing his job satisfactorily enough to avoid discharge absent racial bias." *Cowan v. Glenbrook Sec. Servs., Inc.,* 123 F.3d 438, 445 (7th Cir.1997). Until his termination, West appears to have performed successfully and satisfactorily for OMPC. In August 1998, while employed by Innovex, West violated OMPC policy by distributing an unauthorized letter to a client, but did so prior to receiving OMPC's Policy Manual. West, however, admits that even after discussing this violation with Pascale, on or around July 5, 2000 he again created and distributed a large package of disparaging materials to forty individuals at Holy Cross Hospital, one of OMPC's clients. In the Policy Manual, OMPC clearly establishes such a distribution as an extremely serious violation of several company policies. Although he contends that OMPC did not cover these policies in training sessions, West acknowledges receiving the Policy Manual and has to concede that he signed a pledge not to create or dispense such materials unless they were supplied by OMPC.

Both parties agree that after West's August 1998 violation of OMPC policy, Pascale counseled West regarding OMPC's policies and told West that he needed to obtain authorization before sending out such materials. According to West, on July 4, 2000,

the day before he distributed the materials, he obtained that very authorization from Pascale. West claims that he read the cover letter to Pascale over the telephone and that Pascale told West that the letter "sounded fair." West further claims that Pascale made no changes to the document. If true, Pascale's approval of the materials could be extremely troubling, as Pascale is simultaneously the one with the alleged discriminatory animus, and the one who initiated the termination process. Pascale denies that he even approved the distribution or that he knew about it until after it had taken place, but for the purposes of this motion, we must assume that West's allegations are accurate.

**\*9** OMPC argues that even if Pascale approved the Holy Cross distribution, Pascale's actions would only be relevant if he had played a decision making role in West's termination. OMPC cites to *Owens v. Top Transportation Services, Inc.,* a case in which the plaintiff also argued that his supervisor had authorized his violations, for the proposition that, as a non-decision maker, Pascale's authorization was irrelevant. 168 F.Supp.2d 866 (N.D.Ill.2001). The *Owens* court, however, found that what the supervisor knew was irrelevant, not because he was not the decision maker, but rather because he "did not participate in the circumstances surrounding [plaintiff's] discharge." *Id.* at 870. Furthermore, the court explained that the plaintiff had shown "no link" between the decision makers and the supervisor. *Id.*

West, on the other hand, has adduced sufficient evidence connecting Pascale to the termination process. Pascale informed Taylor of West's violation by faxing her the cover letter, investigated the extent of the violation along with Taylor, and communicated the termination decision to West. *See Aguilera,* 2002 WL 31841023, at \*7 ("an inference of discrimination may exist if the decision maker ... relied on information supplied by someone with [racial] animus"). Moreover, in passing the offending materials onto Taylor, Pascale presumably did not tell her that he had authorized them. As the *Owens* court recognized, *Owens,* 168 F.Supp.2d at 870, the Seventh Circuit has held that where an employee influences a decision maker "by concealing relevant information," that employee's prejudices are imputed to the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

"employee who has formal authority over the plaintiff's job." *Maarouf,* 210 F.3d at 754 (quoting *Wallace,* 103 F.3d at 1400). This is perhaps especially true in this case, where Taylor relied so heavily on Pascale as an intermediary and where she terminated West without speaking to him directly about the offense. *See Curry v. Menard, Inc.,* 270 F.3d 473, 481 (7th Cir.2001)(Rovner, J., concurring).

Due to Pascale's approval, West has established a genuine issue of fact as to whether he was meeting the legitimate expectations of his employer. Indeed, the Seventh Circuit has held that when those judging the plaintiff's performance are the same as those accused of discriminating against that plaintiff, the legitimate expectations prong of the burden shifting test is an unnecessary part of the analysis. *See Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 612 n.3 (7th Cir.2001). As a result, West need not show that he was meeting OMPC's legitimate expectations in order to satisfy his *prima facie* case.

The fourth prong of *McDonnell Douglas* requires West to show that in being discharged, he was treated differently than similarly situated employees who are not African-American. A "similarly situated employee is someone "directly comparable" in "all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). The relevant factors depend upon the facts of the case. *Id.* In this case, West would have to point to a non-African-American employee, who is on his level and under Pascale's supervision, who violated the same policies at OMPC, who also did so with Pascale's approval, but who was not terminated by Taylor. Neither OMPC (who does not have the burden to do so) nor West present evidence of such an employee. West argues that Pascale was an employee, outside the protected class, who also violated the OMPC polices and who was not terminated. As West's supervisor, however, Pascale cannot be described as similarly situated for the purposes of this prong. *Id.*

**\*10** Yet this Court must draw all inferences in the light most favorable to West and accept that Pascale did set West up by approving the distribution of disallowed materials and then informing Taylor of the violation. Given that scenario, it runs counter to Title VII goals to prevent West from progressing in his claim simply because Pascale would have no reason to authorize another employee to violate OMPC policy and to inform Taylor of that violation. Moreover, Taylor, who had evidenced no racial animus of her own towards West, would have no reason *not* to terminate any such employee.

The Seventh Circuit has noted that the " '*McDonnell Douglas* test was never meant to be applied rigidly," ' *Leffel,* 113 F.3d at 793 (quoting *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 n .4 (7th Cir.1995)), and that while "[e]vidence of disparate treatment is certainly one of the most obvious ways to raise an inference of discrimination absent direct proof of discriminatory animus .... [i]t should not be understood as the only means of doing so." Id. at 794; *see also Gordon,* 246 F.3d at 893 (Easterbrook, J., dissenting) (decrying the *McDonnell Douglas* analysis as "so encrusted with the barnacles of multi-factor tests and inquiries that it misdirects attention" and cautioning courts to remember that the underlying inquiry is simple: "Could a reasonable trier of fact conclude that [the plaintiff] is the victim of ... discrimination?"). Indeed, in several single discharge cases such as this, the Seventh Circuit has replaced the "similarly situated" inquiry with an inquiry into whether the "employer sought a replacement for [the plaintiff]." *See, e.g., Flores v. Preferred Tech. Group,* 182 F.3d 512, 515 (7th Cir.1999) (discriminatory discharge based on national origin); *Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1123 (7th Cir.1998) (discriminatory discharge based on age); *Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993) (discriminatory discharge based on national origin). Under this inquiry, which appears more appropriate than the "similarly situated" inquiry given the facts of West's termination, West must establish that OMPC replaced him, thereby demonstrating that he was not fired because of a reduction in force or some other legitimate business reason. West was indeed replaced by Marnelle Wong shortly after his termination. There is some dispute over whether Wong is Asian or Caucasian (Pl.'s Resp. at 10; Def. Interrog. Resp. No. 7), however, that is irrelevant as West need not show that he was replaced by a person outside his protected class. *Carson v. Bethlehem Steel*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 4308-2   Filed 06/11/07   Page 10 of 38   Page 9
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Corp.,* 82 F.3d 157, 158 (7th Cir.1996) (per curiam).

