**EXHIBIT 5**

Westlaw.                                              NewsRoom

12/10/01 NLJ A15, (Col. 4)                                    Page 1
 12/10/01 Nat'l L.J. A15, (Col. 4)
(Publication page references are not available for this document.)


                       The National Law Journal
                          Volume 24, Number 15
            Copyright 2001 by The New York Law Publishing Company
                       The National Law Journal


                       Monday, December 10, 2001

                              Business
                            Drug Industry

                       SUITS CLAIM OVERPRICING

              CASES FILED IN A DOZEN COURTS IN A FEW WEEKS.

                        Joseph A. Slobodzian
                  Special to The National Law Journal

 CLASS-ACTION LAWYERS have begun filing suits on behalf of health insurance funds
and others, to recover money they say they lost to inflated drug prices engineered
by the pharmaceutical industry.

 The suits have been encouraged by congressional hearings, a Justice Department
investigation and an $875 million settlement in one case.

 In the last few weeks, proposed class actions have been filed in a dozen federal
courts from California to New York. The defendants include most major
pharmaceutical companies. The suits contend that the companies reaped hundreds of
millions in profits by building market share in select drugs using an inflated
"national average wholesale price."

 AWP, as it is commonly called, is the basis that the U.S. government and, by
extension, many health insurers have used since 1998 to reimburse medical providers
under Medicare for expensive, commonly used drugs.

 The government's source for drug AWPs has been such trade publications as the
"Blue Book," the "Red Book" and "Medispan"--all of which get data from the drug
manufacturers.

Price gap alleged

 Critics of the system contend that the official average wholesale prices now bear
little relation to the actual prices that drug companies charge private doctors,
hospitals and medical providers for non-Medicare patients.

 The lawsuits maintain that the AWP has become a tool to allow pharmaceutical
companies to build market share and a financial carrot to reward doctors who buy
and prescribe their drugs, at the expense of taxpayers and employee medical plans.

 Class action counsel say that November's burst of litigation is just the

         ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Publication page references are not available for this document.)**

beginning.

 "Next you're going to see the suits filed by the states over Medicaid. There are a
lot of levels of AWP lawsuits that are going to be filed," said Marc H. Edelson of
the Doylestown, Pa., firm of Hoffman & Edelson.

 Edelson's firm, joined by seven others around the United States, joined the wave
of litigation on Nov. 15 with a class action racketeering lawsuit against Abbott
Laboratories in the Northern District of Illinois on behalf of the Action Alliance
of Senior Citizens of Greater Philadelphia and the Chicago-based United Food and
Commercial Workers Union and Employers Midwest Health Benefits Fund.

 By the end of business the next day, with the filing of a suit in the Eastern
District of Pennsylvania on behalf of the same plaintiffs against GlaxoSmithKline
PLC, Edelson's legal network had filed nine class actions against drug companies in
federal courts in California, Illinois, Nevada, New Jersey and Washington.

 The individual defendant companies--Abbott, GlaxoSmithKline and Bristol-Myers
Squibb Co.--declined comment on the allegations raised in the complaints.

 During Congressional hearings last year, GlaxoSmithKline officials defended the
use of AWP and said their pricing practices were "fully within the law and always
have been." The company compared AWP to the sticker price of an automobile.

 A spokesman for the industry's leading trade group--the Pharmaceutical Research
and Manufacturers of America--said that the group does not comment on litigation
and has taken no stand on the AWP controversy.

Crossing the line?

 Many health plan administrators are sharply critical of the AWP practice.

 "Our participants are getting squeezed by these inflated prices," said William
Einhorn, administrator for the Teamsters Health & Welfare Fund of Philadelphia and
Vicinity, the plaintiff in a Nov. 19 class action filed against Bristol-Myers
Squibb in U.S. District Court for the Southern District of New York.

 "Everyone knows that medical costs are high enough without an unfair and
artificial pricing mechanism," Einhorn said.

 The Medicare program does not cover most prescription drugs. But the so-called
Part B of Medicare reimburses a doctor or medical provider 80% of the cost of
certain prescription drugs that cannot be self-administered (mostly cancer
chemotherapy), drugs administered using some type of covered "durable medical
equipment" and selected immunizations and self-administered drugs like blood-
clotting factors, some oral cancer drugs and immunosuppressive medications.

 Since 1998, the Part B reimbursement for covered drugs has been based on "the
lower of the actual charge on the Medicare claim for benefits, or 95% of the
national average wholesale price."

 Medicare then reimburses the doctor or medical provider 80% of the allowable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/10/01 NLJ A15, (Col. 4)
 12/10/01 Nat'l L.J. A15, (Col. 4)                          Page 3
(Publication page references are not available for this document.)

amount and the remainder is billed to the patient or Medicare beneficiary as the
"co-payment" or to fulfill the deductible.

 At some point, the lawsuits contend, the drug makers "realized that they could,
and in actuality did, directly control, manipulate and raise the AWP for covered
drugs at various times by simply forwarding to the--publications a new and higher
AWP."

 The result, alleges the Philadelphia suit against GlaxoSmithKline, is that
Medicare pays prices "substantially higher than the prices [GlaxoSmithKline]
charges private sector purchasers."

 Jeffrey L. Kodroff of the Philadelphia firm Spector, Roseman & Kodroff, which
filed the Nov. 19 suit in New York against Bristol-Myers Squibb, called the current
system the result of "simplicity and politics."

 It was easier for the government to adopt the drug industry's suggested wholesale
prices than research wholesale prices on its own, especially in the face of heavy
lobbying from drug makers and American physicians.

 At stake is big money. Last year, for example, a report by the U.S. Office of the
Inspector General found Medicare reimbursements for the 24 leading drugs were $887
million more than actual wholesale prices the pharmaceutical firms charged
physicians and medical providers.

 Based on standard co-payments and deductibles, the lawsuit says, consumers and
third-party payers would have paid $175 million less had Medicare reimbursements
been based on actual wholesale prices.

'The spread'

 Last year's Inspector General's report said that the practice is especially
lucrative to physicians for whom Medicare-reimbursable drugs are heavily used in
their practices. Among medical professionals, it's known as "the spread"--the
difference between the actual wholesale price the drug firms charge doctors and the
wholesale price accepted by Medicare for reimbursement purposes.

 The Inspector General's report, for example, cited the example of an oncologist
who pays the manufacturer $2.75 for 50 milligrams of leucovorin calcium, but gets
reimbursed $17.52 by Medicare based on the inflated AWP for the drug.

 The lawsuits seek the creation of a trust fund from the drug industry's purported
overcharges that would be distributed to class members.

 The incentive is equally attractive for class action lawyers. Earlier this year,
TAP Pharmaceuticals, which is half-owned by Abbott Laboratories, pleaded guilty and
agreed to pay $875 million in criminal and civil penalties for Medicare and
Medicaid overcharges allegedly involving its anticancer drug Lupron. The guilty
plea was the resulted of a Justice Department investigation triggered by a
"whistleblower complaint" under the federal False Claims Act.

 Since then, the U.S. attorney's office in Boston has reportedly initiated AWP

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/10/01 NLJ A15, (Col. 4)                                    Page 4
 12/10/01 Nat'l L.J. A15, (Col. 4)
(Publication page references are not available for this document.)

probes against 20 drug companies and GlaxoSmithKline has confirmed that it has
received subpoenas from the U.S. attorney in Boston, the U.S. Justice Department
and state prosecutors in Texas, California and Nevada, all involving drug-pricing
issues. AstraZeneca has publicly acknowledged it is cooperating with federal
prosecutors in Wilmington, Del., on the same issue.

 Shortly after TAP's guilty plea, Kodroff's firm filed the first private lawsuit
against the pharmaceutical firm seeking reimbursement for senior citizens who were
purportedly overcharged through Medicare Part B reimbursements for Lupron therapy.
Kodroff acknowledged that DOJ's settlement with TAP Pharmaceuticals underscored the
importance of pursuing AWP-based class-action cases.

Spurred by unions

 But the real incentive was provided by officials of the union health and welfare
funds his law firm represents, who last year became increasingly concerned as the
U.S. House Commerce Committee, chaired by Rep. Tom Bliley, R-Va., focused on the
disparity between the AWP relied on by Medicare and the actual wholesale price
charged to medical providers by the drug firms.

 Kodroff noted that the U.S. Department of Veterans Affairs pays far lower prices
than Medicare for the same drugs because it purchases the drugs through competitive
bidding.

 "It's a classic case of the left hand not knowing what the right hand is doing,"
Kodroff said. "The great irony is that the current system is counterintuitive to
everything we learned about economics. To increase demand, the government is
increasing prices."

