**EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                        )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 2-1 - 2-204



BENCH TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 7, 2006, 9:15 a.m.




LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

2-198

## Page 198

1  you'd do for me is flag things you really care about, because
2  -- there was another where this poor woman describes what her
3  breast cancer was and then you say, "Irrelevant." It's not
4  irrelevant. I mean, you have to put context on this stuff.
5        So my only point is, I'm not going to sit and go
6  through this line by line, because some of them are valid and
7  many of them are not. And so if you care a lot about any
8  particular thing, let me know, but I can't -- I mean, this is
9  classic big-firm practice, you know, underline, underline,
10  underline. You tell me when you really care and then if you
11  don't cry wolf, I'll focus.
12        MR. EDWARDS:  Well, your Honor, I have another
13  suggestion to make --
14        THE COURT:  All right.
15        MR. EDWARDS:  -- and that is that Plaintiffs should
16  be required to resubmit these written directs, taking out
17  those statements that are really the testimony of counsel.
18        THE COURT:  Yes. I found some of that disturbing
19  this morning. Those poor women didn't have the foggiest what
20  things were and it was in the affidavit. I mean, to the
21  extent -- you should with the next few witnesses review them,
22  and if it wasn't something the witness knew but was something
23  that you told them, you have an obligation to flag that for
24  us, because it was quite clear that those women didn't know
25  the things that were in the affidavit on their own. Someone

## Page 199

1  told -- it may be true, may have been refreshed through a
2  document.
3        MR. BERMAN:  I understand, your Honor.
4        THE COURT:  So who's up tomorrow?
5        MR. BERMAN:  Tomorrow we have -- hold on one
6  second, your Honor. Mr. Mulrey, Maureen Konigs (ph) from
7  BlueCross, Mr. Ruda (ph) from BlueCross, and then an
8  ex-Schering employee, Mr. Manning (ph).
9        THE COURT:  All right. Now, tomorrow we're going
10  to go till 12:30 and then I have the immigration ceremony.
11  I'm not exactly sure when I'll be back. I'm going to guess
12  in the vicinity of 2 -- it sometimes takes longer than that
13  -- and then we'll go the afternoon.
14        MR. BERMAN:  I think we'll run through these
15  witnesses before 5 o'clock.
16        MR. MONTGOMERY:  We have a pending motion that
17  we've submitted to your Honor to exclude all of the testimony
18  of Ms. Manning.
19        THE COURT:  Of who?
20        MR. MONTGOMERY:  Ms. Manning. He said Mr. Manning,
21  it's the former Schering employee.
22        THE COURT:  So flag that for me. Go ahead.
23        MR. MONTGOMERY:  She was a relator in the
24  Philadelphia settlement with the Department of Justice. Her
25  entire direct testimony except for two references describes

## Page 200

1  the Philadelphia settlement, which has nothing to do --
2        THE COURT:  Yeah. I don't want to hear about the
3  Philadelphia settlement, but is there something about AWP?
4        MR. BERMAN:  Yes, and what happened in Philadelphia
5  was part of the AWP scheme.
6        MR. MONTGOMERY:  Your Honor, you have to read the
7  motion. It had nothing to do with AWP.
8        THE COURT:  Did you take her deposition?
9        MR. BERMAN:  There's been no deposition.
10        MR. MONTGOMERY:  We had no idea this woman was
11  going to testify nor the other two relators that they're --
12        THE COURT:  You know, if there's something about
13  AWP, I'm going to let her testify about it, but if it isn't
14  about AWP, I'm going to -- it's going to be a very quick
15  trip, and I don't want her to have to come back, so when do
16  you have her scheduled?
17        MR. BERMAN:  For tomorrow afternoon.
18        THE COURT:  I know, but I don't want to have it
19  delay. She's not going to come back a second time, because
20  her testimony doesn't seem so -- when is she coming up here?
21        MR. MONTGOMERY:  We're not bringing her.
22        MR. BERMAN:  She's an ex-employee and she's
23  volunteered.
24        THE COURT:  Coming in -- beyond the subpoena power.
25        MR. BERMAN:  And she's going to testify about

## Page 201

1  marketing the spread and free goods on the drugs at issue in
2  this case.
3        THE COURT:  All right, fine. As long as I have
4  that proffered. The motion in limine is denied.
5        Now, let me just -- am I going to be hearing --
6  well, I've got some concern after what I've heard today about
7  BlueCross BlueShield, because they didn't change their
8  position. If I'm going to be hearing more about that, I
9  don't know what that does. I have to think that through
10  legally.
11        MR. BERMAN:  Well, first of all, in terms of -- we
12  have years in this case until 2004.
13        THE COURT:  Well, you know, I didn't put a cutoff
14  date, but I think we need to start discussing that, because
15  as soon as that Medicare bill went through, the world was on
16  notice. The gig was up. Now, they haven't changed their
17  position.
18        MR. BERMAN:  I understand that, and all the
19  testimony they brought in about knowledge of physicians,
20  2003, 2004, there are years of damages in this case that --
21        THE COURT:  So let me just ask you just so we get
22  this right on the table.
23        I ruled that at some point it did become a term of
24  art when Congress started phasing it in in a different way
25  where they were clearly making distinctions at some point

288c0fce-eba9-4b6e-8dbf-515cfbdea99e

Page 202

1  between AWP and ASP and the whole world knew by what year was
2  it, 2003, or at least knowledgeable people knew, anybody who
3  -- BlueCross knew, et cetera.  So is there -- it strikes me
4  that there's a good basis for stopping the class when that
5  bill passed.
6       MR. BERMAN:  You mean stopping the Class 3 class,
7  because the Class 2 class I think you stopped as to the
8  statutory basis until 2004, but there's still --
9       THE COURT:  Well, with respect -- let me put it
10 this way:  It's not coming up to the present time.
11      MR. BERMAN:  I understand that.
12      THE COURT:  Any of these classes.  So what are you
13 proposing as the -- it strikes me when that bill passed, it
14 was a national recognition of the flaws in AWP.
15      MR. BERMAN:  When that bill passed, I think there
16 was a recognition that some drugs were flawed, not the entire
17 system.
18      THE COURT:  You're talking about the drugs at issue
19 here.
20      MR. WISE:  I was just going to say -- I mean, now
21 is not the time to argue it, but the import of that testimony
22 today is much more powerful than simply the termination of
23 the class period, because it goes directly to --
24      THE COURT:  I agree --
25      MR. WISE:  -- causation.

