# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 **CLASS 1 TRIAL** | ) Civil Action No. 01-CV-12257 PBS ) ) ) Judge Patti B. Saris ) Chief Magistrate Judge Marianne B. Bowler ) |

**BMS'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION <u>IN LIMINE</u> TO PRECLUDE DR. HARTMAN FROM TESTIFYING ABOUT MATTERS NOT DISCLOSED IN HIS PRIOR REPORTS**

Defendants Bristol-Myers Squibb and Oncology Therapeutics Network (collectively, "BMS") respectfully submit this memorandum of law in support of their motion <u>in limine</u> to preclude plaintiff's expert, Dr. Raymond S. Hartman, from testifying about matters not disclosed in his prior reports.

Dr. Hartman has submitted a new expert report in which, among other things, he discusses (1) the statutory history of the Medicare Part B program; (2) a new theory for damages allegedly suffered by individuals who had supplemental insurance but made a co-payment in connection with that insurance; and (3) the extent to which the decrease in payments for drugs under the Medicare Modernization Act ("MMA") is not offset by an increase in the payment for services.[1]  At the time of his deposition in February-March 2006, Dr. Hartman explicitly disclaimed any expertise in the Medicare statute and regulations; his extensive damage analysis did not include a theory by which individuals could recover damages for co-payments in connection with supplemental insurance; and he testified that he was instructed by counsel not to

---

[1] Report of Raymond S. Hartman Regarding Bristol-Myers Squibb with Respect to Class 1, dated May 30, 2007 ("Hartman BMS Rpt."), at 4-11 and 45-47.

consider the extent to which any decrease in drug payments would be offset by an increase in payment for services.  Since BMS has not had an opportunity to depose Dr. Hartman on these subjects, and there are many other flaws in his analysis as discussed below, he should be precluded from testifying about them.

1.     Dr. Hartman's Interpretation of the Medicare Statute and Regulations

At his deposition, Dr. Hartman repeatedly testified that he is not an expert on the Medicare statute and regulations:

> "Q:  Now you admitted at your last deposition that you are not an expert on Medicare regulations and you don't have a law degree.  Has that changed?
>
> "A:  No."[2]

> * * *

> "I am not sufficiently schooled in the administrative law or whatever to make -- to make any judgment from this letter [about implementation of the estimated acquisition cost portion of the 1991 regulation] one way or the other.  I mean that's something for a lawyer to conclude."[3]

> * * *

> "I am not an expert in – we know I am not an expert in Medicare regulations . . . ."[4]

> * * *

> "I am not a lawyer or I have not -- I am not an expert on the interpretations on the Medicare statute."[5]

> * * *

> "I am not an expert on the statutory history of -- of Medicare, period."[6]

---

[2] 2/27/06 Dep. Tr. 879.

[3] Id. at 891.

[4] Id. at 897.

[5] 2/28/06 Dep. Tr. 918-19.

* * *

  "But again, I'm not expert on -- on the -- on this -- on the statutory implementation of -- of or the statutory articulations of these standards."[7]

* * *

  "[T]hat's something I will leave to someone who's an expert on the Medicare regulations."[8]

* * *

  "Q:  . . . I believe you also admitted that you are not an expert on those assumptions, on the meaning of the Medicare regulation or statutes . . . .

  "A:  You did understand that correctly."[9]

Similarly, Dr. Hartman testified at the Class 2 and 3 trial: "I am not an expert on all of the Medicare, the statutory history and details of Medicare, that's correct."[10]

      Nevertheless, Dr. Hartman has served a new expert report, dated May 30, 2007, which contains a section entitled "The Medicare Part B Program and Its Reliance on AWP for Cost-Based Reimbursement."[11]  In that report, he engages in an extensive analysis of the history of the Medicare statute and regulations and purports to interpret the statutory scheme.  He concludes that "Medicare reimbursement generally and for Part B drugs specifically was originally and formally designed to be cost-based . . . ."[12]

---

[6] Id. at 924-25.

[7] Id. at 930.

[8] Id. at 931.

[9] 3/1/06 Dep. Tr. 1387.

[10] 11/20/06 Trial Tr. 106.  Over defendants' objection, Dr. Hartman was permitted to give limited testimony about the Medicare regulations during the Class 2 and 3 trial.  Id. at 16-17.

[11] Hartman BMS Rpt. at 4.

[12] Id. ¶ 18.

