UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) | MDL No. 1456 |
| ) | Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO CLASS 1 JURY TRIAL (BMS) ) ) ) | Hon. Patti B. Saris |

**BMS'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE
TO PRECLUDE ANY REFERENCE TO THE COURT'S PLAIN MEANING OPINION
UNTIL INSTRUCTION OF THE JURY**

Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation (collectively, "BMS") respectfully submit this memorandum of law in support of their motion in limine to preclude any reference to the Court's plain meaning opinion, In re Pharm. Indus. Average Wholesale Price Litig., 460 F. Supp. 2d 277 (D. Mass. 2006), until the Court instructs the jury on the law.

**Preliminary Statement**

On November 2, 2006, this Court issued a Memorandum and Order providing that the term "average wholesale price," as used in the 1997 Medicare statute, should be construed "to include discounts and rebates."[1] Id. at 288. The Court did not grant plaintiffs' motion for summary judgment. Id. Nor did the Court indicate what impact, if any, its decision would have on the trial.

---

[1] The court's opinion refers to the 1998 Medicare law, but it is apparent from the context that the Court was referring to the Balanced Budget Act ("BBA") of 1997.

Plaintiffs in the past have suggested that the Court's decision is dispositive of the entire case.[2] The Court has rejected that contention.[3] The Court has also indicated that it may reject plaintiffs' contention that its decision gives rise to per se liability under Mass. G.L. ch. 93A.[4]

Nevertheless, we are concerned that plaintiffs will refer to the Court's decision in their opening statement and throughout the trial. That would be improper; the Court's decision concerns a matter of law. Matters of law should not be discussed by counsel with the jury until the Court determines what its jury charge will be.

### Statement of Facts

The evidence will show that, beginning in the 1970s, BMS reported wholesale list prices to industry publications (the "Publications"), who applied a mark-up factor to calculate AWPs.[5] Prior to 1991, HCFA used AWPs on an ad hoc basis to determine how much to reimburse providers for drugs under the "reasonable charge" standard applicable to Medicare Part B. HCFA first used the term average wholesale price in a regulation adopted in 1991. Initially, HCFA proposed that reimbursement be based on 85% of AWP because "we believe that the Red Book and other wholesale price guides substantially overstate the true cost of drugs."[6] In the final rule, HCFA decided to use 100% of AWP, noting that the thrust of the

---

[2] 11/6/06 Trial Tr. 56; 11/26/07 Trial Tr. 42; Pls.' Post-trial Br. 6-7.

[3] 11/6/06 Trial Tr. 45.

[4] 5/22/06 AstraZeneca Settlement Status Hr'g Tr. 7; 11/20/06 Trial Tr. 39, 120.

[5] Rogers Aff. ¶¶ 1-2; Szabo Aff. ¶ 6; Ihling Dep. Tr. 89-90, 96-97; see also Kaszuba Aff. ¶¶ 3, 6; Kaszuba 11/13/06 Tr. 55, 59, 109, 120.

[6] HCFA, "Medicare Program; Fee Schedule for Physicians' Services, Proposed Rule," 56 Fed. Reg. 25792, 25800 (June 5, 1991) (DX 1048). All citations to "DX __" are to the joint defendants' exhibits in the Class 2 and 3 trial in this action.

comments it had received suggested that "many drugs could be purchased for considerably less than 85 percent of AWP -- particularly multi-source drugs -- while others were not discounted."[7]

Significantly, HCFA did not issue any instructions to the industry on how AWPs should be defined or reported. Accordingly, BMS continued its practice of reporting wholesale list prices -- not AWPs -- to the Publications, who marked up those list prices by 20% - 25% to calculate AWPs. BMS also understood, from published OIG reports, that HCFA knew that the AWPs for some of its drugs -- particularly multi-source drugs -- substantially exceeded the acquisition cost in many instances.[8]

In 1997, Congress passed a statute setting reimbursement for drugs at 95% of the average wholesale price.[9] Even though Congress knew, as reflected in the Court's opinion, that published AWPs could exceed acquisition costs by nearly 1000% in some instances,[10] the Court decided to interpret the statute in accordance with its "plain meaning" because there was confusion in the industry over the meaning of AWP. In re Pharm. Indus., 460 F. Supp. 2d at 281, 285-87. While we respectfully disagree with the Court's decision, we note that the Court did not rule that the statute imposed any obligation on pharmaceutical manufacturers to change the way they reported pricing information to industry Publications.

