## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) MDL No. 1456 |
| | ) Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO CLASS 1 JURY TRIAL (BMS) | ) ) Hon. Patti B. Saris ) |

## BMS'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION <u>IN LIMINE</u> TO EXCLUDE
## EVIDENCE RELATING TO BMS MULTI-SOURCE DRUGS

Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation (together, "BMS") respectfully submit this memorandum of law in support of their motion <u>in limine</u>, pursuant to Rules 402 and 403 of the Federal Rules of Evidence, for an Order precluding plaintiffs from introducing at trial documents and testimony regarding BMS drugs after they faced generic competition. This evidence should be excluded because plaintiff's cannot show either (1) that plaintiffs were administered the BMS version of a multi-source drug or (2) that plaintiffs made a co-payment for a multi-source drug based on the AWP for BMS's version of the drug.

### <u>Preliminary Statement</u>

This case involves seven BMS physician-administered drugs, five of which were "multi-source" for part or all of the class period of 1992-2003 and one (Etopophos), which while technically "single-source" was in fact reimbursed exclusively under a multi-source J-Code for etoposide.[1] Rubex (doxorubicin hcl) and Cytoxan (cyclophosphmide) injectables were multi-

---

[1]      Paraplatin (carboplatin) was the lone BMS subject drug that was single-source for the period 1992 to 2003. It went multi-source in 2004.

source drugs throughout 1992-2003; Blenoxane (bleomycin) became subject to generic competition in 1996; Taxol (paclitaxel) became subject to generic competition in 2000; Vepesid (etoposide) injectibles faced generic competition beginning in 1994 and Vepesid capsules in 2001; and Cytoxan capsules faced generic competition in 2000.[2]  Of the 320 spreads depicted by Dr. Hartman in Attachment E.3 of his Class 1 report as to BMS, 209 related to multi-source NDCs for the years at issue in the case.[3]

Because Medicare reimburses for multi-source drugs based on J-codes that include the NDCs of all brand and generic manufacturers, plaintiffs have conceded they cannot identify the source of the drug, and, therefore, they cannot establish that they were injured by any conduct of BMS.

In the Class 2 and 3 trial, plaintiffs also failed to demonstrate that, for multi-source drugs, the AWP of the BMS drug had any bearing on reimbursement amounts.  Once multi-source competition occurred, reimbursement was based on the median of the generic AWPs (prior to 1998), or the lower of the brand or the median of the generic AWP (after 1998).[4] Since generic AWPs were always below brand AWPs, and BMS did not change its list prices after its drugs lost exclusivity, the reimbursement amount could not have been based on the AWP for the BMS drug.[5]  Thus, plaintiffs cannot show they were harmed by the AWP for any BMS multi-source drug.

---

[2]       Bell Aff. ¶¶ 12, 15-19 and Ex. B (DX 2637).

[3]       Hartman Class 1 BMS Report, Attach. E.3.

[4]       During 1998 itself, Medicare carriers were instructed to add the brand to the "array" in calculating the median, but only if the brand AWP was lower than all generic AWPs.

[5]       Marre 11/14/06 Tr. 155.

## Argument

## I.

## PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEY HAVE A CLAIM RELATING TO MULTI-SOURCE BMS DRUGS

Before it reaches the issue of whether BMS has engaged in misrepresentations, the jury must determine whether plaintiffs have a claim.  As BMS demonstrated in the Class 2/3 trial, to establish that it has standing to sue under Mass. G.L. ch. 93A, a plaintiff must prove that it purchased the defendant's product.  See, e.g., Roberts v. Enter. Rent-A-Car Co. of Boston, Inc., 840 N.E.2d 541, 543-44 (Mass. 2006) (no standing to sue car rental company over allegedly deceptive collision insurance when plaintiff waived coverage).  Other states have similar requirements.[6]  In the context of this case, that means that plaintiffs are required to demonstrate that they made co-payments for drugs manufactured by BMS.

