UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**CLASS PLAINTIFFS' RESPONSE TO SCHERING'S *TWOMBLY* SUBMISSION**

Schering submits *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (U.S. 2007) as supplemental authority. *Twombly* is not applicable.

*Twombly* is a case involving the pleading standard in an antitrust case where courts often examine economic plausibility at the outset. It has no application at this stage of this case.

Moreover, the notion that economic feasibility was not examined in this case is misplaced. For example, plaintiffs introduced at trial the textbook of Dr. Kolassa. In it Schering's own expert expounded on why generic manufacturers would publish fictitious AWPs and would be motivated to promote the spread. Plaintiffs also introduced dozen of pricing alerts signed by Mr. Weintraub informing Schering/Warrick customers of new spreads between AWP and the real price, and these spreads grew during the Class Period. Plaintiffs introduced documents in which Schering acknowledged that "spread differences" were important in getting the business of customers. And Schering spreads increased dramatically during the Class Period. Schering offered no explanation for this conduct – it was content to rely on graphics of green frogs, attacking a theory that had long passed out of the case. All of this is evidence of economic plausibility.

- 1 -

If that is not sufficient, former CMS Administrator Thomas Scully recently testified that in his experience, generics did without doubt game the system:

> Q. Let's talk about this – this generic with multiple participants in a J Code. In that situation, what you say here about manufacturers being able to use profit margins to get people to buy their drugs doesn't work for generics, does it?
>
> THE WITNESS: I believe it does.
>
> BY MR. DALY:
>
> Q. How would that be?
>
> A. Well, I don't recall all the details, but I remember that ipratropium bromide and ***Albuterol*** were a couple of pennies a dose in reality in the market, and people were charging 25 times that, including the multiple generic manufacturers. ***And that the markup on those respiratory drugs were one of the bigger issues we had. Probably the biggest issue as a pure multiplier factor. So it could, in fact, work on generics.*** (Emphasis added.)

Ex. A at 110:18 – 111:13 (attached hereto).

Mr. Scully picked upon this theme again in his testimony:

> Q. Can you think of a drug during this time period where you have a sole source branded drug where it was discounted in such a way as to increase utilization?
>
> A. I wouldn't say discounted, but the primary ones that I would – ***the thing that drove this, ipratropium bromide/albuterol were one on the generic side***. The other two were probably Remicade on the rheumatoid arthritis side, which I believe was sole source, was high volume for rheumatology. And the other two were Procrit, and then once Aranesp came on the market, they competed with each other theoretically, but they really competed over the spread, which is the thing that got my attention, I spent probably the most time on, because the highest volume, highest cost drugs, which was you could roughly – and I may be wrong on the numbers – buy a two week dose of Procrit. And similar, even though it's a one dose shot for Aranesp for 600 dollars every two weeks, and the markup –

- 2 -

>they were competing in their markups between 1200 and 1700 to drive utilization for physicians.
>
>And you could watch the utilization change depending on how much they marked up their AWP. And I – that was probably the thing that got me most stoked up about changing this policy, *because they were adjusting their AWPs by generate more market volume by creating incentives for physicians, which was as clear as the sun come up in the morning*.

*Id.* at 114:4 – 115:10 (emphasis added).

Thus, evidence at trial demonstrated that Schering published phony AWPs and marketed the spread, as does the evidence that continues to come in.

DATED:  June 19, 2007

By     /s/ Steve W. Berman
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth A. Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR PLAINTIFFS**

- 4 -

- 5 -

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE

Docket No. MDL 1456

      I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on June 19, 2007, I caused copies of **CLASS PLAINTIFFS' RESPONSE TO SCHERING'S** *TWOMBLY* **SUBMISSION** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

