# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) ) Master File No. 01-CV-12257-PBS ) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) Judge Patti B. Saris ) ) ) |

## MEMORANDUM IN SUPPORT OF
## HEINS MILLS & OLSON, P.L.C.'S PETITION FOR
## ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES
## IN RELATION TO THE GLAXOSMITHKLINE SETTLEMENT

59471.1

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ..................................................................................................1

    A.    Nature of Action. ......................................................................................1

    B.    GSK Settlement. .......................................................................................1

    C.    Heins Mills & Olson, P.L.C.'s Application for Attorney Fees and
          Expenses. ..................................................................................................2

II.    ARGUMENT ........................................................................................................3

    A.    Legal Standards..........................................................................................3

    B.    HMO's Significant Attorney Time and Resources Devoted to the
          Prosecution of this Case and the Benefit of the Classes are Reasonable and
          Warrant the Requested Fee Award. ..........................................................5

          1.    Heins Mills & Olson, P.L.C.'s Professional Time..........................5

          2.    The Size of the Fund and the Number of People
               Benefited. ........................................................................................7

          3.    The Time and Labor Expended by Counsel. ...................................7

          4.    The Complexity and Duration of the Litigation. ............................8

          5.    The Risks Borne By HMO and Lead Counsel...............................9

          6.    The Skill and Efficiency of Counsel.............................................10

    C.    HMO Should Be Reimbursed for its Expenses Reasonably Incurred in the
          Prosecution of This Matter.......................................................................12

    D.    Public Policy Considerations Support HMO's Petition for Reasonable
          Attorney Fees and Reimbursement of Necessary Expenses. ..................12

CONCLUSION ................................................................................................................ 13

59471.1

i

TABLE OF AUTHORITIES

PAGE

## Cases

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)........................................... 3

*Amcham Prods., Inc. v. Windsor*, 521 U.S. 591 (1977) ..................................................................... 13

*Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899 F.2d
    21 (11th Cir. 1990).......................................................................................................................... 10

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)................................................................................ 3

*Branch v. FDIC*, 1998 WL 151249 (D. Mass. 1998) ........................................................................ 4

*Bussie v. Allmerica Financial Corp.*, 1999 WL 342042 (D. Mass. 1999).................................... 4

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F.Supp. 375 (D. Mass. 1997) ..................... 4

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) .................................. 5, 10

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981) .................................................................................. 13

*In re AOL Time Warner, Inc. Securities and "ERISA" Litig.*, 2006 WL 903236 (S.D.N.Y.
    Apr. 6, 2006) ................................................................................................................................... 11

*In Re Broadcom Corp. Securities Litig.*, SACV No. 01-0275-GLT (C.D.Ca. 2005) .................. 11

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me.
    2003) .................................................................................................................................................. 4

*In re Fidelity/Micron Securities Litig.*, 167 F.3d 735 (1st Cir. 1999)...................................... 4, 12

*In re Newbridge Networks Sec. Litig.*, 1998 WL 765724 (D.D.C. 1998)...................................... 8

*In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982
    F.2d 603 (1st Cir. 1992)................................................................................................................. 12

*In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ............. 1, 6

*In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006) ............... 1

*In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.Supp.2d 172 (D. Mass. 2003) .......... 1

*In re Pharm. Indus. Average Wholesale Price Litig.*, M.D.L.. No. 1456, C.A. No. 01-
    12257-PBS, Slip Op. (D. Mass. June 21, 2007) ........................................................................ 1

*In re Relafen Antitrust Litig.*, 230 F.R.D. 61 (D. Mass. 2005) .............................................. 11, 13

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56
    F.3d 295 (1st Cir. 1995)................................................................................................................. 3

*In Re: Monosodium Glutamate Antitrust Litig.*, MDL 00-1328 (D. Minn. 2003)...................... 11

*Lilly Transp. Corp. v. Royal Institutional Servs., Inc.*, 832 N.E.2d 666 (Mass. App. Ct.
    2005) ................................................................................................................................................ 12

*Mazola v. May Dept. Stores Co.*, 1999 WL 1261312 (D. Mass. 1999)......................................... 4

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1995) .................................................................. 13

*Rosenbaum v. McAllister*, 64 F.3d 1439 (10th Cir. 1995) ............................................................. 10

