1



10716042

Mar 3 2006
4:42PM

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

_____ ,

THIS DOCUMENT RELATES TO:

*The City of New York v. Abbott Labs, et al.*
(S.D.N.Y. No. 04-CV-06054)
*County of Suffolk v. Abbott Labs, et al*
(E.D.N.Y. No. CV-03-229)
*County of Westchester v. Abbott Labs, et al.*
(S.D.N.Y. No. 03-CV-6178)
*County of Rockland v. Abbott Labs, et al.*
(S.D.N.Y. No. 03-CV-7055)
*County of Putnam v. Abbott Labs, et al.*
(S.D.N.Y. No. 05-CV-04748)
*County of Dutchess v. Abbott Labs, et al.*
(S.D.N.Y. No. 05-CV-06458)
*County of Washington v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00408)
*County of Rensselaer v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00422)
*County of Albany v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00425)
*County of Warren v. Abbott Labs, et al*
(N.D.N.Y. No. 05-CV-00468)
*County of Greene v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00474)
*County of Saratoga v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00478)
*County of Columbia v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00867)
*Essex County v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00878)
*County of Chanango v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00354)
*County of Broome v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00456)
*County of Onondaga v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00088)
*County of Tompkins v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00397)

MDL NO. 1456

Civil Action No 01-12257-PBS

Judge Patti B. Saris

*County of Cayuga v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00423)
*County of Madison v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00714)
*County of Cortland v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00881)
*County of Kerkimer v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00415)
*County of Oneida v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00489)
*County of Fulton v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00519)
*County of St. Lawrence v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00479)
*County of Jefferson v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00715)
*County of Lewis v. Abbott Labs, et al.*
(N.D.N.Y. No. 05-CV-00839)
*County of Chautauqua v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06204)
*County of Allegany v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06231)
*County of Cattaraugus v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06242)
*County of Genesee v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06206)
*County of Wayne v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06138)
*County of Monroe v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06148)
*County of Yates v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06172)
*County of Niagara v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06296)
*County of Seneca v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06370)
*County of Orleans v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06371)
*County of Ontario v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06373)
*County of Schuyler v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06387)
*County of Chemung v. Abbott Labs, et al.*
(W.D.N.Y. No. 05-CV-06744)
AND

*County of Nassau v. Abbott Labs, et al.*
(E.D.N.Y. No. 04-CV-5126)

**DEFENDANT TAP PHARMACEUTICAL PRODUCTS INC.'S
SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS**

Defendant TAP Pharmaceutical Products Inc. ("TAP") moves for dismissal of the city of New York and the New York Counties' (hereinafter collectively referred to as the "New York Counties") claims related to Lupron® for reasons not identified in defendants' joint memorandum in support of its motion to dismiss[1]. Specifically, Plaintiffs' claims should be dismissed because all of their claims against TAP based on Lupron® were settled and released by settlements reached in 2001 and 2005. In addition, Plaintiffs are specifically enjoined from continuing to prosecute such claims by an injunctive order entered and pending in this District.

## ARGUMENT

On December 3, 2001, the State of New York reached a settlement with TAP that released TAP from any liability involving the marketing, sale and pricing of Lupron® (the "State Settlement Agreement"). The State Settlement Agreement provides:

> [T]he state of New York…shall release and forever discharge TAP, predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns, and their current and former directors, officers, and employees from any civil or administrative claims for damages or penalties that the state of New York has or may have relating to the Covered Conduct…

(*See* Settlement Agreement, attached as Ex. A, at 8, ¶2.)

The State Settlement Agreement defines "Covered Conduct" to include "alleged conduct from January 1991 through 2001 involving the marketing, sale and pricing of Lupron® …," including, for instance, any allegation that TAP (1) inflated the AWP of Lupron® in order to establish and market the spread; (2) provided free samples of Lupron® knowing and expecting that medical providers would charge for them; (3) provided financial incentives, including grants, travel and entertainment, to induce providers to purchase Lupron®; (4) concealed the

---

[1] TAP adopts and incorporates by reference the defendants' joint memorandum and, to the extent applicable, the arguments contained in the other defendants' individual memoranda in support of the motion to dismiss.

discounted price from governmental agencies; and (5) misreported Best Price and underpaid

Medicaid rebates for Lupron®.  (*Id.* at ¶F(i)-(v).)  The conduct alleged by the New York

Counties here unquestionably falls within the scope of claims released by the State Settlement

Agreement.  (*See* Second Am. Compl. Nassau County ¶¶380-388 and Cons. Compl. ¶¶749-762,

767-769.)

      Moreover, the State Settlement Agreement covered New York's full share of Medicaid

damages relating to TAP's alleged inflation of AWP and Best Price, including any portion that

the New York Counties ultimately paid to the State for its Medicaid recipients.  Specifically, the

State was required to share with the New York Counties the settlement money TAP paid to the

State pursuant to the State Settlement Agreement.  (*See* NY Soc. Ser. Law § 145-b(2) ("amounts

collected pursuant to a judgment under [Medicaid] shall be apportioned between the local social

services district and the state.").)  The State Settlement Agreement therefore precludes the New

York Counties' claims as to Lupron®.

      Furthermore, not only does the State Settlement Agreement release all claims relating to

the pricing, marketing or sale of Lupron®, but the New York Counties are also prohibited from

pursuing any Lupron® claims on behalf of themselves or their citizens because of a nationwide

class settlement approved by the Honorable Richard G. Stearns in this District in the matter of *In

re:  Lupron® Marketing and Sales Practices Litigation*, MDL 1430.  On August 26, 2005, Judge

Stearns entered a Final Order and Judgment (the "August 26, 2005 Order") certifying, for

settlement purposes, a nationwide class of persons and entities who had paid for Lupron®.

Specifically, the "Lupron® Purchaser Class" includes:

> All individual persons or entities who, during the Class Period [January 1,
> 1985 through March 31, 2005], made Lupron® Purchases.  Excluded from
> the class are the Settling Health Plans; Defendants, their respective present
> and former, direct and indirect, parents, subsidiaries, divisions, partners and

- 2 -

> affiliates; and the United States government, its officers, agents, agencies
> and departments, and all other government entities' claims, to the extent
> that they previously released their claims pursuant to the 2001 Settlement
> Agreement and Release resolving the matter of *United States of America v.*
> *TAP Pharmaceutical Products, Inc.* (D. Mass.) and related litigation.

(*See* Aug. 26, 2005 Order, attached as Exhibit B). Judge Stearns' Final Order and Judgment

incorporated the terms of the detailed Settlement Agreement executed by the parties (the "Class

Agreement"). Together, Judge Stearns' Order and the Class Agreement leave no doubt that the

Lupron®-related claims advanced in this action by the New York Counties are improper and

should be dismissed.

*First*, the New York Counties are members of the Lupron® Purchaser Class. These are

governmental entities who have allegedly made Lupron® Purchases--defined in the Class

Agreement as "payment or reimbursement, direct or indirect, for all or part of the cost of

Lupron® prescribed, provided or administered in the United States." (Class Agmt. ¶2(t), relevant

parts attached as Ex. C.)

*Second*, the New York Counties did not submit a request to "opt out" of the Lupron®

Purchaser Class. (*See* Ex. A to the Aug. 26, 2005 Order, listing all persons and entities who

validly excluded themselves from the Class.)

