# EXHIBIT A



10713640

Mar  3 2006
2:18PM

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————— )
)
IN RE PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE )     MDL NO. 1456
LITIGATION )               Civil Action No. 01-12257-PBS
———————————————————————— )
)
THIS DOCUMENT RELATES TO: )     Judge Patti B. Saris
)
*The City of New York v. Abbott Labs., et al.* )
(S.D.N.Y. No. 04-CV-06054) )
*County of Suffolk v. Abbott Labs., et al.* )
(E.D.N.Y. No. CV-03-229) )
*County of Westchester v. Abbott Labs., et al.* )
(S.D.N.Y. No. 03-CV-6178) )
*County of Rockland v. Abbott Labs., et al.* )
(S.D.N.Y. No. 03-CV-7055) )
*County of Putnam v. Abbott Labs, et al.* )
(S.D.N.Y. No. 05-CV-04740) )
*County of Dutchess v. Abbott Labs, et al.* )
(S.D.N.Y. No. 05-CV-06458) )
*County of Putnam v. Abbott Labs, et al.* )
(S.D.N.Y. No. 05-CV-04740) )
*County of Washington v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00408) )
*County of Rensselaer v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00422) )
*County of Albany  v. Abbott Labs, et al* )
(N.D.N.Y. No. 05-CV-00425) )
*County of  Warren v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00468) )
*County of Greene  v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00474) )
*County of Saratoga v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00478) )
*County of Columbia  v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00867) )
*Essex County v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00878) )
*County of Chanango  v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00354) )
*County of Broome v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00456) )
*County of Onondaga v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00088) )
*County of Tompkins v. Abbott Labs, et al.* )
(N.D.N.Y. No. 05-CV-00397) )

*County of Cayuga v. Abbott Labs, et al.*                )
(N.D.N.Y. No. 05-CV-00423)                              )
*County of Madison v. Abbott Labs, et al.*               )
(N.D.N.Y. No. 05-CV-00714)                              )
*County of Cortland v. Abbott Labs, et al.*              )
(N.D.N.Y. No. 05-CV-00881)                              )
*County of Herkimer v. Abbott Labs, et al.*              )
(N.D.N.Y. No. 05-CV-00415)                              )
*County of Oneida v. Abbott Labs, et al.*                )
(N.D.N.Y. No. 05-CV-00489)                              )
*County of Fulton v. Abbott Labs, et al.*                )
(N.D.N.Y. No. 05-CV-00519)                              )
*County of St. Lawrence v. Abbott Labs, et al.*)
(N.D.N.Y. No. 05-CV-00479)                              )
*County of Jefferson v. Abbott Labs, et al.*             )
(N.D.N.Y. No. 05-CV-00715)                              )
*County of Lewis v. Abbott Labs, et al.*                 )
(N.D.N.Y. No. 05-CV-00839)                              )
*County of Chautauqua v. Abbott Labs, et al.*)
(W.D.N.Y. No. 05-CV-06204)                              )
*County of Allegany v. Abbott Labs, et al.*              )
(W.D.N.Y. No. 05-CV-06231)                              )
*County of Cattaraugus v. Abbott Labs, et al.*)
(W.D.N.Y. No. 05-CV-06242)                              )
*County of Genesee v. Abbott Labs, et al.*               )
(W.D.N.Y. No. 05-CV-06206)                              )
*County of Wayne v. Abbott Labs, et al.*                 )
(W.D.N.Y. No. 05-CV-06138)                              )
*County of Monroe v. Abbott Labs, et al.*                )
(W.D.N.Y. No. 05-CV-06148)                              )
*County of Yates v. Abbott Labs, et al.*                 )
(W.D.N.Y. No. 05-CV-06172)                              )
*County of Niagara v. Abbott Labs, et al.*               )
(W.D.N.Y. No. 05-CV-06296)                              )
*County of Seneca v. Abbott Labs, et al.*                )
(W.D.N.Y. No. 05-CV-06370)                              )
*County of Orleans v. Abbott Labs, et al.*               )
(W.D.N.Y. No. 05-CV-06371)                              )
*County of Ontario v. Abbott Labs, et al.*               )
(W.D.N.Y. No. 05-CV-06373)                              )
*County of Schuyler v. Abbott Labs, et al.*              )
(W.D.N.Y. No. 05-CV-06387)                              )
*County of Chemung v. Abbott Lab, et al.*                )
(W.D.N.Y. No. 05-CV-06744)                              )
                        AND                             )
*County of Nassau v. Abbott Labs, et al.*                )
(E.D.N.Y. No. 04-CV-5126)                               )

**INDIVIDUAL MEMORANDUM OF BAYER CORPORATION
IN SUPPORT OF ITS MOTION TO DISMISS (1) THE CONSOLIDATED COMPLAINT
OF NEW YORK CITY AND PLAINTIFF NEW YORK COUNTIES OTHER THAN
NASSAU AND (2) THE SECOND AMENDED COMPLAINT OF NASSAU COUNTY**

Bayer Corporation ("Bayer") has joined the Joint Memorandum in Support of Defendants' Motion to Dismiss the Consolidated Complaint of New York City and Plaintiff New York Counties ("Cons. Cmplt.") and the Second Amended Complaint of Nassau County ("Nassau SAC").  Bayer submits this supplemental memorandum to address additional issues specific to it.

In two settlements executed in January 2001 and August 2003, the state of New York settled claims against Bayer concerning alleged average wholesale price ("AWP") inflation and misreported best prices.  Both the Consolidated Complaint and the Nassau SAC now seek to recover for claims that are barred by those settlements and to revive causes of action that this Court previously dismissed when raised by Suffolk County.  For these reasons, as well as those stated in Defendants' Joint Memorandum, plaintiffs' claims against Bayer should be dismissed pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6).  For the convenience of the Court, a proposed order is attached hereto.

## BACKGROUND

In the Consolidated Complaint and the Nassau SAC, plaintiffs allege that Bayer reported inflated AWPs for certain of its products, resulting in overpayments by the plaintiffs in Medicaid reimbursements for those drugs.  Plaintiffs' only specific allegations of AWP fraud involve the identical products covered by the 2001 settlement – specifically, Kogenate® and Gamimune®. (Cons. Cmplt. ¶¶ 312-13, ¶¶ 316-17, ¶¶ 321-23; Nassau SAC ¶¶ 292-93, ¶¶ 298-303).  Plaintiffs now purport to bring AWP claims for these same drugs, based on allegations of identical conduct.  (Cons. Cmplt. ¶ 307, Ex. A; Nassau SAC ¶ 288, Ex. B).  In addition, both complaints allege that Bayer failed to accurately report the "best prices" of its products, as required by applicable Federal and State Medicaid laws.  Notably, Cipro® and Adalat CC® are the only Bayer products which plaintiffs cite in connection with their best price claims.  (Cons. Cmplt. ¶¶

326-27, Nassau SAC ¶¶ 304-06).  Bayer's 2003 settlement with the state of New York released

best price claims involving these same two drugs.

**ARGUMENT**

Any AWP or best price claims related to plaintiffs' pre-settlement purchases of the Bayer

products Kogenate® and Gamimune® must be dismissed because they were expressly settled

and released by the 2001 settlement.  (Exhibit A to Bayer Mem.).  In addition, the best price

claims related to purchases of Cipro® and Adalat® must be dismissed to the extent they are

precluded by the 2003 settlement.  (Exhibit B to Bayer Mem.).  Finally, any AWP or best price

claims arising from plaintiffs' purchases of other Bayer products must be dismissed because

those claims have not been plead with sufficient particularity to satisfy the requirements of Fed.

R. Civ. P. 8(a) and 9(b).

**I.      All Claims Arising From Pre-Settlement Purchases of Gamimune® and
          Kogenate® Must Be Dismissed Under Fed. R. Civ. P. 12(b)(6).**

Plaintiffs' AWP and best price claims arising from certain alleged purchases of

Kogenate® and Gamimune®[1] are barred by the 2001 settlement with the state of New York.

That settlement, signed by the parties in March and August, 2001, resolved allegations identical

to those for which plaintiffs now seek relief – namely, that Bayer improperly inflated the AWPs

of the drugs Koate-HP®, Kogenate®, Konyne-80®, Gamimune®, and Thrombate® from

January 1993 through August 1999.  (Ex. 1, 2001 State Settlement Agreement (New York), Part

II(C)).  In consideration of its payments under the 2001 settlement, the State broadly released

Bayer "from any civil or administrative monetary claim, action, suit or proceeding the State has

or may have under any source of law" for that conduct.  (Ex. 1, Part III(2)).

There can be no doubt that these plaintiffs, as subordinate bodies of the State, are bound

by the settlement.  Indeed, this Court already has ruled that the 2003 settlement agreement

---

[1] The Consolidated Complaint lists Gamimune® N 5%, Gamimune® N 10% and Kogenate® among
those Bayer products paid for by the plaintiffs and having allegedly false AWPs.  (Cons. Cmplt. ¶ 307-08,
Ex. A).  Nassau County's SAC includes Gamimune N® 10%.  (Nassau SAC ¶ 288, Ex. B).

