# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: | |
| ALL CLASS ACTIONS | Judge Patti B. Saris |

## MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED NATIONWIDE CLASS SETTLEMENT WITH GLAXOSMITHKLINE

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................1

II.   SUMMARY OF THE CASE ......................................................................3

    A.    Plaintiffs' Allegations ....................................................................3

    B.    Class Plaintiffs' Prosecution of the Case ....................................4

    C.    The GSK Defendants' Response to Litigation.............................5

    D.    Damages Calculations....................................................................5

    E.    The Risks of Litigation ..................................................................6

    F.    History of Settlement Negotiations................................................7

    G.    Allocation of the Settlement Amount ............................................8

III.  THE SETTLEMENT ..................................................................................9

    A.    Allocation of the Settlement Amount ............................................9

    B.    Payments to Consumer Class Members........................................9

    C.    Payment to Third-Party Payors and the ISHP Group ...........................11

        1.    Initial payment to ISHP Group ................................11

        2.    The ISHP Group reversion amount..........................13

        3.    Payments to TPP Class Members ............................13

        4.    Accounting for TPP Opt-Outs ................................14

    D.    Rights of Termination ................................................................15

    E.    Attorneys' Fees and Compensation to Class Representatives ...............15

    F.    Payment of Expenses of Litigation and Claims Administration............15

    G.    The Scope of the Release ............................................................16

    H.    Notice Was Given to the Class ....................................................16

IV.    THE CLASS SHOULD BE CERTIFIED.........................................................................19

    A.    The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement....................................................................20

        1.    The requirements of Rule 23(a) have been satisfied..................................22

            a.    Numerosity......................................................................................22

            b.    Commonality and typicality..........................................................23

            c.    Adequate representation.................................................................26

        2.    The requirements of Rule 23(b)(3) have been satisfied.............................27

            a.    Questions of law or fact common to Class Members predominate over any questions affecting only individual members .................28

            b.    A class action is superior to other available methods for the fair and efficient adjudication of this matter....................................29

V.    THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED..................30

    A.    The Standard for Approval of Class Settlement ....................................................30

        1.    There is a presumption in favor of settlement ............................................31

    B.    Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement ................................................................................32

        1.    Comparison of proposed settlement with the likely result of litigation.....33

            a.    Risks of establishing liability.........................................................34

            b.    Risks of proving damages...............................................................35

            c.    Other risks of continuing the litigation ..........................................35

        2.    Stage of the litigation and the amount of discovery completed.................37

        3.    Quality of counsel ......................................................................................38

        4.    Conduct of the negotiations .......................................................................38

        5.    Prospects of the case, including risk, complexity, expense and duration ......................................................................................................39

VI.    THE PLAN OF ALLOCATION SHOULD BE APPROVED ..........................................40

VII.   CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Grunin v. International House of Pancakes,*
    513 F.2d 114 (8th Cir. 1975) ............................................................................................17

*In re "Agent Orange" Prods. Liab. Litig.,*
    597 F. Supp. 740 (E.D.N.Y. 1984) ..................................................................................36

*Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines,*
    455 F.2d 101 (7th Cir. 1972) ............................................................................................17

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)...........................................................................................17, 19, 28

*Andrews v. Bechtel Power Corp.,*
    780 F.2d 124 (1st Cir. 1985)......................................................................................22, 26

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    1994 U.S. Dist. Lexis 16658 (N.D. Ill. Nov. 15, 1994)....................................................25

*Buford v. H&R Block,*
    168 F.R.D. 340 (S.D. Ga. 1996) ......................................................................................24

*Bussie v. Allmerica Fin. Corp.,*
    50 F. Supp. 2d 59 (D. Mass. 1999) ..................................................................................38

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297 (E.D. Mich. 2001) ..................................................................................25

*Carlough v. Amchem Prods., Inc.,*
    158 F.R.D. 314 (E.D. Pa. 1993).......................................................................................16

*In re Cedant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001)..............................................................................................35

*City P'ship Co. v. Atlantic Acquisition L.P.,*
    100 F.3d 1041 (1st Cir. 1996).....................................................................................19, 31

*Collazo v. Calderon,*
    212 F.R.D. 437 (D.P.R. 2002) ..........................................................................................23

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   216 F.R.D. 197 (D. Me. 2003) ........................................................................26, 28, 31, 33

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ...........................................................................................37

*In re Crazy Eddie Sec. Litig.*,
   824 F. Supp. 320 (E.D.N.Y. 1993) ..................................................................................37

*Denney v. Jenkins & Gilchrist*,
   230 F.R.D. 317 (S.D.N.Y. 2005) ......................................................................19, 26, 29

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) .............................................................................................36

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
   177 F.R.D. 54 (D. Mass. 1997) ........................................................................23, 25, 34, 37

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
   183 F.3d 1 (1st Cir. 1999) ................................................................................................31

*Durrett v. Housing Auth. of Providence*,
   896 F.2d 600 (1st Cir. 1990) .......................................................................................16, 31

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
   768 F.2d 884 (7th Cir. 1985) ...........................................................................................31

*Eisen v. Carlisle Jacquelin*,
   417 U.S. 156 (1974) .........................................................................................................17

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985) .............................................................................................20

*In re Fleet/Norstar Sec. Litig.*,
   935 F. Supp. 99 (D.R.I. 1996) ..........................................................................................33

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ..........................................................................................32, 33

*General Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (1982) .........................................................................................................23

*George Lussier Enters. v. Subaru of New Eng. Inc.*,
   2001 U.S. Dist. Lexis 12054 (D.N.H. Aug. 3, 2001) ......................................................24

- v -

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)..................................................................33

*Giusti-Bravo v. United States Veterans Admin.*,
    853 F. Supp. 34 (D.P.R. 1993)............................................. *passim*

*Greenspun v. Bogan*,
    492 F.2d 375 (1st Cir. 1974)..................................................17, 19, 34

*Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health*
    *& Human Servs.*,
    2004 WL 166722 (D.N.H. Jan. 23, 2004)...........................19, 26, 31

*Henry v. Sears Roebuck & Co.*,
    1999 WL 33496080 (N.D. Ill. July 23, 1999)..................................18

*Isley v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ..........................................................31

*Lake v. First Nationwide Bank*,
    156 F.R.D. 615 (E.D. Pa. 1994)......................................................18

*In re Linerboard Antitrust Litig.*,
    2004 U.S. Dist. Lexis 10532 (E.D. Pa. June 2, 2004)......................37

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001)..........................................................25

*In re Lucent Techs., Inc. Sec. Litig.*,
    307 F. Supp. 2d 633, 646 (D.N.J. 2004) ........................................35

*In re Lupron Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005)......................................................25

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
    671 F. Supp. 819 (D. Mass. 1987) ...........................................31, 33

*Mangone v. First USA Bank*,
    206 F.R.D. 222 (S.D. Ill. 2001) ....................................................18

*Mathewson Corp. v. Allied Marine Indus., Inc.*,
    827 F.2d 850 (1st Cir. 1987)..........................................................39

*McAdams v. Massachusetts Mut. Life Ins. Co.*,
    2002 WL 1067449 (D. Mass. May 15, 2002)...........................20, 22

- vi -

*McCuin v. Secretary of Health & Human Servs.*,
    817 F.2d 161 (1st Cir. 1987) ................................................................................22

*McLaughlin v. Liberty Mut. Ins. Co.*,
    224 F.R.D. 304 (D. Mass. 2004) ...........................................................23, 24, 26, 27

*In re Michael Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 46 (S.D.N.Y. 1993) .............................................................................36

*In re Michael Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) .............................................................................18

*In re MicroStrategy, Inc. Secs. Litig.*,
    148 F. Supp. 2d 654 (E.D. Va. 2001) .....................................................................18

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ................................................................................33

*Mowbray v. Waste Mgmt. Holdings, Inc.*,
    189 F.R.D. 194 (D. Mass. 1999), *aff'd*,
    208 F.3d 288 (1st Cir. 2000) ................................................................................28

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) .......................................................................................17, 18

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ...........................................................................28

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...........................................................................34

*Patterson v. Stovall*,
    528 F.2d 108 (7th Cir. 1976) ................................................................................31

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003) .........................................................................24, 28

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005) ...............................................................................3

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    233 F.R.D. 229 (D. Mass. 2006) ..............................................................................3

- vii -

*In re Pharm. Indus. Average Wholesale Price Litig.*,
     263 F. Supp. 2d 172 (D. Mass. 2003) ...............................................................................3

*In re Pharm. Indus. Average Wholesale Price Litig.*,
     431 F. Supp. 2d 98 (D. Mass. 2006) .................................................................................3

