# Exhibit 2, Part 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 1 - 68

PRETRIAL CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
April 11, 2007, 3:05 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 2

1     A P P E A R A N C E S:

2     For the Plaintiffs:

3          STEVE W. BERMAN, ESQ. Hagens Berman Sobol Shapiro LLP,
      1301 5th Avenue, Suite 2900, Seattle, Washington, 98101-1090.
4
           THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
5     Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge,
      Massachusetts, 02142.
6
           DONALD E. HAVILAND, ESQ., The Haviland Law Firm, LLC,
7     740 S. Third Street, Third Floor, Philadelphia, Pennsylvania,
      19102.
8
      For the Defendants:
9
           MICHAEL B. KEATING, ESQ. and MICHAEL P. BOUDETT, ESQ.,
10    Foley Hoag, 155 Seaport Boulevard, Seaport World Trade Center
      West, Boston, Massachusetts, 02210, for AstraZeneca.
11
           D. SCOTT WISE, ESQ., KIMBERLEY D. HARRIS, ESQ., and
12    AIMEE HECTOR, ESQ., Davis, Polk & Wardwell, 450 Lexington
      Avenue, New York, New York, 10017, for AstraZeneca.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price Litigation, Civil Action No. 01-12257, will

4    now be heard before this Court.  Will counsel please identify

5    themselves for the record.

6          MR. SOBOL:  Good afternoon, your Honor.  Thomas

7    Sobol for the class plaintiffs.

8          MR. BERMAN:  Good afternoon, your Honor.  Steve

9    Berman.

10          THE COURT:  Yes.

11          MR. MATT:  Good afternoon, your Honor.  Sean Matt.

12          MR. NOTARGIACOMO:  Ed Notargiacomo.

13          MR. HAVILAND:  Don Haviland, Judge.

14          MR. KEATING:  Michael Keating, your Honor, for the

15    defendant AstraZeneca.

16          MS. HECTOR:  Amy Hector.

17          MR. BOUDETT:  Michael Boudett.

18          MR. WISE:  Scott Wise from Davis Polk for

19    AstraZeneca.

20          MS. HARRIS:  Kim Harris for AstraZeneca.

21          THE COURT:  Well, let me start off by saying

22    "welcome," but I'm not sure I have good news for you, in

23    that the criminal case looks as if it's going to be going to

24    trial.  The defense attorneys gave me a 98 percent chance of

25    going to trial.  I've been told that before and had them all

1    plead the week before.

2          So the first question out of the box is -- I've

3    reserved for you the month of June, and I know somebody has a

4    graduation, et cetera.  I mean, we'll accommodate that.  But

5    the real question I have is, if in fact the criminal case

6    pleads or ends substantially shorter than predicted, which is

7    about three weeks, do you want to be -- I'm just trying to

8    figure out -- on a rolling list and come in earlier?  I mean,

9    what does that do to you?  Or do you prefer the 4th?

10          MR. KEATING:  I think, if I could speak for the

11    defendant, your Honor, I think our preference would be a date

12    certain, and probably the 4th of June, if that's still a

13    viable --

14          THE COURT:  That's a Monday still, right?

15          MR. KEATING:  That's a Monday.  I mean, we're not

16    married to the 4th, but it's, I think, important for us to

17    know for witness presentation, for out-of-state lawyers to

18    get rooms and whatever.  So our preference would be a date

19    certain, and if the 4th is the earliest of the dates certain,

20    that's what our preference would be.

21          THE COURT:  Now, suppose next week the criminal

22    case folds altogether.  I mean, they're now focusing big

23    time, all right, and that always brings some immediacy to

24    things.  So if they plead out -- I should know it within the

25    next week or two -- then I won't want to lose the whole month

1   of May.  So my theory is, once the criminal case starts, I'm

2   going to make it June 4th.  If I find out within the next

3   week or so that it pleads out and I've got that whole month

4   of May, I'm not going to pop it on you, "Be here tomorrow,"

5   but I might give you a week or two notice so I can just start

6   it a little earlier.  So, I mean, this is going to happen, I

7   apologize, but that case has been pending a very long time,

8   and I have the Speedy Trial Act, and it has to go.

9            MR. BERMAN:  Don't we have the "speedy civil act"?

10           THE COURT:  You've had more process than anybody.

11           (Laughter.)

12           THE COURT:  You've had a bigger chunk of this

13   session than many cases, let's just put it that way.

14           MR. SOBOL:  On the scheduling issue, may I just

15   bring to your attention one point?

16           THE COURT:  Yes.

17           MR. SOBOL:  In the event that -- I know that we

18   would impanel on a Monday and begin the trial on a Monday.

19   There's one timing problem that we have with respect to

20   Professor Rosenthal, who you will recall the plaintiffs would

21   like to call first to give a tutorial presentation and

22   outline at the beginning of the case.  She has prior

23   professional engagements in Orlando, Florida, in very early

24   June.  She can fly back on June 5, the evening of June 5.

25   The earliest she can be here in June is June 6 in the

Page 6

1   morning.

2          THE COURT:  Which is the morning you have to be

3   gone?  Is there a morning you cannot be here?

4          MR. KEATING:  I think it's the Thursday, graduation

5   day, your Honor, which is, I think, the 7th.

