# Exhibit 2, Part 2

1   agreement gave rise to the kind of damages and the cause of

2   action that they're asserting in this case.  They're

3   asserting here, frankly, that the AWP was not accurate

4   because it didn't reflect the deep discounts and other

5   things.

6              THE COURT:  And samples.

7              MR. KEATING:  But there's no evidence as to the

8   impact of the sampling.  All I can rely on is what their own

9   witnesses say.

10             THE COURT:  Well, they can't use that in damages,

11   right?

12             MR. BERMAN:  Yes, that's correct.

13             MR. KEATING:  And therefore if they're not used in

14   damages, it seems --

15             THE COURT:  It goes to the state of mind of the

16   corporation.  It's part of that battle.  All is fair in love

17   and war.  Why isn't it part of the battle?

18             MR. KEATING:  Well, what they did in the sampling

19   area, I mean, conceivably would be.  But to introduce a

20   guilty plea to a certain conduct that the company in the plea

21   agreement said never should have occurred, was not part of

22   what we asked our salespeople to do, would seem to me to be

23   so overwhelmingly, I would say, prejudicial to our case

24   here.  I mean, in their papers they say, well, I don't know,

25   why does the plaintiff -- the defendants assume that a guilty

3153f00e-5aaa-4f42-be8f-87649f4486bd

1   plea is going to make any difference?

2           THE COURT:  Of course it's prejudicial, but it's

3   also probative of a corporate state of mind.

4           MR. KEATING:  Well, it seems to me that if it

5   involves conduct that the company itself did not permit and

6   was, as Mr. Engelmann said in his plea colloquy, that it was

7   not part of their articulated policy with salespeople, and

8   perhaps marketing the spread was in other respects,

9   discounting and whatever was, number one, it involved conduct

10  that is not the core issue that they're raising here, that

11  gives it to me extremely narrow relevance here.  And then if

12  you balance that against the impact -- I mean, I wouldn't say

13  it's summary judgment as you just mentioned to them, but it's

14  getting darn close to it.  As a practical matter, if this

15  jury hears that the company entered a guilty plea in a

16  Federal Court for conduct that these very able lawyers will

17  say is part of and closely related to the whole issue that's

18  before them, which is did this company intend to defraud

19  either the government or the consumers, I don't -- I mean, it

20  seems to me inconceivable that the jury could put that plea

21  in any reasonable context in weighing whether or not there

22  was an intent to defraud.  And that's really our --

23          THE COURT:  But I don't know how you can go into

24  the battle with Lupron and explain it and use that as an

25  excuse, if you will, like this is somehow legitimate

1    competition, which is essentially what I heard here.  I mean,

2    all the folks up here essentially justified it by saying,

3    "Well, what else did you expect us to do?"  Basically, "We

4    tried to do it the right way, and we were losing out to them,

5    and so now we had to get back to where they were to win the

6    market share."

7          MR. KEATING:  Your Honor, my understanding is, and

8    I'm not as conversant with these facts as you are, but my

9    understanding is that no part of our defense to this case, in

10   terms of competition with TAP and Lupron, is going to be a

11   suggestion that we told doctors that they could take these

12   free samples and bill Medicare for it.  That's no part of our

13   case.  Our case is:  We told them that they're entitled to

14   discounts.  We told them perhaps that they could recover more

15   through AWP, a substantial profit, and that profit might come

16   close to what they make by selling the more expensive drug

17   like Lupron.  But there will be no offer of evidence in this

18   case from us that sampling was a technique that we used with

19   these doctors and told them that they should bill for free

20   samples as a way of competing with Lupron.  And that's why I

21   think it's not relevant, plus that's really, frankly, no part

22   of the damages that they're going to introduce in this case.

23          THE COURT:  Well, that's right, just because they

24   can't come up with a number.  They flipped a coin, was that

25   what Mr. Hartman said?

1          MR. KEATING:  Yes.

2          THE COURT:  Let me ask you this.  On the civil

3    side, I was torn about the civil piece of it because

4    generally civil settlements are not admissible.  And I know

5    you had the interesting comeback, "But this was incorporated

6    into the plea agreement."

7          MR. BERMAN:  Correct, and it's admissible we think

8    in this context for intent.

9          THE COURT:  But when did it -- that's like your

10   situation with the OIG Guidelines.  When was this plea?

11         MR. BERMAN:  The plea was in --

12         MS. HARRIS:  June of 2003, your Honor.

13         MR. BERMAN:  June of 2003.

14         THE COURT:  So that's the issue with the OIG

15   Guidelines, it was basically when it was all over, so --

16         MR. BERMAN:  But the OIG made it clear that they

17   weren't imposing what they felt was any new obligation.

18         THE COURT:  I'd have to hear -- I don't want you

19   mentioning that in the opening.  That would have to be purely

20   in terms of possible refutation if there's an argument that

21   the government approved this.

