UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | Civil Action No. 01-CV-12257-PBS |
| LITIGATION ) | Judge Patti B. Saris |
| ) | |
| THIS DOCUMENT RELATES TO ALL ) | |
| CLASS ACTIONS ) | |
| ) | |

**BRIEF OF THE UNITED STATES ON THE FEDERAL UPPER LIMIT**

The United States Department of Justice submits this brief in response to the Court's May 17, 2007, request for the Government to elaborate on the Federal Upper Limit ("FUL").

## DISCUSSION

The FUL is one cost containment mechanism used by the Secretary of Health and Human Services ("Secretary") to control state Medicaid program expenditures on multiple source drugs.[1] Set by the Secretary through the Centers for Medicare and Medicaid Services ("CMS"), the FUL reflects the outer bound of what state Medicaid agencies can reimburse retail pharmacies, in the aggregate, for outpatient multiple source drugs and still qualify for federal financial matching funds.[2] As of December 2006, the Secretary has set FULs for over 500 multiple source drugs. A list of the FUL drugs, the FUL itself, and related information is distributed periodically through Medicaid Program issuances and is available online at www.cms.hhs.gov/FederalUpperLimits. Between 1987 and 2007, the FUL calculation methodology remained essentially unchanged.[3]

A.   Background

The Secretary established the FUL in 1987 to allow "the Federal and State governments to take advantage of savings that are currently available in the marketplace for multiple source drugs . . . [while] maintain[ing] State flexibility in the administration of the Medicaid program."

---

[1] The FUL only applies to the Medicaid program. *See* 52 Fed. Reg. 28648, 28653 (July 31, 1987).

[2] States are required to make assurances each year that their aggregate Medicaid expenditures for drugs subject to FULs are within the upper limits set by the Secretary. *See* 42 C.F.R. § 447.333.

[3] In 2005, Congress made some significant changes to the FUL calculation methodology as part of the Deficit Reduction Act of 2005 ("DRA"), Pub. L. 109-171, § 6001, 120 Stat. 4, 54-59 (2006). These changes took effect on January 1, 2007. Unless otherwise noted, this brief describes the FUL in place from 1987 through 2006.

52 Fed. Reg. at 28648.[4]  With the passage of the Drug Price Competition and Patent Term Extension Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b (1994)) (commonly referred to as the Hatch-Waxman Act), which streamlined the Food and Drug Administration's ("FDA") approval process for generic drugs, the Secretary anticipated the entry of more generic drugs into the marketplace and therefore wanted a more flexible cost containment mechanism to keep a pace with rapid changes in market prices.[5]

     B.     <u>Requirements for Setting a FUL</u>[6]

The Secretary may only set FULs for multiple source drugs that meet certain statutory and regulatory requirements.  First, in accordance with the Medicaid Act, CMS calculates a FUL for a drug that has at least three therapeutic and pharmaceutical equivalents, as reflected in the

---

[4] Congress statutorily required the establishment of FULs as part of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 4401(a)(3), § 1927(f)(2), 104 Stat. 1388, 1388-143 (codified at 42 U.S.C. § 1396r-8(e)(4)).

[5] Prior to the FUL, the primary cost control mechanism for multiple source drugs was the Maximum Allowable Cost ("MAC"), which was set by the Health Care Financing Administration ("HCFA") Pharmaceutical Reimbursement Board ("PRB").  *See* Fed. Reg. 32284, 32302 (July 31, 1975).  Under the MAC system, the PRB identified multiple source drugs with high Medicaid expenditures and went through a process that included consulting with the FDA, engaging in a notice and comment period on proposed MAC limits, a public hearing, and ultimately the publication of a MAC in the Federal Register.  *See* 51 Fed. Reg.29560 (Aug. 19, 1986).

[6] The FUL regulation differs slightly from the Medicaid Act in this regard and, provides that the Secretary apply a more rigorous standard before setting a FUL.  The FUL regulation requires that all FDA approved formulations of the drug be evaluated as therapeutically equivalent in order for a FUL to be set.  *See* C.F.R. § 447.332(a)(1)(i).  As applied, if all formulations of a multiple source drug are identified as A-rated (i.e., therapeutically equivalent) in the FDA's Orange Book, at least two formulations must be listed there before CMS will set a FUL.  If, however, all formulations of a multiple source drug are not A-rated, there must be at least three A-rated versions of a drug listed in the Orange Book for CMS to set a FUL for that drug.  *See* Department of Health and Human Services, Office of Inspector General, *Addition of Qualified Drugs to the Medicaid Federal Upper Limit List 20* (OEI-03-04-00320 (Dec. 2004) ("OIG 2004 Report").

