# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE   LITIGATION

THIS DOCUMENT RELATES TO:

*The City of New York v. Abbott Laboratories, Inc., et al.*
S.D.N.Y. Case No. 04-CV-06054

*County of Albany v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0425

*County of Allegany v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-0236

*County of Broome v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0456

*County of Cattaraugus v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-0256

*County of Cayuga v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0423

*County of Chautauqua v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-0214

*County of Chemung v. Abbott Laboratories, Inc., et al.*
W.D.N.Y. Case No. 05-CV-6744

*County of Chenango v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0354

*County of Columbia v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0867

*County of Cortland v. Abbott Laboratories, Inc., et al.*
N.D.N.Y. Case No. 05-CV-0881

MDL NO. 1456
Civil Action No. 01-12257-PBS

Judge Patti B. Saris

[Caption Continues on Next Page]

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT

*County of Dutchess v. Abbott Laboratories, Inc., et al.*   )
S.D.N.Y. Case No. 05-CV-6458   )
    )
*County of Essex v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0878   )
    )
*County of Fulton v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0519   )
    )
*County of Genesee v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-00267   )
    )
*County of Greene v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0474   )
    )
*County of Herkimer v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-00415   )
    )
*County of Jefferson v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0715   )
    )
*County of Lewis v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0839   )
    )
*County of Madison v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-00714   )
    )
*County of Monroe v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6148   )
    )
*County of Nassau v. Abbott Laboratories, Inc., et al.*   )
E.D.N.Y. Case No. 04-CV-05126   )
    )
*County of Niagara v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-06296   )
    )
*County of Oneida v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0489   )
    )
*County of Onondaga v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0088   )
    )
*County of Ontario v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6373   )
    )
*County of Orleans v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6371   )
    )
*County of Putnam v. Abbott Laboratories, Inc., et al.*   )
S.D.N.Y. Case No. 05-CV-04740   )

*County of Rensselaer v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-00422   )
   )
*County of Rockland v. Abbott Laboratories, Inc., et al.*   )
S.D.N.Y. Case No. 03-CV-7055   )
   )
*County of Schuyler v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6387   )
   )
*County of Seneca v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6370   )
   )
*County of St. Lawrence v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0479   )
   )
*County of Saratoga v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0478   )
   )
*County of Steuben v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6223   )
   )
*County of Suffolk v. Abbott Laboratories, Inc., et al.*   )
E.D.N.Y. Case No. 03-CV-12257   )
   )
*County of Tompkins v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0397   )
   )
*County of Ulster v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 06-CV-0123   )
   )
*County of Warren v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0468   )
   )
*County of Washington v. Abbott Laboratories, Inc., et al.*   )
N.D.N.Y. Case No. 05-CV-0408   )
   )
*County of Wayne v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-06138   )
   )
*County of Westchester v. Abbott Laboratories, Inc., et al.*   )
S.D.N.Y. Case No. 03-CV-6178   )
   )
*County of Wyoming v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-6379   )
   )
*County of Yates v. Abbott Laboratories, Inc., et al.*   )
W.D.N.Y. Case No. 05-CV-06172   )

## PRELIMINARY STATEMENT

At issue is the scope of the AWP/Best Price matter that has been filed by the City of New York and 43 New York Counties against defendant drug manufacturers.   There are three questions now before the Court: (1) Which drugs or NDCs are in the case? (2) Are drugs commonly referred to as PADs in the case? (3) Are claims alleging manipulation of the FUL in the case?   Because plaintiffs properly have pleaded all actionable NDCs as required by this Court's prior orders and decisions, and have substantiated that both drugs often referred to as "PADs" and claims involving the federal upper limit ("FUL") should remain in the case, defendants' motion to dismiss should be denied in its entirety.

Defendants contend that plaintiffs' case is too large and the prices used to demonstrate spread too low.  The size of the case, however, is a function of defendants' false price reporting. How the case will be organized going forward is an issue that should be addressed after the threshold question whether plaintiffs have satisfied 9(b) particularity. Defendants' suggestion that the case be winnowed on grounds of manageability are baseless.[1] This not a class action and there is no provision in New York Social Services Law §145-b, GBL §349, the principles of common law fraud, or unjust enrichment to suggest that when a fraud infects $20 billion in expenditures, or more than 1300 drugs it ceases to be a fraud.

As for the prices used to demonstrate spread, plaintiffs have explained in their complaint that the prices used in Exhibits B1-40 to identify which NDCs should be in the case are *actual prices ("AAC") paid by entities in the relevant classes of trade to wholesalers for defendants' drugs*.  City of NY/NY Counties' First Amended Consolidated Complaint, filed June 8, 2007 ("FACC") at ¶145.  Hence, plaintiffs employ the designation "AAC" for "actual acquisition

---

[1]  Manageability is not a concern in any event given, *inter alia*,  that defendants' liability for AWP fraud under New York Soc. Serv. Law §145-b will turn in large part on fact questions that will be resolved by expert calculations of spread between defendants' true prices and those defendants caused to be reported.

1

cost." *Id.*  Use of such AAC prices complies with this Court's prior directives to present a good faith estimate of spread based on actual market prices.   *See, e.g., City of New York et al. v. Abbott Labs, Inc. et al.*, 2007 WL 1051642 (April 2, 2007) at *15.    That is exactly what plaintiffs used.

Defendants complain that the prices used are ridiculous and lead to distorted results.  We agree the prices are ridiculous.  It is ridiculous that chain supermarket Shop-Rite paid Cardinal $0.01 for the generic Budeprion SR 150 mg Tablet pursuant to a contract Shop-Rite had with Teva while New York Medicaid paid based on Teva's fictitious AWP of $181.04.  FACC, Ex. B.

