July 16, 2007

MEMORANDUM TO:		JUDGE PATTI B. SARIS

FROM:			FRANCIS E. McGOVERN
			Special Master

SUBJECT:		Report of the Special Master to the Court in *In Re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, regarding proposed settlement with Defendant GlaxoSmithKline.

    This report is made pursuant to the Court's order of appointment of November 15, 2006 to review the proposed settlement between the plaintiffs and "Track One" defendant GlaxoSmithKline ("GSK") in the above styled cause of action to determine whether it is fair, adequate and reasonable with respect to all class members, focusing in particular on:

      a. the amount of net payment to the consumer class members, and

      b. the method of distribution to the class members.

    The conclusion of this report is that the settlement is fair, adequate and reasonable with respect to all class members, including consumer class members, and is consistent with other similarly situated and approved settlements.

    The criteria for evaluating the fairness, adequacy, and reasonableness of a settlement include (1) the complexity of the litigation, (2) the posture of the case at the same time settlement was proposed, (3) the extent of discovery conducted in the case, (4) the circumstances of the settlement negotiations, (5) the experience of counsel, (6) the relative strength of the plaintiffs' case on the merits, the possible defenses, and other risks in the litigation, (7) the anticipated duration and expense of further litigation, and (8) the reaction of the Class and opposition to the settlement.

    The materials reviewed in connection with this report include:

      a. Joint Motion for Preliminary Approval of the GlaxoSmithKline Settlement

      b. Plaintiff's Exhibits from September 12, 2006 Preliminary Approval Hearing

    c. Class Plaintiff's Supplemental Memo Concerning the Preliminary Approval of the GSK Settlement

    d. Settlement Agreement and Release of the GlaxoSmithKline Defendants (with Exhibits)

    e. Additional Signature and Amendments to Certain Exhibits to the Settlement Agreement

    f. Fourth Amended Master Consolidated Complaint (Redacted Version)

    g. Memorandum and Order Re: Motion for Class Certification, dated August 16, 2005

    h. Consolidated Order Re: Motion for Class Certification, dated January 30, 2006

    i. Text of "An Orientation to the Acquisition of and Reimbursement For Prescription Drugs" (Defendants' 12/3/04 Tutorial)

    j. Written Tutorial of Dr. Meredith Rosenthal (Plaintiffs' 12/3/04 Tutorial)

    k. Report of Independent Expert Professor Ernst R. Berndt

    l. Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages (Redacted as to non-GSK Defendants), dated 12/15/05 (Highly Confidential)

    m. Supplemental Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Damages and Calculation of Damages: Addendum (Redacted as to non-GSK Defendants), dated 2/3/06 (Highly Confidential)

    n. DVD version of the Defendants' "Tutorial"

    o. Class Plaintiffs' Motion and Memorandum in Support of Final Approval of Proposed Nationwide Settlement with GlaxoSmithKline.

    p. Declaration of Katherine Kinsella in Support of Final Approval of Proposed Nationwide Settlement with GlaxoSmithKline

    q. Declaration of Thomas Glenn in Support of Final Approval of Proposed Nationwide Settlement with GlaxoSmithKline

    r. Objections to the proposed settlement filed by Demra Jordan and Health Care Service Corporation, and the Statement of Position filed by the Commonwealth of Pennsylvania

      s.   The Findings of Fact and Conclusions of Law issued by this Court on June 21, 2007 concerning the Trial of the Class 2 and Class 3 Third Party Payor ("TPP") Claims Against the Other "Track One" Defendants (hereinafter the "Track One Trial Opinion").

In addition, this review has involved interviews with the court appointed mediator and counsel for the parties, an analysis of the exclusion and claim form filings, and a telephone survey, discussed below, of individuals who submitted exclusion forms.

      The Court's 189 page Track One Trial Opinion concerning the other Track One defendants illustrates that the litigation is complex. The case against GSK and multiple other pharmaceutical manufacturers was filed in 2001 and the motion to approve the GSK settlement was filed in 2006. There was an extensive motion practice including motions to dismiss, motions for class certification, and numerous discovery motions. In the case against GSK, there were over 2.8 million pages of documents produced, almost 50 depositions were taken and there was extensive third party formal and informal discovery. The settlement negotiations between counsel for GSK and the plaintiffs persisted over two years, generally under the supervision of one of the most experienced and capable mediators in the United States, Eric Green. Those negotiations were rigorous and conducted at arms length. Once an overall settlement number of $70 million had been reached, following a comprehensive analysis of potential damages claims and risk factors, there were equally rigorous and arms length negotiations among counsel for the individual consumer classes, counsel for the third party payor classes and counsel for certain states that had filed *parens patriae* claims on behalf of consumers in their states. Also involved in these negotiations were counsel for certain independent settling health plans, who had informed plaintiffs' counsel after the $70 million figure was negotiated with GSK that they planned to opt out of the TPP class that had been contemplated when that figure was negotiated. Provisions of the settlement also provided for subsequent negotiations among counsel for the defendant and counsel for various states who filed *parens patriae* claims for consumers in their states but declined initially to participate in the settlement. All of the counsel involved are capable, experienced, and fully qualified to represent the interests of their clients.

