# Exhibit G

# THIRD AMENDED COMPLAINT

# Filed on or About December 9, 1999

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

UNITED STATES OF AMERICA )
Ex Rel )
VEN-A-CARE OF THE )
FLORIDA KEYS, INC. )
a Florida Corporation, )
by and through its principal )
officers and directors, )
ZACHARY T. BENTLEY and )
T. MARK JONES, )
Plaintiff, )

v. ) CIVIL ACTION NO.95-1354-CIV-GOLD

ABBOTT LABORATORIES, INC.; ) FILED IN CAMERA AND UNDER SEAL

THIRD AMENDED COMPLAINT
For Money Damages and Civil
Penalties Under the False Claims Act
31 U.S.C. §§3729-3732

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

**Defendants.**

**THIRD AMENDED COMPLAINT**
**FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE CLAIMS ACT 31 U.S.C. §§3729-3732**

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or "GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-CARE" or "the Relator"), and its principal officers and directors, ZACHARY T. BENTLEY, and T. MARK JONES, and by and through the undersigned attorneys on behalf of the UNITED STATES and on the Relator's own behalf and bring this action against ABBOTT LABORATORIES, INC.;

**CIVIL ACTION NO. 95-1354-CIV-GOLD**



, (sometimes referred to collectively as, "DEFENDANTS"), for money damages and civil penalties arising out of the DEFENDANTS' violations of the Federal False Claims Act, 31 U.S.C., §§3729-3732 from on or about June 23, 1989 to the present date.

TABLE OF CONTENTS


| | Page No: |
|---|---|
| SECTION NO. 1<br>SUMMARY OF THE ACTION | 10 |
| SECTION NO. 2<br>THE PARTIES | 12 |
| SECTION NO. 3<br>JURISDICTION & VENUE | 24 |
| SECTION NO. 4<br>HOW MEDICARE AND MEDICAID REIMBURSEMENT IS AFFECTED BY DRUG MANUFACTURERS' PRICE AND COST REPRESENTATIONS | 31 |

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS

Page No:

SECTION NO. 5 — 43
BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER "PART B" OF THE MEDICARE PROGRAM

SECTION NO. 6 — 50
BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE STATES' MEDICAID PROGRAMS

SECTION NO. 7 — 53
THE FALSE CLAIMS SCHEME

Subsection 7a. — 57
The Unique Kinds of Drugs, Patient/Physician Relationships, and Drug Wholesale Distribution Systems That Make The False Claims Scheme Possible

Subsection 7b. — 64
The Medicare and Medicaid Programs Use The Defendants' False and Misleading Price and Costs Representations to Estimate the Acquisition Cost of The Specified Drugs in Setting Reimbursement Amounts

TABLE NO. 1 — 66
DEFENDANTS' false price and cost representations to the Medicare Program

TABLE NO. 2 — 82
DEFENDANTS' price and cost representations to the States' Medicaid Programs

Subsection 7c. — 109
The Defendants Each Determine what Representations Will Be Made to the Drug price and Cost Reporting Compendia and To the Medicare and Medicaid Program, Have Knowledge of the Actual Prices of Their Drugs, and Know if the Government is Being provided with False and Misleading Price and Cost Information

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS Page No:

TABLE NO. 3 — 114
DEFENDANTS' drugs and their approved FDA indications as published in the 1998 edition of *Drug Facts and Comparisons*

Subsection 7d. — 139
The DEFENDANTS Falsely Inflate Reports of Prices and Costs to Create a Positive Profit or "Spread" in Order to Unlawfully Induce the Utilization of Their Drugs

Subsection 7e. — 154
The Illegal Profit Spreads Are Often Enhanced by Additional Unlawful Financial Inducement Such as Free Goods, Direct Monetary Payments, Rebates and Agreements to Falsify Invoices

Subsection 7f. — 155
The DEFENDANTS Intentionally Impede Government Efforts to Accurately Estimate Acquisition Costs and Deprive the Government of the Benefits of Truthful Price and Costs Representations

TABLE NO. 4 — 158

TABLE NO. 5 — 175
Lists some of the specified drugs, the amount approved in 1996 by Florida Medicare, the 20% co-payment paid by the patient, and the true price paid by the Relator

TABLE NO. 6 — 177
Examples of the significant impact of the DEFENDANTS' false claim scheme

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS

| | Page No: |
|---|---|
| TABLE NO. 7 [redacted] | 181 |
| TABLE NO. 8 [redacted] | 182 |
| SECTION NO. 8 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT ABBOTT | 183 |
| SECTION NO. 9 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 191 |
| SECTION NO. 10 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 197 |
| SECTION NO. 11 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 202 |
| SECTION NO. 12 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 210 |
| SECTION NO. 13 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 216 |

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS

Page No:

SECTION NO. 14 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 223

SECTION NO. 15 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 228

SECTION NO. 16 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 232

SECTION NO. 17 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 239

SECTION NO. 18 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 243

SECTION NO. 19 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 247

SECTION NO. 20 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 253

SECTION NO. 21 THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] 258

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS

Page No:

SECTION NO. 22 — 261
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 23 — 264
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 24 — 266
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 25 — 270
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 26 — 274
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 27 — 279
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 28 — 282
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

SECTION NO. 29 — 285
THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted]

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS

| | Page No: |
|---|---|
| SECTION NO. 30<br>THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 291 |
| SECTION NO. 31<br>THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 293 |
| SECTION NO. 32<br>THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT [redacted] | 296 |
| COUNT I<br>FALSE CLAIMS ACT;<br>CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS | 299 |
| COUNT II<br>FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT | 301 |
| COUNT III<br>FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT | 303 |
| COUNT IV<br>FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATION | 305 |

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

TABLE OF CONTENTS Page No:

COUNT V 307
FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; ILLEGAL REMUNERATION

