CIVIL ACTION NO. 95-1354-CIV-GOLD

under the Federal Rules of Civil Procedure. The damages sought herein encompass all

damages and penalties recoverable due to the false claim scheme of the DEFENDANTS

alleged herein relating to all drugs of all sizes about which false price and cost

representations or records were used in connection with, considered or made available in,

caused, aided or otherwise affected the presentment, payment or approval of false claims.

These claims also encompass recovery of the funds paid for false claims due to the

DEFENDANTS' false drug price and cost representations, regardless of the Government

program that actually expended the funds, the person or entity that ultimately received the

funds or the person or entity from which the United States ultimately recovers the funds.

### Subsection 7a.

### The Unique Kinds of Drugs, Patient/Physician Relationships, and Drug Wholesale Distribution Systems That Make The False Claims Scheme Possible

106. The Medicare beneficiaries and Medicaid recipients who receive the

prescription drugs at issue are usually extremely ill and suffer from such diseases and

conditions as ███████████████████████████████████████

████████████████████████

57

ABT008-2663

CIVIL ACTION NO. 95-1354-CIV-GOLD

107.   The specified prescription drugs at issue in this case are a special kind that are usually administered by ██████, injection or ██████ and are not readily available through normal retail pharmacies but are instead provided directly by hospitals, physicians, clinics and specialized pharmacies and home health care providers.

108.   The prescription drugs at issue, like all prescription drugs, may only be provided to a patient upon the order of a physician.

109.   Prescription drugs provided outside of the hospital setting are ordinarily sold by community retail pharmacies (i.e. Walgreens, Eckerds and neighborhood independent drug stores) directly  to the patient.  Typically a patient is provided a prescription for a particular drug by a physician.  The patient takes the prescription and independently decides at which pharmacy the prescription will be filled.  Thus, the prescribing physician has no financial incentive or financial inducement to prescribe a particular drug or recommend a drug as the therapy of choice over that of a possible alternative therapy.

110.   This case, however, focuses on a different and distinct type of prescription drug which cannot be taken by mouth and generally is not self administered.  The specified prescription drugs are generally administered to the patient by a professional (i.e. a nurse) intravenously, by injection ██████████.  ██████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

58

CIVIL ACTION NO. 95-1354-CIV-GOLD

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████the prescription drugs at issue in this case and are sometimes referred to as "the specified drugs."

111.    The DEFENDANTS refer to specialized pharmacies that provide the specified drugs as "closed pharmacies" or by a similar descriptive name which generally means the pharmacies are not open to the public.

112.    The infusion and injectable drugs ███████████ at issue in this case are generally perceived to be high priced and often are high priced during the time they are subject to a patent held by the brand name manufacturer.

113.    Patients do not ordinarily price shop for the prescription drugs at issue in this case, as they often do with prescription drugs purchased at community retail pharmacies, and instead rely on their physician or home health provider to arrange for the drug to be provided to them.  Patients who receive the specified drugs are extremely ill and not in a position to question their physician's decision as to who will provide the specified drugs, which manufacturer's drugs to use or the amount claimed for providing the drug.

114.    The specified drugs are ordinarily prescribed by specialized physicians for the treatment of people ████████████████████████████████

███████████████████████████████████████████████████

ABT008-2665

CIVIL ACTION NO. 95-1354-CIV-GOLD

115. ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

116.   The specialized physicians often are in unique relationships with the DEFENDANTS in that the physicians not only prescribe the specified drugs, but also directly administer or arrange for their administration and often then submit claims for them or have a financial relationship with the entity submitting the claim.

117.   The DEFENDANTS have also developed special wholesale delivery systems for the drugs at issue in this case in order to facilitate the financial inducements for those in a position to cause the DEFENDANTS' respective drugs to be ordered for patients and paid for by Medicare, Medicaid or other Government programs.

118.   The majority of the DEFENDANTS' drugs, not at issue in this action, are distributed through drug wholesalers who resell and distribute the drugs to hospitals, pharmacies, physicians and clinics.

119.   Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source comprise approximately eighty (80%) of the 53 billion dollar annual wholesale drug market.   Except for the specified drugs, the DEFENDANTS do not generally dictate to these wholesalers who they may sell to or at what price they may sell at.   Wholesalers

ABT008-2666

CIVIL ACTION NO. 95-1354-CIV-GOLD

generally sell to any person or entity (i.e. pharmacies, physicians and hospitals) who can lawfully purchase prescription drugs.

120.   Wholesalers purchase the specified drugs at issue in this case at prices that are unilaterally set and controlled by the DEFENDANTS. The wholesalers in turn add a percentage (commonly referred to as an "up-charge") to the price that they pay the DEFENDANTS. The "up-charge", which is an amount usually approved by the DEFENDANT selling the specific drug, covers the wholesaler's expenses such as warehousing, delivery, billing and collections and provides a profit.

121.   The DEFENDANTS also enter into what are known as "charge-back " arrangements with wholesalers whereby the drugs at issue in this case are sold to the wholesaler at a fictitiously inflated price and then the wholesaler is credited by the DEFENDANT for the difference between the fictitious price and the true price to the DEFENDANTS' customer plus the agreed "up charge" for the wholesaler. The "charge-back" scheme allows the DEFENDANTS to utilize the services of the wholesalers while establishing prices for their drugs to their select customers/providers.

