# Exhibit H

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## SOUTHERN DIVISION



UNITED STATES OF AMERICA    )
Ex Rel           )
  VEN-A-CARE OF THE   )
  FLORIDA KEYS, INC.    )
  a Florida Corporation,    )
  by and through its principal  )
  officers and directors,    )
  ZACHARY T. BENTLEY and  )
  T. MARK JONES,     )
      Plaintiff,     )
             )
v.             )
             )
ABBOTT LABORATORIES;   )



CIVIL ACTION NO.
95-1354-CIV-GOLD

FILED IN CAMERA
AND UNDER SEAL
PURSUANT TO
31 U.S.C. §3730

FOURTH AMENDED
COMPLAINT
For Money Damages and
Civil Penalties Under The
False Claims Act
31U.S.C. §§3729-3732

ABT008-2764

Civil Action No: 95-1354-CIV-GOLD



)
)
)
)
)
)
)
)
)
**Defendants.** )
)

## FOURTH AMENDED COMPLAINT
## FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE
## CLAIMS ACT 31 U.S.C. §§3729-3732

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or "GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-CARE" or "the Relator"), and its principal officers and directors, ZACHARY T. BENTLEY, and T. MARK JONES, and by and through the undersigned attorneys on behalf of the UNITED STATES and on the Relator's own behalf and bring this action against, ABBOTT LABORATORIES;

2

ABT008-2765

Civil Action No: 95-1354-CIV-GOLD



(sometimes referred to collectively as, "DEFENDANT DRUG MANUFACTURERS" or "DEFENDANTS"), for money damages and civil penalties arising out of the DEFENDANTS' violations of the Federal False Claims Act ("False Claims Act"), 31 U.S.C., §§3729-3732.

3

ABT008-2766

Civil Action No: 95-1354-CIV-GOLD

## TABLE OF CONTENTS           **Page No:**

SECTION NO. 1
    SUMMARY OF THE ACTION        9

    A.  THE MEDICAID AND MEDICARE FRAUD ARISING FROM
        DEFENDANTS' FALSE PRICE AND COST
        REPRESENTATIONS INVOLVING SPECIALIZED
        PHYSICIANS AND PHARMACIES AND INFUSION DRUGS      11

SECTION NO. 2
    THE PARTIES        15

SECTION NO. 3
    JURISDICTION & VENUE        30

SECTION NO. 4
    HOW DRUG MANUFACTURERS' PRICE AND COST
    REPRESENTATIONS ARE OBTAINED BY THE MEDICARE AND
    STATE MEDICAID PROGRAMS WHICH THEN UTILIZE THEM
    TO CALCULATE DRUG REIMBURSEMENT AMOUNTS      31

SECTION NO. 5
    THE ROLE OF THE DRUG WHOLESALER        37

SECTION NO. 6
    BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID
    FOR DRUG CLAIMS UNDER "PART B" OF THE MEDICARE
    PROGRAM        40

SECTION NO. 7
    BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID
    FOR DRUG CLAIMS UNDER THE STATE MEDICAID
    PROGRAMS        45

SECTION NO. 8
    THE FALSE CLAIMS SCHEME        50

    A.     DEFENDANTS' SCHEME RESULTED IN MULTIPLE
        VIOLATIONS OF THE FALSE CLAIMS ACT      50

    B.     THE NATURE AND IMPACT OF DEFENDANTS' FALSE
        CLAIM SCHEME      58

4

ABT008-2767

Civil Action No: 95-1354-CIV-GOLD

## TABLE OF CONTENTS

Page No:

SECTION NO. 9
    THE DEFENDANT DRUG MANUFACTURERS' KNOWLEDGE
    OF THE FALSE CLAIM SCHEME        67

SECTION NO. 10
    THE DEFENDANTS HAVE REPEATEDLY UNDERMINED
    THE VARIOUS STEPS THAT FEDERAL AND STATE
    GOVERNMENTS HAVE TAKEN TO ENSURE THAT
    GOVERNMENT DRUG REIMBURSEMENT AMOUNTS ARE
    REASONABLE        76

SECTION NO. 11
    THE SPECIFIC FALSE PRICE AND COST
    REPRESENTATIONS OF DEFENDANT
    ABBOTT        77

SECTION NO. 12
    [redacted]        85

SECTION NO. 13
    [redacted]        89

SECTION NO. 14
    [redacted]        92

SECTION NO. 15
    [redacted]        97

SECTION NO. 16
    [redacted]        102

ABT008-2768

Civil Action No: 95-1354-CIV-GOLD



## TABLE OF CONTENTS

| | Page No: |
|---|---|
| SECTION NO. 17 | 106 |
| SECTION NO. 18 | 110 |
| SECTION NO. 19 | 115 |
| SECTION NO. 20 | 118 |
| SECTION NO. 21 | 122 |
| SECTION NO. 22 | 126 |
| SECTION NO. 23 | 130 |
| SECTION NO. 24 | 132 |

6

ABT008-2769

Civil Action No: 95-1354-CIV-GOLD

## TABLE OF CONTENTS

Page No:



SECTION NO. 25

135

SECTION NO. 26

137

SECTION NO. 27

141

SECTION NO. 28

144

SECTION NO. 29

146

SECTION NO. 30

151

SECTION NO. 31

153

SECTION NO. 32

156

7

ABT008-2770

Civil Action No: 95-1354-CIV-GOLD

**TABLE OF CONTENTS**                                          **Page No:**

SECTION NO. 33

[redacted]
                                                                   158

COUNT I
    FALSE CLAIMS ACT;
    CAUSING PRESENTATION OF FALSE OR FRAUDULENT
    CLAIMS                                                        161

COUNT II
    FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
    STATEMENT TO BE MADE OR USED TO GET A FALSE OR
    FRAUDULENT CLAIM PAID OR APPROVED BY THE
    GOVERNMENT                                                    162

COUNT III
    FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR
    STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION
    TO PAY MONEY TO THE GOVERNMENT                                164

COUNT IV
    FALSE CLAIMS ACT; CAUSING PRESENTATION OF
    FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATION              166

COUNT V
    FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
    STATEMENT TO BE MADE OR USED TO GET
    A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY
    THE GOVERNMENT; PROHIBITED REFERRALS,
    CLAIMS AND COMPENSATION ARRANGEMENTS                          168

COUNT VI
    FALSE CLAIMS ACT; CONSPIRING TO DEFRAUD THE
    GOVERNMENT BY GETTING A FALSE OR FRAUDULENT
    CLAIM ALLOWED OR PAID                                         170

REQUESTS FOR RELIEF                                               172

DEMAND FOR JURY TRIAL                                             174

CERTIFICATE OF SERVICE                                            176

ABT008-2771

Civil Action No: 95-1354-CIV-GOLD

## SECTION NO. 1

## SUMMARY OF THE ACTION

1.      This is an action for damages, treble damages, restitution, civil penalties, pre-judgment interest, equitable relief and for attorneys' fees and expenses of the Relator against the DEFENDANTS for violations of the False Claims Act as set out in Counts I through VI. The violations arise from DEFENDANTS' actions which caused Medicare and the State Medicaid Programs to pay grossly inflated prices for DEFENDANTS' prescription drugs.  This Fourth Amended Complaint encompasses all those prescription drugs and biologicals with respect to which DEFENDANTS violated the False Claims Act during the relevant time period by any of the means described herein, including, but not limited to, the prescription drugs and biologicals identified herein unless otherwise included by the Relator in a separate action under the False Claims Act.

