# Exhibit S

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | : | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : | CIVIL ACTION |
| PRICE LITIGATION | : | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : | |
| U.S. ex rel. Ven-a-Care of | : | Judge Patti B. Saris |
| the Florida Keys, Inc. | : | |
|       v. | : | |
| Abbott Laboratories, Inc., | : | Chief Magistrate |
| No. 06-CV-11337-PBS | : | Judge Marianne B. |

- - - - - - - - - - - - - - -x    Bowler

Page 10

1     Videotaped Deposition of THOMAS A.
2  SCULLY, a witness herein, called for examination by
3  counsel for Abbott Laboratories in the above-entitled
4  matter, pursuant to subpoena, the witness being duly
5  sworn by SUSAN L. CIMINELLI, a Notary Public in and
6  for the District of Columbia, taken at the offices of
7  Jones Day, 51 Louisiana Avenue, Northwest,
8  Washington, D.C., at 8:49 a.m. on Tuesday, May 15,
9  2007, and the proceedings being taken down by
10 Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and
11 transcribed under her direction.

Page 11

1  APPEARANCES:
2
3    On behalf of the United States of America:
4       GEJAA T. GOBENA, ESQ.
5       JOHN K. NEAL, ESQ.
6       ANDREW MAO, ESQ.
7       U.S. Department of Justice
8       Civil Division
9       601 D Street, Northwest
10      PHB - 9028/P.O. Box 261
11      Washington, D.C. 20044
12      Gejaa.Gobena@usdoj.gov
13      (202) 307-1088

Page 12

1  APPEARANCES (continued):
2
3    On behalf of the U.S. Department of
4    Health and Human Services:
5       TROY A. BARSKY, ESQ.
6       U.S. Department of Health and Human Services
7       CMS Division
8       C2-05-23
9       7500 Security Boulevard
10      Baltimore, MD  21244-1850
11      (410) 786-8873
12      troy.barsky@hhs.gov
13
14   On behalf of the State of California:
15      NICHOLAS N. PAUL, ESQ.
16      Supervising Deputy Attorney General
17      Civil Prosecutions Unit
18      P.O. Box 85266
19      110 West A Street, #1100
20      San Diego, CA  82186
21      (619) 688-6099
22      nicholas.paul@doj.ca.gov

Page 13

1  APPEARANCES (continued):
2
3    On behalf of the State of Alabama:
4       ROGER BATES, ESQ.
5       Hand Arendall, L.L.C.
6       1200 Park Place Tower
7       2001 Park Place North
8       Birmingham, AL  35203
9       (205) 502-0105
10      Rbates@handarendall.com
11
12   On behalf of the State of Florida:
13      MARY S. MILLER, ESQ.
14      Office of the Attorney General of Florida
15      PL-01, The Capitol
16      Tallahassee, FL 32399-1050
17      (850) 414-3600
18      Mary_Miller@oag.state.fl.us

4 (Pages 10 to 13)

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 78

1  done it phonetically, but do you know how to spell
2  Mr. Urbanowicz's name?
3     A.   U-R-B-A-N-O-W-I-C-Z, I think.  Are you at
4  a convenient stop for a 30-second bio break?  Just
5  very quick.  Sorry about that.
6          THE VIDEOGRAPHER:  The time is 9:47 a.m.
7  We are going off the record.  This ends tape number 1
8  in the deposition of Thomas Scully in the matter of
9  In Re Pharmaceutical Industry Average Wholesale Price
10 Litigation.
11         (Recess.)
12         THE VIDEOGRAPHER:  The time is 10:01 a.m.
13 We are going back on the record, starting tape number
14 2 in the deposition of Thomas Scully, in the matter
15 of In Re Pharmaceutical Industry Average Wholesale
16 Price Litigation.
17         BY MR. DALY:
18    Q.   Mr. Scully, I wanted to go back to what
19 you said about shortly after you left CMS, having
20 checked with CMS about some emails.  What were the
21 circumstances under which you were looking for those
22 emails at that point in time?

