# Exhibit T

Page 289

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

VOLUME II

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| | : |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-A-Care of | : |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc. | : |
| No. 06-CV-11337-PBS | : |

- - -

Continuation of the videotaped deposition of ROBERT VITO was taken, pursuant to notice, at MORGAN LEWIS & BOCKIUS, LLP, 1701 Market Street, Philadelphia, Pennsylvania, on Wednesday, June 20, 2007, beginning at 8:43 a.m., before M. Kathleen Muino, Professional Shorthand Reporter, Notary Public; Michael Hunterton, Certified Legal Video Specialist, there being present:

Vito, Robert - Vol. II                                    June 20, 2007
                         Philadelphia, PA

Page 346

1  drug, we believe current Medicare reimbursements
2  more than compensate suppliers for these costs
3  along with a reasonable profit margin.
4      What did you believe was a reasonable profit
5  margin for this drug?
6          MR. NEAL:  I'll object to the form.
7          THE WITNESS:  We -- we did not have a
8  specific number in mind.
9  BY MR. TORBORG:
10     Q.  But you believed that the supplier
11 should have some profit margin?
12     A.  There would be no one in the business if
13 there wasn't any incentive to have a profit.
14     Q.  Do you recall having any discussions at
15 any time with anyone at OIG or HCFA about what a
16 reasonable profit margin would be for albuterol
17 sulfate?
18         MR. NEAL:  I'll object to the form.
19         You can answer that to the extent that
20 you don't disclose any communications that took
21 place in entrance/exit conferences or other
22 privileged settings.

Page 347

1          THE WITNESS:  I think we had general
2  discussions.
3  BY MR. TORBORG:
4      Q.  What -- what do you remember about those
5  discussions?
6      A.  That it was just, you know, discussions
7  about what -- what should be a -- a markup.
8      Q.  What do you recall about what markup
9  would be appropriate in those discussions?
10         MR. NEAL:  Object to the form.
11         And my instruction stands.
12         THE WITNESS:  I -- I -- I don't remember
13 all the details, but there were discussions about
14 that, because we -- we believed that providers
15 should be paid a fair price.
16         MR. TORBORG:  Can you get me Tab 181.
17             - - -
18         (Whereupon, Exhibit Abbott 240 was marked
19 for Identification.)
20             - - -
21 BY MR. TORBORG:
22     Q.  Mr. Vito, what I've handed you as

Page 348

1  Exhibit Abbott 240 is a copy of a regulation that,
2  I believe, actually relates to the Medicaid
3  program.  I'm going to ask you to, if you would, go
4  to the second page, to the Section 447.204,
5  Encouragement of provider participation.  Are you
6  with me?
7      A.  Yes.
8      Q.  I'll read it in -- into the record.  If
9  you would follow along.  That section provides:
10 The agency's payments -- and I believe this is
11 referring to a state agency given what comes before
12 it on the page.
13     The agency's payments must be sufficient to
14 enlist enough providers so that services under the
15 plan are available to recipients at least to the
16 extent that those services are available to the
17 general population.
18     Mr. Vito, have you reviewed that regulation
19 before today?
20         MR. AZORSKY:  Objection to form.
21         THE WITNESS:  This -- this -- this
22 relates to Medicaid, and all the other lines of

Page 349

1  questionings were Medicare.
2  BY MR. TORBORG:
3      Q.  Yeah.  I -- I'm switching over to
4  Medicaid.
5      A.  Okay.  So this is now focused on
6  Medicaid?
7      Q.  Yes.
8      A.  Okay.  I -- I -- I -- I believe -- I --
9  I don't remember.
10     Q.  Do you recall having discussions about
11 the fact that Medicaid regulations had a provision
12 in them that required that the payment that the
13 state plan provided for drugs needed to be enough
14 to enlist enough providers --
15     A.  Yeah, yeah --
16     Q.  -- so that --
17     A.  -- I think we were certainly aware of
18 that.
19         MR. NEAL:  I'll object to the form.
20         You've answered.
21 BY MR. TORBORG:
22     Q.  Do you recall discussions about that?

