# Exhibit U

Bowen, Marianne                                           June 5, 2007
                           Baltimore, MD

Page 1

```
        UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - -x
IN RE:  PHARMACEUTICAL      : MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION:
PRICE LITIGATION            : 01-CV-12257-PBS
THIS DOCUMENT RELATES TO    :
U.S. ex rel. Ven-a-Care of  : Judge Patti B. Saris
the Florida Keys, Inc. v.   :
Abbott Laboratories, Inc.,  : Chief Magistrate
No. 06-CV-11337-PBS         : Judge Marianne B.
- - - - - - - - - - - - - -x Bowler
          IN THE CIRCUIT COURT OF
       MONTGOMERY COUNTY, ALABAMA
- - - - - - - - - - - - - - -x
STATE OF ALABAMA,           :
             Plaintiff,     :
      vs.                   : Case No.: CV-05-219
ABBOTT LABORATORIES, INC.,  : Judge Charles Price
et al.,                     :
             Defendants.    :
- - - - - - - - - - - - - - -x
```

Bowen, Marianne                                                             June 5, 2007

Baltimore, MD

```
                                                     Page 2
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2         IN AND FOR LEON COUNTY, FLORIDA
 3
 4   THE STATE OF FLORIDA
 5   ex rel.
 6   ---------------x
 7   VEN-A-CARE OF THE FLORIDA     :
 8   KEYS, INC., a Florida          :
 9   Corporation, by and through its :
10   principal officers and directors, :
11   ZACHARY T. BENTLEY and          :
12   T. MARK JONES,                  :
13         Plaintiffs,              :
14      vs.                : Civil Action
15   MYLAN LABORATORIES INC.; MYLAN   : No.: 98-3032G
16   PHARMACEUTICALS INC.; NOVOPHARM  : Judge: William
17   LTD., SCHEIN PHARMACEUTICAL, INC.,:  L. Gary
18   TEVA PHARMACEUTICAL INDUSTRIES   :
19   LTD., TEVA PHARMACEUTICAL USA;   :
20   and WATSON PHARMACEUTICALS, INC., :
21         Defendants,               :
22   ---------------x
```

```
                                                     Page 3
 1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2            STATE OF MISSOURI
 3   ---------------x
 4   STATE OF MISSOURI, ex rel.,    :
 5   JEREMIAH W. (JAY) NIXON,       :
 6   Attorney General,              :
 7   and                            :
 8   MISSOURI DEPARTMENT OF SOCIAL  :
 9   SERVICES, DIVISION OF MEDICAL  : Case No.:
10   SERVICES,                      : 054-1216
11        Plaintiffs,    : Division No. 31
12      vs.                :
13   DEY INC., DEY, L.P., MERCK KGaA, :
14   EMD, INC., WARRICK             :
15   PHARMACEUTICALS CORPORATION,   :
16   SCHERING-PLOUGH CORPORATION, and :
17   SCHERING CORPORATION,          :
18        Defendants,     :
19   ---------------x
20
21
22
```

```
                                                     Page 4
 1        Videotaped Deposition of MARIANNE BOWEN,
 2   a witness herein, called for examination by counsel
 3   for Abbott Laboratories in the above-entitled
 4   matter, pursuant to notice, the witness being duly
 5   sworn by Robert M. Jakupciak, a Notary Public in and
 6   for the District of Columbia, taken at the offices
 7   of Hogan & Hartson, 111 S. Calvert Street,
 8   Baltimore, Maryland, 21201, at 9:30 a.m., on June 5,
 9   2007, and the proceedings being taken down by
10   Stenotype by Robert M. Jakupciak, RPR.
11
12
13
14
15
16
17
18
19
20
21
22
```

```
                                                     Page 5
 1   APPEARANCES:
 2
 3   On behalf of the United States of America:
 4
 5       ANA MARIA MARTINEZ, ESQUIRE
 6       U.S. Department of Justice
 7       99 N.E. 4th Street
 8       Miami, Florida  33132
 9       (305) 961-9431
10
11   On behalf of the Centers for Medicare and
12   Medicaid Services:
13
14       LESLIE M. STAFFORD, ESQUIRE
15       Centers for Medicare and
16       Medicaid Services
17       7500 Security Blvd.
18       Baltimore, Maryland  21244
19       (410) 786-9655
20
21
22   (CONTINUED)
```

2 (Pages 2 to 5)

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                                June 5, 2007
Baltimore, MD

