# Exhibit X

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                )
ex rel. Ven-A-Care of the                )
Florida Keys, Inc.,                      )        Case No. 95-1354-Civ-Kehoe
                                         )
        Plaintiffs,                      )
                                         )
                                         )    **UNITED STATES' UNOPPOSED**
        v.                               )    **APPLICATION FOR EXTENSION OF**
                                         )    **TIME TO ELECT WHETHER TO**
                                         )    **INTERVENE IN QUI TAM ACTION**
                                         )    **AND MEMORANDUM OF LAW**
Abbott Laboratories;                     )
                      et al.,            )
                                         )
        Defendants.                      )
_____)


        The United States, pursuant to 31 U.S.C. § 3730(b)(3), presents to this Court, ex parte

and under seal, this application for an extension of time of one hundred fifty (150) days up to and

including April 23, 1999, in which to notify the Court of its decision whether to intervene in the

above-captioned False Claims Act qui tam action, during which the Complaint and all other

related filings shall remain under seal.[1]

_____

[1] *The Legal Authority supporting the proposed extension is set forth in the Government's
Memorandum accompanying its First Application for an Extension of Time.  Rather than
reiterating the same points, the Government respectfully refers the Court to this previously
submitted memorandum.*

11/17/98

ABT008-1061

Since counsel for the United States appeared before the Court in March 1998, the United States has been diligently investigating the allegations set forth in the relator's Second Amended Complaint, filed in August 1997.  Twenty-four defendants and two other subpoenaed non-parties have continued to provide documents over the course of the past several months.  Counsel for the United States has pressed defendants to state that all responsive documents have been produced yet defendants continue to produce additional documents.  The United States has also incurred considerable expense creating an electronic database for storage and review of the thousands of documents.

As set forth in the Declaration of T. Reed Stephens ("Stephens Declaration") accompanying the instant application, the United States has pursued a non-stop agenda of meetings and telephone conferences with numerous parties in an effort to meet the November 23rd intervention deadline.  The meetings with the defendants and the state Medicaid entities described herein were authorized by the orders partially lifting the seal on the *qui tam* complaint.  Nine face-to-face meetings lasting hours in duration each have been conducted with defense counsel.  Many other meetings in at least five states have taken place among counsel for the United States and the representatives of the 47 state Medicaid Fraud Control Units actively participating in the assessment of this *qui tam* matter.  See Stephens Declaration and Declaration of Carolyn McElroy, Director Maryland Medicaid Fraud Control Unit, accompanying the instant Application for Extension of Time.

Despite this activity, plaintiff's counsel has been able to meet, to date, with counsel for only ten of the 24 defendants.  The first sixty days of the requested extension will permit counsel for the United States to have initial substantive meetings with the remaining 14 defendants and

- 2 -

ABT008-1062

continue to meet with counsel for the first ten.  The final 90 days of the requested extension will be devoted to completing any settlement negotiations.  Thus far, plaintiff is engaged in earnest settlement talks with one of the defendants.

Counsel for the United States has kept the relator's representatives actively involved in the investigation so there would be no question from relator's perspective as to whether the United States has been "dragging its feet" over these past months.  Relator agrees that the five month extension will allow the United States and the State representatives to complete its investigation.

In addition to the reasons set forth in the Stephens Declaration, additional good cause exists for the five month extension.  As set forth in the accompanying Declaration of David Honig, Assistant Attorney General for the State of Florida ("The Honig Declaration"), the State of Florida has been

## CONCLUSION

For the foregoing reasons and those set forth in the accompanying declarations, plaintiff

- 3 -

respectfully requests that the Court grant the instant request for a five month (150) extension of

time in which to elect to intervene — during which this qui tam matter will remain under seal.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By:  _____
MARK A. LAVINE
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
(305) 961-9303 Tel.
(305) 536-4101 Fax
Fla. Bar No. 648876

By:  _____
MICHAEL F. HERTZ
JOYCE R. BRANDA
T. REED STEPHENS
GEORGE VITELLI
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 307-0404

November 17, 1998

- 4 -

ABT008-1064

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY certified that a true and correct copy of the foregoing Motion for

Extension of Time (without the attached declarations) was mailed this _17th_ day of November,

1998 to:

Atlee Wampler, III
James J. Breen
Wampler, Buchanan and Breen
777 Brickell Ave.
Miami, FL  33131


