**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) | MDL NO. 1456 |
| | | CIVIL ACTION:  01-CV-12257-PBS |
| | | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, No. 06-CV-11337-PBS | | Magistrate Judge Marianne B. Bowler |

**ABBOTT LABORATORIES, INC.'S REPLY MEMORANDUM IN
SUPPORT OF ITS RENEWED MOTION TO COMPEL EVIDENCE
<u>WITHHELD UNDER THE DELIBERATIVE PROCESS PRIVILEGE</u>**

**<u>INTRODUCTION</u>**

The Government seeks damages that could reach into the hundreds of millions of dollars, but when asked to turn over evidence and allow witnesses to testify about issues of central importance to this case, it wants to play by different rules.  That is not how litigation or the discovery rules are supposed to work.  "[W]hen the Government seeks affirmative relief, it is fundamentally unfair to allow it to evade discovery of materials that a private plaintiff would have to turn over, thus allowing the government to 'play with defendant's hole card upturned and its hole card down under any claim of governmental or executive privilege.'"  *See EEOC v. Citizens Bank and Trust Co.*, 117 F.R.D. 366, 366 (D. Md. 1987) (quoting *EEOC v. Los Alamos Constructors, Inc.*, 382 F. Supp. 1373, 1383 (D.N.M. 1974)).

The evidence adduced to date demonstrates why discovery relating to the Government's knowledge and decision-making is critical.  It shows that the Government was not fooled into believing that published prices for the products at issue in this case reflected or even approximated the prices at which these products were sold in the marketplace.  To the contrary,

as stated by former CMS Administrator Bruce Vladeck, the Government knew all about large spreads but found it legally and politically difficult to reduce reimbursement:

> Q. [A] HCFA spokesperson gave the following quote, according to the article, to the Chicago Tribune.  "It's very clear, given the way we reimburse physicians, that we're overpaying.  The law requires us to overpay.  There's no flexibility.  That's why we asked to have it reduced."  Is that a fair statement of – of HCFA's position at the time, Dr. Vladeck?
>
> A. Yes.
>
> Q. And HCFA was overpaying because of political considerations that prevented it from changing the law?
>
> * * *
>
> A. I would distinguish two processes.  There are political considerations that, in addition to legal considerations, prevented us from seeking to change the policy administratively.  And then there was political opposition to -- efforts to change the law itself.
>
> Q. And so, it wasn't -- what I'm trying to get at is HCFA wasn't overpaying because it was fooled into believing that what it was paying was actual acquisition costs.  Correct?
>
> * * *
>
> A. We did not believe we were paying actual acquisition costs.

Vladeck Dep. at 381-82 (objections omitted) (excerpts attached as Ex. A).[1]

Although the parties are more than halfway through the fact discovery period in this case, the Government is still withholding key documents and testimony under a privilege that has no place in this case.  Since Abbott's prior briefing on the deliberative process privilege, the Government's assertion of that privilege has taken on an entirely new, and more perverse, dimension in deposition discovery.  The Government's practice of instructing its witnesses not to answer obviously relevant questions can only fairly be described as astonishing when viewed in

---

[1] Dr. Vladeck, the CMS Administrator from May 1993 to September 1997, testified that he knew providers were purchasing sterile supplies such as saline solutions, dextrose, and sterile water—three of the four families of drugs at issue here—at discounts of up to 99%.  *See* Vladeck Dep. at 142-46 (Ex. A).  He knew this because he had read it in *Modern Healthcare* before he became Administrator in 1993.  *Id.*

light of the Government's role in this case and the importance of this case to the overall AWP litigation. While the Government hopes to stack the evidentiary deck in its favor, fairness demands otherwise.

