# Exhibit E

DeParle, Nancy-Ann                          May 18, 2007
                    Washington, DC

                 UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x

IN RE: PHARMACEUTICAL        : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   : CIVIL ACTION:

PRICE LITIGATION             : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO     :

U.S. ex rel. Ven-a-Care of   : Judge Patti B. Saris

the Florida Keys, Inc. v.    :

Abbott Laboratories, Inc.,   : Chief Magistrate

No. 06-CV-11337-PBS          : Judge Marianne B.

- - - - - - - - - - - - - - x Bowler

              IN THE CIRCUIT COURT OF

             MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - x

STATE OF ALABAMA,            :

          Plaintiff,         :

     vs.                     : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,   : Judge Charles Price

et al.,                      :

          Defendants.        :

- - - - - - - - - - - - - - x

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                    May 18, 2007
                    Washington, DC

---

Page 290

1  has been a terribly frustrating and difficult
2  exercise.
3       I also want to mention that the
4  President has for the last four or five years now
5  proposed a law to help us to be able to do this
6  better, to make sure that we get the prices that
7  physicians actually are paying.  With that we
8  have said we would like to make sure that we are
9  paying physicians appropriately for
10 administration of those drugs. That is something
11 that this committee has raised. But we want to
12 make sure Medicare pays a fair price.
13      Q.  Are those answers an accurate
14 description of what you understood to be HCFA's
15 position on this, on this issue in June of 2000?
16      MS. YAVELBERG:  Objection; form.
17      A.  It was my position.
18      Q.  Okay.
19      A.  I was the administrator.
20      Q.  I would like to focus on a couple of
21 things.  First you said it had been a terribly
22 frustrating and difficult exercise to determine

Page 291

1  what actual prices were.  What did you mean by
2  that?
3       A.  It might have just been a description
4  of my life at that point.  But I think what I was
5  referring to is that after the letter to Chairman
6  Bliley that we just discussed dated May 31st,
7  2000, I had asked my staff to continue meeting
8  with oncologists, other physicians, people with
9  hemophilia, cancer patients and the carrier
10 medical directors and others, as we moved forward
11 to implement this new policy of using the data
12 that the Department of Justice and the state
13 Medicaid fraud control units had compiled.  And
14 what came back to me was, were a couple of
15 things.
16      One, that some of the carrier medical
17 directors couldn't assure us that the prices that
18 when the Justice Department documents, the new
19 data, were really prices at which Medicare
20 physicians could obtain chemotherapy drugs.  And
21 so I couldn't be sure that physicians -- we could
22 publish a price and I couldn't be sure that a

Page 292

1  physician could actually obtain the drug for that
2  price.
3       Q.  Right.
4       A.  And also I continued to hear from
5  chemotherapy patients that they were scared, that
6  physicians were saying they might quit providing
7  them with chemotherapy in the offices.
8       I had a friend who had a family member
9  who had hemophilia.  I remember hearing from some
10 of those groups that they were concerned about it
11 and I asked my staff to meet with them and they
12 came back and said, you know, I think they have a
13 point, we can't be sure that physicians can
14 obtain these drugs at those lower prices that are
15 in this new data.
16      I was frustrated because we had told
17 Chairman Bliley we were going to move forward
18 with the new data and then it was appearing that
19 perhaps it wouldn't be the best policy for our
20 patients.
21      And then, secondly, my staff told me
22 they had met with doctors groups and my staff

Page 293

1  said, you know something, it appears that they
2  have a point about the administration of these
3  drugs, that the physician fee schedule probably
4  doesn't adequately compensate them for
5  administering the drugs.  It doesn't -- it
6  wouldn't cover their costs if they were just
7  relying on that.
8       And so they may actually be right, that
9  they have been, you know, using the
10 reimbursements they get for the drugs in order to
11 be able to provide the services to the patients,
12 which is what they had said in response to our
13 announcement of this new policy.  We may have it
14 too low.  And I said, well, can't we do something
15 about that, and it turned out it wasn't something
16 we could do something about by just doing it.
17 You had to go through a change in law or at least
18 a rule-making process that could take a year or
19 more.  So I was frustrated.
20      Q.  And would that explain why in the next
21 paragraph you refer to the Administration saying
22 that it needs to make sure that HCFA is paying

