# Exhibit G

Booth, Charles R.                                    April 23, 2007
                        Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL         :   MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE    :   CIVIL ACTION:
PRICE LITIGATION              :   01-CV-12257-PBS
THIS DOCUMENT RELATES TO      :
U.S. ex rel. Ven-a-Care of    :   Judge Patti B. Saris
the Florida Keys, Inc. v.     :
Abbott Laboratories, Inc.,    :   Chief Magistrate
No. 06-CV-11337-PBS           :   Judge Marianne B.
- - - - - - - - - - - - - - - -x  Bowler

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - - -x

STATE OF ALABAMA,             :
          Plaintiff,          :
          vs.                 :   Case No.: CV-05-219
ABBOTT LABORATORIES, INC.,    :   Judge Charles Price
et al.,                       :
          Defendants.         :
- - - - - - - - - - - - - - - -x

Henderson Legal Services
202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

Page 174

1       MR. GOBENA: Object to the form.
2    A.   Since I clearly wasn't doing it myself,
3  yes.
4    Q.   What did you expect of the individuals
5  within your office when it came to factoring in
6  information that came into the Office of Payment
7  Policy regarding the cost to providers of drugs?
8    A.   Of drugs? Was that the last word?
9    Q.   Of drugs, yes, sir, drugs.
10   A.   I'm not sure I had one. No one actually
11 had, you know, their sole responsibility to deal
12 with drug issues.
13   Q.   But there were individuals in the office
14 for whom it was one of their responsibilities,
15 correct?
16   A.   Right.
17   Q.   And that would be Mr. Patashnik and the
18 people who reported to Mr. Patashnik?
19   A.   Yes, as one of their minor sidelines.
20   Q.   You say minor sidelines. The drug
21 payments for Medicare even during this time period,
22 do you recall about what they were?

Page 175

1    A.   Well, depending upon what time frame
2  you're talking about, a couple of billion dollars
3  excluding Epogen.
4    Q.   And a couple billion dollars was a minor
5  sideline?
6    A.   In terms of what we might be able to do
7  about it and in terms of spending time on issues
8  such as durable medical equipment or physician
9  issues, yes.
10   Q.   When you say in terms of what you could do
11 about it, what do you mean?
12   A.   Well, we talked about having to change the
13 regulations after '91 if we were going to do
14 something about drug payment. That's what I'm
15 talking about. There were other issues and other
16 areas of the program that we could do something
17 about administratively that did not require the
18 amount of work that would have been required for
19 changes in drug payments.
20   Q.   So even if individuals within the office
21 were aware of drugs available in discounts in excess
22 of 20 percent from AWP, is it your testimony that

Page 176

1  your office devoted its resources to other things
2  that promised greater savings?
3       MR. GOBENA: Object to the form.
4    A.   Well, saving money was not the sole issue
5  that caused our existence. It might be the IG's
6  sole purpose, but we were always interested in
7  paying the correct amount to the correct provider,
8  physician, supplier, hospital, and being sure that
9  the beneficiary paid no more in co-insurance that
10 was -- than was absolutely necessary.
11   Q.   Which raises the question I was getting to
12 a little bit earlier, and that is whatever the
13 range, given that -- strike that. If a drug were
14 available at a range of prices and if HCFA were
15 looking to pick one reimbursement price, were there
16 factors that you considered in making that policy
17 decision?
18      MR. GOBENA: Object to the form.
19   A.   I don't remember.
20   Q.   I mean, is it fair to say that in deciding
21 what HCFA chose to pay for drugs reimbursable by
22 Part B, that you would consider access to care for

