# Exhibit H

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - -

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| | : |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-A-Care of | : |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc. | : |
| No. 06-CV-11337-PBS | : |

- - -

          Videotaped deposition of ROBERT
VITO was taken, pursuant to notice, at MORGAN
LEWIS & BOCKIUS, LLP, 1701 Market Street,
Philadelphia, Pennsylvania, on Tuesday, June
19, 2007, beginning at 9:10 a.m., before M.
Kathleen Muino, Professional Shorthand
Reporter, Notary Public; Michael Hunterton,
Certified Legal Video Specialist, there being
present:

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert  
Philadelphia, PA

June 19, 2007

Page 226

1  CMS?
2      A.  Yes. She works with Larry Reed.
3      Q.  Okay. Do you recall having any
4  conversation along those lines with state
5  pharmaceutical representatives?
6      A.  I don't recall any. That doesn't --
7  doesn't mean that there -- we -- I didn't, but I
8  just don't recall any.
9      Q.  Do you recall if, in your discussions
10  with Mr. Reed and Ms. Duzor, that they were
11  conveying what they had heard from state
12  representatives?
13      A.  I don't understand your question.
14      Q.  Let me try it again. You indicated that
15  you recall discussions with Mr. Reed and Ms. Duzor
16  about potential need to, if you were going to lower
17  one aspect of reimbursement, you might have to
18  increase the other aspect of reimbursement in order
19  for --
20      A.  To pay fairly.
21      Q.  To pay fairly. Do you recall if they,
22  Mr. Reed and Ms. Duzor, were expressing comments

Page 227

1  that they had heard from their state counterparts
2  or something that was their own personal view?
3          MR. AZORSKY: Objection --
4          THE WITNESS: I don't know --
5          MR. NEAL: I'll object to the form.
6          THE WITNESS: Yeah, I -- I don't know.
7  It would be better to ask them. I -- I don't know.
8          MR. NEAL: Dave, why don't we go ahead
9  and take a short break now.
10          MR. TORBORG: Let me -- I'm almost done
11  with this section. I think I'm done, but --
12          MR. NEAL: Okay.
13          MR. TORBORG: -- just give me one second.
14          MR. NEAL: Sure.
15          MR. TORBORG: Okay. Yeah, we can take a
16  break.
17          MR. NEAL: Thank you.
18          THE VIDEOGRAPHER: The time is 2:54 p.m.
19  We're going off the record, concluding Tape No. 4
20  in the deposition of Robert Vito in the matter In
21  Re: Pharmaceutical Industry Average Wholesale Price
22  Litigation.

Page 228

1          - - -
2          (Whereupon, a recess was taken.)
3          - - -
4          (Whereupon, Exhibit Abbott 235 was marked
5  for Identification.)
6          - - -
7          THE VIDEOGRAPHER: The time is 3:12 p.m.
8  We're going back on the record, starting Tape No. 5
9  in the deposition of Robert Vito in the matter of
10  In RE: Pharmaceutical Industry Average Wholesale
11  Price Litigation.
12  BY MR. TORBORG:
13      Q.  Welcome back, Mr. Vito.
14      A.  Thank you.
15      Q.  I've handed you, as Exhibit Abbott 235,
16  it's a document titled, Declaration of Robert
17      A.  Vito, that attaches a HHS-OIG Privilege
18  Log, and if -- if we look at page -- the last page
19  of the actual Affidavit, is this something that you
20  signed on April 20th, 2007?
21      A.  Yes.
22      Q.  Mr. Vito, do you recall this Affidavit

Page 229

1  --
2      A.  Yes.
3      Q.  -- or this declaration, I should say?
4      A.  Yes.
5      Q.  And who drafted this declaration?
6      A.  I believe legal counsel.
7      Q.  Did you review the declaration?
8      A.  Yes.
9      Q.  Did you draft any of the language in the
10  declaration?
11      A.  I -- I don't know I drafted [sic], but I
12  -- if there were issues or concerns or anything
13  like that, I -- I would bring it to the counsels'
14  attention.
15      Q.  Did you provide line edits to the draft?
16          MR. AZORSKY: Object to the form.
17          MR. NEAL: I'll object to the form as
18  well.
19          THE WITNESS: I did provided edits.
20  BY MR. TORBORG:
21      Q.  Do you recall what edits you provided?
22      A.  I do not recall what edits I provided.

58 (Pages 226 to 229)

Henderson Legal Services  
202-220-4158

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

### Page 230

1  Q. Was it -- was it a -- an extensive
2  amount of edits --
3      MR. AZORSKY: Objection --
4  BY MR. TORBORG:
5  Q. -- or not?
6      MR. AZORSKY: -- to form.
7      MR. NEAL: I'll join the objection.
8      You can answer.
9      THE WITNESS: I don't think it was.
10 BY MR. TORBORG:
11 Q. Did you have an understanding of why it
12 was that you were asked -- well, let me strike
13 that.
14     Were you asked by legal counsel to sign this
15 declaration?
16 A. Yes.
17 Q. I ask you to go to Page 3, Paragraph 6.
18 The Affidavit states: I am informed that documents
19 in the possession of OIG have been requested in the
20 course of the above-captioned litigation. I
21 requested that certain of these documents not be
22 produced.

### Page 231

1      Mr. Vito, did you request that certain
2  documents not be produced?
3  A. Yes.
4  Q. When did you do -- when did you do that?
5  A. When I met with legal counsel.
6  Q. And when did you meet with legal
7  counsel?
8  A. The dates are beyond me. Within the
9  last two or three months.
10 Q. Who selected the -- the documents that
11 would not be produced?
12     MR. AZORSKY: Objection to form.
13     MR. NEAL: I'll join the objection.
14     THE WITNESS: I believe that the counsel
15 was involved in that, but I made suggestions to
16 them about issues that I thought needed to be
17 protected.
18 BY MR. TORBORG:
19 Q. When did you first become involved in
20 asserting the deliberative process privilege over
21 documents?
22     MR. NEAL: I'll object to the form.

