# Exhibit I

Ragone, Linda - Vol. I                                  April 17, 2007
                          Philadelphia, PA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY    : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    : CIVIL ACTION:

Florida Keys, Inc. v. Abbott      : 06-CV-11337-PBS

Laboratories, Inc.                :

---------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                 : CASE NO.

        Plaintiff,                : CV-05-219

    v.                            :

ABBOTT LABORATORIES, INC.,        : JUDGE

et al.,                           : CHARLES PRICE

        Defendants.               :

---------------------------------X


Henderson Legal Services
202-220-4158

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                                         April 17, 2007
                          Philadelphia, PA

Page 330

1  was following the fact that they had to pay at AWP.
2  BY MR. COOK:
3      Q.  And to the extent that HCFA promulgated
4  a regulation, HCFA determined that it believed, at
5  least, that that was the appropriate amount,
6  correct?
7          MR. NEAL:  Objection as to form.
8          THE WITNESS:  I don't know if they felt
9  it was appropriate.
10 BY MR. COOK:
11     Q.  Did you ever discuss with anybody at
12 HCFA what they thought was an appropriate amount of
13 reimbursement?
14         MR. NEAL:  I'm going to object to the
15 question.
16         In fact, I'm going to instruct you not to
17 answer to the extent that that would reveal any
18 communications that took place at exit or entrance
19 conferences.  You've stated that you didn't -- you
20 don't have any recollection of those conferences.
21         If you can answer the question without
22 referring to any communications that took place

Page 331

1  there, you can answer the question.
2          THE WITNESS:  Would you repeat the
3  question again, please?
4  BY MR. COOK:
5      Q.  Sure.
6          MR. NEAL:  That was a lengthy objection.
7  I apologize.  There are privilege concerns.
8  BY MR. COOK:
9      Q.  Did you ever discuss with anybody at
10 HCFA what HCFA believed would be an appropriate
11 amount of reimbursement for drugs under Medicare
12 Part B?
13     A.  I don't remember if we discussed that at
14 the entrance and exit conferences.
15     Q.  At any time, with any HCFA official, did
16 you discuss what an appropriate amount of Medicare
17 reimbursement would be?
18     A.  I don't remember discussing what the
19 exact amount of appropriate reimbursement would be.
20     Q.  Leaving aside an exact precise amount,
21 do you remember discussing with any HCFA officials
22 how one would go about determining an appropriate

Page 332

1  level of reimbursement for Medicare Part B paid
2  drugs?
3          MR. NEAL:  Objection.
4          You can answer that to the extent that
5  you do not reveal communications that took place at
6  entrance or exit conferences.
7          THE WITNESS:  I believe based on the
8  options we provided them, those were some of the --
9  the discussion was based on the -- our
10 recommendations.
11 BY MR. COOK:
12     Q.  Do you recall, did HCFA implement any of
13 your recommendations?
14     A.  I -- can I go back and read them?
15     Q.  Sure.
16     A.  May I go back and read them?
17     Q.  Absolutely.  It's at Page 7 of Exhibit
18 Abbott 060.
19     A.  I believe, and I don't remember if it
20 was regulatory or legislated, that there was a
21 change made to AWP in later years to provide that
22 Medicare pay a discounted rate.

Page 333

1      Q.  And that would be 95 percent of AWP; is
2  that correct?
3      A.  That's the figure I remember.
4      Q.  And that would have been the Balanced
5  Budget Amendment -- Balanced Budget Act of 1997;
6  does that sound right?
7      A.  It sounds right.
8      Q.  Okay.
9      A.  I don't believe that they'd ever
10 instituted a manufacturer rebate.  I do believe
11 that there are items being competitively bid now.
12 I recall discussions about inherent -- inherent
13 reasonableness.  I do not know if CMS ever did it.
14 And I do not believe that they have -- are paying
15 based on an estimated -- based on an estimated
16 acquisition cost, using that term.
17     Q.  And so you made the recommendation that
18 discounted wholesale price would get to, perhaps,
19 an appropriate reimbursement amount for Albuterol
20 Sulfate, correct?
21         MR. NEAL:  Objection as to form.
22         THE WITNESS:  I think that the

