# Exhibit J

Tawes, David - Vol. I  April 24, 2007
Philadelphia, PA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY      :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION   :  01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :  06-CV-11337-PBS

Laboratories, Inc.                   :

------------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                    :  CASE NO.

        Plaintiff,                   :  CV-05-219

    v.                               :

ABBOTT LABORATORIES, INC.,           :  JUDGE

et al.,                              :  CHARLES PRICE

        Defendants.                  :

------------------------------------X

Tawes, David - Vol. I                                    April 24, 2007
                              Philadelphia, PA

Page 178

1   And then using my highlighter, would you
2   highlight the ones that were -- that are
3   multiple-source, MS?
4       A.  (Complies.)
5       Q.  Now, as you review that schedule, does
6   anything pop out at you in the Percent Saved column
7   for the highlighted columns, multiple-source drugs?
8       MR. NEAL: Objection as to form.
9       THE WITNESS: That there is large
10  potential savings for almost all of the -- as far
11  as percent saved, for the multiple-source drugs.
12  BY MR. TORBORG:
13      Q.  And does that mean there was a larger
14  difference between acquisition cost, as shown in
15  the market and shown in the pricing catalogs, and
16  the AWPs?
17      MR. NEAL: Objection as to form.
18      THE WITNESS: Yes.
19  BY MR. TORBORG:
20      Q.  Okay.  Do you recall discussions at OIG
21  relating to the fact that there were such large
22  differences between the catalog prices for

Page 179

1   multiple-source drugs and the AWPs for those drugs?
2       A.  I don't recall talking about
3   multiple-source drugs specifically.
4       Q.  How about generics?
5       A.  Or -- or generics specifically.  I mean,
6   obviously we did some specific studies on a few of
7   these projects because of the large spreads we
8   found in here.
9       Q.  But fair to say that your -- as
10  reflected in this chart, which provides the detail
11  of your report, right, shows very large savings
12  potential for multiple-source drugs --
13      MR. NEAL: Objection to --
14  BY MR. TORBORG:
15      Q.  -- right?
16      MR. NEAL: -- the form.
17      THE WITNESS: Again, large savings
18  potential as a -- as a percentage, not necessarily
19  as a total dollar figure.
20  BY MR. TORBORG:
21      Q.  Do you think it's appropriate to
22  evaluate the differences between prices as a

Page 180

1   percentage?
2       MR. NEAL: Objection as to form.
3       THE WITNESS: I think it's certainly one
4   way to evaluate it.
5   BY MR. TORBORG:
6       Q.  You -- do you recall any discussions at
7   any time at OIG with the fact that there was such
8   large spreads for generic multi-source drugs?
9       A.  Not generic as a whole.  Again, for a
10  couple particular products, we certainly discussed
11  it.
12      Q.  And which products were those?
13      A.  That would be Albuterol and Leucovorin
14  Calcium, I remember specifically.
15      Q.  What do you recall about Leucovorin
16  Calcium?
17      A.  That in later -- a couple later reports
18  that I worked on, it was a generic, I believe,
19  cancer drug that seemed to have AWPs that were
20  vastly out of line with actual acquisition costs.
21      Q.  Did you have any discussions with
22  individuals at CMS about the large percentage

Page 181

1   differences in the -- in the prices for generic
2   drugs between actual acquisition cost, as shown in
3   catalogs, versus published AWPs?
4       MR. NEAL: I'm going to object to the
5   question.
6       I'll instruct you not to answer to the
7   extent that those -- your answer would reveal
8   communications that took place in the context of
9   entrance or exit conferences with CMS personnel.
10      THE WITNESS: Not outside of entrance or
11  exit conferences.
12  BY MR. TORBORG:
13      Q.  Do you recall having the discussions at
14  all?
15      MR. NEAL: I'm going to instruct the
16  witness not to answer that question.
17      MR. TORBORG: Can I ask him whether,
18  without divulging specific communications, if he
19  recall the discussions happening at all?
20      MR. NEAL: The problem is, the
21  discussions you're talking about involve a specific
22  substance area.

46 (Pages 178 to 181)

Henderson Legal Services
202-220-4158

bcab4204-38f1-4b48-ab34-7037316b0f5a

Page 182

1   MR. TORBORG: That I think is important
2   to the case; that's why I'm asking about it.
3   MR. NEAL: That may be, but, you know,
4   that -- that doesn't play into our privilege --
5   privilege assertion, so...
6   MR. TORBORG: So what you're saying, in
7   essence, is regardless of how important it may be
8   to my defense, you're still going to assert the
9   privilege, no matter what?
10  MR. NEAL: You can characterize it
11  however you want to. I mean, the fact is, this is
12  an important governmental privilege, and we're
13  going to assert the privilege in this case. We
14  have motions pending on -- you know, on this matter
15  as we speak, and the Court will presumably resolve
16  it for us.
17  MR. TORBORG: Okay. Hopefully this will
18  be of assistance.
19  BY MR. TORBORG:
20  Q. If we go to Page 10 of your report,
21  Recommendations, what was the purpose for the
22  Recommendations section of the report?

