# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) |
| AVERAGE WHOLESALE PRICE | ) |
| LITIGATION | ) |

_____

)   MDL NO. 1456
)   Civil Action No. 01-12257-PBS
)
)   Judge Patti B. Saris

THIS DOCUMENT RELATES TO:

*The City of New York v. Abbott Labs., et al.*
(S.D.N.Y. No. 04-CV-06054)
*County of Suffolk v. Abbott Labs., et al.*
(E.D.N.Y. No. CV-03-229)
*County of Westchester v. Abbott Labs., et al.*
(S.D.N.Y. No. 03-CV-6178)
*County of Rockland v. Abbott Labs., et al.*
(S.D.N.Y. No. 03-CV-7055)
*County of Dutchess v. Abbott Labs., et al.*
(S.D.N.Y. No. 05-CV-06458)
*County of Putnam v. Abbott Labs., et al.*
(S.D.N.Y. No. 05-CV-04740)
*County of Washington v. Abbott Labs., et al.*
(N.D.N.Y. No. 05-CV-00408)
*County of Rensselaer v. Abbott Labs., et al.*
(N.D.N.Y. No. 05-CV-00422)
*County of Albany v. Abbott Labs., et al.*
(N.D.N.Y. No. 05-CV-00425)

[Caption Continues on Next Page]

## DEFENDANTS' CORRECTED JOINT REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT

*County of Warren v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00468) )
*County of Greene v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00474) )
*County of Saratoga v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00478) )
*County of Columbia v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00867) )
*Essex County v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00878) )
*County of Chenango v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00354) )
*County of Broome v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00456) )
*County of Onondaga v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00088) )
*County of Tompkins v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00397) )
*County of Cayuga v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00423) )
*County of Madison v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00714) )
*County of Cortland v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00881) )
*County of Herkimer v. Abbott Labs. et al.* )
(N.D.N.Y. No. 05-CV-00415) )
*County of Oneida v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00489) )
*County of Fulton v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00519) )
*County of St. Lawrence v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00479) )
*County of Jefferson v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00715) )
*County of Lewis v. Abbott Labs., et al.* )
(N.D.N.Y. No. 05-CV-00839) )
*County of Chautauqua v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06204) )
*County of Allegany v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06231) )
*County of Cattaraugus v. Abbott Labs., et al.* )
(W.D.N.Y. No. 05-CV-06242) )

*County of Genesee v. Abbott Labs., et al.*                )
(W.D.N.Y. No. 05-CV-06206)                                  )
*County of Wayne v. Abbott Labs., et al.*                  )
(W.D.N.Y. No. 05-CV-06138)                                  )
*County of Monroe v. Abbott Labs., et al.*                 )
(W.D.N.Y. No. 05-CV-06148)                                  )
*County of Yates v. Abbott Labs., et al.*                  )
(W.D.N.Y. No. 05-CV-06172)                                  )
*County of Niagara v. Abbott Labs., et al.*                )
(W.D.N.Y. No. 05-CV-06296)                                  )
*County of Seneca v. Abbott Labs., et al.*                 )
(W.D.N.Y. No. 05-CV-06370)                                  )
*County of Orleans v. Abbott Labs., et al.*                )
(W.D.N.Y. No. 05-CV-06371)                                  )
*County of Ontario v. Abbott Labs., et al.*                )
(W.D.N.Y. No. 05-CV-06373)                                  )
*County of Schuyler v. Abbott Labs, et al.*                )
(W.D.N.Y. No. 05-CV-06387)                                  )
*County of Steuben v. Abbott Labs., et al.*                )
(W.D.N.Y. No. 05-CV-06223)                                  )
*County of Chemung v. Abbott Labs., et al.*                )
(W.D.N.Y. No. 05-CV-06744)                                  )
                                                            )
                        AND                                 )
                                                            )
*County of Nassau v. Abbott Labs., et al.*                 )
(E.D.N.Y. No. 04-CV-5126)                                   )
_____)

## PRELIMINARY STATEMENT

Plaintiffs' attempt to justify the pleading deficiencies in their Amended Complaint is woefully inadequate.  The very fact that plaintiffs' papers on this motion rely upon information and arguments that do not appear anywhere in the Amended Complaint itself, but rather in the affidavit of their counsel, makes it clearer than ever that the Amended Complaint should be dismissed in its entirety.

