# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE  LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) MDL NO. 1456 |
| *The City of New York v. Abbott Laboratories, Inc., et al.* S.D.N.Y.  Case No. 04-CV-06054 | ) ) Civil Action No. 01-12257-PBS ) |
| *County of Albany v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0425 | ) ) Judge Patti B. Saris ) |
| *County of Allegany v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-0236 | ) ) ) |
| *County of Broome v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0456 | ) ) ) |
| *County of Cattaraugus v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-0256 | ) ) ) |
| *County of Cayuga v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0423 | ) ) ) |
| *County of Chautauqua v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-0214 | ) ) ) |
| *County of Chemung v. Abbott Laboratories, Inc., et al.* W.D.N.Y. Case No. 05-CV-6744 | ) ) ) |
| *County of Chenango v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0354 | ) ) ) |
| *County of Columbia v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0867 | ) ) ) |
| *County of Cortland v. Abbott Laboratories, Inc., et al.* N.D.N.Y. Case No. 05-CV-0881 | ) ) |

[Caption Continues on Next Page]

## PLAINTIFFS' SUR-REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT

*County of Dutchess v. Abbott Laboratories, Inc., et al.* )
S.D.N.Y. Case No. 05-CV-6458 )
)
*County of Essex v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0878 )
)
*County of Fulton v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0519 )
)
*County of Genesee v. Abbott Laboratories, Inc., et al.* )
W.D.N.Y. Case No. 05-CV-00267 )
)
*County of Greene v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0474 )
)
*County of Herkimer v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-00415 )
)
*County of Jefferson v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0715 )
)
*County of Lewis v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0839 )
)
*County of Madison v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-00714 )
)
*County of Monroe v. Abbott Laboratories, Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6148 )
)
*County of Nassau v. Abbott Laboratories, Inc., et al.* )
E.D.N.Y. Case No. 04-CV-05126 )
)
*County of Niagara v. Abbott Laboratories, Inc., et al.* )
W.D.N.Y. Case No. 05-CV-06296 )
)
*County of Oneida v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0489 )
)
*County of Onondaga v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0088 )
)
*County of Ontario v. Abbott Laboratories, Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6373 )
)
*County of Orleans v. Abbott Laboratories, Inc., et al.* )
W.D.N.Y. Case No. 05-CV-6371 )
)
*County of Putnam v. Abbott Laboratories, Inc., et al.* )
S.D.N.Y. Case No. 05-CV-04740 )

*County of Rensselaer v. Abbott Laboratories, Inc., et al.*  )
N.D.N.Y. Case No. 05-CV-00422                                )
                                                             )
*County of Rockland v. Abbott Laboratories, Inc., et al.*    )
S.D.N.Y. Case No. 03-CV-7055                                 )
                                                             )
*County of Schuyler v. Abbott Laboratories, Inc., et al.*    )
W.D.N.Y. Case No. 05-CV-6387                                 )
                                                             )
*County of Seneca v. Abbott Laboratories, Inc., et al.*      )
W.D.N.Y. Case No. 05-CV-6370                                 )
                                                             )
*County of St. Lawrence v. Abbott Laboratories, Inc., et al.* )
N.D.N.Y. Case No. 05-CV-0479                                 )
                                                             )
*County of Saratoga v. Abbott Laboratories, Inc., et al.*    )
N.D.N.Y. Case No. 05-CV-0478                                 )
                                                             )
*County of Steuben v. Abbott Laboratories, Inc., et al.*     )
W.D.N.Y. Case No. 05-CV-6223                                 )
                                                             )
*County of Suffolk v. Abbott Laboratories, Inc., et al.*     )
E.D.N.Y. Case No. 03-CV-12257                                )
                                                             )
*County of Tompkins v. Abbott Laboratories, Inc., et al.*    )
N.D.N.Y. Case No. 05-CV-0397                                 )
                                                             )
*County of Ulster v. Abbott Laboratories, Inc., et al.*      )
N.D.N.Y. Case No. 06-CV-0123                                 )
                                                             )
*County of Warren v. Abbott Laboratories, Inc., et al.*      )
N.D.N.Y. Case No. 05-CV-0468                                 )
                                                             )
*County of Washington v. Abbott Laboratories, Inc., et al.*  )
N.D.N.Y. Case No. 05-CV-0408                                 )
                                                             )
*County of Wayne v. Abbott Laboratories, Inc., et al.*       )
W.D.N.Y. Case No. 05-CV-06138                                )
                                                             )
*County of Westchester v. Abbott Laboratories, Inc., et al.* )
S.D.N.Y. Case No. 03-CV-6178                                 )
                                                             )
*County of Wyoming v. Abbott Laboratories, Inc., et al.*     )
W.D.N.Y. Case No. 05-CV-6379                                 )
                                                             )
*County of Yates v. Abbott Laboratories, Inc., et al.*       )
W.D.N.Y. Case No. 05-CV-06172                                )

