UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

**CLASS COUNSEL'S RESPONSE TO THE DECLARATION OF DONALD E.
HAVILAND, JR. IN RESPONSE TO COURT DIRECTIVE CONCERNING
ASTRAZENECA SETTLEMENT**

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................................1

II.     ARGUMENT ...............................................................................................................2

      A.      The Proposed Settlement Amount Is Fair, Reasonable and in the Best
              Interests of the Class ........................................................................................2

      B.      The Claims Process is Fair And Is Designed To Maximize Claims Via A
              Simplified Process Using A Simple Claim Form ......................................................4

      C.      The Proposed Settlement Is The Result Of Class Counsel Consensus ...................9

      D.      The Haviland Declaration Is Misleading And Crafted To Divert The Court's
              Focus From The Facts .............................................................................................12

      E.      Nothing In The Haviland Declaration Negates The Fact That Class Counsel
              With Six Years Of Experience Litigating This Class Action Fully Support
              The Belief That The Proposed Settlement Is Fair And Reasonable ......................14

      F.      The Criticisms Contained In The Haviland Declaration Do Nothing To
              Advance The Interests Of Plaintiffs Or The Class .................................................15

III.    CONCLUSION ...........................................................................................................17

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
    236 F. Supp. 2d 445 (E.D. Pa. 2002) ...................................................................................4

*Evans v. Jeff D.*,
    475 U.S. 717 (1986)...........................................................................................................17

*Kincade v. General Tire & Rubber Co.*,
    635 F.2d 501 (5th Cir. 1981) ...........................................................................................14

*In re Lupron® Mktg. & Sales Practices Litig.*,
    2004 U.S. Dist. Lexis 26461 (D. Mass. Dec. 21, 2004) .....................................................1

*Maywalt v. Parker & Parsley Petroleum Co.*,
    155 F.R.D. 494 (S.D.N.Y. 1994) ....................................................................................14

001534-16  185327 V1

# I.      INTRODUCTION

Many weeks after the Court directed Don Haviland to file a declaration, he has finally done so.  Mr. Haviland continues to object to *a settlement that will provide claimants with double or maybe even triple their damages*.  Haviland objects because (i) Class Members will be required to complete an incredibly simple claim form,[1] and (ii) he wishes those with supplemental insurance coverage to obtain a windfall.  Both objections are meritless.  A settlement distribution process utilizing a claim form is a very common feature of class action settlements and post-judgment procedure, and Class Counsel have ensured that the process proposed here as easy and painless as possible.  Indeed, the claim form itself requires the Class Member to provide little information.  As to the settlement amount, again, all Class Members will likely recover their full damages, especially in light of the Court's Class 2/3 trial ruling adopting a 30% liability and damages yardstick.  Class Members who had supplemental insurance coverage and, therefore, were injured to a lesser degree than those Class Members who did not and who paid the full 20% Medicare co-pay will also likely recover their full damages.

Rather than continue to work with Class Counsel, Mr. Haviland has once again elected to try and undermine a strong settlement with *ad hominem* attacks.[2]  Haviland's attempts to misrepresent the good faith efforts of Class Counsel, and to mislead the Court by disclaiming that he conveyed to Class Counsel his client's approval to the settlement terms at the end of the mediation when he did not, demonstrate the inappropriateness of his objections.[3]

---

[1] The proposed claim form is even more simple than the GSK claim form that the Court has already approved, and that Haviland supported.

[2] As the Court may recall, Judge Stearns found that Mr. Haviland engaged in "deceptive conduct, manipulating the very consumers [he] claims to protect" when objecting to the initial proposed settlement in the *Lupron* litigation. *See In re Lupron® Mktg. & Sales Practices Litig.*, 2004 U.S. Dist. Lexis 26461, at *5-6 (D. Mass. Dec. 21, 2004).

[3] Mr. Haviland's actions are also further evidence why his motion to be appointed Co-Lead Counsel should be denied.

With regard to the picture that Haviland tries to paint in his Declaration – one of Class Counsel working as part of an evil cabal to recover as little as possible for the Class and to discourage Class Members from making claims, all in the face of the Haviland's efforts to be the knight in shining armor crusading for the Class – it is preposterous.  The record instead demonstrates that Class Counsel have fought hard for over six years to recover the best settlement possible for the Class and to encourage Class Members to participate in the substantial fruits of the settlement.

