# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUME JUSTICE . CIVIL ACTION NO.01-12257-PBS
  et al                  .
    Plaintiffs        .
                        .
       V.            . BOSTON, MASSACHUSETTS
                        . MARCH 29, 2006
  ABBOTT LABORATORIES, et al  .
    Defendants        .
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:      David S. Nalven, Esquire
                   Ed Notargiacomo, Esquire
                   Hagens Berman Sobol Shapiro LLP
                   One Main Street
                   4th Floor
                   Cambridge, MA 02142
                   617-482-3700

United States:      George B. Henderson, Esquire
                   United States Attorney's Office
                   1 Courthouse Way
                   Suite 9200
                   Boston, MA 02210
                   617-748-3272

For Adventis:       Michael DeMarco, Esquire
                   Michael Riccuitti, Esquire
                   Kirkpatrick & Lockhart Nicholson Graham LLP
                   One Lincoln Street
                   State Street Financial Center
                   Boston, MA 02111

                   James P. Muehlberger, Esquire
                   Shook, Hardy & Bacon LLP
                   2555 Grand Blvd
                   Kansas City, MO 64108
                   816-474-6550

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

```
National Heritage:      Benjamin M. Wattenmaker, Esquire
                        Shipman & Goodwin LLP
                        One Constitution Plaza
                        Hartford, CT 06103
                        860-251-5786


For Amgen:              Joseph H. Young, Esquire
                        Hogan & Hartson, LLP
                        111 South Calvert Street
                        Suite 1600
                        Baltimore, MD 21202
                        410-659-2775


                        Frank A. Libby, Jr.
                        Kelly, Libby & Hoopes, PC
                        175 Federal Street
                        Boston, MA 02110
                        617-338-9300


For Immunex Corp:       Kathleen O'Sullivan, Esquire
                        Perkins Coie LLP
                        1201 Third Ave
                        40th Floor
                        Seattle, WA 98101
                        206-359-6375


Blue Cross Blue Shield:  Stephen L. Coco, Esquire
                         Robins, Kaplan, Miller & Ciresi
                         L.L.P.
                         111 Huntington Avenue
                         Boston, MA 02199
                         617-267-2300
```

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

3



1                            **I N D E X**

2    Proceedings                                                    3

4

1                         **P R O C E E D I N G S**

2          (Court called into session)

3          THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is March 29th, 2006 in the case of Citizens

5    for Consume v. Abbott Labs, et al, Civil Action No. 01-12257

6    will now be heard.  Will counsel please identify themselves for

7    the record?

8          MR. NALVEN:  Your Honor, I'm David Nalven from Hagens

9    Berman representing the plaintiffs.  My colleague, Ed

10   Notargiacomo is here as well.  He's just stepped out in the

11   hall to see whether he could contact the counsel for one of the

12   parties who appears not to be here.

13         THE COURT:  All right.  Then we'll wait just a

14   moment.  We're in recess briefly and--

15         MR. NALVEN:  I'm sorry, Your Honor, but there are

16   several motions pending and if you like, we can begin with

17   motion number 2 and see what happens next.

18         THE COURT:  All right.  Any objection?  Then we'll go

19   forward.

20         I do note that the notice I think made reference to

21   Docket entry 2052, which was a motion to seal.  I saw no

22   objection.  All right.  So that will be allowed.  All right,

23   then starting with Docket no. 2104, the motion to compel.

24         MS. O'SULLIVAN:  Your Honor, I'm Kathleen O'Sullivan

25   from Perkins Coie.  I represented the defendant, Immunex

5

1  Corporation.  Here with me is Ron Dove and Shanker Derswamey

2  from GSK.  The motion is on behalf all defendants.

3       We're  here on defendants' second motion to compel

4  discovery from the states of Montana, Nevada.  You heard the

5  first motion in September of last year.  You ordered the

6  parties to go back to the table to try to resolve these issues

7  and work them out.  We did go back to the table.  We were able

8  to resolve a number of issues, but we weren't able to resolve

9  all of them and new issues have since arisen.  So defendants

10  filed this second motion to compel in order to ask the court to

11  order the states to produce five categories of documents where

12  the states have simply refused to produce any of those items,

13  and we also moved as to certain categories to which the states

14  agreed to produce but hadn't yet done so and this is a matter

15  in terms of timeliness of some urgency.  We originally had a

16  discovery cut off of January 31st.  It's now March 31st which of

17  course is just days away.

18       So as to these categories of the five refusals, first

19  is the states' refusal to produce any electronic documents from

20  their computer files whatsoever.  No emails, no Word documents,

21  no .pdf files.  No Excel spreadsheets.  Second, they failed to

22  produce any documents from the time period 1985 to 1991 that

23  would show the states' knowledge at that time before their

24  claims even begin that AWP did not represent actual acquisition

25  cost.  Third, they've refused to produce any targeted discovery

6

1   from non-Medicaid state entities that purchased or reimbursed

2   for the same subject drugs at issue.  And a point here is that

3   the states are the plaintiffs.  It is not the state Medicaid

4   agency.  The states of Montana and Nevada filed this lawsuit,

5   yet they now take the position their discovery obligations stop

6   at the door of the state Medicaid agencies.

7          The fourth category is they have failed to produce

8   any documents from the states' executive or legislative offices

9   regarding drug pricing or reimbursement.  And finally, they

10  failed to produce any of the states' rebate data that they have

11  in their possession.

12         I'd like to focus on and begin with the failure to

13  produce any electronic documents because this is probably the

14  most flagrant refusal.  The defendants' briefing contains three

15  essential facts on this point.  Number one, the states have not

16  produced a single electronic document from their computer files

17  in response to our discovery requests filed nearly a year ago

18  which clearly define documents to include electronic documents

19  and emails.  Second, perhaps even more flagrant, they haven't

20  even yet searched for these electronic documents.  And third,

21  there was no litigation hold in either state requiring the

22  preservation of any documents, hard copy or electronic until

23  late 2005, and that is the subject of another motion that is

24  pending before Your Honor.

25         In terms of the relevance of these electronic

1    documents--

2          THE COURT:  I'm just waiting for something to print

3    so I'm sorry.

4          MS. O'SULLIVAN:  Oh, that's okay.

5          THE COURT:  Go right ahead.

6          MS. O'SULLIVAN:  In terms of the relevance of these

7    electronic documents, in the year 2005 it's hard to imagine an

8    objection even being voiced.  Of course they're relevant.  The

9    states used emails.  The states used Word documents.  The exact

10   same documents the states concede are relevant on the hard copy

11   side are relevant on the electronic side, documents about their

12   drug pricing and reimbursement for the drugs at issue.  The

13   states have offered some objections as to burden and we have

14   tried to propose reasonable limitations on this discovery.  For

15   example in Nevada, the state wrote a letter in December saying

16   the state will search the email of a discrete number of email

17   accounts based on search terms provided by the defendants.  We

18   provided them with a list of search terms.  They were the exact

19   same search terms used in the Connecticut AG's AWP case in

20   which the same plaintiff's law firm, Hagens, Berman, Sobel,

21   Shapiro, is representing that state and the state then took six

22   weeks to say no.  They offered no counter proposal.

23          They offer another type of burden argument on emails.

24   They say they can only search one user account or email box at

25   a time, so we said let's talk about a reasonable number of

1  witnesses to search, and we've offered the key witnesses, the

2  deponent.  They simply have done nothing.  There are other some

3  specific responses they bring up.  They can't execute bullion

4  searches.  Well, there are very inexpensive software

5  applications one can purchase for Outlook, $39 or $78 by which

6  one can run bullion searches and they haven't even tried to run

7  a non-bullion search.  For example, the key phrase AWP.

8        They also bring up the issue of cost shifting, saying

9  the defendants should cover these costs and in the relevant

10  case here, Your Honor, is *Zublake*, but what was at issue in

11  that case were data tapes, classically inaccessibly media,

12  where here the vast electronic information that we're

13  interested in, it is accessible.

14        Why don't I turn to the second category, documents in

15  the states' possession from 1985 to 1991.  Again, the

16  defendants requested these documents.  They're relevant to

17  prove that the state knew in the 1980's as a result of federal

18  government reports that AWP did not represent actual

19  acquisition costs.  Again, we've asked for certain categories

20  of documents in this category, not everything back to 1985, and

21  the states have simply refused.  They say well, the defendants

22  didn't produce documents going back before 1991, but the

23  plaintiffs never asked the defendants for these documents.

24  They never held meet and confers explaining why these documents

25  would be relevant to defendants.  They never filed a motion to

1  compel or cross moved, but more importantly they're simply not

2  relevant as to the defendants.

3        The third category of a refusal is the non-Medicaid

4  state entities that purchased or reimbursed for drugs at issue.

5  Again, the defendants requested this discovery.  It's relevant

6  to establish that the state knew or should have known that AWP

7  did not reflect actual acquisition cost and we've obtained

8  additional evidence since filing our original motion that we

9  included in a reply brief filed just this past Friday and a

10  classic example would be in Nevada.  A document produced just

11  last week, it's Exhibit 31 to our reply papers, a Nevada

12  prescription drug policymakers summit, where there was a great

13  deal of exchange of information between different agencies

14  about their acquisition costs and reimbursement rate.  AWP

15  minus different figures or non-AWP based information.  We've

16  also obtained similar information in Montana, not about a

17  summit per se but that there was knowledge by Medicaid as to

18  what non-Medicaid entities were purchasing their drugs for and

19  that was what the Department of Corrections was doing, and what

20  Montana state institutions were doing, and Medicaid reimbursed

21  for those actual acquisition costs, which is entirely different

22  reimbursement methodology and so it shows the states knew there

23  were different options.  AWP was not the only, was not the only

24  option.

