# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
CITIZENS FOR CONSUME, et al. CIVIL ACTION NO. 01-12257-PBS
   Plaintiffs                 .
                              .
   V.                         . BOSTON, MASSACHUSETTS
                              . JULY 20, 2007
ABBOTT LABORATORIES, et al .
   Defendants                 .
   . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States:  John Neil, Esquire
                        Justin Draycott, Esquire
                        United States
                        Department of Justice
                        601 D Street, NW
                        Patrick Henry Building, Room 9028
                        Washington, DC  20004
                        202-307-1088

                        Gejaa T. Gobena, Esquire
                        United States Department of
                        Justice
                        601 D Street NW
                        Patrick Henry Building, Room 9028
                        Washington, DC 20004
                        202-307-1088


For Abbott Labs.:       James R. Daly, Esquire
                        Jones, Day, Reavis & Pogue
                        77 West Wacker Drive
                        Chicago, IL 60601-1692
                        312-782-3939

```
For the Relator:        Jared Anderson, Esquire
                        The Breen Law Firm, P.A.
                        3562 Old Milton Parkway
                        Alpharetta, GA 30005
                        770-740-0008

For State of Texas:     Raymond Winter, Esquire
                        300 W. 15th
                        9th Floor
                        Austin, TX 78701
```

```
Court Reporter:

Proceedings recorded by digital sound recording,
transcript produced by transcription service.
```

**_MARYANN V. YOUNG_**
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1

**<u>I N D E X</u>**

2

Proceedings                                                                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              **P R O C E E D I N G S**

2       (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is July 20, 2007.  The case of Citizens For

5    Consume et al. v. Abbott Laboratories et al., Civil Action No.

6    01-12257 will now be heard.  Would counsel please identify

7    themselves for the record.

8              MR. NEIL:  John Neil on behalf of the United States.

9              MR. GOBENA:  Gejaa Gobena on behalf of the United

10   States.

11             MR. DRAYCOTT:  Justin Draycott on behalf of the

12   United States.

13             THE COURT:  Thank you.

14             MR. DALY:  Good morning, Your Honor, Jim Daly on

15   behalf of Abbott Laboratories.

16             THE COURT:  Thank you.

17             MR. ANDERSON:  Good morning, Your Honor, Jared

18   Anderson counsel for the Relator.

19             MR. WINTER:  Good morning, Your Honor.  I'm Raymond

20   Winter, counsel for the state of Texas.

21             THE COURT:  All right, thank you very much.  Well

22   we're start with these and take them in the order in which they

23   were filed.  So the first is Docket Entry No. 3959 which is

24   Abbott's renewed motion to compel.  Mr. Daly?

25             MR. DALY:  Your Honor, is this the one on the

4

1    deliberative process privilege?

2            THE COURT:  It is.

3            MR. DALY:  We have two--

4            THE COURT:  It is.

5            MR. DALY:  --motions today on, motions to compel.

6    Thank you, Your Honor.

7            THE COURT:  You're welcome.

8            MR. DALY:  The - as the Court is well aware, the

9    government has sued Abbott for fraud.  They've sued Abbott for

10   violations under the False Claims Act.  They've claimed that we

11   mislead them and deceived them and made misrepresentations.

12   They claim in their complaint that they reasonably relied on

13   the things that Abbott told them in their price

14   representations.  They said they didn't know about the spreads.

15   They said they would have acted differently had they known.

16   And they say that Abbott withheld information that was critical

17   to the government's consideration and deliberations about what

18   kind of reimbursement methodology to use.  That's the essence

19   of the complaint against us.

20           Meanwhile there are a host of documents that the

21   government, about 600 in total, that the government has

22   withheld on the basis of what they call the deliberative

23   process privilege.  They have, for example, they've withheld

24   all drafts of any document, whether it's a letter or a report

25   or anything, claiming that drafts are inherently deliberative,

5

1  whatever that means.  We've cited cases that say that being a

2  draft doesn't mean anything under the deliberative process

3  privilege.  They have minutes of meetings between OIG which has

4  done all of these reports that the Court has seen in other

5  context where they, when they get ready to do a report all the

6  OIG folks get together and talk about what they're going to do

7  and why they're doing it.  And then when they're done they ship

8  a copy of it over to CMS, the plaintiff agency, and then they

9  have a meeting and they talk about it.  That's called the exit

10 conference.  And there are minutes and notes and memoranda

11 written about those where people are sitting around talking

12 about the spreads, talking about how AWP is much higher than

13 AAC or actual acquisition costs or average sales price.  And

14 they talk about it back and forth and somebody writes up

15 minutes.  That's the consideration and the deliberation of the

16 facts that they say in their complaint that they don't have and

17 yet all of that stuff is being kept from us.

18         There are listings in both privilege logs of the OIG

19 and CMS that talk about consideration of alternative proposals

20 for recommendations.  In fact there's one that says alternative

21 Medicare Part B reimbursement mechanisms and the pros, cons and

22 potential impact of each.  That's this case.  That's what were

23 they – as Judge Saris has said over and over again she wants to

24 know what they were doing, what they were thinking, what they

25 agreed to, what they didn't agree to and what they understood

6

1   and what they didn't understand.  Here's a document on the

2   privilege log that says they're considering all these

3   alternatives.  Not only doing that, but examining and

4   discussing the pros and cons and potential impact of each.  And

5   yet that goes to the heart of their claim.  It goes to the

6   heart of Abbott's defense and we don't have it.  So we have all

7   these and there's a tremendous amount of examples that we can

8   use but there are 600.  And so what it boils down to is they

9   say we didn't know.  They say they reasonably relied.  They say

10  that we misled the federal government and caused them damages,

11  but we're not going to give you the documents that show what we

12  knew and what we thought and what we considered.  It's a fraud

13  claim--

14          THE COURT:  You'll get your chance.

15          MR. DALY:  There's no reasonable reliance.

16          THE COURT:  Just sit back and relax.

17          MR. NEIL:  Sorry, Your Honor.

18          MR. DALY:  These documents are documents that are

19  written within OIG.  People writing draft reports, people

20  writing memoranda's talking about all the data that they're

21  collecting, all the stuff that shows the disparity between

22  actual acquisition cost and AWP, documents within CMS,

23  documents between those agencies when they get together and

24  talk about it.  Documents – we've asked them for the

25  legislative affairs documents.  They just told us, no, you're

1   not getting them cause that's talking about laws and things we

2   thought about when we were thinking about what kind of

3   methodology we might follow and you can't have them.

4   Deposition transcripts, we've cited them in the briefs, we've

5   attached the transcripts, asking people, you know, in

6   depositions, well you had a meeting, did you talk about

7   alternatives?  Direct you not to answer.  Well, can you at

8   least tell me whether alternatives were discussed?  Direct you

9   not to answer.  That's the deliberative process privilege.

10  They're taking this thing so broadly and so expansively that,

11  you know, the everyday decisions about what word to write in a

12  report is trying to be wrapped up in the deliberative process

13  privilege cause every minute that goes by is some kind of a

14  decision or another and they just stretch this thing beyond

15  anything that the deliberative process privilege would mention

16  and, or would countenance.

