UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF AN AWARD OF TREBLE DAMAGES IN CONNECTION WITH THE CLASS 2/3 TRIAL**

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ....................................................................................................1

II. THE LAW...............................................................................................................2

III. ARGUMENT..........................................................................................................4

A. Defendants Collectively Committed Willful And Knowing Violations..................4

B. AstraZeneca Committed Willful And Knowing Violations ....................................8

C. BMS Committed Willful And Knowing Violations ...............................................9

D. Schering-Plough/Warrick Committed Willful And Knowing Violations .............10

IV. CONCLUSION.....................................................................................................11

# TABLE OF AUTHORITIES

## CASES

**PAGE**

*Computer Sys. Eng'g, Inc. v. Qantel Corp.*,
571 F. Supp. 1365 (D. Mass. 1983) ........................................................... *passim*

*Computer Sys. Eng'g, Inc. v. Qantel Corp.*,
740 F.2d 59 (1st Cir. 1984) ........................................................................................2

*Grossman v. Waltham Chem. Co.*,
436 N.E.2d 1243 (Mass. App. Ct. 1982) ..................................................................4

*International Fid. Ins. Co. v. Wilson*,
443 N.E.2d 1308 (Mass. 1983) ....................................................................... *passim*

*Montanez v. Bagg*,
510 N.E.2d 298 (Mass. App. Ct. 1987) ....................................................................3

*Shaw v. Rodman Ford Truck Ctr., Inc.*,
477 N.E.2d 413 (Mass. App. Ct. 1985) ........................................................2, 3, 8

*Terrie v. Crosbie*,
1990 Mass. App. Div. 188, 190 Mass. App. Div. Lexis 95
(Mass. App. Ct. Nov. 5, 1990)..........................................................................3, 8

*Whelihan v. Markowski*,
638 N.E.2d 927 (Mass. App. Ct. 1994) ....................................................................3

## I. INTRODUCTION

Chapter 93A commands the imposition of double or treble damages when the Court finds that a defendant has committed a "willful or knowing violation" of the statute. Case law has established that a "knowing" violation occurs when the defendant made representations that it knew were untrue. *See, e.g.*, *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1375 (D. Mass. 1983). A defendant commits a "willful" violation when it makes a representation in "willful disregard for truth or falsity of the fact represented." *Id.* at 1375. Now that the Court has ruled that AstraZeneca, BMS and Schering-Plough/Warrick have each violated Chapter 93A, it must use its discretion to decide whether these Defendants have "committed relatively innocent violations of the statute's substantive provisions" or, instead, engaged in willful or knowing conduct justifying the imposition of penalties under Chapter 93A. *International Fid. Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1316 (Mass. 1983).

Under either standard, the Court's trial findings establish that each Defendant committed willful or knowing violations of Chapter 93A. These Defendants are not innocent violators. To the contrary, the Court has repeatedly found that Defendants published or caused to be published ***false*** AWPs; ***well understood the consequences*** of doing so, to wit, causing Medicare, its beneficiaries and private insurers to make inflated drug reimbursements; and, nonetheless, intentionally ***exploited*** the system by marketing the spread. As the Court summarized, Defendants "***unscrupulously*** took advantage of [the] flawed AWP system by establishing secret mega-spreads between the fictitious reimbursement price they reported and the actual acquisition costs of doctors and pharmacies" and then marketed those spreads. Findings of Fact and Conclusions of Law, June 21, 2007 (hereinafter "Trial Ruling") at 5 (emphasis added).

Plaintiffs respectfully submit that the Court's findings at trial are more than ample to support the imposition of multiple damages under Chapter 93A. Massachusetts courts have

awarded multiple damages in much milder circumstances.[1] Given the Court's findings, double damages are mandatory. However, Plaintiffs believe that Defendants' conduct and the Court's trial findings justify the imposition of treble damages and respectfully request that the Court award them.

