UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK 1 TRIAL | Judge Patti B. Saris |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF TRACK 1
<u>DAMAGES SUBMISSION</u>**

I.   INTRODUCTION

Pursuant to the Court's directive, Plaintiffs submit the attached damages proffer, based on calculations performed by Dr. Hartman, which are summarized in the accompanying Declaration of Raymond S. Hartman. Nominal damages and prejudgment interest for each Defendant are as follows:

|  | Class 2 | Class 3 |
|---|---|---|
| **AstraZeneca** | | |
| Nominal through 2002 | $2,090,103 | $4,451,429 |
| With Prejudgment Interest | $3,901,892 | $8,310,176 |
| Nominal through 2003 | $2,609,466 | $5,556,047 |
| With Prejudgment Interest | $4,727,292 | $10,665,696 |
| **Bristol-Myers Squibb** | | |
| Nominal through 2002 | $187,789 | $183,454 |
| With Prejudgment Interest | $346,549 | $347,306 |
| Nominal through 2003 | $266,848 | $183,454 |
| With Prejudgment Interest | $472,194 | $347,306 |
| **Warrick** | | |
| Nominal through 2003 | $5,752 | |
| With Prejudgment Interest | $10,890 | |
| Nominal through 2003-Competitive Price | $2,288.848 | |
| With Prejudgment Interest | $4,223,337 | |

* Note: The 2003 damages for Warrick are <u>not</u> the product of an extrapolation and are based on 2003 data provided by Warrick.

In addition, although the above numbers do not include trebling, Plaintiffs are seeking treble damages under Chapter 93A. The reasons supporting an award of treble damages against each of these three Defendants are detailed in a separate pleading. *See* Plaintiffs' Memorandum In Support of an Award of Treble Damages in Connection with the Class 2/3 Trial (Dkt. No. 4533).

Applying treble damages to the above yields the following damages for each Defendant:[1]

|  | Class 2 | Class 3 |
|---|---|---|
| **AstraZeneca** | | |
| Treble damages through 2002 with prejudgment interest on nominal portion only | $8,082,098 | $17,213,034 |
| Treble damages through 2003 with prejudgment interest on nominal portion only | $9,946,224 | $21,176,790 |
| **Bristol-Myers Squibb** | | |
| Treble damages through 2002 with prejudgment interest on nominal portion only | $722,127 | $714,214 |
| Treble damages through 2003 with prejudgment interest on nominal portion only | $1,005,890 | $714,214 |
| **Warrick** | | |
| Treble damages through 2003 with prejudgment interest on nominal portion only | $22,394 | |
| Treble damages 2003-Competitive Price with prejudgment interest | $8,801,033 | |

Plaintiffs and the above Defendants attempted to reach agreement on the manner in which damages should be calculated under the Court's Class 2/3 Trial Ruling, with varying levels of success, as detailed below.[2]

---

[1] Prejudgment interest does not apply to treble damages and will apply only to the nominal portion. *McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188, 196 (Mass. 1990).

[2] No Defendant has consented to an award of treble damages against it.

## II.     ARGUMENT

**A.     AstraZeneca**

As of this writing, AstraZeneca has not disputed the method employed to calculate the damages proffered by Plaintiffs. Damages for Class 2 through 2002 with prejudgment interest are $3,901,892. For Class 3, the number is $8,310,176. *See* Hartman Decl., Table 2. Treble damages, with prejudgment interest only on the nominal portion, are $8,082,098 for Class 2 through 2002 and $17,213,034 for Class 3 through 2002.

**B.     The BMS Group**

Plaintiffs and BMS have narrowed their disagreement to one discrete issue: the method of calculating prejudgment interest. BMS believes that Plaintiffs are entitled only to simple interest. Plaintiffs believe that BMS's actions, as well as simple notions of economic fairness, support using the compound method.[3] Damages for Class 2 through 2002 with prejudgment interest using the compound method come to $346,549. For Class 3, the number is $347,306. *See* Hartman Decl., Table 2. Treble damages, with prejudgment interest only on the nominal portion, are $722,127 for Class 2 through 2002 and $714,214 for Class 3 through 2002.

