**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
|  | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| CLASS 2 |  |

**WARRICK PHARMACEUTICALS CORPORATION'S**
**MEMORANDUM REGARDING CLASS 2 DAMAGES**

**PRELIMINARY STATEMENT**

In its June 21, 2007 Findings of Fact and Conclusions of Law on Classes 2 and 3 (the "Opinion"), the Court held that Warrick is liable to Class 2 to the extent that, as a result of reporting a lower price for its generic albuterol 0.5% solution, "the median would have shifted downward and a lower price would have been used for Medicare reimbursement." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *41 (D. Mass. June 21, 2007). In fact, lowering Warrick's AWP for that product would not have affected Medicare reimbursement at any point during the class period. While the Court found that a lower Warrick AWP for the product in 1998 and 1999 would have had a small effect on the *median used to calculate reimbursement,* the *actual reimbursement rate* paid by Medicare would have remained unchanged, at $0.14 per milligram. The lack of impact follows as a matter of simple arithmetic from established CMS procedures that are supported by record evidence and other authoritative sources. CMS reimbursed in 1998 and 1999 for the 0.5% albuterol solution in

units measured in milligrams (not milliliters) and only on the basis of whole cents. When CMS-reimbursement procedures are followed, it is clear that the small effect the Court found Warrick's AWP had on the "but for" median makes no difference in the reimbursements that would have been paid by CMS. Because CMS methodology results in no change in the reimbursement amount, and thus, no damages, claims for 0.5 % solution in 1998 and 1999 stand on the same footing as all the other albuterol claims for which the Court found no causation and therefore no liability. *See id.* at *73. Accordingly, the Court should enter judgment for Warrick.

## ARGUMENT

The Court found Warrick liable for its 0.5 % albuterol solution in 1998 and 1999 to the extent that lowering Warrick's AWP in those years would lower "the median used for reimbursement" such that "plaintiffs paid a higher reimbursement amount" than they otherwise would have paid. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *63-64. However, under the CMS methodology for converting a median to a reimbursement rate, the decrease in AWPs identified by the Court would not result in Plaintiffs paying a higher reimbursement amount. To the contrary, under Medicare's reimbursement methodology, in both 1998 and 1999, the actual median AWP and the "but for" median AWP that would have resulted from lowering Warrick's AWP yield the exact same Medicare reimbursement: $0.14 per mg. *See id.* at n.78 (providing "actual" and "but for" median AWPs for 1998 and 1999, measured in milliliters). Because the Medicare reimbursement rate would not have been any lower if Warrick's AWP were lower, Class 2 members paying 20% of that

reimbursement rate would not have paid less; therefore, the Class experienced no damages.[1] It follows from this Court's analysis that there is no "but for" causation and therefore no liability.

## I. LOWERING WARRICK'S AWP WOULD HAVE HAD NO IMPACT ON REIMBURSEMENT.

Warrick could only have caused damage to the Class for its generic albuterol if a lower AWP would have caused "a lower price . . . for Medicare reimbursement." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *41; *see also id.* at *63 ("Plaintiffs must prove that Warrick was a 'but for' cause of their injuries when purchasing albuterol sulfate. In other words, plaintiffs must show that they would not have suffered the same injury if Warrick had reported a true AWP.").

Medicare reimbursement does not necessarily decrease with every decrease in the median AWP. Some decreases are too small to affect the reimbursement rate. Early in the class period, CMS expressed reimbursement in milliliters, and subsequently in milligrams. In providing evidence to the Court on relative AWPs, Dr. Sumanth Addanki[2] used milliliters throughout to provide a consistent basis for comparison. However, Medicare set the reimbursement rate for albuterol sulfate 0.5% solution in 1997 and thereafter in terms of *milligrams*. Therefore, to determine the effect of a change in the median AWP per milliliter, the change has to be expressed in terms of milligrams, discounted by 5%, and then rounded to the nearest penny.

---

[1] Despite repeated invitations, Plaintiffs declined to discuss a possible stipulation on damages. Warrick assumes, therefore, that Plaintiffs do not contest that Warrick has correctly applied the CMS methodology, but merely whether that is the appropriate approach.

