UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK 2 TRIAL | Judge Patti B. Saris |

## CLASS PLAINTIFFS' PROPOSED "ROAD MAP" TO GOVERN TRACK 2 PROCEEDINGS

**A.      The Court Should Jointly Try the Single-Source Case First**

As plaintiffs stated at the last conference, plaintiffs believe that the Court should initially focus on the Track 2 Defendants who made single-source drugs.

There are three such Defendants:  Aventis, Amgen and Watson.  The Aventis drug at issue is Anzemet, which is used to relieve nausea in chemotherapy patients, was sold to and administered by oncologists and competed directly with GSK's Kytril and Zofran.  The Amgen drugs are Aranesp, Epogen, Neulasta and Neupogen.  Aranesp is an erythropoiesis stimulating agent  ("ESA") designed to stimulate the production of red blood cells, including in cancer patients undergoing chemotherapy.  Epogen is also an ESA, but it has a shorter half-life than Aranesp, which it preceded onto the market.  Neulasta is a colony stimulating factor ("CSF") designed to stimulate the production of white blood cells, including in cancer patients undergoing chemotherapy.  Neupogen is also a CSF, but it has a shorter half-life than Neulasta, which it preceded onto the market.  The Watson drug is Ferrlecit, which is a drug used for patients with iron deficient anemia.

Plaintiffs' single-source proposal is not just made because those Defendants manufacture single-source drugs but also because those manufacturers fit the "AstraZeneca model" in that there was competition between two brands that drove spread marketing.  The reason these Defendants and these drugs can and should be tried together is because the marketing model is similar in nature.

Focusing on single-source drugs will also provide the parties and the Court with time to sort out the multi-source case in response to the Court's trial ruling, as discussed further below.

B.      **The Scope Of The Single-Source Trial**

Plaintiffs believe that the single-source trial should take place in November 2007.[1]

Plaintiffs submit that the trial should be a trial of all classes on a nationwide basis.  The Court previously tried a Massachusetts only Class 2/3.  The Court partly did so in response to Defendants' suggestion during class certification proceedings that the knowledge issue was a winner for them as to the TPPs.  Thereafter, the Court tried a test case to see how the issues would play out.  Having done so, the Court is now in a position to see that a TPP class is proper and manageable.

Defendants claim the Court has already ruled against a nationwide class, but this is not so.  The Court ruled that the "motion to certify a nationwide class is denied without prejudice" pending the submission of feasible groupings.  August 16, 2005 Order at page 60.  The TPP claims can be grouped on an intent to defraud basis, as the Court has previously ruled.  Plaintiffs further submit that the state law claims are sufficiently common that they can be presented to the jury in an efficient manner, and trying the claims under the lesser burden of these statutes is in the best interests of the class.  An example of a set of instructions is attached as Exhibit 1.  Apart from looking at proposed state law grouping, any rebriefing other than Plaintiff coverage issues is not necessary.  Indeed, the Court should reject Defendants' call for omnibus, scorched-earth briefing on class certification issues that, under Defendants' proposal, will drag on for the rest of the year.  The Court has already reviewed "cross-cutting" class issues in great detail for Track 1 and issued a comprehensive opinion, and those issues are the same here in Track 2.  There is no need to replow this ground and waste any more time in 2007, the sixth anniversary of this case.

---

[1] Plaintiffs have attempted to plan a schedule that would lead to an October trial (consistent with prior remarks of this Court), but, given the required pre-trial activities set forth in this motion, Plaintiffs believe that an October trial is impractical.

A nationwide class is also the most practical approach, as highlighted by the AstraZeneca experience.  AstraZeneca had its Massachusetts only trial and lost.  Now the TPP victims in the other states seek their day in court, but AstraZeneca has not offered to settle or even discuss settlement.  Therefore, there must be another trial.  But, if there had been a nationwide trial, the case would be over.  The same scenario is true here.  If we try just one state, we will not have resolved the remaining states, and it may be a year or more before we do.  Meanwhile, for Class 1 more and more class members sadly pass away.

