UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 <br> Civil Action No. 01-12257-PBS <br> Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: <br><br> CLASS 2 |  |

**WARRICK PHARMACEUTICALS CORPORATION'S
RESPONSE MEMORANDUM REGARDING CLASS 2 DAMAGES**

**PRELIMINARY STATEMENT**

Plaintiffs propose alternative calculations, one seeking damages of $5,752 allegedly based on the Court's findings, and another seeking $2,228,848 based instead on a so-called "competitive price" theory of recovery.[1]  Each calculation ignores the Court's bedrock legal conclusions that (i) "the pertinent legal question is whether Warrick can be said to have individually caused the plaintiffs' injuries;" (ii) "Plaintiffs must prove that Warrick was a 'but-for' cause of their injuries when purchasing albuterol sulfate;" and (iii) "plaintiffs must show that they would not have suffered the same injury if Warrick had reported a true AWP." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *63 (D.Mass. June 21, 2007).  Plaintiffs ignore these conclusions because acknowledging them inevitably leads to zero damages.

---

[1] Plaintiffs' counsel declined to discuss with Warrick's counsel differences in the parties' approaches, thereby preventing any possibility of narrowing the differences and necessitating this response.

Plaintiffs begin with a calculation ($5,752) that disregards the unambiguous CMS methodology for setting a reimbursement rate – a methodology that Dr. Hartman described in some detail in pre-trial reports,[2] and that Warrick has shown produces zero damages. Unsatisfied with the lack of damages produced by this approach, Plaintiffs move to an even more brazen proposal for larger damages. Because the CMS "fundamental billing unit approach leaves no damages," Plaintiffs assert that Warrick has affected the reimbursement rate by virtue of Schering-Plough's sale of a branded multi-source product (Proventil), and because, in any event, Warrick somehow "caused substantial overpayments" for all forms of albuterol. Of course, the Court already has made extensive findings about Proventil that reject this very theory of liability. The bald assertion that Warrick caused overpayments generally on albuterol likewise is contrary to the evidence and to the Court's findings. Tellingly, Plaintiffs offer not a hint of justification, beyond their demand that Warrick must pay, for adoption of either of these damage approaches. Finally, Plaintiffs' request for multiple damages as to Warrick is misguided because Warrick could not affect the rate at which CMS reimbursed for albuterol, and thus, there are no damages to multiply.

The absence of damages in this case does not reflect any oversight by the Court, but rather the degree to which Plaintiffs have overstated the value of their claims. This is hardly a legitimate basis for failing to follow the Court's decision, or failing to properly follow the CMS methodology for determining the Medicare reimbursement rate. Plaintiffs' invitation to do so is a shameless attempt to achieve outcome-oriented jurisprudence. The Court should reject this unseemly effort to cast the judicial process in such a poor light.

---

[2] (*See* Decl. of Raymond S. Hartman in Supp. of Pls.' Claims for Liability and Calculations of Damages (Dec. 15, 2005) at D.6 (attaching a Medicare Claims Processing Manual stating "[a]fter determining the AWP, carriers multiply it by 0.85 or 0.95, or other percentage as applicable and round to the nearest penny").)

**ARGUMENT**

**I.  PLAINTIFFS' METHOD OF CALCULATING CLASS 2 DAMAGES BASED ON THIS COURT'S OPINION IS WRONG.**

The first of Plaintiffs' damage calculations purports to be a literal application of the Court's findings but is not. The small amount of damages it yields ($5,752) is overstated because it is inconsistent with (i) unambiguous CMS methodology for setting a reimbursement rate – a methodology that their expert Dr. Hartman described in some detail in pre-trial reports, and that Warrick has shown produces zero damages; (ii) CMS data concerning the number of units of 0.5% albuterol solution reimbursed by Medicare; and (iii) the Court's instructions concerning the AWPs to use in determining the impact of the change in Warrick's AWP.[3]

**A.  Plaintiffs' Damage Calculations Ignore the CMS Methodology Used to Set the Reimbursement Rate for 0.5 % Albuterol in 1998 and 1999.**

