UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | **MDL No. 1456**<br>C.A. No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Judge Patti B. Saris |

**MEMORANDUM OF PLAINTIFFS AND CLASS 1 REPRESENTATIVES HAROLD CARTER, REV. DAVID AARONSON, AND HAROLD BEAN IN RESPONSE TO DEFENDANT AMGEN, INC.'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION**

Last fall, this Court held a bench trial of claims brought by Massachusetts third party payors ("TPPs") and consumers against the Track 1 Defendants. The plaintiffs were Class 2 TPPs who made Medicare co-payments, and Class 3 TPPs and consumers who paid for drugs outside the Medicare context. All of the plaintiffs were from Massachusetts, and their claims were governed solely by Massachusetts law.

Both Class 2 and Class 3 were represented solely by TPPs. No Massachusetts consumers appeared at trial as class representatives or as witnesses. Consumer knowledge was not at issue. Thus, the Track 1 defendants understood that the Massachusetts bench trial was "not a consumer case," but "a Section 11 business to business case." *See* November 6, 2006 Transcript of Bench Trial –Day One Before the Honorable Patti Saris, United States District Judge at 65:17-18.

Prior to the Massachusetts bench trial, the parties submitted cross-motions for summary judgment on the meaning of the term "AWP" in the Medicare statute. This Court determined that, by 2003, Congress understood that AWP was different than actual average wholesale prices and

reduced reimbursement to 85% of AWP to account for the overstatement while a new reimbursement system was phased in. *See* November 2, 2006 ruling at 23-24. The Court therefore denied the Track 1 defendants' motion for summary judgment "except with respect to Medicare Part B drugs furnished in 2004." *Id*. at 24. The Court later ruled that the Class 2 and 3 class period ends on December 8, 2003, which was the date Medicare began reimbursing based on 85% of AWP. *See* June 21, 2007 Findings of Fact and Conclusions of Law at 34-35.

Amgen now seeks to impute the Court's rulings to Class 1 consumers who were not part of the Massachusetts Class 2 and 3 bench trial. Well-settled law prevents Amgen from using the Court's rulings from the bench trial in this manner. First, Amgen incorrectly assumes that no Class 1 representative purchased an Amgen drug prior to 2004. Second, Medicare patients should not be collaterally estopped from having their own claims fully adjudicated under their own state laws. Third, the question of what Congress knew in 2003 does not defeat the claims of consumers against Amgen. Fourth, the claims of the proposed class representatives are typical of those of other Class 1 consumers.

### A.    A jury must decide whether Harold Carter purchased Amgen products before 2004.

Amgen asserts that the records submitted by the proposed Class 1 representatives show that the proposed Class 1 plaintiffs purchased Amgen products only in 2004 or later. Amgen Memo. at 2. This is incorrect.

During the class period, Amgen manufactured epoetin alpha for both Johnson & Johnson and Amgen. Johnson & Johnson sold the epoetin alpha as Procrit, and Amgen sold it as Aransesp.

Harold Carter's medical records show that he began receiving injections of Procrit-branded epoetin alpha in 2002. By 2004, he was receiving the Amgen brand, Aranesp. Mr. Carter's records

do not show when the switch to Aranesp was made.  It would be inappropriate for the Court to resolve this disputed factual issue against Mr. Carter in the context of class certification. The jury will have to resolve this question based on Mr. Carter's testimony and other evidence presented at trial, including possibly the records of Amgen and/or Mr. Carter's physician.  Therefore, Mr. Carter should be permitted to litigate the issue of whether he purchased Amgen products prior to 2004, and represent Class 1 accordingly.

> **B.      Class 1 consumers are not precluded from litigating issues resolved in the Class 2 and 3 trial.**

Even if this Court were to determine that all of the proposed Class 1 representatives (including Mr. Carter) received Amgen products in 2004 or later, these consumers should still be permitted to represent Class 1 consumers in this proceeding and to litigate their claims along with all the other Class 1 consumers.

