# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CIVIL ACTION:  01-CV-12257-PBS  Judge Patti B. Saris |

**MEMORANDUM IN SUPPORT OF THE HAVILAND LAW FIRM, LLC'S MOTION FOR APPOINTMENT AS CLASS COUNSEL FOR THE TRACK 2 CONSUMER SUB-CLASSES PURSUANT TO FED.R.CIV.PROC. 23(g).**

## I.    INTRODUCTION

As part of this Court's determination of the propriety of class certification of the Track 2 cases,[1] The Haviland Law Firm, LLC ("HLF"), hereby files this Memorandum in Support of its pending motion to be appointed Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  Specifically, HLF seeks to be appointed Class Counsel for the consumer Sub-Classes in the Track 2 cases – *ie.*, the Class 1 Medicare Beneficiary Sub-Class, and the consumer Sub-Class of Class 3.[2]  To be clear, HLF does not seek to control the entire litigation or to supplant the existing

---

[1]  This Motion is filed as a supplement to the Plaintiff's Motion to Certify Claims with Respect to Track 2 filed on May 8, 2006 ("Motion to Certify Track 2 Claims"), and the following companion pleadings filed in support thereof: Plaintiff's Motion for Leave to Join Harold Bean as a Plaintiff and Proposed Class Representative, filed May 16, 2006 [Docket No. 2581]; Declaration of Donald E. Haviland, Jr. Esquire, in Support of Motion to Certify Class with respect to Track 2 Defendants, filed May 26, 2006 [Docket No. 2615]; Plaintiff's Reply Memo In Support of Motion to Certify Claims with Respect to Track 2 Defendants", filed July 19, 2006 [Docket No. 2889]; Declaration of Donald E. Haviland, Jr. Esquire in Support of Plaintiffs' Response to Track 2 Defendants' Memo re Harold Bean, filed September 5, 2006 [Docket No. 3065]; Class Plaintiffs' Submission of the "Generics Chart" Pursuant to the Oral Request of the Court During the Class Certification Hearing in Connection with Track 2, filed December 21, 2006 [Docket No. 3220].

[2]  As discussed more fully below, HLF respectfully submits that the consumers in Class 3 must be disaggregated from the TPPs in Class 3, and should separately sub-classed within the Class 3 structure.  This is because of the divergent factual circumstances and legal rights and interests of the two groups, made readily apparent by the Class 2/3 trial held last year.   The recent filing by AstraZeneca underscores this point.  *See* Defendant AstraZeneca

representation of the TPP Classes by the Interim Class Counsel [who were appointed Class Counsel in the Track 1 case][3] – as has been charged by such counsel.  Instead, HLF seeks only to continue to represent the interests of its consumer clients, and all those similarly situated, which the firm did in the Track 1 case.  Since some of the same HLF clients certified as Class 1 representatives in Track 1 have been proferred as Class 1 representatives in Track 2, and the balance of the proferred Class 1 representatives in Track 2 are all the existing clients of HLF, granting HLF's 23(g) application will maintain the status quo that has existed in this case since Hagens Berman supported HLF's Entry of Appearance as Co-Lead Counsel in September 2006.[4]  Docket No. 3088.

The HLF clients in Track 2 all have submitted to broad discovery, including extensive, duplicative depositions, and they come before this Court as adequate representatives of the various Class 1 Sub-Classes for the Track 2 case.  However, because of the recent challenge of Interim Class Counsel to HLF to serving as their class counsel, these consumers find themselves seeking class

---

Pharmaceuticals LP's Memorandum of Law In Response to Plaintiffs' August 1, 2007 Damages Submissions [Docket # 4602]("Astra Damages Mem.") at p.4, n.1 ("The Court's findings demonstrate that these institutional entities are differently situated than individuals.  These institutions had greater access to information, but also failed to eliminate AWP as the basis for reimbursement even after it was clear that AWPs exceeded acquisition costs. …Such behavior from sophisticated entities is easily contrasted with that of individuals.").  Such relief properly responds to the Court's query at trial, "[s]o the correct remedy would be to decertify the Class 3 consumer class." Transcript of Bench Trial, Day 2, November 7, 2006 at 89:19-20.

[3]  In its Case Management Order No. 1, this Court designated several firms to act as "class counsel" for the case prior to class certification. The original firms included the Class Counsel from the Track 1 case, *ie*. Hagens Berman, Spector Roseman & Kodroff, Wexler & Associates and Hoffman & Edelson.  However, because such designation in CMO 1 preceded any class certification determination, it was, of necessity, one of "interim counsel" status under Rule 23(g).  *See* Fed.R.Civ.Proc. 23(g)(2)("The court may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action.").  For this reason, these firms will be referred to collectively herein as "Interim Class Counsel",  and the pending Motion for Track 2 Class Certification should be deemed a request by Interim Class Counsel for appointment as Class Counsel for the Track 2 case pursuant to Rules 23(a)(4) and 23(g).

[4]  Since, as of the date of this filing, no additional class representatives for Track 2 Class 1 have been proferred by Interim Class Counsel, it is presumed that no other consumers representatives are "waiting in the wings" to supplant the HLF clients.  If such clients exist, surely they should be proffered at this juncture to avoid any conflict or confusion down the road as the Track 2 case progresses.

certification, and the appointment of their chosen counsel as class counsel, over the objections of Interim Class Counsel. *See generally*, Declarations of consumer class representatives Joyce Howe, Larry Young, Reverend David Aaronson, Harold Carter, Roger Clark, and Harold Bean at Docket Nos. 4647, 4648, 4649, 4650, 4652, and 4653 respectively[5] (incorporated herein by reference thereto); *see also* Counter-Statement by Consumer Representative Plaintiffs to Joint Submission of Plaintiffs and Track 2 Defendants Relating to August 27, 2007 Hearing [Docket No. 4646] (seeking to have this Court adjudicate Track 2 class certification fully on Monday, August 27, 2007). What Interim Class Counsel deem a "waste of time"[6] actually goes to the heart of the matter in this dispute: whether consumers will control their own lawsuit, and whether their legitimate concerns about proposed settlements being brokered on their behalf by class counsel will be addressed *before* the settlements are consummated by counsel.

As the Court will recall, HLF filed a Motion to Amend CMO 1 simply to clarify the representation of Class 1 consumers by HLF. While Interim Class Counsel initially "welcome[d] the participation of Mr. Haviland and his firm" as class counsel in response to the Motion[7], they now oppose it and object to the HLF's representation of consumers.[8] Thus, a full-blown Rule 23(g)

---

[5]   The Declarations all state: "Because I rely exclusively on Mr. Haviland to tell me about the litigation, and I trust Mr. Haviland to represent the best interests of consumers like me in the lawsuit, I respectfully submit that Mr. Haviland and his firm should be appointed Class Counsel to represent the Class of consumers in this case. If Mr. Haviland and his firm cannot serve as Class Counsel, I would like to withdraw as a class representative."

[6]   "Valuable time and expense is being wasted addressing issues that have been discussed between counsel and then voted down by a majority." Class Counsel's Response to the Declaration of Donald E. Haviland, Jr. in Response to the Court Directive Concerning AstraZeneca Settlement, filed July 27, 2007 ("Class Counsel July 27, 2007 Response") at 17.

[7]   *See* Class Counsel's Response to Motion to Amend CMO 1 dated April 5, 2007 [Docket No. 3993].

[8]   It is noteworthy that one (1) of the four (4) original, Court-appointed Co-Lead Counsel, who had ceased serving in such capacity in light of unspecified "divergences of opinion...between Heins Mills & Olson, P.L.C. and certain other members of the Plaintiffs' Lead Counsel Committee" essentially consented to HLF's request to be substituted

inquiry is necessary.   Interim Class Counsel apparently find this inconvenient,[9] but a Rule 23(g) appointment procedure is mandatory when representation of a proposed class is in dispute.[10]   *See* Fed.R.Civ.Proc. 23(g)(2) (setting forth the mandatory procedure to be employed by the Court when "more than one adequate applicant seeks appointment as class counsel").

This Court has expressed concerns about the "rift between class counsel."[11]  Given the stark contradictions in affidavits submitted to the Court, it should be evident that somebody is being less than candid about the communications among plaintiffs' counsel in connection with the AstraZeneca settlement.   This Court needs to know that the lawyers representing consumers—or for that matter, any party in this litigation—are trustworthy.[12]  In particular, in the context of appointing counsel for

---

as Co-Lead. *See* Heins Mills & Olson, P.L.C.'s Response to Motion for Amendment of Case Management Order No. 1 and Consolidated Order Re: Motion for Class Certification [Docket No. 3968] at p. 3. The other former Co-Lead Counsel, Cohen, Milstein, did not respond.

