UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | |
| | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti B. Saris |
| | ) | |
| *United States of America, ex rel. Ven-a-Care* | ) | Magistrate Judge Marianne B. Bowler |
| *of the Florida Keys, Inc., v. Abbott* | ) | |
| *Laboratories, Inc.,* | ) | |
| CIVIL ACTION NO. 06–CV-11337-PBS | ) | |

# EXHIBIT 7, PART 1 TO THE UNITED STATES'OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION TO DISMISS

# UNITED STATES DISTRICT COURTq
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 01-8112-CIV-RYSKAMP/VITUNAC

UNITED STATES OF AMERICA,
ex rel. EDUARDO F. BORGES, M.D.,
and DAVID HERNANDEZ,

     Plaintiff,

v.

DOCTOR'S CARE MEDICAL CTR., INC.,
PAUL ELLIOTT, D.O., SUZANN ELLIOTT, D.O.,
NICHOLAS ELLIOTT, and DOCTORS CARE
HEALTH SERVICES, INC. (a.k.a. PHYSICIANS
HEALTHCARE INC.),

     Defendants.

_____/

## ORDER DENYING MOTIONS TO DISMISS

THIS CAUSE comes before the Court pursuant to the following motions:

-Defendants Paul Elliott, D.O.; Suzann Elliot, D.O.; Doctor's Care Medical Center, Inc.; and Doctors Care Health Services, Inc.'s Renewed Suggestion of Lack of Subject Matter Jurisdiction, filed March 15, 2006 **[DE 111]**.[1]  The United States responded on April 28, 2006 **[DE 132]**.  Defendants replied on June 22, 2006 **[DE 142]**.

-Defendant Paul Elliott, D.O. and Doctor's Care Medical Center, Inc.'s Motion to Dismiss Amended Intervening Complaint, filed March 15, 2006 **[DE 118]**, and Defendants Suzann Elliot, D.O. and Doctor's Care Health Services, Inc's Renewed Motion to Dismiss, filed March 15, 2006 **[DE 113]**.  The United States filed a joint response on April 28, 2006 **[DE 131]**.  Defendants Paul Elliott, D.O. and Doctor's Care Medical Center, Inc. replied on June 22, 2006 **[DE 141]**.  Defendants Suzann Elliot, D.O. and Doctor's Care Health Services, Inc. replied on June 22, 2006 [DE **140]**.

---

[1]The Court construes this filing as a motion to dismiss for lack of subject matter jurisdiction.

Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 3 of 48

2

-Defendant Nicholas Elliott's Motion to Dismiss, filed April 17, 2006 **[DE 129]**.  The United States responded on May 15, 2006 **[DE 136]**.  Nicholas Elliott did not reply.

The Court held a hearing on these motions on November 1, 2006.  These motions are ripe for adjudication.

## I. BACKGROUND

The United States seeks to recover damages and civil penalties from defendants Doctor's Care Medical Center, Inc. ("DCMC") and Paul Elliott, D.O. ("Paul Elliott") for making false claims to the United States, specifically the Medicare Program and the Federal Employees Health Benefits Program ("FEHBP"), for services provided to beneficiaries of said programs.[2]  The United States also seeks to recover damages and civil penalties from DCMC and Paul Elliott for making and using false records to conceal, avoid or decrease DCMC and Paul Elliott's obligation to repay the Medicare Program for payments made to DCMC for certain services that were not actually provided.  The United States seeks this recovery under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-33.  The United States also seeks to recover damages from defendants DCMC, Paul Elliott, Suzann Elliott, D.O. ("Suzann Elliott"), Nicholas Elliott and Doctors Care Health Services, Inc. ("DCHS"), under the common law theory of payment under mistake of fact to recover monies allegedly paid by the United States to DCMC in the erroneous belief that it was entitled to reimbursement.  The United States also seeks to recover damages from DCMC under the common law theory of recoupment of overpayments.  The United States also seeks to recover from DCMC, Paul Elliott, Suzann Elliott, Nicholas Elliott and DCHS under

---

[2] The Court takes the allegations of the Amended Intervening Complaint as true for purposes of adjudicating the Rule 12(b)(6) motions to dismiss.  See La Grasta v. First Union Securities, Inc., 358 F.3d 840, 845 (11th Cir. 2004) (citation omitted).

Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 4 of 48

3

the common law theory of unjust enrichment for monies received as a result of the Medicare

Program and the FEHBP making payments to DCMC for false or otherwise non-reimbursable

claims.

Section 3730 of the FCA allows a person having knowledge of a violation of the FCA to

bring an action in federal district court for himself and for the Government and to share in any

recovery.  The party is known as a relator.  The action a relator brings is called a qui tam action.

The operative complaint in this action is part of a qui tam action brought by relators Eduardo F.

Borges, M.D. ( "Borges") and David Hernandez  ("Hernandez") on behalf of the United States on

February 7, 2001.  The United States elected to intervene on August 11, 2005.

The February 7, 2001 complaint named DCMC and Paul Elliott as defendants.  The

complaint alleged the submission of improper claims to Medicare and Medicaid between April

1998 and April 2000.  On October 9, 2003, the United States brought criminal charges against

Paul Elliott in United States of America v. Paul Elliott, 03-14060-CR-GRAHAM.  On March 5,

2004, a jury convicted Paul Elliott of 22 counts of health care fraud under 18 U.S.C. § 1347 and

one count of obstruction of justice under 18 U.S.C. § 1519.  At his sentencing hearing on April 8,

2005, the Court found that the Government's actual loss was $5,178.44 and ordered Paul Elliott

to pay that amount in restitution.  In addition, Paul Elliott was sentenced to four months

imprisonment, assessed a $20,000 fine, and ordered to pay a $2300 special assessment,

representing $100 for each of the 23 counts for which he was convicted.  He also forfeited

$10,723.07.  Neither the Government nor Paul Elliott filed any appeals.  Accordingly, the

conviction and the sentence are final.

On January 28, 2004, just prior to the criminal trial, this Court fully unsealed the

complaint.  DCMC and Paul Elliott filed a motion to dismiss on July 12, 2004, which the Court

denied on August 31, 2004.  That Government, which elected to intervene on August 11, 2005,

filed its intervening complaint on October 14, 2005.  Defendants moved to dismiss the

intervening complaint on December 14, 2005.  After requesting and receiving two unopposed

extensions in which to prepare and file responses to Defendants' motions, the Government filed

an amended intervening complaint on February 2, 2006.

     DCMC was a medical group practice that maintained its principal office in Port St. Lucie,

Florida and offices and/or clinics in Jupiter, Florida; Stuart, Florida; and in Jensen Beach,

Florida.  DCMC was administratively dissolved on or about October 4, 2002 and is currently an

inactive corporation.  (Amended Intervening Complaint, 15).  Borges, a licensed physician, was

employed by DCMC from approximately May 1999 through April 2000.  Hernandez was

employed by DCMC in administrative positions from approximately April 1998 through January

2000.  (Amended Intervening Complaint, 13-14).  Paul Elliott was a licensed doctor of

osteopathy and was a corporate officer and one third owner of DCMC.  Paul Elliott was also a

physician employee of the entity.  (Amended Intervening Complaint, 16).  Suzann Elliot was a

licensed doctor of osteopathy and was a corporate officer and one third owner of DCMC.

Suzann Elliot was also a physician employee of the entity.  She is the wife of Paul Elliott.

(Amended Intervening Complaint, 19).  Nicholas Elliott was a one third owner of DCMC.

Nicholas Elliott is the father of Paul Elliott.  (Amended Intervening Complaint, 20).  DCHS was

a medical billing and management company formed by Defendant Paul Elliott on May 16, 2000.

DCHS currently operates under the changed corporate name Physicians Healthcare, Inc.  Its

address is listed in Port St. Lucie, Florida.  (Amended Intervening Complaint, 21).

Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 6 of 48

5

The fraud in this case involves the Medicare Part B Program and the FEHBP.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage, typically 80%, of the fee schedule amount for physician, diagnostic and laboratory services.  See 42 U.S.C. § 1395k, 1395l, 1395x (s).  (Amended Intervening Complaint, 24).  The Secretary of Health and Human Services administers the Medicare Program through its agency component, the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA").  (Amended Intervening Complaint, 22).  Reimbursement for Medicare claims is made by the United States through CMS.  CMS then contracts with private insurance carriers to administer and pay Part B claims from the Medicare Trust Fund.  See 42 U.S.C. § 1395u.  (Amended Intervening Complaint, 24).  In this capacity, the carriers act on behalf of CMS.  See 42 CFR § 421.5(b).  (Amended Intervening Complaint, 24).

The United States uses the FEHBP to provide health insurance for its employees.  The Office of Personnel Management ("OPM") manages the program and contracts with medical insurance carriers to provide medical benefits for federal employees.  When an insured individual receives services from a physician or other approved provider, the individual or the provider submits an insurance claim to the participating carrier.  The carrier pays for the services covered by the FEHBP.  The claim for benefits is ultimately paid out by an FEHBP trust fund from the United States Treasury.  (Amended Intervening Complaint, 25).

The carriers receive claims for payment for medical services rendered to their respective beneficiaries.  Physicians and other approved providers submit claims for payment in reimbursement using "claim forms."  To bill Medicare, a provider must submit an electronic or hard copy claim form called CMS 1500, formerly known as HCFA 1500.  (Amended Intervening

Case 1:01-cr-12257-PBS   Document 4661-8   Filed 08/24/07   Page 7 of 48

Complaint, 26).  Upon submission of the claim form, a provider representative certifies that the contents of the claim form are true, correct and complete, and, with respect to Medicare claims, that the CMS 1500 was prepared in compliance with the laws and regulations governing the Medicare Program.  (Amended Intervening Complaint, 27).  The submitting provider must provide certain information on the claim form.  This information includes the identity of the patient, the provider number of the performing provider, the procedure code number and the diagnosis.  (Amended Intervening Complaint, 28).  All health care providers must comply with applicable statutes, regulations and guidelines to be reimbursed by Medicare Part B.  A provider has the duty to have knowledge of the statutes, regulations and guidelines regarding coverage for Medicare services.  (Amended Intervening Complaint, 29).

