# EXHIBIT 1

00001
```
 1                  IN THE DISTRICT COURT OF
 2                   TRAVIS COUNTY, TEXAS
 3                  201st JUDICIAL DISTRICT
 4
 5    THE STATE OF TEXAS
 6          ex rel.
 7
 8    VEN-A-CARE OF THE
      FLORIDA KEYS, INC.,
 9
                  Plaintiffs,
10        v.                      Cause No. GV401286
      ABBOTT LABORATORIES,
11    INC., et al.,

12               Defendants.
13    ~~~~~~~~~~~~~~~~~~~~~~~~~~
14
15
16              VIDEOTAPED DEPOSITION OF
17                   MATTHEW PERRI
18                     VOLUME I

19                 August 20, 2007
20                    8:06 a.m.
21
22            1420 Peachtree Street, N.E.
23                    Suite 800
24                 Atlanta, Georgia
25
                  Lee Ann Barnes, RPR
```

00002

```
 1                    APPEARANCES OF COUNSEL
 2
 3   On behalf of the State of Texas:
 4   RAYMOND C. WINTER, ESQUIRE
 5   ATTORNEY GENERAL'S OFFICE
 6   STATE OF TEXAS
 7        P.O. Box 12548
 8        300 West 15th Street
 9        Austin, Texas  78711
10        Telephone:  (512)936-1709
11        Facsimile:  (512)499-0712
12        E-mail:  Raymond.Winter@oag.state.tx.us
13
14   On behalf of Ven-A-Care of the Florida Keys:
15   JAMES J. BREEN, ESQUIRE
16   THE BREEN LAW FIRM
17        5755 North Point Parkway
18        Suite 39
19        Alpharetta, Georgia  30022
20        Telephone:  (770)740-0008
21        Facsimile:  (770)740-9109
22        E-mail: jbreen@breenlaw.com
23
24
25
```

```
00003
  1              APPEARANCES OF COUNSEL (Continued)
  2
  3   On behalf of the United States:
  4   RENEE BROOKER, ESQUIRE
  5   United States Department of Justice
  6        Civil Division
  7        Commercial Litigation Branch
  8        601 D Street, NW
  9        Washington, D.C.  20003
 10        Telephone:  (202)616-37987
 11
 12   On behalf of Abbott Laboratories:
 13   R. CHRISTOPHER COOK, ESQUIRE
 14   HILARY A. RAMSEY, ATTORNEY AT LAW
 15        JONES DAY
 16        51 Louisiana Avenue, N.W.
 17        Washington, D.C.  20001-2113
 18        Telephone:  (202)879-3939
 19        Facsimile:  (202)626-1700
 20        E-mail:  Christophercook@jonesday.com
 21
 22   Also Present:
 23   Keith Neal, Videographer
 24
 25
```

00045

1   in the record where there was contradictory

2   testimony; correct?

3     A.  Yes.

4     Q.  I think we've agreed that it's

5   impossible to identify all of the instances in

6   which there was contradictory evidence or

7   testimony in the record; correct?

8     A.  Yes.

9     Q.  Of those instances where we can

10  identify where there was contradictory

11  testimony or evidence, can you identify for me

12  which of the testimony or evidence informed

13  your opinion and which did not inform your

14  opinion?

15      MR. BREEN:  Objection; form.

16      THE WITNESS:  Given specifics, yes,

17   I could.

18     Q.  (By Mr. Cook)  And the evidence that

19  did not inform your opinion is not included in

20  your report; correct?

21     A.  No.  I -- I -- as I -- I thought I

22  tried to explain, what is in my report is

23  evidence that I think is -- is very solidly

24  formed based on my evaluation.

25      If something is not there, it's

00135

1       A.    I don't recall specifically from the

2    record if he described a specific scenario,

3    but I'm -- I feel very confident that he

4    testified that -- that this was common to

5    discuss this.

6       Q.    So Mr. Lotz and Mr. Bien's testimony

7    is where you're telling me we could find

8    evidence that the type of sales interaction

9    that you just described for me occurred with

10   respect to Abbott's products?

