# EXHIBIT 3

IN THE DISTRICT COURT OF

TRAVIS COUNTY, TEXAS

201st JUDICIAL DISTRICT

THE STATE OF TEXAS

   ex rel.


VEN-A-CARE OF THE

FLORIDA KEYS, INC.,


    Plaintiffs,   Cause No. GV401286


  vs.


ABBOTT LABORATORIES,

INC., et al.,


    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF


MATTHEW PERRI

VOLUME II


August 21, 2007

8:08 a.m.


1420 Peachtree Street, N.E.

Suite 800

Atlanta, Georgia


Lee Ann Barnes, RPR

1                          APPEARANCES OF COUNSEL

2

3        On behalf of the State of Texas:

4        RAYMOND C. WINTER, ESQUIRE

5        ATTORNEY GENERAL'S OFFICE

6        STATE OF TEXAS

7               P.O. Box 12548

8               300 West 15th Street

9               Austin, Texas   78711

10              Telephone:   (512)936-1709

11              Facsimile:   (512)499-0712

12              E-mail:  Raymond.Winter@oag.state.tx.us

13

14       On behalf of Ven-A-Care of the Florida Keys:

15       JAMES J. BREEN, ESQUIRE

16       THE BREEN LAW FIRM

17              5755 North Point Parkway

18              Suite 39

19              Alpharetta, Georgia   30022

20              Telephone:   (770)740-0008

21              Facsimile:   (770)740-9109

22              E-mail: jbreen@breenlaw.com

23

24

25

```
 1                    APPEARANCES OF COUNSEL  (Continued)

 2

 3     On behalf of the United States:

 4     RENEE BROOKER, ESQUIRE

 5     United States Department of Justice

 6          Civil Division

 7          Commercial Litigation Branch

 8          601 D Street, NW

 9          Washington, D.C.   20003

10          Telephone:   (202)616-37987

11

12     On behalf of Abbott Laboratories:

13     R. CHRISTOPHER COOK, ESQUIRE

14     HILARY A. RAMSEY, ATTORNEY AT LAW

15          JONES DAY

16          51 Louisiana Avenue, N.W.

17          Washington, D.C.   20001-2113

18          Telephone:   (202)879-3939

19          Facsimile:   (202)626-1700

20          E-mail:   Christophercook@jonesday.com

21

22

23     Also Present:

24     Keith Neal, Videographer

25
```

1    such as mailing lists and a database of

2    customers that can be used for other

3    activities.

4           As you pointed out yesterday, the

5    signing of a contract might have much more

6    meaning than just, "You're able to purchase

7    and here's your purchase order number."  It

8    can involve other benefits to both Abbott and

9    the customer.

10          I think those are the -- the main

11   things that come to mind initially.

12      Q.   You stated yesterday that it was

13   difficult for you to discern lines of

14   authority among various Abbott witnesses at

15   various times.

16          Could you elaborate on that for me?

17      A.   There were a couple of issues that I

18   noted.

19          One was that people changed

20   positions frequently, so while I -- I

21   developed an association with what Mike

22   sellers' role was in a particular time, it

23   depend- -- if I'm looking at the record from a

24   later period of time, it might not be that

25   same role.  And that was hard to follow

1    without drawing a lot of pictures and trying

2    to -- to really figure out where people were

3    and when.

4              The other thing was that in the

5    contract marketing area or the pricing area,

6    as you will, the folks that were doing the

7    reporting and the -- and so forth, while they

8    had direct reports, there would also be others

9    that were not a direct report that they had to

10   get approvals from before they would engage in

11   certain activities, such as Jerri Cicerale and

12   Harry Adams and their relationship.

13             Mike Heggie is another good example

14   of that, where I think he was actually in

15   renal, but he had some dashed line authority

16   to somewhere else, maybe alternate site.

17             And it was just -- it was a sense

18   that they had a group of people that were

19   expert at reimbursement and that they worked

20   within the organization without clear lines of

21   reporting and authority on the issues that

22   needed to be taken care of, which is not

23   particularly a problem; it is just simply that

24   it's not as easy to look at that

25   organizational structure and know how

Matthew Perri - Volume II

August 21, 2007

399

1    everybody fits into it.

2         Q.    You concluded that there were not

3    clear lines of authority.

4              Do you know that there were not

5    clear lines of authority or are you not able

6    to discern clear lines of authority?

7         A.    Let's -- let's stick to my specific

8    example, if we can, of Jerri Cicerale and

9    Mr. Adams.

10             I know in her testimony, it's very

11   clear that she reports to someone else, yet

12   she has to get Harry Adams' approval before

13   she does certain things.

