Vladeck, Ph.D., Bruce C.                  May 4, 2007
New York, NY

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X  MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY    : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     : CIVIL ACTION:

Florida Keys, Inc. v. Abbott       : 06-CV-11337-PBS

Laboratories, Inc.                    :

------------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                  : CASE NO.

       Plaintiff,                  : CV-05-219

    v.                              :

ABBOTT LABORATORIES, INC.,         : JUDGE

et al.,                          : CHARLES PRICE

       Defendants.                 :

------------------------------------X

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                              May 4, 2007
                        New York, NY

Page 110

1  a.m. We're going back on the record, continuing
2  with Tape No. 2.
3      Q. Dr. Vladeck, during the break I handed
4  you a copy of what we've previously marked in
5  another deposition as Exhibit Abbott 038. It's a
6  two-page document that was produced to us by --
7  by the government. You see the Bates numbers at
8  the bottom, HHD 008.
9          The first page of Exhibit Abbott 038 is
10 what appears to be a photocopy of 42 CFR Section
11 405.517, as it was enacted in January of 1992,
12 and before it was amended in 1998, which is -- as
13 I gave to you mistakenly earlier as Exhibit
14 Abbott 153.
15         Have you had a chance to take a look at
16 -- at the first page of that exhibit?
17     A. I have.
18         MS. BROOKER: I just interpose just an
19 objection to the characterization. It may or may
20 not be accurate. I'm just not sure. But you can
21 go ahead and proceed.
22     Q. Any reason to believe that this is not

Page 111

1  an accurate copy of -- of that regulation?
2          MS. BROOKER: Objection. Form.
3      A. It looks to me like -- no, there's no
4  reasoning.
5          MR. BREEN: I would only interpose an
6  additional objection. I don't think it's
7  complete. I think this regulation scheme has --
8  has definitions or different sections and things
9  like that. So, I would only interpose that --
10 that technical objection.
11         MR. COOK: Okay.
12     Q. You understand that the Code of Federal
13 Regulations is a very long document.
14         Correct?
15     A. I'm familiar with it, yes.
16     Q. And that it includes more than just
17 this one page?
18     A. Yes, sir.
19     Q. If you could describe for me, what do
20 you understand 405.517 to relate to?
21         MS. BROOKER: Objection. Form.
22     A. My understanding is that this describes

Page 112

1  the methodology for paying for Part B drugs that
2  was in place from after the implementing
3  regulations for over 90 were adopted until the
4  regulations implementing the relevant provisions
5  of the Balanced Budget Act were adopted in 1998.
6      Q. And so, for the entire time that you
7  were administrator of HCFA, from May of 1993
8  until September of 1997, this regulation would
9  have described how Medicare Part B reimbursed
10 providers for certain drugs that were
11 reimbursable under Medicare Part B. Correct?
12     A. That's -- that's my --
13         MS. BROOKER: Objection. Form. Sorry.
14 Go ahead.
15         THE WITNESS: Sorry.
16     A. That -- that's my understanding, yes.
17     Q. If you could look to Part B of -- of
18 this particular regulation, 405.517, it reads
19 that:
20         "Payment for a drug described in
21 Paragraph A should be based on the lower of two
22 measurements."

Page 113

1          Correct?
2      A. That's correct.
3          MS. BROOKER: Objection. Form.
4      Q. Could you tell me what are the two
5  measurements that this regulation provided for as
6  the alternatives for paying for Part B drugs?
7          MS. BROOKER: Objection. Form.
8      A. The alternatives were either actual
9  acquisition cost or average wholesale price.
10     Q. The phrase here "national average
11 wholesale price of the drug," do you see that?
12     A. Yes, sir.
13     Q. Is it your understanding that during
14 the approximately four years, or just over four
15 years that you were administrator of HCFA, that
16 to the extent that Medicare Part B paid for drugs
17 based upon the average wholesale price of the
18 drugs, that they did so based upon published
19 average wholesale prices?
20     A. Yes, that was my understanding.
21     Q. And just some -- some basics of -- of -
22 - of how this regulation works. To whom is this

                                          29 (Pages 110 to 113)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                               May 4, 2007
                              New York, NY

Page 114

1  regulation addressed?
2       MS. BROOKER: Objection. Form.
3       A. This regulation is addressed, as a
4  practical matter, largely to the Medicare
5  carriers, the contractors who administer Part B
6  payments.
7       Q. So, this would be the formal means by
8  which Medicare instructs its carriers on how they
9  should administer the program?
10      MS. BROOKER: Objection. Form.
11      A. Actually, I'm -- although I don't know
12 the specifics in this instance, in general, there
13 would likely have been more specific and detailed
14 instructions to carriers interpreting, expanding
15 upon, talking about technical applications issues
16 associated with this regulation, but it would be
17 based upon this part of the regulations.
18      Q. And when you became -- strike that.
19      The other methodology for payment under
20 Section 405.517 is the estimated acquisition
21 cost. Does the regulation describe how one would
22 determine what the estimated acquisition cost of

Page 115

1  the drug would be?
2       MS. BROOKER: Objection. Form.
3       A. I don't believe that was described in
4  the regulation.
5       Q. Okay. Actually, the next sentence, I
6  think, describes -- you know, I'll just read it.
7       A. That is correct. No, that is correct.
8       Q. Yes. Let me just read it and then we -
9  - I should have done that at the beginning. I
10 apologize. I'll just read it.
11      "The estimated acquisition cost is
12 determined based on surveys that the actual
13 invoiced price is paid for the drug."
14      And then the next sentence reads:
15      "In calculating the estimated
16 acquisition cost of a drug, a carrier may
17 consider factors such as inventory, waste, and
18 spoilage."
19      Is that an accurate description of what
20 you understood the estimated acquisition cost to
21 be between 1993 and 1997 for purposes of -- of
22 this regulation?

Page 116

1       MS. BROOKER: Objection. Form.
2       A. Yes.
3       MR. COOK: And then I'd like to show
4  you what was previously marked as Exhibit Abbott
5  120. I'll have the court reporter hand it to
6  you. If you could take a look at that while I'm
7  flipping to my copy of it.
8       And for the record, that is a copy of
9  relevant pages from the June 5, 1991, Federal
10 Register.
11      When we marked this in a previous
12 exhibit, we all agreed that because the Federal
13 Register is publicly published, we didn't need to
14 include the hundreds of pages that this
15 particular proposed regulation had and -- and put
16 in the record only Pages 25800 and Pages 25801,
17 and a couple of pages around it, rather than the
18 entire -- entire document.
19      MS. BROOKER: If I could just interpose
20 an objection, though, just for the record.
21      It's a proposed rule. No. 1, I just
22 want to clarify that. And -- and I just object

Page 117

1  to the extent that it is only a portion of the
2  Federal Register Notice. And so, Dr. Vladeck
3  will not have access to -- to the entirety of it,
4  for purposes of these questions.
5       MR. COOK: Would you prefer that we
6  publish the -- put on the deposition record the
7  entire hundreds of pages of -- of this proposed
8  rule?
9       MS. BROOKER: I may at trial, so I need
10 to interpose my objection here at the deposition.
11      MR. COOK: I'm asking whether you're
12 going to move to strike his testimony later
13 because I didn't give him the entire thing.
14      MS. BROOKER: I don't know what I may
15 do later, but I'm entitled to interpose
16 objections.
17      MR. COOK: Okay.
18      MS. BROOKER: And that I preserve them
19 for a later time. But I have no idea what you're
20 going to ask him about it. And I will have no
21 idea, since we don't have the entire document
22 here, whether a question you put to him may be

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                New York, NY

Page 142

1    Q.  And for a brand name drug, would you --
2    at the time, did you expect that there would be
3    much variation between various purchasers based
4    upon volume purchases of the brand name drug?
5    A.  I believe we had a perception that the
6    bigger the purchaser, the larger the discount
7    they were likely to be able to achieve; that the
8    very largest pharmacy chains, for instance, or
9    hospital group purchasing operations, probably
10   received the most favorable prices, but that that
11   would be -- and that some small independent
12   pharmacies might actually pay average wholesale
13   price as described in the compendia; that there
14   would be a range below that in which most of the
15   prices would actually occur.
16   Q.  Turning to generic drugs for a minute,
17   what do you understand to be the differences
18   between the market for brand name drugs and the
19   market for generic drugs?
20        MS. BROOKER: Objection. Form.
21   A.  If we're going back to 1997 --
22   Q.  Correct.

