# EXHIBIT B

Bowen, Marianne                                                              June 5, 2007
                                        Baltimore, MD

Page 1

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL     : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION:

PRICE LITIGATION           : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO   :

U.S. ex rel. Ven-a-Care of : Judge Patti B. Saris

the Florida Keys, Inc. v.  :

Abbott Laboratories, Inc., : Chief Magistrate

No. 06-CV-11337-PBS        : Judge Marianne B.

- - - - - - - - - - - - - -x Bowler

              IN THE CIRCUIT COURT OF

           MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - -x

STATE OF ALABAMA,          :

             Plaintiff,    :

      vs.                  : Case No.: CV-05-219

ABBOTT LABORATORIES, INC., : Judge Charles Price

et al.,                    :

             Defendants.:

- - - - - - - - - - - - - -x
```

Bowen, Marianne                                                June 5, 2007
Baltimore, MD

Page 2

```
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2         IN AND FOR LEON COUNTY, FLORIDA
 3
 4  THE STATE OF FLORIDA
 5  ex rel.
 6  ----------------x
 7  VEN-A-CARE OF THE FLORIDA    :
 8  KEYS, INC., a Florida        :
 9  Corporation, by and through its :
10  principal officers and directors, :
11  ZACHARY T. BENTLEY and       :
12  T. MARK JONES,               :
13          Plaintiffs,          :
14      vs.              : Civil Action
15  MYLAN LABORATORIES INC.; MYLAN   : No.: 98-3032G
16  PHARMACEUTICALS INC.; NOVOPHARM  : Judge: William
17  LTD., SCHEIN PHARMACEUTICAL, INC.;:  L. Gary
18  TEVA PHARMACEUTICAL INDUSTRIES   :
19  LTD., TEVA PHARMACEUTICAL USA;   :
20  and WATSON PHARMACEUTICALS, INC., :
21          Defendants,          :
22  ----------------x
```

Page 3

```
 1     IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2             STATE OF MISSOURI
 3  ----------------x
 4  STATE OF MISSOURI, ex rel.,   :
 5  JEREMIAH W. (JAY) NIXON,      :
 6  Attorney General,             :
 7  and                           :
 8  MISSOURI DEPARTMENT OF SOCIAL :
 9  SERVICES, DIVISION OF MEDICAL : Case No.:
10  SERVICES,               : 054-1216
11          Plaintiffs,    : Division No. 31
12      vs.                :
13  DEY INC., DEY, L.P., MERCK KGaA, :
14  EMD, INC., WARRICK              :
15  PHARMACEUTICALS CORPORATION,    :
16  SCHERING-PLOUGH CORPORATION, and :
17  SCHERING CORPORATION,           :
18          Defendants,    :
19  ----------------x
20
21
22
```

Page 4

```
 1        Videotaped Deposition of MARIANNE BOWEN,
 2  a witness herein, called for examination by counsel
 3  for Abbott Laboratories in the above-entitled
 4  matter, pursuant to notice, the witness being duly
 5  sworn by Robert M. Jakupciak, a Notary Public in and
 6  for the District of Columbia, taken at the offices
 7  of Hogan & Hartson, 111 S. Calvert Street,
 8  Baltimore, Maryland, 21201, at 9:30 a.m., on June 5,
 9  2007, and the proceedings being taken down by
10  Stenotype by Robert M. Jakupciak, RPR.
```

Page 5

```
 1  APPEARANCES:
 2
 3  On behalf of the United States of America:
 4
 5       ANA MARIA MARTINEZ, ESQUIRE
 6       U.S. Department of Justice
 7       99 N.E. 4th Street
 8       Miami, Florida  33132
 9       (305) 961-9431
10
11  On behalf of the Centers for Medicare and
12  Medicaid Services:
13
14       LESLIE M. STAFFORD, ESQUIRE
15       Centers for Medicare and
16       Medicaid Services
17       7500 Security Blvd.
18       Baltimore, Maryland  21244
19       (410) 786-9655
20
21
22  (CONTINUED)
```

2 (Pages 2 to 5)

Henderson Legal Services
202-220-4158

762b1f4d-aaec-4471-a08f-4e61a3217d81

Bowen, Marianne                                                                June 5, 2007
Baltimore, MD

Page 98

