# EXHIBIT C

Robey 30(b)(6), Victoria   HIGHLY CONFIDENTIAL                    March 20, 2007
                           Baltimore, MD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------X

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-A-Care of | : Judge Patti B. Saris |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc., | : Chief Magistrate |
| No. 06-CV-11337-PBS | : Judge Marianne B. |
| | : Bowler |

---------------------------X

HIGHLY CONFIDENTIAL

Tuesday, March 20, 2007

The video 30(b)(6) deposition of VICTORIA ROBEY, called for oral examination by Counsel for the Defendant Abbott Laboratories, Inc., pursuant to notice, held in the law offices of Hogan & Hartson, 111 South Calvert Street, Baltimore, Maryland 21202, beginning at 9:20 a.m., before

126bfa54-4e4e-49ff-85e7-999d676a1331

Page 66

1  subpoena in civil litigation and that there is
2  civil litigation going on, that the fiscal
3  intermediaries and carriers may have documents
4  responsive or relating to that litigation?
5      A    Uh-huh.
6      Q    And that should be an indication to
7  them that they should not destroy documents.  Is
8  that what I understand you to be saying about the
9  implicit message of this memo?
10     A    And I can't answer to --
11          MS. THOMAS:  Objection.
12          THE WITNESS:  I can't answer to that
13 because I was not an author of this so I don't
14 know what -- what they were relaying.
15          BY MR. COOK:
16     Q    And I want to step completely out of
17 this memo and say when you say that it's an
18 indication to you that the existence of
19 litigation indicates you should preserve
20 documents, I'm just wondering how you came to
21 that understanding.
22          MS. MARTINEZ:  Objection --

Page 67

1           MS. THOMAS:  Objection.
2           MS. MARTINEZ:  -- to the extent that
3  it calls for privileged communication.
4           BY MR. COOK:
5      Q    I don't want you to talk about
6  conversations with your lawyers but how did you
7  come to the understanding that if there is
8  litigation ongoing and you have documents
9  relating to that litigation, that one should
10 preserve those documents?
11          MS. THOMAS:  Objection.
12          BY MR. COOK:
13     Q    If you remember.
14     A    I mean, that's just common sense.
15 You don't want to throw away things.
16     Q    Anything other than common sense?
17     A    Pardon me?
18     Q    Anything other than common sense?
19     A    No.
20     Q    No?  Just self-apparent?
21     A    Yes.
22     Q    Everybody should know?

Page 68

1           MS. THOMAS:  Objection.
2           BY MR. COOK:
3      Q    I apologize.  Let me move on.  I'm
4  asking you about a memo that you know nothing
5  about, and I know that's hard to do.  I'm afraid
6  this one maybe similar but I do have to find out
7  if you had any involvement other than just
8  receiving it, Ms. Robey.
9           There is a November 18, 2003 memo.
10 For the record, it is documents 0003 through
11 0004.  It is from, again, Gregory Carson.  It's
12 directed this time not only to the fiscal
13 intermediaries and all carriers but to all
14 durable medical equipment regional carriers, and
15 this also has a similar subject.  It is
16 coordination of responses to subpoenas and other
17 requests from outside entities regarding TAP, all
18 caps, T-A-P, Pharmaceutical Products, Inc. and
19 Lupron, L-U-P-R-O-N, Part II, Roman numeral II,
20 preservation of documents and contact
21 identification.
22          As a preliminary matter, were you

Page 69

1  also not involved --
2      A    Correct.
3      Q    -- in drafting this one?
4      A    Correct.
5      Q    But you received it?
6      A    Yes.
7      Q    Is it fair to say this document does
8  direct the addressees to preserve documents?
9      A    Yes.
10     Q    And it indicates, at least as of
11 November 18, 2003, that the recipients of the
12 memorandum should preserve documents that concern
13 TAP, Lupron, Zoladex, Z-O-L-A-D-E-X, drug
14 companies other than TAP, or any other drug
15 reimbursed by Medicare.
16          MS. THOMAS:  Objection.
17          BY MR. COOK:
18     Q    Did you have any documents that you
19 preserved in response to this memorandum?
20     A    I myself or the agency?
21     Q    That's a silly question.  You're not
22 an FI carrier or a DMU regional carrier, are you?

