# EXHIBIT D

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                        New York, NY

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

    --------------------------------X  MDL NO. 1456

    IN RE:  PHARMACEUTICAL INDUSTRY     :  CIVIL ACTION:

    AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

    --------------------------------X

    THIS DOCUMENT RELATES TO:           :

    U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

    Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

    Laboratories, Inc.                  :

    --------------------------------X


                IN THE CIRCUIT COURT OF

                MONTGOMERY COUNTY, ALABAMA

    --------------------------------X

    STATE OF ALABAMA,                   :  CASE NO.

            Plaintiff,                  :  CV-05-219

        v.                              :

    ABBOTT LABORATORIES, INC.,          :  JUDGE

    et al.,                             :  CHARLES PRICE

            Defendants.                 :

    --------------------------------X

                Henderson Legal Services
                    202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
2  ----------------------------------X
3  STATE OF WISCONSIN,         : CASE NO.
4       Plaintiff,        : 04-CV-1709
5    v.           :
6  AMGEN INC., et al.,          :
7       Defendants.       :
8  ----------------------------------X
9
10       IN THE COURT OF COMMON PLEAS
11          FIFTH JUDICIAL CIRCUIT
12  ----------------------------------X
13  STATE OF SOUTH CAROLINA, and   :   STATE OF
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA
15  capacity as Attorney General for  :   COUNTY OF
16  the State of South Carolina,    :   RICHLAND
17       Plaintiff,        :
18    v.           : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.     : 07-CP-40-0283
20       Defendant.        :
21  ----------------------------------X
22

**Page 4**

1       IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2             STATE OF MISSOURI
3  - - - - - - - - - - - - - - - - - -x
4  STATE OF MISSOURI, ex rel.,    :
5  JEREMIAH W. (JAY) NIXON,      :
6  Attorney General,        :
7  and              :
8  MISSOURI DEPARTMENT OF SOCIAL     :
9  SERVICES, DIVISION OF MEDICAL     : Case No.:
10  SERVICES,          : 054-1216
11       Plaintiffs,       : Division
12              : No. 31
13    vs.           :
14  DEY INC., DEY, L.P., MERCK KGaA,  :
15  EMD, INC., WARRICK         :
16  PHARMACEUTICALS CORPORATION,     :
17  SCHERING-PLOUGH CORPORATION, and  :
18  SCHERING CORPORATION,       :
19       Defendants.       :
20  - - - - - - - - - - - - - - - - - -x
21
22

| Page 3 | Page 5 |
|---|---|

**Page 3**

1       IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2          IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  - - - - - - - - - - - - - - - - - -x
6  VEN-A-CARE OF THE FLORIDA     :
7  KEYS, INC., a Florida       :
8  Corporation, by and through its   :
9  principal officers and directors, :
10  ZACHARY T. BENTLEY and       :
11  T. MARK JONES,           :
12       Plaintiffs,       :
13    vs.           : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN   : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM   : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES   : Gary
18  LTD., TEVA PHARMACEUTICAL USA;    :
19  and WATSON PHARMACEUTICALS, INC.  :
20       Defendants.        :
21  - - - - - - - - - - - - - - - - - -x
22

**Page 5**

1          New York, New York
2          Friday, May 4, 2007
3
4
5       Videotaped Deposition of BRUCE C.
6  VLADECK, Ph.D., a witness herein, called for
7  examination by counsel for Abbott Laboratories in
8  the above-entitled matter, pursuant to Subpoena,
9  the witness being duly sworn by JOMANNA DEROSA, a
10  Notary Public in and for New York, taken at the
11  offices of Jones Day, 222 East 41st Street, New
12  York, New York, at 8:38 a.m. on Friday, May 4,
13  2007, and the proceedings being taken down by
14  Stenotype by JOMANNA DEROSA, and transcribed under
15  her direction.
16
17
18
19
20
21
22

2 (Pages 2 to 5)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Page 98

1  a.m. We're going off the record, continuing with
2  Tape No. 2.
3       (Recess taken.)
4       THE VIDEOGRAPHER: The time is 10:22
5  a.m. We're going back on the record, continuing
6  with Tape No. 2.
7       Q.  I think you were in the middle of
8  answering a question about whether you had any
9  professional involvement in drug reimbursement
10 policy after leaving as administrator of HCFA in
11 1997.
12      MS. BROOKER: Objection. Form.
13      A.  And I believe I was talking about some
14 of the public discussion surrounding the
15 enactment of the Medicare Prescription Drug
16 Benefit in 2003. And I may have opined publicly
17 in a general way about pricing issues, although I
18 don't recall any specific instances.
19      Q.  And so, when you were contacted by
20 counsel for Ven-A-Care -- in about 2003?
21      A.  I believe so.
22      Q.  Do I have that time correct?

Page 99

1       That would have been the first time,
2  since leaving as administrator of HCFA, that
3  you've had any professional involvement in the
4  question of Medicare and Medicaid reimbursement
5  for prescription drugs?
6       A.  That's correct.
7       Q.  Returning just for a minute to your
8  conversations with counsel for Ven-A-Care and the
9  Texas Attorney General, at that time, to your
10 knowledge, was the Department of Justice aware of
11 your conversations with the Texas Attorney
12 General and Ven-A-Care?
13      MS. BROOKER: Objection. Form.
14      A.  My understanding was that the
15 Department of Justice was aware of the case and
16 that there were similar cases around the country,
17 of which the Department of Justice was aware.
18 But whether anyone in the Department of Justice
19 was aware of the specifics of my engagement or
20 any conversations I might have had with counsel
21 in conjunction with that case, I have no idea.
22      Q.  It's fair to say that you didn't

Page 100

1  receive a letter from the Department of Justice
2  prohibiting you from talking to counsel for Ven-
3  A-Care or the Texas Attorney General.
4       Correct?
5       MS. BROOKER: Objection. Form.
6       Go ahead.
7       A.  Yes.
8       Q.  In your conversations with Ven-A-Care
9  and the -- the Texas Attorney General, did
10 anybody advise you whether the Department of
11 Justice was aware of your conversations with
12 those parties?
13      MS. BROOKER: Objection. Form.
14      A.  I believe, again, that I learned that
15 the Department of Justice was aware of the
16 litigation, but the degree of involvement, the
17 knowledge of specific activities, I don't recall
18 having been told.
19      Q.  Since that time, have you learned
20 whether or not the Department of Justice was
21 aware of your work for Ven-A-Care and Texas?
22      MS. BROOKER: Objection. Form.

Page 101

1       A.  In -- early in my conversations with
2  Ms. Brooker in the last number of weeks, it -- I
3  learned that they were aware of my involvement in
4  that case.
5       Q.  While you were administrator of HCFA,
6  Dr. Vladeck, did you generate any documents?
7       A.  Did I generate any documents?
8       Q.  Yes, sir. It's a broad question.
9       A.  Some, yes.
10      Q.  Okay. Can you generalize what -- what
11 type of -- of documents you personally generated
12 as the administrator of HCFA?
13      MS. BROOKER: Objection. Form.
14      A.  I would say that I was responsible for
15 the original version of almost no documents
16 during that period, but there would have been
17 memoranda, or in some instances letters to the
18 Secretary, to the President, perhaps to other
19 senior officials in the administration, that I
20 might well have generated personally.
21      There were certainly issues having to
22 do with internal administration, appointments,

26 (Pages 98 to 101)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                May 4, 2007
                        New York, NY

Page 102

1  reassignments, things of that, that I would have
2  generated directly.
3      Q.  How about notes of meetings?
4      A.  I'm not much of a note taker.
5      Q.  E-mail?
6          MS. BROOKER:  Objection.  Form.
7      A.  I am an extensive e-mailer, so --
8      Q.  And did you use e-mail while you were
9  the administrator of HCFA?
10     A.  Yes.
11         MS. BROOKER:  Objection.  Form.
12         THE WITNESS:  Sorry.
13     Q.  What was your e-mail address?
14     A.  That's a good question.  I don't
15  recall.
16     Q.  But you personally were e-mailing.  It
17  wasn't an assistant who was e-mailing on your
18  behalf?
19         MS. BROOKER:  Objection.  Form.
20     A.  No.  I was personally reading and
21  writing lots of e-mails.
22     Q.  Do you know what efforts, if any, were

Page 103

1  made to either preserve or not preserve your e-
2  mail traffic while administrator of HCFA?
3          MS. BROOKER:  Objection.  Form.
4      A.  My understanding was, under the
5  relevant statutes, that all e-mails to and from
6  me, in my position as administrator, were
7  archived and preserved at two levels.  There was
8  a 30-day or 60-day active archive, and then there
9  was a permanent repository.
10     Q.  Do you know where the permanent
11  repository of your e-mail traffic could be found?
12     A.  No.
13     Q.  Do you know who would be responsible
14  for that?
15     A.  There is a records officer at what is
16  now the Centers for Medicare and Medicaid
17  Services, the renaming of HCFA, who, I believe,
18  would have the legal responsibility and authority
19  to superintend those records.
20     Q.  And any paper records that you
21  generated, memos, letters, whatever, do you know
22  what would have happened to those?

