# EXHIBIT E

ANALYSIS OF WHY THE UNITED STATES SHOULD DECLINE INTERVENTION IN

<u>UNITED STATES EX REL. [RELATOR] V. [DEFENDANTS]</u> (S.D. FLA.)(UNDER SEAL)

Submitted on behalf of:

REDACTED

Dated: March 17, 2000

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................... 2

I.  DISCUSSION ....................................................................................................................... 5
   A.  THE GOVERNMENT KNEW THAT "AWP" AND "WAC" DID NOT APPROXIMATE PROVIDER ACQUISITION COST ......................................................................................................................... 5
      1  The December 1968 Report Identified Pricing Differentials ............................................ 5
      2  Information Published During the 1970s Established That "Standard Prices" Exceeded Provider Acquisition Cost ............................................................................................... 6
      3  Information Published During the 1980s Identified the Size of the Differential Between Provider Acquisition Cost and "Standard Prices" .......................................................... 7
      4  Information Published During the 1990s Reinforced That "AWP" Did Not Equal Acquisition Cost and Expanded the Government's Knowledge to the Physician Market ................................ 11
      5  The States Knew That Changing to a "WAC"-Based Reimbursement System Would Not Equate to Paying Provider Acquisition Cost ................................................................................ 17
      6  Conclusion ................................................................................................................. 20
   B.  THERE WAS NO STANDARD OR WIDELY-ACCEPTED DEFINITION OF THE PRICING TERMS ........................ 21
      1  Characterizations of "AWP" Were Not Uniform .......................................................... 22
      2  Characterizations of "WAC" Were Inconsistent .......................................................... 22
   C.  THE GOVERNMENT CANNOT PROVE THE ESSENTIAL ELEMENTS OF AN FCA CLAIM ........................ 23
      1.  The Government Cannot Prove "Falsity" ................................................................... 23
      2.  The Government Cannot Prove the Manufacturers Acted "Knowing" of "Falsity" ...... 27
      3.  The Government Cannot Prove that it Justifiably Relied on the Manufacturers' Statements ................. 30

CONCLUSION ........................................................................................................................... 35

BA - 58559/100 - #88861 v1

ANALYSIS OF WHY THE UNITED STATES SHOULD DECLINE INTERVENTION IN UNITED STATES EX REL. [RELATOR] V. [DEFENDANTS] (S.D. FLA.)(UNDER SEAL)

This Analysis, which sets forth the reasons why the United States should decline intervention in *United States ex rel. [Relator] v. [Defendants]* ("Analysis"), is submitted on behalf of the following Manufacturers:

REDACTED

(collectively, the "Manufacturers"). 1/

## INTRODUCTION

Just over two years ago, in a radio address to the nation regarding the Medicare system, President Clinton stated:

> *Sometimes the waste and abuse aren't even illegal; they're just embedded in the practices of the system.* Last week, the Department of Health and Human Services confirmed that our Medicare program has been systematically overpaying doctors and clinics for prescription drugs – overpayments that cost taxpayers hundreds of millions of dollars.... Now, these overpayments occur because Medicare reimburses doctors according to the published average wholesale price – the so-called sticker price – for drugs. Few doctors, however, actually pay the full sticker price. In fact, some pay just one tenth of the published price.

White House Office of Press Secretary, Remarks by the President in Radio Address to the Nation (Dec. 13, 1997)(emphasis added).

---

_/   This Analysis is presented pursuant to Fed. R. Evid. 408. Submission of this Analysis is not intended to waive, and does not waive, the attorney-client privilege, the attorney work product doctrine, or any other applicable evidentiary privilege or doctrine.

Nevertheless, the Department of Justice has alleged in our discussions that these "overpayments" *were* illegal. The Department contends that each of the Manufacturers "defrauded" the States and federal government by providing "inaccurate" pricing information for their drugs to certain commercial pricing services. As a result, the Department asserts, the Manufacturers "tricked" the government into paying "false" drug reimbursement claims. (The Department's peculiar definition of "false" in this case is "facially true but, in hindsight, the government paid more than the Department thinks it should have paid.")

