# EXHIBIT I

Scully, Thomas A.                                              May 15, 2007
                            Washington, DC

                                                                   Page 1

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL         :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION

PRICE LITIGATION               :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-a-Care of     :  Judge Patti B. Saris

the Florida Keys, Inc.         :

     v.                        :

Abbott Laboratories, Inc.,     :  Chief Magistrate

No. 06-CV-11337-PBS            :  Judge Marianne B.

- - - - - - - - - - - - - - -x    Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

```
                                                   Page 2                                                          Page 4
 1        IN THE CIRCUIT COURT OF                              1        IN THE COURT OF COMMON PLEAS
 2      MONTGOMERY COUNTY, ALABAMA                             2           FIFTH JUDICIAL CIRCUIT
 3  ---------------x                                           3  ---------------------------------X
 4  STATE OF ALABAMA,         :                                4  STATE OF SOUTH CAROLINA, and   :   STATE OF
 5     Plaintiff,     :                                        5  HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6     vs.           : Case No.: CV-05-219                     6  capacity as Attorney General for  :  COUNTY OF
 7  ABBOTT LABORATORIES, INC.,   : Judge Charles Price         7  the State of South Carolina,   :   RICHLAND
 8   et al.          :                                         8      Plaintiff,        :
 9     Defendants.      :                                      9     v.             : CIVIL ACTION NO.
10  ---------------x                                          10  WARRICK PHARMACEUTICALS       : 2006-CP-40-4390
11                                                            11  CORPORATION, et al.       : 2006-CP-40-4399
12  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY          12     Defendants.      :
13  ---------------------------X                              13  ---------------------------------X
14  STATE OF WISCONSIN,      : CASE NO.                       14  STATE OF SOUTH CAROLINA, and   :   STATE OF
15      Plaintiff,    : 04-CV-1709                            15  HENRY D. McMASTER, in his official : SOUTH CAROLINA
16     v.          :                                          16  capacity as Attorney General for  :  COUNTY OF
17  AMGEN INC., et al.,     :                                 17  the State of South Carolina,   :   RICHLAND
18      Defendants.   :                                       18      Plaintiff,        :
19  ---------------------------X                              19     v.             : CASE NO.
20                                                            20  ABBOTT LABORATORIES, INC.    : 2006-CP-40-4394
21                                                            21     Defendant.       :
22                                                            22  ---------------------------------X

                                                   Page 3                                                          Page 5
 1      UNITED STATES DISTRICT COURT                           1        IN THE COURT OF COMMON PLEAS
 2        DISTRICT OF MASSACHUSETTS                            2           FIFTH JUDICIAL CIRCUIT
 3  ---------------------------------X                         3  ---------------------------------X
 4  THE COMMONWEALTH OF MASSACHUSETTS : CIVIL ACTION NO        4  STATE OF SOUTH CAROLINA, and   :   STATE OF
 5      Plaintiff,    : 03-CV-11865-PBS                        5  HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6    v.         :                                             6  capacity as Attorney General for  :  COUNTY OF
 7  MYLAN LABORATORIES, INC., et al.  :                        7  the State of South Carolina,   :   RICHLAND
 8      Defendants.     :                                      8      Plaintiff,        :
 9  ---------------------------------X                         9     v.             : CIVIL ACTION NO.
10                                                            10  PAR PHARMACEUTICALS COMPANIES,   : 2006-CP-40-7151
11       SUPERIOR COURT OF NEW JERSEY                         11  INC.,            : 2006-CP-40-7153
12            UNION COUNTY                                    12     Defendant.       :
13  ---------------------------------X                        13  ---------------------------------X
14  CLIFFSIDE NURSING HOME, INC., on  : LAW DIVISION          14  STATE OF SOUTH CAROLINA, and   :   STATE OF
15  behalf of itself and all others   : DOCKET NO.            15  HENRY D. McMASTER, in his official : SOUTH CAROLINA
16  similarly situated, as defined    : UNN-L-2329-04         16  capacity as Attorney General for  :  COUNTY OF
17  herein,         :                                         17  the State of South Carolina,   :   RICHLAND
18      Plaintiffs,   :                                       18      Plaintiff,        :
19    v.         :                                            19     v.             : CIVIL ACTION NO.
20  DEY, INC., et al.     :                                   20  MYLAN LABORATORIES INC.,    : 2007-CP-40-0282
21      Defendants.   :                                       21     Defendant.       : 2007-CP-40-0283
22  ---------------------------------X                        22  ---------------------------------X
```

