# EXHIBIT L

Page 1

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

    ------------------------------X

    IN RE: PHARMACEUTICAL         : MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE    : CIVIL ACTION:

    PRICE LITIGATION              : 01-CV-12257-PBS

                                  :

    THIS DOCUMENT RELATES TO      :

    U.S. ex rel. Ven-A-Care of    : Judge Patti B. Saris

    the Florida Keys, Inc. v.     :

    Abbott Laboratories, Inc.,    : Chief Magistrate Judge

    No. 06-CV-11337-PBS           : Marianne B. Bowler

    ------------------------------X



            Videotaped Deposition of JULIE CAROLYN

    BOUGHN, held at the Law Offices of Jones Day,

    51 Louisiana Avenue, Northwest, Washington, D.C.

    20001-2113, before Cindy L. Sebo, RMR, CSR, CRR,

    RPR, of Henderson Legal Services, Notary Public in

    and for District of Columbia.

Page 2

1            APPEARANCES OF COUNSEL
2
3    Attorneys for the Plaintiff:
4
5         United States Department of Justice
6         Civil Division
7         601 D Street, Northwest
8         Room 9147
9         Washington, D.C. 20004
10        (202) 307-0405
11        BY: JOHN K. NEAL, ESQUIRE
12
13        Department of Health and Human Services
14        Office of General Counsel
15        CMS Division
16        7500 Security Boulevard
17        Baltimore, Maryland 21244
18        (410) 786-9655
19        BY: LESLIE M. STAFFORD, ESQUIRE
20
21
22    (CONTINUED)

Page 3

1            APPEARANCES OF COUNSEL
2
3    Attorneys for the Defendant Abbott Laboratories:
4
5         Jones Day
6         51 Louisiana Avenue, Northwest
7         Washington, D.C. 20001-2113
8         (202) 879-3939
9         BY: R. CHRISTOPHER COOK, ESQUIRE
10        and HILARY A. RAMSEY, ESQUIRE
11
12   Attorneys for Dey, Inc., Dey, LP and Dey, LP, Inc.:
13
14        Kelley Drye & Warren LLP
15        101 Park Avenue
16        New York, New York 10178
17        (212) 808-7609
18        BY: CLIFFORD KATZ, ESQUIRE (Via Telephone)
19
20   ALSO PRESENT:
21        PAUL H. McVOY, Jones Day
22        MICHAEL HUNTERTON, Videographer

Page 4

1           INDEX OF EXAMINATION
2
3    WITNESS: JULIE CAROLYN BOUGHN              PAGE
4       Examination By Mr. Cook........................ 007
5       Examination By Mr. Katz........................ 244
6
7
8           INDEX OF EXHIBITS
9
10   NUMBER        DESCRIPTION            PAGE
11   Exhibit Abbott 025 - Resume of Julie C. Boughn... 019
12   Exhibit Abbott 026 - Organizational Chart........ 029
13   Exhibit Abbott 027 - Organizational Chart........ 033
14
15
16
17
18
19
20
21
22

Page 5

1              PROCEEDINGS
2         THE VIDEOGRAPHER:  Good morning.  This
3    is the videotaped deposition of Julie Boughn,
4    taken by the Defendant party in the matter of In
5    Re: Pharmaceutical Industry Average Wholesale
6    Price Litigation, MDL Number 1456, Civil Action
7    Number 01-CV-12257-PBS, specifically relating to
8    U.S. ex rel Ven-A-Care of Florida Keys, Inc.
9    versus Abbott Laboratories, Inc., Number 06-CV-
10   11337-PBS, before the United States District Court
11   for the District of Massachusetts.
12        The date is January 16th, 2007, and
13   this deposition is being held at Jones Day, 50 --
14   51 Louisiana Avenue, Northwest, in Washington,
15   D.C.  The time on the monitor is 10:07 a.m.
16        My name is Michael Hunterton, and I'm
17   the certified videographer associated with the
18   firm of Henderson Legal Services, located at 1015-
19   15th Street, Northwest, in Washington, D.C.  The
20   court reporter is Cindy Sebo, associated with the
21   same firm.
22        Will counsel first on the telephone

2 (Pages 2 to 5)

Boughn, Julie Carolyn                                    January 16, 2007
                            Washington, DC

Page 222

1    A.   Um-hum.
2    Q.   Nothing like that?
3    A.   No.
4    Q.   Any formalized mechanism for getting
5  rid of old and outdated documents or information?
6    A.   Not that I'm aware of.
7    Q.   Have you had any involvement
8  whatsoever in either gathering or preserving
9  documents or information in connection with this
10 case?
11   A.   I've had no personal involvement.
12   Q.   Has someone in your office been
13 assigned that responsibility?
14   A.   Not that I'm aware of.
15   Q.   Okay.  When did you first become aware
16 of this litigation?
17   A.   This litigation?
18   Q.   Yeah.
19   A.   I believe it was when Leslie sent me
20 an e-mail with the -- I guess it was a deposition
21 request --
22   Q.   Right.

