# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>C.A. No.: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | Judge Patti B. Saris |

**WATSON PHARMACEUTICALS, INC.'S RESPONSE TO CLASS PLAINTIFFS' RESPONSE TO AMGEN AND WATSON'S <u>SUPPLEMENTAL OPPOSITION TO CLASS CERTIFICATION</u>**

Exhibit 7:    Excerpts from Deposition of Thomas M. Scully (May 15, 2007).

1

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MASSACHUSETTS

3       - - - - - - - - - - - - - -x

4       IN RE:  PHARMACEUTICAL       :   MDL NO. 1456

5       INDUSTRY AVERAGE WHOLESALE   :   CIVIL ACTION

6       PRICE LITIGATION             :   01-CV-12257-PBS

7       THIS DOCUMENT RELATES TO     :

8       U.S. ex rel. Ven-a-Care of   :   Judge Patti B. Saris

9       the Florida Keys, Inc.       :

10           v.                      :

11      Abbott Laboratories, Inc.,   :   Chief Magistrate

12      No. 06-CV-11337-PBS          :   Judge Marianne B.

13      - - - - - - - - - - - - - -x      Bowler

14

15

16

17

18

19

20

21

22

1          Videotaped Deposition of THOMAS A.

2     SCULLY, a witness herein, called for examination by

3     counsel for Abbott Laboratories in the above-entitled

4     matter, pursuant to subpoena, the witness being duly

5     sworn by SUSAN L. CIMINELLI, a Notary Public in and

6     for the District of Columbia, taken at the offices of

7     Jones Day, 51 Louisiana Avenue, Northwest,

8     Washington, D.C., at 8:49 a.m. on Tuesday, May 15,

9     2007, and the proceedings being taken down by

10    Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and

11    transcribed under her direction.

12

13

14

15

16

17

18

19

20

21

22

125

1   million, is that correct?

2        A.    You could have a very rational policy

3   debate about what the appropriate level was, but I

4   would say the 5 to 600 million clearly represented --

5   a large chunk of that was politics.

6        Q.    And so that we are clear, what we are

7   talking about is that under the MMA, when it went

8   into effect, drug reimbursement was reduced by a

9   certain amount, and at the same time, service fees to

10  providers were increased, correct?

11       A.    Yes.

12       Q.    And the increase on the service fees to

13  providers was in the range of 500 to $600 million?

14             MR. GOBENA:  Object to the form.

15             BY MR. DALY:

16       Q.    Is that right?

17             MR. GOBENA:  Mischaracterizes the

18  witness's testimony.

19             THE WITNESS:  Yes.  In the RUC, or in the

20  normal process of roughly $70 million of Part B

21  payments, if you're going to raise oncologists, you

22  have to cut somebody else.  It's a budget neutral

126

1     pot, so what Congress did in this debate was they

2     significantly reduced AWP for drugs for oncology and

3     they took some of that money, I think it was roughly

4     a billion a year in savings, put some of the money,

5     put it back into a nonbudget neutral add-on just for

6     mostly oncologists, some of it was rheumatology,

7     there was probably four -- there were other practice

8     areas that were affected as well -- back in to

9     restore some of their revenues.

10          But it was probably some of that was a

11    political push because obviously the bill was

12    controversial for totally other reasons.  And

13    Congress, with an intense group of opposition from

14    lawyers and oncologists, this was a controversial

15    issue.  This was a side show for the Medicare Part B

16    prescription drug bill, but we were able to pass both

17    bills by one vote in both houses of Congress, got

18    very contentious and so the loud group of screaming

19    people about this particular provision theoretically

20    could have held up the whole bill.  So we added back

21    in more than I think most people thought was

22    justified in the end.

1          You could pick a number anywhere from 50

2     million up to probably 600 and justify it, but the

3     savings, the total savings was over a billion I think

4     in the first year.  And on the other side, dialysis,

5     Congress very consciously, because dialysis really

6     did have bad margins, whereas I would argue

7     oncologists did not, or rheumatologists, dollar for

8     dollar, Congress instructed the agency from AWP

9     savings on dialysis dollar for dollar every dollar

10    that came out went back into a drug add-on.  Dollar

11    for dollar, there were no savings.  There were they

12    conscious savings on the oncology side.

13         So Congress clearly had the intention of

14    saving a lot of money on drugs which I would -- not

15    even an argument.  It was clear that there was a

16    massive overspending on drugs versus any arguable

17    underpayment for services in oncology.

18         In dialysis, I would say the argument

19    wasn't made as thoroughly, but in dialysis we made

20    conscious -- or Congress, Chairman Thomas and

21    Grassley and Baucus made a conscious decision to take

22    every dollar out and put it back in, so dialysis --

128

1    because dialysis had very low to no Medicare margins,

2    whereas I don't believe it was as credible an

3    argument -- or any credible argument on oncology or

4    rheumatology or others.

5            BY MR. DALY:

6        Q.    All right.  So I just wanted to pick up on

7    something you said.  In terms of oncology, you said I

8    don't believe it was as credible an or any credible

9    argument on oncology or rheumatology, is that what

10   you said?

11       A.    I would say that there was not an

12   argument.  There was on dialysis, dialysis had a

13   fairly good argument that their margins were

14   negligible in Medicare.  And if you took away their

15   margins on drugs, that they had no margin on Medicare

16   patients unless it was added back in, dollar for

17   dollar.  I do not think that was a credible argument

18   with oncology or rheumatology.

19       Q.    In other words, oncology in your view

20   didn't have a dollar for dollar argument, but they

21   had an argument that they were underpaid some amount

22   on the service side of the equation, right?

1    the prices at which we purchase a drug and the

2    average wholesale price of the drug."  Do you see

3    that language?

4         A.    Yes.

5         Q.    And do you have an understanding that that

6    is a correct statement?

7              MR. GOBENA:  Objection to form.

8              THE WITNESS:  Yes.  I mean, I think the

9    issue is a matter of proportion.  It's similar to the

10   oncologists, which is they clearly made money on the

11   spread and how much of that -- what measurement

12   appropriately should have been paid to deliver the

13   service, some portion of it.  I don't know enough

14   about the nursing home issue here to know how much

15   there was.  This is a small -- you know, nursing

16   homes are similar to home infusion, where they have

17   Part B Medicare patients in the home, and they

18   provide the service and they get paid for it.

19              So how much did they make on AWP spread

20   and how much of that would have measurably been put

21   back in if they had a more rational policy into a

22   servicing fee?  I'm not sure, but my guess is much

1    like oncology, it probably wouldn't be all of it.

2    And I don't have all the facts to tell you that.  I

3    mean, I did know on the dialysis side, it probably

4    was appropriate to put all of it back in.  In many

5    other settings, it was not.

6              BY MR. DALY:

7         Q.    I'm going to hand you what's been

8    previously marked as Exhibit Abbott 018, which

9    is testimony that was submitted at the hearing that

10   we've been talking about on October 3, 2002 that you

11   attended by the National Alliance for Infusion

12   Therapy and the National Home Infusion Association.

13   And do you recall the presentation that these

14   entities made at the hearing on 10-3-02?

15        A.    No.  I'm sure I wasn't there.

16        Q.    Well, you were there for your part.  This

17   is the same hearing you were at.

18        A.    I traditionally left as soon as I was

19   done.

20        Q.    As soon as possible.

21        A.    As did every other administrator.

22        Q.    Now, did you ever have any meetings or