UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* CIVIL ACTION NO. 06-11337-PBS ) ) ) ) | |

**UNITED STATES' RESPONSE TO DEFENDANT
ABBOTT LABORATORIES INC.'S OBJECTIONS TO AUGUST 13, 2007
ORDER BY MAGISTRATE JUDGE BOWLER**

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                              )
PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE             ) MDL No. 1456
LITIGATION                          ) Pages 1 - 68

PRETRIAL CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
April 11, 2007, 3:05 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA   02210
(617)345-6787

1  been persuaded I'd probably have to do state by state to back

2  it out. And we're going to have a two- to three-week jury

3  trial.

4       Now, let's just start going through some of the big

5  issues, the huge issues.

6       MR. SOBOL: On the cy pres issue briefly?

7       THE COURT: No, we don't need to. We have a lot on

8  our plate today, a huge amount. We have at least, roughly,

9  this is a case involving deceptive conduct, alleged deceptive

10 conduct. You have to prove that AstraZeneca intended to

11 deceive when it published the AWP price. I think the object

12 of that sentence is, intended to deceive whom? The

13 government. So if you all think this is wrong, you're going

14 to need -- because that's the reimbursement mechanism, not at

15 third-party payors, the government, so that it's the state of

16 mind of the corporate entity or their agents or employees

17 when it published the AWP.

18      So if that is the case, I want to walk through

19 Weintraub for a minute. Weintraub is going to say what? I

20 don't have a deposition. What will he say? Who's the

21 Weintraub man? You are?

22      MR. BOUDETT: I get that assignment.

23      THE COURT: Is he going to say -- it was very vague

24 in the papers as to exactly what he would say.

25      MR. BOUDETT: Well, we made a proffer in that

1  regard, your Honor, I believe, during the bench trial.
2              THE COURT:  I just don't remember.
3              MR. BOUDETT:  Okay.  Mr. Weintraub is going to say
4  essentially that he was one of the guys who was dealing with
5  drug companies.  He was the regional head for a period of
6  time.
7              THE COURT:  Did he deal with AstraZeneca?
8              MR. BOUDETT:  His testimony would not be specific
9  to Zoladex, your Honor.  It would be about knowledge of
10 spreads and the AWP system.
11             THE COURT:  But let's be very clear here.  I do not
12 believe in general, with the exception of maybe TAP and
13 Lupron, in general, AstraZeneca will not be smeared by what
14 happened in other companies.  On the other hand, it's not
15 clear to me that knowledge of spreads in other companies is
16 going to be relevant either.  One thing I learned from the
17 bench trial is how specific this is company by company.  Each
18 company has a different tale.  And so will Weintraub be able
19 to say anything about dealings with AstraZeneca?
20             MR. BOUDETT:  No, your Honor.
21             THE COURT:  Well, then why is he relevant?
22             MR. BOUDETT:  Your Honor, I think that it goes to
23 rebut the plaintiffs' expert testimony that this was all a
24 secret, which is a cornerstone of the liability opinion
25 that's been put forward.

1     THE COURT:  Tell me what "it" is.

2     MR. BOUDETT:  Spreads, that the spreads were
3  secret.

4     THE COURT:  Let me tell you, having just been
5  through this, everyone knew about a 20 to 25 percent spread,
6  maybe 30 percent.  Everyone knew, everyone.  This is why I
7  found your papers so difficult to follow.  If all he's going
8  to say is everyone knew about a spread, for want of a better
9  word, within the speed limit, if that's all he's going to
10 say, that's not a problem because it would almost be
11 stipulated to.

12    MR. BOUDETT:  No, your Honor.

13    THE COURT:  All right, what will he say?

14    MR. BOUDETT:  He will testify as to knowledge of
15 discounting off of WAC creating spreads larger than the
16 Hartman speed limit.

17    THE COURT:  What were the Zoladex spreads?  I don't
18 remember.

19    MR. BOUDETT:  Well, it depends what year you ask
20 about.  At their height, they were, I think, 142 percent,
21 according to the Hartman calculation, 140 to 150 percent.

22    THE COURT:  Is he going to say the government knew
23 that?

24    MR. BOUDETT:  He is going to say the government
25 knew of spreads well in excess of the Hartman speed limit.

1  His testimony would not be specific to Zoladex. It was not
2  one of the top five blockbuster, budget-buster drugs that the
3  regulators were paying attention to, which --
4         THE COURT: So as I understand it, the OIG reports,
5  were any of them referencing Zoladex?
6         MR. BOUDETT: Yes, your Honor.
7         THE COURT: Which ones?
8         MR. BOUDETT: The '92 certainly listed Zoladex
9  among the 30 drugs that was listed and gave a spread in
10 excess of 30 percent, if I recall correctly.
11        THE COURT: What was it, Zoladex? I remember
12 Hartman saying that all the 1992 ones were roughly in the
13 speed limit zone.
14        MR. BOUDETT: I don't believe that's the case.
15        MR. BERMAN: It was within the speed limit.
16        THE COURT: What?
17        MR. BERMAN: It was within the speed limit.
18        MR. BOUDETT: I would have to follow up on that
19 one, your Honor.
20        MR. BERMAN: We have an exhibit that shows that
21 from the trial.
22        THE COURT: Let me put it this way: Why don't you
23 make me a proffer as to what he would say in writing. They
24 are very hot and bothered by the notion that the government
25 approved the mega spreads. My sense is that to the extent

Case 1:01-cv-12257-PBS   Document 4718-2   Filed 09/17/07   Page 7 of 7

Page 24

1   that he is going to testify about what he knew, it would be
2   relevant but only as it affected AstraZeneca.  That's why I
3   needed a proffer.  I don't know why, if he knew about some
4   other company's spread, why that would be so relevant.  I'm
5   not saying I'm not.  I was going to say here today, yes, if
6   he knew about the spreads, if he was told specifically about
7   the Zoladex spreads or about the battle going on, that might
8   be relevant to lack of intent to deceive.  I don't know that
9   I'll let you say that the government "approved" it unless you
10  say specifically he has letters or he said, "That's okay, go
11  ahead, guys, do the 600 percent spread."  I don't think you
12  have that, right?
13          MR. BOUDETT:  Not with regard to AstraZeneca
14  specifically, but can I make two quick points in response to
15  what you just said?  We will make the proffer, and I know
16  you're going to think about this issue more, but my two
17  points are these:  First of all, the approval issue that the
18  plaintiffs are trying to set up is a straw man, I would
19  suggest.  Our case is not that the government approved of
20  mega spreads, endorsed them, liked them.  Some people in the
21  government may have done so, others didn't, but that's not
22  our burden.  Our case is that the government knew of the
23  spreads and didn't change the system until 2003.  That's
24  different than approval, so --
25          THE COURT:  Let me just say, they for sure knew,