# EXHIBIT G

```
                                                                    Page 1
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
     In Re:                              )
 4   PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE             ) MDL No. 1456
 5   LITIGATION                          ) Pages 1 - 53
 6
 7
 8                           MOTION HEARING
 9            BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE
10
11
12
13
                                 United States District Court
14                               1 Courthouse Way, Courtroom 19
                                 Boston, Massachusetts
15                               July 26, 2007, 2:05 p.m.
16
17
18
19
20
21
22
                            LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                        United States District Court
24                     1 Courthouse Way, Room 3205
                          Boston, MA  02210
25                          (617)345-6787
```

Page 2

1  APPEARANCES:
2  For the Plaintiffs:
3      JOANNE M. CICALA, ESQ., JAMES P. CARROLL, ESQ.,
   AARON D. HOVAN, ESQ., and J. BRADLEY VATRT, ESQ.,
4  Kirby, McInerney & Squire, LLP, 830 Third Avenue, New York,
   New York, 10022, appearing for the City of New York and all
5  New York counties except Nassau.
6      ROSS B. BROOKS, ESQ., Milberg Weiss & Bershad, LLP,
   One Pennsylvania Plaza, New York, New York, 10119,
7  appearing for Nassau County.
8      THERESA A. VITELLO, ESQ., Levy, Phillips & Konigsberg,
   LLP, 800 Third Avenue, New York, New York, 10022, appearing
9  for Orange County.
10 For the Defendants:
11     LYNDON M. TRETTER, ESQ. and HOA T. T. HOANG, ESQ.,
   Hogan & Hartson, 875 Third Avenue, New York, New York, 10022,
12 appearing for Bristol-Myers Squibb and as liaison counsel for
   the defendants.
13
       JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
14 Ropes & Gray, LLP, One International Place, Boston,
   Massachusetts, 02110, appearing for Schering and Warrick.
15
       MARK H. LYNCH, ESQ., Covington & Burling, LLP,
16 1201 Pennsylvania Avenue, N.W., Washington, D.C., 20004-2401,
   appearing for GlaxoSmithKline.
17
18
19
20
21
22
23
24
25

Page 3

1              PROCEEDINGS
2       THE CLERK: In Re: Pharmaceutical Industry Average
3  Wholesale Price Litigation, Civil Action No. 01-12257, will
4  now be heard before this Court. Will counsel please identify
5  themselves for the record.
6       MS. CICALA: Good afternoon, your Honor. Joanne
7  Cicala from Kirby, McInerney & Squire on behalf of the City
8  of New York and all New York counties in the first amended
9  consolidated complaint except for Nassau.
10      MR. HOVAN: Aaron Hovan, also with Kirby, McInerney
11 & Squire.
12      MR. CARROLL: James Carroll from Kirby, McInerney &
13 Squire.
14      MR. BROOKS: Good morning, your Honor. Ross Brook,
15 Milberg Weiss, on behalf of Nassau County.
16      MR. VATRT: Brad Vatrt, also with Kirby, McInerney
17 & Squire.
18      MR. VITELLO: Good afternoon, your Honor. Theresa
19 Vitello with with Levy Phillips on behalf of Orange County.
20      MR. TRETTER: Lyndon Tretter, Hogan & Hartson, on
21 behalf of BMS and as liaison counsel for the defense.
22      MR. BUEKER: Good afternoon, your Honor. John
23 Bueker from Ropes & Gray on behalf of Schering and Warrick.
24      MR. MONTGOMERY: John Montgomery for Schering and
25 Warrick as well.

