# EXHIBIT C

```
                                    4369.txt
⁋ 00001
            1                  P R O C E E D I N G S
            2
            3           THE VIDEOGRAPHER:  Good morning.  This is
            4   the video deposition of Robert Niemann taken by
            5   counsel for the Defendant in the matter of In Re
            6   Pharmaceutical Industry Average Wholesale Price
            7   litigation in the United States District Court for
            8   the district of Massachusetts, MDL number 1456, Civil
            9   Action Number 01-CV-12257-PBS, held in the offices of
           10   Centers for Medicare & Medicaid Services at 7111
           11   Security Boulevard, Baltimore, Maryland on this date
           12   Friday, September 14th, 2007, at the time indicated
           13   on the video screen, 9:18 a.m.
           14           My name is Ellen Hebert.  I'm the legal
           15   video specialist.  The court reporter is Sue
           16   Ciminelli.  We are employed by Henderson Legal
           17   Services.  Counsel will now introduce themselves and
           18   the parties they represent after which the court
           19   reporter will swear in the witness.
           20           MR. COOK:  Christopher Cook for Abbott
           21   Laboratories for Jones Day.  I'm accompanied by
           22   project assistant Emily Watson.
  00002
            1           MS. REID:  Sarah Reid from Kelley Drye on
            2   behalf of the Day Companies and the DOJ cases and
            3   also on behalf of Day and Mylan at cross notice
            4   states.
            5           MS. MCGEE:  Jennifer McGee, representing
            6   Aventis Pharmaceutical and Sanofi.
            7           MR. JONES:  Scott Jones from Locke Liddell
            8   from Schering & Warrick.
            9           MR. HOVAN:  Aaron Hovan from Kirby
           10   McNerney, representing New York City and all New York
           11   counties other than Nassau and Orange.
           12           MR. WILSON:  Joe Wilson with Cotchett,
           13   Pitre & McCarthy, on behalf of Ven-A-Care.
           14           MS. STAFFORD:  Leslie Stafford of the
           15   Centers for Medicaid Services.
           16           MS. OBEREMBT:  Laurie Oberembt from the
           17   United States Department of Justice representing the
           18   United States.
           19           THE VIDEOGRAPHER:  Will the attorneys on
           20   the phone --
           21           MR. BATES:  I'm Roger Bates representing
           22   the State of Alabama.
  00003
            1           MR. GORTNER:  Eric Gortner, representing
            2   from Kirkland & Ellis representing Boehringer
            3   Ingelheim and Roxane Laboratories Inc.
            4           MR. ARCHIBALD:  Jeff Archibald,
            5   representing the attorney generals for the states of
            6   South Carolina, Wisconsin, Kentucky, Iowa, and Idaho.
            7           MS. MILLER:  This is Mary Miller,
            8   assistant attorney general representing the State of
            9   Florida in the cross notice deposition cross noticed
           10   by Mylan.
           11           MS. KAWATRA:  Sandhya Kawatra from Hogan &
           12   Hartson representing Bristol-Myers Squibb Company.
           13           MS. KATCHERIAN:  Amy Katcherian, White &
           14   Case LLP, representing Sandoz, Inc.
           15           MR. GLASER:  Deputy attorney general Randy
           16   Glaser with the California Attorney General's Office
                                    Page 1
```

```
                              4369.txt
        2      A.    That's what it says.
        3      Q.    Or I assume other drugs, it says these
        4  drugs in the plural, correct?
        5      A.    That's what it says, yes, to price these
        6  drugs.
        7      Q.    Was it your understanding that it was the
        8  policy of HCFA that carriers were not permitted to
        9  obtain invoices and try to establish an estimated
       10  acquisition cost?
       11      A.    Well, I forgot that.  But now that I'm
       12  reading this, I do seem to remember, I remember there
       13  were OMB requirements about data collection from more
       14  than a certain threshold number of people, and there
       15  was a process to go through in order to have that
       16  data collection approved and I do vaguely, not the
       17  details but I vaguely remember this coming into play
       18  with EAC so that, that seems to be what they are
       19  getting at here is that the data collection
       20  requirement had not been cleared through OMB.  I
       21  think they said information collection is probably
       22  what they used.
