# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X    MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY       :   CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION   :   01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :   CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :   06-CV-11337-PBS

Laboratories, Inc.                   :

------------------------------------X


       IN THE CIRCUIT COURT OF

       MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                    :   CASE NO.

       Plaintiff,                    :   CV-05-219

    v.                               :

ABBOTT LABORATORIES, INC.,           :   JUDGE

et al.,                              :   CHARLES PRICE

       Defendants.                   :

------------------------------------X

Ragone, Linda - Vol. I  April 17, 2007
Philadelphia, PA

Page 282

1  at the Office of Inspector General; that buying
2  groups are able to negotiate their prices directly
3  with manufacturers and suppliers?
4      MR. NEAL: Objection as to form.
5      You can answer.
6      THE WITNESS: I don't remember if that
7  was true of all buying groups. I'm not sure which
8  part of your question you want me to answer.
9  BY MR. COOK:
10     Q. Is it consistent with the work that you
11  did while at the Office of Inspector General that
12  buying groups are able to offer lower drug purchase
13  prices to their members as a result of their
14  ability to negotiate prices directly with drug
15  manufacturers?
16     A. I think --
17     MR. NEAL: The same objection.
18     You can answer.
19     THE WITNESS: I believe that what I --
20  that we wrote in the report there is what we
21  believed to be true.
22  BY MR. COOK:

Page 283

1      Q. Let me put it this way: Did you -- you
2  surveyed a number of buying groups in connection
3  with various reports that you did, correct?
4      A. I believe I did.
5      Q. And did you consistently find that
6  buying groups were able to negotiate lower prices
7  than were individual retail customers?
8      A. I don't know if I consistently found
9  that because I don't remember what the results of
10  every buying group that we went to for every drug
11  that we reviewed was.
12     Q. And you don't have a sense of what the
13  results of your -- of your findings and your
14  investigations were?
15     A. The inspections, I mean, I remember
16  overall that we did drug work. I remember that we
17  went to buying groups. I don't remember what the
18  individual results of the -- of all of that data
19  collection was.
20     Q. Well, you do remember that some buying
21  groups you found were able to negotiate lower
22  prices from drug manufacturers because they

Page 284

1  negotiated directly with those manufacturers,
2  correct?
3      A. I know that they had lower prices. What
4  -- my recall is that they had -- when I was looking
5  at their prices, through whatever source we had,
6  that their -- the prices in some instances were
7  lower than the Medicare allowance amount.
8      Q. Do you recall any instance in which a
9  buying group was not able to negotiate a lower
10  price?
11     A. I don't remember.
12     Q. Do you recall any communications with
13  the Health Care Financing Administration that
14  related in any way to the work you did on this
15  comparison of Albuterol Sulfate prices?
16     A. This specific report?
17     Q. Let's start with this specific report.
18     A. If this -- if it followed the normal
19  routine of our office, we would have had an
20  entrance conference and an exit conference with
21  HCFA. I don't know if we did or not. That would
22  have been the normal routine.

Page 285

1      Q. Well, let me ask it more generally. Over
2  the nine years in which you worked on drug pricing
3  reports, do you recall any communications with HCFA
4  relating to drug pricing?
5      A. Yes.
6      Q. What communications do you recall with
7  HCFA relating to drug pricing?
8      A. I know that we have entrance and exit
9  conferences with them for our inspections.
10     Q. And do you remember the specifics of any
11  of those entrance and exit --
12     A. No.
13     Q. -- conferences? You don't -- do you
14  remember who was present for any of those entrance
15  and exit conferences?
16     A. If I was involved in the report, I would
17  be present. If other staff members were involved
18  in the report, they would be present. Most likely
19  our manager, Robert Vito, would have been present.
20  And then whatever staff that HCFA or CMS chose to
21  send would be at the meetings.
22     Q. Do you remember any of the

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                              April 17, 2007
                    Philadelphia, PA

