# EXHIBIT 4

1

2
        IN THE COURT OF COMMON PLEAS IN AND FOR
3
        THE COUNTY OF MONTGOMERY, PENNSYLVANIA
4
              CIVIL DIVISION
5
                 - - -
6
    IN RE:          : NO. 01-10504
7                   :     04-02776
                    :     05-20924
8  BRIDGEPORT FIRE       :
   LITIGATION       :
9
                 - - -
10
    PETITION OF DONALD E. HAVILAND, JR., ESQ. FOR
11   APPOINTMENT AS LEAD COUNSEL FOR THE CLASS and
     PLAINTIFFS' MOTION TO STRIKE PRAECIPE
12
                 - - -
13
              Courtroom H
14           Friday, December 1, 2006
             Commencing at 9:55 a.m.
15
                 - - -
16
           Virginia M. Womelsdorf
17            Official Court Reporter
           Montgomery County Courthouse
18           Norristown, Pennsylvania

19               - - -

20  BEFORE: THE HONORABLE STEVEN T. O'NEILL, JUDGE

21               - - -

22

23

24

25

1

2   COUNSEL APPEARED AS FOLLOWS:

3

    SHANIN SPECTER, ESQUIRE
4     THOMAS KLINE, ESQUIRE
    JASON PEARLMAN, ESQUIRE
5      for the Class Plaintiffs

6

    DONALD E. HAVILAND, JR., ESQUIRE
7     ADAM S. LEVY, ESQUIRE
    MICHAEL LORUSSO, ESQUIRE
8      for the Movant

9        - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2              I N D E X

3

4  CLASS PLAINTIFFS EVIDENCE

5  Witness            Direct  Cross  Redir  Recr

6  RICHARD SOKORAI, ESQ.    7      18    --    --

7  DONALD HAVILAND, JR., ESQ. 211    --    --    --

8              - - -

9  MOVANT'S EVIDENCE

10   JEFF PURDY            28      --    --    --

11  SHANIN SPECTER, ESQ.    83    138    --    --
    (As on Cross)
12
    PAUL BAKER BARTLE, ESQ.   152    179    --    --
13

14              - - -

15

16          E X H I B I T S

17

18  MOVANT'S

19  Number              Marked  Rec'd

20   HLF-1 through HLF-24        --    191

21  HLF-25  Praecipe for dismissal    37    147

22  HLF-26  Printout of Kline and    94    --
          Specter web page
23

24

25

4

1

2          E X H I B I T S (Cont'd)

3

4   MOVANT'S

5   Number                    Marked  Rec'd

6   HLF-27  Printout of Kline and       94    147
           Specter web page
7
     HLF-28  Printout of Kline and       97    147
8           Specter web page

9   HLF-29  Legal Intelligencer        100    147
           Article
10
     HLF-30  Settlement Agreement and   120    147
11          Release

12   HLF-31      Document              123    --
     (Stricken)
13
     HLF-32      Document              123    --
14   (Stricken)

15   HLF-33      Document              127    --
     (Stricken)
16
     HLF-31  Construction Loan         156    --
17          Agreement

18
              - - -
19

20   CLASS PLAINTIFFS'

21   Number                    Marked  Rec'd

22   Class Counsel-4  Notice to Attend   278    --

23   Class Counsel-5  11/29/06 letter   278    --

24

25          - - -

1

2   today, we'll go Tuesday.

3           MR. KLINE:  We're ready, Your

4   Honor.

5           MR. HAVILAND:  Your Honor,

6   again, I object to the production of the bank

7   records in any open forum, whether it be done with

8   these lawyers or with these lawyers.  And I ask you

9   to certify that for immediate appeal, because --

10          THE COURT:  And I am not doing

11  it.  We're going to have the hearing and if you

12  want to preserve your issues for appeal, you're

13  going to have a good record to do it in.

14          I have already said how the

15  Court can protect what I don't even understand what

16  your interest is.  I don't even get where you even

17  have basis for your objection.  I don't get it.

18          MR. HAVILAND:  We have a motion

19  to quash, Your Honor.

20          THE COURT:  I get you.  And I'm

21  denying the motion to quash, because you haven't

22  even given me a basis for a protective order.

23          MR. HAVILAND:  Your Honor, I

24  would ask that we defer this until next week so I

25   can confer with counsel and interpose an objection.

1

2          MR. KLINE:  He wants the time

3   so that he can file an appeal.

