IN THE COURT OF COMMON PLEAS IN AND FOR

THE COUNTY OF MONTGOMERY, PENNSYLVANIA

CIVIL DIVISION

- - -

| IN RE: | : | No. 01-10504 |
| | : | 04-02776 |
| | : | 05-20924 |
| BRIDGEPORT FIRE LITIGATION | : | |

- - -

PETITION OF DONALD E. HAVILAND, JR., ESQ. FOR
APPOINTMENT AS LEAD COUNSEL FOR THE CLASS and
PLAINTIFF'S MOTION TO STRIKE PRAECIPE

- - -

Courtroom 13
Tuesday, December 5, 2006
Commencing at 10:00 a.m.

- - -

Susan M. Laucella
Official Court Reporter
Montgomery County Courthouse
Norristown, Pennsylvania

- - -

BEFORE:  THE HONORABLE STEVEN T. O'NEILL, JUDGE

- - -

COUNSEL APPEARED AS FOLLOWS:

SHANIN SPECTER, ESQUIRE
THOMAS R. KLINE, ESQUIRE
 for the Class Plaintiffs

DONALD E. HAVILAND, JR., ESQUIRE
ADAM S. LEVY, ESQUIRE
 for the Movant

ALSO PRESENT:
DEAN PHILLIPS, ESQUIRE
 for Donald E. Haviland, Jr., Esq.

1                                 2

2                    I N D E X

3   CLASS COUNSEL'S EVIDENCE

4   Witness              Dir  Crs  Redir  Recrs

5   DONALD E. HAVILAND, JR.  32   96

6   KATHLEEN SPURKA      127  157   185     186

7                    - - -

8   COURT'S EVIDENCE

9   BRIAN M. HENION      215  218   220

10   CHRIS HUNSBERGER        221   223

11                    - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    3

2                  E X H I B I T S

3   CLASS COUNSEL'S EVIDENCE
    Number                      Marked  Rec'd
4
    CC-1, 2, 4, 5                    123
5
    CC-3                        124
6
    CC-6   Notice to Attend and Produce    40    123
7
    CC-7   Group of Documents          42    125
8
    CC-8   Letters fromn Levin Fishbein,
9        Sedran and Berman           47    125

10   CC-9   Group of Documents from Website  49    125

11   CC-10  Handwritten notes          54    --

12   CC-11  Handwritten Notes          56    --

13   CC-12  Memo from Kline and Specter    80    127

14   CC-13  Docket entries from Philadelphia
         County                 84    127
15
    CC-14  E-mail from Shanin Specter to
16       Donald Haviland           86    127

17   CC-15  Department of State document   93    123

18   CC-16  List of expenses          134   194

19   CC-17  Yahoo e-mails            193   193

20                - - -
    MOVANT'S EVIDENCE
21
    HLF-32 Westlaw Download Summary      189
22
                 - - -
23

24

25

1          Bridgeport Fire Litigation          4

2                    THE COURT:  He's got a stay of

3    the order to produce the document, because

4    Mr. Haviland has turned this into a chess game.  I

5    guess the next move is yours as to -- I can only

6    read the application he made to the Superior Court,

7    and I see a grant of the stay.

8                    I don't know if the fact that

9    you would withdraw your request for the documents,

10   and whether the order is relevant or not, you still

11   have the request for the documents and he has a

12   stay.

13                   MR. SPECTER:  Yes, Your Honor.

14   We don't withdraw our request for the documents.

15   We think the Court was right on Friday of last

16   week.

17                   Has the Court seen

18   Mr. Haviland's petition in Superior Court asking

19   for a stay?

20                   THE COURT:  I have it.  I got a

21   fax of it.  Mr. Phillips, he is actually being

22   represented by Mr. Phillips.  Superior Court issues

23   per curiam order explaining anything.

24                   MR. SPECTER:  Correct.  And

25   they had a recitation that was materially false in

1          Bridgeport Fire Litigation          18

2   to what we saw last Friday.  It's going in other

3   places, Your Honor.  If we get back to 1700, which

4   is what you have been saying all along, we look at

5   the basic issues, conflicts, whether there are

6   financial resources adequately secured by the

7   plaintiffs, and then what to do about the fiduciary

8   obligation we all hold, including the Court, to

9   this case to make sure it's adequately lawyered

10   going to the finality.

11              THE COURT:  Mr. Haviland, we

12   have a difference of an opinion, first of all, as

13   to what your petition even asks for.  Your petition

14   you filed asked to be appointed class counsel and

15   lead class counsel.  Lead class counsel talks about

16   having a co-role, and the facts of this case is

17   there can't be a co-role.  It is a chess match that

18   goes and says, if I ask you this, I know they will

19   ask to get out.  We made it clear on the record

20   that there is clear conflict between you and Kline

21   and Specter, who is class counsel.  It is clear on

22   the record.

23              You try to say, well, I can

24   work with them.  They can't work with you period.

25   They are class counsel.  You are seeking to be

1          Bridgeport Fire Litigation          19

2   appointed lead class counsel amongst class counsel.

3   You didn't say co.  You might be telling me that

4   now, but that's not what your petition says.

5              MR. HAVILAND:  Your Honor, it

6   says in the alternative, respectfully, the lead --

7   the petition says lead counsel or in the

8   alternative class counsel.

9              THE COURT:  What does class

10   counsel mean?

11              MR. HAVILAND:  Co.

12              THE COURT:  Well, you read it

13   as co.  You didn't say co.  You said class counsel,

14   meaning supplanting present class counsel.

15              MR. HAVILAND:  Your Honor, if I

16   may, I will clarify on the record right now so

17   there is no doubt in this record it means co.

18              THE COURT:  Okay.  Now I know

19   it means co, and now I know it means co, it can't

20   exist because present class counsel has made it

21   very clear, and I can understand by the last three

22   days that I have spent on this case, why am I going

23   to subject the class to what has been demonstrated

24   over the last three days as a complete inability to

25   cooperate on anything, even the time of day.  So I

1       Bridgeport Fire Litigation        20

2    am not going there.  I will make that

3    determination.  You keep saying, well, if I am in

4    as co, their dough is already in it, their dough is

5    in it, if they want to get out, now, Judge, they

6    have got to ask you to get out.

7              I am not going to play these,

8    games, and they are games about it.  If you want to

9    get in, you will get in.  If you know they get out,

10   if they get out, you get to keep the resources they

11   already have in there and, Judge, you can then make

12   them stay in and work with me.

13             MR. HAVILAND:  Your Honor --

14             THE COURT:  You have that and

15   then we let everybody -- each one of these cases,

16   every time we came here, we would have to first get

17   through, are the class counsel in this case, how

18   are they getting along today, and once we find out

19   how they are going to get along, then we can

20   determine how they are getting along, vis-a-vis,

21   already difficult issues with defense and

22   subrogated plaintiffs in this case so --

23             MR. HAVILAND:  Your Honor, if I

24   may.

25             THE COURT:  You may, but you

1       Donald E. Haviland, Jr., Esq. - Direct        48

2   identification.)

3   BY MR. SPECTER:

4   Q.   Mr. Haviland, I am marking as Class Counsel 8

5   a group of documents from the Levin Fishbein firm.

6   Do you recognize these documents, sir?

7   A.   I don't.  I think the first one I have seen

8   before.  I don't think I have seen the second one.

9   And I note for the record that there is --

10  Q.   The Levin Fishbein firm is an exhibit

11  attached.

12  A.   I have a document that has Exhibit A with

13  nothing attached.

14  Q.   Right.  Exhibit A is what this was.  This is

15  Exhibit A to our response to your motion to be

16  named class counsel?

17  A.   I see.

18  Q.   You recognize the Levin Fishbein firm's

19  viewpoint is that you were never a partner there,

20  correct?

21  A.   I recognize that after I left the firm, sir,

22  Levin Fishbein tried to contest my partnership

23  because at the time, as you will remember, sir, you

24  and I were disputing with them whether or not they

25  had the right to lien this case.  They have

1     Donald E. Haviland, Jr., Esq. - Direct     49

2   currently in the Court file in Montgomery County a

3   lien on the client's recovery, and as a reaction to

4   that, because they owed me certain funds, a

5   percentage of those funds, they tried to deny the

6   partnership by this letter I see.

