


PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

1          IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

2

3

   In re:                        )

4  PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS

   AVERAGE WHOLESALE PRICE       ) MDL No. 1456

5  LITIGATION                    )

6

7

8                     MOTION HEARING

9          BEFORE THE HONORABLE PATTI B. SARIS

                UNITED STATES DISTRICT JUDGE

10

11

12

13

                           United States District Court

14                         1 Courthouse Way, Courtroom 19

                           Boston, Massachusetts

15                         January 27, 2006, 2:10 p.m.

16

17

18

19

20

21

22

                      LEE A. MARZILLI

23                CERTIFIED REALTIME REPORTER

                  United States District Court

24                1 Courthouse Way, Room 3205

                      Boston, MA  02210

25                     (617)345-6787




```
 1   A P P E A R A N C E S:

 2

 3        THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP,
     One Main Street, Cambridge, Massachusetts, 02142.
 4
          DONALD E. HAVILAND, JR., ESQ. and TERRIANNE BENEDETTO,
 5   ESQ., Kline & Specter, P.C., 1525 Locust Street, 19th Floor,
     Philadelphia, Pennsylvania, 19102.
 6
          STEPHEN T. SULLIVAN, JR., ESQ., Lynch, Keefe & Bartels,
 7   830 Broad Street, Shrewsbury, New Jersey, 07702.

 8        ROBERT S. LIBMAN, ESQ., Miner, Barnhill & Galland,
     14 E. Eric Street, Chicago, Illinois, 60610.
 9
          C. DAVID JOHNSTONE, ESQ., Assistant Attorney General,
10   Office of the Attorney General, 1024 Capital Center Drive,
     Frankfort, Kentucky, 40601.
11
          CAROL HUNT, ESQ., Assistant Attorney General, Office of
12   the Attorney General, Health Care Bureau, 120 Broadway, 25th
     Floor, New York, New York, 10271.
13
          SUSAN SCHNEIDER THOMAS, ESQ., Berger & Montague, P.C.,
14   1622 Locust Street, Philadelphia, Pennsylvania, 19103-6305.

15        MARK S. THOMAS, ESQ., Office of the Attorney General,
     Medicaid Fraud Control Unit, PL-01, The Capitol, Tallahassee,
16   Florida, 32399-1050.

17        MARK LYNCH, ESQ., Covington & Burling, 1201 Pennsylvania
     Avenue N.W., Washington, D.C., 20015.
18
          JOHN T. MONTGOMERY, ESQ., Ropes & Gray, LLP,
19   One International Place, Boston, Massachusetts, 02110.

20        MICHAEL S. FLYNN, ESQ., Davis, Polk & Wardwell,
     450 Lexington Avenue, New York, New York, 10017.
21

22

23

24

25
```




```
 1  A P P E A R A N C E S: (Continued)

 2

         JOHN R. FLEDER, ESQ., Hyman, Phelps & McNamara, P.C.,

 3  700 Thirteenth Street, N.W., Suite 1200, Washington, D.C.,

    20005.

 4

         HELEN E. WITT, ESQ., Kirkland & Ellis, LLP,

 5  200 East Randolph Drive, Chicago, Illinois, 60601.

 6       NICHOLAS C. THEODOROU, ESQ., Foley Hoag, LLP,

    155 Seaport Boulevard, Seaport World Trade Center West,

 7  Boston, Massachusetts, 02210.

 8       DAVID J. COONER, ESQ., McCarter & English, LLP,

    Four Gateway Center, 100 Mulberry Street, Newark, New Jersey,

 9  07102-4056.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```




```
1              P R O C E E D I N G S
2              THE CLERK:  In re:  Pharmaceutical Industry Average
3    Wholesale Price Litigation, Civil Action No. 01-12257,
4    MDL No. 1456, will now be heard before this Court.  Will
5    counsel please identify themselves for the record.
6              MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol
7    for the MDL plaintiffs.
8              MR. HAVILAND:  Good afternoon, your Honor.  Don
9    Haviland, Kline & Specter, for Local 68 and (Inaudible.)
10             THE COURT:  You need to speak up, okay?
11             MR. HAVILAND:  Sure thing.
12             THE COURT:  Everybody needs to hear you behind.
13             MS. BENEDETTO:  Good afternoon, your Honor.
14   TerriAnne Benedetto from Kline & Specter on behalf of
15   Local 68.
16             MR. SULLIVAN:  Good afternoon, your Honor.  Stephen
17   Sullivan from Lynch Keefe Bartels, also on behalf of
18   Local 68.
19             MR. LIBMAN:  Good afternoon, your Honor.  Robert
20   Libman on behalf of the State of Illinois and the
21   Commonwealth of Kentucky.
22             MR. JOHNSTONE:  David Johnstone, Assistant Attorney
23   General, for the Commonwealth of Kentucky.
24             MS. HUNT:  Good afternoon, your Honor.  Carol Hunt
25   on behalf of the people of the state of New York.
```



PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

Page

```
 1              MR. THOMAS:  Mark Thomas, state of Florida.

 2              THE COURT:  Do you want to go up with the other

 3   AGs, or are you happy back there?  Where are you from?  Are

 4   you from New York as well?

 5              MS. THOMAS:  No.  Susan Thomas for the relator

 6   Ven-A-Care for the state of Florida.

 7              THE COURT:  All right, any other states,

 8   commonwealths, attorney generals?  All right, okay, there we

 9   go.  All right, now --

10              MR. LYNCH:  Mark Lynch, your Honor, for

11   GlaxoSmithKline.

12              MR. MONTGOMERY:  John Montgomery, your Honor, for

13   Schering-Plough and Warrick.

14              MR. FLEDER:  John Fleder for the pharma defendants.

15              MS. WITT:  Helen Witt on behalf of Boehringer

16   Ingelheim.

17              MR. THEODOROU:  Nicholas Theodorou for AstraZeneca,

18   your Honor.

19              MR. FLYNN:  Michael Flynn for AstraZeneca, your

20   Honor.

21              MR. COONER:  David Cooner for AstraZeneca, your

22   Honor.

23              THE COURT:  Have you all spoken as to the priority

24   or the lineup?  Does anyone have a plane to catch that you

25   cannot miss?  All right, so why don't we start off with what
```



1    I view as the simpler, I think the easiest issue, not

2    necessarily the one whether or not a new Supreme Court

3    decision is an order, and easy in terms of it's very narrow

4    and it's a one-issue kind of thing.  Then I thought I'd move

5    into the fraudulent joinder/ -- I guess you'd have to call it

6    material misrepresentation and petition case, which is I

7    think Florida, right, the local case?  And then move into the

8    last which is the most difficult, I think substantively,

9    which is the Florida Medicaid statute and whether that's a

10   substantial federal question.

11           Am I missing something, any of these cases?

12           MR. LIBMAN:  The only other issue, and hopefully we

13   won't need to reach it, but beyond the timeliness issue for

14   Illinois, Kentucky, and I believe New York as well, is if you

15   find timely removal, whether there is in fact a federal

16   question here under Grable.

17           THE COURT:  Right, fair enough.  All right, so

18   who's going to argue -- I guess what we literally have

19   pending is the motion to remand, and who's going to argue on

20   behalf of the states?  Are you all arguing separately?

21           MR. LIBMAN:  Your Honor, Robert Libman.  I intend

22   to argue for Illinois and Kentucky.  Carol Hunt and I have

23   spoken to the extent that there's some additional argument

24   that's necessary or some issues unique to New York that

25   Ms. Hunt would like to make, but I intend to speak primarily




```
 1   for Illinois and Kentucky.

 2              THE COURT:  Well, I think that's a good place to

 3   start.

 4              MS. HUNT:  I won't be overlapping.

 5              THE COURT:  Sure.  And does anybody else want to

 6   speak from any of the states?

 7              MS. THOMAS:  Yes, your Honor.  Mark Thomas for the

 8   state of Florida.

 9              THE COURT:  That's not this order issue, right?  Or

10   is it?  I thought that was a more substantive -- that didn't

11   deal with whether or not it was timely.

12              MS. THOMAS:  Correct.  That's the remand issue.

13              THE COURT:  Right, but it isn't whether or not it

14   was within the 30 days?

15              MS. THOMAS:  Yes.

16              THE COURT:  Okay.

17              MR. LIBMAN:  Thank you, your Honor.  The starting

18   point really for this issue should be the notice of removals

19   themselves for Illinois and Kentucky.  And Paragraph 15 of

20   those notices make clear that there is only one basis for the

21   removal, and that is whether the states' claims on behalf of

22   its Medicare Part B beneficiaries raises a federal question.

23   Specifically, the basis for removal, though, is whether the

24   Grable decision issued by the Supreme Court in 2005 is a,

25   quote, "other paper."
```



```
 1            Now, their briefs make the argument that that

 2   decision may also be an order within the meaning of the

 3   removal statute, but the notice of removal only relies on the

 4   argument that it is a, quote, "other paper."  And as our

 5   briefs point out, the majority rule is that within the

 6   meaning of that removal statute, the "other paper" must be a

 7   paper that is within the action itself.  That comes from the

 8   plain meaning and the plain reading of the statute.  It talks

 9   about "other papers" being served on a defendant.  People

10   don't think of Supreme Court decisions as being served on

11   parties.

12            THE COURT:  Is there any law in the First Circuit

13   construing this?

14            MR. LIBMAN:  I'm not certain that there is, your

15   Honor, certainly not First Circuit case law that I'm aware

16   of.

17            THE COURT:  There's so little appellate case law,

18   in any event.

19            MR. LIBMAN:  Right.

20            THE COURT:  Apart from the First Circuit, are there

21   other District Court cases directly on point?

