


```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
       In Re:                        )
 4     PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS
       AVERAGE WHOLESALE PRICE       ) MDL No. 1456
 5     LITIGATION                    ) Pages 1 - 30
 6
 7
 8            CLASS COUNSEL STATUS CONFERENCE
 9         BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
10
11
12
13
                            United States District Court
14                          1 Courthouse Way, Courtroom 19
                            Boston, Massachusetts
15                          September 11, 2007, 10:10 a.m.
16
17
18
19
20
21
22
                       LEE A. MARZILLI
23                  OFFICIAL COURT REPORTER
                 United States District Court
24               1 Courthouse Way, Room 3205
                   Boston, MA  02210
25                    (617)345-6787
```




```
 1   A P P E A R A N C E S:
 2   For the Plaintiffs:
 3        STEVE W. BERMAN, ESQ. (By Telephone),
     Hagens Berman Sobol Shapiro LLP, 1301 5th Avenue, Suite 2900,
 4   Seattle, Washington, 98101-1090.
 5        THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP,
     One Main Street, Cambridge, Massachusetts, 02142.
 6
          DONALD E. HAVILAND, ESQ., The Haviland Law Firm, LLC,
 7   740 S. Third Street, Third Floor, Philadelphia, Pennsylvania,
     19102.
 8
     ALSO PRESENT:  Andrew J. Jackson, Esq., D. Scott Wise, Esq.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```




PDF-XCHANGE  Click to buy NOW!  www.docu-track.com
PDF-XCHANGE  Click to buy NOW!  www.docu-track.com

```
                      P R O C E E D I N G S
```

1  
2          THE CLERK:  In Re:  Pharmaceutical Industry Average
3  Wholesale Price Litigation, Civil Action 01-12257, will now
4  be heard before this Court.  Will counsel please identify
5  themselves for the record.
6          MR. SOBOL:  Good morning, your Honor.  Thomas Sobol
7  for the class plaintiffs.  With me on the phone is my
8  partner, Steven Berman.
9          THE COURT:  Thank you.
10         MR. HAVILAND:  Good morning, your Honor.  Donald
11  Haviland, Haviland Law Firm, for the plaintiffs.
12         THE COURT:  I'm not sure if any defense counsel
13  have shown up.  They're not needed.  I notice some folks who
14  might be defense counsel sitting here.  Do you want to be
15  recognized or just sit and --
16         MR. WISE:  I'm just observing, your Honor.
17         THE COURT:  Just observing, that's fine.
18         I got a phone call from a Judge William G. Bassler
19  after I had appointed Mr. Haviland as co-lead counsel,
20  basically based on a settlement among the lead counsel team.
21  There had been a serious dispute on the plaintiffs' team.  I
22  thought it was serious.  I was about to enter into the fray
23  when you worked it out, and although I had some misgivings, I
24  simply said, "If you agree, I'll agree."
25         The call from Judge Bassler prompted him sending me



1    a copy of a letter that you sent to him, Mr. Haviland, on

2    July 27, 2007.  I didn't know if Mr. Sobol had seen that or

3    Mr. Berman.

4           MR. SOBOL:  I have not, your Honor.  I don't know

5    if Mr. Berman has.

6           MR. BERMAN:  I have not seen it, your Honor.

7           THE COURT:  There were two things that worried me,

8    but let me get quickly to the thing that worried me the most,

9    which is, you're seeking a national class in the AWP in the

10   state litigation, at least according to this letter.  Is that

11   still true?

12          MR. HAVILAND:  Well, your Honor, that's a great

13   question, and let me just say that at the outset, there has

14   never been any effort to overlap or interfere with this

15   Court's jurisdiction.  You have to remember the history.  We

16   were brought in as Kline & Specter at the time to assist the

17   Local 68 counsel in the summer of 2003.  They had filed two

18   cases, the Vioxx litigation and AWP.  The client intended to

19   pursue a national class in both cases.  Your Honor I know got

20   from defense or actually plaintiffs' counsel the Supreme

21   Court's decision in Vioxx, which is directly involving that

22   plaintiff, and that certainly is informing that client's

23   intentions in New Jersey.

24          THE COURT:  Can you hear, Mr. Berman?

25          MR. BERMAN:  It's very hard to hear.




```
 1              MR. HAVILAND:  I'm sorry, I'll speak up.

 2              THE COURT:  That may not be on, the mike, and I

 3    need you to hear this.