West has established a genuine issue of triable fact on all four prongs and, therefore, has established a *prima facie* case of discrimination. Assuming that OMPC has offered an arguably nondiscriminatory reason for West's dismissal, West must demonstrate that OMPC's reason is a pretext for discrimination. West may make this showing by "providing 'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." ' *Gordon,* 247 F.3d at 888-89 (quoting *Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 395 (7th Cir.1998)). West must do more than show that OMPC's decision was " 'mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." ' *Nawrot v. CPC Int'l,* 277 F.3d 896, 906 (7th Cir.2002) (quoting *Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir.2000)). Courts, however, "need not abandon good reason and common sense in assessing an employer's actions." *Gordon,* 246 F .3d at 889.

**\*11** As is frequently the case, there is significant overlap between the issue of West's satisfactory job performance and the question of whether OMPC's proffered justification may be considered pretextual. OMPC explains that it terminated West because he violated company policy by distributing "homemade, unapproved promotional materials" to Holy Cross personnel. (Def.'s Br. at 5.) But as discussed above, West claims that, for racially discriminatory reasons, Pascale approved the promotional materials in order to get West fired. It is irrelevant that neither Taylor nor Gribbin participated in the alleged set up, or that they had no knowledge of Pascale's actions. An employer cannot claim that a termination was an honest mistake when they were intentionally mislead into taking such an action by an employee such as Pascale.

In *Sarate v. Loop Transfer, Inc.,* No. 95-C-5671, 1997 WL 543068 (N.D.Ill. Aug. 28, 1997), the plaintiff alleged that he was terminated because he had been framed. The highest-ranking participant in the alleged frame, a man named Edinger, did not participate in the investigation of the supposed violation or in the termination decision and there was no evidence that any of the decision makers knew of the set-up. *Id.* at \*4. The court found that by providing the decision makers with false information, however, Edinger had "poisoned the well" and that as a result the defendant's proffered reason for termination was pretextual. *Id.* Due to Pascale's alleged actions, OMPC's termination decision was similarly tainted at its core, and, therefore, West has demonstrated that OMPC's reason for terminating him was pretextual. OMPC's motion for summary judgment on the termination charge in Count I is denied.

### COUNTS II AND III-ADEA CLAIMS

Count II of West's Complaint alleges violation of the ADEA, while Count III alleges a willful violation of the ADEA. West appears to allege age discrimination with respect to his territory reassignments and bonuses, however, as discussed above, his reassignment claims and all but one of his bonus claims are procedurally barred. The final bonus claim fails as it is not an adverse employment action as required under both Title VII and the ADEA. West also appears to allege age discrimination with respect to his termination and a failure to promote claim. He has failed to provide sufficient evidence of age discrimination to survive summary judgment, and therefore, the Court grants OMPC's motion with respect to Counts II and III.

### Termination

West's response to OMPC's motion is completely void of any evidence that OMPC terminated West for age-related reasons. Indeed, despite faulting OMPC for "blithely" asserting that the record contains no relevant age-based comments, West goes on essentially to ignore his ADEA claims, and provides no specific information to support them. Buried within West's 56.1 is the single allegation that, in April 1999, Pascale told West that he was "too old" to advance within OMPC. (Pl.'s 56.1 Resp. ¶ 105; Pl.'s 56.1 Stmt. ¶ 19). Not only is this statement time-barred, however, as it occurred well before November 5, 1999, it is also unrelated to the termination both temporally and causally. *Geier,* 99 F.3d at 242. As a result, West has no direct evidence that he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

impermissibly terminated due to his age. This lack of evidence also fatally hampers his *prima facie* case and his pretextual argument as there is no evidence that Pascale's role in West's termination was motivated by age-related animus.

### Failure to Promote

**\*12** In his discrimination charge, West claims that he was not promoted to the position of Hospital Representative in either February 2000 or June 2000. This claim barely merits discussion, as West entirely ignores it in his response to OMPC's motion for summary judgment. Indeed, West appears to have no factual basis for his allegations. It is undisputed that OMPC had no vacant Hospital Representative positions available in West's region in June 2000. West also does not dispute that the February 2000 position, while in Taylor's district, was not in Pascale's district and adduces no evidence whatsoever that he was somehow passed over for this promotion based on age-related discrimination. West fails to provide evidence sufficient to meet his summary judgment burden, *see Celotex*, 477 U.S. at 322, and as a result, OMPC's motion for summary judgment on Counts II and III is granted.

### CONCLUSION

For the reasons set forth above, OMPC's Motion for Summary Judgment is DENIED as to the race discrimination termination claim in Count I, GRANTED as to the sex discrimination claim and the race discrimination territory reassignments and bonus payments claims under Count I, and GRANTED as to Counts II and III.

IT IS SO ORDERED.

N.D.Ill.,2003.
West v. Ortho-McNeil Pharmaceutical Corp.
Not Reported in F.Supp.2d, 2003 WL 260710 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: Pharmaceutical Industry Average Wholesale Price Litigation ) ) ) ) ) | MDL Docket No. 1456 |
| *U.S. ex rel. West v. Ortho-McNeil Pharmaceutical, Inc. et al.*, No. 03-8239 (N.D. Ill.) ) ) ) ) ) | |

## PLAINTIFF-RELATOR'S MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER 31

Conditional Transfer Order 31 ("CTO-31") was entered by the Clerk of the

Judicial Panel on September 12, 2006. CTO 31 was proper and vacatur should not be

granted because Edward West's ("West") case against Ortho-McNeil Pharmaceutical,

Inc. and Johnson & Johnson (hereinafter collectively referred to as "Defendants")

involves common questions of fact with actions previously transferred by the Panel under

§1407. Further the transfer of this case will promote the just and efficient conduct of

these proceedings while (1) minimizing the risks of duplicate discovery, (2) minimizing

the risks of inconsistent or repetitive trial rulings, and (3) conserving the resources of the

parties, their counsel, and the judiciary, the very reasons the Panel created the AWP

MDL. Defendants' assertions that there are numerous facts unique to West's case and that transfer would not promote the just and efficient conduct of either proceeding is without merit. Based upon the reasons set forth below, Plaintiff respectfully requests that the Panel deny Defendants' request to vacate CTO-31.