 Comparing drug prices

| Drug | Actual Wholesale Price | Reported Average Wholesale Price |
|------|------------------------|----------------------------------|
| Ondansetron (Zofran) | $4.33 | $5.31 |
| Granisetron (Kytril) | $123.58 | $132.80 |
| Leucovorin | $2.75 | $17.52 |
| Blenoxane | $155 | $304.60 |

 Source: Office of Inspector General, General Accounting Office and U.S. House
Commerce Committee.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

12/21/01 BOSTONG C1

NewsRoom

Page 1

12/21/01 Boston Globe C1
2001 WLNR 2262099

Boston Globe (MA)
Copyright (c) 2001, Globe Newspaper Company

December 21, 2001

Section: Business

LAWSUIT TARGETS 28 DRUG MAKERS HUB GROUP SAYS FIRMS MANIPULATE PRICES, VIOLATE
STATE, US LAWS GROUP SUES 28 DRUG FIRMS, ALLEGING PRICE MANIPULATION

Liz Kowalczyk, Globe Staff

A Boston-based consumer coalition sued 28 pharmaceutical companies, claiming that
they sell doctors deeply discounted drugs to promote use of their products - and
then encouraged the doctors to bill consumers and the federal government for the
full price of the medications.

The group, called the Prescription Access Litigation project, said in its
lawsuit filed Wednesday in US District Court in Massachusetts that drug companies
are engaging in industrywide manipulation of drug prices in violation of federal
and state antitrust laws, consumer protection laws, and racketeering statutes.

The PAL project, which has enlisted class-action attorneys who handled the
ground-breaking lawsuits against tobacco companies, began bringing a series of
class-action lawsuits against drug companies in April to challenge the prices of
dozens of drugs.

It's the first time consumer groups have banded together to sue pharmaceutical
firms. But the issue the group raises in its latest lawsuit - how drug companies
charge the federal Medicare program and the elderly for their products - is the
subject of a wide range of criminal investigations, congressional hearings, and
federal reports. Several contacted yesterday - including American Home Products and
Schering-Plough, which are named in the lawsuit - and the Washington, D.C.,
organization that represents drug companies said they could not comment on pending
litigation.

PAL lead attorney Thomas M. Sobol of Boston said that while Congress and federal
agencies have investigated drug pricing there has been little action, leading the
consumer group to try to force changes through the courts. Congress is currently
working on developing a new system for determining how much the Medicare program
pays doctors, hospitals, and pharmacists for drugs.

"Our primary goal is to change the system," said attorney Stephen Rosenfeld of
Boston. "It's not going to happen overnight. Back in 1994, people said successful

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

litigation against the tobacco companies would not happen in our lifetime. In fact, it did."

The lawsuit focuses on alleged manipulation of something called the Average Wholesale Price (AWP), the price that drug companies tell Medicare they sell their products for to retailers in the marketplace. Medicare does not cover most prescription drugs for its enrollees, but it does cover some medications that are administered by health care providers, certain vaccines, and cancer and immunosuppressant therapy. American Home Products' Ativan, used to treat seizures and anxiety, is covered by Medicare, as is Schering-Plough's Garamycin for eye infections.

Since Medicare is a government health insurance program for the elderly, drug companies are required to give the program a price break on drugs by charging 95 percent of the AWP.  Elderly Americans enrolled in Medicare generally pay 20 percent of the cost of covered drugs.

Sobol and Rosenfeld said that the AWP drug companies report is inflated because they actually sell the drugs to health care providers at  discounts - most commonly 13 to 34 percent but swelling to 85 percent on occasion - to encourage use of their products and not those made by competitors. The companies also offer rebates to doctors and encourage them to bill Medicare for free samples, the attorneys said.

None of these price breaks are passed on to Medicare or to consumers, they said. According to a 1997 report from the Office of the Inspector General, Medicare's reimbursement for 22 drugs studied was $447 million more than the actual wholesale price.

In the most recent case of illegal drug company influence over doctors and AWP manipulation, the federal government brought criminal and civil charges against TAP Pharmaceuticals, a joint venture of Abbott Laboratories and Takeda Pharmaceuticals. The government charged that the company gave doctors ski trips and VCRs to prescribe its prostate cancer drug Lupron, and sold the drug to them at prices far lower than the AWP it reported to Medicare. In October, TAP agreed to pay $875 million, the largest penalty ever levied against a health care company.

Schering-Plough spokesman William O'Donnell said the company couldn't comment on the lawsuit but added that it "believes its actions were legal and proper." Jeff Trewhitt, spokesman for the Pharmaceutical Research and Manufacturers of America, said that the organization cannot gather information about company pricing because of antitrust laws.

Frank Fortin, spokesman for the Massachusetts Medical Society, which represents the state's physicians, said the group has a policy against doctors accepting rebates in return for prescribing drugs, or billing Medicare for free samples. He said he did not know if there is a policy against doctors paying a discounted price for drugs and then receiving a higher reimbursement payment from Medicare. But he said Massachusetts law prohibits doctors from dispensing most drugs from their offices, with some exceptions, including cancer drugs.

Liz Kowalczyk can be reached by e-mail at kowalczyk@globe.com.

TYPE: ECO

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                                    The New York Times

4/11/02 NYT C1                                             Page 1

4/11/02 N.Y. Times C1
2002 WLNR 4028991

New York Times (NY)
Copyright (c) 2002 The New York Times. All rights reserved.

April 11, 2002

Section: C

Methods Used For Marketing Arthritis Drug Are Under Fire

MELODY PETERSEN

Centocor, subsidiary of Johnson & Johnson, has been providing doctors with
marketing materials that describe how they can make extra money by prescribing
expensive rheumatoid arthritis drug called Remicade, practice that health care
fraud experts say may be illegal; document once available to doctors on Centocor's
Web site stated that included worksheet where physicians could calculate their
'estimated revenue per patient' from prescribing drug; worksheet stated 'revenue'
was primarily difference between what Medicare pays doctors for drug and lower
amount that Centocor charged doctors for drug; drug is one of few rheumatoid
arthritis treatments that Medicare covers; Centocor says company does not talk
about profitability and how physicians can make money; Dr Paul April says other
doctors have told him that Centocor representatives invited them to meeting where
they could learn about how they could profit from Remicade (M)

Centocor, a subsidiary of Johnson & Johnson, has been providing doctors with
marketing materials that describe how they can make extra money by prescribing a
new drug, a practice that health care fraud experts say may be illegal.

Some doctors have recently raised concerns about Centocor's marketing of the new
drug, Remicade, an expensive treatment for rheumatoid arthritis.

"We need to utilize these medicines based on their merits and not on their profit
potential," said Dr. Arthur Weaver, a clinical professor of medicine at the
University of Nebraska Medical Center and past president of the American College of
Rheumatology.

A document available to doctors on Centocor's Web site until last week, when a
reporter asked about it, stated that one "benefit" of prescribing Remicade was the
"financial impact" on the physician's practice. The document included a worksheet
where physicians could calculate their "estimated revenue per patient" from
prescribing the drug.

The "revenue," according to the worksheet, was primarily the difference between
what Medicare pays doctors for Remicade, which is given intravenously in their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

offices, and the lower amount that Centocor charged doctors for the drug. The drug is one of the few rheumatoid arthritis treatments that Medicare covers.

Legal experts say the document described a marketing practice similar to ones found to be illegal when used by other companies and that remain a focus of federal health care fraud investigators.

In one of those cases, federal prosecutors said that Tap Pharmaceutical Products had illegally promoted Lupron, a drug often prescribed for prostate cancer, by telling doctors they could make money through Medicare and Medicaid reimbursements for the drug. Tap agreed to pay $875 million last year to settle criminal and civil charges in that case, the largest sum ever paid for health care fraud.

Rick D. Anderson, vice president of Centocor's immunology business, who is responsible for Remicade's marketing, said the marketing document was outdated and had been inadvertently left on the Web site. Centocor stopped using the document in 2000, he said, after reviewing all its marketing materials to make sure they complied with Johnson & Johnson's policies.

Johnson & Johnson acquired Centocor in October 1999.

"Our policy is black and white," Mr. Anderson said. "We do not talk about profitability and how physicians can make money."

Dr. Paul April, a rheumatologist in Tulsa, Okla., said that other doctors have told him that Centocor representatives had invited them to meetings where they could learn about how they could profit from Remicade. He said that the rheumatology field is now abuzz with discussion of the money to be made.