Page 203

1       THE COURT:  But at the very least what it does is,
2  it makes them -- it highlights what I've been meaning to
3  highlight all along.  It stops, AWP, the class stops.  And I
4  forget exactly what the date was that the bill passed, but
5  that's when it stops.
6       MR. BERMAN:  Okay.
7       THE COURT:  Now, the second piece of it is -- and
8  I'm just a little worried about what we do with this, because
9  they're a class rep.
10      MR. BERMAN:  Well, what you heard today, though,
11 your Honor, is that -- what she testified on redirect,
12 there's 550 drugs that are under Medicare Part B.  It's a
13 system that does millions of transactions every month.
14 Because there are eight or ten or 12 bad drugs, the
15 organization decided -- that's not a basis to change the
16 whole system.
17      THE COURT:  It was brand-new to me.
18      MR. BERMAN:  Okay.
19      THE COURT:  Not so much there wasn't fraud before
20 or unfair deceptive practices before, maybe there was or
21 maybe there wasn't, but I'm just worried about the fact that
22 how do you prove that they're typical on a causation basis?
23 I mean, I don't know what to do with it on Class 3.  It makes
24 it a much harder case.
25      MR. BERMAN:  But up until this 2003 time, there's

Page 204

1  no evidence yet in this record that they're any different
2  than anyone else.
3       THE COURT:  Maybe.  We'll see.
4       (Proceedings concluded for the day at 4:30 p.m.)
5                    * * * * *
6
7
8
        C E R T I F I C A T E
9
10
11  We, LEE A. MARZILLI and TIMOTHY J. WILLETTE,
12  Official Court Reporters for the United States
13  District Court, do hereby certify that the
14  foregoing pages are a true and accurate
15  transcription of our shorthand notes, taken in
16  the aforementioned matter, to the best of our
17  skill and ability.
18
19
20  _____    _____
    TIMOTHY J. WILLETTE, RDR, CRR    LEE A. MARZILLI, RPR, CRR
21  Official Court Reporters - United States District Court
               1 Courthouse Way - Room 3205
22             Boston, Massachusetts  02210
                    617.345.6787
23
24
25

288c0fce-eba9-4b6e-8dbf-515cfbdea99e

# EXHIBIT 8

MARK J. BENNETT      2672
Attorney General of Hawaii

MINER, BARNHILL & GALLAND, P.C.
CHARLES BARNHILL, JR.
WILLIAM P. DIXON
ROBERT LIBMAN
  (Pro Hac Vice Pending)
44 East Mifflin Street, Suite 803
Madison, Wisconsin 53703
Telephone:  (608) 255-5200
Facsimile:    (608) 255-5380
E-mail:  cbarnhill@lawmbg.com
E-mail:  wdixon@lawmbg.com
E-mail:  rlibman@lawmbg.com

BEASLEY, ALLEN, CROW, METHVIN,
      PORTIS & MILES, P.C.
W. DANIEL "Dee" MILES, III
CLINTON CARTER
  (Pro Hac Vice Pending)
272 Commerce Street
P.O. Box 4160
Montgomery, Alabama 36103-4160
Telephone:  (334) 269-2343
Facsimile:    (334) 954-7555
E-mail:  dee.miles@beasleyallen.com
E-mail:  clint.carter@beasleyallen.com

PRICE, OKAMOTO, HIMENO & LUM
WARREN PRICE, III          1212
KENNETH T. OKAMOTO  2068
RICK J. EICHOR              1588
707 Richards Street, Suite 728
Honolulu, Hawaii   96813
Telephone:  (808) 538-1113
Facsimile:    (808) 533-0549
E-mail:  wprice@pohlhawaii.com
E-mail:  kokamoto@pohlhawaii.com
E-mail:  reichor@pohlhawaii.com

Special Deputy Attorneys General
ATTORNEYS FOR PLAINTIFF

1ST CIRCUIT
STATE OF HAWAII
FILED

2006 APR 27    A 9: 12

M.N. TANAKA
CLERK

I hereby certify that this is a full, true,
correct copy of the original on file in this offic.

Clerk, Circuit Court, First Circuit

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

State of Hawaii,

             Plaintiff,

       vs.

Abbott Laboratories Inc.; Alpharma USPD,
Inc.; Apothecon, Inc.; AstraZeneca
Pharmaceuticals LP, AstraZeneca LP;
Aventis Pharmaceuticals, Inc.; Aventis
Behring LLC n/k/a ZLB Behring; Barr
Laboratories, Inc.; Baxter Healthcare
Corporation; Bayer Corporation; Ben Venue
Laboratories, Inc.; Boehringer Ingelheim
Pharmaceuticals, Inc.; Boehringer Ingelheim
Roxane, Inc. f/k/a Roxane Laboratories, Inc.;
Bristol-Myers Squibb Co.; Centocor, Inc.;
Dey, Inc.; Forest Pharmaceuticals, Inc.;
GlaxoSmithKline Pharmaceuticals; Hoffman-
LaRoche, Inc.; Hospria, Inc.; Ivax
Corporation; Ivax Pharmaceuticals Inc.;
Janssen Pharmaceutical Products, LP;
Johnson & Johnson, Inc.; McNeil-PPC, Inc.;
Merck & Co., Inc.; Mylan Laboratories, Inc.;
Mylan Pharmaceuticals, Inc.; Novartis
Pharmaceuticals Corporation; Ortho Biotech
Products, LP; Par Pharmaceutical Cos., Inc.;
Pfizer, Inc.; Pharmacia Corporation; Purepac
Pharmaceutical Co.; Roche Laboratories,
Inc.; Sandoz, Inc.; Schering-Plough
Corporation; Sicor Pharmaceuticals, Inc. f/k/a
Gensia Sicor Pharmaceuticals, Inc.; TAP
Pharmaceutical Products, Inc.; Teva
Pharmaceuticals USA, Inc.; Warrick
Pharmaceuticals Corporation; Watson
Pharmaceuticals, Inc.; Watson Pharma, Inc.,
f/k/a Schein Pharmaceuticals, Inc.; Watson
Laboratories, Inc.; Doe Corporations 1-100;
Doe Entities 1-100.

             Defendants.

Civil No. 06-1-0720-04  E E H

(Other Civil Action)

**COMPLAINT; EXHIBITS 1 and 2;
SUMMONS TO ANSWER CIVIL
COMPLAINT; DEMAND FOR JURY
TRIAL**

TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................................1

II.     PARTIES...........................................................................................................2

        A.      Plaintiff ...............................................................................................2

        B.      Defendants ..........................................................................................3

III.    FACTUAL BACKGROUND ...............................................................................9

        A.      The Market for Prescription Drugs......................................................9

        B.      The Average Wholesale Price (AWP) ...............................................11

IV.     DEFENDANTS' CONCEALMENT OF THEIR WRONGDOING ........................14

        A.      Defendants' Scheme to Hide Their True Prices for Drugs.....................15

        B.      Defendants' Scheme Continues In Spite of Anecdotal Discovery ............17

        C.      Defendants' Scheme Corrupts the Market for Prescription Drugs............18

V.      THE INJURY TO HAWAII'S MEDICAID PROGRAM AND HAWAII MEDICARE
        BENEFICIARIES............................................................................................19

        A.      The Hawaii Medicaid Program ...........................................................19

        B.      The Medicare Program......................................................................19

VI.     DRUG PRICING.............................................................................................21

        A.      Medicaid Drug Pricing .......................................................................21

        B.      Medicare Drug Pricing.......................................................................23

VII.    DEFENDANTS MANIPULATED THE AWP AND KEPT THE TRUE PRICES
        SECRET ........................................................................................................24

VIII.   TOLLING........................................................................................................25

        Count I – False Claims.....................................................................................26
        Count II – Unfair or Deceptive Acts or Practices ..............................................26
        Count III – Unfair Competition..........................................................................27
        Count IV – Deceptive Trade Practices Act .......................................................28
        Count V - Non-Disclosure ...............................................................................28
        Count VI – Unjust Enrichment.........................................................................29

<u>COMPLAINT</u>

## I.    <u>INTRODUCTION</u>

1.    This case is an enforcement action brought by the State of Hawaii under State law on behalf of its Medicaid program, as well as Hawaii residents who are Medicare beneficiaries, against Defendant Drug Companies who have submitted false claims and engaged in unfair or deceptive acts or practices in the sale, pricing and marketing of their prescription drug products.  The State of Hawaii brings this action exclusively under the common law and statutes of the State of Hawaii.  No federal claims are asserted.  No aspect of the claims asserted herein is brought pursuant to any federal law, including either Medicare or ERISA, nor is any aspect of the claims asserted herein brought for the purpose of interpreting a federal contract or the terms of an ERISA plan.