In addition to doing an about-face from what he testified to at his deposition, Dr. Hartman clearly does not know what he is talking about.  He claims that Medicare Part B "explicitly" linked reimbursements to costs from the outset, even though the government in its amicus brief told the Court that Medicare payments were linked to "the 'reasonable costs' of Part A services and the 'reasonable charges' of Part B services . . . ."[13]  He claims that the resource-based relative-value scale ("RBRVS") -- which relates to services, not drugs -- is a cost-based system,[14] even though HCFA has stated that RBRVS is simply a methodology for allocating aggregate payments among physicians under the "reasonable charge" system.[15]

Dr. Hartman also claims that "usual and customary charge" means the "actual cost" of a drug,[16]  even though HCFA has consistently defined usual and customary to mean the price that the provider and other providers in the geographic area normally charge the general public, without regard to cost.[17]  Similarly, he suggests that the phrase "billed charge" as used in the Medicare regulations under the Balanced Budget Act of 1997 means "the acquisition cost of the drug to the provider,"[18] even though the regulation refers to the "actual charge" and CMS defines actual charge as "[t]he amount of money a doctor or supplier charges for a certain medical service or supply."[19]

---

[13] Brief of the United States as Amicus Curiae, dated September 15, 2006, at 3 (emphasis added).  Dr. Hartman appears to have confused Medicare Part A, which relates to hospitals, with Medicare Part B, which relates to physicians.

[14] Hartman BMS Rpt. ¶ 12.

[15] 56 Fed. Reg. 59502, 59504 (Nov. 25, 1991).  HCFA defined reasonable charge as "the lowest of: (1) the physician's actual charge, (2) the physician's customary charge, or (3) the prevailing charge in the locality for similar services."  Id.; 42 U.S.C. § 1395l(a).

[16] Hartman BMS Rpt. ¶ 13.

[17] 42 C.F.R. §§ 447.502-447.504.

[18] Hartman BMS Rpt. ¶ 15.

[19] 42 C.F.R. § 405.517; www.cms.hhs.gov/apps/glossary (emphasis added).

While BMS could bring these points out on cross-examination, this case will be complicated enough for a jury without the added task of sorting through Dr. Hartman's musings about areas that go far beyond what plaintiffs' counsel told the Court he would testify about.[20] Dr. Hartman testified at his deposition that he had no expertise in this area; BMS has not had an opportunity to take discovery of Dr. Hartman on this subject; and his testimony is demonstrably incorrect. It should be precluded.

       2.     <u>Dr. Hartman's New Damage Theory</u>.

In his initial expert report, dated December 15, 2005, Dr. Hartman purported to estimate damages for all three classes.[21] To calculate damages for Class 1, he simply applied the percentage of co-payors who do not have supplemental insurance to the total Medicare Part B damages.[22] He did the same thing in his supplemental damage calculation, dated February 3, 2006.[23]

Now, in his new report dated May 30, 2007, Dr. Hartman has added a new category of damages to Class 1 -- damages allegedly suffered by individuals who made co-payments to Class 2 insurers in connection with their supplemental insurance.[24] Dr. Hartman did not include those damages in his calculation of Class 1 damages in his prior reports. As a result, defendants were not able to explore this theory at Dr. Hartman's deposition.

Furthermore, in Dr. Hartman's damage calculation for the Class 2 trial, he did not deduct from the total Class 2 damages any co-payments that may have been made by individuals.

---

[20] At a hearing on June 26, 2006, plaintiffs' counsel represented that Dr. Hartman's Class 1 testimony would be limited to damages. 6/26/06 Hr'g Tr. 79.

[21] Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages at 42-50 and Attach. J.

[22] <u>Id.</u> at 43-44, Figure 2 and Attach. J.6.

[23] Supplemental Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages: Addendum at Attach. A.6.

[24] Hartman BMS Rpt. at 47, Table 2.c.

He asked the Court to assume, in effect, that the Class 2 insurers paid the entire amount.  Dr. Hartman is double-counting.

In addition, it appears that Dr. Hartman's analysis of the extent to which individuals made co-insurance payments (as opposed to no co-payments or flat co-payments) is based on sheer speculation.  In several notes in Attachment F.3.a to his report, he states "[i]t is assumed that": (1) all Medigap plans do not require their beneficiaries to pay co-insurance; (2) 60% of employer-sponsored supplemental insurance plans require beneficiaries to pay a 20% co-insurance; and (3) 32.8% of supplemental insurance is provided by employer-sponsored plans.[25] These notes are very confusing and are impossible to understand without explanation.

Furthermore, the materials Dr. Hartman cites as a basis for these assumptions are studies by others, who are not available for cross-examination.[26]  In some cases they appear to be inconsistent with Dr. Hartman's assumptions; in some cases they do not even relate to supplemental insurance; and in all cases they relate only to a particular year, and it is clear that the situation changes from year to year.[27]  These materials are also very difficult to understand without an explanation.

There is no reason why Dr. Hartman could not have proposed this theory at the outset, giving defendants an opportunity to take discovery and examine him on this subject. Indeed, by proposing a theory for Class 2 that is inconsistent with his new theory for Class 1, Dr. Hartman misled defendants as to what he had in mind.  Such gamesmanship should not be permitted by the Court; the testimony should be excluded.