Furthermore, after the statute was passed, HCFA did not direct the pharmaceutical companies to change the way they reported pricing information to industry publications. Indeed, the evidence will show that HCFA and many members of Congress believed that, other than the

---

[7] HFCA, "Medicare Program; Fee Schedule for Physicians' Services, Final Rule," 56 Fed. Reg. 59502, 59524 (Nov. 25, 1991) (DX 1049). The Court has not ruled on what "average wholesale price" meant in the 1991 rule.

[8] Pasqualone 12/06/06 Tr. 16-19; Garofalo 12/08/06 Tr. 108-09. As noted elsewhere, BMS can show that a substantial amount of its net revenue came from sales within 5% of is wholesale list price.

[9] Balanced Budget Act of 1997, Pub. L. 105-33 § 4556(a) (1997) (codified at 42 U.S.C. § 1395u(o)) (DX 1906).

[10] Report of the Committee on the Budget House of Representatives, Balanced Budget Act of 1997, H.R. Rep. No. 105-149 at 1354 (June 24, 1997) (DX 1071). This reference relates to a BMS drug, Vepesid, which was a multi-source drug in 1997.

reduction from 100% to 95% of AWP, nothing had changed.[11] Given this evidence and the evidence of government knowledge of the spreads for BMS's drugs, BMS was justified in believing that the way it had reported pricing information to the Publications since the early 1970s was not false or misleading.

That belief was further reinforced in 2000, when HCFA announced that it had directed its carriers to use lower "more accurate" AWPs that it had obtained from the Department of Justice.[12] In response to complaints from members of Congress, HCFA withdrew this directive for oncology drugs and instructed its carriers to continue to use the Publications' AWPs.[13] The rationale, according to the Administrator of HCFA, was that HCFA had "concluded that Medicare payments for services related to the provision of chemotherapy drugs . . . are inadequate," and the Publications' AWPs enabled physicians to earn margins on drugs that cross-subsidized the shortfall in the payment for services.[14]

Against this backdrop, the government has acknowledged that "the spread between list prices and AWP was known to the government in various ways, and assumed by the Medicare reimbursement system."[15] Furthermore, plaintiffs own expert, Dr. Hartman, has acknowledged that Medicare had an "expectation" that AWP would exceed acquisition cost by

---

[11] HCFA, "Implementation of the New Payment Limit for Drugs and Biologicals" Program Mem. No. AB-97-25 at 1 (Jan. 1998) (HHC021-0032-33) (DX 1076); Donna E. Shalala, Secretary, DHHS, "Report to Congress: The Average Wholesale Price for Drugs Covered Under Medicare" at 2-3 (1999) (HHC902-0801-18) (DX 1080); Senator Saxby Chambliss, et al. to Donna E. Shalala, Secretary, DHHS (July 28, 2000) (DX 1086); Christopher S. Bond and John Ashcroft to Donna E. Shalala, Secretary, DHHS (Aug. 3, 2000) (DX 1087); Senator Spencer Abraham to Donne E. Shalala, Secretary, DHHS (Sept. 6, 2000) (DX 1089).

[12] Donna E. Shalala, Secretary, DHHS, to Representative Thomas Bliley, Chairman, Commerce Committee, U.S. House of Representatives at 2 (May 31, 2000) (HHC001-359-362) (DX 1083).

[13] Nancy-Ann Min DeParle, HCFA Administrator to Members of Congress (Sept. 8, 2000) at 2 (DX 1090); HCFA, "An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program," Program Mem. No. AB-00-86 at 2 (Sept. 8, 2000) (DX 1091).

[14] Donna E. Shalala, Secretary, DHHS to Senator Spencer Abraham at 2 (Oct. 25, 2000) (DX 1092).