With respect to multi-source drugs, plaintiffs cannot satisfy that burden.  Plaintiffs have conceded that multi-source drugs are reimbursed on a J-code basis, and they have no way of identifying the manufacturer that supplied the drug.[7]  This eliminates approximately two-thirds of the claims against BMS.[8]

---

[6]    See also Healy v. McGhan Med. Corp., No. CA975320, 2001 WL 717110, at *4 (Mass. Super. Ct. Mar. 29, 2001) (no standing to sue breast implant manufacturer under ch. 93A where plaintiff's implant was manufactured by another); Tweedell v. Hochheim Prairie Farm Mut. Ins. Ass'n., 1 S.W.3d 304, 307 (Tex. App. 1999) (Texas Deceptive Trade Practices Act ("DTPA") plaintiff must purchase or lease defendant's goods or services to have a claim); Kasprzak v. Am. Gen. Life & Accident Ins. Co., 942 F. Supp. 303, 305 (E.D. Tex. 1996) (plaintiff who did not buy "vanishing premium policy from defendant had no claim under DTPA); Glazewski v. Coronet Ins. Co., 483 N.E.2d 1263, 1268 (Ill. 1985) (plaintiffs did not have standing to bring fraud claim against insurance companies from which they had not purchased the coverage at issue).

[7]    Mulrey 11/08/06 Tr. 53-55; Hartman 12/11/06 Tr. 59-60; see Pl.'s Post-Trial Omnibus Trial Br. 53.  Unless otherwise stated, references herein to testimony, exhibits and briefs are to the Class 2/3 trial record.

[8]    A chart identifying those multi-source drugs is annexed as Exhibit A hereto.

Plaintiffs have also failed to demonstrate that, for multi-source drugs, the AWP of the BMS version of the drug had any bearing on reimbursement amounts.[9]  Once multi-source competition occurred, reimbursement was based on the median of the generic AWPs (prior to 1998), the median of the generic AWP with the brand in array (in 1998) or the lower of the brand or the median of the generic AWP (after 1998).[10]  Since generic AWPs were always below brand AWPs, and BMS did not change its list prices after its drugs lost exclusivity (Pasqualone Aff. ¶ 18; Pasqualone 12/06/06 Tr. 7; Marre 11/14/06 Tr. 133, 154-155; Szabo Aff. ¶ 11), the reimbursement amount could not have been based on the AWP for the BMS drug.[11]  See First State Ins. Co. v. Utica Mut. Ins. Co., 870 F. Supp. 1168, 1178 (D. Mass. 1994) (primary insurer's bad faith refusal to settle within policy limits did not cause injury to excess insurer because claimant would not have accepted policy limits in any event).[12]

Because plaintiffs cannot demonstrate any liability to plaintiffs relating to BMS's multi-source drugs, any evidence relating to those drugs has no relevance to the claims the jury will decide and should be excluded under Fed. R. Evid. 402.  Ahlberg v. Chrysler Corp., 481

---

[9]     Hartman 11/21/06 Tr. 65-67.

[10]    HFCA, "Medicare Program; Fee Schedule for Physicians' Services, Final Rule," 56 Fed. Reg. 59502, 59261 (Nov. 25, 1991) (DX 1049); 42 CFR § 405.517, 2001 (DX 1852).

[11]    See Bell 12/07/06 Tr. 48-51; Comparison of Rubex AWPs & MA Medicare Allowance (NDC 00015335222 = J9000) (DX 2644); Comparison of Cytoxan AWPs & MA Medicare Allowance (NDC 00015054841 = J9096) (DX 2645).

[12]    Accord Haesche v. Kissner, 640 A.2d 89, 93-94 (Conn. 1994) (dismissal of plaintiff's Connecticut Unfair Trade Practices Act claim affirmed because plaintiff could not prove his injury resulted from violation of such act); Food Lion, Inc. v. Capital Cities/ABC Inc., 194 F.3d 505, 512-14 (4th Cir. 1999) (no violation of North Carolina Unfair Trade Practices Act where plaintiff could not show defendants' deceptive acts caused damage to plaintiff); Brown v. Bank of Galveston, 963 S.W.2d 511, 514 (Tex. 1998) (dismissal of Texas DTPA claim affirmed due to plaintiff's failure to show defendant's acts caused his damages).

F.3d 630, 633 (8th Cir. 2007) (evidence regarding Jeep retrofit was irrelevant to issues regarding

Dodge RAM accident, and was therefore properly excluded).[13]

## II.

## PLAINTIFFS CANNOT RESORT TO ANY ALTERNATIVE LIABILITY THEORIES

Plaintiffs suggested in the Class 2 and 3 trial that alternative liability theories such

as market share liability and joint and several liability could solve their proof problems.  (Pls.'