                                           /s/ Steve W. Berman
                                           Steve W. Berman

# Exhibit A

```
            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL            :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE        :   CIVIL ACTION

PRICE LITIGATION                  :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO          :

U.S. ex rel. Ven-a-Care of        :   Judge Patti B. Saris

the Florida Keys, Inc.            :

      v.                          :

Abbott Laboratories, Inc.,        :   Chief Magistrate

No. 06-CV-11337-PBS               :   Judge Marianne B.

- - - - - - - - - - - - - - -x        Bowler
```

```
 1          IN THE CIRCUIT COURT OF
 2          MONTGOMERY COUNTY, ALABAMA
 3    - - - - - - - - - - - - - - -x
 4   STATE OF ALABAMA,         :
 5       Plaintiff,            :
 6     vs.           : Case No.: CV-05-219
 7   ABBOTT LABORATORIES, INC., : Judge Charles Price
 8    et al.                   :
 9       Defendants.           :
10   - - - - - - - - - - - - - - -x
11
12   STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
13   ----------------------------X
14   STATE OF WISCONSIN,       : CASE NO.
15       Plaintiff,     : 04-CV-1709
16    v.                :
17   AMGEN INC., et al.,       :
18       Defendants.           :
19   ----------------------------X
20
21
22
                                        Page 2
```

```
 1           IN THE COURT OF COMMON PLEAS
 2              FIFTH JUDICIAL CIRCUIT
 3   ----------------------------------X
 4   STATE OF SOUTH CAROLINA, and   :   STATE OF
 5   HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6   capacity as Attorney General for : COUNTY OF
 7   the State of South Carolina,   :   RICHLAND
 8       Plaintiff,       :
 9     v.                 : CIVIL ACTION NO.
10   WARRICK PHARMACEUTICALS        : 2006-CP-40-4390
11   CORPORATION, et al.      : 2006-CP-40-4399
12       Defendants.      :
13   ----------------------------------X
14   STATE OF SOUTH CAROLINA, and   :   STATE OF
15   HENRY D. McMASTER, in his official : SOUTH CAROLINA
16   capacity as Attorney General for : COUNTY OF
17   the State of South Carolina,   :   RICHLAND
18       Plaintiff,       :
19     v.                 : CASE NO.
20   ABBOTT LABORATORIES, INC.      : 2006-CP-40-4394
21       Defendant.       :
22   ----------------------------------X
                                        Page 4
```

```
 1         UNITED STATES DISTRICT COURT
 2           DISTRICT OF MASSACHUSETTS
 3   ---------------------------------X
 4   THE COMMONWEALTH OF MASSACHUSETTS : CIVIL ACTION NO.
 5       Plaintiff,     : 03-CV-11865-PBS
 6     v.             :
 7   MYLAN LABORATORIES, INC., et al. :
 8       Defendants.    :
 9   ---------------------------------X
10
11         SUPERIOR COURT OF NEW JERSEY
12                UNION COUNTY
13   ---------------------------------X
14   CLIFFSIDE NURSING HOME, INC., on  : LAW DIVISION
15   behalf of itself and all others   : DOCKET NO.
16   similarly situated, as defined   : UNN-L-2329-04
17   herein,            :
18       Plaintiffs,    :
19     v.             :
20   DEY, INC., et al.    :
21       Defendants.    :
22   ---------------------------------X
                                        Page 3
```

```
 1           IN THE COURT OF COMMON PLEAS
 2              FIFTH JUDICIAL CIRCUIT
 3   ----------------------------------X
 4   STATE OF SOUTH CAROLINA, and   :   STATE OF
 5   HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6   capacity as Attorney General for : COUNTY OF
 7   the State of South Carolina,   :   RICHLAND
 8       Plaintiff,       :
 9     v.                 : CIVIL ACTION NO.
10   PAR PHARMACEUTICALS COMPANIES,  : 2006-CP-40-7151
11   INC.,              : 2006-CP-40-7153
12       Defendant.       :
13   ----------------------------------X
14   STATE OF SOUTH CAROLINA, and   :   STATE OF
15   HENRY D. McMASTER, in his official : SOUTH CAROLINA
16   capacity as Attorney General for : COUNTY OF
17   the State of South Carolina,   :   RICHLAND
18       Plaintiff,       :
19     v.                 : CIVIL ACTION NO.
20   MYLAN LABORATORIES INC.,       : 2007-CP-40-0282
21       Defendant.       : 2007-CP-40-0283
22   ----------------------------------X
                                        Page 5
```