*State of Minnesota v. Philip Morris, Inc.*, 551 N.W.2d 490 (Minn. 1996).................................. 12

*Third Circuit Task Force, Court Awarded Attorneys Fees*, 108 F.R.D. 237 (1985) ...................... 4

59471.1

I.      **INTRODUCTION**

A.      **Nature of Action.**

In this class action, Plaintiffs allege that Defendants engaged in widespread fraud by grossly inflating the published "Average Wholesale Prices" of numerous drugs, causing Medicare Part B program beneficiaries, third party payors and other consumers to significantly overpay for prescription drugs.  This Court is intimately aware of the facts, background and procedural history of this strongly contested litigation.[1]

B.      **GSK Settlement.**

On November 15, 2006, the Court granted preliminary approval to a settlement between Plaintiffs and GlaxoSmithKline ("GSK").  (Dkt. No. 3401).   The terms of the settlement are fully described in Class Plaintiffs' (or "Lead Counsel's") memorandum and supplemental memorandum supporting preliminary approval of the proposed nationwide GSK class settlement. (Dkt. Nos. 2971 and 3255.)  Essentially, the settlement obligates GSK to pay a total of $70 million, $65.5 million of which will be allocated 30% ($19.65 million) for payment of the claims of consumer class members in all 50 states who paid for GSK drugs based on AWP, and 70% ($45.85 million) for payment of the claims of all third party payors ("TPP's").  The remaining $4.5 million of the $70 million total settlement amount is to be paid to participating state plaintiffs ($2.5 million) or to litigating state plaintiffs  that elect to participate in the settlement ($2 million).  Any awards for attorney fees and litigation costs and expenses approved by the Court are to be paid from the $65.5 million settlement amount.

---

[1]  *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.Supp.2d 172 (D. Mass. 2003); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, M.D.L. No. 1456, C.A. No. 01-12257-PBS, Slip Op. (D. Mass. June 21, 2007) (Findings of Fact and Conclusions of Law, Trial of Class 2 and Class 3 Claims).

59471.1
59471.1

C.    __Heins Mills & Olson, P.L.C.'s Application for Attorney Fees and Expenses__.

Heins Mills & Olson, P.L.C. represents the Twin Cities Bakery Workers Health and Welfare Fund, which was designated by this Court as one of the AWP Private Payor Class Representatives.  *See* Order Granting Preliminary Approval of the GlaxoSmithKline Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class and Scheduling Fairness Hearing.  (Dkt. No. 3401.)  Early in this case, the Court established the organization of Plaintiffs' counsel by designating certain firms as the Lead Counsel Committee and appointing members as Chairs of the Lead Counsel Committee on behalf of Plaintiffs.  The Court appointed Samuel D. Heins, Heins Mills & Olson, P.L.C., as one of the chairs of the Lead Counsel Committee, which is charged with responsibility for all major decisions and the overall prosecution and resolution of the case on behalf of Plaintiffs' counsel.  (Case Management Order Nos. 100 and 136.)  Pursuant (and prior) to the Court's case management orders appointing HMO as a Chair of the Lead Counsel Committee, HMO devoted substantial resources and significant time to the investigation, development and prosecution of this litigation on behalf of Plaintiffs and the Classes.   All such work, which is set forth in greater detail below, was performed in consultation and coordination with, and with the approval of, Plaintiffs' Lead Counsel Committee.   After several divergences of opinion developed between HMO and certain other members of Plaintiffs' Lead Counsel Committee concerning case strategy and management issues, and remained unresolved despite attempts to reconcile those differences, HMO continued to participate in the prosecution of this case by performing certain tasks at the request of other members of the Lead Counsel Committee.

HMO supports the request for attorney fees submitted by Class Plaintiffs in the amount of 33% of the $65.5 million GSK settlement amount, and for reimbursement of expenses.  HMO

has provided to Lead Counsel an Affidavit in support of Class Plaintiffs' fee petition, detailing

HMO's attorney fees and expenses.  In an abundance of caution[2] and to facilitate and preserve its

request for reasonable attorney fees and expenses, HMO has submitted its separate petition for

attorney fees and expenses.  Both Lead Counsel's petition and HMO's petition are based on the

percentage of the fund approach favored by the United States Court of Appeals for the First

Circuit and this Court.  HMO seeks recovery of its attorney fees ($6,736,206.25) and expenses

($595,699.22) from (not in addition to) – and upon the same terms as – any award approved by

this Court pursuant to Class Plaintiffs' petition for attorney fees and expenses.