*Third*, the New York Counties are accordingly subject to the release provisions of the

Class Agreement and the August 26, 2005 Order. The Class Agreement provides that Releasors

(which includes all members of the Lupron® Purchaser Class) have released all "Released

Claims," including:

> any and all claims, demands, actions, suits, causes of action, damages
> whenever incurred, liabilities of any nature whatsoever,…that any Releasor
> who has not timely excluded themselves from the Lupron® Purchaser
> Class… ever had, now has, or hereafter can, shall or may have, directly,
> representatively, derivatively or in any capacity, arising out of any conduct,
> events or transactions alleged or that could have been alleged in any

litigation relating to the marketing, sale, cost, pricing or purchase of Lupron®.

(Class Agmt. ¶2(y).)  Judge Stearns' August 26, 2005 Order specifically incorporates that release.  (Aug. 26, 2005 Order ¶ 10.)

> *Finally*, Judge Stearns' August 26, 2005 Order expressly provides that:
>
> No nationwide Lupron® Purchaser Class member, either directly, representatively, or in any other capacity (other than the persons and entities specifically enumerated in <u>Exhibit A</u> hereto), shall commence, continue or prosecute against any or all Releasees any action or proceeding in any court or tribunal asserting any of the Released Claims defined in the Class Agreement and are hereby permanently enjoined from so proceeding.

(*Id.* ¶18.)  By continuing to prosecute claims in this action relating to Lupron® pricing, the New York Counties stand in direct violation of the permanent injunction issued by Judge Stearns.  The New York Counties have released these claims relating to Lupron®, and they have been specifically enjoined from continuing to prosecute such claims against TAP.  These claims should be dismissed.

## **CONCLUSION**

For the foregoing reasons, and those identified in defendants' joint memorandum, TAP respectfully requests that this Court dismiss with prejudice all claims related to Lupron® in the Consolidated Complaint (of New York City and all plaintiff New York Counties other than Nassau) and the Second Amended Complaint of Nassau County.

- 4 -

Dated: March 3, 2006

Respectfully submitted,

DEFENDANT TAP PHARMACEUTICAL
PRODUCTS, INC.


s/Toni-Ann Citera

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, NY 10017-6702
Telephone:   (212) 326-3939
Facsimile:   (212) 755-7306

James R. Daly
JONES DAY
77 W. Wacker St., Suite 3500
Chicago, IL 60601-1676
Telephone:   (312) 782-3939
Facsimile:   (312) 782-8585

- 5 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2006, a true and correct copy of DEFENDANT TAP PHARMACEUTICAL PRODUCTS INC.'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS was served upon all counsel of record by electronic service pursuant to CMO No. 2, by causing a copy to be sent to Lexis/Nexis for posting and notification.

s/ Toni-Ann Citera
Attorney for Defendant TAP Pharmaceutical Products Inc.

CHI-1522453v1



10716042

Mar 3 2006
4:42PM

# EXHIBIT A

## STATE SETTLEMENT AGREEMENT AND RELEASE

### I.     THE PARTIES

This Settlement Agreement ("Agreement") is entered into this __*3ʳᵈ*__ day of

__*December*__ , 2001.  The parties to the Agreement are the state of New York and TAP

Pharmaceutical Products Inc. (formerly known as TAP Holdings Inc. and TAP Pharmaceuticals

Inc.) ("TAP"), a Delaware corporation with a principal place of business in Lake Forest, Illinois,

and are collectively referred to as the "Parties".  The Parties now agree as follows:

### II.     PREAMBLE

A.     WHEREAS, TAP is entering into a civil settlement agreement with the United

States of America, acting through and/or on behalf of its Department of Justice and the United

States Attorney's Office for the District of Massachusetts, and the Office of Inspector General of

the United States Department of Health and Human Services ("HHS-OIG"); TRICARE

Management Activity ("TMA")(formerly known as the  Office of the Civilian Health and

Medical Program of the Uniformed Services), a field activity of the Office of the Secretary of

Defense, the United States Department of Defense, and relators in certain federal False Claims

Act lawsuits, as well as settlement agreements with the state of New York and numerous other

states, all of which are intended to resolve civil claims for the conduct alleged in Paragraph F

below;

B.     WHEREAS, this Agreement addresses the state of New York's claims against

TAP for the conduct alleged in Preamble Paragraph F below;

1

C.     WHEREAS, on or before ___October 16___, 2001, or such other date as

the Court may set in <u>United States of America v. TAP Pharmaceutical Products Inc.</u>, Criminal

Action No. [to be assigned](District of Massachusetts) (the "Criminal Action"), or such other

date as may be determined by the Court, TAP has agreed to enter a plea of guilty pursuant to

Fed. R. Crim. P. 11(e)(1)(C) to a one count Information alleging a violation of Title 18, United

States Code, Section 371, namely, a conspiracy to violate the Prescription Drug Marketing Act,

21 U.S.C. § 331(t) and 333(b) by causing the billing of free drug samples;

D.     WHEREAS, at all relevant times, TAP marketed and sold the drugs Lupron® and

Lupron Depot® (collectively "Lupron") in various dosages to physicians, health maintenance

organizations, hospitals, wholesalers, distributors and others for use in treatment of prostate

cancer;

E.     WHEREAS, the state of New York contends that TAP caused to be submitted

claims for payment for Lupron to the state's Medical Assistance Program ("Medicaid")

established pursuant to Title XIX of the Social Security Act;

F.     WHEREAS, the state of New York contends that it has Medicaid-related civil

claims against TAP under various statutes and the common law for engaging in the following

alleged conduct from January 1991 through the present, involving the marketing, sale and pricing

of Lupron for treatment of prostate cancer:

(i)     The state of New York contends that TAP, through certain of its

employees, provided, and conspired to provide, free samples of the drug Lupron to certain

providers (including physicians), knowing and expecting that those providers would prescribe,

distribute and/or administer the free drug samples to patients and that those free samples would

2

be illegally billed to the Medicaid program. The state of New York further contends that the purpose of providing these free drug samples varied, but that among those purposes were: permitting Medicaid providers to obtain money from the reimbursement for the samples of Lupron; inducing Medicaid providers to order Lupron; providing a source of money for Medicaid providers to pay past-due balances owed to TAP; and increasing the income of Medicaid providers.

(ii)     The state of New York contends that TAP knowingly and willfully offered and/or paid illegal remuneration to certain providers, physicians, physician practices, health maintenance organizations and others in various forms, including, for example, grants, free Lupron, debt forgiveness, travel and entertainment, consulting and audit services, administration fees, nominally priced drug, and VCRs and TVs, for the purpose of either unlawfully obtaining orders to purchase the drug Lupron from TAP or causing Lupron to be placed on formulary by a provider, which drug TAP knew was paid for by the Medicaid program.

(iii)    The state of New York contends that TAP knowingly and willfully offered and/or paid illegal remuneration to providers by marketing TAP's "Return-to-Practice" program to providers to induce unlawful orders to purchase the drug Lupron for treatment of prostate cancer, which drug TAP knew was paid for by the Medicaid program. The state of New York further contends that TAP's Return-to-Practice program consisted of inflating the Average Wholesale Price ("AWP") used by Medicaid for reimbursement of the drug Lupron, deeply discounting the price paid by providers to TAP for the drug ("the discounted price"), and marketing the spread between the AWP and the discounted price to providers as additional profit to be returned to the providers from Medicaid reimbursements for Lupron. The state of New

3

York further contends that TAP concealed the discounted price from Medicaid and other governmental agencies by omitting material information about providers' actual cost, by falsely advising providers that the discounted price could not and should not be reported to Medicaid, and by auditing providers to ensure the claims for payment were submitted at the inflated AWP rather than the discounted price paid by the provider. The state of New York also contends that as a consequence of this conduct, its Medicaid program was damaged.