-2-

between Bayer and the United States and New York precludes County claims for the conduct covered by that agreement. *County of Suffolk v. Abbott Labs., et al.*, 2004 WL 2387125, *3 (D. Mass. Oct. 26, 2004) (*Suffolk II*). Thus, as two courts already have recognized, the 2001 settlement agreement expressly precludes any AWP claims for the covered drugs—including Kogenate® and Gamimune®—for the pre-settlement period. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 321 F. Supp. 2d 187, 208 (D. Mass. 2004) (Montana's claims precluded by identical settlement terms); *State of Nevada v. Abbott Labs.*, No. CV02-00260 (Washoe County Ct. Dec. 13, 2004) (same as to Nevada) (attached hereto as Exhibit 3).

To the extent that plaintiffs base their claims of AWP fraud on alleged inflation of WAC (Cons. Cmplt. ¶¶ 7-8), those claims still are barred as to the Bayer products covered by the 2001 settlement. In addition to addressing claims related to AWP, the agreement expressly resolved all claims that Bayer misreported the WAC for the covered drugs, including Kogenate® and Gamimune®. (Ex. 1, Part II(C)(ii)).

Similarly, to the extent plaintiffs attempt to extend their generalized allegations of best price malfeasance to any of the drugs at issue in the 2001 settlement, those claims also are barred. The 2001 settlement, in addition to addressing AWP and WAC, settled allegations that Bayer misreported the best prices (and thereby underpaid Medicaid rebates) for the covered drugs, including Kogenate® and Gamimune®. (Ex. 1, Part II(C)(iv)). *See In re Pharmaceutical Industry AWP Litig.*, 321 F. Supp. 2d at 208.

## II.   All Best Price Claims Arising From Certain Purchases of Cipro® and Adalat® Must Be Dismissed Under Fed. R. Civ. P. 12(b)(6).

Plaintiffs' best price claims similarly are without merit. Those claims rest solely on allegations of conduct that were resolved by Bayer's 2003 settlement. (Cons. Cmplt. ¶¶ 326-27, Nassau SAC ¶¶ 304-06). That settlement releases Bayer from "any civil or administrative claims for damages or penalties that the state of New York has or may have relating to the Covered Conduct." (Ex. 2, 2003 Settlement Agreement and Release (New York), Sec. III(2)). The

Covered Conduct is identical to that for which plaintiffs now seek relief – namely, failing to disclose the best prices for Cipro® and Adalat®, resulting in underpayment of Medicaid rebates for those drugs.  (*Id.*, Sec. II(F)).

Plaintiffs attempt to minimize the preclusive effect of the 2003 settlement, claiming that it "purports only to resolve" or "may have some impact on" "one or two years of . . . overcharges." (Cons. Cmplt. ¶ 327, Nassau SAC ¶ 305).  That is incorrect.  As this Court has already acknowledged, the 2003 settlement explicitly bars plaintiffs' best price claims for the products and time periods included in that agreement.  *County of Suffolk v. Abbott Labs., et al.*, 2004 WL 2387125, *3 (D. Mass. Oct. 26, 2004) (*Suffolk II*).  Specifically, the agreement releases Bayer from the best price allegations regarding Cipro® from the third quarter of 1995 to the third quarter of 2000, *see id.*, (Ex. 2, Sec. II(F)(i)), and regarding Adalat® from the second quarter of 1997 to the third quarter of 2000 (*Id.* at Sec. II(F)(ii)).

### III.   All Best Price Claims Must Be Dismissed Under Fed. R. Civ. P. 8(a) and 9(b).

Cipro® and Adalat® are the only products for which plaintiffs have alleged any particular facts with respect to their best price claims against Bayer.  (Cons. Cmplt. ¶326, Nassau SAC ¶ 304).  As this Court previously has held, plaintiffs may not maintain best price claims against Bayer for drugs "for which [the County] has not alleged particular facts." *Suffolk v. Abbott Labs, et al.*, Nov. 23, 2004 *Electronic Order*.  The complaints attempt to satisfy the requirements of Rule 9(b) by referencing the investigations leading to the 2001 and 2003 settlements.  However, neither settlement involved any adjudication or acknowledgment of liability, and therefore neither constitute a sufficient allegation of fraud.  *E.g.*, *Gotlin v. Lederman*, 367 F. Supp. 2d 349, 363-64 (E.D.N.Y. 2005) ("courts hold that references in pleadings to administrative investigations that *do not result in adjudication* of underlying issues are immaterial").  Thus, to the extent plaintiffs attempt to bring best price claims against Bayer for products other than Cipro® or Adalat®, those claims must be dismissed under Rules 8(a) and 9(b).

## IV.   All Remaining Claims Against Bayer Must Be Dismissed Under Fed. R. Civ. P. 9(b).

Finally, Plaintiffs purport to bring AWP claims for drugs other than Kogenate® and Gamimune®.  Plaintiffs to the Consolidated Complaint include a lengthy list of Bayer drugs "paid for which the Counties seek relief" at Exhibit A.  (Cons. Cmplt. ¶ 307).  Then in Exhibit B they list a subset of those Bayer products included in Exhibit A, along with prices under the headings "Fraudulent AWP," "Market Price," and "Spread."  (Cons. Cmplt. Ex. B.).   Nassau County includes a similar exhibit listing Bayer products and allegedly "Fraudulent AWPs." (Nassau SAC Ex. A).[2]  Nowhere in either complaint do plaintiffs include any allegations as to how any of those prices or "spreads" are fraudulent.  Indeed, plaintiffs fail even to disclose the sources of the alleged prices.  Instead, plaintiffs rely solely upon the 2001 and 2003 settlements. Those settlements, which resolved plaintiffs' claims for some drugs, provide no basis for any claim that AWPs of other, unrelated products, are fraudulent.  *See Lederman*, 367 F. Supp. 2d  at 363-64.  Thus, plaintiffs have failed to provide the "particular information about [the] allegation that the published AWP for each drug was fraudulent," that this Court has demanded.  *County of Suffolk v. Abbott Labs., et al.*, April 8, 2005 *Memorandum and Order*.

### CONCLUSION

For the foregoing reasons, as well as those stated in Defendants' Memorandum of Law in Support of Their Motion to Dismiss, Bayer requests that the claims against it in the Consolidated Complaint of New York City and Plaintiff New York Counties and in the Second Amended Complaint of Nassau County be dismissed.

---

[2] Only five of the specific Bayer products Nassau includes in Exhibit A also appear on the list of "Nassau County Drug Expenditures."  (Nassau SAC Ex. B).  Any claims by Nassau with respect to any other drugs and formulations included in Exhibit A must be dismissed for a lack of standing.  *See In re Pharm. Indus. AWP Litig.*, 263 F. Supp. 2d 172, 193-94 (D. Mass. 2003) (dismissing AWP claims for drugs for which plaintiffs failed to allege purchases).

Dated: March  3, 2003

Respectfully submitted,

_____/S/_____

| | |
|---|---|
| Richard D. Raskin | Robert P. Sherman |
| Michael P. Doss | DLA Piper Rudnick Gray Cary |
| Jaime L.M. Jones | One International Place |
| SIDLEY AUSTIN LLP | 21st Floor |
| 1 S. Dearborn Street | 100 Oliver Street |
| Chicago, Illinois  60603 | Boston, MA  02110-2613 |
| 312-853-7000 (tel.) | (617) 406-6035 (tel.) |
| 312-853-7036 (facsimile) | (617) 406-6135 (facsimile) |

*Attorneys for Defendant Bayer Corporation*



10713640

Mar  3 2006
2:18PM

# Exhibit 1

## State Settlement Agreement

### Part I: Parties

This Settlement Agreement (hereinafter the "Agreement") is entered into by and between the STATE OF NEW YORK (hereinafter the "STATE") and BAYER Corporation (hereinafter "BAYER") (hereinafter collectively referred to as the "Parties") through their authorized representatives.

### Part II: Preamble

As a preamble to this Agreement, the Parties agree to the following:

A. BAYER Corporation is a corporation organized under the laws of Indiana. Its headquarters are in Pittsburgh, Pennsylvania. BAYER is a manufacturer of pharmaceutical and biological products. Miles, Inc. and Cutter Laboratories, Inc. (which along with BAYER Corporation, shall be referred to hereafter as "BAYER"), were predecessor organizations that ultimately were merged into the company that became known as BAYER Corporation. At all relevant times, BAYER manufactured, marketed and sold certain drugs and biological products to – among others – (1) healthcare providers, (2) "full-line" drug wholesalers, and (3) specialized drug wholesalers sometimes called "distributors."

B. The STATE contends that BAYER caused to be submitted claims for payment to the STATE's Medicaid Program, established by Title XIX of the Social Security Act.