*In re Polymedica Corp. Secs. Litig.*,
     224 F.R.D. 27 (D. Mass. 2004) , *vacated on other grounds*,
     432 F.3d 1 (1st Cir. 2005) ...............................................................................................24

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
     962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998) ...............................31

*In re Prudential Sec., Inc. L.P. Litig.*,
     MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) ..........................................37

*In re Relafen Antitrust Litig.*,
     218 F.R.D. 337 (D. Mass. 2003)......................................................................................22

*In re Relafen Antitrust Litig.*,
     221 F.R.D. 260 (D. Mass. 2004)......................................................................................25

*Reppert v. Marvin Lumber & Cedar Co.*,
     359 F.3d 53 (1st Cir. 2004) .............................................................................................17

*Ressler v. Jacobson*,
     822 F. Supp. 1551 (M.D. Fla. 1992)...........................................................................34, 35

*Rodrigues v. Members Mortg. Co., Inc.*,
     226 F.R.D. 147 (D. Mass 2005)...................................................................................23, 27

*Rolland v. Cellucci*,
     191 F.R.D. 3 (D. Mass. 2000)...........................................................................33, 37, 38

*In re Screws Antitrust Litig.*,
     91 F.R.D. 52 (D. Mass. 1981)..........................................................................................28

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
     323 F.3d 32 (1st Cir. 2003)..............................................................................................22

*Sosna v. Iowa*,
     419 U.S. 393 (1975).........................................................................................................26

- viii -

*Stanton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ........................................................................23

*In re Synthroid Mktg. Litig.*,
    188 F.R.D. 295 (N.D. Ill. 1999)....................................................................25

*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004)....................................................................25

*In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*,
    718 F. Supp. 1099 (S.D.N.Y. 1989)..............................................................36

*United States v. DiBiase*,
    45 F.3d 541 (1st Cir. 1995)............................................................................39

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)............................................................36, 37, 39

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ......................................................................25

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d at 296 ........................................................................................28, 29

*White v. NFL*,
    822 F. Supp. 1389 (D. Minn. 1993)..............................................................18

## STATUTES

18 U.S.C. § 1964..................................................................................................3

## MISCELLANEOUS

MANUAL FOR COMPLEX LITIGATION § 1-30.212 (3d ed. 1995) ....................................17

MANUAL FOR COMPLEX LITIGATION § 13 (4th ed. 2004) ..........................................33

Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS ("NEWBERG")
    § 18:2-18:4 (4th ed. 2002) ............................................................................22

# I.     INTRODUCTION

The Class Plaintiffs David Aaronson, Ruth Aaronson, Cynthia Byrski, Cheryl Barreca,

Anna Choice, Donna Kendall, Constance Nelson, Andrea Palencia, Scott Tell, Joseph Miller,

UFCW, Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust

Fund, Teamsters Health & Welfare Fund of Philadelphia and Vicinity, Philadelphia Federal to

Teachers Health and Welfare Fund, Man-U Service Contract Trust Fund, Twin Cities Bakery

Workers Health and Welfare Fund, Pipefitters Local 537, Blue Cross/Blue Shield of

Massachusetts and Sheet Metal Workers National Health Fund (collectively, "Plaintiffs"),

respectfully submit this memorandum in support of Class Plaintiffs' Motion for Final Approval

of Proposed Nationwide Settlement with Defendant SmithKlineBeecham Corporation d/b/a

GlaxoSmithKline ( "GSK Defendants").[1]

The Settlement Agreement provides for the payment by the GSK Defendants of up to

$70 million (the "Settlement Payment").  The $70 million is divided by certain litigating states,

consumers and Third-Party Payors ("TPPs"), including various independent health plans that

have also settled with Defendants ("Independent Settling Health Plans" or "ISHPs").  The

$70 million will be reduced by payments to certain state Attorneys General, court-awarded fees,

costs and expenses, compensation to the named Class Plaintiffs, and possible reversion amounts,

as more fully described below and in the Settlement Agreement.  The Settlement Payment is well

within the range of reasonableness given the allegations, evidence adduced in the litigation,

damages analysis and the time, burdens, and potential risk of further litigation.  The settlement

will bring to a conclusion this complex class litigation against the GSK Defendants that was

---

[1] Plaintiffs are simultaneously filing:  a Motion and Memorandum in Support of Class Counsel's Petition for
Attorneys' Fees, Reimbursement to Expenses and Compensation to the Named Plaintiffs (the "Fee Petition"), and
Supporting Affidavits of Counsel.  Plaintiffs also will file a response to any objections that are lodged.

commenced nearly six years ago, bringing relief to the injured consumers and Third-Party Payors who constitute the Class.

The Notice Plan has been fully executed.  Notice directed to consumers has included direct mail notice to almost 2.5 million consumers who were identified through records of the Centers for Medicare and Medicaid Services ("CMS") as well as an extensive notice publication. Notice to Third-Party Payors ("TPPs") includes direct notice to over 46,000 TPPs as well as publication in various trade magazines.  While it is too soon to know the total value of claims that have been submitted – the deadline for postmarking of claims was May 28, 2007 and claims are still being received, processed and audited by the Claims Administrator, as of June 12, 2007 there have been 12,497 consumer claims submitted and 2,028 claims submitted by TPP class members.  In the coming months, the Claims Administrator will undertake the process of auditing and verifying the submitted claims.  Given that 30% of $65.5 million, or $19,650,000 has been set aside specifically to satisfy the claims of consumers, it is likely that all consumers who have submitted a claim will be reimbursed 100 percent of their recognized claims, with excess consumer funds available for disposition in accordance with the Settlement Agreement. Additionally, Class Counsel believe that their will be sufficient funds to recommend a $100 minimum payment to each consumer who submitted a valid claim.[2]

The Settlement is fair, reasonable and adequate.  As detailed below, this Settlement is the product of over 5 years of hard fought litigation.  Before they ever started to negotiate the final terms of the Settlement with GSK Defendants, Class Plaintiffs defeated multiple motions to dismiss, deposed 45 of GSK and related third-party witnesses, reviewed millions of pages of

---

[2] In further support of their Motion for Final Approval, Class Counsel has filed herewith the Declaration of Katherine Kinsella of Kinsella/Novak Communications and the Declaration of Thomas R. Glenn of Complete Claims Solutions, Inc. attesting in detail to compliance with this Court's order regarding notice to the class.

- 2 -

GSK documents, engaged in extensive discovery practice and briefed and argued class certification.

As a result of the Settlement all those who paid for the Covered Drugs, including Medicare beneficiaries, health plans and consumers, will receive money to compensate them for their past overpayments.  The Settlement is putting tens of millions of dollars into the hands of individuals and TPPs who paid for GSK Covered Drugs.  The allocation of the Settlement proceeds is consistent with the damages suffered by and the risks faced by each group.

Accordingly, the parties respectfully move for an Order pursuant to Fed. R. Civ. P. 23 approving a proposed class action settlement (the "Settlement") and related relief.

## II.      SUMMARY OF THE CASE

### A.      Plaintiffs' Allegations

In this litigation, Plaintiffs allege that GSK implemented a fraudulent scheme used to manipulate and inflate the monetary spread between the Average Wholesale Price ("AWP") and the cost to doctors and other providers of various drugs ("Subject Drugs" or "Covered Drugs") in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), and various state consumer protection laws.[3]

Plaintiffs allege that GSK illegally manipulated the AWPs of its Subject Drugs during the relevant period, in order to increase profits and market share, at the expense of patients, their insurers, and the Medicare program.  The AWPs that GSK caused to be published – and upon which Plaintiffs and the Class Members based their payments as required by statute for payments

---

[3] The Court is aware of the extensive facts and claims alleged in this action.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 98 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003).  The Class Plaintiffs respectfully will not repeat all of those allegations here.

by Class 1 and Class 2 members, were fictional.  Those allegedly fictional AWPs created a larger profit spread that funneled hidden profits to doctors to prescribe GSK drugs over less expensive alternatives.  GSK's strategy targeted Plaintiffs and members of the Class, who continued to pay more and more for a drug that should have cost less and less.

**B.      Class Plaintiffs' Prosecution of the Case**

Class Plaintiffs have aggressively prosecuted their claims since 2001.  Numerous cases were subsequently consolidated before this Court by the Judicial Panel on Multi-District Litigation on April 30, 2002.

Class Plaintiffs overcame motions to dismiss and briefed and argued dozens of discovery motions and more than one motion for class certification.