6          THE COURT:  The 7th.

7          MR. KEATING:  Yes.

8          MR. SOBOL:  So we were thinking about one of two

9   possibilities:  Either the trial starts June 4 and we skip

10  the Tuesday, because that's the 5th when she can't be here,

11  or, alternatively, we would begin Monday, June 11, in which

12  case she would be here the next day, or even June 11, if the

13  witnesses started on that day.

14         THE COURT:  Why don't you start off with a few of

15  those individual people that you want to bring in, if you

16  have to, and then do the tutorial when she can get here.

17         MR. BERMAN:  We could do that.  I think it would be

18  easier for the jury to understand it if they knew what AWP

19  was and they knew the context that these --

20         THE COURT:  I agree, I agree.  On the other hand,

21  maybe we would go a full day on the 4th.  How many hours

22  would you want?

23         MR. SOBOL:  She'll be in Florida on the 4th, your

24  Honor.  She comes back the evening of the 5th, so her first

25  time to be here is June 6, that Wednesday.  That's the point

1    that I was trying to make, that's all.

2            THE COURT:  Let me just tell you -- let me hold on

3    that -- the only thing harder than impaneling Christmas week

4    is impaneling for people over the July 4 week.  I will lose

5    everybody.  And it's not just that week.  It's that first two

6    weeks of July, it's brutally difficult to get a jury.  So I'm

7    not going to answer that question.  I may make you do a

8    filler, and it just won't be the ideal way.

9            How long do you think the plaintiffs' case will

10    be?

11            MR. BERMAN:  Well, you've given us time limits of

12    five days each, so we should not wind up here July 4.

13            THE COURT:  Five days?  I actually --

14            MR. BERMAN:  I believe so.  It's five days apiece.

15            THE COURT:  Five full days?  I didn't even remember

16    it was that tight.  I was assuming it was a three-week

17    trial.  No?

18            MR. BERMAN:  No.  Excluding jury selection, the

19    plaintiffs will have five --

20            THE COURT:  All right, so you're reminding me.  So

21    maybe that's excluding all those things.  So you're just

22    saying five full days of --

23            MR. BERMAN:  I didn't know if you meant to include

24    openings and closings, but you say, "Excluding jury

25    selection, the plaintiffs will have five days, the defendant

1   will have five days."

2          THE COURT:  That's right, so it's a three-week

3   trial.  That's fair enough.  That's roughly where I thought

4   it would be.  So we would be done then if we started on the

5   4th.

6          MR. BERMAN:  Right.

7          THE COURT:  All right, well, we'll think about

8   that.

9          Let's start going through, and I'm looking directly

10  at you.  When I certified the class, I did so on the express

11  understanding that you'd limited yourself to deceptive

12  conduct, intent to deceive, and unfair conduct only in the

13  sense that if you're deceptive, it's unfair.  So my intent on

14  entering this was simply to give a jury, really much shorter

15  than all of you have thought about, is a fraud instruction,

16  maybe right out of the Restatement, intent to deceive,

17  reliance, causation, materiality.

18         So why did you give me such a long jury form?  I'm

19  not going to charge on unfairness because that is the kind of

20  issue where it varies from state to state.  I don't know of a

21  state -- and maybe I'll turn to the defendants -- a state in

22  the United States where fraud is not an unfair or deceptive

23  act, right?  With that huge binder that you gave me, did you

24  find one state in the United States of America where fraud is

25  not an unfair and deceptive act?  Probably not.

1  MR. BOUDETT: Well, yes, your Honor, in the states

2  where -- I think any number of us could answer this

3  question. We're looking at each other. The answer would be,

4  yes, there are states in which the law enumerates certain

5  listed instances. And if you're buying a boat and it's fraud

6  and it falls under the boat subsection, then that's a

7  violation. If you're not buying a boat and it's a general

8  fraud not covered by the list, then the fraud would not be a

9  violation of the Consumer Protection Act.

10  THE COURT: Okay, you view it as a matter of law,

11  right?

12  MR. BOUDETT: Yes, and our brief does that, that's

13  right, your Honor.

14  THE COURT: So I plan on charging them on fraud,

15  deception, intent to deceive. And I really was planning on a

16  very brief -- and to the extent that you're right and it's

17  only against the law to be fraudulent for a boat and not for

18  drugs, we'll carve it out. I can do that afterwards. Now,

19  so that's what I'm planning on charging.

20  Now, you seem to be backing down from what I

21  thought was such a wise stipulation, trying to get me into

22  the area of unfair. As I know in Massachusetts, unfair is

23  different from deceptive. Sometimes -- I mean, deceptive

24  conduct and fraudulent conduct is probably always unfair, but

25  the reverse isn't true, so I'm just going to charge on

1   fraud.

2           And I went back and reread my class cert.  I didn't

3   go back and read your corrected memo that I got it out of

4   when I said you were so wise to limit yourself to that, but

5   it's certainly been two years, and you didn't disabuse me of

6   that basic notion, because what I'm not giving is -- some

7   poor associate probably died over that, the differences --

8           MR. BERMAN:  Mr. Matt, your Honor, and he's still

9   alive.