22         MR. BERMAN:  But getting to his point --

23         THE COURT:  But I'm just sort of --

24         MR. BERMAN:  Start with the plea agreement, okay?

25   And it seems to us that this is kind of critical because if

3153f00e-5aaa-4f42-be8f-87649f4486bd

1    you go back to the original trial, what they got up and said

2    was, "Look, we tried to be the good guy.  We tried to have a

3    lower-cost drug, and we found out we were competing against

4    TAP."  So what did they do?  They engaged in a scheme to

5    return money to doctors, to give them a profit to induce them

6    to use Zoladex.  That scheme had two forms.  One was

7    sampling.  Although they get up here and say it wasn't part,

8    the corporate officer admitted at Paragraph 6 of Exhibit Q to

9    the information attached to their papers that there were

10   thousands of free samples across the country, that their

11   purpose was to induce use of Zoladex and to increase the

12   income to doctors.  Those are his words, that's our scheme.

13           Now, if they're going to get up here and say, "We

14   were the good guy, we always intended to do right by the

15   federal government," when they hatched the scheme way back

16   when, it's admissible to motive, intent, and a common plan.

17           THE COURT:  All right, let me ask you this:  How do

18   you get in the settlement agreement?  You sort of threw in a

19   paragraph about Federal Rule of Evidence 408.

20           MR. BERMAN:  Well, the settlement agreement, again,

21   it was attached to the plea.  The plea is an admission, and I

22   think we get it in that way.

23           THE COURT:  I don't have to do all or nothing,

24   though, right?

25           MR. BERMAN:  No, you don't have to do all or

1   nothing.

2          THE COURT:  I mean, I worry about throwing those

3   kinds of numbers before a jury for starters.

4          MR. BERMAN:  Well, again, I think, you know, in the

5   context of where you have a company that's going to bring in

6   a Mr. Weintraub and say, "We never intended to defraud, we

7   didn't do anything wrong, and the government said it was

8   okay," or they're going to introduce these government reports

9   to try to argue it was okay, and they turn around and are

10  charged by the government, and they plead, they enter into a

11  settlement that incorporates those very charges, that's

12  relevant to offset what they're saying about the government

13  and its approval.

14         THE COURT:  Well, what if I exclude Weintraub?  The

15  only reason I say it, Weintraub may have nothing to say about

16  AstraZeneca or Zoladex.  That's what it sounds like here.  I

17  mean, he doesn't know anything specific to the company.  He

18  never spoke directly to the company.

19         MR. BERMAN:  I certainly have my cross planned

20  based on that because he doesn't have anything relevant to

21  say about Zoladex.

22         THE COURT:  Then what's there to rebut?  If they

23  don't put in an argument of approval or government

24  knowledge --

25         MR. BERMAN:  Well, they're going to.  They have

3153f00e-5aaa-4f42-be8f-87649f4486bd

Page 42

1    Mr. Milbauer get up and say, you know, "I talked to people at

2    the government, and they said this was A-OK with them."  To

3    the extent that they keep introducing this, "The government

4    knew what we were doing, the government blessed it --"

5            THE COURT:  Is Milbauer going to say that, do you

6    know?

7            MR. BOUDETT:  He's going to say the government knew

8    about this and didn't change the system until 2003, which is

9    when these events happened.  So he's saying that we get to

10   rebut with what the government did to them when they found

11   out.  Well, that's at the end of the day when the policy

12   changed.

13           MR. BERMAN:  It's not at the end of the day.  1998

14   was the first --

15           THE COURT:  All right, I hear the debate.  Let's go

16   through some of the other ones.  Were you planning on putting

17   in anything about other companies?

18           MR. BERMAN:  Yes.

19           THE COURT:  Why?  Why is that relevant?

20           MR. BERMAN:  Well, Dr. Bell got up at the last

21   trial and said, "Hey, marketing the spread, A-OK," in his

22   opinion.  It's relevant to his credibility that two other

23   companies have a practice saying you can't do it, it's wrong.

24           THE COURT:  I will exclude it unless it comes up in

25   some sort of rebuttal form, any other company, except TAP.

1    That's part of this battle.

2              MS. HARRIS:  Well, your Honor, if I could just

3    speak to that for one moment.  As we clearly discussed here

4    today, the issue for this trial is AstraZeneca's intent, not

5    TAP's intent and not TAP's conduct.  And while what

6    AstraZeneca believed and reacted to the competition from TAP

7    is relevant to AstraZeneca's conduct, what TAP thought and

8    how TAP reacted to AstraZeneca's competition is completely

9    irrelevant to any judgment by the jury as to what

10   AstraZeneca's intent was.

11             THE COURT:  For sure, it has to come in admissibly,

12   and I know there's a debate about whether that other

13   deposition qualifies as an unavailable witness with adequate

14   cross-examination, and I haven't read it yet, and I'm going

15   to have to worry about that.  But if you put in the battle

16   with TAP, as long as it's otherwise admissible, it's relevant

17   to your theory.

18             MS. HARRIS:  Well, but, your Honor, we're talking

19   about documents that were in TAP's files and were produced by

20   TAP that we don't even have copies of at this point.  We have

21   never been provided copies of those --

22             THE COURT:  Let me just put it this way:  In

23   general, other companies shouldn't come in other than TAP

24   because TAP is part of your defense that there was this

25   battle, and you actually had to do what you had to do because

Page 44

1    of competition.  If it's not admissible because it's not

2    authentic or to somehow --

3            MS. HARRIS:  Well, there are numerous hearsay

4    objections, authenticity objections.