FDA's publication, Approved Drug Products With Therapeutic Equivalence Evaluations (commonly referred to as the "Orange Book."). *See* 42 U.S.C. § 1396r-8(e)(4). Second, there must be at least three suppliers for a FUL drug, as reflected in "all listings contained in current editions (or updates) of published compendia of cost information for drugs available for sale nationally." 42 C.F.R. § 447.332(a)(1)(ii). Although the FUL regulation does not define "published compendia," it is evident that the Secretary relied upon the Red Book, Blue Book (First Data Bank), and Medispan.[7] *See* OIG 2004 Report, at 20 ("CMS consults the three national drug-pricing compendia which includes Red Book, First Data Bank and Medi-Span to identify current market data.").

Finally, although not reflected in the FUL regulation, the Secretary also considers whether the establishment of a FUL will likely result in savings to the Medicaid program. *See* Department of Health and Human Services, Office of Inspector General, *How Inflated Published Prices Affect Drugs Considered For The Federal Upper Limit List* 3 (OEI-03-05-00350) (Sept. 2005) ("[I]f a drug does not have a published price that, when multiplied by 150 percent, is lower than AWP, CMS does not include the product."); 51 Fed. Reg. at 29563 (discussing setting FULs only where savings would justify the administrative burden on pharmacies and Federal and State governments).

---

[7] In addition to looking for three suppliers among the pricing compendia, the Secretary also makes sure that the drugs are actually available in the marketplace before setting a FUL. Given that a supplier may list a drug in the Red Book before it is actually available nationwide or where it is in limited supply, CMS makes an effort to verify the drug's market availability with manufacturers and suppliers. *See* Department of Health and Human Services, Office of Inspector General, Addition of Qualified Drugs to the Medicaid Federal Upper Limit List 21 (2004) (comments of Mark McClellan, CMS Administrator, to Daniel Levinson, Acting Inspector General).

C.  Mechanics

For a drug that satisfies the requirements discussed above, CMS sets the FUL for that drug at (1) 150% of the published price for the least costly therapeutic equivalent that can be purchased in quantities of 100 tablets or capsules,[8] plus (2) a reasonable dispensing fee set by each state.  *See* 42 C.F.R. § 447.332(b).  The "published prices" that the Secretary uses are the Average Wholesale Prices ("AWP"), Wholesale Acquisition Costs ("WAC"), and Direct Prices ("DP") published in the national drug pricing compendia (Red Book, Blue Book, Medi-Span). *See* OIG 2004 Report, at 20 ("If there are three suppliers of the drug, the FUL system selects the lowest price (Average Wholesale Price, Wholesale Acquisition Cost, or Direct Price) that can be purchased by pharmacists and multiplies it by 150 percent[.]").[9]

Two points are of note.  First, the FUL set for a particular drug will apply for all therapeutically equivalent versions of that drug.  So, for example, when the Secretary set a FUL for albuterol sulfate, that FUL effectively governed all of a state's purchases of therapeutically equivalent versions of that drug, regardless of which manufacturer's version was ultimately dispensed by a retail pharmacist.  Second, although the FUL is set at the *aggregate* level to give states greater flexibility in setting their drug reimbursement rates, most of the states have incorporated the FUL into their reimbursement formulas at the *individual drug* level to ensure

---

[8] For drugs that are not commonly available in quantities of 100, or if the drug is a liquid, the FUL will be set using another commonly listed package size.  42 C.F.R. § 447.332(b).

[9] For example, assuming that Drug X meets the regulatory requirements, CMS will (1) review the most current editions or updates of Red Book, FirstDataBank, and Medispan, (2) identify the lowest published price of Drug X contained in the three pricing compendia, (3) multiply that lowest price by 150%, and (4) add the reasonable dispensing fee set by the state.  The result will be the FUL for all the therapeutically equivalent versions of Drug X.

that their drug expenditures do not exceed the FUL and that all their drug expenditures qualify for federal matching funds.  For example, many states, like Alabama, provide that the maximum price for a multiple source drug is based on the lowest of:

> 1) The federally mandated upper limit established by CMS plus a reasonable dispensing fee[;]
>
> 2) The Alabama Estimated Acquisition Cost plus a reasonable dispensing fee;
>
> 3) The provider's usual and customary charge to the general public for the drug; or
>
> 4) The calculated state maximum allowable cost.