Defendants contend that actual prices paid to wholesalers by chain pharmacies, independent pharmacies or out-patient clinics that are reimbursed based on AWP should not be considered when identifying an actionable drug. The contention makes no sense.

Defendants' protests move beyond the ridiculous when one considers that 78% of the Cardinal actual acquisition costs ("AACs") and over 91% of the Amerisource Bergen ("ABC") AACs that appear in Exhibit B to the FACC were paid pursuant to a contract between the purchaser and the defendant drug manufacturer. Cicala Dec. at ¶¶ 25, 26.  Defendants simply cannot be heard to complain about a methodology that identifies actionable NDCs based on prices paid by entities in the relevant classes of trade pursuant to contracts that defendants themselves negotiated with the purchasing entity.

Under this Court's prior rulings, the only result that matters at this stage is whether the spread is over 25%.  This is a binary exercise.  If a spread is above 25%, the NDC is in the case; if a spread is below, the drug is out.  This is not a damages calculation.  This is merely to identify which drugs are in and anything over 25% is in.

Defendants contend that plaintiffs should have instead used averages and the other bases for spreads previously blessed by the Court.  Defendants ignore that the Court has previously held that plaintiffs need not use averages. *Abbott Labs*, 2007 WL 1051642 (April 2, 2007) at *15, n.8.  The McKesson/Servall prices accepted by this Court in the context of plaintiffs' Consolidated Complaint filed June 15, 2005, ("CC") are not averages, they are actual prices. *Id.* Given that plaintiffs are working with incomplete data, any approach based on averages would have been flawed and prejudicial to plaintiffs[2].

Notably, even if plaintiffs had used weighted averages for the relevant classes of trade together with the spreads previously accepted by this Court, 10,481 of the 11,175 NDCs (93.6%) in Exhibit B would still be in the case. *See* Declaration of Joanne M. Cicala, sworn to July 11, 2007, and submitted in opposition to defendants' joint motion at ¶ 13 (the "Cicala Dec.").

 The prejudice would concern the 694 NDCs that would fall out of plaintiffs' case pursuant to such a methodology. Cicala Dec., Exh. B-2.  These 694 NDCs represent over $1.6 billion in expenditures for the City/County Medicaid programs during the relevant period. Cicala Dec. at ¶ 15.  Given that the averages are based on incomplete data, and given that the deep discounts reflected in FACC Exhibit B raise red flags with regard to defendants discounting practices and reported prices.  It would be premature and prejudicial to force plaintiffs to drop these NDCs from their case.  There is simply no real prejudice to defendants that results from these NDCs remaining in the case at this stage.  Ultimately, with the benefit of a full record, it will be determined if the spreads for these *and all at-issue* NDCs exceed a 20-25% (or 30%)

---

[2] And, of course, such an approach would not have insulated plaintiffs from defendants' attack in any event: defendants would have argued that the average was based on incomplete data; the average should not have been weighted; the average should have been weighted; the average should have only taken into account x, y, z classes of trade; the average should have taken into account all classes of trade; the average does not represent an actual market price.

threshold, (or a 50% threshold for FUL drugs).  Under plaintiffs' theory of the case, there will be no liability and no damage for NDCs whose spreads are within the threshold.

Defendants contend that plaintiffs have expanded their case and disregarded this Court's admonition to not add new drugs or defendants into the case.  Def. Mem. at 1.  This is false.  The FACC identifies 11,175 actionable NDCs.  The prior Consolidated Complaint, filed June 15, 2005 ("CC") identified 11,418.  Cicala Dec. at ¶ 3.  The FACC adds no new defendants. *Id.* at ¶4.

Nor do plaintiffs seek to add new drugs.  The CC identified 1369 drugs; the FACC identifies the same 1369 drugs. *Id.* at Exhibit A-1[3].

Defendants contend plaintiffs improperly have used prices paid by any provider without regard for class of trade.  This too is false.  Plaintiffs are asserting claims based only on prices paid by the classes of trade plaintiffs reasonably believe to be relevant to a calculation of a true estimated acquisition cost.

Defendants completely misrepresent plaintiffs' allegations regarding drugs commonly referred to as PADs (and now referred to by defendants as "dual channel").  Plaintiffs specifically allege these drugs were dispensed by pharmacy providers in New York reimbursed based on AWP and FUL by the City/County Medicaid programs and in an amount that exceeds

---

[3] Exhibit B to the FACC does contain NDCs relating to 348 other drugs. *Id.* at Exh. A-2.  This reflects a technical sorting error.  Plaintiffs absolutely did not intend to add any new drugs to the FACC beyond those drugs that had been previously identified in the CC.  The technical sorting error occurred because plaintiffs' data queries produced actionable spreads for all drugs for which plaintiffs had expenditures during the relevant period.  If the Court is not inclined to entertain a motion for leave to amend to include these drugs, plaintiffs will immediately withdraw any claims as to them.  If, however, the Court is willing to entertain such a motion, plaintiffs would note that the NDCs for these drugs should be included in the case given that the spreads associated with them are beyond the 20-25% range (whether measured based on the FACC Exhibit B actual acquisition cost price or the weighted averages and/or McKesson/Servall prices summarized in Exhibit B to the Cicala Declaration), and defendants were on notice from plaintiffs' prior complaints that the alleged wrongdoing was not confined to the drugs identified therein by name. *See, e.g.*, CC at ¶ 172.

$2.4 billion. FACC at ¶¶ 99-111. There is simply no justification whatsoever for excluding these drugs from plaintiffs' case.