      The litigation risks of the case on the merits, especially for the Class 2 and Class 3 TPP claims, are amply illustrated in the Court's Track One Trial Opinion. The opinion notes numerous disputed factual issues including pricing practices, types of drugs, competition,

marketing practices, and relevant time frames.  The contested legal issues include the statutory framework, statute of limitations, *Daubert* challenges, causation, and apportionment.  All of these factors contributed to a litigation landscape that was subject to substantial risk.

Under the proposed settlement, the $70 million total is divided as follows:  up to a maximum of $4.5 million to certain states for their *parens patriae* claims on behalf of consumers in those states, and the remaining $65.5 million to individual consumers and TPPs.  Of the $65.5 million allocated to the consumer classes and the TPPs, 30% or $19.65 million, is allocated to the consumers and 70% or $45.85 million, is allocated to the TPPs.  The TPP portion is divided between TPPs who remained in the class and those that chose to be part of the Independent Settling Health Plan ("ISHP") group, according to a formula that accounts for the relative size of their total expected claims.

Given the risk factors and the potential damages against GSK set forth in Dr. Hartman's reports, the total payment by the defendant of $70 million as a resolution of the litigation on behalf of the consumers, third party payors and certain states that filed *parens patriae* claims is well within the range of fair, adequate and reasonable settlements.  The allocation of the $65.5 million in settlement dollars set aside for the classes and the ISHPs between (1) the consumer classes and (2) the TPPs, as well as the allocation of the $45.85 million set aside for TPPs between (a) TPP class members and (b) the ISHP group, is fair and reasonable, given the risks faced by each of these groups.

The $19.65 million that has been allocated to the consumer classes is more than the estimate of single damages for the GSK Medicare co-payors set forth in Dr. Hartman's report.  The amount that would be left in the consumer pool after the deduction of reasonable attorneys fees and notice and administrative costs, would still exceed that single damages estimate.

An initial examination of the claims process, claims rate, and consumer opt-out rate revealed potential problems and led to a request for more in-depth review, which the Court granted.  By way of background, in this case eligible consumer class members include: all natural persons in the United States who made, or who incurred, during the class period, a currently enforceable obligation to make, a percentage co-payment under Medicare Part B for any of the GlaxoSmithKline (GSK) Covered Drugs listed in Exhibit A.  There are also individual consumers in Class 3, the Private Payor Class -- that is, all natural persons in the United States who made, or who incurred, during the class period, a currently enforceable obligation to make,

a full payment or a percentage co-payment outside of Medicare Part B for purchases of a physician administered drug manufactured by GSK and listed in Exhibit A. Included in the consumer classes are heirs of persons otherwise included. Excluded from the classes are natural persons who were not charged for the covered medications, made flat co-payments as opposed to percentage co-payments, were reimbursed in full for any payments or co-payments (e.g. under a "Medigap" policy), or who have the right to be fully reimbursed for any payments or co-payments. The consumer classes thus include only those who paid or were obligated to pay for certain drugs either in full or as a percentage co-payment and who were not reimbursed by insurance for such payments or co-payments

In order to provide notice to all potential class members in these circumstances, the notice plan included two major prongs: (a) nationwide notice by publication and by a website established for the settlement, and (b) notice by mail to all persons that could be identified as having had Medicare make an 80% payment for billing codes associated with GSK-covered drugs, a list which included many persons whose 20% co-payment was made for them under a Medigap policy. The details of the publication notice are set forth in the Declaration of Katherine Kinsella which was submitted to the Court in support of final approval of the Settlement and are consistent with notice plans in similarly situated consumer class actions. The notice by mail was sent to approximately 2.5 million persons in January 2007, identified by billing codes in Medicare Part B records of the Centers for Medicare and Medicaid Services (CMS) associated with the GSK drugs at issue. The notice by mail included an explanation of the settlement, a claim form, attached hereto as Exhibit B, and an exclusion form, attached hereto as Exhibit C. The mailed notice to individual potential class members constituted as robust a notice as was feasible given the available data.