COUNT VI 310
FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS

COUNT VII 312
FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS

REQUESTS FOR RELIEF 314

DEMAND FOR JURY TRIAL 317

CERTIFICATE OF SERVICE 318

**SECTION NO. 1**

**SUMMARY OF THE ACTION**

1. This is an action for damages, treble damages, civil penalties and costs against the DEFENDANTS for violations of the False Claims Act as set out in Counts I through VII, pages 299 through 314. In essence, the DEFENDANTS made false representations of prices and costs for certain of their [REDACTED], injectable and [REDACTED] drugs [REDACTED] (hereinafter sometimes referred to as the "specified infusion drugs"

or the "specified drugs"): directly to Medicare Carriers who approve and pay Medicare claims; directly to the States' Medicaid Pharmacy Programs which approve and pay the States' Medicaid claims; and indirectly through drug price and cost reporting compendia including First Data Bank, Medical Economics, and Medi-Span. The DEFENDANTS knew that the Medicare and States' Medicaid Programs intended to base their payments of "reimbursement" for the specified infusion drugs on reasonable estimations of cost. The Medicare and Medicaid Programs relied on the prices reported by the DEFENDANTS in estimating costs. The DEFENDANTS marketed their specified infusion drugs to specialized physicians [redacted] clinics and infusion pharmacies, including the Relator's, through financial inducements, including but not limited to, false price markups (the "Spread"), discounts, free goods and other financial incentives. The DEFENDANTS were in a position to mislead the Medicare and Medicaid Programs because the DEFENDANTS typically report truthful prices for their other drugs that are not the subject of this action. The DEFENDANTS thus wrongfully exploited the Medicare and States' Medicaid Programs by causing them to pay the claims of the DEFENDANTS' customers at grossly inflated amounts that far exceeded a reasonable reimbursement based on an estimation of costs. The DEFENDANTS' false claims scheme damaged the Medicare and States' Medicaid Programs in excess of ONE BILLION and 00/100 DOLLARS ($1,000,000,000.00).

CIVIL ACTION NO. 95-1354-CIV-GOLD

## SECTION NO. 2

## THE PARTIES

2. The Plaintiff in this action is the UNITED STATES. At all times material to this civil action, the United States Department of Health and Human Services ("HHS"), the Health Care Financing Administration ("HCFA"), and The Bureau of Program Operations ("BPO") were agencies and instrumentalities of the UNITED STATES and their activities, operations and contracts in administering the Medicare program were paid from UNITED STATES' funds. The UNITED STATES and its subcontractors performing on behalf of the UNITED STATES provided Medicare benefits to qualified beneficiaries which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS and relied upon the false and fraudulent price and cost representations made by the DEFENDANTS in approving and paying claims.

3. The States, United States Territories, and the District of Columbia provided Medicaid benefits to qualified recipients which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS and relied upon the false and fraudulent price and cost representations made by the DEFENDANTS in

approving and paying claims. A significant part of said Medicaid reimbursement was paid from United States Government funds pursuant to **42 U.S.C. § 1396(b).**

4. The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator's principal officers and directors include Zachary T. Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida. The Relator is an infusion pharmacy and provides prescription drugs , such as the intravenous, injectable [redacted] specified in this Third Amended Complaint, as a Medicare Part B supplier and as a Florida Medicaid provider. The Relator has direct and independent knowledge of the information, and is the "original source" of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A) and (B)**. The Relator has standing to bring this action pursuant to **31 U.S.C. §3730(b)(1)**. The information upon which these allegations are based was voluntarily provided by the Relator to the Federal Government beginning in 1991 and thereafter has been frequently supplemented by the Relator.

5. The Relator, VEN-A-CARE, is a small infusion pharmacy located in Key West, Florida that, due to its position as an industry insider, became aware of the false claim scheme alleged herein. During the early 1990s, Ven-A-Care was destroyed as a viable business because it refused to engage in fee splitting arrangements with referring physicians who wished to benefit from the inflated reimbursement caused by the actions

of the DEFENDANTS. Ven-A-Care became aware that many of the [redacted], inhalation, and injectable drugs [redacted] it provided as a specialty pharmacy were reimbursed by the Medicare and Medicaid Programs at amounts that substantially, in some cases by several thousand percent, exceeded the cost of the drug. It was the huge potential profit spreads generated by the variance between the actual cost of the drugs and the "reimbursement" amounts that many referring physicians demanded a share of. Ven-A-Care's principals were aware that Medicare and Medicaid reimbursed for drugs at amounts that were intended to be based on an estimation of cost and not provide for huge windfall profits at the GOVERNMENT's expense. Ven-A-Care attempted to alert the responsible state and federal government officials to the problem it faced. However, the government agencies lacked sufficient resources and expertise to adequately respond. Accordingly, the Relator commenced this action based upon its original source information.

6. The Defendant, ABBOTT LABORATORIES, INC. ("ABBOTT"), is a corporation organized under the laws of Delaware, with its principal offices in Abbott Park, Illinois. At all times material to this civil action, ABBOTT has transacted business in the Federal Judicial District of the Southern District of Florida by, including, but not limited to, selling and distributing prescription drugs to purchasers within the Southern District of Florida.

7. [redacted]

[redacted]

CIVIL ACTION NO. 95-1354-CIV-GOLD

**PAGES 15 THROUGH 23**

**HAVE BEEN COMPLETELY REDACTED**

**WHICH INCLUDES THE REMAINDER OF**

**PARAGRAPH 7**

**THROUGH THE BEGINNING OF PARAGRAPH 32**

33. Any and all acts alleged herein to have been committed by any or all of the DEFENDANTS were committed by said Defendant's officers, directors, employees, or agents who at all times acted on behalf of their respective DEFENDANT.

**SECTION NO. 3**

**JURISDICTION & VENUE**

34. Jurisdiction is founded upon the **Federal False Claims Act, (the "Act") 31 U.S.C. §3729-32**, specifically **31 U.S.C. §3732**, and also **28 U.S.C. §§1331, 1345**.

35. The Federal False Claims Act reaches the type of fraudulent activity alleged herein in accordance with the express language of the Act as well as precedents arising from applications of the present Federal False Claims Act and earlier versions, See, United States v. Neifert-White Company, 390 U.S. 228; 88 S.Ct. 959 (1968). Specifically, the

United States Supreme Court's application of the Act in Neifert-White applies to this case as follows:

A. ". . . the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." 88 S.Ct., at 961.

B. The Act applies to the conduct of a manufacturer that supplies falsely inflated price information in support of a customer's claim. 88 S.Ct., at 960.