122.   The "charge-back" scheme is illustrated by the following example of the drug,

████████████████████████████████████████████████

███████████████████████████ and wholesaled through McKesson Drug Co. ("McKesson"):

61

ABT008-2667

CIVIL ACTION NO. 95-1354-CIV-GOLD

a)      McKesson's 1998 wholesale price for 

████████, is $109.19 plus an up-charge.

b)      Ven-A-Care is a member of the  Greater New York Hospital Association's ("GNYHA") group purchasing organization.

c)      Ven-A-Care's GNYHA contract price for ███████████████

██████ is $10.00 plus the wholesaler up-charge. VAC's up-charge from McKesson is 7%, therefore, VAC can purchase ████████████████ from McKesson for $10.70 which is $98.49 less than McKesson paid.

d)      McKesson claims a "charge-back" from ███████████████ ██████ of $99.19 which represents the difference in price from what McKesson paid versus what McKesson sold it to VAC for plus McKesson's up-charge.

123.    The DEFENDANTS also sell the specified drugs to other wholesalers which they sometimes refer to as  "distributors","specialty wholesalers" or "oncology supply houses". These wholesalers sell the specified drugs  to select  providers (i.e. specialized physicians and closed pharmacies) at prices that are sometimes a mere fraction of the fictitious prices purported to be paid, before charge-back credit, by McKesson, Cardinal, Bergen Brunswig and Ameri-Source.   These other wholesalers  include Oncology Therapeutics Network ("OTN") a wholly owned subsidiary of ██████████ BRISTOL-MYERS SQUIBB,  Florida Infusion, Alternate Site Distributors "ASD" (a subsidiary of Bergen Brunswig), National  Specialty Services ("NSS")  (a subsidiary of Cardinal) and

62

ABT008-2668

CIVIL ACTION NO. 95-1354-CIV-GOLD

Oncology Supply (a subsidiary of Bergen Brunswig). Their primary business involves selling infusion, injectable and biological drugs. These wholesalers sell many of the drugs at issue in this case; however, the prices are generally net and do not include any wholesaler up-charge. Unlike McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source who determine their own customers, the DEFENDANTS dictate and control who specialty wholesalers such as OTN, Florida Infusion, NSS, ASD, Oncology Supply may sell to and at what price they may sell.

124.   In order to monitor the wholesalers' compliance, the DEFENDANTS require all drug wholesalers to periodically (generally quarterly) report back to the DEFENDANTS all prescription drug sales by NDC number, provider name and sales price.

125.   A representative example of the DEFENDANTS' practice was demonstrated when VAC was informed by a ▌▌▌▌▌▌sales representative that ▌▌▌▌▌▌and other drug manufactures consider this information vital in determining how and where to market their prescription drugs. The ▌▌▌ representative informed VAC that ▌▌▌ prepared reports for every sales representative based on the information compiled from all wholesalers reports and that the ▌▌▌ report was broken down by postal zip code, provider, NDC number, quantity and sales prices.

126.   The DEFENDANTS negotiate prices for their prescription drugs individually with hospitals, Government entities, closed pharmacies, mail order pharmacies, HMO's, physicians, and with group purchasing organizations (" GPO's") who represent groups of

63

ABT008-2669

smaller providers. GPO's provide members lower cost products by negotiating prices for specific drugs from manufacturers. The GPO member is able to purchase the drugs at the negotiated price either in some cases directly from the manufacturer or from a wholesaler that has a charge-back agreement with the specific manufacturer. All of the wholesalers have participated to some degree in the DEFENDANTS' charge-back system. Like the determination by the DEFENDANTS as to who OTN, Florida Infusion, NSS, ASD, Oncology Supply may sell to, acceptable membership in the GPOs is controlled by the DEFENDANTS. The GPO's are required to send periodic detailed reports of membership compliance to the DEFENDANTS.

**Subsection 7b.**

**The Medicare and Medicaid Programs Use
The Defendants' False and Misleading Price and Cost
Representations to Estimate the Acquisition Cost of
The Specified Drugs in Setting Reimbursement Amounts**

127.    The Medicare and Medicaid Programs are each structured so that covered prescription drugs are reimbursed on an estimated cost basis while physicians and other health care providers are reimbursed separately for their professional services and are not

64

ABT008-2670

entitled  to receive any form of financial incentive or inducement for prescribing or delivering drugs.

128.   The Medicare and Medicaid Programs use the price and cost representations of the DEFENDANTS in order to estimate acquisition cost in setting reimbursement amounts.

129.   The DEFENDANTS' price and cost representations are provided to the Medicare and Medicaid Programs directly and  through drug price and cost information reporting services as alleged above.

130.   The States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS and use them to confirm the accuracy of price and cost information used for computing reimbursement amounts.