2.      The Medicare and State Medicaid Programs pay claims for the prescription drugs at issue herein only if three distinct requirements are met.  First, the pharmaceutical drug manufacturer must make price and cost information about the prescription drug publicly available.  Second, the program must elect to cover the prescription drug when medically necessary.  Third, the physician, pharmacy or other health care provider who purchases the prescription drug must confirm that it was administered or dispensed to an eligible person covered by the applicable program.  In some cases, most notably that of the Texas Medicaid Program, pharmaceutical manufacturers must report costs and prices directly to the state program to satisfy the price disclosure requirement.

9

ABT008-2772

Civil Action No: 95-1354-CIV-GOLD

3.      This false claims action reveals an intentional scheme by DEFENDANTS to arrange financial inducements aimed at specialized physicians ███████████████ ███████████████████, clinics and pharmacies to increase sales of DEFENDANTS' prescription drugs which are reimbursed by Medicare and the State Medicaid Programs (sometimes collectively referred to herein as "Medicare/Medicaid").   The particular prescription drugs and biologicals at issue here are hereinafter referred to as the "specified drugs".  The DEFENDANTS, participating in what amounts to a kickback scheme, create financial inducements by falsely inflating their reports of the price and cost of the specified drugs and by offering inducements such as free goods, direct monetary payments and rebates, thus causing Medicare/Medicaid to pay inflated reimbursements to the specialized physician,  clinic or pharmacy (collectively "the Providers") providing the covered drug to the drug recipient.   The financial inducements arranged by the DEFENDANTS are intentionally concealed so that Medicare/Medicaid will not benefit from the true prices in the marketplace.  The DEFENDANTS were fully aware of the Medicare and Medicaid reimbursement methodologies and of the fact that Medicare/Medicaid was required to use drug manufacturers', including the  DEFENDANTS', reported drug prices and costs in establishing Provider reimbursement amounts.  Each DEFENDANT, had it so chosen, could have reported prices and costs  for the specified drugs that fairly and reasonably reflected the  prices  actually  being  charged  and  paid  in  the  marketplace.   The DEFENDANTS were also free to elect not to report prices and thus not have their drugs covered by Medicare/Medicaid.  Rather than choose either of these options, each of the DEFENDANTS  has  knowingly  opted to report inflated prices and costs for the express

10

purpose of creating a "Spread" between the resulting Medicare/Medicaid reimbursement amounts and the prices actually being charged to the Providers. The Spread served as an inducement to Providers to purchase the specified drugs. Providers would then apply for reimbursement for such drugs under Medicaid and Medicare, and receive inflated reimbursement amounts from the Medicaid and Medicare programs pursuant thereto. This was a result which DEFENDANTS not only foresaw, but fully intended.

4.     The DEFENDANTS were fully aware that the Medicare and State Medicaid Programs were required by their reimbursement policies to use drug manufacturers', including DEFENDANTS', reported drug prices and costs in calculating reimbursement amounts.

5.     As a result of the fraudulent and illegal acts alleged herein, DEFENDANTS have reaped millions of dollars in illegal profits at the expense of the federal and State governments and directly contributed to the soaring cost of providing prescription drugs for the nation's elderly and poor.

**A.     THE MEDICAID AND MEDICARE FRAUD ARISING FROM DEFENDANTS' FALSE PRICE AND COST REPRESENTATIONS INVOLVING SPECIALIZED PHYSICIANS AND PHARMACIES AND INFUSION DRUGS**

6.     All fifty states have chosen to provide prescription drug coverage pursuant to Medicaid, the federal medical assistance program for the poor which both the federal and state government fund and which each state administers pursuant to federal statutes, regulations and guidelines. Additionally, "Part B" of the Medicare Program (which covers certain outpatient procedures for those over age 65, persons who are disabled and persons who have end stage renal disease), provides coverage for certain drugs which

11

ABT008-2774

Civil Action No: 95-1354-CIV-GOLD

cannot be taken by mouth or self-administered and for a small number of oral drugs including some chemotherapy and anti-emetic drugs.

7.     This action focuses only on the Medicare/Medicaid reimbursement for the ingredient costs of the prescription drugs at issue herein and not on reimbursement for the administration or dispensing of such drugs. Medicare and Medicaid reimbursement for ingredient costs involves separate payments, using different methodologies, than for reimbursement for professional fees associated with administering and dispensing the prescription drugs.

8.     The drugs at issue in this case are reimbursed by both Medicaid and Part B of Medicare.  These drugs are ordinarily prescribed by specialized physicians for the treatment of serious illnesses, including respiratory diseases, ███████████████████ ████████████████. They are generally available only through a hospital, specialized physician or a specialized pharmacy. ██████████████████████ ████████████████████████████████. The other drugs at issue include, but are not limited to, ██████████████████████████ ███████████████████████████████████████████. ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████ The Medicare beneficiaries and Medicaid recipients who receive the specified drugs are usually extremely ill.  The physicians prescribing these drugs are in a unique relationship with the DEFENDANTS because they can not only prescribe the drugs, they can also directly provide and

12

Civil Action No: 95-1354-CIV-GOLD

administer or arrange for the provision and administration of the drugs.  They then apply for reimbursement from Medicare or Medicaid for the drug.

9.      By reporting falsely inflated costs and prices for the specified drugs to Medicaid/Medicare, the DEFENDANTS created a "Spread" between the inflated acquisition cost that they caused the Medicare/Medicaid Programs to calculate and use for reimbursement purposes and the actual cost of the drug to the Provider.  This "Spread", which constituted an unlawful financial inducement arranged by the DEFENDANTS, directly benefitted the DEFENDANTS because it caused Providers  to order the DEFENDANTS' drugs.

10.     With respect to Medicaid, at least half of the amounts paid by the States consisted of federal funds from which the States were required to pay claims based upon the drug's Estimated Acquisition Cost ("EAC") to the pharmacy submitting the claim.  42 CFR §447.331. The DEFENDANTS knew that each of the States' Medicaid Programs had implemented a mechanism to estimate the acquisition cost of prescription drugs to a pharmacy.   Most states used the DEFENDANTS' representation of their Average Wholesale Price ("AWP") (hereinafter sometimes referred to as "AWP STATES") and some States, including but not limited to, Alabama, Colorado, Florida, Maryland, Massachusetts, Ohio and Rhode Island used the DEFENDANTS' representation of the prices they charged wholesalers for the specified drugs.  The DEFENDANTS made their false price representations both directly to the States and indirectly through one or more of several drug price reporting compendia including First DataBank, Medical Economics

13

ABT008-2776

Civil Action No: 95-1354-CIV-GOLD

and Medi-Span, that assemble drug price data and which State Medicaid Programs utilized in establishing reimbursement amounts.

11.    Throughout the relevant time period, Medicare's reimbursement was calculated with reference to a given drug's reported AWP in the case of single source drugs and biologicals and the median AWP in the case of multiple-source drugs and biologicals. The DEFENDANTS made false representations of prices and costs for the specified drugs  directly to Medicare Carriers and Durable Medical Equipment Regional Carriers ("DMERC's") which approve and pay Medicare claims; and indirectly through the drug price and cost reporting compendia such as First DataBank, Medical Economics, and Medi-Span which Medicare utilized in establishing reimbursement amounts.

12.    The DEFENDANTS knew that the Medicare and State Medicaid Programs intended to base their payments of "reimbursement" for the specified drugs on reasonable estimations of the drug's cost and that Medicare/Medicaid utilized the falsely inflated prices and costs reported by the DEFENDANTS in estimating reimbursement.