Page 79

1     A.   Oh, I think there was a discussion of --
2  there were a variety of investigations going on
3  surrounding the drug bill.  There was another one
4  surrounding a personal issue with me and my, my
5  leaving.  And during the course of the investigation,
6  both GAO people and Inspector General people and
7  people from CMS, at least my recollection, all told
8  me that my emails from those days did not exist.
9          For example, I sent out almost daily an
10 email to all 4,000 employees saying what I was doing
11 that day.  And I think all of those were deleted from
12 the system from what I was told.  I've certainly
13 never seen any of them, and I've asked to see them.
14    Q.   And I think we touched on this, but who is
15 it that you think told you that?
16    A.   I'm pretty certain that I talked to the
17 systems people at CMS.  I know that I talked to --
18 I'm pretty sure I talked to Peter Urbanowicz and Tom
19 Barker.
20    Q.   And this was within three months
21 approximately after you left in January of '04?
22    A.   Three or four months after I left, there

Page 80

1  was a rather large public debate around the cost of
2  the Medicare bill, and various issues about, you
3  know, the negotiation of the Medicare bill during
4  that period.
5     Q.   And you mentioned one type of email which
6  was -- was that a weekly or daily email that you
7  sent?
8     A.   First year and a half, I sent a daily
9  email to all employees.  And then I probably started
10 sending it twice a week after that.
11    Q.   And when you -- you may have not done this
12 personally, but maybe your assistant may have done
13 it, but did you have any kind of process where you
14 would save emails and put them into a folder or
15 archive them or anything like that?
16    A.   My assistant now at my law firm was my
17 assistant, one of my primary assistants back then, so
18 she would know.  But I'm not aware if there was one,
19 if she did it.  Shanetta Allen, she worked for me at
20 CMS and came to my law firm with me.
21    Q.   And what's her name?
22    A.   Shanetta Allen.

Page 81

1     Q.   And if she had a system for maintaining
2  your emails, it's something that she would know
3  about, but you don't?
4     A.   Yes.  But I believe she would also tell
5  you that she has also been told that the emails don't
6  exist.
7     Q.   Did CMS, while you were there, have any
8  policy concerning the retention of emails?
9     A.   Not that I'm aware of.
10    Q.   Who would -- who within CMS would, would
11 know that, if there was such a policy?
12    A.   I'm not sure who's left that would know
13 that.  Let me -- I'm not sure, to be honest with you.
14    Q.   In terms of -- they don't have to still be
15 there.  I mean, if you know somebody that while you
16 were there you think is the person --
17    A.   Well, at the time, most of the time I was
18 there, before she became the deputy, Leslie Norwalk,
19 who is now the acting administrator was the chief
20 counsel.  I mean, she was my personal staff counsel,
21 not the HHS deputy general counsel.  And she probably
22 would have made calls like that.  And she was very

21 (Pages 78 to 81)

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 146

1  Do you see that in the first sentence?
2    A.  Uh-huh.
3    Q.  And then in the third sentence, you say,
4  "for example, in CMS/HCFA's June 1991 proposed
5  physician fee schedule, the agency proposed that
6  payment be based on 85 percent of AWP."  Do you see
7  that?
8    A.  Yes.
9    Q.  And that is the time period with -- during
10 which you were part of the Bush Administration, the
11 Bush I Administration, correct?
12   A.  Yes.
13   Q.  And this is the time period, based on your
14 earlier testimony, where you would have interfaced
15 with Ms. Wollenski?
16   A.  Yes.
17   Q.  And so you were involved at least somewhat
18 on behalf of the administration in this 1991 attempt
19 to reduce the payments based on AWP?
20   A.  Yes.
21      MR. GOBENA:  Object to the form.
22      BY MR. DALY:

Page 147

1    Q.  And that proposal was, according to this,
2  to reduce it from, what, 100 percent of AWP to 85
3  percent of AWP, is that correct?
4    A.  Yes.
5    Q.  I'll hand you what's been previously
6  marked as -- keep that other exhibit with you,
7  because we're going to be going back to it, but I'll
8  hand you what's been previously marked as Exhibit
9  Abbott 120.  And just ask you if this is the
10 proposed rule that's referenced in this first full
11 paragraph on page 5 of your written statement to
12 Congress.
13   A.  I assume so.
14   Q.  I think you mentioned earlier that this
15 attempt to reduce reimbursement levels like many of
16 the others ran into political difficulties during
17 this time period, right?
18      MR. GOBENA:  Object to the form.
19      THE WITNESS:  I can't remember exactly
20 that far back what the issues were, but yes, there
21 was significant concern about the rule at the time, I
22 believe.