16 (Pages 346 to 349)

Page 494

1  report later, but I -- I don't know if you recall
2  this, but the percentage differences -- differences
3  that I showed you in that report, some of them were
4  pretty high for generic drugs, a lot --
5         MR. NEAL: Object --
6  BY MR. TORBORG:
7    Q.  -- of larger percentages were generic
8  drugs?
9         MR. NEAL: I'll object to the form.
10        You can answer.
11        THE WITNESS: I -- I -- I think that
12 there are some high percentages on generic drugs.
13 But if I remember, some of our work, we've also
14 were able to see that there were other problems
15 with some brand name products as well. But there
16 are -- there -- there are those differences with
17 generics.
18 BY MR. TORBORG:
19   Q.  Did you have an understanding about what
20 was causing there to be a large percentage
21 difference on generic drugs between the selling
22 prices in the market and published average

Page 495

1  wholesale prices?
2         MR. NEAL: I'll object to the form.
3         THE WITNESS: Our -- our work mainly
4  focused on the pricing of the products. We were
5  able to show how they varied. I don't know if we
6  actually grouped them in -- in -- in that manner.
7  But one of the products that we featured, doing a
8  lot of work on, was albuterol, and that was a
9  generic drug.
10 BY MR. TORBORG:
11   Q.  Do you -- I -- I'm not sure we're on the
12 same wavelength on my -- on my question. I'll try
13 again.
14    Did you have an understanding about, for
15 generic drugs, why there could be such a high
16 percentage difference between the selling prices in
17 the market to the average published prices?
18        MR. NEAL: Objection as to form.
19        THE WITNESS: That was not part of our
20 review. You know, there -- there was people who
21 made speculation, but we were just to look at the
22 pricing.

Page 496

1  BY MR. TORBORG:
2    Q.  Did you share a copy of this article
3  with anyone at HCFA?
4    A.  I -- I am not certain of that, but if I
5  did, it would have been with Bob Niemann, but I'm
6  not certain I did.
7    Q.  Did you share a copy of this article
8  with any state pharmacy personnel?
9    A.  I'm not certain. I don't think I did,
10 though.
11   Q.  And it's been some ten years since you
12 got a copy of this, correct?
13   A.  Yes.
14   Q.  So you -- so you may have, you just --
15 it's been ten years?
16   A.  Yes.
17        MR. NEAL: I'll object to the form.
18        You've answered.
19        THE WITNESS: Yes. Yes.
20 BY MR. TORBORG:
21   Q.  Do you recall circulating a copy of this
22 to anyone?

Page 497

1    A.  Oh, I think I circulated it in the
2  office.
3    Q.  How about outside of your office?
4    A.  I think I forwarded it to our office in
5  Washington so that they would be able to see it.
6    Q.  Did you forward it to any members of
7  Congress or their staffs?
8    A.  That might have happened.
9    Q.  Do you -- what makes you say that?
10   A.  Because they would ask -- a lot of times
11 they would ask for some background information on
12 -- on what -- what -- what the issue was, and then
13 we -- we obtained and kept records of some of the
14 articles that appeared, and then we would just
15 forward those over when people would ask about this
16 issue.
17   Q.  Is that -- do you recall sending it --
18 this article at your own initiative to any
19 congressional staffers?
20        MR. AZORSKY: Objection to form.
21        MR. NEAL: I'll object to the form of the
22 question.

Page 506

1   Mr. Vito, did you make those comments to Mr.
2   Alpert in your discussions --
3       A.  I did not.
4       Q.  Do you know who did?
5       A.  I do not, but I know that External
6   Affairs was on the phone call with me every time,
7   and I don't -- we're not allowed to talk about any
8   investigations.
9       Q.  Do you have any idea who would have made
10  the comments?
11      A.  No.  I was surprised.
12      Q.  Do you know anyone else who would have
13  been discussing these issues with Mr. Alpert at
14  this time?
15      A.  I know I was and the people from
16  External Affairs, but I don't know anyone else that
17  was from the Office of Inspector General that was
18  having this discussion with him.
19      Q.  Do you know where Mr. Alpert came up
20  with these off-the-record statements?
21          MR. NEAL:  Objection as to form.
22          THE WITNESS:  No, I do not.

Page 507

1   BY MR. TORBORG:
2       Q.  Do you think he made them up?
3           MR. NEAL:  Objection as to form.
4           THE WITNESS:  I think you would have to
5   ask him that, but I could tell you that I did not
6   make that statement.
7   BY MR. TORBORG:
8       Q.  And you understand that you -- that --
9   that you're not permitted to discuss investigations
10  with the public and with reporters; is that right?
11      A.  Yes, and I'm not even in the
12  investigative unit, so it's even more important
13  that I don't say anything.
14      Q.  If I could ask you to flip back one
15  page, the last column on Bates page 472, the third
16  full paragraph, Mr. Alpert wrote -- wrote:  Indeed
17  for makers of generics, unreal average wholesale
18  prices pose a classic social dilemma.  If some but
19  not all rectify their AWPs, the honest makers cut
20  their own throats.  Quote, manufacturers have told
21  me that they act -- have told me that if they act
22  on their own, it will dry up their own business,