Page 90

 1      A.  Okay.  Depending on the type of
 2  information you're looking for.  If you're
 3  looking for document Excel spread sheet type
 4  information, the only place I could look for an
 5  electronic document would be on the LAN and if
 6  the person still was an employee of the agency
 7  and had decided to keep that information on the
 8  LAN, we would be able to retrieve documents by
 9  date.
10      Q.  What about the hard drives?
11      A.  If the person still resides in the
12  agency, we could certainly do a search of their
13  hard drive if they had retained any documents on
14  their hard drive.
15      Q.  What if they were no longer at the
16  agency?
17      A.  What typically happens, and I have to
18  give you a little context here, so bear with me
19  just for a second.  The agency's desktops are not
20  owned by the agency.  A number of years ago we
21  entered into a seat management arrangement for
22  our desktops. We determined that it was actually

Page 91

 1  more cost effective to have somebody else own
 2  them and somebody else maintain them and somebody
 3  else pay for the maintenance on them, than for
 4  the agency to become the owners of them.
 5          And so we only have computers for
 6  people who still work at the agency.  And let me
 7  explain what that means.  If I were to announce
 8  my retirement today, within about 14 days, give
 9  or take a day or two, the contractor who actually
10  owns our desktops would arrive at my office and
11  would go through a series of steps on my computer
12  to re-image it so that it was a fresh computer,
13  so-to-speak.
14          It would remove all of my personal
15  files that I would have stored on there, restore
16  it back to its original configuration and it
17  would be handed off to the next person that
18  needed a computer that came into the agency.
19          And so when people leave the agency, we
20  do not retain their computers in their existing
21  form.  Because it is costs us money to do that.
22  We pay for them per seat.

Page 92

 1          We typically give the office that the
 2  person works in 14 days, if there's anything on
 3  this person's computer you want to get off of it
 4  and retain, do it in the next 14 days.  Because
 5  at that point in time, it's re-imaged, we call it
 6  re-imaging, to its original configuration and we
 7  reuse it.
 8      Q.  The re-imaging removes all of the
 9  documents and information that are stored onto
10  the hard drive itself?
11      A.  That's correct.
12      Q.  Are exceptions ever made for the re-
13  imaging after 14 days?
14      A.  Yes.
15      Q.  What instances are exceptions made?
16      A.  An office may have not gotten to get
17  what they needed off the hard drive and may ask
18  to retain it for a little bit longer.  Quite
19  honestly, there are instances where there is a
20  legal action that we are asked to retain computer
21  systems in their format for a period of time,
22  until the litigation is settled or we're given

Page 93

 1  the okay to re-image the computers.
 2          And there are circumstance like that.
 3  For the most part, it's the timing.  The manager
 4  of the person who's gone may have been on
 5  vacation, didn't get a chance to get to it, and
 6  they ask us to retain it for a little bit longer.
 7  That's usually what we do.
 8      Q.  Tell me about the circumstances
 9  surrounding when a computer is not re-imaged due
10  to pending legal action?
11          THE WITNESS:  You're going to have to
12  tell me if I cross the line here.  I can use a
13  real example?
14          MS. MARTINEZ:  What was your question?
15          MS. RAMSEY:  Tell me the circumstances
16  surrounding when a computer is not re-imaged due
17  to pending legal action.
18          MS. MARTINEZ:  You want a specific
19  example?
20          MS. RAMSEY:  I'd start off with a
21  general example.
22          MS. MARTINEZ:  Is there a general rule?

24 (Pages 90 to 93)

762b1f4d-aaec-4471-a08f-4e61a3217d81

Page 106

1  circumstances surrounding when Rubin Shaw's
2  computer was held back from being re-imaged?
3      A.  Very similar to the one I described for
4  Mr. Scully.  Just a phone call asking to retain
5  his computer from being re-imaged, which I did.
6  And I recall someone doing a forensics check on
7  it.  I honestly don't remember who at this point.
8  And then being given it back and told it was okay
9  to re-image.
10     Q.  Do you recall when you received that
11 phone call?
12     A.  That one, I honestly don't.
13     Q.  Did you go and take with you a laptop?
14     A.  I believe Rubin had a laptop as well.
15     Q.  Did you go to -- I assume this happened
16 after Rubin Shaw left?
17     A.  Yeah.
18     Q.  Did you similarly go to Mr. Shaw's
19 office to pick up the laptop?
20     A.  I would not have personally done that.
21 I would have had someone go do that for me.  But,
22 yes, I would have had someone go pick it up and