_____
ASSISTANT UNITED STATES ATTORNEY

- 5 -

ABT008-1065

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                )
ex rel. Ven-A-Care of the                )
Florida Keys, Inc.,                      )        Case No. 95-1354-Civ-Kehoe
                                         )
                    Plaintiffs,          )        **DECLARATION OF T. REED**
                                         )        **STEPHENS IN SUPPORT OF**
                                         )        **UNITED STATES' UNOPPOSED**
                    v.                   )        **APPLICATION FOR EXTENSION OF**
                                         )        **TIME TO ELECT WHETHER TO**
                                         )        **INTERVENE IN QUI TAM ACTION**
Abbott Laboratories; ▨                   )
▨ et al.,                                )
                                         )
                    Defendants.          )
_____ )

I, T. Reed Stephens, do state and declare as follows:

    1. I am a trial attorney in the Commercial Litigation Branch, Civil Division in the United

States Department of Justice, and I am assigned primary responsibility for the above-captioned

qui tam litigation. I make the instant declaration in support of the United States' Application for

an Extension of Time to Elect to Intervene in the above-captioned litigation.

    2. This case is a qui tam action against numerous pharmaceutical manufacturers —

▨ Dey Labs., Glaxo Wellcome Inc.,

Bayer, Inc., ▨

▨ SmithKline Beacham, Inc., ▨

▨

▨ — initiated by relator Ven-A-Care of the Florida Keys, Inc.

("relator"), pursuant to the False Claims Act, as amended, 31 U.S.C. § 3730(b).

ABT008-1066

3. Relator is a provider of a broad class of specialty drugs that generally cannot be purchased over the counter by the public. These drugs which are not orally administered are often used to treat life-threatening or terminal illnesses, such as AIDS, cancer, and hemophilia. These drugs are typically administered by an injection, IV infusion, or by inhalation.

4. Relator alleges in its complaint that the defendant drug manufacturers inflate the reported prices of the drugs so that government payors, such as Medicare, Medicaid, and TRICARE, pay fraudulently inflated reimbursement to providers who buy these drugs and, in turn, supply them to patients suffering from these serious illnesses. The defendant drug manufacturers' alleged incentive for carrying on this scheme is to attract providers to purchase their drugs. Even though the provider — not the manufacturer — receives the inflated reimbursement payment from the government, the manufacturer benefits greatly through increased profit caused by increases in market share for its drugs.

5. Relator alleges that defendants are able to influence drug brand purchases by providers because they control the basis for Medicare and Medicaid reimbursement for its products -- the reported price. The relator alleges that reported prices for Medicaid and Medicare drugs come in two classes: Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC"). The defendant drug manufacturers allegedly determine -- without any government or private insurance input -- what the AWP and WAC will be for their respective products.

6. In March 1998, the United States and relator came before the Court to request additional time to investigate this matter and pursue settlement negotiations with the defendants. Counsel for the United States identified numerous investigative tasks that the United States would pursue over the course of the extension period. In response, the Court extended the time

- 2 -

ABT008-1067

to make an intervention election until November 23, 1998. During this most recent extension period, the United States has performed virtually all of the tasks which it identified for the Court during the March 1998 hearing. The one task of that list not yet completed is the conducting of meetings with counsel for all 23 defendants. The following is a recitation of a portion of plaintiff's activities since the hearing in March.

7. On March 19 and 20, 1998, counsel for the United States and Relator addressed the National Association of Medicaid Fraud Control Unit Directors during its annual meeting in Washington, D.C. At this time, the United States and Relator shared hundreds of pages of documents with the NAMFCU members who have responsibility for assessing Medicaid fraud allegations affecting their respective states. The membership of NAMFCU has been instrumental in past False Claims Act matters involving multiple jurisdictions because of its ability to efficiently obtain data on potential damages, identify witnesses on the state level, obtain authority to compromise claims or initiate civil actions. In the instant qui tam, which involves 24 defendants, NAMFCU's ongoing participation is necessary to facilitate the orderly resolution or litigation of this matter.

8. The United States sought and obtained from the Department of Health and Human Services Office of Inspector General ("HHS-OIG") additional subpoenas which were served in July 1998 upon the Hearst Corporation (controlling entity for First DataBank and Medi-Span) and Medical Economics (controlling entity for the RedBook), the two entities that the defendants utilize to publish the allegedly false prices to the state and federal governments. First DataBank has cooperated to some extent with the subpoena. Medical Economics has delayed compliance with the subpoena served upon it.