### ARGUMENT

The Government's brief in opposition to Abbott's renewed motion to compel (Dkt. No. 4076) is flawed in three principal respects. *First*, the Government misstates the relevance of the Government's knowledge and deliberations to the fraud-based claims alleged here. *Second*, the Government's brief ignores the very real relevance that the evidence withheld has to this case. *Third*, the Government's application of the balancing test is superficial and incomplete, particularly in light of its abject failure to enunciate any particular harm that would result from disclosure under a protective order. Its lawyer-driven, after-the-fact declarations merely parrot the general purpose of the deliberative process privilege, and are plainly insufficient.[2]

### I. THE GOVERNMENT MISSTATES THE RELEVANCE OF GOVERNMENT KNOWLEDGE AND DELIBERATIONS TO THE CLAIMS PLED HERE.

"Where the adjudication of fraud claims turns upon issues of knowledge, reliance, and causation, direct evidence of the deliberative process is irreplaceable." *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991). This lawsuit is premised on the notion that the federal and state governments were misled into paying "excessive reimbursement" for four families of Abbott products (hereafter, the "Subject Drugs") through the Medicare and Medicaid programs. Compl. ¶ 3. The Government alleges that prices for the Subject Drugs reported in the pricing compendia were "false, fraudulent, and inflated," and that the "Medicare and Medicaid programs relied upon [these prices] to set reimbursement rates for

---

[2] For the reasons set forth in is opening brief (Dkt. No. 3960), Abbott maintains that the Government has waived its right to assert the deliberative process privilege in this case by failing to assert it in the procedurally appropriate manner. From the outset, the Government's actions in asserting the deliberative process privilege here present the exact type of situation that courts have found to be unfortunate, ill-advised, and unpersuasive. *See, e.g.*, *Pacific Gas & Elec. Co. v. U.S.*, 70 Fed. Cl. 128, 136-37 (2006).

Abbott's customers." *Id.* ¶¶ 3, 59-60. The Government further alleges that it "acted in justifiable reliance upon Abbott's misrepresentations," and that it would not have paid for the products at issue "[h]ad the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States." *Id.* ¶¶ 113-14.

The False Claims Act is a fraud statute. *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 227 (1st Cir. 2004) ("We do not agree with [plaintiff] that 'the False Claims Act is not a "fraud" statue' and therefore does not fall within the scope of Rule 9(b)."). To prevail, the Government must show that it was misled or deceived about the prices reported in the compendia for the Subject Drugs.[3] By the same token, if Abbott proves the Government was *not* misled about the Subject Drugs, Abbott must prevail in this case.[4] Even if the Government's knowledge is not itself dispositive in this case, that knowledge—and the Government's reaction to that knowledge—is probative of the Government's true intentions. The Government does not get a free pass to exclude certain elements of its fraud claim—namely,

---

[3] *See United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. (Fla.) 1977) (noting plaintiff in FCA case "must demonstrate that the government was misled by Equifax's application for the reporting business," and concluding "Equifax's application did not make a material misrepresentation, did not mislead the government, and did not defraud the government within the meaning of the False Claims Act"); *United States ex rel. Gudur v. Deloitte Consulting LLP*, No. H-00-1169, 2007 WL 836935, *11 (S.D. Tex. March 15, 2007) ("no violation exists where relevant government officials are informed of the alleged falsity, thus precluding a determination that the government has been deceived"); *United States ex rel. Englund v. Los Angeles County*, No. Civ. S-04-282 LKK/JFM, 2006 WL 3097941, *8 (E.D. Cal. Oct. 31, 2006) (same); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("no violation [of the FCA] exists where the government has not been deceived"), *aff'd*, 168 F.3d 1013 (7th Cir. 1999); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 809 (D. Utah 1988) ("Only if the government gets something less than or different from that which it expected can it be said to have suffered the kind of injury necessary to invoke FCA liability.").

[4] *See United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir.) (if "plaintiff cannot show that the government agency would have acted differently had it known of the omission, 'there is no false claim because [the agency's action] would have occurred regardless of [the defendant's] actions'") (quoting *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563 (8th Cir. 1997)) (alterations in original), *cert. denied*, 126 S. Ct. 797 (2005)); *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) ("Since the [False Claims] Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay."); *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 770 (N.D. Tex. 2003) ("[t]he juxtaposition of the word 'false' with the word 'fraudulent,' plus the meanings of the words comprising the phrase 'false claim,' suggest an improper claim is aimed at extracting money the government otherwise would not have paid") (quoting *Mikes*, 274 F.3d at 696) (internal quotation marks omitted).

justifiable reliance, materiality, and causation—simply because it is the Government. *See, e.g.*, *Am. Heritage Bancorp v. United States*, 56 Fed. Cl. 596, 607 (2003) (government must prove the traditional elements of fraud claim by clear and convincing evidence); *United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 632 (S.D. Ohio 2000) (applying elements of fraud claim to the Government), *aff'd*, 302 F.3d 637 (6th Cir. 2002).