Henderson Legal Services
202-220-4158

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                          May 18, 2007
                        Washington, DC

Page 294

1   physicians appropriately for administration of
2   the drugs?
3      A.  Yes.
4      Q.  As a result of the concerns that were
5   raised by cancer patients, hemophilia patients,
6   oncologists and others, did HCFA change its
7   approach to this issue?
8         MS. YAVELBERG:  Objection; form.
9      A.  I changed.
10     Q.  You changed it?
11     A.  I changed it.
12     Q.  How did you change it?
13     A.  I, in some other document, I don't
14  remember what it was, maybe it was another one of
15  those program memoranda to the carriers, I said
16  that they should move forward to use this new
17  Department of Justice data that we were going to
18  be provided them, but that they should not use it
19  with respect to chemotherapy, hemophilia drugs
20  until we had done more work on it.  I think.
21  That's what I remember.
22     Q.  Right.

Page 295

1      A.  And I also said we were going to work
2   on a legislative proposal to increase the
3   administration fee for physicians who provide
4   those services.
5      Q.  I'll give you two documents that we
6   will mark Exhibit Abbott 215 and Exhibit Abbott
7   216.
8         (Exhibit Abbott 215 and Exhibit
9   Abbott 216 were marked for identification.)
10  BY MR. COOK:
11     Q.  Exhibit Abbott 215 is a September 8,
12  2000 letter entitled Dear Member of Congress,
13  from you; and Exhibit Abbott 216 is a September
14  8, 2000 program memorandum.
15         Do you recognize Exhibit Abbott 215 and
16  Exhibit Abbott 216?
17     A.  Yes.
18     Q.  What are they?
19     A.  They are a letter that I wrote to it
20  looks like all members of Congress -- it says
21  Dear Member of Congress, but I think I probably
22  sent this out to all members -- to update them on

Page 296

1   the actions that the agency would be taking with
2   respect to Medicare payment for outpatient drugs.
3      Q.  And what is Exhibit Abbott 216?
4      A.  It's a program memorandum to
5   intermediaries and carriers dated September 8,
6   2000, the same date as this letter.
7      Q.  I would like to focus first on the
8   letter -- well, let's focus on the program
9   memorandum.  That program memorandum is the
10  direction to the carriers that would implement
11  this new policy; is that correct?
12     A.  Yes.
13     Q.  And with this program memorandum, you,
14  as you indicated, provided a list attached on
15  Exhibit Abbott 216 of the DOJ data that you were
16  providing to the carriers?
17     A.  Yes.  It appears that that's what that
18  is.
19     Q.  There are two attachments to Exhibit
20  Abbott 216; correct?
21     A.  I only see one, but --
22     Q.  Let me --

Page 297

1      A.  Oh, I see it.  Attachment one is pages
2   4 through 14, and attachment two is pages 15
3   through 21?
4      Q.  Correct.  And attachment one is the
5   data that you were directing the carriers to
6   consider in establishing payment rates for
7   Medicare Part B; correct?
8         MS. YAVELBERG:  Objection; form.
9      A.  Yes.
10     Q.  And attachment two is the data that
11  they are not to use; correct?
12     A.  Yes.
13     Q.  The data that you instructed the
14  carriers not to use, what sort of treatments did
15  those represent?
16     A.  Sitting here today, I don't know, but
17  I'm assuming, based on this letter that's Exhibit
18  Abbott 215 and Exhibit Abbott 216 and my
19  recollection of this from seven years ago, that
20  attachment two are the drugs that related to
21  chemotherapy and hemophilia, that I had decided
22  we should not use that new data until we had been

75 (Pages 294 to 297)

a2e99778-7e61-4f3d-8317-e255e740d5a9