Page 177

1  beneficiaries?
2    A.   I would hope.
3    Q.   And that if you picked a price point too
4  low, it would impact access to care for
5  beneficiaries, correct?
6       MR. BREEN: Objection to form.
7       MR. GOBENA: Also I'm going to instruct
8  the witness the extent to which he needs to get into
9  issues that are part of the deliberative process, I
10 instruct you not to answer it, but if you can answer
11 it otherwise, then please go ahead and answer.
12      THE WITNESS: Well, I think that one of
13 the objectives for at least my office at the time
14 was not to adversely impact the quality or quantity
15 of patient care.
16      MR. COOK: Just so I know what he's not
17 telling me, I don't quite understand when you tell
18 him things that impact the deliberative process,
19 what are you telling him not to tell me?
20      MR. GOBENA: Well, to the extent -- your
21 questions are vague, so I'm not quite sure if you're
22 asking about what gave rise to the '91 regulation,

Booth, Charles R.                                         April 23, 2007
                         Washington, DC

**Page 178**

1  for example, that went into effect in 1992, and what
2  considerations went into what was ultimately in that
3  regulation. The extent to which you're trying to
4  get into that, and it's not clear to me from your
5  questions what you're trying to get into, I'm going
6  to instruct him not to answer anything regarding
7  discussions he had giving rise to the issuance of
8  that regulation. Anything else outside of that, I
9  think that's okay.
10      MR. COOK: And just so the record's clear,
11 if I ask Mr. Booth why HHS chose the methodology
12 that they did that's published in the 1991
13 regulations, you'll instruct him not to tell me why
14 the agency chose that methodology.
15      MR. GOBENA: I'll instruct him not to
16 answer that question because you're asking about the
17 deliberative process, why their agency chose -- the
18 extent the agency chose to publish it and came to
19 final decisions that reflected whatever you're
20 looking at right there in front of you.
21      MR. COOK: Okay, so just so I'm clear,
22 it's your position that my ability to determine why

**Page 179**

1  the regulation stated 100 percent of AWP is limited
2  to what the agency chose to publish in the Federal
3  Register?
4       MR. GOBENA: Chris, I think we've already
5  briefed this issue of deliberative process. You've
6  raised a larger deliberative process waiver argument
7  and we've briefed it fully. I think we're well
8  aware of both sides' positions in terms of what we
9  consider to be covered by deliberative process. We
10 made it clear in our briefings. I don't think it's
11 worth going into colloquy here. Let's go question
12 by question to see whether or not you can get the
13 testimony you need without going into the privileged
14 areas.
15      MR. COOK: Well, it would be helpful if
16 you could tell Mr. Booth answer that question or
17 don't answer that question, but telling him don't
18 answer it unless you go into the magic area that I'm
19 going to describe by code words doesn't allow me to
20 know whether Mr. Booth is giving a full answer or
21 half an answer or a third an answer.
22      MR. GOBENA: Okay, well, why don't you

**Page 180**

1  then clarify what it is -- you're talking about the
2  regulation, for example, you're talking about it
3  more broadly, so I can understand.
4       MR. COOK: Sure.
5       MR. GOBENA: So I can understand what
6  you're getting into and then be able to assert the
7  privilege, you know, appropriately.
8       BY MR. COOK:
9   Q.  During the time that you were in the
10 Office of Payment Policy from '84 to '94, Mr. Booth,
11 it was part of your job responsibility to make
12 determinations about what would be an appropriate
13 payment price for Medicare Part B covered drugs,
14 correct?
15  A.  To the extent that we wanted to recommend
16 changes to the payment policy, it would have been
17 within my purview to recommend those changes.
18  Q.  Did you ever recommend a change to payment
19 policy by HCFA at any time between '84 and '94 with
20 respect to Part B reimbursable drugs?
21  A.  Yes, in their 1991 regulation.
22  Q.  Leaving aside the 1991 regulation, did you

**Page 181**

1  ever make any other recommendations for changes in
2  payment policy?
3       MR. GOBENA: You're asking about drugs or
4  generally?
5       BY MR. COOK:
6   Q.  Drugs.
7   A.  We made a recommendation for paying for
8  Epogen in 1989.
9   Q.  Any other recommendations that you can
10 recall?
11  A.  Not that I can recall.
12  Q.  Let's turn first to Epogen. What was the
13 recommendation that you made in 1989 regarding
14 payment for Epogen?
15  A.  I recommended that we -- that we pay for
16 Epogen based on a flat rate per administration. The
17 flat rate would -- I believe $40 for up to 10,000
18 units of Epogen.
19  Q.  What is Epogen?
20  A.  Epogen replaces the red blood cells in the
21 body that the kidney does not make when the kidney
22 is diseased.