### Page 232

1      MR. AZORSKY: Objection to form.
2      THE WITNESS: I believe when we met with
3  them, made it clear that certain things I thought
4  were internal discussions and should be kept that
5  -- that way.
6  BY MR. TORBORG:
7  Q. Now, this Affidavit attaches a privilege
8  log, correct?
9  A. It appears to have one, yes.
10 Q. Paragraph 8 of your declaration
11 indicates it lists 248 documents; is that right?
12 A. I did not count them, but I believe it's
13 right.
14 Q. Okay. And did you pull those 248
15 documents out of a collection yourself, or did
16 legal counsel bring them to you and ask you to
17 assert the privilege over them?
18 A. I believe that I told legal counsel
19 there were certain areas where I felt it would be
20 very chilling if our discussions became -- were
21 made public, so I pointed out to them those
22 particular areas.

### Page 233

1  Q. So legal counsel collected the 248
2  documents and put them all in a log and then asked
3  you to assert the privilege over them; is that
4  right?
5      MR. AZORSKY: Objection --
6      MR. NEAL: I'll object to the form.
7      MS. CONNOLLY: Objection to form.
8      THE WITNESS: I don't think that that's
9  the -- the correct characterization. I believe
10 what happened was, when we met with them, I told
11 them specifically there were indications -- when we
12 were having team meetings, when we were having exit
13 conference and -- and -- and when we were having
14 discussions relating strictly to the product, that
15 that information should not be made available
16 because people were having honest, open discussions
17 that would help them come up with the best
18 methodologies, the best type of reviews, understand
19 both -- all the weaknesses and the strengths, and
20 if people knew that that would be made in the
21 public document, it would have a stifling effect on
22 our work.

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert                                                                 June 19, 2007
Philadelphia, PA

Page 242

1   the documents in there to see what they said and
2   what the things were that were on there.
3       Q.  I -- I think you testified earlier,
4   correct me if I misunderstood you, that you haven't
5   reviewed each of the documents --
6       A.  I -- I --
7       Q.  -- on the log, correct?
8       A.  I -- I have not looked at this and then
9   looked at the other document. If I remember
10  correctly, if -- if -- if -- if the folder -- I
11  believe there was a folder, and I did look at that
12  folder, but I may be mistaking, but I -- I -- I
13  think that it was in -- in a folder, and I think I
14  looked at some of these. I --
15      Q.  Some of these?
16      A.  Yes -- well, I --
17      Q.  You haven't --
18      A.  I -- I --
19      Q.  -- reviewed all of the documents, right?
20      A.  Well --
21          MS. LIANG: Object --
22          MR. NEAL: I'll object to the form.

Page 243

1           MS. LIANG: Object to form.
2           THE WITNESS: You know, I -- I -- I -- I
3   -- if -- if -- if the folder was the one that I'm
4   thinking of, and it had that information in, I
5   flipped through each one of them. I don't know
6   specifically every detail on every one, and I -- I
7   don't -- you could go through here, and I probably
8   won't know how many pages are in any of them.
9   BY MR. TORBORG:
10      Q.  Okay. Your -- your declaration
11  indicates that you've personally reviewed a
12  sampling of the documents?
13      A.  Yes.
14      Q.  So should I read that to mean that you
15  didn't review all of the documents?
16      A.  Again, I -- I -- you're probable -- I --
17  I -- if -- if -- if -- if I am remembering
18  correctly, then I looked at a folder that had them
19  in, but I might be not remembering correctly, and
20  if I'm -- and if that folder wasn't this folder,
21  then you -- you would be correct, in that I did not
22  review every one.

Page 244

1       Q.  How much time did you spend reviewing
2   the documents?
3           MR. AZORSKY: Objection to form.
4           THE WITNESS: I did not spend a great
5   amount of time reviewing the documents.
6   BY MR. TORBORG:
7       Q.  Page -- Paragraph 13, you also state: My
8   statements in this declaration also are based upon
9   information personally known to me or conveyed to
10  me by agency personnel who reviewed every one of
11  the documents for which the privilege is being
12  asserted.
13          What agency personnel conveyed information to
14  you regarding this -- that would support the
15  statements in your declaration?
16      A.  I believe that it was the counsel.
17      Q.  So it was the lawyers?
18      A.  (Indicating.)
19      Q.  Yes? The --
20      A.  Yes.
21      Q.  -- lawyers? What -- what information
22  did they tell you regarding the documents that made

Page 245

1   you feel comfortable about this declaration?
2       A.  Well --
3           MS. LIANG: Objection; attorney-client
4   privilege.
5           MR. TORBORG: I -- I think that he's the
6   one to assert that privilege.
7           MR. NEAL: I'll object. Can I have the
8   question read back.
9               - - -
10          (Whereupon, the previous question was
11  read back.)
12              - - -
13          MR. TORBORG: I -- I think we have a -- I
14  mean, a waiver situation at least. I mean he's
15  relying on information that's conveyed to him to
16  sign an affidavit or declaration. It seems to me
17  I'm -- I'm allowed to probe --
18          MR. NEAL: Your position's understood.
19  Let me -- let me take two minutes and consult with
20  agency counsel briefly on this.
21          We'll go off the record.
22          THE VIDEOGRAPHER: The time is 3:31 p.m.

62 (Pages 242 to 245)

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Page 250

1  listed in your declaration, going through Page 12.
2  Do you recall reviewing any of the particular
3  documents?
4       MR. NEAL: Go ahead and review the
5  declaration.
6       THE WITNESS: I -- I'm not sure.
7  BY MR. TORBORG:
8       Q. Who selected these particular documents
9  for inclusion in the actual text of your
10 declaration?
11      A. I believe legal counsel did, but at my
12 direction. When they came, I told them that I
13 believe certain information should be kept
14 internal, and I told them that it had to do with,
15 you know, discussions at exit and entrance
16 conferences, internal discussions in which we had
17 team meetings in which talked about methodology,
18 how things were going to -- the positives and
19 negatives of how to do this particular review.
20      Q. Have you asserted the deliberative
21 process privilege before, in --
22      A. No.