Ragone, Linda - Vol. I  April 17, 2007
Philadelphia, PA

Page 366

1  Q. Did you have a range of amounts that
2  would have been appropriate in mind?
3      MR. NEAL: The same objection.
4      THE WITNESS: I don't -- I don't remember
5  exactly what I recalled at the time I was writing
6  this, but I don't think I had a range of amounts
7  that I thought would be appropriate.
8  BY MR. COOK:
9  Q. And sticking with the summary findings,
10 you found that the Department of Veterans Affairs
11 -- well, let me switch that over and strike that.
12     You found that Medicare pays between 56
13 percent and 550 percent more than the Department of
14 Veterans Affairs for Albuterol Sulfate in 1998; is
15 that correct?
16 A. That's the way I read that statement.
17 Q. And that was the finding in the report
18 that you drafted, correct?
19 A. Yes.
20 Q. And as the project leader, you would
21 have drafted the report?
22 A. Most likely, yes.

Page 367

1  Q. And the second point under this was that
2  Medicare allowed 20 percent more than the average
3  Medicaid payment for Albuterol Sulfate in 1997; is
4  that correct?
5  A. Yes.
6  Q. You further found that Medicare allowed
7  up to 333 percent more than acquisition costs
8  available for Albuterol Sulfate in 1998, correct?
9  A. Yes.
10 Q. And finally, you found that the
11 customers of mail order pharmacies would pay up to
12 30 percent less than Medicare for Albuterol Sulfate
13 in 1998, correct?
14 A. Yes.
15 Q. Do you remember what it was that
16 prompted you to issue an additional report in
17 August 1998, following your June 1996 report on
18 Albuterol Sulfate?
19 A. I don't remember.
20 Q. To your knowledge, had HCFA taken any
21 actions to respond to the recommendations in your
22 June 1996 report at the time you issued this August

Page 368

1  1998 report?
2      MR. NEAL: Objection as to form.
3      You can answer.
4      THE WITNESS: I -- I don't remember. I'd
5  have to read the comments, the CMS comments of the
6  report.
7  BY MR. COOK:
8  Q. And where would I find those?
9  A. If the agency commented, it would be in
10 the back -- it's in the back of the report.
11 Q. And so that would be this June 11, 1998
12 memo to June Gibbs Brown from Nancy-Ann Min
13 DeParle; is that correct?
14 A. Yes.
15 Q. Looking at that report, it indicates: We
16 reviewed the above-referenced report.
17     Any reason to believe that the Health Care
18 Finance Administration had not reviewed the report?
19 A. I have no reason to believe that, since
20 the statement says that they reviewed it.
21 Q. It indicates, in the second paragraph
22 there, that: HCFA concurs with the intent of the

Page 369

1  OIG report recommendation.
2      And then goes on to make specific responses.
3  Q. Do you recall HCFA concurring with the intent
4  of your recommendations in June of 1998?
5  A. I do not recall it. I'm reading it here
6  now.
7  Q. But you would have had communications
8  with HCFA officials, correct?
9  A. This would have been the official
10 communication on their concurrence or
11 nonconcurrence with the findings and
12 recommendations of the report.
13 Q. But in addition to this, you would have
14 had an entrance -- an entrance meeting, right?
15 A. Normally we would. I can't tell you if
16 we absolutely had it for here. We would have
17 normally had an entrance and an exit conference for
18 this report.
19 Q. Any reason to believe that any of the
20 sentiments expressed in the entrance and exit
21 conferences for this report varied from the
22 official responses given by Ms. Min DeParle in this

93 (Pages 366 to 369)

Page 370

1   memo?
2       MR. NEAL: I'm going to object to the
3   question and instruct you not to answer.
4   BY MR. COOK:
5       Q. Ms. Ragone --
6       MR. MERKL: You're not going to let her
7   answer that yes or no?
8       MR. NEAL: Answering it yes or no would
9   possibly implicate the substance of communications
10  that she had in an exit conference concerning this
11  report.
12  BY MR. COOK:
13      Q. Generally speaking, Ms. Ragone, did you
14  ever find it to be the case that your oral
15  communications with officials at HCFA conflicted at
16  all with the written responses that they would
17  submit to the Office of Inspector General?
18      MR. NEAL: You can answer that generally.
19      THE WITNESS: Generally, for our -- in
20  our -- all of our inspections, not just
21  prescription drugs, there have been times when
22  there haven't been what we believed to be