Page 183

1   A. To make recommendations to CMS about how
2   they could impact or -- or implement some of the
3   changes that would be called for by the findings of
4   our report.
5   Q. Did you attend the exit conference for
6   this report?
7   A. I don't believe so.
8   Q. Do you recall any discussions with CMS
9   about this report?
10  A. No.
11  Q. If you look at page -- I'm sorry -- the
12  section under Discounted Wholesale Price, that
13  recommendation, the fifth sentence down, it starts
14  with, In addition. Are you with me?
15  A. Uh-huh.
16  Q. It says: In addition, the secretary
17  should be granted the authority to conduct sample
18  surveys of actual wholesale prices to determine the
19  amount of difference between actual average
20  wholesale prices and published AWPs. The
21  percentage difference found in the sample could
22  then be applied to all AWPs used by the program to

Page 184

1   determine drug reimbursement.
2   Do you have an understanding of what that
3   recommendation is -- is all about?
4   A. Yes.
5   Q. Do you recall discussing -- discussing
6   that recommendation with anyone at CMS at any time?
7   MR. NEAL: Objection.
8   You can answer that to the extent that
9   you don't reveal the substance of communications
10  that took place at exit or entrance conferences.
11  THE WITNESS: No.
12  BY MR. TORBORG:
13  Q. The second recommendation is Acquisition
14  Cost. It states: Medicare could base the payment
15  of drugs on either actual or estimated acquisition
16  costs. Although Medicare currently has the
17  authority to use EAC, carriers have yet to
18  successfully implement the option.
19  Do you recall any discussions about the
20  inability to use the estimated acquisition cost
21  approach in reimbursing Medicare Part B drugs?
22  A. No.

Page 185

1   Q. By the time you came in, in 1997,
2   estimated acquisition cost was sort of a
3   methodology of the past; is that fair to say?
4   MR. NEAL: I'll object to the form.
5   You can answer.
6   THE WITNESS: In Medicare, yes.
7   BY MR. TORBORG:
8   Q. How about for Medicaid?
9   A. In Medicaid, as far as I know, estimated
10  acquisition cost is still on the books, and it's up
11  to states to determine the definition -- or not the
12  definition, but it's up to states to determine what
13  estimated acquisition cost is.
14  Q. Okay. And do you recall any discussions
15  at OIG about whether or not states were
16  implementing that requirement in accordance with
17  the law?
18  MR. NEAL: Objection as to form.
19  THE WITNESS: I don't think the law gave
20  them specific instruction about how to implement
21  the requirement.
22  BY MR. TORBORG:

Tawes, David - Vol. I                                         April 24, 2007
                              Philadelphia, PA

Page 262

1  what's referred to in this report as high-priced
2  generic drugs?
3      A. No.
4      Q. What is your understanding of what
5  HCFA's responsibility is with respect to
6  determining how much the Medicaid program
7  reimburses for drugs?
8          MR. NEAL: Object to the form.
9          You can answer the question.
10         THE WITNESS: It's my understanding that
11 they set broad guidelines that states are supposed
12 to abide by, and as long as states are within those
13 broad guidelines, short of any other law or
14 regulation saying otherwise, that -- you know, that
15 the -- they just wanted to ensure that states
16 generally meet the -- meet the guidelines.
17 BY MR. TORBORG:
18     Q. What broad guidelines are in existence
19 with respect to Medicaid reimbursement of drugs?
20         MR. NEAL: Objection as to form.
21         THE WITNESS: That states should pay
22 either the lower of the estimated acquisition cost

Page 263

1  or the usual and customary charge for the drug.
2  BY MR. TORBORG:
3      Q. Do you have an understanding of what
4  CMS's statutory or regulatory obligation is to
5  assure that states are reimbursing drugs at a true
6  estimated acquisition cost?
7          MR. NEAL: Objection as to form.
8          You can answer.
9          THE WITNESS: I -- I don't know what
10 CMS's specific authority is to ensure that.
11 BY MR. TORBORG:
12     Q. Do you recall any discussions about
13 whether or not CMS was performing its obligation in
14 overseeing the Medicaid program for reimbursement
15 of drugs?
16     A. In specific Federal Upper Limit studies,
17 I'm sure we looked at the way CMS was sort of
18 ensuring that drugs were added to the Federal Upper
19 Limit List for Medicaid in a timely manner and also
20 ensuring that those prices were appropriate. But
21 as far as, you know, all drugs as a whole, no.
22 BY MR. TORBORG:

Page 264

1      Q. And skipping ahead a little bit to
2  tomorrow, what you found with respect to -- to
3  Federal Upper Limits is that CMS was not timely
4  adding drugs to the Federal Upper Limit List,
5  correct?
6      A. Correct.
7      Q. And it was your understanding that it
8  was CMS or HCFA's statutory obligation to add
9  qualified drugs -- or drugs that were supposed to
10 be on the Federal Upper Limit List to the Federal
11 Upper Limit List, correct?
12         MR. NEAL: Objection as to form.
13         THE WITNESS: Yes, even though the law
14 never said anything about when it had to be done.
15 BY MR. TORBORG:
16     Q. Did you have discussions with anyone at
17 CMS about why it was that CMS was not adding drugs
18 to the Federal Upper Limit List that should have
19 been added to the FUL List?
20         MR. NEAL: Objection.
21         You can answer that question so long as
22 you don't disclose the contents of any