Even if the Court is inclined to consider the plaintiffs' affidavit evidence in deciding this motion, plaintiffs' claims of fraud with respect to branded SADs, FULs, and PADs are so implausible that they should be dismissed under *Bell Atlantic Corp.* v. *Twombly*, --- S. Ct. ---, 2007 WL 1461066 (May 21, 2007).  Moreover, as we demonstrate below, plaintiffs have utterly failed to re-plead spreads in good faith.  At the very minimum, this Court should dismiss the allegations regarding:  (1) new drugs and new NDCs; (2) branded SADs with a spread of less than 30%; (3) FULs; and (4) PADs.  These rulings will yield what the Court demanded of plaintiffs and what they have failed to deliver – a pleading presenting only plausible claims grounded in law and fact that is consistent with reality.

In the text of their Opposition, plaintiffs deny that they have ignored this Court's admonition not to add new drugs and contend that defendants' argument to the contrary is "false."  Buried in a footnote, however, plaintiffs concede that their Amended Complaint adds 348 new drugs.  In fact, the number is more than twice that.

Plaintiffs also continue to include branded SADs (and PADs) with spreads of less than 30% despite this Court's prior rulings that exclude such drugs from the scope of the alleged AWP fraud.  Plaintiffs brazenly ignore this Court's findings (after a two month trial) that certain drugs such as Procrit and Temodar had spreads of less than 30% – stating that if discovery in this case shows spreads under that threshold, as this Court has already found, then of course there

will be no liability and no damages.  This is exactly the kind of argument that the Supreme Court rejected in announcing its plausibility standard in *Twombly*.

In calculating "weighted averages" of wholesalers' prices, plaintiffs use one wholesaler's data or another, depending upon which gives them the results they want, and they include in their calculations wholly inappropriate classes of trade (including physicians, clinics, warehouses and others having nothing to do with retail pharmacies) and meaningless penny "prices."  This Court has said repeatedly that plaintiffs need to calculate spreads reasonably and in "good faith" to survive dismissal, and they have done nothing of the kind.  The Supreme Court's recent decision in *Twombly* now commands what this Court has already called for.  *Twombly* makes clear that plaintiffs need to calculate spreads in a manner that makes sense and that is plausible on its face. Spreads that are calculated on the basis of irrelevant classes of trade, meaningless prices, and in disregard for this Court's rulings do not meet this pleading standard.

Plaintiffs' claims with regard to multi-source drugs subject to FULs are even more implausible.  Plaintiffs simply ignore two features of the FUL system that figures prominently in the Federal Government's brief on the subject:  (1) that HCFA intended to base FULs on an array of undiscounted "published prices" and (2) that FULs were intended as an aggregate upper limit, not actual reimbursement rates for individual NDCs.  Plaintiffs then ignore the FUL regulatory history in which HCFA expressly anticipates the very conduct that plaintiffs now say is fraudulent.  Further, the motive they advance for "FUL fraud" – that manufacturers colluded to set a higher FUL so that they could compete with one another on price – makes no sense, because the FUL does nothing to aid one of them against the others in their competition, and price competition on multi-source drugs is intense.

Finally, although plaintiffs now purport to sue on PADs only when dispensed by non-physician providers (*e.g.*, retailers, nursing homes), plaintiffs do not identify a single county that reimbursed any such provider for any PAD on the basis of AWP.  Plaintiffs also rely on implausible spreads and spreads that are not at all indicative of fraud.  Thus, the PAD claims must also be dismissed with prejudice.

## ARGUMENT

I.   **ALLEGATIONS RELATING TO NEW DRUGS AND NEW NDCs SHOULD BE DISMISSED WITH PREJUDICE FOR DISOBEDIENCE OF THE COURT'S ORDER.**

Plaintiffs baldly assert that they have not "disregarded this Court's admonition to not add new drugs or defendants into this case" and say defendants' contention to the contrary is "false." Opp. at 4.  To prove their point, they state that "the [prior complaint] identified 1369 drugs" and so does the Amended Complaint.  *Id*.  Plaintiffs also cite statistics to suggest that the Amended Complaint does not add any new NDCs.  *Id.*  These claims are, however, demonstrably wrong.

The truth is partially revealed in a footnote, but even that does not tell the complete story. Buried at the bottom of page 4 in plaintiffs' Opposition is a footnote that admits that plaintiffs have added 348 new drugs to their Amended Complaint.  By defendants' count, the number is actually much higher.  *See* Exhibit 1 to the 7/20/07 Declaration of John P. Bueker (listing the 362 additional new drugs that plaintiffs have added to their Amended Complaint without leave of court).  In terms of NDCs, the story is even more shocking.[1]  A comparison of the Amended Complaint to plaintiffs' earlier pleading reveals that plaintiffs have added 3,555 new NDCs to this case and seek to proceed on claims as to an additional 2,912 NDCs for which they had supplied no spread allegations in their prior complaint.  *See* Exhibits 1 and 2 to the 6/27/07

---

[1] This NDC point is the far more important one.  As this Court learned through its MDL trial, the analysis that must be performed in assessing liability is "not only company by company, but drug by drug, NDC by NDC, and even . . . year by year." 7/3/07 Tr., at 22:16-21.