## PRELIMINARY STATEMENT

In their reply, Defendants offer little more than *ipse dixit* and gross mischaracterization to try to reduce the size of this litigation.  Defendants' concern about the legal, financial and public relations exposure they face in this lawsuit is certainly understandable: the New York State Medicaid program to which plaintiffs are statutorily required to contribute and on whose behalf plaintiffs seek damages is the largest in the United States in terms of expenditures.  Every dollar wasted as a result of defendants' extensive and entirely insensitive pricing fraud should have been available to pay for vital public needs.  The City of New York and 43 New York County Governments prosecuting this matter view it as one of extreme importance not only for the plaintiff government entities but the taxpaying public.

Having clamored for averages to confirm the propriety of plaintiffs' methodology to identify actionable NDCs, defendants now criticize plaintiffs' weighted averages on the grounds that (a) the penny prices distort the results and (b) plaintiffs included prices from improper classes of trade.  Neither argument carries any weight. As plaintiffs pointed out in their opposition memorandum, every one of the 344 penny prices defendants call "meaningless" were paid to wholesalers by entities in relevant classes of trade.  *See* Point I *infra*; Plaintiffs' Opp. at 8; Cicala Dec at. ¶ 24.  It is clearly appropriate, at this stage and for the purpose of identifying actionable NDCs, for plaintiffs to consider prices to these classes. Plaintiffs' supplemental submission of a weighted average, which accounts for the volume sold at the penny price, as opposed to a straight average, ensures against distortion and demonstrates the propriety of the Actual Acquisition Cost ("AAC") methodology used in the FACC Exhibit B.

Defendants' reply memorandum offers no explanation for the fact that the vast majority of prices contained in Exhibit B to the FACC appear to be *prices defendants themselves*

*negotiated* with the providers (be they chain pharmacies, mail order pharmacies, clinics, etc). Nor do defendants respond to plaintiffs' reminder that it was proper for plaintiffs to use actual prices to identify actionable NDCs since that is precisely what this Court permitted in its most recent 9(b) ruling. *See City of New York et al. v. Abbott Labs et al.*, No. 01 Civ. 12257, 2007 WL 1051642 at *15 (D. Mass. April 2, 2007) (blessing allegations based not on averages but on the McKesson Servall prices).

Defendants argue that plaintiffs should drop all claims for NDCs with spreads below the 30% Hartman speed-limit. This ignores that Hartman's 30% concerned the knowledge and expectations of private third party payors and Taft-Hartley funds that had retained the services of pharmacy benefit managers. *See In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01 Civ. 12257, 2007 WL 1774644, at *10-11, *51-54 (D. Mass. Jun. 21 2007) ("*In re AWP*"). Hartman offered no opinion whatsoever regarding the knowledge and expectations of Government payors generally, Medicaid payors generally, nor these plaintiffs in particular. *Id.* The argument also ignores that plaintiffs expressly told the Court at the May 16, 2007 Status Hearing that they disagreed with Professor Hartman's 30% threshold and maintained their position that spreads beyond 20-25% were actionable. Tr: 6:6-16. The Court acknowledged plaintiffs' position and did not instruct plaintiffs that they were bound by the Hartman testimony at this point. That conclusion is certainly reasonable given, as this Court has noted, the "very different legal issues" involved in the Medicaid cases as opposed to the TPP and Medicare class case. *See* July 3, 2007, Tr: 13:18-23.

Defendants' misrepresentations abound and are dealt with fully below. Among the most remarkable, however, is the following sentence (note defendants' overt and improper insertion of the word "branded"):

> As defendants point out in their opening brief, this Court has permitted this action to proceed as to "only those [branded] drugs for which the plaintiffs have alleged a spread greater than the 20-25% mark up between WAC and AWP" plus other well known discounts.

Def. Reply at 4.

Defense Counsel tried the same argument at the May 16, 2007 Status Hearing.  Tr: 22:2-3; 24: 8-16**.**  Plaintiffs corrected Defense Counsel then and the Court agreed.

> Ms. Cicala: "[when] generics are reimbursed based on AWP, they're in the case.  So the suggestion that all the generics are out because the FUL claims are out is simply not accurate."
>
> The Court: I didn't say that.

Status Conf. Tr: 24:13-16 (May 16, 2007).

Defendants' gross misrepresentation that this case concerns "only brand SADs" is simply wrong and nothing more than wishful thinking.