The Court should reject Haviland's contentions and should not reconsider its Preliminary Approval Order and should instead permit the notice and claims process to continue uninterrupted so that Class members can receive payment as soon as possible.

## II.    ARGUMENT

Nothing in the Haviland Declaration should lead the Court to reverse its preliminary approval of the proposed AstraZeneca Class 1 settlement.  To the contrary, and notwithstanding Haviland's objections, the Proposed Settlement is fair and reasonable, is proffered in the best interests of the Class Members, and will result in the payment of damages greater than that actually suffered by most if not all Class Members.

**A.    The Proposed Settlement Amount Is Fair, Reasonable and in the Best Interests of the Class**

At the time that it was negotiated, the Proposed Settlement was structured so that all Class Members making claims would receive *at least* their out-of-pocket damages, including prejudgment interest.  Indeed, depending on how many Class Members file claims, Class Counsel expected that Class Members would receive *more* than their out-of-pocket damages plus interest since Class Counsel structured the distribution plan on the basis of *double* the damages calculated by Dr. Hartman under the proposed distribution plan.  Concerned with the consumer

- 2 -

payouts and claims rates in prior cases, we crafted this distribution plan in order to create an incentive to submit claims. Declaration of Steve W. Berman in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration ("Berman Decl."), ¶ 14.

To reiterate, a Class Member without MediGap insurance who took Zoladex® for the entirety of 2002, 2003 and 2004 will be eligible to receive $4,408, even though he or she incurred $2,204 in damage under Dr. Hartman's methodology. If the Class Member had private, supplemental insurance coverage during the entire three-year period, the Class Member will be entitled to the lower, yet still substantial amount of $882.48, based on damages incurred of $441.24. Again, this would be more than the damages actually incurred by this Class Member. Thus, these are fabulous recoveries under any damages theory.

And even though Dr. Hartman's damages model assumes that Class Members covered by supplemental insurance made an out-of-pocket co-payment of 20% of 20%, Class Members, like Mrs. Howe, who had supplemental coverage that required them to pay more than 20% of 20%, will also very likely receive back *all if not more* than their out-of-pocket co-payments. Mr. Haviland apparently does not understand this concept and believes otherwise, even though he has presented *absolutely no* mathematical or expert proof backing his unsupported conjecture. The damage calculations and assumptions presented in this Proposed Settlement are consistent with Dr. Hartman's methodology, which this Court has found appropriate. Berman Decl., ¶ 10. As is Haviland's forté, instead of presenting a substantive alternative model, Haviland has been content to lob false accusations and criticize.

Importantly, the Proposed Settlement is even better now than it was at the time it was negotiated, yet, incredibly, Haviland continues to complain. At the time of the negotiations and mediation, the Court had not yet issued its Class 2/3 trial ruling, in which the Court rejected the

"0% threshold" damages theory and instead adopted the 30% "yardstick." Why is this significant? ***Dr. Hartman's recovery table for the AstraZeneca settlement is based on a 0% yardstick***. Since the Court now views damages through the 30% yardstick lens, most Class Members could very well receive ***triple*** the actual damages that they have sustained, depending on the aggregate claims rate. Therefore, the benefits of the proposed AstraZeneca settlement to the Class have only magnified since the Court's Class 2/3 trial ruling.

Mr. Haviland's arguments should not distract the Court from the most important issue before it with respect to the Proposed Settlement, to wit, whether the Proposed Settlement is fair and reasonable. The Proposed Settlement will very likely provide the Class with a total recovery given that the Court has now adopted a damages theory based on a 30% yardstick. This Proposed Settlement is fair, reasonable and certainly in the best interests of the Class.

**B.** **The Claims Process is Fair And Is Designed To Maximize Claims Via A Simplified Process Using A Simple Claim Form**

Mr. Haviland continues to decry the claims-made aspect of the Proposed Settlement, going so far as to call it "unprecedented in similar drug pricing litigation . . . ." Declaration of Donald E. Haviland, Jr., in Response to Court Directive Concerning the AstraZeneca Settlement ("Haviland Decl."), ¶ 8. This is false. As the Court is aware, a very similar claims process is being employed for the GSK settlement that the Court just approved. And as Special Master McGovern recently concluded in reporting to the Court on the fairness of the GSK settlement, a claims process involving proof of payment is "typical of this type of consumer settlement." Report of the Special Master to the Court at 5; *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 236 F. Supp. 2d 445 (E.D. Pa. 2002) (utilizing claims process in which claim had to be certified by a cardiologist or cardiothoracic surgeon); MANUAL FOR COMPLEX LITIGATION, FOURTH at 331 (2004) ("Class members must