25        The fourth category is the relevance of discovery

10

1   from the states' legislative and executive offices, and I'd

2   like to explain what the defendants are not asking for.  We are

3   not asking for depositions of sitting or former legislators.

4   We are not asking for depositions of sitting or former

5   governors.  These are largely staff people who served in

6   legislative committees or who were policy advisors to the

7   government and they were advising those committees and the

8   governors about drug pressing issues and reimbursement for the

9   exact same drugs at issue here.

10          The final refusal is the state's rebate data.  Again,

11   the defendants requested this data.  It was the subject to our

12   original motion to compel that was heard in September, and it's

13   directly relevant to calculate what the state of Medicaid, what

14   Medicaid pays for these drugs.  On the one hand they reimburse

15   at AWP minus 15% or another formula, but on the hand, the state

16   is receiving payments from manufacturers in the forms of

17   rebates.  This is not particularly burdensome to produce

18   especially in Montana, all of the Montana rebate data are

19   stored electronically at their fiscal agent or claimed

20   processor.  There is no issue regarding burden.  The opposition

21   briefs suggest perhaps there is.  They state there is no

22   electronic base to track supplemental rebates in Montana.  That

23   is a bit of a red herring.  Supplemental rebates are a

24   different category of rebates.  Yes, we want that information

25   but Montana only began collecting that in 2005.  So it's a very

11

1   limited time period.  In 2004, much of the rebate data is

2   available electronically.  Some of it is apparently available

3   at the state in hard copy.  If that is burdensome for the state

4   to go through, the defendants could volunteer to go through it

5   or have volunteered to go through it themselves.

6          The states' final argument in objecting to the rebate

7   data is one of confidentiality, which is a bit ironic because

8   it is the defendants' rebate data that they are asserting this

9   confidentiality objection to but there is a protective order in

10  place.  It has a category for highly confidential data that

11  cannot be seen by for example the sales or CEO's of our

12  companies.  It would be seen by the lawyers and we have offered

13  to provide even a greater level of confidentiality but they

14  have refused.

15         There are a few other categories where I mentioned

16  they agreed to produce these documents in some form but we

17  haven't seen them yet and time is of the essence.  In Nevada

18  this would be post 2003 claims data held by the fiscal agent,

19  the states' agent and pre-2003 physician administered drug

20  data, and in Montana, the two primary categories of these

21  documents are dispensing fee questionnaires filled out by

22  Medicaid providers and also physician administered drug

23  documentation.

24         THE COURT:  All right.  You're almost finished?

25         MS. O'SULLIVAN:  I am finished.

12

1          THE COURT:  All right.

2          MS. O'SULLIVAN:  I was just about to say unless you

3    had any questions, I'm done.

4          THE COURT:  What I want to do is take it category by

5    category, so if you'll give me your response as to the first.

6          MR. NALVEN:  Sure.  Your Honor, if I may, as in all

7    discovery disputes in large cases that go on for some time,

8    context is everything.  This is a case brought by the attorneys

9    general of Nevada and Montana in which an enormous amount of

10   discovery already has occurred.  There have been depositions,

11   documents produced and the process--

12         THE COURT:  I know all of that so let's get--

13         MR. NALVEN:  --has been--

14         THE COURT:  --to this particular category.

15         MR. NALVEN:  The process has been largely cooperative

16   and we were here in September and worked out most of the

17   differences.  The first item that is identified in the briefs

18   is the claim that the states of Nevada and Montana have refused

19   to produce documents from the non-Medicaid agencies.  Now, Your

20   Honor, we have not refused to produce those documents, that is

21   from non-Medicaid agencies per se, but with respect to these

22   claims for documents the states' position is that they are not

23   relevant, overwhelmingly burdensome and cumulative.  There is

24   no claim for damages by the non-Medicaid agencies.  This is

25   only a Medicaid case.  Secondly, there is no meaningful

13

1  knowledge in the other state agencies that purchase or

2  dispense drugs concerning the practices of the Medicaid

3  agencies, and in that connection I would invite you to review

4  again the affidavit that was submitted of Jeniphr Breckenridge.

5  Attorney Breckenridge is primarily responsible for conducting

6  the case for Nevada and Montana and she has undertaken an

7  enormous investigation, including speaking to representatives

8  of each of these non-Medicaid agencies on two occasions, and as

9  her affidavit makes clear, the depositions of these individuals

10 is not going to turn up any information that is new or any

11 information that is--

12        THE COURT:  Well, that's her opinion.  I mean, these

13 depositions, they're available, the documents are available.

14 Do you have them?

15        MR. NALVEN:  with respect to the witnesses, Your

16 Honor, there are subpoenas or requests outstanding now for

17 something on the order of 19 individuals.  There are as well

18 requests for documents sufficient to demonstrate information in

19 a large variety of categories.  We have submitted affidavits

20 from people in those states and from Attorney Breckenridge

21 identifying the enormous burdens that would result and the very

22 low yield that would result in requiring the states to

23 undertake this level of discovery.  It's a case in which at

24 some point enough is enough.  Discovery is--

25        THE COURT:  Well, it depends on who is on what side

14

1    when we hear, I mean--

2         MR. NALVEN:  That's absolutely right and I say that

3    with some trepidation because very often--

4         THE COURT:  You should.

5         MR. NALVEN:  --I'm on the other side.  But this is a

6    case in which there's been an enormous amount of discovery

7    taken and the yield is going to be fantastically low if any.

8    We have done an investigation and under the circumstances--

9         THE COURT:  Well, that's a determination for the

10   defendant to make.

11        MR. NALVEN:  Well, Your Honor, if I may, at this

12   point we have subpoenas outstanding or requests outstanding for

13   19 witnesses for a broad variety of categories of documents.  I

14   would respectfully ask if the Court believes that any of this

15   discovery go forward, that it go forward in steps, in phases in

16   a way that--

17        THE COURT:  Well, what I would suggest is can't you

18   prioritize the list of the deponents because it may well be

19   that there is cumulative information, and if you can prioritize

20   the list of the proposed deponents--

21        MS. O'SULLIVAN:  Certainly the defendants can

22   prioritize that list, Your Honor.

23        MR. NALVEN:  Your Honor, in another matter in which I

24   appeared before you seeking certain discovery from

25   Glaxosmithkline, the Court ruled that we as plaintiffs in that

15

1    case, in that matter, would be entitled to three depositions

2    initially and then directed us to come back and show cause if

3    we believed that we needed more.  I would respectfully request

4    that in this circumstance that if the Court believes that this

5    discovery ought to go forward with respect to depositions, that

6    it be limited to a small number at the outset and then require

7    the defendant, defendants to return to you and show cause if

8    we're not able to agree that others are appropriate as to why

9    those additional depositions would be required.

10            THE COURT:  Well, can we reach a number here that's

11    reasonable?

12            MS. O'SULLIVAN:  Your Honor, I believe that we could.

13    Again, if we did it category by category, so I believe

14    Mr. Nalven was first speaking as to the non-Medicaid state

15    agencies.

16            THE COURT:  Well, give me a number.

17            MS. O'SULLIVAN:  Okay.  I believe that our--

18            THE COURT:  Can we do it with six?

19            MS. O'SULLIVAN:  I believe that our – we could

20    certainly do it with six.

21            THE COURT:  All right six, six to be done.

22            MR. NALVEN:  With respect to documents in that case,

23    Your Honor, there is also a request for documents sufficient to

24    determine on a broad number of categories, and the reason that

25    the defendants at this point have identified certain witnesses

16

1  for deposition, certain 30(b)(6)s for deposition is based in

2  fact on the discovery that is, the documentary discovery that

3  has taken place to date, and so I respectfully request that

4  let's go forward with these depositions based on the

5  documentary discovery that has already been produced by Nevada

6  and Montana, and if indeed there is a need for additional

7  documents at that time, then again either the parties can reach

8  and agreement and if we can't reach an agreement that

9  defendants show cause why it is that they need to impose upon

10  these non-Medicaid state agencies additional document

11  production requirements.

12          THE COURT:  It's a reasonable suggestion.  I'm just

13  concerned about the timeframe because I don't want it slowing

14  things down.

15          MR. NALVEN:  Well, at this point the reason that I am

16  here and not Attorney Breckenridge is that she is in fact

17  defending depositions in Montana today.  So this case is moving

18  quite rapidly at this point, and I fully expect that these

19  depositions will be taking place at a pace of two or three a

20  week or more.  Actually, counsel is more familiar with the case

21  than I am, but--

22          THE COURT:  Well, let me hear from you.  What's the

23  schedule?