17        Now what I'd like to propose, Judge, is that we've

18  cited the law in our brief.  When the plaintiff comes in, and

19  the plaintiff is the United States government, and the

20  plaintiff comes in and sues for fraud, says it doesn't

21  reasonably rely – that it reasonably relied on our

22  representations, says it didn't know and says that it would

23  have acted differently and says that we withheld information

24  from them that would have caused them to take a different

25  course.  That the law, and we cite, you know, really a bunch of

8

1   cases, but we do have the *Garner Supply* case which we cited

2   from this district and we do have the *Department of Economic*

3   *Development v. Arthur Anderson*, which is a Southern District of

4   New York case, two leading cases on the subject.  They

5   basically say when what the government knew and understood is

6   at issue, where adjudication of fraud claims turns on issues of

7   knowledge, reliance and causation, all of which apply to fraud

8   and the False Claims Act, direct evidence of causation is

9   irreplaceable, and they ordered that all this stuff be turned

10  over.

11         So our position is that when the plaintiff brings the

12  action and puts what it knew and puts what it relied on at

13  issue in the case you can't then say, oh, well you know, we did

14  all that but you can't see what we actually thinking.  You

15  can't see what we were actually doing and thinking about and

16  talking about within our own agencies and between agencies and

17  that's not fair.  And, you know, we have a lot of other

18  arguments that, which I'm happy to go through with the Court

19  but – arguments about, you know, where's the prejudice here?  I

20  mean, we're talking about meetings that we had 15 years ago or

21  10 years ago or five years ago or indeed 20 years ago that no

22  one's going to be chilled about.  I mean the law has changed,

23  the Medicare Modernization Act has been entered into, a variety

24  of arguments like that.  Procedural arguments where they did

25  not come in, they haven't identified the prejudice.

9

1          They haven't identified what decision cause to be

2     wrapped within the deliberative process privilege it has to be

3     a pre-decisional document that relates to an identified

4     decision that was ultimately made.  They haven't done that for

5     any document on their list.  And they come in with affidavits

6     only after we file our motion to compel in which we've cited

7     several cases that that alone, the failure to come in on day

8     one with an agency head or a senior person within the agency to

9     claim and identify the privilege in the first instance without

10    waiting for a motion to compel, that that alone is reason

11    enough to wipe out the privilege.

12          So I can go through that.  I can go through examples

13    with the Court.  We can look at the privilege logs itself if

14    you want but my proposal would be we don't have to do any of

15    that and the Court shouldn't have to do any of that if the

16    privilege does not apply.  And I think clearly under the case

17    law it doesn't, so if the Court wants to hear from the

18    government on that maybe it makes sense.

19          THE COURT:  All right.  Why shouldn't I grant your

20    brother's motion?

21          MR. NEIL:  Thank you, Your Honor.  Your Honor, my

22    brother is asking this Court to vitiate or to entirely

23    eliminate an exceptionally important governmental privilege in

24    order to obtain information that, one, they already have access

25    to and, two,--

10

1          THE COURT:  Well, explain yourself--

2          MR. NEIL:  --from other sources.

3          THE COURT:  Explain yourself on that.

4          MR. NEIL:  Let me explain myself.  I think the best

5   way to do that is to look into a specific context.  Let's take

6   a look at the OIG privilege log.  Abbott has requested the work

7   paper files from a very, very large number of OIG audits and

8   inspection reports.  What have we produced in response to my

9   brother's request for production in the OIG context?  Well we

10  produced the reports themselves.  We've produced CMS's comments

11  on those reports.  We produced OIG's response to CMS's formal

12  comments on those reports.  We've produced all of the

13  underlying facts and data--

14         THE COURT:  We're not arguing about what you've

15  produced.

16         MR. NEIL:  Fair enough, Your Honor, but--

17         THE COURT:  It's about what you haven't produced.

18         MR. NEIL:  What we have not produced is a very, very

19  narrow fraction of what we've produced in this case.  Mr. Daly

20  suggested that it's important to his client's to obtain

21  information about what individuals in the government thought,

22  knew, understood, about drug reimbursement.  They have access

23  to that.  They've deposed the authors of any number of these

24  OIG reports.  They've asked them specifically what fact did you

25  rely on?  What did you know about the drug reimbursement

11

1   system?  What did you know about my client's conduct?  All

2   kinds of specific questions.  Those have not generated a

3   request not to answer.  They have access to all of this

4   information.

5           THE COURT:  Then why are you objecting – if those

6   have not generated objections, why are you concerned about the

7   underlying documents?

8           MR. NEIL:  Because the underlying, well, certain

9   underlying documents.  There are certain categories of

10  underlying documents that we've asserted a privilege over and

11  the reasons are set forth in the attached declarations.

12  Essentially, I mean for example in the OIG, you know, in the

13  OIG declaration by Robert Vito who's a regional inspector

14  general with the Office of Inspector General, he, Mr. Vito set

15  forth the process by which inspection reports are finalized.

16  There's a very vigorous internal process in which drafts are

17  circulated, program staff make comments on those drafts, make

18  suggestions, and then the draft is finalized after a meeting

19  with CMS in which representatives from both sides hash out

20  various issues and concerns.  Then at the end of that process

21  CMS comments, OIG finalizes the report and the entire product

22  is published.

23          Mr. Daly and Abbott has access to the final report.

24  They have access to CMS's final formal comments.  And they have

25  access to OIG's response to CMS's formal comments.  They can

12

1   ask individuals within OIG what they thought, what they knew,

2   what they understood and those kinds of questions won't

3   generate objections on this basis.  The drafts themselves and

4   the comments on the drafts of these OIG reports are really the

5   core of the deliberative process.  It is the process of

6   individuals within the Office Inspector General hashing out,

7   debating, discussing, noting objections to a non-final document

8   that then eventually is finalized.  I think Mr. Vito

9   articulated the harm that he felt would come to his program

10  staff if those kinds of comments, if the program staff knew

11  that those kinds of comments were going to be fought over in

12  litigation 10 or 15 years down the road.

13          So the situation with CMS, not to focus exclusively

14  on OIG.  The situation with the CMS in the carrier logs is

15  somewhere.  Abbott filed a request for production – well, let

16  me step back.  In response to subpoenas the United States

17  received in 2004 when the United States was a third party in

18  this MDL, The United States produced documents to a large

19  number of defendants including Abbott.  We produced 115,000

20  pages of documents approximately in response to that subpoena.

21  We withheld approximately 600 documents on deliberative process

22  grounds.  In the instant case Abbott filed a request for

23  production asking for all of the documents that we withheld on

24  deliberative process grounds in our response to the subpoena.

25  We did a re-review and agreed to release about 200 such

13

1    documents but we retained the privilege of approximately 400

2    of those documents.

3           Abbott's got 115,000 pages of documents from that CMS

4    production.  They deposed three former CMS administrators, APEX

5    witnesses, and they deposed them for a total of five days with

6    a sixth day scheduled.  They've asked these administrators

7    about their conversations with Congress, conversations with

8    congressional staff, conversations within the agency that

9    aren't deliberative.  They've obtained an enormous amount of

10   information from these individuals about what they knew, what

11   they understood, what they believed about drug reimbursements,

12   about Abbott, about any number of topics.