## II. THE LAW

Section 9(3) of Chapter 93A directs the Court to award "up to three but not less than two times" actual damages "if the court finds that the use or employment of the act or practice was a willful or knowing violation . . . ." As the court explained in *International Fid. Ins. Co. v. Wilson*, 443 N.E.2d 1308 (Mass. 1983), the possibility of an award of multiple damages under Chapter 93A creates two classes of defendants: (i) those "who have committed relatively innocent violations of the statute's substantive provisions", and (ii) those "who have committed 'willful or knowing' violations." *Id.* at 1375. Thus, the Court must employ its discretion and determine the degree of culpability under the "willful" or "knowing" standards. *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1375 (D. Mass. 1983).

In what the First Circuit would later commend as a "comprehensive and scholarly analysis" of the meaning of "willful or knowing violation,"[2] Judge Keeton surveyed the Massachusetts case law and distilled the following guidelines. To prove that a defendant committed a "***knowing***" violation, "the plaintiff may show that agents of the defendant knew that the fact they represented to be true was not true." 571 F. Supp. at 1374-75 (emphasis added); *see also Shaw v. Rodman Ford Truck Ctr., Inc.*, 477 N.E.2d 413, 415 (Mass. App. Ct. 1985) (A misrepresentation known to be false when it is made can be found to be a "knowing" violation of

[1] *See, e.g., Qantel*, 571 F. Supp. at 1372, 1377 (misrepresentations made to a commercial entity regarding a software product).

[2] *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 68 (1st Cir. 1984). The Massachusetts Court of Appeals would later refer to Judge Keeton's opinion as "well reasoned." *Shaw v. Rodman Ford Truck Ctr., Inc.*, 477 N.E.2d 413, 415 (Mass. App. Ct. 1985).

Ch. 93A.). In some cases, knowing future consequences and not just existing facts could suffice. *Qantel*, 571 F. Supp. at 1374. In other words, one may act "knowingly" with respect to a result if he or she is "aware that it is practically certain that his conduct will cause such a result." *Id.* (quoting ALI Model Penal Code § 202(b) (1962)). It is not necessary to prove that the defendant knew that its acts violated Chapter 93A, although this sort of proof would suffice. *Id.* at 1376.

To prove the defendant committed a "***willful***" violation, the plaintiff may prove that agents of the defendant made a representation in "willful disregard for truth or falsity of the fact represented." *Id.* at 1375 (emphasis added); *accord Shaw*, 477 N.E.2d at 415. It is not necessary to prove that the actor either knew or acted in reckless disregard to the fact that the action was in violation of some unspecified law. *Id.* at 1376-77; *see also Montanez v. Bagg*, 510 N.E.2d 298, 300 (Mass. App. Ct. 1987).

Judge Keeton also provided a "global" boundary on both definitions: Mere negligence does not suffice under either prong. *Qantel*, 571 F. Supp. at 1374.

Fact patterns justifying awards of multiple damages under Section 9 include a property manager choosing to remain uninformed about building code requirements when replacing a glass door in an apartment in disregard of risk to tenant's safety, *see Whelihan v. Markowski*, 638 N.E.2d 927 (Mass. App. Ct. 1994); reckless disregard for truth or falsity in representations regarding a software product, *Qantel*, 571 F. Supp. at 1372, 1377; knowledge of the inaccuracy of representations that a home had hardwood flooring under the carpet, *see Terrie v. Crosbie*, 1990 Mass. App. Div. 188, 189, 1990 Mass. App. Div. Lexis 95, at *5 (Mass. App. Ct. Nov. 5, 1990); landlord's knowledge that apartment was uninhabitable, *see Montanez*, 510 N.E.2d at 300; misrepresentations relating to the sale of a truck, *see Shaw*, 477 N.E.2d 413; a plan of deception whereby misrepresentations were made to obtain a work contract, *see International*

*Fid.*, 443 N.E.2d at 1311, 1313; and knowingly failing to disclose beetle damage to a home, *see Grossman v. Waltham Chem. Co.*, 436 N.E.2d 1243, 1245-46 (Mass. App. Ct. 1982). Plaintiffs submit that Defendants' conduct here was substantially more egregious than the conduct of the defendants in these surveyed cases, and that treble damages should result.