"Whether to compound interest is within the sound discretion of the judge." *See, e.g., Scott v. Boston Hous. Auth.*, 835 N.E.2d 278, 280 (Mass. App. Ct. 2005) (discussing issue under Ch. 231, § 6B in discrimination case); *Chokel v. First Nat'l Supermarkets*, 660 N.E.2d 644, 652 (Mass. 1996). Absent express statutory authority, BMS claims that compound interest can be awarded only in proceedings in equity, yet *Scott* – which announced that the decision to award compound interest is discretionary – was not a proceeding in equity. Moreover, BMS cannot

---

[3] Simple interest is interest paid on the principal only and not on accumulated interest. Compound interest is interest paid on both the principal and the previously accumulated interest. BLACK'S LAW DICTIONARY at 830-31 (8th ed. 2004).

point to a single case under Chapter 93A in which a court refused to award compound interest for the reason that it was not available.

"Whether to award compound interest is left to the discretion of the court. In exercising that discretion, a court should take into account the nature and degree of the misconduct and the circumstances of the case." *Boston Safe Deposit & Trust Co. v. Seifert*, 1997 Mass. Super. Lexis 566, at *19 (Mass. Super. Ct. Jan. 27, 1997) (citing *Shulkin v. Shulkin*, 16 N.E.2d 644 (Mass. 1938)). Based on the Court's findings with regard to the seriousness of each Defendant's conduct, including BMS, the Court should exercise its discretion to apply compound interest and thereby award a higher measure of prejudgment interest to the Class – a measure that truly makes the injured whole. After all, the Court has repeatedly found that all Defendants, including BMS, published or caused to be published false AWPs; well understood the consequences of doing so, to wit, causing Medicare, its beneficiaries and private insurers to make inflated drug reimbursements; and, nonetheless, intentionally exploited the system by marketing the spread. *See generally* Plaintiffs' Memorandum In Support of an Award of Treble Damages in Connection with the Class 2/3 Trial.

Furthermore, economic fairness commends adopting the compound approach:

> Conceptually, the proper way to calculate prejudgment interest is to use the compound interest formulation. Compound interest is required because prejudgment interest is not paid to the plaintiff as it accrues, but is retained by the defendant until the judgment is enforced. . . . Thus, each period the defendant's obligation to the plaintiff increases. Compound interest accounts for this effect. . . .
>
> The award of compound interest is also consistent with commercial practices. . . . Although some commercial contracts call for simple interest, these are almost exclusively short-term contracts of known duration. . . . Simple interest is almost never provided when there is no requirement to pay interest as it accrues and the loan is for an indefinite duration.
>
> Finally, fairness and efficiency require that interest be

> compounded. Simple interest unfairly favors the defendant. With simple interest, the plaintiff is not fully compensated and the defendant does not fully pay for the harm caused. As a result, simple interest underdeters the defendant and overdeters the plaintiff from engaging in the activity that produced the harm. In addition, simple interest encourages the defendant to drag on legal proceedings. . . .

Michael S. Knoll, *A Primer on Prejudgment Interest*, 75 TEX. L. REV. 293, 307-08 (1996) (footnotes omitted); *see also Chokel*, 660 N.E.2d at 652 (citing Grant, *Appraisal Rights: Allowance for Prejudgment Interest*, 17 B.C. INDUS. & COM. L. REV. 1, 19-20 (Nov. 1995) for the proposition that "compounding interest is the only way to make the award of interest truly compensatory"). Indeed, awarding compound prejudgment interest "is the ***norm***" in federal court. *See, e.g., American Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937-38 (7th Cir. 2003) (emphasis added) (citing *In re Oil Spill by the Amoco Cadiz off the Coast of France*, 954 F.2d 1279, 1331-32 (7th Cir. 1992); *West Virginia v. United States*, 479 U.S. 305, 310 (1987)); *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) ("Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded."); *United States v. Pend Oreille County Pub. Util. Dist. No. 1*, 135 F.3d 602, 613 (9th Cir. 1998). It is also the method used to award post-judgment interest in federal court, whether the underlying claim is based on federal or state law. *See* 28 U.S.C. § 1961(b); *Rowe v. Marietta Corp.*, 1999 U.S. App. Lexis 189, at *18-19 (6th Cir. Jan. 6, 1999).

BMS should not escape paying the full measure of damages that it has wrought by only having to pay simple interest. Compound interest is more appropriate.