[2] Dr. Addanki will be available to testify at the damages hearing on August 10 in the event that Plaintiffs dispute his calculations or methodology. Plaintiffs informed the Court at a recent hearing that testimony from Dr. Hartman and Dr. Addanki may be necessary on the damages issue. (*See* Hearing Tr. (07/17/07) 29:11-20 ("THE COURT: Well, what exactly do you anticipate happening with the damage hearing? MR. BERMAN: Well, your Honor . . . If we don't agree, . . . I assume that you'd hear from Dr[]. Hartman and . . .Dr. Addanki with respect to Schering / Warrick.")).

3

There are 5 milligrams of albuterol sulfate in each milliliter of 0.5% solution.[3] Thus, to convert from milliliters to milligrams (the unit of measure used by CMS in paying reimbursements), both Warrick's AWP and the "but for" median AWP must be divided by 5. Performing this conversion on figures identified by the Court, discounting by 5 percent and then rounding to the nearest whole cent, yields zero impact on the Medicare reimbursement rate of $0.14 per milligram. The precise steps in the process are described in the sequence below.

### A. Medicare Set the Reimbursement Rate for 0.5% Albuterol Solution at a Price Per Milligram in 1998 and 1999.

Until March 31, 1997, the applicable J-code for this product was J7625, which had been reimbursed at a rate *per milliliter*.[4] Beginning April 1, 1997, Medicare discontinued use of the earlier J-code, and it put in place a temporary J-code, K0504, for which the fundamental billing unit was the milligram and for which Medicare set a reimbursement rate *per milligram*.[5] As of January 1, 2000, the temporary code K0504 was transitioned to a permanent J-code, J7618,

---

[3] *See* Declaration of Sumanth Addanki, Ph.D. (08/01/07) (hereinafter "Addanki Declaration"), App. I) (PX 4097 at § 14.28-8 (describing methodology for converting to milligrams and stating that 1% solution has 10 milligrams of a drug in each milliliter)).

[4] *See* Addanki Decl., App. E (*Region B DMERC Supplier Manual* (Rev. 20 12/99) (hereinafter "*Region B DMERC Supplier Manual*"), Ch. 16 at 5-3 (describing J7625 as "Albuterol sulfate, 0.5 %, per ml" and noting that the code was invalid after 3/31/97), *available at* http://www.adminastar.com/Providers/DMERC/MedicareManuals/files/9912revisions.pdf)); *id.* at App. F (DME Region A Service Office, *DME Medicare News* (No. 3 12/93) at 16 (showing the Medicare reimbursement rate for J7625 as "$.68. PER ML"), *available at* http://www.medicarenhic.com/dme/dme03.pdf)).

[5] *See* Addanki Decl., App. D (DMERC Region D Supplier Manual (Rev. 1/2003) (hereinafter "Region D Supplier Manual" at HCPCS K- 10) (describing K0504 as "Albuterol, inhalation solution …, concentrated form *per milligram*"); *see also id.* (Region D Supplier Manual, Ch.16 at Table 1 (Table entitled Crosswalk Deleted Codes showing that J7625 was deleted as of 3/31/97 and replaced by K0504)); *id.* at App. O (*Autumn 1998 DMERC Medicare Advisory,* Issue 28, at 110 (showing a 1998 Medicare reimbursement rate for K0504 of $0.14 which only makes sense if the rate is expressed per milligram.)); *id.* at App. P (*Winter 1999 DMERC Medicare Advisory,* Issue 31, at 127 (showing a 1999 Medicare reimbursement rate for K0504 of $0.14)). Apparently, Medicare switched to reimbursement per milligram because under the old per milliliter J-code, providers were taking a single unit (*i.e.,* ml) of 0.5 % solution which contained 5 mg of the active ingredient and diluting it to create and seek reimbursement for 6 units (*i.e.*, ml) of the .083% unit dose solution which contains 2.5 mg per 3 ml. *See id.* at App. G (7/28/95 Memorandum to All Medicare Dialysis Centers Attaching National Fraud Alerts Issued by the Office of the Inspector general at Alert 6 (Nebulizer Drugs), *available at* http://www.kansasmedicare.com/part_A/news/1995/9507289513FraudAbuse.htm)).