Defendants claim that a nationwide case is not possible.  However, before the Class Action Fairness Act ("CAFA"), these cases would be in various state courts.  No one can contest that a state law claim under one state's consumer protection law could not be certified.  Now, under CAFA all such cases will go to a federal court, and if they raise similar issues, will be consolidated by the MDL Panel.  Defendants will always claim multi-state classes are improper.  If the Court accepts this proposition, a class is never possible and consumer fraud can never be remedied.  This cannot be the intent of CAFA.

**C.     Proposed Trial Schedule**

  1.     September 1, 2007:  Joint Exchange of Expert Reports.[2]

  2.     Expert Depositions Finished by September 30, 2007.

  3.     Summary Judgments Filed September 30, 2007.

  4.     Response October 15, 2007.

  5.     Trial November 5, 2007.

---

[2] Defendants were given a list of missing data needed to compute ASP/AWP's and damages at the July status conference.  Only Aventis and Immunex supplied the data.  The Court should order that this data be supplied by August 15.  A copy of what Plaintiffs supplied at the last hearing is attached as Exhibit 2.

The Track 2 Defendants claim that an impending trial would interfere with mediation efforts.  This is false.  With the exception of GSK, the settlements garnered in this litigation so far have come on the eve of *certain trial dates*.   Trial dates are simply necessary.

**D.     Proposed Class Certification Dates To Maintain A November 2007 Trial**

     1.     Class Notice to go Out Two Weeks After Certification Order

           (Assume notice goes out September 13, 2007.)

     2.     Thirty Day Opt Out.

**E.     Multi-Source Path**

The first step is to obtain data necessary to complete damage analyses to see how the drugs at issue stack up.  Plaintiffs have asked for such data but have not received it.

Plaintiffs suggest that the next step is for the Court to make a global decision on the appropriate measure of damages for multi-source drugs.  In its ruling on Warrick is albuterol, the Court held that, where a drug was not the brand, damages are the difference between a company's AWP and the median if the AWP exceeded the median.  However, the median itself is an *inflated* number because, as the Court has already found, all manufacturers were inflating their AWPs.  If this standard is applied to Track 2, there may be minimal damage and few drugs to focus on.

Therefore, damages in the multi-source arena must be based on a competitive benchmark that is unaffected by inflated pricing, and Plaintiffs have submitted a proposal on this issue *vis-à-vis* the Warrick albuterol part of the case.  This suggested approach is consistent with damages methodologies in other, yet applicable, contexts.  An example is provided by antitrust law, where damages are commonly measured as the difference between the anticompetitive price and what the price would have been in a competitive market unaffected by the anticompetitive activity – an approach frequently referred to as the "yardstick" approach and not dissimilar from Dr.

Hartman's yardstick methodology here.  For instance, in *In re: NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996), the court described as "widely accepted" damage methodologies that, among other things, compared (i) spreads on Class securities with spreads in a subsequent time period, after collusion ended, and (ii) spreads on Class securities on the NASDAQ market with those on comparable securities traded on other markets that are competitive.  *Id*. at 521; *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591-92 (7th Cir. 1998) (approving yardstick approach based on prices charged by non-conspirators in other markets during same time period at issue); ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS (6th ed. 2007) at 841 ("The 'yardstick' approach compares profits earned or prices paid by a plaintiff with the corresponding data for a firm or market unaffected by the violation. . . .  In either case, the plaintiff is required to show that the two sets of time periods, firms, or markets are generally comparable except for the effect of the violation.") (footnotes omitted (citing cases)).

The seminal point of these authorities is that an uninfected benchmark must be used to remove the effects of anticompetitive activity.  Unfortunately, as presently formulated, the Court's approach here does not account for the already inflated median at issue.  Nor does it account for SPW's pivotal role in creating that inflated median by reporting an inflated AWP for the brand and Warrick's role in creating mega-spreads.  Indeed, under the Court's theory, SPW is arguing that damages are *zero* – that it can get away with its wrongful conduct.  This is not an equitable result given the Court's findings and, if maintained, will likely result in minimal damages in the Track 2 case, where the majority of drugs at issue are multi-source.