As demonstrated in Warrick's Memorandum Regarding Class 2 Damages ("Warrick's Damages Memorandum") and the accompanying 8/1/07 Declaration of Sumanth Addanki, Ph.D ("Addanki Declaration"), Medicare reimbursement for 0.5 % Albuterol solution in 1998 and 1999 would have remained unchanged at $0.14 per mg if Warrick had reported a lower AWP in those years. (Warrick's Damages Mem. at 1-2; Addanki Decl. at ¶ 3, Ex. 3.) Plaintiffs fail to follow the proper CMS methodology based on fundamental billing units described in Warrick's papers and Dr. Hartman's prior submissions to this Court. Instead, Plaintiffs calculate damages based on AWPs expressed per milliliter (which was not the fundamental billing unit) and without rounding to the nearest whole cent, thus finding $5,752 worth of damages when there are none. Plaintiffs' damages submission does not dispute that Warrick's damage calculation is proper under CMS methodology; all they can say against it is that "Warrick … uses a fundamental

---

[3] Warrick incorporates by reference BMS's Brief on Pre-Judgment Interest (08/01/07) to the effect that pre-judgment interest should not be compounded.

billing unit approach that leaves no damage." (Pls.' Mem in Supp. of Track 1 Damages Submission, at 10 (dkt # 4535) (*hereinafter*, Pls.' Damages Mem.).) They cannot dispute the propriety of using CMS's reimbursement methodology for assessing the impact of changes on Medicare reimbursement or the accuracy of Warrick's implementation of that methodology because the key elements of the approach and its implementation are confirmed by evidence in the record, including testimony of their own expert.[4]

### B.  Plaintiffs Assert that an Impossible Number of Units of Warrick Albuterol Were Reimbursed in 1998 and 1999.

CMS makes publicly available the utilization data for every J-code reimbursed. Since such data is readily available for both 1998 and 1999, apportioning reimbursement for Massachusetts Medigap is a simple matter of applying Dr. Hartman's own coefficients – the very coefficients he uses to derive the numbers presented by Plaintiffs – to CMS data. Plaintiffs, however, eschew CMS utilization data despite its ready availability, authoritative source, and simplicity as a step toward arriving at a final calculation. Instead, they create a complex and indirect method of estimating the number of units reimbursed by Medicare starting with Warrick's total sales of the product and using estimates of the percentage reimbursed by Medicare. (*See* Dir. Test. of Dr. Hartman (Nov. 1, 2006) at 146-48 (Dkt. # 3296).)[5] They subtract from Warrick's total sales of albuterol the number of units that CMS says were reimbursed by Medicaid (thus using CMS data for that purpose), and then declare, with no

---

[4] (Dir. Test. of Raymond S. Hartman at ¶ 171(b) ("those drugs reimbursed under a HCPCS or J Code are to be filed using 'the unit of measure by which such HCPCS code is defined' which has been called the 'Fundamental Billing Unit.'")(quoting Medicare Claims Processing Manual); *id.* at n.53 (for purposes of comparing drugs other generic drugs Dr. Hartman notes "AWPs are expressed in terms of the fundamental billing unit); Decl. of Raymond S. Hartman in Supp. of Pls.' Claims for Liability and Calculations of Damages (Dec. 15, 2005) at D.6 (attaching a Medicare Claims Processing Manual stating "[a]fter determining the AWP, carriers multiply it by 0.85 or 0.95, or other percentage as applicable and round to the nearest penny."); PX 4101 (DMERC Fee Schedule showing Medicare reimbursement in whole cents); PX 4102 (same).)

[5] For most drugs, Dr. Hartman relied at trial on NDTI and NAMCS data, which he described as "survey data summarizing method of payment for procedures at physicians' office," to estimate Medicare utilization. (*Id.* at ¶¶ 180-83.) Dr. Hartman did not use NDTI or NAMCS data to estimate Medicare utilization of albuterol.

4

support whatsoever, that 75% of the rest were reimbursed by Medicare.[6] The result – 75% of non-Medicaid reimbursement, or 58.1% of total sales – is deemed to represent the number of units of Warrick albuterol reimbursed by Medicare. (*See* PX 973 at Attachment J.5.a.)