Although Amgen carefully avoids the phrase, it seeks to invoke "issue preclusion" to prevent consumers from litigating the question of whether they can recover for AWP-based payments made in 2004 and later.  The  doctrine of issue preclusion, also known as "collateral estoppel," provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Martin v. Ring*  401 Mass. 59, 60-61 (1987).  Collateral estoppel is "defensive" when wielded by a defendant to bar a plaintiff from relitigating an issue previously decided in the defendant's favor in a suit against other parties. *Acevedo-Garcia v. Monroig*  351 F.3d 547, 574 (1st Cir. 2003).

"It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard*." Parklane Hosiery Company, Inc.*

*v. Shore*, 439 U.S. 322, 327 n.7 (1979).  Thus, stringent requirements must be met for defensive collateral estoppel to be invoked:

>   (1)    a final judgment or order on the merits in the prior case;
>
>   (2)    "identity of parties," meaning privity between the losing party in the prior case and the party against whom preclusion is asserted in the current case;
>
>   (3)    "identity of issues," meaning that the issue in the prior case must be identical to the issue in the current case;
>
>   (4)    the issue must have been actually litigated in the prior case; and
>
>   (5)    the issue in the prior case must have been essential to the earlier judgment.

*In re Sonus Networks, Inc. Shareholder Derivative Litigation,* 422 F.Supp.2d 281, 288 (D. Mass. 2006) *(citing Kobrin v. Board of Registration in Medicine,* 444 Mass. 837, 843-44 (2005)).

The touchstone for determining whether collateral estoppel can be invoked is the "trial court's sense of justice and equity." *Boston Scientific Corp. v. Schneider (Europe) AG,* 983 F.Supp. 245, 256 (D. Mass. 1997) (*citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 333, 91 S.Ct. 1434, 1445 (1971)).  The "guiding principle" for the trial court is "whether the party against whom it is asserted 'lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.'" *Martin v. Ring,* 401 Mass. 59, 62 (1987) (quoting Restatement (Second) of Judgments § 29 (1982)).  If the party "did not have a fair opportunity procedurally, substantively and evidentially to pursue his claim" in the prior action, the party should not be collaterally estopped from litigating his case fully.  *Boston Scientific Corp.*, 983 F.Supp. at 256 (noting that an "appropriate inquir[y]" would be "whether without fault of his own the [party] was deprived of crucial evidence or witnesses" in the prior action).

Ignoring the above requirements, Amgen devotes two paragraphs to explaining why Class 1 consumers should be prevented by the Class 2 bench trial from litigating their claims for post-2003 drug payments. *See* Amgen Memo. at 4-5.  Amgen contends that because both Class 1 and Class 2 payments were tied directly to what Medicare paid for Part B drugs, and because this Court determined in the Class 2 proceeding that by December 2003 Congress had figured out that AWP was not reflective of actual prices, "the Court's rationale in deciding this issue applies with equal force to Class 1." Amgen Memo. at 4.  Thus, Amgen asserts that the Class 1 class period should be cut off at December 2003, the claims of the proposed class representatives should be dismissed for lack of standing, and class certification should be denied for lack of a class representative.  *Id*. at 5.

Class 1 consumers should not be collaterally estopped by the Class 2 TPP proceeding from litigating their claims for AWP payments made in 2004 and later. First, there has been no "final judgment on the merits" in the prior case.  Although "a final judgment in the traditional sense is not essential to the applicability of issue preclusion," factors such as whether "the parties were fully heard, the judge's decision is supported by a reasoned opinion and the earlier opinion was subject to review or in fact reviewed" should be considered in deciding whether an earlier determination is sufficiently "final" to be binding.  *Tausevich v. Board of Appeals of Stoughton*, 402 Mass. 146, 521 N.E.2d 385, 387 (1988).  Class 1 consumers were not fully heard in the proceedings culminating in the Court's November 2, 2006 ruling and June 21, 2007 verdict.  Although the Court issued both a reasoned opinion regarding the meaning of AWP and detailed factual findings and legal conclusions with respect to Classes 2 and 3, the Court did so without evidentiary or legal submissions from Class 1 consumers on the post-2003 meaning of AWP.   Moreover, these rulings have not been reduced to final judgment, reviewed, or even subject to appellate review.  And, far from advocating that the

Court's rulings should be considered "final" and binding, the Track 1 Defendants contend that the June 21, Findings of Fact and Conclusions of Law have no effect in other proceedings. *See* Track 1 Defendants' Memorandum of Law In Support of Their Motion For Entry of Judgments Under Rule 54(b) at 6 n.3. If the Court's rulings are not "final" enough to be binding on the Track 1 Defendants, they certainly are not binding on Class 1 consumers, who were not even part of the Track 1 trial for Classes 2 and 3.