[9] *See* July 27, 2007 Declaration of Steven W. Berman In Support of Class 1 AstraZeneca Settlement and In Response to the Haviland Declaration ("Berman Decl."), at par. 2.

[10]  The matter of HLF's continued representation of its consumer clients and the consumer Sub-Classes in Track 2 might have been passed by this Court, without question, in view of the Court's prior acceptance of Mr. Haviland/HLF as class counsel. *See* Declaration of Donald E. Haviland, Jr. In Response to Court Directive Concerning the AstraZeneca Settlement (filed contemporaneously herewith and incorporated herein by reference thereto) ("Haviland Decl.") at Exhibit "B" (enclosing HLF's September 2006 Entry of Appearance as "Co-Lead Counsel for Plaintiff and the Class" sponsored by Hagens Berman).

[11] *See* electronic Order dated July 2, 2007 at Haviland Decl. Ex. "A".

[12]  *See Organogenesis Securities Litig.*, 241 F.R.D. at 408 (D.Mass., 2007)(Tauro, J.) (*citing Nowak v. Ford Motor Co.*, 240 F.R.D. 355, 364, 408-409 (D.Mich. 2006)(finding the "fine shading of words" by class counsel to be "disturbing" and observing that "the court must employ and to some extent rely on representations made to it by counsel...Such carefully worded, arguably true representations made by Lead Counsel can erode the confidence of the court and opposing counsel in the lawyer making such statements, and this reduced trust can, in turn, impede the efficient progress of a complex case.").

consumers, the Court should also consider whether the clients, if they knew all they should know about the lawyers, would choose them as their counsel over all others.[13]

There are several reasons why this Court should appoint HLF to represent the consumer classes in this litigation, rather than Interim Class Counsel. First, the stated preference of the proposed class representatives for HLF and Mr. Haviland should be given considerable weight by this Court. All of the proposed consumer representatives for Track II are clients of HLF exclusively. Moreover, all of the proposed consumer representatives have expressed their preference for HLF and their counsel Mr. Haviland as counsel for consumers. None have expressed a preference for Interim Class Counsel. *See generally*, Declarations of Consumer Representative Plaintiffs at Docket Nos. 4647, 4648, 4649, 4650, 4652, and 4653 respectively.

Second, the Court's acknowledgment in its August 2005 memorandum decision on class certification that a potential conflict of interest might arise between TPPs and consumers has now come to pass. *See* Memorandum of Plaintiffs and Class One Representatives Harold Carter, Rev. David Aaronson, and Harold Bean in Response to Defendants Amgen, Inc.'s Supplemental Memorandum In Opposition to Class Certification [Docket No. 4641] (incorporated herein by reference thereto) (hereinafter "Consumers' Amgen Brief"). Indeed, Class 3 consumers were all but ignored in the Class 2/3 trial against the Track I Defendants, because the issue of TPP knowledge engulfed the trial. TPPs and consumers also have divergent interests in whether inflated AWPs

---

[13] *In re Medtronic, Inc., Implantable Defibrillator Product Liability Litigation,* 434 F.Supp.2d 729, 732 (D.Minn., 2006) (holding that the Court's fiduciary duty to the Class "requires the Court to question whether, other things being equal, and assuming full knowledge, the transferee plaintiffs [in an MDL proceeding] would select as their counsel an attorney whose law firm had been indicted for violating its duties to the court and its clients.").

should continue to be used as a basis for reimbursement.[14] *See generally* Consumers' Amgen Brief. As such, the same lawyers cannot represent both groups simultaneously, in the same litigation.

Consumers in this case diverge materially from TPPs in both their factual and legal circumstances. For example, Defendants themselves concede that consumers had no knowledge of the AWP fraud, and this Court has determined that consumers have standing to pursue consumer fraud claims under the laws of nearly forty states where TPPs do not. These and other differences between TPPs and consumers caused this Court to require separate representation of Medicare beneficiaries and their insurers, and to certify a near-nationwide Class of consumers in Track 1, but a statewide-only Class of TPPs in Massachusetts.[15] This Court's recent bench trial of the Class 2/3 claims against the Track 1 Defendants underscored these differences – and the need for separate class representation – especially since consumers have never had their day in court on these and other issues.[16] *See* Transcript of Bench Trial, Day 2, November 7, 2006 at 89:19-20.

The Supreme Court of the United States has admonished that such conflicts, once realized, cannot be overlooked or brushed aside until some future date in the litigation, such as the allocation

---

[14] As this Court found in its Class 2/3 trial verdict, and as AstraZeneca echoes in its recent submission, "Remarkably, BCBSMA, the behemoth insurer in the Massachusetts market, and other large TPPs, were not proactive in adjusting to cost data once Medicare did the legwork for them in devising more reasonable drug pricing and service fees." Astra Damages Mem. [Docket # 4602] at p.4, n.1. Indeed, AstraZeneca impliedly concedes that the need for declaratory and injunctive relief against concerning inflated AWPs sought by consumers in Class 3 remains an outstanding issue: "The Court's findings demonstrate that these institutional entities are differently situated than individuals. These institutions not only had greater access to information, but also failed to eliminate AWP as the basis for reimbursement even after it was clear that AWPs exceeded acquisition costs." *Id.*

[15] The Court also has indicated a likelihood to follow the same model for class certification in Track 2.

[16] AstraZeneca suggests in its recent submission that consumers in Class 3 were not part of the judgment and therefore have no right to recover damages. Astra Damages Mem. [Docket # 4602] at p.4, n.1. ("Here, Plaintiffs are seeking damages for members of Classes 2 and 3, which are *institutional entities*, not individuals.")(emphasis in original).

of a lump-sum settlement.[17]   Consequently, resolution of the Rule 23(g) issue—including whether separate counsel should be appointed to represent consumers and if so, who—is critical in determining adequacy of representation of the proposed Classes for Track II under Rule 23(a)(4).

Third, Interim Class Counsels' recent rant against Mr. Haviland in response to the factual submissions made in the Haviland Declaration requested by this Court further evidences the fact that Interim Class Counsel are not the "best able" to represent the interests of the consumer Sub-Classes in Track II, especially if they continue to represent TPPs.  *See* Fed.R.Civ.Proc 23(g). In particular, their reference to the proceedings from *In re Lupron* shows that Interim Class Counsel are so blinded by animus toward Mr. Haviland that they will say or do anything to prevent him from representing consumers, even if it works to the disadvantage of the consumers whom they supposedly represent. Far from serving as some sort of indictment of Mr. Haviland, *In re Lupron* is an example of the sort of duplicity and shoddy work that has typified the representation of consumers by Interim Class Counsel.[18]

---

[17]  *See generally, Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  In *Amchem*, although the lawyers for the parties, including nine (9) class representatives, labored for years to construct a complicated settlement matrix to effect global relief for asbestos claimants nationwide, an inherent, unresolved conflict in the class representation caused the Supreme Court to decertify the settlement class and nullify all of that work.

[18] Among other things, Interim Class Counsel now admit, some six (6) years later, their expert in *In re Lupron* –the same expert here–made a critical mistake in calculating damages, a mistake that cost consumers millions of dollars in the case but benefitted their TPP clients. *See* Declaration of Raymond S. Hartman Revised Damages for Track 1 Defendants: Class 2 and 3 ("Hartman Revised Damages Decl.") at 1-2 ("In preparing for the Class 1 trial, Counsel asked that I move a portion of the damages calculated for Class 2 to Class 1. Specifically, the copayment amounts paid by consumers who participated in employer-sponsored plans were moved to Class 1."); *see also* Defendant AstraZeneca Pharmaceutical LP's Memorandum of Law in Response to Plaintiffs' August 1, 2007 Damages Submissions ("Astra Damages Mem.") at 9-10 (citing eight Hartman reports filed in this case–not counting those in *In re Lupron* –and noting that "after submitting reports over the past three years in connection with class certification, summary judgment, liability and the Trial of Class 2 and Class 3, Dr. Hartman now – for the first time – incorporates an assumption that 6 in 10 (60%) of employer-sponsored supplemental insurance plans require beneficiaries to pay a 20% co-insurance…").   In other words, this means that, of the 60% of claimed TPP damages in the Class 2/3 trial, 20% actually belong to consumers.

For all these reasons, and those presented below and to be presented at the upcoming hearing on Track II class certification, The Haviland Law Firm, LLC, respectfully submits that it should be appointed Class Counsel of the consumer Sub-Classes of Classes 1 and 3 against the Track 2 Defendants.