Given the volume of claims submitted to carriers, the carriers are unable to review the medical record of each patient prior to paying the claim and generally pay on the basis of the physician's representation of the patient's diagnosis, treatment rendered and certification included on the claim form.  (Amended Intervening Complaint, 30).  Reimbursement is only available under Medicare Part B or the FEHBP unless adequate documentation exists in the beneficiary's medical file to demonstrate the performance and necessity of the services being billed.  If the carrier pays the claim and subsequently discovers that the medical documentation is inadequate, the United States is entitled to deny the claim retroactively and obtain a refund.  See 42 CFR § 413.64 (f).  (Amended Intervening Complaint, 31).  Physicians and other approved providers usually obtain reimbursement by submitting claim forms using standardized numeric codes to represent the services provided rather than narrative descriptions.  These codes are found in the American Medical Association's Current Procedural Terminology Manual ("CPT Manual") or the

Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 8 of 48

Health Care Financing Administration Common Procedural Coding System book ("HCPCS"), each of which provides a corresponding description of medical services for each code. (Amended Intervening Complaint, 32).  Medicare and the FEHBP typically rely upon the CPT code to determine the provider's level of service and, consequently, the appropriate payment. (Amended Intervening Complaint, 33).  Each code is assigned a maximum allowable fee by the respective program.  Generally, reimbursement to providers is limited to 75 to 80% of the lesser of the actual cost of the procedure or the maximum allowable fee, with the remaining percentage, or "co-payment," to be paid by the beneficiary or a secondary supplemental insurance program, depending upon the program.  To aid in processing and adjudication of submitted claims, physicians and other approved providers are also typically required to use standardized codes on the claim forms to describe the pertinent diagnoses justifying the services billed.  The diagnostic codes are found in the International Classification of Diseases Manual ("ICD-9 CM"). (Amended Intervening Complaint, 35).

DCMC and Paul Elliott submitted claims under DCMC's group provider member to the Medicare Program and the FEHBP, among others, or services allegedly provided by DCMC's employees.  (Amended Intervening Complaint, 36).  Paul Elliott was actively involved in the operation and administration of DCMC, including supervision and control over medical personnel and administrative personnel.  (Amended Intervening Complaint, 37).  At all times relevant, Paul Elliott maintained and exercised control over billing done by DCMC, including the selection of CPT codes used on the claim form submitted under DCMC's group provider number to the Medicare Program and the FEHBP for the types of services that are the subject of this action.  (Amended Intervening Complaint, 38).  At all times relevant to this section, Nicholas

Case 9:01-cv-08112-KLR   Document 701   Entered on FLSD Docket 01/29/2007   Page 8 of 47
Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 8 of 48

8

Elliott was a de factor manager/administrator of DCMC who was actively involved in the

administration and operation of DCMC.  (Amended Intervening Complaint, 40).

From approximately 1998 through 2002, Paul Elliott directed and caused the preparation

and submission of false, fraudulent and otherwise non-reimbursable claims to the Medicare

Program and the FEHBP.  More specifically, Paul Elliott made false entries in treatment records,

logs and superbills; directed and caused other DCMC employees to make false entries in

treatment records, logs and superbills; and directed and caused the preparation and submission of

claims to the Medicare Program and to the FEHBP for non-rendered, upcoded and non-

reimbursable medical services and procedures.  (Amended Intervening Complaint, 39).  The

United States, through the Medicare Program and the FEHBP, paid claims submitted by or at the

behest of defendants DCMC and Paul Elliott for services allegedly provided to beneficiaries by

employees of DCMC.  As a one third owner of DCMC, Paul Elliott shared in the profits of

DCMC, which include payments received from the Medicare Program and the FEHBP as a result

of the false, fraudulent otherwise non-reimbursable claims that are the subject of this action.

(Amended Intervening Complaint, 42).  At all relevant times, Suzanne Elliott as a one third

owner of DCMC shared in the profits of DCMC, which include payments received from the

Medicare Program and the FEHBP as a result of the false, fraudulent otherwise non-reimbursable

claims that are the subject of this action.  (Amended Intervening Complaint, 43).  The same is

true for Nicholas Elliott.  (Amended Intervening Complaint, 44).

In approximately May 2000, DCHS began acting as a management and billing entity for

DCMC.  From approximately May 2000 until at least 2002, Paul Elliott operated and controlled

DCHS.  (Amended Intervening Complaint, 45).  DCHS, as a management and billing entity for

Case 9:01-cv-01257-PBS   Document 651   Entered on FLSD Docket 01/29/2007   Page 9 of 47
Case 1:01-cv-12257-PBS   Document 4661-8   Filed 08/24/07   Page 10 of 48

9

DCMC, received payments from DCMC, which include payments received from the Medicare Program and the FEHBP as a result of the false, fraudulent and otherwise non-reimbursable claims that are the subject of this action.  (Amended Intervening Complaint, 46).

The false, fraudulent and non-reimbursable claims that DCMC and Paul Elliott submitted or caused to be submitted to the Medicare Program and the FEHBP concern several specific types of services: MRIs, EMGs, evaluation and management services, echocardiograms and carotid ultrasounds.  (Amended Intervening Complaint, 46).  Attached to the Amended Intervening Complaint, and incorporated therein by reference, are documents identifying some of the alleged false, fraudulent otherwise non-reimbursable claims submitted or caused to be submitted to the United States by DCMC and Paul Elliott.  Schedule A is a sample list of the alleged false, fraudulent and otherwise non-reimbursable claims submitted to the Medicare Program by DCMC and Paul Elliott.  Schedule B is a sample list of the false, fraudulent or otherwise non-reimbursable claim submitted to the FEHBP by DCMC and Paul Elliott. (Amended Intervening Complaint, 48).

From at least 1998 through and including 2002, DCMC and Paul Elliott routinely billed the Medicare Program and the FEHBP for MRIs with and without contrast when the service actually performed was MRIs without contrast.  (Amended Intervening Complaint, 51).  DCMC allegedly received more than $339,019 in overpayments from Medicare and the FEHBP from false MRI billings.  DCMC and Paul Elliott allegedly acted with actual knowledge, deliberate ignorance or reckless disregard of the laws, regulations and guidance applicable to federal health care programs when submitting claims for MRIs with and without contrast when in fact the actual services performed for MRIs without contrast.  (Amended Intervening Complaint, 53).

10

From at least 1998 through including 2002, DCMC and Paul Elliott routinely billed Medicare and the FEHBP for payment for the performance of EMGs and NCVs when the only services actually provided were NCVs.[3] (Amended Intervening Complaint, 58). DCMC allegedly received more than $57,445 in overpayments from Medicare and the FEHBP as a result of the false EMG billings described in the preceding paragraphs. (Amended Intervening Complaint, 61).

DCMC and Paul Elliott billed Medicare for a level 4 office visit for a patient on January 14, 1999. Treatment records pertaining to this patient do not reflect the occurrence of a level 4 office visit. (Amended Intervening Complaint, 66). DCMC received more than $425,663 in overpayments for Medicare and the FEHBP as a result of the false billings described in these paragraphs. (Amended Intervening Complaint, 68).

From 1998 through 2002, Defendants DCMC and Paul Elliott routinely billed Medicare and the FEHBP seeking payment for color flow velocity mapping impulse wave tests that were not actually performed and/or for which no test results justifying the claims are maintained in the treatment records.[4] (Amended Intervening Complaint, 71). DCMC allegedly received more than

[3]An NCV test determines the speed of conduction of electrical impulses through nerve. Electrodes are placed at various surfaces along their path and stimulated with an electrical impulse. The distance between the electrodes and the time required for the impulse to travel between them is calculated to determine the nerve conduction velocity. (Amended Intervening Complaint, 55). An EMG is a more invasive and precise nerve conduction test. This exam requires a needle electrode to be inserted into the muscle as to which nerve conduction is to be measured. The activity detected is examined against known default values to measure the ability of the muscle to respond to nerve stimulation. (Amended Intervening Complaint, 56). Different procedure codes apply for each test. The codes for EMGs are reimbursed at higher rates than the code for NCV. (Amended Intervening Complaint, 57).

[4]Echocardiograms use ultrasound waves to create moving pictures of the heart. Color flow velocity mapping impulse wave testing are sometimes performed in conjunction with echocardiograms to evaluate bloodflow across the heart's valves. These are additional tests for which separate codes exist and for which a provider may seek reimbursement. (Amended Intervening Complaint, 70).

11

$98,298 in overpayments from Medicare and the FEHBP as a result of false echocardiogram

billing.  (Amended Intervening Complaint, 74).

Carotid ultrasound uses high frequency sound waves combined with sonar detection to

generate a picture of the carotid arteries.  The procedure allows the physician to detect narrowing

of the arteries.  (Amended Intervening Complaint, 75).  The codes for these procedures cover

both the technical component, the administration of the test, and the professional component, the

reading and interpretation of the results.  When a provider performs only one component of the

test, he or she is required to use a modifier to designate which component it performed.

(Amended Intervening Complaint, 76).  From 1998 through 2002, Defendants DCMC and Paul

Elliott routinely billed Medicare and the FEHBP seeking payment for both the technical and

professional components of carotid ultrasound and echocardiograms tests where DCMC

employees only performed the technical component of the test, or performed no test at all.

(Amended Intervening Complaint, 78).  DCMC received more than $57,444 in overpayments

from Medicare and the FEHBP as a result of false echocardiogram and carotid ultrasound

billings.  (Amended Intervening Complaint, 81).