11      A.    I think that -- that both of those

12   testimonies would -- would provide evidence

13   that the -- the spread was used in a marketing

14   sense, yes.

15      Q.    But more specifically, the type of

16   interaction between a salesperson and a

17   provider, a customer, such as you described,

18   you would point me to the testimony of

19   Mr. Bien and Mr. Lotz to find a description of

20   that type of interaction?

21      A.    Absolutely for Mr. Bien.

22            And for Mr. Lotz, I -- I can't tell

23   you that he described a scenario, but I can

24   tell you that he made clear, from my

25   recollection of his testimony, that the reason

00136

1    he was able to sell more product was because

2    he had become aware of this issue and that he

3    used that in his sales techniques or implied

4    that he did.

5          Q.    Was it common for Abbott salespeople

6    to use that sales technique?

7          A.    Drawing on the testimony from

8    numerous witnesses where the -- the importance

9    of AWP and spread and reimbursement issues was

10   made clear to me and drawing on Abbott's very

11   strong desire to meet customers' needs, I

12   would answer that yes.

13         Q.    Fair to say you're concluding that

14   those interactions must have occurred?

15            MR. BREEN:   Object to the form.

16            THE WITNESS:   I know that

17            interactions regarding AWP and

18            reimbursement did occur from the

19            testimony.

20         Q.    (By Mr. Cook)  And you've pointed me

21   to the testimony of Mr. Bien and Mr. Lotz as

22   examples of testimony describing those sorts

23   of interactions?

24         A.    That testimony you -- you asked me

25   specifically with regard to that scenario that

00137

1   we -- that we painted, which was a

2   hypothetical that I just used as an example,

3   and I thought those two give us evidence of

4   that.

5            And then related to that is this

6   other issue of spread and reimbursement being

7   important to many of Abbott's customers,

8   Abbott's recognition of that importance, and

9   Abbott's desire to meet the needs of those

10  customers.

11      Q.   My question to you is what evidence

12  you can point me to that would suggest that

13  Abbott sought to meet those needs with the

14  type of salesperson interaction that you

15  described just a minute ago, of a salesperson

16  explicitly encouraging a provider to purchase

17  Abbott products based upon the spread.

18            MR. BREEN:   Objection; form.

19            THE WITNESS:   Aside from Lotz --

20       Mr. Lotz and Mr. Bien, in proposals that

21       Abbott made to customers, bid proposals,

22       AWP and spread were identified in some of

23       those documents.

24            To the extent that those documents

25       were shared with customers to provide

00138

```
 1          insight into their reimbursement and the

 2          reimbursement that would be obtainable

 3          from competitors' products, which was

 4          also on those -- on some of those forms,

 5          to me and in my opinion, that would be

 6          essentially the same thing as having that

 7          kind of interaction.  Maybe not the same

 8          words, but certainly provide the same end

 9          point.

10          Q.    (By Mr. Cook)  Any other evidence

11     you can point me to?

12          A.    Again, we're still talking about

13     communication of the spread?

14          Q.    Active selling of the spread to

15     customers such as that which you described

16     earlier in --

17          A.    Are we still talking about a

18     face-to-face encounter?

19          Q.    Let's start with face-to-face

20     encounters and if there's more, you can move

21     beyond that.

22          A.    I'm not sure that all the bid

23     proposals that I'm referring to were

24     face-to-face encounters.  These may have been

25     transmitted, mailed, they could have been
```

00139

1    presented.  I think they probably were done

2    all three of those ways.

3            I'm trying to recollect if there

4    were other examples and I can't really think

5    of anything right now.

6        Q.   Any other evidence at all -- strike

7    that.

8            Any other instances at all to which

9    you can point of Abbott actively marketing the

10   spread to its customers?

11           MR. BREEN:  Objection; form.

12           THE WITNESS:  In my opinion, the

13           reporting of prices to the various

14           compendium and making that available

15           provided evidence of that.

16           The -- that data then becoming

17           available in Abbott's wholesale

18           distribution network through various

19           systems that identified AWP spread and

20           lowest cost -- lowest purchase prices, as

21           well as highest spread products, systems

22           such as the -- I guess it was called

23           Emphasis.  There were other systems, as

24           well.