14             So -- and I didn't read or see on

15   any of the pictures that there was a line or a

16   dashed line between her and Mr. Adams.  So at

17   this point, I don't know what that

18   relationship was.

19        Q.    So there may be Abbott policies or

20   charts, manuals, or other guidance which would

21   make very clear what the lines of authority

22   are for various functions that you haven't

23   reviewed; correct?

24        A.    Is it possible that they exist?

25   Yes.

1      Q.    Yes.

2            And so when you say that there were

3      not clear lines of authority, it's more

4      accurate to say that, based upon your review

5      of a limited number of records and a limited

6      amount of testimony and not having had the

7      opportunity to ask questions yourself of the

8      witnesses, you are unable to determine what

9      the lines of authority are?

10           MR. BREEN:   Objection; form.

11           THE WITNESS:   Two things I want to

12      say in response to that.

13           Primarily that, yes, I agree with

14      that, but to qualify that, I want to say

15      that all of my opinions are predicated on

16      the -- the issue that my opinions are

17      based on the documents I was able to

18      review.

19      Q.    (By Mr. Cook)  And we'll get back to

20      that in a minute, but what I'd like to ask is

21      based upon that, in your inability to discern

22      clear lines of authority based upon the

23      document and the testimony that you've

24      reviewed, can you testify about the level of

25      authority at which decisions were made that

1    impacted the spread on individual Abbott

2    products?

3         A.    It -- it's my understanding from --

4    from the documents I reviewed that the

5    establishment of those list prices that we

6    talked about yesterday was done by groups.

7    And in those groups were marketing managers,

8    product managers, business unit or business

9    sector managers, Harry Adams, and I think some

10   others that I haven't been able to name.

11             And that occurred at the level of

12   those managers.  So is that a high level or a

13   lower level?  It's the level where Abbott

14   assigned responsibility for those decisions.

15        Q.    Abbott as a company has, at a

16   minimum, hundreds of individual drug products;

17   correct?

18        A.    Yes.

19        Q.    What I'd like to explore with you is

20   the possibility that decisions relating to

21   those hundreds of drug products may have

22   resulted in an impact on reimbursement when

23   the individuals making those decisions did not

24   see spread as an important marketing concern.

25             Do you understand the premise I'd

1    like to explore?

2                MR. BREEN:  Objection; form.

3                THE WITNESS:  I understand that.  I

4        need to ask you if you're making that

5        assumption that they did not know?

6        Q.    (By Mr. Cook)  I'd like to explore

7    the possibility that that is the true state of

8    affairs here, given the limited documents and

9    the limited testimony that you've reviewed.

10               MR. BREEN:  Objection; form.

11       Q.    (By Mr. Cook)  So do you understand

12   the premise that I'd like to explore with you

13   for a minute?

14       A.    Yes.

15       Q.    You would agree with me that for the

16   individual salesperson in a meeting with a

17   particular customer for whom spread is an

18   issue, for that employee of Abbott, spread at

19   that moment in time would have relatively high

20   marketing significance; correct?

21       A.    Yes.

22               MR. WINTER:  Objection; form.

23       Q.    (By Mr. Cook)  Abbott may have a

24   policy attempting to prevent that employee

25   from speaking about the spread; correct?

1        A.    Yes.

2        Q.    It would be difficult for that

3    employee to comply with that policy because

4    the customer wants to know about spread;

5    correct?

6              MR. BREEN:  Objection; form.

7              THE WITNESS:  Yes.

8        Q.    (By Mr. Cook)  But that interaction

9    between the customer and the individual

10   salesperson does not inform you, in reviewing

11   it from the outside, about whether or not

12   Abbott intentionally created the spread in

13   order to facilitate the sale, does it?

14             MR. BREEN:  Objection; form.

15             THE WITNESS:  That interaction that

16        you just described, in its isolated

17        capsule with no other assumptions, yes.

18       Q.    (By Mr. Cook)  So what I'd like to

19   do is back up from that and move up the chain

20   of Abbott management to the point where the

21   decision was made that resulted in the spread.

22             Do you understand?

23       A.    Yes.

24       Q.    All right.  Do you know how far up

25   the chain of Abbott management I have to move

 1     to get to that decision?

 2               MR. WINTER:  Objection; form.

 3               THE WITNESS:  If we look at the

 4          reading log, you'll see that -- that the

 5          documents that I have only go to a

 6          certain level, the level that either Mike

 7          Sellers or Pete Baker, Harry Adams, Joe

 8          Fiske, Jerry Eichorn, that level.

 9          That's -- I believe those are the highest

10          levels that I have at this time.

11          Q.   (By Mr. Cook)  And I believe you

12     testified yesterday that based upon the record

13     that you've reviewed, you don't know who at

14     the various times over these 25 years was the

15     individual who decided what Abbott's list

16     price would be; correct?