Page 143

1    A.  -- I think it's fair to say that I had
2    really only a very limited understanding of the
3    marketplace for generic drugs and an even more
4    limited understanding of the difference between
5    the market for generic drugs and for brand drugs.
6        And, again, my perception at the time
7    was that that was likely more like a commodity
8    market in which there was probably more
9    purchasing power on the part of the large
10   purchasers, but not the same ability to raise
11   prices on the up-side to small purchasers that
12   prevailed on the brand name side.
13   Q.  I'd like to focus you just for a
14   minute, before we turn to a specific document,
15   about a particular generic drug.  I think you
16   mentioned commodities.  Are you familiar with
17   sodium saline solution?
18   A.  Yes.
19   Q.  It's a bag of salt water, essentially.
20   Correct?
21   A.  That's correct.
22   Q.  Would you agree with me that you can't

Page 144

1    get much more commoditized in a bag of salt water
2    in the drug market?
3    A.  The only quibble I would provide to
4    that question is I never really thought of it as
5    classically being part of the pharmaceutical
6    market.  It was such a -- it was really a
7    hospital supply kind of market.  It was such a
8    standard product that even though it was FDA
9    regulated and -- and sterility issues were so
10   forth, it tended to be -- hospitals tend to stock
11   it, for example, in sterile supplies, put it on
12   their cost report as part of sterile supplies
13   rather than through their pharmacies.
14   Q.  But a home infusion provider reimbursed
15   under Part B, for example, might be reimbursed
16   for sodium saline solution.
17       Was that your understanding in '97?
18       MS. BROOKER: Objection. Form.
19   A.  Yes, but whether that was as a supply
20   or a drug, I honestly couldn't tell you.  I would
21   have thought of it as a supply.
22   Q.  Turning to the market of it, whether we

Page 145

1    call it a drug or -- or a supply, did you have an
2    understanding, in 1997, of what the market would
3    look like for a product such as sodium saline
4    solution?
5        MS. BROOKER: Objection. Form.
6        MR. BREEN: Objection. Form.
7    A.  Yes, I did.
8    Q.  And what was your understanding?
9    A.  Well, I actually -- in the 1980s, I
10   believe, when I was first becoming involved in
11   some of these issues in health care economics was
12   the first development of hospital group
13   purchasing operations, and I recall -- and the
14   first widespread circulation of the -- of "Modern
15   Healthcare," the magazine, and I recall monthly
16   headlines in "Modern Healthcare" about group
17   purchasing operations being -- achieving
18   discounts of 98 and 99 percent in their purchase
19   of basic infusion products and sterile supplies.
20       So, my perception was that on the
21   supply market, which, again, I understood and
22   still would contend is actually a separate market

37 (Pages 142 to 145)

Page 146

1  from the pharmaceutical market that list prices,
2  are essentially entirely meaningless and that
3  only the weakest and smallest scale buyers pay
4  anything close to it.
5     Q.  And so, as of 1993, for example, would
6  you be surprised if a single bag of sodium saline
7  solution sold to a provider who bought maybe five
8  would pay $10 per bag, and a large purchaser who
9  bought a very large volume would pay less than a
10 dollar?
11    MS. BROOKER:  Objection.  Form.
12    A.  I would not have been surprised.
13    Q.  Okay.  So, to that extent that --
14 President Clinton referring to a 10-to-1 ratio is
15 something that would be consistent with your
16 understanding of that particular market.
17 Correct?
18    MS. BROOKER:  Objection.  Form.
19    Q.  I'm sorry.  You have to verbalize.
20    A.  Again, I would have thought that market
21 was a subset of the supplies market rather than
22 the drug market.

Page 147

1     Q.  That was my question.  But you would
2  have distinguished between the drug market, where
3  10-to-1 would not -- you would not expect to see.
4  Correct?
5     A.  That's correct.
6     Q.  And the supply market, where sodium
7  saline solution would be found, where there could
8  be a huge variation between a small purchaser
9  purchasing at list price and a very large
10 purchaser purchasing at 99 percent off of list
11 price?
12    MS. BROOKER:  Objection.  Form.
13    A.  I would have made such a distinction,
14 and I would not have been surprised to see those
15 sorts of differentials of the supply market.
16    Q.  And in between the commodities supply
17 market of sodium saline and the patent-protected
18 market of a brand name drug, would you expect
19 generic drugs to be somewhere between those two
20 extremes?
21    MS. BROOKER:  Objection.  Form.
22    MR. BREEN:  Objection.  Form.

Page 148

1     A.  That would be a question I never
2  thought about before today.  But today I would
3  say that we always made the distinction between -
4  - between drugs and -- and supplies.  And, again,
5  I would fall back on the Medicare green eyeshade
6  distinction between what's sterile supplies and
7  what's pharmacy.
8     MR. COOK:  Let's take a break.
9     THE VIDEOGRAPHER:  The time is 11:28
10 a.m.  We're going off the record, concluding Tape
11 No. 2 in the deposition of Dr. Bruce Vladeck in
12 the matter of In re Pharmaceutical Average
13 Wholesale Price Litigation.
14    (Recess taken.)
15    THE VIDEOGRAPHER:  The time is 11:46
16 a.m.  We're going back on the record, starting
17 Tape No. 3 of the deposition of Dr. Bruce Vladeck
18 in the matter of In re Pharmaceutical Average
19 Wholesale Price Litigation.
20    Q.  Doctor, based upon what we were talking
21 about just before the break, would it be fair to
22 say that while you were administrator of HCFA,

Page 149

1  you did not understand published average
2  wholesale price to be the average of prices at
3  which wholesalers were selling their drugs to
4  their customers?
5     A.  It would -- it would be fair to say
6  that I did not believe it was, in fact, an
7  empirical estimate, that rather it was a -- an
8  amount reported by the manufacturer to -- of the
9  compendium compilers or whatever, yes.
10    Q.  And, again, akin to a sticker price?
11    A.  That's correct.
12    Q.  Where did you get that understanding?
13    A.  I believe that was probably what my
14 staff explained to me when I first encountered
15 the concept sometime after I took office.
16    Q.  Do you recall anybody within HCFA who
17 was under the belief that average wholesale price
18 was an average of prices at which wholesalers
19 sold drugs to customers?
20    MS. BROOKER:  Object to form.  And I
21 would just instruct the witness, just, you know,
22 be mindful of not disclosing deliberations,

Page 146

 1  from the pharmaceutical market that list prices,
 2  are essentially entirely meaningless and that
 3  only the weakest and smallest scale buyers pay
 4  anything close to it.
 5      Q.  And so, as of 1993, for example, would
 6  you be surprised if a single bag of sodium saline
 7  solution sold to a provider who bought maybe five
 8  would pay $10 per bag, and a large purchaser who
 9  bought a very large volume would pay less than a
10  dollar?
11          MS. BROOKER: Objection. Form.
12      A.  I would not have been surprised.
13      Q.  Okay. So, to that extent that --
14  President Clinton referring to a 10-to-1 ratio is
15  something that would be consistent with your
16  understanding of that particular market.
17  Correct?
18          MS. BROOKER: Objection. Form.
19      Q.  I'm sorry. You have to verbalize.
20      A.  Again, I would have thought that market
21  was a subset of the supplies market rather than
22  the drug market.