```
 1  days, can you put it in a safe place.  And I
 2  would say, sure, bring it in my office, and I
 3  lock my office at night.
 4      Q.  What happened to these computers that
 5  were pulled off from being re-imaged?
 6      A.  After whoever was interested in
 7  whatever was on them was done, they would just be
 8  re-imaged and reissued.
 9      Q.  To your knowledge, does HCFA have any
10  computers that have been pulled aside for re-
11  imaging now?
12      A.  Let me make sure I understand your
13  question.  You asked me if there are any
14  computers that I'm aware of right now that have
15  been pulled aside to be re-imaged?
16      Q.  No.  To not be re-imaged.
17      A.  I see.  I believe I understand, and I
18  do not know this as firsthand knowledge, I do
19  understand that Tom Gustafson's computer has
20  asked to be held aside.  But I was not the person
21  asked to take that action.
22      Q.  How did you come to that understanding?
```

Page 99

```
 1      A.  I came to that understanding from
 2  discussions with my attorney.
 3      Q.  Did you -- strike that.
 4          Are you aware of anyone else's computer
 5  that has been pulled aside for hold off from re-
 6  imaging?
 7      A.  I honestly am not.  I'm not working in
 8  that area any longer so I wouldn't be involved in
 9  any of those types of actions.
10      Q.  When you discontinued responsibility
11  for this around 2003, at that point were there
12  any computers that had been held aside for re-
13  imaging that were still in your office; for
14  example?
15      A.  No.
16      Q.  Would they have been anywhere else?
17      A.  Not to my knowledge.
18      Q.  Do you know the names of anyone else
19  that has a computer that has been pulled to not
20  be re-imaged?
21      A.  In the past?
22      Q.  Yes.
```

Page 100

```
 1      A.  I do.
 2      Q.  Who would that be?
 3      A.  Tom Scully.
 4      Q.  What do you know about --
 5      A.  And one more.  Ruben King Shaw.
 6      Q.  Describe for me what you know about Mr.
 7  Scully's computer being pulled from re-imaging?
 8      A.  I was -- I received a phone call late
 9  in the day one day asking if Mr. Scully's
10  computer had been re-imaged yet and it was
11  shortly after he left the agency, after some
12  investigation.  It was still in his office.  It
13  hadn't been touched yet.  And I was asked to
14  retrieve it.  And quite honestly, he had a
15  laptop, it was a Sony Vaio, and I kept that
16  laptop in my office for probably six months and,
17  to my knowledge, no one ever actually looked at
18  it.  I just held onto it until they told me it
19  was okay to re-image it.
20      Q.  Who did you receive the phone call
21  from?
22      A.  Oh, geez.  I honestly don't remember
```

Page 101

```
 1  who called me.
 2      Q.  Do you recall what office they were in?
 3      A.  I believe it was someone from the
 4  Office of Operations Management.
 5      Q.  No guess who that may have been?
 6      A.  I'm trying to remember.  CMS, in case
 7  you haven't noticed, is an agency that people
 8  come and go very frequently.  And I just can't
 9  remember who was in that office at that time.
10          It may have been one of the attorneys,
11  but honestly I just can't remember which one or
12  who.
13      Q.  When did this phone call occur?
14      A.  I remember the office I was sitting in
15  at the time.  It was probably in 2003, if my
16  recollection is correct.  I'm picturing myself in
17  the office I was in at that time, if I recall,
18  that was around 2003.
19      Q.  Do you recall how long approximately it
20  had been since Mr. Scully had left?
21      A.  Geez, I honestly don't.  Honestly, I
22  just don't remember.  I don't remember when Mr.
```

26 (Pages 98 to 101)

```
                                        Page 102
 1   Scully left the agency.
 2       Q.  It was a short enough time period
 3   though that his office --
 4       A.  Correct.
 5       Q.  -- his personal office was still set
 6   up?
 7       A.  Correct.  And honestly, the agency
 8   doesn't use Sony Vaio computers as our typical
 9   laptop.  That was -- he wanted that particular
10   computer and so that's why it hasn't been
11   touched, because no one else wanted it.
12       Q.  Do you know why the Office of
13   Operations Management, did I get that correct?
14       A.  That's correct.
15       Q.  Do you know why the Office of
16   Operations Management wanted Mr. Scully's
17   computer to be preserved?
18       A.  I believe the rationale was that
19   someone had asked to look at the contents of the
20   hard drive.
21       Q.  Were you told who was asked to --
22       A.  No, I wasn't.
```