18 (Pages 66 to 69)

Page 74

1  on behalf of all of CMS with respect to this.
2          MR. COOK: Oh, sure.
3          BY MR. COOK:
4     Q   Oh, sure.  We're not asking you what
5  you've done to gather documents.  I'm not asking
6  for CMS to testify about what you, Vicky Robey,
7  did to preserve the documents.
8          MS. MARTINEZ: No, no.  What I mean
9  is that you were not asking -- since this is a
10 30(b)(6) depo, I just want to be clear on the
11 record that that was not the answer on behalf of
12 CMS.
13         BY MR. COOK:
14    Q   Correct.  That question and answer,
15 you were testifying as Vicky Robey, not as the
16 designee of the 30(b)(6).  I should have made
17 that clear.
18         Back into character, though -- do we
19 have a copy of the complaint?
20         MR. GABEL: The original?
21         MR. COOK: Yes.
22         BY MR. COOK:

Page 75

1     Q   I'd like to show you real quickly --
2  we'll set those aside and come back it -- a copy,
3  I'll mark it as Exhibit Abbott 070.
4              (Exhibit Abbott 070,
5              document entitled Original
6              Complaint, was marked for
7              identification.)
8          MS. MARTINEZ: Could I see it before
9  you --
10         MR. COOK: Oh, absolutely.  It is a
11 copy of -- that one is thicker because it is two
12 of them.  It is a copy of the original complaint
13 filed by Ven-a-Care.  It indicates on the cover
14 sheet that Ven-a-Care put on the document
15 Original Complaint filed on about June 23, 1996.
16 I believe that's incorrect for the record, that
17 it is 1995, inasmuch as the civil case number is
18 a '95 case number.
19         MS. MARTINEZ: Do you have an extra
20 copy that counsel for Ven-a-Care could use?
21         MR. COOK: Absolutely.  Absolutely.
22         MS. THOMAS: Thank you.

Page 76

1          MR. COOK: Does anybody else need a
2  copy?  I would love to get rid of them so I don't
3  have to carry them back.
4          BY MR. COOK:
5     Q   If you could just take a quick
6  moment, I realize that's a lengthy document but
7  take a look at it and tell me whether you've ever
8  seen that document before?
9          MS. THOMAS: You might want to
10 clarify whether you mean, whether she's ever seen
11 this document that may or may not have had these
12 redactions.
13         MR. COOK: Okay.
14         THE WITNESS: No.  I've never seen
15 this before.
16         BY MR. COOK:
17    Q   Either with or without the
18 redactions?
19    A   No.
20    Q   And just for the record, on page 69,
21 it indicates that it was served on June 23 of
22 1995.

Page 77

1          To the best of your knowledge,
2  Ms. Robey, did CMS institute any document
3  preservation instruction in connection with this
4  complaint that was filed on June 23, 1995?
5     A   Not that I'm aware of.
6     Q   Going back to the February 19, 2004
7  memorandum included within Exhibit Abbott 069, are
8  you aware of any subsequent memoranda that were
9  issued relating to the litigation described in
10 this February 19, 2004 memorandum regarding
11 preservation of documents?
12    A   There was one after this in January
13 of 2007, I believe.
14    Q   And what did that one -- again, is
15 that a privileged communication?
16         MS. MARTINEZ: Objection to the
17 extent it calls for privileged communication.
18 You may be able to ask her if she has information
19 from anybody who is a nonlawyer regarding that.
20         BY MR. COOK:
21    Q   Just sticking with the memorandum and
22 then moving on to information from a nonlawyer,