Page 104

1          MS. BROOKER:  Objection.  Form.
2      A.  Similarly, I believe all such documents
3  were archived, but the physical arrangements
4  under which they're archived, I have no idea.
5      Q.  Before getting into the substance of --
6  of your work with drug reimbursement policies,
7  Dr. Vladeck, I'd like to try to figure out who
8  you worked with while at HCFA on -- on those
9  issues.
10         Can you tell me, was there a particular
11  person with whom you had primary communications
12  within HCFA on drug reimbursement policy?
13         MS. BROOKER:  Objection.  Form.
14     A.  They were very separate.  It was always
15  the case at HCFA on Medicare and Medicaid
16  policies.  The principal Medicaid drug pricing
17  expert, drug reimbursement expert during most of
18  my tenure was an expert in the Medicaid Bureau by
19  the name of Randall Graydon.
20     Q.  How do you spell Graydon?
21     A.  G-R-A-Y-D-O-N.  His supervisor, with
22  whom I worked the most closely, although I don't

Page 105

1  recall specifically on these issues, would have
2  been Rozann Abato, who was deputy director of the
3  Medicaid Bureau.
4      Q.  How do you spell Abato?
5      A.  A-B-A-T-O.
6          On the Medicaid issues, the principal
7  person with whom I would have worked would have
8  been Tom Hoyer, H-O-Y-E-R, who was in charge of
9  the hodgepodge of -- Medicare reimbursement for a
10  hodgepodge of services other than the hospitals
11  and physicians.  And his supervisor, with whom I
12  also would have discussed these issues, was
13  Thomas Ault, A-U-L-T, who was deputy director and
14  then director of what was then the Policy Bureau.
15         Tom's supervisor was Kathy Buto, B-U-T-
16  O, who was head of the Policy Bureau, and then an
17  associate administrator.
18         And in '96 and '97, the issue of
19  Medicare reimbursement for prescription drugs
20  took on a legislative component.  And so, I would
21  also have been in conversation with folks on the
22  legislative staff.

27 (Pages 102 to 105)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
New York, NY

Page 262

1   principle liaison with OIG.  So, it probably
2   would have been that official plus people from
3   some of the other parts of the agency that had
4   particular concerns or particular agenda issues
5   or things of that sort.  Undoubtedly, someone
6   from our financial management office as well
7   would have participated.
8        Q.   And who was the director of the Office
9   for Program Integrity?
10       A.   The first director was Judith Berik.
11   She was director from '94 through mid-to late
12   '96.  I believe he was succeeded by Linda Ruiz.
13       MS. BROOKER:  How do you spell that
14   last name?
15       THE WITNESS:  Berik is B-E-R-I-K.  Ruiz
16   is R-U-I-Z.
17       A.   I think that was it during my tenure.
18       Q.   We have a number of letters that I
19   would like to show that were addressed to you
20   from Ven-A-Care.  Before pulling them out --
21   well, let me pull them out and put them in front
22   of you so you can recall them.

Page 263

1        The first is very lengthy, and I
2   apologize, but we're only going to be talking
3   about the first few pages of this very lengthy
4   document.  And so this will be Exhibit Abbott
5   160. I'll ask the court reporter to mark that and
6   hand it to you.
7        (Exhibit Abbott 160, Exhibit
8   Abbott 161, Exhibit Abbott 162, and Exhibit
9   Abbott 163 marked for identification.)
10       (Discussion off the record.)
11       MR. COOK:  For the record, we'll put
12   the following exhibits and then I'll hand them to
13   Dr. Vladeck.  First is an October 2nd, 1996,
14   letter from Ven-A-Care to Dr. Vladeck.  Its
15   Exhibit Abbott 160.  The second is a December 3,
16   1996, letter from Ven-A-Care to Thomas Hoyer.
17   It's numbered Exhibit Abbott 161.
18       August 13, 1997, letter from --
19   addressed to Dr. Vladeck from Ven-A-Care.  Its
20   Exhibit Abbott 162.
21       Next is a July 10, 1997, letter from
22   Ven-A-Care to Dr. Vladeck.  It's Exhibit Abbott

Page 264

1   163.
2        Q.   And I'll hand all of those to Dr.
3   Vladeck and ask you to take a quick look.
4        A.   Thank you.  This document is dated June
5   12th with a cover sheet to the Inspector General.
6   I don't have a number on it.
7        MS. BROOKER:  We don't have a June 12th
8   one.
9        MR. COOK:  I'm sorry.  It's at the top.
10   It's been previously marked as Exhibit Abbott
11   017, a June 12, 1997, letter from Bruce Vladeck
12   to Ven-A-Care, with a cover fax sheet from Zach
13   Bentley and Mark Jones to June Gibbs Brown.
14       Q.   Dr. Vladeck, I would like to turn first
15   to the October 2, 1996 letter.  It's with the
16   large exhibit, and it's marked Exhibit Abbott
17   160.  And I'm going to focus just on the first
18   few pages of that very large exhibit, which is
19   the actual letter from Zach Bentley and Mark
20   Jones at Ven-A-Care to you on October 2,1996.
21       First, have you ever seen this letter
22   before?

Page 265

1        A.   I have.
2        Q.   When do you recall first seeing this
3   letter?
4        A.   I -- I honestly don't recall whether I
5   saw it in -- in '96.  I may have.  I'm certain I
6   saw it when I was engaged by Mr. Azorsky in 2003.
7   I've seen it on a number of occasions since, but
8   during that time I tried to remember whether I
9   saw it in '96 and I -- I'm not certain one way or
10   another.
11       Q.   If you did not see it in October --
12   whether or not you saw it in October of 1996,
13   what would have been the typical process for
14   handling this sort of correspondence coming in to
15   you as administrator of HCFA?
16       A.   I'm not sure this would have received
17   the typical process because of the heading at the
18   top that it was sensitive and under court seal
19   and so forth.  It might, therefore, have been
20   routed in the first instance to counsel's office.
21   Had it not been, it would have probably been
22   routed to the Department of Integrity Office by

67 (Pages 262 to 265)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                    New York, NY

Page 266

1  the agency's executive secretary to prepare a
2  response for my signature or something of that
3  sort.
4     Q.  How would we go about determining, 11
5  years later, how this document and its contents
6  were circulated within HCFA in 1996?
7        MS. BROOKER: Objection. Form.
8     A.  If there were ever a response received
9  from anywhere in the agency, a written response
10 by Ven-A-Care, one could track the letter back
11 through a correspondence file.  If there was no
12 follow-up I think one would have to work
13 backwards from the correspondence and associated
14 -- documents associated with it as they made
15 their way through the agency.
16    Q.  And so, to the extent that there was a
17 response, there would be a way from tracking from
18 the response to the documents supporting that
19 response?
20       MS. BROOKER:  Objection, form.
21    A.  There should be.
22    Q.  Was that your understanding of how

Page 267

1  correspondence was kept at HCFA?
2     A.  To the extent there was a response,
3  there should be a way of working backwards from
4  that to the initial incoming document and the
5  intermediate documents generated in the process
6  of preparing a response.
7        MR. COOK:  I'll ask the court reporter
8  to mark as Exhibit Abbott 164.
9          (Exhibit Abbott 164 marked for
10 identification.)
11    Q.  Could you take a look at that and tell
12 me if you've seen that document before?
13    A.  No, I don't believe so.
14       MR. COOK:  For the record, this is a
15 December 17, 1996, letter from Kathleen Buto to
16 T. Mark Jones of Ven-A-Care of the Florida Keys.
17    Q.  Does this appear to be the response
18 from Kathleen Buto to Mr. Jones following the
19 October 2, 1996, letter to you?
20       MS. BROOKER:  Objection, form.
21    A.  It would appear to be that, yes.
22    Q.  And at the end of the first paragraph

Page 268

1  when it says the administrator referred the
2  letter to Ms. Buto and payment policy is one of
3  her areas of responsibility, would that be
4  consistent with your regular practice and
5  procedure of handling correspondence such as
6  this?
7     A.  Again, I wouldn't have personally done
8  that but, yes, that would have made its way to
9  Kathy, yes.
10    Q.  And to the extent that someone within
11 HCFA was to be put on notice of facts contained
12 within the correspondence from Ven-A-Care, is it
13 fair to say that Ms. Buto is the one person most
14 responsible for Medicare drug payment policy at
15 this time within HCFA?
16    A.  Yes, it would be.
17    Q.  The letter from Ven-A-Care dated
18 October 2, 1996, ends with Mr. Bentley and Mr.
19 Jones stating that they would be happy to meet
20 with you and answer any questions or concerns
21 about the issues raised in the letter?  Did you
22 ever meet with Mr. Jones or Mr. Bentley?