This Analysis examines the factual evidence and legal principles that together demonstrate that the government's False Claims Act ("FCA") case is without merit. The President's statement identifies one of the principal reasons the Department of Justice cannot meet its burden in this case: federal and state government officials have long been aware that the "average wholesale price" ("AWP") is not the price at which providers purchase prescription drugs in a typical transaction.[2] Furthermore, federal and state officials also knew that "wholesale acquisition cost" ("WAC") was not intended to equate to provider acquisition cost.

Government knowledge negates any inference of wrongful intent and prevents the government from showing that it reasonably relied on the information

---

[2]  As the government has conceded, its case with respect to Medicare is particularly wanting because, in addition to the information discussed in this Analysis, the Medicare statute explicitly incorporates "AWP"-based reimbursement. *See, e.g.*, 42 U.S.C. § 1395u(o). This Analysis therefore focuses on the government's inability to prove a case based on claims submitted to Medicaid.

submitted. Wrongful intent and government reliance are essential elements of a "causes to be filed" FCA case such as this one. 3/

---

3/ To establish liability under section 31 U.S.C. § 3729(a)(1), the government must prove:

(1)  The defendant presented or caused another person to present a "claim" for payment or approval to the United States;

(2)  The claim was "false or fraudulent"; and

(3)  The defendant acted "knowing" the claim was false or fraudulent.

*United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1258-59 (S.D. Fla. 1989); see JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS (1995 & Supp. 1999) § II.A [hereinafter BOESE].

Patently, none of the Manufacturers submitted "claims" to the United States, for § 3729(c) defines "claim":

> **(c)**  **Claim defined.** — For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

In providing information to the commercial pricing services, the Manufacturers did not make any request or demand for property or money, and their actions therefore do not fall within the scope of § 3729(c). Judicial interpretation is consistent with our conclusion. Courts and commentators have consistently recognized that statements or demands that result in no immediate financial detriment to the government are not "claims." *United States v. McNinch*, 356 U.S. 595 (1958) (no claim presented when government not required to pay any money or suffer immediate financial detriment); *see United States v. Niefert-White Co.*, 390 U.S. 228 (1968) ("claim" includes cases in which government has legal obligation to disburse the funds immediately and situations in which the government disburses funds without any legal obligation to do so). The Supreme Court has reiterated that a

4

\BA - 58559/100 - #8886\ v1

Furthermore, "AWP" and "WAC" are not, as the Department of Justice today asserts, precisely defined terms. "AWP" has been widely understood to be a "sticker price;" "WAC" has been generally known to be an undiscounted wholesaler list price that does not reflect discounts, chargebacks, rebates, or special promotional prices to purchasers. Given that the these terms were widely and consistently understood *not* to reflect provider acquisition cost, the government will be unable to prove that the Manufacturers acted with the intent required by the FCA: that is, that they "knowingly" provided false information to the commercial pricing services or "knowingly" caused false claims to be submitted.

## I.   DISCUSSION

### A. The Government Knew That "AWP" and "WAC" Did Not Approximate Provider Acquisition Cost

#### 1. The December 1968 Report Identified Pricing Differentials

As early as 1968, the government had extensive knowledge of the issues that it claims to have "discovered" in this case. The report of the Task Force on Prescription Drugs of the Department of Health Education and Welfare ("HEW") entitled "The Drug Makers and the Drug Distributors" (Dec. 1968) pointed out that

---

"claim" connotes "a demand for money or some transfer of public property." *United States v. Borstein*, 423 U.S. 303, 309 n.4 (1976) (quoting *McNinch*, 356 U.S. at 599).

In "causing [false claims] to be filed" cases, the government must prove that it justifiably relied on the information provided. *See, e.g., United States v. Data Translation, Inc.*, 984 F.2d 1256, 1259 (1st Cir. 1992) (Breyer, J.). Furthermore, the United States District Court for the Southern District of Florida has held that damages are an element of a § 3729(a)(1) claim. *Stinson*, 721 F. Supp. at 1258. The government's burden under § 3729(a)(2) is substantially similar. *See* BOESE, *supra*, at § II.A.2.