Scully, Thomas A.                                                May 15, 2007
                              Washington, DC

```
                                              Page 6                                                Page 8
 1        IN THE COURT OF COMMON PLEAS               1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2          FIFTH JUDICIAL CIRCUIT                   2           STATE OF MISSOURI
 3    ---------------------------------X             3    - - - - - - - - - - - - - - - - x
 4    STATE OF SOUTH CAROLINA, and     :  STATE OF   4    STATE OF MISSOURI, ex rel,     :
 5    HENRY D. McMASTER, in his official : SOUTH CAROLINA 5 JEREMIAH W. (JAY) NIXON,     :
 6    capacity as Attorney General for  :  COUNTY OF 6    Attorney General,              :
 7    the State of South Carolina,      :  RICHLAND  7    and                            :
 8         Plaintiff,                   :            8    MISSOURI DEPARTMENT OF SOCIAL  :
 9         v.                           :  CIVIL ACTION NO. 9 SERVICES, DIVISION OF MEDICAL : Case No.
10    BARR PHARMACEUTICALS, INC.        :  2007-CP-40-0280 10 SERVICES,                  :  054-1216
11         Defendant.                   :  2007-CP-40-0286 11    Plaintiffs,             :  Division No. 31
12    ---------------------------------X            12         vs.                       :
13                                                  13    DEY INC., DEY, L.P., MERCK KGaA, :
14       IN THE CIRCUIT COURT OF THE FIRST CIRCUIT  14    EMD, INC., WARRICK             :
15              STATE OF HAWAII                     15    PHARMACEUTICALS CORPORATION,   :
16    ---------------------------------X            16    SCHERING-PLOUGH CORPORATION, and :
17    STATE OF HAWAII,                  :  CASE NO. 17    SCHERING CORPORATION,          :
18         Plaintiff,                   :  06-1-0720-04 EEH 18    Defendants.            :
19         v.                           :            19   - - - - - - - - - - - - - - - - x
20    ABBOTT LABORATORIES, INC., et al. :  JUDGE EDEN 20
21         Defendants.                  :  ELIZABETH HIFO 21
22    ---------------------------------X            22

                                              Page 7                                                Page 9
 1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT  1           COMMONWEALTH OF KENTUCKY
 2          IN AND FOR LEON COUNTY, FLORIDA          2         FRANKLIN CIRCUIT COURT - DIV. II
 3    THE STATE OF FLORIDA                           3    ---------------------------------X
 4    ex rel.                                        4    COMMONWEALTH OF KENTUCKY,       :  CIVIL ACTION NO.
 5    - - - - - - - - - - - - - - - - x              5         Plaintiff,                 :  03-CI-1134
 6    VEN-A-CARE OF THE FLORIDA        :             6         v.                         :
 7    KEYS, INC., a Florida            :             7    ABBOTT LABORATORIES, INC., et al. :
 8    Corporation, by and through its  :             8         Defendants.                :
 9    principal officers and directors, :            9    ---------------------------------X
10    ZACHARY T. BENTLEY and           :            10
11    T. MARK JONES,                   :            11           COMMONWEALTH OF KENTUCKY
12         Plaintiffs,                 :            12         FRANKLIN CIRCUIT COURT - DIV. I
13         vs.                         :  Civil Action 13    ---------------------------------X
14    MYLAN LABORATORIES INC.; MYLAN   :  No.: 98-3032G 14 COMMONWEALTH OF KENTUCKY, ex rel. : CIVIL ACTION NO.
15    PHARMACEUTICALS INC.; NOVOPHARM  :  Judge: William 15 GREGORY D. STUMBO, Attorney General: 04-CI-1487
16    LTD., SCHEIN PHARMACEUTICAL, INC.; :  L. Gary   16        Plaintiff,                :
17    TEVA PHARMACEUTICAL INDUSTRIES   :            17         v.                         :
18    LTD., TEVA PHARMACEUTICAL USA;   :            18    ALPHAPHARMA, INC., et al.       :
19    and WATSON PHARMACEUTICALS, INC., :           19         Defendants.                :
20         Defendants.                 :            20    ---------------------------------X
21    - - - - - - - - - - - - - - - - x             21             Washington, D.C.
22                                                  22             Tuesday, May 15, 2007
```

3 (Pages 6 to 9)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                              May 15, 2007
                             Washington, DC

Page 10

```
 1        Videotaped Deposition of THOMAS A.
 2   SCULLY, a witness herein, called for examination by
 3   counsel for Abbott Laboratories in the above-entitled
 4   matter, pursuant to subpoena, the witness being duly
 5   sworn by SUSAN L. CIMINELLI, a Notary Public in and
 6   for the District of Columbia, taken at the offices of
 7   Jones Day, 51 Louisiana Avenue, Northwest,
 8   Washington, D.C., at 8:49 a.m. on Tuesday, May 15,
 9   2007, and the proceedings being taken down by
10   Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and
11   transcribed under her direction.
12
13
14
15
16
17
18
19
20
21
22
```

Page 11

```
 1   APPEARANCES:
 2
 3      On behalf of the United States of America:
 4         GEJAA T. GOBENA, ESQ.
 5         JOHN K. NEAL, ESQ.
 6         ANDREW MAO, ESQ.
 7         U.S. Department of Justice
 8         Civil Division
 9         601 D Street, Northwest
10         PHB - 9028/P.O. Box 261
11         Washington, D.C. 20044
12         Gejaa.Gobena@usdoj.gov
13         (202) 307-1088
14
15
16
17
18
19
20
21
22
```

Page 12

```
 1   APPEARANCES (continued):
 2
 3      On behalf of the U.S. Department of
 4      Health and Human Services:
 5         TROY A. BARSKY, ESQ.
 6         U.S. Department of Health and Human Services
 7         CMS Division
 8         C2-05-23
 9         7500 Security Boulevard
10         Baltimore, MD  21244-1850
11         (410) 786-8873
12         troy.barsky@hhs.gov
13
14      On behalf of the State of California:
15         NICHOLAS N. PAUL, ESQ.
16         Supervising Deputy Attorney General
17         Civil Prosecutions Unit
18         P.O. Box 85266
19         110 West A Street, #1100
20         San Diego, CA  82186
21         (619) 688-6099
22         nicholas.paul@doj.ca.gov
```

Page 13

```
 1   APPEARANCES (continued):
 2
 3      On behalf of the State of Alabama:
 4         ROGER BATES, ESQ.
 5         Hand Arendall, L.L.C.
 6         1200 Park Place Tower
 7         2001 Park Place North
 8         Birmingham, AL  35203
 9         (205) 502-0105
10         Rbates@handarendall.com
11
12      On behalf of the State of Florida:
13         MARY S. MILLER, ESQ.
14         Office of the Attorney General of Florida
15         PL-01, The Capitol
16         Tallahassee, FL  32399-1050
17         (850) 414-3600
18         Mary_Miller@oag.state.fl.us
19
20
21
22
```

4 (Pages 10 to 13)

Page 46

1  was something you were aware of in 1997?
2      A.   Yes.
3      Q.   And you were also aware of that in
4  1990-1991, correct?
5      A.   Yes.
6      Q.   Did the hospitals have associated with
7  them -- strike that.
8           Is it true that some hospitals have
9  affiliates that might be what you call sort of
10 offsite outpatient settings that they, that are
11 affiliated with the hospitals you represented?
12          MR. GOBENA:  Objection.  Form.
13          BY MR. DALY:
14     Q.   It wasn't a great question, but if you
15 understand it, go ahead.
16     A.   Yes, most hospitals, to be part of a
17 hospital complex as a license, you basically have to
18 been on the campus, so you would be unable to serve
19 your center if you weren't, largely.  So offsite,
20 it's possible, but most outpatient units are on site.
21     Q.   As -- well, are there offsite oncology,
22 dialysis or infusion businesses, were those, any of