Page 223

1    A.   -- if I remember it from earlier,
2  saying, who can answer all of these questions.
3    Q.   I have a -- a last series of
4  questions, and then we can take a short break and
5  -- and make sure that I haven't forgotten
6  something really obvious and -- and hopefully wrap
7  it up.
8         I apologize ahead of time if some of
9  these questions are -- are -- are redundant, but
10 in terms of going from the general to the
11 specific, I'd like to go to the -- to -- to the
12 rather specific.
13   A.   Okay.
14   Q.   And that is, if we were to try to
15 collect e-mails to start with for specific
16 employees who were employed by CMS between 1991
17 and 2001, starting with all of the e-mails for
18 certain specified employees, what would be the
19 best way for going about doing that?
20   A.   The request would certainly have to
21 come into -- to my office, and this is assuming
22 that all the proprietary stuff's been worked out,

Page 224

1  okay?
2    Q.   Precisely.  That's -- that's -- that's
3  these folks' jobs over here.
4    A.   Yeah.  The request would come into my
5  office, and then we would, you know, basically
6  need to take a look at what is it we actually have
7  that we can provide --
8    Q.   Um-hum.
9    A.   -- you might even want to have that
10 conversation before, just to say here's what we
11 could do --
12   Q.   Okay.
13   A.   -- and -- and then we would go about
14 doing what we could, you know, here's the backups
15 -- or, you know, here's so-and-so's PST folders,
16 you know, whatever it took to -- to comply as well
17 as we could.
18   Q.   Assuming that there was a PST folder,
19 assuming it was -- it was a current employee, they
20 were on the Out -- Outlook and Exchange server and
21 they had a PST folder --
22   A.   Um-hum.

Page 225

1    Q.   -- how difficult is it to make a copy
2  of that PST folder?
3    A.   That's easy.  That's actually
4  something we do pretty routinely.
5    Q.   And what's the best way for doing it,
6  copying it onto a portable hard drive, DVD?
7    A.   We usually put it on CD or DVD.
8    Q.   For older data, say, Groupwise --
9    A.   Um-hum.
10   Q.   -- how does the process differ there?
11   A.   It's only different in the sense that
12 I don't have to go to the Department's e-mail
13 servers, I have those servers sitting on the floor
14 of my data center.
15   Q.   But in terms of the -- the difficulty
16 or ease of making a copy of that folder is
17 similar?
18   A.   Yes.
19   Q.   What information would you need in
20 order to -- to do a -- a comprehensive search for
21 -- for such folders?  Would it be simply a name or
22 is there other information that -- that you would

57 (Pages 222 to 225)

Henderson Legal Services, Inc.
(202) 220-4158

271ebd97-cf4b-4d10-9d80-ab3d42892489

Boughn, Julie Carolyn                                                    January 16, 2007
Washington, DC

Page 226

```
 1  need?
 2      A.  Any of the employee's names, I -- what
 3  helps me is user I.D.s, if I know their user
 4  I.D.s, and then, for lack of a better word,
 5  permission to do it --
 6      Q.  Right.
 7      A.  -- you know, authority.
 8      Q.  But in terms of the actual information
 9  name and user I.D.?
10      A.  If it was a lot of data, we would be
11  talking -- I mean, if it was a lot of users,
12  something, you'd be talking about providing the
13  CDs or DVDs or whatever, something like that, I
14  mean, it would obviously take staff time to do
15  that.
16      Q.  Right.  And as it multiplies, it just
17  -- it gets difficult simply by virtue of being a
18  lot of work?
19      A.  Um-hum.
20      Q.  Not by being difficult in the -- in
21  the doing of it?
22      A.  No, right.
```

Page 227

```
 1      Q.  When it comes to shared drives or
 2  portions of the shared drive --
 3      A.  Um-hum.
 4      Q.  -- attributable to a specific
 5  employee, is it sim -- would the process be
 6  similar?
 7      A.  Um-hum.
 8      Q.  And similarly easy in the doing,
 9  perhaps getting difficult in the magnitude --
10      A.  Yep.
11      Q.  -- if there are too many requests?
12      A.  Yes.
13      Q.  And how long does it take to do a
14  single -- a single drive?
15      A.  It depends entirely upon how much data
16  they have.
17      Q.  Let's assume it's a huge one.
18      A.  We usually ask, you know, when it's a
19  one -- one-off, two-off, you know --
20      Q.  Um-hum.
21      A.  -- type of thing, we usually ask for
22  24 hours.
```

Page 228

```
 1      Q.  I assume it's easier for you if it's
 2  batched, rather than dripped one at a time over?
 3      A.  You know, honestly, I don't know how
 4  we would do it in a batched mode.  It seems to be
 5  something that we'd have to have one person doing
 6  for one thing, but --
 7      Q.  Oh, so no matter how many you get,
 8  you're going to be doing one at a time anyway, so
 9  it's serial?
10      A.  I -- I'm just not aware of any sort of
11  scripts or things that we have --
12      Q.  Um-hum.
13      A.  -- and even if you had a script, you'd
14  have to still put in every person's user I.D. in
15  order to start doing it, but, yeah.
16      Q.  You say it's something you do with
17  some -- some regularity?
18      A.  Sure.  I mean, you know, the IG's
19  investigating somebody for some reason, they want
20  their mailbox, their mail folder, you know, their
21  fol -- fol -- folders --
22      Q.  Right.
```

Page 229

```
 1      A.  -- so it's not like every day we get a
 2  dozen of them or anything like that, but it
 3  happens enough that we know how to do it.
 4      Q.  More than once in a blue moon?
 5      A.  Yeah.
 6      Q.  The same analysis for archived files?
 7      A.  For the group -- for the archives on
 8  the IXOS?
 9      Q.  Precisely.
10      A.  I'm not quite as familiar with how we
11  would do that, but I believe -- I mean,
12  functionally, it should be very similar.
13      Q.  And the Groupwise archives?
14      A.  The Groupwise are just PST folders, so
15  it's same.
16      Q.  Is it easier to pull an entire PST
17  file than it is to pull individual e-mails from
18  out of a PST file that meet criteria, whether it's
19  by date, keyword or whatever?
20      A.  Yes.
21      Q.  If we take -- I guess we've already
22  asked that.  I think we've already tied up that,
```

58 (Pages 226 to 229)

Henderson Legal Services, Inc.
(202) 220-4158

271ebd97-cf4b-4d10-9d80-ab3d42892489