Page 4

1       MR. DAVIS: William Davis from Mintz Levin on
2  behalf of Eli Lilly, your Honor.
3       MR. LYNCH: Mark Lynch for GlaxoSmithKline.
4       THE COURT: All right, many familiar faces. Is
5  there anyone up here who wants to introduce themselves?
6  Okay.
7       So we're in the next round, and maybe as a few
8  preliminary matters, I know you've seen the memo from the
9  United States on how FUL works, and I'm assuming that
10 everyone in this room agrees that that's basically how it
11 works. Is that right?
12      MS. CICALA: We do, your Honor.
13      MR. BUEKER: I don't think we have any
14 disagreement. I think that --
15      THE COURT: It was a point of enormous confusion to
16 me before, and I think that that was an extremely helpful
17 description that both sides seemed to agree to.
18      MS. CICALA: We do agree.
19      THE COURT: So that helps me understand the FUL
20 claim, which was the primary reason why I permitted some sort
21 of an amendment, is because we didn't really know what it
22 was. So to backtrack, it's the big issue outstanding in my
23 mind. Let me just say this. It strikes me that if a FUL
24 claim is to survive, it must be based on published price. Is
25 that right?

Page 5

1       MS. CICALA: Yes, absolutely, your Honor, the FUL
2  is based on the lowest published price.
3       THE COURT: And if you looked at their little
4  example, and I think the defendant actually laid it out in
5  the brief, you know, Example 1, Example 2, Example 3 -- that
6  was extremely helpful to me in understanding it -- I don't
7  know if it was to you -- but it can't just be any published
8  price. It would have to have made a difference.
9       MS. CICALA: I completely agree. It was actually
10 set out in our brief, your Honor.
11      THE COURT: So it was yours?
12      MS. CICALA: Yes.
13      THE COURT: So don't you have to allege that for
14 each drug, that whatever the published price is was, A,
15 false, and, B, would have made a difference?
16      MS. CICALA: Yes, your Honor, that's absolutely
17 what we have to allege and what we believe we have alleged in
18 our first amended complaint.
19      THE COURT: So it's not relying on transactional
20 price?
21      MS. CICALA: Well, it is relying on transactional
22 prices to the extent that what our argument is is that the
23 published prices must be tethered to what the actual provider
24 acquisition costs were, and we believe that that's consistent
25 with what HCFA and the OIG and the DOJ say.

Page 6

1  THE COURT: But suppose --
2  MS. CICALA: So, for example, the defendants --
3  THE COURT: But have you actually done the checkup
4  to say -- let's say that the AWP was or the WAC you would say
5  was fictitious, under whatever measure it is.
6  MS. CICALA: Right, under whatever measure you use.
7  THE COURT: Did you then go back and look at the
8  FUL for whatever time period we're talking about, a quarter
9  or a year?
10  MS. CICALA: Absolutely.
11  THE COURT: And say whether or not that would have
12  taken it down?
13  MS. CICALA: Yes, that's exactly what we did. What
14  we did, first, we calculated what we believed the true
15  published price should have been based on the actual prices
16  to the providers, and then we applied to that number -- let's
17  call it an ASP, a true ASP -- we applied to that number
18  150 percent. If we come up with a figure that is below the
19  FUL, then, we argue, had defendants reported their true ASP,
20  the FUL would have been lower. And that's precisely what
21  we've --
22  THE COURT: Now, in doing the ASP, I -- and maybe
23  I'm jumping too far ahead here --
24  MS. CICALA: No, that's fine.
25  THE COURT: -- I completely agree with the

Page 7

1  defendants that the pennies don't count. There are too
2  many -- it creates a distortion. And maybe to some extent
3  I'm importing knowledge that I've gained through my big
4  trial, but that's also one of the reasons of having an MDL
5  judge.
6  MS. CICALA: Sure.
7  THE COURT: They're sometimes used for samples,
8  sometimes for charity, it could have been for other reasons,
9  but no one's selling stuff at a fraction of a penny. I think
10  that creates a distortion. So if at some point you get
11  expert testimony that there is some other thing that I don't
12  understand, maybe; but I'm not going to let thousands of
13  drugs be a matter of discovery. It's just too big an
14  expansion, based on what I understand. So take those out.
15  MS. CICALA: May I comment on that?
16  THE COURT: And you've now recalculated based on
17  some sort of weighted average.
18  MS. CICALA: Sure.
19  THE COURT: So what does that do to the complaint?
20  MS. CICALA: I can answer that precisely. There
21  are 344 penny drugs at issue based on the AACs that we put in
22  Exhibit B to the complaint. If we recalculate those based on
23  a weighted average, all but 26 would still be in the case.
24  THE COURT: All right, so those 26 should come out
25  until you provide some sort of a good-faith basis, through