00169
        1      Q.    Do you recall whether HCFA made efforts to
        2  satisfy those requirements to conduct surveys and
        3  establish estimated acquisition costs?
        4      A.    I don't.
        5      Q.    What was your understanding of what
        6  estimated acquisition cost would have represented had
        7  HCFA implemented that, that provision of the
        8  regulation?
        9      A.    Well, I would have -- I take that term at
       10  its literal meaning.  I mean, it would, it would have
       11  been an estimate of what the cost was to the
       12  physician who is billing us, what that physician
       13  paid.
       14      Q.    And was it your understanding that had
       15  HCFA implemented that aspect of the regulation that
       16  HCFA would have attempted to establish it drug by
       17  drug?
       18            MS. OBEREMBT:  Objection.
       19            THE WITNESS:  I --
       20            BY MR. COOK:
       21      Q.    I guess there is only one way to do it, it
       22  would have to be on a drug by drug basis correct?
00170
        1      A.    I guess that's true.  I guess so.
        2      Q.    And in the Exhibit 310 which appears to
        3  be, would you agree with me, Dr. Steffen's response
        4  to the July 1996 letter?  The first paragraph in this
        5  letter to Ms. Merrill states "we agree that the
        6  central office should be made aware of the issues
        7  that we discussed, namely the great difference
        8  between the EAC and the AWP the barriers to obtaining
        9  the EAC."  Do you understand in that letter the EAC
       10  referred to acquisition costs as indicated in the Re
       11  line?
       12      A.    I don't but oh, right.  Yes.
       13      Q.    Would you have been the individual within
       14  the central office who you assume would be made aware
       15  of the great difference between acquisition costs and
       16  the AWP for Medicare reimbursable drugs?
       17      A.    Yes.
       18      Q.    Did you participate in to your
                              Page 62
```

```
                              4369.txt
        19  recollection this conversation between Ms. Merrill
        20  and Dr. Steffen?
        21       A.   I don't remember that I did.  No.
        22       Q.   You'll see a little bit farther down the
00171
         1  page Dr. Steffen calculates some, some numbers for
         2  Zoladex, in particular and calculates that for
         3  provider with --
         4       A.   Can I -- something is troubling me.
         5       Q.   Please do.
         6       A.   Of a former, when you asked me the only
         7  way to implement AEC would have been on a drug by
         8  drug basis and I said I guess so because I'm not used
         9  to thinking about these things and thinking them
        10  through.
        11       Q.   Oh no please?
        12       A.   I don't think that would be true.
        13       Q.   How would one do it?
        14       A.   No.  I have no idea how it could be done
        15  and the range of possibilities.
        16       Q.   Uh-huh?
        17       A.   But I would think the EAC could be used in
        18  combination to come up with a price for a HCPCS code
        19  that represented a range of suppliers for a drug.
        20  All I'm getting at is I didn't want to be locked into
        21  speculating that the only way EAC could be used was
        22  on a specific drug by drug basis.  I don't want to
00172
         1  agree to that because I don't know that to be true.
         2       Q.   Well, between 1993 and 1997, when you were
         3  the program, the policy analyst who was response for
         4  drug payment issues at Medicare, the regulation was
         5  still extant, correct that had EAC as one of the
         6  options, correct?
         7       A.   Yes.
         8       Q.   Did you consider any of the ways in which
         9  Medicare could have implemented the EAC option?
        10       A.   I don't remember that that ever, we never
        11  got that far.
        12       Q.   And how so?
        13       A.   Well, for the reasons we are saying, that
        14  either because of resources or because the
        15  information collection hurdle was never overcome, so
        16  we didn't have the data so I don't remember us ever
        17  having to consider that.
        18       Q.   So as I understand the position then of
        19  when I say the position, I don't mean the poll
        20  circumstances I mean the position that HCFA found
        21  itself in between 1991 and 1997 was it was paying
        22  with a Medicare allowable based upon AWP, correct?