Page 286

1  recommendations that you made for HCFA about how
2  they could or should change their drug
3  reimbursement policy?
4      A. I don't remember the specific text. I
5  mean, through the -- through the years, we
6  suggested they pay more appropriately. I believe
7  that some of the earlier recommendations were to
8  have -- potentially have a rebate program like
9  Medicaid did; to use a -- a greater discount on
10 average wholesale price; competitive bidding, I
11 think, was an -- was one other option we might have
12 floated.
13     Q. Do you remember any other of the
14 recommendations that you made to HCFA?
15     A. I don't remember any right now, offhand.
16     Q. Tell me, how typically does an entrance
17 conference work for one of these reports?
18     A. Typically we would -- for CMS, we would
19 write a design -- that's now, it's changed through
20 the years. We would write a design -- we'll write
21 a design, it would be submitted to headquarters, it
22 would be approved, and we would send the design to

Page 287

1  CMS, or HCFA, and then we would meet to discuss it.
2  That's the entrance conference.
3      Q. And what would be -- well, you said that
4  that process has changed over the years?
5      A. Well, I think that when I first started,
6  I don't remember if we sent the design first or
7  gave it to them, which I -- I don't remember the
8  actual -- what the process was.
9      Q. And what was the purpose of sitting down
10 with HCFA, now CMS, at the beginning of the
11 inspection process?
12     A. I believe the process was to get
13 feedback from CMS about our design. To present our
14 design to them in a presentation, and then to hear
15 or have any questions or comments they may have.
16     Q. And then how long would these
17 conferences typically last?
18     A. An hour.
19     Q. In person or by telephone?
20     A. Well, most of them, we would have done
21 in person in Baltimore.
22     Q. So you would go down to HCFA offices?

Page 288

1      A. Yes.
2      Q. And sit down with them?
3      A. Yes.
4      Q. And for the entrance conferences on
5  these various drug pricing reports, do you remember
6  the identities of any of the HCFA people with whom
7  you spoke?
8      A. I remember somebody named Joel.
9      Q. Joel?
10     A. I don't recall the other names.
11     Q. And then you would have an exit
12 conference?
13     A. Yes.
14     Q. All right. Tell me how the exit
15 conference comes about.
16     A. The exit conference, as I said, now,
17 would come about after we complete the working
18 draft and it's approved through our central office
19 processing -- process, we would then provide CMS
20 with an advanced copy of the working draft and sit
21 down with them and present our findings and
22 recommendations and, again, hear their comments and

Page 289

1  any questions they have.
2      Q. And the written response of HCFA that I
3  -- that I see attached to these reports, does that
4  come before or after the exit conference?
5      A. After the exit conference.
6      Q. And so you give them a draft ahead of
7  time so they can read it and digest it. About how
8  long do you give them to understand the report
9  before you have a conference?
10     A. A week or two. I think it's like --
11 like two weeks, sometimes it's a week.
12     Q. How do you determine who at the -- at
13 the agency to send the report to?
14     A. Well, it's sent by our liaison staff,
15 our special staff in headquarters. And if we have
16 specific people that we have had conversations with
17 during the course of the study, we ask that it be
18 sent to them.
19     But they also have a distribution list they
20 send to, I believe, over to the audit liaison in
21 CMS, and then they decide who to distribute it to.
22     Q. Okay. And so you send it out, they

73 (Pages 286 to 289)

Ragone, Linda - Vol. I                                    April 17, 2007
                        Philadelphia, PA

Page 290

1  digest it. You go down to Baltimore again?
2      A.  Yes --
3      Q.  And you sit down --
4      A.  Usually.
5      Q.  -- with them -- sometimes it's here?
6      A.  No, it's never here. It might be on the
7  phone.
8      Q.  Okay. So you go down there or by
9  telephone, one or the --
10     A.  Yes.
11     Q.  -- other? Sit in a conference room like
12 this?
13     A.  (No verbal response.)
14     Q.  How many people?
15     A.  It's -- there is no standard. It could
16 be --
17     Q.  What's the smallest one you've ever had?
18     A.  I think we had one where no one showed
19 up, and then --
20     Q.  That's so depressing.
21     A.  -- and then the audit liaison was there,
22 and they might have brought one other person in.