4          THE COURT:  Hold on.  Hold on.

5          MR. SPECTER:  Right.

6          MR. KLINE:  That's what he

7   wants the time for.

8          THE COURT:  Look, I want to

9   move on with it.  I can't stop you if I can't have

10   your hearing today, so you can run out and say

11   there is an objection that was overruled.  There

12   was a motion made that was denied.  Those are the

13   two things you seem to be doing here, right?

14          You'll, one, object to them

15   calling you as a witness and examining your bank

16   records, and before that you put a motion for

17   protective order in there so that you wouldn't have

18   a public disclosure of your bank records.

19          MR. HAVILAND:  Right.  And we

20   made an offer to the Court to make a disclosure.

21          THE COURT:  So now on the

22   objection being denied, I guess you believe you

23   could take that objection up somehow.

24          MR. HAVILAND:  I believe it's a

25   collateral order, Your Honor.

1

2            THE COURT:  An objection

3   denial?

4            MR. HAVILAND:  No.  The

5   objection to quash.

6            THE COURT:  I hear you.  So the

7   objection I denied.

8            Now you have a motion to quash

9   a what?  The production of records?

10           MR. HAVILAND:  Correct.

11           THE COURT:  Okay.  And I will

12  deny that motion, because you haven't even -- all

13  you did is say, I want it.  You didn't explain one

14  thing, one reason.  You didn't put anything on the

15  record as to why you wouldn't produce those

16  records, why you shouldn't have to produce them,

17  other than now to say you've already exposed your

18  hand to say, please deny it so I can go ahead and

19  get an immediate appeal to the Superior Court.

20           Sounds to me like strategy.

21           MR. HAVILAND:  Your Honor,

22  again, I made an offer to make a production to you

23  in camera.  If you think at that point in time that

24  it needs to go beyond that, then you can make that

25   decision.  In fairness, I believe Your Honor should

1

2  look at the issue in camera first before we take

3  another step.

4           MR. KLINE:  Your Honor, we have

5  two different things --

6           THE COURT:  I can probably

7  handle it.  I have already made the decision that I

8  can protect you by keeping the record that you want

9  of this case, which we have put for many days we've

10  made a record of this, to have the record, clear

11  the courtroom so we at least can do it in this

12  room.

13           I will then review that

14  testimony.  And if it needs to be sealed, I will

15  seal it, but how you would possibly say it couldn't

16  be part of a record of a case that you have brought

17  yourself, I can't figure.

18           So what I definitely don't want

19  you to do is to now say, okay, you're denied that

20  type of motion so that you can get an immediate

21  appeal to the Superior Court and delay this case.

22           MR. HAVILAND:  No, Your Honor,

23  if I may, what we said in our motion to quash was

24  exactly what Mr. Specter said on the stand last

25   week, that the issue of counsel's finances has

1

2  never been disclosed in court and, in fact, if

3  disclosed in court, would be used by other parties

4  defense counsel.

5           MR. SPECTER:  I didn't say

6  that.

7           MR. HAVILAND:  Yes, he did.

8           THE COURT:  Listen.  Your

9  finances are relevant.  Yours are relevant.  You

10  tried to make theirs relevant.  They've answered it

11  by saying to the Court's satisfaction, we will put

12  a million dollars in escrow if that becomes an

13  issue.  Okay?

14           Now, I don't think it's an

15  issue for that firm, but that's at least the way

16  they've headed off any long inquiry to them which

17  you have still not to this date said that they do

18  not have the financial resources to handle this

19  case.

20           He cut you off, but you haven't

21  said it.  If, in fact, you said it, I felt a

22  million dollars in escrow would be sufficient.

23           Now, we're on to you.

24           MR. HAVILAND:  Okay.

25            THE COURT:  It is very relevant

1

2  what your financial resources are.

3         MR. HAVILAND:  Okay.

4         THE COURT:  In your own case,

5  you never took the stand and dealt with that.  You

6  have not dealt with it.  You've danced around it.

7         You've said if they give me

8  that money over there, I'll be okay.  And if this

9  couple of things work with that case, I'll be okay.

10  And if the Attorney General does this, I'll be all

11  right.

12         That's what you're doing,

13  instead of just getting on there and saying, I have

14  the adequate financial resources to do it.  You

15  never once said that.

16         MR. KLINE:  There is the second

17  issue, as well, Your Honor.