7   Q.   You represent yourself on your web site to

8   have been a partner in that firm?

9   A.   That's correct.

10   Q.   You don't acknowledge on your web site that

11   they dispute you were a partner?

12   A.   I don't, but I know for a fact that Kathy

13   Spurka was at the holiday party December 20th when

14   we toasted my partnership.

15           MR. SPECTER:  I am marking this

16   Class Counsel 9.

17               (Whereupon, Group of Documents

18   from the Haviland Law Firm web site was marked as

19   Plaintiff's Class Counsel Exhibit CC-9, for

20   identification.)

21   BY MR. SPECTER:

22   Q.   Sir, is that a copy of your web site in paper

23   form as it appeared September of 2006?

24   A.   I have no way of knowing that.

25   Q.   Didn't you write it yourself?

1      Donald E. Haviland, Jr., Esq. - Direct      82

2   Q.   You don't know what I saw, do you, sir?

3   A.   I do.  You took issue with the State of

4   Connecticut submission we made and you wanted to

5   see all such submissions after that.  I know for a

6   fact you reviewed the state of Michigan --

7   Q.   I took issue with you about Connecticut

8   because you said you were a partner, didn't you?

9   A.   I did not say that, sir.

10   Q.   You wrote in a document that you were a

11   partner, didn't you?

12   A.   The document said that, sir.

13   Q.   And that's what you submitted, correct?

14   A.   Kline and Specter submitted that.

15   Q.   You were criticized by me in writing for

16   saying that you were a partner in a document

17   presented to the Arizona AG, correct?

18   A.   You told me that that was an error.  I said I

19   acknowledged that was an error.  It was, in fact, a

20   mistake to have said, so it was a typographical

21   error.  And you said from there on out, you wanted

22   to see every such submission to Attorney General

23   offices, which is why you reviewed the State of

24   Michigan one in January of 2006 which said I was a

25   member of the American Bar Association and

1        Donald E. Haviland, Jr., Esq. - Direct        83

2   Pennsylvania Bar Association, as well as other

3   lawyers in the class action department.

4   Q.   Mr. Haviland, I wanted to ask you about your

5   capacity to handle multiple litigations at the same

6   time.  For how many weeks has the Average Wholesale

7   Price case been pending in Boston?

8   A.   Weeks --

9   Q.   When I say pending, on trial in Boston?

10   A.   They began the first week of November.

11   Q.   They are still on trial, correct?

12   A.   It's intending to wrap up by the end of next

13   week.

14   Q.   You have an employee of your firm up there

15   helping the team?

16   A.   Physically in Boston?

17   Q.   That's my question, yes.

18   A.   I don't.

19   Q.   November 17th, you were here in court instead

20   of being in Boston, correct?

21   A.   November 17th, I was ordered to be here on

22   this petition.  I was here.

23   Q.   Did you also have litigation in Philadelphia

24   County on the 17th of November?

25   A.   Not that I am aware of.

1          Kathleen Spurka - Direct          134

2    representations for that web site remain?

3    A.   Up until recently, I believe it was, the end

4    of October -- the end of November.

5    Q.   Which one?

6    A.   I think it was the end of November, the 16th.

7    Q.   I'm sorry?

8    A.   November 16th or 17th.

9    Q.   Ms. Spurka, as part of your job at Kline and

10   Specter, do you check the accuracy of costs?  I am

11   talking now in particular about computer research

12   that may be billed to a file?

13   A.   I do not for the entire firm; for our

14   department.

15   Q.   And did you check on the accuracy of certain

16   expenses that were billed to certain files by

17   Mr. Haviland, by Mr. Levy?

18   A.   I did.

19   Q.   Did you prepare a document in that regard?

20   A.   I did.

21               MR. SPECTER:  I have marked

22   that document, Your Honor, as Class Counsel 16.

23               (Whereupon, List of expenses

24   was marked as Plaintiff's Class Counsel Exhibit

25   CC-16, for identification.)

1          Kathleen Spurka - Direct          135

2  BY MR. SPECTER:

3  Q.   Miss Spurka, is that the document you just

4  referenced?

5  A.   Yes, it is.

6  Q.   Would you explain to the judge what the

7  document is?

8  A.   It is any research that was billed for matters

9  that were not Kline and Specter cases where they

10  were saved, what case the research was charged to,

11  and there is another column here on -- in

12  comparison to the date and time of the research was

13  done when, in Mr. Haviland's calendar, what he was

14  working on or what case he was billing at that

15  time.

16  Q.   So you cross referenced the research to

17  Mr. Haviland's billing records?

18  A.   I did.

19  Q.   Let's take the first page of this document.

20  You title that as Bridgeport Fire expense; is that

21  correct?

22  A.   Yes.

23  Q.   And just so we can maybe get to the bottom

24  line, before we get to the top line, the bottom

25  line is, that these were 13 pages of improper

1              Kathleen Spurka - Direct              136

2    charges, correct?

3    A.   Correct.

4    Q.   The first page, what case does that relate to?

5    A.   Well, the expenses were applied to Bridgeport

6    Fire.

7    Q.   And were the expenses, in fact, related to the

8    Bridgeport Fire case?

9    A.   No.

10   Q.   Who made the charges?

11   A.   Mr. Haviland.

12   Q.   Both the time charges and also the research

13   charges?

14   A.   Yes.

15   Q.   Let's talk about what was actually done for

16   which there was either money charged to Bridgeport

17   Fire or time charged to Bridgeport Fire.

18              Let's take, for example, the

19   first one, January 25, 2006.  This, by the way, was

20   after the point in time when he has told you he

21   intends to leave Kline and Specter?

22              MR. HAVILAND:  Objection,

23   leading.

24              THE COURT:  Overruled.

25              THE WITNESS:  Correct.

1        Kathleen Spurka - Direct        137

2    BY MR. SPECTER:

3    Q.   At 10:02 in the morning, according to this

4    document, he did research and charging time to the

5    Bridgeport Fire?

6    A.   Correct.

7    Q.   What was the research actually done on?  What

8    was the actual subject of the research?

9    A.   This says party walls regarding his future

10   residence.

11   Q.   Party walls?

12   A.   Yes.

13   Q.   It says DEH Lippincott Research.  What is

14   Lippincott?

15   A.   Lippincott is Mr. Haviland's current

16   residence.

17   Q.   Near Washington Square?

18   A.   Yes.

19   Q.   In Philadelphia; is that correct?

20   A.   Yes.

21   Q.   The second line, is that also Lippincott

22   research?

23   A.   It is.

24   Q.   Was the time and the time charged to

25   Bridgeport Fire?

1           Kathleen Spurka - Direct        138

2  A.  Yes.

3  Q.  Same thing for the third entry?

4  A.  Yes.

5  Q.  And the fourth?

6  A.  Yes.

7  Q.  The fifth entry -- those were all January

8  25th, correct?

9  A.  Yes.

10  Q.  The next entry is tenant Mercer.  What's that

11  about?

12  A.  This directory, I am not sure what the Mercer

13  thing is, I believe it's the plaintiff name, in a

14  case that was found on or researched on Westlaw.

15  It is saved in the DH personal tenant file, which

16  is where his tenant, all the paperwork for his

17  tenant was filed under.

18  Q.  And while it was saved in his directory

19  regarding his personal tenant issues, to what case

20  was time charged?

21  A.  The AWP litigation.

22  Q.  Average Wholesale Price litigation?

23  A.  Yes.

24  Q.  What file was charged for the cost of the

25  research?

1          Kathleen Spurka - Direct          139

2   A.   The Bridgeport Fire matter.

3   Q.   And the next thing also involves tenant

4   issues; is that correct?

5   A.   Yes.

6   Q.   But it was charged, the file was charged for

7   the time, Average Wholesale Price and cost of the

8   search was charged to Bridgeport Fire; is that

9   correct?