22            MR. LIBMAN:  I don't believe so, your Honor, at

23   least not that I've located.  The majority rule, though, is

24   summarized by the Morsani case we've cited in our brief, I

25   believe from the Middle District of Florida.  The point here
```



1    is that important deadlines, your Honor, should not be

2    subject to dispute.  That's the reason for the rule.

3              THE COURT:  Do you know what the batting average

4    is?  I know many District Courts have written on it, and

5    there's a divide.

6              MR. LIBMAN:  I don't know the precise count, your

7    Honor, but I would say, to me, at least, 70-80 percent of the

8    cases, perhaps more, follow this rule.  And the cases that

9    they have cited are including the Smith case where it's

10   explicitly repudiated by another District Court in that same

11   district.  But the point is that important deadlines should

12   not be subject to dispute.  That's the reason for the rule.

13             I mean, you can imagine, for example, that as there

14   are in this case about the meaning of Grable, if a decision

15   from an appellate court were to trigger a new time for

16   removal, you'd have disagreements about the meaning of that

17   court decision as well as the date that the party, quote,

18   "received" the decision.

19             We're urging the Court to just look at the plain

20   language of the removal statute, an "other paper," there's

21   got to be a paper that was within the same case.

22             Now, they've cited the Doe V. Red Cross and the

23   Green cases, which I should point out initially only speak to

24   the issue of whether a Supreme Court or appellate court

25   decision is an order within the meaning of the removal



1    statute.   And as I've explained, the notices of removal here

2    do not make that argument.

3            THE COURT:   Why should that be so important?

4            MR. LIBMAN:   Well, perhaps it's not, but I think if

5    you're going to look at the notice of removal itself, which I

6    think is -- unless they're going to be allowed to make new

7    arguments every time while we're waiting for this issue to be

8    resolved --

9            THE COURT:   The removal issue I can see.   You're

10   supposed to put in the petition the basis for removal.

11           MR. LIBMAN:   Yes.

12           THE COURT:   But the paper versus the order, I don't

13   know if that would --

14           MR. LIBMAN:   I can knock it down anyway, your

15   Honor.   That is, Doe and Green themselves, first of all,

16   recognized the majority rule which I just cited to you, which

17   is that the order, if it is an order, of another appellate

18   court should be within the same -- come from the same case.

19   And it's a very narrow exception that Doe and Green carved

20   out, and it's a four-part test, and they took great pains to

21   say that this was a narrow exception as well.   The four-part

22   test is whether the case comes from a court superior in

23   judicial hierarchy -- I'll concede that's been met here, the

24   Supreme Court -- or whether it's directed to a particular

25   defendant.   It must expressly authorize that same defendant



1    to remove an action against another case, and the case must

2    involve similar facts and legal issues.  And none of those

3    last three factors have been met here.

4          That really should be the end of the inquiry.

5    Simply, Doe and Green do not support removal here.  And in

6    fact the defendants are not asking you simply to apply the

7    Green and Doe cases here.  They're asking you to go beyond

8    what Green and Doe held for the reasons I just said:  This

9    does not involve a case with the same defendants, there's no

10   express authorization for removal of the case, and certainly

11   no similar facts or legal issues.  So they're looking for an

12   expansion of Doe and Green.

13         The problem, of course, is that the litigation

14   floodgates would open if every time an appellate court

15   decision came down it would start the removal clock again,

16   and that's clearly not what was contemplated by Congress when

17   they enacted the statute.  So we would urge you again to just

18   simply apply the plain meaning of the statute and find that a

19   Supreme Court decision is not an "other paper" or an order

20   within the meaning of the removal statute.

21         I would also like to briefly touch on a second

22   argument, which is whether the Grable case, even if you

23   consider it to be an order within the meaning of the removal

24   statute, was when the defendants, quote ". . . first

25   ascertained that the case was removable."  That's also a



1    requirement of the removal statute itself.  And their

2    argument again is that a decision you issued in June of 2003

3    essentially would have foreclosed them from removing; you

4    would have certainly remanded these cases if they had removed

5    at the time.

6            There's a number of reasons why that argument

7    simply is without merit.  First is that less than a month

8    after you issued that decision, many of the defendants in our

9    cases removed the Local 68 case.  That is, they -- and the

10   notice of removal there said the very same basis for removal

11   that is cited in the notices of removal as to Illinois and

12   Kentucky, that the Medicare Part B claims raised a

13   substantial federal question as to the meaning of AWP.  So

14   many of the defendants themselves realized at that time that

15   your opinion didn't foreclose them from removing.  They in

16   fact did remove.

17           Secondly, as to the three Kentucky cases --

18           THE COURT:  Well, it's always a good question.  In

19   many of these cases, there's screaming, "This is frivolous.

20   Give us attorneys' fees."  But once I've ruled under First

21   Circuit law, which I think I had no choice in doing because

22   our Circuit followed one split in the analysis, which is you

23   had to have a cause of action, once I followed that, it was

24   pretty hopeless.

25           MR. LIBMAN:  Well, then why did they remove the




1    Local 68 case on the same basis?

2            THE COURT:  I can't answer that.

3            MR. LIBMAN:  I can't either, and I don't think

4    anyone can.  Well, perhaps the defendants can.

5            But, additionally, let me ask you to focus on the

6    Sixth Circuit case law as well.  Grable was a case that came

7    from the Sixth Circuit.  In the Grable decision, the Supreme

8    Court affirmed the Sixth Circuit opinion in Grable.

9            Now, the Sixth Circuit opinion was decided in July

10   of 2004.  And as to the three Kentucky cases, two of them

11   were filed prior to that time, and the Grable case in that

12   event may not have been the controlling law.  But clearly as

13   to the third Kentucky case, which is the larger one -- and

14   for the record, it's civil action here 05-12493 -- was filed

15   in November of 2000.  So the controlling law in the

16   Sixth Circuit was that the lack of a private right of action

17   did not per se preclude --

18           THE COURT:  Were they in the other split?  In other

19   words, I can't remember how it lined up, but there were a

20   group of circuits that went one way and a group of circuits

21   that had gone another way.

22           MR. LIBMAN:  The Supreme Court only cites the

23   Sixth Circuit and then a Seventh Circuit opinion that went

24   the other way.  Those are the only two.  The Sixth Circuit

25   was affirmed by Grable.



PDF-XCHANGE   Click to buy NOW!   www.docu-track.com

Page

```
 1              THE COURT:  Right.  And I think the First Circuit
 2   cited the Seventh Circuit, if I remember.
 3              MR. LIBMAN:  It had, and I'll get to the First
 4   Circuit in a moment, however, your Honor.  But in the
 5   Sixth Circuit, the law was not changed by the Supreme Court
 6   decision in Grable.  And they have argued that the law of the
 7   Sixth Circuit wouldn't apply; they would have notified the
 8   JPML and had it transferred over here, and you would have to
 9   apply, being the transferee court, the law of the First
10   Circuit.
11              There was a case, and I don't think it's cited in
12   our brief, but the Templeton case out of the First Circuit
13   that was decided shortly after your opinion in June of 2003,
14   and the Templeton decision is consistent with what the
15   Supreme Court said in Grable.  In fact, just quoting briefly
16   from it, and citing to a previous First Circuit case, the
17   Almond V. Capital Properties case, which I believe you cited
18   in your opinion as well, said, "We believe that Almond also
19   stands for the proposition that there is a discrete type of
20   case where federal subject matter jurisdiction will lie
21   notwithstanding the absence of a federal cause of action."
22              THE COURT:  That was a contract case because we had
23   to deal with that line of cases.
24              MR. LIBMAN:  The Almond case, right.  The Templeton
25   case was not.  In any event, my point simply is that the law
```

1   in the First Circuit, to the extent that you were following

2   case law prior to Templeton, was also in effect at the time

3   of the removal of the Illinois case and the later --

4           THE COURT:  All right, thank you.  Why don't I get

5   to defense because I don't know that I need to enter into a

6   Grable analysis, which seems quite complicated here.

7           MR. LYNCH:  I wouldn't think so, your Honor.  I

8   think that when you had the Minnesota and Montana cases, you

9   decided that there was a federal question, you remanded

10  because of the lack of a private cause of action.  Grable,

11  certiorari was taken, it says right in the opinion was taken

12  for the sole purpose of resolving a split in the circuits as

13  to whether a private cause of action was a necessary

14  condition for federal jurisdiction.  And it's true Grable

15  says a lot of things that are kind of complicated, but it's

16  clear that Grable wasn't undertaking to restate the law of

17  what a substantial federal question is.

18          THE COURT:  But can we move backwards --

19          MR. LYNCH:  Yes, let's move backwards.

20          THE COURT:  -- because, I mean, we've done some

21  research, probably not as much as all of you have done.  I

22  think it's quite correct that the majority rules against you

23  here.

24          MR. LYNCH:  The majority of the District Court

25  cases is against us, your Honor.  There's no doubt about



1   that.  But the key cases here are the Third Circuit decision

2   in Red Cross and the Fifth Circuit decision in Green.  And

3   I'll concede right off the bat that the facts here are

4   different, but the inevitable implication of those two

5   circuit cases supports us.  The ratio decidendi of those

6   cases supports us, and if you'll give me a little time to go

7   through the facts, I'll explain why that's the case, your

8   Honor.

9           The states want to take the position that 1446(b)

10  is confined to papers or orders within the case that is being

11  removed, and the one thing that the Red Cross and the Green

12  case made clear is that an order or an opinion from another

13  case can start the clock for removal anew.  So Green and

14  Red Cross clearly break out of the fence that the states are

15  trying to put around 1446(b) with this so-called rule that it

16  has to be an order or other paper generated within the case

17  that's being removed.  That simply isn't what happened in

18  Red Cross and Green.

19          Now, it is true that in Red Cross, Red Cross was a

20  defendant in both cases, and the Supreme Court case included

21  an order that authorized Red Cross to remove its other

22  cases.  But the fact remains, it was another case.  And in

23  Green the facts get even better for us.  In Green, the first

24  case that was removed was remanded because there was no

25  fraudulent joinder.  Then the Fifth Circuit decided a case



1    construing the Texas product liability statute that made it

2    clear that there was fraudulent joinder; there was no claim

3    against the grocery store, the local grocery store that was

4    sued.  And Green was removed again on that basis, and the

5    Fifth Circuit held that the clock had begun to run anew on

6    the basis of its prior decision.

7          Now, in that case, sort of gratuitously, the

8    tobacco companies that were the defendants happened to be

9    defendants in both cases, but the cases were not related the

10   way the Red Cross cases were, and clearly there was no order

11   from the Fifth Circuit explicitly authorizing the tobacco

12   companies to re-remove as was the case in Red Cross.

13         I think what we have here, your Honor, is sort of a

14   classic case of common law expansion of legal principles to

15   different factual situations.  And I'll be quite candid that

16   we're asking you to take one more step because none of the

17   parties here, none of the defendants in this case were

18   defendants in Grable.  We're asking you to take one more

19   step, but we submit, your Honor, that that step is compelled

20   clearly by the rationale, by the ratio decidendi of those two

21   Circuit cases in Red Cross and Green.

22         THE COURT:  But here Grable is a hard case because

23   what Souter is telling me to do is a very nuanced kind of

24   decision.  He's saying there are no bright lines here, and no

25   bright lines, you can't use the existence or nonexistence of



1    a cause of action.   But the existence of a substantial

2    federal question is not by itself enough either.   He asks you

3    to look at some wholistic states and federal government

4    and --

5            MR. LYNCH:   Right.

6            THE COURT:   That's why I reserved till the last the

7    Florida question.   So that even my thought process at the

8    time, which I'm sticking with, which is that it's a

9    substantial federal question, that's not -- what did he call

10   it? -- that may be a welcome mat but not the key?   I forget

11   his metaphor.   What's the response to his point, which is,

12   every time there's a new federal case, bang, you have to

13   reexamine the whole removal analysis?

14           MR. LYNCH:   The Grable decision is one of those

15   Supreme Court decisions that makes life hard for district

16   judges and litigators.   There's no doubt about that.   But the

17   key thing, I think -- I think what Justice Souter does in

18   Grable is, he says:   If there is a substantial federal

19   question, federal jurisdiction may still be subject to veto.

20   And then he gets into this question of whether exercising

21   federal jurisdiction would upset any Congressionally approved

22   balance of labor between the state and Federal Courts.

23           THE COURT:   Well, that's particularly poignant in

24   our case.

25           MR. LYNCH:   I think, in our view, you've already


PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

1    got state cases here.

2         THE COURT:  No, but it's also true that the federal

3    government entrusted to the states -- in other words, we can

4    have this big debate, which I expect to have in about a half

5    an hour, but all I'm saying is, I think the thing that

6    strikes me the most is the argument that you need some

7    finality in where you're going to be.  And unless there's a

8    slam-dunk opinion as there was in Red Cross where for sure

9    just, you know, there's a clear-cut question of law, if I

10   were doing this, wouldn't I be inviting an appeal in

11   absolutely every case that was remanded for any appellate

12   case that arguably undercut the rationale?

13        MR. LYNCH:  I don't think so, your Honor, and

14   you've thrown up several issues for me to address there.

15   First of all, when you're talking about -- well, let's go

16   back to this division of labor between the state and Federal

17   Courts.  We are removing on the basis of state claims seeking

18   to recover on behalf of Medicare beneficiaries.  The Florida

19   case is a Medicaid case only.  There aren't claims for

20   Medicare beneficiaries.  And as you said last week when we

21   were here, Medicare beneficiaries are your people.

22        THE COURT:  Right, they're federal protectees, if

23   you will.

24        MR. LYNCH:  The claims for Medicare beneficiaries

25   are thoroughly subfused with federal interests, and I think



1    that that's been clearly established in the course of this

2    case.

3              Now, there's one decision I'd recommend to your

4    Honor that was decided after the briefing was complete.  It's

5    County of Santa Clara, 224 Fed Supp 2nd, 292.  I'm sorry

6    that's the wrong one.  Well, I'll get you the cite in a

7    minute.  It was a case decided in December by Judge Alsop in

8    the Northern District of California, and it was a case

9    brought by the County of Santa Clara alleging, in much the

10   same way as the states allege here, that the pharmaceutical

11   companies had overcharged them under something called the

12   340(b) program, which provides for sales of pharmaceuticals

13   to public health facilities.  And there was no timeliness

14   issue there, but there's a very thorough discussion in that

15   case of the substantial federal question and this question of

16   whether there's going to be any upset of the division between

17   state and Federal Courts.  And Judge Alsop says something

18   that's very, very relevant.  He said there is no

19   Congressionally approved division of labor with respect to

20   these cases; they're regularly litigated in both the state

21   and the Federal Courts.

22             THE COURT:  When you're dealing with Medicare.

23             MR. LYNCH:  Medicare, right.  And we are dealing

24   with Medicare in Kentucky, Illinois, and New York, so those

25   are Medicare claims.



1          THE COURT:  Are there Medicaid claims as well?

2          MR. LYNCH:  There are also Medicaid claims.  But

3    it's also clear, also clear from your Honor's early opinion,

4    and particularly there's a Second Circuit case that we've

5    cited, Bruder, that all it takes is one federal question to

6    remove the case.  There has to be a federal question; there

7    doesn't have to be all federal questions.

8          Let me explain why we -- the point that was made

9    about the New Jersey case, as you'll recall, you

10   initially --

11         THE COURT:  Which one's the New Jersey case?

12         MR. LYNCH:  Mr. Libman was saying that we removed

13   the New Jersey case after your decision, so why didn't we

14   remove these other cases?

15         THE COURT:  Is that the Local --

16         MR. LYNCH:  Yes, Local whatever, 65.

17         THE COURT:  -- 68 case?

18         MR. LYNCH:  68.  And the reason for that is, your

19   decision in Montana came down on June 11, 2003.  The time for

20   removal of the Local 68 from New Jersey came in July 3,

21   2003.  But as you'll recall, we filed a motion for

22   reconsideration from your decision, and you wrote an opinion

23   which you issued on August 20, 2003.  So when the time came

24   for us to remove in July, we still had the hope that you

25   might reconsider your decision on Abbott, and that's why we



1   asserted the same grounds there that we had in the Montana

2   case.

3           THE COURT:  But before we get into the very, in my

4   opinion, interesting question of the extent of Grable, you

5   have to get past paper or order.  And what you're saying to

6   me is, what you'd like me to do is take Green and Red Cross

7   one step further?

8           MR. LYNCH:  That's absolutely right, your Honor.

9   That's our submission.

10          THE COURT:  All right, thank you very much.

11          MR. LYNCH:  Thank you, your Honor.  Oh, the

12  Santa Clara, Judge, it's 401 Fed Supp 2nd, 1022.

13          THE COURT:  So he's disagreeing with the judge who

14  wrote that very long decision from the Eastern District of

15  Pennsylvania?

16          MR. LYNCH:  Yes.

17          THE COURT:  Judge Sanchez?

18          MR. LYNCH:  Judge Sanchez.  One of the interesting

19  things is, Judge, the cases that have gone against us not

20  only disagree with your decision in Montana and Minnesota;

21  they disagree with each other.  And one of the problems here

22  is, these judges made these decisions the first thing that

23  came up in the case.  They didn't have the opportunity to

24  familiarize themselves with these programs the way you've

25  had, probably more than you'd like, but they were making




1    decisions about Medicare.

2           THE COURT:  At every second I love this case.

3           (Laughter.)

4           MR. LYNCH:  We do too, your Honor.  We've had a

5    great time for four years.  And Judge Sanchez said there's no

6    federal question at all, clearly inconsistent with you.  Then

7    Judge Crabb in Wisconsin said, "Well, I disagree with

8    Judge Sanchez about that, but I'm going to remand because I

9    get into this Justice Souter, whether there's upset of the

10   balance between the state and Federal Courts."  And then

11   Judge Alsop said, "No, well, Judge Crabb got it wrong."  So

12   there's great contrariety here and --

13          THE COURT:  Well, this piece of it is difficult,

14   and so that's what I have to get into, if I get beyond

15   whether it's a paper or an order.  How does Wright & Miller

16   rule on it?

17          MR. LYNCH:  Well, they don't get this particular.

18   They haven't dealt with this particular issue.  They take

19   actually quite an expansive view of what "order" and "other

20   paper" is.  And you asked about First Circuit cases.  I'm

21   pretty certain there are no cases from the Court of Appeals,

22   but we have found a couple of District Court cases in the

23   First Circuit.  One is Mill-Bern Associates, 69 Fed Supp 2nd,

24   240, Judge O'Toole here in Massachusetts, and Parker V.

25   County of Oxford, 224 Fed Supp 2nd, 292, Judge Carter in

Page

1  Maine.   And these cases are not directly on point.   They deal

2  with --

3            THE COURT:   They go against you, right?

4            MR. LYNCH:   No, I don't think -- one does and one

5  doesn't, I think.   There's a Connecticut case as well that

6  does go our way.

7            THE COURT:   I love Connecticut, but we actually

8  moved that into the Second Circuit, so --

9            (Laughter.)

10           THE COURT:   I've always wondered why, but --

11           MR. LYNCH:   Connecticut was originally in the First

12  Circuit.

13           These cases deal with whether an affidavit or a

14  deposition transcript, but they have some general language

15  about "order" or "other paper."   But the key cases, frankly,

16  your Honor, our position rises and falls on your willingness

17  to take Green and Red Cross that one step further, which we

18  think is compelled by the logic of those cases.

19           THE COURT:   Well, thank you very much.   Did you

20  want to respond at all?

21           MR. LIBMAN:   I'll do it from here.   Briefly, your

22  Honor, on the issue of timeliness, the five courts that have

23  remanded, not all reach the timeliness question.   All those

24  that did found it was untimely.

25           THE COURT:   In these pharmaceutical kinds of cases?


1    MR. LIBMAN:  The precise same issues that removal

2    was sought, the basis for which removal was sought here as

3    well.  They're unanimous.  Alabama didn't say much about it.

4    I don't think they reached it.  But the other cases are

5    Minnesota, Pennsylvania, Wisconsin, and Texas.  They're

6    unanimous in terms of this timeliness question, and they

7    reject the argument that the defendants are asking you to

8    accept here.

9         The Green case, just very briefly, the Green case,

10   the intervening appellate court decision there found that the

11   federal law preempted state law as to these very same

12   defendants.  So you have Red Cross that the Supreme Court

13   specifically said these cases could be removed, and in Green

14   it's a preemption issue, very different from the facts here.

15        And then, finally, the Santa Clara case -- I know

16   this speaks to Grable, but in the Santa Clara case, there was

17   a federal contract at issue that had to be interpreted in

18   accordance with federal common law, and that should inform

19   your judgment about whether that is analogous to this

20   situation here.

21        THE COURT:  Thank you very much.  All right, so

22   we're going to move on.

23        MS. HUNT:  Your Honor, is it necessary for me to

24   just tell you one more reason why Grable is not

25   "other paper"?