 4              MR. HAVILAND:  So the answer to your question, your

 5    Honor, is it's unclear, simply because the original complaint

 6    filed in 2003 against 56 companies sought a nationwide class

 7    action.  Since that time, your Honor has certified a

 8    nationwide class action, at least for consumers.  You're

 9    considering the same for Track Two.  So today I can tell you

10    that we're not looking to do anything that would overlap or

11    interfere with that.  By the same token, there are some

12    defendants that are not in the MDL.  And so what we were

13    asked to respond to for Judge Bassler, who, by the way, has

14    been appointed special master by the state court judge, and

15    we asked him, your Honor, to contact you so that we could

16    coordinate to make sure that there was --

17              THE COURT:  It just says in this July 27, 2007

18    letter, "On the strength of the recent Vioxx decision

19    involving the same representative plaintiff," which I assume

20    is International Union of Operating Engineers, "plaintiff

21    seeks certification of a nationwide class defined as

22    follows."  Now, this is just a month ago.

23              MR. HAVILAND:  Right.

24              THE COURT:  "-- defined as follows:  All persons

25    and entities in New Jersey and throughout the country," and
```



1    then it talks, "paid beginning at least 1991 through the

2    present any cost of a cancer, inhalant, and miscellaneous

3    other drugs manufactured, marketed, distributed and sold by

4    defendants."  Now, I don't know exactly who all the

5    defendants are in that case.

6           MR. HAVILAND:  There are 56, and, your Honor --

7           THE COURT:  Fifty-six, so I'm assuming there's a

8    big overlap here, right?

9           MR. HAVILAND:  Big, yes, in the sense of 20 some

10   defendants.

11          THE COURT:  Okay, so --

12          MR. HAVILAND:  That language comes right out of the

13   complaint, just so you know, your Honor.  We were asked by

14   Judge Bassler to give him what the class as pled was.

15          THE COURT:  As you remember, maybe not, when I

16   remanded the case, I was enormously concerned because of a

17   lack of reasonable research as to whether these doctors all

18   had consented to the removal.  However, there were direct

19   representations made to me that it was only going to be a

20   New Jersey class.  And I haven't looked up the Consumer Class

21   Action Fairness Act in a while.  I don't even know whether or

22   not your proposed national class action is still viable

23   through a state system, but, in any event, it's directly

24   inconsistent with your obligations to this Court.

25          MR. HAVILAND:  Well, and, first of all, your Honor,



```
 1   Mr. Sullivan spoke that day.  In his prefatory comments, I

 2   wasn't aware of his saying those things.  They were

 3   inconsistent with the complaint, but he said that there were

 4   state claims, state-specific, and there were no federal --

 5             THE COURT:  Who's Sullivan?

 6             MR. HAVILAND:  He's the associate who appeared that

 7   day from Keefe Bartels, from the firm that represents

 8   Local 68 directly in both Vioxx and the AWP case.

 9             THE COURT:  Well, regardless, it was

10   representations made to me.

11             MR. HAVILAND:  No question.

12             THE COURT:  I was concerned that there wasn't a

13   reasonable investigation as to consent or not consent.  I

14   remanded.  A very experienced senior federal judge is

15   actually helping, as I understand it, the state court and

16   handled the thing.  And as we do, actually, behind the

17   scenes, we pick up the phone to each other, and it was

18   literally by serendipity a day after I had appointed you as

19   co-lead counsel.

20             MR. HAVILAND:  Right.

21             THE COURT:  Or two days after, something like

22   that.  And so I need to know that you're not seeking

23   something that, A, is inconsistent with your ethical

24   responsibilities to this Court, and, B, that would defeat my

25   jurisdiction as MDL judge.
```



```
 1              MR. HAVILAND:  Neither do I, your Honor, and I

 2    understood from your clerk when I got the phone call about

 3    today, I'm coming today to tell you that's not going to

 4    happen.  Again, the history:  This case got remanded.  It's

 5    finally gotten with a special master appointed.  We

 6    encouraged Judge Bassler to call you so that we could make

 7    sure that we knew exactly what your Honor was doing as that

 8    case progressed.  So, you know, the schedule has the case

 9    going through 2010.  We are going to wait to see what

10    happens.  I think we have class next summer.  Mr. Jackson is

11    here for Baxter, who's liaison counsel in the New Jersey

12    case.  So we don't even have briefing until well down the

13    road.

14              THE COURT:  Yes, but this cannot -- you made a

15    specific representation to the court you were seeking a

16    national class action.  Somebody else but on behalf of the

17    same party made a specific representation to me that it was

18    only a state case.  But even putting aside all of that, I

19    think you wanted to be co-lead counsel here, and you had not

20    been appointed until that point.

21              MR. HAVILAND:  Well, Kline & Specter had, and

22    that's right, your Honor, my law firm had not, and I agree

23    with that.