## Factual Background

### I.    The AWP MDL

#### A.    Nature of the Claims of the AWP MDL

On April 30, 2002 this Panel determined that actions involving numerous pharmaceutical defendants, and multiple pharmaceutical products were comprised of common questions of fact. The common facts linking these actions was whether "the pharmaceutical defendants engaged in fraudulent marketing, sales and/or billing schemes by unlawfully inflating the average wholesale price of their Medicare covered prescription drugs to health care professionals and thereby boost the pharmaceutical companies' profits." *In re Immunix Corp. Average Wholesale Price Litigation*, 201 F.Supp.2d 1378, 1380 (J.P.M.L. 2002). In order to avoid "duplication of discovery, prevent inconsistent or repetitive pretrial rulings and conserve the resources of the parties, their counsel, and the judiciary" the Panel created MDL-1456. *Id.* at 1381.

Prior to the AWP MDL's inception, pharmaceutical defendants argued against its creation, arguing (like Defendants herein) that individual questions of fact would result in an unwieldy situation and the better course of action would be to centralize on a "company-by-company basis." *Id.* at 1380. The Panel rejected this argument because of the

> ...salutary effect of placing all related actions before a single judge who can formulate a pretrial program that: 1) allows pretrial proceedings with

respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, (citation omitted) and 2) ensures that pretrial proceedings will be conducted in a manner leading to a just and expeditious resolution of all actions to the overall benefit of the parties.

*Id.*

The Panel has transferred 99 cases to the AWP MDL. See CTO-31 (Exhibit A). All of those actions are before the Honorable Patti B. Saris. *Id.* The most recent transfer prior to CTO-31 took place on July 11, 2006. *See* United States' and Relator's Notice of Transfer to MDL Docket No. 1456, In re Pharmaceutical Industry Average Wholesale Price Litigation (Exhibit B). That case was captioned *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc. and Hospira, Inc. Id.* Similar to the West case, this case is also brought under the whistleblower provisions of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

Johnson & Johnson ("J&J"), along with several of its subsidiaries, are among the numerous pharmaceutical defendants whose cases have been transferred to the AWP MDL alleging that they have engaged in marketing practices that fraudulently inflated the AWP of their products. *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 233 F.R.D. 229, 232 (D.Mass. 2006). Two of J&J's pharmaceutical products, Remicade and Procrit, are among the numerous drugs that have been implicated in the AWP MDL as having their AWP inflated through the use fraudulent marketing practices. *Id.* at 234 – 235.

Judge Saris is also presiding over numerous cases[1] that have been brought by or on behalf of the states themselves. At issue in these state cases is the same common set

---

[1] Cases representing the states of California, Florida, Nevada, New York, and Montana are currently before Judge Saris. Judge Saris is also presiding over cases brought by or on behalf of New York City and several counties throughout New York.

of facts, viz, whether the defendant pharmaceutical companies engaged in fraudulent

marketing practices designed to inflate the AWP of their products.

There are also lawsuits not currently pending before Judge Saris that have been

brought by the Attorney General of their respective states[2] alleging certain

pharmaceutical defendants engaged in fraudulent marketing practices designed to inflate

the AWP of their products. Those lawsuits are currently pending in the Attorneys

Generals' respective state courts.

### B.    Procedural Status of the AWP MDL

Judge Saris has developed a multiple track system of handling the volume of

litigation currently pending in the AWP MDL. Each track is on a separate time table for

concluding the respective steps through the pretrial and trial process. J&J was placed in

Phase 1 and has concluded discovery in a consumer class action. In an August 16, 2005

class certification ruling, Judge Saris certified the class in part and denied part. *In re

Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 63 (D.

Mass 2005). Summary judgment motions in the consumer class action cases have been

briefed and are pending before Judge Saris. Trial for the group of defendants in this first

track is set to begin November 6, 2006.

The state government cases in the MDL have not advanced as far through the

litigation because they are in Phase 2 or the "regular track". Discovery remains open and

ongoing in some, but not all, of these cases. With the recent transfer of *United States of

America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc. and

Hospira, Inc.*, Judge Saris continues to integrate cases in her existing dual track system.

---

[2] The Attorney Generals for the states of Alabama, Arizona, Illinois, Kentucky, Mississippi, Pennsylvania, and Wisconsin have all filed such suits.

II.     **West v. Ortho-McNeil Pharmaceutical, Inc., and Johnson & Johnson**

   A.     **Nature of West's Claims**

   West was a sales representative of Ortho-McNeil Pharmaceutical, Inc. ("Ortho").

While there he was a part of Ortho's "nationwide marketing and sales force." *See* First

Amended Complaint ¶¶ 10, 21. Based upon his experiences and observations at Ortho,

West filed an action seeking "to recover damages and civil penalties...arising from false

and/or fraudulent records, statements and claims made, used or caused to be made, used

or presented by" Ortho.[3] *Id.* at ¶ 1.

   West alleges Ortho violated the Federal Civil False Claims Act, 31 U.S.C. § 3729

*et seq.*, as amended, by engaging in fraudulent and illegal marketing practices such as

offering

> ...illegal remuneration and kickbacks to medical providers in various
> forms, including but not limited to: (1) "grants" to hospitals to keep
> Levaquin on hospital formularies in place of less expensive antibiotics, (2)
> payments to high-prescribing physicians for 'research' studies that impose
> minimal obligations on the physician and provide no research of value to
> Ortho-McNeil, (3) valuable gifts including web site design and
> maintenance, and (4) improper gratuities including 'speaking' fees,
> 'research' grants, trips, dinners and golf outings.

*Id.* at ¶ 3.