Centocor says that its representatives have been trained to avoid any talk about the incomes of doctors and that it is not aware of such meetings. "Our policy is clear and concise in what we expect from employees," Mr. Anderson said.

Dr. April said he believed that some doctors were prescribing Remicade, which can cost more than $20,000 a year, before they tried a low-cost generic drug called methotrexate, a standard treatment for rheumatoid arthritis. He said some doctors were also choosing Remicade over Enbrel, a similar new medicine that is also expensive, because of the extra money they could make.

Doctors are also motivated to prescribe Remicade, Dr. April said, to help their elderly patients afford an effective medicine since it is covered by Medicare and similar drugs are not.

American College of Rheumatology guidelines suggest that doctors prescribe Remicade or Enbrel only after patients have not responded to methotrexate, or have shown they cannot tolerate it.

Both Remicade and Enbrel, made by Immunex in a marketing partnership with Wyeth, have been shown in studies to offer quick help to people with serious rheumatoid arthritis. The disease, a chronic inflammatory disorder that harms the joints, can cause serious pain and crippling harm. But both drugs have side effects, including an increased risk of serious, life-threatening infections.

"Remicade is a good drug," Dr. April said, "but it is being overused because there

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/11/02 NYT C1                                                         Page 3

is money to be made by using it."

Medicare pays only for drugs that must be administered by a physician. Of drugs for
rheumatoid arthritis, Remicade is one of very few covered by Medicare because it
must be given intravenously. Enbrel, also a biologically engineered medicine, can
be injected by patients themselves and is not covered. Most of the other drugs for
rheumatoid arthritis are taken orally.

Remicade and Enbrel, which were approved in 1998, are in a heated marketing battle.
Sales of both drugs have risen rapidly since they were approved in 1998, but Enbrel
has been outselling Remicade. Now Remicade is gaining ground.

Sales of Remicade were $658 million last year, more than double the $256 million in
sales in 2000, according to NDCHealth, a health care information company. Sales of
Enbrel were $907 million last year, up almost 18 percent from $770 million in 2000.

Kathleen McDermott, a former assistant United States attorney who works at Blank
Rome Comisky & McCauley law firm, said Centocor's marketing statements in the Web
site document could invite scrutiny from federal health care fraud investigators.
"Are doctors only going to prescribe what benefits their pocketbook, or will they
prescribe what benefits the patient?" she said. "That is the core issue."

Thomas M. Sobol, a lawyer at Lieff Cabraser Heimann & Bernstein, said Centocor's
document described a practice very similar to that used by Tap Pharmaceutical
Products in marketing Lupron.

According to court documents, Tap urged doctors to prescribe Lupron so that they
could benefit from the "spread" -- the difference between the Medicare
reimbursement and what doctors paid for the drug.

Medicare is supposed to receive a discount on the prices that pharmaceutical
companies charge other customers. Medicare, therefore, reimburses doctors for drugs
at 95 percent of what is called the average wholesale price. But investigators have
found that some companies have inflated the average prices reported to the
government so that Medicare reimbursements are higher than what the companies most
often charge.

"Centocor appears to be engaging in the same unlawful marketing of the spread that
TAP did with Lupron," Mr. Sobol said. "This has been an issue of numerous federal
and state investigations and private lawsuits."

Mr. Sobol has filed a lawsuit on behalf of a coalition of consumer groups against
more than two dozen drug makers that had been identified by federal investigators
as using this price spread to market their drugs. Remicade is not part of the suit.

According to the federal government, Medicare's payments for Remicade skyrocketed
last year. Medicare paid at least $141 million for Remicade last year -- almost
three times the $48 million the government paid for the drug in 2000.

                    ---- INDEX REFERENCES ----

COMPANY: NDCHEALTH CORP; CENTOCOR INC; WYETH; JOHNSON AND JOHNSON

NEWS SUBJECT:  (Business Management (1BU42); Social Issues (1SO05); Health & Family

         ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

6/8/02 ECONOMIST (No Page)

6/8/02 Economist (Pg. Unavail. Online)
2002 WLNR 10445368

Economist
Copyright © 2004 Economist Intelligence Unit. All rights reserved.

June 8, 2002

Pharmaceuticals: Courting trouble

(c) 2002 The Economist Intelligence Unit Ltd.

This is not the first time that the attorneys-general have taken on the pharmaceutical industry. Last December, many of the same states launched a joint suit, also against Bristol-Myers Squibb, alleging that the firm had illegally spun out its patent protection, and raked in excessive profits, from another drug, BuSpar.

Earlier this year, Nevada and Montana separately sued a clutch of pharmaceutical companies for misrepresenting the "average wholesale price" (AWP) for their products--the price that government-financed health-insurance programmes, such as Medicare and Medicaid, use to reimburse doctors prescribing for their members. The states claim that drug companies have been buying physicians' favour by selling their products at a discount to the declared AWP, allowing the doctors to pocket the difference.

States are up in arms about drug prices because they are increasingly out of pocket from covering them. Ohio, which is leading the charge on Taxol, expects its drug bill to rise by 18% this year; in 2000 the state spent $878m, roughly a tenth of its Medicaid budget, on pharmaceuticals. As well as their solidarity in the courts, at least 35 states have banded together to form a task-force to look into drug-pricing issues.

ENC608AE.GIF

They are not the only coalition fighting the drug makers. The Prescription Access Litigation project, a collection of 80 consumer and patient-advocacy groups, is suing a dozen firms, including Johnson & Johnson and Schering-Plough, for a variety of tactics that they say unfairly drive up drug costs.

Drug companies are well used to class-action suits over product liability. Grassroots litigation over product pricing, on the other hand, is a troublesome novelty. Ahaviah Glaser, director of the Prescription Access Litigation project, says that consumers are tired of waiting for legislators to make drugs more accessible, and have simply taken matters into their own hands.

With waves of blockbuster drugs going off patent, and problems over getting their successors to market, tough questions about prices are the last thing drug

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/8/02 ECONOMIST (No Page)                                            Page 2

companies want. But they should not feel uniquely cursed. As Nancy Myers of Lehman Brothers points out, the lawyers who have drug makers in their sights have already challenged the tobacco and managed-care industries. Judging by the hard talk on both sides, peace is unlikely any time soon.

The industry faces a wave of litigation over drug prices

AMONG the side-effects of Taxol, a drug used to treat cancer, are hypersensitive American states. On June 4th, 29 state attorneys-general sued Bristol-Myers Squibb, the drug's manufacturer, for "fraudulently securing patents that had no legal validity" on the drug, thereby preventing generic competitors from entering the market and lowering prices for consumers.

---- INDEX REFERENCES ----

COMPANY: BRISTOL MYERS SQUIBB CO; SCHERING PLOUGH CORP; JOHNSON AND JOHNSON

NEWS SUBJECT:  (Business Lawsuits & Settlements (1BU19); Business Litigation (1BU04); Social Welfare (1SO83); Legal (1LE33); Social Issues (1SO05); Technology Law (1TE30); Government Litigation (1GO18); Major Corporations (1MA93))

INDUSTRY:  (Pharmaceuticals Cost-Benefits (1PH30); Pharmaceuticals & Biotechnology (1PH13); Manufacturing (1MA74))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (BRISTOL; JOHNSON JOHNSON; MEDICARE; MYERS SQUIBB; NEVADA; OHIO; PRESCRIPTION ACCESS LITIGATION; SCHERING PLOUGH; LTD (THE))  (Ahaviah Glaser; Courting; Grassroots; Medicaid; Montana; Pharmaceuticals)

Word Count: 571
6/8/02 ECONOMIST (No Page)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                                        NewsRoom

6/26/02 PHILA-INQ C03                                             Page 1


6/26/02 Phila. Inquirer C03
2002 WLNR 2876672

                         Philadelphia Inquirer (PA)
                  Copyright Philadelphia Newspapers Inc. 2002

                              June 26, 2002


                            Section: BUSINESS



                         Business News in Brief

                Compiled from staff reports, the Associated Press,
                 Bloomberg News, Reuters, and other wire services

In the Region

    HP not yet decided about fate of Mount Laurel unit

    The fate of the Mount Laurel software division of computer giant Hewlett-Packard
Co. has not yet been determined, even though HP may not continue to market those
products. Yesterday, BEA Systems Inc., a San Jose, Calif., company that makes
similar software products, announced a marketing agreement with HP. Hewlett-Packard
recently confirmed that it was reviewing options for its Mount Laurel unit, the
former Bluestone Software Inc. The options include selling or closing the unit,
which employed about 300 in Mount Laurel and Lester, Pa., at the time HP acquired
the business in January 2001. HP would not disclose current employment for the
software unit. The company had indicated that a plan for the local division would
be unveiled at the end of the month, but an exact date has not been set.