2.    The Defendant Drug Companies' fraudulent pricing and marketing of their prescription drugs have impacted elderly, disabled, and poor Hawaii citizens covered by Medicaid and Medicare by causing them to pay grossly excessive prices for the Defendants' prescription drugs.  Defendants have taken advantage of the enormously complicated and non-transparent market for prescription drugs to engage in an unlawful scheme to cause Hawaii and its citizens to pay inflated prices for prescription drugs.  The scheme involves the publication by Defendants of phony "average wholesale prices," which become the basis for calculating the cost at which "providers" - the physicians, hospitals, and pharmacies who provide these prescription drugs to patients - are reimbursed by Plaintiff.  Defendants reinforce this basic tactic with other deceptive practices described in this Complaint, including the use of secret discounts and rebates to

providers and the use of various devices to keep secret the prices at which their drugs are currently available in the marketplace to other purchasers.  By willfully engaging in this scheme, Defendants have succeeded in having Plaintiff finance windfall profits to these providers.  Defendants attempt to profit from their scheme by using the lure of these windfall profits competitively to encourage providers to buy their drugs instead of competing in the marketplace solely on the basis of legitimate factors such as price and the medicinal value of their drugs.

3.      Fair and honest drug pricing is a matter of great importance to the State and its citizens.  Expenditures by the State and its agencies for prescription drug reimbursement have increased dramatically in the past several years as a result, in part, of Defendants' fraudulent pricing scheme.  Each year Hawaii spends millions of dollars on prescription drugs under the Hawaii Medicaid program.  The cost of prescription drug services in the Hawaii Medicaid program has seen dramatic increases rising from $25.4 million in 1997 to $117 million in 2004, an increase of over 350%.

4.      This exponential increase in prescription drug costs in recent years has contributed to a health care funding crisis within the State that requires action to ensure fair dealing between the Defendants and the State and Hawaii Medicare beneficiaries.

## II.      PARTIES

### A.      Plaintiff

5.      This action is brought by the State of Hawaii for violations of 1) the Hawaii False Claims Act, Unfair Competition, Deceptive Trade Practices, Non-Disclosure, and Unjust Enrichment, and 2) as *parens patriae* on behalf of Medicare beneficiary purchasers for Unfair or Deceptive Acts or Practices and/or Unfair Competition, Deceptive Trade Practices, declared unlawful by H.R.S. §480-2, H.R.S. §480-13 and H.R.S. § 481A-3(a)(9),

2

(11) and (12) and Unjust Enrichment. No claim is asserted for Medicare beneficiaries who made flat insurance co-payments and those whose co-payment was reimbursed in full by a third-party insurer.

6.     The Attorney General is authorized to bring this action on behalf of the State of Hawaii and its agencies by virtue of H.R.S. §28-1. The Attorney General is authorized to bring this case for indirect purchasers based upon unfair or deceptive acts or practices and/or unfair competition declared unlawful by H.R.S. §480-2 by virtue of H.R.S. §480-14.

### B.     Defendants

7.     Defendants are all pharmaceutical companies whose fraudulent schemes, including the publication of excessive and inflated prices for prescription drugs, as described in this complaint, have caused to be presented to officers and/or employees of the State of Hawaii false or fraudulent claims for payment or approval of certain drugs to get these false or fraudulent claims paid or approved by the State of Hawaii Medicaid program, and have resulted in Hawaii and its citizens paying for drugs at inflated prices, as detailed below.

8.     At all times material to this civil action, each Defendant has transacted business in the State of Hawaii by, including but not limited to, selling directly or through wholesalers its drugs, including those identified in this complaint, to purchasers within the State of Hawaii.

9.     Defendant Abbott Laboratories Inc. ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Rd., Abbott Park, IL 60064-6400.

10.    The following two defendants are hereinafter referred to as the Alpharma group:

      (a)    Defendant Alpharma USPD, Inc. ("Alpharma") is a Delaware corporation in the business of manufacturing and selling pharmaceuticals. Alpharma's principal place of business is One Executive Dr., Ft. Lee, NJ 07024; and

      (b)    Defendant Purepac Pharmaceutical Co. ("Purepac") is a Delaware corporation in the business of manufacturing and selling pharmaceuticals. Purepac's principal place of business is 14 Commerce Dr., Ste. 301, Cranford, NJ 07016.  Purepac is a wholly owned subsidiary of Alpharma, Inc.

11.    Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP ("AstraZeneca") are related Delaware corporations with their principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

12.    The following two Defendants are referred to as the Aventis group:

      (a)    Defendant Aventis Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located at 300-400 Somerset Corporate Blvd., Bridgewater, NJ 08807-2854; and

      (b)    Defendant Aventis Behring, LLC n/k/a ZLB Behring is headquartered at 1020 First Ave., King of Prussia, PA  19406-2854.

13.    Defendant Barr Laboratories, Inc. ("Barr") is a Delaware corporation with its principal place of business located at 400 Chestnut Ridge Rd., Woodcliff Lake, NJ 07677.

14.    Defendant Baxter Healthcare Corporation ("Baxter") is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, IL 60015.

15.    Defendant Bayer Corp. ("Bayer") is an Indiana corporation with its principal place of business located at 100 Bayer Rd., Pittsburgh, PA 15205-9741.

16.     The following three defendants are hereinafter referred to as the Boehringer group:

(a)     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Pharm"), a wholly-owned subsidiary of Boehringer Ingelheim Corp. ("Boehringer"), is a Connecticut corporation engaged in the business of manufacturing and selling pharmaceuticals. Boehringer Pharm's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877; and

(b)     Defendant Boehringer Ingelheim Roxane, Inc. ("BIRI"), f/k/a Roxanne Laboratories, Inc., a wholly-owned subsidiary of Boehringer, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  BIRI's principal place of business is located at 1809 Wilson Rd., Columbus, OH 43216-6532; and

(c)     Defendant Ben Venue Laboratories, Inc. ("Ben Vue") is a wholly owned subsidiary of Boehringer Ingelheim Corporation and is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ben Venue's principal place of business is located at 300 Northfield Rd., Bedford, OH 44146.  Ben Venue is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Bedford Laboratories.

17.     Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Bristol-Myers' principal place of business is located at 345 Park Ave., New York, NY 10154-0037.  Bristol-Myers is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to E.R. Squibb & Sons, Inc. and Apothecon, Inc.

18.     Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Dr., Napa, CA 94558.

19.     Defendant Forest Pharmaceuticals, Inc. ("Forest") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals.  Forest's principal place of business is located at 909 Third Ave., New York, NY 10022.

20.     Defendant GlaxoSmithKline Pharmaceuticals ("GlaxoSmithKline"), is a Delaware corporation with its principal place of business at One Franklin Plaza, Philadelphia, PA 19102.

21.     Defendant Hoffman-LaRoche, Inc. ("Hoffman-LaRoche") is a New Jersey corporation with its principal place of business located at 340 Kingsland Street, Nutley, NJ 07110-1199.  Hoffman LaRoche is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Roche Laboratories, Inc.