---

[25] Hartman BMS Rpt. Attach. F.3.a.

[26] Dr. Hartman cites two articles: (1) Frank B. McArdle et al., "Large Firms' Retiree Health Benefits before Medicare Reform: 2003 Survey Results," Health Affairs (Jan. 14, 2004) and (2) F.J. Eppig and G.S. Chulis, "Trends in Medicare Supplemental Insurance: 1992-1996," Health Care Financing Review, Vol. 19(1) (Fall 1997).

[27] For example, the McArdle article relates to 2003 and does not appear to concern supplemental insurance; the Eppig article relates to 1996 and appears to address only a portion of supplemental insurance plans.

3.      The Offset for Services

During the Class 2 and 3 trial, there was extensive testimony that reimbursement for drugs cross-subsidized under-reimbursement for services, and any reduction in the reimbursement for drugs would have necessitated an increase in the reimbursement for services. This is important because the class members make co-payments on the amounts paid for both drugs and services.

At his deposition, Dr. Hartman testified that he was instructed by counsel not to consider the trade-off between reimbursement for drugs and services -- even though he agreed that a decline in reimbursement for drugs would cause an increase in the reimbursement for services.[28]  He testified the same way at trial.[29]  He also testified at his deposition that he was not even aware that reimbursement for services was increased under the MMA.[30]

Nevertheless, Dr. Hartman's new report includes an analysis of the extent to which the increase in reimbursement for services has offset the decrease in reimbursement for drugs under the MMA.  Again, this is a subject on which we have not had an opportunity to depose Dr. Hartman.[31]  Furthermore, the analysis is completely misleading because it looks at only certain dosages for certain drugs; it does not include all regimens for the drugs at issue; and it does not consider whether the ASPs were in fact higher during the class period.[32]

---

[28] 2/28/06 Dep. Tr. 1055, 1058.

[29] 11/21/06 Trial Tr. 47, 50.

[30] 2/28/06 Dep. Tr. 1064-65.

[31] Dr. Rosenthal included one of Dr. Hartman's charts in her rebuttal testimony.  She admitted in her written testimony that she had not prepared the chart, and on cross-examination she acknowledged that it only included one regimen.  (12/18/06 Trial Tr. 53-55.)  Interestingly, Dr. Rosenthal does not include this subject in her new report.

[32] The most egregious example is Dr. Hartman's chart for Taxol, a copy of which is annexed as Exhibit A.  The "but for" analysis relates to one regimen for one NDC of Taxol in 2005 -- after the class period.  There are a number of NDCs for Taxol and it is administered in many regimens.  Furthermore, Taxol did not become multi-source until 2001, so the ASP for Taxol was significantly higher during most of the class period-- again, something Dr. Hartman did not analyze.  As a result of those flaws in Dr. Hartman's analysis, plaintiffs cannot demonstrate that, if one

This is an analysis that Dr. Hartman could have included in his original report, and if he had, BMS would have been able to question him about it at his deposition.  This is a particularly egregious example because plaintiffs' counsel told him not to conduct the analysis. If expert reports are to have any meaning, this analysis should be excluded.

considers all regimens on all BMS subject drugs during the class period, total reimbursements would have been any lower.

<u>CONCLUSION</u>

For the foregoing reasons, Dr. Hartman should be precluded from testifying about his interpretation of the Medicare statute and regulations; his new damage theory with respect to co-payments by individuals who have supplemental insurance; and his analysis of the trade-offs between reimbursement for drugs and services under the MMA.

Dated:  June 11, 2007

<div style="margin-left:40%">

Respectfully submitted,


By:  /s/  Jennifer Ryan (BBO No. 661498)

    Thomas E. Dwyer, Jr. (BBO No. 139660)
    Jennifer Ryan (BBO No. 661498)
    **DWYER & COLLORA**
    600 Atlantic Avenue
    Boston, Massachusetts
    Tel: (617) 371-1000
    Fax: (617) 371-1037
    tdwyer@dwyercollora.com
    jryan@dwyercollora.com

    Steven M. Edwards
    Lyndon M. Tretter
    *Admitted pro hac vice*
    **HOGAN & HARTSON LLP**
    875 Third Avenue
    New York, New York 10022
    (212) 918-3000

    *Attorneys for Defendants Bristol-Myers Squibb Co., and Oncology Therapeutic Network Corp.*

</div>

## CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE

I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on June 11, 2007, I caused a copy of **BMS'S MOTION IN LIMINE TO PRECLUDE DR. HARTMAN FROM TESTIFYING ABOUT MATTERS NOT DISCLOSED IN HIS PRIOR REPORTS** and **MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE DR. HARTMAN FROM TESTIFYING ABOUT MATTERS NOT DISCLOSED IN HIS PRIOR REPORTS** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

        /s/ Lyndon M. Tretter
        Lyndon M. Tretter