[15] 6/24/04 "Gov't Mem. re RTP as a Kickback" at 1, United States v. Mackenzie, No. 01-CR-10350-DPW (D. Mass.) (DX 1215).

30%.[16]  In addition, the Court has observed that "everyone knew about a 20 to 25 percent spread, maybe 30 percent."[17]

## Argument

### PLAINTIFFS SHOULD NOT BE PERMITTED TO DISCUSS ISSUES OF LAW BEFORE THE JURY

As a general matter, absent unusual circumstances, it is improper for counsel to make statements to the jury about the law, particularly before the Court has decided what its charge will be.  See Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997) ("it is for the judge, not the lawyers . . . to inform the jury of the law applicable in the case"); United States v. Wables, 731 F.2d 440, 449 (7th Cir. 1984) ("It is beyond question that it is for the judge, not counsel, to explain the law to the jury.") (citations omitted); United States v. Parr-Pla, 549 F.2d 660, 662 (9th Cir. 1977) ("It is the duty of the court, not counsel, to advise the jury as to the law . . . .").  The jury's job is to determine the facts.  Dimick v. Schiedt, 293 U.S. 474, 486 (1935) ("The controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts."); United States v. Articles of Drug Consisting of Following: 5,906 Boxes, 745 F.2d 105, 111 (1st Cir. 1984) (a jury's role is to determine disputed facts and it should not be asked to decide issues of a legal, as opposed to factual, nature).

Counsel's statements to the jury, therefore, should be limited to the facts.  See, e.g., United States v. Ademaj, 170 F.3d 58, 66 (1st Cir. 1999) (district court refused to allow defense counsel to define "reasonable doubt" in closing argument because "the court would explain the law to the jury"); Commonwealth v. Verde, 827 N.E.2d 701, 707 (Mass. 2005)

---

[16] Hartman 11/20/06 Tr. 116, 118-21; Hartman Dep. Tr. 661, 672, 804-06, 1235, 1241.  Dr. Rosenthal has testified that it was well-known that AWP exceeded WAC by 20% - 25%.  Rosenthal 11/15/06 Tr. 86, 92-93.

[17] 4/11/07 AstraZeneca Pretrial Hr'g Tr. 22; see also 1/26/07 Trial Tr. 148.

(district court refused to allow prosecutor to describe charged offense in closing argument and "directed the prosecutor to go ahead with the facts" because the court "would explain the law to the jury").

This is particularly true with respect to opening statements, which occur well before the court has decided what its charge to the jury will be. See, e.g., United States v. Young & Rubicam, Inc., 741 F. Supp. 334, 352-53 (D. Conn. 1990) (denying government's motion for leave to make opening statement regarding meaning of statutory term as "amount[ing] to a request to make a legal argument during opening statement which is precisely what should be avoided in opening statements"); United States v. Clarke, 159 Fed. Appx. 128, 132 (11th Cir. 2005) (defendant did not have a right to make legal arguments in opening statement); Henry v. United States, No. 96 C 6799, 1996 WL 628093, at *2 (N.D. Ill. Oct. 28, 1996) (district court sustained objection to assertion in opening statement "as constituting counsel's legal argument, rather than the factual presentation to which opening statements should address themselves"); Cent. Commc'ns, Inc. v. TCI Cablevision, Inc., 610 F. Supp. 891, 904 (W.D. Mo. 1985) ("Legal arguments offered during the course of an opening statement are improper.").

The Court's ruling on the meaning of average wholesale price in the statute is a ruling of law. The parties will not be calling witnesses to testify about the meaning of the statute.[18] The jury will not be asked to decide the meaning of the statute.