Omnibus Post-Trial Br. at 52-64.)  The Class 2 and 3 Trial, however, involved the consumer

protection statute of only one state, Massachusetts; moreover, the Court has now determined to

try the Class 1 case as a common law fraud case.  Common law fraud requires proof of causation

or reliance.  In any event, regardless of consumer or common law or state choice of law, the

alternative liability theories cannot be applied to plaintiffs' claims.

A.    The Common Law Fraud Law of All Relevant Jurisdictions Requires Proof of
        Causation and/or Reliance.

The Court has determined that it will try the case based on common law fraud

legal principles.  In every one of the 37 relevant jurisdictions, however, the law requires that

plaintiff show that defendant's actions caused damages to plaintiff or that plaintiff's reliance on

defendant's action caused his injury.  See, e.g., Nazami v. Patrons Mut. Ins. Co., 910 A.2d 209,

214 (Conn. 2006) (plaintiff must show he relied on defendant's false statement to his detriment);

Time Savers, Inc. v. LaSalle Bank, N.A., 863 N.E.2d 1156, 1167 (Ill. App. Ct. 2007) (plaintiff

---

[13]    In addition, any evidence relating to those drugs would tend to confuse or mislead the jury and should be
excluded under Fed. R. Evid. 403.  As BMS demonstrated at trial, its pricing strategy relating to single-source drugs
differed from that relating to multi-source.  (Pasqualone 12/6/06 Tr. 6-7.)  Admission of evidence relating to multi-
source drugs will likely mislead or confuse the jury, because it will be problematic for the jury to distinguish the
evidence relating to single-source drugs from that relating to multi-source.  See Ahlberg, 481 F.3d at 633 (in Dodge
RAM case, minimal probative value of retrofit evidence in different vehicle model "was substantially outweighed by
the dangers of unfair prejudice, confusion of the issues, and misleading the jury"); Bizzle v. McKesson Corp., 961
F.2d 719, 721-22 (8th Cir. 1992) (in case regarding alleged injury due to breaking of cane, minimal probative value
of evidence regarding another cane model was "easily outweighed by the dangers of unfair prejudice to [defendant]
and of misleading the jury").

must show he suffered damages due to his reliance on defendant's statement); Schneider v. Schaaf, 603 N.W.2d 869, 874 (N.D. 1999) (plaintiff must show actual damage proximately caused by defendant's misrepresentation); Johnson v. Owens, 140 S.E.2d 311, 313 (N.C. 1965) (plaintiff must be deceived by plaintiff's misrepresentation and caused to suffer loss); Erickson v. Dep't of Labor and Indus., No. 54781-0-I, 2005 WL 1313505, at *4 (Wash. Ct. App. May 31, 2005) (plaintiff must show damages caused by defendant's false factual representation); Small v. Fritz Cos., 65 P.3d 1255, 1277 (Cal. 2003) ("[a] 'complete causal relationship' between the fraud or deceit and the plaintiff's damages is required").  Thus, plaintiffs are required to show they suffered damages due to reliance on BMS's false misrepresentation.  As discussed above, as to multi-source drugs, they cannot make that showing.

   B.   Plaintiff Cannot Rely On Alternative Liability Theories.

        Plaintiffs assert that they can rely on alternative liability theories such as market share and joint and several liability to finesse the causation requirements of various state laws.[14] BMS's research reveals that of the 37 states whose laws are at issue in this case, 29 either have expressly rejected a market share approach or have never applied it under any circumstances.[15]

---

[14]     The plaintiffs also relied on "alternative liability" theory in their Pretrial Brief as to Class 2 and 3, but abandoned that position post-trial, recognizing that their failure to join all possible liable parties doomed that theory. See, e.g., Spencer v. Baxter Int'l, Inc., 163 F. Supp. 2d 74, 79-80 (D. Mass. 2001) (to establish a claim based on alternative liability, all potential tortfeasors must be joined before the court); Erickson v. Baxter Healthcare, Inc., 151 F. Supp. 2d 952, 969 (N.D. Ill. 2001) (same); Cimino v. Raymark Indus. Inc., 151 F.3d 297, 314 n.35 (5th Cir. 1998); Skipworth v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 174 (Pa. 1997) (same); Marshall v. Celotex Corp., 651 F. Supp. 389, 392 (E.D. Mich. 1987) (same); see also Wood v. Eli Lilly & Co., 38 F.3d 510, 512 (10th Cir. 1994) (finding Oklahoma has rejected theory in product liability cases).  There are many other companies not party to this case who market generic versions of BMS's drugs.  (See Bell Aff., Ex. B (DX 2637).)