2 (Pages 2 to 5)

```
 1       IN THE COURT OF COMMON PLEAS
 2          FIFTH JUDICIAL CIRCUIT
 3  ---------------------------------X
 4  STATE OF SOUTH CAROLINA, and    : STATE OF
 5  HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6  capacity as Attorney General for   : COUNTY OF
 7  the State of South Carolina,    : RICHLAND
 8        Plaintiff,              :
 9    v.                : CIVIL ACTION NO.
10  BARR PHARMACEUTICALS, INC.    : 2007-CP-40-0280
11    Defendant.          : 2007-CP-40-0286
12  ---------------------------------X
13
14      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
15             STATE OF HAWAII
16  ---------------------------------X
17  STATE OF HAWAII,         : CASE NO.
18     Plaintiff,          : 06-1-0720-04 EEH
19    v.             :
20  ABBOTT LABORATORIES, INC., et al. : JUDGE EDEN
21    Defendants.         : ELIZABETH HIFO
22  ---------------------------------X
                                            Page 6
```

```
 1  IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2             STATE OF MISSOURI
 3  - - - - - - - - - - - - - - - - x
 4  STATE OF MISSOURI, ex rel,      :
 5  JEREMIAH W. (JAY) NIXON,        :
 6  Attorney General,               :
 7  and                             :
 8  MISSOURI DEPARTMENT OF SOCIAL   :
 9  SERVICES, DIVISION OF MEDICAL   : Case No.
10  SERVICES,                       : 054-1216
11      Plaintiffs,                 : Division No. 31
12    vs.                           :
13  DEY INC., DEY, L.P., MERCK KGaA, :
14  EMD, INC., WARRICK              :
15  PHARMACEUTICALS CORPORATION,    :
16  SCHERING-PLOUGH CORPORATION, and :
17  SCHERING CORPORATION,           :
18      Defendants.                 :
19  - - - - - - - - - - - - - - - - x
20
21
22
                                            Page 8
```

```
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2         IN AND FOR LEON COUNTY, FLORIDA
 3  THE STATE OF FLORIDA
 4  ex rel.
 5  - - - - - - - - - - - - - - x
 6  VEN-A-CARE OF THE FLORIDA         :
 7  KEYS, INC., a Florida             :
 8  Corporation, by and through its   :
 9  principal officers and directors, :
10  ZACHARY T. BENTLEY and            :
11  T. MARK JONES,                    :
12      Plaintiffs,                   :
13    vs.                  : Civil Action
14  MYLAN LABORATORIES INC.; MYLAN    : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM   : Judge: William
16  LTD., SCHEIN PHARMACEUTICAL, INC.;:   L. Gary
17  TEVA PHARMACEUTICAL INDUSTRIES    :
18  LTD., TEVA PHARMACEUTICAL USA;    :
19  and WATSON PHARMACEUTICALS, INC., :
20      Defendants.                   :
21  - - - - - - - - - - - - - - x
22
                                            Page 7
```

```
 1          COMMONWEALTH OF KENTUCKY
 2        FRANKLIN CIRCUIT COURT - DIV. II
 3  ---------------------------------X
 4  COMMONWEALTH OF KENTUCKY,       : CIVIL ACTION NO.
 5     Plaintiff,          : 03-CI-1134
 6    v.             :
 7  ABBOTT LABORATORIES, INC., et al. :
 8     Defendants.         :
 9  ---------------------------------X
10
11          COMMONWEALTH OF KENTUCKY
12        FRANKLIN CIRCUIT COURT - DIV. I
13  ---------------------------------X
14  COMMONWEALTH OF KENTUCKY, ex rel. : CIVIL ACTION NO.
15  GREGORY D. STUMBO, Attorney General: 04-CI-1487
16     Plaintiff,          :
17    v.             :
18  ALPHAPHARMA, INC., et al.    :
19     Defendants.         :
20  ---------------------------------X
21               Washington, D.C.
22               Tuesday, May 15, 2007
                                            Page 9
```

```
 1        Videotaped Deposition of THOMAS A.
 2   SCULLY, a witness herein, called for examination by
 3   counsel for Abbott Laboratories in the above-entitled
 4   matter, pursuant to subpoena, the witness being duly
 5   sworn by SUSAN L. CIMINELLI, a Notary Public in and
 6   for the District of Columbia, taken at the offices of
 7   Jones Day, 51 Louisiana Avenue, Northwest,
 8   Washington, D.C., at 8:49 a.m. on Tuesday, May 15,
 9   2007, and the proceedings being taken down by
10   Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and
11   transcribed under her direction.
12
13
14
15
16
17
18
19
20
21
22
                                            Page 10
```

```
 1   APPEARANCES:
 2
 3      On behalf of the United States of America:
 4          GEJAA T. GOBENA, ESQ.
 5          JOHN K. NEAL, ESQ.
 6          ANDREW MAO, ESQ.
 7          U.S. Department of Justice
 8          Civil Division
 9          601 D Street, Northwest
10          PHB - 9028/P.O. Box 261
11          Washington, D.C. 20044
12          Gejaa.Gobena@usdoj.gov
13          (202) 307-1088
14
15
16
17
18
19
20
21
22
                                            Page 11
```

```
 1   APPEARANCES (continued):
 2
 3      On behalf of the U.S. Department of
 4      Health and Human Services:
 5          TROY A. BARSKY, ESQ.
 6          U.S. Department of Health and Human Services
 7          CMS Division
 8          C2-05-23
 9          7500 Security Boulevard
10          Baltimore, MD  21244-1850