## II.   ARGUMENT

### A.   Legal Standards.

Under the "American Rule," litigants are responsible for their own counsel fees.  *See*

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245 (1975).  An exception is the

equitable common fund doctrine.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)

(recognizing that an attorney who creates a fund for the benefit of a class is entitled to "a

reasonable attorney's fee from the fund as a whole" (citations omitted)).  "The common fund

doctrine is founded on the equitable principle that those who have profited from litigation should

share its costs."  *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire

Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995).  A common fund fee award should be determined on

a percentage of the fund basis.  *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).

The First Circuit recognizes that in common fund cases, "the district court, in the exercise

of its informed discretion, may calculate counsel fees either on a percentage of the fund basis or

by fashioning a lodestar."  *In re Thirteen Appeals,* 56 F.3d at 307.  However, the First Circuit has

---

[2] HMO was not able to obtain assurance that its attorney fees and expenses would be included in Class Plaintiffs' joint petition or appropriately reimbursed from any Court approved award.

59471.1

3

also articulated strong policy reasons for favoring the percentage of the fund approach. Specifically, the percentage of the fund approach "is often less burdensome to administer than the lodestar method"; allows the trial court to properly focus on the benefit to the class; reduces "the possibility of collateral disputes that might transform the fee proceeding into a second major litigation"; "enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency"; and, "because the POF technique is result-oriented rather than process-oriented, it better approximates the workings of the market place." *Id.* The percentage of the fund approach in common fund cases such as this is therefore preferred by this Court and other district courts within the First Circuit.[3]

Although the First Circuit has not established specific factors that district courts must use in applying the percentage of the fund approach, the Third Circuit Task Force Report identifies several factors that may be used in determining the reasonableness of an attorney fee request. These include: (1) the size of the fund created and the number of persons benefited; (2) the skill and efficiency of the attorney; (3) the complexity and duration of the litigation; (4) the risk of nonpayment; (5) the amount of time devoted to the case by plaintiffs' counsel; and (6) the awards in similar cases. *Third Circuit Task Force, Court Awarded Attorneys Fees*, 108 F.R.D. 237 (1985). The Second Circuit has identified similar factors, including the time and labor expended, the complexities of the litigation, the risks of the litigation, the quality of the

---

[3]   *See, e.g., Mazola v. May Dept. Stores Co.,* 1999 WL 1261312 (D. Mass. 1999) ("The only way for such a plaintiff to recover is to become part of a consumer class action, and the only way in which to make such an action economically feasible is to award a percentage of the fund."); *Bussie v. Allmerica Financial Corp.,* 1999 WL 342042 (D. Mass. 1999) (noting public policy benefits of percentage of the fund method); *Branch v. FDIC,* 1998 WL 151249, at *2-4 (D. Mass. 1998); *Duhaime v. John Hancock Mut. Life Ins. Co.,* 989 F.Supp. 375, 377 (D. Mass. 1997); *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 215 (D. Me. 2003). The percentage of the fund method not only enhances efficiency, but "relieves courts of the burden of wading through often foot-thick stacks of bills attempting to parse the value of the lawyers' time." *See In re Fidelity/Micron Securities Litig.,* 1998 WL 313735, at *4 (D. Mass. 1998), *vacated and remanded on other grounds,* 167 F.3d 735 (1st Cir. 1999).

59471.1

4

representation, the amount of the fee request in relation to the settlement, and public policy

considerations.  *See Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir. 2000).

      **B.**    **HMO's Significant Attorney Time and Resources Devoted to the Prosecution of this Case and the Benefit of the Classes are Reasonable and Warrant the Requested Fee Award.**

            1.    <u>Heins Mills & Olson, P.L.C.'s Professional Time</u>.