      (iv)    The state of New York contends that TAP manipulated reported prices, including AWP, to increase reimbursement from the Medicaid program. Specifically, the state of New York contends that TAP engaged in a marketing scheme where it set AWPs of Lupron at levels far higher than the majority of its customers actually paid for the drug when purchasing either directly from TAP or through a wholesaler or distributor. As a result, the state of New York contends that TAP's customers received reimbursement from the Medicaid program at levels significantly higher than the providers' actual costs or the wholesalers' average price. The state of New York further contends that certain providers submitted claims for payment to the Medicaid programs that were subsequently paid, based upon falsely inflated AWPs, to the financial detriment of the Medicaid program;

      (v)    The state of New York contends that TAP knowingly misreported and underpaid its Medicaid rebates for Lupron used for treatment of prostate cancer, *i.e.*, the amounts that it owed to the state under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8. The state of New York further contends that TAP was generally required on a quarterly basis to rebate to its state Medicaid program the difference between the Average Manufacturer Price ("AMP") and its "Best Price," as defined by 42 U.S.C. § 1396r-8(k)(1) and 1396r-8(c)(1)(C).

4

The state of New York alleges that TAP falsely reported to the Center for Medicare and Medicaid Services ("CMS") (formerly the "Health Care Financing Administration" or "HCFA") its Best Price for Lupron used for treatment of prostate cancer because TAP calculated its Best Prices for Lupron without accounting for "off-invoice" price concessions provided in various forms, including, for example, grants, free Lupron, debt forgiveness, travel and entertainment, consulting and audit services, administration fees, nominally priced drugs, and VCRs and TVs. As a result, the state of New York contends that TAP misreported and underpaid its Medicaid rebates to the states under the Medicaid Rebate Program.

TAP's conduct alleged in Preamble Paragraph F is hereinafter referred to as the "Covered Conduct."

G.     WHEREAS, the state of New York contends that it has administrative claims against TAP for administrative and monetary penalties under state and federal law for the Covered Conduct.

H.     WHEREAS, other than such admissions as TAP makes in connection with its guilty plea in the Criminal Action, TAP denies the remaining allegations of the state of New York set forth herein.

I.     WHEREAS, to avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final compromise of the civil and administrative Medicaid-related claims the state of New York has against TAP.

5

### III.   TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.      TAP agrees to pay to the United States, to the individual states, to the relators in certain federal False Claims Act lawsuits and to any relators in any pending state court *qui tam* or "whistleblower" lawsuits, collectively, the maximum collective sum of five hundred eighty five million dollars ($585,000,000) (the "Settlement Amount"). Payments to the United States and to the individual states shall be made pursuant to the following terms and conditions:

A.      TAP has agreed to pay to the United States the sum of five hundred fifty nine million four hundred eighty three thousand five hundred sixty dollars ($559,483,560) (the "Federal Settlement Amount"), which represents the federal share of the Settlement Amount and the share of the Settlement Amount payable to the relators in certain federal False Claims Act lawsuits. The Federal Settlement Amount shall be paid pursuant to the civil settlement agreement entered between TAP and the United States (the "Federal Agreement").

B.      TAP agrees to deposit into an escrow account the sum of twenty five million, five hundred sixteen thousand, four hundred forty dollars ($25,516,440) (the "State Settlement Amount"), which represents the state-funded portions of the claims settled for the Medicaid programs of all fifty states and the District of Columbia ("the Participating States"). TAP shall pay the State Settlement Amount into an escrow account within seven business days after the latest date on which all of the following have occurred: (1) the Federal Agreement is fully

6

the custody and control of a Medicaid Fraud Control Unit, which shall be designated by the negotiating team for the National Association of Medicaid Fraud Control Units and which shall act as Escrow Agent and shall retain such funds until their release in accordance with the payment terms set forth in subparagraph E below.

C.   The total portion of the Settlement Amount paid by TAP in settlement for alleged injury to the Medicaid Program for the state of New York is $9,802,253.39, consisting of a portion paid to the state of New York under this Agreement and another portion paid to the federal government as part of the Federal Settlement Amount.   The individual portion of the State Settlement Amount allocable to the state of New York, and which may be withdrawn by the state of New York from escrow pursuant to this Agreement, is $5,055,088.32 (the "Individual State Settlement Amount"), plus any accrued interest on that portion of the State Settlement Amount.   The portion of the Federal Settlement Amount allocable to the state of New York is $4,747,165.07.

D.   The state of New York shall be entitled to disbursement of its Individual State Settlement Amount from the escrow account ten days after the Escrow Agent has received fully executed state settlement agreements from all of the Participating States.   Any escrowed funds not disbursed within 200 days after the Escrow Agent has received the State Settlement Amount shall be disbursed to TAP.

E.   If TAP's agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(e)(1)(C) in the Criminal Action described in Preamble Paragraph B is not accepted by the Court or the Court does not impose the agreed upon sentence for whatever reason, this Agreement shall be null and void at the option of either the state of New York or TAP.   If either the state of New York or

7

not disbursed within 200 days after the Escrow Agent has received the State Settlement Amount shall be disbursed to TAP.

E.      If TAP's agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(e)(1)(C) in the Criminal Action described in Preamble Paragraph B is not accepted by the Court or the Court does not impose the agreed upon sentence for whatever reason, this Agreement shall be null and void at the option of either the state of New York or TAP.  If either the state of New York or TAP exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within four business days of the Court's decision, the Parties will not object and this Agreement will be rescinded.  If this Agreement is rescinded, TAP waives any affirmative defense based in whole or in part on the statute of limitations for the period of time between April 17, 2001, and thirty days after recission of this Agreement.

2.      In consideration of this Agreement and payment set forth herein and subject to the exceptions from release set forth in Paragraph 3 below, the state of New York on behalf of itself, its officers, agents, agencies and departments shall release and forever discharge TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns, and their current and former directors, officers, and employees from any civil or administrative claims for damages or penalties that the state of New York has or may have relating to the Covered Conduct as defined in Preamble Paragraph F.  The payment of the Settlement Amount fully discharges TAP from any obligation to pay Medicaid-related restitution, damages, and/or any fine or penalty to the State for the Covered Conduct.

3.      Notwithstanding any term of this Agreement, the state of New York specifically does not herein release TAP, its predecessors, subsidiaries, joint venture owners, and their corporate

8

parents and affiliates, successors and assigns, and their current and former directors, officers, and employees from any and all of the following:  (a) any potential criminal, civil or administrative claims arising under state of New York revenue codes; (b) any criminal liability not specifically released by this Agreement; (c) any potential liability to the state of New York for any conduct other than the Covered Conduct; (d) any claims based upon obligations created by this Agreement; (e) any reporting of AWP for Lupron to First Data Bank or any other national reporting service for use in Medicaid reimbursement submitted subsequent to the effective date of this agreement; (f) except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (g) any express or implied warranty claims or other claims for defective or deficient products and services provided by TAP; (h) any claims for personal physical injury or property damage or for other consequential damages arising from the Covered Conduct; (i) any claim based on a failure to deliver items or services due; or (j) any civil or administrative claims against individuals, including current and former directors, officers, and employees of TAP, its predecessors, subsidiaries, joint venture owners, and their corporate affiliates, who receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement related to the Covered Conduct.