C. The STATE contends that it has civil claims against BAYER under various state statutes and common law for engaging in the following conduct during the period January 1993 through August 1999 involving the marketing and sale of Koate-HP

Page 1

Antihemophilic Factor (Human), Kogenate Antihemophilic Factor (Recombinant), Konyne-80 Factor IX Complex (Human), Gamimune N, 5% Immune Globulin Intravenous (Human, 5%), Gamimune N, 10% Immune Globulin Intravenous (Human, 10%), and Thrombate III Antithrombin III (Human) (collectively referred to hereafter as the Qui Tam Drugs):

  i)  The STATE contends that BAYER, in a manner similar to the practices of certain other manufacturers, knowingly and intentionally engaged in a marketing scheme whereby it set the Average Wholesale Prices ("AWPs") of the Qui Tam Drugs at levels far higher than what the vast majority of its customers actually paid for these products when purchasing either directly from BAYER or through a wholesaler. Because the majority of Medicaid programs use AWP as a benchmark in determining reimbursement rates, the STATE contends that as a result of BAYER's actions, BAYER's customers received reimbursement from state Medicaid programs at levels far higher than their actual costs.

  ii)  The STATE also contends that BAYER knowingly and intentionally misled certain state Medicaid programs that reimburse on the basis of Wholesale Acquisition Cost ("WAC") by, among other actions, representing to third party reporting services such as First DataBank and Medi-Span that it did not sell the Qui Tam Drugs through wholesalers and by misleading Medicaid officials about the prices it charged to wholesale purchasers in order to avoid reporting accurate

Page 2

wholesale or distributor price information that would have affected the reimbursement levels of the Qui Tam Drugs in states that use WAC as the reimbursement benchmark.  As a result, the STATE contends that BAYER's customers received reimbursement from the state Medicaid programs at levels far higher than their actual costs.

iii)   The STATE also contends that BAYER knowingly and intentionally misled certain state Medicaid programs that rely on actual acquisition cost information about the prices at which BAYER sold the Qui Tam Drugs to its customers, including home health agencies.  The STATE alleges that BAYER did so by falsely reporting its prices on surveys and by providing invoices to home health companies that did not reflect the actual net cost of the Qui Tam Drugs to customers.  As a result, the STATE contends that BAYER's customers received reimbursement from the state Medicaid programs at levels far higher than their actual costs.

iv)   The STATE contends that BAYER knowingly and intentionally misreported and underpaid its Medicaid Rebates for the Qui Tam drugs, *i.e.*, the amounts that it owed to the Medicaid program under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8.  BAYER generally was required on a quarterly basis to rebate to each state Medicaid program the difference between the Average Manufacturer Price and "Best Price," as defined by 42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  The STATE alleges that BAYER misreported and

underpaid its Medicaid rebates to all states by calculating its Best Prices for the Qui Tam Drugs without factoring in the value of discounts, rebates, short-dated goods discounts, unrestricted educational grants, free goods, chargebacks, and other price reductions which were not disclosed to the states or the federal government or the Medicaid programs.

BAYER's conduct and transactions referenced herein Paragraph II(C)(i-iv) are hereinafter referred to as the "Covered Conduct."

D.  The STATE contends that it has certain administrative claims against BAYER for administrative and monetary penalties under state and federal law for the Covered Conduct.

E.  BAYER denies the STATE's contentions as set forth in Paragraphs II (B – D) and denies that it has any liability relating to these allegations.

F.  In order to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, and as a result of mutual desire to settle their disputes, the Parties reach a full and final settlement as set forth below.

G.  This Agreement does not constitute an admission by BAYER or evidence of any liability or wrongful conduct.

H.  Concurrent with this Agreement, BAYER is entering into a settlement agreement regarding the Covered Conduct with the United States of America and with the relator (the "Relator") in a lawsuit filed pursuant to the qui tam provisions of the federal False Claims Act, Civil Action No. 95-95-1354 (S.D. Fla., under seal), and BAYER also is entering into a Corporate Integrity Agreement with the Office of

Inspector General of the United States Department of Health and Human Services and into similar settlement agreements with numerous other states.

## Part III: Terms and Conditions

NOW, THEREFORE, in consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree as follows:

1.  (a)  BAYER agrees to pay the United States, the individual states and the Relator the maximum collective sum of fourteen million dollars ($14,000,000) (the "Settlement Amount"). BAYER agrees to make payment of the federal share of the Settlement Amount and the Relator's share of the Settlement Amount pursuant to the terms of BAYER's separate settlement agreement with the United States and the Relator. BAYER agrees to pay the maximum sum of six million, one hundred seventy-two thousand dollars ($6,172,000) of this total (the "Total State Settlement Amount"), representing the state-funded portions of the claims settled for the participating states' Medicaid programs, to the participating states identified on Exhibit "A" to this Agreement.    The STATE's share of the Total State Settlement Amount is $1,319,989.28 (the "Individual State Settlement Amount").

    (b)  Within three business days of the Effective Date of the federal settlement agreement, the Effective Date of the Corporate Integrity Agreement or the execution of an escrow agreement with the State of New York, whichever is later, BAYER shall deposit the Total State Settlement Amount in an interest bearing escrow account under the custody and control of the State of New

York Medicaid Fraud Control Unit, which shall act as Escrow Agent and shall retain such funds until their release in accordance with the payment terms set forth in c).

(c) The STATE shall be entitled to disbursement of its Individual State Settlement Amount from the escrow account ten days after receipt by the Escrow Agent of a copy of this Agreement executed by both the STATE and BAYER;  provided, however, that the STATE shall not be entitled to disbursement of the Individual State Settlement Amount until the Escrow Agent has received fully executed state settlement agreements from all those states identified on Exhibit "B" (the "Threshold States") .  Any escrowed funds not disbursed within 200 days after the Escrow Agent has received the Total State Settlement Amount shall be disbursed to BAYER.

2) Subject to the exceptions in Paragraph III(6) below, in consideration of the obligations of BAYER set forth in this Agreement, conditioned upon BAYER's payment in full of the Individual State Settlement Amount, the STATE (on behalf of itself, its officers, agents, agencies and departments) agrees to release BAYER, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders from any civil or administrative monetary claim, action, suit or proceeding the STATE has or may have under any source of law for the Covered Conduct.  The payment of this settlement amount fully discharges BAYER from any obligation to pay restitution, damages, and or any fine or penalty to the STATE for the Covered Conduct.

3) In consideration of the obligations of BAYER set forth in this Agreement, conditioned upon BAYER's payment in full of the Individual State Settlement Amount, the STATE agrees to release and refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusion from the Medicaid program against BAYER, its parent corporation(s), subsidiaries and affiliates, predecessors, successors and assigns as well as its current and former directors, officers, employees, agents and shareholders for the Covered Conduct as relates to the STATE's Medicaid program, except as reserved in Paragraph III(6), below, and as reserved in this Paragraph.

4) In the event that any person(s) has(have) filed any qui tam "whistleblower" actions under the laws of the STATE relating to the Covered Conduct, it is the STATE's understanding that: such person(s) shall take such actions as are necessary and appropriate to dismiss said actions against BAYER and secure state court approvals, to the extent necessary, of this Agreement; and, the STATE agrees that it shall negotiate in good faith with the person(s) as to the person's(s') share in connection with the state action. In the event that an agreement cannot be reached, the STATE agrees that it shall submit that issue to the state court having jurisdiction. The STATE shall also join in any necessary motions before the state court to secure approvals of this Agreement.

5) BAYER fully and finally releases the STATE, its agencies, employees, servants, and agents from any claims (including attorneys fees, costs, and expenses of every kind and however denominated) which BAYER has asserted, could have asserted, or may assert in the future against the STATE, its agencies, employees, servants, and agents,

related to the Covered Conduct and the STATE's investigation and prosecution thereof.

6) Notwithstanding any other terms of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including BAYER) are any and all of the following:

(a)    Any civil, criminal or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code) or the STATE's Revenue Code;

(b)    Any criminal liability;

(c)    Except as explicitly stated elsewhere in this Agreement, any administrative liability, including mandatory exclusion from any state health care programs;

(d)    Any civil or administrative liability that BAYER has or may have under any state statute, regulation or rule not released in Paragraph III(2) above;

(e)    Any claims based upon such obligations as are created by this Agreement;

(f)    Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by BAYER;

(g)    Any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(h)    Any claims based on a failure to deliver items or services due; and,

(i)    Any civil or administrative claims against individuals, including current or former directors, officers, employees, agents or shareholders of defendant BAYER, who are criminally convicted in relation to the Covered Conduct.

7) BAYER has entered into a Corporate Integrity Agreement with the Office of the Inspector General of the United States Department of Health and Human Services ("OIG"), the goal of which is to ensure the accurate and complete communication of drug pricing information to specified drug price reporting services and the states. BAYER acknowledges that the OIG may share information provided under the Corporate Integrity Agreement with the STATE and that the Corporate Integrity Agreement does not preclude the STATE from taking any appropriate action against BAYER for future conduct under the STATE's laws.