In discovery, Class Plaintiffs reviewed, analyzed, coded and loaded into a database over 2.8 million pages of documents produced by GSK and third parties.  The selected documents were analyzed and coded by a team of attorneys over a period of 18 months.  Through that review, the Class Plaintiffs created a detailed, computerized, searchable database of relevant documents.  Through negotiation and motion practice, Plaintiffs pressed GSK for additional relevant documents and data, resulting in GSK producing additional information after the close of discovery.  Plaintiffs also undertook detailed analysis of GSK transactional data on dozens of GSK products.  For some of the drugs, the analysis covered a period of time in excess of ten years.

Class Plaintiffs also took over 45 depositions of GSK's current and former employees, including senior managers, consultants, and contractors.  The depositions resulted in nearly 1000 marked deposition exhibits.

- 4 -

At the same time, Plaintiffs were issuing subpoenas to physicians, trade associations and other third parties to obtain additional evidence.  Third-party witnesses with knowledge of GSK activities or the effects of GSK's conduct were also sought out, interviewed, and in some cases deposed.

**C.     The GSK Defendants' Response to Litigation**

GSK has denied, and continues to deny, that it has committed any violation of law or any wrongdoing, and further deny that they have any liability with respect to any claims asserted in the Complaint, and deny all liability to Plaintiffs and the Class.  They litigated extensive Motions to Dismiss, and vigorously opposed Plaintiffs' Motion for Class Certification of a litigation Class.  They have indicated that if the case proceeds, they would continue to vigorously oppose Plaintiffs' claims through summary judgment and trial.

Defendants also engaged in extensive defensive discovery.  Defendants took the depositions of all named Plaintiffs, including multiple depositions of the corporate Plaintiffs.  Plaintiffs responded to interrogatories from the Defendants and produced voluminous documents and (for the health plan Plaintiffs) electronic transactional and claims data.

**D.     Damages Calculations**

Plaintiffs consulted extensively with economic experts to estimate the economic impact of GSK Defendants' scheme on Class Members.  Dr. Raymond Hartman, using available data sets, including data obtained in discovery, estimated the damages suffered by each of the Classes with respect to the GSK Covered Drugs.  In the Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages filed under seal with the Court on December 15, 2005 ("Hartman Decl."), Dr. Hartman estimated the total, single damages suffered by Medicare Co-Payment Class (Class 1) to be $7 million.  *See* Hartman Decl., Attach. J.3.a.

- 5 -

Dr. Hartman estimated the total, single damages suffered by the MediGap TPP Class (Class 2) to be $35 million.  Hartman Decl., Attach. J.3.c.  For the Private Payor Class (Class 3), Dr. Hartman calculated total single damages to be $341 million.  In total, for all classes, Dr. Hartman's analysis calculated damages for the GSK Covered Drugs to be approximately $383 million.[4]

## E.     The Risks of Litigation

Throughout the discovery and settlement negotiation processes, the Class Plaintiffs, consumers, Attorneys General, and the ISHPs gained a thorough understanding of the strengths and weaknesses of their case.  The Class Plaintiffs and the ISHPs ultimately agreed to the Settlement after evaluating various factors, including certain risks to Plaintiffs' theories of liability and damages.

Specifically, the Class Plaintiffs recognized liability risks including:

- The Defendants' arguments that many Class Members were aware of how the AWP was manipulated and that many people knew the AWP was not reliable.  Class Counsel believes this argument is seriously flawed, particularly for Class 1, it still presents a litigation risk.

- The Defendants also adduced evidence that many TPPs continued to use AWP as a basis for reimbursement even after the Complaint was filed, thus indicating that they were aware of the alleged AWP manipulation but chose, for a variety of reasons, to continue to rely on AWP.

---

[4] Dr. Hartman's analysis for all three classes was conducted through and including 2004.  The Settlement contemplates that the time period for Class 1 and Class 2 terminates on January 1, 2005 and for Class 3 on the date of the Settlement or August 10, 2006.

- The existence of numerous reports from the federal government discussing overpayments for drugs.

- Some of these government reports date from 1996 or earlier, which the Defendants argued triggered the running of the statute of limitations on Plaintiffs' claims.

- The risk that some Class Members might not have documentation or claims data to prove or substantiate payments from the early '90s or beyond. Many TPPs do not retain data for more than 5 to 7 years, thus it would have been difficult to prove damages for the early years of the Class Period. For consumers, the same is true.

Class Plaintiffs believe that they could overcome these risks, but there is no certainty that this in fact would happen, particularly when such matters are put before a jury.

Another important factor considered by the Class Plaintiffs in evaluating the reasonableness of the Settlement was the value to Class Members of receiving payment as soon as possible, as opposed to litigating through trial and the almost certain appeals. Many of the Consumer Class Members are elderly and the prospect of an increased payment, years in the future, is of little value to them. Indeed, two of the proposed Class Representatives died during the pendency of this litigation.

As a result of these as well as other factors, and after years of contentious litigation and months of arms-length negotiations between Defendants, Class Plaintiffs and certain individual Plaintiffs, the parties were able to obtain this Settlement, which the parties believe to be fair and reasonable.

**F.      History of Settlement Negotiations**

The settlement negotiations among the parties, although always courteous, were long, detailed, and contentious. Over a two-year period, in separate series of meetings, each of which

- 7 -

extended over several months, the parties met, conferred, exchanged information and debated the

other's evidence and interpretations.  Both sides made detailed presentations to each other,

presented extensive analysis and conclusions of experts, and noted their positions on legal

theories, evidence, and possible damages.  In addition to many face-to-face negotiations, there

were a significant number of additional discussions by phone.  The negotiating sessions often

spanned many hours, and always involved considerable back-and-forth between counsel for the

several parties.  The court-appointed mediator, Eric Green, was involved in many of these

sessions.  Eventually, the overall sum of $70 million was reached which represents a substantial

recovery.

## G.      Allocation of the Settlement Amount

The next step was to determine an allocation between consumer, TPPs, and participating

Attorneys General.  Each constituency had an assigned allocation counsel, Class counsel did not

advocate for any allocation.[5]  All groups accepted Class Counsel's recommendation that

$70 million was a fair amount and proceeded to work out their points and the split of monies

between them, and then all the parties spent many days and long hours negotiating a MOU and

Settlement Agreement with all required Exhibits.  In addition, there were extensive negotiations

between TPP counsel, ISHP counsel, and consumer class counsel about the allocation among

these entities.  The attorneys participating collectively brought to the negotiation full knowledge

of the facts of the case and the terms of the settlement with Defendants, and substantial

experience in these kinds of negotiations.  The extensive result of that work is now presented to

the Court for final approval.

---

[5] The Attorneys General were represented by Assistant Attorneys General from Arizona, Connecticut, Montana, New York and Nevada.  Counsel for the states of Pennsylvania, Kentucky, Wisconsin, and Illinois were invited to settlement meetings and all chose not to attend.  Consumer allocation counsel was Dianne M. Nast of Roda Nast and Kent Williams, two highly experienced class action litigators.  TPP allocation counsel was Jonathan O. Karmel.

- 8 -

# III.    THE SETTLEMENT

## A.    Allocation of the Settlement Amount

The Settlement Agreement allocates the $70 million as follows:  (1) a payment totaling $2.5 million to various participating states (New York, Arizona, Connecticut, Montana and Nevada); (2) a potential payment of $2 million to states that are litigating and may wish to participate but have not yet done so[6]; and (3) $65 million to the Class and ISHPs.  Of that $65.5 million, 30% will be allocated exclusively to consumers and 70% to TPPs.

## B.    Payments to Consumer Class Members

Of the $65.5 million allocated to the claims of Class Members and the ISHPs, 30% or $19,650,000, referred to in the Settlement Agreement as the "Consumer Settlement Pool," is designated exclusively for the benefit of consumers.  Additionally, because of the four Litigating States (Illinois, Kentucky, Pennsylvania and Wisconsin) only the Commonwealth of Pennsylvania elected to participate in the Settlement, the funds set aside for the other litigating states will be made available to pay the cost of notice to consumers.  In the event that the entire amount of the Consumer Settlement Pool is not used to satisfy the claims of consumers, any residual funds will be subject to a binding mediation with Professor Eric Green, in which all constituencies may participate.  Professor Green's decision is subject to review by this Court. No unused funds will flow back to Defendants.  In addition, there is no provision for the reduction of funds from the Consumer Settlement Pool as a result of consumers excluding themselves from the Settlement.

---

[6] Only one Litigating State has chosen to participate in the Settlement.  On February 2, 2007, the Commonwealth of Pennsylvania entered into a separate settlement agreement with GSK effectively becoming a Participating State under the terms of the Settlement Agreement.  The state was paid its share of the $2 million set aside for participating states.  That amount was 40.2% of $2 million or $804,000.  The remaining amount set aside for participating states or $1,196,000.00 is to be used to satisfy the cost of notice to consumers, pursuant to § 6(e) of the Settlement Agreement.