10          MR. MATT:  I'm still alive, your Honor.

11          THE COURT:  You can do a Law Review article

12  together with someone here, okay, do a Law Review article,

13  okay?  My vision of this is a fraud instruction, and then

14  we'll back out of it things like you just said where it's

15  only the boat.  You'll make your argument on reliance, but

16  we're dealing with poor sick people here.  So, as a practical

17  matter, we're not going to have an issue of, should they have

18  known about the violation, unlike the third-party payor?  I

19  mean, I'd never heard of it until it unfortunately got

20  assigned to me, so we're not going to have those issues with

21  this class.

22          What we might have on the statute of limitations

23  point is, there are some states you've told me about where

24  there's a fraudulent concealment saving -- there's three

25  different ways, am I right, that you can -- some of it is,

1   the statute of limitations runs upon discovery.  Now, for the

2   old people, that probably just means when the suit was

3   brought it would start to run.  But then some of it runs from

4   when the injury is, right, regardless of when you discovered

5   it, right?  Do I have this right?  Am I right that some of it

6   runs from injury?  And there's no tolling, you told me,

7   right?

8           MS. HECTOR:  Yes.  And also, I mean, there's also

9   reliance issues and transaction requirements that we have

10  briefed in the --

11          THE COURT:  Right, but all of that's going to be

12  law, whether there's a transaction.  We know what happened

13  here, okay?  So the transaction I'll worry about afterwards.

14  If there's no finding and no intent to deceive, we all don't

15  have to spend our life doing this.  If there's an intent to

16  deceive, I have some image of a settlement coming to the

17  fore.  Maybe not.

18          So I'm just worrying now about what I have to give

19  to the jury.  We have to give them intent to deceive.  We

20  have to give them whether they've proven up a fraud claim,

21  right?  Transaction is just a question of law.  I think

22  reliance is just a question of law, whether or not when these

23  people --

24          MS. HECTOR:  Well, I think it's a mixed question of

25  fact and law.

1          THE COURT:  Okay, why?

2          MS. HECTOR:  Perhaps you could find that on these

3    facts there cannot be reliance because no individual actually

4    saw or heard this and make that determination --

5          THE COURT:  You may be right, yes, that's law.

6          MS. HECTOR:  -- which is briefed in our memorandum

7    accompanying our jury instructions.

8          THE COURT:  That's law, that's law.  Okay, so tell

9    me, the one other fact issue I thought of that has to go to a

10   jury was, as I read through your tombs (Sic) -- I probably

11   should say "tomes" is probably a better way of saying it --

12   statute of limitations runs from injury, is one choice.  One

13   choice is when they discovered it, and then the third choice

14   is whether there's fraudulent concealment, right?

15         MR. MATT:  Or equitable tolling.

16         THE COURT:  Well, equitable tolling because of

17   fraudulent concealment, right?

18         MR. MATT:  They're closely related.

19         THE COURT:  Let me just say, I think fraudulent

20   concealment would have to go to a jury because that's an

21   intent issue.  I think that's a disputed issue of fact.  So

22   the things I was thinking of sending to the jury is the fraud

23   claim, the basic fraud claim, and fraudulent concealment as a

24   possible tolling mechanism.  Is there anything else that has

25   to go to the jury that's a fact question other than the fraud

1  claim and the fraudulent concealment?  Oh, damages, damages.

2  So that's what I'm planning.  And I'm planning on something

3  like an hour charge and maybe about --

4       Now, on damages, the question is, do I have to do

5  damages state by state?  Will I need 42 states?  Are you

6  going to divvy it up state by state or use just one aggregate

7  pool, and we'd worry about it afterwards?

8       MR. BERMAN:  Well, we had done it state by state

9  where we were tracking our forum, which groups all the

10  state.  If you're going to have one overriding intent

11  instruction, then we don't need to break up the states.

12       MR. KEATING:  Well, how do you deal with damages if

13  you're going to --

14       THE COURT:  I'm thinking out loud.  I don't know.

15       MR. KEATING:  Well, let me just speak to that

16  because if you are going to exclude certain states, and what

17  I'm not clear about is if you intend to do that before or

18  after the jury decides --

19       THE COURT:  After, after.

20       MR. KEATING:  Okay, so let's assume there's a state

21  that requires a transaction, let's assume there's a state

22  that requires some form of reliance or whatever -- and this

23  is a question, not an argument -- is it your intention to

24  take the fraud finding and say, "Now I'm going to go through

25  the standards of the 42 states and lop off whatever number,"

1    don't -- to have other requirements in addition to the fraud

2    requirement?

3            THE COURT:  Right, like as a boat, so that would

4    argue for having it state by state.

5            MR. KEATING:  I don't know otherwise how you can

6    determine the damages because otherwise you're going to take

7    a percentage or something of the -- you know, you have 42

8    states, you'd knock off 21, and you'd get a 50 percent, which

9    I don't think is probably the correct way to do it.

10            THE COURT:  It probably isn't, I agree.  So, I

11    mean, I don't see a way around that.

12            MR. WISE:  Actually, we have some papers in on this

13    subject in one of the motions in limine that relates to the

14    propriety of the plaintiffs seeking an aggregate damage

15    award.

16            THE COURT:  Well, they've got to do that state by

17    state, at the very least.

18            MR. WISE:  And they can't even do it state by

19    state, it seems to us, because there really is not an

20    adequate and will not be an adequate factual basis to

21    aggregate any claims in the situation where we don't know

22    whether these individuals were billed on an AWP basis or paid

23    on an AWP basis.