5            THE COURT:  Well, are you saying there are specific

6    documents that you say are not your documents so they

7    shouldn't be treated as admissions?  Is that it?

8            MS. HARRIS:  Well, your Honor, there are over a

9    hundred documents on plaintiffs' exhibit list that are TAP

10   documents, produced by TAP, generated by TAP.  I have no idea

11   whether they're even TAP business records because I've never

12   seen these documents.

13           THE COURT:  So they don't come in unless there's a

14   basis for authenticating them.  So how do you authenticate

15   them?

16           MS. HARRIS:  And for establishing a hearsay

17   exception.

18           THE COURT:  Right.

19           MR. KEATING:  But why against AstraZeneca?

20           MS. HARRIS:  Exactly, your Honor.

21           THE COURT:  If it's about -- you're putting in the

22   battle, right?

23           MS. HARRIS:  Yes, but we're putting in the

24   competition, the dynamic between AstraZeneca and TAP because

25   it's relevant to what AstraZeneca intended to do and how

1   AstraZeneca priced its product.  But what TAP --

2          THE COURT:  But if AstraZeneca sends TAP

3   something --

4          MS. HARRIS:  No, but we're talking about way beyond

5   that.  We're not talking about --

6          THE COURT:  You know what this is highlighting for

7   me?  Unless I see the documents and the specifics, I'm not

8   going to be able to do it.

9          MS. HARRIS:  And I agree, your Honor.  We'd like to

10  see the documents as well because we've never seen them.

11         THE COURT:  Well, I assume --

12         MS. HARRIS:  No.  There are TAP documents on their

13  exhibit list which have never been provided to us.

14         THE COURT:  So you'll give them the specific

15  documents, and let's hear how you get it in through the

16  hearsay rule.

17         MR. HAVILAND:  Judge, I'll address that.  It's a

18  real simple issue.  TAP has claimed confidentiality, and

19  we've said, well, they're covered by various confidentiality

20  provisions which they should get if they're a defendant in

21  the case, so --

22         THE COURT:  Boy, I don't want to hear about this

23  now.  This trial is in a month.  Give it to them.

24         MR. HAVILAND:  Well, they're in the case, Judge, so

25  we're happy to turn them over, provided we don't hear from

3153f00e-5aaa-4f42-be8f-87649f4486bd

Page 46

1   the TAP counsel that there's some violation by doing that.

2              THE COURT:  I am ordering you to produce the

3   documents subject to whatever protective order.  An

4   overinclusive protective order has been signed somewhere,

5   okay?  So then you can object specific document by document.

6              MS. HARRIS:  Thank you, your Honor.

7              THE COURT:  And maybe we can understand, is this

8   one of your documents that made their way into TAP files, is

9   it a letter from you, or is it just a separate internal

10  document to TAP, which is hearsay?

11             MS. HARRIS:  Exactly, your Honor.

12             THE COURT:  I don't know.

13             MS. HARRIS:  The same would go for the transcripts

14  of these depositions, your Honor, which we also don't have

15  any access to.  They weren't taken in litigations where we

16  were a defendant.

17             THE COURT:  Well, there's one where they said that

18  you did get notice and were invited to attend.

19             MS. HARRIS:  No, your Honor.  These depositions

20  were all taken in the context of Lupron-specific litigation.

21  TAP decided to cross-notice those depositions in the Swanson

22  case in Arizona because they were also a defendant in that

23  case.  At the time that that occurred, you had issued a stay

24  of any discovery in Swanson because you were considering the

25  remand motion at that period of time, and so we did not feel

1   that it was appropriate for that deposition to take place

2   with respect to any other defendant or any other drug other

3   than TAP or Lupron at the time.  So we made Mr. Haviland

4   aware of that objection that the stay was in place based on

5   your order in this courtroom, and he --

6           THE COURT:  So you might not be able to get that

7   in.

8           MR. HAVILAND:  Well, here's the problem, Judge.

9   Mr. Durand was the whistleblower against both companies, TAP

10  and AstraZeneca.  He was the pinnacle for why the government

11  prosecuted those companies.

12          THE COURT:  So bring him in.

13          MR. HAVILAND:  So we took the deposition, duly

14  noticed all counsel to attend --

15          THE COURT:  Bring him here.  He's a whistleblower.

16  They love to litigate.  Just bring him in as a witness.

17          MR. HAVILAND:  We'd love to.  I'm told that he's

18  difficult to get because he's in Florida.

19          THE COURT:  He's in all those states.  So bring him

20  in.  It sounds like they didn't have an opportunity to

21  cross-examine.  Okay?  If you want him, you've got to

22  supplement your witness list.

23          So where are we up to now?  We're up to Weintraub.

24  Why is knowledge of the third-party payors relevant, unless

25  they're Medicare carriers?

1      MR. BOUDETT:  Well, okay, my first argument is the

2  Medicare carrier issue, which includes Blue Cross-Blue Shield

3  of Massachusetts along with numerous other entities, but

4  overall, your Honor, it goes to rebut the secrecy point.  And

5  I think it does depend on what plaintiffs' experts say, both

6  on direct and on cross, because we will cross them with their

7  prior reports in which they said this whole thing was a

8  secret and unknown.