*See* Ala. Admin. Code 560-X-16.06 (2007).

Given that the Secretary sets the FUL based upon the prices published in the drug pricing compendia, a false or fraudulent drug price may directly affect the FUL and a state's Medicaid drug reimbursements.  For example, assume that (1) there are three suppliers of therapeutically equivalent versions of Drug X, (2) that supplier #1 reported an AWP of $1.80 and a DP of $1.45; supplier #2 reported an AWP of $2.00 and a WAC of $1.60; and that supplier #3 reported an AWP of $3.00 and a WAC of $2.40; and (3) that the Secretary set the FUL at $2.175 based on the DP of supplier #1 ($1.45 x 150%).  Then assume that supplier #3's reported prices were false and that its AWP was actually $.50 and its WAC was actually $.40.

In the example above, supplier #3's false prices caused harm on at least two levels.  At a minimum, states overpaid retail pharmacies for supplier #3's version of Drug X to the extent the states relied upon supplier #3's reported prices.  So, for example, Alabama should have reimbursed for supplier #3's drugs based on an AWP of $.50 or a WAC of $.40 (instead of basing reimbursement on the $2.175 FUL).  Moreover, in addition to causing states to overpay for

5

supplier #3's drug, supplier #3's failure to report accurately its prices undermined the ability of the FUL to cabin state expenditures on the other versions of Drug X as well.  Had supplier #3 reported its prices accurately, the Secretary would have set the FUL for Drug X at $.60 (Supplier #3's WAC ($.40) times 150%), and virtually all states would have limited their reimbursement for supplier #1 and supplier #2's versions of Drug X to $.60.  Again using Alabama as an example, had supplier #3 reported accurate prices, Alabama would have incorporated the FUL and cabined its reimbursement for supplier #1 and #2's drugs at the FUL.

      D.     Deficit Reduction Act of 2005

In 2005, Congress made two significant changes to the FUL which took effect January 1, 2007.  First, Congress required the Secretary to set a FUL for each multiple source drug for which the FDA has rated two or more products as therapeutically and pharmaceutically equivalent in the Orange Book.  *See* Pub. L. 109-171, 120 Stat. at 55.  Second, Congress redefined the FUL calculation methodology and provided that the FUL for multiple source drugs be set at 250% of the Average Manufacturer Price ("AMP") of the least costly therapeutic equivalent version of a drug.  *See id.*  Thus, instead of referring to the drug pricing compendia, the Secretary in calculating the FULs will base that calculation on 250 percent of the AMP (as computed without regard to customary prompt pay discounts).

## CONCLUSION

For the foregoing reasons, the Federal Upper Limit is an important part of Medicaid's efforts to contain expenditures for multiple-source drugs.

Respectfully submitted,

For the United States of America,

| | |
|---|---|
| MICHAEL J. SULLIVAN | PETER D. KEISLER |
| UNITED STATES ATTORNEY | ASSISTANT ATTORNEY GENERAL |

| | |
|---|---|
|  /s/ George B. Henderson, II |  /s/ Andy J. Mao |
| George B. Henderson, II | Joyce R. Branda |
| Assistant U.S. Attorney | Andy J. Mao |
| John Joseph Moakley U.S. Courthouse | Laurie A. Oberembt |
| Suite 9200, 1 Courthouse Way | Civil Division |
| Boston, MA 02210 | Commercial Litigation Branch |
| Phone: (617) 748-3272 | P. O. Box 261 |
| Fax: (617) 748-3971 | Ben Franklin Station |
| | Washington, D.C. 20044 |
| R. ALEXANDER ACOSTA | Phone: (202) 616-0539 |
| UNITED STATES ATTORNEY | Fax: (202) 514-0280 |
| SOUTHERN DISTRICT OF FLORIDA | |

Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101                                     Dated: June 28, 2007

### CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above "Brief of the United States on the Federal Upper Limit" to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: June 28, 2007                                     /s/ George B. Henderson, II
                                                        George B. Henderson, II