Finally, regarding FULs, defendants seek to avoid the consequence that their failures to report accurate prices to the publishing compendia have had on CMS' establishment of the FUL. As this Court succinctly framed it during a colloquy with defense counsel at the May 16, 2007 status conference:

> The Court:  But you're saying, if everyone lies, everyone's off the hook?
>
> Mr. Cross:   No.  The people who set the FUL.  She has to plead who set the FUL.  If my client didn't set the FUL because my WAC was higher than Mylan's WAC, I've got nothing to do with the transaction.
>
> The Court:  Unless you lied.

Tr. at 33:14-20 (Exhibit C to Cicala Dec.)

Although the FUL is based only on the lowest published price, each defendant has an interest in inflating its published price so as to ensure that its price for that particular NDC does not lead to a reduction in the fraudulently inflated FUL.  By keeping the FUL high, the defendants who manufacture and/or package that NDC give the pharmacist an incentive to dispense this drug rather than a competing drug with a different NDC.  Plaintiffs seek to hold a defendant liable for fraudulent inflation of the FUL only if the FUL would have been lower if that defendant had published its true price for that NDC.  In each such instance, that defendant's fraud is a but-for cause of plaintiffs' overpayment.  It makes no difference that another defendant's lower, but still fraudulently inflated, false price was the actual basis for setting the FUL.  *Bell Atlantic Corp. v. Twombly.* --- S.Ct.---- 2007 WL 1461066 at *11 (May 21, 2007) has no application here.   Plaintiffs' FUL claims should be permitted to go forward.

In all, defendants' attack on plaintiffs' FACC fails entirely and the joint motion should be denied.

## **BACKGROUND**

The Court has already determined that plaintiffs have adequately pleaded causes of action for common law fraud, violation of New York Social Services Law §145-b, violation of New York General Business Law §349 and for unjust enrichment. *Abbott Labs*, 2007 WL 1051642, at *7-14. For those of plaintiffs' claims that are subject to Fed. R. Civ. P. 9(b), the Court has determined that all drugs where plaintiffs "alleged a spread of greater than the 20-25% mark up between WAC and AWP" are in the case. *Id.* at *14-15 and n. 8.

Further, the Court has determined that plaintiffs alleged Best Price claims against Biogen (for Amevive, Zeralin and Avonex); GlaxoSmithKline (for Paxil and Flonase); Merck (for Zocor), Pfizer (for Lipitor) and TAP (for Lupron). *Id.* at *17 And, the Court determined that plaintiffs adequately alleged specific FUL pricing manipulation by Alpharma (for Clobetasol), Barr (for Chlordiazepoxide), the Boehringer Group (for Furosemide and Prednisone), Endo (for Selegiline, Captopril-HCTZ, and Carbidopa/Levo), Ethex (for Doxazosin Mesylate), and the Ivax Group (for Buspirone).

At the May 16, 2007 status conference, this Court, from the bench, granted leave for plaintiffs to file an amended complaint. Cicala Dec. Exh. F at 51. Plaintiffs filed the First Amended Consolidated Complaint on June 8, 2007.

It is ironic and entirely unfair that one of defendants' attacks on the FACC is that it was filed without leave of Court. The transcript of the May 16, 2007 status conference plainly shows that Plaintiffs were prepared to file a motion for leave to amend those parts of their complaint for which leave to amend would have been necessary. *Id.* at 50. It was *defense*

*counsel* who recommended the alternative approach that the Court and the parties ultimately adopted. *Id.*   In fact, the Court granted plaintiffs leave to amend the very claims which defendants now accuse plaintiffs of "brazenly" smuggling into the case.  Having suggested this approach in the first place, defendants cannot be heard to complain about it now.[4]  This part of defendants' motion should be ignored entirely.[5]

## ARGUMENT

### I.      EXHIBIT B PROPERLY SETS FORTH THE AT-ISSUE NDCs

### A.  The Prices Set Forth In Exhibit B Are Entirely Proper

The prices in Exhibit B are actual prices actually paid by entities in the relevant classes of trade to wholesalers for defendants' drugs. FACC at ¶ 145.  Plaintiffs do not present these prices for the purposes of calculating damages, nor for the purpose of affixing liability.  The sole purpose of the prices is to identify which NDCs are properly in this case in light of this Court's prior 9(b) rulings.

These actual market prices are exactly what the court has previously directed plaintiffs to use as the basis for an estimate of spread.  *See, e.g. Abbott Labs*, 2007 WL 1051642 at *15, n.8. Based on this Court's prior rulings and the classes of trade that were considered, it is entirely proper for plaintiffs to use these actual invoice prices to identify which drugs are properly within the scope of this case.

---

[4] Defendants also misrepresent the scope of the leave that was granted.  Plaintiffs' counsel expressly stated that one of the issues any motion for leave would address concerned which drugs were in the case.  In response to the Court's comment "We're not adding new drugs, new defendants, nothing", (Tr. at 45) plaintiffs' counsel responded, "That's correct though there is the question of which drugs off our master list are in the case or not and we will clarify that as well in the context of this motion [for leave]."  Tr. at 45.

[5] Even were leave to amend not granted from bench, leave should be freely granted where, as here, the defendants cannot claim prejudice, undue delay, or surprise.  The drugs at issue in the FACC were first identified in the CC filed over two years ago.  Cicala Dec. at Exh. A.  Defendants have long known that plaintiffs' claims concerned these drugs.  *Qaak v. Dexia, S.A.*, 445 F.Supp.2d 130 (D Mass. 2006) (Saris, J.). (Court grants leave to amend in light of case law construing Fed. R. Civ. P. 15(a) liberally, and lack of prejudice to defendant).

Defendants can offer only speculative *ipse dixit* in response.  They boldly argue the following:

> It is clear that, in many cases, plaintiffs' spread calculations are in fact not based on actual sales at all.  These pennies are more likely placeholders for charitable contributions than actual prices for sales.  Regardless of what they are, their use in calculating spreads obviously distorts the result.   Again, Procrit is a good example.  Procrit was undoubtedly never sold to anyone for a penny.