The claim form developed for the settlement, which was included in the mailed notice and also made available to those who received publication notice and requested it, enabled class members to make a claim for qualified expenditures for each covered drug during the class period. Proof of payment included a written prescription; a receipt, a cancelled check or credit card statement reflecting payment; an explanation of benefits showing an obligation to pay; a letter from a physician proving an obligation to pay; or a notarized statement proving payment. These kinds of required proofs are typical of this type of consumer settlement. The deadline for filing exclusions was May 27, 2007 and the deadline for filing claims was May 28, 2007.

By the April-May 2007 period, approximately 10,000 consumer claim forms had been filed with a preliminarily estimated average value of about $230, and about 20,000 requests for exclusion or "opt outs" were made. The large number of requests for exclusion relative to the claim forms led to a request to the Court to delay the filing of this report until a greater understanding of the nature of these claim and "opt out" requests could be analyzed. On May 21, 2007, the Court approved a request to conduct a survey of consumers who filed exclusion forms. The survey was conducted, and the survey instruments are attached hereto as Exhibit D.

Fifteen hundred consumers were selected at random from the consumers who had submitted exclusion forms. Phone numbers were located for 1,367 (91%) of those selected for the survey. A pre-call letter, included in Exhibit D, was mailed to all 1,367 members of the phone survey sample.

The survey was conducted between May 22 and June 10, 2007. A total of 876 consumers, or 64% of the phone survey population, were interviewed, by phone, by professional call center staff from Rust Consulting Inc., an affiliate of the claims administrator, Complete Claim Solutions, who conducted the survey. The surveyors were trained in asking the survey questions, conducted practice interviews before calling began, and were monitored by supervisory staff throughout the calling period. Those who agreed to be interviewed answered a series of questions designed primarily to determine (a) whether they were truly class members as opposed to, for example, persons who took a GSK Covered Drug but had Medigap insurance that covered their co-payments and, (b) if they were part of the class, why they chose to exclude themselves from the settlement.

A significant number of those surveyed did not remember taking any of the covered drugs, many had insurance that covered their co-payment obligation, and many had no recollection of having made a percentage co-payment or paying for the drug in full themselves. Of those surveyed, 15.65% were estimated to be actual class members based on recalling the covered drugs, having been charged for the drugs, and either having no insurance or having made a percentage co-payment.[1] Counsel for plaintiff and GSK have indicated that this result is

---

[1] As discussed below, if it is assumed that this same 15.65% of all consumers who submitted exclusion forms were actually class members (and that the rest were not because, e.g., their co-payments were covered by a "Medigap" policy), then, of those consumers who filed exclusion forms, about 3,344 of them were actually class members.

6

generally consistent with studies that estimate that more than 85% of Medicare recipients have "Medigap" coverage that would typically cover their 20% co-payment.

Consumers whose survey responses indicated that they were, in fact, class members were asked what they had intended to do by submitting the exclusion form that was part of the notice packet that they received by mail. Sixteen percent (16%) of this group reported that they, in fact, had originally intended or meant to file a claim.

Among those surveyed who were class members who had originally intended to exclude themselves from the settlement, the following, in rank order, were the most frequently named reasons for exclusion:

| Reasons | Mentioned by: |
|---|---|
| a. Did not have/could not find amount paid/proof of payment | 30.38% |
| b. Did not understand what the settlement was about/could not tell whether or not eligible/qualified to be included/receive payment | 27.85% |
| c. Effort/time/trouble to complete the form/find documents would not be worth it for the return expected | 15.19% |
| d. Liked doctor or medication/treatment received/has no complaints | 15.19% |
| e. Class actions typically return very little money | 10.13% |
| f. Wanted nothing to do with it/not to be bothered | 8.86% |
| g. Do not approve of class action litigation or class action settlements or lawyers/litigation | 6.33% |
| h. Wanted to preserve right to sue/pursue own lawsuit | 2.53% |
| i. Claim form was too complicated/difficult to complete | 2.53% |

During the course of the phone survey, those determined to be actual class members were told that they may be able to reconsider their decision to exclude themselves if they wished to do so, and 18% indicated that they were interested in filing a claim. This, added to the 16% who said they originally intended to file a claim when they submitted the exclusion form, totals 34% of those who were determined to be class members who said they were interested in filing a claim form. In light of these results, new claim forms were mailed to everyone who had originally filed an exclusion form and might be interested in filing a claim form, along with a

letter saying that they could revoke their exclusion request and file a claim form by a new deadline of July 31, 2007.

As of July 11, 2007, there were 21,365 consumers who filed exclusion forms. As noted above, the survey results suggest that 15.65% of those who submitted exclusion forms were, in fact, members of the class. This would extrapolate to 3,344 actual class members who requested to opt out of the settlement. In addition, the survey results suggest that some 16% of the actual class members who sent in an exclusion form did so under the mistaken view that they were then filing a claim. If this 16% is subtracted from the 3,344 total of class member opt-outs, there would be 535 fewer opt outs or a total of 2,809 actual class members intending to be excluded from the settlement.