C. The Act applies even where the price information supplied by the DEFENDANTS is inflated by only approximately 25% over the truthful price. 88 S.Ct., at 960.

D. The Act applies even if the DEFENDANTS did not submit the false price information directly to the Government and even though the DEFENDANTS received no payment of funds from the Government.

E. The Act applies even though the inflated portion of the price was received by customers of the DEFENDANTS who are not parties to the case. 88 S.Ct., at 960.

36. Venue in the Southern District of Florida is appropriate under **31 U.S.C. §3732(a)** and sufficient contacts exist for jurisdiction in that each of the DEFENDANTS transacted business in the Southern District of Florida by selling directly or through wholesalers their specified prescription drugs in the Southern District of Florida which the respective DEFENDANTS knew would be supplied to Medicare beneficiaries and Medicaid

recipients and for which the DEFENDANTS knew that grossly excessive and unreasonable payments for claims would be made to the providers/suppliers by the Medicare and Medicaid programs.

37. A copy of the initial Complaint and Amended Complaints and written disclosure of substantially all material evidence and information VEN-A-CARE possesses were served on the Government pursuant to Rule 4(d)(l), Fed.R.Civ.P., prior to the filing of the initial and Amended Complaints in camera and under seal by delivering a copy of the summons, Complaints, material evidence and information to the United States Attorney for the Southern District of Florida and by sending a copy of the summons, Complaints, material evidence and information by certified mail to the Attorney General of the United States at Washington, District of Columbia. Thereafter the Relator has continued its investigation of the matters herein and has diligently and expeditiously provided any and all documentary and other evidence to the Office of the Attorney General of the United States and to the Office of the United States Attorney for the Southern District of Florida prior to filing this Third Amended Complaint. A copy of the Third Amended Complaint was served in the manner required by law on the Attorney General and on the United States Attorney for the Southern District of Florida prior to filing with the Court.

38. The Relator alleges: (A) that no allegation or transaction of defrauding the United States was made prior to the filing of the Complaints in public disclosures regarding the subject matter herein against any of the DEFENDANTS; (B) that none of the

DEFENDANTS was named in public disclosures made prior to the filing of the Complaints regarding the subject matter herein; and (C), if the Court makes a finding against the Relator as to the allegations set forth in (A) and/or (B), that the Relator has direct and independent knowledge of the information on which these allegations are based within the meaning of **31 U.S.C. §3730(e)(4)(A)** and **(B)** and has voluntarily provided the information to the Government before filing the Complaints which are based on the information provided by the Relator to the Government and the Relator is the original source.

39. Federal Court jurisdiction also exists over this cause for reasons which include, but are not limited to, the following:

A) The RELATOR and its principal officers and directors have sustained significant injury and damage due to the acts of the DEFENDANTS in that referring physicians, and others able to influence the ordering of infusion pharmacy services, typically demand a portion of the financial inducements created by the DEFENDANTS' false price representations in exchange for referrals. The RELATOR, a one time profitable business, has refused to engage in such conduct and, as a result, has been unable to compete in its chosen health care market.

B) The RELATOR, due to its status as an industry insider, has acquired substantial information that is of significant value to the Government about the DEFENDANTS' false claim scheme and has provided said information to the Government in accordance with the False Claims Act.

C) The RELATOR has expended substantial time, money and resources, and has incurred substantial financial and other risks in reviewing its own information and in acquiring, analyzing and disclosing to the Government its information about the DEFENDANTS' false claims scheme, prior to commencing this action.

D) The remedies provided by the False Claims Act include, in part, an award to the RELATOR for providing to the Government the information about the DEFENDANTS' false claim scheme that is at issue in this action. In order to secure redress of its right to such award, the RELATOR has complied with the requirements of the False Claims Act that it initiate this action under seal and disclose all its information to the Government.

E) This False Claims Act case constitutes the only lawful mechanism whereby the RELATOR may receive redress in the form of compensation for providing information about the DEFENDANTS' false claim scheme and for assisting the Government in recovering amounts paid, multiple damages and penalties.

F) The False Claims Act provides a mechanism whereby the RELATOR may secure redress for its cause of action, to wit, its right to compensation for benefitting the Government through use of its information about the False Claims scheme in the manner contemplated by the False Claims Act.

G) The RELATOR is also entitled, under the False Claims Act, to litigate the Government's right to damages and penalties, arising from the false claim scheme and

has a stake in the outcome in that the RELATOR is entitled by the False Claims Act to share in any recovery secured by or on behalf of the Government.

H) The relief provided under the False Claims Act is designed, in part, to deter future violations and the false claim scheme alleged herein is ongoing and continues to impede the RELATOR'S ability to lawfully compete and is likely to continue in the future absent the RELATOR'S exercise of its rights and responsibilities as a realtor under the False Claims Act.

I) The deterrent impact of a judgment under the False Claims Act will act to redress the injuries sustained by the RELATOR, and limit or curtail future injuries to the RELATOR, due to the DEFENDANTS' ongoing false claims scheme.

J) The DEFENDANTS each possess a substantial interest in disproving the RELATOR'S allegations of violations of the False Claims Act and the RELATOR possesses a substantial interest in proving said allegations, as well as the investment of the RELATOR's costs and its overall compliance with the pre filing and post filing procedural and jurisdictional provisions of the False Claims Act, because the determination of these issues under the False Claims Act will establish whether:

(i) The DEFENDANTS violated the federal False Claims Act;

(ii) The DEFENDANTS are liable for treble damages, penalties, costs, RELATOR's expenses and attorneys fees.

(iii) The RELATOR is entitled to redress in the form of compensation for providing its information about the false claims scheme to the Government and for assisting the Government in the manner required by the False Claims Act;

(iv) The RELATOR is entitled to redress, on behalf of the Government, in the form of damages and penalties from the DEFENDANTS.

(v) The RELATOR is entitled to redress in the form of its relator's share of the award of damages and penalties.

(vi) The RELATOR is entitled to redress in the form of compensation for its expenses , incurrence of risk, and investment of time and resources in acquiring and providing to the Government its information about the false claims scheme.