131.   **The Fraud on Medicare**: This case focuses, in part, on the specified drugs that are covered under Part B of the Medicare program which are sold and/or distributed by the DEFENDANTS and for which claims are paid by the Medicare Part B carriers and the DMERCs in amounts that are based in whole or in part on estimations of acquisition cost. The drugs at issue in this case, for which Medicare has paid claims, include but are not limited to those specified in the following table, together with their respective HCPCS codes. By way of example, the claim amount approved by the Florida Medicare Carrier for each drug in 1996, or in some instances 1997, if specified, is compared with the Relator's cost in order to illustrate the grossly excessive payments resulting from the

65

ABT008-2671

CIVIL ACTION NO. 95-1354-CIV-GOLD

DEFENDANTS' false representations of price and cost.  The DEFENDANTS' false price and cost representations to the Medicare Program have resulted in claims being paid in exorbitant amounts in excess of the drug's cost as more specifically alleged in the following Table No. 1:

## TABLE NO. 1

| 1(A)  DEFENDANT ABBOTT | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | J7050 | $9.43 | $0.95 | $8.48 | 892% |
| Sodium Chloride 0.9% 50 ml | 00074-7983-03 | J7040 | $10.14 | $0.95 | $9.19 | 967% |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | J7030 | $11.06 | $1.03 | $10.03 | 973% |
| 5% Dextrose in Water w/5% etoh 500 ml | 00074-7922-03 | J7060 | $9.98 | $0.96 | $9.02 | 939% |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | J7070 | $11.23 | $1.12 | $10.11 | 902% |
| Dextrose 5% with Sodium Chloride 0.9% 500 ml | 00074-7941-03 | J7042 | $10.24 | $1.03 | $9.21 | 894% |
| Ringers Lactate 1000 ml | 00074-7953-09 | J7120 | $12.43 | $1.14 | $11.29 | 990% |
| Vancomycin HCL 500 mg | 00074-4332-01 | J3370 | $12.91 | $3.51 | $9.40 | 267% |

ABT008-2672

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 1(A)  DEFENDANT ABBOTT | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Tobramycin Sulfate 80 mg | 00074-3578-01 | J3260 | $6.74 | $3.63 | $3.11 | 85% |

| 1(B)  ■■■■■■■■■■ | | | | | | |
|---|---|---|---|---|---|---|
| DRUG | NDC # | HCPCS CODE | 1996 FLORIDA MEDICARE ALLOWABLE | 1996 RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| ■■■ | ■■■ | ■ | ■ | ■ | ■ | ■ |
| ■■■ | ■■■ | ■ | ■ | ■ | ■ | ■ |
| ■■■ | ■■ | ■ | ■ | ■ | ■ | ■ |
| ■■■ | ■■ | ■ | ■ | ■ | ■ | ■ |
| ■■■ | ■■ | ■ | ■ | ■ | ■ | ■ |
| ■■ | ■■ | ■ | ■ | ■ | ■ | ■ |
| ■■ | ■■ | ■ | ■ | ■ | ■ | ■ |
| ■■ | ■■ | ■ | ■ | ■ | ■ | ■ |

67

ABT008-2673

CIVIL ACTION NO. 95-1354-CIV-GOLD

# PAGE 68 THROUGH PAGE 80

# HAVE BEEN COMPLETELY REDACTED

ABT008-2674

CIVIL ACTION NO. 95-1354-CIV-GOLD





132.   **The Fraud on Medicaid**:  This case, in part, focuses on the specified drugs

that are covered under the States' Medicaid Programs which are sold and/or distributed

by the DEFENDANTS and for which the States' Medicaid Programs paid claims in amounts

that are based in whole or in part on estimations of acquisition cost.  The drugs at issue

in this case for which Medicaid has paid claims are identified in the following table,

81

CIVIL ACTION NO. 95-1354-CIV-GOLD

together with their respective NDC numbers.  By way of example, the claim amount approved by Florida Medicaid for each drug in 1996 (unless specified as 1997) is compared with the Relator's cost in order to illustrate the grossly excessive payments resulting from the DEFENDANTS' false representations of price and cost. The DEFENDANTS' price and cost representations to the States' Medicaid Programs have resulted in claims being paid in exorbitant amounts in excess of the drug's cost as more specifically alleged in the following Table No. 2:

## TABLE NO. 2

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Sodium Chloride 0.9% 50 ml | 00074-7101-13 | $11.28 | $1.23 | $10.05 | 817% |
| Sodium Chloride 0.9% 100 ml | 00074-7101-23 | $11.28 | $1.23 | $10.05 | 817% |
| Sodium Chloride 0.9% 250 ml | 00074-7983-02 | $9.37 | $0.95 | $8.42 | 886% |
| Sodium Chloride 0.9% 500 ml | 00074-7983-03 | $9.37 | $0.95 | $8.42 | 886% |
| Sodium Chloride 0.9% 1000 ml | 00074-7983-09 | $11.16 | $1.03 | $10.13 | 983% |
| 5% Dextrose in Water 50 ml | 00074-7100-13 | $11.28 | $1.23 | $10.05 | 817% |

82

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| 5% Dextrose in Water 100 ml | 00074-7100-23 | $11.28 | $1.23 | 410.05 | 817% |
| 5% Dextrose in Water 250 ml | 00074-7100-02 | $13.67 | $1.33 | $12.34 | 928% |
| 5% Dextrose in Water 500 ml | 00074-7922-03 | $9.53 | $0.96 | $8.57 | 892% |
| 5% Dextrose in Water 1000 ml | 00074-7922-09 | $11.13 | $1.12 | $11.01 | 983% |
| 5% Dextrose/ Sodium Chloride 0.9% 250 ml | 00074-7941-02 | $10.24 | $1.03 | $9.21 | 894% |
| 5% Dextrose/ Sodium Chloride 0.9% 500 ml | 00074-7941-03 | $10.23 | $1.03 | $9.20 | 893% |
| 5% Dextrose/ Sodium Chloride 0.9% 1000 ml | 00074-7941-09 | $12.51 | $1.23 | $11.28 | 917% |
| Ringers Lactate 250 ml | 00074-7953-02 | $11.34 | $1.08 | $10.00 | 926% |
| Ringers Lactate 500 ml | 00074-7953-03 | $11.34 | $1.08 | $10.26 | 950% |
| Ringers Lactate 1000 ml | 00074-7953-09 | $12.72 | $1.14 | $11.58 | 915% |