13.    The DEFENDANTS were well situated to mislead the Medicare and State Medicaid Programs because the DEFENDANTS  reported truthful prices and costs for many drugs that are not the subject of this action.

14.    The "Spreads" which DEFENDANTS created between the reimbursement amounts that they caused the Medicare/Medicaid Programs to calculate and use for reimbursement purposes and the actual cost of the drug to Providers, were large and often enormous (over 1000% in some instances). DEFENDANTS' reported costs and prices for the specified drugs became mere marketing tools employed to increase sales while

14

ABT008-2777

Civil Action No: 95-1354-CIV-GOLD

bearing no relationship whatsoever to the actual prices Providers were paying for the specified drugs. DEFENDANTS thus duped the Medicare/Medicaid Programs into paying claims for the specified drugs at inflated amounts in order to increase the DEFENDANTS' sales and market share. In short, the DEFENDANTS falsely reported the price and cost of their specified drugs in order to cause Medicare/Medicaid to unwittingly fund unlawful kickbacks to Providers.

15.    The DEFENDANTS thus wrongfully exploited the Medicare and State Medicaid Programs by knowingly causing them to pay Providers grossly inflated amounts that far exceeded a reasonable reimbursement amount based on an estimation of costs. This wrongful exploitation by DEFENDANTS caused the United States to incur single damages in excess of Ten Million Dollars for which the UNITED STATES and States Medicaid Programs are entitled to recover treble damages plus up to Ten Thousand Dollars per false claim, interest, costs and attorneys' fees.

## SECTION NO. 2

## THE PARTIES

16.    The Plaintiff in this action is the UNITED STATES. At all times material to this civil action, the United States Department of Health and Human Services ("HHS"), the Health Care Financing Administration ("HCFA"),and its successor agency the Centers for Medicare and Medicaid Services ("CMS") and The Bureau of Program Operations ("B.O.") were agencies and instrumentalities of the UNITED STATES and their activities, operations and contracts in administering the Medicare program were paid from UNITED STATES' funds. The UNITED STATES and its subcontractors performing on behalf of the UNITED

15

ABT008-2778

Civil Action No: 95-1354-CIV-GOLD

STATES provided Medicare benefits to qualified beneficiaries which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS and utilized the false and fraudulent price and cost representations made by the DEFENDANTS in approving and paying claims.

17.    The States, United States Territories, and the District of Columbia provided Medicaid benefits to qualified recipients which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS and utilized the false and fraudulent price and cost representations made by the DEFENDANTS in approving and paying claims. A significant percentage (at least 50%) of said Medicaid reimbursement was paid from United States Government funds pursuant to 42 U.S.C. § 1396(b).

18.    The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator's principal officers and directors include Zachary T. Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida. The Relator is a pharmacy and is licensed to provide prescription drugs and biologicals specified in this Fourth Amended Complaint and has been, during the relevant period of this Complaint, a Medicare Part B supplier and a Florida Medicaid provider. The Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1). The information upon which these allegations are based was voluntarily provided by the Relator to the Federal Government prior to June 23, 1995 and thereafter has been frequently supplemented by the Relator.

16

ABT008-2779

Civil Action No: 95-1354-CIV-GOLD

19.     VEN-A-CARE's principals were aware that Medicare and Medicaid reimbursed for drugs at amounts that were intended to be based on an estimation of cost and not provide for huge windfall profits at the GOVERNMENT's expense. VEN-A-CARE attempted to alert the responsible state and federal government officials to the scheme being perpetrated by the DEFENDANTS.  However, the government agencies lacked sufficient resources and expertise to adequately respond.  Accordingly, the Relator commenced this action based upon its original source information.

20.     The DEFENDANT, ABBOTT LABORATORIES ("ABBOTT"), is a corporation organized under the laws of Illinois with its principal offices in Abbott Park, Illinois.  At all times material to this civil action, ABBOTT has transacted business in the Federal Judicial District of the District of Florida by, including but not limited to, selling and distributing its drugs, including those identified in this Complaint,  to purchasers within the Southern District of Florida.

21.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

22.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

17

Civil Action No: 95-1354-CIV-GOLD

PAGES 18 THROUGH 28

HAVE BEEN COMPLETELY REDACTED

WHICH INCLUDES THE REMAINDER OF

PARAGRAPH 22 THROUGH PARAGRAPH 46

18

ABT008-2781

Civil Action No: 95-1354-CIV-GOLD



46.

47.     Any and all acts alleged herein to have been committed by any or all of the

DEFENDANT  DRUG  MANUFACTURERS  were  committed  by  said  DEFENDANT'S

29

ABT008-2782

Civil Action No: 95-1354-CIV-GOLD

officers, directors, employees, or agents who at all times acted on behalf of their respective

DEFENDANT DRUG MANUFACTURER.

## SECTION NO. 3

## JURISDICTION & VENUE

48.    Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the

"False Claims Act"), 31 U.S.C. §3729-32, specifically 31 U.S.C. §3732, and also 28 U.S.C.

§§1331, 1345.

49.    Venue in the Southern District of Florida is appropriate under 31 U.S.C.

§3732(a) and sufficient contacts exist for jurisdiction in that each of the DEFENDANTS

transacted   business in the Southern District of Florida by selling directly or through

wholesalers their prescription drugs, including those identified in ths Complaint, in the

Southern District of Florida which the respective DEFENDANTS knew would be supplied

to Medicare beneficiaries and Medicaid recipients and knew claims for reimbursement with

respect to DEFENDANTS' specified  drugs would be made by Medicaid and Medicare

Providers.

50.    A copy of the initial Complaint and this Fourth Amended Complaint and

written disclosure of substantially all material evidence and information the Relator

possesses were served on the Government pursuant to Rule 4(i)(1)(A) and (B),

Fed.R.Civ.P., prior to the filing of the initial Complaint and this Fourth Amended Complaint

in camera and under seal by delivering a copy of the initial Complaint and this Fourth

Amended Complaint, material evidence and information to the United States Attorney for

the Southern District of Florida  and by  sending a copy of the initial Complaint and this

30

ABT008-2783

Civil Action No: 95-1354-CIV-GOLD

Fourth Amended Complaint, material evidence and information by certified mail to the

Attorney General of the United States at Washington, District of Columbia.

### SECTION NO. 4

### HOW DRUG MANUFACTURERS' PRICE AND COST REPRESENTATIONS ARE OBTAINED BY THE MEDICARE AND STATE MEDICAID PROGRAMS WHICH THEN UTILIZE THEM TO CALCULATE DRUG REIMBURSEMENT AMOUNTS

51.   Prescription drug manufacturers, including the DEFENDANTS, the Medicare

and Medicaid Programs, drug price and cost reporting services, hospitals, pharmacies,

physicians, wholesalers, third party payors and administrators (i.e. insurance companies),

governmental health benefit plans (i.e. federal and state employees) and others involved

in the health care industry communicate about drug prices and costs by describing the

price and cost with terms such as:

      a)     Average Wholesale Price ("AWP")

      b)     Wholesaler Acquisition Cost ("WAC")

      c)     List Price

      d)     Direct Price ("DP")

      e)     Wholesale Net Price

52.   Average Wholesale Price ("AWP") is the drug price most commonly utilized

by the healthcare industry and by third party payors, including the Medicare and State

Medicaid Programs, to calculate the reimbursement amount for a given drug.