Page 148

1       BY MR. DALY:
2    Q.  And do you remember what the result of the
3  proposal was?
4    A.  I don't, but I'm sure we didn't publish a
5  final rule in the Senate.  There was a physician fee
6  rule that year, and I believe it didn't include -- I
7  may be wrong, I don't think it included final AWP
8  reform.
9    Q.  Let me hand you what's been previously
10 marked as Exhibit number, Exhibit Abbott 038, which
11 is the final rule that was issued emanating from
12 these proceedings that are referenced in '91-'92.  Do
13 you recognize it as such?
14   A.  I'm sure you're correct.  I don't
15 recognize it, but I'm sure you're correct that's what
16 it is.
17   Q.  Take a look at the second page of the
18 exhibit.  I'm sorry.  The first page of the exhibit.
19 Under methodology.  Do you see that?
20   A.  Yes.
21   Q.  And I just want to understand your
22 understanding of this at the time.  Is it your

Page 149

1  understanding that the methodology that was put out
2  in the rule was to pay AWP or estimated acquisition
3  costs?
4       MR. GOBENA:  Object to the form.
5       THE WITNESS:  It's been 15 years.  I don't
6  remember.  I'm sure that's correct.
7       BY MR. DALY:
8    Q.  Do you remember the concept of estimated
9  acquisition costs?
10   A.  Vaguely.
11   Q.  What do you remember it to be?
12   A.  Unworkable.
13   Q.  Well, we'll get to that in a second.  What
14 was it supposed to be?
15   A.  I think it was supposed to be calculating
16 roughly what the cost that a physician or other
17 provider could actually acquire the drugs for.
18   Q.  And it was to be that or the published
19 AWP, whichever was lower, right?
20   A.  I believe so.
21   Q.  And you said that that estimated
22 acquisition cost was unworkable?

38 (Pages 146 to 149)

Scully, Thomas A.   May 15, 2007
Washington, DC

Page 374

1  Q. And to do so -- well, I mean, I take it
2  that fixing 50 state Medicaid programs would be, you
3  know, versions of trying to fix Medicare times 50.
4  Is that fair?
5  A. Yes.
6  Q. Because each state would have its own
7  political issues, for example, correct?
8      MR. GOBENA: Object to the form.
9      THE WITNESS: Yes. Medicaid is 54
10 territories, 55 different programs that are all
11 complex and all different payment rates and different
12 politics and makes Medicare reform look simple.
13     BY MR. DALY:
14 Q. And for example, you would have, you know,
15 providers within each state, this time including
16 pharmacies, for example, that would be complaining to
17 state governments if reimbursement levels attempted
18 to be reduced, be reduced, is that true?
19     MR. GOBENA: Objection. Form.
20     THE WITNESS: Yes. Every state had
21 different pharmacy politics with the providers and
22 what the dispensing fees were and what the

Page 375

1  acquisition costs were. Yes.
2      BY MR. DALY:
3  Q. But it was your view, it was CMS's view
4  that if a state wanted to pay to reimburse pharmacies
5  at AWP minus, say, 10 percent, for example, even
6  though the actual acquisition cost of the drug might
7  be AWP minus 72 percent, you did not find that to be
8  unreasonable?
9      MR. GOBENA: Objection to the form. This
10 witness is not here as a 30(b)(6) testifying about
11 CMS's views.
12     BY MR. DALY:
13 Q. Go ahead.
14     MR. GOBENA: You can answer.
15     THE WITNESS: My personal view was that it
16 was -- was it unreasonable? Yes. I mean, I spent a
17 lot of time complaining to states about trying to
18 make sure that they paid the lower cost for drugs,
19 and some did. And I pushed on a lot of states to
20 hire third party PBMs which a lot of them did, to buy
21 their drugs and lower their acquisition costs and
22 come up with a market-based pricing, which

Page 376

1  increasingly some did.
2      And I authorized the number multi-state
3  purchasing groups which were controversial for states
4  to go ahead and use private PBMs to lower their cost.
5  So it was a concern. For me it was more direct and
6  immediate concern for the Medicare program, which I
7  was directly responsible for. But when states asked
8  me what to do on Medicaid drug pricing, my general
9  advice, which a lot of them did, was to hire a PBM to
10 go out, put them at risk, and drive prices down,
11 which a number of them did.
12     BY MR. DALY:
13 Q. In your testimony in 2003, you testified
14 that Medicaid has actually become a larger program
15 than Medicare. Do you recall that testimony?
16 A. Yes.
17 Q. And so why do you say that you didn't have
18 direct responsibility for trying to reduce the
19 federal government's Medicaid payments?
20     MR. GOBENA: Object to the form.
21 Mischaracterizes the witness's testimony. You can
22 answer.