Page 508

1   said -- says Medi-Cal's Neff.  Quote, if I'm a
2   buyer and one drug maker gives me a -- gives me 20
3   percent higher reimbursement, who am I going to go
4   with?  End quote.
5       Do you recall ever discussing that sort of
6   social dilemma with anyone in your work?
7           MR. AZORSKY:  Objection to form.
8           MR. NEAL:  I'll join the objection.
9           You can answer.
10          THE WITNESS:  I believe that there has
11  been discussions about leveling the playing field.
12  BY MR. TORBORG:
13      Q.  And who did you have those discussions
14  with?
15      A.  I'm not sure, but I think it comes back
16  to the ones where I told you it might have been --
17  have to do with the -- the Department of Justice
18  AWPs that were supposed to more closely approximate
19  the acquisition cost.
20      Q.  Do you agree that the makers of generic
21  drugs face a social dilemma when it comes to
22  whether or not to lower their -- their published or

Page 509

1   cause to be lowered their published prices?
2       A.  I don't know about the -- the social
3   issue.  I do understand what they're saying,
4   though, is that if they report the true price and
5   then people don't use that product because they're
6   not making any money, I understand what -- their
7   position, but I do not understand the social
8   dilemma.
9       Q.  Do you recall having any discussions
10  with HCFA about what this article discussed
11  relating to the differences between published
12  prices for nutritionals and solutions with the
13  prices available in the marketplace?
14          MR. NEAL:  I'll object to the form of the
15  question.
16          THE WITNESS:  I -- I -- I don't -- I
17  don't recall.  We may.  We may not.  I -- I -- I
18  don't recall.
19  BY MR. TORBORG:
20      Q.  If I had been ask -- able to ask you
21  that question five years ago, you may have had a
22  better recollection on whether or not you had those

37dbe22c-39bb-473f-8cc6-c16d7974b122

Page 510

1  discussions?
2       MR. NEAL:  I'll object to the form.
3       MR. AZORSKY:  Objection to form.
4       THE WITNESS:  It might be better if it
5  was like eight more -- or -- or ten back, but I --
6  I -- I hope that I would be able to remember what
7  happened then if I was right close to that time
8  frame.
9  BY MR. TORBORG:
10     Q.  Do you think it would have been a good
11  idea for you to have informed CMS of the pricing
12  spreads on intravenous nutritionals and solutions?
13      MR. NEAL:  Objection as to form.
14      MR. AZORSKY:  Objection to form.
15      THE WITNESS:  Well, actually, we had
16  already informed them on the enteral nutrition
17  because that report was issued on May 1996, and I
18  think the next one on enteral -- on -- on
19  parenteral nutrition was issued on July of 1997, so
20  at this time I don't know if we had started that
21  job or that we were even -- that job might have
22  already been at CMS for their comments.  I'm not

Page 511

1  sure.
2       MR. TORBORG:  Mark this.
3            - - -
4       (Whereupon, Exhibit Abbott 251 was marked
5  for Identification.)
6            - - -
7       MR. TORBORG:  For the record, what I have
8  marked as Abbott Exhibit 241 -- Exhibit Abbott 251
9  bears the Bates Nos. HHD062-0288 through 295.
10 BY MR. TORBORG:
11     Q.  Mr. Vito, I can represent to you that
12 counsel has indicated that this collection of
13 documents was produced from your files.  My first
14 question will be whether or not you recall this
15 document?
16     A.  I don't recall this specific document,
17 but I do remember that there was some kind of
18 request that came in.
19     Q.  Request regarding what?
20     A.  I think it -- it came in -- they wanted
21 -- they -- they referenced the Barron's article,
22 and then I believe they wanted to get some

Page 512

1  information.  It -- it says that they wanted to
2  initiate an investigation in order to identify the
3  person or persons responsible for the statements.
4       Q.  Okay.  So this is a -- starting with
5  Bates page ending 291, is a letter from Akin Gump
6  on behalf of Baxter Healthcare Corporation,
7  correct?
8       A.  I think -- I think -- well, I guess.  I
9  -- is it Baxter?
10      Q.  I'm looking at Bates page 291 --
11      A.  291.
12      Q.  -- the first paragraph:  I am writing --
13      A.  Yep.
14      Q.  -- to you on behalf --
15      A.  -- our client.  Yes.
16      Q.  And Baxter was one of the entities that
17 was identified in the Barron's article --
18      A.  Yes.
19      Q.  -- right?  And it looks like a -- it's a
20 -- I don't know if you recall this, but is this --
21 is the sum and substance of the correspondence from
22 Akin Gump on behalf of Baxter that they were upset