Page 107

1  bring it back to my office.
2      Q.  Did you store the laptop as you did
3  with Mr. Scully's?
4      A.  Yes, I did.
5      Q.  Do you recall how long you stored that
6  one?
7      A.  That one I honestly don't remember.
8      Q.  Do you have any sense of a time period?
9  Whether it was a year, whether it was a week?
10     A.  I don't.  Honestly, I just don't.
11     Q.  What eventually happened to Mr. Shaw's
12 computer?
13     A.  To the best of my knowledge, it was
14 eventually re-imaged and once again became part
15 of our loaner pool.
16     Q.  I'm not sure whether I asked you this
17 initially.  Do you recall who you received this
18 phone call from to have Mr. Shaw's image pulled
19 from re-imaging?
20     A.  I honestly don't.
21     Q.  So again, if your directions were
22 followed, Mr. Shaw's laptop would have been re-

Page 108

1  imaged?
2      A.  That's correct.
3      Q.  And the third computer that you
4  mentioned was Tom Gustafson?
5      A.  Tom Gustafson.
6      Q.  Tom Gustafson?
7      A.  Now you are confusing me.  Tom
8  Gustafson. Would you like me to spell that name?
9      Q.  Please.
10     A.  G-U-S-T-A-F-S-O-N.
11     Q.  Were there similar circumstances
12 surrounding this request to --
13         MS. MARTINEZ:  Objection to form.
14     Q.  -- to pull Mr. Gustafson's computer?
15         MS. MARTINEZ:  Let me just remind you.
16 When I object to form, you can just go ahead and
17 answer.  The only times that you might not want
18 to answer is when I object based on privilege.
19 And just to remind you, communications with
20 attorneys are privileged communications, so
21 counsel will probably ask you what you did rather
22 than what anybody told you that was an attorney.

Page 109

1         THE WITNESS:  Okay.  I was not
2  personally involved in the Tom Gustafson computer
3  retention.  So I honestly have no knowledge of
4  how, when, where or why.
5      Q.  You are only away that it has been
6  pulled?
7      A.  I was told that it was.
8      Q.  Other than these three individuals, do
9  you recall the names of anyone that has also had
10 their computer pulled to be, to be prevented from
11 re-imaging?
12     A.  No, I'm not.
13     Q.  To your knowledge, do any records exist
14 that would detail what other computers have been
15 pulled?
16     A.  Typically -- I'm going to answer this
17 as best as I possibly can, so bear with me a
18 second.  Typically we have moved away from the
19 action of becoming intimately involved, federal
20 employees become intimately involved in
21 forensics' activities.  As I described earlier, we
22 consider this forensics' activities.

Page 222

 1        I also asked some questions about what
 2   was available, what data was available from an e-
 3   mail and LAN perspective and what data was not.
 4        Q.  Did they produce to you any hard copy
 5   documents?
 6        A.  I do believe I have a couple of e-mail
 7   documents that transmit information you see on a
 8   spread sheet we handed out this morning as well
 9   as about a page of information about our back-ups
10   and what happens when people leave, et cetera.
11        Q.  Did you provide to Lockheed Martin the
12   list of the 34 names that are identified in the
13   Amended Notice of Deposition?
14            MS. MARTINEZ:  It's 33.
15            MS. RAMSEY:  Is it 33?  I keep saying
16   35.
17            MS. MARTINEZ:  I'm sorry.  I believe
18   it's 33.  God willing, I'm not wrong.  It's just
19   that I have counted them a number of times and I
20   think it is 33.
21            MS. RAMSEY:  It is 33.  Let's start
22   that again.

Page 223

 1   BY MS. RAMSEY:
 2        Q.  Did you provide the 33 names of
 3   individuals that are listed in the Amended Notice
 4   of Deposition to Lockheed Martin?
 5        A.  No, I did not.
 6        Q.  Why did you not provide them to them?
 7        A.  I wasn't sure -- I take that back a
 8   step.  Of the 33 names, only five people still
 9   work here.  So my conversations with Lockheed
10   Martin -- my first conversations were around what
11   happens when people leave.
12        Q.  What did they tell you?
13        A.  And what they told me was for e-mail we
14   basically, with the department, working with
15   them, we basically change the e-mail address,
16   which is for all intents and purposes the user
17   identifier in the e-mail system, so that it's not
18   visible in the address book any longer.  The data
19   stays on the e-mail system for approximately 30
20   days which allows the component that the person
21   worked in to have time to go get what they need
22   out of that person's account, print it out, store