- 3 -

ABT008-1068

9. Throughout May, June, and July, Counsel for the United States maintained a steady line of communication with the directors of the Medicaid Fraud Control Units of over a dozen states including Florida, Arizona, North Carolina, Maryland, Washington state, Rhode Island, and Illinois, as well as the Medicaid pharmacy personnel in many of these states. These communications were coordinated by NAMFCU. The United States has also committed substantial financial resources to creating electronic document storage and review databases for the tens of thousands of pages of documents produced by the defendants pursuant to the subpoenas served upon them by HHS-OIG.

10. Counsel for the United States entered into an informal working relationship with the Executive Committee of NAMFCU in order to facilitate the identification of witnesses and evidence relevant to the allegations. This work has enabled the United States and the Relator to organize a substantial amount of information as a prelude to substantive discussions with the defendants. In particular, the NAMFCU representatives have been gathering from all 50 states the specific pieces of information relating to the allegedly fraudulent reimbursement claims submitted by the providers who purchased defendants' drugs. See Declaration of Carolyn McElroy, Director Maryland Medicaid Fraud Control Unit, Accompanying the Motion for Extension of Time. This activity continues to the present and is vital to the efficient resolution of this qui tam matter since the allegations include all 50 states as well as the federal Medicare program.

11. In July 1998, counsel for the United States initiated contacts with the defendants' counsel regarding the evidence produced by the defendants. Counsel for the United States conducted telephone conferences with counsel for one of the defendants during the weeks of July

- 4 -

ABT008-1069

13th and the 20th.

12. In August 1998, counsel for the United States initiated the first of a series of telephone conferences with counsel for Medical Economics in an effort to obtain its good faith compliance with the subpoena served upon it. To date, Medical Economics has produced only one document in response to the subpoena. Also during August, during the week of August 10th, counsel for the United States conducted a telephone conference with counsel for another defendant.

13. On September 1, 1998, counsel for the United States met with Relator and its counsel in Miami, Florida to review documents produced by defendants and to prepare for the first settlement conference with one of the defendants.

14. On September 10, 1998, counsel for the United States and Relator and its counsel met with representatives of the state of Illinois in Chicago, Illinois, to obtain additional assistance in gathering evidence regarding the qui tam matter.

15. On September 16, 1998, counsel for the United States, for the Department of Health and Human Services, and for the States of Maryland and Washington (representing all 47 members of NAMFCU) conducted a five hour settlement conference with counsel for one of the defendants in Washington, D.C. The meeting yielded sufficient progress to warrant scheduling a second meeting for the following week.

16. On September 14, 1998, counsel for the United States and the Department of Health and Human Services Office of Inspector General again attempted to negotiate Medical Economics' compliance with the OIG subpoena served upon it.

17. During the week of September 14th, counsel for the United States also initiated

- 5 -

discussions with the Food and Drug Administration regarding evidence regarding the subject of the September 14th settlement conference.

18.   On September 24th, a second settlement conference was conducted with counsel for the defendant with whom lengthy discussions were held on September 16th.

19.   On October 8, 1998, counsel for the United States met with counsel for a different defendant in Miami, Florida to discuss the qui tam allegations.  In addition, to presenting its initial responses to the allegations, defense counsel inquired as to how much time was available to it before the qui tam intervention deadline.

20.   On October 14, 1998, counsel for the United States, for the HHS-OIG, and NAMFCU met with counsel for a third defendant in Washington, D.C. to discuss the qui tam allegations against it.  Defense counsel also inquired about the intervention deadline and its opportunity to rebut the evidence.

21.   On October 19, 1998, Relator and its counsel traveled to San Diego, California to share information with representatives of the state of California.  Counsel for the United States participated in the first day of the meeting by telephone.  The meeting resulted in additional cooperation and assistance being pledged by the state of California.

22.   On October 20, 1998, counsel for the United States met again with counsel for the second defendant in Washington, D.C. to hear defense counsel's partial rebuttal of the evidence. Defense counsel also disclosed that it had hundreds of pages in its possession that it was now prepared to turn over to the United States.

23.   After meeting with Defense Contract Audit Agency and Defense Criminal Investigative Service representatives in Miami, Florida on October 21, 1998, counsel for the

- 6 -

ABT008-1071

United States returned to Washington, D.C. to meet again with the second defendant's counsel on October 23, 1998. At that time, counsel for the United States reviewed several hundred pages of newly produced documents relevant to the qui tam allegations.