The Government's arguments about the relevance of "government knowledge" are wrong. The Court has already indicated such evidence *is* relevant and should be subjected to the "crucible of trial."[5] The Government has not cited a single case that stands for its proposition that "government knowledge" is relevant *only* to issues of *scienter*. The cases cited by the Government merely discuss how government knowledge may be relevant to *scienter*; they do not hold that such evidence is relevant *exclusively* to that issue. Numerous courts have evaluated the importance of government knowledge and decision-making on core issues in FCA cases, such as reliance, materiality, and causation, and even falsity. *See supra* note 4.

Indeed, the FCA case the Government cites, *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2007 WL 781729 (N.D. Ill. March 13, 2007), discussed issues of reliance, materiality, and causation in detail, and it is clear from the opinion that "government knowledge" evidence *was* featured prominently at trial in ways that had nothing to do with the *scienter* issue. *See id.* at *4 ("The jury heard evidence that [defendant's] promises not to discriminate were material because [defendant] would not have been awarded the contracts without them."). The Government's citation of this Court's opinion in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 478 F. Supp. 2d 164 (D. Mass. 2007), also misses the mark. Judge Saris did not say that government knowledge evidence was relevant only to *scienter*. Rather, the Court stated that whether government knowledge negated the fraud or

---

[5] *See In re Pharm. Indus. Average. Wholesale Price Litig.*, 478 F. Supp. 2d 164, 174-75 (D. Mass. 2007).

falsity element of an FCA claim "presents a difficult legal question" and merely cited a case, *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999), for the proposition that government knowledge of particulars would be required for government knowledge to defeat the fraud or falsity element.  There is no reason to believe this Court disagrees with the numerous decisions recognizing the importance of government-knowledge evidence on issues of reliance, materiality, and causation.  *See supra* notes 3 and 4.  Indeed, the Court's prior comments indicate otherwise.[6]

The Government also argues, without any citation whatsoever, that its reliance on published drug prices was "established by statute and regulation" because "Abbott was obligated to report prices for its drugs that would ensure that published AWPs were consistent with the plain meaning of the regulatory term."  Dkt. No. 4076 at 11.  But as Dr. Vladeck testified, the Medicare statutes and regulations at issue here were addressed to *CMS and its Part B carriers*, not to manufacturers like Abbott.  *See* Vladeck Dep. at 113-14 (Ex. A).  CMS well knew, from numerous sources such as OIG, that AWPs contained in the compendia were "not a reliable indicator of the cost of a drug to physicians" and bore "little resemblance to actual wholesale prices available in the marketplace."[7]  If the Government is suggesting it was justified in using published AWPs because Medicare statutes and regulations *required* it to use those prices, the Government is taking a position precisely counter to its amicus brief.  *See* Dkt. No. 3104 at 15-20.  Whatever its position, the Government's knowledge of whether published AWPs equaled or

---

[6] The Government's citation of *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984), and its language that "[m]en must turn square corners when dealing with the government," is misplaced. *Heckler* does not stand for the proposition that Government-plaintiffs do not have to show justifiable reliance in fraud cases.  The Supreme Court in *Heckler* merely held that the Government was not estopped from recouping overpayments made to a Medicare provider who included employee costs in its cost reports that were already paid by federal grants, even though a Medicare carrier had orally approved the provider's treatment.  *Heckler* did not involve a fraud or FCA claim.

[7] *Physicians' Costs for Chemotherapy Drugs*, CIN A-02-91-01049, at 1 (Nov. 1992) (Ex. B); *Excessive Medicare Payments for Prescription Drugs*, OEI-03-97-00290, at 9 (Dec. 1997) (Ex. C).

approximated actual market prices is directly relevant to whether it justifiably relied upon those prices.