Page 202

1  Q. Let me rephrase that. Why did HCFA
2  reimburse at an amount greater than what it
3  understood to be the ingredient cost for a provider
4  who administered an appropriate dose of Epogen?
5     MR. GOBENA: Object to the form.
6  A. I think you've mischaracterized my
7  remarks.
8  Q. You've indicated to me that the
9  reimbursement amount for Epogen in many instances
10 would exceed ingredient cost to the provider,
11 correct?
12 A. No.
13 Q. No? Their ingredient cost would be less?
14 A. I don't think I said many.
15 Q. All?
16 A. Not all. Actually, most.
17 Q. Most. For those providers where the
18 reimbursement amount exceeded the ingredient cost,
19 did HCFA have an understanding of what that excess
20 amount would be used to pay for?
21    MR. GOBENA: Object to the form. He's not
22 a 30(b)(6) witness. You can answer in your personal

Page 203

1  capacity.
2  A. There was clearly going to be some
3  spoilage of the drug because particularly at the
4  beginning, it was difficult to make, difficult to
5  ship, difficult to store. There were clearly going
6  to be administration costs to administer the drug
7  even where there was a shunt, and in some cases
8  there wasn't, and we wanted to set the reimbursement
9  rate high enough that facilities would administer
10 Epogen to those patients who were receiving blood
11 transfusions. And obviously this is not an exact
12 science. We have only the clinical trials to base
13 the judgments on that we made, and we said at the
14 time that if it turned out that we had made
15 incorrect judgments, that we would make adjustments
16 in the price.
17 Q. After 1989, as I understand it, ESRD
18 facilities would be paid based upon a combination of
19 a composite rate in the separately billed drugs. Do
20 I have that correct?
21 A. Not just after 1989.
22 Q. Before 1989 also, correct?

Page 204

1  A. From sometime in 1984, as I recall.
2  Q. So between 1989 and some point after 2001,
3  ESRD facilities received both a composite rate
4  payment and a payment for separately billable drugs,
5  correct?
6     MR. GOBENA: Object to the form.
7  A. At least through 19 -- June of 1997.
8  Q. Between 1989 and June of 1997, did HCFA
9  change the composite rate that ESRD facilities were
10 paid for treating Medicare beneficiaries?
11 A. I don't remember.
12 Q. Do you recall any discussions about
13 whether the composite rate should be changed in
14 light of profits the facilities were making on the
15 drug component?
16    MR. GOBENA: Chris, can I clarify? What
17 discussions? Discussions with agency officials
18 within the agency or --
19    MR. COOK: With anybody at all.
20    MR. GOBENA: Okay, I'll instruct you to
21 not answer the question on deliberative process
22 grounds the extent to which your answer would cover

Page 205

1  discussions within the agency.
2     THE WITNESS: Then I can only tell you
3  that there were end-stage renal facilities that came
4  to see us and wanted an increase in the composite
5  rate.
6     BY MR. COOK:
7  Q. Do you recall what response you gave to
8  those facilities about whether you would give an
9  increase to the composite rate?
10 A. I recall very few increases in the
11 composite rate.
12 Q. Do you recall expressing to any of these
13 facilities the notion that the composite rate was
14 not being increased because of money being made on
15 the drug component?
16 A. Never.
17 Q. Do you recall internal discussions in
18 which the decision not to raise the composite rate
19 was tied to money being made on the drug component?
20    MR. GOBENA: I'm going to object and
21 instruct the witness not to answer on deliberative
22 process grounds.