Page 251

1       Q. -- previous litigation?
2       A. No.
3       Q. This is the first time that you've done
4  it?
5       A. I think this is the first time I've been
6  involved in litigation.
7       Q. Okay. Do you understand that the -- the
8  deliberative process privilege is a qualified
9  privilege?
10      MR. NEAL: I'll object to the form.
11      You can answer.
12      THE WITNESS: Qualified in -- in -- in
13 what manner?
14 BY MR. TORBORG:
15      Q. Meaning it's not an absolute privilege,
16 unlike attorney-client privilege, where, generally
17 speaking, it's a absolute privilege pretty much no
18 matter what. Unless there's a crime going on, I'm
19 not allowed to know what you and John talked about
20 with respect to seeking and receiving legal advice,
21 on one hand.
22      On the other hand, there's a qualified

Page 252

1  privilege, such that the -- such as the
2  deliberative process privilege, that's not absolute
3  and can be overcome based upon a -- a showing of
4  need or a balancing of factors.
5       Do -- do you have that understanding?
6       A. Yes.
7       MR. NEAL: I'll object --
8       MR. AZORSKY: Objection.
9       MR. NEAL: I'll object to the form.
10      THE WITNESS: Yes.
11 BY MR. TORBORG:
12      Q. And do you understand that one of the
13 factors is what harm would come to OIG if
14 particular documents were disclosed?
15      MR. NEAL: I'll object to the form.
16      You can answer.
17      THE WITNESS: Yes.
18 BY MR. TORBORG:
19      Q. Why don't we go to the first document in
20 -- on Page 7, HHD900-0638 --
21      A. Uh-huh.
22      Q. -- through 652. What harm would come to

Page 253

1  OIG if this particular document was disclosed to
2  Abbott in this case?
3       MR. NEAL: I'll object to the form.
4       You can answer.
5       THE WITNESS: It's depending upon what
6  version it was of the report, how -- how many times
7  I had looked at it. What -- what -- what you're
8  talking about now is a document that's given to me
9  the first time in which then I would have to do my
10 review on it, make a determination as to the issues
11 that are involved with it. This -- this is --
12 usually I get the reports after the team has looked
13 at them, and then I work with the team to make a
14 final product.
15      And many times when this information
16 comes to me I have to go through and we have to
17 talk about the data that they have, the analysis
18 that they've done. All this is in the process that
19 makes us be able to do what we do. Because if I
20 was -- if I knew that you would be getting every
21 piece of information involved in every type of
22 review that we do, it would have a very chilling

Vito, Robert                                    June 19, 2007
Philadelphia, PA

Page 254

1  effect. I would not be able to communicate as
2  openly and freely and have an open dialogue with my
3  staff on this particular issues.
4  BY MR. TORBORG:
5       Q. How about with respect to a document on
6  -- on page -- why don't we go to the next one on
7  Page 7. What particular harm would come to OIG if
8  this particular document was disclosed to Abbott?
9       MR. NEAL: Objection as to form.
10      THE WITNESS: Again, this -- this allows
11 for my office members to communicate among themself
12 in a free and open -- a free-and-open environment,
13 to say what they feel, whether that means to be --
14 whether it has anything to particularly do with
15 this or not.
16      What I'm trying to say is that this
17 allows the communication process that we could talk
18 about what we have, the data we have, their --
19 their analysis as to how -- how it got there, my
20 questions as it relates to how why this -- why this
21 is done this way, why -- it would just be -- I
22 guess in some ways it would be your first draft and

Page 255

1  you want everybody to see your first draft of a --
2  a -- a document that eventually goes out, but the
3  first draft is often the area where a large amount
4  of effort is done to talk about what's in here, how
5  they arrived at what they got, and ways to -- that
6  we want to communicate what we found.
7  BY MR. TORBORG:
8       Q. Is there anything in particular about
9  this document and the comments provided by an OEI
10 staff member to another staff member that you think
11 would cause particular harm if it was disclosed to
12 be Abbott?
13      MR. AZORSKY: Objection.
14      MR. NEAL: I'll object to the form.
15      THE WITNESS: I -- I think, again, it has
16 to do with what the discussions -- the -- the
17 people are saying to each other. They -- they
18 might be saying, you know, something that I -- I
19 think would be internal to our office and should be
20 kept internal just to the office, because if
21 information about our internal deliberations and
22 discussions are now becoming public documents, then

Page 256

1  we will not be able to have any more internal
2  discussions and deliberations.
3  BY MR. TORBORG:
4       Q. Do you know what the particular comment
5  was from one staff member to another on March 21st,
6  2001; have you -- have you reviewed that comment?
7       MR. NEAL: Objection as to form.
8       You can answer that yes or no.
9       THE WITNESS: I don't recall. I -- I
10 don't.
11      MR. NEAL: Or I don't recall.
12 BY MR. TORBORG:
13      Q. Do -- do you know if you actually
14 reviewed that particular document?
15      A. I don't recall. I -- I -- I'd just like
16 to tell you that the workload that I have has been
17 very significant, and I have tried to do what I
18 have been asked to do.
19      Q. And I think what I've found out today,
20 and please correct me if I'm wrong, is that you
21 didn't spend a whole lot of time looking at the
22 particular documents. Correct?

Page 257

1       MR. NEAL: Objection as to form.
2       MR. AZORSKY: Objection.
3       THE WITNESS: I -- I -- I --
4  BY MR. TORBORG:
5       Q. Or a --
6       A. I don't --
7       Q. -- great deal of time, I think are the
8  words you used?
9       MR. AZORSKY: Objection to form.
10      MR. NEAL: The same objection.
11      THE WITNESS: I -- I did not -- I -- I
12 did not spend, yes, the time -- a significant
13 amount of time.
14 BY MR. TORBORG:
15      Q. What particular harm would come to OIG
16 if the first document on Page 7 were disclosed
17 under a protective order in this case; in other
18 words, it wouldn't necessarily go out to the
19 public, it would be limited to use in this
20 litigation?
21      MR. NEAL: Objection as to form.
22      THE WITNESS: Again, I -- I -- I think

65 (Pages 254 to 257)

Henderson Legal Services
202-220-4158

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert                                                          June 19, 2007
Philadelphia, PA

## Page 258

1  the issue at hand is for us to be able to
2  communicate in -- in a manner that keeps the
3  dialogue open between the people who are doing the
4  review and -- and -- and the people that are
5  reviewing the review, as well as being able to
6  communicate the issues at hand.
7       If -- if we were -- if -- if you were to
8  get every document and we knew that it would become
9  public, then I believe it would have a significant
10 stifling effect on our office, in that we would not
11 be able to do any of this type -- what would leave
12 any reference in there about what the discussions
13 were we had.
14 BY MR. TORBORG:
15    Q.  I -- I -- I think you misunderstood my
16 last question given the response. You -- you
17 included the comment that it would become public.
18    What I'm asking you here is: What harm would
19 result to OIG if this particular document was
20 disclosed to Abbott under a protective order in
21 this case and not available for public consumption?
22    MR. AZORSKY: Objection.