Page 371

1   objections raised during these conversations, and
2   then when we get the formal comments, there will be
3   technical comments or objections raised that we
4   never heard at the exit conference.
5   BY MR. COOK:
6       Q. And so if -- back up one. Have you ever
7   had the experience where an objection was raised at
8   the exit conference that was not reflected in the
9   written --
10      A. Yes --
11      Q. -- comments?
12      A. -- I believe I've had an experience
13  where somebody has raised a personal objection,
14  their feelings, and that doesn't become part of the
15  formal comments back to our agency.
16      Q. And so if Abbott and the other
17  defendants were seeking to determine what it is
18  that HCFA knew and what it is that HCFA intended to
19  do when it comes to Medicare reimbursement, we
20  would need to find out what was said at the exit
21  conference to get a complete picture of what the
22  agency knew and intended, correct?

Page 372

1       MR. NEAL: I'm going to object --
2       MS. POLLACK: Objection.
3       MR. NEAL: -- to the form of the
4   question.
5       THE WITNESS: I don't know --
6       MR. NEAL: You can answer.
7       THE WITNESS: I don't know if you would
8   get from those what the whole agency intended or
9   knew about it. You would just -- if you heard
10  anything, it would be the people that were in that
11  room, and not everybody in those converse -- in
12  those conferences speaks, so I don't know what you
13  would get from those. I don't remember the
14  conversations.
15  BY MR. COOK:
16      Q. But there would -- you admit that there
17  would be more information about what the agency
18  knew and intended from those communications than
19  from simply the written comments submitted,
20  correct?
21      MR. NEAL: I'm going to object to the
22  form of the question.

Page 373

1       THE WITNESS: I believe that there are
2   statements made during those conferences that do
3   not appear in the formal written comments.
4   BY MR. COOK:
5       Q. Do you know why?
6       A. I don't know why. I believe that it's
7   because it's an informal conversation. I mean, we
8   often will provide them with details during those
9   conferences that we discuss back and forth. As I
10  said, sometimes there's conversation, sometimes
11  there's not a lot of conversation. It varies based
12  on the report.
13      Q. The first OIG recommendation listed in
14  this June 11, 1998 memorandum says: HCFA
15  immediately reduced Medicare reimbursement for
16  Albuterol Sulfate by 15 percent, using the new
17  authority outlined in the Balanced Budget Act of
18  1997.
19      That's on Page A2.
20      A. Well, you're looking at their comments.
21  Yes.
22      Q. Yes, ma'am. I'm looking at that the

Page 386

1  Q. Okay. So to wrap it up, could you
2  please give testimony to the jury about how you
3  knew $0.43 was inappropriate?
4       MR. NEAL: Objection to the form. This
5  has been asked and answered a number of times.
6       MR. COOK: Okay. Your objection's on the
7  record. I'll read it again.
8  BY MR. COOK:
9  Q. Could you please testify and tell the
10 jury how you knew that $0.43 was an inappropriate
11 amount of reimbursement for Medicare to pay for
12 Albuterol Sulfate?
13 A. We base those findings and our
14 recommendations on the work that we did, where we
15 found prices in the marketplace that were far below
16 the price that Medicare was paying.
17 Q. What do you mean by far below?
18 A. I'd have to go back to reports, but the
19 percentages that you were reading off.
20 Q. So in 1996, you found that buying groups
21 were paying between 13 and $0.19, correct?
22 A. I believe that's true. I don't have the

Page 387

1  report in front of me, but yes.
2  Q. And retail pharmacy customers were
3  paying $0.38 or above, correct?
4  A. We found that 55 percent of them were
5  charging less than what Medicare reimbursed, 45
6  percent were more.
7  Q. And 75 percent were paying $0.38 or
8  more, correct?
9  A. I don't know if 75 is the correct
10 number.
11 Q. And so can you tell me, how much is far
12 below?
13 A. No.
14 Q. And so it's your testimony that you can
15 opine on what is inappropriate without having an
16 opinion about what is appropriate?
17      MR. NEAL: Objection; asked and answered.
18 This is argumentative.
19 BY MR. COOK:
20 Q. Is that your testimony?
21 A. My testimony is that I could produce
22 findings and recommendations based on what I found