Page 265

1  conversations that took place during exit or
2  entrance conferences.
3          THE WITNESS: The conversations were all
4  in entrance and exit conferences.
5  BY MR. TORBORG:
6      Q. Well, let me see if I can ask this. Did
7  CMS officials at the entrance and exit conferences
8  explain to you why it was that drugs were not being
9  added timely to the Federal Upper Limit List?
10         MR. NEAL: I'm going to instruct you not
11 to answer the question.
12         It gets into the substance of their --
13         MR. TORBORG: Just a yes --
14         MR. NEAL: -- topics --
15         MR. TORBORG: -- or no question.
16         MR. NEAL: Answering that question yes or
17 no would reveal the contents of the communications,
18 so...
19         MR. TORBORG: It wouldn't reveal -- it's
20 just a -- the broad general topic, whether it was
21 discussed.
22         MR. NEAL: It's on the borderline, but

### Page 266

1   I'm going instruct him not to answer at this time.
2   BY MR. TORBORG:
3       Q. Other than a lack of resources, did HCFA
4   provide any other explanations as to why drugs were
5   not being added to the Federal Upper Limit List?
6           MR. NEAL: Objection.
7           You can answer that to the extent that
8   you don't reveal the substance of any
9   communications that took place during entrance or
10  exit conferences with CMS.
11          THE WITNESS: Outside of those
12  conferences, anything -- any explanations that they
13  came up with would have been in their comments to
14  the reports.
15  BY MR. TORBORG:
16      Q. Let me see if I can ask that again.
17  Other than a lack of resources at CMS, did HCFA
18  provide any other explanations as to why drugs were
19  not being added to the Federal Upper Limit List?
20          MR. NEAL: I'll object to the question.
21          And then you can answer that to the
22  extent that you don't reveal the substance of

### Page 267

1   communications that took place at entrance or exit
2   conferences with CMS.
3           THE WITNESS: Again, without going back
4   to their official comments to the report, I mean,
5   that's the extent outside of entrance and exit
6   conferences.
7   BY MR. TORBORG:
8       Q. At the entrance and exit conferences,
9   did CMS provide any explanations, besides
10  resource-based reasons, why drugs were not being
11  added to the FUL List?
12          MR. NEAL: I'm going to instruct you not
13  to answer the question.
14          MR. TORBORG: Just a yes or no, he can't
15  answer that?
16          MR. NEAL: I'm going to instruct not to
17  answer, yeah, it's -- my objection stands.
18          MR. TORBORG: So there may be reasons why
19  CMS did not add specific drugs to the FUL List that
20  I'm not going to get to figure out?
21          MR. NEAL: I mean, your question
22  presupposes certain substantive communications from

### Page 268

1   CMS and --
2           MR. TORBORG: That's why --
3           MR. NEAL: -- he's not --
4           MR. TORBORG: -- I'm asking --
5           MR. NEAL: -- going to disclose --
6           MR. TORBORG: -- yes or no.
7           MR. NEAL: He's not going to disclose
8   those communications.
9           MR. TORBORG: Well --
10          MR. NEAL: The objection stands. I'm not
11  --
12          MR. TORBORG: -- I'm not --
13          MR. NEAL: -- going to debate --
14          MR. TORBORG: -- trying to pre --
15          MR. NEAL: -- with you right now, but, I
16  mean, I -- the objection stands. You're asking
17  about the substance of communications that took
18  place and entrance and exit conferences, and, you
19  know, we've asserted a -- a fairly broad objection
20  over the substance of those communications. I
21  don't think he can answer that even yes or no
22  without disclosing the substance of the

### Page 269

1   communication.
2           MR. TORBORG: I guess that answers the
3   question in itself, but --
4           MR. NEAL: I don't know --
5           MR. WINGET-HERNANDEZ: Objection to form.
6           MR. NEAL: -- what you're talking about,
7   but...
8           MR. HAVILAND: John, you're under oath
9   now.
10          MR. TORBORG: Yeah.
11  BY MR. TORBORG:
12      Q. The last paragraph of HCFA's response to
13  this report states: Furthermore, HCFA is
14  undertaking a more comprehensive review of drug
15  prices and how they affect the Medicaid program and
16  will issue future guidance to the states on this as
17  appropriate.
18          Do you recall HCFA taking a more comprehensive
19  review of drug prices?
20      A. No.
21      Q. Do you have any idea what they're
22  referring to there?

Page 296

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

VOLUME II

-----------------------------------X  MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY      : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION  : 01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      : CIVIL ACTION:

Florida Keys, Inc. v. Abbott        : 06-CV-11337-PBS

Laboratories, Inc.                  :

-----------------------------------X

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA,                   : CASE NO.

        Plaintiff,                  : CV-05-219

    v.                              :

ABBOTT LABORATORIES, INC.,          : JUDGE

et al.,                             : CHARLES PRICE

        Defendants.                 :

-----------------------------------X

58feec2f-99ac-42be-8c4e-803a680a2c55

Page 345

1  Q. Is it regulated by statute?
2     MR. NEAL: Objection as to form.
3     THE WITNESS: At the time of this report,
4  it was not.
5  BY MR. TORBORG:
6  Q. Is it regulated by statute today?
7     MR. NEAL: Objection as to form.
8     THE WITNESS: I'm not sure if it is or
9  not.
10 BY MR. TORBORG:
11 Q. Did you become aware, in your work at
12 OIG, that different manufacturers had different
13 practices with how they calculated WAC?
14 A. I am not sure that -- in fact, I know I
15 never spoke with any manufacturers about how WAC
16 was -- how they calculated WAC.
17 Q. Are you aware of any communications
18 between the United States government and
19 pharmaceutical manufacturers with respect to how
20 WAC, or wholesale acquisition costs, should be
21 reported?
22    MR. NEAL: Objection as to form.