Declaration of Kim B. Nemirow (filed in support of Defs. Joint Motion to Dismiss).  At a minimum, each and every one of these new NDCs should be dismissed from this case.

## II.    BRANDED SADs, ESPECIALLY THOSE WITH A SPREAD OF 30% OR LESS, SHOULD BE DISMISSED FROM THIS CASE.

As defendants point out in their opening brief, this Court has permitted this action to proceed as to "only those [branded] drugs for which the plaintiffs have alleged a spread greater than the 20-25% mark up between WAC and AWP" plus other well-known discounts.  *See* 4/2/07 Opinion, at 37 n.9; 5/16/07 Tr. at 22:8-16 (recording a colloquy in which plaintiffs' counsel agrees with the Court's assessment that there are other "bona fide" and "routine" discounts, such as the prompt-pay discount, over and above the 20-25% mark-up, that are not indicative of any "kind of problem" or "violation").  Since then, this Court has expressly found that "the 30% yardstick methodology used by Dr. Hartman [is] reliable."  6/21/07 Opinion, at 140.  Yet, plaintiffs ignore these clear directives, manipulate wholesaler pricing data in disingenuous ways, and cling doggedly to a 25% "yardstick" by which drugs priced fully in accordance with what this Court has determined to be industry expectations would be deemed fraudulent.

### A.    Plaintiffs Disingenuously Calculate Their Spreads.

Plaintiffs' first ploy to avoid the effects of this Court's prior rulings was to change the method by which they calculated spreads.  In their Amended Complaint, plaintiffs measured spreads from the single lowest "price" purportedly charged by any wholesaler to any customer in any class of trade for each NDC alleged to be at issue.  When that measure was exposed as having no connection to market prices in any meaningful sense, plaintiffs abandoned it in favor of "weighted averages" of prices charged by one wholesaler or another to selected classes of trade, some of which have nothing to do with retail pharmacies that fill the vast majority of

Medicaid prescriptions.  In other words, plaintiffs replaced an obviously unrepresentative indicator of market prices with another obviously unrepresentative indicator.

Plaintiffs' latest method for calculating spreads is just as disingenuous and flawed as the method that they employ in their Amended Complaint.  Plaintiffs contend that they "considered only proper classes of trade," *see* Opp. at 10, when in fact they include in their calculation of the prices generally available in the marketplace for branded SADs sales to the "managed care home infusion," "managed care nursing home," and "managed care mail order" classes of trade. Indeed, by their own admission, plaintiffs even include sales to "high volume warehouses" and "miscellaneous warehouses."  *Id.*  These entities have the ability to develop formularies or to buy in such bulk that they can obtain discounts on branded SADs.  *See* 6/21/07 Opinion, at 23. However, sale prices to such entities are not indicative of the prices generally available in the marketplace to <u>retail pharmacies</u> and, thus, are irrelevant for purposes of calculating spreads on branded SADs reimbursed by New York Medicaid.  Nevertheless, in calculating spreads for branded SADs here, plaintiffs include them for no apparent reason other than to artificially inflate the spreads they calculate.

Plaintiffs also exaggerate spreads by including "penny prices" in their weighted averages, vigorously defending this practice on the ground that these penny prices are found in the wholesaler data that they have gathered as having been paid by chain pharmacies, independent small chains, and the mail order retail class of trade.  *See* Opp. at 8.  For example, plaintiffs say, "the wholesaler data tells us that Procrit (NDC 596766034001) was sold to someone for a penny. It was sold to an independent retail pharmacy on numerous occasions at that price."  *Id.*  There are numerous possible explanations for why the wholesaler data might reflect penny pricing (*e.g.*, most manufacturers do not have a sufficiently well-developed distribution network that

would allow them to dispense "free care" products to indigent patients so they accomplish that through the wholesalers).  While it might not be appropriate for this Court to determine which explanation for the random penny prices cited is the correct one, the United States Supreme Court's recent decision in *Bell Atlantic Corp.* v. *Twombly*, --- S. Ct. ---, 2007 WL 1461066 (May 21, 2007), makes clear that the Court ought not simply accept at face value plaintiffs' naked assertion that such prices reflect arm's length sales to pharmacies on "numerous occasions." *Twombly* requires that, to survive dismissal, a complaint must allege facts that are plausible on their face.  *Id*. at *11-14.  Plaintiffs' own data shows that Procrit was sold on average for $1,737.06.  *See* Exhibit B-1 to Cicala Declaration.  In light of this fact, and the Court's own findings in the first trial, the inference that the "penny prices" cited in the Amended Complaint reflect numerous arm's length sales to retail pharmacies for commercial resale is simply not plausible.