Defendants misrepresent that plaintiffs' AAC prices are prices "purportedly charged by any wholesaler to any customer in any class of trade."  Def Reply at 4.  This is completely false. Plaintiffs' methodology -- unlike defendants' pricing -- is entirely transparent and has been set out for the Court in the complaint, in plaintiffs' opposition brief and the accompanying Cicala Declaration.  Plaintiffs have now thrice explained that they used actual transaction prices paid to wholesalers by entities in the classes of trade plaintiffs reasonably believe to be relevant.  *See* FACC at ¶145, Plaintiffs' Opp. at 1, 10-12, and the Cicala Dec. at ¶10.

Defendants contend plaintiffs now have "abandoned" the AAC prices they used to identify actionable NDCs in favor of weighted averages.  Def. Reply at 4.  That is false as well. Plaintiffs have abandoned nothing and presented the weighted averages (a) because defendants attacked plaintiffs for not using averages; (b) to demonstrate the propriety of their position that

the NDCs in Exhibit B to the FACC are properly part of this case; and, (c) to demonstrate the prejudice that would result in light of the incompleteness of data.  *See* Plaintiffs' Opp. at 3.

On *Twombly*.  Defendants would have this Court believe that *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ("Twombly"), (i) addressed facts and a complaint identical to those at issue here; and (ii) essentially stands for the proposition that pleadings now are held to summary judgment standards and defendants need only launch broad baseless attacks in order to defeat a claim.  Of course, defendants are overstating *Twombly*'s reach.  In *Twombly*, the Supreme Court found that plaintiffs had filed a complaint that alleged a conspiracy and agreements among the defendants to thwart competition.  *Id.* at 1962.  Yet, the *Twombly* plaintiffs supplied no evidence of such agreements and instead argued that the agreements should be inferred from defendants' parallel conduct.  *Id.* at 1970 ("[T]he complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs.").  Here, in sharp contrast, plaintiffs have supplied specific evidence from third party wholesalers that reveals -- on an NDC by NDC basis -- the extent and nature of defendants' undisclosed discounting practices and reporting of false and inflated prices.  Plaintiffs have submitted this supporting information for every NDC at issue in the case.  Plaintiffs have informed the Court and defendants of the source of the data and their methodologies for working with same.  In short, plaintiffs assert no cause for which they have not supplied particular pricing data to demonstrate that the reported AWP for any given NDC is false and inflated.  Plaintiffs have met the burden imposed by any reasonable reading of *Twombly*.

Defendants' reply arguments regarding drugs commonly referred to as PADs are simply bizarre.  Defendants now say that "plaintiffs do not identify a single County that reimbursed any

[non-physician provider] for any PAD on the basis of AWP." Def. Reply at 3. This notwithstanding that plaintiffs allege repeatedly that every single NDC listed in Exhibit B to the FACC was reimbursed based on AWP or FUL. *See* FACC at ¶¶ 99,105, 106, and 145. As for identifying the Counties who paid, defendants need only consult the FACC caption and ¶41 which clearly states, *inter alia*, "each plaintiff has paid for the subject drugs."

Defendants' FUL arguments are readily resolved. First*,* the fact that HCFA intended for there to be some profit margin built into the FUL reimbursement formula does not mean that defendants were free to report/publish any price they chose irrespective of their true prices to providers. HCFA clearly contemplated that the FUL would reflect actual provider cost. Plaintiffs noted in their opposition memorandum that the DOJ and OIG agree that the FUL should reflect actual provider cost, plus a reasonable profit. Plaintiff Opp. at 18. Defendants ignore this point entirely on reply. Second, plaintiffs have alleged that defendants were motivated to keep the FUL high so that they could compete based on deep undisclosed discounts, *i.e.,* compete on spread. Third, plaintiffs do not allege a FUL conspiracy, nor were they required to. Plaintiffs allege that each defendant independently seeks to create a spread between reimbursement price (be it FUL or AWP) and AAC.

In all, defendants' reply brief carries no legal freight and defendants' motion to dismiss the FACC should be denied in its entirety.

## ARGUMENT

## I.    EXHIBIT B PROPERLY SETS FORTH THE AT-ISSUE NDCs

### A. Plaintiffs' Classes of Trade Choices Are Entirely Proper

Defendants, as expected, criticize the averages that plaintiffs submitted in opposition to defendants' opening brief.  The primary criticism concerns plaintiffs' class of trade choices. Defendants write:

> Plaintiffs contend that they "considered only proper classes of trade," *see* Opp at 10, when in fact they include in their calculation of the prices generally available in the marketplace for branded SADs sales to the managed care home infusion, managed care nursing home" and managed care mail order classes of trade. Indeed, by their own admission, plaintiffs even include sales to "high volume warehouses" and "miscellaneous warehouses". *Id.*  These entities have the ability to develop formularies or to buy in such bulk that they can obtain discounts on branded SADs.  *See* 6/21/07 Opinion at 23.    However, sales prices to such entities are not indicative of the prices generally available in the marketplaces to retail pharmacies and thus are irrelevant for purposes of calculating spreads on branded SADs reimbursed by New York Medicaid.