- 4 -

usually file claims forms providing details about their claims and other information needed to administer the settlement. . . .   Verification of claims forms by oath or affirmation under 28 U.S.C. § 1746 may be required, and it may be appropriate to require substantiation of the claims (*e.g.*, through invoices, confirmations, or brokers' records).").  Indeed, even the Court itself envisioned that a claims process would follow any trial judgment in favor of the class.  *See* April 11 Pre-Trial Conference Hearing Tr. at 14-15.

Interestingly, Mr. Haviland supported the claims process in the GSK settlement.  He now insists that the claims-made settlement proposed here is "completely different from the process of 'claims administration'" that he supported *vis-à-vis* the GSK settlement merely because there is the possibility of a reverter.  Haviland Decl. at 4 n.6.  This is a distinction without a difference. A claims-made settlement is just that:  one which requires the Class Member to file a claim form in order to participate in the monetary benefits provided by the settlement.  The process proposed to be employed in the AstraZeneca settlement is similar to that used in the GSK settlement, but simplified here.  And Mr. Haviland ultimately accepted a claims process in the *Lupron* action that allowed for the possibility of some reversion.  The fact remains that Haviland supported a claims-made settlement in this very litigation and a related case before and is now taking an inconsistent position.  It is also worth noting that even Mr. Haviland, who now decries the possibility of a reverter to AstraZeneca, was in favor of a reverter provided that there was no cap on a claims made settlement.[4]  Of course, this is not only inconsistent with Haviland's new "no reverter" crusade but also inconsistent with his newly-minted opinion that there will be few claims; after all, if Haviland believed that the claims rate would be so low, why would he have been concerned with a cap?

---

[4] *See* May 3, 2007 Haviland e-mail, found at Exhibit I to the Haviland Declaration.

And Class Counsel submit that the claims process here is eminently reasonable and fair. In addition to basing claims on double damages in order to encourage Class Members to make claims, Lead Counsel went to great pains to recommend a proposed Notice that is simple, concise and written in plain English.  We obtained AstraZeneca's agreement to a simplified claims process in which the Class Member, at a bare minimum, need only represent that he or she made a co-payment for Zoladex® at some point during the Class Period.  Thus, if the Class Member cannot locate paperwork for treatments that may, in many cases, have been administered a *very* long time ago, he or she can still participate in the Settlement.  And for those consumers who incurred a co-pay obligation but did not yet pay it, the Settlement provides them with an opportunity to participate in the claims process once they pay their debts and demonstrate that they have done so.  As both the proposed Notice and Claim Form explain:

> If, **after** receiving this Notice, you make a percentage co-pay for Zoladex® under Medicare Part B based on a bill that you received from a doctor or clinic related to taking Zoladex® from January 1, 1991 through December 31, 2004, you may submit a claim but **must** submit a receipt, cancelled check, or credit card statement evidencing the payment and proof that the payment was for Zoladex® taken between January 1, 1991 and December 31, 2004 in order to be eligible to participate in the Settlement.

These features of the proposed Settlement – the easy claims process and the ability for those incurring obligations to still participate – and more are very consumer friendly and represent major concessions on AstraZeneca's part.

Moreover, the proposed Claim Form itself is incredibly simple to complete.  The Class Member need only provide his or her contact information, the period during which he or she took Zoladex®, the period, if any, for which the Class Member had supplemental insurance coverage, his or her signature and acceptable proof of a percentage co-payment for Zoladex®, if such proof can be obtained.  And Class Counsel are working to obtain AstraZeneca's agreement to waive

the requirement that the Class Member provide information on when he or she took Zoladex®.

We have recently learned that Zoladex® transaction data may be available through a CMS

subcontractor.[5]  In other words, if this data can be obtained, notice will only be sent to those

persons who were administered Zoladex® during the Class Period, and we may be able to "hard

code" on the Claim Form the time period during which the patient was administered Zoladex.®

This would make a simple claims process even simpler.