24          MS. O'SULLIVAN:  The schedule is that next week

25  there's one deposition.  The week after that there's one

1  deposition, the week of April 17th there are four depositions,

2  so there is time for other depositions.  I would like to

3  respond to Mr. Nalven's suggestion that there be no new

4  document discovery, only depositions.  As Your Honor is of

5  course familiar with, it's very difficult to take a deposition

6  without the documents that that particular person was

7  knowledgeable about and what are the relevant documents are how

8  that other agency acquired drugs.  Was it through a state

9  purchasing pool or what was the basic method and how they

10 reimbursed for them.  The basic reimbursement methodology, not

11 all the underlying every single price that they paid for each

12 individual drug over 14 years but the framework so we could ask

13 the basic questions.  And I did have a clarifying question--

14         THE COURT:  Well, can you narrow your request then?

15         MS. O'SULLIVAN:  Yes, we have attempted to do so and

16 I will articulate in open court that it is number one the

17 standard by which or the method by which these entities acquire

18 drugs, how they reimburse for them or the reimbursement

19 methodology and, finally, documents regarding any

20 communications between those other entities and Montana or

21 Nevada Medicaid and their employees.

22         THE COURT:  Reasonable.

23         MR. NALVEN:  Your Honor, it sounds to me like counsel

24 has in mind particular witnesses, and so if I may what I would

25 suggest is that the, and going with counsel's view that in

18

1    order to take an effective deposition you have to have their

2    documents before them, if we can narrow our search to the

3    documents in those categories that are in the position of the

4    perspective deponents, that will make the search manageable and

5    responsive to defendants' needs.

6         THE COURT:  All right.  Before you leave here today

7    see if you can sit down and do that.

8         MS. O'SULLIVAN:  May I ask one question, Your Honor,

9    about the number of witnesses.  Yu said six.  I just want to

10   clarify that.  Is that six per state or is that six between the

11   states of Montana and Nevada?

12        MR. NALVEN:  Well, I don't presume to know what you

13   meant, Your Honor, but six between the states of Nevada and

14   Montana is 12 depositions and I think that--

15        THE COURT:  Six total for now.

16        MR. NALVEN:  Your Honor, with respect to the

17   legislative and executive offices, you know, the issues are

18   largely the same; that is, that the executive office, the

19   governor's office's function in Medicaid is limited to

20   budgetary matters not rate setting.  There is simply no

21   information in that office that has not already been generated

22   in that case that is relevant.

23        With respect to the legislative counsel bureau, not

24   only is there no information that is relevant to this case that

25   is cumulative, but most of their information is publicly

19

1   available on their website.  Your Honor, ordinarily in,

2   ordinarily there is a limit on the number of depositions and

3   the number of document requests.  In this case we have

4   suspended them because it is such a large case, but the

5   principles remain.  We're talking now about an additional six

6   depositions of Nevada and Montana, non-Medicaid agencies to go

7   ahead and impose additional depositions on the legislative and

8   gubernatorial branches with only the remotest relevance that is

9   plainly cumulative would be a burden that would not, it

10  wouldn't be commensurate with the benefit that would be derived

11  and so we respectfully request that with respect to the

12  legislative and executive branches that the defendants' request

13  be denied.

14          THE COURT:  Do you want to respond briefly?

15          MS. O'SULLIVAN:  Yes.  Although Mr. Nalven states

16  that this information is all publicly available, the state

17  government doesn't quite work like the federal register.  It is

18  not easy to find all of this information.  It's been our

19  discovery that it's not all publicly available and there are

20  certain legislative committee staffers.  The most important one

21  is this Mr. Steve Aba in Nevada who had regular communications

22  with Nevada Medicaid on issues related to drug pricing and he

23  clearly has relevant documents.  So at a minimum we would want

24  his deposition and documents searched from his files.

25          THE COURT:  I'll permit it as to the staff people but

20

1    not to the representatives and governors.  It's usually the

2    staff people that have the answers.

3              MR. NALVEN:  Your Honor, in connection with the non-

4    Medicaid agencies, you made a ruling limiting the numbers.  May

5    we limit the numbers in this case to one person from each state

6    for a total of four depositions from the legislative branch and

7    from the gubernatorial branch?

8              THE COURT:  What's your response?

9              MS. O'SULLIVAN:  Your Honor, I think that we could

10   have two in Nevada of Mr. Aba, who I mentioned and

11   Mr. Willerbee and one in Montana.

12             THE COURT:  The designee in Montana, do you know by

13   name?

14             MS. O'SULLIVAN:  I believe it is Mr. Steve Snezik,

15   S-N-E-Z-I-K.

16             THE COURT:  All right.  Those three, limited.

17             MR. NALVEN:  Your Honor, with respect to rebate data,

18   there is a Medicaid statute, a statute that prohibits the

19   states from disclosing manufacturer specific Medicaid rebate

20   data.  My sister suggests that because that statute is for the

21   benefit of the protection of the manufacturers that they can

22   waive it and that this Court can order that that information be

23   produced notwithstanding the statute.  The confidentiality

24   agreement, the protective order in this case, however, Your

25   Honor, does not supersede the statute.  The state is

21

1   statutorily barred from producing manufacturer specific

2   Medicaid rebate data.

3           Let me add two other points, Your Honor.  The first

4   is that the burden of producing this information on a

5   defendant-by-defendant basis really is enormous.  In some cases

6   it's available electronically but in both states it's

7   scattered.  Some of it is, it's in different systems and some

8   of it is hard copy.  Finally, the defendants themselves have

9   this data because of course that's how the states get

10  reimbursed on their rebates and the defendants have in

11  connection with meet and confers said, we'll use our data

12  provided that the states stipulate to its accuracy.  Your

13  Honor, we have no problem with the defendants using their

14  data--

15          THE COURT:  Have you done that to date?

16          MR. NALVEN:  We have no problem with the states

17  using--

18          THE COURT:  No, but have you sat down and looked at

19  it and stipulated to the accuracy?

20          MR. NALVEN:  We have not, Your Honor.  We have no

21  stipulated to the accuracy.  Like any of the, like of the

22  defendants' evidence, you know, if it's permitted to come into

23  at trial, then it's permitted to come into trial subject to

24  cross examination as to the way that it was developed and its

25  accuracy.

22

1          THE COURT:  You don't have to tell me that.

2          MR. NALVEN:  Of course not, Your Honor.

3          We suggest that the defendants use their data and if

4   they need to present their data at trial it will be subject to

5   the ordinary cross examination that anything is subject to.

6          THE COURT:  Well, that's fine if you'll stipulate to

7   it now.

8          MR. NALVEN:  Your Honor, we're not in a position to

9   stipulate to the accuracy of the defendants' data.

10         THE COURT:  Well, then you'll have to produce it.

11  You can't have it both ways.

12         MR. NALVEN:  Respectfully, Your Honor, I don't

13  believe that we are trying to have it both ways.  The

14  defendants have this data.  It's enormously burdensome for the

15  plaintiffs, for Nevada and Montana to produce it.  They're

16  statutorily barred from producing--

17         THE COURT:  Well, you either have to sit down and

18  look at it and say, we will stipulate to it or if you object to

19  that you produce your own.  What's your choice?

20         MR. NALVEN:  Your Honor, we are not prepared to

21  stipulate at this moment to the accuracy of the defendants'

22  data.

23         THE COURT:  Then produce.

24         MR. NALVEN:  I would respectfully ask then that, if I

25  may be permitted to confer with my counsel who is in Montana

23

1    today and present these alternatives to her and provide within

2    a short period of time--

3              THE COURT:  All right.

4              MR. NALVEN:  --my response to the defendants.

5              There are two other areas where the defendants have

6    sought to compel.  The first is production of pre-1991

7    information.  Now in this case the claims' period is 1991 to

8    the present and my sister has accurately stated that the

9    defendants have not produced information prior to 1991 either.

10   Number one, information--

11             THE COURT:  It's specifically `85 to `91 that you

12   want, correct?

13             MS. O'SULLIVAN:  Yes, Your Honor.

14             MR. NALVEN:  Now, to begin with information preceding

15   the date of the claims' period in this case is patently

16   irrelevant.  Secondly, this is a question of basic fairness.

17   The defendants have not produced the information, their

18   information prior to 1991 and there is absolutely no reason why

19   under those circumstances that Nevada and Montana state

20   Medicaid agencies should be compelled to go back to their files

21   that are 15 years old, pull those documents from storage and

22   look for specific documents that are in the 1985 to 1991

23   category.  The relevance is not there.  The burden is enormous

24   and just as a matter of basic fairness with defendants not

25   having done it, it is unjust to require plaintiffs to do it as

24

1    well.

2            THE COURT:  Why do you need these documents?

3            MS. O'SULLIVAN:  We need these documents, Your Honor,

4    I'm going to give you an example from a deposition that was

5    taken last week of a former Nevada Medicaid administrator from

6    the 1980's.  His name is Keith McDonald, and his testimony as

7    "and to be quite honest with you many of us in the business

8    called it artificial wholesale price."  They knew in the 1980's

9    before their claims even begun that AWP did not represent

10   actual acquisition cost.  Those arguments will bolster our

11   defense.  Those documents from the defendants would have

12   nothing to do with the plaintiffs' affirmative claims.

13           MR. NALVEN:  This is yet another case, Your Honor, in

14   which the burden of searching these documents is grossly

15   outweighed by the marginal relevance.  If in fact this

16   testimony is accurately read, the testimony is the testimony.