13          So what we're trying to protect here is not an

14   extraordinary amount of information.  We're, you know, Abbott

15   has access to information about what the government knew,

16   understood and believed in, you know, a variety of ways.  We're

17   producing that information.  We're continuing to produce that

18   information.  And Abbott can, you know, continue to ask

19   witnesses about it.  We're only withholding a very, very narrow

20   band of documents and a very, very narrow set of information

21   that goes to the core of the deliberative process.  We've been

22   judicious.

23          One other point before we turn back to my brother,

24   there's a real question about the relevance to the specific

25   allegations in this case of the documents on the logs.  One

14

1   thing that Judge Saris has really made clear on a number of

2   statements and rulings that when evaluating issues in this MDL,

3   you really have to look at it on a company by company, drug by

4   drug basis.  I know that Your Honor has embraced that reasoning

5   in a number of your own rulings.  Precious few of the documents

6   on any of these privilege logs involve Abbott at all.  They

7   don't mention Abbott drugs.  They don't mention Abbott the

8   company.  Of the more than 600 documents on the three logs, a

9   very, very rough calculation that I did, if you include Lupron

10  which is not an Abbott drug but is a drug manufactured by TAP

11  in which Abbott is a joint venture, I counted about 60, 60

12  documents that even mentioned Abbott in any way.  That's

13  something I would have to confirm by going to the documents

14  themselves but about 60 documents--

15           THE COURT:  Are you willing to give those 60 over?

16           MR. NEIL:  I don't think they're relevant but I'd be

17  willing to give them to you for an *in camera* review.

18           THE COURT:  I'm glad you're willing.

19           MR. NEIL:  It's better than 600, Your Honor.  So that

20  would be one sort of compromise step that I think we could take

21  here that might facilitate this.

22           THE COURT:  Okay.  I'll think about it.  You know,

23  the two least favorite words for Judges are *in camera* and pro

24  se.

25           MR. NEIL:  We'll understand.  Thank you.

15

1          THE COURT:  Enjoy being a juror, Mr. Shapiro?

2          MR. SHAPIRO:  Would you make me decide?

3          THE COURT:  No.

4          MR. DALY:  Your Honor, a couple of things.

5          THE COURT:  Just briefly, Mr. Daly, and then we'll

6    move on to the next motion.

7          MR. DALY:  Certainly.  If you look at the deposition

8    testimony that we've cited in our briefs and attached, one of

9    things that I think is important to mention is that we've

10   deposed a lot of people.  We're asking them about meetings and

11   events and decisions that were made five, 10, 15 years ago

12   because that's all within the period that the government is

13   suing us for.  Witness after witness is saying I don't

14   remember.  That's 10 years ago, I can't – how can you expect

15   them to remember that?  And we're like, well, we wish we hadn't

16   taken so long but it's not our doing, so these documents are a

17   critical source of information for us.  And one thing that the

18   Court did not hear in Mr. Neil's presentation is any basis for

19   having the privilege apply.

20          They don't address the legal argument that when you

21   put reliance, causation, lack of knowledge, you misled us, you

22   withheld from us, at issue, which they've done by the

23   allegations of their complaint, it's out the window.  You

24   didn't hear anything about that because there's nothing to say.

25   And I think it's a policy position of the government that they

16

1    try to maintain these privileges wherever they can.  But in

2    this case as the cases we've cited have held, when you put it

3    at issue when it is at issue, it's gone.  And giving the 60

4    documents, I mean I definitely object to that.  I don't think

5    we need an *in camera* review of anything here because as a legal

6    matter they have - the privilege doesn't apply because they've

7    put those deliberations, they've put the reasons why they did

8    what they did and didn't do what they didn't do at issue by

9    suing us for fraud.  And I do object to getting 60, Judge.  And

10   I do object to getting an *in camera* review, and I don't have

11   the sense the Court wants to do it today certainly but, you

12   know, I'd be prepared to walk through all 400 with them and I

13   think you'd see, I even have some examples, but we're talking

14   about things that are--

15           THE COURT:  400 or 600?

16           MR. NEIL:  Your Honor, there are approximately 600

17   documents on the three logs.

18           THE COURT:  Yeah.

19           MR. DALY:  But--

20           THE COURT:  All right.  I've heard enough on that.

21   So let's move on to docket entry No. 4135, which is Abbott's

22   motion to compel United States and the Relator for adequate

23   responses.

24           MR. DALY:  Your Honor, this is our motion to compel,

25   which I think through the happening of events and the passage

17

1  of time and some discussions and some additional productions

2  has limited itself to three broad areas which I'll try to get

3  through very quickly.  The first one relates to our

4  interrogatory 3 which simply asks for who received copies of

5  the various OIG reports and other studies, GAO reports, things

6  that were done, all of the documents that the Court has seen

7  several times in various iterations depending on what motion is

8  before you.  But we've said, okay, who got those?  And, you

9  know, they've objected and said well we can't go tell you

10  everybody who got it because we don't know.  So we've said,

11  okay, that makes sense.  I'm not asking you to certify

12  everybody who ever got one of these things but can you at least

13  give us a distribution list?  I mean was there a distribution

14  list, you know, and it would change over time as to who would

15  get this.  Is there a person or persons that we can talk to who

16  could tell us who circulated these things?  Things of that

17  nature of a very general nature and we've been foreclosed on

18  that and we would like to have that.

19          THE COURT:  All right.  Why not, Mr. Draycott?

20          MR. DRAYCOTT:  First of all, they can't have it to

21  the extent we have it and the exhibits to the government's

22  opposition to the motion to compel demonstrates how we've been

23  trying to turn precisely this information over and have been

24  trying to make it available.  And it in fact has been turned

25  over and has been used by Abbott at deposition and if the Court

18

1  will permit me I'll refer Your Honor to a couple of the

2  exhibits.

3          First it's important to understand the process of the

4  generation of these reports and where the critical interaction

5  is.

6          THE COURT:  Well, let's just cut right to it.  Is

7  there somebody who would know?

8          MR. DRAYCOTT:  No.  I think if Your Honor would

9  permit me, I'll explain why this is - what the process is.

10 There is an inspection is begun at within different offices at

11 OIG.  The report is generated and what is a critical, well

12 there's what's called a final draft of that report.  That draft

13 is then sent over to in this case, CMS and CMS then comments on

14 it.  Now with respect to - and later a final draft comes out

15 and attaches a memorandum which contains the agency comments.

16 That draft is then posted on an OIG website and has been for

17 years and that is just available and out there in the public

18 domain.  So this distribution--

19         THE COURT:  Starting in what year was it posted on

20 the website?

21         MR. DRAYCOTT:  I don't - I was afraid Your Honor

22 might ask that--

23         THE COURT:  Then you should have known.

24         MR. DRAYCOTT:  Well, it's as long as - I've been

25 trying actually to find that out.  It's been as long as I can

1  remember and as long as anybody can remember so as long as

2  it's been available, but we'll certainly obtain that

3  information.  But there's no doubt those reports have been

4  generated and posted and they've been in the public domain.

5  But if Your Honor will permit me, with respect to--

6          THE COURT:  Do you have any idea, Mr. Daly, about –

7  are you familiar with this website or?

8          MR. DALY:  Yes, Your Honor.  I don't know the year

9  that it started either, Judge, I apologize.