## III. ARGUMENT

The Court's liability findings compel the imposition of not only multiple damages under the above standards, but of ***treble*** damages against Defendants AstraZeneca, BMS and Schering-Plough/Warrick.

### A. Defendants Collectively Committed Willful And Knowing Violations

At the outset of the Court's Trial Ruling, the Court underscored the egregiousness of ***all*** of the Defendants' actions, conduct that caused substantial injuries to the government and all Class Members:

> Many pharmaceutical companies unscrupulously took advantage of [the] flawed AWP system by establishing secret mega-spreads between the fictitious reimbursement price they reported and the actual acquisition costs of doctors and pharmacies. These spreads grossly exceeded the standard industry markup. The publication of false, inflated AWPs caused real injuries to the government, insurers, and patients who were paying grossly inflated coinsurance payments for critically important, often life-sustaining drugs. Once the mega-spreads became widely known, the conduct was still egregious under the unfairness prong of Chapter 93A because neither the third party payors nor the government could move quickly or effectively to fix the problem.

Trial Ruling at 5.

With respect to the devastating impact of Defendants' actions, the Court highlighted the burden shouldered by the vulnerable patient who was required to make 20 percent co-pays on the inflated AWPs. *Id.* at 20. Importantly for purposes of demonstrating a "knowing" violation, the Court found that the Defendants "***understood well***" this impact on the patient (citing

AstraZeneca's Buckanavage as an example),[3] were "***aware***" of the political ramifications of raising AWPs (citing J&J Dooley memo), and "***understood***" that their strategy "had the effect of inducing doctors to prescribe a drug at least partly based on return to practice rather than just on the therapeutic quality of the drug." Trial Ruling at 20-21 (emphasis added). Moreover, even though BMS and J&J instituted internal ethical guidelines to ban marketing the spread, the Court found it "remarkable . . . how few of the pharmaceutical witnesses at trial were concerned about the impact of an inflated AWP on old and sick people making co-payments based on a percentage of AWP." *Id.* at 22.

The Court made even more findings on a global basis that buttress the inevitable conclusion that, collectively, Defendants "willfully and knowingly" violated Chapter 93A. For instance, the following findings highlight the fact that Defendants knowingly and willfully exploited an entrenched AWP system:

- Defendants "published false AWPs (or their formulaic counterparts: false WACs or WLPs) ***knowing*** that TPPs and the government did not understand the extent of the mega-spreads between published prices and true average provider acquisition costs." *Id.* at 144 (emphasis added).
- "[D]efendants ***knew*** that neither the government nor the TPPs could do much to change the AWP reimbursement benchmark because they were locked into the nationwide reimbursement scheme established by statute or contract." *Id*. at 144 (emphasis added).

[3] *See Qantel*, 571 F. Supp. at 1374 (discussing that a defendant acts "knowingly" with respect to a result if he or she is "aware that it is practically certain that his conduct will cause such a result") (quoting ALI Model Penal Code § 202(b) (1962)).

- The industry "***understood*** that if the size of spreads and the marketing of spreads became public, a public relations nightmare would ensue. As such, the manufacturers insisted on confidentiality in physician contracts and lobbied to undermine government surveys." *Id.* at 147 (emphasis added).
- "Significantly, the defendants ***well understood*** the devastating impact the mega-spreads had on old and sick patients required to make co-payments they could ill afford, and set up programs to help some needy patients by subsidizing their costs. The spiraling drug costs incurred by third-party payors and the government, however, were never a concern." *Id.* at 147 (emphasis added).
- "Furthermore, several pharmaceutical witnesses confirmed causation by testifying that they ***knew*** that TPPs and consumers were paying more for a drug every time the AWP was raised. Plaintiffs' damages were not only foreseeable, defendants were ***well aware*** of them throughout the class period." *Id.* at 148 (emphasis added).