### C.     Schering-Plough/Warrick

With regard to Schering-Plough/Warrick ("SPW"), the Court has indicated that it will measure Class 2 damages based on the difference between the actual median AWP and the but-for median AWP had Warrick reported a true AWP for albuterol. Findings of Fact and

Conclusions of Law, June 21, 2007 (hereinafter "Trial Ruling") at 177.  Plaintiffs respectfully submit that this approach will not compensate the Class 2 Members for the damages that they have sustained as a result of SPW's violations of Chapter 93A and will permit Warrick to escape paying meaningful damages to redress its wrongful conduct.  Therefore, the Court should adopt a damages approach that fully compensates Class 2 members for their losses – one based on a competitive benchmark as described below.

### 1. Warrick Damages Should be Measured against A Competitive Benchmark in Order to Remove the Effects of Deliberate AWP Inflation on the Median

As it should, the Court is attempting to award overcharge damages.  For example, with respect to BMS, the Court has determined that the overcharge damages are the difference between the ASP for BMS's brand drug and the corresponding median at which reimbursements were made.  Trial Ruling at 171, n.86.  This approach compensates for overcharges actually incurred by Class Members because, had BMS reported a true AWP for its branded multi-source drugs, Medicare would have reimbursed based on that branded drug's AWP, rather than the inflated median, and Plaintiffs and Class Members would have paid less.  *Id.* at 152.  In other words, the but-for ASP serves as the uninfected benchmark.

Unlike the "BMS paradigm," where the infected median is eliminated by awarding the difference between the median AWP at which reimbursements were made and BMS's ASP (that is, what the AWP should have been), constructing a "but-for" median by looking only at Warrick's minimal effect thereon ignores the fact that *the median itself is still infected, that is, the product of unfair and deceptive conduct*.  Thus, the Court has chosen an alternative benchmark that is itself the product of wrongdoing and, consequently, the Class Members will not recoup all of the damages sustained as a result of SPW's unlawful conduct and will likely only recover a very small fraction of those damages.

As the Court has recognized, Medicare reimbursed multi-source drugs at 95% of the lesser of the median of the generic AWPs or the lowest brand AWP.  Trial Ruling at 151.  "For these Part B drugs, the branded drugs nearly always had higher AWPs such that in actuality Medicare reimbursed based on the median generic AWP."  *Id.*  As the Court has found, Warrick set its AWP for albuterol by "following the standard industry practice of listing the generic AWP 10%-20% below the branded drug's AWP."  *Id.* at 154.  Indeed, the Court acknowledged that "***all*** twenty-nine or so generic manufacturers of albuterol did independently post inflated AWPs ***which caused the median itself to be inflated, which in turn caused substantial overpayments by TPPs and patients***."  *Id.* (emphasis added).[4]  The Court also concluded that, "when one manufacturer causes the median to be inflated, it affects reimbursement for every manufacturer's version of the drug" without regard to who manufactured the particular version used by a plaintiff.  *Id.* at 156.

Thus, trying to limit recoverable damages to a small slice represented by Warrick's discrete impact on the already inflated median does not account for the true damages suffered by the Class.  Nor is doing so commensurate with SPW's wrongdoing.  First, as the Court highlighted, a manufacturer, like Warrick, that inflates its AWP causes damage to all purchasers, even of other drugs.  Second, the median AWP is *itself* necessarily inflated because it is pegged to the brand drug's inflated AWP – in this case, **Schering-Plough's Proventil** for most of the Class Period.  As Dr. Hartman has explained, "[t]he apparent Nash equilibrium in the dispersion of generic AWPs is often linked to the AWP of the branded drug for which the generics are bioequivalent.  Hence, the entire dispersion, including the median, is artificially inflated to the extent the branded AWP is artificially inflated."  Direct Testimony of Raymond A. Hartman at

---

[4] The Court thus adopted, inferentially, Dr. Hartman's tacit Nash equilibrium theory wherein all manufacturers of a multi-source drug maintain the median AWP as high as possible.  *Id.* at 153.

29 (Dkt. No. 3296).  Dr. Hartman demonstrates how the albuterol median is pegged to the AWP of Proventil:

**Figure 1.C**

**Proventil, Ventolin, and Albuterol Sulfate 0.5% (J7611) AWP per Unit**

[Chart showing AWP per Unit from 1991-2004 with series: SP Proventil AWP, GSK Ventolin AWP, Generic AWPs, Median Generic AWP. Source: 1991-2004 RedBooks]

*See id.* at 32, Figure 1.C.  Although the Court did not assign liability to Proventil, the Court did find that its AWP was inflated, at times as much as 60%.  Trial Ruling at 175-76.