4

which is also reimbursed on a per milligram basis.[6]  The record evidence shows Medicare reimbursement at a rate per milligram.  *See* Addanki Decl., App. R (PX 4102) (DMERC Fee Schedule showing reimbursement rate for J7618 "albuterol … concentrated form, per 1 mg" of $0.14 per mg of albuterol)).  Thus, in 1998 and 1999, the 0.5 % albuterol solution was reimbursed by Medicare under J-code K0504, at a rate *per milligram* – $0.14.[7]

To calculate the change in Medicare reimbursement rate resulting from a lower Warrick AWP for its 0.5 % solution, the "actual" and "but for" medians found by the Court – which were expressed as AWP per *milliliter* – must be converted into AWP per *milligram*.  *See* Addanki Decl. at ¶¶ 9-10.  Since there are five milligrams of albuterol in each milliliter of 0.5 % solution, the median rate per milliliter in footnote 78 of the Opinion must be divided by five to arrive at the median rate per milligram on which Medicare would have based reimbursement in 1998 and 1999.  Table 1 below shows the conversion.

Table 1

|  | **1998** | **1999** |
|---|---|---|
| "Actual" Median AWP per ml (from Fn 78) | $0.7495 | $0.7410 |
| "But For" Median AWP per ml (from Fn 78) | $0.7325 | $0.7325 |
| "Actual" Median AWP per mg | $0.1499 | $0.1482 |
| "But For" Median AWP per mg | $0.1465 | $0.1465 |

---

[6] *See* Addanki Decl., App. D (*Region D Supplier Manual*, Ch.16 at Table 1 (showing that K0504 was replaced by J7618 as of 1/1/2000)).

[7] According to CMS data, notwithstanding the fact that J7625 was inactive or deleted as of March 31, 1997, in both 1998 and 1999, some small number of units, less than .1% of the overall units of the drug reimbursed by Medicare, appear to have been processed under this retired J-code for which reimbursement would have been set on a per milliliter basis.  *See* Addanki Decl. at ¶ 16, Ex. 5.  However, the CMS data reveals that the Region A DMERC responsible for Massachusetts did not reimburse any units under the archaic, per milliliter J-code in 1998.  *See id*. at ¶ 19, Ex. 5.  Moreover, in 1999, Medicare reimbursement would not have changed even if the rate were calculated on a per milliliter basis.  *See id*. at ¶ 20, Ex. 4.

5

**B.     Medicare Reimbursement of Generics Was Set at Ninety Five Percent of the Median Generic AWP in 1998 and 1999.**

In 1998 and 1999, Medicare reimbursed at 95% of the median generic AWP. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *62 (citing 42 C.F.R. § 405.517 (2003)). Thus, to assess the impact of a change in median AWP on reimbursement rate, the change must be discounted by 5% (or multiplied by 0.95). Table 2 shows the effect of the discount.

Table 2

|  | **1998** | **1999** |
|---|---|---|
| "Actual" Median AWP per mg | $0.1499 | $0.1482 |
| 95 % of "Actual" Median AWP per mg | $0.1424 | $ 0.1408 |
| "But For" Median AWP per mg | $0.1465 | $0.1465 |
| 95 % of "But For" Median AWP per mg | $0.1392 | $0.1392 |

**C.     Rounding to the Nearest Whole Cent, Medicare Reimbursement Rates for 0.5 % Albuterol Solution Are Unaffected by Moving to the "But-For" Median AWPs.**

Whereas the Court's opinion specifies AWPs out to four decimal places, as Dr. Hartman's report in December 2005 confirms, Medicare reimbursement is in whole pennies. *See* Addanki Decl., App. M (Decl. of Raymond S. Hartman in Supp. of Pls.' Claims for Liability and Calculations of Damages at D.6 (attaching a *Medicare Claims Processing Manual,* which states, "[a]fter determining the AWP, carriers multiply it by 0.85 or 0.95, or other percentage, as applicable, and **round to the nearest penny**")). Accordingly, all fee schedules and claim payment forms in evidence show reimbursement rates in whole cents. *See id.* at App. Q (PX 4101 (DMERC Fee Schedule showing various Medicare reimbursement rates all expressed in