Plaintiffs submit that Track 2 multi-source case should focus on this issue, even ***before***

class certification.  This issue will drive which drugs will be in the case for the purpose of a

class.

Therefore, Plaintiffs suggest the following schedule:

> November 1, 2007 submissions on the appropriate measure of
> damages/liability for multi-source drugs.

Plaintiffs also suggest that the government and other Plaintiffs have an interest on this

issue and should be invited to make submissions.

After these submissions, the Court can rule and the parties can reevaluate the further

status of the multi-source portion of the Track 2 proceedings.  All of this can be done in tandem

with the single-source trial so that meaningful progress will be made on multi-source drugs too.


DATED:  August 2, 2007

By___**/s/ Steve W. Berman**_____
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

001534-16 188039 V1

Elizabeth A. Fegan
Hagens Berman Sobol Shapiro LLP
820 North Blvd., Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  188039 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE

Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of Plaintiffs' attorneys and that, on August 2, 2007, I caused copies of **CLASS PLAINTIFFS' PROPOSED "ROAD MAP" TO GOVERN TRACK 2 PROCEEDINGS** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

  /s/ Steve W. Berman
Steve W. Berman

001534-16  188039 V1

**EXHIBIT 1**

Below is a sample set of truncated jury instructions, taken from the proposed instructions submitted by Plaintiffs in connection with the BMS Class 1 trial.[1]

The instructions relating to unfair or deceptive trade practices are brief and will apply to many of the states.  Consistent with the Court's prior pre-trial guidance vis-à-vis the AstraZeneca and BMS Class 1 trials, numerous issues to decided as a matter of law can be taken up by the Court after the jury verdict.  Such issues include potential findings, as a matter of law, regarding reliance and causation.  The same applies to the proposed fraud instruction.  As the Court has already observed, a finding of fraud will also constitute a violation of most state unfair trade practice statutes.

The fraud instruction contains nine elements and encompasses the pattern jury instructions of many states for fraud or deceit.[2]  It also encompasses RESTATEMENT (SECOND) OF THE LAW OF TORTS, § 525, which provides:  "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."  As with the unfair or deceptive trade practice charge and in keeping with the Court's expressed desires, if the jury returns a verdict

---

[1] This set is "truncated" in the sense that, for present purposes, Plaintiffs are not repeating instructions relating to fraudulent concealment, statute of limitations and enhanced damages.

[2] *See* REVISED ARIZONA JURY INSTRUCTIONS (CIVIL), *Commercial Torts* § 24 (4th ed. 2005); CONNECTICUT CIVIL JURY INSTRUCTIONS § 7.19 (April 30, 2002); CALIFORNIA JURY INSTRUCTIONS, CIVIL § 12.31 (9th ed.); DEL. P.J.I. CIV. § 1.6.1 (2000); FLORIDA STANDARD JURY INSTRUCTIONS IN CIVIL CASES § MI 8.1(a); 2-44 ILLINOIS FORMS OF JURY INSTRUCTION § 44.02; 1-31 INDIANA PATTERN JURY INSTRUCTIONS – Civil Instr. 31.63; MARYLAND CIVIL PATTERN JURY INSTRUCTIONS 11:1; MASSACHUSETTS JURY INSTRUCTIONS, CIVIL § 6.1 (1999); 1-22 NEW HAMPSHIRE CIVIL JURY INSTRUCTION § 22.1; OKLAHOMA UNIFORM JURY INSTRUCTIONS – CIVIL § 18.1; PENNSYLVANIA SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS 13.14; 1-8 TENNESSEE CIVIL JURY INSTRUCTIONS 8.35; WASHINGTON PATTERN JURY INSTRUCTIONS, CIVIL 160.01 (5th ed. 2005).

under the fraud instruction, the Court can decide later in post-trial motion practice the states to which the verdict will apply.