The result is a grotesque overstatement of Medicare utilization of albuterol. Using Dr. Hartman's own coefficients, their estimate that 58.1% of Warrick's total units were reimbursed by Medicare equates to Medicare reimbursement of *260,909,618* units of *Warrick's* 0.5 % albuterol in 1998, and *256,853,054* units of *Warrick's* 0.5% albuterol in 1999. (*See* Rebuttal Declaration of Sumanth Addanki, Ph.D. (08/02/07) (hereinafter "Addanki Rebuttal Declaration") at ¶7, Ex. 3-4.)[7] In contrast, CMS reports that it reimbursed 23,383,641 units of 0.5% albuterol in 1998 and 24,825,783 in 1999, *of all manufacturers*. *See id*. In other words, Plaintiffs' damages calculation of $5,752 rests on the assumption that reimbursement for Warrick's albuterol in Massachusetts was more than *ten times* the total reimbursement of all albuterol for all manufacturers nationwide.[8]

This flaw in Dr. Hartman's method of calculating the number of units reimbursed by Medicare was exposed during his cross-examination. (*See* Trial Tr. (12/11/06) 7:8-30:19.) Dr. Hartman's answers were unsatisfying then, and they remain so today. Comparing Plaintiffs' calculation to *actual* CMS reimbursement data for the 0.5 % albuterol sulfate solution leaves no

---

[6] *See* PX 974 at 3-4 (Attachment to 10/06 damage calculations justifying the use of the 75% allocation of non-Medicaid reimbursement to Medicare based on completely unsupported statements that "it is known that nebulizers are more common for Medicare beneficiaries" and that the "apportionment is based on the best information and judgment available at this time").

[7] As Dr. Addanki notes in his Rebuttal Declaration, *see* Addanki Rebuttal Decl. at n.1, Plaintiffs did not describe, in their August 1 filings, how they arrived at their damages calculations, nor did they file back-up materials for those calculations. Dr. Addanki, however, uses the backup material provided to Counsel for Warrick on July 23, 2007.

[8] This same flaw in Dr. Hartman's methodology of determining the units at issue infect Plaintiffs' calculations under their "alternative" damages model. Again, however, Plaintiffs did not submit to the Court background information showing the number of units of the various drugs that Plaintiffs run through this model.

5

doubt that Plaintiffs' method grossly inflates the number of Warrick units at issue in Class 2, thus inflating Plaintiffs' damage calculation.

### C. Plaintiffs Ignore the Court's Instructions and Use an Irrelevant AWP to Measure Damages in 1999.

While the Court clearly identified the AWPs to use in assessing damages, Plaintiffs use others instead. The Court directed that "the basis for the damage calculations is limited to the difference between the actual median AWP and the 'but for' median AWP had Warrick reported a true AWP." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *73.[9] In 1999, when Warrick's AWP was $0.7495 per ml, the Court found the actual median AWP was $0.7410 and the "but for" median was $0.7325. *Id.* at 63 n.78. Instead of calculating damages based on the difference between the actual median AWP ($0.7410) and the "but for" median AWP ($0.7325) – as directed by the Court – Plaintiffs calculate for 1999 the difference from Warrick's AWP ($0.7495), which was not the median.[10] Thus, for this reason, too, Plaintiffs overstate damages.[11]

### D. Plaintiffs' Proposed Damages Do Not Amount to "Substantial Consumer Injury" Necessary to Justify Liability Under Chapter 93A.

Quite apart from the flaws in the Plaintiffs' methodology, the amount of the proposed damages allegedly caused by Warrick – $5,752 – is not sufficient to support liability under chapter 93A. The First Circuit recently re-affirmed the principle that "whether [a practice] causes substantial injury to consumers" is a "requirement" to establishing chapter 93A liability.

---

[9] As shown in Warrick's Damages Memorandum, that difference between the "actual" and the "but for" median, is the starting point for determining effect on Medicare reimbursement and thus the extent of any damages to the Class.

[10] (*See* Addanki Rebuttal Decl., App. A (Plaintiffs' worksheet entitled "Worksheet for Warrick Class 2 Damages Calculations for Albuterol Based on the Difference Between Warrick's AWP and the "But-For" Median AWP" in the workbook "SP MA Damages.xls" sent to Warrick on 7/23 as backup documents to Dr. Hartman's Warrick Summary of Class 2 Damages (Massachusetts)).)