Second, there is a dissimilar interest between consumers and TPPs in determining whether post-2003 claims for payments based on AWP are actionable. This Court already has recognized that a conflict may exist between TPPs and Medicare beneficiaries given "the different economic interests between the groups." *See* August 16, 2005 Memorandum and order Re: Class Certification at 42. Those disparate economic interests, and the potential conflict that the Court recognized over two years ago, are readily apparent here.

Since 2003, Medicare has jettisoned AWP in favor of ASP as a benchmark for reimbursement. As this Court determined at trial, however, "to date TPPs generally have not shifted away from AWP despite likely cost savings." *See* June 21, 2007 Findings of Fact and Conclusions of Law at 36. TPPs evidently have their own business reasons for continuing to use a reimbursement benchmark that they know to be inflated. *Id.* Among other things, the predictability of AWPs allows TPPs to better anticipate their future costs and increase their rates accordingly. *See id.* at 149 (noting that there is as much as a two-year period between the time a TPP experiences a cost and the time when those costs can be incorporated into a rate increase). In contrast, consumers who currently pay a percentage of inflated AWPs have no interest in continuing such payments. They have no rate-

setting process to manage, or network of providers to keep satisfied.  They simply want to pay less for their drugs.

This divergence of economic interests between consumers and TPPs in the continuing use of AWPs as a benchmark for reimbursement may rise to the level of a conflict.  A TPP that knows or should know that AWPs are fraudulently inflated, but continues to set reimbursement based on AWPs, might be exposed to liability to its insureds for forcing them to pay a percentage of what the TPP knows to be inflated prices.  A finding that post-2003 AWPs are not actionable would help diminish, if not eliminate, this exposure.  Under these circumstances, it can hardly be said that consumers are in "privity" with TPPs such that collateral estoppel would be appropriate.[1]

Third, it is questionable whether the issue of liability for post-2003 AWP payments was "actually litigated" in connection with the Class 2 and 3 trial.  As this Court candidly acknowledged in ruling on the meaning of AWP, "the parties have not addressed whether the term AWP in the 2003 statute should be construed differently."  *See* Order at 23.  This Court went on to determine that AWP should be construed differently in the 2003 statute, without receiving briefing on, among other things, whether the reduction to 85% of AWP was sufficient to offset the amount by which AWP was inflated.  If permitted to do so, Class 1 consumers would submit expert testimony and other

---

[1] An additional conflict exists between Class 3 consumers and TPPs.  This Court certified Class 3 under Rule 23(b)(2), which allowed Class 3 to seek an order enjoining the defendants from continuing to publish fraudulently inflated AWPs. In compliance with such an order, some drug companies might stop publishing AWPs completely, which would effectively force TPPs to switch to a different reimbursement benchmark.  Others might simply lower their inflated AWPs to the ASPs reported to Medicare.  While TPPs would presumably be reluctant to incur the cost of implementing a new reimbursement system (something it took Medicare years to accomplish),or lower their reimbursement rates to ASP, consumers would welcome such changes, since they would end up paying less for their drugs.  Thus, since TPPs and consumers do not have the same interest in enjoining the continuing publication of inflated AWPs, they do not have the same interest in proving ongoing (i.e. post-2003) fraud with respect to AWP.  These and other conflicts between Class 3 TPPs and consumers, and the lack of a consumer representative for Class 3 consumers, call into question the propriety of including consumers in Class 3.

evidence showing that they still overpaid for Part B drugs after 2003, even at the 85% benchmark set by Congress.