## II.   FACTUAL BACKGROUND

### A.   HLF Qualifications

While The Haviland Law Firm, LLC's qualifications have never been challenged by the defense in this or any other case,[19] briefly summarized, they consist of the following.[20]

Although the firm was formed just under a year ago, it draws upon the extensive experience of its founding member, Donald E. Haviland, Jr., who has been practicing in the area of class action litigation, and particularly consumer class action litigation, for over seventeen (17) years.  Mr. Haviland began his career working with the renowned class action author and litigator, Herb Newberg, and spent his formative years co-authoring and editing, as part of Professor Newberg's research team, various chapters of the seminal treatise, *Newberg on Class Actions*.

In the years since Professor Newberg's passing in 1992, Mr. Haviland worked at several prominent firms, during which time he served as Co-Lead Counsel and as part of the Executive

---

[19]  As noted above, Interim Class Counsel represent no Class 1 consumers in the Track 2 proceedings. Accordingly, HLF respectfully submits that the objection interposed by Interim Class Counsel should not be accorded any weight by this Court, in the absence of any cited authority for the proposition that counsel with no representative clients have standing to object to the Rule 23(g) application of counsel for the proposed representatives of the subject Sub-Classes, *ie.*, consumer Classes 1 and 3.

[20]  While none of the Interim Class Counsel have made submissions in support of their respective petitions for appointment as class counsel of the various Sub-Classes in Track 2 pursuant to Rule 23(g), HLF is prepared to submit its firm biography, to make any other supplemental submission the Court may require, and to answer any direct inquiry of the Court in order to resolve the application process mandated by the Rule.

Committee of plaintiffs' counsel in several high-profile cases.  Neither Mr. Haviland, nor the firms at which he has worked, have ever had their applications to serve as class counsel rejected by any court.

### 1.      HLF Prior Work

Of special note to the instant application is the work Mr. Haviland has done for consumers in various cases.  For instance, Mr. Haviland's firm served as one of the Lead Counsel who prosecuted a consumer antitrust case against the National Football League ("NFL"), and various member clubs of the NFL, the settlement of which brought about significant changes in the law of antitrust and the way in which sports leagues manage their broadcast game rights. *See, e.g., Shaw v. Dallas Cowboys Football Club, et al.* 172 F.3d 299 (3rd Cir.1999) (holding that the antitrust exemption provided by the 1961 Sports Broadcasting Act did not apply to sports leagues when they sell game rights outside of network television).  In that case, Mr. Haviland directed the work of several other plaintiff firms, including Hoffman & Edelson [Interim Class Counsel here], in bringing about a successful resolution through settlement.

Mr. Haviland and HLF also serve as outside counsel for the Office of the Attorney General for the Commonwealth of Pennsylvania in several cases affecting consumer interests.  For instance, in one multi-district litigation pending in the District of New Jersey against various drug companies, including Schering-Plough Corporation, for alleged antitrust and consumer fraud law violations arising out of the sales and marketing of potassium supplements, Mr. Haviland has been appointed by the Court to serve as "Coordinating Counsel for the Non-Class Governmental Purchasers", a group which consists of all other affected Attorneys General in the country.

2.      **HLF work in AWP cases.**

a.      **In re Lupron.**

Interim Class Counsel have referred to the *Lupron* litigation on more than one occasion.  In the past they have used the *Lupron* settlement as a benchmark for the reasonableness of settlements in the AWP litigation.  More recently, they have cited to an unfavorable opinion Judge Stearns wrote about Mr. Haviland and his predecessor firm, Kline & Specter, in the *Lupron* litigation.  The relevance of this opinion to these proceedings, or to the appointment of class counsel under Rule 23(g), is not explained; as such, it can only be read as a rather clumsy attempt to smear Mr. Haviland. Ironically, however, certain significant aspects of the *Lupron* proceedings show that it is Interim Class Counsel who are "up to their old tricks" in this case.

The *Lupron* litigation commenced in federal and state courts around the country.  The federal cases were combined into MDL No. 1430 and transferred to Judge Stearns in the District of Massachusetts. The same firms who are Interim Class Counsel in the AWP litigation were appointed Interim Class Counsel in the federal *Lupron* litigation.

The state cases, however proceeded independently of the federal cases, and independently of each other as well.  Mr. Haviland was appointed Lead Counsel by two state courts for two certified litigation classes: a statewide class of consumers in New Jersey and a nationwide class of consumers in North Carolina.  Mr. Haviland led a consortium of nine (9) law firms, referred to as "The Kline & Specter Group," which consortium efficiently litigated both state court cases such that by the Fall of 2005, both cases were on the verge of trial.

As part of the nationwide notice program for the litigation class of consumers certified in North Carolina, the trial court ordered Class Counsel to establish a website to deflect the anticipated

volume of consumer contacts, to allow consumers to register in the Class if they wanted to have their claims directly prosecuted and to be kept informed of developments in the case.  Thousands of cancer patients across the country registered on the North Carolina class action litigation website. Approximately one thousand of these individuals directly contacted Mr. Haviland and entered into retainer agreements to have their cases prosecuted individually in the event the nationwide class certification did not withstand appeal.[21]

By the summer of 2005, discovery had been completed in both the North Carolina and New Jersey class cases.  The group led by Mr. Haviland had reviewed millions of pages of discovery documents from Defendants and third parties and had taken over 100 depositions; in contrast, Interim Class Counsel had taken less than 25 depositions.  Mr. Haviland's group had also defeated defense motions for summary judgment in the New Jersey case, and trial was scheduled to commence on October 25, 2005.  In contrast, Interim Class Counsel in MDL 1430 had not faced summary judgment motions, and had no trial date.  In fact, they did not even have a certified class, since they were still briefing the issue of class certification.

In August of 2005, in an effort to stop the state court cases before they made the federal MDL irrelevant, Interim Class Counsel petitioned Judge Stearns to enjoin the state court litigation under the All Writs Act.  He refused to do so.  Then, on October 1, 2005, only three weeks before the class trial in Mr. Haviland's New Jersey case was to begin, Interim Class Counsel announced that they had reached a nationwide settlement with the Defendants.  This announcement came as a shock to Mr.

---

[21]As it turned out, the North Carolina Court of Appeals reversed the trial court's nationwide class certification decision and remanded for reconsideration in light of the standards established by the appellate court.  *Stetser v. TAP Pharmaceutical Products, Inc.*, 165 N.C.App. 1, 598 S.E.2d 570 (N.C.App., 2004).  In the Fall of 2005, the case was certified as a North Carolina statewide class. The trial court left open the possibility that consumers from other states could opt into the North Carolina class if they wished.

Haviland's group, since they had not been involved in the negotiations, or even apprised that negotiations were taking place.

After reviewing the basic terms of the settlement, Mr. Haviland's group viewed the MDL Settlement as a "reverse auction" and submitted objections to preliminary approval on behalf of some of their consumer clients in the state cases. *See Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir., 2002). Among other things, Mr. Haviland's group advocated for first class mail notice to be consumers, for payments to be increased to consumers [they had been capped at 30% by MDL Plaintiffs Counsel], and other modifications. Judge Stearns overruled the objections and granted preliminary approval. Judge Stearns also enjoined any class member from continuing to litigate their claims until after he decided whether to grant final approval to the settlement, which stopped the New Jersey and North Carolina certified class action cases from proceeding.

Mr. Haviland criticized the proposed settlement in communications to his clients who had registered on the North Carolina litigation website or who otherwise contacted his firm. Mr. Haviland invited them to opt out of the federal settlement and to remain in the state court litigation, which had set trial dates. He also posted his views about the proposed settlement on the website that had been approved by the North Carolina trial court.[22]

Judge Stearns disagreed with Mr. Haviland's opinions about the federal court settlement, and he thought that consumers would be misled into thinking that Mr. Haviland's opinions were authorized by, or otherwise representative of, those of the Court. He therefore ordered that a

---

[22] In their opposition memorandum filed in MDL 1430, Interim Class Counsel falsely asserted that Mr. Haviland had set up the website *after* preliminary approval of the *Lupron* settlement had been granted. To the contrary, over two years before, the North Carolina court had ordered that the website be set up as part of the nationwide notice plan approved by both Defendants and the Court.

curative enotice be sent to dispel any confusion.  Significantly, Judge Stearns later acknowledged the attorney-client relationship between  Mr. Haviland and his clients, as well as the value Mr. Haviland brought to the settlement process.  Because the efforts of Mr. Haviland's group had caused the Defendants to increase the consumer percentage recovery by 60%-- ie. from 30% to 50% of the consumer's out-of-pocket expenditures—Judge Stearns awarded Mr. Haviland's group a "bonus" of $1.5 million for their efforts.