The United States brings a five count complaint.  Count I is a claim against DCMC and

Paul Elliott for presentation of false claims via the use of false records or false statements in

violation of 31 U.S.C. § 3729 (a)(1)-(a)(2).  The United States seeks treble damages and

penalties, including an $11,000 civil penalty for each violation.

Count II is an action for reverse false claims against DCMC and Paul Elliott in violation

of 31 U.S.C. § 3729 (a)(7).  In approximately January 2003, DCMC and Paul Elliott, through

their then attorney, delivered to the United States approximately 149 false and fabricated EMG

Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 13 of 48

12

test result reports in response to a subpoena. (Amended Intervening Complaint, 91). They represented to the United States that the reports show the results of EMG tests performed upon the Medicare patients for whom the claims had been submitted. (Amended Intervening Complaint, 92). These tests were not actually performed, however. (Amended Intervening Complaint, 93). Accordingly, Defendants have an obligation to repay the United States for monies received pursuant to these false claims. The United States again seeks treble damages plus an $11,000 civil penalty for each such false document or statement.

Count III is a common-law action against Paul Elliott, Suzanne Elliott, Nicholas Elliott and DCHS for payment under mistake of fact. This count seeks recovery of monies paid to DCMC under mistake of fact between 1998 through and including 2002. During this time, the United States made payments to DCMC in the erroneous belief that its was entitled to reimbursement, without knowing that the claims were for services that were not actually rendered, were upcoded, and/or for non-reimbursable medical services and procedures.

Count IV is a common-law action for recoupment for recovery of monies unlawfully paid by the United States to DCMC between 1998 through including 2002. The United States seeks an accounting and return of such funds.

Count V is a common-law action for unjust enrichment against DCMC, Paul Elliott, Suzanne Elliott, Nicholas Elliott and DCHS. From 1998 through including 2002, the United States paid to DCMC reimbursement for services that were not actually rendered, were upcoded, and/or were non-reimbursable medical services and procedures, which resulted in the unjust enrichment of said defendants at the expense of the United States.

13

## II.  **MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Defendants move to dismiss the common law claims of payment under mistake of fact,

recoupment of overpayments and unjust enrichment for lack of subject matter jurisdiction.

According to Defendants, 42 U.S.C. § 405(h) divests the Court of subject matter jurisdiction over

common-law claims brought by the Government to recover funds improperly paid to Medicare

providers.  Defendant maintains that the United States may only recover Medicare payments in

accordance with the administrative framework of the statute.  The United States argues that 42

U.S.C. § 405(h) has no bearing on the Court's jurisdiction over the common-law claims, noting

that jurisdiction in this matter is predicated on 28 U.S.C. § 1345.  Furthermore, the statutory

provision governs only provider challenges to Medicare payment decisions.

28 U.S.C. § 1345 provides in relevant part:

> Except as otherwise provided by Act of Congress, the district
> courts shall have original jurisdiction of all civil actions, suits or
> proceedings commenced by the United States....

Here, the United States has invoked 28 U.S.C. § 1345 to bring an action under common law for

payment by mistake of fact, recoupment of overpayments and unjust enrichment.  The United

States has a common-law right to recover Medicare overpayments.  See U.S. v. Wurts, 303 U.S.

414, 415, 58 S.Ct. 637, 638 (1938) (government's right to recover funds from a person who

received them by mistake and without right is not barred unless Congress has clearly manifested

its intention to raise a statutory barrier); Bell v. New Jersey, 461 U.S. 773, 782 n.7, 103 S.Ct.

2187, 2193 (1983) (government has a common-law right to recover funds any time a grant

recipient fails to comply with statutory conditions); U.S. v. Systron-Donner Corp., 486 F.2d 249,

251 (9th Cir. 1973) (government's common-law right of recovery for payment by mistake exists

14

independently of right of recovery for fraud under the FCA); <u>U.S. v. Mead</u>, 426 F.2d 118, 124 (9th Cir. 1970) (government retained common-law right of recovery for payments erroneously made to farmers pursuant to a conservation program).

Defendants claim that 42 U.S.C. § 405(h) impliedly repeals the Court's 28 U.S.C. § 1345 jurisdiction over this matter. Any "implied repeal" of 28 U.S.C. § 1345 requires an "irreconcilable" conflict between a statute and 28 U.S.C. § 1345, or clear indication that the statute is intended to "substitute" for 28 U.S.C. § 1345. <u>See</u> <u>U.S. v. Lahey Clinic Hospital, Inc.</u>, 399 F.3d 1, 9 (1st Cir. 2005); <u>Colorado River Water Conservation Dist. v. U.S.</u>, 424 U.S. 800, 808, 96 S.Ct. 1236, 1241-42 (1976). "Implied repeals [of Section 1345] are not lightly to be indulged." <u>U.S. v. Comm. of</u> <u>Puerto Rico</u>, 721 F.2d 832, 836 (1st Cir. 1983) (quoting <u>Kremer v. Chemical Construction Corp.</u>, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890 (1982) (citations omitted)). Given the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," any attempt to deprive the district Court of its jurisdiction must be carefully scrutinized. <u>See</u> <u>Colorado River</u>, 424 U.S. at 817, 96 S.Ct. at 1246. The United States, as a sovereign, is not bound by a statute that by its general terms would divest it of pre-existing rights or privileges unless the statute plainly so provides. <u>See</u> <u>Danning v. United States</u>, 259 F.2d 305, 310 (9th Cir. 1958). Additionally, statutes in derogation of the common law are to be strictly construed, and Congressional intent to override the common law will not be lightly inferred. <u>See</u> <u>also</u> <u>Midlantic National Bank v. New Jersey Department of Environmental Protection</u>, 474 U.S. 494, 501, 106 S.Ct. 755, 759 (1986) ("the normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.") (citation omitted). Implied repeal of Section

Case 9:01-cv-08158-KLR   Document 701   Entered on FLSD Docket 01/29/2007   Page 15 of 47
Case 1:91-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 16 of 48

15

1345 jurisdiction over any given case or class of cases exists only where Congressional intent is clear:

> When [as in Section 1345] there are statutes clearly defining the jurisdiction of the courts [,] the force and effect of such provisions should not be disturbed by a mere implication flowing from subsequent legislation.  In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is with earlier and later statutes are irreconcilable.

Colorado River, 424 U.S. at 808, 96 S.Ct. at 1242 (internal quotations omitted).

To determine whether Congress intended to repeal a district court's Section 1345 jurisdiction over a particular case or controversy, the court first analyzes the express terms of the statute itself, here Section 405(h), and then turns to the statute's legislative history.  See Colorado River, 424 U.S. at 807-09, 96 S.Ct. at 1240-1242; Puerto Rico, 721 F.2d at 834-38; Lahey, 399 F.3d at 9-14.  If neither indicates an intent to repeal, the court asks whether (1) the subject statute is in "irreconcilable conflict" with 28 U.S.C. § 1345, and (2) whether the statute "covers the whole subject of [28 U.S.C. § 1345's grant of jurisdiction over the particular case]... and is clearly intended as a substitute [for 28 U.S.C. § 1345 jurisdiction]."  Puerto Rico, 721 F.2d at 834-35 (quotation omitted); Lahey, 399 F.3d at 9-14.

42 U.S.C. § 405(h) provides as follows:

> the findings and decision of the [Secretary] after a hearing shall be binding on all individuals who were parties to such hearing.  No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the [Secretary] or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

16

42 U.S.C. § 405(h) is applied to the Medicare program by 42 U.S.C. § 1395ii. Defendants' primary argument for "implied repeal" is that the second sentence of section 405(h) "preempt[s]" the district court's original jurisdiction over a common law action brought by the United States for Medicare overpayment.

The terms of Section 405(h), alone and in context, do not create an "implied repeal" of jurisdiction under Section 1345. The structure of Section 405 as a whole does not support Defendants' preemption argument. The Medicare Act adopts by reference the Social Security Act's procedures for hearings and appeals as defined in 42 U.S.C. § 405. See 42 U.S.C. § 1395ff(b), 1395ii. Subsection 405(h), and as incorporated by Section 1395ii, channels challenges by recipients of Medicare funds or services through the administrative and judicial review processes provided for in the Social Security Act. Far from being an attempt to restrict the Government's common-law right to recoup monies erroneously paid, Section 405(h) manifests Congressional intent that actions brought by the United States are excluded from its scope. Section 405 establishes procedures to adjudicate administratively the claims brought by Social Security (including Medicare) beneficiaries in program participants and requires those private persons and entities to exhaust those procedures. Section 405(a) concerns the adoption of rules and regulations to govern such procedures. Section 405(b) establishes procedures for hearings and appeals of "any individual applying for a payment under this subchapter." Under the Dictionary Act, the words "person" and "whoever" are broader terms that include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as "individuals." 1 U.S.C. § 1. The term "individual" does not include the "Federal Government."

17

Section 405(d) and (e) concern issuance and enforcement of subpoenas in these administrative proceedings. Section 405(g), which provides for judicial review of these administrative proceedings, refers pointedly not to the federal government's right of review, but, instead, to such a right of "any individual:"

> Any individual, after any final decision of a Commissioner of
> Social Security [or, in the Medicare System, the Secretary of HHS]
> may after a hearing to which he was a party, irrespective of the
> amount in controversy, may obtain a review of such decision by a
> civil action....

42 U.S.C. § 405(g). Section 405(g) also provides that "[s]uch action shall be brought in the District Court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia." This language also suggests an intent to limit application of Section 405 to individuals and entities other than the government. The overall structure of Section 405 makes clear its intended application to non-governmental individuals seeking review of the Secretary's decisions, not to government actions to recover overpayments.

Nor does the language of Section 405(h) support the preemption argument. The section has three sentences, all of which pertain to the statute's establishment of the appeal process for private beneficiaries and participants in the Social Security program. The first sentence reads:

> The findings and decision of the Commissioner of Social Security
> [or Secretary of HHS] after hearings shall be binding upon all
> individuals who were parties to such hearing.