25       Q.   (By Mr. Cook)  Now, Emphasis, that's

00140

1    not an Abbott system, is it?

2         A.   No, it's not.  It's one of their

3    customer systems that they provided through

4    the GPO their members that specific data, the

5    link being that Abbott reported the prices

6    that were then used in those systems.

7         Q.   So is it your testimony that the

8    price sold itself?

9              MR. BREEN:  Objection; form.

10             THE WITNESS:  No.

11        Q.   (By Mr. Cook)  You understand the

12   difference that I'm trying to get at between

13   actively marketing the spread and simply

14   reporting price; correct?

15        A.   I understand that you might

16   distinguish between those two, yes.

17        Q.   All right.  Can you give me any more

18   examples of Abbott actively marketing the

19   spread other than the testimony of Omnicare

20   employee Tim Bien, the Abbott employee,

21   Mr. Lotz, and the Abbott bids and proposals

22   that you've identified?

23        A.   I recall seeing some e-mails or --

24   or letters -- I can't recall if they were

25   e-mails or letters now -- where Abbott would

00151

1    rules for how the Texas Vendor Drug Program is

2    going to reimburse for Abbott drugs; correct?

3        A.    That's correct.

4        Q.    Do you know whether the Texas

5    government or the United States government has

6    ever indicated whether they feel it is

7    appropriate for pharmaceutical manufacturers

8    to discuss the spread?

9            MR. BREEN:   Objection; form.

10           THE WITNESS:   No, I don't know.

11       Q.    (By Mr. Cook)   To the extent that a

12   government entity had expressed concern about

13   salespeople discussing the spread, you would

14   agree with me that that would be a perfectly

15   legitimate reason why Abbott would instruct

16   its salespeople not to discuss the spread;

17   correct?

18           MR. BREEN:   Objection; form.

19           THE WITNESS:   I -- I -- I agree in

20       general with that statement, yes.

21       Q.    (By Mr. Cook)   And the fact that

22   Abbott instructed its salespeople not to

23   discuss the spread in the face of criticism

24   from the governing entity wouldn't suggest

25   that Abbott thought it was wrong to discuss

00152

1    the spread, would it?

2            MR. WINTER:  Objection; form.

3            THE WITNESS:  The problem that I'm

4        having with your question is that -- that

5        this issue of not discussing the spread

6        and it being something that Abbott told

7        them not to do, I did see evidence

8        that -- that Abbott instructed -- for

9        example, a memo where I believe Mr. Ward

10       had written on the side -- circled the

11       statement and said, "Don't mention this

12       again," okay?

13           However, I -- I also note that while

14       this was mentioned from time to time --

15       and I can't give you a timeline on it

16       all -- the -- there was not a policy in

17       place not to discuss the spread until, I

18       believe, 2004 -- late 2003 or 2004.

19       Q.    (By Mr. Cook)  Do you know who the

20   Office of Inspector General for the Department

21   of Health and Human Services is?

22       A.    I might could venture a guess, but

23   I'd rather not.

24       Q.    Do you know when or if the Office of

25   Inspector General promulgated guidelines for

00154

1    its sales force?

2        A.    No, I don't think so.

3        Q.    That wouldn't have any bearing

4    whatsoever on how you viewed Abbott

5    promulgating written guidelines?

6        A.    With respect to the written

7    guidelines, it -- it would provide me with an

8    answer to a question as to why they did it

9    then.   It would provide evidence to that

10   effect.

11       Q.    And what I'm struggling with -- and

12   you can tell me if I have it right -- is it

13   your testimony that because Abbott managers

14   instructed salespeople not to market the

15   spread, that you see that as evidence that

16   Abbott marketed the spread?

17              MR. BREEN:   Objection.

18              MR. WINTER:   Objection.

19              THE WITNESS:   No, I don't think I

20        drew connections between those two.