17               MR. WINTER:  Objection; form.

18               THE WITNESS:  I -- I -- my

19          recollection is -- is that we discussed

20          that and you -- you informed me that

21          there might be an individual that was

22          actually in this role at various times or

23          different individuals over time.

24               My understanding was that the price

25          was set by the group that Harry Adams

1           described in his testimony.

2           Q.    (By Mr. Cook)  But can you name for

3    me for each drug and at each time where within

4    the organization list price was established

5    and how that process was -- was accomplished,

6    whether by an individual signing off on

7    something or a committee signing off on

8    something or some other mechanism?

9               MR. WINTER:  Objection; form.

10              THE WITNESS:  Your question is -- is

11         can I do that for each drug?  No.

12         Q.    (By Mr. Cook)  And for each year?

13         A.    No.

14         Q.    So other than a general

15   understanding that at one point in time, Harry

16   Adams had something to do with it, we can't

17   get, based on your understanding, specificity

18   about how that decision was made at each point

19   in time; correct?

20         A.    I disagree with that, because there

21   were several of those people who had been with

22   Abbott 20, 25, 30, even more years than that.

23              And if they were present during all

24   that time, then there must be some

25   consistencies there --

1          Q.    But I think in --

2          A.    -- and I can gain an understanding

3      that is -- that is helpful in determining what

4      happened.

5          Q.    But again, in trying to determine

6      what the intent was in establishing list

7      price, it would be important to know for each

8      year for each drug exactly what the process

9      was in determining list price for that product

10     for that year; correct?

11              MR. BREEN:  Objection; form.

12              THE WITNESS:  If that can be known,

13         it would not be information that would

14         be -- that would be unhelpful.

15         Q.    (By Mr. Cook)  Let's start with a

16     specific product.

17              We talked yesterday -- we talked

18     about -- was it dextrose 5 percent solution?

19         A.    Yes.

20         Q.    It's been around -- is it fair to

21     say that dextrose 5 percent solution has been

22     around for a long time?

23         A.    Yes.

24         Q.    Would it surprise you if the

25     original list price for dextrose 5 percent

1    solution was set long before any living person

2    has memory of how it was set?

3            MR. BREEN:  Objection; form.

4            THE WITNESS:  It's a very

5        interesting question.  I've never

6        actually thought about how old of a

7        company Abbott might be and when they

8        might have introduced something like

9        dextrose solution, but it's possible,

10       yes.

11       Q.   (By Mr. Cook)  And, in fact, most of

12   the multiple-source injectable products about

13   which we're talking here that have large

14   spreads are very, very old products?

15           MR. BREEN:  Objection; form.

16           THE WITNESS:  I know that every one

17       of those products has to have an NDC

18       number and that NDC would be applied for

19       and there's a date when that product was

20       introduced.

21           Products are constantly coming and

22       going from the market, reformulated.  I

23       really -- what I'm saying is I really

24       can't answer that question.

25       Q.   (By Mr. Cook)  For such a product,

1    would you agree with me that it's at least

2    possible that the list price for that product

3    was set a long time ago and was increased

4    according to an inflation index year by year

5    by year?

6         A.    Yes.

7         Q.    And, in fact, the record that you

8    read is consistent with that being the process

9    by which the list price in 1999 was

10   established for dextrose 5 percent solution, a

11   product that had been around since 1950?

12               MR. BREEN:  Objection; form.

13               THE WITNESS:  That's possible, yes.

14        Q.    (By Mr. Cook)  And the record is

15   consistent with that -- that hypothesis;

16   correct?

17               MR. BREEN:  Objection; form.

18               THE WITNESS:  I don't believe I

19        reviewed anything in the record that

20        would have given me information about

21        when prices were originally set for very

22        old products.

23        Q.    (By Mr. Cook)  And if the price for

24   a product, such as dextrose, in 1999 existed

25   because of that process, is there anything in

1    the record that would cause -- let me strike

2    that.

3              If the price for dextrose were

4    established in that way, the very old list

5    price increased according to a formula year by

6    year, is it your testimony that you can

7    attribute intent to Abbott having established

8    that list price in order to affect the AWP for

9    that drug?

10             MR. WINTER:  Objection; form.

11             THE WITNESS:  I understand that

12         you're asking me in a specific scenario

13         and that your question asks me if I

14         evaluated their intent, but even in your

15         scenario, there are other factors that I

16         feel like we would need to talk about in

17         order to understand what the intent might

18         be.

19        Q.   (By Mr. Cook)  What are those

20    factors?

21        A.   For example, the list price for your

22    dextrose 5 percent that was established in,

23    let's say, 1950 and has increased just a

24    little bit over the years until 1999, I've

25    reviewed documents that have shown that over

1    anomaly; correct?