Page 147

 1      Q.  That was my question. But you would
 2  have distinguished between the drug market, where
 3  10-to-1 would not -- you would not expect to see.
 4  Correct?
 5      A.  That's correct.
 6      Q.  And the supply market, where sodium
 7  saline solution would be found, where there could
 8  be a huge variation between a small purchaser
 9  purchasing at list price and a very large
10  purchaser purchasing at 99 percent off of list
11  price?
12          MS. BROOKER: Objection. Form.
13      A.  I would have made such a distinction,
14  and I would not have been surprised to see those
15  sorts of differentials of the supply market.
16      Q.  And in between the commodities supply
17  market of sodium saline and the patent-protected
18  market of a brand name drug, would you expect
19  generic drugs to be somewhere between those two
20  extremes?
21          MS. BROOKER: Objection. Form.
22          MR. BREEN: Objection. Form.

Page 148

 1      A.  That would be a question I never
 2  thought about before today. But today I would
 3  say that we always made the distinction between -
 4  - between drugs and -- and supplies. And, again,
 5  I would fall back on the Medicare green eyeshade
 6  distinction between what's sterile supplies and
 7  what's pharmacy.
 8          MR. COOK: Let's take a break.
 9          THE VIDEOGRAPHER: The time is 11:28
10  a.m. We're going off the record, concluding Tape
11  No. 2 in the deposition of Dr. Bruce Vladeck in
12  the matter of In re Pharmaceutical Average
13  Wholesale Price Litigation.
14          (Recess taken.)
15          THE VIDEOGRAPHER: The time is 11:46
16  a.m. We're going back on the record, starting
17  Tape No. 3 of the deposition of Dr. Bruce Vladeck
18  in the matter of In re Pharmaceutical Average
19  Wholesale Price Litigation.
20      Q.  Doctor, based upon what we were talking
21  about just before the break, would it be fair to
22  say that while you were administrator of HCFA,

Page 149

 1  you did not understand published average
 2  wholesale price to be the average of prices at
 3  which wholesalers were selling their drugs to
 4  their customers?
 5      A.  It would -- it would be fair to say
 6  that I did not believe it was, in fact, an
 7  empirical estimate, that rather it was a -- an
 8  amount reported by the manufacturer to -- of the
 9  compendium compilers or whatever, yes.
10      Q.  And, again, akin to a sticker price?
11      A.  That's correct.
12      Q.  Where did you get that understanding?
13      A.  I believe that was probably what my
14  staff explained to me when I first encountered
15  the concept sometime after I took office.
16      Q.  Do you recall anybody within HCFA who
17  was under the belief that average wholesale price
18  was an average of prices at which wholesalers
19  sold drugs to customers?
20          MS. BROOKER: Object to form. And I
21  would just instruct the witness, just, you know,
22  be mindful of not disclosing deliberations,

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 150

1  internal deliberations.
2       THE WITNESS: Understood.
3       A. I -- I think the most accurate way for
4  me to answer the question -- I hope his response
5  would be to say we did not believe -- I did not
6  believe that it was an actually empirically-
7  derived number in any form, that it was not
8  necessarily, although it was possible, by chance,
9  a reflection of what was occurring in the
10 marketplace.
11      Let me perhaps expand on that. Again,
12 the analogy of the sticker price was one that had
13 great influence in my thinking, and I would
14 probably have expected, at that point, that there
15 were always some poor suckers who were paying
16 that price, just like there's always folks who
17 end up paying list.
18      Q. Were you familiar with the distinction
19 between average wholesale price as published in
20 these compendia, and a list price or direct price
21 that manufacturers would -- would have for their
22 products?

Page 151

1       MR. BREEN: Objection. Form.
2       MS. BROOKER: Objection. Form.
3       A. I would have understood, at the time,
4  if someone had made that sort of intellectual
5  distinction. I would -- again, trying to
6  characterize precisely what I thought ten or 12
7  years ago -- I would have been perhaps puzzled or
8  surprised, but probably not shocked to learn that
9  there was a significant discrepancy between a
10 formal published price list and an average
11 wholesale price that appeared in a compendium.
12      Again, I would have -- let me not put
13 so many negatives in there, perhaps for clarity.
14 I would have expected that most published price
15 lists conformed, by -- that manufacturers
16 themselves issued to their salespeople or to
17 their customers would have contained list prices
18 that were equivalent to the average wholesale
19 prices they reported to the compendium.
20      Q. Did you understand, between 1993 and
21 1997, then that AWP did not refer to the price at
22 which a pharmaceutical firm sold a drug to its

Page 152

1  customer?
2       MS. BROOKER: Objection. Form.
3       MR. BREEN: Objection. Form.
4       A. Again, I would have expected there were
5  some customers who, in fact, paid the average
6  wholesale price, but I didn't not believe that it
7  was an accurate reflection of the average revenue
8  received by the manufacturer for -- or the
9  wholesaler for a particular product.
10      Q. I guess to put it another way, you
11 understood, between 1993 and 1997, that AWP did
12 not represent the average acquisition cost for a
13 pharmaceutical?
14      A. That's correct. We --
15      MS. BROOKER: Objection. Form.
16      MR. BREEN: Form.
17      A. -- we distinguished acquisition cost
18 from average wholesale price, and believed that,
19 in general, it was likely to be lower.
20      Q. I would like to get back a bit to the -
21 - we were talking a bit about the relationship
22 between published average wholesale prices and

Page 153

1  prices within the marketplace.
2       You indicated your belief about the
3  relationship between AWP and prices in the
4  marketplace for brand name drugs, I think.
5       Correct?
6       MS. BROOKER: Objection. Form.
7       A. I believe I did, yes.
8       Q. Okay. And -- and you testified, as I
9  recall, that you thought that there was a
10 percentage difference, on average, between
11 published AWP's and prices within the
12 marketplace.
13      Do I have that correct?
14      MS. BROOKER: Objection. Form.
15      A. That is correct.
16      Q. Regardless of whether that's what you
17 testified before, I've correctly summarized what
18 your belief was. Correct?
19      A. That's correct.
20      Q. When you say that it was an average, do
21 I understand correctly it was your belief that it
22 wasn't a fixed percentage between the two?