```
                                        Page 103
 1       Q.  You indicated that you kept Mr.
 2   Scully's computer for approximately six months?
 3       A.  I just held onto it for approximately
 4   six months.
 5       Q.  Did you keep it in your office?
 6       A.  I did.
 7       Q.  Were any copies of his computer made?
 8       A.  No.
 9       Q.  So you physically took his laptop, kept
10   it in your office?
11       A.  Locked it in a cabinet for six months.
12       Q.  What happened after the six months?
13       A.  I believe I was moving to a new
14   location and spoke with the attorneys in the
15   agency and said I've been holding onto this for a
16   period of time and they said, oh, no, we don't
17   need to keep it any longer.  You can just have it
18   re-imaged.  And honestly we have a laptop loaner
19   pool at the agency.  My assumption is it went back
20   into that and that loaner pool is if you needed
21   to borrow a laptop for travel you would borrow it
22   for the period of time you were going to be away
```

```
                                        Page 104
 1   and then return it.
 2       Q.  So this would have been approximately
 3   mid-2004?
 4       A.  It was probably still in 2003.  I think
 5   I was asked to hold onto it earlier in 2003.  So
 6   I would think before the end of the year in 2003
 7   it was turned back in.
 8       Q.  If I represented to you that Mr. Scully
 9   did not leave the agency until the end of 2003, I
10   believe his technical last day was early 2004,
11   does that fresh your recollection of when you may
12   have had the computer?
13       A.  It may have been early 2004 that I got
14   the phone call then.
15       Q.  Sure.  So you held onto it for six
16   months, you initiated a phone call with an
17   individual asking whether you needed to preserve
18   it, preserve the computer, and you were told
19   that, you were told what?
20       A.  Not any longer.  You know, we don't
21   need it any longer, you can just re-image it and
22   put it back into the loaner pool.
```