Page 78

1  do you remember from whom the January 2007
2  memorandum was from?
3      A    It was from our program area -- I'm
4  trying to remember the lady's name, Mary Beth --
5  Mary Beth Jason, I think.  I'm not sure about the
6  last name.
7      Q    Is she an attorney?
8      A    No.
9      Q    Without describing the contents of
10 the memorandum, can you describe generally what
11 the nature of the document was?
12         MS. THOMAS:  Objection.
13         MS. MARTINEZ:  If you would focus
14 your question with respect, if she has any
15 information from a nonlawyer regarding whether or
16 not that document instructed anyone to preserve,
17 you might be able to get an answer that is
18 helpful.
19         BY MR. COOK:
20     Q    Do you have any information from a
21 nonlawyer that would indicate whether that
22 document was intended to preserve documents

Page 79

1  relating to litigation?
2      A    Yes, I do.
3      Q    From whom do you have that
4  information?
5      A    It is from Mary Beth, I think the
6  last name is Jason.
7      Q    She was the author of the memorandum?
8      A    I believe so, yes.
9      Q    Is this a conversation you had with
10 Ms. Jason?
11     A    A conversation as well as a copy of
12 the correspondence.
13     Q    Do you remember when and where this
14 conversation took place, approximately?
15     A    I talked with her yesterday as well
16 as in the past where she contacted me regarding
17 the agency's policy on retention.
18     Q    As best you can recall, what did you
19 say to Ms. Jason, what did she say to you in the
20 earlier conversations?
21     A    I can't remember.
22     Q    Do you remember the nature of the

Page 80

1  conversation?
2      A    It was with regard to preservation --
3  not preservation but what the agency's policy was
4  on retention and the appropriate way to word
5  records management language in notice about
6  preservation.
7      Q    So, she called with a question?
8      A    Yes.
9      Q    And you answered her question?
10     A    Yes.
11     Q    A long conversation?  Short
12 conversation?
13     A    I can't remember.  It was before the
14 holidays.
15     Q    But she called to ask you about how
16 one would go about drafting a document
17 preservation or a hold memorandum?
18     A    She wanted records management
19 language to use.  She didn't -- I did not -- I --
20 I didn't give her content.  I just talked with
21 her and gave her instructions.
22     Q    And what was your understanding about

Page 81

1  why she was asking this question of you?
2      A    Because she was going to be preparing
3  correspondence that was being released about
4  preservation.
5      Q    Do you know why she was going to send
6  out correspondence relating to preservation at
7  that time?
8      A    She did not go into that with me.
9      Q    You say just before the holidays.
10 This would have been December of '96?
11         MS. THOMAS:  Objection.
12         THE WITNESS:  Oh. I'm talking -- no.
13         BY MR. COOK:
14     Q    You said January of 2007.  That's why
15 I had my dates off.  About when was this
16 conversation, I should ask you?
17     A    It was before the holidays in 2006.
18     Q    Okay.  So, before the Christmas
19 holidays of 2006?
20     A    I believe, yes.
21     Q    So, it would have been November,
22 December of 2006?

21 (Pages 78 to 81)

Page 82

```
 1    A   I can't remember.
 2    Q   But within the last five months, six
 3   months?
 4    A   Maybe.
 5    Q   Okay.  I just wanted to make sure I
 6   had the right year, that I wasn't off by 12
 7   months.
 8    A   You just said '96 before that.
 9    Q   Right.  So, before the holidays,
10   December of --
11    A   But you said 1996.
12    Q   I'm so old that '96 and 2006 seem
13   like the same year.  I apologize.  I didn't even
14   understand it when you told me I had it wrong.
15   So, 2006.
16    A   Okay.
17    Q   Within the last half a year?
18    A   (Witness nods head.)
19    Q   Is there any way you would figure out
20   when that conversation took place?
21    A   No.
22    Q   As the records management officer for
```

Page 83

```
 1   the CMS home office had -- let me strike that and
 2   step one step back.  Do you know what litigation
 3   she was asking in connection with?
 4    A   I can't remember.  I get hundreds of
 5   calls.
 6    Q   The case about which Ms. Jason --
 7    A   Mary Beth, I think the last name is
 8   Jason.  The first name is Mary Beth.
 9    Q   The case about which Mary Beth
10   contacted you before the holidays in 2006, was
11   that a case about which anybody, to your memory,
12   had contacted you before?
13        MS. THOMAS:  Objection.
14        THE WITNESS:  I can't remember.
15        BY MR. COOK:
16    Q   And without revealing any of the
17   substance of it, did a memorandum subsequently
18   come out from Mary Beth?
19    A   Yes.
20    Q   To whom was it addressed?
21    A   I can't remember.
22    Q   Did it describe -- did it relate
```