Page 269

1     A.  No, I don't believe so.
2     Q.  The letter begins at the beginning of
3  Exhibit Abbott 160 that Ven-A-Care of the Florida
4  Keys -- and it reads:
5         "Has attempted for more than seven
6  years to assist the health care financing
7  administration" -- regarding the issues in that
8  letter.
9         Do you know what, if anything, Ven-A-
10 Care did for seven years prior to 1996?
11       MS. BROOKER: Objection, form.
12    A.  Again, other than some of the earlier
13 activities described in the letter itself, I had
14 no independent knowledge of anything about Ven-A-
15 Care.
16       MR. BREEN:  I was not looking at the
17 document.  I want to pose a form objection to the
18 last question and response now that I've looked
19 at what you're referring to as an exhibit.
20    Q.  The second page of the letter lists a
21 number of Office of Inspector General reports.  Do
22 you recall you and I looked at a report from 1992

68 (Pages 266 to 269)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                May 4, 2007
                      New York, NY

Page 270

1  that talked about the invoice price of vancomycin
2  by dialysis providers?
3       A.  Yes, we did.
4       Q.  Can you tell me, does it appear that
5  that particular OIG report is not listed by Ven-
6  A-Care in the OIG reports that it enumerates
7  there for you?
8       MS. BROOKER:  Objection to form.
9       A.  The list of IG reports on Page 2 does
10 not contain the report we were discussing about
11 earlier -- discussing earlier.
12      Q.  In the paragraph that follows, the
13 letter-writers from Ven-A-Care state in this
14 letter to you -- and I'll read it:
15      "Over a year ago we traveled to the
16 HCFA in Baltimore and made a detailed
17 presentation regarding these excessive
18 reimbursements and their impact on the health
19 care delivery system."
20      Do you know anything about whether Ven-
21 A-Care made a trip to Baltimore and met with HCFA
22 officials?

Page 271

1       A.  Other than the assertion in the letter,
2  that's all I know.
3       Q.  So you don't recall ever talking to
4  anybody within HCFA about meetings with Ven-A-
5  Care in approximately 1995?
6       A.  No, I don't.
7       Q.  The next sentence asserts that:
8       "No meaningful action has been either
9  proposed or implemented by your agency to deal
10 with these issues."
11      Would you agree that as of October of
12 1996 no meaningful action had been proposed or
13 implemented by HCFA --
14      MS. BROOKER:  Objection.
15      Q.  -- to deal with the issues described in
16 this letter?
17      MR. BREEN:  Objection, form.
18      A.  I would not agree.  Again, we had
19 proposed to change the Medicare Part B drug
20 pricing methodology.
21      Q.  On Page 5 of the letter in the second
22 paragraph, the last sentence of the second

Page 272

1  paragraph reads:
2       "Our company has been solicited on
3  numerous occasions by drug manufacturers who brag
4  about their use of falsely inflated pricing
5  information as a reason for purchasing their
6  product over a competitors with a lower AWP."
7       First of all, do you have any idea
8  whether or not Ven-A-Care's allegation here is
9  true?
10      MS. BROOKER:  Objection to form.
11      A.  I have no independent information about
12 that.
13      Q.  But you would agree with me that as of
14 October 2, 1996, Kathleen Buto at least was aware
15 that that was an allegation that Ven-A-Care was
16 making.
17      A.  I would say that whoever in the agency
18 actually read this letter and looked at the
19 material would have been aware of the allegation,
20 yes.
21      MR. COOK:  And then the next letter, in
22 terms of sequencing of date, is Exhibit Abbott

Page 273

1  161, which is a December 3 letter to Thomas
2  Hoyer, H-O-Y-E-R, Office of Chronic Care and
3  Insurance Policy.  And it's marked Exhibit Abbott
4  161.
5       Q.  Do you recognize that, Mr. Vladeck?
6       A.  No, I don't.  I don't believe I've seen
7  it before today.
8       Q.  Who is Tomas Hoyer?
9       A.  Tom was the director, again, in charge
10 of essentially Medicare reimbursement for
11 everything other, but hospitals and physician.
12      Q.  So Thomas Hoyer would be responsible
13 for reimbursement for infusion therapy, for
14 example?
15      A.  He was certainly responsible for home
16 care and DME reimbursement policies.
17      Q.  The next letter in -- going again date
18 sequence is, I believe -- tell me if I'm wrong --
19 what we've previously marked as Exhibit Abbott
20 017, a June 12, 1997, letter to you?
21      A.  Yes.
22      Q.  Do you recall that letter, Dr. Vladeck?

                              69 (Pages 270 to 273)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                         New York, NY

Page 285

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS

Laboratories, Inc.                :

---------------------------------X


            IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                 :  CASE NO.

         Plaintiff,               :  CV-05-219

     v.                           :

ABBOTT LABORATORIES, INC.,        :  JUDGE

et al.,                           :  CHARLES PRICE

         Defendants.              :

---------------------------------X

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                         New York, NY

Page 286

1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
2  ----------------------------------X
3  STATE OF WISCONSIN,          : CASE NO.
4      Plaintiff,           : 04-CV-1709
5      v.               :
6  AMGEN INC., et al.,          :
7      Defendants.          :
8  ----------------------------------X
9
10      IN THE COURT OF COMMON PLEAS
11        FIFTH JUDICIAL CIRCUIT
12  ----------------------------------X
13  STATE OF SOUTH CAROLINA, and    :   STATE OF
14  HENRY D. McMASTER, in his official :  SOUTH CAROLINA
15  capacity as Attorney General for   :   COUNTY OF
16  the State of South Carolina,    :    RICHLAND
17      Plaintiff,          :
18      v.            : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.       : 07-CP-40-0283
20      Defendant.          :
21  ----------------------------------X
22

Page 287

1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2        IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  ------------------x
6  VEN-A-CARE OF THE FLORIDA     :
7  KEYS, INC., a Florida       :
8  Corporation, by and through its  :
9  principal officers and directors, :
10  ZACHARY T. BENTLEY and      :
11  T. MARK JONES,           :
12        Plaintiffs,      :
13      vs.        : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN   : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM   : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES   : Gary
18  LTD., TEVA PHARMACEUTICAL USA;   :
19  and WATSON PHARMACEUTICALS, INC.  :
20        Defendants.      :
21  ------------------x
22

Page 288

1  IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2        STATE OF MISSOURI
3  ------------------x
4  STATE OF MISSOURI, ex rel.,    :
5  JEREMIAH W. (JAY) NIXON,      :
6  Attorney General,        :
7  and             :
8  MISSOURI DEPARTMENT OF SOCIAL    :
9  SERVICES, DIVISION OF MEDICAL    : Case No.:
10  SERVICES,            : 054-1216
11      Plaintiffs,     : Division
12            : No. 31
13      vs.        :
14  DEY INC., DEY, L.P., MERCK KGaA,  :
15  EMD, INC., WARRICK        :
16  PHARMACEUTICALS CORPORATION,    :
17  SCHERING-PLOUGH CORPORATION, and  :
18  SCHERING CORPORATION,      :
19      Defendants.      :
20  ------------------x
21
22

Page 289

1        New York, New York
2        Thursday, June 21, 2007
3
4      CONTINUED Videotaped Deposition of
5  BRUCE C. VLADECK, Ph.D., a witness herein, called
6  for examination by counsel for Abbott Laboratories
7  in the above-entitled matter, pursuant to
8  Subpoena, the witness being duly sworn by JOMANNA
9  DEROSA, a Notary Public in and for New York, taken
10  at the offices of Jones Day, 222 East 41st Street,
11  New York, New York, at 8:54 a.m. on Thursday, June
12  21, 2007, and the proceedings being taken down by
13  Stenotype by JOMANNA DEROSA, and transcribed under
14  her direction.
15
16
17
18
19
20
21
22

                              2 (Pages 286 to 289)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                          June 21, 2007
                      New York, NY

Page 306

1   anybody cover duplicative areas.  I think Mr. Cook
2   has been pretty thorough.
3           And I just wanted to make that
4   statement for the record.
5           MR. COOK:  Sure.  Just so we're
6   clear, the documents that we've requested that
7   we're waiting for in particular are documents
8   related to the Office of Legislative Affairs at
9   CMS, for which I don't believe we've received any
10  documents at all.
11          Dr. Vladeck, obviously, didn't work
12  in the Office of Legislative Affairs, and it's my
13  strong hope that -- that we're able to finish the
14  -- the deposition today.
15          And I have no interest in bringing
16  Dr. Vladeck back, and, obviously, I don't know,
17  until I've seen the documents, but I'm going to do
18  my best to -- to question the witness in a way
19  that -- that doesn't require us to -- to try to
20  bring him back.
21          MS. BROOKER:  I appreciate it.
22