5

"wholesalers, retailers, hospitals and government agencies often pay markedly different prices for the same drug and dosage form." *Id.* at 31. The report expressly acknowledged: "The Red Book and the Blue Book do not reflect the actual manufacturers' prices to wholesalers and retailers . . . . The catalog [list] price constitutes an 'umbrella' beneath which the company can maneuver against competing products." *Id.* Thus, over 31 years ago, the government knew that "list prices" reported by the commercial pricing services were subject to discounts and other pricing differentials. *See also* 34 Fed. Reg. 1244, 1245 (Jan. 25, 1969)(HEW specifically notes that ingredient cost "may vary according to the size and location of the pharmacy and according to whether the dispensing is done by a physician").

### 2. Information Published During the 1970s Established That "Standard Prices" Exceeded Provider Acquisition Cost

During the 1970s, government reports showed that "AWP" *and* published prices *other than* "AWP" did not equate to provider acquisition cost. In November 1974, HEW published a proposal to establish limits on Medicaid payments for multiple source drugs, including drugs dispensed by physicians. The notice stated: "Red Book data, Blue Book data (i.e., AWP) *and other standard prices* . . . were frequently in excess of actual acquisition cost." 39 Fed. Reg. 41,480 (Nov. 27, 1974)(emphasis added); *see* 40 Fed. Reg. 34,516 (Aug. 16, 1975)(final rule). This published notice says more than that the government knew of the disparity between "AWP" and provider acquisition cost: it expressly states that "other standard prices" (such as "WAC") were *also* in excess of that cost.

6

HCFA reminded the States in a December 1977 Action Transmittal that they were required to estimate provider acquisition cost in setting reimbursement. HCFA criticized the states' use of "AWP" in implementing federal regulations, stating: "[T]he Department is not convinced that those states which continue to reimburse at average wholesale price *or wholesale invoice cost* have made a real effort to approach actual acquisition cost." "Title XIX Social Security Act: Limitation on Payment Reimbursement for Drugs: Estimated Acquisition Cost (EAC)," HCFA Action Transmittal 77-13 (MMB) (Dec. 13, 1977) (emphasis added), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 28,714.

Thus, by the end of the 1970s, the government had published a report, a Federal Register notice, and a HCFA transmittal recognizing that "AWP," "wholesale invoice cost," and "other standard prices" were in excess of provider acquisition cost. The next decade saw the publication of authoritative information explaining the size of the differential.

### 3. Information Published During the 1980s Identified the Size of the Differential Between Provider Acquisition Cost and "Standard Prices"

During the 1980s the government examined on repeated occasions the amount of the difference between provider acquisition cost and "AWP." The first two reports focused on retail pharmacies.

In 1980, the General Accounting Office reported that the Department of Health and Human Services ("HHS") was aware that "AWP" was typically 15%-18% higher than the price pharmacists actually paid for the drug. *See* GAO, "Programs to Control Prescription Drug Costs Under Medicaid and Medicare Could

7

be Strengthened," GAO Rep. No. HRD-81-36 (Dec. 31, 1980), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 30,907. Retail pharmacies have consistently acknowledged that they pay among the highest prices for pharmaceuticals, *see, e.g., In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 783, 786 (7th Cir. 1999), *cert. denied*, 2000 WL 198975 (U.S. Feb. 22, 2000), so the States could surely have deduced by 1980 that other providers were paying substantially less than even "AWP" minus 15%.

This message was unequivocally reiterated less than four years later. In 1984, the Office of the Inspector General ("OIG") of HHS reported that pharmacies purchased most drugs at an average of 15.9% below "AWP," "Changes to Medicaid Prescription Drug Program Could Save Millions," (ACN:06-40216), and that the actual prices charged to retail pharmacies were as much as 42% below "AWP." *See* Medicaid Action Transmittal No. 84-12 (Sept. 1984), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 34,157.