Page 47

1  those entities members of FAH?
2      A.   Not that I'm -- some of the companies
3  probably had subsidiaries they owned, but that was
4  not their primary focus.  Their primary focus at the
5  time was outpatient departments.
6      Q.   Okay.  And in your duties as the president
7  and CEO of FAH, and in connection with your lobbying
8  efforts on behalf of that organization, who did you
9  interface with in the Federal Government?
10     A.   That's a long list.  Pretty much everyone.
11     Q.   Maybe it is.  Let me break it down.
12     A.   CMS administrator, HCFA administrator was
13 somebody I was very friendly with.
14     Q.   Okay.  And who was that?
15     A.   Nancy-Ann Mindeparo, who had replaced me
16 at OMB at the beginning of the Clinton
17 Administration, and then moved on to HCFA.  So I had
18 a long, good professional relationship with her.  And
19 obviously back then, I can't remember who the -- I
20 guess it was probably Chairman Thomas of the Ways and
21 Means Committee, and primarily -- I can't remember
22 who the chairman of the finance committee was back

Page 48

1  then.  I guess it was probably -- I can't remember
2  who was in power, but Senator Grassley or Baucus, one
3  of those, which committee.
4           But you know, most of the committee staff
5  and the relevant committees, I had known for years
6  and the members and the ranking members and chairmen.
7      Q.   And that would be, that would include the
8  Ways and Means Committee?
9      A.   Yes.
10     Q.   And the Senate Finance Committee?
11     A.   Senate Finance, and Commerce.
12     Q.   Commerce.
13     A.   Commerce.
14     Q.   And these are the folks that you would
15 have had periodic contact with throughout your tenure
16 as president and CEO of FAH?
17     A.   Yes.  And all through the first Bush
18 Administration, generally people I had known for
19 years.  All through the first Bush Administration.
20     Q.   And you stayed with FAH until 2001, is
21 that correct?
22     A.   Yep.

Page 49

1      Q.   And then you were appointed --
2      A.   Start from scratch, we are in trouble.
3      Q.   And then you were appointed to be the
4  administrator of HCFA, is that correct?
5      A.   I think I was probably nominated in
6  February-March.  I think I was confirmed roughly in
7  May, but I took -- basically became a consultant with
8  HCFA, I think in probably early 2001.  Until I was
9  confirmed.
10     Q.   All right.  So you were nominated, and
11 prior -- I just want to understand that -- prior to
12 being confirmed, you worked as a consultant?
13     A.   Prior to being confirmed, I worked as a
14 consultant.
15     Q.   So beginning in February or March?
16     A.   Yes.
17     Q.   And we are talking 2001?
18     A.   2001.
19     Q.   And insofar as you know, how is it that
20 you came to be nominated for this position?
21     A.   God knows.  I think I had a long
22 relationship with first, obviously the first Bush

### Page 50

1   Administration.  And not planning to go back into the
2   government, but I ran into Secretary Thompson or
3   something, and a mutual friend had recommended that
4   he encourage me to do this.  So it was largely
5   through Secretary Thompson.  And since I had a long
6   history with the Bush Administration, hopefully I was
7   an acceptable choice to the White House.
8        Q.   And you stayed there until -- you stayed
9   as administrator of HCFA and CMS, which was one of
10  the first things you did was to change the name,
11  until what, the end of --
12       A.   Technically, it was January 4th of 2004,
13  was my technically last day.
14       Q.   Will you mark this?  This will be 181, I
15  believe.  Exhibit Abbott 181.
16            MS. MILLER:  Mary Miller on behalf of the
17  Florida Attorney General's office.  Florida reserves
18  the right to strike all testimony relating to
19  documents used as exhibits here today with respect to
20  the Mylan case and cross-noticed case, due to failure
21  to produce said documents based on properly served
22  request for production of documents.

### Page 51

1            (Exhibit Abbott 181 was
2                marked for identification.)
3            BY MR. DALY:
4        Q.   Mr. Scully, I'm handing you what
5   apparently the government did not properly serve on
6   the Florida qui tam, which is a copy of your CV,
7   resume that was, I think, provided to us by
8   Mr. Gobena last week.  Is that indeed your current
9   resume?
10           MS. MILLER:  Objection to form.
11  Clarification.  It wasn't the government that failed
12  to produce said documents.  It was the Mylan
13  defendants who failed to produce said documents.
14           MR. GOBENA:  I'm confused by her
15  objection.
16           MR. DALY:  I didn't have an objection.
17           MS. MILLER:  It was the Mylan defendants
18  and the other defendants who failed to produce the
19  documents.  It wasn't the government who was required
20  to produce the documents.
21           MR. ESCOBAR:  I'm Phil Escobar on behalf
22  of the Mylan defendants.  You say that you're

### Page 52

1   objecting to a document that the Mylan defendants did
2   not give you that came from the government?
3            MS. MILLER:  That we had properly served.
4   It's to the extent that it should have been produced
5   to document requests properly served on the
6   defendants in the cross-noticed case.  We reserve
7   that right.  I just wanted to clarify what my
8   objection was, so the Abbott counsel was clear about
9   this.
10           MR. BREEN:  Just so the record is clear,
11  in the Florida ex rel Ven-a-Care Mylan action, the
12  state has requested documents from Mylan.  And Mylan
13  has objected, I believe, to the lack of a protective
14  order or something at this point in time.  And I
15  believe the AG's objection is simply that if any of
16  those documents are used in this deposition today,
17  with respect to the deposition is used in the Mylan
18  case, Florida is objecting.  It's that simple, right,
19  Mary?
20           MS. MILLER:  Yes.  It is that simple.
21  Thank you.
22           MR. GOBENA:  The only subpoena we received

### Page 53

1   was from Abbott Labs.  We provided -- asking for the
2   resume.  We provided it to you, so there is nothing
3   improper that we did in terms of nonservice.
4            BY MR. DALY:
5        Q.   I don't think so either, but I -- at least
6   in terms of this resume.
7            MR. GOBENA:  Fair enough.
8            THE WITNESS:  Hopefully, there is nothing
9   bad on my resume.  I'd hate to be in the Joe Biden
10  camp here.
11           BY MR. DALY:
12       Q.   So this is indeed a copy of your current
13  resume, Mr. Scully?
14       A.   I think so.  It looks like it is.
15       Q.   Okay.  Now, after you left CMS in January
16  of '04, you went to work for Alston & Bird?
17       A.   Simultaneously Welsh Carson and Alston &
18  Bird.
19       Q.   And you're still at Alston & Bird?
20       A.   Yes.
21       Q.   And what do you do there?
22       A.   I started the health care practice, and I