Page 8

1  discovery or whatever --
2  MS. CICALA: That's fine.
3  THE COURT: -- that this isn't a sample, because
4  samples are handed out, and it isn't a charity, and it isn't
5  just an accounting placeholder. Typically these drugs are
6  sold -- well, I want a typical price.
7  MS. CICALA: Sure.
8  THE COURT: Not something that's likely to be
9  something else, all right. So that's point one. So you
10  would say all the 26, if I use the 20 to 25 percent markup
11  range.
12  MS. CICALA: Exactly right, yes. And then, I mean,
13  I entirely respect where your Honor is coming from on the
14  pennies. We put them in based on our understanding of the
15  wholesale data and given how many of them are pursuant to
16  contract and given the classes of trade we used.
17  And, also, we had run weighted averages before we
18  filed the first amended consolidated complaint, and as we saw
19  that in large part due to binary exercises they are out, we
20  felt comfortable with the methodology. But, in any event,
21  your Honor, I guess the bottom line is, of the 344 penny
22  prices in the complaint, all but 26 would stay in based on a
23  weighted average.
24  THE COURT: So the next issue is, the defendants
25  allege -- and it's a little hard for us, we didn't sit and

Page 9

1  bean count through -- that there are a huge number of
2  additional drugs. What is it, 300 plus?
3  MS. CICALA: Your Honor, we have disagreement on
4  the number of new drugs, but --
5  MR. TRETTER: Your Honor, I'm prepared to go
6  through that in very abbreviated fashion.
7  THE COURT: Yes, I'm just saying any new drug
8  should go out. That wasn't what the purpose of this was.
9  MS. CICALA: Your Honor, if I may, I guess the
10  question that we --
11  THE COURT: We may have a fight as to what was new
12  and what wasn't new.
13  MS. CICALA: Right, that's the issue. I mean, we
14  had -- your Honor's pleading standard was such, when we filed
15  the consolidated complaint in June of 2005, that there was
16  not required an NDC-by-NDC allegation of spread.
17  THE COURT: Let me just say, NDC is different.
18  Different NDCs can come in.
19  MS. CICALA: Right.
20  THE COURT: But what I said was no new drugs. And
21  they say there are some wholly new drugs in there, right?
22  MS. CICALA: Well, they say there are some wholly
23  new drugs. They also say that some of the drugs were in the
24  case previously but assigned -- the drug belonged to a
25  different defendant, and if the drug belonged to a different

Page 10

1  defendant --
2       THE COURT:  No, I'm not going to play that, but any
3  brand-new drug -- this was not the purpose for the
4  amendment -- should be out.  So how many brand-new --
5       MS. CICALA:  And you don't mean branded, right.
6       THE COURT:  But how many new drugs that were never
7  listed before?  Not a new NDC but a new drug.
8       MR. TRETTER:  Our view is 710, but the reason --
9       THE COURT:  700?  Why are you both so far apart?
10      MR. TRETTER:  If I may?
11      THE COURT:  Yes.
12      MR. TRETTER:  Let's say they say albuterol is in
13 the case as to Warrick, but they never mentioned it before as
14 to Dey or fifteen other defendants in this case.  If it
15 appears for the first time as to Dey and these other
16 defendants in this first amended consolidated complaint, for
17 that defendant, it's a very new drug.  And, as you know, your
18 Honor --
19      THE COURT:  How many are completely new drugs?
20      MR. TRETTER:  I take them at their word that it's
21 300 and whatever completely new as to any defendant.
22      THE COURT:  Those are the ones that come out.
23      MR. TRETTER:  But what about the ones where, you
24 know, a defendant never -- because, as you know, your Honor,
25 when you have to go looking for the median or the lowest