00173
         1       A.   Uh-huh.
         2       Q.   It did not have, HCFA did not have in
         3  place any limitations on provider's charges, it would
         4  have prevented providers from charging more than
         5  their cost or more than a percentage over their cost,
         6  correct?
         7       A.   It's how I remember it.
         8       Q.   Right.  That HCFA had one alternative of
         9  estimated acquisition costs that would have allowed
        10  it if implementable to gauge the Medicare allowable
        11  amount to something closer than to actual acquisition
        12  cost, correct?
                              Page 63
```

4369.txt

13    A.    Yes.
14    Q.    Was it your sense that HCFA as an
15 organization wanted to move towards EAC?
16        MS. OBEREMBT:  Objection.
17        THE WITNESS:  I don't know how to answer
18 that. I mean, how many people would have been
19 involved in this and what their opinions would have
20 been, I never polled anybody.
21        BY MR. COOK:
22    Q.    Okay. Was there anybody within the agency

00174

1 who preferred to stay with AWP rather than go to EAC
2 in your memory?
3        MS. OBEREMBT:  Objection to the extent
4 you're asking him about deliberative process
5 conversations.
6        THE WITNESS:  So what do I do?
7        MS. OBEREMBT:  Why don't we take a break
8 and let me find out what he was going to say.
9        MR. COOK:  Okay.
10       THE VIDEOGRAPHER:  This marks the end of
11 tape three in the deposition of Robert Niemann. The
12 time is 13:54:38.
13       (Recess.)
14       THE VIDEOGRAPHER:  This marked the
15 beginning of tape four in the deposition of Robert
16 Niemann. Going back on the record. The time is
17 1414:02:57.
18       MS. OBEREMBT:  Chris, I understand your
19 question to be asking him about discussions he had
20 with others at CMS about what the drug policy should
21 be.
22       MR. COOK:  Yes.

00175

1        MS. OBEREMBT:  So on that basis I'm going
2 to instruct him not to answer because it does go to
3 deliberative process.
4        MR. COOK:  And just so I know the
5 parameters of the instruction not to answer, to the
6 extent that there was anybody within CMS who actually
7 preferred to go with, stay with AWP knowing that AWP
8 exceeded acquisition costs rather than going to EAC
9 which would approximate acquisition cost you're going
10 to instruct him not to answer those questions?
11       MS. OBEREMBT:  I'm going to instruct him
12 not to disclose discussions he had about what a
13 policy should be because that goes to the heart of
14 the deliberative process privilege.
15       MR. COOK:  Well, I'll ask him a question
16 and you can instruct him not to answer because I want
17 this one to be, I want to know what I can ask and
18 what I can and I'll just go through the questions and
19 you can instruct him not to answer them if you think
20 that they are not, that they are not permissible.
21       BY MR. COOK:
22    Q.    Mr. Niemann, you understood that there

00176

1 were essentially two options available to the
2 Medicare program between 1991 and 1997 for
3 establishing what the Medicare allowable should be or
4 would be for physician administered drugs, correct?
5 It's restating an earlier question. I know.
6    A.    On the allowable, it's really technically

Page 64

```
                             4369.txt
         7  I guess three.
         8       Q.    Okay?
         9       A.    Because we pay the lower of the actual
        10  charge on the thing.
        11       Q.    All right. But there will always be a
        12  charge in connection with the claims for physician
        13  administered drug correct?
        14       A.    Right.
        15       Q.    And the question is going to be if that
        16  charge exceeds a certain amount, will you pay the
        17  charge or that certain amount, correct?
        18       A.    Right.
        19       Q.    So if, for example, the charge is, well I
        20  guess the last data point in any claim would be the
        21  actual cost to the physician, correct, although
        22  that's not one that you have.
00177
         1       A.    Well, all I was saying is that there are
         2  three.