Page 291

1  That's the smallest I've ever been in.
2      Q.  And the largest?
3      A.  I couldn't tell you. Probably more than
4  twenty.
5      Q.  All right. Do you remember what report
6  it was that you had more than twenty people?
7      A.  No, I don't.
8      Q.  It didn't stick in your mind that that
9  was a particularly hot report?
10     A.  I think all the reports are hot.
11     Q.  I know. But one that your client agency
12 thought was particularly hot, because so many
13 people showed up to?
14     A.  I don't recall which ones were the --
15     Q.  Do you remember how big, for example,
16 these Albuterol Sulfate reports?
17     A.  I don't remember.
18     Q.  Do you know if you had a joint exit and
19 entrance conference for these various reports that
20 were done at about the same time?
21     A.  I do not remember.
22     Q.  Okay. Do you remember any specific

Page 292

1  individuals who attended any of the exit
2  conferences for the drug pricing reports you did?
3      A.  Well, if I had written it and been the
4  team leader, I would have attended.
5      Q.  Right.
6      A.  Robert Vito, my manager, would have
7  attended. Usually your program specialist, who was
8  an OEI staff member in our central office in
9  Baltimore, would attend. And then if we had other
10 team members, they may attend or may not attend.
11 And then the CMS staff would attend.
12     Q.  Okay. And what's the typical back and
13 forth in one of these exit conferences?
14     A.  Typically we put copies on the table,
15 because even though they're supposed to have copies
16 beforehand, they don't always read them or get
17 them, and then we would most likely make a
18 presentation, just, you know, speaking at a
19 conference table like this, present our findings,
20 or in the case of the entrance, our design, and
21 then we would open it up to questions or concerns.
22     Q.  And is any record made of the exit or

Page 293

1  entrance conference?
2      A.  There are notes taken.
3      Q.  And who's responsible for taking notes
4  at these conferences?
5      A.  The team.
6      Q.  And so each team member takes individual
7  notes?
8      A.  They may, but usually people will each
9  take notes, if they want to, but the team knows
10 that somebody has to. And then one member of the
11 team would either, in the old days, just have it
12 written, or it would now probably make an
13 electronic -- type it up and make it electronic.
14     Q.  And so for each exit and entrance
15 conference, there should be a written record from
16 OIG of -- some sort of written record of what
17 occurred at the meeting?
18     A.  Should be.
19     Q.  Right. At some level of generality?
20     A.  (No verbal response.)
21     Q.  To the best of your knowledge, would a
22 memorandum exist or some record exist of what was

752f543d-a1b8-4aaf-8de4-a5ada851a581

Page 294

```
 1  discussed at the exit and entrance conferences for
 2  each of these reports?
 3      A.  I don't know if they do.
 4      Q.  Okay.
 5      A.  If they did, they would be in the work
 6  paper files.
 7      Q.  And I take it that at the exit
 8  conference, for example, for Exhibit Abbott 060, you
 9  would have advised HCFA of each of the
10  recommendations contained within your report,
11  beginning at Page 7?
12      A.  Well, we would have advised them of the
13  main rec -- the recommendation is the bolded one --
14      Q.  Okay.
15      A.  -- and then the ones underneath it would
16  have been the options.
17      Q.  Okay.  So you would have sat down with
18  them and told them in so many words, whatever,
19  Medicare, you, HCFA, should change -- you should
20  re-examine the Medicare drug reimbursement
21  methodologies that you use?
22      A.  We would say that is our recommendation.
```

Page 295

```
 1      Q.  All right.  Do you recall, from any of
 2  these exit or entrance conferences, any specific
 3  comments made by any HCFA official?
 4          MR. NEAL:  I'll object to the form.
 5          You can answer that yes or no.
 6          THE WITNESS:  I don't remem -- recall any
 7  specific comments.
 8          MR. NEAL:  Or I don't remember.
 9          MR. COOK:  Yeah.
10  BY MR. COOK:
11      Q.  Do you have any general sense of what
12  the comments were or the feedback you would get
13  from HCFA would be at these exit conferences?
14          MR. NEAL:  The same objection.
15          You can answer that yes no or --
16          THE WITNESS:  I don't --
17          MR. NEAL:  -- I don't remember.
18          THE WITNESS:  -- remember for this report
19  what their comments were.
20  BY MR. COOK:
21      Q.  For all of your drug pricing reports, do
22  you have any sense of how HCFA was reacting at
```