18         THE COURT:  I hear you.  I'm

19  going to get to that.  That's your defense.  You're

20  defending a motion by saying not only does this guy

21  not got the dough, but look what he was doing as

22  far as his own firm, he didn't disclose on it.  I

23  get that, but we're not to that yet.

24         So I don't know where, you

25  know, where you would have any basis.  So I'm

1

2  prepared to try to do something today, but at this

3  stage I mean I owe it to these Drug Court people to

4  get them in here.  I have reserved Tuesday for

5  this.

6              MR. KLINE:  We can use the

7  time, Your Honor, to go through the records and

8  conduct a clean examination of him as soon as your

9  Drug Court is over.

10              THE COURT:  There is no chance

11  of a clean examination.

12              MR. KLINE:  Well, an

13  examination that's efficient would be the way I

14  describe it.  If we get the records right now --

15              THE COURT:  Do you have the

16  records?

17              MR. HAVILAND:  They're in my

18  office, Your Honor.

19              MR. SPECTER:  You know, Judge,

20  last week he said they were in his custody and --

21              MR. KLINE:  Oh, that's --

22              THE COURT:  All right.  All

23  right.  Look, I get the emotional context of this,

24  but we've been living with it now for a few weeks.

25          MR. SPECTER:  He's got notice

1

2    to attend --

3              MR. KLINE:  And notice to bring

4    records.

5              MR. SPECTER:  Exactly.  He said

6    last week to the Court he had them in his custody

7    so there wouldn't be an issue.  We sent him an

8    e-mail earlier this week -- I'm sorry.  A fax

9    earlier this week saying that notice to attend --

10             MR. HAVILAND:  I'm sorry, Your

11   Honor.  I misspoke.  I have them in the car.

12             THE COURT:  All right.  They're

13   in the car.  They're in the car.  Go get them from

14   the car and let them look at them.  At least we can

15   use that time to some benefit.  So set them up -- I

16   don't know where you --

17             MR. HAVILAND:  Your Honor, I

18   don't intend to let them out of my custody.

19   They're original bank records.

20             THE COURT:  I didn't expect you

21   to.  You're going to sit with them and isn't that

22   going to be comfortable?  That should be really

23   comfortable.

24             MR. HAVILAND:  Last objection

25   on the record --

1

2          THE COURT:  The objection is on

3   the record.  That objection is overruled.  Your

4   motion to quash and even if it's to be taken as a

5   protective order, is denied.  If you seek me to

6   certify it for immediate appeal, that is denied.

7          (Whereupon, a recess was taken

8   for Judge O'Neill to conduct Drug Court.)

9          THE COURT:  All right.  I

10  assume things didn't go that well back there.

11          MR. KLINE:  No.  We weren't

12  provided anything, Your Honor.  Contrary, and in

13  violation of Your Honor's order, Mr. Haviland never

14  showed up, never brought the records, never came

15  back to meet with us.  So we were sitting there

16  with the sheriffs for 45 minutes.

17          THE COURT:  What were you

18  doing, Mr. Haviland?  Now he's here.  He's right

19  there.

20          MR. KLINE:  He refused to show,

21  contrary to Your Honor's order.

22          THE COURT:  What are you doing?

23          MR. HAVILAND:  Your Honor, I

24  came to court.  I'd like to make a statement for

25   the record that I again renew my offer to show the

1

2  Court in camera anything the Court wishes to ask of

3  me and my law firm with respect to financial

4  resources.

5           On the advice of counsel, I

6  have to respectfully decline to follow Your Honor's

7  order on the grounds that I think it's irrelevant

8  to this proceeding in terms of it has no bearing on

9  my firm's assets and the ability to finance this

10  case, which is the issue before the Court.

11           And to produce such records

12  anywhere outside of an in-camera proceeding would

13  be a violation of my privacy rights.  And I'd ask

14  that the Court stay its decision until an immediate

15  appeal, which is being prepared right now with the

16  Superior Court be adjudicated so that we can

17  proceed from then on.

18           THE COURT:  And I have already

19  denied it.  I said I'm not going to do it.

20           At this stage, look, if you're

21  refusing to do it, I'm not going to sit here and

22  hold a contempt hearing and play all these games

23  here.

24           But if you're now telling me

25   that it's your position that you don't intend to

1

2  comply with a Court Order, which is nothing more

3  than to show them your asset records, that's what

4  we're dealing with first.

5           Then we've got to deal with the

6  next stage as to whether they can inquire of them.