10  A.   Correct.

11  Q.   Ditto with the next one?

12  A.   Yes.

13  Q.   And the next one after that?

14  A.   Yes.

15  Q.   And the next one after that as well, correct?

16  A.   Yes.

17  Q.   And just so we are clear, my three dittos was

18  tenant issue, as was the second, as was the third;

19  is that correct?

20  A.   Yes.

21  Q.   Actually the third was to purchase of his

22  residence; is that correct?

23          MR. HAVILAND:  Objection,

24  leading, foundation, Judge.

25          THE COURT:  Overruled.

1          Kathleen Spurka - Direct          140

2   BY MR. SPECTER:

3   Q.   Last one on that page, Lippincott research,

4   that would be residence?

5   A.   Yes.

6   Q.   So to summarize on this page, we had one, two,

7   three, four, five, six, seven, eight, nine improper

8   charges, correct?

9   A.   Yes, correct.

10   Q.   All of the costs of the research was charged

11   to Bridgeport Fire; is that right?

12   A.   Yes.

13   Q.   And the time on four of them was charged to

14   Bridgeport Fire, and the time on the other five

15   were charged to the Average Wholesale Price

16   litigation; is that correct?

17   A.   Yes.

18   Q.   Have you gone and removed from the costs card

19   for Bridgeport Fire these associated costs or have

20   you directed it be done?

21   A.   I met with our accountant and did that, yes.

22   Q.   Have you removed the time charges from the

23   Bridgeport Fire case and the Average Wholesale

24   Price case?

25   A.   I have.

1            Kathleen Spurka - Direct          141

2   Q.   The next page -- I may have misspoken.

3   Actually there were 14 pages here of incorrect

4   charges here?

5   A.   Yes.

6   Q.   The next page you have listed as Average

7   Wholesale Price and expense, correct?

8   A.   Yes.

9   Q.   And that's page one of 13; is that right?

10   A.   Correct.

11   Q.   And the prior page was page one of one; is

12   that correct?

13   A.   Yes.

14   Q.   And could you advise the Court perhaps in

15   summary fashion what this page regards?

16   A.   The first page is, again, personal research of

17   Mr. Haviland's regarding -- the bottom is also

18   Lippincott purchases.  The top is -- first two I

19   recognize as -- I'm sorry, the second and third

20   line are research that he did on a piece of

21   property that was up for sheriff's sale.

22   Q.   On this page, you have 17 improper charges?

23   A.   Yes.

24   Q.   And the file charge in terms of the cost of

25   the searches was which file?

1          Kathleen Spurka - Direct          142

2    A.   AWP.

3    Q.   And on one, two, three, four, five, six,

4    seven, eight, nine, ten, eleven, was time charged

5    to the Bridgeport Fire file?

6    A.   Yes.

7    Q.   For personal research?

8    A.   Yes.

9    Q.   And on one of the charges, time was charged to

10   Average Wholesale Price?

11   A.   Yes.

12   Q.   And on one, two, three, four, five lines,

13   there was no charging of time to any file; is that

14   correct?

15   A.   Correct.

16   Q.   And as it works out, on those five occasions,

17   those were all in 2005, correct, those last five,

18   except for the last one, which was January of 2006?

19   A.   Yes, the first four are '05, yes.

20   Q.   First four are '05?

21   A.   Yes.

22   Q.   And just so we are clear about this, Ms.

23   Spurka, there are two issues here, am I correct;

24   one is the charging of his time to a certain file

25   when the time was spent doing something else.

1             Kathleen Spurka - Direct        143

2   That's one thing, correct?

3   A.   Correct.

4   Q.   And the other is charging the research costs

5   with our firm, and then eventually our client will

6   be billed by the vender that's being used for the

7   computer access?

8   A.   Correct.

9   Q.   The third page involves what?  It's page two

10   of 13, but the third page of this exhibit.

11   A.   This is all -- the top 16 are purchases of

12   neighbors in the Lippincott building.

13   Q.   Purchases?

14   A.   Of their units, individual units.

15   Q.   What's being searched here?

16   A.   What each person paid for their unit.

17   Q.   There are 16 such searches?

18   A.   On that page, yes.

19   Q.   And the file claim for the actual expense was

20   Average Wholesale Price?

21   A.   Yes.

22   Q.   And that was, just to give an example, that

23   was $229.74 for the cost; is that correct?

24   A.   For those on that page and the few '06

25   purchases on the previous page, yes.

1           Kathleen Spurka - Direct          144

2   Q.   The time charged for the previous file was

3   Bridgeport Fire?

4   A.   Yes.

5   Q.   And what's down on the bottom three on that

6   same page?

7   A.   The third from the bottom is a personal

8   research that Mr. Haviland did on, says it was a

9   Sunday, for a personal lawsuit he had.

10  Q.   That's a Barton matter?

11  A.   Barton appears to be the case Mr. Haviland was

12  the defendant in this case.

13  Q.   DB versus Haviland?

14  A.   Yes.

15  Q.   Do you know who DB is?

16  A.   I do, yes.

17  Q.   Who is DB?

18              MR. HAVILAND:  Objection.

19  A.   Disciplinary Board.

20              MR. HAVILAND:  Objection, Your

21  Honor.

22              MR. SPECTER:  Excuse me?

23              THE COURT:  Just ask what it

24  is.  No basis for anything.

25  BY MR. SPECTER:

1               Kathleen Spurka - Direct          145

2   Q.  Let's go to the next one.

3   A.  The last two are Pacer researches done on a

4   case that was saved in the phone tax directory or

5   these are bills from Pacer for phone tax.

6   Q.  Let's go to the next page?

7               THE COURT:  Four of 13 you are

8   on?

9               MR. SPECTER:  Three of 13, Your

10  Honor.

11              THE WITNESS:  The top two are

12  phone tax research again.  The next three are

13  Milberg and Weiss research.

14  BY MR. SPECTER:

15  Q.  Let's talk about phone tax for a second.  Was

16  a file opened on the phone tax case at Kline and

17  Specter?

18  A.  No.

19  Q.  What was the office procedure for opening

20  files?

21  A.  I would send an e-mail to the -- I would issue

22  a number in our department, a file number

23  specifically, two class action numbers, and I would

24  let the person who opened it up on the program, we

25  use time matters, and tell her what number I opened

1          Kathleen Spurka - Direct          146

2   it up under, and then our file department would

3   open up an actual file.

4   Q.   And was that done here with the phone tax

5   case?

6   A.   No, it was not.

7   Q.   How about the Milberg case?

8   A.   No, it was not.

9   Q.   Do all of the charges on page three of 13

10   relate to the Milberg case or the phone tax case?

11   A.   They do.

12   Q.   And was the time charged in one, two, three,

13   four, five, six, seven, eight, nine, ten, 11, 12

14   instances the Bridgeport Fire case?

15   A.   Yes.

16   Q.   And was the time charged in the other six

17   instances to the Average Whole Price case?

18   A.   Five, yes.

19   Q.   Five, excuse me.  I miscounted.  And were the

20   costs charged to the Average Wholesale Price case

21   in all 17 instances?

22   A.   Yes.

23   Q.   Let's go to the next page, four of 13.  What's

24   on here?

25   A.   This is all Milberg Weiss research.  A lot of

1        Kathleen Spurka - Direct        147

2   these are done by Mr. Levy, most of them.

3   Q.  How many of them?

4   A.  15.

5   Q.  15.  And the final charge for the cost of the

6   research was the Average Wholesale Price case?

7   A.  Yes.

8   Q.  Did you ever authorize Mr. Levy to charge the

9   Average Wholesale Price case for research he was

10  doing on some other case?

11  A.  No, I did not.

12  Q.  Did you hear Mr. Haviland talk on Friday about

13  you doing something with Mr. Levy, vis-a-vis,

14  giving him access to the Kline and Specter system

15  so he could do research?

16  A.  Mr. Levy worked on the Lupron trial with us,

17  and at one point, he was given -- he used to come

18  into the office, he was given the one of the

19  department's Westlaw numbers to do research on the

20  Lupron case.

21  Q.  Was he gone by May of 2005?

22  A.  Yes.

23  Q.  Did he ever return to the Kline and Specter

24  firm to do research after May of 2005?

25  A.  Not to my knowledge, no.

1    Kathleen Spurka - Direct   148

2 Q. Was the class action department all on one

3 floor?