```
 1              THE COURT:  Go for it.  I forget, your name again?

 2              MS. HUNT:  Carol Hunt.  I just wanted to bring it

 3      to your Honor's attention that in New York, again, there's

 4      another reason why Grable is not "other paper," and that's

 5      because this is the second time that New York and New York

 6      cases have been removed.  You remanded these actions back in

 7      2003, and Section 1447(d) of Title 28 states that "An order

 8      remanding a case is not reviewable on appeal or otherwise."

 9      And that's an absolute prohibition.  And what defendants are

10      doing is essentially seeking a review of your previous remand

11      order, and in the removal papers, they said, "Judge Saris was

12      incorrect in light of this new law."  And in fact what

13      they're doing is trying to go into the very same thing they

14      argued before.  They're arguing federal claims raised --

15              THE COURT:  But in fact I denied the motion for

16      reconsideration.  I was quite convinced that the First

17      Circuit mandated a certain thing.  However, it is true that

18      that line of analysis, what I'll call roughly the Seventh

19      Circuit line, was rejected.

20              MS. HUNT:  But as you also pointed out, Grable

21      brings into this whole a nuanced interpretation beyond what

22      you decided.  In fact, your decision could still hold in

23      light of the Grable analysis of the balancing between the

24      state and federal --

25              THE COURT:  Right, and that's a far more
```



1    complicated problem.

2          MS. HUNT:   And that's the point, that Grable

3    expressly did not overrule any law, and that's why in fact

4    the defendants are just adding yet another opinion to their

5    argument that removal is appropriate, and they cannot do that

6    under 1447(d).

7          The "other paper" cases that involved two removals

8    all found not only that an opinion, a subsequent court

9    opinion was not "other paper," but they also said, "Well, you

10   can't do this anyway under 1447(d)."  Morsani said it's an

11   irony, the defendants are arguing that they were asking to

12   review an unreviewable order.   It's regardless -- regardless

13   of whether the court was right or wrong in their previous

14   decision.   Combs says the same thing, that remand is

15   appropriate for a second reason, in that the decision was

16   unreviewable.

17         THE COURT:   Thank you very much.

18         MS. HUNT:   Thank you.

19         MR. LYNCH:   Your Honor, could I just speak to that

20   point briefly?   If Ms. Hunt were correct, then the cases in

21   Red Cross and Green could not have been removed the second

22   time.   And in fact there's a discussion of this very point

23   within the Red Cross, the Third Circuit decision.   It's not a

24   re-removal, and if New York's position were correct, those

25   cases would have been stuck and couldn't have been




```
 1    re-removed.

 2            THE COURT:  Thank you very much.  All right, now

 3    we're going to move on to part two, so. . .

 4            MS. BENEDETTO:  Local 68, your Honor.

 5            THE COURT:  You're Local 68, all right.  And your

 6    name again is?

 7            MS. BENEDETTO:  I'm Terry Benedetto.

 8            THE COURT:  All right, Ms. Benedetto, and you

 9    represent the local?

10            MS. BENEDETTO:  Yes, your Honor.  This is the

11    local's motion for remand, which this case has been around a

12    while.  The remand was filed back in June of '03, and I'm

13    sure your Honor has, I think, four rounds of briefing on this

14    remand.

15            THE COURT:  What are the underlying claims?  Are

16    they all under state law?

17            MS. BENEDETTO:  Yes, your Honor.

18            THE COURT:  So this is a diversity case?

19            MS. BENEDETTO:  Well, your Honor, they basically --

20            THE COURT:  You're claiming -- all right, go ahead.

21            MS. BENEDETTO:  They removed the case based on

22    ERISA and Medicare preemption.  And we claim that before you

23    even get to the substantive basis of removal, you have to

24    satisfy the procedural bases for removal, which they didn't

25    have unanimity of consent.
```



1    Basically there are three key points that I want to
2    touch on.  The first is that the plaintiff has viable claims
3    against these doctor defendants.
4    THE COURT:  All right, help me.  How many doctor
5    defendants are there?
6    MS. BENEDETTO:  There are three.  There's Antoun,
7    Hopkins, and Berkman, New Jersey, Florida, and Ohio
8    respectively.  And these doctors pled guilty to federal
9    criminal charges respecting a conspiracy to bill for free
10   samples of AstraZeneca's drug Zoladex.
11   THE COURT:  Did they sell to the Local 68?
12   MS. BENEDETTO:  Well, it's also a class case, your
13   Honor, Local 68 on behalf of an alleged purported nationwide
14   class.  And certainly Local 68 --
15   THE COURT:  Would Local 68 have standing against
16   the doctors?
17   MS. BENEDETTO:  Yes, your Honor.  One of the
18   doctors is in New Jersey, Dr. Antoun, and in the same area as
19   Local 68's base of employees.
20   THE COURT:  So you have evidence that some of your
21   employees bought these pills, or whatever it was, from
22   Antoun?
23   MS. BENEDETTO:  We know that he is in the area of
24   our employees and certainly many of whom bought Zoladex.  We
25   also represent a class, nationwide class, respecting



1  purchasers of Zoladex and the other drugs that these

2  defendant pharmaceuticals companies manufacture.

3          And my second point is that the doctor defendants

4  don't want to be in Federal Court either.  They filed their

5  own motion for remand based on Section 1448, and those

6  motions were filed back in July of 2003 and August of 2003,

7  their motions for remand under the defendants' right to file

8  for remand under Section 1448.

9          And my third major point is that this Court's

10 decision in Mills, which is cited in the briefing

11 extensively, governs.  And that requires that in an analysis

12 of fraudulent joinder, an objective standard is used.  And

13 clearly this circles back to my first point, that plaintiffs

14 have objectively a viable claim against these defendants who

15 pled guilty to federal criminal charges.  And therefore the

16 defendant AstraZeneca shouldn't be entitled to discovery or

17 to get into the subjective settlement negotiations, if any

18 took place, of the plaintiffs and the doctor defendants.

19         THE COURT:  Well, it plays out in different ways.

20 I mean, did any of these doctors -- well, did all of these

21 doctors settle?

22         MS. BENEDETTO:  With the federal government.

23         THE COURT:  No, but with you?

24         MS. BENEDETTO:  No, your Honor.  The negotiations

25 were stalled.