24              THE COURT:  So you can't do this.

25              MR. HAVILAND:  Well, we can't seek a nationwide
```



1  class where it's overlapping.  I absolutely agree with that,

2  your Honor.

3        THE COURT:  So should I issue an injunction?  I

4  mean, I don't know if Mr. Sobol and Mr. Berman or Mr. Wise,

5  who's sitting here now on behalf of AstraZeneca, or the folks

6  from Baxter knew about this, but I must admit, red flags

7  popped up all over the place for me.

8        Mr. Sobol?

9        MR. BERMAN:  Your Honor, if I may say one thing,

10  and then I'll let Mr. Sobol speak.  We didn't really know

11  that this was happening until after this hearing was set and

12  we began to investigate this, but I'm looking at the

13  transcript of the proceeding before the special master where

14  Mr. Haviland has appeared with his cocounsel, Mr. Williams,

15  in the case, and the special master asked at Page 27,

16  "I guess we've answered the question.  It's the plaintiffs'

17  position that they want a nationwide class?"  Answered by

18  Mr. Williams, "Yes, your Honor."

19        So on August 5, I think after Mr. Haviland was

20  appointed lead counsel before your Honor, he and his co-lead

21  counsel were taking the position in the New Jersey court that

22  they were seeking a national class.

23        THE COURT:  Well, what do I do with this?  I mean,

24  I -- let me just say, the second thing that's created some

25  misgivings for me was a statement that I had appointed you



1    co-lead counsel as of July 27, 2007, which was not the case.

2    Now, that, you could argue, was subsequently cured with the

3    settlement, but at the time, of course, it was a huge pissing

4    battle -- excuse my French -- within the plaintiffs.  So I

5    hadn't appointed you co-lead.  That was the very issue that

6    was pending.  So I'm just worried -- this is a worried

7    conference call -- about whether you are, A, candid with the

8    New Jersey court and with me, and, B, what do I do about

9    this?

10             MR. HAVILAND:  Well, if I could answer the what you

11   do about it, we have Judge Bassler speaking to your Honor for

12   the very purpose so that there isn't a problem, okay?  It's

13   not going to be addressed until sometime next summer when we

14   file a class.  There are a host of defendants that are in

15   this MDL.  Now, your Honor has ordered mediation, and that

16   may come to fruition.  There are 19 some attorneys general

17   pursuing those other companies, Hoffmann-La Roche, for

18   instance.  Local 68 intended when it filed the case in Vioxx

19   and AWP to have a national class on the strength of that

20   Vioxx case.  The Supreme Court has now ruled that that's a

21   question.  Co-lead counsel here have said --

22             THE COURT:  The Supreme Court of New Jersey or

23   Supreme Court of the United States?

24             MR. HAVILAND:  New Jersey.  That's the opinion that

25   co-lead counsel sent to you, I think this week, explaining



```
 1    that we don't believe that that affects your decision here

 2    for the TPP class.

 3              THE COURT:  You know, I know you'd like to think

 4    that I'm totally current on all 5,000 docket entries, but I

 5    don't remember seeing that yet, and maybe I will, but right

 6    now I need a representation from you.

 7              MR. HAVILAND:  Yes.

 8              THE COURT:  I don't like to enjoin state courts.

 9    A, I think the case law is muddy on whether I can do it --

10    that's a difficult area -- but as a matter of policy, I

11    prefer to work together with the state courts, so --

12              MR. HAVILAND:  And we could craft a stipulation to

13    that effect, your Honor.  It's never been raised until this

14    moment --

15              THE COURT:  You need this to drop all allegations.

16    Now, I don't know who, like, the lead counsel is for

17    defendants there.  Are you Baxter?  Are you lead down there?