   Medicare, Medicaid and other state and federal health care programs paid "false

or fraudulent claims for reimbursement of prescriptions that would not have been paid

but for Ortho-McNeil's illegal business practices." *Id.* at ¶ 4.

   "Various statutory pricing formulas determine the payment for prescription drugs

under the government health care programs" such as Medicare and Medicaid. *Id.* at 28.

---

[3]West filed this action on behalf of the "United States, the State of California, the State of Delaware, the
State of Florida, the State of Hawaii, the State of Massachusetts, the State of Nevada, the State of
Tennessee, the State of Texas, the State of Virginia, and the District of Columbia." Id. at ¶ 1.

In order to pay the correct amount, these government programs and their formulas are dependent on the "integrity of price and sales data directly or indirectly furnished by pharmaceutical manufacturers." *Id.* West alleges that Ortho knew that its illegal marketing programs would cause the submission of thousands of claims that were not eligible for program reimbursement." *Id.* at ¶ 9.

The First Amended Complaint alleges, by way of example, that when Ortho was faced with price competition from Britsol-Meyers Squibb's drug Tequin, Ortho responded with a marketing strategy for Levaquin that included illegal kickbacks. *Id.* at ¶¶ 19-20.

> Ortho-McNeil understood that if they tried to compete with Tequin by lowering the price of Levaquin at hospitals, Ortho-McNeil would be forced to lower the reimbursement level for Levaquin for government programs since most of the reimbursement programs take into account the lowest price at which the drug is offered. To avoid lowering the cost of Levaquin to hospital formularies, Ortho-McNeil began offering monetary inducements to persuade hospitals not to switch from Levaquin to Tequin. These payments, labeled as 'educational grants,' had one, and only one purpose -- to indirectly lower the cost of Levaquin to the hospital, and thereby induce the hospital to continue to purchase Levaquin.

*Id.* at ¶ 66.

To further its scheme, Ortho also offered rebates to the hospitals designed to increase the hospitals' profits. While the hospitals were purchasing Levaquin at a contract price from a wholesaler, they were given rebate checks directly from Ortho and the sales representative. This lowered the actual price the hospitals were paying for Levaquin while not affecting the AWP of Levaquin for purposes of Ortho's reporting and government reimbursement. *Id.* at ¶ 74. In fact, Ortho went so far as to have it sales representatives educate the hospitals on the "hidden profit" they could make since there would be no accounting record from the wholesaler showing the rebate. *Id.* at ¶ 75.

West also points to numerous other payments Ortho made to influence their drugs' market while allowing it to keep its AWP at inflated levels. These payments took the form of payments for "research studies" and "speaking fees" that were "substantially in excess of the value of any services provided." *Id.* at ¶ 88.

**B.    Procedural Status of West's Case**

West filed his complaint under seal in the United States District Court for the Northern District of Illinois in November 2003. Over the next two and a half years each of the governmental entities on whose behalf West is proceeding was afforded an opportunity to investigate his claims. On March 18, 2004 West filed his First Amended Complaint with the same court.

In 2006, at the conclusion of their investigation, the federal government notified West that it was not prepared to intervene on his behalf. As is common, the states followed the federal government's lead and also declined to intervene. In June 2006 the case was unsealed and the defendants were served with the Complaint.

To date the parties have exchanged Rule 26(a)(1) initial disclosures and Defendants have filed a motion to dismiss the First Amended Complaint. That motion is currently pending before Judge Virginia Kendall.

**III.    JPML Proceedings**

On August 22, 2006, West filed notice with the Clerk of the Panel that he had a "tag along action" per Panel Rule 1.1 because it involves common questions of fact with actions that were previously transferred to the MDL pursuant to 28 U.S.C. § 1407. On September 12, 2006 the Clerk of the Panel entered Conditional Transfer Order (CTO-31) transferring this case to the AWP MDL. On October 11, 2006 Defendants filed their

Motion to Vacate Conditional Transfer Order 31 and their Memorandum of Law in

Support of Defendants' Motion to Vacate Conditional Transfer Order 31.

## Legal Argument

### I.   Transfer is Proper Under 28 U.S.C. §1407

####     a.   Sufficient and Substantial Common Issues of Fact Are Present

In granting consolidation pursuant to §1407 for In Re Pharmaceutical Industry

Average Wholesale Price Litigation (MDL-1456), this Panel held:

> … that all actions in these four dockets involve common questions of fact
> concerning whether (either singly or as part of a conspiracy) the
> **pharmaceutical defendants engaged in fraudulent marketing, sales**
> **and/or billing schemes by unlawfully inflating the average wholesale**
> **price of their Medicare covered prescription drugs in order to**
> **increase the sales of these drugs to health care professionals and**
> **thereby boost the pharmaceutical companies' profits.** Centralization of
> all actions under Section 1407 in the District of Massachusetts will serve
> the convenience of the parties and witnesses and promote the just and
> efficient conduct of this litigation. Congregating all these actions there is
> necessary in order to avoid duplication of discovery, prevent inconsistent
> or repetitive pretrial rulings, and conserve the resources of the parties,
> their counsel and the judiciary. As a result, resolution of overlapping
> issues – relating to discovery concerning these similar practices and class
> certification – will be streamlined.

J.P.M.L. Order dated April 30, 2002 ("Initial Transfer Order") (emphasis added).

West's case involves common questions of fact with the cases previously

transferred to the AWP MDL. The gravamen of West's allegations is that Ortho engaged

in fraudulent marketing schemes designed to allow it to increase its market share while

maintaining an inflated average wholesale price ("AWP") which forms the basis of the

amounts to be charged to government programs, including but not limited to Medicare

and Medicaid. West sets forth illegal remuneration and kickbacks to include but not be

limited to

...(1) "grants" to hospitals to keep Levaquin on hospital formularies in place of less expensive antibiotics, (2) payments to high-prescribing physicians for 'research' studies that provide impose minimal obligations on the physician and provide no research of value to Ortho-McNeil, (3) valuable gifts including web site design and maintenance, and (4) improper gratuities including 'speaking' fees, 'research' grants, trips, dinners and golf outings.

See First Amended Complaint at ¶ 3.