    Japanese firm to pay $40 million in Exton patent suit

    Mattson Technology Inc., Fremont, Calif., said it settled a patent-infringement
lawsuit with a Japanese company for $40 million in past damages plus future
royalties. CFM Technologies, an Exton manufacturer of semiconductor processing
machinery, accused Dainippon Screen Manufacturing Co. Ltd. of illegally using a CFM
processing technique. Mattson acquired CFM in January 2001. Woodcock & Washburn
L.L.P., Philadelphia, represented CFM and persuaded a San Jose jury to find in its
favor in March. The settlement of the five-year litigation includes the monetary
damages and an agreement for both parties to drop outstanding suits against each
other.

    Pa. lends two Phila. manufacturers $712,000 to expand

    Two Philadelphia manufacturers received $712,000 in state-subsidized loans to
help expand operations and create 29 jobs, the Pennsylvania Industrial Development
Authority said yesterday. Metal Stock Inc., which cuts, burns and distributes metal

             ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products, borrowed $400,000 to buy and renovate a 43,710-square-foot building on Cottman Avenue near Interstate 95. Tri-County Sheet Metal Inc. borrowed $312,000 to buy and renovate a 20,000-square-foot building on Sandmeyer Lane in Northeast Philadelphia. Tri-County designs and manufactures sheet-metal products and installs HVAC systems. The loans have a 15-year term and carry a 3 percent interest rate.

SPS Technologies gets $130 million revolving-credit loan

SPS Technologies Inc., Jenkintown, said it had agreed to a $130 million, three-year revolving-credit facility. SPS said it would use the loan to refinance borrowings under an expiring credit agreement and for general corporate purposes. SPS's products include specialty metals and aerospace structures.

Drugmaker accused of bribing doctors to sell product

Johnson & Johnson is accused in a lawsuit of boosting demand for the arthritis drug Remicade by bribing doctors and encouraging them to seek inflated Medicare reimbursement. The suit says the drugmaker lists the published average wholesale price of Remicade as $666 per vial, while charging doctors "substantially less." Because Medicare relies on the published price to reimburse doctors, they pocket large profits, the suit alleges. Johnson & Johnson marketed this profit potential to doctors to induce them to prescribe the drug more, says the suit, filed Friday in federal court in Newark, N.J., by United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund; New Jersey Citizen Action, a watchdog group; and United Senior Action of Indiana Inc. Johnson & Johnson and its Centocor Inc. unit, Malvern, also paid unspecified illegal bribes and kickbacks to doctors to induce them to prescribe Remicade, the suit says. A spokesman for Centocor, Ron Schmid, said he could not comment on pending litigation. A spokeswoman for Johnson & Johnson referred a call to Schmid.

DuPont anticipates boost in quarter's operating earnings

DuPont Co., Wilmington, said yesterday that higher sales in many of its businesses would boost second-quarter operating earnings per share to between 64 cents and 67 cents per share, up to 22 percent higher than its previous estimate of 55 cents. During the same period last year, DuPont reported earnings of 41 cents per share on a comparable basis. The diversified chemical maker also said it would take a charge against earnings in the quarter to write down a portion of its $2.9 billion in goodwill, associated primarily with the 1999 purchase of Pioneer Hi-Bred International Inc. DuPont said it would report results July 24.

MBNA promotes Hammonds to CEO of subsidiary

MBNA Corp., Wilmington, promoted chief operating officer Bruce L. Hammonds to chief executive officer of its MBNA America Bank credit-card subsidiary. Chief marketing officer John R. Cochran 3d was named chief operating officer of the bank. Bank founder Charles M. Cawley has stepped back from day-to-day bank operations, but he will remain president of MBNA Corp., focusing on strategy and European expansion.

E-book publisher reports $26 million loss for fiscal year

Franklin Electronic Publishers Inc., Burlington, reported a loss of $26.6 million, or $3.38 per share, for its fiscal year ended March 31. That compared with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

net income of $914,000, or 11 cents, for the prior year. The company, which makes handheld electronic books, attributed this year's losses to noncash charges and inventory write-downs on some of its products. Franklin also said it took a $1 million charge for the restructuring of its European operations. Last year, the company slashed 20 percent of its workforce, and now employs 220 worldwide. It could not say how many jobs were eliminated at its headquarters in Burlington.

Elsewhere

Arthur Andersen lawyers want felony conviction tossed

Lawyers for Arthur Andersen L.L.P. have asked a federal judge to throw out the firm's felony conviction for shredding and doctoring Enron Corp.-related documents last year. Lead lawyer Rusty Hardin filed a request late Tuesday that U.S. District Judge Melinda Harmon either toss out the jury's verdict or grant Andersen a new trial. The filing called the guilty verdict "insupportable" and said the firm was convicted of obstruction of justice on the basis of "conduct that was not criminal."

Pols jockey as $5.95 trillion debt limit looms

The Treasury Department put off a planned debt auction yesterday, and President Bush urged Congress to increase the government's ability to borrow, saying action was essential "as we fight for freedom" against terrorism. House Democratic Leader Dick Gephardt said members of his party were eager to cooperate - if GOP leaders agree to a campaign-season series of votes on the broader issues of taxes, spending, and borrowing from Social Security trust funds. The political jockeying came amid estimates that the current debt limit of $5.95 trillion would probably be reached on Friday. While that would prevent further borrowing, officials said Treasury Secretary Paul O'Neill had other measures at his disposal that could prevent a government default for an unspecified period.

Antitrust suits against AstraZeneca are dismissed

AstraZeneca P.L.C. persuaded a federal judge to dismiss two antitrust lawsuits filed by consumers who accused the drugmaker of filing patent-infringement claims to block generic competition to Prilosec. U.S. District Judge Jed Rakoff said the plaintiffs failed to prove that AstraZeneca's suits against 10 generic-drug-makers were "sham" litigation designed to thwart competition to the heartburn drug. AstraZeneca's U.S. headquarters is in Wilmington.

Bush postpones IRS plan to tax stock options

Under pressure from Congress and corporate boardrooms, the Bush administration decided to postpone indefinitely an IRS plan to begin collecting Social Security taxes on two popular types of stock options. The move announced by the Treasury Department drew immediate praise from industry groups that contend the proposed 15.3 percent payroll tax would wreak havoc on incentive stock options and employee stock-purchase plans.

---- INDEX REFERENCES ----

COMPANY: CENTOCOR INC; DAINIPPON SCREEN MANUFACTURING CO LTD; EI DU PONT DE NEMOURS AND CO; HEWLETT PACKARD CO; BEA SYSTEMS INC; ASTRAZENECA PLC; BLUESTONE SOFTWARE

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                                      NewsRoom

6/30/02 MEDMKTMED 70                                          Page 1


6/30/02 Med. Mkt. & Media 70
2002 WLNR 5246801

                    MEDICAL MARKETING & MEDIA
        Copyright © 2004 ProQuest Information and Learning. All rights reserved.

                            June 30, 2002

                          Volume 37; Issue 6

             Using litigation to regulate drug prices: The assault on    AWP

                          Spears, James M

 A "sleeper" issue hangs over the Rx industry. The TAP/Lupron settlement with the
government opened up the contentious subject of "average wholesale price" (AWP) -
the actual cost of Medicare Part B drugs to providers and what they charge Medicare
and other insurance carriers. With lawsuits on the horizon, one article, authored
by knowledgeable beltway attorneys, presents a suggested industry defense to these
suits, and, in a companion piece, MM&M comments on the charges brought in a
representative legal action.

or the past several years, federal healthcare agencies have been engaged in a
smoldering dispute over whether the average wholesale price (AWP) or "sticker"
price for pharmaceutical products should be used in reimbursement formulas under
Medicare Part B. In the late 1990s, healthcare reformers sought to replace AWP--
based reimbursement with alternative formulae tied more directly to actual
acquisition costs. President Clinton's 1998 budget contained that specific
proposal. However, Congress rejected the president's proposal, electing to maintain
AWP-based reimbursement, although at a reduced (95 percent) rate.