22.     Defendant Hospira, Inc. ("Hospira") is a corporation organized under the laws of Delaware, with its principal offices at 275 N. Field Drive, Lake Forest, IL. 60045, Hospira is the successor to Abbott's Hospital Products Division.

23.     The following five defendants are hereinafter referred to as the Johnson & Johnson group:

> (a)     Defendant Johnson & Johnson, Inc. ("J&J") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. J&J's principal place of business is located at One Johnson & Johnson Plaza, New Brunswick, NJ 08933; and
>
> (b)     Defendant Janssen Pharmaceutical Products, LP ("Janssen"), a wholly-owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals. Janssen's principal place of business is located at 1125 Trenton-Harbourton Rd., Titusville, NJ 08560; and
>
> (c)     Defendant Ortho Biotech Products, LP ("Ortho Biotech"), a wholly-owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals.  Ortho Biotech's principal place of business is located at 700 U.S. Hwy. 202, Raritan, NJ 08869; and
>
> (d)     Defendant McNeil-PPC, Inc. ("McNeil"), a wholly-owned subsidiary of J&J, is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals.  McNeil's principal place of business is located at 7050 Camp Hill Rd., Ft. Washington, PA 19034.  McNeil Consumer & Specialty Pharmaceuticals ("McNeil Cons") is a division of McNeil; and

(e)     Defendant Centocor, inc. is a wholly owned subsidiary of Defendant Johnson Johnson & Johnson with its principal place of business at 800/850 Ridgeview Dr., Horsham, PA 19044. The principal drug it markets is Remicade for autoimmune conditions.

24.     Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation engaged

in the business of manufacturing and selling pharmaceuticals. Merck's principal place of

business is located at One Merck Dr., Whitehouse Station, NJ 08889-0100.

25.     The following two defendants are hereinafter referred to as the Mylan group:

(a)     Defendant Mylan Laboratories, Inc. ("Mylan") is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals, mainly through its subsidiaries. Mylan's principal place of business is located at 1500 Corporate Dr., Ste. 400, Canonsburg, PA 15317; and

(b)     Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharm"), a wholly-owned subsidiary of Mylan, is a West Virginia corporation engaged in the business of manufacturing and selling pharmaceuticals. Mylan Pharm's principal place of business is located at 1500 Corporate Dr., Ste. 400, Canonsburg, PA 15317.

26.     The following two defendants are hereinafter referred to as the Novartis

group:

(a)     Defendant Novartis Pharmaceuticals Corp. ("Novartis") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Novartis' principal place of business is located at One Health Plaza, East Hanover, NJ 07936; and

(b)     Defendant Sandoz, Inc. ("Sandoz"), formerly known as Geneva Pharmaceuticals, Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Sandoz's principal place of business is located at 506 Carnegie Ctr., Princeton, NJ 08540.

27.     Defendant Par Pharmaceutical Cos., Inc. ("Par") is a Delaware corporation

with its principal place of business located at One Ram Ridge Rd., Spring Valley, NY

10977. Par is also being sued for the conduct of its subsidiaries and/or divisions, including

but not limited to Par Pharmaceutical, Inc.

28.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal

place of business at 235 E. 42nd St., New York, NY 10017.  In April, 2003, Pfizer acquired

Pharmacia Corp.  Pfizer is also being sued for the conduct of its subsidiaries and/or

divisions, including but not limited to Warner-Lambert, Pfizer-Warner-Lambert, and Parke-

Davis.

29.     The following two defendants are hereinafter referred to as the Schering

group:

> (a)     Defendant Schering-Plough Corp. ("Schering-Plough") is a New
> Jersey corporation with its principal place of business located at 2000
> Galloping Hill Rd., Kenilworth, NJ 07033-0530.  Schering-Plough has
> engaged in the practices described in this complaint under its own name and
> through its wholly-owned subsidiary, Warrick Pharmaceutical Industries,
> Ltd.; and

> (b)     Defendant Warrick Pharmaceuticals Corporation ("Warrick"), is a
> Delaware corporation with its principal place of business at 12125 Moya
> Blvd., Reno, NV 89506-2600.  Warrick is a wholly-owned subsidiary of
> Defendant Schering-Plough and has been since its formation in 1993.
> Warrick manufactures generic pharmaceuticals.

30.     Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a Delaware

corporation headquartered at Bannackburn Lake Office Plaza, 2355 Waukegan Rd.,

Deerfield, IL 60015.  TAP is jointly owned by Abbott Laboratories and Takeda Chemical

Industries, Ltd.

31.     The following four Defendants are referred to as the Teva Group:

> (a)     Defendant Teva Pharmaceuticals USA, Inc. ("Teva US") is a
> Delaware corporation engaged in the business of manufacturing and selling
> pharmaceuticals.  Teva's principal place of business is located at 650 Cathill
> Rd., Sellersville, PA 18960.  Teva US is a subsidiary of an Israeli
> corporation, Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."); and

> (b)     Defendant Ivax Corp. ("Ivax"), which became a wholly owned
> subsidiary of Teva Ltd. on January 26, 2006, is a Florida (formerly Delaware)
> corporation engaged in the business of manufacturing and selling
> pharmaceuticals. Ivax's principal place of business is located at 4400
> Biscayne Blvd., Miami, FL 33137; and

(c)     Defendant Ivax Pharmaceuticals Inc. ("Ivax Pharm"), a wholly-owned subsidiary of Ivax, is a Florida corporation engaged in the business of manufacturing and selling pharmaceuticals.  Ivax Pharm's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137; and

(d)     Defendant Sicor Pharmaceuticals, Inc., f/k/a Gensia Sicor Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business at 19 Hughes, Irvine, CA 92618-1902.  Sicor is owned by Teva Ltd.

32.     The following three defendants are hereinafter referred to as the Watson group:

(a)     Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation engaged in the business of manufacturing and selling pharmaceuticals.  Watson's principal place of business is located at 311 Bonnie Cir., Corona, CA 92880; and

(b)     Defendant Watson Pharma, Inc., f/k/a Schein Pharmaceuticals, Inc. ("Watson Pharma"), a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. since 2000, is a Delaware corporation.  Watson Pharma's principal place of business is located at 311 Bonnie Cir., Corona, CA 92880; and

(c)     Defendant Watson Laboratories, Inc. ("Watson Labs"), a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., is a Nevada corporation with its principal place of business located at 311 Bonnie Cir., Corona, CA 92880.

33.     This Court has jurisdiction over Plaintiff's claims as they involve claims arising exclusively under Hawaii statutes and the *parens patriae* authority of the Attorney General to act on behalf of the State of Hawaii and its citizens.

## III.   FACTUAL BACKGROUND

### A.   The Market for Prescription Drugs

34.     The market for prescription drugs is extremely complex.  It is composed of over 65,000 separate National Drug Codes (NDCs).  Each NDC represents a quantity of each drug manufactured by each manufacturer.  The essential structure of the prescription drug market is as follows:

35.     Drugs are manufactured by large complex corporations that are hugely profitable.  Defendants sell the drugs (with varying numbers of intermediaries and agents involved in the process) to physicians, hospitals, and pharmacies.  In medical jargon these are known as the "providers."  The providers then, in essence, resell the drugs to their patients when the drugs are prescribed for and administered or dispensed to those patients.