---

[18] To the extent that plaintiffs attempt to "slip this in" through their experts, it is completely inappropriate. Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997) (joining at least seven other circuits in prohibiting expert testimony on legal issues); Sparton Corp. v. United States, No. 92-580C, 2007 WL 1180472, at *7 (Fed. Cl.) ("federal courts have found expert testimony on issues of law, either giving a legal conclusion or discussing the legal implications of evidence, to be inadmissible"). Dr. Hartman and Dr. Rosenthal are not experts on statutory interpretation, and even if they were, any opinions they offer as to the meaning of a statutory term would nevertheless violate the prohibition against testimony by experts regarding legal issues. See, e.g., Marx & Co., Inc. v. Diner's Club, Inc., 550 F.2d 505, 509-10 (2d Cir. 1977) (noting that expert's testimony regarding contract interpretation could not be rendered admissible by declaring him "an expert in contract law" because "[i]t is not for witnesses to instruct the jury as to applicable principles of law").

The jury will be asked to decide (among other things) whether BMS made a misrepresentation of fact with an intent to deceive.[19] The factual proof will concern what BMS's understanding of AWP was and what it said, as well as BMS's state of mind. After the jury hears that factual proof, it will have to decide whether BMS committed fraud as defined in the Court's instructions.

BMS candidly admits that it will try to persuade the Court not to instruct the jury on its "plain meaning" ruling. The jury can determine whether BMS committed fraud without relying on the Court's "plain meaning" ruling. Most fraud cases are determined without reference to a statutory definition. The issue is what people said and understood, not what appears in the statutory definition. That is especially true where, as here, the common understanding differed from the statutory definition.

As noted above, whatever the "plain meaning" of the statute, many people did not understand it to mean that the pharmaceutical manufacturers were required to ensure that reported AWPs equaled acquisition costs. That was true for members of Congress and government officials, as well as industry participants like BMS. The jury will be hopelessly confused if plaintiffs are permitted to regale it with argument about the "plain meaning" in their opening statement, and then the jury hears proof that, as the Court observed, "everyone knew about the 20 to 25 percent spread, perhaps 30."[20]

BMS recognizes that the Court may ultimately decide to instruct the jury on its plain meaning ruling, but the time to cross that bridge is after the proof is in and the Court can determine the proper instruction. The Court can then tailor the instruction to fit the evidence in

---

[19] Plaintiffs have undertaken to satisfy a fraud standard in proving their case.

[20]  4/11/07 AstraZeneca Pretrial Hr'g Tr. 22; see also 1/26/07 Trial Tr. 148.

the case. The Court will not have to contend with the possibility that its version of the plain meaning ruling differs from plaintiffs'.

More importantly, the Court will have the option of deciding not to issue an instruction on plain meaning. If the Court decides not to issue an instruction on plain meaning, but plaintiffs have already been permitted to discuss the plain meaning ruling with the jury, it will be too late. Plaintiffs should not be permitted to infect the jury, and potentially cause a mistrial, by discussing issues of law in the early phases of the trial.

The best approach is to separate the law from the facts. The trial, as presented to the jury, should be about the facts. The law should be presented only after the jury has heard the facts.

### Conclusion

Accordingly, BMS respectfully requests that the Court grant its *in limine* motion precluding any reference to the Court's plain meaning ruling until the Court instructs the jury on the law.

Dated:   June 11, 2007

Respectfully submitted,

By:   /s/ Jennifer M. Ryan (BBO No. 661498)
Thomas E. Dwyer (BBO No. 139660)
Jennifer M. Ryan (BBO No. 661498)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
Tel: (617) 371-1000
Fax: (617) 371-1037
tdwyer@dwyercollora.com
jryan@dwyercollora.com

Steven M. Edwards (SE 2773)
Lyndon M. Tretter (LT 4031)
Thomas J. Sweeney, III (TS 6557)
Admitted *pro hac vice*
**HOGAN & HARTSON LLP**
875 Third Avenue
New York, NY  10022

Tel: (212) 918-3000

*Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation*

## CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE

     I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on June 11, 2007, I caused a copy of **BMS'S MOTION IN LIMINE TO PRECLUDE ANY REFERENCE TO THE COURT'S PLAIN MEANING OPINION UNTIL INSTRUCTION OF THE JURY** and **MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE ANY REFERENCE TO THE COURT'S PLAIN MEANING OPINION UNTIL INSTRUCTION OF THE JURY** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

                                                /s/ Lyndon M. Tretter
                                                  Lyndon M. Tretter