[15]     The Court is already aware of the decisions of Massachusetts appellate courts on this point.  Payton v. Abbott Labs., 437 N.E.2d 171, 188 (Mass. 1982); Santiago v. Sherwin Williams Co., 3 F.3d 546, 549-51 (1st Cir. 1993); Mills v. Allegiance Healthcare Corp., 178 F. Supp. 2d 1, 8-9 (D. Mass. 2001) (Saris, J.).  State or federal courts in 19 other states have declined to adopt the market share theory including Arizona, Arkansas, Connecticut, Delaware, District of Columbia, Idaho, Illinois, Indiana, Maryland, Michigan, Missouri, Nebraska, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island and Texas.  See, e.g., White v. Celotex Corp., 907 F.2d 104, 106 (9th Cir. 1990) ("It is highly unlikely that the Supreme Court of Arizona would adopt in asbestos litigation a theory [market share liability] that it has not even adopted as to a single fungible product."); Jackson v. Anchor Packing Co., 994 F.2d 1295, 1303 (8th Cir. 1993) ("Arkansas has not adopted alternative or market share

The remaining states that have considered market share liability have done so only in cases involving negligence or other common law torts for personal injury; and market share liability has not applied to cases such as this one involving economic harm for fraud or under consumer protection statutes.  See Hunnings v. Texaco, Inc., 29 F.3d 1480, 1488 (11th Cir. 1994) (market share theory inapplicable to economic torts, applying Florida law); Sindell v. Abbott Labs., 607 P.2d 924 (Cal. 1980) (personal injury case).  Plaintiffs cite no case applying the theory in a consumer fraud case.

As to joint and several liability, that theory requires plaintiffs to demonstrate that two or more tortfeasors are responsible for a single injury.  See, e.g., Boucher v. Lowell

---

liability, but has retained the traditional requirement of proximate cause in all tort cases."); Gullotta v. Eli Lilly & Co., No. Civ. H-82-400, 1985 WL 502793, at *6 (D. Conn. May 9, 1985) ("[T]his Court notes several difficulties with the theory [of market share liability] as applied, and finds that the Connecticut Supreme Court would not adopt such a theory of liability."); Nutt v. A.C. & S. Co., Inc., 517 A.2d 690, 694 (Del. Super. Ct. 1986) ("This Court has previously declined accepting market-share liability as part of Delaware tort law."); Clayton v. Owens-Corning Fiberglas Corp., 662 A.2d 1374, 1383 n.10 (D.C. 1995) (declining to head "down the road toward a theory of 'market share' liability," which "has been generally rejected by courts in other jurisdictions"); Doe v. Cutter Biological, 852 F. Supp. 909, 913 (D. Idaho 1994) (noting that the Idaho Supreme Court has never sanctioned the use of market share liability); Smith v. Eli Lilly & Co., 560 N.E.2d 324, 345 (Ill. 1990) (rejecting market share liability "because of the infirmities in the proposed theory" and because it "is too great a deviation from a tort principle which we have found to serve a vital function in the law, causation in fact"); City of Gary ex rel. King v. Smith & Wesson Corp., 801 N.E.2d 1222, 1245 (Ind. 2003) (noting that "this [market share] approach to allocation of liability has not been adopted in Indiana"); Lee v. Baxter Healthcare Corp., No. 89-2143, 1990 WL 27325, at *4 (4th Cir. 1990) (refusing to adopt market share liability because it "directly contravene[s] Maryland tort law"); Marshall v. Celotex Corp., 651 F. Supp. 389, 392 (E.D. Mich. 1987) ("The Michigan Supreme Court has not adopted market share liability."); Zafft v. Eli Lilly & Co., 676 S.W.2d 241, 246 (Mo. 1984) (rejecting market share liability as "unfair, unworkable, and contrary to Missouri law, as well as unsound public policy"); Menne v. Celotex Corp., 861 F.2d 1453, 1468 n.24 (10th Cir. 1989) (declining to predict that Nebraska would adopt market share liability); Griffin v. Tenneco Resins, Inc., 648 F. Supp. 964, 966 (W.D.N.C. 1986) (noting that "North Carolina has never adopted the exotic theories [including market share liability] advanced" by plaintiffs and that "the existing analogous North Carolina authority is to the contrary"); Black v. Abex Corp., 603 N.W.2d 182, 189 (N. D. 1999) (finding it unnecessary to address market share theory); Case v. Fibreboard Corp., 743 P.2d 1062, 1067 (Okla. 1987) (declining to adopt market share liability because it would result in an "abrogation of the rights of a potential defendant to have a causative link proven between that defendant's specific tortious acts and the plaintiff's injuries"); Senn v. Merrell-Dow Pharm., Inc., 751 P.2d 215, 223 (Or. 1988) (declining to adopt any alternative theory of liability, including market share liability, because "we cannot pretend that any such theory is consistent with common law principles of tort liability"); Skipworth v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 172 (Pa. 1997) (declining to adopt market share liability because doing so "would result in a significant departure from Pennsylvania law"); Gorman v. Abbott Labs, Inc., 599 A.2d 1364 (R.I. 1991) (refusing to adopt market share doctrine); Cimino v. Raymark Indus., 151 F.3d 297, 313-14 (5th Cir. 1998) (Texas has not adopted market share theory).  There are nine additional states where it appears the Courts have never addressed the issue of adopting market share liability, including Colorado, Kansas, Minnesota, Nevada, New Hampshire, New Mexico, Vermont, West Virginia and Wyoming.