11          (410) 786-8873
12          troy.barsky@hhs.gov
13
14      On behalf of the State of California:
15          NICHOLAS N. PAUL, ESQ.
16          Supervising Deputy Attorney General
17          Civil Prosecutions Unit
18          P.O. Box 85266
19          110 West A Street, #1100
20          San Diego, CA  82186
21          (619) 688-6099
22          nicholas.paul@doj.ca.gov
                                            Page 12
```

```
 1   APPEARANCES (continued):
 2
 3      On behalf of the State of Alabama:
 4          ROGER BATES, ESQ.
 5          Hand Arendall, L.L.C.
 6          1200 Park Place Tower
 7          2001 Park Place North
 8          Birmingham, AL  35203
 9          (205) 502-0105
10          Rbates@handarendall.com
11
12      On behalf of the State of Florida:
13          MARY S. MILLER, ESQ.
14          Office of the Attorney General of Florida
15          PL-01, The Capitol
16          Tallahassee, FL 32399-1050
17          (850) 414-3600
18          Mary_Miller@oag.state.fl.us
19
20
21
22
                                            Page 13
```

```
 1  the provider gets reimbursed the same amount no
 2  matter which individual manufacturer's drug is used
 3  within that J Code, correct?
 4         MR. GOBENA: Objection. Form. You're
 5  talking about generics, right?
 6         BY MR. DALY:
 7     Q.  Yes.
 8     A.  In generics?
 9     Q.  Yes.
10     A.  I'm sure you're correct. My focus here
11  was much more at the time on Procrit.
12     Q.  On Procrit. Which would be a branded
13  drug, right?
14     A.  Yes. There were certainly abuses in area
15  of ipratropium bromide and Albuterol, which had the
16  same issues with stunning markups that were
17  theoretically generic.
18     Q.  Let's talk about this -- this generic with
19  multiple participants in a J Code. In that
20  situation, what you say here about manufacturers
21  being able to use profit margins to get people to buy
22  their drugs doesn't work for generics, does it?
```
Page 110

```
 1         MR. GOBENA: Objection. Form.
 2         THE WITNESS: I believe it does.
 3         BY MR. DALY:
 4     Q.  How would that be?
 5     A.  Well, I don't recall all the details, but
 6  I remember that ipratropium bromide and Albuterol
 7  were a couple of pennies a dose in reality in the
 8  market, and people were charging 25 times that,
 9  including the multiple generic manufacturers. And
10  that the markup on those respiratory drugs were one
11  of the bigger issues we had. Probably the biggest
12  issue as a pure mulitplier factor. So it could, in
13  fact, work on generics.
14     Q.  Were they -- were those drugs part of a J
15  Code?
16     A.  I assume they were. I'm not sure.
17     Q.  So regardless of which drug within that J
18  Code might have been selected by the provider, the
19  provider would be reimbursed the same amount, right?
20         MR. GOBENA: Objection. Form.
21         THE WITNESS: Yes. But the incentive to
22  generate higher utilization was to give them a very
```
Page 111

```
 1  big spread, which was the case all across the board.
 2         BY MR. DALY:
 3     Q.  And if you have a single source branded
 4  situation, there is just one drug and it's a sole
 5  source, that's not a situation -- well, strike that.
 6  If single source drug branded, did you believe as you
 7  look at this sentence, that in that situation, that
 8  prices could be manipulated to increase utilization?
 9         MR. GOBENA: Objection. Form.
10         THE WITNESS: Yes.
11         BY MR. DALY:
12     Q.  Do you have -- when you have a single
13  source branded drug, isn't it true that the sales
14  price, the actual acquisition cost is pretty close to
15  the manufacturer's WAC, wholesale acquisition cost,
16  or its list price?
17         MR. GOBENA: Objection. Form.
18         MR. BREEN: Objection. Form. Breen,
19  objection, form.
20         MR. GOBENA: Gobena, objection, form.
21         THE WITNESS: I would say generally no.
22         BY MR. DALY:
```
Page 112

```
 1     Q.  Generally no. So you feel that a branded
 2  drug without competition would discount itself?
 3     A.  No. I may have missed your question.
 4     Q.  Okay. Let's start all over with sole
 5  source. If you have a sole source branded drug?
 6     A.  Yes.
 7     Q.  It's the only drug that -- you know, there
 8  is no real competition for it, there is no J Code,
 9  there is no multiple source, drugs like that
10  typically sell pretty close to the drug's list price,
11  right?
12         MR. GOBENA: Objection. Form.
13         MR. BREEN: Objection. Form.
14         BY MR. DALY:
15     Q.  That's been your experience?
16         MR. GOBENA: Same objection.
17         THE WITNESS: I would say generally. On
18  the other hand, if you're trying to generate volume
19  and make it attractive to the provider to use more of
20  it, you generally raise your AWP as high as you
21  possibly can imagine, and the physician or the
22  practice group makes a higher profit and they have
```
Page 113