Beginning well before and continuing after the Court's case management order

appointing HMO as a Chair of the Lead Counsel Committee, HMO devoted significant resources

and time to the investigation, development and prosecution of this litigation on behalf of

Plaintiffs and the Classes.  HMO's professional time and activities benefiting the Classes are

detailed in the accompanying Declaration of David Woodward ("Woodward Decl.").  All of

HMO's activities in prosecuting this case were undertaken in cooperation and coordination with,

and with the approval of, the Lead Counsel Committee.  (Woodward Decl. ¶ 5.)

Beginning in November 2001, HMO attorneys engaged in numerous tasks contributing to

Plaintiffs' prosecution of this litigation.  HMO, for example, engaged in extensive factual

investigation; conducted in-depth legal research on a variety of issues; developed litigation

theories and claims; engaged in numerous periodic conferences with other members of the Lead

Counsel Committee regarding case strategy and planning; participated in the drafting and editing

of pleadings, including Plaintiffs' initial and subsequent amended complaints; attended hearings

before this Court; researched, drafted and edited briefs, including at the critical stage of litigating

motions to dismiss by Defendants, including GSK; pursued both party and third party discovery,

including engaging in various meet and confer discussions with opposing counsel on discovery

issues; took and defended depositions; and retained, consulted and worked closely with an

expert, Stephen W. Schondelmeyer, on various issues including claim theories and liability, and

in supporting Class Plaintiffs' motion for class certification via the comprehensive expert

declaration of Dr. Schondelmeyer.  Dr. Schondelmeyer, the director of the PRIME Institute at the

University of Minnesota, is a pharmaceutical economist with more than 25 years of professional

experience relating to the management and economics of the pharmaceutical market.  *See*

Declaration of Stephen W. Schondelmeyer in Support of Plaintiffs' Motion for Class

Certification.  In its Memorandum and Order Re: Motion for Class Certification dated August

16, 2005, the Court, in discussing the background and workings of the pharmaceutical industry,

including the mechanics of drug pricing and distribution, cited several times to Dr.

Schondelmeyer's Declaration.[4]

   HMO further participated in reviewing and analyzing the extensive documents produced

in the course of discovery.  Lead Counsel underscored the importance of the massive discovery

efforts extended by Plaintiffs' counsel, including HMO, in pursuing this case:  "Defendants

produced millions of documents and Plaintiffs' counsel spent more than four years reviewing

said documents, organizing documents for use, creating an electronic database and making

determinations on utilization of important documents, additional discovery and general

assistance in the litigation of this matter."  Class Plaintiffs' Memorandum of Law in Support of

Joint Motion for Preliminary Approval of Proposed Nationwide GSK Class Settlement,

Certification of Settlement Class, and Approval of Notice Plan, at 19.  (Dkt. No. 2971.)

   HMO participated in extensive motion practice and briefing in the long course of this

vigorously contested case.  HMO participated in the preparation and defense of the deposition of

Plaintiffs' expert witness, Stephen W. Schondelmeyer.  Further, HMO, with other Lead Counsel

Committee members, engaged in early negotiations with GSK during the period of August –

---

[4]  *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 69, 72, 73, 74 and 76 (D. Mass.
Aug. 16, 2005).

December 2004, which involved mediation, consideration of various settlement proposals and related consultations by HMO with Plaintiffs' expert. Woodward Decl. ¶ 5.

HMO's fee request, and that reflected in Class Plaintiffs' petition for attorney fees and reimbursement of expenses, are eminently fair and reasonable in light of established fee award considerations.

2.      The Size of the Fund and the Number of People Benefited.

$65.5 million (of the total $70 million settlement) will be distributed to and will benefit consumers and third party payors in all 50 states. The terms of distribution, the simplified claim form and the significant concept of a minimum distribution amount per consumer – the importance of which this Court properly recognized in preliminarily approving the GSK settlement (Dkt. No. 3401, at ¶ 18) – are fully described in Class Plaintiffs' memorandum and supplemental memorandum in support of preliminary approval of the nationwide GSK class settlement. Dkt. Nos. 2971 and 3255. The size of the settlement and the significant monetary benefit it provides to Class members are the result of the many years of hard labor and efforts over many years of Lead Counsel, HMO and other Plaintiffs' counsel in pursuing this significant litigation for the benefit of Plaintiffs, the Classes and the public.