4.      In consideration of the obligations of TAP set forth in this Agreement, conditioned upon TAP's payment in full of the Settlement Amount and except as reserved in paragraph 3 above, the state of New York agrees to release and refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusions from the state of New York's Medicaid program against TAP, its predecessors, subsidiaries, joint venture owners, their

9

corporate parents and affiliates, successors and assigns, for the Covered Conduct or for TAP's

conviction in the Criminal Action.  Nothing in this Agreement precludes the state of New York

from taking action against TAP in the event that TAP is excluded by the federal government, or

for conduct and practices other than the Covered Conduct or the conviction in the Criminal

Action.  The Medicaid Fraud Control Unit for the state of New York further agrees to refrain

from recommending, causing or attempting to cause any administrative action or sanction,

including debarment, by any other government agency of the state of New York for the Covered

Conduct or for the conviction in the Criminal Action.  TAP acknowledges that the state of New

York does not have the authority to release TAP from any claims or actions which may be

asserted by private payors or insurers, including those that are paid on a capitated basis for

providing health care to the States' Medicaid programs.

   5.  This Agreement is expressly conditioned upon resolution of the Criminal Action.

In consideration of the Criminal Action, the state of New York agrees that it shall not

investigate, prosecute, or refer for prosecution or investigation to any agency, TAP, its

predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates,

successors and assigns for the Covered Conduct.

   6.  TAP fully and finally releases the state of New York, its agencies, employees,

servants, and agents from any claims (including attorneys fees, costs, and expenses of every kind

and however denominated) which TAP has asserted, could have asserted, or may assert in the

future against the state of New York, its agencies, employees, servants, and agents, related to or

arising from the investigation and prosecution of the Covered Conduct up to the effective date of

this Settlement Agreement.

10

7.     TAP waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this Settlement Agreement bars a remedy sought in such criminal prosecution or administrative action.  Provided, however, that nothing in this paragraph is intended to, or will operate to, limit the scope of paragraph 5, in which the state of New York agrees not to prosecute or investigate TAP for certain conduct.

8.     The Settlement Amount that TAP must pay pursuant to Paragraph 1 above will not be decreased as a result of the denial of claims for payment now being withheld from payment by the state of New York's Medicaid program where such denial resulted from the Covered Conduct.  If applicable, TAP agrees not to resubmit to the program any previously denied claims where such denial resulted from the Covered Conduct and agrees not to appeal any such denials of claims.

9.     This Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity, including but not limited to any individual or entity that purchased Lupron from TAP.

10.    Nothing in any provision of this Agreement constitutes an agreement by the state of New York concerning the characterization of the Settlement Amount for purposes of the state internal revenue laws.

11.    In addition to all other payment and responsibilities under this Agreement, TAP agrees to pay all reasonable travel costs and expenses of the state negotiating team.  TAP will

11

pay this amount by separate check or wire transfer made payable to the National Association of Medicaid Fraud Control Units after all Participating States execute this Agreement.

12.     TAP covenants to cooperate fully and truthfully with the state of New York in any ongoing investigation or investigation commenced within five years of the execution of this Agreement of individuals and entities not specifically released by this Agreement (including any parties with whom TAP has or has had a business or professional relationship, including but not limited to vendors, contractors, partners, joint venturers, physicians, and referral sources) relating to the Covered Conduct. More specifically, upon reasonable request from the state of New York:

(a)     TAP will make reasonable efforts to facilitate access to, and encourage the cooperation of, its current and former directors, officers, and employees for interviews and testimony relating to the Covered Conduct, consistent with the rights and privileges of such individuals. To encourage the cooperation of such individuals, TAP agrees to advise such individuals in writing that the state of New York wishes to interview them or seek their testimony, and that the individuals' cooperation is in the best interest of TAP. Cooperation provided pursuant to this subparagraph will include identification of witnesses who, to TAP's knowledge, may have material information related to the state of New York's inquiry. The testimony referred to in this paragraph includes, but is not limited to, testimony deemed necessary by the state of New York or a court to identify or establish the source, original location, authenticity, or other evidentiary foundation for any documents and to authenticate such documents in any criminal, civil and administrative investigations and proceedings in which the state of New York is involved.

12

(b)     TAP will provide copies of non-privileged documents and records in its possession, custody or control relating to the Covered Conduct and relating to the subject of the state of New York's inquiry.  In connection with this, TAP shall provide such technical assistance as is necessary and reasonable to facilitate the state of New York's access to any computerized information covered by this Paragraph.

Nothing in this agreement shall be construed as a waiver by TAP of its attorney-client privilege or work product privilege.  Notwithstanding that fact, the existence of any such privilege does not affect TAP's obligation to comply with this Agreement.

13.     Notwithstanding any provision of this Agreement, TAP is not required to (1) request of its present or former officers, directors, employees or agents that they forego seeking the advice of an attorney nor that they act contrary to that advice; (2) take any action against its directors, employees or agents for following their attorney's advice or for failing to submit to an interview or otherwise cooperate with the state of New York; or (3) waive any privilege or claim of work product.  The failure of any individual to submit to an interview or otherwise to refuse to cooperate with the state of New York shall not constitute a breach of this agreement by TAP.

14.     The state of New York acknowledges TAP's cooperation in the state of New York's investigation of drug pricing practices and agrees to communicate the nature and extent of this cooperation to other parties upon the request of TAP.  The making of this Agreement, and TAP's provision of information pursuant to it, shall not be construed by the state of New York as a basis for the exclusion of any of TAP's products from the state of New York's formulary.

15.     TAP represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

13

16.     TAP has entered into a Corporate Integrity Agreement ("CIA") with HHS-OIG. TAP acknowledges that the state of New York may gain access to and use the pricing information provided by TAP under the CIA, provided that the state of New York meets its obligations relating to the use and confidentiality of that information as set forth in this Agreement. TAP acknowledges that the CIA does not preclude the state from taking any appropriate action against TAP for future conduct under the state of New York's laws. The state of New York hereby agrees to abide by all confidentiality provisions and restrictions contained in the CIA and to afford all such information the maximum degree of confidentiality permitted by law.

17.     TAP shall report directly to the Medicaid Program for the state of New York the average sale price, as defined below, for pharmaceutical and other products for which the Medicaid Program for the state of New York provides reimbursement (hereafter "Government Reimbursed Products").

(a) AVERAGE SALE PRICE DEFINITION: For purposes of this Agreement, "average sale price" means, with respect to each dosage form, strength and volume of the Government Reimbursed Product (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package) the average of all final sales prices charged by TAP for the product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Drug Rebate purposes, pursuant to 42 U.S.C. § 1396r-8, and excluding direct sales to hospitals. (Those purchasers for which the sales are included in the calculation of average sale price are hereafter referred to as the "Relevant Purchasers".) The prices identified in the calculation of the average sale price should be net of

14

all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates[1]; and all other price concessions provided by TAP to any Relevant Purchaser that result in a reduction of the ultimate cost to the purchaser. Notwithstanding the foregoing, the average sale price shall not include the value of bona fide charity care or grants.

TAP shall report the average sale price by National Drug Code ("NDC") for each Government Reimbursed Product identified by TAP's NDC.  The average sale price reported shall be properly weighted to reflect the volume of sales at each sale price, *i.e.*, for each NDC, the price reported shall be an average per unit price determined by dividing the sum of all final prices charged by TAP to a Relevant Purchaser, net of all price reductions identified above, for a Government Reimbursed Product in a quarter by the total number of units of that product sold in that quarter.

(b)     TIME FRAME: Except as otherwise noted below, thirty (30) days after the last day of each calendar quarter, TAP shall report, in accordance with section 17.a. above, the average sale prices of each of its Government Reimbursed Products identified by TAP's NDC to: (1) the Medicaid programs of those States who have executed a state settlement agreement with TAP; and (2) First DataBank Inc.[2] solely for the purpose of reporting pricing information

---

[1] The term "rebate" as used in this paragraph does not include any payments made by TAP to the States pursuant to the Medicaid Drug Rebate Program (42 U.S.C. § 1396r-8)

[2] If appropriate to reflect changes in the sources from which the Medicaid programs for the Participating States receive pricing information, TAP agrees that, upon the receipt of a written request by any of the Participating States, TAP will report the required information to a drug pricing reporting source other than, and in addition to, First DataBank, provided that the price reporting source agrees to protect the confidentiality of TAP's pricing information in a written agreement containing reasonable provisions equivalent to the confidentiality provisions governing the submission of pricing information to First Data Bank.