8) BAYER shall report certain drug and biological product pricing information to the STATE's Medicaid Program as set forth herein for the purpose of furnishing the STATE with true pricing information that accurately reflects the prices at which actual purchasers buy the drug and biological products sold by BAYER. BAYER understands that this information may be relied upon by the STATE in establishing reimbursement rates for drugs and biological products.

    a) Price Reporting: Thirty days after the last day of each calendar quarter, BAYER shall report, in accordance with sub-paragraph (b), the average sale price of each of its drugs and biological products identified by BAYER'S NDC codes that are or shall be reimbursed by the STATE's Medicaid Program, to First DataBank and to the STATE's Medicaid Program, except that the first such report shall be submitted on February 28, 2001, or fifteen days after the Effective Date of this Agreement, whichever is later. If appropriate to reflect changes in the sources from which the STATE's Medicaid program

receives its pricing information, BAYER agrees that, upon the receipt of a written request from the STATE, it will report the prices to a drug pricing reporting source other than, and in addition to, First DataBank, subject to reasonable provisions equivalent to those in place with First DataBank to ensure the confidentiality of that information.

b) Average Sale Price Reporting Procedure: The price reported by BAYER with respect to each dosage form, strength and volume of the drug or biological product (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package), shall be the average of all final sale prices charged by BAYER for the drug or biological product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Rebate Program purposes, pursuant to 42 USC § 1396r-8, and direct sales to hospitals. The prices identified in the calculation of the average sale price should be net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates* and all other price concessions provided by BAYER to any relevant purchaser, as earlier defined in this paragraph, that result in a reduction of the ultimate cost to the purchaser. Notwithstanding the foregoing, the average sale price shall not include the value of bona fide charity care or grants. The average sale price reported shall be properly weighted to reflect

the volume of sales at each sale price, *i.e.,* for each NDC code, the price reported shall be an average per unit price determined by dividing the sum of all final prices charged by BAYER, net of all price reductions as defined above, for a drug or biological product in a quarter by the total number of units of that drug or biological product sold in that quarter. The methodology by which BAYER has calculated average sale prices in accordance with these standards shall be identified to the STATE as provided in Paragraph III.8(d).

c) Limitations on Reporting of Average Wholesale Price: With respect to the Qui Tam Drugs, BAYER shall not report an AWP to First DataBank, or any other reporting service, to be used for purposes of setting Medicaid reimbursement prices for the Qui Tam Drugs, and BAYER shall expressly inform such reporting services to this effect. This restriction shall not limit BAYER's ability to report AWP information for the Qui Tam Drugs to price reporting services for uses unrelated to Medicaid, or its ability to report AWP information for any purposes for drugs or biological products other than the Qui Tam drugs.

d) Certification Requirement: With each report of average sale price information BAYER sends to the STATE Medicaid Agency, BAYER shall also provide a detailed description of the methodology used to calculate the average sale price. A high managerial agent of BAYER

---

\* The term "rebate" as used here is not understood to include any payments made by BAYER to the States pursuant to the Medicaid Rebate Program.

will certify that the average sale prices reported therein are the prices that have been reported to First DataBank, or any successor reporting agency, and that they have been calculated in accordance with the described methodology.   Said certification shall be in the form annexed to this Agreement and shall include an acknowledgment that the average sale prices reported will be filed with and used in the administration of the STATE's Medicaid program.  To the extent that BAYER's methodology involves accruing for the impact of future events, BAYER shall include a description of its accrual methodology in its certification, and shall on a quarterly basis evaluate such methodology in light of its actual experience and make any appropriate adjustments.

e) It is understood that BAYER considers the average sale price information and the methodology by which it is calculated to be confidential commercial information and proprietary trade secrets that if disclosed would cause substantial injury to the competitive position of BAYER.  It is further understood, however, that all information provided by BAYER to the STATE Medicaid Program pursuant to this Agreement shall be made available to the STATE's MFCU upon request.

f) BAYER agrees to submit average sale price information in accordance with this paragraph for a period of five years from the Effective Date of this Agreement.

g) BAYER shall retain all workpapers and supporting documentation relating to the average sale prices of its drugs for six years after the date of each certification and will make such documentation available for inspection by the STATE's Medicaid Program and the STATE's MFCU.

9) BAYER waives and will not assert any defenses BAYER may have to any criminal prosecution or administrative action relating to the Covered Conduct, which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the United States Constitution or any corresponding section of the STATE's Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the United States Constitution or the corresponding section of the STATE's Constitution, this settlement bars a remedy sought in such criminal prosecution or in any administrative action that has not been released pursuant to this Agreement.

10) BAYER covenants to cooperate fully and truthfully with the STATE in any ongoing investigation or investigation commenced within five years of the Effective Date of this Agreement of individuals and entities not specifically released by this Agreement (including any parties with whom BAYER has or has had a business or professional relationship, including but not limited to vendors, contractors, partners, joint venturers, physicians, and referral sources) relating to the Covered Conduct.  More specifically, upon reasonable request from the STATE:

(a) BAYER will make reasonable efforts to facilitate access to, and encourage the cooperation of, its current and former directors, officers, and

employees for interviews and testimony relating to the Covered Conduct, consistent with the rights and privileges of such individuals. To encourage the cooperation of such individuals, BAYER agrees to advise such individuals in writing that the STATE wishes to interview them or seek their testimony, and that the individuals' cooperation is in the best interest of BAYER. Cooperation provided pursuant to this subparagraph will include identification of witnesses who, to BAYER's knowledge, may have material information related to the STATE's inquiry. The testimony referred to in this paragraph includes, but is not limited to, testimony deemed necessary by the STATE or a court to identify or establish the source, original location, authenticity, or other evidentiary foundation for any documents and to authenticate such documents in any criminal, civil and administrative investigations and proceedings in which the STATE is involved.

(b) BAYER will provide copies of non-privileged documents and records in its possession, custody or control relating to the Covered Conduct and relating to the subject of the STATE's inquiry. In connection with this, BAYER shall provide such technical assistance as is necessary to facilitate the STATE's access to any computerized information covered by this Paragraph.

(c) Nothing in this agreement shall be construed as a waiver by BAYER of its attorney-client privilege or work product privilege. Notwithstanding that

fact, the existence of any such privilege does not affect BAYER'S obligation to comply with this Agreement.

11) This Agreement is intended to be for the benefit of the Parties only and, except as stated herein, the Parties do not by this instrument release any claims against any other person or entity, including any individual or entity that purchased drugs or biological products from BAYER.

12) The STATE acknowledges BAYER's cooperation in the STATE's investigation of drug pricing practices and agrees to communicate the nature and extent of this cooperation to other parties upon the request of BAYER. The making of this Agreement, and BAYER's provision of information pursuant to it, shall not be construed by the STATE as a basis for the exclusion of any of BAYER's products from the STATE's formulary.

13) Concurrent with the execution of this Agreement and payment of the Settlement Amount, the STATE agrees to dismiss with prejudice any lawsuit against BAYER, including any STATE qui tam "whistleblower" lawsuit currently pending against BAYER in the courts of the STATE, relating to the Covered Conduct.

14) Nothing in this Agreement shall be construed to abrogate or alter any existing obligation of BAYER pursuant to State law.

15) This Agreement, including all exhibits, constitutes the complete agreement between the Parties and may not be amended except by written consent of the Parties.

16) Each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17) This agreement is governed by the laws of the State of New York.

18) Unless otherwise stated in writing subsequent to the Effective Date of this Agreement, all notifications and communications made pursuant to this Agreement shall be submitted to the entities listed below:

**STATE :**

**[For the submission of average sale price data]**

**Pharmacy Director**
**Pharmacy Policy & Operations**
**40 Marlboro Road**
**Delmar, New York 12054**

**[For legal notices and all other purposes]**

**State of New York**
**Office of the Attorney General**
**Medicaid Fraud Control Unit**
**120 Broadway**
**13th Floor**
**New York, New York 10271**

**BAYER:**

**Assistant General Counsel**
**Bayer Corporation Pharmaceutical Division**
**400 Morgan Lane**
**West Haven, CT  06516**

19) BAYER represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

20) The undersigned individuals signing this Agreement on behalf of BAYER represent and warrant that they are authorized by BAYER to execute this Agreement. The undersigned STATE signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

21) Each party agrees to perform any further acts and to execute and deliver any further documents reasonably necessary to carry out this Agreement. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

22) The parties have read the foregoing Agreement and accept and agree to the provisions contained therein and hereby have caused this Agreement to be signed as of the day and date adjacent to their signature.

23) The Effective Date of this Agreement shall be the date upon which all the parties below have executed this Agreement.

**State of New York**
**Office of Attorney General**
**Medicaid Fraud Control Unit**

By: _____ Date: 3/9/01

Title: Deputy Attorney General

**Bayer Corporation**

By: _____ Date: 8/6/0

Title: Vice President Assistant General Counsel

**Sidley & Austin, Counsel for BAYER**

By: _____ Date: 8/1/01

Paul E. Kalb, Esq.
I. Scott Bass, Esq.
Robert Fabrikant, Esq.

Page 17

**Exhibit "A"**
**Participating States**

ALABAMA
ALASKA
ARKANSAS
CALIFORNIA
COLORADO
CONNECTICUT
DELAWARE
FLORIDA
GEORGIA
HAWAII
IOWA
ILLINOIS
INDIANA
KANSAS
KENTUCKY
LOUISIANA
MASSACHUSETTS
MARYLAND
MAINE
MICHIGAN
MINNESOTA
MISSOURI
MISSISSIPPI
MONTANA
NORTH CAROLINA
NEW HAMPSHIRE
NEW JERSEY
NEW MEXICO
NEVADA
NEW YORK
OHIO
OKLAHOMA
OREGON
PENNSYLVANIA
RHODE ISLAND
SOUTH CAROLINA
SOUTH DAKOTA
TEXAS
UTAH
VIRGINIA
VERMONT
WASHINGTON
WISCONSIN
WEST VIRGINIA
WYOMING

**Exhibit "B"**
**Threshold States**

ALABAMA
ARKANSAS
CALIFORNIA
CONNECTICUT
FLORIDA
ILLINOIS
LOUISIANA
MASSACHUSETTS
MARYLAND
MICHIGAN
MINNESOTA
MISSOURI
NORTH CAROLINA
NEW JERSEY
NEW YORK
OHIO
PENNSYLVANIA
SOUTH CAROLINA
TEXAS
VIRGINIA
WASHINGTON
WISCONSIN

**Exhibit "C"**
**Certification Form**

**CERTIFICATION**

The undersigned, a high managerial agent of Bayer Corporation, hereby certifies that the attached average sale price information has been communicated to First DataBank and that it has been calculated in accordance with the methodology described herein.   I further acknowledge that the average sale prices so reported will be filed with and used in the administration of the State of New York Medicaid program.