Consumers wishing to make a claim for a portion of the Consumer Settlement Pool were required to provide a completed claim form, which asked them to provide the total amount of their out-of-pocket expenditures for the purchase of Covered Drugs net of any reimbursement from insurers.  In addition, as a safeguard against fraud, consumers were required to provide a single proof of purchase for each Covered Drug for which they make a claim.  Proof of purchase may be in the form of a prescription, evidence of payment (such as a receipt or cancelled check), a letter from their doctor, or, in the event they can provide no external evidence of payment, a sworn affidavit attesting to the amount of their out-of-pocket expenditures.  Proof of every injection, and proof of the exact payment made for each injection, is not required.  By requiring some proof of purchase, but not requiring an exhaustive search for records on behalf of consumers, counsel seek to encourage consumers to make claims, while discouraging any false or fraudulent claims.  As a further safeguard, the Claims Administrator will audit both a random number of consumer claims as well as any claim that, in the Claim Administrator's experience and discretion, is worthy of additional scrutiny.

If approved by the Court, payments will be made to authorized Consumer Class Members (consumers who are not "opt-outs") out of the Consumer Settlement Pool in pro rata shares based on their claims authorized by the Claims Administrator.[7]  Each Consumer Class Member will receive either a pro-rata portion of their recognized claim (up to 100%) or a minimum payment of $100, whichever is greater.  The pro-rata percentage and the exact amount of the minimum payment will be determined after all Consumer Class claims have been received and verified.  To date the Claims Administrator has received a total of 12,497 consumer claims and

---

[7] Exhibit G to the Settlement Agreement sets forth the recognized claim percentages and provides examples of how claims would be calculated for consumers.

- 10 -

21,194 requests for exclusion.  Class Counsel anticipate that there will be sufficient funds in the

Consumer Settlement Pool to pay each consumer 100% of their Recognized Claim and to

provide for a the full $100 minimum payment.  Any remaining money will be distributed as the

Court deems appropriate (but not to GSK) after a mediation between counsel for Consumers and

the States, before Eric Green, whose recommendation will be submitted to the Court with any

comments from the consumers, and Class Counsel and the States.

 As the Court has expressed concern over the high number of consumer opt-outs,

Professor Francis McGovern, appointed as Special Master to help the Court evaluate the terms of

the Settlement, has undertaken a telephone survey of a statistically significant number of the

consumer opt-outs.  The final results of that survey are not yet known, however by the time the

Court holds a hearing on final approval Professor McGovern will have a report of the full results

for the Court's consideration.  Based on a preliminary discussion with Professor McGovern,

Class Counsel believe that the survey will demonstrate that a vast majority of the consumers who

filed opt-out forms were not in fact Class Members as they did not pay out-of-pocket for any

portion of the drug due to supplemental insurance.  They apparently filed opt-out forms in an

overabundance of caution.  Of those who were in fact Class Members a significant percentage

believed they were filing a claim rather than excluding themselves.  Once the exact figures are

known, Class Counsel will file supplemental briefing on the subject if necessary to protect the

interests of these consumers.

## C. Payment to Third-Party Payors and the ISHP Group

### 1. Initial payment to ISHP Group

 As stated above 70% of $65.5 million set aside to satisfy class claims, or $45,850,000, is

allocated to satisfy the claims of TPPs.  In recognition their substantial interests in this litigation,

the ISHPs have negotiated a right to a portion of these funds.  However, in recognition of the fact that the ISHPs, as TPPs, are also members of the proposed settlement class, Class Counsel sought a mechanism to ensure that ISHPs would only receive that share of the TPP settlement funds to which the ISHPs would have otherwise been entitled if they participated in the class settlement like any other TPP; that is, their pro-rata share of the entire $45,850,000 based upon their purchases as compared to the universe of TPP purchases.  The treatment of ISHPs in the Settlement Agreement represents a fair balance between allowing private litigants to settle on their own terms, as the litigating ISHPs were entitled to do, and ensuring that such a settlement would not unfairly disadvantage the remaining TPP Class Members.

In summary, the ISHP's total payment from the $45,850,000 set aside for all TPPs will be determined based upon the purchases of Covered Drugs by members of the ISHP Group as a percentage of all purchases of Covered Drugs by all TPPs, including members of the ISHP Group, TPPs who make claims in the settlement, and any TPPs who choose to exclude themselves from the Settlement.  This is no more than the amount to which ISHPs would be entitled than if they participated fully in the Settlement as TPP Class Members.

This total amount of $45,850,000 is initially split evenly between the "TPP Settlement Pool" and the "ISHP Settlement Pool" each funded with $22,925,000.  The total payment to the ISHP Group, which represents at least 70% of all of the privately insured individuals in the United States, will be paid in two different stages.[8]  The first payment to the ISHPs, referred to in the Settlement Agreement as the "ISHP Group Initial Payment," is an up-front payment of $11 million which was made within ten days of this Court's preliminary approval of the

---

[8] The percentage of the total covered lives in the United States controlled by the ISHPs has been confirmed to be over 70 percent, as required under the Settlement Agreement.

- 12 -

Settlement.  The remaining money (approximately $12 million) in the "ISHP Settlement Pool" is

held in reserve to ensure that in the unlikely event the purchases of the ISHPs turn out to be less

than 50% of all of the TPP claims, money can be paid back to the TPP Settlement Pool from the

ISHP Settlement Pool and distributed to TPP Class Members.

> **2.      The ISHP Group reversion amount**

The second payment to ISHPs will be calculated once the total percentage of all ISHP

purchases are known in relation to all TPPs.  ISHP Group Members are required to submit claim

documentation, identical to the information that must be provided by TPP Class Members, to the

Claims Administrator.  Based on the total of ISHP Group claims as a percentage of all TPP

claims (including ISHP Group Members claims) has been determined by the Claims

Administrator, any percentage of the TPP purchases made by the ISHP Group over 50% would

be used to determine if the ISHPs are entitled to more than the $11 million they received as the

ISHP Group Initial Payment and the approximately $12 million remaining in the ISHP

Settlement Pool.  This back-end payment is referred to in the Class Agreement as the "ISHP

Group Reversion Amount."  If the amount remaining in the ISHP Settlement Pool is not

sufficient to satisfy the ISHP Group Reversion Amount (because ISHPs represent more than

50% of all TPP purchases and only 50% of money allocated to all TPPs was deposited in the

ISHP Settlement Pool), money from the TPP Settlement Pool will flow to the ISHPs.  However,

because of the way these amounts are calculated, the ISHPs, in total, will receive no more than

they would have been entitled if their claims were submitted as TPP members of the Class.

> **3.      Payments to TPP Class Members**

All TPPs making claims for their share of the TPP Settlement Pool are required to submit

to the Claims Administrator a claim which sets forth the amount they have paid for the purchase

- 13 -

of Covered Drugs for their members during the period from January 1, 1999 to December 31, 2004.[9]  This period of years was used as a proxy for purchases over the entire Class Period.  The purchases during these years will be used to determine the percentage share of the entire $45,850,000 set aside for TPPs to which any given TPP is ultimately entitled.  Use of this five-year period of time on which to base payments to TPPs was employed due to the fact that many TPPs, especially smaller TPPs, do not have electronic access to purchases dating back as far as 1991 and requiring data on payments back to 1991 would put smaller TPPs at a disadvantage in the claims process.

### 4.        Accounting for TPP Opt-Outs

The Settlement Agreement provides for a modification of the $45,850,000 available to satisfy the claims of all TPPs (including the ISHPs) based upon the purchases of any TPP that chooses to opt-out of the Settlement.  GSK is entitled to a refund, from both the TPP Settlement Pool and the ISHP Settlement Pool equally, in an amount determined by the purchases of Covered Drugs by TPP Opt-outs as a percentage of all purchases of Covered Drugs by all TPPs, including members of the ISHP Group, TPPs who make claims in the settlement, and any TPP Opt-outs.  This is no more than  a TPP Opt-out would be entitled to if they participated fully in the Settlement.[10]  At present, the Settlement Administrator has received opt-out requests from 12 TPPs.  It is unclear at present whether these TPPs have any claims that would qualify for

---

[9] In addition, any claim that states payments in excess of $300,000.00 by a TPP must also be accompanied by computerized records proving the payments in the amount claimed.  All TPPs with claims below $300,000.00 are subject to audit by the Claims Administrator and have been requested to collect the same computerized records to ensure their ready availability upon request by the Claims Administrator.