24            THE COURT:  You know, I'm not going to --

25            MR. WISE:  Let me just finish the thought because

1  what you can do and what we would suggest is more like a sort

2  of damage ribbon concept.  If the jury determines that there

3  has been something that produces liability, they can

4  determine what the basis of the damages would be; you know,

5  the difference between this price and that price, if that's

6  their determination.

7          THE COURT:  And then do what?

8          MR. WISE:  And then leave it for another day how

9  many people actually --

10         THE COURT:  No other day.

11         MR. WISE:  Well, you've got to have a claims

12  process at some point.

13         THE COURT:  Right, right, so that's what I'm

14  planning on doing is do an aggregate state by state.  I think

15  I've got to do that or I can't back things out afterwards.

16  And then to the extent that -- it comes up every day in a

17  class action -- if not enough people qualify, for reasons you

18  explain, then I have some money at the end, and I could

19  either do a -- what do you call it, a cy pres? -- a pool kind

20  of thing, or I can give it back to you.

21         MR. WISE:  I commend the papers to you on the

22  subject because this case is not like an antitrust case where

23  purchases can be proved on a mathematical basis, and you can

24  know from listening to an expert who's looked at purchase

25  data how many sales took place at what price.  We don't even

Page 16

1   know, and we will not know until the claims procedure, how

2   many people actually were billed for a prescription in this

3   case.

4           THE COURT:  You know, I understand what you're

5   saying, but I don't --

6           MR. WISE:  This is an important point because the

7   factual basis --

8           THE COURT:  But there is going to be no other --

9   you know, if you're right, you're only going to be liable to

10  the extent that people come in and claim, and I'll have to

11  decide what to do with the overage.  So if people don't claim

12  because they were never billed, maybe that goes back to

13  AstraZeneca rather than into a cy pres fund.  I can decide

14  that afterwards, but I don't see how I can't do it.  There is

15  going to be no other jury.  This is it.

16          MR. WISE:  I'm not suggesting there needs to be

17  another jury or that there would be more to do, but what I am

18  suggesting, and I think when you read the papers you'll see

19  the point better than I'm making it orally, that in this

20  particular case, there is not an adequate evidentiary showing

21  that would justify a damage award in the aggregate because

22  there is no scientific way for the jury to have any basis to

23  determine how many people were injured, how much their injury

24  was on an aggregate basis.

25          THE COURT:  Okay, thank you for that, but at least

1    I've got to do state by state, right?

2              MR. WISE:  You certainly have to do that, but we

3    would say --

4              THE COURT:  Well, why do you care?

5              MR. WISE:  Because the law does not permit a

6    judgment to be awarded against my client in the aggregate,

7    giving you what you would say is your cy pres power to do

8    what you will with money that's not claimed, because that

9    money is not being awarded in a way that is legal.  I mean,

10   there is not enough evidence --

11             THE COURT:  Well, your expert in the last trial

12   said that a certain percentage of doctors will never collect,

13   but we have no way of knowing what that is.

14             MR. WISE:  We don't, that's exactly my point.

15             THE COURT:  It could be one percent, or it could

16   be --

17             MR. WISE:  That's exactly my point.

18             THE COURT:  But his number is sky-high in ways that

19   you could never support.

20             MR. WISE:  That's exactly my point.  This is not an

21   antitrust case where you know there were 100 machines sold at

22   an overcharged price.  This is a case where you can tell how

23   many prescriptions were prescribed.  You have no way of

24   knowing how many were actually billed to the consumer or how

25   many were paid by the consumer.  And therefore there is not

1    an adequate legal basis to make an award on that aggregate

2    number.

3           THE COURT:  Well, what do you say to that?  I mean,

4    the issue is, usually if people don't come to claim because

5    they're dead or something like that, you give it to charity,

6    you do something with it.  But what about his point?

7    Wouldn't that money go back to AstraZeneca?

8           MR. SOBOL:  Well, the answer to that is "no."

9    First, to back up, the class is defined not just as those

10   persons who paid but those persons who incurred a debt still

11   legally enforceable at the time that the judgment gets

12   entered.  So it's not simply a matter of who paid but also

13   who incurred the debt.  We learned from the Class 2 and

14   Class 3 trial that there's more than sufficient adequate

15   factual basis upon which experts can credibly testify as to

16   what the aggregate damages are incurred to the class as a

17   whole.  The defendants' arguments in response to that during

18   Class 2 and Class 3 were simply around the edges:  Well,

19   there may have been some situations where there was no

20   collection of a debt that the doctors were statutorily

21   obligated to charge.  But they never came forward with

22   evidence in that regard.

23          So our position, first, before we get to the

24   cy pres issue in a moment, is that under the law and the

25   facts, that there's more than an adequate basis upon which

1   the experts can testify regarding what the aggregate damages

2   are to the class, both in terms of what they paid and what

3   they legally incurred as a debt.

4          THE COURT:  Let me jump back to you, Mr. Wise.

5   What about the argument that the class includes people who

6   incurred a debt?

7          MR. WISE:  You know, we have no idea what that

8   means on a state-by-state basis and what's enforceable and

9   what's distinguished by law instead of by  time --

10         THE COURT:  Okay --

11         MR. WISE:  Let me just say, we have briefed this

12   issue.  This is a significant issue.