9      THE COURT:  Well, you can set it.  Just bring him

10  in.  So I'll wait on that.  But in general, under Rule 403, I

11  think it brings us pretty far afield to get into separate

12  contracts with third-party payors or anything like that.

13      MR. BOUDETT:  Carving out Medicare carriers, your

14  Honor?

15      THE COURT:  I don't know.  It's the first time I

16  thought of that, so maybe it's in here somewhere, but I

17  haven't thought about that --

18      MR. BOUDETT:  It's in our papers.

19      THE COURT:  Okay.  All right, Weintraub, you're

20  going to give me a proffer.  I'm not going to exclude meeting

21  competition defense.

22      Efficacy of Zoladex, I think you're entitled to do

23  something about what the drug is and how it's administered

24  and why you were competing with Lupron, but you've only got a

25  week.  I mean, I don't think we need to see like one of those

Page 49

1    ads on TV, somebody dancing through a meadow.

2         MR. KEATING:  I think it's really going to be

3    offered in a brief way to give some context to what the case

4    is all about.

5         THE COURT:  Fine, that's fine, just like I'm going

6    to let plaintiffs put on whoever they want as members of

7    their class.  This is a trial.  You can paint your client a

8    little bit in sympathetic ways as long as it's not

9    overboard.

10        Similarly, if it goes to state of mind of

11   AstraZeneca, the fact that you disclosed certain things to

12   the IMS data seems relevant.  AMP, I'm not sure.  I'm not

13   sure.  That's the stuff that's done for Medicaid under seal?

14        MR. BOUDETT:  Your Honor, our point there, and this

15   is in the papers --

16        THE COURT:  That maybe under 403 more confusing

17   than it is helpful because they're not allowed to share

18   across entities, as I understand it.

19        MR. BOUDETT:  They actually are and they do, and

20   what we have are government reports in which the government

21   is looking at overpayments in the Medicare system and saying,

22   "How do we know how much we're overpaying?  Well, we're

23   comparing it to AMP and Medicaid, and look at the delta, and

24   this is how much money could be saved."  So they do use it

25   explicitly for cross-comparison, and that goes directly to

Page 50

1   the company's state of mind.

2   THE COURT:  I don't have strong feelings about that

3   if you have a good-faith basis for saying there actually was

4   some sharing.  I heard some evidence to the contrary, so --

5   MR. BOUDETT:  What you're referring to, your Honor,

6   is the statute saying it's to be confidential and not used

7   outside Medicaid.  You're recalling that, and that's true on

8   the one hand, and it's meant to protect the manufacturer

9   primarily from disclosure of sensitive price data.  But when

10  the government wants to use it to understand what's going on

11  in the reimbursement world --

12  THE COURT:  Do you have an expert that will say

13  this?

14  MR. BOUDETT:  Yes, your Honor.  We'll have a report

15  in which they explicitly compare them.

16  MR. MATT:  Mr. Scully testified, your Honor, that

17  they didn't have access, that Medicare couldn't have access

18  to what Medicaid had because that's the way the law was set

19  up.  The law was changed.

20  THE COURT:  When?

21  MR. MATT:  The law was changed with the MMA.

22  THE COURT:  Oh, with the MMA.

23  MR. MATT:  Yes.  So access to that data legally and

24  formally is a late development.

25  MR. BOUDETT:  Your Honor, that's not true, and the

Page 51

1   comparisons I'm talking about predate the MMA.

2           THE COURT:  Is this something that the industry

3   knew at the time so it would be relevant to what their state

4   of mind was?

5           MR. BOUDETT:  Yes, and it's published, your Honor,

6   exactly.  And Mr. Milbauer and others are going to tie that,

7   that they monitor what's going on with these reports, so,

8   yes.

9           THE COURT:  Maybe.  It's not a big point.

10          Now, going to the plaintiffs' -- did I miss any of

11  yours?  I'm going to --

12          MR. BERMAN:  You missed so far the MAP program.

13  Remember AstraZeneca spent a lot of time trying to show that

14  they --

15          THE COURT:  Yes, MAP and PAP?

16          MR. BERMAN:  MAP and PAP.  Again --

17          THE COURT:  I don't know how relevant that is.

18          MR. BERMAN:  It's marginal relevance.  This is a

19  case about what the consumers knew, and they have made no

20  showing that they intended when they went out and pitched MAP

21  to get to the consumers.

22          THE COURT:  The only reason the Patient Assistance

23  Program might come in is if there's any issue with respect to

24  damages.

25          MR. BOUDETT:  Willfulness, your Honor.

Page 52

1        THE COURT:  Excuse me?

2        MR. BOUDETT:  Willfulness, among other things.

3        THE COURT:  Well, all right, that's a good point,

4   willfulness.  I'm glad you just raised that because I'd

5   forgotten to mention that.  So are any of these jurisdictions

6   ones that only a jury can double or treble, or is it all left

7   to a judge?

8        MR. BOUDETT:  No, your Honor.  In some of them it's

9   a jury issue, in some of them it's mandated a court issue,

10   and in some of them it's advisory, it's a mix.