Def. Mem. at 6.  Every sentence in the above excerpt is entirely false.   The AACs in Exhibit B either come from McKesson-Servall, a source this Court has already accepted as valid for estimating spreads, *Abbott Labs*, 2007 WL 1051642 at *15, n. 8, or are actual invoice (transaction) prices actually paid to wholesalers by entities in the relevant classes of trade.  FACC at ¶145.  82% or 283 of the 344 penny prices in Exhibit B were paid by entities in the chain pharmacy, independent small chain, and mail order retail classes of trade. Cicala Dec at. ¶ 24.   The remaining 18% or 61 of penny price sales were to entities in the other selected relevant classes (namely, non-acute care facilities, specialty pharmacies, out patient clinics and retail inter-companies).   It is entirely proper for plaintiffs to be considering prices to all of these classes.[6]

Defendants' speculation notwithstanding, the wholesaler data tells us that Procrit (NDC 59676034001) was sold to someone for a penny.  It was sold to an independent retail pharmacy on numerous occasions at that price.  Cicala Dec. at ¶ 16.  The drug is properly in this case at this stage.  Procrit's actionability also can be confirmed based on a weighted average.  That weighted average produces a 35% spread. Cicala Dec. at Exh. B.  If, on a full record, the spread is determined to be under the threshold, there will be no damage and no liability for Procrit.

---

[6] Defendants assert, without explanation, "[t]hese pennies are more likely placeholders for charitable contributions"? Plaintiffs have uncovered no testimony anywhere from the wholesaler, nor any documents that define or ever even reference the term "placeholders".   Wholesaler deposition testimony confirms that the prices appearing in the utilized databases reflect actual invoice prices.  (Cicala Dec. at ¶ 27)

Defendants also highlight Schering's Temodar 20 MG saying that plaintiffs' spread is higher than what the Court found in the context of the MDL Class Trial.[7]  The extent to which the parties here are bound by the Court's findings in the Class trial is not an issue before the Court on this motion.  Regardless, the spread contained in Exhibit B is based on an actual prices paid by an out-patient cancer care center entity in the oncology class of trade.  Cicala Dec. at ¶17.  A weighted average for Temodar produces a spread of 28%. Cicala Dec. at Exh. B.  The propriety of having this drug in the case at this stage reasonably cannot be disputed given that the Court has ruled that any drugs where plaintiffs plead a spread of greater than 20-25% is in the case.[8]

## B.    On the Use of Averages

Defendants contend plaintiffs should have calculated averages instead of using actual prices.  Plaintiffs disagree. First, this Court has previously rejected the use of averages to estimate spread.  *Abbott Labs*, 2007 WL 1051642, at *15, n.8.  Second, the McKesson/Servall Prices accepted in the April 2, 2007 decision are not averages; they are actual market prices. The Court found that plaintiffs satisfied 9(b) by comparing reported AWPs against these actual market prices. *Id.*  Third, Plaintiffs do not yet have access to all the necessary data to calculate an accurate average.  That will come later.  At this stage, plaintiffs have in their possession only a portion of the Cardinal Disktrack database covering transactions for 2000-2005, a portion of the two relevant ABC databases (STAR and DiskTrack) and nothing from McKesson (beyond the

---

[7] Defendants' argument that plaintiffs' spreads have changed since earlier filings is a red herring that can be ignored entirely. Of course the spreads have changed, plaintiffs have more data.  The only relevant inquiry is whether spread is over/under 25% and our new data merely confirms that it was proper for drug to have been in the case in the first place.

[8] GlaxoSmithKline's Avandia 4 MG is another interesting example.  The wholesaler data on which plaintiffs relied show that Avandia was available from Cardinal to The Medicine Shoppe, a member of the chain pharmacy class of trade, for $0.01.   The weighted average across all relevant classes of trade for this same drug reveals spreads of 31% below AWP.  *See* Cicala Dec. Exh. B.  Avandia is properly in this case at this time.

Servall Prices) or any other wholesalers.  Cicala Dec. at ¶ 7.  Full blown discovery against defendants has been long stayed and/or limited only to that which the defendants had produced to the MDL class plaintiffs.[9]  Any average at this stage thus would be meaningless given that it would reflect only a subset of all relevant data and, as detailed below, would have been unfairly prejudicial to plaintiffs as a result.

Fourth, had plaintiffs used weighted averages for the relevant classes of trade together with the price points already accepted by this Court, 10,481 of the 11,175 NDCs identified in Exhibit B would still be in the case.  Such an approach, relying on incomplete data, would result in 694 NDCs representing over $1.6 billion in expenditures falling out of the case, however.  Given the AACs for these NDCs (appearing in FACC Exh. B and also in Cicala Dec. Exh. B-2) reveal such deep discounts off AWP, it would be premature to drop them from the case.  There is no prejudice to defendants associated with producing pricing data for these NDCs given the time periods at issue in this matter.  *See* Protective Order entered June 22, 2007 in *U.S. ex rel Ven-A-Care of the Florida Keys v. Dey, Inc.*, et al. No. 05-cv-11084-PBS.  (only current pricing data considered confidential.)

### C.  Plaintiffs Considered Only Proper Classes of Trade

Defendants mistakenly argue that plaintiffs are relying on prices paid by any provider without regard to class of trade.  In fact, plaintiffs are only relying on prices paid by the classes of trade plaintiffs reasonably believe to be relevant to a calculation of a true estimated acquisition cost.  Below are the specific classes of trade whose prices plaintiffs consider relevant for this exercise.  *See* Cicala Dec. at ¶ 10.