An overall opt out rate can be calculated from these survey results. The estimated 2,809 exclusions filed by persons who were eligible class members and who actually intended to opt out becomes the numerator needed to form the class member opt-out percentage. The calculation of the number of total actual class members, the denominator in determining an opt out rate, started with the 2.5 million people who received mailed notice based on the CMS Medicare Part B list of those who took drugs with a J-Codes associated with GSK.[2] The survey finding that 15.65% of those surveyed were actual class members can be applied to the 2.5 million total, with the result that the universe of actual class members would be 15.65% of 2.5 million or 391,250. In all probability, however, the universe of actual class members from the total who were mailed notice would be substantially less. This is because (a) the CMS list may have included those who paid for non-GSK drugs and are therefore not GSK class members,[3] and (b) the survey sample was taken from persons who affirmatively sent in an exclusion form and therefore were even more likely to be class members than those who did nothing. Those who did not respond at all with either a claim form or an exclusion form may have had lower

---

[2] Publication notice was also used in this case. It was the only way to reach potential class members who were *not* covered by Medicare Part B but may have made a percentage co-payment or full payment for a GSK-covered drug outside of the Medicare context. There is no effective method for determining how many such "non-Medicare" GSK settlement class members there may be in the United States. It was determined that only 146 of those who submitted opt-out forms did not receive the mailed notice sent to the "Class One" persons covered by Medicare Part B. This is a small number of potential "non-Medicare" class member opt-outs, and is undoubtedly a small percentage of whatever the number of class members may be that are not covered by Medicare Part B.

[3] The list CMS provided of potentially eligible GSK class members covered by Medicare Part B was likely over-inclusive, because it included those billed with J-Codes that may have covered drugs made by other manufacturers -- and that were not therefore covered by the GSK settlement.

drug name recognition, no proof of payment, or a higher chance of having full insurance coverage for their co-payment obligation, or may have been less likely to be class members for another reason as compared with those who actually responded in some way. It would be reasonable, therefore, to predict that the percentage of actual class members from the 2.5 million total persons who got mailed notice from the CMS list might be as low as half the percentage of actual class members who filed an exclusion form and were studied in the survey. Given these assumptions, a fair estimate of the number of actual Medicare Part B GSK class members would be between half of 391,250, or 195,625, and 391,250.

The estimated opt-out percentage of actual class members is between 2,809 of 195,625, or 1.4%, and 2809 of 391,250, or 0.71%. Moreover, the traditional definition of opt-out is a person who opts out in order to preserve the right to sue or pursue a lawsuit. In the survey, only 2.53% of the actual class members who intended to exclude themselves reported this reason for opting out. Extrapolating from the survey percentage to the number of estimated opt-outs by actual class members, an estimated 71 of the 2809 opt outs could be seen as traditional opt outs under this definition. This would translate into an opt-out rate of between 0.036% and 0.018% among the estimated number of actual "Class One" consumer class members.

To date there have been 12,705 claims filed. Using the predicted range of 197,581 to 395,162 as the universe of actual "Class One" consumer class members, this would translate into a claims-filed rate of between 3% and 6%.

Response rates for consumer class action settlements like this have historically been low. In a sample of 10 cases of over one million class members per case, the response rate ranged from less than 1% to 11%, with a mean response rate of 3.4%. Opt out rates in those same cases ranged from 0% to 0.8%. The response rate and opt out rate in this case fall within that range.

A preliminary estimate of the average claim payment completed in April, 2007, from a random sample of 140 claim forms filed, suggested that the average claim payment would be $237. Assuming this number reflects the average value of actual claims once they are all tabulated and approved, the total value of the claims paid out would be $3,014,515, the rough estimate of the average claim value multiplied by the 12,705 claim forms filed. This total represents a significant percentage of the total single damages estimate for consumers made by Dr. Hartman prior to the settlement. As previously indicated, there are sufficient funds available under the settlement agreement to make this payment.

The reaction of the consumer class to the settlement in this case is, therefore, consistent with comparable class action settlements. The method of distribution to the consumer class members is also consistent with common practices. The class member opt-out rates and claims filing rates are consistent with what is typically seen in these kinds of approved settlements. Finally, the amount of funds allocated under the settlement agreement to consumer class members appears adequate, given that the monies available under the settlement exceed the amount of current estimated payments to consumer class members.

These conclusions reflect current, accepted practices for distribution in consumer class actions. It is beyond the scope of this report to consider other techniques in future cases for notice and for dispensing settlement funds that might increase the low historic claim rates in these types of cases.

EXHIBITS

- A. GSK AWP Covered Drugs
- B. Claim Form
- C. Exclusion Form
- D. Survey Instruments