(vii) The RELATOR is entitled to redress in the form of the deterrent impact of a False Claims Act judgement, against one or more DEFENDANTS, on the ongoing and future conduct of the DEFENDANTS that has injured and continues to injure the RELATOR as alleged herein.

K) In the event that the Government intervenes with respect to some or all of the RELATOR'S allegations and claims, then the RELATOR is entitled to participate

in the litigation to the extent and under the conditions specified in the False Claims Act and to further pursue redress in the form of its right to share in any award and receive compensation for its costs and expenses.

L) In the event that the Government does not intervene with respect to some or all of the RELATOR's allegations and claims, then the RELATOR'S causes of action alleged herein are directed at further redress in that only by prevailing in litigation based on its information about the false claim scheme will the RELATOR be able to seek: redress in the form of deterrence of ongoing and future conduct injurious to the RELATOR; compensation for its information about the DEFENDANTS' false claim scheme; compensation for the assistance and benefit it provided to the Government; compensation for its expenses, risks and devotion of time and resources in acquiring and providing its information to the Government; and compensation for establishing the DEFENDANTS' liability for damages and penalties.

## SECTION NO. 4

## HOW MEDICARE AND MEDICAID REIMBURSEMENT IS AFFECTED BY DRUG MANUFACTURERS' PRICE AND COST REPRESENTATIONS

40. Drug manufacturers, including the DEFENDANTS, the Medicare and Medicaid Programs, drug price and cost reporting services, hospitals, pharmacies, physicians, wholesalers, third party payors and administrators (i.e. insurance companies),

governmental health benefit plans (i.e. federal and state employees) and others involved in the health care industry communicate about drug prices and costs by describing the price and cost with terms such as:

a) Average Wholesale Price ("AWP")

b) Wholesaler Acquisition Cost ("WAC")

c) List Price

d) Direct Price ("DP")

e) Wholesale Net Price

41. Of the above terms, Average Wholesale Price, or AWP, is most utilized by the healthcare industry and by third party payors including the Medicare and Medicaid Programs to describe the average price of a drug sold to a retailer (i.e. Physicians, Hospitals and Pharmacies) who then provides the drug to its ultimate recipient.

42. During the time covered by this complaint until January 1 1998, Medicare based its reimbursement for prescription drugs, including the drugs at issue, on the manufacturers' published AWP for patented ("single source") drugs as represented by the manufacturer, and at the median published AWP, as represented by the manufacturers, for drugs with generic equivalents and for biologicals. From January 1, 1998 until the present, Medicare has based its reimbursement for drugs at 95% of the published AWP for single source patented drugs as represented by the manufacturer, and at 95 % of the

median published AWP, as represented by the manufacturers, for drugs with generic equivalents and for biologicals.

43. The States' Medicaid programs are required by 42 CFR 447.331 to reimburse providers at the provider's Estimated Acquisition Cost ("EAC"). The Health Care Financing Administration ("HCFA"), which must approve all State reimbursement plans for prescription drugs, has approved approximately 38 state plans whose methodology for arriving at the provider's EAC includes discounting a percentage off of the published AWP prices. This discounting ranges from Alaska, whose state formula is AWP minus 5%, to Michigan, whose state formula is AWP minus 13.5 - 15.1 %. Nineteen states' formulas are AWP minus 10%. Seven states' formulas are WAC plus a percentage or an AWP discount/WAC hybrid. The State of Delaware bases reimbursement on the providers' actual acquisition cost ("AAC"). The balance of the states use a EAC/AWP discount mix.

44. The Office of Personnel Management administers health insurance for all Federal employees. Benefits and reimbursements for prescription drugs are based upon the published AWP's as represented by the drug manufacturers.

45. The Department of Defense's CHAMPUS program, now known as Tricare, bases benefits and reimbursements for prescription drugs upon the published AWP's as represented by the drug manufacturers.

46. The Relator's investigation has determined that most private third party health insurers also use the published AWP's as represented by the drug manufacturers in establishing prices for prescription drug benefits.

47. The drug manufacturing industry, including the DEFENDANTS, uses various forms of media to publicize the prices and cost of their drugs including but not limited to:

a) Direct mailings or electronic communications (i.e. fax or e-mails) to hospitals, pharmacies, physicians, the States' Medicaid programs and the Medicare Carriers;

b) Advertisements in bi-monthly medical publications, such as :

(i) *Medical Economics,* that is mailed bi-monthly to most physicians and hospitals, free of charge by its publisher; and

(ii) *Drug Topics*, that is mailed to bi-monthly to most pharmacies and hospitals, free of charge by its publisher;

c) *PDR Generics* published annually by Medical Economics, Inc. who also publishes *The Physicians Desk Reference ("PDR")*

d) Advertisements provided directly to physicians and pharmacists by drug companies' representatives.

48. The Relator's information provided to the Government demonstrates the common and wide spread use of the term "Average Wholesale Price" (AWP) to describe

drug prices in a manner whereby interested parties can make decisions that are affected by price, including but not limited to:

a) Representative examples of advertisements routinely delivered by some of the DEFENDANTS and Non-Defendant drug manufacturers directly to individual State Medicaid Programs that were delivered to the State of New Jersey's Medicaid Pharmacy Program.

b) Representative examples of advertisements routinely delivered by the DEFENDANTS and Non-Defendant drug manufacturers directly to individual Medicare Carriers responsible for approving and paying Medicare claims in the States of Florida and Utah.

c) Representative examples of direct mail advertisements sent to the Relator by Non-Defendant drug companies expressing their respective drug prices in terms of AWP .

d) Representative examples of advertisements that the DEFENDANTS caused to be published in *Medical Economics* that express their respective drug prices in terms of AWP.

e) Representative examples of advertisements that the respective drug manufacturers caused to be published in *Drug Topics* that express their respective drug prices in terms of AWP.

f) Representative examples of the publisher's representations about the 1996 edition of *PDR Generics*, which contains representations about drugs at issue in this case including price and cost information expressed in terms of AWP. The advertisement also states that *PDR Generics* provides physicians and other health care professionals with "cost of therapy tables" that enable the physician to compare cost of therapies. The cost of therapies are based upon the manufacturers' published AWPs for the respective drugs.