83

ABT008-2677

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Vancomycin HCL  500 mg | 00074-4332-01 | $30.85 | $3.51 | $27.34 | 779% |
| Vancomycin HCL 500 mg | 00074-6535-01 | $22.19 | $6.29 | $15.90 | 252% |
| Vancomycin HCL 1 gm | 00074-6533-01 | $61.68 | $5.53 | $56.15 | 1015% |
| Vancomycin HCL 5 gm | 00074-6509-01 | $138.76 | $35.10 | $103.66 | 295% |
| Tobramycin Sulfate 20 mg | 00074-3577-01 | $4.86 | $1.94 | $2.92 | 150% |
| Tobramycin Sulfate 60 mg | 00074-3582-01 | $6.21 | $3.68 | $2.53 | 68% |
| Tobramycin Sulfate 60 mg | 0074-3469-13 | $21.45 | $5.16 | $16.29 | 315% |
| Tobramycin Sulfate 60 mg | 00074-3254-03 | $16.04 | $3.97 | $12.07 | 304% |
| Tobramycin Sulfate 80 mg | 00074-3470-23 | $23.45 | $5.57 | $17.88 | 321% |
| Tobramycin Sulfate 80 mg | 00074-3583-01 | $10.26 | $4.12 | $6.14 | 149% |
| Tobramycin Sulfate 80 mg | 00074-3578-01 | $9.64 | $3.63 | $6.01 | 165% |
| Tobramycin Sulfate 80 mg | 00074-3255-03 | $10.72 | $4.33 | $6.39 | 147% |
| Tobramycin Sulfate 2000 mg | 00074-3590-02 | $241.07 | $87.68 | $153.39 | 174% |
| Pentamidine 300 mg | 00074-4548-01 | $111.40 | $43.00 | $68.40 | 159% |

84

ABT008-2678

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Clindamycin Phosphate 300 mg | 00074-4053-03 | $11.07 | $1.74 | $9.33 | 536% |
| Clindamycin Phosphate 300 mg | 00074-4050-01 | $10.99 | $1.47 | $9.52 | 647% |
| Clindamycin Phosphate 600 mg | 0074-4054-03 | $20.35 | $2.95 | $17.40 | 589% |
| Clindamycin Phosphate 600 mg | 00074-4051-01 | $21.34 | $2.69 | $18.65 | 693% |
| Clindamycin Phosphate 900 mg | 00074-4052-01 | $26.96 | $3.20 | $23.76 | 742% |
| Clindamycin Phosphate 900 mg | 00074-4197-01 | $221.11 | $30.95 | $190.16 | 614% |
| Clindamycin Phosphate 900 mg | 00074-4055-03 | $27.22 | $3.46 | $23.76 | 686% |
| Sodium Bicarbonate 50 ml | 00074-6625-02 | $6.57 | $0.62 | $5.95 | 959% |
| Sodium Bicarbonate 8.4% 50 ml | 00074-6637-01 | $18.28 | $1.66 | $16.62 | 1001% |
| Amikacin Sulfate 500 mg, 2 ml | 00074-1958-01 | $55.18 | $15.50 | $39.68 | 256% |
| Amikacin Sulfate 100 mg, 2 ml | 00074-1955-01 | $40.20 | $11.50 | $28.70 | 249% |

85

ABT008-2679

CIVIL ACTION NO. 95-1354-CIV-GOLD

| 2(A)  DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| DRUG | NDC # | FLORIDA MEDICAID PAYMENT | RELATOR'S COST | PROVIDER'S GROSS PROFIT $ | PROVIDER'S GROSS PROFIT % |
| Amikacin Sulfate 1 gm, 4 ml | 00074-1957-01 | $49.81 | $28.50 | $21.31 | 75% |
| Heparin Lock Flush  10u/ml, 30 ml | 00074-1151-78 | $2.86 | $0.38 | $2.48 | 652% |
| Heparin Lock Flush  100u/ml 30 ml | 00074-1152-78 | $3.26 | $0.44 | $2.82 | 640% |
| Heparin Lock Flush  100u/ml 10 ml | 00074-1152-70 | $1.40 | $0.28 | $1.12 | 400% |
| Water for Inj. 20 ml | 00074-4887-20 | $1.72 | $0.23 | $1.49 | 647% |
| Water for Inj. 10 ml | 00074-4887-10 | $1.37 | $0.19 | $1.18 | 621% |
| Water for Inj. 30 ml | 00074-3977-03 | $1.84 | $0.20 | $1.64 | 820% |
| Water for Inj. 1000 ml | 00074-1590-05 | $11.34 | $1.13 | $10.21 | 903% |
| Wa ter for Inj. 1000 ml | 00074-7990-09 | $10.27 | $1.04 | $9.23 | 887% |
| Water for Inj. 100 ml | 00074-4887-99 | $3.42 | $0.71 | $2.71 | 381% |
| Dex 5%/ Kcl/NaCl 1000 ml | 00074-7902-09 | $17.46 | $2.05 | $15.41 | 751% |
| Furosemide 40 mg 4 ml | 00074-6102-04 | $4.13 | $0.35 | $3.78 | 1080% |