53.   During the time period covered by this Complaint until January 1 1998,

Medicare based its reimbursement for prescription drugs, including the drugs at issue, on

31

ABT008-2784

Civil Action No: 95-1354-CIV-GOLD

the manufacturers' published AWP for patented ("single source") drugs as represented by the manufacturer, and at the median published AWP, as represented by the manufacturers, for drugs with generic equivalents and for biologicals. Pursuant to Congressional investigation, and in an effort to arrive at reasonable Medicare drug reimbursement amounts, the Federal government changed the Medicare drug reimbursement formula pursuant to the Balanced Budget Act of 1997. Consequently, from January 1, 1998 until December 31, 1998, Medicare based its reimbursement for drugs at 95% of the published AWP for single source patented drugs and biologicals as represented by the manufacturer, and at 95 % of the median published AWP for all generic forms of a drug (or biological). Since January 1, 1999, Medicare has also considered the average wholesale price of brand forms of drugs when reimbursing for multiple source drugs and biologicals as discussed, infra.

54.    The States' Medicaid programs are required by 42 CFR §447.331 to reimburse Providers at the Provider's Estimated Acquisition Cost ("EAC"). CMS, which must approve all State reimbursement plans for prescription drugs, has approved approximately 44 states' plans (plus that of Washington, D.C.) whose methodology for arriving at the Provider's EAC includes discounting a percentage off of the published AWP prices. This discounting ranges from Alaska and California, whose state formula is AWP minus 5%, to Illinois, whose state formula is AWP minus 12%. About fifteen states' formulas (plus that of Washington D.C.) are AWP minus 10%. Texas uses price representations obtained directly from drug manufacturers. About four states' formulas are WAC plus a percentage or an AWP discount/WAC hybrid.

32

55.   Medical Economics, Inc., the Hearst Corporation and Medi-Span are nationally recognized companies that specialize in gathering drug pricing and cost information including Average Wholesale Price ("AWP"), Wholesaler Acquisition Cost ("WAC") and Direct Price ("DP").

56.   Medical Economics, Inc. annually publishes a book entitled *Drug Topics Red Book*, (along with addendums to that book), which expresses drug prices and costs in terms of AWP. Medical Economics, Inc. also publishes a monthly update that contains current packaging and pricing data expressed in terms of AWP on the most widely prescribed drugs in the United States together with any updated prices expressed in terms of AWP for new products.

57.   The Relator's information provided to the Government reveals that approximately 90% of all Medicare Carriers contracted by CMS to process Medicare Part B reimbursement claims use the AWPs as represented in Medical Economics annual *Drug Tropics Red Book* publication and the *Red Book* monthly updates in determining the reimbursement amounts for Medicare prescription drug claims.

58.   Additionally, the DEFENDANTS regularly make representations of false price and cost information directly to the Carriers.

59.   The Hearst Corporation, through its First DataBank Division, annually published until 1997 a book entitled *the First DataBank Blue Book* that expressed drug prices and costs in terms of AWP, Suggested Retail Price ("SRP") and Direct Price. Throughout the relevant time period First DataBank (sometimes referred to herein as "FDB") has also offered an entirely automated database service through which the

33

ABT008-2786

Civil Action No: 95-1354-CIV-GOLD

DEFENDANTS published their representations in the form of AWP, Direct Price and Wholesale Net/WAC.

60.     First DataBank's automated service provides drug prices and costs for approximately 60,000 national drug code numbers ("NDC" numbers) comprising different drugs, sizes and strengths expressed in terms of AWP, WAC and Direct Price.   The Relator's investigation has determined that more than 90% of the States' Medicaid Pharmacy Programs have utilized the AWPs and WACs as represented by First DataBank through either the Blue Book or First DataBank's automated services in determining reimbursement amounts for Medicaid prescription drug claims.

61.     Medi-Span provides drug prices and costs for approximately 60,000 NDC numbers comprising different drugs, sizes and strengths through an electronic or automated service expressed in terms of AWP, Direct Price and WAC.  The Relator's investigation has determined that only the State of New York's Medicaid Program uses Medi-Span's automated service in determining reimbursement amounts for New York Medicaid prescription drug claims.     Medi-Span was acquired by the Hearst Corporation/First DataBank in January 1998 and was subsequently divested to Lippincott, Williams & Wilkins, a subsidiary of Wolters Kluwer, in January, 2002.  From the beginning of 1998 through 2001, therefore, First DataBank included Medi-Span.

62.     In determining the drug pricing data which they report, First DataBank, Medical Economics and Medi-Span all receive and rely upon the respective drug manufacturers', including the DEFENDANTS', representations of their drug prices and costs.

34

ABT008-2787

Civil Action No: 95-1354-CIV-GOLD

63.     First DataBank, Medical Economics and Medi-Span all report drug prices that include a representation of the drugs' AWP.

64.     The Relator's investigation has determined that drug manufacturers, including the DEFENDANTS, provide First DataBank, Medical Economics and Medi-Span with the specific prices and costs of their drugs and instructions, if necessary, expressed in a manner that allows the price reporting companies to establish the necessary pricing information for publication that is utilized by Medicare, Medicaid and others in determining reimbursements for prescription drugs.

65.     During the relevant time period of this Complaint, a form entitled "New Product Submission Form" has been provided by First DataBank to drug manufacturers to transmit information including their prices to First DataBank. The form permits drug manufacturers to submit prices expressed in terms of Wholesale (Distributor) Price, Direct Price and AWP Price.  After causing new products to be added to a national drug data formulary maintained by First DataBank, drug manufacturers, including DEFENDANTS, thereafter provided additional updated price representations such as Wholesale Net Price, Suggested Retail Price, Direct Price and/or AWP Price.  Wholesale (Distributor) Price, Wholesale Net Price and WAC were represented to be the same price by the DEFENDANTS.

66.     During the relevant time period of this Complaint, forms entitled "Product Listing Verification" and "New Product Information Form" have been provided by Medical Economics/*Red Book* to drug manufacturers to transmit information including their prices to Medical Economics / *Red Book*. The forms permit drug manufacturers to submit prices

35

ABT008-2788

expressed in terms that include, but are not necessarily limited to, AWP.   Drug manufacturers, including DEFENDANTS, provide updated price and cost representations to Medical Economics Red Book expressed in terms that include, but are not necessarily limited to, AWP.

67.     Each of the DEFENDANTS has been the source of the price and cost information reported by First DataBank, Medical Economics and MediSpan to the Medicare and States' Medicaid Programs at all times at issue in this action.   The Relator reported its information to the Government, including specific identification of representatives of First DataBank and Medical Economics to whom such information was reported.   Thereafter, the Government conducted an investigation which confirmed the information supplied by the Relator including the information that each of the DEFENDANTS has repeatedly and systemically communicated with First DataBank, Medical Economics and Medi-Span with the express purpose and effect of causing First DataBank, Medical Economics and Medi-Span to report prices and costs of the specified drugs in amounts set by the DEFENDANTS.

68.     The DEFENDANTS also regularly make direct representations of false price and cost information directly to the various state Medicaid agencies that are relied upon in approving and paying claims.

36

Civil Action No: 95-1354-CIV-GOLD

## SECTION NO. 5

## THE ROLE OF THE DRUG WHOLESALER

69.     The majority of the DEFENDANTS' drugs, including the specified drugs at issue in this action, are distributed through drug wholesalers who resell and distribute the drugs to hospitals, pharmacies, physicians and clinics.

70.     Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source have comprised approximately eighty (80%) of the over $70 billion dollar annual wholesale drug market during the relevant time period of the Complaint. On August 29, 2001, Bergen Brunswig and AmeriSource merged to form AmeriSource Bergen Corporation.  Wholesalers generally sell to any  person or entity  (i.e. pharmacies, physicians  and hospitals) who can lawfully purchase prescription drugs.