Page 377

1      THE WITNESS: I did have responsibility
2  for Medicaid. The federal government runs and
3  manages Medicare day-to-day. And when you had a
4  situation like you did for Medicare, I felt it was
5  probably next to prescription drug reform, which was
6  my number one priority going back in the government.
7  And number two was probably fixing AWP, because it
8  was a big fiscal and management and policy problem
9  for the agency.
10     So I spent a lot of time trying to fix it.
11 On Medicaid, I had equal interest but the single
12 biggest Medicaid policy fiscal issue that we had was
13 if -- was the states scamming reimbursement matches
14 which I mentioned earlier, which was a multibillion
15 dollar problem, state by state, with the states
16 because they had a fiscal partnership between the
17 federal and state governments. The single biggest
18 policy problem there that I spent most of my time on
19 was to trying to prevent the states from putting up
20 air to match federal, and drawdown federal dollars
21 without putting out state dollars.
22     Once we got to the point where we're

95 (Pages 374 to 377)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                                May 15, 2007
                          Washington, DC

Page 378

1  actually running the state Medicaid programs as
2  partnership with equal partners putting up their
3  matches, it was a lot easier to talk to them about
4  trying to -- they didn't care as much about what they
5  paid for drugs when they were spending federal
6  dollars.
7          So my biggest policy priority on Medicaid
8  was to trying to get the states to actually live with
9  a match.  Once they did that, they were magically
10 much more interested in trying to figure out how to
11 pay the right amount for drugs.  They weren't quite
12 as interested in what they paid for drugs or for
13 physicians or nursing homes or anything else when
14 they were paying with 100 percent federal dollars or
15 90 percent federal dollars.
16         So my number one priority was to make sure
17 they were putting in their share and then magically
18 they became much more interested in trying to figure
19 out what the right amount to pay for drugs was, which
20 many states did.  And the states that I worked with,
21 including governors, Michigan and a lot of other
22 states that formed multistate cooperatives were very

Page 379

1  interested in lowering their drug costs.
2          And my view was because they did not have
3  the statutory construct that we had in Medicare, the
4  smartest states hired private PBMs, I think seven or
5  eight of them in the multistate cooperative, and a
6  lot of the third party negotiators to lower the drug
7  cost, which many of them did.  And that was the
8  growing trend while I was at CMS.
9          BY MR. DALY:
10    Q.  When you said that the states didn't have
11 statutory constructs, what do you mean by that?
12    A.  I don't believe the states had -- they
13 were able to file state Medicaid plans to pay for
14 drugs under a variety of mechanisms.  Their average
15 might have been ASP minus 10, but they consensually
16 -- as long as they covered the basic categories of
17 drugs and beneficiaries mandated by Medicaid law,
18 they could pay -- they could do it under a wide
19 variety of payment schemes, and they did.  And
20 probably as many different ways to pay for drugs as
21 there were states.
22    Q.  But the OIG is telling you that the

Page 380

1  discounts below AWP run all the way up to 72 percent,
2  correct?
3          MR. GOBENA:  Object to the form.
4          THE WITNESS:  That states were paying?
5          BY MR. DALY:
6    Q.  Yes.
7    A.  I'm sure that's right.  The discount is
8  below that if you measure it versus AWP, but AWP is a
9  meaningless number for me.  So were some states
10 negotiating prices much lower than that?  I'm sure
11 they probably were.
12    Q.  Well, but OIG is telling you that it's the
13 average reimbursement by state Medicare agencies is
14 AWP minus 10.3 percent?
15         MR. GOBENA:  Object to the form.
16         THE WITNESS:  Yes.
17         BY MR. DALY:
18    Q.  So that's the average?
19    A.  Yes.
20         MR. GOBENA:  Object to the form.
21         BY MR. DALY:
22    Q.  And if for certain drugs, the actual sales