Page 513

1  that some quotes were made from an angry
2  investigator or others from OIG about the
3  government investigation into pharmaceutical
4  pricing?
5       MR. NEAL:  I'll object to the form.
6       You can answer.
7       THE WITNESS:  Were they upset about it?
8  BY MR. TORBORG:
9       Q.  Yes.
10      A.  It appears to be.
11      Q.  Based on the -- the letter?
12      A.  Yes.
13      Q.  And then Mr. -- I assume it's Mr. Grob,
14 looking at Bates page ending 289, is that a
15 transmittal sheet from George to you?
16      A.  That is, yes.
17      Q.  Does -- does it appear that he's -- he's
18 forwarding this on to you?
19      A.  I believe he was.
20      Q.  Do you know why he was forwarding that
21 on to you?
22      MR. NEAL:  Object to the form.

Page 514

1    You can answer.
2    THE WITNESS: I believe I was involved in
3  -- in the discussion with Mr. -- the -- the article
4  in Barron's.
5  BY MR. TORBORG:
6    Q. Any other reason?
7    A. I'm sure that they had to look into this
8  and find out -- you know, to address this. It says
9  that it -- please prepare a reply, so it went to
10 our Office of Investigation.
11   Q. Do you recall if any investigation was
12 conducted about that?
13   A. I think -- I think they have asked me
14 questions, and I believe one of the major
15 advantages of only talking to people when External
16 Affairs are on the line is that External Affairs
17 can verify what you've said, so that's the reason
18 why we are required to do that, and that's the
19 safeguard position that allows us to make the
20 determination that I was not involved in that.
21   Q. And the -- who was the External Affairs
22 person?

Page 515

1    A. Director was Judy Holtz.
2    MR. TORBORG: Mark this as our next
3  exhibit, please.
4       ---
5    (Whereupon, Exhibit Abbott 252 was marked
6  for Identification.)
7       ---
8    THE WITNESS: Thank you.
9  BY MR. TORBORG:
10   Q. What I've marked as Exhibit Abbott 252
11 bears the Bates Nos. HHD 059-0014 through 32.
12   A. Uh-huh.
13   Q. And, Mr. Vito, if you would take a look
14 at those and then tell me what they are?
15   A. They are faxes from me to Bob Reid, the
16 director of the Medicaid program; Jerry Dunham, our
17 Office of Audit person; Michael Edge, the director
18 of the SADMERC; Rich Warczynski, a person in Office
19 of Audit Service; and also Susan McLeod and Jerry
20 Wells from the Medicaid bureau in -- in Florida.
21   And then -- then the next one is something
22 different, that's the Med Trade (ph) registration

Page 516

1  form, the last document.
2    But the rest, apparently, I forwarded the --
3  the -- the Barron's article out to them.
4    Q. And we're talking about the June 10th,
5  1996 Hooked on Drugs article?
6    A. Well, let me see the date on this again.
7  1996. And this is -- yes.
8    Q. And if we go to the Bates page ending
9  015 --
10   A. Uh-huh.
11   Q. -- that's the June 12th, 1996 fax from
12 yourself to Rob -- Bob Reid?
13   A. Bob Reid.
14   Q. Ohio Medicaid?
15   A. Yes.
16   Q. And who was he?
17   A. He was the -- a director of the
18 pharmaceutical -- he was the director of the
19 pharmacy program at Ohio, in Medicaid.
20   Q. And what prompted you to send this
21 article to Mr. Reid?
22   A. I don't remember. I didn't even

Page 517

1  remember that I sent it to them. As a matter of
2  fact, I -- I believe that I told you that I didn't,
3  so obviously I was wrong.
4    Q. And you may have sent it to additional
5  personnel, but you don't recall here today and
6  perhaps you don't have documents about as well?
7    A. May --
8    MR. NEAL: I'll object to the form of the
9  question.
10   You can answer.
11   THE WITNESS: Maybe, but you see, I -- I
12 seem to have a lot of documents, as you could see,
13 as we could see. I -- I seem to keep a lot of
14 documents, so my guess is there might have -- be
15 more, but, I mean, if I kept these, I don't know
16 why I wouldn't have kept others.
17 BY MR. TORBORG:
18   Q. When did you begin using email?
19   A. Email? I think we had email for a
20 while.
21   Q. Were you using email back in 1996? I
22 think we've seen some -- some -- some documents