Page 224

 1   it electronically, do whatever they need to do,
 2   and then at the end of 30 days that e-mail
 3   account is deleted along with the data associated
 4   with it.
 5        Q.  Is it your testimony today that there
 6   is not a single e-mail which exists for the
 7   former employees of CMS listed on this deposition
 8   notice?
 9            MS. MARTINEZ:  Objection as to form.
10        A.  It is my testimony today that there are
11   not e-mail accounts for the former CMS employees
12   on this list that CMS or Lockheed Martin could go
13   back to look for e-mails.
14        Q.  Is there any way at all to retrieve e-
15   mails for the former employees which are provided
16   on this list?
17            MS. MARTINEZ:  Objection as to form.
18        A.  There is no electronic way to retrieve
19   e-mail for former employees on this list.
20        Q.  Other than the five individuals listed
21   on your chart, no electronic e-mails have been
22   retained for the other individuals listed on the

Page 225

 1   Amended Notice of Deposition?
 2            MS. MARTINEZ:  Objection as to form.
 3        A.  As I've stated earlier, when an
 4   employee leaves the agency, the component they
 5   worked in has the opportunity to go into their e-
 6   mail and remove data from it in the form of a
 7   hard copy that is filed as a paper copy, stored
 8   on some other storage media, moved into another
 9   employee's e-mail account.  I would not have
10   knowledge of that.  It would be pretty hard to
11   find that electronically.
12        Q.  Have any of the 28 other employees
13   provided on the Amended Notice of Deposition left
14   CMS since 1995?
15        A.  I would have to take a look at the list
16   again.
17            MS. MARTINEZ:  You mean to the extent
18   that she personally can recall other people's
19   employment histories?  It's going to be limited
20   by her memory.
21        A.  It's definitely going to be limited by
22   my memory.  Some people I worked closely with, so

57 (Pages 222 to 225)

Bowen, Marianne                                                June 5, 2007
Baltimore, MD

Page 226

1  I was aware of when they came and went.  Some
2  people I did not work so closely with, so I'm not
3  going to be as aware.
4       I would say there are people on this
5  list who have left since 1995.
6    Q.  What about 2003?
7    A.  Since 2003?  Well, Tom Scully is on the
8  list.  I would say that at least one person has
9  left since 2003, simply because Tom Scully is on
10 there.
11   Q.  And he was a former administrator of
12 CMS?
13   A.  He was a former administrator.
14      MS. MARTINEZ:  And I believe Gustafson.
15   A.  And Gustafson, of course, when this
16 started Tom Gustafson was still employed.
17   Q.  Anyone that has left since 2004?
18   A.  Tom Gustafson.
19   Q.  2006?
20   A.  Tom Gustafson.
21      MS. MARTINEZ:  Tom Gustafson.
22   A.  Tom Gustafson.  Just don't know.

Page 227

1    Q.  Have there been any efforts to preserve
2  the e-mails of these former employees of CMS?
3    A.  Well, I think, as I've said --
4    Q.  In their electronic format?
5    A.  In their electronic format.  Let me
6  take a step back and I will directly answer that
7  question.  CMS has always contended from the
8  inception of e-mail at CMS that important
9  documents, documents that need to be retained,
10 should be printed out in hard copy and maintained
11 according to our retention policy.
12      From the electronic format, we, from
13 the technology side of the house, have given the
14 offices that these folks worked in every
15 opportunity to retain anything in their e-mail or
16 on their LAN drive electronically if they felt
17 they needed to do that and did not delete their
18 e-mail or their LAN accounts without a notice of
19 reasonable amount of time to retrieve anything
20 they wanted or print it out.
21      And it was only after there was fair
22 warning and, you know, absolute opportunity to

Page 228

1  retrieve anything electronically, were these
2  accounts deleted.  It was not a case of, they're
3  gone, let's get rid of them.  It was always a
4  case for every individual, whether they're a mail
5  clerk or an administrator, everyone gets the same
6  consideration.
7    Q.  The administrator gets the same
8  consideration as a mail clerk?
9    A.  Yeah.
10   Q.  To your knowledge, has CMS made any
11 efforts to preserve the electronic documents and
12 e-mails of the individuals listed on this notice
13 other than encouraging the individuals to save
14 their e-mails?
15      MS. MARTINEZ:  You're covering all 33,
16 including the current?
17      MS. RAMSEY:  We will start with the
18 former.
19   A.  With the formers?  I honestly, I have
20 not been part of that.  If they have attempted to
21 retain the e-mails, I've not been part of it.
22   Q.  In your preparation for today's