24. During the week of October 19, 1998, counsel for the United States contacted counsel for a fourth defendant to discuss the qui tam allegations. Defense counsel stated that it would review its records and formulate a response to the evidence and the allegations. Defendant has, to date, not offered any formal rebuttal to the evidence.

25. On October 28, 1998, counsel for the United States, for the HHS-OIG met with counsel for a fifth defendant in Washington, D.C. to discuss the qui tam allegations for three hours. Despite having had months to interview company employees and review its own records, defense counsel professed to having no actual knowledge of its client's potential responses to the evidence presented by the United States at this meeting. Defense counsel inquired about the intervention deadline however.

26. On October 30, 1998, counsel for the United States and for the HHS-OIG conducted a telephone conference with a law firm that represents five other defendants in this matter. Counsel for the United States expressed concern regarding the possible conflict of interest in the multiple representations then disclosed the qui tam allegations to defense counsel. Defense counsel, in this instance as well, professed ignorance as to what factual responses its five clients would have to the evidence presented despite having had an open line of communication to counsel for the United States since the service of the HHS-OIG subpoenas in October 1997.

27. On November 4, 1998, counsel for the United States and Relator and its counsel met with representatives of the Office of Attorney General of the State of New York in New York

- 7 -

ABT008-1072

City to obtain specific additional assistance and cooperation in investigating the qui tam allegations.

28.  In addition, on November 4, 1998, counsel for the United States met again with counsel for the first defendant in New York, New York.  At that time, defense counsel presented a second settlement proposal that may successfully address not only the financial issues but also may provide a regulatory blueprint for resolving the regulatory issues raised by the qui tam litigation.  Additional meetings are necessary, and defense counsel have asserted that their client has yet to work out all settlement issues internally.

29.  On November 4, 1998, counsel for the United States interviewed a key employee of a non-party drug manufacturer to learn how that company's drug pricing practices differed from the defendant drug manufacturers.

30.  On November 10, 1998, counsel for the United States, HHS-OIG, and NAMFCU met with counsel for the third defendant in order to receive from defendant a more detailed presentation of its defenses.  Despite this presentation, the third defendant has yet to make available any witnesses for interview in support of its purported defenses.  At this meeting, counsel requested an additional meeting during the week of November 23rd.  The meeting has since been confirmed

31.  On November 12, 1998, counsel for the United States and for HHS-OIG met with counsel for the fifth defendant in Washington, D.C. to discuss in further detail the qui tam allegations.  Although counsel for the United States first spoke to the defendant's in-house counsel three weeks prior to the meeting date, defense counsel was unable to provide any information to the United States regarding the evidence or identities of witnesses who could

- 8 -

ABT008-1073

potentially support defendant's defense theories.  At the end of the meeting, defense counsel specifically stated that it would support the United States' request for an extension of the seal.

32.  On November 13, 1998, counsel for the United States and NAMFCU representatives met with counsel for First DataBank, a subpoenaed non-party, in New York City.  The purpose of the meeting was to obtain press for further compliance with the HHS-OIG subpoena and obtain an explanation of how First DataBank goes about obtaining the pricing information that it publishes to the public on behalf of the defendants.

33.  Counsel for the second defendant has scheduled a meeting with Counsel for the United States on November 17th because of concerns that it will not have the opportunity to make a full rebuttal presentation prior to the intervention deadline.

34.  In all, Counsel for the United States has conducted in the past 60 days alone nine face-to-face meetings with counsel for five of the defendants.  Two additional meetings are currently scheduled within the next ten days.  In addition, Counsel for the United States conducted a three hour conference call with the law firm representing five other defendants and a face-to-face meeting with a crucial subpoenaed non-party.  The Civil Division's policy is generally to afford a defendant an opportunity to be apprized of the False Claims Act allegations and make a substantive response before the government makes its election to intervene in a matter such as this.  To date, the defendants have insisted mostly on face-to-face meetings with Counsel for the United States.  The sheer volume of defendants has, however, made it impossible for Counsel for the United States — despite its best efforts — to give a meaningful opportunity to each of the 23 defendants.  Additional time is needed to complete this process which will allow all parties to fully frame the legal and factual issues.  There are several tasks that the Counsel for

- 9 -

ABT008-1074

the United States will perform by April 1999 if the Court grants the instant unopposed request for extension.