Finally, the Government's position on the limited relevance of government knowledge and deliberations would lead to absurd results. The jury would never hear testimony like that of three former CMS Administrators who testified about the real reasons the Government continued to use published prices, knowing full well that they far exceeded actual acquisition costs. *See* Scully Dep. at 141-42, 173 (Ex. D) (recalling political backlash when the various Presidential administrations tried to reform the AWP system from 1990 through 2003, and noting "politics is politics and that's what drove this issue for 10 years"); DeParle Dep. at 292-94 (Ex. E) (noting that she paid particular attention to concerns raised by physicians' groups regarding the inadequacy of administration fees, and a made a decision not to use revised pricing information for certain drugs based upon those concerns); Vladeck Dep. at 189-90 (Ex. A) ("I had a growing feeling – again, I would put this in a period probably beginning about 1995 through the time I left the government – of frustration that we were significantly overpaying for Part B drugs, and that because of some combination, frankly, of political and legal constraints, we were unable to change it."), 381-82 (quoted *supra* at 2).

In short, what the Government is required to prove, Abbott is entitled to disprove.

## II.    THE EVIDENCE BEING WITHHELD IS CRITICAL TO A FULL AND FAIR RESOLUTION OF THIS CASE.

The Government's broad-based contention that the evidence it is withholding is "collateral" is disingenuous; it has already admitted to asserting the privilege as to *all* documents it believes satisfy the initial criteria for assertion of the privilege. There has been no real consideration of its relevance to Abbott's defense. *See* Letter from D. Torborg to J. Neal (3/20/07) (Ex. F). The Government is not withholding evidence because it is fair, right, or

legally justified.  It is just the Government's policy to withhold all internal deliberations unless and until the Court says otherwise.

Abbott's prior briefing addressed why documents withheld by the Government appear reasonably calculated to lead to the discovery of relevant evidence and should be produced. Since that time, the Government has asserted the privilege to thwart Abbott's deposition questioning into, among others, the following areas critical to a fair resolution of this case:

**Bruce Vladeck – CMS, Administrator, May 1993-September 1997**

- Whether CMS believed AWP actually was an empirically driven average of market prices, and internal discussions on how AWP was an "artificial construct of some sort, rather than a – a true empirical reflection of actual prices in market transactions" (Vladeck Dep. at 149-50, 313-14) (Ex. A);

- Whether CMS should change the reimbursement methodology for Vancomycin when a 1992 OIG report showed the drug had an Estimated Acquisition Cost of $3.45, compared to a median AWP of $19.17 (*id.* at 177-78);

- "Extensive discussion" about alternative methods to using undiscounted AWP for reimbursing drugs (*id.* at 185-89);

- Whether creation of a dispensing fee under Medicare Part B was intended to compensate for lost profits from switching from AWP to a reimbursement model tied to acquisition cost (*id.* at 372); and

- Discussions prior to 1997 concerning the extent of the spreads for generic drugs (*id.* at 498-99).

**Charles Booth – CMS, Director of Office of Payment Policy (1984-1994); Director of the Office of Hospital Policy in the Bureau of Policy Development (1994 -1997)**

- Why HHS choose to incorporate an AWP-based methodology in its 1991 Medicare regulation (Booth Dep. at 176-79) (Ex. G); and

- Why CMS did not increase the "composite rate" for professional services rendered by End-Stage Renal Disease (ESRD) providers, and whether it had anything to do with the profit providers were making on drugs (*id.* at 204-05).[8]

---

[8] The Subject Drugs were used by ESRD providers.  *See* Ex. K, *Cost of Dialysis-Related Drugs*, A-01-91-00526, at 6 (Oct. 1992) (Vancomycin).  After being instructed not to reveal internal CMS deliberations, Mr. Booth testified:  "Then I can only tell you that there were end-stage renal facilities that came to see us and wanted an

- 8 -

**Robert Vito – OIG, Regional Inspector General**

- Discussions with CMS on what a reasonable profit margin should be for Medicare Part B drug suppliers (Vito Dep. at 346-47) (Ex. H);

- Discussions with CMS on whether Medicare statute and regulations required that reimbursement be based upon published prices (*id.* at 453-54);

- Discussions with CMS on the cause of large spreads for generic drugs (*id.* at 491-92); and

- Discussions with CMS on whether payment for services was "built into" the payment for drugs, and whether payment for ingredient cost subsidized inadequate payment for services (*id.* at 607-08, 611-12).