## Page 259

1       MR. NEAL: Objection as to form.
2       You can answer.
3       THE WITNESS: I -- I, again, think that
4  just for any of our work to be shared before it is
5  ready to be shared, it -- it would have a
6  significant impact on how we would be able to do
7  work in the future.
8  BY MR. TORBORG:
9     Q.  And some -- some of these documents on
10 the privilege log go back to the early-1990s,
11 right, at least the mid-1990s; is that fair to say?
12    A.  I think so.
13    Q.  A number of the -- for example -- well,
14 I'll just ask you to go to Page 6 of 15 of the
15 privilege log. The second to the last entry refers
16 to handwritten notes from an exit conference?
17    A.  Yes.
18    Q.  Did you review any of the notes or
19 summaries of any of the exit conferences, Mr. Vito?
20    MR. NEAL: I'll object to the form.
21    THE WITNESS: I think I did.
22 BY MR. TORBORG:

## Page 260

1     Q.  Okay. How many did you review?
2     A.  I don't -- I don't actually recall, but
3  I think that I did look at some of those --
4     Q.  Okay.
5     A.  -- because I had to go through the --
6  the files, and on occasions, I did go through
7  those.
8     Q.  And is there anything in your review of
9  those documents that -- those specific documents
10 and the comments made in those specific documents
11 that would cause harm to either OIG or CMS if they
12 were disclosed to Abbott in this case under
13 protective order?
14    MR. NEAL: Objection as to form.
15    You can answer.
16    THE WITNESS: I -- I think, again, the
17 discussions that we have with CMS are open
18 discussions that we hope to learn from them and to
19 have an open dialogue that allows us to communicate
20 back and forth. If there -- if we knew that every
21 document that we were sharing with them, that it
22 would become a public document, then it would be

## Page 261

1  something that we would be -- have to change the
2  way we do our work.
3  BY MR. TORBORG:
4     Q.  And I think you've -- you've done a nice
5  job of summarizing sort of a general purpose of the
6  deliberative process privilege. What I'm trying to
7  figure out is: Is there anything in those
8  particular documents, such as the exit interview
9  notes that you did review some, that causes you to
10 think there would be any particular harm, a
11 specific reason for that specific document, why it
12 would harm OIG or CMS if it was disclosed?
13    MR. NEAL: Objection as to form.
14    You can answer that question to the
15 extent you don't disclose the specific comments --
16    THE WITNESS: Yeah, I --
17    MR. NEAL: -- made in exit note -- exit
18 conference reports.
19    THE WITNESS: I think there might be.
20 BY MR. TORBORG:
21    Q.  Can you -- can you articulate any
22 specific harm that would come from disclosure of

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Page 262

1  any particular exit conference note?
2         MR. NEAL: Objection as to form.
3         You can answer that consistent with my
4  last instruction.
5         THE WITNESS: I -- I think there are some
6  things in there that are said during a
7  free-and-open conversation that would not be said
8  if -- if there were to become public documents. So
9  there are specific items I -- that I think I'm
10 certainly aware of that I would not want our
11 internal deliberations to make -- make -- make --
12 become public.
13 BY MR. TORBORG:
14    Q.  Do you recall, in reviewing any of those
15 exit conference notes, thinking to yourself, well,
16 that -- that seems kind of relevant to this case?
17        MR. NEAL: Objection as to form. Mr.
18 Vito's not a lawyer.
19        You can answer.
20 BY MR. TORBORG:
21    Q.  Well, you understand the issues that are
22 at play in this case, don't you?

Page 263

1         MR. NEAL: Objection as to form.
2         MR. AZORSKY: Objection to form.
3  BY MR. TORBORG:
4     Q.  Generally speaking?
5         MR. NEAL: The same objection.
6         THE WITNESS: I -- I think that the
7  issues that are there relate to multiple items, and
8  I -- I believe that it would have a chilling effect
9  on our organization if every document and every
10 discussion that we had during our review process
11 would become a -- made a public document.
12 BY MR. TORBORG:
13    Q.  Did you, in reviewing any of these
14 documents, without telling me the substance of the
15 document, think to yourself, boy, that's an
16 interesting document and would be relevant to the
17 lawsuits?
18        MR. NEAL: Objection as to form.
19        MR. AZORSKY: Objection to form.
20        THE WITNESS: The -- the one -- the ones
21 that I -- I looked at, I -- I -- I don't
22 think. I mean, I -- I -- I just think the ones

Page 264

1  that I remember had comments that relate strictly
2  to what we were doing, why we did it, how we did
3  it, and -- and the discussion among -- either
4  internally, among my staff and myself, or among our
5  staff and CMS.
6  BY MR. TORBORG:
7     Q.  And you reviewed a sampling of them,
8  right?
9     A.  I -- I -- I believe that I reviewed a
10 sampling of them, yes.
11    Q.  When you were making your decision on
12 whether to -- well, who -- whose decision was it,
13 Mr. Vito, to assert the deliberative process
14 privilege in this case?
15        MR. NEAL: Objection as to form.
16        You can answer.
17        THE WITNESS: I believe that I asked the
18 counsel to see if they could protect this
19 information because it was information that we were
20 using as we were doing our reports and information
21 that I thought would -- would be stifling our work
22 if -- if this information became public. I believe

Page 265

1  that I pointed out to the -- our legal counsel,
2  when we were looking at some of the documents, and
3  told them that I would like these documents to be
4  used in a deliberative manner.
5         I -- I -- I'm -- I'm not sure that I knew
6  all the exact legal terms, but I did say that I
7  thought that this information would be information
8  that would be not good if it became public, and I
9  believe that I gave them the general parameters in
10 which I felt that that would fit.
11 BY MR. TORBORG:
12    Q.  When you made the decision to assert the
13 privilege, did you consider what relevance any of
14 the documents withheld might have to the case?
15        MR. NEAL: Objection as to form.
16        You can answer that.
17        THE WITNESS: I -- I am not familiar with
18 all of the documents, but some of them strictly
19 relate to the way we did our work, the issues that
20 were involved in our work, communication among
21 staff about the -- the -- what we did, how we did
22 it, the pluses and minuses for doing certain

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Page 266

1  things.
2  BY MR. TORBORG:
3     Q. But you didn't do a document-by-document
4  review of -- balancing, you know, boy, that might
5  be relevant to the case, I'm not sure, I don't know
6  all the issues, but that might be relevant to the
7  case, vis-a-vis, oh, I really don't want to give
8  that one up, it's core to my deliberations; did you
9  do that kind of analysis?
10        MR. NEAL: I'll object to the form.
11        MR. AZORSKY: Objection.
12        MR. NEAL: But you can answer.
13        THE WITNESS: I don't -- I don't -- I did
14  not do that type of analysis.
15  BY MR. TORBORG:
16     Q. You'll be happy to know that I'm moving
17  on. I'd like to turn now to the work that your
18  office did related to albuterol sulfate in the
19  mid-1990s.
20     A. Yes, we did a lot of reports on
21  albuterol sulfate.
22        MR. TORBORG: I want to skip that one.