Page 388

1  that suggest that something is not appropriate or
2  not reasonable and not provide what is appropriate
3  or reasonable.
4  Q. Do you know whether it was the position
5  of the Office of Inspector General that the Office
6  of Inspector General had no opinion about what an
7  appropriate amount of Medicare Part B drug
8  reimbursement would be?
9       MR. NEAL: Objection to the form.
10      THE WITNESS: I do not know what the
11 Inspector General at that -- during this juncture
12 would have thought would be the appropriate price
13 for a drug.
14 BY MR. COOK:
15 Q. Getting back to Exhibit Abbott 064,
16 Lisa Foley is listed as a program specialist. On an
17 earlier sign-in sheet, it appeared that Lisa Foley
18 was signed in as an attorney. Is Lisa Foley an
19 attorney?
20 A. I believe Lisa Foley is an attorney.
21 Q. And a program specialist?
22 A. She might -- might have been for a short

Page 389

1  period of time. I don't remember her being a
2  program specialist.
3  Q. Okay. But at some point in time she
4  became an attorney?
5  A. I know when I met her, she was an
6  attorney.
7  Q. And when she worked with you on this
8  report, as a program specialist at headquarters,
9  was she acting as an attorney?
10 A. I don't recall any conversations with
11 Lisa about this report. I don't know.
12 Q. Do you recall any conversations with
13 Cynthia Hansford relating to this report?
14 A. I don't remember any of them, no.
15 Q. Do you recall any conversations with
16 Robert Vito relating to this report?
17 A. No, I don't remember any conversations
18 about this report.
19 Q. Stuart Wright?
20 A. No.
21 Q. Back to Ms. Min DeParle's responses to
22 OIG's recommendations in her June 11, 1998 memo,

Page 390

1  and I'm here at Page A-2 of Exhibit Abbott 064. The
2  second sentence of Ms. Min DeParle's response, at
3  the bottom there of Page A-2, reads: If given the
4  authority, HCFA would like to increase the discount
5  we now take on the published average wholesale
6  price and base our price on the acquisition cost.
7      Is that consistent with what employees of HCFA
8  advised you about what HCFA would like to do when
9  it comes to Medicare Part B reimbursement?
10     MR. NEAL: Objection.
11     I'm going to instruct you not to answer
12 to the extent that would get into conversations
13 that took place at exit or entrance conferences.
14 BY MR. COOK:
15     Q. Can you answer the question consistent
16 with the instruction?
17     A. I don't recall -- I don't remember any
18 -- any of the conversations that we had with CMS
19 staff about their feelings about this
20 recommendation.
21     Q. The sentence begins, at the bottom of
22 Page A-2: If given the authority, HCFA would like

Page 391

1  to increase the discount we now take on the
2  published average wholesale price.
3      Was it your understanding that HCFA did not
4  have authority to increase the discount they took
5  on the published average wholesale price?
6      MR. NEAL: Object to the form.
7      You can answer.
8      THE WITNESS: I don't remember ten, you
9  know, years ago what I knew the authority to be or
10 not to be at that time.
11 BY MR. COOK:
12     Q. This sentence refers to both the
13 published average wholesale price and as an
14 alternative basing the price on acquisition cost.
15 Was it your understanding that in June of 1998, the
16 Health Care Finance Administration did not believe
17 that average wholesale price was the same as
18 acquisition cost?
19     MR. NEAL: Objection as to form.
20     THE WITNESS: I don't know what they
21 believed in June of 1988 [sic].
22 BY MR. COOK:

Page 392

1      Q. Well, you had discussions with HCFA,
2  correct?
3      MR. NEAL: Objection to the form. I don't
4  know that she said that.
5  BY MR. COOK:
6      Q. You had communications with individuals
7  at HCFA with respect to Medicare drug pricing
8  reimbursement -- and reimbursement, correct?
9      A. We would have had entrance and exit
10 conferences, yes.
11     Q. Were you able to draw any conclusions
12 from the conversations about whether individuals at
13 HCFA understood that published average wholesale
14 price was the same or different than acquisition
15 cost?
16     MR. NEAL: Objection.
17     You can answer that yes, no, or I don't
18 remember.
19     THE WITNESS: I don't -- I don't know
20 what they understood. I don't remember.
21 BY MR. COOK:
22     Q. Well, in the next sentence, Ms. Min