Page 346

1     You can answer.
2     THE WITNESS: No.
3  BY MR. TORBORG:
4  Q. Do you recall any discussions with CMS
5  about the possibility of using the WAC price of
6  $0.11 per milligram to reim -- as a basis for
7  reimbursing under Medicare Part B?
8     MR. NEAL: I'll instruct you to answer
9  that question -- you can answer that question to
10 the extent that your answer does not implicate any
11 privileged conversations with CMS officials.
12    THE WITNESS: I don't recall any specific
13 discussions about WAC.
14 BY MR. TORBORG:
15 Q. Do you recall any general conversations
16 at all about the subject of WAC during your time at
17 OIG?
18 A. Other than discussions about WAC being
19 another -- another compendia price similar to AWP,
20 no.
21 Q. Did Mr. Vito comment that that was
22 another price that was not legally defined or

Page 347

1  regulated?
2     MR. NEAL: Objection as to form.
3     THE WITNESS: I don't know if he
4  commented on that specifically, on WAC
5  specifically, in that manner.
6  BY MR. TORBORG:
7  Q. If we go to the next page, three little
8  "I," under your recommendations, under the section,
9  Medicare should reduce excessive reimbursements
10 amounts for Albuterol, the second sentence in the
11 first paragraph, you wrote: We have consistently
12 found that the published average wholesale prices
13 currently used by Medicare to establish
14 reimbursement amounts bear little to no -- little
15 or no resemblance to actual wholesale prices that
16 are available to suppliers and large government
17 purchasers.
18    We understand that unlike most drugs covered
19 by Medicare, Albuterol is usually provided by
20 suppliers rather than administered by physicians.
21    Is a supplier -- what is a supplier?
22 A. In terms of Albuterol, it would be a

Page 348

1  pharmacy, either a physical pharmacy or an on-line
2  pharmacy.
3  Q. Then you also wrote, continuing: These
4  suppliers obviously need to make a profit from the
5  products they provide, yet the spread between what
6  Medicare reimburses for Albuterol and the price at
7  which suppliers are able to purchase the drug is
8  significant.
9     What did you mean when you wrote, suppliers
10 obviously need to make a profit from the products
11 they provide?
12    MR. NEAL: Objection as to form.
13    THE WITNESS: Exactly what the sentence
14 says; that suppliers -- that pharmacies make their
15 money by selling drugs for more than they purchase
16 the drugs.
17 BY MR. TORBORG:
18 Q. Did OIG have an opinion on what amount
19 of profit would be appropriate for pharmacies who
20 provide drugs to Medicare Part B beneficiaries?
21    MR. NEAL: I'll object to the form. This
22 is not a 30(b)(6) deposition.

Page 365

1 inadequate Medicare payments for services related
2 to furnishing the drug, such as the administration
3 of chemotherapy for cancer. We need to pay
4 appropriately for the drugs and the services
5 related to furnishing these drugs.
6    Do you recall any discussions about that with
7 CMS?
8        MR. NEAL: You can answer that question
9 to the extent that your answer doesn't implicate
10 any privileged communication.
11       MR. WINGET-HERNANDEZ: Objection to form.
12       THE WITNESS: I don't recall any specific
13 discussions outside of entrance or exit
14 conferences.
15 BY MR. TORBORG:
16   Q. Did you ever use the term "drug profits"
17 during your time at OIG?
18       MR. NEAL: Object to the form.
19       You can answer.
20       THE WITNESS: I -- I don't recall using
21 that specific term.
22 BY MR. TORBORG:

Page 366

1    Q. Did you ever use -- do you ever recall
2 using the term "cross-subsidize"?
3    A. I don't think I would have used that
4 specific term either.
5    Q. Do you recall anyone else using that
6 term?
7    A. Aside from -- that specific term, aside
8 from these comments, no.
9    Q. Do you recall any discussions within OIG
10 or CMS about the concept of the payment for the
11 drug making up for underpayment for physician
12 services?
13       MR. NEAL: You can answer that consistent
14 with my previous instruction on privileged
15 communication.
16       MR. WINGET-HERNANDEZ: Objection to form.
17       THE WITNESS: I recall those discussions.
18 However, again, I'm not sure that it was -- it was
19 more along the lines of this is what physicians
20 say. There was no real discussion of the validity
21 of -- of the physicians' claims.
22 BY MR. TORBORG:

Page 367

1    Q. Because OIG had never studied that
2 particular issue, right?
3        MR. NEAL: Objection as to form.
4        THE WITNESS: As far as I know, at least
5 OEI had not studied that issue.
6 BY MR. TORBORG:
7    Q. Do you recall CMS ever asking OIG to
8 study that issue?
9        MR. WINGET-HERNANDEZ: Objection to form.
10       THE WITNESS: I recall being asked to
11 look at the dispensing-fee issue. I don't
12 necessarily recall being asked to look into
13 physician service costs.
14 BY MR. TORBORG:
15   Q. What do you -- what do you recall about
16 being asked to look at the dispensing-fee issue?
17   A. In converse -- in conversations with
18 CMS, them asking how much it really cost physicians
19 -- I'm sorry -- how much it really cost the
20 pharmacies to dispense the drugs and what services
21 they're -- they're providing for those dispensing
22 fees.