Plaintiffs pick and choose between one wholesaler's "weighted average price" and another's when it suits their purposes.  The Court need look no further than the "weighted average source" column in Exhibit B-1 to the Cicala Declaration to see that.  More revealing than that, however, is a comparison of Exhibit B-1 to the Cicala Declaration with the data plaintiffs produced to each defendant following the May 16, 2007 status conference.  Such a comparison makes it immediately apparent that plaintiffs have populated their "weighted average spread" columns using whichever wholesaler's data results in the absolutely highest spread possible.  Furthermore, plaintiffs' spread calculations are plagued with errors.  For example, almost none of the spreads for Schering's Intron-A seem to make any sense in light of the data set forth in the Cicala Declaration or this Court's findings in its Track 1 decision.

The implausibility of plaintiffs' allegations is starkly apparent with regard to Procrit and Temodar, both of which were the subject of a lengthy trial on some of the very same issues as here.  Plaintiffs assert that, because <u>their</u> data produce a weighted average spread for Procrit of 35%, they should be allowed to proceed with their claims.  This assertion ignores the evidence taken in more than 21 days of trial and summarized in a 183 page opinion that finds that "the actual spread between the Procrit ASP and the published AWP never exceeded 30%."  *See* 6/21/07 Opinion, at 62.  The Court makes a similar finding with regard to Temodar.  *Id.* at 93-94. Nevertheless, plaintiffs dismiss the prospect that defendants might be subjected to years of expensive discovery, saying no more than that, if "on a full record," this Court's findings are proven correct, there will be no liability and no damages.  *Twombly* expressly rejected such an approach to litigation, holding that defendants should not be subjected to the "potentially enormous expense of discovery in cases with 'no reasonably founded hope that the discovery process will reveal relevant evidence' to support a . . . claim."  *Twombly*, 2007 WL 1461066, at *11.

Whether considered individually or collectively, these deficiencies in plaintiffs' spread calculations make them sufficiently unreliable so as to require dismissal of plaintiffs' claims as implausible under *Twombly*.

**B.    At a Minimum, this Court Should Dismiss Claims as to NDCs for Which Even the Spreads Plaintiffs Calculate Are Less Than 30%.**

Even if the Court is not inclined to dismiss this case in its entirety, at the very least, it should apply a 30% threshold to plaintiffs' spread allegations and dismiss from this case any NDC for which plaintiffs have calculated a spread – however flawed – of 30% or less.  Doing so would be entirely consistent with this Court's prior rulings and would eliminate 1,448 NDCs (58% of the branded SADs) from this case.  *See* Exhibit 2 to the Declaration of John P. Bueker.

The reasons for applying the 30% "yardstick" are particularly compelling here. As discussed above, plaintiffs' "weighted average" spreads are clearly inflated. NDCs that drop out on the basis of <u>plaintiffs'</u> spread calculations certainly do not belong in this case.[2] In fact, again using plaintiffs' spreads (which defendants do not accept are properly calculated), by way of illustration, applying slightly higher thresholds to compensate for the disingenuous manner in which plaintiffs calculate spreads, many more NDCs drop out. At a 35% threshold, 1,824 NDCs (73%) would be eliminated. *Id.* If the threshold were raised to 40%, 1,956 NDCs (78%) would be dismissed. *Id.* Unfortunately, defendants had neither access to the data on which plaintiffs rely, nor the time to correct the errors in plaintiffs' new spread calculations. They can, therefore, only urge the Court to faithfully apply *Twombly* and dismiss plaintiffs' claims in their entirety or, at a minimum, to apply the 30% threshold that this Court has announced, on several prior occasions, to plaintiffs' flawed spreads allegations and dismiss from the case those NDCs that do not meet that 30% threshold.

## III.   PLAINTIFFS' CLAIMS OF "FUL FRAUD" SHOULD BE DISMISSED.

As defendants' briefing shows, it is simply not possible to concoct a plausible claim of "FUL fraud." The FUL regulatory regime was designed by HCFA to work within the parameters of the market for generic drugs and is not dependant on AWP. In fact, the FUL system was designed in such a way that AWP was entirely unlikely to affect the FUL set by HCFA. For this basic reason, and the other reasons that follow, plaintiffs' attempt to construct a claim of "FUL fraud" cannot succeed.