Def. Reply at 5.

Working backwards, and as plaintiffs have stated repeatedly, this case is not only about branded drugs — be they SADs or PADs or whatever other name defendants want to call them. This case is about all drugs reimbursed by New York Medicaid on the basis of AWP on FUL. This Court has already ruled that all drugs with spreads greater than 20-25% are in the case. *Abbott Labs*, 2007 WL 1051642 at *15, n.9.

Second, the sales prices to every one of the entities identified above are entirely relevant to a calculation of a true EAC.  Each class of trade includes Medicaid enrolled "Pharmacy Providers" (defined at FACC ¶107) who were reimbursed at AWP or FUL upon submission of a claim.  *See Id.* at ¶¶ 93-94.

Defendants appear not to understand the meaning of the word "Pharmacy" as it is used in the context of "Pharmacy Providers."   New York Education Law §6802 (1) defines "Pharmacy" as "any place in which drugs, prescriptions or poisons are possessed for the purpose of compounding, preserving, *dispensing or retailing*, or in which drugs, prescriptions or poisons are

preserved, *dispensed or retailed*, or in which such drugs, prescriptions or poisons are by advertising or otherwise offered for sale at retail."  New York Jurisprudence explains further in the section called "Pharmacy As Profession", to wit:

> The practice of the profession of pharmacy is defined as the preparing, compounding, preserving or dispensing of drugs, medicines and therapeutic devices on the basis of prescriptions or other legal authority. *A distinction should be and has been made between the profession of pharmacy and the keeping of a drugstore, which is more in the nature of a trade or business.*

60 N.Y. Jur. 2d Food, Drugs, Poisons, etc. §78. (emphasis added).

Defendants' class of trade argument is essentially that plaintiffs should only be considering prices paid by *drugstores*.  That is not what New York Social Services Law requires. New York Social Services Law §367(a)-9 says nothing of drugstores; nor does it confine EAC to retail establishments. New York Social Services Law 367(a)-9(ii) speaks to the estimated acquisition cost of pharmacies.

Moreover, a review of the entities in each of the classes of trade questioned by defendants makes clear that these are engaged in the practice of pharmacy, *i.e.*, they are dispensing drugs to Medicaid recipients.[1]

Fourth, the suggestion that these entities are irrelevant merely because they have formulary power and can buy in such bulk ignores that chain pharmacies and GPOs representing independent pharmacies (such as McKesson Servall) have similar if not greater bargaining power given their ability to move market share.  *See also* FACC at ¶17.

---

[1] For example, the "Nursing Home" class of trade includes: PharmaCare (the specialty pharmacy of CVS); NCS Healthcare (now part of OmniCare, one of the largest Long Term Care and Specialty Pharmacies in the nation); Kindred Pharmacy Services, a nationwide Long Term Care and Specialty pharmacy; B.J.K., Inc. d/b/a Chem Rx, a New York based Long Term Care and Specialty Pharmacy.   "Home Infusion" class of trade includes Walgreens Advance Care; PharmaCare (CVS); Option Care, (a network of home infusion and specialty pharmacies in 35 states recently purchased by Walgreens on July 2, 2007). The "Mail Order" class of trade includes Walgreens Health Care Plus, NCS Health Care (now Part of OmniCare); Express Scripts (PBM); Advance Rx (PBM); Caremark (PBM); Allscripts (PBM).  The "High Volume Mail Order Warehouse" includes Walgreens, Duane Reade, Longs Pharmacy, and Tom Thumb Stores.

**B.      Consideration of The Penny Prices Is Entirely Proper**

Defendants' protests regarding the penny prices are particularly incredible and entirely improper at this stage of litigation.  First, as plaintiffs pointed out in their opposition brief, fully 82% of the penny prices were to retail pharmacies.  Plaintiffs' Opp. at 8.  The remaining 18% were to entities in classes of trade that plaintiffs reasonably allege are relevant for calculation of a true AWP.  *Id.*  The wholesaler deposition testimony tells us that every price appearing in the wholesaler database represents an invoice price from the wholesaler to the retailer. *See* Cicala Dec. at ¶27 (citing June 7, 2007 deposition transcript of Cardinal witness Ron Reich) **.**

In a remarkable display of bootstrapping, Defendants respond to the penny prices as follows:

> [t]here are numerous possible explanations for why the wholesaler data might reflect penny pricing (e.g. most manufacturers do not have a sufficiently well-developed distribution network that would allow them to dispense "free care" products to indigent patients so they accomplish that through the wholesalers). While it might not be appropriate for the Court determine which explanation for the random penny prices cited is the correct one, the United States Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, --- S. Ct. ---, 2007 WL 1461066 (May 21, 2007), makes clear that the Court ought not to accept at face value plaintiffs' naked assertion that such prices reflect arm's length sales to pharmacies on "numerous occasions.