Preceding the signature line on the Claim Form is the simple, non-threatening declaration

that AstraZeneca sought and, we believe, was perfectly reasonable to provide:

> I declare under penalty of perjury that the information provided
> here is, to the best of my knowledge correct.  I also declare under
> penalty of perjury that I paid a percentage for Zoladex® at some
> time during the period from January 1, 1991 through December 31,
> 2004.  If not submitting this for myself, I am authorized to submit
> this form on behalf of the Class Member identified above because I
> am the spouse of a deceased Class Member or the legal
> representative of a deceased Class Member's estate.

This statement is then followed by a footnote containing the following text:

> Please note that your signature on this Claim Form indicates that
> you declare, under penalty of perjury, that you (or someone on
> whose behalf you are acting) made a percentage co-payment for
> Zoladex® at some time during the Class Period.  As a result,
> providing false information on this Claim Form could constitute
> perjury.

A class action settlement is not a free give-away; it is a method for providing efficient

redress to Class Members who have valid claims and who would have no other way of recouping

losses.  We have worked hard to make the claims process simple and believe that we have

---

[5] As we did in previous class notice campaigns undertaken in this litigation, Class Counsel contacted CMS with a request for the names and addresses of Medicare beneficiaries who were administered Zoladex® during the Class Period.  CMS advised that it would use a vendor named ResDec to expedite the data request, and that the information could be available in two to four weeks from submission of the request.  We also learned that ResDec may be able to provide us with transaction data showing the dates of Zoladex® administration for each beneficiary and the corresponding Medicare payment.  Generally, ResDec only provides this type of information for academic purposes.  However, it may be willing to provide the service for this case, and we are presently negotiating with ResDec.  It may ultimately be necessary for a subpoena to issue from the Court.

achieved this goal.  Indeed, AstraZeneca sought a more onerous claims process.  For instance,

AstraZeneca wanted to require that Class Members have their completed claim forms notarized.

Berman Decl., ¶ 16.  Convinced that the notarization requirement would discourage claims,

Class Counsel refused to agree to either point, and AstraZeneca relented.

In an effort to tarnish Class Counsel, Haviland cites a May 1 e-mail and asserts that Class

Counsel employed efforts to make the claim form "scary" in order discourage Class Members

from making claims.  Haviland Decl., ¶ 12.  In addition to being unprofessional, this allegation is

patently false.  The claim form originally proposed by Class Counsel was nothing more than a

form advising the Class Member of the recovery formula and asking the Class Member to

indicate whether they made an out-of-pocket payment for the 20% co-pay portion for Zoladex

and when they started treatment.  Berman Decl., ¶ 16.  Concerned that fraud may result,

AstraZeneca objected and wanted the Class Member to sign the claim form under penalty of

perjury.  As even a cursory review of just a few of Class Counsel e-mails show, they simply

communicate in a terse manner, frequently using short-hand phrases that are then clarified in

telephone calls such as Co-Lead Counsel's weekly conference calls.  The phrase "claim form.

penalty of perjury. we can word it to make it scary" is nothing more than a very short-hand

reference to AstraZeneca's desires that the claim form be signed under penalty of perjury in

order to deter fraudulent claims, a concern that AstraZeneca consistently expressed throughout

the course of negotiations.  Berman Decl., ¶ 16.  No other interpretation can be made of this

statement given (i) the zeal with which Class Counsel have prosecuted this case for over six

years, (ii) the context of the e-mail against the backdrop of AstraZeneca concern about fraud,

(iii) the simplified claims process proposed and the clear, easy-to-complete proposed Claim

Form itself, and (iv) continuing efforts by Class Counsel to simplify the process further.

In sum, once it became clear that AstraZeneca would not change its position on the claims process, Class Counsel advocated, and garnered, a very simple claims process.[6]  The Court should quickly reject Haviland's deliberate misinterpretation of e-mails in a flailing effort to show otherwise.  Moreover, Class Counsel are continuing to try and simplify that process to the extent that AstraZeneca is willing to modify the agreement to do so if the Zoladex® administration data becomes available through ResDec as discussed above.

**C.      The Proposed Settlement Is The Result Of Class Counsel Consensus**

Haviland intemperately parades confidential e-mail communications between Class Counsel that reflect, only in part, the ongoing settlement discussions with Eric Green and AstraZeneca.  Haviland Decl., ¶¶ 8-19.  The e-mails unremarkably document the shift in position that frequently occurs during negotiations in response to both the educational efforts of the mediator and what a defendant is willing or unwilling to agree to.  Positions frequently change in the give-and-take of negotiations, and these negotiations were no different from that paradigm.