17   Whether it's relevant or not is a question that we can decide

18   later, but the relevance is so thin given the fact that it

19   precedes the claim period and the burden of searching state

20   files that are 15 years old or more, this is precisely why

21   defendants did not do this as well.

22           THE COURT:  All right, at this time denied because

23   it's outside the claim period.

24           MR. NALVEN:  The final issue, Your Honor, is

25   electronic discovery.  Now, the states have produced hard

1    copies of electronic documents when they have them.  So this

2    is not a question of producing no Word documents or no emails.

3    It's a question of searching databases.  We agree as a general

4    principle that electronic documents are relevant so this is

5    really a question of how it's going to be undertaken, what is

6    the burden and who is to bear the cost.  We have submitted with

7    our papers affidavits of the IT managers for the Nevada and

8    Montana agencies and they have in detail portrayed the ability

9    of those agencies given their hardware and software capacities

10   to actually undertake the searches that have been requested by

11   defendants, and as you know from these affidavits that have

12   been provided, the answer is that these small state agencies

13   just do not have the capacity to undertake the kinds of

14   enormous searches--

15          THE COURT:  Well, but your sister suggests that with

16   very inexpensive hardware it can be done.

17          MR. NALVEN:  I am not an IT manager, Your Honor, but

18   any options that have been previously presented by the

19   defendants were presented to our IT managers.  We're talking--

20          THE COURT:  Are you willing to buy them the software?

21          MS. O'SULLIVAN:  Yes, Your Honor.

22          THE COURT:  Why not?

23          MR. NALVEN:  Well, if we're moving on to the issue of

24   cost shifting, that is also an area where we can, where I think

25   the Court can explore what the requirements of each party are.

26

1       THE COURT:  Well, if they're wiling to provide you

2   with the software that they think will do the trick, I think

3   that's reasonable.

4       MR. NALVEN:  The resource demands go well beyond

5   providing software.  These are small state agencies, Your

6   Honor, that are providing healthcare to the poor, that are

7   adjusting to Medicare Part D at this time that are doing, you

8   know, an enormous number of governmental functions, and so

9   simply to say here's a $39 package of software if that's what

10  it takes would be inadequate.  I can't say from personal

11  knowledge whether the software options are inadequate, are

12  adequate, but I would suggest, Your Honor, that the resource

13  demands go well beyond a $39 software package.

14      THE COURT:  No, I'll allow it.  I'll allow it.

15      MR. NALVEN:  Your Honor, in terms of the way that the

16  search is undertaken, that is whether it's the whole system,

17  whether it's limited to particular witnesses, I would

18  respectfully suggest that at minimum if the states are required

19  to undertake these searches that they be limited to the

20  databases of a discrete number of employees.

21      THE COURT:  All right.  Well, now that I've allowed

22  it, you sit down, meet and confer, see if you can work it out.

23      MR. NALVEN:  Yes, Your Honor.  What I was suggesting

24  was to the extent that they have deposed individuals or intend

25  to dispose individuals, it's their databases, their computers

1  need to be searched with respect to specific terms, that those

2  kinds of searches would be, I don't know whether they're

3  manageable but they're reasonable.

4          THE COURT:  I would suspect it will be broader than

5  that, but I suggest you sit down now that you know that you're

6  going to have to do it and see if you can work out a regime.

7          MR. NALVEN:  Your Honor, there is a last motion to

8  compel category in the defendants' papers which they have not

9  raised, and I don't know if they're not pressing it at this

10 time, but just so the record is clear, we have reached

11 agreement on the production of certain other categories of

12 documents.  There is no question that Nevada and Montana is in

13 the process of and will produce those documents.  Defendants

14 seek an order from you compelling us to produce that which

15 these state attorney generals have already agreed to produce.

16 Under the circumstances, I don't know whether defendants are

17 not pressing that.

18         THE COURT:  Are you withdrawing that at this time?

19         MS. O'SULLIVAN:  We're not withdrawing it to the

20 extent that we have not received the dispensing fee surveys

21 from Montana to which Montana relays a belated objection after

22 filing their opposition brief.  They claim confidentiality,

23 which again, would be covered by the protective order in this

24 case.

25         MR. NALVEN:  Well, first of all, Your Honor, I'm –

28

1   with respect to every other category, I don't believe that

2   it's appropriate to impose an order once there is an agreement

3   with respect to production.

4          THE COURT:  Okay.  Denied without prejudice at this

5   time as to that.  It can be renewed at a later date if need be.

6          MR. NALVEN:  With respect to this last category of

7   data, Your Honor, that is not part of this motion and I'm not

8   prepared to respond to it today.

9          THE COURT:  All right.

10         MR. NALVEN:  However, we will respond promptly and if

11  we can't work it out, we'll agree to bring it to the Court's

12  attention promptly.

13         THE COURT:  All right.

14         MS. O'SULLIVAN:  Your Honor, I had two clarifying

15  questions, if I may?

16         THE COURT:  Uh-huh.

17         MS. O'SULLIVAN:  One is as to the non-Medicaid

18  entities, you said we could have three depositions from each

19  state and documents from those file holders' files.  And as to

20  the legislative and executive staffers, you ordered two

21  depositions in Nevada, one of Montana, and I would just ask

22  clarifying, would that include documents searched from those

23  three individuals' files?

24         THE COURT:  Yes.

25         MS. O'SULLIVAN:  And then the second and important

1   from the defendants' perspective is the question of timing

2   given that we have defendants' summary judgment motions and

3   expert reports due on May 5th in this case.

4           THE COURT:  Well, time is of the essence.  How

5   quickly can these be done?

6           MR. NALVEN:  Your Honor, I will confer with my

7   partner who is handling the Montana case--

8           THE COURT:  ASAP.

9           MR. NALVEN:  --and we will confer with the

10  defendants.

11          THE COURT:  All right.  Next motion?  I think we may

12  have skipped over one, which is 2053.

13          MR. NOTARGIACOMO:  Your Honor, I'm Ed Notargiacomo,

14  Hagens, Berman, Sobel, Shapiro for the plaintiffs, movants in

15  that motion.  I don't believe that counsel for

16  AmerisourceBergen is here unless someone has come in in the

17  last five minutes and I don't see them.  When I realized no one

18  was here I attempted to--

19          THE COURT:  Have you had any contact?

20          MR. NOTARGIACOMO:  Not with respect to this motion.

21  We are local counsel stepping in for Chicago counsel who was

22  doing this discovery as to AmerisourceBergen.  I understood

23  from them that defendants knew that this motion was going to

24  happen.

25          THE COURT:  Well, I suggest that you step out in the

30

1   hall, make some phone calls and find out where counsel is.

2          MR. NOTARGIACOMO:  I have attempted to do that and

3   will attempt again, Your Honor.

4          THE COURT:  All right.  All right.  So that takes us

5   to 2957.  All right.

6          MR. NALVEN:  Your Honor, this is plaintiffs' motion,

7   plaintiffs' motion directed to defendant Amgen.  Your Honor,

8   the Court is familiar with these disputes because this is the

9   second time that the plaintiffs are before you on this.  We

10  were before you in February on a motion to compel that was

11  filed in October.  To refresh you, Amgen is the manufacturer

12  of--

13         THE COURT:  This you don't need to refresh.

14         MR. NALVEN:  Your Honor, I know that there are so

15  many defendants and so many drugs.

16         THE COURT:  Yeah, but give me credit for something.

17         MR. NALVEN:  I give you a world of credit, Your

18  Honor.  So as the Court knows, these are drugs that are within

19  the heartland of this case, physician administered drugs

20  involving the treatment of anemia and chemotherapy.  So these

21  are really central, these are central drugs where we've seen in

22  general a great degree of abuse of AWP.  When we were before

23  you in October, I'm sorry, when we were before you in February,

24  the motion that was before you was an October motion, and

25  during the period of time from October to February, during the

1  pendency of the motion many of the issues that were raised in

2  October were resolved or were in the process of being resolved

3  and so Your Honor despite my effort to try to persuade you

4  otherwise ruled that our motion was moot.  I did try to engage

5  you in dealing with some of the current issues, which are now

6  part of this motion but Your Honor I'm afraid wisely declined,

7  and so we are now back here to deal with these additional

8  motions.

9          As was the case last time, since the time that we

10  filed this last motion, the defendant Amgen has produced some

11  of the documents that are subject to our motion, and as you see

12  in the defendants' response there are categories of things that

13  have been done since the time that we filed our motion.  So

14  some deficiencies have been cured.  Your Honor, this is a

15  continuing problem with plaintiffs and this defendant.  I mean,

16  these deficiencies clearly should have been cured during the

17  meet and confer process, not as a result of our having to make

18  a motion.  In addition there are areas, I'm obviously not going

19  to burden you or the record with the areas in which they have

20  done it except to note that it was only as a result of our

21  filing a motion.  There are areas of non-compliance that we

22  believe require the Court's continued attention.

23          Just to put this in perspective, the defendant,

24  Amgen, to date has produced 47,000 or so documents.  The last,

25  this coming I think yesterday or the day before.  In a case of

32

1    this magnitude, that is a very, very small number of

2    documents.  With respect to the areas of non-compliance, the

3    first critical area is, there has been an ongoing dispute as to

4    the timeframe pursuant to which documents should be produced.