10         MR. DRAYCOTT:  But that, at any rate that is how

11  these reports are currently posted.  So if I may back up to the

12  final draft and direct your attention – the other thing that

13  Mr. Neil explained is that with respect to that final draft

14  it's then, there's then a referral about the final draft.  And

15  so that's the draft that then goes to the agency and which it

16  gets the agency response.  And so the final report is this

17  thing from the final draft is the critical issue.

18         Now within the work papers if I can direct Your

19  Honor's attention to our Exhibit 4.  I don't know if you have

20  it in front of Your Honor--

21         THE COURT:  I don't.

22         MR. DRAYCOTT:  But what it is is these are rosters.

23  Now the material that hasn't been reviewed from these work

24  paper productions are the types of information they're set out

25  in Exhibit 4 which is a roster of the conference that occurred

20

1    between CMS and OIG regarding the report.  This is, if you'll

2    permit me to quote those, and this is where the rubber meets

3    the road, this is who was consulted on the final draft.  And if

4    you look at the first page of Exhibit 4 it identifies not only

5    the individuals but their affiliation within CMS.  So this is

6    the most direct, this is absolutely the core document if you

7    want to look at where the information that is being generated

8    in the context of inspection is going within CMS.  It's the

9    roster that reflects the exit conference with respect to that

10   draft.

11           THE COURT:  All right.  Mr. Daly, what do you think

12   is out there that you don't have?

13           MR. DALY:  Your Honor, we've asked in depositions,

14   for example, who's in charge of circulating the stuff.  Counsel

15   is talking about the pre-finalization of the report where you,

16   you have these meetings where people are talking about what the

17   reports say.  That's one of the things we want that they're

18   hiding under the deliberative process privilege.  But what I'm

19   asking for is where does the report go after it's done.  In

20   other words, before it was posted on the internet which can't

21   be any later in time than probably the late `90's and a lot of

22   these reports go back to 1992, 1991, even the late `80's.  Who

23   was in charge of circulating those?  We want to know what

24   federal agencies it went to.  We want to know who was in charge

25   of sending it to the states and by what means because a lot of

21

1    these are Medicaid--

2            THE COURT:  All right.  The government's ordered to

3    produce somebody to address these issues.

4            MR. DALY:  Thank you, Your Honor.

5            THE COURT:  Next?

6            MR. DALY:  Your Honor, the next category is what I'll

7    call generally documents gathered during their 11 year

8    investigation of Abbott before they unsealed.  And basically

9    what we're asking for here is to give us copies of subpoenas or

10   certificates of their civil investigative demands that you

11   served on third parties.  Give us the documents that you got

12   pursuant - I mean if we had been in litigation if they'd

13   unsealed we'd have all this stuff because they'd be Rule 45

14   subpoenas.  So they spent 11 years digging up stuff and dealing

15   with their investigation.  We'd like to have that.  We're not

16   asking for their work product.  We're asking for stuff that

17   they've got.  They've told us for example--

18           THE COURT:  Well let's narrow it into categories.

19           MR. DALY:  Okay.

20           THE COURT:  Other than stuff.

21           MR. DALY:  Sorry, Judge.  Witness statements, they've

22   told us that we can have those.  They say we've gotten them in

23   the Texas litigation.  We've asked, well, we--

24           THE COURT:  Okay, any additional witness statements

25   that have not been produced.

22

1      MR. DRAYCOTT:  They've all been produced.

2      MR. DALY:  We'd like them then to be produced in our

3  case because, you know, these cases are separate, and if that's

4  true then they should just reproduce them to us.  There aren't

5  that many.

6      THE COURT:  How many?

7      MR. DRAYCOTT:  There are a few categories of witness

8  statements.  There are six which we have confirmed were

9  produced.  These were voluntary statements that were taken for

10 six individuals.  They were turned over by the state of Texas

11 to Abbott in May of 2006.  I thought this was a frankly a dead

12 issue based on my conversation with other Abbott counsel.

13 They've absolutely got the witness statements.  The other

14 category of statements--

15     THE COURT:  So can you agree to that, Mr. Daly, that

16 in that category that you have them someplace?

17     MR. DALY:  If counsel is certifying that we have that

18 category through the Texas litigation--

19     THE COURT:  Okay, moot then.

20     MR. DALY:  --then I'll accept that, Your Honor.

21     MR. DRAYCOTT:  I'll give Mr. Daly the names of the

22 six individuals and if he, if for any reason Abbott doesn't

23 have them they can come back to us.

24     THE COURT:  All right.  What about the other

25 category?

23

1          MR. DRAYCOTT:  The other category is there is, there

2    are no, there are – the way the government can take statements

3    is pursuant to a CID.  We have no statements pursuant for a CID

4    but our federal CID, that is our Civil Investigative Demand

5    Statute places severe restrictions on what we can do by way of

6    dissemination of material that we, the, for example,

7    transcripts that we obtained.  That's not really the issue

8    because we don't have deposition transcripts.  The state of

9    Texas has its own False Claims Act under which it has a similar

10   procedure for taking something called an examination under

11   oath.  There was some coordination between the state of Texas

12   and the United States in which the United States has what are

13   called EUO's--

14          THE COURT:  How many people?

15          MR. DRAYCOTT:  --examinations under oaths.  Those,

16   all the EUO's that were taken by the state of Texas that we've

17   had access to have also been turned over to Abbott by the state

18   of Texas.  But as I explained to Abbott counsel was is that

19   given that I'm completely unfamiliar with restrictions on

20   dissemination of statements that were taken pursuant to a Texas

21   law--

22          THE COURT:  All right.

23          MR. DRAYCOTT:  --I would just prefer because of any,

24   because the state of Texas is better able to deal with

25   restrictions on dissemination if there are any in their

24

1   statute, that they get them from the state of Texas which

2   they've done.  There's a complete production of the EUO's by

3   the state of Texas to Abbott.  They've got them all.

4           THE COURT:  Okay.  He thinks you have them, Mr. Daly.

5   I want you to meet and confer to determine whether or not in

6   fact you do have them if you don't figure out a way to produce

7   them.

8           MR. DRAYCOTT:  With respect to the other category

9   which is the documents we have from a very – the documents that

10  we've obtained during the investigation, we have been

11  absolutely explicit from an early point in this case and indeed

12  I've made an attachment to our opposition all the transmittal

13  letters by which we have provided third party materials that we

14  obtained and it's only being produced.  There are some

15  documents which haven't and those have been the subject of

16  correspondence between myself and Abbott counsel where there is

17  pricing information from other companies that were included on

18  third party material.  We've asked them to respond how we

19  should deal with that.

20          THE COURT:  All right.  As to this category it sounds

21  as if Abbott may actually have the documents.  So sit down,

22  find out if in fact you have them.

23          MR. DALY:  Very well, Your Honor.

24          THE COURT:  Next category?

25          MR. DALY:  We would like, whether there's an EUO or a

25

1   formal statement, we would like a list of witnesses that the

2   government interviewed which, you know, cause there may be

3   people we want to go out and depose because it factored into

4   their investigation.

5           THE COURT:  Time period?

6           MR. DRAYCOTT:  Your Honor, just if I could--

7           MR. DALY:  Time period of their investigation, you

8   know, from `95 to 2006--

9           THE COURT:  All right.

10          MR. DALY:  --when they unseal it.

11          MR. DRAYCOTT:  Your Honor, on this category I think

12  the most significant thing is when I asked Abbott counsel

13  whether or not they would be willing to produce a list of

14  people they interviewed once they learned of the government's

15  investigation.  I was told in no uncertain terms that that was

16  privileged information.  It would not be something that would

17  be turned over by Abbott.