And the following findings underscore the "unscrupulous[]," "egregious," "unethical" and "oppressive" nature of Defendants' conduct:

- "***Unscrupulously*** taking advantage of the flawed AWP system for Medicare reimbursement by establishing secret mega-spreads far beyond the standard industry markup was ***unethical and oppressive***. It caused real injuries to the insurers and the patients who were paying grossly inflated prices for critically important, often life-sustaining, drugs. . . . This is exactly the sort of false and misleading information for which Chapter 93A is intended to provide relief." *Id.* at 145 (emphasis added).

- Once mega-spreads became widely known in 2001, "the conduct was still ***egregious*** under the unfairness prong of Chapter 93A because neither the TPPs nor the government could move quickly or effectively to fix the problem." Even though, in retrospect, the Medicare statute created perverse incentives by "putting the proverbial pharmaceutical fox in charge of the reimbursement chicken coop," defendants "unfairly took advantage of the system by setting sky high prices with no relation to the marketplace." *Id.* at 146 (emphasis added).
- Marketing spreads was "***particularly outrageous and unethical***," as even some participants in the industry recognized. *Id.* at 146 (emphasis added) (citing to BMS and J&J instructions to sales teams, although instructions "were often ignored").

These findings alone justify the imposition of treble damages under Chapter 93A's "willful and knowing" standards. These are not defendants "who have committed relatively innocent violations of the statute's substantive provisions." *International Fid.*, 443 N.E.2d at 1316. Rather, each Defendant knew that it was making false representations about the pricing of the Subject Drugs, well understood the impact that those misrepresentations would have on the Medicare program, its beneficiaries and private insurance companies, yet exploited the system by establishing mega-spreads and then marketing those spreads. Given Defendants' knowing and willful gaming of the system, and their cavalier demeanor with respect to the sheer magnitude of the harm perpetrated, there should be no question that Defendants here have engaged in willful and knowing violations, especially given the less egregious conduct of other defendants against whom Massachusetts courts have awarded multiple damages under Chapter 93A. *See, e.g.*, *Qantel*, 571 F. Supp. at 1372, 1377 (misrepresentations regarding software in a transaction

between two commercial entities); *Shaw*, 477 N.E.2d 413 (misrepresentations relating to the sale of a truck); *Terrie*, 1990 Mass. App. Div. Lexis 95, at *5 (misrepresentations relating to flooring of home).

But there is more, as the Court has also made specific findings against each individual Defendant that support an award of multiple damages.

## B. AstraZeneca Committed Willful And Knowing Violations

The Court has determined that AstraZeneca "continued to increase WAC and the corresponding AWP such that beneficiaries and TPPs were forced to pay higher amounts despite the falling sales price of Zoladex." Trial Ruling at 161-62. Moreover, the Court found "particularly troubling that AstraZeneca raised AWP in 1998 in order to torpedo Medicare's attempt to reign in costs by reducing reimbursement to 95% of AWP in the BBA." *Id.* at 162. As the Court has found, all of this was part of AstraZeneca's carefully considered strategy to compete with Lupron. AstraZeneca decided that, "[i]n order to compete in [a] market dominated by Medicare, there needs to be a compelling argument based on 'total return to practice.'" *Id.* at 52. Thus, the Court explained, "AstraZeneca chose to begin offering discounts to its physicians, while continuing to make increases in the WAC price and the corresponding AWP," which it ***knew*** to be "a fictitious and artificial number . . . ." *Id.* at 52-53. AstraZeneca then actively marketed the spread "with gusto," *id.* at 163,[4] even in the face of acknowledged concerns that doing so was unethical and/or illegal. *Id.* at 55.

In sum, AstraZeneca willfully and knowingly chose to join TAP in a race to the bottom. It chose to increase spreads and then market those spreads even though some at AstraZeneca

[4] *See also id.* at 54-55 (citing examples of AstraZeneca's spread marketing campaign).

recognized the nefariousness of doing so. And AstraZeneca was callous with respect to the consequences of its misrepresentations and manipulations, as the Court has highlighted:

> Despite understanding that patients and payors were paying for Zoladex based upon these inflated AWPs, AstraZeneca seemed unconcerned. Alan Milbauer, AstraZeneca's VP of Public Affairs, acknowledged that "yes, the reimbursements went up, but it was overall less cost to the health care system and less cost to the patient. So I actually felt good about that."