Therefore, SPW is wholly responsible for the inflated median:  Schering-Plough guaranteed that the median would be inflated by inflating its AWP for the brand, Proventil, and Warrick added "insult to injury" by also reporting inflated AWPs for the generic version.  This "one-two punch" is not at all reflected in the damages theory employed by the Court, which awards minimal damages as the difference between an extremely inflated AWP and a lower yet substantially inflated AWP.  And even if SPW had not been the brand leader, the median should still not be used given the Court's finding that *all* manufacturers of albuterol reported inflated AWPs.

In order to remove the infected median, damages should be assigned to Warrick based on the difference between the median AWP and Warrick's ASP adjusted for the 30% threshold, bringing Warrick damages more in-line with the BMS paradigm.[5]  In choosing a competitive benchmark in this manner, the infected median – which is the result of SPW reporting inflated AWPs for **both** Proventil and Warrick's albuterol – is removed.  As Dr. Hartman explains, "had the generic manufacturers behaved competitively, they would have driven their prices to cost, which is essentially the same for these manufacturers.  As a result, the ASPs of these manufacturers would have been essentially the same."  Hartman Decl. at 5.  Under this approach, Class 2 damages through 2003 with prejudgment interest equal $4,223,337.  *See* Hartman Decl., Table 3.b.  Treble damages, with prejudgment interest only on the nominal portion, are $8,801,033.

This is consistent with damages methodologies in other, yet applicable, contexts.  An example is provided by antitrust law, where damages are commonly measured as the difference between the anticompetitive price and what the price would have been in a competitive market unaffected by the anticompetitive activity – an approach frequently referred to as the "yardstick" approach and not dissimilar from Dr. Hartman's yardstick methodology here.  For instance, in *In re: NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996), the court described as "widely accepted" damage methodologies that, among other things, compared (i) spreads on Class securities with spreads in a subsequent time period, after collusion ended, and (ii) spreads on Class securities on the NASDAQ market with those on comparable securities traded on other markets that are competitive.  *Id.* at 521; *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591-92 (7th Cir. 1998) (approving

---

[5] The Court did not address this issue in its Trial Ruling and therefore did not explicitly reject it.  Perhaps the Court was not focused on it.

yardstick approach based on prices charged by non-conspirators in other markets during same time period at issue); ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS (6th ed. 2007) at 841 ("The 'yardstick' approach compares profits earned or prices paid by a plaintiff with the corresponding data for a firm or market unaffected by the violation. . . . In either case, the plaintiff is required to show that the two sets of time periods, firms, or markets are generally comparable except for the effect of the violation.") (footnotes omitted (citing cases).

The seminal point of these authorities is that an uninfected benchmark must be used to remove the effects of anticompetitive activity. Unfortunately, as presently formulated, the Court's approach here does not account for the already inflated median at issue. Nor does it account for SPW's pivotal role in creating that inflated median by reporting an inflated AWP for the brand and Warrick's role in creating mega-spreads. Indeed, under the Court's theory, SPW is arguing that damages are *zero* – that it can get away with its wrongful conduct. This is not an equitable result given the Court's findings and, if maintained, will likely result in minimal damages in the Track 2 case, where the majority of drugs at issue are multi-source.

### 2. In the Alternative, Warrick Should Pay $10,890 in Damages

Under the Court's damages approach to Warrick, nominal damages are $5,752, or $10,890 with prejudgment interest. *See* Hartman Decl., Table 3.a. Treble damages, with prejudgment interest only on the nominal portion, are $22,394.

Warrick contends that damages are zero. The difference between Warrick's approach and Plaintiffs' approach is that Plaintiffs enact a literal interpretation of the Court's order, basing damages on the difference between the median AWP and the but-for median AWP. Warrick instead uses a fundamental billing unit approach that leaves no damage.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a damages judgment against Track 1 Defendants AstraZeneca, BMS and Warrick in the amounts proffered by Plaintiffs.

DATED:  August 1, 2007.

By   /s/ **Steve W. Berman**
      Thomas M. Sobol (BBO#471770)
      Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 1, 2007, I caused copies of **PLAINTIFFS' MEMORANDUM IN SUPPORT OF TRACK 1 DAMAGES SUBMISSION** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

                                          **/s/ Steve W. Berman**
                                          Steve W. Berman