6

whole cents)); *id.* at App. R (PX 4102 (same)).  Table 3 shows that in both 1998 and 1999, lowering Warrick's AWP as found by the Court would not have affected the Medicare reimbursement rate of $0.14.[8]

Table 3

|  | **1998** | **1999** |
|---|---|---|
| 95 % of "Actual" Median AWP per mg | $0.1424 | $ 0.1408 |
| Medicare Reimbursement Rate based on "Actual" Median AWP | **$0.14** | **$0.14** |
| 95 % of "But For" Median AWP per mg | $0.1392 | $0.1392 |
| Medicare Reimbursement Rate based on "But For" Median AWP | **$0.14** | **$0.14** |

Thus, even though lowering Warrick's AWP "would have resulted in the median shifting slightly downward," *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *63, that downward shift would have been too small to change the Medicare reimbursement rate.  In other words, members of Class 2 would have paid the exact same amount if Warrick's AWP had been lower.  As a result, Plaintiffs' claims as to Warrick albuterol in 1998 and 1999 suffer from the same lack of causation as all of the Plaintiffs' other claims as to albuterol.  *Id.* (finding no liability where lowering Warrick's AWP for albuterol would not have caused a reduction in Medicare reimbursement).  Consistent with this Court's prior decision, absent causation, there can be no liability for 0.5 % albuterol solution in 1998 and 1999.  *See, e.g., Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc*., 840 N.E.2d 526, 532 (Mass. 2006)

---

[8] These calculations are confirmed by the fact that DMERC documents show the Medicare reimbursement rate for 0.5 % solution in 1998 and 1999 was $0.14.  *See* Addanki Decl., App. O (*Autumn 1998 DMERC Medicare Advisory,* Issue 28, at 110 (showing a 1998 Medicare reimbursement rate for K0504 of $0.14)); *see id.* at App. P (*Winter 1999 DMERC Medicare Advisory,* Issue 31, at 127 (showing a 1999 Medicare reimbursement rate for K0504 of $0.14)).

7

(affirming summary judgment against plaintiffs who could not prove a violation of chapter 93A caused them any loss).

## II.      WARRICK'S MARKET SHARE IS IRRELEVANT.

Since the Class suffered no damages, there are no damages to apportion, and market share data is unnecessary. As the Court requested market share data, however, Warrick submits that its share of the Medicare market in Massachusetts for 0.5% solution of albuterol sulfate in 1998 and 1999 was between 50% and 73%. While specific market share data for reimbursement of 0.5% solution of albuterol sulfate by Medicare in Massachusetts is not available, there are reasonable proxies. Warrick's share of the nationwide market for 0.5% albuterol sulfate as indicated by IMS data in 1998 and 1999 was approximately 50%. *See* Addanki Decl., at n. 14, App. S. Alternatively, Warrick's share of the Massachusetts Medicaid market for reimbursement of 0.5% solution of albuterol sulfate in 1998 and 1999, as indicated by CMS, is 70.72% and 71.76% respectively. *See id.* The CMS Medicaid data is specific to the state, but it is for a program – Medicaid – that serves a different population than the Medicare program, and thus, the IMS data might be a better indication of Medicare market share in Massachusetts.

## CONCLUSION

Because Medicare's reimbursement of 0.5 % albuterol would not have changed if Warrick's AWP in 1998 and 1999 had been lower, Warrick did not cause any damages at all. Therefore, the 0.5% solution for 1998 and 1999 should be treated the same as the albuterol products for which the Court found no causation and no liability.

Respectfully submitted,

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Daniel J. Bennett (BBO#663324)
Jobe G. Danganan (BBO #660446)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Warrick Pharmaceuticals Corporation*

Dated:  August 1, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2007, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

                                                  /s/ Daniel J. Bennett_____
                                                  Daniel J. Bennett