The jury should report their findings on each element, because, even if the jury does not find that Plaintiffs proved the existence of all nine elements of common law fraud, a subset of those elements may nonetheless constitute a violation of a state UDTPA.  For example, reliance is not an element of most UDTPAs, even though Plaintiffs believe that reliance is manifest here, *since Plaintiffs and Class members made payments based on AWP*.  Indeed, Plaintiffs request that the Court find as a matter of law that the elements relating to reliance and reasonable and justifiable reliance are satisfied such that these factors need not be decided by the jury.[3]

Regarding causation, the Court has already recognized that variations in state UDTPA causation standards are not material:

> in this context, where consumers (elderly people with cancer or another serious disease) make a percentage co-payment based on the stated AWP, there is *no indication that different definitions of reliance and causation will matter* or cannot be resolved as a matter of law prior to trial.  Thus, the common legal and factual issues predominate over the individual ones.

*In re Pharm. Average Wholesale Price Litig.*, 230 F.R.D. 61, 85 (D. Mass. 2005) (emphasis added).

Some states' UDTPAs require a plaintiff to establish proximate causation via proof that the unfair or deceptive practice directly produces the harm and without which the harm would not occurred.  *See, e.g.,* DEL. P.J. I. CIV. § 21.1 (2000); WASHINGTON PATTERN JURY INSTRUCTION 310.07.  Other UDTPAs require only that the practice be a substantial factor in bringing about the damage.  MASS. SUPERIOR CT. CIVIL PRAC. JURY INSTRUCTION § 16.5;

---

[3] For this reason, Plaintiffs have included proposed findings and instructions relating to the reliance factors as alternative matters only.

HAWAII CIVIL JURY INSTRUCTIONS, Instruction No. 7.1 (1999).  Defendants' AWP scheme directly led to overcharges for Subject Drugs thereby causing harm under any of the standards for proving causation.  For this reason, Plaintiffs' single proposed jury instruction for causation reflects the strictest causation standard of any of the state UTPAs that require direct, "but for" causation.

Please note that these instructions are *but one example* of how the "meat" of the claims can be efficiently tried to a jury.  Plaintiffs reserve the right in future briefing to propose an expanded set of instructions that deals in a more targeted manner with state law groupings.

## I.      ELEMENTS OF CLAIMS

**1.01    Fraud**

The following instructions relate specifically to Question Nos. __ and __ on the Jury Verdict Form.

You must determine whether [DEFENDANT] defrauded Plaintiffs and the Class.  In making this determination, you must consider whether the following nine factors are present:

(1)  [DEFENDANT] made a representation;

(2)  The representation was false;

(3)  The representation was material, which means that it was sufficiently important to influence a reasonable person's actions;

(4) [DEFENDANT] knew that the representation was false;

(5) [DEFENDANT] intended that Plaintiffs would act upon the representation in the manner reasonably contemplated by [DEFENDANT];

(6) Plaintiffs did not know that the representation was false;

(7) Plaintiffs relied on the truth of the representation;

(8) Plaintiffs' reliance was reasonable and justified under the circumstances; and

(9) As a result, Plaintiffs were damaged.

[[REVISED ARIZONA JURY INSTRUCTIONS (CIVIL), *Commercial Torts* § 24 (4th ed. 2005); encompasses CONNECTICUT CIVIL JURY INSTRUCTIONS § 7.19 (April 30, 2002); encompasses CALIFORNIA JURY INSTRUCTIONS, CIVIL § 12.31 (9th ed.); encompasses DEL. P.J.I. CIV. § 1.6.1 (2000); encompasses FLORIDA STANDARD JURY INSTRUCTIONS IN CIVIL CASES § MI 8.1(a); encompasses 2-44 ILLINOIS FORMS OF JURY INSTRUCTION § 44.02; encompasses 1-31 INDIANA PATTERN JURY INSTRUCTIONS – Civil Instr. 31.63; MARYLAND CIVIL PATTERN JURY INSTRUCTIONS 11:1; encompasses MASSACHUSETTS JURY INSTRUCTIONS, CIVIL § 6.1 (1999); encompasses 1-22 NEW HAMPSHIRE CIVIL JURY INSTRUCTION § 22.1; encompasses OKLAHOMA UNIFORM JURY INSTRUCTIONS – CIVIL § 18.1; encompasses PENNSYLVANIA SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS 13.14; encompasses 1-8 TENNESSEE CIVIL JURY INSTRUCTIONS 8.35; encompasses WASHINGTON PATTERN JURY INSTRUCTIONS, CIVIL 160.01 (5th ed. 2005).]]