[11] Even using Warrick's 1999 AWP instead of the "actual" median in 1999, the reimbursement rate per milligram still remains the same as $0.14. (*See* Warrick's Damages Mem. at 4-7.)

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005) (holding that Plaintiffs' allegations regarding unjust enrichment could meet this and other "requirements" for chapter 93A liability); *see also In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, *58 (citing "MEEI"); *Burns ex rel Office of Public Guardian v. Hale and Dorr LLP*, 445 F.Supp.2d 94, 97 (D.Mass. 2006) ("[Plaintiff] must also establish that the alleged violation(s) caused her substantial injury" to establish a claim under 93A). Liability requires a harm that is substantial, and "neither trivial nor merely speculative." *United Cos. Lending Corp.*, 20 F.Supp.2d at 201.

In this "massive" multi-district class action, Plaintiffs have contended for over five years that Warrick's conduct caused vast injury to third party payors. The nationwide damage calculations submitted by its expert at various stages of the proceeding have amounted to hundreds of millions of dollars. (*See, e.g.,* Decl. of Raymond S. Hartman in Support of Pls.' Claims of Liability and Calculation of Damages: Addendum (2/15/06) ¶ 3.) With the benefit of a trial on the merits, however, the actual impact calculated by the Plaintiffs under the Court's ruling now can be characterized as no better than "trivial," and in Plaintiffs' own words, "meaningless." *See Pls.' Mem in Supp. of Track 1 Damages Submission*, at 6 (dkt # 4535) (*hereinafter*, Pls.' Damages Mem.). Spread over a class numerous enough to warrant certification,[12] the recovery of $5,752 for Massachusetts third-party payors amounts to almost nothing for any of them. Accordingly, this case does not involve the type of conduct, or the degree of impact, that chapter 93A was designed to remedy.

---

[12] Plaintiffs have never submitted any information about the total number of the members of Class 2. However, Complete Claim Solutions mailed notices of this class action to over 43,500 third party payors nationwide. (*See* Decl. of Charlene Young, Notice and Administration Manager, Complete Claim Solutions, LLC, Regarding Mailing and Publication of Notice to Class Members at ¶¶ 14-16 (Mar. 29, 2007) (Dkt # 3965).)

7

## II. PLAINTIFFS' ALTERNATIVE DAMAGE CALCULATION RESTS ON A THEORY EXPRESSLY REJECTED BY THE COURT.

After a two-month trial, the Court held that liability existed only to the extent that the Medicare reimbursement rate would have been lower had Warrick reported a lower AWP. *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *63 ("[g]iven that there are no claims or evidence of conspiracy or joint enterprise, the pertinent legal question is whether Warrick can be said to have individually caused the plaintiffs' injuries."). Notwithstanding this Court's unequivocal ruling, Plaintiffs submit an alternative method of calculating damages "based on a competitive benchmark," which rests on their postulation of a tacit Nash equilibrium and a collective effort by all manufacturers to peg their AWPs to Schering's Proventil, which were expressly rejected by the Court.

### A. The Court Expressly Held That Warrick Was Liable Only for Its Individual Effect on Reimbursement.

This Court determined that causation, and therefore liability, could exist only if and to the extent "Warrick can be said to have *individually* caused the plaintiffs' injuries." *Id.* at 63 (emphasis added). Plaintiffs' alternative damage calculations defy these fundamental determinations of the Court in favor of their original, rejected damage model that has no basis in the reimbursement rate paid by Medicare and the class. Given Medicare's reimbursement at the median generic AWP, Warrick could not have done anything that would have lowered Medicare reimbursement to the level at which Plaintiffs seek to measure damage – 1.3 times the ASP.

Plaintiffs justify their alternative measure by resurrecting previously rejected arguments and seeking to hold Warrick liable because "its AWP and those of other generic manufacturers were all inflated." *See* Pls.' Damages Mem. at 7 (referring to Dr. Hartman's direct testimony on the "apparent Nash equilibrium," "the median should still not be used [to calculate damages] given the Court's finding that all manufacturers of albuterol reported inflated AWPs"). The

8

Court discussed these theories at length and then rejected them, concluding that "[g]iven that there are no claims or evidence of conspiracy or joint enterprise," causation and liability only exist where Warrick individually caused the reimbursement rate to be higher than it otherwise would have been.  *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *62-63.