Fourth, imputing the Court's ruling on the meaning of AWP in 2004 and beyond to all consumers would effectively deprive many non-Massachusetts Class 1 consumers of their right to a jury trial on this issue. This Court previously ruled that the claims of each subclass would be governed by the laws of their respective jurisdictions. *See* January 30, 2006 Consolidated order Re: Class Certification at 3. Since Classes 2 and 3 were limited to residents of Massachusetts, these claims were governed solely by Chapter 93A, which provides no right to a jury trial. It was therefore appropriate for the Court to determine fact disputes that, were a jury trial contemplated, traditionally would have been left for the jury to decide.

In contrast, Class 1 covers forty states, including Massachusetts. Many of these state consumer protection statutes provide a trial by jury in consumer protection actions. *See, e.g., Zorba Contractors, Inc. v. Housing Authority, City of Newark*, 362 N.J. Super. 124, 139-140 (App. Div. 2003) (holding that there is a right to a jury trial in actions brought under the New Jersey Consumer Fraud Act); *Hoang v. Arbess*, 80 P.2d 863, 869-870 (Colo. App. 2003) (whether the defendant violated the Colorado Consumer Protection Act was a question for the jury); *Waggener v. Seever Systems*, 233 Kan. 517, 522, 664 P.2d 813, 818 (1983) (holding that there is a right to a jury for an action brought under the Kansas Consumer Fraud Act alleging deceptive acts). Thus, this Court has previously indicated that a jury will adjudicate the claims of Class 1 consumers. *See, e.g.*, March 6, 2007 Pretrial Order (setting a jury trial of Class 1 claims against AstraZeneca).

The Supreme Court has previously recognized that where a litigant has a right to a jury trial, "we have never accorded collateral estoppel effect to the trial court's factual determinations."

*Lytle v. Household Manufacturing*, 494 U.S. 545, 552-53 (1990). Giving collateral estoppel effect to this Court's factual determinations regarding the post-2003 meaning of AWP would contradict this precedent, as well as this Court's existing class certification and case management orders.

For the above reasons, Class 1 consumers should be given a full opportunity to litigate their claims, including the issue of whether AWP-based payments made in 2004 and later are actionable.

**C.      Class 1 consumers should be permitted to litigate their claims for spread marketing regardless of when they were prescribed or paid for drugs.**

In its supplemental memorandum, Amgen assumes, without explaining why, consumers who paid for drugs in 2004 should be non-suited by what Congress knew in 2003.  Amgen Memo. at 4-5. Amgen essentially contends that because payments by Medicare beneficiaries were "derivative" of the allowable amounts set by the federal government, Medicare beneficiaries can only claim to have been defrauded to the extent Congress was defrauded.  Thus, according to Amgen, the viability of each consumer's claim rises and falls on what Congress knew about AWPs at the time the consumer was prescribed and paid for a drug.

As the Court found in the Class 2 and 3 trial, cancer patients trusted their physicians to choose drugs for them based on effective treatment criteria, rather than profitability.  *See* June 21, 2007 Findings of Fact and Conclusions of Law at 21. Drug companies, however, created "perverse incentives" for doctors to breach this trust, by manipulating the "spread" between a doctor's acquisition cost for a drug and the amount the doctor could receive for the drug. *See id.* at 13-19. The Court analogized this manipulation to using a pair of scissors:  drug companies could raise the top blade (i.e. increase the AWP upon which the doctor's reimbursement was based), or lower the bottom blade (i.e. reduce the doctor's acquisition cost with rebates, discounts, and the like).  *Id.* at

16-17.   Drug companies then marketed the spreads to doctors, which the Court found to be

"particularly outrageous and unethical." *Id*. at 146.