Although Interim Class Counsel imply that the opinion by Judge Stearns is of particular relevance to these proceedings, they ignore other aspects of the *Lupron* litigation that are much more significant.  First, several of Mr. Haviland's clients interposed specific objections to Judge Stearns and appeared to testify at the Fairness Hearing.  One such objector, Steve Rowan of Tampa, Florida, testified that he had been so victimized by the inflated spreads for Lupron that at the time of the settlement, he personally owed over **$70,000.00** to the Tampa medical facility that had treated his prostate cancer.  The settlement proposed by MDL Plaintiff Counsel, however, resolved his claims without providing him with the requisite funds to pay these inflated bills.  Judge Stearns characterized the unconscionable conduct of the Tampa doctors as "criminal" and ordered the *Lupron* Defendants to find some way to resolve the issue of Mr. Rowan's outstanding billings, which they did.  *See* Supplemental Declaration of Donald E. Haviland Jr. ("Haviland Supplemental Decl.") at Ex. "A" p. 57.

In light of this episode, in this case, Mr. Haviland insisted on behalf of his consumer representative clients that any class definition covering consumers include persons who had not only paid, but who had obligations to pay for Subject Drugs.  Interim Class Counsel eventually agreed to this definition and this same class definition was adopted by the Court in its January

2006 class certification Order. However, Interim Class Counsel later chose to abandon it in the proposed AstraZeneca settlement. Thus, people like Mr. Rowan would have no right to recover for the criminal conduct of their doctors, because Interim Class Counsel have required class members to pay the full amount of their inflated drug charges before they can qualify for any settlement proceeds.[23]

Second, as the Court is aware, Dr. Hartman was Interim Class Counsel's damages expert in the *Lupron* litigation, as well as in this case. His opinions about the distribution of payments between TPPs and consumers were the principal basis for the allocation of settlement proceeds between TPPs and consumers in the *Lupron* litigation. It has now become abundantly clear, however, that Dr. Hartman has utilized a flawed methodology for his calculation and allocation of damages in the AWP cases. This fundamental flaw originated in *Lupron* and permeated this case until it was corrected (by Mr. Haviland), but it remains uncorrected in *Lupron*.[24]

---

[23] Certified AstraZeneca Class 1 consumer representative Joyce Howe understands the significance of this issue, even if Interim Class Counsel do not. Mrs. Howe has included among her objections to the AstraZeneca settlement Class Counsel's attempt to re-define this Court's litigation class definition by limiting recovery of settlement proceeds to only those who have paid fully the fraudulent overcharge, as opposed to those who have incurred debts that remain outstanding. That Interim Class Counsel believe all cancer patients can simply write a check to qualify for a settlement that likely won't be reimbursed for a year or more shows how divorced they are from the reality of people in the consumer classes they seek to represent.

[24] While Dr. Hartman admits his error in this case in his recent submission to the Court–*See* Hartman Revised Damages Decl.–Interim Class Counsel who serve as fiduciaries to the consumer settlement class in MDL 1430 have never apprised Judge Stearns of Dr. Hartman's newfound revelations, or the fact that the allocation of the settlement proceeds was based on a critical flaw that overstated TPP damages by millions.

As AstraZeneca points out,[25] Dr. Hartman has filed eight (8) reports in this case, and reports in *Lupron* that preceded the reports in this case, all of which consistently over-reported damages to TPPs to the detriment of consumers.  Dr. Hartman wrongly assumes in these reports that consumers paid only 13% of the overall cost of prescription drugs, when in actuality the figure is much higher.  It was not until March 2006 – mere weeks before the AstraZeneca consumer trial, and only then after Mr. Haviland had discovered the flaw and confronted both Dr. Hartman and Interim Class Counsel-- that the necessary change was made.  In the case of the Class 1 AstraZeneca Sub-Class, this single change yielded over $8 million dollars in additional damages for consumers.[26]  While Dr. Hartman concedes his mistake and has since corrected the error in this case going forward, Plaintiff Counsel in MDL 1430 appear to be content to let the flaw lie unreported to Judge Stearns and unresolved for consumers in *Lupron*.

Third, Rule 23(e) requires that all agreements pertaining to a settlement—including agreements with objectors—be disclosed to the Court.  In *Lupron*, Mr. Haviland questioned whether a lawyer for the lone potential TPP objector, Ron Goldser of the Zimmerman Reed firm, had been paid to withdraw his client's objection.  Interim Class Counsel represented to Judge Stearns at the Fairness Hearing that there were no agreements respecting the settlement, including any fee agreements with counsel for any objecting party, that had not been disclosed.

---

[25]  *See* Astra Damages Mem. at 9-10 (citing eight Hartman reports filed in this case and noting that "after submitting reports over the past three years in connection with class certification, summary judgment, liability and the Trial of Class 2 and Class 3, Dr. Hartman now – for the first time – incorporates an assumption that 6 in 10 (60%) of employer-sponsored supplemental insurance plans require beneficiaries to pay a 20% co-insurance…").  In other words, this means that of the  60% of claimed TPP damages in the Class 2/3 trial, 20% actually belong to consumers.

[26]  This figure is merely the tip of the iceberg in terms of the overall monetary benefit to consumers Mr. Haviland's correction created when calculated across all consumers in the various Class 1 and Class 3 Sub-Classes of Tracks 1 and 2.

*See* Haviland Supplemental Decl., Ex. "A" (April 15, 2005 Transcript, pp. 19-21, denying the existence of any undisclosed fee agreement with objector-turned-supporter of the settlement, Mr. Goldser and/or his firm, Zimmerman Reed).

Later events all but proved this representation to be false.  Although neither he nor his firm had participated in the federal or state *Lupron* litigation, Mr. Goldser's firm, Zimmerman Reed, submitted an affidavit as part of Interim Class Counsel's joint submission reporting aggregate lodestar fees of **$49,601.25**. *See* Haviland Supplemental Decl. Ex. "B" (Exhibit 30 to the Appendix to MDL counsel's fee submission). Over a year later, on June 28, 2006, and at the insistence of Judge Stearns,[27] Interim Class Counsel filed an "Accounting Pursuant to the Court's Order of May 15, 2006" ("Accounting") which listed the fee disbursements and multiplers for all counsel.  *See* Accounting, p.4 at Haviland Supplemental Decl. Ex. "C" hereto. Exhibit "C" to the Accounting reported that fees of exactly **$300,000.00** were paid to the Zimmerman Reed firm, and that the multiplier on the Zimmerman Reed lodestar was "**1.0**." If the submission from Interim Class Counsel is to be believed, in the year after the final approval hearing Zimmerman Reed (which had not participated in the *Lupron* litigation at all except to object to the settlement) was assigned an additional $250,398.75 of work in *Lupron*, which coincidentally made its lodestar exactly $300,000.00. Of course, it is more plausible that Zimmerman Reed's lodestar was only $49,601.25 the whole time, as reported by sworn affidavits submitted by both Mr. Goldser and MDL Plaintiff Counsel, which meant they received a staggering 6.0 multiplier on their lodestar, by far the largest multiplier of any counsel in the *Lupron* case.  And, the largest

---

[27]  Class Counsel had fought public disclosure, but Judge Stearns denied their application to file the accounting under seal  *See* Order at MDL 1430 Docket No.499.

multiplier was paid, not to a firm that actively litigated the case, but to a firm representing an objector.[28]  It is little wonder that Interim Class Counsel resisted filing the Accounting publicly.

Overall, the *Lupron* litigation shows that Mr. Haviland zealously represented his consumer clients, to the point of fighting a "reverse auction" settlement, incurring the wrath of a federal judge, and ultimately improving the settlement to the point that the same judge acknowledged the benefit Mr. Haviland had added and awarded his group $1.5 million.  As for Interim Class Counsel, the *Lupron* litigation shows that they made mistakes which they have repeated in this case, and would continue to make if not confronted by Mr. Haviland.  Even worse, Interim Class Counsel appear to have paid off an objector to the settlement and attempted to conceal this fact from the Court.