18

The second sentence provides that there shall be no further review by a federal court of the HHS

Secretary's findings and decisions except by following the appeal procedures established by

Section 405:

> Findings of fact or decision of the Commissioner of Social Security
> [or Secretary of HHS] shall be reviewed by any person, tribunal, or
> government agency except as herein provided.

The third and final sentence expressly limits the right of private parties to sue the United States:

> Action against the United States, the Commissioner of Social
> Security, or any officer or employee thereof shall be brought under
> section 1331 ["Federal Question"] or 1346 ["United States as
> Defendant"] of Title 28 to recover on any claim arising under this
> subchapter.

Defendants' interpretation of the second sentence as prohibiting the federal government itself

from bringing any action to recover Medicare overpayment in district court until the federal

government has exhausted all of the foregoing administrative procedures-in addition to running

afoul of the entire structure and purpose of the statute-does not accord with the text of Section

405(h).  The second sentence refers specifically to any "review" of the decision or factual finding

of the Secretary.  If Congress wanted to prohibit the executive branch from suing to recover as a

Medicare overpayments without first exhausting administrative remedies, Congress would have

said so and, under law, would be required to have said so to implement any repeal of Section

1345 jurisdiction.

The third sentence expressly refers to an "action against the United States, the

Commissioner of Social Security, or any officer or employee thereof" and explicitly refers to

actions under 1331 and 1346.  Nowhere does the Section refer to an action brought by the United

States or any agency or officer thereof, and nowhere does it restrict jurisdiction under Section

19

1345.  Congress did not place in 42 U.S.C. § 405 any limitation on the district court's original jurisdiction over suits brought by the United States.  Given the bar to private actions established in the third sentence, the second sentence provides a mechanism available for individuals to obtain administrative consideration and judicial review.

The legislative history of Section 405(h) does not support an implied repeal argument.  "The Senate Report is void of any expression by Congress of intent to repeal federal jurisdiction under [Section] 1345." United States ex rel. Body v. Blue Cross and Blue Shield of Alabama, Inc., 156 F.3d at 1104, n.13 ("Nowhere... is there any mention of congressional intent to preclude federal-question jurisdiction over claims other than those brought by beneficiaries challenging the denial of benefits or eligibility for benefits.").  The text of Section 405(h) has remained unchanged since its enactment in 1939, except for technical changes irrelevant to whether the provision bars an action brought by the government under Section 1345.  Section 405(h) is therefore not in "irreconcilable conflict" with 28 U.S.C. § 1345.  Nor can Section 405(h) be said to "cover[] the whole subject of [28 U.S.C. § 1345's grant of jurisdiction over the present case]" or to be "clearly intended as a substitute" for the District Court's Section 1345 jurisdiction over the present case.

The text of the statute does not require the United States to exhaust any administrative remedies prior to filing suit to recover overpayments.  The purpose of the administrative exhaustion doctrine is to prevent premature judicial interference with administrative agency processes.  No such danger exists where, as here, the agency itself, through its counsel, institute a civil action.  See United States v. Lahey Clinic Hospital, No. Civ.A.03-10194-RWZ, 2004 WL 950448 at *2 (D. Mass. Apr. 30, 2004) ("Section 405(g) clearly contemplates administrative

exhaustion in cases *against* the Secretary-not cases *by* the Secretary.") (emphasis in original).
See also United States v. Aquavella, 615 F.2d 12, 21 (2nd Cir. 1979) ("405(h) by its terms
applies only to actions brought against the government and not by the government [and] to hold
otherwise would totally deprive [the providers] of any judicial review."); United States v. Tenet
Healthcare Corp., 343 F. Supp.2d 922, 934-35 (C.D. Cal. 2004) ("[N]o body of federal common
law regarding Medicare reimbursement exists which might conflict with the regulatory scheme.
Recovery can only be obtained if Defendants' claims exceed the amount permitted under
controlling federal regulations.  Accordingly, preemption is not indicated and the court [denies]
Defendants' motion to dismiss on the basis that the government's common law claims are
preempted by the comprehensive nature of the Medicare Act.").

Numerous courts have held, however, that Section 405(h) does not bar a common-law
recoupment action brought by the Government against providers under 28 U.S.C. § 1345.  In
Aquavella, the Second Circuit concluded that the district court possessed jurisdiction under 28
U.S.C. § 1345 to decide that the government's claims of overpayment and the private provider's
defenses.  See 615 F.2d at 20.  As to the district court's jurisdiction to decide the Government's
claims of overpayment, the court reasoned as follows:

> It is clear that no portion of [Section] 405(h) specifically divests
> the district courts of jurisdiction in actions such as this one
> [brought by the government]....Indeed, the entire thrust of the
> section is to prevent claimants to seek judicial review of their
> claims for benefits from bypassing the specific procedural
> requirements provided by Congress in the various acts... [Section]
> 405(h) was not intended to preclude the district court from
> considering the merits of the government's claim of overpayment...
> [Section] 405(h) by its terms applies only to actions brought
> against the government and not by the government....

Id.  Numerous other district courts have considered this issue and agree that Section 405(h) does

not deprive the District Court of section 1345 jurisdiction over government suits to recover

overpayments, even absent a prior overpayment decision by HHS.  See Lahey, 2004 WL 950448,

*2, aff'd Lahey, 399 F.3d 1; Tenet, 343 F. Supp. 2d at 928; United States v.  Estate of Rogers ,

No. 1: 97CV461, 2001 WL 818160, at *24 (E.D. Tenn. June 20, 2001) (caselaw does "not bar

the United States government from maintaining the instant suit in federal court against the

defendants under the FCA and common law.  The FCA and the common law provide a separate,

independent basis for this Court to exercise subject matter jurisdiction over the government's

claims."); United States v. Seibert, 403 F. Supp. 2d 904, 920 (S.D. Iowa 2005) ("Sections 405(h)

and (g) are designed to force plaintiffs to exhaust their administrative appeals before suing the

government in Federal Court for disputes arising under the Medicare Act.  Section 405(g), by its

terms, applies only to actions brought against the government, and also applies only to claims

"arising under" the Medicare statutes.  This bar does not require the government to seek an

administrative remedy before prosecuting.").  As the Tenet court aptly concluded:

> Here, although the government's claim implicates reimbursement
> determinations, it is not the type of claim that falls within the scope
> of [Section] 405(h).  Since the Court is not faced with a claim for
> reimbursement from a dissatisfied provider that should be
> channeled through the administrative process, this case does not
> "arise under" the Medicare Act.  Rather, because the government's
> action is predicated on the submission of the inaccurate or
> misleading claims, the common law, not the Medicare Act,
> provides both standing and the substantive basis for the claim.
> Thus, in accordance with the relevant Supreme Court precedent,
> the "jurisdictional bar in 405(h) does not apply to this action filed
> by the United States Government under... the common law...
> seeking to recover damages and restitution to be paid to the
> government."

343 F. Supp. 2d 928 (citing <u>Rogers</u>, 2001 WL 818160, at *25; <u>Body</u> 156 F.3d at 1105-06).

Only one decision, <u>United States</u> v. <u>University of Mass. Memorial Medical Center</u>, 296 F. Supp.2d (D. Mass. 2003), *rev'd* <u>Lahey</u>, 399 F.3d 1 (2005), has held that Section 405(h) deprives the district court of original jurisdiction over Government suits for recovery of Medicare overpayments absent a prior overpayment decision by HHS.  The <u>University of Massachusetts</u> court granted the provider's motion to dismiss for failure to exhaust administrative remedies, relying upon the second section of section 405(h).  <u>See</u> 296 F. Supp. 2d at 25.  This decision suffers from numerous flaws, however.  The decision interpreted two Supreme Court cases to conclude that as long as the government had the option to re-open the fiscal intermediary's notice of program reimbursement and has failed to exercise that option to make an overpayment determination, then Section 405(h) bars district court jurisdiction under 28 U.S.C. § 1345.  <u>See</u> <u>id</u>. (citing <u>Shalala v. Illinois Council on Long-Term Care, Inc.</u>, 529 U.S. 1, 120 S.Ct. 1084 (2000); <u>Your Home Visiting Nurse Services v. Shalala</u>, 525 U.S. 449, 119 S.Ct. 930 (1999)). The Government's right to reopen is completely independent of, and its exercise is not a prerequisite to, the Government's right to sue to recover Medicare overpayments.  <u>See</u> <u>U.S. ex rel. Rahman v. Oncology Associates, P.C.</u>, 198 F.3d 502, 513 (4th Cir. 1999) ("Although the United States has authority to reopen certain [Medicare Part B] decisions within the administrative process...[t]he statutes and regulations governing the Medicare Part B program... do not preclude the United States from bringing an independent action in Federal Court to litigate claims under statutes such as the FCA..., the Federal Debt Collection Procedures Act, or related common-law claims, as was done in this case."); <u>U.S. v. Medica-Rents Co.</u>, 285 F. Supp. 2d 742,

776 n. 71 (N.D. Tex. 2003) (holding that, notwithstanding the Medicare Part B reopening

requirements, "the United States is not required to pursue an administrative action before seeking

an overpayment action [in a Medicare Part B case] under theories of unjust enrichment or

payment by mistake."); Rogers, 2001 WL 818160,*20,*33 ("Because HCFA declines to reopen

the [fiscal intermediary's] determination [under 42 CFR § 1885(d) after referral by the court

under the primary jurisdiction doctrine]..., the Court must now proceed to exercise its jurisdiction

[under 28 U.S.C. § 13 45] to adjudicate the government's complaint ["to recover restitution for

the overpayments"] are pursuant to the [FCA] and common law... The Court may not abdicate its

duty to exercise its subject matter jurisdiction merely because the plaintiff's action sounds in

administrative law.").