21        And --

22       Q.    (By Mr. Cook)   You'd agree --

23       A.    -- just to clarify, I -- we've --

24   we've -- we've skirted the issue of Craig

25   Smith, Mr. Smith, a couple of times today

00155

 1   where that was the -- the primary source of

 2   Mr. Lotz' dismay about the whole issue of the

 3   spread, was that he -- he believed he was

 4   instructed not to talk about the spread, but

 5   Mr. Smith denied saying that.

 6        Q.   So --

 7        A.   So I think there's more to this

 8   issue and I -- I can't answer your question

 9   completely without addressing those other

10   issues.

11        Q.   You would agree with me that the

12   factual record on this question is, at best,

13   murky?

14             MR. BREEN:   Objection; form.

15             THE WITNESS:   I -- I don't -- if by

16             "murky" you mean it's not crystal clear,

17             yes, I would agree that there -- there is

18             some -- there's going to be more need to

19             weigh the evidence in this case than in

20             others.

21        Q.   (By Mr. Cook)  Is it your testimony

22   that Craig Smith testified that he did not

23   tell Mr. Lotz not to --

24        A.   No.

25        Q.   -- market the spread?

00156

1        A.    My testimony is he did not recall

2    telling him that.

3        Q.    And you see that as some evidence

4    that Mr. Lotz' testimony about Mr. Smith

5    telling him not to market the spread should

6    not be believed?

7              MR. BREEN:  Objection to form.

8              MR. WINTER:  Objection; form.

9              THE WITNESS:  No, I did not say

10        that.

11        Q.    (By Mr. Cook)  Well, then tell me.

12              Do you believe that Mr. Smith told

13    Mr. Lotz not to market the spread?

14        A.    What was most important to me in

15    that interchange was an awareness that

16    Mr. Lotz learned of the spread and discussed

17    it with his customers and used that in his

18    selling of Abbott products.

19              Of secondary importance was the

20    interaction between two people that there

21    seemed to be, from my reading of the record,

22    some level of contact between a troublesome

23    employee and a district manager.

24              Having -- having been in those kinds

25    of positions before, I understand how those

00157

1   relationships can be, and I was not surprised

2   that there were differences in opinions about

3   their interactions.

4        Q.   Do you believe that Mr. Smith told

5   Mr. Lotz not to market the spread?

6        A.   In weighing the -- the testimony of

7   Mr. Smith and the testimony of Mr. Lotz and in

8   the absence of any kind of a formal reprimand,

9   written, anything like that, in weighing, I

10  tend -- tended, in that case, to give

11  Mr. Lotz' testimony more weight than I did

12  Mr. Smith's.

13       Q.   And Mr. Lotz testified that

14  Mr. Smith told him not to the market the

15  spread; correct?

16       A.   Yes.

17       Q.   And Mr. Smith simply didn't recall

18  any such interchange; correct?

19       A.   Correct.

20       Q.   So your opinion is based upon, in

21  part, the assumption that Mr. Smith told

22  Mr. Lotz not to market the spreads?

23       A.   No, as I said, that wasn't -- that

24  wasn't crucial to my opinion at all.  That --

25  that was an ancillary fact that may or may not

00158

```
 1    have happened.  What --

 2         Q.    Dr. Perri, you brought it up.

 3               MR. BREEN:  Objection; form.

 4               MS. BROOKER:  Objection.

 5               MR. BREEN:  Is there a question

 6         pending?

 7         Q.    (By Mr. Cook)  All right.  I'll ask:

 8    Dr. Perri, isn't it true that you brought up

 9    Mr. Smith's testimony today?

10               MR. BREEN:  Objection; form.

11               THE WITNESS:  Yes, that's true.

12         Q.    (By Mr. Cook)  But your testimony is

13    it's not important to your opinion?

14         A.    No.

15         Q.    And you brought up Mr. --

16         A.    Excuse me.  I --

17         Q.    Oh, I'm sorry, go ahead.

18         A.    I don't think I answered your

19    question correctly.

20         Q.    Go ahead, please.

21         A.    Could -- you asked if -- if I

22    thought that it was important to --

23    Mr. Smith's testimony was important to forming

24    my opinion?

25         Q.    Yes.
```