2         A.    Not based on the documents I

3    reviewed, no.

4         Q.    The documents you've reviewed is not

5    a representative sampling of all of Abbott's

6    marketing activities?

7              MR. BREEN:  Objection; form.

8              THE WITNESS:  I don't think I've

9         characterized them as a

10        non-representative sample.  I've

11        characterized them as the documents that

12        were provided to me.

13        Q.    (By Mr. Cook)  And you don't know

14   whether the documents provided to you gives

15   you a complete picture of how Abbott

16   interacted with its customers, sold its drugs,

17   or ran its business, do you?

18             MR. BREEN:  Objection; form.

19             THE WITNESS:  I don't know one way

20        or the other.

21        Q.    (By Mr. Cook)  Virtually all of the

22   documents and testimony that you reviewed

23   related to the alternate site business and the

24   hospital products division?

25        A.    Yes.

1       Q.    The hospital product -- that

2    alternate site business is, I think you

3    thought, maybe 10 percent of the hospital

4    products division's business?

5       A.    Yes.

6       Q.    You don't know what percentage of

7    Abbott's entire business the hospital products

8    division represents; correct?

9       A.    I'm not sure about the numbers, no.

10      Q.    And you don't know what percent of

11   the alternate site unit's business the home

12   infusion business represents; correct?

13      A.    No.

14      Q.    So in generalizing to the entire

15   company that the home infusion business is a

16   good starting point to describe Abbott's

17   market savvy overstates, really, what you're

18   able to testify about, doesn't it?

19          MR. BREEN:  Objection; form.

20          MR. WINTER:  Objection; form.

21          THE WITNESS:  I don't think so, not

22       in -- not in the context that we're

23       talking about it here.

24          First of all, it is a starting

25       point, and I believe that I provide other

1      Q.   Do you know whether these trip

2   reports or significant events reports reflect

3   that Abbott was marketing the spread to its

4   customers?

5      A.   I recall specifically that in some

6   of these reports, discussions about spread and

7   reimbursement issues were present.

8      Q.   Do you know how many trip reports or

9   significant event reports are generated by

10  Abbott on a yearly basis?

11     A.   No.

12     Q.   Do you know whether the trip reports

13  and significant event reports to which you

14  refer are an anomaly?

15     A.   Anomaly or not, they exist and they

16  talk about spread and reimbursement issues.

17     Q.   You've come to conclusions about

18  what Abbott, as a multibillion-dollar

19  organization, perceived, knew, did, and

20  intended; correct?

21     A.   Yes.

22     Q.   Would you agree with me that it's

23  important to you to know whether discussion of

24  spread in a single trip report is a unique

25  event or a common event?

```
 1            MR. WINTER:  Objection; form.

 2            THE WITNESS:  When you say "unique,"

 3       do you mean in one case?  I think it was

 4       more than that, but...

 5       Q.   (By Mr. Cook)  All right.  Is a rare

 6   event or a common event?

 7            MR. BREEN:  Objection; form.

 8            THE WITNESS:  I think I would need

 9       to know if -- if that was the only time

10       it ever happened, yes.

11       Q.   (By Mr. Cook)  You don't know, do

12   you?

13            MR. BREEN:  Objection; form.

14            THE WITNESS:  You -- you have

15       implied to me over the last two days that

16       there are documents that exist that would

17       tell me a different story, and I am not

18       aware of that.  And if there's something

19       else I need to know, you know, I'm

20       available to review that material.

21       Q.   (By Mr. Cook)  Actually, no, Doctor,

22   I'm asking a more limited question.

23       A.   Okay.

24       Q.   And that is whether the process that

25   you've undertaken is sufficient to reach the
```

1     very broad conclusions that you've drawn about

2     what Abbott as an organization did or

3     perceived or intended?

4              MR. BREEN:  Objection; form.

5         Q.   (By Mr. Cook)  And so I'll ask you:

6     Given our discussion over the last two days

7     and your understanding of the size of Abbott,

8     do you believe that the limited review that

9     you've undertaken of documents is sufficient

10    for you to gain an understanding of what

11    Abbott, as an organization, intended to do?

12             MR. BREEN:  Objection; form.

13             MR. WINTER:  Objection; form.

14             THE WITNESS:  I believe that the

15        documents I've reviewed provided a good

16        starting point for understanding the

17        marketing activities.

18             I think that if you look at any one

19        of these facts by itself, it doesn't

20        paint a full picture.  If you look at

21        them in conjunction and you connect the

22        dots with these -- with these disjointed

23        facts, like my explanation of the

24        marketing savvy based on their ability to

25        gather market intelligence on their