39 (Pages 150 to 153)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                          May 4, 2007
                          New York, NY

Page 174

1   A. That's correct.
2   Q. We were talking a little bit earlier
3   about the -- the range of prices that a -- a
4   commodity, a supply such as sodium chloride
5   solution might have, being as much as 100-to-1.
6       Correct? You recall that?
7   A. Yes.
8   Q. Okay. As to generic drugs, would it be
9   consistent with your understanding, between 1993
10  and 1997, that a generic drug such as vancomycin
11  could have a market range of prices as wide as
12  that reflected in this chart?
13      MS. BROOKER: Objection. Form.
14  A. I am -- I think the most accurate way
15  to answer that was I am surprised, as of today,
16  to see that kind of data, and I think I would
17  have been even more surprised, during the '93 to
18  '97 period, to see that kind of data.
19  Q. But this is data that was reported to
20  your agency. Correct?
21  A. That's -- that's my understanding, yes.
22  Q. And you would have expected members of

Page 175

1   your staff to have taken this data into account
2   in either a -- and let's start with establishing
3   Medicaid or Medicare reimbursement policy.
4       MS. BROOKER: Objection. Form.
5   A. I would have expected, given the nature
6   of this report then, to have been much more
7   influenced by the bolded section in the box on
8   Page 2.
9   Q. And what aspect of that would you
10  expect them to be influenced by?
11  A. Again, the finding that -- that most
12  prices were, in fact, below the AWP, but that in
13  two of the cases the differential was 15 to 20
14  percent.
15  Q. And that would refer, presumably, going
16  back to Appendix 2, to the Calcigex and Inferon?
17  A. I -- presumably, yes.
18  Q. Because those were the single-source
19  drugs. Correct?
20  A. Yes.
21  Q. And to the extent that Medicare
22  reimbursed for the multiple-source drug here,

Page 176

1   vancomycin, would you expect your staff to take
2   into account the difference between single-source
3   drug prices and multiple-source drug prices in --
4   in considering changes to Medicare payment
5   policies?
6       MS. BROOKER: Objection. Form.
7   A. The only thing I can observe
8   empirically is that I don't recall, in our
9   conversations over the years about changing
10  Medicare drug pricing policy, the distinction
11  between brand and generics arising very often, if
12  at all.
13  Q. At the time this report was -- was
14  written, am I correct that Medicare was
15  reimbursing at undiscounted AWP for Part B drugs?
16      Correct?
17      MS. BROOKER: Objection. Form.
18  A. I -- I believe that's correct.
19  Q. It was either EAC, according to survey
20  --
21  A. Right.
22  Q. -- or AWP. Right?

Page 177

1   A. The only reason I hesitate in response
2   to your question is trying to remember whether
3   dialysis drugs were treated separately from other
4   Part B drugs, but I don't believe they were.
5   Q. To the extent that -- that dialysis
6   drugs were reimbursed pursuant to 405.517, they
7   were being reimbursed by Medicare at 100 percent
8   of AWP. Correct?
9   A. That is correct.
10  Q. And to the extent that the data on the
11  chart at Appendix 2 is -- is accurate, that would
12  indicate that for Calcigex, for example, if it
13  were reimbursed under that methodology, am I
14  correct that every single one of the providers
15  surveyed would be reimbursed at an amount in
16  excess of their acquisition cost? Correct?
17  A. That is correct.
18  Q. And for Inferon, all but two of the
19  providers would have been reimbursed at above
20  their acquisition cost. Correct?
21      MS. BROOKER: Objection. Form.
22  A. That's what it shows, yes.

                                      45 (Pages 174 to 177)

Vladeck, Ph.D., Bruce C.　　　　　　　　　　　　　　May 4, 2007
New York, NY

Page 178

1　Q.  And for vancomycin, at least one
2　provider would have had a cost of $3.45 and a
3　reimbursement amount of $19.17.  Correct?
4　A.  That's what the charge shows, yes.
5　Q.  I'm getting a little bit ahead of
6　myself, but did you ever have discussions within
7　HCFA about whether to change that reimbursement
8　methodology for drugs such as this?
9　　　MS. BROOKER:  I'm going to instruct you
10　to be mindful of not discussing internal pre-
11　decisional deliberations on the record.
12　A.  We proposed, a number of times, to
13　change the methodology, and, in fact, the
14　proposal cited by the President, in his speech
15　that we discussed earlier, was one that we had
16　been advocating for -- within the administration
17　since, I believe, about 1995.
18　　　I think it is fair to say as well that
19　I believed, as -- as far back as '95, that 85
20　percent of average wholesale price as a payment
21　method was inferior to something closer than
22　average acquisition cost, but that the

Page 179

1　administrative difficulties, and the potential
2　administrative burden on physicians as a
3　political issue, if not a real issue, made it
4　likelier that we would be able to succeed with
5　the legislative proposal still tied to AWP than
6　one that went all the way back to its acquisition
7　costs.
8　Q.  Now, as I understand it, from '91 --
9　strike that.
10　　　As I understand it, during the time you
11　were a HCFA administrator, from 1993 until 1997,
12　reimbursement for Part B drugs under Medicare,
13　under the regulation 405.517, was made pursuant
14　to HHS regulation.  Correct?
15　A.  That is correct.
16　Q.  And that could have been changed
17　without legislation.  Correct?
18　　　MS. BROOKER:  Objection.  Form.
19　A.  Theoretically, yes.  We were -- it was
20　my perception, during that period, that the
21　statute -- the statute offered us the alternative
22　of an acquisition price-based methodology, but

Page 180

1　that the Office of Management and Budget, and
2　perhaps the Department of Health and Human
3　Services themselves, would not authorize us to
4　undertake the data collection to determine
5　acquisition costs, and that we -- our perception
6　was we did not believe we had the authority to go
7　to a percentage of AWP as an alternative
8　methodology without legislation.
9　Q.  Well, the -- the regulation that was
10　promulgated in 1991 providing for estimated
11　acquisition cost according to a survey or average
12　wholesale price as published in the Red Book, was
13　promulgated by the Department of Health and Human
14　Services.  Correct?
15　A.  That is correct.
16　Q.  And an alternative regulation changing
17　that rule also could have been promulgated by the
18　Department of Health and Human Services any time
19　prior to the enactment of the Balanced Budget Act
20　of 1997.  Correct?
21　　　MS. BROOKER:  Objection.  Form.
22　A.  I -- I'd have to check, but it was my

Page 181

1　perception at the time that our legal authority
2　pretty much left us with those -- in the absence
3　of further legislation, pretty much left us with
4　those two alternatives; in other words, 100
5　percent of AWP or actual acquisition price.
6　　　My -- I don't recall whether that was
7　because of a perception that Congress would
8　object to any effort to use a fraction of AWP or
9　-- I don't -- the opinion that we had only those
10　two alternative -- let me restate that.
11　　　It was my belief, at the time, that the
12　-- having only those two alternatives was an
13　unavoidable reality.  Whether that was legal or
14　political, I'm not sure I was clear at the time,
15　and I'm certainly not clear now.
16　Q.  So, as I understand it, between 1993
17　and 1997, according to regulation, HCFA could
18　reimburse based upon two methodologies.
19　Correct?
20　A.  That's correct.
21　Q.  One was the published average wholesale
22　price.  Correct?