```
                                        Page 105
 1       Q.  What did you do with the computer then?
 2       A.  I gave it to the technician that worked
 3   for me who was responsible for the loaner pool at
 4   that time and said could you, please, have the
 5   contractor just re-image it and make it part of
 6   our normal loaner laptop.
 7       Q.  So you have no reason to believe that
 8   Mr. Scully's laptop was not re-imaged?
 9       A.  No.
10       Q.  Had your directions been followed?
11       A.  Had my directions been followed, I have
12   no reason to believe it wasn't.
13           MS. MARTINEZ:  Counsel, I just want to
14   ask you, try to refrain from asking her directly
15   about communications with counsel.  Because we do
16   object on privilege grounds.
17           MS. RAMSEY:  Sure.
18   BY MS. RAMSEY:
19       Q.  I believe the other individual that you
20   mentioned was Ruben King Shaw.
21       A.  Correct.
22       Q.  What can you tell me about the
```

                                          27 (Pages 102 to 105)

Bowen, Marianne                                            June 5, 2007
Baltimore, MD

Page 174

1      Under Outlook there are no post
2  offices. It's all one giant plate of spaghetti
3  and we're just identified by our individual e-
4  mail addresses.
5      And so if I were given the challenge of
6  figuring out how to do that, I would first have
7  to understand the period of time in which we're
8  talking about, I would then have to have someone
9  provide for me the names of every person who
10 worked in an individual area during that period
11 of time, and if they still existed, if they were
12 still employees of CMS, would have to
13 individually go to each of their GroupWise PST
14 files and find that data.
15     And that would be a challenge.
16    Q.  So when the GroupWise e-mail was
17 transferred to Outlook as a PST file, you lost
18 the post office?
19    A.  Yes.  We retained -- we identified the
20 mail for Marianne Bowen with Marianne Bowen's ID,
21 and Marianne Bowen got her mail.  And that's it.
22 It's not connected anywhere else.

Page 175

1    Q.  So you would have to do it on a user-
2  by-user basis?
3    A.  Correct.  Assuming we could, making a
4  couple of assumptions.  One, that the users who
5  were under a given post office during the period
6  of time that we would be looking for, are still
7  at CMS.
8    Q.  Why does that have anything to do with
9  it?
10   A.  When someone leaves employment with CMS
11 and goes off for greener pastures, we have no
12 reason, on a day-to-day basis under normal
13 circumstances, to retain their mail.  When a
14 person leaves CMS, we -- I want to get this right
15 for you. We actually -- the day they leave, their
16 last day, we make a change to their e-mail
17 address that hides it from the address book.
18 Which means no one can send anymore mail to them,
19 and it locks their account.
20     The office that person works in has the
21 opportunity to retrieve any mail they want from
22 that e-mail account, store it however they feel

Page 176

1  they need to, and after a period of about 30
2  days, the e-mail account itself is deleted.
3    Q.  Everything in that user's e-mail
4  account is deleted?  Their archives are deleted?
5  I'm sorry, Ms. Bowen, I was just going to remind
6  --
7    A.  You told me that and I'm surprised that
8  was the first time I shook my head and didn't say
9  yes all day, but yes.
10   Q.  Can we repeat the question?  I believe
11 that I asked, everything in that user's e-mail
12 account is deleted?
13   A.  That's correct.
14   Q.  Their archives are deleted?
15   A.  That's correct.
16   Q.  So unless special measures are taken,
17 an employee who leaves CMS, and every e-mail they
18 have is gone within 30 days?
19     MS. MARTINEZ:  Objection to form.
20   A.  Unless someone takes the initiative to
21 save any of the documents or e-mail that was in
22 that person's account before the 30 days are up

Page 177

1  or someone takes measures to assure that it's not
2  deleted for a given reason, the account is
3  deleted.
4    Q.  That's the same for the user's files
5  that are stored on the LAN drive and also for the
6  e-mails?
7    A.  The files that are stored on the LAN
8  drive, it works pretty much the same, with a
9  little variation to it.
10   Q.  For the e-mail files, are requests ever
11 made for a user's e-mail to be frozen once they
12 leave, or it not to be deleted?
13     MS. MARTINEZ:  To the extent that she
14 knows.
15     MS. RAMSEY:  Yes.  To the extent that
16 you know.
17   A.  To the extent I know, we would never
18 agree.  I have never agreed to retain someone's
19 e-mail forever.  As I mentioned, if someone
20 leaves and there's information or data in their
21 e-mail that needs to be retained, it is the
22 responsibility of the organization the person

45 (Pages 174 to 177)

202-220-4158

762b1f4d-aaec-4471-a08f-4e61a3217d81

Page 222

```
 1        I also asked some questions about what
 2   was available, what data was available from an e-
 3   mail and LAN perspective and what data was not.
 4       Q.  Did they produce to you any hard copy
 5   documents?
 6       A.  I do believe I have a couple of e-mail
 7   documents that transmit information you see on a
 8   spread sheet we handed out this morning as well
 9   as about a page of information about our back-ups
10   and what happens when people leave, et cetera.
11       Q.  Did you provide to Lockheed Martin the
12   list of the 34 names that are identified in the
13   Amended Notice of Deposition?
14           MS. MARTINEZ:  It's 33.
15           MS. RAMSEY:  Is it 33?  I keep saying
16   35.
17           MS. MARTINEZ:  I'm sorry.  I believe
18   it's 33.  God willing, I'm not wrong.  It's just
19   that I have counted them a number of times and I
20   think it is 33.
21           MS. RAMSEY:  It is 33.  Let's start
22   that again.
```

Page 223

```
 1   BY MS. RAMSEY:
 2       Q.  Did you provide the 33 names of
 3   individuals that are listed in the Amended Notice
 4   of Deposition to Lockheed Martin?
 5       A.  No, I did not.
 6       Q.  Why did you not provide them to them?
 7       A.  I wasn't sure -- I take that back a
 8   step.  Of the 33 names, only five people still
 9   work here.  So my conversations with Lockheed
10   Martin -- my first conversations were around what
11   happens when people leave.
12       Q.  What did they tell you?
13       A.  And what they told me was for e-mail we
14   basically, with the department, working with
15   them, we basically change the e-mail address,
16   which is for all intents and purposes the user
17   identifier in the e-mail system, so that it's not
18   visible in the address book any longer.  The data
19   stays on the e-mail system for approximately 30
20   days which allows the component that the person
21   worked in to have time to go get what they need
22   out of that person's account, print it out, store
```

Page 224