Page 84

```
 1   specifically to a particular litigation?
 2    A   Yes.
 3    Q   Prior to that memorandum being
 4   distributed, without revealing the contents of
 5   that of that memorandum, had there ever been any
 6   prior communications within CMS relating to
 7   document preservations in connection to that
 8   case?
 9        MS. MARTINEZ:  Objection to the
10   extent that she knows.
11        MR. COOK:  Sure.
12        BY MR. COOK:
13    Q   To the extent that you are aware of
14   as the records officer for CMS, had there ever
15   been any prior records preservation directions
16   issued relating to that case that was the subject
17   of Mary Beth's memorandum?
18    A   Yes.
19    Q   When was that?
20    A   Early 2003, late 2004.
21    Q   So, it is your understanding that
22   those two cases were somehow connected?
```

Page 85

```
 1    A   Yes.
 2    Q   The same case or connected?
 3    A   I just associated it because of
 4   information that was provided in the subject
 5   line.
 6    Q   Okay.
 7    A   I'm not an expert on that.
 8    Q   And I understand completely.  Other
 9   than the 2003-2004 prior preservation memo, and
10   that's the one we have here at pages 5 through 7,
11   correct -- yes, 5 through 7.
12    A   Yes.
13    Q   Other than that February 19, 2004
14   communication, had there ever, before that, been
15   any preservation instructions issued in
16   connection with that case?
17    A   Not that I'm --
18        MS. THOMAS:  Objection.
19        THE WITNESS:  Not that I'm aware of.
20        THE REPORTER:  Counsel, is this a
21   good time to take a recess?
22        MR. COOK:  I'd be happy to.  Thank
```

126bfa54-4e4e-49ff-85e7-999d676a1331

Page 138

1  litigation hold being placed on any boxes in the
2  warehouse as a result of the January 2007 memo
3  from Mary Beth Jason?
4       A    No.
5       Q    Are any boxes in the warehouse
6  currently subject to a litigation hold?
7            MS. THOMAS:  Objection.
8            THE WITNESS:  Yes, MSP.
9            BY MR. COOK:
10      Q    Other than MSP, are there any
11 litigation holds currently in place in the
12 warehouse?
13           MS. THOMAS:  Objection.
14           THE WITNESS:  There may be.  I won't
15 -- don't know without looking at my records.
16           BY MR. COOK:
17      Q    But not that you remember right now?
18      A    No.
19      Q    I'd like to turn to the Federal
20 Records Center.
21      A    Okay.
22      Q    What is the manual process of sending

Page 139

1  records to the Federal Records Center?
2       A    The record owner has eligible records
3  in accordance with the record schedule that they
4  want to send to storage that are no longer active
5  files.  They request the storage boxes from me.
6  I provide them the boxes.  They box up their
7  files.  They do an inventory of what is in each
8  box.  They prepare a record transmittal receipt
9  for that to me electronically.  I send that to
10 the Records Center for approval.
11           Once they send back an approved copy
12 of the transmittal sheet, I put that in box
13 number one and then the records are sent to the
14 Federal Records Center.
15      Q    What information is sent to the
16 Federal Records Center along with the physical
17 box of documents?
18      A    The records transmittal receipt which
19 provides contact information, who the record
20 owner is, our agency information, the accession
21 number, the number of boxes that are being sent,
22 a description, the disposition authority, as well