Page 307

1        EXAMINATION BY COUNSEL FOR
2           ABBOTT LABORATORIES:
3   BY MR. COOK:
4       Q.    It's good to see you again, Dr.
5   Vladeck.
6       A.    Thank you.
7       Q.    The feeling, I'm sure -- I'm sure
8   is not mutual.
9       A.    No.  I would distinguish the
10  personal and the professional.
11      Q.    Fair enough.  I'd like to start by
12  just going over a couple of things from your last
13  deposition that I didn't get to come back to and
14  fill out when we ended.
15          The first was you indicated in your
16  last deposition that you personally read and wrote
17  a lot of e-mails while you were the administrator
18  of, at that time, HCFA.
19          Do you recall that?
20      A.    Yes, I do.
21      Q.    The e-mails that you read and
22  wrote, what would be the -- the purposes for which

Page 308

1   you would receive and send e-mails as the
2   administrator of HCFA?
3           MS. BROOKER:  Objection.  Form.
4       A.    I would range the gamut.  I would -
5   - particularly in light of the fact that I spend
6   most of the time in our Washington offices, but a
7   large portion of the staff was in Baltimore.  A lot
8   of it would be the communications, asking
9   questions about issues, expressing direction,
10  giving direction about certain items, reviewing
11  drafts of material that might be sent to me
12  electronically because it would be quicker or more
13  efficient to do that.
14          And then because I made it a point
15  of making sure that every employee of the agency
16  had my e-mail address, there would be a broad
17  range of other kinds of issues.
18          I remember particularly one
19  employee who was especially concerned about the
20  issue of bicycle lockers at our new facility in
21  Baltimore.  And after five or six exchanges with
22  him, I just sort of turned him over to one of my

Page 309

1   colleagues, but -- so, it really ran the whole --
2   the gamut of sort of things.
3       Q.    And was it your experience that
4   when you were administrator of HCFA that there
5   was, for lack of a better word, an e-mail culture,
6   that people used e-mail extensively?
7           MS. BROOKER:  Objection.  Form.
8       A.    I -- I think -- I think it was
9   stylistic and partially generational.  I think
10  there were folks in the organization that were
11  very paper-dependent.  There were folks in the
12  organization, although a small minority, I would
13  say, who were allergic to writing anything down,
14  or if they did you couldn't understand what it was
15  anyway.
16          And then there was -- I think over
17  time, as people became more familiar with it, more
18  accustomed to it, a growing reliance on e-mail as
19  a means of internal communications certainly.
20      Q.    Would some of your e-mail
21  communications have related to drug reimbursement
22  issues?

                              7 (Pages 306 to 309)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                          June 21, 2007
                        New York, NY

Page 310

1          MS. BROOKER: Objection. Form.
2      A.    It could very well have. Again, as
3  I believe I testified at our last session, it was
4  not one of the major sort of issues on my
5  attention or on which I was focusing, but to the
6  extent that it came up it was as likely to come up
7  through an e-mail exchange as through an oral
8  conversation or a written document.
9      Q.    And at least for me personally, if
10 I wanted to go back and recreate what I was doing,
11 and the various issues were that were raised
12 during a particular time period, looking at my old
13 e-mails is -- is the most effective way for me to
14 do that nowadays.
15          Would that be true for you as well
16 during this time period?
17         MS. BROOKER: Objection. Form.
18     A.    I don't know that I ever had the
19 opportunity to do that or think about it. It
20 would certainly be a very useful spur to the
21 memory. I would probably get so bogged down in
22 being reminded of things I had totally forgotten

Page 311

1  that it might not be that efficient, but it would
2  -- I think it would be very helpful to try to
3  reconstruct.
4      Q.    You mentioned the name of Randall
5  Graydon as your preeminent drug reimbursement
6  expert when you were there.
7          Can you tell me a little bit --
8  what's Randall Graydon's background?
9      A.    I honestly don't know. He was
10 already -- I'm trying to remember if he actually
11 had formal training in pharmacy. I believe he
12 did. He may have, but I do not recall. He may
13 have actually had been licensed as a professional
14 pharmacist before, or at about the time he came to
15 work at the agency.
16          He certainly had been working on
17 drug issues for the organization for a number of
18 years before I got there. I think it's been a
19 good part of his professional career at the
20 agency.
21     Q.    How old was he at the time you were
22 administrator?

Page 312

1      A.    Oh, I wouldn't be able to say. I
2  would guess he was roughly a contemporary of mine,
3  and I would have been in my mid 40s.
4      Q.    Do you recall any conversations
5  with Randall Graydon relating specifically to
6  average wholesale price and -- and those drug
7  reimbursement issues?
8          MS. BROOKER: Objection. Form.
9      A.    The only conversation I recall with
10 -- specific conversation I recall with a member of
11 my staff about average wholesale price and drug
12 pricing issues, which I believe we discussed last
13 time, although I'm not certain, was with Tom
14 Hoyer, relative to the Medicare drug pricing
15 issues, and -- and the issue of average wholesale
16 price.
17         I also know that I had one or more
18 conversations with his supervisor, Mr. Ault, at
19 some point. Whether it was the same conversation
20 or a separate conversation, I couldn't say.
21     Q.    Do you recall when those
22 conversations or conversation took place?

Page 313

1      A.    I couldn't tell you when -- it was
2  early -- I recall the conversation with Mr. Hoyer
3  particularly because it was really, I think, the
4  first time I ever got -- had any extensive
5  substantive conversation about the issue of
6  average wholesale price, and learned a little bit
7  about the history of the implementation of the
8  Medicare provisions for OBRA '90 relative to the
9  efforts to survey physicians about acquisition
10 cost that was aborted, and so forth.
11          And I just, for some reason,
12 remember his referring to the Red Book and
13 explaining to me that it was derived not from
14 independent investigation but from information
15 supplied to the publisher by the manufacturers.
16     Q.    Do you remember anything else that
17 Mr. Hoyer or Mr. Ault told you relating to average
18 wholesale price?
19         MS. BROOKER: Objection. Calls for
20 hearsay. Also, I just want to be mindful just to
21 instruct the witness to be careful about
22 disclosing pre-decisional deliberative

Henderson Legal Services
202-220-4158

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                                June 21, 2007
New York, NY

Page 366

1  that was never actually implemented.
2      Q.    The next paragraph, if you could
3  just read the paragraph.  It purports to describe
4  the comments of oncologists regarding the
5  inadequacy of -- of payments for drugs under the
6  proposed methodology.
7          Could you read that and tell me
8  whether that is consistent with the comments that
9  would relate to you as the objections of
10 oncologists to reducing payments for chemotherapy
11 drugs?
12         MS. BROOKER:  Objection.  Form.
13     A.    Yes, those are the arguments with
14 which I subsequently became familiar.
15     Q.    And do you recall whether anyone
16 made you aware of the oncologists' position
17 earlier in your tenure as -- as administrator than
18 the '96/'97 time frame?
19         MS. BROOKER:  Objection.  Form.
20     A.    I don't recall.  And, again, I
21 don't -- it's possible, but I don't recall any
22 incidents.

Page 367

1      Q.    Did you discuss with anybody
2  whether the reason that HCFA went to 100 percent
3  of AWP rather than 85 percent of AWP, was, in
4  part, the objections of the oncologists relating
5  to their additional costs?
6          MS. BROOKER:  Objection.  Form.
7      A.    I was not aware that, again, the
8  objections to 85 percent were focused on the
9  oncologists.
10     Q.    That would have been before --
11 before your time as -- as the administrator.
12         Correct?
13     A.    That's correct.
14     Q.    If you could turn in your book to
15 Exhibit Abbott 203.
16     A.    Exhibit Abbott 203?
17     Q.    Yes, sir.  That is going to be in
18 the third pile of books.
19         While you're turning to that, for
20 the record, Exhibit Abbott 203 is a facsimile to
21 Rob Vito from Maureen Adolf Furletti, F-U-R-L-E-T-
22 T-I, with the HCFA Office of Legislation, re:

Page 368

1  Medicare overpayment for drugs.  And it is dated
2  March 2, 1998.
3          As an initial matter, have you ever
4  seen this document before, Dr. Vladeck?
5      A.    Not to my knowledge, no.
6      Q.    Do you know who Rob Vito is?
7      A.    No.
8      Q.    Do you know who Maureen Adolf
9  Furletti is?
10     A.    Yes.
11     Q.    Who is she?
12     A.    She was, I believe, a presidential
13 management intern in the Office of Legislation.  I
14 know more about her than I otherwise might,
15 because in 2000 or 2001, after she left the
16 government, I actually hired her as a research
17 associate at Mount Sinai Medical Center, and she
18 worked there for about two years until she and her
19 husband relocated to the Philadelphia area.
20     Q.    The -- the note that accompanies
21 this reads -- and I'll just read it for the
22 record:

Page 369

1          "Attached is last year's language
2  from the President's budget bill.  The
3  administration is again putting forth this
4  proposal in the FY 1999 budget package.
5          "Also attached is a short
6  summary/rationale from last year's budget package.
7  Let me know if you need further info."
8          And just so you know, Dr. Vladeck,
9  the -- one of the things that we were hoping to
10 get before your deposition would be a complete
11 copy of -- of the excerpt that's attached to this.
12         If you could take a look at the
13 attachment.  It is two pages of what appears to be
14 proposed legislative language, followed by one
15 page of bullet points with budgetary scoring.
16         Take a look.  I'd like to first
17 turn your attention to the first two pages of
18 this, which starts "Proposals" at the top of the
19 page, and has the -- the statutory language.
20         Could you take a look at that and
21 tell me if that's consistent with the legislative
22 proposal that the administration made, and that

22 (Pages 366 to 369)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                    New York, NY

Page 370

1   you testified about, back on May 4th relating to
2   going to an actual acquisition cost methodology
3   for payment of drugs?
4           MS. BROOKER: Objection. Form.
5       A.   That is my -- consistent with my
6   memory of what we had proposed, yes.
7       Q.   And could you describe what the
8   payment methodology would have been if this
9   statutory proposal had been adopted by Congress?
10      A.   Well, again, it would have been
11  lower of average wholesale price, now with -- with
12  the little clause there under Section B, the
13  opportunity to write regulations -- defining what
14  average wholesale price was or actual acquisition
15  cost, with a further provision that if there was
16  insufficient information about the actual
17  acquisition cost to the individual physician or
18  supplier, we could employ national average data.
19      Q.   Assuming that this is language from
20  a budget proposal for the administration in Fiscal
21  Year 1998, who would have actually drafted this
22  language?

Page 371

1       A.   Probably the actual -- the actual
2   drafting of the language would have been done, I
3   believe, by staff in the counsel's office at HHS,
4   working with HCFA staff and staff of the Office of
5   Legislation.
6       Q.   Do you recall being involved in the
7   crafting of -- of the language relating to this
8   budget proposal?
9       A.   I -- I don't believe I was involved
10  in the actual language drafting, no.
11      Q.   If you look at the -- Page 4 of the
12  facsimile, which is Page 0322 on the Bates
13  numbers, the second paragraph -- the first full
14  paragraph at the top refers to a dispensing fee
15  for pharmacies.
16          Absent this legislation, or at the
17  time this legislation was proposed, Medicare did
18  not pay a dispensing fee for pharmacies for drugs
19  reimbursed under Part B. Is that correct?
20      A.   That is correct.
21      Q.   And this would have given the
22  Secretary authority to pay entities such as Ven-A-

Page 372

1   Care an explicit dispensing fee.
2           Correct?
3       A.   That's how I understand it, yes.
4       Q.   Was there any discussion within
5   HCFA that the creation of that dispensing fee was
6   to make up, in some measure, for the lost profits
7   from going from AWP to acquisition costs?
8           MS. BROOKER: Objection.
9           I would just instruct you to be
10  mindful of not disclosing pre-decisional
11  deliberations, and to just stick to policy.
12      A.   I don't know if this addresses the
13  objection of the concern or not. I don't recall
14  any specific discussion about that. My
15  presumption was that as a policy it would have the
16  effect similar to what you described, but I don't
17  have any specific memory of this provision at all,
18  frankly.
19      Q.   Okay. Who would be the best person
20  to ask within HCFA for the -- the reason that this
21  dispensing fee for pharmacies provision was
22  included in the proposed legislation?

Page 373

1       A.   I think probably again Ms. Buto or
2   Mr. Hoyer.
3       Q.   The other provision that piques my
4   interest -- and unfortunately it's cut off -- is
5   the Section 11237 immediately following. This
6   says:
7           "Payments to physicians'
8   assistants, nurse practitioners, and clinical
9   nurse specialists."
10          And the first subheading refers to:
11          "Coverage in home and ambulatory
12  settings in which a facility or a provider fee is
13  not billed for physicians' assistants, nurse
14  practitioners, and clinical nurse specialists."
15          First, do you know what that teaser
16  of a heading relates to in terms of the proposed
17  legislation?
18          MS. BROOKER: Objection. Form.
19      A.   I have a surmise. I don't have any
20  direct memory.
21      Q.   And what would the surmise be?
22      A.   My guess would be it would permit

Henderson Legal Services
202-220-4158

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

| Page 510 |
|---|

1        The next sentence says:
2        "Without adequate compensation,
3    commenters suggested, many physicians would
4    perform the service in hospital outpatient
5    departments at substantially higher costs."
6        Do you agree with that?
7        MS. BROOKER: Objection.
8        A.    Frankly, I drew sort of the -- I
9    draw sort of the opposite conclusion from that
10   sentence. What I conclude or my view of the issue
11   I think is most accurate is, because physicians
12   were being overpaid for chemotherapy provided in
13   their offices, they began establishing -- treating
14   more patients in their office or establishing
15   freestanding infusion centers rather than treating
16   patients in the hospital outpatient departments.
17   And that was in itself a reflection or an
18   indication that the payments for -- to physicians
19   for these services were too high.
20       Q.    Well, isn't -- isn't that something
21   that HCFA wanted, it wanted physicians to
22   establish treatment clinics so that patients could

| Page 511 |
|---|

1    be treated outside of the hospital?
2        A.    No.
3        MS. BROOKER: Objection to form.
4        A.    That was not our policy.
5        Q.    That was not something that you
6    discussed while you were administrator of HCFA?
7        MS. BROOKER: Objection.
8        A.    I don't believe we ever encouraged
9    or supported that transition. We did support
10   outpatient treatment for chemotherapy, but in
11   terms of encouraging freestanding centers as
12   opposed to hospital-based centers? That was never
13   our policy.
14       Q.    Let me ask you to take a look at a
15   document that was previously marked as Exhibit
16   Abbott 079.
17       Do you have that in front of you?
18       A.    I don't know. I'll see.
19       Yes, sir.
20       MR. EDWARDS: Now, for the record,
21   this is a report from the Office of Inspector
22   General to William Toby, acting administrator of

| Page 512 |
|---|

1    HCFA, dated November 1992, entitled "Physicians'
2    cost for chemotherapy drugs."
3        Q.    Have you ever seen this document
4    before?
5        A.    I believe I was questioned about it
6    on the prior day of deposition.
7        Q.    Okay. And was Mr. Toby your
8    predecessor?
9        A.    Mr. Toby was the acting
10   administrator at the time I became administrator.
11       Q.    And this was an effort by OIG to
12   determine the acquisition costs of chemotherapy
13   drugs and compare those costs to AWPs?
14       Is that correct?
15       MS. BROOKER: Objection. Form.
16       A.    Apparently, yes.
17       Q.    And if you look at Page 4, where
18   there's a description of the methodology. One of
19   the things that the OIG did was it went to
20   physicians and asked them for payment records for
21   drugs they had purchased. Is that correct? That's
22   in the second-to-the-last paragraph?

| Page 513 |
|---|

1        A.    That's what it says, yes.
2        Q.    And is there any reason why HCFA
3    could not have done that at any time?
4        MS. BROOKER: Objection. Form.
5        A.    HCFA itself could not have done it.
6    Could we have asked our contractors to do that
7    directly? At some point it becomes a survey
8    requiring OMB approval, and we would have had to
9    have such approval before doing it.
10       Q.    But short of doing a survey that
11   requires OMB approval, there is nothing that would
12   prevent anybody in HCFA from calling up an
13   oncologist and asking him what his acquisition
14   costs were. Isn't that true?
15       MS. BROOKER: Objection. Form.
16       A.    That's true. I also believe
17   there's nothing that would require the oncologist
18   to answer the call.
19       Q.    Do you know whether anybody in HCFA
20   attempted to do that during the time that you were
21   the administrator?
22       A.    I would be surprised if they did.

                              58 (Pages 510 to 513)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                     June 21, 2007
New York, NY

Page 514

1      Q.     And if you look at the next
2   paragraph on Page 4, it talks about a limited
3   survey that Equicore did of invoiced costs for
4   chemotherapy drugs.
5           Do you know who Equicore was?
6      A.     No.  And it may have been the
7   corporate name for the Equitable contractor.
8      Q.     Well, if I represent to you that
9   Equicore was a Medicare carrier, would that be
10  inconsistent with your understanding?
11     A.     No.  I would certainly find that
12  plausible.
13     Q.     And did you ever hear that Equicore
14  had conducted a survey of invoiced costs for
15  chemotherapy drugs?
16     A.     Only as referred to in this
17  document.
18     Q.     Do you know whether any other HCFA
19  carriers conducted surveys or asked physicians
20  about their invoiced costs for chemotherapy drugs?
21         MS. BROOKER:  Objection.
22     A.     No.