This 1984 OIG report audited drug prices in six states and concluded that "AWP" was not "even an adequate estimate of the prices providers are generally paying for their drugs. AWP represents a list price and does not reflect several types of discounts." The OIG recommended that Medicaid program policy and regulations be revised to require states "to abandon the AWP reimbursement

8

methodology" and adopt drug pricing systems that would more closely estimate the prices providers paid for pharmaceuticals.4/

State Medicaid officials could certainly have concluded that a 42% discount to a retail pharmacy suggested that even larger discounts from "AWP" were offered to providers with greater purchasing power. Indeed, they could hardly have reached any other conclusion from the OIG's findings. 5/

The published information that was available to State Medicaid officials about pharmaceutical pricing outside the retail pharmacy arena took a quantum leap with the August 1989 publication of the Senate Special Committee on Aging's Majority Staff Report entitled "Prescription Drug Prices: Are We Getting Our Money's Worth?" This document contains the following observations about the reimbursement system:

- "There are two markets in the U.S. for most big selling prescription drugs: a price competitive market characterized by deep discounts off the published list price, and a high-priced market, where retail

---

4/ In 1989, the OIG again concluded that pharmacies were purchasing drugs at large discounts below "AWP," and recommended that "alternate reimbursement methods be studied and consideration be given to using a reimbursement method other than AWP or permit AWP to be appropriately discounted for reimbursement purposes." Report of DHHS, OIG, "Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program," A-06-89-00037, *reprinted in* Medicare & Medicaid Guide (CCH) ¶38, 215.

_/ Texas, for example, stated in pleadings in 1985 that "AWP" was basically the suggested price for a drug and likened "AWP" to "the sticker price on a new car." "Thus, while claiming reimbursement using the AWP as a cost basis for the drug, the providers actually paid much less than the AWP." Decision No. 961, Department of Health and Human Services, Departmental Grant Appeals Board, Docket Nos. 87-137, 87-177, 88-09, 88-70.

9

> customers, Medicare and Medicaid purchase their prescription drugs."
>
> - "The VA achieves an average discount of *41% off AWP for single source drugs and 67% off AWP for multiple source drugs.*"
>
> - "Hospitals, HMOs and nursing homes that contract with wholesalers *achieve discounts up to 99% off AWP.*"

(Emphasis added).

What did this publicly available report tell government officials about price discounting? First, "published list price" was subject to "deep discounts" for "most big selling prescription drugs" – in other words, published list prices (such as "WAC") were not necessarily the price at which providers actually bought pharmaceuticals.

Second, the Veterans' Administration ("VA") achieved *average* discounts of 41% off AWP for single source drugs and 67% for multiple source drugs. The report showed that manufacturers sold to the government *not* at "AWP" or even "AWP minus 15%," but at an *average* price of "AWP minus 41%" and "AWP minus 67%." It is worth noting that the Federal Supply Schedule from which the VA purchases pharmaceuticals was a matter of public record.

Third, providers with purchasing power (hospitals, HMOs, and nursing homes) were able to contract with *wholesalers* to purchase pharmaceuticals for discounts of up to "AWP minus 99%." This statement obviously shows that "AWP" did not represent acquisition cost for these providers.

In light of this information, States looking at the "WAC" published by the commercial pricing services could not reasonably have interpreted it to equal

10

provider acquisition cost. The conclusion is inescapable, for States knew that (i) providers could obtain pharmaceuticals for "deep discounts" of up to "AWP minus 99%" *and* (ii) the published "WAC" was not 99% less than "AWP." Once again, and still, "WAC" was generally understood to be the *undiscounted* price to wholesalers, not actual provider acquisition cost. 6/

### 4. Information Published During the 1990s Reinforced That "AWP" Did Not Equal Acquisition Cost and Expanded the Government's Knowledge to the Physician Market

By the 1990s, it was beyond question that "AWP" did not equal or approximate provider acquisition cost. HCFA repeatedly refused to permit states to reimburse Medicaid providers at AWP and disallowed matching funds to those that did. A published court decision and administrative decisions held that States could not rely on "AWP" in carrying out their responsibility to determine "Estimated Acquisition Cost" ("EAC") for pharmaceuticals. 7/ HCFA also revised the State Medicaid Manual by specifically including an advisory to state Medicaid administrators that "AWP" exceeded actual acquisition cost and that it was not acceptable for a state plan to reimburse drug cost using "AWP" without factoring in

---

_/     HCFA's senior officials obviously were aware of the substance of the Special Committee on Aging's Report; they told a U.S. Senate Committee in November of 1993 that: "[H]ospitals and health maintenance organizations are employing in-house formularies to negotiate effectively with pharmaceutical manufacturers for significant price discounts."