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 74

1    So I spent a lot of time talking to and
2  working with her.  And Nancy-Ann Mindeparo, who was a
3  good friend, was the Clinton Administration's last
4  political appointee.  And I spent a lot of time
5  talking to her about staff and which staff was strong
6  and not.  So I spent a lot of time talking to her.
7  Did I email with her?  I would assume I probably did,
8  but we have been friends for many years.
9       Q.   When you came on board at CMS, I assume
10 that Ms. Mindeparo would have had files of her own,
11 email files, hard copy files, things of that nature.
12 When you came on board, were any of those files given
13 to you?
14      A.   No.  Not that I'm aware of.
15      Q.   And in terms of the 10 months that
16 Ms. McMullen served as acting administrator, did she
17 provide you with the files that she had accumulated
18 during her 10 months?
19      A.   Not that I recall.
20      Q.   How did you maintain your email files
21 while you were at the CMS?
22      A.   I mean, I didn't maintain email files.  I

Page 75

1  just obviously used a lot of email.  I'm sure there
2  were many years backed up, but I know that they were
3  all apparently erased when I left somehow, because I
4  know that, for other purposes, they don't exist.
5       Q.   And what is the basis for your belief that
6  they were erased after you left?
7       A.   Based on other issues that had to do with
8  the cost of the prescription drug bill, things I
9  negotiated when Congress was looking into it, when I
10 left all my files and emails apparently were --
11 because I wanted to get ahold of them.  Somebody else
12 -- my understanding is they were -- there was no
13 record of them that I could find.  At least that I
14 was allowed to have from the government's point of
15 view.
16      Q.   And when did you try to get that
17 information?
18      A.   There was a fairly significant
19 investigation, various fronts of the Medicare
20 prescription drug bill, which I was the primary
21 negotiator for with Congress.  And during that
22 period, I was trying to go back to get emails.  I was

Page 76

1  told they didn't exist.  If they do, I've never been
2  allowed to see them.
3       Q.   Okay.  So you're referring to the time
4  period while you were still at CMS?
5       A.   After I left CMS.
6       Q.   All right.  So after you left CMS, you
7  tried to obtain copies of your own emails?
8       A.   I asked if they were there, and also
9  during the course of other investigations from
10 Congress and GAO and other places, I was told by
11 others that they didn't exist.
12      Q.   Who told you that?
13      A.   Congressional staff, GAO, other people.
14 If it's not true, it's news to me.
15      Q.   No.  I'm not saying it's not true.  I'm
16 just asking --
17      A.   Yes.  That's what I was told.  I was
18 interested, as were other people, in going back and
19 looking at my old emails about the cost of the
20 Medicare bill, and things that went on.  And I was
21 told when I left that they were, without my
22 knowledge, were all -- they no longer exist.

Page 77

1       Q.   And this is something that you recall
2  being told by what, congressional staffers?
3       A.   And GAO and also CMS people, three or four
4  months after I left.
5       Q.   Who did you talk to at CMS three or four
6  months --
7       A.   I don't remember.  I just know that I
8  asked about them, and was told they don't exist.
9       Q.   Who would you have called, based on your
10 contacts there, if you were calling up CMS to say,
11 hey, I'd like to see copies of, you know, my emails
12 on subject X?  Who would that be?
13      A.   At the time, probably would have been Pete
14 Urbanowicz, I would guess.  I don't remember
15 specifically talking to him, or Tom Barker, who was
16 -- both -- who was a career lawyer who worked for me.
17      Q.   Tom Barker?
18      A.   Tom Barker.  Yes.
19      Q.   Marker, M-A-R-K-E-R?
20      A.   B-A-R-K-E-R.  Barker.  He was kind of my
21 staff counsel.  He now works for the Secretary.
22      Q.   And you mentioned a couple of times, I've

20 (Pages 74 to 77)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                                    May 15, 2007
                              Washington, DC

Page 78

1  done it phonetically, but do you know how to spell
2  Mr. Urbanowicz's name?
3      A.   U-R-B-A-N-O-W-I-C-Z, I think.  Are you at
4  a convenient stop for a 30-second bio break?  Just
5  very quick.  Sorry about that.
6          THE VIDEOGRAPHER:  The time is 9:47 a.m.
7  We are going off the record.  This ends tape number 1
8  in the deposition of Thomas Scully in the matter of
9  In Re Pharmaceutical Industry Average Wholesale Price
10 Litigation.
11         (Recess.)
12         THE VIDEOGRAPHER:  The time is 10:01 a.m.
13 We are going back on the record, starting tape number
14 2 in the deposition of Thomas Scully, in the matter
15 of In Re Pharmaceutical Industry Average Wholesale
16 Price Litigation.
17         BY MR. DALY:
18     Q.   Mr. Scully, I wanted to go back to what
19 you said about shortly after you left CMS, having
20 checked with CMS about some emails.  What were the
21 circumstances under which you were looking for those
22 emails at that point in time?

Page 79

1      A.   Oh, I think there was a discussion of --
2  there were a variety of investigations going on
3  surrounding the drug bill.  There was another one
4  surrounding a personal issue with me and my, my
5  leaving.  And during the course of the investigation,
6  both GAO people and Inspector General people and
7  people from CMS, at least my recollection, all told
8  me that my emails from those days did not exist.
9          For example, I sent out almost daily an
10 email to all 4,000 employees saying what I was doing
11 that day.  And I think all of those were deleted from
12 the system from what I was told.  I've certainly
13 never seen any of them, and I've asked to see them.
14     Q.   And I think we touched on this, but who is
15 it that you think told you that?
16     A.   I'm pretty certain that I talked to the
17 systems people at CMS.  I know that I talked to --
18 I'm pretty sure I talked to Peter Urbanowicz and Tom
19 Barker.
20     Q.   And this was within three months
21 approximately after you left in January of '04?
22     A.   Three or four months after I left, there

Page 80

1  was a rather large public debate around the cost of
2  the Medicare bill, and various issues about, you
3  know, the negotiation of the Medicare bill during
4  that period.
5      Q.   And you mentioned one type of email which
6  was -- was that a weekly or daily email that you
7  sent?
8      A.   First year and a half, I sent a daily
9  email to all employees.  And then I probably started
10 sending it twice a week after that.
11     Q.   And when you -- you may have not done this
12 personally, but maybe your assistant may have done
13 it, but did you have any kind of process where you
14 would save emails and put them into a folder or
15 archive them or anything like that?
16     A.   My assistant now at my law firm was my
17 assistant, one of my primary assistants back then, so
18 she would know.  But I'm not aware if there was one,
19 if she did it.  Shanetta Allen, she worked for me at
20 CMS and came to my law firm with me.
21     Q.   And what's her name?
22     A.   Shanetta Allen.