Page 11

1  price, or whatever it is, every single defendant now has
2  to --
3       THE COURT:  Well, I'm drawing -- the only thing I
4  said was no new drugs.  And I actually viewed it as a direct
5  violation, and I don't know why you didn't flag it or why you
6  did that, or at least asked permission to go beyond that.
7  The theory wasn't -- I was trying to constrict, not add, and
8  you added 300 new drugs, completely contrary to what I said.
9       MS. CICALA:  Your Honor, I have two responses.  We
10 absolutely did not intend to violate an express order of the
11 Court.  After your Honor made that directive at the last
12 status conference, I responded by saying, yes, your Honor,
13 but there's the question of which drugs off of our master
14 list are in the case.  And I can quote to you from the
15 transcript, if you'd like.
16      THE COURT:  In any event, they're gone.
17      MS. CICALA:  And that's fine, your Honor.
18      THE COURT:  I don't even want to debate them.  This
19 has got to have some constraint, not expansion.
20      MS. CICALA:  Okay.
21      THE COURT:  On new drugs, I didn't say that.  I had
22 a direct order before that no new drugs, and so --
23      MR. TRETTER:  Right, and the issue is what's new.
24      THE COURT:  Yes, I know, and I'm not -- that's what
25 I'm defining now, no brand-new, never-before-mentioned drug.

Page 12

1  And I understand your point, but I have to draw certain lines
2  here, so that's what I'm doing.
3       And the other issue is, with respect to some didn't
4  have spreads and they've added in a spread, that's okay, but
5  no completely -- we're not adding.  And this is it.  This is
6  the frozen list right now.
7       MS. CICALA:  That's fine, your Honor.
8       THE COURT:  Now, with respect to
9  physician-administered drugs, I have to admit I don't
10 understand the issue, and I found it very confusing.
11      MR. TRETTER:  I'm prepared to discuss that, and I
12 would also like to discuss the 30 percent rule as it applies
13 to single-source because that's an important gating decision
14 as well.
15      THE COURT:  I understand.  But the
16 physician-administered drugs --
17      MR. TRETTER:  I can explain that in two shakes,
18 your Honor.
19      THE COURT:  Yes.
20      MR. TRETTER:  Where we started is that when the
21 drug is administered by a physician in a physician's office,
22 it is not reimbursed on an AWP logic, and therefore it is out
23 of the case.  Everybody agrees with that.
24      THE COURT:  Right, and they still do.
25      MR. TRETTER:  Now, you have the same drug that

Page 13

1  could be theoretically brown-bagged to the physician's
2  office.  In other words, it can be purchased or picked up by
3  the Medicaid patient from a retail pharmacist, for example,
4  and walked over to the doctor's office.  And in that case,
5  what the plaintiffs are alleging is, the retail pharmacist is
6  entitled to be reimbursed for that same
7  physician-administered drug on an AWP logic.  So it's the
8  situs of where it's infused or dispensed.
9       THE COURT:  Okay, so why isn't that enough to
10 count?
11      MR. TRETTER:  Because what they do is, they have
12 one allegation that we spent $1.4 billion on such drugs for
13 such non-physician providers.  And we say, and your
14 Honor's --
15      THE COURT:  They say they get it out of their
16 records that they paid for these based on AWP, so they came
17 from the pharmacy.
18      MR. TRETTER:  Right, but what we're saying is that
19 they don't have any particularization as to any county.  For
20 instance, we don't know whether Onondaga County --
21      THE COURT:  Why does it matter?
22      MR. TRETTER:  Well, it matters because each
23 defendant is a separate defendant in this case, and we don't
24 know whether this all relates to one physician-administered
25 drug, 20 physician-administered drugs, because take my --