         3       Q.    Right?
         4       A.    Components to the decision.
         5       Q.    Correct. And if we were to look at an
         6  individual claim, there would be four, there would be
         7  three data points, one would be the physician has an
         8  actual cost, correct?
         9       A.    Right.
        10       Q.    You don't know what that is?
        11       A.    Right.
        12       Q.    The physician states a charge to the, the
        13  program, correct?
        14       A.    Right.
        15       Q.    You Doe know what that number is?
        16       A.    Yes.
        17       Q.    And the program through its carriers has
        18  an allowable amount which the charge may not exceed
        19  or will be disallowed to the extent that it exceeds
        20  the allowable, correct?
        21       A.    They wouldn't pay any more than that.
        22       Q.    Right. There were two options for the
00178
         1  program to set what the allowable amount would be
         2  under the Medicare regulations as they existed
         3  between 1991 and 1997, correct?
         4       A.    Yes. I would just say I recognize you're
         5  struggling. The maximum allowable.
         6       Q.    Precisely?
         7       A.    Because it would never exceed the actual
         8  charge.
         9       Q.    Precisely.
        10       A.    I get the drift of what you're saying.
        11       Q.    And the two options for setting the
        12  maximum allowable would be 100 percent of the maximum
        13  allowable as published in Red Book or other compendia
        14  right?
        15       A.    Or other compendia.
        16       Q.    That's right?
        17       A.    I think that's what it said.
        18       Q.    The other option under the Medicare
        19  program under the regulations was to establish an
        20  estimated acquisition cost, correct?
        21       A.    Yes.
        22       Q.    Unlike the average wholesale price, that
00179
                             Page 65
```

```
                              4369.txt
 1  would be a calculated number, correct?
 2       A.    Yes.
 3       Q.    It would be calculated by HCFA?
 4       A.    I --
 5       Q.    Or the carriers?
 6       A.    Yes.  I think the carriers.
 7       Q.    By either HCFA for its agent?
 8       A.    Right.
 9       Q.    Would calculate that number correct?
10       A.    Yes.
11       Q.    And do you have an understanding of how
12  hick have or its agents would calculate that number?
13       A.    No.
14       Q.    Do you have an understanding of what that
15  number would represent?
16       A.    Oh as I said before, I think it would be
17  the best estimate of what the physician's acquisition
18  cost was but I don't necessarily mean that individual
19  physician.
20       Q.    And in choosing between the published
21  average wholesale price and the best estimate of what
22  the physician's acquisition cost was, that is
00180
 1  estimated acquisition cost, did you have any
 2  discussions within the agency about which option to
 3  use?
 4             MS. OBEREMBT:  You can answer that.  You
 5  can tell him whether or not you had discussions about
 6  options.
 7             THE WITNESS:  Yes.
 8             BY MR. COOK:
 9       Q.    And were there individuals who advocated
10  for staying with the average wholesale price?
11             MS. OBEREMBT:  I'll direct you not to
12  answer that on the grounds of deliberative process.
13             MR. COOK:  So I can't get the process of
14  whether there were individuals who took that
15  position.
16             MS. OBEREMBT:  That's right.  Because
17  because that goes to the substance of the
18  discussions.  Your previous went to whether or not
19  there were discussions now you're getting into the
20  substance so I have to object.
21             BY MR. COOK:
22       Q.    Were there individuals who advocated using
00181
 1  the estimated acquisition cost?
 2             MS. OBEREMBT:  Objection.  Grounds of
 3  deliberative process.  I'll direct you not to answer.
 4             BY MR. COOK:
 5       Q.    who participated in these discussions?
 6       A.    It would have been my division director,
 7  me and the deputy group director.  Legislative
 8  personnel on our legislation staff.  I don't mean, I
 9  don't mean staffers on the Hill.  I mean our people.
10  People like that.
11       Q.    when did these conversations take place?
12       A.    I guess off and on for the whole time that
13  I was involved in it.  Maybe not, not too early.  I
14  don't have that clear recollection of --
15       Q.    As a matter of fact, for the entire time
16  period where estimated acquisition cost was an option
17  available to HCFA, HCFA in fact established its
                             Page 66
```

```
                              4369.txt
         18  maximum allowable cost based upon average wholesale
         19  price, correct?