Page 296

```
 1  these exit conferences to your recommendations?
 2          MR. NEAL:  The same objection.
 3          THE WITNESS:  Sometimes they would say
 4  okay.  I think sometimes they might have technical
 5  issues with the report, I mean, in general.
 6  BY MR. COOK:
 7      Q.  If we were to try to determine what
 8  actually was said at these exit and entrance
 9  conferences, is it fair to say that the best source
10  would be to go to the notes prepared and kept in
11  the working file for each of these exit and
12  entrance conferences?
13      A.  I think the best source now would be
14  that.  I mean, people might have better memories
15  than I do, but...
16      Q.  Yeah.  And you and I could probably have
17  a better discussion of it if we had those notes to
18  work from, right?
19      A.  I would be able to read the notes and
20  tell you what's in the notes.
21      Q.  You might remember something from
22  reading those notes, right?
```

Page 297

```
 1      A.  I don't know until I read the notes.
 2      Q.  Fair enough.  Nor do I.  Do you remember
 3  at any point that HCFA, relating to any of these
 4  drug -- any drug pricing report that you did, that
 5  HCFA resisted a recommendation made --
 6          MR. NEAL:  Objection.
 7  BY MR. COOK:
 8      Q.  -- by OIG?
 9          MR. NEAL:  Objection.
10          You can answer that yes, no, or I don't
11  remember.
12          THE WITNESS:  I remember them not always
13  saying, you know, that they agree with every one of
14  these points.  I mean, it wasn't the purpose of the
15  entrance conference to tell us what they agreed or
16  not agreed with formally.  That's the purpose of
17  the written comments.
18      Q.  Okay.
19          MR. COOK:  And, John, just so I have it
20  clear, what's your objection?
21          MR. NEAL:  I believe the substance of the
22  entrance and exit conferences would get to the
```

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I        April 17, 2007
Philadelphia, PA

Page 298

1  deliberative process privilege. So to the extent
2  that she doesn't remember any of those
3  conversations specifically, you know, and she's
4  just talking about what generally happens at, you
5  know, these particular meetings, that's certainly
6  fine.
7    To the extent that she has a specific
8  recollection of, you know, what's happened at an
9  exit conference and who recommended what, and what
10  the back and forth was, we would interpose an
11  objection and instruct her not to answer.
12    MR. COOK: Okay. And just briefly for
13  the record, could you explain to me what the
14  deliberative process privilege basis is for these
15  discussions?
16    MR. NEAL: The exit conferences are very
17  fundamental to the deliberative process. It is
18  officials from HCFA and officials from OIG sitting
19  down and hashing out what the appropriate response
20  is to a draft study. Formal comments are
21  published, and you certainly have access to those,
22  but that's after a venting process. You know, the

Page 299

1  back and forth -- the predecisional back and forth
2  that takes place at these exit conferences, as Ms.
3  Ragone has generally described them, is fundamental
4  to the deliberative process of the agency.
5  BY MR. COOK:
6   Q. Is it fair to say, Ms. Ragone, that as
7  your counsel has indicated, that in these exit
8  conferences, you would have a back and forth with
9  the agency about what their policy should be?
10   A. That occurs at some --
11   Q. And in these --
12   A. -- exit conferences.
13   Q. And in these drug pricing reports, for
14  example, Exhibit Abbott 060, and other drug pricing
15  reports that you prepared, you would, in these exit
16  conference, have a back-and-forth discussion with
17  HCFA about whether they should continue basing
18  their reimbursement based upon average wholesale
19  price, correct?
20   A. I can't recall what the back and forth
21  was. Some reports have back and forth. Some
22  reports they basically go, okay, and you'll get our

Page 300

1  formal comments.
2   Q. One thing that's absolutely clear is
3  that at all of these exit conferences, the Office
4  of Inspector General clearly stated its
5  recommendations, as reflected in these reports, to
6  the agency, correct?
7   A. Yes.
8   Q. And repeatedly told HCFA that average
9  wholesale price exceeded acquisition cost, correct?
10    MR. NEAL: Objection as to form.
11    THE WITNESS: The exit conferences for
12  the reports where we provided information for
13  certain drugs, that -- the data that we had found,
14  we would have presented that to CMS during those
15  exit conferences.
16  BY MR. COOK:
17   Q. Any question in your mind that the HCFA
18  officials who attended those exit conferences
19  walked away with any doubt about the
20  recommendations being made by HCFA [sic] with
21  respect to drug pricing and reimbursement?
22    MR. NEAL: I'll object to the form.