7           I have already said that I

8  would implement something to protect whatever you

9  believe some privacy interest that you may have.  I

10  can't even figure out what that is in a case such

11  as this where adequate financial resources are an

12  absolute relevant inquiry of this Court to make

13  here when you're claiming somehow it can be done by

14  affidavit, and I'm denying it being done by

15  affidavit.

16           At this stage I ordered you to

17  go back and show them the documents so that they

18  can look at them.  And you're refusing to show the

19  documents, then you must not really want what

20  you're asking for.

21           If you're not willing in some

22  way -- the Court isn't going to do an in-camera

23  review of yours and not allow them to review the

24  same documents and inquire of them if they're

25   relevant as to your adequate financial resources.

1          HAVILAND - DIRECT

2               So that's it.  So I mean at

3  this stage you're saying you're going to refuse to

4  cooperate with showing them the records.  At this

5  stage I have denied your protective motion.  I'm

6  denying you any automatic, you know, certification

7  of an interlocutory appeal there.

8               So I don't know what you want

9  me to do.  I'm sure they're going to want me to

10  hold you in contempt at this stage.  And that's a

11  whole separate hearing at this stage.

12               MR. SPECTER:  Actually, Your

13  Honor, if I may, let's just get him up on the

14  witness stand and get going and we'll deal with the

15  issue of the bank records as we go.

16               THE COURT:  All right.  They're

17  calling Donald Haviland.

18          CLASS PLAINTIFFS' EVIDENCE

19               - - -

20               DONALD E. HAVILAND, JR.,

21  ESQUIRE, having been duly sworn, was examined as

22  follows:

23               DIRECT EXAMINATION

24

25

1                    HAVILAND - DIRECT

2   BY MR. SPECTER:

3   Q    Mr. Haviland, did you pay to Mr. Williams

4   $20,018.75 in or around June of 2006 from the

5   Haviland Law Firm account or other wise?

6   A    I did not.

7                    THE COURT:  What was that

8   question?

9                    (The court reporter read back

10   as follows:

11                    "Question:  Mr. Haviland, did

12   you pay to Mr. Williams $20,018.75 in or around

13   June of 2006 from the Haviland Law Firm account or

14   other wise?"

15   BY MR. SPECTER:

16   Q    Did the Haviland Law Firm pay any funds of any

17   type to Mr. Williams prior to September 7, 2006?

18   A    No.

19   Q    Is there any -- did you personally pay any

20   money to Mr. Williams prior to September 7th, 2006?

21   A    Other than the fact that's not relevant to

22   this proceeding, the answer is no.

23   Q    Did Haviland Law Firm make any expenditures

24   prior to September 7, 2006?

25   A    I believe that question is broad.

1                    HAVILAND - DIRECT

2   Q    Please answer the question.

3   A    I don't understand the question.

4   Q    Did the Haviland Law Firm make any

5   expenditures prior to September 7, 2006?

6   A    I don't understand the question.

7   Q    Did the Haviland Law Firm spend any money

8   before September 7, 2006?

9   A    As a going concern, no.

10   Q    Let's not parse words here, Mr. Haviland.  I'm

11   not talking about as a quote, going concern, or

12   not.  You opened an account in June of 2006, right?

13   A    No.

14   Q    Well, you have -- there is an e-mail on your

15   Yahoo account which has been marked as Class

16   Counsel-3, which says, hey, I have set up my

17   Haviland Law Firm business account and transferred

18   substantial funds.  And the date of that is June 7,

19   2006.  Was that a false statement on your part?

20   A    It was not and I object to using a private

21   e-mail in this proceeding.

22   Q    It was not a false statement or was a false

23   statement?

24   A    It was not a false statement.

25   Q    Okay.  How much money did you deposit into

225

2  to your car and get these things because your personal

3  counsel, the non-present Mr. Elliott, has told you not

4  to do it?

5           THE WITNESS:  That's correct,

6  Your Honor.

7           THE COURT:  All right.  So he's

8  not getting it.  He's going to violate this Court's

9  order to go out to his car and bring those documents

10  to the courtroom.  So I don't know what his record is

11  for the Superior Court.  Maybe he's going to try to,

12  you know, get Mr. Elliott to go up and, you know,

13  simply because it's Mr. Elliott, get them to give them

14  some kind of interim relief.  But I don't know what

15  you're even going to be talking about because you

16  won't even bring them to the courtroom.