4 A. Yes.

5 Q. Did you know where people were most of the

6 time?

7 A. Yes.

8 Q. At least if they were on the floor, you would

9 know they were on the floor?

10 A. Yes.

11 Q. Very small floors, correct?

12 A. Yes.

13 Q. As a matter of fact, at 4:12, 4:15 in the

14 afternoon of September 6, 2006, Ms. Spurka, was

15 Mr. Haviland at Kline and Specter?

16 A. On the 6th, yes.

17 Q. Was he there at 4:12 in the afternoon?

18 A. On the 6th?

19 Q. I misspoke.  On the 7th?

20 A. On the 7th, no, he was not there.  He was out

21 of the office from about 3:30 until approximately

22 4:40.

23 Q. Let's go back to this document.  So on page

24 four of 13, there are one, two, three, four, five,

25 six, seven, eight, nine, ten, 11, 12, 13, 14, 15

1           Kathleen Spurka - Direct           149

2   charges by Mr. Levy on research regarding the

3   Milberg Weiss case to research on Pacer for the

4   Average Wholesale Price case; is that fair?

5   A.   Yes.  That's correct.

6   Q.   Do you know one way or the other what he

7   billed that time to?

8   A.   No, I do not.

9   Q.   Because he wasn't part of Kline and Specter's

10   firm, was he?

11   A.   No, he was not.

12   Q.   Let's go to the next page, which is five of

13   13, what's on here?

14   A.   Same thing.

15   Q.   Milberg Weiss?

16   A.   Yes.

17   Q.   No Milberg Weiss file was ever opened?

18   A.   No.  That's correct.

19   Q.   Are you aware, by the way, that you heard the

20   name Chris Seeger mentioned to the judge on Friday.

21   A.   Yes.

22   Q.   He is with Seeger Weiss in New York?

23   A.   New York.

24   Q.   Are you aware of that?

25   A.   Yes, I am.

1        Kathleen Spurka - Direct          150

2   Q.   Are you aware that the Weiss of Seeger Weiss

3   is the son of Melvin Weiss of Milberg Weiss?

4   A.   I am.

5   Q.   Do you know that Mr. Kline and I have a close

6   relationship with the Seeger Weiss firm?

7   A.   Yes.

8   Q.   Do you think that knowing Mr. Kline and I as

9   you do, that we would sue Mr. Weiss, Milberg Weiss,

10  given our relationship with Seeger Weiss?

11  A.   I don't believe --

12            MR. HAVILAND:  Objection, calls

13  for speculation.

14            THE COURT:  Overruled.

15            THE WITNESS:  I don't believe

16  you would.

17  BY MR. SPECTER:

18  Q.   To your knowledge, did Mr. Kline or myself

19  ever authorize an investigation of potential

20  lawsuit against the Milberg Weiss firm?

21  A.   I don't believe so.

22  Q.   Would it have shocked you if we had?

23  A.   Yes.

24  Q.   Page five of 13 would be one, two, three,

25  four, five, six, seven, eight, nine, ten, 11, 12,

1          Kathleen Spurka - Direct          151

2  13, 14, 15, 16, 17, 18 charges by Mr. Levy, the

3  Average Whole Price, filed on Milberg Weiss

4  investigation?

5  A.   Yes.

6  Q.   Page six of 13, there is also charges by Mr.

7  Levy to the Average Wholesale Price file?

8  A.   Yes.

9  Q.   On Milberg Weiss?

10  A.   Yes.

11  Q.   18 such charges?

12  A.   Yes.

13  Q.   Page seven of 13, are those also Milberg Weiss

14  researches charged to the Average Wholesale Price

15  file by Mr. Levy?

16  A.   Yes.

17  Q.   Eight such charges?

18  A.   Yes.

19  Q.   Have you removed all these charges from the

20  AWP file?

21  A.   Yes, I have.

22  Q.   Have you removed all the improper charges on

23  all 14 of these pages?

24  A.   I have.

25  Q.   Both as to time and cost?

1           Kathleen Spurka - Direct          152

2   A.   Yes, I have.

3   Q.   Let's go to page eight of 13.  What's on page

4   eight of 13?

5   A.   The top is Milberg.

6   Q.   That was a charge by Mr. Haviland or Mr. Levy?

7   A.   The very top is, I believe, was from

8   Mr. Haviland.

9   Q.   The time was charged to Bridgeport Fire?

10   A.   Yes.

11   Q.   And the cost of the search was charged to the

12   Average Wholesale Price litigation?

13   A.   Yes.

14   Q.   Is that true of the first two -- I'm sorry,

15   that's the first entry, correct?

16   A.   Yes.

17   Q.   The second entry would be Mr. Levy's charge?

18   A.   Yes.

19   Q.   Also regarding Milberg?

20   A.   The second and third one, yes.

21   Q.   The second and third one, and the file charged

22   for the research was the Average Wholesale Price

23   case?

24   A.   Yes.

25   Q.   And how about the remainder of the page?

1          Kathleen Spurka - Direct          153

2   A.   The first seven are to Milberg Weiss.  The

3   next three are Isostatic case, that's the file

4   number there.

5   Q.   The Isostatic case, was that a case that was

6   authorized to be open in the office?

7   A.   Yes.  That has a file number on there.

8   Q.   But the time was not charged Isostatic -- the

9   costs were not charged Isostatic; it was charged to

10   Average Wholesale?

11   A.   Correct.

12   Q.   By Mr. Levy?

13   A.   Yes.

14   Q.   How about the last four entries on the page?

15   A.   The last --

16   Q.   Page eight of 13?

17   A.   The last four entries, yes, are more research

18   dob in Mr. Haviland's Lippincott building.

19   Q.   This is now June of 2006?

20   A.   Yes.

21   Q.   The time was charged to Average Wholesale

22   Price file?

23   A.   Yes.

24   Q.   And the costs of the computer searches were

25   charged to the same file?

1           Kathleen Spurka - Direct            154

2  A.  Yes.

3  Q.  Let's go to page nine of 13.  What's on here?

4  A.  The top four are the same, the Lippincott

5  searches.  The 11 from the bottom are all Isostatic

6  research.

7  Q.  And who charged the Lippincott charges?

8  A.  Mr. Haviland.

9  Q.  And the time was charged to Average Wholesale

10  Price, as was the cost of the computer searching?

11  A.  Yes.

12  Q.  And the bottom one, two, three, four, five

13  six, seven, eight, nine, ten, 11 entries were Mr.

14  Levy; is that correct?

15  A.  Yes.

16  Q.  And charging Isostatic research to the Average

17  Wholesale Price file, correct?

18  A.  Correct.

19  Q.  How about the next page, ten of 13?

20  A.  The entire page is Isostatic research.

21  Q.  19 charges?

22  A.  Yes.

23  Q.  Let's go to page 11 of 13.  One, two, three,

24  four, five, six, seven, eight, nine, ten, 11, 12,

25  13, 14, 15, 16 charges on Isostatic to Average

1           Kathleen Spurka - Direct           155

2   Wholesale Price?

3   A.   Yes.

4   Q.   By Mr. Levy?

5   A.   Yes.

6   Q.   How about the bottom three entries?

7   A.   The bottom three are in the potential

8   litigations folder, just says tenant dismissals.

9   Doesn't say who or what they were for.

10  Q.   Was the time charged to Bridgeport Fire for

11  that research?

12  A.   Yes.

13  Q.   Was the file that was charged for the costs

14  the Average Wholesale Price litigation file?

15  A.   Yes.

16  Q.   And the last entry?

17  A.   That's another Isostatic entry.

18  Q.   Mr. Levy again?

19  A.   Yes.

20  Q.   Let's go to page 12 of 13.  Are those more

21  Levy charges, Isostatic to the Average Wholesale

22  Price file?

23  A.   Yes.

24  Q.   How many in that category?

25  A.   11.

1         Kathleen Spurka - Direct         156

2   Q.   What else is on this page?

3   A.   This is research Mr. Haviland did.  It doesn't

4   say who or what it's actually for.  It's just in

5   his personal directly.