```
 1              THE COURT:  So have you settled with -- prior to

 2   adding them, did you settle with any of these?

 3              MS. BENEDETTO:  No, your Honor.

 4              THE COURT:  Have you since settled with any of

 5   them?

 6              MS. BENEDETTO:  No, your Honor.

 7              THE COURT:  There are no settlement agreements?

 8              MS. BENEDETTO:  That's correct.  Well, AstraZeneca

 9   was able to obtain from one of the counsel for one of the

10   doctor defendants, there was a memorandum of understanding

11   that was never executed, and AstraZeneca has set that

12   memorandum of understanding in its papers before the Court.

13              THE COURT:  Were there any oral -- in other words,

14   here's the problem --

15              MS. BENEDETTO:  There was no quid pro quo.

16              THE COURT:  Have there been depositions -- I

17   haven't been able to figure out how far this has gone in

18   discovery.  Has there been discovery with respect to any of

19   these doctors?

20              MS. BENEDETTO:  Your Honor, the defendant

21   AstraZeneca's counsel was at the depositions taken in this

22   case.  Not related to Local 68 but in MDL 1456, each one of

23   these doctors were deposed.  They were deposed before your

24   Honor even ordered --

25              THE COURT:  About the settlement, about the
```




1    discussions?

2         MS. BENEDETTO:  Well, they had already asked for

3    discovery in that regard, and they had the opportunity to

4    take these doctors' depositions.  Our position is that the

5    only thing that they should be discovering from these doctors

6    is whether or not in fact Local 68 has a viable claim against

7    the doctors.

8         THE COURT:  Well, I see it differently actually,

9    and that's why I was a little annoyed that the discovery

10   isn't complete now because this is just taking too long.  It

11   strikes me, if you have a viable claim against these doctors

12   and you settle it in cooperation, almost like a criminal

13   case, for want of a better word -- you know, viable case,

14   reasonable basis in fact and law -- and you know they're not

15   the deep pockets, and they agree to provide documents and

16   otherwise testify for you, I'm not sure that's a violation of

17   any law.  But if you've settled the whole thing up before

18   suit and you add them, and then you bring the suit only for

19   purposes of them refusing to consent, I might have a problem

20   with that.  And so chronology is everything.

21        MS. BENEDETTO:  Your Honor, there are no

22   settlements with any of these doctors.

23        THE COURT:  But here's my problem:  It's your

24   say-so.  And so that's why I authorized discovery.  And I got

25   some objection from Dr. Hopkins' lawyer, who asked not to be



PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

1    here, which is fine.  But, you know, Judge Bowler said,

2    "Provide the information," and it didn't happen.  So I'm

3    just trying to figure out, how far did it go in discovery?

4              MS. BENEDETTO:  There was significant amount of

5    discovery produced.

6              THE COURT:  I just want to know.

7              MS. BENEDETTO:  Dr. Hopkins produced -- was up to

8    Bates No. 500 and something pages' worth of E-mails back and

9    forth between himself and the lawyers from my firm, and,

10   frankly, the lawyers from the defense firms.  And

11   Mr. Mustakoff, who was counsel for Dr. Antoun, actually

12   produced the memorandum of understanding that was being

13   negotiated, but there was never a final agreement reached.

14             THE COURT:  And what was the third doctor?

15             MS. BENEDETTO:  Berkman.

16             THE COURT:  Yes, and what happened with him?

17             MS. BENEDETTO:  His counsel produced an affidavit

18   which satisfied the defendants.  The defendants didn't pursue

19   any further.  And I think he produced, like, seven pages'

20   worth of documents.

21             THE COURT:  Well, what hasn't been produced?  In

22   other words, did the defendants request depositions and

23   people refused to do it?

24             MS. BENEDETTO:  The only thing outstanding, your

25   Honor -- I believe the defendants are satisfied with what



1    they've received from Dr. Berkman's counsel, Mr. Sherman, and

2    I believe they're satisfied with what they received from

3    Dr. Antoun's counsel, Mr. Mustakoff.  What they are still

4    pursuing ostensibly is the settlement negotiations documents

5    from Dr. Hopkins' counsel, which is Mr. Fernandez.

6            THE COURT:  Well, do you have them?  Do you have

7    the settlement papers with Hopkins?

8            MS. BENEDETTO:  Your Honor, obviously there were

9    settlement negotiations with Dr. Hopkins.  It's listed on his

10   privilege log as the basis for why he was not turning over

11   those E-mails back and forth.

12           THE COURT:  But they're not privileged.  I mean,

13   they are if they're between him and his counsel, but not if

14   they're between you and the counsel, or whoever is

15   representing the local.

16           MS. BENEDETTO:  Your Honor, our point in all of

17   this is, if we're having settlement discussions with -- for

18   example, if we're having settlement discussions with

19   AstraZeneca, is GlaxoSmithKline entitled to find out about

20   that?  I mean, it could open up a whole can of worms.

21           THE COURT:  It depends, it depends.  You know,

22   everything is "It depends."  So I'm happy to put it under a

23   protective order, but I just have to be content in my heart

24   there was no collusion.

25           MS. BENEDETTO:  And I think the point of the matter



1  is that as differing from the other cases that the defendants

2  cite, such as in the Fen-Phen case that they cite from the

3  Eastern District, the lawyer for the plaintiff said that

4  there was such a quid pro quo agreement, "If you agree to

5  object to removal, we'll settle with you," the phentermine

6  defendants.  But there was also an added aspect there.  In

7  that case, there was clearly no way that the plaintiffs could

8  make out a cause of action against the phentermine defendants

9  as opposed to the Pondimin and Redux defendants.  Here we

10  have defendants who pled guilty to the cause of action that

11  we're alleging.

12        THE COURT:  I agree, but there's at least a

13  question about standing, and that's what I'm sort of stuck

14  on.  Now, I've also got a problem with that because there was

15  a misrepresentation in the removal papers, so I'm not sure

16  which trumps which.  But I think that you're quite right,

17  that if there's a reasonable basis in fact and law, and then

18  you settled it for purposes of discovery or to cooperate as

19  witnesses or whatever, I'm not sure that violates anything.

20  What would worry me is if there was an agreement, verbally or

21  in E-mail form, and you simply sued them anyway so they

22  wouldn't consent.  I'm assuming for a minute that that's not

23  going to prove up, but that's why I ordered discovery.  And

24  one of the reasons I'm a little annoyed is, I had hoped this

25  would all be done by now so we could stop the skirmishing and



1    I could just rule.

2            MS. BENEDETTO:  Your Honor, I'm here today to tell

3    you and Mr. Haviland is here today to tell you that there are

4    no such settlement agreements.

5            THE COURT:  I know, but that's why we have

6    discovery, so someone says it under oath, you know?  That's

7    the thing.  Now, if you want to put it -- I don't know,

8    counsel usually don't like putting things under oath, but,

9    you know, if somebody who was involved wants to put it under

10   oath, "There was no discussion about it, no agreement about

11   it," whatever, it would go a long way.

12           MR. HAVILAND:  Your Honor, I'm Don Haviland for the

13   local plaintiffs, and I'll put under oath that there was no

14   discussion with any of these doctors' counsel as a quid pro

15   quo that "If you refuse your consent to removal, we will

16   settle with you."  I'll tell you exactly what happened.

17           THE COURT:  But did you discuss consent to removal

18   at all?  Did it come up?

19           MR. HAVILAND:  Not prior to removal, Judge, not

20   prior to the removal.  The removal came.  The discussion was

21   raised, as it was with the defense counsel, about whether

22   they would consent.

23           THE COURT:  But I guess they remove, and then

24   there's a question of -- well, you know, I don't want to do

25   this here.  At some point, if you want to put in affidavit



 1   form the chronology and exactly what happened with respect to

 2   consent, both of you, and then you get counsel from the other

 3   side to do it, that may be enough for me.  But what I don't

 4   like is, I ordered it, and it hasn't happened.  And then

 5   Judge Bowler ordered it again and I've got some objection.

 6   It should be pretty simple.  It should just be easy.

 7          MR. HAVILAND:  The objection we had, your Honor, as

 8   plaintiffs' counsel is, when you have post-litigation

 9   communications amongst plaintiffs' counsel and with defense

10   counsel about settlement, we have our work product, our

11   internal notes, we've got internal communications.  And we

12   were asked by AstraZeneca's counsel, respectfully, to log

13   everything.

14          THE COURT:  You can't -- then fine, assert the

15   privilege.  I'm only talking about documents between you and

16   the doctors.

17          MR. HAVILAND:  And I believe they have everything,

18   your Honor.  I don't believe the defendant has withheld --

19          THE COURT:  Well, somebody wrote me a -- is

20   objecting to Judge Bowler's order.

21          MR. HAVILAND:  I know Dr. Hopkins has taken a

22   strong line on that.  I know that.  I don't know about the

23   case of Dr. Antoun.

24          THE COURT:  I'm about to overrule that, but I just

25   want it to all happen soon so I can just rule.



1        MR. HAVILAND:  Your Honor, we're asking to put it

2    in affidavit form.

3        THE COURT:  Let me just assume for a second you get

4    past this hurdle.  Okay, let's just address the merits for a

5    minute.  Now, let's assume I find that there was a

6    misrepresentation in the removal papers, all right, that they

7    actually consented.  So now what do I -- and let's assume for

8    a minute, however, that their point is well-taken that, in

9    any event, it wasn't material because they hadn't been

10   properly served it.  What do I do with that fact pattern?

11       MS. BENEDETTO:  Your Honor, I think under the New

12   Jersey rules -- and I've been a member of the New Jersey bar

13   for fifteen years -- if a defense counsel accepts service on

14   your behalf, they've accepted service.  These doctors'

15   counsel have said that they -- particularly if you look at

16   Dr. Antoun, he accepted service on July 1.  The case was

17   removed on July 3.  And they point to Rule 4:4-4(c).

18       THE COURT:  Okay, this is helpful.  So they say it

19   was removed on the 3rd, and then they accepted service on --

20       MS. BENEDETTO:  The 1st, two days before,

21   Dr. Antoun's counsel.

22       THE COURT:  There was one little squirmish about

23   whether they signed something.  Did they?

24       MS. BENEDETTO:  No.  There's no requirement that

25   they have to.  What the rule says, 4:4-4(c), is that a



1    plaintiff's attorney could not take default against a

2    defendant who had accepted mail service until such time as

3    that defendant appeared or answered.

4            THE COURT:  So there's no requirement.

5            MS. BENEDETTO:  We wouldn't be able to take a

6    default against Dr. Antoun by virtue of the fact that his

7    counsel agreed to accept service on his behalf on July 1.

8    There's nothing in the rule that says, by virtue of the fact

9    that Dr. Antoun's counsel didn't appear in the case until he

10   filed his joinder in the remand on July 18, that does not

11   mean that the effective date of service then becomes July the

12   18th.  That's not what the rule says.

13           THE COURT:  So just to play it out, so let's assume

14   he accepts service on the 1st.  You say that was enough to be

15   valid service, and that the argument about when it went into

16   effect doesn't defeat the validity of service?  Is that

17   right?

18           MS. BENEDETTO:  Well, the way the rule is worded

19   does not deem that the effective date of service changes to

20   the date on which the defense counsel appears.  So the only

21   thing that that rule goes to is the default issue.  The rule

22   goes to the issue of plaintiff's counsel can't serve by mail

23   a counsel or a defendant and then take a default against them

24   before that counsel has appeared in the case.

25           THE COURT:  Is there a case or a New Jersey



```
 1   practice that talks about the effect of that rule?  You know

 2   how we have Mass. Practice here, you know, and it tells you

 3   how to serve, et cetera.