18              MR. JACKSON:  I'm lead liaison counsel, your Honor,

19    Andy Jackson.

20              THE COURT:  Well, so I know you don't want to be

21    here, but you are.  So can you think of any reason why, if he

22    filed a stipulation of dismissal with respect to the request

23    for a national class action on all the companies that are

24    involved in the MDL, that that would create any kind of a

25    problem?
```



1    MR. JACKSON:  Let me back up a little bit just to

2  make sure that you have the record clear, your Honor.  There

3  wasn't just the statement in front of you that you referred

4  to earlier about the New Jersey matter being in New Jersey.

5  There was a letter written to you as well by Mr. Keefe in

6  September, I guess it was 10th, the day before your argument

7  on the New Jersey remand motion, where they in that letter

8  made a very direct representation that the New Jersey matter

9  was a state class only, and then the next day in the hearing

10  here, they made the same representation.  So we've thought

11  until that time that the New Jersey matter, we have lots of

12  problems with it, lots of class problems, lots of merit

13  problems, but at least based upon that and your actions, we

14  thought that that was a New Jersey class.

15    Now, the issue you raised about a stipulation for

16  our client, that would be great.  Since the other defendants

17  who are not here or who don't have overlapping MDL versus

18  New Jersey matters, we have to look at what the stipulation

19  would look like.  We'd get it to all our defense counsel.

20    THE COURT:  Well, here's my problem:  I don't have

21  jurisdiction over any claims or defendants which do not exist

22  in the MDL.  Now, it may be that you could make an allegation

23  that it's either judicial estoppel or law of the case or

24  fraud, I mean, whatever you would want to say that would

25  somehow bring that case back up here, which I'm not looking



1   forward to, but I can't do anything with that.  That has to

2   be handled totally through the New Jersey action, it strikes

3   me; in other words, either an additional notice of removal or

4   some sort of a request to dismiss for unethical conduct.

5   That's in your -- I don't have it.  I can't do anything.  But

6   on my case on my watch and my hunt, I do have jurisdiction;

7   and I believe I have the power to protect the authority, the

8   jurisdiction of this Court by enjoining the Haviland firm and

9   his party from pursuing a national class action with respect

10  to any overlapping claims and defendants.  I could do that,

11  or he could simply drop them expressly before the Court.

12          And I don't know -- this is may be the first time

13  that Mr. Sobol or Mr. Berman have seen this -- I don't know

14  if it affects their agreement to have him be part of the

15  class team if you didn't even know about this.

16          MR. SOBOL:  Well, let me address a few things, your

17  Honor, take a couple of steps back to make sure we put this

18  in context because I think you want to make sure you know

19  what it is that people knew or were aware of.

20          In August of 2007, at the end of August when we

21  came before you and we worked out the resolution with

22  Mr. Haviland, the only thing that we knew was that there had

23  been a case that had been remanded back to New Jersey, to

24  which there had been a representation to the Court that it

25  was going to be a New-Jersey-only action.  Our assumption,



1    meaning the co-leads' assumption, would be that if there were

2    actions that were going to be taken in New Jersey, that

3    Mr. Haviland would confer with us prior to taking them so

4    that we would make sure that that was coordinated with what

5    we were doing, and that's essentially, as I understand it,

6    all we knew.

7              As Mr. Berman indicated when we got notice of this

8    hearing, we then looked into what the circumstances were for

9    why it is that the Court wanted this, and we learned

10   essentially the things that have been indicated here:  First,

11   to our surprise, there was a representation made down in

12   New Jersey that the New Jersey action would go forward on a

13   nationwide basis rather than a New-Jersey-only-wide basis,

14   and that's something that had not been reviewed by us.  And

15   obviously that's something that, you know, would be an issue

16   of concern.

17             Second, it was at least a little bit ironic to us

18   that although the class counsel here in Boston had been --

19   there were disparaging remarks made about us because we were

20   representing both third-party payors and consumers in the AWP

21   case by Mr. Haviland, and yet that's exactly what's also

22   being done, or at least Mr. Haviland is representing TPPs and

23   consumers, or at least TPPs in the New Jersey action, and

24   that was a concern to us.  And there were a variety of other

25   things that we sort of looked at that gave us pause.



```
 1            Now, where did that leave us?  Well, where it

 2   really leaves us is that we're in a position where our

 3   overall view is, we want to be representing the class, and we

 4   want to be representing the class effectively.  And so we're

 5   willing to continue to work with Mr. Haviland if that's what

 6   the Court thinks is appropriate.  On the other hand, if the

 7   Court does not think that that's appropriate, then we're

 8   willing to step down from doing that, but --

 9            THE COURT:  Well --

10            MR. SOBOL:  Let me -- I want to go into the balance

11   of it so you can hear about the overall.  It's also just as

12   important to understand that, I don't know, but at least in

13   theory, there might be defendants in the New Jersey action

14   that are not defendants here in the AWP MDL, or there might

15   be drugs in New Jersey that are at issue that are not at

16   issue here in the MDL.  And to that extent, then there

17   wouldn't be any overlapping, okay?  But it's not enough

18   simply to say, go forward only on a New-Jersey-wide basis

19   because there would still be a need for coordination if, A,

20   the New Jersey action has some of the same defendants and

21   drugs and it's doing the New Jersey piece.  That would be an

22   issue for us, and we would need to make sure that we have,

23   you know, coordination with what was going on down there, at

24   a minimum, and communication.