By making hidden and illegal payments to hospitals, physicians and pharmacies, Ortho was able to increase its market share without having to lower its AWP to compete with other lower priced competitors[4]. Because federal programs such as Medicare and Medicaid rely upon the integrity of price and sales data being furnished by Ortho, this practice allowed Ortho to profit on the spread between the AWP that it reported and what the true AWP should have been – taking into account the illegal marketing practice payments. *Id.* at ¶ 28. Ortho's profits as a result of that spread came directly at the expense of the federal government and anyone else relying upon the AWP prices Ortho published. West alleges, *inter alia*, Ortho advised its sales representative to educate hospitals about the opportunity for them to make "hidden profits" off of the spread. *Id.* at ¶ 75. Because no accounting records available showed the rebates Ortho was paying the hospitals directly, the hospitals could hide from Medicare and Medicaid the fact that they had received any rebates. *Id.*

In ruling on various class certification motions that were before the AWP MDL, Judge Saris provided instructive information regarding the background and nature of the claims at issue in the AWP MDL. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61 (D. Mass. 2005). "In almost every sale of prescription

---

[4] These fraudulent marketing and billing schemes were used by Ortho in an attempt to compete with Tequin a competitor on the market which had a lower AWP. *See* First Amended Complaint paragraphs 66, 67, 71, 72-77, 79-87, a copy of which is attached hereto as Exhibit C and incorporated herein by this reference.

drugs, reimbursement from the government or TPP is based on AWP, WAC or a discount from one of these numbers." *Id.* at 68. A spread is created because "manufacturers actually sell drugs to providers like pharmacies and doctors at far below AWP and WAC. *Id.* The spread is the difference between "the reimbursement rate paid by...the government" and actual price paid by health care providers. *Id.* As Judge Saris noted, the "gravamen of the fraudulent scheme alleged...is that defendant manufacturers send publishers their AWPs...knowing that...government payors consider them indicators of prices to providers" and "will make reimbursement payments based on those prices." *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 69 (D. Mass. 2005). Instead, through the use of "hidden discounts, off-invoice rebates, free samples, education grants, and other promotional means," the pharmaceutical defendants actually sell their prescription drugs at a net price substantially below the AWP. *Id.* at 69. The pharmaceutical defendants engaged in this practice in order to "increase their market share or sales, at a cost to the end payor." *Id.* at 69.

The activities described and enumerated by Judge Saris could hardly be more consistent with the allegations set forth in West's complaint. The AWP MDL and West's complaint are both focused on illegal and fraudulent marketing schemes designed to increase market share or sales, while allowing the pharmaceutical defendant to maintain an artificially high AWP. Defendants' Motion to Vacate Conditional Transfer Order 31 should be denied because there are common issues of fact that justify transfer.

### a. Type of Drug Not Relevant To The Commons Issues of Fact Present

Defendants contend that conditional transfer of West's case should be vacated because this case involves different drugs than the two J&J drugs currently involved in

the AWP MDL. *See* Defendants Memorandum of Law in Support of Defendants' Motion

to Vacate Conditional Transfer Order 31, Page 8. The logic of this argument flies in the

face of the very creation and continued existence of the AWP MDL. The AWP MDL is a

consolidation of multiple claims brought against multiple pharmaceutical companies

alleging they fraudulently overstated the AWP of their prescriptions drugs. The type of

drug and/or the name of the drug are not at issue in this litigation. Cases involving more

than 100 different prescription drugs have been transferred into the AWP MDL. The

common factor making transfer of all the cases involving all these different prescription

drugs proper is the allegation that the pharmaceutical defendants engaged in illegal

marketing schemes designed to overstate their AWP on those prescription drugs. The

Panel's approach is supported in prior case law. In *In re Vernitron Securities Litig.*, the

Panel upheld transfer and consolidation of actions brought against brokerage firms for

market manipulation and securities fraud despite the fact that not all of the stock

purchases were identical by all the plaintiffs. 469 F.Supp. 297, 299 (J.P.M.L. 1979). In

*In re Zyprexa Products Liability Litig.*, the Panel stated that the presence of an additional

defendant or product is not significant when the underlying action contains the same

claims and allegations. 314 F.Supp.2d 1380, 1382 (J.P.M.L. 2004). Panels have held

that when there are sufficient underlying factual questions central to the theme of the

case, the transfer and consolidation was justified even when there are different products

involved . *In re Data General Corp. Antitrust Litig.*, 470 F.Supp. 855, 858 (J.P.M.L.

1979); *In re 'East of the Rockies' Concrete Pipe Antitrust Cases*, 302 F.Supp. 244, 247

(J.P.M.L. 1969); *In re Japanese Electronic Products Antitrust Litigation*, 388 F.Supp.

565, 567 (J.P.M.L. 1975). The fact that the drugs at issue in West's case are different

from those in the AWP MDL provides no justification to vacate CTO-31, since the allegations here focus on the fraudulent marketing schemes employed by the pharmaceutical companies.

Defendants cite three cases in support of their argument that when different drugs are involved, the same type of conduct does not make them factually related for purposes of transfer and consolidation. *See* Defendants Memorandum of Law in Support of Defendants' Motion to Vacate Conditional Transfer Order 31, Page 8. A closer look at these cases reveals that the type of drug is relevant when the cases focus on the *use* of the drug unlike, in this instance, where the focus is on the fraudulent marketing schemes employed by pharmaceutical companies.[5]

West's claims do not relate to the use of the prescription drugs. Rather, his claims focus on Ortho's fraudulent marketing activities employed to gain market share and maintain the AWP at an artificially high price. This is squarely on point with the issues surrounding the litigation that has been transferred to the AWP MDL.