Yet the campaign against AWP-based reimbursement for Medicare at the Department of
Health and Human Services (HHS) continues unabated. In the fall of 2001, the stakes
in the dispute were raised considerably in the settlement of a case (United States
v. TAP Pharmaceutical Products Inc.) that principally alleged "garden variety
fraud." In that settlement, the Justice Department and the Office of Inspector
General (OIG) suggested that establishing or maintaining a "spread" between AWPs
and the actual prices providers pay to acquire pharmaceutical products, could
provide grounds for a False Claims Act (FCA) case against the pharmaceutical
manufacturer. That settlement has now triggered an avalanche of class action cases
and suits by state attorneys general - all based on the idea that listing an AWP
that is higher than the actual price providers pay for the pharmaceutical product
constitutes a fraud against the United States, specific states, third-party payors,
and/or consumers.

This theory is fatally flawed for numerous reasons. Among others, it ignores the
history of AWP-based reimbursement and disregards that federal and state officials
have been aware for years that AWPs are "sticker" prices. State and federal
officials have also long been aware that "spreads" existed between AWPs and actual

       ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

acquisition prices and, in fact, they have been admonished by HHS not to rely on AWPs as the actual acquisition costs. More fundamentally however, this theory of liability cannot be reconciled with Congress' clear and unambiguous decision to maintain AWP-based reimbursement for Medicare Part B. As a result of this extraordinarily broad articulation of liability, pharmaceutical companies that did nothing more than comply with the standards articulated by Congress and HHS now find themselves defending multi-million dollar lawsuits in which they are charged with committing fraud.

This article explores these issues and demonstrates that the broad theory of AWP-based liability articulated in the TAP settlement is unfounded in law and fact. It will also briefly review the flurry of cases filed in the wake of the flawed TAP settlement to demonstrate how this broad theory of AWP liability exposes the pharmaceutical industry to billions of dollars of potential liability and threatens to erode HHS' and Congress' authority to set policy in this critical area.

AWP - the "sticker price" for pharmaceuticals

Although the federal Medicare program does not normally pay the cost for prescription pharmaceutical products, Medicare Part B allows for payment for certain "covered drugs" that are administered by a physician or HMO or certain self-administered drugs relating to cancer or immunosuppressant therapy. Under currently applicable federal regulations, physicians and HMOs are typically reimbursed at the rate of 95 percent of the "average wholesale price" or "AWP" for drugs that they prescribe and dispense to their patients.

For more than 30 years, AWP has been viewed by both industry and government not as an actual price for any product but, like the "sticker price" for automobiles, as an "asking" price for pharmaceutical products. Periodically, each pharmaceutical company issues a wholesale price list for its drug portfolio. The AWP for each price is either suggested by the manufacturer or calculated by one of the commercial price reporting companies, such as the Red Book or Medispan, by applying a percentage increase to the price list values. The AWPs for these prescription pharmaceutical products are then published by the commercial price reporting companies.

The adjusted wholesale price has long been recognized by both the regulators and the regulated industry as a "sticker price," and not the actual price at which providers may acquire drugs from wholesalers or distributors. As early as 1968, a report of the Task Force on Prescription Drugs of the Department of Health Education and Welfare CHEW," the predecessor agency to HHS), noted that "wholesalers, retailers, hospitals, and government agencies often pay markedly different prices for the same drug and dosage form," and that "the Red Book and the Blue Book do not reflect the actual manufacturers' prices to wholesalers and retailers. ... The catalog price constitutes an "umbrella" beneath which the company can maneuver against competing products."

When, in 1974, HEW sought to place limits on Medicaid payments for multiple source drugs, including drugs provided by physicians, HEW observed that "Red Book data, Blue Book data ... and other standard prices ... were frequently in excess of actual acquisition cost." In December 1977, the Healthcare Financing Administration (HCFA) admonished states as they were setting reimbursement rates not to rely on AWP as an accurate reflection of actual cost, observing that "the Department is not convinced that those states which continue to reimburse at average wholesale price

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/30/02 MEDMKTMED 70                                               Page 3

or wholesale invoice cost have made a real effort to approach actual acquisition
cost." Thus, almost 25 years ago, HHS was disabusing states of the notion that AWP
approximated or even "approached" actual transaction costs.

Indeed, by the 1990s, the fact that AWP exceeded actual transaction costs was so
much a part of the system that HCFA warned states that they could not rely upon AWP
to calculate the estimated acquisition cost - the estimate of the price generally
and currently paid by pharmacists for the drug product - of pharmaceuticals for
Medicaid reimbursement unless AWP was significantly discounted. Indeed, OIG itself
compared AWPs and actual costs to physicians of chemotherapy drugs in 1992 and
concluded that the difference or "spread" between AWP and actual cost varied from
12 to 83 percent. As the report noted, "there is no single discount rate which can
be applied to the AWP to provide a reasonably consistent estimate of the
physician's acquisition cost." In December 1997, OIG issued a report entitled
"Excessive Medicare Payments for Prescription Drugs," which concluded "Medicare and
its beneficiaries are making excessive payments for prescription drugs. The
published AWPs that are currently being used by Medicare-contracted carriers to
determine reimbursement bear little or no resemblance to actual wholesale prices
that are available to the physician and supplier communities that bill for these
drugs."

Indeed, that AWP reflects nothing more than the "sticker" price for pharmaceuticals
was a fact that was often exploited. The belief that this practice was not unlawful
is perhaps best reflected in a radio address that President Clinton made to the
nation in 1997 in which he remarked: "Sometimes the waste and abuse aren't even
illegal, they're just embedded in the practices of the system. Last week, the
Department of Health and Human Services confirmed that our Medicare program has
been systematically overpaying doctors and clinics for prescription drugs -
overpayments that cost taxpayers hundreds of millions of dollars. ... Now, these
overpayments occur because Medicare reimburses doctors according to the published
average wholesale price - the so-called sticker price - for drugs. Few doctors,
however, actually pay the full sticker price. In fact, some pay just one tenth of
the published price."

HHS stabs at AWP -- Congress parries

President Clinton's remarks reflected that his administration had sided with the
reformers in believing that reimbursement based upon actual costs was preferable to
reimbursement calculated from AWP. Specifically, HHS proposed in the president's
1998 budget that physicians be required to bill Medicare the actual acquisition
cost for drugs; HHS also proposed that it be allowed to define AWP.

Congress rejected the president's proposal. Rather than abandon AWP, the Balanced
Budged Act of 1997 set Medicare reimbursement at the lesser of the billed charge or
95 percent of AWP While HCFA officials recognized that Congress had opted for a
different solution, HHS remained convinced that a move away from AWP-based
reimbursement to some other system that more closely approximated actual
transaction prices was needed.

Allegations of "garden variety fraud"

Notwithstanding the president's acknowledgment that overpayment caused by high AWPs
is not illegal and in fact is an "embedded practice," HHS began considering ways in
which the well-established interpretation of AWP could be moved towards a model

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

more to its liking. An opportunity presented itself in 1998 as the Justice
Department, through the United States Attorney's Office in Massachusetts,
investigated whether TAP Pharmaceuticals had engaged in illegal conduct in the
manner in which it promoted the use of its Lupton brand of leuprolide acetate, a
highly-regarded pharmaceutical product used in the treatment of prostate cancer.

According to allegations made by the Justice Department and qui tam relators,
AstraZeneca Pharmaceuticals introduced a competitive product in the mid-1990s that
was sold under the brand name of Zoladex and priced significantly lower than
Lupron. The complainants argued that by 1996, it had become clear to TAP that
Lupron's market position was threatened as physicians and HMOs began switching
patients to the lower-priced Zoladex. Reluctant to reduce the price of Lupron, the
Justice Department's complaint alleged, TAP had its sales force provide incentives
to physicians and HMOs, including unrestricted 11 educational grants" of tens of
thousands of dollars, if they would continue their clinical use of Lupron. The
Justice Department also alleged that TAP sales personnel had provided individual
physicians with dozens of free dosages of Lupron, on the assumption that the
physician would nonetheless claim reimbursement and thereby net a windfall profit
from the federal government.

Most of these allegations, if proven true, would likely violate the anti-kickback
provision of the Medicare and Medicaid Fraud and Abuse statute and the Prescription
Drug Marketing Act of 1987. Had the United States prevailed on these claims, HHS
would have had the authority to exclude TAP from participation in Medicare and
other federal healthcare programs, a result that would have imperiled the economic
viability of the company. To settle the dispute and avoid the possibility of being
excluded from continued participation in federal healthcare programs, TAP agreed to
settle the matter, enter a single count guilty plea, and pay a substantial fine and
civil penalty. But beyond inclusion of the specific allegations of the anti-
kickback provision and the PDMA in the Settlement Agreement, HHS and the Justice
Department also included language that effectively reopened the debate as to
whether AWP should match or approach actual transaction prices. Consequently,
according to the Settlement Agreement, TAP violated the federal False Claims Act
by, among other things: "... inflating the average wholesale price (AWP) used by
Medicare and others for reimbursements of the drug Lupron, deeply discounting the
price paid by physicians to TAP for the drug ... and marketing the spread between
the AWP and the discounted price to physicians as additional profit to be returned
to the physicians practice from Medicare reimbursements for Lupron. ... engag(ing)
in a marketing scheme where it set AWPs of Lupron at levels far higher than the
majority of its physician customers actually paid for the drug when purchasing
either directly from TAP or through a wholesaler or distributor. As a result, the
United States contends that TAP's customers received reimbursement from Medicare
and state Medicaid programs and others at levels significantly higher than the
physician's actual costs or the wholesalers' average price.