36.     In the case of Medicare and Medicaid programs, the price that is paid for the patient's prescribed drug ultimately will be paid in whole or in large part by a government entity, and in the case of Medicare, the Medicare beneficiary pays a 20 percent co-payment.  These entities are known as the "payers" or "third party payers."  In the case of Medicare and Medicaid programs the reimbursement is made directly to the provider, not to the patient.

37.     This market structure means that the prescription drug market differs in two crucial respects from most markets.

38.     First, in most markets, the consumer determines the product demand.  This is not the case for prescription drugs.  In the prescription drug market, the decision to use a prescription drug is made by the physicians, by the hospitals in which the patient is treated, home health care agencies, long term care facilities or (with respect to the decision to use generic drugs versus brand-name drugs) a pharmacy.  Since prescription drugs are dispensed only on a physician's order, the physician has the principal say in what drug will be chosen for the patient.  However, hospitals, particularly teaching hospitals, also have considerable influence over this choice.  If a hospital decides to put one drug as opposed to a competing drug on its "formulary" (the list of drugs that the

10

hospital pharmacy stocks), the result will be that the physician will likely order that drug rather than a competing drug.  Likewise, although pharmacies do not prescribe drugs, pharmacies can exert an important influence over the choice of which drug the patient will purchase where there is a choice between buying the generic version or the brand-name version of the drug which the physician has prescribed.

39.     A second difference of the prescription drug market from other markets is that in ordinary markets, the ultimate consumer of the product pays for it directly.  In the prescription drug market, however, most payments are made by "payers" through private or public insurance programs.

40.     The structure of the prescription drug market produces the following fundamental fact that underlies Defendants' unlawful scheme.  If a Defendant Drug Manufacturer can cause a "payer" to reimburse for the Defendant's drug at a higher price than the price the provider paid to buy the drug from the Defendant, there will be a "spread" between the two prices, and that "spread" is retained by the provider as profit. The larger the "spread" that it can create for a particular drug, the greater the incentive the provider has for choosing, or for influencing the choice of, that drug rather than a drug from a competing manufacturer.

**B.      The Average Wholesale Price (AWP)**

41.     Each of the Defendants and/or their subsidiaries has for years identified an average wholesale price ("AWP") and, more recently, a price denominated as the wholesale acquisition cost ("WAC") (or similar terms used to denote either the price charged by wholesalers or a drug's cost to wholesalers) for most of their drugs. Defendants disseminate these prices to the public through publication in certain medical compendiums such as the *Red Book* and *Blue Book*.

11

42.    For many years Hawaii, as a payer under the Medicaid program, has based its reimbursement formula for prescription drugs on the Defendants' published AWPs. Hawaii has relied on these prices for many reasons.  First, simplified and reliable estimates of the cost of drugs prescribed for Hawaii citizens are needed because the huge number of different drugs and the non-transparency of the marketplace make it impracticable for Hawaii to track the drug price changes drug by drug on a daily basis. Second, the AWPs come directly from the Defendants, the most knowledgeable source. Third, by using the term "average wholesale price," Defendants convey that they have a good faith basis for their wholesale price calculation.  Fourth, the compendiums in which these prices are published are widely used and respected.  Fifth, these published prices are the only prices publicly available.  Sixth, Defendants conceal the true cost of their drugs as set forth below.  Seventh, Hawaii relies on the honesty of those who profit from Hawaii's Medicaid assistance programs and other State programs.

43.    As a result, Hawaii's drug reimbursement system has been, and remains, almost completely dependent on Defendants' reported wholesale prices.  Defendants know this fact and rely on it to make their AWP scheme work.

44.    Defendants have illegally misrepresented the true AWP for virtually all of their drugs.  One purpose of this scheme was and is to create the spread between the true wholesale price of a drug and the false and inflated AWP and thereby increase the incentive for providers to choose the drug for their patients, or, at a minimum, to counteract the same tactic used by a competitor, since if competing manufacturers are also publishing false and inflated AWPs for their drugs, a given Defendant will be at a competitive disadvantage unless it does the same for its own drugs.

45.     The higher the spread between the AWP and the wholesale price the provider actually pays, the more profit a provider can make.  Defendants often market their products by pointing out (explicitly and implicitly) that their drug's spread is higher than a competing drug's.

46.     All of the Defendants have inflated their reported average wholesale prices to levels far beyond any real average wholesale price of their drugs and those of their subsidiaries.  One high-ranking industry executive has described it as the industry practice to do so.  Dey brought a lawsuit against First DataBank, the publisher of the medical compendium that Hawaii Medicaid relies on for prescription drug pricing, because it published the *actual* average wholesale price of Dey's drugs instead of the false average wholesale price sent to the publisher by Dey.  One of Dey's allegations in that lawsuit was that the publication of its actual prices for drugs was inconsistent with the practice in the industry of accepting and publishing reported, inflated AWPs, and that such publication put Dey at a competitive disadvantage because it had no "spread" to advertise.

47.     Attached as Exhibit 1 to this Complaint is a list of drugs manufactured by the Defendants and/or their subsidiaries that the U.S. Department of Justice, after an extensive investigation, found to have inflated AWPs.  The U.S. Department of Health and Human Services more recently concluded, with respect to all drugs utilized in the Medicare Program that "[a] general conclusion reached in reviewing GAO [General Accounting Office] and OIG [Office of Inspector General] data is that there is a level of overstatement in the listed AWP for *all* drugs. . . ." Payment Reform for Part B Drugs, 68 Fed. Reg. 50,430 (August 20, 2003) (emphasis added).

13

48.     Examples of the Defendants' practices of inflating AWPs include the following:

| Manufacturer | Drug | 2000 AWP | 2000 Available Price | Spread |
|---|---|---|---|---|
| Janssen Pharm | Nizoral 200 mg | $351.11 | $292.58 | $58.53 |
| Merck | Pepcid 20 mg | $177.08 | $141.66 | $35.42 |
| Novartis | Tegretol XR tab | $45.26 | $36.97 | $8.29 |
| Novartis | Clozaril | $352.26 | $243.65 | $108.61 |

49.     Exhibit 2 contains additional examples of drugs manufactured by Defendants with inflated AWPs.  Plaintiff has continued to obtain information relating to Defendants' publication of the prices of their drugs including material obtained by complaints filed by other states, prices available to buyers other than Hawaii's Medicaid program, and wholesaler data too voluminous to attach to a complaint, and have found that the evidence uniformly supports the conclusion that Defendants have pervasively inflated their published wholesale prices.

50.     Defendants have similarly illegally and deceptively misrepresented and inflated the wholesale acquisition cost ("WAC") of many of their drugs making it appear that any reduction in the purchase price beyond the listed WAC would result in a loss to the wholesaler and was, hence, unachievable, when in fact the WAC was secretly discounted to purchasers other than the Medicaid and Medicare programs through an elaborate charge back system.

## IV.    DEFENDANTS' CONCEALMENT OF THEIR WRONGDOING

51.     Defendants have been able to succeed in their drug pricing scheme for more than a decade by exacerbating the complexities of the incredibly huge, and dauntingly complex, drug market, and by purposely concealing their scheme and the true acquisition cost of drugs to providers from Hawaii and its citizens, as set forth below.