Automatic Transmission, No. 9722, 2001 WL 920693, at *2 (Mass. App. Div. May 16, 2001);

Mitchell v. Hastings & Koch Enter., 647 N.E.2d 78, 84 (Mass. App. Ct. 1995); see also Bluestar

Energy, Inc. v. Murphy, 205 S.W.3d 96, 99 (Tex. App. 2006); Bondy v. Allen, 635 N.W.2d 244,

249 (Minn. App. 2001); Brown v. Spokane County Fire Protection Dist. No. 1, 586 P.2d 1207,

1212 (Wash. Ct. App. 1978).

The Restatement of Torts also recognizes this requirement.  See Restatement

(Third) of Torts: Apportionment of Liability §§ 17-E19 (2000) (all forms of joint and several

liability contain the preliminary requirement that "the independent tortious conduct of two or

more persons is a legal cause of an indivisible injury").[16]  The Restatement defines "legal cause"

as the requirement that a defendant's allegedly tortious conduct must be a "factual cause of the

plaintiff's injury."  Id. at § A 18 cmt. c; § B18, cmt. c; § C18, cmt. c; § D18, cmt. e; § E18, cmt. f.

Plaintiffs, who cannot demonstrate (a) receipt of a BMS version of a drug and/or (b) that the

AWP for the BMS drug affected the reimbursement rate, fail to satisfy this standard.[17]  Thus,

joint and several liability does not apply to Plaintiffs' claims.

### III.

### PLAINTIFFS' EXPERT TESTIMONY ON DAMAGES DOES NOT SATISFY THE REQUIREMENT TO SHOW INJURY

Plaintiffs may seek to finesse their obligation to prove injury/causation as to each

plaintiff in the Class by submitting Dr. Hartman's damages analysis, which attempts to estimate

from BMS sales data how many "units" of BMS drugs made their way to Class members.   As

---

[16]     The Restatement recognizes several different varieties of joint and several liability depending on state law, but all such variations require a showing of defendants' legal responsibility for plaintiff's injur y.  Restatement (Third) of Torts: Apportionment of Liability §§ 17-E19 (2000).

[17]     Plaintiffs have claimed they need only show that BMS's conduct was a substantial contributing factor to their injury but the Restatement makes clear that plaintiffs must also show that BMS's conduct was the factual cause of the plaintiff's injury.  Id. at § A18 cmt. c.

noted in BMS's memorandum in support of its motion in limine to exclude evidence of aggregate damages (the "BMS Aggregate Damages Memorandum"), Dr. Hartman's methodology is unreliable as a measure of damages. Here, we emphasize why Dr. Hartman's damages analysis, even if it were reliable for damages (which it is not), cannot be a substitute for proof of causation.