29 (Pages 110 to 113)

```
 1  incentive to use more, which you can read about in
 2  the front page of the paper this week.
 3        BY MR. DALY:
 4    Q.  Can you think of a drug during this time
 5  period where you have a sole source branded drug
 6  where it was discounted in such a way as to increase
 7  utilization?
 8    A.  I wouldn't say discounted, but the primary
 9  ones that I would -- the thing that drove this,
10  ipratropium bromide/albuterol were one on the generic
11  side.  The other two were probably Remicade on the
12  rheumatoid arthritis side, which I believe was sole
13  source, was high volume for rheumatology.  And the
14  other two were Procrit, and then once Aranesp came on
15  the market, they competed with each other
16  theoretically, but they really competed over the
17  spread, which is the thing that got my attention, I
18  spent probably the most time on, because the highest
19  volume, highest cost drugs, which was you could
20  roughly -- and I may be wrong on the numbers -- buy a
21  two week dose of Procrit.  And similar, even though
22  it's a one dose shot for Aranesp for 600 dollars
```

Page 114

```
 1  every two weeks, and the markup -- they were
 2  competing in their markups between 1200 and 1700 to
 3  drive utilization for physicians.
 4        And you could watch the utilization change
 5  depending on how much they marked up their AWP.  And
 6  I -- that was probably the thing that got me most
 7  stoked up about changing this policy, because they
 8  were adjusting their AWPs by generate more market
 9  volume by creating incentives for physicians, which
10  was as clear as the sun come up in the morning.
11        MR. GOBENA:  Tom, you're going to have to
12  speak a little bit more slowly because the court
13  reporter is having a tough time keeping up with you.
14        BY MR. DALY:
15    Q.  Lost some people.
16    A.  It was probably the Aranesp and Procrit
17  people dropping off.  But I would add, those views
18  were extremely clear in all my testimony and public
19  statements for years.
20    Q.  And Procrit is a drug that is used by what
21  kind of practice area?
22    A.  Procrit and Epo are the identical drug.
```

Page 115

```
 1  Procrit is a J&J drug licensed to use for oncology,
 2  and Epo is an Amgen drug.  It's identical, it's
 3  licensed -- it's manufactured to use for dialysis.
 4    Q.  And the --
 5    A.  Aranesp is an extended version from
 6  Procrit.  I think it's once every two-week dosage,
 7  but functionally equivalent, as I pointed out in
 8  prior lives.
 9    Q.  And this was a drug used by oncologists,
10  or those were two drugs --
11    A.  Procrit and Aranesp were used by
12  oncologists to raise red blood cell counts in cancer
13  patients.  And the identical drug, Epo, is used for
14  dialysis to raise red blood cell counts for dialysis
15  patients.
16        MR. BREEN:  Is that Epogen?
17        THE WITNESS:  Epogen, Epo.
18        BY MR. DALY:
19    Q.  And what the oncologists were doing with
20  that drug was they would keep the spread that they
21  got between, say, 95 percent of AWP that they put in
22  the reimbursement for, and what they paid for it, the
```

Page 116

```
 1  oncologists would keep the spread, correct?
 2        MR. GOBENA:  Object to the form.
 3        THE WITNESS:  Yes.  If you could buy
 4  Procrit, hypothetically, for 600 dollars for a
 5  two-week course of treatment, which I think is six
 6  treatments, then you could -- the AWP would vary
 7  because it moved, but let's say it was roughly
 8  anywhere from 12 to 1700 dollars, I think, while I
 9  was at CMS.  And so if you were an oncologist, it's
10  an attractive spread.
11        BY MR. DALY:
12    Q.  And the spread would be -- so the
13  oncologist would keep the spread, correct?
14    A.  Yes.
15    Q.  And what the oncologists had been telling
16  you, and had been telling Congress and CMS over the
17  years was that they needed that spread to make up for
18  inadequate service fees, correct?
19        MR. GOBENA:  Object to the form.
20        THE WITNESS:  That was their contention.
21        BY MR. DALY:
22    Q.  And the oncologists did, in fact, use that
```

Page 117

30 (Pages 114 to 117)