3.      The Time and Labor Expended by Counsel.

HMO and Lead Counsel Committee members have been investigating, researching, developing and pursuing this litigation for over five years. During that considerable time span, HMO and Plaintiffs' Lead Counsel Committee firms focused significant time, energy and resources from the commencement of the case through intensely fought motions, discovery, class certification and, eventually, settlement. Defendants, including GSK, represented by some of the ablest and most resourceful defense counsel in the nation, have denied and aggressively disputed

at each and every step of the way that they engaged in any illegal conduct or committed a single violation of law.  Just as the defense has been formidable, the litigation required the complete, sustained effort and dedication of time and resources detailed in HMO's fee petition and supporting papers, and in Class Plaintiffs' fee petition, memorandum and supporting materials. The efforts of Plaintiffs' counsel, including HMO, were essential in advancing the case to its current stage, including the GSK settlement which provides significant benefits to Plaintiffs and the Classes.  *See In re Newbridge Networks Sec. Litig.*, 1998 WL 765724, at *3 (D.D.C. 1998) (recognizing that over the four years of the litigation, plaintiffs' counsel's "efforts in posturing this case for trial. . . played a role in spurring the settlement [and] produced a substantial payout to the class.").  Additionally, the consuming investment of time and resources required to sustain this action over the course of many years obviously precluded HMO and other Plaintiffs' counsel from working on other cases.  As indicated in its accompanying declaration, HMO devoted a total of 21,037.5 hours on behalf of the Plaintiffs and Classes and expended $595,699.22 in reasonably incurred expenses in connection with prosecuting this litigation.  Consideration of these factors fully supports HMO's and Class Plaintiffs' petitions for attorney fees and reimbursement of expenses.

> 4.    The Complexity and Duration of the Litigation.

This class action, alleging violations of various state consumer protection statutes, RICO and antitrust laws, has from its outset involved complex, intricate issues of law and fact.  As the Court well knows, this case involves an alleged systemic, widespread AWP fraud perpetrated over many years and involving multiple defendants and numerous drugs.  The case from the very beginning and throughout its extended history has required the Court's immersion in highly technical and complex issues relating to the pricing and distribution of pharmaceutical products,

health insurance and governmental regulations.  The case has advanced well beyond the class certification stage.  The complexity of the issues and the long duration of the litigation further support HMO's and Class Plaintiffs' fee petitions.

5.      The Risks Borne By HMO and Lead Counsel.

The extraordinary risks undertaken by HMO, Lead Counsel and other Plaintiffs' counsel in prosecuting this action strongly support the requested fees.  HMO has prosecuted this case on an entirely contingent basis.  Woodward Decl. ¶ 6.  From the beginning, HMO understood that it and other plaintiff firms were launching a long and tremendously costly litigation that would bring forth highly skilled lawyers who would strenuously advocate for large corporate defendants with essentially unlimited resources.  In representing the Classes, HMO, Lead Counsel and other Plaintiffs' counsel assumed the professional responsibility of dedicating whatever money, resources and time would be necessary to effectively prosecute this litigation for as long as necessary to further the interests of Plaintiffs and the Classes.  HMO and other Lead Counsel firms knew from the opening gate that they would incur millions of dollars in attorneys' time and advance substantial out-of-pocket expenses related to the prosecution of this action on behalf of the Classes.  Successful prosecution of large, complex cases demands that plaintiffs' counsel advance enormous expenses, and continue to do so until the very end of litigation that predictably may last, and certainly in this case has lasted, for years.

Examples of risks assumed and overcome abound in this litigation.  For example, at the important motion to dismiss stage, at which HMO attorneys were heavily involved, defendants raised numerous challenges to Plaintiffs' various pleadings on a variety of issues necessitating in-depth research, briefing and resolution by the Court.  These issues included whether alleged Congressional acquiescence in widespread pricing and reporting practices involving overstating

AWP figures raised political questions warranting dismissal under the prudential abstention doctrine, whether the Medicare statute or ERISA preempted Plaintiffs' state consumer law claims and whether various Plaintiffs possessed standing to litigate their claims. Although HMO and Lead Counsel were successful in overcoming Defendants' motions to dismiss, the motions to dismiss posed considerable (indeed, potentially case-ending) risks.