15

based on those average sale prices to the Medicaid Programs of those States that have executed a state settlement agreement. The first such report of average sale prices shall be made no later than 30 days after the end of the first full calendar quarter following the Effective Date of the CIA.

(c)    CERTIFICATION: With each report of price information TAP sends to the Medicaid Program for the state of New York, an appropriate employee or agent of TAP will certify that the price information reported has been reported to First DataBank, or any successor or alternative reporting agency, and that the price information has been calculated in accordance with the methodology described in this Agreement. Said certification shall be in the form annexed to this Agreement as Exhibit "A". TAP agrees that this certification by an appropriate employee or agent of TAP constitutes a certification by TAP.

(d)    DOCUMENT RETENTION: TAP shall retain all supporting work papers and documentation relating to the average sale price of its Government Reimbursed Products for eight years after the effective date of the CIA, and, to the extent not protected by appropriately asserted privileges, shall make such documentation available for inspection by the MFCU for the state of New York, or a duly authorized representative of the MFCU, pursuant to the confidentiality provisions set forth in paragraph 18 below.

(e) TIME PERIOD. TAP agrees to submit average sale price in accordance with this Agreement for a period of seven years from the effective date of the CIA.

18.    (a) TAP and the state of New York acknowledge that the pricing information provided by TAP is considered to be confidential commercial information and proprietary trade secrets that if disclosed may cause substantial injury to the competitive position of TAP. It is

16

further understood that all information provided by TAP shall be made available to the state of New York's MFCU upon request. The state of New York hereby agrees to afford to the pricing information disclosed by TAP the maximum degree of confidentiality permitted by law.

(b)  The Medicaid Program of the state of New York has been advised by the MFCU of the purpose and use of this information. The parties acknowledge that this information may be relied upon by the state of New York in establishing reimbursement rates for TAP products, provided however the state of New York will not change reimbursement rates for any TAP product based on this information without conducting meaningful review for all government-reimbursed therapeutically similar products.

19.    Unless otherwise stated in writing subsequent to the execution of this Agreement, all notifications and communications made pursuant to this Agreement shall be submitted to the entities listed below:

**STATE PHARMACY MANAGER**
**[For the submission of Average Sale Price Data]:**

Office of Medicaid Management, D.O.H.
40 Marlboro Rd.
Delmar, NY  12054

**STATE MEDICAID FRAUD CONTROL UNIT**
**[For legal notices and other purposes]:**

MFCU of New York
Office of the Attorney General
120 Broadway, 13th Fl.
New York, NY  10271

17

**TAP**

Legal Department
TAP Pharmaceutical Products Inc.
675 N. Field Drive
Lake Forest, IL  60045

20.    The undersigned TAP signatory represents and warrants authorization by the

Board of Directors to execute this Agreement.  The undersigned state of New York signatories

represent that they are signing this Agreement in their official capacities and they are authorized

to execute this Agreement on behalf of the state of New York through their respective agencies

and departments.

21.    This Agreement is governed by the laws of the state of New York.

22.    This Agreement is effective on the date of signature of the last signatory to the

Agreement.

23.    This Agreement shall be binding on all successors, transferees, heirs and assigns

of the Parties; provided, however, this Agreement shall not apply to the products of an acquiring

company or a company merging with TAP except to the extent such company, as a result of the

acquisition of or merger with TAP, becomes involved in the sales, marketing or pricing of, or

Medicaid Drug Rebate program obligations associated with, Government Reimbursed Products

(as defined in this Agreement) originally manufactured by TAP prior to the merger or

acquisition, in which case the obligations of this agreement shall apply only to those products

which had been Government Reimbursed Products when they were manufactured by TAP.

18

24.     This Agreement constitutes the complete agreement between the Parties with regard to the Covered Conduct.  This Agreement may not be amended except by written consent of the Parties.  As to Paragraph 1 only, TAP and the NAMFCU TAP Negotiating Team may agree in writing to amend this Agreement by (1) extending beyond 200 days the time in which all Participating States must execute settlement agreements and/or (2) reducing the number and identity of Participating States that must return executed state settlement agreements before funds are disbursed from escrow.

25.     Each party agrees to perform any further acts and to execute and deliver any further documents reasonably necessary to carry out this Agreement.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

19

**For the State of New York:**

By: _____     Dated: _____

Title: _____
      JOSE MALDONADO
      Deputy Attorney General


**TAP PHARMACEUTICAL PRODUCTS INC.**

By: _____     Dated: _12/3/01_
      H. THOMAS WATKINS
      President
      TAP Pharmaceutical Products Inc.


By: _____     Dated: _____
      DANIEL REIDY
      Jones, Day, Reavis & Pogue
      77 West Wacker
      Chicago, Illinois 60601
      Counsel to TAP Pharmaceutical Products Inc.


By: _____     Dated: _____
      JOSEPH SAVAGE
      Testa, Hurwitz & Thibeault, LLP
      125 High Street
      Boston, MA 02110
      Counsel to TAP Pharmaceutical Products Inc.

20

EXHIBIT 'A' CERTIFICATION FORM

CERTIFICATION

The undersigned, an agent of TAP Pharmaceutical Products Inc., hereby certifies that the attached average sale price information has been communicated to First Databank or any successor or alternative reporting agency, and that it has been calculated in accordance with the methodology described in the State Settlement Agreement and as futher described in TAP's Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services.

Signed _____

Title _____

Date _____

21



10716042

Mar 3 2006
4:42PM

# EXHIBIT B



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: LUPRON® MARKETING AND SALES PRACTICES LITIGATION | **MDL NO. 1430** |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **CA No. 01-CV-10861**  **Judge Richard Stearns** |

## RCS ~~[PROPOSED]~~ FINAL ORDER AND JUDGMENT

This Court having considered: (a) the Settlement Agreement and Release dated November 15, 2004, including all Exhibits thereto (the "Class Agreement") between the Plaintiffs and Defendants TAP Pharmaceutical Products Inc. ("TAP"), Abbott Laboratories ("Abbott") and Takeda Pharmaceutical Company Limited (f/k/a Takeda Chemical Industries, Ltd.) ("Takeda") (collectively the "Defendants"); (b) the proposed allocation and distribution of the Class Settlement Fund; (c) various pleadings and motions of the parties, intervenors, and other objectors; and having held a three day fairness hearing on April 13-15, 2005 and a further hearing on June 24, 2005, and otherwise being fully informed, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1.      This Final Order and Judgment incorporates herein and makes a part hereof: (i) the Court's May 12, 2005 Memorandum and Order Approving Settlement and Certifying the Class (the "May 12 Memorandum"); (ii) the Class Agreement, including the Exhibits thereto; (iii) the June 10, 2005 Implementation Agreement Between and Among MDL Plaintiffs, MDL Class Counsel, Defendants and K&S Group (the "Implementation Agreement"); (iv) the Court's November 24, 2004 Order Granting Preliminary Approval of Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class, and Scheduling Fairness Hearing



("Preliminary Approval Order"); and (v) the various agreements between and among MDL

Plaintiffs, Defendants, and the States of Idaho, Illinois, Kentucky, Minnesota, Pennsylvania, and

Wisconsin (the "States Agreements"). Unless otherwise provided herein, the terms defined in

the Class Agreement shall have the same meanings for purposes of this Final Order and

Judgment.