_____
Signature

_____
Title

_____
Date

# Exhibit 2

## STATE SETTLEMENT AGREEMENT AND RELEASE

### I. PARTIES

This Settlement Agreement ("Agreement") is entered into by the State of New York and Bayer Corporation ("Bayer"), an Indiana corporation with a principal place of business in Pittsburgh, Pennsylvania, hereinafter referred to as "the Parties."

### II. PREAMBLE

As a preamble to this State Agreement, the Parties agree as follows:

A.     This Agreement addresses the claims against Bayer for the conduct described in filings in United States v. Bayer Corporation, Criminal Action No. [to be assigned](District of Massachusetts)(the "Criminal Action"), and in filings in United States ex rel. Couto v. Bayer Corporation, Civil Action No. 00-CV-10339 (District of Massachusetts)(the "Civil Action") for the conduct alleged in Preamble Paragraph F below.

B.     On or before April 16, 2003, or some other date as may be determined by the Court, Bayer has agreed to or has entered a plea of guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) to a one-count Information alleging a violation of Title 21, United States Code, Sections 331(p), 333(a)(2) and 360(j) by failing to list a drug product with the FDA between August and December 1995, namely, Cipro, that was private labeled by Bayer for Kaiser Permanente Medical Care Program ("Kaiser").

C.     At all relevant times, Bayer marketed and sold pharmaceutical products nationwide, including among other drugs, two prescription drug products: (1) ciprofloxacin hydrochloride tablets, an antibiotic, marketed under the brand name Cipro®; and (2) nifedipine extended release tablets, an anti-hypertensive, marketed under the brand name Adalat CC® (collectively, "the drugs"). Bayer sold the drugs to various customers including, among others, health maintenance organizations ("HMOs"), hospitals, long term care providers, and chain pharmacies. Two HMOs that purchased the drugs from Bayer were Kaiser and PacifiCare

1

Health Systems ("PacifiCare").  PacifiCare purchased the drugs from Bayer through Prescription Solutions, a pharmacy benefit manager and wholly owned subsidiary of PacifiCare.

D.      Effective August 1995, Bayer agreed to private label Cipro for Kaiser and to sell the private labeled Cipro to Kaiser at a discounted price.  The term "private labeled" as used herein, means drug product that Bayer sold to a purchaser to which Bayer affixed a label that substituted the purchaser's national drug code ("NDC") for Bayer's NDC number.  Effective April 1997, Bayer agreed to private label Adalat CC for Kaiser and to sell the private labeled Adalat CC to Kaiser at a discounted price.  Effective October 1998, Bayer agreed to private label Adalat CC for PacifiCare and to sell the private labeled Adalat CC to PacifiCare at a discounted price.

E.      At all material times, Bayer participated in the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, which is part of the federal Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.  As a participant in the Medicaid Rebate Program, Bayer entered into a rebate agreement with the Secretary of the Department of Health and Human Services, which agreement is administered by the Health Care Financing Administration ("HCFA"), currently known as the Center for Medicare and Medicaid Services ("CMS"), and Bayer's drug products were covered by state Medicaid plans that provided medical assistance for outpatient prescription drugs.  42 U.S.C. §§ 1396a(10)(A); 1396d(a)(12), and 1396r-8(a)(1).  Under the Medicaid Rebate Program and rebate agreement with HCFA, Bayer generally agreed: (i) to report quarterly to HCFA its average manufacturer price and Best Price for its drug products, as defined by 42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C); and (ii) to pay quarterly rebates to the states based on the product of (a) the units of each dosage form and strength paid for under the State Medicaid plan during the rebate period as reported by the state, and (b) the greater of the difference between the average manufacturer price and Best Price, or a minimum rebate percentage of the average manufacturer price, as further defined in 42 U.S.C. § 1396r-8(c)(1).

F.      The State of New York contends that it has certain civil claims against Bayer Corporation under the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, the Drug Pricing Program, 42 U.S.C. § 256b, other federal and state statutes, and/or common law doctrines for engaging in the following conduct:

(i)      The State of New York contends that, from Third Quarter 1995 through Third Quarter 2000, Bayer knowingly misreported its Best Price to HCFA and underpaid its Medicaid rebates for Cipro tablets by omitting the price of Cipro that was private labeled for Kaiser from its determination of Best Price;

(ii)     The State of New York contends that, from Second Quarter 1997 through Third Quarter 2000, Bayer knowingly misreported its Best Price to HCFA and underpaid its Medicaid rebates for Adalat CC by omitting the price of Adalat CC that was private labeled for Kaiser and PacifiCare from its determination of Best Price;

(iii)    The State of New York contends that, in May and June 1999, Bayer knowingly submitted false statements or records to the Office of Inspector General, Office of Audit Services, Department of Health and Human Services ("OIG-OAS") by (a) omitting material information about the price of Cipro tablets that was private labeled for Kaiser; (b) falsely stating that a higher priced package of Cipro was private labeled for Kaiser when it was not; and (c) falsely stating that the actual price at which Bayer sold Cipro to Kaiser was higher than Bayer's reported Best Price;

(iv)     The State of New York contends that, in First Quarter 1998, Bayer knowingly misreported its Best Price to HCFA and underpaid its Medicaid rebates for Adalat CC by omitting a $100,000 payment made by Bayer to Prescription Solutions in connection with Adalat CC;

(v)      The State of New York contends that Bayer knowingly failed to list the Cipro that Bayer private labeled for Kaiser with the FDA to conceal the private labeling arrangement from the FDA and customers of Bayer's Cipro.

3

Bayer's conduct as described in the Criminal Action, the currently pending claims in the Civil Action, and this Preamble Paragraph are hereafter referred to as the "Covered Conduct."

G.     The State of New York represents that it does not have an administrative claim for exclusion against Bayer under the provisions for mandatory exclusion from the Medicare, Medicaid and other federal health care programs, 42 U.S.C. § 1320a-7(a) or corresponding state statutes, for Bayer's conviction in the Criminal Action or for the Covered Conduct, but alleges that it does have certain administrative claims for exclusion against Bayer under the provisions for permissive exclusion from the Medicare, Medicaid and other federal health care programs, 42 U.S.C. § 1320a-7(b) and corresponding state statutes, for the Covered Conduct.

H.     Other than such admissions as Bayer makes in connection with its plea to the Information to which Bayer has agreed to enter a plea of guilty, which Bayer admits, Bayer denies the remaining allegations of the United States, relator(s) and the State of New York as set forth herein.  This Agreement does not constitute an admission by Bayer or evidence of any liability or wrongful conduct.

I.     To avoid the delay, expense, inconvenience, and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement as set forth below.

### III.  TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.     Bayer agrees to pay to the United States and to the Escrow Agent described below for distribution to the states and the District of Columbia that execute a state settlement agreement that has also been executed by Bayer ("Participating States") the sum of two-hundred, forty-two million, one-hundred twenty-six thousand, five-hundred eighty dollars ($242,126,580)

4

(the "Medicaid Settlement Amount") and any pre-transfer interest as set forth in Section III.1.A and III.1.B herein. Payments to the United States and to the Participating States shall be made pursuant to the following terms and conditions:

A.      Bayer has agreed to pay to the United States the sum of one-hundred, thirty-three million, one-hundred and sixty-nine thousand, six-hundred and nineteen dollars ($133,169,619) (the "Federal Medicaid Settlement Amount"), which represents the federal share of the Medicaid Settlement Amount and the share of the Medicaid Settlement Amount payable to the relator(s) in certain federal False Claims Act lawsuit(s). The Federal Medicaid Settlement Amount, plus any pre-transfer interest pursuant to Section III.1.A of the Federal Agreement, shall be paid pursuant to a civil settlement agreement entered between Bayer and the United States (the "Federal Agreement").

B.      Bayer agrees to deposit into an escrow account the sum of one-hundred and eight million, nine-hundred, fifty-six thousand, nine-hundred and sixty-one dollars ($108,956,961) (the "State Medicaid Settlement Amount"), which represents the state-funded portions of the claims settled for the Medicaid programs of all states (except Arizona) and the District of Columbia. Bayer shall pay the State Medicaid Settlement Amount, plus any pre-transfer interest pursuant to Section III.1.B of the Federal Agreement, into the escrow account no later than seven business days after Bayer receives written transfer instructions from the negotiating team for the National Association of Medicaid Fraud Control Units ("NAMFCU Negotiating Team") and following the latest of the dates on which the following occurs: (1) the Federal Agreement is fully executed by the Parties and delivered to Bayer's attorneys, (2) the Escrow Agreement is executed by or on behalf of the Participating States and Bayer, and (3) the Court accepts the Fed. R. Crim. P. 11(e)(1)(C) guilty plea in connection with the Criminal Action as described in Preamble Paragraph II.B, and imposes the agreed upon sentence. The escrow account into which Bayer shall deposit the State Medicaid Settlement Amount shall be an account under the custody and control of the Medicaid Fraud Control Unit of the State of New

5

York, which shall be designated by the NAMFCU Negotiating Team and which shall act as
Escrow Agent and shall retain such funds until their release in accordance with the Escrow
Agreement entered into between Bayer and the Medicaid Fraud Control Unit of the State of New
York.