[10] GSK Defendants are required to set aside 33% of the ISHP Group Reversion Amount for up to two years.  If there is a subsequent settlement with any TPP Opt-out, the GSK Defendants are required by the terms of the Settlement to notify Class Counsel of such a settlement within ten (10) days of execution of a settlement agreement with any TPP Opt-out.  Class Counsel may then petition the Court both for access to the terms of any settlement as well as for an order directing that a portion of the settlement with any Opt-out be paid to Class Counsel as a reasonable attorneys' fee to compensate Class Counsel.

- 14 -

reimbursement from the TPP Settlement Pool, but if they do, Class Counsel anticipate that they will likely be minimal.

**D.  Rights of Termination**

The Settlement Agreement provides both Defendants and Class Counsel a right to terminate the Settlement on 30 days written notice after the Court's refusal to approve the Settlement in substantially the same terms as agreed upon by the parties, or within 30 days of any appellate court reversal or material modification of the Settlement Agreement.  A change in the payment of the amount of attorneys fees, expenses, or compensation to the named Plaintiffs or a change in the proposed plan of distribution does not constitute a material change giving rise to the right of termination.

**E.  Attorneys' Fees and Compensation to Class Representatives**

Contemporaneously with the submission of this motion, Class Counsel has moved for an attorneys' fee and litigation expense award of 33% of the $65.5 million designated for payment to Class Members or $21,615,000.  The Settlement Agreement also provides for compensation as determined by this Court for services rendered to members of the Class by the Class Representatives.  Class Counsel has moved for a total of $100,000 to be paid to each of nine TPP Class Representatives and a total of $25,000 to be paid to each of 10 Consumer Class representatives.

**F.  Payment of Expenses of Litigation and Claims Administration**

All costs and expenses of litigation that are awarded by the Court, as well as the cost of claims administration and notice to Class Members will be paid by TPPs, ISHPs and by Consumers in the same proportion to the total amounts that were deposited into the TPP

- 15 -

Settlement Pool, the ISHP Settlement Pool and the Consumer Settlement Pool respectively.[11]

Although a separate request and award of litigation expenses is contemplated by the Settlement

Agreement, Class Counsel has requested that its expenses be considered in conjunction with its

request for single percentage of the total Class fund.

## G.        The Scope of the Release

As described fully in the Settlement Agreements, all Consumer Class Members, all TPP

Class Members and all ISHP Group Members (including various entities on whose behalf a TPP

warrants it is authorized to act) are releasing GSK and its various subsidiaries, related entities

and personnel from all claims relating to the marketing, sale, cost, pricing or purchase of the

Subject Drugs.  Claims concerning product liability or personal injury are excluded from the

release of claims.

## H.        Notice Was Given to the Class

Reasonable notice must be provided to Class Members to allow them an opportunity to

object to the proposed Settlement.  *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600,

604 (1st Cir. 1990).  Rule 23 (e) requires notice of a proposed settlement "in such manner as the

court directs."  In a settlement class maintained under Rule 23(b)(3), class notice must meet the

requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).  *See Carlough v. Amchem Prods., Inc.*,

158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter

than requirements of Rule 23(e) and arguably stricter than the due process clause).  Under Rule

23(c)(2), notice to the class must be "the best notice practicable under the circumstances,

including individual notice to all members who can be identified through reasonable effort."

---

[11] The one exception to this provision is the use of funds remaining from the Litigating States' Allocation of
$2 million.  $1,196,000.00 of this amount will be used to fund the cost of notice to Consumer Class Members.

- 16 -

*Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997); *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).

The MANUAL sets forth several elements of the "proper" content of notice.  If these requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2) and 23(e), and due process, and binds all members of the Class. The Notice must:

1.      Describe the essential terms of the Settlement;

2.      Disclose any special benefits or incentives to the class representatives;

3.      Provide information regarding attorneys' fees;

4.      Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.      Explain the procedures for allocating and distributing Settlement funds; and

6.      Prominently display the address of class counsel and the procedure for making inquiries.

MANUAL FOR COMPLEX LITIGATION § 1-30.212 (3d ed. 1995).  *See*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *accord Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974).  The notice program proposed by the parties and approved by the Court clearly meets this standard.

- 17 -

Co-Lead Class Counsel complied with the Court's directives concerning Class notice. Co-Lead Counsel employed, and the Court appointed, Complete Claims Solutions, Inc., which specializes in the administration of class actions, to oversee the administration of the Class, and Katherine Kinsella, of Kinsella/Novak Communications, to create and execute the Notice Plan.

Notice via first class mail, publication in print media such as newspapers and periodicals, and website publication, are all avenues for notice that have been approved by various courts. *See*, *e.g.*, *White v. NFL*, 822 F. Supp. 1389, 1400 (D. Minn. 1993) (notice by mail to identified class members and publication once in *USA Today* "clearly satisfy both Rule 23 and due process requirements"); *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628 (E.D. Pa. 1994) (approving as reasonable notice by third class mail to identified class members and publication two times in the national edition of *USA Today*); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (notice by mail to identified class members and publication in *USA Today*); *Mullane*, 339 U.S. at 316 ("This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning."); *see also In re MicroStrategy, Inc. Secs. Litig.*, 148 F. Supp. 2d 654, 669-70 (E.D. Va. 2001) (approving publication of summary notice in nationwide newspapers and posting full notice on websites maintained by co-lead counsel); *Henry v. Sears Roebuck & Co.*, 1999 WL 33496080 (N.D. Ill. July 23, 1999) (the Court directed that the Class Action Settlement Notice be mailed by first class mail to all identified class members, and the Summary Notice be published twice in the national edition of *USA Today*); *Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) (the Court approved Class Notice mailed to the last known address of all Class Members identified through reasonable effort by Defendant,

- 18 -

published a Summary Notice on three separate days in the nationally published newspaper *USA Today* published the Class Notice and other pertinent information on the Internet).

The Court has received the certifications of compliance with notice requirements by Katherine Kinsella and Thomas R. Glenn, of Complete Claims Solutions whose Declarations are filed herewith.  Class Counsel has complied with the Court's Order on Notice as outlined these declarations.

## IV.     THE CLASS SHOULD BE CERTIFIED

A class action cannot be compromised or settled without the approval of the Court.  Fed. R. Civ. P. 23(e).[12]  Prior to addressing the adequacy of a proposed Settlement, the Court must determine whether the plaintiff class, as agreed to by the parties, may be certified for purposes of the Settlement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 613; *Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health & Human Servs.*, 2004 WL 166722, at *1 (D.N.H. Jan. 23, 2004).  Further, the decision to approve or reject a proposed settlement is committed to the Court's sound discretion.  *City P'ship Co. v. Atlantic Acquisition L.P.*, 100 F.3d 1041, 1043-44 (1st Cir. 1996).  Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis.  To that end, when analyzing a motion to certify, "district courts in this circuit have frequently recognized that 'Rule 23(a) should be liberally

---

[12] Plaintiffs have the burden of showing that the proposed class comports with Rule 23 and the burden of establishing that the Settlement should be approved.  *Greenspun v. Bogun*, 492 F.2d 375, 378 (1st Cir. 1974).  *See also* MANUAL FOR COMPLEX LITIGATION § 21.631 (4th ed. 2004).  "That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint.  However, 'a district court is forbidden to weigh the evidence on class certification [and] plaintiffs need not establish the elements of Rule 23 by a preponderance of the evidence.'"  *Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317, 326 (S.D.N.Y. Feb. 18, 2005) (citing *In re Initial Public Offering*, 2004 WL 2297401, at *19 (S.D.N.Y. 2004) (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93) (2d Cir. 1999)).

- 19 -

construed in order not to undermine the policies underlying the class action rule.'" *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 WL 1067449, at \*2 (D. Mass. May 15, 2002) (quoting *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984)).  Consistent with this rule, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class." *McAdams*, 2002 WL 1067449, at \*2 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case, any error, if there is to be one, should be committed in favor of allowing a class action.").

Certification of the Settlement Class is appropriate in this case because the requirements of Rule 23(a) and Rule 23(b) are satisfied.

**A.    The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement**

The parties filed their Joint Motion for Preliminary Approval of the Settlement on August 10, 2006.  In an Order dated November 15, 2006 this Court preliminary certified Settlement Classes defined as:

> A.    Medicare Part B Co-Payment Class ("Medicare Co-Payment Class")
>
> All natural persons in the United States, who made, or who incurred a currently enforceable obligation to make, a co-payment based on AWP for a Medicare Part B covered drug manufactured by GSK set forth on <u>Exhibit A</u> hereto. Excluded from the class are persons who made flat co-payments, who were reimbursed in full for any co-payments, or who have the right to be fully reimbursed for any co-payments.