13         THE COURT:  I've at least skimmed all the papers.

14         MR. WISE:  Okay.

15         THE COURT:  A lot of it's come in.  I'm on trial in

16   another case.  I'm always on trial.  But, in any event, I at

17   least know what the issues are, and luckily they're not

18   strange to me because I'm working them through in the bench

19   trial.  I mean, most of these are very familiar issues to me.

20         MR. WISE:  Our only point is that you could do what

21   would be necessary in a kind of damage ribbon approach

22   showing a difference over time; you know, in 1998 the AWP was

23   this, the ASP was this, therefore for any --

24         THE COURT:  I'm not going to ask this jury to do

25   it.  This is going to be a straightforward fraud case.  I've

3153f00e-5aaa-4f42-be8f-87649f4486bd

Page 20

1  been persuaded I'd probably have to do state by state to back

2  it out.  And we're going to have a two- to three-week jury

3  trial.

4           Now, let's just start going through some of the big

5  issues, the huge issues.

6           MR. SOBOL:  On the cy pres issue briefly?

7           THE COURT:  No, we don't need to.  We have a lot on

8  our plate today, a huge amount.  We have at least, roughly,

9  this is a case involving deceptive conduct, alleged deceptive

10 conduct.  You have to prove that AstraZeneca intended to

11 deceive when it published the AWP price.  I think the object

12 of that sentence is, intended to deceive whom?  The

13 government.  So if you all think this is wrong, you're going

14 to need -- because that's the reimbursement mechanism, not at

15 third-party payors, the government, so that it's the state of

16 mind of the corporate entity or their agents or employees

17 when it published the AWP.

18          So if that is the case, I want to walk through

19 Weintraub for a minute.  Weintraub is going to say what?  I

20 don't have a deposition.  What will he say?  Who's the

21 Weintraub man?  You are?

22          MR. BOUDETT:  I get that assignment.

23          THE COURT:  Is he going to say -- it was very vague

24 in the papers as to exactly what he would say.

25          MR. BOUDETT:  Well, we made a proffer in that

3153f00e-5aaa-4f42-be8f-87649f4486bd

1    regard, your Honor, I believe, during the bench trial.

2              THE COURT:  I just don't remember.

3              MR. BOUDETT:  Okay.  Mr. Weintraub is going to say

4    essentially that he was one of the guys who was dealing with

5    drug companies.  He was the regional head for a period of

6    time.

7              THE COURT:  Did he deal with AstraZeneca?

8              MR. BOUDETT:  His testimony would not be specific

9    to Zoladex, your Honor.  It would be about knowledge of

10   spreads and the AWP system.

11             THE COURT:  But let's be very clear here.  I do not

12   believe in general, with the exception of maybe TAP and

13   Lupron, in general, AstraZeneca will not be smeared by what

14   happened in other companies.  On the other hand, it's not

15   clear to me that knowledge of spreads in other companies is

16   going to be relevant either.  One thing I learned from the

17   bench trial is how specific this is company by company.  Each

18   company has a different tale.  And so will Weintraub be able

19   to say anything about dealings with AstraZeneca?

20             MR. BOUDETT:  No, your Honor.

21             THE COURT:  Well, then why is he relevant?

22             MR. BOUDETT:  Your Honor, I think that it goes to

23   rebut the plaintiffs' expert testimony that this was all a

24   secret, which is a cornerstone of the liability opinion

25   that's been put forward.

1          THE COURT:  Tell me what "it" is.

2          MR. BOUDETT:  Spreads, that the spreads were

3     secret.

4          THE COURT:  Let me tell you, having just been

5     through this, everyone knew about a 20 to 25 percent spread,

6     maybe 30 percent.  Everyone knew, everyone.  This is why I

7     found your papers so difficult to follow.  If all he's going

8     to say is everyone knew about a spread, for want of a better

9     word, within the speed limit, if that's all he's going to

10    say, that's not a problem because it would almost be

11    stipulated to.

12         MR. BOUDETT:  No, your Honor.

13         THE COURT:  All right, what will he say?

14         MR. BOUDETT:  He will testify as to knowledge of

15    discounting off of WAC creating spreads larger than the

16    Hartman speed limit.

17         THE COURT:  What were the Zoladex spreads?  I don't

18    remember.

19         MR. BOUDETT:  Well, it depends what year you ask

20    about.  At their height, they were, I think, 142 percent,

21    according to the Hartman calculation, 140 to 150 percent.

22         THE COURT:  Is he going to say the government knew

23    that?

24         MR. BOUDETT:  He is going to say the government

25    knew of spreads well in excess of the Hartman speed limit.

Page 23

1    His testimony would not be specific to Zoladex.  It was not

2    one of the top five blockbuster, budget-buster drugs that the

3    regulators were paying attention to, which --

4              THE COURT:  So as I understand it, the OIG reports,

5    were any of them referencing Zoladex?

6              MR. BOUDETT:  Yes, your Honor.

7              THE COURT:  Which ones?

8              MR. BOUDETT:  The '92 certainly listed Zoladex

9    among the 30 drugs that was listed and gave a spread in

10   excess of 30 percent, if I recall correctly.

11             THE COURT:  What was it, Zoladex?  I remember

12   Hartman saying that all the 1992 ones were roughly in the

13   speed limit zone.