11        THE COURT:  So I'm really glad you brought that

12   up.  So when we talk about what I have to send to the jury

13   now is fraud, fraudulent concealment, and possibly

14   willfulness?

15        MR. BOUDETT:  Yes, your Honor.

16        MR. MATT:  And damages.

17        THE COURT:  And damages.  So what do I do with

18   willfulness?  Should that be a bifurcated part two, as we

19   sometimes do like in patent trials or something like that?

20   What do you think?

21        MR. BOUDETT:  Your Honor, first of all, I'm saying

22   willfulness as a concept.  That is a many splendid thing.

23   There are states which require that to be proven by clear and

24   convincing evidence.  There are ones in which it's words

25   other than "willfulness."

1          THE COURT:  But it's a jury issue.  I mean, as a

2     judge, I could --

3          MR. BOUDETT:  In some of the states, yes.

4          THE COURT:  So when I ask the jury this, I'm going

5     to have to say, "Do you find by clear and convincing evidence

6     willfulness?"

7          MR. BOUDETT:  Under some states.

8          THE COURT:  And some we do preponderance,

9     willfulness, and that's where you say that the PAP and MAP

10    and all that kind of stuff come in?

11         MR. BOUDETT:  Yes, your Honor, among other reasons.

12         THE COURT:  So I'm really glad you raised that.

13    Should I be doing that as a bifurcated part two?

14         MR. BERMAN:  I think it should all go to the same

15    jury.

16         THE COURT:  It will be the same jury, of course,

17    but part two.  I mean, in other words, not put in --

18         MR. BOUDETT:  Certainly, your Honor, to the extent

19    the plaintiffs may try and put evidence of AstraZeneca's

20    overall wealth and profitability, if that --

21         THE COURT:  Well, we're not putting in

22    AstraZeneca's overall wealth and profitability.  That would

23    be inflammatory.  But I think with respect to the drug

24    Zoladex, it's relevant.

25         MR. BERMAN:  Well, certainly if they're going to be

Page 54

1   able to do the PAP, the good corporate citizen stuff.  But I

2   do want to argue about the PAP issue.  Just because they

3   assisted some people, what relevance does that have on their

4   intent to deceive the rest?

5          THE COURT:  Well, it may not.  I'm just saying

6   that's why it would be part two.  In other words, if you're

7   thinking -- well, let me ask you, do you want double and

8   treble damages?

9          MR. BERMAN:  Of course.

10         THE COURT:  Of course.  So the question really is,

11  how do I do that?  It's a really good point that you've

12  raised.  And what I've done before in issues, whether it's in

13  1983 cases or sometimes patent willfulness cases or whatever,

14  you have the jury come back with a basic liability finding.

15  Then you do just a little bit of an additional trial, like

16  maybe a day or something, and you put in the extra stuff that

17  may not be relevant to intent to deceive, like you say, but

18  may be relevant to whether you want to double or treble.

19         MR. SOBOL:  But because the case is being tried on

20  an intent to deceive basis, it's hard, at least as I'm

21  standing here right now, to think of any additional evidence

22  at least that the plaintiffs would put forward on the issue

23  of willfulness that we would have held back on the intent to

24  defraud.

25         THE COURT:  It's a send-a-message kind of thing.

1    Aren't you going to want -- maybe you won't.

2         MR. SOBOL:  Well, in terms of the quantity, whether

3    to double or to treble, or to put a punitive damage award

4    that's not tethered to doubling or trebling but just tied to,

5    for instance, profits from Zoladex, we do intend to put that

6    information in there.  But even that information goes to the

7    intent to defraud.  How much money they could make from

8    Zoladex is relevant there too.

9         THE COURT:  It may.  I'm simply saying think about

10   it, I mean, whether or not I should do -- if there is

11   willfulness, one way to do it is to waive the jury claim on

12   it, and one way to do it is, if the jury can't do it, there's

13   a Part B stage, and one way to do it would be to blend it all

14   into one big trial.

15        MR. BOUDETT:  Your Honor, that's all correct, and

16   we should think about that and get back to you.  I just want

17   to raise, we don't agree that the Patient Assistance Program

18   only comes in on willfulness.  I was merely agreeing that

19   that's an obvious case in which it comes in.  We expect them

20   to argue that the company put profits ahead of patients.

21        THE COURT:  I don't think it's relevant to intent

22   to deceive on AWP.  I think it's quite relevant as to whether

23   or not you want to double or treble.

24        MR. BOUDETT:  It's also relevant, your Honor, to

25   damages, to the extent there were people not paying for

Page 56

1    Zoladex because the company --

2         THE COURT:  Well, you may want to ask that needs to

3    be backed out of any -- to the extent any patient was

4    reimbursed through the program, you could ask the expert,

5    were those damages backed out?  That may be.

6         MR. BOUDETT:  On cross, for instance, yes.  And the

7    MAP program, your Honor --

8         THE COURT:  And what about MAP?  Why is that --

9         MR. BOUDETT:  That goes directly to intent, your

10   Honor.  If we're out there showing the spreads around to

11   payors who act on the interest of the consumer beneficiaries,

12   that goes to our intent.  It also goes to --

13        THE COURT:  The concern I run into there is, it's

14   not the government.  Did you ever offer that to the

15   government?