---

[9] One defendant (GSK) is in a different posture.  GSK produced a substantial amount of transactional data to plaintiffs in late April/early May 2007.  However, it is not yet clear to plaintiffs what data from GSK's production properly could be used for pleading purposes.  Moreover, at this stage of litigation and in the interest of a uniform approach, it was entirely reasonable for plaintiffs to use wholesaler (which it has for all defendants) to identify actionable NDCs.

| **Cardinal Classes of Trade** | | **ABC Classes of Trade** | |
|---|---|---|---|
| 10 | Independent | B | Miscellaneous Chain |
| 20 | Chain Pharmacy | C | Chain Drug - Primary Supplier |
| 21 | Chain Supermarket | D | Independent Small Chain |
| 22 | Chain Mass Merchandiser | E | Mass Merchandise |
| 23 | Chain Mail Order | F | Food/Drug Combination Store |
| 24 | Chain Warehouse | G | Grocery or Convenience Store |
| 41 | Managed Care Home Infusion | I | Independent Drug Store |
| 42 | Managed Care Nursing Home | J | Miscellaneous Food Chain |
| 44 | Managed Care Mail Order | K | Miscellaneous |
| 50 | Med/Surg. | L | Mail Order Retail Pharmacy |
| | | N | Nursing Home Supplier |
| | | Q | Miscellaneous Warehouse |
| | | R | High Volume Warehouse |
| | | S | Surgery Center |
| | | T | Home Health Care Provider |
| | | U | Other Non Acute Care |
| | | V | Physicians/Clinics |
| | | W | Oncology |
| | | Y | High Vol. Mail Order Warehouse |
| | | 1 | Retail Interco |
| | | 4 | Dialysis |
| | | 5 | Pharmabuy |
| | | 6 | Urology |
| | | 9 | Internet |

Plaintiffs confirmed the propriety of these class of trade choices by reviewing all available information, including the deposition testimony of the Cardinal and ABC witnesses deposed thus far.[10]

Plaintiffs specifically exclude prices offered to the following classes of trade in this analysis, recognizing that reasonable minds could differ as to the propriety of including same in a calculation of the EAC of Medicaid providers. *See* Cicala Dec. at ¶ 11.

---

[10] For example, plaintiffs sought to confirm that prices designated as "10 Independent" in the Cardinal data reflected prices paid by independent retail pharmacies. The following colloquy between Cardinal witness Ron Reich and John P. Bueker, Esq., counsel for Warrick at Mr. Reich's June 7, 2007 deposition, confirmed the point:

> Q:      Are there – in the look up table, is there a description on or a definition of what,
>         say, Cardinal considers to be an independent pharmacy?
> A:      I know that the code would be a 10 and it would say retail.

Cicala Dec. at ¶ 27.

| Cardinal Classes of Trade | | ABC Classes of Trade[11] | |
|---|---|---|---|
| 30 | Hospital[12] | A | Medical Center Store |
| 40 | Managed Care/HMO/PPO | H | Hospital Pharmacy |
| 43 | Managed Care Other | M | Health Maintenance Org. |
| 45 | Managed Care Warehouse | O | Hospital Miscellaneous |
| 49 | N/A | P | Health Systems Mail Order Phcy |
| 60 | Government - Federal | X | Retail DME |
| 61 | Government - State | Z | Manufacturer/Wholesaler |
| 90 | Brokerage | 0 | Central Fill Interco. |
| 92 | Intercompany | 2 | Consignment – TIMS |
| 97 | Order Flow Monitor | 3 | Health Systems Interco |
| | | 7 | Wholesale Interco. |
| | | 8 | Dock to Dock Interco. |

D.  **Defendants Ignore the Proper Standard of Review**

Plaintiffs' factual allegations are assumed to be true at the pleading state. *Marrero-Gutierrez v. Molina*, ---- F.3d-----, 2007 WL 1765550 (1st Cir. June 20, 2007)  The only purpose behind Exhibit B is to define the universe of NDCs that are at issue.  As noted above, Exhibit B could just as easily have contained columns saying "yes/no" or "in/out" for every NDC for which the City/County Medicaid programs paid.   As demonstrated herein and in the Cicala Declaration, plaintiffs absolutely have a good faith basis to maintain that every NDC in Exhibit B should be in this case.  Whether based on the actual price paid by an entity in a relevant class of trade to the wholesaler, or based on a weighted average, or based on the price points previously accepted by this court: these NDCs should be examined.  If, on a full record, it is determined that the spreads for these drugs were below 20-25% (or 30%), there will be a finding of no liability and no damage.

---

[11]  Prices from the ABC classes of trade ("manufacturer/wholesaler" and "wholesale interco") were inadvertently included in Exhibit B to the FACC.  Cicala Dec. at ¶20.   65 NDCs out of the 11,175 listed in Exhibit B have AACs from these two improper classes of trade.  Those 65 NDCs are listed in Exhibit D to the Cicala Dec. 59 of the NDCs came from the "wholesale interco" class of trade; 6 came from "manufacturer/wholesaler".  *Id.* at ¶ 21.  All but two of these 65 NDCs, however, belongs in this case.  *Id.*  Also, plaintiffs emphasize that their calculation of weighted averages as reflected in Cicala Dec. Exh. B and described herein *does not* include these two ABC classes.

[12]  Among defendants' many baseless accusations is that plaintiffs indiscriminately used hospital prices to create FACC Exh. B.  Plaintiffs did not.

## II.     ALL NDCs IN EXHIBIT B HAVE BEEN REIMBURSED AT AWP AND/OR FUL AND ARE PROPERLY WITHIN THE SCOPE OF PLAINTIFFS' CASE

The only way that defendants can succeed in their PAD/Dual-Channel argument is by misrepresenting plaintiffs' allegations.  And so that is what defendants try to do.  The simple truth is, plaintiffs have adequately alleged that the City/County Medicaid programs have reimbursed providers for every NDC listed in Exhibit B on the basis of AWP and FUL.