49. Drug manufacturers including some of the DEFENDANTS also represent drug prices in terms of AWP when comparing the price and cost of their drugs to the prices and costs of their competitors' drugs. These comparisons of prices are promoted to physicians, pharmacists and hospitals touting that one company's drug is less costly than that of its competitors.

50. Medical Economics, Inc., the Hearst Corporation and Medi-Span are nationally recognized companies that specialize in gathering drug pricing and cost information including Average Wholesale Price ("AWP"), Wholesaler Acquisition Cost ("WAC") and Direct Price ("DP").

51. Medical Economics, Inc. publishes annually a book entitled *Drug Topics Red Book* that expresses drug prices and costs in terms of AWP. Representative examples of *Drug Topics Red Book* for the years 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998

and 1999 contain approximately the following number of pages expressing drug prices and costs in terms of AWP:

a) 1991 - 605 pages

b) 1992 - 575 pages

c) 1993 - 542 pages

d) 1994 - 331 pages

e) 1995 - 369 pages

f) 1996 - 413 pages

g) 1997 - 454 pages

h) 1998 - 470 pages

i) 1999 - 454 pages

52. Medical Economics also provides addendums to the annual *Red Book* that express drug prices and costs in terms of AWP.

53. Representative excerpts of advisements contained in the annual *Reb Book* publications for the years 1995, 1996, 1997, 1998 and 1999 include:

a) The 1995 advertisement describes the price information as "nationally recognized average wholesale prices (AWPs, direct prices and federally upper limited prices for prescription drugs)."

b) The 1996 advertisement states "nationally recognized Average Wholesale Prices (AWPs), Direct Prices and Federal Upper Limit prices for prescription drugs that help you make sure your prices are on-target."

c) The 1997 advertisement states "complete pricing information: AWPs, direct and suggested retail prices."

d) The 1998 advertisement states "RED BOOK is the first and only source of accurate, up-to-date product information, prices on prescription drugs, OTC items and reimbursable medical supplies and more!"

e) The 1999 advertisement states "nationally recognized Average Wholesale Prices (AWPs), Direct Prices and Federal Upper Limit prices for prescription drugs that help you make sure your prices are on-target."

54. Medical Economics, Inc. also publishes a monthly update that contains current packaging and pricing data expressed in terms of AWP on the most widely prescribed drugs in the United States together with any updated prices expressed in terms of AWP for new products.

55. The Relator's information provided to the Government reveals that approximately 90% of the Medicare Carriers use the AWPs as represented in Medical Economics annual *Drug Tropics Red Book* publication and the *Red Book* monthly updates in determining the reimbursement amounts for Medicare prescription drug claims.

56. The Hearst Corporation published until 1997 annually a book entitled *the Blue Book* that expressed drug prices and costs in terms of AWP. Representative examples of the *First Databank Blue Book* for the years 1990, 1991, 1992, 1993, 1994, 1995 and 1996 contain approximately the following number of pages expressing drug prices and costs in terms of AWP:

a) 1990 - 498 pages

b) 1991 - 492 pages

c) 1992 - 482 pages

d) 1993 - 402 pages

e) 1994 - 755 pages

f) 1995 - 391 pages

g) 1996 - 432 pages

57. First Data Bank also publishes a monthly update entitled "Price Alert" that expresses drug prices and costs in terms of AWP.

58. First Data Bank also provides drug prices and costs for approximately 60,000 different drugs, sizes and strengths expressed in terms of AWP and WAC through an electronic or automated service. The Relator's investigation has determined that more than 90% of the States' Medicaid Pharmacy Programs utilized the AWPs and WACs as represented by First Data Bank's automated services in determining reimbursement amounts for Medicaid prescription drugs and claims.

59. The monthly newsletter *Monthly Interest* , Vol. 6 No. 9, September 1991, published by First Data Bank was mailed to the States' Medicaid pharmacy programs. The article entitled "Understanding AWP" describes in detail First Data Bank's methods for determining AWPs in order to insure the State Medicaid Programs "that the AWP reflects reality."

60. Medi-Span provides drug prices and costs for approximately 60,000 drugs, sizes and strengths through an electronic or automated service. The Relator's investigation has determined that only the State of New York's Medicaid Program uses Medi-Span's automated service in determining reimbursement amounts for New York Medicaid prescription drug claims. Medi-Span was acquired by the Hearst Corporation/First Data Bank.

61. First Data Bank, Medical Economics and Medi-Span all receive and rely upon the respective drug manufacturers', including the DEFENDANTS, representations of their drugs' prices and cost in determining the drug pricing data that they report.

62. First Data Bank, Medical Economics and Medi-Span all report drug prices that include a representation of the drugs' AWP.

63. The Relators investigation has determined that drug manufacturers including the DEFENDANTS provide First Data Bank, Medical Economics and Medi-Span with the specific prices and costs of their drugs and instructions, if necessary, expressed in a manner that allows the price reporting companies to establish the necessary pricing

information for publication that is utilized by Medicare, Medicaid and others in determining reimbursements for prescription drugs.

64. The Relator's information is, during the time covered by this complaint, that:

a) Medical Economics/*RED BOOK* has defined AWP as the price a retail hospital or pharmacy pays if it purchases the drug from a wholesaler before a discount if any.

b) First Data Bank/*BLUE BOOK* has defined AWP as an average price which a wholesaler charges for a particular drug.

c) Medi-Span has defined AWP as the most common wholesaler price charged to the retailer or hospital.

65. A form entitled "New Product Submission Form" is provided by First Data Bank to drug manufacturers to transmit information including their prices to First Data Bank. The form permits drug manufacturers to submit prices expressed in terms of Wholesale (Distributor) Price, Direct Price and AWP Price.

66. A form entitled "Product Listing Verification" is provided by Medical Economics / *Red Book* to drug manufacturers to transmit information including their prices to Medical Economics / *Red Book*. The form permits drug manufacturers to submit prices expressed in terms of AWP and WAC.

67. The Relators' information revealed that each of the DEFENDANTS had been the source of the price and cost information reported by First Data Bank and Medical

Economics to the Medicare and States' Medicaid Programs at all times at issue in this action. The Relator reported its information to the Government, including specific identification of representatives of First Data Bank and Medical Economics to whom such information was reported. Thereafter, the Government conducted an investigation which confirmed the information supplied by the Relator.