86

ABT008-2680

CIVIL ACTION NO. 95-1354-CIV-GOLD

# PAGE 87 THROUGH PAGE 105

# HAVE BEEN COMPLETELY REDACTED

ABT008-2681

CIVIL ACTION NO. 95-1354-CIV-GOLD



133.   The representations of their drugs' prices made by the DEFENDANTS to First

Data Bank, Medical Economics, Medi-Span and directly to the Medicare carriers and the

States' Medicaid Programs are material for the establishment of reasonable

reimbursements by Medicare and the States' Medicaid Programs.  The importance that

drug manufacturers represent truthful costs and prices and how these representations

106

CIVIL ACTION NO. 95-1354-CIV-GOLD

affect reimbursements in both States whose formula is WAC plus a percentage and States whose formula is AWP minus a percentage  is demonstrated by the following example:

ABT008-2683

CIVIL ACTION NO. 95-1354-CIV-GOLD



108

ABT008-2684

CIVIL ACTION NO. 95-1354-CIV-GOLD



### Subsection 7c.

**The Defendants Each Determine What Representations Will
Be Made to the Drug Price and Cost Reporting Compendia and
To the Medicare and Medicaid Programs,
Have Knowledge of the Actual Prices of Their Drugs, and
Know If the Government Is Being Provided with
False and Misleading Price and Cost Information**

134.    The DEFENDANTS are prohibited by the False Claims Act from making false

representations in connection with claims for Government funds, are required by the Food

and Drug Act to report true prices and are prohibited by the Medicare and Medicaid Anti-

Kickback laws from arranging financial inducements for providers.

135.    The patients and third party payers, including the Medicare and States'

Medicaid Programs, are not aware of the prices actually paid for the specified drugs by the

physician, clinic or specialty pharmacy presenting the claim for payment.    The

DEFENDANTS concealed from the Medicare and States' Medicaid Programs price

109

ABT008-2685

reductions occurring due to competition in the marketplace and falsely and fraudulently represented drug prices that far exceeded the truthful prices.

136.   At all times material to this action, each of the DEFENDANTS acted "knowingly" as that term is defined at 31 U.S.C. §3729(b) by:

a)   Causing the presentation of false and fraudulent claims for payment or approval by the Medicare and States' Medicaid programs; and

b)   Making and using false statements and/or records for the purpose of getting false or fraudulent claims approved or paid by the Medicare and States' Medicaid programs.

137.   The DEFENDANTS were clearly placed on notice that their conduct would cause the Medicare and States' Medicaid programs to pay claims for the specified drugs in amounts exceeding that permitted by applicable law, in part, because:

a)   Each of the DEFENDANTS was on notice of federal statutes and regulations that limit payment of Medicare Part B claims for the specified drugs to 80% of a reasonable cost.

b)   Each of the DEFENDANTS was on notice of federal statutes and regulations limiting payment of Medicaid claims for the specified drugs to an amount necessary to cover the cost of the drug.

110

CIVIL ACTION NO. 95-1354-CIV-GOLD

c)      Each of the DEFENDANTS was on notice that neither the Medicare nor the States' Medicaid programs were authorized or permitted by applicable law to pay claims for the specified drugs in excessive amounts.

d)      Each of the DEFENDANTS was on notice that federal statutes and regulations prohibited them from making misleading representations about the specified drugs, including misleading price or cost representations.

138.   Defendants  ABBOTT, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ repeatedly, systematically and falsely represented to the Medicare and States' Medicaid Programs that the prices of certain of their specified drugs were increasing or remaining substantially constant when they knew that in truth and in fact the prices had fallen substantially or were otherwise priced far below the represented prices and the Medicare and States' Medicaid Programs would pay and approve claims based on their false representations of the price of their drugs.

139.   Each of the DEFENDANTS was on notice that federal statutes and regulations prohibited them from making misleading representations about the specified drugs, including misleading price or cost representations:

a)      Each of the DEFENDANTS is required to comply with the Federal Food, Drug and Cosmetic Act 21 U.S.C. §321 et. seq., and the regulations promulgated pursuant thereto.

111

ABT008-2687

b)      The price and cost representations about the specified drugs constitute advertising that is included in the "labeling" provisions of the Federal Food and Drug Act and related regulations. 21 U.S.C. §§201(m); 202.1(k)(2).

c)      Each of the DEFENDANTS is prohibited from disseminating any information about their prices or costs of the specified drugs that is "false or misleading in any particular . . ." 21 U.S.C. §§5.02; 302(b).

d)      Each of the DEFENDANTS was on notice that they possessed a duty to assure that their representations about prices and costs of the specified drugs were not misleading, taking into account:

> "  .  .  . not only representations made or suggested by
> statement, word, design, device, or any combination thereof,
> but also to the extent to which the labeling or advertising fails
> to reveal facts material in light of such representations"