71.     Wholesalers purchase the specified drugs at prices that are unilaterally set and controlled by the DEFENDANTS.  The wholesalers in turn add a percentage (commonly referred to as an "up-charge") to the price to cover the wholesaler's expenses such as warehousing, delivery, billing and collections and to provide a profit.  The percentage of up-charge is negotiated between the pharmacy and the wholesaler and is usually based on the pharmacy's purchasing volume. By way of example, the Relator's up-charge from McKesson during the time period covered by this Complaint was 6.5%.

72.     Throughout the time period covered by this Complaint, each DEFENDANT closely monitored and was aware of the prices it charged wholesalers for its drugs, including the specified drugs, and the impact which rebates, charge-backs and any other off-price discounts had upon the net price of the drug to the wholesaler.

37

ABT008-2790

Civil Action No: 95-1354-CIV-GOLD

73.     Throughout the time period covered by this Complaint, each DEFENDANT closely monitored and was aware of the prices which wholesalers charged Providers for its drugs and the net impact which rebates, volume discounts and any other off-invoice discounts had upon the net price to the Provider.

74.     The DEFENDANTS' "charge-back" arrangements with wholesalers were used in a manner which facilitated the reporting of inflated costs and prices for drugs including some of the drugs in this case. In the charge-back arrangements at issue here, the drug manufacturer directly negotiates with entities such as a group purchasing organization or managed care organization ("contract customers"), for the sale of a given drug at a negotiated contract price. The wholesaler then agrees to buy from the DEFENDANT at an inflated price the drug which is destined for the contract customer. The wholesaler then sells the drugs to the contract customer at a price which is lower than (in some cases by 50% or more) what the wholesaler ostensibly paid for the drug from the DEFENDANT. The manufacturer, meanwhile, credits the wholesaler for the difference between the inflated cost to the wholesaler and the actual price received by the wholesaler from the contract customer, as well as pays the wholesaler an up-charge. The DEFENDANTS' use of the "charge-back" device in this manner permitted the DEFENDANTS to control prices charged by wholesalers while falsely reporting an inflated wholesaler cost by excluding the often significant impact of the charge-back on the net effective wholesale acquisition cost.

75.     In order to monitor the wholesalers' compliance, the DEFENDANTS require all drug wholesalers to periodically (generally quarterly) report back to the DEFENDANTS all prescription drug sales by NDC number, provider name and sales price.

38

Civil Action No: 95-1354-CIV-GOLD

76.    A representative example of this practice was demonstrated when Ven-A-Care was informed by a ███ sales representative that ███ and other drug manufacturers consider this information vital in determining how and where to market their prescription drugs. The ███ representative informed VAC that ███ prepared reports for every sales representative based on the information compiled from all wholesalers' reports and that the ███ report was broken down by postal zip code, provider, NDC number, quantity and sales prices.

77.    The DEFENDANTS negotiate prices for their prescription drugs individually with hospitals, Government entities, closed pharmacies, mail order pharmacies, HMO's, physicians, and with group purchasing organizations (" GPO's") who represent groups of smaller Providers. GPO's provide members lower cost products by negotiating prices for specific drugs from manufacturers. The GPO member is able to purchase the drugs at the negotiated price either in some cases directly from the manufacturer or from a wholesaler that has a charge-back agreement with the specific manufacturer. Numerous wholesalers have participated to some degree in the DEFENDANTS' charge-back system. Acceptable membership in the GPO's is controlled by the DEFENDANTS.   The GPO's are required to send periodic detailed reports of membership compliance to the DEFENDANTS.

ABT008-2792

Civil Action No: 95-1354-CIV-GOLD

### SECTION NO. 6

### BACKGROUND OF HOW UNITED STATES' MONIES
### ARE PAID FOR DRUG CLAIMS UNDER
### "PART B" OF THE MEDICARE PROGRAM

78.     HHS, through CMS, provides health insurance benefits to aged and disabled
Americans pursuant to the provisions of the Medicare program, Title XVIII of the Social
Security Act, 42 U.S.C. §1395 et seq.

79.     The Medicare program provides covered health care benefits to certain
targeted populations such as those persons who are over age 65, persons who are
disabled, and persons who have end stage renal disease.

80.     The Medicare program is divided into two distinct parts: (A) Medicare Part A
(Hospital Insurance for the Aged and Disabled) which covers services and goods furnished
by hospitals, home health agencies, hospices, and skilled nursing facilities; and (B)
Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) which
covers physician services, and a range of other noninstitutional services, such as durable
medical equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and
certain limited drug products and supplies.

81.     This case focuses on the Medicare Part B's limited benefit for drugs which
are provided either:  (a) incident to a physician's service and cannot generally be self-
administered; or, (b) in conjunction with the medical necessity of an infusion pump or
nebulizer or other DME device payable under Medicare's DME benefit.  Because this
limited drug benefit is provided on an "incident to" a physician's service basis or in
conjunction with the medical necessity of a DME device, Congress' statutes and the

40

ABT008-2793

Civil Action No: 95-1354-CIV-GOLD

corresponding HHS regulations and CMS policies have sought to limit Medicare's payments for claims for the drugs at issue to a reasonable amount based upon the cost of the drug.   This is due, in part, to the fact that the Medicare program is already paying for the physicians' professional fees and for the covered DME equipment. The exorbitant profits created by the DEFENDANTS' false price and cost representations have totally thwarted the fundamental requirements of the Medicare Program and States' Medicaid Programs that payment of claims for the specified drugs be limited to reasonable amounts to cover the added cost of the drugs.

82.    CMS administers the Medicare program. CMS awards cost-reimbursement contracts to private companies (hereinafter referred to as "Contractors") to evaluate and to process Medicare beneficiaries' claims for payment on behalf of CMS. Under Part A, CMS refers to contractors as "intermediaries." Under Part B, CMS refers to contractors as "carriers" and durable medical equipment regional carriers ( "DMERCs").  Under Part B, CMS pays the carriers and the DMERCs to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the Providers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. 42 U.S.C. §1395(j) et. seq.

83.    Congress has mandated that the Medicare Program pay no more than eighty percent (80%) of: (1) the reasonable cost of drugs covered under Part B pharmaceutical claims from federal funds through 1997 and (2) no more than 95% of the drug's Average Wholesale Price, after 1997.  42 U.S.C. §1395(l) et seq.

41

ABT008-2794

Civil Action No: 95-1354-CIV-GOLD

84.    Medicare Regulation 42 CFR §405.517 (contained in Subpart E - - Criteria For Determining Reasonable Charges) sets out the methodology to determine the charge for payment of claims for drugs and biologicals. Prior to January 1, 1998, the methodology for single source drugs and biologicals provided therein was based on the lower of estimated acquisition cost or the national average wholesale price of the drug or biological. The methodology for multiple source drugs was based on the lower of the estimated acquisition cost or the wholesale price that is the median price for all sources of the generic form of the drug or biological. This regulation provided instructions to be used by the Part B Carriers and DMERCs on how the estimated acquisition cost was to be determined. The instructions stated that the estimated acquisition cost was to be based on surveys of actual invoice prices of drugs paid by the Providers. The regulation also stated that the Medicare Part B Carriers and DMERCs may consider such other factors as inventory, waste and spoilage in calculating the estimated acquisition cost of the drug but did not provide for profit on the drug itself.