Page 381

1  price is 75 percent lower than AWP, then those states
2  are overpaying by 65 percent, right?
3          MR. GOBENA:  Object to the form.
4          THE WITNESS:  In theory, some states may
5  have, but I believe over the time that I was there,
6  that probably -- that may be the average, but my
7  guess is that the weighting, weighted average may
8  have been lower, because more and more states hired
9  third party PBMs to do negotiating for them.  And I
10 don't believe they -- maybe I'm wrong, but I don't
11 think that number counts rebates either.
12         BY MR. DALY:
13    Q.  When you said that you wanted to -- when
14 you came on with CMS, you wanted to work on the
15 prescription drug benefit and fix AWP, right?
16    A.  Right.  Many other things, but that was --
17    Q.  Among other things?
18    A.  Those were certainly number one and three
19 or four of my top 10 probably.
20    Q.  And AWP is also an issue on the Medicaid
21 side of the equation within CMS, right?
22    A.  Yes.  But it was not as high a priority as

96 (Pages 378 to 381)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Page 422

1  Health in Florida, so I'm assuming since I don't
2  discuss it with him, he probably didn't like the --
3  probably, he always felt this way, didn't like the IG
4  taking shots at states, so he probably asked to
5  remove it.
6      But we didn't discuss it, but it's very
7  Rubenesque. I would guess that was the intent of the
8  tone is he just didn't like the IG suggesting states
9  are overpaying, so much more than any other factual
10 basis. Much more than any other policy based factor.
11 I think he probably just didn't like the comments
12 about accusing the states of overpaying.
13     Q. Because CMS had approved their plans to
14 pay whatever it was that they were paying, right?
15     MR. GOBENA: Object to the form.
16     THE WITNESS: Because it implies the
17 states are making errors or overpaying, and Ruben had
18 just been a state Medicaid administrator and was
19 probably as aggressive as anybody in the country
20 about trying to reduce drug prices. So I'm sure he
21 resented that. Probably took it out for that result
22 -- for that reason.

Page 423

1      BY MR. DALY:
2      Q. He resented the implication that the
3  states were doing anything wrong, is that what you're
4  saying?
5      A. The states were not effectively trying to
6  negotiate the lowest prices, at least in his state,
7  which is the way he thought, so I'm guessing this was
8  a much more personal thing than a policy
9  consideration at CMS.
10     Q. Although when he wrote this letter, he was
11 speaking on behalf of --
12     A. He was.
13     Q. CMS, right?
14     A. I'm just saying that he had been -- I'm
15 guessing from our previous letters with Mike
16 McMullen, he had been deputy administrator for about
17 two weeks, and I know from dealing with him as my
18 deputy for two and half years, he had strong feelings
19 about what the states -- states rights to run their
20 own programs.
21     MR. DALY: Well, I've got probably three
22 or four more areas to cover with you. It's not going

Page 424

1  to be all day or half a day or anything like that,
2  but I'm not going to be able to finish it tonight, so
3  I'm thinking that at 6 o'clock, I know a lot of
4  people have to go. I know I have to catch a plane,
5  so you know, subject to your prior comments, I think
6  this might be a good time to conclude.
7      THE WITNESS: Is there any reason why
8  other people can't stay longer, I mean, given the
9  issue of -- I mean, it would be convenient for
10 everybody's time, but it's extremely inconvenient for
11 my time to come back for any more than I have to
12 obviously. And if you have to catch a plane, is
13 there any reason why other people can't ask
14 questions, with the other counsel, co-counsel here?
15     MR. GOBENA: Why don't we go off the
16 record.
17     MR. DALY: Off the record.
18     THE VIDEOGRAPHER: The time is 6:04 p.m.
19 Off the record with videotape number 7.
20     (Recess.)
21     THE VIDEOGRAPHER: The time is 6:08 p.m.
22 We are continuing with tape number seven.

Page 425

1      BY MR. DALY:
2      Q. Mr. Scully, I just wanted to follow up on
3  something you gave in one of your last few answers
4  which was when we were talking about average
5  discounts below AWP that pharmacies for example and
6  others were able to acquire drugs under the Medicaid
7  program. We were talking about the averages and you
8  said that there were a lot of high volume, low cost
9  drugs which might skew that average. Do you recall
10 that testimony?
11     A. Yes.
12     Q. And those are high volume, low cost drugs,
13 that's where you would expect the larger spreads to
14 be?
15     A. I just generally recollect that was the
16 case. Some of the higher, the higher spreads were in
17 low cost drugs.
18     Q. Okay. And the low cost drugs would
19 include sodium chloride, dextrose and water?
20     MR. GOBENA: Object to the form.
21     THE WITNESS: I'd have to look. I don't
22 remember those particular. I remember ipratropium