Vito, Robert - Vol. II                                              June 20, 2007
                        Philadelphia, PA

```
                                                      Page 518
 1  today during --
 2      A.  Some --
 3      Q.  -- that time.
 4      A.  Some emails, yes.
 5      Q.  Did you ever write emails to state
 6  Medicaid personnel?
 7      A.  I have to say, generally, I don't think
 8  I -- I remember sending emails to them.  It would
 9  either be on the phone or we would be sending a
10  letter or faxing.
11      Q.  But you do recall sending letters and
12  having phone calls with those personnel?
13          MR. NEAL:  I'll object to the form.
14          You can answer.
15          THE WITNESS:  I -- I -- I did not
16  remember, but you have proof that I sent them, so
17  that means that I must have sent them.
18  BY MR. TORBORG:
19      Q.  And you may have had phone calls where
20  you shared information such as the Barron's article
21  or other work you had done with state pharmacy
22  personnel that you don't recall today because it's
```

```
                                                      Page 519
 1  been ten years; is that fair to say?
 2          MR. AZORSKY:  Objection --
 3          MR. NEAL:  Objection to form.
 4          MR. AZORSKY:  -- to form.
 5          THE WITNESS:  That might be correct, yes.
 6  BY MR. TORBORG:
 7      Q.  When was the last time that you spoke
 8  with Bob Reid?
 9      A.  I don't remember.
10      Q.  And you don't have any idea, as you sit
11  here today, of why you would have sent it to Mr.
12  Reid in particular?
13      A.  He -- he was -- he was the Medicaid
14  pharmacist in Ohio, and it must have been that he
15  actually was in touch with me for some other issue
16  and we had just corresponded.
17      Q.  Did Mr. Reid hold any position at that
18  time in any state pharmacy association?
19      A.  I don't know.
20      Q.  And you also sent the Barron's article
21  to Susan McLeod and Jerry Wells at the Florida
22  Medicaid?
```

```
                                                      Page 520
 1      A.  Yes.
 2      Q.  And do you know why you sent it to those
 3  two individuals?
 4      A.  Jerry Wells is -- was the director of
 5  the pharmacy program for the State of Florida, the
 6  Medicaid.
 7      Q.  And who was Susan McLeod?
 8      A.  I believe that was an individual who
 9  worked underneath him.  I think we had -- we had
10  been working with them on some issue, and I think
11  that I forwarded it to them when it was -- when the
12  report -- when the article came out, but I don't
13  remember.
14      Q.  And in the comments line to that fax,
15  which is the Bates page ending 18, where you
16  stated:  I thought you might be interested in these
17  articles.
18          Do you recall why you thought that those
19  individuals might be interested in the Barron's
20  article?
21      A.  Because I think they were interested in
22  -- in setting prices in the Medicaid program.
```

```
                                                      Page 521
 1      Q.  Do you recall conversations with them
 2  about the difference between published average
 3  wholesale prices and acquisition costs?
 4      A.  I believe, yes.  Generally speaking, I
 5  think we talked about AWP with Mr. Wells.
 6      Q.  Do you recall having conversations
 7  regarding the differences between AWP and
 8  acquisition cost with any other pharmacy personnel
 9  -- state pharmacy personnel?
10      A.  Maybe.  I -- I -- I'm not sure.  There
11  -- there are -- I probably did.  I spoke at their
12  conferences, so maybe I did, but I don't recall.
13      Q.  And did -- did you maintain -- when you
14  gave a -- when you spoke at the conferences, did
15  you prepare materials --
16      A.  We --
17      Q.  -- overheads, presentations, Power
18  Points, thing of that nature?
19      A.  Generally, yes.  We -- we spoke on
20  reports that were issued.
21      Q.  And did -- and have you maintained a
22  copy of those presentations or Power Points?
```

                                                  59 (Pages 518 to 521)

37dbe22c-39bb-473f-8cc6-c16d7974b122

Page 546

1  would be possible for Robert Vito to speak to our
2  group.  If you need further information or if I can
3  assist Robert in any way, please let me get -- let
4  me know.
5       Mr. Vito, do you recall if you attended this
6  symposium?
7       A.   I don't think I attended.  I'm not sure,
8  but I just -- I was just asked to speak at a -- a
9  conference in which Mr. Ridout asked me to speak
10 at, and it was at the same building as this one
11 was, and I don't remember ever being there.  I -- I
12 -- I could be wrong, but I don't remember being in
13 -- in Grove whatever it's called.
14      Q.   Do you recall attending any annual
15 symposiums of the Medicaid Pharmacy Administrators?
16      A.   Yes.
17      Q.   When did you start attending those?
18      A.   When they asked me, and they would
19 periodically ask me to go and speak on subjects
20 that were of interest to them, mainly subjects that
21 our -- our reports had a -- addressed.
22      Q.   And a number of your reports addressed