Page 229

1  deposition you would have become aware of it had
2  CMS retained these e-mails; correct?
3    A.  Yes.  I believe I would.
4       MS. MARTINEZ:  Objection as to form.
5  They may have been retained in all kinds of
6  places, she has repeatedly testified.  Not just -
7  - anyway, her testimony speaks for itself.
8    A.  I believe if they had been retained
9  electronically in a format that was intended to
10 preserve the e-mails and have them associated
11 with the former employees on this list
12 electronically, I would have, I would will have
13 seen that.
14   Q.  You did not find any electronic e-mails
15 listed for the 28 former employees listed in the
16 Amended Notice of Deposition?
17   A.  There were no e-mail accounts for the
18 28 former employees in this deposition.
19   Q.  Would the electronic e-mails be
20 anywhere else other than in the e-mail accounts?
21   A.  As I said earlier, the electronic e-
22 mails, if the components chose to retain them

58 (Pages 226 to 229)

Bowen, Marianne                                          June 5, 2007
                         Baltimore, MD

Page 238

1  not.  I'm not even aware of what Tom would have
2  had in his e-mail or on his LAN drive or on his
3  hard drive for that matter.  I'm just not aware.
4      Q.  You learned in the course of preparing
5  for today's deposition that at least, that Mr.
6  Gustafson's hard drive had been preserved?
7      A.  That's correct.
8      Q.  Did you make any similar inquiries as
9  to whether any individual's electronic documents
10 had been pulled?
11         MS. MARTINEZ:  Objection as to form.
12     A.  I'm not sure I completely understand.
13 I'm sorry.
14     Q.  Oh, no.  No.  No.
15     A.  If -- I was made aware that Tom
16 Gustafson's hard drive, actually I believe his
17 whole computer was pulled and was I aware of
18 anyone else's electronic --
19     Q.  I'm wondering whether any efforts have
20 been made, to which you are aware, to pull and
21 preserve the electronic files and e-mails for the
22 28 people, former employees listed in this

Page 239

1  Amended Notice?
2      A.  Okay.  I think what I'm hearing, I
3  apologize if I'm being dense, I'm tired.  I think
4  what I'm hearing is:  Did I, in my preparation,
5  make any effort to do a search of the e-mail and
6  LAN systems to see if there was anything left
7  from these 28 folks electronically?
8      Q.  That's one part of my question.  We can
9  start there.
10     A.  The answer to that is no.  I did not
11 make that effort.
12     Q.  You did not search for --
13     A.  I did not do a search.
14     Q.  Did you rely on the searches performed
15 by Lockheed Martin?
16         MS. MARTINEZ:  Objection as to form.
17     A.  My -- what I relied on was Lockheed
18 Martin's response to me about what happens when
19 someone leaves the agency and what we do with
20 their electronic data.
21     Q.  So they told you that their electronic
22 documents and data for the 28 former employees

Page 240

1  has been destroyed?
2          MS. MARTINEZ:  Objection as to form.
3      A.  It has been, it has not been destroyed.
4  I don't like to use these terms.  Their data,
5  their accounts were deleted after the appropriate
6  amount of time that the agency's policies support
7  for retaining e-mail and LAN accounts for
8  employees who leave the agency.
9      Q.  Are you aware of any special measures
10 that were taken for these 28 former employees?
11         MS. MARTINEZ:  Objection; asked and
12 answered.  I think several times.  Asked and
13 answered.  You can answer again.
14     A.  Okay.  I think I've spoken about Tom
15 Scully and told you that I did receive a phone
16 call asking to have his laptop, his Sony Vaio
17 maintained for about a six month period of time.
18 And as for the other folks on the list, with the
19 exception of Tom Gustafson, who I see falling in
20 another category, I am not aware of anyone else
21 who was a former employee of any of their
22 hardware or e-mail accounts being pulled to

Page 241

1  retain for electronic discovery.
2      Q.  And this would include electronic
3  documents stored on the LAN drives as well?
4      A.  This would include electronic documents
5  stored on the LAN drives.
6          MS. MARTINEZ:  Before you shift to
7  another subject --
8          MS. RAMSEY:  Would you like a break?
9          MS. MARTINEZ:  No.  I want to make sure
10 you are satisfied with that answer and that
11 question so we don't ask it ten more times.  I'm
12 sorry to be affirmative on that, but it's getting
13 tiring, it's just -- I do feel like I've heard it
14 a few times, you might have said it in a
15 different way.  And just please try to just focus
16 and look at your question and answer and see if
17 you're happy with it.
18 BY MS. RAMSEY:
19     Q.  Ms. Bowen, I'm not trying to wear you
20 down.  I'm just bad on the technology aspect of
21 things.
22         MS. RAMSEY:  Do we want to go ahead and

                                    61 (Pages 238 to 241)