35. The United States will (1) continue its settlement negotiations with defendants who have communicated good faith offers of settlement, (2) continue to pursue opportunities to interview the witnesses represented by the various defense counsel and witnesses employed by non-parties, First DataBank and Medical Economics, (3) continue to meet with each defendant's counsel so that the defendant can be fully informed of the qui tam allegations and be given a reasonable time in which to respond to the evidence and the allegations. At the current rate of nearly one meeting per week, we will have an opportunity to conduct at least one substantive meeting with each defendant by mid-January. The remaining 90 days of the 150 period is intended to provide time for follow-up communications of a substantive nature between the parties. These follow-up communications include the witness interviews referenced above as well as the settlement negotiations.

36. To date, no defendant has expressed any reservations regarding the continuance of the seal. To the contrary, the defendants — rather than asserting prejudice at the continuance — have, instead, suggested that they need additional time to rebut the allegations prior to the November 1998 intervention deadline. This circumstance has been caused primarily by the number of defendants (several of which were named for the first time when the qui tam complaint was amended in August 1997) named by the relator.

37. The United States and the various state Medicaid programs are also continuing to work on efforts to mitigate further the damages caused by the alleged scheme to defraud the state and federal healthcare programs. For example, the current settlement negotiations have led to at

- 10 -

ABT008-1075

least one proposal from a defendant that could allow for substantial mitigation of damages for certain drugs identified in the complaint.  Further, the McElroy Affidavit gives additional information on the state level efforts to achieve regulatory changes — with the assistance of defendants — that mitigate the damages.  The lifting of the seal at this time could result in a lost opportunity that likely would not be available during the first several months of the litigation.

38.  I have discussed the instant extension request with counsel for relator.  Relator does not object to the request for a 150 day extension.

I declare under penalty of perjury that the foregoing is true and correct.

T. Reed Stephens

Dated: November 16, 1998

- 11 -

ABT008-1076

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

UNITED STATES OF AMERICA                    *
Ex Rel
                                            •
    **VEN-A-CARE OF THE**
    **FLORIDA KEYS, INC.**                   •
    a Florida Corporation,
    by and through its principal              *
    officers and directors,
    **ZACHARY T. BENTLEY and**                 *
    **T. MARK JONES,**
                                            *
        **Plaintiff,**
                                            *

**v.**                                      **CIVIL ACTION NO. 95-1354-CIV-MARCUS**
                                            *
**ABBOTT LABORATORIES;**                    **FILED IN CAMERA AND UNDER SEAL**
                                            •
                                            **SECOND AMENDED COMPLAINT**
                                            *
**BAYER CORPORATION f/k/a MILES, INC.;**    *   **For Money Damages and Civil**
                                            **Penalties under the False Claims Act**
                                            *   **31 U.S.C. §§3729-3732**
                                            •
                                            *
**DEY LABORATORIES;**
                                            *
                                            *
**GLAXO WELLCOME, INC.;**
                                            *
                                            *
                                            *
                                            *
                                            *
                                            *
**SMITHKLINE BEECHAM**
**CORPORATION;**                            •

ABT008-1077

CIVIL ACTION NO. 95-1354-CIV-MARCUS

*

*

*

*

**Defendants**                    *

ABT008-1078

## AFFIDAVIT IN SUPPORT OF EXTENDING SEAL

The National Association of Medicaid Fraud Control Units (NAMFCU), by Maryland

Assistant Attorney General Carolyn J. McElroy, joins the United States Department of Justice in

asking the Court to extend the seal on this case for an additional 150 days, and provides this

Affidavit in support of the request.

1. This case involves allegations that the defendant pharmaceutical manufacturers caused

falsely inflated claims to be submitted to the Medicaid programs for reimbursement. The case has

been unsealed as to the 47 state Medicaid Fraud Control Units (MFCUs) and the 50 state

Medicaid programs. Your Affiant is a member of the team of attorneys designated to represent

the 47 states with Medicaid Fraud Control Units in connection with the investigation and litigation

of this case. Medicaid Fraud Control Units are federally subsidized law enforcement units

established to investigate and prosecute fraud in the Medicaid programs.

2. Attorneys from the Department of Justice, and the relators and their counsel, made a

presentation to the NAMFCU Directors in March, 1998. At that time, the Directors were

provided with a copy of the Second Amended complaint, and educated as to the evidence

developed by the relators and the federal government. Following the presentation, NAMFCU

appointed a team to lead and coordinate the efforts of the individual states in connection with the

litigation.