**Linda Ragone – OIG, Deputy Regional Inspector General (1998 – Present); Program Analyst (1989-1998)**

- Discussions with CMS on the appropriate amount of reimbursement for drugs under Medicare Part B (Ragone Dep. at 330-32) (Ex. I);

- Whether CMS expressed any sentiments in entrance and exit conferences related to OIG reports that were different than the official responses provided by CMS (*id.* at 369-70); and

- Discussions with CMS about CMS' desire to increase the discount off of AWP, including in situations where CMS knew AWP exceeded acquisition cost by up to ten times, and CMS' explanation as to why they continued to use the same reimbursement methodology (*id.* at 389-90, 480-84).

**David Tawes – OIG, Director of the Medicare and Medicaid Drug Pricing Unit (2005- Present); Program Analyst (1995 - 2005)**

- Discussions with CMS on large spreads for generic drugs (Tawes Dep. at 180-82) (Ex. J);

- Discussions with CMS on why multiple-source drugs that met the statutory criteria were not being added to the Federal Upper Limit list (*id.* at 264-68);

- Discussions with CMS on whether to use WAC pricing in determining Medicare Part B reimbursement (*id.* at 346);

- Discussions with CMS on whether payment for ingredient cost subsidized inadequate payment for services (*Id.* at 366);

---

(continued…)

increase in the composite rate."  Booth Dep. at 205.  Evidence that CMS may have deliberately chosen not to increase service fees paid to providers because of the margin made on drugs is clearly relevant to this case.

- 9 -

- Discussions with CMS on whether a dispensing fee should include a level of profit for Medicare and Medicaid drug suppliers (*Id.* at 368-69);

- Discussions with CMS on potential access problems if Medicaid changed the way in which it reimbursed for drugs (*Id.* at 395-400); and

- Discussions with CMS on the ability of CMS to share Average Manufacturer Price (AMP) data with states (*Id.* at 489-90).[9]

Abbott's discovery and questioning in these areas are important. Testimony and documentary evidence show that federal officials *did* know that the published prices for the Subject Drugs here did not equate to or closely approximate average provider acquisition costs.[10] The next question, naturally, is: *Why* didn't the Government change the way Medicare and Medicaid reimbursed these drugs when CMS *knew* the published prices bore little resemblance to the decreasing market prices for those drugs? The Government should not be permitted to withhold the answer to that question.

There is ample reason to believe that the Government's apparent positions on why it continued to use published prices for the Subject Drugs are incorrect. *First*, it is absolutely clear that CMS did not contemporaneously interpret the term "average wholesale price" to be an actual average of market prices, as this Court has previously ruled in another AWP matter.[11] Every

---

[9] Excerpts from the cited deposition transcripts are attached as Exhibits A (Vladeck), G (Booth), H (Vito), I (Ragone), and J (Tawes). To the extent the Court believes it is necessary to decide the deliberative process privilege on a question-by-question basis, Abbott respectfully requests that the Court begin with these lines of questioning.

[10] *See supra* note 1; Ex. K, *Cost of Dialysis-Related Drugs*, A-01-91-00526, at 6 (Oct. 1992) (finding estimated acquisition cost of Vancomycin, the fourth family of the Subject Drugs, to be four times less than the median of published AWPs).

[11] Abbott respectfully suggests that the Court's determination of the meaning of AWP may have been different had the Government provided what this Court specifically requested: *CMS*'s views on the matter. *See* Aug. 3, 2006 Hrg. Tr. at 29-30 ("[I]t's a statutory issue and they're the agency . . . [s]o I would like to know what CMS's position is."). Instead of providing that information, the DOJ provided mere legal argument. *See* Letter from J. Draycott to C. Cook at 2 (7/12/07) (Ex. L) ("The subject addressed in the Government's amicus brief – the meaning of the term "AWP" – was briefed by the United States as a legal question . . . ."); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 825 (1st Cir. 1992) ("In short, the plain-meaning doctrine is not a pedagogical absolute. This rule of construction is more 'an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence' in contradiction to supposedly plain meaning if such evidence exists.") (citation omitted). An honest agency interpretation of AWP—consistent with the way CMS interpreted the term contemporaneously (AWP referred to prices published in the compendia)—is the type of evidence that this Court at