Page 267

1  BY MR. TORBORG:
2     Q. And at the out -- at the outset --
3        MR. TORBORG: I want to skip that one
4  too. Let's go to the next two.
5  BY MR. TORBORG:
6     Q. I'd like to start off by handing you a
7  couple of the reports that your office did.
8        THE WITNESS: Thank you. Thank you.
9        MR. TORBORG: For the record, I've handed
10 Mr. Vito copies of Exhibit Abbott 030, which is the
11 June 1996 OIG report titled, Suppliers' Acquisition
12 Costs for Albuterol Sulfate; as well as Exhibit
13 Abbott 060, which is a June 1996 OIG report titled,
14 A Comparison of Albuterol Sulfate Prices.
15 BY MR. TORBORG:
16    Q. Mr. Vito, I believe you'll tell me that
17 you're familiar with these reports and that they
18 were prepared under -- under your direction, in
19 your office. Is that right?
20    A. Yes, sir.
21    Q. And just to try to orient ourselves to
22 the reports, if we go to Exhibit Abbott 030, the

Page 268

1  suppliers' acquisition --
2     A. Okay.
3     Q. -- report, to the purpose on -- under
4  the Executive Summary. In that report, you were
5  examining suppliers' acquisition costs for
6  albuterol sulfate and comparing it to Medicare
7  allowances; is that right?
8     A. Yes, we were getting the acquisition
9  costs from suppliers and then comparing that to the
10 Medicare allowance.
11    Q. And then if we can go to the other
12 report --
13    A. Okay.
14    Q. -- A Comparison of Albuterol Sulfate
15 Prices, if we look under the Executive Summary,
16 under Purpose, the Purpose states: To assess the
17 appropriateness of the amount Medicare allows for
18 albuterol sulfate, a prescription inhalation drug
19 used in nebulizers.
20       And then under Background, the third
21 paragraph, the report states: We surveyed
22 pharmaceutical buying groups, mail order

Page 269

1  pharmacies, and retail pharmacy stores and compared
2  their prices for generic versions of albuterol
3  sulfate to the amount that Medicare allows.
4     Did I read that right?
5     A. Yes.
6     Q. And were you involved in these two
7  reports?
8     A. Yes.
9     Q. Now, both of these reports have a number
10 and a report 94 --
11    A. Yes.
12    Q. -- correct? And --
13    A. Yes.
14    Q. -- what -- what does that signify?
15    A. It's the -- when we start a job, we're
16 asked to give a -- get a CIN number, and this was
17 the number that they provided to us. Generally
18 speaking, it usually means that you started in '94;
19 however, the -- the conventions used by our office
20 did not always follow that -- that pattern.
21    Q. Do you have any reason to believe that
22 these two reports here that bear a 94 number did

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Page 289

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

VOLUME II

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| | : |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-A-Care of | : |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc. | : |
| No. 06-CV-11337-PBS | : |

- - -

Continuation of the videotaped deposition of ROBERT VITO was taken, pursuant to notice, at MORGAN LEWIS & BOCKIUS, LLP, 1701 Market Street, Philadelphia, Pennsylvania, on Wednesday, June 20, 2007, beginning at 8:43 a.m., before M. Kathleen Muino, Professional Shorthand Reporter, Notary Public; Michael Hunterton, Certified Legal Video Specialist, there being present:

37dbe22c-39bb-473f-8cc6-c16d7974b122

Vito, Robert - Vol. II                                              June 20, 2007
                        Philadelphia, PA

Page 346

1  drug, we believe current Medicare reimbursements
2  more than compensate suppliers for these costs
3  along with a reasonable profit margin.
4       What did you believe was a reasonable profit
5  margin for this drug?
6       MR. NEAL: I'll object to the form.
7       THE WITNESS: We -- we did not have a
8  specific number in mind.
9  BY MR. TORBORG:
10      Q.  But you believed that the supplier
11 should have some profit margin?
12      A.  There would be no one in the business if
13 there wasn't any incentive to have a profit.
14      Q.  Do you recall having any discussions at
15 any time with anyone at OIG or HCFA about what a
16 reasonable profit margin would be for albuterol
17 sulfate?
18      MR. NEAL: I'll object to the form.
19      You can answer that to the extent that
20 you don't disclose any communications that took
21 place in entrance/exit conferences or other
22 privileged settings.

Page 347

1       THE WITNESS: I think we had general
2  discussions.
3  BY MR. TORBORG:
4       Q.  What -- what do you remember about those
5  discussions?
6       A.  That it was just, you know, discussions
7  about what -- what should be a -- a markup.
8       Q.  What do you recall about what markup
9  would be appropriate in those discussions?
10      MR. NEAL: Object to the form.
11      And my instruction stands.
12      THE WITNESS: I -- I -- I don't remember
13 all the details, but there were discussions about
14 that, because we -- we believed that providers
15 should be paid a fair price.
16      MR. TORBORG: Can you get me Tab 181.
17      - - -
18      (Whereupon, Exhibit Abbott 240 was marked
19 for Identification.)
20      - - -
21 BY MR. TORBORG:
22      Q.  Mr. Vito, what I've handed you as

Page 348

1  Exhibit Abbott 240 is a copy of a regulation that,
2  I believe, actually relates to the Medicaid
3  program. I'm going to ask you to, if you would, go
4  to the second page, to the Section 447.204,
5  Encouragement of provider participation. Are you
6  with me?
7       A.  Yes.
8       Q.  I'll read it in -- into the record. If
9  you would follow along. That section provides:
10 The agency's payments -- and I believe this is
11 referring to a state agency given what comes before
12 it on the page.
13      The agency's payments must be sufficient to
14 enlist enough providers so that services under the
15 plan are available to recipients at least to the
16 extent that those services are available to the
17 general population.
18      Mr. Vito, have you reviewed that regulation
19 before today?
20      MR. AZORSKY: Objection to form.
21      THE WITNESS: This -- this -- this
22 relates to Medicaid, and all the other lines of