Page 393

1  DeParle states that: The acquisition price and the
2  average wholesale price are two distinct pricing
3  methods.
4      First, given the work that you did in '96,
5  '97, and '98 on Medicare Part B drug reimbursement,
6  would you agree that acquisition price and average
7  wholesale price are two distinct pricing methods?
8      MR. WINGET-HERNANDEZ: Objection to form.
9      MR. NEAL: I join the objection.
10     THE WITNESS: I believe that the
11 acquisition prices that we saw for some of the
12 drugs that we reviewed were not similar to average
13 wholesale price.
14 BY MR. COOK:
15     Q. And so paying based upon acquisition
16 price would be a different pricing method than
17 paying based upon average wholesale price, correct?
18     MR. WINGET-HERNANDEZ: Objection to form.
19     MR. NEAL: The same objection.
20     THE WITNESS: I think it would depend on
21 what the average wholesale price -- what the
22 average wholesale price represented for an

Page 412

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

VOLUME II

------------------------------------X  MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY      :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION  :  01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

Laboratories, Inc.                  :

------------------------------------X

         IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                   :  CASE NO.

         Plaintiff,                 :  CV-05-219

    v.                              :

ABBOTT LABORATORIES, INC.,          :  JUDGE

et al.,                             :  CHARLES PRICE

         Defendants.                :

------------------------------------X

Ragone, Linda - Vol. II                                April 18, 2007
                    Philadelphia, PA

Page 477

1   A. It goes -- right now it goes up on the
2   Internet, yes.
3   Q. And the purpose of that distribution
4   process is to put these reports in the hands of
5   policymakers, who can use this information in
6   making policy decisions?
7        MR. DRAYCOTT: Objection.
8        MR. COOK: What's the objection?
9        MR. DRAYCOTT: For one, you didn't, first
10  of all, establish that she would know what the
11  purpose for the distribution is when you asked her
12  what the distribution -- what the purpose is.
13  BY MR. COOK:
14  Q. If I ever ask you a question, Ms.
15  Ragone, and you don't know the answer, feel free to
16  say I don't know.
17       Can you tell me whether one of the purposes of
18  distributing these reports was to put it in the
19  hands of policymakers who can use this information
20  in making policy decisions?
21  A. I believe it is our hope that by putting
22  these findings and recommendations together and

Page 478

1   putting them in published reports, that the people
2   who this information would be germane to would read
3   it and have access to it.
4   Q. Now, this was in December 1997. Do you
5   know if anytime after December 1997, HCFA, later
6   CMS, abandoned AWP as the benchmark for reimbursing
7   Medicare Part B drugs?
8   A. I haven't been in the drug arena as much
9   at the end. I believe that they are using new
10  strategies now, reimbursement methodologies, in
11  Medicare.
12  Q. When was it that you left the
13  prescription drug -- was that 2004?
14  A. There were a few times I had been the
15  DRIG, and then a team leader, Dave Tawes, began
16  leading most of the drug work, and he would work
17  more often directly with our manager, Robert Vito,
18  so the actual pricing work, I haven't done in quite
19  some time.
20  Q. As of 2004, was Medicare still using AWP
21  to base its Medicare Part B drug reimbursement?
22  A. I don't remember what the time period

Page 479

1   was when it changed to --
2   Q. Can you give me a rough? After 2000?
3   A. Yes.
4   Q. After 2002? After 2001?
5   A. I think after 2002. I'm not quite sure
6   when the legislation was enacted.
7   Q. So whenever the legislation was enacted,
8   perhaps for as many as five years after receiving
9   the conclusions of this report, Medicare Part B
10  continued to pay, for the 22 drugs reviewed in this
11  report, based upon AWP, correct?
12       MR. DRAYCOTT: Objection.
13       THE WITNESS: Based upon, I guess,
14  starting in 1998, they paid AWP minus 5 percent.
15  BY MR. COOK:
16  Q. But still based upon the AWP?
17  A. Correct.
18  Q. Did you ever have an argument with
19  anybody at HCFA about the wisdom of doing that?
20       MR. DRAYCOTT: Objection.
21       THE WITNESS: I'm not -- I don't know if
22  I would call it an argument. We've certainly had