Page 368

1    Q. And just to back up a step, what is a
2 dispensing fee?
3    A. A dispensing fee is a fee paid with each
4 prescription filled by a pharmacy.
5    Q. Is the dispensing fee supposed to
6 include a level of profit?
7        MR. NEAL: Objection as to form.
8        THE WITNESS: I am not sure about the --
9 about what it's supposed to include.
10 BY MR. TORBORG:
11   Q. With whom did you have these
12 conversations?
13       MR. NEAL: Let me just instruct you to
14 answer that question consistent with my previous
15 instruction. You can discuss this so long as you
16 don't implicate essentially privileged
17 communications at entrance and exit conferences.
18       THE WITNESS: I don't recall exactly who
19 was at the meeting. It would have been someone
20 that I mentioned earlier as folks that I had met
21 with, but I can't remember specifically who was
22 there.

Page 365

1  inadequate Medicare payments for services related
2  to furnishing the drug, such as the administration
3  of chemotherapy for cancer. We need to pay
4  appropriately for the drugs and the services
5  related to furnishing these drugs.
6      Do you recall any discussions about that with
7  CMS?
8          MR. NEAL: You can answer that question
9  to the extent that your answer doesn't implicate
10 any privileged communication.
11         MR. WINGET-HERNANDEZ: Objection to form.
12         THE WITNESS: I don't recall any specific
13 discussions outside of entrance or exit
14 conferences.
15 BY MR. TORBORG:
16     Q. Did you ever use the term "drug profits"
17 during your time at OIG?
18         MR. NEAL: Object to the form.
19         You can answer.
20         THE WITNESS: I -- I don't recall using
21 that specific term.
22 BY MR. TORBORG:

Page 366

1      Q. Did you ever use -- do you ever recall
2  using the term "cross-subsidize"?
3      A. I don't think I would have used that
4  specific term either.
5      Q. Do you recall anyone else using that
6  term?
7      A. Aside from -- that specific term, aside
8  from these comments, no.
9      Q. Do you recall any discussions within OIG
10 or CMS about the concept of the payment for the
11 drug making up for underpayment for physician
12 services?
13         MR. NEAL: You can answer that consistent
14 with my previous instruction on privileged
15 communication.
16         MR. WINGET-HERNANDEZ: Objection to form.
17         THE WITNESS: I recall those discussions.
18 However, again, I'm not sure that it was -- it was
19 more along the lines of this is what physicians
20 say. There was no real discussion of the validity
21 of -- of the physicians' claims.
22 BY MR. TORBORG:

Page 367

1      Q. Because OIG had never studied that
2  particular issue, right?
3          MR. NEAL: Objection as to form.
4          THE WITNESS: As far as I know, at least
5  OEI had not studied that issue.
6  BY MR. TORBORG:
7      Q. Do you recall CMS ever asking OIG to
8  study that issue?
9          MR. WINGET-HERNANDEZ: Objection to form.
10         THE WITNESS: I recall being asked to
11 look at the dispensing-fee issue. I don't
12 necessarily recall being asked to look into
13 physician service costs.
14 BY MR. TORBORG:
15     Q. What do you -- what do you recall about
16 being asked to look at the dispensing-fee issue?
17     A. In converse -- in conversations with
18 CMS, them asking how much it really cost physicians
19 -- I'm sorry -- how much it really cost the
20 pharmacies to dispense the drugs and what services
21 they're -- they're providing for those dispensing
22 fees.

Page 368

1      Q. And just to back up a step, what is a
2  dispensing fee?
3      A. A dispensing fee is a fee paid with each
4  prescription filled by a pharmacy.
5      Q. Is the dispensing fee supposed to
6  include a level of profit?
7          MR. NEAL: Objection as to form.
8          THE WITNESS: I am not sure about the --
9  about what it's supposed to include.
10 BY MR. TORBORG:
11     Q. With whom did you have these
12 conversations?
13         MR. NEAL: Let me just instruct you to
14 answer that question consistent with my previous
15 instruction. You can discuss this so long as you
16 don't implicate essentially privileged
17 communications at entrance and exit conferences.
18         THE WITNESS: I don't recall exactly who
19 was at the meeting. It would have been someone
20 that I mentioned earlier as folks that I had met
21 with, but I can't remember specifically who was
22 there.

Tawes, David - Vol. II                                         April 25, 2007
                        Philadelphia, PA

Page 369

1  BY MR. TORBORG:
2    Q.  Do you recall if it was related to
3  Medicare or Medicaid?
4    A.  Actually, we've had discussions with
5  both sets of -- of -- of CMS staff about
6  dispensing-fee issues.
7    Q.  Did OIG ever conduct studies regarding
8  the appropriate dispensing fees to pay under
9  Medicare or Medicaid reimbursement?
10       MR. NEAL:  I'll object to the form.
11       You can answer.
12       THE WITNESS:  Our Boston office did a
13  study on Medicare dispensing fees that examined
14  what services were being provided by -- by
15  pharmacies or suppliers, but it didn't recommend a
16  specific fee.
17  BY MR. TORBORG:
18    Q.  Do you recall who in the Boston office
19  was involved in that?
20    A.  Ken Price, Ivan Troy, and Joyce
21  Greenleaf (ph).
22    Q.  Are those individuals still in the