---

[2] Moreover, a branded drug manufacturer has no incentive to inflate AWP for SADs in the first place. This is because pharmacists (the Medicaid provider in the context of SADs) have no control over which branded product they dispense; that is determined by the prescribing physician. The physician, on the other hand, is not reimbursed for the drug and has no pecuniary interest in which drug is prescribed.

Plaintiffs' claims of "FUL fraud" are belied by a reimbursement regime that is not based on AWP.  During the relevant period, Medicaid set an upper limit on the reimbursement for all generic drugs in the aggregate that was based on the lowest price from an array of undiscounted "published prices," which array included, as the Federal Government stated in its brief on this issue, "Average Wholesale Prices ('AWP'), Wholesale Acquisition Costs ('WAC'), and Direct Prices ('DP') published in the national drug pricing compendia (Red Book, Blue Book, Medi-Span)."  Gov't Br. at 4.

Although this array of prices included AWP, as the Government's brief points out, in practice, HCFA only set a FUL "if a drug [had] a published price that, when multiplied by 150 percent, [wa]s lower than AWP."  *Id.* at 3 (citing a Sept. 2005 OIG report).  HCFA's objective in adopting a FUL was to save money.  Thus, it is virtually impossible that AWP would ever form the basis for a FUL.  Since, as the Court knows from its MDL experience, AWP is invariably higher than WAC and DP, *see* 6/21/07 Opinion, at 150 & n.72, it is these lower benchmarks that are almost always the basis for the FUL.

By deciding to base FULs on undiscounted "published prices" and setting FULs at 150% of such prices, HCFA clearly intended that FULs would be <u>higher than</u> the actual prices at which providers were acquiring the drugs in the marketplace.  The regulatory history expressly acknowledges "building into [the] rates for ingredients, a <u>profit margin</u> for pharmacists" and encouraging pharmacists to purchase as prudently as possible by allowing them to "retain the difference between what they pay for the drug and the upper limit of payment established by HCFA."  *See* Medicare and Medicaid Programs; Limits on Payments for Drugs, 52 Fed. Reg. 28,648, at 28,656 (July 31, 1987); Medicare and Medicaid Programs; Limits on Payments for Drugs, 51 Fed. Reg. 29, 560, at 29,562 (Aug. 19, 1986).  HCFA saw this regulatory framework

as a means of stimulating "the substitution of lower cost" generic drugs and, thus, reducing Medicaid's overall expenditure for its prescription drug benefit. *See* 52 Fed. Reg. 28,648, at 28,656. It is within this framework and against the backdrop of this regulatory history that plaintiffs must allege facts that make plausible their claims of "FUL fraud."

### A.      Plaintiffs' Theory of Motive Is Entirely Implausible.

Plaintiffs' Opposition states:

> Although the FUL is based only on the lowest published price, each defendant has an interest in inflating its published price so as to ensure that its price for that particular NDC does not lead to a reduction in the fraudulently inflated FUL. By keeping the FUL high, the defendants who manufacture and/or package that NDC give the pharmacist an incentive to dispense this drug rather than a competing drug with a different NDC.

Opp. at 5, 20. This statement makes no sense. Under New York Medicaid's reimbursement methodology, <u>all</u> versions of a therapeutically equivalent multi-source drug with a FUL are reimbursed at the <u>same</u> rate, the FUL, unless the provider requests a lower reimbursement amount. A pharmacist must dispense a prescription as written; it is, therefore, not legally possible for the pharmacist to substitute a "competing" drug (one that is not therapeutically equivalent) on which the pharmacist will make more money. Thus, no manufacturer can create an incentive for the pharmacist to dispense that manufacturer's version of the drug (or a "competing" drug) by reporting a higher price to the pricing compendia. *See* 6/21/07 Opinion, at 23. Once a single reimbursement rate is fixed for all therapeutically equivalent products, the only way that a manufacturer can compete for market share within that market is by reducing its prices – the very activity that was clearly contemplated by the FUL regulatory history.

Plaintiffs' suggestion that competitors who manufacture therapeutically equivalent multi-source products conspire with each other to inflate AWPs so that they may then compete with each other by undercutting their collaborators' prices is precisely the type of allegation that was

found to be implausible in *Twombly* and dismissed.  *See Twombly*, 2007 WL 1461066, at *14.