Def. Reply at 5-6.

It would be premature for either party to argue that the full breadth and impact of *Twombly* is yet known, but this much can be said with certainty based on the express language of that decision: *Twombly* does not stand for the proposition that a pleading is no longer a pleading, but rather is a motion for summary judgment.  *See Twombly*, 127 S.Ct. at 1973 n.14.  Nor does *Twombly* stand for the proposition that defendants can attack good faith, reasonable, substantiated allegations with broad brush unsupported *ipse dixit*: "Your Honor, we do not know what X means and it may not be proper for the Court to determine what X means, but we know

for certain that X does not mean what plaintiffs suggest."    This is precisely the sort of unsubstantiated legal conclusion that *Twombly* rejects.  *Id.* at 1970 ("[T]he complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. . . .  [T]hese are merely legal conclusions resting on the prior allegations."). From plaintiffs' perspective, based on the testimony from the wholesalers and all data reviewed to date, it is not only plausible that the penny prices were actual sales, it appears to be a fact.  *See* Cicala Dec. at ¶27 (citing deposition of Cardinal witness Ron Reich).

For now, even in this post-*Twombly* world, it is entirely proper for plaintiffs' well researched and substantiated allegations to stand.

 Without a word of explanation, defendants say that "plaintiffs' spread calculations are plagued with errors.  "For example, almost none of the spreads for Schering's Intron-A seem to make any sense in light of the data set forth in the Cicala Declaration or this Court's findings in its Track 1 decision."  Def. Reply at 6.   Plaintiffs re-checked their Intron-A calculations in light of this assertion.  Every one of them is entirely accurate.[2]

Defendants suggest the number of NDCs with actionable spreads associated with these new drugs is "shocking."   Once again plaintiffs agree and note that the number of NDCs with actionable spreads is a function of the extent of defendants' false price reporting.   Defendants are claiming "shock" specifically because Exhibit 1 to the Nemirow Declaration tells them that plaintiffs improperly are adding thousands of new NDCs to this case.  Defendants can relax.  Ms. Nemirow's Exhibit 1, which purports to list all the drugs in the FACC that were not identified

---

[2]  Plaintiffs verified their Intron-A spreads as follows:  they pulled the reimbursement price for each NDC from FACC Exhibit B and the weighted averages from Cicala Dec. Exhibit B-1.  Then, plaintiffs recalculated the spread pursuant to the following: Spread = Reimbursement Price-weighted average price/weighted average price.

anywhere in the plaintiffs' Consolidated Complaint, filed June 15, 2005, (the "CC") is incorrect. Fifty-Three percent of the NDCs drugs listed in Nemirow Exhibit 1 belong to drugs that were listed, by name, in the CC.  Compare Cicala Dec. Exh. A with Nemirow Exh. 1.

Finally, defendants mischaracterize plaintiffs' position regarding the "new" drugs that are listed in Exhibit B to the FACC.  Plaintiffs have expressly told this Court that they will withdraw their allegations in respect of these new drugs if the Court is not inclined to entertain a motion for leave to include them.  *See* Plaintiffs' Opp. at 4 n.3.

### C.   There Is No Basis For Dismissing NDCs With 25-30% Spread

Defendants argue in conclusory fashion that *Twombly* tells the Court to dismiss all NDCs with spreads between 25-30%.  No other legal support for the argument is offered.  The argument completely misses the mark.  Hartman's 30% speed limit concerned the knowledge and expectations of the Class 3 plaintiffs.  *See In re AWP*, 2007 WL 1774644, at *10-11, *51-54. Hartman did not offer any opinion about government knowledge generally, Medicaid payor knowledge generally or the knowledge of these plaintiffs in particular.  This Court already has acknowledged that there are "very different legal issues" between the Medicaid cases and the class case. July 3, 2007, Tr: 13:18-23.  In short, there is no reasonable basis to assume or conclude, on the instant record and at this stage, the applicability of the Hartman Class 3 speed limit.[3]

In addition, plaintiffs are constrained to point out the misleading mathematical errors at page 8 of defendants' brief.  The errors appear in the context of an argument that defendants