As the e-mail string also demonstrates, Class Counsel vigorously sought the best deal possible for the Class.  Not surprisingly, Class Counsel's initial demand upon AstraZeneca was quite high, and our initial proposal was not to employ a claims-made process.  However, as often occurs, these positions evolved during the course of negotiations, as AstraZeneca responded and Mr. Green mediated by cogently pointing out the risks to Plaintiffs' case.  For example, and as the e-mails in part show, Plaintiffs dropped the amount of their monetary demand over time, just as AstraZeneca increased its counter-offers over time.  As another example, Class Counsel eventually agreed to a claims-made process once it became clear that AstraZeneca, which had

---

[6] This evidence also impeaches Haviland's unsupported claim that Class Counsel sought to "buttress[] an anticipated low claims rate with a *cy pres* payment to justify higher fees . . . ."  Haviland Decl., ¶ 12.  We do not anticipate a low claims rate and, in fact, expect that the up to $10 million *cy pres* amount will not be needed given the measures that are being instituted to encourage, and make it easy for, Class Members to submit claims. .  And we most emphatically reject Haviland's suggestion that fee considerations drove the negotiations.

objected to Plaintiffs' initially proposed distribution plan as "too relaxed," would not agree to simply have checks mailed to Class Members.  On this point, AstraZeneca consistently maintained throughout the negotiations that it was concerned about Class Members submitting claims for money when they had not been damaged because, for instance, they had supplemental insurance policies that covered the 20 percent co-pay.  Moreover, records from CMS would not indicate whether Class Members had their co-pays reimbursed by Medi-Gap insurers.  Thus, those who made a full co-pay could be prejudiced if those who had partial co-pay coverage participated to the same extent as those who did not.  Berman Decl., ¶ 18.  The use of a claim form removes this concern.  This is very common, as recognized by the MANUAL FOR COMPLEX LITIGATION,[7] and no Class Member should fear being honest about reporting the information requested in the claim form.

Thus, the e-mails highlight in part the process through which Class Counsel came to a consensus around the Proposed Settlement.  The ultimate result achieved is not a capitulation as asserted, but the considered judgment of highly experienced class litigators who carefully evaluated the risks of trial and obtained a result that will provide Class Members with a recovery greater than their actual damages.  To be sure, and as is obvious, there were differences of opinion among Class Counsel along the way.  But, importantly, "consensus" does not equate to unanimity.[8]  We have always made important decisions in the prosecution of this case on the basis of majority view, which is the most common method of co-lead counsel governance.  The vote is frequently unanimous but sometimes is not, and the days leading up to the AstraZeneca

---

[7] MANUAL FOR COMPLEX LITIGATION, FOURTH at 331 (2004) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement. . . .  Verification of claims forms by oath or affirmation under 28 U.S.C. § 1746 may be required, and it may be appropriate to require substantiation of the claims (*e.g.*, through invoices, confirmations, or brokers' records).")

[8] "Consensus" means collective opinion or general agreement.  AMERICAN HERITAGE DICTIONARY (2d coll. ed. 1982).

mediation provide one example.  We have been able to move the case forward even when

differences of opinion occurred.  Berman Decl., ¶ 5.  Importantly, if unanimous consent were

required on every major decision, the case could never be prosecuted.  As Co-Lead Ken Wexler

attests:

> In the end, the issue is whether the settlement is fair, adequate and
> reasonable to the Class as whole, and our papers demonstrate that
> it is.  To be sure, everyone among plaintiffs' lead counsel wanted
> more than what we settled for, but that's the essence of settlement
> – compromise.  It also strikes me that the essence of effective
> leadership of a class action is to make decisions through consensus
> after a full airing of ideas.  If a lone dissenter was permitted to
> control the decisions of the majority of lead counsel, no complex
> case such as this would ever be brought to a conclusion.  Rule 23
> and CMO No. 1 charge us with certain responsibilities, which we
> have fulfilled, not by agreeing on everything all the time but by
> knowing when and how to move past debate and make decisions
> for the benefit of the Class.

Declaration of Kenneth A. Wexler in Support of Class 1 AstraZeneca Settlement and in

Response to the Haviland Declaration ("Wexler Decl. II"), ¶ 5.