5    The request that defendants, I'm sorry, the request that

6    plaintiffs made initially was 1991 to the present.  Amgen took

7    the position that they would only be required to produce

8    documents from 1997 to 2001.  That was an issue that was

9    brewing the last time we were here but was not properly framed.

10   It's now properly framed.  Since we've made our motion, Amgen

11   has said fine.  We will produce documents in some categories

12   from 1991 to 2004.  So there are three problems that remain.

13   The first is that Amgen has not said they will produce

14   documents in all categories from 1991 until the end period of

15   the production range.  The second issue is that the 1991 to

16   2004 period still ignores plaintiffs' request and as well

17   ignores the class cert order that was issued by Judge Saris

18   that sets the class period in this case to 2005 and with

19   request to some subclasses to the present.  So the relevance of

20   our request for to the present is unmistakable, particularly

21   considering Judge Saris' class cert order.

22        And the third problem is that we don't have a win.

23   That is Amgen in its reply papers say we have or are in the

24   process of producing these materials but they don't say when

25   they will be forthcoming.  Now, in the Track 2 defendant side

33

1    of this case as you know, there was a discovery cutoff of

2    December 3rd.  There's a motion before Judge Saris.  There's

3    some degree of agreement as to continuing discovery but at this

4    point we're open ended.  We don't know exactly where we are.

5    We do know, however, that we are beyond at least the cutoff

6    that's on paper, although Judge Saris has said, has indicated

7    that we ought to keep going.  So time is of the essence in

8    terms of this production.  So first area of noncompliance is

9    timeframe.

10          Second area of noncompliance is in the area of

11   sampling.  The defendants have taken the position, or defendant

12   Amgen has taken the position that with respect to our document

13   request that is acceptable for them rather than to produce the

14   all documents that we have requested, that in certain

15   categories that it is sufficient for them to produce samples of

16   documents.  The genesis of this is that back in May when we

17   provided to Amgen a list of the documents that we would like on

18   a priority basis, that we said to them in certain circumstances

19   we'll consider at least at the outset clearly without waiver of

20   our ability to obtain what was requested in our document

21   request a sample.  And, Your Honor, this has been done with

22   many of the defendants in this case.  I've personally done it

23   with Glaxosmithkline very effectively as a way of easing the

24   burden on the defendants and at the same time focusing the

25   discovery.

1          Amgen has taken the position that by offering that

2    as a first wave that we have now waived our right to all

3    documents and we clearly did not.  We would have been glad to

4    review samples and then figure out, you know, what else would

5    be needed based on those samples if when we provided our

6    request in May these samples were provided in May, but they

7    were not.  In fact, the first documents in this case were not

8    provided until after we filed our motion in October and they're

9    still coming.  At this point given the time constraints

10   sampling is simply not going to work.  We did not waive our

11   ability to obtain all documents and we should be entitled to

12   all our documents and we should be entitled to all our

13   documents.

14          There is one area in which we are, my colleague in

15   Seattle continues to discuss with Amgen sampling and that is in

16   the area of contracts with providers, and we will continue to

17   discuss that but in any other area, Your Honor, it is our

18   position that there was no agreement as to samples.  Certainly

19   the defendant can point to nothing that identifies the

20   methodology that would be used in determining the sample.

21   Amgen simply says, we'll decide what the appropriate sample is.

22   Under the circumstances, there's no agreement to samples and at

23   this point in time in the discovery sampling is simply not a

24   realistic option.

25          Let me add as well that we have asked Amgen's

35

1   counsel, tell us which categories you've sent the samples in

2   because we don't even know based on their production and we

3   have not gotten a response.

4         The third area of disagreement is with respect to

5   targeted follow up documentary discovery.  Now, we do have this

6   issue as to whether there was a December 3rd cutoff or where

7   exactly we are in discovery.  Given the fact that discovery

8   production is ongoing, it's not plaintiffs' intention to send a

9   blunderbuss request to Amgen for additional documents, but

10  surely, given that we're just getting documents now and

11  reviewing them on a rolling basis, that when we need particular

12  production, for example to depose particular witnesses, that we

13  ought to be entitled to that targeted discovery and this issue

14  has actually come to a head in this motion because one of the

15  things that we did was we served as a result of reviewing the

16  documents nine deposition notices, six to sales people, three

17  to pricing people, and on those six notices to sales people we

18  identified six categories of sales representative related

19  documents.  Their call notes.  Their presentation materials.

20  Their communications with their superiors, things of that

21  nature.  Amgen has taken the position that, and with the three

22  pricing people we had three categories of documents.  Amgen has

23  taken the position that document discovery is over.  We're not

24  producing anymore documents.  Respectfully, Your Honor, I

25  believe that these documents were encompassed in our original

36

1    request, but at any rate under the circumstances, this sort of

2    production is plainly permissible.

3              Defendants' central argument as to why it is that

4    things are taking so long is that it was plaintiffs who were

5    not responding to their requests to keep things going.  And,

6    Your Honor, there was a period in 2003 and 2004 when it was

7    unclear whether Amgen was going to remain a defendant in this

8    case.  Amgen had certain very specific defenses that were

9    unavailable to other defendants because of the drugs that it

10   manufacturers but by May of 2000, and I believe that it was

11   finally decided in February or March of 2005 that they would be

12   defendant in this case, and so there were communications, very

13   specific communications, including the preparation of a memo by

14   my colleague, Ed Notargiacomo, that was sent to Amgen's counsel

15   saying as a first wave, let's get going.  Here are the things

16   that we need.  And so it may be the case that during the period

17   of 2003 and 2004 the plaintiffs were not aggressive in getting

18   Amgen to produce documents, but during that time there was a

19   question as to whether Amgen was going to be in the case.  But

20   once it's clear that Amgen is in the case, all of that is

21   ancient history and we have been seeking to get Amgen's

22   attention.  And so given that context, given that we have so

23   few documents now, that is the reason that plaintiff also has

24   made this motion asking the Court to impose penalties on Amgen

25   and to provide plaintiffs with their fees for this motion.

37

1           THE COURT:  All right.  I'll hear from Amgen.

2           MR. YOUNG:  Your Honor, Joseph Young on behalf of

3 Amgen.  Frank Libby is with me this morning as well.

4           Your Honor, I appreciate Mr. Nalven's comments about

5 how Amgen was different.  The timeframe is a little off.  Amgen

6 wasn't back in this case until February of 2005 till last year.

7 And I think it's important for the Court in considering the

8 motion this morning and certainly in considering any kind of

9 notion of sanctions and whether they're appropriate in this

10 kind of a case, to have a little bit of a factual background.

11 We were not in the case until February.  We had spoken with

12 plaintiffs' counsel.  They understood the impact that that had

13 on discovery obligations at the time.  Notwithstanding that

14 fact, we did make every effort in December through May of last

15 year, a six-month period, to meet with the plaintiffs to try to

16 whittle down the omnibus requests and to get them to focus on a

17 more narrow set, which now we call, I don't know, the

18 Notargiacomo memo, the Berman May 2005 memo, but whatever it

19 was, that was the focus of what discovery was supposed to on a

20 going forward basis rely on and I think that's important in

21 considering this morning's motions for a couple of reasons.

22 The biggest one is we're shooting at a moving target.  That

23 Berman memo continued to be the basis of the parties'

24 understanding going through last fall and more importantly when

25 the timeframe issue was finally raised in January, I think it's

38

1   January 9th of 2006, and as the correspondence the Court has

2   as part of these motions makes clear, the parties were

3   negotiating whether to extend the timeframe limitations with

4   respect to those specific categories of documents that had been

5   agreed upon in that May 2005 meet and confer.  What I'm hearing

6   this morning, what I see in the motion, is plaintiffs' efforts

7   now to say well, no, no, no.  That was just a preliminary.  Now

8   we want everything from the omnibus request, and, Your Honor,

9   if we're to go back to square one and respond to the seventy

10  some odd requests rather than the more narrow discrete

11  categories, it would be enormously overwhelming and far from

12  hastening discovery's conclusion.  It would drag it out for

13  years to go back to where we were in the beginning.  So, I

14  encourage the Court to focus on that May timeframe as the

15  starting place for the parties' discussions and then to look at

16  the conduct as we move forward.

17          THE COURT:  Well, let's talk about the three problem

18  areas that counsel has outlined.

19          MR. YOUNG:  Sure.

20          THE COURT:  First, what about from `91 forward in all

21  categories?