18          THE COURT:  Well you can file your motion to compel

19  if you--

20          MR. DRAYCOTT:  Your Honor, my point is I don't

21  believe that this is a proper - it is work product and what

22  Abbott did--

23          THE COURT:  The identities are work product?

24          MR. DRAYCOTT:  Yes, I think so, Your Honor.  This is

25  not, this is just who we decided to interview.  In the same way

26

1  - we're not suggesting that we're not going to turn over this

2  category of information because Abbott won't.  We think it's an

3  improper--

4          THE COURT:  What's your case?

5          MR. DRAYCOTT:  --request.

6          THE COURT:  What's your - give me a case that the

7  identities are work product.

8          MR. DRAYCOTT:  I think the ones cited in the brief

9  all go to that issue which is that the fact - even the

10  questions that are asked to that third party witness are

11  protected work product.

12          THE COURT:  We're not talking about the questions.

13  We're talking about the identity.

14          MR. DRAYCOTT:  Well, Your Honor, I think that what

15  I'm asking Your Honor to consider is whether or not Abbott is,

16  this is a credible argument that's not protected when Abbott is

17  asserting exactly the same privilege with respect to that

18  information when it's in Abbott's--

19          THE COURT:  That's a tit for tat.  That argument

20  doesn't--

21          MR. DRAYCOTT:  The question I'd respectfully ask Your

22  Honor to ask Mr. Daly is, is he willing to produce to us

23  precisely the same category of information that he is asking

24  the government to produce?

25          THE COURT:  No, I'm not going to ask him that.  You

27

1   want to file a motion, if you want to file a request you can

2   request and then we'll deal with it in turn.

3           MR. DRAYCOTT:  And also, Your Honor--

4           THE COURT:  I don't see any reason why - I don't see

5   that the identities of the individuals--

6           MR. DRAYCOTT:  Your Honor, it reflects - it is who we

7   elect to go out and interview.  It's a judgment about

8   investigative and it turns us to who the, who may have

9   information that's relevant.  It is absolutely reflects a

10  judgment about whether or not--

11          THE COURT:  All right.  I'll take another look at the

12  cases but my inclination is that I will probably permit it.

13  All right, Mr. Daly?

14          MR. DALY:  Your Honor, in terms of pre-unsealing and

15  investigation documents, the other thing we've asked for is the

16  Relator when it files its complaint it files something, it

17  gives to the government what's called a Relator's statement

18  which under the False Claims Act is an assimilation of the

19  facts, you know, as a matter of statute, of facts that upon

20  which they base the complaint that they filed that they then

21  give to the government with the complaint and say do you want

22  to intervene.  We have asked for the Relator's statement that

23  was filed with the or given to the government in connection

24  with the complaint that was filed against Abbott in 1995, and

25  we've also asked and could even do these together, who within

28

1    the government got that and who got the Relator's complaint?

2    So in other words, go back in time because this goes to

3    knowledge for example because it's got all these facts about

4    Abbott and others in there.  It's got all these facts about the

5    spread.  We would like to have those facts because they're just

6    facts, number one.  And then we want to know to whom within the

7    government was it distributed because that will tell us who got

8    the stuff, who knew, who read it and we can go talk to them if

9    necessary.

10          MR. DRAYCOTT:  There is clear case law that the

11   disclosure statement is a work product document.  With respect

12   to the facts therein this is a case in which relators have

13   served initial disclosures and have answered discovery from

14   Abbott.  The disclosure statement is not simply a listing of

15   facts, but it's an explanation as to the significance of those

16   facts.  It's a laying out of legal theory.  It's tying them

17   together.  With respect to the facts that are in relator's

18   possession that's turned over in the initial disclosures, it's

19   subject to discovery which is ongoing in this case.  The only

20   thing that the disclosure statement adds to that is it presents

21   the analysis of relator's counsels and lays out and ties up and

22   is a presentation of a legal theory associated with that.  It's

23   clear work product.  There's clear case law that it's protected

24   and there's just no need to turn it over.  It's also

25   irrelevant.  It doesn't - what Abbott has to defend against in

29

1   this case is the allegations in the complaint not what's in

2   the disclosure statement.  The disclosure statement is not part

3   of the file.  It's not by statute required to be served on in

4   the court.  It is just served on the Attorney General.  So it's

5   not a matter of them getting access to a document under seal

6   because it's not under seal because it's not ever served with a

7   court.  So it's not a matter of disclosing something that's

8   somehow part of the record in this case which any Court has

9   ever seen.  It's clearly a work product and there's just no

10  relevance here and there's no need for it given that all the

11  facts in relator's possession are, is evidence that can come

12  out in the course of discovery.

13          THE COURT:  All right.

14          MR. ANDERSON:  Your Honor, if I may because this is

15  also pending against the Relator, I'd also add that even

16  Abbott's case law cited in their briefs recognizes that opinion

17  work product is protected and that's only the portions of the

18  disclosures that they don't have.  All of the underlying facts

19  have been produced that were part of the disclosure.  So even

20  their precedent that they are relying upon in their briefing is

21  perfectly in tune with what the Relator has produced so far.

22          MR. DALY:  Your Honor, we're not seeking opinion work

23  product, I mean, they could redact this if need be.  But I

24  don't know how counsel can say that the facts upon which the

25  complaint that was filed against us in 1995 are irrelevant.

30

1    They are not irrelevant and we don't know that it's been

2    produced.  The government has refused to give it to us.  Maybe

3    they're saying that bits and pieces of it have been produced in

4    other context, I don't know.  But in terms of our request to

5    get the Relator's statement we've been completely foreclosed on

6    that.

7           MR. DRAYCOTT:  That's certainly not my position, Your

8    Honor.  The facts obviously they're entitled to.  What is

9    irrelevant is a theory that may be expressed, a legal opinion

10   that's expressed in a disclosure statement that isn't part of

11   the complaint is just not a legal theory that has to be

12   defended against in this case.

13          THE COURT:  All right, denied at this time.

14          MR. DALY:  Your Honor, what about the two issues that

15   I tied to that.  One, who got it within the government and then

16   who got the Ven-A-Care complaint that was filed in 1995?  Would

17   I be entitled to that?

18          THE COURT:  What is your position on that?

19          MR. DRAYCOTT:  Again, when we asked counsel for

20   Abbott whether or not they were going – Abbott's been aware of

21   this investigation from the first subpoena or first CID that

22   was served and their position in terms of who they spoke to

23   with the company about that investigation, when it occurred,

24   who they went to in the company for information about the

25   investigation, all of it according to Abbott is protected,

1    privileged information that they will not disclose.  We agree

2    with that position.  What we disagree with strenuously is that

3    somehow that these arguments only cut in one direction, that

4    the same type of information when it's being held by Abbott is

5    absolutely privileged and we agree it is privileged and it's

6    also irrelevant.  It's not, you know, who the government in its

7    judgment within another branch of government or anywhere else

8    elected to consult about a complaint is not the evidence in

9    this case.  And again, I want to make clear that we're not

10   objecting to this because Abbott won't turn it over.  I think

11   Your Honor should be very skeptical on argument that this is

12   somehow non-privileged information they're entitled to when

13   precisely the same category of information they're asserting a

14   privilege, won't turn it over and have said, you know, you

15   don't get it.