*Id.* at 54 (citing trial transcript).

AstraZeneca has engaged in willful or knowing violations of Chapter 93A, and the Court should award treble damages against AstraZeneca.

**C. BMS Committed Willful And Knowing Violations**

The Court found that BMS "knew, expected, and intended that when it reported a price, the publications would predictably calculate an AWP that was 20 to 25 percent higher than WLP," was "actively involved with approving the AWP before publication," and therefore "at times fully control[led] the AWP for its drugs." *Id.* at 69-70. The Court also made additional findings about BMS's knowledge, findings that demonstrate that BMS committed knowing and willful violations of Chapter 93A:

> BMS was ***well aware*** that AWP was used as a reimbursement mechanism both under Medicare Part B and through private reimbursement plans. . . . ***BMS also knew that AWP was an 'artificially inflated number.'*** (PX 195) Yet despite these understandings, there was very little concern, if any, about payors and cancer patients overpaying for their drugs. Sales Representative Douglas Soule best summed up the attitude of BMS when he said, "it's just the system." . . . . When asked if it ever bothered him that people were paying a percentage of a phony price, he finally responded, "No."

*Id.* at 74 (citations omitted) (emphasis added). The Court decried the "mega-spreads" that BMS established for some drugs, like Vepesid and Cytoxan, calling the spreads "shocking and on their

own prove a sufficient degree of unfairness and deception . . . because they are so oppressive and injurious to the insurers and patients who must pay such inflated prices." *Id.* at 172.

And despite having a "clear policy" against spread marketing, there was substantial evidence demonstrating that BMS representatives marketed the spreads. *Id.* at 73-74. That is, they knowingly and willfully did something that even BMS acknowledged was wrong. As an example, the Court explained how "BMS carefully educated its sales force on the reimbursement system, the existence of the spread, and the subsequent profitability for a doctor administering Taxol," thereby ensuring that representatives were "fully prepared to discuss the spread and profitability." *Id.* at 80. The Court went on to cite numerous examples of the "substantial evidence" of spread marketing activities for Taxol. *Id.* at 80-81. The Court also referred to the ubiquitous "Cost Differential" report, which serves as a "significant piece of spread marketing evidence that applies to all the BMS drugs at issue here." *Id.* at 74.

BMS has engaged in willful or knowing violations of Chapter 93A, and the Court should award treble damages against BMS.

**D. Schering-Plough/Warrick Committed Willful And Knowing Violations**

The Court found that Warrick never lowered reported AWPs despite offering significant discounts that reduced ASPs and was "well aware of the role that the spread played in driving purchasing decisions for [its] products." *Id.* at 91. Further, Warrick increased the spreads on albuterol over time, and the spreads for every NDC in every year were over 100%, reaching over 800% in 2003. *Id.* at 100. The Court condemned the mega-spreads and Warrick's active knowledge of the impact those spreads had on Class Members: "the persistent existence of mega-spreads is by itself unfair to insurers and patients who are paying based on a median AWP that has no relation to real acquisition costs. ***Warrick continued this practice despite knowing that patients were overpaying for the drug***." *Id.* at 176 (emphasis added).

Schering-Plough/Warrick has engaged in willful or knowing violations of Chapter 93A, and the Court should award treble damages against Schering-Plough/Warrick.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court treble the amount of damages awarded against Track 1 Defendants AstraZeneca, BMS and Warrick.

DATED: August 1, 2007.

By **/s/ Steve W. Berman**
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL 60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE**
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 1, 2007, I caused copies of **PLAINTIFFS' MEMORANDUM IN SUPPORT OF AN AWARD OF TREBLE DAMAGES IN CONNECTION WITH THE CLASS 2/3 TRIAL** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

**/s/ Steve W. Berman**
Steve W. Berman