I will next provide you with more detailed instructions relating to some of these factors.

**1.011   The First Two Factors**

In deciding factors one and two (whether [DEFENDANT] made a representation and whether the representation was false), you must consider the following findings that the Court has already made.

First, I have found that [DEFENDANT] caused AWPs to be published. [DEFENDANT] sent to publishers in the industry, either the *RedBook* or *First DataBank*, the average wholesale prices ("AWPs") or wholesale list prices ("WACs") for the [DEFENDANT'S] Drugs. The publishers then published the "AWPs" based on the AWPs or the WLPs supplied to them by [DEFENDANT]. During the period 2002 to 2004, one of the publishers raised the AWPs by 5%. [DEFENDANT] took no action to correct the published AWPs in response to that increase. Therefore, I have found that [DEFENDANT] is responsible for the accuracy of the published AWPs for the [DEFENDANT'S] Drugs.

Second, I have ruled that the term "Average Wholesale Price" or "AWP" was intended to be an actual average of prices. As an average, the published AWP should have included and accounted for discounts, rebates and other incentives provided to doctors. Let me put this another way. Assume that the published AWP for a [DEFENDANT] Drug was $100. Also assume that doctors on average were able to purchase that [DEFENDANT] Drug at $50. The published AWP should have reflected those discounts and therefore should have been $50. I am just using these numbers as an example.

Third, I have found that the AWPs for the [DEFENDANT] Drugs were not an average price and did not reflect discounts and other cost advantages given to doctors.

**1.012   Factor No. 4**

With respect to factor number four (whether [DEFENDANT] knew that the AWPs were false), the maker of a representation knows that it is false if the maker:

(a) knows or believes that the matter is not as he represents it to be;

(b) does not have the confidence in the accuracy of his representation that he states or implies; or

(c) knows that he does not have the basis for his representation that he states or implies. [[RESTATEMENT (SECOND) OF TORTS, § 526 and comment (a)]]

Furthermore, a representation that the maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made with the intention that it be understood in the sense in which it is false. [[RESTATEMENT (SECOND) OF TORTS, § 527]]

### 1.013   Factor No. 5

With respect to factor number five (whether [DEFENDANT] intended that Plaintiffs would act upon the representation in the manner reasonably contemplated by [DEFENDANT]), "intent" means that a person had the purpose to do something. In other words, to do an act with intent means to do it consciously and voluntarily and not inadvertently or accidentally. Intent ordinarily cannot be proved directly, because there is no way to look inside another person's mind, but you may infer intent from the surrounding circumstances. You may consider any statement made, or act done or omitted, by the person making the representation, and all other evidence which indicates his state of mind. You may assume that a person ordinarily intends the kinds of likely results following from that person's knowing actions or inaction. [[as adapted from 1-20 CIVIL JURY INSTRUCTIONS FOR D.C. § 20.02(D)]]

The maker of a representation can be liable to the person he intends to influence, regardless of whether he makes the representation to them directly or conveys the information through some other person or means. [[as adapted from 1-20 CIVIL JURY INSTRUCTIONS FOR D.C. § 20.05]] It is not necessary that he have any particular person in mind. It is enough that he intends or has reason to expect to have it repeated to a particular class of persons and that the person relying upon it is one of that class. [[RESTATEMENT (SECOND) OF TORTS, § 533 & cmts. d and g]]

[[***NOTE:  The following instruction is submitted in the alternative and only in the event that the Court declines to find as a matter of law that Plaintiffs relied on the false AWPs***]]

### 1.014   Factor No. 7

Regarding factor number seven (whether Plaintiffs relied on the truth of the representation), the Court has found that this element is satisfied if you find that a Plaintiff made a payment for a [DEFENDANT] Drug.