> **B.     The Court Rejected Plaintiffs' Argument that Proventil's AWP was Inflated and That Warrick Should be Liable for Setting its AWP Based on Proventil's AWP.**

Plaintiffs' alternative calculation likewise re-visits previously advanced and rejected arguments that Warrick should be liable beyond its affect on the median AWP and the Medicare reimbursement rate because the "median AWP *itself* is necessarily inflated because it is pegged to the brand drug's inflated AWP – in this case, **Schering Plough's Proventil**."  (Pls.' Damages Mem. at 6.)  The Court expressly rejected that assertion, finding that Proventil's AWP was not inflated and dismissing Schering-Plough from the case.  *See  In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *72-73 (finding only an "isolated, anomalous occurrence" during the relevant time period of Proventil spreads over 30%); *see also id.* at 72 n.88 (noting that 83% of Proventil sales were made within 5% of WAC).  The Court also expressly rejected Plaintiffs' theory that generic manufacturers set their AWPs in parallel in relation to any product, finding that "there are no claims or evidence of conspiracy or joint enterprise."  *Id.* at 63.[13]

> **C.     Plaintiffs' Comparison to BMS Drugs Is Inapposite.**

Plaintiffs say that their alternative damage calculation is preferable because it fits the "BMS paradigm," which measures damages by "the difference between the median AWP at

---

[13] Additionally, Plaintiffs cannot support their assertion that Medicare would have paid 1.3 times Warrick's ASP if all manufacturers had reported lower AWPs.  There was no evidence of any albuterol ASPs other than Warrick's.  Without such evidence, there is no basis for asserting that *Warrick's* ASP would have been the median.

9

which reimbursements were made and BMS's ASP (that is, what the AWP should have been)." Pls.' Damages Mem. at 6.  Plaintiffs are wrong because they ignore a decisive difference between the BMS multi-source drugs and Warrick's albuterol.  The BMS paradigm makes sense under the Court's decision for the BMS multi-source drugs because those multi-source drugs are branded, not generic, and their ASPs in the "but for" world would have been lower than the median generic AWP and, therefore, would have set the Medicare reimbursement rate.  That paradigm makes no sense for Warrick's albuterol because Warrick's albuterol is generic, not branded, and its ASP would not have set the reimbursement rate for generic albuterol in the "but for" world.  In other words, the Court's approach to damages for Warrick's albuterol and BMS's multi-source drugs are identical because both cases measure damages by comparing the actual reimbursement rate with the but-for reimbursement rate.  The implementation of the approach, however, is different because of differences in how Medicare reimbursement is affected by changes in the AWP of branded versus generic multi-source drugs.  *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *63.

The Court expressly found that "if BMS had reported a true AWP for its branded multi-source drugs, Medicare would have reimbursed based on that branded drug's AWP… and plaintiffs would have paid less."  *Id.* at 62.  In contrast, the Court expressly found that "causation for *generic* multi-source drugs" such as Warrick's albuterol is different.  *Id.* (emphasis added). Reimbursement at the median means that, had Warrick reported an AWP equal to its ASP, such ASP would not have served as the basis for reimbursement.  Thus, the Court held that there could be causation, liability, and damages for Warrick's albuterol only where, and to the extent

10

that, Warrick's reporting a lower AWP would have lowered the median and thereby Medicare reimbursement.[14]

### III. TREBLE DAMAGES ARE UNWARRANTED BECAUSE WARRICK'S CONDUCT WAS NOT A WILLFUL OR KNOWING VIOLATION OF 93A.

Multiple damages may be awarded under c. 93A if the violation is "willful or knowing." *International Fidelity Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1316 (Mass. 1983). A violation is "willful or knowing " only if the defendant had a subjectively culpable state of mind. *Anthony's Pier Four, Inc. v.. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991); *see also Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365, 1375 (D. Mass.1983). Multiple damages are "directed against the callous and intentional violations of the law." *Heller v. Silverbranch Constr. Corp.*, 382 N.E.2d 1065, 1070 (Mass. 1978). They are limited to "*intentional* employment of sharp practices" that exemplify "*a more purposeful level of culpability.*" *Wasserman v. Agnastopoulos*, 497 N.E.2d 19, 25 (Mass App. Ct. 1986)(emphasis added). Warrick's conduct did not manifest this purposeful level of culpability; therefore, even if Warrick had caused damages to Class 2, multiple damages would be inappropriate.