Even if consumers were charged with the knowledge of Congress after 2003 that AWPs were

inflated, this would account for only the "top blade" of spread manipulation.  It does not relieve

Amgen of liability for manipulating spreads by lowering acquisition costs, or for marketing spreads

so that doctors chose more expensive drugs over less expensive alternatives.  Thus, even if Class 1

consumers were prohibited from litigating Congress' knowledge about inflated AWPs, and even if

Congress' knowledge about inflated AWPs were imputed to consumers, this would not relieve

Amgen of liability for inflated drug payments made after 2003.  All Class 1 consumers—including

those who made payments in 2004 and after—can recover for the consequent increase in drug costs

caused by doctors prescribing relatively expensive drugs. Because this Court's summary judgment

ruling does not even address the impact of spread marketing, all Class 1 consumers should be

allowed to press these claims, regardless of when they paid for their drugs.[2]

D.      **Claims of consumers who purchased drugs in 2004 and later are typical and common of other consumers.**

Amgen contends that even if the proposed class representatives are found to have standing,

their claims are not typical or common to the class.  Once again, Amgen is incorrect.

Amgen attaches great significance to the fact that, after 2003, reimbursement for Medicare

Part B drugs was governed by the Medicare Prescription Drug, Improvement and Modernization Act

("MMA") rather than the Balanced Budget Act of 1997.  *See* Amgen Memo. at 6-7.  Amgen touts

the fact that these are "different statutes" which set "new reimbursement benchmarks." *Id*.  Amgen

---

[2] The Reverend David Aaronson made a similar point in his May 30, 2007 Response to the Notice of Lack of Class 1 Representative As To Defendants Bristol Myers Squibb Co. and Oncology Therapeutics Network Corp, at ¶¶ 9-10. For the sake of brevity, Messrs. Carter, Aaronson and Bean incorporate Rev. Aaronson's May 30, 2007 Response in its entirety as if fully set forth herein.

appears to contend that these differences will expose the proposed class representatives to unique arguments and defenses that threaten to engulf the trial.

For purposes of this case, the only practical difference between the Balanced Budget Act and the MMA is that the Balanced Budget Act set reimbursement at 95% of AWP, and the MMA set reimbursement at 85% of AWP.[3]  AWPs were no less inflated in 2004 than they were in 2003, just as they were no less inflated in 1998 than they were in 1997.  Nor does Amgen contend otherwise. The only difference between pre-and post-2004 purchasers is that the latter will have to prove that the decision by Congress to reduce reimbursement by an additional 10% did not completely offset the financial injury caused by AWP inflation.  All other issues in this case, including whether Amgen manipulated and marketed spreads to doctors, the extent to which this influenced doctors to prescribe Amgen drugs, and the financial impact of this conduct on consumers, will be the same for all consumers, regardless of when they were prescribed drugs. Thus, the proposed class representatives satisfy the typicality and commonality tests for class certification.

---

[3] The same is true with respect to Congress' move to 95% of AWP in 1997, from the prior reimbursement benchmark of the "lesser of" AWP and Estimated Acquisition Cost ("EAC").

**CONCLUSION**

For the foregoing reasons, a nationwide class of Medicare beneficiaries should be certified

against Amgen, and Messrs. Carter, Aaronson and Bean should be certified as class representatives.


Dated: August 23, 2007                                    /s/ Donald E. Haviland, Jr.
                                                          Donald E. Haviland, Jr., Esquire
                                                          Adam S. Levy, Esquire, Of Counsel
                                                          Michael J. Lorusso, Esquire
                                                          THE HAVILAND LAW FIRM LLC
                                                          740 S. Third Street, Third Floor
                                                          Philadelphia, PA 19147
                                                          Telephone: (215) 609-4661
                                                          Facsimile: (215) 392-4400
                                                          haviland@havilandlaw.com

                                                          *Counsel for Harold Carter,*
                                                          *Rev. David Aaronson and Harold Bean*

**CERTIFICATE OF SERVICE**

I, Donald E. Haviland, Jr., Esquire, hereby certify that on August 23, 2007, I filed the foregoing Memorandum of Plaintiffs and Class 1 Representatives Harold Carter, Rev. David Aaronson, and Harold Bean in Response to Defendant Amgen, Inc.'s Supplemental Memorandum in Opposition to Class Certification, with the Clerk of this Court via the CM/ECF system.


/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr., Esquire
THE HAVILAND LAW FIRM LLC
740 S. Third Street, Third Floor
Philadelphia, PA 19147
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
haviland@havilandlaw.com