### b.   State Cases in Arizona, New Jersey and Pennsylvania

HLF was retained by an Arizona consumer client in March 2003 to pursue a state class action case in Maricopa County, Arizona.  Despite a long hiatus in Federal Court, this Court remanded the case on January 9, 2004. *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 307 F. Supp.2d 190 (D.Mass., 2004). Since being remanded, the case has defeated all defense motions to dismiss and has been litigated as a "Coordinated State Court Case" pursuant to this Court's CMO 9.  In light of this Court reaching class certification in the Track 2

---

[28]  In this case, there has been one settlement with GSK approved by the Court.  There was one law firm who initially objected on behalf of a TPP, but then abruptly withdrew its objection.  No Rule 23(e) disclosure was made by Class Counsel.  Cause for concern also lies in the fact that TPP allocation counsel was inaccurately reported to the Court in the settlement agreement.  Jonathan Karmel – defined as  "TPP allocation counsel" in the settlement papers – never served in such capacity; instead, the later-named "ISHP Counsel" Messrs. Cohen and Simmer, had acted as TPP allocation counsel throughout the negotiations to allocate the Class settlement with the consumer allocation counsel, Ms. Nast and Mr. Williams. It was after the allocation negotiation was concluded, and Messrs. Cohen and Simmer threatened to opt out of the TPP Class if their demand for a side settlement was not met, that they re-surfaced in the settlement agreement as designated "ISHP Counsel".  Such deception to protect TPP interest causes concern.

case, the Honorable Janet E. Barton indicated at the status conference held a few weeks ago that she intended to contact this Court with a view to determining the status of the MDL proceedings to allow the state class case to move forward in coordination therewith.

HLF also was asked to serve as co-counsel to a firm retained by a union fund in June 2003 to pursue a state court class action in New Jersey on behalf of consumers and TPPs. That case too was wrongly diverted to Federal Court for more than two years, after which this Court remanded the case, finding that Rule 11 had been violated by defense counsel. *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 431 F.Supp.2d 109 (D.Mass., 2006). HLF defeated all defense motions to dismiss this past Spring, and the case is proceeding through coordinated discovery and class certification, with the assistance of a retired Federal jurist, William G. Bassler (who also has indicated a desire to speak with this Court about coordination).

Finally, HLF has been retained to pursue a case on behalf of the Commonwealth of Pennsylvania, which case was filed in March 2004. HLF successfully defeated defense motions to dismiss ["preliminary objections" under State rules] and the case is currently awaiting a remand decision – along with several other Attorney General cases – from this Court. In the meantime, the case has been conducting coordinated discovery with the other Attorney General cases still pending in state court.

### c.  MDL 1456

The experience of Mr. Haviland and HLF is of-record in this Court and should not need to be touted simply to rebut the baseless attack of Interim Class Counsel that Mr. Haviland and his firm have "failed to carry the weights and burdens of Class Counsel leadership." Class Counsel July 27, 2007 Response at 17. A few salient examples should suffice.

As this Court is aware, on September 12, 2006, Mr. Haviland argued Track 2 class certification on behalf of the consumer Sub-Classes in this case.  What the Court is unaware of is that Mr. Haviland was chosen among the Co-Lead counsel as the best suited to take lead in court on this issue.

Interim Class Counsel claim that Mr. Haviland and his firm have done little in this case, and, particularly, that they did little with respect to the Track 2/3 trial.  Although the Court has not required the submission of attorney time reports yet in the context of its award of statutory attorney's fees for the verdict – and such submission by HLF will demonstrate both the breadth and quality of the work HLF attorney did – this Court observed firsthand how one trial assignment Mr. Berman gave to Mr. Haviland was handled.  *See generally*, Transcript of Bench Trial, November 7, 2006, at 91 - 100 (wherein Mr. Haviland conducted the direct examination of Rebecca Hopkins, the only consumer witness whose testimony was admitted at trial as all others were stricken for lack of foundation).  During that examination, Mr. Haviland offered and had admitted by the Court the first documentary consumer evidence received by the Court in plaintiffs' case-in-chief.  *See id.* at 109 – 110.

Should the Court require some further demonstration of the work done by HLF in this lawsuit in resolving the Rule 23(g) application, the same will provided forthwith.

**B.     Hagens Berman's Unreported Record of Advancing Consumer Interests**

**1.     Poland Spring**

On March 22, 2006, three separate verdicts were entered against Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), and Steve Berman and Tom Sobol individually (collectively "Defendants"), finding all the Defendants liable for (1) Legal Malpractice; (2) Tortious

19

Interference with Prospective Advantageous Relationship; (3) Breach of Contract; and (4) Breach of Fiduciary Duty against three small water bottlers, in the matter of *Glenwood Farms Inc., et al., v. Hagens Berman Sobol Shapiro LLP, et al.*  Civil Action No. 03-CV-217-P-S (D.Me.) (herein after "*Poland Spring*").  *See* Special Verdict Form for Plaintiffs Carrabassett Spring Water Company, Inc., Glenwood Farms, Inc., and Tear of the Clouds LLC, attached as Exhibits "D", "E" and "F", respectively to the Haviland Supplemental Decl.

The professional malpractice case arose from the representation by Hagens Berman of three small water bottlers, Glenwood Farms, Inc. and Carrabassett Spring Water Company, Inc. [both of Maine], and Tear of the Clouds LLC  [of New York]  against Nestle Waters North America, the owners of Poland Spring Water.  Tear of the Clouds LLC is co-owned by Robert F. Kennedy Jr.

In the underlying lawsuit, the three Poland Spring water bottlers asserted claims against Nestle over Poland Spring's labels, contending that the "natural spring water" labels were misleading because the water was actually pumped from wells, not springs.  In doing so, counsel for the Plaintiffs in the initial matter, Jan Schlichtmann [of "*A Civil Action*" fame], conducted an extensive investigation concerning Poland Spring products and/or the sources of waters for those products, sharing the fruits of his investigation with the attorneys from Hagens Berman upon their involvement in the case.  Following mediation, on June 16, 2003, Nestle agreed to the terms of a settlement that would result in Glenwood and Carrabassett each receiving lucrative ten year contracts to supply Nestle with spring water, as well as Nestle agreeing to make substantial charitable donations for five years.

On June 18, 2003, despite their clients' express directive to preserve and facilitate the settlement agreement with Nestle, and strict demands by Nestle regarding the confidentiality of both the initial action and the settlement, attorneys from Hagens Berman filed multiple Poland Spring-related class action lawsuits against Nestle on behalf of parties who were not a party to the mediation on matters directly arising out of the Poland Spring matter.  Further, Hagens Berman notified news agencies and developed a website to publicize the allegations against Poland Spring, which was also in direct contravention to Nestle's insistence on confidentiality. The subsequent class actions brought by Hagens Berman, and the ensuing negative publicity, resulted in Nestle backing out of the settlement with the bottlers and instead settling several different class actions based on the same conduct, with substantial attorneys fees paid to the Hagens Berman firm.

On August 21, 2003, the bottlers, including Mr. Kennedy, filed a professional malpractice case against Hagens Berman alleging causes of action for (1) punitive damages; (2) negligence; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) misappropriation of confidential information; (6) breach of fiduciary duty; (7) conversion; and (8) tortious interference with economic relations.  *See* Complaint attached to Haviland Supplemental Decl. at Exhibit "G".

The professional malpractice case "focused on legal ethics and raised questions on whether lawyers can create theoretical classes of consumers and make legal decisions on their behalf – such as whether to settle a case and for how much – without consulting anyone."  March 23, 2006, Associated Press article, "Jury awards more than $10 million in water bottlers' lawsuit", attached to Haviland Supplemental Decl. at Exhibit "H".  The jury unanimously found

21

that the lawyers from Hagens Berman, including Mr. Berman and Mr. Sobol, violated their duty of loyalty to the plaintiffs by "dumping" those clients for a "more lucrative class-action case." *Id.* The jury awarded $3,898,129 each to Glenwood Farms, Inc. and Carrabassett Spring Water Company, Inc., and an additional $3,000,000 to Robert F. Kennedy Jr.'s company, Tear of the Clouds LLC. The trial court then had the jurors return for a two-day trial on punitive damages. The claim for punitive damages was ultimately settled, however, prior to the jurors reconvening.

As Mr. Kennedy put it, "[t]his was not a case of the attorneys taking care of consumers. This was a case of attorneys grabbing everything they could for themselves." *Id.*

### 2. iPod Nano

Two years after the *Poland Spring* matter began, the Hagens Berman firm, along with David P. Meyers & Associates ("Meyers"), filed a class action in the Northern District of California against Apple Computers, Inc., alleging violations of (1) state consumer protection statutes; (2) express warranty statutes; (3) implied warranty statutes; (4) negligent misrepresentation common laws; and (5) unjust enrichment common laws, with respect to the iPod Nano ("Nano"). The case alleged that the Nano was defectively designed causing the Nano to scratch resulting in irreparable damage to the Nano's screen, during foreseeable and normal usage. Hagens Berman filed the case, captioned *Jason Tomczak v. Apple Computer, Inc.,* on behalf of Jason Tomczak, individually and on behalf of all others similarly situated. The suit names Tomczak as the sole class representative of the putative class action ("the *Nano* case").