Second, the University of Massachusetts court disregarded the conclusions of pre-1973

decisions on the basis that Congress amended the Social Security Act in 1972 to allow for

provider appeals. While the status of the claims at issue as pre-1973 or post-1973 claims may

affect a determination as to whether providers' defenses are barred by Section 405(h), such has no

bearing on the right of the United States to invoke jurisdiction under Section 1345.

The remainder of the decisions Defendants cite to support the argument that Section

405(h) bars this action are cases brought by dissatisfied private persons and entities against the

United States or against the fiscal intermediary to recover monies not previously paid. United

States v. Sanet, 666 F.2d 1370 (11th Cir. 1982) involved a provider's attempt to challenge the

Secretary's final administrative payment decision in connection with a government action to

recover an overpayment and is therefore inapposite. In fact, the ultimate holding in that decision

was to affirm summary judgment in favor of the United States in the overpayment recovery

action brought under 28 U.S.C. § 1345.  U.S. v. Idaho Falls Assoc. Ltd. Partnership, 81 F. Supp.

2d 1033, 1049 (D. Idaho 1999) simply found a lack of jurisdiction to decide private parties'

defenses because the private defendants, skilled nursing facilities, not the government, failed to

exhaust their administrative remedies, a requirement to their asserting any "without fault"

defense under 42 U.S.C. § 1395gg.

Finally, Defendants claim that the United States' common law claims are based on

equitable theories barred because the FCA provides an adequate remedy at law.  As an initial

matter, the claims for payment by mistake, recoupment and unjust enrichment are legal in nature

and seek legal relief in the form of damages.  See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477,

82 S.Ct. 894, 899 (1962) (insofar as the complaint requests a money judgment it presents a claim

that is unquestionably legal).  Moreover, the United States may plead both equitable and legal

claims in the alternative in the same complaint under Fed.R.Civ.P. 8(e)(2), which allows parties

to "set forth two or more statements of a claim or defense alternately or hypothetically" and to

"state as many separate claims or defenses as the party has regardless of consistency."  Finally,

other courts have regularly approved of the United States pursuing common-law claims for

unjust enrichment and payment by mistake in actions under the FCA.  See United States v.

Applied Pharmacy Consultants, Inc., 182 F.3d 603, 608 (8th Cir. 1999) (awarding damages under

unjust enrichment claim where government chose not to pursue contract claim, and did not

prevail on FCA claim); Mead, 426 F.2d at 124 (awarding damages for payment by mistake claim

pleaded as alternative to FCA claim).  The common-law claims pleaded in this action are

alternative causes of action to the FCA action as to Defendants Paul Elliott and DCMC.  As to

the remaining Defendants not named in the FCA count, the common law claims are the sole

25

theory of recovery, and as such, assuming Defendants' argument was well taken, which is not, there would not be an adequate remedy at law. The motion to dismiss the Amended Intervening Complaint for lack of such matter jurisdiction is denied.

### III. <u>MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

**A.      Paul Elliott and DCMC**

Under Rule 12(b)(6), the United States' complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt the [United States] can prove no set of facts in support of [its] claims which would entitle [it] to relief." <u>Friedlander v. Nims</u>, 755 F.2d 810, 813 (11th Cir. 1985) (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>McKinnis v. Mosley</u>, 693 F.2d 1054, 1058 (11th Cir. 1982)). In considering Defendants' Motion to Dismiss under Rule 12(b)(6), the Court must accept as true all facts set forth in the United States' Amended Intervening Complaint. <u>See</u> <u>La Grasta</u>, 358 F.3d at 845 (citation omitted). Any inferences the Court draws from the Amended Intervening Complaint must be construed in the light most favorable to the United States. <u>See</u> <u>id</u>.

Defendants assert that, while the Amended Intervening Complaint alleges fraudulent practices, it fails to allege the actual submission of a claim, an essential predicate to FCA liability. To maintain a cause of action under the FCA, the United States must establish: "(1) a false and fraudulent claim; (2) which was presented, or caused to be presented, by the defendant[s] to the United States for payment or approval; (3) with the knowledge that the claim was false." <u>U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.</u>, 433 F.3d 1349, 1355 (11th Cir. 2005).

The purpose of Rule 9(b) is to provide Defendants with sufficient details of the "precise misconduct with which they are charged," so that they may prepare a proper defense. Durham v. Business Management Associates, 847 F.2d 1505, 1511 (11th Cir. 1988). See also In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318, 333 (D. Conn. 2004) ("It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend "'upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'") (quoting Payne v. United States, 247 F.2d 41, 46 (8th Cir. 1957), cert. den. 355 U.S. 923 (1958)).  "Rule 9(b) does not completely vitiate the liberality of Rule 8."  United States Ex Rel. Pogue v. Diabetes Treatment Centers of America, Inc., 238 F. Supp.2d 258, 269 (D.D.C. 2002) (citation omitted).  Accordingly, Rule 9(b) does not require the United States to allege each and every detail about each every false and fraudulent claim submitted to the United States.  The FCA claims are no surprise to Defendants, as many of the allegations are based on the same transactions that led to the criminal conviction of Paul Elliott.

Relying on the divided decision in United States ex rel. Clausen v. Laboratory Corp. of America, 290 F.3d 1301 (11th Cir. 2002), Defendants insist that the United States is required to plead every detail about every claim alleged to be false, including the actual date upon which Paul Elliott and DCMC submitted claims to the United States in the actual amount of each and every claim submitted.  Defendants also assert that the United States should have pled the names of the physicians performing office visits in the fraudulent scheme involving "upcoding" of evaluation and management codes.  In Clausen, the Eleventh Circuit found that the relator, a

competitor of the defendant, alleged certain fraudulent schemes implemented by defendant, but that the relator failed to make any allegations showing how the alleged scheme translated into actual claims being submitted to the United States.  290 F.3d at 1312 (discussing failure of relator to allege "the plot's execution").  At issue was not that the complaint suffered from insufficient specificity, but that the relator was a "corporate outsider" whose allegations may have been speculative.  290 F.3d at 1314.  Walker clarified Clausen and the level of pleading required in FCA cases under Rule 9(b).  The relator in Walker was a nurse practitioner and former employee of the defendant.  433 F.3d at 1360.  Although the relator did not identify any particular false claim, the court upheld the complaint because she sufficiently explained why she believed defendant submitted false or fraudulent claims to the United States.  433 F.3d at 1360.  The court interpreted Clausen as requiring only enough factual allegations to demonstrate reasonably that false claims were submitted.

The Amended Intervening Complaint alleges that Paul Elliott, a one-third owner and physician employee of DCMC, was the individual responsible for the billing functions of DCMC.  (Amended Intervening Complaint, 16, 38).  The United States alleges that, in this capacity, Paul Elliott "submitted claims under [DCMC's] group provider number to the Medicare Program and the FEHBP …."  (Amended Intervening Complaint, 36).  The Amended Intervening Complaint further alleges that the claims submitted to the federal programs are false and fraudulent.  (Amended Intervening Complaint, 39).  In addition, the United States alleges that the submission of false and fraudulent claims by Defendants were made with knowledge that the claims were false.  (Amended Intervening Complaint, 53, 60, 67, 73, 80).  Also attached to the Amended Intervening Complaint are Schedules A and B, which identify several claims actually

submitted by Defendants to the Medicare Program and the FEHBP in furtherance of the alleged fraud.  For each submitted claim appearing on the Schedules, the United States identifies the beneficiary, the alleged date of service, the provider name and CPT code, any identification numbers assigned to the submitted claims by Medicare and the FEHBP Carrier, Blue Cross/Blue Shield.  In the body of the pleading, the United States uses examples from the Schedules to illustrate each of the alleged fraudulent schemes and the claims submitted by Defendants. (Amended Intervening Complaint, 52, 59, 66, 72, 79).

Defendants take issue with the fact that the United States did not use examples from Schedule B within the allegations pertaining to the alleged fraudulent schemes, seeming to allege that the United States was required to allege the specific details of each and every false claim submitted to the United States.  Neither Rule 12 nor Rule 9 require such a level of pleading, however.  See Friedlander, 755 F.2d at 813, n.3 ("a court considering a motion to dismiss... should always be careful to harmonize the directives of Rule 9(b) with the broader policy of notice pleading"); see also United States ex rel. Franklin v. Parke-Davis, 147 F. Supp.2d 39, 49 (D. Mass. 2001) (citing cases where courts "have not... require[d] pleading with total insight" when fraud is complex or occurred over a span of time).  Defendants note that the United States claims that Paul Elliott and DCMC "routinely billed the Medicare Program and the FEHBP" in furtherance of the fraudulent schemes.  Defendants take this language to mean that the United States has failed to specify that Defendants "actually submitted" claims.  This argument amounts to mere semantics.  The verb "to bill" is defined as "to submit a bill of charges to." Webster's Dictionary, 121 (11th ed. 2003).  The Amended Intervening Complaint alleges that Paul Elliott and DCMC submitted claims to the United States.

The United States sets forth a comprehensive set of facts describing in detail the fraudulent schemes in the false and fraudulent billings that were submitted to the Federal Medicare program and the FEHBP by Paul Elliott and DCMC.  The Amended Intervening Complaint contains allegations setting forth Defendants' billing practices, which the United States learned from Relators, who are former employees of DCMC, and from the course of its investigation.  The United States further alleges that Paul Elliott, the individual who had control over DCMC's billing practices, submitted false and fraudulent claims to the Medicare program and the FEHBP in furtherance of five fraudulent schemes involving billing for MRIs, EMGs, echocardiograms, carotid ultrasound and evaluation and management codes.  (Amended Intervening Complaint, 39, 49-81).  Notably, the Amended Intervening Complaint provides specific examples of false claims that were actually submitted to the Federal programs by Defendant.  (Amended Intervening Complaint, 52, 59, 66, 72, 79, Schedules A and B).