00159

```
 1        A.    Of course it was.  The -- the issue

 2     is what I was looking for in terms of

 3     evidence, in terms of Abbott's marketing

 4     behavior, Mr. -- whether Mr. Smith and

 5     Mr. Lotz agreed or not on that issue was not

 6     of crucial importance.

 7            What I was trying to learn from that

 8     scenario was whether or not Mr. Lotz used AWP

 9     spread and reimbursement information to sell

10     Abbott products.  Secondary to that, their

11     interchange, their relationship, may have

12     informed me in some way.

13        Q.    In determining whether Abbott as a

14     corporation marketed the spread, is it more

15     important to you that a field sales rep,

16     Mr. Lotz, marketed the spread until he was

17     told to stop or is it more important to you

18     that his boss or manager told him not to do

19     it?

20            MR. BREEN:  Objection; form.

21        Q.    (By Mr. Cook)  Which of those pieces

22     of evidence is more probative of the policy of

23     the corporation?

24            MR. BREEN:  Objection; form.

25            THE WITNESS:  That is a -- that is a
```

00160

```
1        very difficult question to answer, and
2        I'll tell you -- I'll explain why.
3            Mr. Lotz is Abbott to the customer
4        and Mr. Smith is management.  To the
5        extent that the customer and the
6        interface between -- when -- when the
7        customer sees Abbott, they see Mr. Lotz.
8            So looking at Abbott's behavior, if
9        you're looking at it through the eyes of
10       the customer, you may get one answer.  If
11       you're looking at it through the eyes of
12       management, Mr. Smith's testimony should
13       bear more on what the corporate policy
14       was.
15       Q.   (By Mr. Cook)  Your report wasn't
16   addressed to the customer, was it?
17           MR. WINTER:  Objection; form.
18       Q.   (By Mr. Cook)  It's an obvious
19   answer.
20       A.   Well, no, it wasn't addressed to
21   Abbott's customers, no.
22       Q.   To whom was it addressed?
23       A.   I assume to the Court.
24       Q.   In the Court's eyes, you
25   communicated that Abbott marketed the spread;
```

00162

```
 1    hierarchy within the sales organization within

 2    Abbott; correct?

 3              MR. BREEN:  Objection; form.

 4              THE WITNESS:  I guess he'd be the --

 5         the bottom of their organizational

 6         structure in terms of sales.

 7         Q.   (By Mr. Cook)  -- learns about the

 8    opportunity to market the spread from a

 9    pharmacist who has no employment relationship

10    with Abbott; correct?

11         A.   Correct.

12         Q.   Mr. Lotz then markets the spread to

13    customers; correct?

14         A.   Yes.

15         Q.   Mr. Lotz' boss, Craig Smith, learns

16    Mr. Lotz is marketing the spread to customers;

17    correct?

18         A.   I think that's where the facts

19    become disputed or not clear, less -- less

20    clear, more murky.

21         Q.   And for purposes of your analysis,

22    you assumed that, in fact, Mr. Smith learned

23    about Mr. Lotz' marketing activity; correct?

24              MR. BREEN:  Objection; form.

25              THE WITNESS:  No, not entirely.
```

00164

```
 1    to market the spread; correct?

 2              MR. BREEN:  Objection; form.

 3              THE WITNESS:  Correct.

 4         Q.   (By Mr. Cook)  There's no testimony

 5    that you're aware of that Mr. Smith told

 6    Mr. Lotz to market the spread, is there?

 7         A.   No.  Well --

 8         Q.   He --

 9         A.   -- in Mr. Lotz' testimony, he did --

10    he did go to some lengths to say, "Hey, you

11    know, my boss wanted to know what I was doing

12    so he could tell other people."

13         Q.   And so did Mr. Smith take that --

14    that information and disseminate it within

15    Abbott as a great way to sell Abbott's

16    products?

17         A.   I don't know.

18         Q.   Is there any evidence to suggest

19    that?

20              MR. BREEN:  Objection; form.

21              THE WITNESS:  The -- the only

22         evidence that I would have to suggest

23         that would include that the sales reps

24         generated reports.  Those reports were

25         generally circulated.
```