46 (Pages 178 to 181)

Vladeck, Ph.D., Bruce C.                                         May 4, 2007
New York, NY

Page 182

1    A.  That's correct.
2    Q.  One was EAC, established according to
3 survey.  Correct?
4    A.  That's correct.
5    Q.  We'll get to it later, but for whatever
6 reason, that was not available to you because the
7 surveys were not or could not be conducted?
8    A.  That's correct.
9        MS. BROOKER:  Objection to form.
10   Q.  And so, your understanding was that
11 pursuant to regulation, your only alternative
12 between '93 and '97, while you were administrator
13 of HCFA, was to pay based upon the published
14 average wholesale price.  Correct?
15   A.  That's correct.
16   Q.  And during the time that you were
17 paying the published average wholesale price, you
18 were aware that average wholesale price exceeded
19 acquisition cost.  Correct?
20       MS. BROOKER:  Objection. Form.
21   A.  Yes.
22   Q.  You were aware that for generic drugs,

Page 183

1 the difference could be greater than for brand
2 name drugs.  Correct?
3        MR. BREEN:  Objection.
4    A.  I'm not certain I was aware of that.
5    Q.  But for supplies such as sodium
6 chloride, you were aware that the difference
7 could be as much as 99 percent.  Correct?
8    A.  Yes, I was.
9        MR. BREEN:  Objection. Form.
10       MS. BROOKER:  Objection. Form.
11   Q.  And the same would be true for other
12 commodity products similar to sodium chloride
13 such as, for example, dextrose in water.
14    Correct?
15       MR. BREEN:  Objection. Form.
16   A.  Yes, that's correct.  Or sterile saline
17 or something of that sort.
18   Q.  Which are two of the other drugs at
19 issue in this case.  Correct?
20   A.  I wasn't aware that -- that they were,
21 but okay.
22   Q.  And during that time, you, as

Page 184

1 administrator of HCFA, considered alternatives to
2 100 percent of AWP.  Correct?
3        You, as administrator of HCFA,
4 considered alternatives to reimbursing at 100
5 percent of AWP.  Correct?
6    A.  I don't know if we're getting into
7 deliberative --
8        MS. BROOKER:  You should be mindful
9 that you should not disclose any pre-decisional
10 deliberative process.
11       MR. COOK:  I think it's going to be
12 easier if you either direct him not to answer or
13 let him answer, because I'm aware -- I'm a little
14 leery of having the witness put in the difficult
15 position of having to parse within his head --
16   A.  Well, let me -- I can say I was aware
17 that conceptually there were alternatives to 100
18 percent of AWP.
19       MS. BROOKER:  Let me say you can state
20 what your understanding was in your official
21 capacity, and you can certainly state what the
22 official policy was or the regulation, or what

Page 185

1 the statute was.  You just cannot discuss pre-
2 decisional deliberative conversations that you --
3 that you had with others.
4        THE WITNESS:  I think I got that.
5    Q.  All right.  Without revealing what the
6 deliberations were, were there deliberations
7 within HCFA about alternative methods for
8 reimbursing to undiscounted AWP?
9        MS. BROOKER:  Objection to form.
10   A.  Extensive discussion.
11   Q.  Who -- who was involved in those
12 extensive discussions?
13   A.  I don't know if that gets too
14 deliberative.
15       MS. BROOKER:  You can say who was
16 involved in deliberations.
17   A.  I would say that with the exception of
18 the Medicaid folks, the list of people I
19 enumerated earlier as experts I would have
20 consulted on these issues would have been
21 involved, whoever the deputy administrator was at
22 the time would have been involved.  And, again,

47 (Pages 182 to 185)

Henderson Legal Services
202-220-4158

Vladeck, Ph.D., Bruce C.                                          May 4, 2007
New York, NY

Page 186

1  probably other members of the staff of the office
2  administrator probably would have been involved,
3  as would additional staff in the Office of
4  Legislation and Policy, in addition to the
5  individuals I named earlier.
6      Q. And it involved numerous meetings at
7  which the -- the -- the possibilities were
8  discussed; I take it?
9      MS. BROOKER: Objection. Form.
10     A. I would say we were, in 1996 and 1997 -
11 - certainly probably beginning in 1995, there
12 were very frequent conversations about budgetary
13 issues and policies with potential budgetary
14 impacts of one kind or another, and there was
15 always a list of potential policies and changes
16 to Part B drug reimbursement was frequently on
17 those lists, and was not discussed at every
18 meeting, but was frequently discussed.
19     Q. How many alternatives were discussed?
20     MS. BROOKER: Objection. You should
21 not discuss exactly what -- you should not
22 discuss any of your deliberations, so you

Page 187

1  shouldn't talk about -- I mean, that's -- that's
2  prohibited.
3      MR. COOK: Well, are you instructing
4  him not to answer?
5      MS. BROOKER: You can talk about what
6  official policy was.
7      MR. COOK: All right. I'll make it
8  easy.
9      Q. In your internal deliberations at HCFA,
10 how many alternative methods of reimbursement did
11 you consider?
12     A. I couldn't say. I -- it's not a
13 question of privilege. I couldn't say.
14     Q. Okay. But within your internal
15 deliberations, you did consider alternative
16 methods of reimbursement. Correct?
17     A. That is correct.
18     Q. And, again, to -- to make the record as
19 sharp as possible, what did you discuss in those
20 deliberations?
21     MS. BROOKER: Objection. You cannot
22 discuss exactly what your deliberations were.

Page 188

1      And I also object that these questions
2  are incredibly vague. So, I object to form. I
3  don't know exactly what program we're even
4  talking about. I don't know what time period
5  we're talking about. I don't know what the
6  specifics are that you're talking about in this
7  whole line of questions.
8      MR. COOK: But you understand enough
9  that you won't let him answer it?
10     MS. BROOKER: If he's going to talk
11 about internal deliberations. And -- and, again,
12 just for the record, it's not that I won't let
13 him talk about it. I am here to protect on --
14 not on behalf of the witness, but on behalf of
15 the government, deliberative process privilege.
16 It's not my privilege. It's not the witness'
17 privilege. It's the federal government's
18 privilege.
19     MR. COOK: All right. The United
20 States, who has sued my client, will not allow
21 the witness to talk about it.
22     Is that fair to say?

Page 189

1      MS. BROOKER: I don't think that's a
2  fair characterization.
3      MR. COOK: Okay.
4      MS. BROOKER: Look, Chris --
5      MR. COOK: I know. I know.
6      MS. BROOKER: We have this issue before
7  the Judge. There's no reason to bicker about it
8  before the witness. Let's just all be
9  professional about it.
10     Q. And so, it is fair to say that during
11 the time you were the administrator of HCFA, the
12 agency did not choose to change the manner in
13 which it reimbursed Medicare Part B drugs?
14     MS. BROOKER: Objection. Form.
15     A. I would -- I would frankly personally
16 object to that characterization because I had a
17 growing feeling -- again, I would put this in a
18 period probably beginning about 1995 through the
19 time I left the government -- of frustration that
20 we were significantly overpaying for Part B
21 drugs, and that because of some combination,
22 frankly, of political and legal constraints, we

48 (Pages 186 to 189)

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Page 190

were unable to change it.
    Again, whether that was a matter of law or a matter of political judgment, whether I was clear then, I'm not clear now, but it was certainly a source of very great frustration to me that we continued to pay what I believed was excessive amounts for the drugs.
    Q. And so, "choose" was a bad choice of words?
    A. Yes.
    Q. Okay. Did not, in fact, change the way in which it reimbursed it, for several reasons?
    MS. BROOKER: Objection. Form.
    A. Those methods were not, in fact, changed until 2004, I believe.
    Q. You indicated that political considerations were one of the bases -- let me rephrase that.
    You indicated the political pressures were one of the reasons why the methodology was not changed. Correct?
    A. I did, yes. That's correct.