```
 1   it electronically, do whatever they need to do,
 2   and then at the end of 30 days that e-mail
 3   account is deleted along with the data associated
 4   with it.
 5       Q.  Is it your testimony today that there
 6   is not a single e-mail which exists for the
 7   former employees of CMS listed on this deposition
 8   notice?
 9           MS. MARTINEZ:  Objection as to form.
10       A.  It is my testimony today that there are
11   not e-mail accounts for the former CMS employees
12   on this list that CMS or Lockheed Martin could go
13   back to look for e-mails.
14       Q.  Is there any way at all to retrieve e-
15   mails for the former employees which are provided
16   on this list?
17           MS. MARTINEZ:  Objection as to form.
18       A.  There is no electronic way to retrieve
19   e-mail for former employees on this list.
20       Q.  Other than the five individuals listed
21   on your chart, no electronic e-mails have been
22   retained for the other individuals listed on the
```

Page 225

```
 1   Amended Notice of Deposition?
 2           MS. MARTINEZ:  Objection as to form.
 3       A.  As I've stated earlier, when an
 4   employee leaves the agency, the component they
 5   worked in has the opportunity to go into their e-
 6   mail and remove data from it in the form of a
 7   hard copy that is filed as a paper copy, stored
 8   on some other storage media, moved into another
 9   employee's e-mail account.  I would not have
10   knowledge of that.  It would be pretty hard to
11   find that electronically.
12       Q.  Have any of the 28 other employees
13   provided on the Amended Notice of Deposition left
14   CMS since 1995?
15       A.  I would have to take a look at the list
16   again.
17           MS. MARTINEZ:  You mean to the extent
18   that she personally can recall other people's
19   employment histories?  It's going to be limited
20   by her memory.
21       A.  It's definitely going to be limited by
22   my memory.  Some people I worked closely with, so
```

57 (Pages 222 to 225)

Bowen, Marianne                                                         June 5, 2007
Baltimore, MD

Page 234

1  account?
2      A.  That's correct.  I'm sorry.
3      Q.  So the only way to determine any Tom
4  Scully e-mails that might still exist would be to
5  run a key word search on all the individual
6  employee's e-mails?
7      A.  Yes.  And that would assume that anyone
8  kept Tom's notes.  If they decided to delete his
9  notes, they do come out on a daily basis for a
10 while, and if they decided to delete his notes,
11 they're deleted.
12     Q.  Someone else may have decided to keep
13 his e-mails though?
14     A.  That's correct.
15     Q.  And someone in his department after his
16 departure may have adopted his e-mails as their
17 own; is that correct?
18     A.  That's certainly a possibility.
19     Q.  Is this, does this equally apply with
20 the electronic documents located in the LAN
21 folders?
22         MS. MARTINEZ:  Objection as to form.

Page 235

1  I'm not sure what you mean by this.
2      A.  I'm assuming you mean key word search.
3      Q.  Key word searches.
4      A.  I don't know the answer to that.  I
5  would have to find that out, do some research on
6  that.
7      Q.  When you testified that there were no
8  electronic documents for the 28 former employees
9  --
10         MS. MARTINEZ:  Objection to form.
11     Q.  -- this includes e-mails and electronic
12 documents that would be on the LAN system; is
13 that correct?
14         MS. MARTINEZ:  Objection as to form.
15     A.  I don't exactly remember the context in
16 which you asked me that question, but I'll try to
17 answer it.
18     Q.  I can rephrase it.
19     A.  Okay.
20     Q.  Are there any electronic documents on
21 the LAN folders, the group drives, the individual
22 drives, for these 28 former employees?

Page 236

1      A.  Again, you have to keep in mind, their
2  accounts are gone.
3      Q.  Their accounts have been deleted?
4      A.  Their accounts are gone.  Should
5  someone else have taken those electronic
6  documents and stored them on their LAN drive,
7  stored them on their hard drive, stored them on a
8  diskette, on a CD, paper format, they would still
9  be around if they haven't deleted those.
10     Q.  CMS has not taken any efforts to
11 preserve the electronic files for these 28 former
12 employees; is that correct?
13         MS. MARTINEZ:  Objection as to form.
14     A.  Actually, I don't agree with that.
15 Because when you talk about CMS, keep in mind
16 you're talking about the entire entity and not
17 just the IT environment.  I'm representing the IT
18 environment. So from an IT perspective, I can
19 tell you that we did not take any steps to
20 preserve Tom Scully's or the other 27 former's
21 electronic documents.
22     Q.  Are you aware whether CMS took any

Page 237

1  steps to preserve these electronic documents?
2      A.  I am not aware.
3      Q.  Would you have become aware through the
4  course of your preparation for today's
5  deposition?
6      A.  No, I wouldn't have.
7      Q.  If these electronic documents had been
8  pulled or retained, would you have learned this
9  in your preparation for today's deposition?
10         MS. MARTINEZ:  Objection; asked and
11 answered.
12         THE WITNESS:  Does that mean I answer?
13         MS. MARTINEZ:  Yeah.  Unless I say that
14 it's a privilege, it's an objection privilege,
15 you can always answer.
16     A.  Okay.  No.  I don't think I would have.
17 Because I'm completely focused on our electronic
18 environment and how we came to where we are, how
19 we operate where we are.  I would not have been
20 part of discussions with the administrator's
21 office, for example, on what they were going to
22 preserve from Tom's LAN or e-mail accounts or

60 (Pages 234 to 237)

Page 258