Page 140

1  as the disposal date and then attached to that is
2  the box inventory.
3       Q    If that box -- if you or someone at
4  CMS want to retrieve that box, how would you go
5  about doing it?
6       A    Electronically, I am hooked into a
7  server where I can order the boxes.  They process
8  it within 24 hours, and the Records Center
9  receives the request, pulls the box, and then
10 ships it to me.
11      Q    Are you -- do you have access to a
12 record of all boxes sent to the Federal Records
13 Center by CMS and all boxes retrieved from the
14 Federal Records Center at CMS?
15      A    I have -- not retrieved.  I have a
16 record of everything that is at the Federal
17 Records Center.  I'm sorry.  I'm wrong.  I have
18 my -- I keep an internal log of records that have
19 been requested from the Records Center and then
20 returned.
21      Q    Okay.  So, you have your own traffic
22 log of what went out, what came back, what went

Page 141

1  back?
2       A    Yes.
3       Q    And similar to -- step back a
4  minute -- the warehouse, do you keep a similar
5  log of retrieval requests and returns for the CMS
6  warehouse?
7       A    It's maintained in the database.
8       Q    It is?  Okay.  So, if I have a line
9  with accession box number one from Louie Gabel,
10 disposition date, given to me on stuff and such a
11 date, retrieved on another date and returned back
12 to me on the following date?
13      A    That information is available but
14 it's not in one report.  You would have to go
15 into several different screens to get it.
16      Q    Okay.  At the Federal Records Center,
17 do you know if the Federal Records Center keeps
18 also a log of comings and goings of the boxes for
19 which it maintains custody?
20      A    I don't know.
21      Q    Do you have any way of knowing what
22 happens to a box at the Federal Records Center

Page 142

```
 1  when the disposal date arrives?
 2      A    No.
 3      Q    Do you know whether a similar
 4  communication to the custodian goes out from the
 5  Federal Records Center when the disposal date
 6  arrives?
 7      A    Yes, it does.
 8      Q    What's included in that
 9  communication?
10      A    The accession number, the box number,
11  the description, the disposal date.  It is a form
12  about the size of an envelope, and it is on --
13  computer generated form and they send it out to
14  -- they all come to me.  They don't go into each
15  specific record owner.
16      Q    Once you receive it, what happens?
17      A    Then I go back to my records to find
18  out who the record owner is because that
19  information is not on the form that the Records
20  Center sends me, and I either send an e-mail or I
21  generate a disposal notice and put it in our
22  interoffice mail and send it to the record owner.
```

Page 143

```
 1      Q    If the record owner indicates that
 2  the documents still should be kept for a longer
 3  period of time, what happens?
 4      A    I then -- I make the annotation on my
 5  hard copy of the records transmittal sheet that
 6  they sent to me initially when they wanted to do
 7  the records transfer.  I mark the new disposal
 8  date on there and then I send an e-mail to the
 9  Federal Records Center notifying them that we
10  need to defer disposal to a later date and
11  provide them the justification why.
12      Q    You've got the next question.  Is it
13  purely at the record owner's discretion or must
14  it be justified in some way?
15      A    It has to be justified.
16      Q    What are acceptable justifications
17  for continued retention of documents at the
18  Federal Records Center?
19      A    If it is litigation, if it's subject
20  to FOIA, if there are any privacy issues
21  involved, I mean, there's a multitude of reasons
22  why the date -- the disposal date can be
```

Page 144

```
 1  deferred.
 2      Q    And with respect to documents within
 3  the CMS warehouse, is it the same reasons or a
 4  different set of justifications?
 5      A    Same reasons.
 6      Q    What happens if a custodian is no
 7  longer with the agency when the notice comes out
 8  from the Federal Records Center that the disposal
 9  date has arrived?
10      A    Then I have to find the new person
11  who is taking over.  Usually, what I do is get in
12  contact with the administrative executive
13  officer.  Each of the centers and offices within
14  CMS has a designated person who handles all
15  executive type areas for their boss.  I contact
16  them.  I give them a description of what the
17  records are, and then they point me in the right
18  direction as to which office would be the best to
19  address the issue.
20      Q    The same is true for the CMS
21  warehouse?
22      A    Yes.
```