Page 515

1      Q.     And if you turn over to Page 5
2   you'll see that OIG also contacted manufacturers
3   concerning transaction prices of chemotherapy
4   drugs.  Do you see that?
5      A.     Yes.
6      Q.     Do you know which manufacturers
7   were contacted?
8      A.     No.
9      Q.     During the time that you were
10  administrator of HCFA, did you, or anybody else to
11  your knowledge, contact manufacturers to have
12  discussions such as the one reflected here on Page
13  5 of this exhibit?
14     A.     Not to my knowledge.
15     Q.     It goes on to say that:
16         "We also reviewed catalogs and
17  price lists from oncology wholesalers and
18  consulted with officials representing the Red
19  Book."
20         Do you know whether anybody at HCFA
21  did that during the time that you were
22  administrator?

Page 516

1      A.     I don't know one way or another.
2      Q.     Okay.  And is there anything that
3   would have prevented HCFA from contacting either
4   manufacturers or wholesalers or the Red Book
5   during the time that you were administrator?
6           MS. CONNOLLY:  Objection to form.
7      A.     I believe -- again, our
8   understanding of the rebate law was such that we
9   believed that manufacturers had absolutely no
10  obligation to provide us with any pricing
11  information other than that required in the rebate
12  law under those confidentiality agreements.
13         I do believe, I have the impression
14  that my colleagues did talk to the publishers of
15  the Red Book and consult some of the catalogs that
16  were generally available in the industry.
17     Q.     There was nothing that prevented
18  you from asking manufacturers for information; was
19  there?
20         MS. BROOKER:  Objection.
21         MS. CONNOLLY:  Objection.
22     A.     No.

Page 517

1      Q.     And you're not aware of any
2   instance in which you asked manufacturers for
3   information and they refused to provide it; are
4   you?
5           MS. BROOKER:  Objection.
6      A.     I'm not aware of any specific
7   instances, no.
8      Q.     Now, if you look at Appendix 2 to
9   this document, it's the page with the No. HHC
10  0020052 in the lower right-hand corner?
11         MS. BROOKER:  There's a number on
12  yours?
13         MR. EDWARDS:  Oh, I'm sorry.  We're
14  looking at two different versions of this.
15     Q.     But do you have Appendix 2 in front
16  of you?
17     A.     Appendix 2?
18     Q.     Yes.
19     A.     Yes.
20     Q.     And you see this is a summary of
21  the discussions that OIG had with Red Book when it
22  conducted this analysis in 1992.  And if you look

                          59  (Pages 514 to 517)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

---

Page 518

1    at the last paragraph it says:
2            "The Red Book does not represent
3    its AWP as a measure of the physicians'
4    acquisition cost for drugs."
5            Did you understand that to be the
6    case?
7            MS. BROOKER: Objection.
8       A.   As I think I've testified countless
9    times in the two days of deposition, whenever I
10   first became aware of these issues I understood
11   that the published AWP data was not equivalent to
12   the market transaction.
13      Q.   And it was not represented to be
14   equivalent. Correct?
15           MS. BROOKER: Objection.
16      A.   Represented by whom?
17      Q.   Well, in this case by Red Book.
18      A.   No, I believe Red Book says average
19   wholesale prices.
20      Q.   Well, this paragraph says:
21           "The Red Book does not represent
22   its AWP as a measure of the physicians'

---

Page 519

1    acquisition cost for drugs."
2            This was something that HCFA knew,
3    because OIG wrote it in a report to HCFA.
4            Correct?
5            MR. BREEN: Objection. Form.
6            MS. BROOKER: Objection to form.
7       A.   That question has no meaning to me.
8    HCFA is an organization. It's not an
9    intelligence. I didn't know it. My understanding
10   was that AWP was what was published in the Red
11   Book.
12      Q.   Well, certainly -- certainly the
13   people in HCFA who read this report would have
14   known about that statement. Correct?
15           MR. BREEN: Objection to form.
16           MS. BROOKER: Objection to form.
17      A.   Again, yes, I believe that's a
18   self-answering question.
19      Q.   Right. And you would have expected
20   a number of people in HCFA to have read this
21   report. Correct?
22           MS. BROOKER: Objection.

---

Page 520

1       A.   I don't know what you mean by "a
2    number." More than two, yes.
3       Q.   Well, that's a number.
4       A.   That's right.
5       Q.   The report goes on to say that --
6    in the last sentence of that paragraph, that:
7            "Considering that we also found
8    that there is no single discount rate which can be
9    applied to the AWP to provide a reasonably
10   consistent estimate of the physicians' acquisition
11   cost, we do not feel that AWP provides a useful
12   measure of acquisition cost for a drug to
13   physicians."
14           Now, is that consistent with your
15   understanding?
16           MS. BROOKER: Objection. Form.
17      A.   Yes.
18      Q.   Going back to Page 5 of this
19   document, you'll see that this summarizes the
20   results of the review?
21      A.   Yes.
22      Q.   And it says in the first paragraph

---

Page 521

1    there:
2            "AWP is not a reliable indicator of
3    the cost of a drug to physicians."
4            And that's consistent with your
5    understanding. Correct?
6       A.   It still is.
7       Q.   And then it says again in the third
8    paragraph:
9            "AWP is not designed to reflect
10   physicians' cost."
11           Correct?
12           MS. BROOKER: Objection.
13      Q.   Do you see that?
14      A.   No.
15      Q.   In the third paragraph of that
16   section, second sentence?
17      A.   It says:
18           "The fact is AWP is not reliable
19   indicator of physician cost."
20      Q.   Right. And then --
21      A.   Red Book officials confirm the AWP
22   is not designed to reflect -- yes. Yes, I see

---

60 (Pages 518 to 521)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                          New York, NY

Page 522

1  that.
2       Q.    It says:
3            "Red Book officials confirmed that
4  the AWP is not designed to reflect physicians'
5  cost."
6            Correct?
7       A.    Right.
8       Q.    And then it says:
9            "We also found that the
10 relationship between AWP and cost for multiple-
11 source drugs varies, depending in large part on
12 the manufacturer."
13           Now, is that consistent with your
14 understanding?
15           MS. BROOKER:  Objection.
16      A.    Well, again, it was my
17 understanding that there was no single price in
18 the marketplace, that different purchasers paid
19 different prices which in general were below AWP.
20 I did not have a perception that the size of the
21 differential was manufacturer-specific, but it was
22 our -- my perception, reflecting what I learned

Page 523

1  from my staff, that there was an awful lot of
2  variability in the prices for any given drug,
3  depending upon who's purchasing it.
4       Q.    And if you look at Appendix 3 to
5  this document, you'll see that there is an
6  indication of that variability.
7            Do you have Appendix 3 in front of
8  you?
9       A.    I do.
10      Q.    And this compares the invoice costs
11 of drugs to the AWPs for those drugs.  Correct?
12      A.    That's correct.
13      Q.    And some of the drugs in this
14 survey were brand name drugs, and some were
15 generics.  Correct?
16      A.    That is correct.
17      Q.    And is it also correct that the
18 generics have higher spreads, as reflected in this
19 appendix, than the single-source drugs?
20      A.    In general, yes.  They do.
21      Q.    In fact, the spreads for some of
22 the generic drugs are over 80 percent.  Correct?

Page 524

1       A.    The top of the range is over 80
2  percent, yes.
3       Q.    So, this would be inconsistent with
4  your impression prior to 1996 that the spreads for
5  generic drugs were 15 to 20 percent below AWP.
6            MS. BROOKER:  Objection.  Form.
7       Q.    Is that correct?
8       A.    That is correct.
9       Q.    So, would it be fair to say that
10 even though you had the impression prior to 1996
11 that spreads were generally 15 to 20 percent below
12 AWP for both brand name and generic drugs, other
13 people in HCFA who studied this report would have
14 a contrary impression?
15           MS. BROOKER:  Objection.  Form.
16      A.    I would like to think of it as a
17 different impression, but ...
18      Q.    Okay.  So, other people in HCFA
19 knew that for generic drugs the spreads could
20 exceed 15 to 20 percent, even though you,
21 personally, didn't know that.
22           MR. BREEN:  Objection.  Form.

Page 525

1            MS. BROOKER:  Objection.  Form.
2       A.    I would have to presume so.
3       Q.    Now, in 1996 you received a letter
4  from Ven-A-Care which was previously discussed at
5  this deposition.  I believe it's Exhibit Abbott
6  160?
7       A.    I don't know.  I'll look, because I
8  don't know if I saw that letter.
9       Q.    That may be one of the loose
10 exhibits, Exhibit Abbott 160.
11      A.    Exhibit Abbott 160?
12           I have the letter.  I do not know
13 if I recall seeing this specific letter.
14      Q.    Okay.  But you have no reason to
15 doubt that the letter was received by HCFA; do
16 you?
17           MS. BROOKER:  Objection.
18           MR. BREEN:  What's the date on that
19 letter?
20           THE WITNESS:  October 2nd, 1996.
21           MS. BROOKER:  I'm sorry.  What's
22 the number you're looking at?