7/    *Louisiana v. United States Dep't of Health & Human Servs.*, 905 F.2d 877, 880 (5th Cir. 1990) ("Several commenters suggested that AWP would be a good measure, but the Secretary and SRS rejected this because 'AWP data are frequently inflated'") (quoting 40 Fed. Reg. 34,518 (Aug. 15, 1975)); *In re Arkansas Dept. of Human Servs.*, No. 1273 (HHS Dept. App. Bd. Aug. 22, 1991); *In re Oklahoma Dept. of Human Servs.*, No. 1271 (HHS Dept. App. Bd. Aug. 13, 1991).

11

a significant discount. "Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products," Report of DHHS, OIG, Office of Audit Services, A-06-97-00011, *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 45,559.

Given these rulings, States as a matter of law could not have "relied" on "AWP" to equal provider acquisition cost. To the contrary, HCFA had specifically and repeatedly told them *that it did not*.8/ States knew that to carry out their responsibility to determine "EAC," they had to determine a percentage *below* "AWP" at which to reimburse. Whether they used empirical methods to choose that amount – and what amount they chose – had nothing to do with the information the Manufacturers provided to the commercial pricing services.9/

---

_/     The GAO advised Maryland in 1993 that it was reimbursing retail pharmacies amounts that exceeded the actual purchase price by as much as 34%. *See* GAO, Medicaid: Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland (Mar. 1993). In February 1997, the OIG found that Maryland pharmacies on average were paying 41.9% below "AWP" for generic drugs. Maryland responded by suggesting that HCFA link AWP to average manufacturer price as defined in the Medicaid rebate program. Report of DHHS, OIG, Office of Audit Services, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Maryland Department of Health and Mental Hygiene," A-06-89-00037 (1996).

_/     In a 1991 administrative appeal, Arkansas argued that "AWP" represented the state's "best estimate of the price generally and currently paid for those drugs." The hearing board rejected that claim, finding: "[the] State *was aware* that pharmacies generally paid less than that amount and that ... the State had *no pertinent records to support a determination that AWP represented the price generally and currently paid*." Docket No. 90-119, August 21, 1991 (emphasis added).

HCFA underscored the need for the States to use empirical methods in the fall of 1994, when it sent the Directors of State Medicaid Agencies a circular entitled "Expiration of Pharmacy Reimbursement Moratorium – INFORMATION." The circular reminded States that they would be able to adjust reimbursement rates for prescription drugs effective December 31, 1994 and reminded states that they should:

> [D]etermine that their estimated acquisition cost (EAC) levels are current. By definition, EAC means the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers. States wishing to modify their EAC levels may, among other methods of verification, audit an appropriate number of pharmacies to determine current acquisition costs before making modifications to the EAC levels. Additionally, States will also be able to expand or develop their own State maximum allowable cost program for multiple source drugs, as we do currently on the Federal Upper Limits (FUL) List.

The Manufacturers do not know what the States or HCFA did in response to this directive, but HCFA's February, 1998 description of its FY 1999 legislative proposals again stated that "AWP" "is but a 'sticker' price." These are the precise words the President had used months earlier in telling the nation that Medicare was paying too much for prescription drugs for reasons that "aren't even illegal."