Page 81

1      Q.   And if she had a system for maintaining
2  your emails, it's something that she would know
3  about, but you don't?
4      A.   Yes.  But I believe she would also tell
5  you that she has also been told that the emails don't
6  exist.
7      Q.   Did CMS, while you were there, have any
8  policy concerning the retention of emails?
9      A.   Not that I'm aware of.
10     Q.   Who would -- who within CMS would, would
11 know that, if there was such a policy?
12     A.   I'm not sure who's left that would know
13 that.  Let me -- I'm not sure, to be honest with you.
14     Q.   In terms of -- they don't have to still be
15 there.  I mean, if you know somebody that while you
16 were there you think is the person --
17     A.   Well, at the time, most of the time I was
18 there, before she became the deputy, Leslie Norwalk,
19 who is now the acting administrator was the chief
20 counsel.  I mean, she was my personal staff counsel,
21 not the HHS deputy general counsel.  And she probably
22 would have made calls like that.  And she was very

21 (Pages 78 to 81)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 374

1  Q.  And to do so -- well, I mean, I take it
2  that fixing 50 state Medicaid programs would be, you
3  know, versions of trying to fix Medicare times 50.
4  Is that fair?
5  A.  Yes.
6  Q.  Because each state would have its own
7  political issues, for example, correct?
8      MR. GOBENA:  Object to the form.
9      THE WITNESS:  Yes.  Medicaid is 54
10 territories, 55 different programs that are all
11 complex and all different payment rates and different
12 politics and makes Medicare reform look simple.
13     BY MR. DALY:
14 Q.  And for example, you would have, you know,
15 providers within each state, this time including
16 pharmacies, for example, that would be complaining to
17 state governments if reimbursement levels attempted
18 to be reduced, be reduced, is that true?
19     MR. GOBENA:  Objection.  Form.
20     THE WITNESS:  Yes.  Every state had
21 different pharmacy politics with the providers and
22 what the dispensing fees were and what the

Page 375

1  acquisition costs were.  Yes.
2      BY MR. DALY:
3  Q.  But it was your view, it was CMS's view
4  that if a state wanted to pay to reimburse pharmacies
5  at AWP minus, say, 10 percent, for example, even
6  though the actual acquisition cost of the drug might
7  be AWP minus 72 percent, you did not find that to be
8  unreasonable?
9      MR. GOBENA:  Objection to the form.  This
10 witness is not here as a 30(b)(6) testifying about
11 CMS's views.
12     BY MR. DALY:
13 Q.  Go ahead.
14     MR. GOBENA:  You can answer.
15     THE WITNESS:  My personal view was that it
16 was -- was it unreasonable?  Yes.  I mean, I spent a
17 lot of time complaining to states about trying to
18 make sure that they paid the lower cost for drugs,
19 and some did.  And I pushed on a lot of states to
20 hire third party PBMs which a lot of them did, to buy
21 their drugs and lower their acquisition costs and
22 come up with a market-based pricing, which

Page 376

1  increasingly some did.
2      And I authorized the number multi-state
3  purchasing groups which were controversial for states
4  to go ahead and use private PBMs to lower their cost.
5  So it was a concern.  For me it was more direct and
6  immediate concern for the Medicare program, which I
7  was directly responsible for.  But when states asked
8  me what to do on Medicaid drug pricing, my general
9  advice, which a lot of them did, was to hire a PBM to
10 go out, put them at risk, and drive prices down,
11 which a number of them did.
12     BY MR. DALY:
13 Q.  In your testimony in 2003, you testified
14 that Medicaid has actually become a larger program
15 than Medicare.  Do you recall that testimony?
16 A.  Yes.
17 Q.  And so why do you say that you didn't have
18 direct responsibility for trying to reduce the
19 federal government's Medicaid payments?
20     MR. GOBENA:  Object to the form.
21 Mischaracterizes the witness's testimony.  You can
22 answer.

Page 377

1      THE WITNESS:  I did have responsibility
2  for Medicaid.  The federal government runs and
3  manages Medicare day-to-day.  And when you had a
4  situation like you did for Medicare, I felt it was
5  probably next to prescription drug reform, which was
6  my number one priority going back in the government.
7  And number two was probably fixing AWP, because it
8  was a big fiscal and management and policy problem
9  for the agency.
10     So I spent a lot of time trying to fix it.
11 On Medicaid, I had equal interest but the single
12 biggest Medicaid policy fiscal issue that we had was
13 if -- was the states scamming reimbursement matches
14 which I mentioned earlier, which was a multibillion
15 dollar problem, state by state, with the states
16 because they had a fiscal partnership between the
17 federal and state governments.  The single biggest
18 policy problem there that I spent most of my time on
19 was to trying to prevent the states from putting up
20 air to match federal, and drawdown federal dollars
21 without putting out state dollars.
22     Once we got to the point where we're

95 (Pages 374 to 377)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.  
Washington, DC  
May 15, 2007

Page 378

1  actually running the state Medicaid programs as
2  partnership with equal partners putting up their
3  matches, it was a lot easier to talk to them about
4  trying to -- they didn't care as much about what they
5  paid for drugs when they were spending federal
6  dollars.
7         So my biggest policy priority on Medicaid
8  was to trying to get the states to actually live with
9  a match. Once they did that, they were magically
10 much more interested in trying to figure out how to
11 pay the right amount for drugs. They weren't quite
12 as interested in what they paid for drugs or for
13 physicians or nursing homes or anything else when
14 they were paying with 100 percent federal dollars or
15 90 percent federal dollars.
16        So my number one priority was to make sure
17 they were putting in their share and then magically
18 they became much more interested in trying to figure
19 out what the right amount to pay for drugs was, which
20 many states did. And the states that I worked with,
21 including governors, Michigan and a lot of other
22 states that formed multistate cooperatives were very