         20      A.    Yes.   Except where a carrier may have done
         21  it sooner than when this all came about with OMB and
         22  the information collection.
00182
          1      Q.    In any of these discussions, do you recall
          2  any participant ever expressing to you the belief
          3  that by paying average wholesale price Medicare
          4  program was reimbursing physicians at their actual
          5  acquisition cost?
          6            MS. OBEREMBT:  Objection on the grounds of
          7  deliberative process.  I'll instruct you not to
          8  answer.
          9            BY MR. COOK:
         10      Q.    Has anybody ever in your time at HCFA
         11  expressed to you the belief that average wholesale
         12  price is a reliable indicator of the acquisition cost
         13  to physicians for drugs?
         14            MS. OBEREMBT:  I'm going to object to the
         15  extent you're asking him about conversations he had
         16  that involve deliberative processes of the agency.
         17  I'm going to instruct you not to answer that too.
         18            BY MR. COOK:
         19      Q.    In any of these conversations relating to
         20  the possibility of abandoning AWP and going to
         21  estimated acquisition cost, did any of the
         22  individuals that you've described ever raise concerns
00183
          1  about what the consequences would be to beneficiaries
          2  access to care or other program goals of going to
          3  EAC?
          4            MS. OBEREMBT:  Objection on the grounds of
          5  the deliberative process privilege.  I'll instruct
          6  you not to answer.
          7            BY MR. COOK:
          8      Q.    What position did you take about using
          9  average wholesale price or the estimated acquisition
         10  cost?
         11            MS. OBEREMBT:  Objection on the grounds of
         12  deliberative process.  I'll instruct you not to
         13  answer.
         14            BY MR. COOK:
         15      Q.    Did politics ever play a role in the
         16  Medicare program's decision to continue to use
         17  average wholesale price rather than use estimated
         18  acquisition costs to establish its maximum allowable
         19  payment amount for drugs?
         20            MS. OBEREMBT:  Objection to the extent
         21  you're asking him about discussions with agency
         22  personnel where a policy decision was made.  I have
00184
          1  to instruct you not to answer that too, I think.
          2            BY MR. COOK:
          3      Q.    At various points in time between 1991 and
          4  1997 without telling me about what discussions were
          5  made, is it fair to say the decision was made to stay
          6  with AWP and not go to estimated acquisition cost?
          7      A.    Well that was the stated, that was the
          8  regulation.
          9      Q.    Well the regulation allowed both?
         10      A.    Oh, allowed both?
         11      Q.    Yes?
                              Page 67
```

```
                             4369.txt
          12        A.   I'm sorry would you repeat.
          13        Q.   I assume -- at various points in time when
          14   the possibility of going from AWP to EAC was
          15   considered?
          16        A.   Right.
          17        Q.   In fact, HCFA continued to use AWP,
          18   correct?
          19        A.   It did.
          20        Q.   All right.  After discussions relating to
          21   a possible change and after it was decided to remain
          22   with AWP, did you ever have any discussions with any
00185
           1   other personnel at HCFA about the decision that had
           2   already been made to stay with AWP and whether that
           3   was a good idea?
           4             MS. OBEREMBT:  Objection because again I
           5   think you don't have a specific point demarche ated
           6   and his post policy discussions may be predecisional
           7   to subsequent policies so I can't, I'm going to
           8   object again on deliberative process and instruct you
           9   not to answer.
          10             BY MR. COOK:
          11        Q.   Did you ever have any discussions with
          12   anyone outside of HCFA about whether Medicare could,
          13   should continue to pay based upon AWP or should use
          14   some other methodology for establishing the maximum
          15   allowable amount?
          16        A.   That I don't remember.  Outside of HCFA.
          17        Q.   Yes?
          18        A.   I don't remember.
          19        Q.   Say someone with Congress?
          20        A.   That would have occurred.  I can't
          21   remember specifically, but that would have occurred.