Page 301

1    THE WITNESS: I don't know what they were
2  feeling or not feeling.
3  BY MR. COOK:
4   Q. Did you and colleagues at OIG make it
5  clear to them what your recommendations were?
6    MR. NEAL: The same objection.
7    THE WITNESS: We would state the findings
8  and the recommendations as they were written in the
9  working draft at that time.
10  BY MR. COOK:
11   Q. And as clearly as you could?
12   A. Yes.
13   Q. And your goal was to communicate those
14  findings as bluntly and clearly as you could,
15  correct?
16   A. The goal was --
17    MS. POLLACK: Objection to form.
18    MR. NEAL: The same objection.
19    You can answer.
20    THE WITNESS: The goal was to communicate
21  them as they were written in the report.
22  BY MR. COOK:

76 (Pages 298 to 301)

Henderson Legal Services
202-220-4158

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                                    April 17, 2007
                        Philadelphia, PA

Page 302

1    Q.  And so, for example, can we assume that
2  in the exit interview for this June 1996 study on A
3  Comparison of Albuterol Sulfate Prices, OIG clearly
4  communicated to HCFA that, in reading from the
5  Recommendation section: Using the median of the
6  published average wholesale prices does not reflect
7  the actual wholesale pricing of Albuterol Sulfate
8  that is occurring in the marketplace?
9        MR. WINGET-HERNANDEZ:  Objection to form;
10 calls for speculation.
11       MR. NEAL:  I'll join the objection.
12       You can answer.
13       THE WITNESS:  I'm not sure that we read
14 them that exact sentence.  They would have been
15 provided a copy of the report with that sentence in
16 it.
17 BY MR. COOK:
18   Q.  And the goal of your meeting would have
19 been to convey that finding, among others, correct?
20   A.  The goal of the meeting would have been
21 to convey the findings and recommendations.
22   Q.  Do you recall any official from HCFA on

Page 303

1  any occasion, whether an exit conference or
2  otherwise, denying that published average wholesale
3  prices exceed actual wholesale pricing in the
4  marketplace?
5        MR. NEAL:  Objection.
6        You can answer that yes no or...
7        THE WITNESS:  I don't recall what was
8  said at the entrance and exit conferences.
9  BY MR. COOK:
10   Q.  But to be clear, in all of the
11 conversations that you had with HCFA officials over
12 the years relating to the work that you've done in
13 these reports, you don't recall a single instance
14 in which a HCFA official expressed to you a belief
15 that average wholesale prices represent actual
16 market prices?
17       MR. NEAL:  Objection.
18       THE WITNESS:  I don't remember ever
19 having that conversation.
20 BY MR. COOK:
21   Q.  But you don't remember a HCFA official
22 ever telling you that that official believed that

Page 304

1  average wholesale prices reflect actual market
2  prices?
3    A.  Saying that exact statement, I don't
4  remember.
5    Q.  Expressing that sentiment?
6    A.  Well, they would --
7        MR. NEAL:  I'm going to object to the
8  form.
9        THE WITNESS:  They would express
10 sentiment -- they didn't always agree with our
11 findings.  They did not always agree with our
12 findings and recommendations, so...
13 BY MR. COOK:
14   Q.  But I'm trying to focus on average
15 wholesale price and whether average wholesale price
16 reflects actual market prices.
17      In all of your conversations with HCFA
18 officials, do you recall any conversation in which
19 any official ever expressed to you a belief that
20 average wholesale price reflects actual market
21 prices?
22       MR. WINGET-HERNANDEZ:  Objection to --