17           So at this stage you can ask him

18  questions or I'm going to have to convene a sanctions

19  hearing to deal with this.

20           MR. SPECTER:  All right, Judge.

21  BY MR. SPECTER:

22  Q   How many checks were written from the Haviland

23  Law Firm account between June 6th and September 7,

24  2006?

25  A    I don't know.

1                    HAVILAND - DIRECT

2  Q   Give me an estimate.

3  A   Maybe less than ten.

4  Q   To what vendors?

5  A   I don't know.

6  Q   Name any.

7  A   A vendor that was working on a website.

8  Q   When was that check written?

9  A   Don't know.

10  Q   In what amount?

11  A   Can't say.

12  Q   What month was the check written?

13  A   I don't remember.

14  Q   What other vendors?

15  A   Can't think of any as I sit here today.

16  Q   What bank were the funds deposited in?

17  A   Commerce Bank.

18  Q   What's the account number?

19  A   I don't know it.

20  Q   You got computers when, Mr. Haviland, for your

21  firm?

22  A   Late September.

23  Q   You got telephone when?

24  A   Late September.

25  Q    Didn't you have a cell phone that you -- that you

231

1               HAVILAND - DIRECT

2  A   That's right.

3  Q   And then it says:  "Phone, June 15th."  Correct?

4  A   That's what it says.

5  Q   Not late September; right?

6  A   That's what it says.

7  Q   And it says:  "Furniture, April 1st."  Right?

8  A   It says:  "F-U-R-N."

9  Q   Right.  F-U-R-N standing for furniture; correct?

10  A   Yep.

11  Q   And then it says:  "Website/e-mail, June 15th."

12  Correct?

13  A   That's right.

14  Q   Okay.  Who are these vendors?  Who was the

15  website vendor?

16  A   I don't know their name as I sit here.

17  Q   Who was the furniture vendor?

18  A   There was none.

19  Q   Who was the computer vendor?

20  A   I can't think of the names as I sit here.

21  Q   These are all things that we see in your check

22  ledger; right?

23  A   Possibly.

24  Q   Do you have a lot of credit, Mr. Haviland?

25    A    Yes, I do.

232

1                    HAVILAND - DIRECT

2 Q   With a bank?

3 A   Yes.

4 Q   Who's the bank?

5 A   Well, I have several.

6 Q   Okay.  Well, for Haviland Law Firm, who was the

7 bank with whom you had a line of credit?

8 A   I can't think of the name of the bank at this

9 point.

10 Q   You cannot think of the name of the bank with

11 whom you have a line of credit?

12 A   I can't think of it, no.

13 Q   How much money do you have in a line of credit

14 with these banks?

15 A   For the firm?

16 Q   Yes.

17 A   Current?

18 Q   Let's deal first with how much financing you've

19 arranged for your firm.  How much financing have you

20 arranged for your firm?

21 A   I can't understand the question, Mr. Specter.

22 Q   How much money have you arranged to borrow from

23 the bank in order to run your firm?

24 A   Well, I'm dealing with cash right now.  I have

25  cash.

233

1           HAVILAND - DIRECT

2 Q   How much money have you arranged to borrow from a

3 bank in order to run your firm?

4 A   I don't understand your question.

5 Q   You've told us that you've gone to a couple of

6 banks and you've gotten lines of credit; correct?

7 A   Yes.

8 Q   How much money do you have in lines of credit,

9 total, with banks?

10 A   I don't know as I sit here today.

11 Q   Tell us which banks you have arranged these lines

12 of credit.

13 A   You've asked me that question.  I can't tell you

14 as I sit here today.

15 Q   Tell us any one of the banks.

16 A   I told you I have an account with Commerce Bank.

17 Q   How much money do you have in a line of credit

18 with Commerce Bank?

19 A   As I said, I can't tell you as I sit here today.

20 Q   How is it secured?

21 A   How is it secured?

22 Q   Yes.

23 A   Real estate.

24 Q   What real estate?

25 A    My real estate.

1                    HAVILAND - DIRECT

2  Q    What were they?

3  A    Insurance cases.

4  Q    Where?

5  A    All around.  Montgomery County.

6  Q    When is the last time you gave a closing speech

7  in a case?

8  A    In a case like that?

9  Q    In any case.

10  A    1994, 1993.

11  Q    What case was that?

12  A    I don't know.

13  Q    Are you admitted to practice in the District of

14  Massachusetts?

15  A    I'm admitted pro hac vice.

16  Q    Are you a member of that Bar?

17                    THE COURT:  Can you wait one

18  second?  Okay.