6   Q.   And it's charged to the Average Wholesale

7   Price case?

8   A.   Yes.

9   Q.   And there are three such charges?

10  A.   Yes.

11  Q.   And how about the next page, page 13 of 13?

12  A.   That's three more of the same type of charge,

13  and the bottom one was actually -- it was all

14  the -- there was another case called Hagens Berman

15  that was being researched.  There was a lot of that

16  on, I believe it was, a water bottle case or spring

17  water.

18  Q.   There was a case where Hagens Berman, who is a

19  co-lead counsel with Mr. Haviland in Boston, where

20  they were, as a law firm they were sued themselves,

21  correct?

22  A.   Correct.

23  Q.   They were sued in Maine for money damages?

24  A.   Yes, correct.

25  Q.   And according to this, Mr. Haviland did

1          Kathleen Spurka - Direct          157

2   research on the lawsuit against the Hagens Berman

3   law firm; is that correct?

4   A.   Yes.

5   Q.   And he charged the Average Wholesale Price

6   file for the cost of that research?

7   A.   Yes.

8   Q.   In fact, our law firm at that very time was

9   co-lead counsel with Hagens Berman in that case,

10   correct?

11   A.   Correct.

12          MR. SPECTER:  Cross-examine.

13          CROSS-EXAMINATION

14   BY MR. HAVILAND:

15   Q.   Ms. Spurka, earlier on this courtroom on

16   September the 8th, I believe it was Mr. Specter

17   turned to you and said you have been my assistant

18   for 16 years.  Today you are saying that's not the

19   case; is that right?

20   A.   Not 16 full years.

21   Q.   Right.

22   A.   That's correct.

23   Q.   If you do the math, Ms. Spurka, I got out of

24   law school in 1992.  You weren't with me in law

25   school; is that right?

1          Kathleen Spurka - Cross          158

2   A.   Right.

3   Q.   And you said you weren't with me at Harvey

4   Pennington; is that right?

5   A.   Right.

6   Q.   In fact, when I was at Levin and Fishbein,

7   Marion Hudson was my assistant, was she not.

8   A.   Marion worked for you four days a week and I

9   worked for you on Mondays.

10  Q.   Part time, right?

11  A.   That's what I said, I covered, yes.

12  Q.   Now, I want to talk to you a little bit about

13  this Westlaw issue.  The firm Kline and Specter has

14  a Westlaw account, an aggregate account for the

15  firm?

16  A.   Yes.

17  Q.   Can you tell me how many Westlaw numbers the

18  firm actually has in that account?

19  A.   I don't know.

20  Q.   Maybe ten?

21  A.   I don't know.

22  Q.   You never checked that?

23  A.   No, I did not.

24  Q.   Are you aware that, in fact, the firm does not

25  have enough Westlaw numbers for all the attorneys?

1            Kathleen Spurka - Cross            159

2   A.   They do now.

3   Q.   They do now, today?

4   A.   Yes.

5   Q.   They didn't before?

6   A.   Every attorney did not have their own number,

7   no.

8   Q.   When did they get?

9   A.   If someone would leave, they would give that

10   number, it would recycle the number if someone

11   left.

12   Q.   Right.  So someone else's number would appear

13   as their research; is that right?

14   A.   Right.

15   Q.   Now, when did the firm go out and actually get

16   a Westlaw number for every attorney?

17   A.   I don't know that.

18   Q.   Recently?

19   A.   More recently, everybody in my department has

20   their own card with their own number on it, yes.

21   Q.   And during the time when I was head of the

22   department, that wasn't the case, was it?

23   A.   That was not the case.

24   Q.   In fact, Mr. Engler, when he was our summer

25   clerk, he didn't have a number, did he?

1           Kathleen Spurka - Cross          160

2   A.   I don't believe so.

3   Q.   He used my number, didn't he?

4   A.   I don't know whose number he used.

5   Q.   He used someone's number?

6   A.   I guess.

7   Q.   Not one ascribed to him, though?

8   A.   I guess, yes.

9   Q.   The same is true with Mr. Pearlman, he didn't

10  have a number when he came on board; isn't that

11  right?

12  A.   I would guess.

13  Q.   He used someone else's number, right?

14  A.   Correct.

15  Q.   So when Mr. Pearlman or Mr. Engler were doing

16  research, it would actually show up as the name of

17  the attorney whose account it was, even though it

18  wasn't that attorney; isn't that right?

19  A.   Yes, right.

20  Q.   So then you have experienced then the bills

21  that were generated in Westlaw were actually done

22  by other attorneys, even though the account would

23  reflect other attorneys?

24  A.   Their name, yes, but not who they would put in

25  for a bill, who to charge.

1          Kathleen Spurka - Cross          161

2   Q.   Who makes the determination as to who to

3   charge?

4   A.   The attorney that's doing the research, it's

5   their responsibility to put in the correct account.

6   Q.   Right.  So in a case where Mr. Engler or

7   Mr. Pearlman was using someone else's account, they

8   would be responsible for making the appropriate

9   allocation to the charge?

10  A.   Right.

11  Q.   If there was a mistake or something

12  deliberate, that would have been done by that

13  attorney, right?

14  A.   I guess, yes.

15  Q.   But it would be difficult to know, wouldn't

16  it, to know whether or not it was Mr. Engler or

17  Mr. Pearlman doing that since they are actually

18  using someone else's account; isn't that right?

19  A.   I guess, yes.

20  Q.   And, in fact, the bill that comes in to Kline

21  and Specter, it's an aggregate Westlaw bill; isn't

22  it?

23  A.   No, it's broke down.

24  Q.   It's one big bill, is it not?

25  A.   It is one big bill that shows detail of each

1          Kathleen Spurka - Cross          162

2    search by lines or by minutes.

3    Q.   And who does the actual billing of that,

4    accounting the Westlaw bill to the accounts?

5    A.   That would be Donna Murray.

6    Q.   Donna in the --

7    A.   Accounting department.

8    Q.   Isn't it true for a time, Mr. Finger actually

9    allocated Westlaw charges to various accounts

10   himself?

11   A.   No.  Mr. Finger did not do that.  At one point

12   reviewing the bills, there were a few instances

13   that were blank that were billed to a different

14   case, the next one, yes.

15   Q.   So they were just allocated to another case;

16   is that right?

17   A.   Yes, but they were fixed.

18   Q.   So there were instances where those mistakes

19   were made but they were fixed?

20   A.   Yes.

21   Q.   And that's common place, isn't it, in that

22   department to actually go through an appropriate

23   time before a bill is generated for fee report to

24   go through and excise out mistakes; isn't that

25   right?

1           Kathleen Spurka - Cross          163

2   A.   When doing a fee petition, you would go

3   through, and if something didn't look right, you

4   would take the word of the attorney to do billing

5   that it was done properly.

6   Q.   In a case of Lupron, took some six months or

7   so to get those bills corrected, didn't it, before

8   they were actually submitted to a court?

9   A.   Yes.

10  Q.   Very painful process, wasn't it?

11  A.   Yes, it was.

12  Q.   You worked on it with Ms. Benedetto and a

13  number of other people?

14  A.   Yes.

15  Q.   During that process, you found a number of

16  discrepancies, didn't you?

17  A.   Yes.

18  Q.   And they were corrected, weren't they?

19  A.   Yes, they were.

20  Q.   Even so, a bill was submitted to the Federal

21  court in Boston, which double counted an expert

22  bill, didn't it?

23  A.   Yes.

24  Q.   Dr. Shalamar?

25  A.   Because as we were running the numbers, the

1          Kathleen Spurka - Cross          164

2   numbers -- the checks were being made downstairs as

3   we ran the numbers upstairs.

4   Q.   So a double bill was sent to the Court?

5   A.   Yes, and we submitted a supplemental and fixed

6   it, yes.

7   Q.   The mistake was caught, it was fixed, but even

8   though it went out to the court, it then got fixed?

9   A.   Yes.

10   Q.   That happens at Kline and Specter because of

11   the way the accounting system is set up?

12   A.   It could happen.

13   Q.   Well, you experienced, didn't you, working

14   with Mr. Miller, the outside vender, the difficulty

15   it was integrating the class action billing system

16   into the overall firm system, didn't you?