 4           MS. BENEDETTO:  I did research, your Honor.  I

 5   couldn't find it.  I do know there's cases out there that

 6   talk about, you know, defense counsel accepting service.

 7   It's certainly anticipated and it's certainly done in

 8   practice in New Jersey.

 9           THE COURT:  So you don't have a practice series

10   from New Jersey that you know of?

11           MS. BENEDETTO:  I didn't look at -- I did research

12   on Westlaw for that.  I didn't look at the practice series.

13           THE COURT:  If you see something, that would be

14   very useful, because I know we have a very practical treatise

15   on what it all means and plays out under state law, and

16   sometimes a district court, you know, lower court opinions in

17   the state court, and it would be very useful to have that.

18           So assume for a minute it was effective service.

19   You're saying that they didn't consent, and they would have

20   objected?  Is that it?

21           MS. BENEDETTO:  Well, counsel for the defendants

22   stated that they tried to contact Mr. Mustakoff, who's

23   Dr. Antoun's counsel, a doctor in New Jersey, and he was on

24   trial, they didn't contact him.  Yet they still put in their

25   removal papers that "We believe we're the only served
```



1  defendant," even though AstraZeneca and Dr. Antoun were

2  subject to the motion for our preliminary restraints that we

3  filed and both of them have indicated on the certificate of

4  service were served via overnight mail, Federal Express.  So

5  Dr. Antoun got service the same way AstraZeneca did.  So if

6  there's anything wrong with Dr. Antoun's service, then

7  AstraZeneca is basically saying, "It's okay the way you

8  served us, but it's not okay the way that you served

9  Dr. Antoun."  So, I mean, they used the service upon them on

10  July 1 as a basis, you know, to remove the case.

11          THE COURT:  Okay, thank you.

12          MS. BENEDETTO:  And if I could just make one more

13  point, your Honor.  Just with respect to this discovery, this

14  did not come to a head -- I mean, we even filed a 16.1

15  statement with your Honor back in April, and the defendants

16  never raised at that point in time that they wanted to have a

17  discovery schedule.

18          THE COURT:  Didn't I put it in my last order?

19          MS. BENEDETTO:  Yes, your Honor, but, I mean, they

20  waited to press it until this last round of briefing.  And, I

21  mean, they have been arguing fraudulent joinder all along,

22  and it's only --

23          THE COURT:  Did they give notices of deposition for

24  these people?

25          MS. BENEDETTO:  They did originally, yes, your



1    Honor, back in July of 2003, and then they abandoned them.

2              THE COURT:  I issued my order a lot more recently

3    than that.

4              MS. BENEDETTO:  Correct, correct.

5              THE COURT:  It certainly wasn't 2003, right?  It

6    was just within the last six months, right?

7              MS. BENEDETTO:  Yes, your Honor.

8              THE COURT:  Did they renotice the depositions?

9              MS. BENEDETTO:  They did, they did.  And then, as

10   to Dr. Antoun's lawyer and as to Dr. Hopkins' lawyer, they

11   accepted the affidavits and the documents they produced, and

12   then did not pursue the depositions.

13             THE COURT:  All right, well, I'll ask them what it

14   is that they think they don't have.

15             MS. BENEDETTO:  Thank you, your Honor.

16             THE COURT:  Thank you.

17             MR. FLYNN:  Good afternoon, your Honor.  Michael

18   Flynn from Davis Polk.  A number of things have been said

19   which I'll clarify.

20             THE COURT:  Can I just start off by saying, look, I

21   had a real problem with the statement made in the removal

22   petition.  It was just wrong.

23             MR. FLYNN:  I think our statement, your Honor, was

24   twofold.  First of all, as we said initially, we believe that

25   under New Jersey service rules, that none of the doctor




Page

1    defendants --

2              THE COURT:   Then you should have just said that.

3              MR. FLYNN:   We did, and, your Honor, the first

4    statement in the removal petition says, "We believe no doctor

5    defendant has been served."   In the second statement, we went

6    above and beyond that because at the time we had no belief,

7    your Honor, that these doctor defendants would not consent to

8    removal.   And here's the basis for --

9              THE COURT:   You know what, I just was pretty upset

10   when I read it because I just thought that -- now, it could

11   have been negligence rather than an intentional

12   misrepresentation -- it way overstated what it was.

13             MR. FLYNN:   I can explain to your Honor in good

14   faith why we believe that, and if there's any confusion about

15   the language chosen, we obviously did not mean anything

16   intentional by that language.   But let me tell you the basis

17   on which we believe that the doctor defendants would

18   consent.   An associate in our office called counsel for two

19   of the doctors on the day the removal petition was filed,

20   indicated to them that we intended to remove, asked them, had

21   they been properly served?   The answer to that was "no."

22   In both instances, they did not believe they had been

23   properly served, so we did not believe we needed their

24   consent.   But having raised the issue of our removal, neither

25   of them objected.



1        THE COURT:  Yes, but then you should have said,

2   "Having raised the issue, neither objected."  That's

3   different than they consented.  You never asked the question,

4   "Do you consent?"

5        MR. FLYNN:  And I agree, your Honor, we did not ask

6   that question because our belief was that we did not need

7   their consent.  And I don't believe the removal --

8        THE COURT:  Then you should have said that in the

9   removal petition.  It overstated your case.

10        MR. FLYNN:  And I think it was, again, your Honor,

11   it was above and beyond what we thought was necessary.

12        The other reason is, your Honor, which really

13   informed our belief about whether or not the doctor

14   defendants would consent, is that we had every reason to

15   believe, until they started to file papers in opposition to

16   remand, that they would want to be in the MDL proceedings.

17   Under your Case Management Order No. 2, your Honor, their

18   case, subsequently transferred class action, would be

19   subsumed in the AMCC --

20        THE COURT:  Well, then you say that, you say that.

21   It looked when I read it as if they consented, they said to

22   you, "We agree."  That's the way it is usually when all these

23   pharmaceutical companies are called -- I'm hoping that that's

24   true -- that somebody from the firm actually says, "We

25   consent."



Page

```
 1            It overstated the case, and I'm not sure what to do

 2   with that.  I mean, I sort of half expected someone to come

 3   in and say, "Yes, I'm the partner who signed off on that

 4   thing, and I just misunderstood what my associate said, and

 5   I'm sorry."  But instead I get a justification for it.

 6            MR. FLYNN:  Well, I think, your Honor -- and

 7   Mr. Wise's affidavit in response to your order I think

 8   explains and no need for me to continue to reiterate it.  I

 9   understand, and I apologize for any confusion on that point,

10   but we really did believe, your Honor, for several reasons

11   that the doctors would be amenable to being in this court

12   because they would be subsumed in a case where they were not

13   a defendant, and we had no reason to believe that they would

14   want to stay in New Jersey state court.

15            Let me address, your Honor, unless you have other

16   questions --

17            THE COURT:  Well, let me ask you this:  Suppose I

18   find that there was a material misrepresentation in the

19   removal petition.  What do I do with that?

20            MR. FLYNN:  If you find that, your Honor, again,

21   it's not, in our view -- and I'll get to this in a minute --

22   we believe it has nothing to do with the remand issue.

23            THE COURT:  Well, that's what I'm asking you.

24            MR. FLYNN:  Yes, but because the remand issue, your

25   Honor, we believe, with respect to the procedural defect,
```



1  rises or falls completely on the issue of whether or not, as

2  you pointed out before, whether or not the doctor defendants

3  have been properly served under New Jersey law at the time

4  the removal petition was filed.  And I have with me, your

5  Honor, cocounsel from New Jersey who can speak to the New

6  Jersey service rules.  And so to answer --

7         THE COURT:  Can I just say, I did not hear that

8  cell phone, but if I had, there's a $250 fine in Federal

9  Court for it.  So I didn't hear it, but I don't want to hear

10  it again, all right?  Some judges are pretty strict on it,

11  but I have the one-ring rule, so, hopefully, if somebody

12  turns it off and I haven't seen whom.

13         All right, go ahead.

14         MR. FLYNN:  So we believe, your Honor, that it has

15  no material effect on the remand and the removal notice here

16  because we believe that consent was irrelevant because of the

17  service issue.  So if you find that there was a material

18  misrepresentation on the issue of consent, we believe it has

19  no effect on the remand issue at all because we believe that

20  the doctor defendants' consent was not required because they

21  had not been served.

22         THE COURT:  All right.  So now let's get to part

23  two.  I found this very, you know, like a law exam question

24  here.  So let's assume for a minute that there's a little mud

25  on the defendants.  Now let's assume for a minute that there



1    was an agreement between plaintiffs and the doctors that they

2    would settle with them in exchange for production of

3    documents and cooperative testimony.  What's wrong with

4    that?

5            MR. FLYNN:  The only thing that's wrong with it,

6    your Honor, is if they were joined in order to defeat

7    removal.

8            THE COURT:  All right, fair enough, okay, because

9    you throw a lot out about how this was just about -- you

10   know, it wasn't about really suing them; they were suing them

11   in order to get cooperation.  I couldn't think of a reason

12   why that was wrong.

13           MR. FLYNN:  Well, that in and of itself, your

14   Honor, might not be wrong, but when it's coupled in a

15   circumstance where we believe there's significant indicia

16   that there's no intent on the plaintiff here to pursue a

17   claim against these doctor defendants to join judgment, we

18   think that satisfies the fraudulent joinder.  And, again, we

19   don't think you need to reach it because of the issue of

20   service, and their consent is not required.

21           But we do think there's a lot of indicia here of

22   discussions.  Before your Honor, counsel for plaintiff

23   indicated that they had no discussions with the doctors.  The

24   discovery we've been able to take so far, your Honor,

25   indicates the following things:  We have an affidavit from



Page

1   one of the doctor's lawyers who says in his affidavit

2   undisputed that counsel for the plaintiffs indicated at the

3   time the service issue was arising, the removal issue was

4   arising in early July, 2003, that "We are not interested in

5   your client as a defendant, only as a fact witness.  And it

6   is in your best interest," meaning the doctor defendant --

7   this is Dr. Berkman from Ohio -- "for the case to remain in

8   New Jersey state court."

9              We have prior to the complaint --

10             THE COURT:  So let me just ask.  So with Berkman,

11   are you content with the discovery at this point?

12             MR. FLYNN:  Yes.

13             THE COURT:  All right, so Berkman is complete.  All

14   right, now move on to the next one.

15             MR. FLYNN:  The next one, your Honor, is of

16   Dr. Antoun in New Jersey.  Several pieces of evidence, your

17   Honor, we believe indicates that the plaintiff had no

18   intention to pursue a joint judgment with respect to

19   Dr. Antoun.  Number one, your Honor, Dr. Antoun was also part

20   of a preliminary injunction that the plaintiff filed against

21   AstraZeneca and the individual doctors, and it was hotly

22   contested in the New Jersey courts before removal was --

23   before a decision was made.  And Dr. Antoun never answered,

24   never appeared, and they never pursued that injunctive relief

25   against him.  There is no --


1      THE COURT:  What do you want in terms of discovery

2  against Antoun, anything?

3      MR. FLYNN:  No.  Dr. Antoun, we have an affidavit

4  from his attorney, Mr. Mustakoff, which we believe

5  establishes that under New Jersey service rules, service was

6  not effected, and so therefore Dr. Antoun's consent was not

7  required.

8      THE COURT:  So you don't want any more discovery on

9  Mr. --

10      MR. FLYNN:  No, no.  We've got a draft MOU,

11  memorandum of understanding, circulated to Dr. Antoun's

12  counsel before the complaint was even filed.  We also have,

13  your Honor --

14      THE COURT:  Wait a minute.  Does it discuss

15  consent, and in exchange you've got to consent?

16      MR. FLYNN:  No, it does not, your Honor.

17      THE COURT:  So who's the last one?

18      MR. FLYNN:  The last one is Dr. Hopkins,

19  Mr. Fernandez.  You have his papers, your Honor.  And your

20  Honor is correct that Mr. Fernandez moved for a protective

21  order.  After your order issued in August, we issued

22  discovery notices pursuant to that order, and Mr. Fernandez

23  moved for a protective order.  We opposed.  Judge Bowler

24  agreed with us, as your Honor has already indicated.

25  Notwithstanding that, Dr. Hopkins and his attorney have filed



1    objections, and we have opposed those, your Honor, and those

2    are now before you.

3              The privilege log, your Honor, that Mr. Fernandez

4    produced indicates that he is withholding documents, E-mail

5    correspondence with plaintiff's counsel in the early July,

6    2003 time period relating to discussions regarding

7    settlement.  And this is at the very time, your Honor --

8              THE COURT:  Sure, I understand that.  So what you

9    want from him is what, just these documents?

10             MR. FLYNN:  And also we've noticed his deposition,

11   and he's refused.

12             THE COURT:  And did you notice it in a timely way,

13   within three months?

14             MR. FLYNN:  Yes.  Yes, we did, your Honor.

15             THE COURT:  So you just want a deposition with the

16   lawyer?

17             MR. FLYNN:  With the lawyer.  We've noticed his

18   deposition, unless, as we've done with the other doctors --

19   we're not trying to be unreasonable here -- to the extent

20   that doctors are willing to put in affidavits, we're not

21   looking to drag people through unnecessary discovery.

22             THE COURT:  So whom did you notice?

23             MR. FLYNN:  We noticed Dr. Antoun's lawyer,

24   Mr. Mustakoff.

25             THE COURT:  No, no, no, no.  Whom did you notice