25            THE COURT:  Well, the judge was fabulous.  I mean,
```



1    he and I are definitely talking.

2              MR. SOBOL:  Right.

3              THE COURT:  So, I mean, in that sense, I think just

4    as in the Neurontin case, I'm working with Judge Freedman and

5    the state courts of New York, I mean, I'm willing to

6    coordinate and work.  In fact, I think it's fabulous that he

7    picked up the phone because I didn't even know about this

8    issue.  I wouldn't have known about it.

9              MR. SOBOL:  Right, but if I may --

10             THE COURT:  So if that's what Mr. Haviland is

11   urging, well, then that's a feather in his cap.  But let me

12   just say this:  I've got a problem, Mr. Haviland.  Let me

13   just be really blunt.  I knew about the problems you had with

14   Judge Stearns.  I knew.  I read about it.  I know about it.

15   I've talked with Judge Stearns.  I knew.  Strike one.

16             Strike two, I had problems with getting the Friday

17   before the hearing all the affidavits from class reps in a

18   case that had been going on for six years that would pull the

19   plug on a case that wasn't just about those class reps; you

20   know, people who are sick and with cancer who might not be

21   able to have a proceeding, or if I ruled against them, they

22   could appeal; if I ruled for them, they got money.  But it

23   was just after six years just, you know, "I'm going to take

24   my toys and go home if I don't get it my way."  So but I was

25   willing to go with the settlement.  But then when I see this,



```
 1    it's like the third strike kind of thing, and I'm just -- I

 2    have to make sure that someone's going to have the utmost

 3    duty and loyalty to the class.

 4              MR. HAVILAND:  My problem, your Honor, is, when I

 5    was at Kline & Specter, we were engaged by a number of firms

 6    to work with them.  When Kline & Specter decided to pull out

 7    of these cases, we were left with them.  So this is a case

 8    that I had the responsibility for by a prior arrangement.

 9              I want you to see the case management order that's

10    been proposed.  Andy Jackson proposed it.  We agree with it.

11    It's got coordination under CMO 9 directly.  We've always

12    agreed with the defendants that this case should be under the

13    rubric of the MDL, despite the fact it went back to state

14    court.

15              And I know you understand from Judge Stearns what

16    happened there.  Lupron was an unfortunate circumstance where

17    cases were filed at the same time and proceeded to trial in

18    state court, and it just so happens that the case got settled

19    up here.  And it got worked out with a lot of work by the

20    lawyers and the attorneys general, and it got resolved.

21              And, you know, I won't go back and revisit the fact

22    that there were thousands of folks that were unhappy about

23    that, and we were representing them directly by direct

24    retainer agreements.  It's one of the problems you have, as

25    in this case, where I represent a dozen folks directly.
```



PDF-XCHANGE

PDF-XCHANGE

1   Mrs. Howe, for instance, in AstraZeneca -- I see Mr. Wise is

2   in the courtroom -- she paid 50 percent out of pocket, and

3   the settlement doesn't accomplish her issue.  So it's still a

4   problem, but we're working together cooperatively.  We've had

5   a call about that to try to resolve that.

6           THE COURT:  It's just she's not part of the class.

7   It doesn't mean that you can't represent her separately on a

8   separate cause of action.  She's just not part of this class

9   because of the common question issue.  But putting that

10  aside, I need to trust you.  Let's get past all the legal --

11          MR. HAVILAND:  Sure, absolutely.

12          THE COURT:  I need to trust you, and I keep trying

13  to make sure that if there's a consensus among the

14  plaintiffs' team, well, I'll trust you.  But truthfully, at

15  this point, I don't trust you.  I mean, that sounds like a

16  very mean thing to say, but, you know, at some point I tell

17  people, "You make your bed, you lie in it."  You know, I put

18  aside the Stearns things -- well, okay you started a new

19  chapter -- and then there were all the problems with the

20  mediation in front of Eric Green, and there was, like, just

21  this huge human cry about what happened, and I said, "All

22  right, well, that's contested."  And then I got the

23  affidavits from these class reps saying, "I'm going to pull

24  out unless it's me," that makes me worried that you were more

25  concerned about you than you were about the class reps.  And



```
 1    then I sealed it, and then I see this, and I feel like you

 2    weren't --

 3              MR. HAVILAND:  I'm concerned about those clients,

 4    your Honor.  That's the number one thing.

 5              THE COURT:  The what?

 6              MR. HAVILAND:  I'm concerned about those clients.

 7    I've always been concerned about those clients.  They're the

 8    folks represented since 2001 in Lupron and this case.  This

 9    case is a case that we cocounseled with the Local 68

10    counsel.  We encouraged this coordination for the

11    Keefe Bartels firm so that your Honor would know fully about

12    this, as soon as Judge Bassler got appointed with his

13    experience as a federal judge, that he would speak with you

14    and that there wouldn't be a problem.  We're trying to avoid

15    that.

16              I think Mr. Jackson will agree, we've worked

17    cooperatively to make sure that we don't have a problem.

18    Nobody wants another Lupron.  I certainly don't want another

19    Lupron, your Honor, on my card.  I want to see this thing

20    worked out where everyone is brought to the table.