### b. The Overlapping Factual Issues Are Sufficiently Numerous and Complex to Justify Transfer

Defendants' remaining arguments all hinge upon their dubious assertion that no common issues of fact justify transfer. Defendants would have the Panel count the number of times that AWP is listed in West's complaint rather than actually examine the

---

[5] The Panel in *In re Aredia and Zometa Products Liability Litigation* held that claims arising from the ingestion of drugs other than Aredia and/or Zometa did not present common questions of fact to justify consolidation with the claims against Novartis for the ingestion of Aredia and/or Zometa. 429 F.Supp.2d 1371, 1372 (J.P.M.L. 2006). All actions before the Panel in *In re Celexa and Lexapro Products Liability Litigation,* asserted claims against the Defendants relating to the ingestion of Celexa or Lexapro, therefore the Panel held that any claims against Defendant involving a prescription drug other than Celexa or Lexapro did not share sufficient questions of fact. 416 F.Supp.2d 1361, 1363 (J.P.M.L. 2006). Finally, the Panel in *In re Vioxx Products Liability Litigation,* ruled that claims involving a prescription drug other than Vioxx did not share sufficient questions of fact with claims that focus on alleged increased health risks when taking Vioxx. 360 F.Supp.2d 1352, 1354 (J.P.M.L. 2005).

underlying substance of the complaint. The Defendants conclude, under their contrived

test for commonality, that any "allegedly overlapping factual issues" are far outnumbered

by the unique allegations of the various kickback schemes and off-label marketing

claims." *See* Memorandum of Law in Support of Defendants' Motion to Vacate

Conditional Transfer Order 31, Page 9. Even a cursory examination of Judge Saris's

description of the marketing practices employed by the pharmaceutical defendants

demonstrates a striking overlap between the fraudulent marketing techniques utilized. *In*

*re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 69 (D.

Mass. 2005). West complains that Ortho engaged in

> ...illegal kickbacks and remuneration to medical providers in various
> forms, including but not limited to: (1) "grants" to hospitals to keep
> Levaquin on hospital formularies in place of less expensive antibiotics, (2)
> payments to high-prescribing physicians for 'research' studies that provide
> impose minimal obligations on the physician and provide no research of
> value to Ortho-McNeil, (3) valuable gifts including web site design and
> maintenance, and (4) improper gratuities including 'speaking' fees,
> 'research' grants, trips, dinners and golf outings.

*See* First Amended Complaint at ¶ 3.

These allegations are completely consistent with "hidden discounts, off-invoice

rebates, free samples, education grants and other promotional means" that Judge Saris

describes as the means through which the pharmaceutical defendants are alleged to have

sold their prescription drugs to retailers at a lower price than AWP. *In re Pharmaceutical*

*Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 69 (D. Mass. 2005). The

kickback schemes - that Defendants suggest create numerous issues unrelated to the

AWP MDL - are what Judge Saris describes as the gravamen of the AWP MDL.

West's off-label marketing allegation is a small subcomponent of his claim. That

these allegations may not factually overlap with those in the AWP MDL is not sufficient

to vacate transfer. "Transfer under <u>Section 1407</u> does not require a complete identity or

even majority of common factual issues as a prerequisite to transfer." *In re Zyprexa*

*Products Liability Litig.,* 314 F.Supp.2d 1380, 1381 (J.P.M.L. 2004); *In re Acacia Media*

*Technologies Corp. Patent Litig.,* 360 F.Supp.2d 1377, 1379 (J.P.M.L. 2005); *In re*

*Accutane Products Liability Ligit.,* 343 F.Supp.2d 1382, 1383 (J.P.M.L. 2004).

## II. <u>Transfer Will Promote The Just And Efficient Conduct of The Litigation</u>

### a. Transfer is Necessary to Avoid Duplication of Discovery

The Panel originally established the AWP MDL to "(1) avoiding duplication of

discovery, (2) preventing inconsistent or repetitive pretrial rulings; and (3) conserving the

resources of the parties, their counsel, and the judiciary." *In re Immunix Corp. Average*

*Wholesale Price Litigation,* 201 F.Supp.2d 1378, 1380 (J.P.M.L. 2002). The transfer of

West's case to the AWP MDL will serve all of these interests.

While discovery related to consumer class actions against J&J has closed,

discovery regarding claims asserted by the State of New York remains open. *See*

Memorandum of Law in Support of Defendants' Motion to Vacate Conditional Transfer

Order 31, Page 4. Judge Saris has presided over the AWP MDL since its inception and is

intimately familiar with the considerations surrounding the discovery issues of AWP

complaints. Judge Saris' knowledge of the cases and discovery makes her the best

member of the judiciary to preside over this matter and avoid unnecessary duplicative

discovery. For example on October 28, 2002 in Case Management Order No. 5 Judge

Saris ordered production of the following:

> b. <u>Other Legal Proceedings</u>: A copy of the set or sets of
> documents, if any, previously produced by a defendant in connection with
> any other legal proceeding not listed above (e.g., court proceedings,
> arbitrations) in which the defendant is or was alleged to have overstated

- 14 -

AWP, misstated AWP, manipulated the AWP or otherwise failed to account for certain costs (e.g., the costs of free samples, purported educational grants, gifts, rebates, offsets, etc.) in the AWP, for any drug manufactured by that defendant during the Class Period.

*See* AWP MDL Case Management Order No. 5 (Exhibit "D").

This is exactly the kind of document production that would be relevant in the West case. Judge Saris is aware of this order and the documents that were required to be produced whereas another member of the Judiciary would not be. Because Judge Saris is the only member of the judiciary familiar with the discovery orders that have been issued in the AWP MDL, sharing of discovery would not be sufficient to eliminate the substantial risk of duplicative discovery.

As previously noted, the transfer of *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc. and Hospira, Inc.* was finalized on July 28, 2006 - less than one month prior to West's notification of this Panel that he had a "tag along action." Discovery concerns were not an impediment to transfer in that case and should not be an impediment here. Transfer of West's case will not impede discovery in the AWP MDL and will minimize the risk of duplicative discovery.

### c. Transfer is Necessary to Avoid Inconsistent and Repetitive Rulings

Defendants argue there is no threat of inconsistent or repetitive pretrial rulings because (they contend) there is no factual overlap between West's case and the AWP MDL. As discussed earlier in this memo, factual issues overlap. Given the significant factual overlap between the West case and the AWP MDL there is significant risk of inconsistent and repetitive rulings. Judge Saris has issued numerous rulings in these matters to date and will continue to do so in her dual track system for handling these

cases. Judge Saris is in the best position, perhaps the only position, to ensure that inconsistent and repetitive rulings are avoided.

### d. Transfer will Conserve Resources

Defendants next argue that transfer will not conserve the resources of the parties, because the "primary locus of West's claims is Chicago". *See* Memorandum of Law in Support of Defendants' Motion to Vacate Conditional Transfer Order 31, Page 11. This argument wholly ignores the claims and allegations set forth in West's complaint.