Thus, the net effect of the settlement was to translate a practice that the
president had characterized four years earlier as both "legal" and "embedded in the
practices of the system" into actionable fraud, and also effectively nullify
Congress' 1997 policy decision to maintain AWP-based reimbursement. Moreover, as
noted here in greater detail, by articulating a broad theory of fraud-based
liability without any concomitant announcement of limiting factors or "safe
havens," the settlement effectively places the future of the AWP debate into the
hands of unelected judges, juries, and the plaintiffs' bar.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

False Claims Act does not apply to AWP pricing

Given the federal government's long-standing acknowledgment that AWP is but a
"sticker price" for pharmaceuticals and that the government persisted in using AWP
as the basis for applying reimbursement formulas under Medicaid and Medicare, it
would seem difficult, if not impossible, for the government to make out a credible
FCA claim had the TAP case actually gone to litigation. To be entitled to damages
under the FCA, the government must first demonstrate that (1) the defendant
submitted false information; (2) the defendant knew it to be false; and (3) the
government relied upon the false information to its detriment. In this case, to
establish the "falsity" of the information submitted, the government would be
required to demonstrate that its interpretation of AWP - that the AWP must bear
some reasonable and yet undefined relationship to the actual transactional price -
is correct and that any other potential interpretation of AWP is unreasonable.
Clearly when the president describes the AWP as a "sticker price," the burden of
proof facing the government is substantial.

In the same way, it would be difficult for the government to prove that drug
manufacturers knowingly provided false information to the reporting services. A
defendant who has relied upon a good faith interpretation of a regulation is not
subject to liability. Given that the HHS has acknowledged for over 30 years that
AWP bears little if any relationship to the actual transactional price for a drug,
it would seem difficult for the government to establish that the manufacturer's
failure to tie the pricing information provided to the reporting services more
closely to the actual transaction price of the product constitutes the knowing
provision of false information by the manufacturer.

Moreover, it is difficult to conceive how the government might be able to show that
either it or the state healthcare agencies were harmed as a result of the
information that a pharmaceutical company may have submitted to the reporting
service. The fact that HCFA has, for at least a decade, admonished state Medicaid
agencies that they should not rely upon AWP as even "approaching" actual
transaction prices, should refute any argument that any governmental agency
detrimentally relied upon the pricing information that the pharmaceutical
manufacturers reported.

While it might be difficult for the government to prevail in a False Claims Act
case based upon this revised interpretation of AWP, the fact that HHS has the power
to exclude pharmaceutical companies from Medicare and other healthcare programs in
the event that it does prevail effectively precludes judicial review. A
responsibly-- managed pharmaceutical company will simply not risk the destruction
of its business in order to vindicate some abstract legal proposition, particularly
where it might be vulnerable to an enforcement claim under some alternate and less
questionable theory of culpability. Consequently, it is not likely that the issue
of AWP liability will be resolved in litigation involving the federal government
anytime soon.

Raising the bar

The issue will instead be resolved in the cloud of private party and state attorney
general litigation which has exploded in the wake of the TAP settlement. Indeed,
having articulated a broad theory of fraud liability that potentially sweeps in
every pharmaceutical company in the nation, it is not surprising that the TAP
settlement has been followed by dozens of class action cases that parrot the claims

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

set forth in the TAP settlement that the maintenance of AWP above and beyond actual transaction prices constitutes a fraud. The Justice Department and HHS lawyers have tried to articulate limits to the theory of AWP liability reflected in the TAP settlement, such as the notion that manufacturers will not be challenged if they maintained a reasonable spread over time or did not actively promote or market the "spread" to physicians. The private class action and state plaintiffs, on the other hand, have shown no reluctance in pressing claims with little regard to the regulatory and legal history of the program or the specific conduct of the manufacturer, either in terms of how AWP might have been set in a given case or whether manufacturers did or did not actively market any resulting spread.

Illustrative of the non-selectivity of the private plaintiff cases is the complaint filed in Citizens for Consumer Justice v. Abbott Laboratories, Inc., a massive class action case that was brought in the district of Massachusetts. In that case, a collection of self-appointed "citizen watchdog" and "consumer advocacy" groups purport to represent all persons who received medication under Part B Medicare and who were required to pay a 20 percent co-pay obligation for pharmaceutical products dispensed under that program have sued every pharmaceutical manufacturer that has sold products subject to Part B Medicare reimbursement. The position taken by the class action plaintiffs is that the reporting of any AWP above the actual transactional price of those pharmaceutical products constitutes a violation of federal antitrust laws and a "repeated, fraudulent, and unlawful course of conduct constituting an pattern of racketeering."

The future of these cases may be best represented by the complaint filed in Board of Trustees of Carpenters and Millwrights of Houston v. Abbott Laboratories, Inc. There, a statutorily defined employee benefit plan representing a group of class action plaintiffs brought fraud and RICO claims against all "engaged in the business of manufacturing, marketing, and selling prescription pharmaceuticals throughout the United States." The class includes any entity in the United States "who purchased a drug manufactured by any defendant when the purchase price of that drug was based in whole, or part, upon the published AWP during the period 1993 through the present." The plaintiffs salt the now familiar charges regarding AWP with anecdotal snippets gleaned from government settlements and congressional investigative reports and public documents, some of which relate questionable non-AWP related activities by certain manufacturers, to bolster their case against the industry.

The now ubiquitous state attorneys general have also climbed aboard the AWP bandwagon. Illustrative is the State of Nevada v. Abbott Laboratories, Inc., a state law-based suit that purports to join as defendants companies that are or have been "engaged in the business of manufacturing, marketing, and selling prescription pharmaceuticals throughout the United States." (See companion article on next page.) Again, notwithstanding the HCFA's repeated admonitions to state Medicaid authorities that AWP did not constitute the transaction price for pharmaceuticals, Nevada now asserts that the reporting of any AWP above and beyond the actual transactional price of pharmaceutical products was illegal and fraudulent. Moreover, the degree to which these lawsuits would strip from the responsible federal agencies the ability to define the basis for calculating reimbursement formulae is best reflected in Nevada's case where, as part of the prayer for relief, the complaint asks the state court to define the AWP as "the average wholesale prices and best prices paid by physicians and pharmacies." Regardless of whether Nevada's proposed definition is internally consistent or not, it remains that the state would have a state trial court judge impose his or her own view as

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to what constitutes an appropriate measure of AWP upon HCFA, HHS, and the entire nation. These cases are representative of dozens of lawsuits that have been or will be filed against the pharmaceutical industry based upon a questionable theory of illegal conduct. That theory of liability flies in the face of well-- entrenched regulatory policies that were specifically described by the president as being both "legal" and "embedded" in the Medicare program and subsequently reaffirmed by Congress. Regardless of the outcome, these cases guarantee that the pharmaceutical industry will be required to pay millions to defend practices undertaken in good-faith reliance upon an established and unambiguous regulatory regime. And to the extent that the courts adopt any of the theories of AWP liability being advanced in these cases, the ability of HHS and the Congress to maintain control over this critical regulatory program will be substantially and forever compromised.

by James M. Spears and Jeff Pearlman

James M. Spears is a partner in the Washington office of the law firm Ropes & Gray, where he practices antitrust litigation and trade regulation, with an emphasis on the pharmaceutical and technology sectors of the economy. He has had extensive government service with the United States Department of Justice and the Federal Trade Commission. He can be contacted at 202 626-- 3981 or jspears@ropesgray.com

Jeff Pearlman is an associate in the Washington office of the law firm Ropes & Gray, where he practices complex civil litigation. He can be contacted at 202 626-3989 or jpearlman@ropesgray.com