14

### A.   Defendants Scheme to Hide Their True Prices for Drugs

52.   First, Defendants sell their drugs in a unique manner that hides the true price of their drugs. This scheme works as follows: Upon agreeing on a quantity and price of a drug with a provider, or group of providers, the Defendants purport to sell the agreed upon drugs to wholesalers with whom they have a contractual arrangement, at a price they call the Wholesale Acquisition Cost ("WAC"). The WAC may be, and often is, higher than the price agreed upon by the provider and the drug manufacturer. The wholesaler then ships the product to the provider, charging the provider the (lower) price originally agreed upon by the drug manufacturer and the provider. When the wholesaler receives payment from the provider, it charges the manufacturer for handling, and any applicable rebates and discounts, and sends a bill to the manufacturer, called a "charge back," for the difference between the WAC and the price actually paid by the provider. These charge backs, (or shelf adjustments, or other economic inducements) are kept secret, so that it appears that the wholesaler actually purchased the drug at the higher WAC price. The effect of this practice is to create the impression that the "wholesale price" of the drug is higher than it really is.

53.   Second, Defendants further inhibit the ability of the State of Hawaii and Hawaii consumers to learn the true cost of their drugs by wrapping the sales agreements they negotiate with providers in absolute secrecy, terming them trade secrets and proprietary, to preclude providers from telling others the price they paid.

54.   Third, Defendants further obscure their true prices for their drugs with their policy of treating different classes of trade differently. Thus, for the same drug, pharmacies are given one price, hospitals another and doctors yet another.

55.     Fourth, some Defendants have hidden their real drug prices by providing free drugs and phony grants to providers as a means of discounting the overall price of their drugs.  For example, in 2004 Schering Sales Corporation, a subsidiary of Schering-Plough, plead guilty to a federal criminal indictment for engaging in such misconduct, as did Defendant Pfizer and in 2003 Defendants AstraZeneca and Bayer Corp.  These illegal practices appear to be part of an industry-wide marketing effort that may well represent the industry norm, but further discovery on this issue is required.

56.     Defendants have hidden their motive for utilizing an inflated AWP from the public.  Only with the disclosure of materials secured by litigants in recent discovery has it become apparent that Defendants have purposely manipulated their AWPs and one reason Defendants do so is to compete for market share on the basis of a phony price spread, instead of the true selling price of their drugs or the medicinal value of these drugs to their users.

57.     Defendants have further concealed their conduct by making sure that all of the entities purchasing drugs directly from the Defendants (and, hence, knowledgeable about the true price of their drugs) have had an incentive to keep Defendants' scheme secret.  Defendants' scheme permits all providers, pharmacies, physicians, and hospitals/clinics, to make some profit from Defendants' inflated spread, because all of them are reimbursed in some manner on the basis of the AWP for at least some of the drugs they sell or administer.  For providers, therefore, the greater the difference between the actual price and the reported AWP, the more money they make.  Thus, providers willingly sign drug sales contracts requiring them to maintain secrecy about the prices they pay for drugs.

58.     Defendants have themselves continuously concealed the true price of their drugs and continued to publish deceptive AWPs and WACs as if they were real, representative prices.

### B.     Defendants' Scheme Continues In Spite of Anecdotal Discovery

59.     Although from time to time reports have emerged which indicate one drug or another, at one time or another, could be purchased for less than the AWP, Hawaii has been powerless to either discover the nature of Defendants' fraud or arrest it for many reasons.  First, Defendants have fraudulently concealed their scheme by publishing AWPs and WACs as if they were true prices and by hiding their true prices through elaborate cover-ups.  To this day Hawaii has no idea what the true wholesale prices of Defendants' drugs are.  Second, only recently has the outline of Defendants' scheme become known.  Indeed, as late as 2000 the United States Congress was sufficiently confused by what Defendants were doing that it directed the General Accounting Office to launch a full scale investigation of the market.  And it was not until 2003 that the U.S. Department of Health and Human Services was able to modify the Medicare reimbursement system for drugs.  Third, the motive for Defendants engaging in this scheme - the belief that a larger spread enhances sales prospects - has only recently been discovered, making it clear, for the first time, that the disparities in reported AWP/actual prices were not simply a result of transient market forces but were, instead, the result of a purposefully deceptive scheme by the Defendants.  Fourth, at the national level, providers have opposed any attempt by the legislatures to change the reimbursement formulas by submitting misleading data about their costs and expenses.  Fifth, as a public policy matter it is impracticable to respond effectively to evidence that some drugs, at some time, for some reason, have AWPs higher than their actual purchase price.  Hawaii does not have the resources to investigate

17

each drug company to validate the reported prices of over 65,000 NDC's on an ongoing

basis. And Hawaii is not at liberty simply to slash its drug reimbursement levels in the

dark. If it unknowingly reduced its levels of reimbursement to below that which the

providers actually pay for drugs, the providers would simply stop supplying the drugs, to

the detriment of Hawaii citizens. Thus, although Hawaii has now uncovered the outline of

Defendants' unlawful scheme, the damage resulting to the State and its citizens from

Defendants continues unabated and will continue until Hawaii learns the true wholesale

prices of Defendants' drugs.

**C.      Defendants' Scheme Corrupts the Market for Prescription Drugs**

60.     Instead of competing on prices and medicinal value alone, the Defendants

deliberately created a powerful financial incentive for providers to prescribe drugs based

on the spread between the true price of a drug and its published AWP or WAC. Creating

incentives for providers to prescribe drugs based on such a spread is inconsistent with

Hawaii's public policy.

61.     Large price spreads on higher priced drugs encourage providers to

prescribe more expensive drugs instead of their lower priced substitutes thereby

increasing the cost of health care. Competition on the basis of such spreads has the

potential to influence (consciously or unconsciously) providers to prescribe less efficacious

drugs over ones with greater medicinal value. Because the Defendants have concealed

their scheme, Hawaii and its citizens have unknowingly underwritten this perversion of

competition in the drug market.

62.     In sum, Defendants have been, and continue to be, engaged in an insidious,

fraudulent scheme that is causing Hawaii and its citizens to pay scores of millions of

dollars a year more than they should for their prescription drugs, and may well be inducing some providers to prescribe less efficacious drugs.

## V.   THE INJURY TO HAWAII'S MEDICAID PROGRAM AND HAWAII MEDICARE BENEFICIARIES

### A.   The Hawaii Medicaid Program

63.     The Hawaii Medicaid Program is a state-administered program that pays for medical care including prescription drug benefits for Hawaii's low-income and disabled citizens.  The Medicaid Program also pays for drug services for certain persons who qualify for both Medicaid and Medicare, including the 20% Medicare co-payment.

64.     In 2004 there were approximately 43,189 individual recipients of Hawaii's Medicaid drug services.  The cost of drug services in the Hawaii Medicaid program have seen dramatic increases rising from slightly over $20.7 million in 1997 to slightly over $112.5 million in 2004, an increase of over 500%.

65.     In its report to the Legislature on Act 259, Part III, Section 39 Prescription Drugs for Fee for Service Clients, the Department of Human Services (DHS) reported expending $63,255,737 for medication in calendar year 2000.  There were approximately 35,000 eligible recipients.  In its report to the Twenty-Third Hawaii State Legislature in 2005, DHS reported that it spent $112,575,993.82 for all prescription drugs in fiscal year 2004 in its Med-Quest program.

### B.   The Medicare Program

66.     Medicare is a health insurance program created by the federal government for the elderly and disabled and other eligible persons. 42 U.S.C. 1395, *et. seq.*  Typically, individuals become eligible for Medicare health insurance benefits if they are over 65 years

19

of age, disabled, or have end stage renal disease.  There are two major components of the Medicare Program, Part A and Part B.