First, it is improper to conflate the separate and distinct issues of causation and damages. See Hydrite Chem. Co. v. Calumet Lubricants Co., 47 F.3d 887, 890-91 (7th Cir. 1995) ("fact of injury and the amount of injury (damages) are analytically distinct"). As we establish in BMS Aggregate Damages Memorandum, Dr. Hartman's analysis does not demonstrate that any particular class member was dispensed a BMS drug or that an AWP for a BMS drug was used to determine the reimbursement rate the class member paid. All Dr. Hartman does is assume that various percentages of BMS's total sales went to doctors who sought reimbursement from Medicare. At best, Dr. Hartman's analysis would cause the jury to speculate as to whether BMS's conduct caused plaintiffs' injuries. Jury verdicts may not be based on speculation. See Santiago v. Sherwin Williams Co., 3 F.3d 546, 552 (1st Cir. 1993); Rexall Drug Co. v. Nihill, 276 F.2d 637, 644-45 (9th Cir. 1960); Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1216 (10th Cir. 2004); Mazda Motor Corp. v. Lindahl, 706 A.2d 526, 533 (Del. Sup. Ct. 1998); Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065. 1072-73 (6th Cir. 1999); Young v. Francis, 832 F. Supp. 132, 137 (E.D. Pa. 1993).

Second, plaintiffs do not articulate any legal theory that justifies relieving them from the requirement to show causation as to each member of the class. As discussed above, the various alternative liability theories they rely upon simply do not work here, and their attempt to avoid proving causation on an individual basis contravenes well-established and fundamental tort

law in many jurisdictions.  Payton v. Abbott Labs., 437 N.E.2d 171, 188 (Mass. 1982)

("Identification of the party responsible for causing injury to another is a longstanding

prerequisite to a successful negligence action."); Nutt v. A.C. & S. Co., Inc., 517 A.2d 690, 694

(Del. Super. Ct. 1986) (adoption of market share liability would constitute "a change in

traditional tort law"); Claytor v. Owens-Corning Fiberglas Corp., 662 A.2d 1374, 1383 n.10

(D.C. 1995) (adoption of market share liability "would effectively abolish the common law

cause-in-fact requirement" and "represents a radical departure from traditional theories of tort

liability") (citations omitted); Smith v. Eli Lilly & Co., 560 N.E. 2d 324, 345 (Ill. 1990)

(rejecting market share liability as "too great a deviation from a tort principle which we have

found to serve a vital function in the law, causation  in fact"); Lee v. Baxter Healthcare Corp., No.

89-2143, 1990 WL 27325, at *4 (4th Cir. Feb. 27, 1990) (theories such as market share liability

"directly contravene Maryland tort law, which requires direct proof that the defendant is liable

for the plaintiff's injuries because the defendant manufactured, distributed, sold, or was otherwise

responsible for or controlled the product").[18]

---

[18]    See also Zafft v. Eli Lilly & Co., 676 S.W.2d 241, 247 (Mo. 1984) (adoption of theories such as market share liability would result in "abandonment of so fundamental a concept of tort law as the requirement that a plaintiff prove, at a minimum, some nexus between wrongdoing and injury"); Griffin v. Tenneco Resins, Inc., 648 F. Supp. 964, 966 (W.D.N.C. 1986) (theories such as market share liability constitute "radical departures from traditional theories of tort liability") (citations omitted); Case v. Fibreboard Corp., 743 P.2d 1062, 1067 (Okla. 1987) (adoption of market share liability would result in "abrogation of the rights of a potential defendant to have a causative link proven between that defendant's specific tortious acts and the plaintiff's injuries"); Senn v. Merrell-Dow Pharm., Inc., 751 P.2d 215, 223 (Or. 1988) (adoption of theories such as market share liability "requires a profound change in fundamental tort principles of causation" and therefore "we cannot pretend that any such theory is consistent with common law principles of tort liability"); Skipworth v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 172 (Pa. 1997) ("Adoption of the market share liability theory would result in a significant departure" from the "general rule that a plaintiff, in order to recover, must establish that a particular defendant's negligence was the proximate cause of her injuries."); Gorman v. Abbott Labs., Inc., 599 A.2d 1364 (R.I. 1991) (rejecting market share liability because "[w]e are of the opinion that the establishment of liability requires the identification of the specific defendant responsible for the injury"); Cimino v. Raymark Indus., 151 F.3d 297, 313-14 & n.32 (5th Cir. 1998) (theories such as market share liability are contrary to the "fundamental principle of traditional products liability law . . . that the plaintiffs must prove that the defendant supplied the product which caused the injury") (citations omitted).