Courts recognize that attorneys' risk is a critically important factor in determining an appropriate fee award. *See, e.g., Goldberger,* 209 F.3d at 54. As the court in *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990), reasoned:

> A contingency fee arrangement often justifies an increase in the award of attorneys' fees. This rule helps assure that the contingency fee arrangement endures. If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Id.* (citations omitted).

HMO and Lead Counsel have undertaken representation for the benefit of Plaintiffs and the Classes without ever having any assurances that any fees would be awarded. HMO and Plaintiffs' counsel have received no compensation despite having borne all risks and devoted millions of dollars in attorney fees and expenses to sustain this intensely fought litigation. Because of the significant risks undertaken on a pure contingency basis, HMO's and Lead Counsel's requested reasonable fees should be awarded.

6.     The Skill and Efficiency of Counsel.

The reputation, experience and ability of counsel for plaintiffs is a recognized factor in determining an appropriate fee award. *See, e.g., Rosenbaum v. McAllister*, 64 F.3d 1439, 1445 n.3 (10th Cir. 1995). HMO and Lead Counsel Committee firms brought to this litigation

established reputations as litigators with many years of experience in prosecuting complex

actions, especially class actions.  HMO and Lead Counsel Committee firms have engaged in

class action litigation involving the pharmaceutical industry.  In a recent case before the District

of Massachusetts involving pharmaceutical industry practices, the Court, by the Honorable

William G. Young, Chief Judge, approved the fee petition submitted by plaintiffs' counsel,

including HMO, serving as Co-Lead Counsel, and the Hagens-Berman LLP firm.  *In re Relafen*

*Antitrust Litig.*, 230 F.R.D. 61 (D. Mass. 2005) (approving settlement and awarding attorney fees

in the amount of 33-1/3% of the $67 million settlement fund).  HMO has provided the Court with

its firm resume.  Woodward Decl., Ex. 3.  HMO's practice centers on complex litigation in the

areas of antitrust, deceptive trade practices, consumer fraud and securities fraud.  HMO attorneys

have successfully prosecuted over 100 class actions, frequently serving as lead or co-lead

counsel.  Courts have recognized the skill, experience and professionalism demonstrated by

HMO in serving as class counsel in complex cases.[5]

---

[5] In an April 5, 2006 Order granting final approval of a $2.65 billion settlement in a securities law case, the Honorable Shirley Wohl Kram, United States District Court for the Southern District of New York, commented: "Indeed, Lead Plaintiff's Counsel, Heins Mills & Olson, P.L.C., is a respected class action litigator, with considerable experience in major securities and antitrust class action lawsuits.  Lead Plaintiff's Counsel has garnered judicial praise for its representation in previous actions, and has continued to show its client commitment and exceptional lawyering in this case." *In re AOL Time Warner, Inc. Securities and "ERISA" Litig.,* 2006 WL 903236, at *18 (S.D.N.Y. Apr. 6, 2006) (citations omitted.)  In another securities fraud class action in which HMO served as lead counsel for plaintiffs, the Honorable Gary L. Taylor, United States District Court for the Central District of California, remarked, "I know that there is an extremely high level of lawyering that has taken place on both sides in this case . . . Everybody has done a very hard job, a very hard working job and has really approached it with a great deal of professionalism and a great deal of experience and a great deal of legal knowledge." *In Re Broadcom Corp. Securities Litig.,* SACV No. 01-0275-GLT, Reporter's Tr. of Proceeding, June 27, 2005 at 18 (C.D.Ca. June 27, 2005).  In granting final approval of the settlement in *In Re Broadcom Corp. Securities Litigation*, the Honorable Dickran Tevrizian noted that "Class Counsel's ability to obtain a favorable settlement despite formidable opposition confirms their immense skill."  *In Re Broadcom Corp. Securities Litig.,* No. SACV 01-0275 DT, Order Granting Lead Counsel's Motion for Approval of Lead Counsel's Application for Award of Attorneys' Fees and Reimbursement of Expenses at 12 (C.D.Ca. Sept. 14, 2005).  In a multi-district antitrust case in which HMO served as co-lead counsel for the class, the Honorable Paul A. Magnuson, United States District Court for the District of Minnesota, said: "I'll make no bones about this, I think this is as fine a job of plaintiff lawyering as I've ever seen . . . I particularly take my hat off to plaintiffs' counsel here."  *In Re: Monosodium Glutamate Antitrust Litig.,* MDL 00-1328 (PAM/JGL) Tr., Before the Honorable Judge Paul A. Magnuson, United States District Court Judge, Civil Motions Proceedings at 11 (D. Minn. Jan. 9, 2003).  Excerpts from the judicial proceedings and orders containing these remarks are included in Woodward Decl., Exs. 4-7.