       2.      The Court has personal jurisdiction over all Class Representatives, nationwide

Lupron® Purchaser Class Members, and Defendants for purposes of this settlement only, and has

subject matter jurisdiction to approve the Class Agreement.

       3.      The record shows that Notice has been given to the nationwide Lupron®

Purchaser Class in the manner approved by the Court in its Preliminary Approval Order. The

Court finds that such Notice: (i) constitutes reasonable and the best practicable notice; (ii)

constitutes notice that was reasonably calculated, under the circumstances, to apprise members of

the nationwide Lupron® Purchaser Class of the pendency of the Lupron® MDL Actions, the

terms of the Settlement, and nationwide Lupron® Purchaser Class Members' right to object to or

exclude themselves from the nationwide Lupron® Purchaser Class and to appear at the settlement

fairness hearing held on April 13 - 15, 2005 (the "Fairness Hearing"); (iii) constitutes due,

adequate, and sufficient notice to all persons or entities entitled to receive notice; and (iv) meets

the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure.

       4.      No individuals or entities, other than those listed on Exhibit A hereto, have

excluded themselves from the nationwide Lupron® Purchaser Class. This Final Order and

Judgment shall have no force or effect on the persons or entities listed on Exhibit A hereto.

       5.      Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the May 12

Memorandum, the Court hereby finally approves in all respects the Settlement set forth in the



Class Agreement as modified by the Court-approved Implementation Agreement and the States Agreements ("the Settlement").

6.     The Court finds that the Settlement, the Class Agreement, and the plan of distribution of the Class Settlement Fund as set forth in Paragraph 17 of the Class Agreement, and as modified by the Court-approved Implementation Agreement and the States Agreements, are, in all respects, fair, reasonable and adequate, and in the best interest of the nationwide Lupron® Purchaser Class.

7.     The Court further approves the establishment of the Class Settlement Fund under the terms and conditions set forth in the Class Agreement and the Escrow Agreement submitted by the parties. The parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Class Agreement, as modified by the Implementation Agreement and the States Agreements. In addition, the parties are authorized to agree to and adopt such amendments and modifications to the Class Agreement as (i) shall be consistent in all material respects with this Final Order and Judgment, and (ii) do not limit the rights of nationwide Lupron® Purchaser Class Members.

8.     The Court finds that no further relief, in the form of an injunction or other equitable relief, is warranted against any Defendant in light of (i) the requirement that TAP comply with a comprehensive Corporate Integrity Agreement entered into with the United States relating to Lupron®; and (ii) changes to government statutes and regulations as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, that, among other things, changed the pricing and reimbursement approach for Lupron®.

9.     The Lupron® MDL Actions (listed in Exhibit B) are hereby dismissed with prejudice and without costs to any party, except as otherwise provided herein.



10.     Upon the Effective Date of the Class Agreement, the Releasors (as defined in Paragraph 2(z) of the Class Agreement) shall release and forever discharge the Releasees (as defined in Paragraph 2(x) of the Class Agreement) from the Released Claims (as defined in Paragraph 2(y) of the Class Agreement).  The Court specifically incorporates herein the comments made on pages 40-42 of the May 12 Memorandum regarding the appropriate scope of the Release.

11.     In addition, each Class Member expressly waives and releases, upon the Effective Date of the Agreement, any and all provisions, rights and benefits conferred by §1542 of the California Civil Code, which reads:

> Section 15.42.  General Release; extent.  A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law or any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code.  Each Releasor may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of the Agreement, but each Releasor expressly waives and fully, finally and forever settles and releases, upon this Order becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims with respect to the subject matter of the Agreement whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.  Each Releasor also hereby expressly waives and fully, finally and forever settles and releases any and all Released Claims it may have against Releasees under § 17200, et seq., of the California Business and Professions Code.



12.    The Court finds that the Class Settlement Fund is a "Qualified Settlement Fund" as defined in section 1.468B-1(a) of the Treasury Regulations in that it satisfies each of the following requirements:

    (a)    The Class Settlement Fund is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

    (b)    The Class Settlement Fund is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of an alleged violation of law; and

    (c)    The assets of the Class Settlement Fund are segregated from other assets of TAP, the transferor of payments to the Class Settlement Fund, and from the assets of persons related to TAP.

13.    Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

    (a)    The Class Settlement Find met the requirements of paragraphs 12(b) and 12(c) of this Order prior to the date of this Order approving the establishment of the Class Settlement Fund subject to the continued jurisdiction of this Court; and

    (b)    TAP and the "administrator" under section 1.468B-2(k)(3) of the Treasury Regulations may jointly elect to treat the Class Settlement Fund as coming into existence as a "Qualified Settlement Fund" on the later of the date the Class Settlement Fund met the requirements of paragraphs 12(b) and 12(c) of this Order or January 1 of the calendar year in which all of the requirements of paragraph 12 of this Order are met. If such relation-back election is made, the assets held by the Class Settlement Fund on such date shall be treated as having been transferred to the Class Settlement Fund on that date.

14.    Nothing in this Final Order and Judgment, the Settlement, the Class Agreement, the Implementation Agreement, or the States Agreements is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by any of the Defendants.

15.    As set forth in Exhibit C hereto, the Class Representatives and other appropriate persons are hereby granted an incentive award, which amount is in addition to whatever monies

5



they will receive from the Class Settlement Fund pursuant to the terms of the Class Agreement and this Final Order and Judgment.

16.     Without affecting the finality of this Final Order and Judgment, the Court retains continuing and exclusive jurisdiction over all matters relating to administration, consummation, enforcement and interpretation of the Class Agreement, Implementation Agreement, the States Agreements, and of this Final Order and Judgment, to protect and effectuate this Final Order and Judgment, and for any other necessary purpose. Defendants, Class Representatives, the parties to the Implementation Agreement, the parties to the States Agreements, and each member of the nationwide Lupron® Purchaser Class are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for the purpose of any suit, action, proceeding or dispute arising out of or relating to those agreements, including the Exhibits thereto, and only for such purposes. Without limiting the generality of the foregoing, and without affecting the finality of this Final Order and Judgment, the Court retains exclusive jurisdiction over any such suit, action or proceeding. Solely for purposes of such suit, action or proceeding, to the fullest extent they may effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

17.     In the event that the Settlement does not become effective according to the terms of the Class Agreement, this Final Order and Judgment shall be rendered null and void as provided by the Class Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Class Agreement.



18.     No nationwide Lupron® Purchaser Class Member, either directly,

representatively, or in any other capacity (other than the persons and entities specifically

enumerated in <u>Exhibit A</u> hereto), shall commence, continue or prosecute against any or all

Releasees any action or proceeding in any court or tribunal asserting any of the Released Claims

defined in the Class Agreement, and are hereby permanently enjoined from so proceeding.

19.     This judgment is entered pursuant to Federal Rule of Civil Procedure 58 and is a

final order.