        C.      The total portion of the Medicaid Settlement Amount paid by Bayer in
settlement for alleged injury to the Medicaid Program for the State of New York is
$17,256,166.63, consisting of a portion paid to the State of New York under this Agreement and
another portion paid to the federal government as part of the Federal Settlement. The individual
portion of the State Medicaid Settlement Amount allocable to the State of New York is the sum
of $9,133,252.63 ("Individual State Medicaid Settlement Amount").

        D.      The State of New York shall be entitled to disbursement of its Individual
State Medicaid Settlement Amount from the escrow account pursuant to the terms of the Escrow
Agreement, which is attached hereto as Exhibit A and is incorporated by reference herein.

      2.      In consideration of this Agreement and payment set forth herein and subject to the
exceptions from release set forth in Paragraph 3 below, the State of New York on behalf of itself,
its officers, agents, agencies and departments shall release and forever discharge Bayer, its
current and former parents, affiliates, divisions, and subsidiaries, and their predecessors,
successors and assigns, from any civil or administrative claims for damages or penalties that the
State of New York has or may have relating to the Covered Conduct. The payment of the
Medicaid Settlement Amount fully discharges Bayer from any obligation to pay Medicaid-related
restitution, damages, and/or any fine or penalty for the Covered Conduct.

      3.      Notwithstanding any term of this Agreement, the State of New York specifically
does not herein release Bayer, its current and former parents, affiliates, divisions, and
subsidiaries, and their predecessors, successors and assigns, and its current and former directors,
officers, agents and employees from any and all of the following:  (a) any potential criminal,
civil or administrative claims arising under State of New York revenue codes; (b) any criminal

6

liability not specifically released by this Agreement; (c) any civil or administrative liability that Bayer has or may have under any state statute, regulation, or rule not covered by the release; (d) any liability to the State of New York (or its agencies) for any conduct other than the Covered Conduct; (e) any claims based upon such obligations as are created by this State Settlement Agreement.

4.      In consideration of the obligations of Bayer set forth in this Agreement and payment set forth herein and except as reserved in Paragraph 3 above, the State of New York agrees to release and refrain from instituting, directing, recommending or maintaining (a) any administrative claim; or (b) any action seeking exclusion from the State of New York's Medicaid program; against Bayer, its current and former parents, affiliates, divisions, and subsidiaries, and their predecessors, successors and assigns, for the Covered Conduct or for Bayer's conviction in the Criminal Action. Nothing in this Agreement precludes the State of New York from taking action against Bayer in the event that Bayer is excluded by the federal government, or for conduct and practices other than the Covered Conduct or the conviction in the Criminal Action. The Medicaid Fraud Control Unit for the State of New York further agrees to refrain from recommending, causing or attempting to cause any administrative action or sanction, including debarment, by any other government agency of the State of New York for the Covered Conduct or for the conviction in the Criminal Action. The State of New York does not have the authority to release Bayer from any claims or actions which may be asserted by private payors or insurers, including those that are paid by a State's Medicaid program on a capitated basis, which are not a party to the Medicaid Rebate Program.

5.      The making of this Agreement shall not be construed by the State of New York as a basis for the exclusion of any of Bayer's products from the State of New York's formulary or as a basis for a change in status regarding prior authorization.

6.      The State of New York agrees to dismiss with prejudice any lawsuit specifically as to Bayer, including any state qui tam "whistleblower" lawsuit, in which the state has

7

intervened and/or has the authority to dismiss, currently pending against Bayer in the courts of the State of New York, relating to the Covered Conduct.

7.      This Agreement is expressly conditioned upon acceptance of Bayer's plea of guilty in the Criminal Action.  In consideration of the acceptance of Bayer's plea of guilty in the Criminal Action, the State of New York agrees that it shall not investigate, prosecute, or refer for prosecution or investigation to any agency, Bayer, its current and former parents, affiliates, divisions, and subsidiaries, and their predecessors, successors and assigns, for the Covered Conduct.

8.      Bayer fully and finally releases the State of New York, its agencies, employees, servants, and agents from any claims (including attorneys fees, costs, and expenses of every kind and however denominated) which Bayer has asserted, could have asserted, or may assert in the future against the State of New York, its agencies, employees, servants, and agents, related to or arising from the investigation and prosecution of the Covered Conduct up to the effective date of this Settlement Agreement.

9.      Nothing in this agreement shall preclude either Bayer or the State of New York from pursuing any rights they have pursuant to the Medicaid Rebate Program as to adjustments to Rebate Payments, except to the extent that no adjustment shall be made to Best Price based upon Covered Conduct, which this agreement settles.

10.     Bayer waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this Settlement Agreement bars a remedy sought in such criminal prosecution or administrative action.  Provided, however, that nothing in this paragraph is intended to, or will operate to, limit the scope of Paragraph 7, in which the State of New York agrees not to prosecute or investigate Bayer for certain conduct.

8

11.    Except as otherwise specified herein, this Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity, including but not limited to any individual or entity that purchased Cipro and Adalat from Bayer.

12.    Nothing in any provision of this Agreement constitutes an agreement by the State of New York concerning the characterization of the Medicaid Settlement Amount for purposes of the state internal revenue laws.

13.    In addition to all other payment and responsibilities under this Agreement, Bayer agrees to pay all reasonable travel costs and expenses of the NAMFCU Negotiating Team. Bayer will pay this amount by separate check or wire transfer made payable to the National Association of Medicaid Fraud Control Units after the Participating States execute this Agreement.

14.    Bayer covenants to cooperate fully and truthfully with the State of New York in any ongoing investigation or investigation commenced within five years of the effective date of this Agreement of individuals and entities not specifically released by this Agreement (including any parties with whom Bayer has or has had a business or professional relationship, including but not limited to vendors, contractors, partners, joint venturers, physicians, and referral sources) relating to the Covered Conduct.

15.    Notwithstanding any provision of this Agreement, Bayer is not required to (1) request of its present or former officers, directors, employees or agents that they forego seeking the advice of an attorney nor that they act contrary to that advice; (2) take any action against its directors, employees or agents for following their attorney's advice or for failing to submit to an interview or otherwise cooperate with the State of New York; or (3) waive any privilege or claim of work product. The failure of any individual to submit to an interview or otherwise to refuse to cooperate with the State of New York shall not constitute a breach of this Agreement by Bayer.

9

16.     Bayer shall enter into an Addendum to its existing Corporate Integrity Agreement with HHS-OIG in connection with this matter.

17.     Bayer represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

18.     The undersigned Bayer signatory represents and warrants authorization by the Board of Directors to execute this Agreement.  The undersigned State of New York signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the State of New York through their respective agencies and departments.

19.     This Agreement is governed by the laws of the State of New York.

20.     This Agreement is effective on the date of signature of the last signatory to the Agreement.

21.     This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties; provided, however, this Agreement shall not apply to the products of an acquiring company or a company merging with Bayer except to the extent such company, as a result of the acquisition of or merger with Bayer, becomes involved in the sales, marketing or pricing of, or Medicaid Drug Rebate program obligations associated with, drug and biologic products for which the Federal health care programs provide reimbursement ("Government Reimbursed Products") originally manufactured by Bayer prior to the merger or acquisition, in which case the obligations of this agreement shall apply only to those products which had been Government Reimbursed Products when they were manufactured by Bayer.

22.     This Agreement constitutes the complete agreement between the Parties with regard to the Covered Conduct.  This Agreement may not be amended except by written consent of the Parties.

23.    Each party agrees to perform any further acts and to execute and deliver any further documents reasonably necessary to carry out this Agreement.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

**For the State of New York:**

By: _William J. Conoshey_                    Dated: _8-14-03_

Title: _Director_
_MEDICAID FRAUD CONTROL UNIT_

**BAYER CORPORATION**

By: _____                    Dated: _12/31/03_
JON R. WYNE
Senior Vice President and Treasurer
Bayer Corporation

By: _____                    Dated: _12/23/03_
PAUL E. KALB
JAMES C. STANSEL
Sidley Austin Brown & Wood, LLP
1501 K Street, NW
Washington, DC 20005
Counsel to Bayer Corporation

11

# Exhibit 3

CODE 2840

# FILED

DEC 14 2004

RONALD A. LONGTIN, JR., CLERK
By: ___K. Rogers___
DEPUTY

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

STATE OF NEVADA,

                       Plaintiff,

     vs.