- 20 -

B.      Third-Party Payor MediGap Supplemental Insurance Class
("MediGap TPP Class")

All Third-Party Payors in the United States who made
reimbursements for a Medicare Part B covered drug
manufactured by GSK and set forth on Exhibit A hereto,
based on AWP, during the Class Period.

C.      Consumer and Third-Party Payor Class for Payments Made
for Medicare Part B Drugs Outside the Medicare Context
("Private Payor Class")

All natural persons in the United States who made, or who
incurred a currently enforceable obligation to make, a
payment for, and all Third Party Payors in the United States
who made reimbursements based on contracts using AWP
as a reimbursement standard for purchases of a physician
administered drug manufactured by GSK set forth on
Exhibit A hereto, during the Class Period.  Excluded from
the class are natural persons who made flat co-payments,
who were reimbursed in full for any payments or co-
payments, or who have the right to be fully reimbursed for
any payments or co-payments.[13]

Excluded from each of the AWP Payor Classes are Defendants and their officers,

directors, management, employees, subsidiaries, and affiliates.  Excluded from the MediGap TPP

Class and the Private Payor Class are:  (1) the United States government and its agencies and

departments, and all other governmental entities that made payments pursuant to any state's

Medicaid program; (2) the Independent Settling Health Plans (ISHPs), as defined in

Paragraph 2(w) of the Settlement Agreement; and (3) all federal, state or local governmental

entities, ***except for*** the following, which are ***not*** excluded from the Medigap TPP or Private

Payor Classes:  (a) non-Medicaid state or local government entities that made AWP-based

prescription drug payments as part of a health benefit plan for their employees, but only with

respect to such payments, and (b) other non-Medicaid state government agencies or programs of

---

[13] Settlement Agreement ¶ 1, p. 6.

- 21 -

the Participating States other than New York and Connecticut and of the additional participating states, if any.

### 1.      The requirements of Rule 23(a) have been satisfied

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to satisfy four prerequisites:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem*, 521 U.S. at 613).  In this case, all four requirements of Rule 23(a) have been met.

### a.      Numerosity

Numerosity requires that the class include so many members that joinder would be impracticable.  Fed. R. Civ. P. 23(a)(1).  Although there is no magic number of Class Members that will qualify for class certification, numerosity "is not a difficult burden to satisfy." *McAdams*, 2002 WL 1067449, at *3 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)).  Courts have generally found groups of more than forty to satisfy the numerosity requirement.  *Id.* at *3.  *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (broadly drawn class definition "suggests that members of the class, once identified, will be 'so numerous and widely dispersed that joinder . . . is impracticable'"). Precise quantification of Class Members is not necessary, and a court may make common sense assumptions to support a finding of numerosity.  *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985) (court can consider economy, geographic dispersion and ability of individual members to bring suit); Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 18:2-18:4 (4th ed. 2002).

- 22 -

In this case, the numerosity requirement is not in doubt.  The proposed Settlement Class includes at least hundreds of TPPs and thousands of individual consumers.  These persons are geographically dispersed throughout the entire United States.  A class of this size makes joinder of all members impracticable.

### b.    Commonality and typicality

The commonality requirement is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Typicality, on the other hand, requires that the claims of the named plaintiffs be typical of the claims of the class.  Fed. R. Civ. P. (23)(a)(3).  Often, the requirements of Rule 23(a)(2) and (3) are considered together.  *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Rodrigues v. Members Mortg. Co., Inc.*, 226 F.R.D. 147, 151 (D. Mass. 2005).  The crux of both requirements is "to ensure that maintenance of a class action is economical and that the named plaintiff's claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 157 n.13.

To satisfy the commonality requirement, the named plaintiffs' claims must share at least one common question of law or fact with the class' claims.  *See*, *e.g.*, *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309 (D. Mass. 2004) (While requiring that "questions of law or fact be shared by the prospective class," Rule 23(a)(2) does not require that "every question be common."); *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *Collazo v. Calderon*, 212 F.R.D. 437, 442 (D.P.R. 2002).  The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted."  *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted).  It requires only that there be a single question of law or fact

- 23 -

that is common to all class members. *George Lussier Enters. v. Subaru of New Eng. Inc.*, 2001 U.S. Dist. Lexis 12054, at *11 (D.N.H. Aug. 3, 2001).

The commonality requirement "does not require that class members' claims be identical." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (quoting *Mack v. Suffolk Cty.*, 191 F.R.D. 16, 23 (D. Mass. 2000)).[14]

With respect to typicality, "[t]he central inquiry in determining whether a proposed class has typicality is 'whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class.'" *In re Polymedica Corp. Secs. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004) (quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin*, 224 F.R.D. at 310; *see also* 1 NEWBERG § 3.13 (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named Plaintiffs and the class sought to be represented"). Furthermore, the plaintiff does not need to show "substantial identity between [his] claims and those of absent class members," but only that "[his] claims arise from the same course of conduct that gave rise to the claims of the absent members." *In re Polymedica*, 224 F.R.D. at 36 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) (internal quotation marks omitted)); *see Payne*, 216 F.R.D. at 26 (typicality requires "the same essential characteristics" among claims).

In this case, a single set of facts proves the causes of action alleged. The documentary and testimonial evidence applies across the entirety of the Class. Virtually all elements of Plaintiffs' claims involve proof of GSK Defendants' conduct, not the conduct of Class Members.

---

[14] "In RICO cases, commonality is frequently satisfied. An alleged scheme to defraud which affects a class of people is a common question of law and/or fact, regardless of the characteristics of the scheme's intended victims." *Buford v. H&R Block*, 168 F.R.D. 340, 349 (S.D. Ga. 1996).

- 24 -

Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar to those alleged in this case. *See In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) (certifying class of persons and entities who "purchased" a drug); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug competition); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 703 (S.D. Fla. 2004) (certifying class of persons and entities who "paid" all or part of the purchase price for a drug); *In re Cardizem*, 200 F.R.D. at 332 (class of "purchasers" of Cardizem); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *3-4 (N.D. Ill. Nov. 15, 1994) (class of "purchasers" of "brand name prescription drugs"). Indeed, Courts in this District have approved closely analogous classes in a variety of circumstances. *See*, *e.g.*, *Duhaime*, 177 F.R.D. at 54 (class was ascertainable because it was defined to include persons who purchased life insurance policies from one time period through another). In the present action, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class Members. Plaintiffs and Class Members were all harmed by Defendants' unlawful scheme. Accordingly, the named Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and easily satisfy Rule 23(a)(3).

- 25 -

### c.  Adequate representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This inquiry is satisfied if:  (a) the plaintiff's counsel is qualified, experienced, and able to prosecute the action on behalf of the class vigorously, and (b) the interests of the representative parties do not conflict with the interests of any class members. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *McLaughlin*, 224 F.R.D. at 310, *Andrews*, 780 F.2d at 130; *Hawkins*, 2004 WL 166722, at *3; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003).  It is well established that "in complex litigation . . . a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." *Denney*, 230 F.R.D. at 328 (quoting *In re AM Int'l Inc., Secs. Litig.*, 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985)).

The Class Counsel include some of the most qualified and experienced lawyers in the United States in the successful prosecution of class actions.  These firms have vigorously pursued the rights of the Class Members in this case for almost six years, conducted discovery, prepared countless filings and memoranda in this action, and have engaged in extensive, arduous settlement negotiations with the GSK Defendants.  Further, these firms and their co-counsel continue to stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution, if the Settlement is not approved. The resumes of the Class Counsel whose approval is sought, Hagens Berman Sobol Shapiro LLP, Spector, Roseman & Kodroff, P.C., Wexler Toriseva Wallace LLP, Edelson & Associates, LLC, have been previously submitted to the Court but will be provided again upon request.

Neither any of the Plaintiffs nor their counsel have any interests that are antagonistic to those of the Class Members who now stand to benefit from the Settlement.  The central issues in this case – the existence, unlawfulness and effect of the GSK Defendants' scheme to improperly manipulate the AWP of the drugs at issue – are common to the claims of Plaintiffs and the other members of the Class.  Each representative plaintiff, like each absent Class Member, has a strong interest in proving the GSK Defendants' scheme, establishing its unlawfulness, and demonstrating how it was affected by the illegal conduct.  They have submitted to discovery, given or prepared for depositions, and worked with their counsel for the protection of the Class.  There is no conflict between the Plaintiffs and the Class Members, so Plaintiffs satisfy the requirements of Rule 23(a)(4).