14             MR. BOUDETT:  I don't believe that's the case.

15             MR. BERMAN:  It was within the speed limit.

16             THE COURT:  What?

17             MR. BERMAN:  It was within the speed limit.

18             MR. BOUDETT:  I would have to follow up on that

19   one, your Honor.

20             MR. BERMAN:  We have an exhibit that shows that

21   from the trial.

22             THE COURT:  Let me put it this way:  Why don't you

23   make me a proffer as to what he would say in writing.  They

24   are very hot and bothered by the notion that the government

25   approved the mega spreads.  My sense is that to the extent

Page 24

1    that he is going to testify about what he knew, it would be

2    relevant but only as it affected AstraZeneca.  That's why I

3    needed a proffer.  I don't know why, if he knew about some

4    other company's spread, why that would be so relevant.  I'm

5    not saying I'm not.  I was going to say here today, yes, if

6    he knew about the spreads, if he was told specifically about

7    the Zoladex spreads or about the battle going on, that might

8    be relevant to lack of intent to deceive.  I don't know that

9    I'll let you say that the government "approved" it unless you

10   say specifically he has letters or he said, "That's okay, go

11   ahead, guys, do the 600 percent spread."  I don't think you

12   have that, right?

13        MR. BOUDETT:  Not with regard to AstraZeneca

14   specifically, but can I make two quick points in response to

15   what you just said?  We will make the proffer, and I know

16   you're going to think about this issue more, but my two

17   points are these:  First of all, the approval issue that the

18   plaintiffs are trying to set up is a straw man, I would

19   suggest.  Our case is not that the government approved of

20   mega spreads, endorsed them, liked them.  Some people in the

21   government may have done so, others didn't, but that's not

22   our burden.  Our case is that the government knew of the

23   spreads and didn't change the system until 2003.  That's

24   different than approval, so --

25        THE COURT:  Let me just say, they for sure knew,

Page 25

1    and I would allow it to come in, about spreads in the

2    30 percent range.

3            MR. BOUDETT:  We will prove well beyond the

4    30 percent, they knew and didn't change the system.

5            THE COURT:  But you can only put it in if it

6    affects Zoladex, or possibly, possibly Lupron, I mean,

7    because that's part of the same tale; but not if it's about

8    albuterol sulfate because that everyone knew, right?  Because

9    that was a multi-source and it was a different animal.  I

10   mean, I've been struggling with them one by one.  Each one

11   has a different story.  Each drug within the company has a

12   different story.  So you make the proffer, but I'm not saying

13   "no" in general.  And he's not going to say the government

14   approved it.  I think that would be wrong.  He's not here as

15   a spokesman for the government, and he's not been designated

16   as such.

17           MR. BOUDETT:  Correct.

18           THE COURT:  What he knew might be relevant but only

19   if it's about this company and these drugs.

20           MR. BOUDETT:  This is my second point.  It's very

21   brief, your Honor.  I would urge your Honor to wait to make

22   that ruling until you hear the plaintiffs' expert testimony

23   and rule on this during cross, and we can have a side bar on

24   this issue before cross --

25           THE COURT:  Okay.

1      MR. BOUDETT:  -- just because I submit to you that

2  the plaintiffs' expert's opinions talk about secrecy in

3  general regarding spreads as part of their whole economic

4  incentives model, and if the spreads were not secret -- I'm

5  talking about spreads in excess of 30 percent -- were not

6  secret, those opinions fall apart.  And we're entitled to

7  make that point, and I think you could rule on that during

8  cross.

9      THE COURT:  Well, sure, if they knew about the

10 spreads in Zoladex.  So, I mean, the OIG report strikes me as

11 relevant to rebut secrecy if in fact in 1992 -- but not every

12 OIG on every single drug.  I mean, this is going to be about

13 your company -- the battle you had with TAP and Lupron, I'm

14 not going to exclude that -- and what happened to you, what

15 you did.  For example, I think it's appropriate for them to

16 put in, if they published IMS data to show that they weren't

17 trying to keep it a secret, it rebuts your point that it was

18 all a big secret.  So it's about your company and what you

19 did.  And I don't think it's relevant what the third-party

20 payors necessarily knew and did.  It's really about what the

21 government knew.

22     MR. BOUDETT:  On that point, your Honor --

23     THE COURT:  Assuming, by the way, no beneficiaries

24 knew and --

25     MR. BOUDETT:  That's stipulated.  I mean, they

1   didn't know one way or the other.  That's understood.

2         Just on the third-party payors argument, your

3   Honor, I see where the Court is coming from.  The thing to

4   keep in mind is that many of these third-party payors were

5   also the Medicare carrier, like Blue Cross-Blue Shield of

6   Massachusetts, and were agents of Medicare and the CMS.

7         THE COURT:  That's a good point.  What about that,

8   the ones that were the carriers?

9         MR. BERMAN:  I don't think it's relevant.  Well,

10   first of all, if the secrecy part of the opinion, that the

11   company's tried to keep this stuff secret, is the linchpin to

12   get all this in, our experts won't say that.  We don't need

13   that.

14         THE COURT:  Well, okay, I'm just simply saying all

15   of this will be as it plays out, but that is what it would be

16   fair to rebut, because if you're going to say everything was

17   kept secret and that's how this fraud was allowed to -- I

18   mean, isn't that part of your case?