16        MR. BOUDETT:  Yes, your Honor, and only it was

17   called LCA.

18        THE COURT:  Well, then maybe that's what you

19   could --

20        MR. BOUDETT:  Well, the LCA I think clearly is

21   admissible.

22        THE COURT:  LCA again is?

23        MR. BOUDETT:  Least costly alternative, yes,

24   starting with South Carolina and then going to other states.

25        THE COURT:  That might be what is relevant.

Page 57

1      MR. BOUDETT:  I think that certainly comes in, but

2  I think the MAP program also goes directly to intent, your

3  Honor, to the extent this is a secrecy-shrouded fraud.

4      THE COURT:  Well, I'll think about that.  So what

5  else?  Is there anything else that I've missed?

6      MR. BERMAN:  I don't see anything, your Honor.

7      THE COURT:  Have you all issued voir dire

8  questions?  Oh, that new thing that came in about corporation

9  counsel.  Were you planning on calling him?

10     MR. BERMAN:  Yes.

11     THE COURT:  On what?

12     MR. BERMAN:  Well, because he's the one most

13  knowledgeable about the letters that were sent from DOJ to

14  the company asking, are you committing AWP fraud?

15     THE COURT:  Well, what are you going to ask that

16  isn't privileged?

17     MR. BERMAN:  The letters are not privileged.  A

18  letter from DOJ to counsel?

19     THE COURT:  So admit them.

20     MR. BERMAN:  Through who?  He's the witness with

21  knowledge of the subject.  They're going to call these

22  salespeople and the VP, probably has no idea about the

23  documents.  But I can call him and say, "Did you get this

24  letter?"  The letter will be admissible, and the jury can see

25  the letter.

Page 58

1          THE COURT:  If all you're going to ask is three

2     questions, I'll let you do it, but that's it.

3          MR. BERMAN:  Well, I've got to get these in.

4     They're critical documents.

5          THE COURT:  Maybe they'll stipulate.  Do they come

6     in?

7          MR. KEATING:  Well, I'd like to see what Mr. Berman

8     is talking about.

9          THE COURT:  Sure.

10          MR. KEATING:  I mean --

11          MR. BERMAN:  They're listed in the exhibit list.

12          THE COURT:  I know, but there are like a billion

13     exhibits.  So just show him what you're talking about.  Maybe

14     they can stipulate that they were sent to the company and

15     sent general counsel, and then the knowledge is imputed to

16     the company.

17          MR. BERMAN:  Well, no, I think I can then ask

18     him --

19          THE COURT:  Aha.

20          MR. BERMAN:  No, hold on.  It's not privileged.  If

21     he got a letter from the government, and their position is

22     that the government approved or they told the government

23     everything, I can ask him, "Sir, did you tell the Department

24     of Justice after you got this letter about return to

25     marketing practice?"  And I bet you the answer will be "No."

1    We can ask him now.

2           MR. KEATING:  Well, I'm going to object to it at

3    the trial, and I'm going to object to it now.  It doesn't

4    seem to me it's an appropriate question.  He's the general

5    counsel of the company.

6           MR. BERMAN:  He's the conduit, one of the conduits

7    with the government that they're now claiming knew

8    everything.

9           THE COURT:  Was it a criminal investigation?

10          MR. BERMAN:  It was a criminal and civil.

11          THE COURT:  "You have the right to remain silent.

12   Anything you say can and will be used against you."  I don't

13   know.  But you see the documents.  It strikes me that it is

14   relevant to state of mind if the Justice Department was

15   pursuing something, whether they knew that there was

16   something wrong about it.  It's a red flag anyway.  I don't

17   know whether, "Did you tell the Justice --"  I mean, I don't

18   know, that's part of -- "Were you cooperating with a criminal

19   investigation?" that's just a little iffy.  Was it a target

20   letter?  What was it?

21          MR. BERMAN:  No, it was not a target letter.  It

22   was a letter they were seeking information.  I have to go

23   back to whether it's criminal or civil, but they were seeking

24   to find out what this company was doing back in 1998 with

25   respect to AWP, and they sought information over a course of

Page 60

1   years, and this gentleman was involved in that discourse with

2   the government.  That's not privileged.

3           THE COURT:  Well, it may not be privileged, but you

4   need to play it out for me.

5           MR. SOBOL:  It's interesting, though, your Honor.

6   I mean, in part, AstraZeneca's defense is, "We thought it was

7   legal."

8           THE COURT:  Well, that's why the letters may come

9   in, but what he did --

10          MR. SOBOL:  Right, and what I'm saying is, if

11  that's a part of the defense, or at least a reasonable

12  interpretation of the defense, it lends itself to a waiver

13  of -- in part, it's implicitly relying upon the advice of

14  counsel, and it's opening that issue up.  Well, it is in

15  part.  You know, if --

16          THE COURT:  Wait, wait, wait.  Has there been a

17  statement of reliance on advice of counsel?

18          MR. SOBOL:  No, no, no, there hasn't been.  All I'm

19  saying is, it suggests, depending upon the way that

20  AstraZeneca's defense unfolds itself, in part their

21  interpretation is, from here and there and whatever, "We

22  thought that our conduct was legal."  And if it turns out

23  that they say that, then they implicitly are opening up the

24  door to what it is that their lawyers were telling them at

25  the time.  I would suggest it would.