The relevant allegations appear at ¶¶ 99-111 of the FACC.  Below are select excerpts that, by themselves dispose, entirely of defendants' attack:

> The Medicaid reimbursements at issue in this litigation are those made on the basis of AWP and FUL.  Every drug listed in Exhibit B to this complaint, regardless what type of drug it is or what form it takes  (i.e. tablet, vial, inhalant, injectible, syringe, solution, etc) *or whether it could also be identified as or labeled "physician administered"* has been reimbursed by New York Medicaid based on AWP or FUL.   FACC at ¶99 (emphasis in original).

> Between 1997-2004 alone, New York Medicaid has reimbursed Pharmacy Providers based on AWP or FUL for the injectibles, syringes, inhalants and vials listed in the Exhibits hereto in an amount that exceeds $2.4 billion.  FACC at ¶110

> New York Medicaid only reimburses for drugs based on actual (or invoice) cost when the drug is "provided by a medical practitioner and claimed separately by the practitioner".  N.Y. Soc. Serv. Law §367-a(9)(a).  Medicaid practitioners are not Pharmacy Providers under New York Medicaid; Pharmacy Providers are not medical practitioners.  FACC at ¶ 111.

Defendants question plaintiffs' probity on this subject and refer to the allegation at paragraph 99 above as "conclusory".    Def. Mem. at 19.   Plaintiffs' allegations are not conclusory; they are 100% accurate.  The City/County Medicaid programs reimbursed pharmacy providers for every NDC in FACC Exhibit B on the basis of AWP or FUL.  Where a medical practitioner submitted a separate claim for such a PAD or dual channel drug, that medical practitioner is reimbursed at actual cost.  Reimbursements based on actual cost are not in this case.  Reimbursements made based on AWP or FUL are.

The foregoing more than adequately disposes of defendants' arguments with respect to PADs or "dual channel" drugs.

### III. PLAINTIFFS HAVE PLEAD FUL FRAUD

The FACC clearly explains how defendants' failure to report accurate reimbursement prices to the publishers caused inflated FULs to issue, thereby damaging Medicaid.

> Defendants' failure to submit accurate pricing data to the publishing compendia can cause false and inflated FULs to issue.  It is clear that, in many instances, had defendants submitted accurate prices to pricing compendia, the FULs set by CMS would have been lower and the New York State Medicaid Program would have paid less.

FACC at ¶ 14; see also ¶¶ 9, 13

Plaintiffs particularize how defendants' failure to report accurate prices causes specific FULs to be inflated.  The FACC explains:

> Exhibit B to this complaint details the many examples where a specific defendant's failure to report an accurate price for its drug resulted in a false and inflated FUL being set.  In each example of "FUL fraud" set forth in Exhibit B, the Counties allege that defendant's true price (or the "actual acquisition cost" "ACC") for the NDC at issue was more than 50% lower than the established FUL. Had the defendant reported its true price for that NDC, the operative FUL would have been based on that defendant's true price and would have been lower than it was.   In such case, the County Medicaid Program's FUL-based reimbursement for that particular multi-source drug would have been less.  Thus, the Counties allege FUL fraud for every NDC listed in Exhibit B where the defendant's AAC is more than 50% below the established FUL.

FACC at ¶ 15;  *See also* FACC at ¶ 30.

Defendants take issue with the prices plaintiffs have used to demonstrate FUL manipulation.  Once again, though, for the reasons set forth herein, whether the Court considers FACC Exhibit B, the weighted averages in Cicala Dec. Exh. B or the McKesson Servall prices, it is clear that defendants' failures to report accurate prices resulted in the publication of inflated reimbursement benchmarks, both AWP and FUL.

**A. Plaintiffs' Do Not Allege That Defendants Are Obligated To Report Their Lowest Prices To Publishers; Plaintiffs Allege That Defendants Must Report Accurate Prices.**

Defendants make two primary arguments against plaintiffs' FUL claims.  First, despite plaintiffs' allegations detailing defendants' obligation to report prices that are accurate (meaning tethered to the actual prices paid by the relevant classes of trade), *See, e.g.*, FACC ¶¶ 114, 115, 155, 158, defendants insist that plaintiffs' have alleged that defendants have a duty to report their lowest prices to the publishing compendia.  *See* Def. Mem. at 8-18.  As detailed above, plaintiffs nowhere allege this.  Further, plaintiffs do not state that the AACs in Exhibit B are necessarily the very prices that defendants were obligated to report.  Rather, in response to the Court's prior rulings on particularity, plaintiffs used actual acquisition costs paid by entities in the relevant classes of trade to demonstrate which NDCs are properly in this case.   Use of such prices fully complies with this court's prior directives to present a good faith estimate of spread based on an actual market price. *Abbott Labs*, 2007 WL 1051642, at *15, *e.g.*

**B. Plaintiffs' Allegations Are Entirely Consistent With The FUL Regulations and the OIG and DOJ Interpretations Thereof; Defendants' Argument That They May Report Whatever Prices They Wish Is Not**

Defendants' second primary argument is that the 1987 FUL regulations put plaintiffs on notice that FULs were inflated or, more specifically, provided notice of multi-source published price inflation vis-a-vis actual provider acquisition costs.  Because of the language of the 1987 regulation, defendants say, when New York adopted the FUL as one of its Medicaid reimbursement benchmarks, New York made the choice to reimburse based on inflated prices.  Def. Mem. at 12.  Thus, defendants argue, New York's overpayments flow from that informed choice, not from anyone's fraud.  Def. Mem. at 12.  In this regard, Defendants also make the remarkable argument that plaintiffs are incorrect when they allege that defendants had a duty to

report accurate prices. *Id.* at 13. To the contrary, defendants say that the 1987 regulation accepts that the FUL will be based on the inflated "list prices" that the compendia publish and defendants thus have liberty to publish whatever prices they wish. *Id.*

The argument is remarkable given the clear intent of the FUL and the undeniable goal of the Medicaid program to reimburse at EAC (42 C.F.R. 447.331; FACC at ¶5).