A. The Government's investigation revealed that each of the DEFENDANTS has repeatedly and systemically communicated with First Data Bank and Medical Economics for the express purpose of causing First Data Bank and Medical Economics to report prices and costs of the drugs at issue in this case in amounts set by the DEFENDANTS.

B. The Government's investigation secured documentary information between the DEFENDANTS and First Data Bank and Medical Economics wherein the DEFENDANTS caused specific prices and costs for their drugs to be reported by First Data Bank and Medical Economics.

68. The DEFENDANTS' fraudulent inflation of price and cost information to cause the Government to pay excessive reimbursement for the specified drugs at issue is in stark contrast to the truthful representations that the DEFENDANTS make when they are not offering financial inducements to their customers.

69. Unlike the specialized physicians, clinics and infusion pharmacies which receive the financial inducements for ordering the drugs at issue in this action, most

providers do not receive grossly excessive reimbursements for prescribing the majority of other drugs and instead rely on the manufacturers' truthful representations of price and cost in an effort to minimize the cost of drugs to their patients.

70. The vast majority of drug manufacturers, including the DEFENDANTS, are truthful when representing prices and costs of all or most drugs, except for the drugs at issue in this case.

## SECTION NO. 5

## BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER "PART B" OF THE MEDICARE PROGRAM

71. HHS, through HCFA, provides health insurance benefits to aged and disabled Americans pursuant to the provisions of the Medicare program, **Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq.**

72. The Medicare program provides covered health care benefits to certain targeted populations such as those persons who are over age 65, persons who are disabled, and persons who have end stage renal disease.

73. The Medicare program is divided into two distinct parts: (A) Medicare Part A (Hospital Insurance for the Aged and Disabled) which covers services and goods

furnished by hospitals, home health agencies, hospices, and skilled nursing facilities; and (B) Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) which covers physician services, and a range of other noninstitutional services, such as durable medical equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and certain limited drug products and supplies.

74. This case focuses on the Medicare program's limited benefit for drugs which are provided either: (A) incident to a physician's service and cannot be self administered; or, (B) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit. Because this limited drug benefit is provided on an "incident to" a physician's service basis or in conjunction with the medical necessity of a DME device, Congress' statutes and the corresponding HHS regulations and HCFA policies have sought to limit Medicare's payments for claims for the drugs at issue to a reasonable amount based upon the cost of the drug. This is due, in part, to the fact that the Medicare program is already paying for the physicians' professional fees and for the covered DME equipment. The exorbitant profits created by the DEFENDANTS' false price and cost representations have totally thwarted the fundamental requirements of the Medicare Program and States' Medicaid Programs that payment of claims for the specified drugs be limited to reasonable amounts to cover the added cost of the drugs.

75. HCFA administers the Medicare program. HCFA awards cost-reimbursement contracts to private companies to evaluate and to process Medicare beneficiaries' claims

for payment on behalf of HCFA. Under Part A, HCFA refers to contractors as "intermediaries". Under Part B, HCFA refers to contractors as "carriers" and durable medical equipment regional carriers ( "DMERCs"). Under Part B, HCFA pays the carriers and the DMERCs to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the providers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. **42 U.S.C. §1395(j) et. seq**.

76. Congress has mandated that the Medicare Program pay no more than eighty percent (80%) of: (1) the reasonable cost of drugs covered under Part B pharmaceutical claims from federal funds through 1997 and (2) no more than 95% of the drug's Average Wholesale Price, after 1997. **42 U.S.C. §1395(l) et seq.**

77. Medicare Regulation 42 CFR, §405.517, effective January 1, 1992, sets out the methodology to determine the reasonable charge for payment of claims for drugs and biologicals. The methodology for single source drugs is based on the lower of estimated acquisition cost or the national average wholesale price of the drug. The methodology for multiple source drugs is based on the lower of the estimated acquisition cost or the wholesale price that is the median price for all sources of the generic form of the drug. This regulation provides instructions to be used by the Part B Carriers and DMERCs on how the estimated acquisition cost is to be determined. The instructions state that the estimated acquisition cost is to be based on surveys of actual invoice prices of drugs paid by the providers. The regulation also states that the Medicare Part B Carriers and

DMERCs may consider such other factors as inventory, waste and spoilage in calculating the estimated acquisition cost of the drug but does not provide for profit on the drug itself. For purposes of reimbursement, HCFA reimburses biologicals under the same methodology as other drugs. Claims are to be paid at the lesser of an estimated amount based upon average wholesale price ("AWP") or actual acquisition cost (taking into consideration inventory cost and waste but including no profit on the drug itself).

78. The Medicare program has been unable to determine actual acquisition costs for the drugs at issue in this case. Therefore, until January 1 1998, Medicare payed claims based upon the average wholesale price for single source patented drugs as represented by the manufacturer, and at the median average wholesale price, as represented by the manufacturers, for drugs with generic equivalents and for biologicals. From January 1, 1998 until the present, Medicare pays claims based upon 95% of the at the average wholesale price for single source patented drugs as represented by the manufacturer, and at 95 % of the median average wholesale price, as represented by the manufacturers, for drugs with generic equivalents and for biologicals.

79. The following is an example of how in 1997 the Medicare Carriers established reimbursement for the generic Chemo drug Etoposide 100 mg. HCPSC J9182.

a) The Carrier references the 1997 *Drug Topics Red Book* listing for Etoposide. The following chart is an excerpt from pages 291 and 545 of the 1997 *Drug Topics Red Book* listing for Etoposide.