21 U.S.C. §201(n).

140.    Notwithstanding the legislative intent of the Food Drug and Cosmetic Act, the DEFENDANTS, acting individually and in concert with one another, purposely created confusion and made false and misleading statements about drug pricing in order to deceive the United States Government and the States' Medicaid Programs. For several years, various Governmental agencies including the HHS Office of Inspector General "OIG" and the General Accounting Office "GAO" attempted to examine the issue of the reasonableness of reimbursements by the Medicare and States' Medicaid Programs for

112

many of the drugs at issue in this Third Amended Complaint. The OIG's and GAO's efforts were thwarted, in part, by the DEFENDANTS withholding and concealing pertinent information that was being sought by the OIG and GAO. The OIG and GAO attempted through numerous published reports to identify the problem of unreasonable reimbursements; however, they were unsuccessful due to the actions of the DEFENDANTS. The DEFENDANTS concealed and disguised the unreasonable reimbursements from the United States Government and States' Medicaid Programs, in part, by the following facts and circumstances:

a)    The DEFENDANTS can and do make truthful representations of price and costs for many of their drugs sold in retail community pharmacies and, in some instances, infusion, injectable and inhalation drugs and biologicals sold to physician groups, outpatient clinics and specialty infusion pharmacies.

b)    Some drug manufacturers (other than the DEFENDANTS) make representations of costs and price only in terms of Average Wholesale Price "AWP".

c)    Some of the DEFENDANTS make representations of cost and price only in terms of "List Price," "Wholesale Net," Direct Price "DP" or "DIRP,"or Wholesaler Acquisition Costs, "WAC," to which Medical Economics and First Data Bank apply an industry average mark-up and establish an AWP.

d)    Some of the DEFENDANTS make representations of cost and price in terms of both AWP and DP (or DIRP).

113

CIVIL ACTION NO. 95-1354-CIV-GOLD

141.   **The Defendants Create the False Price Spread to Induce Sales of Drugs**

**Used to Treat Very Serious Medical Conditions**:  The following Table No. 3 lists each

of the DEFENDANTS drugs and their approved FDA indications as published in the 1998

edition of *Drug Facts and Comparisons* and the percent of pricing fraud is represented by

the mark-up between the DEFENDANTS AWP listing in the 1998 *Drug Topics* Red Book

and Ven-A-Care's true 1998 wholesale cost for a common size.

### TABLE NO. 3

| ABBOTT | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Acyclovir** (Antiviral) | HSV-1 and HSV-2<br>Varicella Zoster(Shingles)<br>Herpes Simplex Encephalitis | 363% |
| **Amikacin** (Antibiotic) | Bacterial Septicemia<br>Respiratory Tract Infection<br>Bone and Joint Infection<br>Skin and Soft Tissue Infection<br>Intra-abdominal Infection<br>Burns<br>Urinary Tract Infections | 437% |
| **Amino Acids/ Electrolytes** (Nutrition) | Given to prevent nitrogen and weight loss and meet metabolic requirements when the gastrointestinal tract cannot be used or is inadequate. | 1776% |
| **Clindamycin** (Antibiotic) | Respiratory Tract Infections<br>Skin and Soft Tissue Infection<br>Septicemia<br>Female Pelvis and Genital Tract Infections<br>Hematogenous Osteomyelitis | 846% |

114

ABT008-2690

CIVIL ACTION NO. 95-1354-CIV-GOLD

| ABBOTT | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Dextrose 5% in Water** (Fluid) | Intravenous Replenishment Solution | **1562%** |
| **Dextrose 5% with Sodium Chloride** (Fluid) | Intravenous Replenishment Solution | **1014%** |
| **Dextrose 5% with Potassium and Sodium Chloride** (Fluid) | Intravenous Replenishment Solution | **2309%** |
| **Furosemide** (Diuretic) | Edema<br>Hypertension<br>Acute Pulmonary Edema<br>Congestive Heart Failure<br>Chronic Renal Failure | **3061%** |
| **Heparin** (Anticoagulant) | Venous Thrombosis<br>Pulmonary Embolism<br>Peripheral Arterial Embolism | **936%** |
| **Lactated Ringers** (Fluid) | Intravenous Replenishment Solution | **1076%** |
| **Pentamidine Isethionate** (Antiprotozoan) | Pneumocystis Carinii Pneumonia (PCP)<br>By Inhalation: Prevention of Pneumocystis Carinii Pneumonia (PCP) in high risk HIV patients | **400%** |
| **Sodium Chloride 0.9%** (Fluid) | Dilutent for Inhaled and Injected Drugs<br>Intravenous Replenishment Solution | **1335%** |

115

ABT008-2691

CIVIL ACTION ฅ. 95-1354-CIV-GOLD

| ABBOTT | | |
|---|---|---|
| **DRUG** | **F.D.A. APPROVED INDICATIONS** | **THE FALSE PRICE SPREAD** |
| **Tobramycin** (Antibiotic) | Septicemia<br>Lower Respiratory Tract Infection<br>Central Nervous System Infections<br>Intra-Abdominal Infections<br>Skin and Skin Structure Infection<br>Bone and Joint Infection<br>Urinary Tract Infection | **515%** |
| **Vancomycin** (Antibiotic) | Serious or severe infections not treatable with other antimicrobials including:<br>Resistant *Staphylococcal* Infections<br>Resistant *Streptococcal* Infections<br>*Diptheroid* Endocarditis<br>Pseudomembranous Colitis | **1153%** |
| **Sterile Water for Injection** (Fluid) | Reconstitution Solution for Injection Drugs | **684%** |

116

CIVIL ACTION NO. 95-1354-CIV-GOLD

# PAGE 117 THROUGH PAGE 136

# HAVE BEEN COMPLETELY REDACTED

ABT008-2693



142.   Each DEFENDANT was on notice that it was prohibited by federal statute, from paying, or causing the payment of, directly or indirectly, money or other financial benefit to induce its customers to order the specified drugs when the Medicare or States' Medicaid Programs would be paying claims. 42 U.S.C. §1320a-7b(b)(2).