85.    The Medicare program has been unable to determine actual acquisition costs for the drugs at issue in this case. Therefore, until January 1, 1998, Medicare paid claims based upon the national average wholesale price for single source patented drugs or biologicals as represented by the manufacturer, and at the median national average wholesale price for all generic forms of a drug or biological, as represented by the manufacturers, for drugs or biologicals with generic equivalents. From January 1, 1998 until December 31, 1998, under 42 C.F.R. § 405.517, Medicare paid claims based upon 95% of the national average wholesale price for single source patented drugs and

42

Civil Action No: 95-1354-CIV-GOLD

biologicals as represented by the manufacturer, and at 95 % of the median national average wholesale price of all generic forms, as represented by the manufacturers, for drugs and biologicals with generic equivalents.

86.    Effective January 1, 1999, the methodology for multiple source drugs and biologicals changed under 42 C.F.R. § 405.517 (but not any other aspect of the reimbursement methodology) to the extent that Medicare now pays 95% of the lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name form of the drug or biological. 42 C.F.R. §405.517. Consideration of the AWP for all generic forms of a drug with generic equivalents until 1999 and consideration of the AWP for all generic and brand forms of a drug with generic equivalents from 1999 until the present to determine the reimbursement amount are collectively referred to herein as the "J Code Medicare reimbursement methodology".

87.    To arrive at the median average wholesale price, the Carrier first obtains the AWP amounts as reported for all generic versions of a given drug from the current Red Book.  Second, the Carrier arrays the listings from the most expensive to the least expensive of all the manufacturers' generics. Third, the Carrier finds the median AWP. The Relator's investigation has determined that when the array contains an even number of reported AWP's, some Carriers choose as the median the higher listing of the two AWP's in the middle of the array and some choose the lower.

88.    Part B drug claims are submitted either in hard copy form or through an electronic claims filing procedure.

43

Civil Action No: 95-1354-CIV-GOLD

89.     Providers submit claims for payment to the Medicare Program for the specified drugs at issue in this case using HCFA's Common Procedure Coding System ("HCPCS" or the "J Code System"). The HCPC system for pharmaceuticals is a 5 digit alphanumeric code, such as ███████, 50 mg.; HCPCS Code J███.

90.     HCFA requires all Part B Carriers and the DMERCs to report to HCFA Central quarterly claims activity by HCPCS Code for all drugs submitted by Providers for reimbursement by the Medicare Program.

91.     Beneficiaries' claims are processed by the carriers as either "assigned", those claims for which payment is made directly to the provider, or "unassigned", those claims for which payment is made directly to the beneficiaries.

92.     All or nearly all drug claims for the charges at issue are made on an assigned basis.

93.     During the early 90's the Medicare Carriers' attempted to survey physicians' actual invoice prices paid for drugs to comply with the regulation 42 CFR §405.517 but were stopped by a complaint filed by the American Society of Clinical Oncologists ("ASCO") with the Executive Office of Management and Budget asserting that the Paperwork Reduction Act had been violated. A subsequent effort by CMS to design a new survey to determine physicians' actual invoice costs was also stopped by ASCO. ASCO complained that the actual prices being paid were discounts and confidential in nature and that the survey had other flaws.

44

ABT008-2797

Civil Action No: 95-1354-CIV-GOLD

94.     At all times at issue in this case, the Medicare program used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

### SECTION NO. 7

### BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE STATE MEDICAID PROGRAMS

95.     The United States Government partially funds state sponsored medical assistance programs for the poor pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.

96.     Benefits for drugs are optional but all states have opted to provide Medicaid drug reimbursement coverage.

97.     The federal portion of States' Medicaid payments, Federal Medical Assistance Percentage ("FMAP") is based on a state's per capita income compared to the national average. The federal portion consists of a minimum of 50% up to a maximum of 83%. For example, Florida's FMAP contributed by the United States in 1995 was 56.28%.

98.     The States, United States Territories and the District of Columbia are required to implement a State Health Plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures.

42 U.S.C. §1396a(a)(30)(A).

45

ABT008-2798

Civil Action No: 95-1354-CIV-GOLD

99.     State Health Plans must, in part, provide for payment of claims for prescription drugs pursuant to a formula approved by the Secretary of HHS which determines the maximum allowable claim amount for each drug manufactured by each manufacturer whose prescription drugs qualify for Medicaid reimbursement based upon an estimation of the provider's acquisition cost plus a reasonable dispensing fee. 42 CFR §447.331.

100.    CMS has approved approximately 44 state plans whose methodology for arriving at a provider's Estimated Acquisition Cost ("EAC") as required by 42 CFR §447.331 includes discounting a percentage off of the AWP prices, separately for each covered drug, as computed by or collected by and published by First DataBank (and by Medi-Span in the case of New York).

101.    The Food and Drug Administration ("FDA") assigns National Drug Codes, called NDC numbers to identify each individual manufacturer and its drugs' strengths and sizes. NDC numbers are eleven digits, with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package size.

102.    Providers are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for drugs to the States' Medicaid programs.

103.    The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process Medicaid recipients' claims for payment. The States refer to these contractors as fiscal agents.

46

Civil Action No: 95-1354-CIV-GOLD

104. Prescription drug claims are submitted either in hard copy form or through an electronic claims filing procedure.

105. At all times at issue in this case, all of the States' Medicaid programs used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

106. CMS has approved state plans whose methodology formulae for arriving at a pharmacy's estimated acquisition cost as required by 42 CFR §447.331 includes:

        a)    discounting a percentage off of the AWP prices as computed by or collected by and published by First DataBank ;

        b)    adding a percentage to the WAC prices as computed by or collected by and published by First DataBank ; and,

        c)    requiring the drug companies, including the DEFENDANTS, to certify their prices directly in writing to the Texas Medicaid Vendor Drug Program.

110. During the time period covered by this Complaint, the CMS-approved State plans for Medicaid reimbursement based on WAC have included, without limitation:

| | Drug | Dispensing Fee |
|---|---|---|
| Alabama | WAC+9.2% | $5.40 |
| Colorado | lesser of AWP-10% or WAC+18% | $4.08 |
| Florida | WAC+7% | $4.23 |
| Maryland | WAC+10% | $4.21 |

47

ABT008-2800

Civil Action No: 95-1354-CIV-GOLD

| | | |
|---|---|---|
| Massachusetts | WAC+10% | $3.00 |
| Ohio | WAC+11% | $3.70 |
| Rhode Island | WAC+5% | $2.85-$3.40 |
| Illinois | WAC+8% (brand) WAC+12% (generic) | $3.30- $15.45 |

111.    The Texas Medicaid Program has gone to exceptional lengths to verify that drug manufacturers, including the DEFENDANTS, provide truthful price and cost information for reimbursement purposes. The Texas Medicaid authorities, acting pursuant to 25 Texas Administrative Code §35.801, required the DEFENDANTS to certify, in writing, the accuracy of their price and cost representations as a condition to their drugs being covered for reimbursement.

112.    The State of Texas pays reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge or Estimated Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the estimated price paid by Providers purchasing a drug from a wholesaler. DEAC is the estimated price paid by a Provider purchasing the drug directly from the drug's manufacturer.

113.    The State of Texas has calculated the WEAC reimbursement amounts by calculating: 1) the drug manufacturer's reported "price to wholesaler and/or distributor" plus 12% and 2) reported AWP minus a percentage, which percentage has varied throughout the relevant period of the Complaint, but has never exceeded 18%, and then selecting the

48

ABT008-2801

lesser of the two resulting amounts as the WEAC for payment of claims.   DEAC

reimbursement reflects the drug manufacturers' Direct Price as reported directly by the

drug manufacturer.  The Texas Medicaid Program has also often considered the amounts

reported by Defendants through First DataBank as a check or point of comparison to

determine if Defendants' representations should be reviewed for correctness.