107 (Pages 422 to 425)

Scully, Thomas A.                                              May 15, 2007
                              Washington, DC

Page 426

 1  bromide and Albuterol being the two kind of poster
 2  children for that.
 3          BY MR. DALY:
 4      Q.  Do you recall sodium chloride, dextrose
 5  and water being low cost drugs under the Medicaid
 6  program?
 7          MR. GOBENA:  Object to the form.
 8          THE WITNESS:  I don't.  I'd have to look
 9  at the pricing.  I assume they are, but I'm --
10          MR. DALY:  All right.  I just wanted to
11  get that.  And did you have anything you wanted to
12  say after your meeting?
13          MR. GOBENA:  Yes.  As Mr. Scully has
14  indicated, he is prepared to proceed as long as
15  possible tonight to get as much of the questioning
16  done.  So what I want to do is go around the room and
17  ask each one of the defense counsel here representing
18  various drug companies whether or not they are
19  willing to continue going tonight, even though I
20  understand Mr. Daly has to catch a plane, Mr. Cook is
21  here.  He could ask questions for Abbott if Abbott
22  has additional areas of inquiry.  But I'll let all of

Page 427

 1  you speak for yourselves to state on the record
 2  whether you're willing to stay further tonight, so we
 3  can continue and complete as much of his testimony as
 4  possible.
 5          MR. DALY:  I mean, you can ask anybody
 6  whatever you want to ask them.  I just have two
 7  things to say.  One, there was no indication from you
 8  that this would be a one-day deposition.  Number two,
 9  the court reporter has informed us they are not going
10  to stay here all night.  They have been at this now
11  for however many hours it's been, and it's just not
12  reasonable that folks, you know, have to continue and
13  work 14 hours straight, or 15 or 16 or 18, or however
14  --
15          THE WITNESS:  Well, that's a
16  misrepresentation by my counsel, then, because I
17  very, very, very clearly and very directly told them
18  that I want to start as early today as I could and go
19  -- excuse me, and go as long as I possibly could
20  today.
21          MR. GOBENA:  It's no misrepresentation.
22  Look, we don't know how long a deposition is going to

Page 428

 1  take until you actually get into it.  There's been a
 2  lot of, frankly, in our opinion, repetitive,
 3  redundant questioning going on today.  But you know,
 4  there might be a disagreement about that.
 5          But leaving that aside, we are willing to
 6  continue.  We are not talking about going all night
 7  long until tomorrow morning.  We can go for hopefully
 8  a few more hours at least, try and get some of the
 9  questioning in from Dey's counsel, from Roxane's
10  counsel, you know, and try and get as much of it done
11  as possible.
12          MR. ESCOBAR:  Let me ask you this.  Why is
13  it that you're saying that?  Is there no day in the
14  next six months where we can all reconvene and do
15  this in an orderly way?
16          MR. GOBENA:  I'm not saying that, I'm just
17  asking whether or not --
18          MR. ESCOBAR:  Excuse me, are you saying
19  that there is no day --
20          MR. GOBENA:  Let me answer your question,
21  Mr. Escobar.  I'm saying -- what I'm asking right now
22  is a different question.  Are you willing to ask some

Page 429

 1  questions now.  I'm not saying there is no day or
 2  anything.  I'm not taking a position on that.
 3          MR. HAAS:  But it's a moot point.  We
 4  don't have a court reporter.  I mean, correct me if
 5  I'm wrong, but there is no notice that this was going
 6  later than the standard number of hours today.
 7  People have their plans based upon that.  We don't
 8  have a court reporter, and I don't understand the
 9  point.
10          MR. GOBENA:  What are the standard number
11  of hours.  In our case, it says 14 --
12          MR. HAAS:  There is nothing about going 14
13  hours a day.
14          MR. GOBENA:  It doesn't say anything about
15  going 8 hours or not.
16          MR. HAAS:  In this case, have you gone 14
17  hours?
18          MR. GOBENA:  No one's talking about going
19  14 --
20          MR. HAAS:  I'm asking you.  There is none.
21          MR. BREEN:  Let me just interject here.
22  Let's not get all hot under the collar.  The bottom

108 (Pages 426 to 429)