Page 547

1  the difference between published wholesale prices
2  and the cost at which products were available in
3  the marketplace; is that right?
4       A.   The -- they were primarily reports that
5  focused on the Medicare, yes.
6       Q.   But those Medicare reports would also
7  contain information regarding the difference
8  between published prices and prices available in
9  the marketplace, right?
10         MR. NEAL:  I'll object to the form.
11         You can answer that question.
12         THE WITNESS:  It would show the pricing
13 information that we obtained from our sources.  It
14 would show what we were able to get, yes.
15         MR. TORBORG:  Would you mark this as the
16 next exhibit.
17              - - -
18         (Whereupon, Exhibit Abbott 254 was marked
19 for Identification.)
20              - - -
21         THE COURT REPORTER:  Exhibit Abbott 254.
22         MR. TORBORG:  For the record, what I've

Page 548

1  marked as Exhibit Abbott 254, I hope, bears the
2  Bates Nos. HHD061-0989 through 995.
3  BY MR. TORBORG:
4       Q.   Mr. Vito, once you've had a chance to
5  look at this, I'll ask you if you recall it.
6       Can you tell me what this document is?
7       A.   It appears that -- it says:  Topics,
8  three different versions depending on what you
9  finally decide to cover.
10      I believe that was Linda Ragone's handwriting,
11 and I guess it was about what to talk about or have
12 a discussion about at -- at --at the Medicaid
13 Pharmacy Administrators Annual Symposium.
14      Q.   And if we could go back to the document
15 I was just asking you about, Exhibit Abbott 253, to
16 the Bates page 981, it appears to be a draft agenda
17 for this -- part of the draft agenda for this
18 symposium; is that right?
19      Do you see there's an entry for Friday, March
20 21st, 1997, and you're listed, at least in this
21 draft, as making a presentation from 10:15 to
22 10:45?

Page 549

1       A.   Yes.
2       Q.   On the topics of OIG Report, AWP,
3  J-codes and Home Infusion Therapies?
4       A.   Yes --
5       Q.   Does that --
6       A.   -- I see it.  Yes.
7       Q.   Do those topics correspond with the
8  topics for discussion listed on Bates page 990 of
9  Exhibit Abbott 254?
10      A.   It -- it appears that at least one does,
11 and that is J codes, because that represents
12 billing and rebates for physician-provided drugs in
13 the state Medicaid program.
14      Q.   It says -- the first one listed there
15 discusses Variability of Parenteral --
16      A.   That might -- that might apply to Home
17 Infusion Therapies.
18      Q.   That was going to be my questions.  Does
19 this refresh -- refresh your recollection at all,
20 and I'm talking Exhibit Abbott 254, of whether or
21 not you spoke at the Medicaid Pharmacy
22 Administrators Annual Symposium in March of 1997?

37dbe22c-39bb-473f-8cc6-c16d7974b122

Page 550

1    A.  I -- I -- I pretty much believe that I
2    didn't speak there, but I guess I can't be certain,
3    but I -- I just usually would remember because they
4    keep saying that this Asheville is so nice, and I
5    believe the first time I went there was just
6    recently.  So I -- I -- I can't be sure, but I just
7    don't think that I -- I did speak at numerous
8    conferences, but I'm not sure I spoke at this one.
9        Q.  Do you recall any other symposiums of
10   national organizations, such as the Medicaid
11   Pharmacy Administrators organization, that you've
12   spoke at?
13       A.  I've been requested to speak at numerous
14   conferences, and I don't remember all of them, but
15   I have been requested to speak at numerous ones.
16       Q.  And have you spoke at numerous ones?
17       A.  I believe I have.
18       Q.  And was the topic of AWP discussed in
19   those -- in those conferences?
20       A.  Maybe at some of the meetings, yes.  I
21   -- I -- I'm not sure, depending upon what the
22   subject was, because I believe we talked about

Page 551

1    other things than just drugs.
2        Q.  Do you recall discussing the Barron's
3    Hooked on Drugs article at any state -- or any
4    symposium or seminar involving state pharmacy
5    representatives?
6        A.  I'm not sure.  I don't recall.
7        Q.  But you may have?
8            MR. NEAL:  I'll object to the form.
9            You can answer.
10           THE WITNESS:  I think I -- I may have,
11   but -- but I -- I'm -- I'm not sure. I've learned
12   now to say I'm not sure because I can't remember
13   everything.
14   BY MR. TORBORG:
15       Q.  If I could ask you to go to Bates -- I'm
16   sorry -- to Exhibit Abbott 253, to the second page,
17   there's some names there I wanted to ask you about.
18   MJ Terrebonne, do you know who that is?
19       A.  Yes.  She was one of the state -- she
20   was equivalent to Benny in another state.
21       Q.  Have you met with her before?
22       A.  She has been at those meetings, yes.