3. In April, 1998, the team asked the 47 MFCUs to collect utilization data for

approximately 350 pharmaceutical products for five years' time. The information collected by the

MFCUs establishes the number of units reimbursed, and amount of money paid by each of the

ABT008-1079

state Medicaid programs, for each of the products that are the subject of this suit. As such, the information is crucial in showing usage trends and in calculating the losses suffered by the programs.

4. Collecting the utilization data is always difficult and time consuming in cases involving a large number of states. The Medicaid programs, or their fiscal intermediaries, must separate the data for the claims at issue from millions of Medicaid claims. In addition, the states have different formats for keeping and managing the claims information. Once collected, the information has to be integrated into a single table or computer file for use by the team. The team in this case has collected utilization data from 40 of the 47 states and integrated it into a single data base at this writing and is continuing to work on getting data from the remaining states. The states have also collected evidence of the defendants' statements and representations to the Medicaid programs with respect to their products' pricing, and have investigated the details of the states' various reimbursement methodologies.

5. The NAMFCU team has participated in the settlement negotiations with attorneys from the Department of Justice and the Department of Health and Human Services, describing the issues and processes from the states' perspective. Given the rapid and encouraging progress in the negotiations with one of the defendant manufacturers, the state team has begun working on implementing corrective pricing and other compliance-related issues. Because the states' fee schedules are calculated by reference to different sources and "caps," and because the means of adjusting pricing caps differs among states, the task is complex. The team has not yet completed the work that is needed to support the settlement structure.

6. The MFCU team is also researching issues related to supporting and if necessary, joining any litigation that may ensue in Florida. The states' may need to establish a process to

ABT008-1080

coordinate separate state litigation to protect issues related to the state-funded share of the Medicaid program.  To the best of the knowledge of the team, this is the first time these issues have been addressed.

7. The MFCU team is working on the investigation and believes that the requested extension of time would allow the states to complete the work necessary to support the ongoing settlement efforts, to collect the evidence needed to fully evaluate the qui tam complaint and the harm to the Medicaid program, and to evaluate the issues and procedures related to the states' direct and indirect interest in the case.


I certify that I am over the age of 18 years and have personal knowledge of the contents of this affidavit.  I further certify that the information contained herein is true to the best of my knowledge, information and belief.

CAROLYN J. McELROY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,   )
   )
ex rel.   )
      VEN-A-CARE OF THE   )
      FLORIDA KEYS, INC.,   )
   )
          Plaintiff,   )
v.   )   CASE NO. 95-1354-CIV-KEHOE
   )   Judge Kehoe
ABBOTT LABORATORIES;   )
 ▓▓▓▓▓▓▓▓▓▓   )   FILED IN CAMERA AND UNDER SEAL
et. al.,   )
   )
          Defendants.   )

## DECLARATION OF DAVID B. HONIG
## IN SUPPORT OF THE UNOPPOSED EX-PARTE APPLICATION
## TO EXTEND TIME TO CONSIDER ELECTION TO INTERVENE

I, David B. Honig, hereby declare and state as follows:

1.     I am an Assistant Attorney General for the State of Florida. I am the Chief of the Major Case Bureau of the State of Florida Medicaid Fraud Control Unit.

2.     I have been assigned by the ATTORNEY GENERAL to represent the State of Florida in a *Qui Tam* case filed in Leon County, Florida, THE STATE OF FLORIDA ex rel. VEN-A-CARE OF THE FLORIDA KEYS, INC. a Florida Corporation, v. ABBOTT LABORATORIES; ▓▓▓▓▓▓▓▓▓▓ et. al.

3.     This Cause of Action has been brought pursuant to the Florida False Claims Act, F.S. §§68.081-092.

4.     The State cause of action names the same Defendants as the Federal cause

of action, plus additional Medicaid provider defendants.

5.      The State of Florida cause of action was filed on June 1, 1998, in Leon

County, Florida.

6.      The State of Florida has not yet made a determination of its intention to

intervene.



I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.

Executed this 13 day of November, 1998 at Tallahassee, Florida.

David B. Honig
Assistant Attorney General

DEPARTMENT OF LEGAL AFFAIRS
The Capitol / Plaza 1
Tallahassee, Florida 32399
(850)414-3600

ABT008-1084         L