federal government witness deposed to date, including three former CMS Administrators, has testified unequivocally that he or she understood the term "AWP," including as used in Medicare statutes and regulations, to refer to prices reported in the pricing compendia.[12]  Thomas Scully, who served as CMS Administrator from 2001 to 2003, and previously in the Office of Management and Budget, directly refuted paragraph 42 of the Government's Complaint.  When asked if AWP "is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail customer who then administers it to a patient," as alleged in paragraph 42, Mr. Scully testified:  "I don't think that's what AWP is commonly considered to be[.]  I think that's an inaccurate description."  Scully 7/13/07 Dep. at 232-33 (rough transcript) (Ex. N).  Mr. Scully later gave the following testimony:

> Q.  All right.  Have you ever used average wholesale price to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail customer?
>
> A   No.
>
> MR. GOBENA:  Object to the form.
>
> BY MR. COOK:   Have you ever heard anybody else use AWP to refer to the price of which a pharmaceutical firm or a wholesaler sells a drug to a retail customer?
>
> MR. GOBENA:  Object to the form.
>
> A   No.

*Id.* at 396 (rough transcript).

---

(continued…)

least sought to consider when it made its request to the United States in August of 2006.  *See S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002) ("Where Congress has entrusted rulemaking and administrative authority to an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority.").

[12] The testimony from federal government witness deposed to date on the meaning of AWP is quoted in the chart attached as Exhibit M.  Transcript excerpts are also contained at Exhibit M.

The documents and testimony (even as limited by the Government's assertion of the deliberative process privilege) show that HHS officials were well aware of the fact that published AWPs could be exponentially higher than market prices, but that those officials continued to use published AWPs because they understood political pressure provided them no choice but to do so. *See, e.g.*, *supra* at 7 (testimony from three former CMS Administrators). Abbott is entitled to the contemporaneous evidence showing that the Government was aware of such overpayment and nonetheless knowingly (*i.e.*, without reliance on any direct or indirect representations from Abbott) continued to reimburse providers in excess of their costs for prescription drugs.

*Second*, how the Subject Drugs were used to treat Medicare and Medicaid patients is important. Since the late 1980s, CMS has struggled to patch a hole in Medicare's reimbursement for home infusion therapy, the process of administering drugs such as antibiotics, pain medicine, and chemotherapy in the home.[13] Pharmacies dispensing home infusion therapies incur significantly greater administration and dispensing costs due to the complexity of home infusion treatment,[14] but those costs are not reimbursed separately by Medicare. As a result, "[f]or home infusion therapy, the drug payment is the only available payment mechanism for the services that are essential to providing good quality care." Statement by the National Alliance for Infusion Therapy/National Home Infusion Association at 3 (Ex. P).[15] Abbott is entitled to discover if CMS knowingly cross-subsidized home infusion therapy through payments on ingredient cost. *See, e.g.*, Eli's Home Care Week article ("In the past, Redmon [National Community

---

[13] The Subject Drugs were used extensively in the home infusion setting.

[14] *See* Ex. O at 24 (Myers & Stauffer dispensing fee study for the Texas Vendor Drug Program shows average dispensing fee for pharmacies dispensing intravenous/home infusion prescriptions of $41.75).

[15] While Plaintiffs often express the spreads for the Subject Drugs as a percentage—so as to suggest no Government policy-maker could ever knowingly countenance them—that is misleading here. The Subject Drugs are primarily commodity drugs like saline solutions, dextrose solutions, and sterile water that do not have spreads in the hundreds of dollars that result in huge windfalls to providers.

Pharmacists' Association] claims, Medicare officials would argue that the service component was 'built into the fee schedule' for prescription drugs") (Ex. Q).

*Third*, the Government itself recognizes the relevance of these issues, having recently subpoenaed the National Home Infusion Association ("NHIA"), an advocacy group for home infusion providers.  *See* Ex. R (DOJ subpoena).  Among other things, the DOJ's subpoena asks NHIA to produce all communications it has had with state and federal Medicare and Medicaid officials and legislators relating to the issues of drug reimbursement or pricing.  Moreover, the Government has sought and received numerous documents from Abbott relating to its lobbying efforts, and recently conducted an extensive deposition of Cynthia Sensibaugh, Abbott's Senior Director of Federal Government Affairs.[16]  The Government's discovery in these areas has not been limited to the Subject Drugs, and simply cannot be reconciled with the Government's contention that general Government policy is "irrelevant" or "collateral" to this case.