Page 349

1  questionings were Medicare.
2  BY MR. TORBORG:
3       Q.  Yeah.  I -- I'm switching over to
4  Medicaid.
5       A.  Okay.  So this is now focused on
6  Medicaid?
7       Q.  Yes.
8       A.  Okay.  I -- I -- I -- I believe -- I --
9  I don't remember.
10      Q.  Do you recall having discussions about
11 the fact that Medicaid regulations had a provision
12 in them that required that the payment that the
13 state plan provided for drugs needed to be enough
14 to enlist enough providers --
15      A.  Yeah, yeah --
16      Q.  -- so that --
17      A.  -- I think we were certainly aware of
18 that.
19      MR. NEAL: I'll object to the form.
20      You've answered.
21 BY MR. TORBORG:
22      Q.  Do you recall discussions about that?

16 (Pages 346 to 349)

Page 450

1    THE WITNESS: In -- in -- in 199 -- in
2  October 1st 1997, in -- in her response?
3  BY MR. TORBORG:
4    Q. Yes.
5    A. I -- I -- I didn't see anything
6  specifically in her response relating to albuterol
7  sulfate, but I didn't look at it carefully.
8    Q. And when you had conversations with HCFA
9  about the fact that they had to reimburse based
10 upon the prices in Red Book and other price
11 listings, it wasn't limited to albuterol sulfate,
12 was it?
13   MR. NEAL: Object to the form of the
14 question.
15   THE WITNESS: When -- when we -- when we
16 met with CMS on this report, it was specifically
17 addressing this report. When we met with CMS on
18 the other report, it was to specifically address
19 that report.
20 BY MR. TORBORG:
21   Q. I think earlier you testified that you
22 recalled some conversations with HCFA with respect

Page 451

1  to the fact that they felt that they had to pay
2  based upon the average wholesale prices published
3  in Red Book and other price listings?
4    A. Yeah, I said depending upon what time it
5  was --
6    Q. Yeah, the time period.
7    A. Yes. That --
8    Q. Okay.
9    A. Because even in her comments on October
10 1st, 1997, they're talking about estimated -- it
11 says: Contracted carriers determine the amount
12 that Medicare will pay for its drugs based on the
13 lower of the estimated acquisition cost or the
14 national wholesale average price.
15   Then it further defines estimated acquisition
16 cost as the survey of actual invoice prices paid
17 for the drug.
18   Q. Which report are you referring to?
19   A. The one that --
20   Q. The '97 report?
21   A. Yes, on Page D-2. Do --
22   Q. Yeah, I see.

Page 452

1    A. Okay.
2    Q. And in your report, page little I --
3    A. Yes.
4    Q. -- Roman et I, you had indicated that:
5  On January 1, 1998, Medicare Part B will begin to
6  reimburse covered drugs at 95 percent of the
7  average wholesale price. Correct?
8    A. Yes, sir.
9    Q. So that -- that's the date at which the
10 regulation changed to no longer allow use of
11 estimated acquisition cost, but then required the
12 use of average wholesale price; is that right?
13   A. I -- I -- I believe so, yes.
14   Q. And do you recall having conversations
15 after the Balanced Budget Act of 1997 or after
16 January 1, 1998 about the fact that HCFA felt it
17 was required to pay based upon the published prices
18 in Red Book and other price listings?
19   MR. NEAL: I'll object to the form.
20   And again instruct you: You can answer
21 that so long as you don't disclose the substance of
22 any communications that took place in privileged

Page 453

1  settings, such as the exit or entrance conferences.
2    THE WITNESS: I'm -- I'm -- I -- I think
3  we probably did.
4  BY MR. TORBORG:
5    Q. And were those conversations limited to
6  albuterol sulfate, or did they apply to all drugs
7  reimbursed by the Medicare program?
8    MR. NEAL: I'll object to the form.
9    You can answer.
10   THE WITNESS: I think it depended upon
11 when -- when we issue one report, we only talk
12 about the findings that relate to that specific
13 report. So that when we were talking about
14 albuterol sulfate, it was focused mainly on
15 albuterol sulfate. On the other -- in this
16 particular report, the one in 1997, it was twenty
17 of the top utilized drugs by dollar volume, so we
18 would be talking about those in this -- in this
19 report.
20   Q. Did you have conversations with respect
21 to the drugs of the 1997 report, where HCFA told
22 you that they felt that they had to pay based upon

Vito, Robert - Vol. II                                             June 20, 2007
                        Philadelphia, PA

Page 454

1  the published prices in the compendia?
2       MR. NEAL: Objection as to form.
3       And, again, you can answer that
4  consistent with my previous instruction on
5  privilege.
6       THE WITNESS: I -- I -- I don't remember.
7  There might have been, but I -- I really don't
8  remember. And, again, it's the -- the time frames
9  also.
10      MR. TORBORG: Let's do one more document,
11 if we could, and then we'll break for lunch.
12      MR. NEAL: That's fine.
13 BY MR. TORBORG:
14   Q.  Mr. Vito, I'm going to hand you, as you
15 correctly predicted --
16   A.  Thanks.
17   Q.  -- a later report. This is an OIG
18 report titled Medicare Reimbursement of Albuterol,
19 June of 2000. It indicates -- the report indicates
20 it was also prepared under your direction. Is that
21 right?
22   A.  Yes, sir.