Page 480

1   discussions during exit conferences about the fact
2   that a different pricing methodology might be
3   appropriate.
4   BY MR. COOK:
5   Q. What do they say about that?
6        MR. DRAYCOTT: Objection.
7        Instruct you not to answer.
8   BY MR. COOK:
9   Q. I know you're going to be instructed not
10  to answer, but I do have to put the questions on
11  the record, Ms. Ragone.
12       So let me get this straight. You sit down in
13  a room, at a conference table like this with folks
14  from HCFA; you tell them that AWP exceeds
15  acquisition costs, as defined in the report, by up
16  to ten times, right?
17  A. Yes.
18  Q. You tell them that the OIG recommends
19  that they stop paying that high an amount for
20  prescription drugs, right?
21       MR. DRAYCOTT: Objection to the extent
22  that you're asking for the contents of her

                                    18 (Pages 477 to 480)

Henderson Legal Services
202-220-4158

1d6c6e27-b012-4f09-8e5b-80880a7fe603

Ragone, Linda - Vol. II                                       April 18, 2007
                         Philadelphia, PA

Page 481

1   communications to HCFA during the exit conference.
2         MR. COOK: If you'd just instruct her not
3   to answer. Are you instructing her not to answer?
4         MR. DRAYCOTT: I am.
5   BY MR. COOK:
6       Q. So you make whatever communications you
7   do to HCFA in these exit conferences --
8         MR. DRAYCOTT: Objection.
9   BY MR. COOK:
10      Q. -- after giving them a copy of this
11  report, right?
12        MR. DRAYCOTT: Objection.
13        And you're instructed not to answer.
14  BY MR. COOK:
15      Q. And you make your recommendations,
16  correct?
17        MR. DRAYCOTT: You can answer that
18  question.
19        THE WITNESS: During the exit
20  conferences, we will tell them the findings and
21  recommendations.
22  BY MR. COOK:

Page 482

1       Q. And you encourage them, that is,
2   officials at HCFA, to reimburse prescription drugs
3   based upon something other than the published
4   average wholesale price?
5         MR. DRAYCOTT: Objection.
6         You're instructed not to answer.
7   BY MR. COOK:
8       Q. And, in fact, you do so heatedly,
9   correct?
10        MR. DRAYCOTT: Objection.
11        And you're instructed not to answer.
12  BY MR. COOK:
13      Q. And they respond?
14        MR. DRAYCOTT: You can answer whether or
15  not they responded.
16        THE WITNESS: If they have comments, they
17  will respond when we provide the findings and
18  recommendations.
19  BY MR. COOK:
20      Q. Did they explain why HCFA continued to
21  pay based upon AWP, notwithstanding the fact that
22  HCFA knew average wholesale price could exceed

Page 483

1   acquisition cost by as much as ten times?
2         MR. DRAYCOTT: You can answer as to
3   whether or not they responded without revealing the
4   response, if you remember.
5         THE WITNESS: I believe that they stated
6   why they were using the reimbursement strategy they
7   were using at that time.
8   BY MR. COOK:
9       Q. And what was their explanation?
10        MR. DRAYCOTT: Objection.
11        And you're instructed not to answer.
12  BY MR. COOK:
13      Q. Why do you believe HCFA continued to use
14  average wholesale price to pay for Medicare Part B
15  drugs after you issued this report in December
16  1997?
17        MR. DRAYCOTT: Objection.
18        And you're instructed not to answer to
19  the extent your belief is based on communications
20  from HCFA during an exit conference.
21  BY MR. COOK:
22      Q. I'll let you work out that metaphysical

Page 484

1   problem.
2       A. I -- I believe --
3         MR. DRAYCOTT: Well --
4         THE WITNESS: -- that the --
5         MR. DRAYCOTT: Let me ask you: Can you
6   answer that question without revealing the content
7   of communication from HCFA during the conference?
8         THE WITNESS: I believe I can. I believe
9   I can.
10        MR. DRAYCOTT: Okay.
11        THE WITNESS: I believe that the level of
12  people that we were talking to believed that the
13  regulations or legislations were set for payment at
14  a certain place and that that's what Medicare was
15  bound to reimburse at.
16  BY MR. COOK:
17      Q. Who at HCFA is responsible for setting
18  Medicare Part B drug payment policy?
19      A. Policy?
20      Q. What the amount is that they would pay.
21      A. I believe that would be regulated or
22  legislated.

                                        19 (Pages 481 to 484)

Henderson Legal Services
202-220-4158

1d6c6e27-b012-4f09-8e5b-80880a7fe603