Page 370

1  Boston office of OIG?
2    A.  Yes.
3    Q.  And is that -- are they in the Office of
4  Evaluations and Inspections or Office of Audit
5  Services?
6    A.  They're in OEI.
7    Q.  I meant to ask you yesterday.  You
8  mentioned some individuals from the Office of Audit
9  Services that you worked with -- or met with with
10  respect to reimbursement of drugs?
11    A.  Yes.
12    Q.  Paul Chesser, William Shrigley, and
13  Gordon and Sato.  Where are they located?
14    A.  Paul and Bill were in Little Rock.  I'm
15  not sure where Bill is now.  And Gordon Sato was in
16  Dallas.
17    Q.  Do you know if they're still with OES
18  today?
19    A.  Bill Shrigley is not with OES.
20    Q.  Do you know where he is today?
21    A.  I'm not sure.
22    Q.  But the other two are --

Page 371

1    A.  Yes.
2    Q.  -- still there?  When was the last time
3  that you've talked with them?
4    A.  Bill Shrigley, it's been -- I saw him at
5  a Medicaid -- the Medicaid Rebate Conference that I
6  mentioned yesterday, however -- two years ago.
7  Paul Chesser, I believe I ran into at CMS last
8  year.  And Gordon Sato, it's been three or four
9  years.
10    Q.  Have you ever discussed litigation
11  relating to drug issues with them?
12    A.  I'm sure at -- at one of the mini
13  conferences that we had that I had mentioned
14  yesterday, that the lawsuits may have been brought
15  up, but more for informational purposes, just to
16  discuss what was going on in the -- in the topic
17  area, but I don't remember any specific
18  discussions.
19    Q.  What are -- what is Bill Shrigley's
20  position as compared to Paul as compared to Gordon;
21  like who's the highest in the ranking?
22    A.  I'm -- I -- I'm not sure.  At the time I

Page 372

1  believe that Gordon -- I -- I don't know if Gordon
2  and Bill were equals as far as rank goes in the
3  organization, but Paul worked for Bill.  Since Bill
4  left OIG, Paul has assumed his position.
5    Q.  Do you re -- do you recall any other
6  studies that OIG has done with respect to
7  dispensing fees?
8    A.  No.
9    Q.  You're just aware of a study done by the
10  Boston office that evaluated the various services
11  involved in dispensing a drug, but never
12  recommended a specific fee, correct?
13    A.  Yes.
14       MR. NEAL:  Is now a good time for a short
15  break?
16       MR. TORBORG:  Yes, it is.
17       THE VIDEOGRAPHER:  Off the video at 9:03.
18       - - -
19       (Whereupon, a recess was taken.)
20       - - -
21       THE VIDEOGRAPHER:  We're back on the
22  record at 9:23.

                                        20 (Pages 369 to 372)

Henderson Legal Services
202-220-4158

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                                   April 25, 2007
                        Philadelphia, PA

Page 377

1       MR. NEAL: Object to the form.
2       THE WITNESS: Can you repeat the
3   question?
4   BY MR. TORBORG:
5       Q. When deciding how much Medicare or
6   Medicaid should pay providers to administer or
7   dispense drugs, is it, in your opinion, fair to
8   just look at how much the provider pays for the
9   drug?
10      MS. POLLACK: Objection to form.
11      MR. NEAL: The same objection.
12      THE WITNESS: I don't believe that how
13  much a provider pays for the drug has anything to
14  do with the cost of the services.
15  BY MR. TORBORG:
16      Q. All right. If we can go to the next
17  document in your stack, it's Exhibit Abbott 087.
18  It's a 2000 report -- 2004 report entitled, Update:
19  Excessive Medicare Reimbursement for Albuterol.
20  And you were the team leader on this report as
21  well, correct?
22      A. Yes.

Page 378

1       Q. And the objective of this report, as
2   stated in one little "I," was to update the 2002
3   report, correct?
4       A. Yes.
5       Q. Do you know -- do you know what prompted
6   all of your work on Albuterol Sulfate?
7       MR. NEAL: Objection as to form.
8       THE WITNESS: By the time I had started,
9   we had done work on Albuterol in the past and found
10  specific problems with its reimbursement. It was
11  also one of the top drugs reimbursed by Medicare,
12  and also had one of the largest spreads between the
13  published prices and the Medicare reimbursement
14  amounts.
15  BY MR. TORBORG:
16      Q. Would you agree with me that Medicare
17  has continued payment of amounts several times
18  greater than pharmacists' acquisition costs for
19  Albuterol Sulfate was not because HCFA was misled
20  about how much Albuterol Sulfate was selling for in
21  the market?
22      MR. NEAL: Objection as to form.

Page 379

1       THE WITNESS: Misled by -- I -- misled by
2   whom? The -- CMS knew from our reports what the
3   actual acquisition costs were.
4   BY MR. TORBORG:
5       Q. Why didn't they pay on acquisition cost?
6       MR. NEAL: Objection as to form.
7       THE WITNESS: Because the law didn't
8   allow them to pay based on acquisition cost.
9   BY MR. TORBORG:
10      Q. And that would be the same with respect
11  to other drugs as well, would it not?
12      A. Yes.
13      Q. So, for example, if CMS were aware that
14  the acquisition cost of a provider for a drug like
15  Vancomycin was several times greater than the
16  acquisition cost, CMS still was not allowed to
17  change their reimbursement, correct?
18      MR. NEAL: Objection as to form.
19      THE WITNESS: Again, they had inherent
20  reasonableness or competitive bidding authorities,
21  but those were limited authorities to change
22  prices.