Simply put, it is implausible to believe that defendants were motivated to collude to engage in an

activity – price competition – that is encouraged by our economic system generally, encouraged

by the FUL regulatory scheme specifically, and within each manufacturer's ability to accomplish

independently.  Such a finding of implausibility, moreover, would be entirely consistent with this

Court's finding after more than five years of AWP litigation that there is absolutely no evidence

that the defendant-manufacturers actually conspired to compete.  *See* 6/21/07 Opinion, at 154.

**B.      The Medicaid FUL Program Is Not Analogous to Medicare Medians.**

Plaintiffs' attempt to analogize Medicaid's FULs to Medicare's median AWP is equally

unavailing.  First, as explained above, FULs are not typically set on the basis of AWPs.

Therefore, there is no analogy to this Court's conclusion that false or inflated AWPs are the "but-

for" cause of Medicare's setting an inflated median reimbursement rate.  Second, the regulatory

history in the Medicaid context expressly recognizes that, "[b]y using the lowest compendia

price for a drug as the benchmark . . . , the low price supplier may be encouraged to raise its

published prices to a point just below the next higher price" and "wholesalers [may] invent new

ways of offering discounts . . ., thereby expanding the practice of discounting."  *See* 52 Fed. Reg.

28,648, at 28,658.  In other words, HCFA expressly anticipated and sought to encourage the very

activities that plaintiffs now attempt to characterize as "FUL fraud."  Equally important, HCFA

clearly understood that it would not get the direct benefit of the price discounting it was seeking

to encourage.  *Id.* at 28,656.

HCFA, the regulatory history explains, desired this result because it would encourage

"the substitution of lower cost generic drugs" and reduce Medicaid's overall expenditures.  *Id.*

HCFA accepted that it was the "retail druggist and wholesaler" who would most directly benefit

from setting FULs on the basis of "published prices." *Id.* at 28,658.  In relevant part, the

regulatory history recognizes, "neither the State programs nor the Federal Medicaid program"

would benefit directly from the "reductions in wholesale prices." *Id.*  In short, plaintiffs have not

alleged facts that would make plausible their theory of "FUL fraud" in light of this regulatory

history and the plain language of the FUL regulation.[3]

### C.    The Plaintiffs' "Averages" Are Unrepresentative of Actual Prices and Cannot Form the Basis for Any Claim of "FUL Fraud."

In their attempt to salvage their "FUL fraud" claims, plaintiffs concede the insufficiency

of their own pleading.  Plaintiffs state in their Opposition that they "do not allege that defendants

[were] obligated to report their lowest prices to publishers."  Opp. at 15.  That statement is flatly

inconsistent with their Amended Complaint, which asserts "FUL Fraud" as to 2,503 NDCs, each

of which is supposedly supported by the particularized "spread" alleged in Exhibit B to the

Amended Complaint, all of which are based on the single lowest "price" purportedly charged by

any wholesaler to any customer in any class of trade.  *See* Am. Compl., ¶ 15.  The Amended

Complaint sets forth no other "spread" allegations.  *Id.*  If the plaintiffs abandon these

allegations, as logic demands they do, then they have no particulars to support their allegations

of "FUL fraud," and those allegations should be dismissed for lack of particularity.

---

[3] Contrary to plaintiffs' argument that HCFA did not anticipate that "mega-spreads" might develop between the FUL and actual market prices, *see* Opp. at 17-18, the regulatory history warns "drugs with high compendia prices could generate <u>extremely high payment levels</u>" and encourages states to design mini-MAC and other programs to cap reimbursement amounts at lower levels.  *Id.* at 28,655 (emphasis added).  New York, moreover, had access to information about the actual acquisition cost of most drugs being reimbursed by its Medicaid program, because as this Court has found it reimbursed physician-providers on the basis of their actual acquisition cost, not AWP.  *See* 4/2/07 Opinion, at 38 (citing N.Y. Soc. Serv. L. § 367-a(9)(a)).  Given the large variation in prices found in the data that plaintiffs use in an attempt to support their claims, ironically, it is the State of New York and plaintiffs who were in the better position to determine the actual prices being paid by providers to wholesalers in the marketplace.