---

[3] Relatedly, defendants' comments regarding the Court's spread findings for Procrit and Temodar are premature. First, Hartman's spread calculations for these and all other drugs at issue in the Class Trial were based only on prices paid by Medicare providers.  *See* Direct Testimony of Raymond S. Hartman at 65, 68.  Medicare providers are not  the same as Medicaid Providers and it is the EAC of the Medicaid providers that is relevant here.  Second, even if the spreads for these drugs in the context of a Medicaid case are determined to be in the 25-30% range (and there is not yet a complete record on which to make this determination), such may nevertheless be actionable given plaintiffs' position, at this stage and as approved by the Court, that any drug with a spread between WAC and AWP of greater than 20-25%  is in the case.

make in cavalier fashion regarding a hypothetical increase to the 30% Hartman threshold. Defendants write that at a 35% threshold, 1,824 NDCs (73%) would be eliminated from plaintiffs' case and, if the threshold were raised to 40%, 1,956 NDCs (78%) would be eliminated. These figures are completely incorrect and make no sense. The first error is that defendants say they are focusing on brand SADs because only brand SADs are in the case. Wrong. The Court has ruled that all drugs with spreads greater than 20-25% are in the case. *See Abbott Labs*, 2007 WL 1051642 at *15 n.9. All drugs --be they brand or multi-source-- not subject to a FUL are part of this action if their spread exceeds 20-25%. Thus, at a 35% threshold, 316 NDCs would be eliminated, but that represents only 3% of plaintiffs' case. At a 40% threshold, 457 would be eliminated, but that represents only 4% of plaintiffs' case. *See* FACC Exhibit B.

Defendants' lack of sensitivity to the impact of these threshold increases is truly revealing. It reminds of a statement one brand manufacturer made recently when defending its practices of offering routine undisclosed discounts that are never accounted for in the reported or published prices. The statement was that "*mos*t sales to *key* customers are *at or about or within 10% of WAC*." Defendants do not seem to appreciate the impact that even relatively small but routine undisclosed discounts have on the integrity of the Medicaid reimbursement system and the bottom line expenditures of financially-strapped government payors. Defendants well know, but do not care, that the system is endeavoring to reimburse providers at their EAC. Defendants' reporting of these false prices renders that impossible. And, in terms of impact on New York Medicaid, even a routine 1% fraud on a drug like Zyprexa 10mg Tablet (for which New York Medicaid spent $383 million during the relevant period) translates into $3.83 million in unnecessary reimbursements.

## II. PLAINTIFFS' PAD CLAIMS SHOULD NOT BE DISMISSED

Plaintiffs have properly alleged claims for every NDC listed in Exhibit B to the FACC and have explained repeatedly that every such NDC has been reimbursed based on AWP or FUL by New York Medicaid.  *See* FACC at ¶¶99,105, 106, 145.  Plaintiffs have explained that every single NDC in FACC Exhibit B was dispensed by a "Pharmacy Provider" (defined as "a licensed and enrolled pharmacy under NY Medicaid" (*see* FACC ¶ 105) and that the pharmacy provider was reimbursed based on AWP or FUL.  Plaintiffs have satisfied 9(b) for all drugs in Exhibit B, be they PAD or SAD or dual channel or something else entirely.

Defendants' argument that plaintiffs' class of trade choices were incorrect in respect of PADs because the physician/clinics, oncology and urology classes of trade would be reimbursed based on actual cost is incorrect.  New York Medicaid does not reimburse on the basis of whether a drug is a PAD or a SAD or based on the type of entity to which a drug was sold.  The dispositive issue is *who submits the reimbursement claim and how*. *See* FACC ¶99 *et seq.*  This case concerns reimbursements paid to Pharmacy Providers based on the claims such Pharmacy Providers submit.  Clinics of all forms (oncology, urology, etc.) and even hospitals that maintain an outpatient pharmacy are all Pharmacy Providers (*see* FACC ¶107) that are routinely reimbursed by New York Medicaid based upon AWP or FUL.  As such, the prices paid by entities in these classes of trade are directly relevant to EAC.

## III. PLAINTIFFS' FUL CLAIMS SHOULD BE PERMITTED TO PROCEED

### A.   Manufacturers of Multi-source Drugs Are Motivated to Create Spreads Between the FUL and Provider Acquisition Cost

Plaintiffs have articulated an entirely logical motivation for defendants whose drugs are subject to a FUL to report false and inflated prices.  Plaintiffs allege that "[d]efendants submit false and inflated price information to the publishing compendia in order to 'create a spread'

between the AAC of a drug (defined at ¶145, actual acquisition cost) and the amount at which the drug is reimbursed."  FACC at ¶16.