During the negotiations, Mr. Haviland initially agreed with Class Counsel's positions,

and then his opinions began to diverge from those of Class Counsel.  But at the end of the

mediation, based on Mr. Haviland's report that his client approved of the settlement, we believed

that he had come to agree with Class Counsel's arguments and had "come around" to the

conclusion that the Proposed Settlement was very strong and in the best interests of all Class

Members.  As is now evident, he had not, notwithstanding his declaration to Class Counsel that,

at the end of the day, his client supported the settlement.  It is unclear why Mr. Haviland has

taken the positions he has or chosen this antagonistic course of action.  He either intentionally

duped Class Counsel or simply changed his mind.  Regardless, Class Counsel, as is explained

throughout this brief and in Class Counsel's Opposition to Motion of Named Class Rep. M.

Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement

with Astrazenca, and Mr. Townsend strongly disagree with Mr. Haviland's positions and his insistence that he can hold Class Counsel – and the Class itself – hostage to his own idiosyncratic opinions in derogation of the more experienced majority consensus.

## D.     The Haviland Declaration Is Misleading And Crafted To Divert The Court's Focus From The Facts

In his Declaration, Mr. Haviland chooses to focus almost entirely on a handful of positions that he took that differed from the consensus view of Class Counsel.  Why he does so is puzzling, given that Class Counsel have already pointed out that Mr. Haviland and Class Counsel had a divergence of opinion at times.  For instance, we advised the Court:

> Haviland was involved in negotiations leading up to the mediation and was present in person during the mediation session itself.  During and before the mediation, there was discussion and analysis of various different points of view by and among all Lead Counsel on both the content of discussions and style by which to proceed.  ***Mr. Haviland, as all counsel did throughout the course of this litigation generally and specifically during the settlement discussions with AstraZeneca, expressed different points of view and opinions on the best course of action***.  Any and all discussions were always inclusive of everyone's thoughts, ideas and suggestions.

Class Counsel's Opp. to Motion of Named Class Rep. M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with Astrazenca at 13.

Thus, the bulk of Mr. Haviland's declaration argues a point that Class Counsel never disputed:  that Mr. Haviland had a difference of opinion along the way.  But, at the end of the mediation, Haviland did not object.  Haviland misleads at paragraph 24 of his Declaration when he declares:  "Upon returning to the mediation room, I advised class counsel that Mrs. Howe's decision had not changed, that I could not recommend the settlement to my client, and that I would not be signing the MOU."  Haviland Decl., ¶ 24.  According the sworn declarations of the three Class Counsel present in person at the mediation, upon returning to the mediation room,

Haviland *declared that his client had approved of the settlement terms*, after which Haviland participated in discussions over the amount of incentive awards to the named plaintiffs. Declaration of Marc H. Edelson in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca ("Edelson Decl. I"), ¶¶ 4-5; Declaration of Kenneth A. Wexler in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca ("Wexler Decl. I"), ¶ 5; Declaration of Jeffrey Kodroff in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca ("Kodroff Decl. I"), ¶ 5. Class Counsel thus believed that Haviland left that mediation in support of the settlement, *and we did not know about his apparent meeting with Mr. Green until reviewing the Haviland Declaration*. Declaration of Marc H. Edelson in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration ("Edelson Decl. II"), ¶ 6; Declaration of Jeffrey Kodroff in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration ("Kodroff Decl. II"), ¶ 4; Wexler II Decl., ¶ 4.

Not only did Mr. Haviland convey his client's express approval of the Settlement at the end of the mediation (contrary to his testimony now), he was provided the Memorandum of Understanding that very evening, which he does not deny. Thus, Mr. Haviland was well aware of the *final* terms of the Proposed Settlement and never communicated to Class Counsel after leaving the mediation that his client disapproved. Class Counsel left that mediation with the clear impression that Mr. Haviland had approved the Proposed Settlement. This belief was affirmed when Haviland did not object after receiving the Memorandum of Understanding after

- 13 -

the mediation concluded.  Again, despite Mr. Haviland's best efforts to conjure up a non-existent conspiracy to keep the terms of the Settlement from him (*see* Haviland Decl., ¶¶ 29-32), ***he was aware of those very terms all along***.