22          MR. YOUNG:  The all categories being the Berman

23  memorandum, that's what we agreed to and with all due respect

24  to Mr. Nalven, it was not after the motion was filed.  We

25  agreed to it by correspondence dated, it's in the file, I think

39

1   it's February 7th or 9th and as confirmed in an email on

2   February 15th, shortly after our last hearing before Your Honor.

3   The response to that was the motion to compel.  There was no

4   further discussion about whether, I mean, it was all over

5   nothing with respect to the omnibus requests.  We have agreed

6   to supplement every category of the Berman 2005 letter or list

7   and have produced or are in the process of producing, and I can

8   talk about that timeframe as well, all of the data including

9   the IMS data through actually 2006, which is broader than what

10  they had requested.  The sales, information sales data for all

11  of our products through January 1, `04, and dating back to

12  January 1, 1991.  The same with our credit and rebate data.

13  Our price histories for each price increase have also been

14  produced I believe to date now.  The compendia communications

15  for each price increase.  Each of those categories.  The only

16  exceptions are that we stopped it on January 1, 2004, which we

17  believed was a reasonable compromise in light of what

18  plaintiffs have requested and required other defendants in both

19  Track 1 and Track 2 and because we frankly think that there are

20  good waiver arguments relating to this timeframe issue anyway

21  because it wasn't raised until January.  The categories, and

22  this flows into the second consideration about sampling, the

23  categories where we have provided less than every document in a

24  category or one of the line items would be sales contracts

25  where the parties had agreed to talk about some way to identify

40

1  a more discrete class of top tier customers rather than every

2  sales contract Amgen has and similarly documents relating to

3  our sales representatives.  There are hard copy and electronic

4  and, they're called field sales reports or Ryan reports, and

5  consistent with what we spoke to Mr. Sobel about in `04, what

6  we spoke to Mr. Berman about in `05, and what we were

7  continuing to talk about I thought in January and February of

8  this year, what we had agreed to do was to identify a top tier

9  group of sales reps, the top performing sales reps and to

10 provide their documents both forward from here that they were a

11 top tier sales rep and backward if they were working for the

12 company prior to that.  And just in order so the Court

13 understands where that's taken, as for the `97-2001 timeframe,

14 that resulted in the identification I believe of 33 custodians.

15 With the addition up through January 1, `04, there had been

16 another 39 custodians who have been identified and whose

17 documents are currently in process, the hard copy and

18 electronic, which would result in 72 total sales rep

19 custodians.

20        And that leads me to the sampling issue.  I think

21 frankly the parties just have a misunderstanding.  There was no

22 sampling of the Berman categories.  There was a sampling of

23 custodians within those discrete categories relating to sales

24 reps and to the sales contracts but not to the contracts

25 themselves, which is what I understood Mr. Nalven and certainly

1    plaintiffs' motion to be indicating.

2         I guess lastly, Your Honor, with respect to the

3    deposition notices, we're not objecting to the notices of

4    deposition themselves.  Obviously the plaintiffs can't identify

5    witnesses until they've had an opportunity to look at

6    documents, and all of the Track 2 defendants understood that.

7    That's incorporated in the Track 2 proposal that's before Judge

8    Saris.  What we are objecting to are tag on request for

9    additional documents that could be used as sort of a side door

10   or a way to end run the close of discovery.  We are looking for

11   a way to cut off the document review process and the document

12   production process and don't want to be sort of sidetracked on

13   that with the supplemental and additional requests on a going

14   forward basis.

15        THE COURT:  All right.  Let's go through it one by

16   one.

17        MR. NALVEN:  Your Honor, a premise of Amgen's

18   presentation and position is that by providing in connection

19   with the meet and confer process a memo identifying as a first

20   cut plaintiff's priorities, plaintiff has somehow waived its

21   claim to all documents from each of the categories in the

22   initial document request, and, Your Honor, that sort of waiver

23   would be accompanied by either a new document request or a very

24   formal letter.  Plaintiff simply would not waive their right to

25   a Rule 34 request that was outstanding, and I do not believe

42

1    that there is a misunderstanding in this area, but if there is

2    a misunderstanding, the reason that they're, the reason that

3    misunderstandings like this should not occur is because these

4    sorts of agreements are accompanied by a degree of formality.

5    And if I understand what Amgen is saying, what they're saying

6    is look at the conduct.  That's all we talked about.  Again, I

7    don't believe that that is the case, but there is clearly no

8    waiver by plaintiffs.  Our position that we need not simply

9    those that we identified in the, you know, first waive review,

10   but all documents stands.  It's our request and we believe that

11   we are--

12          THE COURT:  Well, what are we talking about in terms

13   of quantity?

14          MR. NALVEN:  --entitled to them.

15          MR. YOUNG:  In terms of quantity, I'm sorry, with

16   respect to which category, Your Honor?

17          THE COURT:  Which your brother has just outlined.

18          MR. YOUNG:  If we were to go back to the original

19   omnibus requests?  Your Honor, it requests every communication

20   between every individual within the company regarding to

21   pricing AWP.  It would include all of our sales

22   representatives.  Currently we have 2,000 plus active sales

23   reps historically because people come and go.  You're talking

24   about several thousand in addition.

25          One other, and with all due respect to Mr. Nalven,

43

1   and I know he was not on the front lines of my discussions

2   with Mr. Lopez, but the focus, with all due respect, was on

3   that modified list and a supplementation of that list.  And

4   it's attached I know as an exhibit to Mr. Lopez' declaration

5   and I believe it was also attached to ours, but there's a

6   February 15th email where he says in asking for clarification of

7   what I had agreed to in both my correspondence and subsequent

8   emails, does your first substantive paragraph mean that Amgen

9   is now willing to make a production from `91 to January 1, 2004

10  of responsive non-privileged documents requested in plaintiffs'

11  omnibus request as modified but not supplanted by the

12  Notargiacomo memo of May 2005?  This would not be samplings.

13  Now, grant it I think we have a misunderstanding of what

14  samplings meant, but this would not be a sampling of certain

15  categories but rather all responsive non-privileged documents

16  save for contract documents which contract documents would be

17  produced in accordance with the proposal we made in my January

18  9, 2006 letter.  In other words, Amgen is now willing to make a

19  supplemental production in accordance with plaintiffs' proposal

20  as set forth in our January 9 letter save for substituting an

21  end date of January 1, 2004 for 2005.  I don't think that could

22  be more plain.  It's not let's go back to the well and start

23  from scratch.  It's consistent with what we've discussed from

24  2004 forward.  Let's focus it on discrete categories.  Let's

25  not do a data dump, which is I guess now what they want, and

44

1   limit it to whether, I don't care if it's 40,000 or 400,000 or

2   100,000, but the key documents that are relevant to their

3   allegations and that's what we did.

4           THE COURT:  Why can't we do that?

5           MR. NALVEN:  Your Honor, there are two reasons.  The

6   first is that the context in which Mr. Lopez' language to Mr.

7   Young arose was in the context of simply trying to understand

8   what Amgen's position was.  This was not an offer and there was

9   not acceptance.  This was simply trying to understand where

10  they were coming from.

11          The second reason is that we served pursuant to Rule

12  34 a document request.  We are waiting to receive the documents

13  and plaintiffs did not waive their right to receive those

14  documents nor can Mr. Young point to any document where any

15  plaintiffs' lawyer said yes, the document request is now so

16  limited.  The memo that was prepared by my colleague,

17  Mr. Notargiacomo, is an extremely informal memo.  I don't even

18  think it's on letterhead.  It was simply, here's a working

19  document to get us started.  This is not a document that

20  reflects an intent to waive and indeed we did not waive.

21          MR. YOUNG:  I guess my only response to that is the,

22  and the Court has this ad nauseum in the record, the parties'

23  discussions up through May of 2005 and the affidavits relating

24  to what the parties understood that meeting accomplished.  And

25  more importantly, I think how plaintiffs have addressed,

45

1    certainly in the Track 2 context, all of the defendants.

2    Nobody is being held to responding to the entire omnibus

3    request.  It just doesn't make sense.

4           THE COURT:  Well, I'm going to order you to sit down

5    once again and see what categories you can narrow it to, and

6    with the thought in mind that if you come back here, I'm not

7    going to allow everything.  So sit down with a mind that it's

8    going to be narrower than the broad request.

9           Okay.  What about time periods in light of Judge

10   Saris' order?

11          MR. YOUNG:  Your Honor, Amgen has agreed to extend

12   that to 2004, which we believed was a reasonable accommodation

13   given all of the parties' interests.  I think it's consistent

14   with what the plaintiffs have required certainly of the Track 1

15   defendants and as I understand of the Track 2 defendants.  I'm

16   not aware of any defendant who has been required or even

17   requested to produce up through January 1 of 2006.

18          THE COURT:  Is that correct?

19          MR. NALVEN:  Your Honor, when the Track 1 defendants-

20   -

21          THE COURT:  Yes or no question.

22          MR. NALVEN:  Your Honor, I'm not aware of whether any

23   defendants have produced documents up to--

24          THE COURT:  2005 for now.

25          MR. YOUNG:  January 1st, 2005?

46

1          THE COURT:  Yup.

2          MR. YOUNG:  Yes, Your Honor.

3          THE COURT:  And what about a schedule for production?

4          MR. YOUNG:  I was prepared to say that we could

5     complete for the January 1, 2004 and the delays in processing

6     the individual custodian documents and the time to upload, that

7     I had been advised will probably be 30 to 45 days to complete.

8     I ask that--

9          THE COURT:  Can you do it in waves?

10         MR. YOUNG:  Oh, absolutely.  We're planning on

11    rolling.  We're not holding it for the 45th day and dumping.

12         THE COURT:  Okay.

13         MR. YOUNG:  I guess what I would suggest to the Court

14    is if you need a specific timeframe, I'd have to talk with our

15    IT people.  I could certainly communicate that as part of a

16    meet and confer with um--

17         THE COURT:  All right.  Well, let's say 45 days,

18    hopefully within 45 days but rolling.