16          THE COURT:  All right, denied at this time.  Anything

17   else, Mr. Daly?

18          MR. DALY:  Yes, Your Honor.  The third – that was all

19   the investigatory information.  The final category is we've

20   asked for the government to produce to us their evidence of

21   false claims and false statements, kind of a basic aspect of

22   the case.  They've sued us under the False Claims Act.  We've

23   asked for them to identify the false statements we made, the

24   alleged misrepresentations.  What were they?  When were they?

25   What was wrong with them and what they should have been?

32

1    That's on the false statement side.  On the false claims side

2    under the False Claims Act, we've said, give us the false

3    claims and we've even offered for them to do representative

4    samples of both.  In other words for each year, for each NDC,

5    give us the misrepresentations or the representations, give us

6    the alleged false claims and we'll start there because it is a

7    large job.

8           One of the problems is that with Medicare for example

9    I think the Court's heard mention that there are, you know,

10   twenty some carriers that actually processed the claims for

11   Medicare, they all have different AWP's that they use so the

12   same drug Abbott's Vanco, for example, for one carrier might be

13   reimbursed at $3 and for another carrier it's $15.  Well, you

14   know what, the fraud claim that they make is going to be

15   different for each one of those.  So we've asked them to come

16   forward on that.  On the Medicaid side as the Court is aware,

17   the state has a slightly different and sometimes dramatically

18   different way to reimburse these drugs.  Some of them do a lot

19   of AWP's, some of them do it on other reporting prices.  Some

20   of them put max or FUL's, maximum allowable costs or federal

21   upper limit type numbers on them and so the government has sued

22   us for all of the reimbursements by the states under Medicaid,

23   and we think it's only fair that they have to come forward and

24   show us what's false and show us what it should have been.  And

25   giving us, which they're in the process of doing, claims

33

1   information, doesn't cut it because all claims information is

2   going to say that on such and such a date the state of

3   Connecticut paid $25 for a vial of Vanco and it's going to be,

4   you know, embedded in data.  That's not going to tell us what's

5   false, what it should have been or anything like that.  So

6   that's why we've offered at least preliminarily for them to do

7   a representative sample of these items NDC by NDC, year by

8   year.

9          THE COURT:  Why not?

10         MR. DRAYCOTT:  Absolutely they're entitled to the

11  claim data as I think Mr. Daly just indicated.  We are

12  endeavoring to produce it.  It is a time consuming process

13  because of the manner in which this data is maintained.  It's

14  an antiquated system.  We can't simply download the claims data

15  to a hard drive.  We have to – and we are now in consultation,

16  that is the technical components of the two offices with Abbott

17  trying to figure out the format in which the claims data can be

18  produced.  And there's two--

19         THE COURT:  All right, so you're going to get the

20  claims data.

21         MR. DRAYCOTT:  Well, just to be--

22         MR. DALY:  Right.  They're working on it, correct.

23         MR. DRAYCOTT:  --fair to Mr. Daly, I think there's

24  two components of what he's talking about in terms of the

25  damage analysis.  The other part of it of course is what the,

34

1   it reflects the amounts that were paid and the claims that

2   were paid with respect to the subject drugs at issue.  The

3   other component is of course what should have been paid by the

4   just as Abbott has requested data information from the

5   government.  We in the same way have asked for sales and

6   transaction data from Abbott.  That is only now beginning to be

7   forthcoming and there is a back and forth between other folks

8   in my office and Abbott trying to, you know, they appear to

9   have produced some electronic media with transactional data on

10  it.  We're now trying to figure out how to open it, how to read

11  it, figuring out what kind of format it's in.  Until all that

12  is done and we can figure out what the transactional prices

13  were which is then going to indicate the range of which the AWP

14  actually should have been reported, you know, that is just a

15  time consuming process and it requires information from Abbott

16  in order for us to then be able to come up with a damage

17  calculation which will then of course will be expressed in an

18  expert report and is going to be I think the subject of a

19  future round of discovery when it comes down to the expert

20  phase of this litigation, at least the expert phase of the

21  discovery process.  And it's just too earlier for the

22  government to, since we have not even been able to open yet the

23  Abbott transactional data that we certainly can't provide that

24  information yet.

25          MR. DALY:  Just as I said, they are giving us the

35

1   claims data.  My point about that is that our requests aren't

2   about the claims data.  Our request is about what's false.

3   What's the false statement?  What's the false claim?  And we

4   believe, and as I tried to explain, the data isn't going to

5   answer that.  The data is just going to give us a transaction

6   price of 20 or 30 or 10 or 15 or $20, whatever it might be.

7          THE COURT:  Well can you tell them how in what format

8   you want this into?

9          MR. DALY:  We have, Your Honor, in a letter.  It's

10  Exhibit 8 to our brief.  We've asked them to give us by NDC by

11  year for Medicaid, I'm sorry, Medicare, a statement of, you

12  know, what's false, what's the false statement?  What are you

13  saying we misrepresented?

14         THE COURT:  All right, why not?

15         MR. DRAYCOTT:  Well we've indicated – we've indicated

16  that it is the statement, the AWP statement through the

17  compendia which again is this is a, in order to answer this

18  question you have to understand the context in which these

19  claims are made which is that the AWP is not a--

20         THE COURT:  Trust me counsel, I understand.

21         MR. DRAYCOTT:  --is not, if I've been presumptuous I

22  apologize, Your Honor.  But the reported price actually doesn't

23  go to the government.  It goes to the private compendia.  And

24  that is a transaction which the government is not a direct

25  party and certainly that is an area of discovery that we're

36

1   taking against Abbott to get those statements.  But that's

2   going to be the core statement.  With respect to the claim then

3   that, the claim which is rendered false by that statement of an

4   inflated AWP is the one that's paid for the beneficiary and

5   that's the claims data we're trying to produce and we are in

6   the process of producing.  And I think the other part of this

7   is, is again the falsity is--

8           THE COURT:  All right, I'm going to wait until

9   everything's produced.  Denied without prejudice.  You can

10  renew it after you get a look at everything.

11          MR. DALY:  I understand, Your Honor.  Judge, that's

12  all that there is on that motion.

13          THE COURT:  All right.  So the final motion is the

14  motion for a protective order.

15          MR. DALY:  Yes, Your Honor.

16          THE COURT:  4135.

17          MR. DALY:  And that I believe is ours as well, Judge.

18          THE COURT:  Yep.

19          MR. DALY:  This is the argument concerning the

20  government's notice for a deposition of Myles White--

21          THE COURT:  Right.

22          MR. DALY:  --who is the chief executive officer and

23  the chairman of the board of my client, Abbott Laboratories.

24  As the CEO and chairman, Mr. White is protected from potential

25  harassment and abuse by the law that the Court's seen in the

37

1   briefs about what a party has to do in order to get an APEX

2   deposition.  The standard is clear that Mr. White must possess

3   what the cases call unique personal knowledge of the subjects

4   relevant to the case and the government must show that they

5   have attempted less burdensome means to get the same

6   information that they are seeking from the senior officer and

7   we've cited a variety of cases for those two points.