[[*NOTE:  The following instruction is submitted in the alternative and only in the event that the Court declines to find as a matter of law that Plaintiffs' reliance was reasonable and justified*]]

### 1.015   Factor No. 8

With respect to factor number eight (whether Plaintiffs' reliance was reasonable and justified under the circumstances), a person is not justified in relying upon a false representation if he knows it is false, if its falsity is obvious to him, or if he had no confidence in the representation.  For a person's reliance to be justified, his conduct must not be so unreasonable, in light of all of the information available to him and the circumstances of the transaction, that it is proper to decide that his loss is his own responsibility.  [[as adapted from 1-20 CIVIL JURY INSTRUCTIONS FOR D.C. § 20.02(F)]]

Plaintiffs ordinarily are not required to investigate the truth of assertions that are made and are ordinarily justified in relying on its truth.  If the Defendant's representations were such as to induce the Plaintiffs not to undertake an independent examination of the pertinent facts, lulling them into placing confidence in [DEFENDANT'S] assurances, then the Plaintiffs' failure to ascertain the truth through investigation does not preclude recovery.  [[Encompasses RESTATEMENT (SECOND) OF TORTS, § 540]]

### 3.016   Factor No. 9

For assistance in determining factor nine, see Instruction 1.02 below.

## 1.02   Unfair Acts or Practices

The following instruction relates specifically to Question No. __ on the Jury Verdict Form.

You must determine whether [DEFENDANT] committed unfair acts or practices.  In order to establish that [DEFENDANT] committed unfair acts or practices, Plaintiffs must prove that [DEFENDANT'S] conduct meets at least one of the following two criteria:

(1) it is immoral, unethical, oppressive or unscrupulous; or

(2) it causes substantial injury to consumers, competitors or other business persons.

I will now give additional instructions on these two criteria:

Immoral, Unethical, Oppressive or Unscrupulous.  You simply need to determine whether you believe that the Defendant's conduct was immoral, unethical, oppressive or unscrupulous.  Common English dictionaries define these words as follows:

"Immoral" means conflicting with generally or traditionally held moral principles.

- 6 -

"Unethical" means the act or practice does not conform to moral standards.

"Oppressive" means unreasonably burdensome.

"Unscrupulous" means unprincipled.

<u>Substantial Injury to Consumers</u>.  To prove substantial injury to consumers, the Plaintiffs must demonstrate that the Defendant's conduct caused an injury that is:  (1) substantial; (2) not outweighed by countervailing benefits to consumers or competition; and (3) that the consumers could not reasonably have avoided the injury

Plaintiffs contend that the publication of AWPs and/or the marketing of the spread to doctors, in the context of a Medicare payment system that uses AWP, was an unfair practice that meets the elements set forth above.  Defendant denies that it engaged in an unfair practice.

## 1.03   Deceptive Acts or Practices

The following instruction relates specifically to Question No. __ on the Jury Verdict Form.

You must determine whether [DEFENDANT] committed deceptive acts or practices.  In order to establish that [DEFENDANT] committed deceptive acts or practices, Plaintiffs must prove that [DEFENDANT'S] conduct has the capacity or tendency to mislead or deceive.  Under this general test, Plaintiffs need not prove that Defendant intended to mislead anyone or that anyone was, in fact, misled.

## 1.04   Proximate Cause

The following instruction relates specifically to Question Nos. __ and __ on the Jury Verdict Form.

In order to recover damages, Defendant's acts must be shown by either a preponderance of the evidence or clear and convincing evidence to be a proximate cause of injury to Plaintiffs and the Class.

Proximate cause is a cause that directly produces the harm, and but for which the harm would not have occurred.  A proximate cause brings about, or helps to bring about, the injury, and it must have been necessary to the result.

Plaintiffs claim that the publication of false AWPs injured Plaintiffs and the Class by causing overpayment.  Defendant denies that its AWPs caused injury to the Class.