As this Court recognized, Warrick had no incentive to inflate AWPs for generic albuterol: "all versions of a generic drug are reimbursed based upon the same single measure, such as a median or MAC, so that there is *no competitive gain from having a higher AWP.*" *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *38 (emphasis added). Since "Medicare generally reimburses multi-source drugs at 95 percent of the median of the generic AWPs . . . [and since] TPPs typically impose a maximum allowable cost ('MAC') or

---

[14] Proventil, a multi-source brand, is also in a different position than the BMS drugs referenced by Plaintiffs. First, the Court found that Proventil's AWPs were not problematic. Second, as the Court recognized, Proventil's ASPs were almost always above the median generic AWP. *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *40. Therefore, even if Schering had reported an AWP for Proventil equal to its ASP, the Medicare reimbursement rate would have remained unchanged.

other limit to curtail costs, reimbursement is not even calculated on the drug's AWP." *Id*. at 10. Additionally, the Court found that "Warrick's AWP were almost always below the median," finding only two years for one product where Warrick's AWP was at, or slightly above, the median. *Id*. at 41. Even then, in those anomalous instances, Warrick did not affect Medicare reimbursement[15] and received no benefit from the anomalies.

The existence of large spreads on albuterol were well known by 1998. As this Court recognized, "[i]n 1996, the OIG focused on ... albuterol sulfate ... and concluded that 'Medicare's allowances for albuterol sulfate substantially exceed suppliers' acquisition costs for the drug." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *43. Dr. Hartman concedes that large generic spreads were known as early as 1992 (*see* Trial Tr. (11/20/06) 122:5-123:21 (Hartman) (discussing Trial Ex. 1053 (HHS-OIG, Physicians' Costs for Chemotherapy Drugs, A-02-91-01049 (11/92))), and that large albuterol spreads "began to reach public awareness in 1996." (Direct Test. of Raymond S. Hartman (Docket No. 3296) ("Hartman Direct") ¶ 77(d).)

In addition, Warrick's conduct was fully in accord with industry practice: its AWPs were set using the same criteria as the AWPs for other generic products, and the differences between those AWPs and transaction prices were known to sophisticated insurers, including CMS, by 1998. Thus, as the Court acknowledged, what Congress "understood and intended AWP to mean is not the same as what the industry [including Warrick] understood" in 1997. *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 2007 WL 1774644, at *61. Warrick had no reason to believe – and there is no evidence to the contrary – that its AWPs on generic albuterol communicated to CMS or any other insurer any inaccurate information. It had no

---

[15] (*See* Warrick's Damages Memorandum at 1-2.)

12

incentive to mislead CMS or any other insurer, and it knew that it had no opportunity to mislead CMS or any other participant in the reimbursement system who knew (as CMS surely did) of the large spreads between AWPs and transaction prices.  Warrick reasonably believed that others shared its understanding of AWP and, thus, did not "willfully or knowingly" report unfair or deceptive AWPs.  Simply put, Warrick should not be held for multiple damages – much less any damages – for participating in a system it did not create, did not attempt to exploit (*e.g.*, by marketing the spread), and most importantly, did not affect with a material change in reimbursement.

## CONCLUSION

The Court recently noted that it has not been able in certain instances to discern the effect of its rulings in this matter.  (*See* Hearing Tr. (07/03/07) 46:6-8) (stating "take Warrick.  I have no idea what the dollar [value] of these multi-source cases are.  I felt that was the hardest legal issue in the case.").  The recent submissions on damages have lifted the veil on one of those mysteries, and it is now plain that Warrick had no actionable impact on reimbursement received by third party payors in Massachusetts.  As a result, it has no liability under chapter 93A.

Respectfully submitted,

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Daniel J. Bennett (BBO#663324)
Jobe G. Danganan (BBO #660446)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Warrick Pharmaceuticals Corporation*

Dated:  August 3, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2007, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

>                                   /s/ Daniel J. Bennett_____
>                                   Daniel J. Bennett