What came next is eerily familiar: in an "Open Letter to the Mac Community," Tomczak denied ever authorizing Hagens Berman to file the class action on his behalf and maintains that the firm did so expressly without his permission. *See* May 22, 2006, Open Letter to the Mac

22

Community, The Truth Behind the iPod Nano "Scratch" Class Action Suit, attached to Haviland Supplemental Decl. at Exhibit "I". In fact, Tomczak stated that he "did not approve, endorse, authorize, initiate or promote the lawsuit against Apple." *Id.* In his "Open Letter" Tomczak recounted the notoriety he endured in the Mac community as a result of his name being associated with the Nano Scratch case and stated, "[t]he truth is that I never sought ought nor did I ever hire David P. Meyer & Associates or Hagens Berman Sobol Shapiro to represent me in any case, much less the iPod Nano Class Action suit." *Id.* Although Tomczak acknowledged having "problems" with his Nano, he maintained that he "clearly told [the law firms] that they should do their own professional and technological study of the iPod Nano." *Id.* Further, Tomczak told the Meyers firm "that [he] wanted to remain private, and that [his] wish for privacy, among other considerations, would preclude [him] from getting involved in the case." *Id.*

 Tomczak stated:

> At no time did David P. Meyers & Associates or Hagens Berman Sobol Shapiro ever receive any attorney-client agreement form from me. On their own time and based on their own schedules and plans, they prepared the paperwork and filed the iPod Nano Class Action suit in California using my name as Lead Plaintiff, however this was done without my knowledge or consent.

*Id.* (emphasis added)

 Based on the conduct of Hagens Berman and the Meyers firm, Tomczak retained personal counsel and filed his own professional malpractice lawsuit against the two firms in Los Angeles Superior Court. *See Jason Tomczak v. Hagen Berman Sobol Shapiro LLP, et. al.* Civil Action No. BC347824, complaint attached to Haviland Supplemental Decl. at Exhibit "J". The lawsuit asserts several causes of action including but not limited to (1) negligence; (2) breach of fiduciary duty; (3) breach of oral contract; (4) breach of the implied covenant of good faith and fair

dealing; (5) violation of California civil code section 3344 [regarding unauthorized use and exploitation of one's name]; and (6) violation of the California Business & Professional Code.

Specifically, Tomczak alleges that Hagens Berman and the Meyers Firm were negligent in "soliciting [Tomczak's] participation in a class action lawsuit under false pretenses, misleading [Tomczak] into believing that he was being contacted for technical and research purposes only, failing to disclose anything about a class action lawsuit until after it was filed and unilaterally naming [Tomczak] as the lead and sole plaintiff in the class action, without his consent or knowledge, knowing that it would cause serious emotional and economic harm to [Tomczak]." *Id.* at ¶ 21.  Further, with respect to Tomczak's cause of action for violation of the California Business & Professional Code, he avers that Hagens Berman and the Meyers firm "(1) unlawfully solicited prospective clients; (2) made statements to prospective clients which are false, deceptive, or which tends to confuse, deceive or mislead; (3) failed to state facts necessary to make the statements made to a prospective client, in the light of the circumstances under which they are made, not misleading; (4) communicated with prospective clients in a manner which involves intrusion, coercion, duress, compulsion, intimidation, threats, or vexatious or harassing conduct; and (5) solicit prospective clients under the false pretenses that their solicitation was for purposes of information and research only." *Id.* at ¶ 72.

## III.   ARGUMENT

### A.   Legal Standards Under Rules 23(g) and 23(a)(4)

A fundamental prerequisite of a class action, pursuant to Federal Rule of Civil Procedure 23(a)(4), is the finding that the "the representative parties will fairly and adequately protect the interests of the class." F.R.Civ.P. 23(a)(4).  That adequacy requirement pertains to both the

individual class representatives and the qualifications of class counsel and, until the 2003 amendments to the Federal Rules, served as the sole instrument through which the Court scrutinized the proposed class counsel. In 2003, the Advisory Committee adopted Rule 23(g) to "respond[] to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action." Advisory Committee Notes Rule 23, 2003 Amendments, Subsection (g).

Rule 23(g) requires that "[c]lass counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests."[29] *Id.* The rule establishes the procedures and standards to be applied whether there are one or more applicants for appointment as class counsel. If there is only one applicant, the court may appoint that applicant "only if the applicant is adequate under Rule 23(g)(1)(B) and (C)." F.R.Civ.P. 23(g)(2)(B). If there are multiple applicants, the court must appoint the applicant "best able to represent the interests of the class." *Id.* Consistent with the other prerequisites, applicants for the appointment as class counsel have the burden of showing their adequacy. *In re Organogenesis Securities Litigation,* 241 F.R.D. 397, 408 (D.Mass., 2007).

"In determining lead counsel, a court should conduct an independent review to ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all of the parties on their side, and that their charges will be reasonable." *In re Delphi ERISA Litigation*, 230 F.R.D. 496, 498 (E.D.Mich., 2005) (*citing Manual for Complex Litigation* § 10.22, Pp. 24-28 (4th Edition, 2004). In making this determination, the Court *must*

---

[29] As noted above, HLF seeks only to represent the interests of its consumer clients, and all those similarly situated, which clients have been preferred to represent the interests of the consumer Classes in the Track 2 cases.

consider "the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class."  F.R.Civ.P. 23(g)(c)(i). Rule 23(g)(c)(ii) further allows the Court to "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  The Advisory Committee notes shed further light on this standard, suggesting that the court "go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants," specifically providing that an "important consideration might be the applicant's existing attorney-client relationship with the proposed class representative."  *Id.*

Despite Interim Class Counsel's assertions to the contrary,[30] the appointment of class counsel is of paramount importance to the successful resolution of this action.  The importance of such judicial evaluation of the proposed counsel was articulated in *In re J.P. Morgan Chase Cash Balance Litigation*, wherein the Court stated that "[a]ppointment of class counsel is an extraordinary practice with respect to dictating and limiting the class members' control over the attorney-client relationship and thus requires a heightened level of scrutiny to ensure that the interests of the class members are adequately represented and protected."  2007 WL 1549121, *10 (S.D.N.Y., Mar. 15, 2007).  Accordingly, the Federal Rules mandate that this Court conduct an independent review of the applicants seeking appointment as class counsel employing a heightened level of scrutiny to ensure that the interests of the class members are adequately

---

[30] *See* Declaration of Marc H. Edelson in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration ("Edelson Decl."), at par. 7.

represented and protected.  This is necessary despite the fact this Court has named interim

counsel, as that designation is separate from the 23(a)(4) adequacy requirement for class

certification and temporary in nature.

In resolving the pending Motion for Track 2 Class Certification and the instant motion for

appointment as class counsel for the consumer Sub-Classes, the Court must be cautious not to

create a situation wherein one group of plaintiffs is favored.  *See In re Cardinal Health, Inc.*

*ERISA Litigation,* 225 F.R.D. 552, 556 (S.D.Ohio, 2005) ("Counsel cannot represent different

classes of plaintiffs with conflicting claims who are seeking recovery from a common pool of

assets.") (*citing ABA Code of Professional Responsibility,* DR 5-105 and EC 5-14, prohibiting

counsel from representing different plaintiffs with conflicting claims against the same defendant

because it creates "the appearance of divided loyalties of counsel).  Respectfully, the record, both

in this case and in other actions involving the same interim counsel, has shown that such

favoritism would inevitably result if the TPP-retained Interim Class Counsel were to be named

class counsel exclusive of any consumer representation.

In *In re Cardinal Health,* the court considered applications for the appointment of class

counsel from five (5) different groups of plaintiffs.  225 F.R.D. 552.  In that case, the court

rejected the application of the group comprised of the law firms of Schiffrin & Barroway and

Keller Rohrback, based in part on the "difficulties the [Schiffrin] firm encountered" in an

unrelated case, *Moore v. Halliburton, Co.*, No. 3:02-CV-1152-M, 2004 WL 2092019, (N.D. Tex.

Sept. 9, 2004).  In *Moore,* the court refused to approve a settlement agreement, in part, because

the firm had "commenced settlement negotiations with the defendant, Halliburton, without

informing the lead plaintiff, the Archdiocese of Milwaukee Supporting Fund ("AMSF") that

settlement discussions were ongoing." 225 F.R.D. at 557 (*citing Moore* at *1).  As a result, the court found that the firm had deprived the class of the benefits of multiple Lead Plaintiffs by "taking one of the lead plaintiffs out of the decision-making loop." *Id.*  The *Moore* court stated it was "dismayed that Lead Counsel here felt at liberty to exclude any of the Lead Plaintiffs from significant involvement in material activities in the case, which settlement surely is. No one can know how active involvement of AMSF in the negotiations might have affected the outcome of the negotiations." *Id.* at 558.