Paul Elliott and DCMC assert that the Amended Intervening Complaint fails because it allegedly does not state which Defendant submitted the alleged false claims.  The United States alleges that Paul Elliott selected the information to include in the billing for DCMC, directed and caused the preparation of false and fraudulent claims and then submitted those claims to the federal programs.  (Amended Intervening Complaint, 36-39).  The claims were submitted under DCMC's group provider number, and thus were "submitted by" DCMC.  A corporation cannot act but through a human actor.  The only human actor involved in these particular allegations is Paul Elliott.  The Amended Intervening Complaint adequately alleges that Paul Elliott was responsible for causing the submission of these claims to the United States.

Defendants also take issue with the fact that the claims identified in Schedules A and B attached to the Amended Intervening Complaint are described as "false, fraudulent and otherwise non-reimbursable claims." The Government explains that the "otherwise non-reimbursable" claims include payments relating to the mistake of fact and unjust enrichment claims, neither of which requires allegations of fraud. Hence, Rule 9(b) does not apply to these claims, but even if it did, the requirements are more than satisfied.

Defendants also contend that the United States' allegations relating to the "upcoding" of evaluation and management codes are "inadequate" to support a claim under the FCA because the United States' allegations are based on a determination that the patient records do not support the billing codes. The Amended Intervening Complaint alleges that Defendants submitted false claims to the United States "seeking payment for higher level office visits than were actually performed and justified by the record." (Amended Intervening Complaint, 65). Each false claim alleged involves level four office visits. (Amended Intervening Complaint, 66; Schedules A and B; E&M codes 99214). With respect to the submitted claims, the United States alleges that the treatment records do not justify the billing for this level of visits and that Defendants engaged in a pattern of upcoding for approximately five years. (Amended Intervening Complaint, 65-66). Defendants' cases do not hold to the contrary. For instance, in United States ex rel. Showell v. Philadelphia AFL-CIO Hosp. Ass'n, 2000 WL 424274 (E.D. Pa. Apr. 18, 2000), the relator's complaint alleged certain documents were false because they contained inaccurate dates on which prescriptions were written. See id. at *3. In dismissing the complaint, the court noted that in several instances, the relator "[did] not assert the prescriptions were ever submitted to the Government for payment." Id. at *4 n.3. In United States ex rel. Obert-Hong v. Advocate Health

Care, 211 F.Supp.2d 1045 (N.D. Ill. 2002), the court held that the relator's upcoding claim failed

because he did not allege a pattern of upcoding by defendant and cited only a single example

where an administrative review board reduced the upcoding for claims submitted by defendant.

211 F.Supp. at 1051.  Finally, in United States ex rel. Stewart v. The Louisiana Clinic, 2002 WL

1066745 (E.D. La. May 28, 2002), the court dismissed an upcoding claim against one of several

defendants when the relators' complaint failed to allege "that the code submitted was false or

even that a different code should have been used."  Id. at *2 n.2.  The Stewart court allowed the

upcoming claims to go forward with respect to four of the defendants because the complaint set

forth "the basic manner in which the code submitted by [those defendants were] alleged to be

false." Id. at *2.  Contrary to Defendants' assertion, the Court has found that a complaint

sufficiently stated an upcoding claim based on the alleged insufficiency of documentation in the

patient records.  In United States ex rel. Harris v. Bernad, 275 F.Supp.2d 1 (D.D.C. 2003), the

court found that the United States' complaint in intervention was sufficient in pleading that for

six years, defendants submitted claims for level 4 and 5 office visits when the complaint alleged

that defendants knowingly up coded for higher levels of service, then actually provided.  Id. at 6.

The court did not require the complaint in intervention to establish what level each of the claimed

visits should have been.  See id.

The United States alleges that Paul Elliott and DCMC billed for the technical and

professional components of certain diagnostic tests, but only performed the technical component

of the tests, and in some instances, performed neither component.  (Amended Intervening

Complaint, 78-79).  Defendants argue that they are entitled to dismissal of these claims as a

matter of law because of the existence of the "purchased diagnostic test rules" contained in 42

Case 1:01-cr-12257-PBS  Document 4661-3  Filed 08/24/07  Page 33 of 48

32

U.S.C. § 1395u(n) and 42 C.F.R § 414.50. These provisions allow the technical and professional components of diagnostic tests to be performed by the physician (or by employees under his or her direct supervision) or by an "outside supplier" and purchased by the physician. Pursuant to that scheme, the billing physician must identify the supplier and indicate the amount that the supplier charged the billing physician for the performance of the test component. See 42 U.S.C. § 1395u(n)(1). As alleged in the Amended Intervening Complaint, Defendants represented that they performed the professional component of certain diagnostic tests, when in fact, they did not. (Amended Intervening Complaint, 78-79). The United States alleges that Defendants failed to notify Medicare that the professional components were performed by an outside supplier. (Amended Intervening Complaint, 79) (alleging false claim where Defendants billed for both components where treatment records show both components were performed by Stuart Cardiology Group). Defendants do not allege in their brief that they have, in fact, complied with the purchased diagnostic test rules.

Defendants contend that even if the allegations relating to the FEHBP are true, the United States has not shown that any false claims were submitted to the government or that the payment system of the FEHBP harms the federal fisc. Defendants argue that the "fixed" "statutory formula" for Government funding of the FEHBP, combined with the providers' submission of claims to the carriers, preclude the United States' claims under the FCA. The FEHBP is a federally-funded health care program established by Congress in 1959 pursuant to the Federal Employees Health Benefits Act. See 5 U.S.C. § 8901 et seq. Monies for the FEHBP are maintained in the Employees Benefits Fund ("Treasury Fund"), which the Office of Personnel Management ("OPM") administers. See 5 U.S.C. § 8909(a). Federal employees and their

agency employees contribute to the Treasury Fund to pay insurance premiums, referred to as contributions.  See 5 U.S.C. § 8906.  The United States Treasury holds and invests the Treasury Fund balances.  See 5 U.S.C. § 8909.  The Treasury Fund is the source of all relevant payments to the carriers, such as the Blue Cross Association, for services rendered to members.  See 5 U.S.C. § 8909 ("there is in the Treasury of the United States an Employees Health Benefits Fund….").  The carriers are paid by the Treasury Fund through a Letter of Credit account ("LOC Accounts") for which carriers draw down funds "on a checks-presented basis."  5 U.S.C. § 8909(a).  The Treasury Fund also contains portions set aside for contingency reserves for each carrier and an account for payments to OPM for the cost of administering the program.  See 5 U.S.C. § 8909(b).  The carriers have no claim to any excess funds in the Treasury Fund that may remain in the LOC Account or in the contingency reserves at the end of the year.  See 5 U.S.C. § 8909(b) (stating that unused balances in contingency reserves "may be used to defray increases in future rates are applied to reduce the contributions of enrollees in the Government….").  Defendants misconstrue 5 U.S.C. § 8906(a) in describing the provisions of establishing a "predetermined annual sum toward health care."  The Treasury does not pay carriers a fixed fee, rather, the Treasury reimburses carriers with federal funds based upon claims submitted by providers for actual benefit costs.  See 5 U.S.C. § 8909(a).  Carriers have no right to monies in the Treasury Fund unless and until (1) they incur legitimate cost for actual services rendered to members of the FEHBP, and (2) claims are submitted to the United States for payment of the services.  The United States therefore suffers a definitive and quantifiable loss when the FEHBP pays claims by providers that are not eligible for payment.  Defendants cite U.S. ex rel. Bustamante v. United Way/Crusade of Mercy, Inc., No. 98C5551, 2000 WL 690250, at *5-*6

(N.D. Ill. May 26, 2000), in which the relator alleged that defendant falsely certified to the

United States OPM that certain charities met the requirements of the Combined Federal

Campaign, a federally-sponsored donation program.  In dismissing the complaint, the court noted

that the participating federal employees contributed their own salaries and no payments were

made directly from the federal Treasury.  Such is not the case with the FEHBP.  Not only are the

payments to carriers under the program directly from monies residing in the Treasury, this money

also includes contributions by federal agencies.  Defendants overlook United States ex rel. Hunt

v. Merck-Medco Managed Care, L.L.C., 336 F.Supp.2d 430 (E.D. Pa. 2004), in which the United

States brought a complaint against the pharmacy benefit manager alleging false claims submitted

by defendant for payment under the FEHBP.  See 336 F.Supp.2d at 434-35, 438.  The defendant

there argued that submission of claims to the carrier did not constitute a presentment of claims to

the United States under the FCA.  The court disagreed, holding that the United States sufficiently

alleged harm to the federal government, reasoning that the United States suffers a loss if the

funds it has set aside were wasted on false claims.  See id. at  442-44.  See also United States v.

Squire, No. 05 C 3781, 2005 WL 3470297, at *5 (N.D. Ill. Dec. 12, 2005) (cause of action under

FCA sufficiently alleged where provider submitted false claims to fiscal intermediary that paid

claims for its commercial bank account and then requested and received Medicare

reimbursement).

The FCA imposes liability on any person who "knowingly makes, uses or causes to be

made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or

transmit money or property to the Government."  31 U.S.C. § 3729(a)(7).  Defendants assert that

the "reversed false claim" liability claim is deficient as a matter of law because Defendant did not

Case 9:01-cv-08111-KLR   Document 704   Entered on FLSD Docket 01/29/2007   Page 35 of 47
Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 36 of 48

35

owe an existing obligation to pay the United States.  An "obligation" within the meaning of the

statute can take the form of a fixed obligation, such as that under a judgment, contract, statute or

regulation.  See United States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1237 (11th Cir. 1999) (en

banc) (discussing obligation arising under government contract); United States v. Q International

Courier, Inc., 131 F.3d 770, 773 (8th Cir. 1997) (stating that statutes and regulations give rise to

legal obligations under the FCA).  Defendants' motion to dismiss ignores the relationship

between Medicare and Defendants, which is created by the regulatory scheme governing the

provision of services and payments.