00165

```
 1              I didn't see that issue circulated,
 2         but I also didn't see many of those
 3         reports.
 4         Q.    (By Mr. Cook)  So we have Mr. Lotz
 5    being told to stop marketing the spread and no
 6    evidence to suggest that Mr. Smith told others
 7    to market the spread, and you draw from that
 8    the conclusion that Abbott marketed the
 9    spread?
10              MR. BREEN:  Objection; form.
11              THE WITNESS:  Not in -- not
12         independent of all the other factors that
13         we've discussed.
14         Q.    (By Mr. Cook)  You see that sequence
15    of events as supporting your conclusion that
16    Abbott marketed the spread?
17         A.    Yes.
18         Q.    The fact that Mr. Smith told
19    Mr. Lotz to stop marketing the spread supports
20    your conclusion that Abbott marketed the
21    spread?
22              MR. BREEN:  Objection; form.
23              THE WITNESS:  I'll repeat that if --
24         if we're talking about that exact
25         sentence that you're referring to in the
```

00166

```
 1        record or couple of sentences, did it
 2        make me conclude that Abbott marketed the
 3        spread?   No.
 4        Q.    (By Mr. Cook)   Not my question.
 5             MR. BREEN:   I don't know that the
 6        witness was finished with his answer.
 7        Q.    (By Mr. Cook)   Okay.   Please
 8   continue.
 9        A.    No, I -- I think I need
10   clarification of your question.
11             MR. COOK:   Read the question back.
12        Q.    (By Mr. Cook)   The fact that
13   Mr. Smith told Mr. Lotz to stop marketing the
14   spread, period, does that support your
15   conclusion that Abbott marketed the spread?
16             MR. BREEN:   Objection; form.
17             MR. WINTER:   Objection; form.
18             THE WITNESS:   That statement, in and
19        of itself, does not support my conclusion
20        that Abbott marketed the spread, taken
21        alone.
22        Q.    (By Mr. Cook)   That statement or
23   that fact?
24             MR. BREEN:   Objection; form.
25             MR. WINTER:   Objection; form.
```

00167

```
  1              THE WITNESS:  I -- I'm a little bit
  2         confused, because I -- I don't know that
  3         it's a fact that he did or didn't, at
  4         this point, tell Mr. Lotz to stop
  5         marketing the spread.
  6         Q.   (By Mr. Cook)  Did you conclude
  7    whether he did or didn't?
  8         A.   I've made every attempt through the
  9    record when I read evidence -- and we talked
 10    at length about this this morning -- to allow
 11    testimony to inform me, some testimony more
 12    than other.
 13              What -- what the value -- what the
 14    value of this incident is exists in my mind,
 15    in my opinion.
 16         Q.   And so in weighing the record, you
 17    not only determined which evidence weighed
 18    more heavily than other evidence, you
 19    determined which events were more important
 20    than other events in coming to your
 21    conclusion; correct?
 22         A.   Well, there were a limited number of
 23    events, and I considered all the events that I
 24    was exposed to.
 25         Q.   But you considered some to be more
```

00168

1      significant than others?

2          A.    I don't know that you can draw the

3      conclusion that because it was included in my

4      report, that it's the only evidence, as we've

5      talked about.

6              And to look at it independent of all

7      the other issues that are associated with this

8      interaction isn't fair to -- to say that that

9      was what I based my opinion on.

10         Q.    I'm asking whether it supported your

11     opinion?

12             MR. BREEN:   Objection; form.

13         Q.    (By Mr. Cook)  And I believe your

14     testimony was that to the extent that it

15     happened, Mr. Smith telling Mr. Lotz to stop

16     marketing the spread, in fact, does not

17     support your opinion?

18         A.    I don't know if this is appropriate,

19     but what you haven't asked me is how this

20     circumstance could have supported my opinion.

21         Q.    How could this circumstance have

22     supported your opinion?