Page 191

    Q. And it's possible that legislative impediments were one of the reasons why the methodology was not changed. Correct?
    MS. BROOKER: Objection. Form.
    A. Again, I would -- I would restate it. What I was trying to say was that we believed that -- there's sort of two parts to this -- that any effort to change it through any mechanism would create political objections and might well prevent us from moving forward. Some of those barriers might have been legislative, but whether we actually required legislation to make changes, again, is something I'm a little bit unclear about.
    Q. It is fair to say that one of -- it was not a reason for the lack of a change in methodology that you were relying upon average wholesale price to represent an average of acquisition prices?
    MS. BROOKER: Objection. Form.
    A. Please restate that.
    Q. You're right. That has way too many

Page 192

negatives in it. I'm not even going to try to clean that one up. I apologize.
    You had communications with Congress during this time period about the issue of Medicare Part B reimbursement for prescription drugs?
    A. I don't know the extent to which I did personally, but certainly at the staff level there was continual conversation about this issue.
    Q. Do you know the extent to which the facts underlying these policy decisions were communicated by your staff to Congress?
    MS. BROOKER: Objection. Form.
    A. I don't know the extent to which I am a reliable source of information in this regard, but it is my perception, again, that the general sense of a 15, 20 percent spread between average wholesale price and actual acquisition or actual market cost was very widespread within the policy community in Washington, so that the Congressional staff and the HCFA staff and other

Page 193

HHF staff and, frankly, industry representatives, would have all seen the same documents, would all have shared the same sort of gossip and perceptions.
    In addition to which certainly at the time of the President's speech, I'm almost certain in 1996, and it's possible in 1995 there were official savings estimates from OMB and the Congressional budget office of what an adoption of, say, a proposal to go to 85 percent of AWP would save the Medicare program.
    So, there were numbers, quantitative estimates, of the effect of this change that were blessed by the official numbers blessers, so there was sort of a common set of parlance expectation and understanding about the magnitude of these issues.
    Q. And from -- you mentioned political pressures that -- that prevented changes, and a change to methodology.
    From where did those political pressures come, in your experience?

Page 310

        MS. BROOKER: Objection. Form.
    A.  It could very well have. Again, as
I believe I testified at our last session, it was
not one of the major sort of issues on my
attention or on which I was focusing, but to the
extent that it came up it was as likely to come up
through an e-mail exchange as through an oral
conversation or a written document.
    Q.  And at least for me personally, if
I wanted to go back and recreate what I was doing,
and the various issues were that were raised
during a particular time period, looking at my old
e-mails is -- is the most effective way for me to
do that nowadays.
        Would that be true for you as well
during this time period?
        MS. BROOKER: Objection. Form.
    A.  I don't know that I ever had the
opportunity to do that or think about it. It
would certainly be a very useful spur to the
memory. I would probably get so bogged down in
being reminded of things I had totally forgotten

Page 311

that it might not be that efficient, but it would
-- I think it would be very helpful to try to
reconstruct.
    Q.  You mentioned the name of Randall
Graydon as your preeminent drug reimbursement
expert when you were there.
        Can you tell me a little bit --
what's Randall Graydon's background?
    A.  I honestly don't know. He was
already -- I'm trying to remember if he actually
had formal training in pharmacy. I believe he
did. He may have, but I do not recall. He may
have actually had been licensed as a professional
pharmacist before, or at about the time he came to
work at the agency.
        He certainly had been working on
drug issues for the organization for a number of
years before I got there. I think it's been a
good part of his professional career at the
agency.
    Q.  How old was he at the time you were
administrator?

Page 312

    A.  Oh, I wouldn't be able to say. I
would guess he was roughly a contemporary of mine,
and I would have been in my mid 40s.
    Q.  Do you recall any conversations
with Randall Graydon relating specifically to
average wholesale price and -- and those drug
reimbursement issues?
        MS. BROOKER: Objection. Form.
    A.  The only conversation I recall with
-- specific conversation I recall with a member of
my staff about average wholesale price and drug
pricing issues, which I believe we discussed last
time, although I'm not certain, was with Tom
Hoyer, relative to the Medicare drug pricing
issues, and -- and the issue of average wholesale
price.
        I also know that I had one or more
conversations with his supervisor, Mr. Ault, at
some point. Whether it was the same conversation
or a separate conversation, I couldn't say.
    Q.  Do you recall when those
conversations or conversation took place?

Page 313

    A.  I couldn't tell you when -- it was
early -- I recall the conversation with Mr. Hoyer
particularly because it was really, I think, the
first time I ever got -- had any extensive
substantive conversation about the issue of
average wholesale price, and learned a little bit
about the history of the implementation of the
Medicare provisions for OBRA '90 relative to the
efforts to survey physicians about acquisition
cost that was aborted, and so forth.
        And I just, for some reason,
remember his referring to the Red Book and
explaining to me that it was derived not from
independent investigation but from information
supplied to the publisher by the manufacturers.
    Q.  Do you remember anything else that
Mr. Hoyer or Mr. Ault told you relating to average
wholesale price?
        MS. BROOKER: Objection. Calls for
hearsay. Also, I just want to be mindful just to
instruct the witness to be careful about
disclosing pre-decisional deliberative

Page 314

1  conversations.
2      A.   I do believe there was some
3  discussion of the extent to which average
4  wholesale price was an artificial construct of
5  some sort, rather than a -- a true empirical
6  reflection of actual prices in market
7  transactions.
8      Q.   Do you recall if anybody else was
9  part of this conversation?
10     A.   I don't. It could have been, but I
11 -- I don't recall.
12     Q.   Do you remember any other details
13 about the conversation?
14          MS. BROOKER: Objection.
15          MR. COOK: What's the objection?
16          MS. BROOKER: It calls for hearsay.
17 I'm entitled to put that objection on the record.
18          MR. COOK: You're objecting to
19 hearsay at a deposition?
20          MS. BROOKER: I have to make my
21 objections at the deposition. Absolutely.
22          MR. COOK: I think we can -- I

Page 315

1  think we can all agree that hearsay objections are
2  preserved until trial.
3           MS. BROOKER: I'm going to make my
4  objections when appropriate.
5           MR. COOK: You're coaching the
6  witness.
7           MS. BROOKER: It's not coaching the
8  witness.
9           MR. COOK: Come on.
10     Q.   Do you remember anything else about
11 the conversation?
12          MS. BROOKER: Okay. Let me --
13 Chris --
14          MR. COOK: First of all, it's not
15 hearsay to ask him if he remembers any of the
16 details about the conversation.
17          MS. BROOKER: I have allowed you to
18 ask him many questions about who was present at
19 conversations and so forth. And I haven't made
20 hearsay objections. Only when I hear that it
21 calls for hearsay.
22          If you want to agree, on the

Page 316

1  record, that when I say "objection, form," that
2  also covers hearsay objections, then I can agree
3  to that.
4           MR. COOK: I'm not agreeing that
5  objections to form includes hearsay. Fine. Make
6  whatever objections you want.
7           MS. BROOKER: Well, if you would
8  like that agreement, then I don't have to say
9  "hearsay." I will just say "objection, form."
10          MR. COOK: Make whatever objections
11 you want.
12          MR. BREEN: See, the problem -- the
13 problem, Chris -- and I -- I realize you're
14 irritated by this. Okay?
15          The problem is we've got this thing
16 cross-noticed so many doggone ways, and there's so
17 many rules, there's always one place where you
18 need to make your hearsay objections, and this is
19 arguable on the record.
20          So, if everybody could agree that
21 form objections includes hearsay, and they're all
22 our respected rules, it would certainly resolve

Page 317

1  your issue about potential -- about this -- this -
2  - this -- this coaching suspicion you've got.
3           MR. COOK: The deal, Jay, is
4  litigating only in federal court.
5           MR. BREEN: Well --
6           MR. COOK: And I don't think that
7  there's --
8           MR. BREEN: One objection -- do you
9  want to --
10          MR. COOK: Does anybody think that
11 hearsay objections have to be made at a -- at a
12 deposition --
13          MR. BREEN: Where's John McDonald?
14          MR. COOK: -- under the federal
15 rules?
16          MR. MCDONALD: I'm right here.
17          MR. BREEN: This isn't only under
18 the federal -- I don't know about -- I don't know
19 about that. Is -- are we -- are we going to agree
20 that in any -- are we agreeing in any state case -
21 - there's some folks in state cases here -- that
22 the federal rules totally apply to this thing?