```
 1  is lost if it is printed out.
 2      A.  There is a, there is an amount of data
 3  that's associated with the e-mail note that I
 4  don't believe is captured when you print it out.
 5  So you're correct.
 6      Q.  For example in this case, the case
 7  management order requires that electronic
 8  documents be produced in their native format?
 9      A.  Okay.
10      Q.  So the meta data and electronic
11  information associated with those documents is
12  preserved?
13      A.  Okay.
14          MS. MARTINEZ:  Objection as to form.
15      A.  So if we're looking to preserve
16  documents and data in their electronic form,
17  well, I'm not sure.  I would have to give a
18  little more thought to that than I have time to
19  sit in this room and do.
20      Q.  Is pulling a back-up tape one way to do
21  it?
22      A.  Pulling a back-up tape is certainly a
```

Page 259

```
 1  way to do it, but keep in mind, back-up tapes
 2  aren't kept forever.
 3      Q.  I'm talking about pulling a back-up
 4  tape from the normal process of being recycled
 5  and reused?
 6          MS. MARTINEZ:  Objection as to form.
 7      A.  Pulling a back-up tape that is done as
 8  a full back-up, because keep in mind, I mentioned
 9  that at least from the LAN perspective we do
10  incremental back-ups on a day-to-day basis, and I
11  don't know how valuable they would be for a
12  discovery action.  A full back-up on a Friday
13  night into Saturday for our LAN should have
14  everything that was there on that given day,
15  period.
16      Q.  If you had been asked to pull a back-up
17  tape of your system in 1995, could you have done
18  it?
19          MS. MARTINEZ:  Objection as to form.  I
20  just want to be clear.  This is not my only
21  objection as to form.  Are you talking about 1995
22  before they moved into the new building or after
```

Page 260

```
 1  1995 after they moved into the new building?
 2      Q.  We will deal with after 1995 before you
 3  moved into the new building, or was there any
 4  difference between the two?
 5      A.  Once we moved into the new building, we
 6  got into a little more of a routine.  If you will
 7  recall, when I talked about prior to the move to
 8  the building, we didn't really have an agency
 9  LAN.  We had some home grown LANs that were put
10  together with money that components might have
11  individually been able to scrape up and buy a
12  server and maybe some software.
13          Before moving into the building, I'm
14  not sure we would have been able to pull a back-
15  up tape for you.  I'm not sure we did a very good
16  job of that.
17      Q.  What about after the move?
18      A.  Shortly after the move we began putting
19  our standard operating procedures in place.  And
20  began getting into a routine of how we were going
21  to do back-ups.  We could have, after we moved
22  into the building, pulled a back-up tape for you
```

Page 261