Page 145

```
 1      Q    I don't know if this has ever
 2  happened, but what if the agency doesn't provide
 3  any response to the Federal Records Center?  What
 4  happens to the documents?
 5      A    They continue to keep them.  They
 6  have to receive a signed notice authorizing the
 7  disposal of the records.  Otherwise, they will
 8  continue to keep them.  And I operate the same
 9  way.
10      Q    So, for every document that has been
11  destroyed by either the CMS warehouse or the
12  Federal Records Center, there should be -- at one
13  point, there should have been a signed
14  authorization authorizing the destruction of that
15  document?
16      A    Yes, either signed authorization or
17  e-mail, giving approval to destroy.
18      Q    How long are those approvals kept?
19      A    I have them all.
20      Q    All.  Once authorization is received
21  at the CMS warehouse to destroy a document, how
22  quickly are they destroyed?
```

37 (Pages 142 to 145)

Page 146

```
 1     A    They are usually destroyed within a
 2   week.
 3     Q    And from the Federal Records Center,
 4   do you know how quickly the Federal Records
 5   Center moves to dispose?
 6     A    No, I don't.
 7     Q    Have you been asked to search your
 8   database with respect to the destruction of
 9   documents in connection with this case?
10     A    No.
11     Q    Have you been asked to search for
12   what records you have within the CMS warehouse
13   for any names in connection with this case?
14     A    No.
15     Q    So, for example, to pick a name, Tom
16   Scully, who was administrator of CMS in, I guess,
17   around 2000, 2001, do you have documents in the
18   CMS warehouse for which he would be the
19   custodian?
20     A    He would not be the custodian.
21   Whoever prepares the records for storage.  He
22   would be listed as the supervisor or the person
```

Page 147

```
 1   that has responsibility for those records.
 2     Q    Okay.  So, we'll call that guy John
 3   Doe.  There is a John Doe out there who has
 4   responsibility for the records in Tom Scully's
 5   office.
 6     A    Uh-huh.
 7     Q    In connection with this case, have
 8   you been asked to determine whether there are any
 9   boxes within the CMS warehouse that were -- for
10   whom John Doe is the custodian?
11     A    No.
12         MS. MARTINEZ:  Objection to form.
13         BY MR. COOK:
14     Q    Or documents that were destroyed for
15   which John Doe was the custodian?
16     A    No.
17         MS. MARTINEZ:  Objection to form.
18         BY MR. COOK:
19     Q    How would I go about determining who
20   the custodian of records would be for the
21   administrator of HCFA?
22     A    I don't know; whoever in the
```

Page 148

```
 1   administrator's office prepares the records for
 2   storage.
 3     Q    And it doesn't -- even if -- if John
 4   Doe is acting on behalf of Tom Scully, he
 5   wouldn't put Tom Scully -- for example, my
 6   secretary creates a document on the system for
 7   me.
 8     A    Uh-huh.
 9     Q    She puts my employee number on it
10   because it's my document.  In your system, what
11   you're saying is it wouldn't show Tom Scully's
12   name.  It would show John Doe's name?
13     A    Yes.
14     Q    At what level of seniority is that
15   true within CMS?
16         MS. MARTINEZ:  Objection to form.
17          MS. THOMAS:  Objection.
18         BY MR. COOK:
19     Q    In your experience?
20     A    Each office operates differently.
21     Q    Okay.  So, it is up to the local
22   office who is going to be responsible for sending
```

Page 149

```
 1   stuff off to storage and in what name?
 2     A    Yes.
 3     Q    You just receive it with a CMS
 4   employee's name on it and that's the person you
 5   go back to and put in the database?
 6     A    Correct.
 7     Q    The same is true for Federal Records
 8   Center, that you've not been asked to identify or
 9   retrieve boxes in the Federal Records Center
10   custody relating to this case?
11     A    Yes.
12         MS. THOMAS:  Objection.
13         BY MR. COOK:
14     Q    How many boxes do you have in the CMS
15   warehouse?
16     A    Close to 6,000.
17     Q    So, for human beings a lot, for a
18   computer, a pretty manageable number?
19         MS. MARTINEZ:  Objection to form.
20         MR. COOK:  You are right.  That's a
21   silly question.
22         THE WITNESS:  You lost me.
```

                                              38 (Pages 146 to 149)