Henderson Legal Services
202-220-4158

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                          June 21, 2007
                          New York, NY

---

Page 530

1          MS. CONNOLLY:  Objection to form.
2      A.    Again, I don't know what you mean
3  by "HCFA didn't know."  This letter has -- noted
4  copies of people in the Inspector General and
5  Department of Justice.  We've already established,
6  I believe in earlier testimony, that our own
7  program integrity people were looking at it.  So,
8  to the extent that people involved with
9  enforcement of program integrity issues were on
10 notice -- this constituted notice, and they were
11 aware of it.  I think the Ven-A-Care people said
12 in the letter themselves that they had noticed
13 some of those folks.
14     Q.    So, I want you to take a look at
15 Pages 4 and 5 of this letter.  You'll see at the
16 bottom of Page 4 there's a discussion of a drug
17 called VePesid.
18     A.    Uh-huh.
19     Q.    And VePesid is a drug that was
20 manufactured by my client, Bristol-Myers?
21     A.    Uh-huh.
22     Q.    And it says that Bristol-Myers

---

Page 531

1  reported an AWP of $136.49 for hundred milligrams
2  of VePesid.
3          Do you see that?
4      A.    Yes.
5      Q.    And if you go over to Page 5,
6  you'll see in the second-to-the-last sentence of
7  that paragraph -- of the statement:
8          "The price for 100 milligrams of
9  etoposide has plummeted to $18."
10         Now, I will represent to you that
11 etoposide and VePesid are the same thing.
12         Is it correct then that someone
13 reading this letter would understand that the AWP
14 for VePesid was $136.49 even though the market
15 price had plummeted to $18?
16         MR. BREEN:  Objection to form.
17         MS. BROOKER:  Objection to form.
18     A.    That's what's asserted in the
19 letter.
20     Q.    And do you know what that comes to
21 in terms of a percentage spread?
22     A.    I could do the arithmetic.  I -- I

---

Page 532

1  don't see it right here, but it looks like it's
2  about a 90 percent spread.
3      Q.    90 percent below AWP.
4      A.    No.  That would be high.  It would
5  be 118 out of 136.
6          Yeah, between 80 and 90 percent, I
7  guess.
8      Q.    And so this was something that HCFA
9  was made aware of in this letter.  Correct?
10         MS. BROOKER:  Objection.  Form.
11     A.    Again, yes.
12     Q.    Okay.  And if you go back to the
13 first page of the document you'll see that it says
14 in the second paragraph:
15         "Enclosed with this letter you will
16 find two volumes of exhibits."
17         Would you have expected the people
18 reviewing this letter to have reviewed those
19 exhibits as well?
20     A.    Not necessarily in any detail.
21     Q.    The exhibits were certainly
22 available to them to review if they wanted to.

---

Page 533

1          Right?
2      A.    I would assume so, yes.
3      Q.    And if you go to the next page, in
4  the first full paragraph, or maybe the second full
5  paragraph, there's a sentence -- I think it's the
6  fourth sentence -- that says:
7          "Much of the information which we
8  have provided over the past several years is now
9  being reported by the media, Exhibit 1."
10         Do you know what Exhibit 1 was that
11 was referred to there?
12     A.    No.
13         MR. EDWARDS:  What I want to do is
14 mark as the next BMS exhibit -- and I'm told that
15 the previous exhibit really should have been
16 Exhibit BMS 002, not Exhibit BMS 001, but we'll
17 correct the numbering system.  But let's mark this
18 as Exhibit BMS 003.
19         And, for the record, it's an
20 article that appeared in Barron's on June 10th,
21 1996, entitled "Hooked on Drugs."
22         (Discussion off the record.)

63 (Pages 530 to 533)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                          June 21, 2007
                              New York, NY

Page 534

1       Q.    I didn't realize that this is
2   actually attached to your copy of Exhibit Abbott
3   160. So, if you can bring out Exhibit Abbott 160
4   again, we can look at it that way.
5       A.    Okay.
6       Q.    Do you have Exhibit 1 to Exhibit
7   Abbott 160 in front of you?
8       A.    I do.
9       Q.    And again, it's an article that
10  appeared in Barron's in June of 1996 entitled
11  "Hooked on Drugs."
12          Do you recall ever seeing this
13  article?
14      A.    No.
15      Q.    Let me ask you to turn to the third
16  page of the article. It's got R2039420 in the
17  lower right-hand portion.
18          Do you have that?
19      A.    Yes, I do.
20      Q.    And in the first full paragraph in
21  the left-hand column it says:
22          "For about 300 dose forms of the

Page 535

1   drugs Barron's got AWPs from the Red Book and the
2   Blue Book. Then we collected current quotes or
3   price lists from several leading wholesalers
4   specializing in selling to doctors, home health
5   firms, nursing homes, and hospitals."
6          Do you see that?
7       A.    I do.
8       Q.    Now, this is something Barron's
9   did. I take it HCFA or OIG could have done the
10  same thing. Correct?
11          MR. BREEN: Objection to form.
12      A.    Yes, I guess we could have.
13      Q.    Okay. And if you look at the
14  right-hand column you'll see it says:
15          "But for generic drugs nearly every
16  manufacturer's price was nearly 60 percent to 85
17  percent below the published average wholesale
18  price."
19          That is something HCFA could have
20  discovered if it had done the same thing that
21  Barron's did here. Correct?
22          MR. BREEN: Objection to form.

Page 536

1   Counsel, just for the record, do you mean to imply
2   that Barron's did this as opposed to the reports
3   it's talking about in the article?
4          MR. EDWARDS: I'm sorry. I don't
5   understand your objection, but --
6          MR. BREEN: Well, I'll object that
7   you question is highly misleading if you're
8   inferring in the question or representing in the
9   question, without letting the witness read this
10  article, that Barron's did this study rather than
11  reporting on a government report, which is what
12  it's doing.
13          MR. EDWARDS: Well, what I'm
14  suggesting is that this is an article by Barron's.
15      Q.    Right?
16          Is that correct, Dr. Vladeck?
17      A.    Yes.
18      Q.    And it says that Barron's went out
19  and got the dose forms and the AWPs from Red Book
20  and Blue Book. Correct?
21      A.    Right.
22      Q.    And then it collected quotes and

Page 537

1   price lists from several leading wholesalers?
2       A.    That's what it says.
3       Q.    And then it talks about the
4   results, and it says:
5          "For generic drugs, nearly every
6   manufacturer's price was 60 to 85 percent below
7   the published average wholesale price."
8          Correct?
9          MS. BROOKER: Where are you reading
10  from right now? Which column?
11          MR. EDWARDS: I'm reading from the
12  top of the right-hand column on Page R2039420.
13      A.    That's what it says.
14      Q.    And this information wasn't a
15  secret; it was published in a magazine article.
16          Correct?
17      A.    Apparently, yes.
18          MS. LIANG: Objection. Form.
19      Q.    And, again, you would have expected
20  the person or persons who reviewed the Ven-A-Care
21  letter, when it was received by HCFA as to which
22  this was an exhibit, to have read the exhibit.

                                    64 (Pages 534 to 537)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 538

1        Correct?
2            MS. BROOKER:  Objection, and asked
3   and answered.
4       A.    Possibly, but it would have been of
5   no relevance.
6       Q.    Well, again, if anybody were to
7   suggest that HCFA had no way of knowing in 1996
8   that for generic drugs the spreads could be 60 to
9   85 percent below the average published wholesale
10  price, that would not be correct.
11           Isn't that true?
12           MS. BROOKER:  Objection.
13      A.    But that information was irrelevant
14  to Medicare payment policy.
15      Q.    And why was it irrelevant?
16      A.    Because Medicare was required by
17  law to pay the average wholesale price.
18      Q.    Well, in 1996, the -- there was no
19  statute adopting AWP; it was a Medicare
20  regulation.  Correct?
21      A.    No, I believe that regulation was
22  consistent with OBRA '90, which allowed one of

Page 540

1       A.    That's correct.
2       Q.    And Congress rejected that proposal
3   in favor of 95 percent of AWP.
4       A.    That's correct.
5       Q.    And do you know whether Congress
6   knew that the spreads between transaction prices
7   and AWPs could be as much as 1,000 percent?
8            MS. BROOKER:  Objection.
9       A.    I would never presume to suggest
10  what Congress knew of anything.
11           MR. EDWARDS:  What I want to do is
12  mark BMS Exhibit - Exhibit BMS 004?  This will now
13  be Exhibit BMS 003, as I decided not to mark the
14  Barron's article.
15           So, this is Exhibit BMS 003, and
16  it's an excerpt from a report of the Committee on
17  the Budget of the House of Representatives dated
18  June 24, 1997.
19           THE VIDEOGRAPHER:  The time is 3:09
20  p.m.  We're going off the record, Concluding Tape
21  No. 9.
22           (Recess taken.)

Page 539

1   three choices, two of which had been precluded by
2   the Office of Management and Budget in its refusal
3   to permit HCFA to conduct the survey of average
4   acquisition costs.
5            THE VIDEOGRAPHER:  We have
6   approximately five minutes left on this tape.
7       Q.    Well, in any event, the information
8   that transaction prices for generic drugs could be
9   60 to 85 percent below the average published
10  wholesale price was out there and available to
11  anybody who read this Barron's article.  Correct?
12           MS. BROOKER:  Objection.
13      A.    Apparently, yes.
14      Q.    Now, you talked a little bit about
15  the Balanced Budget Act of 1997 in your earlier
16  testimony.  Do you recall that?
17      A.    Yes.
18      Q.    And leading up to the Balanced
19  Budget Act, the administration made a proposal
20  that reimbursement be based on actual acquisition
21  cost.  Correct?
22           MS. BROOKER:  Objection.

Page 541

1            (Exhibit BMS 003 marked for
2   identification.)
3            THE VIDEOGRAPHER:  The time is 3:22
4   p.m.  We're going back on the record, starting
5   Tape No. 10.
6       Q.    Dr. Vladeck I want to hand you what
7   we have marked as Exhibit BMS 003, which I stated
8   earlier is an excerpt from a report of the
9   Committee on the Budget of the House in connection
10  with the Balanced Budget Act of 1997.  The report
11  is dated June 24th, 1997.
12           Do you have that in front of you?
13      A.    I do.
14      Q.    Okay.  I want to direct your
15  attention to the second page of this document, the
16  middle of the page.  You'll see it says Section 10
17  616, "Reimbursement for Drugs and Biologicals"?
18      A.    Yes.
19      Q.    And it says -- it describes the
20  current law and explains the proposed change, and
21  then under "reason for change" it says:
22           "The Inspector General for the

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                        New York, NY

Page 554

1  that in general they were too low, particularly
2  given the new responsibilities imposed on retail
3  pharmacies by -- by OBRA '90 -- O-B-R-A -- and
4  that our conclusions were that we should require
5  the states to have some rational basis, if I
6  remember correctly, for establishing dispensing
7  fees, and they ought to be somewhere between 4 and
8  $6 per script. But I wouldn't swear to those
9  numbers, but it was in that range, I believe.
10       Q.    Let me direct your attention to
11  Page 41 of this document?
12       A.    Okay.
13       Q.    And you'll see there's a table,
14  Table 3.2?
15       A.    I do.
16       Q.    And you'll see there's an analysis
17  of overall payment costs and then a column for
18  ingredient payment costs?
19       A.    Right.
20       Q.    And then a column for dispensing
21  payment costs?
22       A.    Right.

Page 555

1       Q.    And then something called "overall
2  payment adequacy index"?
3       A.    Right.
4       Q.    Do you have an understanding of
5  what this table purports to show?
6       A.    My understanding of what it
7  purports to show is that in general, with some
8  normal variation that one would otherwise expect,
9  the Medicaid programs were paying pharmacies, for
10  the ingredients, something very, very close to
11  what the ingredients were costing them, again,
12  with some variation. Whereas with only a very few
13  exceptions they were paying dispensing costs that
14  were less than, and in some cases significantly
15  less than, the pharmacies' cost of dispensing.
16       Q.    Well, the overall level for the
17  U.S. nationwide on the dispensing cost front was
18  79 percent of actual cost. Correct?
19            MS. BROOKER: Objection.
20       A.    That's what it says, yes.
21       Q.    And in some cases on the ingredient
22  cost, you -- the payment was significantly above

Page 556

1  ingredient cost. For example, I know you and Mr.
2  Escobar discussed New York, and here it suggests
3  that New York was paying 17 percent above
4  acquisition cost.
5       A.    That's correct.
6       Q.    If you look at Page 48 of this
7  document, you'll see in the sixth sentence of the
8  first full paragraph a statement:
9            "As noted earlier, it appears that
10  the states trade off higher payments for
11  ingredient costs with lower payments for
12  dispensing fees."
13            That was one of the conclusions of
14  this report. Right?
15            MS. BROOKER: Objection.
16       A.    That's one of the things that they
17  report. I'm not sure that we totally agreed with
18  that conclusion.
19            MR. BREEN: What paragraph are you
20  on?
21            MR. EDWARDS: I'm on the first full
22  paragraph of Page 48.

Page 557

1            MR. BREEN: Thank you. I'm sorry.
2       Q.    And is it the case that even in
3  those situations where the states seem to be
4  trading off higher payments with ingredient costs
5  and lower payments for dispensing fees, HCFA was,
6  nevertheless, approving those state plans?
7       A.    Could you repeat the question? I'm
8  sorry.
9            MR. EDWARDS: Go ahead.
10            (The requested portion of the
11  record was read.)
12            MS. BROOKER: Objection, form.
13       A.    I think it's correct to say that
14  HCFA had approved the state plans that were in
15  effect when this data was collected in 1991.
16       Q.    I have one last document to show
17  you, and we'll mark this as Exhibit BMS 007. It's
18  an OIG report dated April 10, 1997.
19            (Exhibit BMS 007 marked for
20  identification.)
21       Q.    Are you familiar with this report?
22       A.    I believe I've seen this before.

69  (Pages 554 to 557)

Henderson Legal Services
202-220-4158

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                          June 21, 2007
                        New York, NY

Page 558

1     Q.     What is it?
2     A.     It's a report from the Inspector
3  General on actual acquisition cost of brand name
4  prescription drug products dated April 1997, with
5  a memo from -- a cover memo from the Inspector
6  General to me.
7     Q.     And you recall receiving this
8  document?
9     A.     Not specifically, but I don't have
10 any doubt that I did.
11    Q.     On the first page in the first
12 paragraph, in the middle of the paragraph there's
13 a sentence that says:
14           "As you know, most states use AWP
15 minus a percentage discount which varies by state
16 as a basis for reimbursing pharmacies for drug
17 prescriptions.  Although this discount is most
18 commonly about 10 percent nationally, it has been
19 recognized as not being a sufficient discount to
20 ensure that the reasonable price is paid for
21 drugs."
22           So, is that consistent with your

Page 559

1  understanding that in many cases states reimburse
2  for drugs under Medicaid at AWP minus 10 percent?
3     A.     Yes.
4     Q.     And if you look at Page 4 of this
5  document, and you have to sort of get through the
6  cover memo and then go to the body of the document
7  itself, you'll see a section headed "findings and
8  recommendations"?
9     A.     Yes.
10    Q.     And it says:
11           "We estimated that the invoice
12 price for brand name drugs was a national average
13 of 18.3 percent below AWP."
14           Do you see that?
15    A.     I do.
16    Q.     So, states were reimbursing
17 pharmacies for brand name drugs at AWP minus 10
18 percent even though this study shows that the
19 invoice prices for brand name drugs averaged AWP
20 minus 18.3 percent.  Correct?
21    A.     That's correct.
22           MS. CONNOLLY:  Objection.

Page 560

1     Q.     And I take it, notwithstanding that
2  information, HCFA continued to approve the state
3  plans that provided for reimbursement at AWP minus
4  10 percent.  Is that correct?
5           MS. BROOKER:  Objection.
6     A.     I don't believe we had any legal
7  basis to not do so.
8     Q.     And one of the things that you
9  emphasized in your response to this report was
10 that you can't simply look at the ingredient cost;
11 you have to look at other aspects of the Medicaid
12 program, including the dispensing fee.
13           Is that correct?
14           And I'm referring in particular to
15 Page 2 of 2 of Appendix 3.
16    A.     I believe that the paragraph is
17 referring solely to the estimation of potential
18 cost savings.
19    Q.     Right.  But in the very last
20 paragraph -- and these are your comments on the
21 OIG report.  Correct?
22    A.     Right.

Page 561

1     Q.     And it says:
2           "Taken alone, we agree with OIG's
3  estimate of potential savings.  However, as OIG
4  acknowledges, estimated acquisition cost is only
5  one factor in pharmacy reimbursement.  Other
6  factors to consider are the AWPs" -- and then you
7  mentioned dispensing fees.  Correct?
8     A.     Right.
9     Q.     So, that's another factor --
10    A.     In the estimation of potential
11 savings.
12    Q.     Well, is that also another factor
13 that you considered in deciding whether to approve
14 state plans?
15           MS. BROOKER:  Objection.
16    A.     Not in relationship to the
17 ingredient cost, no.
18    Q.     You mentioned that as a result of
19 the report that we've marked as Exhibit BMS 006
20 HCFA proposed some changes in dispensing fees?
21    A.     That's correct.
22    Q.     And did HCFA do any additional

70 (Pages 558 to 561)

320d321f-596a-4e1f-8444-2c4e6f42d4ae