HCFA concurred in the President's view that the conduct was legal. In November 1998, the HHS-OIG reported that "the published AWPs used in determining the Medicare allowed amounts for certain prescription drugs can be many times greater than the actual acquisition costs available in the marketplace." "Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs,"

13

OEI-03-97-00293, at ii (Nov. 1998). Certainly this information came as no shock to HCFA. In fact, HCFA Administrator Nancy-Ann Min De Parle responded that under HHS' 1998 budget proposal, "physicians and suppliers who bill Medicare for outpatient drugs . . . would be paid their acquisition cost. This would have removed the mark-up currently being paid above the true market price." Thus, in HCFA's view, the gap between "AWP" and acquisition cost – for physicians and suppliers – was not some nefarious construct of the Manufacturers, but was simply a known mark-up.

The Department of Justice has hinged its arguments in this case on the contention that HCFA knew about the mark-up in the pharmacy market, but somehow did not realize the extent of the mark-up in other provider-administered tiers of the pharmaceutical market. The published information discussed above would be sufficient without more to dispose of that contention, but there is more. The data that the government reported during the 1990s lay the Department's position to rest.10/

In November 1991, HCFA responded to public comments on a proposed Medicare physician fee schedule for pharmaceuticals administered in physician offices. Although the Department of Justice has asserted in this case that "no one

---

10/  There continued to be a wealth of information about the amount below "AWP" at which retail pharmacies purchased prescription drugs. For example, reports submitted by the National Association of Retail Druggists to Congress in 1992 showed that AWP for brand-name drugs could exceed the price paid by the provider by up to 94%. *See* Hearing Before the Subcomm. on Health and the Environment of the Comm. on Energy and Commerce for the House of Representatives (Jul. 31, 1992).

14

understood" the mark-up that physicians made on pharmaceuticals they administered, the alleged "lack of understanding" was not due to any lack of knowledge. Comments published in the Federal Register flatly stated that physicians could purchase many drugs for "*considerably less* than 85% of AWP." 56 Fed. Reg. 59,524 (Nov. 25, 1991)(emphasis added). Government officials must have recognized that even if they reimbursed at "AWP minus 15%" (and few states had reduced reimbursement to that level in 1991), physicians were getting a "considerable" mark-up on "many" drugs.

Published reports continued to evidence HCFA's understanding of discounts in the physician market. In 1992, the OIG compared the AWP and physicians' actual cost for commonly-used chemotherapy drugs and noted spreads of 12% to 83%. *See* DHHS, OIG Report, "Physicians' Costs for Chemotherapy Drugs, A-02-91-01049, at App. II and III (Nov. 1992), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 40,927. The report expressly found: "there is no single discount rate which can be applied to the AWP to provide a reasonably consistent estimate of the physician's acquisition cost." There is no basis for the government to argue that State Medicaid officials did not understand that physicians were obtaining a mark-up administering drugs when acquisition cost was as low as "AWP minus 83%" and reimbursement was typically "AWP minus 5%."

The OIG report also highlights – almost eight years ago and well before the qui tam involved here was filed – that information published by the

commercial pricing services was not intended to address the acquisition cost of drugs administered in physician offices:

> Red Book officials advised us that their data on AWPs, like the information used by the Blue Book or Medispan, is meant to approximate the cost to retailers (pharmacists) only. These officials also emphasized that their focus has always been the pharmacy sector which is their chief market *and that this is clearly understood by those who supply information to the Red Book.*

*Id.* at ¶ 33,792 (emphasis added). Thus, in 1994, the OIG recognized that the Manufacturers "clearly understood" that the information they supplied to the commercial pricing services related to pricing to retail pharmacies. The Department of Justice's attempt to suggest otherwise in this case is a wholesale rewriting of history.

It is not even necessary to analyze the many government reports pointing out that "AWP" did not equal provider acquisition cost. The following widely available characterizations of "AWP" are sufficient to prove that the government long knew the difference.

- The HEW Report cited above described "AWP" as "an umbrella under which prices are discounted rather than reflecting actual prices." (1968)

- The Medicaid Bureau of HCFA referred to "AWP," "which was a realistic catalogue price in 1970, but which now is an arbitrary price, based on the Red Book." (October 1977)

- The Office of Inspector General described "AWP" as "non-discounted list price." (1984)

- The General Accounting Office defined "AWP" as "the price pharmacies would pay if they did not receive discounts from manufacturers." (March 1993)