Page 379

1  interested in lowering their drug costs.
2         And my view was because they did not have
3  the statutory construct that we had in Medicare, the
4  smartest states hired private PBMs, I think seven or
5  eight of them in the multistate cooperative, and a
6  lot of the third party negotiators to lower the drug
7  cost, which many of them did. And that was the
8  growing trend while I was at CMS.
9         BY MR. DALY:
10    Q.  When you said that the states didn't have
11 statutory constructs, what do you mean by that?
12    A.  I don't believe the states had -- they
13 were able to file state Medicaid plans to pay for
14 drugs under a variety of mechanisms. Their average
15 might have been ASP minus 10, but they consensually
16 -- as long as they covered the basic categories of
17 drugs and beneficiaries mandated by Medicaid law,
18 they could pay -- they could do it under a wide
19 variety of payment schemes, and they did. And
20 probably as many different ways to pay for drugs as
21 there were states.
22    Q.  But the OIG is telling you that the

Page 380

1  discounts below AWP run all the way up to 72 percent,
2  correct?
3         MR. GOBENA: Object to the form.
4         THE WITNESS: That states were paying?
5         BY MR. DALY:
6    Q.  Yes.
7    A.  I'm sure that's right. The discount is
8  below that if you measure it versus AWP, but AWP is a
9  meaningless number for me. So were some states
10 negotiating prices much lower than that? I'm sure
11 they probably were.
12    Q.  Well, but OIG is telling you that it's the
13 average reimbursement by state Medicare agencies is
14 AWP minus 10.3 percent?
15        MR. GOBENA: Object to the form.
16        THE WITNESS: Yes.
17        BY MR. DALY:
18    Q.  So that's the average?
19    A.  Yes.
20        MR. GOBENA: Object to the form.
21        BY MR. DALY:
22    Q.  And if for certain drugs, the actual sales

Page 381

1  price is 75 percent lower than AWP, then those states
2  are overpaying by 65 percent, right?
3         MR. GOBENA: Object to the form.
4         THE WITNESS: In theory, some states may
5  have, but I believe over the time that I was there,
6  that probably -- that may be the average, but my
7  guess is that the weighting, weighted average may
8  have been lower, because more and more states hired
9  third party PBMs to do negotiating for them. And I
10 don't believe they -- maybe I'm wrong, but I don't
11 think that number counts rebates either.
12        BY MR. DALY:
13    Q.  When you said that you wanted to -- when
14 you came on with CMS, you wanted to work on the
15 prescription drug benefit and fix AWP, right?
16    A.  Right. Many other things, but that was --
17    Q.  Among other things?
18    A.  Those were certainly number one and three
19 or four of my top 10 probably.
20    Q.  And AWP is also an issue on the Medicaid
21 side of the equation within CMS, right?
22    A.  Yes. But it was not as high a priority as

96 (Pages 378 to 381)

Page 443

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL           :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       :  CIVIL ACTION

PRICE LITIGATION                 :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO         :  U.S. ex rel.

Ven-a-Care of The Florida        :  Judge Patti B. Saris

Keys, Inc.                       :

    v.                           :

Abbott Laboratories, Inc.,       :  Chief Magistrate

No. 06-CV-11337-PBS              :  Judge Marianne B.

- - - - - - - - - - - - - - -x     Bowler


            THOMAS A. SCULLY - VOLUME II

                   JULY 13, 2007

                  WASHINGTON, DC




    (CAPTION CONTINUED)

15199ddc-fb97-46a6-9907-a9804764b3c3

Page 444

```
 1         IN THE CIRCUIT COURT OF
 2       MONTGOMERY COUNTY, ALABAMA
 3  ---------------x
 4  STATE OF ALABAMA,        :
 5      Plaintiff,           :
 6    v.                     : Case No.: CV-05-219
 7  ABBOTT LABORATORIES, INC.,: Judge Charles Price
 8  Et al.                   :
 9      Defendants.          :
10  ---------------x
11  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
12  ----------------------------x
13  STATE OF WISCONSIN,      : CASE NO.
14      Plaintiff,    : 04-CV-1709
15    v.                     :
16  AMGEN INC., et al.,      :
17      Defendants.          :
18  ----------------------------x
```

Page 445

```
 1       UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3  ---------------------------------x
 4  THE COMMONWEALTH OF MASSACHUSETTS : CIVIL ACTION NO
 5      Plaintiff,     : 03-CV-11865-PBS
 6    v.                     :
 7  MYLAN LABORATORIES, INC., et al.  :
 8      Defendants.          :
 9  ---------------------------------x
10         SUPERIOR COURT OF NEW JERSEY
11              UNION COUNTY
12  ---------------------------------x
13  CLIFFSIDE NURSING HOME, INC., on : LAW DIVISION
14  Behalf of itself and all others  : DOCKET NO.
15  Similarly situated, as defined   : UNN-L-2329-04
16  Herein,                  :
17      Plaintiffs,          :
18    v.                     :
19  DEY, INC., et al.        :
20      Defendants.          :
21  ---------------------------------x
22
```

Page 446

```
 1       IN THE COURT OF COMMON PLEAS
 2          FIFTH JUDICIAL CIRCUIT
 3  ---------------------------------x
 4  STATE OF SOUTH CAROLINA, and    :   STATE OF
 5  HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6  Capacity as Attorney General for  :  COUNTY OF
 7  The State of South Carolina,    :    RICHLAND
 8      Plaintiff,              :
 9    v.                        : CIVIL ACTION NO.
10  WARRICK PHARMACEUTICALS     : 2006-CP-40-4390
11  CORPORATION, et al.         : 2006-CP-40-4399
12      Defendants.             :
13  ---------------------------------x
14  STATE OF SOUTH CAROLINA, and    :   STATE OF
15  HENRY D. McMASTER, in his official : SOUTH CAROLINA
16  Capacity as Attorney General for  :  COUNTY OF
17  The State of South Carolina,    :    RICHLAND
18      Plaintiff,              :
19    v.                        : CASE NO.
20  ABBOTT LABORATORIES, INC.,    : 2006-CP-40-4394
21      Defendant.              :
22  ---------------------------------x
```