          22        Q.   Without the specifics?
00186
           1        A.   Not a member of Congress but the staffer.
           2        Q.   The staffer.  Do you remember generally
           3   what the subject matters were relating to the
           4   possible departure from AWP as a methodology in your
           5   conversations with congressional staffers?
           6        A.   I'm sorry.  What was the -- what's the
           7   crux of that?  Do I remember what.
           8        Q.   Do you remember generally what the subject
           9   matters of those conversations were?
          10        A.   Subject matters?
          11        Q.   Let me ask it a little bit easier.  Do you
          12   remember anything at all about your conversations
          13   with congressional staffers?
          14        A.   That is easier.  Not much, but it would,
          15   it would have been the IG information and some kind
          16   of methodology to pay a fair price.
          17        Q.   Do you recall whether you or anybody else
          18   from HCFA was advocating a change in the methodology
          19   to these congressional staffers?
          20             MS. OBEREMBT:  You can answer that.
          21             THE WITNESS:  Was anybody advocating a
          22   change to what the staffers were recommending?  I'm
00187
           1   sorry.
           2             BY MR. COOK:
           3        Q.   The status quo was that?
           4        A.   AWP and we never implemented AEC.  That
           5   was the status quo.
                                Page 68
```

```
                              4369.txt
        6            MS. OBEREMBT:  Are you asking him in his
        7  conversations with people on the Hill?
        8            MR. COOK:  Yes.
        9            MS. OBEREMBT:  Okay.  So focus your answer
       10  on just conversations you had with people on the
       11  Hill, what was said.
       12            THE WITNESS:  Not HCFA people but
       13  staffers.
       14            MS. OBEREMBT:  Right.
       15            BY MR. COOK:
       16       Q.   Right.  Did you or anybody else from HCFA
       17  in these conversations with staffers on the Hill ever
       18  advocate a change in the methodology away from AWP?
       19       A.   Yes.  Yes.
       20       Q.   What?
       21            MS. OBEREMBT:  Objection.  That goes to a
       22  deliberative process issue since you're asking him
00188
        1  why they would have expressed that opinion to the
        2  staffers.
        3            MR. COOK:  So the decision was whether to
        4  talk to Congress.
        5            MS. OBEREMBT:  You can ask him what was
        6  said to the staffers, but you can't ask him why that
        7  was said because that does go to deliberative process
        8  information okay.
        9            MR. COOK:  Just so I understand and I've
       10  got the record straight.  Exactly which decision is
       11  that deliberation predecisional to?
       12            MS. OBEREMBT:  To decisions made within
       13  the agency to either continue with the existing
       14  policy or to proceed with change in policy so why
       15  don't don't you ask him what he said to the staffer
       16  or was he present in any other HCFA meeting with a
       17  congressional staffer.
       18            BY MR. COOK:
       19       Q.   Did you express to the congressional
       20  staffers why it was that HCFA was advocating a change
       21  in the methodology by which Medicare paid for
       22  physician administered drugs?
00189
        1       A.   Yes.  I'm sure I would have expressed the
        2  reason.
        3       Q.   And what was that reason?
        4       A.   It would have been the IG reports if the
        5  fact that, that at least some of the drugs under the
        6  AWP policy were, were, we were paying too much.
        7       Q.   When you say too much, can you quantify
        8  that for me?
        9       A.   No, I can't quantify it because of the
       10  reason you have cited that it wasn't a single amount
       11  with every drug.  It varied.
       12       Q.   When you say too much, is that a dollar
       13  amount, a percentage?
       14       A.   I remembered that being some concern.  And
       15  remember being released that I wasn't the one who had
       16  to pick the number.  I mean it's a judgment call
       17  what, like whether to knock off 5 percent or 15
       18  percent, that's a judgment call.
       19       Q.   And 10 percent of a $400 drug is a lot
       20  more than a thousand percent of a $2 drug, correct?
       21       A.   Indeed it is.
       22       Q.   Did you express to Congress any position
                              Page 69
```