Page 305

1        MR. NEAL:  I'm going to object -- I'm
2  going to object to the form.
3        I'm going to instruct you to answer that
4  as either a yes, no, I don't remember.
5        THE WITNESS:  I don't remember.
6  BY MR. COOK:
7    Q.  So you don't remember any instance in
8  which a HCFA official expressed that sentiment to
9  you?
10   A.  I do not remember.
11   Q.  And you've had several conversations
12 with folks in the industry outside of HCFA as well,
13 correct?
14   A.  We've had -- the office has had
15 conversations with industry.
16   Q.  Right.  Who have you personally had
17 conversations with in the drug industry about these
18 drug pricing issues?
19   A.  I --
20       MR. NEAL:  I'll object to the form.
21       You can answer.
22       THE WITNESS:  I've heard -- I've heard

77 (Pages 302 to 305)

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. II                           April 18, 2007
                    Philadelphia, PA

Page 481

1  communications to HCFA during the exit conference.
2       MR. COOK: If you'd just instruct her not
3  to answer. Are you instructing her not to answer?
4       MR. DRAYCOTT: I am.
5  BY MR. COOK:
6    Q. So you make whatever communications you
7  do to HCFA in these exit conferences --
8       MR. DRAYCOTT: Objection.
9  BY MR. COOK:
10   Q. -- after giving them a copy of this
11 report, right?
12      MR. DRAYCOTT: Objection.
13      And you're instructed not to answer.
14 BY MR. COOK:
15   Q. And you make your recommendations,
16 correct?
17      MR. DRAYCOTT: You can answer that
18 question.
19      THE WITNESS: During the exit
20 conferences, we will tell them the findings and
21 recommendations.
22 BY MR. COOK:

Page 482

1    Q. And you encourage them, that is,
2  officials at HCFA, to reimburse prescription drugs
3  based upon something other than the published
4  average wholesale price?
5       MR. DRAYCOTT: Objection.
6       You're instructed not to answer.
7  BY MR. COOK:
8    Q. And, in fact, you do so heatedly,
9  correct?
10      MR. DRAYCOTT: Objection.
11      And you're instructed not to answer.
12 BY MR. COOK:
13   Q. And they respond?
14      MR. DRAYCOTT: You can answer whether or
15 not they responded.
16      THE WITNESS: If they have comments, they
17 will respond when we provide the findings and
18 recommendations.
19 BY MR. COOK:
20   Q. Did they explain why HCFA continued to
21 pay based upon AWP, notwithstanding the fact that
22 HCFA knew average wholesale price could exceed

Page 483

1  acquisition cost by as much as ten times?
2       MR. DRAYCOTT: You can answer as to
3  whether or not they responded without revealing the
4  response, if you remember.
5       THE WITNESS: I believe that they stated
6  why they were using the reimbursement strategy they
7  were using at that time.
8  BY MR. COOK:
9    Q. And what was their explanation?
10      MR. DRAYCOTT: Objection.
11      And you're instructed not to answer.
12 BY MR. COOK:
13   Q. Why do you believe HCFA continued to use
14 average wholesale price to pay for Medicare Part B
15 drugs after you issued this report in December
16 1997?
17      MR. DRAYCOTT: Objection.
18      And you're instructed not to answer to
19 the extent your belief is based on communications
20 from HCFA during an exit conference.
21 BY MR. COOK:
22   Q. I'll let you work out that metaphysical

Page 484

1  problem.
2    A. I -- I believe --
3       MR. DRAYCOTT: Well --
4       THE WITNESS: -- that the --
5       MR. DRAYCOTT: Let me ask you: Can you
6  answer that question without revealing the content
7  of communication from HCFA during the conference?
8       THE WITNESS: I believe I can. I believe
9  I can.
10      MR. DRAYCOTT: Okay.
11      THE WITNESS: I believe that the level of
12 people that we were talking to believed that the
13 regulations or legislations were set for payment at
14 a certain place and that that's what Medicare was
15 bound to reimburse at.
16 BY MR. COOK:
17   Q. Who at HCFA is responsible for setting
18 Medicare Part B drug payment policy?
19   A. Policy?
20   Q. What the amount is that they would pay.
21   A. I believe that would be regulated or
22 legislated.