19                    THE WITNESS:  I'm sorry, I was

20  not done answering the question.

21                    THE COURT:  Answer it.

22                    THE WITNESS:  My answer was I'm

23  admitted pro hac vice for several matters in that

24  court.

25  BY MR. SPECTER:

257

1                HAVILAND - DIRECT
2  Q   Are you a member of that Bar?

3  A   As I said, I'm admitted pro hac vice for several

4  matters.

5  Q   Are you a permanent member of that Bar?

6  A   No.

7  Q   Are you a member of the Bar of the Eastern

8  District of North Carolina?

9  A   I was admitted pro hac vice for purposes of one

10  matter.

11  Q   Are you a permanent member of that Bar?

12  A   No.

13  Q   Your website before you took it down represented

14  you as being a member of those two bars, didn't it?

15  A   It was a typographical error that neglected to

16  put in the pro hac vice language, which it now says.

17  Q   Which it now says?  The website is down, isn't

18  it?

19  A   Well, it's being repaired, as I said,

20  Mr. Specter, at the beginning of my testimony.

21  Q   This website was set up for two months without

22  that being repaired; correct?

23  A   I don't know.

24  Q   You read our response to your petition to name

25  class counsel; correct?

258

1               HAVILAND - DIRECT

2  A   I did.

3  Q   You saw it in there that we pointed out that you

4  weren't a member of those Bars; correct?

5  A   I read what you wrote.

6  Q   How many weeks lapsed between your reading that

7  and your correcting the website?

8  A   I don't know.  I don't remember when you --

9  Q   I can't hear you.

10  A   I don't remember when you filed your papers.

11  Q   Are you a member of the American Bar Association?

12  A   I was up until the time that Kline and Specter

13  didn't pay the bill.

14  Q   When you left Klein and Specter, were you a

15  member of the American Bar Association?

16  A   I believed I was because Klein and Specter was

17  obligated to pay the bill from January of 2006, so for

18  nine months I believed that I was.

19  Q   So that your answer is I was not a member of the

20  American Bar Association; correct?

21  A   No, I believed that I was, Mr. Specter, because

22  we made filings before the Attorney General that

23  represented that fact and I believed that I was.

24  Q   You say that you believe that you were, but, in

25  fact, you know that you weren't; correct?

260

1                    HAVILAND - DIRECT

2  A   That's right.

3  Q   So have you corrected your website in that

4  regard?

5  A   That information has been taken out.

6  Q   And how about the Pennsylvania Bar Association,

7  are you a member of the Pennsylvania Bar Association?

8  A   I was in the better part of 2006, I believe.

9  Q   You believe.  Are you a member of the

10  Pennsylvania Bar Association?

11  A   Again, not until receiving your papers and

12  realizing that Kline and Specter didn't pay the bill,

13  I didn't know that I wasn't a member of the

14  Pennsylvania Bar Association.

15  Q   Have you corrected your website in that regard,

16  also?

17  A   I've taken that information out.

18  Q   Are you actively prosecuting the Vioxx class

19  action case in Atlantic County, New Jersey?

20  A   I was up until the point in time when you wrote

21  an unsolicited e-mail to Mr. Seeger seeking to have me

22  taken off the case.

23  Q   So the answer is you're not; is that correct?

24  A   I am not today.

25 Q    All right.  Have you corrected your website in

261

1                    HAVILAND - DIRECT

2 that regard?

3 A    I've taken the link or the reference to the Vioxx

4 case off the website.

5 Q    What portion of the Bridgeport file do you

6 currently have?

7 A    I have none of that paper file.

8 Q    Pardon me?

9 A    I have none of that paper file, other

10 than certain work files that were in my possession.

11 Q    Okay.  Well, here we have more parsing of words.

12 I'm not asking about paper versus electronic.  How

13 much of the file do you have in any form?

14 A    I don't know what the question means.

15                    MR. SPECTER:  Judge, please help

16 me.

17                    THE COURT:  I can't help you.  I

18 mean, just tell us how much of the Bridgeport file do

19 you have?

20                    THE WITNESS:  I don't have any

21 of the paper file that -- I have certain electronic

22 things that I worked on while I was on my home

23 computer.  I have some pieces of that.  I've got work

24 files that I had in my possession when I left Kline

25  and Specter.  What portion, I don't know.  The file is