17   A.   They did billing different than we did, and it

18   wasn't just because we had a fund set up.  It

19   wasn't just running one number.  It was difficult,

20   yes.

21   Q.   It was an incapatability between the things

22   going on in class action and the firm itself; is

23   that fair?

24   A.   I guess that could be fair.

25   Q.   It took time to get those issues sorted out?

1          Kathleen Spurka - Cross          165

2   A.   It took time.

3   Q.   In fact, Lupron just disclosed some of those

4   issues.  There was an issue taken from Lupron to

5   fix those problems going forward?

6   A.   Yes.

7   Q.   In the case of the files, you were aware, were

8   you not, that there was, in fact, a directory open

9   on the Kline and Specter server called potential

10  litigations?

11  A.   Yes.

12  Q.   And did you open that up?

13  A.   No.  You opened that up.

14  Q.   You were aware of it?

15  A.   I was aware of it, yes.

16  Q.   You were aware there were a number of files,

17  right?

18  A.   Yes.

19  Q.   They were files that didn't have file numbers

20  necessarily in the firms accounting system; isn't

21  that right?

22  A.   They would -- yes.  There was a file set up

23  for potential litigations.  Once I was told to open

24  a file, I would open up a template file, rename it

25  whatever the case is, issue the number, and move

1      Kathleen Spurka - Cross          166

2   anything that was in the potential litigation

3   folder into the folder that I had created.

4   Q.   In that potential litigations file, other than

5   the two cases Mr. Specter has been describing in

6   this Court, there were other files, were there not?

7   A.   Small, yes.

8   Q.   Do you recall a case called Lloyds that was in

9   that directly?

10  A.   Yes.

11  Q.   Wasn't that a case that Ms. Benedetto had sent

12  over as a case to be investigated when she went to

13  the Schiller firm?

14  A.   I don't know that.

15  Q.   Do you know that there was research conducted

16  in that case?

17  A.   I saw that, yes.

18  Q.   Do you know who did that research?

19  A.   Do not.

20  Q.   Have you done anything to excise that research

21  from wherever it was billed since there was no file

22  number?

23  A.   I saw that on the Pacer bill or the Westlaw

24  bill.

25  Q.   What has happened to that bill now?

1          Kathleen Spurka - Cross          167

2   A.   It was billed, but I believe that would say --

3   normally when you did not have a number open, you

4   would put the name of the case in.  You would say

5   potential and the name of it.  So that once it was

6   opened, they would probably be applied.

7   Q.   Well, in fact, in the Westlaw, you couldn't do

8   that anymore, you actually had to put a number in,

9   didn't you?

10   A.   Yes, and you would put in --

11   Q.   A number?

12   A.   -- a firm number.

13   Q.   But if there was no firm number, you had to

14   put something else in?

15   A.   There was a firm number.

16   Q.   Well, in the case of investigation files, were

17   you aware you had to put a firm number that was not

18   necessarily a number that you would ascribe to the

19   potential case?

20   A.   I don't understand your question.

21   Q.   Well, you are not an attorney, right?

22   A.   That's correct.

23   Q.   You didn't do legal research for the firm,

24   right?

25   A.   I did cite checking and I do know how to use

1         Kathleen Spurka - Cross         168

2   Westlaw.

3   Q.   In the case of investigating new cases, like

4   the Grand case for Mr. Kline's friend, do you know

5   where the bills went for that?

6   A.   Wherever you told it to go.  I don't know.

7   Q.   Right.  For instance, if you used the 200/200

8   account, what would that have been?

9   A.   They would have been applied to Lupron.

10  Q.   What about the ADP file, what's the master

11  file number on that?

12  A.   200/700.

13  Q.   200/700.  In fact, that was the host account

14  for an overall matter, was it not?

15  A.   Yes.

16  Q.   Underneath that, there were subcategories for

17  MDL 1456?

18  A.   200/700 number was the MDL number.  The

19  general and the MDL were the same number.

20  Q.   Normally there was a general account number

21  that was established for every overall --

22  A.   No.

23  Q.   You had a separate one for New Jersey?

24  A.   We opened up a New Jersey one, but if we had

25  MDL --

1          Kathleen Spurka - Cross          169

2   Q.   I am asking a different question.  You had a

3   separate account number for AWP New Jersey?

4   A.   Right, yes.

5   Q.   You had a separate account number for

6   Pennsylvania case?

7   A.   Yes.

8   Q.   You had a separate account number for Arizona

9   case?

10   A.   Yes.

11   Q.   When you had a general number, you had general

12   charges that could relate to any and all of those

13   things, right?

14   A.   Right.

15   Q.   Appropriate time, as in Lupron, that account

16   then gets disaggregated and billed properly to the

17   files where the work was being billed to?

18   A.   It was put in the master number, it would be

19   billed to the master.

20   Q.   I am asking a different question because

21   master is not actually a file like Lupron.  We had

22   to actually allocate --

23   A.   We did the same thing --

24              MR. SPECTER:  This is now

25   testimony from the questioner.

1      Kathleen Spurka - Cross        170

2              MR. HAVILAND:  It's

3   cross-examination, Your Honor.

4              THE COURT:  The question is

5   meaningless, soliciting an answer --

6              THE WITNESS:  We did the same

7   thing in AWP that we did in the Lupron matter.

8   BY MR. HAVILAND:

9   Q.   That's my point, that it needs to be allocated

10   at some point in time when a fee report is being

11   generated for the Court because AWP General doesn't

12   exist in the world; is that right?

13   A.   It would have gone into the MDL.

14   Q.   AWP General does not exist in the world.  It's

15   not a case?

16   A.   Yes.

17   Q.   It's a constructive Kline and Specter to deal

18   with overall billing for an issue, right?

19   A.   Yes.  That's the way you set it up.

20   Q.   And in the case of Mr. Grand, to give an

21   example of potential litigation, all that work that

22   was done was actually billed to some other existing

23   host account number at Kline and Specter, right?

24   A.   If there was anything done on Mr. Grand, I did

25   not do research on it.  Whoever did the research,

1          Kathleen Spurka - Cross          171

2   the bills would be applied to wherever that person

3   doing the research applied them to.

4   Q.   That's what I am asking you.  You went into

5   that --

6   A.   If that person put in the 200/700 number, then

7   that is the case that would have been charged, yes.

8   Q.   So in the case of Mr. Grand, if that host

9   account was used for Mr. Grand's research on his

10   matter that was in potential litigations, it would

11   have gone under the AWP general overall cost

12   accounting, correct?

13   A.   No.

14   Q.   It would have gone into the 200/700, if that

15   account was used, wouldn't it?

16   A.   Whoever was doing the research put that number

17   in there, yes, it would.

18   Q.   Right.  And it would have to be excised out at

19   the end of the day before it was actually billed to

20   a court or client?

21   A.   We did not go through every line to make sure

22   that the attorney that put that number in put the

23   correct number in.

24   Q.   Did you go -- when you were looking at these

25   potential litigation issues Mr. Specter asked you

1          Kathleen Spurka - Cross          172

2    about, phone tax and Milberg, did you actually look

3    in the Grand file to see what was done there?

4    A.   I did.

5    Q.   What did you find?

6    A.   I don't believe that there was anything

7    applied to it, or I think it said Grand, so it was

8    applied to wherever the billing department applied

9    it.

10   Q.   But without a file number, they couldn't bill

11   it to anybody?

12   A.   They then bill it to the firm.

13   Q.   You were aware, were you not, that Mr. Kline

14   expressly did not want a file open on Mr. Grand's

15   matter; is that right?

16   A.   I didn't know that.

17   Q.   You weren't privy to that?

18   A.   No, I was not.

19   Q.   Do you understand what the Milberg

20   investigation was?

21   A.   No.

22   Q.   You were aware that that law firm was

23   criminally -- principles of that firm were

24   criminally indicted?

25   A.   I remember you mentioning something like that,

1          Kathleen Spurka - Cross          173

2   yes.