```
 1    that you want now?

 2              MR. FLYNN:  Now the only person who is left is

 3    Mr. Fernandez.

 4              THE COURT:  All right.

 5              MR. FLYNN:  Let me go through, your Honor, a couple

 6    of other indicia.

 7              THE COURT:  So how long would it take to do his

 8    deposition and get those documents, two weeks?

 9              MR. FLYNN:  I assume so, your Honor, yes, that

10    would be fine.  If he produces the documents to us, we'd be

11    ready to go as soon as your Honor wanted us to.

12              THE COURT:  He didn't want to show today, so I'm

13    going to do that on the papers, but I'll do that as soon as I

14    can.

15              MR. FLYNN:  Okay.  A couple of other points, your

16    Honor, just because I think this issue of fraudulent joinder

17    is important.  You raised the issue before, your Honor, in

18    questions to counsel about standing and about the face of the

19    complaint, which were other reasons why we believed, your

20    Honor, that there's no intent here to pursue a joint judgment

21    against these doctor defendants.  There is no allegation in

22    the complaint that the plaintiff was prescribed our client's

23    drug Zoladex at all, that plaintiff ever paid for Zoladex,

24    not one single allegation.  There are no personal

25    jurisdiction allegations against the two out-of-state
```



1    doctors, not a single allegation in the complaint that would

2    suggest that there is any claim to be pursued.

3            They make a lot of noise about the fact that these

4    doctor defendants pled guilty to crimes in a conspiracy with

5    our client.  Those relate to totally different issues not at

6    issue in the AWP case.  Those relate to free samples, and

7    it's not something that is a claim that they have asserted

8    any right to bring to seek relief on.  So there's nothing on

9    the face of the complaint, your Honor, that we believe

10   suggests that there are real claims here.

11          THE COURT:  Well, suppose I have both.  This is

12   what I have been struggling with with my law clerks:  I have

13   what I consider a material misrepresentation and removal

14   petition and a question about whether there's a reasonable

15   basis for standing against these doctors, or jurisdiction,

16   whatever you want.  I don't think there's a problem that you

17   just -- suing them in order for their testimony.  I don't

18   think there's case law that says that.  So what do I do with

19   that?

20          MR. FLYNN:  Well, your Honor, a couple of things.

21   Let's be clear here that something that they don't want to

22   talk about at all is, there's clearly federal jurisdiction

23   here, ERISA, complete preemption.  Under your California

24   decision, all three prongs are met.  They don't even

25   seriously contest that.



Page

```
 1              THE COURT:  The issue is consent and --

 2              MR. FLYNN:  Well, no.  The issue is consent on the

 3    procedural defect.  We think that, again to reiterate, the

 4    consent issue need not be reached because the doctors weren't

 5    served, and if your Honor would like --

 6              THE COURT:  Did you find a New Jersey practice

 7    series?

 8              MR. FLYNN:  I can turn it over to my colleague,

 9    Mr. Cooner, to talk about the New Jersey service rules, which

10    I believe are clear, your Honor, that the effective date of

11    service has to be an initial appearance.  Think of a

12    situation, your Honor -- and Mr. Cooner pointed this out to

13    me before -- think of a situation where someone says, "I'll

14    agree to accept service on July 1."  On August 20 they make

15    their first appearance.  If the July 1 date is the effective

16    date, when they make their first appearance, they are already

17    in default.  It makes no sense, your Honor, and --

18              THE COURT:  That's what she was saying, which is

19    you can't default someone for that.

20              MR. FLYNN:  Well, they've cited no basis for that,

21    your Honor.  And I think Mr. Cooner can explain to you --

22              THE COURT:  Do you have a New Jersey practice

23    section?  You must have like a New Jersey practice series,

24    right?