21              One thing we're disagreeing with defendants on is a

22    mediation.  Judge Bassler spoke at that conference a long

23    time about mediation.  We want the mediation to be here as

24    part of the mediation your Honor has ordered.  The defendants

25    didn't agree to that.  Their cover letter said, "No, we want
```



1   something else."  So I don't know how that's going to play

2   out.  I suspect Judge Bassler is going to go with his

3   instincts and order that it happen here.  That's certainly

4   something we encourage.

5          MR. BERMAN:  Your Honor, this is Steve Berman.

6          THE COURT:  I need some thought from the

7   plaintiffs' team about what makes sense here, and then I need

8   to know from the defense team.  Although you don't have a

9   direct role in this, what happens in New Jersey will affect

10  you.  The last thing I want to do is to disqualify him if it

11  means that every class rep pulls out, and yet I'm worried

12  here.

13         MR. BERMAN:  Let me mention two things on that.  If

14  the class reps pull out, which I think he's -- I don't know

15  how he can do that consistent with his obligation to the

16  class, we've done an examination of this; and, unfortunately,

17  because we didn't want it to be this way, we think 99 percent

18  of the class reps that he currently has only bought drugs in

19  2004 or later.  And therefore, under your prior rulings, we

20  actually don't have consumer class reps for most of the

21  defendants at this point.

22         The second thing -- and I apologize I didn't point

23  this out earlier -- on the trustworthy issue, when I talked

24  to Professor Green about this, I think I should disclose to

25  the Court that he was very upset.  I mean, he said he



```
 1   couldn't call me for two days, he was so angry that

 2   Mr. Haviland would file the internal workings, E-mails back

 3   and forth of the settlement negotiations with the Court in

 4   open court, because one thing you do with Professor Green is,

 5   you sign a confidentiality statement that he thinks is like

 6   the bible of how you have to conduct settlement

 7   negotiations.  So he was very upset and concerned that that

 8   happened and is trying to figure out, you know, going

 9   forward, if Mr. Haviland is one of the co-lead counsel, you

10   know, how could this work.

11          MR. HAVILAND:  Your Honor, we sought leave to put

12   that under seal, and we're still asking you.  The request for

13   that is still before your Honor.

14          THE COURT:  When you filed it, did you file it with

15   a motion to seal?

16          MR. HAVILAND:  We sent it to your Honor first as

17   your Honor had asked for with a request that it be put under

18   seal, so that if there was --

19          MR. BERMAN:  It was filed on the ECF.

20          THE COURT:  Was that a mistake in court chambers,

21   or was that a mistake of counsel?

22          MR. HAVILAND:  Well, we don't know, your Honor.  We

23   first sent it to you when your Honor asked for the

24   declaration, and we asked that it be treated under seal.

25   The ECF picked it up on the Friday before that hearing.  We
```



```
 1   spoke to Robert, Mr. Sobol and I did, about sending a request
 2   under seal.  I submitted that to Tom --
 3            THE COURT:  Well, you must know.  Did someone on
 4   your staff docket it on -- that's the only way it gets there
 5   initially.  Did someone forget to put it -- did someone send
 6   it over the Internet?
 7            MR. HAVILAND:  I think so, yes.
 8            THE COURT:  All right, so someone in your office
 9   made a mistake.
10            MR. HAVILAND:  Right, and what we asked for it to
11   be under seal, your Honor, consent for it to be under seal.
12            THE COURT:  Well, it's that problem with the
13   Internet.  We can pull it off, but once it's there --
14            MR. HAVILAND:  Right, that's what we talked to
15   Robert about that day.
16            THE COURT:  In any event, I don't know what to do.
17   I must say, as soon as I read it, I wanted to think about it
18   for a few days.  I want this.  I'm not doing anything
19   precipitously.  If anybody in this room wants to file some
20   thoughts for me -- at this point I actually don't even have a
21   pending motion, and yet I do have certain fiduciary
22   obligations as a court.  In the meantime, regardless of how
23   this works, I need you to do something about that New Jersey
24   action.  They're under the impression, because you said it,
25   that you're pursuing a national class action.  Regardless of
```



Page