West's allegations are not limited to conduct that occurred in Chicago, in fact he alleged that Ortho used "a combination of illegal cash incentives and kickbacks, as well as misrepresentations about the efficacy of these drugs," and thereby "improperly induced a large number of physicians across the country to prescribe these medications for patients who are insured by state and/or federal health programs including Medicare and Medicaid." *See* First Amended Complaint ¶ 2 (emphasis added). West noted in his complaint that Ortho maintained a nationwide marketing and sales force. *Id.* at ¶ 21. The conduct alleged in the Complaint is not limited to Chicago, nor is it limited to the State of Illinois. Depositions and actual testimony will be required of individuals from the nationwide marketing and sales force as well as health care providers all across the country to which Ortho was fraudulently marketing. Discovery will include documents and information from hospitals and physicians throughout the United States.

Transfer of West's case to the AWP MDL will promote the just and efficient conduct of the litigation. It is the only way to further the purpose of the transfer and consolidation of actions before Judge Saris by avoiding duplication of discovery, maintaining consistent pretrial rulings and conserving resources.

### e. Not all AWP MDL Cases are Close to Completion

Defendants also assert that Judge Saris is nearing completion of the AWP MDL cases and that the transfer of the West case will likely tax judicial resources inappropriately. This statement is belied by the recent transfer of *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc. and Hospira, Inc.* Additionally, as noted in Defendants' Memorandum of Law, discovery is not yet closed with respect to all the plaintiffs' cases in the AWP MDL. As transfers to and discovery in the AWP MDL continue, that the notion West's case would frustrate Judge Saris' progress is untenable.

Defendants also argue that Judge Saris will some how be distracted from the core claims of the AWP MDL by the numerous factual and legal issues unique to West's claims. As we discussed above, the only issue unique to West's claim is the off-label marketing portion which comprises only two pages of the complaint. The gravamen of the complaint is the illegal and fraudulent marketing schemes Ortho employed to increase market share while maintaining an artificially inflated AWP. These are the same illegal and fraudulent marketing schemes that Judge Saris describes as being the core of the claims at issue in the AWP MDL. To the extent that Judge Saris feels the off-label marketing impairs her ability to handle the core claims at issue in the AWP MDL or just feels it should more appropriately be handled elsewhere, she has the ability to remand that portion of the West case. As this Panel noted in establishing the AWP MDL, it was "confident in Judge Saris's ability to streamline pretrial proceedings in these actions, while concomitantly directing the appropriate resolution of all claims." *In re Immunex Corp. Average Wholesale Price Litig.*, 201 F.Supp.2d 1378, 1381 (J.P.M.L. 2002). The

Panel stated that if upon refinement of the issues it is determined that certain claims should be remanded prior to others, Judge Saris could make that determination and remand the action with minimum delay. *Id.*

### III.    West is Seeking Transfer for Judicial Economy

#### a.    Court Has Subject Matter Jurisdiction

Defendants point to the False Claims act under which West's claims have been asserted and argue that in saying his claims are based on the same conduct challenged in the AWP MDL cases, West is conceding that the court lacks subject matter jurisdiction. Defendants cite to 31 U.S.C. § 3730(e)(4)(A) which provides that courts lack subject matter jurisdiction to hear claims brought by private citizens that arise out of "allegations or transactions" that previously have been publicly disclosed. While their quoting of that statute is correct, they attempt to stretch the language into something far beyond what is meant.

Information in the public about other pharmaceutical companies that have engaged in fraudulent marketing practices in an effort to manipulate their AWP does not automatically mean that Ortho has engaged in that same behavior with respect to Levaquin and Ultram. West based his claim upon his own personal knowledge of the marketing activities conducted at Ortho. In a similar action involving Rite Aid the court determined that "public allegations of fraud on the part of specific pharmacy chains other that Rite Aide is not public disclosure of fraud at Rite Aid." *Friedman v. Rite Aid Corporation*, 152 F.Supp.2d 766, 770 (E.D. Penn. 2001). A similar result was reached in a case where Blue Cross Blue Shield of Florida sought to have a false claims case dismissed against them on the grounds that reports of Medicare fraud of this kind were

widespread. *Cooper v. Blue Cross Blue Shield of Florida, Inc.*, 19 F.3d 562, 566 (11th

Cir. 1994). The court in refusing to dismiss the relator's claim explained, "requiring that

allegations specific to a particular defendant be publicly [sic] disclosed before finding the

action potentially barred encourages private citizen involvement and increased the

chances that every instance of specific fraud will be revealed." *Id.*

  West came forth with allegations of a fraudulent marketing scheme utilized by

Ortho to increase market share for Levaquin and Utlram while keeping the AWP for

those products artificially inflated. The illegal marketing scheme designed to artificially

manipulate the AWP is the common factor that makes transfer of this case to the AWP

MDL proper. West coming forward with evidence demonstrating that <u>Ortho</u> engaged in

this practice with respect to <u>Levaquin and Ultram</u> is what affords West relator status with

respect to the claim and affords this court subject matter jurisdiction. As discussed

before, the names of the pharmaceutical defendants and the pharmaceutical products are

not what is important in determining if West's case should be transferred to the AWP

MDL.

###    b.  <u>West Has No Ulterior Purpose</u>

  Finally, Defendants would have the Panel consider ulterior purposes as a reason

to vacate Conditional Transfer Order 31. According to Defendants the reason West is

seeking transfer is that Judge Saris has issued an opinion that is "perceived" to be

favorable towards plaintiffs. *See* Memorandum of Law in Support of Defendants'

Motion to Vacate Conditional Transfer Order 31, Page 13. This argument fails to take

into account the fact that off-label marketing is a small portion of West's claim. It would

hardly make sense for West to seek transfer of his case based upon a "perceived"

favorable ruling in a matter that makes up a small portion of his overall claim. As this

Panel noted Judge Saris is capable of streamlining "pretrial proceedings in these actions,

while concomitantly directing the <u>appropriate</u> resolution of all claims." *In re Immunex*

*Corp. Average Wholesale Price Litig.*, 201 F.Supp.2d 1378, 1381 (J.P.M.L. 2002)

(emphasis added). The Panel noted that Judge Saris could certainly remand a matter is

she felt it was so warranted. *Id.* A "perceived" favorable ruling on an issue that

represents only a small portion of West's claim, is no basis for the Panel to vacate

Conditional Transfer Order 31.