Copyright CPS Communications Jun 2002

---- INDEX REFERENCES ----

COMPANY: ABBOTT LABORATORIES; ASTRAZENECA PLC; TAP PHARMACEUTICAL PRODUCTS INC

NEWS SUBJECT:  (Legal (1LE33); Social Issues (1SO05); Antitrust Regulatory (1AN52); Monopolies (1MO68); Social Welfare (1SO83); Judicial (1JU36); Major Corporations (1MA93); Health & Family (1HE30); Government (1GO80); Government Litigation (1GO18); Health & Safety (1HE24); Crime (1CR87); Mergers & Acquisitions (1ME39); Criminal Law (1CR79); Economics & Trade (1EC26); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Pharmaceuticals & Biotechnology (1PH13); Manufacturing (1MA74); Healthcare Regulatory (1HE04); Drugs (1DR89); Pharmaceuticals Regulatory (1PH03); Healthcare (1HE06); Healthcare Cost-Benefits (1HE10); Healthcare Economics (1HE56); Prescription Drugs (1PR52))

REGION:  (North America (1NO39); Americas (1AM92); New England (1NE37); Massachusetts (1MA15); USA (1US73); Nevada (1NE81))

Language:  EN

OTHER INDEXING:  (ABBOTT LABORATORIES INC; ASTRAZENECA PHARMACEUTICALS; AWP; AWP CONGRESS; AWPS; BALANCED BUDGED ACT; BLUE BOOK; CONGRESS; CONSUMER JUSTICE; DEPARTMENT OF HEALTH; EXCESSIVE MEDICARE PAYMENTS; FALSE CLAIMS ACT; FCA; FEDERAL FALSE CLAIMS; FEDERAL TRADE COMMISSION; HCFA; HEALTHCARE FINANCING ADMINISTRATION; HEW; HHS; HUMAN SERVICES; JUSTICE; JUSTICE DEPARTMENT; LUPRON; MEDICAID; MEDICAID FRAUD; MEDICARE; MM; NEVADA; OFFICE OF INSPECTOR; OIG; PDMA; PRESCRIPTION DRUG

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MARKETING ACT; PRESCRIPTION DRUGS; RED BOOK; SETTLEMENT AGREEMENT; STATE; STATE
MEDICAID; TAP; TAP PHARMACEUTICAL PRODUCTS INC; TAP PHARMACEUTICALS; TASK FORCE)
(Clinton; Illustrative; James M. Spears; Jeff Pearlman; Part B. As; Ropes Gray;
Zoladex)

Word Count: 4528
6/30/02 MEDMKTMED 70

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 6**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | M.D.L. No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | Civil Action No. 01-12257-PBS |
| LITIGATION | ) | |
| | ) | Judge Patti B. Saris |

REPORT OF INDEPENDENT EXPERT

PROFESSOR ERNST R. BERNDT

TO JUDGE PATTI B. SARIS

FEBRUARY 9, 2005

**Attachment B**

**OIG Reports Related to Medicare & Medicaid**

| Date | Report Title | Key Findings / Recommendations |
|------|-------------|-------------------------------|
| Nov. 1992 | "Physicians' Costs for Chemotherapy Drugs" (A-02-91-01049) | For a small, judgmental sample of NY physicians, OIG found that [13] chemotherapy drugs could be purchased at amounts below the established AWP, and that AWP was not a reliable indicator of cost.  Recommendations include that HCFA (1) define reimbursement policy to encourage "most economical means" available for physician purchase of drugs; (2) revise coding and reimbursement systems to pay for drugs based on dosage actually administered.  NB: Report noted that Equicore, the TN Medicare carrier, based payments for 5 chemo drugs on physician invoice prices. |
| Feb. 1996 | "Medicare Payments for Nebulizer Drugs"  (OEI-03-94-00390) | OIG examined differences in reimbursement methodologies between Medicare and Medicaid for 3 inhalation drugs in 17 states (1/94-2/95), finding that Medicare payments were considerably higher than those from Medicaid would have been due to (1) Medicare not using a discounted AWP, and (2) Medicare not having a drug rebate program with manufacturers.  Recommendations included (1) use of a discounted AWP to establish drug prices (which would require revising Medicare's claims coding system to an NDC basis); (2) pursuing legislative options to establish a rebate program or competitive bidding process; (3) use the "inherent reasonableness" authority to set charge limits (would require streamlining  that authority); (4) base payment on estimated acquisition cost (EAC) (although the regional carriers -- DMERCs --  had not been successful in gathering the necessary information).  NB: Report made reference to OIG intent to examine other drugs that Medicare reimburses. |
| May 1996 | "Appropriateness of Medicare Prescription Drug Allowances"  (OEI-03-95-00420) | OIG compared Medicare and Medicaid drug payment methodologies for 17 physician-administered drugs (based on Medicare 1994 allowances for those drugs), finding that Medicaid's greater use of more heavily discounted AWP, and rebates, would have afforded lower prices than Medicare was paying.  Recommendations were similar to those for nebulizer drugs, above.  NB: With respect to Medicaid, the report also noted that states differed in their application of payment methodologies.  More states used a discounted AWP to establish reimbursements to pharmacies than they did to physicians, meaning that some states used different discounting methodologies to reimburse pharmacy-dispensed vs. physician-administered drugs.  Some states handled rebates differently for physician-administered drugs than for self-administered drugs. |

| Jun. 1996 (a) | "Suppliers' Acquisition Costs for Albuterol Sulfate" (OEI-03-94-00393) | OIG found that Medicare allowances for albuterol sulfate substantially exceeded suppliers acquisition costs. Same recommendations as for nebulizer drugs. HCFA concurred with recommendations, but noted that OMB did not approve a 1994 survey attempt to collect acquisition cost data because of burdensome nature of the task. |
|---|---|---|
| Jun 1996 (b) | "A Comparison of Albuterol Sulfate Prices" (OEI-03-94-00392) | OIG found that many pharmacies surveyed charged less than the Medicare allowance for albuterol, and that 5 buying groups surveyed had negotiated prices between 56 – 70% less than Medicare's reimbursement amount. Same recommendations as for nebulizer drugs. |
| Apr. 1997 | "Medicaid Pharmacy – Actual Acquisition Costs of Prescription Drug Products for Brand Name Drugs" (A-06-96-00030) | OIG sampled Medicaid pharmacy providers in 11 states, comparing their actual invoices for drug purchases to AWP. OIG identified an average discount of 18.3% off AWP on a national basis (CY 1994), substantially larger than many states' reimbursement policies allowed (typically a 10% discount). OIG recommended HCFA work with states to ensure that reimbursement of the "ingredient portion" of Medicaid drug purchases was more in line with OIG's findings. [NB: Based on methodology, it appears that this analysis would have included primarily, and perhaps exclusively, self-administered drugs.] The report specifically refers to the June 1996 Barrons's article comparing AWP to actual acquisition costs, noting that industry insiders joked that AWP really meant "Ain't What's Paid". |
| Dec. 1997 | "Excessive Medicare Payments for Prescription Drugs" (OEI-03-97-00290) | OIG focused on 22 drug codes representing Medicare's largest dollar outlays in 1995, and found that program and beneficiary payments would have been lower by 29% if reimbursements were based on actual wholesale prices rather than AWP. OIG specifically noted that published AWPs bore little or no resemblance to actual wholesale prices available to the physician and supplier communities. Medicare allowances were significantly greater than prices available thru wholesalers and Group Purchasing Organizations (gpos). OIG also found inconsistency in carriers' establishing and updating Medicare drug reimbursement amounts. Recommendations included (1) basing reimbursement on a more substantial discount off AWP than 5%; (2) pursing an actual or EAC option; establishing limits on increases in subsequent year price increases; (3) invoking the "inherent reasonableness" authority to set charge limits; (4) pursuing legislative options to establish rebates or competitive bidding; (5) standardizing reimbursement amounts for each HCPCS drug code. |
| May 1998 | "Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs (A-06-97-00052) | OIG recommended that HCFA develop and submit a legislative proposal that would require drug manufacturers participating in Medicaid's outpatient Rx drug program to *pay Medicaid rebates based on AWP rather than on AMP* as provided by statute. OIG sought to reduce the anomaly of reimbursements to pharmacies being calculated relative to AWP while rebates were based on AMP. Manufacturers were |

| | | |
|---|---|---|
| | | inconsistent in their calculation of AMP, and OIG estimated substantial savings from aligning the rebate and reimbursement calculations.  OIG recognized that there were problems with AWP but felt that, with certain safeguards, the use of AWP in rebate calculations could result in its being a more "meaningful and accurate number".  HCFA did not believe that a legislative initiative was feasible, but agreed that changing from AMP to AWP would reduce an administrative burden.  A March 2002 OIG report notes that President Bush's Fiscal Year 2003 budget proposed changing the basis for calculating rebates from AMP to AWP. |
| Jul. 1998 | "The Impact of High-Priced Generic Drugs on Medicare and Medicaid"  (OEI-03-97-00510) | OIG examined 4 drugs in which Medicare reimbursements were excessive because of the inclusion of high-priced generics (i.e., higher than brand prices) in the median generic price on which reimbursement was based.  Re Medicaid (FL) – OIG examined 8 drugs for which reimbursements could have been less but for (1) inclusion of high-priced generics that (2) yielded lower rebates than branded drugs.  OIG recommended the exclusion of higher-priced generics from median calculations used to determine reimbursement levels (Medicare), and restrict reimbursements by Medicaid to [pre-rebate] lower-priced brand or generic drugs. |
| Aug. 1998 | "Are Medicare Allowances for Albuterol Sulfate Reasonable?"  (OEI-03-97-00292) | OIG found Medicare allowances for albuterol substantially exceeded what the VA would pay for generic albuterol in 1998, and that mail order customers would pay up to 30% less than Medicare's allowances in 1998. |
| Nov. 1998 | "Comparing Drug Reimbursement: Medicare and the Department of Veterans Affairs"  (OEI-03-97-00293) | OIG examined 34 drug codes, for which Medicare payments were substantially greater than VA payments.  In the absence of statutory reform, OIG recommended that HCFA invoke "inherent reasonableness" authority, and implement competitive bidding.  HCFA noted that its DMERCs were recommending an 11% reduction in albuterol reimbursements, and that other drugs might be similarly reviewed.  HCFA was subsequently challenged on the albuterol reductions, with "inherent reasonableness" authority put on hold. |
| Jun. 2000 (a) | "Medicare Reimbursement of Albuterol"  (OEI-03-00-00311) | OIG compared Medicare reimbursements for albuterol with those of Medicaid and the VA, as well as with prices paid by chain and internet pharmacies.  As with earlier reports, Medicare was again the outlier.  Recommendations of previous reports were reiterated, with the notation that ability to invoke the "inherent reasonableness" authority had been limited by the 1999 Balanced Budget Refinement Act – GAO was to study the potential effects of using this measure before HCFA could invoke it.  HCFA's response indicated it was moving to take advantage of DOJ and NAMFCU  prices provided to First Databank, and was taking other actions including establishing a competitive bidding project in TX for albuterol purchases.  The First DataBank prices were considered to be "more accurate data on average wholesale prices developed for Medicaid" as a result of a DOJ |

| | | investigation. |
|---|---|---|
| Jun 2000 (b) | "Medicare Reimbursement of End-Stage Renal Disease Drugs" (OEI-03-00-00020) | OIG comparison of Medicare reimbursement of five ESRD drugs with that of Medicaid and VA. Similar findings, recommendations, and HCFA responses as above, with additional emphasis placed on HCFA's seeking legislative efforts to reduce its outlays. |
| Jan. 2001 | "Medicare Reimbursements of Prescription Drugs" (OEI-03-00-00310) | OIG compared Medicare's reimbursement for 24 drugs (physician-administered or used with a nebulizer) with that of the VA, the physician/supplier community, and Medicaid. In addition to finding Medicare payments far exceeded those of the comparators, OIG noted that local Medicare carriers were not establishing consistent reimbursement amounts for certain drugs. In its response, HCFA noted that efforts to have its carriers use the DOJ's First DataBank AWPs had been hampered by legislation (H.R. 5543) that put a freeze on changes to AWP in use by Medicare as of 9/1/00. |
| Jul. 2001 | "Cost Containment of Medicaid HIV/AIDS Drug Expenditures" (OEI-05-99-00611) | OIG compared Medicaid's net unit cost for antiretrovirals to that of other federal purchasers, and found that Medicaid paid from 5% - 33% more than the comparators. Part of the difference was attributed to different federally mandated formulae, however the discussion highlighted problems in determining an EAC, and the role of AWP manipulation in contributing to excessive payments. |
| Aug. 2001 | "Medicaid Pharmacy - Actual Acquisition Costs of Brand Name Prescription Drug Products (A-06-00-00023) | OIG examined pharmacy actual acquisition costs of brand name drugs for 8 states, determining that the average discount off AWP for branded drugs was 21.84% for 1999 (an increase of 19.3% from their 1997 analysis for 1994 prices). However, this discount was greater than the discount allowed under most states' reimbursement policies. While AWP was not the basis for EAC in all states it was nonetheless predominant, with the average discount on a national basis being 10.31% of AWP. (OIG also compared WAC to actual acquisition price for pharmacies, and determined that invoice prices were, on a national basis, 1.81% below WAC.) |
| Mar. 2002 (a) | "Excessive Medicare Reimbursement for Ipatroprium Bromide" (OEI03-01-00041) | OIG compared Medicare reimbursements (based on AWP) for this inhalant product to prices paid by the VA, and to catalog and wholesaler/supplier prices. Medicare paid considerably more than any of the comparators, even though payments to 23 suppliers (accounting for 60% of Medicare payments) were presumably to outfits purchasing large quantities of the product (and thus able to attract manufacturer discounts). |
| Mar. 2002 (b) | "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products (A-06-01-00053) | OIG examined pharmacy actual acquisition costs of generic drugs in 8 states, determining that the average discount off AWP for generic drugs was 65.93% for 1999 (an increase of 55% from their 1997 analysis of 1994 prices.) However, states' reimbursement methodologies did not allow them to capture much of this discount, and OIG recommended that reimbursements for ingredient costs be brought more in line with pharmacy acquisition costs. Since some states used WAC to determine reimbursement, OIG also examined WAC |

| | | |
|---|---|---|
| | | relative to acquisition cost, finding invoice prices averaging 30.55% below WAC.   OIG felt that WAC was not a true wholesale acquisition cost and was significantly higher than actual acquisition costs for generic drugs.  OIG also cited a 1984 report in which it found that pharmacies purchased drugs at 15.9% below AWP, and a 1989 report showing a 15.5% discount.  However, these reports combined brand and generic drugs.  The cover letter to this report references the Bush FY 2003 proposal to use AWP rather than AMP in rebate calculations. |
| Sep. 2002 | "Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (A-06-02-00041) | A follow-up to the March 2002 report, OIG extended their analysis of discounts off AWP for additional drug categories, including single and multiple source innovator drugs, and drugs with and without federal upper limits (FULs).  OIG found wide variation in prices paid by pharmacies, with average discounts off AWP ranging from 17.2% for single source innovator drugs to 72.1% for multiple source drugs with upper limits.  OIG recommended that for states that continued to reimburse for drugs based on AWP, a four-tiered reimbursement methodology be introduced that better captured the within-category fluctuations in actual discounts: (1) single source innovator drugs; (2) all drugs without FULs; (3) multiple source drugs without FULs; (4) multiple source drugs with FULs.  Without evaluating CMS' FUL prices, OIG also observed that drug manufacturers appeared to provide steeper discounts off AWP for drugs with FUL listings. Finally, OIG reiterated their recommendation that AWP be substituted for AMP in calculating rebates due from manufacturers. |
| Jan. 2004 (a) | "Update: Excessive Medicare Reimbursement of Albuterol" (OEI-03-03-00510) | Another comparison of Medicare reimbursements vs. Medicaid payments for albuterol.  Findings similar to above; some additional discussion about DMERCs charged with determining reimbursement methodologies in their respective regions, based on Medicare methodology. |
| Jan. 2004 (b) | "Medicare Reimbursement for Lupron"  (OEI-03-03-00250) | OIG discusses a  "local medical review policy ("LRMP") whereby Medicare carriers apply a "least costly alternative" standard in determining reimbursement.  Specifically, OIG reviewed jurisdictions' application of that standard with respect to Lupron being covered at the less expensive Zoladex price, and found that not all jurisdictions were applying the standard. |
| Jan. 2004 © | "Update: Excessive Medicare Reimbursement for Ipatroprium Bromide" (OEI-03-03-00520) | Update of 2002 OIG comparison of Medicare reimbursements for this inhalant relative to those of Medicaid and the VA. |
| Sep. 2004 | 'Variation in State Medicaid Drug Prices"  (OEI-05-02-00681) | For 28 drugs, OIG found considerable variation across states in reimbursement rates, with prices varying more for the 10 non-innovator drugs than for the 18 innovator products. Comparable estimated acquisition cost formulae (e.g., AWP-10%) might still yield very different prices.  There were also |

| | | differences in setting "U&C" charges as well as MAC. |

All reports accessed through www.oig.hhs.gov/reports.htm.