67.     Medicare Part B is an optional program that provides coverage for some healthcare services for Hawaii's participating elderly and disabled citizens not covered by Part A. 42 U.S.C. 1395j through 1395w-4.  Medicare Part B is supported by government funds and premiums paid by eligible individuals who choose to participate in the program.

68.     The Medicare Program Part B reimburses physicians, pharmacies and health care providers for certain drugs prescribed for, and dispensed to, Hawaii Medicare recipients.  At issue here is Medicare Part B's limited benefit for drugs which are provided either: (a) incident to a physician's service and cannot generally be self-administered; or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other durable medical device payable under Medicare's DME benefit equipment (DME).

69.     In order to calculate the portion Medicare recipients and Hawaii's Department of Human Services (DHS) must pay for Part B benefits, the Medicare program has generally relied upon the falsely reported AWP.  For example, from January 1, 1999, the methodology for calculating the allowable cost of multiple source drugs and biologicals is 95% of the lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or lowest average wholesale price of the brand name form of the drug or biological.  42 C.F.R § 405.517.  Medicare then pays eighty percent (80%) of the allowable cost.  The remaining 20% is paid as a co-payment by the Medicare Part B beneficiary, or for eligible individuals, by the Medicaid Program.

70.     Because Medicare Part B participants must pay 20 percent of the allowable cost, which is based on the AWP, for their medications, and because Defendants have

20

published false and inflated AWPs for their drugs, Medicare Part B participants are paying substantially more for their co-pay than they would pay if Defendants published their true wholesale prices. Indeed, with respect to some drugs, the 20% co-pay for the Medicare Part B participant is greater than the entire cost of the drug.

71.     As described more fully herein, for the past decade or more the Defendant Drug Manufacturers have used the distribution chain, including but not limited to physicians, hospitals, pharmacists and others, to create and thereby profit from an unfair or deceptive scheme that improperly inflated the prescription drug payments made by the DHS and Hawaii's citizens.

## VI.     DRUG PRICING

### A.     Medicaid Drug Pricing

72.     Plaintiff State of Hawaii, via the Department of Human Services (DHS), administers Hawaii's Medicaid program and reimburses physicians and pharmacies for drugs prescribed for, and dispensed to Medicaid recipients. Hawaii Medicaid also pays the 20% co-payment for prescription drugs for Hawaii Medicare beneficiaries who are qualified to receive Medicaid benefits.

73.     Hawaii's Medicaid program provides services through various programs such as the Fee For Service program that provides services to qualified persons who are aged 65 and over, or certified blind or disabled under which payment is made directly to the provider, and the Med-Quest program that provides coverage for all other qualified persons under a managed care program.

74.     Reimbursement under the Hawaii Medicaid program for prescription drugs is limited in accordance with formulas based, in part, on the maximum allowable cost established for drugs. The maximum allowable cost for drugs is based, in part, on the

Estimated Acquisition Cost (EAC) determined from price information provided by pharmaceutical manufacturers and a pricing update service.  When a manufacturer reports false pricing information, or conceals true pricing information from the Medicaid program, then the calculation of EAC is inflated, and thus the reimbursement schedule is also inflated.  These circumstances result in drug reimbursement overpayments to drug providers by the State's Medicaid program.  At all relevant times Defendant Drug Manufacturers were aware of Hawaii's Medicaid reimbursement formulas.

75.    The Hawaii Medicaid program reimburses providers for medications as follows:

For single source drugs the lowest of:

1.    The estimated acquisition cost (EAC) for a drug product plus a dispensing fee,

2.    The billed charge, or

3.    The provider's usual and customary charge to the general public.

76.    For multiple source drugs the lowest of:

1.    The billed charge,

2.    The provider's usual and customary charge to the general public,

3.    The Federal Upper Limit (FUL) price plus a dispensing fee,

4.    The State Maximum Allowance Cost (SMAC) plus dispensing fee, or

5.    The estimated acquisition cost (EAC) for a drug product plus a dispensing fee.

77.    Hawaii has estimated the EAC as the Average Wholesale Price (AWP) minus 10.5%.

78.     Hawaii has adopted a list of drugs that are covered without prior authorization.  In determining which drugs will be included on the list, DHS considers information provided by prescription drug manufacturers regarding the AWP and the wholesale acquisition cost (WAC).

**B.     Medicare Drug Pricing**

79.     During the period 1992 through 1997, Medicare's reimbursement for Covered Drugs was set at the lesser of the Estimated Acquisition Cost (EAC) or national Average Wholesale Price (AWP).  For generic drugs, payment was based on the lower of the EAC or wholesale price that was defined as the median price for all sources of the generic form of the drug.  This payment methodology was set forth in 42 C.F.R. §405.517, a regulation first published in the Federal Register on November 25, 1991 and which became effective on or about January 1, 1992.

80.     Historically, Medicare has used the AWP published in the *Red Book* or other compendia as a ceiling for Medicare reimbursement.

81.     On January 1, 1998, 42 C.F.R. §405.517 was amended to provide that the allowed amount would be based upon the lower of the billed charge on the Medicare claim form or 95% of AWP.[1]

82.     The Medicare program has publicly announced that it would use the AWP published in pharmaceutical industry magazines as the basis for reimbursement. Specifically, Program Memorandum AB-99-63 (dated September 1999 but re-issued PM AB-98-76 dated in December 1998), a publicly available Medicare Program bulletin, confirmed that reimbursement for certain Medicare Part B drugs and biologicals "are paid

---

[1]  P. L.108-173, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, changed the basis of Medicare Part B drug reimbursement from AWP to Average Sales Price (ASP), a statutorily defined price calculated from actual sales transactions.

based on the lower of the billed charge or 95% of the AWP as reflected in sources such as the *Red Book*, *Blue Book*, or Medi-Span."

83.     Pursuant to PM AB-99-63, the AWP for a single-source drug or biological equals the AWP of the single product. For a multi-source drug or biological, the AWP is equal to the lesser of the median AWP of all the generic forms of the drug or biological or the lowest brand name product AWP.

84.     Medicare Part B reimburses medical providers 80% of the allowable amount for a Covered Drug. The Medicare Part B beneficiary must pay the remaining 20%, the "co-payment" amount. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

85.     As described more fully herein, Defendants engaged in an unfair or deceptive scheme or trade practices, anti-trust and unfair competition in violation of H.R.S. Ch. 480 and H.R.S. § 481A-3(a)(9), (11) and (12), entitling Hawaii and its citizens to compensatory damages trebled, plus attorneys' fees and costs pursuant to H.R.S. §480-13 and/or enhanced elder penalties provided for in H.R.S. §480-13(b).

## VII. DEFENDANTS MANIPULATED THE AWP AND KEPT THE TRUE PRICES SECRET

86.     The Defendants knew that the actual transaction price data, the amounts actually charged to providers and others for the drugs, was not publicly available, and they kept this information highly confidential and secret. The reimbursement system is based upon published AWP that was itself dependent on the honesty of the drug manufacturers.

The Defendants knew they could directly control and fabricate the AWP for their drugs at any time through the materials they sent to the publishers of medical compendium.

87.   At all relevant times, the Defendants were aware that the Medicare / Medicaid programs used the published AWP to establish the amount to reimburse health care providers for drugs dispensed to Medicare beneficiaries and others.

88.   Defendants willfully and knowingly misrepresented their reported prices when in fact the reported prices were far higher than their drugs were made available in the marketplace.  In addition, Defendants further manipulated the AWP by giving health care providers various rebates, grants, discounts and "free" samples all of which served to increase the "spread" between the published AWP and the actual prices charged to the prescribing providers.  By manipulating the AWP and keeping secret the true AWP, Defendant Drug Manufacturers inflated the prescription drug prices thus causing Hawaii and its citizens to overpay for their drug purchases.

## VIII.   TOLLING

89.   By concealing the true AWP, not disclosing that the price data reported to the trade journals was false, and the use of rebates, discounts and "free" samples to create the AWP spread, the Defendant Drug Manufacturers concealed the State's and Hawaii's Medicare beneficiaries' causes of actions.

90.   In addition, Defendant Drug Manufacturers' AWP scheme is subject to H.R.S. § 480-24 and is tolled as a continuing violation.

91.   Any applicable statute of limitation has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  The State of Hawaii and Hawaii's Medicare beneficiaries have been kept in ignorance of vital information essential

to the knowledge of, and the pursuit of, these claims and Hawaii's citizens could not reasonably have discovered the fraudulent nature of the scheme.

92.     Defendants were and continue to be under a continuing duty to disclose to Plaintiff the fact that the published AWPs bore and continue to bear no relationship to the prices or pricing structures for Covered Drugs and brand name drugs.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the published AWPs, Defendants are estopped from relying on any statutes of limitations.

## Count I – False Claims
(On Behalf of the State of Hawaii)

93.     Defendant Drug Manufacturers knowingly caused to be presented to an officer or employee of the State a false or fraudulent claim for payment, and/or caused to be made or used a false record or statement and/or conspired to defraud the State by getting a false or fraudulent claim allowed or paid in violation of H.R.S. § 661-21 (a)(1), (2) and (3).

## Count II – Unfair or Deceptive Acts or Practices
(On Behalf of Hawaii Medicare Beneficiaries)

94.     Plaintiff re-alleges and incorporates all the above allegations.

95.     The AWP Scheme constitutes an unfair or deceptive act or practice in violation of Chapter 480, Hawaii Revised Statutes.

H.R.S. § 480-2 provides in part:

>     (a)     Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

96.     Defendants violated this section by, including but not limited to, intentionally engaging in a scheme to falsify the true AWP of their drugs, reporting false, misleading and inflated pricing information on their drugs to national reporting services while at the

same time concealing actual AWP pricing information.  The reporting services in turn published the Defendants' inflated pricing information to substantial numbers of persons, including but not limited to, the Medicare/Medicaid program, in connection with the promotion of the sale of, or to increase the consumption of, Defendants' prescription drugs and thereby enabled Defendants to obtain excessive, unjust and illegal profits.  In addition, this conduct caused the beneficiaries to overpay, and allowed Defendants to increase their market share.

## Count III – Unfair Competition

### (On Behalf of Medicare Beneficiaries and the State of Hawaii)

97.     Plaintiff re-alleges and incorporates all the above allegations.

98.     The AWP Scheme constitutes an unfair competition act in violation of Chapter 480, Hawaii Revised Statutes.

99.     Defendants violated this section by, including but not limited to, intentionally engaging in a scheme to falsify the true AWP of their drugs, reporting false, misleading and inflated pricing information on their drugs to national reporting services while at the same time concealing actual AWP pricing information.  The reporting services in turn published the Defendants' inflated pricing information to substantial numbers of persons, including but not limited to, the Medicare/Medicaid program, in connection with the promotion of the sale of, or to increase the consumption of, Defendants' prescription drugs and thereby enabled Defendants to obtain excessive, unjust and illegal profits.  In addition, this conduct caused the beneficiaries and the State to overpay, and allowed defendants to increase their market share.

27

## Count IV – Deceptive Trade Practices Act

### (On Behalf of Medicare Beneficiaries and the State of Hawaii)

100.    Plaintiff re-alleges and incorporates all the above allegations.

101.    H.R.S. § 481A-3 provides:

    (a)    A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:

        (9)    Advertises goods or services with the intent not to sell them as advertised;

        (11)    Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

        (12)    Engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

102.    Defendants violated these sections and thereby committed a per se violation of H.R.S. § 480-2 by, including but not limited to, intentionally engaging in a scheme to falsify the true AWP of their drugs, reporting false, misleading and inflated pricing information on their drugs to national reporting services while at the same time concealing actual AWP pricing information.  The reporting services in turn published the Defendants' inflated pricing information to substantial numbers of persons, including but not limited to, the Medicare/Medicaid program, in connection with the promotion of the sale of or to increase the consumption of Defendants' prescription drugs and thereby enabled Defendants to obtain excessive, unjust and illegal profits.

## Count V - Non-Disclosure

### (On Behalf of the State of Hawaii)

103.    Plaintiff re-alleges and incorporates all the above allegations.

104.    Defendants intentionally and/or negligently caused to be published false and incorrect pricing information, as described above, in trade publications.

105.    Defendants engaged in this scheme with the intent that others, including the State of Hawaii's Medicaid Program, use it in their business transactions.

106.    Plaintiff State of Hawaii's Medicaid Program relied upon the false and incorrect AWP information, as alleged above, and was damaged by overpaying for Defendants' drug products.

## Count VI – Unjust Enrichment
### (On Behalf of Medicare Beneficiaries and the State of Hawaii)

107.    Plaintiff re-alleges and incorporates all the above allegations.

108.    Defendant Drug Manufacturers knew that pharmacies and physicians who obtained Medicare/Medicaid reimbursement for Defendants' drug products were not entitled to improperly inflated reimbursement rates that were based on Defendants' false pricing information.

109.    As a result of the excessive payments to health care providers of all or part of the "spread," Defendants were unjustly enriched at the expense of the State of Hawaii and its citizens.

110.    Defendants knew they were not entitled to the profits that resulted from the sales obtained through the use of the spreads they created, and should be required to make restitution of all such amounts obtained through the use of such spreads.

WHEREFORE, Plaintiff and the Attorney General on behalf of its citizens, ask the Court for the following relief and seek judgment against the Defendant Drug Manufacturers as follows:

a.    That general and special damages be awarded to the State of Hawaii and Hawaii Medicare beneficiaries.

29

b.    That mandatory treble damages be awarded pursuant to HRS §
480-13, 480-14, or alternatively punitive damages.

c.    That qualifying Medicare beneficiaries be awarded the statutory
minimum damages of $5,000 per incident for unfair and deceptive acts and practices
against elderly persons pursuant to HRS § 480-13(b).

d.    That the Court award costs of suit, pre-judgment and post-judgment
interest, and attorneys' fees pursuant to HRS § 480-13 and 480-14 or as otherwise
allowed by law; and such other relief as this Court deems just and proper.

e.    That the Court enjoin the Defendant Drug Manufacturers from
continuing the deceptive or unfair acts or practices complained of herein.

f.    That the Court grant such other and further relief or equitable relief
that it deems just and proper.

Dated:  Honolulu, Hawaii, _APR 2 7 2006_____.

MARK J. BENNETT
ATTORNEY GENERAL
STATE OF HAWAII

CHARLES BARNHILL, JR.
WILLIAM P. DIXON
ROBERT LIBMAN
W. DANIEL "Dee" MILES, III
CLINTON CARTER
WARREN PRICE, III
KENNETH T. OKAMOTO
RICK J. EICHOR

SPECIAL DEPUTY ATTORNEYS GENERAL
ATTORNEYS FOR PLAINTIFF

30