Finally, attempts to show causation on a global, rather than individual, basis have been soundly rejected by the courts. In In re Fibreboard Corp., 893 F.2d 706 (5th Cir. 1989), an asbestos case, the Court rejected an attempt to use the results of the trial (called "Phase II") of 41 illustrative plaintiffs cases as binding on defendants as to all 2,990 class members. Plaintiffs proposed to offer expert testimony as to why all class members were similar to the 41 representative plaintiffs. The Court rejected this procedure, saying:

> The core problem is that Phase II, while offering an innovative answer to an admitted crisis in the judicial system, is unfortunately beyond the scope of federal judicial authority. It infringes upon the dictates of Erie that we remain faithful to the law of Texas, and upon the separation of powers between the judicial and legislative branches.
>
> Texas has made its policy choices in defining the duty owed by manufacturers and suppliers of products to consumers. These choices are reflected in the requirement that a plaintiff prove both causation and damage. In Texas, it is a "fundamental principle of traditional products liability law . . . that the plaintiffs must prove that the defendant supplied the product which caused the injury." (citation omitted). These elements focus upon individuals, not groups.

Id. at 711.

In response to Plaintiff's argument that expert testimony could make the connection between the class members and the illustrative plaintiffs, the Court stated:

> A contemplated "trial" of the 2,990 class members without discrete focus can be no more than the testimony of experts regarding their claims, as a group, compared to the claims actually tried to the jury. That procedure cannot focus upon such issues as individual causation, but ultimately must accept general causation as sufficient, contrary to Texas law.
>
> *   *   *
>
> Commonality among class members on issues of causation and damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury.

Id. at 711-12.[19]

Similarly, here, Dr. Hartman's damages analysis cannot be a substitute for specific proof that each member of the class was injured by BMS's conduct.

---

[19]     See also Cimino, 151 F.3d at 312 (Rule 23(b)(3) does not alter required proof of all elements of cause of action including individual showing of causation and damages); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344-45 (4th Cir. 1998) (reversing class action judgment because trial court permitted plaintiffs to present class "as a large unified group that suffered a uniform, collective injury," thus ignoring individual issues); In re Paxil Litig., 212 F.R.D. 539, 546-47 (C.D. Cal. 2003) (rejecting plaintiffs' reliance on generic causation for the class as a whole because it ignores individual circumstances concerning each plaintiff); Gartin v. S & M Nutec LLC, No. CV 06-2747SVWPLAX, 2007 WL 1424654, at *11 (C.D. Cal. Apr. 4, 2007) ("the burden of proof must be satisfied with regard to each class member's claim -- thus, requiring that liability and damages be proven on an individual basis."); In re Dow Corning, 250 B.R. 298, 360-61 and n.34 (E.D. Mich. 2000) (government was required to submit individual proof with respect to each federal beneficiary to recover on its claim for medical expenses); see also cases listed in Defs.' Memo. of Law In Supp. of Its Mot. In Limine to Exclude Test. and Evid. Concerning Aggregate Damages 4 & n.3.

## Conclusion

For the reasons stated herein, BMS respectfully requests that the Court grant its in limine motion excluding any evidence relating to BMS's multi-source drugs.

Dated:    June 11, 2007

Respectfully submitted,

By:    /s/ Jennifer M. Ryan

**DWYER & COLLORA, LLP**
Thomas E. Dwyer (BBO No. 139660)
Jennifer M. Ryan (BBO No. 661498)
600 Atlantic Avenue
Boston, MA  02210
Tel: (617) 371-1000
Fax: (617) 371-1037
tdwyer@dwyercollora.com
jryan@dwyercollora.com

Steven M. Edwards (SE 2773)
Lyndon M. Tretter (LT 4031)
Thomas J. Sweeney, III (TS 6557)
Admitted *pro hac vice*
**HOGAN & HARTSON LLP**
875 Third Avenue
New York, NY  10022
Tel: (212) 918- 3000

*Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation*

<u>**CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE**</u>

       I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on June 11, 2007, I caused a copy of **BMS'S MOTION <u>IN LIMINE</u> TO EXCLUDE EVIDENCE RELATING TO BMS MULTI-SOURCE DRUGS** and **MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION <u>IN LIMINE</u> TO EXCLUDE EVIDENCE RELATING TO BMS MULTI-SOURCE DRUGS** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

     /s/ Lyndon M. Tretter     

Lyndon M. Tretter