C.     **HMO Should Be Reimbursed for its Expenses Reasonably Incurred in the Prosecution of This Matter.**

Courts recognize that "lawyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax." *In re Fidelity/Micron Securities Litig.*, 167 F.3d at 737; *In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606 (1st Cir. 1992). HMO's expenses are detailed in Woodward Decl., Ex. 2. Such expenses are commonly incurred and billed by attorneys in providing representation to clients, and include costs such as Plaintiffs' expert's fees, copying costs for the tremendous volume of documents produced in this litigation, computerized research and necessary travel to prosecute this case. These expenses were reasonably incurred and were necessary in order to pursue this extensive and expensive litigation. HMO stands ready to provide the Court upon request with copies of its underlying computerized attorney time and expense records.

D.     **Public Policy Considerations Support HMO's Petition for Reasonable Attorney Fees and Reimbursement of Necessary Expenses.**

Consumer laws are designed to protect the public. *See, e.g., Lilly Transp. Corp. v. Royal Institutional Servs., Inc.*, 832 N.E.2d 666, 673 (Mass. App. Ct. 2005) (noting that "[b]y requiring proper disclosure of relevant information and proscribing unfair or deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the market place." (citations and internal quotations omitted)); *State of Minnesota v. Philip Morris, Inc.*, 551 N.W.2d 490, 495-96 (Minn. 1996) (stating that the Consumer Fraud Act "reflect[s] a clear legislative policy encouraging aggressive prosecution of statutory violations" and therefore should be "generally very broadly construed to enhance consumer protection.") The class action mechanism plays an

essential role in the administration of justice.  *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99 (1981) ("Class actions serve an important function in our system of civil justice."); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1977) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (citation omitted)); and *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1995) (noting that "most of the plaintiffs would have no realistic day in court if a class action were not available.").  Indeed, as Chief Judge Young observed in approving a settlement and attorney fee award in a recent pharmaceutical common fund case, "[o]ne thing is clear beyond peradventure – were it not for the class action procedures prescribed under Rule 23, not a single consumer would ever have received a dime from SmithKline."  *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 84 (D. Mass. 2005).  That is unquestionably true here.  By approving appropriate fee awards in settlements of successful, meritorious class actions, district courts promote and reinforce private enforcement, ensure compliance with consumer protection laws, secure the core purposes of the class action device and protect the rights of all Class members.

## CONCLUSION

For the above reasons, HMO respectfully requests that the Court approve HMO's fee and expense petition and enter an order directing that HMO's attorney fees in the amount of $6,736,206.25, together with HMO's reasonably incurred expenses of $595,699.22, be awarded and paid from, and on the same basis and terms as, any award approved by the Court pursuant to Class Plaintiffs' petition for attorney fees and expenses.

59471.1

13

Dated:  June 22, 2007                       Respectfully submitted,


  s/ David R. Woodward
Samuel D. Heins
Vincent J. Esades
David R. Woodward (admitted *pro hac vice*)
**HEINS MILLS & OLSON, P.L.C.**
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 338-4605
Facsimile: (612) 338-4692

**COUNSEL FOR PLAINTIFF
TWIN CITIES BAKERY WORKERS HEALTH
AND WELFARE FUND**

59471.1

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the following documents:

1.   Memorandum in Support of Heins Mills & Olson, P.L.C.'s Petition for Attorney Fees and Reimbursement of Expenses in Relation to the GlaxoSmithKline Settlement; and

2.   Declaration of David R. Woodward, with Exhibits 1-7;

were served on June 22, 2007 upon all counsel of record electronically via Lexis File and Serve pursuant to Case Management Order No. 2.

By:   /s/ David R. Woodward
      David R. Woodward

59471.1

15