SO ORDERED,

DATED: August 26, 2005

Richard G. Stearns
United States District Judge



## EXHIBIT A

INDIVIDUALS AND ENTITIES THAT HAVE PROPERLY EXCLUDED
THEMSELVES FROM THE NATIONWIDE LUPRON® PURCHASER CLASS IN
ACCORDANCE WITH THE ORDER OF NOVEMBER 24, 20004

### I.    CONSUMER EXCLUSIONS

| | | | |
|---|---|---|---|
| 1. | THERESA | PA | 4 |
| 2. | EDWARD | OH | 13 |
| 3. | ROBERT | PA | 45 |
| 4. | RICHARD | MO | 51 |
| 5. | BERNARD | NJ | 59 |
| 6. | HARRY | NJ | 60 |
| 7. | DALE | NJ | 61 |
| 8. | PHILIP | NJ | 62 |
| 9. | VICKI | MI | 70 |
| 10. | JUDENE | PA | 75 |
| 11. | DAWN | LA | 82 |
| 12. | NORMADENE | PA | 92 |
| 13. | LYWANDA | AL | 152 |
| 14. | MONTE | CT | 155 |
| 15. | ESTATE OF WILLIE | MS | 167 |
| 16. | MARVIN | NC | 171 |
| 17. | FRANK | NJ | 180 |
| 18. | KATLEEN | LA | 195 |
| 19. | TED | NY | 213 |
| 20. | PHILIP | IA | 214 |
| 21. | JACQUELINE | MD | 219 |
| 22. | RAY | VA | 228 |
| 23. | DENNIS | IN | 239 |
| 24. | ROBERT | CA | 241 |
| 25. | WALTER | AZ | 383 |
| 26. | MINNIE | AL | 468 |
| 27. | VIRGINIA | TX | 522 |
| 28. | CYNTHIA | GA | 549 |
| 29. | BRENDA | SC | 681 |
| 30. | ANDREA | FL | 876 |
| 31. | VICTORIA | MO | 952 |
| 32. | DENICE | PA | 965 |
| 33. | CARLENE | NJ | 979 |
| 34. | SUSAN | IA | 1002 |
| 35. | DENISE | MD | 1015 |
| 36. | JEFFREY | CA | 1023 |



| | | | | |
|---|---|---|---|---|
| 37. | LORI | AR | 1029 | |
| 38. | LEONARD | NJ | 1030 | |
| 39. | DENEEN | GA | 1031 | |
| 40. | JACQUELINE | WA | 1043 | |

## II.   TPP EXCLUSIONS

| | | | | | |
|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |
| 1. | BLUE CROSS AND BLUE SHIELD OF ALABAMA | PO BOX 530910 | BIRMINGHAM | AL | 35298 |
| 2. | BLUE CROSS AND BLUE SHIELD OF MICHIGAN | PO BOX 530910 | BIRMINGHAM | AL | 35298 |
| 3. | LIFE INSURANCE COMPANY OF ALABAMA | PO BOX 349 | GADSDEN | AL | 35902 |



# EXHIBIT B

Lupron® MDL Actions Dismissed, With Prejudice, by this Final Order and Judgment

| | | |
|---|---|---|
| 1. | *William M. Porter, Estate of William Brickey, Estate of Carl Goetting, Beacon Healthplans, Inc., and Twin Cities Bakery Workers Health and Welfare Fund v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd* | Master No. 01 CV 10861 |
| 2. | *Empire Healthchoice, Inc., d/b/a Empire Blue Cross and Blue Shield, Blue Cross and Blue Shield of Florida, Inc., Health Options, Inc., Trigon Insurance Company, d/b/a Trigon Blue Cross Blue Shield, Healthkeepers, Inc., Priority Health Care, Inc., Health Peninsula Care, Inc., Blue Cross and Blue Shield of Kansas City, Good Health HMO, Inc., Wellmark, Inc., d/b/a Wellmark Blue Cross and Blue Shield of Iowa, Wellmark of South Dakota, Inc., d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, Blue Cross Blue Shield of Montana, Inc., California Physicians' Service, d/b/a Blue Shield of California, CareAmerica Life Insurance Company, CPIC Life Insurance Company, Highmark Inc., d/b/a/ Highmark Blue Cross Blue Shield, Keystone Health Plan West, Keystone Health Plan Central, Highmark Services, Inc., Healthguard of Lancaster, Inc., Blue Cross and Blue Shield of Nebraska, Corporate Diversified Services, Inc., Louisiana Health Service & Indemnity Company, Inc., d/b/a Blue Cross and Blue Shield of Louisiana, and Blue Cross Blue Shield of Tennessee, Inc., Tennessee Health Care Network, Inc., Volunteer State Health Plan, Inc., Horizon Healthcare Services, Inc., and Oxford Health Plans, Inc. vs. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd.* | Master No. 01 CV 10861<br><br>(Original Case Nos. 02-10015 and 02-10139) |
| 3. | *Aetna Health, Inc. vs. TAP Pharmaceutical Products, Inc.* | Master No. 01 CV 10861<br><br>(Original Case No. 1:04-CV-10076) |
| 4. | *Cobalt Corporation vs. Abbott Laboratories, Inc., Takeda Chemical Industries Ltd. and TAP Pharmaceutical Products Inc.* | Master No. 01 CV 10861<br><br>(Original Case No. 02-11692) |
| 5. | *Health Care Service Corporation, a Mutual Legal Reserve Company vs. Takeda Chemical Industries, Ltd., TAP Pharmaceutical Products, Inc., and Abbott Laboratories* | Master No. 01 CV 10861<br><br>(Original Case Nos. 02-10015 and 02-10139) |



## **Exhibit C**

### INCENTIVE AWARD PAYMENTS

| Incentive Award Recipient | Amount of Award |
| --- | --- |
| Beacon Health Plans, Inc. | $25,000 |
| Twin Cities Bakery Workers Health and Welfare Fund | $25,000 |
| | |
| Acie Clark | $ 5,000 |
| Estate of William Brickey | $ 5,000 |
| Estate of Carl Goetting | $ 5,000 |
| William Porter | $ 5,000 |
| Joseph Benoit | $ 2,500 |
| Jamie Grass | $ 2,500 |
| Milton Greene | $ 2,500 |
| J. Kelly Farris | $ 2,500 |
| Brenda Campbell-Hubbard | $ 2,500 |
| Kenneth David Lee Jarman | $ 2,500 |
| Debra Kibodeaux | $ 2,500 |
| George Wilson Landry | $ 2,500 |
| Henry Landry, Sr. | $ 2,500 |
| Amy LeBlanc | $ 2,500 |
| Donna Litchfield | $ 2,500 |
| Steve Rowan | $ 2,500 |
| Alexandra Samsell | $ 2,500 |
| Ariel Samsell | $ 2,500 |
| Angela Sledge | $ 2,500 |
| Carol Sullivan | $ 2,500 |
| Robert Swanston | $ 2,500 |

11



# EXHIBIT 2



10716042

Mar 3 2006
4:42PM

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE LUPRON® MARKETING AND SALES PRACTICES LITIGATION | Master File No. 01-CV-10861 (MDL 1430) |
| THIS DOCUMENT RELATES TO ALL ACTIONS |  |

### SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Class Agreement") is submitted pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Subject to the approval of the Settlement Court, this Class Agreement is entered into between and among (i) the Class Representatives on behalf of themselves and the Lupron® Purchaser Class (the "Plaintiffs") and (ii) Defendants TAP Pharmaceutical Products Inc. ("TAP"), Abbott Laboratories ("Abbott"), and Takeda Pharmaceutical Company Limited (f/k/a Takeda Chemical Industries, Ltd.) ("Takeda") (collectively the "Defendants"), by and through their respective counsel.

WHEREAS, there is pending in the United States District Court for the District of Massachusetts a consolidated and coordinated proceeding comprised of actions, including the above-captioned actions, in which the Plaintiffs have alleged, *inter alia*, that some or all Defendants have engaged in improper and fraudulent marketing, pricing, and sales of the prescription drug Lupron®.

WHEREAS, Defendants have asserted a number of defenses to the claims by the Plaintiffs;

(p)     "Defendants' Counsel" means the law firms of JONES DAY, WINSTON & STRAWN LLP, and JENNER & BLOCK LLP.

(q)     "Effective Date" has the meaning ascribed in Paragraph 7 of this Class Agreement.

(r)     "Escrow Account" means the account established pursuant to Paragraph 9 of this Class Agreement.

(s)     "Lupron®" means Lupron® and Lupron Depot®.

(t)     "Lupron® Purchases" means payment or reimbursement, direct or indirect, for all or part of the cost of Lupron® prescribed, provided or administered in the United States; including, but not limited to, the payment or partial payment for or reimbursement of Lupron® to any doctor, medical practice, pharmacy or any other health care provider, or the payment of a co-insurance amount, deductible amount, flat payment amount or co-pay amount for Lupron® pursuant to a Medicare co-insurance obligation, an insurance agreement, or other health care plan. "Lupron® Purchases" includes, but is not limited to, transactions where the cost, reimbursement amount or price of the Lupron® to the Consumer Class Member, TPP Class Member, SHP Group Member, or any doctor, pharmacy or other health care provider, was based in any part on the Average Wholesale Price ("AWP") or any other price of Lupron® or any other product as published by Redbook, Medispan, or any similar

publication. "Lupron® Purchases" does not include purchases of Lupron® for resale purposes.

(u)   "Lupron® MDL Actions" means the consolidated claims of the Lupron® Purchaser Class and SHP Group in *In Re Lupron® Marketing and Sales Practice Litigation*, Case No. 01-CV-10861 (D. Mass.) (MDL 1430).

(v)   "Lupron® Pricing Litigation" means the Lupron® MDL Actions and all other pending litigation in any federal or state court asserting claims against the Defendants or any of them in any way similar to the Released Claims.

(w)   "Plaintiffs" means the Class Representatives together with all putative members of the Lupron® Purchaser Class.

(x)   "Releasees" means TAP Pharmaceutical Products Inc. (formerly TAP Holdings Inc.); TAP Pharmaceuticals Inc.; TAP Finance Inc.; Abbott Laboratories; Takeda Pharmaceutical Company Limited (formerly Takeda Chemical Industries, Ltd.); Takeda Pharmaceuticals North America, Inc.; Takeda America Holdings, Inc.; and each of their respective past, present and future, direct and indirect, parents, subsidiaries, divisions, partners and affiliates, and their respective past, present and future stockholders, officers, directors, employees, managers, sales representatives, agents, attorneys, insurers, and any other persons or entities who are alleged to have been involved in the distribution, dispensing and prescription of Lupron® and any of

their legal representatives, and the predecessors, heirs, successors, executors, trustees, administrators and assigns of each of the foregoing. As used in this Paragraph, "affiliates" means entities controlling, controlled by or under common control with a Releasee.

(y)    "Released Claims" means any and all claims, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasor who has not timely excluded themselves from the Lupron® Purchaser Class, whether or not they object to the settlement and whether or not they make a claim upon or participate in the Class Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any capacity, arising out of any conduct, events or transactions alleged or that could have been alleged in any litigation relating to the marketing, sale, cost, pricing or purchase of Lupron®. "Released Claims" specifically includes, but is not limited to, all claims against any person or entity relating to Lupron® transactions where the cost, reimbursement amount or price of the Lupron® to the Consumer Class Member, TPP Class Member, SHP Group Member, or any doctor, pharmacy or other health care provider, was based in any part on the Average Wholesale Price ("AWP") or any other price of Lupron® or any other product as published by Redbook, Medispan, or any similar publication. All Releasors covenant and agree that, after the Effective Date of this Class Agreement, they shall not seek to establish liability based, in whole or in part,

CHI-1445245                              10

on any of the Released Claims.  "Released Claims" shall not include claims arising out of this Class Agreement or claims between members of the Lupron® Purchaser Class and any of the Releasees concerning product liability or personal physical injury.

(z)   "Releasors" means (1) all Consumer Class Members, as well as their successors, assigns, heirs, executors, trustees, and administrators, and (2) all TPP Class Members and each TPP Class Member's respective present and former, direct and indirect, parents, subsidiaries, divisions, partners and affiliates, their respective present and former stockholders, officers, directors, employees, managers, agents, attorneys and any of their legal representatives, any future operating entities created and controlled by a TPP Class Member (not including any successor of a TPP Opt-Out), and any predecessors, successors, heirs, executors, trustees, administrators and assigns of each of the foregoing, all in their capacities as such, and any entities or persons (including, to the extent that a TPP Class Member administered their Lupon® Purchases, all entities for which any TPP Class Member provides or provided administrative services) on whose behalf the TPP Class Member is authorized to act.  All Released Claims are forever discharged, and such claims cannot be asserted by any of Releasors' future, direct and indirect, parents, subsidiaries, divisions, partners and affilliates, their respective future stockholders, officers, directors, employees, managers, agents, attorneys and any of their legal representatives, or any successors, heirs, executors, trustees, administrators, or assigns of each of the foregoing.  As used in this Paragraph, "affiliates"

CHI-1445245                    11

means entities controlling, controlled by or under common control with a Releasor.

(aa)   "Settlement Amount" means one hundred fifty million dollars ($150,000,000), which is to be paid by TAP in full and final satisfaction of all Released Claims held by any Consumer Class Member, TPP Class Member or SHP Group Member.  The Settlement Amount is inclusive of any payments for reasonable attorneys' fees and costs of any kind, including all costs associated with Settlement Notice and claims and escrow administration.

(bb)   "Class Settlement Fund" means ninety-five million dollars ($95,000,000), which represents the Settlement Amount minus the SHP Group Initial Payment.  TAP shall transfer the Class Settlement Fund, and it shall be allocated into the "TPP Settlement Pool" and the "Consumer Settlement Pool" as provided in Paragraph 9.

(cc)   "Settlement Notice" means the Notice of Pendency and Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Hearing substantially in the form annexed hereto as <u>Attachment 1</u> to <u>Exhibit A</u> and the Summary Notice annexed hereto as <u>Attachment 2</u> to <u>Exhibit A</u>.

(dd)   "SHP Group," "Settling Health Plans," or "SHPs" means all of the entities identified in <u>Exhibit C</u> to this Class Agreement (the "SHP Group Members"), together with all self-funded healthcare plans and/or entities ("SFPs") for which one or more SHP Group Members provides or provided

HAGENS BERMAN LLP

By: _____
    Thomas M. Sobol

One Main Street, 4th Floor
Cambridge, MA 02142
*Class Plaintiffs' Liason Counsel*

SPECTOR ROSEMAN & KODROFF

By: _____
       Jeffrey L. Kodroff

1818 Market Street, Suite 2500
Philadelphia, PA 19103
*Class Co-Lead Counsel*

COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.

By: _____
    Lisa Mezzetti

1100 New York Avenue, N.W., Suite 500, West Tower
Washington, DC 20005
*Class Co-Lead Counsel*

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:     _____
        Joseph Saveri

275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
*Class Co-Lead Counsel*

FOOTE MEYERS  MIELKE AND FLOWERS

By: _____

Robert Foote

416 South Second Street
Geneva, IL 60134

*Counsel for Goetting*
*Liason Counsel for Coordinated Cases*

CHI-1445245                                    53

JONES DAY

By:  Daniel E. Reidy
     James R. Daly

77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692

*Counsel for TAP Pharmaceutical Products Inc.*

WINSTON & STRAWN LLP

By: _____
     George C. Lombardi
     Erik W. Snapp

35 West Wacker Drive
Chicago, IL 60601-9703

*Counsel for Abbott Laboratories*

JENNER & BLOCK LLP

By: _____
    Thomas P. Sullivan
    Jeffrey D. Colman

One IBM Plaza
41st Floor
Chicago, IL 60611

*Counsel for Takeda Pharmaceutical Company Limited*