ABBOTT LABORATORIES, INC.; BAXTER
INTERNATIONAL, INC.; BAXTER HEALTHCARE
CORPORATION; BRISTOL-MYERS SQUIBB
COMPANY; ONCOLOGY THERAPEUTICS
NEWTORK CORP.; APOTHECON, INC.; DEY,
INC.; GLAXOSMITHKLINE P.L.C; SMITHKLINE
BEECHAM CORPORTION; GLAXO WELLCOME,
INC; PHARMACIA CORPORATION;
PHARMACIA & UPJOHN, INC.; and TAP
PHARMACEUTICAL PRODUCTS, INC., et al.,

                     Defendants.
                                /

Case No.  CV02-00260

Dept. No. 8

## ORDER GRANTING MOTION TO DISMISS THE AMENDED COMPLAINT

Bayer Corporation (hereinafter "Bayer") presents this Court with a *Motion to Dismiss the Amended Complaint*. The State of Nevada (hereinafter "State") opposes this motion. This Court, having considered all papers and pleadings on file herein, finds and concludes as follows.

This case arose out of an industry-wide investigation into alleged average wholesale price (hereinafter "AWP") inflation by pharmaceutical companies for six drugs. These drugs are Koate-HP; Kogenate; Konyne-80; Gamimune N, 5%; Gamimune N, 10%; and

1    Thrombate III (hereinafter collectively "Qui Tam Drugs"). Bayer was the first

2    pharmaceutical company to settle allegations of AWP inflation, and entered into a

3    settlement agreement (hereinafter "Agreement") with the State in 2001.  Pursuant to the

4    terms of the Agreement, Bayer paid $14 million, which was to be allocated pro rata among

5    the federal government and settling states. Accordingly, the State received approximately

6    $11,300. Part II(C)(i-iv) of the Agreement sets forth what conduct is covered by the

7    Agreement (hereinafter "Covered Conduct"). The Covered Conduct consists of the State's

8    allegations that Bayer violated various state statutes and common law. Specifically, the

9    State contends that Bayer knowingly and intentionally (1) engaged in a marketing scheme

10   whereby it set the AWP of the Qui Tam Drugs at levels far higher than what the vast

11   majority of its customers actually paid for these products, and since the majority of

12   Medicaid programs use AWP as a benchmark in determining reimbursement rates,

13   Bayer's customers received reimbursement from state Medicaid programs at levels far

14   higher than their actual costs; (2) misled certain state Medicaid programs that reimburse

15   on the basis of Wholesale Acquisition Cost; (3) misled certain state Medicaid programs

16   that rely on actual acquisition cost information about the prices at which Bayer sold the Qui

17   Tam Drugs to its customers; and (4) misreported and underpaid its Medicaid Rebates for

18   the Qui Tam Drugs. Bayer denied all of the State's contentions, and the Agreement "does

19   not constitute an admission by BAYER or evidence of any liability or wrongful conduct."

20   Agreement, Part II(G).

21       In consideration of the Agreement, the State agreed to "release BAYER…from any civil

22   or administrative monetary claim, action, suit or proceeding the STATE has or may have

23   under any source of law for the Covered Conduct," subject to certain exceptions

24   enumerated in Part III(6) of the Agreement. Id. at III(2). The Agreement went on to declare,

25   "The payment of this settlement amount fully discharges BAYER from any obligation to pay

26   restitution, damages, and or any fine or penalty to the STATE for the Covered Conduct."

27   Id. The Agreement also stated, "In order to avoid the delay, uncertainty, inconvenience and

28   expense of protracted litigation of these claims, and as a result of mutual desire to settle

1  their disputes, the Parties reach a full and final settlement as set forth [in the Agreement]."

2  Id. at II(F).

3      After Bayer and the State entered into the Agreement, the State filed a First Amended

4  Complaint, seeking to pursue claims against Bayer and several other pharmaceutical

5  companies. Part of the Amended Complaint was filed by the State in a *parens patriae*

6  capacity on behalf of its citizens relating to the same Qui Tam Drugs.[1] Thereafter, Bayer

7  filed a Motion to Dismiss, arguing that the 2001 settlement precludes most of the State's

8  claims and those claims not precluded by the settlement lack the particularity required by

9  NRCP 9(b). On August 30, 2004, this Court denied Bayer's motion on the NRCP 9(b)

10  grounds, but requested oral argument regarding the *parens patriae* claims. Oral argument

11  was heard on November 5, 2004.

12      In its motion, Bayer candidly admits that the citizens of Nevada themselves are free to

13  file suit against Bayer regarding the Qui Tam Drugs. Bayer argues, however, that the

14  Agreement bars the State from pursuing its present claims against Bayer in a *parens*

15  *patriae* capacity. Bayer asserts that the Agreement encompasses *parens patriae* claims,

16  and such claims are not contained in the enumerated list of exclusions from the

17  Agreement. See Agreement, Part III(6) (setting forth those claims that are specifically

18  reserved and excluded from the scope of the Agreement). Bayer argues that *parens*

19  *patriae* claims belong to the State, and thus are barred by the express terms of the

20  Agreement. Bayer thus requests that this Court dismiss the State's First Amended

21  Complaint.

22      In response, the State argues that the Agreement does not bar its claims against Bayer

23  in a *parens patriae* capacity because the release of liability did not encompass *parens*

24  *patriae* claims. The State concedes that it cannot recover its own damages regarding any

25  Bayer medicine for the time period after the date of the Agreement, nor can it recover its

26  own damages regarding three specific Bayer medicines for any time period. However, the

27

28

---

[1] *Parens patriae* literally means "parent of the country," and refers traditionally to the role of state as sovereign and guardian of persons under legal disability. Black's Law Dictionary, 5th ed., p. 1003.

3

1   State contends that *parens patriae* claims were not contemplated by the parties to be part
2   of the Agreement, and Bayer is now trying to include a settlement term that was not
3   originally included. The State asserts that *parens patriae* claims are for the benefit of its
4   citizens, not the State. This is why, the State argues, its *parens patriae* claims may go
5   forward even though they were not expressly reserved in Part III(6) of the Agreement. The
6   State thus requests that its First Amended Complaint not be dismissed.

7        Upon review, this Court determines that the Agreement bars the State from bringing
8   suit against Bayer in a *parens patriae* capacity. In reaching this conclusion, and as more
9   fully discussed below, this Court determines that *parens patriae* claims brought by the
10  State on behalf of its citizens fall within the scope of Covered Conduct, the State has a
11  separate and distinct interest in *parens patriae* claims from its citizens, and the Agreement
12  did not preserve *parens patriae* claims.

13       The Covered Conduct, as the name suggests, is the only conduct released by the
14  Agreement. The State contends that the money paid under the Agreement was "only for
15  Medicaid Program overpayments and penalties" and the "recovery did not in any way
16  represent inflated co-payments made by Nevada private payors." Opposition, p. 8: 9-11,
17  May 10, 2004. Thus, the State contends that its *parens patriae* claims are not Covered
18  Conduct and can proceed since they do not relate to conduct in association with the
19  Medicaid program. Bayer, on the other hand, asserts that the Covered Conduct relates to
20  the alleged AWP inflation for the six Qui Tam Drugs, which is precisely what the parties
21  settled when they entered into the Agreement.

22       This Court agrees with Bayer's interpretation of the meaning of Covered Conduct. The
23  Covered Conduct is not limited in scope to the Medicaid program, as the State claims.
24  Rather, the Covered Conduct relates to Bayer's marketing scheme whereby it allegedly
25  inflated the AWP of the Qui Tam Drugs. See Agreement, Part II(C)(i) (alleging that Bayer
26  knowingly and intentionally engaged in a marketing scheme whereby it inflated the AWP of
27  the six Qui Tam Drugs). Although the Agreement was not an admission by Bayer of any
28  liability or wrongful conduct, the basis of the allegations against Bayer was that it

1  knowingly and intentionally engaged in AWP inflation. Id. at II(C) and (G). Thus, any
2  claims, even those initiated by the State in a *parens patriae* capacity, relating to alleged
3  AWP inflation of the six Qui Tam Drugs fall within the meaning of Covered Conduct as
4  contemplated by the Agreement.

5      The State's assertion that its *parens patriae* claim is brought as a representative of the
6  public rather than in a proprietary capacity is misplaced. While Nevada citizens are free to
7  pursue individual claims against Bayer, the Agreement bars the State itself from pursuing
8  recovery. Case law is clear that the State has a distinct "interest apart from the interests of
9  particular private parties." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458
10  U.S. 592, 607 (1982). The State, as plaintiff, is more than just a nominal party in a *parens*
11  *patriae* action and must express a quasi-sovereign interest. Id. Quasi-sovereign interests
12  "consist of a set of interests that the State has in the well-being of its populace." Id. at 602;
13  see also Foucha v. Louisiana, 504 U.S. 71, 96 (1992) (stating that in "the civil context, the
14  State acts in large part on the basis of its *parens patriae* power to protect and provide for
15  an ill individual"). The State itself "has a legitimate interest under its *parens patriae* powers
16  in providing care to its citizens who are unable to…care for themselves." Heller v. Doe by
17  Doe, 509 U.S. 312, 332 (1993). Thus, the State has a definite interest in its *parens patriae*
18  claim separate from its citizens. Part III(2) of the Agreement expressly declares that the
19  State releases Bayer "from *any* civil or administrative monetary claim, action, suit or
20  proceeding *the STATE has or may have under any source of law* for the Covered
21  Conduct." (emphasis added). *Parens patriae* claims, as civil claims the State has, were
22  thus released when the parties entered into the Agreement.

23      As the State correctly notes, *parens patriae* claims were not expressly released in the
24  Agreement. However, this does not mean that such claims were preserved. Part III(2)
25  states that all of the State's claims against Bayer are released, "[s]ubject to the exceptions
26  in Part III(6)." Thus, only those claims expressly included in Part III(6) are not released by
27  the settlement. Part III(6) does not mention *parens patriae* claims, and accordingly, they
28  were not preserved. Since *parens patriae* claims are Covered Conduct under the

1    Agreement, and because they are not preserved under Part III(6), the State is barred from

2    bringing such claims. Of course, as Bayer concedes, Nevada citizens may pursue their

3    own individual claims against Bayer. However, the State itself cannot bring such claims,

4    even in a *parens patriae* capacity.

5       Part III(2) of the Agreement states that Bayer's payment of the settlement "fully

6    discharges BAYER from any obligation to pay restitution, damages, and or any fine or

7    penalty *to the STATE* for the covered Conduct." (emphasis added). Pursuant to Nevada

8    law, any money recovered by the State in a *parens patriae* capacity must be distributed to

9    those affected Nevada citizens. See NRS 598.0975(3)(b) (asserting that money collected

10    for restitution ordered in a deceptive trade practices action "must be deposited by...the

11    attorney general for distribution to the person for whom the restitution was ordered"). Thus,

12    no money will be paid to the State when suit is brought in a *parens patriae* capacity.

13    However, the fact that the State will not recover any money in its *parens patriae* claim is

14    not dispositive. Although any money recovered in a *parens patriae* claim goes directly to

15    the affected citizens, a *parens patriae* claim is still one that the State has, and such an

16    action is clearly barred by Part III(2) of the Agreement. See Alfred L. Snapp & Son, Inc.,

17    458 U.S. at 607 (stating that the State has a separate and distinct interest apart from is

18    citizens in a *parens patriae* claim). Since the State has an independent interest in the

19    action, the Agreement bars it from going forward with any claims against Bayer.

20       The State further argues that it has standing to seek restitution for its citizens under the

21    Deceptive Trade Practices Act, which, the State contends, expressly authorizes the State

22    to bring *parens patriae* claims. See NRS 598.0903 to 598.0999. The State incorrectly

23    interprets these statutory provisions. The State cites NRS 598.0975(3)(b), claiming that it

24    allows the Attorney General to bring an action in restitution. However, nothing in NRS

25    598.0975(3)(b) confers upon the Attorney General a statutory right to seek restitution.

26    Rather, section 598.0971(2)(c) confers upon the commissioner of consumer affairs the

27    authority to order a violator of the Deceptive Trade Practices Act to pay restitution for any

28    money or property improperly received or obtained as a result of a violation. Such

1  restitution is ordered on behalf of individuals who were victims of a defendant's deceptive

2  trade practices, not on behalf of the State. NRS 598.0975(3)(b) does not, as the State

3  contends, grant a statutory right to restitution. All it does is provide that any restitution

4  recovered by the Attorney General shall be distributed to those citizens for whom the

5  restitution was ordered, rather than be deposited in the state general fund as required in

6  subsection (1) of NRS598.0975. This inquiry regarding restitution is entirely different from

7  the State's claim that the legislature has expressly conferred *parens patriae* authority upon

8  its Attorney General. See In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 521 (E.D.

9  Mich. 2003). Thus, NRS 598.0975(3)(b) does not provide the State with the authority to

10  seek restitution, and separately, the State's *parens patriae* authority has been barred by

11  the Agreement.

12      A similar action has been brought in the United States District Court for the District of

13  Massachusetts. In re Pharmaceutical Industry Average Wholesale Price Litigation, 01-

14  12257-PBS, June 10, 2004. In that case, the States of Montana and Nevada alleged that

15  pharmaceutical manufacturers fraudulently overstated the published AWP of many of their

16  prescription drugs. Facing the same issue and an identical settlement agreement as this

17  Court faces in the present matter, the Massachusetts court dismissed "all fraud claims

18  concerning drugs covered by the 2001 and 2003 settlements between Montana and Bayer,

19  even those brought in a *parens patriae* capacity." Id. Thus, this Court's ruling that the

20  Agreement bars the State's *parens patriae* claims is consistent with the opinion issued by

21  the Massachusetts court.

22      The State's Amended Complaint names several pharmaceutical companies, including

23  Bayer, as defendants. However, of the named defendants, only Bayer has previously

24  entered into a settlement. The subject matter of the State's Amended Complaint – alleged

25  AWP inflation – is identical to the subject matter of the Agreement entered into between

26  the parties. Bayer's settlement with the State was effected to "avoid the delay, uncertainty,

27  inconvenience and expense of protracted litigation." Agreement, Part II(F). Allowing the

28  State to pursue its *parens patriae* claim would go against the underlying purpose of the

7

Agreement. Under the Agreement, the State released Bayer from any claims it has or may have. A *parens patriae* claim certainly is one the State has, and the State gave up its right to pursue such a claim when it entered into the settlement with Bayer. Therefore, the State is barred from bringing a claim against Bayer in a *parens patriae* capacity. Accordingly, with respect to the State's *parens patriae* claims, Bayer's *Motion to Dismiss the Amended Complaint* is GRANTED.

IT IS SO ORDERED.

Dated this ___13___ day of December, 2004.

DISTRICT JUDGE

CERTIFICATE OF MAILING

The undersigned hereby certifies that on the ___ /4 __ day of December, 2004, she mailed copies of the foregoing ORDER DENYING MOTION TO DISMISS in Case No. CV02-00260 to the following:

Steve W. Berman, Esq.
Sean R. Matt, Esq.
Hagens Berman, LLP
1301 Fifth Ave., Suite 2900
Seattle, WA 98101

Brian Sandoval, Esq.
Nevada Attorney General
L. Timothy Terry, Esq.
198 N. Carson Street
Carson City, NV 89701

R. Christopher Cook
Jones, Day, Reavis & Pogue
51 Louisiana Avenue, NW
Washington, DC 20001-2113

Burton Barltett & Glogovac
50 W. Liberty St., Ste. 650
Reno, NV 89501

Daniel E. Reidy, Esq.
Jones, Day, Reaves & Pogue
77 West Wacher, Ste. 3500
Chicago, IL 60601-1692

Matthew A. Rossi, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036

Clark V. Vellis, Esq.
Jones Vargas
100 West Liberty Street, 12th Floor
Reno, NV 89504-2081

Merle M. DeLancey, Esq.
Tina D. Reynolds, Esq.
Dickstein, Shapiro, Morin & Oshinsky

9

2101 L Street NW
Washington, DC 20037-1526

Lisa C. Phelan, Esq.
Akin, Gump, Strauss, Hauer & Feld LLP
2029 Century Park East, Ste. 2400
Los Angeles, CA 90067

Thomas B. Hamilton, Esq.
Akin, Gump, Strauss, Hauer & Feld LLP
1700 Pacific Avenue, Ste. 4100
Dallas, TX 75201

Lyndon M. Tretter, Esq.
Hogan & Hartson
875 Third Avenue
New York, NY 10017

Pat Lundvall, Esq.
McDonald, Carano, Wilson, McCune
  Bergen, Frankovich & Hicks
241 Ridge Street, 4th Floor
Reno, NV 89505-1670

Stephen Hudspeth, Esq.
Coudert Brothers, LLP
1114 Avenue of the Americas
New York, NY 10036

J. Thomas Susich, Esq.
Crowell, Susich, Owen & Tackes, Ltd.
510 W. Fourth Street
Carson City, NV 89703

Allen J. Wilt, Esq.
Lionel, Sawyer & Collins
50 West Liberty Street
Suite 1100
Reno, NV 89501

Ethan M. Posner, Esq.
Covington & Burling
1201 Pennsylvania Ave. NW
Washington, DC 20004-2401

Matthew L. Larrabee, Esq.

```
 1   Heller, Ehrman, White & McAuliffe, LLP
     333 Bush Street
 2   San Francisco, CA 94104

 3
     Robert B. Hubbell, Esq.
 4   Heller, Ehrman, White, McAuliffe
     601 South Figueroa St.
 5   40th Floor
     Los Angeles, CA 90017
 6

 7   Thomas F. Kummer, Esq.
     Gavin C. Jangard, Esq.
 8   Kummer, Kaempfer, Bonner & Renshaw
     3800 Howard Hughes Parkway
 9   Seventh Floor
     Las Vegas, NV 89109
10

11
     Scott A. Stempel, Esq.
12   Morgan, Lewis & Bockius, LLP
     1111 Pennsylvania Ave. NW
13   Washington, DC 20004

14

15

16

17
                                        Kathryn Rogers
18                                     Administrative Assistant

19

20

21

22

23

24                                     CERTIFIED COPY
                              The document to which this certificate is
25                            attached is a full, true and correct copy of
                              the original on file or of record in my office.
26
                              DATE: JAN 3 1 2005
27                            RONALD A. LONGTIN, Jr., Clerk of the Second
                              Judicial District Court in and for the County
28                            of Washoe, State of Nevada.

                              By _____ Deputy
```

11