To the extent it can be argued that in the settlement context the consumers had interests different from those of the TPPs because they were competing over the same $65.5 million, the requirements of *Amchem* were fully satisfied.  Throughout the Settlement negotiations, the interests of consumers and TPPs were represented by separate counsel.  There is no conflict between the Plaintiffs and the Class Members, and Plaintiffs satisfy the requirements of Rule 23(a)(4).

### 2.    The requirements of Rule 23(b)(3) have been satisfied

Plaintiffs must also show that they satisfy at least one of the conditions of Rule 23(b).  Here, the Settlement Class should be certified because, in addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies those of Rule 23(b)(3):  namely, (1) questions of law or fact common to Class Members predominate over any questions affecting only individual members, and (2) the class action is superior to other available methods for the fair and efficient adjudication of this matter.  *McLaughlin*, 224 F.R.D. at 311; *Rodrigues*, 226 F.R.D.

- 27 -

at 152; *In re Compact Disc*, 216 F.R.D. at 204; *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981).

In this case, all the specific and general issues – Defendants' liability under RICO and various state consumer protection acts; the formation and fulfillment of the scheme; liability evidence showing improper promotion of the spread and its effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action. A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

> **a.    Questions of law or fact common to Class Members predominate over any questions affecting only individual members**

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996). This inquiry, however, does not require "uniformity of claims across the entire class." *Payne*, 216 F.R.D. at 26 (citing *Amchem*, 521 U.S. at 623-25). In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 296

- 28 -

("single, central issue" as to the defendant's conduct vis-à-vis class members can satisfy predominance requirement even when other elements of the claim require individualized proof).

Individual issues in this case will not overwhelm the common questions of law or fact because the central question is whether the GSK Defendants illegally manipulated the published AWP for the Covered Drugs and improperly marketed the spread on the Covered Drugs. There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme at any trial of this matter. Further, common proof of marketing the spread will apply to all of the Class claims.

> **b.    A class action is superior to other available methods for the fair and efficient adjudication of this matter**

With respect to the superiority requirement, a court must consider these factors:  (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). However, the U.S. Supreme Court recognized that where a Court is "[c]onfronted with a request for settlement-only class certification, a [local] court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (citing *Amchem*, 521 U.S. at 620); *Denney*, 230 F.R.D. at 326.

Analyzing the three remaining factors under the superiority requirement, it is clear that a class action would provide the fairest and most efficient method of adjudication. First, those

Class Members who have a significant interest in individually controlling the prosecution of separate actions have done so.  The ISHPs, representing the largest insurers, and over 70 percent of the claims, have settled.  The remainder of the Class consists of individual consumers and small to medium size TPPs, most of whom have losses too small to pursue through individual cases.

The large size of the Class, the relatively small potential recovery of each individual Class Member, the complexity of the litigation, the cost of the litigation and similar issues all make a class action the superior method of adjudicating the claims of Class Members.  The interests of Class Members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism.  It would be a waste of judicial and the parties' resources to require thousands of separate prosecutions.  Such an approach would necessarily risk inconsistent adjudications establishing varying standards for identical conduct.

Because Plaintiffs satisfy the various requirements of Rule 23, this Court should certify the Settlement Classes.

## V.   THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED

Initially, Plaintiffs note that the Settlement consists of $70 million in cash; there is no non-monetary consideration or coupons.  The $65.5 million set aside for the Class is presently in escrow, earning interest to the benefit of the Class.  Perhaps the strongest evidence that the Settlement is fair is the fact that to date, Plaintiffs have notice of one consumer objecting to the Settlement and no TPP objections.

### A.   The Standard for Approval of Class Settlement

In determining whether to approve a settlement, the First Circuit, as required by Rule 23(e)(1)(C), has held that "[a] district court can approve a class action settlement only if it is fair,

- 30 -

adequate and reasonable." *City P'ship Co.*, 100 F.3d at 1043.  The Court must undertake a detailed assessment of the terms of the Settlement, the interests of the Class Members as well as any third parties that might be affected by the settlement, and the circumstances of the litigation and the proposed settlement.  *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durrett*, 896 F.2d at 604; *Hawkins*, 2004 WL 166722, at *3.

The First Circuit has given great deference to trial courts and has "refrain[ed] from intervening unless there is found to be an abuse of discretion." *City P'ship Co.*, 100 F.3d at 1043-44; *Durrett*, 896 F.2d at 603.  A court reviewing a settlement "is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement." *City P'ship Co.*, 100 F.3d at 1043-44.[15]

### 1.        There is a presumption in favor of settlement

In this Circuit, a presumption in favor of settlement is to be found "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length." *City P'ship Co.*, 100 F.3d at 1043; *In re Compact Disc*, 216 F.R.D. at 207; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *see also* NEWBERG § 11.41 at 453. This Settlement was the result of intense litigation and arms-length negotiations between counsel.  The litigation was hard fought and the negotiations were lengthy and detailed,

---

[15] Also, as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement. *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976).  Accordingly, the Court is not called upon to determine whether the Settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial. *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."); *In re Compact Disc*, 216 F.R.D. at 211 (Judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case...and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side. *Isley v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

- 31 -

conducted in several sessions over the course of years.  There are simply no allegations of

inappropriate conduct by counsel during the settlement negotiation process.  There was no

collusion, and all the negotiations were conducted at arms length.  Therefore the Plaintiffs are

entitled to a presumption that the Settlement is fair.

As to the adequacy of discovery, this factor is important to determine whether counsel

negotiating the settlement are sufficiently aware of the strengths and weaknesses of their case.  *In

re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir. 1995) (trial

court should consider whether counsel participating in the settlement negotiations "had access to

***sufficient information*** to appreciate the merits of the class's case") (emphasis added).  The

Plaintiffs were fully aware of the value of their claims before the case was settled.

In this case, the parties exchanged voluminous written discovery, conducted over 50

depositions, and obtained extensive discovery from third-party sources such as other pending

litigation, trade associations, physicians and the federal government.  Defendants produced

approximately 2.8 million documents and Plaintiffs' counsel spent almost two years reviewing

and analyzing those documents, organizing documents for use, creating an electronic database

and making determinations on utilization of important documents, additional discovery and

general assistance in the litigation of this matter.  Plaintiffs had also argued multiple rounds of

motions to dismiss and numerous discovery motions.  Plaintiffs' counsel had conducted

sufficient discovery to be intimately familiar with the strengths and weaknesses of their case.

**B.      Factors to Consider When Determining the Fairness, Adequacy and Reasonableness
         of a Settlement**

Although there is no single test in the First Circuit for determining whether a proposed

class action settlement is fair, adequate and reasonable, other Circuits generally have considered

"the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial."  *In re Compact Disc*, 216 F.R.D. at 206; *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000) ("The fairness determination is not based on a single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation.").  Specifically, courts consider some or all of the following factors:

(1)     comparison of the proposed settlement with the likely result of litigation;

(2)     stage of the litigation and the amount of discovery completed;

(3)     quality of counsel;

(4)     conduct of the negotiations; and

(5)     prospects of the case, including risk, complexity, expense and duration.

*In re Compact Disc*, 216 F.R.D. at 206.[16] Applying these six factors to the proposed Settlement in this case clearly indicates that the Settlement is more than adequate and should be approved.

**1.      Comparison of proposed settlement with the likely result of litigation**

This factor involves the question of "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense."  *In Re Compact Disc*, 216 F.R.D. at 207; *Giusti-Bravo*, 853 F. Supp. at 36 (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost unsurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided"); MANUAL FOR COMPLEX LITIGATION § 13 (4th ed. 2004) ("The high

---

[16] *See Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996); *In re GMC Pick-Up Truck*, 55 F.3d at 785; *Giusti-Bravo*, 853 F. Supp. at 36; *M. Berenson Co.*, 671 F. Supp. at 822-23; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

- 33 -

stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in litigation.").

In making this assessment, a court is cautioned not to "decide the merits of the case or resolve unsettled legal questions."  *Giusti-Bravo*, 853 F. Supp. at 36; *Greenspun v. Bogan*, 492 F.2d at 381 (district court should not "engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial"); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992) (courts should limit inquiry to "whether the possible reward of continued litigation with its risks and costs are outweighed by the benefits of the settlement").  Also, the court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim.  Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation."  *Duhaime*, 177 F.R.D. at 68.

As part of their settlement negotiations, and the ultimate decision to accept $70 million, Plaintiffs analyzed various risks of continuing litigation.  These included risks related to establishing liability at trial and risks relating to the amount of damages that could be recovered at trial.  A consideration of all the various risk factors and potential recovery reveals that the $70 million Settlement is more than adequate.

### a.   Risks of establishing liability

The Plaintiffs recognize that they faced substantial risks in establishing their case at trial. While the documentary evidence against the GSK Defendants strongly supported a finding of liability, the issues were nevertheless very complex.[17]  Plaintiffs knew they would face some

---

[17] As the court in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) recognized, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced."  *Id*. at 475 (citation omitted).

- 34 -

difficulty in presenting their case to a jury in a streamlined, easily comprehensible fashion.

While Plaintiffs knew they would present strong evidence on the issues, there was always the

risk that the jury would accept, or at least be confused by, the GSK Defendants' numerous

defenses.

> **b.      Risks of proving damages**

A substantial risk of establishing damages at trial was a battle of experts between

Plaintiffs' experts, who would opine that but for GSK's improper marketing conduct, Plaintiffs

would have paid considerably less for the Covered Drugs, and defense experts, who would opine

that Class Members either knew that AWP was not an actual price or that the spreads for the

Covered Drugs were not outside industry expectations.  "In the 'battle of experts,' it is

impossible to predict with any certainty which arguments would find favor with the jury."

*Ressler v. Jacobson*, 822 F. Supp. at 1554; *see also In re Cedant Corp. Litig.*, 264 F.3d 201, 239

(3d Cir. 2001) (recognizing risks associated with jury being confronted with competing damage

expert opinions) and *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004)

("The outcome of such battles is never predictable, and the Court recognizes the very real

possibility that a jury could be swayed by defense experts, who would seek to minimize the

Class Members' losses or to show that the losses were attributable to factors other than the

alleged [misconduct]").

> **c.      Other risks of continuing the litigation**

Another important factor considered by the Class Plaintiffs in evaluating the

reasonableness of the Settlement was the value to Class Members of receiving payment as soon

as possible, as opposed to litigating through trial and the almost certain appeals.  Many of the

Consumer Class Members are elderly and ill, and the prospect of an increased payment years in

- 35 -

the future is of little value to them.  Of course any victory at trial would be subject to many months of appeals to the First Circuit and the Supreme Court.  *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class.").

Because of the uncertainty surrounding the outcome of this litigation, approval of this Settlement will afford the entire Class "the quickest, surest remedy to their claims."  The Settlement will provide Class Members with "benefits fully commensurate with any results reasonably attainable after protracted litigation."  *Giusti-Bravo*, 853 F. Supp. at 38. Weighing all of the risks the Plaintiffs faced, a Settlement of $70 million is reasonable.

Many courts have cautioned that the overall percentage of recovery by itself is not telling; what must be considered are the risks of proceeding towards trial.  The court in *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989), recognized that "[t]he dollar amount of the settlement by itself is not decisive in the fairness determination . . . Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *Id*. at 1103.  Other Courts have approved settlements which provide only a small percentage of the recovery sought.  *See In re Michael Milken & Assocs. Sec. Litig*., 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Detroit v. Grinnell Corp*., 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

Many other courts have approved settlements providing a recovery of 10-12% of potential damages where substantial risks exist. *See In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. Lexis 10532, at *15-17 (E.D. Pa. June 2, 2004).   Similarly, in *Warfarin*, the Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to 14%." *Warfarin*, 391 F.3d at 539 (citing *Cendant*, 264 F.3d at 241); *see also In re Prudential Sec., Inc. L.P. Litig.*, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages) and *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages).   In comparison, the $65.5 million set aside for the Class represents more than 17% of the calculated damages of $383 million.

## 2.      Stage of the litigation and the amount of discovery completed

The Court is also required to evaluate whether the amount of evidence obtained through discovery is sufficient to determine the settlement's adequacy. *Giusti-Bravo*, 853 F. Supp. at 38 (finding that although it is probable substantial discovery still remains, the amount of discovery already conducted was sufficient to permit "an accurate assessment of each party's chances at trial"); *Rolland*, 191 F.R.D. at 8 (finding discovery to be sufficient given that the parties had a voluminous amount of information at the time as well as the advice and reports of their experts).[18]   In addition, courts have taken into consideration the stage of litigation at which settlement is reached "because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Duhaime*, 177 F.R.D. at 67 (citing *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 325 (7th Cir. 1980)).

---

[18] Settlements have been supported with far less discovery. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (where no formal discovery was taken, access to other information such as indictments, documents produced to Grand Jury and leadings was deemed adequate).

As noted above, the Settlement was reached after discovery was complete.  The Plaintiffs had received millions of pages of documents from the GSK Defendants, and had reviewed the documents.  At the time settlement was reached in the summer of 2006, Plaintiffs had created a roadmap of how their case would be proven and presented at trial.  Plaintiffs had evaluated many of the perceived weaknesses of their case in the context of responding to the Defendants' aggressive and detailed motions to dismiss.

### 3.      Quality of counsel

As stated above, "[w]hen the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight."  *Rolland*, 191 F.R.D. at 10; *Bussie v. Allmerica Fin, Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999).  With respect to the quality of counsel, the Court has looked at a variety of factors, including "the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation."  *Giusti-Bravo*, 853 F. Supp. at 40.  This Court has already found that Plaintiffs' lead counsel are qualified to represent the Class.  Plaintiffs further note that their counsel had been involved in this case from the beginning, having created and filed the original Class Action Complaint in this Court, even prior to the creation of an MDL.  As detailed in the resumes of Plaintiffs' counsel, Plaintiffs' firms have been appointed lead counsel in numerous class actions.

### 4.      Conduct of the negotiations

Settlement negotiations were conducted vigorously over the course of months between experienced counsel.

- 38 -

**5.      Prospects of the case, including risk, complexity, expense and duration**

The last factor outlined in *Compact Disc* captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation."  *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("Settlements reduce excessive litigation expenses and transaction costs."); MANUAL FOR COMPLEX LITIGATION § 13.22 (4th ed. 2004) ("One of the major incentives to settle is to avoid the cost and burden of further discovery.").  Without question, in a "complex class action involving prolonged litigation," such as this, "settlements are strongly favored by the courts because they represent the easiest, and quickest, way of disposing of the case." *Giusti-Bravo*, 853 F. Supp. at 35-36.[19]

It has been a substantial undertaking for the Plaintiffs and their counsel to prosecute this case.  If this case proceeded further, significant additional resources would have been expended by Plaintiffs' counsel to prepare for trial, including:  the conclusion of discovery; the briefing of voluminous motions; the preparation of expert reports and depositions of defense experts; preparation of fact witnesses; and mock trial and/or jury consultation.

Of course, the trial of this matter would be extremely complex, lasting several weeks and requiring numerous experts for both Plaintiffs and the GSK Defendants.  This would have caused the Plaintiffs to spend substantial additional time and expense to present their case to the jury. The inevitable post-trial appeals would have consumed even more time and resources, and a final result would not be reached for several more years.

---

[19] In the *Warfarin Sodium Antitrust Litig.*, the Court stated "[w]e agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial.  Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude . . .  the time and expense leading up to trial would have been significant.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004).

- 39 -

The factors discussed above support the approval of this Settlement.  Plaintiffs' counsel are experienced and had intimate knowledge of the facts of this case.  They thoroughly evaluated their risks and spent several months negotiating with the Defendants.  The claims made to date indicate that claimants, both consumers and TPPs, will receive an excellent recovery.  For all of these reasons, this Court should finally approve the Settlement.

## VI.    THE PLAN OF ALLOCATION SHOULD BE APPROVED

The allocation of the Settlement between the ISHPs, all other TPPs and consumers was the product of negotiation between experienced counsel designated to represent the interests of these various groups.  The allocation reflects each group's overall portion of the total damages from the GSK Defendants' manipulation as well as the relative strengths and weaknesses of each group's claims.

Significantly, to date no TPP has objected to the allocation.  Moreover, the volume of consumer claims filed to date reveals that all consumer claimants will likely receive their full damages, with potentially millions of dollars still remaining in the Consumer Settlement Pool. This is the best evidence that the consumers were not treated unfairly during the allocation process.

## VII.    CONCLUSION

The Settlement here is the result of hard fought litigation and negotiation.  The Settlement provides an excellent result.  Plaintiffs respectfully request that the Court:  (1) certify the Settlement Class; (2) grant final approval to the Settlement Agreement; and (3) approve the plan of allocation.

DATED:  June 22, 2007

By    __/s/ **Steve W. Berman**_____

    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth A. Fegan
Hagens Berman Sobol Shapiro LLP
820 North Blvd., Suite B
Oak Park, IL  20302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE

Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on June 22, 2007, I caused copies of **MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED NATIONWIDE CLASS SETTLEMENT WITH GLAXOSMITHKLINE** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

  /s/ Steve W. Berman
Steve W. Berman