19         MR. BERMAN:  But don't they have to show to make

20   this relevant that that TPP would somehow be in communication

21   with the beneficiary?  Because you stated, your Honor -- and

22   this is where I'm going to for the first time today quarrel

23   with something you said, and I apologize in advance for doing

24   so -- but you said that the intent instruction that you're

25   going to issue is whether AstraZeneca intended to defraud the

1  government.  Well, the trial here is whether they intended to

2  defraud consumers who were also part of the scheme.

3       THE COURT:  All right, so that's a good push-back

4  point, so --

5       MR. BERMAN:  So if we start from that premise, that

6  the issue here is whether consumers were deceived and whether

7  they intended to deceive consumers, then the question is, how

8  does government knowledge play into this?

9       Let's take Mr. Weintraub, for example.

10 Mr. Weintraub is just one person at the government.  We know,

11 we've seen other documents in which the government says it's

12 supposed to be an average.  We know that you ruled --

13      THE COURT:  Well, wouldn't it be intent to deceive

14 both?  I'm thinking out loud through all these issues, so

15 this is why we're doing this because you were all off in 42

16 different states and boats and unfair practice.  So once I'm

17 focused on intent to deceive --

18      MR. BOUDETT:  Well, this goes to the heart of it,

19 your Honor.

20      THE COURT:  Yes, yes, but let him finish his

21 thought, and then I'll let you come back.

22      MR. BERMAN:  So we have Mr. Weintraub come up, and

23 you've already ruled what AWP is, what it was supposed to

24 mean, and I think the jury needs to be instructed on that,

25 okay?

1     THE COURT:  I will.

2     MR. BERMAN:  So once that instruction goes out,

3  then Mr. Weintraub's testimony, to me, is going to be

4  completely confusing to the jury.

5     THE COURT:  No, hold it.  But what I find Congress

6  meant is different from whether there's an intent to

7  deceive.  I keep coming back to my touchstone.  We can argue

8  about whether it's the government because they're getting

9  80 percent on that or the consumer because it's 20 percent.

10     MR. BERMAN:  But Mr. Weintraub can't -- if

11  AstraZeneca never told the government what they were doing,

12  and the government had general knowledge that maybe there was

13  some spread stuff going on but they didn't know who, how does

14  that have anything to do with AstraZeneca's intent?

15     THE COURT:  Well, it may not.

16     MR. BERMAN:  It doesn't.  Furthermore, that leads

17  to another point, and that is -- and we didn't do this in the

18  trial and we should have, but I think we must do it in this

19  trial -- while they're saying that they had no intent to

20  deceive the government and Mr. Weintraub is going to come and

21  testify about that, on the very same years -- and we're going

22  to introduce this testimony, so if you're going to let it in,

23  it's got to come in on our side -- the Department of Justice

24  is writing Mr. Fullerton, who's in the courtroom right here,

25  and Mr. Engelmann, the general counsel for AstraZeneca,

1   demanding to know whether they were engaging in the exact

2   practices that we're complaining about.  And we designated

3   these as trial exhibits, the correspondence.  And the

4   government is accusing AstraZeneca of AWP fraud and getting

5   in the exact formula that Mr. Hartman did.  So if this is

6   going to come in that they had no intent vis-a-vis people

7   like Weintraub, then we get to bring in the Department of

8   Justice saying, "We think you committed a crime."

9           THE COURT:  Maybe you get to do that anyway.

10          MR. BERMAN:  Maybe we get to do it anyway.

11          THE COURT:  I mean, it's all about the intent of

12  the corporation.  That's what this is focused on.

13          MR. BERMAN:  If they want to bring Weintraub in,

14  they want to bring this government evidence in, bring it in,

15  as long as we can bring in the government's response.

16          THE COURT:  You might be able to.

17          MR. SOBOL:  Because we have prepared the case as if

18  the case is to be tried on intent to deceive consumers.  And

19  if the case were limited to intent to deceive consumers, then

20  there wouldn't be -- I'm not saying you'd limit it that way,

21  but the witness list and everything is not intended right now

22  to be a debate as to what happened either, you know, at CMS

23  or at the DOJ or at the prosecuting states' attorneys general

24  over the past twelve years.  But if AstraZeneca is intending

25  that to be its defense -- i.e., that the government in some

1   way acquiesced, and implicitly therefore our conduct can't be

2   intent to deceive -- as Mr. Berman put out, we should be able

3   to squarely then point out what the government --

4           THE COURT:  -- I was thinking about intent to

5   deceive whom?  And the reality is that there are two

6   potential victims on this piece of it, which is the

7   government and the consumer.  Eighty percent of it goes to

8   the government, so you can't carve out what happened with the

9   government in understanding what the intent of the

10  corporation was, I mean, either what they thought the

11  government knew and approved or what -- I mean, I'm assuming

12  we'll hear from people from the company who will say they

13  thought it was okay.

14          MR. BOUDETT:  Absolutely, your Honor.

15          THE COURT:  And you want to be able to put in your

16  case, right?

17          MR. BOUDETT:  Yes, your Honor.

18          THE COURT:  I mean, it's your corporate state of

19  mind that's at issue here.

20          MR. BOUDETT:  Exactly, and the evidence will all be

21  tied to that state of mind, not to the outcome of dealings

22  with the government, but what was the company's state of mind

23  as to what the government knew and didn't know.

24          THE COURT:  So if you got notice from the

25  Department of Justice that the Department of Justice thought

Page 32

1    it was illegal, that must have been something.  I'm not

2    saying you get to, by the way, interrogate the corporation

3    counsel.  That's another issue altogether.  But that seems

4    fair game for them to put in and fair game as to why you

5    thought that they knew.

6           MR. BOUDETT:  Your Honor, and Mr. Keating is ready

7    to speak to this as well, but let me just touch on it.  The

8    fact that there were investigations and requests for

9    information may come in, depending on certain other

10   evidence.  I think you may need to rule on that during trial

11   and see how that comes in.  I don't think that's a ruling you

12   need to make pretrial.  Mr. Berman has used the words

13   "accused, found."  All that happened on the issue of spreads

14   is, there was an investigation.  There were subpoenas served

15   in 1997, that's correct.  And eventually there was a civil

16   settlement in which AstraZeneca denied liability, and that is

17   inadmissible.  That's what happened on spreads.

18          THE COURT:  Is that the one that was incorporated

19   into the plea agreement?

20          MR. KEATING:  Yes.

21          MR. BOUDETT:  They cross-reference each other, yes,

22   your Honor, but --

23          THE COURT:  That's a tough legal issue.

24          MR. BOUDETT:  No, the plea agreement was on the

25   sampling, and you know our position on that.  That's

3153f00e-5aaa-4f42-be8f-87649f4486bd

1   completely separate.

2          THE COURT:  Well, let's get to that.  Why

3   wouldn't -- well, it's clearly admissible as an admission of

4   a party opponent, so now the question is whether or not it's

5   relevant.

6          MR. KEATING:  Well, I don't think it would be

7   admissible if it's -- you're talking about the plea itself

8   now?

9          THE COURT:  The plea itself.

10         MR. KEATING:  Well, I mean, it would seem to me

11  that, A, it involves incidents that are not the subject

12  matter of this particular case.  It involves strictly the

13  sampling.  There's nothing that I've heard from the

14  plaintiffs' side about their damage theory that involves some

15  assertion of damages based on sampling misconduct by

16  AstraZeneca.  It's clear it was not conduct that AstraZeneca

17  condoned.  That was clear from the plea agreement that --

18         THE COURT:  I'm just simply saying it's admissible,

19  right, admission of a party opponent?

20         MR. KEATING:  But not as a plea.

21         THE COURT:  Yes, it is.

22         MR. KEATING:  I would say -- well, I would say it

23  is not admissible certainly if it's not relevant, and I would

24  say my first point is, it's not relevant.  Secondly, as you

25  know that it's also our contention that the prejudice of

Page 34

1   letting in a guilty plea in a case like this would overwhelm

2   any possible relevance that the issue --

3        THE COURT:  Well, why wouldn't it go to state of

4   mind?  In other words, not what TAP did and not what the

5   three doctors did.  I understand that.  And the civil piece

6   is a separate piece.

7        MR. KEATING:  I realize that.

8        THE COURT:  But why wouldn't it be a sort of

9   404(b), which is pattern, plan, motive, that kind of thing?

10       MR. KEATING:  Well, I think there's a risk that

11  they're trying to use it to demonstrate a prior misconduct is

12  evidence of the existence of misconduct in the case in chief,

13  so I think for that reason it's actually improper.

14       THE COURT:  Isn't it the state of mind to get the

15  return to practice out to the physicians?  I mean, it's not

16  so unrelated.

17       MR. KEATING:  Well, I think it would be a harder

18  case for me to argue if the conduct that the company pleaded

19  guilty to, which was essentially the sampling misconduct, or

20  however way you want to put it -- and we've submitted the

21  papers to you on the plea colloquy -- was the same conduct

22  that's at issue in this case.  This issue involves spread, it

23  involves the marketing the spread, it involves the alleged

24  fraud, if you will, of what the articulate AWP is.

25       In their experts' reports, their experts concede

1    that they are not relying on the sampling misconduct as any

2    element that gave rise to financial damages to their

3    clients.  Their experts say, "We have no idea how the

4    sampling might have impacted."  One late expert report they

5    submit, their expert, Mr. Hartman, I think says it's a guess,

6    it's a coin flip.

7            THE COURT:  But isn't this part of the

8    Lupron-Zoladex battle, the sampling piece, just to grab

9    market share?

10           MR. KEATING:  I mean, I think in the context of

11   what you could relate the conduct to, you could relate the

12   conduct to the battle that was going on on marketing; but you

13   have to, I think, your Honor, at least acknowledge that the

14   conduct by these salespeople was totally at odds with what

15   the company's directives to them were.

16           THE COURT:  That would be fair, but I'm just simply

17   saying, you all want to put in the whole battle.  They've

18   sought to exclude it.  I don't see how I exclude it.  It's

19   like directing a verdict.  That's their story.  That's why

20   they were doing it.  I'm not going to exclude the battle with

21   Lupron and TAP.  You might as well ask for summary judgment

22   on the point.  So that's part of it.  But if it is part of

23   it, why isn't sampling part of that battle?

24           MR. KEATING:  Because I think they must demonstrate

25   that the sampling activity that was the focus of the plea