1       THE COURT:  You do a proffer on what you'd would

2  want to ask him.  I do think the letters are probably

3  admissible unless -- I don't know how inflammatory they are.

4  Let Mr. Keating take a look at them.  Tell me what you want

5  to say, and then I'll worry about it.

6       You're going to all submit jury voir dire

7  questions?

8       MR. KEATING:  We would like to.

9       THE COURT:  How many jurors do you want in terms

10  of -- you know, in a typical jury trial, you only need to do

11  eight here in civil, so --

12       MR. KEATING:  I would probably be inclined to

13  suggest you impanel a couple extra.

14       THE COURT:  Maybe ten?  You have to do six plus two

15  alternates.  Maybe I'd do ten because it's a longer trial.

16  And there will be four or five peremptories apiece, so --

17       MR. KEATING:  Actually, this goes to, just as an

18  inquiry, to the voir dire questions.  Would you entertain any

19  questions that would be presented to the jury in a written

20  form not in open court?  And the reason I raise it is not for

21  one of these vast jury questionnaires about what newspapers

22  do they read and what organizations they're involved with,

23  but maybe pertaining to cancer or prostate cancer or other

24  issues that might have a sensitivity that they'd be reluctant

25  to raise their hand in the back of the room.

Page 62

1          THE COURT:  Right, and particularly given the kind

2     of cancer, it might be embarrassing to people to say they

3     have prostate cancer.  I have done written questionnaires

4     but, like, one page.

5          MR. KEATING:  Well, that's what I'm thinking about,

6     not an extended one but one that might hit that particular

7     issue, the one that occurs to me now that might be sensitive

8     enough so that a juror might be reluctant to say publicly

9     they have prostate cancer or they had it or their spouse did,

10    or whatever.

11         THE COURT:  Yes, maybe something like that.  And

12    certainly I thought I would ask questions about, do you have

13    any views against class actions, or do you have any views

14    against pharmaceutical companies --

15         MR. KEATING:  That's a good question.

16         THE COURT:  -- that would interfere with your

17    ability to be fair and impartial?  I mean, I think I need to

18    ask both ends of that question.  One thought that occurred to

19    me was, anybody who did take either of these drugs probably

20    shouldn't be on the jury because they'd probably be members

21    of the class, at least with respect to Zoladex.  And if it

22    was Lupron, hearing about it may be a problem.  What do you

23    think about that?  I'm thinking out loud.

24         MR. BERMAN:  We think class members should sit in

25    the jury, always.

Page 63

1    THE COURT:  The class members are out, but what

2  about people who took Lupron?  I'm thinking it may be a

3  little too close for comfort.

4    MR. KEATING:  I think it's too close for comfort,

5  and I think, truthfully, you don't know and no one could

6  predict how someone in that situation would react.

7    MR. BERMAN:  We agree.

8    THE COURT:  Another issue is -- of course, I'm

9  chugging along working on the mega treatise -- I will not

10  come out with an opinion before the trial, so people should

11  rest assured on that, that I won't do it.  Not that anyone's

12  been covering it.  I think it's too complicated for anyone

13  other than the industry perhaps, but whichever way I came

14  out, I wouldn't want any kind of publicity to affect the jury

15  pool.  It would have been impossible if it had been done next

16  month, and the following month would have been in the range

17  of possibility, but I'm not going to do it.

18    So let me just go off the record for a minute.

19    MR. KEATING:  Can I just stay on the record for

20  one --

21    THE COURT:  Yes.

22    MR. KEATING:  I don't mean to interrupt you, your

23  Honor.

24    THE COURT:  No, go ahead.

25    MR. KEATING:  But this is really just a procedural

1   point that I want to raise.  It's not to reargue anything

2   that Mr. Berman has suggested, but I want to be clear on the

3   record.  Because we had this dialogue earlier this afternoon

4   in terms of what you're going to instruct on and intent to

5   defraud and whatever, that I want to be clear that it is our

6   position in this case -- and certainly we said it two or

7   three times in the submissions to you -- that this is not a

8   claim brought under any generalized state fraud claim by the

9   plaintiffs.  And we actually think the appropriate way and

10  the only legally appropriate way to instruct the jury in this

11  case is under the 40 or how many statutes are left, consumer

12  protection laws precisely.  In other words, that's why we

13  submitted to you that stack of consumer protection laws.  I

14  recognize it was very lengthy and could probably be cut back,

15  but we do not accept, and therefore I have to put this on the

16  record, the notion that you can amalgamate an intent to

17  defraud instruction that covers the 42 states that may be

18  involved in this case.

19           THE COURT:  Well, the plaintiffs long ago -- maybe

20  they didn't want to remember it -- had basically conceded

21  that in order to get a national class action, they would

22  limit themselves to deception.  And so I threw the challenge

23  back to all of you, which is, if there's any state in which

24  deception is not an unfair or deceptive trade practice,

25  you've got to let me know.  You came back and said, well,

1   there's certain states where it carves off certain kinds of

2   transactions, which we all agreed then could be done as a

3   matter of law.  So unless you can find me a case that said

4   fraud doesn't violate some consumer protection law acts and

5   sort of as a general matter, in which case I just knock out

6   that state.

7          MR. KEATING:  You said that, and I'm not quarreling

8   with that, and I'm not quarreling with the fact that the

9   plaintiff on several occasions in your class certification

10  said that this was an intent to deceive case, not an

11  unfairness case or unconscionable conduct case.  That's not

12  what I'm raising.  I'm not really trying to reargue anything

13  here.

14         THE COURT:  You just want to preserve it.

15         MR. KEATING:  I want to preserve our point that the

16  only way this case could ever be tried appropriately as a

17  class action, if it ever could -- and we have some question

18  about that -- is if you were to instruct on each of the state

19  consumer protection law statutes.

20         THE COURT:  Okay, fair enough.  All right, so right

21  now you've flagged four things I need to send to this jury,

22  but you may think of others because I sort of surprised

23  everyone a little bit here.  It's the intent to deceive, the

24  basic fraud claim; B, fraudulent concealment.  I think that

25  only comes up under some statutes, and that's why, if you've

Page 66

1    waived secrecy, that's a problem for you.  Three is damages

2    state by state; I've been persuaded that I've got to do it

3    that way.  And fourth is if there's a willfulness claim, and

4    you'd better look at that, how I do it.  If there's something

5    else that needs to go to the jury under all these myriad of

6    statutes, you need to let me know if there's something else

7    that really is going to be a fact question for them.  And I

8    don't mean to exclude causation or reliance or all that, but

9    I pick that up in the elements of a fraud claim.

10        MR. KEATING:  Is it your intention when we -- let's

11   assume we're going forward on the 4th, just for purposes of

12   argument.  Is it your intention that sometime in advance of

13   the 4th, between today and that date, we'll see you again, or

14   is it likely that the next time we see you we'll be

15   impaneling a jury?

16        THE COURT:  Well, it's a good question.

17        MR. KEATING:  I just didn't know whether some of

18   these items we're talking about today --

19        THE COURT:  I'll try and rule in the margins.  I'm

20   sure I won't be writing opinions.  I'll try and write in the

21   margins.  And if not, if something comes up and you think you

22   need to see me again, just ask me.

23        Let me ask you this:  There's a whole little rain

24   dance that I don't completely understand involving

25   plaintiffs' counsel.  Do I need to resolve that?  Yes, this

1   is on the record.  There's, like, a little not too nasty but

2   definitely not in agreement issue on the Lawyers Committee

3   and who's on it and who's cochair and all that kind of stuff.

4              MR. HAVILAND:  Judge, and we filed the motion

5   simply to try to clarify some things that have been

6   outstanding since we came into the case a year and a half

7   ago, and I was surprised by the opposition.  We're trying to

8   have it clarified, so going forward for the clients --

9              THE COURT:  Why does it matter?

10             MR. HAVILAND:  It just matters for purposes of

11  being able to be involved in the discussions about the case,

12  the trial management, the settlement, those types of things,

13  because right now there's not cohesion in terms of some of

14  those issues, and so we need to have --

15             THE COURT:  So does this make sense for me to do

16  just with you all, as opposed to not having defense here?

17             MR. HAVILAND:  I think so, Judge.  Since there

18  hasn't been an opposition filed by the defendant, I think

19  that's appropriate, Judge.

20             THE COURT:  Do you feel the need to be part of

21  this, anybody?  No.  All right, so at some point -- are you

22  coming in to see me soon on anything?  I don't want to bring

23  Mr. Berman back here.

24             MR. BERMAN:  I'm back here on First Databank on

25  May 22.

1          THE COURT:  Do you want to just discuss it then?

2    Mr. Haviland, I forget, where are you from?

3          MR. HAVILAND:  Philadelphia, Judge.

4          THE COURT:  Philly, not too bad.  It's not like

5    Seattle.  So do you want to deal with it on the 22nd, or do

6    you want to deal with it before then?

7          MR. BERMAN:  Well, since we just got Mr. Haviland's

8    reply and he raises some issues that we ought to talk

9    about --

10          THE COURT:  Why don't you see if you can work it

11    out, and if you can't, I'll deal with it on the 22nd.

12          MR. HAVILAND:  The only trouble with that, it's the

13    one week in two years I'm taking my family away, Judge.

14          THE COURT:  Where are you going?

15          MR. HAVILAND:  Hilton Head.

16          THE COURT:  Just work out a date, and I'm sure

17    Mr. Sobol can do it so Mr. Berman doesn't have to fly across

18    the world to get here, okay?  So the next thing I want to go

19    off the record.

20          (Discussion off the record.)

21          (Adjourned, 4:25 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS     ) ss.
    CITY OF BOSTON                )
5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 68 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13  Industry Average Wholesale Price Litigation, and thereafter

14  by me reduced to typewriting and is a true and accurate

15  record of the proceedings.

16           In witness whereof I have hereunto set my hand this

17  13th day of April, 2007.

18

19

20

21

22

23      _____

        LEE A. MARZILLI, CRR
24      OFFICIAL FEDERAL COURT REPORTER

25