This Court has already rejected that defendants were at liberty to publish any prices they chose to the compendia. *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 460 F. Supp. 2d 277, 285 (D. Mass. 2006) ("this history provides little support for the argument that…Congress intended AWP to be a term of art for whatever price the industry chose to put in the industry publications. …The weight of the legislative history reflects congressional intent to have the AWP moored to actual wholesale pricing.").

Defendants argument rests on entirely selective and ultimately false representations of 1) the intent of HCFA in drafting the FUL regulation; 2) the intent of Congress; 3) the expectations of the extent of published price inflation in back 1987 when the FUL regulation was passed; and 4) the Department of Justice.

### 1)   HCFA Intended The FUL To Be Tethered To Provider Costs

Defendants confuse HCFA's knowledge in 1987 that reimbursement prices for generic drugs were inflated in the range of 20-25% over actual provider cost, with the notion that HCFA gave defendants a blank check to report any reimbursement price defendants' desired. Defendants essentially argue that their price reporting obligations are completely divorced from any duty to consider "actual prices." *See* Def. Mem. at 13.

This argument must be rejected for the same reason that similar propositions were rejected in the context of the MDL class case. The fact that the government was aware of some

inflation in reported prices does not mean that the government gave defendants unfettered license to report wildly inflated prices or prices untethered in any way to actual provider cost. To the contrary, any informed read of the FUL regulations reveals that the government was establishing a pricing cap that accounted for the expected 20-25% markup between actual cost and reported price for generic drugs. The regulation was written in 1987. In 1987, the expected range of inflation for published prices was simply not comparable to today's expectations and reality. HCFA was not endorsing the sort of mega-spread discounting that took root in the years after 1987.

The expectation that the FUL would be tethered to actual provider acquisition costs is also supported by the language in the FUL regulation itself, which clearly contemplates published prices that reflect the actual prices paid by providers.[13]

This expectation is confirmed by the very FUL provision that defendants cite, "Medicare and Medicaid Programs; Limits on Payments for Drugs", 51 Fed. Reg. 29,560 (Aug. 19, 1986). Contrary to what we know to be true today, this FUL provision definitively states that the mark-up between actual acquisition costs and published prices for generic drugs (in 1986-87) was the same as the mark up for brand drugs, or 20-25%. *See Id.* at 29,566. Thus, while it is true that in setting the FUL at 150% of published prices (which published prices HCFA acknowledged to be 20-25% over actual prices), HCFA accepted that the FUL would result in a somewhat inflated reimbursement, in no way did HCFA or Medicaid contemplate or condone a mega-spread

---

[13] *See* Medicare and Medicaid Programs; Limits on Payments for Drugs, 52 Fed. Reg. 28,648 (July 31, 1987) at 28,650 ("by setting an aggregate limit for multiple source drugs, we believe that we can provide more than adequate flexibility to States to use payment standards that reflect **the prices** and availability of particular drugs.").

disconnect between the published prices and the actual prices.  Exhibit B to the FACC identifies which NDC pricing contributed to this disconnect, as does Exhibit B-1 to the Cicala Dec.[14]

### 2) The OIG Agrees That FULs Should Be Tethered To Actual Provider Costs

The OIG agrees that the FUL regulations sought to tie Medicaid reimbursements to actual drug costs.  In its 2005 report "How Inflated Published Prices Affect Drugs Considered For The Federal Upper Limit List", the OIG stated that "[t]he Federal upper limit program was put in place to ensure that the Federal Government acts as a prudent payer by taking advantage of *current market prices* for multiple-source drugs."  *See Id*. at i (emphasis added).[15]

### 3) The Department of Justice Agrees That FULs Should be Tethered to Actual Costs

The recently filed DOJ FUL brief makes clear that the DOJ agrees that the published prices on which FULs are based must be tied to actual provider acquisition costs.  And, in that brief, the DOJ provides an example of how defendants' disregard of the actual sales costs harms Medicaid.

> Given that the Secretary sets the FUL based upon the prices published in the drug pricing compendia, a false or fraudulent drug price may directly affect the FUL and a state's Medicaid drug reimbursements. For example, assume that (1) there are three suppliers of therapeutically equivalent versions of Drug X, (2) that supplier #1 reported an AWP of $1.80 and a DP of $1.45; supplier #2 reported an AWP of $2.00 and a WAC of $1.60; and that supplier #3 reported an AWP of $3.00 and a WAC of $2.40; and (3) that the Secretary set the FUL at $2.175 based on the DP of supplier #1 ($1.45 x 150%). Then assume that supplier #3's reported prices were false and that its AWP was actually $.50 and its WAC was actually $.40.
>
> In the example above, supplier #3's false prices caused harm on at least two levels. At a minimum, states overpaid retail pharmacies for supplier #3's version

---

[14] Further support for the expectation is found in HCFA's repeated references to "reasonable dispensing fees" tied to pharmacy costs, as opposed to any price that defendants fancy.  *See e.g. id*. at 28,651.  It defies logic that HCFA would limit the dispensing fee so that it is reasonable, while simultaneously condoning the massive pricing inflation plaintiffs allege.

[15] *See also id*. at iii, "Congress created the Federal upper limit program to help Medicaid take advantage of *current market prices* for lower-cost generic drugs".

> of Drug X to the extent the states relied upon supplier #3's reported prices. So, for example, Alabama should have reimbursed for supplier #3's drugs based on an AWP of $.50 or a WAC of $.40 (instead of basing reimbursement on the $2.175 FUL). Moreover, in addition to causing states to overpay for supplier #3's drug, supplier #3's failure to report accurately its prices undermined the ability of the FUL to cabin state expenditures on the other versions of Drug X as well. Had supplier #3 reported its prices accurately, the Secretary would have set the FUL for Drug X at $.60 (Supplier #3's WAC ($.40) times 150%), and virtually all states would have limited their reimbursement for supplier #1 and supplier #2's versions of Drug X to $.60. Again using Alabama as an example, had supplier #3 reported accurate prices, Alabama would have incorporated the FUL and cabined its reimbursement for supplier #1 and #2's drugs at the FUL.

*See* Brief Of The United States On The Federal Upper Limit, AWP docket #4413, filed on June 28, 2007, at 5-6

So, contrary to the defendants' contentions, the FUL regulations do not provide defendants with license to create mega-spreads.  As in the context of the AWP, the issue is not knowledge of the fact of inflation, the issue is knowledge of the extent of inflation. Published prices were not known to be in the mega-spread range in 1987, when the regulations defendants rely on were written. Rather, the published prices, particularly the WAC and the DP were believed to be tethered to the relevant transaction prices from 1987 until recently.

### 4) Defendants Remaining Arguments Are Unavailing

Defendants' maintain that plaintiffs' allegations should be dismissed as implausible under *Twombly*, because of two primary deficiencies. First, defendants claim that plaintiffs assert that defendants are required to publish their lowest sale prices.  As explained above, plaintiffs do not make this assertion. Defendants' arguments based on this misrepresentation of plaintiffs' complaint should be rejected.

Second, defendants say that plaintiffs' alleged motive for FUL fraud is flawed because

> [c]ompeting for market share through manipulation of published prices is
> impossible where all drugs are reimbursed based on one manufacturers published
> price.  If manufacturer B reports a $2 price…, it would not matter if Manufacturer
> A reported a price of $5, or $15, or even $25.  The FUL would still be $3... and
> the spread on manufacturer A's product would continue to be the difference
> between $3 and the price at which manufacturer A's drugs were sold to providers
> in the marketplace…once a FUL is in place, the only way for manufacturers A
> and B to compete against one another for market share is through price
> competition [which] is a good thing that should be encouraged… [as it reduces]
> the overall cost to the Medicaid agency of providing prescription drug benefits."

Def. Mem. at 17.

Defendants' hypothetical ignores the fact that each defendant has an interest in ensuring that its published price for a particular NDC does not lead to a reduction in the fraudulently inflated FUL.  The FUL is based on the lowest published price.  By fraudulently inflating their published prices, defendants keep the FUL high, and thereby give the pharmacist and incentive to dispense this drug rather than a competing drug with a different NDC.  For each defendant that published a fraudulently inflated price, the FUL would have been lower if that defendant had published its true price, and that defendant's fraud is a but-for cause of overpayment.  It makes no difference that another defendant's lower, but still fraudulently inflated, false price was the actual basis for setting the FUL.[16]

Defendants' motion to dismiss plaintiffs' claims for FUL fraud should be denied in its entirety.

---

[16] In the AWP PAD class action, defendant Warrick argued that it had no motive to inflate generic AWP, FOF/COL at 154.  The Court dismissed that contention, noting that "[r]egardless of motive, it is still true that all 29 generic manufacturers of albuterol did independently post inflated AWPs which caused [the Medicare MAC] to be inflated." *Id.*  The same motive – marketing the spread – exists for inflation of generic drugs priced at FUL as for inflation of brand name drugs.  In any event, each defendant for whom FUL fraud is alleged did independently post inflated published prices which caused the FUL to be inflated, "which in turn caused substantial overpayments" by Medicaid (as well as those TPPs whose MAC lists referenced the FUL.)  *Id.*; *see also* Cicala Dec. Exh. B-1.

## <u>CONCLUSION</u>

For all the foregoing reasons, defendants' joint motion to dismiss should be denied in its

entirety and discovery should be permitted forthwith on all NDCs listed in FACC Exhibit B1-40.

Dated:  July 11, 2007

Respectfully submitted,

KIRBY McINERNEY & SQUIRE, LLP
Attorneys for the City of New York and all
Captioned New York Counties Except Nassau
830 Third Avenue
New York, New York 10022
(212) 371-6600

By:  _____/s/_____
     Joanne M. Cicala (JC 5032)
     James P. Carroll Jr. (JPC 8348)
     Aaron D. Hovan (AH 3290)

For the City of New York

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
John R. Low-Beer (JL 3755)
Assistant Corporation Counsel
100 Church Street, Room 3-162
New York, New York 10007
(212) 788-1007

LORNA B. GOODMAN
Peter J. Clines
Nassau County Attorney, by

 MILBERG WEISS LLP
 Melvyn I. Weiss
 Ross B. Brooks
 One Pennsylvania Plaza
 New York, New York 10119-0165
 Telephone: (212) 594-5300
 Facsimile:  (212) 868-1229

Special Counsel for the County of Nassau

21

**<u>Certificate of Service</u>**

I certify that on July 11, 2007 a true and correct copy of the foregoing Memorandum in Opposition to Defendants' Joint Motion to Dismiss the First Amended Consolidated Complaint was served on all Counsel of Record by electronic service pursuant to Case Management Order No. 2 by sending a copy to LexisNexis File and Serve for posting and notification to all parties.


 /s/ Aaron D. Hovan
Aaron D. Hovan