CIVIL ACTION NO. 95-1354-CIV-GOLD

RX PRODUCT LISTINGS **291**/EUCAL

| PROD/MFR | NDC | AWP | DP | OBC |
|---|---|---|---|---|
| **ETOPOSIDE (Abbott Hosp)** | | | | |
| INJ, IJ (VIAL, FLIPTOP,BULK PKG) | | | | |
| 20 mg/ml, 50ml ..... | **00074-1485-03** | 1264.21 | | **AP** |
| **(Astra USA)** | | | | |
| INJ, IJ (VIAL) | | | | |
| 20 mg/ml,5 ml 10s ... | **00186-1571-31** | 387.50 | | **EE** |
| **(Bedford)** | | | | |
| INJ, IJ (M.D.V.) | | | | |
| 20 mg/ml, 5 ml.......... | **55390-0291-01** | 110.00 | | **AP** |
| **(Bristol-Myer Onc/Imm)** See VEPESID | | | | |
| **(Bristol-Myer Onc/Imm)** See VEPESID VHA + | | | | |
| **(Gensia)** | | | | |
| INJ, IJ (M.D.V. POLYMER) | | | | |
| 20 mg/ml, 5 ml ........ | **00703-5653-01** | 141.97 | | **AP** |
| (M.D.V.) | | | | |
| 20 mg/ml, 5 ml......... | **00703-5643-01** | 141.97 | | **AP** |
| (M.D.V. POLYMER) | | | | |
| 20 mg/ml, 25 ml ..... | **00703-5656-01** | 692.10 | | **AP** |
| (M.D.V.) | | | | |
| 20 mg/ml, 25ml ...... | **00703-5646-01** | 692.10 | | **AP** |
| (BULK PACKAGE) | | | | |
| 20 mg/ml, 50 ml ...... | **00703-5668-01** | 1338.13 | | **AP** |
| **(Pharmacia/Upjohn)** *See TOPOSAR* | | | | |
| **(Schein)** | | | | |
| INJ, IJ (M.D.V.) | | | | |
| 20 mg/ml, 5 ml......... | **00364-3028-53** | 141.50 | | **AP** |
| **(Supergen)** | | | | |
| INJ, IJ (M.D.V.) | | | | |
| 20 mg/ml, 5 ml......... | **58406-0711-12** | 141.00 | | **AP** |
| 12,500 ml........... | **58406-0714-18** | 352.50 | | **AP** |

RX PRODUCT LISTINGS **545**/TOPOS

**TOPOSAR (Pharmacia/Upjohn)**
**etopside**

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

INJ, IJ (M.D.V.)
20 mg/ml, 5 ml........**00013-7336-91** 136.49 **AP**
10 ml.................**00013-7346-94** 272.98 **AP**
25 ml................**00013-7356-88** 665.38 **AP**

b) The Carrier arrays the listings from the most expensive to the least expensive of all the manufacturers' generics (in this case [REDACTED] is the Brand so it is not included) that list a 100 mg. size (20 mg/ml, 5 ml = 100mg.).

**Gensia)**
(M.D.V.)
20 mg/ml, 5 ml.........**00703-5643-01** 141.97 = $ 141.97 ea.
**(Schein)**
INJ, IJ (M.D.V.)
20 mg/ml, 5 ml.........**00364-3028-53** 141.50 = $ 141.50 ea.
**(Supergen)**
INJ, IJ (M.D.V.)
20 mg/ml, 5 ml.........**58406-0711-12** 141.00 = $ 141.00 ea.
**TOPOSAR (Pharmacia/Upjohn)**
**etopside**
INJ, IJ (M.D.V.)
20 mg/ml, 5 ml........**00013-7336-91** 136.49 = $ 136.49 ea.
**(Bedford)**
INJ, IJ (M.D.V.)
20 mg/ml, 5 ml.........**55390-0291-01** 110.00 = $ 110.00 ea.
**Astra USA)**
INJ, IJ (VIAL)
20 mg/ml,5 ml 10s ..**00186-1571-31** 387.50 = $ 38.75 ea.

c) The Carrier then finds the median AWP. In this instance the median is between [REDACTED] The Relators investigation has determined

that some Medicare Carriers choose the higher listing of the median and some choose the lower.

80. Part B drug claims are submitted in one of two ways. The first is by submitting to the Part B carriers or DMERCs a completed (hard copy) HCFA 1500 Form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy HCFA 1500 Form is transmitted to the Medicare Part B carriers or DMERCs. Two HCFA 1500 Form versions were used during the time relevant to these proceedings. HCFA Form 1500 (1/84) was used by the Medicare program for Part B drug claims filed on or after January, 1984. In or about December 1990, HCFA created HCFA Form 1500 (12/90) and required its use for drug claims submitted on or after May 1, 1992. Either HCFA Form 1500 (12/90) or HCFA Form 1500 (1/84) could be used for Part B drug claims from December, 1990 through April, 1992.

81. Providers submit claims for payment to the Medicare Program for the specified drugs at issue in this case using HCFA's Common Procedure Coding System ("HCPCS"). The HCPCS system for pharmaceuticals is a 5 digit alphanumeric code, such as Leucovorin, 50 mg. = HCPCS Code J0640.

82. HCFA requires all Part B Carriers and the DMERCs to report to HCFA Central quarterly claims activity by HCPCS Code for all drugs submitted by providers for reimbursement by the Medicare Program. This quarterly data collected by HCFA Central

from all the Part B Carriers and the DMERCs is summarized in a report known as the Part B Extract and Summary System ("BESS") or Bess Reports.

83. Beneficiaries' claims are processed by the carriers as either "assigned", those claims for which payment is made directly to the provider, or "unassigned", those claims for which payment is made directly to the beneficiaries.

84. All or nearly all drug claims for the charges at issue are made on an assigned basis.

85. During the early 90's the Medicare Carriers' attempted to survey physicians' actual invoice prices paid for drugs to comply with the regulation 42 CFR §405.517 but were stopped by a complaint filed by the American Society of Clinical Oncologists ("ASCO") with the Executive Office of Management and Budget asserting that the Paperwork Reduction Act had been violated. A subsequent effort by HCFA to design a new survey to determine physicians' actual invoice costs was also stopped by ASCO. ASCO complained that the actual prices being paid were discounts and confidential in nature and that the survey had other flaws.

86. At all times at issue in this case, the Medicare program used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

**SECTION NO. 6**

**CIVIL ACTION NO. 95-1354-CIV-GOLD**

**BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE STATES' MEDICAID PROGRAMS**

87. The United States Government partially funds state sponsored medical assistance programs for the poor pursuant to **Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq**.

88. Benefits for drugs are optional but all states have opted to provide Medicaid drug reimbursement coverage.

89. The federal portion of States' Medicaid payments, Federal Medical Assistance Percentage ("FMAP") is based on a state's per capita income compared to the national average. The federal portion consists of a minimum of 50% up to a maximum of 83%. By example, Florida's FMAP contributed by the United States in 1995 was 56.28%.

90. The States, United States Territories and the District of Columbia are required to implement a State Health Plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. **42 U.S.C. §1396a(a)(30)(A)**.

91. State Health Plans must, in part, provide for payment of claims for prescription drugs pursuant to a formula approved by the Secretary of HHS which determines the maximum allowable claim amount for each drug manufactured by each manufacturer whose prescription drugs qualify for Medicaid reimbursement based upon

an estimation of the provider's acquisition cost plus a reasonable dispensing fee. 42 CFR 447.331.

92. HCFA has approved approximately 38 state plans whose methodology for arriving at a provider's Estimated Acquisition Cost ("EAC") as required by 42 CFR 447.331 includes discounting a percentage off of the AWP prices, separately for each covered drug, as computed by or collected by and published by First Data Bank. This discounting ranges from Alaska, whose state formula is AWP minus 5%, to Michigan, whose state formula is AWP minus 13.5 - 15.1 %. Nineteen HCFA approved states' formulas are on a basis of AWP minus 10%. Seven states' formulas are WAC plus a percentage or an AWP discount/WAC hybrid. The State of Florida's formula is WAC plus 7%. The State of Delaware bases reimbursement on AAC.

93. The Food and Drug Administration ("FDA") assigns National Drug Codes, NDC numbers to identify each individual manufacturer and its drugs' strengths and sizes. NDC numbers are eleven digits, with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package size.

94. Providers are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for drugs to the States' Medicaid programs.

95. The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process Medicaid recipients' claims for payment. The States refer to these contractors as fiscal agents.

96. Prescription drug claims are submitted in one of two ways. The first is by submitting to the fiscal agent or state agency a completed (hard copy) pharmacy claim form. The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy is transmitted electronically to the Medicaid fiscal agent or state agency.

97. At all times at issue in this case, all of the States' Medicaid programs used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

**SECTION NO. 7**

**THE FALSE CLAIMS SCHEME**

98. The DEFENDANTS are each liable under the False Claims Act because they caused the Medicare and Medicaid Programs to pay claims for certain of their prescription drugs in exorbitant amounts, far in excess of the reasonable reimbursement permitted under the applicable statutes and regulations. The DEFENDANTS manufactured and/or distributed the specified prescription drugs in this action and sold the specified prescription drugs either directly to specialized infusion pharmacies, physicians, clinics and others or indirectly through such intermediaries as wholesalers and group purchasing organizations.

The false claims for excessive reimbursement were then submitted to the Medicare and the States' Medicaid Programs by the DEFENDANTS' through their false price and cost statements and by their customers who thereby received a windfall financial benefit in the amount by which the Government's approved "reimbursement" exceeded a reasonable estimate of acquisition cost.

99. The DEFENDANTS also caused the submission of false claims by actively marketing their specified drugs to their customer providers by the use of financial inducements created by " the spread" between the DEFENDANTS' true prices to their customers and the Medicare and the States' Medicaid Programs reimbursements based on the DEFENDANTS' falsely inflated prices reported to Medicare and the States' Medicaid Programs and their subcontractors. The financial inducements were in many cases enhanced by additional inducements such as free goods, discounts, rebates, direct money payments, off invoice pricing and deceptive invoicing.

100. The DEFENDANTS knew that the Medicare and States' Medicaid Programs would not pay or approve claims for the specified drugs if it were disclosed to the Medicare and States' Medicaid Programs that said claims were for amounts that included illegal remuneration prohibited by the anti-kick back statutes, 42 U.S.C. §1320a-7b(b)(2) and 1395nn(a)(1)(B).

101. The DEFENDANTS also knew that their customers, in presenting claims for the specified drugs to the Medicare and States' Medicaid Programs, would not and did not

disclose that the claim amounts included the remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2) and 1395 nn(a)(1)(B).

102. The DEFENDANTS each carried out their scheme to defraud the Government by knowingly providing false and misleading price and cost information to the Medicare and Medicaid Programs so that the specialized pharmacies, physicians and others submitting the claims would be reimbursed in excessive amounts and thus be financially induced to prescribe and purchase the DEFENDANTS' specified drugs. The DEFENDANTS thus each participated in a fraudulent scheme to cause the Government to pay and approve false claims in excessive amounts.

103. The claims in question are each false claims under the False Claims Act, in part, because they were each supported by, and the payment amount determined due to the Government's use of, the false and misleading price and cost information provided by the DEFENDANTS in connection with their respective specified drugs. The false and misleading price and cost information provided by the DEFENDANTS was material in that the information was used in setting Medicare and Medicaid reimbursement amounts and each DEFENDANT acted knowingly, as defined in the False Claims Act, in providing the false and misleading price and cost information that caused the Government to pay claims for the DEFENDANTS' drugs in excessive amounts. The price and cost information provided by the DEFENDANTS was provided to cause the Government to pay amounts based on the information and thus constitutes claims submitted to the Government.

104. The false claims at issue in this action were each submitted to the Medicare and Medicaid Programs by or on behalf of physicians, specialized pharmacies and others that sought and received payment in excessive amounts because of false and misleading price and cost representations made by the DEFENDANTS directly or indirectly to the Medicare and Medicaid Programs. The specific false claims are thus each and every claim submitted to the Medicare or Medicaid Program for which the payment amount was determined by use, in whole or to any degree, of the false and misleading price representations of the DEFENDANTS. The false claims at issue number in the tens of thousands and each claim is in the possession of a state's Medicaid Program or Medicare Carrier to which it was submitted. The Relator has identified the specific false claims to the Government by providing the truthful prices concealed from the Government by the DEFENDANTS for each drug, providing information about the DEFENDANTS' exploitation of financial inducements to induce utilization of the specified drugs and specific identification information about the prescription drugs and the specific false price representations in question from which the Relator and the Government identified the specific false claims.

105. The damages sought herein include, but are not limited to, those arising from the false claims for the specified drugs set out in Sections 8 through 32 and elsewhere throughout this Third Amended Complaint. The false claims for the specified drugs set out herein are alleged to meet the specificity and particularity requirements for pleading