143.   Notwithstanding the DEFENDANTS' knowledge that the Government relied upon the DEFENDANTS' representations of price and cost and their knowledge of the applicable statutory requirements and prohibitions, each of the DEFENDANTS repeatedly, systematically and falsely reported inflated price and cost information, including but not limited to:

ABT008-2694

a)      Defendants ABBOTT, ███████████████████

████████████ repeatedly, systematically and falsely represented to the Medicare and

States' Medicaid Programs that the prices of certain of the generic versions of the specified

drugs were the same or higher than the published price for the equivalent brand drug when

they knew that, in truth and in fact, the price of their generic drug was far less than the

published price of the brand and that the States' Medicaid Programs and Medicare would

pay and approve claims based upon their false representations of the price of their drugs,

and

b)      Defendants ABBOTT, ███████████████████

████████████████████████████████████████████

█████████████████████████ repeatedly, systematically and falsely represented to the

Medicare and States' Medicaid Programs that the prices of certain of their specified drugs

were increasing or remaining substantially constant when they knew that in truth and in fact

the prices had fallen substantially or were otherwise priced far below the represented

prices and the Medicare and States' Medicaid Programs would pay and approve claims

based on their false representations of the price of their drugs.

138

ABT008-2695

CIVIL ACTION NO. 95-1354-CIV-GOLD

**Subsection 7d**

**The DEFENDANTS Falsely Inflate Reports of Prices and
Costs to Create a Positive Profit or "Spread" in Order to
Unlawfully Induce the Utilization of Their Drugs**

144.   The DEFENDANTS benefit directly from their false pricing scheme of
concealing their true prices while making grossly inflated false and fraudulent
representations of prices and costs by maximizing their products' sales volume, capturing
market share for their products, and increasing utilization of their products by providers.
An example of how the DEFENDANTS directly benefit from their false pricing scheme is
demonstrated by data for the first quarter of 1997 from the State of Florida's Medicaid
Program setting out Florida Medicaid's reimbursements paid to the customers of drug
manufacturers and utilization of their products by their customers for the drug ███████
███████████████████████████.

145.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

139

ABT008-2696

146.

ABT008-2697

CIVIL ACTION NO. 95-1354-CIV-GOLD

147.

141

ABT008-2698

CIVIL ACTION NO. 95-1354-CIV-GOLD



148.    The DEFENDANTS regularly make  representations of false price and cost information  directly to the Medicare Part B Carriers.

149.    The DEFENDANTS also regularly make direct representations of false price and cost information directly to the various state Medicaid agencies that are relied upon in approving and paying claims.

142

ABT008-2699

150.   In many instances, the kickbacks paid from Governments' funds were in excess of 1,000% over the providers' true costs and over the reasonable reimbursement amounts which the Governments intended to pay.  The grossly excessive profits have led to a proliferation of illegal split fee arrangements between the drug manufacturers' customers and persons or entities who are in a position to refer patients.  The split fee/kickbacks also serve as a financial inducement for the referrals of more patients and greater utilization of the products.

151.   The knowledge of the DEFENDANTS is further demonstrated by their systematic and ongoing, written and verbal communications with customers whereby they encourage and induce them to submit claims to Medicare and Medicaid to receive the excessive payments resulting from the DEFENDANTS' false price and cost representations.

152.   As an example of the DEFENDANTS' use of their false and fraudulent practices to market their products follows:



ABT008-2700

CIVIL ACTION NO. 95-1354-CIV-GOLD



144

ABT008-2701

CIVIL ACTION NO. 95-1354-CIV-GOLD



145

ABT008-2702

CIVIL ACTION NO. 95-1354-CIV-GOLD



154.   **Patient Specific Examples Best Demonstrate the Huge Financial Inducements Created by the False Claim Schemes**: The financial inducement to those in a position to increase the utilization of the DEFENDANTS' drugs is illustrated by the following examples of common drug therapies for certain of the specified drugs:

146

ABT008-2703

CIVIL ACTION NO. 95-1354-CIV-GOLD

# PAGE 147 THROUGH PAGE 153

# HAVE BEEN COMPLETELY REDACTED

ABT008-2704

CIVIL ACTION NO. 95-1354-CIV-GOLD



### Subsection 7e

### The Illegal Profit Spreads Are Often Enhanced By Additional Unlawful Financial Inducements Such As Free Goods, Direct Monetary Payments, Rebates, And Agreements To Falsify Invoices

155.   The DEFENDANTS' false and misleading price and cost representations, as alleged above, create a profit spread between the cost of the drug to the provider and the reimbursement paid by Medicare and Medicaid. The amount of the financial inducement is thus paid from public funds under circumstances where paying or arranging such payments is expressly prohibited by law. The DEFENDANTS further act to increase the illegal profit spread, over and above that resulting from their false price and cost reports , through additional unlawful financial inducements such  as:

a)   Providing or arranging for the delivery of free goods in exchange for the purchase of the DEFENDANTS' specified drugs, the value of which is concealed from the Government,  resulting in an additional spread between the true acquisition cost of the specified drugs and the false prices upon which Medicare and Medicaid reimburse.

154

ABT008-2705

CIVIL ACTION NO. 95-1354-CIV-GOLD

b)     Making direct monetary payments to the provider ordering the drugs and concealing the true purpose of the payment by classifying it as a "marketing grant", "educational grant", "administrative fee", "research grant" or other name when the payment is, in truth, a financial inducement for ordering the drugs. These payments further reduce the providers' costs and are concealed from the Government.

c)     Paying rebates to the providers which are concealed from the Government, further reducing the true cost of the drug and increasing the illegal profit spread.

d)     Falsifying invoice prices to conceal additional reductions in the provider's true acquisition cost of the drugs.

156.   Each of the methods employed by the DEFENDANTS in paying illegal financial inducements have the effect of misleading the Medicare and Medicaid Programs about the providers' cost of the drugs and of impeding the Programs' ability to estimate acquisition costs. The DEFENDANTS' actions result in claims being paid at exorbitant amounts.

### Subsection 7f

**The DEFENDANTS Intentionally Impede Government Efforts
to Accurately Estimate Acquisition Costs and Deprive the Government of the
Benefits of Truthful Price and Cost Representations**

157.   The DEFENDANTS have each knowingly and actively impeded the efforts of the Government:  to arrive at reasonable estimates of acquisition cost in  setting payment amounts for claims for the specified drugs; to benefit from drug price competition;

155

ABT008-2706

and to use the Government's huge volume purchasing power for the benefit of the taxpayer. The DEFENDANTS' acts include the knowing reporting of inflated price and cost information alleged throughout this Amended Complaint and in many instances include additional acts and omissions such as those alleged in this Subsection.

158. 

159.

160.

ABT008-2707

CIVIL ACTION NO. 95-1354-CIV-GOLD

161.

162.

157

ABT008-2708

163.



ABT008-2709



164.   Some state Medicaid programs have gone to exceptional lengths in their efforts to  verify that drug manufacturers provide valid price and cost information for reimbursement purposes. By way of example, the Texas Medicaid authorities, during the time at issue in this Amended Complaint, required each of the DEFENDANTS  to certify, in writing, the accuracy of their price and cost representations as a condition to their drugs being covered for reimbursement. The Relator's investigation has revealed that each  of

ABT008-2710

CIVIL ACTION NO. 95-1354-CIV-GOLD

the DEFENDANTS, when responding to Texas, either affirmatively lied about their true prices, or omitted material information in order to mislead the Texas Medicaid officials.

165.   The State of Texas required the DEFENDANTS to complete a specific form regarding the prices of their drugs. Immediately before the required signature by the DEFENDANTS' representatives is the following language:

"I hereby certify that the information submitted is correct to the best of my knowledge... I also agree to inform the Texas Department of Health of any changes in......price....within fifteen (15) days of such change."

166.   The State of Texas pays reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge or Estimated Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the average price paid by providers purchasing a drug from a wholesaler. DEAC is the average price paid by a provider purchasing the drug directly for the drug's manufacturer.

167.   Had the DEFENDANTS truthfully disclosed the price and cost information about the specified drugs, Texas Medicaid would have set reimbursement amounts for the specified drugs consistent with a reasonable estimation of acquisition cost. Because each of the DEFENDANTS having a duty to make truthful disclosures made false statements or omissions about the specified drugs, Texas Medicaid reimbursement has been paid at substantially greater amounts than intended by applicable law and Texas Medicaid policy.

160

ABT008-2711

168.   The Relator has provided the United States and Texas government authorities with sufficient information to identify the specific false statements and omissions of each DEFENDANT. A representative example is that of DEFENDANT ABBOTT'S false statements for the price of its injectable drug Furosemide made in its written certification of drug prices to Texas Medicaid. ABBOTT knowingly and falsely represented to Texas Medicaid that the price to wholesalers and direct to pharmacies of Furosemide, NDC No. 00074-6054-02, was $82.75 for twenty five of the 10 mg/2ml vials when ABBOTT knew that its true price was $27.48 and substantially less than $81.75. The Relator was, at all times from June 1, 1994 through May 31, 1997, able to purchase ABBOTT's Furosemide, NDC No: 00074-6054-02, for only $27.48 through a group purchasing organization.

169.   The United States Congress has attempted to assist the States' Medicaid programs in limiting reimbursement amounts for prescription drugs to a reasonable estimate of acquisition cost, by empowering the Health Care Financing Administration to set a "Federal Upper Limit" ("FUL") for drugs paid for by Medicaid. HCFA has not established a FUL for most of the infusion, injectable and biological drugs at issue in this case. However, some of the DEFENDANTS have expanded the false claims scheme to certain oral prescription drugs for which an FUL has been set.  These oral drugs are dispensed by retail pharmacies and  the creation of a spread may financially induce the pharmacy to dispense the generic version with the greatest profit spread between acquisition cost  and  the FUL. False inflated price reports cause the FUL to be set at a

ABT008-2712