114.    The State of Texas required the DEFENDANTS to complete a specific form

regarding the prices of their drugs. Immediately before the required signature by the

DEFENDANTS' representatives is the following language:

> I hereby certify that the information submitted is correct to the best of my
> knowledge . . . I also agree to inform the Texas Department of Health of any
> changes in . . . price . . . within fifteen (15) days of such change.

Attached hereto as Exhibit "1" is a true and correct copy of a certification used by the

Texas Medicaid Vendor Drug Program during the relevant time period of this Complaint.

115.    Pharmacies are reimbursed for prescription drugs by the States' Medicaid

Programs in accordance with:

1.    the State's CMS approved plan (i.e. Massachusetts' WAC+ 10%);

2.    the pharmacies' usual and customary charges to the general public;

      or,

3.    the Federal Upper Limit ("FUL"), (which is inapplicable to all but a few

of the specified drugs at issue in this Complaint), plus a reasonable professional or

dispensing fee.

ABT008-2802

Civil Action No: 95-1354-CIV-GOLD

113.    The States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS and use them to confirm the accuracy of price and cost in computing reimbursement amounts.

### SECTION NO. 8

### THE FALSE CLAIMS SCHEME

**A.    DEFENDANTS' SCHEME RESULTED IN MULTIPLE VIOLATIONS OF THE FALSE CLAIMS ACT**

114.    By knowingly reporting falsely inflated cost and price representations bearing no relation to the actual prices Providers had paid for the specified drugs, both directly to Medicare/Medicaid and indirectly by means of the various drug reporting compendia, the DEFENDANTS caused false claims for excessive reimbursement to be submitted to Medicare/Medicaid by Providers.  Pursuant to this kickback scheme engineered by DEFENDANTS, Providers then received a windfall financial benefit from Medicare/ Medicaid in the amount by which the Government's approved "reimbursement" amount exceeded a reasonable estimate of the Provider's true acquisition cost.   The DEFENDANTS are each liable therefore under the False Claims Act, 31 U.S.C. §§3729-3732.

115.    The DEFENDANTS also caused the submission of false claims by actively marketing the Spread on their specified drugs to Providers. This financial inducement was in many cases enhanced by additional inducements such as free goods, discounts, rebates, direct money payments, off invoice pricing and deceptive invoicing, all of which increased the Spread by lowering the true price for the specified drugs.

50

ABT008-2803

Civil Action No: 95-1354-CIV-GOLD

116. Each DEFENDANT acted knowingly, as defined in the False Claims Act, in providing the false and misleading price and cost information and in marketing the Spread, which actions caused Medicare/Medicaid to pay claims for the DEFENDANTS' drugs in excessive amounts.

117. As the DEFENDANTS knew, when Providers purchased a drug for which the reported prices and costs were falsely inflated, not only would Providers receive excessive reimbursement under Medicaid for such drug but, in all likelihood, the Provider would receive excessive reimbursement under Medicare as well. Also as DEFENDANTS knew, this was true even in the case of multiple-source Medicare drugs because in addition to DEFENDANTS' own inflated reported AWPs, other drug manufacturers were falsely inflating their AWPs for competing versions of such drugs falling under the same HCPCS code. The DEFENDANTS were aware of the amount of excessive reimbursement which a Provider would receive under Medicare and Medicaid for their specified drugs.

118. DEFENDANTS inflated their reported price and cost information and marketed the "Spread" resulting therefrom, with the purpose and intent of increasing sales of their respective specified drugs to Providers. As a direct, foreseeable and proximate result thereof, they caused false claims for excessive reimbursement to be made to both the Medicare and Medicaid Programs. But for each DEFENDANT'S actions, Medicaid/Medicare would not have paid the excessive reimbursement amounts which were in fact paid for each DEFENDANT'S respective specified drugs. Each DEFENDANT is thus liable under the False Claims Act for each Medicare and Medicaid reimbursement

51

ABT008-2804

Civil Action No: 95-1354-CIV-GOLD

claim for its respective specified drugs which resulted in payment of a falsely inflated reimbursement amount.

119.   <u>Medicaid Drugs and Single Source Medicare Drugs</u> -- As the DEFENDANTS knew, for any given drug under Medicaid, only that drug's reported price or cost was utilized to calculate the reimbursement amount, and not the reported price or cost of any competing brand or generic version of the same drug with a different NDC number. As the DEFENDANTS also knew, for any single source drug under Medicare, only that drug's reported AWP was utilized to calculate the reimbursement amount since no competing brand or generic version sharing the same HCPCS code existed.

120.   <u>Joint And Several Liability As To Multiple-Source Drugs Under Medicare</u> --

(a) Each DEFENDANT which reported a falsely inflated AWP for its brand or generic version of a drug falling under a given HCPCS code is jointly and severally liable with every other DEFENDANT which reported a falsely inflated AWP for its version of the drug falling under that HCPCS code, for the sum of all falsely inflated reimbursement amounts paid to Providers under that HCPCS code. In particular: 1) each DEFENDANT knowingly engaged in the same wrongful conduct, namely, reporting an inflated AWP; 2) each DEFENDANT acted concurrently with other drug manufacturers in reporting falsely inflated AWPs; 3) each DEFENDANT knew, or at a minimum was recklessly indifferent to the fact, that other drug manufacturers were inflating their AWPs on their respective version of the drug; 4) it was foreseeable by each DEFENDANT that their wrongful conduct (reporting an inflated AWP) could, if combined with the same wrongful conduct on the part of another drug manufacturer(s), jointly cause an inflated reimbursement amount to be paid

52

Civil Action No: 95-1354-CIV-GOLD

to Providers for the drug; 5) the DEFENDANTS' wrongful conduct did in fact coalesce to
jointly cause the payment of an inflated reimbursement amount for the drug; and 6) in each
instance the harm resulting from DEFENDANTS' joint reporting of inflated AWP's was
inflicted upon the same entity, namely, the Federal Government.

(b)   DEFENDANTS knew the applicable drug reimbursement formula for
multiple-source drugs and were aware, if not specifically, at least generally, of the amount
of reimbursement which a Provider would receive under Medicare for their specified drugs.
The DEFENDANTS also knew that other drug manufacturers were inflating their reported
AWPs for such specified drugs as well and thus knowingly participated jointly in a scheme
whereby Providers received excessive reimbursements for such specified drugs under
Medicare.   The DEFENDANTS had no legitimate business purpose for inflating the
reported AWP's of their specified drugs.  In fact, the DEFENDANTS only engaged in such
a practice in order to illegally inflate the drug reimbursement amounts calculated and paid
by both Medicare and the State Medicaid Programs, and to thereby increase sales of their
respective specified drugs.   With respect to each specified drug which was a multiple-
source drug reimbursed under Medicare, DEFENDANTS that: 1) were sources of any
brand or generic version of such drug falling under a given HCPCS code, and 2) knowingly
reported inflated AWP information with respect to their versions of such drug, were
therefore jointly and severally liable for the sum of the falsely inflated reimbursement
amounts paid to Providers for all brand and generic versions of that multiple-source drug.

121.   <u>Joint And Several Liability As To Multiple-Source Drugs Under Medicaid</u> –

53

Civil Action No: 95-1354-CIV-GOLD

(a) Many State Medicaid programs reimburse certain Providers, such as physicians, for multiple-source drugs using a methodology similar to the J Code Medicare reimbursement methodology described herein. To the extent that any DEFENDANT jointly with other drug manufacturer(s) caused inflated reimbursement amounts to be paid for any multiple-source drug under any such State Medicaid reimbursement methodology, each such DEFENDANT is jointly and severally liable for the total of the falsely inflated reimbursement amounts paid for all versions of such multi-source drug for the reasons set forth in the preceding paragraph.

(b) A few of the specified drugs are multiple-source drugs which are subject to a Federal Upper Limit ("FUL") for Medicaid purposes.  Pursuant thereto, the reimbursement amount for such drugs has been capped at 150 percent of the published price for the least  costly therapeutically equivalent version of the drug plus a reasonable dispensing fee.  42 CFR §447.331-333.  Each DEFENDANT who manufactured a drug subject to an FUL, and reported a falsely inflated reported price or cost with respect to such drug is, therefore, jointly and severally liable (along with all other DEFENDANTS who engaged in the same wrongful conduct with respect to such drug) for the sum of all falsely inflated reimbursement amounts paid for all versions of that drug. In this regard, each such DEFENDANT: a) knowingly reported falsely inflated price and cost information with respect to such drug, b) knew the reimbursement methodology for an FUL drug, and c) knew that if it provided truthful price and cost information, that the reimbursement amount would not have been inflated beyond what the FUL was intended to allow. Each such DEFENDANT also knew, or was recklessly indifferent to the fact, that if the DEFENDANT reported an

54

ABT008-2807

Civil Action No: 95-1354-CIV-GOLD

inflated price or cost, it was foreseeable that the reimbursement amount, despite the FUL, would be excessive, particularly since the DEFENDANT knew, or had ample reason to suspect, that other drug manufacturers were falsely inflating their reported prices and/or costs for their respective version of such multiple-source drug.

122.   <u>Joint And Several Liability Arising From Drug Marketing Agreements</u> – At various times certain DEFENDANTS entered into contractual relationships ("Drug Marketing Agreements"), with other drug companies to either: a) market and sell a drug which the other drug company manufactured or b) allow another drug company to market and sell a drug the DEFENDANT manufactured. In the case of drugs subject to such an agreement, when Providers sought Medicare/Medicaid reimbursement, the reimbursement amount was generally calculated with reference to the drug manufacturer's reported prices and costs. When these reported prices and costs were falsely inflated therefore, the drug companies with marketing rights, together with the drug manufacturers, enjoyed the benefit of the resultant inflated reimbursement amounts in the form of increased sales. Drug companies with marketing rights knew, or at a minimum were recklessly indifferent to the fact, that drug manufacturers had falsely inflated the reported prices and costs of the drugs covered by a Drug Marketing Agreement. In essence then, when drugs subject to a Drug Marketing Agreement had falsely inflated reported prices and costs, both parties to such Drug Marketing Agreement were knowingly participating jointly in a scheme whereby Providers received excessive Medicare/Medicaid reimbursement for such drugs. Therefore, to the extent certain DEFENDANTS entered into such Drug Marketing Agreements to either grant or to receive marketing and selling rights to drugs with falsely

55

ABT008-2808

Civil Action No: 95-1354-CIV-GOLD

inflated reported prices and costs, they are each jointly and severally liable with the other party to such Agreement for the sum of the falsely inflated reimbursement amounts paid to Providers for such drugs.

123.   The DEFENDANTS knew that Medicare/Medicaid would not pay or approve claims for the specified drugs if it were disclosed to Medicare/Medicaid that said claims were for amounts that included kickbacks.

124.   The DEFENDANTS also knew that the Providers, in presenting claims for the specified drugs to Medicare/Medicaid, would not and did not disclose that the claim amounts included kickbacks.

125.   The DEFENDANTS each carried out their scheme to defraud Medicare/Medicaid by knowingly providing false and misleading price information directly or indirectly to Medicare/Medicaid so that the Providers would be reimbursed in excessive amounts and thus be financially induced to prescribe and purchase the DEFENDANTS' specified drugs. The DEFENDANTS thus each participated in a fraudulent scheme to cause Medicare/Medicaid to pay and approve false claims in excessive amounts.

126.   The claims in question are each false claims under the False Claims Act, in part, because they were each supported by and the payment amount determined from, the false and misleading price information provided by the DEFENDANTS in connection with their respective specified drugs.

127.   The false claims at issue in this action were each claim for reimbursement submitted to Medicare/Medicaid by or on behalf of Providers that sought and received payment in excessive amounts because of false and misleading price and cost

56

Civil Action No: 95-1354-CIV-GOLD

representations made by the DEFENDANTS directly or indirectly to Medicare/Medicaid. The false claims at issue number in the tens of thousands, and were submitted by thousands of Providers nationwide throughout the relevant time period of the Complaint. Each claim is in the possession of Medicare or the applicable State Medicaid Programs.

128.   For many of the specified drugs, the Relator has identified the false claims to the Federal government by:   providing the truthful prices concealed from Medicare/Medicaid by the DEFENDANTS for each specified drug; providing information about the DEFENDANTS' exploitation of financial inducements to induce utilization of these drugs and specific identification information about these drugs and by providing the specific false price representations in question from which the Relator and the Federal government identified the specific false claims.

129.   The damages sought herein include, but are not limited to, those arising from the false claims for the specified drugs set out in Sections 12 through 34 and elsewhere throughout this Fourth Amended Complaint.  The damages sought herein also encompass all damages and penalties recoverable due to the false claim scheme of the DEFENDANTS alleged herein relating to all drugs of all sizes about which false price representations or records were used in connection with, considered or made available in, caused, aided or otherwise affected the presentment, payment or approval of false claims. These claims also encompass recovery of the funds paid for false claims due to the DEFENDANTS' false drug price representations, regardless of the Federal or State program that actually expended the funds, the person or entity that ultimately received the

ABT008-2810

Civil Action No: 95-1354-CIV-GOLD

funds or the person or entity from which the Federal government or the States ultimately recovers the funds.

130. Some of the information supporting the Relator's allegations is in the exclusive control of the DEFENDANTS, in particular, certain information relating to the actual prices of certain drugs taking into account the impact of rebates, charge-backs, discounts, bonuses, free goods and/or any other mechanism which lowers the ultimate cost of a drug to Providers.

**B.  THE NATURE AND IMPACT OF THE DEFENDANTS' FALSE CLAIM SCHEME**

131.  **DEFENDANTS' Actively Used the Spread as a Marketing Tool Directed at Providers to Promote Increased Sales of the Specified Drugs.**  By means of, among other things, direct mailing, facsimile transmission and verbal communications by sales representatives, DEFENDANTS repeatedly and systematically promoted the inflated reimbursement amounts Providers would receive from both Medicare and Medicaid as a result of DEFENDANTS' inflated reported prices and costs.

132. ▮▮▮▮▮▮▮▮▮▮▮

a) ▮▮▮▮▮▮▮▮▮▮▮

58

ABT008-2811

Civil Action No: 95-1354-CIV-GOLD



133. **Defendants Create the False Price Spread to Induce Sales of Drugs Used to Treat Very Serious Medical Conditions**. The attached Exhibit 2 lists some of the DEFENDANTS' drugs and their approved FDA indications as published in the 1998 edition of *Drug Facts and Comparisons*. The percent of pricing fraud is represented by the mark-

59

ABT008-2812