Page 552

1        Q.  And what -- what state is she from?
2        A.  I -- I really don't know.  I think it's
3    a southern state, but I'm -- I'm not -- I'm not
4    sure.
5        Q.  Louisiana ring a bell?
6        A.  I can't be sure.
7        Q.  How about Jeff Irland, do you know him?
8        A.  I'm not as familiar with that name.
9        Q.  How about Elizabeth Geary?
10       A.  I am familiar with Elizabeth, yes.
11       Q.  And she's from Connecticut; is that
12   right?
13       A.  I do not know.
14       Q.  And have you met with Ms. Geary?
15       A.  If she -- if she was in the presence
16   when I did my presentation, then she would have
17   been there and I would have been in the meeting
18   with her.
19       Q.  If you flip a couple pages to Bates page
20   980, it is the agenda for Thursday, an individual
21   by the name of Ted Collins from Wisconsin Medicaid
22   is listed.  Have you met with Mr. Collins?

Page 553

1        A.  I'm not certain.
2        Q.  Have you met with individuals from the
3    -- Wisconsin before?
4        A.  I'm not certain.
5        Q.  And that's because it may -- it may have
6    been some time since you had those meetings; is
7    that correct?
8        A.  It has --
9            MR. NEAL:  I'll object to form.
10           THE WITNESS:  It has been some time since
11   -- since 1997.
12   BY MR. TORBORG:
13       Q.  Have you met with individuals from the
14   State of Alabama Medicaid Pharmacy Program?
15       A.  If you have names, that might help.
16   Again, they were probably at the meeting in which I
17   spoke.
18       Q.  I think I know a name, but I don't want
19   to guess.  A Larry Tatum (ph)?
20       A.  I'm familiar with that name.
21       Q.  And have you met with him?
22       A.  If they were at the meeting, then I --

37dbe22c-39bb-473f-8cc6-c16d7974b122

Vito, Robert - Vol. II                                          June 20, 2007
                       Philadelphia, PA

Page 554

1  then they would have heard me speak.
2      Q.  Have you met with individuals from the
3  State of Texas Medicaid Pharmacy --
4      A.  If they were --
5      Q.  -- Agency?
6      A.  -- there -- if they were there, I -- we
7  met with them.  But in addition to that, I think we
8  had subsequent other -- other discussions with the
9  people from Texas, not just at that conference.
10     Q.  And what -- what can you tell me about
11 those discussions?
12     A.  I think we were asking them -- they --
13 they were one of the states that was supposed to
14 have asked for acquisition cost, and we wanted to
15 see how they were getting it and what that
16 information was.
17     Q.  Do you recall with whom you met from
18 Texas?
19     A.  I don't know if we met them personally
20 or did it by the phone, but it's probably -- I
21 think it might be Martha McNeill (ph).  I'm not
22 sure.

Page 555

1      Q.  And how many conversations have you had
2  with Martha McNeill?
3      A.  Multiple.
4      Q.  When did you first start having
5  discussions with Ms. McNeill?
6      A.  I cannot recall.
7      Q.  Did those discussions involve issues of
8  drug pricing?
9      A.  Yes.
10         MR. TORBORG:  Mark this as our next one.
11            - - -
12         (Whereupon, Exhibit Abbott 255 was marked
13 for Identification.)
14            - - -
15         MR. TORBORG:  For the record, what I've
16 marked as Exhibit Abbott 255 is a document that
17 bears Bates number of HHD068-0411 through 12.  It
18 appears to be an email chain between Mr. Vito and
19 an individual named Paula Avarista, as well as
20 involving Cynthia Denemark.
21         THE WITNESS:  Yes.
22 BY MR. TORBORG:

Page 556

1      Q.  Mr. Vito, do you recall this email
2  correspondence?
3      A.  I don't recall it, but I know it -- it
4  probably came.
5      Q.  And do you know -- have you met -- or do
6  you know Paula Avarista?
7      A.  Yes.
8      Q.  And who is that?
9      A.  She's a Medi -- Medicaid pharmacy
10 director I think in probably Rhode Island.
11     Q.  How about Cynthia Denemark, do you know
12 who she is?
13     A.  Yeah.  I think she works in the State of
14 Delaware.
15     Q.  And have you had conversations with
16 those two individuals?
17     A.  Yes.  And they were at the meetings in
18 which I spoke at.
19     Q.  Which meetings were they?
20     A.  I believe I spoke at this meeting, July
21 18th through 20th.
22     Q.  And that would be 2003?

Page 557

1      A.  I believe so.
2      Q.  If I could start at the bottom of the
3  email chain, this is the email from Cynthia
4  Denemark to yourself dated February 20th, 2003, and
5  Ms. Denemark stated:  It seems hard to believe that
6  it's been almost ten years that I have been
7  consulting for the Delaware Medical Assistance
8  Program.  One of the very first meetings I attended
9  was in Chicago, where you were part of the
10 presentation team.
11     Do you recall attending a meeting in Chicago
12 with state Medicaid officials?
13     A.  Yes, I do believe I was in attendance in
14 Chicago at one of their meetings -- at least one of
15 their meetings.
16     Q.  And when was that?
17     A.  I don't recall.
18     Q.  Ms. Denemark indicates that it's -- it
19 was hard for her to believe that she's been
20 consulting for the Delaware Medical Assistance
21 Program for almost ten years, right?
22     A.  Yes.

68 (Pages 554 to 557)

Vito, Robert - Vol. II                                              June 20, 2007
                              Philadelphia, PA

Page 558

1     Q.  So -- and this email was dated February
2  of 2003, correct?
3     A.  Yes.
4     Q.  And she in -- she indicates that one of
5  the first meetings she attended was in Chicago,
6  where you were part of the presentation team.  Does
7  that assist you in putting a time frame on when you
8  would have attended a meeting of the state pharmacy
9  representatives in Chicago?
10        MR. NEAL:  I'll object to the form.
11        You can answer the question.
12        THE WITNESS:  I -- I guess, if you want
13  to do the math, but, again, I don't have any
14  recollection of it.  I do know that I did speak
15  there, and I know that I speak -- I have spoken on
16  -- in Chicago at least two times, I believe, to
17  this group.
18  BY MR. TORBORG:
19     Q.  And did you prepare presentations or
20  Power Points for that conference or those
21  conferences?
22     A.  Sometimes I did -- usually I did.

Page 559

1  Earlier on in my career, I might not have.
2     Q.  And have you -- did you maintain copies
3  of that?
4        MR. NEAL:  I'll object to the form.
5        THE WITNESS:  I'm not sure.
6  BY MR. TORBORG:
7     Q.  Did you make any efforts to maintain
8  copies of those at any -- at any point in time?
9        MR. NEAL:  The same objection.
10        THE WITNESS:  Yes.
11  BY MR. TORBORG;
12     Q.  When did you start taking efforts to
13  maintain copies of those kinds of documents?
14     A.  Oh, no.  I -- I --
15        MR. AZORSKY:  Objection to form.
16        THE WITNESS:  I -- I -- could you repeat
17  your question?
18  BY MR. TORBORG:
19     Q.  My question was have you taken any
20  efforts to maintain documents of that sort,
21  presentations to state Medicaid pharmacy officials?
22     A.  No --

Page 560

1        MR. NEAL:  I'll object to the form.
2        You can answer.
3        THE WITNESS:  No special.
4  BY MR. TORBORG:
5     Q.  Ms. Denemark also stated:  It would be
6  great if you could attend.  I have read several
7  articles related to your pharmacy -- related to the
8  pharmacy questions your group is reviewing.  These
9  types of over year -- overviews and preliminary or
10  final results make great topics for our program.
11     Do you know what kind of work she's referring
12  to?
13     A.  I believe she's --
14        MR. NEAL:  I'll object to the form.
15        You can answer.
16        THE WITNESS:  I believe she's referring
17  to the reports that we issue.
18  BY MR. TORBORG:
19     Q.  And it indicates here that -- it appears
20  as though she's indicating that you at times would
21  share preliminary results of your findings?
22        MR. NEAL:  I'll object to the form.

Page 561

1        THE WITNESS:  No, we don't share
2  preliminary results.
3  BY MR. TORBORG:
4     Q.  When did you first learn about the
5  deliberative process privilege?
6        MR. NEAL:  I'll object to the form.
7        You can answer.
8        THE WITNESS:  The -- could you repeat it
9  again?
10  BY MR. TORBORG:
11     Q.  When did you first learn about the
12  deliberative process privilege?
13     A.  I -- when counsel was in our office in
14  Philadelphia and we were getting all the files
15  together, I suggested that certain pieces of
16  information I believe should not be shared and that
17  we should keep that information confidential, and
18  that's when I learned about this -- that process.
19     Q.  Have you ever discussed the deliberative
20  process privilege with members of your staff?
21        MS. LIANG:  Object to the form.
22        THE WITNESS:  I -- I -- I -- I have been

                                                      69 (Pages 558 to 561)