### III.   THE GOVERNMENT HAS FAILED TO ARTICULATE ANY LEGITIMATE HARM THAT WOULD RESULT FROM DISCLOSURE, AND THE BALANCE TIPS HEAVILY IN FAVOR OF DISCLOSURE.

For the reasons set forth in Abbott's prior briefing on the deliberative process privilege and the cases cited therein (*see* Dkt. Nos. 3513, 3594 & 3960), the Government's role as plaintiff here renders it unable to withhold evidence under the deliberative process privilege.  It should not be permitted to withhold documents any more than any other litigant could under the Federal Rules of discovery.

Moreover, even under a balancing test, the balance tips decidedly in favor of disclosure.  The Government's application of the balancing test is flawed and incomplete.  When each factor is given full consideration, it becomes clear that the vague deliberative process claims made by

---

[16] Despite seeking this discovery, the Government refuses to produce or log documents from CMS's Office of Legislation or its official Rulemaking Support Files.  *See* Letter from J. Draycott to D. Torborg (6/27/07) (Ex. S).

the Government's lawyers are insufficient in light of the clear relevance and importance of the material that the Governments seeks to withhold.

The first factor of the balancing test, the relevance of the material sought, is addressed above and in Abbott's prior briefing.  In short, the Government is withholding evidence that sheds light on why Government officials continued to rely on published drug prices despite extensive knowledge that they did not represent a reliable indication of acquisition costs.

The second consideration, the availability of other evidence, also supports disclosure.  As discussed in Abbott's opening brief (Dkt. No. 3960), the Government's delay in prosecuting this case has resulted in the loss of key evidence due to fading memories and the destruction of documents.  *See* Dkt. No. 3960 at 8-9.  The contemporaneous documents may provide the most reliable and unbiased evidence of the Government's knowledge concerning drug prices and its deliberations regarding the efficacy of changing its reimbursement policies.  Abbott should be entitled to full discovery of what evidence remains.

Tellingly, the Government relegates the third and fourth factors of the balancing test to a footnote, baldly asserting that these factors "are less relevant to the instant case."  Dkt. No. 4076 at 16 n.2.  The Government glosses over these factors in hopes of minimizing their significance.  But in reality, these two factors—the seriousness of the litigation and the role of the government in the litigation—are perhaps the most important factors for the Court to consider in this dispute.  *See United States v. Hooker Chems. & Plastics Corp.*, 123 F.R.D. 3, 12 (W.D.N.Y. 1988) ("Perhaps most importantly, the government asserting the privilege in this case is a party to the litigation.").  The Government's role as plaintiff comes with certain costs, including the obligation to turn over documents that disprove its claims or prove Abbott's defenses.  *See EEOC v. Airborne Express*, No. 98-1471, 1999 WL 124380, at *2 (E.D. Pa. Feb. 23, 1999)

(finding it "fundamentally unfair" for the Government, as party plaintiff, to evade discovery of material that a private plaintiff would have to turn over and thus rejecting the Government's assertion of the deliberative process privilege) (internal quotation marks omitted).[17]

Finally, with respect to the fifth factor, the Government has failed to articulate any harm that would be caused if the documents were disclosed. The Government instead relies upon vague statements contained in after-the-fact, lawyer-drafted declarations that simply track the rationale for the privilege. That is insufficient. *See Diamond*, 773 F. Supp. at 604 (rejecting assertion of deliberative process privilege when Government's affidavits provide "merely a paraphrase of the rationale for the deliberative-process privilege described in the case law").

The declarations submitted by Robert Vito and Leslie Norwalk fail to identify any concrete harm that would be occasioned by the disclosure of particular documents on the Government's privilege logs. The lack of any claim of particularized harm is not surprising since the declarants appeared to have had minor input into their declarations. For instance, Mr. Vito testified that the declaration was drafted by the Government's lawyers and that he made very few edits. *See* Vito Dep. at 229-30 (Ex. H). He admitted that the lawyers selected the particular documents to be withheld. *Id.* at 231. He admitted that he "flipped through" only a sampling of the withheld documents and, because of his workload, "did not spend a great amount of time" reviewing even the sample he did review. *Id.* at 243-44, 256. Even for those documents discussed in his declaration, Mr. Vito was unable to articulate any particular harm that would

---

[17] *See also United States v. Ernstoff*, 183 F.R.D. 148, 153 (D.N.J. 1998) (where the Department of Justice was plaintiff, the court rejected its assertion of the deliberative process privilege finding that "[c]ommon sense and basic fairness requires that [the withheld material] receive no greater protection than they would in the hands of a private litigant"); *Resolution Trust Corp. v. Diamond*, 773 F. Supp. 597, 605 n.7 (S.D.N.Y. 1991) (FTC's role as plaintiff "tends to open the door to discovery of FTC's decision-making processes"); *Dep't of Econ. Dev.*, 139 F.R.D. at 596 ("[T]he British Government's position as plaintiff in this case tips the balance of interests in favor of disclosure of the documents"; "by asserting a fraud against [defendant], the British Government necessarily places at issue questions of knowledge, justifiable reliance and causation") (internal quotation marks omitted).

result from disclosing the documents under a protective order.  *Id.* at 252-63.  And he made no effort to consider if the documents withheld were relevant to the litigation.  *Id.* at 265-66.

The failure to articulate "precise and certain reasons for preserving the confidentiality of the requested information" is a fatal flaw in the Government's assertion of privilege.  *See Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, 6 (N.D.N.Y. 1983) (internal quotation marks omitted); *see also Walsky Contr. Co. v. United States*, 20 Cl. Ct. 317, 320 (1990) (government must "supply the court with 'precise and certain reasons' for maintaining the confidentiality of the requested document").

In *Haus v. City of New York*, No. 03-4915, 2004 WL 3019762 (S.D.N.Y. Dec. 29, 2004), the City of New York submitted an affidavit from the Commanding Officer of the Patrol Borough Manhattan South in support of its efforts to resist discovery into the department's critiques of tactics and police performance under the deliberative process privilege.  The affidavit in that case was substantially similar to the declarations filed by the Government here:

> [The affiant] observe[d] in a conclusory fashion, that [i]t [was his] belief that disclosure of these documents would inhibit the frank and candid exchange of opinions that is part of the deliberative process and that best informs final department decisions.  Disclosure of comments and recommendations concerning department course of action and strategy would inhibit ongoing and future consultations and deliberations that take place in the Department's review of its procedures.

*Id.* at *3.  The court ruled that "[t]his formulaic assertion, taken almost word-for-word from innumerable other such agency submissions, plainly fails to offer a persuasive basis for believing that production under the governing confidentiality order would pose any harm to the public interest."  *Id.* at *4.  Similarly, in *Pacific Gas & Electric Co. v. United States,* 71 Fed. Cl. 205, 209 (2006), the court ruled that the government's "vague, general and conclusory statement[s] as to why the confidentiality of the listed documents should be maintained" were insufficient.  Rather, the court ruled that the deliberative process privilege could be invoked "only if the

proponent of the privilege explains *with particularity* how or why disclosures of the substance of the documents would harm an identified deliberative function." *Id.* (emphasis in original; internal quotation marks omitted).

The after-the-fact, lawyer-drafted declarations that the Government submits in support of its current assertion of the privilege are even more vague and conclusory than those considered in *Haus* and *Pacific Gas & Electric Company*, and should be rejected.

## CONCLUSION

For the reasons stated above, and for those stated in Abbott's prior briefing (Dkt. Nos. 3513, 3594 & 3960), the Court should grant Abbott's Renewed Motion to Compel Production of Evidence Withheld Under the Deliberative Process Privilege.

Dated:  July 17, 2007                                       Respectfully submitted,

/s/ R. Christopher Cook
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories, Inc.*

## **CERTIFICATE OF SERVICE**

      I, David S. Torborg, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION TO COMPEL EVIDENCE WITHHELD UNDER THE DELIBERATIVE PROCESS, and supporting memorandum and exhibits, to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 17th day of July, 2007.

                                             /s/ David S. Torborg
                                             David S. Torborg