Page 455

1    Q.  And in this report, you found -- or the
2  purpose of this report was to compare the amount
3  that Medicare reimburses for albuterol with the
4  amounts reimbursed by Medicaid and the Department
5  of Veterans Affairs and prices available at
6  pharmacies; is that right?
7    A.  Yes.
8    Q.  And what you concluded is that Medicare
9  at that point was allowing $0.47 per milligram; is
10 that right?
11   A.  I'll go and look at the chart. I'm
12 sorry, I --
13   Q.  It's on the bottom of Page 1 of the
14 Executive Summary.
15   A.  Okay. 47, yes.
16   Q.  And the VA was able to purchase
17 albuterol in its generic form through the Federal
18 Supply Schedule for $0.07 per milligram; is that
19 right?
20   A.  Yes.
21   Q.  And per milligram is -- is not
22 necessarily the same thing as per milliliter; is

Page 456

1  that right?
2    A.  That's correct.
3    Q.  Do you have a sense of what the -- what
4  would $0.47 per milligram translate to per
5  milliliter?
6    A.  I think it's in here, but I don't
7  remember offhand.
8    Q.  I think it is too. I was hoping you
9  could tell me to save time.
10   A.  I -- I -- I can't remember offhand, but
11 I know we had numerous discussions in my office to
12 make sure that that was handled properly.
13      MR. TORBORG: The collective masses are
14 invited to point it out if they find it.
15      THE WITNESS: Okay. I think it might be
16 in the Methodology. Conversion of prices, on Page
17 8.
18 BY MR. TORBORG:
19   Q.  With that guidance, do you have a sense
20 for how $0.47 per milligram would translate to a
21 per-milliliter amount?
22   A.  It says by dividing the Medicaid Federal

Page 457

1  Upper Limit price of $0.20 per milliliter by 0.823,
2  we calculated the Medicaid upper limit payment
3  equals $0.24 per milligram. So apparently we
4  converted the milliliters to milligrams. But,
5  again, I -- I don't remember offhand on this, but I
6  do remember that we tried to do it right.
7    Q.  Okay. And I'm sure you guys did.
8    A.  Thank you.
9    Q.  And you also determined that the Federal
10 Upper Limit for albuterol was $0.24 per milligram?
11 That's on Page 2, I think.
12   A.  Yes. Medicare's reimbursement amount
13 was almost double the $0.24 per milliliter, yes --
14 or gram.
15   Q.  Do you know when it was that HCFA
16 implemented an Federal Upper Limit for albuterol
17 sulfate in this dosage?
18   A.  There -- there is -- I don't remember
19 the exact date on this, but I do remember that
20 there were times when there was a Federal Upper
21 Limit price and then there were also times that
22 there were not a Federal Upper Limit price for this

43 (Pages 454 to 457)

Page 490

1    Q. Starting with the -- the first part of
2 the article, in the first column, where the type
3 gets really small, and I'll -- I'll do the favor of
4 reading it --
5    A. Thank you.
6    Q. -- because it -- it will be even
7 difficult for me to read it, but I'll do my best.
8    A. As you get older, it's harder to see.
9    Q. It's starting to get for me as well. For
10 many drugs, especially the growing number coming
11 off patent and going generic, the drug providers
12 actually pay wholesale prices that are 60 to 90
13 percent below the so-called average wholesale
14 price, or AWP, used in reimbursement claims.
15    When did you become aware of the fact that
16 there were -- that generic drugs were being sold to
17 providers at amounts 60 to 90 percent below average
18 wholesale prices?
19    MR. NEAL: I'll object to the form of the
20 question.
21    THE WITNESS: I think we became -- I
22 mean, of course, this article pointed it out, but I

Page 491

1 think we also, our work in albuterol sulfate, which
2 is the generic, demonstrated some of those issues
3 as well, as well as some of the other work that we
4 have done here. I believe at this time Leucovorin
5 was also a generic, so there were other generic
6 products that we had seen and seen some pricing
7 variations on.
8 BY MR. TORBORG:
9    Q. Do you recall discussions with CMS
10 officials in this time frame about the fact that
11 generic drugs were selling at amounts 60 to 90
12 percent below the so-called average wholesale
13 prices?
14    MR. NEAL: Objection as to form.
15    THE WITNESS: I believe when we issued
16 our reports, the reports pointed out that the
17 products were selling below the -- the AWP and that
18 clearly some of the products were generic.
19 BY MR. TORBORG:
20    Q. Did you have a more global discussion
21 about generic drugs in general and what was causing
22 many of those drugs to sell at prices -- for there

Page 492

1 to be such a difference between the actual selling
2 price and average wholesale prices?
3    MR. NEAL: I'll object to the form and
4 just instruct the --
5    Instruct you that you can answer that
6 question consistent with my previous instructions
7 not to disclose the substance of any communications
8 that took place at entrance or exit conferences
9 with CMS.
10    THE WITNESS: Could you restate the
11 question now? I -- I -- I totally --
12    MR. NEAL: That's a lengthy instruction.
13    THE WITNESS: Yeah.
14    MR. NEAL: I apologize.
15 BY MR. TORBORG:
16    Q. Did you have any global discussions
17 about generic drugs in general with CMS --
18    A. Well --
19    Q. Let me finish.
20    A. I'm sorry.
21    Q. -- regarding the fact that there was a
22 -- a larger difference between the actual selling

Page 493

1 prices to providers and the published average
2 wholesale price?
3    MR. AZORSKY: Object to the form.
4    MR. NEAL: I object to the form as well.
5    And you heard my previous instruction.
6    THE WITNESS: I -- I -- I believe that we
7 -- our reports spoke for themself, in that there
8 were some products that were generics that were --
9 that had that difference, and there were also some
10 brand name products that had that difference as
11 well. And, again, it was each -- each report stood
12 on its own merit. Albuterol, I think that you
13 showed me we probably did at least -- I saw at
14 least four of the ones that we did, and they were
15 generic drugs, and we were showing what was going
16 on in that.
17    In addition to that, I -- I -- the
18 excessive Medicare reimbursement report, I believe
19 that also pointed out some problems both with the
20 brand name products and the generic products.
21 BY MR. TORBORG:
22    Q. And we'll -- we'll get into the 1997

Page 606

1   A.  I don't recall it, but I -- I -- I'm
2   sure I read it.
3   Q.  If I could ask you to go to the bottom
4   of the first column, last paragraph, it starts,
5   With drugs?
6   A.  Uh-huh.
7   Q.  The article states: With drugs such as
8   albuterol and infusion drugs, quote, there is a
9   profit margin, end quote, notes Tim Redmon, with
10  the National Community Pharmacists Association. He
11  adds that, after last year's small reduction,
12  industry observers, quote, at least suspected that
13  somebody would come back for more cuts. That's
14  exactly what's happening now. End quote.
15      Then there's a section that says, HCFA Can
16  Develop a Dispensing Fee, where the article states:
17  In addition to reducing the reimbursement for
18  prescription drugs to 95 percent of the average
19  wholesale price, the 1998 budget gave the Health
20  Care Financing Administration the authority to
21  develop a dispensing fee for those drugs, notes
22  Attorney Alan Parver with Powell, Goldstein, Frazer

Page 607

1   and Murphy in Washington, DC. That authority is
2   something we could certainly use to develop our
3   educational efforts with HCFA, Parver notes.
4       Pharmacies, infusion providers, and DME
5   dealers need to teach HCFA more about what they do
6   and what services they render, since Medicare
7   currently does not pay at all for services in
8   addition to drugs, Parver insists.
9       Quote, it's unclear to me how, if an entity is
10  paid its acquisition cost for a drug, it could
11  possibly provide any services, Parver adds. In the
12  infusion area, that would probably make it very
13  difficult for a pharmacy to provide any services.
14      In the past, Redmon claims, Medicare officials
15  would argue that the service component was, quote,
16  built into the fee schedule for prescription drugs.
17  Now that this component may be removed, Medicare's
18  insistence that it, quote, won't pay for services,
19  end quote, means that the providers are left unable
20  to service beneficiaries, he maintains.
21      I wanted to read all of that just to give you
22  the -- the context. Do you recall comments to the

Page 608

1   effect, Mr. Vito, from HCFA officials that claimant
2   -- that payment for services was built into the fee
3   schedule for prescription drugs?
4       MR. NEAL:  I'll object to the form.
5       And just instruct you that you can answer
6   that to the extent you don't implicate any
7   privileged communications with HCFA officials.
8       THE WITNESS:  I -- I -- I am not certain
9   on -- on that.  I -- I -- I don't know for
10  sure if that's what was discussed or if they said
11  that the cost is -- is -- that the reimbursement is
12  the reimbursement, so I don't -- I -- I don't
13  recall.
14      THE VIDEOGRAPHER:  Excuse me, Counsel.
15  Whoever just joined the conference call,
16  if you'll please put your phone on mute; we're
17  getting a feedback echo on this end.
18      My apologies.
19  BY MR. TORBORG:
20  Q.  So are -- are you not -- not certain it
21  was discussed, or you just --
22  A.  I -- I am --

Page 609

1   Q.  -- don't know --
2   A.  I --
3       MR. PAUL:  Objection.
4       THE WITNESS:  I don't totally recall and
5   that the answer to your question [sic]. I'm not
6   sure.
7   BY MR. TORBORG:
8   Q.  Have you ever heard the term cross
9   subsidize?
10  A.  I have.
11  Q.  And in what context?
12  A.  I believe that in the prescription drug
13  work, they said that -- I -- I -- I -- I heard that
14  prices, excessive prices for the ingredient cost
15  would be used to help subsidize the other side.
16  Q.  And who is "they"?
17  A.  I believe that that was mentioned at the
18  hearing, and I don't know exactly who -- who talked
19  about that at the hearing.
20      THE VIDEOGRAPHER:  Excuse me, Counsel,
21  we're still getting a feedback on the audio. Do
22  you want me to --

Vito, Robert - Vol. II                                      June 20, 2007
                         Philadelphia, PA

Page 610

1   MR. TORBORG: I'm just about done.
2   THE VIDEOGRAPHER: -- get an operator on
3   the phone?
4   MR. McDONALD: Well, yeah, but, David,
5   it's going to terrible. Why don't you just mute it
6   or something? It's going to be worthless to have
7   the video and not -- I mean, I can hear the
8   feedback back here. Just mute the conference call.
9          ---
10  (Whereupon, the telephone was muted.)
11         ---
12  BY MR. TORBORG:
13  Q.  And do you recall who it was that made
14  the comment at the hearing?
15  A.  I don't recall, but I do believe that
16  that was mentioned at -- at the -- at the hearing.
17  It might have been GAO or it might have been -- I
18  don't know exactly who it was, but there is a
19  record of the hearing. I believe it was in -- in
20  2001, either September or October.
21  Q.  Was that concept ever discussed at the
22  state pharmacy association meetings that you

Page 611

1   attended?
2   A.  The -- the -- again, you're talking
3   about the Medicare context of -- and then the other
4   -- the state representatives are the Medicaid. So
5   I believe that the Medicaid, we mainly talked about
6   the AWP issues. We did not -- in our reports, we
7   did not talk about the Medicare issues with them
8   unless it had to do with J codes, in which they
9   were being billed to the Medicaid program.
10  Q.  Do you recall discussions at the state
11  pharmaceutical meetings that you attended that the
12  payment for ingredient costs would subsi --
13  subsidize an insufficient dispensing fee?
14  MR. NEAL: Objection as to form.
15  THE WITNESS: I -- I think there has
16  always been questions about the dispensing fee and
17  if it's proper or not, so there probably was some
18  discussions about that.
19  BY MR. TORBORG:
20  Q.  And do you recall any conversations with
21  HCFA relating to the Medicare side about whether or
22  not the payment for ingredient cost would subsidize

Page 612

1   inadequate payment for services?
2   MR. NEAL: You can answer that consistent
3   with my previous instruction on privileged
4   communications with HCFA officials.
5   THE WITNESS: I think it --
6   MR. AZORSKY: Objection to form.
7   THE WITNESS: I think it was -- in our
8   later reports, we mention that in the conclusion or
9   the recommendation, so I think there was -- that
10  was definitely, I believe, in a public document
11  from the OIG.
12  BY MR. TORBORG:
13  Q.  With -- without revealing to me the
14  substance of the communications, was that a -- a
15  topic that was discussed at the exit conferences
16  that you had with HCFA?
17  MR. NEAL: You can answer that question
18  yes or no.
19  THE WITNESS: Hmph.
20  MR. NEAL: Or I -- or I don't remember.
21  MR. AZORSKY: Objection to form.
22  THE WITNESS: I don't remember.

Page 613

1   MR. TORBORG: Why don't we break for the
2   day.
3   MR. NEAL: That's fine.
4   MR. TORBORG: Thank you very much, Mr.
5   Vito, for your time.
6   THE VIDEOGRAPHER: The time is 4:34 p.m.
7   We're going off the record, concluding this day's
8   testimony, consisting of six tapes in the
9   deposition of Robert Vito, in the matter of In Re:
10  Pharmaceutical Average Wholesale Price Litigation.
11  This -- this day of testimony consists of six tapes
12  and will be held by Henderson Legal Services of
13  Washington, DC.
14         ---
15  (Whereupon, the deposition adjourned at
16  4:35 p.m.)
17         ---
18
19
20
21
22

82 (Pages 610 to 613)

Henderson Legal Services
202-220-4158

37dbe22c-39bb-473f-8cc6-c16d7974b122