Page 380

1   BY MR. TORBORG:
2       Q. If we go to two little "I," the last
3   sentence of the paragraph at the bottom of the
4   page, so the last sentence.
5       THE WITNESS: Sorry. I -- I --
6       MR. NEAL: Can we go off the record for
7   --
8       THE WITNESS: -- spilled something.
9       MR. NEAL: -- just a second.
10      MR. TORBORG: Sure.
11      THE VIDEOGRAPHER: Off the record at
12  9:30.
13          - - -
14      (Whereupon, there was a brief pause in
15  the proceeding.)
16          - - -
17      THE VIDEOGRAPHER: We're back on the
18  record at 9:31.
19  BY MR. TORBORG:
20      Q. Okay. I was asking you to look at two
21  little "I," last sentence of the page.
22      A. Okay.

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                                April 25, 2007
                        Philadelphia, PA

Page 393

1  worked with in the last year on Federal Upper Limit
2  topics.
3      Q.  Do you remember an individual named
4  William Scanlon (ph)?
5      A.  I've -- I've heard that name, but I
6  don't know exactly who he was.  I know I never --
7      Q.  That's not --
8      A.  -- spoke with him.
9      Q.  That's not one of the people that you --
10     A.  No.
11     Q.  -- talked with?  Okay.  In the bottom of
12 the first column, last paragraph, it states:
13 There's no doubt there are problems with AWP-based
14 payments, acknowledged Susan Winckler, group
15 director of policy and advocacy for the American
16 Pharmaceutical Association.  She agreed that AWP is
17 neither an average price nor a wholesale price.
18 But focusing on AWP distracts attention from the
19 real problem - payment for professional services.
20     Quote, if you want to base drug payments on
21 more accurate figures, fine, Winckler said, but
22 that must be coupled with an acknowledgment of all

Page 394

1  the costs involved in getting the product out the
2  door.  We can unbundle the costs of professional,
3  administrative, and distributive services, but we
4  cannot ignore -- but we can't ignore them.  No other
5  business is expected to sell products at cost or
6  lower.
7      Do you agree or disagree with the statements
8  made by Ms. Winckler as quoted in this article?
9      MR. NEAL:  Objection as to form.
10     MR. WINGET-HERNANDEZ:  Compound.
11     THE WITNESS:  In relation to pharmacies,
12 I don't disagree that businesses aren't expected to
13 sell products at cost or lower.  And I think that
14 in order to determine -- in -- in order to ensure
15 that providers are reimbursed fairly, that both
16 segments need to be considered.  That's why it --
17 you know, that's why those recommendations were
18 typically in our reports.
19 BY MR. TORBORG:
20     Q.  If we go to the -- to the third column,
21 there is a quote from John Rector, vice president
22 of the government affairs and general counsel for

Page 395

1  the National Community Pharmacists Association.
2  And the article states:  Focusing acquisition --
3  focusing on acquisition cost sounds good in
4  congressional testimony, but it's a recipe for
5  financial disaster.
6      Do you see that?
7      A.  Yes.
8      Q.  Do you recall any discussions with OIG
9  or HCFA of what would happen if CMS changed the way
10 it reimbursed for drugs?
11     MR. WINGET-HERNANDEZ:  Objection to form.
12     MR. NEAL:  I'll object to the form as
13 well.
14     You can answer that question to the
15 extent that your answer would not divulge any
16 privileged communication.
17     THE WITNESS:  In various conversations, I
18 know that especially in the pharmacy area, not
19 necessarily in the physician area, that there --
20 and that's why we had conversations about
21 dispensing fees -- that CMS wanted to ensure that
22 -- that beneficiary access wasn't inhibited based

Page 396

1  on any -- based on any cost reductions.
2  BY MR. TORBORG:
3      Q.  Do you recall who made those -- with
4  whom you had those conversations?
5      A.  No.
6      Q.  Do you have a recollection of when those
7  conversations occurred?
8      A.  They have occurred recently about the
9  Federal Upper -- the Federal Upper Limit work that
10 we've done.  They -- I don't recall earlier
11 conversations.  They were most likely done in
12 entrance or exit conferences, some of them, and
13 others during work planning meetings.
14     Q.  A fairly frequent topic of conversation?
15     A.  No.  I mean, maybe once a year at most.
16     Q.  With respect to the recent work you're
17 doing on Federal Upper Limits, you indicated that
18 you had discussions with CMS about what I'll call
19 the access issue; is that fair to say?
20     MR. NEAL:  I'll --
21     MR. PAUL:  Objection to --
22     MR. NEAL:  I'll object to the form.

Tawes, David - Vol. II                              April 25, 2007
                    Philadelphia, PA

Page 397

1       You can answer.
2       THE WITNESS: Yes.
3  BY MR. TORBORG:
4    Q. And with whom did you have
5  conversations; do you recall?
6    A. Larry Reid and Deirdre Duzor.
7    Q. And do you -- what can you recall about
8  those conversations?
9       MR. NEAL: You can answer that question
10 consistent with my previous instruction on
11 privileged communication.
12      THE WITNESS: It was simply based on
13 initial results from a draft report that we're
14 working on and how the new Federal Upper Limit
15 amounts related to actual acquisition costs for
16 pharmacies.
17 BY MR. TORBORG:
18   Q. And what stage is that report at right
19 now?
20   A. We're awaiting comments from CMS, so
21 it's a draft report.
22   Q. And so you've received some oral

Page 398

1  comments from CMS?
2    A. Yes.
3    Q. But not formal?
4    A. Correct.
5    Q. How long ago -- how long ago did you
6  receive the oral comments?
7    A. Two or three months ago.
8    Q. Is there any record of those oral
9  comments?
10   A. Yes.
11   Q. Did you take notes?
12   A. Yes.
13   Q. Where -- where are those notes today?
14   A. They would be part of the exit
15 conference notes.
16   Q. Anything else you -- you can recall
17 about the specifics of those conversations?
18      MR. NEAL: You can answer that question
19 consistent with my previous instructions.
20      THE WITNESS: No.
21 BY MR. TORBORG:
22   Q. Is CMS concerned that basing the Federal

Page 399

1  Upper Limits on AMP data may cause an access issue?
2       MR. NEAL: Objection as to form.
3       You can answer that question consistent
4  with my instruction on privileged communications.
5       THE WITNESS: Since I haven't seen their
6  official comments, I can't say what the official
7  position of CMS is.
8       Outside of exit conference, there have
9  been a couple conversations involving the data that
10 we have that does -- that -- where they did
11 indicate that there may be some small issues that
12 they're concerned with. You can also look at their
13 comments to the GAO report which -- and which
14 looked at the same issue that we're looking at in
15 this and -- and get a better idea of where they --
16 where they stand.
17 BY MR. TORBORG:
18   Q. Do you recall in other conversations
19 you've had with CMS relating to the Federal Upper
20 Limit issue and -- let me back up.
21      You've done other reports on Federal Upper
22 Limits --

Page 400

1    A. Yes.
2    Q. -- correct? Starting, I think, in about
3  2004?
4    A. It may have been earlier. I'm not sure.
5    Q. Have any of the conversations you've had
6  with CMS relating to those reports discussed the
7  access issue?
8       MR. NEAL: I'll instruct you not to
9  answer that question to the extent that it will
10 require you to divulge privileged communications
11 with CMS.
12      THE WITNESS: Outside of entrance and
13 exit conferences, there were a few discussions
14 about how Federal Upper Limits were calculated and
15 concerns that sometimes that the lowest price
16 available -- or the lowest price listed in
17 compendia wasn't accurate and not available to --
18 to all pharmacies, and, therefore, setting the
19 Federal Upper Limit amount based on that price
20 could lead to access issues.
21 BY MR. TORBORG:
22   Q. Do you recall with whom those

                                27 (Pages 397 to 400)

Page 489

1  state Medicaid agencies would have access to that
2  information. In September 1995, CMS addressed this
3  issue in response to comments received on a
4  proposed rule regarding Medicaid payment for
5  outpatient drugs. The CMS asserted that they would
6  not disclose AMP to states, but maintained that the
7  statute contemplates a disclosure of manufacturer
8  pricing data to the states, and that they believe
9  Congress intended that states have access to
10 sufficient pricing information to implement the
11 Medicaid drug rebate program.
12       Do you recall any conversations at any time,
13 Mr. Tawes, regarding the ability of CMS to share
14 AMP data with states?
15    A. Yes.
16    Q. Okay. Tell me what you recall about
17 those conversations.
18         MR. NEAL: I'll just instruct the
19 witness:
20         You can answer that question to the
21 extent that your answer would not implicate
22 privileged communications that you may have had.

Page 490

1          THE WITNESS: Simply a difference of
2  opinion between CMS and some of the folks in Region
3  5 OIG, and I would assume O -- the OIG in general,
4  as to whether CMS could provide AMP data to states.
5  BY MR. TORBORG:
6     Q. Did Region 3 of OIG have a position on
7  that issue?
8          MR. NEAL: Objection as to form.
9          THE WITNESS: No.
10 BY MR. TORBORG:
11    Q. Had you ever evaluated that issue
12 yourself?
13    A. No.
14    Q. What do you recall about conversations
15 regarding this issue; who were they with, when they
16 were --
17    A. It would have --
18    Q. -- what was said?
19    A. It would have been with -- with various
20 staff in Region 5 -- Madeline Francescatti, Ann
21 Maxwell, Erin Lemire, just about whether they
22 believed states -- or CMS could provide this data

Page 491

1  to states or not.
2     Q. Do you recall what they said?
3     A. That they believed that -- that CMS
4  could provide this information to states.
5     Q. Did they make any comments about why CMS
6  was narrowly interpreting the confidentiality
7  clause?
8          MR. NEAL: Objection as to form.
9          THE WITNESS: Not that I recall.
10 BY MR. TORBORG:
11    Q. Have you ever formed any opinion on this
12 yourself?
13         MR. NEAL: I'll object to the form.
14         You can answer.
15         THE WITNESS: No.
16 BY MR. TORBORG:
17    Q. Do you know if Mr. Vito has formed any
18 opinion on this?
19         MR. NEAL: The same objection.
20         You can answer.
21         THE WITNESS: No.
22 BY MR. TORBORG:

Page 492

1     Q. If I could ask you to go to the 2004
2  report that you did relating -- entitled, Omission
3  of Drugs From the Federal Upper Limit List in 2001,
4  and then if you would -- do you have the exhibit
5  number there?
6     A. Exhibit Abbott 108.
7     Q. Thank you. And this is a report that
8  you were the team leader for?
9     A. Yes.
10    Q. And did you draft this report?
11    A. Yes.
12    Q. Did you share this report with state
13 Medicaid programs?
14    A. I don't believe so.
15    Q. And in summary, can you explain to the
16 jury what you found in this report?
17         MR. NEAL: Objection as to form.
18         THE WITNESS: We found that numerous
19 drugs that met the established criteria for being
20 included on the Federal Upper Limit List -- on the
21 Federal Upper Limit List were not being included on
22 the list in 2001.