   **1.**  **Plaintiffs' claim of "FUL Fraud" cannot be premised on the allegation that defendants should have reported "lowest" available prices.**

  Plaintiffs cannot premise their "FUL fraud" claims on the theory that defendants should have reported their AMPs or similar prices to the national pricing compendia.  The pricing compendia have never published Best Price or AMP and, until 2005, the compendia did not publish ASPs.  Besides, just as defendants demonstrated in their opening brief as to the single lowest prices on which plaintiffs initially tried to premise their claims, *see* Defs. Br. at 15-16, OIG and GAO have recently found that setting FULs at even 250% of the lowest reported AMP, as CMS proposes to do, would exclude many Medicaid recipients from access to drugs.  *See* Department of Health and Human Services, Office of the Inspector General, Deficit Reduction Act of 2005:  Impact of the Medicaid Federal Upper Limit Program, OEI-03-06-00400 (June 2007); United States Government Accountability Office, Medicaid Outpatient Prescription Drugs:  Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Cost, GAO-07-239R (Dec. 22, 2006).  In two separate reports commenting on these proposed changes to the FUL regulatory scheme, OIG and GAO show that using lowest reported AMPs as the basis of FULs under-compensates pharmacists and denies access to Medicaid beneficiaries.  The referenced OIG report finds, for example, that for 19 out of the top 25 drugs in terms of Medicaid reimbursement, if the FUL had been set on the basis of even <u>250%</u> of the lowest reported AMP (not 150%), the average pharmacy acquisition cost would have been <u>higher</u> than the FUL.  *See* June 2007 OIG Report at iii.  Thus, plaintiffs' new theory is not only implausible as a gloss on the Medicaid system it is alleged to interpret, but also contrary to the intent of that system and detrimental to the interests of Medicaid beneficiaries.

## 2.    Plaintiffs' reliance on weighted "average" prices fails to state a claim.

Plaintiffs' "new" FUL theory – improperly asserted in their Opposition to Defendants'

Motion to Dismiss and without a basis in the Amended Complaint itself – appears to be that

defendants were obligated to report not the lowest wholesaler prices but rather some unspecified

"accurate prices."  Plaintiffs provide no explanation of what "prices" are "accurate" or why the

undiscounted list prices that the manufacturers reported to the pricing compendia were not

"accurate" in this context.  *See* Opp. at 15.  Nor could they.  As this Court has recognized,

industry-participants have long understood that AWP is not an actual average of wholesale

prices, *see* 6/21/07 Opinion at 150 & n.72, nor is it even likely to be the basis for a FUL.  *See*

*supra* at 10-11.  Similarly, there is no indication that HCFA ever understood WAC or DP to be

other than a list price.

To the contrary, the very fact that when HCFA proposed basing FULs on discounted

prices – AMPs – it recognized that the multiplier would have to be increased to 250% renders

implausible plaintiffs' theory that the "accurate" prices that defendants were expected and

required to report to the compendia for publication were some form of discounted prices.  As the

OIG and GAO reports make clear, even the use of that higher multiplier may result in significant

access problems.  These facts are entirely inconsistent with any argument that the current system,

which uses a multiplier of 150%, could be expected to function using discounted prices as a basis

for FULs.

Moreover, the "spread" allegations set forth in Exhibit B-1 to the Declaration of Joanne

Cicala, even if properly asserted in a pleading rather than an opposition to a motion, do not

support a claim of "FUL fraud."  In a radical departure from any prior theory of AWP liability,

plaintiffs attempt to base their claims on a "market price calculation" that is untethered to any

reasonably defined "price" such as ASP or AMP, and depends instead on data that were not available to defendants during the relevant time.  It cannot be that drug manufacturers were obligated to calculate and report some weighted average of the prices at which <u>wholesalers</u> sold products to the wholesalers' customers:

- To calculate a weighted average for any one wholesaler, or for the market more generally, manufacturers would have required complete information about the prices and quantities at which wholesalers sold products to providers;

- The very range of prices reflected in plaintiffs' data belies a claim that there was <u>one</u> "accurate" price that defendants (even if they had had more complete information for each wholesaler) could have reported to the pricing compendia; and

- The implausibility of plaintiffs' theory is demonstrated by the very data on which they seek to rely.  For example, for 49 out of the 56 Warrick NDCs at issue (88%), had Warrick reported the ABC or Cardinal "weighted average market price" that plaintiffs calculate to the pricing compendia for publication, and had HCFA set a FUL on that basis, the FUL or reimbursement amount would have been <u>below</u> (and sometimes well below) the McKesson ServAll prices reported in plaintiffs' own data.  In simple terms, the FUL would have been less than the price allegedly paid by every single independent pharmacy in this country's largest independent pharmacy buying group.  *See* Ex. B-1 to the Declaration of Joanne Cicala, at pp. 161-65.

In short, as the foregoing demonstrates, the FUL regulatory scheme was functioning as it was designed to work.  FULs set on the basis of "published prices" were ensuring adequate access to the Medicaid system while, at the same time, allowing pharmacists to make a profit on the ingredient costs of the generic drugs that they dispensed, thus stimulating generic substitution and lowering the total cost to Medicaid of providing a prescription drug benefit.  *See, e.g.,* Department of Health and Human Services, Office of the Inspector General, Medicaid Program Savings Through the Use of Therapeutically Equivalent Generic Drugs (July 1994) (projecting additional savings from expanding the use of FULs).  This also explains why plaintiffs cannot now articulate a plausible theory of "FUL fraud."

**IV.     PLAINTIFFS' PAD ALLEGATIONS FAIL TO SATISFY *TWOMBLY*, RULE 9(b), AND THE PLEADING STANDARDS THAT THIS COURT HAS PREVIOUSLY ARTICULATED.**

This Court has found, as a matter of law, that plaintiffs cannot assert claims for the reimbursement of drugs administered by physicians and other "medical practitioners."  *See* 4/2/07 Opinion, at 38.  Under New York law, since June 9, 1994, New York Medicaid has reimbursed claims made by these providers on the basis of the providers' actual acquisition costs, not AWP.  *See* N.Y. Soc. Serv. L. § 367-a(9)(a).  Thus, the only claims that remain in this case are ones for the reimbursement of PADs dispensed by providers <u>other than</u> physicians and other "medical practitioners" – what plaintiffs call "Pharmacy Providers" of PADs.  These claims should not survive for three reasons.

<u>First</u>, the allegation that "[e]very drug listed in Exhibit B to this complaint . . . has been reimbursed by New York Medicaid based on AWP or FUL" combined with the allegation that, in the aggregate, New York Medicaid "has reimbursed Pharmacy Providers based on AWP or FUL for the injectibles, syringes, inhalants and vials listed in the Exhibits . . . an amount that exceeds $2.4 billion" is not enough – as plaintiffs' Opposition suggests it is.  *See* Opp. at 13 (quoting Paragraphs 99 and 110 of the Amended Complaint).  Albuterol, for example, is an "inhalant" that undoubtedly was subject to and reimbursed on the basis of a FUL, but it is not a PAD.  Simply put, the Amended Complaint does not specify which of the more than 10,000 NDCs at issue are PADs that plaintiffs say were reimbursed on the basis of AWP.  Rule 9(b) entitles defendants to understand the who, what, why, when, and how of the fraud in which they are alleged to have engaged.  *See New England Data Servs., Inc.* v. *Becher*,  829 F.2d 286, 288 (1st Cir. 1987).  Paragraphs 99 and 110 of the Amended Complaint fall far short of this mark and

certainly do not provide defendants with sufficient information to enable them to meaningfully respond to the PAD allegations in the Amended Complaint.  *See* Fed. R. Civ. P. 8.

Second, plaintiffs do not even purport to calculate prices for PADs to the "Pharmacy Provider" class of trade and, thus, plaintiffs have no real basis for alleging spreads.  Plaintiffs' Opposition reveals that, at least in part, plaintiffs have calculated spreads for PADs on the basis of sales to the "physician/clinics," "oncology," and "urology" classes of trade.  *See* Opp. at 10. Drugs dispensed by these providers cannot possibly be relevant to the claims at issue here, as these providers would have been – as the Court has found – reimbursed not on the basis of AWP, but rather on the basis of their actual acquisition cost.  For the same reason, spreads for PADs that are calculated on the basis of sales to these classes of trade are implausible and, accordingly, the PAD claims should be dismissed under *Twombly*.

Third, as this Court observed in its MDL decision, there is "no compelling reason" to treat SADs and PADs differently for purposes of applying the 30% "yardstick."  *See* 6/21/07 Opinion, at 128 n.62.  While, again, defendants do not accept plaintiffs' spreads as having been properly calculated, for the reasons discussed above, any PAD for which plaintiffs have calculated a spread of less than 30% certainly does not belong in this case.  Applying the 30% "yardstick" to PADs eliminates 166 NDCs from this case.  *See* Declaration of John P. Bueker, at ¶ 5.

Defendants respectfully request all PAD claims be dismissed with prejudice on the ground that plaintiffs have been given leave to re-plead too many times.  At a minimum, however, those PADs with a spread of 30% or less should certainly be dismissed with prejudice.

## CONCLUSION

For all the foregoing reasons, Defendants' Joint Motion to Dismiss should be

GRANTED.

Schering-Plough Corporation, Schering
Corporation, and Warrick Pharmaceuticals
Corporation

By their attorneys,

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
John P. Bueker (BBO#636435)
Kim B. Nemirow (BBO# 663258)

ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Date:   July 20, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2007, I caused a true and correct copy of the foregoing
to be served on all counsel of record by electronic service pursuant to Case Management Order
No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Kim B. Nemirow
Kim B. Nemirow