Plaintiffs further allege that "[a]t all times relevant hereto, each defendant has intentionally reported or caused to be reported to industry publications wholesale pricing information that it knew to be false and inflated, with the intention and knowledge that the published information would be relied upon by CMS for FUL calculation and by Medicaid, and by private payors for calculating drug payments and reimbursements."  FACC at ¶144. "Defendants' own marketing and sales materials show that defendants market their products based on the spread between reimbursement (based on AWP, FUL, WAC or a WAC equivalent) and actual acquisition cost."  *Id*.

### B.   Plaintiffs' AACs Are Actual Prices Properly Used to Identify At-Issue NDCs; Plaintiffs' Weighted Averages Confirm the Propriety of Plaintiffs' Methodology

Defendants first complained that plaintiffs could not assert FUL fraud claims based on the AACs or actual acquisition costs set forth in the FACC.  Def. Br. at 14-16.  Now in truly predictable fashion (*see* Plaintiffs' Opp. at 3 n.2), defendants complain that plaintiffs' weighted averages are insufficient because they "are unrepresentative of actual prices."  Def. Reply at 12. The argument is disingenuous.  Plaintiffs' weighted averages are based on sales from wholesalers to entities in the relevant classes of trade.  These averages are offered merely to confirm the propriety of plaintiffs' methodology for identifying actionable NDCs.  The fact is that plaintiffs absolutely have satisfied 9(b) with respect to their FUL-based claims.  They have alleged specific prices that, if reported, would have resulted in a lower FUL.

13

This is not a "new" FUL theory calling for unspecified "accurate prices" as defendants state.  Def. Reply at 14.  Plaintiffs' theory is now and always has been that defendants' failure to report accurate prices causes false and inflated FULs at issue.

Defendants respond that the deep and secret discounts that result in the mega-spreads were sanctioned by HCFA.  It is illogical to suggest, however, that HCFA intended when enacting the FUL regulations to give defendants license to report any price they wanted.  Plaintiffs' opposition notes that both the OIG and the DOJ argue that the FUL should be tethered to actual provider costs.  Plaintiffs' Opp. at 18.  Defendants entirely ignore this on Reply.

In all, defendants' position that HCFA sanctioned mega-spreads is simply untenable given HCFA's observation that published prices for "non-brand multiple source_drugs…[and] the leading brand product [have] markups…that are similar, and reflect primarily the costs of dispensing."  Plaintiff Opp. at 17, citing "Medicare and Medicaid Programs; Limits on Payments for Drugs", 51 Fed. Reg. 29,560 (Aug. 19, 1986).  It would be entirely improper for this Court to determine now, as a matter of law, that HCFA sanctioned the creation of the mega-spreads that are so prevalent in the multi-source arena.

### C.  Defendants' Access Defense To Their False Price Reporting Is Audacious And Illogical

Defendants' access defense to their false price reporting is essentially this: we had to lie about our prices because if we did not, Medicaid beneficiaries would not be able to obtain necessary drugs.  This argument is as disingenuous as it is circular.  Defendants set AAC and the published prices, and thereby control (1) the FUL; (2) Medicaid Reimbursement; and (3) Pharmacy acquisition costs.  By manipulating the AAC in conjunction with the published prices, defendants' controlled every aspect of pharmacists' profit, which profit defendants grossly inflated to help sell drugs.  This manipulation occurred to the great detriment of Medicaid

programs, and ultimately Medicaid recipients.  To argue, in light of these facts, that the Medicaid recipient access issues somehow exonerates defendants from liability for their manipulative fraud is both audacious and illogical.  Defendants are liable to the extent they lied about their prices and unlawfully caused Medicaid to overpay.  The access issues explored by CMS/HCFA in their attempt to set a FUL that is in line with acquisition costs has nothing to do with Defendants' fraud, and should be ignored.

### D.  HCFA (Like Everyone Else Except Defendants) Believed That WACs Were Real

Defendants have the temerity to argue that "there is no indication that HCFA ever understood WAC or DP to be other than a list price."  Def. Reply at 14.   In fact, HCFA, like all Medicaid payors, believed WAC was a real price.  One need look no further than the 1986 HCFA regulations to confirm this.  These state that published prices (which include WAC) for "non-brand multiple source drugs…[and] the leading brand product [have] markups…that are similar, and reflect primarily the costs of dispensing."  Plaintiff Opp. at 17, citing "Medicare and Medicaid Programs; Limits on Payments for Drugs", 51 Fed. Reg. 29,560 (Aug. 19, 1986)**.**  Such is entirely consistent with the reimbursement formulas adopted by *every* state.  Every state was required to reimburse at EAC and defined EAC as either: "WAC plus [a percentage]" or "AWP minus [a percentage]."[4]   No state reimbursed below WAC.  *Id*.  Why? Because, as plaintiffs allege, no state ever knew that WACs were inflated and that deep discounts off of WAC were routine and pervasive.  *See* FACC ¶¶28-29.  Consider the following from noted pharmacoeconomist Steven Schondelmeyer:

In the past decade, WAC was a term that typically included adjustments for discounts, rebates, purchasing allowances, or other forms of economic

---

[4] *See e.g.* Exhibit A, CMS State Approved Plans Report, "Medicaid Prescription Reimbursement by State- Qtr Ending March 2005", showing that Alabama, Florida, Maryland, Massachusetts, Missouri, Ohio, Rhode Island and Texas all reimburse at WAC plus, and that no one reimburses at WAC minus.

consideration. More recently, WAC has come to mean a list price before any form of price adjustment. WAC is closer to wholesaler's actual acquisition cost than is AWP. However, due to different levels of discounts across drug products and specific classes of trade, the WAC does not generally have a reliable relationship to the actual acquisition cost.

*See* Stephen W. Schondelmeyer and Marian V. Wrobel, Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices, Abt Associates Inc., Cambridge, MA, August 30, 2004, p. 14.

Second, plaintiffs do not claim that pharmacists "substitute a 'competing drug'… that is not therapeutically equivalent" (i.e. claim that pharmacists can fill an albuterol/proventil/ventolin/accuneb prescription with a "competing" non-therapeutically equivalent medication such as Advair Diskus). Rather (and directly contrary to defendants' mischaracterization), plaintiffs allege that pharmacists are free to choose which therapeutically equivalent drug they will dispense. *See* FACC at ¶¶ 25, 144, 158. Plaintiffs allege that pharmacists make this choice in large part, if not entirely, on the basis of the spread between the drugs actual acquisition cost and its reimbursement rate. *Id.* Plaintiffs allege that defendants create this spread through false price reporting and secret deep discounting. *Id.* Plaintiffs are certainly correct that each "manufacturer can create an incentive for the pharmacist to dispense that manufacturers version of the drug," not only "by reducing its prices" but by reducing its prices while at the same time reporting false and inflated prices to the publishers. Defendants' reply speaks only to the price reduction and purposefully ignores the published price inflation. The argument fails.

Defendants' argument that plaintiffs are alleging an implausible FUL conspiracy that must be dismissed pursuant to *Twombly* is misplaced as well. Unlike in *Twombly*, where plausible allegations of a conspiracy was a condition precedent for the antitrust claims, plaintiffs

do not need conspiracy in order to have valid FUL based fraud claims, nor have plaintiffs alleged such.  Each manufacturer of multi-source drugs has an independent motivation to report high false prices and then sell at deep undisclosed discount in order to create a spread for its products. *See* FACC ¶¶ 25, 144.  Finally, plaintiffs do not allege that the FUL was set based on AWP, as defendants now contend for no apparent reason whatsoever.  Plaintiffs expressly allege that the FUL is set based on the lowest published price in the publishing compendia — whether that price is an AWP, DP, WLP or something else.  *See* FACC at ¶¶ 12-15, 195.

## **CONCLUSION**

For all the foregoing reasons, defendants' joint motion to dismiss should be denied in its

entirety and discovery should be permitted forthwith on all NDCs listed in FACC Exhibit B1-40.

Dated:  July 24, 2007

Respectfully submitted,

KIRBY McINERNEY & SQUIRE, LLP
Attorneys for the City of New York and all
Captioned New York Counties Except Nassau
830 Third Avenue
New York, New York 10022
(212) 371-6600

By:             /s/
          Joanne M. Cicala (JC 5032)
          James P. Carroll Jr. (JPC 8348)
          Aaron D. Hovan (AH 3290)

For the City of New York

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
John R. Low-Beer (JL 3755)
Assistant Corporation Counsel
100 Church Street, Room 3-162
New York, New York 10007
(212) 788-1007


LORNA B. GOODMAN
Peter J. Clines
Nassau County Attorney, by

MILBERG WEISS LLP
Melvyn I. Weiss
Ross B. Brooks
One Pennsylvania Plaza
New York, New York 10119-0165
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

Special Counsel for the County of Nassau

## <u>Certificate of Service</u>

I certify that on July 24, 2007 a true and correct copy of the foregoing Sur-Reply Memorandum in Further Opposition to Defendants' Joint Motion to Dismiss the First Amended Consolidated Complaint was served on all Counsel of Record by electronic service pursuant to Case Management Order No. 2 by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

 /s/ Aaron D. Hovan
Aaron D. Hovan