**E.      Nothing In The Haviland Declaration Negates The Fact That Class Counsel With Six Years Of Experience Litigating This Class Action Fully Support The Belief That The Proposed Settlement Is Fair And Reasonable**

Even if Mr. Haviland had declared to Class Counsel at the end of the mediation that he did not support the Proposed Settlement, Class Counsel would have agreed to the Settlement nonetheless given the very substantial benefits that the Proposed Settlement provides to the Class Members, who have been waiting years for redress, and the assent of plaintiff Townsend to the Proposed Settlement.  Berman Decl., ¶ 21.  As one court has explained, "the compelling obligation of class counsel in class action litigation is to the group which makes up the class. . . . To that end, Class Counsel must act in a way which best represents the interests of the 'entire class and is not dependent on the special desires of the named plaintiffs.'"  *Maywalt v. Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 496 (S.D.N.Y. 1994) (quoting *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982)); *see also Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981).

Class Counsel recognize that Haviland is entitled to present objections to this Proposed Settlement, and the Court should consider the substantive points made by Haviland when the settlement is presented for final approval, although those points should be rejected as meritless. Having said this, Haviland has no right to ignore the consensus decision-making of Class Counsel, to make misrepresentations about the Proposed Settlement, to take confidential e-mails out of context and publish them in a nefarious light and to otherwise act unprofessionally before this Court.

**F.     The Criticisms Contained In The Haviland Declaration Do Nothing To Advance The Interests Of Plaintiffs Or The Class**

Haviland has made serious allegations about Class Counsel.  While we believe that the very favorable terms of the Proposed Settlement themselves constitute the best evidence refuting Haviland's allegations, it is unfortunately necessary for Class Counsel to respond to some of Haviland's more egregious statements and thereby preserve the integrity of the record.

First, the positions that Mr. Haviland has taken are not credible in light of points that he has advocated in the past.  For example, as noted earlier, the positions that Mr. Haviland now takes are at odds with his support for the GSK settlement.

Another example is provided by reference to the *Lupron* settlement, where Mr. Haviland ultimately supported a settlement amount much lower on a per-Class Member basis than the Proposed Settlement presented here, as well as a claims process that was more involved than that proposed here and included a notarization requirement.  Kodroff Decl. II, ¶¶ 5-6.  In *Lupron*, consumer class members received full recovery of their single damages estimated at 50% of their out-of-pocket expenditure.  Despite the claims process employed in the Lupron settlement, there were still some $16 million in Class claims that were paid.  Kodroff Decl. II, ¶ 8.  Here, Class Members will receive double their damages, including interest, based on Dr. Hartman's calculated overcharges associated with the price inflation of Zoladex (and the effective recovery is now greater than double damages given the Court's ruling that damages for Class 1 accrue only after the 30% speed bump).  This is telling considering that Lupron was a much more expensive drug than Zoladex.  The average payment to consumers in the *Lupron* settlement is $1,065.66.  While we do not know what the average payment will be in the AstraZeneca case, we have estimated that named plaintiff Leroy Townsend is entitled to claim $11,102.46 under the current methodology.  Kodroff Decl. II, ¶ 7.

Class Counsel have challenged Haviland to explain how he could oppose double damages based on a single damage figure that, by itself, exceeds the payout in *Lupron*, a case in which liability was stronger.  Mr. Haviland has never responded with a cogent explanation.  Berman Decl., ¶ 15.

Second, Mr. Haviland has stopped contributing to the meaningful prosecution of these cases and did so long before lodging the instant motion and objections.  For instance, Haviland contributed little to the Class 2/3 trial when compared with the efforts of Co-Lead Counsel.  Berman Decl., ¶¶ 3-4, 22.  Furthermore, in the run-up to the AstraZeneca trial, Mr. Haviland did little substantive work.  While Class Counsel was busy designating trial exhibits and deposition testimony, preparing the opening statement and witness outlines, and preparing the proposed jury instructions and associated briefing, Haviland did little.  Nor did Mr. Haviland attend the important focus group "mock" trial that Class Counsel held against AstraZeneca on behalf of his client, even though Haviland was invited to attend.  Berman Decl., ¶ 11.  Despite making a big effort to attend as many Court hearings as possible in Boston and lodge an appearance to make it *appear* like he was a key member of the prosecution, Mr. Haviland has not been pulling his weight either with substantive work or in shouldering the burden of cost sharing.  Berman Decl., ¶ 4.

Third, during the negotiations, and as revealed by the e-mails attached to the Haviland Declaration, Mr. Haviland was but a "one-note" record, refusing to show any flexibility on his extreme positions and failing to contribute to the ultimate result achieved.  For example, he had nothing to do with the "double-damages" theory of settlement distribution, which Class Counsel introduced in order to incentivize claims.  Berman Decl., ¶¶ 13-14.  Nor did Mr. Haviland contribute any other useful ideas to encourage Class Members to take advantage of the claims

- 16 -

process and thereby participate meaningfully in the substantial fruits of the Settlement.  Berman

Decl., ¶ 15.  As another example, Mr. Haviland continued to take the position that fees should

not be discussed, even though such discussions are appropriate to have in statutory fee-shifting

cases such as this one, facilitates settlement given the defendant's interest in wanting to know

what the total payout will be and, as here, where a fee demand was requested by the mediator.[9]

The Court is well aware that Mr. Haviland is seeking Co-Lead counsel status since

departing from the firm of Kline & Specter, which was, at one time, a Co-Lead.[10]  Class Counsel

respectfully suggest that this drive has colored Haviland's arguments.  When the GSK settlement

was consummated at a time when Haviland was part of the Lead Counsel structure under the

umbrella of Kline & Specter, he did not assert the type of objections that he now brings.  Mr.

Haviland's change of course was effected only after he left Kline & Specter, failed to carry the

weights and burdens of Class Counsel leadership and then, consequently, realized that he was no

longer welcome as a Co-Lead.  The Court should be mindful of this when reviewing the

Haviland Declaration.

### III.    CONCLUSION

Valuable time and expense is being wasted addressing issues that have been discussed

between counsel and then voted down by a majority.  The Court need not have the responsibility

of weighing in on each decision made by Class Counsel that is not favored by Mr. Haviland.

The Court should see the Haviland Declaration for what it is, to wit, sour grapes posturing as part

of a misguided effort to force his way into a Co-Lead position.  Nothing in the Haviland

---

[9] As Class Counsel explain in their Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with AstraZeneca at 11, discussing a statutory fee award as part of the overall settlement package is appropriate.  *See, e.g., Evans v. Jeff D.*, 475 U.S. 717, 738 n.30 (1986).  Nonetheless, potential fees did not in any way taint the negotiations.

[10] For more background on the issue, please see paragraphs 6-7 and 22 of the Berman Declaration.

Declaration should lead the Court to reverse its preliminary approval of the proposed

AstraZeneca Class 1 settlement.


DATED:  July 27, 2007.                         By____**/s/ Steve W. Berman**_____
                                                    Thomas M. Sobol (BBO#471770)
                                                    Edward Notargiacomo (BBO#567636)
                                               Hagens Berman Sobol Shapiro LLP
                                               One Main Street, 4th Floor
                                               Cambridge, MA  02142
                                               Telephone: (617) 482-3700
                                               Facsimile: (617) 482-3003

                                               **LIAISON COUNSEL**

                                               Steve W. Berman
                                               Sean R. Matt
                                               Hagens Berman Sobol Shapiro LLP
                                               1301 Fifth Avenue, Suite 2900
                                               Seattle, WA  98101
                                               Telephone: (206) 623-7292
                                               Facsimile: (206) 623-0594

                                               Elizabeth Fegan
                                               Hagens Berman Sobol Shapiro LLP
                                               820 North Boulevard, Suite B
                                               Oak Park, IL  60302
                                               Telephone: (708) 776-5600
                                               Facsimile: (708) 776-5601

                                               Jeffrey Kodroff
                                               Spector, Roseman & Kodroff, P.C.
                                               1818 Market Street, Suite 2500
                                               Philadelphia, PA  19103
                                               Telephone: (215) 496-0300
                                               Facsimile: (215) 496-6611

                                               Kenneth A. Wexler
                                               Jennifer Fountain Connolly
                                               The Wexler Firm LLP
                                               55 West Monroe Street, Suite 3300
                                               Chicago, IL  60602
                                               Telephone: (312) 346-2222
                                               Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  185327 V1

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on July 27, 2007, I caused copies of **CLASS COUNSEL'S RESPONSE TO THE DECLARATION OF DONALD E. HAVILAND, JR. IN RESPONSE TO COURT DIRECTIVE CONCERNING ASTRAZENECA SETTLEMENT** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


 **/s/ Steve W. Berman**
Steve W. Berman

001534-16  185327 V1