19         MR. YOUNG:  Yes, Your Honor.

20         MR. NALVEN:  Your Honor, I have a few sort of

21    clarifications at this point.  Number one, do I understand that

22    at least with respect to whatever categories of documents the

23    Court will eventually order be produced, that it not be--

24         THE COURT:  I'm hoping that I will not have to order.

25         MR. NALVEN:  Well, whatever—

47

1        THE COURT:  I'm hoping that you will take my words

2   as some guidance to narrow it to what you really need.

3        MR. NALVEN:  Your Honor, you know that we always take

4   your words that way.  It's way to scary to come back here

5   otherwise.  But with respect to the categories that will be

6   produced, do I understand Amgen's position that it is all

7   documents from those categories with the exception of provider

8   contracts that will be produced and not a sample of those

9   documents?

10       THE COURT:  Correct?

11       MR. YOUNG:  I think that's correct, Your Honor, if I

12   understand.

13       THE COURT:  Yeah.

14       MR. NALVEN:  Okay.  The second--

15       MR. YOUNG:  I'm sorry, contracts and we'd also

16   discussed this, the identification of sales reps which will be

17   something we'll have to talk to either Mr. Nalven or Mr. Lopez

18   about.

19       MR. NALVEN:  Well, I would respectfully suggest, Your

20   Honor, that that will be, I anticipate that that will be an

21   area where there will be a best heart bargaining.  We know from

22   experience that among the best evidence that plaintiffs have

23   developed in this case is from their depositions of the sales

24   reps who are the ones who are in the room with physicians

25   communicating the company's position with respect to AWP.

48

1          THE COURT:  All right.

2          MR. NALVEN:  The second question I have, Your Honor,

3   is we will sit down and meet and confer of course, but I think

4   given the pressive time, we need some mechanism to be able to

5   get back to the Court relatively quickly.  Now, Your Honor, has

6   taken this motion fairly quickly after it was made.

7          THE COURT:  Well, file a motion for an expedited

8   hearing.  If you file a motion for an expedited hearing, I will

9   say at this point that then the response should be filed within

10  seven days rather than 14.  That goes just to this matter.

11  That's not for everything else, but in order to keep this on a

12  fast track.

13          MR. YOUNG:  Your Honor, you put a 45 day turnaround

14  time on the documents.  I think it's on a fast track and we're

15  certainly going to heed to that.

16          THE COURT:  Sure.  Okay.

17          MR. NALVEN:  And finally, Your Honor, as the briefs

18  and the affidavits reflect, plaintiffs believe that this is a

19  case in which the enormous difficulty that has been posed on

20  defendants compel the Court to consider our application for

21  sanctions and for fees, and we ask that on this motion that

22  those requests in our motion be considered.

23          THE COURT:  Denied without prejudice at this time to

24  be renewed if you wish at the end of the case.

25          MR. NALVEN:  Thank you, Your Honor.

49

1          THE COURT:  Do you have any enlightenment for us?

2          MR. NOTARGIACOMO:  I received a voice mail from

3   counsel for Amerisource, Ms. Meredith Myers-Maconi, who

4   indicates that she did not receive notice of the hearing.  I

5   have been unable to contact plaintiffs' counsel in Chicago who

6   filed the original motion to find out whether they've had

7   communications with her office or any of her associates about

8   It, so without proof that in fact they received notice, I would

9   say that plaintiffs would take the position that we wouldn't

10  mind rescheduling the motion to a later date.

11         THE COURT:  All right.  All right.

12         UNIDENTIFIED:  Your Honor, excuse me.  My apologies

13  for my appearance.

14         THE COURT:  Very sporty.

15         UNIDENTIFIED:  I apologize, my firm is local counsel

16  to AmerisourceBergen.  We literally just got a call from

17  out-of-town counsel asking us to come here and apparently meet

18  the principle counsel on both sides.  I have spoken one another

19  and agreed to a brief continuance of the hearing in light of

20  the notice issue.  So I wanted my fellow counsel to be aware of

21  that as well as the Court on that.  And again, I apologize, we

22  did not know about the hearing.

23         THE COURT:  You should keep a tie in the office.

24         UNIDENTIFIED:  I apologize.

25         THE COURT:  All right.  Perhaps if you don't leave

1   until the end, then you can confer with counsel and the clerk

2   and we can give you a date for this particular motion to have a

3   hearing.

4          MR. NOTARGIACOMO:  Your Honor, before we are excused,

5   with respect to the Court's denial without prejudice on the

6   issue relating to sanctions, I just want the record to be

7   clear, I mean we take great exception to that motion.  I think

8   it's spelled out clearly why we believe it's unfounded.

9          THE COURT:  That's clear.

10          MR. NOTARGIACOMO:  Okay.  And--

11          THE COURT:  That's clear.

12          MR. NOTARGIACOMO:  And we would certainly would want

13   to be heard on that.

14          THE COURT:  Years from now. All right.  2162?

15   (Pause)

16          THE COURT:  All right.  Moving party?

17          MR. DeMARCO:  Good morning, Your Honor.

18          THE COURT:  Mr. DeMarco.

19          MR. DeMARCO:  Michael DeMarco on behalf of Adventis.

20   With me Jim Muehlberger from Shook, Hardy and Bacon, national

21   counsel for Aventis.

22          MR. MUEHLBERGER:  Good morning, Your Honor.

23          MR. DeMARCO:  My partner, Michael Riccuitti.

24          MR. RICCUITTI:  Good morning, Your Honor.

25          THE COURT:  I usually see Mr. Ricuitti at the front

51

1    table, but times have changed I guess.

2           MR. DeMARCO:  He's at a different table nowadays.  We

3    hope he stays with us.

4           Your Honor, we filed a motion to compel in according

5    with the failure of discovery in connection with subpoenas that

6    were served in this case back in the fall beginning in October.

7    The motions to compel were filed against Blue Cross Blue Shield

8    of Massachusetts as well as National Heritage Insurance

9    Company, two of the Medicare Part B insurance carriers.  There

10   are two carriers because they cover different periods of time.

11   Blue Cross Blue Shield of Mass., now a plaintiff in this case I

12   might add, handled Medicare Part B claims reimbursement from

13   1991 to 1997 at which point they apparently transferred or sold

14   the assets of their business to National Heritage Insurance

15   Company from 1997 to the present time.

16          THE COURT:  I should note at the outset that my

17   medical insurance is Blue Cross Blue Shield through the

18   government plan, so if anyone has a problem with that.  It

19   might be hard to find another judge in the courthouse, but I

20   know that for the record--

21          MR. DeMARCO:  You've got to have insurance with

22   somebody and--

23          THE COURT:  I note it for the record and it will have

24   no bearing on my decision.

25          MR. DeMARCO:  I don't think that there are many of us

52

1   that don't have insurance with Blue Cross Blue Shield in

2   Massachusetts, but in any event, Your Honor, that business,

3   that type of business, which is not what we're involved in

4   because we're not Medicare Part B eligible yet, thank goodness,

5   and was transferred to NHIC.  The NHIC part of our concerns

6   that bring us to you today, we believe have been resolved. I

7   say that with some reserve only because after five months of

8   discussions inspiring an email and letter writing and the rest,

9   which is apparently the usual course of these kinds of

10  discovery discussions, the NHIC folks, along with the

11  Department of Justice folks who are also involved by virtue of

12  the federal involvement called us, contacted our counsel, our

13  colleagues yesterday very late in the day.  We were on the

14  conference call with them until 7:00 or thereafter last night

15  hammering out whatever we could agree upon.  So for the sake of

16  this discussion, Your Honor, this hearing, I am not going to

17  address our concerns with regard to the compel of NHIC.  NHIC's

18  counsel is here, Mr. Wattenmaker.  He was on the call

19  yesterday.  I would just ask that for the record, Your Honor,

20  that as far as NHIC's issues are as they concern us, which are

21  in pleadings number 2303, their cross motion 2305, their

22  opposition to our compel and their brief in support of the

23  cross motion number 2296, HHS' cross motion and number 2297,

24  HHS' brief in support of the cross motion, that those motions

25  be withdrawn without prejudice.

53

1          THE COURT:  Is the government here?

2          MR. DeMARCO:  The government is here or was here.

3   Yeah, there they are, here he is.

4          MR. HENDERSON:  I want to make clear, are all of the

5   pending motions including the defenses' pending motions being--

6          THE COURT:  Why don't you identify yourself for the

7   record.

8          MR. HENDERSON:  I'm sorry, your Honor.

9          THE COURT:  I know you--

10         MR. HENDERSON:  George Henderson for the United

11   States--

12         THE COURT:  --but the typist won't.

13         MR. HENDERSON:  --and HHS.  And I agree that an

14   agreement has been worked out and it's my understanding

15   basically that the matter will be put into abeyance pending

16   implementation of the agreement.

17         MR. DeMARCO:  Yeah, I was getting to that.

18         THE COURT:  So withdrawn without prejudice.

19         MR. DeMARCO:  Yes.  Well, we want to be sure, Your

20   Honor, that our rights are saved with regard to the follow up.

21   Right now we have an "agreement".

22         THE COURT:  Tell me the numbers of the motions that

23   you want withdrawn without prejudice.

24         MR. DeMARCO:  Yeah, 2303, which is identified as

25   NHIC's cross motion, 2305, which is NHIC's opposition/brief in

54

1  support of the cross motion.

2      THE COURT:  Well, the opposition doesn't need to be

3  withdrawn.  I only need motions.

4      MR. DeMARCO:  Okay.  Well, I'm sorry.  2296 is Health

5  and Human Service's cross motion, and then there was a brief in

6  support of that.

7      THE COURT:  No, I only need the motion.

8      MR. DeMARCO:  The motion numbers 2162 through 2164

9  are our motions to compel with regard to NHIC.  We would ask

10  the Court to hold those in abeyance, which is what my brother

11  was just mentioning to you, the government's lawyer.

12      THE COURT:  So 2162, withdrawn without prejudice at

13  this time.  Otherwise it keeps popping up on the report.

14      MR. DeMARCO:  Okay.  Fine.  Whatever procedurally is

15  the best way to go about it.

16      THE COURT:  And then all you have to do is re-file

17  it.

18      MR. DeMARCO:  Right.  We have some events that have

19  to take place and because this has been a five month and rather

20  long drawn out process, we want to be sure that everybody does

21  what they're supposed to do.

22      THE COURT:  No problem.

23      MR. DIMARCO:  So that's where we are.  Now, which

24  leaves us with the remainder to be brought to your attention,

25  Your Honor, and those motion, the motion to compel and various

55

1   papers as concerns Blue Cross Blue Shield of Massachusetts.

2          MR. HENDERSON:  I'm sorry. May I interrupt?  Before

3   we move onto Blue Cross Blue Shield--

4          MR. DIMARCO:  Sure.

5          MR. WATTENMAKER:  Ben Wattenmaker on behalf of

6   National Heritage Insurance Company.

7          THE COURT:  Thank you.

8          MR. WATTENMAKER:  I just want to make sure that all

9   of the motions we read into the record, they're all going to be

10  withdrawn without prejudice on both sides.

11         THE COURT:  Tell me the numbers if you--

12         MR. WATTENMAKER:  Okay.  I just want to make

13  absolutely certain that I'm clear, 2303, 2305, 2296, 2162

14  through 2164.

15         THE COURT:  Let me just look at this other docket.

16  (Pause)

17         THE COURT:  Okay.  Again 2163 and 2164 are not

18  motions.

19         MR. WATTENMAKER:  Okay.

20         THE COURT:  2162 is the operative motions.

21         MR. DeMARCO:  Right.

22         THE COURT:  It's only the motions that get withdrawn.

23  The rest--

24         MR. WATTENMAKER:  Thank you, your Honor.

25         MR. DeMARCO:  Those are the numbers I read, Your

56

1    Honor.

2            THE COURT:  All right.  Withdrawn without prejudice,

3    can be re-filed at a later date.

4            MR. DeMARCO:  Fine.  Now, with respect to Blue Cross

5    Blue Shield of Massachusetts, we do not have an agreement and

6    the reason we are here pressing our motion to compel Blue Cross

7    and Blue Shield of Massachusetts to provide us--

8            THE COURT:  Which his docket entry number?

9            MR. DeMARCO:  Which is docket entry number 2162--

10           THE COURT:  Well, you just, are we withdrawing part

11   of it but not all of it?

12           MR. DeMARCO:  Yeah, right.  It was a motion that was

13   filed against Blue Cross and NHIC.  The NHIC part is withdrawn.

14   The Blue Cross part is not.

15           THE COURT:  Okay.  Perfect.

16           MR. DeMARCO:  Let me sum it up as clearly and

17   concisely as I possibly can with regard to Blue Cross, Your

18   Honor.  As I began my argument, we started this about five

19   months ago.  We served subpoenas.  We served deposition

20   notices.  We asked for documents and we asked for 30(b)(6)

21   designees.  Lots of discussion took place, emails, a three-ring

22   binder full of stuff.  What we have is essentially sort of a

23   revolving door argument, a circuitous sort of argument where

24   Blue Cross says well, you know, we don't have that business

25   anymore.  We sold it to NHIC in `97 so all of the information

57

1  since 1991, which is the first operative year, to 1997 is

2  gone.  We shipped it all off to them so we ain't got nothing.

3  We come back and we say well, they tell us they only have

4  documents and relevant information and people from `97 forward.

5  What are we going to do about these other six years.  And they

6  say, well, we'll have to look and we'll see.  They come back

7  and they say, we've looked.  There is no one and there are no

8  documents.  They're all gone.  They don't tell us who they've

9  spoken to.  They don't tell us what they've looked for.  They

10  haven't identified in any way, shape or form.  They've given us

11  affidavits which are somewhat troublesome.  First beginning

12  with a letter, and this really I think expresses the essence

13  of--

14             THE COURT:  Why don't you take a deposition?

15             MR. DIMARCO:  We'd love to take a deposition.  In

16  fact, we told them to designate someone for us and they told us

17  that there isn't anyone they could designate.  They're all

18  gone.  We told them that the law requires that you have to find

19  someone even if it's a former employee.  We told them we've

20  provided, it took us months for Aventis to find a half dozen

21  former employees on these various pricing issues.  We provided

22  them.  We presented them.  They were deposed.  If we had to do

23  it, you've got to do it.  You're a party.  They come back and

24  they say, it's pointless.  There's nothing else we can do.

25  We've talked to people.  We've looked around.  They don't tell

58

1   us who they've talked to.  So we tell them all right, let's

2   put the deposition issue aside for the moment, give us some

3   documents or give us a declaration, something under oath for

4   the record indicating that you don't have anybody and/or you

5   don't have any documents but at least we have something under

6   oath that expresses your position for the record.  No, we won't

7   give you that either.  So what I'm hearing and what I'm seeing

8   in the record, and this is what they put in writing to us by

9   affidavit and in letters, and I won't bore you with all the

10  details of all this, but it's actually, it's very troublesome

11  to see a party plaintiff in a case take a position that there

12  is no individual, there's no human that we can provide to you

13  and there are no documents that we can provide and we won't

14  give you a declaration saying that there are no people or

15  documents.

16          THE COURT:  Why no declaration?

17          MR. COCO:  Your Honor, this is Steven Coco from

18  Robins, Kaplan, Miller, Cerisi representing Blue Cross Blue

19  Shield of Massachusetts.  The, we are prepared to do that.  I

20  mean, if--

21          THE COURT:  Why hasn't it been done already?

22          MR. COCO:  Well, the declaration that is part of the

23  papers was simply a declaration from a keeper of the records

24  saying here are the documents that are attached or we have no

25  documents.  For that purpose of it, we can, I'm not sure that

59

1    you need a declaration.

2         THE COURT:  All right.  Declaration to be filed

3    within 14 days.  If you're not satisfied with the declaration,

4    notice of deposition.

5         MR. COCO:  And with respect to the notice of

6    deposition, is that a deposition with respect to the subject

7    matters of the subpoena or would that be a deposition of an

8    individual who can testify here are the steps we have taken to

9    locate documents, locate individuals?  I mean, that is--

10        THE COURT:  What do you want Mr. DeMarco?

11        MR. DeMARCO:  We want someone with some knowledge of

12   the documents.  I mean, this is a pricing case.  We're looking

13   for pricing documents.

14        THE COURT:  And whether or not the person is in the

15   employee of Blue Cross or not doesn't matter.

16        MR. DeMARCO:  It doesn't matter, doesn't matter.

17        THE COURT:  Find the person with the most knowledge

18   as to where this information went.

19        MR. DeMARCO:  They've got to find a person.

20        MR. COCO:  Well, again, where this information went

21   or the substance of the information.  I mean, then let me

22   explain, Your Honor, in this circumstance, Blue Cross Blue

23   Shield enters into a contract with CMS to provide these

24   services, then at the end of 1997 Blue Cross Blue Shield

25   stepped out of that contract.  It was taken over by NHIC.

60

1          THE COURT:  Okay.  There's no need to go further.

2          MR. COCO:  Okay.

3          THE COURT:  Declaration within 14 days.  If

4  Mr. DeMarco is not satisfied with the declaration, he will tell

5  you exactly who he wants for the deposition, the person, not by

6  identity but with the circle of knowledge.

7          MR. COCO:  And that's simply my concern is the circle

8  of knowledge the lack or knowledge or is--

9          THE COURT:  Well, he will determine that after he

10  sees the declaration.

11          MR. COCO:  Okay.  Fair enough, Your Honor.

12          THE COURT:  All right?

13          MR. DeMARCO:  I mean, they gave us, not Mr. Coco, but

14  his, but the associate general counsel of Blue Cross sent us a

15  letter back in the fall and at the very end of the letter he

16  said, basically he says to us, if you can identify someone for

17  us that you think will help you, we'll notice, you can notice

18  their deposition.  Well, that's not the standard.  We don't

19  have to go and find their person.  They've got to find their

20  person and present him to us.

21          THE COURT:  All right.  You'll have the declaration

22  and if need be the deposition.

23          MR. COCO:  Okay.

24          THE COURT:  All right.

25          MR. COCO:  I'll refrain.

61

1          THE COURT:  Anything else?

2          MR. DeMARCO:  I don't believe so.  Thank you, Your

3    Honor.

4          THE COURT:  All right.  Then we stand in recess.

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

62

CERTIFICATION

1

2       I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young                    July 25, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MARYANN V. YOUNG**
**Certified Court Transcriber**
**(508) 384-2003**

63

1

2