8           As to the second point about trying to exhaust other

9   means to get the information that they seek, the government

10  hasn't done anything.  They haven't said, they haven't argued

11  the point.  They say they don't have to.  Well, in fact, under

12  the case law they do because it makes sense to do it because,

13  you know, the law is there for a reason.  The law is there, you

14  only get these people when you have a real need to do it.  And

15  so we didn't even confer about this.  We attached the letter

16  that the government wrote to us following our meet and confer.

17  And this is the government's letter and they gave us four

18  reasons why they say that they want to take Mr. White's

19  deposition.

20          The first reason that they give in their letter is

21  that Mr. White was the recipient of a litigation hold memo that

22  went to about 70 other people.  You know, your typical form,

23  you know, there's litigation or there's an investigation,

24  please maintain your files.

25          THE COURT:  And has the letter been produced?

38

1          MR. DALY:  Yes, Your Honor.

2          THE COURT:  It has.

3          MR. DALY:  But the fact that somebody got a

4    litigation hold memo doesn't get you to take the deposition of

5    the CEO and chairman of the board of a company.  Unless the

6    Court has any questions, I don't have anything left to say

7    about that particular reason.

8          Reason number two, they say they want to inquire of

9    Mr. White about briefings that he may have gotten about

10   congressional inquiries or other investigations.  Well, by

11   defining it in that way about briefings is Mr. White is being

12   told things by other people.  By definition therefore he

13   doesn't have unique personal knowledge of the subject that he's

14   being briefed by others.  So I think that topic is outside the

15   scope of what they can do because it's not unique.  It's by

16   definition not unique.  And we've filed also a short affidavit

17   from Mr. White that confirms that.

18         The next reason given is that he was the addressee of

19   a letter written by Congressman Stark several years ago.  We've

20   cited the cases that indicate that getting a letter in the

21   course of a litigation or pre-litigation isn't something that's

22   subjects an APEX executive to a deposition.  Mr. White's

23   affidavit addresses this by saying that he, you know, he's

24   advised by others from time-to-time about, you know, pricing,

25   marketing, issues like that relating to the price of drugs and

39

1   so I think we've addressed that in the sense that there's no

2   indication that he has any unique knowledge about this and

3   getting a letter from a congressman in and of itself is not

4   reason to put somebody out for a deposition.

5             THE COURT:  And has the letter been produced?

6             MR. DALY:  Yes.  The government sent it so they have

7   it.

8             THE COURT:  Yeah.

9             MR. DALY:  It's out there.  It's something that's

10  been around for a number – I think it's a, I want to say it's a

11  2000 letter, Your Honor.

12            The final reason given is that they say that because

13  Mr. White is the CEO he's responsible for everything and,

14  therefore, he's responsible for Abbott's ethics and compliance

15  policy and we want to talk to him because he's the CEO.  If

16  that were true the CEO being responsible ultimately for

17  everything that goes on in a corporation they would be deposed

18  everyday, all day in any case against these sorts of companies,

19  and I don't think that that's reason enough.

20            I guess there was one more reason, Judge, and that is

21  they wanted to ask him about the TAP settlement, that's in

22  their letter which we attached.  The Court's already ruled that

23  out of the case in terms of discovery so I don't have anything

24  more to say about that particular issue.

25            So we had a meet and confer.  They gave us a letter,

40

1  it's attached.  That's what they say they want to do.  I don't

2  think that those fall within any categories.  They've done

3  nothing on any of those categories to see if, you know, by

4  written interrogatories or some other means, they can't get the

5  information that they are seeking.  They say they don't have to

6  do that, that they can just go right to the top.  I think the

7  law is to the contrary.

8          THE COURT:  All right, who's going to address that?

9          MR. NEIL:  It's me, Your Honor, thank you.  First of

10 all you might have been wondering why the state of Texas was

11 here, and my colleague Ray Winter from the state AG's office is

12 here because they've also noticed the deposition of Mr. White

13 in connection with their state case against Abbott.  In fact if

14 the Court grants this, I'm sorry, if the Court denies the

15 motion and Mr. White is deposed there will be several

16 plaintiffs and we'll obviously work with them to coordinate as

17 necessary any deposition.  But I don't want to be presumptuous.

18 Let me argue the merits first.

19         As Your Honor's well aware you've already allowed the

20 deposition of the CEO's in these cases.  I think AstraZeneca

21 attempted to get a protective order or didn't produce a CEO for

22 a deposition.  In the course of that there's a motion to compel

23 by the MDL plaintiff's and you recognized that there are very

24 important issues at stake in these cases and that corporate

25 wide knowledge about how the company decided the price of

41

1  spreads is something that's very important and is relevant to

2  this case.  So you allowed the deposition of AstraZeneca's CEO

3  when they didn't want to produce it.  And it's my understanding

4  also that you allowed the deposition of Bristol Myers Squibb or

5  if you didn't allow it they didn't fight it necessarily.  But

6  CEO's have been deposed in these cases cause they're very

7  significant cases.  And in fact on the government's side we've

8  allowed the deposition of three CMS administrators.  CMS

9  administrators are the equivalent of a CEO.  They run obviously

10 multi, hundreds of millions of dollars for federal program of

11 health care.  You know that.  And that's cause there are

12 important issues at stake and the government didn't try and

13 block those depositions, although Abbott's, you know, if you

14 try, it we tried to establish whether Abbott had shown the

15 specific knowledge of Abbott's conduct and possession of those

16 CMS people I think it'd be hard to do.

17         But more importantly let me go through the reasons.

18 Mr. Daly discussed the reasons that we articulated for taking

19 Mr. White's deposition and he didn't quite do them 100%

20 justice.

21         In September of 2000 the House Ways and Means

22 Committee was investigating Abbott at the same time the

23 government was and news broke.  And when the news broke of that

24 Abbott's CEO, Mr. White, was questioned about it and he made

25 various public statements.  He talked about how if there are

42

1    abuses in the system, they need to be fixed, the AWP system.

2    He talked about the structure of the regulations.  He talked

3    about the, you know, some of these allegations from the Ways

4    and Means Committee in 2000 might have been politically

5    motivated.  He displayed a deep knowledge of the issues that

6    were involved in terms of AWP pricing and the government

7    reimbursement for drugs.  That's not where the story ends

8    obviously.

9          In October of 2000 Congressman Stark, the ranking

10   democrat on the House Ways and Means Committee sent a letter to

11   Mr. White.  It wasn't just any letter, Your Honor.  Congressman

12   Stark basically went through and wrote a seven-page letter with

13   11 exhibits, it's an attachment to Abbott's motion for a

14   protective order as well as our opposition, where he went

15   through and systematically described what he thought was a

16   fraud that was being committed against the United States, the

17   same fraud that we're now suing Abbott on.  He went through and

18   he pointed out that none of this was sanctioned by any

19   governmental entity whether it was the executive branch or the

20   legislative branch.  And he also pointed out the public health

21   concerns that are arising from it cause one of the drugs that

22   we sued on is Vancomycin and there's over prescription of

23   Vancomycin which led to a real problem cause it's an antibiotic

24   last resort.  He wrote that letter in October of 2000.  It's

25   not everyday that a CEO gets a letter from a congressman

43

1   accusing the company of fraud.  And I think the United States

2   is entitled to ask Mr. White what he did when he received that

3   letter.

4          Now in the briefings Abbott writes that, you know,

5   there's no evidence that Mr. White got the letter.  Well, if he

6   didn't get the letter why did he put it in the affidavit he

7   submitted to the Court?  You know, there is a lot of factual

8   background that we need to find out what happened when that

9   letter was received.  Now something did happen when that letter

10  was received, Your Honor.  Abbott ended the fraud.  The

11  fraudulent scheme in this case ends in May of 2001.  And it

12  ends in May of 2001 and there are documents that we finally

13  received from Abbott that indicate that reason why the fraud

14  ended in May of 2001 was in part because the public scrutiny

15  that was coming from Congress and the press related to Abbott's

16  pricing policies could not justify, was not justified by the

17  amount of profit the company is earning.  And there's a

18  memorandum that discusses it that we have with our materials

19  that we submitted in our opposition.  But there's a direct link

20  between the letter from Congressman Stark to Mr. White to a

21  major corporate decision to end the way that Abbott was pricing

22  its drugs in our view ends the fraudulent scheme here.

23         In some respects Mr. White may very well be the hero

24  of the story for us in terms of being the one who decided that

25  as a corporate matter I'm the CEO, I'm tired of Congress coming

44

1    in and accusing us of fraud, we need to change what's going on

2    here.  And they did ultimately change it.  So he's at the core

3    of the end, the end of the fraud in this case.  And there's

4    nothing in the affidavit that he submitted that indicates

5    otherwise.  The only thing you have in the affidavit is a know

6    nothing affidavit, I don't know anything, what I knew I knew

7    from secondary sources.  Well as Your Honor knows from the

8    *Traveler's* decision in this district where Judge Collings said

9    that these kinds of know nothing affidavits, you know, are

10   subject to discovery, are subject to questioning because if

11   they didn't know anything it could be telling.  If Mr. White

12   got a letter from a congressmen accusing him of fraud and

13   throws it in the trash can well that actually goes to the

14   company's scienter cause under the False Claims Act if a

15   company CEO is deliberately ignorant when put on notice of a

16   fraud that's relevant to scienter.  And based on the

17   evidentiary record that we've seen he didn't just throw it

18   away.  Someone, Mr. White, and we'll find out from Mr. White

19   whether he was the hero of the story, ended the fraud and

20   that's what we want to get to the bottom of.  Thank you, Your

21   Honor.

22            THE COURT:  Briefly, Mr. Daly.

23            MR. DALY:  Yes, Your Honor.

24            THE COURT:  I'll get to you.

25            THE COURT:  Your Honor, the Stark letter as the

45

1   affidavits to the attached state was never responded to first

2   of all.  Second of all, as Mr. White says in his affidavit, you

3   know, events surrounding that would have been discussions with

4   counsel and they would be privileged.  One of the things that

5   you don't hear in the argument from the government is that any

6   suggestion that this individual's knowledge is unique, if they

7   want to know, and they do want to know and they have been

8   asking questions of others, you know, what happened?  Did you

9   get the Stark letter?  You know, what changes did you make, why

10  did you make them, et cetera, et cetera, et cetera, go ahead

11  and ask away.  But what they have to do to get Mr. White is

12  show that there's something unique about his knowledge because

13  the cases make clear that at most I think my brother, Mr.

14  Gobena, his argument would suggest that Mr. White might have

15  discoverable information.  The cases make clear that that's not

16  enough.  You need to have unique personal knowledge that you

17  can't get from anybody else and we've heard nothing that

18  remotely suggests that there's something that they can only get

19  from Mr. White.

20        THE COURT:  What's your response to that?

21        MR. NEIL:  My response is that a letter was sent from

22  a congress person to Mr. White, the CEO of the company.  The

23  only person who's going to know whether he received it, how he

24  reacted to it, the way he directed to do firsthand is going to

25  be Mr. White.  It's not going to be anyone else.  I don't think

46

1   the United States should be required to go and get hearsay

2   testimony--

3            THE COURT:  All right, you can ask him that in

4   written deposition questions, three written deposition

5   questions, and then you can renew this motion.

6            MR. NEIL:  Okay.

7            MR. GOBENA:  I take it then, Your Honor, that you

8   wouldn't want to hear from me on this?

9            THE COURT:  Well, if you'd like to speak I'll always

10  let you speak but I think that's going to be my approach.

11  Unless you have some further information beyond what's in your

12  papers as to his specific knowledge.

13           MR. GOBENA:  I do, Your Honor, I'll be brief.

14           THE COURT:  All right then.

15           MR. GOBENA:  First, I would ask that the Court review

16  the *Travelers'* opinion that came out of this district.

17           THE COURT:  I know the *Travelers'* opinion.

18           MR. GOBENA:  And I think it sets forth a standard

19  that is slightly different in significant ways than my brother,

20  Mr. Daly, set forth.  I think in pertinent part it does not

21  state that this knowledge has to be at the level that he

22  requires, but furthermore I want to say specifically that I

23  personally have taken the deposition of several witnesses and

24  this memo where pricing changes are instituted by Abbott and

25  explicitly mention the Stark letter, the 2000 Stark letter

47

1  addressed to Myles White individually, that is specifically

2  mentioned in the memo as a part of the reason why these changes

3  are being instituted.  That has been marked as Exhibit 940.  We

4  have asked several witnesses if they have seen that.  Do they

5  know anything about that memo and they all say no.

6         Now, the reason why I mention that is because this

7  letter from Congressman Stark went to Myles White.  However it

8  was delegated by Mr. White a response was provided.  The

9  response was not in a written response to Congressman Stark.  A

10  response was in the form of a change in their price reporting

11  and price setting conduct.  That I think is very pertinent.

12  And the *Travelers'* opinion says that when you have a case that

13  involves motive and intent getting testimony from the APEX

14  individual is critical because ultimately that has far more

15  probative value about what the corporation intended, what the

16  corporation motives were.

17         THE COURT:  Well, I'm not saying that you're not

18  going to be permitted to have that deposition, but what I'm

19  saying is as a preliminary matter I will allow three written

20  deposition questions on this limited area, and you can renew

21  the motion after that if you're not satisfied with the

22  information you get and you think you need then to have this

23  live deposition.  So it's a start.

24         MR. GRABINO:  I understand.  Thank you, Your Honor.

25         THE COURT:  All right.  So as to docket entry 3959,

48

1   the motion on deliberative process, I'm going to take that

2   under advisement and give you a short ruling.  As to 4135,

3   allowed in part and denied in part as set froth in the record

4   in open court.  And as to 4202, it's denied except to the

5   extent that you may file three written deposition questions as

6   set forth specifically in court.

7          All right, hearing nothing else – all right and I

8   appreciate counsel accommodating the change in the Court's

9   schedule.

10          MR. DALY:  Thank you very much, Judge.

11          MR. NEIL:  Thank you, Your Honor.

12          THE COURT:  You're welcome.

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

49

1                          CERTIFICATION

2          I, Maryann V. Young, court approved transcriber, certify

3     that the foregoing is a correct transcript from the official

4     digital sound recording of the proceedings in the

5     above-entitled matter.

6

7     /s/ Maryann V. Young                July 30, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

                         *MARYANN V. YOUNG*
                      **Certified Court Transcriber**
                          **(508) 384-2003**