<u>**Exhibit 2**</u>

**Summary of Key Notes for the Calculation of Track 2 Damages**


**I.      Manufacturer Specific Notes**

    **A. Abbott**

        1.  Data were provided from 1994 to 2004.

    **B. Amgen**

        1.  Spreads were calculated using: invoice data from 1993 to 2001 and 2004 (missing 2002-2003); chargeback data from 1994 to 2001 (missing 2002-2003); rebate data from 1994 to 2001 (missing 2002-2003).

    **C. Aventis**

        1.  Invoice, chargeback and rebate data were provided from 1998 to 2001 only. Data for Gammar P IV were not provided.  (So missing 2002-2003)
        2.  Where available, classes of trade (hospitals, government, HMOs, etc.) were excluded using class of trade codes.  When such codes were not available, classes of trade were excluded using a list of keywords found in customer names.  In these cases, using keywords is an imperfect methodology, but it is the only one available until complete COT data are provided.  So class of trade data is missing.

    **D. Baxter**

        1.  Data for Bebulin (for treating hemophilia, physician administered, maybe self-administered) were not provided.
        2.  Data for Buminate (given to patients with low blood protein or severe volume loss, primarily inpatient) were not provided.
        3.  Baxter did not provide certain fields in the chargeback data that allow us to exclude certain units sold to non-Class customers.  If such data were provided, damages would probably decrease.

    **E. Bayer**

        1.  Invoice and chargeback data were provided from 1997 to 2001 only.  (Missing 2002-2003)
        2.  Rebate data were not provided.

**F.  Dey**

1. Sales and chargeback data were provided for the entire time period (1991-2004).
2. Sales through wholesalers do not appear to be contained in the invoice data received from Dey productions.  To compensate for this issue, sales units and dollars to indirect purchasers were aggregated using transactions in the chargeback data.
3. Rebate data were not provided.  (So missing 97-2004)
4. Where available, classes of trade (hospitals, government, HMOs, etc.) were excluded using class of trade codes.  When such codes were not available, classes of trade were excluded using a list of keywords found in customer names.  In these cases, using keywords is an imperfect methodology, but it is the only one available until complete COT data are provided
5. "Albuterol sulfate" and "albuterol nebulizer" are assumed to be the same thing, *i.e.*, damages were only calculated for the NDCs of albuterol that are used with a nebulizer.

**G.  Fujisawa**

1. Invoice data were provided from 2000 to 2004 only.  (Missing 97-99)
2. Chargeback and rebate data were not provided and could not be incorporated in this analysis.
3. No data whatsoever were provided for Lyphocin (brand form of vancomycin, used as an antibiotic for severe infections, mostly inpatient).
4. No data whatsoever were provided for flourouracil (an oncology drug used in colorectal and pancreatic cancers).

**H.  Immunex**

1. Invoice and chargeback data were provided from 1996 to 2002.  (Missing 2003)
2. Relating to sales of the products at issue, Immunex claims the following:
   a. Immunex sold the rights to leucovorin calcium and methotrexate in June 2001.
   b. Immunex was acquired by Amgen in July 2002.  Amgen sold the marketing rights for Novantrone in November 2002.
   c. Therefore, Immunex does not have data beyond 2001 or 2002, depending on the drug.
3. Rebate data were not provided.

**I.  Pfizer/Pharmacia**

1. Invoice and chargeback data were provided from 1997 to 2003 only.
2. Rebate data were not provided.
3. Class of trade data were not provided.  Therefore, exclusions for hospitals, government and other non-Class customer types were made based on a set of

keywords found in customer names.  Though this is an imperfect
methodology, it is the only one available until COT data are provided.

**J.  Sicor/Gensia**

1. Invoice data were provided from 1994 to 2005.
2. Chargeback data were not provided and therefore could not be incorporated
   into this analysis.
3. Rebate data were not provided in a useable form and could not be
   incorporated into this analysis.

**K.  Watson**

1. Invoice data were provided for 2000 to 2004 only.  (So missing 97-99)
2. The chargeback data that were provided (2000 to 2004) did not have sufficient
   information in order to conduct any sort of non-Class exclusions.
3. Rebate data were not provided.