In this case, the record demonstrates that the named representative plaintiff for AstraZeneca Sub-Class 1, Mrs. Howe, and her counsel, were taken out of the decision-making loop with respect to the AstraZeneca settlement negotiation, despite their express objections to key provisions, at a critical juncture.  Interim Class Counsel admit that "the parties were ***still*** negotiating into the evening on Sunday May 21, over important details (of the settlement, and) … it was still unclear just the evening before the papers were filed whether the deal would unravel." Counsel Counsels' Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca ("Class Counsel Opp. To Reconsideration"), at n.4, p.14 [emphasis in original].  Given this, the representative and her counsel had the right to be involved in the negotiations "into the evening" of May 21.  They were not.  Indeed, Interim Class Counsel admit they excluded Mrs. Howe and her counsel from the negotiation of these "important details".  *See* Class Counsel July 27, 2007 Response at 13.  In the words of the *Moore* Court, no one can know how the involvement of Mrs. Howe in the proceeding negotiations might have affected the outcome.  *See id.* at 558.   The

Class was deprived of the benefits of Mrs. Howe's involvement by the unilateral decision of Interim Class Counsel to exclude her. *Id.* at 557.

Such ill-advised decisionmaking by Interim Class Counsel was not limited to AstraZeneca. On the heels of the AstraZeneca settlement, Interim Class Counsel sought the authority of Reverend Aaronson to begin settlement negotiations with Bristol-Myers Squibb, per this Court's directive, in advance of the July 2007 trial. Reverend Aaronson, through counsel, denied such authority pending the resolution of certain outstanding issues about the nature and scope of the settlement demand, largely driven by the problems exposed in the AstraZeneca settlement, such as whether the nine (9) States outside this Court's certified BMS Sub-Class 1 would be included from the outset, among other issues. Remarkably, Interim Class Counsel chose to ignore Reverend Aaronson, and to proceed to negotiate without him or his consent– or that of any other Class 1 client. It was only *after* Interim Class Counsel had achieve an agreement in principle to settle with BMS that they engaged in the unseemly act of cherrypicking names from the GSK Settlement Class database in order to solicit a "replacement" consumer class representative for Reverend Aaronson, to backfill the Rule 23(a)(4) requirement of an adequate representative.[31] They used the same database obtained as a result of Reverend Aaronson's service as the lone consumer Class 1 representative of the GSK Settlement Class against him to accomplish their objectives with BMS. And, they have excluded him and his counsel ever since, despite this Court's clear admonition to keep them "in the loop." *See*

---

[31] *See, e.g*, Plaintiff's Response to BMS' Notice of Lack of Class Representative as to Defendants Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp [Docket No. 4283] at Exhibit "1" (enclosing the 2007 CMS Medicare Summary Notice for proposed replacement BMS Class 1 representative, Agnes Swayze of Lancaster, California reflecting her receipt of GSK's Zofran (ondansetron hcl injection)).

Transcript of July 3, 2007 Hearing at 46:8-10 ("I think you need to bring Mr. Haviland in the loop so at least I know…").

The *Moore* court expressed further concern about the 'vigor of Lead Counsel's settlement advocacy,' noting that "lead counsel supported a release that would have extinguished claims completely unrelated to the suit" and also "because the $6 million proposed settlement, which was negotiated by Schiffrin & Barroway, would have guaranteed Schiffrin & Barroway approximately $1,500,000 in attorneys fees, leaving a net recovery of $3,000,000 for a class of 800,000 potential claimants." *Id.*

In this case, Interim Class Counsel have demonstrated questionable "vigor" in their "settlement advocacy" on behalf of consumers by: (1) continuing to utilize Dr. Hartman's damage figures in settlement negotiations that do not account for the nine (9) States excluded from this Court's January 2006 certification order; (2) agreeing to a "claims made" settlement despite the novelty of the same and express objections of the named respresentatives to the same; (3) allowing for a reverter to AstraZeneca; (4) setting up a "Quick Pay" for the payment of their attorneys fees, while requiring their clients, the cancer patients in the Class, to suffer through a year or more of claims administration and unfettered audits by AstraZeneca; and (5) openly discussing fee provisions during substantive settlement negotiations.[32]   Accordingly, this Court should be equally concerned about the vigor of Interim Class Counsel's settlement advocacy respecting consumers, and should take steps to insure that the interests of the consumer Sub-

---

[32]  Despite vehemently denying initially that they engaged in simultaneous negotiations of fees along with the AstraZenenca Class settlement terms, Interim Class Counsel did a 180 degree turn in the wake of the revelations in the Haviland Declaration [and exhibits thereto] and now defend the propriety of such simultaneous negotiations. (Because there has been no objection to the filing of the Haviland Declaration, and given the relevancy of the factual record contained therein to the instant dispute, the same is being filed of record today in conjunction with this Memorandum and supporting documentation.)

Classes do not fall victim to the desires of TPP-retained counsel to assuage their staggering lodestar/expense bill.

In *In re Medtronic, Inc., Implantable Defibrillator Product Liability Litigation,* the court found that it was in the best interest of the transferee plaintiffs that the Milberg Weiss firm be "severed from their service on the [plaintiff steering committee], and from continued service on behalf of the transferee plaintiffs."   434 F.Supp.2d 729, 730 (D.Minn., 2006).  That decision came in the wake of the federal indictment of the Milberg Weiss firm and was premised upon the District Court's fiduciary duty owed to the Class.  In that case, the Court pointed to the "independent duty" it owed to the transferee parties in a Multi-District Litigation case, and noted that, in such a Multi-District case "many transferee plaintiffs do not select their case-managing counsel in the traditional fashion."  *Id.* at 731.  Therefore, the Court held that fiduciary duty "requires the Court to question whether, other things being equal, and assuming full knowledge, the transferee plaintiffs would select as their counsel an attorney whose law firm had been indicted for violating its duties to the court and its clients." *Id.* at 732.

Similarly, in *Organogenesis Securities Litigation,* this Court refused to certify a putative class seeking to appoint the renowned class action law firm, Milberg Weiss, as Class Counsel based in part on the "indictment's determination of probable cause that criminal conduct has occurred" and the "shady" misrepresentations made to the court by Milberg Weiss regarding the indictment. 241 F.R.D. 397, 410 (D.Mass.,2007).  In that case, this Court noted that the firm took a month to inform it of the indictment and attempted to assure the Court that none of the attorneys litigating that matter had been indicted, despite the fact that one of the indicted lead partners had signed the Amended Complaint and the engagement letter with all four Lead

Plaintiffs.  *Id.* at 408.  This Court questioned the "fine shading of words" with which the firm disclosed the indictment pointing out that "the court must employ and to some extent rely on representations made to it by counsel" and that "such carefully worded, arguably true, representation made by Lead Counsel 'can erode the confidence of the court and opposing counsel in the lawyer making such statements, and this reduced trust can, in turn, impede the efficient progress of a complex case."  *Id.* at 408-409.

Here, Hagens Berman has never made disclosure to this Court of the jury verdict against it in the *Poland Spring* case, even though it was clearly relevant to the firm's adequacy as Class Counsel.  At a minimum, disclosure of the March 22, 2006 verdict against Hagens Berman, Steve Berman and Tom Sobol finding *inter alia* malpractice and breach of fiduciary duty was warranted, given the pendency of the instant Rule 23 Track 2 class certification Motion that was filed May 8, 2006.  In light of Mr. Kennedy's assessment -- that, "[t]his was not a case of the attorneys taking care of consumers.  This was a case of attorneys grabbing everything they could for themselves" [Haviland Supplemental Decl. at Exhibit "H"] -- Judge Tauro's appropriate concern about the erosion of confidance by the Court in counsel seeking to be appointed class counsel commanded far more from Interim Class Counsel here, especially in light of their meritless and venomous attack on the undersigned for no reason other than their zealous advocacy on behalf of consumer clients.

As stated previously, it is not the goal of HLF to supplant the representation of Interim Class Counsel in the overall case, as they have wrongly claimed.  By the same token, however, it should not be the goal of Interim Class Counsel to change the status quo of having Mr. Haviland and HLF serve as Class Counsel for consumers, nearly two (2) years into this now six (6) year-

old case.  But therein lies the problem, created wholly by the desire of Interim Class Counsel to take over.  The problem is not insurmountable.

The inevitable favoritism that would be afforded TPPs and the ensuing conflict of interest that would result from appointing solely TPP-retained counsel as 23(g) Class Counsel for all Classes can be cured with the addition of a separate consumer advocate.  *See In re Luxoticca Group, S.p.A. Securities Litigation,* 2004 WL 2370650, *5 (E.D.N.Y., Oct. 24, 2004) (*citing Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir.1998) ("[T]he addition of new and impartial counsel can cure a conflict of interest even where previous counsel continues to be involved in the case").  Such a "cure" exists simply by the Court affirming its prior decision to have HLF serve as Class Counsel but, respectfully, with the added directive that counsel to the consumers cannot simply be "outvoted" by the "majority" of firms.  Instead, since four (4) firms directly represent the various TPP constituencies, and only one (1) represents Class 1 consumers, the decisionmaking as to consumer issues must be left to the consumers and their counsel.[33]  The TPPs can decide the appropriate course for their case with their counsel.  And, the two sets of lawyers can, and should, work together to find common ground where they can vis-à-vis the Defendants.

As discussed above, it is not the intention of the Haviland Law Firm to supplant the existing representation of the TPP classes by the Interim Class Counsel, rather this Motion seeks to cure the conflict that this Court forebode in August 2005, by allowing the case to proceed with

---

[33] Since two (2) of the four (4) Interim Class Counsel firms claim to be "Co-Lead", but were never appointed by this Court to serve in such capacity, their involvement in "majority votes" on case management issues in suspect. *See* CMO 1 [Docket No. 100] at pp. 5-6 (designating the "Chairs of the Lead Counsel Committee") and p. 7 (charging such Chairs with "the authority and responsibility for the day-to-day management of the interests of Class Plaintiffs in the lawsuit").

counsel for both the TPPs and the consumer Sub-Classes able to advocate and protect the divergent factual circumstances and legal rights and interests of the two groups.  Such an appointment would preserve the status quo from Track 1 and would protect the interests of the consumer Classes, while at the same time allowing the TPP counsel to continue asserting the rights of the TPPs and allowing all Classes to benefit from the familiarity and experience of both groups of counsel, as they have for the last two (2) years.

**B.      Interim Class Counsel's Inconsistent Positions in This Court Warrant Maintenance of the Status Quo of Class Counsel and Explicit Direction of this Court as to "Voting Rights" of the Separate Classes**

Interim Class Counsel's stated positions with this Court about their actions and their interactions with Mr. Haviland and are internally inconsistent and contradictory.   [Such contradictions typically arise when one tries to backpedal after initially committing to a false position, as in the case of Interim Class Counsel's unified representation that Mr. Haviland allegedly lied to them at the AstraZeneca mediation about Mrs. Howe's rejection of the AstraZeneca settlement.]

The following examples demonstrate such inconsistencies:

First, Interim Class Counsel have argued repeatedly that there was always "open discussion" about issues, that Mr. Haviland had a "full opportunity" to express his views, and that all decisions were made by "majority vote."[34]   At the same time, however, they contend throughout their many filings and Declarations that neither Mr. Haviland nor HLF are "Co-Lead Counsel" in this case, with

---

[34] *See, e.g.,* Class Counsel July 27 Response, p. 17  ("Valuable time and expense is being wasted addressing issues that have been discussed between counsel and then voted down by a majority.").  Mr. Berman echoes this point in his recent Declaration: "[i]n this case, Co-Lead Counsel have voted on how to proceed on hundreds of occasions, even where one or more of us may not have agreed with the decision."  Berman Decl., par 5.

*no* right to vote or to have meaningful control over litigation decisions affecting consumers.[35] Presumably then, whatever "voting rights" Mr. Haviland supposedly has are hollow at best.

Second, just three (3) months ago, Interim Class Counsel suggested to this Court that HLF's and Mr. Haviland's involvement "was valuable", and that their "clients can serve as class representatives". They even agreed that Mr. Haviland and HLF should be class counsel, just not a "chair" situated "ahead of" other firms in their class counsel hierarchy.[36] Now, however, after having their own words betray them in Court,[37] Interim Class Counsel have closed ranks and profess to want nothing to do with Mr. Haviland: they say, Mr. Haviland is "no longer welcome as a Co-Lead." Class Counsel July 27, 2007 Response, p. 17. The petulant changes in position of Interim Class Counsel should not influence the Court's appointment of counsel for the consumer Sub-Classes.

Third, Interim Class Counsel claim that HLF deliberately chose to not "continue to work with Class Counsel" on the AstraZeneca settlement issues. Class Counsel July 27, 2007 Response, p. 1. In reality, it was Interim Class Counsel who chose to exclude Mrs. Howe and Mr. Haviland from the continuing negotiations of what they term "important details" of the settlement during the period from the May 4 Mediation with Professor Green up to the eve of their filing the Motion for Preliminary Approval. If (as Interim Class Counsel contend) "the parties were *still* negotiating into the evening on Sunday May 21, over important details" that threatened to "unravel" the settlement,

---

[35] *See, e.g*, Berman Decl. at par. 22 ("Mr. Haviland has asked to be Co-Lead Counsel. I do not believe that it is in the best interests of the Class to appoint him as such.").

[36] *See* Class Counsel April 5 Response, at 1-2 ("Though Class Counsel welcomes the participation of Mr. Haviland and his firm, we do not agree that he should be elevated to a chair position, which is what his motion does. It thus moves him ahead of Wexler Toriseva Wallace LLP and Hoffman & Edelson. … Though Mr. Haviland's participation is valuable, his clients can serve as class representatives without his elevation to a 'chair position'.")

[37] *See* Exhibits to Haviland Decl. (consisting of writings authored by Interim Class Counsel).

[38] why were Mr. Haviland or Mrs. Howe not contacted?  And, if they believed that Mr. Haviland was on board with the settlement, why did they not provide him with a single draft of the settlement documents, notice plan, forms of notice, or supporting memorandum before any of the documents were filed with his name on them?

Lastly, Interim Class Counsel have gone out on a limb with their story that, at the AstraZeneca mediation, Mr. Haviland, after weeks of protest, suddenly announced that his client was on board with the settlement.  Now they are faced with the fact that, if what they say is true, Mr. Haviland said the exact opposite to Professor Green thirty seconds later, when he asked Professor Green to remove  his name from the final MOU.[39]  Of course, Interim Class Counsel did not know about Mr. Haviland's private conversation with Professor Green at the mediation until after they had committed to their story.  Undaunted, however, and in their tradition of "that's my story and I'm sticking to it," Interim Class Counsel are now reduced to feeble excuses like "Why Mr. Haviland's signature line was not on the MOU is a mystery to me"[40] and "When I signed the [MOU] I did not notice that Mr. Haviland's name was not included.  The only names I noted were my own and counsel for the defendant."[41]

Respectfully, consumers deserve better.

---

[38] Counsels' Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca, at n.4, p.14 [emphasis in original].

[39] Indeed, they now know it was Mr. Green who removed Mr. Haviland's name from the final MOU before it was signed.

[40] Declaration of Kenneth A. Wexler in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration at par. 4.

[41] Declaration of Jeffrey L. Kodroff in Support of Class 1 AstraZeneca Settlement and in Response to Haviland Declaration at par. 4.

IV.    **CONCLUSION**

For the foregoing reasons, The Haviland Law Firm, LLC, respectfully requests that its Motion under Rule 23(g) to be appointed Class Counsel for the consumer Classes 1 and 3 of Track be granted.


Dated:   August 24, 2007                    /s/ Donald E. Haviland, Esquire
                                            Donald E. Haviland, Esquire
                                            Adam S. Levy, Esquire, Of Counsel
                                            Michael J. Lorusso, Esquire
                                            THE HAVILAND LAW FIRM, LLC
                                            740 South Third Street, Third Floor
                                            Philadelphia, PA 19147
                                            Telephone: (215) 609-4661
                                            Facsimile: (215) 392-4400
                                            haviland@havilandlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Donald E. Haviland, Jr., Esquire, hereby certify that on August 24, 2007, I filed the foregoing Memorandum in Support the Haviland Law Firm, LLC's Motion for Appointment as Class Counsel for the Track 2 Consumer Sub-Classes Pursuant to Fed.R.Civ.Proc.23(g) with the Clerk of this Court and used the CM/ECF system to send notification of such filing to all registered person(s).

/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr., Esquire
THE HAVILAND LAW FIRM
740 South Third Street
Third Floor
Philadelphia, PA 19147
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
haviland@havilandlaw.com