 The Amended Intervening Complaint alleges that Defendants submitted claims for

payment to the Centers for Medicare and Medicaid Services ("CMS") using Form CMS 1500.

(Amended Intervening Complaint, 27).  When submitting a completed form, Defendants certify

that all of the information contained therein was truthful and accurate.  The United States alleges

that Defendants knowingly submitted false claims to Medicare seeking payment for the

performance of EMG tests when only NCV tests were performed.  (Amended Intervening

Complaint, 55-61).  As a result of the submission of these false claims, Defendants received

overpayments to which they were not entitled.  Regulations provide for the United States to

receive a refund of the overpayments.  See 42 CFR § 413.64(f); Amended Intervening

Complaint, 58-59; 18 U.S.C. § 1347.  The reversed false claim arises because Defendants sought

to avoid this duty to refund the overpayments by submitting to the United States falsified medical

records.  (Amended Intervening Complaint, 90-95).  The duty to refund overpayments was not a

potential or future obligation because the regulatory scheme gives rise to an actual obligation to

repay the monies.  See United States v. Raymond & Whitcomb Co., 53 F.Supp.2d 436, 446

(S.D.N.Y 1999). Raymond & Whitcomb held that defendant's submission of false certifications to the United States Postal Service created liability under the statute where defendants certified that it would be "liable for, and agree to pay, subject to appeals prescribed by postal laws and regulations, any revenue deficiencies assessed on [the] mailing…." The court found that an actual obligation to repay deficiencies existed even without an actual assessment by the Postal Service. Q International Courier, Inc., cited by Defendants, is distinguishable. There, the court reviewed the statutes and regulations governing eligibility for discounted international postal rates and found that the statutes did not impose an obligation on defendant to pay a higher domestic mail rate, but rather relieved the United States from any obligation to deliver the mail. See id. at 773-74. "A finding of wrongful use of the non-profit rate yields a clear and actual obligation to pay the deficiency." Raymond & Whitcomb, 53 F.Supp.2d at 446. When the Senate report referred to "money owed" the government, it was emphasizing the direction of the payment, not the status of the debt itself for the timing of the false statement. Even if the obligation here were a potential obligation, which it is not as it is affixed to a presently owed obligation, there would still be coverage under section 3729(a)(7).

Defendants further argue that the United States failed to plead its reverse false claim with sufficient particularity because it does not allege who prepared the fabricated reports, how the reports were fabricated or whether Defendants "were involved in the alleged 'fabrication.'" The statute makes clear that liability attaches to any party who "uses or causes to be... used, a false record or statement..." 31 U.S.C. § 3729(a)(7). The Amended Intervening Complaint alleges that, in response to a subpoena by the United States to DCMC and Paul Elliott, Defendants submitted, through their then attorney, false records that contained fabricated information

pertaining to EMG test results. (Amended Intervening Complaint, 91-93). The United States

alleges that these reports were false and that Defendants knowingly submitted these reports to

avoid an obligation to refund overpayments due to the United States. (Amended Intervening

Complaint, 94-96). Accordingly, the United States has set forth a claim under 31 U.S.C. §

3729(a)(7).

Paul Elliott claims that his paying restitution in the "full amount of the Government's

loss" in the criminal matter prevents the United States from seeking damages in this matter.

Such is no bar to the United States' seeking damages in this action. First, the civil case is broader

than the criminal case. The criminal case resulted in a conviction on 22 counts of health-care

fraud, but those represent only a portion of the false and fraudulent billings upon which this

action is based. As such, Defendant is mistaken that the "full amount" of loss suffered by the

United States as a result of Defendants' conduct has been adjudicated. Second, payment of

restitution by Defendant does not preclude the United States' recovery under the FCA, but it may

be considered as a factor in calculating damages in a civil case. The FCA allows the United

States to recover civil penalties "plus 3 times the amount of damages which the Government

sustains…." 31 U.S.C. § 3729(a). Such treble damages are not available in the criminal context.

See 18 U.S.C. § 3663A (under Victim and Witness Protection Act criminal court's order for

restitution is limited only to those offenses charged). Moreover, compensatory payments

received by the United States from any source, which may include payments of restitution, are

subtracted after the actual damages are trebled. See United States v. Entin, 750 F.Supp. 512, 519

(S.D. Fla. 1990). Paul Elliott's restitution might entitle him to an offset or credit against any

treble damages award, but it does not insulate him from a damages award. Third, governing case

law dispenses with Paul Elliott's assertion that the United States should be estopped from bringing civil claims against him. The doctrine of estoppel does not apply to the United States unless there exist exceptional circumstances, or the necessity to avoid manifest injustice. See United States v. American Diversified Defense, Inc., 702 F. Supp. 1551, 1557 (N.D. Ala. 1988). American Diversified Defense involved a promise from the United States to agree not to pursue any further FCA monetary penalties against the defendant as part of a plea agreement in the underlying criminal matter. See id. at 1555. The United States has made no such representation in this matter, nor does Paul Elliott so contend. Indeed, the FCA contains a provision estopping a defendant from denying essential elements of an FCA claim "in any action which involves the same transaction as in the criminal proceeding," thereby implying that Congress expressly contemplated FTC civil actions to follow criminal proceedings based on the same facts. See 31 U.S.C. § 3731(d).

Finally, Paul Elliott maintains that the common law claims should be dismissed because they are contingent upon allegations of fraud are not pled with particularity. Defendants cite no authority for this proposition. Indeed, the cases Paul Elliott cites do not support this conclusion. In both United States v. Hughes Aircraft Co., No. CV 89-6842-WJR (SX), 1991 WL 133569, *1 (C.D. Cal. Apr. 5, 1991) and United States ex rel. Perron v. Hughes Aircraft Co., No. CV 89 3312 (SX), 1991 WL 352416, *1 (C.D. Cal. Apr. 29, 1991), the court found that the common law claims were governed by the Contract Disputes Act and dismissed them for lack of subject matter jurisdiction. Here, the United States alleges that the claims at issue are false, but in the alternative, that such claims are, at a minimum, not reimbursable. The United States may establish unjust enrichment even if Defendants obtained the overpayments innocently, therefore,

an unjust enrichment claim is not based on fraud.  In any event, the Court has already ruled that the Amended Intervening Complaint satisfies the requirements of Rule 9(b).  Paul Elliott and DCMC's motion to dismiss is denied.

**B.**     **Suzann Elliott and Doctors Care Health Services, Inc.**

The United States brings claims for unjust enrichment and payment under mistake of fact against Defendants Suzann Elliott and DCHS.  Suzann Elliott and DCHS request dismissal of these claims on a variety of grounds.  The Court will address each argument in turn.

Suzann Elliott and DCHS argue that since they were not parties to the payments by the Government, the Government cannot recover against them under an unjust enrichment theory. The federal common law elements of a claim for unjust enrichment are "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefits, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof."  Hercules, Inc. v. Pages, 814 F. Supp. 79, 80 (M.D. Fla. 1993) (citation omitted).  It is proper for the Court to apply federal common law when determining the rights or duties of the United States under a federal program. See Downey v. State Farm Fire & Cas. Co., 266 F.3d 675, 681 (7th Cir. 2001) ("when the duties or rights of the United States are at stake under a federal program, that Federal interest requires the application (and if necessary, the creation) of federal law.") (citing Clearfield Trust Co. v. United States, 318 U.S. 363, 366, 63 S.Ct. 573, 575 (1943)).  Suzann Elliott and DCHS maintain that the United States must allege that it conferred a benefit directly upon them to plead a claim of unjust enrichment.  The federal common law does not so require, however.  Nor does the federal common law require the United States to pierce the corporate veil to reach Suzann Elliott.

Case 1:01-cr-12257-PBS Document 704 Filed 08/24/07 Page 41 of 48

The remaining cases Defendants cite consist of state courts deciding the state claims and federal courts interpreting state law.  See Peoples National Bank of Commerce v. First Union National Bank of Florida, 667 So.2d 876, 879 (Fla. 3d DCA 1996) (applying state common-law to state claims); Huntsman Packaging Corp. v. Kerry Packaging Corp., 992 F. Supp. 1439, 1446 (M.D. Fla. 1998) (applying state common-law principles to state common-law claims).

Suzann Elliott and DCHS argue that the common law claim of payment under mistake of fact fails to state a claim.  The United States has a federal common-law right to recover government funds lost or wrongful or erroneous acts of its agents.  "The government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid.  No statute is necessary to authorize the United States to sue in such a case.  The right to sue is independent of statute."  Wurts, 303 U.S. at 415, 58 S.Ct. at 639 (citation omitted).  A claim for payment under mistake of fact requires the government to show that payment occurred pursuant to an erroneous belief which was material to the decision to pay.  See Mead, 426 F.2d at 124.  The United States does not need to demonstrate that the Defendants knew the claims were false, nor does the United States need to prove that the payments were made directly to each of the Defendants.  Again, the United States need not pierce the corporate veil to reach Suzann Elliott.  The Amended Intervening Complaint alleges that, for a period of approximately 5 years, the United States paid DCMC for claims under the mistaken belief that it was properly entitled to reimbursement.  (Amended Intervening Complaint, 98, 101).  The claims for payment submitted under the DCMC group provider number, however, were actually made as part of fraudulent schemes in which Defendants misrepresented "the level, type, performance, and reimbursability of the services allegedly provided."  (Amended Intervening Complaint, 100).  The United States'

mistaken belief was material to the amount of the payments made by the federal health care programs. (Amended Intervening Complaint, 102). As explained in the discussion of the unjust enrichment claim, the overpayments by the United States flowed to each of the Defendants, who came into possession of funds not due them.

Suzann Elliott and DCHS next argue that the claims of mistake of fact and unjust enrichment are barred by the applicable statute of limitations. Defendants note that the Amended Intervening Complaint alleges that improper payments with respect to Suzann Elliott and DCHS occurred between 1998 and 2002, yet the initial Intervening Complaint was not filed until October 14, 2005. Thus, unless the United States alleges that the funds at issue were obtained in the last two months and 2002, the unjust enrichment claim should be barred under the three-year statute of limitations pursuant to 28 U.S.C. § 2415(b).

The common law claims are timely pursuant to the relation back doctrine expressed in Rule 15(c). In applying the relation back doctrine to a complaint in intervention, courts construe intervening complaints by the United States as those they were amendments to the relators' complaints for this limited purpose. See United States ex rel. Campbell v. Lockheed Martin Corp., 282 F. Supp. 2d 1324, 1336-37 (M.D. Fla. 2003) (ruling that United States' non-FCA claims relate back to relator's complaint); In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. at 357 ("Rule 15(c)(2) may apply to a complaint-in-intervention filed by the United States in a qui tam proceeding, even though it is not technically an amended complaint by the original party."). Defendants maintain that the relation back doctrine is inapplicable because the Amended Intervening Complaint does not allege that DCHS or Suzann Elliott had notice of the relators' complaint, which was filed under seal, and does not expressly allege that the relation

back doctrine should apply.  It is manifest that DCH S and Suzann Elliott were on notice of the

claims against Paul Elliott and DCMC, at such complaint was partially unsealed and the contents

thereof revealed to Defendants as of April 28, 2003.  The common law claims arise out of the

same transactions upon which the FCA claims were based and are therefore timely under the

relation back doctrine.

Even if the common law claims did not relate back to the relators' complaint, these claims

are governed by 28 U.S.C. § 2415(a), not 28 U.S.C. § 2415(b).  Under 28 U.S.C. § 2415(a),

every action for money damages founded on contract or in money erroneously paid must be filed

within six years after the right of action accrues.  The only case Defendants sent to the contrary,

Blusal Meats, Inc. v. United States, 638 F. Supp. 824 (S.D.N.Y.1986), is not persuasive, and at

least one circuit has recognized that this case "displayed no awareness of the history" of the issue.

See United States v. First National Bank Cicero, 957 F.2d 1362, 1370-72 (7th Cir. 1992)

(holding that the United States' unjust enrichment claim was a quasi-contract remedy and

therefore subject to the six-year statute of limitations); United States v. P/B STCO 213, 756 F.2d

364, 370, 374-76 (5th Cir. 1985) (finding a six-year statute of limitations applies even though

quasi-contract remedy may require proof of what might be tortious conduct).  The six-year statute

of limitations also applies to claims for payment by mistake of fact.  See United States ex rel.

Zissler v. Regents of the University of Minnesota, 992 F. Supp. 1097, 1105 (D. Minn. 1998)

(holding that 28 U.S.C. § 2415(a) applies to claims for unjust enrichment and payment by

mistake).

Furthermore, 28 U.S.C. § 2416(c) sets forth the statutory tolling provision for purposes of

computing the statute of limitations and provides for the exclusion of all periods during which

"facts material to the right of action are not known and reasonably could not be known by an

official of the United States charged with the responsibility to act in the circumstances."  The

"official of the United States charged with the responsibility to act" is an official within the Civil

Division of the Department of Justice.  See Jankowitz v. United States, 533 F.2d 538, 548 (Ct.

Cl. 1976), *overruled on other grounds*, 52 Fed. Cl. 399 (Ct. Cl. 2002) (for purposes of 28 U.S.C.

§ 2416, the United States did not have "actual knowledge of facts tending to indicate the

presence of alleged fraud" until the "allegations [were] received by the United States Attorney").

Defendants have not provided the date when the Civil Division of the Department of Justice

should have known of the material facts alleged in the Amended Intervening Complaint.  The

United States submits, and the Court agrees, that the earliest date these facts could have been

known was February 12, 2001, the date it received Relators' complaint and disclosure under 31

U.S.C. § 3730(b).  The United States brought its complaint on October 14, 2005, within six years

of when it knew of the material facts.  Defendants complain that United States "fail[ed] to allege

tolling in its counts and amended complaint with particularity," thereby depriving it of the tolling

argument, but such is excessively formalistic.  The procedural history of this case is known to all

parties and individuals involved herein.  The United States first received notice of Defendants'

alleged fraud on February 12, 2001.  It filed its complaint in intervention within six years of that

date.  As such, the tolling provision renders the unjust enrichment and payment by mistake

claims timely.

       Next, Suzann Elliott claims that the United States has failed to plead facts sufficient to

pierce the corporate veil as between her and the corporate defendants.  As noted, the required

elements of claims for unjust enrichment and payment under mistaken facts do not require the

44

United States to pierce the corporate veil.

Finally, Suzann Elliott and DCHS claim that the common law claims should be dismissed because they are contingent upon allegations of fraud not alleged with sufficient particularity. Defendants cite no authority for the proposition that such claims must be alleged with particularity. The Court has already explained that the cases Defendants cite do not support this proposition. See Hughes Aircraft Co., 1991 WL 133569, at *1; Hughes Aircraft Co., 1991 WL 352416, at *1 (disclaiming jurisdiction over common-law claims pursuant to Contract Disputes Act). The United States alleges that the claims at issue are false, but in the alternative, it alleges that such claims are, at a minimum, not reimbursable. The common law claims are simply alternate theories not based on fraud and are therefore exempt from Rule 9(b) pleading requirements. Suzan Elliott and DCHS's renewed motion to dismiss is denied.

## C.    Nicholas Elliott

The United States brings claims for payment under mistake of fact and unjust enrichment against Nicholas Elliott. Nicholas Elliott requests that the action against him be dismissed for a variety of reasons. The Court will address each argument in turn.

Nicholas Elliott maintains that the United States must plead fraud with particularity to bring common law claims of unjust enrichment and payment under mistake of fact against him. The Court has already determined that the Amended Intervening Complaint states a valid claim for unjust enrichment against Defendants. The United States conferred a benefit upon Nicholas Elliott by virtue of his financial relationship with DCMC. During the relevant time period, Nicholas Elliott was a one third owner of DCMC and shared in its profits. (Amended

Case 9:01-cv-08143-KLR   Document 704   Entered on FLSD Docket 01/29/2007   Page 45 of 47
Case 1:01-cr-12257-PBS   Document 4661-3   Filed 08/24/07   Page 46 of 48

45

Intervening Complaint, 44).  Such profits included overpayments made by the United States.  (Amended Intervening Complaint, 42-43).  Nicholas Elliott did not decline the overpayments, nor did he voluntarily bring them to the attention of the United States.  Nicholas Elliott cites no authority for the proposition that the unjust enrichment claim must meet the requirements of Rule 9(b).  The United States alleges that the claims submitted are false, but in the alternative, that such claims are, at a minimum, not reimbursable.  As previously noted, it is this alternative pleading upon which the claim for unjust enrichment rests.  The United States may establish a claim for unjust enrichment even if Defendants obtained the payments innocently.  Accordingly, the unjust enrichment claim is not based on fraud, and as such, Rule 9(b) is inapplicable.  Even if such rule applied, however, the Court has already ruled that the Amended Intervening Complaint is sufficiently particular.

Nicholas Elliott also insists that the United States is required to allege fraud in order to recover against him under the common law theory of payment under mistake of fact.  The Court has already traced the elements of a federal common law claim to recover funds improperly paid under a mistake of fact.  Pursuant to the elements, the United States does not need to demonstrate that Defendant knew the claims were false.  The United States need only show that it paid Defendant money based on a factual mistake.  Nor does the United States need to demonstrate that the payments went directly to Nicholas Elliott.  Again, even if the allegations were required to satisfy Rule 9(b), the Amended Intervening Complaint is sufficiently particular.

Finally, Nicholas Elliott maintains that the United States must exhaust administrative remedies prior to asserting common law claims in this action. Nicholas Elliott maintains that the common law claims of unjust enrichment and payment under mistake of fact are "inextricably intertwined" with its recoupment claim, which the United States asserts against DCMC only. The claims for unjust enrichment and payment under mistake of fact are alternative theories and are not dependent upon the recoupment claim. In fact, the United States has a common law right to recoup improper payments made to providers under the Medicare Program. See Mount Sinai Hospital v. Weinberger, 517 F.2d 329, 337 (5th Cir. 1975), cert denied, 425 U.S. 935 (1976); Szekely v. Florida Medical Association, 517 F.2d 345, 349 (5th Cir. 1975)(recognizing the United States' common law right to recoup improper payments made to providers under the Medicare Program). Nicholas Elliott's motion to dismiss is denied.

## IV. <u>CONCLUSION</u>

The Court, having considered the parties' written submissions and oral argument, hereby ORDERS AND ADJUDGES that the Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed March 15, 2006 **[DE 111]**, is DENIED. It is further

ORDERED AND ADJUDGED that Paul Elliott and DCMC's Motion to Dismiss for Failure to State a Claim, filed March 15, 2006 **[DE 118]**, is DENIED. It is further

ORDERED AND ADJUDGED that Suzann Elliott and DCHS's Renewed Motion to Dismiss for Failure to State a Claim, filed March 15, 2006 **[DE 113]** is DENIED. It is further

47

ORDERED AND ADJUDGED that Nicholas Elliott's Motion to Dismiss for Failure to

State a Claim, filed April 17, 2006 **[DE 129]**, is DENIED.

DONE AND ORDERED at Chambers in West Palm Beach, Florida this 25th day of

January, 2007.

Copies provided:                                    Kenneth L. Ryskamp
all parties and counsel of record                   KENNETH L. RYSKAMP
                                                     UNITED STATES DISTRICT JUDGE