23         A.    The fact that the average

24     salesperson on the street could uncover this

25     and figure out a way to market the products

00169

```
 1    tells me that this was something that could

 2    have very easily been a much bigger strategy.

 3    It could have been -- if people were sitting

 4    around trying to think of ways to do it, this

 5    could have been something that came to mind.

 6        Q.   It could have.

 7             Did it?

 8        A.   Well, that's what -- that's what

 9    this -- this evidence that I've looked at has

10    led me to the conclusion that they did.

11        Q.   You've identified Mr. Lotz'

12    interactions with his customers as evidence of

13    Abbott marketing the spread.

14             Can you point to any other?

15             MR. BREEN:  Objection; form.

16             THE WITNESS:  Well, as we've talked

17        about already, other -- for example,

18        Ms. Snead, in her testimony, she makes it

19        very clear that she knew that customers

20        were very concerned about spread and

21        reimbursement issues.

22             Other witnesses, while I can't go

23        down a list and give you names without my

24        working documents, were -- were examined

25        at length about specific providers,
```

00170

1          whether it be OmniCare or whether it be

2          GeriMed or whether it be PBI or MHA or

3          any of these, to elicit whether or not

4          they agreed that these customers were

5          interested in, concerned about

6          reimbursement and spread issues.  And in

7          each case, they were.

8               So when I -- when I look at that

9          testimony and understand the desire to

10         satisfy these customers' needs and the

11         communications that went back and forth

12         between all of those group purchasing

13         organizations, the care providers, people

14         like Omnicare, CarePartners, I -- from --

15         from that body of evidence, not any one

16         specific fact or any one interaction, is

17         what led me to formulate the opinions

18         that I did.

19         Q.    (By Mr. Cook)  Did Ms. Snead market

20    the spread?

21         A.    By virtue of communicating AWP

22    information, I believe so.

23         Q.    Did Ms. Snead do anything other than

24    respond to a client request for information?

25              MR. BREEN:  Objection to form.

00177

1    the -- not just that factor alone, but the

2    creation of the artificially high AWP and

3    communicating that.

4         Q.   Is it your testimony that there's

5    some misunderstanding within Abbott that

6    Abbott employees can communicate the

7    difference between reimbursement amounts and

8    acquisition cost and not know that they're

9    marketing the spread?

10        A.   Can you do that one more time?

11        Q.   Yeah.  I'll -- forget it.

12             Is it your belief that Abbott

13   employees are somehow mistaken about what it

14   means to market the spread?

15        A.   I don't know that they're mistaken;

16   I just don't know that they realize the

17   implications of -- of their communications.

18        Q.   Can you point me to any other

19   instances in which Abbott employees provided

20   reimbursement information to customers as part

21   of the marketing effort?

22        A.   Sure.  The home infusion business

23   for years provides great examples of all of

24   that.

25        Q.   And so the home infusion business

00188

1    on that at some point, when you're looking for

2    a phenomenon and you see evidence that it

3    existed, it doesn't really matter what else

4    you see.  If it -- if it occurred, you've --

5    you've identified it.

6        Q.   And again, going back to my soda

7    straw example, if it occurred in every

8    instance that you're looking through the soda

9    straw at and you have no visibility to the

10   rest of the universe, your conclusion might

11   turn out to be an incorrect generalization;

12   correct?

13            MR. BREEN:   Objection; form.

14            THE WITNESS:   There's -- there's

15        just more -- there's more to it, but I'll

16        grant you that, given your assumptions,

17        that -- that I largely agree with that

18        statement.  But it's not 100 percent.

19       Q.   (By Mr. Cook)  And I don't know if

20   this is a complete analogy to deductive and

21   inductive reasoning, but the other way you

22   could determine what Abbott did would be to go

23   to the top of the pyramid, correct, and look

24   at Abbott policy?

25       A.   It's one other method, yes.

00189

```
 1       Q.    So, for example, if Abbott had

 2   either a written or unwritten policy that

 3   Abbott would sell its products by selling the

 4   spread, that would suggest to you that Abbott,

 5   as an organization, marketed the spread;

 6   correct?

 7              MR. BREEN:  Objection to the form.

 8              THE WITNESS:  Can you please just

 9       read that back?

10       Q.    (By Mr. Cook)  Sure.

11       A.    You don't need to rephrase it, just

12   please read it back.

13       Q.    So, for example, if Abbott had

14   either a written or unwritten policy that

15   Abbott would sell its products by selling the

16   spread, that would suggest to you that Abbott

17   as an organization marketed its spread;

18   correct?

19       A.    So if they had a written or

20   unwritten policy that they would sell that

21   way, it would suggest that to me, yes.

22       Q.    That's not the process that you

23   engaged in in this particular exercise, is it?

24              MR. BREEN:  Objection; form.

25              THE WITNESS:  I'm sorry, I'm
```

00190

1       confused.

2       Q.    (By Mr. Cook)  You didn't draw your

3    conclusions from Abbott policies directing its

4    employees to market the spread, did you?

5       A.    No.

6       Q.    And so you were left with, in my

7    formulation of it, the deductive approach of

8    looking at data points and drawing a

9    conclusion from that?

10       A.    Yes.

11       Q.    In fact, do you know whether Abbott

12    had a policy regarding marketing the spread?

13            MR. WINTER:   Objection to form.

14            THE WITNESS:   I -- I asked for and

15       reviewed a few documents that I would

16       consider marketing planning documents.

17            They were not very specific and they

18       were not very helpful in determining the

19       answer to that question.

20       Q.    (By Mr. Cook)  Did any of those

21    documents suggest that Abbott directed its

22    employees to market the spread?

23       A.    Again, no, not directly.  There

24    were -- there were certain phrases that, from

25    a marketing perspective and in marketing

00194

```
1         Q.    Could you possibly imagine a
2   pharmaceutical manufacturer not thinking about
3   marketing its products?
4         A.    As I said, it -- it's -- it's a no
5   brainer.
6         Q.    It's unremarkable?
7         A.    Right.
8         Q.    And, in fact, isn't it true that
9   prior to 2003, Abbott had an unwritten policy
10  prohibiting salespeople from marketing the
11  spread?
12             MR. BREEN:  Objection to the form.
13             Could you read that question back,
14        please?
15             (Whereupon, the record was read by
16        the reporter as follows:
17                       Question, "And, in fact,
18        isn't it true that prior to 2003, Abbott
19        had an unwritten policy prohibiting
20        salespeople from marketing the spread?")
21             THE WITNESS:  Again, this is one of
22        those areas that I had to weigh the
23        evidence, and I don't think I agree with
24        that.
25             I think that there is plenty of
```

00195

1          testimony that says, you know, we weren't

2          supposed to talk about it, but there's

3          also plenty of testimony where people

4          indicated that they never told anybody

5          not to market the spread and there was

6          no...

7          Q.    (By Mr. Cook)  So Mr. Smith is a

8     manager and he told his employee to stop

9     marketing the spread.

10          Is that evidence that there was an

11    unwritten policy against it?

12          MR. WINTER:  Objection; form.

13          THE WITNESS:  It -- it could be,

14          just as the -- the John Ward handwriting,

15          not -- "Don't mention this again," could

16          be construed as evidence that there was

17          an unwritten policy.

18          Q.    (By Mr. Cook)  Not to market the

19    spread; correct?

20          A.    Right.

21          But I don't know for a fact one way

22    or the other whether they had this policy or

23    not.

24          It -- it was remarkable to me that

25    if they were that opposed to it, that they

00196

```
 1    didn't have some kind of a policy that was
 2    written, and -- because they had policies
 3    about many things.  I shouldn't say many.
 4    They had -- they had a policy manual.  I did
 5    not review in detail that policy manual.
 6         Q.   One more question and then we'll
 7    break for lunch.  I've taken you longer than I
 8    said I would have.  I apologize for that.
 9              You looked at Abbott proposals and
10    bid sheets, I think you said?
11         A.   Yes.
12         Q.   How many?
13         A.   Numerous.
14         Q.   How were those chosen, do you know?
15         A.   They were exhibits.  They were -- I
16    think every one that I looked at was an
17    exhibit in the deposition testimony.
18         Q.   Do you know how many Abbott
19    proposals and bid sheets there are in the
20    universe of Abbott proposals and bid sheets?
21         A.   My guess is that they are about as
22    numerous as the prescriptions that I filled.
23         Q.   Do you know, in fact, whether
24    plaintiff's counsel chose which of those
25    proposals and bid sheets to attach as exhibits
```