9 (Pages 314 to 317)

Page 370

1  you testified about, back on May 4th relating to
2  going to an actual acquisition cost methodology
3  for payment of drugs?
4       MS. BROOKER: Objection. Form.
5       A.   That is my -- consistent with my
6  memory of what we had proposed, yes.
7       Q.   And could you describe what the
8  payment methodology would have been if this
9  statutory proposal had been adopted by Congress?
10      A.   Well, again, it would have been
11 lower of average wholesale price, now with -- with
12 the little clause there under Section B, the
13 opportunity to write regulations -- defining what
14 average wholesale price was or actual acquisition
15 cost, with a further provision that if there was
16 insufficient information about the actual
17 acquisition cost to the individual physician or
18 supplier, we could employ national average data.
19      Q.   Assuming that this is language from
20 a budget proposal for the administration in Fiscal
21 Year 1998, who would have actually drafted this
22 language?

Page 371

1       A.   Probably the actual -- the actual
2  drafting of the language would have been done, I
3  believe, by staff in the counsel's office at HHS,
4  working with HCFA staff and staff of the Office of
5  Legislation.
6       Q.   Do you recall being involved in the
7  crafting of -- of the language relating to this
8  budget proposal?
9       A.   I -- I don't believe I was involved
10 in the actual language drafting, no.
11      Q.   If you look at the -- Page 4 of the
12 facsimile, which is Page 0322 on the Bates
13 numbers, the second paragraph -- the first full
14 paragraph at the top refers to a dispensing fee
15 for pharmacies.
16           Absent this legislation, or at the
17 time this legislation was proposed, Medicare did
18 not pay a dispensing fee for pharmacies for drugs
19 reimbursed under Part B. Is that correct?
20      A.   That is correct.
21      Q.   And this would have given the
22 Secretary authority to pay entities such as Ven-A-

Page 372

1  Care an explicit dispensing fee.
2           Correct?
3       A.   That's how I understand it, yes.
4       Q.   Was there any discussion within
5  HCFA that the creation of that dispensing fee was
6  to make up, in some measure, for the lost profits
7  from going from AWP to acquisition costs?
8       MS. BROOKER: Objection.
9           I would just instruct you to be
10 mindful of not disclosing pre-decisional
11 deliberations, and to just stick to policy.
12      A.   I don't know if this addresses the
13 objection of the concern or not. I don't recall
14 any specific discussion about that. My
15 presumption was that as a policy it would have the
16 effect similar to what you described, but I don't
17 have any specific memory of this provision at all,
18 frankly.
19      Q.   Okay. Who would be the best person
20 to ask within HCFA for the -- the reason that this
21 dispensing fee for pharmacies provision was
22 included in the proposed legislation?

Page 373

1       A.   I think probably again Ms. Buto or
2  Mr. Hoyer.
3       Q.   The other provision that piques my
4  interest -- and unfortunately it's cut off -- is
5  the Section 11237 immediately following. This
6  says:
7           "Payments to physicians'
8  assistants, nurse practitioners, and clinical
9  nurse specialists."
10          And the first subheading refers to:
11          "Coverage in home and ambulatory
12 settings in which a facility or a provider fee is
13 not billed for physicians' assistants, nurse
14 practitioners, and clinical nurse specialists."
15          First, do you know what that teaser
16 of a heading relates to in terms of the proposed
17 legislation?
18      MS. BROOKER: Objection. Form.
19      A.   I have a surmise. I don't have any
20 direct memory.
21      Q.   And what would the surmise be?
22      A.   My guess would be it would permit

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Page 378

1  of -- of this document.
2       MS. BROOKER: What's the Bates
3  number on it?
4       MR. COOK: It's Bates Page 0251.
5    Q.  And if you count up from the
6  bottom, it's the sixth paragraph up from the
7  bottom.
8    A.  Beginning "among doctors"?
9    Q.  Beginning with "armed with this
10 kind of evidence." It's on Page 251, at the
11 bottom.
12   A.  Oh, 251.
13   Q.  Yes.
14   A.  I'm sorry. Yes, I see it. Thank
15 you.
16   Q.  First of all, do you remember this
17 -- this article and -- and being interviewed for
18 this article, Dr. Vladeck?
19   A.  No, I do not.
20   Q.  Let me read to you a couple of
21 quotes that are attributed to you, and -- and you
22 can tell me, and I'll ask you a couple of

Page 379

1  questions about it. The lead-in paragraph to your
2  quote is:
3       "Armed with this kind of evidence,
4  the Clinton Administration tried to tamp down drug
5  costs by proposing a rule of limited
6  reimbursements to what doctors actually paid for
7  their drugs. The rule went nowhere, a casualty,
8  according to a former HCFA head, Vladeck, of
9  timidity of the agency's Office of the Department
10 of Health and Human Services."
11      And then the quote attributed to
12 you in the next paragraph is:
13      "Some of my colleagues in HHS were
14 concerned that the docs would get very mad, that
15 there would be a political problem, and it would
16 be burdensome, Vladeck recalled, if we (HCFA
17 officials) weren't permitted to go ahead with it."
18      First of all, do you remember
19 giving that quote to the Tribune?
20   A.  Not specifically, although I -- I
21 would not question its accuracy or doubt that I
22 did, in fact, say that.

Page 380

1    Q.  You say that they were concerned
2  that the docs would get very mad and that there
3  would be a political problem.
4       What was the political problem to
5  which you were referring?
6       MR. BREEN: Objection. Form.
7    A.  That particularly given the
8  partisan composition and proclivities of -- of the
9  Congress, there would be all sorts of
10 denunciations to the administration. There would
11 probably be hearings. There would be allegations
12 of all sorts ginned up by the campaign.
13   Q.  And the result of that was that
14 HCFA continued to pay based upon average wholesale
15 price. Correct?
16      MS. BROOKER: Objection. Form.
17   A.  That is correct.
18   Q.  And then in the next paragraph
19 there is a quote attributed to a HCFA
20 spokesperson. And I'll just read the quote:
21      "It's very clear, given the way we
22 reimburse physicians, that we're overpaying."

Page 381

1       MS. BROOKER: I'm sorry, Chris. I
2  didn't mean to interrupt you, but where are you?
3  Oh, I see. I'm there.
4       MR. COOK: It's the second half of
5  the next paragraph.
6       MS. BROOKER: Okay.
7    Q.  It's -- I think a HCFA spokesperson
8  gave the following quote, according to the
9  article, to the Chicago Tribune.
10      "It's very clear, given the way we
11 reimburse physicians, that we're overpaying. The
12 law requires us to overpay. There's no
13 flexibility. That's why we asked to have it
14 reduced."
15      Is that a fair statement of -- of
16 HCFA's position at the time, Dr. Vladeck?
17   A.  Yes.
18   Q.  And HCFA was overpaying because of
19 political considerations that prevented it from
20 changing the law?
21      MR. BREEN: Objection. Form.
22      MS. BROOKER: Objection. Form.

25 (Pages 378 to 381)

Page 382

1   A.   I would distinguish two processes.
2   There are political considerations that, in
3   addition to legal considerations, prevented us
4   from seeking to change the policy
5   administratively. And then there was political
6   opposition to -- efforts to change the law itself.
7        Q.   And so, it wasn't -- what I'm
8   trying to get at is HCFA wasn't overpaying because
9   it was fooled into believing that what it was
10  paying was actual acquisition costs.
11       Correct?
12       MS. LIANG: Object to the form.
13       MR. BREEN: Objection. Form.
14       MS. BROOKER: Objection. Form.
15  A.   We did not believe we were paying
16  actual acquisition costs.
17       MR. COOK: Let's take a short
18  break.
19       THE VIDEOGRAPHER: The time is
20  10:47 a.m. We're going off the record, concluding
21  Tape No. 7.
22       (Recess taken.)

Page 383

1        THE VIDEOGRAPHER: The time is
2   11:01 a.m. We're going back on the record,
3   starting Tape No. 8.
4        Q.   Dr. Vladeck, I'd like to ask you
5   just a few questions about the attempted survey
6   that HCFA undertook pursuant to 42 CFR 405.517, as
7   it was promulgated in November of 1991.
8        I've asked you to turn to Exhibit
9   Abbott 038 in the exhibit books before you.
10       MR. COOK: And for the record,
11  Exhibit Abbott 038 is a copy of that regulation
12  from 1991 before it was amended several years
13  later.
14       Q.   And if you could look to Paragraph
15  B, which describes the methodology. Do you see
16  that?
17  A.   Yes, sir.
18       Q.   And am I correct that Paragraph B
19  describes the methodology under which HCFA would
20  pay for drugs under Part B -- as Part B of
21  Medicare -- at the lower of either the national
22  average wholesale price or the estimated

Page 384

1   acquisition cost, and the estimated acquisition
2   cost would be determined based upon a survey of
3   the actual invoice prices paid for the drug?
4        Is that correct?
5   A.   That's correct.
6        Q.   And that in estimating the
7   acquisition cost, the agency or the agency's
8   carriers, at least, would be allowed to include
9   such factors as inventory waste and spoilage.
10       Right?
11  A.   That's correct.
12       Q.   As I understand it, HCFA never
13  undertook the surveys authorized by Section
14  405.517. Right?
15  A.   Not to get into semantics, the
16  surveys were never, in fact, conducted, I believe.
17       Q.   Who was responsible for -- well,
18  let me strike that.
19       Did HCFA take any steps towards
20  conducting such surveys?
21  A.   My understanding, which, frankly, I
22  think is based on information that's become

Page 385

1   available to me in the course of either my
2   preparation for this deposition or my earlier
3   involvement with Mr. Azorsky on the other
4   litigation, is that HCFA actually was prepared to
5   direct its carriers to undertake this survey, and
6   then the process was stopped -- I believe I have
7   been told, or I read somewhere that that was
8   because the Office of Management and Budget
9   refused to approve the survey instrument itself.
10       Q.   Do you know why it was the Office
11  of Management and Budget refused to approve the
12  survey?
13       MS. BROOKER: Objection. Form.
14  A.   I don't know why. I am -- I am
15  aware that in that time period the Office of
16  Management and Budget was very sensitive to
17  concerns about allegations about the burden that
18  government surveys in general were imposing on the
19  private sector that was, in part, the rationale
20  for why OMB had to approve all surveys.
21       And it is my understanding, again,
22  secondhand or thirdhand, that there was

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                                   June 21, 2007
                               New York, NY

Page 498

1  should have known earlier; that, in fact, the 15
2  to 25 percent or 15 to 20 percent was the rule of
3  thumb for sole-source brand drugs, that, in fact,
4  the expectation, the belief about generics, was
5  that it was more likely to be between 25 and 40
6  percent difference between actual market price and
7  average wholesale price.
8      Q.   So, when you testified about your
9  belief that the difference was somewhere between
10 15 and 20 percent, you were just talking about
11 your own personal belief and not the belief of
12 others at HCFA. Is that correct?
13         MS. BROOKER: Objection to form.
14     A.   I think it's fair to say that my
15 own beliefs were formed on the basis of what I was
16 told by my colleagues at HCFA. So, I think if I
17 described that as the consensus view among the
18 people I would have consulted or would have
19 advised me about the issue, that would be a fair
20 characterization, because there's nowhere else
21 from which I would have got that impression.
22     Q.   Did you have discussions with

Page 499

1  others at HCFA prior to 1996 or 1997 concerning
2  what the difference between AWP and transaction
3  prices was for generics?
4          MS. BROOKER: Objection.
5          I would ask you also to be mindful
6  of not discussing predecisional deliberative
7  conversations.
8      A.   I think I can say that, again, in
9  thinking about the average wholesale price and its
10 relationship to anything else, it was not prior to
11 then that I distinguished between generics and
12 brand name drugs and, therefore, it's unlikely I
13 would have had such a conversation at all.
14     Q.   Okay. How many people worked at
15 HCFA during the time that you were there?
16         MS. BROOKER: Objection.
17     A.   About 4,000.
18     Q.   And did some of those people have
19 the responsibility to understand what was going on
20 in the marketplace?
21         MS. BROOKER: Objection.
22     A.   That's an interesting question and

Page 500

1  a somewhat sore subject. I don't know that there
2  was anyone in the agency who had specific
3  responsibility for detailed knowledge of the
4  prescription drug marketplace.
5      Q.   I take it some of them did have
6  knowledge of the prescription drug marketplace.
7  Is that correct?
8          MS. CONNOLLY: Objection to form.
9      A.   That was my perception.
10     Q.   Let's take a look once again at the
11 1991 regulation. I believe it's been marked as
12 Exhibit Abbott 261?
13     A.   Yes, sir.
14     Q.   And I believe you may have
15 testified earlier that you had seen this
16 regulation before. Is that correct?
17     A.   That is correct.
18     Q.   What I want you to do is look at
19 the page with the No. 62 in the upper right-hand
20 corner.
21     A.   Yes, sir.
22     Q.   Under the "comment" section it --

Page 501

1  it talks about the reimbursement level for drugs
2  and it says:
3          "We received a great many comments
4  on this issue, primarily from oncologists,
5  indicating that our 85 percent standard was
6  inappropriate."
7          Was it your understanding that
8  originally HCFA proposed that the reimbursement
9  level be set at 85 percent of AWP?
10         MS. BROOKER: Objection.
11     A.   Yes.
12     Q.   And it published a proposed reg and
13 then solicited comments from interested persons.
14         Is that correct?
15     A.   The typical administrativesque
16 process, yes.
17     Q.   Okay. And the next sentence says:
18         "The thrust of most of the comments
19 was that many drugs could be purchased for
20 considerably less than 85 percent of AWP,
21 particularly multisourced drugs, while others were
22 not discounted."