```
 1  and that would have given you whatever was stored
 2  on the LAN at that point in time.
 3      Q.  So at least as early as 1995 after the
 4  move, you could have pulled a back-up tape?
 5      A.  We could have.
 6      Q.  How much does a back-up tape cost?
 7      A.  I have no idea.  No idea at all.
 8          MS. MARTINEZ:  Could we go off the
 9  record for one second?
10          VIDEOGRAPHER:  Off the record at 4:34.
11              - - -
12          (Recessed at 4:34 p.m.)
13          (Reconvened at 4:36 p.m.)
14              - - -
15          VIDEOGRAPHER:  On the record at 4:36.
16  BY MS. RAMSEY:
17      Q.  Ms. Bowen, other than providing
18  information to Lockheed Martin regarding who was
19  a former employee and who was a present employee,
20  did you provide them with any other information?
21      A.  I don't believe I told you that I
22  provided them with the list of people in the
```

Bowen, Marianne                                                June 5, 2007
                              Baltimore, MD

Page 270

1  thereafter.
2       MS. MARTINEZ:  Sure.
3       VIDEOGRAPHER:  Off the record at 4:48.
4           - - -
5       (Recessed at 4:48 p.m.)
6       (Reconvened at 4:59 p.m.)
7           - - -
8       VIDEOGRAPHER:  On the record at 4:59.
9  BY MS. RAMSEY:
10      Q.  Ms. Bowen, I just have a few last
11 questions for you.  The chart you provided
12 detailing the electronic information that exists
13 for these five users, this chart details what
14 currently exists?
15      A.  Correct.
16      Q.  Have any measures been taken to
17 preserve this electronic information?
18      A.  I have not taken any measures to
19 preserve this information.
20      Q.  So Larry Reed could go in tomorrow and
21 delete all of his Outlook e-mail and it would be
22 gone?

Page 271

1       MS. MARTINEZ:  Objection to form.  You
2  know, obviously there has been preservation
3  directives in this case, so the question, if he
4  did that, he would be doing that in violation of
5  a preservation directive.  And also just to
6  recall the previous testimony that Ms. Bowen is
7  aware that there has been a pulling or some kind
8  of effort taken with respect to Tom Gustafson,
9  who is a former employee.  And now I'm going to
10 have you go back to your question.  I'm sorry.
11 BY MS. RAMSEY:
12      Q.  I believe my question was, so Larry
13 Reed could go in tomorrow and delete all of his
14 Outlook e-mails and it would be gone?
15      A.  He could go in tomorrow and delete all
16 of his Outlook e-mails from his Outlook mailbox,
17 but the back-up tape would still be around.
18      Q.  But after ten days or so the back-up
19 tapes would also be gone?
20      A.  I believe the department's back-up
21 practice for Outlook mail is very similar to
22 CMS's practice for our LAN back-ups and I believe

Page 272

1  they do keep them for a period of, and I cannot
2  remember the number of weeks.  It's somewhere in
3  the six week range.
4       Q.  The information for Tom Gustafson has
5  been pulled; correct?
6       A.  To my knowledge, I've been told that
7  Bridget Berardino has been asked to pull Tom
8  Gustafson's hard drive information and I assume
9  his e-mail information.
10      Q.  So he is the only one of the 33
11 individuals for which there's currently a polled
12 file?
13      MS. MARTINEZ:  I'm sorry.  I didn't
14 understand the question.  What was the last
15 phrase that you used?
16      MS. RAMSEY:  File?
17      MS. MARTINEZ:  A hold file?
18      MS. RAMSEY:  No.  No.  A polled file.
19      MS. MARTINEZ:  Objection.  Objection as
20 to form.  I just don't understand what that
21 means.
22      A.  I assume it means his, his e-mail and

Page 273

1  his hard drive information has been retained
2  since he is someone who has retired since this
3  began.  I have been told that his hard drive has
4  been pulled.  I assume that a hold has been put
5  on his e-mail, but I was not the person asked to
6  do that.  So I can't 100 percent verify that
7  that's done.
8       Q.  He would be the only individual for
9  whom we have a secure copy of the data?
10      MS. MARTINEZ:  Objection as to form.
11      A.  To my knowledge, he would be the only
12 individual that OIS has taken responsibility for
13 assuring that his hard drive, and I assume his
14 other data, has been preserved.
15      Q.  How much total data does CMS have?
16      A.  Wow.
17      MS. MARTINEZ:  I guess you mean
18 electronic data?
19      MS. RAMSEY:  Electronic data.
20      A.  I'm going to ask even a further
21 clarifying question.  How much data CMS has as a
22 whole or related to more of the administrative

                                    69 (Pages 270 to 273)