Page 447

```
 1       IN THE COURT OF COMMON PLEAS
 2          FIFTH JUDICIAL CIRCUIT
 3  ---------------------------------x
 4  STATE OF SOUTH CAROLINA, and    :   STATE OF
 5  HENRY D. McMASTER, in his official : SOUTH CAROLINA
 6  Capacity as Attorney General for  :  COUNTY OF
 7  The State of South Carolina,    :    RICHLAND
 8      Plaintiff,              :
 9    v.                        : CIVIL ACTION NO.
10  PAR PHARMACEUTICALS COMPANIES,  : 2006-CP-40-7151
11  INC.,                       : 2006-CP-40-7153
12      Defendant.              :
13  ---------------------------------x
14  STATE OF SOUTH CAROLINA, and    :   STATE OF
15  HENRY D. McMASTER, in his official : SOUTH CAROLINA
16  Capacity as Attorney General for  :  COUNTY OF
17  The State of South Carolina,    :    RICHLAND
18      Plaintiff,              :
19    v.                        : CIVIL ACTION NO.
20  MYLAN LABORATORIES INC.,    : 2007-CP-40-0282
21      Defendant.              : 2007-CP-40-0283
22  ---------------------------------x
```

2 (Pages 444 to 447)

15199ddc-fb97-46a6-9907-a9804764b3c3

```
                                       Page 448                                              Page 450
 1      IN THE COURT OF COMMON PLEAS               1      IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2         FIFTH JUDICIAL CIRCUIT                  2              STATE OF MISSOURI
 3   ---------------------------------X            3   -------------------x
 4   STATE OF SOUTH CAROLINA, and    :  STATE OF   4   STATE OF MISSOURI, ex rel,    :
 5   HENRY D. McMASTER, in his official : SOUTH CAROLINA  5   JEREMIAH W. (JAY) NIXON,      :
 6   Capacity as Attorney General for  :  COUNTY OF  6   Attorney General,             :
 7   The State of South Carolina,    :  RICHLAND   7     and                           :
 8       Plaintiff,               :                8   MISSOURI DEPARTMENT OF SOCIAL   :
 9     v.                :  CIVIL ACTION NO.       9   SERVICES, DIVISION OF MEDICAL   : Case No.
10   BARR PHARMACEUTICALS, INC.,    :  2007-CP-40-0280 10   SERVICES,                  :  054-1216
11       Defendant.        :  2007-CP-40-0286      11       Plaintiffs,       :  Division No. 31
12   ---------------------------------x            12     v.                 :
13      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT  13   DEY INC., DEY, L.P., MERCK KGaA, :
14              STATE OF HAWAII                    14   EMD, INC., WARRICK            :
15   ---------------------------------x            15   PHARMACEUTICALS CORPORATION,   :
16   STATE OF HAWAII,           :  CASE NO.        16   SCHERING-PLOUGH CORPORATION, and :
17       Plaintiff,         :  06-1-0720-04 EEH   17   SCHERING CORPORATION,          :
18     v.                :                         18       Defendants.        :
19   ABBOTT LABORATORIES, INC., et al., :  JUDGE EDEN 19   -------------------x
20       Defendants.         :  ELIZABETH HIFO    20
21   ---------------------------------x            21
22                                                 22

                                       Page 449                                              Page 451
 1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT 1          COMMONWEALTH OF KENTUCKY
 2       IN AND FOR LEON COUNTY, FLORIDA           2        FRANKLIN CIRCUIT COURT - DIV. II
 3           THE STATE OF FLORIDA                   3   ---------------------------------x
 4              Ex rel.                             4   COMMONWEALTH OF KENTUCKY,   :  CIVIL ACTION NO.
 5   -------------------x                           5       Plaintiff,    :  03-CI-1134
 6   VEN-A-CARE OF THE FLORIDA    :                 6     v.              :
 7   KEYS, INC., a Florida        :                 7   ABBOTT LABORATORIES, INC., et al., :
 8   Corporation, by and through its  :             8       Defendants.        :
 9   Principal officers and directors, :            9   ---------------------------------x
10   ZACHARY T. BENTLEY and         :              10          COMMONWEALTH OF KENTUCKY
11   T. MARK JONES,            :                   11        FRANKLIN CIRCUIT COURT - DIV. I
12       Plaintiffs,       :                       12   ---------------------------------x
13     v.            :  Civil Action               13   COMMONWEALTH OF KENTUCKY, ex rel., : CIVIL ACTION NO
14   MYLAN LABORATORIES INC.; MYLAN   :  No.: 98-3032G  14   GREGORY D. STUMBO, Attorney General:  04-CI-1487
15   PHARMACEUTICALS INC.; NOVOPHARM  :  Judge: William  15   Plaintiff,         :
16   LTD., SCHEIN PHARMACEUTICAL, INC.; :  L. Gary   16     v.               :
17   TEVA PHARMACEUTICAL INDUSTRIES   :             17   ALPHAPHARMA, INC., et al.,   :
18   LTD., TEVA PHARMACEUTICAL USA;   :             18       Defendants.        :
19   And WATSON PHARMACEUTICALS, INC., :            19   ---------------------------------x
20       Defendants.       :                       20
21   -------------------x                           21
22                                                 22
```

                                              3 (Pages 448 to 451)

Page 452

```
 1                      Volume II
 2                   Washington, D.C.
 3                 Friday, July 13, 2007
 4
 5
 6         Videotaped Deposition of THOMAS A.
 7  SCULLY, a witness herein, called for examination by
 8  counsel for Abbott Laboratories in the above-entitled
 9  matter, pursuant to subpoena, the witness being duly
10  sworn by Cassandra E. Ellis, a Notary Public in and
11  for the District of Columbia, taken at the offices of
12  Jones Day, 51 Louisiana Avenue, Northwest, Washington,
13  D.C., at 8:50 a.m. on Friday, July 13, 2007, and the
14  proceedings being taken down by Stenotype by CASSANDRA
15  E. ELLIS, RPR, Livenote Certified Reporter, and
16  transcribed under her direction.
```

Page 453

```
 1   APPEARANCES:
 2
 3      On behalf of the United States of America:
 4         GEJAA T. GOBENA, ESQUIRE
 5         JOHN K. NEAL, ESQUIRE
 6         U.S. Department of Justice
 7         Civil Division
 8         601 D Street, Northwest
 9         PHB - 9028/P.O. Box 261
10         Washington, D.C. 20044
11         Gejaa.Gobena@usdoj.gov
12         (202) 307-1088
13
14   On behalf of the U.S. Department of
15   Health and Human Services:
16         BRIAN KELLEY, ESQUIRE
17         U.S. Department of Health and Human Services
18         CMS Division
19         C2-05-23
20         330 Independence Avenue, Southwest
21         WASHINGTON, D.C.
22         (202) 205-8702
```

Page 454

```
 1   APPEARANCES (continued):
 2      On behalf of the State of California:
 3         NICHOLAS N. PAUL, ESQ.
 4         Supervising Deputy Attorney General
 5         Civil Prosecutions Unit
 6         P.O. Box 85266
 7         110 West A Street, #1100
 8         San Diego, CA 82186
 9         (619) 688-6099
10         Nicholas.paul@doj.ca.gov
11
12      On behalf of the State of Alabama:
13         CLINTON CARTER, ESQ.
14         Beasley, Allen, Crow, Methvin,
15         Portis, & Miles, P.C.
16         272 Commerce Street
17         Post Office Box 4160
18         Montgomery, AL 36103
19         (334) 269-2343
20         Clint.carter@beasleyallen.com
21
22   (continued)
```

Page 455

```
 1   APPEARANCES (continued):
 2      On behalf of the State of Florida:
 3         (Via Telephone)
 4         MARY S. MILLER, ESQ.
 5         Office of the Attorney General of Florida
 6         PL-01, The Capitol
 7         Tallahassee, FL 32399-1050
 8         (850) 414-3600
 9         Mary_Miller@oag.state.fl.us
10
11      On behalf of Ven-a-Care of the Florida Keys, Inc.:
12         RAND RIKLIN, ESQ.
13         Goode, Casseb, Jones, Riklin, Choate, & Watson
14         2122 North Main
15         San Antonio, TX 78212
16         Riklin@goodelaw.com
17         (210) 733-6030
18
19
20
21
22   (continued)
```

4 (Pages 452 to 455)

Scully, Thomas A. - Vol. II          July 13, 2007
              Washington, DC

Page 496

1    A.  Yes.
2    Q.  And the ultimate resolution of that was
3  to pay 100 percent of AWP; correct?
4    A.  Yes, I believe so.  It's been a long
5  time.
6    Q.  And the proposed rule was to pay 85
7  percent of AWP; correct?
8    A.  I think that's correct.
9    Q.  And your best recollection is that
10 there was a debate within the administration in
11 which your position was that AWP was essentially
12 a made-up number?
13   MR. GOBENA:  I'm going to object on the
14 -- and caution the witness not to get into
15 deliberate discussions about his participation in
16 the final rule making that happened in `91.
17   A.  My recollections, to be brief about it,
18 was back then I had a much broader area of
19 responsibility at HHS or HCFA, and I was involved
20 in the decision, to some degree.  I didn't really
21 understand it, I watched it, I didn't have a
22 strong opinion or involvement.  I just was

Page 497

1  engaged in it.  And I think it left a bad taste
2  in my mouth that the policy wasn't right.
3       So I believe it started out at 85
4  percent AWP.  I believe a lot of providers
5  screamed and yelled and complained about it, is
6  my recollection, and it got reversed for the
7  lawyers leading the non-substantive political
8  purpose reasons, and it was a bad call.
9       So I -- I thought, from the beginning,
10 I thought the policy was flawed.  And as years
11 went on I saw it from the provider's side, after
12 I left the government, I think I understood how
13 flawed it was.  And it was on my -- high on my
14 agenda to fix when I went back to the government.
15   Q.  And I apologize for asking you about
16 events that occurred 17 years ago.  I would have
17 a hard time, myself.
18   A.  That's all right.
19   Q.  Just as a foundational issue it's fair
20 to say that your ability to remember what
21 happened 17 years ago is somewhat diminished?
22   A.  Yes.

Page 498

1    Q.  And if I had been able to ask you these
2  questions in 1997 or 1996 your ability to
3  remember those events back in 1990 and `91 would
4  be better?
5    A.  They would be about the same.  When I
6  was running CMS I was extremely involved in the
7  details.  And I was actually pretty involved in
8  the details when I was running a big hospital
9  association.
10      It was -- it was more peripheral an
11 issue to me when I was in the ONB in the white
12 house, and I was aware of it, and involved in it,
13 but I wasn't driving it.
14      So I don't think even then, if you
15 asked me in 1992, I could have had a thorough
16 discussion of what the policy was around AWP.
17   Q.  But you certainly could have given me
18 your recollection of it more accurately?
19   A.  Probably.
20   Q.  And if I wanted to go back and recreate
21 what the debate was back in 1990, `91, and `92,
22 about what the appropriate policy should be, what

Page 499

1  the goals of that policy should be, sitting here
2  in 2007, how would I go about doing that?
3    A.  You would probably have to drag poor
4  Gayle Wollenski in here and ask her.
5    Q.  Other than dragging poor Gayle
6  Wollenski in, and asking her, is there anything
7  else I could do to try to recreate what happened
8  17 years ago on this issue?
9    A.  I think --
10   MR. GOBENA:  Objection, form.
11   A.  I think the only people involved in a
12 really detailed way probably were the staff of
13 CMS.  And if Tom Gustafson was there, back then,
14 I'm not sure of he was involved in this.
15      Gayle was the administrator, she was
16 very involved in everything.  We worked together
17 a lot.  We were good friends.  And one of the
18 reasons I probably didn't have a strong opinion
19 is we were close friends and I trusted her
20 judgment on most things.  So I usually backed her
21 up.  But I know that she wasn't happy with it, at
22 the time.

15 (Pages 496 to 499)

Henderson Legal Services
202-220-4158

15199ddc-fb97-46a6-9907-a9804764b3c3