3   Q.   So you recall me discussing that with you?

4   A.   Not with me.  I had overheard you talking to

5   Kent Williams about that case.

6   Q.   Okay.  And do you recall -- so you don't know

7   about what the nature of the investigation was

8   that's being undertaken; is that right?

9   A.   That's true.

10  Q.   And you said you have removed all these

11  charges that you just dealt with on the ledger that

12  you put out there; is that right?

13  A.   I did.

14  Q.   And so, in fact, no client or court has ever

15  been billed with these charges which you say are

16  improper; isn't that right?

17  A.   Not now because we haven't submitted our time

18  and I won't submit it until I know it's right.

19  Q.   And do you remember on Friday I was asked some

20  questions about issues pertaining to improper

21  billing, and there was a response given about that

22  I believed you had your own Westlaw account?

23              Let me ask you, do you have

24  your own Westlaw account?

25  A.   I do now.

1      Kathleen Spurka - Cross          174

2   Q.   Did you before?

3   A.   No.  I used a secretary who had been there

4   before who left several years ago.

5   Q.   When did you get your own Westlaw account?

6   A.   Sometime in September.

7   Q.   Before that, you didn't have one?

8   A.   Again, I used the secretary who had gone.

9   Q.   So did the research that you conducted show up

10  in her name?

11  A.   It did.

12  Q.   And so if anyone on the outside world was

13  looking, they would have thought she was actually

14  doing that work?

15  A.   Yes.

16  Q.   Now, in a case of Pacer, Kline and Specter has

17  one Pacer account; is that right?

18  A.   Yes, that's correct.

19  Q.   All attorneys use it?

20  A.   Yes.

21  Q.   Now, you have testified about a change in our

22  relationship.  When you came to Kline and Specter,

23  I invited you to come over from Levin and Fishbein?

24  A.   You did.

25  Q.   And you came over?

1          Kathleen Spurka - Cross          175

2   A.  I did.

3   Q.  Who negotiated your salary?

4   A.  You did.

5   Q.  Who negotiated your benefits?

6   A.  You did.

7   Q.  Who negotiated your guaranteed bonus?

8   A.  You did.

9   Q.  When you had problems with your bonus over the

10  years, who did you come to?

11  A.  Well, I discussed it with you.  I was going to

12  the accounting department myself, and you told me

13  that I should probably calm down first and send an

14  e-mail, and you would help me compose it.

15  Q.  Do you recall in December 2005 coming to me

16  and being upset that the firm had capped your bonus

17  at five thousand?

18  A.  No, that's not what happened, but --

19  Q.  You recall the problem?

20  A.  Yeah.  That was not the number, but yes.

21  Q.  I don't want to talk about your numbers in

22  court.  Do you recall how that was resolved?

23  A.  I wrote an e-mail to you, you helped me tweak

24  it, I sent it to Mr. Finger, he passed it along to

25  Mr. Specter, probably Mr. Kline as well, they

1          Kathleen Spurka - Cross          176

2    discussed it with you, and then they approved it.

3    Q.   They reinstated your bonus?

4    A.   Yes.

5    Q.   Have they guaranteed that for you this year?

6    A.   No.

7    Q.   Do you have a guaranteed salary?

8    A.   I have a salary, yes.

9    Q.   Is it guaranteed?

10   A.   Yes.

11   Q.   Through this year into next year?

12   A.   I guess a raise every year, yes.

13   Q.   I asked if it was guaranteed.  You had earlier

14   testified there was one concern about my only

15   giving you a guarantee of two years.  Do you have a

16   guarantee with Kline and Specter?

17   A.   For as long as I want to stay there, yes.

18   Q.   That guarantee is from whom?

19   A.   Mr. Specter.

20   Q.   When did you get that guarantee?

21   A.   A month ago, two months ago.

22   Q.   Do you recall during the time when the Lupron

23   money was coming in in December of 2005, there was

24   high expectation in the department for bonuses?

25               MR. SPECTER:  Your Honor, I

1          Kathleen Spurka - Cross          177

2    object to other people's expectations.

3               THE COURT:  Where are we going

4    with this?  What's it related to the direct

5    examination?

6               MR. HAVILAND:  I am going to

7    the issue that was specifically put about the

8    reasons for her, Ms. Spurka's, current feelings

9    that were directed -- I am only trying to place it

10   in December.

11              MR. SPECTER:  The question is

12   related to what he just said.

13              MR. HAVILAND:  Well --

14              THE COURT:  How is that

15   question related to that?

16              MR. HAVILAND:  I will withdraw

17   it, Judge.

18   BY MR. HAVILAND:

19   Q.   In December 2005, Ms. Spurka, you are aware

20   the firm was going to bring in something in the

21   order of 9.5 million dollars in Lupron?

22   A.   Yes.

23   Q.   And do you recall sometime in November

24   principles of Kline and Specter giving to me an

25   expense ledger that had essentially netted out all

1        Kathleen Spurka - Cross            178

2    that money?

3                MR. SPECTER:  Your Honor, I

4    object.

5                THE COURT:  What's it related

6    to, in at least as far as their direct examination

7    of this witness?

8                MR. HAVILAND:  Well, Ms. Spurka

9    was involved in that, Judge.  I want to get through

10   that so I can get to the point.

11               THE COURT:  Involved in what?

12   What direct examination are you now crossing?  What

13   is it?

14               MR. HAVILAND:  I am crossing on

15   the issues of the very beginning of Ms. Spurka's

16   examination about personal views that she has of me

17   today.  I want to get back to the point of time

18   December 2005 and finish up.

19               THE COURT:  All right.  You can

20   answer the question.

21               THE WITNESS:  I do.

22   BY MR. HAVILAND:

23   Q.   Do you remember you and I working with Gary

24   Finger, at least attempting to, to try to work

25   through the issues of that expense ledger?

1           Kathleen Spurka - Cross           179

2  A.  Yes, I do.

3  Q.  Do you recall having extreme difficulty with

4  that?

5  A.  It was bonus time.  End of year figures had to

6  be done.  It took Gary sometime to get you that.

7  Q.  Do you remember I shared all that information

8  with you to get you to try to have you help me with

9  that issue?

10  A.  Yes.

11  Q.  We were at the time in earnest trying to

12  retool a business plan for the department to try to

13  keep it going?

14  A.  I was going over the figures, you were doing a

15  new business plan, yes.

16  Q.  You were actually counting computers, taking

17  square footage of the space, trying to make clear

18  to Gary Finger that the assessment that the firm

19  was leveraging on the department was too great?

20          MR. SPECTER:  Your Honor, this

21  is relevant to nothing.

22          THE COURT:  Yes.

23          MR. SPECTER:  I object.

24          THE COURT:  I hear.  I am

25  trying to figure out at this stage, she said she

1          Kathleen Spurka - Cross          180

2   did not want to go with you into your new endeavor.

3   And now you are probing with what happened

4   internally in Kline and Specter and her view of it

5   or still her view of you?

6               MR. HAVILAND:  No.

7               THE COURT:  Are you trying to

8   get her to say something about you favorable?

9               MR. HAVILAND:  I will withdraw

10   that question.

11   BY MR. HAVILAND:

12   Q.   At the point in time when we had a discussion

13   about whether you would come with me to a firm that

14   I had formed, do you remember that time frame?  It

15   was at the tail end of this process trying to deal

16   with getting the department profitability?

17   A.   It began around the holiday party of last

18   year.

19   Q.   After discussion I had had with Mr. Specter?

20   A.   I don't remember that.

21   Q.   Do you recall I had another discussion with

22   him in March?

23               MR. SPECTER:  Your Honor, she

24   is not even a witness to these conversations.

25               MR. HAVILAND:  Well, she was by

1          Kathleen Spurka - Cross          181

2   me, Your Honor.  That's what I am asking.

3   BY MR. HAVILAND:

4   Q.   So, in fact --

5               THE COURT:  Your questions will

6   be based upon statements you made to her as to why

7   she either didn't go with you or she told you at

8   one stage she would go with you -- where are you

9   going with this?

10              MR. HAVILAND:  I am almost

11  finished.

12              THE COURT:  Not that her

13  opinion of you is strikingly important to this

14  Court in what we are trying to find out here.  But,

15  I mean, what happens is, they put it in and now you

16  feel the need to defend yourself.  So let's try to

17  get it done.  Okay?

18              MR. HAVILAND:  Fair enough.

19              THE COURT:  This isn't

20  critical.  It really isn't.

21              MR. HAVILAND:  I am just going

22  to show this to the witness.  I am not going to

23  mark it.

24  BY MR. HAVILAND:

25  Q.   Ms. Spurka, do you remember that after we had

1          Kathleen Spurka - Cross          182

2    that discussion, you sent me an e-mail?

3    A.   The discussion that we had, I thought you were

4    talking about, was the discussion you had with

5    Mr. Specter in March.

6    Q.   I am focusing you right now on the discussion

7    you and I had?

8    A.   We had several in '06 --

9    Q.   Okay.

10   A.   -- about you forming a firm, going there.  I

11   never said that I was going.  In the beginning, I

12   felt obligated to go because, like you said

13   earlier, you brought me to Kline and Specter.  I

14   felt obligated to go.

15                I was very troubled for months

16   over it.  I discussed it with my husband for a long

17   time whether it was the right thing to do or not.

18   I felt it was not the right thing to do and that's

19   why I wrote this e-mail.

20   Q.   And you wrote to me that, for your own

21   reasons, and for reasons of discussions with your

22   family, you declined to come?

23   A.   Right.

24   Q.   You never said at that point in time you had

25   all these other issues; isn't that right?

1          Kathleen Spurka - Cross          183

2  A.  That's correct, and --

3  Q.  And you said at the end --

4          MR. SPECTER:  Pardon me.  I

5  don't think she was finished.

6          THE COURT:  Let her finish.

7          THE WITNESS:  I was not

8  finished, thank you.

9          You have a tendency to not take

10  criticism well, Don, and when people have come to

11  you over five years to give you criticism or their

12  view on anything, you would hold things personal to

13  them.

14  BY MR. HAVILAND:

15  Q.  Did you ever approach Mr. Specter with the

16  views that you had of him?

17  A.  No, I did not.  I don't work with him directly

18  everyday.

19  Q.  You never approached him to complain about

20  your feelings on the elevator with him?

21          THE COURT:  All right.  Now,

22  look, I know this isn't personal to you,

23  Mr. Haviland, you told me over and over, it doesn't

24  appear personal.  You are asking someone, who is an

25  adverse witness, I have all times said in this case

1          Kathleen Spurka - Cross          184

2   alone, why you think you are going to get something

3   positive out of an adverse witness in your case, I

4   don't know.  But you are a trial attorney and

5   knowing that's usually one of the cardinal rules,

6   you do it anyway.  She answers it.  You don't like

7   the answer and now you say, well, what about him,

8   you said bad things about him, but it's not

9   personal.

10              Now, move on.  Let's move on.

11   She didn't want to go with you.  She didn't want to

12   tell you why she didn't want to go with you.  Now

13   you brought this petition, he is asking her, now

14   she does want to say why she doesn't want to go

15   with you.

16              Why she stayed there, despite

17   the things she may have told you all the bad things

18   about Mr. Specter, which you would like, if we

19   could put a fisher in between her and Mr. Specter,

20   you would like to try that.  Not on my watch.  Move

21   on.

22   BY MR. HAVILAND:

23   Q.   Ms. Spurka, when you e-mailed me, I asked you

24   to maintain the trust and confidence that I always

25   placed in you, didn't I?

1            Kathleen Spurka - Cross            185

2  A.  You did.

3            MR. HAVILAND:  I have no

4  further questions.

5            THE COURT:  Redirect.

6            REDIRECT EXAMINATION

7  BY MR. SPECTER:

8  Q.  Ms. Spurka, let's talk about the subject of

9  making charges to various files for a moment

10  Mr. Haviland discussed with you?

11            Did Mr. Pearlman or Mr. Engler

12  work on the Milberg case, to your knowledge?

13  A.  No, they did not.

14  Q.  In fact, did any lawyer in the firm or any

15  person of the firm work on that matter, aside from

16  Mr. Haviland?

17  A.  Not as far as I am aware.

18  Q.  How about the tax case, did Mr. Haviland work

19  on the tax case?

20  A.  Not to my knowledge.

21  Q.  No files ever opened in that?

22  A.  Yes.

23  Q.  Confidential firm procedure, correct?

24  A.  Right.

25  Q.  Did anybody else at the Kline and Specter firm

1          Kathleen Spurka - Redirect        186

2   have some interest or fascination with Lippincott

3   property, aside from Mr. Haviland?

4   A.   Not to my knowledge, no.

5   Q.   And putting aside the charges, can you see any

6   justification in all your experience in doing class

7   action accounting and billing to bill a cost to one

8   file but bill the time, the same very same time

9   spent when the cost, in fact, incurred to some

10  other file?

11  A.   No.

12  Q.   To your knowledge, did Mr. Kline ever order

13  that some matter involving Richard Grand not be

14  opened as a file?

15  A.   I am not aware of that, no.

16          MR. SPECTER:  No further

17  questions.

18          RECROSS EXAMINATION

19  BY MR. HAVILAND:

20  Q.   Ms. Spurka, the issue of time that you put in

21  your ledger, in fact, you would take a book that I

22  would maintain and just do blocks of time and would

23  you create time entries; isn't that right?

24  A.   Correct.

25  Q.   And you would trust in me and other attorneys

1          Kathleen Spurka - Recross          187

2    as to representing what time they were working on;

3    isn't that right?

4    A.   Yes.

5    Q.   So for purposes of this project you undertook

6    for the Kline and Specter firm, you took blocks of

7    time that were demarcated for particular files and

8    you then just assumed that these charges taking

9    place inside these blocks of time were

10   inappropriately billed within those blocks; is that

11   right?

12   A.   Yes.

13   Q.   So you didn't take into account, did you, that

14   where there were not blocks of time that the work

15   actually would have been done the other time but

16   simply as a convenience factor they were billed at

17   that time?

18              MR. SPECTER:  Your Honor, I

19   think the question makes no sense.

20              THE COURT:  Rephrase the

21   question --

22              MR. HAVILAND:  Sure.

23              THE COURT:  -- so I can

24   understand it.

25              MR. HAVILAND:  Sure.

1          Kathleen Spurka - Recross          188

2   BY MR. HAVILAND:

3   Q.   There were blocks of time that were outside

4   the blocks of time that you took as gospel for

5   purposes of this time sheet, right?

6               MR. SPECTER:  Again, Your

7   Honor --

8               MR. HAVILAND:  I want to make

9   sure.

10               THE COURT:  I don't want to

11   know what blocks of time taking as gospel.

12               MR. HAVILAND:  Here is the

13   problem I have.

14               THE COURT:  Stop everybody.  I

15   don't understand that question, so I won't

16   understand her answer.  What is gospel?

17               MR. HAVILAND:  I don't

18   understand this document at all because I have

19   never seen it before, and I object to its entry

20   into this proceeding, so I am trying to understand

21   it.

22   BY MR. HAVILAND:

23   Q.   Ms. Spurka, is it right when you say time two,

24   you were relying upon a block that had a line for a

25   time slot for, say, 9 to ten o'clock; isn't that

1          Kathleen Spurka - Recross          189

2   right?

3               MR. SPECTER:  Your Honor, this

4   is beyond the scope of redirect.

5               THE COURT:  It really is.  I

6   have permitted, they didn't go back into it.  You

7   had her for as long as you wanted on

8   cross-examination.

9               MR. HAVILAND:  All right.

10              THE COURT:  Now you went

11   through all the documents, you went through how it

12   gets, now you are suddenly saying, I don't

13   understand the document, I have never seen it

14   before, and you are talking about blocks of time.

15              MR. HAVILAND:  Let me go back

16   to the area of the redirect then.

17              I will mark this as 32.

18              (Whereupon, Westlaw Download

19   Summary was marked as Movant's Exhibit HLF-32, for

20   identification.)

21   BY MR. HAVILAND:

22   Q.   Miss Spurka, I am showing you what I have

23   marked as Exhibit 32.  Do you recognize this

24   document?

25   A.   It appears that I did research on a case and