25              MR. COONER:  There is a New Jersey practice series,
```



PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

1    and more than that, the bible of New Jersey practice is

2    Pressler's handbook, Judge Pressler, Sylvia Pressler.

3            THE COURT:  Do you have the Pressler handbook for

4    me?

5            MR. COONER:  I have the sections of it as it

6    relates to this issue, and I can let you know that --

7            THE COURT:  I'd love it.

8            MR. COONER:  -- as to the specific issue that

9    you're raising, it is silent on it.

10           THE COURT:  Of course.

11           (Laughter.)

12           THE COURT:  Okay, but is this the only treatise on

13   point?

14           MR. COONER:  No.  There's a broader New Jersey

15   practice series that covers a whole series of different

16   topics, one of which is civil practice and procedure.  I

17   believe the author of that book is Del Deo.

18           THE COURT:  Okay, well --

19           MR. COONER:  Affectionately known as the

20   "Red Books."

21           THE COURT:  What I'd appreciate is if there is --

22   on that rule about attorney acceptance of service, if there

23   are sections on it from either side, I'd appreciate it.  It's

24   not crystal clear what it all means when you read it.

25           MR. FLYNN:  I just point out, your Honor, in our


1    briefs, it's not New Jersey practice itself, but we do cite

2    practice series that make it abundantly clear that the

3    effective date for service does not relate back to an oral

4    agreement to accept service.  And that's in our papers.

5           MR. COONER:  And that's the cornerstone of what

6    we've tried to say, your Honor, is not just merely service,

7    but does service become effective?  If you step back a little

8    bit, consent is only required from properly served

9    defendants.  And you spoke earlier today about the

10   chronology, and in this case, the chronology is that

11   snapshot, and the snapshot is on July 3, 2003.  And on that

12   day, there are three different ways you can effect service in

13   New Jersey, and they're all in the Rule 4:4-4.  There's an

14   (a), a (b), and a (c).  (a) is the primary way that you

15   effect service.  It's delivery to the person.  It is sheriff

16   service.

17          THE COURT:  We agree that didn't happen.

18          MR. COONER:  Okay, (b) is substituted service.

19   Substituted service is also not in play here because you need

20   to --

21          THE COURT:  Right.  (c)?

22          MR. COONER:  (c) is mail service, and mail service,

23   incidentally, requires it to be done by ordinary mail,

24   certified mail, United States mail, not private service

25   mail.  Regardless, though, it's effective only when there's



1   an answer or an appearance.  A snapshot again, 7303:  There

2   was no answer.  There was no appearance.  There was no

3   document in any way, shape, or form at that moment.

4        THE COURT:  So you're saying, if everybody is

5   served on the same day this way, everyone becomes effective

6   at the same time, the defendants can jump the process, remove

7   it, and say, "I don't need the consent of anyone."  In other

8   words, it's effective against all of them on the same day.

9   They say, "Ah-huh, we've got the better firm.  We've figured

10  this out.  We're jumping into Federal Court, and we don't

11  have to have the consent of the other folks because it's not

12  effective for another ten days."

13       MR. COONER:  What I would say, your Honor, there,

14  defendants don't choose how to be served.  It's the plaintiff

15  who goes, and the plaintiff is the one who initiates the

16  lawsuit, and they initiate the service of process.  It's the

17  plaintiff who chooses to go in the (c) direction.

18       THE COURT:  Okay, I understand, I think, the issue

19  right now.  And I've got to actually cut people.  We've got

20  to get to the Florida case.  And I have a revocation hearing

21  at 3:30, so I need to -- is there one last --

22       MR. COONER:  To underscore the point made by

23  Mr. Flynn, 60 days you have to answer or appear.  If someone

24  were served today, they wouldn't have to answer until

25  March 27.  If they entered an appearance, filed a notice of



1   appearance on St. Patrick's Day, and that somehow reverted

2   back to today, they would be out of time to answer.  Our

3   rules stress --

4          THE COURT:  Suppose you serve all fifteen

5   defendants on the same day this way, and then on the next day

6   only one of them removes and says, "Ah-huh, I don't need

7   anyone else's consent."  That's your view as to how it

8   works?

9          MR. COONER:  There's not effective service, that's

10  correct.

11         MS. BENEDETTO:  If I may hand something up?

12         THE COURT:  What is it?

13         MS. BENEDETTO:  These are the documents produced by

14  Mr. Mustakoff.  It's a whole packet.  I'm only going to turn

15  to the documents, the pages that appear at MUST-000001 --

16         THE COURT:  I tell you what, don't do it this way.

17  Send me a motion to supplement record and flag where you want

18  me to look, okay?

19         MS. BENEDETTO:  Also, your Honor, in an effort to

20  save the issue of a deposition, instead of a deposition,

21  could Mr. Fernandez put forth an affidavit that he wants to

22  put forth to the Court?  I think the problem is, he didn't

23  want to sign the affidavit that AstraZeneca wanted him to

24  sign.  He'd sign an affidavit but --

25         THE COURT:  If you work it out that way, I'm



1    happy.  Otherwise, I don't know what the harm here is, take a

2    two-hour deposition.  How long could the thing take?

3            MR. FLYNN:  Your Honor, could I just add one thing

4    I forgot to mention?  We've also served discovery on

5    plaintiffs, who have refused to produce documents, and

6    there's a hearing before Judge Bowler next week on February 2

7    on our motion to compel.

8            THE COURT:  It's too late.  All I'm going to do

9    right now is -- I don't want this to go forever.  That's why

10   I did it.  I'm annoyed that this didn't happen because I was

11   hoping to rule on the whole thing, you know, have something

12   tied up.  I just want it all to happen within two weeks.

13           MR. FLYNN:  And that means their producing

14   documents as well?

15           THE COURT:  Yes.  They've got to produce documents

16   unless they're privileged.

17           MR. FLYNN:  And they have to produce a privilege

18   log.  They've refused to do that.

19           THE COURT:  You've got to produce a privilege log.

20   That's the way it works.

21           MR. FLYNN:  Thank you, your Honor.

22           THE COURT:  And the settlement papers aren't

23   privileged.  Now, there may be other grounds, work product,

24   attorney-client.  I mean, for sure there are others, joint

25   defense or joint, I guess, plaintiff's memos and that sort of



1    thing.  But you've got to give a reason for it.  But I don't

2    want to be here for the rest of my life on privilege issues.

3    You're either going to -- what's it? -- a clear and

4    convincing case or not.  And I must say, to bring it back, I

5    wasn't happy.  I don't believe that you thought it was not

6    material to say everyone consented or you wouldn't have put

7    it in.  And I'm just saying that I don't know what legal

8    significance it all has, and I find that complicated.  It's

9    just it shouldn't even be part of this case.  It shouldn't

10   be.

11          MR. FLYNN:  I understand, your Honor.  We believe

12   it wasn't, but --

13          THE COURT:  Okay, thank you.  Now we're going to

14   just move on to Florida.

15          MR. THOMAS:  Thank you, your Honor.  Mark Thomas,

16   state of Florida.  I'll be very brief, your Honor.  I know

17   we're running short on time.

18          First of all, thank you very much for allowing the

19   state of Florida to appear.  We're going to split our

20   argument today.  Ms. Thomas, who represents the relator, is

21   going to handle the matters involving disputed substantial

22   federal question.

23          THE COURT:  Can I actually start with this.  I got

24   confused at some point with the --

25          MR. THOMAS:  Yes, Judge.



1    THE COURT:  What's the status of that other case?

2  There are two cases.

3    MR. THOMAS:  Mylan and Alpharma?

4    THE COURT:  Yes.  And you practically begged to

5  come in, and I'm happy to have you in Boston, but I'm just

6  wondering why I shouldn't hear you and then just wait until I

7  hear from the other folks as well.

8    MR. THOMAS:  It is our expectation that

9  Judge Hinkle in the Northern District will timely rule on the

10  state's motion for remand.  While there has been a

11  conditional transfer order issued, we have anticipation that

12  Judge Hinkle will be ruling quickly in the Mylan case, and it

13  will not come up to this MDL.

14    THE COURT:  Well, when will I know?

15    MR. THOMAS:  I had to turn my cell phone off prior

16  to coming into court, but I was hoping for a decision --

17    THE COURT:  So it wasn't yours, huh?

18    MR. THOMAS:  No, your Honor.  I was hoping for a

19  decision before we began argument.  It should be imminent.

20    THE COURT:  Well, let me just say this:  You'll

21  probably be the bottom of my barrel anyway because some of

22  these others will be easier to write, and yours is a more

23  complex analysis.  So if in fact the other folks are still in

24  federal jurisdiction and they want a hearing, I would wait to

25  rule on yours till they got in here as well because that was



1   my big concern, as you can well imagine, that I not do it

2   twice, but here you are.

3           MR. THOMAS:  Yes, your Honor, and glad to be here.

4   We will try and keep this simple.  Actually, we're surprised

5   to hear that you find the Florida case one of the more

6   complex cases because we found it rather simple.  Ms. Thomas

7   is going to be handling the disputed substantial federal

8   question argument.  If necessary, I'll be happy to address

9   Justice Souter's more ephemeral Grable matters.

10          THE COURT:  Not ephemeral, wholistic.

11          MR. THOMAS:  Wholistic.

12          MS. THOMAS:  Good afternoon, your Honor.  Susan

13  Thomas from Berger Montague, who represent the relator

14  Ven-A-Care, who is the relator in the Florida case.

15          As Mr. Thomas -- no relationship, by the way --

16  indicated, we actually were quite surprised to hear your

17  Honor indicate that she thought there was a real issue with

18  Florida because the Florida case asserts claims under the

19  Florida False Claims Act and under Florida common law.  These

20  claims are Medicaid price fraud only.

21          THE COURT:  All right, so Medicaid, now, does

22  the -- I had a hard time understanding the statutory scheme.

23  Does your Medicaid state statute use the term "AWP"?

24          MS. THOMAS:  It is in the statute and the regs,

25  your Honor, and indeed that is where the term "AWP" and "WAC"



1  come from in terms of pharmaceutical reimbursement.  They do

2  not come from the federal statute or regs; they come from the

3  state.

4           THE COURT:  All right, and do they -- this is what

5  I need to understand better and where you'll be very helpful

6  because it wasn't so clear from the briefings.  So when they

7  use the word "average wholesale price," do they make specific

8  reference to as defined in the Medicare statute?  I'd like to

9  see the statutory sections and the regs themselves.  Do they

10  reference back to the federal standard?

11           MS. THOMAS:  No, your Honor, they do not because

12  there isn't a federal statute.

13           THE COURT:  The federal statutory term, do they

14  reference back to the federal statutory term?

15           MS. THOMAS:  There is a Medicare federal statutory

16  term, and they do not reference to that.

17           THE COURT:  I actually know that, okay?  They do

18  not --

19           MS. THOMAS:  They do not reference to it.  In

20  Medicaid, there is no federal term "AWP" and "WAC" because

21  Medicaid allows each state to set up its own plan and its own

22  reimbursement.

23           THE COURT:  Right, and sometimes they piggyback on

24  the federal terms, and I just want to know, do they say --

25  does the Florida statute use the term "average wholesale



```
 1   price"?  You say "yes," right?

 2             MS. THOMAS:  Yes, it does.  It uses that and "WAC."

 3             THE COURT:  Okay, and "wholesale acquisition cost,"

 4   right?

 5             MS. THOMAS:  Yes.

 6             THE COURT:  And then they're defined by regulation,

 7   right?

 8             MS. THOMAS:  They are not defined, which I'm sure

 9   your Honor is familiar with at this point in this litigation.

10             THE COURT:  Yes.

11             MS. THOMAS:  But nor do they in any way reference

12   back to anything in the federal statute.

13             THE COURT:  Okay, they do not reference back at all

14   to anything, you know, as defined in the federal statute

15   or --

16             MS. THOMAS:  Absolutely not.

17             THE COURT:  -- as codified in policies from the

18   Center for -- what is it, Medicare and -- what's it called?

19             MS. THOMAS:  Medicare or Medicaid Services or

20   something?

21             THE COURT:  Yes.  So they don't reference back in

22   any way to federal standards, either in the statute,

23   regulation, or policy?

24             MS. THOMAS:  That is correct.

25             THE COURT:  All right, thank you.
```



```
 1          MS. THOMAS:  And that is consistent with the way

 2   the system is set up where although Medicaid is a jointly

 3   funded federal and state program, it is primarily

 4   administered by the states.  And with respect to

 5   pharmaceutical reimbursement, first of all, that's an option

 6   of a state Medicaid program whether or not to reimburse to

 7   cover pharmaceuticals, and then how they do it is governed by

 8   state statute or regulations, and that is indeed as it is

 9   done in Florida.  So we have no Medicare copay claims, either

10   by the Medicaid state agency paying copays for dual eligibles

11   or as parens patriae on behalf of Florida citizens who are

12   themselves paying the Medicare copays.  We have no Medicaid

13   rebate claims, which might well have been confusing from the

14   defendants' briefs because they spent pages and pages talking

15   about Medicaid rebates.  They're not in our case.

16          THE COURT:  Does Medicaid pay for the copays for

17   the Medicare patients who are poor?

18          MS. THOMAS:  I believe it does, your Honor, but we

19   are not bringing those claims.

20          MR. THOMAS:  Correct.

21          MS. THOMAS:  So they're not in this case.  And

22   there is no reference to Medicare AWP, which was the issue

23   that was presented to the Texas court where under the

24   physician reimbursement structure of the Texas Medicaid

25   program, physician reimbursement specifically looked to
```



PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

Page

1   Medicare AWP, and that became the question for decision that

2   the Federal Court there decided.  Still sent it back, by the

3   way, still found there was not a substantial federal

4   question, but at least had something to think about.  We

5   don't see anything to think about here.

6            THE COURT:  Yes, but if I get a clear understanding

7   of the state statute, maybe I won't either, but what's not

8   crystal clear is, I'm dealing with how many different states

9   at this point?

10           MS. THOMAS:  I understand, your Honor.

11           THE COURT:  I understand there's a state statutory

12  scheme, and your point is that there are no policies,

13  regulations, or state statutes at the state level that

14  piggyback onto a federal standard?

15           MS. THOMAS:  That is correct, with respect to the

16  terms "AWP" and "WAC."

17           THE COURT:  And WAC.  Thank you.

18           MS. THOMAS:  I mean, they do use federal upper

19  limits.  There's some other connections.  Obviously they're

20  part of the federal Medicaid rebate program, but those are

21  not claims in our case.  With respect these pricing terms,

22  they have no federal connotation.

23           THE COURT:  So you're saying the FUL -- I'm glad

24  you reminded me of that -- is only relevant with respect to

25  the size of a rebate, and you're not challenging the rebates



PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

PDF-XCHANGE

Click to buy NOW!

www.docu-track.com

Page

1   here?

2          MS. THOMAS:  Those are two different points, your

3   Honor.

4          THE COURT:  Okay, well, go for it.

5          MS. THOMAS:  The rebate is one issue, and we have

6   no claims pertaining to rebate.  And if your Honor would ask

7   me, I would happily answer as to whether or not the relator's

8   still-sealed complaint has any allegations about rebates,

9   although I can't otherwise discuss that without your Honor's

10  permission.  But I don't want your Honor to have a

11  misapprehension that there's something going on as it was in

12  California, if you remember back to that case.

13         THE COURT:  Well, I'm reluctant to do that here

14  because there's a reason it's sealed and -- let me put it

15  this way:  I'm asking you that question, but I don't want you

16  to answer here.  I want you to answer in an in camera

17  affidavit.

18         MS. THOMAS:  Okay.  I will tell you that defendants

19  certainly have made no arguments that there is anything in

20  the still-sealed complaint that affects this Court's

21  decision.

22         THE COURT:  Thank you.

23         MS. THOMAS:  And I just, because I'm familiar with

24  what was going on in California, I just don't want there to

25  be a misapprehension on that point either.



1          THE COURT:  All right, thank you very much.

2          I'm going to jump to defense at this point.  Who's

3     handling this?

4          MS. THOMAS:  Could I just take a few minutes to

5     address the arguments they make as to why --

6          THE COURT:  No.  Maybe on rebuttal if you do,

7     because I've got a pretty good understanding of what your

8     position is.

9          MR. FLEDER:  Good afternoon, your Honor.

10          THE COURT:  You spent a lot of time in your brief

11     talking about why this will affect certain aspects of

12     reimbursement by the federal government.  Is that really the

13     limit of what you think the federal interest is at this

14     point?

15          MR. FLEDER:  No, it isn't, your Honor.  There are a

16     number of federal interests that are implicated by the

17     complaint in this case, and it's not just limited to the

18     words of the complaint, but as we've cited in our case, it's

19     the underlying claim.  But just on the basis of the words in

20     the complaint, AWP and WAC do have meanings that have federal

21     implications.  I think if you look at Judge Crabb's decision

22     in the Wisconsin case, which was both a Medicare and a

23     Medicaid decision, she said that the plaintiff's claims did

24     represent a substantial and disputed question of federal law

25     with regard to recoupment of alleged overpayments under the




1    federal Medicaid and Medicare laws.

2              But in addition to AWP and --

3              THE COURT:  Can I just say, I happen to agree under

4    Medicare.  How it all balances out we can discuss, but if in

5    fact it's true that this is only under Medicaid and they

6    don't specifically reference back to the federal standards,

7    you're essentially asking me to draw the inference that

8    that's what it must be doing?

9              MR. FLEDER:  It's more than that, your Honor,

10   because, first of all, Ms. Thomas made reference to the

11   federal upper limits.  And as I understood what she was

12   saying, she was saying it's only relevant to the rebate.  But

13   on Page 7 of their complaint, Paragraph 19, the state talks

14   about the way that reimbursement occurs independent of

15   rebates, and they talk about average wholesale price.  That's

16   Factor A, B is wholesale acquisition costs, and C is the

17   federal upper limit.  So they have put the applicability of

18   federal upper limit into the Florida statute and therefore

19   into the cause of action that they have brought in this

20   case.

21             But it does go beyond that because as we did say in

22   our case, in Paragraph 93 of their complaint, they are

23   seeking damages based on what they paid versus what they

24   think they should have paid, without obviously conceding that

25   they should have paid any less.  By definition, by necessity,

1    there is a federal component in that analysis.   There has to

2    be in two different respects:   both the rebates that are paid

3    by the pharmaceutical companies to the state of Florida,

4    which obviously is set by federal law and by a federal

5    contract --

6               THE COURT:   Isn't that basically a best price

7    benchmark?

8               MR. FLEDER:   Best price and average manufacturer's

9    price.

10              THE COURT:   Right, so it's a different standard.

11              MR. FLEDER:   It's a different standard, but it is

12   governed by federal common law, and it is governed by the

13   federal contract.   And there's absolutely no doubt that if

14   the state were to be correct that they are entitled to

15   damages, by necessity this Court would have to get into

16   whether the rebates were proper because we would be seeking,

17   for certain, a setoff for any rebate payments that were

18   made:   Were they too much?   Were they too little?   Were they

19   just the right amount?

20              THE COURT:   But if I'm doing the balancing, the

21   Souter balancing, then I would say -- let's assume your

22   point, there is a federal interest here.   Wouldn't the state

23   interest under its own statute with its own scheme outweigh

24   it?

25              MR. FLEDER:   I don't think so, your Honor.   Can I



1  just mention also the other part of this and then directly

2  answer your question?  There's also the second side of this

3  which is the federal payment, the FFP made to the state of

4  Florida for the drugs that were purchased and are the subject

5  of this case.  That is obviously something that has a very

6  direct federal interest.

7           THE COURT:  That's what you're saying, it affected

8  the amount of the FFP how you ruled on that.

9           MR. FLEDER:  That's correct.

10           THE COURT:  So I'm not denigrating at all your

11  argument that there's some federal interest here.  The part

12  that I think -- I don't know your colleagues -- there would

13  be a lot of litigation over is, how do I balance that all

14  out?  And that's why I said this was the hardest piece of

15  this.  There's obviously some federal interest, but there's

16  also a strong state interest.

17           MR. FLEDER:  Well, and we are not saying and have

18  not said that the state of Florida has no legal right to

19  bring a cause of action.  That's not an issue in this case.

20  They could have brought a cause of action in state court.

21  They could have done what the Commonwealth of Massachusetts

22  did in a Medicaid case, which is to bring a cause of action

23  directly in Federal Court, the same cause of action, just

24  different venue.

25           Now, I'd like to just supplement on what Mr. Lynch



1   said and refer the Court to the recent decision in the

2   Santa Clara case where the judge -- this is the County of

3   Santa Clara V. Astra U.S.A., Inc.

4           THE COURT:  Could you remind me, was that Medicaid

5   or Medicare?

6           MR. FLEDER:  I believe it was Medicare, but what

7   the court did was go into a great analysis, and I'll just

8   read a short paragraph:  "Santa Clara nevertheless argues

9   that shifting cases to Federal Court premised on

10  pharmaceutical companies' overcharges would disrupt the

11  proper federal-state balance.  There is, however, no

12  Congressionally approved balance of judicial responsibilities

13  in this arena.  Counsel for Santa Clara also argued that

14  Pharmacy and Wisconsin, two of the recent state cases,

15  persuasively found that federalizing a case such as this one

16  would upset the proper balance of judicial responsibilities.

17  This order disagrees.  This order also disagrees with the

18  Wisconsin court's suggestion that moving all state cases

19  involving drug price into Federal Court would work a

20  destruction akin to that feared by the Merrill-Dow court."

21          So let's look at what Congress intended with regard

22  to Medicaid lawsuits.  To the extent that Congress has said

23  anything in the statute, the Medicaid statute, there is not a

24  word, as we looked at it recently, there's not a word, your

25  Honor, that suggests that any Medicaid case should be going




1    to state court.

2           Now, we're not saying that no Medicaid case should

3    go to state court.  What we're saying is, if you look at the

4    statute, if there's judicial review provisions at all, they

5    go into Federal Court.  And just like the recent case that we

6    cited in our brief that's going to be heard by the Supreme

7    Court is a dispute between what I believe is a resident of

8    the state of Arkansas and the Arkansas Medicaid agency, and

9    we went back and looked, and the District Court took

10   jurisdiction under federal question jurisdiction, 28 U.S.C.

11   1331.  There's a legion of cases involving Medicaid questions

12   that are brought in Federal Court under federal question

13   jurisdiction.  So using the --

14          THE COURT:  Well, it's a partnership.  I've written

15   so much in this area.  I think in one of my opinions, I mean,

16   both sides are allowed to bring suits frequently.  I mean, it

17   authorizes, in fact encourages, Medicaid to police its own

18   program.

19          MR. FLEDER:  And, again, we're not disputing the

20   state of Florida's right to bring a suit.  The question is,

21   using the Grable analysis and your Honor's prior rulings,

22   where does this case best lie?  And we submit that the answer

23   is very clear.

24          THE COURT:  Okay, thank you.  I understand that.

25   All right, as I say, I have a revocation coming up.  I need



1  to just report to counsel on a few things.  I did talk to

2  Professor Berndt, and I basically cut him loose, so there

3  will be no need for further payments.  I told him that I very

4  much valued his services and would very much like to use him

5  if I need him on a motion for summary judgment.  I didn't

6  know exactly when that would be happening, and I wasn't sure

7  whether or not he would take a case, a client or whatever, in

8  the interim that would preclude that.  So I just left it with

9  him that I'd deal with it at the time.  But what I want to be

10  quite clear on is, I don't need his services any more for

11  class cert, and so plaintiffs are not obligated or defendants

12  to pay, you know, the bookmark expenses that you were

13  incurring to hold onto him.

14        As far as I'm concerned, I did yesterday or today

15  or something receive a letter response from defendants, as

16  well as I got a letter from plaintiffs, about the class cert

17  motion.  I don't like letters, so just please in the future,

18  just do it in memos.  But that's it.  I don't want any more

19  briefing on it, and I'll just take that under advisement.  I

20  need to work on that, and I'll hopefully get something out

21  soon on that.  And so I think that that record is pretty much

22  closed unless I -- I haven't even read the defense response

23  yet because I've been in court all day, but unless I don't

24  understand something, I certainly am not going to take up any

25  new arguments.  I'm just not even going there, so you don't



Page

1    need to reply to anything new.  I'm just going to take what

2    I've got and rule, hopefully next week, but for sure by the

3    following week.

4              MR. MONTGOMERY:  Your Honor, you also asked us last

5    week to discuss scheduling going forward in the MDL.  We have

6    done that, and you will see when it comes across your desk

7    that we have substantial differences on how to schedule the

8    case going forward.  And I know you have a revocation

9    hearing, but if you'd like us to stick around, I think we

10   could resolve that in a few minutes.

11             THE COURT:  I have no idea how long that will be,

12   so I think that probably not.  Just give me just two

13   different versions, and I'll rule.

14             MR. MONTGOMERY:  We have already done that but

15   without any supporting argument.

16             THE COURT:  Local 68, without killing yourselves,

17   how much longer to finish up, to clean up this last piece of

18   discovery, which is one deposition and/or an affidavit and

19   the production of documents and/or privilege log by

20   plaintiffs?

21             MS. BENEDETTO:  One week, your Honor.

22             THE COURT:  One week?  Could you all do that in a

23   week?

24             MR. FLYNN:  Yes, your Honor.  Assuming we get the

25   documents, we could pursue the deposition.



1      THE COURT:  Why don't we just say two weeks so

2  there are no associates doing round-the-clock, okay?  Can we

3  do that?  And so two weeks just to clean up the discovery,

4  and within that time period, no longer than a five-page

5  supplemental brief, if it's warranted by whatever comes in.

6  No reply briefs or replies or whatever, just if you need a

7  cleanup brief on anything new that's learned.

8      MS. BENEDETTO:  So simultaneously submitted

9  supplemental briefs on --

10      THE COURT:  That's fine, okay, and with the

11  attachments --

12      MS. BENEDETTO:  Two weeks from today, Friday?  I'm

13  sorry, I don't have a calendar.

14      THE COURT:  Two weeks puts us at --

15      MS. BENEDETTO:  February 10?

16      THE CLERK:  February 10.

17      MR. FLYNN:  Your Honor, will you issue a written

18  order for Mr. Fernandez so he knows he has to act?

19      THE COURT:  That's a good point.  I suppose I

20  should do that, although I'm assuming that you all always

21  order these transcripts.  So Ms. Marzilli is in the middle of

22  a big trial.  I don't know when she can get it out, but if

23  you want to give me a draft of one, I'll work on it.

24      MR. FLYNN:  We'll submit an order, your Honor.

25      THE COURT:  Okay.  And you flew up from Florida,



```
 1   right?

 2            MS. THOMAS:  I flew up from Philadelphia actually.

 3   Mr. Thomas flew up from Florida.

 4            THE COURT:  Anyone who would fly up from Florida --

 5            MS. THOMAS:  We would like a few more minutes, or,

 6   alternatively, a chance to submit a simultaneous three- or

 7   four-page --

 8            THE COURT:  No.  I think I've got the gravamen of

 9   this.

10            MS. THOMAS:  I mean, truthfully, if Florida

11   stays -- I don't want to antagonize all the other AGs here --

12   every case that has been before your Honor and that is now

13   before your Honor would still be here.  Every case has state

14   Medicaid price fraud claims, and you have routinely sent them

15   back if they don't have something more.

16            THE COURT:  Thank you.  I've got that point.

17   Anything you want to add?

18            MR. THOMAS:  That's it your Honor.  Under Grable,

19   if Florida stays in Federal Court, they're all coming to you,

20   every single one of them.  There is no case more

21   state-specific than the Florida case.

22            THE COURT:  Thank you very much.  Have a wonderful

23   weekend.  And if I need you on case management, I'll let you

24   know.

25            MR. LYNCH:  Your Honor, could I throw out one
```



PDF-XCHANGE
Click to buy NOW!
www.docu-track.com

Page

```
 1   more --

 2              THE COURT:  No, no.  I've got this revocation.

 3   Sorry, sorry.

 4              THE CLERK:  Court is in recess.

 5              (Adjourned, 3:40 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```




1                     C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS      ) ss.

    CITY OF BOSTON                 )

5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 77 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13  Industry Average Wholesale Price Litigation, and thereafter

14  by me reduced to typewriting and is a true and accurate

15  record of the proceedings.

16          In witness whereof I have hereunto set my hand this

17  15th day of February, 2006.

18

19

20

21

22

23         _____

            LEE A. MARZILLI, CRR

24          OFFICIAL FEDERAL COURT REPORTER

25