```
1    whether you're co-lead or not, I'm going to enjoin that.
2    That needs to end with respect to the overlap here.
3                MR. HAVILAND:  Right.  I think your Honor's
4    suggestion to just stipulate to it, we're happy to do that
5    with Mr. Jackson and get the New Jersey court to enter it so
6    that your Honor then has that, which it shows in the record
7    in New Jersey it's not happened.  That letter was sent in
8    response to a letter that Mr. Jackson had written asking
9    about the framework for the discussion with Judge Bassler,
10   and we cited, as I said, the complaint, which originally
11   sought the New Jersey class pre the Supreme Court in Vioxx,
12   pre any of this.  So --
13               THE COURT:  Well, I may be misremembering.  I
14   believe that the Hagens Berman Sobol, whatever the whole name
15   of the firm is, filed a memo saying that it was basically
16   beyond dispute right now that you can't certify a state court
17   class action that's national.  Something to that effect,
18   right?  It was somewhere in one of your briefs, through state
19   court as opposed as through Federal Court.
20               MR. SOBOL:  Oh, well, newly filed actions under
21   CAFA.
22               THE COURT:  Right.
23               MR. SOBOL:  But this is, Operating Engineers, the
24   New Jersey case is pre-CAFA.
25               THE COURT:  So it's predating it.
```



1    MR. SOBOL:  Right.  If your Honor may, I think that

2  the co-lead counsel -- well, it sounds like Mr. Haviland

3  would like to file something, so can we have a date for that

4  just so you would have a date that you would be expecting to

5  see something from us?

6    THE COURT:  A week?

7    MR. SOBOL:  Is that doable, Mr. Berman, a week?

8    MR. BERMAN:  A week is fine.

9    THE COURT:  I don't know if Baxter wants to say

10 anything or AstraZeneca.  I don't know.  I'm troubled.  I

11 actually don't have anything in front of me.  I sort of with

12 some misgivings, I guess, agreed to your settlement because

13 of the profound riff that had existed before and what I knew

14 about Judge Stearns's case and my concern about the

15 affidavits coming in that Friday before.  I just bit my

16 tongue and I agreed to it on the theory that, well, it was --

17 it was a majority vote?  Was that how it worked?

18   MR. SOBOL:  Well, that's right, your Honor.  And,

19 of course, as you can expect, one of the reasons we entered

20 into the stipulation was to avoid the need for the Court to

21 have to grapple with the issues too.

22   THE COURT:  In any event, I agreed to it and I

23 appointed him to it.  And then literally within two days I

24 got this phone call, and I have been worried because it is, I

25 think, ultimately my call as to what's going to serve the



1    best interest of the class, and there's now a trust issue.

2          MR. HAVILAND:  Well, your Honor, since the time of

3    that agreement, we had a productive call.  We don't want to

4    talk about the logistics of what's going on in the settlement

5    discussions, but it was raised, the issue of the rearview

6    mirror stuff, the BMS and the Astra settlement.  And I

7    learned some things that I didn't know from the time that we

8    were taken out of the loop that were encouraging, that could

9    resolve that.  And I don't want to say too much about where

10   that's at and where we're working, but we're working

11   cooperatively.  A lot of the issues were vetted that they

12   hadn't been before, and that's essentially what we were

13   trying to get to when we reached the agreement with

14   Mr. Sobol.

15         THE COURT:  I'm going to take this under

16   advisement.  I just need to think about it.  I obviously

17   wasn't going to do anything without seeing folks, but, for

18   example, I don't know how you represented to this New Jersey

19   court that you were co-lead counsel when that was so

20   embattled at that point.

21         MR. HAVILAND:  Well, your Honor, in fairness, we

22   believed from the time that we came in in August of '05 that

23   all the papers had us listed as co-lead counsel.  There never

24   was a dispute until AstraZeneca.  That's the point in time

25   when it became a question.  Your Honor had -- there was an



1  entry of appearance for us in September, '05, so we never had

2  cause to question that as the Haviland Law Firm.  When we

3  were Kline & Specter, there was never an express appointment

4  there either, so there was always that fifth chair, your

5  Honor, if you will.  And so the embattlement came in

6  Track Two when we were talking about interim class counsel

7  becoming class counsel for Track Two, and that was the whole

8  issue of 23(g), not Track One where we had served with GSK

9  and Astra and the Track One defendants.

10        THE COURT:  It says, "The undersigned lead counsel

11  for plaintiffs in this action have been recognized by the

12  Boston Court as one of the co-lead counsels for class

13  plaintiffs in MDL 1456."

14        I think a fairer or truer statement would have been

15  that this is -- you've taken the position that you've always

16  been one, the other lead counsel had taken the position that

17  you weren't, and this would be decided by me, right?  I mean,

18  I remember you always sitting back there and there not being

19  a battle, but I truthfully don't know the little nuances and

20  the niceties until it was briefed to me between the -- with

21  the split-off from Kline & Specter and your new firms.

22        MR. HAVILAND:  And, your Honor, it was all done by

23  a consensus, and none of it was vetted, in fairness.  I mean,

24  the original CMO had a firm Heins, Mills & Olson, which is no

25  longer -- they're not even around anymore.  They're still



```
 1    here, but they're not here.  So there have been a lot of

 2    changes since 2001.

 3             THE COURT:  And I agree you may or may not have had

 4    a valid position, but at the time you wrote this letter, it

 5    was a matter of huge acrimonious disagreement.

 6             MR. HAVILAND:  That's fair.

 7             THE COURT:  So it was a little misleading to this

 8    court, the New Jersey court, and I knew what was going on.

 9             MR. HAVILAND:  But there was no intent, your Honor,

10    to deceive.  By having it vetted, by having Judge Bassler

11    coordinate with your Honor to speak, we wanted this to be

12    open, discussed.

13             One of the problems, if I can go back to something

14    that I think is not a good thing to discuss is Lupron.  We

15    didn't do that early on.  We didn't have Judge Visalli from

16    Cape May County speak to Judge Stearns and Judge Brewster

17    (Phon), the special master, speak to Judge Stearns early.  In

18    the summer of, I think, 2004, Judge Stearns was considering

19    an injunction against the state court case a month from

20    trial, and it was only at that point in time that the

21    dialogue began, that the coordination began, that the

22    resolution finally came a year later.  That's why it's

23    productive to have it, your Honor, and I encourage that in

24    all of our cases.

25             THE COURT:  And I think that is a good idea, and
```



1    I've done it in the Neurontin cases.  And I think over time,

2    I hope when I transfer some of these cases back, I'll be

3    talking to the judges in those federal district courts, and

4    when I start remanding cases to state courts, I'll talk to

5    those state courts.  I mean, I'm trying to get to stage two

6    of this big massive case.  The federal government is starting

7    to unleash a bunch of qui tam actions.  I mean, it's a huge

8    case, as you know, and I'll need to coordinate with the state

9    courts.

10         However, my basic obligation is to oversee this

11   case, and I am at this point troubled on the co-lead counsel

12   thing.  And although there's been nothing pending in front of

13   me, I need your thoughts on what your position is and what's

14   in the best interest of the class.  If you want to file

15   something, Mr. Haviland, you should probably do this within a

16   week.  If anyone here wants to file something, you can.

17   Regardless of how I rule on it, I order that you dismiss any

18   of the cases that conflict with this one.

19         Now, you may have to do something -- I'm pointing

20   to the Baxter folks -- may have to do something with respect

21   to that case.  I don't know.  You do your own thing.  I can't

22   have jurisdiction at this point over the rest of the case

23   that doesn't overlap with mine.  I mean, you might be better

24   off there.  I mean, I'm just swamped with this case, so you

25   might get better attention from what seems like a lovely and



Page

1  experienced, probably more experienced than I am, federal

2  judge who's doing this down in New Jersey for the state

3  court.  So that's your call, but I need to take care of this

4  case.

5           MR. SOBOL:  The July 27 letter that you mentioned,

6  it's a letter -- I just want to make sure -- we're going to

7  try and get copies because we'll need to read it.

8           THE COURT:  July 27 to the Honorable William G.

9  Bassler from Donald D. Haviland, Jr., cc:  John Keefe, Jr.,

10 Andrew Jackson, Esq., Michael Rosenberg.  I'll just leave it

11 here, and you can underline it.

12          MR. SOBOL:  Well, Mr. Haviland has indicated that

13 he'll get us a copy now that I know exactly which letter it

14 is.  Thank you.

15          THE COURT:  In any event, so something within a

16 week?

17          MR. JACKSON:  Your Honor, to the extent that

18 they're going to file something, I think we'd like to look at

19 it first --

20          THE COURT:  Fair enough.

21          MR. JACKSON:  -- before the defendants either here

22 or in New Jersey or elsewhere.  I mean, we'd like to see it,

23 and then we'll decide whether we need to respond.

24          THE COURT:  To the extent the case does stay in

25 New Jersey, though, Judge Bassler and I are talking.  As you



Page

1   know, Judge Bowler is the coordinating magistrate judge on

2   this case -- I gave him her phone number -- to the extent

3   there are outstanding discovery issues that could be

4   coordinated between the two actions, and I am happy to help

5   that out.  That having been said, as soon as we stay it with

6   respect to all the cases that are here, I'm not sure that

7   there will be a lot of overlap anymore.

8           MR. HAVILAND:  Your Honor, can I show you the case

9   management order that's under consideration just so you can

10  see that we've already got that built in?

11          THE COURT:  Okay.  I think that's it, right?

12          MR. SOBOL:  Thank you, your Honor.

13          THE CLERK:  Court is in recess.

14          (Adjourned, 10:45 a.m.)

15

16

17

18

19

20

21

22

23

24

25




1                  C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS     ) ss.

    CITY OF BOSTON                )

5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 30 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13  Industry Average Wholesale Price Litigation, and thereafter

14  by me reduced to typewriting and is a true and accurate

15  record of the proceedings.

16            In witness whereof I have hereunto set my hand this

17  13th day of September, 2007.

18

19

20

21            /s/ Lee A. Marzilli

              _____

22            LEE A. MARZILLI, CRR

              OFFICIAL FEDERAL COURT REPORTER

23

24

25