### Conclusion

WHEREFORE, for the above reasons Plaintiff Relator requests that the Panel

deny Defendants Motion to Vacate Conditional Transfer Order 31.


October 30, 2006                           Respectfully Submitted,
                                           Edward West,



                                    By: _____
                                           One of His Attorneys


John A. Bruegger (JBruegger@simmonscooper.com)
SimmonsCooper LLC
707 Berkshire Blvd., P.O. Box 521
East Alton, Illinois 62024
(618) 259 - 2222 (phone)
(618) 259 - 2251 (fax)

**EXHIBIT 3**



# SimmonsCooper LLC
### Attorneys at Law

*From the Desk of*
*John A. Bruegger*
*Attorney at Law*
*Licensed in IL/MO*

August 22, 2006

Clerk of the Panel
Judicial Panel on MultiDistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, NE Room G-255 North Lobby
Washington, DC 20002-8004

     RE:    MDL-1456, In re Pharmacy Industry Average Wholesale Price Litigation
                Notification of a Tag-Along Action per Panel Rule 7.4

Dear Clerk:

This letter is to inform the Panel of a tag-along action to the above reference MDL,
pursuant to Panel Rule 7.4. My office is co-counsel for plaintiff in West v. Ortho-McNeil
Pharmaceutical, Inc., Case Number 03-C-8239, currently pending in the Northern District
of Illinois. A copy of the First Amended Complaint is enclosed for your review.

Mr. West's case is a qui tam action under the False Claims Act alleging that Defendants
Ortho-McNeil and Johnson & Johnson engaged in an illegal marketing scheme to
promote two of their prescription drugs, Ultram and Levaquin. This is a "tag along
action" per Panel Rule 1.1 because it involves common questions of fact with actions
previously transferred in this MDL pursuant to 28 U.S.C. 1407. Specifically, the initial
transfer order signed by Judge Hodges and dated April 30, 2002 states:

> ...the Panel finds that all actions in these four dockets involve common
> questions of fact concerning whether (either singly or as part of a
> conspiracy) the pharmaceutical defendants engaged in fraudulent
> marketing, sales and/or billing schemes by unlawfully inflating the
> average wholesale price of their Medicare covered prescription drugs in
> order to increase the sales of these drugs to health care professionals and
> thereby boost the pharmaceutical companies' profits. JPML Order dated
> April 30, 2002, page 3.



| Main Office | www.simmonscooper.com | Chicago Office | | Texas Office | |
|---|---|---|---|---|---|
| 707 Berkshire Blvd. | 800.479.9533 | 209 South LaSalle St. | 312.759.7500 | 103 North Sycamore | 866.574.2322 |
| P.O. Box 521 | 618.259.2222 | Suite 805 | 312.759.7516 Fax | P.O. Box 1640 | 940.574.2322 |
| East Alton, IL 62024 | 618.259.2251 Fax | Chicago, IL 60604 | | Archer City, TX 76351 | 940.574.2551 Fax |

JPML
RE: *West v. Ortho-McNeil*
August 22, 2006
Page 2

Mr. West's case involves the same common questions of fact as stated above.  He alleges
that Ortho-McNeil used fraudulent marketing and billing schemes to inflate the average
wholesale price that hospitals could charge to government programs, including Medicare
and Medicaid, including hidden kickbacks, "grants" and "speaker's fees".  He also alleges
that Ortho-McNeil sales representatives were instructed on how to advise the hospital to
hide rebates and to alter their billing methods on Levaquin in order to bill Medicare at a
higher AWP than they should have.  See, e.g., Amended Complaint paragraphs 67, 71,
72-77, 79-87.

Therefore, we are requesting the Panel issue a Conditional Transfer Order as soon as
possible transferring this case from the Northern District of Illinois to the pending MDL
in the District of Massachusetts.  Please contact me directly with any questions or
concerns.  Thank you for your cooperation.

Sincerely,

John A. Bruegger
Attorney at Law
JAB/mw

Enclosure

**EXHIBIT 4**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 0 2006

FILED
CLERK'S OFFICE

*DOCKET NO. 1456*

## *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION*

*United States ex rel. Edward West, et al. v. Ortho-McNeil Pharmaceutical, Inc., et al.,*
**N.D. Illinois, C.A. No. 1:03-8239**

## *BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR., KATHRYN H. VRATIL, DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL***

## *ORDER OF TRANSFER WITH SIMULTANEOUS SEPARATION AND REMAND*

Presently before the Panel is a motion by defendants Johnson & Johnson, Inc. (J&J) and Ortho-McNeil Pharmaceutical, Inc. (Ortho-McNeil), pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), to vacate the Panel's order conditionally transferring the action to the District of Massachusetts for inclusion in the Section 1407 proceedings occurring there in this docket. Plaintiffs favor inclusion of this action in MDL-1456 proceedings.

On the basis of the papers filed and hearing session held (without oral argument), the Panel finds that this action shares questions of fact with actions in this litigation previously transferred to the District of Massachusetts. Transfer of the action to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The Panel further finds that transfer of this action is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. In that order, the Panel held that the District of Massachusetts was a proper Section 1407 forum for actions relating to the alleged unlawful inflation of the average wholesale price (AWP) of prescription drugs by numerous pharmaceutical defendants. *See In re Pharmaceutical Industry Average Wholesale Price Litigation,* 201 F.Supp.2d 1378 (J.P.M.L. 2002).

---

\*   Judge Motz took no part in the decision of this matter.

\*\*   Panel members who could be members of the certified nationwide class in this litigation have renounced their participation in this class and have participated in this decision. Alternatively, to the extent that their disqualifications should be determined for any reason to survive the renunciations, the Panel invokes the "rule of necessity" in order to provide the forum created by the governing statute, 28 U.S.C. § 1407. *See In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation,* 170 F.Supp.2d 1356, 1357-58 (J.P.M.L. 2001).

- 2 -

The Panel is persuaded, however, that claims involving allegations relating to off-label marketing by J&J and Ortho-McNeil do not share sufficient questions of fact with claims in previously centralized MDL-1456 actions to warrant inclusion of these claims in MDL-1456 proceedings.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, this action is transferred to the District of Massachusetts and, with the consent of that court, assigned to the Honorable Patti B. Saris for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 1407(a), the claims related to off-label marketing are simultaneously separated and remanded to the Northern District of Illinois.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman